IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, JANE HAMILTON,     §
SERGIO DELEON, FLOYD J. CARRIER,     §
ANNA BURNS, MICHAEL MONTEZ,     §
PENNY POPE, OSCAR ORTIZ, KOBY     §
OZIAS, JOHN MELLOR-CRUMLEY,     §          Case No. 2:13-cv-00193
JANE DOE, JOHN DOE, LEAGUE OF     §
UNITED LATIN AMERICAN CITIZENS     §
(LULAC), and DALLAS COUNTY, TEXAS,     §
     §
        *Plaintiffs*,     §
     §
v.     §
     §
RICK PERRY, Governor of Texas; and JOHN     §
STEEN, Texas Secretary of State,     §
     §
        *Defendants*.     §

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      The State of Texas has a long, notorious history of disfranchising voters by various

methods and discriminating against classes of voters, especially on account of race and ethnicity.

Senate Bill 14 of 2011 ("SB 14") is another effort to achieve those unlawful ends.  Accordingly,

this suit seeks to enjoin SB 14 as a violation of the Constitution and laws of the United States, as

applied to voters and prospective voters who lack one of the few photo IDs listed in SB 14.

2.      SB 14 requires voters who are already registered to obtain a second registration

certificate (containing a photo of the voter) of a type specified in SB 14 ("SB 14 ID").  This

certificate is unobtainable at the voter registration office.  It is obtainable only from a limited

number of sources or locations, often inconvenient and expensive.  Obtaining the SB 14 ID is the real voter registration in Texas, because merely "registering" at the voter registration office does not entitle a person to vote (except for limited categories of people who may vote by mail). Indeed, county voter registration officers under SB 14 are entirely superfluous as registration now must, in most circumstances, take place at state drivers license offices.

(a)     On information and belief, the number of Texas residents who were "registered to vote" in the Secretary of State's voter registration database as of 2012 was 13,065,504. According to the U.S. Department of Justice, it is estimated that 7,835,055 (61.5%) are Anglo, 1,472,669 (11.6%) are black, and 3,003,059 (23.6%) are Hispanic (and 2,909,014 (22.25%) have Spanish surnames).   Of the total number of registered voters (13,065,504 as of 2012) approximately 1,893,143 of those registered voters could not be matched to a record in either the State of Texas driver's license data base or the State's license to carry data base.   On further information and belief, it has been estimated that of these 1,893,143 voters who could not be matched, 850,424 (49.0%) are Anglo, 304,931 (17.6%) are black, and 525,503 (30.3%) are Hispanic. In other words, 20.7% of black voters and 17.5% of Hispanic voters cannot be matched, while only 10.9% of Anglo voters cannot be matched. In addition, 17.5% of voters with Spanish surnames cannot be matched, whereas 13.6% of voters with non-Spanish surnames cannot be matched.  Individuals who cannot be matched to a Texas driver's license record (or an ID issued by the Texas DPS) or license to carry record are unlikely to have the state-issued ID needed to vote pursuant to SB 14.  Even the State of Texas acknowledges that the number of persons who are currently registered to vote but lack a photo ID issued by the State DPS office, or at risk voters, is quite large.  In 2012, the Defendant Texas Secretary of State provided a list of

registered voters to the United States Department of Justice whose records were not successfully matched with records in the DPS' driver's license database. The matching criteria consisted of first name, last name, and date of birth, and those individuals who provided a DPS ID number when they registered to vote were counted as matching. The list created by the Secretary of State showed 795,555 Texas voters who could not be confirmed to possess a DPS-issued photo ID card.

(b)     As described below, in judging the lawfulness of SB 14, this number of voters who lack an SB 14 ID must be measured against the extent of the alleged problem that SB 14 seeks to "fix."

3.     Further, a disproportionate number of registered voters who lack SB 14 ID are racial or ethnic minorities, or poor, elderly or disabled people.

4.     The Supreme Court has many times addressed Texas' restrictive voting procedures and Texas' history and present-day legacy of discrimination.

(a)     In *White v. Regester*, 412 U.S. 755, 768 (1973), the Supreme Court said Texas had "the most restrictive voter registration procedures in the nation."  SB14 gives Texas again the distinction of having the most restrictive voter registration procedures in the nation.

(b)     The Supreme Court further said in *White v. Regester* that Texas' history and present-day legacy of discrimination, were factors that led the Court to strike down the voting practice at issue in that case (multi-member election districts) even though the Court had recently upheld the same voting practice in a different state, Indiana. *Whitcomb v. Chavis,* 403 U.S. 124 (1971).  The Court relied on Texas' history and present-day legacy of discrimination to

distinguish multi-member districts upheld in Indiana from the ones found to be invidiously discriminatory in Texas.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 2284; and pursuant to 42 U.S.C. §§ 1973, 1973j(f).  Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201, 2202, and 2284, as well as by Rules 57 and 65 of the Federal Rules of Civil Procedure.  Venue is proper pursuant to 28 U.S.C. §§ 1391(b).

## PARTIES

### Plaintiffs

 6.      Individual plaintiffs are all citizens and residents of Texas.  All individual plaintiffs are eligible and registered to vote in Texas and all have voted in Texas in the past.

7.      (a)      Plaintiff Marc Veasey is a resident of Ft. Worth, Tarrant County, Texas.  He is African-American.  He is an elected U.S. Representative from the 33d Congressional District of Texas.

(b)      Plaintiff Floyd James Carrier is a resident of China, Jefferson County, Texas.  He is African-American.  He is physically disabled (wheel-chair bound).

(c)      Plaintiff Anna Burns is a resident of Ft. Worth, Tarrant County, Texas.  She is Latino.

(d)      Plaintiff Michael Montez is a resident of Galveston, Galveston County, Texas.  He is Latino.  He is an elected Constable in Galveston County.

(e)      Plaintiff Penny Pope is a resident of Galveston, Galveston County, Texas.  She is African-American.  She is an elected Justice of the Peace in Galveston County.

(f)     Plaintiff Jane Hamilton is a resident of Dallas, Dallas County, Texas.  She is African-American.  She is active in political organization in her community, including efforts to organize and encourage people to vote.

(g)     Plaintiff Sergo DeLeon is a resident of Fort Worth, Tarrant County, Texas.  He is Latino.  He is an elected Justice of the Peace in Tarrant County.

(h)     Plaintiff Oscar Ortiz is a resident of Corpus Christi, Nueces County, Texas.  He is Latino.  He is an elected County Commissioner in Nueces County.

(i)     Plaintiff Koby Ozias is a resident of Corpus Christi, Nueces County, Texas.  He is Anglo.

(j)     Plaintiff John Mellor-Crumley is a resident of Houston, Harris County, Texas.  He is Anglo.

(k)     Plaintiff Jane Doe is an eligible citizen of Texas and the United States who lacks a SB 14-listed ID and thereby will be denied the right to vote.

(l)     Plaintiff James Doe is an eligible citizen of Texas and the United States who lacks a SB 14-listed ID and thereby will be denied the right to vote.

(m)     Plaintiff League of United Latin American Citizens ("LULAC") is the oldest and largest national Latino civil rights organization.  LULAC is a nonprofit organization, incorporated under the laws of the State of Texas, with presence in most of the fifty states and Puerto Rico.  LULAC has chapters in most Texas counties, including Nueces, Dallas and Harris County and individual members in those counties who reside and vote in those counties.  LULAC has long been active in representing Latinos and other minority interests in all regions

of the State, including Harris County.   Since 1971, LULAC has filed well over a hundred lawsuits on behalf of Latino voters throughout Texas, and has been successful in many of them.

(n)   Plaintiff Dallas County is one of the largest counties in the State of Texas.   It operates a voter registration system within its County Elections Department that complies with state and federal law.

8.   (a).   Plaintiffs have a direct, substantial, and legally protectable interest in the subject matter of this litigation.

(b)   Plaintiff Carrier lacks a SB 14-listed ID's, and thus is barred from voting in person by SB 14.   Plaintiff Carrier is a disabled Army veteran who, despite his long military service, lacks an SB 14-listed ID – since his Veterans Administration photo ID is not among the favored preferences that Texas chose to include in SB 14.

(c)   Plaintiff Burns does possess a driver's license which should qualify her under SB 14 -- but, despite her efforts to change it, the name on her driver's license does not match the full name on her voter registration certificate, meaning that SB 14 disqualifies her.

(d)   Plaintiff Ozias does possess a passport which should qualify him under SB 14 -- but, despite his efforts to change it, the records on the passport do not match his voter registration information.   The stringent requirements of SB 14 will likely disqualify Plaintiff Ozias from voting, and he has a reasonable fear of being injured in this way.

(e)   Plaintiff Mellor-Crumley does possess a driver's license which should qualify him under SB 14 -- but, despite his efforts to change it, the name on his driver's license does not match the full name on his voter registration certificate, meaning that SB 14 disqualifies him.

(f)    Until SB 14 took effect, Dallas County used to register voters in compliance with federal laws including the National Voter Registration Act and relevant state laws.   Dallas County, prior to SB 14, used to provide eligible citizens with the documentation they needed to cast a ballot at the polls.   As a result of SB 14, voters can no longer obtain all of the documents they need in order to vote in Texas from the Dallas County Elections Office because the County's Election offices do not have the ability to photograph voters or produce one of the SB 14 acceptable photo identification.   Dallas County desires to maintain its ability to promote and facilitate every voters' ability to vote, but it can no longer do so because the state, in enacting SB 14, has tied its hands.   Dallas County also contends that SB 14 will increase election costs to the county, as well as cause unnecessary confusion and anger among voters and poll officials during periods of early voting and on Election Day.   Dallas County, by being required to give effect to, and enforce SB 14, is being required to intentionally and unlawfully discriminate against its citizens and association members without even having been provided the financial resources from the State to do so.   Dallas County, through its elections office, will be required to train poll workers, supervise and ensure rejection of voters at the polls, process a considerable increase in provisional ballots, provide additional staff to allow voters to return to County's offices with appropriate SB 14 ID, when available, and to take numerous other governmental actions none of which is funded under SB 14.   In short Dallas County will become an instrumentality of the State's intentional discrimination against its voters, in opposition to the will of the popularly elected local officials and with the commensurate requirement that county tax assessments be used to enforce SB 14.

(g)     The remaining individual Plaintiffs are public entities, office-holders or candidates, or political organizers, or civil rights groups who represent largely minority communities and voters in Texas.  Though a number of the individually named Plaintiffs possess an SB 14-listed ID, they will be injured by enforcement of SB 14 because it will cause these Plaintiffs to incur additional costs and effort in registering voters and administration of elections, running political campaigns and seeking, organizing and turning out supporters and voters whom SB 14 allows to vote.

9.     African-Americans and Latinos represented by these Plaintiffs are more likely than non-minority voters to lack an SB 14-listed ID, and are therefore more susceptible to injury from enforcement of SB 14.

10.     The disfranchising effect of SB 14 suffered by Plaintiff Burns – disqualifying voters because the name on their registration certificate and the name on their "second" registration certificate – in Burns' case, her driver's license – predominantly falls on women because of the well-known fact that many women change their maiden surname to their husband's surname upon being married.

11.     The League of United Latin American Citizens, is a membership organization consisting of Latinos and African Americans around the Country and in Texas.  LULAC as an association, prosecutes this case on behalf of its members, Texas Latinos and African Americans who will be denied the right to vote under SB 14.

### Defendants

12.     (a)     Defendant Rick Perry is the Governor of Texas and pursuant Article IV, Section I to the Texas Constitution is the chief executive officer of the State of Texas.

8

(b)     Defendant John Steen is the Secretary of State of Texas and is the State's chief election officer.

## FACTS

### Nature and Operation of SB 14

13.     SB 14 creates a double registration system that strips registered voters of the right to vote unless they obtain a second registration certificate.  SB 14 provides that this second certificate is not obtainable at a voter registration office.   Rather, SB 14 limits the second registration certificate to one of several types:

> (1) Texas driver's license or ID issued by driver's license office;
> (2)  some U.S. government employee ID's (military personnel);
> (3) some Texas state agency ID's (concealed weapons permits);
> (4)  U.S. passport;
> (5)  U.S. citizenship certificate.

Though SB 14 allows certain older age and/or disabled citizens to vote by mail when they lack acceptable ID, such restriction nevertheless harms the rights of such citizens because it requires them to cast an effective ballot at a different time and utilize a different method than is allowed to other citizens.  In many cases, such citizens will be required to vote well before the election campaign is completed and well before the majority of other eligible citizens.

14.     In designating the above categories as acceptable and other categories of photo ID's as not acceptable, SB 14 picks and chooses among voters to decide who is favored and who is not. Thus, for example, SB 14 decides that military personnel of the U.S. are favored but not civilian personnel, not even civilian employees of the military.  Holders of a state agency permit are favored if it is for a concealed weapon, but not if it is a state hunting or fishing license, a state-

9

college student, faculty or athletic coach ID, or a state employee ID, even if the state employee is a Texas Ranger.  The final category, "citizenship certificate," may sound broad, but in fact is available only to non-U.S.-born persons who were citizens at birth (usually because of U.S.-citizen parents residing abroad), and persons who were young children when their parents became naturalized and thus automatically became citizens without taking a separate oath.  The citizenship certificate is not available to anyone beyond these two minuscule categories.

15.     As further described below, obtaining the necessary SB 14 ID is inconvenient and expensive for many people, especially racial and ethnic minorities and people who are poor, disabled or elderly.

16.     Inconvenience.  A voter registration office, where a person could formerly qualify to vote, is located in every one of Texas' 254 counties, so every Texas resident could qualify in their own county.  Some counties have more than one voter registration office (Harris County has 10), and every one is open during all business hours, usually 9-5, Monday-Friday.  These offices are now largely irrelevant in the voting process.

17.     By contrast, SB 14 eliminates all these offices and for most people, requires that they go to a Department of Public Safety office, where drivers' licenses are issued.  Barely half of Texas' counties have a fully functioning DPS office.  Approximately one-third of Texas counties have no DPS office at all.  This means that residents of those counties cannot qualify to vote in their own county.  Another 40 counties have offices open only sporadically, sometimes as little as one day per week.

18.     Expense.  The only one of the SB 14 ID's that can be obtained without cost is the military ID, which of course is available only to a limited class of voters in active military service.  Several of the other SB14 ID's have an explicit fee for issuance, which cannot be waived.  These include:  Concealed weapons permit:  $140.00 plus the cost of training and ammunition for qualifying exam.  U.S. Passport: $135.00.  Citizenship certificate (CIS Form I-560):  $59.95.

Driver's license: $25 plus the cost for any training and exam preparation and access to a vehicle for the driving portion of the exam.

19.     This leaves the other identification issued by DPS, the "election identification certificate (EIC), which for some reason are stamped with the words "not for identification."  While there is no charge specifically attached to issuance of an EIC, it cannot be issued without presentation of other documents that do cost money to obtain.  The least expensive option is to obtain an original birth certificate at the minimum cost of $22.  In order to obtain a birth certificate, eligible citizens must travel to an additional government office than DPS that in many cases is equally or more inconvenient.  In addition, there are tens of thousands of eligible Texas citizens who cannot obtain a birth certificate at any cost because one is not available for them.

### Demographic effects

20.     Enforcement of SB 14 will disproportionately disfranchise minority voters, especially African-Americans and Latinos.  This is so for several reasons, all of them growing out of Texas' history and present-day legacy of racial and ethnic discrimination.

21.     The percentage of currently registered voters who lack an SB 14 ID is significantly higher among African-Americans and Latinos than among non-minority voters.

22.     The percentage of currently registered voters who lack an SB 14 ID is significantly higher among poor Texans than non-poor Texans.  African-Americans and Latinos are disproportionately found in the ranks of the poor population.

23.     Overcoming the inconvenience and expense of trying to acquire an SB 14 ID will be more difficult for minority voters, especially African-Americans and Latinos, and as a result, the

disparity between them and non-minority voters based on current possession of an SB 14 ID can be expected to grow.

24.     Currently registered voters who are elderly or disabled are also injured by SB 14 because they are less likely to possess an SB 14 ID and less likely to be able to overcome the inconvenience and expense of acquiring one.

25.     Although SB 14 allows elderly voters to vote by mail, such an alternative still burdens their right to vote insofar as it requires them to fill out additional paperwork and rely on the accuracy of government mailing systems.  Moreover, vote by mail is not an equal substitute to voting in person as it requires the voter to formulate their election choices prior to the end of the campaign.  Elderly voters without a SB 14 approved ID will be required to vote early and by mail.  Unlike other voters who choose to hold their vote until Election Day, SB 14 burdens a significant number of voters by forcing them to cast their votes before the election campaign has concluded.

26.     The scattered location of DPS offices further exacerbates the injury, disproportionately among minority voters especially Latinos, because the areas lacking DPS offices are disproportionately located in areas heavily populated by Latino voters.

### The District of Columbia trial

27.  When SB 14 was enacted, Section 5 of the Voting Rights Act was in effect, requiring federal preclearance before SB 14 could be enforced.  The result was a three-judge court trial in the United States District Court for the District of Columbia, in which the State of Texas and the opponents of SB 14 had a full and fair opportunity to put on their case.  The trial resulted in a decision, with detailed findings, against SB 14 on grounds of racial discrimination and

retrogression, *i.e.,* that SB 14 made the position of minority voters in Texas worse than it had been. *Texas v. Holder*, 888 F.Supp.2d 113 (D.D.C. 2012). Although the decision has been vacated and remanded for further consideration in light of the Supreme Court's subsequent holding that parts of the Voting Rights Act are unconstitutional, the district court's findings, based on extensive testimony and exhibits, are a powerful affirmation that SB 14 is discriminatory as alleged in this Complaint.

28. Among other findings in the opinion, the D.C. court found "in this particular litigation and on this particular record, Texas has failed to demonstrate that its particular voter ID law lacks retrogressive effect." Rejecting Texas' proffered evidence as "invalid, irrelevant, and unreliable," the court instead credited the evidence of the United States and private intervenors (including some of the plaintiffs herein) that "SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African American voters."

29. In reaching this conclusion, the Court explained that the Texas law "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas are disproportionately likely to live in poverty."

30. Among the hardships imposed by SB 14, the D.C. court emphasized the following:

> --although one of the forms of SB 14 ID (an "election identification certificate" or EIC), is purportedly "free," the applicant would have to present a government-issued form of ID to receive the EIC, "the cheapest of which, a certified copy of a birth certificate, costs $22."

> --EIC's (as well as driver's licenses) are available only at DPS offices, and "81 Texas counties have no [DPS] office, and 34 additional counties have [DPS] offices open two days per week or less."

> --for some voters, a trip to and from a DPS office would be 200-250 miles.

> --many DPS offices are inaccessible by public transportation.

13

31.     All these and other facts contributed to the district court's observation that the Texas Legislature had "ignored warnings that SB 14, as written, would disenfranchise minorities and the poor," and "defeated several amendments" which would have substantially mitigated the retrogressive effect of the new identification requirement. Now, Texas' movement to immediately enforce SB 14, within hours of the Supreme Court's decision concerning preclearance, demonstrates Texas has again ignored clear evidence and notice of the discriminatory effects of this law, thereby naturally leading to the unmistakable conclusion that Defendants fully intend the racially and non-racially discriminatory effects of SB 14.

### Texas' Interests and Scant Record of Need

32.     Election fraud should be prevented.   However, a fundamental principle of law and common sense is that a solution should fit the problem.   Here the problem is the "risk" of in-person impersonation, *i.e.,* the risk that a person will appear at a polling place claiming to be another person.   Texas' "solution" to this "problem" was SB 14, so the question is whether the solution is appropriate to the problem.

33.     The State has not produced, despite concerted efforts to do so in the D.C. case, evidence of a single incident of voter impersonation that SB 14 would have prevented.   Even if the State could produce such an instance, such events are rare and in no way justify SB 14 onerous burdens.

34.     The reason voter impersonation -- the only type of fraud which SB 14 could address-- is so rare is because it is extremely difficult to impersonate another voter and not be caught.   In close elections, the campaigns go over the list of successful voters checking for impersonation. Also, polling locations involve small geographic regions where voters and voting staff recognize

14

one another.  Lastly, there are steep criminal penalties that pre-exist SB 14 that have proven adequate to deter such conduct.  Someone trying to vote on behalf of another must always worry that the person whom they impersonate will have voted earlier or will attempt to vote later — in either case exposing to election workers that impersonation has occurred or been attempted.

35.    A public official, if acting in good faith, could hardly think that disfranchising and imposing a severe and discriminatory burden on thousands of registered voters is an appropriate solution for a "risk" of the level described above.

36.    It is true that the Supreme Court held in *Crawford v. Marion County Election Board,* 553 U.S. 181 (2008), that Indiana need not show actual incidents of election fraud before adopting a photo ID requirement, but, as noted above in paragraph 5, Texas is not Indiana, and the Supreme Court has previously recognized that Texas' history and legacy of discrimination can make a voting procedure that is valid in Indiana invalid in Texas.

37.    It is also true that Texas, like all states, has an interest in voter confidence in the election process, but that confidence is surely damaged more by the spectacle of a state disfranchising possibly hundreds of thousands of voters than by a fear of a tiny handful, at most, of imposter voters.  Moreover, as described in the *Crawford* case, instilling voter confidence is important largely in order to increase voter participation, yet how is that interest in increased voter participation advanced by disfranchising voters?

### Mitigating Factors and Narrow Tailoring

38.    As the representative of its people, not their master, the State of Texas and its officials have no legitimate interest in depressing or discouraging voter participation, but instead have and must recognize a strong state interest in promoting its citizens' voting participation.  Thus, if the

defendants and the state legislators simply believed in good faith that a photo ID requirement is needed, they were obligated to and would have taken steps to promote voters' obtaining the photo ID's that would qualify them to vote under SB 14.

39.　　In enacting SB 14, Texas chose to deny its citizens' interest by acting and failing to act in a variety of ways that could have mitigated the harshness and discrimination of the law, and advanced the interests of its voters, without impeding the interests it claimed to advance in SB 14.

40.　　This is equivalent to the requirement of narrow tailoring, an analysis which is applicable when a state's interest in a law is to be balanced" against the interests of those aggrieved by the law. In a case like this, the degree of narrow tailoring or mitigation of harshness and discrimination is highly relevant.

41.　　As noted in paragraph 28, above, the D.C. court listed some steps Texas chose not to take that could have mitigated the harshness and discrimination of SB 14. Other steps were also available.

42.　　Texas could have exempted the elderly and disabled from the requirement, especially inasmuch as they are least likely to have a driver's license or have any other reason to visit a DPS office. Moreover, the elderly are more likely than others to lack the ability to ever obtain a birth certificate having been born in a time when government record keeping was less robust than today.

43.　　Texas could have provided a "reasonable impediment" exemption, as South Carolina has done, allowing a voter to proceed without an SB 14 ID if a reasonable impediment prevented them from acquiring one.

44.    Texas could have included additional types of photo ID's in the SB 14 list.

45.    Texas could have kept the current voter registration offices as real registration offices by providing those offices with simple cameras, as South Carolina has done, so that a voter could truly register at the so-called registration office.

46.    Texas could have provided a DPS office in every county, and open every business day, so that voters could qualify in their home county.

47.    Texas could have actually funded a legitimate effort to raise public awareness of the new requirements and increase the likelihood citizens had the eligible identification.  Texas could have actually funded county election offices to the degree necessary to reasonably and consistently enforced SB 14.

48.    With today's technology, Texas could easily provide a photo ID capability at every polling place so that every voter who comes to vote at the polling place without already having an SB 14 photo ID could have their photo taken by a poll official on an ordinary cellphone camera and entered into the state database.

49.    All in all, instead of taking any constructive steps, Texas has acted in every way to punish voters and to pick and choose which voters it will favor and which it will punish, especially choosing to punish African-American and Latino voters as it has in every redistricting cycle for at least four decades.  SB 14 is designed not to qualify lawful voters but to disqualify them.

### Discriminatory purpose

50.    SB 14 was enacted with the purpose and intent to discriminate against racial and ethnic minorities.

51.     This conclusion is supported by Texas' history of such discrimination, continuing up to the present.  SB 14 was passed at the same time and with the same intent as state-wide redistricting maps that have already been adjudicated to be discriminatory by this Court, as well as by the Voting Rights Act Court in the District of Columbia.

52.     Further supporting the conclusion that SB 14 was enacted with the purpose and intent to discriminate is the racially discriminatory effect, and the refusal of the Texas legislature to take any steps to mitigate the burdens, as cited by the D.C. court, and as listed in paragraphs 35-42, above.

53.      Defendants renewed efforts to implement SB 14 now that the Supreme Court has ruled against preclearance, are additional acts of intentional discrimination.  The Defendants have willfully chosen to ignore what they learned in the D.C. trial and from the D.C. court's opinion.

54.     A well-known principal of law is that a person, such as these Defendants and the Texas legislature, is presumed to intend the natural consequence of their acts.  By that standard, enactment of SB 14 was plainly intended to be racially and ethnically discriminatory.

55.     The State of Texas has engaged in a long history of discriminatory voting practices and procedures, including the voter ID requirement at issue in this suit, and these discriminatory actions continue to this day.

56.     Absent an order granting relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), Texas will continue to discriminate on the basis of race and language minority status in violation of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution.

## CLAIMS

**Count 1**

**Race and Language Minority Discrimination, Section 2, Voting Rights Act**

57.     Plaintiffs reallege the facts set forth above.

58.     SB 14 violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, because it results in a denial of the right to vote on account of race and language minority, in that, under the totality of the circumstances, Plaintiffs and minority voters are denied an equal opportunity to participate effectively in the political process.

59.     SB 14 also violates Section 2 because it denies and abridges the right to vote on account of race and language minority.

**Count 2**

**Race Discrimination, 14th Amendment**

60.     Plaintiffs reallege the facts set forth above.

61.     SB 14 violates the Fourteenth Amendment to the Constitution of the United States because it purposely denies equal protection in registering and voting to Plaintiffs and other minority voters on account of race and ethnic origin.

**Count 3**

**Race Discrimination, 15th Amendment**

62.     Plaintiffs reallege the facts set forth above.

63.     SB 14 violates the Fifteenth Amendment to the Constitution of the United States because it purposely denies and abridges the right to register and vote to Plaintiffs and other minority voters on account of race and ethnic origin.

19

**Count 4**

**Non-racial discrimination in Voting, 14th Amendment**

64.     Plaintiffs reallege the facts set forth above.

65.     SB 14 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because it mandates arbitrary and disparate treatment of voters and denies equal access to the right to vote to eligible citizens.

66.     SB 14 imposes <u>severe burdens</u> on voters, in time, inconvenience and expense.  The burden is severe whether measured by how it affects a single voter or by how many voters it affects.

67.     SB 14 <u>facially discriminates</u> between classes of voters (such as between those having and those lacking an SB 14 ID, between holders of equivalent forms of photo ID who are treated differently by SB 14 such as federal military employees versus federal civilian employees, between residents of 134 counties who can qualify to vote in their home counties versus residents of the 120 counties who can do so either rarely or never, and other facial classifications).

68.     Either the <u>severe burden</u> described in paragraph 57, standing alone, or the <u>facial discrimination</u> described in paragraph 58, standing alone, is sufficient to require that SB 14 be judged by strict scrutiny, and can survive only if its specific terms meet a compelling state interest (actual, not hypothetical) and if each of its provisions is narrowly tailored to meet that compelling interest in the least restrictive way.  In this inquiry, the burden of proof is on Texas. SB 14 cannot meet this exacting test.

69.     Indeed, SB 14 cannot even meet the less exacting test (applicable where a voting regulation is not burdensome and does not classify on its face) of balancing Texas' interest claimed here (modest at best) against the critically important interests of Plaintiffs and other Texas registered voters who are disfranchised by SB 14, especially as that balancing test is applied against the background of Texas' longstanding and recent history of purposeful racial and ethnic discrimination, and in light of the number of poor, disabled and elderly voters targeted by SB 14.

**Count 5**

**Denial of Free Speech, First Amendment applied through the 14th Amendment**

70.     Plaintiffs reallege the facts set forth above.

71.     Voting and participating in the election process is a form of expression which is the ultimate in free speech and association entitled to First Amendment protection.  In light of the Supreme Court's cases giving strong First Amendment protection to campaign funds spent to influence voters, the voters themselves can hardly be entitled to less protection.

72.     As a restriction on free speech and association, SB 14 must be judged by the same strict scrutiny outlined above in paragraph 59, a scrutiny that SB 14 cannot survive.

**Count 6**

**Poll Tax, 24th Amendment**

73.     Plaintiffs reallege the facts set forth above.

74.     SB 14 is an unconstitutional poll tax on the right to vote in violation of the Fourteenth and Twenty-Fourth Amendments to the United States Constitution.

75.     For voters who lack the required identification, SB 14 requires a payment of money in order to vote - $22 at the minimum – in violation of the Equal Protection Clauses of the Fourteenth Amendment.

76.     Even if applied equally to all voters, conditioning the right to vote on the payment of a fee conflicts with the Twenty-Fourth Amendment.

## EQUITY

77.     Plaintiffs have no adequate remedy at law.  Unless restrained, Defendants will injure and continue to injure Plaintiffs and other Texas voters in the manner set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

78.     Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that SB 14 is illegal and unconstitutional as described above, in violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973 and the First, Fourteenth, Fifteenth and Twenty-Fourth Amendments to the United States Constitution.

79.     Enjoin the Defendants, their agents, employees, and those persons acting in concert with them, from enforcing or giving any effect to the requirements of SB 14, including enjoining Defendants from conducting any elections utilizing SB 14.

80.     Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory and injunctive orders in this case.

81.     Issue an order requiring Defendants to pay Plaintiffs' costs, expenses and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Voting Rights Act and the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. §§ 1973l(e) & 1988.

82.     Retain jurisdiction and require Texas to obtain preclearance pursuant to Section 3(c) of

the Voting Rights Act, 42 U.S.C. § 1973a(c) with respect to its voting practices and procedures;

83.     Grant such other and further relief as it deems proper and just.


                        This the 22nd day of August, 2013.


                                        Respectfully submitted,

                                        **BRAZIL & DUNN**

                                         _/s/ Chad W. Dunn_
                                        Chad W. Dunn
                                        State Bar No. 24036507
                                        K. Scott Brazil
                                        State Bar No. 02934050
                                        Brazil & Dunn
                                        4201 Cypress Creek Parkway, Suite 530
                                        Houston, Texas  77068
                                        Telephone:  (281) 580-6310
                                        Facsimile:   (281) 580-6362
                                        chad@brazilanddunn.com
                                        scott@brazilanddunn.com

                                        J. Gerald Hebert
                                        D.C. Bar No. 447676
                                        Campaign Legal Center
                                        215 E Street, NE
                                        Washington, DC 20002
                                        Telephone (202) 736-2200 ext. 12
                                        Facsimile (202) 736-2222
                                        GHebert@campaignlegalcenter.org
                                        (Pro Hac Vice Motion Forthcoming)


                                        23

Neil G. Baron
State Bar No. 01797080
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539
Telephone (281) 534-2748
Facsimile (281) 534-4309
neil@ngbaronlaw.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone (512) 476-0005
Facsimile  (512) 476-1513
daverichards4@juno.com

Armand G. Derfner
Derfner, Altman & Wilborn, LLC
P.O. Box 600
Charleston, S.C. 29402
Telephone (843) 723-9804
aderfner@dawlegal.com
(Pro Hac Vice Motion Forthcoming)

*Attorneys for Plaintiffs*

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
State Bar No.  20546740
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
Telephone (210) 225-3300
Facsimile (210) 225-2060
lrvlaw@sbcglobal.net

*Attorney for LULAC*

24

Craig M. Watkins
Dallas County District Attorney
State Bar No. 00791886
Teresa G. Snelson
Chief, Civil Division
Dallas County District Attorney's Office
State Bar. No. 08577250
411 Elm Street, 5th Floor
Dallas, TX 75202-4606
Telephone (214) 653-7358
Facsimile (214) 653-6134
Teresa.Snelson@dallascounty.org

*Attorneys for Dallas County, Texas*