EXHIBIT A

Protect Voting Rights: RenewtheVRA.org

# VOTING RIGHTS IN TEXAS
# 1982-2006

## A REPORT OF RENEWTHEVRA.ORG
## PREPARED BY
## NINA PERALES, LUIS FIGUEROA, AND CRISELDA G. RIVAS

### JUNE 2006



RenewtheVRA.org

# VOTING RIGHTS IN TEXAS, 1982-2006

## NINA PERALES, LUIS FIGUEROA, AND CRISELDA G. RIVAS[1]

### TABLE OF CONTENTS

Introduction and Executive Summary 3

I. Introduction to the Voting Rights Act and Texas' Coverage under the Act 6

II. History of Voting Discrimination in Texas 8

III. Texas Demographics 13

IV. Section 5 Objections in Texas 14

    A. Redistricting 17

    B. Annexations 19

    C. Method of Election 21

    D. Voting Procedures 25

V. Section 2 Litigation in Texas 26

    A. Voting Rights in the city of Seguin 29

VI. Continuing Discrimination in the 2004 Election 30

VII. Texas Voter Access Record under Sections 4(f)(4) and 203 31

    A. Section 203 coverage in Texas 32

    B. High Number of LEP Citizens 32

    C. Education Discrimination against Latino Citizens 33

    D. High Illiteracy Rates among LEP Citizens 35

---

[1] Nina Perales, Southwest Regional Counsel for the Mexican American Legal Defense and Educational Fund. Luis Figueroa, Legislative Staff Attorney for the Mexican American Legal Defense and Educational Fund. Griselda G. Rivas, Master's Candidate, Department of Sociology, The University of Texas at San Antonio.

|       |                                                                               |     |
|-------|-------------------------------------------------------------------------------|-----|
| E.    | Non-Compliance with Sections 203 and 4(f)(4)                                  | 37  |
| F.    | Department of Justice Section 203 Enforcement Actions                         | 38  |
| VIII. | Conclusion                                                                    | 39  |
| IX.   | Appendix A: Texas Section 5 Objections since August 1982                      | 40  |
| X.    | Appendix B:  Census Data from July 2002 Section 203 Coverage Determinations   | 50  |
| XI.   | Appendix B-1: Texas Jurisdictions Covered by Section 203 Census Data for Spanish Heritage | 52  |
| XII.  | Appendix B-2: Texas Jurisdictions Covered by 203 for American Indian Languages | 55  |
| XIII. | Appendix B-3: Texas Jurisdictions Covered by 203 for Asian languages          | 56  |

INTRODUCTION AND EXECUTIVE SUMMARY

The Voting Rights Act of 1965 (VRA) has been indispensable to guaranteeing minority voters access to the ballot in Texas.  Texas has experienced a long history of voting discrimination against its Latino and African-American citizens dating back to 1845.  The enactment of the VRA in 1965 began a process of integrating Latinos, African Americans, and more recently, Asian Americans, into the political structures of Texas.  Yet, a review of the minority voting experience in Texas since the 1982 VRA reauthorizations indicates that this process remains incomplete.  Infringements on minority voting rights persist and noncompliance with the VRA continues at the state and local level.  The VRA has proven to be an essential tool for enhancing minority inclusion in Texas.

Texas is home to the second largest Latino population in the U.S. and demographic projections show that by 2040, Latinos will constitute the majority of citizens in the state.  Texas also possesses a growing Asian-American population and an African-American population of more than 2 million.  The increasing number of racial and ethnic minority citizens in Texas highlights the need to protect vigilantly the voice and electoral rights of the state's minority electorate.

Section 5 of the VRA, the preclearance requirement, was extended to Texas in 1975 due to the State's history of excluding Mexican Americans from the political process.  According to the U.S. Department of Justice (DOJ), since 1982, Texas has had the second highest number of Section 5 objections interposed by the DOJ -- including at least 107 objections, 10 of which were for statewide voting changes.  Only Mississippi, with 120 objections, has had more.  Moreover, the majority of the DOJ's objections to discriminatory changes actually occurred *post*-1982.  Only 96 objections (including seven for statewide voting changes) occurred between 1965 and 1982, compared to the 107 since the VRA's most recent reauthorization.

Texas leads the nation in several categories of voting discrimination, including recent Section 5 violations and Section 2 challenges.  Since 1982, there have been at least 29 successful Section 5 enforcement actions in which the U.S. Department of Justice has participated.  For example, in 1997, the Supreme Court held that Dallas County wrongly failed to submit a rule limiting poll worker selection that had a discriminatory impact on Latino citizens.[2]

Section 5 preclearance has had important deterrence effects in Texas.  For example, Texas had far more Section 5 withdrawals, following the DOJ's request for information to clarify the impact of a proposed voting change, than any other jurisdiction during the 1982-2005 time period.  These withdrawals include at least 54 instances in which the state eliminated discriminatory voting changes after it became evident they would not be precleared by the DOJ.  Finally, at least 206 successful Section 2 cases have been brought in Texas since 1982 – many unreported.  These cases constitute nearly one-third of all such cases in the nine states covered statewide by Section 5.

---

[2] *Foreman v. Dallas County*, 521 U.S. 979 (1997).

Today's Section 5 objections offer a concise snapshot of the remaining challenges to minority voting rights in Texas.  Discriminatory voting changes that have been stopped by Section 5 range from statewide voting changes, such as redistricting, to local changes involving changes in election rules, polling place re-locations, and the method of electing officials.   Since 1982, the 97 local objections affected nearly 30 percent (72) of Texas's counties, where 71.8 percent of the state's non-white voting age population reside.  Additionally, 10 statewide objections worked to protect the voting rights of citizens across the state.

The language assistance provisions of the VRA, enacted in 1975, have also played an important role in increasing Latino and Asian-American voter access to the political process in Texas.  These provisions provide for translated voting materials, public notice and assistance at the polls for Texas voters who are limited-English proficient (LEP).  Texas' coverage under the language minority provisions addresses the historical discrimination that impeded Latino voters from learning English and ensures that new Latino and Asian-American citizens can participate fully in civic life.

Disparities in English proficiency between Anglos and language minorities in Texas continue today.  According to the July 2002 Census determinations, 818,185 people, or 6.15 percent of all voting age citizens in Texas, are LEP Spanish-speaking voting age citizens.  In El Paso and Maverick Counties, LEP American-Indian voting age citizens make up more than 24 percent and 59 percent, respectively, of the voting age citizens.  In Harris County, where Houston is located, there are nearly 17,000 LEP Vietnamese voting age citizens.

Unequal education and lack of English language learning opportunities have resulted in high illiteracy rates among covered language groups in Texas.  Statewide, about 20 percent of LEP Spanish-speaking voting age citizens are low-literate, over fourteen times the national illiteracy rate.  In Maverick County, over 86 percent of LEP American Indian voting age citizens are low-literate.  Vietnamese LEP voting age citizens in Harris County have a low-literacy rate nearly six times the national rate.

An assessment of the availability of translated voting materials and language assistance in Texas conducted by the Mexican American Legal Defense and Educational Fund (MALDEF), provides a stark indicator of the failure of county election officials to make voting accessible to LEP Texans.  In connection with the MALDEF study, of the 101 counties investigated, 80 percent were unable to produce voter registration forms, official ballots, provisional ballots and their written voting instructions; only one county was able to produce evidence of full compliance with the language minority provisions of the Voting Rights Act.  Recent DOJ enforcement activities in Ector, Hale and Harris counties confirm that there is widespread non-compliance with the language assistance provisions in Texas.

This non-compliance, combined with low rates of English proficiency and literacy, contributes significantly toward depressed voter registration and turnout for Latino voting

age citizens in Texas.  According to the Census Bureau, in the November 2004 presidential election, 58.5 percent of Latino voting age citizens reported that they were registered to vote, compared to 74.7 percent of all non-Hispanic white voting age citizens.  Latino turnout also lagged 15.5 percent behind non-Hispanic white turnout in that election.

Texas has also been underserved by the federal observer provisions of the VRA, despite widespread documented voting discrimination.  Currently, 18 counties in Texas are designated for federal observers, yet observers were present in just 10 elections between August 1982 and 2004.  In spite of these problems, the recent designation of Ector County for observer coverage as part of a consent decree shows that the federal observer provisions continue to play an important role in enforcing the Voting Rights Act in Texas.

The recent 2004 election offers insight into continuing voter discrimination in Texas.  In conjunction with other organizations, MALDEF served as a resource center to address election irregularities.  Fielding complaints throughout the voting period, MALDEF learned of several voting rights violations, including:

- The closing of a polling place in a predominately African-American precinct, contrary to state law, despite the fact that voters remained in line;

- Minority voters being turned away from their polling locations and asked to return at a later time;

- Election judge intimidation through demands for identification, contrary to Texas law, and threats of jail time if it was determined that voters had outstanding warrants;

- Disproportionately stringent voter screening and questioning; and

- A racial slur directed at a minority voter by an election judge.

The Voting Rights Act has made a significant difference in Texas, particularly in light of Texas' growing Latino voting population.  According to data from the U.S. Census Bureau, in the 1984 presidential election, there were about 681,000 Latino voters in Texas, representing about 11 percent of the state's total voters.  In the November 2004 presidential election, there were 1,533,000 Latino voters, representing nearly 18 percent of the state's total voters.

The VRA has also contributed to increased political representation for Latinos, African-Americans, Asian Americans and other under-represented minority groups in Texas.  For example, in 1973, there were 565 Latino elected officials in the state.  By 1984, the number had grown to 1,427.  In January 2005, the number had increased to 2,137 Latino elected officials, nearly four times the number in 1973.  The growth of Latino elected officials elected to Congress and to the state legislature has been particularly significant.

Between 1984 and 2005, the number of Latino Members of Congress doubled from three to six, the number of state senators nearly doubled from four to seven and the number of state representatives increased from 21 to 29.  Additionally, between 1970 and 2001, the number of African-American elected officials in Texas rose from 29 to 475, including two members of Congress (up from zero in 1970).  Despite these substantial gains, Latinos and African Americans continue to be vastly underrepresented at every level of federal, state, and local government.  This under-representation demonstrates that despite the progress made, Texas still has far to go.

The evidence discussed in this report makes clear that racially discriminatory and exclusionary practices continue to plague the Texas electoral system despite legal challenges and gradual progress.  The reauthorization of Sections 5, 203, and the federal observer provisions is of paramount importance to secure the fundamental right to vote for minority citizens in Texas.  Therefore, the expiring provisions of the Voting Rights Act should be renewed for 25 years.

## I.      Introduction to the Voting Rights Act and Texas' Coverage under the Act

The VRA is made up of temporary and permanent provisions.  The temporary provisions were designed with expiration dates to address specific discriminatory issues that Congress felt could be eradicated over time.  The focus of this report, Sections 5[3] and 203[4] and the federal observer provisions,[5] are three key provisions of the VRA that must be reauthorized by 2007 if they are to continue to protect minority voters at the polls.  Section 5 requires "preclearance"[6] by the DOJ or the U.S. District Court for the District of Columbia of all voting changes proposed in covered jurisdictions.  "Voting changes" include any type of change in the manner of voting, including redistricting plans, annexations, the use of at-large election methods, voter registration, and polling place or ballot changes.  By requiring administrative or judicial review of election changes, Section 5 ensures that new election changes do not place minority voters in a worse position than they were in before the change, *i.e.* have a "retrogressive effect," or have a discriminatory intent.

Section 5 coverage is based on whether a state or political sub-jurisdiction has a history of discrimination and disproportionately low minority voter participation.[7]  In response to discrimination against and low registration and voter turnout among Latinos, Congress extended Section 5 to cover jurisdictions with English literacy tests and other evidence of discrimination against Latinos, Alaskan Natives, and American Indians.  By placing the burden of proof on the governmental body proposing the election change, Section 5 protects the franchise of not only minority voters, but also all citizens from the unnecessary burden of litigation costs.

---

[3] 42 U.S.C. § 1973c.

[4] 42 U.S.C. § 1973aa-1a.

[5]  42 U.S.C. §§ 1973d – 1973g.

[6] 28 C.F.R. § 51.2 (2006). "Preclearance" refers to the obtaining of a declaratory judgment (described in section 5), or to the failure of the Attorney General to interpose an objection pursuant to section 5, or to the withdrawal of an objection by the Attorney General pursuant to section 51.48(b).

[7] 42 U.S.C. § 1973b(b) (2006).

Texas was designated for Section 5 coverage in 1975 because it satisfied the requirements of Section 4(f)(4), sometimes called "the language minority trigger."[8] Texas became covered because, as of November 1972: (1) over five percent of its voting-age citizens were Latinos; (2) its election materials were in English only; and (3) fewer than 50 percent of all of its voting-age citizens were registered to vote or turned out to vote.

Since its enactment in 1965, the provisions of Section 5 have withstood extensive re-evaluation by Congress during the 1970, 1975 and 1982 reauthorizations.  Each time Congress has determined that based on continuing discrimination, the protections of Section 5 must be extended.

The VRA was further enhanced in 1975 to reach additional minority voter impediments. Congress enacted the language assistance provisions in Sections 4(f)(4) and 203 after finding that:

> [T]hrough the use of various practices and procedures, citizens of language minorities have been effectively excluded from participation in the electoral process. Among other factors, the denial of the right to vote of such minority group citizens is ordinarily directly related to the unequal educational opportunities afforded them resulting in high illiteracy and low voting participation. The Congress declares that, in order to enforce the guarantees of the fourteenth and fifteenth amendments to the United States Constitution, it is necessary to eliminate such discrimination by prohibiting these practices, and by prescribing other remedial devices.[9]

A jurisdiction is covered by Section 203 where: (1) a single language minority group (e.g., Spanish) has limited-English proficient voting-age citizens who comprise more than 5 percent of the voting-age citizen population or number more than 10,000; and (2) the illiteracy rate (defined as the failure to complete at least the fifth grade) of the voting-age citizens in the  language minority group is higher than the national illiteracy rate (which was 1.35 percent in 2000).  Section 203 applies to four language minority groups that Congress found have faced discrimination in the voting process:  Alaska Natives, American Indians, Asian Americans, and persons of Spanish heritage.

The language assistance provisions ensure that voting-age citizens who are LEP are not denied access to the electoral process.  Consequently, jurisdictions must provide translated voting-related materials, oral language assistance throughout the election process, and outreach and publicity regarding the availability of these services.[10]  For historically unwritten languages, including some Alaska Native and American Indian languages, Sections 4(f)(4) and 203 require language assistance in the form of "oral

---

[8] 40 Fed. Reg. 43746 (Sept. 23, 1975); 40 Fed. Reg. 49422 (Oct. 22, 1975).
[9] 42 U.S.C. § 1973aa-1a(a).
[10] 42 U.S.C. § 1973aa-1a.

instructions, assistance, or other information relating to registration and voting."[11]

## II.   History of Voting Discrimination in Texas

The Latino and African-American populations in Texas have experienced a turbulent history of voting discrimination and political exclusion.  Efforts to disenfranchise U.S. citizens of Mexican origin in Texas date back to 1845, the year that Texas gained its statehood.  Early laws focused on prohibiting new Texas citizens from using their native Spanish language and organizing political rallies.[12]  These laws also prohibited Mexican-Americans from serving as election judges.  During the early 1900s, poll taxes, direct primaries, and white primaries were adopted with the purpose of establishing voting requirements that the vast majority of Mexican Americans could not meet, although they already constituted a decisive voting bloc in many areas of the state.[13]

At the time of emancipation in 1865, African Americans were systematically denied the right to vote, hold office, serve on juries, and even intermarry with whites.[14]  Blacks achieved significant political participation during Reconstruction, but the end of Reconstruction in 1873 brought what one former Texas governor called "the restoration of white supremacy and Democratic rule."  From then on, black Texans struggled to overcome obstacles such as the gerrymandering of voting districts implemented with the purpose of disenfranchising blacks, as well as many other forms of political and social discrimination.[15]

Discriminatory election practices to disenfranchise African-American and Latino voters, such as white primaries and poll taxes, remained commonplace in Texas into the mid-1900s.[16]  The manifestations of voting discrimination in Texas have been both insidious and entrenched.[17]  These exclusionary practices were rooted in Anglo Texans' perceptions of minority citizens as "racial inferiors."[18]  When political maneuvers failed to prevent the election of Black officeholders, local whites resorted to 'fraud, intimidation, intrigue, and murder.'[19]  The struggle for political power and land between Mexican Americans and Anglo Texans similarly escalated into acts of violence on the part of Texas Rangers:

---

[11] 42 U.S.C. § 1973aa-1a(c).

[12] David Montejano, ANGLOS AND MEXICANS IN THE MAKING OF TEXAS, 1836-1986 130 (University of Texas,  1987).

[13] *Id.* at 143.

[14] QUIET REVOLUTION IN THE SOUTH: THE IMPACT OF THE VOTING RIGHTS ACT, 1965-1990 234 (Chandler Davidson and Bernard Grofman eds., Princeton University Press 1994).

[15] *Id.* at 234-35.

[16] Montejano, *supra* note 12, at 143.

[17] *See id.* ("In 1904 the State Democratic Executive Committee approved the Practice of the White Man's Primary Association by suggesting that county committees require primary voters to affirm that 'I am a White person and a Democrat'").

[18] *See id.* at 131 ("These Mexicans belonged to a class of foreigners who claim American citizenship but who are as ignorant of things American as the mule." (quoting the *Carrizo Springs Javelin* August 5, 1911")).

[19] QUIET SOUTH, *supra* note 14, at 235.

> Texas Rangers, in cooperation with land speculators, came into small Mexican villages in the border country, massacred hundreds of unarmed, peaceful Mexican villagers and seized their lands.  Sometimes the seizures were accompanied by the formality of signing bills of sale – at the point of a gun."[20]

One major tactic that whites used to disenfranchise both African Americans and Latinos in Texas was the infamous "white primary," which arose in a patchwork of Texas jurisdictions in the early 1900s.  This practice began in 1923, when Texas enacted a state law barring African Americans from voting in Democratic primary elections.[21]  A black El Paso doctor, Lawrence Nixon, challenged this law, and the U.S. Supreme Court found that it violated the Fourteenth Amendment.[22]  However in 1927, the year after the Court struck down Texas' white primary law, the Texas Legislature passed a law authorizing political parties to set their own voter qualifications, and the Democratic Party simultaneously enacted a rule that only whites could vote in the primary.  Nixon again filed suit, and this law was struck down in 1932.[23]  That same year, the Texas Democratic party passed a new resolution limiting party membership to white citizens.  The lower court in this instance permitted the state Democratic Party to exclude blacks from all primaries, treating the party as a private association.[24]  Thurgood Marshall and the newly formed NAACP Legal Defense Fund won a reversal of that precedent in the 1944 case *Smith v. Allwright*.[25]  The Court later struck down the "Jaybird primary" for good in 1953.[26]  It was not until 1966, however, that the poll tax was eliminated in its entirety as a prerequisite for voter participation.[27]  In response, the first Senate bill of the first 1966 Texas legislative session required voters to register annually.  The annual registration requirement was not removed until 1971.

Black and Latino voters also faced barriers throughout this period that diluted minority voting strength through the use of multi-member districts, racial gerrymandering, and malapportionment.[28]  Into the 1970s, Texas demonstrated a steadfast commitment to excluding racial minorities from political life; when forced to abandon one discriminatory measure, the state would enact a new one shortly thereafter.

From the earliest periods of Texas history, Mexican Americans and African Americans experienced segregation and unequal access to the privileges enjoyed by Anglos.  Ranch owners employed rules that segregated Mexican cowboys from their Anglo workers in a

---

[20] Montejano, *supra* note 12, at 127.

[21] QUIET SOUTH, *supra* note 14, at 237-38. The statewide white primary law focused on African-Americans, but in some Texas jurisdictions the purpose of the White Man's Primary was that, according to a Texas newspaper, it "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards." Montejano, *supra* note 11, at 144.  In another example, the Dimmit County White Primary association was formed expressly to exclude Mexican American voters.

[22] *Nixon v. Herndon*, 273 U.S. 536 (1927).

[23] *Nixon v. Condon*, 286 U.S. 73 (1932).

[24] *Grovey v. Townsend*, 295 U.S. 45 (1935).

[25] *Smith v. Allwright,* 321 U.S. 649 (1944).

[26] *Terry v. Adams*, 345 U.S. 461 (1953).

[27] QUIET SOUTH, *supra* note 14, at 239.

[28] QUIET SOUTH, *supra* note 14, at 243.

hierarchical structure "in which Anglo stood over Mexicans."[29]  Workplace structures carried over into social arenas.  Mexican Americans, regarded as an inferior race, were refused entry into restaurants, housing, theaters, and schools.[30]  Blacks in Texas also faced extreme segregation and discrimination after emancipation.[31]

In the decades that followed, Latinos and African Americans would also face exclusion from the education system.  When finally allowed to enter Texas schools, minority citizens were segregated into separate and inferior schools.[32]  At the time of the Texas Revolution, the new state had pledged to provide all citizens with a system of education.[33]  But minorities were quickly ignored notwithstanding this pledge to Texas' citizens.

Article VII, Section 7, of the Constitution of 1876 provided for separate schools for white and black students.  From 1902 to 1940, and especially after 1920, many Texas school districts also opened mandatory segregated schools for Hispanic children.  The "Mexican School" segregation spread rapidly.  Houston, San Antonio and El Paso had "Mexican Schools" by the turn of the century.  By 1942-43, these schools were operated in fifty-nine counties throughout the state.[34]

A 1942 study by Wilson Little found 50 percent of the Mexican American students segregated through the 6th grade in 122 districts in "widely distributed and representative counties" of the state.  Few Mexican-American students went beyond the sixth grade.  By the 1940s, whole sections of the state had segregated "Mexican School" belts of towns, many of these developed specifically by the growers to isolate Mexican Americans.[35]

By the mid-1950s, schools across the state segregated Latino students under the ruse of "instructional purposes" and also used freedom of choice plans, selected student transfer and transportation plans, and classification systems based on language or scholastic ability to maintain segregation.  In response to student walk-outs and boycotts in 1967 and 1970, the U.S. Department of Health, Education, and Welfare (HEW) began to take legal action against offending school districts.  By 1972, HEW gained compliance in

---

[29] MONTEJANO, *supra* note 12, at 83.

[30] *See id*. at 114.

[31] QUIET SOUTH, *supra* note 14, at 234.

[32] Jorge C. Rangel and Carlos M. Alcala, *Project Report: De Jure Segregation of Chicanos in Texas Schools*, 7 HARV. C.R.-C.L. L. REV. 307, 311-14 (1972); *See also,* QUIET SOUTH, *supra* note 14, at 234.

[33] MONTEJANO, *supra* note 12, at 391.

[34] *United States. v. Texas*, 506 F. Supp. 405, 412 (E.D. Tex. 1981).

[35] In the Lower Rio Grande Valley, Edinburg, Harlingen, and San Benito school systems were segregated, while on Hwy. 83, Mercedes, McAllen, Mission, Pharr, San Juan, Alamo, and Weslaco districts were completely segregated.  On the Gulf Coast in South Texas, Raymondville, Kingsville, Robstown, Kenedy, and Taft schools districts were segregated, while in the Winter Garden, Crystal City, Carrizo Springs, Asherton, and Frio Town were segregated towns with segregated schools. MONTEJANO, *supra* note 12, at 168; Julie Leininger Pycior. LBJ & MEXICAN AMERICANS: THE PARADOX OF POWER 14 (University of Texas Press 1997); Guadalupe San Miguel Jr. LET ALL OF THEM TAKE HEED: MEXICAN AMERICANS AND THE CAMPAIGN FOR EDUCATIONAL EQUALITY IN TEXAS, 1910-1981 56 (Texas A&M University Press 2001); US Comm'n. Civ. Rts., "Mexican American Education Study," Report 1: Ethnic Isolation of Mexican Americans in the Public Schools of the Southwest, 1971 at 13.

many South Texas towns, including Bishop, Lyford, Los Fresnos, Beeville, and Weslaco, and it put Del Rio under court order to monitor its compliance.[36]

Educational segregation and discrimination continued into the 1970s.[37]  In 1975, the Corpus Christi school district was finally forced to implement a remedy for its segregation of Mexican-American students, after the Fifth Circuit declared that "action by the school district here has, in terms of cause and effect, resulted in a severely segregated school system in Corpus Christi."[38]

A 1977 report issued by the U.S. Commission on Civil Rights reported that 19 percent of the Mexican Americans over age 25 in Texas were illiterate.  Mexican Americans had twice the Anglo unemployment rate, and 15 percent of them still lived in overcrowded housing with inadequate plumbing as compared to 1.7 percent of Anglos.  A clear holdover to the Texas "Mexican towns" was the 70 percent of Mexican Americans in Texas who still lived in barrios.  In San Antonio, for example, a 1980 study concluded that the limited residential access of middle-class Mexican Americans to the three affluent northern census tracts tended also to limit their educational access.[39]  A nationally publicized report in 1984 by the National Commission on Secondary Schooling reported that in Texas, the majority of Mexican-American students are still in "inferior and highly segregated schools."  They are "extremely overage" and "disproportionally enrolled in remedial English classes."  Texas Mexican-American students still have an unacceptably high dropout rate, and receive poor preparation for college.[40]

As recently as 1981, a federal court declared that the state of Texas continued to fail to meet its obligations to provide compensatory bilingual education to Mexican-American students, noting that:

> [w]hile many of the overt forms of discrimination wreaked upon Mexican-Americans have been eliminated, the long history of prejudice and deprivation remains a significant obstacle to equal educational opportunity

---

[36] San Miguel, Jr., *supra* note 36 at 76, 120, 123, and 134; Jorge C. Rangel and Carlos M. Alcala, *Project Report: De Jure Segregation of Chicanos in Texas Schools*, 7 HARV. C.R.-C.L. L. REV. 369 (1972).

[37] For example, in 1971, Latino students in Seguin, Texas were expelled for allegedly having lice, despite recurrent doctors' examinations showing the allegations to be greatly exaggerated. These students were subsequently placed in the back of the classroom and prohibited from speaking Spanish. Chad Richardson, BATOS, BOLILLOS, POCHOS, AND PELADOS: CLASS AND CULTURE ON THE SOUTH TEXAS BORDER 125, 145 (University of Texas Press 1999).

[38] *Cisneros v. Corpus Christi Indep. Sch. Dist.*, 467 F.2d 142, 148 (5th Cir. 1972).  The Court of Appeals affirmed the district court's finding that the school district had:  located new school and renovated old schools in racially segregated neighborhoods; provided an elastic transfer policy that allowed Anglo students to avoid ghetto schools; did not allow African American or Latino students the option of attending Anglo schools and by assigning minority teachers to minority schools.  *Id.* at 149.

[39] U.S. Comm'n. Civ. Rts., "The Unfinished Business: Twenty Years Later," Washington DC, 1997 at 184; Roldofo Rosales, The Illusion of Inclusion: The Untold Political Story of San Antonio 12 (University of Texas Press 2000).

[40] *See Session v. Perry*, 298 F.Supp.2d 451 (E.D. Tex. 2004), GI Forum Exhibit # 92 (Expert Report of Dr. Andres Tijerina).

> for these children.  The deep sense of inferiority, cultural isolation, and
> acceptance of failure, instilled in a people by generations of subjugation,
> cannot be eradicated merely by integrating the schools and repealing the
> "No Spanish" statutes.  In seeking to educate the offspring of those who
> grew up saddled with severe disabilities imposed on the basis of their
> ancestry, the State of Texas must now confront and treat with the adverse
> conditions resulting from decades of purposeful discrimination. The
> effects of that historical tragedy linger and can be dealt with only by
> specific remedial measures.[41]

Today, many Texas counties now have whole segregated school districts that have
replaced the old "Mexican Schools."  In Nueces County, for example the 95 percent
Mexican American school district in Robstown, which was established by Robert
Kleberg as a segregated town for his Mexican-American agricultural labor force, adjoins
the Callalen I.S.D., in which the students are 55.6 percent Anglo.  In Bexar County, the
Edgewood school district's students are 94 percent Latino and the San Antonio school
district's students are 93 percent Latino and African-American.  Adjoining the San
Antonio school district is Alamo Heights ISD, in which the students are 70 percent
Anglo.  The Dallas ISD, which is 83 percent Latino and African-American adjoins
Highland Park ISD, which is 68 percent Anglo.  In Harris County, North Forest ISD's
students are 74 percent African-American and 25 percent Latino; the adjoining Humble
school district is 72 percent Anglo.[42]

The Texas decision *Graves* v. *Barnes* also highlights the continuing effects of historical
discrimination on minority populations in Texas:

> Because of long standing educational, social, legal, economic, political, and other
> widespread and prevalent restrictions, customs, traditions, biases and prejudices,
> some of a so-called *de jure* and some of a so-called *de facto* character, the
> Mexican-American population of Texas…has historically suffered from, and
> continues to suffer from, the results and effects of invidious discrimination and
> treatment in the fields of education, employment, economics, health, politics and
> others.[43]

---

[41] *United States. v. Texas*, 506 F. Supp. at 412.

[42] Texas Legislative Council, "School Districts with Population," RED-M635, April 3, 2002.

[43] *Graves v. Barnes,* 343 F.Supp 704, 728 (W.D. Texas 1972), *rev'd*, 405 U.S. 1201 (1972).  Cases
discussing official discrimination against Mexican Americans in voting and other aspects of civic life
include *League of United Latin Am. Citizens v. N. E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1085 (W.D. Tex.
1995) ("There is no dispute that Texas has a long history of discrimination against its Black and Hispanic
citizens in all areas of public life."); *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994) *aff'd sub
nom Bush v. Vera*, 517 U.S. 952 (1996)(upholding creation of Latino-majority districts in South Texas and
noting "Texas has a long, well-documented history of discrimination that has touched upon the rights of
African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process.
Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are
an unfortunate part of this State's minority voting rights history."); *Overton v. Austin*, 871 F.2d 529, 536
(5th Cir. 1989) (noting the "common histories of discrimination" of African Americans and Mexican
Americans in Austin); *Sierra v. El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 807-809 (W.D. Tex. 1984)
("[C]onsidered in conjunction with the history of official discrimination and the pattern of polarized voting,

Courts have repeatedly noted the various forms of discrimination against minorities in Texas and elsewhere and its relationship to social inequality.  In the 2004 decision *Session v. Perry*, a federal 3-judge panel stated that it was "keenly aware of the long history of discrimination against Latinos and Blacks in Texas, and recognize[d] that their long struggle for economic and personal freedom is not over."[44]

With neither constitutional advances nor litigation having ensured the *total* and *complete* protection of the electoral franchise for minority voters in Texas, the ongoing process to protect their meaningful political participation will require continued vigilance on the part of both courts and lawmakers.  Texas' long history of discrimination has resulted in a substantial gap between minority voters and their Anglo counterparts in educational attainment,[45] health care access[46] and other important measures of economic and social well-being.  Although no longer characterized by violence and brutality, present day voting experiences continue to be plagued by attempts to block and dilute minority voting.

## III.     Texas Demographics

The U.S. Census reports that in 2004, African Americans made up 11 percent of the total Texas population, Hispanics 34.9 percent and non-Hispanic whites 49.5 percent.[47]  The Texas Demographer's Report for July 1, 2004 projected that by 2040, Hispanics will grow to make up approximately 52.6 percent of the total population in Texas, non-Hispanic whites 32.2 percent, African Americans 9.5 percent, and all other racial and

---

the conclusion is inescapable that Mexican-Americans have less opportunity than do other members of the electorate to participate in the political process."); *Seamon v. Upham*, 536 F. Supp. 931, 987 (E.D. Tex. 1982) (Justice, C.J., dissenting) (referring to West Texas, "[e]ven when official discrimination in politics and the political process is viewed in isolation, the legacy is long and almost overwhelming.  No one can seriously contend that a catalog of legal actions pertaining to discrimination in voting adequately captures the harsh reality of political racism in Texas.").  *United States v. Uvalde Consol. Indep. Sch. Dist.*, 625 F.2d 547, 556 n.16 (5th Cir. 1980) (allowing lawsuit against school district alleging intentional vote dilution and citing Senate Report for 1975 amendments to the Voting Rights Act stating at-large election schemes "effectively deny Mexican American and black voters in Texas political access in terms of recruitment, nomination, election and ultimately, representation"); *Pablo Puente v. Crystal City, Texas*, No. DR-70-CA-4 (April 3, 1970) (finding that the real property ownership requirement incorporated in the Charter of Crystal City for candidates for city office was invidiously discriminatory against the Mexican-American Plaintiffs and their class and hence was unconstitutional); *Muniz v. Beto*, 434 F.2d 697 (5th Cir. 1970) (finding exclusion of Mexican Americans from juries in El Paso); *Indep. Sch. Dist. v. Salvatierra*, 33 S.W. 2d 790 (Tex. Civ. App., 1930), *appeal dismissed and cert. denied*, 284 U.S. 580, 52 S. Ct. 28, 76 L. Ed. 503 (1931) (challenging Mexican school); *Delgado v. Bastrop Indep. Sch.  Dist.*, Civ. No. 388 (W.D. Tex. June 15, 1948) (challenging Mexican school).

[44] *Session v. Perry*, 298 F. Supp. 2d at 473.

[45] Henry Flores, *Educational Attainment of Latinos 1960-2001*, WILLIAM C. VELASQUEZ INST., Census Project Rep. No. 2, at 5 (Fall 2005).

[46] *Key Facts Race, Ethnicity & Medical Care*, Figure 19b, No Usual Source of Health Care: Adults 18-64, by Race/Ethnicity and Poverty Status, 1999-2000, page 18 citing National Center for Health Statistics, National Health Interview Survey, 1999-2000.

[47] U.S. Census Bureau, "Texas Quickfacts," http://quickfacts.census.gov/qfd/states/48000.html (last visited June 11, 2006).

ethnic minority groups 5.7 percent.[48]

According to the 2000 Census, of the 14.9 million voting age citizens in Texas, 42.65 percent are racial or ethnic minorities: 28.6 percent (4.2 million) are Hispanic, 10.9 percent (about 1.6 million) are African-American, 2.8 percent (about 423,276) are Asian, and .35 percent (about 52,562) are American Indian.[49]

Minority groups comprise the fastest growing population in Texas.  The 1990s saw the Texas population grow by 3.8 million persons, with Latinos accounting for the majority of that growth (approximately 2.4 million).[50]  The Asian population alone grew by 125 percent.[51]  Texas has the second highest number of Latinos in the United States, trailing only California.[52]

The tremendous growth of racial and ethnic minority voting age citizens in Texas highlights the continuing need for the Voting Rights Act, particularly when combined with evidence of widespread voting discrimination and non-compliance.

## IV.     Section 5 Objections in Texas

The persistence and breadth of voting discrimination across Texas reveals the need for continued efforts to protect minority voting rights. It also counsels against the premature removal of the safeguards provided by Section 5 of the Voting Rights Act.  Section 5 objections to voting changes in Texas involve a wide variety of discriminatory election rules, procedures, and methods of election, including:

- Discriminatory use of numbered posts and staggered terms that ensure that a majority – or even plurality – of non-Hispanic white voters continue to be overrepresented in elected offices.[53]

---

[48] Texas State Data Center and Office of the State Demographer, *Projections of the Population of Texas and Counties in Texas by Age, Sex and Race/Ethnicity for 2000-2040*, http://txsdc.utsa.edu/tpepp/2004projections/ (last visited June 6, 2006).

[49]  Census 2000 Redistricting Data (Public Law 94-171) Summary File , available at http://factfinder.census.gov/servlet/DTTable?_bm=y&-geo_id=04000US48&-ds_name=DEC_2000_PL_U&-_lang=en&-redoLog=false&-mt_name=DEC_2000_PL_U_PL004&-format=&-CONTEXT=dt (last visited June 15, 2006).

[50] Leo Estrada, *Redistricting 2000: A Lost Opportunity for Latinos* (Joint Center for Political and Economic Studies, Voting Rights and Minority Representation Conference Paper), available at http://www.jointcenter.org/whatsnew/redistricting-conference/Estrada.pdf

[51] U.S. Census Bureau, 2004 American Community Survey, http://factfinder.census.gov (select "Texas" hyperlink and then select "2004" column); 1990 Asian population estimates are available in *The Asian Population: 2000*, Census 2000 Brief (February 2002, at 5), available at http://www.census.gov/prod/2002pubs/c2kbr01-16.pdf.

[52] U.S. Census Bureau, 2004 Am. Cmty. Survey, Hispanic or Latino (of any race), http://factfinder.census.gov (select "Texas" hyperlink and then select "2004" column).

[53] Letter from James P. Turner, Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ to attorneys for Ms. Brenda Adams, City Secretary, El Campo, Texas (November 8, 1985).

- Discriminatory implementation of majority vote and/or runoff requirements.[54]

- Polling place or election date changes that deny minorities equal voting opportunities.[55]

- Discriminatory absentee voting practices.[56]

- Discriminatory annexations or deannexations.[57]

- Dissolution of single member districts, reductions in the number of offices, or revocation of voting rules when minority candidates of choice are about to be elected to office.[58]

- Election procedures that violate Section 203 of the Voting Rights Act.[59]

- Discriminatory redistricting practices to deny minorities an equal opportunity to elect their chosen candidates.[60]

These objections range in time from October 1982, immediately after the VRA's reauthorization, to an objection in May of 2006 to the discriminatory reduction of polling places in the North Harris Montgomery Community College District.  The breadth of Section 5 objections made by the DOJ since 1982 illustrates the nature of voting discrimination in Texas, as well as the subtle practices used to keep this political exclusion under the radar.  Since 1982, Texas has had the second highest number of objections of any covered state, trailing only Mississippi.[61]

In total, the DOJ has issued 201 Section 5 objections to proposed electoral changes in Texas since the state was covered in 1976.  Of those 201 objections, 52 percent (N=107)

---

[54] Letter from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. DOJ to Mr. Max Harris, Superintendant, Liberty-Eylau Independent School District (February 26, 1985).

[55] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, U.S. DOJ to James Finstrom, Esq., Marion County District Attorney (April 18, 1994); Letter from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. DOJ to Analeslie Muncy, Esq., City Attorney, City of Dallas (March 13, 1991).

[56] Letter from James P. Turner, Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ to Mary Milford, Esq., Law Offices of Earl Luna, P.C. (February 27, 1989).

[57] Letter from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. DOJ to Cindy Maria Garner, Esq., City Attorney, Crockett, Texas (December 21, 1990).

[58] Letter from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, U.S. DOJ to Lavon L. Jones, Assistant Criminal District Attorney, Beaumont (October 20, 1993); Letter from James P. Turner, Actin Assistant Attorney General, Civil Rights Division, U.S. DOJ to Robert T. Bass, Allison & Associates (July 19, 1993).

[59] Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, U.S. DOJ to The Honorable Ronald Kirk, Secretary of State, Texas Elections Division (February 17, 1995).

[60] Letter from J. Michael Wiggins, Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ to Denise Nance Pierce, Esq., Bickerstaff, Health, Smiley, Pollan, Kever & McDaniel (June 21, 2002).

[61] NATIONAL COMMISSION ON THE VOTING RIGHTS ACT, PROTECTING MINORITY VOTERS: THE VOTING RIGHTS ACT AT WORK 1982-2005 (2006).

occurred *after* the 1982 reauthorization of Section 5.  Ten of the post-1982 objections were interposed in response to statewide voting changes.  A summary of all of Texas's Section 5 objections is included in Appendix A to this report.[62]

Discriminatory election practices in Texas potentially affect a very large number of minority voters.  Since 1982, the DOJ has prevented the implementation of discriminatory electoral changes in nearly 30 percent (N =72)[63] of Texas's 254 counties, where 71.8 percent[64] of the state's non-white voting age population resides.

The majority of Texas' proposed changes related to local jurisdictions.  For example, in *Foreman v. Dallas County*, the U.S. Supreme Court held that Dallas County wrongfully failed to submit a voting change for Section 5 preclearance.[65]  The voting change had a significant impact on Latino participation as poll workers, limiting the selection of poll workers on the basis of party affiliation.  In other jurisdictions where party affiliation was used as a prerequisite to serving as a poll worker, the practice had a negative impact on the availability and quality of language assistance under Section 203.

As noted above, repeated Section 5 violations are not limited to local jurisdictions.  Ten of Texas' post-1982 objections involved statewide voting changes.  Moreover, forty percent (N=28) of the 72 Texas counties cited by the DOJ are repeat offenders, utilizing various strategies to obstruct minority political participation.

From a public policy standpoint, Section 5 is a cost-effective means to prevent discrimination.  Each of the 107 objections, and the 388 voting changes withdrawn, altered or abandoned following DOJ "More Information Requests" (MIRs) since 1982 presented a potential lawsuit; Section 5 removed the need for private parties to spend their own and judicial resources to block these discriminatory changes.  More importantly, litigation inevitably takes years to resolve and leaves minority voters without a remedy until these cases are successfully resolved.

Section 5 also has a strong deterrent effect in Texas.  Since 1982, Texas has had the largest number of Section 5 submissions withdrawn by jurisdictions after the DOJ signaled that the submission was inadequate and identified specific deficiencies in a jurisdiction's submission.[66]  Texas also had the largest number of electoral changes deterred by MIRs, with 366 changes either withdrawn changed or dropped since 1982.[67]  A recent study submitted to the Senate Judiciary Committee in connection with its renewal hearings estimated that the use of MIRs increases the deterrent effect of Section 5 by more than 50 percent, because MIRs frequently lead to withdrawals, superseding

---

[62] U.S. Dep't of Justice, *Section 5 Objections Texas*, http://www.usdoj.gov/crt/voting/sec_5/tx_obj2.htm (last visited June 6, 2006).

[63] *See id.* (Noting that 72 of Texas' 254 counties had proposed electoral changes interposed by the DOJ).

[64] U.S. Census Bureau, *Census 2000 Redistricting Data (Public Law 94-171) Summary File*, http://www.census.gov.

[65] *Foreman v. Dallas County*, 521 U.S. 979 (1997).

[66] *See* PROTECTING MINORITY VOTERS, *supra* note 61.

[67] Luis Ricardo Fraga and Maria Lizet Ocampo, *More Information Requests and the Deterrent Effect of Section 5 of the Voting Rights Act* (2006) (manuscript at 10, on file with authors).

changes, or no responses from jurisdictions proposing changes (all of which prevent the proposed change from being implemented).[68]  Texas' experience, in particular, illustrates the substantial deterrent effect of Section 5 resulting from the MIR process.

Despite the aforementioned DOJ oversight, compliance with Section 5's mandates is still a problem in Texas.  Since 1982, more successful Section 5 enforcement actions (in which DOJ has participated) have been brought in Texas (N = 13) than in any other state.[69]  In addition, Section 5 has been vigorously enforced by private voters in Texas.  For example, at least 23 additional successful Section 5 enforcement cases were filed by voters since 1982.  Numerous Section 5 enforcement actions were brought against Texas jurisdictions that failed to submit to the DOJ voting changes that typically discriminated against Latinos.  In summary, Section 5 plays a critical role in protecting minority voters – even when state officials are recalcitrant and fail to comply with it.  However, Texas' failure to comply with Section 5 also shows that the state has a long way to go before it fully ensures equal voting opportunities to all of its voting age citizens.[70]

### A.    Redistricting

Redistricting plans often seek to redraw district lines to diminish minority voting strength.  Such plans can render minority populations electorally ineffective and unable to elect candidates of their choice.

Of the 107 DOJ Section 5 objections filed since 1982, 57 percent (N = 61) of those objections have been related to redistricting plans proposed at various levels of government (i.e., state, county, city, school districts, community college districts).[71]  While 87 percent (N = 53) of these objections have been filed at the local level, eight of these objections relate to redistricting at the state level, culminating with the Texas redistricting in 2001.

Between 1982 and 1991, the DOJ objected to 28 redistricting plans at various levels of government for their dilutive impact on minority voting populations.[72]  Since 1992, there have been at least 33 redistricting plans that received DOJ objections for diluting minority voting power.[73]  Examples include:

- In 1992, the DOJ objected to a redistricting proposal for Calhoun County Commissioner and Justice of the Peace precincts in which the Latino community was fragmented across four districts and no district afforded Latino voters the opportunity to elect their candidate of choice.[74]

- In 1992, the DOJ objected to a Justice of the Peace and Constable redistricting

---

[68] *Id.* at 3.
[69] *See* PROTECTING MINORITY VOTERS, *supra* note 61, at Map 11.
[70] *See id.*
[71] *See* Appendix A.
[72] *See id.*
[73] *See id.*
[74] *See id.*

plan in Galveston County that fractured African-American and Latino voters and provided no opportunity districts among the eight districts in the plan; African Americans and Latinos make up 31 percent of the county's population.[75]

- In 1992, the DOJ objected to the redistricting plan for the Castro County Commissioners Court.  Although Latinos made up 46 percent of the county population, the two districts with the highest Latino populations were ineffective because they contained a minority of Latino voters.  Later that same year, the DOJ objected again to Castro County Commissioners Court's proposed redistricting plan.  This proposed plan re-numbered a Latino opportunity district in order to delay the election for a Latino preferred candidate.  No Latino had ever been elected to the Commissioner Court.[76]

- In 1993, the DOJ objected to proposed redistricting plans by Bailey County which would have reduced the number of Justice of the Peace and Constable precincts from 4 to 1 and then objected again when Bailey County used the un-precleared district to conduct a local option election.[77]

As recently as 2002, the DOJ objected to a redistricting plan proposed by Waller County, Texas, stating that:

> The 2000 Census indicates that Waller County has a…voting age population (of) 24,277, of whom 7,601 (31.3 percent) are black and 3,871 (15.9 percent) are Hispanic…
> [T]he proposed redistricting plans contain only one district in which minority persons are a majority of the voting age population.  According to the information that you provided, the black percentage of the voting age population in proposed Precinct 1 voting age population drops to 29.7 percent.  Within the context of electoral behavior in Waller County, the county has not established that implementation of this plan will not result in a retrogression in the ability of minority voters to effectively exercise their electoral franchise.  Moreover, the viability of alternative plans demonstrates that the potential retrogression of the proposed plan is avoidable.[78]

The DOJ further observed that racially polarized voting served to undermine minority voting strength in Waller County:

> Our analysis of county elections shows that minority voters in Precinct 1 have been electing candidates of choice since 1996, and that those candidates are elected on the basis of strong, cohesive black and Hispanic support.  Our statistical analysis also shows that white voters do not provide significant support

---

[75] *See id.*
[76] *See id.*
[77] *See id.*
[78] Letter from Ralph F. Boyd, Jr. Assistant Attorney General, Civil Rights Division, U.S. DOJ to attorneys for Waller County, Texas (June 21, 2002).

to candidates sponsored by the minority community, and that interracial elections are closely contested.  For example, the black candidate for commissioner in Precinct 1 prevailed in the last election by two votes.  As a result, the proposed reduction in the minority voting age percentage in Precinct 1 casts substantial doubt on whether minority voters would retain the reasonable opportunity to elect their candidate of choice under the proposed plan, particularly if the current incumbent in Precinct 1 declines to run for office again.[79]

This objection illustrates an example of a jurisdiction that was committed to structuring electoral competition in ways to disadvantage the minority population.

Local jurisdictions also employ what is known as "packing" to concentrate minority populations into districts, virtually guaranteeing them the ability to elect the candidate of their choice in that specific district, but ultimately serving to minimize their influence in surrounding areas.  The end result of this strategy is often that only one minority candidate of choice is elected when two or more could be elected under a fairer plan.

For example, in 1992, the DOJ objected to the Terrell County Commissioners Court redistricting plan.  Although the Latino population in the county had increased from 43 percent to 53 percent, the proposed redistricting plan diminished the Latino population in one of the two Latino majority districts, while increasing Latino population in the other to 83 percent.[80]

In sum, the use of redistricting strategies to dilute minority voting power is an indicator that jurisdictions forced to guarantee access to the ballot frequently respond with more sophisticated measures to thwart meaningful political participation for minority constituents.

## B.    Annexations

Attempts to implement discriminatory voting changes have found their way into a range of procedures commonly used by governmental bodies, including annexations.  On their face, annexations of residential areas outside larger political jurisdictions are often undertaken to provide the outlying area with public services, such as water, sewage, and electricity, among other things.  However, annexations can also be dilutive when the proposed addition of an outlying area with a white majority will have the effect of minimizing existing or growing strength of minority voters.  This is a form of minority vote dilution because it serves to minimize the political strength of a growing minority groups and is often proposed for that purpose.

A recent example of attempted vote dilution through annexation occurred in 1997 when the DOJ prevented city officials in Webster, (Harris County) Texas from reducing

---

[79] Letter from J. Michael Wiggins, Acting Assistant Attorney General, U.S. Department of Justice, Civil Rights Division to attorneys for Waller County, Texas (June 21, 2002), *available at* http://www.usdoj.gov/crt/voting/sec_5/pdfs/l_062102.pdf.
[80] *See id.*

minority voting strength through the annexation of a predominately white outlying area. The DOJ noted that:

> Hispanic residents constitute 19 percent and black residents constitute 5 percent of the City's total population…The annexation in Ordinance 95-33 adds approximately 1,162 persons to the City's total population, all of whom appear to be white.  Thus the proposed annexation will reduce the City's Hispanic proportion to 15.0 percent and the black proportion to 4.2 percent of the total population.[81]

In its review of the annexation change proposed by Webster officials, the DOJ uncovered a predominantly Hispanic outlying area that was not considered for annexation by city officials.  If annexed in addition to the outlying white area, this tract would have reduced the possibility of minority vote dilution.  The DOJ found that:

> This block has a significant minority population percentage: Hispanic persons constitute 39 percent and black residents constitute 7 percent of the total population…[T]he annexation of Block 101B alone would have increased the City's Hispanic population to 20.2 percent and the black population to 5.3 percent…[T]he Hispanic councilmember and another leader of the Hispanic community opposed the annexation contained in Ordinance 95-33 indicating that if the City was going to annex the all-white residential property…it should also annex the residential property contained in Block 101B…[T]heir requests were refused.[82]

After an extensive investigation into the operation of city government in Webster, Texas, the DOJ concluded its review of Webster's Section 5 submission by stating, "the city's application of its annexation policy and the city's annexation choices appear to have been tainted, if only in part, by an invidious racial purpose" and that claims of unawareness of the racial makeup of the block under review were "at best disingenuous."[83]

Minority vote dilution in the form of "fracturing" or "cracking" minority voters occurs at all levels of government.  One recent statewide example illustrates the point.  In 2001, the state of Texas enacted a redistricting plan for the Texas House of Representatives that fractured Latino populations across South and West Texas and resulted in the loss of Latino electoral control in four districts.

The DOJ objected to the Texas House plan, noting that the state had reduced by four the number of districts in which Latino voters would be able to elect their candidate of choice.  One Latino majority district in San Antonio, which contained close to 70 percent Latino voting age population, was simply eliminated in the state's new redistricting plan and its Latino voters scattered across other districts.  In West Texas District 74, the State

---

[81] Letter from Isabelle Katz Pinzler Acting Assistant Attorney General Civil Rights Division U.S. DOJ to Attorneys for the City of Webster Texas (Harris County) (March 17, 1997).
[82] *Id.*
[83] *See id.*

reduced the Latino voting age population by more than 15 percent; DOJ noted that this reduction rendered the district ineffective for Latino voters and that this change in population was unnecessary because the district fell within the acceptable population deviation at the time of the 2000 Census.  In South Texas, the state reduced the Latino-majority District 44 to a bare 50.2 percent Latino voter registration majority, prompting DOJ to note that the district no longer allowed Latino voters to elect their preferred candidate.  Finally, in the Rio Grande Valley, the state reduced the Latino population in District 38 and rendered it ineffective for Latino voters.

DOJ concluded that although the state had created a new Latino-majority District 80 in South Texas, there was a net loss of three districts in which Latinos could elect their candidate of choice, and thus, the Texas plan was retrogressive.

Following the DOJ's objection, and because a vote dilution lawsuit challenging this redistricting plan was already pending, a federal court ordered a new map in which these districts were restored.[84]

### C.    Method of Election

Since 1982, the DOJ has made 47 of its 107 objections based on proposed changes to the method of election.[85]  A jurisdiction's method of election is the system it uses to elect representatives, including single member districts, at-large elections, majority vote requirements, and numbered place elections.  Certain methods of election, when combined with the racial polarization prevalent in many parts of Texas, result in minority vote dilution.[86]  Polarized voting patterns transcend partisanship and illustrate not only the continuing racial cleavage between Anglo and minority voters, but also the particular challenges that people of color face in electing candidates of their choice.

The numbered post system of election, also known as numbered place, forces candidates to sign up and run for a particular seat on the governing body when more than one seat is up for election.  Numbered post elections often discriminate against minority voters because they result in head-to-head contests, usually between an Anglo and minority candidate.  In the context of racially polarized voting, these head-to-head races allow Anglo voters to cast more votes than minority voters in each race.  The numbered post system is often intentionally designed to prevent minority voters from electing their candidates of choice.  By contrast, when all candidates run in a field for multiple seats on the governing body, minority voters can "single shot vote" for their preferred candidate and prevail in at least one race.   Despite their disparate negative impact on minority voters, local governmental bodies continue to propose the implementation of numbered post systems.

---

[84] *Balderas v. Texas*, No. 6:01-CV-158 (E.D. Tex. November 28, 2001).

[85] *See* Appendix A.

[86] A report regarding the phenomenon of racially polarized voting, including a detailed analysis of Texas election voting patterns, will follow as an Appendix from MALDEF in conjunction with Rudy Espino, Ph.D., Department of Political Science, Arizona State University.

In 1990, the DOJ objected to an election change proposed by the state of Texas for the creation of fifteen additional Judicial Districts with numbered post requirements. In response, the DOJ stated in their objection:

> "The history of the numbered post feature in Texas elections indicates that its adoption and continued maintenance over the years appears calculated to place an additional limitation on the ability of minority voters to participate equally in the political process and elect candidates of their choice. In that regard, we note that it is commonly understood that numbered posts along with other features such as the use of a majority-vote requirement in the context of an at-large election system, have had a discriminatory impact on racial and ethnic minorities…Numerous federal court decisions have chronicled instances where these features have been adopted in Texas for clearly discriminatory motives, and where their use has produced the intended discriminatory effects."[87]

In 1999, the DOJ objected to a proposal by the Sealy Independent School District to adopt the numbered post system of election because it would impair the ability of minority voters to successfully single shot vote for their preferred candidate.[88]

The use of at-large elections in the context of racially polarized voting can also dilute minority votes. Because the at-large election system ensures that political contests contain a majority of Anglo votes, it virtually guarantees that the minority group will be unable to elect the candidate of their choice, particularly when this system is coupled with a majority vote requirement. Such systems weaken minority political power by requiring minority voters to vote in circumstances where an identifiable white bloc vote will defeat their preferences.

In comparison, single member districts subdivide political jurisdictions and their constituencies, allowing for the election of minority candidates as well as white candidates, and resulting in fair and equitable representation.

In 1991, the DOJ objected to election changes proposed for the Refugio Independent School District located in Refugio County. The changes included implementing two at-large and five single member districts for the election of their school board members. In its objection, the DOJ noted that this was a repeated attempt to propose a previously rejected plan deemed discriminatory in nature:

> "On May 8, 1989, the Attorney General interposed an objection under Section 5 to an earlier five district, two at large plan adopted by the school district. In that regard, we found that in light of the electoral circumstances present in the school district (in particular, the apparent pattern of polarized voting), the proposed plan

---

[87] Letter from John R. Dunne, Assistant Attorney General, U.S. Department of Justice, Civil Rights Division to Mr. Tom Harrison, Special Assistant for Elections, Elections Division, on file with author (November 5, 1990).
[88] Letter from Bill Lann Lee, Acting Assistant Attorney General, Civil Rights Division, U.S. DOJ to attorneys for Sealy Independent School District, Austin County, Texas (June 5, 2000).

unnecessarily minimized the opportunity of minorities to elect candidates of their choice.  We noted that our information tended to support a concern that the 5-2 system had been selected over a system of seven single-member districts 'to avoid the potential for fair minority representation in three majority-minority districts.'…we note that, even though our May 8, 1989 letter expressed concern over the lack of opportunity for minority citizens to participate in that decision making process, it appears that in developing the instant plan the school district perpetuated this problem.  Thus while the district did establish a committee of minority citizens to examine the election method issue, the committee appears to have been excluded from any participation in the process once it made known its preference for a seven single-member district plan."[89]

Additionally, in August of 2002, the DOJ objected to a change in the method of election proposed by the City of Freeport, Texas, which involved abandoning single-member districts in favor of an at-large election system.  The DOJ explained:

Until 1992, the City elected its four-member council on an at-large basis.  In that year it began to use the single-member district system, which it had adopted as part of a settlement of voting rights litigation challenging the at-large system.  Under the subsequent single-member district method of election, minority voters have demonstrated the ability to elect candidates of choice in at least two districts, wards A and D.  The City now proposes to reinstitute the at-large method of election.  Our analysis shows that the change will have a retrogressive effect on the ability of minority voters to elect a candidate of their choice.[90]

At the time of the proposal, Latinos made up 47.3 percent and African Americans 12.3 percent, of the city's voting age population.  Approximately 29 percent of the city's registered voters were Spanish-surnamed.[91]  In its objection letter, the DOJ recognized that within the context of racially polarized voting, at-large elections would impair the ability of minority voters to elect a candidate of their choice.

Similar changes were proposed for the Haskell Consolidated Independent School District in Haskell, Knox and Throckmorton counties.  In this submission, the DOJ found that after successful litigation for single-member districts,[92] county officials sought to revert to at-large elections.  County officials cited higher voter turnout statistics under the at-large system as opposed to the single-member districts as reason for the reversal; however the DOJ found that their numbers and "assertion(s) (did) not withstand close scrutiny."[93]

---

[89] Letter from John R. Dunne, Assistant Attorney General, Civil Rights Division, U.S. Department of Justice to attorneys for the Refugio I.S.D. (April 22, 1991).

[90] Letter from J. Michael Wiggins, Acting Assistant Attorney General, Civil Rights Division, U.S. Department of Justice to the attorney for the City of Freeport in Brazoria County, Texas (August 12, 2002).

[91] *See id.*

[92] *League of United Latin Am. Citizens*, *Dist. 5* (*LULAC*) *v. Haskell Consol. Indep. Sch. Dist.*, No. 193-CV-0178 (C) (N.D. Tex. Oct 21, 1994).

[93] Letter from Ralph F. Boyd, Jr., Assistant Attorney General, Civil Rights Division, U.S. Department of Justice to attorneys for the Haskell Consolidated Independent School District (September 24, 2001).

These efforts to return to electoral arrangements that are known to disadvantage minority communities demonstrate the persistence of intentional efforts to dilute minority voting power in Texas, and powerfully make the case for the continuing necessity of the state's Section 5 coverage. In the absence of Section 5, each of these retrogressive efforts would require a costly and time-consuming Section 2 lawsuit to reestablish principles that the Voting Rights Act has long established. Significantly, while the litigation took place, voters would be suffering a loss of their effective voting power.

Other examples of discriminatory methods of elections that were prevented because of Section 5 of the VRA include the following:

- In January 1992, the DOJ objected to a proposal by the city of El Campo to eliminate single-shot voting by converting from at-large plurality elections to majority vote requirements. The DOJ had previously objected to other attempts by El Campo to eliminate single shot voting in 1985, 1986, and 1989.[94]

- In 1992, the DOJ objected to a law passed by the Texas Legislature providing that if one of the legislative redistricting plans were to change, there would be no new primary election if a primary had already been held. Under the statute, the candidate-designee would be chosen by the party executive committee. In light of the continued domination of Anglos in Texas' political party leadership, allowing party executive committees to select a candidate would place minority voters in a worse position than before.[95]

- In the city of Wilmer (Dallas County), Latinos made up 30 percent of the population and African Americans 20 percent, yet no minority had ever been elected to the City Council. The DOJ objected in 1992 to a proposal that would have eliminated single shot voting and prevented minorities from electing their candidate of choice.[96]

- In 1992, the DOJ objected to the adoption by the city of Ganado of staggered terms and numbered post voting, noting that the changes were retrogressive and that the minority community was not afforded the opportunity to participate in the process for adopting these changes.[97]

- Also in 1992, in Galveston County, the DOJ objected to the adoption of numbered post voting and the change from an at-large election to a 4-2 mixed system. At the time, the combined minority population in the county was 49 percent.[98]

In addition, there is substantial evidence in Texas of non-compliance with Section 5's

---

[94] *See* Appendix A.
[95] *See id.*
[96] *See id.*
[97] *See id.*
[98] *See id.*

preclearance requirements.  A number of counties proceeded to implement voting plans before the DOJ had an opportunity to object to them, in direct violation of Section 5 of the VRA.  The following Texas counties illegally implemented their unprecleared redistricting plans in the March 1992 primary election: Castro, Cochran, Deaf Smith, Hale, Bailey and Terrell.  The history of Section 5 enforcement litigation, by both the DOJ as well as private parties further demonstrates the extent of non-compliance by jurisdictions across the state.

In many of these changes, the end goal was to remove or exclude minority elected officials from office by repackaging age-old strategies.  Without the basic and essential representation afforded to minorities through their ability to elect the candidates of their choice, minority voters will continue to face hurdles not only within the electoral system, but in all social arenas.

### D.    Voting Procedures

There have been 12 DOJ objections regarding voting procedures since 1982.  Examples of voting procedure changes include changes in polling place locations, the form of ballots and absentee ballots used, election dates, and general voter registration requirements.

The loss of a traditional polling place in a minority community can result in voter confusion and, ultimately, depressed voter turnout.  Unfortunately, many counties make changes in their voting procedures without submitting the changes for preclearance with the DOJ.  For example, in August 2003, Bexar County (which includes the City of San Antonio) announced that it would eliminate the five early voting polling places that serve the predominantly-Latino West Side of San Antonio, leaving the area with no early voting polling place for the upcoming September constitutional amendment election.  The loss of every early voting polling place on the West Side would have had a devastating impact on the political participation of the area's Latino voters.  Because Bexar County did not timely submit its proposed polling place changes to the DOJ, but instead moved ahead with the changes without securing preclearance, MALDEF brought suit and enjoined the polling place closures.[99]

Voter registration requirements also remain an area of contention.  Prairie View A&M is a historically black university in Waller County whose students comprise 20 percent of the county's voting population.  In 2003, after two students decided to run for county office, the district attorney in Waller County, Oliver Kitzman, attempted to prevent Prairie View students from registering and voting.  Kitzman argued that "it's not right for any college student to vote where they do not have permanent residency,"[100] and ultimately threatened to prosecute students who declared Prairie View as their residence. Waller County has a history of attempting to restrict the votes of the mostly black

---

[99] *Miguel Hernandez Chapter of the Am. GI Forum v. Bexar County*, No. SA-04-CA-181-FB (W.D. Tex. August 27, 2003).
[100] *Voter Suppression Tactics Slapped on Prairie View A&M University Students,* GARLAND JOURNAL NEWS, March 2004, *available at* http://www.garlandjournalnews.com/past_articles/200403.html.

students at Prairie View, whose right to register and vote in Waller County was upheld in a precedent setting case decided by the U.S. Supreme Court in 1979.[101]  In the face of that historical experience, and the controlling Supreme Court decision, Prairie View A&M students were indicted in 1992 for "illegally voting" (the charges were later dropped), despite the fact that this change in policy was never submitted for preclearance and flew in the face of a court order.[102]  The DOJ wrote to the county demanding that it comply with the previous injunction.  The Texas Secretary of State and the Texas Attorney General also condemned the attempt to unlawfully restrict the students' right to vote.[103]  Five students and the local NAACP chapter sued the district attorney, demanding the right to vote in the 2004 election without improper prosecution.  Eventually, the county settled and agreed to let the students vote.[104]

The issue did not end there, however.  Less than a week after the lawsuit was filed, and a month before the election, the Waller County Commissioners' Court voted to greatly reduce the availability of early voting at the polling place near Prairie View A&M – an important change since the primary election date was during the students' spring break.  In effect, this voting change was an attempt to achieve the same end as the district attorney's unlawful voter intimidation campaign through another means.  It thus presents a textbook example of the brand of persistent and adaptive discrimination that gave rise to Section 5 more than 40 years ago.  The NAACP filed a Section 5 enforcement action to enjoin Waller County from implementing this change without Section 5 preclearance.  County officials abandoned the change, technically mooting the suit (although its objectives were fulfilled).  Most of the Prairie View students who voted utilized early voting, and the Prairie View student running for a seat on the Commissioners' Court won narrowly.[105]

Racially exclusionary political strategies have plagued Texas since 1845 and continue to do so, despite legal challenges and advances.  In light of these ongoing challenges to political empowerment, it is apparent that despite measurable progress, the racial cleavages that have afflicted this country, and Texas, have not been so easily eradicated.  Given these circumstances, the continued protection of Section 5 of the VRA is of paramount importance to ensuring equal voting opportunities for minority voters, and indeed, all voters in Texas.


## V.      Section 2 Litigation in Texas

Section 2 of the VRA is a permanent provision, which "prohibits voting practices or procedures that discriminate on the basis of race, color, or membership in one of the

---

[101] *Symm v. U.S.*, 439 U.S. 1105 (1979).
[102] AMERICAN CIVIL LIBERTIES UNION, THE CASE FOR EXTENDING AND AMENDING THE VOTING RIGHTS ACT (2006).
[103] *See id.* at 842-43.
[104] *Prairie View Chapter of NAACP v. Kitzman*, No. H-04-459 (S.D. Texas); *Prairie View Chapter of NAACP v. Waller County Comm'n*, No. H-04-0591 (S.D. Texas).
[105] *See* PROTECTING MINORITY VOTERS, *supra* note 61, at 65-66.

language minority groups."[106]  Section 2 is an important tool for helping to ensure equal voting opportunities.  However, a primary shortcoming of Section 2 of the VRA is the added litigation expenses for all parties involved and the need for private plaintiffs to put significant resources (often not reimbursable under civil rights fee-shifting statutes[107]) into enforcement litigation.

Since 1982, Texas voting rights plaintiffs have prevailed in or successfully settled more than 150 Section 2 cases, more than in any other state.[108]  As a result of these post-1982 cases, 142 jurisdictions in Texas have altered their discriminatory voting procedures.[109]

Section 2 cases represent ongoing and recurrent attempts to discriminate against minority voters in Texas.  They underscore the continuing need to protect the minority electoral franchise, particularly in light of the aforementioned examples of Texas jurisdictions that continue their attempts to knowingly revert to dilutive electoral arrangements.  In 1988, the Fifth Circuit affirmed a ruling that the city of Baytown had violated Section 2 of the VRA by using an at-large election system that diluted the voting strength of Latinos and African Americans.[110]  The court concluded that at-large elections, conducted with numbered post and majority vote requirements worked with racially polarized voting to prevent the election of minority candidates to the City Council.  Despite the fact that 25 percent of the City population was Latino or African-American, no minority had ever been elected to the Baytown City Council.  After evaluating rates of racially polarized voting and noting that Latinos and African Americans suffer the lingering socio-economic effects of past discrimination, the district court concluded that Latinos and African Americans were not able "to participate fully in the electoral system in Baytown."[111]

In the 1990 case *Williams v. City of Dallas*, a federal court ruled that the at-large seats in the Dallas City Council's mixed system diluted the voting strength of both blacks and Mexican-Americans and therefore violated Section 2 of the Voting Rights Act.[112]  Under the "8-3" system, eight council seats were elected by district and three were elected at large.  No African Americans, and only one Mexican American,[113] had ever won an at-large seat, although as of the 1980 Census, Dallas was 41.67 percent minority (29.38

---

[106] U.S. Dep't of Justice, *Section 2 of the Voting Rights Act,*
http://www.usdoj.gov/crt/voting/sec_2/about_sec2.html#sec2 (last visited June 6, 2006).
[107] The VRA renewal bills in both houses of Congress appropriately contain provisions to permit the recovery of expert fees and expenses for prevailing parties.
[108] The Voting Rights Initiative: Documenting Discrimination, *Judicial Findings Under Section 2 of the Voting Rights Act since 1982*, http://www.sitemaker.umich.edu/votingrights/search (last visited June 6, 2006); According to the National Commission on the Voting Rights Act, there were at least 206 successful Section 2 cases brought in Texas between August 1982 and the end of 2005; PROTECTING MINORITY VOTERS, *supra* note 61, at 87.
[109] *Id.*
[110] *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988).
[111] *Id.* at 1250.
[112] *Williams v. City of Dallas*, 734 F.Supp. 1317 (N.D. Tex. 1990).
[113] The one Mexican-American elected at large was elected "due to some very unusual circumstances that will not be repeated," according to the Court (there was no white candidate). *Id.* at 1318.

percent African-American and 12.29 percent Mexican-American).[114]  The "8-3" system was introduced after Dallas' previous all-at-large system was invalidated as violative of the VRA.[115]  The court in *Williams* conducted a searching inquiry into the long history of discrimination against blacks and Latinos in Dallas and the various ways white majorities ensured that blacks and Latinos could only hold political office "with the permission of the white majority."[116]  The court noted severe racial tension relating to police brutality and other issues, and continuing patterns of racially polarized voting.  In a referendum on how to revise the voting system, the court also found that some of the white at-large council members "simply ignored the minority areas of the city."[117]  The court held that because of "substantial economic disparities between white and minority residents," it was not possible for minority candidates to raise the large sums of money from their own communities that are necessary for competing in at-large elections.[118]  The court also held that the district lines for the eight districted seats under the "8-3" system had diluted the black vote by "packing" African Americans into two concentrated districts and then "cracking" the remaining black voters into multiple districts to prevent the election of a third black candidate.[119]

Likewise in 1995, a federal court in San Antonio ruled that the at-large election system used by the Northeast Independent School District violated Section 2 of the VRA.[120]  Although the combined African-American and Latino population of the district was 30 percent, from 1973 to 1994, Anglo candidates won 47 of 48 elections, a Latino candidate won one election and African-American candidates won none.  The district court noted that "voting in NEISD school board elections is significantly polarized along racial lines [and] absent special circumstances, there are not enough Anglo cross-over votes to allow a minority candidate to succeed in the at-large election system presently used in NEISD school board elections."[121]  The district court's conclusion that the school district violated Section 2 was based on very thorough fact findings, including that: persistent socio-economic disparities between Anglos and minorities in NEISD resulting from past discrimination still impair the ability of minority voters to participate in the political system; one high school in NEISD flew the Confederate flag until 1993; NEISD used a numbered place system that prevented single-shot voting by minorities to elect their candidate of choice; and, until 1999, the district provided only eight polling places for a jurisdiction of more than 250,000 people. [122]

It is noteworthy that many of the successful Section 2 cases in Texas occurred through settlements, without any reported decision, and are known only to local residents and the parties and counsel that litigated them.  The examples described above illustrate the

---

[114] *Id.* at 1323.
[115]  *Lipscomb v. Wise*, 399 F.Supp. 782 (1975), *rev'd* 551 F.2d 1043 (5th Cir.1977), *but aff'd* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).
[116] *Williams,* 734 F.Supp. at 1320.
[117] *Id.* at 1364-65, 1384.
[118] *Id.* at 1382.
[119] *Id.* at 1415.
[120] *LULAC v. North East Indep. Sch. Dist.*, 903 F. Supp. 1071 (W.D. Tex. 1995).
[121] *Id.* at 1084-85.
[122] *Id.* at 1086.

ongoing importance of Section 2 of the VRA as one necessary, but not sufficient, tool for ensuring the political enfranchisement of Texas' minority citizens.

### A.   Voting Rights Violations in the City of Seguin – A Case Study in Persistent Discrimination

The experience of minority voters in the city of Seguin, Texas provides a notable example of how jurisdictions will use a series of tactics to dilute minority voting strength and how both Section 2 and Section 5 of the Voting Rights Act operate in concert to ensure equal access in voting.[123]

In 1978, Latino plaintiffs sued the city of Seguin for failing to redistrict following the 1970 Census.  At the time, the city elected eight council members from four multi-member wards and the city was 40 percent Mexican American and 15 percent African American.  There had never been more than two minority candidates elected at a time to the council.  A federal court enjoined the 1978 election and the following year adopted a new redistricting plan for Seguin proposed by the city.  The plaintiffs objected to this plan because it afforded insufficient Latino representation.

Shortly afterwards, the plaintiffs filed a second lawsuit seeking to block implementation of the city's plan until it received the required preclearance from the DOJ.  Ultimately, the plaintiffs won a ruling from the U.S. Court of Appeals for the Fifth Circuit requiring the redistricting plan to be precleared.[124]

Following these victories, the city of Seguin failed to redistrict after the 1980 and 1990 Census.  By 1993, 60 percent of the City was minority, but only three of nine city Council members were Latino.  Latino plaintiffs sued again and won a settlement in 1994 from the City that created eight single member districts.[125]

Following the 2000 Census, Seguin redistricted but fractured the city's Latino population across the districts to preserve the incumbency of an Anglo councilmember and thus maintain a majority of Anglos on the City Council.  When the DOJ refused to preclear the redistricting plan, Seguin corrected the violation but then closed its candidate filing period so that the Anglo incumbent would run for office unopposed.  Latino plaintiffs sued once again, securing an injunction under Section 5 of the Voting Rights Act.  The parties settled after negotiating a new election date, and today, a Latino majority serves on the Seguin City Council.[126]  The persistence of the opposition to minority voting power in Seguin presents powerful evidence that the equality principles protected by the VRA would not be vindicated in Texas absent vigilant enforcement of all of the VRA's protections.

---

[124] *Ramos v. Koebig*, 638 F.2d 838 (1981) and *Trinidad v. Koebig*, 638 F.2d  846 (1981).
[125] *LULAC Council #682 v. City of Seguin,* No. 93-0333 (W.D. Tex.).
[126] *LULAC v. City of Seguin* , No. SA-02-369-OG (U.S. Dist. Ct. W.D. Tex.).

**VI.     Continuing Discrimination in the 2004 Election**

During the November 2004 presidential election, MALDEF served as a legal resource center for coalitions conducting election protection work, including NALEO (National Association of Latino Elected Officials), the Bexar County Voting Rights Coalition, and Texas Election Protection.  MALDEF received numerous telephone calls from Latino voters unable to find their polling site, many as a result of language barriers.  In addition to the calls about polling site locations, MALDEF received more than 30 calls relating to irregularities, complaints, assistance needed, or problems in the voting process from predominantly Latino and African-American voters.  Specific reports from callers included:

- At polling places in a predominantly Latino precinct, understaffing of poll workers resulted in long lines and only two voting stalls being put to use. Election judges informed voters they should come back at a later time.

- An elderly Latina voter was told that she was not on the voter registration list and not allowed to vote with a provisional ballot, despite the recently enacted Help America Vote Act (HAVA), which provides for provisional ballots in such situations.  She and her family had been voting at the same location for more than 20 years.  The election judge refused to unlock a box containing provisional ballots until a MALDEF attorney arrived and negotiated on behalf of the Latina voter.

- An eligible African-American woman was told by an Anglo election judge to "take that doo-rag off your head" before voting.

- Police officers were stationed outside three polling sites in the outskirts of San Antonio's far west side, an overwhelmingly Latino area.  This practice is a familiar form of voter intimidation.

- A polling site closed while voters were still in line in a predominantly African-American precinct contrary to Texas law, resulting in vote denial.

The national Election Protection coalition issued a report entitled, "Shattering the Myth: An Initial Snapshot of Voter Disenfranchisement in the 2004 Elections."  The report documents the following additional incidents in Texas:

- During early voting at the Power Center in Harris County, a voter observed Harris County police officers yelling at the 200 or more voters in line that they must show I.D. and that anyone with a warrant would go to jail.  People left the line, including the voter who reported the situation.  Proof of identity is not required to vote in Texas.

- An African-American voter and her mother were subjected to heightened

30

> levels of questioning at their local polling place.  At the time they arrived, they were the only black voters present. The poll workers first asked all voters for registration or I.D. and then if they had moved.  The voter and her mother were subjected to additional questions, as the workers appeared not to believe their responses.  The polling agents took the voter's license to check against other records.  Reportedly, this did not happen to other voters.  She was eventually allowed to vote.

Even with federal legislative efforts such as the National Voter Registration Act, and HAVA, the need for the VRA's permanent and temporary provisions cannot be overstated.  The 2004 election demonstrated the continuing discriminatory practices that occur on the ground level of elections.  Legislative efforts to repress minority voting rights continue to garner support and represent a real threat to Latinos and African-Americans' ability to elect candidates of their choice.

## VII.   Texas's Voter Access Record under Sections 4(f)(4) and 203

Historical discrimination against Latinos in Texas, including the practice of educational segregation, is strongly linked to the limited English proficiency (LEP) status of many of Texas' Latino citizens.  Additionally, failure to accommodate LEP voters has resulted in low voter participation, especially when elections are conducted only in English.

In *White v. Regester,* the U.S. Supreme Court recognized that discrimination resulted in the social and linguistic isolation of native-born Mexican Americans in Texas.  With respect to this history of discrimination, the court noted that:

> The bulk of the Mexican-American community in Bexar County occupied the Barrio, an area consisting of about 28 contiguous census tracts in the city of San Antonio. Over 78% of Barrio residents were Mexican-Americans, making up 29% of the county's total population. The Barrio is an area of poor housing; its residents have low income and a high rate of unemployment. The typical Mexican-American suffers a cultural and language barrier that makes his participation in community processes extremely difficult, particularly, the court thought, with respect to the political life of Bexar County. '[A] cultural incompatibility . . . conjoined with the poll tax and the most restrictive voter registration procedures in the nation have operated to effectively deny Mexican-Americans access to the political processes in Texas even longer than the Blacks were formally denied access by the white primary.'[127]

Today, Latinos in Texas continue to suffer language-based discrimination and marginalization in the election process, further demonstrating the need for the protections of Section 203.  For example, in 2003, the chairman of Texas House Redistricting Committee stated that he did not intend to hold redistricting hearings in the Rio Grande Valley in South Texas, where many U.S. citizens are Latino, because only two members

---

[127] *White v. Regester*, 412 U.S. 755, 768 (1973).

31

of the Redistricting Committee spoke Spanish.  Chairman Crabb stated that the members of the Committee who did not speak Spanish "would have a very difficult time if we were out in an area other than Austin or other English speaking areas to be able to have committee hearings to be able to converse with the people that did not speak English."[128] This is a stark example of a situation in which limited LEP status was invoked as a justification for closing off access to critical governmental functions that bear upon the lives of all of Texas's citizens.  Only after widespread media coverage of his remarks did the Chairman agree to hold hearings in South Texas.

In Texas, there are still many Mexican Americans, as well as other racial minorities, who are LEP as a result of educational discrimination.  In 2000, the U.S. Census reported that 473,099 Latino voting age *native born citizens* in Texas were limited English proficient.[129]  For similar reasons, many Spanish-speaking American Indians are LEP.[130] In addition, naturalized citizens who are limited English proficient benefit from Spanish language assistance in voting.  The language assistance provisions – Sections 203 and 4(f)(4) – perform the indispensable role of ensuring equal access for Spanish-speaking Texans to the democratic process.

### A.      Section 203 Coverage in Texas

Texas must comply with Section 203 because of its coverage under Section 4(f)(4) of the Voting Rights Act.  Thus, all political subdivisions of Texas must provide language assistance to Spanish-speaking voters where it is needed in statewide elections.

In addition, 103 counties are separately covered for Spanish in their own right because of high LEP and illiteracy rates among language minority citizens.  Two of these counties (El Paso and Maverick counties) are also covered for American Indian languages.  In addition, Harris County is covered for an Asian language (Vietnamese).

### B.      High Number of LEP Citizens

Section 203 of the VRA defines those citizens categorized as having Limited English Proficiency (LEP) as being "unable to speak or understand English adequately enough to participate in the electoral process."[131]

According to the Census Bureau's July 2002 determinations of jurisdictions covered by Section 203, in Texas, there are **818,185 Latino voting-age citizens** – or nearly one out of every four Latino voting-age citizens – who are not yet fully proficient in English. These numbers are highest in the state's most populous counties, for example:

---

[128] *See Session v. Perry*, 298 F.Supp.2d 451 (E.D. Tex. 2004), Jackson Exhibit #122 (Letter from Texas Representative Richard Raymond to Department of Justice regarding preclearance of Plan 1374C).
[129] Data provided by Dr. Jorge Chapa, June 15, 2006, on file with MALDEF.
[130] *See* Section B. below.
[131] U.S. Dep't of Justice, Civil Rights Div., *Bilingual Election Requirements*, http://www.usdoj.gov/crt/voting/42usc/subch_ib.htm#anchor_1973aa-1a (last visited June 6, 2006).

- In Bexar County (San Antonio), there are 98,165 Latino voting-age citizens – or nearly one out of every four Latino voting-age citizens – who are LEP;

- In Dallas and Tarrant Counties (Dallas/Fort Worth), there are 79,335 Latino voting age-citizens – or nearly one out of every three Latino voting-age citizens – who are LEP; and,

- In Harris County (Houston), there are 107,915 Latino voting-age citizens – or nearly one out of every three Latino voting-age citizens – who are LEP.

In El Paso and Maverick counties, over 24 percent and 59 percent, respectively, of American-Indian voting age citizens are LEP.  In Harris County, where Houston is located, there are nearly 17,000 LEP Vietnamese voting age citizens.  Overall, about 42 percent of the 200,000 Asian Americans in Harris County are LEP.

Appendix B summarizes the LEP numbers for Texas and the 103 separately covered counties, identifying the language group triggering coverage.

## C.    Educational Discrimination against Latino Citizens

Texas has an unfortunate past and present history of providing unequal education opportunities to Latinos that has impaired their ability to learn English and resulted in the high LEP rates described above.  In Section 203(a) of the VRA, Congress expressly concluded that education discrimination results in depressed language minority voter registration and turnout.[132]  Congress additionally concluded that educational discrimination manifests itself through both "present barriers to equal educational opportunities" and "the current effect that past educational discrimination has on today's Hispanic adult population."[133]

The most egregious forms of educational segregation against Latinos in Texas precedes the last reauthorization of the VRA.  Today, 473,099 native born and voting age Latinos in Texas are LEP as a result of this discrimination.[134]

In 1981, U.S. District Court Judge William Wayne Justice found the Texas bilingual education plan inadequate, and that measures had not been taken to fully "remove the disabling vestiges of past *de jure* discrimination."[135]  He ordered corrections to train teachers, identify LEP students, and to expand the program.  He noted that many school districts simply ignored their obligation to deliver bilingual education:

Unfortunately, the monitoring conducted by the TEA throughout the state

---

[132] *See* 42 U.S.C. § 1973aa-1a(a).

[133] S. REP. NO. 102-315, at 5.  The Senate Report also documented the history of educational discrimination against Asian American citizens and American Indian and Alaska Native citizens.  *Ibid.* at 5-7.

[134] Dr. Jorge Chapa analysis of 2000 Census PUIMS data.

[135] *U.S. v. Texas*, 506 F. Supp. 405 (E.D. Tex. 1981);  *U.S. v. Texas*, 523 F. Supp. 703 (E.D. Tex. 1981); *U.S. v. Texas*, 680 F.2d 356 (5th Cir. 1982).

has revealed that these laudable guidelines are frequently ignored by local school districts. A few examples should suffice to demonstrate the wide gap between theory and practice in this field:

A TEA visit to Lockhart Independent School District in 1975 found that the bilingual program was conducted primarily in English.

A TEA visit to Aransas Pass Independent School District in 1977 found that no substantive courses within the bilingual program were being taught in Spanish.

In 1977, the North Forest Independent School District's bilingual program offered no instruction in Spanish for language or reading.

In 1979, the TEA reported that there was no teaching of substantive content in Spanish in the Laredo Independent School District

A 1978 TEA monitoring report found very little native language instruction in the Fort Worth Independent School District bilingual program.[136]

[The State] stipulated to the existence of these and similar deficiencies in local bilingual programs in at least twenty-five additional school districts throughout the state.[137]

In short, many Latino voters age 40 and over either attended segregated Mexican schools into the 1960s, or attended inadequate educational programs into the 1980s, and bear the effects of this discrimination and educational neglect in the form of low literacy and limited-English proficiency.

The youngest cohort of voters, who have exited the public school system more recently, as well as children in public schools today, still face an inferior educational system for LEP students.  According to the Department of Education, there are at least 570,022 LEP students in Texas's public schools.[138]  On February 4, 2006, MALDEF and META filed a Motion for Further Relief on behalf of Intervenors LULAC and the GI Forum, with the federal court overseeing the desegregation remedy in *U.S. v. Texas*.  The motion is set for a hearing on July 24, 2006.[139]

In the motion, MALDEF and META assert that the state of Texas has failed to monitor, supervise and enforce the bilingual education program as required by state and federal

---

[136] *U.S. v. Texas*, 506 F.Supp. at 422.
[137] *Id.* at 411, 412.
[138] U.S. DEPARTMENT OF EDUCATION, OFFICE OF ENGLISH LANGUAGE ACQUISITION, LANGUAGE ENHANCEMENT AND ACADEMIC ACHIEVEMENT FOR LIMITED ENGLISH PROFICIENT STUDENTS (OELA), SURVEY OF THE STATES' LIMITED ENGLISH PROFICIENT STUDENTS AND AVAILABLE EDUCATIONAL PROGRAMS AND SERVICES 4, 19 (Oct. 2002).
[139] *U.S.  v. Texas*, 6:71-CV-5281 (E.D. Tex. 2006).

law.  The motion is supported by Texas Education Agency data stating that LEP students in Texas are pushed out of school prior to graduation at rates of more than twice the rate of non-LEP students and are failing the state standardized test at rates in excess of 80 percent for some grade levels.  For the class of 2004, 16.3 percent of LEP students dropped out of school statewide, as compared with only 1.9 percent of white students and 3.9 percent of all students.

Even taking into consideration the large number of LEP students who drop out of school by grade 11, the failure rate among those remaining LEP students on the April administration of the 2004-2005 TAKS exit exam was 81 percent, or more than 8 in 10. According to TEA data in 2004-2005, more than 8 out of 10 (84 percent) of Texas LEP students in Grade 7 failed to meet the state's standards on the TAKS test; more than 8 out of 10 (86 percent) of Texas LEP students in Grade 8 failed to meet the state's standards on the TAKS test; almost 9 out of 10 (87 percent) of Texas LEP students in Grade 9 failed to meet the state's standards on the TAKS test; and more than 9 in 10 (94 percent) of Texas LEP students in Grade 10 failed to meet the state's standards on the TAKS test.[140]

These English Language Learners ("ELLs") have been denied the opportunity to learn English, resulting in a substantial impairment in their ability to be fully literate without receiving assistance in Spanish.  They join hundreds of thousands of other LEP Texans who also suffer the lingering effects of educational discrimination, and who will be denied meaningful participation in the voting process without adequate language assistance.

### D.    High Illiteracy Rates among LEP Citizens

Texas' long history of unequal education has also resulted in depressed literacy and graduation rates for many LEP Texans.

According to the 2000 Census, the following numbers of voting age citizens in Texas do not have a high school diploma: nearly 1.2 million Latino voting age citizens, (approximately 40 percent of all Latino voting age citizens in Texas); more than 43,000 Asian voting age citizens (16.5 percent of all Asian voting age citizens); and nearly 33,000 American Indian voting age citizens (approximately 22 percent of all American Indian voting age citizens).[141]  Access to higher education for Texas' minority residents has also been restricted by unequal opportunity.  Just 9 percent of all Latino voting age citizens in Texas have a four-year college degree.  In sharp contrast, 86.5 percent of all Anglo voting age citizens have a high school diploma and over 27.5 percent have a four-year college degree.[142]  As late at 1993, the state of Texas settled a court challenge to its failure to provide equal higher educational opportunities to residents in South Texas by

---

[140] Texas Education Agency Division of Performance Reporting Academic Excellence Indicator System 2004-2005 State Performance Report available at http://www.tea.state.tx.us/perfreport/aeis/2005/state.html.
[141] *See* 2000 Census, sampled data files, available at http://advancedquery.census.gov <http://advancedquery.census.gov/ > .
[142] *Id.*

agreeing to improve University of Texas System schools in Brownsville, Edinburg, San Antonio, and El Paso, and newly acquired Texas A&M University System branches in Corpus Christi, Laredo, and Kingsville.[143]

The failure of Texas to educate LEP students in the public schools has contributed to high illiteracy rates among minority voters in Texas.  The illiteracy rate (defined as the percent who have less than a fifth-grade education) for LEP Latino voting-age citizens is an extraordinarily high 19.46 percent.  This percentage equates to more than fourteen times the national illiteracy rate.

Illiteracy rates are particularly high in the state's most populous counties, and are the product of very high dropout rates.  For example,

- In Bexar County (San Antonio), the illiteracy rate among Latino voting-age citizens is 15.22 percent, over eleven times the national average.  About 32.7 percent (145,000) of Bexar County Latino voting-age citizens have not completed high school, with less than ten percent (43,685) having at least a four-year college degree.

- In Dallas County (Dallas), the illiteracy rate among LEP Latino voting-age citizens is 17.42 percent, nearly thirteen times the national average.  About 45.3 percent (82,858) of Dallas County Latino voting-age citizens have not completed high school, with only 8.8 percent (16,180) having at least a four-year college degree.

- In Tarrant County (Fort Worth), the illiteracy rate among LEP Latino voting-age citizens is 16.33 percent, more than twelve times the national average.  About 39.8 percent (42,231) of Tarrant County Latino voting-age citizens have not completed high school, with only 10.8 percent (11,507) having at least a four-year college degree.

- In Harris County (Houston), the illiteracy rate among LEP Latino voting-age citizens is 14.97 percent, over eleven times the national average.  About 42.5 percent (159,233) of Harris County Latino voting-age citizens have not completed high school, with only 9.2 percent (34,503) having at least a four-year college degree.[144]

Latino voting age citizens are not the only ones who suffer from high illiteracy rates as a result of educational discrimination and neglect in Texas.  In Maverick County, over 86 percent of LEP American Indian voting age citizens are low-literate.  Vietnamese LEP voting age citizens in Harris County have an illiteracy rate nearly six times the national

---

[143] See *Richards v. LULAC*, 868 S.W.2d 306 (1993) and description of *LULAC v. Richards* settlement in the Handbook of Texas online, *available at* http://www.tsha.utexas.edu/handbook/online/articles/MM/jom1.html
[144] *See* Dr. James Thomas Tucker & Rodolfo Espino, Minority Language Assistance Practices in Public Elections Appendix C (Mar. 2006).

illiteracy rate.

Appendix B summarizes the illiteracy numbers for Texas and the 103 separately covered counties, identifying the language group triggering coverage.  In light of these statistics, the importance of providing translated voting materials and election information cannot be understated.

###### E.   Non-Compliance with Sections 203 and 4(f)(4)

In 2005, MALDEF sent letters to 101 Texas counties covered by Section 203 requesting, under the Texas Open Records Act, copies of translated voting materials and information on language assistance in elections.  The letters called for voting related materials or election information relevant to determining whether covered counties in Texas are complying with the language minority provisions.  Requested materials included, but were not limited to, voter registration forms, official ballots, polling place notices related to voting locations, days and hours of voting, and the availability of Spanish speaking poll workers.[145]

Of the 101 requests for translated voting materials, 67 counties or 66 percent of Texas counties responded to MALDEF's request.  Of the 67 counties that responded to the request for records, 47 (70 percent) failed to demonstrate that they provided voter registration forms, a ballot, a provisional ballot and written voting instructions in Spanish.  Of the counties that could demonstrate provision of some basic language assistance to voters, only one could show that it complied fully with the requirements of Section 203.

In addition, a substantial amount of Spanish language voting materials provided by covered counties to MALDEF were characterized by incomplete and inaccurate translations, including misplaced gender identifiers, and misspellings.  For example, one Texas county failed to translate on the ballot the political offices for which the election was being held.  In another county, a notice directing voters to contact the county clerk for additional election information did not translate the term "county clerk."

The survey indicates widespread non-compliance with the requirements of Section 203.

---

[145] The Voting Rights Act Open Records Checklist used by MALDEF can be found as an appendix to this report. In its request, MALDEF asked for copies of translated:  voter registration forms; official ballot; application to vote a ballot by mail; written instructions provided to voters who were sent a ballot by mail; Help America Vote Act (HAVA) identification requirements; provisional ballot instructions; election-related material mailed to voters; sample ballot; written voting instructions provided at the polls; notices related to election law provided at the polls; polling place notice informing voters of the availability of Spanish language assistance; polling place notices informing voters of the days and hours of voting; and election-related information published in newspapers, radio, and/or other media; election-related information published on the internet.  In addition, MALDEF requested information showing:  the polling places at which the county posted notices informing voters of the availability of Spanish language assistance to voters; the names of all Spanish-speaking county employees who respond to oral or written requests for election-related information; public notices and advertisements used by the county to recruit Spanish-speaking election judges and clerks; the names of Spanish-speaking election judges and clerks in the county; and all training offered to individuals who provide Spanish language assistance to voters.

In light of the failure of most covered counties to provide even the most basic materials guaranteeing access to the ballot for Spanish speaking voters, the provisions of Section 203 must be reauthorized.

### F.    Department of Justice Section 203 Enforcement Actions in Texas

The DOJ has become increasingly active in identifying violations of Section 4(f)(4) and 203 and bringing enforcement actions to remedy those violations.

In 2005 and 2006, the DOJ filed Section 203 enforcement lawsuits against Hale County and Ector County, Texas.[146]  In Ector County, the county conceded that it had not fully complied with the language minority provisions of the VRA and agreed to a consent decree.  This decree required the county to immediately implement a Spanish language program for minority voters and to use federal observers during elections to monitor compliance.

Opponents of Section 203 argue that naturalized American citizens must be able to speak English as a requirement of naturalization and that efforts to provide minority language voting information are unnecessary and expensive.  These arguments fail to account for the fact that some immigrants, particularly the elderly, may naturalize with a level of English proficiency that is often insufficient to be able to understand and vote a complex ballot.  Ballot language can be confusing even for native English speakers.

On February 27, 2006, the United States filed a complaint alleging that Hale County in Texas violated Section 203 of the Voting Rights Act of 1965.  The complaint alleged that Hale County violated Section 203 requirements by failing to provide an adequate number of bilingual poll workers trained to assist Spanish-speaking voters on election day and failing to effectively publicize election information in Spanish.  On the same day that the complaint was filed, the United States also filed a proposed consent decree agreement. The consent decree will allow the Department to monitor future elections in Hale County and will require the County to increase the number of bilingual poll workers, employ a bilingual coordinator, and establish a bilingual advisory group.[147]

On August 23, 2005, the United States filed a complaint alleging that Ector County in Texas violated Section 4(f)(4) of the Voting Rights Act.  As with Hale County, the complaint claimed that the County failed to provide an adequate number of bilingual workers to serve the county's Spanish-speaking population and failed to effectively publicize information to the Spanish-speaking community.  On the same day that the complaint was filed, the United States also filed a proposed consent decree agreement. The consent decree agreement, which was approved by a federal district judge on August 26, 2005, requires the county to establish an effective Spanish language program and authorizes the use of federal observers to monitor the county's elections.[148]

---

[146] U.S. Dep't of Justice: Civil Rights Div., *Litigation Brought by the Voting Section,* http://www.usdoj.gov/crt/voting/litigation/caselist.htm (last visited June 6, 2006).
[147] *Available at* http://www.usdoj.gov/crt/voting/litigation/recent203.htm#hale.
[148] *Available at* http://www.usdoj.gov/crt/voting/litigation/recent203.htm#ector.

The DOJ also intervened in Harris County, Texas, which includes the city of Houston. According to the 1990 and the 2000 Census, 1.7 percent of the county population was Vietnamese, and about half of these Vietnamese households are considered linguistically isolated.[149]  In 2002, Harris County was required under Section 203 to provide ballots in both Spanish and Vietnamese.  The county failed to arrange Vietnamese translations within the voting machines, and a plan to provide backup paper ballots was not implemented.  The DOJ intervened, and the county signed a Memorandum of Agreement outlining the steps by which it would comply with Section 203.  In the next election in 2004, Vietnamese turnout doubled, allowing the first Vietnamese candidate in history to be elected to the Texas Legislature (and defeating the incumbent chair of the Appropriations Committee by 16 votes out of over 40,000 cast).  A community leader involved in bringing the Vietnamese translations to Harris County testified that while the Asian American community is interested in working with the county to provide Chinese language translations as well, on a voluntary basis, the county is not '"enthusiastic"' about any accommodations not mandated by Section 203.[150]  If Section 203 were to expire, it is likely that some of the jurisdictions currently providing language accommodation would cease to do so.

The continuing need for Sections 4(f)(4) and 203 in Texas is clear.  These provisions have a substantial impact in increasing language minority registration and turnout, and ensuring the meaningful participation of Texas' language minority citizens in the electoral process.

## VII.   Conclusion

The Voting Rights Act has undoubtedly had a profound impact on securing the rights of minority voters to effectively exercise their franchise in many Texas jurisdictions with substantial histories of imposing barriers to minority voting power.  The reauthorization of the temporary provisions of the VRA for 25 years is crucial to ensuring that minority voters' voices will be heard in Texas, and to guard against the backsliding that would occur if the VRA's enforcement provisions were weakened or abandoned.

---

[149] Asian American Justice Center, A Community of Contrasts: Asian Americans and Pacific Islanders in the United States (2005).

[150] Testimony of Rogene Gee Calvert, National Commission on the Voting Rights Act, Southwest Regional Hearing (Tempe, AZ), April 7, 2005.

**Appendix A:  Section 5 Objections to Voting Changes in Texas since August 1982[151]**

| | | |
|---|---|---|
| Harris County School District (82-0519) | Election date | 10-4-82 |
| Pleasanton (Atascosa Cty.) (82-0025) | Numbered posts | 10-14-82 |
| Stockdale Independent School District (Wilson Cty.) (83-1188) | Numbered posts | 8-19-83 |
| Jefferson County (Beaumont and South Park Independent School Districts) (83-0785, 83-3379) | Dissolution of the Beaumont Independent School District; the creation of a common school district and its attachment to the South Park Independent School District | 10-20-83 |
| Pewitt Consolidated Independent School District (Cass, Morris, and Titus Ctys.) (83-0935) | Numbered posts | 12-27-83 |
| Wilmer-Hutchins Independent School District (Dallas Cty.) (84-0339) | Four polling place and absentee voting location changes | 4-2-84 |
| El Paso Independent School District (El Paso Cty.) (84-0391) | Implementation schedule for the election of board members | 11-9-84 |
| Rusk Independent School District (Cherokee Cty.) (83-0174) | Numbered posts | 1-18-85 |
| Liberty-Eylau Independent School District (Bowie Cty.) (84-0121) | Majority vote requirement | 2-26-85 |
| Dawson County (84-0343) | Bilingual election procedures | 8-6-85 |
| El Campo (Wharton Cty.) (84-1364) | 1975 imposition of numbered positions and a majority vote requirement, and the 1985 change to | 11-8-85 |

[151]   United States DOJ Voting Section home page, http://www.usdoj.gov/crt/voting/sec_5/tx_obj2.htm (last visited June 6. 2006).

| | the election of four councilmembers by single-member districts and three at large with a new staggering method | |
|---|---|---|
| Lynn County (85-0895) | Redistricting (justice of the peace and constable precincts); reduction in the number of justices and constables from five to two | 11-18-85 |
| Terrell County (85-0674) | Reduction in number of justices of the peace from four to one and the resulting at-large method of election | 1-13-86 |
| Plainview Independent School District (Hale Cty.) (86-0674) | Method of election and districting plan | 4-10-86 |
| El Campo (Wharton Cty.) (86-1633) | Two districting plans | 7-18-86 |
| Trinity Valley Community College District (Anderson, Henderson, Hunt, Kaufman and Van Zandt Ctys.) (86-0002) | Redistricting plan | 10-14-86 |
| Wharton Independent School District (Wharton Cty.) (86-1638) | Majority vote requirement | 12-29-86 |
| Marlin Independent School District (Falls Cty.) (87-0487) | Method of election; numbered positions and staggered terms for two at-large seats; implementation schedule | 6-22-87 |
| Crockett County (87-0300) | Chapter 2, S.B. No. 88 (1987)--to the extent that it proposes to use the at-large system with numbered positions for electing the board of directors for the newly created Crockett County Hospital District | 10-2-87 |
| Columbus Independent School District (Colorado and Austin Ctys.) (87-0025) | Numbered positions and majority vote requirement | 1-4-88 |
| Hondo Independent | Method of election; districting plan | 1-22-88 |

| | | |
|---|---|---|
| School District (Frio and Medina Ctys.) (87-0952) | | |
| Marshall Independent School District (Harrison Cty.) (87-0060) | Method of election; districting plan; majority-vote requirement for trustees elected from single-member districts; polling place consolidation | 4-18-88 |
| San Patricio County (87-1132) | Reduction in the number of justice of the peace and constable precincts and the districting plan adopted for its implementation | 6-14-88 |
| Jasper (Jasper Cty.) (88-0951) | Ordinance No. 3-88-1--annexation | 8-12-88 Withdrawn 12-24-91 upon change in method of election |
| Lynn County (85-0895) | Reduction in the number of justice of the peace and constable precincts from five to one | 9-26-88 |
| El Campo (Wharton Cty.) (88-1471) | Numbered positions and a majority-vote requirement for the at-large positions | 2-3-89 |
| Dallas County (88-0363) | Absentee voting procedures for the November 8, 1988, general election | 2-27-89 |
| Baytown (Chambers and Harris Ctys.) (88-0634) | Method of election (5-3-1); districting plan; increase in number of councilmembers from seven to nine; provision that the three at-large members other than the mayor will be elected from numbered positions to staggered terms | 3-20-89 |
| Refugio Independent School District (Refugio Cty.) (88-1251) | Method of election from seven trustees elected at large (with numbered posts and plurality win) to five single-member districts and two at-large positions (plurality win), the districting plan, an implementation schedule that includes staggered terms for the two at-large seats, and the selection of two polling places | 5-8-89 |
| Cuero (DeWitt Cty.) (89-0326) | Districting plan | 10-27-89 |
| Denver City (Yoakum Cty.) (88- | Adoption of numbered positions and a majority vote requirement for | 2-5-90 |

| 1530; 88-1533) | councilmanic elections | |
|---|---|---|
| Nolan County Hospital District (89-0794) | Method of election and districting plan, as contained in Senate Bill No. 315 (1989), for the board of directors of the newly created Nolan County Hospital District | 2-12-90 |
| San Patricio County (89-0874) | 1987 transfer of registration duties from the county clerk to the county tax assessor/collector | 5-7-90 |
| State (90-0015) | Chapter 632, S.B. No. 1379 (1989)--creation of fifteen additional judicial districts and the implementation schedule | 11-5-90 Clarified 11-20-90 to limit objection to nine judgeships. Objection ruled untimely in Mexican American Bar Ass'n v. Texas, 755 F. Supp. 735 (W.D. Tex. 1990), appeal dismissed for want of jurisdiction, 500 U.S. 940 (1991) |
| Freeport (Brazoria Cty.) (90-0164) | Majority vote requirement | 11-13-90 |
| Grapeland (Houston Cty.) (90-0960) | Four annexations (March 27, 1990) | 12-21-90 Withdrawn 4-19-91, based on change in method of election |
| Dallas (Collin, Dallas, Denton, Kaufman & Rockwall Ctys.) (89-0245) | Charter amendments under Chapter XXIV, Section 21 (1-5), which provide for a delay of the regularly scheduled May 4, 1991, election and an implementation schedule therefore | 3-13-91 Withdrawn 8-2-91, based on change in method of election |
| Lubbock County Water Control and Improvement District No. 1 (Lubbock Cty.) (90-4938) | Selection of polling places for Precincts 2 and 3 | 3-19-91 |
| Refugio Independent School District (Refugio Cty.) (90-1268) | Method of electing the school board from at large to five single-member districts and two at large, the concurrent election of the at-large seats by numbered position, the districting plan and the implementation schedule | 4-22-91 |

| | | |
|---|---|---|
| Dallas (Collin, Dallas, Denton, Kaufman and Rockwall Ctys.) (89-0245, 91-0642) | Redistricting plans and the proposed charter amendments establishing the 10-4-1 method of election and changing the definition of terms under the consecutive terms provisions for non-mayoral candidate eligibility | 5-6-91 |
| State (90-0003) | Chapter 206, S.B. No. 907 (1989), which provides for three alternative methods of election for hospital district governing boards (at large; at large with numbered posts; mixed single-member districts and at large) | 8-23-91 Withdrawn 8-4-92 following Texas Attorney General opinion interpreting the act to allow for straight single-member district method of election |
| Houston (Harris, Montgomery and Fort Bend Ctys.) (91-2353) | Redistricting plan | 10-4-91 |
| State (91-3395) | Texas House redistricting plan | 11-12-91 |
| Del Valle Independent School District (Travis Cty.) (91-3124) | Change in method of election to five trustees elected from single-member districts and two elected at large, the districting plan, and a polling place change | 12-24-91 |
| El Campo (Wharton Cty.) (91-0530) | Method of electing the at-large councilmembers (in a four district, three at-large method of election) involving the separate designation of one seat on the ballot and the adoption of a majority vote requirement for that seat | 1-7-92 |
| State (92-0070) | Senate redistricting plan (S.B. No. 1 (1992)) | 3-9-92 Declaratory judgment granted in Texas v. United States, No. 91-2383 (D.D.C. July 27, 1992) |
| State (92-0146) | Chapter 3, Section 8, H.B. No. 2 (1992), procedures for nomination of candidates by political party executive committees in the event that a different redistricting plan for either house of the legislature is used for the 1992 general election than was used for the primary | 3-10-92 |

| | | |
|---|---|---|
| Gregg County (91-3349) | Redistricting plan (commissioners court districts) | 3-17-92 |
| Calhoun County (91-3549) | Redistricting plan (commissioners court districts, and justice of the peace and constable districts) | 3-17-92 |
| Galveston County (91-3601) | Redistricting plan (justice of the peace/constable districts) | 3-17-92 |
| Castro County (91-3780) | 1991 redistricting plan (commissioners court districts) | 3-30-92 |
| Monahans-Wickett-Pyote Independent School District (Ward Cty.) (91-3272) | 1991 redistricting plan (trustee districts) | 3-30-92 |
| Ellis County (91-4250) | 1991 redistricting plan (commissioners court districts) | 3-30-92 |
| Lubbock Independent School District (Lubbock Cty.) (91-3910) | 1991 redistricting plan | 3-30-92 |
| Terrell County (91-4052) | 1991 redistricting plan (commissioners court districts) | 4-6-92 |
| Bailey County (91-3730) | 1991 redistricting plan (commissioner and justice of the peace/constable districts) | 4-6-92 |
| Cochran County (91-4049) | 1991 redistricting plan (commissioners court districts) | 4-6-92 |
| Hale County (91-4048) | 1991 redistricting plan (commissioners court districts) | 4-10-92 |
| Deaf Smith County (91-4051) | 1991 redistricting plan (commissioners court districts) | 4-10-92 |
| Gaines County (91-3990) | 1991 redistricting plan (commissioners court districts) | 7-14-92 |
| Wilmer (Dallas Cty.) (90-0393) | Use of numbered positions for city council elections | 7-20-92 |
| Del Valle Independent School District (Travis Cty.) (92-3482) | Method of election, districting plan, and the majority vote requirement for at-large position | 7-31-92 |
| Ganado (Jackson Cty.) (92-0319) | The adoption of numbered positions and staggered terms; and the | 8-17-92 Withdrawn 1-22-93, as to |

|  | implementation schedule | staggered terms |
|---|---|---|
| Castro County (92-4027) | 1992 redistricting plan (commissioners court districts) | 10-6-92 |
| Galveston (Galveston Cty.) (92-0136) | Method of election; four single-member districts and two at-large seats; the adoption of numbered posts | 12-14-92 |
| Atlanta Independent School District (Cass Cty.) (92-3754) | Method of election; five single-member districts and two at-large seats | 2-19-93 |
| Carthage Independent School District (Panola Cty.) (92-4890) | Method of election from seven members elected at large by numbered places and majority vote to five members elected from single-member districts and two at-large seats by numbered places with a majority vote requirement | 3-22-93 Withdrawn 1-3-94 |
| Corsicana Independent School District (Navarro Cty.) (92-4186) | Majority vote requirement for election of school board trustees | 3-22-93 |
| Lamesa (Dawson Cty.) (92-0907) | Majority vote requirement for election of mayor | 4-26-93 |
| Bailey County (93-0880) | Procedures for conducting the January 5, 1993, special local option election | 5-4-93 |
| Castro County (93-0917) | 1993 redistricting plan for the commissioners court | 5-10-93 |
| McCulloch County (93-0075) | 1991 redistricting plan for the commissioners court | 6-4-93 |
| Bailey County (93-0194) | Reduction in the number of justice of the peace and constable districts from four to one | 7-19-93 |
| Wharton County (92-5239) | Redistricting plans (commissioners court, justices of the peace/constables) | 8-30-93 |
| Edwards Underground Water District (93-2267) | Chapter 626 (1993)--dissolution of the Edwards Underground Water District with elected governing body, and its replacement by the Edwards Aquifer Authority with an appointed governing body | 11-19-93 |
| Marion County (93-3983) | Polling place change | 4-18-94 |

| State District Court (93-2585) | Chapter 1032 (1993)--creation of the 385th Judicial District Court in Midland County | 5-9-94 |
| Harris County Criminal Court at Law (Harris Cty.) (93-2664) | Chapter 318 (1993)--creates a fifteenth county criminal court at law judgeship | 5-31-94 |
| Fort Bend County Court at Law (Fort Bend Cty.) (93-2475) | Chapter 653 (1993)--creates a third county court at law judgeship | 5-31-94 |
| Mexia Independent School District (Limestone Cty.) (93-4623) | Method of election--five single-member districts and two at large | 6-13-94 |
| Tarrant County (94-3012) | Chapter 38 (1987)--creation of, and implementation schedule for, Tarrant County Criminal Court Nos. 7 through 10 | 8-15-94 |
| Edna Independent School District (Jackson Cty.) (94-0866) | Method of election--five single-member districts and two at large | 8-22-94 |
| Morton (Cochran Cty.) (94-1303) | Method of election--cumulative voting | 9-12-94 |
| San Antonio (Bexar Cty.) (94-2531) | Special election procedures--failure to comply with bilingual procedures | 10-21-94 |
| Karnes City (Karnes Cty.) (94-2366) | Increase in the number of officials from 2 to 5 insofar as the additional positions would be elected at large with staggered terms | 10-31-94 Withdrawn 10-23-95 |
| Gonzales County Underground Water Conservation District (Gonzales Cty.) (94-0333) | Districting plan | 10-31-94 |
| Judson Independent School District (Bexar Cty.) (94-4175) | Special bond election | 11-18-94 |
| State (94-4077) | Spanish language versions of registration forms and instructions | 2-17-95 |
| Edwards | Temporary use of punch card ballots | 3-2-95 |

| | | |
|---|---|---|
| Underground Water District (Bexar, Hays, and Comal Ctys.) (94-3902) | and the procedures relating thereto | |
| Andrews (Andrews Cty.) (94-2271) | Method of election from at-large by majority vote with numbered posts, staggered terms, and a 2-2-1 method of staggering to cumulative voting by plurality vote with numbered posts, staggered terms, and a 3-2 method of staggering | 6-26-95 Declaratory judgment entered 1-29-96, in City of Andrews v. Reno (D.D.C. 1995) |
| State (95-2017) | Chapter 797 (1995)--authorizes agency employees to make determinations of an individual's eligibility to register based on citizenship information contained in the agency's file | 1-16-96 |
| Webster (Harris Cty.) (96-1006) | Annexation (Ordinance No. 95-33) | 3-17-97 Withdrawn 4-7-98 |
| State (98-1365) | Procedure for filling prospective judicial vacancies | 9-29-98 Withdrawn 10-21-98 |
| Galveston (Galveston Cty.)(98-2149) | Method of election to four single-member districts and two at-large seats, the adoption of numbered posts for the at-large seats, the adoption of a majority vote requirement for the election of city officers, and the proposed redistricting criteria | 12-14-98 Withdrawn 02-04-02 |
| Lamesa (Dawson Cty.) (99-0270) | Deannexation by referendum of the property annexed under Ordinance No. 0-06-98 | 7-16-99 |
| Sealy Independent School District (Austin Cty.) (99-3823) | Numbered posts | 6-5-00 |
| Haskell Consolidated Independent School District (Haskell, Knox, and Throckmorton Ctys.) (2000-4426) | Cumulative voting with staggered terms | 9-24-01 |
| State (2001-2430) | Redistricting plan (House) | 11-16-01 |
| Waller County | 2001 redistricting plans for the | 6-21-02 |

| | | |
|---|---|---|
| (2001-3951) | commissioners court, justice of the peace and constable districts | |
| Freeport (Brazoria Cty) (2002-1725) | Method of electing city council members | 8-12-02 |
| North Harris Montgomery Community College District (2006-2240) | Reduction in polling places and early voting locations | 5-5-06 |

**Appendix B: Census Data from July 2002 Section 203(c) Coverage Determinations[152]**

Tables C-1 through C-4 were compiled from sampled data used by the Census Bureau to make its July 26, 2002 determinations under Section 203 of the Voting Rights Act. According to the Voting Rights Output File Documentation, the determination data was created from sampled weights of data from the Census 2000 long forms (Summary Table Files 3 and 4). The file contains records for the entire United States, including all states and political subdivisions, which are defined as "counties for all states except for Connecticut, Maine, Massachusetts, Michigan, New Hampshire, Rhode Island, Vermont, and Wisconsin" where political subdivisions are minor civil divisions ("MCDs") or MCD equivalents. There are 62 records in the file, including one each for total population and Spanish/Hispanic/Latino, one for American Indian/Alaskan Native and 42 for American Indian/Alaskan Natives tribal groups, one for Asian and 16 for Asian groups.

The Census Bureau has suppressed data for jurisdictions indicated by an asterisk ("*") to avoid disclosure of specific persons. According to Census documentation, "[t]his means that data in a record are suppressed if the unweighted count of voting age citizens for a record is less than 50 and the weighted population count for the record is not 0 or the unweighted population count for the record is not 0." The Census Bureau rounded data that has not been suppressed. Section 203 determinations are based on data prior to rounding and prior to suppression.

"LEP Number (N)" refers to the number of voting age citizens in the identified language group who are limited-English proficient, or "LEP." A person is LEP if they speak English less than "very well."

"LEP Percent (P)" refers to the percentage of voting age citizens in the identified language group who are LEP.

"Illiteracy Rate" refers to the percent of voting age citizens in the identified language group who are LEP and low-literate. According to the Census Bureau, "voting age limited-English proficient illiteracy" refers to all voting age citizens who are limited-English proficient and who have completed less than fifth grade. Jurisdictions are covered if they meet one of the population triggers and have an illiteracy rate among voting age citizens in a single language minority group that exceeds the national illiteracy rate of all voting age citizens of 1.35 percent.

"Coverage basis" refers to the population trigger resulting in Section 203 coverage. There are four different bases for coverage: "N" if the number of LEP voting age citizens in a single language group is more than 10,000; "P" if the percentage of LEP voting age citizens in a single language group is more than five percent of all voting age citizens; "RW" if an Alaskan Native or American Indian reservation is wholly located within the

---

[152] This summary and data is the Texas portion of data taken from Dr. James Thomas Tucker & Dr. Rodolfo Espino et al., MINORITY LANGUAGE ASSISTANCE PRACTICES IN PUBLIC ELECTIONS App. C (Mar. 2006) (summarizing the July 2002 Census determination).

jurisdiction and the percentage of LEP voting age citizens in a single language group is more than five percent of all voting age citizens on that reservation; and "RP" if an Alaskan Native or American Indian reservation is partially located within the jurisdiction and the percentage of LEP voting age citizens in a single language group is more than five percent of all voting age citizens on that reservation.  A jurisdiction can be covered for a single language group by multiple population triggers.

**Table B-1: Texas Jurisdictions Covered by Section 203 for Spanish Heritage**

## TEXAS

| Covered Jurisdiction | Number LEP (N) | Percent LEP (P) | Illiteracy Rate | Coverage Basis |
|---|---|---|---|---|
| State of Texas[†][*] | 818185 | 6.15 | 19.46 | P |
| Andrews County | 585 | 7.22 | 29.91 | P |
| Atascosa County | 3985 | 15.62 | 25.35 | P |
| Bailey County | 330 | 8.26 | 21.21 | P |
| Bee County | 3335 | 13.58 | 21.44 | P |
| Bexar County | 98165 | 10.65 | 15.22 | N, P |
| Borden County | * | * | * | P |
| Brewster County | 620 | 9.48 | 31.45 | P |
| Brooks County | 1540 | 29.39 | 24.03 | P |
| Caldwell County | 1790 | 8.06 | 21.51 | P |
| Calhoun County | 935 | 6.79 | 27.81 | P |
| Cameron County | 46875 | 26.84 | 25.05 | N, P |
| Castro County | 620 | 12.34 | 35.48 | P |
| Cochran County | 295 | 12.66 | 32.20 | P |
| Concho County | 265 | 8.14 | 24.53 | P |
| Crane County | 210 | 8.64 | 19.05 | P |
| Crockett County | 415 | 15.34 | 15.66 | P |
| Crosby County | 580 | 12.17 | 29.31 | P |
| Culberson County | 420 | 22.52 | 38.10 | P |
| Dallas County | 53985 | 4.17 | 17.42 | N |
| Dawson County | 1270 | 11.64 | 40.16 | P |
| Deaf Smith County | 1650 | 14.66 | 30.61 | P |
| DeWitt County | 890 | 5.94 | 34.83 | P |
| Dimmit County | 1950 | 29.84 | 34.87 | P |
| Duval County | 2500 | 27.65 | 22.40 | P |
| Ector County | 6775 | 8.75 | 18.97 | P |
| Edwards County | 230 | 15.70 | 32.61 | P |
| El Paso County | 85400 | 23.12 | 16.00 | N, P |
| Fisher County | 185 | 5.70 | 43.24 | P |
| Floyd County | 555 | 10.85 | 32.43 | P |
| Frio County | 2360 | 21.17 | 25.42 | P |
| Gaines County | 895 | 10.94 | 30.17 | P |
| Garza County | 365 | 10.80 | 10.96 | P |
| Glasscock County | 45 | 5.45 | 33.33 | P |
| Goliad County | 350 | 6.99 | 31.43 | P |
| Gonzales County | 1085 | 8.85 | 29.03 | P |

---

[†] All 254 counties and their political subdivisions are covered as a result of statewide coverage of Texas.

[*] Loving County apparently was inadvertently included by the Census Bureau in its coverage determination. Census data indicates it is only flagged for statewide coverage. Therefore, it is excluded from this table.

## TEXAS (CONT.)

| Covered Jurisdiction | Number LEP (N) | Percent LEP (P) | Illiteracy Rate | Coverage Basis |
|---|---|---|---|---|
| Guadalupe County | 3540 | 5.79 | 20.34 | P |
| Hale County | 2625 | 10.97 | 27.43 | P |
| Hall County | 130 | 5.06 | 23.08 | P |
| Hansford County | 180 | 5.41 | 22.22 | P |
| Harris County | 107915 | 5.49 | 14.97 | N, P |
| Hidalgo County | 75255 | 27.86 | 26.04 | N, P |
| Hockley County | 1285 | 8.29 | 33.07 | P |
| Howard County | 1945 | 8.08 | 17.74 | P |
| Hudspeth County | 355 | 23.13 | 22.54 | P |
| Irion County | 75 | 5.88 | 33.33 | P |
| Jeff Davis County | 170 | 10.97 | 26.47 | P |
| Jim Hogg County | 1025 | 29.50 | 27.80 | P |
| Jim Wells County | 5530 | 20.99 | 19.26 | P |
| Karnes County | 1505 | 12.85 | 30.56 | P |
| Kenedy County | 90 | 33.33 | 22.22 | P |
| Kinney County | 365 | 15.77 | 38.36 | P |
| Kleberg County | 3430 | 15.64 | 16.18 | P |
| Knox County | 210 | 7.05 | 38.10 | P |
| La Salle County | 1170 | 28.92 | 28.63 | P |
| Lamb County | 1135 | 11.52 | 33.92 | P |
| Live Oak County | 815 | 8.64 | 28.83 | P |
| Lubbock County | 9285 | 5.26 | 25.20 | P |
| Lynn County | 495 | 11.47 | 33.33 | P |
| Madison County | 540 | 5.50 | 6.48 | P |
| Martin County | 320 | 10.88 | 40.63 | P |
| Matagorda County | 1385 | 5.64 | 31.77 | P |
| Maverick County | 8530 | 41.87 | 19.87 | P |
| McMullen County | 60 | 9.68 | 25.00 | P |
| Medina County | 2920 | 10.75 | 23.46 | P |
| Menard County | 145 | 8.41 | 44.83 | P |
| Midland County | 4290 | 5.62 | 21.21 | P |
| Mitchell County | 765 | 10.06 | 21.57 | P |
| Moore County | 940 | 8.67 | 23.94 | P |
| Nolan County | 625 | 5.54 | 39.20 | P |
| Nueces County | 26190 | 12.18 | 20.41 | N, P |
| Parmer County | 655 | 11.47 | 32.82 | P |
| Pecos County | 1850 | 16.88 | 33.51 | P |
| Presidio County | 955 | 29.25 | 30.37 | P |
| Reagan County | 175 | 9.51 | 20.00 | P |
| Reeves County | 2110 | 25.65 | 29.15 | P |
| Refugio County | 540 | 9.52 | 35.19 | P |
| Runnels County | 525 | 6.46 | 24.76 | P |
| San Patricio County | 5740 | 12.68 | 29.18 | P |
| Schleicher County | 230 | 11.86 | 34.78 | P |

## TEXAS (CONT.)

| Covered Jurisdiction | Number LEP (N) | Percent LEP (P) | Illiteracy Rate | Coverage Basis |
|---|---|---|---|---|
| Scurry County | 660 | 5.52 | 35.61 | P |
| Starr County | 10050 | 44.47 | 24.08 | N, P |
| Sterling County | 75 | 8.11 | 46.67 | P |
| Sutton County | 375 | 14.34 | 29.33 | P |
| Swisher County | 430 | 7.44 | 32.56 | P |
| Tarrant County | 25350 | 2.71 | 16.33 | N |
| Terrell County | 70 | 9.66 | 21.43 | P |
| Terry County | 900 | 10.32 | 35.00 | P |
| Titus County | 1005 | 5.98 | 29.85 | P |
| Tom Green County | 4180 | 5.65 | 21.53 | P |
| Travis County | 19195 | 3.54 | 15.37 | N |
| Upton County | 260 | 11.85 | 36.54 | P |
| Uvalde County | 3245 | 19.99 | 29.43 | P |
| Val Verde County | 5740 | 23.07 | 24.22 | P |
| Victoria County | 3915 | 6.78 | 25.03 | P |
| Ward County | 785 | 10.84 | 24.84 | P |
| Webb County | 33000 | 36.03 | 14.91 | N, P |
| Wharton County | 1450 | 5.22 | 29.66 | P |
| Willacy County | 3875 | 30.96 | 32.26 | P |
| Wilson County | 1675 | 7.45 | 22.69 | P |
| Winkler County | 460 | 10.53 | 36.96 | P |
| Yoakum County | 390 | 9.08 | 25.64 | P |
| Zapata County | 1940 | 29.24 | 23.97 | P |
| Zavala County | 2860 | 40.92 | 30.42 | P |

### Table B-2: Texas Jurisdictions Covered by Section 203 for American Indian Languages

**TEXAS**

| Covered Jurisdiction | Covered Language | Indian Reservation (RP or RW) | Number LEP (L) | Percent LEP (P) | Illiteracy Rate | Coverage Basis |
|---|---|---|---|---|---|---|
| El Paso County | Pueblo | Ysleta Del Sur Pueblo and Off-Reservation Trust Land | 40 | 24.24 | 10 | RP |
| Maverick County | Other American Indian | Kickapoo (TX) Reservation | 145 | 59.18 | 86.21 | RP |

**Table B-3: Texas Counties Covered by Section 203 for Asian Languages**

### TEXAS

| Covered Jurisdiction | Covered Asian Languages | Number LEP (N) | Percent LEP (P) | Illiteracy Rate | Coverage Basis |
|---|---|---|---|---|---|
| Harris County | Vietnamese | 16970 | 0.86 | 7.81 | N |