**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

---

| | |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, JANE DOE, JOHN DOE, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), and DALLAS COUNTY, TEXAS,  )<br><br>    *Plaintiffs,*  )<br><br>v.  )<br><br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State,  )<br><br>    *Defendants.*  ) | CIVIL ACTION NO. 2:13-CV-193 (NGR) [Lead case] |
| UNITED STATES OF AMERICA,  )<br><br>    *Plaintiff,*  )<br><br>v.  )<br><br>STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE MCCRAW, in his official capacity as Director of the Texas Department of Public Safety,  )<br><br>    *Defendants.*  ) | CIVIL ACTION NO. 2:13-CV-263 (NGR) [Consolidated case] |
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES,  )<br><br>    *Plaintiffs,*  )<br><br>v.  )<br><br>JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE MCCRAW, in his official capacity as Director of the Texas Department of Public Safety,  )<br><br>    *Defendants.*  ) | CIVIL ACTION NO. 2:13-CV-291 (NGR) [Consolidated case] |

---

**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Summary of Argument ................................................................................ 1

Argument ................................................................................................... 3

    I.    The Claims Brought By Plaintiffs Carrier, Burns, Ozias, And Mellor-Crumley Must Be Dismissed For Failing To Properly Allege An Article III "Case[]" Or "Controvers[y]." ................................ 3

        A.    Carrier Fails To Allege An Article III Injury. ............................ 4

        B.    Burns, Ozias, And Mellor-Crumley Fail To Allege An Article III Injury. ................................................................. 5

    II.    "John Doe" And "Jane Doe" Must Be Dismissed From The Case Because There Is No Justification For Anonymous Litigation. ............. 6

    III.    The Organizations, Elected Officials, Community Organizers, And Dallas County Have No Third-Party Standing To Assert The Voting Rights Of Others. ................................................................. 9

        A.    The Organizations, Elected Officials, Community Organizers, And Dallas County Fail To Allege Or Demonstrate That Voters Who Lack Photo Identification Will Encounter "Hindrances" To Suing To Advance Their Own Rights. ................................................................. 10

        B.    The Organizations, Elected Officials, Community Organizers, And Dallas County Fail To Allege Or Demonstrate A "Close Relation" With Voters Who Lack Photo Identification. ................................................................. 10

    IV.    The Organizations, Elected Officials, Community Organizers, And Dallas County Have No Cause Of Action To Challenge Senate Bill 14. ................................................................. 12

    V.    The Plaintiffs' ID-Disparity Theory Fails To State A Claim On Which Relief Can Be Granted. ................................................................. 16

        A.    Senate Bill 14 Does Not "Deny" Or "Abridge" The Right To Vote. ................................................................. 18

B.  Senate Bill 14 Does Not "Result" In A Denial Or Abridgement Of The Right To Vote "On Account Of Race Or Color," Or "Because" Of One's Membership In A Language-Minority Group...........................................................21

1.  The text of section 2 does not prohibit laws that merely have a disparate impact on racial or language minorities. .....................................................21

2.  Federal courts of appeals have uniformly rejected the notion that section 2 prohibits voting laws that merely impose a disparate impact on minorities.............23

3.  The plaintiffs' construction of section 2 must be rejected because it would require every voting law to have a racially symmetrical impact. .............................24

C.  States Have A Constitutionally Protected Prerogative To Enforce Voter-Identification Requirements For State And Federal Elections, So Long As They Do Not Violate The Restrictions Imposed By The Fifteenth, Nineteenth, Twenty-Fourth, And Twenty-Sixth Amendments......................26

VI.  The Plaintiffs' Allegations Of Racially Discriminatory Purpose Fail To State A Claim On Which Relief Can Be Granted....................28

VII.  The Remaining Claims Brought By The Veasey Plaintiffs Fail To State A Claim On Which Relief Can Be Granted. ...........................30

VIII.  Steve McCraw And Rick Perry Must Be Dismissed From The Case. ................................................................................................31

A.  Plaintiffs Lack Standing To Sue Steve McCraw. .......................31

B.  Governor Perry Must Be Dismissed From The Case. ................32

Conclusion.........................................................................................................34

Certificate of Service.........................................................................................37

# TABLE OF AUTHORITIES

## Cases

*1st Westco Corp. v. School Dist. of Phila.*,
    6 F.3d 108 (3d Cir. 1993) ................................................................................. 34

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ......................................................................................... 13

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    133 S. Ct. 2247 (2013) ............................................................................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................... 3, 28, 30

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................... 3, 28, 30

*Bd. of Trustees of the Univ. of Ala. v. Garrett*,
    531 U.S. 356 (2001) ......................................................................................... 27

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ......................................................................................... 27

*Brown v. Detzner*,
    895 F. Supp. 2d 1236 (M.D. Fla. 2012) ........................................................... 24

*Brunner v. Ohio Republican Party*,
    555 U.S. 5 (2008) ............................................................................................. 13

*Children's Healthcare is a Legal Duty, Inc. v. Deters*,
    92 F.3d 1412 (6th Cir. 1996) ........................................................................... 34

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ..................................................................................... 3

*Coon v. Ledbetter*,
    780 F.2d 1158 (5th Cir. 1986) ................................................................... 15, 16

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ................................................................................ *passim*

*Davis v. Passman*,
    442 U.S. 228 (1979) ......................................................................................... 12

*Doe v. Blue Cross & Blue Shield United,*
   112 F.3d 869 (7th Cir. 1997) ............................................................................ 6

*Doe v. City of Chicago,*
   360 F.3d 667 (7th Cir. 2004) ............................................................................ 8

*Doe v. Frank,*
   951 F.2d 320 (11th Cir. 1992) .......................................................................... 8

*Doe v. Sheriff of DuPage Cnty.,*
   128 F.3d 586 (7th Cir. 1997) ............................................................................ 8

*Doe v. Smith,*
   429 F.3d 706 (7th Cir. 2005) ............................................................................ 8

*Doe v. Stegall,*
   653 F.2d 180 (5th Cir. Unit A Aug. 1981) ................................................. 6, 7

*Domino's Pizza, Inc. v. McDonald,*
   546 U.S. 470 (2006) ....................................................................................... 13

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.,*
   438 U.S. 59 (1978) ......................................................................................... 11

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades*
   *Council,* 485 U.S. 568 (1988) .................................................................. 18, 25

*Fitts v. McGhee,*
   172 U.S. 516 (1899) ....................................................................................... 33

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) ......................................................................................... 4

*Horne v. Flores,*
   557 U.S. 433 (2009) ....................................................................................... 13

*INS v. St. Cyr,*
   533 U.S. 289 (2001) ................................................................................. 18, 25

*Katzenbach v. Morgan,*
   384 U.S. 641 (1966) ....................................................................................... 27

*Kimel v. Fla. Bd. of Regents,*
   528 U.S. 62 (2000) ......................................................................................... 27

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ................................................................................... 9, 10

v

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) ........................................................................... 31

*Lytle v. Griffith,*
 240 F.3d 404 (4th Cir. 2001) .......................................................... 34

*Mazurek v. Armstrong,*
 520 U.S. 968 (1997) ........................................................................... 30

*McDonald v. Santa Fe Trail Transp. Co.,*
 427 U.S. 273 (1976) ........................................................................... 24

*City of Mobile v. Bolden,*
 446 U.S. 55 (1980) .............................................................................. 26

*Monsanto Co. v. Geertson Seed Farms,*
 130 S. Ct. 2743 (2010) ........................................................................ 3

*Morse v. Republican Party of Va.,*
 517 U.S. 186 (1996) ........................................................................... 13

*Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott,*
 647 F.3d 202 (5th Cir. 2011) ............................................................ 4

*NLRB v. Catholic Bishop of Chicago,*
 440 U.S. 490 (1979) ..................................................................... 18, 25

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw,*
 719 F.3d 338 (5th Cir. 2013) ............................................................ 4

*Okpalobi v. Foster,*
 244 F.3d 405 (5th Cir. 2001) ............................................... 31, 32, 33

*Oregon v. Mitchell,*
 400 U.S. 112 (1970) ........................................................................... 27

*Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.,*
 28 F.3d 306 (3d Cir. 1994) .......................................................... 23, 24

*Rizzo v. Goode,*
 423 U.S. 362 (1976) ..................................................................... 15, 16

*Shaw v. Garrison,* 545 F.2d 980 (5th Cir. 1977), *rev'd on other grounds*
 *sub nom. Robertson v. Wegmann,* 436 U.S. 584 (1978) .............. 15, 16

*Snoeck v. Brussa,*
 153 F.3d 984 (9th Cir. 1998) .......................................................... 34

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .................................................................. 22

*S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*,
    599 F.2d 707 (5th Cir. 1979) ............................................................ 7

*United States v. McElveen*,
    177 F. Supp. 355 (E.D. La. 1959) .................................................... 28

*United States v. Microsoft Corp.*,
    56 F.3d 1448 (D.C. Cir. 1995) .......................................................... 7

*Warth v. Seldin*,
    422 U.S. 490 (1975) ....................................................... 3, 9, 10, 11

*Washington v. Davis*,
    426 U.S. 229 (1976) .................................................................. 26

*Wesley v. Collins*,
    791 F.2d 1255 (6th Cir. 1986) ................................................. 23, 24

*Wygant v. Jackson Bd. of Educ.*,
    476 U.S. 267 (1986) .................................................................. 24

## Constitutions, Statutes, Rules, and Regulations

### Federal

U.S. CONST. art. I, § 2, cl. 1 .......................................................... 18, 27

U.S. CONST. amend. XIV, § 2 ............................................................ 18

U.S. CONST. amend. XIV, § 5 ............................................................ 26

U.S. CONST. amend. XV ................................................................... 21

U.S. CONST. amend. XV, § 2 ............................................................. 26

28 U.S.C. § 2201(a) .................................................................. 14, 16

42 U.S.C. § 1973 ....................................................................... 31

42 U.S.C. § 1973(a) ................................................................. 17, 21

42 U.S.C. § 1973b(f)(2) ............................................................. 17, 21

42 U.S.C. § 1973j(d) ................................................................... 13

42 U.S.C. § 1973*l*(c) .............................................................. 26

42 U.S.C. § 1983 .................................................................... 14

FED. R. CIV. P. 10(a) ......................................................... 2, 6, 8

FED. R. CIV. P. 12(b) ............................................................... 1

**Texas**

TEX. CONST. art. IV, § 1 ......................................................... 32

1 TEX. ADMIN. CODE § 81.71(c) ................................................. 6

25 TEX. ADMIN. CODE § 181.22 ............................................ 20, 29

25 TEX. ADMIN. CODE § 181.22(c) .............................................. 29

38 Tex. Reg. 7307 (2013) .................................................... 20, 29

Senate Bill 14 § 1 ..................................................................... 4

Senate Bill 14 § 9(c) ................................................................. 5

TEX. ELEC. CODE § 31.003 ......................................................... 4

TEX. ELEC. CODE § 63.001(b) .................................................... 18

TEX. ELEC. CODE § 63.001(c) ................................................. 5, 6

TEX. ELEC. CODE § 63.001(g) .................................................... 20

TEX. ELEC. CODE § 63.001(h) ..................................................... 4

TEX. ELEC. CODE § 63.0101(1) ................................................. 18

TEX. TRANSP. CODE § 521A.001 ............................................ 18, 20

**Other Authorities**

David P. Currie, *Misunderstanding Standing,*
      1981 SUP. CT. REV. 41 ...................................................... 15

Frank H. Easterbrook, *Criminal Procedure as a Market System,*
      12 J. LEGAL STUD. 289 (1983) ............................................ 12

Lior Jacob Strahilevitz, *Pseudonymous Litigation,*
      77 U. CHI. L. REV. 1239 (2010) ............................................. 7

TEXAS SECRETARY OF STATE, NO. 2013-13, ELECTION ADVISORY:
ACCEPTABLE FORMS OF PHOTO IDENTIFICATION (2013)......................................4

*Texas Statewide Survey*, UNIVERSITY OF TEXAS & TEXAS TRIBUNE (FEB.
2011), http://s3.amazonaws.com/static.texastribune.org/media/
documents/uttt-SummaryDoc-day3.pdf ...........................................................1

Defendants the State of Texas, Rick Perry (in his official capacity), John Steen (in his official capacity) and Steve McCraw (in his official capacity) move to dismiss all of the complaints filed in these consolidated cases. *See* FED. R. CIV. P. 12(b).

Voter-identification laws are constitutional. The Supreme Court so held in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and even apart from *Crawford* the Constitution permits the States to determine the qualifications of voters in state and federal elections, *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2253-54, 2257-58 (2013). And the plaintiffs make no plausible allegation of racism. The Texas Legislature enacted the State's voter-identification law for good and obvious reasons. Contemporaneous polling at the time Senate Bill 14 was passed showed that nearly three-fourths of Texas voters approved of voter identification. *See Texas Statewide Survey*, UNIVERSITY OF TEXAS & TEXAS TRIBUNE (FEB. 2011), http://s3.amazonaws.com/static.texastribune.org/media/documents/uttt-SummaryDoc-day3.pdf. And it did so in response to the Supreme Court's approval of voter-identification laws as a valid method for promoting public confidence in the election process and deterring voter fraud. *See Crawford*, 553 U.S. at 194-98. Each of the complaints should be dismissed.

## SUMMARY OF ARGUMENT

None of the plaintiffs has stated a claim on which relief can be granted, and many of them lack standing to challenge Senate Bill 14.

First, several of the plaintiffs have failed to allege an injury in fact under Article III. Second, the "John Doe" and "Jane Doe" plaintiffs have no basis for suing

anonymously; they must disclose their names or face dismissal from the case.  *See* Fed. R. Civ. P. 10(a).  Third, even if each of the plaintiffs can allege Article III standing, the organizations, elected officials, community organizers, and Dallas County lack standing to assert the third-party rights of voters.  Fourth, even if those plaintiffs can allege both Article III standing and third-party standing, they have no cause of action to assert the third-party rights of voters.  The only private litigants who may challenge Senate Bill 14 are those who allege that its voter-identification requirement violates *their own* right to vote.

To the extent the Court can reach the merits, each of the plaintiffs' claims must be dismissed for failing to state a claim on which relief can be granted.  Even if one accepts as true the plaintiffs' factual allegation that racial and language minorities "disproportionately lack" photo identification, section 2 of the Voting Rights Act does not prohibit States from enacting voter-identification laws in these circumstances.  To begin, a requirement to obtain and present photo identification does not even qualify as a "denial" or "abridgment" of the right to vote, because anyone who lacks photo identification can get an election-identification certificate that Texas offers free of charge.  *See Crawford*, 553 U.S. at 198.  Even if this requirement were a "denial" or "abridgment," it does not deny or abridge the right to vote "on account of" race or color, or "because" of membership in a language-minority group.  Finally, any construction of section 2 that prohibits States from enacting voter-identification laws such as Senate Bill 14 violates the

constitutionally protected prerogative of States to establish voter qualifications in state and federal elections.  *See Inter Tribal Council*, 133 S. Ct. at 2257-59.

The plaintiffs' allegations of racially discriminatory purpose also fail to state a claim on which relief can be granted.  The Supreme Court held in *Crawford* that voter-identification laws are a legitimate device for ensuring the integrity of the State's elections and preventing voter fraud, and the plaintiffs' allegations of racism fail to satisfy the plausibility standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009).  The remaining claims brought by the Veasey plaintiffs are foreclosed by *Crawford* and should be promptly dismissed.

## ARGUMENT

### I.   THE CLAIMS BROUGHT BY PLAINTIFFS CARRIER, BURNS, OZIAS, AND MELLOR-CRUMLEY MUST BE DISMISSED FOR FAILING TO PROPERLY ALLEGE AN ARTICLE III "CASE[]" OR "CONTROVERS[Y]."

Article III's case-or-controversy requirement obliges a plaintiff to allege an injury in fact that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010).  A complaint must allege clear, concrete facts that demonstrate Article III standing; conclusory assertions will not suffice.  *See Warth v. Seldin*, 422 U.S. 490, 518 (1975) ("It is the responsibility of the complainant *clearly to allege facts demonstrating* that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.") (emphasis added); *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1150 n.5 (2013) ("[P]laintiffs bear the burden of *pleading and proving*

3

*concrete facts* showing" Article III standing.) (emphasis added).  Plaintiffs Carrier, Burns, Ozias, and Mellor-Crumley have not carried their burden of establishing that they have Article III standing to challenge Senate Bill 14.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990); *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208-09 (5th Cir. 2011).[1]

### A.    Carrier Fails To Allege An Article III Injury.

Plaintiff Floyd James Carrier has pleaded himself out of court by acknowledging that he possesses "Veterans Administration photo ID."  Veasey 1st Am. Compl. ¶ 8(b).  Veterans Administration photo identification qualifies as acceptable identification under the Secretary of State's authoritative construction of Senate Bill 14.  *See* Texas Secretary of State, No. 2013-13, Election Advisory: Acceptable Forms of Photo Identification (2013); *see also* Tex. Elec. Code § 31.003 (authorizing the Secretary of State to provide authoritative interpretations of the State's election code).  He therefore has not been injured by Senate Bill 14 and has no Article III standing to challenge it.  Carrier also fails to allege injury in fact because Senate Bill 14 exempts voters with disabilities from presenting photo identification when appearing to vote at the polls.  *See* Senate Bill 14, § 1; Tex. Elec. Code § 63.001(h); *see also* Veasey 1st Am. Compl. ¶ 7(b) ("[Plaintiff Carrier] is

---

[1] We have flagged these obvious standing deficiencies because although federal courts can "*avoid* complex questions of standing in cases where the standing of others makes a case justiciable, it does not follow that . . . a court that *knows* that a party is without standing [can] nonetheless allow that party to participate in the case."  *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013) (emphasis in original).

physically disabled (wheel-chair bound)."); *id*. ¶ 8(b) ("Plaintiff Carrier is a disabled Army veteran . . . .").

### B. Burns, Ozias, And Mellor-Crumley Fail To Allege An Article III Injury.

Plaintiffs Anna Burns, Koby Ozias, and John Mellor-Crumley fail to allege an injury in fact because Senate Bill 14 does not require that the name on the voter's photo identification match the name on his or her voter-registration certificate. The names need only be "substantially similar."  *See* Senate Bill 14 § 9(c); TEX. ELEC. CODE § 63.001(c).  Burns, Ozias, and Mellor-Crumley do not allege that the name appearing on their photo identification is not "substantially similar" to the name on their voter-registration certificate; indeed, none of these plaintiffs even describes the alleged discrepancy.  Alleging the lack of an exact match is not sufficient to plead an Article III injury.

Burns does not say whether her discrepancy is the result of maiden and married names, although the complaint implies that this is so.  *See* Veasey 1st Am. Compl. ¶ 10.  Regulations issued by the Secretary of State address this situation:

> A voter's name on the presented ID document is considered substantially similar to the name on the official list of registered voters and a voter's name on the official list of registered voters is considered substantially similar to the name on the presented ID document if one or more of the circumstances in paragraphs (1)-(4) of this subsection are present. . . . :
>
> . . . .
>
> (3) The voter's name on the presented ID document contains an initial, a middle name, *or a former name* that is not on the official list of registered voters or the official list of registered voters contains an initial, a middle name, *or a former name* that is not on the presented ID document. . . .

1 TEX. ADMIN. CODE § 81.71(c) (emphases added); *see also* TEX. ELEC. CODE § 63.001(c) (calling for "standards adopted by the secretary of state [for determining whether] the voter's name on the documentation is substantially similar to but does not match exactly with the name on the list"). The complaint's allegation that women with maiden and married names will suffer a "disfranchising [sic] effect" from Senate Bill 14 is patently untrue given these rules that protect voters with former names. Veasey 1st Am. Compl. ¶ 10.

Burns, Ozias, and Mellor-Crumley must plead facts showing that the names on their photo identification and voter-registration certificate are not "substantially similar" under the standards established by the Secretary of State. They cannot survive a motion to dismiss by concealing the nature of the discrepancy and refusing even to allege that the names are not "substantially similar."

## II.   "JOHN DOE" AND "JANE DOE" MUST BE DISMISSED FROM THE CASE BECAUSE THERE IS NO JUSTIFICATION FOR ANONYMOUS LITIGATION.

The Federal Rules of Civil Procedure require all plaintiffs to disclose their names in the complaint. *See* FED. R. CIV. P. 10(a); *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. Unit A Aug. 1981); *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997) (Posner, J.). There are no grounds in this case for departing from Rule 10(a) and allowing "John Doe" and "Jane Doe" to challenge Senate Bill 14 anonymously. *See* Veasey 1st Am. Compl. ¶ 7(k)-(l).

Because Rule 10(a) requires plaintiffs to disclose their names and makes no allowance for anonymous litigation, a plaintiff may proceed under a pseudonym only when some higher source of law—such as a federal statute, the Constitution, or

a decision of the Fifth Circuit—compels a departure from the Rule's regime of disclosure.  No decision of the Fifth Circuit authorizes anonymous litigation in any situation remotely resembling this one.

The Fifth Circuit has permitted litigants to use pseudonyms in cases involving threats of violence, *see Stegall*, 653 F.2d at 186, or when disclosure of a litigant's name would reveal "matters of a sensitive and highly personal nature," *see S. Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 712 (5th Cir. 1979) (internal quotation marks and citation omitted).  That is not the situation here.  The plaintiffs are challenging a popular voter-identification law, but there is no risk that they will suffer threats of violence or disclosure of intimate details of their personal lives.  Plaintiffs Carrier, Burns, Ozias, Mellor-Crumley, and others have no such apprehensions about proceeding as named plaintiffs in this case.

A plaintiff cannot sue anonymously simply because he does not want his name disclosed to the public.  *See* Lior Jacob Strahilevitz, *Pseudonymous Litigation*, 77 U. Chi. L. Rev. 1239, 1244 (2010) (noting that plaintiffs "typically prefer to litigate pseudonymously whenever they can" because filing suit "signals [their] litigiousness to the world").  Courts have repeatedly held that the public has a right to know the names of litigants, an interest grounded in the First Amendment.  *See Stegall*, 653 F.2d at 185 ("First Amendment guarantees are implicated when a court decides to restrict public scrutiny of judicial proceedings."); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995) (per curiam) ("[P]arties to a

lawsuit must typically openly identify themselves in their pleadings to 'protect[ ] the public's legitimate interest in knowing all of the facts involved, including the identities of the parties.'") (quoting *Doe v. Frank*, 951 F.2d 320, 322 (11th Cir. 1992) (per curiam); *Blue Cross*, 112 F.3d at 872 ("Identifying the parties to the proceeding is an important dimension of publicness.  The people have a right to know who is using their courts."); *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) ("Judicial proceedings are supposed to be open, as these cases make clear, in order to enable the proceedings to be monitored by the public.  The concealment of a party's name impedes public access to the facts of the case, which include the parties' identity."); *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005) ("The public has an interest in knowing what the judicial system is doing, an interest frustrated when any part of litigation is conducted in secret.").  For this reason, anonymous litigation is "disfavored" and, "except when exceptional circumstances are present, all parties to a suit must be identified." *Doe v. Sheriff of DuPage Cnty.*, 128 F.3d 586, 587 (7th Cir. 1997).  No such "exceptional circumstances" are present here.

Disclosure of the plaintiffs' names is also compelled by due-process concerns. The defendants must be able to research whether John Doe and Jane Doe are registered to vote in Texas, whether they lack the photo identification needed to vote, and the lengths to which they would need to go to obtain photo identification. It is not acceptable for their claims to proceed on the say-so of their lawyers.  John Doe and Jane Doe must comply with Rule 10(a) and disclose their names, or else face dismissal of their claims.

### III. THE ORGANIZATIONS, ELECTED OFFICIALS, COMMUNITY ORGANIZERS, AND DALLAS COUNTY HAVE NO THIRD-PARTY STANDING TO ASSERT THE VOTING RIGHTS OF OTHERS.

Even if the organizations, elected officials, community organizers, and Dallas County meet their burden of establishing Article III standing, their claims must still be dismissed because they are all asserting that Senate Bill 14 violates *someone else*'s right to vote—not their own right to vote.  They do not have standing to assert these third-party rights.

The Supreme Court has long held that a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (internal quotation marks and citation omitted).  Litigants may assert the rights of third parties only when:  (1) the litigant has "a close relation to" the third party; *and* (2) there is some "hindrance" to the third party's ability to protect his or her own interests.  *See id.* at 130.  In addition, the complaint must clearly allege facts demonstrating that these criteria for third-party standing are met.  *See Warth*, 422 U.S. at 518 ("It is the responsibility of the complainant *clearly to allege facts demonstrating* that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.") (emphasis added).  The plaintiffs have failed to allege facts demonstrating their standing to assert third-party rights, as required by *Warth*, and in all events they cannot show that third-party standing is proper in this case.

**A.** **The Organizations, Elected Officials, Community Organizers, And Dallas County Fail To Allege Or Demonstrate That Voters Who Lack Photo Identification Will Encounter "Hindrances" To Suing To Advance Their Own Rights.**

A plaintiff cannot sue to vindicate the rights of third parties unless he clearly alleges and demonstrates that the third-party rights-holders face a "hindrance" to protecting their own rights. *See Kowalski*, 543 U.S. at 130; *Warth*, 422 U.S. at 518. The organizations, elected officials, community organizers, and Dallas County do not even allege that voters who lack photo identification face a "hindrance" to suing on their behalf. That alone warrants dismissal.

Even if they tried, the plaintiffs would be unable to demonstrate that some "hindrance" affects the ability of individual voters to sue on their own behalf. Any voter who suffers injury in fact as a result of Senate Bill 14 can sue to challenge it, and there is no shortage of capable and highly motivated attorneys willing to provide representation free of charge. Numerous plaintiffs in this case claim to lack photo identification and have encountered no obstacles to suing on their own behalf. Their presence in this case belies any possible claim of "hindrance" by the plaintiffs who want to assert rights belonging to others.

**B.** **The Organizations, Elected Officials, Community Organizers, And Dallas County Fail To Allege Or Demonstrate A "Close Relation" With Voters Who Lack Photo Identification.**

Even if the organizations, elected officials, community organizers, and Dallas County could somehow demonstrate that some "hindrance" affects the ability of individual voters to challenge Senate Bill 14, they must also allege and demonstrate a "close relation[]" with the third-party rights-holders. *See Kowalski*, 543 U.S. at

130; *Warth*, 422 U.S. at 518.   Once again, the plaintiffs do not allege anything regarding this criterion for third-party standing, seemingly unaware of their obligation under *Warth* to "clearly allege facts demonstrating" that the organizations, elected officials, community organizers, and Dallas County are "a proper party to invoke judicial resolution of the dispute." 422 U.S. at 518.

The organizations, elected officials, community organizers, and Dallas County are attempting to assert the rights of every person in their community who lacks photo identification—many of whom they have never even met.   Many of those voters oppose the elected officials who are purporting to sue on their behalf.   And many of those voters oppose the organizational goals of MALC, the NAACP, and the Texas League of Young Voters, and also oppose their stance on voter-identification laws.   There is no "close relation" between the individuals and entities who are suing in this case and the voters whose interests they claim to represent.

Third-party standing doctrine must also give individual voters autonomy to decide whether to invoke their federal rights against a law that was enacted for their benefit and protection.   *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80 (1978) (noting that one "reason[] for th[e] prudential limitation on standing when rights of third parties are implicated" is "the avoidance of the adjudication of rights which those not before the Court may not wish to assert").   Constitutional rights are an individual's own to assert, and voters who lack identification may decide that the assurance of knowing that Texas elections will be free of voter impersonation is worth more to them than the federal rights that they

could assert against Senate Bill 14. Criminal defendants, for example, have a constitutional right to a jury trial, yet they often waive that constitutional right in exchange for some nonconstitutional entitlement that they value more—such as a promise of reduced charges or a lighter sentence. *See generally* Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 J. LEGAL STUD. 289 (1983). Texas voters should have the same freedom to choose between their entitlements— without being told by the plaintiffs what they should prefer. The plaintiffs may not think that voters should place much value on the protections from voter impersonation that Senate Bill 14 confers, but they have no prerogative to make that decision for the voters of Texas.

## IV. THE ORGANIZATIONS, ELECTED OFFICIALS, COMMUNITY ORGANIZERS, AND DALLAS COUNTY HAVE NO CAUSE OF ACTION TO CHALLENGE SENATE BILL 14.

Even if the organizations, elected officials, community organizers, and Dallas County could somehow avoid these judicially imposed limits on third-party litigation, their claims must still be dismissed because they have no cause of action to challenge Senate Bill 14.

The cause-of-action inquiry is distinct from the question of standing. As the Supreme Court has explained, "*standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction," while "*cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979); *see also id.* (rebuking the Court of

Appeals for "confus[ing] the question of whether petitioner had standing with the question of whether she had asserted a proper cause of action"). Even plaintiffs who can surmount the Supreme Court's doctrinal restrictions on third-party standing must still point to a provision of law that authorizes them to sue.

The Voting Rights Act establishes a cause of action only for the Attorney General of the United States. *See* 42 U.S.C. § 1973j(d). To the extent that courts have derived an "implied cause of action" for private litigants to enforce section 2 of the Voting Rights Act, that cause of action can extend only to litigants who are asserting their *own* rights—not the rights of third parties.[2] The entire enterprise of creating "implied causes of action" is dubious, *see, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275 (2001), and its problems are exacerbated if a court-created cause of action is extended to litigants asserting the third-party rights of others. Federal civil-rights statutes typically allow only the rights-holder to sue under the statutory cause of action. *See, e.g.*, *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006). It is not tenable to assert that section 2—which contains *no* language authorizing private litigants to sue—contains an implied cause of action more expansive than the express causes of action established in other civil-rights statutes. Section 2 does

---

[2] Court decisions recognizing an "implied cause of action" that permits private plaintiffs to sue directly under the Voting Rights Act are inconsistent with recent Supreme Court rulings that prohibit courts from inventing private rights of action in this manner. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275 (2001); *Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008); *Horne v. Flores*, 557 U.S. 433, 456 n.6 (2009). We acknowledge, however, that Supreme Court decisions predating *Alexander* have permitted private litigants to sue directly under section 2—notwithstanding the absence of a cause of action in the language of the Voting Rights Act. *See, e.g.*, *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (collecting authorities). The State believes that those cases recognizing an "implied cause of action" should be reconsidered in light of *Alexander*, and wishes to preserve that contention for appeal.

not create an implied cause of action for anyone with Article III injury, as the plaintiffs appear to believe.

Nor can the organizations, elected officials, community organizers, and Dallas County use 42 U.S.C. § 1983 or the Declaratory Judgment Act to assert third-party claims. Neither of those statutes establishes a cause of action that would allow a litigant to assert the rights of non-litigant third parties. *See* 42 U.S.C. § 1983 (providing that every "person" who acts under color of state law and deprives another person of his constitutional or federal rights "shall be liable *to the party injured*") (emphasis added); 28 U.S.C. § 2201(a) (authorizing federal court to "declare the rights and other legal relations of *any interested party seeking such declaration*") (emphasis added).

Courts have long recognized that the text of section 1983 limits the class of permissible *defendants* to: (1) "person[s]," (2) who act "under color of" state law, and (3) who deprive others of "rights, privileges, or immunities" secured by "the Constitution and laws." 42 U.S.C. § 1983. But section 1983 also limits the class of *plaintiffs* who may invoke its cause of action. When a person acting under color of state law deprives "any citizen of the United States or other person within the jurisdiction thereof" of constitutional rights, the state officer "shall be liable *to the party injured*." *Id.* (emphasis added). That section 1983 deploys a definite article ("*the* party injured," not "*a* party injured") indicates that its description of the permissible plaintiffs refers back to its earlier description of the "citizen" or "person"

14

who has suffered the deprivation of his rights.  In the words of Professor Currie,

section 1983

> plainly authorizes suit by anyone alleging that he has been deprived of
> rights under the Constitution or federal law, *and by no one else*.  It
> thus incorporates, *but without exceptions*, the Court's "prudential"
> principle that the plaintiff may not assert the rights of third parties.

David P. Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41, 45 (emphases

added).  Only the rights-holder may sue as a plaintiff under section 1983; the

statutory language does not accommodate lawsuits brought by plaintiffs who seek

to vindicate the constitutional rights of third parties.

*Rizzo v. Goode*, 423 U.S. 362 (1976), recognizes that liability under section

1983 can attach only to conduct that violates *the complainant's* federally protected

rights—and not the rights of non-litigant third parties.  The *Rizzo* Court explained

that "[t]he plain words of the statute impose liability whether in the form of

payment of redressive damages or being placed under an injunction *only for* conduct

which 'subjects, or causes to be subjected' *the complainant* to a deprivation of a right

secured by the Constitution and laws."  *Id.* at 370-71 (emphases added).  The Fifth

Circuit has followed *Rizzo*'s construction of section 1983, holding in *Coon v.

Ledbetter*, 780 F.2d 1158 (5th Cir. 1986), that plaintiffs who invoke section 1983 are

"required to prove some violation of their *personal* rights."  *Id.* at 1160 (emphasis

added); *see also id.* (citing with approval rulings from other federal courts that

prohibit third-party litigation under section 1983).  And in *Shaw v. Garrison*, 545

F.2d 980 (5th Cir. 1977), *rev'd on other grounds sub nom. Robertson v. Wegmann*,

436 U.S. 584 (1978), the Fifth Circuit allowed a section 1983 lawsuit to proceed only

after concluding that it was "not an attempt to sue under the civil rights statutes for deprivation of another's constitutional rights" and noting that "[s]uch suits are impermissible." *Id.* at 983 n.4. This Court cannot allow the plaintiffs' third-party claims to proceed under section 1983 without contradicting the binding pronouncements in *Rizzo*, *Coon*, and *Shaw*—not to mention the unambiguous language of section 1983.

The Declaratory Judgment Act imposes the same obstacle to the third-party claims in this case. The text of the statute provides, in relevant part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations *of any interested party seeking such declaration.*

28 U.S.C. § 2201(a) (emphasis added). By authorizing the federal courts to declare the rights and legal relations "of *any interested party seeking such declaration*," the Declaratory Judgment Act necessarily excludes actions brought to declare the rights or legal relations of non-parties—or anyone other than the party "seeking such declaration" under the Act. It provides no authority for a federal court to declare the rights of those who are not "seeking" a declaration under the statute.

The organizations, elected officials, community organizers, and Dallas County have no cause of action to assert third-party claims, and their claims must be dismissed.

## V. THE PLAINTIFFS' ID-DISPARITY THEORY FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

The plaintiffs allege that black and Hispanic voters "disproportionately lack" the photo identification required by Senate Bill 14. *See* DOJ Compl. 7-8; *see also*

16

Veasey 1st Am. Compl. 3 ("[A] disproportionate number of registered voters who lack SB 14 ID are racial or ethnic minorities, or poor, elderly or disabled people."); TLYVEF & Clark Compl. 8, 10, 16; NAACP & MALC Compl. 2, 13, 14.   The plaintiffs further claim that this alleged ID disparity establishes that Senate Bill 14 "result[s] in" a denial or abridgment of the right to vote on account of race or color. But even if the plaintiffs could prove that minority voters "disproportionately lack" photo identification, their ID-disparity theory fails to state a claim on which relief can be granted.  This is so for three independent reasons.

First, a requirement to obtain and present photo identification does not even qualify as a "denial" or "abridgment" of the right to vote, because anyone who lacks photo identification can get an election-identification certificate that the State offers free of charge.

Second, section 2 prohibits only laws that "result[] in a denial or abridgment of the right . . . to vote *on account of race or color*," or *"because"* of membership in a language-minority group.   *See* 42 U.S.C. § 1973(a) (emphasis added); *id.* § 1973b(f)(2) (emphasis added).   Section 2 does not prohibit laws with a mere disparate impact on members of a particular race, and the plaintiffs' disparate-impact theory contradicts the statutory language as well as numerous cases rejecting section 2 challenges to voting laws that disproportionately affect racial and language minorities.

Third, the States hold a constitutionally protected prerogative to establish voter qualifications in state and federal elections, so long as they do not violate the

17

specific restrictions imposed by the Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments.  *See* U.S. CONST. art. I, § 2, cl. 1; U.S. CONST. amend XIV, § 2; *Inter Tribal Council*, 133 S. Ct. at 2253-54.  The plaintiffs' construction of section 2 violates the Constitution by prohibiting States from requiring photo identification to vote.  At the very least, the plaintiffs' interpretation of section 2 raises serious constitutional questions and must be rejected under the canon of constitutional doubt.  *See, e.g.*, *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501, 504 (1979).

## A.    Senate Bill 14 Does Not "Deny" Or "Abridge" The Right To Vote.

Senate Bill 14 does not "deny" or "abridge" the right to vote, because anyone who lacks photo identification can get an election-identification certificate.  *See* TEX. TRANSP. CODE § 521A.001; *see also* TEX. ELEC. CODE §§ 63.001(b), 63.0101(1).  The plaintiffs have not alleged that anyone in Texas is unable to obtain this identification.  They claim only that the "burden" of obtaining photo identification will cause some people to *choose* not to obtain it.  *See, e.g.*, DOJ Compl. 7; Veasey 1st Am. Compl. 9-12.  That is not sufficient to allege a "denial" or "abridgment" of the right to vote.

Every jurisdiction regulates voting in ways that impose burdens and inconveniences on the electorate. Most States, for example, require voters to register and travel to a polling place to cast their ballots. These laws undoubtedly cause people to choose not to vote, because for many voters the burdens of registering or traveling outweigh the benefits of casting a ballot. But these laws do not "den[y]" or "abridg[e]" the right to vote of those who make that choice. Citizens who are capable of complying with the requirements for voting, but choose not to do so because they would rather spend their limited time and resources on other endeavors, have not had their right to vote "deni[ed] or "abridg[ed]."

Laws requiring voters to present photo identification are no more a "denial" or "abridgment" of the right to vote than laws that require voter registration or in-person voting at polling stations. The Supreme Court specifically held in *Crawford* that the inconvenience associated with obtaining photo identification is no more significant than "the usual burdens of voting." *See* 553 U.S. at 198 (Stevens, J.) ("[T]he inconvenience of making a trip to the DMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."); *id.* at 209 (Scalia, J. concurring in the judgment) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not even represent a significant increase over the usual burdens of voting. And the State's interests are

sufficient to sustain that minimal burden.") (internal quotation marks and citations omitted).   The plaintiffs defy *Crawford* by asserting that a voter-identification requirement "deni[es]" or "abridg[es]" the right to vote—especially when Senate Bill 14 mitigates the inconvenience by offering election-identification certificates free of charge, *see* TEX. TRANSP. CODE § 521A.001, and by allowing voters to cast provisional ballots if they appear at the polls without photo identification, *see* TEX. ELEC. CODE § 63.001(g).   Texas also issues birth certificates for no more than $3 if a voter needs it to obtain an election-identification certificate.   *See* 38 Tex. Reg. 7307-10 (2013) (to be codified as an amendment to 25 TEX. ADMIN. CODE § 181.22).

The only way that the plaintiffs can reconcile their argument with *Crawford* is to acknowledge that the "usual burdens of voting"—such as registering and traveling to the polls—also constitute a "denial" or "abridgement" of the right to vote under section 2.   But on this reasoning, the plaintiffs would have to concede that laws requiring in-person voting at polling stations violate section 2 because minorities disproportionately lack access to motor vehicles.   *See* DOJ Compl. ¶¶ 14, 52, 56.   Surely the Attorney General does not believe that the Voting Rights Act requires every State to abolish in-person voting and allow everyone to vote by mail, as Oregon has done.   But that result logically follows from the Attorney General's contention that lack of access to motor vehicles among racial minorities prohibits Texas from enacting a voter-identification law.   *See id.*

**B.   Senate Bill 14 Does Not "Result" In A Denial Or Abridgement Of The Right To Vote "On Account Of Race Or Color," Or "Because" Of One's Membership In A Language-Minority Group.**

The plaintiffs believe that any voting law that disproportionately affects racial or language minorities violates section 2. *See, e.g.*, United States Compl. ¶ 38 (alleging that "Hispanic and African-American voters in Texas, as compared to Anglo voters, disproportionately lack the forms of photo ID required by SB 14" and that Senate Bill 14's requirements "will disproportionately affect Hispanic and African-American Texans, who are disproportionately poor and disproportionately lack access to transportation"). They are wrong; section 2 extends only to laws that deny or abridge the right to vote "*on account of*" race or color, or "*because" of* one's membership in a language-minority group. Mere claims that Senate Bill 14 will have a disparate impact on minorities fail to allege a section 2 violation.

**1.   The text of section 2 does not prohibit laws that merely have a disparate impact on racial or language minorities.**

The "results" prong of section 2 does not extend to laws that merely have a disparate impact on certain racial groups. It prohibits only laws that "result[] in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*," or "*because* he is a member of a language minority group." *See* 42 U.S.C. § 1973(a) (emphasis added); *id*. § 1973b(f)(2) (emphasis added). This language tracks section 1 of the Fifteenth Amendment. *Compare* U.S. CONST. amend. XV ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."), *with* 42 U.S.C. §§ 1973(a), 1973b(f)(2) (prohibiting voting

21

laws that "result[] in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color," or the effect of "deny[ing] or abridg[ing] the right of any citizen of the United States to vote because he is a member of a language minority group").  Section 2 therefore extends only to laws that "result" in violations of the Fifteenth Amendment.

Persons who cannot vote because they are unwilling or unable to obtain photo identification have not had their right to vote denied or abridged *on account of* their race or color, or *because* of their membership in a language-minority group.  If they are unable to vote, it is only on account of their failure to obtain the required identification.  It does not matter whether the racial makeup of affected voters mirrors the racial makeup of the citizen voting-age population.  Section 2 requires only that States enact facially neutral voting laws and enforce those laws in a race-neutral manner.

This is not to say that a voter-identification law can never implicate section 2.  Section 2 would, for example, prohibit racially biased enforcement of the law that denied minorities the right to vote *on account of* or *because of* their race.  *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).  The plaintiffs do not allege that Senate Bill 14 will be enforced in such a racially discriminatory manner.  Their allegations, even if true, show only that Senate Bill 14 may have a disparate impact on minorities, and that is not sufficient to state a claim on which relief may be granted.

     **2.    Federal courts of appeals have uniformly rejected the notion that section 2 prohibits voting laws that merely impose a disparate impact on minorities.**

Felon-disenfranchisement laws have been repeatedly attacked on the ground that they disproportionately affect racial and language minorities.  Yet courts have uniformly held that felon-disenfranchisement laws do not to "result[] in" a denial or abridgement of the right to vote on account of race or color, or because of one's membership is a language-minority group.  *See, e.g.*, *Wesley v. Collins*, 791 F.2d 1255, 1261 & n.8 (6th Cir. 1986) (collecting authorities).  To the extent that felon-disenfranchisement laws deny or abridge the right to vote, they do so on account of one's past criminal convictions, not on account of race or color or membership in a language-minority group.  The same logic applies to voter-identification laws: Persons unable to vote under Senate Bill 14 are affected on account of their lack of photo identification, not their race.  If felon-disenfranchisement laws do not "result[] in" a denial or abridgement of the right to vote on account of race or color, then neither do voter-identification laws.

Voter-roll-integrity statutes likewise have a disparate impact on racial and language minorities.  Yet these statutes also have been found not to "result[] in" a denial or abridgement of the right to vote on account of race or color.  *See Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 308 (3d Cir. 1994) (upholding Pennsylvania's voter-purge statute even as it "recogniz[ed] that African-American and Latino voters are purged at disproportionately higher rates than their white counterparts").  A voter-roll-integrity statute removes voters who fail to vote for two years from the list of registered voters.  To the extent that

these laws deny or abridge the right to vote, they do so on account of one's past failure to vote, not on account of one's race or color or membership in a language-minority group. *See also Brown v. Detzner*, 895 F. Supp. 2d 1236, 1249 (M.D. Fla. 2012) (rejecting a challenge to Florida's amendments to its early-voting laws and recognizing that "in the Eleventh Circuit a plaintiff must demonstrate something more than disproportionate impact to establish a Section 2 violation").

The plaintiffs' ID-disparity theory requires this Court to reject the holdings of *Wesley*, *Ortiz*, and *Brown*, and condemn *every* voting law that disproportionately affects racial or language minorities.  This theory cannot state a claim on which relief can be granted, unless this Court is willing to explicitly reject the law of the Third, Sixth, and Eleventh Circuits.

> **3.  The plaintiffs' construction of section 2 must be rejected because it would require every voting law to have a racially symmetrical impact.**

The plaintiffs' "disparate impact" interpretation of section 2's results prong leads to the absurd conclusion that every voting law must have a racially symmetrical impact.  The text of section 2 protects "*any citizen* of the United States" from laws that "result[] in a denial or abridgement of the right . . . to vote on account of race or color."  This language confers identical protections on voters of all races.  *See generally McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79 (1976) (holding that Title VII's prohibition of discrimination against "any individual" because of "such individual's race" protects white employees); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273-74 (1986) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting

judicial examination.") (internal quotation marks and citation omitted).  So if whites were less likely than minorities to possess photo identification, then the plaintiffs would have to admit that a voter-identification law "disproportionately impact[s]" white voters and therefore denies or abridges the right to vote "on account of race or color."  Every voting-related law would have to have an exactly proportional effect on members of every race.

The plaintiffs cannot escape this absurd result by maintaining that section 2 protects only racial or language minorities from laws with disproportionate effects. In addition to contradicting the statutory language, any construction of section 1973(a) that excludes white voters from the scope of its protections would violate the equal-protection component of the Fifth Amendment by establishing legal protections that are available only to members of particular races.  At the very least, an interpretation of section 2 that protects only minority voters from laws with disproportionate effects would present serious constitutional questions, and must be rejected under the canon of constitutional doubt.  *See, e.g., St. Cyr*, 533 U.S. at 299-300; *Edward J. DeBartolo Corp.*, 485 U.S. at 575; *Catholic Bishop*, 440 U.S. at 499-501, 504.

But that means the only way for the plaintiffs to salvage their ID-disparity theory is to argue that section 2 forbids any State to enact a voter-identification law—unless the percentage of registered voters who possess identification is exactly the same among whites, blacks, Asians, Hispanics, Native Americans, and Native

Alaskans.  *See* 42 U.S.C. § 1973*l*(c).  That is a preposterous construction of section 2.
No voting law will have an impact that is symmetrical across all races.

**C.    States Have A Constitutionally Protected Prerogative To Enforce Voter-Identification Requirements For State And Federal Elections, So Long As They Do Not Violate The Restrictions Imposed By The Fifteenth, Nineteenth, Twenty-Fourth, And Twenty-Sixth Amendments.**

Any construction of the Voting Rights Act that precludes Texas from
implementing its voter-identification law will exceed Congress's enforcement power
under section 2 of the Fifteenth Amendment.  At the very least, the Attorney
General's construction of the Voting Rights Act's "results" prong presents grave
constitutional questions that this Court must avoid under the canon of
constitutional doubt.

Section 2 of the Fifteenth Amendment and section 5 of the Fourteenth
Amendment empower Congress to "enforce" the provisions of those amendments
with "appropriate" legislation.  *See* U.S. CONST. amend. XV, § 2; U.S. CONST. amend.
XIV, § 5.  But the Fourteenth and Fifteenth Amendments prohibit only *purposeful*
racial discrimination.  *See City of Mobile v. Bolden*, 446 U.S. 55 (1980).  They do not
prohibit States from enacting laws with a mere disparate impact on racial groups.
*See id.*; *Washington v. Davis*, 426 U.S. 229, 242 (1976).  The plaintiffs' construction
of section 2 sweeps far beyond what is needed to "enforce" the Fourteenth and
Fifteenth Amendments.

Even if the Constitution could be construed to empower Congress to enact
legislation that extends beyond the rights established in the Fourteenth and
Fifteenth Amendments, any attempt by Congress to invoke its powers in this

26

prophylactic manner raises serious constitutional questions. That is why Congress is required to state its extra-constitutional prohibitions in clear and explicit language and justify this prophylaxis with legislative findings. *See, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641, 645 (1966) (upholding a congressional prohibition on literacy tests after noting "evidence suggesting that prejudice played a prominent role in the enactment of the [literacy-test] requirement"); *Oregon v. Mitchell*, 400 U.S. 112, 117 (1970) (opinion of Black, J.) (upholding a federal ban on literacy tests based on a congressional finding that "literacy tests have been used to discriminate against voters on account of their color"). *See also Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000); *City of Boerne v. Flores*, 521 U.S. 507 (1997). There are no findings in the Voting Rights Act that a ban on facially neutral voter-identification laws is necessary to enforce the guarantees of the Fourteenth and Fifteenth Amendments. And there is certainly no clear statement in the statute that purports to prohibit all facially neutral voting qualifications that happen to have a disproportionate impact on racial or language minorities.

The States also hold a constitutionally protected prerogative to establish the qualifications for voting in state and federal elections. *See* U.S. CONST. art. I, § 2, cl. 1; *Inter Tribal Council*, 133 S. Ct. at 2253-54. That includes the right to require voters to obtain and present photo identification when appearing to vote at the polls. The plaintiffs' construction of section 2 violates the Constitution by sweeping beyond the Fourteenth and Fifteenth Amendments and depriving the States of their

27

entitlement to determine the qualifications of their voters.  At the very least, an interpretation of section 2 that prohibits States from enacting laws that do not actually violate the Fifteenth Amendment but merely have a disparate impact on minority voters raises grave constitutional concerns and must be rejected for that reason alone.  *United States v. McElveen*, 177 F. Supp. 355, 358 (E.D. La. 1959) (Wright, J.) ("To be appropriate under the Fifteenth Amendment, legislation must be directed against persons acting under color of law, state or federal, and it must relate to the denial, by such persons, of citizens' right to vote *because of race*.  Any congressional action which does not contain these two elements cannot be supported by the Fifteenth Amendment.") (emphasis added).  The decision whether to require photo identification from persons seeking to vote is as much within the State's sovereign prerogatives as the decision whether to allow children or convicted felons to vote.

## VI. THE PLAINTIFFS' ALLEGATIONS OF RACIALLY DISCRIMINATORY PURPOSE FAIL TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

The plaintiffs' allegations of racially discriminatory purpose also fail to state a claim on which relief can be granted.  The plaintiffs cannot survive a motion to dismiss merely by asserting that Senate Bill 14 reflects a racially discriminatory purpose.  Rather, any accusation of racism in the plaintiffs' complaints must be "'plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Nothing in the plaintiffs' complaints comes anywhere close to a plausible allegation that Senate Bill 14 is a racist law.

First, the plaintiffs do not even allege that they—or anyone else—will be unable to obtain the election-identification certificates that the State offers free of charge. *See* Part VI.A, *supra*. Second, the State of Texas mitigated the burdens of its voter-identification regime by providing election-identification certificates free of charge and allowing voters who forget to obtain proper identification before Election Day to cast provisional ballots and present their identification within six days. Texas also has reduced the fees charged for birth certificates from $22 to no more than $3 for those who need a birth certificate to obtain an election-identification certificate. *See* 25 TEX. ADMIN. CODE § 181.22(c); 38 Tex. Reg. 7307-10 (2013) (to be codified as an amendment to 25 TEX. ADMIN. CODE § 181.22). Third, the Supreme Court upheld a similar voter-identification requirement in *Crawford* as a legitimate fraud-prevention device. Fourth, numerous States outside the South have enacted voter-identification laws, and the bipartisan Carter-Baker Commission recommended that every State enact a photo-identification requirement. *See Crawford*, 553 U.S. at 193-94 (Stevens, J.) (quoting with approval the relevant passage from the Carter-Baker Commission's report). Surely the plaintiffs do not believe that the members of the Carter-Baker Commission and the Supreme Court Justices who endorsed this report were racists who were hoping to suppress the minority vote. They have no plausible basis for leveling this defamatory accusation at the Texas legislators who followed the Carter-Baker Commission's recommendation and the Supreme Court's guidance in *Crawford*.

The plaintiffs cannot unlock the doors of discovery by making bald and unsupported assertions of racially discriminatory purpose.  *See Iqbal*, 556 U.S. at 677-79; *Twombly*, 550 U.S. at 555-56.  They must plead a claim that is "plausible on its face," and it is not plausible to believe that the supporters of voter-identification laws have racially nefarious motives.  The Texas Legislature's eagerness to pass Senate Bill 14 reflects the fact that voter-identification laws are politically popular; it is not evidence of racism.  And the plaintiffs' allegations that racial minorities are disproportionately likely to lack photo identification do not establish a plausible allegation of racially discriminatory motive.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("We do not assume unconstitutional legislative intent even when statutes produce harmful results.").

## VII.   THE REMAINING CLAIMS BROUGHT BY THE VEASEY PLAINTIFFS FAIL TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED.

The Veasey plaintiffs present a few additional claims, each of which is foreclosed by *Crawford*.  *Crawford* rejected the plaintiffs' contention that strict scrutiny should apply when voter-identification laws are challenged under the Fourteenth Amendment, and further rejected the "poll tax" claim brought by the plaintiffs in that case.  553 U.S. at 190, 203-04.  Finally, the plaintiffs' claim that voter-identification laws violate the freedom of speech protected by the First and Fourteenth Amendments is not tenable.  Voting is not speech, and the Supreme Court has recognized that States may determine the qualifications of their voters, even though States cannot decide who may and may not speak.  *See Inter Tribal*

*Council*, 133 S. Ct. at 2253-54, 2257-58. The plaintiffs' efforts to equate voting with speech fail to state a claim on which relief can be granted.

## VIII.   STEVE MCCRAW AND RICK PERRY MUST BE DISMISSED FROM THE CASE.

### A.   Plaintiffs Lack Standing To Sue Steve McCraw.

Section 2 of the VRA prohibits state officials from enforcing voting qualifications that have the purpose or effect of denying the right to vote on account of race, color, or membership in a language-minority group. 42 U.S.C. § 1973. McCraw is the Director of the Texas Department of Public Safety. He does not enforce the State's election laws. His only connection to this lawsuit is that he heads the agency that issues driver's licenses. The plaintiffs have not and cannot allege that a state official breaks the law by simply issuing ID cards—a ministerial task that DPS has performed for decades. The plaintiffs' actual complaint is with the Secretary of State, the official charged with enforcing the requirement that voters bring their photo IDs to the polls.

The Fifth Circuit closely polices lawsuits filed against the wrong state officials. Sitting en banc, the Fifth Circuit has instructed that plaintiffs lack Article III standing to sue a state official who is not charged with enforcing an allegedly unconstitutional law. There can be no "case or controversy," the court explained, when plaintiffs sue an "impotent defendant[ ]" who does not "play a causal role in the plaintiffs' injury." *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (holding that Article III standing requires "a causal connection between the injury and the conduct complained of").

31

Issuing a photo identification does not cause a voting-rights injury. The plaintiffs do not even attempt to allege that it does. The Court can give the plaintiffs all the relief they need by enjoining the Secretary of State. The court should have little interest in issuing a hollow injunction against McCraw to stop doing something that he has no ability to do. *See Okpalobi*, 244 F.3d at 426 ("For all practical purposes, the injunction granted by the district court is utterly meaningless.").

**B.    Governor Perry Must Be Dismissed From The Case.**

It is even plainer that Governor Perry must be dismissed from this case. The Governor's office has no connection to the plaintiffs' alleged injuries whatsoever. The Governor does not enforce the State's election laws. He does not even head the department charged with issuing photo IDs. His only connection to this lawsuit is his role as "the chief executive officer of the State of Texas." Veasey 1st Am. Compl. ¶ 12. The en banc Fifth Circuit has reminded plaintiffs that simply being the Governor is not enough. *See, e.g.*, *Okpalobi*, 244 F.3d at 426 (dismissing claims against Louisiana's governor and endorsing Judge Friendly's holding that plaintiffs cannot sue the State's chief executive simply because the governor has a general duty to "take care that the laws are faithfully executed") (internal quotation marks and citation omitted).

The Texas Constitution divides the executive. TEX. CONST. art. IV, § 1. The State's election laws are administered by the Secretary of State, not the Governor. As explained above, the plaintiffs have no case or controversy with the Governor. Because he did not cause their alleged injury, they have no standing to sue him.

And because any order against the Governor to stop breaking the law by requiring photo ID at the polls would be utterly meaningless, the plaintiffs' claims against the Governor are not redressable and must be dismissed for lack of subject-matter jurisdiction.

*Okpalobi* discusses a second and related reason that Governor Perry must be dismissed from the case:  Plaintiffs cannot overcome state sovereign immunity when they sue the wrong official.  *Okpalobi* dismissed claims against Louisiana's governor for lack of standing, as explained above, but the en banc court went on to explain that it also would have thrown out the claims on sovereign-immunity grounds.  That is because the *Ex Parte Young* exception to state sovereign immunity, on which the private plaintiffs' claims against Governor Perry depend, allows parties to seek prospective relief against a state official only when the official sued is "*specially charged*" with the execution of a state enactment alleged to be unconstitutional." *Okpalobi*, 244 F.3d at 413 (quoting *Fitts v. McGhee*, 172 U.S. 516, 529 (1899)) (emphasis added by Fifth Circuit).  *Okpalobi* explains that claims against Louisiana's governor were barred by sovereign immunity, *Ex Parte Young* notwithstanding, because the governor had no connection to the statute that the plaintiffs were challenging, other than a generic duty to "take care that the laws are faithfully executed." *Id.* at 413-16 (internal quotation marks and citation omitted). This limit on the *Ex Parte Young* exception has been the law for over a century, and it has been faithfully applied in circuits across the country. *See Fitts*, 172 U.S. at 529 (holding that the state's sovereign immunity remained intact because plaintiffs

had sued the state attorney general and solicitor of the eleventh judicial district, neither of whom "appear[s] to have been charged by law with any special duty in connection with the act"); *Lytle v. Griffith*, 240 F.3d 404, 412-13 (4th Cir. 2001) (Wilkinson, C. J., dissenting) (collecting cases and noting that "[t]he *Young* exception is limited, however, by its requirement that named state officials bear a special relation to the challenged statute"); *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998) (holding that the availability of *Ex Parte Young* "must be determined under state law depending on whether and under what circumstances a particular defendant has a connection with the challenged state law"); *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996); *1st Westco Corp. v. School Dist. of Phila.*, 6 F.3d 108, 113 (3d Cir. 1993).

For this reason, too, the plaintiffs' claims against Governor Perry must be dismissed. Both the United States and the private plaintiffs are seeking an injunction against the office of the Secretary of State. That injunction will provide the plaintiffs with all the relief they need, and, as the Fifth Circuit has instructed, this Court lacks jurisdiction to do any more.

## CONCLUSION

The claims brought by Carrier, Burns, Ozias, and Mellor-Crumley should be dismissed for failure to allege an Article III injury. All claims brought against McCraw and Governor Perry should be dismissed for failing to allege an Article III case or controversy. The claims brought by "John Doe" and "Jane Doe" should be dismissed unless those plaintiffs reveal their names. The claims brought by the

organizations, elected officials, community organizers, and Dallas County should be dismissed for lack of third-party standing, as well as for lack of a cause of action.

All of the plaintiffs' remaining claims should be dismissed for failing to state a claim on which relief can be granted.

Respectfully submitted.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

J. REED CLAY, JR.
Special Assistant and Senior Counsel
    to the Attorney General

/s/ John Scott
JOHN SCOTT
Deputy Attorney General for Litigation
Texas Bar No. 17901500
Southern District of Texas Bar No. 10418
ATTORNEY-IN-CHARGE

ARTHUR C. D'ANDREA
RICHARD B. FARRER
Assistant Solicitors General

209 West 14th Street
P.O. Box 12548
Austin, Texas 78711-2548
Ph: (512) 475-0131
Fax: (512) 474-2697

COUNSEL FOR STATE OF TEXAS, RICK PERRY,
JOHN STEEN, AND STEVE MCCRAW

Dated:  October 25, 2013

## CERTIFICATE OF SERVICE

I certify that a copy of this document is being served by electronic mail on October 25, 2013, to the following individuals:

Armand Derfner
P.O. Box 600
Charleston, SC 29402
843-723-9804
Email: aderfner@dawlegal.com

Chad W. Dunn
Brazil & Dunn
4201 Cypress Creek Pkwy, Ste. 530
Houston, TX 77068
281-580-6310 / Fax: 281-580-6362
Email: chad@brazilanddunn.com
COUNSEL FOR PLAINTIFFS MARC VEASEY, SERGIO DELEON, JANE HAMILTON, FLOYD CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN DOE, JOHN MELLOR-CRUMLEY, DALLAS COUNTY, TEXAS, JANE DOE, AND LEAGUE OF UNITED LATIN AMERICAN CITIZENS

J. Gerald Hebert
Campaign Legal Center
215 E. Street, NE
Washington, D.C. 20002
202-736-2200 ext. 12
202-736-2222
GHebert@campaignlegalcenter.org
COUNSEL FOR PLAINTIFF MARC VEASEY

Kembel Scott Brazil
Brazil & Dunn
4201 Cypress Creek Parkway Suite 530
Houston, TX 77068
281-580-6310 / Fax: 281-580-6362
Email: scott@brazilanddunn.com

Neil G. Baron
914 FM 517 Rd W Suite 242
Dickinson, TX 77539
281-534-2748 / Fax: 281-534-4309
Email: neil@ngbaronlaw.com
COUNSEL FOR PLAINTIFFS MARC VEASEY, SERGIO DeLEON, JANE HAMILTON, FLOYD
CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, JOHN MELLOR-
CRUMLEY, DALLAS COUNTY, TEXAS, JANE DOE

Luis Roberto Vera, Jr.
111 Soledad Ste 1325
San Antonio, TX 78205
210-225-3300 / Fax: 210-225-2060
Email: lrvlaw@sbcglobal.net
COUNSEL FOR LEAGUE OF UNITED LATIN AMERICAN CITIZENS

Anna Baldwin, Elizabeth S. Westfall, Daniel J. Freeman,
Jennifer L. Maranzano, Meredith Bell-Platts
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
202-305-4278
Email: anna.baldwin@usdoj.gov
Email: elizabeth.westfall@usdoj.gov
Email: daniel.freeman@usdoj.gov
Email: jennifer.maranzano@usdoj.gov
Email: meredith.bell-platts@usdoj.gov

Bruce I. Gear
Department of Justice
1800 G St NW
Washington, DC 20006
202-353-0419
Email: bruce.gear@usdoj.gov

John Albert Smith, III
Office of the U.S. Attorney
800 N Shoreline Blvd  Ste 500
Corpus Christi, TX 78401
361-888-3111 / Fax: 361-888-3200
Email: john.a.smith@usdoj.gov
COUNSEL FOR CONSOLIDATED PLAINTIFF UNITED STATES OF AMERICA

Christina A. Swarns, Leah Aden, Natasha Korgaonkar, Ryan Haygood
NAACP Legal Defense and Educational Fund, Inc.
40 Rector St 5th Floor
New York, NY 10006
212-965-2200 / Fax: 212-229-7592
Email: cswarns@naacpldf.org
Email: laden@naacpldf.org
Email: nkorgaonkar@naacpldf.org
Email: rhaygood@naacpldf.org

Danielle Conley, Jonathan E. Paikin, Kelly Dunbar, Sonya Lebsack
Wilmer Cutler et al
1875 Pennsylvania Avenue NW
Washington, DC 20006
202-663-6703
Email: danielle.conley@wilmerhale.com
Email: jonathan.paikin@wilmerhale.com
Email: kelly.dunbar@wilmerhale.com
Email: sonya.lebsack@wilmerhale.com
COUNSEL FOR CONSOLIDATED PLAINTIFF TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND AND IMANI CLARK

Rolando L. Rios
115 E Travis Ste 1645
San Antonio, TX 78205
210-222-2102 / Fax: 210-222-2898
Email: rrios@rolandorioslaw.com
COUNSEL FOR TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY
COMMISSIONERS

Joseph M Nixon
Bierne Maynard & Parsons
1300 Post Oak Blvd Ste 2500
Houston, TX 77056
713-871-6809 / Fax: 713-960-1527
Email: jnixon@bmpllp.com
COUNSEL FOR TRUE THE VOTE

Ezra D. Rosenberg
Dechert LLP
902 Carnegie Ctr  Ste 500
Princeton, NJ 08540-6531
609-955-3222
Email: ezra.rosenberg@dechert.com

Amy L. Rudd
Dechert LLP
300 W 6th St Suite 2010
Austin, TX 78701
512-394-3000
Email: amy.rudd@dechert.com

Jennifer Clark, Vishal Agraharkar, Wendy Weiser, Ezra D. Rosenberg
Brennan Center for Justice
NYU School of Law
161 Avenue of the Americas 12th Fl
New York, NY 10013
646-292-8310
Email: jenniferl.clark@nyu.edu
Email: vishal.agraharkar@nyu.edu
Email: wendy.weiser@nyu.edu

Erandi Zamora, Mark A. Posner, Sonia Kaur Gill
Lawyers' Committee of Civil Rights Under Law
1401 New York Ave Ste 400
Washington, DC 20005
202-662-8345
Email: ezamora@lawyerscommittee.org
Email: mposner@lawyerscommittee.org
Email: sgill@lawyerscommittee.org
COUNSEL FOR MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF
REPRESENTATIVES AND TEXAS STATE CONFERENCE OF NAACP BRANCHES

Robert M Allensworth
B14522
BMRCC 251 N IL 37 S
Ina, IL 62846-2419
PRO SE

                                          /s/ John Scott
                                          JOHN SCOTT
                                          Deputy Attorney General for Litigation