**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND; IMANI CLARK; AURICA WASHINGTON; CRYSTAL OWENS; and MICHELLE BESSIAKE, <br><br> *Plaintiff-Intervenors,* <br><br> v. <br><br> STATE OF TEXAS; JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, <br><br> *Defendants.* | Civ. Nos. 2:13-cv-00263; 2:13-cv-00193 |

**AMENDED COMPLAINT IN INTERVENTION
OF PLAINTIFF-INTERVENORS THE TEXAS LEAGUE OF
YOUNG VOTERS EDUCATION FUND, IMANI CLARK,
AURICA WASHINGTON, CRYSTAL OWENS,
<u>AND MICHELLE BESSIAKE</u>**

NOW COMES the Texas League of Young Voters Education Fund (the "Texas League," or "Texas League of Young Voters") Imani Clark, Aurica Washington, Crystal Owens, and Michelle Bessiake (together, "Plaintiff-Intervenors") to file this Amended Complaint in Intervention against Defendants the State of Texas (the "State" or "Texas"), John Steen, in his official capacity as Secretary of State of Texas, and Steve McCraw, in his official capacity as Director of the Department of Public Safety ("DPS") of Texas (collectively, "Defendants"), to allege:

1.      Plaintiff-Intervenors have intervened in this action to enjoin Defendants'
implementation of Senate Bill 14 ("SB 14") (codified at Tex. Elec. Code Ann. § 63.0101 and
elsewhere), which denies them their fundamental right to vote, both because it was enacted
with a racially discriminatory purpose and because it will have a discriminatory effect
against them, in violation of Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C. § 1973
("Section 2"), and the Fourteenth and Fifteenth Amendments of the United States
Constitution, pursuant to 42 U.S.C. § 1983. *See* U.S. Const., amends. XIV & XV, 42 U.S.C.
§§ 1973, 1983.

2.      SB 14, which restricts in-person voting to those who are able to produce one of seven
limited forms of photo identification ("required photo IDs," or "accepted photo IDs"),
violates Section 2 because it is a "voting qualification or prerequisite to voting or standard,
practice, or procedure," that has both the purpose and effect of denying Plaintiff-Intervenors'
right to vote "on account of race or color." 42 U.S.C. § 1973(a).

3.      SB 14, which (a) imposes severe burdens upon Plaintiff-Intervenors' fundamental
right to vote, and (b) purposefully denies the right to vote, on the basis of their race, to
otherwise qualified voters like Individual Plaintiff-Intervenors, Imani Clark, Aurica
Washington, Crystal Owens, and Michelle Bessiake, and the constituents of Organizational
Plaintiff-Intervenors, the Texas League, also violates the Fourteenth Amendment of the
United States Constitution, pursuant to 42 U.S.C. § 1983, because it denies Plaintiff-
Intervenors' equal protection of the laws. U.S. Const., amend. XIV § 1; 42 U.S.C. § 1983.

4.      SB 14, which impedes Mss. Clark's, Washington's, Owens's, and Bessiake's, and the
constituents of the Texas League's access to the polls in Texas, violates the Fifteenth
Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, because it

denies and abridges Plaintiff-Intervenors' right to vote on account of their race. U.S. Const., amend. XV; 42 U.S.C. § 1983.

## I. JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1357, 2201, and 42 U.S.C. §§ 1973, 1973j(f), 1983, and 1988.

6.     Venue is proper pursuant to 28 U.S.C. §§ 124(b)(6), 1391(b).

## II. PARTIES

### PLAINTIFFS

7.     Plaintiff is the United States of America.

8.     Individual Plaintiff-Intervenor Imani Clark, who has a legally protectable interest in defending her right to vote, in-person, free of racial discrimination, is a citizen of the United States and a resident of Texas.

9.     Ms. Clark is a lawfully registered Black voter in Waller County, where she resides and is a student at Prairie View A & M University, a historically Black public university and the second oldest public institution of higher education in Texas.

10.     Ms. Clark has previously voted in person in Texas using her Prairie View A & M University student identification, but does not possess any of the photo IDs required under SB 14 for in-person voting. Acquiring such forms of photo identification would be unduly burdensome for Ms. Clark.

11.     Ms. Clark does not own or possess a car, nor has she ever driven one. She does not have a driver's license.

12.     Ms. Clark's voting rights are impeded by SB 14, as she will be prevented from voting in-person at the polls because of Defendants' unnecessarily strict and racially discriminatory photo identification law.

13.     Individual Plaintiff-Intervenor Aurica Washington, who has a legally protectable interest in defending her right to vote, in-person, free of racial discrimination, is a citizen of the United States and a resident of Texas.

14.     Ms. Washington is a lawfully registered Black voter in Harris County, where she resides and is a student at Texas Southern University, a historically Black public university founded in 1927.

15.     Ms. Washington does not possess any of the photo IDs required under SB 14 for in-person voting, and acquiring such forms of photo identification would be unduly burdensome for her.

16.     Ms. Washington does not own or possess a car, nor does she have a Texas driver's license.

17.     Ms. Washington's voting rights are impeded by SB 14, as she will be prevented from voting in-person at the polls because of Defendants' unnecessarily strict and racially discriminatory photo identification law.

18.     Individual Plaintiff-Intervenor Crystal Owens, who has a legally protectable interest in defending her right to vote, in-person, free of racial discrimination, is a citizen of the United States and a resident of Texas.

19.     Ms. Owens is a lawfully registered Black voter in Harris County, where she resides and is a student at Texas Southern University.

20.     Ms. Owens does not possess any of the photo IDs required under SB 14 for in-person voting, and acquiring such forms of photo identification would be unduly burdensome for her.

21.     Ms. Owens does not own or possess a car, nor does she have a Texas driver's license.

22.     Ms. Owens's voting rights are impeded by SB 14, as she will be prevented from voting in-person at the polls because of Defendants' unnecessarily strict and racially discriminatory photo identification law.

23.     Individual Plaintiff-Intervenor Michelle Bessiake, who has a legally protectable interest in defending her right to vote, in-person, free of racial discrimination, is a citizen of the United States and a resident of Texas.

24.     Ms. Bessiake is a lawfully registered Black voter in Harris County, where she resides and is a student at Texas Southern University.

25.     Ms. Bessiake does not possess any of the photo IDs required under SB 14 for in-person voting, and acquiring such forms of photo identification would be unduly burdensome for her.

26.     Ms. Bessiake does not own or possess a car, nor does she have a driver's license.

27.     Ms. Bessiake's voting rights are impeded by SB 14, as she will be prevented from voting in-person at the polls because of Defendants' unnecessarily strict and racially discriminatory photo identification law.

28.     Organizational Plaintiff-Intervenor the Texas League is a non-profit, non-partisan organization whose mission is to empower young people, particularly those of color, through strategic educational initiatives that cultivate full, equal, and active political participation of

young people and their communities. Ensuring that young voters have access to, and fully participate in, the electoral process is a central aim of the Texas League.

29.     A significant portion of the population served by the Texas League—college-enrolled young people of color, non-college-enrolled young people of color, and low-income young people—lack any of the photo IDs required under SB 14.

30.     Because of the discriminatory voting requirements imposed by SB 14, the Texas League is forced to divert its limited resources (financial and other) from fulfilling its core mission of registering and mobilizing young people of color to vote, and to, instead, helping its existing base of voters secure one of SB 14's required photo IDs.

31.     In particular, the Texas League is now forced to undertake such activities as: (a) assessing who among its constituency lacks one of the forms of required photo IDs under SB 14 and/or determining which such IDs (or underlying documents required to obtain them) each such constituent needs; (b) hosting public education campaigns designed to inform young voters of color that Defendants' previously court-rejected photo ID law is now in effect; and (c) providing financial assistance and transportation to young voters who lack the required photo IDs and/or underlying documents so that they can acquire them where possible.

32.     SB 14 substantially undermines the Texas League's ability to fulfill its stated mission, and forces the organization, instead, to focus on ensuring that its existing young voters are able to cross the threshold of polling stations' doors on Election Day.

33.     The Texas League's constituents are aggrieved by SB 14 in the manner described in this Amended Complaint. SB 14 purposefully abridges their right to vote on account of their

race and denies them an opportunity to participate in the electoral process on an equal basis with other Texas citizens.

34.     The Texas League and its constituents share a common interest in ensuring that young voters, particularly young voters of color, have equal access to the electoral process.

35.     Practical obstacles prevent the Texas League's constituents from suing to enjoin SB 14. The Texas League's constituents—college-enrolled young people of color, non-college-enrolled young people of color, and low-income young people—lack the financial and other resources that litigation requires.

DEFENDANTS

36.     Defendant State of Texas is one of the fifty United States of America.

37.     Defendant John Steen is being sued in his official capacity as the Secretary of State of Texas. *See* Article IV, Section I of the Texas State Constitution. The Secretary of State of Texas is the State's chief election official, and is charged with coordinating the implementation of SB 14. *See* Texas Election Code § 31.001.

38.     Defendant Steve McCraw is being sued in his official capacity as the Director of the Texas Department of Public Safety, the Texas agency tasked with issuing a number of accepted photo IDs under SB 14.

III. ALLEGATIONS

### Texas Demographics

39.     According to the 2010 Census, Texas had a total population of 25,145,561, with a Latino population of 9,460,921 (37.6%), and a non-Hispanic Black population of 2,975,739 (11.8%).

40.     According to the 2010 Census, Texas had a voting-age population ("VAP") of 18,279,737, with a Latino VAP of 6,143,144 (33.6%), and a non-Hispanic Black VAP of 2,102,474 (11.5%).

41.     The 2007-2011 five-year aggregate American Community Survey ("ACS") estimated that the citizen voting age population ("CVAP") of Texas was 15,583,700, with a Latino CVAP of 4,048,210 (26%), and a non-Hispanic Black CVAP of 1,988,805 (12.8%).

42.     Based on comparisons of the 2000 and the 2010 Censuses, non-Hispanic Black people comprised 13.4% of Texas's total population growth.

43.     The 2007-2011 ACS estimated that non-Hispanic Black people in Texas experience poverty at roughly three times the rate of non-Hispanic whites, and that the non-Hispanic white median per capita income is approximately double the non-Hispanic Black median per capita income.

44.     The 2009-2011 ACS estimated that 3.8% of non-Hispanic white-led households in Texas lack access to a vehicle, as compared to 12.9% of non-Hispanic Black-led households.

***Senate Bill 14's Passage Was Motivated By Discriminatory Purpose***

45.     Against a backdrop of substantial growth of Texas's communities of color (and in particular, of Black and Latino communities in Texas), the State legislature sought to implement increasingly restrictive, unnecessary, and burdensome Voter ID bills over several legislative sessions in the previous decade. For example, following the 2010 Census, which further demonstrated the significant rate at which Texas communities of color were growing, the Texas legislature in 2011 enacted SB 14, which is widely recognized as one of the most restrictive photo ID laws for in-person voting in the country.

46.     SB 14 denies otherwise qualified voters—including Mss. Clark, Washington, Owens, and Bessiake—access to in-person voting at the polls if they are unable to present one of the limited number of photo IDs required under SB 14.

47.     Pursuant to SB 14, only voters who are able to present one of the following seven forms of photo ID are eligible for in-person voting in Texas: (1) a DPS-issued driver's license (unexpired or expired within 60 days of election); (2) a DPS-issued non-driver's license ID (unexpired or expired within 60 days of election); (3) a DPS-issued license to carry a weapon (unexpired or expired within 60 days of election); (4) a U.S. passport (unexpired or expired within 60 days of election); (5) a U.S. military photo ID card (unexpired or expired within 60 days of election); (6) a U.S. citizenship certificate with photo; and (7) a DPS-issued Election Identification Certificate ("EIC") (unexpired). SB 14, § 14 (codified at Tex. Elec. Code § 63.0101).

48.     Designed as "emergency legislation" to expedite its consideration, SB 14's ultimate passage was characterized by a series of unusual departures from the procedures and customs ordinarily followed by the Texas legislature.

49.     For example, the Texas legislature departed from State Senate rules and practices for the purpose of exempting SB 14 from certain of the Senate's traditional majority vote procedures. In the State House, a committee comprised of a small and select number of state representatives assembled to consider that bill alone.

50.     The evaluations and concerns of legislators representing districts with high populations of people of color were marginalized in legislative debates about SB 14.

51.     Although the Texas legislature was informed that SB 14 would have a discriminatory impact on voters of color, the Texas legislature rejected a number of amendments that were

proposed by legislators representing districts with large minority populations that sought to ameliorate the known discriminatory impact of the law by (a) expanding the universe of required IDs under SB 14 to include, for example, the type of student ID possessed by Mss. Clark, Washington, Owens, Bessiake, and other university students to vote in person, and, in the case of Ms. Clark, previously used by her in election(s); and, (b) mitigating the costliness of transportation and underlying documents for indigent voters, a disproportionate number of whom are people of color.

52.     Although the proponents of SB 14 indicated that in-person voter impersonation and ensuring electoral integrity were the stated purposes of the law, they offered virtually no evidence of such criminal activity—and have still not done so to date—and they did not demonstrate that Texas's then-current voter ID law was inadequate to prevent in-person voter impersonation or to ensure electoral integrity.

53.     Although stemming voter fraud was one of the legislature's stated purposes in passing SB 14, the law does not address the procedure through which most reported voter fraud in Texas occurs: the absentee or mail-in ballot system.

54.     The Texas legislature, moreover, knew or should have known that voters of color in Texas would disproportionately lack the forms of accepted photo IDs under SB 14.

55.     The Texas legislature knew or should have known that SB 14 would impose a severe burden on thousands of voters, particularly those from communities of color in Texas, who are disproportionately poor and disproportionately lack transportation, as the demographics above reflect, to which state officials had ready access, while considering SB 14.

56.     Proponents of SB 14, nevertheless, made no effort to analyze or study the likely racially discriminatory effect of SB 14 on communities of color. Rather, proponents of the

law rejected amendments that would have required that Texas investigate the racially disparate impact of SB 14 on communities of color and failed to adopt amendments that would have ameliorated the foreseeable discriminatory impact.

***SB 14 Creates Severe Burdens For Black And Other Voters of Color***

57.    A substantial subset of the hundreds of thousands of registered voters in Texas—a subset disproportionately comprised of voters of color—do not currently have any of the forms of photo ID required by SB 14.

58.    SB 14 severely burdens the right to vote of thousands of registered Black voters in Texas because they do not have any of the forms of required photo ID under SB 14 for in-person voting.

59.    It is more difficult for Black voters in Texas, who are disproportionately poor and disproportionately lack transportation, as the demographics above reflect, to obtain the required IDs than it is for white voters.

60.    Acquiring one of the required IDs, including the Election Identification Certificates ("EIC"), requires voters to expend resources (e.g., time and money)—a severe burden that falls particularly hard on Black voters.

61.    Though voters may apply at a DPS office for an EIC, numerous Texas counties lack a DPS office.

62.    SB 14 requires some voters to travel approximately 200 miles roundtrip in order to obtain an EIC from a DPS office.

63.    DPS offices in certain counties are only open for business for limited periods of time, with some being open only one or two days a week and others closed on weekends or after 6 p.m.

64.     Many DPS offices, including those in urban centers, are not accessible via public transportation. In addition, DPS offices in urban centers are often located several miles away from neighborhoods where high concentrations of voters of color live.

65.     Due to the limited number of DPS offices, the limited operating hours of some DPS offices, and the often lengthy travel times to DPS offices, many voters have to take time off during a work or school day to obtain an EIC.

66.     To obtain an EIC, otherwise eligible voters, including Individual Plaintiff-Intervenors, Mss. Clark, Washington, Owens, and Bessiake, or constituents of Organizational Plaintiff-Intervenor, the Texas League, are required to present a combination of documents establishing their identity and citizenship. The required combination of such documents, which is burdensome and can be confusing, may include one or more of the following:  (1) a DPS-issued driver's license that has been expired for over 60 days but under 2 years (establishes identity only), (2) a DPS-issued ID non-driver's license card that has been expired for over 60 days but under 2 years (establishes identity only); (3) an original or certified copy of a state-issued birth certificate (alone, establishes citizenship only; with other documents, can establish identity); (4) U.S. citizenship or naturalization papers (alone, establishes citizenship only; without a photo, and with other documents, can establish identity); or (5) a court order indicating a change of name or gender (can be used with other documents to establish identity). SB 14, § 20 (codified at Tex. Transp. Code § 521A.001); 37 Tex. Admin. Code § 15.182.

67.     Texas law provides that an otherwise eligible voter seeking to vote in-person who lacks an acceptable photo ID may cast a provisional ballot. SB 14, §§ 9 & 15 (codified at Tex. Elec. Code §§ 63.001(g) & 63.011). A provisional ballot will *not* count unless the voter

travels—requiring resources (e.g., time and money)—to the county voter registrar *within six days* of casting the provisional ballot, and presents either a required photo ID under SB 14 or executes an affidavit attesting that the voter has a religious objection to being photographed, or has lost her/his photo ID in a declared natural disaster that occurred within forty-five days of the election. SB 14, §§ 17-18 (codified at Tex. Elec. Code §§ 65.054-.0541).

68.     The strictly limited required photo IDs under SB 14, and the travel, financial, and time burdens to obtain such photo ID (including the EIC) imposed by SB 14 has the purpose and effect of denying Plaintiff-Intervenors, and thousands of other Texas voters, of whom a disproportionate subset are voters of color, the ability to vote in-person.

### *A Federal Court Previously Rejected SB 14 Because Of Its Discriminatory Impact*

69.      Until the U.S. Supreme Court's June 2013 decision in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612, 2631 (2013), Texas was one of nine completely "covered state[s]" under Section 5 of the Voting Rights Act, U.S.C. § 1973c ("Section 5"). U.S. Dep't of Justice, Civil Rights Division, Voting Section, *Section 5 Covered Jurisdictions*, http://www.justice.gov/crt/about/vot/sec_5/covered.php.

70.     In July 2011, Texas sought administrative preclearance under Section 5 for SB 14 from the Department of Justice ("DOJ").

71.     DOJ denied preclearance to SB 14 in March 2012, determining that Texas did not meet its burden of showing that the proposed law would be not be retrogressive, particularly with respect to Latino registered voters, and, moreover, that Texas "provided no data on whether African-American . . . registered voters are also disproportionately affected by S.B. 14." Letter from Thomas E. Perez, Asst. Att'y Gen., U.S. Dep't of Justice, to Keith Ingram,

Director of Elections, State of Texas (Mar. 12, 2012), attached as Exhibit 1 to Plaintiff's Compl., ECF No. 1-1, at 3, 5.

72.     After failing to receive administrative preclearance, Texas filed suit for judicial preclearance of SB 14 in the U.S. District Court for the District of Columbia (the "D.C. Court"). *See* Expedited Complaint for Declaratory Judgment, *Texas v. Holder*, No. 1:12-cv-00128, ECF No. 1 at 22 (D.D.C. Jan. 24, 2012).

73.     In August 2012, following a bench trial, the D.C. Court issued a unanimous Order rejecting Texas's request for judicial preclearance under Section 5. *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated and remanded*, 133 S. Ct. 2886 (2013).

74.     The D.C. Court denied preclearance based on Texas's failure to demonstrate that SB 14 would not have a retrogressive effect on Black and Latino voters. *Texas*, 888 F. Supp. 2d at 144 ("[E]verything Texas has submitted as affirmative evidence is unpersuasive, invalid, or both. Moreover, uncontested record evidence conclusively shows that the implicit costs of obtaining SB 14–qualifying ID will fall most heavily on the poor and that a disproportionately high percentage of African[-]Americans and Hispanics in Texas live in poverty.").

75.      The D.C. Court also found that the evidence submitted by the United States and Defendant-Intervenors affirmatively suggested that the implementation of SB 14 would have a retrogressive effect on Black and Latino voters. *Id*.

76.     The D.C. Court determined that SB 14 violated Section 5 due to the burdens that the law would impose on voters without the required ID, and considered the socioeconomic disparities between people of color (including Black voters) and white people in Texas.  *Id.* at 140.

14

77.     The D.C. Court noted the considerable gap in the poverty rates in Texas for Black people versus white people, and recognized that the burden of traveling to a DPS office to obtain accepted photo ID under SB 14 would be particularly severe for "the predominantly minority population whose households lack access to any car at all," given that "13.1% of African Americans . . . live in households without access to a motor vehicle, compared with only 3.8% of whites." *Id.*

78.     The D.C. Court determined that SB 14 is the most "stringent [photo ID law] in the country," because it "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas [who] are disproportionately likely to live in poverty." *Id.* at 144.

79.     The D.C. Court emphasized that, notwithstanding that the legislative record showed that the Texas Legislature was repeatedly warned that SB 14 would disfranchise voters of color, the Texas Legislature nevertheless rejected ameliorative amendments that would have substantially mitigated the retrogressive effect of the new identification requirement. *Id.*

80.     On June 25, 2013, the Supreme Court issued an opinion in *Shelby County*, declaring Section 4(b) of the Voting Rights Act, the coverage provision of Section 5, unconstitutional. 133 S. Ct. at 2631. Accordingly, Texas is no longer a "covered state" under Section 5.

81.     The Supreme Court did not reach the constitutionality of Section 5, although without Section 4(b), that provision has no present effect.

82.     Texas Attorney General Greg Abbott declared—just hours after the *Shelby County, Alabama* ruling—that "with today's decision, the State's voter ID law will take effect immediately." Press Release, Att'y Gen. of Tex., Statement by Texas Attorney General Greg Abbott (June 25, 2013), https://www.oag.state.tx.us/oagnews/release.php?id=4435.

83.     On June 27, 2013, the Supreme Court vacated the judgment of the D.C. Court denying preclearance to SB 14, and remanded the case to the district court for further consideration. *See Texas v. Holder*, 133 S. Ct. 2886 (2013).

84.     Defendants moved forward with the implementation of SB 14 despite the D.C. Court's finding that the law would have a discriminatory effect on "a substantial subgroup of Texas voters, many of whom are African[-]American or Hispanic," *Texas v. Holder*, 888 F. Supp. 2d at 138, and despite the testimony and other evidence presented to the D.C. Court concerning SB 14's discriminatory purpose.

85.     Since the D.C. Court's finding, Texas has not ameliorated or otherwise significantly altered SB 14.

### Past And Ongoing Intentional Discrimination In Voting in Texas

86.     Texas's initial 1972 coverage under Section 4(b) of the Voting Rights Act, and its additional coverage in 1975 under the then-new "language minority" provision, was based on the State's use of discriminatory tests and devices for voter registration, and low voter registration rates.

87.     Texas remained a covered state until the recent *Shelby County* decision because of its ongoing record of persistent unconstitutional discrimination in voting against Black, Latino, and other communities throughout Texas.

88.     During the most recent reauthorization of the Voting Rights Act in 2006, evidence was presented documenting Texas's unabated record of intentional racial discrimination in voting. *See* Exhibit A, Nina Perales, et al., *Voting Rights in Texas 1982-2006* (June 2006), *available at* http://www.protectcivilrights.org/pdf/voting/TexasVRA.pdf.

89.     Texas has a pervasive history of state-sanctioned racial discrimination against Black and Latino people, and other people of color. *See, e.g., LULAC v. Perry*, 548 U.S. 399, 439-40 (2006); *Bush v. Vera*, 517 U.S. 952, 981-82 (1996) (plurality opinion); *White v. Regester*, 412 U.S. 755, 767-70 (1973).

90.     Throughout history and into the present, Texas's use of intentionally discriminatory voting schemes has necessitated federal intervention. *See, e.g.*, *White*, 412 U.S. at 768 (poll tax); *Terry v. Adams*, 345 U.S. 461 (1953) (private primary); *Smith v. Allwright*, 321 U.S. 649 (1944) (white primary); *Nixon v. Herndon*, 273 U.S. 536 (1927) (exclusion of minorities).

91.     In fact, Prairie View students' struggle to secure full voting rights is well-documented. *See, e.g., United States v. Texas*, 445 F. Supp. 1245, 1261 (S.D. Tex. 1978), (holding as unconstitutional Waller County's practice of denying the opportunity to register to vote to Prairie View students whose families were not "native" to the County) *aff'd*, sub nom. *Symm v. United States*, 439 U.S. 1105 (1979).

92.     In 1992, nineteen Prairie View students were indicted for improperly voting. Those indictments were later dismissed for lack of evidence.

93.     In 2004, the Waller County District Attorney threatened to arrest student voters on the baseless ground that students could not legally vote using their university addresses. Terry Kliewer, *Waller County DA apologizes in vote flap*, Hous. Chron., Feb. 25, 2004, at A1*, available at* http://www.chron.com/news/houston-texas/article/Waller-County-DA-apologizes-in-vote-flap-1957246.php.

94.     In 2008, Waller County resolved a lawsuit brought by DOJ concerning the County's voter registration practices, acknowledging in a consent decree that the County rejected voter

registration applications in violation of federal voting rights laws and that its illegal actions primarily had an impact on Prairie View students. Order, *United States v. Waller Cnty., Texas*, No. 4:08-cv-03022, ECF No. 7 (S.D. Tex. Oct. 17, 2008) (approving Consent Decree); *see also* Docket, *United States v. Waller Cnty., Texas*, No. 4:08-cv-03022 (S.D. Tex. Oct. 9, 2008).

95.     Notwithstanding this history of intentionally discriminatory voting schemes, Texas adopted SB 14. The State did so without taking meaningful ameliorative steps to reduce the disproportionate burden the law imposes on voters of color.

96.     Texas's contemporary relationship with racial discrimination in voting extends outside of the voter ID context. As recently as March 2012, DOJ denied preclearance to Galveston County's proposed redistricting plan for County Commissioners on the basis of discriminatory purpose. The County, among other things, failed to adopt set criteria for redistricting, and deliberately excluded the sole minority-preferred County Commissioner from the process of redistricting. *See* Exhibit B, Letter from Thomas E. Perez, Asst. Att'y Gen., U.S. Dep't of Justice, to James E. Trainor, III, (Mar. 5, 2012), *available at* www.justice.gov/crt/about/vot/sec_5/ltr/l_030512.php.

97.     Also in 2012, a three-judge panel in the Western District of Texas reconfigured the State's 2011 redistricting plan for the U.S. House of Representatives after finding that the legislature that adopted the original plan had "impermissibly focused on race" in the decennial redistricting. *Perez v. Perry*, No. 5:11-cv-360, ECF No. 690 at 6 (W.D. Tex. Mar. 19, 2012).

98.     In 2012, a D.C. Court reviewing Texas's redistricting plan for the U.S. House of Representatives stated that DOJ and intervening voters of color had "provided more evidence

of discriminatory intent than [the Court had] space, or need, to address." *Texas v. United States*, 887 F. Supp. 2d 133, 161 n.32 (D.D.C. 2012), *vacated and remanded*, 133 S. Ct. 2885 (2013); *see also id.* at 161 (explaining that "the totality of the evidence" demonstrated that the plan "was motivated, at least in part, by discriminatory intent").

99.     The same Court also blocked preclearance of the State's 2011 State House redistricting plan based on discriminatory effect, but noted that "the full record strongly suggests that the retrogressive effect we found may not have been accidental." *Id.* at 177; *see also id.* (characterizing the map drawer's testimony as "incredible" and "reinforc[ing] evidence suggesting mapdrawers cracked [precincts] along racial lines to dilute minority voting power").

100.     SB 14 was passed by the same Texas state legislature that passed the aforementioned discriminatory 2011 redistricting plans.

101.     SB 14 was passed at approximately the same time as the aforementioned discriminatory 2011 redistricting plans.

102.     SB 14 was passed with the same discriminatory purpose as the aforementioned 2011 redistricting plans.

103.     Race, color, and membership in a language minority group continue to be determinative factors in citizens' access to Texas's political process, as reflected by the following:

> (1) racially polarized voting marks Texas elections at all levels;
>
> (2) Black and other people of color in Texas face the ongoing effects of state-sanctioned discrimination, including in the context of voting, as discussed *infra*;

(3) Black and other people of color in Texas disproportionately encounter socio-economic barriers to their full and complete access to the political process in the State, as discussed *infra*;

(4) electoral campaigns in Texas continue to involve racial appeals;

(5) the State legislature continues to be less responsive to the concerns of Black and other people of color than to the majority population; and

(6) as discussed *infra*, the purported rationales for the electoral device here—preventing impersonation fraud and ensuring electoral integrity—are tenuous at best and false in reality because Texas has not shown any evidence to support these rationales.

### *Equitable Relief Under Section 3(c) Is Warranted*

104. The history and ongoing record of voting discrimination in Texas, including its implementation of SB 14, establishes that it has implemented and will continue to implement schemes to limit the electoral opportunity of voters of color.

105. Without preclearance review under Section 3(c), Texas is likely to persist in violating the voting rights of Plaintiff-Intervenors, and the constitutional guarantees under the Fourteenth and Fifteenth Amendments.

## IV. CLAIMS

### Count 1

106. Plaintiff-Intervenors reallege the facts set forth above.

107. SB 14 violates Section 2 because it abridges Plaintiff-Intervenors' right to vote free of discrimination based on race or color.

108.    SB 14 violates Section 2 because Texas adopted SB 14 for the purpose of denying Black and other people of color full and equal access to the political process.

109.    In addition, under the totality of the circumstances, Texas's implementation and enforcement of SB 14 will interact with social and historical conditions in the State to deny equal opportunities for Black voters and other voters of color to participate in the political process, resulting in a denial of the right to vote, in violation of Section 2.

110.    The totality of the circumstances demonstrating a Section 2 violation include but are not limited to

(1)    the disproportionate and severe burden that SB 14 will impose on Black voters;

(2)    the Texas legislature's knowledge that SB 14 would severely burden minority voters;

(3)    the long history of official voting-related discrimination in the State;

(4)    Texas's past use of voting practices and procedures that tend to enhance the opportunity for discrimination against voters of color;

(5)    the significant extent to which Black and other people of color in Texas bear the effects of discrimination in areas such as education and employment, which will, in turn, make it more difficult for them to obtain the required IDs under SB 14;

(6)    the legislature's failure to identify evidence of in-person voter fraud in the State of Texas, which indicates that the Texas legislature's stated justification for SB 14 is pretextual;

(7)    the Texas legislature's rejection of measures that would have reduced the burdens SB 14 places on voters of color, despite having been informed of those burdens and having been presented with reasonable ameliorative measures;

(8)    the fact that the Texas legislature that passed SB 14 acted with a documented intent to discriminate against voters of color when it passed other contemporaneous voting laws;

(9)    Texas's decision to implement SB 14 without amendment even after a federal court found that SB 14 would produce discriminatory results;

(10)    evidence demonstrating that the Texas legislature departed from its usual procedures when it passed SB 14;

(11)    the fact that Texas legislators knew or should have known that Black and Hispanic Texans disproportionately lack the required IDs under SB 14 and would have a particularly difficult time obtaining those IDs;

(12)    the passage of SB 14 against the backdrop of substantial growth in Texas's non-white, voting-age population in the past decade;

(13)    Texas's history of racially polarized voting; and

(14)    the use by Texas politicians of racial appeals during political campaigns.

## Count 2

111.    Plaintiff-Intervenors reallege the facts set forth above.

112.    SB 14 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it purposefully abridges the right to vote of otherwise eligible voters like Individual Plaintiff-Intervenors and the constituents of Organizational Plaintiff-Intervenors on the basis of race or color.

113.    In passing SB 14, the Texas legislature was motivated by an intent to deny Black and other voters of color of an equal opportunity to vote. The Texas legislature's intent to discriminate is evidenced by, among other things:

(1)    the disproportionate and severe burden that SB 14 will impose on Black voters;

(2)    the Texas's legislature's knowledge that SB 14 would severely burden minority voters;

(3)    the Texas legislature's rejection of measures that would have reduced the burdens SB 14 places on voters of color, despite having been informed of those burdens and having been presented with reasonable ameliorative measures;

(4)    the legislature's failure to identify evidence of in-person voter fraud in the State of Texas, which indicates that the legislature's stated justification for SB 14 is pretextual;

(5)    SB 14's failure to address voting procedures—such as mail-in balloting—that are known to involve substantial voter fraud, further demonstrating that combating voter fraud was not the legislature's true purpose;

(6)    the fact that the Texas legislature that passed SB 14 acted with a documented intent to discriminate against voters of color when it passed other contemporaneous voting laws;

(7)    the Texas legislature's failure to meaningfully amend SB 14 even after a federal court found that SB 14 would produce discriminatory results;

(8)    the legislature's departure from its usual procedures during the passage of SB 14;

(9)     the fact that Texas legislators knew or should have known that Black and Hispanic Texans disproportionately lack the required IDs under SB 14 and would have a severely burdensome experience obtaining them; and

(10)     the passage of SB 14 against the backdrop of substantial growth in Texas's non-white, voting-age population in the past decade.

## Count 3

114.   Plaintiff-Intervenors reallege the facts set forth above.

115.   SB 14 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it discriminates against Plaintiff-Intervenors by intentionally denying or abridging their equal opportunity to vote and to access voting polls on election day on account of their race or color.

116.     The Texas legislature's intent to discriminate is evidenced by, among other things:

  (1) the severe burden that SB 14 will impose on Black voters;

  (2) the Texas's legislature's knowledge that SB 14 would severely burden voters of color;

  (3) the Texas legislature's rejection of measures that would have reduced the burdens SB 14 places on voters of color, despite having been informed of those burdens and having been presented with reasonable ameliorative measures;

  (4) the legislature's failure to identify evidence of in-person voter fraud in the State of Texas, which indicates that the legislature's stated justification for SB 14 is pretextual;

(5) SB 14's failure to address voting procedures—such as mail-in balloting—that are known to involve voter fraud, further demonstrating that combating voter fraud was not the legislature's true purpose;

(6) the fact that the Texas legislature that passed SB 14 acted with a documented intent to discriminate against voters of color when it passed other contemporaneous voting laws;

(7) the Texas legislature's failure to significantly amend SB 14 even after a federal court found that SB 14 would produce discriminatory results;

(8) the legislature's departure from its usual procedures during the passage of SB 14;

(9) the fact that Texas legislators knew or should have known that Black and Hispanic Texans disproportionately lack the IDs required by SB 14 and would have a severely burdensome experience obtaining them; and

(10) the passage of SB 14 against the backdrop of substantial growth in Texas's non-white, voting-age population in the past decade.

**Count 4**

117.    Plaintiff-Intervenors reallege the facts set forth above.

118.    SB 14 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it denies many Texas citizens, including Plaintiff-Intervenors, their constitutionally protected right to participate in elections on an equal basis with other Texas citizens.

119.    SB 14 imposes severe, unconstitutional burdens on the right to vote of many Texas citizens, particularly those who are poor, who lack one of the required IDs under SB 14.

120.    As a result of SB 14's particular requirements and other factors (such as the inaccessibility of many DPS offices), the amount of resources (including time and money) that many eligible voters will be forced to expend to obtain one of the required IDs will be substantial.

121.    Thousands, potentially hundreds of thousands, of Texas voters currently lack one of the required IDs and, therefore, will be forced to bear the significant cost of obtaining the necessary ID.

122.    Because the cost of complying with SB 14 will be prohibitive for many of these voters, SB 14 will disfranchise a significant number of registered and otherwise eligible Texas voters.

123.    Defendants have not demonstrated and cannot show an interest sufficient to justify the severe, unconstitutional burdens that SB 14 places on many Texas voters who lack the requisite IDs.

124.    Though purportedly designed to protect against in-person voter fraud, there is no evidence that such voter fraud actually occurred in Texas before SB 14's passage or that existing State and federal laws did not adequately deter in-person voting fraud.

125.    SB 14 thus purportedly targets a problem that does not exist in fact. The law places a severe, unconstitutional burden on the fundamental right to vote of many Texas citizens, including Plaintiff-Intervenors, which is not justified by any legitimate, countervailing state interest.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenors respectfully pray that this Court:

126.    Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that SB 14: (1) abridges Plaintiff-Intervenors' right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act; (2) imposes severe burdens on Plaintiff-Intervenors' right to vote in violation of the Fourteenth Amendment to the United States Constitution; (3) was adopted by the Texas legislature with a racially discriminatory purpose in violation of Section 2 and the Fourteenth and Fifteenth Amendments to the United States Constitution; (4) is unconstitutional because it violates the Fourteenth and Fifteenth Amendments to the United States Constitution.

127.    Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the requirements of SB 14, including enjoining Defendants from conducting any elections using SB 14.

128.    Issue an order pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), retaining jurisdiction and requiring Texas to obtain preclearance, for a necessary and appropriate period of time, from DOJ for any and all future changes in voting law, upon determination that the State has shown that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.

129.    Issue an order requiring Defendants to pay Plaintiff-Intervenors' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. §§ 1973 and 1988.

130.    Grant such other further relief as it deems proper and just.

| | |
|---|---|
| Date:  November 14, 2013 | Respectfully Submitted,<br><br>/s/ Ryan P. Haygood<br><br>Sherrilyn Ifill<br>  *Director-Counsel*<br>Christina A. Swarns<br>Ryan P. Haygood<br>  *Attorney-in-Charge*<br>Natasha M. Korgaonkar<br>Leah C. Aden<br>NAACP Legal Defense and<br> Educational Fund, Inc.<br>40 Rector Street, 5th Floor<br>New York, New York 10006<br>Tel: (212) 965-2200<br>Fax: (212) 226-7592<br><br>Danielle Conley<br>Jonathan Paikin<br>Kelly P. Dunbar<br>Sonya L. Lebsack<br>Wilmer Cutler Pickering<br>Hale and Dorr LLP<br>1875 Pennsylvania Ave., NW<br>Washington, DC 20006<br>Tel: (202) 663-6000<br>Fax: (202) 663-6363<br><br>*Attorneys for Plaintiff-Intervenors* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2013, I served a copy of the foregoing using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record registered with the ECF system.


/s/ Ryan P. Haygood
RYAN P. HAYGOOD

NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006