IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>RICK PERRY, *et al.*,<br><br>    Defendants. | Civil Action No. 2:13-cv-193 (NGR) |
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>TEXAS LEAGUE OF YOUNG VOTERS<br>EDUCATION FUND, *et al.*,<br><br>    Plaintiff-Intervenors,<br><br>TEXAS ASSOCIATION OF HISPANIC<br>COUNTY JUDGES AND COUNTY<br>COMMISSIONERS, *et al.*,<br><br>    Plaintiff-Intervenors,<br><br>  v.<br><br>STATE OF TEXAS, *et al.*,<br><br>    Defendants.<br><br>TRUE THE VOTE,<br><br>    Movant-Intervenor. | Civil Action No. 2:13-cv-263 (NGR) |

TEXAS STATE CONFERENCE OF NAACP
BRANCHES, *et al.*,

               Plaintiffs,

      v.

JOHN STEEN, *et al.*,

             Defendants.

Civil Action No. 2:13-cv-291 (NGR)

## **THE VEASEY-LULAC PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF RELEVANT FACTS ............................................................................. 2

SUMMARY OF ARGUMENT ............................................................................................ 8

APPLICABLE LEGAL STANDARDS .............................................................................. 9

I.      RULE 12(b)(1) STANDARD ................................................................................. 9

II.     RULE 12(b)(6) STANDARD ................................................................................. 9

ARGUMENT ......................................................................................................................... 10

I.      THE PLAINTIFFS HAVE ARTICLE III STANDING TO CHALLENGE
        SB 14 ......................................................................................................................... 10

        A.      Floyd James Carrier, Anna Burns, Koby Ozias, and John Mellor-
                Crummey Have Established Their Standing to Challenge SB 14 .................. 10

                1.      Floyd James Carrier Has Suffered, and Will Continue to
                        Suffer, an Injury-in-Fact As a Disabled Veteran Who Lacks
                        the Identification Required to Vote Under SB 14 ................................ 11

                2.      Anna Burns, Koby Ozias, and John Mellor-Crummey Face a
                        Reasonable Fear that They Will Be Denied Their Right to Vote
                        Under SB 14 ................................................................................................ 13

        B.      The Elected Officials, Community Organizers, LULAC, and Dallas
                County Have Standing to Challenge SB 14 ....................................................... 16

                1.      The Plaintiffs Are Injured Directly Because They Will Have to
                        Spend Additional Money to Run Campaigns, Register Voters,
                        and Turn Out Supporters ....................................................................... 16

                2.      LULAC Also Has Associational Standing to Challenge SB 14 ........... 17

                3.      Dallas County Further Has Standing Under Other Supreme
                        Court Precedent ....................................................................................... 18

        C.      The Plaintiffs Have Standing to Sue Rick Perry ............................................. 20

II.     The Organizations, Elected Officials, Community Organizers, and Dallas
        County Have Asserted Valid Causes of Action ...............................................23

III.    THE PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF
        CAN BE GRANTED..........................................................................................25

        A.    Plaintiffs Have Pleaded Sufficient Facts to State a Claim Under
              Section 2 of the Voting Rights Act........................................................25

        B.    The Veasey-LULAC Plaintiffs Have Also Pleaded Sufficient Facts to
              State a Claim of Unconstitutional Racial Discrimination ................................29

        C.    The Speech, Association and Equal Protection Claims All State Valid
              Causes of Action ...................................................................................30

        D.    Plaintiffs Have Pleaded Sufficient Facts to State a Claim that SB 14 Is
              an Unconstitutional Poll Tax.................................................................33

        CONCLUSION ...........................................................................................33

## <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps;">Cases</span>

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...............................................................30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................2

*Ass'n of Community Organizations for Reform Now (ACORN) v. Fowler*, 178 F.3d 350
    (5th Cir. 1999) .......................................................................................................15

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...............................................................................30

*Burdick v. Takushi*, 504 U.S. 428 (1992) .........................................................................30

*Bush v. Gore*, 531 U.S. 98 (2000) ....................................................................................30

*Chisom v. Roemer*, 501 U.S. 380 (1991) ..........................................................................23

*Common Cause of Georgia v. Billups*, 554 F.3d 1340 (2009)...............................1, 2, 12

*Craig v. Boren*, 429 U.S. 190 (1976)................................................................................20

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).......................... passim

*Ex parte Young*, 209 U.S. 123 (1908)...............................................................................22

*Florida State Conference of NAACP v. Browning*, 569 F. Supp. 2d 1237 (N.D. Fla. 2008)
    *aff'd on other grounds*, 522 F.3d 1153 (11th Cir.) .......................................... 16-17

*Frew v. Hawkins*, 540 U.S. 431 (2004)............................................................................22

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) ...................................................................32

*Harman v. Fossenius*, 380 U.S. 528 (1965)......................................................................33

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966)..................................33

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................17

*Higgins v. Texas Department of Health Services*, 801 F. Supp. 2d 541 (W.D. Tex. 2011) ...........9

*Home Builders Association of Mississippi., Incorporated v. City of Madison, Mississippi*,
    143 F.3d 1006, 1010 (5th Cir. 1998) ......................................................................9

*Husted v. Obama for America*, 133 S. Ct. 497 (Oct. 16, 2012)........................................31

*International Union, United Automobile, Aerospace and Agricultural Implement Workers
    of America v. Brock*, 477 U.S. 274 (1986).....................................................17, 18

*Johnson v. DeGrandy*, 512 U.S. 997 (1994) ................................................................23, 25

*Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984) .................................................28

*Kirksey v. Board of Supervisors of Hinds County*, 554 F. 2d 139 (5th Cir. 1977) (en banc), *cert. denied*, 434 U.S. 968 (1977) ...........................................................................28

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ........................................................................16

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) ................................................................22

*League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) ............22, 23

*Leal v. McHugh*, 731 F.3d 405 (5th Cir. 2013) ..................................................................9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................10, 13

*Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996) ........................................23

*Norman v. Reed*, 502 U.S. 279 (1992) ..............................................................................30

*Obama for America v. Husted*, 697 F3d 423 (6th Cir. 2012) .........................................31

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) ...............................................21, 22, 23

*Perez v. Perry*, 132 S. Ct. 934 (2012) ...............................................................................22

*Public Citizen, Inc. v. Bomer*, 274 F.3d 212 (5th Cir. 2001) .........................................10

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ................................................9

*Secretary of State of Maryland v. Munson Co., Inc.*, 467 U.S. 947 (1984) ...................24

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .......................................................28

*Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012), *vacated and remanded*, *Shelby County v. Holder*, U.S. , 133 S.Ct. 2612 (2013) ..........................................................27

*Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) .......................16, 17

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .......................................................................25

*United Food & Commercial Workers Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) .................................................................................................................................18

*United States v. Marengo County*, 731 F.2d 1546 (11th Cir. 1984) ..............................28

*United States v. McElveen*, 180 F. Supp. 10 (1960) .......................................................29

*United States v. Thomas*, 362 U.S. 58 (1960) ...............................................................32

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252
(1977) ........................................................................................................................29

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ...................................................................27

*Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982) ...............................19

*Whitcomb v. Chavis*, 403 U.S. 124 (1971).......................................................................2

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ....................................................................30

STATUTES

§ 2 of the Voting Rights Act, 42 U.S.C. § 1973 ...................................................... passim

TEX. ELEC. CODE § 13.002(i) .........................................................................................13

TEX. ELEC. CODE § 15.001(c) .........................................................................................13

TEX. ELEC. CODE § 63.0101 ...........................................................................................11

TEX. ELEC. CODE § 63.0101(1) .......................................................................................26

TEX. GOV'T CODE § 401.041 ..........................................................................................21

LEGISLATIVE MATERIALS

S. Rep. No. 94-295 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774.................................23

OTHER AUTHORITIES

About the Office Texas Secretary of State, http://www.sos.state.tx.us/about/index.shtml
(last visited Nov. 19, 2013).......................................................................................20

Plaintiffs Marc Veasey, Jane Hamilton, Sergio DeLeon, Floyd J. Carrier, Anna Burns, Michael Montez, Penny Pope, Oscar Ortiz, Koby Ozias, John Mellor-Crummey, Jane Doe, John Doe, League of United Latin American Citizens ("LULAC") and Dallas County, Texas, (hereafter, the "Veasey-LULAC Plaintiffs") respectfully submit this memorandum in opposition to the motion to dismiss filed on behalf of Defendants Rick Perry, John Steen, Steve McCraw and the State of Texas.

## INTRODUCTION

This case involves the most restrictive voter ID law in the history of the United States. As the Amended Complaint alleges, the new law, SB 14 of 2011, injures hundreds of thousands and potentially millions of Texas voters, who are disproportionately African-American and Hispanic—just as the law was intended to do.

The Veasey-LULAC Plaintiffs, along with other consolidated plaintiffs, are individuals and entities who allege that SB 14 injures them and does so by violating numerous provisions of federal law.  Plaintiffs' allegations of standing and violation (causes of action) are familiar ones which the Supreme Court and other federal courts have repeatedly recognized in voting cases, including voter ID cases.

Nevertheless, the Defendants have filed a motion to dismiss, challenging both Plaintiffs' standing and Plaintiffs' causes of action.  The motion is unusual because—while citing many off-the-point cases—it somehow manages to avoid the cases that are the most direct authority.

Standing.  In the twelve pages that Texas devotes to standing issues, Defs.' Mot. to Dismiss 3-15, two dozen cases are cited, but not once does it cite either of the two cases that upheld broad standing in *voter ID* cases: the Supreme Court case *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), and the Eleventh Circuit case *Common Cause of Georgia*

1

*v. Billups*, 554 F.3d 1340 (2009).  Both of these cases specifically upheld the standing of plaintiffs just like the Plaintiffs in this case, yet Texas does not inform the Court of these cases.

<u>Cause of action</u>.  Here Texas does cite *Crawford*, but only for the purposes of misciting it.  On page 1 of their motion, the Defendants claim: "Voter identification laws are constitutional.  The Supreme Court so held in *Crawford* . . . ."  That is not what the Supreme Court held in *Crawford*.  The Court there held that voter identification laws *can* be constitutional, depending on the proof.  More to the point, the Supreme Court in *Crawford* obviously recognized a cause of action to challenge a voter ID law on various federal grounds, just as Plaintiffs are doing here.

*Crawford* arose in Indiana, and Texas says here that its voter ID law should be upheld because the Supreme Court upheld Indiana's law.  Forty years ago, Texas made the same argument, asking the Supreme Court to uphold multi-member districts in Dallas and Bexar Counties because the Court had just upheld such districts in Indiana.  *Whitcomb v. Chavis*, 403 U.S. 124 (1971).  The Supreme Court rejected the analogy.  The Court determined that what is valid in Indiana is not necessarily valid in Texas, and proceeded to unanimously strike down Texas's multi-member districts.  *Id.*

The Defendants are entitled to present a vigorous defense and, at a later time, they are entitled to ask the Court to rule against the Plaintiffs' case.  This motion to dismiss stage is not that time.  The Defendants motion should therefore be denied.

## STATEMENT OF RELEVANT FACTS

Allegations in a complaint are assumed to be true and to carry with them every reasonable inference.  A complaint may not be dismissed unless there is no way the allegations can support a judgment for the plaintiff.  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), has put a gloss on the rule, requiring that allegations be plausible, but the rule against dismissal has not changed.  In the Veasey-LULAC Plaintiffs' Amended Complaint, this requirement of plausibility is plainly

2

met, especially because most of the factual allegations are matters of public record and are beyond dispute.  To the extent any allegations are conclusory, they are likewise plausible because they are amply supported by foundations laid in nearby paragraphs of objective validity.

Against that background, the following is a summary of the major allegations of the Amended Complaint.

Before passage of SB 14, registering to vote was a simple and singular process that could be completed at registration offices located in every county (in fact, some counties had more than one office).  Am. Compl. ¶ 16.  These offices are open during normal business hours, usually from 9am to 5pm, Monday through Friday.  *Id.* ¶ 16.  Under this voter registration regime, the State could not produce, despite concerted efforts to do so in the D.C. case, a single instance of voter impersonation that SB 14 could have prevented.  *Id.* ¶ 33.  The principal reason for this is there are so many checks and protections in the voting process at the polls that impersonation is extremely difficult.  *Id.* ¶¶ 33, 34.

Nevertheless, the legislature enacted, and Governor Perry signed, SB 14 into law in 2011.  In doing so, they rendered the voter registration offices largely irrelevant.  SB 14, by requiring registered voters to present a second document at the polls in order to vote, creates a double registration system.  *Id.* ¶¶ 13, 16.  This second certificate is not obtainable at a voter registration office.  Rather, SB 14 limits the second registration certificate to one of the following types: a Texas driver's license, state identification, concealed weapons permit, or election identification certificate (EIC) (which voters can obtain only from a Department of Public Safety office), or a U.S. passport, military ID, or citizenship certificate (which voters can obtain only from the U.S. government).  *Id.* ¶ 13.

3

The acceptable IDs under SB 14 are also significantly harder to obtain than voter registration certificates, which were formerly sufficient.  Instead of going to the voter registration office, located in every county, voters must go to Department of Public Safety (DPS) offices.  *Id.* ¶¶ 2, 13, 16.  More than a third of Texas's 254 counties do not have a DPS office at all.  *Id.* ¶ 17. Many others have offices that are open only part-time, with some open as little as one day per week.  *Id.*  Thus, for many people, especially those who work during normal business hours or who live in rural areas, obtaining identification from a DPS office is difficult and inconvenient. ¶ 17.

The new requirement is also expensive.  The only one of the SB 14 photo identifications that can be obtained without cost is the military identification, which of course is available only to a limited class of voters in active military service.  *Id.* ¶ 18.  Other costs for other IDs allowed by SB 14 include: $140, plus the costs of training and ammunition for a qualifying exam, for a concealed weapons permit; $135 for a U.S. Passport; $59.95 for a U.S. citizenship certificate (CIS Form I-560); and $25, plus the costs of any training or exam preparation, for a Texas driver's license.  *Id.* ¶ 18.  The statute does create an Election Identification Certificate (EIC), which is theoretically free, but it cannot be obtained without supporting documents, such as a certified copy of a birth certificate.  *Id.* ¶ 19.  For many people, these supporting documents are costly or even unobtainable at any price.  *Id.*

The effect is huge.  Texas has just over 13,000,000 registered voters.  *Id.* ¶ 2.  Of these, an estimated 795,555 did not have a valid photo ID, based on their lack of a DPS-issued license or identification.  *Id.*  And that was the lowest estimate, which came from the Secretary of State's office.  The Department of Justice put the number of registered voters who lacked a valid photo ID closer to two million (1,893,143).  *Id.* ¶¶ 2, 4, 7.

4

These voters who lack a photo ID permitted under SB 14 are not evenly distributed among racial groups.  Instead, they are disproportionately African-American or Hispanic, and are disproportionately poor, elderly and disabled.  *Id.* ¶¶ 2-3, 21-22, 26.  According to figures provided at trial in the D.C. preclearance case, an estimated 7,835,055 (61.5%) of registered voters are Anglo, 1,472,669 (11.6%) are black, and 3,003,059 (23.6%) are Hispanic.  *Id.* ¶ 2.  But, of the 1,893,143 voters who lacked a Texas ID, only 850,424 (49.0%) are Anglo, compared to 304,931 (17.6%) who are black, and 525,503 (30.3%) who are Hispanic.  *Id.*  In other words, 20.7% of black voters and 17.5% of Hispanic voters lacked a valid Texas ID, while only 10.9% of Anglo voters lacked a Texas ID.  *Id.*  The distance, inconvenience and expense of obtaining the type of photo ID permitted by SB 14 will also bear more heavily on minority voters, a disproportionate percentage of whom are poor.  *Id.* ¶ 22, 29.  As a result, the disparity cited above will likely grow worse.  *Id.* ¶¶ 23, 26.

These effects, especially the negative effects for African-American and Hispanic voters, were intentional.  The evidence for this is strong.  SB 14 was adopted in tandem with a redistricting bill that a federal court has already found to be purposely discriminatory.  *Id.* ¶ 51.  Additionally, the law was adopted in the face of legislators' knowledge that the voter fraud claim was a sham.  *Id.* ¶ 33.  The legislature further declined to ameliorate the law's effects, despite its awareness of the likely impacts for racial and ethnic minorities, and despite examples from other states of ameliorative measures, such as providing for photo IDs in voter registration offices or providing for the exceptions Indiana included in its law that the Supreme Court heavily weighed upon in *Crawford*.  *Id.* ¶¶ 31, 45.  Against the backdrop of Texas's history of discrimination against minority voters, it is clear that the legislature enacted the law with a discriminatory purpose.  *Id.* ¶¶ 1, 36, 55.

5

On the basis of these facts, a three-judge federal court examined the impacts of SB 14 and concluded that "SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African American voters." *Id.* ¶ 28 (quoting *Texas v. Holder*, 888 F. Supp. 2d 113, 138 (D.D.C. 2012)).  As a result, the court denied preclearance. *Id.* ¶ 27.  Despite that court's findings, however, Texas moved immediately to implement SB 14, without change, after the Supreme Court struck down Section 5 of the Voting Rights Act. *Id.*  The Plaintiffs then filed this suit to enjoin the enforcement of SB 14.

The Plaintiffs include several individuals who allege that they will not be able to vote under the new law because they lack one of the limited forms of photo ID required under SB 14, or because they do not have a photo ID that matches the name on their voter registration.  These Plaintiffs are Floyd James Carrier,[1] Anna Burns, Koby Ozias, and John Mellor-Crummey. *Id.* ¶¶ 7-8.

A second group of individual Plaintiffs includes people who have run and plan to run for elected office, who will have to spend additional resources on educating, encouraging and otherwise mobilizing voters to obtain photo IDs—resources that must be diverted from their ordinary allocation to campaigning, mobilizing, and getting out the vote.  These Plaintiffs include Marc Veasey, Michael Montez, Penny Pope, Sergio DeLeon, and Oscar Ortiz. *Id.* Additionally, Jane Hamilton has been an active political organizer in her community and has worked to organize and encourage people to vote.  She currently serves as chief of staff to Plaintiff Rep. Marc Veasey.

---

[1] Carrier has a Veterans' Administration identification, but it does not have a photograph.  The allegation in paragraph 8(b) states that Mr. Carrier does have a Veterans' Administration photo ID, but that allegation is erroneous and will be corrected in an amendment.

6

The Plaintiffs also include the League of United Latin American Citizens (LULAC), which is the oldest and largest national Latino civil rights organization.  *Id.* ¶ 7.  As a result of SB 14, it will have to spend additional resources to register and organize voters.  *Id.*  Moreover, it brings this case on behalf of its Hispanic and African-American members who lack valid photo identification under SB 14.  *Id.* ¶ 11.

Finally, the Plaintiffs include Dallas County, Texas.  *Id.* ¶ 7.  As a direct result of SB 14, Dallas County is no longer able to provide all of the services necessary for Dallas County voters to ensure that they are eligible to vote.  *Id.* ¶ 8.  The law also imposes significant increases in election costs, which the County is required to bear.  *Id.*  As a result of SB 14, the County also faces the threat of legal liability for giving effect to an intentionally and unlawfully discriminatory law.  *Id.*

These Plaintiffs allege that SB 14 violates Section 2 of the Voting Rights Act, in that it was enacted with the purpose of, and will have the result of, denying or abridging the right to vote on account of race and/or language minority status.  Additionally, the Plaintiffs allege that SB 14 is unconstitutional because: (1) it burdens the fundamental right to vote, in violation of the First Amendment, as incorporated by the Fourteenth Amendment; (2) it denies the Plaintiffs the equal protection of the laws and denies or abridges their right to vote on account of their race, in violation of the Fourteenth and Fifteenth Amendments; (3) it imposes arbitrary requirements, severe burdens, and disparate treatment of voters, in violation of the Fourteenth Amendment; and (4) it amounts to a poll tax, in violation of the Twenty-Fourth Amendment.  They therefore request that the Court issue a declaratory judgment and enjoin the Defendants from enforcing SB 14.

## SUMMARY OF ARGUMENT

The Defendants' motion to dismiss should be denied. The Plaintiffs each allege an injury, caused by SB 14, which could be redressed by a favorable decision of this Court. Additionally, each plaintiff—including each elected official, community organizer, organization, and Dallas County—has alleged sufficient facts to establish a valid cause of action. Accordingly, the Plaintiffs may bring this challenge to SB 14 and its implementation in this Court. The Plaintiffs may also bring the suit against the Defendants, including Rick Perry, who will injure the Plaintiffs in the course of carrying out his duties.

The Plaintiffs have also pleaded sufficient facts to state claims upon which relief may be granted. Despite the Defendants' apparent but mistaken belief that voter-identification laws are categorically constitutional, *see* Defs.' Mot. to Dismiss 1, the lawfulness of a voter identification law is fact dependent, as evidenced by the Supreme Court's opinion in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008). Additionally, *Crawford* considered a limited number of claims—namely that the Indiana voter identification law violated the Fourteenth Amendment on its face because it imposed substantial burdens. Because the Plaintiffs in this case have asserted additional claims, with different facts, against a different law, the Supreme Court's decision in *Crawford* does not—as much as Defendants might like it to—stand for the proposition that voter identification laws are always constitutional. To the contrary, *Crawford* makes it clear that in a different state, under different circumstances, with different effects, the law can very well violate federal statutory and constitutional rights. That is precisely what the Plaintiffs claim in this case. Indeed, the Plaintiffs included numerous facts in their Amended Complaint that, if true, will entitle the Plaintiffs to relief under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and under the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments to the U.S. Constitution.

8

## APPLICABLE LEGAL STANDARDS

### I.      RULE 12(B)(1) STANDARD

The Defendants' claim that the Plaintiffs lack Article III standing is considered under Rule 12(b)(1).  *See, e.g.*, *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998); *Higgins v. Tex. Dep't of Health Servs.*, 801 F. Supp. 2d 541, 547 (W.D. Tex. 2011).  A motion under 12(b)(1) "should be granted only if it appears certain that the plaintiff[s] cannot prove any set of facts in support of [their] claim[s] that would entitle plaintiff[s] to relief."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Home Builders Ass'n*, 143 F.3d at 1010).

In ruling on such a motion, the Court may consider "(1) the complaint alone; the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of disputed facts."  *Ramming*, 281 F.3d at 161.  That is, in contrast to a Rule 12(b)(6) motion, the district court is empowered to consider matters outside the Complaint and matters of fact that may be in dispute.  *Id.*

### II.     RULE 12(B)(6) STANDARD

The Defendants also move to dismiss this case under Rule 12(b)(6), arguing that the Plaintiffs fail to state a claim upon which relief may be granted.  Motions to dismiss under 12(b)(6) are "viewed with disfavor and [are] rarely granted."  *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).  Thus, a Court reviewing a 12(b)(6) motion is to "construe[] facts in the light most favorable to the nonmoving party," and it need only determine that the complaint "allege[d] enough facts to move the claim 'across the line from conceivable to plausible.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## **ARGUMENT**

## I.   **THE PLAINTIFFS HAVE ARTICLE III STANDING TO CHALLENGE SB 14**

The Plaintiffs have met the elements of standing.[2]  To have standing to sue in federal court, the Plaintiffs must establish: "they have suffered an 'injury in fact'; the injury is 'fairly traceable' to the defendant's actions; and the injury will 'likely . . . be redressed by a favorable decision." *Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 217 (5th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The injuries asserted must be "concrete and particularized," as well as "actual or imminent."  *Id.*  Injuries are "particularized" if they affect the plaintiff in a "personal and individual way," as opposed to "a generalized grievance, common to all citizens or litigants in Texas."  *Public Citizen*, 274 F.3d at 218-19 (quoting *Lujan*, 504 U.S. at 560-61) (internal quotation marks omitted).  Because each of the Veasey-LULAC Plaintiffs has alleged a concrete and particularized injury, "fairly traceable" to SB 14, that can be redressed by a favorable decision of this Court, the Plaintiffs have Article III standing to pursue their claims.[3]

## A.   **FLOYD JAMES CARRIER, ANNA BURNS, KOBY OZIAS, AND JOHN MELLOR-CRUMMEY HAVE ESTABLISHED THEIR STANDING TO CHALLENGE SB 14**

The individual Plaintiffs in this case have pleaded sufficient facts to establish that they face actual or imminent injuries, particular to them, as a result of SB 14.  Their injuries arise

---

[2] Defendants argue that the John Doe and Jane Doe Plaintiffs must be dismissed because there is no justification for anonymous litigation here.  Defs. Mot. to Dismiss 6-8.  The Veasey-LULAC Plaintiffs listed John Doe and Jane Doe as Plaintiffs because the Complaint and Amended Complaint were filed before any elections were held in which SB 14 was in effect.  Accordingly, John Doe and Jane Doe are placeholders.  We will be amending the complaint to add plaintiffs whose experiences during the Fall 2013 elections cycle are representative of the impacts that SB 14 has on voters' abilities to exercise their rights to vote.

[3] The Supreme Court has held that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Lujan*, 504 U.S. at 561.

because they either lack identification acceptable to vote in person under SB 14 or because the names on their identification do not match their names on the voter registration lists.  As a result, the Plaintiffs reasonably feared that they would be denied their right to vote in the November 2013 elections, and they continue to reasonably fear that they will be denied the right to vote in the upcoming 2014 primary and general elections.  To the extent the Defendants deny any of the individual Plaintiffs' standing to challenge SB 14, the Defendants misunderstand and/or mischaracterize the injuries the Plaintiffs allege.

      1.     Floyd James Carrier Has Suffered, and Will Continue to Suffer, an Injury-in-Fact As a Disabled Veteran Who Lacks the Identification Required to Vote Under SB 14

Mr. Carrier has established his standing to challenge SB 14 because he does not have one of the forms of photo identification required to vote in person under the law and he thus faces the actual and imminent risk that he will be denied the opportunity to vote in person.  Am. Compl. ¶ 8(b).  His Veterans' Administration identification was not listed among the favored forms of identification in SB 14. TEX. ELEC. CODE § 63.0101.[4]

The Defendants assert that Mr. Carrier does have SB 14 approved identification, however, because the Texas Secretary of State issued guidance to elections officials on October 17, 2013 allowing voters to present Veterans' Administration identifications.  Defs.' Mot. to Dismiss 4-5 (citing TEXAS SEC'Y OF STATE, No. 2013-13, ELECTION ADVISORY: ACCEPTABLE FORMS OF PHOTO IDENTIFICATION (2013)).  Thus, according to the Defendants, Mr. Carrier would not, nor will not, suffer any injury as a result of SB 14.  But the regulation does not sufficiently dispel the actual or threatened injury.  SB 14, by its text, does not include Veterans'

---

[4] As noted in footnote 2, the Amended Complaint incorrectly states that Mr. Carrier holds a *photo* Veterans' Administration identification.  In fact, his Veterans' Administration identification card does not include a photo.  The Veasey-LULAC Plaintiffs will correct this in an amendment.

Administration identifications among the narrow categories of acceptable identification and the law does not appear to provide the Texas Secretary of State authority to amend the list of approved IDs.  Consequently, neither Mr. Carrier, nor others in his situation, can have reasonable confidence they will be permitted to vote.

Moreover, even if Mr. Carrier did have one of the forms of photographic identification listed in SB 14, he would still suffer injuries sufficient to confer standing.  By having to show one of a limited number of photo identifications, which he was not previously required to show, Mr. Carrier is sufficiently injured for standing purposes.  As the Eleventh Circuit explained in *Common Cause of Georgia v. Billups*, "[e]ven if [the individual plaintiffs] possessed an acceptable form of photo identification, they would still have standing to challenge the statute that required them to produce photo identification to cast an in-person ballot." 554 F.3d 1340, 1351 (2009).  This is so because "[a] plaintiff need not have the franchise wholly denied to suffer injury." *Id.* (internal quotation marks and citations omitted).  And, just as the inability to pay a poll tax is not required to challenge it, *id.* (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966), neither is the inability to produce an acceptable photo identification required to challenge a photo identification requirement, *id.* at 1351-52.

More still, Mr. Carrier's injuries are not addressed by the exemption for voters with disabilities.  In claiming that his injuries are redressed by that exemption, the Defendants ignore the question of whether Mr. Carrier is qualified under the statute for that exemption.  Further, even if Mr. Carrier could qualify for that exemption, the Defendants ignore the numerous hurdles he must overcome before he is able to exercise his right to vote under the exemption.  The first of these hurdles is that Mr. Carrier must obtain a voter registration certificate containing a disability notation. TEX. ELEC. CODE § 15.001(c).  To obtain this notification, he must comply with

different registration requirements, including: (1) providing written documentation from the

United States Social Security Administration or from the United States Department of Veterans

Affairs evidencing his disability and (2) completing a statement "in a form prescribed by the

secretary of state" that he does not have an SB 14 identification. *Id.* at § 13.002(i).  Thus, even if

he does qualify for the exemption, he now must go to great and new lengths to be able to vote in

person, as he was previously able to do.

        2.       Anna Burns, Koby Ozias, and John Mellor-Crummey Face a Reasonable
               Fear that They Will Be Denied Their Right to Vote Under SB 14

Plaintiffs Anna Burns, Koby Ozias, and John Mellor-Crummey have established their

standing to challenge SB 14 because they each possess identification that, while falling within

the list of SB 14-approved identification, contains a name that does not match the information on

the voter registration rolls.  Am. Compl. ¶ 8.  Contrary to Defendants' assertion, Defs.' Mot. to

Dismiss 5, alleging that the identification is not an "exact match" is sufficient to plead an Article

III injury.

First, Ms. Burns, Mr. Ozias and Mr. Mellor-Crummey have pleaded sufficient facts to

overcome this argument at the motion to dismiss stage.  They pleaded in the complaint that the

names on their photo identification differ from the names on their voter registration certificates

and that, as a result of this mismatch, they could be denied the right to vote under SB 14.  Am.

Compl. ¶ 8(c)-(e).  At the motion to dismiss stage, the Court must "presum[e] that general

allegations embrace those specific facts that are necessary to support the claim."  *Lujan*, 504 U.S.

at 561 (quoting *Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)) (internal quotation marks

omitted).  Thus, contrary to Defendants' claim that the Plaintiffs "must plead facts showing that

the names on their photo identification and voter-registration certificates are not 'substantially

similar' under the standards established by the Secretary of State," the Court must presume at

13

this stage that the Plaintiffs' names on their identification and voter registration certificates are sufficiently different that they could be barred from voting under SB 14.

Second, the extent of the discrepancies between the names is immaterial to the Plaintiffs' ability to establish an injury for standing.  While the Secretary of State has issued regulations on the meaning of "substantially similar," the regulations are vague and they give little guidance on how to determine whether names are "substantially similar."  Additionally, the law gives poll workers, who receive little training, the incredible power and discretion to decide which voters to "accept" on the grounds that their names are "substantially similar."  Poll workers across the state will no doubt inconsistently apply the regulations.  Therefore, a voter whose name is deemed "substantially similar" by one election official will be deemed "substantially similar" by a different official in future elections.  Thus, the only way that a voter can ensure that he or she will be accepted for voting is to have an identification that exactly matches the information on the voter registration list.  As discussed in the complaint, Ms. Burns, Mr. Ozias, and Mr. Mellor-Crummey have identification with names that do not exactly match the information on the voter registration certificates and, as a result, they cannot know whether they will be allowed to vote in any particular election.[5]

Finally, these individuals, even if they are permitted to cast a ballot, face burdens that other voters will not.  The Plaintiffs and other voters whose identification do not exactly match the information on the voter registration list must go through the process of first having an election official (or several) contemplate whether their names are "substantially similar."  Once that determination is made, these voters must read and sign affidavits to attest to their identity.

---

[5] If an election official determines that the name on the voter registration rolls is not substantially similar to the name on the photo ID, a voter (including Plaintiffs Burns, Ozias, and Mellor-Crummey) could be required to vote provisionally and have to make a return trip to the elections office within six days after the election to validate their provisional ballot.

They may also be asked to fill out forms to update the information on the voter registration lists. Even if these appear to be relatively small burdens, these additional steps, required only of some voters, are enough to establish an injury in fact.  *See Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)) (explaining that an alleged injury "need not measure more than an 'identifiable trifle'"). Additionally, in a high turnout election, these requirements could impose considerable burdens on voters, including all of the Plaintiffs here, as they will cause significant delays in the voting process.

        The delays will also not fall uniformly across the electorate.  Rather, individuals whose identification and voter registration information do not "exactly" match will likely face greater delays at the polls.  Additionally, voters in precincts with populations that are more likely to possess identification that does not exactly match the voter rolls will also face greater delays. That is, even if these individual Plaintiffs are not ensnared in the "substantially similar" net, the long lines they will likely face in a high turnout election threatens to prevent them from timely voting, or, at the very least, significantly raises the burdens they fact to cast an effective ballot. And inasmuch as Texas for many years required married women to have their maiden name as their middle name on their driver's licenses, women are far more likely to have a name mismatch in the voter registration database than men and are thus likely to face greater burdens in casting their ballots.  Ms. Burns, Mr. Ozias, and Mr. Mellor-Crummey have thus clearly pleaded sufficient facts to establish their standing to challenge SB 14.

B.      THE ELECTED OFFICIALS, COMMUNITY ORGANIZERS, LULAC, AND DALLAS COUNTY HAVE STANDING TO CHALLENGE SB 14

The remaining Plaintiffs have also established their own standing to challenge SB 14 because they have pleaded sufficient facts that SB 14 injures them.  LULAC and Dallas County have also established associational and representational standing to challenge the law.[6]

1.      The Plaintiffs Are Injured Directly Because They Will Have to Spend Additional Money to Run Campaigns, Register Voters, and Turn Out Supporters

SB 14 imposes new burdens on elected officials, community organizers, and community organizations whose primary work includes running electoral campaigns, registering voters, and getting voters to go to the polls on Election Day.  Am. Compl. ¶ 8(g).  As a result of SB 14, these Plaintiffs will incur additional costs in pursuing these endeavors.  This Circuit has previously held that these additional costs are an injury sufficient to establish standing.  In *Texas Democratic Party v. Benkiser*, the Fifth Circuit found that the Texas Democratic Party had "direct standing" because the challenged action "would cause it economic loss."  459 F.3d 582, 586 (5th Cir. 2006).  In particular, the court of appeals in *Benkiser* found that the party "would suffer an injury in fact because it would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame."  *Id.*  This decision is consistent with the Supreme Court's decision in *Crawford*, which recognized the Democratic Party's

_____

[6] Much of the Defendants' motion to dismiss with respect to the elected officials, community organizers, LULAC, and Dallas County focuses on whether they have third party standing.  Defs.' Mot. to Dismiss 9-12.  We do not address this issue at length because these parties clearly have first party standing and, where applicable, associational standing.  Nevertheless, we believe that these Plaintiffs can also satisfy the third party standing requirements.  *See Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  They have a close relationship to the "third parties" (*i.e.*, voters who will be disenfranchised by SB 14) because they have an interest in empowering those voters and they share common interests with them.  Additionally, many of the voters who were, or will be, denied their right to vote as a result of SB 14 face hindrances to protecting their own rights.  The State has failed to conduct effective outreach and education to the estimated two million people who lack a state ID, so many may not know that they will be unable to comply with SB 14's identification requirements when they go to vote in the higher turnout 2014 primary and general elections.  For a helpful discussion on this issue, see Order on Standing at 6-8,

16

standing to challenge the Indiana voter ID law because of the additional costs it would incur. 553 U.S. at 189 n.7 (noting the Court's agreement with the unanimous view of the lower court judges that the Democratic Party had standing); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (recognizing organizations suffer their own injuries when their purposes are impeded and they face additional costs as a result).

The Plaintiffs here are similarly situated to the plaintiffs in these prior cases. The Amended Complaint, ¶8(g), makes clear that Plaintiffs conduct a wide range of election-related activities, including administering elections, running political campaigns, and seeking, organizing and turning out supporters and voters to vote. In performing these activities, these Plaintiffs will incur significant costs: to educate potential voters about the new requirements; to verify whether registered voters have acceptable identification; to assist voters who do not have acceptable identification to obtain it; and to achieve electoral success or advance their organizational purposes.

2.     LULAC Also Has Associational Standing to Challenge SB 14

LULAC has associational standing. "It has long been settled that '[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986). "An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 282

---

*Fla. State Conference of NAACP v. Browning*, 569 F. Supp. 2d 1237 (N.D. Fla. 2008) *aff'd on other grounds*, 522 F.3d 1153 (11th Cir.) (No. 4:07CV-402-SPM/WCS).

(quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)) (internal quotation marks omitted).

LULAC is a membership organization consisting primarily of Hispanics and African-Americans around the country and in Texas.  Am. Compl. ¶ 11.  LULAC filed this suit, in part, on behalf of its Hispanic and African-American members whose rights to vote are unduly burdened by SB 14, especially because of their race, ethnicity, and language minority status.  *Id.*  LULAC's challenge is germane to its mission of advancing the political influence of the Hispanic population.  Furthermore, the participation of individual members is not required to fully adjudicate the claims in this case.  *See United Food & Commercial Workers Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (explaining that the individual participation of members of an organization is not normally necessary when an association seeks only prospective injunctive relief for its members).  LULAC thus, in addition to its direct standing to challenge SB 14, has pleaded sufficient facts to establish associational standing to sue on behalf of its members (and seeks only prospective relief).

> 3.     Dallas County Further Has Standing Under Other Supreme Court Precedent

As discussed above, Dallas County plainly has standing on the same basis as the other entities.  It must expend money and resources to carry out SB 14's mandates.  Am. Compl. ¶ 8.  The county's money and resources are therefore being diverted from other uses of taxpayer money.  Second, in its representative capacity, it represents many people who are severely burdened by SB 14, including many already-registered voters who do not have a photo ID listed in SB 14 and whose voter registration—provided by Dallas County—is now essentially irrelevant.

In addition, though, Dallas County has standing as a governmental body whose ability to comply with the law and carry out its statutory obligations is threatened by a state enactment.  As alleged in the Amended Complaint, Dallas County and its officials are charged with statutory duties that include functions necessary to enable its citizens to exercise their fundamental right to vote.  Dallas County officials take an oath to perform their duties faithfully in accordance with the Constitution and laws of Texas and the United States of America.  Their ability to faithfully carry out that oath is threatened by SB 14, because SB 14 requires Dallas County and its officials to act in ways that threaten to deprive citizens of the United States of valuable rights.  Thus, Dallas County is caught in a dilemma: obey the state law and putatively deprive its citizens of their rights, or violate the state law, with obvious attendant penalties and other consequences.

That was precisely the dilemma recognized by the Supreme Court of the United States in *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457 (1982).  There too, the public plaintiff was an entity created by, and with obligations under, state law.  The public entity alleged it was powerless to carry out its obligations under state law, in compliance with its duty to obey the Constitution and the laws of the state and nation.  It also alleged, as Dallas County does here, that it faced potential challenges from its citizens, who could claim the entity would violate their rights if it enforced the unlawful act as it was charged to do under state law.

Ironically, the specific issue at the heart of the *Seattle* case is the same as here—a state law transferred powers between a locality and the state with the serious consequence, and purpose of, treading on citizens' rights.  In *Seattle*, it was a state law limiting the local school district's power to combat racial discrimination.  Here, it is a state law—SB 14—which takes the power to determine which voters are qualified to vote away from Dallas County and its election officials and transfers that power to a single state agency, the Department of Public Safety.  That

transfer, it is alleged, is the engine of denying the rights of people, including the citizens and voters of Dallas County.

Likewise, the Supreme Court has recognized that being caught in a dilemma arising from conflicting legal obligations is a classic form of Article III injury that establishes standing:

> "The legal duties established by the statutory schemes under challenge are addressed directly to vendors such as appellant. She is obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer . . . sanctions and perhaps loss of license. This Court has repeatedly recognized that such injuries establish the threshold requirements of a case or controversy mandated by Article III."

*Craig v. Boren*, 429 U.S. 190, 194-94 (1976).

For the foregoing reasons, Dallas County plainly has standing to sue in this case.

### C.    THE PLAINTIFFS HAVE STANDING TO SUE RICK PERRY

The Plaintiffs have Article III standing to sue Governor Perry.[7]   As noted previously, Article III standing requires that the Plaintiffs assert an injury that is "fairly traceable" to a defendant's conduct and that is capable of redress. Because the Plaintiffs' injuries are fairly traceable to Governor Perry's conduct, and because Governor Perry has the power to redress the Plaintiffs' injuries, he is a proper Defendant in this case.

Governor Perry, who originally signed SB 14 into law, is the chief executive officer of the state. In his role, he appoints the Secretary of State, who oversees the Division of Elections and who is charged with certain responsibilities related to implementing SB 14.[8]   For example, among other things, the Governor's appointed Secretary of State is responsible under SB 14 for:

---

[7] The State also asserts that certain Plaintiffs lack standing to sue Defendant McCraw, the Department of Public Safety Director. The Veasey-LULAC Plaintiffs did not name him as a Defendant, but agree with the other Plaintiffs that he is a proper Defendant.

[8] Once appointed, the Secretary of State continues to "serve[] at the pleasure of the Governor." About the Office, Tex. Secretary of State, http://www.sos.state.tx.us/about/index.shtml (last visited Nov. 19, 2013).

adopting the training standards and developing the training materials required to implement SB 14 (Section 22 of SB 14); prescribing the wording for the notice of SB 14's identification requirements to be included on each voter registration certificate (Section 3); prescribing procedures for those voters who cast a provisional vote because they did not meet the identification requirements under SB 14 (Section 18); and conducting a statewide effort to educate voters regarding SB 14's ID requirements (Section 5).

Governor Perry also appoints the members of the Public Safety Commission, who in turn select the Director of the Department of Public Safety.  The Director plays a significant role in SB 14's implementation, such as: overseeing the department of state government that issues certain IDs under SB 14, including drivers' licenses, election identification certificates, and licenses to carry firearms (Section 14 of SB 14); developing the form and appearance of an election identification certificate, in cooperation with the secretary of state (Section 20); and requiring each applicant for an original or renewal election identification certificate to furnish certain information to DPS.

More still, the Governor is the "chief budget officer of the state," TEX. GOV'T CODE § 401.041, and, in that role, he is responsible for requesting funds to administer programs and services, including requesting funds for the programs and services run by the Secretary of State's office and the Department of Public Safety.  As a result of these duties and activities, which establish a direct link between Governor Perry and SB 14's enforcement, the Plaintiffs have Article III standing to sue Governor Perry.

The Defendants' arguments to the contrary are unavailing.  They seek to rely on *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), in which the Fifth Circuit held that the plaintiffs had not established Article III standing to sue the Louisiana Governor or Attorney

General.  That decision rested, however, on the fact that "no state official ha[d] any duty or ability to do *anything*" under the challenged statute because the statute created a private cause of action for private litigants.  *Id.* at 427.  The state therefore played no role whatsoever in the statute's enforcement.  *Id.* at 422.  *Okpalobi* thus has no relevance to this case.  Here, the Plaintiffs challenge state-administered methods of voter registration, voter verification, and elections, and Governor Perry—who, by his actions, helped to cause those injuries—is not powerless to redress their injuries.

The Eleventh Amendment also cannot shield Governor Perry from this suit.  It is well established that "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law."  *Frew v. Hawkins*, 540 U.S. 431 (2004).  Carved out by the Supreme Court in *Ex parte Young*, this exception allows suits against state officials to enjoin their enforcement of unconstitutional laws when those officials have "some connection" to the enforcement of the challenged laws.  *Ex parte Young*, 209 U.S. 123, 157 (1908).  Indeed, Governor Perry has been a defendant in many election law-related cases, including *Perez v. Perry*, 132 S. Ct. 934 (2012) and *LULAC v. Perry*, 548 U.S. 399 (2006).

In claiming that the Eleventh Amendment prevents the Plaintiffs from suing Governor Perry, the Defendants again mistakenly rely on *Okpalobi*, 244 F.3d 405.[9]  In *Okpalobi*, a plurality dismissed the claims against the Governor and Attorney General, in part, on Eleventh Amendment grounds.  Defs.' Mot. to Dismiss 33-34.  And, while it is true the plurality found that "the governor had no connection to the statute that the plaintiffs were challenging, other than

---

[9] The Defendants also cite *Okpalobi* to suggest that Defendants must be "specially charged" with executing a particular statute.  Defs.' Mot. to Dismiss 33.  Putting aside the question of what "specially charged" means, the Defendants fail to cite *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010), in which a panel of the Fifth Circuit explained that the portion of the *Okpalobi* opinion addressing Eleventh Amendment immunity "did not garner majority support" and was thus "not binding precedent."

a generic duty to 'take care that the laws are faithfully executed,'" Defs.' Mot. to Dismiss 33

(quoting *Okpalobi*, 244 F.3d at 413-16), the court determined that the governor lacked the

requisite connection to the statute because the challenged law was "a purely private tort statute"

that created a cause of action for private litigants, *Okpalobi*, 244 F.3d at 422.  Again, aside from

authorizing a private cause of action, the state government and its officials played no role

whatsoever in the statute's enforcement and the only claim asserted against the Louisiana

Governor and Attorney General was the generic duty to take care that the laws are faithfully

executed.

By contrast, SB 14 does not relate to merely private conduct.  It fundamentally changes

the state's methods of registering and accepting voters and of conducting elections.  Because

Governor Perry signed the bill into law, has authority over the agencies that enforce and

implement SB 14's provisions, and appoints the state officials who carry out SB 14, the Eleventh

Amendment cannot shield him from liability.

## II.   THE ORGANIZATIONS, ELECTED OFFICIALS, COMMUNITY ORGANIZERS, AND DALLAS COUNTY HAVE ASSERTED VALID CAUSES OF ACTION

The Defendants argue that the organizations, elected officials, community organizers, and

Dallas County lack a valid cause of action.[10]  Defs.' Mot. to Dismiss 12-16.  But their arguments

---

[10] Defendants appear to only challenge whether the organizations, elected officials, community organizers, and Dallas County have a cause of action to challenge SB 14.  Defs.' Mot. to Dismiss 12.  To the extent their comments at page 13 of their motion can be read as a present challenge to whether a private cause of action exists under Section 2 of the Voting Rights Act for *any* private plaintiffs, that claim is easily disregarded on the grounds that courts, including the Supreme Court, have consistently recognized private causes of action under that statute.  *See, e.g.*, *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006) (deciding a Section 2 case brought by LULAC); *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (internal quotation marks and citations omitted) ("[T]he existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965."); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Johnson v. De Grandy*, 512 U.S. 997 (1994).  Additionally, if their comments regarding third party standing can be read as a challenge to organizations' rights to sue under Section 2, either to redress the injuries to the organizations or their members, this claim is also easily disposed of by cases in which courts have allowed organizations to pursue Section 2 claims.  *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399; *see also* S. Rep. No. 94-295, at 40 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 806-07 ("An

are based on an erroneous understanding of the injuries that the Plaintiffs allege.  Their arguments focus solely on whether third parties have causes of action under the Voting Rights Act, Section 1983, and the Declaratory Judgment Act.  *Id.*  They argue, for example, that actions under Section 1983 are only available to "*the party injured.*"  *Id.* at 14-15.  But, putting aside the issue of whether third parties can assert the rights of others under any of these statutes,[11] the Defendants utterly fail to recognize that these Plaintiffs seek to assert their own rights and, in the case of LULAC, also the rights of its members.

The Defendants also fail to even mention *Crawford*, in which the standing and cause of action issues were closely analogous to the ones presented here.  In *Crawford*, the Democratic Party filed suit against the Indiana voter ID law under 42 U.S.C. § 1983 and various constitutional and statutory provisions, and the Supreme Court recognized that the Democrat Party had a cause of action to do so.[12]  This omission in the Defendants' motion to dismiss critically undermines their argument that the elected officials, community organizers, community organizations, and Dallas County lack a cause of action to challenge SB 14.

---

'aggrieved person' is any person injured by an act of discrimination.  It may be an individual or an organization representing the interests of injured persons.").

[11] *See, e.g.*, *Sec'y of State of Md. v. Munson Co., Inc.*, 467 U.S. 947 (1984) (allowing a party to sue under Section 1983 and the First Amendment on behalf of others because "there are situations where competing considerations outweigh any prudential rationale against third-party standing, and that th[e] Court has relaxed the prudential-standing limitation when such concerns are present").

[12] The *Crawford* Court did not address the standing of the elected officials or nonprofit organizations that also challenged Indiana's law, because the Democratic Party's standing to challenge the law made it unnecessary to do so.  *Crawford*, 553 U.S. at 189 n.7.  This Court too, once it determines one of the Veasey-LULAC Plaintiffs has standing, does not need to engage in further analysis as to the standing of other Plaintiffs.

III.    THE PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE
        GRANTED

In their Amended Complaint, the Plaintiffs have pleaded sufficient facts to state claims

under Section 2 of the Voting Rights Act, and under the First, Fourteenth, Fifteenth, and Twenty-

Fourth Amendments.

A.      PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO STATE A
        CLAIM UNDER SECTION 2 OF THE VOTING RIGHTS ACT

Texas argues that Plaintiffs have failed to state a claim under Section 2 of the Voting

Rights Act.  Defs.' Mot. to Dismiss 16-30.  A violation of Section 2 is established when a voting

qualification or prerequisite to voting is imposed or applied "*in a manner which results in* a

denial or abridgement of the right of any citizen of the United States to vote on account of race

or color, or [membership in a language minority group]."]  42 U.S.C. § 1973 (emphasis added).

When Congress last amended Section 2 in 1982, it made clear that "a violation could be proved

by showing discriminatory effect alone and to establish as the relevant legal standard the 'results

test.'"  *Thornburg v. Gingles*, 478 U.S. 30, 35-36 (1986).  Under Section 2, the court must

determine, based on the totality of circumstances, whether the challenged voting qualification or

perquisite to voting deprives minority voters "an equal measure of political and electoral

opportunity."  *Johnson v. DeGrandy*, 512 U.S. 997, 1013 (1994).[13]

The Veasey-LULAC Plaintiffs' Amended Complaint clearly states a *prima facie* case

under Section 2.  The complaint is replete with allegations that SB 14 will harm African-

American and Hispanic voters in Texas.  For example, paragraph 15 alleges that obtaining an SB

14 identification is especially inconvenient and expensive for racial and ethnic minorities;

---

[13] In 1982, Congress substantially revised Section 2 to clarify that a violation requires evidence of discriminatory results alone, and "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2."  *Gingles*, 478 U.S. 30.  Most courts analyze vote denial claims under essentially the same standard as vote dilution claims.  *See e.g. id.* (1986) ("Section 2 prohibits all forms of voter discrimination not just vote dilution.").

25

paragraph 20 claims that enforcement of SB 14 will disproportionately disfranchise minority voters; paragraph 21 states that the percentage of those persons currently lacking an SB 14 identification is significantly higher among African-Americans and Hispanics. Numerous other paragraphs further detail how SB 14 will cause injuries to Hispanics and African-Americans. Am. Compl. ¶¶ 22-23, 26-31, 49.

As set forth in the Amended Complaint and SB 14, an election identification certificate must be issued by a DPS office and requires presentation of other documents, including a birth certificate, which does cost money to obtain. Am. Compl. ¶ 19; TEX. ELEC. CODE § 63.0101(1) (providing that an "election identification certificate . . . [is] issued to the person by the Department of Public Safety"). The allegations of the Amended Complaint are that SB 14 will result in racial and language minorities being denied the right to vote. Am. Compl. ¶¶ 59, 63, 69. Voters without an acceptable voter photo identification under SB 14 must travel to DPS offices to obtain an election identification certificate. *Id.* ¶ 16. Barely half of Texas counties' have a fully functioning DPS office, with about one-third of Texas counties have no DPS office at all. *Id.* ¶ 17. This means that residents of those counties cannot qualify to vote in their own county. *Id.* Another 40 counties have offices open sporadically, sometimes as little as one day per week. *Id.* Further, although Defendants allege the election identification certificate is free, in actuality a voter must present documents to the DPS to obtain the certificate that are not free: the cheapest option is an original birth certificate which costs a minimum of $22.[14] *Id.* ¶ 19. Further, to obtain an original birth certificate, an eligible citizen must travel to another government office to

---

[14] Defendants claim the State of Texas will issue birth certificates for those born in Texas for $3 if a voter needs it to obtain an election identification certificate. Defs.' Mot. to Dismiss 20. Even if this accommodation of lower cost birth certificates is true, it does not assist the many Texas citizens who were born elsewhere and who must pay more than $3 to obtain one. Moreover, there is still a cost associated with obtaining the "free" election identification certificate, and the voter still must travel to a DPS office with documents that the voter is required to obtain from other state agencies. All of these new requirements amount to additional expense and burdens.

request and receive the document. *Id.* Finally, none of this addresses the tens of thousands of eligible Texas citizens who cannot obtain a birth certificate at any cost because one is not available for them. *Id.*[15]

Defendants utterly fail to acknowledge these numerous factual allegations in Plaintiffs' Amended Complaint. Instead, they mischaracterize Plaintiffs' claims, arguing that Plaintiffs' Section 2 claim is based upon a "mere" disparate impact. Such an argument is flawed by simple reference to Plaintiffs' Amended Complaint. The Veasey-LULAC Plaintiffs' Amended Complaint states a "results" claim against SB14 under Section 2 of the Voting Rights Act, asserting SB 14 will operate in a manner that particularly harms racial and language minority citizens. Such allegations plainly state a cause of action under Section 2. Furthermore, the above-referenced allegations in Plaintiffs' Amended Complaint set forth sufficient facts to support a claim that SB 14 denies or abridges the Plaintiffs' right to vote under Section 2 of the Voting Rights Act.

Defendants claim that "[a]ny construction of the Voting Rights Act that precludes Texas from implementing its voter-identification law will exceed Congress's enforcement power under section 2 of the Fifteenth Amendment." Defs.' Mot. to Dismiss 26. To the contrary, Section 2 directly enforces the Fifteenth Amendment. *See South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966); *Voinovich v. Quilter*, 507 U.S. 146, 152-3 (1993). Texas may choose to challenge

---

[15] The Texas law "imposes strict, unforgiving burdens on the poor and racial minorities in Texas are disproportionately likely to live in poverty." *Texas v. Holder*, 888 F.Supp.2d 113, 144 (D.D.C. 2012) (vacated and remanded in light of *Shelby County v. Holder*, ___ U.S. ___, 133 S.Ct. 2612 (2013)). In *Holder*, the District of Columbia court found that, despite the state's argument otherwise, an election identification certificate was not free because the applicant would have to present a government-issued form of identification to receive an election identification certificate and the identification would cost money. In addition, the District of Columbia Court agreed that the sparse locations of DPS offices imposes a hardship on minority voters. *Holder*, 888 F.Supp.2d at 141 ("Based on the record evidence before us, it is virtually certain that these burdens [SB 14 burdens] will disproportionately affect racial minorities.").

the constitutionality of Section 2, but dismissal of the complaint is not warranted under this new novel theory.

Also, Defendants' argument on this point is built on its mistaken belief that Plaintiffs rely solely on a "mere" disparate impact theory.  Defs.' Mot. to Dismiss 21.  As noted above, Congress established a "totality of circumstances" test under Section 2.  Moreover, as noted above, Plaintiffs' Amended Complaint contains allegations that go well beyond "mere" assertions of disparate effect.  In *Jones v. City of Lubbock*, 727 F.2d 364, 373 (5th Cir. 1984), the Fifth Circuit rejected this same argument.  Section 2 does not purport to usurp the judicial role of defining the substantive scope of the Fourteenth and Fifteenth Amendment; rather, it was enacted to protect the core values of these amendments.  *Id*.  Congressional power to adopt measures to vindicate the purposes of the Fourteenth and Fifteenth Amendments is unquestioned, and Congress has made clear its understanding that courts applying Section 2 will use a purely results-minded examination.  *Id*. at 373-75.

Defendants' brief in support of it motion to dismiss also claims there are voters "capable" of complying with SB 14, "but choose not to do so because they would rather spend their limited time and resources on other endeavors."  Defs.' Mot. to Dismiss 19.  Such arguments, that minority voters are not victims of voting discrimination because they are apathetic, have been considered in other cases and have been rejected.  *See United States v. Marengo Cnty.*, 731 F.2d 1546 (11th Cir. 1984) (rejecting the argument that "the absence of elected black officials" was attributable to "voter apathy" and "a failure of blacks to turn out their votes"); *see also Kirksey v. Bd. of Supervisors of Hinds Cnty.*, 554 F. 2d 139, 150 (5th Cir. 1977) (en banc), *cert. denied*, 434 U.S. 968 (1977) ("The responsibility of the defendants to permit minority voters a proper role in democratic political life must be discharged by stronger stuff than gossamer possibilities of all

variables falling into place and leaning in the same direction.").  This Court should similarly reject the voter apathy argument advanced by Texas, especially when such an argument relies heavily on fact issues not yet ripe for the Court to consider.

### B. THE VEASEY-LULAC PLAINTIFFS HAVE ALSO PLEADED SUFFICIENT FACTS TO STATE A CLAIM OF UNCONSTITUTIONAL RACIAL DISCRIMINATION

Defendants assert in their motion to dismiss that Plaintiffs' complaint does not "come[] anywhere close to a plausible allegation that Senate Bill 14 is a racist law."  Defs.' Mot. to Dismiss 28.  But the Veasey-LULAC complaint makes allegations of discriminatory purpose that are squarely within the framework of the leading case on unconstitutional racial discrimination, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). In that case, the Supreme Court articulated several factors that are relevant in assessing the issue of racially discriminatory intent: the effect or impact of the law or decision, particularly if it falls more heavily on one race or group than another; the historical background of the decision, especially if it reveals a series of official actions taken for invidious purposes; the sequence of events that led up to the challenged law or practice; procedural departures from the norm; substantive departures from the norm, wherein decisionmakers ignore factors usually considered important and which, if followed, would produce a decision contrary to the one reached; and the legislative history.  *Id.* at 267-68.

The Veasey-LULAC Plaintiffs' Amended Complaint sets forth allegations of racially discriminatory intent that are embraced within the *Arlington Heights* decision.  *See, e.g.*, Am. Compl. ¶¶ 50-56.  Those allegations include harmful effects of SB 14 on Hispanics and African-Americans, *id.* ¶¶ 22-23, 26-31, 49, 53; Texas's long history of discrimination, *id.* ¶ 51; the legislative history of SB 14, *id.*; and the sequence of events that led up to the enactment of SB 14, *id.* ¶¶ 51-53.

### C.    THE SPEECH, ASSOCIATION AND EQUAL PROTECTION CLAIMS ALL STATE VALID CAUSES OF ACTION

Texas opposes the Veasey-LULAC Plaintiffs' causes of action based on the First and Fourteenth Amendments, both of which relate to free speech and association, as well as equal protection.  These causes of action are solidly based on Supreme Court precedent, especially a line of cases that includes: *Anderson v. Celebrezze*, 460 U.S. 780 (1983) (making multiple references to the First and Fourteenth Amendment rights of voters and candidates);  *Burdick v. Takushi*, 504 U.S. 428 (1992); *Bush v. Gore*, 531 U.S. 98, 104 (2000); *Buckley v. Valeo*, 424 U.S. 1 (1976); *Norman v. Reed*, 502 U.S. 279 (1992); and *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).  These cases teach that voting is at the heart of citizenship in a democratic society.  Indeed, as the Supreme Court said in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) voting is regarded as fundamental "because  [it is] preservative of all rights."  These cases establish that voters have First Amendment interests and have a fundamental right to vote on equal terms with all other voters.  These rules are carried out by balancing the speech and associational interests of voters against the governmental interest in regulating the fairness and integrity of the election process.  *See, e.g.*, *Anderson*, 460 U.S. 780; *Burdick*, 504 U.S. 428.  The typical balancing test provides that a voting restriction is reviewed by a rational basis standard *if* it is not discriminatory and if it is not severe.  *Burdick*, 504 U.S. at 434.  If it is either discriminatory or severely burdensome, it is judged by strict scrutiny.  *Id.*

Here plaintiffs have clearly alleged, and supported the allegations, that SB 14 is discriminatory on its face.  For example, SB 14 singles out for favored treatment certain narrow classes of voters who have photo IDs from one source, while disqualifying other voters with photo IDs from others.  Defendant Perry and the Texas legislators are free in their private capacities to admire gun owners, but when they bestow government benefits on gun owners,

while denying the same benefits to other people, such as students or state employees, that is an invitation to strict scrutiny, and fatal for SB 14.  In that connection, it should be noted that both Indiana and Georgia, whose photo ID laws have been upheld, authorized the use of photo IDs issued by any agency of the state or federal government.  Like the arbitrariness involved in the distinctions among state IDs, it was also an arbitrary decision by Texas to extend benefits to those with military IDs but not federal civilian employee IDs.  Last year, the Sixth Circuit invalidated just such a distinction.  In *Obama for America v. Husted*, 697 F3d 423 (6th Cir. 2012), Ohio did something closely analogous to what Texas is doing here—it provided more days of early voting for military personnel than for civilians.  The district court granted a preliminary injunction, and the Sixth Circuit affirmed.  *Id.*

The other factor that invites strict scrutiny and likely invalidation of SB 14 is the severity of the burden imposed by the law.  Here, the Plaintiffs have alleged that SB 14 is extremely severe.  Of course, that is a matter for proof, but for the Defendants to deny that there is a cause of action is simply frivolous.

The problem is that defendants seem to believe there are really no constitutional limits on the State's power to manipulate the voting process to favor and disfavor at the Governor's and the legislators' pleasure.  This mindset was shown in an episode last Fall, involving the Ohio law that discriminated between military and nonmilitary voters.  When the Sixth Circuit affirmed the preliminary injunction, Ohio sought a stay in the Supreme Court, and no fewer than 15 states, including Texas, filed an *amicus* brief.  Texas's brief protested vehemently against requiring equality before the law, arguing instead that states had a virtually unlimited prerogative—read, free hand—to regulate their voting laws as they saw fit.  The claims of state power were

31

extravagant, not to say outlandish.  The Supreme Court had no difficulty in promptly denying the stay.  *Husted v. Obama for Am.*, 133 S.Ct. 497 (Oct. 16, 2012).

Defendants' citation to *United States v. McElveen*, 180 F. Supp. 10 (1960), Defs.' Mot. to Dismiss 28, is curious because that case proves that even seemingly routine actions relating to voting can be invalid and can be enjoined—the opposite of what the State asserts here.  In that case, private citizens exercised the traditional right of challenging the eligibility of other voters, but those challenges were enjoined the Supreme Court affirmed.  *McElveen*, 180 F. Supp. 10, *aff'd sub nom. United States v. Thomas*, 362 U.S. 58 (1960).  That case was a classic example of a state using a normal process to abuse voters, or, more accurately, certain voters.  That is precisely what the Plaintiffs allege here.

Another useful comparison is *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), where Alabama reshaped the city limits of Tuskegee, Alabama, to remove almost all black voters.  The state said it was just exercising its normal power over municipalities, but the Supreme Court knew better:

> According to the allegations here made, the Alabama Legislature has not merely redrawn the Tuskegee city limits with incidental inconvenience to the petitioners; it is more accurate to say that it has deprived the petitioners of the municipal franchise and consequent rights and to that end it has incidentally changed the city's boundaries.

*Id.* at 347.  The Supreme Court then summed it up this way:

> While the form is thus merely an act redefining metes and bounds, if the allegations are established, the inescapable human effect of this essay in geometry and geography is to despoil colored citizens, and only colored citizens, of their theretofore enjoyed voting rights.

*Id.* at 347.  The allegations here are similar.  The First and Fourteenth Amendment causes of action should be sustained and the motion to dismiss them should be denied.

**D.    PLAINTIFFS HAVE PLEADED SUFFICIENT FACTS TO STATE A CLAIM THAT SB 14 IS AN UNCONSTITUTIONAL POLL TAX**

A poll tax need not be called by that name to be invalid.  *See Harman v. Fossenius*, 380 U.S. 528 (1965) (invalidating selective treatment of those not paying a voluntary tax).  Rather, there is a continuum.  In *Crawford*, the Court found the possibility of having to pay a small sum did not render Indiana's ID law—which could be dispensed with by indigent voters—a poll tax. However, the allegations in this complaint aver that Texas has systematically created a set of procedures that almost inevitably requires payment of significant sums for some voters.  That is sufficiently close to *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), or at least *Harman*, 380 U.S. 528, on the continuum to allow the claim to go forward to proof.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny the Defendants' motion to dismiss in all respects.

Respectfully submitted,

**BRAZIL & DUNN**

 */s/ Chad W. Dunn*
Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
4201 Cypress Creek Parkway, Suite 530
Houston, Texas  77068
Telephone:  (281) 580-6310
Facsimile:   (281) 580-6362
chad@brazilanddunn.com
scott@brazilanddunn.com

J. Gerald Hebert
D.C. Bar No. 447676
Campaign Legal Center
215 E Street, NE
Washington, DC 20002

Telephone (202) 736-2200 ext. 12
Facsimile (202) 736-2222
GHebert@campaignlegalcenter.org
(Pro Hac Vice Motion Granted Dkt. #13)

Neil G. Baron
State Bar No. 01797080
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539
Telephone (281) 534-2748
Facsimile (281) 534-4309
neil@ngbaronlaw.com

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone (512) 476-0005
Facsimile  (512) 476-1513
daverichards4@juno.com

Armand G. Derfner
Derfner, Altman & Wilborn, LLC
P.O. Box 600
Charleston, S.C. 29402
Telephone (843) 723-9804
aderfner@dawlegal.com
(Pro Hac Vice Motion Granted Dkt. # 6)

*Attorneys for Plaintiffs Marc Veasey, Floyd James Carrier, Anna Burns, Michael Montez, Penny Pope, Jane Hamilton, Sergio DeLeon, Oscar Ortiz, Koby Ozias, John Mellor-Crummey, Jane Doe, James Doe, League of United Latin American Citizens ("LULAC") and Dallas County, Texas*

LUIS ROBERTO VERA, JR.
LULAC National General Counsel
State Bar No.  20546740
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
Telephone (210) 225-3300

34

Facsimile (210) 225-2060
lrvlaw@sbcglobal.net

*Attorney for LULAC*


Craig M. Watkins
Dallas County District Attorney
State Bar No. 00791886
Teresa G. Snelson
Chief, Civil Division
Dallas County District Attorney's Office
State Bar. No. 08577250
411 Elm Street, 5th Floor
Dallas, TX 75202-4606
Telephone (214) 653-7358
Facsimile (214) 653-6134
Teresa.Snelson@dallascounty.org

*Attorneys for Dallas County, Texas*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of November, 2013, I served a copy of the foregoing on all counsel of record by filing a copy of the same in this Court's ECF system. For those attorneys not receiving a copy via ECF, copies were served via email or first-class mail, postage prepaid.

*J. Gerald Hebert*
J. GERALD HEBERT

35