IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*,<br><br>         Plaintiffs,<br><br>    v.<br><br>RICK PERRY, *et al.*,<br><br>         Defendants. | Civil Action No. 2:13-cv-193 (NGR) |
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*,<br><br>         Plaintiff-Intervenors,<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*,<br><br>         Plaintiff-Intervenors,<br><br>    v.<br><br>STATE OF TEXAS, *et al.*,<br><br>         Defendants.<br><br>TRUE THE VOTE,<br><br>         Movant-Intervenor. | Civil Action No. 2:13-cv-263 (NGR) |

TEXAS STATE CONFERENCE OF NAACP

BRANCHES, *et al.*,

                   Plaintiffs,

        v.

JOHN STEEN, *et al.*,

                  Defendants.

Civil Action No. 2:13-cv-291 (NGR)

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

I.      BACKGROUND…………………………………………………………………..1

        A.      Section 2 of the Voting Rights Act……………………………………………..1

        B.      Overview of the Facts Alleged in the United States' Complaint…………………2

II.     LEGAL STANDARD UNDER FEDERAL RULE 12(B)(6)…………………………..……..7

III.    ARGUMENT………………………..……………………………………………8

        A.      SB 14 Violates Section 2 of the Voting Rights Act………………………………8

                1.      Texas Misconstrues the Meaning of "Denial or Abridgment" Under
                        Section 2…………………………………………………………………10

                        a.      A Burden on Voting Need Not Be Impossible To Overcome In
                                Order to Qualify as a Denial or Abridgement of the Right to Vote
                                Under Section 2……………………………………………..12

                        b.      SB 14 Is Not Insulated From Review Under Section 2 by the
                                Supreme Court's Decision in Crawford…………………………15

                2.      The United States Has Pled Facts Showing That SB 14 Results in a
                        Violation of Section 2……………………………………………………....17

                        a.      The United States' Section 2 Claim Does Not Rest on Bare
                                Allegations of Disparate Impact………………………..…….17

                        b.      A Section 2 Claim Need Not Allege Discriminatory Intent…...…19

                        c.      Application of Section 2 in This Case Raises No Constitutional
                                Concerns……………………………………………………....19

        B.      The United States has Pled Facts Showing the State Intentionally Violated
                Section 2……………………………………………………………………22

        C.      Steve McCraw, Director of the Texas Department of Public Safety, is a Proper
                Defendant……………………………………………………………..24

IV.     CONCLUSION……………………………………………………………………..25

TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Arizona,*
    133 S. Ct. 2247 (2013)……………………………………..………………….…21

*Arlington Heights v. Metropolitan Housing Development Corporation,*
    429 U.S. 252 (1977)…………………………………………………………22-23

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)…………………………………………………………….7

*Baker v. Putnal,*
    75 F.3d 190 (5th Cir. 1996)……………………………………………………8

*Brown v. Dean,*
    555 F. Supp. 502 (D.R.I. 1982)………………………………………………12

*Brown v. Detzner,*
    895 F. Supp. 2d 1236 (M.D. Fla. 2012)…………………………………...18-19

*Carrington* v. *Rash,*
    380 U. S. 89 (1965)……………………………………………….........20

*Chisom v. Roemer,*
    501 U.S. 380 (1991)…………………………………………………...18

*City of Rome v. United States,*
    446 U.S. 156 (1980) …………………………………………………21-22

*Crawford v. Marion County Election Board,*
    553 U.S. 181 (2008)…………………………………………...11, 15-16

*Erickson v. Pardus,*
    551 U.S. 89 (2007)………………………………………………....8

*Garza v. County of Los Angeles,*
    918 F.2d 763 (9th Cir. 1990)……………………………………………23-24

*Hayden v. Pataki,*
    449 F.3d 305 (2d Cir. 2006)……………………………………………19

iii

*Hicks v. Miranda,*
    422 U.S. 332 (1975)……………………………………………………………..20

*Indiana Democratic Party v. Rokita,*
    458 F. Supp. 2d 775 (S.D. Ind. 2006)……………………………………………15

*Johnson v. Governor of Florida,*
    405 F.3d 1214 (11th Cir. 2005)…………………………………………………19

*Jones v. Lubbock,*
    727 F.2d 364 (5th Cir. 1984)……………………………………………………20

*Katzenbach v. Morgan,*
    384 U.S. 641 (1966)……………………………………………………….....21

*League of United Latin American Citizens, Council No. 4434 v. Clements,*
    999 F.2d 831 (5th Cir. 1993)……………………………………………………14

*Lopez v. Monterey County,*
    525 U.S. 266, 283 (1999)………………………………………………………..22

*Major v. Treen,*
    574 F. Supp. 325 (E.D. La. 1983)………………………………………………20

*Mandel v. Bradley,*
    432 U.S. 173 (1977)……………………………………………………………..20

*Matrixx Initiatives, Inc. v. Siracusano,*
    131 S. Ct. 1309 (2011)…………………………………………………………….7

*McMillan v. Escambia County,*
    748 F.2d 1037 (5th Cir. 1984)………………………………………………...22

*Mississippi Republican Executive Committee v. Brooks,*
    469 U.S. 1002 (1984)…………………………………………………………...19-20

*Mississippi State Chapter, Operation PUSH v. Allain,*
    674 F. Supp. 1245 (N.D. Miss. 1987),……………..………………..……………13

*Mississippi State Chapter, Operation PUSH v. Mabus,*
    932 F.2d 400 (5th Cir. 1991)…………………………………………...10, 12, 13, 17

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980)…………………………………………………………….1, 19

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001)………………………………………………………24

*Oregon v. Mitchell,*
    400 U.S. 112 (1970)………………………………………………………....21

*Ortiz v. City of Philadelphia,*
    28 F.3d 306 (3d Cir. 1994)………………………………………………………18

*Perkins v. Matthews,*
    400 U.S. 379 (1971)………………………………………………………...12

*Prosser v. Elections Board,*
    793 F. Supp. 859 (W.D. Wis. 1992)……………………………………….....20

*Reno v. Bossier Parish School Board,*
    520 U.S. 471 (1997)……………………………………………………....23

*Salas v. Southwest Texas Junior College District,*
    964 F.2d 1542 (5th Cir. 1992)………………………………………………...12

*Shaw v. Hunt,*
    861 F. Supp. 408 (E.D.N.C. 1994)………………………………………….....20

*Shelby County v. Holder,*
    133 S. Ct. 2612 (2013)………………………………………………………...6, 7

*Sierra v. El Paso Independent School District,*
    591 F. Supp. 802 (W.D. Tex. 1984)……………………………………….....20

*Spirit Lake Tribe v. Benson County,*
    Civ. No. 10-95, 2010 U.S. Dist. LEXIS 116827 (D.N.D. Oct. 21, 2010)………………12

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)……………………………………………………8

*Teague v. Attala County,*
    92 F.3d 283 (5th Cir. 1996)………………………………………………...18

*Terrazas v. Clements,*
    581 F. Supp. 1329 (N.D. Tex. 1984)………………………………………….22

*Texas v. Holder,*
    888 F. Supp. 2d 113 (D.D.C. 2012)……………………..………………….....11, 14, 16

*Texas v. Holder*,
    133 S. Ct. 2886 (2013)……………..…………………..…………………………6

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)……………………………………………………8, 9, 19

*United States v. Blaine County*,
    363 F.3d 897 (9th Cir. 2004)……………………………………………..17,  20

*United States v. Brown*,
    561 F.3d 420 (5th Cir. 2009)………………………………………………22-23

*United States v. Marengo County Commission*
    731 F.2d 1546 (11th Cir. 1984)……………………………………...20, 22

*Ex parte Virginia*,
    100 U.S. 339 (1880)…………………………………………………….21

*Wesley v. Collins*,
    605 F. Supp. 802 (M.D. Tenn. 1985)…………………………………...19, 20

## Constitution and Statutes

U.S. Const. art. I, § 4, cl. 1………………………………………………………21

U.S. Const. amend. XIV, § 2……………………………………………………19

42 U.S.C. § 1973……………………………………………………………..1

42 U.S.C. § 1973(a)………………………………………………………………1

42 U.S.C. § 1973(b)………………………………………………………………1

42 U.S.C. § 1973c(a)……………………………………………………………5

42 U.S.C. § 1973b(f)(2)………………………………………………………....5

42 U.S.C. § 1973j(d)……………………………………………………………24

Ind. Code Ann. § 3-5-2-40.5(a)………………………………………………16

## Congressional Reports

S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177………………………...………2, 9

The United States submits this opposition to the motion to dismiss filed by the State of Texas as well as by John Steen and Steve McGraw, who are sued in their official capacities as Texas Secretary of State and Director of the Texas Department of Public Safety, respectively. *See* Defs.' Mot. to Dismiss (ECF No. 52) ("Mot. to Dismiss").  As detailed below, the United States has properly pled a claim under Section 2 of Voting Rights Act, 42 U.S.C. § 1973, and, contrary to Texas's assertion, Steve McGraw is a proper defendant in this case.  Accordingly, for the reasons stated below, this Court should deny defendants' motion to dismiss the United States' complaint.[1]

## I.  BACKGROUND

**A.      Section 2 of the Voting Rights Act**

Section 2 of the Voting Rights Act ("Act") prohibits any State or political subdivision from imposing or applying a "voting qualification," "prerequisite to voting," or "standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race[,] color[, or language minority status]."  42 U.S.C. § 1973(a).  A plaintiff establishes a violation of Section 2 by proving:

> based on the totality of circumstances . . . that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b).  The current statutory language reflects Congress's 1982 response to *City of Mobile v. Bolden*, 446 U.S. 55 (1980), in which a plurality of the Supreme Court held that

---

[1] This response addresses only those arguments concerning the United States' complaint and should not be interpreted as agreement with other arguments raised in the State's brief in support of its motion to dismiss.

1

Section 2 required proof of intentional discrimination.  Congress amended Section 2 to provide a remedy for voting practices that have a discriminatory result and "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2."  S. REP. NO. 97-417, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 179.  Section 2 plaintiffs can prevail by proving either discriminatory "intent, or, alternatively, . . . that the challenged system or practice . . . results in minorities being denied equal access to the political process."  S. REP. NO. 97-417, at 27.

## B.     Overview of the Facts Alleged in the United States' Complaint

In 2011, Texas enacted SB 14, which requires nearly all in-person voters to present a government-issued photographic identification in order to cast a regular ballot.  Under SB 14, all in-person voters, except those who meet one of the law's narrow exceptions, must present one of the following forms of photographic identification in order to vote: (1) a Texas driver license, personal identification card, or election identification certificate ("EIC") issued to the voter by the Department of Public Safety ("DPS"); (2) a DPS-issued license to carry a concealed handgun; (3) a United States military identification card; (4) a United States citizenship certificate; or (5) a United States passport.  SB 14 further conditions the use of these items on their being current or expired for less than 60 days.  Compl. (*United States v. Texas*, Civ. No. 13-263 (S.D. Tex.), ECF No. 1) at ¶¶ 16-17.  A substantial number of Texas voters, of whom a statistically significant, disproportionate percentage are Hispanic or African American, do not possess any of these forms of identification.  *Id*. at ¶¶ 16, 17 & 36.

Of equal significance is that the process of obtaining an EIC will pose major impediments to the thousands of voters who do not possess any of the other forms of photographic identification required by SB 14.  *Id*. at ¶ 38.  Voters who wish to obtain an EIC must apply in

2

person at a DPS driver license office.  Scores of Texas counties do not have a DPS driver license office, and in dozens of additional counties, the DPS driver license office is only open two or three days per week.  Some Texas voters will be forced to travel hundreds of miles to obtain an EIC.  This will impose a substantial and disparate burden on voters in households that lack access to a vehicle—households that, to a statistically significant degree, are disproportionately Hispanic and African American.  *Id*. at ¶¶ 18-22; Compl. Ex. 1 at 4.

In addition, to obtain an EIC, an applicant must present to DPS at least one of the following documents: (1) an expired Texas driver license or personal identification card; (2) an original or certified copy of a birth certificate; (3) United States citizenship or naturalization papers; or (4) a court order indicating a change of name or gender.  None of these documents can be obtained free of charge.  According to the 2007-2011 American Community Survey, African Americans and Hispanics in Texas experience poverty at roughly three times the rates of non-Hispanic whites, making it more burdensome for minority voters to obtain the supporting documents necessary to vote.  *Id*. at ¶¶ 13, 23 & 24.

Although eligible voters who are unable to present requisite identification at the polls may cast a provisional ballot, that ballot will not be counted unless the voter presents a form of required photographic identification to the voter registrar within six days of the election or executes an affidavit attesting that the voter (a) has a religious objection to being photographed, or (b) has lost his or her photographic identification in an officially declared natural disaster within 45 days of the election.  *Id*. at ¶ 25.

SB 14 was enacted against the backdrop of dramatic growth in the Hispanic population in Texas, and its passage was motivated, at least in part, by discriminatory intent.  Between 2000 and 2010, Hispanics accounted for 65% of Texas's total population growth. *Id*. at ¶¶ 12, 26-34.

3

Starting in 2005, each successive session of the Texas Legislature advanced increasingly stringent voter identification laws, culminating in SB 14, which, when passed, imposed the country's strictest voter photographic identification requirements.  *Id*. at ¶ 35 (citing *Texas v. Holder*, 888 F. Supp. 2d 113, 144 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013)).  The State knew or should have known that Hispanic and African-American Texans disproportionately lack any of the limited forms of photographic identification required by SB 14, and that the process of obtaining an EIC would impose a substantial burden on thousands of voters, especially Hispanic and African-American Texans who are disproportionately poor and lack access to transportation. Id. at ¶¶ 12, 26, 30, 31, 32 & 68.  Furthermore, the same legislature that passed SB 14 was found by a three-judge federal district court to be "impermissibly focused on race" during the enactment of statewide redistricting plans that occurred in the same legislative session.  *Id*. at ¶ 34 (quoting *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. Mar. 19, 2012) (three-judge court) (ECF No. 690)).

Legislators' efforts to pass voter photographic identification requirements were accompanied by anti-immigrant rhetoric and suggestions that such voter identification legislation was needed to prevent noncitizens from voting.  Yet noncitizens may lawfully possess several of the permissible forms of identification under both SB 14 and Texas's predecessor voter identification bills.  Although proponents of voter photographic identification requirements also argued that SB 14 was necessary to ensure the integrity of elections, they cited virtually no evidence of in-person voter impersonation, the only type of fraud a photographic identification requirement would prevent.  *Id*. at ¶¶ 27, 29, 40 & 68.

After prior attempts to pass voter identification bills in previous legislative sessions proved unsuccessful, Texas departed from its usual processes and instead invoked a series of

procedures in 2011 designed to minimize the ability of minority legislators to participate in the
legislative process and designed to guarantee the passage of SB 14.  At the start of the legislative
session, the Senate passed a rule that expressly exempted voter identification bills from the
traditional requirement that bills receive two-thirds support of the Senators present.  Immediately
after the Senate adopted its rules, the Governor designated SB 14 as emergency legislation,
allowing for passage during the first 60 days of the legislative session.  In the House, the Speaker
handpicked the members of a select committee, which was charged solely with considering SB
14.  Despite significant concerns expressed by minority legislators about the effect of SB 14,
particularly the obstacles that it would create to impede the ability of Hispanic and African-
American voters to participate equally in the electoral process, the legislature made little to no
effort to analyze SB 14's likely impact on those citizens or to adopt alternative methods to obtain
the required photographic identification.  *Id*. at ¶¶ 28, 31 & 33.  In fact, during the debate on SB
14, the Texas Legislature consistently rejected amendments intended to mitigate its burdens,
including amendments to expand the types of permissible forms of identification and to alleviate
the costs for indigent voters of transportation and/or obtaining underlying documents.  *Id*. at
¶ 33.

The governor signed SB 14 into law on May 27, 2011.  At that time, Texas could not
implement any changes to its voting procedures without complying with Section 5 of the Voting
Rights Act, which required demonstrating that those changes "neither ha[d] the purpose nor
w[ould] have the effect of denying or abridging the right to vote on account of race or color," or
membership in "a language minority group."  42 U.S.C. §§ 1973c(a), 1973b(f)(2).  Texas
initially submitted SB 14 to the Attorney General for administrative review.  Compl. at ¶¶ 43-45.

On March 12, 2012, the Attorney General interposed an objection under Section 5 because Texas had failed to show that SB 14 would not result in minority voters having less opportunity to participate in the electoral process than they did previously.[2]  Based on Texas's own data, Hispanic voters were at least 46.5% more likely and potentially up to 120.0% more likely than non-Hispanics to lack a DPS-issued driver license or personal identification card. The State did not provide any data as to the effect of SB 14 on African-American voters.  Texas also failed to show that the availability of the EIC would mitigate the retrogressive effect of SB 14 on Hispanic registered voters, due to Hispanics' comparative lack of access to vehicles, the limited hours of operation of many DPS offices, and the lack of DPS driver license offices in nearly one-third of Texas counties.  *Id*. at ¶¶ 43-52.

On January 24, 2012, Texas filed a complaint seeking judicial review under Section 5 of the voting changes in SB 14.  *Id*. at ¶ 54 (citing *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. filed Jan. 24, 2012)).  On August 30, 2012, following a weeklong bench trial, the three-judge court issued a unanimous decision holding: "SB 14, if implemented, would in fact have a retrogressive effect on Hispanic and African American voters."  *Id*. at ¶ 55 (quoting *Texas v. Holder*, 888 F. Supp. 2d 113, 138 (D.D.C. 2012), *vacated*, 133 S. Ct. 2886 (2013)).[3]  The district court concluded: "(1) a substantial subgroup of Texas voters, many of whom are African American or Hispanic, lack photographic identification; (2) the burdens associated with obtaining ID will weigh most heavily on the poor; and (3) racial minorities in Texas are disproportionately likely

---

[2] Because Texas failed to show that SB 14 would not have a discriminatory effect, the Attorney General did not reach a determination as to discriminatory purpose.  Compl. at ¶ 53.

[3] On June 27, 2013, the Supreme Court vacated the judgment in *Texas v. Holder* and remanded for further consideration in light of *Shelby County v. Holder,* 133 S. Ct. 2612 (2013).  *See Texas v. Holder*, 133 S. Ct. 2886 (2013).  Compl. at ¶ 62.

to live in poverty." *Id*. (quoting *Texas v. Holder*, 888 F. Supp. 2d at 138).  The court's findings noted that the Texas legislature enacted "the most stringent [voter identification law] in the country;" "ignor[ed] warnings that SB 14, as written, would disenfranchise minorities and the poor;" and rejected or tabled potentially ameliorative amendments.  *Id*. at ¶ 57 (quoting *Texas v. Holder*, 888 F. Supp. 2d at 144 (internal citations omitted)).  Texas subsequently filed a direct appeal to the Supreme Court.  *Id*. at ¶¶ 54-59.

On June 25, 2013, the Supreme Court held in *Shelby County v. Holder* that it is unconstitutional to use the coverage formula in Section 4(b) of the Voting Rights Act to subject jurisdictions to preclearance under Section 5.  133 S. Ct. 2612, 2631 (2013).  Within hours of the *Shelby County* decision, Texas announced it would begin enforcing SB 14.  Compl. at ¶¶ 60, 61.

Viewed in the totality of circumstances in Texas, its implementation and enforcement of SB 14 will interact with the social and historical legacy of intentional discrimination in Texas to deny equal opportunities for Hispanic and African-American voters to participate in the political process.  Compl. at ¶¶ 39, 69.  The United States' complaint more than adequately pleads that SB 14 violates Section 2 of the Voting Rights Act, and Texas' motion to dismiss should be denied.

## II.  LEGAL STANDARD UNDER FEDERAL RULE 12(b)(6)

A complaint need only set forth "a short and plain statement . . . showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under Federal Rule of Civil Procedure 12(b)(6), "to survive a motion to dismiss, [a plaintiff] need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc v. Siracusano*, 131 S. Ct. 1309, 1322 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When ruling

7

on a motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and must avoid a "rigid, mechanized, or ritualistic" definition of a prima facie claim. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (internal citation and quotation marks omitted).  In addition, a court generally may not consider facts outside the pleadings in ruling on a motion to dismiss. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

### III.  ARGUMENT

The United States' complaint alleges facts that are more than sufficient to state a claim under Section 2 of the Voting Rights Act.  As discussed below, Texas's arguments in favor of dismissal ignore long-established Section 2 case law and fail to account for the facts pled in the United States' complaint.

**A.  SB 14 Violates Section 2 of the Voting Rights Act**

The determination that a challenged practice violates Section 2 is based on a review of "the totality of the circumstances" in the jurisdiction and requires "a searching practical evaluation of the past and present reality and [] a functional view of the political process." *Thornburg v. Gingles*, 478 U.S. 30, 43, 45 (1986) (citations and internal quotation marks omitted).  The Senate Report to the 1982 amendments of the Voting Rights Act identifies a number of factors that may inform a court's evaluation of whether a challenged practice or procedure denies minority voters the same opportunity to participate in the political process as other citizens.[4]  These "Senate Factors" include:

---

[4] This report is "the authoritative source for legislative intent" concerning Section 2's results test.  *See Gingles*, 478 U.S. at 43 n.7.

8

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles*, 478 U.S. at 36-37 (quoting S. REP. NO. 97-417, at 28-29).  The Senate Report identified

two additional factors that may have probative value for a plaintiff's Section 2 claim:

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S. REP. NO. 97-417, at 29.  This list is non-exhaustive, and no particular factor, number of

factors, or any particular combination of factors needs be proven to sustain a Section 2 claim.

*Id*.; *Gingles*, 478 U.S. at 45.  Proof of relevant Senate Factors establishes a causal connection

9

between the challenged practice and a prohibited denial or abridgment of the right to vote. *See Mississippi State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 405 (5th Cir. 1991).

As the complaint alleges, Hispanic and African-American voters constitute a disproportionate share of the electorate who lack the photographic identification SB 14 requires. Compl. at ¶¶ 35-38. In addition, the same widespread socio-economic disparities that Congress and the courts have found to hinder minorities' effective political participation also disproportionately burden minority voters' ability to obtain an EIC. *Id*. at ¶ 38. These disparities, and the State's failure to alleviate them, arise in an electoral context that has been marked by the effects of a history of official discrimination. Race and language minority status continue to play a significant role in Texas's electoral process, resulting in a legislature that is unresponsive to minority concerns, including during the consideration of SB 14. Augmenting the totality of circumstances existing in Texas are high levels of racially polarized voting and racial campaign appeals. *Id*. at ¶ 39. Both individually and cumulatively, these facts demonstrate that the disparities caused by SB 14 will result in higher rates of disenfranchisement among minority voters than Anglo voters, unlawfully denying Hispanic and African-American voters an equal opportunity to participate in the political process. These facts plainly state a claim under Section 2's results test. *See, e.g*., *Operation Push*, 932 F.2d at 405 (affirming finding of a Section 2 violation based upon the disparate burden that voter registration procedures imposed on African-American voters when viewed in concert with relevant Senate Factors).

### 1. Texas Misconstrues the Meaning of "Denial or Abridgment" Under Section 2

Texas argues that SB 14 cannot result in a "denial or abridgment" of the right to vote under Section 2. Mot. to Dismiss at 18-20. According to the State, a person who lacks the

10

requisite photographic identification may nonetheless vote using an EIC, which Texas issues free of charge.  Texas contends that if the burdens of obtaining an EIC dissuade some individuals from voting, that is their "choice," rather than a cognizable denial or abridgement of the right to vote.  Mot. to Dismiss at 19.  Texas also argues that SB 14 imposes no greater burden than voter registration or in-person voting requirements and is thus immune from Section 2 challenge under *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).  Mot. to Dismiss at 19-20.  None of these arguments has merit.

    As detailed in the United States' complaint, "EICs will not be costless."  *Texas v. Holder*, 888 F. Supp. 2d at 116.  Voters who lack the underlying documents necessary to obtain an EIC must incur monetary costs to obtain such documents, and voters who reside in a counties without a DPS driver license office may be forced to expend significant time and money, both in transportation costs and lost wages, to travel long distances to apply for an EIC.  Compl. at ¶¶ 18-24, 38.  Not only are minority voters more likely than Anglos to lack otherwise-acceptable SB 14 identification, the process of obtaining an EIC will be more burdensome given that minorities in Texas are disproportionately more likely to have limited access to transportation and to have a comparatively lower socio-economic status.  *Id*. at ¶¶ 13, 14, 36-38.  Because, to a statistically significant degree, the burdens associated with obtaining an EIC will fall disproportionately on African-American and Hispanic citizens in Texas, who are disproportionately less able to meet them, SB 14 results in a denial or abridgement of the right to vote under Section 2.

a.   *A Burden on Voting Need Not Be Impossible To Overcome In Order to Qualify as a Denial or Abridgement of the Right to Vote Under Section 2*

Contrary to Texas's suggestion (*see* Mot. to Dismiss at 19), a burden on voting need not be impossible to overcome in order to qualify as a "denial or abridgement" of the right to vote. Indeed, the burden imposed by a contested practice need only "hinder [minority] citizens' ability to participate in the political process" to violate Section 2.  *Operation Push*, 932 F.2d at 409; *see also Salas v. Sw. Tex. Junior College Dist.*, 964 F.2d 1542, 1555-56 (5th Cir. 1992) (concluding that evidence of "practical impediments to voting" may establish a causal link between a challenged electoral structure and a discriminatory result).  Courts have ordered that polling places be opened on a Native American reservation in light of evidence that many reservation residents would find it difficult to find transportation to more remote voting locations.  See *Spirit Lake Tribe v. Benson County*, Civ. No. 10-95, 2010 U.S. Dist. LEXIS 116827 (D.N.D. Oct. 21, 2010).  Finding that "the use of polling places at locations remote from black communities . . . may well abridge the class members' free exercise of the right to vote," the court in *Brown v. Dean*, 555 F. Supp. 502, 505 (D.R.I. 1982), also ordered a change in polling place locations.  *Id*. at 506.  In a similar context under Section 5, the Supreme Court recognized in *Perkins v. Matthews*, 400 U.S. 379, 388 (1971), that locating polling places "at distances remote from black communities" could result in "denying or abridging the right to vote on account of race or color."

In addition, the Fifth Circuit has made clear that Section 2 prohibits more than insurmountable hurdles to voting.  In *Mississippi State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991), the Fifth Circuit affirmed that Mississippi's dual voter registration system, which required registration with the county registrar to vote in federal, state, and county elections, and separately with the municipal clerk to vote in municipal elections, violated Section

12

2.  Mississippi had also imposed a prohibition on satellite registration, under which voter registration could take place only at the county courthouse during business hours.  *See Mississippi State Chapter, Operation PUSH v. Allain*, 674 F. Supp. 1245 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400, 403 (5th Cir. 1991).  The plaintiffs alleged that a significant percentage of Mississippi's black citizens did not have "(1) access to the transportation necessary to travel to the county courthouse to register, or (2) the type of jobs that would allow them to leave work during business hours to register to vote," such that the challenged laws "resulted in black citizens registering to vote at a rate [25 percentage points] lower than white citizens."  932 F.2d at 403.  The district court found that the registration system violated Section 2 because, although "Mississippi's registration laws no longer contain provisions that allow registrars to administer explicit tests to citizens, . . . the [challenged] statutes permit administrative barriers . . . . [that] are harder to overcome for persons of lower socio-economic status and persons of lower educational attainment, a group that is disproportionately black."  674 F. Supp. at 1256.

It is spurious to argue that SB 14 cannot cause a denial or abridgment of the right to vote because anyone may vote if he or she "choose[s]" to "spend . . . limited time and resources" on obtaining an EIC.  Mot. to Dismiss at 19.  The decisions in *Operation Push*, as well as in cases requiring jurisdictions to move their polling places to provide equal access to minority voters, demonstrate why Texas's argument must fail.  If Texas's strained reading of Section 2 were correct, it would not have been enough in *Operation Push* to show that "administrative barriers" to voter registration interacted with the social and historical legacy of discrimination in Mississippi to result in unequal access for black citizens.  Instead, the plaintiffs in *Operation Push* would have been required to prove that minority voters were categorically unable to make

two trips to the county courthouse in order to register to vote.  But such a showing of impossibility is not what Section 2 requires.

We note that the D.C. Court, in the Section 5 case over SB 14, likewise declined to accept Texas's argument about voter "choice."  *Texas v. Holder*, 888 F. Supp. 2d at 124 ("in an attempt to advance its own definition of "deny" and "abridge"—one that would essentially exempt voter ID laws from section 5 preclearance—Texas ignores what the Supreme Court has said these terms mean. . . . Just as educational and economic conditions might affect whether minorities 'choose' to vote, those conditions could also affect whether minorities 'choose' to obtain photographic identification. . . . Our rejection of Texas's unqualified assertion that laws are immune from section 5 so long as they can be tied to 'voter choice' should come as little surprise. . .").

Moreover, the case law is clear that courts may consider whether socio-economic disparities caused by past discrimination hinder the ability of racial or language minority voters to take all of the actions necessary for effective political action in the face of the challenged practice.[5]  In this case, the United States has pled that the socio-economic effects of discrimination will, at a minimum, exacerbate the inability of minority voters, who constitute a disproportionate share of those voters without SB 14 identification, to obtain the documents necessary to cast a regular ballot, if not totally preclude them from doing so.  Minority voters

---

[5] *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 866-67 (5th Cir. 1993) (en banc) (explaining with reference to Senate Factor 5 that "courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation.  Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation") (quoting S. Rep. 417 at 29 n.114).

without SB 14 identification face significant and disproportionate burdens to obtain an EIC because of the fees for the underlying documents, as well as the costs involved in travelling long distances to visit an office with limited hours, and potentially losing wages because of the time required to do so.  Compl. at ¶¶ 18-24, 30, 32, 38-39.

As *Operation Push* and the line of cases on polling place locations establish, the alleged burdens involved in complying with SB 14, which African American and Hispanic voters are disproportionately unable to overcome, plainly constitute a sufficient allegation of an abridgement or denial of the right to vote to state a claim under Section 2.

### b. SB 14 Is Not Insulated From Review Under Section 2 by the Supreme Court's Decision in **Crawford**

Texas also argues that the Supreme Court's decision in *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), immunizes SB 14 from challenge under Section 2.  Mot. to Dismiss at 19-20.  *Crawford*, however, addressed very different claims, under very different facts and under a very different law.  First, *Crawford* contained neither a Section 2 claim nor any race discrimination claim at all, but, instead, concerned a First and Fourteenth Amendment facial challenge to Indiana's photographic identification law (known as "SEA 483").  Indeed, the district court concluded that there was no evidence in that case that racial minority groups would be disproportionately impacted by Indiana's law.  *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 823-24 (S.D. Ind. 2006).

The *Crawford* plaintiffs, given their facial constitutional challenge, were required to show that Indiana's law was invalid "in all its applications."  *Id*. at 200.  The Supreme Court was concerned only with the contours of Indiana's voter identification law and its general impact on all voters.  *Id*. at 201-02 (noting that "the record says virtually nothing about the difficulties

faced by . . . indigent voters" and that at any rate, the Court was considering "only the statute's broad application to all Indiana voters").  The Supreme Court concluded only "on the basis of the record that has been made in this litigation," that Indiana's law did not "impose[] excessively burdensome requirements."  *Id.* at 202 (citations omitted).  Therefore, by no stretch of the imagination did *Crawford* hold that Section 2 could not be violated by a voter identification law that imposes significant time and document costs and results in racially- and ethnically-identifiable groups having a demonstrably more difficult time voting.  We note that the D.C. District Court in the Section 5 case regarding SB 14 also rejected Texas's argument that *Crawford* immunized SB 14 from challenge.  *Texas v. Holder*, 888 F. Supp. 2d at 125 ("Contrary to Texas's argument, *Crawford* does not control this case.")

In addition, Texas's SB 14 is not Indiana's SEA 483: Indiana's law is far less restrictive than SB 14.  For example, Indiana's photographic identification law permits the use of any federal or Indiana identification with an individual's name, photograph, and an expiration date after the most recent general election.  Ind. Code Ann. § 3-5-2-40.5(a).  The law further allows indigent voters without identification to cast a valid vote by provisional ballot through filing an affidavit with a circuit court clerk or county election board.  *Id.* at § 3-11.7-5-2.5(c)(2).

For many African-American and Hispanic Texas voters without SB 14 identification, traveling to a distant DPS office and incurring costs for the underlying documents necessary to obtain an EIC will impose burdens far more significant than those associated with registering to vote or traveling to a neighborhood polling place on election day.  When viewed in the totality of the circumstances, the increased burdens that SB 14 imposes on Texas voters who do not have the required SB 14 photographic identification are well beyond those typically associated with voting, and, as a result will deny African-American and Hispanic voters an equal opportunity to

16

participate in the political process.  Compl. at ¶¶ 35-42.  *Crawford* simply does not speak to the proper application of Section 2's results test to the facts pled in this case.

## 2.  The United States Has Pled Facts Showing That SB 14 Results in a Violation of Section 2

Texas next argues that dismissal is warranted on the grounds that SB 14 does not deny or abridge the right to vote "on account of race or color" or "because" of membership in a language minority group.  Specifically, the State asserts (1) that the United States' results claim fails to satisfy the "account of race" requirement because it is based solely on a showing of disparate impact, and (2) that Section 2 extends only to laws that violate the Fifteenth Amendment—*i.e.*, laws that are intentionally discriminatory.  Mot. to Dismiss at 21-26.  Both arguments are incorrect.

### a.  The United States' Section 2 Claim Does Not Rest on Bare Allegations of Disparate Impact

Contrary to Texas's assertion, Mot. to Dismiss at 24-25, the United States is not basing its Section 2 claim solely on racial disparities in rates of SB 14 identification possession.  A racial disparity is the highly relevant starting point—although by no means the entirety of the analysis—of the United States' Section 2 claim here.  *See Operation Push*, 932 F.2d at 409 ("We find it difficult to conceive of a more appropriate measure of the discriminatory effects of these laws than figures representing disparity in registration rates between all black and white eligible voters in the state."); *see also United States v. Blaine Cnty.*, 363 F.3d 897, 909 (9th Cir. 2004) (Section 2's "results test . . . does not look for mere disproportionality. . . . Rather, plaintiffs must establish that under the totality of the circumstances, the challenged procedure prevents minorities from effectively participating in the political process").

17

The factual allegations contained in the United States' complaint do more than establish an initial statistical disparity.  The complaint alleges not only racial disparities in photographic identification possession rates, but also that the disparate socio-economic circumstances resulting from discrimination in education, employment, and housing, as described in Senate Factor 5, do not provide minority voters with an opportunity, equal to that of other members of the electorate, to obtain the requisite identification.  This unequal ability also stems from an electoral system that is scarred by a legacy of intentional discrimination and by an on-going lack of responsiveness to the concerns of racial minorities.  Moreover, because voting in Texas is racially polarized, and racial appeals continue to characterize some campaigns, it is clear that race and membership in a language minority group remain significant factors in the electoral process in Texas.  Compl. at ¶¶ 35-39.  These allegations are more than sufficient to allow the court to conclude, after "an intensely local appraisal of the design and impact of the contested electoral mechanisms," that SB 14 violates Section 2.  *Teague v. Attala Cnty.*, 92 F.3d 283, 287 (5th Cir. 1996) (quoting *Gingles*, 478 U.S. at 79).

None of the case law on which Texas relies supports its motion to dismiss the United States' claim.  *See* Mot. to Dismiss at 23-24.  Neither *Ortiz v. City of Philadelphia*, 28 F.3d 306 (3d Cir. 1994), nor *Brown v. Detzner*, 895 F. Supp. 2d 1236 (M.D. Fla. 2012), undermine the United States' complaint.  The Section 2 claims in those cases failed for lack of a substantial, disparate burden.  *See Ortiz*, 28 F.3d at 314 n.14 (holding that Section 2 was not violated by a voter purge statute where "the procedures for re-registering to vote are identical to those for registering in the first place; therefore, they are no more complicated, burdensome, or discriminatory than the requirement of initial registration"); *Brown v. Detzner*, 895 F. Supp. 2d at 1253 (rejecting challenge to early voting law that actually "increase[d] the overall number of

18

weekend voting hours").  In this case, SB 14 imposes new and significant monetary, time, and travel costs on a disproportionate basis on minority voters who, on average, are least able to bear such burdens.  Additionally, case law limiting the applicability of Section 2 to felon disfranchisement laws (*see* Mot. to Dismiss at 23-24) is wholly inapposite here, as those cases are based on the explicit recognition in the Fourteenth Amendment of States' ability to limit the right to vote in response to criminal conviction.[6]  *See* U.S. Const. amend. XIV, § 2.

### b.   *A Section 2 Claim Need Not Allege Discriminatory Intent*

Texas's attempt to re-inject an intent requirement into Section 2 is meritless.  Texas argues that the United States' results claim must be dismissed because "Section 2 . . . extends only to laws that 'result' in violations of the Fifteenth Amendment."  Mot. to Dismiss at 22. While the Fifteenth Amendment itself prohibits only intentional discrimination, *Mobile*, 446 U.S. at 62, the Supreme Court has held and "made clear that a violation of § 2 could be established by proof of discriminatory results alone."  *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *accord Gingles*, 478 U.S. at 35, 43-44; *id.* at 83-84 (O'Connor, J., concurring in judgment) .

### c.   *Application of Section 2 in This Case Raises No Constitutional Concerns*

Supreme Court precedent squarely forecloses Texas's argument that Congress lacks enforcement power to prohibit States from "enacting laws that do not actually violate the Fifteenth Amendment."  Mot. to Dismiss at 28.  The Supreme Court has summarily affirmed the constitutionality of Section 2's results test.  *Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984).  The jurisdictional statement in *Brooks* specifically asked "whether Section 2, if

---

[6] *See, e.g.*, *Hayden v. Pataki*, 449 F.3d 305, 315-16 (2d Cir. 2006) (en banc);  *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1234 (11th Cir. 2005) (en banc); *Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986).

construed to prohibit anything other than intentional discrimination on the basis of race in registration and voting, exceeds the power vested in Congress by the Fifteenth Amendment." 469 U.S. at 1003 (Stevens, J., concurring).  The Supreme Court's summary affirmance necessarily "reject[ed] the specific challenges presented in the statement of jurisdiction." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  *Brooks* therefore establishes that Section 2's results test is a valid exercise of Congress's enforcement powers.  That decision is binding on this Court.  *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975).

Moreover, the constitutionality of Section 2's results test has been upheld by the Fifth Circuit and every other court to consider the issue.  *Jones v. Lubbock*, 727 F.2d 364, 372-75 (5th Cir. 1984); *accord United States v. Blaine Cnty.*, 363 F.3d 897 (9th Cir. 2004); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1556-63 (11th Cir. 1984), *cert. denied* 469 U.S. 976; *Shaw v. Hunt*, 861 F. Supp. 408, 438 (E.D.N.C. 1994) (three-judge court), *aff'd in part, rev'd in part on other grounds*, 517 U.S. 899 (1996); *Prosser v. Elections Bd.*, 793 F. Supp. 859, 869 (W.D. Wis. 1992) (three-judge court); *Wesley v. Collins*, 605 F. Supp. 802, 808 (M.D. Tenn. 1985), *aff'd,* 791 F.2d 1255 (6th Cir. 1986); *Sierra v. El Paso Indep. Sch. Dist.*, 591 F. Supp. 802, 806 (W.D. Tex. 1984); *Major v. Treen*, 574 F. Supp. 325, 342-49 (E.D. La. 1983) (three-judge court).  In upholding the constitutionality of the results test, courts have noted that while the Constitution prohibits intentional discrimination, "Congress could rationally conclude that a different statutory standard would permit fuller enforcement of that constitutional prohibition." *Marengo Cnty. Comm.*, 731 F.2d 1546, 1558 n.17 (11th Cir. 1984); *see also Blaine Cnty.*, 363 F.3d at 909 (same).

Thus, while States have "broad powers to determine the conditions under which the right of suffrage may be exercised," *Carrington* v. *Rash*, 380 U. S. 89, 91 (1965), there is nothing

20

remarkable about Congress's ability to impose limitations on those powers.  The restrictions embodied in the Fourteenth and Fifteenth Amendments "are directed to the States, and they are to a degree restrictions of State power." *Ex parte Virginia,* 100 U.S. 339, 346 (1880).  Congress's legitimate enforcement of those restrictions "is no invasion of State sovereignty."  *Id.*

Contrary to Texas's argument, the Supreme Court's decision in *Arizona v. Inter Tribal Council of Arizona*, 133 S. Ct. 2247 (2013), does not undercut these well-established principles. While *Inter Tribal Council* recognized that the Elections Clause of the Constitution, U.S. Const. art. I, § 4, cl. 1, "did not confer upon Congress the power to regulate voter qualifications in federal elections," 133 S. Ct. at 2258 n.8, it did not directly address, much less limit, the scope of Congress's Fourteenth and Fifteenth Amendment enforcement authority.  The powers that States have under the Elections Clause to regulate voter qualifications must be exercised consistent with all applicable Constitutional guarantees.  Thus, although the Constitution permits States to determine voting qualifications generally, Congress has broad powers under the Fourteenth and Fifteenth Amendment to prohibit States from imposing voting qualifications that result in discrimination on the basis of race or language minority status.  *See, e.g*., *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (upholding the ban imposed by Section 4(e) of the Voting Rights Act on New York's English language literacy test as applied to voters educated in Puerto Rico and rejecting New York's argument that Congressional authority to outlaw state voting qualifications was limited only to those qualifications that violated the Constitution).  Indeed, the Supreme Court has repeatedly upheld Congress's exercise of its Fourteenth and Fifteenth Amendment enforcement powers to prohibit voting practices that were not necessarily directly prohibited under the Constitution.  *See, e.g*., *Oregon v. Mitchell*, 400 U.S. 112 (1970); *Morgan*, 384 U.S. at 648.  *See also City of Rome v. United States*, 446 U.S. 156, 173 (1980) ("[T]he prior decisions of

21

this Court foreclose any argument that Congress may not, pursuant to § 2 [of the Fifteenth

Amendment], outlaw voting practices that are discriminatory in effect."); *Lopez v. Monterey*

*County*, 525 U.S. 266, 283 (1999) ("under the Fifteenth Amendment, Congress may prohibit

voting practices that have only a discriminatory effect") (quoting *Rome*, 446 U.S. at 175).

Consistent with the guarantees of the Fourteenth and Fifteenth Amendments, States may

adopt an electoral system that best suits their needs, including one requiring proof of voter

identification, "so long as that system provides for equal opportunities for effective participation

by racial and language minorities." *Marengo*, 731 F.2d at 1560. In short, the United States'

straight-forward application of Section 2's totality-of-the-circumstances standard to establish that

SB 14 violates Section 2 raises no constitutional concern, "grave" or otherwise.

**B.     The United States has Pled Facts Showing the State Intentionally Violated Section 2**

In *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252,

266-68 (1977), the Supreme Court identified a non-exhaustive list of factors to consider in

determining whether racially discriminatory intent exists, including: whether the impact of the

decision bears more heavily on one racial group than another; contemporaneous statements by

the decisionmakers; the historical background of the decision; the sequence of events leading up

to the decision; and whether the decision departs from the normal practice. The *Arlington*

*Heights* standard applies in determining whether voting changes were enacted with

discriminatory intent. *See, e.g., Terrazas v. Clements*, 581 F. Supp. 1329, 1347 (N.D. Tex. 1984)

(three-judge panel) (applying the *Arlington Heights* factors to intent analysis under Section 2).

The Senate Factors also "supply a source of circumstantial evidence regarding discriminatory

intent." *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). In addition, "'normal

inferences to be drawn from the foreseeability of defendant's actions'" may be considered.

*McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1047 (5th Cir. 1984) (quoting S. REP. NO. 97-417, at 27 n.108).  "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act" for a violation to occur.  *Brown*, 561 F.3d at 433 (citing *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984)).  *See also Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997) (adopting *Arlington Heights* framework for determining discriminatory purpose under Section 5 of the Act).

In asserting that the United States makes a "bald" allegation of racially discriminatory purpose, Mot. to Dismiss at 30, Texas ignores the complaint's detailed factual allegations relevant to the *Arlington Heights* factors that may be probative of racially discriminatory intent. 429 U.S. at 266-68.  Amongst other allegations, the complaint describes the entirely foreseeable discriminatory impact of SB 14, the tenuous justifications and anti-immigrant rhetoric espoused by SB 14's proponents, the legislature's consistent rejection of ameliorative measures, the use of irregular and exclusionary procedures to pass the law, and the fact that SB 14 was passed by the same legislature that was found to have engaged in racially invidious practices in statewide redistricting.  Compl. at ¶¶ 26-34.

Establishing the existence of a racially discriminatory intent, however, does not require proof of racial animus, only that the underlying motivation is intentionally discriminatory.

> Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities.  Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home.  On the basis of that belief, you join a pact not to sell your house to minorities.  Have you engaged in intentional racial and ethnic discrimination?  Of course you have.  Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied,* 498 U.S. 1028 (1991).  The United States need not prove that SB 14 is simply "a racist law" without any legitimate purposes, nor that all of the bill's supporters had "racially nefarious motives."  Mot. To Dismiss at 28-30.

Contrary to the State's assertion, the facts pled by the United States are more than sufficient to state a claim of intentional discrimination under Section 2.  The Court should therefore deny the State's motion to dismiss the complaint.

**C.    Steve McCraw, Director of the Texas Department of Public Safety, is a Proper Defendant**

Defendants argue that Steve McCraw, director of the DPS, is not a proper defendant and should be dismissed because DPS's role in administering SB 14 is limited to issuing the requisite forms of state photographic identification, including EICs.  *See* Mot. To Dismiss at 31-32.  According to Texas, under *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), the only appropriate official capacity defendant is Texas Secretary of State John Steen.

The State's reliance upon *Okpalobi* is misplaced.  In *Okpalobi*, the Fifth Circuit held that private plaintiffs lacked standing to assert constitutional claims against the governor and state attorney general to challenge a private tort statute, where the governor and state attorney general lacked authority to enforce the statute.  244 F.3d at 409, 426-27.  Here, by contrast, the Attorney General has statutory enforcement authority to bring an action whenever any person has engaged in any practice prohibited by Section 2, *see* 42 U.S.C. § 1973j(d), and the complaint is replete with allegations that DPS has engaged, and continues to engage, in conduct that violates Section 2 by imposing a substantial burden on minority voters seeking to obtain an EIC.

24

The complaint makes specific allegations that DPS' process to obtain an EIC will impose substantial burdens on some voters by requiring them to travel long distances to DPS offices and pay out-of-pocket costs to obtain necessary, predicate documents.  These burdens and resulting disenfranchisement will fall most heavily on Hispanic and African-American Texans, who are disproportionately poor and disproportionately lack access to transportation.  *Id.* at ¶ 38.  As a result, these voters will not be able to obtain an EIC and will be unable to cast a valid ballot.  Compl. at ¶¶ 19-24, 38.

Defendant McCraw is the director of DPS, the agency that SB 14 charged with creating and issuing EICs.  *Id.* at ¶ 7.  As such, he controls the EIC application and issuance process, including regulating the requirements for an EIC application, overseeing the determinations of eligibility for an EIC, and directing the offices charged with issuing EICs, including their locations and hours of operations.  *See id.* at ¶¶ 7, 18-24.  Although Defendants contend that McCraw has only a "ministerial" function, Mot. to Dismiss at 31, the DPS role in providing EICs is a significant component of SB 14's implementation and its discriminatory result.  Thus, the United States' complaint properly asserts its Section 2 claim against McCraw, and the State's motion to dismiss him should be denied.

## IV.  **CONCLUSION**

As set forth above, the United States has stated a claim upon which relief can be granted pursuant to Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.  Therefore, the State of Texas's motion to dismiss as to the United States' claims should be denied.  Pursuant to Local Rule 7.4(d), a proposed order denying the State's motion in that regard is attached hereto.

Date:  November 22, 2013

                                          Respectfully submitted,

KENNETH MAGIDSON                     JOCELYN SAMUELS
United States Attorney               Acting Assistant Attorney General
Southern District of Texas         Civil Rights Division

                                             s/ Anna M. Baldwin
                                          T. CHRISTIAN HERREN, JR.
                                          MEREDITH BELL-PLATTS
                                          ELIZABETH S. WESTFALL
                                          BRUCE I. GEAR
                                          JENNIFER L. MARANZANO
                                          ANNA M. BALDWIN
                                          DANIEL J. FREEMAN
                                          Attorneys, Voting Section
                                          Civil Rights Division
                                          Department of Justice
                                          950 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20530

26

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2013, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

John B. Scott
Office of the Texas Attorney General
john.scott@texasattorneygeneral.gov

*Counsel for Defendants*

Chad W. Dunn
Kembel Scott Brazil
Brazil & Dunn
chad@bradzilanddunn.com
scott@bazilanddunn.com

Neil G. Baron
Law Offices of Neil G. Baron
neil@ngbaronlaw.com

Armand Derfner
Derfner, Altman, & Wilborn
aderfner@dawlaw.com

Luiz Roberto Vera, Jr.
lrvlaw@sbcglobal.net

*Counsel for Veasey Plaintiffs*

Rolando L. Rios
Law Offices of Rolando L. Rios
rrios@rolandorioslaw.com

*Counsel for Texas Association of Hispanic County Judges and County Commissioners Plaintiff-Intervenors*

Christina Swarns
Ryan P. Haygood
Natasha M. Korgaonkar
Leah C. Aden
NAACP Legal Defense and Educational
    Fund, Inc.
cswarns@naacpldf.org
rhaygood@naacpldf.org
nkorgaonkar@naacpldf.org
laden@naacpldf.org

Danielle Conley
Jonathan Paikin
Kelly P. Dunbar
Sonya L. Lebsack
WilmerHale LLP
danielle.conley@wilmerhale.com
jonathan.paikin@wilmerhale.com
kelly.dunbar@wilmerhale.com
sonya.lebsack@wilmerhale.com

*Counsel for Texas League of Young Voters Plaintiff-Intervenors*

Joseph M. Nixon
Bierne, Maynard, & Parsons
jnixon@bmpllp.com

*Counsel for True the Vote Movant-Intervenor*

Ezra D. Rosenberg
Amy L. Rudd
Dechert LLP
ezra.rosenberg@dechert.com
amy.rudd@dechert.com

Wendy Weiser
Jennifer Clark
Vishal Agraharkar
Brennan Center for Justice at NYU School of
    Law
wendy.weiser@nyu.edu
jenniferl.clark@nyu.edu
vishal.argraharkar@nyu.edu

Mark A. Posner
Sonia Kaur Gill
Lawyers' Committee for Civil Rights
mposner@lawyerscommittee.org
sgill@lawyerscommittee.org

*Counsel for Texas State Conference of NAACP Branches Plaintiffs*

<u>*/s/ Anna M. Baldwin*</u>
Anna M. Baldwin
Voting Section
Civil Rights Division
U.S. Department of Justice
Anna.Baldwin@usdoj.gov