UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,     )    CASE NO: 2:13-CV-00193
                     )
         Plaintiffs,  )      CIVIL
                     )
    vs.              )    Corpus Christi, Texas
                     )
RICK PERRY, ET AL.,      )   Friday, November 15, 2013
                     )
         Defendants.  )   (9:32 a.m. to 10:19 a.m.)


CIVIL INITIAL CONFERENCE (TELEPHONIC)

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:          See Next Page

Court Recorder:      Genay Rogan

Clerk:             Brandy Cortez

Court Security Officer:  Adolph Castillo

Transcriber:         Exceptional Reporting Services, Inc.
                     P.O. Box 18668
                     Corpus Christi, TX 78480-8668
                     361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>TELEPHONIC APPEARANCES FOR</u>:


Plaintiffs:                     ARMAND DERFNER, ESQ.
                                P. O. Box 600
                                Charleston, SC 29402

                                CHAD W. DUNN, ESQ.
                                KEMBEL SCOTT BRAZIL, ESQ.
                                Brazil and Dunn
                                4201 Cypress Creek Parkway
                                Suite 530
                                Houston, TX 77068

                                J. GERALD HEBERT, ESQ.
                                191 Somervelle Street
                                #405
                                Alexandria, VA 22304

                                NEIL G. BARON, ESQ.
                                914 FM 517 Road, W.
                                Suite 242
                                Dickinson, TX 77539

                                ANNA BALDWIN, ESQ.
                                U.S. Department of Justice
                                950 Pennsylvania Avenue, N.W.
                                NWB 7273
                                Washington, DC 20009

                                ELIZABETH S. WESTFALL, ESQ.
                                U. S. Department of Justice
                                950 Pennsylvania Avenue, N.W.
                                NWB Room 7125
                                Washington, DC 20530

                                BRUCE I. GEAR, ESQ.
                                Department of Justice
                                1800 G Street, N.W.
                                Washington, DC 20006

                                JENNIFER L. MARANZANO, ESQ.
                                U.S. Department of Justice
                                Civil Rights Division - Voting Section
                                950 Pennsylvania Avenue, N.W. - NWB
                                Washington, DC 20530

**APPEARANCES FOR:**                    (CONTINUED)

Plaintiffs:                      ROLANDO L. RIOS, ESQ.
                                 115 E. Travis
                                 Suite 1654
                                 San Antonio, TX 78205

                                 ROBERT S. BERMAN, ESQ.
                                 U.S. Department of Justice
                                 950 Pennsylvania Avenue, N.W. - NWB
                                 Washington, DC 20530

                                 JOHN ALBERT SMITH, III, ESQ.
                                 Office of the U.S. Attorney
                                 800 N. Shoreline Boulevard
                                 Suite 500
                                 Corpus Christi, TX 78401

                                 EMMA SIMPSON, ESQ.
                                 (No address provided)

                                 MANUEL ESCOBAR, ESQ.
                                 (No address provided)

Defendants:                      JOHN BARRET SCOTT, ESQ.
                                 Scott, Yung, L.L.P.
                                 208 N. Market Street
                                 Suite 200
                                 Dallas, TX 75202

                                 JOSEPH M. NIXON, ESQ.
                                 Beirne, Maynard and Parsons
                                 1300 Post Oak Boulevard
                                 Suite 2500
                                 Houston, TX 77056

                                 JAMES EDWIN TRAINOR, III
                                 Beirne, Maynard and Parsons, L.L.P.
                                 401 W. 15th Street
                                 Suite 845
                                 Austin, TX 78701

Movants:                         M. HASAN ALI, ESQ.
                                 KELLY DUNBAR, ESQ.
                                 Wilmer, Cutler, Pickering, et al.
                                 1875 Pennsylvania Avenue, N.W.
                                 Washington, DC 20006

**APPEARANCES FOR:**          (CONTINUED)

Movants:                     NATASHA KORGAONKAR, ESQ.
                             NAACP Legal Def and Educational
                             Funds, Inc.
                             40 Rector Street
                             5th Floor
                             New York, NY 10006

                             RYAN HAYGOOD, ESQ.
                             NAACP Legal Def and Educational
                             Fund, Inc.
                             40 Rector Street
                             5th Floor
                             New York, NY 10006

                             EZRA D. ROSENBERG, ESQ.
                             Dechert, L.L.P.
                             902 Carnegie Center
                             Suite 500
                             Princeton, NJ 08540-6531

                             VISHAL AGRAHARKAR, ESQ.
                             Brennan Center for Justice
                             NYU School of Law
                             161 Avenue of the Americas
                             12th Floor
                             New York, NY 10013

                             MARK A. POSNER, ESQ.
                             SONIA KAUR GILL, ESQ.
                             Lawyers' Committee for Civil Rights
                             1401 New York Avenue, N.W.
                             Suite 400
                             Washington, DC 20005

                             ERANDI ZAMORA, ESQ.
                             Lawyers' Committee of Civil Rights
                             Under Law
                             1401 New York Avenue
                             Suite 400
                             Washington, DC 20005

                             VICTOR GOOD, ESQ.
                             (No address provided)

                             NINA PEREZ, ESQ.
                             (No address provided)

**<u>APPEARANCES FOR:</u>**          (CONTINUED)

                        DANIEL KOBICH, ESQ.
                        (No address provided)

1    **Corpus Christi, Texas; Friday, November 15, 2013; 9:32 a.m.**

2                    **(Call to Order)**

3            **THE COURT:**  Court calls Cause Number C-13-193,

4    *Veasey, et al versus Perry, et al.*  Brandy is going to take

5    roll to see who is present.  I don't think anyone is present in

6    the courtroom.  Is that right, Brandy?

7            **THE CLERK:**  That's correct, your Honor.

8            **THE COURT:**  Okay, go ahead.

9            **THE CLERK:**  Do I have parties present for the

10   individuals and the League of United Latin American Citizens?

11   Would you please announce?

12           **MR. RIOS:**  Rolando Rios for the Hispanic County

13   Judges and Commissioners.

14           **THE CLERK:**  Okay.

15           **MR. ESCOBAR:**  Manuel Escobar appearing on behalf of

16   LULAC.

17           **THE COURT:**  I'm sorry.  Who was that?

18           **MR. ESCOBAR:**  Manuel Escobar, E-s-c-o-b-a-r.

19           **THE CLERK:**  Do I have Mr. Dunn present?

20           **MR. ESCOBAR:**  Yes.  This is Chad Dunn on behalf of

21   Veasey Plaintiff group.  With me on the call is Armand Derfner,

22   Gerry Hebert, Neil Baron, Scott Brazil and a new lawyer joining

23   our team, Emma Simpson.

24           **THE CLERK:**  Thank you.

25           Do I have Ms. Bell-Platts or Ms. Westfall present for

7

1   the United States of America?

2           **MS. WESTFALL:**  Yes.  This is Elizabeth Westfall of

3   the United States.  I'm joined by John Smith, Robert Berman,

4   Jennifer Maranzano, Bruce Gear and Anna Baldwin.

5           **THE CLERK:**  Thank you.

6           Mr. Rios is present for the Texas Association of

7   Hispanic County Judges?

8           **MR. RIOS:**  Yes.

9           **THE CLERK:**  Is Mr. Nixon present for True the Vote?

10          **MR. TRAINOR:**  This is Trey Trainor and Joe Nixon and

11  we're present for True the Vote.

12          **THE CLERK:**  Thank you.

13          Do I have Ms. Aden or Mr. Haygood present for Texas

14  League of Young Voters?

15          **MR. HAYGOOD:**  Yes, yes, ma'am.  This is Ryan Haygood

16  for the Texas League of Young Voters.  I'm joined by Ali

17  Natasha Korgaonkar and Kelly Dunbar and Hasan Ali.

18          **THE CLERK:**  Thank you.

19          Do I have Mr. Rosenberg present for the Mexican

20  American Legislative?

21          **MR. ROSENBERG:**  Yes, I am and with me on the phone

22  are Mark Posner, Vishal Agraharkar, Victor Good, Nina Perez,

23  Erandi Zamora, Sonia Gill and Daniel Kobich.

24          **THE CLERK:**  Thank you.

25          And for the Defendants, do I have Mr. Scott present?

1          **MR. SCOTT:**  Yes, ma'am.

2          **THE CLERK:**  Thank you, Mr. Scott.

3          Your Honor, those are the ones present.

4          **THE COURT:**  That's everybody?

5          All right.  Counsel, we are here this morning for

6   initial pretrial conference on this case and there is a couple

7   of pending motions that I wanted to address first.  The first

8   one is Docket Entry Number 41.  It's the motion for

9   intervention filed by the Texas Association of Hispanic County

10  Judges and County Commissioners and Maria Longoria Benevides.

11  I did see where the United States had filed a response to that

12  motion to intervene but I didn't see a response from anyone

13  else.  If anyone else filed a response, let me know.  If you

14  don't say anything, I'm going to assume that was just the

15  United States.  Okay.

16          And I believe the United States -- let's see -- it

17  opposed the motion just as -- an intervention as a right but

18  did not oppose the motion to proceed as a permissive

19  intervention; is that correct, Ms. Westfall?

20          **MS. WESTFALL:**  Yes, this is Ms. Westfall.  Anna

21  Baldwin will be responding to questions concerning this motion,

22  your Honor.

23          **THE COURT:**  Okay, Ms. Baldwin?

24          **MS. BALDWIN:**  And, your Honor, that's correct.  We do

25  not oppose permissive intervention.

1          **THE COURT:**  Does anyone else wish to be heard on that

2    motion for intervention?

3          Okay, no one is saying anything.  So Court is then

4    going to grant the motion -- that motion to intervene by the

5    Texas Association of Hispanic County Judges and County

6    Commissions and Maria Longoria Benevides' motion under 20 --

7    under 24(b)(1) and that was Docket Entry Number 41 that's been

8    granted then.  So if nothing else --

9          **MR. SPEAKER:**  No, your Honor.

10         **THE COURT:**  -- on that issue, we will proceed then to

11   the motion for intervention of True the Vote which is Docket

12   Entry Number 38 and the United States had filed an opposition

13   to that motion to intervene.  Is there any other oppositions

14   that have been filed or that wish to be heard this morning on

15   that motion?

16         Okay.  Then I'm going to allow -- is it Mr. Nixon?

17   Are you proceeding or Mr. Trainor on that motion for

18   intervention?

19         **MR. TRAINOR:**  Your Honor, this is Trey Trainor and

20   I'll be handling the motion for our side.

21         **THE COURT:**  Okay.  You can proceed on your motion.

22         **MR. TRAINOR:**  Very good.  Your Honor, we made a

23   motion to intervene both in the matter of right and as

24   permissive intervention and as we cited in our brief, the law

25   with regard to the rule and we cited specifically that as a

1    matter of right, True the Vote should be allowed to intervene

2    because the intervention is timely, that there's no adequate

3    representation of the interests of True the Vote in the case.

4    And we would point out that on this particular point in the

5    previous litigation surrounding Senate Bill 14 and preclearance

6    to Senate Bill 14, the Plaintiffs in this case, the United

7    States, engaged in discovery regarding activities that True the

8    Vote conducted during the legislative process on the passage of

9    Senate Bill 14 and in that process came in and looked at

10   records and other documents that True the Vote had.

11            And there was nothing done by the Defendants who were

12   also Plaintiffs in the Section 5 preclearance case to protect

13   the rights of True the Vote essentially with regard to First

14   Amendment rights, free association and right decision and so

15   there was a very intrusive discovery process that was

16   propounded upon True the Vote.

17            **THE COURT:**  Why couldn't True the Vote protect itself

18   from that discovery?

19            **MR. TRAINOR:**  Well, we -- obviously we're not a party

20   to the litigation that went on in the District of Columbia and

21   obviously the distance there, for one.  So as far as the

22   adequacy of --

23            **THE COURT:**  Right.  But I'm just saying True the

24   Vote, an individual third-party person, can always protect

25   itself from any discovery propounded to it.  Is that --

1          **MR. TRAINOR:**  That's correct, your Honor, but these

2     discovery processes, especially if they happen in the Section 5

3     case -- information was turned over by the Plaintiffs in that

4     case to what True the Vote had conducted without ever

5     consulting with True the Vote as to whether or not they were

6     waiving any rights that True the Vote may have had to the

7     information that had been provided to legislators and others in

8     that process.

9          **THE COURT:**  Okay.  So the State of Texas provided

10    information that was, I guess, information that belonged to

11    True the Vote --

12         **MR. TRAINOR:**  Well, it's information that True the

13    Vote had provided to legislators and the decision not to stay

14    -- to waive whatever rights they may have had -- our opinion is

15    that it infringed somewhat on the right of True the Vote to

16    petition the Government and have that information be protected

17    in the information that was provided to those legislators.

18         **THE COURT:**  Okay.  All right, you can proceed.  So

19    that was one issue as to why no adequate representation,

20    correct?

21         **MR. TRAINOR:**  That's correct.

22         **THE COURT:**  So anything --

23         **MR. TRAINOR:**  And with regards to the harm here that

24    would be propounded on True the Vote, the -- an integral

25    mission of True the Vote as a nonprofit organization is to

1    protect the integrity of the elections in the state of Texas

2    and they train hundreds of volunteers to go through and look at

3    those public records all over the state and just put those

4    records together with various entities, whether it be death

5    records and election -- voter registration records -- all of

6    these records, they have volunteers to go through and look at

7    those and they have supplied both the Plaintiffs and the

8    Defendants in this case with information concerning the

9    integrity of the elections in the state of Texas which has had

10   very little done with that information.

11           So True the Vote has a database of information where

12   they had sought to have the Plaintiff in this case come in and

13   help protect the integrity of the election and nothing has been

14   done with that information that's been provided to the

15   Plaintiff and so the interest that True the Vote is trying to

16   protect here is one of itself as an organization who engages in

17   the process of addressing election integrity issues and has

18   been unable to get redress from the Plaintiff in this case to

19   correct the problems that it has identified with the voter

20   rolls and, in fact, what we see in this case is just the

21   opposite where True the Vote is -- thinks that Senate Bill 14

22   is an integral part of helping to protect the integrity of the

23   election, the Plaintiffs in this case have come in and said,

24   well, it's not and, again, is just thwarting the efforts of

25   True the Vote to advance something to help protect the

1    integrity of the election.

2             So with that, we believe that there's definitely a

3    direct interest that True the Vote has as an organization with

4    regard to its goal of helping to protect the integrity of the

5    election.  And then --

6             **THE COURT:**  But isn't that what the integrity of the

7    elections -- I guess the Government -- or the United States is

8    going to argue that's just the generalized interest that

9    everyone has?  Isn't that going to be their argument?

10             **MR. TRAINOR:**  Well, the certainly asserted that in

11    their brief that that is and I think I'm speaking more

12    specifically, your Honor, about the fact that True the Vote has

13    actually -- it's more than just a generalized interest with

14    regard to True the Vote.  As a nonprofit organization, its

15    mission is to go out and train people at the local level to

16    investigate their own voter rolls and help protect the

17    integrity of the election.

18             And in this particular case, what we've seen is that

19    True the Vote in fulfilling that mission that it was created

20    for has actually gone to the Plaintiff in this case, the

21    Government, and said, here are documented cases of election

22    fraud that are going on or potential election fraud that we

23    need investigated and it's turning that information over to the

24    Plaintiff in this case, the Government.  They haven't done

25    anything with it.

14

1        So if it is a generalized interest that True the Vote

2   is trying to protect, then the Government is supposed to

3   protect that.  There is proof that the Government has and so

4   True the Vote should be allowed to intervene in this process to

5   show that those interests are not being protected by what's

6   being reported to them by the Government.

7        So I think it's a little disingenuous for the

8   Government to say, well, we can protect the integrity of the

9   election if you'll just give us the information and True the

10  Vote has, in fact, given the information and nothing is done

11  with it and then they want to object to True the Vote

12  intervening in the case to bring to the Court's attention where

13  there are voter integrity issues when the Court is trying to

14  address whether or not something as simple as voter I.D. is, in

15  fact, a reasonable effort to thwart election fraud.

16        **THE COURT:**  Okay.  Anything else on -- from True the

17  Vote regarding intervention as a matter of right?

18        **MR. TRAINOR:**  Not as to a matter of right, your

19  Honor.

20        **THE COURT:**  Okay.  Then I'll let the United States

21  respond regarding intervention as a matter of right.

22        **MS. BALDWIN:**  Thank you, your Honor.  This is Anna

23  Baldwin.  As to intervention as a matter of right -- to take

24  the two issues that Mr. Trainor discussed, first, the United

25  States disagrees that True the Vote has any direct and natural

15

1    legally protectable interest in this litigation.  All the

2    interests that Mr. Trainor and True the Vote discussed are

3    either generalized interests such as protecting confidence in

4    the election or it can consider both generalized and

5    speculative such as preventing vote collusion resulting from

6    fraudulent votes.

7           So we don't think that there's any direct substantial

8    legally protectable interest at stake here and even if there

9    were, True the Vote would still have to show that there is

10   inadequate representation by the State of Texas in this case

11   and that's simply not a showing that they can make.

12          First, there's a presumption of adequacy where the

13   parties share the same goal and that's an especially strong

14   presumption when it's the Government party defending its laws

15   as Texas is doing here.  Texas has vigorously litigated this

16   case in the past and as we can see from the motions to dismiss,

17   the United States has no doubt that it will continue to do so.

18          Inadequacy would go to a showing that there's some

19   kind of collusion between the parties and that simply isn't the

20   case here.  True the Vote's examples as to inadequacy of

21   representation is talking about discovery of True the Vote.  As

22   the United States attached its motion, Texas did -- in fact, in

23   the prior litigation objected discovery related to True the

24   Vote as it was directed to Texas based on information that

25   Texas had in their possession.  So, for example, in deposition,

1    Texas took the position that that kind of discovery was barred

2    by the legislative privilege, a position that we disagree with

3    but nonetheless that Texas vigorously asserted.

4              So we would say, you know, on that particular point

5    as well as that's not -- in fact, we don't show, in fact, that

6    Texas will not adequately defend SB 14 in this litigation.

7              **THE COURT:**  All right.  But True the Vote is saying

8    they have this information that might show voter fraud or does

9    show voter fraud, whatever it is, and no one is doing anything

10   about it.  The Government is not looking into it and is not

11   going to be presented if they're not part of this case.

12             **MS. BALDWIN:**  Well, your Honor, first I would say,

13   you know, that information that True the Vote is talking about

14   is information that it has said it has provided to both of the

15   parties.  So it's not information that uniquely is True the

16   Vote's possession, first of all.  And second of all, the

17   information that we understand that they're talking about seems

18   to be dealing primarily with -- from allegations about voter

19   registration and voter registration irregularities.  That --

20   those kinds of allegations argue and attempt to expand the

21   scope of this litigation and this litigation about Texas' voter

22   identification laws.

23             We don't think that you can show inadequacy of

24   representation by attempting to, you know, adding on germane

25   allegations and say that those non-germane allegations aren't

1  going to be litigated once that *** 9:48:13.

2          THE COURT:  All right.  Let me let Mr. Trainor

3  respond to that specific issue about what the information

4  involves.

5          MR. TRAINOR:  Thank you, your Honor.  The information

6  involved the election irregularities that have been derived by

7  True the Vote from all of the election monitoring that True the

8  Vote has done previously here in Texas and, in fact, if you go

9  look at *Texas versus Holder* -- and we cited it in our brief.

10 It's actually in a footnote but the District Court in the

11 District of Columbia placed essentially no weight whatsoever on

12 the data offered in there --

13         THE COURT:  Okay.  But what the Government -- I'm

14 sorry.  What the Government is saying is that your information

15 goes to voter registration, not to what's at issue or is going

16 to be at issue in this case which is the federal I.D. law.

17         MR. TRAINOR:  And we obviously disagree, your Honor.

18 Our data shows election irregularities derived from actual

19 monitors in polling locations on election day and they --

20         THE COURT:  So you're saying it's beyond voter

21 registration?

22         MR. TRAINOR:  It is beyond voter -- now, obviously a

23 bulk of that information because True the Vote has the ability

24 to do searches across multiple public information platforms

25 that we do have voter registration data as well but True the

18

1    Vote does have election irregularity issues in data that has

2    been provided both to the State and to the Government and has

3    not been used and was not vigorously propounded by the

4    Defendant in this case, the State, whenever -- when *Texas*

5    *versus Holder* was being argued in the District of Columbia.

6         **THE COURT:**  All right.  Ms. Baldwin, do you want to

7    respond to that?  He's saying it's beyond just the voter

8    registration information.

9         **MS. BALDWIN:**  Your Honor, that may be but the point

10   is it's information that by counsel's statement is already in

11   Texas' possession.  It's not something that True the Vote

12   uniquely has in this case and --

13        **THE COURT:**  And that's not the argument.  I think the

14   argument is information may be in the possession of the

15   Government but no one is doing anything about it.

16        **MS. BALDWIN:**  Your Honor, and in this case, whether

17   the Government is taking an action or not, taking action

18   against seems to be not as a side issue to --

19        **THE COURT:**  I'm sorry, gentlemen.  I'm picking up

20   other conversations going on and it's hard for us to hear here

21   in the courtroom.

22        **MS. BALDWIN:**  I'm sorry, your Honor.

23        **THE COURT:**  There are some people who are appearing

24   by phone.  Other counsel may be talking between themselves and

25   it makes it difficult for us to hear.

1           So go ahead, Ms. Baldwin.

2           **MS. BALDWIN:**  Thank you, your Honor.  What I'm saying

3    is that I'd like for True the Vote -- the allegations that

4    they're making are seeking to gear into what action the

5    Government does and does not take in response to information

6    that they've allegedly collected and, again, that's information

7    which is far outside the scope of the purpose and the results

8    of the passage of SB 14 on racial and language minority voters

9    in the state of Texas.

10          **THE COURT:**  All right.  I'm going to proceed then on

11   to the permissive intervention.  Mr. Trainor?

12          **MR. TRAINOR:**  Yes, your Honor, thank you.  So, your

13   Honor, what we just heard that there's information that True

14   the Vote has that's not being used and, of course, the key

15   prong for the permissive intervention as cited by the Fifth

16   Circuit in *New Orleans Public Service versus United Gas*

17   *Pipeline* is will the intervention significantly contribute to

18   the full development of the underlying factual issues in the

19   suit?

20          And I think the discussion that we've just had with

21   regard to the information that True the Vote had, that it

22   developed itself and to make it non-hearsay data for the Court

23   to look at and to investigate the data that they have with

24   regard to election irregularities, so the participation of True

25   the Vote in the case at least permissively would allow for the

1    full development of factual issues in this case and would allow

2    for True the Vote to be able to, one, present the data that it

3    has to help support the passage of Senate Bill 14 and the voter

4    I.D. bill to the Court and why it is a reasonable assertion by

5    the State that voter I.D. should be used.

6              And so from that standpoint, we believe that True the

7    Vote should be allowed to permissively intervene because of the

8    factual information that they have and more importantly we know

9    based upon the prior litigation of these two parties that True

10   the Vote is going to -- you know, in this particular instance,

11   True the Vote is going to have to appear before the Court at

12   least to assert the First Amendment right that it claims and

13   has claimed now in its pleading that you have before you with

14   regard to the information that was discovered against it in the

15   last proceeding.

16             So True the Vote is going to be in this case and

17   obviously information that True the Vote has was very relevant

18   to the Section 5 case.  It will be relevant to this Section 2

19   claim and so we believe that we should be allowed to

20   permissively intervene.

21             **THE COURT:**  All right.  Ms. Baldwin?

22             **MS. BALDWIN:**  Your Honor, the United States' position

23   is that the interest that True the Vote seeks to address would

24   be entirely adequately addressed through amicus participation

25   and that full-fledged permissive intervention would only seek

1    to extend the burden on all parties.  You know, True the Vote

2    in its motion would address these things like the propriety of

3    relief, non-germane allegations that the United States would,

4    secondly, not concede the accuracy about the United States'

5    conduct in the Section 5 preclearance process and so we think

6    that the interest that True the Vote does have, there is no

7    reason that this has to be, you know, expanded beyond just

8    amicus participation.

9              **THE COURT:**  Okay.  I'm going to take that under

10   advisement.  I should have a ruling on that motion to intervene

11   if not within the week, within two weeks.

12             I'd like to proceed to the scheduling order and it

13   looks like the main argument is some parties wanting to have

14   those finalized before the November 2014 election and others

15   saying that's impossible and want it into 2015.  So I'm going

16   to allow the Veasey -- Mr. Dunn, are you speaking for the

17   Veasey Plaintiffs?

18             **MR. DUNN:**  Yes.  My co-counsel Mr. Derfner may also

19   address some issues.

20             **THE COURT:**  Okay.  You --

21             **MR. DUNN:**  May I proceed now?

22             **THE COURT:**  Yes.

23             **MR. DUNN:**  All right, your Honor, I think the most

24   important point the Veasey Plaintiffs would like to make is

25   that considering we have a considerable about of time -- nearly

22

1    a year -- until the next election, I think it's premature for

2    the Court to simply throw up its hands and decide there's not

3    enough time to resolve this case in advance of the first major

4    election after implementation of the law.

5              Obviously, a Court order scheduling events in the

6    case is a powerful motivator.  There were issues that we

7    conceded in the D.C. case we participated in in terms of the

8    State not providing databases and having some issues with Court

9    orders and the Court there had to make itself available for a

10   number of in-person phone conferences to work out production of

11   the databases by the State.  No doubt that those issues may

12   arise again in this proceeding.

13             Nevertheless, in the D.C. case, that case was filed

14   in January.  It was tried in July.  The discovery period

15   essentially lasted three and a half or so months and I don't

16   think anybody was happy necessarily with the discovery process

17   and its comprehensiveness but nevertheless we're looking at

18   three to four times that in the proposed schedule that the

19   Veasey Plaintiffs offer.

20             So essentially what we would suggest is that the

21   Court put in place a schedule along the lines of what the

22   Veasey Plaintiffs have suggested, deal with discovery issues

23   within the Court's ability as they arise and if issues arise

24   later that make a trial of the case before the election is

25   probable, the Court can deal with that but at least the maximum

1    amount of discovery will have occurred in advance of the

2    November election.

3            **THE COURT:**  So what was done in terms of discovery in

4    the D.C. court versus what has not been done that needs to be,

5    I guess, developed in this case?

6            **MR. DUNN:**  Well, some of the -- again, this is Chad

7    Dunn, your Honor.  Some of the litigants in the case, including

8    my clients, intend to do some matching of databases.  There's

9    differing expert opinion and litigation opinion on the scope of

10   such matches but nevertheless there will be some matching of

11   the state driver's license and election identification

12   certificate database and the state concealed handgun license

13   database and then a multiple federal database which is called

14   the "passports" and veterans' I.D.s and essentially all of the

15   federal and state databases resulting from the issuance of

16   I.D.'s that are permitted under Senate Bill 14.

17           And so the production of those databases in a useable

18   electronic format -- the crossing with one another and

19   interpretation of results by experts is the process that's

20   expected to take time.  In the D.C. case, that occurred but the

21   federal databases were not included in the maps.  So there is a

22   wider sort of net of databases that have to be produced for

23   various agencies and then cross-referenced and dealt with by

24   experts.  So that's what different about the discovery.

25           **THE COURT:**  All right.  And, Mr. Rios, what is your

1    client's position?

2            **MR. RIOS:**  Well, your Honor, our position is that

3    through -- and through this whole process, the Court should be

4    aware that the State of Texas is continually -- will

5    continually use the various powers it has under the federal

6    court system to delay this process to go forward.  Their whole

7    effort is to keep minorities from voting and just delay --

8            **THE COURT:**  Well, I guess my question is really -- so

9    you're with the D.C. --

10           **MR. RIOS:**  We would oppose -- we think that this

11   thing should go to trial before the -- they're able to

12   implement this bill in another election.  So we're definitely

13   in support of --

14           **THE COURT:**  Okay.

15           **MR. RIOS:**  -- the trial going forward before the

16   November election.

17           **THE COURT:**  All right.  Mr. Haygood?

18           **MR. HAYGOOD:**  Yes, your Honor.  Our position is

19   consistent with the United States' position which is, you know,

20   was stated -- one of your Honor's questions was about the

21   difference between this case and the Section 5 case and one of

22   the material differences is the standard here is different

23   under Section 2 which required, to be frank, a lot more

24   evidence to be proffered in support of our claims.  I think

25   more expert testimony -- we're dealing with a federal database

1  which we did not deal with in the Section 5 case.

2  　　　　　And so we would proffer to this Court that we should

3  proceed along the lines of the United States and --

4  　　　　　**THE COURT:**  Okay.

5  　　　　　**MR. HAYGOOD:**  **--** I would ask for a trial that would

6  commence in 2015 and a longer discovery schedule to allow for

7  the full exposition of the evidence we need to amass in this

8  case.

9  　　　　　**THE COURT:**  All right.  Mr. Rosenberg?

10  　　　　　**MR. ROSENBERG:**  Yes.  On behalf of Texas NAACP and

11  MALC, we agree with the comments just expressed by Mr. Haygood.

12  I would add that not only are -- is there going to be a lot

13  more work done for the matching of the databases but the fact

14  discovery is going to be much more extensive mainly because we

15  were pressed -- I was also involved in the Senate 5 litigation

16  and we had 90 days to do everything and there were things that

17  we wanted to do with respect to discovery of their motions to

18  -- for the purpose that we did not do and were not able to do

19  in that short period of time and I think we're going to need an

20  extensive amount of discovery that's going to have to be

21  happening.

22  　　　　　**THE COURT:**  All right.  Ms. Westfall?

23  　　　　　**MS. WESTFALL:**  Yes, your Honor.  I would like to

24  reiterate some of the points made and just provide additional

25  information about what happened in the previous action.  We

1  believe that our proposed schedule addresses one of the most

2  important concerns that arose in the Section 5 litigation

3  called *Texas v Holder*.  That Court concluded that the parties

4  neither presented it with sufficient amount of data nor

5  subjected the data to an adequate level of analysis.  So it

6  couldn't rely on the parties -- any of the parties' evidentiary

7  presentations.

8        Here we believe that the proposed schedule that we

9  have before -- with the Court provides the time that will be

10  needed to develop and present a full and complete record.  We

11  also note that under our schedule, any party can file a motion

12  for preliminary relief before the November 2014 election.

13  That's, of course, always available.

14        And to expand a little bit upon my first point

15  related to the Section 5 matter, we believe that really

16  demonstrates a hazards proceeding on an expedited schedule

17  given the claims and the factual issues and the experts'

18  analysis that needs to be developed.  In *Texas v Holder*, the

19  parties conducted complex and voluminous discovery to determine

20  which Texas voters possessed the necessary state forms of photo

21  I.D. under SB 14 but because of the expedited schedule in that

22  case, the parties didn't present expert analysis of the Texas

23  voters who possessed several forms of I.D. or met the

24  disability section under Senate Bill 14 because that also

25  relies upon federal agencies' determination.

1          So in finding that Texas had not met its burden under

2     Section 5, the Court noted that it did so without reliable

3     expert evidence on a number of Texas registered voters who

4     lacked any of these forms of I.D.  The Court also noted that

5     the record was incomplete because Texas had sought to receive

6     an expedited schedule at the expense of obtaining data related

7     to the federal I.D.

8          So in this matter, you know, already Texas has

9     indicated that it's going to seek data from five federal

10    agencies related to the federal forms of I.D. and also the

11    disability exception under Senate Bill 14 and the federal

12    agencies involved are the Department of Defense, the Department

13    of Veterans Affairs, the Social Security Administration, the

14    State Department and Citizenship and Immigration Services.

15    None of these federal agencies produced any information during

16    the previous case.

17         We believe that our schedule allows sufficient time

18    to conduct all the comparisons of several millions of records

19    across multiple state and federal databases, time to analyze

20    the data, prepare reports and provide the Court with a complete

21    record which is our -- of course, our goal and the goal that

22    I'm sure the parties share.  The issues involved in these

23    comparisons are especially complex and especially time-

24    consuming.

25         We also -- I think it's worth noting that the

1   (indiscernible) raised previously during this conference that

2   we believe our schedule recognizes that there is time also

3   needed to litigate complex legal issues related to legislative

4   privilege that the State indicates it will probably assert here

5   to withhold discovery related to the legislature's intent in

6   enacting Senate Bill 14.

7         We do -- with all this said, we share the concerns of

8   all parties and the issues -- that they are of vital importance

9   and that we need to proceed as expeditiously as possible.  We

10  want to reiterate that should factual developments proceed

11  faster than anticipated, the parties are, of course, free to

12  seek preliminary relief prior to November 2014.

13        Again, back to a point that Mr. Dunn made, we believe

14  that it's not premature for the Court to set a schedule.  We

15  believe that we need a schedule right now to proceed with

16  orderly discovery and to know what the expectations are.  If we

17  don't decide when the trial will be and how to schedule, we're

18  going to have to play --

19        **THE COURT:**  I don't know that he was proposing not

20  having a scheduling order.  He was saying enter your scheduling

21  order and then if it's not doable, that's something we can

22  address as we go along or something like that.  I don't know

23  that he proposed no scheduling order --

24        **MS. WESTFALL:**  Okay, well --

25        **THE COURT:**  -- but I may have missed that.

1      **MS. WESTFALL:**  -- well, yes -- no, I think I may have

2   slightly tweaked what Mr. Dunn said but I think on that point

3   that if we were to proceed under the Veasey schedule and then

4   revisit the issue a few months later, we think that this can --

5   this will be a disorderly way to proceed with discovery.  We're

6   trying to avoid a train wreck here and we think that if we had

7   to proceed with the Veasey schedule, we would perhaps truncate

8   our discovery in the short term and not do what we feel is

9   necessary to prove our claim under Section 2 of The Voting

10  Rights Act.

11      Then if in a few months later we came to a point

12  where it appears that the September trial date is not feasible,

13  the United States would then have to go back, redo discovery

14  and also, you know, prepare at the same time for other ongoing

15  matters.  So I think it would be tremendously inefficient to go

16  with the Veasey schedule and then revisit it because it just

17  means that we're going to be truncating discovery and all the

18  federal database analysis, et cetera.  In a way, it will create

19  perhaps the same problems that arose in the Section 5 matter.

20      **THE COURT:**  All right.  Mr. Scott, are you speaking

21  for the State of Texas?

22      **MR. SCOTT:**  Yes, ma'am.  I mean, if we're attempting

23  to maximize confusion, I think Mr. Dunn has provided a path for

24  that.  If we're attempting to have an orderly process, I think

25  that the scheduling order or proposed order that DOJ and all

1    the rest of the parties have agreed to, including the State of

2    Texas, provides that.

3            In hearing about the preliminary injunction

4    potential, I would throw out that while we do not have that

5    allowance in the proposed order, our Secretary of State's

6    office, at least in the last litigation -- probably we need at

7    least July in order to be able to implement and to modify the

8    education process of those who will actually be winning the

9    election in November.  So from that perspective, I guess,

10   whatever schedule the Court's inclined to do, we would ask that

11   to the extent we're going to have the potential for some type

12   of preliminary injunction that we allow for such a deadline in

13   the proposed order.

14           The other two things that we have in our proposed

15   order that are a little different and not much -- it's just a

16   deadline for adding two parties and a deadline to amend

17   pleadings.

18           **THE COURT:**  Okay.  Mr. Dunn, do you want to address

19   the issue of the possibility of seeking preliminary relief

20   prior to the '14 election versus trying to get all of this

21   information that was not, I guess, tapped into for the D.C.

22   suit -- trying to get all of that analyzed and everything else

23   that needs to be done for a full, complete picture for the

24   Court?  Do you want to address the possibility of looking at

25   preliminary relief instead of trying to truncate everything

1    that needs to be done?

2         **MR. DUNN:**  Yes.  Yes, your Honor.  Again, this is

3    Chad Dunn for the record.  So whatever things were stated in

4    the Court's question and in the argument -- but first on the

5    issue of can we get the information available, as experienced

6    trial counsel and I'm sure as an experienced trial judge,

7    discovery periods tend to start off at a crawl and then a walk

8    and then a jog and then a sprint towards the end and what we're

9    suggesting is have a schedule entered now that encourages the

10   parties to get to the jog and the sprint sooner rather than

11   later so that some of these detailed processes can be done.

12        If it were a matter of a month or two as it was in

13   the D.C. case, then I think the argument that's advanced by

14   other counsel in terms of not having enough time would have

15   some merits but we're talking about ten months' worth of

16   discovery that can be allowed because the Court has the

17   discretion to allow discovery up until trial as was done in the

18   Section 5 D.C. case.  So we do think there's ample time.

19        On the issue of whether preliminary relief is

20   available, I would just note that in the last few years, the

21   Circuit has issued a number of opinions addressing various

22   District Courts in Texas who have enjoined state law,

23   especially election laws but other high-profile laws, and

24   various panels of the Fifth Circuit have consistently said that

25   it is an extremely rare case when a District Court should

32

1    enjoin a state law.  In fact, those positions have been taken

2    at the request and briefing of the State, many cases in which I

3    have been involved.

4            So our concern is by simply saying, well, look, the

5    Plaintiff can pursue a preliminary injunction and the State

6    will then turn around and say, but you don't get a preliminary

7    injunction striking down or somehow inhibiting the State

8    statute because look at this list of recent Fifth Circuit

9    cases.  But more -- in addition to that point, as you just

10   heard the State suggest, they want a preliminary injunction

11   ruling to be issued by July.

12           I'll come back to whether that makes sense in a

13   minute but even if that were the case, then that means under a

14   scheduling proposal that has us not going to trial until March,

15   there's very little -- we're still going to be at maybe the

16   beginning of the jog cycle of the discovery process or the tail

17   end of the walk at the point when Plaintiffs will be obligated

18   to file a preliminary injunction motion and, therefore, would

19   not have the advantage of much of the discovery we hope to

20   accomplish and seek from all the parties.

21           Now, as to the issue of whether an injunction ought

22   to be sought by July, Mr. Scott correctly noted, as I recall,

23   the Secretary of State's testimony in the D.C. case that the

24   State took the position that in order to allow them to

25   implement Senate Bill 14, they would need to have had a ruling

1   from the D.C. Court in July in advance of the November

2   election.  It's one thing to implement a law which all of the

3   Plaintiffs, I believe, contend is confusing, difficult and

4   results in omission of voters or rejection of voters from being

5   able to cast a ballot.

6        It's quite another to simply announce that we're not

7   going to do this law this election cycle and you can continue

8   to operate under the I.D. laws that have just been in effect

9   for years and decades in the state.  So we don't think a ruling

10  is required that far in advance.  Hopefully my other responses

11  have addressed those questions.

12       **MR. DERFNER:**  Your Honor, this is Mr. Derfner.  Could

13  I add something for just a second?

14       **THE COURT:**  Yes.

15       **MR. DERFNER:**  Thank you.  I think Mr. Dunn, my

16  co-counsel, has laid it all out.  I just wanted to underline

17  one thing and that's in regards to the notion of the

18  possibility of preliminary injunction and that is what your

19  Honor is facing now is not simply setting a trial date but the

20  schedule leading up to that because if the discovery schedule

21  is not on a timeframe that looks to the possibility of an early

22  trial as we suggest, then at this junction there just won't be

23  enough evidence amassed by the parties to look for a serious

24  preliminary injunction.

25       **THE COURT:**  Okay.  I think that a compelling argument

1    has been made that we need to attempt to get this case resolved

2    before the 2014 election.  So the Court is going to adopt the

3    D.C. Plaintiffs' proposed order regarding a trial date of

4    September 2nd, 2014.  I know it did not address a deadline for

5    adding parties.  I believe the parties had agreed to a December

6    6, 2013 date on that.

7              And then we need a date to amend pleadings which --

8    let's see.  I guess we can do that by March 2nd, 2014.  We need

9    a pretrial conference date which -- Brandy, what are we looking

10   at pre-September 2nd trial?

11             **THE CLERK:**  August 28th, 2013.

12             **THE COURT:**  Is that two weeks before?

13             **THE CLERK:**  That's the -- your Honor, August 21st.

14             **THE COURT:**  Okay.  Pretrial -- final pretrial

15   conference being August 21st, what other deadlines do we need

16   to address?

17             **MR. SCOTT:**  Your Honor, John Scott for the State of

18   Texas.  And, again, I want to re -- I guess -- assert the issue

19   relating to confusion amongst the electorate.  There is a

20   critical role the Secretary of State of Texas regarding the

21   education of local election officials and simply having

22   sufficient time to be able to address that is -- it may be

23   impossible with a September trial date.

24             **THE COURT:**  Well, you know, it's not any different

25   position, I guess, than where the State of Texas was asking the

1    D.C. Court to -- let's -- we want to get heard now quickly as

2    soon as possible and now it's just reversed with the other side

3    wanting to be heard quickly and, you know, it's just the

4    position we're in, the situation we're in with what's before

5    the Court.

6            Okay.  Any other deadlines we need to address?

7            **MR. ROSENBERG:**  Your Honor, Ezra Rosenberg for the

8    Texas NAACP and MALC.  The March 2nd, 2014 date for amending

9    pleadings, is that going to include adding new parties?

10           **THE COURT:**  No, the new parties -- I believe, you-all

11   had agreed or at least I saw that on a joint plan that was

12   submitted was December 6th, 2013.

13           **MR. ROSENBERG:**  Okay.  The only question was we had

14   that as ripe for December 6th and thereafter a leave of the

15   Court.

16           **THE COURT:**  Yes, that's okay.

17           **MR. ROSENBERG:**  Okay, great.  Thank you, your Honor.

18           **THE COURT:**  Okay.  And then any other deadlines that

19   need to be addressed?

20           **MS. WESTFALL:**  Your Honor, this is Elizabeth Westfall

21   for the United States.  I wanted to raise the issue of initial

22   disclosures which the United States will be making on November

23   21st.  The State has indicated when it will make its initial

24   disclosure and also pursuant to your ruling on the trial date,

25   we respectfully request that we have an opportunity to request

36

1   a status conference in a certain -- in a few months where -- at

2   the time of your -- as you wish to revisit the schedule and see

3   how discovery is proceeding.

4           **THE COURT:**  Okay.  Do you-all want to -- how about in

5   February -- that'll be about 90 days out -- just to see --

6           **MS. WESTFALL:**  Okay.  That would be very

7   satisfactory.

8           **THE COURT:**  Okay.  Brandy, do you want to give them a

9   date in February?

10          And then if any disputes or issues come up, just get

11  with Brandy.  We can get on the phone and see if we can resolve

12  them without briefing.  By me briefing, maybe I can put you on

13  a short schedule regarding the briefing.

14          **MS. WESTFALL:**  Thank you, your Honor.

15          **MR. HAYGOOD:**  Your Honor, this is Ryan Haygood with

16  the Texas League of Young Voters and Imani Clark.  I just

17  wanted to thank the Court for the consideration of the status

18  conference and wanted to add one additional distinction between

19  this case and the earlier Section 5 case is that this case

20  includes, as your Honor knows, a request for bail in under

21  Section 3C of The Voting Rights Act.  So that's an additional

22  date consideration for this Court to consider when thinking

23  about the schedule in this case.

24          **THE COURT:**  Okay, thank you.

25          Brandy, status date?

1          **THE CLERK:**  February 12th at 9:00 a.m.

2          **THE COURT:**  Okay, February 12th at 9:00 a.m.  And

3    then I know there was an issue regarding interrogatories and I

4    think in all fairness to both sides, it should be the same.  I

5    know we've got a lot of intervenors now on the Plaintiffs'

6    side.  So I believe the State of Texas had proposed 50

7    interrogatories per side.  Is there an objection from any of

8    the Plaintiffs and intervenors on that?

9          **MS. WESTFALL:**  Yes, your Honor.  This is Elizabeth

10   Westfall for the United States.  We believe that it is not

11   appropriate to have fewer than 25 interrogatories --

12         **THE COURT:**  Per party?

13         **MS. WESTFALL:**  -- per party under the Federal Rules.

14   So we would request 25 interrogatories for the United States,

15   your Honor.

16         **THE COURT:**  Okay.  What's the position on the other

17   -- the D.C. Plaintiffs?

18         **MR. RIOS:**  This is Mr. Rios.  We don't have any

19   problems with what you suggested, your Honor.

20         **THE COURT:**  Okay.

21         **MR. SPEAKER:**  Your Honor, the State clearly leaves it

22   within the discretion of the Court.

23         **THE COURT:**  Mr. Dunn?

24         **MR. DUNN:**  Your Honor, we agree that a number of the

25   parties having the burden of proof are likely to need

38

1    additional interrogatories than others.  What I would propose

2    is that the parties live within the 50 that the Court suggested

3    at this time and then when we come back in February, we can

4    address having more as necessary.

5            THE COURT:  Or sooner if necessary but I'll set it at

6    50 interrogatories per side at this point and you can certainly

7    urge the Court for more on that if necessary and you can do

8    that by phone conference by calling Brandy if it's something

9    that needs to be addressed quickly.  Okay?

10           And there is an agreement regarding a discovery order

11   which I'll sign.  Is there any agreement regarding a protective

12   order?

13           MS. WESTFALL:  Your Honor, this is Elizabeth Westfall

14   for the United States.  We have circulated a draft of a

15   protective order and we submitted one most recently two days

16   ago.  We're waiting for a response from the other parties and

17   requested that they provide a response by November 20th.  So

18   hopefully we can reach agreement on the terms shortly.

19           MR. TRAINOR:  Your Honor, this is Trey Trainor for

20   True the Vote and we have no objections to the United States'

21   protective order.

22           THE COURT:  Okay.  Anything else that needs to be

23   addressed this morning?

24           I don't hear anything.  So I'm going to assume not

25   and I will move on then.  If nothing further, you're excused.

39

1    Thank you.

2             **MR. SPEAKER:**   Thank you, your Honor.

3             **MS. SPEAKER:**   Thank you.

4         **(This proceeding adjourned at 10:19 a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          December 11, 2013

                    TONI HUDSON, TRANSCRIBER