UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiffs,*<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, HIDALGO COUNTY and MARIA LONGORIA BENEVIDES, ET AL.<br>*Plaintiff Intervenors*,<br><br>V.<br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br>*Defendants,* | § § § § § § § § § § § § § § § § § § § § § Case No. 2:13-cv-00193<br>Consolidated 2:13-cv-00263 |

**FIRST AMENDED COMPLAINT IN INTERVENTION OF PLAINTIFF-INTERVENORS TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, HIDALGO COUNTY, AND MARIA LONGORIA BENEVIDES, ET. Al.**

NOW COMES the TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS (the "HJ&C," or "Hispanic Judges and Commissioners"), HIDALGO COUNTY, MARIA LONGORIA BENEVIDES, et al. to file this First Amended Complaint in Intervention against Defendants the State of Texas (the "State" or "Texas"), John Steen, in his official capacity as Secretary of State of Texas, and Steve McCraw, in his official capacity as Director of the Department of Public Safety ("DPS") of Texas (collectively, "Defendants"), to allege:

1. The State of Texas has a long, notorious history of disfranchising voters by various

methods and discriminating against classes of voters, especially on account of race and ethnicity. Senate Bill 14 of 2011 ("SB 14") is another effort to achieve those unlawful ends. Accordingly, this suit seeks to enjoin SB 14 as a violation of the Constitution and laws of the United States, as applied to voters and prospective voters who lack one of the few photo IDs listed in SB 14

2. This is an action to enjoin Defendants' implementation of Senate Bill 14 ("SB 14"), which will deny them and their constituents of their fundamental right to vote, because it was enacted with a racially discriminatory purpose and the law will have a discriminatory effect, in violation of Section 2 of the Voting Rights Act ("VRA"), 42 U.S.C.§ 1973 ("Section 2"), and the Fourteenth and Fifteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. § 1983. *See* U.S. Const., amends. XIV & XV, 42 U.S.C.§§ 1973, 1983.

3. SB 14, which restricts in-person voting to those who are able to produce one of seven forms of photo ID ("accepted photo IDs," or "required photo IDs"), violates Section 2 of the Federal Voting Rights Act because it is a "voting qualification or prerequisite to voting or standard, practice, or procedure," that has both the purpose and effect of denying Plaintiff-Intervenors' right to vote "on account of race or color." 42 U.S.C. § 1973(a).

4. SB 14, which (a) imposes severe burdens upon Plaintiff-Intervenors' and their constituents fundamental right to vote even though there is no actual benefit to Texas and (b) purposefully denies the right to vote, on the basis of their race, to otherwise qualified voters and the members and constituents of the Hispanic Judges and Commissioners in violation of the Fourteenth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983, because it denies Plaintiff-Intervenors' equal protection of the laws. U.S. Const., amend. XIV § 1; 42 U.S.C. § 1983.

5. SB 14, which imperils constituents and members of the Hispanic Judges and Commissioners, access to the polls in elections in Texas, violates the Fifteenth of the United States Constitution, pursuant to 42 U.S.C. § 1983, because it denies and abridges Plaintiff-Intervenors' right to vote on account of their race. U.S. Const., amend. XV; 42 U.S.C. §1983.

### a. **JURISDICTION AND VENUE**

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 1357, 2201, and 42 U.S.C. §§ 1973, 1973j(f), 1983, and 1988.

7. Venue is proper pursuant to 28 U.S.C. §§ 124(b)(6), 1391(b).

## II. PARTIES

8. Plaintiff-Intervenor TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS (HJ&C), is an association of county elected officials; they are Hispanic elected county officials, voters and represent Hispanic voters; they have an interest in protecting the right to vote, free of racial discrimination.

9. Plaintiffs RAMON GARCIA, Hidalgo County Judge, Commissioners A.C. CUELLAR, HECTOR PALACIOS, JOSE FLORES and JOSEPH PALACIOS are all members of the HJ&C and also comprise the Hidalgo County Commissioners Court.

10. Hidalgo County will incur considerable expense with enforcing SB14; the County has traditionally been charged with registering voters, Tex. Elec. Code §§13.142, 13.144; SB14 strips them of the voter registration responsibility.

11. HJ&C include elected officials from counties that do not have offices of the Texas Department of Public Safety which is the only state office authorized to issue an election identification certificate (an "EIC"). SB 14, § 14 (codified at Tex. Elec. Code § 63.0101).

12. County officials are the officers traditionally charged with registering voters, Tex. Elec. Code §§13.142, 13.144; SB14 strips them of the voter registration responsibility.

13. SB 14 substantially undermines the Hispanic Judges and Commissioners ability to fulfill their traditional responsibility and requires them, instead, to focus on ensuring that its existing young voters are able to cross the threshold of polling stations' doors on Election Day.

14. Defendant State of Texas is one of the fifty United States of America.

15. Defendant John Steen is being sued in his official capacity as the Secretary of State of Texas. *See* Article IV, Section I of the Texas State Constitution. The Secretary of State of Texas is the State's chief election official, and is charged with coordinating the implementation of SB 14. *See* Texas Election Code 31.001.

16. Defendant Steve McCray is being sued in his official capacity as the Director of the Texas Department of Public Safety, the Texas agency tasked with issuing a number of accepted photo IDs under SB 14.

### III ALLEGATIONS

17. According to the 2010 Census, Texas had a total population of 25,145,561, with a Hispanic population of 9,460,921 (37.6%), and a non-Hispanic Black population of 2,975,739 (11.8%).

18. The number of Texas residents who were "registered to vote" in the Secretary of State's voter registration database as of 2012 was 13,065,504. According to the U.S. Department of Justice, it is estimated that 7,835,055 (61.5%) are Anglo,1,472,669 (11.6%) are black, and 3,003,059 (23.6%) are Hispanic (and 2,909,014 (22.25%) have Spanish surnames). Of the total number of registered voters (13,065,504 as of 2012) approximately

1,893,143 of those registered voters could not be matched to a record in either the State of Texas driver's license data base or the State's license to carry data base.

19. Even the State of Texas acknowledges that the number of persons, who are currently registered to vote but lack a photo ID issued by the State DPS office, or at risk voters, is quite large. In 2012, the Defendant Texas Secretary of State provided a list of registered voters to the United States Department of Justice whose records were not successfully matched with records in the DPS' driver's license database. The matching criteria consisted of first name, last name, and date of birth, and those individuals who provided a DPS ID number when they registered to vote were counted as matching. The list created by the Secretary of State showed 795,555 Texas voters who could not be confirmed to possess a DPS-issued photo ID card.

20. As described below, in judging the lawfulness of SB 14, this number of voters who lack an SB 14 ID must be measured against the extent of the alleged problem that SB 14 seeks to "fix."

21. Further, a disproportionate number of registered voters who lack SB 14 ID are racial or ethnic minorities, or poor, elderly or disabled people.

22. The TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS includes elected officials and voters from the following South and West Texas Counties: Hidalgo, Cameron, Starr, Zavala, Zapata, Webb, Maverick, Frio, LaSalle and El Paso. As of 2012 these counties have over 1 million registered voters of whom approximately 80% are Spanish Surnamed.

23. Because of the discriminatory voting requirements imposed by SB 14, many of the counties represented by the HJ&C are required to divert their limited resources (financial and other) away from fulfilling its core mission of registering voters and conducting elections

without the added administrative burden of the SB 14 picture ID requirements.

24. In particular, Texas Counties are now required to undertake such activities as: (a) assessing whom, among its members and constituency, lacks one of the forms of required photo IDs under SB 14 and/or determining which such IDs (or underlying documents required to obtain them) each member/constituent needs; (b) hosting public education campaigns designed to inform young voters of color that Defendants' previously court- rejected photo ID law is now in effect; and (c) providing financial assistance and transportation to young voters that lack the required photo IDs and/or underlying documents, so that they can acquire them.

25. Hidalgo County, one of the counties represented by the HJ&C will have to hire more staff and expend more resources to conduct their elections because of SB14. Further:

   a. The poverty rate of Hidalgo County over 45%; this is one of the highest rates in Texas.

   b. Given the high number minorities and low income persons, Hidalgo County elections administration will experience voter suppression, long lines at the polls and extensive administrative expenses associated with the verifications required by SB 14;

   c. Moreover, the high rate of Spanish Surnamed registered voters and the high poverty rate, according to the findings in *Texas v. Holder*, 888 F. Supp. 2d 113 at 138[1], Hidalgo County will be dramatically impacted and therefore SB 14, as applied to Hidalgo County, violates voting the rights law of minorities

---

[1] "(1) a substantial subgroup of Texas voters, many of whom are African American or Hispanic, lack photo ID; (2) the burdens associated with obtaining ID will weigh most heavily on the poor; and (3) racial minorities in Texas are disproportionately likely to live in poverty." Based on these findings, the Court concluded that SB 14 would violate Section 5 of the Voting Rights Act "because it would in fact have a retrogressive effect on Hispanic and African American voters." *Texas v. Holder*, 888 F. Supp. 2d at 138

as protected by federal law.

26. SB 14 substantially undermines the Hispanic Judges and Commissioners ability to fulfill their traditional election day responsibilities and requires them, instead, to focus on ensuring that eligible voters overcome the morass of documentation awaiting voter to cross the threshold of polling stations' doors on Election Day.

27. Hispanic voters are twice as likely to not have a photo ID as non Hispanics.

### *Senate Bill 14's Passage Was Motivated by Discriminatory Purpose*

28. Against a backdrop of substantial growth of Texas's communities of color (and in particular, of Black and Hispanic communities in Texas), the State legislature sought to implement increasingly restrictive, unnecessary, and burdensome voter ID bills over several legislative sessions in the previous decade. Following the 2010 census, which further demonstrated the significant rate at which Texas communities of color were growing, the Texas legislature in 2011 enacted SB 14, which is widely recognized as one of the most restrictive photo ID laws for in-person voting in the country.

29. SB 14 denies otherwise qualified voters, including MARIA LONGORIA BENVIDES and the other persons named in paragraph 9 above , access to in-person voting at the polls if they are unable to present one of the limited number of required photo IDs under SB 14.

30. Pursuant to SB 14, only those who are able to present one of the following seven forms of photo ID are eligible for in-person voting in Texas: (1) a DPS-issued driver's license (unexpired or expired within 60 days of election); (2) a DPS-issued non-driver's license ID (unexpired or expired within 60 days of election); (3) a DPS-issued license to carry a weapon (unexpired or expired within 60 days of election); (4) a U.S. passport (unexpired or expired

within 60 days of election); (5) a U.S. military photo ID card (unexpired or expired within 60 days of election); (6) a U.S. citizenship certificate with photo; and (7) a DPS-issued Election Identification Certificate ("EIC") (unexpired). SB 14, §14 (codified at Tex. Elec. Code § 63.0101).

31. Designed as "emergency legislation" in order to expedite its consideration, SB 14's ultimate passage was characterized by a series of unusual departures from a number of procedures and customs ordinarily followed by the Texas legislature.

32. State Senate rules, for example, were changed for the purpose of exempting SB 14 from certain of the Senate's traditional majority vote procedures. In the state House, SB 14 was considered by a committee comprised of a small and select number of state representatives assembled to consider that bill alone.

33. The evaluations and concerns of legislators representing districts with high populations of people of color were marginalized in legislative debates about SB 14.

34. The Texas legislature rejected a number of amendments that were proposed by these legislators that sought to ameliorate the known discriminatory impact of the law by (a) expanding the universe of IDs accepted under SB 14 to include, for example, the type of student ID possessed and previously used by Ms. Clark and other university students to vote in person, and (b) mitigating the costliness of transportation and underlying documents for indigent voters, a substantial number of whom are people of color in Texas.

35. Although the proponents of SB 14 indicated that in-person voter impersonation was the stated purpose of the law, they offered virtually no evidence of such criminal activity— and have still not done so to date—and they did not demonstrate that Texas's previous voter ID procedures were inadequate to prevent in-person voter impersonation.

36. The Texas legislature, however, knew or should have known that communities of color

in Texas would disproportionately lack the forms of photo ID that SB 14 requires.

37. The Texas legislature knew or should have known that SB 14 would impose a substantial burden on thousands of voters, particularly those from communities of color in Texas, who are disproportionately poor and disproportionately lack transportation, as the demographics above reflect, to which state officials had ready access, while considering SB 14

38. Proponents of SB 14 nevertheless made no effort to analyze or to study the likely racially discriminatory effect of SB 14 on communities of color; rather, proponents of the law rejected amendments that would have required that Texas investigate the racially disparate impact of SB 14 on communities of color and failed to adopt amendments that would have ameliorated the foreseeable discriminatory impact.

### *SB 14 Creates Severe Burdens for Hispanic Voters*

39. A substantial subset of the hundreds of thousands of registered voters in Texas—a subset disproportionately comprised of voters of color—do not currently have any of the forms of photo ID required by SB 14.

40. SB 14 severely burdens the right to vote of thousands of registered Hispanic voters in Texas because they do not currently have any of the forms of photo ID required by SB 14 for in-person voting.

41. Though voters may apply at a DPS office for an Election Identification Certificate ("EIC")—which is one of SB 14's accepted IDs, SB 14, § 20 (codified at Tex. Transp. Code§ 521A.001)—numerous Texas counties lack a DPS office.

42. SB 14 requires some voters to travel approximately 200 miles roundtrip in order to obtain an EIC.

43. Certain counties with DPS offices are only open for business for a limited period of time,

with some being open only one or two days a week and others closed on weekends or after 6 p.m.

44. Due to the limited number of DPS offices and the limited operating hours of some DPS offices, some voters will have to take time off during a work or school day to obtain an EIC.

45. Each of the documents required to obtain an EIC costs money. For example, a copy of a certified birth certificate from the Texas Bureau of Vital Statistics is $22. A copy of U.S. citizenship or naturalization papers costs $345.

46. Texas law provides that an otherwise eligible voter seeking to vote in person who lacks an acceptable photo ID may cast a provisional ballot. SB 14, §§ 9 & 15 (codified at Tex. Elec. Code §§ 63.001(g) & 63.011). A provisional ballot will not count unless the voter travels to the county voter registrar within 6 days of casting the provisional ballot, and either presents a required photo ID under SB 14 or executes an affidavit attesting that the voter has a religious objection to being photographed or has lost her/his photo ID in a declared natural disaster that occurred within forty-five days of the election. SB 14, §§ 17-18 (codified at Tex. Elec. Code §§ 65.054-.0541).

47. The strictly limited accepted photo IDs under SB 14, and the travel, financial, and time burdens to obtain an acceptable photo ID, including the EIC, imposed by SB 14 has the effect of denying thousands of Texas voters, of whom a disproportionate subset are voters of color, including Plaintiff-Intervenors, the ability to vote in person.

### *A Federal Court Previously Rejected SB 14 Because of Its Discriminatory Impact.*

48. Until the U.S. Supreme Court's June 2013 decision in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612, 2631 (2013), the Texas was one of nine completely "covered state[s]" under Section 5 of the Voting Rights Act, U.S.C. § 1973c ("Section 5"). U.S. Dep't of Justice, Civil Rights Division, Voting Section, *Section 5 Covered Jurisdictions* :

http://www.justice.gov/crt/about/vot/sec_5/covered.php.

10

49. In July 2011, under Section 5, Texas sought administrative preclearance for SB 14 from the Department of Justice ("DOJ").

50. DOJ denied preclearance in March 2012, determining that Texas did not meet its burden of showing that the change would be not be retrogressive, and, moreover, "provided no data on whether African American . . . registered voters are also disproportionately affected by S.B. 14," as are Latino registered voters. Letter from Thomas E. Perez, Asst. Att'y Gen., U.S. Dep't of Justice, to Keith Ingram, Director of Elections, State of Texas (Mar. 12, 2012), attached as Exhibit 1 to Plaintiff's Compl., Doc. 1-1 at 3, 5.

51. After failing to receive administrative preclearance, Texas filed suit for judicial preclearance of SB 14 in the U.S. District Court for the District of Columbia (the "D.C. Court"). *See* Expedited Complaint for Declaratory Judgment, *Texas v. Holder*, No. 1:12-cv-00128, Doc. 1 at 22 (D.D.C. Jan. 24, 2012).

52. In August 2012, following a bench trial, the D.C. Court issued an Order rejecting Texas's request for judicial preclearance under Section 5. *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. Aug. 30, 2012).

53. The D.C. Court denied preclearance based on Texas's failure to demonstrate SB 14 would not have a retrogressive effect on minority voters. *Texas*, 888 F. Supp. 2d at 144. ("[E]verything Texas has submitted as affirmative evidence is unpersuasive, invalid, or both. Moreover, uncontested record evidence conclusively shows that the implicit costs of obtaining SB 14–qualifying ID will fall most heavily on the poor and that a disproportionately high percentage of African[-]Americans and Hispanics in Texas live in poverty.").

54. The D.C. Court also found that the evidence submitted by the United States and

11

Defendant-Intervenors in that case affirmatively suggested that the implementation of SB 14 would have a retrogressive effect on African-American and Latino voters. *Id.*

55. The D.C. Court determined that SB 14 violated Section 5 due to the burdens that the law would impose on voters without acceptable ID, and considering the socioeconomic disparities between people of color in Texas, including African-Americans, and white people in Texas. *Texas v. Holder*, 888 F. Supp. 2d at 140.

56. The D.C. Court noted the considerable gap in the poverty rates in Texas for minorities versus white people, and recognized that the burden of traveling to a DPS office to obtain accepted photo ID under SB 14 would be particularly severe for "the predominantly minority population whose households lack access to any car at all," given that "13.1% of African Americans . . . live in households without access to a motor vehicle, compared with only 3.8% of whites." *Id.*

57. The D.C. Court determined that SB 14 is the most "stringent [photo ID law] in the country," because it "imposes strict, unforgiving burdens on the poor, and racial minorities in Texas [who] are disproportionately likely to live in poverty." *Id.* at 114.

58. The D.C. Court emphasized that, notwithstanding that the legislative record showed that the Texas Legislature was repeatedly warned that SB 14 would disfranchise voters of color, the Texas Legislature nevertheless rejected ameliorative amendments that would have substantially mitigated the retrogressive effect of the new identification requirement. *Id.* at 144

59. On June 25, 2013, the Supreme Court issued an opinion in *Shelby County, Alabama*, declaring Section 4(b) of the Voting Rights Act, the coverage provision of Section 5, unconstitutional. 133 S. Ct. at 2631. Accordingly, Texas is no longer a "covered state" under Section 5.

60. The Supreme Court did not reach the constitutionality of Section 5, although without Section 4(b), that provision has no present effect.

61. On June 27, 2013, the Supreme Court vacated the judgment of the D.C. Court denying preclearance to SB 14, and remanded the case to the district court for further consideration. *See Texas v. Holder*, 133 S. Ct. 2886 (2013).

62. Defendants moved forward with the implementation of SB 14 despite the D.C. Court's finding that the law would have a discriminatory effect on "a substantial subgroup of Texas voters, many of whom are Hispanic," *Texas v. Holder*, 888 F. Supp. 2d at 138, and despite the testimony and evidence presented to the D.C. Court concerning SB 14's discriminatory purpose.

63. Since the D.C. Court's finding, Texas has not ameliorated or otherwise altered its discriminatory law.

### *Past and Ongoing Intentional Discrimination in Voting in Texas*

64. Texas's initial 1972 coverage under Section 4(b) of the Voting Rights Act, and its additional coverage in 1975 under the then-new "language minority" provision, was based on the State's use of tests and devices for voter registration, and low voter registration rates.

65. Texas remained a covered state until the recent *Shelby County, Alabama* decision because of its sustained record of persistent unconstitutional discrimination in voting against African-American and Latino communities throughout Texas.

66. Texas has a pervasive history and ongoing record of state-sanctioned racial discrimination against African-American and Latino people, and other people of color. *See, e.g., LULAC v. Perry*, 548 U.S. 399, 439-40 (2006); *Bush v. Vera*, 517 U.S. 952, 981-82 (1996) (plurality opinion); *White v. Regester*, 412 U.S. 755, 767-70 (1973).

67. Throughout history and into the present, Texas's use of intentionally discriminatory voting

13

schemes has necessitated federal intervention. *See, e.g.*, *White*, 412 U.S. at 768 (poll tax); *Terry v. Adams*, 345 U.S. 461 (1953) (private primary); *Smith v. Allwright*, 321 U.S. 649 (1944) (white primary); *Nixon v. Herndon*, 273 U.S. 536 (1927) (exclusion of minorities)

68. Notwithstanding this history of intentionally discriminatory voting schemes, Texas nevertheless adopted SB 14.

69. As recently as March 2012, DOJ denied preclearance to Galveston County's proposed redistricting plan for County Commissioners on the basis of discriminatory purpose. The County, among other things, failed to adopt set criteria for redistricting, and deliberately excluded the sole minority-preferred County Commissioner from the process of redistricting. *See* Exhibit B, Letter from Thomas E. Perez, Asst. Att'y Gen., U.S. Dep't of Justice, to James E. Trainor, III, (Mar. 5, 2012), *available at* www.justice.gov/crt/about/vot/sec_5/ltr/l_030512.php.

70. Also in 2012, a three-judge panel in the District of D.C. declined to pre-clear the State's 2011 redistricting plan for the U.S. House of Representatives based on discriminatory intent, finding that the legislature that adopted the plan was "impermissibly focused on race" in decennial redistricting. *Perez v. Perry*, No. 5:11-cv-360, Doc. 690 at 6 (W.D. Tex. Mar.19, 2012)

71. In 2012, a D.C. Court reviewing Texas's redistricting plan for the U.S. House of Representatives stated that DOJ and intervening voters of color had "provided more evidence of discriminatory intent than [the Court had] space, or need, to address." *Texas v. United States*, 887 F. Supp. 2d 133, 161 n.31 (D.D.C. 2012); *see also id.* at 161 (explaining that "the totality of the evidence" demonstrated that the plan "was motivated, at least in part, by discriminatory intent")

72. The same Court also blocked preclearance of the State's 2011 State House redistricting plan based on discriminatory effect, but noted that "the full record strongly suggests that the retrogressive effect we found may not have been accidental." *Id.* at 177; *see also id.* at 178

14

(characterizing the map drawer's testimony as "incredible" and "reinforc[ing] evidence suggesting map drawers cracked [precincts] along racial lines to dilute minority voting power").

73. SB 14 was passed by the same Texas state legislature that repeatedly attempted to pass the aforementioned discriminatory 2011 redistricting plans.

74. SB 14 was passed at approximately the same time as the aforementioned discriminatory 2011 redistricting plans.

75. SB 14 was passed with the same discriminatory purpose as the aforementioned 2011 redistricting plans.

76. Race, color, and membership in a language minority group continue to be determinative factors in citizens' access to Texas's political process, as reflected by the following: (1) racially polarized voting marks Texas elections at all levels; (2) African- American and other people of color in Texas face the ongoing effects of state-sanctioned discrimination, including in the context of voting, as discussed *infra*; (3) African-American and other people of color in Texas encounter disproportionate socio-economic barriers to their full and complete access to the political process in the State; (4) electoral campaigns in Texas continue to involve racial appeals; (5) the State legislature continues to be less responsive to the concerns of African-American and other people of color than to the majority population; and (6) as discussed above, the purported rationale for the electoral device here—ensuring electoral integrity and preventing electoral fraud—is tenuous at best and false in reality because Texas has not shown any evidence to support this rationale.

### *Equitable Relief under Section 3(c) is Warranted*

77. The history and ongoing record of voting discrimination in Texas, including its implementation of SB 14, establishes that it has implemented and will continue to implement schemes to limit the electoral opportunity of voters of color.

78. Without preclearance review under Section 3(c) of the Federal Voting Rights Act, 42 U.S.C. § 1973( C), Texas is likely to persist in violating the Voting Rights Act of Plaintiff-Intervenors, and their constitutional guarantees under the Fourteenth and Fifteenth Amendments.

## IV. CLAIMS Count 1

79. Plaintiff-Intervenors reallege the facts set forth above.

80. SB 14 violates Section 2 of the Federal Voting Rights Act because it abridges Plaintiff-Intervenors' right to vote free of discrimination based on race or color.

81. SB 14 violates Section 2 because Texas adopted SB 14 for the purpose of denying

82. Hispanics and other people of color full and equal access to the political process.

83. Under a combination of the totality of the circumstances factors, Texas's implementation and enforcement of SB 14 will interact with social and historical conditions in the State to deny equal opportunities for Hispanic voters and other voters of color to participate in the political process, resulting in a denial of the right to vote, in violation of Section 2.

## Count 2

84. Plaintiff-Intervenors reallege the facts set forth above.

85. SB 14 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it (a) imposes severe burdens upon Plaintiff-Intervenors' fundamental right to vote, and (b) purposefully abridges the right to vote of otherwise eligible voters like Individual Plaintiff-Intervenor MARIA LONGORIA BENEVIDES and the members and constituents of TEXAS ASSOCIATION OF HISPANIC JUDGES AND COMMISSIONERS, on the basis of race or color.

## Count 3

86. SB 14 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42

U.S.C. § 1983, because it discriminates against Plaintiff-Intervenors by intentionally denying or abridging their an equal opportunity to vote and to access voting polls on election day on account of their race or color.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenors respectfully pray that this Court:

a) Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that SB 14: (1) abridges Plaintiff-Intervenors' right to vote on account of race or color, in violation of Section 2 of the Voting Rights Act; (2) imposes severe burdens on Plaintiff-Intervenors' right to vote in violation of the Fourteenth Amendments to the United States Constitution; (3) was adopted by the Texas legislature with a racially discriminatory purpose in violation of Section 2 and the Fourteenth and Fifteenth Amendments to the United States Constitution; (4) is unconstitutional because it violates the Fourteenth and Fifteenth Amendments to the United States Constitution.

b) Issue a permanent injunction enjoining Defendants from enforcing or giving any effect to the requirements of SB 14, including enjoining Defendants from conducting any elections using SB 14.

c) Issue an order pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. §

d) 1973a(c), retaining jurisdiction and requiring Texas to obtain preclearance, for a necessary and appropriate period of time, from DOJ for any and all future changes in voting law, upon determination that the State has shown that the proposed changes do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.

e) Issue an order requiring Defendants to pay Plaintiff-Intervenors' costs, expenses, and

reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. §§ 1973 & 1988.

f)   Grant such other further relief as it deems proper and just.

Dated: February 3rd, 2014.

>Respectfully Submitted,
>
>LAW OFFICES OF ROLANDO L. RIOS
>115 E. Travis, Suite 1645
>San Antonio, Texas 78205
>Ph:    (210) 222-2102
>Fax:   (210) 222-2898
>E-mail:rrios@rolandorioslaw.com
>
>LAW  OFFICE OF  FERNANDO  G. MANCIAS
>4428  South  McColl  Road
>Edinburg,  Texas  78539
>Telephone:  (956) 686-0385
>Telecopier:  (956) 686-0707
>
>Attorneys for the TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, MARIA  LONGORIA BENEVIDES, ET. AL.
>
>By:_____/S/_____
>       Rolando L. Rios
>       SBN 1693500
>       Attorney in Charge
>
>LAW OFFICES OF PRESTON HENRICHSON P.C.
>222 West Cano
>Edinburg, TX 78539
>Fax 956/383-3585
>Phone 956/383-3535
>preston@henrichsonlaw.com
>
>By: _____/S/_____
>      Preston Henirichson
>      Texas Bar No. 09477000
>      Federal I.D. # 1922
>Attorney in charge for HIDALGO COUNTY