# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SHANNON PEREZ; HAROLD DUTTON, JR.; GREGORY TAMEZ; SERGIO SALINAS; CARMEN RODRIGUEZ; RUDOLFO ORTIZ; NANCY HALL and DOROTHY DEBOSE<br><br>Plaintiffs<br><br>v.<br><br>STATE OF TEXAS; RICK PERRY, in his official capacity as Governor of the State of Texas; DAVID DEWHURST, in his official capacity as Lieutenant Governor of the State of Texas; JOE STRAUS, in his official capacity as Speaker of the Texas House of Representatives; HOPE ANDRADE, in her official capacity as Secretary of State of the State of Texas<br><br>Defendants | CIVIL ACTION NO.<br>**11-CA-360-OLG-JES-XR**<br>CONSOLIDATED ACTION<br>[Lead case] |

O P I N I O N

On February 28, 2012, this Court issued PLAN H309 as the interim plan for the districts to be used to elect members in 2012 to the Texas House of Representatives. This opinion explains that plan.

I. Background.

The decennial census was conducted in 2010 pursuant to Article I, § 2 of the United States Constitution and showed that the population of Texas had increased 20.6%, from the 2000 population of 20,851,820 to 25,145,561 for 2010. The population

1

changes mean that the current Texas House districts (the "benchmark plan") are malapportioned and in violation of the one-person, one-vote principle.[1] Thus, the State reapportioned seats. The 82nd Texas Legislature enacted House Bill 150, which implemented a new plan for the Texas House ("the enacted plan") that was signed into law on June 17, 2011.

Plaintiffs mount a number of constitutional and statutory challenges to the enacted plan in this Court under Section 2 of the Voting Rights Act ("the VRA") and the Fourteenth Amendment. The plaintiffs and the United States have also objected to "preclearance" of the enacted plan in the United States District Court for the District of Columbia ("the D.C. Court") under Section 5 of the VRA.[2] The State sued in the D.C. Court to obtain preclearance of its enacted plan, and that suit is pending.[3]

Because the enacted plan cannot be implemented, and because the benchmark plan is concededly unconstitutional on account of population growth, this Court is left with the "unwelcome obligation," *Connor*, 431 U.S. at 415, of implementing an interim plan so that the 2012 elections may go forward. The Supreme Court has directed this Court to implement an interim plan by taking guidance from the enacted plan except in geographical areas in which the plan is legally defective. *Perry v. Perez*, 565 U.S. ___, 132 S. Ct. 934, 941-42 (2012) (per curiam). Specifically, the Supreme Court has directed this Court to use the State's enacted map and voter tabulation district ("VTD") cuts except in areas in which the plaintiffs have either shown that there is a likelihood of success on the merits on their Section 2 and constitutional claims or that their

---

[1] *See Connor v. Finch*, 431 U.S. 407, 410 (1977) (announcing that the constitutional guarantee of one person, one vote requires districts to achieve population equality "as nearly . . . as is practicable") (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964); *Chapman v. Meier*, 420 U.S. 1, 22 (1975)).

[2] Texas is subject to the preclearance requirements of Section 5 of the VRA, as amended and codified at 42 U.S.C. § 1973c. Until a state obtains preclearance for such a plan, the plan cannot be effective as law and cannot be implemented. *Clark v. Roemer*, 500 U.S. 653, 646 (1991).

[3] *Texas v. United States*, Civ. Ac. No. 1:11-CV-1303 (D.D.C. 2012).

2

Section 5 claims are "not insubstantial." *Id.* Accordingly, we analyze the various claims and defenses to the enacted plan under Sections 2 and 5 of the VRA and the Constitution.

II. Analysis of Claims.

A. Districts Left Undisturbed from the Enacted Plan.

Following the Supreme Court's direction to leave undisturbed any district that is free from legal defect, *id.* at 941, this Court's interim map for the Texas House configures 122 of the 150 districts in the identical manner as did the Legislature.[4] To the extent that legal challenges are levied against any of those districts, we preliminarily find that any Section 2 and constitutional challenges do not have a likelihood of success, and any Section 5 challenges are insubstantial. Nevertheless, we emphasize the preliminary nature of this order and that, except for the fact that PLAN H309 sets the districts for the 2012 elections, nothing in this opinion reflects this Court's final determination of any legal or factual matters in this case or the case pending in the D.C. Court.

B. Challenges to House District 41.

In Hidalgo County, the plaintiffs in this Court object to the configuration of the districts under one-person, one-vote. In addition, the Department of Justice ("DOJ") and intervenors in the D.C. Court have raised Section 5 challenges to House District 41 under theories of retrogression and discriminatory purpose. House District 41, located in Hidalgo County, is represented by a Democrat incumbent (Representative Gon-

---

[4]The districts in the interim plan that are identical to their configuration in the enacted plan are House Districts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 119, 120, 121, 122, 123, 125, 126, 127, 130, 131, 132, 134, 135, 138, 139, 140, 141, 142, 146, 147, and 150.

zalez), and neighboring District 40 is represented by a Republican incumbent (Representative Pena), who had switched parties after winning the 2010 election. In an apparent effort to aid Pena's reelection, the State reconfigured HD 41 to take in almost all of the Republican-leaning precincts in the McAllen metropolitan area. More important, Pena's residence was placed in HD 41,[5] and Gonzalez's was put into HD 40, effectively switching their districts. As a result, if Gonzalez were to seek reelection, she would be forced to run in a district that contains only 1.5% of the population she has been representing, and if Pena were to seek reelection, he would run in a district that contains only 1.1% of the district he currently represents.

Most problematic is that enacted HD 41—the only district in Hidalgo County that has a realistic chance of electing a Republican—is substantially underpopulated (by 4.41% from the ideal district size), but the rest of the districts in the county are substantially overpopulated (2.83%, on average).[6] This apparently systematic overpopulation of Democrat districts and underpopulation of the one possible Republican district presents serious concerns under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd mem. sub nom. Cox v. Larios*, 542 U.S. 947 (2004). Thus, the plaintiffs have a likelihood of success on the merits on their one-person, one-vote claims with respect to HD 41.

Because this Court's interim plan returns HD 41 to a performing ability district, and because it does not incorporate any portion of the State map that is allegedly tainted by discriminatory purpose, this Court need not reach the remaining claims.

---

[5] We sometimes abbreviate references to House districts as "HD xx."

[6] Enacted HD 41 is underpopulated by 7,399 persons, while adjoining Districts 36 and 40 were respectively overpopulated by 4,368 and 5,856. The districts adjoining HD 41, in addition to being more Democrat, are also more heavily Latino. The total Hispanic citizen voting age population ("HCVAP") in HD 41 is 72.1%, while the total HCVAP's in HD 36 and HD 40 are respectively 88.7% and 89.0%. The total Spanish-surname voter registration ("SSVR") in HD 41 is 63%, while the total SSVR's in HD 36 and HD 40 are respectively 85.1% and 85.8%. The total Latino population in HD 41 is 79.8%, while the total Latino population is 93.7% in HD 36 and 94.6% in HD 40.

C.  Challenges to House District 35.

House District 35 in the benchmark plan extended into seven rural counties in South Texas. In the enacted plan, the Legislature reconfigured HD 35 by taking out three of those counties and adding three other rural south Texas counties. The DOJ has alleged in the D.C. Court that enacted HD 35 retrogresses minority voting strength in violation of Section 5. The intervenors further contend that the decision to keep HD 35 in rural South Texas instead of moving it further south to the Rio Grande Valley, an area of fast population growth with a high Latino population, evidences discriminatory purpose under Section 5. Finally, the plaintiffs in this Court allege that the configuration of HD 35 violates Section 2 and reflects intentional discrimination in violation of the Fourteenth Amendment.

To support its claim of retrogression, the DOJ cites its expert's conclusion that HD 35 performance was reduced from 40% to 20% in exogenous elections.[7] As further evidence of retrogression, the Department's expert also concludes that under the benchmark plan, HD 35 elected the minority-preferred candidate in 80% of endogenous elections. Because it appears that HD 35 in the enacted plan diminishes the ability of minorities to elect their candidate of choice, the claim of a Section 5 violation is not insubstantial.

This Court need not make a preliminary ruling on the Section 2 and intentional-discrimination claims, because restoring HD 35 to benchmark (or higher) "performance" levels and shifting the district south to the Rio Grande Valley (as plaintiffs requested) provide an appropriate remedy for those claims.

D.  Challenges to House District 117.

In the D.C. Court, the DOJ and intervenors lodge Section 5 retrogression and discriminatory purpose objections to the configuration of HD 117. Specifically, they

---

[7] Under the index of the Texas Office of the Attorney General ("the OAG index"), performance decreased from 50% to 40% in exogenous elections.

5

allege that the State intentionally reconfigured the district in an effort to trade mobilized Hispanic voters for Hispanic voters who do not regularly vote. They argue that as a result of these swaps, minorities are no longer able to elect the candidate of their choice.[8]

In 2010, HD 117 elected a Republican, Representative Garza, to the Texas House of Representatives. To protect him, the Legislature increased the Republican performance of the district. In achieving that end, however, the State may have focused on race to an impermissible degree by targeting low-turnout Latino precincts. Although the HCVAP increased from 58.8% to 63.8%, the SSVR decreased from 50.3% to 50.1%. The fact that the map drawers were able to increase the HCVAP substantially while simultaneously decreasing the proportion of registered voters with Spanish surnames indicates that they may have intentionally focused on precincts with low Latino turnout. This outcome, combined with Garza's statement in his deposition that he "wanted to get more Anglo numbers," is evidence that the decisionmakers were impermissibly focused on race in trying to make the district more Republican. Accordingly, the Section 5 claim is not insubstantial, and the Court has reconfigured HD 117 to return it to benchmark "performance" levels. Because we modify HD 117 to address the Section 5 intentional-discrimination issues, we need not reach the other claims regarding that district.

E. Challenges to House District 33.

The DOJ and intervenors in the D.C. court have objected to the configuration of Nueces County under Section 5. The plaintiffs in this case also raise Section 2 and Fourteenth Amendment objections. Under the 2000 Census, Nueces County had a large enough population for approximately two and a half districts. Because it was not

---

[8] According to the DOJ's expert, benchmark HD 117 elected the minority-preferred candidate in 60% of endogenous elections. In exogenous elections, the Department's expert concluded that performance decreased from 60% to 20%. Under the OAG index, performance in exogenous elections decreased from 50% to 20%.

6

possible to draw two districts wholly within Nueces County without violating one-person, one-vote principles, the benchmark plan included two Latino opportunity districts (HD 33 and HD 34) in its configuration, with the remaining population being shed into HD 32 in San Patricio County.

The 2010 Census revealed, however, that Nueces County, which had a population increase of about 8% over the past decade, grew substantially more slowly than the statewide average of about 21%. Because the Texas House has a static number of seats, that is the electoral equivalent of population loss for the county. As a result, Nueces County's population is currently only 2.02 times the ideal district size, meaning that two districts could be drawn wholly within Nueces County without either breaking the County Line Rule of the Texas Constitution or having impermissibly high population variations in violation of the U.S. Constitution. In other words, and by coincidence, two districts fit almost perfectly into Nueces County, with only a 1% deviation from the ideal size of a House district.

In the enacted plan, the State chose to eliminate one district in Nueces County, HD 33, moving it to Rockwall County in north Texas, which grew by almost 82% over the past decade. Because Nueces County does not have a majority SSVR as a whole, the choice to remove one district required the elimination of one of the Hispanic ability districts.

With regard to the Section 5 claim, any retrogression has been offset in the interim plan by the creation of a new Hispanic opportunity district, HD 144, which we discuss below.[9] In addition, the Court cannot conclude, at this stage of the proceedings, that plaintiffs are likely to succeed on their Section 2 claim, because they must show that the totality of the circumstances justifies an additional Latino district in Nueces County even if all three *Gingles* preconditions are met. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

---

[9]To the extent any of the intervenors raises a Section 5 challenge in the D.C. Court based on discriminatory purpose, this Court is unable to conclude, based on the evidence presented, that any intervenor has met the standard imposed by the Supreme Court.

Based purely on total population, Nueces County is only entitled to 2.02 districts, and the only way to maintain two Latino districts in Nueces County is to cut a county line in violation of the State constitution. Absent a Section 5 retrogression violation, this seems inappropriate in the particular circumstances of this case. This is not to say that Section 2 of the VRA could never require a county line cut. This Court can envision a situation in which the refusal to cut a county line could, even in the absence of discriminatory purpose, result in vote dilution. However, in the particular circumstances of this case, traditional redistricting principles counsel in favor of maintaining two districts in Nueces County.

F. Challenges to House District 144.

Located in far eastern Harris County, the benchmark HD 144 was an Anglo-citizen majority district with a large and growing Hispanic population (35% HCVAP). Indeed, the Hispanic population across Harris County has increased significantly over the previous decade, while the Anglo population has declined. In the enacted plan, the State adjusted HD 144 in a manner that reduced the HCVAP to 31%, thus likely making the district safer for its Republican incumbent, Representative Legler. The plaintiffs allege that Section 2 required the State instead to reconfigure HD 144 so that it would contain a majority HCVAP such that Hispanics will have the opportunity to elect the candidate of their choice.

The Court concludes that the plaintiffs have demonstrated a likelihood of success on the merits of their Section 2 claim in eastern Harris County. First, the plaintiffs presented numerous demonstration maps to this Court, and during the legislative session, illustrating that an additional compact majority HCVAP district is possible in eastern Harris County. Second, the plaintiffs have submitted a number of expert reports analyzing whether racially polarized voting exists in Texas, and also specifically whether it exists in Harris County. Based on these reports and on the testimony of the plaintiffs' experts, the Court concludes that the plaintiffs have preliminarily established that racial block voting and cohesive voting patterns exist in Harris

8

County.

Finally, the Court preliminarily concludes that the creation of a new Latino district in eastern Harris County is justified by the totality of the circumstances. Over the past 10 years, minority growth in Harris County has increased by over 700,000, while Anglo population decreased by more than 82,000. Latinos constitute 23% of the citizen voting age population ("CVAP") in Harris County but are the voting majority in only 17% of the districts in the enacted plan. Moreover, a significant amount of evidence was presented to the Court regarding historical racial discrimination in Texas. For these reasons, the Court concludes that the plaintiffs have shown a likelihood of success on their claim that Section 2 requires the creation of a Latino opportunity district in eastern Harris County.

This Court has reconfigured HD 144 in the same general manner as the plaintiffs request. The Court's configuration also offsets the elimination of a minority-opportunity district in Nueces County. *See Texas v. United States*, 2011 WL 6440006, at \*17 (D.D.C. Dec. 22, 2011) (indicating that new ability districts may offset any lost ability districts).

G. Challenges to House District 149.

Based purely on population, Harris County is entitled to 24.4 districts; but, in the benchmark map Harris County had 25 districts, which was purportedly the result of a legislative compromise to allow for greater minority representation. The enacted plan reduced the number of districts to 24. The Legislature chose to dismantle HD 149, represented by Democrat Representative Vo, the first and only Vietnamese-American legislator in the Texas House. His residence was placed in HD 137, a minority coalition district represented by fellow Democrat Representative Hochberg. The new HD 149 was moved to fast-growing Williamson County, in central Texas, in the enacted plan.[10] As a result, enacted HD 149 does not allow minorities the ability

---

[10]Over the last decade, Texas grew by 20.6%, Harris County by 20.3%, and Williamson
(continued...)

to elect the candidate of their choice. The plaintiffs contend that the change violates Section 2 of the VRA and the Fourteenth Amendment. The DOJ and intervenors also raise Section 5 retrogression and discriminatory purpose challenges in the D.C. case.

It is difficult to imagine a legislative district more diverse than what HD 149 was in the benchmark plan: a CVAP of 38% Anglo, 26% Black, 19% Hispanic, and 16% Asian. Voters and political activists residing in benchmark HD 149 testified that a coalition of voters from all four major ethnicities in the district worked together to elect Vo in 2004 and to reelect him since. Because Vo is likely the minority candidate of choice of one or more minorities in benchmark HD 149, the district could be considered either a "coalition district" or a "crossover" district. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009). The D.C. Court has indicated that Section 5 protects such districts from retrogression, *Texas v. United States*, 2011 WL 6440006, at *18-19, so the Section 5 case with respect to HD 149 and its effect on statewide retrogression is not insubstantial. As a result, we make no determination with respect to the other claims as to HD 149.

H. Challenges to House Districts 77 and 78

In El Paso County, the intervenors[11] in the D.C. Court have alleged that the line between HDs 77 and 78 was drawn with discriminatory purpose. The plaintiffs in this Court also allege that the El Paso configuration violates Section 2 of the VRA and is intentionally discriminatory under the Fourteenth Amendment. That line is indeed bizarre, even for a legislative district. District 77 has two "deer antler" protrusions that reach into HD 78 and grab predominantly Latino neighborhoods. The protrusions have the effect of concentrating Latinos into District 77, protecting a Latino Republican incumbent, Representative Margo, in District 78.

---

[10](...continued)
County by 69.1%.

[11]The DOJ expressed its opinion during this Court's February 14, 2012, hearing that the intervenors' discriminatory purpose claim for El Paso is not insubstantial.

10

Although it is difficult to tell whether those lines were drawn on partisan or racial lines, the high number of split precincts in the protrusions increases the likelihood that the map-drawers were focused on race because partisan voting data are not available below the precinct level. The State has not offered any explanation why the precincts were split, so we conclude that plaintiffs have presented a Section 5 claim that meets the low "not insubstantial" standard. Because the court-ordered remedy with regard to the Section 5 discriminatory purpose claim also provides an appropriate remedy for the alleged Section 2 and Fourteenth Amendment violations, the Court need not reach those issues.

### III. The Interim Texas House Plan.

In summary, this Court's plan, H309, obeys the Supreme Court's directive by adhering to the State's enacted plan except in the discrete areas in which we have preliminarily found plausible legal defects under the standards of review the Court has announced. In the interim plan, we correct those perceived defects by taking guidance from the State's valid political considerations as reflected in the enacted plan. *See Perez*, 132 S. Ct. at 941.

In South Texas, H309 equalizes the population deviations in Hidalgo County while restoring HD 41 largely to its benchmark configuration, making necessary adjustments resulting from population shifts. This Court's interim plan also moves HD 35 from rural South Texas into the Rio Grande Valley, where it will be a performing minority ability district. In Harris County, HD 149 is restored, and in its stead, HD 136, a 75% Anglo district represented by retiring Republican Representative Woolley, is moved to another part of the state. Further, any changes in this area are made so as to not affect the ability of minorities in neighboring districts, such as HD 137, to elect the candidate of their choice. On the east side of Harris County, HD 144 is substantially reconfigured so that it contains a majority HCVAP and is likely to elect the Latino candidate of choice. Finally, in El Paso County, the Court addresses the intentional discrimination allegation by retracting HD 77's "antlers" somewhat,

11

making the districts more compact. The effect is to increase District 78's HCVAP to 58.3% and to provide minorities the ability to elect the candidate of their choice.

All other districts in the enacted plan are unchanged unless an alteration is required by changes to adjoining districts. Thus, in sum, 122 districts in this Court's interim plan are exactly the same as those in the enacted plan; 7 districts have been altered minimally; and 21 districts have been altered substantially.

IV. Conclusion.

We emphasize the preliminary and temporary nature of the interim plan, ordered in adherence to the standards set forth by the Supreme Court in this very case, as we undertake our "unwelcome obligation"[12] mindful of the exigent circumstances created by the need for timely 2012 primaries and general elections in Texas. Nothing in this opinion explaining this Court's independently drawn PLAN H309 represents a final judgment on the merits as to any claim or defense in this case.

It is hereby ORDERED that Plan H309 be used on an interim basis as the redistricting plan for the 2012 elections for the Texas House of Representatives.

SIGNED on this 19th day of March, 2012.

_____/s/_____
JERRY E. SMITH
UNITED STATES CIRCUIT JUDGE

_____/s/_____
ORLANDO L. GARCIA
UNITED STATES DISTRICT JUDGE

_____/s/_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[12]*Perez*, 132 S. Ct. at 940 (quoting *Connor*, 431 U.S. at 415).