# EXHIBIT 10

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
    Defendant-Intervenors,         )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
    Defendant-Intervenors,         )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
    Defendant-Intervenors.         )

**********************************************
               ORAL DEPOSITION OF
           STATE OF TEXAS 30(b)(6)
                 LEE GUYETTE
                JUNE 19, 2012
**********************************************



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                    JUNE 19, 2012

                                                                      2

1          ORAL DEPOSITION OF LEE GUYETTE, produced as a

2     witness at the instance of the Defendant, was duly

3     sworn, was taken in the above-styled and numbered cause

4     on the JUNE 19, 2012, from 3:13 p.m. to 6:09 p.m.,

5     before Chris Carpenter, CSR, in and for the State of

6     Texas, reported by machine shorthand, at the Offices of

7     the Texas Attorney General, 209 West 14th Street, 6th

8     Floor, Austin, TX  78701, pursuant to the Federal Rules

9     of Civil Procedure and the provisions stated on the

10    record or attached hereto.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

3

1

2

3                    A P P E A R A N C E S

4       FOR THE PLAINTIFF, STATE OF TEXAS:

5              Patrick K. Sweeten
               Reynolds Brissenden
6              OFFICE OF THE ATTORNEY GENERAL OF TEXAS
               P.O. Box 12548
7              Austin, TX  78711-2548

8              209 West 14th Street
               8th Floor
9              Austin, TX  78701
               (512) 936-1307
10             patrick.sweeten@texasattorneygeneral.gov

11

        FOR THE DEFENDANT, HOLDER, ET AL:
12

               Daniel Freeman
13             Victor Williamson
               U.S. DEPARTMENT OF JUSTICE
14             950 Pennsylvania Avenue, NW
               NWB - Room 7202
15             Washington, DC  20530
               (202) 305-7766
16             daniel.freeman@usdoj.gov

17

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

4

1                               INDEX

2        Appearances......................................2

3        Stipulations pages attached after Page..........93

4        LEE GUYETTE

5                Examination by Mr. Freeman................5
                Examination by MR. Sweeten...............85
6                Further Examination by Mr. Freeman.......87
                Further Examination by Mr. Sweeten........89

7

         Signature and Changes...........................90
8
         Reporter's Certificate..........................92
9
                              EXHIBITS
10

         NO. DESCRIPTION                        PAGE MARKED
11

        971    E-mail string, January 25-27, 2011        22
12

        972    E-mail string, January 27 thru February 1,  28
13             2011

14       973    E-mail string, November 15-16, 2011       45

15       974    E-mail string, November 7 thru December 9,  47
               2011
16
        975    E-mail string, January 25, 2011           49
17
        976    Mendoza E-mail, January 25, 2011 1:03 p.m.  60
18
        977    Mendoza E-mail, January 25, 2011 3:35 p.m.  63
19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

5

```
1                    LEE GUYETTE,

2    having been first duly sworn to testify the truth, the

3    whole truth, and nothing but the truth, testified as

4    follows:

5                    EXAMINATION

6    BY MR. FREEMAN:

7        Q.   Sir, could you state your name for the record.

8        A.   Lee Guyette.

9        Q.   And how do you spell your last name?

10       A.   G-u-y-e-t-t-e.

11       Q.   Okay.  Thank you.

12              My name is Dan Freeman, and I'm here on

13   behalf of the defendant in this matter, Eric H. Holder,

14   Jr.  To my right is my colleague, who can introduce

15   himself.

16              MR. WILLIAMSON:  I'm Victor Williamson.

17              MR. FREEMAN:  And if your counsel can

18   introduce themselves for the record as well.

19              MR. SWEETEN:  Patrick Sweeten on behalf of

20   the State of Texas and on behalf of the witness, Lee

21   Guyette.

22              MR. BRISSENDEN:  Reynolds Brissenden on

23   behalf of the State of Texas and the witness,

24   Mr. Guyette.

25              MR. SWEETEN:  Dan, maybe for the record, I
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

6

1     want to go ahead and talk about where we are.

2                    MR. FREEMAN:  Sure.

3                    MR. SWEETEN:  We are presenting

4     Mr. Guyette today for Topic 8, which is, has been

5     required by the court pursuant to an order yesterday.

6                    At that time, the court required us to

7     have Mr. Guyette sit -- or a corporate representative

8     sit for Topic 8, which is any and all of registered

9     voters who possess Texas driver's license or personal

10    identification card, conducted between January 1st, 2005

11    and May 27th, 2011, including but not limited to

12    analysis conducted in February or March of 2011 by the

13    DPS and the Elections Division of the Secretary of

14    State.  Mr. Guyette is being presented here on very

15    short notice, based upon the provisions of the court

16    order.

17                   In addition, prior to the deposition --

18    and I think it was about an hour and a half prior to, I

19    provided Mr. Freeman some documents.  The court had

20    required us to provide documents that Mr. Guyette had

21    relied upon.  We made at that time -- we've asserted and

22    continue to assert an attorney-client privilege with --

23    or an attorney-client privilege with respect to a number

24    of these documents, which contain information from

25    Ms. McGeehan.  However, we interpreted the court's order



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

7

1   to require us to provide that information, and

2   therefore, we are not in any way waiving our argument

3   with respect to the attorney-client privilege, but

4   instead to comply with the court's order of yesterday.

5               With that, you can proceed.

6               MR. FREEMAN:  Okay.  Thank you.

7        Q.   (By Mr. Freeman) And Mr. Guyette, just so you

8   know, you're aware that this is a deposition in the

9   matter of Texas v. Holder, preclearance litigation in

10  the District of Columbia?

11       A.   Yes, sir.

12       Q.   Okay.  Have you ever been deposed before?

13       A.   No, I have not.

14       Q.   Okay.  So a deposition functions as a question

15  and answer.  I get to ask the questions, you give the

16  answers.  There's a court reporter to my left,

17  Mr. Carpenter, and he will write down everything that is

18  said in the room.  However, in order to get a good

19  record, you need to articulate your answers rather than

20  gesturing, because that can't be recorded by the court

21  reporter.  Do you understand?

22       A.   I understand.

23       Q.   Okay.  The purpose of the deposition is to

24  obtain your full and complete answers, so I need you to

25  provide as full of an answer as you can on the basis of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

8

1  your knowledge in response to my questions.  Do you

2  understand?

3       A.   I understand.

4       Q.   I may not always be clear.  This is

5  particularly the case, as I have received documents

6  relatively recently, and as you can tell, I'm reading

7  from a computer rather than having worked things out

8  completely in advance, so I'll have to apologize if my

9  questions aren't clear.

10            If you don't understand at all, please ask

11  me to restate the question or reframe the question.  I'm

12  happy to do so.  It's much more important that you

13  provide accurate testimony in response to my questions

14  rather than leave some kind of uncertainty.  Do you

15  understand?

16       A.   I understand.

17       Q.   Okay.  If you need a break, tell me, and we'll

18  finish the question and see about a break.  Is that all

19  right?

20       A.   Yes.

21       Q.   Okay.  If you need any water, coffee or

22  anything, please grab water between questions and not

23  during.  And I don't mean just drinking from the bottle

24  of water in front of you.  That's fine.  If you want the

25  extra bottle of water at the end the table, finish the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

9

1    question first.

2              If you want to talk to your attorney,

3    again, that's fine.  But similarly, if there is a

4    question pending or you're in the middle of an answer,

5    please finish that up first, okay?

6         A.   I understand.

7         Q.   Sometimes you may remember things later in the

8    day, based on a question I ask or an answer you give.

9    If that happens, please let me know what's in your mind,

10   and we'll add it to the record.  Will you do that?

11        A.   I will.

12        Q.   Okay.  I'll give you a chance to do that at the

13   end as well.  Okay?

14        A.   Yes, sir.

15        Q.   Okay.  Sometimes, after we've been talking for

16   a while, you may realize that a prior answer was not

17   entirely accurate.  If you realize that, will you let me

18   know, so that you can correct the record?

19        A.   I will.

20        Q.   Okay.  Sometimes while you're answering, you

21   may think of a document that would help you remember or

22   help you answer more accurately.  If you do, please let

23   me know.  We may have that document here, and if not, we

24   may be able to get it to help you.  Okay?

25        A.   I understand.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

10

1      Q.   Are you on medication or drugs of any kind that
2    might make it difficult for you to understand and answer
3    questions?
4      A.   No.
5      Q.   And these are just routine questions.  Don't
6    take offense.
7      A.   No.  Okay.
8      Q.   Have you had anything alcoholic to drink in the
9    last eight hours?
10     A.   No.
11     Q.   Are you at all sick today?
12     A.   No.
13     Q.   Are you currently under a doctor's care for any
14   illness that would limit your ability to answer
15   questions?
16     A.   No.
17     Q.    Is there any reason you can think of why you
18   will not able to answer my questions fully and
19   accurately?
20     A.   No.
21     Q.   The last thing:  I want to remind you that you
22   are under oath, and you're subject to federal penalties
23   for giving false or misleading testimony, so it's
24   important that you answer my questions truthfully,
25   accurately and completely.  Do you understand?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

11

1      A.    I understand.

2      Q.    Okay.  Also, it's very important that we not

3   speak over each other.

4      A.    I just did.  Yeah, I got you.

5      Q.    It makes it very hard for the court reporter to

6   make a good record.  So I'll try and wait for you to

7   finish answering before asking you a question, if you

8   could try to wait for me to finish asking the question

9   before answering, it will make life easier for everyone.

10     A.    I understand.

11     Q.    Great.  Good.

12           Do you understand that you are testifying

13   on behalf of the State of Texas and not in your

14   individual capacity today?

15     A.    Yes.

16     Q.    What is your position?

17     A.    Project manager.

18     Q.    Okay.  And is that within the Office of the

19   Secretary of State?

20     A.    Yes.

21     Q.    Is that within the IT division specifically?

22     A.    Yes.

23     Q.    Okay.  How long have you held that position?

24     A.    Three years.

25     Q.    And how long have you been at the Office of the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

12

1    Secretary of State?

2         A.   The same three years.

3         Q.   Okay.  As project manager, do you supervise any

4    other individuals?

5         A.   Yes.

6         Q.   How many individuals?

7         A.   Seven individuals.

8         Q.   Okay.  And are you responsible for any

9    particular area of the information technology systems of

10   the Office of the Secretary of State?

11        A.   Yes.  Software development for the voter

12   registration database.

13        Q.   Is that also known as the TEAM database?

14        A.   Yes.

15        Q.   And can you tell me what the TEAM database

16   stands for?

17        A.   Texas Elections Administration Management.

18        Q.   Okay.  The last witness I asked that was not

19   totally sure.  Now we know.  Thank you.

20             And do you work on any other databases

21   besides TEAM?

22        A.   Yes.

23        Q.   What other databases?

24        A.   There is a system called PPRI, which tracks

25   funding, and a system known as ENR, which is election



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                JUNE 19, 2012

13

1    night returns.

2         Q.   Okay.  Anything else?

3         A.   No.

4         Q.   Okay.  Thank you.

5              What is your educational background?

6         A.   A bachelor's in electrical engineering, a

7    master's in electrical engineering with computer

8    science.

9         Q.   Okay.  Do you have any certifications with

10   regard to databases or programing in any way?

11        A.   I have certifications, not in databases, but in

12   project management.

13        Q.   And what are those certifications?

14        A.   PMP, as well as -- I'll leave it at PMP.

15        Q.   Okay.  And what does PMP stand for?

16        A.   Project Management Professional.

17        Q.   Okay.  And who provides that certification?

18        A.   It's provided by PMP.  The name is the same as

19   the certification.

20        Q.   Okay.  That's the organization?

21        A.   Yes.

22        Q.   Okay.  And prior to coming work for the Office

23   of the Secretary of State, where were you employed?

24        A.   Previously employed at Dell Computer.

25        Q.   Okay.  For how long?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

14

1         A.    Ten years.

2         Q.    And were you a project manager as well?

3         A.    Project managers at some time, but also senior

4    manager.

5         Q.    Okay.  And prior to Dell, where were you

6    employed?

7         A.    Compaq Computer, now HP.

8         Q.    And how long were you at Compaq?

9         A.    Five years.

10        Q.    And were you also a project manager or a senior

11   manager?

12        A.    Yes, software management.

13        Q.    And prior to Compaq, where were you?

14        A.    Department of Defense for three years.

15        Q.    Okay.

16        A.    Software development.

17        Q.    Okay.  Was that out near D.C.?

18        A.    That was actually in California.

19        Q.    Even better.

20        A.    Yeah.

21        Q.    And prior to DoD, where were you?

22        A.    General Dynamics for five years.

23        Q.    Okay.

24        A.    Software development.

25        Q.    Okay.  And I think we've gone far enough back.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                      JUNE 19, 2012

15

1       A.    That's pretty far.

2       Q.    That's fine.

3             When did you first learn that you would be

4    testifying on behalf of the State?

5       A.    This morning.

6       Q.    If you could take a look at this.  This has

7    previously been marked as U.S. Exhibit 830.  Just take a

8    moment to look it over.

9       A.    (Witness reviewing document.)

10      Q.    Okay.  You can hold on to it.

11      A.    Okay.

12      Q.    Have you seen that document before?

13      A.    I don't recall seeing this specific document.

14      Q.    Have you seen any portion of the document, any

15   of the text previously?

16      A.    Well, I don't -- I don't know.  I've seen

17   similar text in everywhere from paper to potentially

18   e-mail.  I can't say if any piece of this is a stand

19   out.

20      Q.    Okay.  Could you turn to the last two pages.

21      A.    Yes.

22      Q.    And do you see a list of topics, 1 through 12,

23   listed here?

24      A.    Yes.

25      Q.    Have you seen Topic 8 before?  And maybe take a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

16

1    look at it.

2        A.   Yes.

3        Q.   And are you prepared to testify on behalf of

4    the State of Texas concerning Topic 8?

5        A.   Yes.

6        Q.   Okay.  Could you read, just for the record,

7    what Topic 8 is?

8        A.   "Any and all analysis of registered voters who

9    possess a Texas driver's license or a personal

10   identification card, conducted between January 1st, 2005

11   and May 27th, 2011, including, but not limited to

12   analysis conducted in February or March 2011 by the

13   Department of Public Safety and the Elections Division

14   of the Secretary of State."

15       Q.   Okay.  What did you do to prepare for this

16   deposition?

17       A.   Went back and reviewed some e-mails --

18       Q.   Okay.

19       A.   -- which I believe were part of the package you

20   received this afternoon.  I went and contacted some key

21   purchase events.  Keith Ingram, who is director of

22   elections, Karen Richards, who used to head the voter

23   registration TEAM for elections, and John Mendoza, who

24   was a key analyst for the topic we're going to discuss.

25       Q.   Anything else?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

17

1     A.   Looked at some old programming that was done

2    and tried to research -- I researched if there's any

3    programing or software appropriate prior to January of

4    2011.

5     Q.   You said you previously produced some e-mails.

6    Did you produce to your attorneys a full set of e-mails

7    to review?

8     A.   Yes.  It's the same e-mails that have been

9    previously provided to OAG.

10     Q.   Okay.  And was Mr. Ingram in the Office of the

11    Secretary of State at the time that you -- or at the

12    time that the analysis at issue occurred?

13     A.   No.

14     Q.   What did you discuss with Mr. Ingram?

15     A.   Questions about what to expect potentially this

16    afternoon, as well as if he was aware, through a

17    disclosure to legislation of the January results, the

18    January 2011 results.

19     Q.   And was he aware of any disclosure?

20     A.   He is not aware of any disclosure.

21     Q.   Did Mr. Ingram provide you with any

22    instructions?

23     A.   No.

24     Q.   Did you discuss anything else?

25     A.   No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

18

```
1        Q.    And you also stated that you spoke with Karen
2    Richards?
3        A.    Correct.
4        Q.    And you said she was the head of the voter
5    registration team at the time?
6        A.    Yes.
7        Q.    Is that in January of 2011?
8        A.    Yes.
9        Q.    And what is her current position?
10       A.    She currently holds a position with a third
11   party, VOTEC, V-O-T-E-C.
12       Q.    So she's in the private is sector now?
13       A.    In the private sector, right.
14       Q.    What were her responsibilities as head of the
15   voter registration team?
16       A.    She would provide IT groups, such as myself,
17   direction on needed analysis and other TEAM development
18   work.
19       Q.    So she's the business side of the TEAM
20   database?
21       A.    Yes.
22       Q.    Okay.  And what subjects did you discuss with
23   Ms. Richards?
24       A.    Key focus was on whether or not this
25   information, the January 2011 results were disclosed
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

19

1     legislation, and that was the primary discussion.

2         Q.   Any secondary discussion?

3         A.   I did ask if she remembered the January 2011

4     analysis.

5         Q.   Did she?

6         A.   Parts.

7         Q.   And did she recall if the January 2011 analysis

8     had been disclosed to any legislator?

9         A.   She was not aware of any disclosure.

10        Q.   And then you said that you spoke to John

11    Mendoza, correct?

12        A.   Yes.

13        Q.   And you described him as an analyst, correct?

14        A.   Developer analyst, yes.

15        Q.   Does he still hold that position?

16        A.   Yes.

17        Q.   And are you his superior?

18        A.   Yes.

19        Q.   And what did you discuss with Mr. Mendoza?

20        A.   We reviewed some of the old programs and

21    discussed some of the analysis that took place in

22    January of 2011.

23        Q.   And so does the code still exist from the

24    January 2011 map?

25        A.   I saw some of the software code, but portions



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

20

1       may be missing.

2           Q.   Okay.

3                MR. FREEMAN:  Mr. Sweeten, if we were to

4       want copies of that code, do we need to make separate --

5       a separate request, or will you just provide it?

6                MR. SWEETEN:  I don't know anything about

7       what it would involve.  Let me speak to him at the

8       break, and I may be informed.

9                MR. FREEMAN:  That's fine.

10          Q.   (By Mr. Freeman) And other than Mr. Ingram,

11      Ms. Richards and Mr. Mendoza, did you meet anyone else

12      or talk with anyone else?

13          A.   No.

14          Q.   Did you meet with your attorney?

15          A.   Excuse me.  Yes.

16          Q.   I'm not going to ask what you talked you about,

17      but I will ask:  When did you meet with them?

18          A.   Started at noon today.

19          Q.   And who did you meet with specifically?

20          A.   The two gentlemen that are here right now.

21          Q.   Anyone else?

22          A.   No.

23          Q.   Where did you meet?

24          A.   Right above this conference room.

25          Q.   Okay.  Did you bring any other documents with



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

21

1    you here today?

2         A.   I brought a copy of an e-mail that you received

3    this afternoon.

4         Q.   So beyond the documents that you reviewed and

5    produced through your attorney?

6         A.   No, no other documents.

7         Q.   Okay.  And you didn't speak with anyone else

8    about the deposition?

9         A.   My boss, to make sure he was aware I'd be here

10   this afternoon.

11        Q.   And who is your boss?

12        A.   Well, the gentleman you had a deposition

13   earlier today with, Scott Brandt.

14        Q.   Okay.  And did he provide you with any

15   instructions?

16        A.   No.

17        Q.   Did he say that I'm terrifying?

18        A.   No comment.

19        Q.   I will withdraw the question.

20        A.   (Laughing).

21        Q.   All right.  Mr. Guyette, did the Office of the

22   Secretary of State receive any requests to perform

23   analysis of registered voters who possess a Texas

24   driver's license or a personal identification card

25   between January 1st of 2005 and May 27th, 2011?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

22

1        A.    I can speak for what I received, a request from

2    the Elections Division to produce results in January

3    2011.

4        Q.    Are you aware of any requests having been made

5    prior to January 2011 for a similar analysis?

6        A.    I'm not aware of any.

7        Q.    Are you aware of any similar analysis having

8    been conducted to prior to January of 2011?

9        A.    I am not aware of any.

10        Q.    Okay.  Specifically when in January 2011 was a

11   request for such analysis received?

12        A.    Would it be possible to access some of the

13   e-mails you have?

14        Q.    Sure.  Of course.

15             MR. FREEMAN:  This document will be marked

16   as U.S. Exhibit 971.

17             (U.S. Exhibit 971 marked for

18   identification.)

19             MR. FREEMAN:  That's your copy.  That copy

20   is for your counsel.

21        Q.    (By Mr. Freeman) If you could just take a

22   moment and just look that over, and it will refresh your

23   recollection.

24        A.    (Witness reviewing document.) So the time frame

25   was on or about January 25th, 2011.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                    JUNE 19, 2012

23

1      Q.   And does this document say that -- pardon me.

2           Did you send an e-mail at 1:03 p.m. on

3   January 25th of 2011, saying that you had conducted

4   analysis and spent two and a half hours on this request?

5      A.   Yes.  It's -- on January 25th, it's the totals

6   that came up on short notice, which leads me to believe

7   that's when the analysis took place, on or about January

8   25th.

9      Q.   Okay.  Do you recall if you started working on

10  the analysis immediately after you received the request?

11     A.   I don't recall.

12     Q.   And who gave you the request?

13     A.   The request, as dictated, you know, through the

14  chain, typically came from either Ann McGeehan or Karen

15  Richards.

16     Q.   Do you recall in this instance whether you had

17  received the request from Ann, from Ms. Richards or from

18  another individual?

19     A.   For the initial request, I do not recall.

20     Q.   Okay.  Do you know where the request itself

21  originated, who made the request to the Division of

22  Elections or the Office of the Secretary of State?

23     A.   This specific request I do not recall, but

24  traditionally, all requests come through in business

25  partner, which would be Ann and Karen.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                               JUNE 19, 2012

                                                                      24

1          Q.   Okay.  But you're not -- you don't know whether

2     it came from the legislature or from an individual

3     legislator, et cetera?

4          A.   I do not recall, but typically, legislators

5     don't contact IT directly to perform such functions.

6          Q.   Fair enough.  And just for the record, did the

7     State of Texas conduct any analysis in response to that

8     request?

9          A.   Yes.

10         Q.   How many separate rounds of analysis did the

11    State of Texas conduct?

12         A.   During this January time period?

13         Q.   Yes.

14         A.   Roughly six.  Six that I'm aware of.

15         Q.   Okay.  Are you aware -- just so we can narrow

16    the time frame --

17         A.   Sure.

18         Q.   -- for the rest of the conversation, are you

19    aware of any other requests for analysis after this

20    approximately January 25 request, but before May 27th,

21    2011?

22         A.   I'm not aware of any others.

23         Q.   And are you aware of any other analysis, after

24    these approximately six rounds of analysis, around

25    January 25th and before May 27th?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                           JUNE 19, 2012

25

1          A.    I'm not aware of any other analysis or efforts.

2          Q.    Great.  So we can talk about a narrow window.

3                Who performed the actual analysis in

4      response to the request?

5          A.    That would be John Mendoza.

6          Q.    And did you supervise that analysis?

7          A.    Yes.

8          Q.    What instructions did you give to Mr. Mendoza?

9          A.    Instructions were given by Ann McGeehan and

10     Karen Richards.  Our response was to follow those

11     instructions down to the letter.

12         Q.    Okay.  So you were simply passing things along

13     to the programmer?

14         A.    Yes.

15         Q.    Okay.  Normally, do you pass along such

16     instructions with the same quote, unquote, "to the

17     letter" sort of mentality or instruction?

18              MR. SWEETEN:  Objection, vague.  Go ahead.

19         A.    Okay.  It really just depends on the case.

20         Q.    (By Mr. Freeman) Okay.

21         A.    In this condition, it was very clear what Ann

22     and Karen were asking for.

23         Q.    How did they make it clear that they were

24     asking for that precise type of analysis?

25         A.    They dictated the data to be used and they



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

26

1     dictated the matching criteria.

2         Q.    Is Ms. Richards familiar -- to the extent of

3     your knowledge, is she familiar with the technical

4     contents of the TEAM database?

5         A.    More than enough to be able to make this

6     request.

7         Q.    Okay.  And is Ms. McGeehan familiar with the

8     technical contents of the TEAM database to the level

9     necessary to make a specific request of this nature?

10              MR. SWEETEN:  Objection, calls for

11    speculation.

12        Q.    (By Mr. Freeman) And to the extent of your

13    knowledge?

14        A.    To the extent of my knowledge, yes.

15        Q.    Okay.  And I'll just clarify that your counsel

16    may make objections at various points.  Unless he

17    instructs you not to answer affirmatively, you can go

18    ahead and answer.  But I'll remind you and he'll remind

19    you, et cetera.

20              MR. SWEETEN:  Yeah.

21        Q.    (By Mr. Freeman) Did the Department of Public

22    Safety or its employees provide any input concerning

23    this analysis?

24        A.    No.  Excuse me.  No.

25        Q.    And did the Office of the Attorney General



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

27

1    provide any input with regard to the analysis?

2         A.   Not that I'm aware of.

3         Q.   Did the Department of Public Safety receive any

4    copies of this analysis?

5         A.   I do not know.

6         Q.   Did the Office of the Attorney General receive

7    any copies of this analysis at this time?

8         A.   I do not know.

9         Q.   How long was Karen Richards in her position as

10   the head of the voter registration team; do you know?

11        A.   Long before I arrived, so I don't know.

12        Q.   And when did she leave again?

13        A.   2011.  I can't recall a specific month.

14        Q.   Are you aware of whether David Falk, F-a-l-k,

15   was involved in this analysis?

16        A.   I don't recall, but I'm going to say I don't --

17   I don't know.  I do not recall working with David on

18   this.

19        Q.   Okay.  Do you know if Todd Giberson was

20   involved with this in any capacity?

21        A.   I'm not familiar with Todd.

22        Q.   Do you know if Joshua Zahn, Z-a-h-n, was

23   involved in any capacity?

24        A.   Are these OAG employees?

25        Q.   I'll represent to you that they are employees



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

28

1    of the Office of the Attorney General, yes.

2        A.   I don't recall any other employees being

3    involved in this activity.

4        Q.   Okay.  And so it was just you, Mr. Mendoza,

5    Ms. Richards, and Ms. McGeehan?

6        A.   Yes.

7        Q.   Okay.  Do you recall when you completed the

8    project, all six rounds of analysis?

9        A.   There's a chance there's another e-mail I'd

10   like to take a look at that has the summary.

11            MR. FREEMAN:  We'll mark this as U.S.

12   Exhibit 972.

13            (U.S. Exhibit 972 marked for

14   identification.)

15       A.   I see that on February 1st, Ann had the results

16   that she needed and was going to communicate it.

17       Q.   (By Mr. Freeman) And if you look a little bit

18   further down, did Karen Richards transmit statistics

19   from six queries on January 27th?

20       A.   Yes.

21       Q.   Okay.  So, was that the extent of the analysis,

22   six queries?

23       A.   To the best of my knowledge, these were the

24   final results of the queries.

25       Q.   Okay.  Who else, besides Ann McGeehan and Karen



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

29

1    Richards, received copies of this analysis?

2         A.    I see the intent of the e-mail, but I don't

3    know if it went beyond the group that you mentioned.

4         Q.    Who is Coby?

5         A.    That would be Deputy Secretary Coby Shorter,

6    Secretary of State.

7         Q.    And the top of this e-mail, does Ms. McGeehan

8    state that she has attached a draft summary that she

9    will send to Coby and John so that they can distribute

10   to legislative folk?

11        A.    That's correct.  And to clarify, the John that

12   she's referencing is likely the John Sepehri, who was

13   general counsel.

14        Q.    Okay.  And to the extent of your knowledge, did

15   this distribution end with Coby and John?

16        A.    To be honest with you, I don't even know if it

17   went to Coby and John.  This is the extent of my

18   knowledge.

19        Q.    Okay.  All I can ask you for is the extent of

20   your knowledge.

21        A.    That's...

22        Q.    Now, if you can look back real quickly at

23   Exhibit 491.  Do you see on Wednesday, January 26th, at

24   just before 4:00 p.m., Karen Richards sent out an e-mail

25   saying that some queries had already been done, some



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

30

1    queries needed to be done?  Is that correct?

2         A.   So, 491.  I'm not sure -- I've got 971, 972,

3    970.

4         Q.   I'm sorry.  I meant 971.

5         A.   Okay.

6         Q.   You can see the page that is marked 44399.

7         A.   Okay.

8         Q.   And do you see that there are queries listed as

9    having been done and queries listed as needing to be

10   done?

11        A.   Yes, I do.

12        Q.   Is this the format in which you received

13   instructions from Ms. Richards concerning the analysis

14   that was needed?

15        A.   I believe there was probably some instruction

16   prior to that, judging from John's earlier response on

17   January 25th.  I also believe that Karen's additional

18   instruction, for your reference, of January 26th, lines

19   up with the summary of the six queries that were

20   provided.

21        Q.   But in terms of the manner in which

22   Ms. Richards provided instructions to you, is this how

23   she essentially defined the scope of the project, these

24   types of bullet points?

25        A.   These types, but I would also say that it



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

31

1    wasn't unusual for us to have telephone conversations to

2    enforce and into more detail on instructions.

3         Q.    Okay.  Do you recall receiving several

4    different sets of instructions as to how the run the

5    queries that resulted in the total of six queries, or

6    were all six given at once?

7         A.    Judging from -- and I'm going by the e-mail

8    that we both share -- it looks like there was some,

9    maybe not iteration of queries, but there were some

10   iteration on thought on what the queries should be.

11        Q.    Okay.

12        A.    So, you could tell that it slowly evolved,

13   through this e-mail chain, what the target queries and

14   matching criteria are; even some discussion about the

15   age that should be used.

16        Q.    So if you start at the bottom, the January 25th

17   e-mail, that match was a county code, last name, first

18   name, date of birth match, correct?

19        A.    So, I'm sorry.  Which document are you

20   referring to?

21        Q.    Still 4 -- excuse me -- 971, the last page.

22        A.    Okay.

23        Q.    That it says county code, last name, first

24   name, date of birth, correct?

25        A.    Last name, first name, date of birth, and



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

                                                                            32

1    county, that's correct.

2         Q.   Okay.  And further up in the e-mail when

3    Ms. Richards is describing queries needed to be done,

4    she lists the same query, but she strikes out first

5    name, correct?  And this is on 44399.

6         A.   That's correct.

7         Q.   So that would provide a less accurate -- sorry,

8    strike that.

9         A.   It would provide a different set of data.

10        Q.   It would provide a different set of data.  And

11   it would provide a greater set of matches if you

12   eliminate one of the match criteria?

13        A.   I believe you have the results that show that

14   in 972.  For example, in 972, you have a query 5 --

15   excuse me.  You have query 3 that removes the first

16   name, and the other query you were comparing against --

17   last name, first name, date of birth and county -- is

18   query 1, last name, first name, date of birth.  So you

19   -- you're asking for a comparison between query 1 and

20   query 3, and I think you'll have your results there.

21        Q.   What I'm asking is:  As a general matter, if

22   you have a match that requires matching on four

23   different criteria, and then you eliminate one of those

24   criteria, so that you only need to match on three of the

25   four criteria, you will have a greater number of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

33

1    matches, assuming that at least one of the no match is

2    as a result of the no match on the eliminated criteria?

3                MR. SWEETEN:   Objection, calls for

4    speculation.   Objection, assumes facts not in

5    evidence.   And I think you're now asking him to make a

6    qualitative judgment based upon the matching criteria.

7    I think that's beyond the scope of the topic.

8                With all those objections, you can answer

9    the question as best as you can.

10        A.   I think it's possible to leave it to the

11   numbers that you were provided, which have last name,

12   date of birth, the same county.   The only difference

13   between 1 and 3, is 1 has a first name and query 3 does

14   not.

15        Q.   (By Mr. Freeman) Okay.   I guess what I'm trying

16   to get at is:   By eliminating first name, the number of

17   matches went up from one to three, correct?

18        A.   That is correct.

19        Q.   Okay.   Did anyone ever tell you the purpose of

20   eliminating first name?

21        A.   No.

22        Q.   It was just an instruction?

23        A.   It was an instruction.

24        Q.   Okay.   And were you ever told that these

25   queries were emergencies?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

34

1       A.   I would draw the conclusion that yes, given

2    that subject line of the e-mail chain is, "Emergency,

3    Special Query."

4       Q.   And then in an e-mail from Karen Richards to

5    Ann McGeehan, did Ms. Richards say she had talked to

6    Mr. Mendoza and impressed the urgency of the queries?

7       A.   Is that also part of -- part of Line 971?

8       Q.   It is.

9       A.   I know you know the answer, but if you could

10   help direct me to what page it.

11      Q.   On 44399.  I'm sorry.  It's not a quiz.  It's

12   Wednesday.

13      A.   Yes.  Karen states on Wednesday, January 26th,

14   that she spoke to John on the phone and impressed the

15   urgency.

16      Q.   Okay.  Now, the e-mail chain on 4 -- I keep

17   saying 4. -- 972.  If you look at Ms. Richards's e-mail

18   of January 27 -- we've previously discussed this -- but

19   she provides matching criteria and results for six

20   queries, correct?

21      A.   Yes, that's correct.

22      Q.   And she bases it on the total voters in the

23   state of 12,657,834 on the top of Page 2?

24      A.   That is correct.

25      Q.   And for each query, does she first eliminate a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

35

1    number of voters who will have a TDL ID number in their

2    TEAM record?

3        A.   That is correct, with the exception of query 2,

4    4, and 6, where she also eliminates individuals 70 years

5    or older.

6        Q.   Okay.  Thank you for that clarification.

7             And then are the remaining individuals

8    then matched to DPS records based on the set of named

9    criteria?

10       A.   That is correct.

11       Q.   And do the total unmatched records range

12   between approximately 504,000 and 845,000?

13       A.   That is correct.

14       Q.   Okay.  And I know that we discussed this a

15   little bit when we were discussing who you met with

16   previously.  But does the middle e-mail indicate that

17   Ms. McGeehan is typing up a summary of that data?

18       A.   That is correct, it does.

19       Q.   And does she state that she's typing up the

20   summary to provide the summary to legislative staff?

21       A.   That is correct.  Ann states, "I am typing up a

22   summary of this comparison to provide to legislative

23   staff."

24       Q.   And I know that you testified to this, a

25   variation on this earlier, but what legislative staff



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

36

1    received that summary?

2         A.    I am not aware of any legislative staff that

3    received this summary.

4         Q.    Okay.  Now, the top e-mail, does the top e-mail

5    state this Ms. McGeehan had talked to John Sepehri

6    concerning the summary?

7         A.    I think she -- I believe that the first John

8    she's referring to is John Mendoza.

9         Q.    Oh.

10        A.    I believe the second John she's referring to,

11   in the section, is John Sepehri.

12        Q.    Thank you for the clarification.

13             Does she state that she has attached a

14   draft summary that she plans to send to Coby and John?

15        A.    Yes, she does.

16        Q.    If you turn to the third page, is that a

17   summary of the queries?

18        A.    Yes, it is.

19        Q.    Okay.  If you can please review in it total,

20   and then I'll ask you a couple of questions.

21        A.    (Witness reviewing document.) All right.  I'm

22   ready.

23        Q.    Does the summary explain only two queries?

24        A.    It explains query 3 and 5.  And let me

25   verify.  It may do 1 as well.  The first paragraph after



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

37

1       the discussion does reference the number 2,814,965,

2       which is in query number 1.  The second paragraph --

3            Q.   Just a quick clarification.  Isn't the

4       2,814,965 number the total number of voters who did not

5       list a Texas driver's license or a Texas ID number on

6       their voter registration application, so it's present in

7       query 1, 3, and 5, all the queries where the universe of

8       total voters was not filtered out to eliminate voters

9       age 70 and older?

10           A.   That is right.

11           Q.   Okay.

12           A.   The second paragraph -- the second paragraph --

13      can you give me a couple of minutes to review this?

14           Q.   Of course.  Yes.  Yes.

15           A.   I know I can't write on this.  Can I borrow a

16      pen?

17           Q.   You can if you'd like.  If you find it helpful,

18      you can write on it.

19           A.   (Reviewing document and taking notes.)

20                Okay.  All right.  Reviewing Ann's

21      summary, it appears that the first query she references

22      is last name, first name, date of birth and same county.

23           Q.   And that's query 1, correct?

24           A.   And that corresponds to query 1.  The second

25      portion with the second query was last name, date of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

38

1    birth, and same county.  And that's query 3.  So she

2    references two of the six queries.

3         Q.    And am I correct that her summary states that

4    the office performed two queries to obtain the estimated

5    range of voters who had not been issued a TDL ID

6    number?  She does not say three or six, correct?

7         A.    She does state, "We performed two queries to

8    obtain the estimated range of voters."

9         Q.    And she does not reference any other analysis

10   performed beyond query 1 and query 3, correct?

11        A.    I agree.

12        Q.    Do you know why she did that, to the extent of

13   your knowledge?

14        A.    I do not know.

15        Q.    Okay.  Did you receive any instruction to run

16   any queries other than the six queries listed here?

17        A.    I don't recall any other queries.

18        Q.    Do you know if Mr. Mendoza received any

19   instruction to run any queries other than the six

20   queries listed here?

21        A.    I'm not aware of any additional queries.

22        Q.    Okay.  If you had received such an instruction,

23   is it your normal procedure to run those queries if you

24   were instructed to do so?

25        A.    Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

                                                                    39

1          Q.   Okay.  And with regard to this specific summary

2     document, are you aware of anyone who received it beyond

3     the recipients of the e-mail that has been marked

4     Exhibit 972?

5          A.   I'm not aware of anyone outside the recipients

6     of 972.

7          Q.   But it's possible, correct?

8               MR. SWEETEN:  Objection, relevance.  Don't

9     guess or speculate.

10         A.   I do not know.

11         Q.   (By Mr. Freeman) Okay.  Do you know if anyone

12    provided an instruction not to send this information to

13    the legislature?

14         A.   I have seen no such instruction.

15         Q.   Okay.  Besides the documents that you provided

16    today, what records of the analysis still exist?

17         A.   We previously discussed that we do have some

18    old code.

19         Q.   Okay.

20         A.   We may be able to access.  I'm not aware of any

21    other documents outside of what's been provided.  Now, I

22    will say that I'm sure the e-mail stack you've received

23    over the last few weeks.  But I'm not aware of any of

24    the relative documents in there.

25         Q.   All I can ask is what you know.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

                                                                    40
1      A.    Yeah.   Thank you.

2      Q.    I don't know if anyone fully knows what's in

3  e-mail stack that we've received in the last few weeks.

4            Okay.   I apologize, again, that some of my

5  questions may dart and back and forth because, as you

6  know, we received these documents recently.   I'm going

7  to try and keep it in some sort of a coherent narrative.

8            We talked about communications.   I'd like

9  to speak a little bit about the content of the matches,

10  the technical content.

11           What database or databases were you using

12  as the universe of data on the DPS side of this match?

13     A.    For the DPS, we used -- once a year, DPS

14  distribution, that data is typically used to develop

15  jury pools.

16     Q.    Okay.

17     A.    The data we used here is from October 2010.

18     Q.    And is that known as the annual jury wheel

19  process?

20     A.    Yes, sir.

21     Q.    And is it produced in October every year?

22     A.    It's -- I don't know.

23     Q.    Okay.   Is it typically produced in October?

24     A.    Typically produced every year around October.

25     Q.    Okay.   On or about October?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

41

1           A.    Yes, sir.   Thank you.

2           Q.    Sure.   And that's a production from the

3    driver's license database?

4           A.    Yes.

5           Q.    Did you use any match to the license to carry

6    database?

7           A.    I'm not aware of any matches with the license

8    to carry database.

9           Q.    Okay.   Are you aware of what fields are

10   provided to the Office of the Secretary of State as part

11   the annual jury wheel process?

12          A.    I'm aware of some of the basic fields which are

13   included in the matching criteria.

14          Q.    Okay.   If you go back to Ms. McGeehan's draft

15   summary, the last page of Exhibit 972, do you see that

16   she says -- do you see if she says, "Our copy of the DPS

17   database contains only those data field relevant for

18   voter registration:   TDL number, the last name, first

19   name, middle name, name suffix, date of birth, date

20   created, last modified, and transaction type"?

21          A.    I do see that.

22          Q.    Do you additionally have county data?

23          A.    I don't know.   Oh, can I retract that?

24          Q.    Of course.

25          A.    I believe, yes, the county data is included.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

42

1      Q.   So there are additional fields beyond what was
2   listed Ms. McGeehan's letter, correct?
3      A.   I state that since county was used as one of
4   the matching criteria.
5      Q.   Are you aware of what other criteria you have
6   from DPS?
7      A.   I don't know additional criteria came from DPS
8   in the jury file.
9      Q.   Do you know if -- if you have data concerning
10   whether the driver's license is expired?
11           MR. SWEETEN:   You're asking had.  You're
12   talking about the January analysis?
13           MR. FREEMAN:   I'm asking about the data
14   that he had available to him to perform the January
15   analysis.
16           MR. SWEETEN:   All right.
17      A.   I don't know if it includes expiration dates.
18      Q.   (By Mr. Freeman) Okay.  Do you know if you had
19   a field indicating whether a driver's license had been
20   suspended?
21      A.   I do not know.
22      Q.   Do you know if you had a field indicating
23   whether the individual at issue did not have a Texas
24   driver's license?
25      A.   And we're speaking about the DPS data?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

43

1      Q.   We are.

2      A.   I'd rather not speculate, but I don't know if

3  it had a non -- a nonTDL.

4      Q.   Okay.  Are you aware of whether the driver's

5  license database contains out-the-state drivers who

6  receive tickets in the state of Texas?

7      A.   I do not know.

8      Q.   Okay.  Are you aware of whether the driver's

9  license data produced to the Office of the Secretary of

10  State indicates whether an individual is deceased?

11      A.   I do not know.

12      Q.   Do you know how many cases were in the driver's

13  license data that you received overall?

14      A.   How many --

15      Q.   Individual records.

16      A.   I don't have record of that with me.

17      Q.   Okay.  And you don't know?

18      A.   I do not know.

19      Q.   Okay.  Prior to matching the voter registration

20  data to the driver's license database, did you drop any

21  records from the driver license database?

22      A.   I understand that there was some filtering on

23  the side of DPS.  For example, felons gets filtered.  So

24  there is filtering done, not by myself and my team, but

25  I'm not aware of any other filtering we did to the DPS


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

44

1   database.

2        Q.   So as part of the jury wheel process, data is

3   filtered on the DPS side prior to providing it to SOS,

4   correct?

5        A.   That is correct.

6        Q.   And other than the felons, what other filters

7   are you aware of that are applied to the jury wheel

8   data?

9        A.   I'd be speculating.

10       Q.   Okay.  I'm only asking what you're aware of.

11            Do you know DPS filters for felons, what

12   criteria they use?

13            MR. SWEETEN:  Objection, outside the

14   scope.

15            MR. FREEMAN:  Mr. Sweeten, I'm asking

16   about the data that he used to perform the match, and I

17   think we're well within the scope.

18            MR. SWEETEN:  That's not what you asked.

19   You said, "Do you know how DPS filters," and that's a

20   present tense.  We're here talking about the analysis

21   from January of 2011.  So, if you want to ask about

22   whether he knew that about that data, then that's a fair

23   question, and I'll allow him to answer that.

24            MR. FREEMAN:  All right.

25            MR. SWEETEN:  I think if you're asking



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

1    general, sort of procedure, I think --

2              MR. FREEMAN:  I'm happy to change the

3    tense of my question.

4              MR. SWEETEN:  But in any event, I think

5    his answer was no.

6              THE WITNESS:  No.

7              MR. FREEMAN:  Okay.  That's solves the

8    problem.

9              MR. SWEETEN:  It does.  It solves a lot of

10   problems between us.

11       Q.   (By Mr. Freeman) Did you, prior to running the

12   match, search for any duplicates within the DL side of

13   the database?

14       A.   Not that I'm aware of.

15       Q.   Okay.

16              MR. SWEETEN:  Can we have a restroom break

17   if we're at a good spot?

18              MR. FREEMAN:  Yeah.  Fine.

19              (Recess from 4:19 p.m to 4:34 p.m.)

20              MR. FREEMAN:  If you could mark this

21   document as Exhibit 973.

22              (U.S. Exhibit 973 marked for

23   identification.)

24       Q.   (By Mr. Freeman) Now, I'm not going to ask you

25   any questions about the actual time frame of this



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

46

1    e-mail, because it's outside the scope of this
2    deposition.  What I am going to ask about is whether you
3    similarly loaded additional records into the jury wheel
4    data before performing this match, the match at issue in
5    January?
6              MR. SWEETEN:  Dan, what you're trying to
7    do is, you're asking, did he do something similar to
8    what this e-mail, which is outside the scope, was.
9              I don't mind if you want to ask him about
10   the analysis of January, but I think that your question,
11   it relates to something, you know, that occurred at a
12   later time than what he's here on Topic 8 to testify
13   to.  So if you want to ask him about what he did with
14   the jury wheel, I have no issue with that, but he's not
15   going to compare something that may have happened later
16   that's outside the scope of the topic.
17             MR. FREEMAN:  All I was trying to do is
18   use this to refresh his recollection about the
19   possibility, and so if you want me to not use it as a
20   framework try to and help him, that's fine.
21             MR. SWEETEN:  Well, he's seen it.  I mean,
22   I would prefer if you'd just ask him if he did
23   something, the analysis, whatever.
24             MR. FREEMAN:  That's fine.
25        Q.    (By Mr. Freeman) Did you load any additional



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

47

1    records into the jury wheel data prior to performing the

2    match in January 2011?

3         A.   I'm not aware of any additional records that

4    were added.

5         Q.   Okay.  What is test data?

6         A.   Where do you reference test data?

7                   (U.S. Exhibit 974 marked for

8         identification.)

9                   MR. FREEMAN:  Okay.  I'm going to mark

10   this as U.S. Exhibit 974.  And I am putting it in front

11   of the witness only for the purposes of refreshing the

12   witness's recollection with regarding to a particular

13   term and not with regard to anything that happened in

14   November of 2011.

15        Q.   (By Mr. Freeman) So if you could look at

16   Page 3.

17        A.   I got a question.  I can't share this with

18   counsel?

19        Q.   Oh, he has a copy.

20                  MR. SWEETEN:  He gave it to me, yeah.

21                  I mean, again, Dan, we're going outside

22   the scope here.  You're showing him an e-mail from

23   November 29th, 2011, it appears.  The scope of the

24   deposition is any analysis performed prior to May 27th.

25   He is here to answer questions about an analysis that I



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

48

1      think you've quizzed him on in January of 2011.

2                    If you want to ask him about test data

3      with respect to the analysis in January, I think that's

4      appropriate, and I'll let that go on.  But I don't --

5      you know, we're not going to get in beyond the scope of

6      Topic 8.

7                    MR. FREEMAN:  And I will ask no questions

8      with regard to this match.  I'm only trying to refresh

9      the witness's recollection with regard to a concept, and

10     then apply that concept to the match.  So I don't think

11     we should have any problems.

12          Q.    (By Mr. Freeman) Do you understand?

13          A.    I understand.

14          Q.    Okay.

15          A.    With regards to the January 2011 -- or the

16     October 2010 --

17          Q.    Data.

18          A.    -- data, I don't recall if test data was

19     removed or remained.  That's a DPS term.

20          Q.    Okay.  Prior to the match, did you filter the

21     DPS data to eliminate expired drivers' licenses?

22          A.    For purposes of January 2011, I don't recall

23     doing that.

24          Q.    Okay.  Did you filter for suspended drivers'

25     licenses?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

49

1          A.    I don't recall that additional filtering.

2                MR. FREEMAN:   I'll mark this as

3     Exhibit 975.

4                (U.S. Exhibit 975 marked for

5     identification.)

6          Q.    (By Mr. Freeman) Take a moment to review it.

7          A.    (Witness reviewing document.)

8          Q.    Have you seen that e-mail before?

9          A.    No, I have not.

10         Q.    At the time that you performed the analysis or

11    supervised the analysis in January of 2011, were you

12    aware of any effect that suspension of a license would

13    have on an individual's ability to vote under the

14    legislation that was then being considered?

15         A.    No, I was not.

16         Q.    Did you filter out for individuals who did not

17    have a Texas driver's license or a Texas ID but were in

18    the driver's license database?

19         A.    I don't recall filtering for those, for the

20    driver's license.  You said no driver's license?

21         Q.    No Texas ID card, but were in the database.

22         A.    I don't recall any of that filtering.

23         Q.    Did you filter out individuals who were marked

24    in the Texas driver's license database as being

25    deceased?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

                                                                  50

1        A.    See, I don't recall that additional filtering,

2   if any, were used upon the DPS database.

3        Q.    Okay.  Did you ask for any additional fields

4   for the driver's license database related to deceased

5   individuals, individuals with suspended licenses, or

6   individuals with no ID?

7        A.    I don't recall any additional fields being

8   asked beyond what's provided in the October 2010

9   database.

10       Q.    Okay.  Did you filter out any individuals with

11  invalid social security numbers?

12       A.    I don't recall ever filtering out based on

13  social security number.

14       Q.    And the last one these:  Did you filter out any

15  individuals based on an invalid county code?

16       A.    I do not recall filtering based on an invalid

17  county code.

18       Q.    Okay.  So let's move over to the social --

19  excuse me -- the Secretary of State's Office side of the

20  data match.  What database or databases did you start as

21  the starting universe of data on the Secretary of

22  State's side?

23       A.    I don't recall the specific period of the

24  database, but traditionally, we'll run from production,

25  which is the latest live database.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

51

1      Q.   Okay.  So that's part of the TEAM database?

2      A.   Yes.

3      Q.   And is that sort of a snapshot?

4      A.   Every time you run a query, you'll get new

5  data, the latest data.

6      Q.   Okay.  Do you know what date the data

7  extraction was that was used for the matches here?

8      A.    It would be speculation, but -- and I'll leave

9  it at that.

10      Q.   Was it on or about January 25th?

11      A.   Yes.

12      Q.   Okay.  Was the same data extraction used for

13  all six queries?

14      A.   Judging from the results, I would say no.

15      Q.    Isn't it the case that the total number of

16  voters in the state in each of the six queries is the

17  same?

18      A.    The key that I'm triggering off of is voters

19  with no TDL ID number varies.

20      Q.   Doesn't it vary only based on whether a filter

21  was run for individuals 70 and over?

22      A.   No.

23      Q.   Pardon me?

24      A.   No.  For example, query 1 result is different

25  than query 3 for no TDL number.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

52

1          MR. FREEMAN:  And for the record, the

2     witness is pointing to Page 2 of Exhibit U.S. 972.  And

3     for the record, the witness is quite right.

4          Q.   (By Mr. Freeman) Okay.  If you can turn back to

5     Exhibit 971.  Do you see the first e-mail from

6     Mr. Mendoza to Ms. Richards?  Do you see the postscript

7     to that e-mail?

8          A.   "I went ahead and added the VR numbers, but as

9     you mentioned, it is a moving target.  These two have

10    slightly different VR numbers."

11         Q.   So is it the case that there were slightly

12    different data extractions for the six runs?

13         A.   I would speculate that that would be the case,

14    but I'm not -- I can't swear to it.

15         Q.   Okay.  But logically, based on your experience,

16    if Mr. Mendoza said that it was a moving target and that

17    totals were slightly different for each query, would

18    that lead you to conclude the most likely outcome is

19    that there were slightly different data extractions for

20    each of these queries?

21         A.   Which is very typical of -- which is very

22    typical of running queries on a live database.

23         Q.   Okay.  Thank you.  And thank you for working

24    through that with me.  These documents are all new to me

25    as well.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

53

1              Are you aware of what tables within the

2    TEAM database were used for this match?

3         A.   I don't recall the specific tables that were

4    used.

5         Q.   Do you know what fields were used in the match

6    process?

7         A.   At a minimum, it would be the fields that are

8    dictated in the match.  I'm not aware of additional

9    fields that were used.

10        Q.   So that would be TDL ID number, correct?

11        A.   For the initial one, yes, that's correct.  For

12   the initial filtering, that is correct.

13        Q.   Okay.  And then in total, among the six

14   queries, the additional fields would be last name, first

15   name, date of birth, county, age, which is likely

16   derived from date of birth?

17        A.   That's correct.

18        Q.   And that's all?

19        A.   That is correct.

20        Q.   Okay.  Did you receive any instruction to run

21   the queries on a frozen extract of the database so that

22   they would be based on the same total number of voters?

23        A.   I don't recall such instruction.

24        Q.   Did you consider running the queries on a

25   frozen database?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                    JUNE 19, 2012

54

1          A.    I do not recall.

2          Q.    Okay.  And were any cases dropped from the SOS

3    side of the analysis prior to the match, other than the

4    filter for individuals with a TDL or ID number?

5          A.    The only other criteria is must be an active or

6    a suspense voter.

7          Q.    Okay.  So individuals who are in the live check

8    status were not part of the match?

9          A.    Give me a minute.  I do not recall, but I see

10   some reference on Exhibit 971 where the analyst did not

11   find any live check match records.

12         Q.    Okay.  So the alternative to active and

13   suspense is an individual in a live check status?

14         A.    Possibly cancelled.

15         Q.    Okay.  And what is your understanding of what

16   live check status means?

17         A.    Live check status is the part of the process

18   where we're confirming the information on the

19   individual.

20         Q.    Okay.  And what is a cancelled voter?

21         A.    A cancelled voter is a voter that can no longer

22   vote.

23         Q.    And so is that someone who was once an active

24   voter but is no longer on the rolls?

25         A.    I think that might be a fair question to ask



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

55

1    the Elections Division.

2         Q.   I'm asking for your understanding.

3              MR. SWEETEN:  Don't guess or speculate.

4         A.   Okay.  I'm not going to guess.

5         Q.   (By Mr. Freeman) Okay.  Are they in a separate

6    cancelled voter table within the database?

7         A.   I do not know.

8         Q.   Is there a cancelled voter field?

9         A.   I do not know.

10        Q.   Within the database, how do you identify a

11   cancelled voter?

12             MR. SWEETEN:  Are we talking about his

13   analysis in January of 2011?

14             MR. FREEMAN:  I'm trying to understand how

15   he excluded cancelled voters from the analysis.

16        A.   I would need to review the code --

17        Q.   (By Mr. Freeman) Okay.

18        A.   -- again.  Keep in mind that there's tens of

19   thousands of fields in this database, so for me to talk

20   about individual fields --

21        Q.   That's fine.

22        A.   -- I'd have to go investigate.

23        Q.   I understand your argument.

24             But cancelled voters were not included in

25   your analysis, correct?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

56

1          A.    That's correct.

2          Q.    Okay.  Did you search for duplicates within the

3     database prior to performing the match?

4          A.    I don't recall searching for duplicates.

5          Q.    And again, within the SOS side of things, did

6     you filter for any particular criteria prior to

7     performing the match, other than the TDL ID number being

8     present?

9          A.    I do not recall any other filtering.

10         Q.    Okay.  I'm just going to run through real

11    quickly and say no, then we can move on.

12               Did you filter for test data?

13         A.    On the SOS --

14         Q.    Yes.

15         A.    -- database?  I don't recall any test data.

16         Q.    Did you filter to see whether "test" was the

17    entry in any fields prior to performing the match, such

18    as a first name being test or a last name being test?

19         A.    I don't believe we filtered on test.

20         Q.    Did you include suspense voters in your match?

21         A.    Yes.

22         Q.    In terms of the removal of individuals who

23    provided a driver's license or a Texas ID number at the

24    time of registration, did you consider this a form of

25    matching, or did you consider this simply a filter?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

57

1    A.   I'm trying to -- maybe you could help

2    distinguish the difference between the two.

3    Q.   Sure.  Did you consider, when performing the

4    match, that an individual who had listed a Texas

5    driver's license or a Texas ID number was an individual

6    who had a valid current Texas driver's license?

7    A.   I'll have to review the code to determine.

8    Q.   Are you aware of whether the presence of a

9    Texas driver's license number within the TEAM database

10   is an indication of whether the driver's license is

11   current and valid?

12   A.   I'm not aware if that's a pure indication if

13   it's a current valid driver's license.

14   Q.   Is the presence of a Texas driver's license

15   number in the TEAM database an indication of whether

16   that driver's license actually matches the individual?

17   A.   I'm not aware if that's strong indicator that

18   that matches the individual.

19   Q.   Are you aware of whether the presence of a

20   Texas driver's license number in the TEAM database is an

21   indication of whether that driver's license has been

22   revoked?

23   A.   I would have no indication.

24   Q.   Okay.  This was simply a filter that you were

25   instructed to impose, correct?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

58

1          A.    That's correct.

2          Q.    Okay.  A couple more of these easy filter

3     questions for you.  Did you filter out individuals who

4     are marked in the TEAM database as being deceased?

5          A.    I do not recall removing deceased.

6          Q.    Is there an indicator in the TEAM database of

7     whether individuals are deceased?

8          A.    For the sake of this exercise, I'm not aware if

9     that was used.  We have -- so I'm not aware if deceased

10    records were considered in this.

11         Q.    Okay.  Is there an indicator, however, in the

12    TEAM database of whether individuals are deceased?

13         A.    Yes.

14         Q.    How is that determined?

15               MR. SWEETEN:  That's outside the scope.

16    I'm going to object to the question as outside the

17    scope.  You're asking how a field is populated, the

18    determination that goes in to it.  That was subject to a

19    30(b)(6) motion -- I mean deposition.  We've also -- I

20    mean, this isn't a discovery deposition.  He's here for

21    Topic 8, so I think you're outside the scope of that

22    question.

23               MR. FREEMAN:  Are you instructing him not

24    to answer?

25               MR. SWEETEN:  I mean, you can answer this



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

59

1    question if you know, but, I mean, we're getting far

2    afield, Counsel, I think, so, I'm going to maintain my

3    objection, obviously.

4         A.   I'd prefer to review the material before

5    answering that question.

6         Q.   (By Mr. Freeman) You're not aware?

7         A.   I'm not aware.

8         Q.   Again, solving me and Mr. Sweeten's problems.

9         A.   Yeah.

10        Q.   Was there any filter for invalid social

11   security numbers?

12        A.   I'm not aware of any social security number

13   filtering.

14        Q.   Any filter for individuals with an unrealistic

15   age?

16        A.   I'm not aware of any filtering for unrealistic

17   age.

18        Q.   Any filter for an invalid county code?

19        A.   I'm not aware of any filters for invalid county

20   codes.

21        Q.   Any other filters?

22        A.   I'm not aware of any other filters.

23        Q.   Okay.  Great.

24             So just very quickly, if we can proceed

25   through the six matches.  There were six, correct?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

60

1          A.    That is correct.

2                    MR. FREEMAN:  Mark this as U.S. 976.

3                    (U.S. Exhibit 976 marked for

4     identification.)

5          Q.   (By Mr. Freeman) Is this an e-mail conveying

6     the query 1 results?

7          A.    The criteria looks appropriate, but I'd have to

8     check the numbers to verify that's it an exact match of

9     query 1 in the summary.

10         Q.    Okay.  But you've seen this e-mail before,

11    correct?

12         A.    To be honest, I've seen the e-mail, but I

13    haven't seen the attachment.

14         Q.    Okay.  You're cc'd on this e-mail, right?

15         A.    That is correct.

16         Q.    And you normally read e-mails that you receive

17    from Mr. Mendoza?

18         A.    Yes, I do.

19         Q.    Okay.  And according to the -- strike that.

20                    Just to understand the process of the

21    match, the first step was to remove the individuals who

22    have a Texas driver's license or ID, and that is

23    indicated in Columns C and D of the attached

24    spreadsheet, correct?

25         A.    To be honest, I'd have to go back and look at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                           JUNE 19, 2012

61

1    the numbers, because both CD and EF all say without TDL

2    ID.  So let me make sure I fully understand what these

3    numbers represent.

4         Q.   If you look at the last page of Exhibit 976, do

5    you see Totals?

6         A.   I do see Totals.

7         Q.   And am I correct that these totals, if you add

8    up Column C and Column D, that you get 2,814,965?

9         A.   That's correct.

10        Q.   And is that the number of voters with no TDL or

11   ID, both active and suspense and listed in query 1?

12        A.   That does match query 1.

13        Q.   Okay.  If you add the second, E and F totals,

14   am I correct that you'd get 1,970,252?

15        A.   That's correct, which matches query 1.

16        Q.   And that's the number who do match.  So am I

17   correct that this spreadsheet does not provide the total

18   number of voters that do not match a DPS record?

19        A.   This spreadsheet does not, but -- are you doing

20   the same math I'm doing right now?

21        Q.   I'm just waiting for you to do it.

22        A.   With this information, that is correct.

23        Q.   Okay.  So if I were to -- or you were to

24   subtract the total of Column CD -- pardon me -- the

25   total of Column EF from the total of Column CD, you



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                JUNE 19, 2012

                                                                      62

1      would get the numbers of voters who neither have a TDL
2      ID number in their TEAM entry nor were matched to a DPS
3      record under query 1, correct?
4          A.    That is correct.
5          Q.    Okay.  I am proud of both of us for still
6      having arithmetic skills in this age of omnipresent
7      calculators.
8                      Now, you did not, in performing this
9      match, also assess whether an individual was reported in
10     the TEAM database as having a Spanish surname, correct?
11         A.    I don't recall doing anything with Spanish
12     surnames.
13         Q.    Are Spanish surname analyses easy to do,
14     perform when using the TEAM database?
15         A.    They weren't part of this January effort.
16         Q.    Sure.  But is it just a matter of filtering for
17     one field, a match or a no match, essentially, to that
18     field?
19         A.    I'd have to go back and do some investigation,
20     but parts of -- I don't know --
21         Q.    Okay.
22         A.    -- is the answer.
23         Q.    But no one asked you to perform that analysis,
24     so you didn't?
25         A.    No.  No.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

63

1      Q.   And you wouldn't ever perform that analysis on
2  your own, you would just have -- you would have to be
3  asked to do it by someone on the business side?
4      A.   That's correct.
5      Q.   And is that true with all six of the queries?
6      A.   That is correct.
7      Q.   Okay.  Are you aware of whether anyone received
8  this attachment other than Ms. Richards and yourself?
9      A.   Potentially, but I see the e-mail was forwarded
10  from Mrs. Richards to Ann McGeehan.
11     Q.   And that's --
12     A.   The second.
13     Q.   -- the second to the last e-mail in Exhibit --
14     A.   971.
15     Q.   -- 971?
16     A.   So that's all the information I have on that.
17     Q.   Okay.
18              MR. FREEMAN:  Mark this as U.S.
19  Exhibit 977.
20              (U.S. Exhibit 977 marked for
21  identification.)
22     Q.   (By Mr. Freeman) Have you seen this e-mail
23  before?
24     A.   Yes.
25     Q.   What is this e-mail?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

64

1          A.    This e-mail is similar to the previous exhibit,

2     except revision is made to query the voters that are 70

3     -- younger than 70 years of age.

4          Q.    Okay.

5          A.    So it's an e-mail.

6          Q.    And did you take a look at what the totals were

7     again for Column CD and Columns EF?

8          A.    I just looked at CD.

9          Q.    And was the total for Column C and D, which are

10    the without TDL ID columns, is that 2,096,789?

11         A.    It is.

12         Q.    And is that actually the total for query 6,

13    which does not match for same county?

14         A.    And let me -- let me check the second number to

15    make sure that is -- I'd have to go back over with you,

16    because the first number appears to match query 6.

17         Q.    But the second number doesn't match any of the

18    queries, correct?

19         A.    That is correct.

20         Q.    Okay.  But it appears that this is simply a

21    filter of query 1, but the -- sorry, strike that.  Let

22    me try and get that out making a little bit of sense.

23                From the e-mail chain, does it appear that

24    the only change that Mr. Mendoza made from the first

25    query is to eliminate the voters that are 70 years of



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

65

1    age or older?

2           A.    Based solely what's in the e-mail --

3           Q.    Okay.

4           A.    -- I agree.

5           Q.    And that would be query 2, correct?

6           A.    I do not know if this was run as -- it's -- the

7    criteria -- the criteria appears -- to be honest, I'm

8    not sure if this is query 2.

9           Q.    Okay.  The criteria appear to match query 2,

10   correct?

11          A.    Based strictly on this e-mail chain.

12          Q.    Okay.  And the time of this e-mail is 3:35 p.m.

13   on January 25th?

14          A.    That is correct.

15          Q.    And that's only two and a half hours after the

16   query 1 e-mail that we previously discussed was sent,

17   correct?

18          A.    That is correct.

19          Q.    Okay.  So it's possible that some of the totals

20   in Exhibit 972, on the second page, are not quite right,

21   or that this spreadsheet is not quite right?

22          A.    I'd have to review why there's a difference

23   between the spreadsheet and the final numbers.

24          Q.    But there's some kind of discrepancy?

25          A.    There is a discrepancy in the numbers with the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

66

1    two e-mails that have been provided.

2        Q.    Okay.  And you're not certain of the basis for

3    that discrepancy?

4        A.    Not without investigating further.

5        Q.    Okay.  At this time?

6        A.    At this time.

7        Q.    Great.  Were you given a reason why a filter

8    should be performed to take out the voters 70 years of

9    age or older, or simply instructed to do so?

10       A.    Instructed to do so.

11       Q.    Okay.  Just to clean up the record, because I

12   should have asked this before.  Are the numbers for the

13   totals of C and -- Column C and Column D on Exhibit 977,

14   do they approximately equal the number of voters without

15   a Texas driver's license number or Texas ID number in

16   the TEAM database once you exempt individuals 70 or

17   older?

18       A.    That is correct.

19       Q.    Okay.

20       A.    Keeping in mind that it's active and suspense

21   voters.

22       Q.    But query 2, query 4, and query 6 all have

23   approximately 297 -- excuse me -- 2,097,000 individuals

24   who are under the age of 70 and lack a TDL or ID number?

25       A.    That's what the results are indicating.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

67

1          Q.    Okay.  And Columns E and F appear to be the

2     result of a number of voters that matched a DPS record

3     in one of the under 70 queries, although it doesn't

4     quite match any of the three such totals found for

5     queries 2, 4, and 6 in Exhibit 972?

6          A.    That is true.

7          Q.    Okay.  And just to clear up for the record, the

8     six queries, because I don't think we ever read them

9     in.  The first query was last name, first name, date of

10    birth, and same county, correct, for matching criteria?

11         A.    That is correct.

12         Q.    The second is the same as the first, but

13    exempts individuals 70 and older, correct?

14         A.    That is correct.

15         Q.    The third is last name, date of birth, and same

16    county?

17         A.    Correct.

18         Q.    The fourth is the same as that, but exempts

19    individuals 70 and older?

20         A.    Correct.

21         Q.    The fifth is the last name, first name, and

22    date of birth?

23         A.    Correct.

24         Q.    And the sixth is the same as the fifth but

25    exempting individuals 70 and older?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

68

1       A.    Correct.

2       Q.    Okay.  When running these queries, did you only

3  take out individuals on the TEAM side if there was a

4  unique one-to-one match on the DL side?  Does that make

5  sense?

6       A.    You could try repeating the question.

7       Q.    Sure.  What I mean by unique matches, if there

8  are several John Smiths born on June 1st, 1950, in the

9  both the voter registration database and the DPS

10 database, would you have considered them all to be

11 matched?

12            MR. SWEETEN:  According to the analysis?

13      Q.    (By Mr. Freeman) When running these queries?

14 For example, in query 5, last name, first name, date of

15 birth.

16      A.    I'd have to go back and review the code to make

17 sure that would match unique and not multiple matches.

18      Q.    So you're not sure at this time?

19      A.    I'm not sure at this time.

20      Q.    Okay.  And if there were several John Smiths

21 born on June 1st, 1950 in the voter registration

22 database and only one John Smith born on June 1st, 1950

23 in the driver's license database, do you know if the

24 code would have considered all those June 1st, 1950 John

25 Smiths in the voter registration side to be matched?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

69

1      A.    I'm not sure.  I'd have to review the code.

2      Q.    Okay.

3      A.    For those scenarios.

4      Q.    Okay.  What is fuzzy matching?

5      A.    I can tell you what fuzzy matching is, but I

6  don't believe we did, or I don't recall doing any fuzzy

7  matching in this exercise.

8      Q.    Well, you skipped to the second question and

9  avoided the name for the first.  That's fine.

10           So just to clarify, there was no form of

11  fuzzy matching whatsoever with regard to the last name

12  or date of birth?

13     A.    No, there wasn't fuzzy matching.

14     Q.    And was there any kind of substitution matching

15  for a space or a hyphen in the last name field?

16     A.    I don't recall any special handling of unique

17  characters.

18     Q.    Okay.  So for example, if the voter

19  registration database had someone with the last name

20  Sandoval-Martinez, and the driver's license database had

21  Sandoval space Martinez, would that be a no match or

22  would that be a match?

23     A.    I'd rather hold off and look at the code and

24  give you an answer.

25     Q.    Okay.  So you don't know at this time?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

70

1        A.    I do not know at this time.

2        Q.    If you don't know, you don't know.

3              Did you use strict case matching?

4        A.    I do not know at this time.

5        Q.    Are there any sorts of rules to the TEAM

6   database that requires that the first letter of a last

7   name or first name entry be capitalized and that the

8   remaining letters being lower case?

9              MR. SWEETEN:  I think we're outside the

10  scope here, so I would object, outside the scope.

11       Q.    (By Mr. Freeman) You can answer.

12       A.    I'm going to follow counsel.

13       Q.    But as long as counsel doesn't instruct you not

14  to answer --

15       A.    Okay.

16       Q.    -- to the extent that you have knowledge, you

17  do need to answer.

18       A.    Okay.  I do not know.

19       Q.    Okay.  That's fine.  The only reason I'm asking

20  the question is to try and understand the nature of the

21  match and work around your lack of knowledge concerning

22  case matching.  I'm trying to eliminate the problem.

23              Was there any special rule for treating

24  individuals who were listed with January 1st as their

25  birth date?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

71

1          A.     I don't recall any special scenarios.  No, I'm

2     not aware of any special handling of January 1st birth

3     dates.

4          Q.     Okay.  Was the output of the query the

5     spreadsheet, the type of spreadsheet that was attached

6     to Mr. Mendoza's January 25th e-mails?

7          A.     I'd have to go back and verify the attachment

8     you shared, but that's -- that's one potential output.

9          Q.     What are the other potential outputs?

10         A.     It could be a -- I'd be speculating, but

11    potentially, it could be an Oracle output --

12         Q.     Okay.

13         A.     -- and converted to the spreadsheet.

14         Q.     Okay.  And that's based on the systems that the

15    SOS has?

16         A.     Yes.

17         Q.     Great.  Was it possible that the output

18    actually produced the names or records for all

19    nonmatched individuals?  Do you know if it did?

20         A.     No, I do not know if it did.

21         Q.     So you're not aware at all of the format of the

22    output?

23         A.     No, I am not.

24         Q.     And were you instructed to filter or categorize

25    the data at all based on SSVR?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

72

```
 1        A.    SSVR?

 2        Q.    The Spanish surname voter registration.

 3        A.    No, no such instruction.

 4        Q.    And were you instructed or did you -- I'll ask

 5   one at a time.  I'm sorry.  Were you instructed to

 6   filter or categorize by ethnicity collected by DPS?

 7        A.    No, it was not asked.

 8        Q.    And did you filter by ethnicity collected by

 9   DPS?

10        A.    No, we did not filter.

11        Q.    Or categorize?

12        A.    Or categorize.

13        Q.    Thank you.  That was my question, not your

14   answer that was at fault.

15              MR. FREEMAN:  Okay.  We'll take a brief

16   recess, just to go off the record, and then we can

17   probably wrap this up pretty quickly.

18              (Recess from 5:28 p.m. to 5:49 p.m.)

19              MR. FREEMAN:  Back on the record after a

20   medium-length break.  I appreciate everyone's patience.

21        Q.    (By Mr. Freeman) Mr. Guyette, were you and

22   your counsel able to discuss obtaining the old code

23   during the break?  You had said previously you might --

24              MR. SWEETEN:  We did not, and if you want

25   us to do that, I mean, I don't know what's involved, but
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

1    we can do it after your questioning.

2                    MR. FREEMAN:  That's fine.

3        Q.   (By Mr. Freeman) Are you aware of whether there

4    was any follow-up communication with Senator Williams

5    after the question that he asked, either conveying or

6    not conveying the data?

7        A.   I have no idea.  I'm not aware.

8        Q.   Have you ever conducted analysis concerning the

9    Spanish surname component of the TEAM database?

10       A.   In this January?

11       Q.   In general.

12       A.   So can you repeat that question?  I want to

13   make sure --

14       Q.   Have you ever conducted any analysis breaking

15   out into categories those voters with Spanish surname

16   and those who do not have a Spanish surname?

17                   MR. SWEETEN:  If you can confine your

18   answer to the 2005 to May 27th, 2011 time frame that's

19   in Topic 8.  I'm going to instruct you to confine your

20   answer to that time period.

21       A.   I'm not aware of any analysis during that time

22   frame.

23       Q.   (By Mr. Freeman) But have you ever personally

24   conducted, for any purpose -- that's fine, during that

25   time frame your counsel has instructed you.  But have



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                             JUNE 19, 2012

74

1    you ever conducted any analysis related to Spanish
2    surname code or voters with Spanish surnames?
3         A.   I'm not aware of any related during this time
4    period.
5         Q.   What do you mean by related?
6         A.   There may have been some analysis done, but I
7    have to go back and do a lot of digging and find out
8    what it was.
9         Q.   You don't recall personally --
10        A.   I don't recall anything, no.
11        Q.   Are you aware that during her deposition in
12   this case, Ann McGeehan testified that such analysis was
13   routinely performed in your office?
14        A.   I wasn't aware of Ann's testimony.
15        Q.   Okay.
16        A.   And there are reports, and I can get you that
17   information.  But with regards to voter ID, I'm not
18   aware --
19        Q.   Okay.
20        A.   -- of anything that was --
21        Q.   Is there another individual in your office who
22   generally does analysis related to Spanish surname to
23   voters?
24        A.   There -- it would be limited to a very small
25   number of individuals that would.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

75

1          Q.    Who are those individuals?

2          A.    Primarily John Mendoza, the gentleman that has

3     been on some of these e-mails, that would have knowledge

4     of that.

5          Q.    And he did -- he did these queries here, right,

6     that we've been discussing today?

7          A.    That is correct.

8          Q.    Okay.  Was the purpose of this match ever

9     explained to you?

10         A.    Primarily just focusing on the guidance I've

11    got from Elections.  Didn't ask why.

12         Q.    They just said, we need you to run the

13    following data?

14         A.    Yeah, the following matches and data.  There

15    may be some reference -- I think there was some

16    reference in the e-mails to content.  But our focus was

17    on the direction given by the Elections Division.

18         Q.    Is it your ordinary practice not to ask the

19    purpose of a particular data request?

20         A.    It depends on the case.

21         Q.    If you ask the purpose of the data request,

22    aren't you better able to suggest particular ways for

23    the analysis to be run?

24         A.     It was pretty clear cut, the directions we were

25    given in this case.  In many cases, we don't have that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

76

1      clear guidance.  So we do have to ask and work with the

2      business partner.

3          Q.   So you don't know what the purpose of this

4      match was?  Sorry, strike that.

5          A.   Yeah.

6          Q.   What was the purpose of this match?

7          A.   The purpose of the match is -- was -- it would

8      be speculation on what they were going for on this --

9      the purpose of the match.

10         Q.   What is your understanding of the purpose of

11     this match, to the extent that you have one?

12              MR. SWEETEN:  Objection, asked and

13     answered.

14         Q.   (By Mr. Freeman) You can answer.

15         A.   Okay.  The purpose was the number of voters

16     without TDL number, and then which ones matched and

17     didn't match or how many matched or didn't match the DPS

18     record.  We get numerous asks for queries.

19         Q.   Do you feel that that match was achieved?

20         A.   That seems like speculation to me.  I mean, I

21     believe --

22              MR. SWEETEN:  Objection, vague.  You can

23     answer.

24         A.   I believe that we built the queries to get the

25     results for what was being asked.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

                                                                77

1        Q.   (By Mr. Freeman) And do you think that those

2   queries provided the results that you were asked to

3   provide?

4        A.   I believe they do.

5        Q.   Are there any shortcomings of which you're

6   aware?

7             MR. SWEETEN:  Objection, foundation.

8   Objection, calls for speculation.

9        Q.   (By Mr. Freeman) You can answer.

10       A.   I think it would be --

11            MR. SWEETEN:  Objection, outside the

12   scope.  Go ahead, you can answer.  You can answer.

13       A.   Okay.  I'd like to go back and research the

14   spreadsheet discrepancy that you mentioned.

15       Q.   (By Mr. Freeman) Uh-huh.

16       A.   And go back and become more familiar with the

17   code to make sure that, to answer some of the scenarios

18   you built.  But I'm not aware of any other outstanding

19   issues.

20       Q.   Okay.  Did any problems come up while the code

21   was being built or while you were conducting the

22   analysis?

23       A.   I'm not aware of any problems.

24       Q.   Anything related to any compatibility between

25   the fields in the driver's license database and fields



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

78

1    in the TEAM database?

2         A.    I'm not aware of any problems.

3         Q.    Any problems related to corruption of the data

4    or ability to read the data?

5         A.    No, I'm not aware of any problems.

6         Q.    And on the DL side was data that you had

7    routinely used for jury wheel purposes, correct?

8         A.    That is correct.

9         Q.    Are you confident that the match between the

10   data on both sides was accurate?

11        A.    Per the guidance given by the business

12   division, I believe that the matches met the criteria.

13        Q.    Are you confident, per the criteria given by

14   the business side, that the match was complete?

15        A.    That the match was complete?

16             MR. SWEETEN:   Objection, asked and

17   answered.   Objection, foundation.   You can answer.

18        A.    Can you elaborate on that?

19        Q.    (By Mr. Freeman) Sure.   Are you confident that

20   the match found all of the matching driver's license

21   records pursuant to the criteria that you were given?

22        A.    To the best of my knowledge, I believe it fit

23   the criteria that was given.

24        Q.    Okay.   Do you believe that the match is

25   misleading in any way?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

79

1                      MR. SWEETEN:  Objection, vague.

2                      THE WITNESS:  I can still answer, though?

3                      MR. SWEETEN:  Yeah.  And objection to

4        form.  Go ahead.

5                      THE WITNESS:  Okay.

6                      MR. SWEETEN:  Objection to foundation.  Go

7        ahead.

8           A.   I'm sorry.  Repeat the question one more time.

9           Q.   (By Mr. Freeman) Do you believe that the match

10       is misleading in any way?

11                     MR. SWEETEN:  Same objection.

12          A.   With regards to the criteria that was provided,

13       I believe we met the criteria.

14          Q.   (By Mr. Freeman) Did you have sufficient

15       confidence in the match such that you were willing to

16       have it shared with the rest of the Office of the

17       Secretary of State?

18          A.   That wasn't my judgment to make.  This

19       information was provided to Elections Division to make

20       that judgment.

21          Q.   Okay.  Did you have sufficient confidence in

22       the match such that you were willing to share it with

23       Ms. McGeehan?

24          A.   Yes.

25          Q.   And the decision after that point was up to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

80

1   her?

2       A.   That is correct.

3       Q.   Or her supervisors?

4       A.   That is correct.

5       Q.   But you wouldn't have had any qualms about it

6   being shared beyond the division, correct?

7       A.   Beyond the IT division or beyond Elections?

8       Q.   I'm sorry.  Beyond Elections.

9            MR. SWEETEN:  Objection, relevance.

10      A.   For the data that was produced and the criteria

11  that we fulfilled, I didn't have an objection with it.

12      Q.   (By Mr. Freeman) Okay.  Is this type of match

13  similar to the match that is performed in the live check

14  process, to the extent of your knowledge?

15           MR. SWEETEN:  Objection, vague.

16      A.   I'd have to revisit the live check process to

17  be able to answer that.

18      Q.   (By Mr. Freeman) Is there any other type of

19  matching that goes on between the TEAM database and

20  external databases, to the extent of your knowledge?

21           MR. SWEETEN:  Are you talking about within

22  the time period of Topic 8?

23           MR. FREEMAN:  Sure.  Let's talk about

24  within the time period of Topic 8.  That's fine.

25      A.   There are possible matches.  There's matches to



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                             JUNE 19, 2012

81

1      verify address of postal office, make sure of correct

2      format.  I'd have to do some more investigation to find

3      out if there's any other matches that are performed

4      generally throughout the ongoing time.

5          Q.   (By Mr. Freeman) And you rely on that -- that

6      postal match, you use that moving forward after the

7      match has been run?

8          A.   No.  Once the match is run, you have your

9      results.

10         Q.   Okay.

11         A.   So, no, it's not done in addition to this

12     match.

13         Q.   Yes.  No, that -- that postal match you were

14     talking about, the Office of the Secretary of State uses

15     the results of that for some purpose, correct?

16         A.   There are -- there is quite a few matches.

17     There's deceased matching.  There's postal match.

18     There's several matches that are pretty much outside the

19     scope of this, but that is done.

20         Q.   But they occur?

21         A.   They do occur.

22         Q.   Have you written code for any of those matches?

23         A.   I have personally not written any code for

24     those matches.

25         Q.   Has Mr. Mendoza?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

82

1      A.   I'd have to investigate and see if Mr. Mendoza

2    or other developers have written code for those

3    different matches.

4      Q.   Are you aware of any other instance when you

5    performed work that was in response to a legislator's

6    query and that work was not released to the legislator?

7      A.   I personally -- I don't know.  I'm personally

8    not aware, but I don't always see what goes on to

9    legislators.

10      Q.   But you're not aware of any other instance when

11    that has happened, correct?

12           MR. SWEETEN:   Objection, foundation.

13      A.   I'm not aware.

14      Q.   (By Mr. Freeman) Okay.  As a general matter, is

15    the Office of the Secretary of State responsive to

16    legislative queries?

17           MR. SWEETEN:   Objection, relevance.

18    Objection, outside the scope of Topic 8.

19      Q.   (By Mr. Freeman) To the extent of your

20    knowledge, you can answer.

21      A.   To the best of my knowledge, we -- IT provides

22    expedient answers to requests.

23      Q.   From the legislature?

24      A.   From the legislature.

25      Q.   Is the Office of the Secretary of State relying



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

                                                              83

1    on the legislature for appropriations?

2         A.    That's outside my scope.

3         Q.    Do you know?

4              MR. SWEETEN:   Objection, calls for

5    speculation.

6         A.    I'm speculating on how much finance.

7         Q.    (By Mr. Freeman) Okay.   We don't want you to

8    speculate.   That's fine.

9              Are you aware of whether Secretary of

10   State Andrade stated that matches between DPS and SOS

11   data are misleading?

12             MR. SWEETEN:   Objection, outside the scope

13   of Topic 8.   We are way outside now of the January

14   analysis of 2011.   And that statement that you made is

15   outside the scope of the topic as well.   It's not -- I

16   think what you're quoting, I don't even think you could

17   find that quote within the time frame of Topic 8.   So

18   now you're really outside the scope, Dan, and so I'm --

19   you're asking him something that is not related to what

20   he's here to testify about.   It's just simply not

21   related.   So I'm going to ask you to withdraw the

22   question.

23             MR. FREEMAN:   The basis that I believe

24   it's related is that to the extent that criticisms were

25   levied of matches between DPS and SOS data, it's



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

84

1    relevant to this January match as to whether this match
2    was in any way misleading.
3                MR. SWEETEN:  You can ask him if he thinks
4    -- I mean, that is so far outside the topic number.  I
5    mean, come on, Dan, really.  That is tangentially, at
6    best, relevant to this topic area.  This is outside the
7    scope.  You're using this for a purpose for which it
8    wasn't noticed.  We've put him up on short notice.  It's
9    not fair of you to ask this witness this question.  He
10   can talk about the January 2011 analysis.
11               MR. FREEMAN:  You know, I think -- that's
12   fine.  I'll withdraw the question.
13        Q.   (By Mr. Freeman) Okay.  At this point, are
14   there any answers that you wish to change?
15        A.   I can't think of any.  Can I solicit counsel
16   for recommendations?  No phone-a-friend?
17        Q.   No.  I actually had to tell -- I had previously
18   said in a deposition in this case, there is no
19   phone-a-friend in a deposition.  And that was Speaker of
20   the House Joe Straus.  So don't worry about it.  If
21   there's nothing you wish to change, there is nothing you
22   wish to change.
23               Is there any information that you didn't
24   recall previously that you now recall?
25        A.   No.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

85

1      Q.   Okay.  And is there anything you would like to

2      add so that we can understand your answers more

3      clearly?

4              MR. SWEETEN:  Objection, vague.  Go ahead.

5      A.    Not at this time.  Do I have the ability the

6      answer or respond later?

7              MR. SWEETEN:  Yeah.  We can talk later

8      about that.

9              MR. FREEMAN:  I mean, so we are going to

10     object to the State of Texas's failure to produce a

11     witness with knowledge of the -- of the fate of this

12     analysis, what became of it after it was actually

13     conducted.  We are also -- we also believe that the

14     documents produced today do not relate to the provision

15     of legal advice by Ms. McGeehan, and therefore should

16     have been previously produced, and therefore, given that

17     they were not produced prior to Ms. McGeehan's

18     deposition, that we have been prejudiced and may seek

19     leave of the court for some form of limited further

20     relief.

21              And with that, I pass the witness.

22                          EXAMINATION

23     BY MR. SWEETEN:

24     Q.   Okay.  Let me ask you a few questions.  We're

25     here to talk today about any analyses that were



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

86

1    performed from 2005 to 2011.  Is that your

2    understanding?

3         A.    Sorry.  That's correct.

4         Q.    All right.  And the cut-off date is May 27,

5    2011, right?

6         A.    Right.

7         Q.    How many analyses were performed from 2005 to

8    2011, to your knowledge, related to the DPS and voter

9    registration database?

10        A.    These six queries.

11        Q.    Okay.  And when those six queries --

12   approximately what date did you run those six queries?

13        A.    January 25th, 26th.

14        Q.    Are you aware of any other analysis during that

15   time whatsoever between the DPS and voter registration

16   database?

17        A.    I'm am not.

18        Q.    Okay.  Have you -- in preparing for this

19   deposition, you talked to several members of the

20   Secretary of State's Office?

21        A.    That's correct.

22        Q.    And in visiting with those individuals from the

23   Secretary of State, have you seen any indication

24   whatsoever that the results of this analysis were

25   provided to any member of the legislature?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

87

1         A.    I have not.

2         Q.    Okay.   Are you familiar with Ms. McGeehan's

3    testimony indicating that she did not provide this to

4    Tommy Williams, to Senator Williams?

5         A.    I am.

6         Q.    And have you seen anything to dispute that?

7         A.    I have not.

8         Q.    Okay.   Did you run a Spanish surname review of

9    this analysis in January of 2011?

10        A.    Did not, no.

11              MR. FREEMAN:   Objection, asked and

12   answered.

13              MR. SWEETEN:   All right.   I have no

14   further questions.   Thank you.

15              MR. FREEMAN:   I just one quick clarifying

16   question, just to be clear on Mr. Sweeten's question.

17                    FURTHER EXAMINATION

18   BY MR. FREEMAN:

19        Q.    When he asked whether you were aware of any

20   matches between DPS and SOS, was your answer limited to

21   with regard to voter ID, or you were testifying that

22   you're not aware of any other circumstances in which

23   data from the Department of Public Safety has been

24   matched to data in the TEAM database?

25              MR. SWEETEN:   During the time period.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                    JUNE 19, 2012

                                                                         88
1        Q.    (By Mr. Freeman) During the time period.

2        A.    I'm not aware of any -- during that time period

3   of any data matches done during that period.

4        Q.    Between data from those two sources?

5        A.    I mean, I'm not aware -- between those two

6   sources between -- from the 2005 to the May 2011 time

7   period.

8        Q.    Okay.  But you are aware of matches between the

9   TEAM database and other data sources outside the office

10  of the Secretary of State, just not DPS, correct?

11       A.    Is it possible for me to talk to counsel, or

12  no?

13       Q.    Unfortunately, it's not.

14       A.    DPS is a source to validate information on

15  voters, so there's -- there's an ongoing matching that's

16  done for that for a live check.

17       Q.    Okay.

18       A.    For example.

19       Q.    So, for example, during a live check process,

20  data is routinely matched from DPS sources to the SOS

21  databases, correct?

22       A.    It's a copy of the DPS database at TEAM.

23       Q.    Okay.  So that's done every day when there's a

24  new voter registration application --

25       A.    That's correct.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

89

1       Q.    -- that comes in?

2       A.    Right.

3             MR. FREEMAN:  I pass the witness.

4                    FURTHER EXAMINATION

5   BY MR. SWEETEN:

6       Q.    All right.  The topic that we're here on was

7   any and all analysis of registered voters who possess a

8   Texas driver's license or personal identification card

9   between January 1st, 2005 and May 27, 2011.  Okay?  Do

10  you understand that?

11      A.    Yes.

12      Q.    Other than January 2011, are you aware of any

13  such analysis having been performed?

14      A.    Not analysis.

15      Q.    Okay.

16      A.    No.

17            MR. SWEETEN:  I have no further questions.

18            MR. FREEMAN:  Nor do I.

19            Thank you so much for your testimony.

20            THE WITNESS:  Thank you.

21            (Signature reserved.)

22            (Deposition concluded at 6:09 p.m.)

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                              JUNE 19, 2012

90

1    CHANGES AND SIGNATURE

2              RE: TEXAS VS. HOLDER, ET AL

3    PAGE   LINE   CHANGE              REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20       I, LEE GUYETTE, have read the foregoing deposition

21   and hereby affix my signature that same is true and

22   correct, except as noted above.

23

24                    _____

25                         LEE GUYETTE



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                          JUNE 19, 2012

91

1       THE STATE OF _____)

2       COUNTY OF_____)

3

4               Before me,_____, on this day

5       personally appeared LEE GUYETTE, known to me (or proved

6       to me under oath or through_____

7       (description of identity card or other document) to be

8       the person whose name is subscribed to the foregoing

9       instrument and acknowledged to me that they executed the

10      same for the purposes and consideration therein

11      expressed.

12              Given under my hand and seal of office

13      this_____day of _____, 2012.

14

15

16              _____

17              NOTARY PUBLIC IN AND FOR
                THE STATE OF _____

18

19

20

21

22

23

24

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

92

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     STATE OF TEXAS,              )
 3                               )
                  Plaintiff,     )
 4                               )
     VS.                         )
 5                               )
     ERIC H. HOLDER, JR. in his  )
 6   official capacity as Attorney)
     General of the United States,)
 7                               )
                  Defendant,     )
 8                               )
     ERIC KENNIE, et al,         )
 9                               )
          Defendant-Intervenors, )
10                               )
     TEXAS STATE CONFERENCE OF   )  CASE NO. 1:12-CV-00128
11   NAACP BRANCHES,             )  (RMC-DST-RLW)
                                 )  Three-Judge Court
12        Defendant-Intervenors, )
                                 )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al,      )
14                               )
          Defendant-Intervenors, )
15                               )
     TEXAS LEGISLATIVE BLACK     )
16   CAUCUS, et al,              )
                                 )
17        Defendant-Intervenors, )
                                 )
18   VICTORIA RODRIGUEZ, et al., )
                                 )
19        Defendant-Intervenors. )
20                REPORTER'S CERTIFICATION
                  DEPOSITION OF LEE GUYETTE
21                     JUNE 19, 2012
22        I, Chris Carpenter, Certified Shorthand Reporter in
23   and for the State of Texas, hereby certify to the
24   following:
25        That the witness, LEE GUYETTE, was duly sworn by the
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

LEE GUYETTE                                                    JUNE 19, 2012

93

1    officer and that the transcript of the oral deposition

2    is a true record of the testimony given by the witness;

3         That the deposition transcript was submitted on the

4    _____day of _____, 2012, to the witness or to the

5    attorney for the witness for examination, signature and

6    return to_____, by

7    _____, 2012; and if returned, the original

8    transcript will forwarded to Daniel Freeman, the

9    custodial attorney;

10        That the amount of time used by each party at the

11   deposition is as follows:

12        Mr. Freeman: 2 hours, 19 minutes

13        Mr. Sweeten: 1 minute

14        I further certify that I am neither counsel for,

15   related to, nor employed by any of the parties or

16   attorneys in the action in which this proceeding was

17   taken, and further that I am not financially or

18   otherwise interested in the outcome of the action.

19        Certified to by me this 20th day of June, 2012.

20

21                          _____

22                          Chris Carpenter, Texas CSR 1151
                            Expiration Date:  12/31/2012
23                          100 Congress Avenue, Suite 2000
                            Austin, TX  78701
24                          (512)328-5557
                            Firm Registration No. 283

25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com