## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEX, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, JANE DOE, JOHN DOE, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS,<br>    *Plaintiffs,*<br>v.<br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State,<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| UNITED STATES OF AMERICA,<br>    *Plaintiffs,*<br><br>TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AURICA WASHINGTON, CRYSTAL OWENS, AND MICHELLE BESSIAKE,<br>    *Plaintiff-Intervenors,*<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, HIDALGO COUNTY, AND MARIA LONGORIA BENAVIDES,<br>    *Plaintiff-Intervenors,*<br>v.<br>STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br>    *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 2:13-CV-193 (NGR)
[Lead case]

CIVIL ACTION NO. 2:13-CV-263 (NGR)
[Consolidated case]

TEXAS STATE CONFERENCE OF NAACP )
BRANCHES;    and    the    MEXICAN )
AMERICAN LEGISLATIVE CAUCUS OF )
THE        TEXAS        HOUSE        OF )
REPRESENTATIVES, )
     *Plaintiffs,* )
v. )
  )   CIVIL ACTION NO.
JOHN STEEN, in his official capacity as )   2:13-CV-291 (NGR)
Secretary of State of Texas; and STEVE )   [Consolidated case]
McCRAW, in his official capacity as Director )
of the Texas Department of Public Safety, )
     *Defendants.* )
_____ )
BELINDA ORTIZ, LENARD TAYLOR, )
EULALIO MENDEZ JR., LIONEL )
ESTRADA; ESTELA GARCIA ESPINOSA, )
ROXANNE HERNANDEZ, LYDIA LARA, )
MARGARITO MARTINEZ LARA, )
MAXIMINA MARTINEZ LARA, AND )
*LA UNION DEL PUEBLO ENTERO, INC.* )
     *Plaintiffs,* )
v. )
  )
  )   CIVIL ACTION NO.
STATE OF TEXAS; JOHN STEEN, in his )   2:13-CV-348 (NGR)
Official capacity as Texas Secretary of State; )   [Consolidated case]
And STEVE McCRAW, in his official capacity )
As Director of the Texas Department of )
Public Safety, )
     *Defendants.* )
_____

## DEFENDANTS' RESPONSE TO THE UNITED STATES' MOTION TO COMPEL THE PRODUCTION OF LEGISLATIVE DOCUMENTS

The Defendants file this response to the United States' Motion to Compel the Production of Legislative Documents (ECF No. 162). At issue in the United States' Motion are two universes of documents. The first relates to a set of legislative documents identified within a privilege log previously produced in *Texas v. Holder*

and incorporated in the present lawsuit by Defendants.  The second relates to an unknown number of documents that might exist in the legislature's computer system.

The United States' Motion to Compel should be denied for three reasons: (1) the United States' request is procedurally flawed because all but one of the 250 legislators the United States has identified are not parties to this case[1] and should have instead been subpoenaed; (2) the legislative privilege bars production of the legislative documents the United States seeks; and (3) the United States' proposed method of searching documents through the Texas Legislative Council ("TLC") is not only legally flawed, it is practically flawed because searches through the TLC will produce an under inclusive universe of documents, *see* Declaration of Jon Heining, Exhibit 1, and it would greatly increase the burden of production.

I.   **THIS MOTION TO COMPEL IS PROCEDURALLY IMPROPER BECAUSE IF DOJ WISHES TO SEEK DISCOVERY FROM NON-PARTIES SUCH AS STATE LEGISLATORS OR THE TEXAS LEGISLATIVE COUNCIL, IT MUST SUBPOENA THEM BECAUSE THE DOCUMENTS THEY SEEK ARE NOT IN THE CUSTODY, POSSESSION, OR CONTROL OF THE DEFENDANTS.**

Because all but one of the legislators from whom DOJ seeks production are nonparties to this litigation, this Court should not compel them to produce documents in their possession.  *See* FED. R. CIV. P. 45(b)(2).  DOJ's motion to compel is procedurally improper and should be denied for that reason alone.

Individual legislators are not "parties" when a suit is brought by or against a sovereign.  *See, e.g.*, *Alabama Educ. Ass'n v. Bentley*, 2013 WL 124306, at *12 (N.D.

---

[1] The only legislator DOJ identified who is a party to this case is a plaintiff—Congressman Marc Veasey.

Ala. Jan. 3, 2013) ("Of course, the [State] Officials on whose behalf motions to quash the subpoenas have been filed are not, in fact, being sued," even though the State of Alabama was); *Florida v. United States*, 886 F. Supp.2d 1301 (N.D. Fla. 2012) (denying motion to compel discovery against state legislators on similar theory).

The non-party status of legislators is reinforced by intervention cases.  For example, the Supreme Court has held that individual legislators may intervene on behalf of the State to defend the constitutionality of a state law after the state attorney general declined to defend.  *See Karcher v. May*, 484 U.S. 72 (1987).  The Court observed that the individual legislators were not "parties" in their own rights; indeed, that was the whole reason that they had to go through the trouble of intervening in the first place, and it is why the legislators lost their "party" status when they could no longer represent the only party named in the suit (namely, the State).

The converse also is true:  If someone sues a state official in her individual capacity for actions taken under the color of state law, the State itself is not a "party" and is not liable.  *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 168 (1985) ("Indeed, unless a distinct cause of action is asserted against the [State] itself, the [State] is not even a party to a personal-capacity lawsuit and has no opportunity to present a defense.").

If DOJ insists on  seeking access to these legislators' privileged documents, the legislators must be subpoenaed.

4

II.   **THE LEGISLATIVE PRIVILEGE PROTECTS LEGISLATIVE COMMUNICATIONS AND DELIBERATIONS FROM DISCOVERY IN CIVIL LITIGATION ABSENT "EXTRAORDINARY" CIRCUMSTANCES.**

   A.  **State Legislators Enjoy a Common-Law Privilege Against Testimony and Discovery Regarding the Legislative Process.**

The Supreme Court has long recognized a legislative privilege that protects anyone acting in a legislative capacity, including staff, from testifying about legislative acts. *See, e.g.*, *Gravel v. United States*, 408 U.S. 606, 615-16 (1972). The Federal Constitution's Speech and Debate Clause confers a privilege to United States "Senators [,] Representatives," and legislative staff. *Id.* at 614-15 (quoting U.S. CONST. art. I, § 6, cl. 1). Although state legislators lie beyond the reach of this Clause, they may invoke a similar legislative privilege under federal common law. *See Supreme Court of Virginia v. Consumers Union of the U.S, Inc.*, 446 U.S. 719, 731–32 (1980) ("We have also recognized that state legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.") (internal citations omitted); *see also Chastain v. Sundquist*, 833 F.2d 311, 319 (D.C. Cir. 1987) (discussing "the equivalent to federal Speech or Debate immunity traditionally enjoyed by state legislators"); FED. R. EVID. 501 ("The common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege.").

Little separates the scope of protections provided under the constitutional and federal common law legislative privileges. *See, e.g.*, *Supreme Court of Virginia*, 446 U.S. at 731–32. This is so because "regardless of the level of

government, the exercise of legislative discretion should not be inhibited by judicial interference." *See Bogan v. Scott-Harris*, 523 U.S. 44, 52 (1998).  It is simply "'not consonant with our scheme of government for a court to inquire into the motives of legislators.'"  *Id.* at 55 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951)).

Although the state legislative privilege is not always co-extensive with the constitutional privilege protected by the Speech and Debate Clause, the core of the constitutional privilege established in the Speech and Debate Clause informs the scope of the common-law privilege available to state legislators.  *See Tenney v. Brandhove*, 341 U.S. 367, 372-76 (1951).  And inter-legislator communications fall within the core of the evidentiary privilege protected by the Speech and Debate Clause.  *See Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 52 (D.D.C. 2007) (holding that the Speech and Debate Clause "affords a testimonial (or 'non-disclosure') privilege pursuant to which Members cannot be required either to produce documents or to answer questions, whether in a deposition or on the witness stand.").  Decisions enforcing the state legislative privilege are numerous, and a sample is set out in the margin.[2]

---

[2] *See, e.g.*, *Schlitz v. Commonwealth of Virginia*, 854 F.2d 43, 46 (4th Cir. 1988) ("Where, as here, the suit would require legislators to testify regarding conduct in their legislative capacity, the doctrine of legislative immunity has full force."); *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, (D.N.H. 1996) ("Effectuating the intentions of the legislative immunity doctrine, legislators acting within the realm of legitimate legislative activity, should not be required to be a party to a civil action concerning legislative activities, nor should they be required to testify regarding those actions"); *2BD Assocs. Ltd. P'ship v. County Comm'rs of Queen Anne's County*, 896 F. Supp. 528, 531 (D. Md. 1995) ("[T]he effect of the [common-law legislative privilege] doctrine is twofold; it protects [state] legislators from civil liability, and it also functions as an evidentiary and testimonial privilege. . . . [I]f immunity from civil liability attaches to a given action, then such testimonial immunity applies as well."); *Suhre v. Board of Comm'rs*, 894 F. Supp. 927, 932 (W.D.N.C. 1995)

As a general rule, the Supreme Court has determined that the legislative privilege is very difficult to waive.   *See United States v. Helstoski*, 442 U.S. 477, 491, 493 (1979).   Thus, in *Helstoski*, the Court held: "waiver can be found only after explicit and unequivocal renunciation of the protection.   The ordinary rules for determining the appropriate standard of waiver do not apply in this setting . . . ." *Id.* at 491.   In support, the Court observed that "[t]he Speech or Debate Clause was designed neither to assure fair trials nor to avoid coercion.   Rather, its purpose was

---

("Because the commissioners are entitled to legislative immunity, they are protected from testifying concerning their motives for refusing to remove the [Ten Commandments display]. . . .   Where the defense of the case would require the commissioners to testify about their legislative conduct and their motives, legislative immunity precludes the suit."), rev'd on other grounds, 131 F.3d 1083 (4th Cir. 1997); *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 297 (D. Md. 1992) ("Legislative immunity not only protects state legislators from civil liability, it also functions as an evidentiary and testimonial privilege. . . . The immunity enjoyed by legislative staff derives from the individual legislators themselves: to the extent a legislator is immunized, his staffers are likewise 'cloaked.'"); *Jeff D. v. Otter*, 643 F.3d 278, 288-90 (9th Cir. 2011) (upholding protective order preventing the deposition of a non-party legislative budget analysis based on legislative privilege); *E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 180-81 (4th Cir. 2011) ("Legislative privilege against compulsory evidentiary process exists to safeguard this legislative immunity and to further encourage the republican values it promotes."); *Butnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996) (local legislators are entitled to immunity and testimonial privilege for legislative acts); *Comm. for a Fair and Balanced Map v. Illinois State Bd. of Elections*, 2011 WL 4837508, at *11 (N.D. Ill. 2011) (denying motion to compel seeking "(1) information concerning the motives, objectives, plans, reports and/or procedures used by law makers to draw the 2011 Map; [and] (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map" but holding that legislative privilege did not shield "objective facts" lawmakers relied on); *Cunningham v. Chapel Hill, ISD*, 438 F. Supp. 2d 718, 722 (E.D. Tex. 2006) ("local legislators are protected by the testimonial privilege from having to testify about actions taken in the sphere of legitimate legislative activity"); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 103 (S.D.N.Y. 2003) (denying motion to compel "to the extent that the plaintiffs seek information concerning the actual deliberations of the Legislature- or individual legislators-which took place outside [a non-legislative advisory group], or after the proposed redistricting plan reached the floor of the Legislature . . . ."); *M Sec. and Invs., Inc. v. Miami-Dade Cnty., Fla.*, 2001 WL 1685515, at *2 (S.D. Fla. 2001) (legislative immunity protects against testimonial discovery); *Cano v. Davis*, 193 F. Supp.2d 1177 (C.D. Cal. 2002) (granting protective order precluding depositions of state legislators in VRA redistricting case); *In re Perry*, 60 S.W.3d 857, 860 (Tex. 2001) ("Because the immunity doctrine serves important public purposes, courts have affirmed that the doctrine generally shields legislative actors not only from liability, but also from being called to testify about their legislative activities); Florida v. United States, No. 12-mc-00003 (N.D. Fla 2012) (denying motion to compel testimony and documents in VRA case); MINPECO, S.A. v. Commodity Servs., Inc., 844 F.2d 856, 859 (D.C. Cir. 1988) ("A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.").

to preserve the constitutional structure of separate, coequal, and independent branches of government …. [A]ny lesser standard would risk intrusion by the Executive and the Judiciary [into legislative matters]." *Id.* The privilege is not a shared privilege, and one member of a legislative body may not waive the privileges of other members. *Cano v. Davis*, 193 F. Supp. 1177, 1179 (C.D. Cal. 2002) ("A majority of the court concludes that … a member of the legislature such as Assemblymember Vargas, who elects to waive the privilege, may not give unfettered testimony regarding the legislative acts of other members.") (redistricting case).

This is not the first time that Texas and DOJ have confronted the issue of legislative privilege. DOJ has attempted to pierce the legislative privilege in all of its recent voting-rights disputes with Texas, but no court has ever ruled in its favor. And in the Voter ID preclearance lawsuit, DOJ's advances were largely rebuffed. DOJ sought to pierce the legislative privilege, arguing that the privilege did not exist, and that, if it did, it must yield in Voting Rights Act cases. The United States District Court for the District of Columbia brushed aside DOJ's attempt to rifle through the confidential papers of Texas legislators:

> This Court has already found that *the state legislative privilege is not abrogated in all VRA actions*, and thus the Court rejects the [United States'] first argument. Similarly, the parties have already filed extensive briefing on whether there are "extraordinary instances" in this case that would support abrogating the legislative privilege. The current arguments raised by [the United States], focusing mainly on the irregular procedures used in adopting [the Voter ID law], largely reiterate the arguments we previously found insufficient and therefore *fail to establish extraordinary instances*.

Order at 4-11, *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. June 5, 2012) (three-judge court) (ECF No. 167) (emphasis added and citations omitted).

The D.C. District Court observed that "[f]ederal common law, for many years, recognized a legislative privilege," which "dates back to at least 1399." *Id.* (quoting *Barr v. Mateo*, 360 U.S. 564, 579 (1959) (Warren, C.J., dissenting)).   Indeed, the court noted, "this legislative privilege was deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution [as the Speech or Debate Clause]." *Id.*   Finally, the court explained that "[l]ike the Constitution's Speech or Debate Clause, the legislative privilege provides a legislator not only immunity from suit, but also a testimonial and evidentiary privilege, *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)." *Id.* (citations omitted).   The DOJ now contends that the D.C. District Court evidently had insufficient information before it when it upheld the applicability of the legislative and attorney-client privilege to the documents at issue.   Instead, the DOJ asks this Court to hold its hand while leaping out to create new law that disregards over six centuries of legal precedent relating to legislative privilege.

DOJ has urged similar arguments in voting rights cases challenging Texas redistricting maps with similar results.   In *Perez et al. v. Perry*, et al., 5:11-cv-00360, the three-judge panel presiding over Section 2 challenges to Texas's redistricting efforts confronted legislative privilege issues similar to those presented here. There, Texas moved for a protective order to prevent the disclosure of presumptively

privileged communications made between and among Texas legislators and their staffs. *See* Defendants' Motion for Protective Order (Doc. 62), *Perez et al. v. Perry, et al.*, 5:11-cv-00360 (W.D. Tex. July 21, 2011). Although the Perez court denied Texas's motion for a protective order without prejudice as premature, *see* Order Denying Defendants' Motion for Protective Order (Doc. 102) at 5-6, *Perez et al. v. Perry, et al.*, 5:11-cv-00360 (W.D. Tex. Aug. 1, 2011), the Court ultimately maintained the privilege until a waiver was obtained from the individual legislators who were parties to the communications. And finally, a few weeks ago, the three judge district court in *Perez v. Perry* granted Texas's motion to modify a protective order to better defend the legislative privilege, requiring DOJ to assert "compelling, competing interests" before sweeping it aside:

> Any legislator, legislative aide, or staff member that asserts the privilege . . . may choose not to answer specific questions, citing the privilege. In that event, Plaintiffs may thereafter file a motion to compel and the Court will thereafter determine whether the privilege has been waived or is outweighed by a compelling, competing interest.

*Perez v. Perry (Perez II)*, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014) (three-judge court). The United States quotes the four-part balancing test described in *Perez II*, and discusses boilerplate from the court's opinion, but it fails to acknowledge that the *Perez II* court has *not once* applied its balancing test to pierce the legislative privilege. Indeed, it would be nearly impossible to grant DOJ's demand for sweeping discovery from Texas lawmakers while staying faithful to the Supreme Court's command that such discovery should be limited to "extraordinary

instances" and that "[p]lacing a decision maker on the stand is . . . usually to be avoided."

Despite these judicial setbacks, the United States continues to litigate the issue of legislative privilege, seeking discovery from 250 current and former members of the Texas Legislature, one of whom is a party to this lawsuit (Marc Veasey), some of whom are dead, and 43 of whom did not serve in the legislature until 2013.  *See* Declaration of Jon Heining, Exhibit 1.  As a courtesy, we have agreed to contact each of the still-living legislators to better understand if they are agreeable to allowing discovery relating to Voter ID.  If a legislator indicates a willingness to waive legislative and attorney-client privilege, we will ask the legislator to perform an office search, and grant access to the Legislative Council if necessary, so that a search of the servers that contain any of the legislator's electronically stored information relating to Voter ID may be identified and obtained.

In *Arlington Heights*, the United States Supreme Court rejected the notion (advanced here by DOJ) that legislators could be forced to testify in discriminatory-purpose litigation.  *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977).  The Court insisted that litigants must instead determine whether a discriminatory purpose exists by examining *publicly available* sources—such as legislative history, floor debates, and the historical background of the decision.  *Id.*  In rejecting a plaintiff's claim that the Village's zoning decision had been motivated by racial bias, the Court wrote:

> The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision making body, minutes of its meetings, or reports. *In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See Tenney v. Brandhove*, 341 U.S. 367 (1951); *United States v. Nixon*, 418 U.S. 683 (1974); 8 J. Wigmore, Evidence s 2371 (McNaughton rev.ed. 1961).

429 U.S. at 268 (emphasis added).  In a footnote, the Court further explained its disapproval of allowing litigants to compel testimony from state or local lawmakers:

> This Court has recognized, ever since Fletcher v. Peck, 6 Cranch 87, 130-131 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government. *Placing a decision maker on the stand is therefore "usually to be avoided." Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971).

429 U.S. at 268 n.18 (emphasis added).

*Arlington Heights* establishes two propositions.  First, litigants who seek to establish a discriminatory legislative purpose cannot compel testimony from state legislators except in "extraordinary instances."  Second, even when an "extraordinary instance" might justify compelling testimony from a state lawmaker, the testimony sought from that legislator will "frequently" be barred by privilege. Although *Arlington Heights* does not define the scope of this "privilege," the Court's citation of *Nixon* indicates that the privilege must extend to confidential communications involving state legislators.  *Cf. Nixon v. Sirica*, 487 F.2d 700, 717 (D.C. Cir. 1973) (noting that "[executive] privilege, intended to protect the

12

effectiveness of the executive decision-making process, is analogous to that between a congressman and his aides under the Speech and Debate Clause").

Neither a court nor a litigant can deny the existence of an evidentiary privilege for state legislative communications and remain faithful to the Supreme Court's pronouncement in *Arlington Heights*. *See, e.g.*, *Cano v. Davis*, 193 F. Supp.2d. 1177, 1179 (C.D. Cal. 2002) (enforcing legislative privilege in a redistricting lawsuit by prohibiting a legislator who waived his privilege from "testify[ing] to the legislative acts of legislators who have invoked the privilege or to those of staffers or consultants who are protected by the privilege"). The "privilege" that *Arlington Heights* describes is not simply legislative immunity, or the attorney-client privilege, or the physician-patient privilege, or the marital privilege. It is a "privilege" that protects the confidential deliberations, negotiations, and communications of state and local lawmakers. *Id.*

The Supreme Court has recognized only one exception to this privilege. *United States v. Gillock*, 445 U.S. 360, 373 (1980). In *Gillock*, the Supreme Court held that an indicted state legislator cannot invoke legislative privilege when she is being prosecuted in federal court for violating a federal *criminal* statute. But *Gillock* was careful to limit its holding to the context of federal criminal prosecutions, and rejected the claim of legislative privilege only after conducting a balancing test and concluding that the federal government's interest in enforcing its criminal statutes was sufficiently strong to categorically preclude any assertion of state legislative privilege. *See id.* at 373. The protections of legislative privilege

13

remain applicable in civil litigation alleging discriminatory purpose, as *Arlington Heights* and numerous other court decisions make clear. *See, e.g.*, *Comm. for Fair and Balanced Map v. Illinois State Bd. of Elections*, 2011 WL 4837508 at *7 (N.D.Ill. Oct. 12, 2011); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 94-104 (S.D.N.Y. 2003); *Cano*, 193 F. Supp. 2d at 1179-80; *Dyas v. City of Fairhope*, No. 08-0232-WS, 2009 WL 3151879, at *9 (S.D. Ala. Sept. 24, 2009) ("The plaintiffs insist the Supreme Court has validated their demand for [questioning of city council members] but it has done very nearly the opposite.").

DOJ insists that the state legislative privilege must yield whenever a litigant seeks to establish a discriminatory purpose under a statute enacted pursuant to the Civil War Amendments, or at least in a voting-rights case, DOJ Mot. at 5-8, but DOJ's position cannot be reconciled with *Arlington Heights*. DOJ is essentially asking this Court to expand *Gillock*'s holding into voting-rights litigation. *Gillock* holds that the federal government's interest in enforcing criminal law trumps the common-law evidentiary privilege claimed by an indicted state legislator. The *Gillock* exception is unremarkable: Even the attorney-client privilege—the "oldest of the privileges for confidential communications known to the criminal law" — does not protect communications made in furtherance of committing a crime or fraud. *See United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). If the Court accepts DOJ's invitation to extend *Gillock* to civil cases like this one, it will leave little work for legislative privilege to do. The privilege would protect zoning boards and city councils, while leaving state

14

legislators vulnerable to intrusive discovery whenever their out-voted colleagues across the aisle seek a do-over in federal court.

Another problem with DOJ's argument (that the federal interest in enforcing voting-rights legislation has an equally strong claim as the century-old crime-fraud exception) is that the federal interest in preventing unconstitutional racial discrimination is not in any way diminished when the issue involves access to housing (as in *Arlington Heights*) rather than voting.   Yet the Supreme Court insisted in *Arlington Heights* that discovery (depositions) of city council members are heavily disfavored—even when litigants seek to enforce the Fourteenth Amendment's protections against purposeful racial discrimination.   A showing of "extraordinary instances" is needed before a state or local decision maker can be forced to submit to discovery.   *See Arlington Heights*, 429 U.S. at 268.   And *Arlington Heights* recognizes that even when "extraordinary instances" might allow for state legislator testimony, "such testimony frequently will be barred by privilege."   429 U.S. at 268.

DOJ also suggests that state legislative privilege must yield when "Congress has placed 'government intent' at the heart of a cause of action," but that argument proceeds as though *Arlington Heights* never existed, and proves too much.   *See* DOJ Mot. (Doc. 162) at 5-6.   On DOJ's view, all state legislators can be deposed in any case alleging unlawful discriminatory purpose under the Constitution—a view that ignores *Arlington Heights*.[3]

---

[3] The United States' suggestion that the legislative privilege should yield in all voting rights cases extends Section 2 well beyond the standards created for 14th Amendment cases generally. Such a

Absent an explicit waiver, however, such documents are privileged, and the Defendants cannot disclose such communications without the individual legislator identified in the communication waiving the privilege.

The legislative privilege applies with full force to communications between legislators and Texas Legislative Council. *See Gravel v. United States*, 408 U.S. 606, 616-17 (1972) (noting that "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants; that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos."). Application of the legislative privilege to communications between legislators and Texas Legislative Council is critical for the Council to be effective. Courts have made clear that informal information gathered by legislators and their staff from any source qualifies as a "legislative act" protected from subsequent disclosure. *See, e.g., Jewish War Veterans of the United States of America, Inc. v. Gates*, 506 F. Supp. 2d 30, 55-56 (D.D.C. 2007).

The Texas Legislative Council is intended to operate, and in fact does so, as an extension of the staff of each legislator and committee. *See* Declaration of Deborah Fulton, Exhibit 2; Tex. Gov't Code § 323.001(a). By statute, the Texas Legislative Council has no other purpose. It is governed by a board exclusively made up of members of the Legislature, including the Lieutenant Governor as presiding officer of the Texas Senate. *See* Tex. Gov't Code § 323.001.

---

view greatly increases the well-recognized and constitutionally suspect burdens already imposed by the Voting Rights Act and raises new constitutional questions that should and can easily be avoided by heeding *Arlington Heights*.

The Texas Legislative Council's sole function is to provide legal advice to the Legislature.  *See* TEX. GOV'T CODE § 323.0036.   And Section 323.017 of the Texas Government Code provides that communications between a member of the Legislature or Lieutenant Governor and any Texas Legislative Council employee that relate to a request by the official for information, advice, or opinions from a council employee are confidential; and information, advice and opinions from a council employee are confidential, and information, advice, and opinions given privately by a council employee to a member of the Legislature, or the Lieutenant Governor, acting in the person's official capacity, are confidential.  TEX. GOV'T CODE § 323.017.   The only individuals who can waive the confidential nature of these privileged communications are the members of the Legislature.  *Id.*

## III.  COMMUNICATIONS BETWEEN THE TEXAS LEGISLATIVE COUNSEL AND THE LEGISLATURE ARE ALSO PROTECTED BY ATTORNEY-CLIENT PRIVILEGE.

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981).  The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Id.*

Confidential communication in the context of the attorney-client privilege means "the information is to be protected if one can say that the person who communicated the information never intended it to be disclosed and, but for its disclosure now, it would never have been known."  *Evans v. Atwood*, 177 F.R.D. 1, 5

17

n.2 (D.D.C. 1997).  A client engages in confidential communication with an attorney when the client "reasonably believes that no one will learn the contents of the communication."  *Id.* (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121); *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir. Unit B 1981) ("A communication is protected by the attorney-client privilege . . . if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential.").

There can be no question that an attorney-client relationship exists between the Texas Legislative Council and individual members of the Legislature.  *See* Exhibit 2.  The Texas Legislative Council is a nonpartisan legislative agency that provides bill drafting, computing, research, publishing, and document distribution services to the Texas Legislature and other legislative agencies.  *Id.*  Attorneys from the Texas Legislative Council regularly advise members of the Legislature and their staffs on legal issues with the full understanding by those legislators and staff members that such communications are subject to the attorney-client privilege. TEX. GOV'T CODE § 323.017; TEXAS HOUSE RULE 2, § 10.  These communications are confidential and made for the purpose of rendering legal advice to members of the Legislature.

Based on those statutes, rules, and settled understandings, it is plain that legislators who communicated with TLC "intended [the communications] to remain confidential" and that the communications were "made under such circumstances that it was reasonably expected and understood to be confidential." *Melvin*, 650

18

F.2d at 645.  Indeed, the Texas House Rules explicitly promise that the "attorney-client privilege" attaches to such communications:

> Legislative Council Employees: Confidentiality — (a) Communications between an attorney employed by the Texas Legislative Council and the speaker, another member of the house, or an employee of a member or committee of the house *are confidential in accordance with the rules and laws concerning attorney-client privilege.*

TEXAS HOUSE RULE 2, § 10 (emphasis added).

The Rule's explanatory notes observe that the attorney-client privilege is critical to the proper functioning of TLC, and threaten harsh penalties for breach:

> There are numerous statutes, rules, and policies that impose a duty of confidentiality on legislative employees, *particularly attorneys and staff who work for legislative agencies such as the Texas Legislative Council.*  See, for example, Section 323.017, Government Code, Rule 1.05, Texas disciplinary Rules of Professional Conduct, and the Texas Legislative Council Confidentiality Policy. A deliberate or accidental breach of the duty of confidentiality, whether by the youngest member of a legislator's staff at a cocktail reception or by a senior legislative agency employee, is serious. Legislative staff, regardless of whether they are employed by a member or a legislative agency, should be clear on their duties to strictly safeguard confidential information. This rule underscores the responsibility of legislative employees (specifically, those employed by the Texas Legislative Council) to maintain confidentiality in these communications.

House Rule 2, explanatory note (emphasis added).

DOJ suggests that even if the attorney-client privilege exists in this context, the lawyers at TLC are acting unethically by representing multiple legislators at once.  This incendiary argument fails to acknowledge that there is nothing unusual about government lawyers representing multiple government officials at once. According to DOJ, a lawyer to the Senate Judiciary Committee is acting unethically

if she gives legal advice to more than one senator on the committee.  That has never been the law, as most rules of professional conduct make plain:

> The responsibilities of government lawyers, under various legal provisions, including constitutional, statutory and common law, may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships. For example . . . *lawyers under the supervision of these officers may be authorized to represent several government agencies in intragovernmental legal controversies in circumstances where a private lawyer could not represent multiple private clients.* They also may have authority to represent the public interest in circumstances where a private lawyer would not be authorized to do so. These rules do not abrogate any such authority.

TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, Preamble, Item 13 (emphasis added).    Likewise, lawyers in the federal Office of Legislative Counsel often provide advice to more than one member of Congress:

> Our Office has a long history of successfully working with opposing sides on legislative policy issues while maintaining confidentiality with respect to communications with each Member and committee. For example, it is routine for an attorney who has drafted a bill for a committee to then draft floor amendments for individual Members on all sides of issues raised by the bill. Some controversial policy issues lead to an attorney drafting separate bills for the majority staff and minority staff of a committee, as well as bills on the same topic for individual Members, without ever revealing the existence of multiple drafts on the same topic.

Office of the Legislative Counsel, U.S. House of Representatives "Confidentiality and Impartiality," http://www.house.gov/legcoun/HOLC/About_Our_Office/ Confidentiality_and_Impartiality.html (last visited Feb. 24, 2014).

This Court should deny the United States' motion to compel production of documents that are protected by the legislative privilege or attorney-client privilege absent a waiver by each applicable individual legislator.

## IV.   THE UNITED STATES' REQUEST IS PROCEDURALLY IMPROPER AND UNDULY BURDENSOME.

Not only is the United States' request legally improper as described above, it is practically and procedurally improper and is unduly burdensome.   If DOJ wants relevant legislative e-mails produced, searching for those e-mails by using the TLC will give them an under inclusive universe of documents.   *See* Declaration of Jon Heining, Exhibit 1.   Further, searching using the TLC increases the burden of production:   only three individuals at TLC are qualified to do such searches, *see* Exhibit 1 at para. 7, and using those three individuals to sequentially search 250 legislators' e-mails is substantially more burdensome than the individual offices searching concurrently.   Last, DOJ has provided no explanation for why individual offices' searching for their own e-mails is insufficient to comply with their request for production.   Indeed, in *Texas v. Holder*, legislators searched their own e-mail accounts based on an agreed-upon list of search terms.   Here, DOJ has given no reason why they suspect that method is insufficient to comply with their RFPs.   Instead, they are attempting an end-around by using the TLC.

DOJ's remaining objections to the Defendants' assertions of attorney-privilege rest on a simple misunderstanding.[4]

---

[4] The defendants' initial production of documents in this case included all documents that were produced in the Voter ID preclearance lawsuit.   DOJ is mistaken when it says that "[b]y reincorporating the privilege logs from the previous litigation, Defendants appear to seek a different ruling from this Court over these documents."   DOJ Mot. at 14 n.9.   To expedite our initial production, we relied on our privilege log from the previous lawsuit—but we nevertheless produced all documents that the D.C. District Court held were not protected by privilege.   Most if not all of the documents that DOJ seeks from the privilege logs are already in the custody of the United States.   If further discussion is necessary, we will work in good faith with DOJ to resolve this misunderstanding.

## V.    CONCLUSION

The often-rejected arguments presented by the United States should likewise be rejected by this Court, and the United States' Motion to Compel should be denied.

Dated: February 24, 2014

                           Respectfully submitted,

                           GREG ABBOTT
                           Attorney General of Texas

                           DANIEL T. HODGE
                           First Assistant Attorney General

                           JONATHAN F. MITCHELL
                           Solicitor General

                           J. REED CLAY, JR.
                           Special Assistant and Senior Counsel
                           to the Attorney General
                           Southern District of Texas No. 1160600

                           */s/ John B. Scott*
                           JOHN B. SCOTT
                           Deputy Attorney General for Litigation
                           Southern District of Texas No. 10418
                           Texas State Bar No. 17901500
                           ATTORNEY-IN-CHARGE

                           G. DAVID WHITLEY
                           Assistant Deputy Attorney General
                           Southern District of Texas No. 2080496

                           STEPHEN RONALD KEISTER
                           Assistant Attorney General
                           Southern District of Texas No. 18580

                           SEAN PATRICK FLAMMER
                           Assistant Attorney General
                           Southern District of Texas No. 1376041

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

COUNSEL FOR THE STATE OF TEXAS,
RICK PERRY, JOHN STEEN, and STEVE
MCCRAW

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2014, I served a true and correct copy of the foregoing document is being served via the Court's ECF system to all counsel of record.

*/s/ John B. Scott*
JOHN B. SCOTT