IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, JANE DOE, JOHN DOE, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS, *Plaintiffs,* v. RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State, *Defendants.* | CIVIL ACTION NO. 2:13-CV-193 (NGR) [Lead case] |
| UNITED STATES OF AMERICA, *Plaintiffs,* TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AURICA WASHINGTON, CRYSTAL OWENS, AND MICHELLE BESSIAKE, *Plaintiff-Intervenors,* TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, HIDALGO COUNTY, AND MARIA LONGORIA BENAVIDES, *Plaintiff-Intervenors,* v. STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, *Defendants.* | CIVIL ACTION NO. 2:13-CV-263 (NGR) [Consolidated case] |

1

| | |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES,<br>    *Plaintiffs,*<br>v.<br><br>JOHN STEEN, in his official capacity as Secretary of State of Texas; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br>    *Defendants.* | CIVIL ACTION NO.<br>2:13-CV-291 (NGR)<br>[Consolidated case] |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ JR., LIONEL ESTRADA; ESTELA GARCIA ESPINOSA, ROXANNE HERNANDEZ, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.*<br>    *Plaintiffs,*<br>v.<br><br>STATE OF TEXAS; JOHN STEEN, in his Official capacity as Texas Secretary of State; And STEVE McCRAW, in his official capacity As Director of the Texas Department of Public Safety,<br>    *Defendants.* | CIVIL ACTION NO.<br>2:13-CV-348 (NGR)<br>[Consolidated case] |

## DEFENDANTS' RESPONSE TO NON-UNITED STATES PLAINTIFFS AND PLAINTIFF-INTERVENORS' SUPPLEMENTARY BRIEF IN SUPPORT OF UNITED STATES' MOTION TO COMPEL THE PRODUCTION OF LEGISLATIVE DOCUMENTS

The Defendants file this response to the Non-United States Plaintiffs and Plaintiff-Intervenors' Supplementary Brief in Support of United States' Motion to

Compel the Production of Legislative Documents (ECF No. 182) ("Supplementary Brief"). Plaintiffs and Plaintiff-Intervenors spend the majority of their supplementary brief arguing that their alleged interest in perusing the private communications of State legislators abrogates the legislative privilege. But like the United States, Plaintiffs and Plaintiff-Intervenors fail to appreciate the Supreme Court's caution against judicial prying into the inner workings of co-ordinate branches of government. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977). At a minimum, the Supreme Court's high regard for the legislative privilege should have induced Plaintiffs to seek discovery through the proper means, by subpoenaing the individual legislators or staff who have possession of the requested documents. Plaintiffs and Plaintiff-Intervenors have not only sought to pierce the legislative privilege, they have also tried to shift the burdens of extensive discovery to Defendants. The Court should deny the United States' Motion to Compel.[1]

## I. TEXAS LEGISLATORS, NOT DEFENDANTS, ARE THE PROPER SOURCE OF LEGISLATIVE MATERIALS.

The legislative branch, which includes individual legislators and the Texas Legislative Council, is not party to this lawsuit, or to any suit against the State. *See, e.g.*, *Alabama Educ. Ass'n v. Bentley*, 2013 WL 124306, at *12 (N.D. Ala. Jan. 3, 2013) ("Of course, the [State] Officials on whose behalf motions to quash the subpoenas have been filed are not, in fact, being *sued*," even though the State of

---

[1] Defendants have already addressed Plaintiffs and Plaintiff-Intervenors' arguments in their Response to the United States' Motion to Compel the Production of Legislative Documents. ECF No. 183. Defendants refer the Court to that document and will not repeat their arguments in full.

Alabama was); *Florida v. United States*, 886 F. Supp. 2d 1301 (N.D. Fla. 2012) (denying motion to compel discovery against state legislators on similar theory). Federal Rule of Civil Procedure 45 describes the procedures that must be followed when a party seeks discovery from a non-party. Rule 45 provides several protections to non-parties. For instance, a non-party can move to quash a subpoena, FED. R. CIV. P. 45(d)(3), or assert a privilege, *id.* 45(e)(2). Plaintiffs and Plaintiff-Intervenors seek to circumvent those protections by demanding that executive-branch Defendants produce legislative materials. But most of what Plaintiffs seek is not in Defendants' "possession, custody, or control." *Id.* at 34(a)(1). And, of course, Defendants have no ability to compel members of the legislative branch to turn documents over to them. The Court should not yield to Plaintiffs' request by ordering Defendants to do the impossible.

The Texas Attorney General's Office (OAG) is also not a party to this suit. To the extent that any of the requested materials are in the OAG's possession, Plaintiffs should have sought these materials through Rule 45 subpoenas. More problematic, however, is that the OAG lacks any legal authority to disclose such documents, which were obtained, if at all, while the OAG was representing individual legislators during the discovery process in *Texas v. Holder*. Declaration of Stacey Napier, Exhibit 1. The attorney-client privilege protects these documents, and the OAG, just like all other attorneys, is powerless to waive that privilege. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1372 (Fed. Cir. 2007) ("The attorney-client privilege belongs to the client, who alone may waive it.").

4

It is easy to see why Plaintiffs and Plaintiff-Intervenors might wish to avoid the procedures established by the Federal Rules. By deliberately muddling the line between the legislative branch and the parties to this litigation, Plaintiffs seek to shift the heavy burden imposed by their production requests onto Defendants. Playing by the normal rules, Plaintiffs would be required to weigh the costs and benefits of subpoenaing documents (and later testimony) from 250-plus legislators, many of whom might mount a vigorous defense to such requests. No doubt this is time consuming and burdensome. It is a process that could and should have been initiated shortly after the Rule 26(f) conference. There, Plaintiffs were reminded that the legislative branch is not a party to this case and informed that many legislators would likely assert privilege. *See* Joint Report of the Rule 26(f) Meeting, at 6-7 (Dk. No. 61). They cannot now foist this burden on Defendants.

## II. LEGISLATIVE PRIVILEGE PROTECTS THE DOCUMENTS THAT PLAINTIFFS SEEK.

When a litigant asserts that a state law was enacted with a racially discriminatory purpose, she cannot compel testimony from state legislators absent "extraordinary instances." *See Arlington Heights*, 429 U.S. at 268. Because "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government," a decision to "plac[e] a decisionmaker on the stand" is "usually to be avoided." *Id.* at 268 n.18 (citations and internal quotation marks omitted). Even when an "extraordinary instance[]" allows a court to compel testimony from state legislators, their testimony "frequently will be barred by privilege." *Id.* at 268. This privilege likewise protects

5

the confidential deliberations, negotiations, and communications of individual legislators. *See, e.g.*, *Cano v. Davis*, 193 F. Supp.2d. 1177, 1179 (C.D. Cal. 2002).[2]

*Arlington Heights* reflects the longstanding unwillingness of federal and state courts to inquire into the motivations and thought processes of individual legislators—even when legislative purpose is directly at issue. The federal judiciary's reluctance to invade the legislative sphere is directly related to the proposition that an individual legislator's impure motives are not to be attributed to the legislature as a whole. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996) ("[A]n isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body."). Instead, courts discern legislative purpose from publicly available evidence, records of legislative proceedings, and other publicly available information. *See Arlington Heights*, 429 U.S. at 267-68. But forcing individual legislators to disclose their confidential communications is a line that should not be crossed, as it offends the dignity and autonomy of legislative bodies and rarely if ever leads to useful evidence. Federal and state courts have consistently and emphatically affirmed this principle for more than a century. *Soon Hing v. Crowley*, 113 U.S. 703, 710 (1885) ("[T]he rule is general with reference to

---

[2] The plaintiffs quote *Arlington Heights* out of context when they say that "[t]he Supreme Court has thus recognized that litigants and courts must have access to evidence essential to proving that intent, including 'highly relevant' sources such as 'contemporary statements by members of the decision-making body, minutes of its meetings, or reports.' *Arlington Heights*, 429 U.S. at 268." The relevant passage from *Arlington Heights* says: "The *legislative or administrative history may be highly relevant*, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege." *Id.* (emphasis added). The Court was saying that only *publicly available* sources will be "highly relevant."

the enactments of all legislative bodies that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or infer[able] from their operation, considered with reference to the condition of the country and existing legislation."); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed."); *Goldstein v. Pataki*, 516 F.3d 50, 62 (2d Cir. 2008) (forbidding plaintiffs in an eminent-domain dispute to depose "pertinent government officials" and discover their "emails, confidential communications, and other pre-decisional documents" because this would represent "an unprecedented level of intrusion."); *People ex rel. Wood v. Draper*, 15 N.Y. 532, 545 (1857) ("The courts cannot impute to the legislature any other than public motives for their acts."); *Stahm v. Klein*, 179 Cal. App. 2d 512, 518 (Dist. Ct. App. 1960) ("Any attempt . . . by the judiciary to define the personal thoughts of the legislator in voting for the passage of a law involves such delicate and frustrating problems that it has always been frowned upon.").

Plaintiffs and Plaintiff-Intervenors claim that the Supreme Court's discussion of the legislative privilege in *Arlington Heights* was dicta. Supplementary Brief at 5 n.5. They are mistaken. This discussion was part and parcel to one of the primary holdings in *Arlington Heights*; namely, identifying the "proper subjects of inquiry in determining whether racially discriminatory intent existed." *See Arlington Heights*, 429 U.S. at 268 ("The foregoing summary

identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed. With these in mind, we now address the case before us."). In all events, federal courts are bound by the considered dicta of the Supreme Court. *See, e.g.*, *Southern Wine and Spirits of America, Inc. v. Division of Alcohol and Tobacco Control*, 731 F.3d 799, (8th Cir. 2013); *ACLU v. McCreary County*, 607 F.3d 439, 448 (6th Cir. 2010); *McCoy v. MIT*, 950 F.2d 13, 19 (1st Cir. 1991).

Plaintiffs and Plaintiff-Intervenors also assert that their case satisfies the *Arlington Heights* "extraordinary instances" requirement, yet they do not explain their position. *See* Supplementary Brief at 6 n.5. Presumably, Plaintiffs are relying on their belief in the Voting Right Act's unique importance. *See id.* at 6 (stating that the Act stands "at the pinnacle of our laws"). But they never explain why or how the enforcement of the Fifteenth Amendment differs in importance from enforcement of the Fourteenth Amendment, nor do they cite any authority that confers a preferred-position status on litigants in voting-rights cases. But many of the documents that Plaintiffs seek to compel were withheld in *Texas v. Holder* pursuant to an order by a three-judge court that explicitly recognized the viability of state legislative privilege in voting-rights cases, even where discriminatory purpose is alleged. Orders on Motions to Compel, *Texas v. Holder, et al.*, No. 1:12-cv-128 (D.D.C. June 5, 2012) (three-judge court) (Dk. No. 167). In that case, the United States sought to compel documents withheld under the legislative privilege by making arguments that are virtually identical to the arguments made here. Those

arguments were almost entirely rejected. The three-judge court stated unequivocally that "[t]he state legislative privilege is well grounded in Supreme Court case law," Order at 1, *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. April 20, 2012) (three-judge court) (Dk. No. 84) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252, 268 (1977)), and specifically rejected the argument presented again here that "legislative privilege should yield to the important federal interest in enforcing the Voting Rights Act," Order on Motions to Compel at 1, 4 *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. June 5, 2012) (three-judge court) (Dk. No. 167) ("This court has already found that the state legislative privilege is not abrogated in all VRA actions, and thus rejects the Defendants' first argument.").

Contrary to this earlier ruling on precisely this issue, Plaintiffs seek to categorically set aside legislative privilege. And although presented with an extensive and detailed privilege log, Plaintiffs do not identify any individual document that should be produced despite legislative privilege. Instead, they speculate as to the existence of secret documents which would reveal the supposedly true and discriminatory purpose of the Texas Legislature. Supplementary Brief at 2. Instead of narrowing their search to the specific types of documents that they believe might exist, the plaintiffs ask this court to give them carte blanche to rummage through all legislative business related to S.B. 14. Indeed, the requests are so broad that Plaintiffs and Plaintiff-Intervenors seek to scrutinize post-enactment legislative business *and* legislative activities related to prior iterations of voter-identification laws. Plaintiffs and Plaintiff-Intervenors have come nowhere

9

near demonstrating the kind of extraordinary circumstances that would justify this massive intrusion into the legislative business of a co-equal sovereign or the staggering discovery burdens that their Motion to Compel seeks to impose on Defendants.

Indeed, it's hard to imagine how Plaintiffs could ever come close to demonstrating the circumstances that would need to exist before such an intrusion would be warranted. Even if Plaintiffs eventually found the needle in the haystack they seek—an instance in which a legislator expressed an improper motive for S.B. 14—that motive could not be attributed to the Texas Legislature or used as grounds for invalidating the statute. Courts have repeatedly recognized that an individual legislator's impure motives are not to be attributed to the legislature as a whole. *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810) (noting a court of law "cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."); *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."); *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 752 (2012) ("[T]he views of a single legislator, even a bill's sponsor, are not controlling."); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996) ("[A]n isolated statement by an individual legislator is not a sufficient basis from which to infer the intent of that entire legislative body."); *Hispanic Coalition on Reapportionment v. Legislative*

*Reapportionment Comm.*, 536 F. Supp. 578, 586 (D. Pa. 1982) (holding that discriminatory statements made by the chairman of a city redistricting committee were insufficient to prove discriminatory intent absent a showing that the state legislative body adopted the chairman's views). It cannot be true that, even if a single legislator had a nefarious motive, the legislator could unilaterally taint the entire legislature. The "purpose" of S.B. 14 is not to be determined by the subjective motivations of individual legislators, but by the public evidence of the statute's goals.

The Plaintiffs and Plaintiff-Intervenors argue that the Court could eliminate any potential harm to the legislative process by allowing discovery of privileged documents to proceed under a protective order. *See* Supplementary Brief at 12-14. This proposed solution is no solution at all. A protective order does not avoid the federalism costs associated with one sovereign invading the legislative sphere of another. Here, the United States would still be free to rummage through the legislative activities of a sovereign state. Further, a protective order would not alleviate the significant and costly burden associated with complying with Plaintiffs' expansive requests. And finally, a protective order would not change the fact that Plaintiffs have failed to use the proper discovery procedure: Rule 45 subpoenas. Neither individual legislators nor the Texas Legislative Council are parties to this suit, and Plaintiffs should have subpoenaed them if they sought materials in the possession of the legislative branch. The problem is not merely procedural: neither Defendants nor the OAG are in possession, custody, or control of

11

many of the requested documents, and they have no legal authority to compel the legislative branch to produce them.

The Plaintiffs suggest that this Court should ignore the legislative-privilege analysis in *Texas v. Holder*, No. 1:12-cv-128 (D.D.C. June 5, 2012) (three-judge court) (Dk. No. 167), because (according to the plaintiffs) "Section 2 cases do not present the same federalism concerns that prompted the three-judge panel … to limit discovery from Texas on the basis of legislative privilege." *See* Supplementary Brief at 10 n.8. But federalism concerns are present whenever the United States or a private litigant demands access to a state legislator's confidential communications, regardless of whether the claims are brought under the Fourteenth Amendment, the Fifteenth Amendment, or any other provision of law. In all events, the plaintiffs' interpretation of section 2 raises unique federalism concerns, as they insist that section 2 extends far beyond the Fifteenth Amendment and prohibits any voter qualification with a disparate impact on minorities. *See generally City of Boerne v. Flores*, 521 U.S. 507 (1997). And the plaintiffs do not present any argument for why litigants in voting-rights cases (as opposed to plaintiffs in "run of the mill" Fourteenth Amendment intentional-discrimination cases) should have special dispensations in legislative-privilege disputes.

Finally, that Texas has named some legislators and their staffs as potential witnesses in this litigation does not in any way undermine the claims of privilege. *See* Supplementary Brief at 9. Those legislators and their staff may testify about non-privileged matters. Their willingness to testify about non-privileged matters

does not waive privilege, nor does it suggest that the disclosure of privileged materials will be harmless.

### III. THERE IS NO "INDICIA OF DISCRIMINATORY INTENT AND PURPOSE" THAT COULD SUPPORT A FISHING EXPEDITION INTO LEGISLATORS' CONFIDENTIAL COMMUNICATIONS.

The plaintiffs also contend that private litigants can override legislative privilege and rifle through the confidential communications of individual legislators whenever there are "indicia of discriminatory intent." *See* Supplementary Brief at 9–12. The plaintiffs' allegations come nowhere close to suggesting that the Texas legislature acted out of racially discriminatory motives.

Voter-identification laws have been enacted by numerous States in all areas of the country and have been upheld by the Supreme Court as a legitimate fraud prevention device. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008). The Supreme Court has held that a State may enact voter-identification laws even if there have been no documented cases of voter impersonation in that State, because these laws serve the added purpose of ensuring public confidence in the outcomes of elections. *Id.* And the bipartisan Carter-Baker Commission recommended that every State enact a photo-identification requirement. *See Crawford*, 553 U.S. at 193–94 (Stevens, J.). Certainly, the plaintiffs do not contend that the members of the Carter-Baker Commission or the Supreme Court Justices who endorsed the legitimacy of voter-identification were motivated by a discriminatory purpose. Finally, polls conducted virtually contemporaneously with the enactment of S.B. 14 demonstrate that voter identification laws were extremely

13

popular—including among racial minorities—at the time S.B. 14 was enacted. *See Texas Statewide Survey*, UNIVERSITY OF TEXAS & TEXAS TRIBUNE (FEB. 2011), http://www.laits.utexas.edu/txp_media/html/poll/files/201102-summary.pdf, (showing 75% of registered voters supported voter identification laws); *see also* Voter Identification, Breakdown by Race, *Texas Statewide Survey*, UNIVERSITY OF TEXAS & TEXAS TRIBUNE (FEB. 2011), http://www.laits.utexas.edu/txp_media/html/poll/features/201102_voter_id/slide3.html, (showing voter identification laws were supported by over 60% of African-American and Hispanic registered voters).

The Texas legislature also mitigated any potential burdens of its voter-identification regime by providing election identification certificates free of charge and allowing voters who forget to obtain proper identification before Election Day to cast provisional ballots and present their identification within six days. These provisions refute accusations or suggestions that the legislature acted out of an intent to deny minorities the right to vote. *See, e.g.,* TEX. TRANSP. CODE § 521A.001; *see also* TEX. ELEC. CODE §§ 63.001(b), 63.0101(1). Anyone who lacks photo identification can get an election identification certificate free of charge, and anyone who forgets their identification can cast a provisional ballot. A legislature that seeks to deny minorities the right to vote does not enact ameliorative measures of this sort. Indeed, Senate Bill 14 does not deny *anyone* the right to vote, because anyone who lacks photo identification can obtain it free of charge from the State.

Finally, the Texas Legislature's eagerness to pass Senate Bill 14 is not evidence of racism, instead it likely reflects the fact that voter-identification laws are politically popular. The rejection of amendments from Democratic legislators who sought to water down the bill also is not evidence of racism; it simply reflects that legislators wanted a bill that would be more effective in preventing voter impersonation and safeguarding public confidence in elections—interests that the Supreme Court of the United States has approved as legitimate. There is nothing "pretextual" about relying on rationales that the Supreme Court has approved. The plaintiffs have alleged nothing that could provide an "indicia of discriminatory intent and purpose" even if that were the standard to justify a fishing expedition into legislators' confidential communications.

## IV. THE PLAINTIFFS' REQUEST IS OVERLY BURDENSOME.

Even if the plaintiffs could somehow pierce the legislative privilege, their discovery request remains overbroad and overly burdensome because it demands *all* legislative communications related to Senate Bill 14 (rather than only those communications that mention legislative purpose) from over 250 current and former legislators, many of whom were not involved in any way with the passage of S.B. 14. Further, the plaintiffs demand communications from legislators dating back until 2005. Even if the subjective motivations of a single legislator could be imputed to the entire legislative body (and they cannot), those motivations surely cannot be imputed to future Legislatures. The chilling effect that these disclosures would place on legislators and their staff far outweigh any probative value that could be

15

found in communications having nothing to do with race or communications from past legislative sessions. There is no conceivable justification for that broad of a discovery request.

V. CONCLUSION

The Supplementary Brief fails to explain why Plaintiffs should be allowed to circumvent the subpoena process or pierce the legislative privilege. The Court should deny the United States' Motion to Compel.


Dated: February 28, 2014

                              Respectfully submitted,

                              GREG ABBOTT
                              Attorney General of Texas

                              DANIEL T. HODGE
                              First Assistant Attorney General

                              JONATHAN F. MITCHELL
                              Solicitor General

                              J. REED CLAY, JR.
                              Special Assistant and Senior Counsel
                              to the Attorney General
                              Southern District of Texas No. 1160600

                              */s/ John B. Scott*
                              JOHN B. SCOTT
                              Deputy Attorney General for Litigation
                              Southern District of Texas No. 10418
                              Texas State Bar No. 17901500
                              ATTORNEY-IN-CHARGE

                              G. DAVID WHITLEY
                              Assistant Deputy Attorney General
                              Southern District of Texas No. 2080496

STEPHEN RONALD KEISTER
Assistant Attorney General
Southern District of Texas No. 18580

SEAN PATRICK FLAMMER
Assistant Attorney General
Southern District of Texas No. 1376041

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

COUNSEL FOR THE STATE OF TEXAS, RICK PERRY, JOHN STEEN, and STEVE MCCRAW

## CERTIFICATE OF SERVICE

    I hereby certify that on February 28, 2014, I served a true and correct copy of the foregoing document is being served via the Court's ECF system to all counsel of record.


*/s/ John B. Scott*
JOHN B. SCOTT