Clerk, U.S. District Court
Southern District of Texas
FILED

MAR 06 2014

David J. Bradley, Clerk of Court

Marianne Serpa, Dep-in-Charge
US District Clerk's Office
1133 N Shoreline Blvd #208
Corpus Christi TX 78401

Mar 4 14

I am the active interested party pro se in USA v TEXAS TXSD 2:13cv193/263 suggesting a 2nd ballot by limited voting for the Texas State House with candidates on the limited voting ballot in their own and two-four add'l districts upon paying a filing deposit which may be modified by the court before or at trial.

I suggest preliminary filing deposits of $1000 1st six, $2000 next six, and $3000 subsequent candidates for their own and two add'l districts, $1000 each for 3rd and 4th add'l districts beyond their own. I intend low filing deposits to get a fair bunch of candidates in some if not most House Districts. I want no cap on the number of candidates/district.

I suggest the filing deposit be doubled Aug 12, three weeks before trial.

"Testimony and opinions of historians were offered and received without objection. These showed that the 1901 Alabama Constitutional Convention was part of a movement that swept the post-Reconstruction South to disenfranchise blacks (opponents of a political machine). See S Hackney, Populism to Progressivism in Alabama 147 (1969); C Vann Woodward, Origins of the New South, 1877-1913, 321 (1971). ...'What is it that we want to do?...to establish white supremacy in this State.' 1 Official Proceedings of the 1901 Alabama Constitutional Convention, 8 (1940)."

-HUNTER v UNDERWOOD 1985 471 US 222,9 105 Sct 1916,20, 85 LE2 222.

Robert M Allensworth

Robert M Allensworth B14522
BMRCC 251 N IL 37 S
Ina IL 62846 2419



# AMERICAN FREE PRESS

**Book Orders**

645 Pennsylvania Ave., SE, Suite 100
Washington, D.C. 20003
1-888-699-6397
1-202-547-5585

**Order Number** 21097

**Date of Invoice** 1/10/2014 **Date of Order Received** 1/6/2014

**Customer Number** 114279 **Tracking No.**

**Customer Name**
Robert Allensworth B14522

**Customer Street** 251 N. Il Hwy 37
**Customer Street 2**
**Customer City** Ina.
**Customer State** Il
**Customer Zip** 62846 2419
**Cust Country**

| Quantity | ItemNum | ItemDescription | Price | Line price |
|---|---|---|---|---|
| 1 | Fab.1024 | Lone Wolf Terror By George Michael | $30.00 | $30.00 |

Marianne Serpa, Dep-in-Charge
US District Clerk's Office
1133 N Shoreline Blvd #208
Corpus Christi TX 78401

Mar 4 14

I have been on C grade and commissary destriction most of the last three years limiting me to one $15 shop/month except for one Xmas shop/year. BMRCC doesn't sell unstamped envelopes or stamped post cards. IIgot an insolence disciplinary ticket in Sep 2013 for asking for (un)stamped envelopes at the commissary. I got three months across the board: C grade, Commissary restriction and yard/ gym denial. This punishment has not been reversed, set aside vacated.

**Ship** $6.00 **Order Total Amount** $36.00

Thank you for your order. As Voltaire said, "To learn who rules over you, simply find out who you are not allowed to criticize." Your purchase supports journalists and authors, and filmmakers who have been fearlessly exposing these forces since 1975. We appreciate your interest and support.
Our goal is to provide you uncensored knowledge and to empower you with inexpensive tools to live healthy, wealthy and free. Feel free to contact us if you have any suggestions, questions or comments.

**for USA v TEXAS TXSD 2:13cv193/263** **Mar 4 14**

from AFFIDAVIT OF BRET A ISOM DOC 6-1 9/30/09
USA v CALERA AL ALND 2:08cv1982-KOB

6. The Affrican-American pop of Calera is insufficiently geographically compact to draw a majority-minority district.

7. The limited voting system proposed by Calera allows minority voters to elect the candidate of their choice. A "threshold of exclusion" is based on worst-case assumptions:

a. other voters will cast all the votes available to them.

b. none of their votes will be for the minority-preferred candidate.

c. concentrated entirely on the other candidates equal to the number to be filled and,

d. divided equally among the other candidates.

8. Calera has 6679 registered voters, so the threshold of exclusion is (6679/7=) 935. There are 1097 non-white registered voters in Calera, so the proposed limited voting system will enable minority voters to elect the candidate of their choice, if the voters are politically cohesive.

FURTHER AFFIANT SAYETH NOT.

BRET A ISOM

**I lack and want current info on how Calera AL elects its city council.**

Robert M Allensworth

**Robert M Allensworth B14522**
**BMRCC 251 N IL 37 S**
**Ina IL 62846 2419**

5. Under Calera's interim voting plan, the City proposes to conduct a new municipal election to a six-member council[1] before the end of 2009, based on current and reliable voter registration data. *Johnson v. DeSoto County Bd. of Commissioners*, 204 F. 3d 1335, 1341-42 (11th Cir. 2000)(allowing the use of voter registration data to determine population, and noting that "there is no *per se* rule against the use of voter registration data in voting rights cases."). The election would be at-large with a limited voting system by which each voter would have one vote to cast of any candidate for city council. The winning candidates would be the ones who receive the six highest vote totals.[2] Each voter also would have one vote for mayor.

6. The at-large voting plan proposed by the City of Calera allows minority voters to elect the candidate of their choice by the use of a limited-choice voting mechanism. *See generally*, ***Exhibit B*** *(affidavit of Brett Isom, ¶¶ 7-8).* Under this plan, each voter has one vote, which can be cast for any of the six candidates for election to the Calera City Council. The effectiveness of the limited-choice voting plan can be demonstrated by calculating a coefficient called the "threshold of exclusion," which identifies the percentage of the electorate that a minority group must exceed in order to elect the candidate of its choice, regardless of how other voters vote. *Id.* This coefficient is based on a series of worst-case assumptions, from the minority group's point of view, about what other voters will do. *Id.* These assumptions are that:

a. the other voters will cast all of the votes available to them, but

[1] The present municipal voting plan has 5 council members elected from single-member districts, and a mayor elected at-large. The proposed interim voting plan has six council members, elected at-large by limited voting, and a mayor elected at-large. The council has been increased from five members to six members in order to ensure that the number of minority voters exceeds the threshold of exclusion. *See infra*, *¶¶ 8-9.*

[2] This interim voting plan would not be used as the benchmark for measuring retrogression with regard to the Calera City Council.

blacks as whites. This disparate effect persists today. In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under section 182 for the commission of nonprison offenses." 730 F.2d, at 620.

So far as we can tell the impact of the provision has not been contested, and we can find no evidence in the record below or in the briefs and oral argument in this Court that would undermine this finding by the Court of Appeals.

Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of *Arlington Heights* to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment:

> "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. ... Proof of racially discriminatory intent or purpose [228] is required to show a violation of the Equal Protection Clause." 429 U.S., at 264–265, 97 S.Ct., at 563.

See *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Once racial discrimination is shown to have been a "substantial" or "motivating" factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor. See *Mt. Healthy*, 429 U.S., at 287, 97 S.Ct., at 576.

Proving the motivation behind official action is often a problematic undertaking. See *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). When we move from an examination of a board of county commissioners such as was involved in *Rogers* to a body the size of the Alabama Constitutional Convention of 1901, the difficulties in determining the actual motivations of the various legislators that produced a given decision increase. With respect to Congress, the Court said in *United States v. O'Brien*, 391 U.S. 367, 383–384, 88 S.Ct. 1673, 1682–1683, 20 L.Ed.2d 672 (1968) (footnote omitted):

> "Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."

But the sort of difficulties of which the Court spoke in *O'Brien* do not obtain in this case. Although understandably no "eyewitnesses" to the 1901 proceedings testified, testimony [229] and opinions of historians were offered and received without objection. These showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks. See S. Hackney, Populism to Progressivism in Alabama 147 (1969); C. Vann Woodward, Origins of the New South, 1877–1913, pp. 321–322 (1971). The delegates to the all-white convention were not secretive about their purpose. John B. Knox, president of the convention, stated in his opening address:

> "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State." 1 Official Proceedings of the Constitutional Convention of the State of Alabama, May 21st, 1901 to September 3rd, 1901, p. 8 (1940).

Indeed, neither the District Court nor appellants seriously dispute the claim that

for USA v TEXAS TXSD 2:13cv193/263 from Robert M Allensworth

The 1901 Alabama Constitutional Convention was part of a movement

that swept the post-Reconstruction South to disenfranchise blacks.

HUNTER v UNDERWOOD 1985 471 US 222,9 105 Sct 1916,20 85 LE2 222.



this zeal for white supremacy ran rampant at the convention.

As already noted, the District Court nonetheless found that the crimes provision in § 182 was not enacted out of racial animus, only to have the Court of Appeals set aside this finding. In doing so, the Court of Appeals applied the clearly-erroneous standard of review required by Federal Rule of Civil Procedure 52(a), see *Pullman-Standard v. Swint*, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982), but was "left with a firm and definite impression of error ... with respect to the issue of intent." 730 F.2d, at 620. The evidence of legislative intent available to the courts below consisted of the proceedings of the convention, several historical studies, and the testimony of two expert historians. Having reviewed this evidence, we are persuaded that the Court of Appeals was correct in its assessment. That court's opinion presents a thorough analysis of the evidence and demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks. We see little purpose in repeating that factual [230] analysis here. At oral argument in this Court appellants' counsel essentially conceded this point, stating: "I would be very blind and naive [to] try to come up and stand before this Court and say that race was not a factor in the enactment of Section 182; that race did not play a part in the decisions of those people who were at the constitutional convention of 1901 and I won't do that." Tr. of Oral Arg. 6.

In their brief to this Court, appellants maintain on the basis of their expert's testimony that the real purpose behind § 182 was to disenfranchise poor whites as well as blacks. The Southern Democrats, in their view, sought in this way to stem the resurgence of Populism which threatened their power:

> "Q. The aim of the 1901 Constitution Convention was to prevent the resurgence of Populism by disenfranchising practically all of the blacks and a large number of whites; is that not correct?
>
> "A. Yes, sir.
>
> "Q. The idea was to prevent blacks from becoming a swing vote and thereby powerful and useful to some group of whites such as Republicans?
>
> "A. Yes, sir, that's correct.
>
> "Q. The phrase that is quite often used in the Convention is to, on the one hand limit the franchise to [the] intelligent and virtuous, and on the other hand to disenfranchise those [referred] to as 'corrupt and ignorant,' or sometimes referred to as the ignorant and vicious?
>
> "A. That's right.
>
> "Q. Was that not interpreted by the people at that Constitutional Convention to mean that they wanted to disenfranchise practically all of the blacks and disenfranchise those people who were lower class whites?
>
> "A. That's correct."
>
> . . . . .
>
> "Q. Near the end of the Convention, John Knox did make a speech to the Convention in which he summarized [231] the work of the Convention, and in that speech is it not correct that he said that the provisions of the Suffrage Article would have a disproportionate impact on blacks, but he disputed that that would be [a] violation of the Fifteenth Amendment?
>
> "A. Yes, sir, that is true. Repeatedly through the debates, the delegates say that they are interested in disfranchising blacks and not interested in disfranchising whites. And in fact, they go out of their way to make that point.... But the point that I am trying to make is that this is really speaking to the galleries, that it is attempting to say to the white electorate that must ratify this constitution what it is necessary for that white electorate to be convinced of in order to get them to vote for it, and not merely echoing what a great many delegates say.... [I]n general, the delegates aggressively say that they are not interested in disfranchising any whites. I think falsely, but that's what they say.

R Allensworth B14522 4B21
BMRCC 251 N IL 37 S
Ina IL 62846 2419

THIS CORRESPONDENCE IS FROM AN INMATE OF THE ILLINOIS DEPARTMENT OF CORRECTIONS

UNITED STATES POSTAGE PITNEY BOWES
$ 00.00⁰
02 1M
000426668 2014
MAILED FROM 62846




Clerk, U.S. District Court
Southern District of Texas
FILED

MAR 06 2014

David J. Bradley, Clerk of Court

Marianne Serpa, Dep-in-Charge

US District Clerk's Office

1133 N Shoreline Blvd #208

Corpus Christi TX 78401

78401$2042 C029