```
                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION




MARC VEASEY, ET AL.,              )      CASE NO: 2:13-CV-00193
                                 )
              Plaintiffs,        )            CIVIL
                                 )
      vs.                        )      Corpus Christi, Texas
                                 )
RICK PERRY, ET AL.,              )      Wednesday, March 5, 2014
                                 )
              Defendants.        )      (9:27 a.m. to 11:16 a.m.)
```

MOTION HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

Appearances:            See Next Page

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Office:  Adrian Perez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiffs:                     ARMAND DERFNER, ESQ.
                                P. O. Box 600
                                Charleston, SC 29402

                                CHAD W. DUNN, ESQ.
                                K. SCOTT BRAZIL, ESQ. (Phone)
                                Brazil and Dunn
                                4201 Cypress Creek Parkway
                                Suite 530
                                Houston, TX 77068

                                J. GERALD HEBERT, ESQ. (Phone)
                                191 Somervelle Street
                                #405
                                Alexandria, VA 22304

                                NEIL G. BARON, ESQ.
                                914 FM 517 Road, W.
                                Suite 242
                                Dickinson, TX 77539

                                EMMA SIMPSON, ESQ. (Phone)
                                TERESA GUERRA SNELSON, ESQ. (Phone)

United States                   ANNA BALDWIN, ESQ.
of America:                     U.S. Department of Justice
                                950 Pennsylvania Avenue, N.W.
                                NWB 7273
                                Washington, DC 20009

                                ELIZABETH S. WESTFALL, ESQ. (Phone)
                                U.S. Department of Justice
                                950 Pennsylvania Avenue, N.W.
                                NW NWB 7125
                                Washington, DC 20530

                                DANIEL J. FREEMAN, ESQ.
                                U.S. Department of Justice
                                950 Pennsylvania Ave. NW
                                NWB 7123
                                Washington, DC 20009

3

<u>APPEARANCES FOR (Cont'd):</u>

| | |
|---|---|
| United States of<br> America: | JOHN ALBERT SMITH, III, ESQ.<br>Office of the U.S. Attorney<br>800 N. Shoreline Boulevard<br>Suite 500<br>Corpus Christi, TX 78401 |
| Texas Association of<br>Hispanic County Judges<br>and County<br>Commissioners: | ROLANDO L. RIOS, ESQ.<br>115 E. Travis<br>Suite 1654<br>San Antonio, TX 78205 |
| | PRESTON E. HENRICHSON, ESQ. (Phone)<br>222 W. Cano<br>Edinburg, TX 78539 |
| Oscar Ortiz, et al.: | JOSE GARZA, ESQ.<br>7414 Robin Rest Dr.<br>San Antonio, TX 78209 |
| State of Texas: | JOHN BARRET SCOTT, ESQ.<br>Scott, Yung, L.L.P.<br>208 N. Market Street<br>Suite 200<br>Dallas, TX 75202 |
| | JOHN REED CLAY, JR., ESQ.<br>S. RONALD KEISTER, ESQ. (Phone)<br>Office of the Attorney General<br>P. O. Box 12548<br>MC001<br>Austin, TX 78711-2548 |
| | DAVID WHITLEY, ESQ. |
| Texas League of Young<br>Voters Education Fund: | RYAN HAYGOOD, ESQ.<br>NATASHA KORGAONKAR, ESQ.<br>NAACP Legal Def and Educational<br>Fund, Inc.<br>40 Rector Street<br>5th Floor<br>New York, NY 10006 |
| | M. HASAN ALI, ESQ. (Phone)<br>Wilmer Cutler Pickering, et al.<br>1875 Pennsylvania Ave. NW<br>Washington, DC 20006 |

<u>APPEARANCES FOR (Cont'd):</u>


Mexican American            EZRA D. ROSENBERG, ESQ.
Legislative Caucus,         Dechert, LLP
et al.:                     902 Carnegie Center
                            Suite 500
                            Princeton, NJ 08540-6531


                            DANIEL COVICH, ESQ.
                            GARY BLEDSOE, ESQ. (Phone)


                            VISHAL AGRAHARKAR, ESQ. (Phone)
                            Brennan Center for Justice
                            NYU School of Law
                            161 Avenue of the Americas
                            12th Floor
                            New York, NY 10013

Texas State Conference      ERANDI ZAMORA, ESQ.
 of NAACP Branches:         MARK A. POSNER, ESQ. (Phone)
                            Lawyers' Committee of Civil Rights
                            Under Law
                            1401 New York Ave., Suite 400
                            Washington, DC 20005

1     **Corpus Christi, Texas; Wednesday, March 5, 2014; 9:27 a.m.**

2                          **(Call to Order)**

3                **(Courtroom and Telephonic Appearances)**

4          **THE COURT:**  Court calls Cause Number 2:13-193,

5     *Veasey, et al, versus Perry, et al.*

6          We'll start with the plaintiffs, if, I guess, counsel

7     representing Veasey and LULAC plaintiffs -- go ahead.

8          **MR. DUNN:**  Good morning, your Honor.

9          **THE COURT:**  You're over here.  You were there last

10    time.

11         **MR. DUNN:**  Yes.  I've somehow or another switched

12    around.  My name is Chad Dunn.  I'm -- here with me in the

13    courtroom is Armand Derfner, Teresa Guerra Snelson, and Neil

14    Baron.  We also have Gerry Hebert and Emma Simpson on the

15    telephone.

16         **THE COURT:**  Okay.  You're going to be speaking today?

17         **MR. DUNN:**  Yes, on -- principally, yes, Judge.

18         **THE COURT:**  All right.  Government, The United States

19    of America?

20         **MR. FREEMAN:**  Good morning, your Honor.

21         **THE COURT:**  Morning.

22         **MR. FREEMAN:**  Dan Freeman on behalf of the United

23    States.  With me in the courtroom are my colleagues, Anna

24    Baldwin and John Smith, and on the phone are a host of others.

25         **THE COURT:**  Okay.

1           **MR. FREEMAN:**  But I will be --

2           **THE COURT:**  You'll be taking the lead?

3           **MR. FREEMAN:**  -- speaking for the Government.

4           **THE COURT:**  Mexican American Legislative Caucus,

5  Texas State Conference of NAACP Branches, and Texas House of

6  Representatives.  Go ahead.

7           **MR. ROSENBERG:**  Thank you, your Honor.  Ezra

8  Rosenberg on behalf of MALC and the Texas State NAACP.  With me

9  is my colleague, Daniel Covich, and also on the phone, I

10  believe, are a host of people from the Brennan Center Lawyers'

11  Committee.  Thank you.

12           **THE COURT:**  Okay.

13           **MR. ROSENBERG:**  And I will be speaking.

14           **THE COURT:**  All right.  Plaintiff Ortiz?

15           **MR. GARZA:**  Jose Garza for the plaintiffs Ortiz, et

16  al., your Honor.

17           **THE COURT:**  Okay.  Then, we have Texas League of

18  Young Voters Education Fund?

19           **MR. HAYGOOD:**  Good morning, your Honor.  Ryan

20  Haygood.  I'm joined by my colleagues, Kelly Dunbar and Natasha

21  Korgaonkar.

22           **THE COURT:**  Okay.  The Texas Association of Hispanic

23  County Judges and County Commissioners?

24           **MR. RIOS:**  Rolando Rios here for the Association, and

25  I believe we have a couple of attorneys on behalf of Hidalgo

1    County on the phone.

2           **THE COURT:**  Okay.  Is that all of the plaintiffs?

3           And, then, defendants.

4           **MR. SCOTT:**  Your Honor, John Scott on behalf of the

5    State of Texas with Reed Clay and David Whitley.  Mr. Clay will

6    be taking the --

7           **(Interruption on phone)**

8           **MR. SCOTT:**  Mr. Clay will be taking a portion of the

9    argument, and Mr. Whitley will be taking something on the --

10   the later.

11          **THE COURT:**  Okay.  I'm assuming, then, the people by

12   phone are just going to be listening?  Is that correct,

13   Counsel?

14          **MR. ROSENBERG:**  That's correct.

15          **THE COURT:**  Okay.  So, Brandy, you have their names?

16          **THE CLERK:**  Yes, your Honor.  On the phone is

17   Mr. Hebert; I believe Mr. Brazil just spoke; Ms. Westfall with

18   some other counsel, but Ms. Westfall was the only one that

19   announced for them.  And that's all that I had on the phone.

20          **THE COURT:**  Okay.  Anyone else present by phone?

21          **MR. AGRAHARKAR:**  Yes.  This is Vishal Agraharkar from

22   Brennan Center.

23          **THE COURT:**  I'm sorry.  Can you repeat that?

24          **MR. AGRAHARKAR:**  Vishal Agraharkar from the Brennan

25   Center.

1          **THE COURT:**  Okay.  Anyone else?

2          **MS. ZAMORA:**  Hi.  This is Erandi Zamora with the

3    Lawyers' Committee for Civil Rights.

4          **THE COURT:**  Anyone else?

5          **MR. SPEAKER:**  Scott (indiscernible).

6          **MR. POSNER:**  Mark -- Mark -- Mark Posner also with

7    the Lawyers' Committee.

8          **MR. HENRICHSON:**  This is Preston Henrichson with

9    Hidalgo County.

10          **THE COURT:**  Anyone else on the phone?

11          **MR. KEISTER:**  This is Ronnie Keister with the

12   Attorney General's Office, Texas.

13          **MR. ALI:**  This is Hasan Ali with the Texas League of

14   Young Voters.

15          **THE COURT:**  Is that all?

16          **MR. BLEDSOE:**  Gary Bledsoe with the NAACP.

17          **THE COURT:**  Okay.  I don't hear anyone else, so we're

18   going to proceed.

19          I'm not really sure how to address that, if we need

20   to get everyone on the phone, their name on -- you know, I

21   guess if they're going to speak, we'll need to get their names.

22   But, anyway, we may need to address that later.

23          There are various matters pending before the Court,

24   and one matter that was left hanging or that we were set to

25   address today was that on February 18th this Court entered an

```
 1    agreed order and supplemental protective order that was in

 2    response to the joint motion to enter a discovery order and

 3    protective order that we had addressed at a hearing.  And it's

 4    my understanding that order didn't address all the issues that

 5    were presented at that hearing.  So, what's left?  I know there

 6    were some database issues that we were needing to address.

 7              MS. BALDWIN:  Your Honor, Anna Baldwin for the United

 8    States.  I'm happy to address where we are with respect to

 9    database issues.

10              Since the Court entered the supplemental protective

11    order on February 18th, the parties have made a great deal of

12    progress on the database discovery issues.  Essentially, once

13    the order was entered on the 18th, Texas turned over its

14    databases on the 19th to all parties.  Since that time both

15    defendants and all plaintiffs have finalized their database

16    comparison search protocols, the so-called algorithms.  And, as

17    a result of a number of discussions that the United States has

18    had with defendants, we've come to an agreement on the

19    essential data preparation steps that we need to have agreement

20    on so that the federal agencies will be able to run these

21    comparisons as part of one computational process.

22              THE COURT:  Okay.  Very good.

23              MS. BALDWIN:  So, essentially, where we are right now

24    is that once we got the data from the State of Texas, we

25    prepared that data and did some standardization steps and have
```

1    gone ahead and distributed it to the federal agencies on

2    encrypted hard drives, and we are in the steps with them

3    talking about really operationalizing the process.  At this

4    point, all plaintiffs have discussed some interim modifications

5    to the schedule that would need to be made to accommodate the

6    length of time that the database process will take, and none of

7    those date changes, proposed date changes, would affect the

8    September 2nd trial date.  So, we've reached agreement among

9    the plaintiffs, and we've just this morning circulated a

10   proposal to defendants, and we hope to be getting back to the

11   Court in a few days with what we hope will be an agreed-upon

12   proposed amended scheduling order.

13           **THE COURT:**  Okay.  Anything from -- anything further

14   from the plaintiffs?  It's my understanding there is an

15   agreement with all of the plaintiffs regarding that issue?

16           **MR. DERFNER:**  Yes.  Armand Derfner for the Veasey

17   plaintiffs, and we were -- we had raised some of the issues

18   that brought this issue to --

19           **THE COURT:**  Uh-huh.

20           **MR. DERFNER:**  -- before the Court.  And what

21   Ms. Baldwin has said is basically correct, and I'm pleased to

22   say that it was the procedure the Court -- that the Court

23   followed that helped us get to this, to this point.

24           **THE COURT:**  Okay.  Well, I'm glad you all have been

25   able to work through that.

1          **MR. SCOTT:**  Your Honor, nothing additional other than

2    we have not really reviewed anything on the proposed scheduling

3    order.  We have not (indiscernible) yet, so --

4          **THE COURT:**  Okay.  So --

5          **MR. SCOTT:**  (indiscernible)

6          **THE COURT:**  -- you all are going to look at that, and

7    then, if there is an issue the Court needs to address, you'll

8    let me know.

9          **MR. SCOTT:**  Yes, ma'am.

10         **THE COURT:**  Otherwise, you all will submit an agreed

11    order?

12         **MR. SCOTT:**  Yes, ma'am.

13         **MS. BALDWIN:**  Yes, ma'am.

14         **THE COURT:**  Okay.  Anything else on that issue?

15       **(No audible response)**

16         Okay.  Then -- and I know this is not ripe yet; I

17    probably should have shortened the response on this.  But the

18    United States filed a motion for a protective order to limit

19    the extent of the defendant's request for production.  Can we

20    address that?  I know it's not ripe, but have you all talked

21    further on that, or is that a matter we can take up this

22    morning, at least to limit it some way?

23         **MS. BALDWIN:**  Your Honor, I'm not prepared to argue

24    that motion.  I could broadly describe what it's about.

25         **THE COURT:**  I mean, it just seems fairly basic.

1    There are some definitions, I guess, that the Government is

2    saying are overbroad, causing some issues as to how they can

3    respond.  And I can wait; I just thought if we could address

4    any outstanding matters, particularly discovery, that we

5    should.  But if you're not ready, that's fine.

6              MR. SCOTT:  Your Honor, we're in the middle of

7    preparing a response to them, and before we get that on file

8    with the Court we'll reach out to the folks at DOJ and

9    rehash --

10             THE COURT:  Yeah.

11             MR. SCOTT:  -- those issues --

12             THE COURT:  I think you all should do that.

13             MR. SCOTT:  -- to try and narrow it.

14             THE COURT:  Because I think there is some common

15   ground here we could -- you all are probably at far sides on

16   this issue that -- you know, I think they have some legit

17   concerns just from what I read.  Obviously, you haven't

18   responded.  But it might be something that you all can come a

19   little closer on.

20             When might you get a response on file?

21             MR. SCOTT:  We were operating under the -- just the

22   local rules, looking at that, but I think that we would be in a

23   position to reach out to them sooner than that --

24             THE COURT:  Okay.

25             MR. SCOTT:  -- probably early part of next week, be

1  able to reach back out to them and kind of probably better

2  articulate, perhaps, and even provide them a copy of what we

3  intend to put on filing on the response.

4      **THE COURT:**  Okay.  Then, that will remain pending.

5          And, then, the other issue, probably the last matter,

6  was the United States' motion to compel production of

7  legislative documents.  That was filed; briefing's been done by

8  the defense and the other plaintiffs.  So, I just want to ask a

9  couple of things before I let you argue that.  But first, in

10  reading the briefing, I noticed that defendants said -- I'm

11  assuming you all conferred, because there was a notice that you

12  all had conferred regarding this matter, but I did see where

13  the defendants had said that they would agree to go contact the

14  legislators to see if they agreed, if they waived this

15  privilege, without me even deciding that.  But, I mean, if

16  that, in fact, is so, why are you all -- why haven't we done

17  that, or has that been done?

18      **MR. SCOTT:**  Your Honor --

19      **THE COURT:**  Then I wouldn't have to address this.

20      **MR. SCOTT:**  Well, we have actually reached out to the

21  251 legislators that the DOJ had sought discovery from, or at

22  least reduced the overall universe of materials that they were

23  seeking down to the 251 folks.  And we have, in fact, provided

24  to DOJ a spreadsheet of the responses back from all of those

25  different legislators.

1          **THE COURT:**  So, did they waive, or didn't waive, or

2    some did, some didn't?

3          **MR. SCOTT:**  The latter.

4          **THE COURT:**  Okay.  How many?  Do we know?

5          **MR. SCOTT:**  I could count the sheet, but I did not

6    have a number ready for the Court on what the exact number is,

7    but I do have a spreadsheet.

8          **THE COURT:**  Because there seemed to be an issue on

9    that number 250 also as to whether -- well, the defense said

10   some of them were no longer living --

11         **MR. SCOTT:**  And that's two of them.

12         **THE COURT:**  -- some were not involved in this, didn't

13   come on to be legislators until 2013; so --

14         **MR. SCOTT:**  That's about 40 of them.

15         **MR. FREEMAN:**  Your Honor, it's the position of the

16   United States that documents that were produced by e-mail by

17   legislators, even if they're no longer in the legislature, and,

18   unfortunately, even if they've passed, are still relevant to

19   the intent of SB 14.  In addition, documents produced by

20   legislators who joined the legislature just last year may be

21   relevant to both the legislature's action or inaction in

22   response to the district court decision in D.C., as well as the

23   Supreme Court's decision in Shelby County, as well as the means

24   by which SB 14 is being implemented.  And, so, we would argue

25   that those documents are relevant.  And, in fact, just

1  yesterday a court in North Carolina found that similar

2  documents were relevant to a challenge to North Carolina's

3  voter I.D. bill.

4          **THE COURT:**  Okay.  I don't think there is any

5  question there is a privilege.  I do believe it's qualified.  I

6  think it's just figuring out what it covers and what it doesn't

7  cover.  But one of the issues raised by the defendants is that

8  the plaintiffs haven't procedurally done this properly, that

9  the request should have gone to the legislators as nonparties,

10 I guess, through subpoenas.  So, what's the Government's

11 position on that?

12         **MR. FREEMAN:**  Your Honor, Texas is in possession of

13 thousands of documents that are set out in their privilege

14 logs.  They conceded on page 33 of their initial disclosures

15 that they were in possession of those documents.  And, so, the

16 United States believes that it should not be required to

17 subpoena third parties who may also be in possession, custody,

18 or control of those documents.

19         **THE COURT:**  There's two issues, I guess.  One, I

20 don't know that Texas can raise the privilege or assert the

21 privilege for those legislators, one.  And two is whether they

22 can -- Texas can produce that if there's this privilege.  But

23 I'm just getting a mix of things here from the defense:  one,

24 we've already produced a bunch of documents in the D.C. case

25 regarding this; and, then, two, they're not in our possession,

1     custody, or control.  So, what is it?

2              **MR. CLAY:**  Well, I think there is a little bit of

3     confusion.  There's kind of two sets of documents we're talking

4     about.  The first is what defendant -- or plaintiffs' counsel

5     was just discussing, which were -- came into play during the

6     preclearance case up in D.C.  Some of those documents are in

7     the possession of the Attorney General's office, who is also

8     not a party to this case, so the subpoena issue is still there.

9              There is also another set of documents that would be

10    responsive to their very, very expansive request.  As we've

11    already discussed, they've asked for documents for people who

12    were not even at the -- in the legislature at the time the

13    preclearance case was proceeding.  And, so, those sets of

14    documents are definitely not in anybody's custody or control

15    other than the legislators.  And I think your Honor is correct

16    in pointing out that even those documents that are in the

17    custody of the Attorney General's office, the Texas Attorney

18    General's office, who is not a party to this case, are subject

19    to a host of privileges, one of which, of course, is

20    legislative privilege, and the exact contours of that is the

21    subject of this motion.  And the other is the attorney-client

22    privilege, because the only reason those documents are in the

23    possession of the Texas Attorney General's office is in our

24    capacity as representing them during the discovery process in

25    the preclearance case in D.C.

1          **MR. FREEMAN:**  Your Honor, if I could respond.  If

2    documents were covered by the attorney-client privilege when

3    they were turned over to an attorney for purposes of discovery,

4    then no documents would ever be produced in litigation.  Those

5    documents were not turned over for the purpose of obtaining

6    legal advice; they were turned over for the purposes of

7    complying with discovery.  And, so, they're not covered by the

8    attorney-client privilege.  It's -- also, the State of Texas

9    conceded in its initial disclosures that they were in

10   possession, custody, or control of those documents.

11         Moreover, it's the position of the United States that

12   the State of Texas must include the Office of the Attorney

13   General.  Unlike when private plaintiffs bring suit, the United

14   States has sued the state in its entirety.  And, so, that

15   includes the State of Texas, it includes state agencies such as

16   the Texas Legislative Council, who is in possession -- which is

17   in possession of the e-mail servers at issue that contain the

18   documents that the United States seeks.  It's not general

19   practice that a party should have to seek third-party subpoenas

20   in order to obtain documents that are also in the possession of

21   a party to this case.

22         **THE COURT:**  All right.  So, it appears that quite a

23   few documents were produced in the D.C. case, correct?

24         **MR. CLAY:**  Correct.

25         **THE COURT:**  And, so, there is -- the United States is

1  wanting more than what that court ordered produced?

2         MR. FREEMAN:  Yes, your Honor.  The court in D.C.

3  limited the scope of production in order to limit the

4  federalism issues that it saw to be raised by Section 5 of the

5  Voting Rights Act and, specifically, the application of

6  Section 5 only to a limited universe of states.  And, so, it

7  did apply a state legislative privilege in that case.  The

8  United States believes that -- that no state legislative

9  privilege should shield the documents at issue from production

10  here for the reasons set out in our brief, and, so, the United

11  States seeks to compel the production of a broad scope of

12  documents that Texas withheld in the last litigation.

13         In addition, the United States seeks a new set of

14  searches largely because in the last litigation the State of

15  Texas had individual legislators pull their e-mail on sort of

16  the client's side through -- through their own computer, the

17  Microsoft Outlook, as opposed to the ordinary way that

18  documents are produced consistently across numerous e-mail

19  users in any litigation involving a large corporation, which is

20  to pull them from the server side with a uniform set of search

21  terms.  In addition, a new search is necessary to update the

22  set of e-mails to include e-mails and other documents produced

23  after the last litigation.  And, in addition --

24         THE COURT:  But that's just updating --

25         MR. FREEMAN:  Sorry.

1        **THE COURT:**  -- which I'd suspect that's not a

2   problem; updating what you've already produced, correct?

3        **MR. CLAY:**  Well, I don't think it's a simple matter

4   of updating because I --

5        **THE COURT:**  Well, not everything.  I'm just saying

6   what -- obviously, we're now -- however further along, how -- I

7   don't know when that order was issued by the D.C. court; I

8   don't know when the documents were produced.  But there's going

9   to be some updating, I would think.

10        **MR. CLAY:**   Well, there would be -- to the extent

11   that documents are responsive to their request for documents

12   that were created after the 2011 legislative session, there

13   would be -- there are more -- there are probably more documents

14   out there related to SB 14 created after that time.  We

15   maintain that those documents have no bearing whatsoever on the

16   intent of the 2011 legislature enacting voter I.D.  So, I mean,

17   the short answer is, yes, there is updating, but I'm not sure

18   there's documents that are at all relevant to the issues in

19   this case.

20        **THE COURT:**  Okay.  So, there is no agreement to

21   produce the category of documents you've already produced

22   simply just updating that category of documents.

23        **MR. CLAY:**  Certainly not on the scale that they're

24   seeking.

25        **MR. FREEMAN:**  And, your Honor, just to be clear, the

1    State of Texas produced no internal documents related to the

2    legislature in the last litigation.  It's a huge scope of

3    relevant and potentially highly probative documents that the

4    United States seeks in this motion.  Similar documents have

5    been relied upon by numerous courts hearing Voting Rights Act

6    cases, and two courts have found that the exact same

7    legislature that enacted SB 14 either likely intentionally

8    discriminated on account of race or did intentionally

9    discriminate, relying on just such documents or legislator

10   testimony.

11           **THE COURT:**  But both of those courts found a

12   qualified privilege, correct?  And they went through trying to

13   sort what would be -- what should be produced.

14           **MR. FREEMAN:**  Well, the court in the Western District

15   of Texas required a full production but under seal.  And --

16           **THE COURT:**  But it found a qualified privilege --

17           **MR. FREEMAN:**  It subsequently did find a qualified --

18           **THE COURT:**  -- and personal qualified privilege.

19           **MR. FREEMAN:**  Yes, your Honor.

20           **THE COURT:**  And the other court did, too, the D.C.

21   court.

22           **MR. FREEMAN:**  The D.C. court did not specifically

23   find a privilege because it said that any such privilege had

24   been waived in the *Perez* litigation and that that waiver would

25   apply in D.C. as well.  But it did note that no such privilege

1    was found in Rule 501 or had been found by the D.C. Circuit.

2         MR. CLAY:  I would just respond that in the District

3    of Columbia, in the redistricting case to which counsel refers,

4    the court gave short shrift to the legislative privilege only

5    noting that the D.C. Circuit had never recognized a legislative

6    privilege, ignoring the Supreme Court case law and various

7    other federal case law out there.  And, obviously, you know,

8    we're in the Fifth Circuit, and even this Court has recognized

9    a qualified legislative privilege, at least in the context of a

10   1983 action.

11        Also, numerous cases that they cite in support of

12   their arguments to do away with or abrogate legislative

13   privilege in this case actually support the idea that

14   legislative privilege is a viable and applicable doctrine, even

15   in Section 2 cases, even in Fifteenth Amendment cases.

16        THE COURT:  All right.

17        MR. FREEMAN:  Your Honor --

18        THE COURT:  I'm kind of -- go ahead.  I'm going to

19   let you all argue, but I just needed to clear up a few things

20   before we proceeded.

21        MR. FREEMAN:  Sure.  I mean, just to respond to

22   counsel for the defendants, while it's true and the United

23   States has always stated that there are numerous courts that

24   have applied a qualified privilege, it's the United States'

25   position that *United States v Gillick* (phonetic) and *Jaffee v.*

1    *Redmond* establish that there is no -- that any comity interest

2    that might support a state legislative privilege simply is

3    overcome by an important federal interest, such as federal

4    criminal prosecutions.  And that doctrine is not limited to

5    federal prosecutions and should certainly apply in an important

6    context such as this.  And, as a result, the United States is

7    not aware of any case in which a court has declined to provide

8    documents to the United States when the United States has

9    brought a Section 2 case, and it is not aware of any case in

10   which a court has issued a blanket prohibition on production of

11   internal legislative documents even when there are private

12   plaintiffs who have brought the suit.  The court has at least

13   required the production of some documents in all of the cases

14   of which the United States is aware.

15          **THE COURT:**  And I think that's where the issue is;

16   what documents.

17          **MR. FREEMAN:**  Well, your Honor, there are a few

18   different approaches that courts have taken.  In some cases,

19   such as *Perez*, the court has required a full production under

20   seal.  In other cases, such as *Favors v. Cuomo*, the court has

21   undergone an in-camera review.  However, that in-camera review

22   is still ongoing after over a year.  And, so, under this

23   Court's schedule, the United States believes that if this Court

24   only thinks that a subset of documents are relevant,

25   unfortunately, it's not really possible from defendant's

1    privilege logs to identify exactly which documents are the most

2    appropriate, as they're all relevant, and the privilege log

3    merely establishes that they are internal to the legislature.

4    And, so, likely the best procedure would be a production under

5    seal, as the -- as the Court carried out in *Perez*, and if the

6    parties want to introduce those documents in court, we could

7    subsequently discuss individual documents, and there would be

8    no negative effect on the legislature, as the documents would

9    be produced either subject to the protective order that's

10   already in place or under seal.

11            **MR. CLAY:**  Well, I think all of this kind of gets to

12   the point of that we've put the cart before the horse here.

13   We're talking in broad strokes about a legislative privilege

14   and -- and about the amorphous contours of that privilege.  But

15   we don't have -- if we had gone about this the correct way,

16   which is subpoenaing various legislators or the Attorney

17   General's office with respect to specific documents, we might

18   be in a better position to discuss the actual contours and

19   whether a particular document is or is not subject to a

20   privilege.

21            **THE COURT:**  Okay.  Well, let me just say; the ones

22   that have waived the privilege, I don't need to deal with them

23   at all.  Correct?

24            **MR. CLAY:**  That's correct.

25            **THE COURT:**  They're going to provide whatever needs

 1  to be provided.

 2          **MR. CLAY:**  It's their privilege, and if they waive

 3  it, they waive it.

 4          **THE COURT:**  And how many are we talking about?  I'm

 5  trying to get a grasp as to the magnitude of this.  And you can

 6  look at that if you need some time.

 7          **MR. CLAY:**  He was supposed to be counting.

 8      **(Laughter)**

 9          **MR. FREEMAN:**  Your Honor, none of the principal

10  sponsors of SB 14 nor the speaker nor the lieutenant governor

11  have waived.

12          **THE COURT:**  Look, you requested a lot of documents.

13  I need to figure out where we are, how much I don't even have

14  to deal with at all, and that's what I'm trying to figure out.

15          **MR. FREEMAN:**  Understood, your Honor.

16          **MR. SCOTT:**  Your Honor, I only have one document,

17  which I believe is the same thing we've provided to the United

18  States.  It's a 12-page spreadsheet of legislators who we have

19  received the representation letter.  And, so, the Court --

20  whether we can infer the rest do not wish to assert their

21  privilege or not is another issue.  We know the ones who have

22  affirmatively said:  We want the State of Texas to protect our

23  legislative privilege.

24          **THE COURT:**  And how many were those?

25          **MR. SCOTT:**  I --

1          **THE COURT:**  Oh.  Okay.

2          **MR. SCOTT:**  That gives you a quick glance of who they

3    are, specifically.

4          **THE COURT:**  I'm just trying to figure out the number

5    here.  So, all these want to assert the privilege.

6          **MR. SCOTT:**  Yes, ma'am.  Well, the ones that are

7    noted on that.  That's the complete universe of the 251

8    representatives that were identified by the Department of

9    Justice that they wanted their records from them and their

10   staff for those four or five legislative periods.

11         **THE COURT:**  Okay.  But who -- how many have waived

12   the privilege?  I thought that's what we said earlier, that you

13   all had checked with them to see if anyone would waive that

14   privilege, and that some did.

15         **MR. SCOTT:**  We checked with them to find out if they

16   wished us to represent them on the issue of legislative

17   privilege.  And we sent a letter out to each one of them and

18   said:  If you want us to assert any privilege in this case,

19   then you need to notify us by a date certain.  And --

20         **THE COURT:**  And they haven't?

21         **MR. SCOTT:**  -- those are the ones that have not

22   responded in there, have never responded to us.

23         **THE COURT:**  Wait, wait, wait.  I just need numbers.

24         **MR. SCOTT:**  And, your Honor, I'll get them.

25   (indiscernible).

1          **THE COURT:**  Okay.  I have 250 people here.  I don't

2    know by looking at this -- and my eyes get worse every day --

3    as to --

4          **MR. SCOTT:**  I appreciate --

5          **THE COURT:**  -- who has waived privilege and so that

6    we don't even talk about those people.  They've waived the

7    privilege; the Government gets what they want or what they've

8    requested.

9          **MR. SCOTT:**  And I want to make sure that I'm on the

10   same track with the Court.  I don't think there was anything

11   about our letter that left those representatives or legislators

12   with the understanding that the failure to comply with -- or

13   failure to ask us to represent waived that privilege.

14         **THE COURT:**  Okay.  Let me just say this.  I thought,

15   in reading the briefs, State of Texas said:  We've agreed to

16   reach out to the legislators, see if anyone will waive the

17   privilege, and we'll let you know who's waived the privilege.

18         **MR. SCOTT:**  We agreed to -- asked each of those

19   legislators to get back to us if they wanted us to represent

20   them on that privilege.  And that's what we have, in fact,

21   done, and --

22         **THE COURT:**  That's not the way I read your briefing.

23   And I don't know what page it was on at this point, but I

24   thought State of Texas said:  We have agreed to contact the

25   legislators to see if they'll waive the privilege, and then

```
 1   we'll let you know.  Is that not what the deal was?
 2             MR. SCOTT:  I -- I wrote the letter, and, so, I -- I
 3   think my intent was --
 4             THE COURT:  Okay.
 5             MR. SCOTT:  -- and, your Honor, if that was in the
 6   brief, I apologize, because that's not the intent.
 7             THE COURT:  Okay.  Well, let's go outside the briefs.
 8             MR. SCOTT:  Sure.
 9             THE COURT:  Isn't that the best way to handle this?
10             MR. SCOTT:  I think that --
11             THE COURT:  Does anybody waive?  If you waive the
12   privilege, we don't have an issue for the Court to address at
13   least as to those people, and I don't have to maybe review a
14   bunch of documents regarding those people.
15             MR. SCOTT:  I think, absolutely, your Honor's correct
16   in that.  The question then gets to be the procedure that we
17   get to that point, because currently there are no documents
18   that would be relevant to that discussion, because there has
19   never been a request made to those specific legislators that
20   they produce a document.  And, so, that's part of the problem
21   with --
22             THE COURT:  Well, and that's where the *Perez* court
23   said this is premature.
24             MR. SCOTT:  Yes.
25             MR. FREEMAN:  Your Honor, to the extent that
```

1    defendants have produced thousands upon thousands of pages of

2    privilege logs, they've represented both that they possessed

3    those documents and that those documents were privileged, and

4    the United States has not received any of those documents

5    subject -- or subject to -- subsequent to a waiver by a Texas

6    state legislature -- legislator.  It is our understanding that

7    all of the legislators whose claimed state legislative

8    privilege is at issue in those privilege logs continue to

9    maintain the privilege.

10           **THE COURT:**  So, nobody has waived.  Because I thought

11   in the *Perez* case someone said they went forward with

12   depositions and these legislators didn't claim the privilege.

13   Or is that not correct?

14           **MR. FREEMAN:**  In the *Perez* case, yes, legislators

15   did --

16           **THE COURT:**  So --

17           **MR. FREEMAN:**  -- did waive.

18           **THE COURT:**  -- if we push them a bit, may they waive

19   it?  I mean, come on, guys.  You know, this is a lot of stuff

20   to sort through and look through.  Are they waiving it or not?

21           **MR. FREEMAN:**  Your Honor, at least with regard to the

22   key sponsors and the speaker --

23           **THE COURT:**  Is that all you wanted me to look at is

24   the key sponsors?  I mean, here we have 250 legislators.

25           **MR. FREEMAN:**  Unfortunately, due to the State of

1    Texas's deletion policy of their e-mails, we don't know who's

2    held on to e-mails.  And that's part of the reason why we have

3    sought e-mails so broadly.  But what we are certain is that the

4    vast bulk of documents that are in the logs are from those

5    individuals and that the individuals named in the privilege

6    logs, it's our understanding that they have not waived and that

7    the issue is (indiscernible).

8          THE COURT:  Okay.  I may be missing the big picture

9    here; but wouldn't it be very simple to start out with:  Who's

10   waiving the privilege?  We'd cut that category out.  I don't

11   even need to deal with them.

12         MR. FREEMAN:  Absolutely, your Honor.  It's just the

13   understanding of the United States that few, if any, have

14   waived.  We --

15         THE COURT:  Well, I guess my problem is that you all

16   haven't even figured that out.

17         MR. FREEMAN:  Well, your Honor, we've been

18   requesting --

19         THE COURT:  You could be getting a bunch of documents

20   here that -- if they've waived the privilege.

21         MR. FREEMAN:  Your Honor, we requested these

22   documents months ago, and there is -- we are running out of

23   time, unfortunately.  And the State of Texas seems to have not

24   asked legislators if they wish to waive, but merely if they

25   wished to be represented with regard to state legislative

1    privilege.  We believe that this issue is -- is ripe,

2    especially with regard to the documents and the privilege log,

3    and I believe that if you were to cross-reference the

4    legislators at issue in the log and those who have

5    affirmatively asserted a privilege or asked to be represented

6    by the State with regard to the privilege, you would be

7    covering a very large percentage of those privilege logs.

8         **THE COURT:**  Okay.  Well, and the other issue we've

9    briefly touched on is State of Texas is saying -- and I think

10   *Perez* court said also -- that this is a personal privilege to

11   those legislators and you need to request the information from

12   them.

13        **MR. FREEMAN:**  Your Honor, the *Perez* court did not

14   specifically say that we needed to request the information from

15   them; it merely said that the privilege itself is personal.

16   There could, theoretically, be a personal privilege over a

17   document that is, nonetheless, in the possession of the State

18   of Texas, and --

19        **THE COURT:**  And, so, you're saying Texas is allowed

20   to waive that privilege for those legislators?

21        **MR. FREEMAN:**  No, your Honor.  I'm simply saying that

22   if this Court finds that the privilege is qualified and should

23   be overcome in this case, that the State of Texas can produce

24   the documents without the burden of third-party subpoenas.

25        **MR. CLAY:**  Your Honor, I think this whole discussion

1   highlights why the procedural flaw here isn't just a procedural

2   flaw; it's substantive.  The only way to know for sure, absent

3   constant hounding of legislators, to know whether or not they

4   would like to assert the privilege is to subpoena them.  And

5   then if they respond with -- with the privilege, then they are

6   asserting the privilege.  If they do not respond with the

7   privilege or fail to respond, then they have waived the

8   privilege.  That's why this Rule 45 is written the way it's

9   written, is so that -- we're not allowed to waive the privilege

10  of legislators, either the attorney-client or the legislative

11  privilege.

12          **THE COURT:**  So, how did it work in the D.C. court,

13  then?

14          **MR. CLAY:**  I'm sorry; which, the -- in the --

15          **THE COURT:**  The --

16          **MR. CLAY:**  In the voter I.D. preclearance case?

17          **THE COURT:**  Yes.

18          **MR. CLAY:**  Or the redistricting case?

19          **THE COURT:**  Because the Government, obviously, got

20  some documents from the legislators in that case.

21          **MR. CLAY:**  Well, we had some legislators who were

22  willing to forgo the subpoena and give them the documents.

23          **THE COURT:**  Well, that's what I'm trying to get to.

24          **MR. CLAY:**  And the --

25          **THE COURT:**  But you all did it.  It was through the

1    State of Texas.  It wasn't the Government subpoenaing them

2    individually.

3            **MR. CLAY:**  It was through the Attorney General's

4    office as counsel to several legislators --

5            **THE COURT:**  Why can't we work like that in this case?

6            **MR. CLAY:**  Well, your Honor, the list of legislators

7    from whom they sought documents in that case was a fraction of

8    the size of this one.  And that's part of the problem, is I'm

9    not sure that our office will ever be able to get an answer

10   from 250 different people who are spread all over the state.

11   As you know, the Texas legislature is not in session right now,

12   and they're -- everyone is everywhere.  And a lot of these

13   people that they have asked for documents are not even

14   legislators anymore.

15           **THE COURT:**  But they're saying there is still some

16   information in the computers, or whatever it may be, that

17   would --

18           **MR. CLAY:**  All I'm saying is it's -- since they're

19   not legislators, our ability to track them down and get an

20   affirmative answer from them is --

21           **THE COURT:**  I know, but there's --

22           **MR. CLAY:**  -- is severely hindered.

23           **THE COURT:**  -- probably a hundred at least, half of

24   these, that you could.

25           **MR. SCOTT:**  There's 78, is the number, that have

1 responded affirmatively and asked the State of Texas to

2 represent them -- A.G.'s office to represent them here.

3    **THE COURT:**  Seventy-eight out of two fifty?

4    **MR. SCOTT:**  Two hundred and fifty-one.

5    **THE COURT:**  I'm sorry?

6    **MR. SCOTT:**  Out of 251.

7    **THE COURT:**  Only 78.

8    **MR. SCOTT:**  Oh, 250.  I'm sorry.

9    **THE COURT:**  Only --

10    **MR. SCOTT:**  Seventy-eight responded to us, your

11 Honor.

12    **THE COURT:**  So --

13    **MR. SCOTT:**  They have affirmatively said yes.  I

14 mean, there's two on here that have affirmatively said they did

15 not want us --

16    **THE COURT:**  What did your letter say?

17    **MR. SCOTT:**  To contact us if you -- there is ongoing

18 litigation; there is a current request that seeks to obtain

19 information over which you have a privilege -- and I will get

20 you a exact copy of it.  I don't have it with me right now,

21 your Honor.

22    **THE COURT:**  And you gave them a date certain?

23    **MR. SCOTT:**  Let me know if you want the State of

24 Texas OAG to represent your interests in asserting that

25 privilege.

1          **THE COURT:**  And you gave them a date certain?

2          **MR. SCOTT:**  And gave them a date certain.  And

3   that's --

4          **THE COURT:**  And that date has passed.

5          **MR. SCOTT:**  Yes, ma'am.

6          **THE COURT:**  Then, I'm sorry; I think they don't get

7   to claim that.  And we -- at some point we need to have this

8   addressed.

9          **MR. CLAY:**  Your Honor, I'm not sure how they -- how

10  their not being subject to a legitimate request for production

11  and their nonresponse to a letter from us constitutes a waiver

12  of their privilege.  The rule says that they're supposed to be

13  subpoenaed because they're nonparties.  If they have failed

14  to --

15         **THE COURT:**  Didn't the D.C. court at some point say,

16  look, they've waived it; if they haven't brought it up at this

17  point, they've waived it?  And I'm not saying we're there yet

18  in this case, but wasn't there -- wasn't there some language in

19  one of those cases?  Maybe it was *Perez*; I don't think so --

20  that said:  Okay, at this point, hasn't been brought up, it's

21  waived.  And I don't think -- it sounds like they were not

22  individually subpoenaed in that -- in that case.

23         **MR. CLAY:**  They weren't.  And that's -- that's -- and

24  I don't want to get into the legal strategy behind that,

25  because that's attorney-client privilege, but in that case

1   we -- the legislators made the decision -- the limited group of

2   legislators from whom they sought documents made the decision

3   that they would forgo a subpoena and just -- and just

4   willingly --

5          **THE COURT:**  Okay.  How many were we talking about in

6   that case?

7          **MR. CLAY:**  I don't remember.  I think it's in the few

8   dozens, right?

9          **MR. FREEMAN:**  I believe it was over 50.

10          **THE COURT:**  So, then -- go ahead.

11          **MR. ROSENBERG:**  Ezra Rosenberg on behalf of MALC and

12   Texas NAACP.  It strikes me that, at least as a first step, we

13   should be able to begin with that universe which were, you

14   know, among the people who were most involved in SB 14.  The

15   State just stated that it has those documents -- that those

16   documents were not given pursuant to -- were not provided

17   pursuant to subpoena, and, you know, we have a very short time

18   period in which to --

19          **THE COURT:**  Well --

20          **MR. ROSENBERG:**  -- to do this discovery.

21          **THE COURT:**  -- I'm trying to do that.  I'm trying to

22   narrow what we're dealing with here.

23          **MR. ROSENBERG:**  And, so, I would suggest that, at

24   least step one, let's deal with that group of -- I think it's

25   30, 31, whatever it is, and those were some of the key people,

1    and let's get their documents.

2            THE COURT:  What does Texas have to say on that?

3            MR. CLAY:  Well, I mean, I still think that they

4    need -- we need to go through the subpoena process, because

5    each of these legislators may want to assert the privilege in a

6    different way, and they need a chance --

7            THE COURT:  Okay.  But --

8            MR. CLAY:  -- for their day in court.

9            THE COURT:  -- what is it about this case that's

10   different from the other case where we can't kind of work it

11   the same way where maybe those legislators would say --

12           MR. CLAY:  I think at this particular juncture in

13   time it's that they haven't been faced with an actual request

14   for production.

15           THE COURT:  I know.  And I guess that my question is,

16   why?  We've been dealing with this --

17           MR. CLAY:  I don't know, because we told them in our

18   26(f) conference that they were nonparties and that we would

19   assert legislative privilege.  That was four months ago.

20           MR. FREEMAN:  Your Honor --

21           MR. CLAY:  I mean, to the extent that time has been

22   wasted, it is not on our end.  We --

23           MR. FREEMAN:  Your Honor, the United States has

24   continuously maintained that the State of Texas includes Texas

25   state agencies and the Texas legislature.  The cases cited by

1    defendant to the contrary, two of them the State was not a

2    party to the case, despite the representations of Texas in

3    their brief.  In the other case that subpoenas were denied, it

4    had no reason -- no -- nothing to do with whether or not the

5    legislators were a part of the State because there had been

6    subpoenas.  There is no basis for the State of Texas to assert,

7    in a case challenging the State's action through its

8    legislature, that the State does not include the State's

9    legislature.  In fact, the district court in the I.D. case

10   requested a brief on this issue from the State of Texas when

11   Texas at first made the same claim that subpoenas were

12   necessary.  However, just before the brief was due, the State

13   of Texas agreed to produce documents through the State.

14            Now, particularly with regard to legislators, who

15   have agreed to representation by the State in this matter,

16   there is no reason why, if their attorneys are in court right

17   now, we should have to go through the delay of the subpoena

18   process.

19            THE COURT:  I mean, I kind of agree with that.  If

20   they told you all, yes, assert that privilege for me, why can't

21   we work through you all to get to those legislators?

22            MR. CLAY:  Because they haven't appeared in this

23   case.  And the proper way to do it is by subpoena.

24            THE COURT:  They didn't appear in the --

25            MR. CLAY:  And I'm not sure how they're arriving at

1    the absolute conclusion that legislators are parties to a case

2    when a state is sued.  All of the cases they cite on this

3    legislative privilege, nearly all of them have to do with a

4    subpoena to a nonparty legislator.  I mean, that's the process

5    that is supposed to be followed, and they have had four months

6    to do it, and they haven't.  And that's not --

7             **THE COURT:**  But I guess you have --

8             **MR. CLAY:**  -- that's not --

9             **THE COURT:**  Texas has the documents.

10            **MR. CLAY:**  We have some of the documents.

11            **THE COURT:**  And you're saying you can't turn them

12   over because?

13            **MR. CLAY:**  Because they're subject to a privilege,

14   either attorney-client or legislative, held by the legislators.

15            **MR. ROSENBERG:**  I was just going to restate

16   something, and perhaps in indirect response to what the State

17   just said, is, number one, they have the documents of at least

18   a sub-universe of the legislators that they've gotten for

19   strategic reasons, as they stated, in the Section 5 litigation.

20   And those should be -- we should be able to deal with.

21            And, number two, because this is a qualified

22   privilege, as your Honor stated, your Honor can make use of the

23   strict provisions of the protective order.  Obviously, we

24   don't -- we don't want to burden your Honor with having to

25   review documents in camera if they're not going to be offered

1 into evidence -- have those documents produced, have them

2 produced under seal, have them be designated highly

3 confidential, and if and when the parties choose to offer any

4 of those into evidence, then your Honor will be able to take a

5 look at the specific document against any claims of privilege

6 at that time.

7        **MR. DUNN:**  Your Honor, this is Chad Dunn, if I may

8 speak a moment.  I agree with what Mr. Rosenberg said.  The one

9 thing I would add, that the State has been rowing this boat in

10 these cases both in D.C. and San Antonio of, you know, we

11 don't -- our right hand isn't connected to our left hand, and

12 no court has been on this yet.  This notion that you've got to

13 go chase down everybody that's on the State payroll, everybody

14 that's associated with the State, get them served with a

15 subpoena, in some cases have it enforced by judges in other

16 federal jurisdictions --

17        **THE COURT:**  Yeah, I mean, it does seem unworkable

18 because of the number of people we're talking about and

19 subpoenas.

20        **MR. CLAY:**  Well, it's their number though.  And

21 that's why the subpoena process is set up how it is, is so that

22 they have to determine -- they have to weigh the costs and

23 benefits of that process.  It shouldn't be foisted upon the

24 State.  That's not how -- that's not how the rules were

25 contemplated.

1          **THE COURT:**  Okay.  Let's look at the small number of

2   legislators that you do have documents on.  Let's just talk

3   about those.

4          **MR. CLAY:**  (indiscernible)

5          **MR. SCOTT:**  And for clarification, your Honor --

6   excuse me for a moment -- I want to make sure we understand the

7   path we're going down, because if it's true that any document

8   in the  possession of the Dechert law firm, in any of their

9   offices, for any of their clients, is in the possession of the

10  counsel that they have in front of the Court -- and I think

11  that's what I'm hearing -- then anything one of my civil

12  Medicaid fraud divisions goes out after one of their clients

13  has -- we have the ability to then go get those documents from

14  that law firm?  And I don't believe that's the case.  I believe

15  that each of those clients has the ability to go tee up an

16  issue that they have before a court to protect the privileges

17  that they may have.  And that's the logic --

18         **THE COURT:**  I get --

19         **MR. SCOTT:**  -- that's the line we're going down.

20         **THE COURT:**  I get that.  I'm just still kind of

21  wondering why in the other court you all could produce those

22  documents for some legislators and here you are saying go

23  subpoena all of them.

24         **MR. ROSENBERG:**  If I may respond on behalf of the

25  Dechert law firm.

1      (Laughter)

2          The fact is that there was not a previous suit

3   against the Dechert law firm.  There was a previous suit

4   against the State of Texas, and you're dealing with a -- what

5   was specifically stated as a strategic decision to have those

6   produced without the necessity of subpoena, and here is another

7   suit involving the State of Texas as a party, and we're not

8   talking about in the lawyer -- purely in their lawyer role, but

9   as the State of Texas.

10         MR. FREEMAN:  Your Honor, also, to supplement, the

11  State of Texas has requested documents from the U.S. Department

12  of Justice.  Now, the party to this case is the United States

13  of America.  And by the same logic that Texas has asserted, the

14  documents in the possession of the United States -- or of the

15  U.S. Department of Justice are in the possession of the United

16  States' lawyer.  In this case, where the state in its entirety

17  has been sued and the legislature is the body of the state that

18  took the relevant action in -- primarily, with regard to the

19  intent claim, it simply does not make sense that the State

20  could disclaim that the legislature is a part of the State.

21         MR. CLAY:  I would make one clarification.  Part of

22  the reason that we have made requests to the Department of

23  Justice in this case is because they're the administrative body

24  that was charged with preclearing SB 14.  And, so, it's not

25  quite a fair comparison.

1          And, in addition, counsel for the plaintiffs a minute

2  ago referred to -- several minutes ago now -- referred to or

3  analogized the legislature to a corporation.  That's just not

4  right, because each of these individual legislators is their

5  own particular office, and they -- yes, they meet as a body and

6  make decisions eventually by vote, as a body, but they're --

7  they're individual persons and individual political figures.

8          **THE COURT:**  Okay.  I'm going to backtrack, because I

9  got everyone off track with -- I had some specific questions,

10  but if the Government wants to argue its motion to compel

11  generally, you can proceed on that.  I'm trying to -- I was

12  trying to narrow the issue.

13          **MR. CLAY:**  I think that --

14          **THE COURT:**  But it sounds like Texas is just saying

15  you need to go subpoena everyone.  So, you can go ahead.

16          **MR. FREEMAN:**  Thank you, your Honor.  Thank you for

17  the opportunity to be heard on this motion on such an expedited

18  basis.  I know I appreciate it.  I'll try and keep my

19  presentation brief and not repeat the issues that we've already

20  addressed.

21          In order to enforce the important federal interest in

22  the elimination of intentional discrimination in voting, the

23  United States has brought suit alleging that the State of

24  Texas, acting through its legislature, has violated Section 2

25  of the Voting Rights Act by enacting SB 14 with a

1    discriminatory purpose.  The legislative documents sought are

2    relevant and potentially highly probative to the United States'

3    claim.

4            THE COURT:  And what all are you seeking?

5            MR. FREEMAN:  The United States seeks documents that

6    relate to the legislative session and the internal

7    deliberations of the legislature concerning SB 14 and

8    predecessor bills, as well as the actions of the legislature

9    following the decision of the D.C. District Court not to

10   preclear and not to grant a declaratory judgment to the State

11   of Texas and the actions of the Texas legislature in response

12   to the decision of the Supreme Court of the United States

13   vacating that decision and allowing Texas to implement its law.

14           Under the *Arlington Heights* framework, this Court --

15           THE COURT:  And you're asking that of all these 250

16   or 51 legislators.

17           MR. FREEMAN:  We are, your Honor, but the burden that

18   the State of Texas is asserting is simply not as high as one

19   might think.  Because of the ability that corporations

20   routinely use to conduct searches from the server side using

21   multiple mailbox features, it's simply one search that will

22   pull in all of the relevant documents from all of these -- from

23   all of these legislators' inboxes and archives, and produce

24   them into one set that can be then produced to the United

25   States or further screened for privilege prior to that

1    production.

2              These documents are potentially highly probative.  As

3    I discussed earlier -- and I'll keep it short -- the -- both

4    the *Perez* court and the *Texas v. United States* court relied on

5    similar evidence in finding intentional discrimination by the

6    same session of the Texas legislature that we are addressing

7    here.  The talking points that the sponsors of SB 14 used in

8    both the house and the senate were identical.  And those

9    legislators refused to engage with questions and concerns

10   raised by minority legislators.  That's why it's necessary that

11   we reach beyond the universe of documents that were produced in

12   *Texas v. Holder* and -- and reach into the set of documents over

13   which Texas is asserting a state legislative privilege.  These

14   include within the privilege logs conversations among the

15   sponsors of the bill, the lieutenant governor's office, the

16   speaker's office, and their staff, and it is -- these documents

17   are certainly relevant and potentially probative to the United

18   States' claim.

19             Texas did not challenge the relevance of these

20   documents until its surreply.  However, Texas did not look to

21   either *White v. Regester* or *Rogers v. Lodge*, Supreme Court

22   cases that relied on circumstantial evidence to find

23   intentional discrimination related to voting.  The intent of

24   the legislature issue here is not limited to the surface of the

25   bill or to the public statements of the legislators.  The

1   Supreme Court cases on which Texas relies predate *Washington v.*

2   *Davis*, in which the Supreme Court began requiring a finding of

3   intent to violate the constitution; and in *United States v.*

4   *O'Brien*, a case on which defendants rely, footnote 30 of that

5   case states that where the intent of the legislative body is

6   the question at issue in a constitutional claim, the general

7   caution against inquiry into a legislator -- a legislature's

8   intent does not apply.

9           If the Court has any other questions about cases

10  raised in defendant's surreply, the United States would be

11  happy to answer them.

12          **THE COURT:**  Okay.

13          **MR. FREEMAN:**  With regard to the State legislative

14  privilege, the Court has already concluded that a categorical

15  privilege applies.  However, under the -- or, excuse me -- that

16  a case-by-case qualified privilege applies.  However, under

17  either approach the result should be the same.

18          The five factors that were applied by the *Perez* court

19  as well as the *Favors v. Cuomo* court in New York, *Baldus v.*

20  *Brennan* in Wisconsin, and *United States v. Irving* (phonetic) in

21  the Los Angeles County challenge from a couple of decades ago,

22  those courts all applied five factors:  relevance, the

23  availability of alternative documents, the seriousness of the

24  litigation, the role of the Government, and future -- the

25  potential future timidity of the legislature.

1            Texas did not contest the way that these factors play

2    out in its brief.  We've already discussed relevance, and we've

3    already discussed that the alternative documents, the ones that

4    Texas did produce, are not sufficient for this Court's

5    *Arlington Heights* inquiry because they are limited to public

6    statements that did not -- did not respond to the concerns of

7    minority legislators.

8            The seriousness of this litigation is beyond

9    question.  And the role of Texas as the defendant in this case

10   indicates that the privilege should be given -- should be

11   overcome, because asserting the privilege would allow them to

12   use the privilege as both a sword and a shield.  They intend to

13   put forward legislators to speak about their public statements

14   but not allow effective cross examination that would result

15   from being able to see the documents at issue.

16           And, finally, the Court in *The United States v.*

17   *Gillick* said that any mere theoretical assertion of future

18   timidity on legislators is not sufficient.  And Texas has not

19   put forward any evidentiary basis to support their claim of

20   privilege that might suggest that Texas legislators will be

21   chilled in their speech following a limited disclosure in this

22   case.  In fact, Texas legislators have been producing documents

23   and testifying in <u>Voting Rights Act</u> litigation for decades.

24           Whether defendants rely on dicta found in *Arlington*

25   *Heights*, a pre-*Gillick* decision, in claiming not only that

1   there is a privilege, but that there is some extraordinary

2   circumstances requirement, as the United States explained in

3   its brief, the Supreme Court was referring to the decision to

4   call a legislator as extraordinary and was not saying that

5   there was some threshold finding that was necessary.  In fact,

6   in footnote 20 of *Arlington Heights* the Supreme Court noted

7   that there had been legislative discovery in that case and

8   found no abuse of discretion.  And there was no finding that

9   that case constituted extraordinary circumstances.

10        Third, defendants have asserted an attorney-client

11  privilege that is far more broad than the actual application of

12  the privilege.  With regard to the documents in the privilege

13  log, defendants have not contested the United States' request

14  to compel the documents on which an attorney is merely carbon

15  copied; documents that were communicated between legislative

16  offices, thus waiving any attorney-client privilege between a

17  legislator and their counsel; and to documents that address

18  mere policy or political advice, which is not -- which does not

19  constitute a request for legal advice that would be subject to

20  the attorney-client privilege.

21        Now, Texas has claimed that communications between

22  legislators and the Texas Legislative Council are covered by an

23  attorney-client privilege.  But it is not plausible that the 50

24  attorneys in the Texas Legislative Council have formed

25  attorney-client relationships with each of the 181 separately

1   Texas legislators despite the conflicts that exist between

2   those legislators on the issues at stake.  Even if this Court

3   were to find that legislators had granted the affirmative

4   waiver necessary to overcome those conflicts -- and defendants

5   have not submitted any evidence of such affirmative waiver in

6   support of their privilege claim -- then, at a minimum,

7   communications with the research division of the Texas

8   Legislative Council cannot be covered by the attorney-client

9   privilege.  As Ms. Fulton, the head of the Texas legal -- legal

10  division of the Texas Legislative Council explained in her

11  declaration, there are distinctions between the legal division

12  and the research division, and the research division does not

13  provide legal advice.

14          **THE COURT:**  So, the documents that have been

15  requested by the Government, these -- State of Texas or the

16  defendants have said both the legislative privilege applies and

17  the attorney-client privilege applies to all of them?

18          **MR. FREEMAN:**  No, your Honor.

19          **THE COURT:**  No; just --

20          **MR. FREEMAN:**  The assertion of attorney-client

21  privilege based on the production for purposes of discovery was

22  a new argument raised in defendant's surreply.  They have --

23          **THE COURT:**  But it just targets certain documents?

24          **MR. FREEMAN:**  Yes.  And the United States does not

25  contest the full universe of documents over which Texas has

1    asserted the attorney-client privilege.  There are some good

2    claims there.  We just believe that the attorney-client

3    privilege has been asserted more broadly than the actual

4    privilege would permit.  The legislative privilege is at issue

5    in nearly every document raised on the three privilege logs at

6    issue that concern legislative documents.

7            Finally, and we have discussed this issue at length,

8    the legislative documents are in the possession, custody, or

9    control of the State of Texas.  Courts have noted that that --

10   that those three items are in the disjunctive.  It only is

11   required that a document be in the possession rather than

12   necessarily the custody or control of a party in order for

13   those documents to be subject to disclosure.  By analogy, it's

14   possible for a bank which has been given documents with the

15   belief of confidentiality to, nonetheless, turn them over to

16   the United States subject to a proper warrant.  And,

17   specifically, the claim that Texas has made with regard to

18   possession, an analogy can be made to the Stored Communications

19   Act that prevents disclosure when you have a public e-mail

20   provider but does not apply to a private e-mail server, such as

21   this one.  The e-mail -- the e-mails that are at issue are in

22   the possession of a Texas state agency, and that state agency

23   is a component of the State of Texas, which is the principal

24   defendant in the United States' suit in this case.

25           Finally, Texas has made various assertions with

1    regard to server-side searches and its ability to conduct

2    searches through the server rather than through the end user,

3    the legislator.   In 2014 their -- their claim that they are not

4    able to do that is simply not plausible.   The software that

5    Texas uses, Microsoft Exchange, includes a multi-mailbox search

6    feature.   It's not plausible that Microsoft has disclaimed the

7    feasibility of using that, that search feature, as is

8    represented in Mr. Hining's (phonetic) declaration.   And, so,

9    the United States believes that Texas should -- can and should

10   -- search for and produce even the remaining documents that are

11   not currently on the privilege log and clearly in the State's

12   possession.

13           In sum, the United States is not aware of any case in

14   which a Court has denied the United States access to

15   legislative documents in litigation under Section 2 of the

16   Voting Rights Act.   Any case.   There is no basis to deny access

17   in this case.   And, therefore, the United States respectfully

18   requests that this Court grant the pending motion to compel.

19           Thank you so much, your Honor.

20           **THE COURT:**   Thank you.

21           **MR. CLAY:**   Your Honor, since we've already discussed

22   so much here today, I'm just going to respond to a few points

23   that counsel for plaintiffs just brought up, the first being

24   the burden question that results from their expansive request

25   to over 250 legislators and the -- beyond just that, they have

1   an idea about how the State or the legislature should go about

2   responding to these requests and are demanding that we follow

3   that process.  The problem with that, namely, doing searches

4   through TLC, or the Texas Legislative Council, the problem with

5   that is they fundamentally misunderstand the relationship

6   between -- the technological relationship between the

7   legislative council and the individual legislators.

8           Again, the analogy of a corporation has come up, and,

9   again, it is simply incorrect.  TLC is not the IT department

10  for the legislature.  And what they would have us do is conduct

11  the searches, the expansive searches that they want, through

12  the TLC.  The problem with that -- and I'm going to let my

13  colleague, David Whitley, kind of explain the technical stuff,

14  because I don't really understand that a whole lot -- but is

15  that that would actually produce an under-inclusive amount of

16  documents.  It likely would produce less documents and would

17  fail to uncover documents that are responsive to their request

18  by simply searching through the individual offices of the

19  legislators.

20          And I'll let David Whitley discuss the technological

21  issues.

22          **MR. WHITLEY:**  Your Honor, the corporate structure

23  that DOJ contemplates does not exist in the legislature.  These

24  are individual office holders; they each have records,

25  retention schedules that are separate for each of their

1 offices; and the contemplation by DOJ to search the legislative

2 council for their e-mails on a server-side search does not

3 accomplish what DOJ seeks to accomplish because -- and one of

4 the things that Mr. Freeman referred to was a in-place e-

5 discovery, I believe.  And that is a Microsoft Exchange 2013

6 function, and at our 26(f) conference plaintiff's counsel

7 pointed out that they run Exchange 2010.  So, they are unable

8 to search PST files, which are how the e-mails are saved, in a

9 programmatic fashion.  Each of these individual legislator --

10 legislative offices archives their e-mails however they wish.

11 They do not archive them in a way that legislative council can

12 search one big server for all of these e-mails.  That

13 capability simply does not exist.

14          **THE COURT:**  Okay.

15          **MR. CLAY:**  The next issue I'd like to address is the

16 privilege with respect to documents that flow from the

17 legislative council to and from legislators.

18          **THE COURT:**  That's what you all are claiming

19 attorney-client privilege on?

20          **MR. CLAY:**  We're -- with respect to some of it, yes,

21 it's attorney-client privilege.  A lot of what TLC does is

22 provide legal advice for the various legislators.

23          **THE COURT:**  And what is the case law on that?  What's

24 the relationship there between TLC and the legislators?

25          **MR. CLAY:**  Well, the relationship is they have a

1  legal division where the legislators can go to get legal

2  advice.  Any individual legislator can go there and get legal

3  advice.  The statutory framework in the Texas Government Code

4  makes very clear that's to be confidential and --

5          THE COURT:  Does anywhere say that's an attorney --

6  is there any authority to support that that's an attorney-

7  client relationship?

8          MR. CLAY:  I'm not aware of any in the Government

9  Code, but, of course, to have an attorney-client privilege

10  under the federal common law, it doesn't have to be explicitly

11  stated there; it only has to satisfy the elements of the

12  federal common law.  And what's happening here, there's

13  legislators --

14          THE COURT:  And you're saying the elements are

15  covered?

16          MR. CLAY:  Absolutely.  Because --

17          THE COURT:  As to the legal division.

18          MR. CLAY:  As to the legal division, and which --

19          THE COURT:  What about the research division that was

20  brought up?

21          MR. CLAY:  The research division I don't think that

22  TLC would say is -- and, again, we're speaking on their behalf

23  here as part of -- they're part of the legislative branch, so

24  I -- I hesitate to speak too definitively for them; but I think

25  what they would say is that the research division is generally

54

```
 1   not, although maybe not categorically, generally not involved

 2   in giving legal advice.  What they are involved is giving

 3   research and data, legal drafting, things of that nature, that

 4   fall within what is generally considered to be the core of

 5   legislative privilege.

 6         If you look at some of the cases that were cited in

 7   the plaintiffs' briefs, particularly in the context of voting

 8   rights cases, like the committee for -- I'm sorry -- the Kay

 9   versus City of Rancho Palos Verdes -- it talks about

10   governmental entities being covered by the privilege when they

11   worked very closely with the legislators for these very obvious

12   legislative functions like drafting and research.  And, so, we

13   believe that it falls within the core of what is considered the

14   legislative privilege.

15         The next thing I would address is the sword versus

16   shield argument that is simply -- the fact that we have some --

17   for some reason waived privilege or are trying to use it

18   unfairly because legislators may or may not testify at a trial

19   that may or may not happen isn't indicative that the privilege

20   is being used as a sword or a shield.  Those legislators would

21   testify as to what has happened in the public sphere, in the

22   public record, and they will be able to be cross examined on

23   that.  And that is the very crux of what Arlington Heights

24   allows for showing intentional discrimination is reliance on

25   the circumstantial evidence, the public record, the legislative
```

1    record, and the public debate that happened in those.  And the

2    fact that legislators may testify to that doesn't implicate the

3    privilege being used as a sword or a shield at all.

4              The next thing I would address, and relatedly, is the

5    previous testimony by legislators.  Much of that came in the

6    context of redistricting, and none of the cases they cite

7    suggest that that testimony was over the assertion of privilege

8    and that privilege was abrogated by the court in those cases.

9    And the reason I bring up the fact that it's in a redistricting

10   case is because redistricting is a fundamentally type --

11   different type of legislative activity in the way that it

12   involves thousands of thousands decisions on a very local level

13   that are typically done in Texas and elsewhere as kind of a

14   coalition process where various parts of the state and various

15   parts of legislatures will draw drop-in maps with respect to

16   that part of the state.  And they're the ones who know about

17   the decision-making and the reasons why particular decisions

18   were made in those cases, versus here we have a run-of-the-mill

19   bill that everyone has had the opportunity to research and vote

20   on, and it doesn't involve different distinct parts of the

21   legislature making individualized decisions at a local level.

22   And, so, testimony in redistricting cases is -- from

23   legislators is very, very common and not that unusual.  And

24   that's why a lot of what we've been discussing here today is

25   the reason that the strategy in those cases probably unfolded

1    the way it did, is because in order to really talk about the

2    purpose of those cases you kind of need to get to the -- to the

3    individual legislators who helped draw the lines.

4            The last thing that I would contest is the idea that

5    we've admitted that these documents are relevant.  I think if

6    you read the voting rights, the Section 2, the Fifteenth

7    Amendment cases that are cited in the plaintiffs' case in their

8    briefs, there is a pretty good analysis in *Kay versus City of*

9    *Rancho Palos Verdes* and probably a better analysis in the

10   *Committee for a Fair and Balanced Map* case where the relevance

11   and probative value of various types of legislative activities

12   or communications is weighed against the balancing test that

13   the plaintiffs would have this Court undertake.  And certain

14   types of communications, which we've discussed in our brief,

15   are clearly of very little probative value because the Supreme

16   Court's caution on looking at the individual thought processes

17   or deliberations of an individual legislature and then

18   extrapolating that across the legislature's purpose as a whole.

19   Those cases --

20           **THE COURT:**  I don't think there is any question that

21   the information is relevant that they're looking for, for this

22   type of case.

23           **MR. CLAY:**  I think -- I think what those cases say

24   is -- and I think this is -- this is what motivated the

25   district court of the District of Columbia in the preclearance

1    case to withhold documents along these lines -- is that their

2    probative value is very little in relation to what -- the legal

3    standard they needed to satisfy on *Arlington Heights*, and when

4    you weigh that against the intrusiveness that -- of -- and

5    burden of conducting discovery amongst all of these different

6    legislators, it's outweighed in those cases.

7            Finally, you know, we've talked about the nonparty

8    over and over again.  The plaintiffs continue to maintain that

9    these legislators are somehow a party to this case when they

10   haven't been named, when all of the cases in which they cite in

11   their briefs that talk about legislative privilege presume that

12   they are not legislators because they discuss third-party

13   subpoenas to nonparty legislators.  And we would just rest upon

14   the other cases we've cited in our brief.  There -- it's very

15   clear that legislators are not a party to a lawsuit against the

16   State.

17           Finally, I think one of the things that's gotten lost

18   in our earlier discussion is, you know, because they've

19   never -- the plaintiffs have never made an overture about

20   subpoenas, we've never broached the subject of whether or not

21   the Attorney General's office would accept the subpoenas on

22   behalf of the legislators.  And the answer to -- with respect

23   to the ones that we represent is, yes, that we would.  And

24   then, at that point, I think it becomes clear that once we have

25   a standard about what legislative privilege is, we can go about

1   turning over whatever documents don't fall within the purpose

2   of that or the scope of the privilege.

3          THE COURT:  So, for how many was it?  A hundred

4   and --

5          MR. CLAY:  I think it was 78.

6          MR. SCOTT:  Seventy-eight, your Honor, plus there's

7   two that are actually represented by the plaintiffs that are on

8   that list, so that gets us up to 80.

9          MR. CLAY:  If there is no --

10          THE COURT:  So, for those people you're saying they

11   don't need to subpoena them if the Court decides that's what

12   should be done?

13          MR. CLAY:  Well, I'm saying we would -- we --

14          THE COURT:  That they can work through -- you will --

15          MR. CLAY:  We would accept a subpoena on their

16   behalf, and that we would -- we would --

17          THE COURT:  And they will work through you.

18          MR. CLAY:  Yes.  That --

19          THE COURT:  And not with --

20          MR. CLAY:  That's right.  If there are no further

21   questions --

22          THE COURT:  Okay.  Let me ask you about the attorney-

23   client privilege, because I guess the issue is the Government

24   is saying that you all are trying to include -- it's too broad,

25   what the State of Texas is saying, or what the defendants are

1   saying, regarding that privilege, and you're trying to cover

2   documents where maybe an attorney was simply copied and there

3   is no attorney-client relationship there or maybe documents

4   regarding policy matters or political things.  So --

5          **MR. CLAY:**  And, to be honest, I'm not sure exactly

6   what they refer to.  I mean -- I mean, normally, the way I

7   think this would go is they would refer to particular things in

8   our very extensive and detailed privilege logs and we'd have a

9   debate about those.  Simply -- I mean, I'm not sure --

10         **THE COURT:**  But you agree that would --

11         **MR. CLAY:**  -- how to respond to their arguments

12  that --

13         **THE COURT:**  You agree political matters wouldn't be

14  covered, policy matters wouldn't be covered; it's simply

15  advice, legal opinions, you know --

16         **MR. CLAY:**  As I understand it, the privilege -- the

17  attorney-client privilege covers confidential legal advice or

18  legal opinions or legal representation.

19         **THE COURT:**  So --

20         **MR. CLAY:**  Confidential communications that are for

21  that purpose, either representation in court --

22         **THE COURT:**  So, you all haven't truly discussed some

23  of the specific documents that the Government says:  These are

24  not attorney-client privilege because they're X; they're

25  political matters; they're policy matters; there is not an

1  attorney here, it's just an attorney was copied; or there is

2  not an attorney relationship here.  You all haven't discussed

3  those documents?

4          **MR. CLAY:**  No.  They did not -- they have not brought

5  up any individual documents which they believe are -- are --

6          **THE COURT:**  Isn't that the way this works, that you

7  all -- Government needs to point out to them why these

8  documents are not based on your privilege log, why these are

9  not protected by the privilege?

10         **MR. FREEMAN:**  If I may, your Honor, the United States

11 raised two specific category -- two specific instances in the

12 privilege logs that clearly addressed policy matters.  There

13 were policy memos contained within the speaker's office, and I

14 believe within the lieutenant governor's office there was --

15 there were e-mails addressing polling data.  However, in most

16 cases the privilege logs are not sufficiently specific for the

17 United States to be able to determine whether or not they

18 address --

19         **THE COURT:**  Okay.  Have you all sat down and talked

20 about that?  Look, these documents here, clearly not covered;

21 you've given defendants a chance to look at that.  These

22 documents, I'm not clear on what this is, to determine if there

23 is a privilege.

24         **MR. FREEMAN:**  Your Honor --

25         **THE COURT:**  Because if you can't do it, I certainly

```
 1   can't do it based on the evidence -- well, I might read it

 2   differently, I guess --

 3             MR. FREEMAN:  In most cases --

 4             THE COURT:  -- and think there is enough information.

 5             MR. FREEMAN:  I'm sorry for interrupting.

 6             THE COURT:  That's okay.  I'm sorry, too.

 7             MR. FREEMAN:  In most cases, all or nearly all of the

 8   documents at issue are -- they are also asserting state

 9   legislative privilege.  So, unless and until this Court makes a

10   ruling on the assertion of state legislative privilege, we

11   can't really get to these documents.  That's exactly what

12   happened in Texas v. Holder.

13             THE COURT:  But I guess that's why I was asking

14   earlier the context of.  Are there separate attorney-client

15   privileges; are they all legislative privilege documents, and

16   on top of that there are certain attorney-client privilege on

17   some of those; and -- so --

18             MR. FREEMAN:  The latter, your Honor.

19             THE COURT:  Okay.  Are you all confident that you all

20   fully -- because I read the issue in the briefing regarding

21   these are nonparties and they need to be subpoenaed

22   individually.  Now there is a little -- I think State of Texas

23   is now saying:  For at least this number of legislators we will

24   accept their subpoenas and you all can work through us, but

25   still saying they need to be subpoenaed, but at least we're
```

1    directing them to the party, the defendants here.  Are you all

2    comfortable you all have briefed that issue fully?  Because I'm

3    going to need to go back and look at that in your briefs.

4            Government?

5            **MR. FREEMAN:**  Your Honor, the Government is

6    comfortable with the fact that it has briefed out that the

7    State of Texas includes its legislators.  I'm not sure if I

8    otherwise understand exactly your question.  In footnote 11 of

9    the Government's reply we did respond to the cases cited by

10   Texas with regard to their claims that legislators are

11   nonparties.  The real difference is that when private parties

12   sue a state they generally sue an executive officer because of

13   Eleventh Amendment immunity.  And that's what happened in the

14   two cases at issue that were raised by the State.  In *Alabama*

15   *Education Association v. Bentley*, only executive branch

16   officials had been named as defendants.  And in *Karcher v. May*,

17   the only named defendants were the New Jersey Department of

18   Education, its commissioner, and two township boards of

19   election -- or excuse me -- of education.  The United States

20   can and has sued the State of Texas in its entirety, and we

21   believe that the State of Texas includes the legislators.

22           **THE COURT:**  All right.

23           **MR. CLAY:**  I would just say, we haven't, obviously,

24   had a chance to respond to the reply that they filed because

25   the briefing schedule didn't contemplate that, so --

1          **THE COURT:**  Right.

2          **MR. CLAY:**  -- the footnote to which he refers we

3     haven't responded to.  I'm happy to take a look at and discuss

4     with the legal team whether we need to do any further briefing

5     and, if we do, submit something at that time.

6          **THE COURT:**  Okay.  Anything else from anyone else

7     present on this issue?

8          **MR. ROSENBERG:**  May I, your Honor?

9          **THE COURT:**  Yes.

10         **MR. ROSENBERG:**  Thank you, your Honor.  I'll be very

11    brief.  I want to respond to Mr. Clay's comments on -- first on

12    relevance.  I had to chuckle when he described SB 14 as a run-

13    of-the-mill legislation, because, as we've set forth in our

14    brief, this was treated as anything but run-of-the-mill by the

15    legislature.  There were extraordinary legislative procedures

16    that were taken, decades-old legislative procedures that were

17    abrogated, and we believe that's one of the reasons why this

18    discovery is particularly relevant.

19         Second, Mr. Clay talked about the fact that you can't

20    hold a single legislator responsible for the entire

21    legislature's intent.  One of the cases the State relies on

22    came out the wrong way in terms of its balancing, which is

23    *Florida versus United States*, but, as your Honor indicated,

24    this is highly relevant.  And there, even in that case, the

25    Court said:

1          "A single legislator's testimony on the legislator's

2          own purpose or a single legislator's opinion

3          testimony about other legislators' purpose may not

4          say much about the actual overall legislative

5          purpose, but the testimony may say enough to move the

6          needle at least a little, and relevance requires

7          nothing more."

8          And that's, again, one of their cases.  And the

9     reason that case went in the other direction were at least two

10    reasons that we don't have here.  First, there the State was

11    not going to call any legislator.  And the Court specifically

12    said:

13         "A legislator who agrees to testify, of course, may

14         be deposed; by voluntarily testifying, the legislator

15         waives any legislative privilege on the subjects that

16         will be addressed in the testimony."

17         So, another reason why here, where Texas has

18    indicated that legislators were or are likely to be witnesses,

19    another reason for this discovery.

20         But overall, I think it's important for the Court to

21    focus on the ramifications of the State's position.  Under the

22    State's position, if those legislators who were the leadership

23    in pushing through SB 14 had in their files or on their e-mails

24    factual information that was at odds with the public positions

25    that they were taking in SB 14, we're not allowed to see that

1    and this Court is not allowed to see that.  Under the State's

2    position, if those same legislators who were pushing SB 14 in

3    e-mails and documents stated that their intent was to suppress

4    minority votes, apparently we're not allowed to see that and

5    your Honor is not allowed to see that.  And that can't possibly

6    be the answer under Section 2.

7            In terms of burden, I think we've talked a lot about

8    that.  I think the easy first step, again, is to start with

9    those 30 some-odd legislators whose documents the State has

10   from the Section 5 litigation, have that produced under seal,

11   be highly confidential, and let discovery start.  Because I

12   think that's -- it's important for that to occur without burden

13   on your Honor to do in-camera review until it's absolutely

14   necessary.

15           I'd be happy to take any questions.

16           **THE COURT:**  All right.  Anything else from the

17   plaintiffs?  And then I'll let the defense respond.

18           **MR. SPEAKER:**  Okay.  Thank you.

19           **MR. DUNN:**  Your Honor, Chad Dunn on behalf of the

20   Veasey LULAC plaintiffs.  And I won't repeat anything; there

21   are a couple of things that happened in the D.C. case, I think,

22   that the Court should be aware of or reminded of in the event

23   it is aware of it.

24           You know, it's impossible, obviously, to know exactly

25   what's going on here, but this notion of, Let's issue subpoenas

1    to 250 something people, it's busy work.  And, more

2    importantly, it's work that's going to take up a significant

3    amount of time.  And one of the things the State was chastised

4    for at length by the three-judge court in D.C. was taking too

5    long to do things, and the court actually was concerned that

6    the State's proposals on discovery were actually designed to

7    burn up the discovery period and prevent meaningful discovery

8    in advance of what was a much shorter trial schedule than we

9    even have in this case.

10             So, I'm here to make some constructive proposals to

11   the Court on how to deal with these issues of -- in light of

12   the Court's at least preliminary finding that there is a

13   qualified privilege and that it must be dealt with; instead of

14   having the parties take what I would assume would be at least a

15   couple of weeks to sit down and come up with 78 subpoenas that

16   the State would then accept -- on document requests, everybody

17   already knows what they are -- that we ought to be able to set

18   those aside, the Court ought to be able to set a deadline in

19   the reasonable future, say two weeks, for the State to turn

20   over those documents that are in their possession.

21             With respect to the remaining legislators who didn't

22   respond, we think the Court is in -- is in even footing to

23   decide now that that's a waiver.  And, indeed, that's the way

24   the D.C. court -- they said, look, if it hasn't been assigned

25   by now, then it's -- it's decided.  But if the Court has

1   reservations about that, the State ought to send out a notice

2   tomorrow, the response deadline ought to be Wednesday of next

3   week, and if a legislator hasn't invoked privilege or doesn't

4   respond, you know, that's it, so that we have a final universe

5   of the people involved.  And I think it really will take some

6   direction from this Court and some hard deadlines in order to

7   move past this issue.

8          Now, the final thing I'll say relates to depositions,

9   because I want the Court to be aware that this is what's coming

10  around the corner.  Obviously, the parties have to get to work

11  taking depositions.  And it's ironic that the State takes the

12  position that it can't control a legislator, it can't even

13  communicate efficiently with any legislator, because I can

14  assure this Court, come September 2nd, the State's going to

15  have an exhibit list of legislators and their staff that

16  they're going to march in here one after another and take the

17  position that this wasn't discriminatory in design or won't be

18  discriminatory, in effect, et cetera.  And they want to be able

19  to put on that testimony and prohibit or prevent any meaningful

20  cross examination of it.  And that's really what these

21  documents are all about.  And that's why the court in *Perez*,

22  the Section 5 court in -- on redistricting in D.C., the photo

23  I.D. court in D.C., have all found ways to get these documents

24  turned over.  Then, when we transition to depositions, the

25  legislators and their staff are available to answer meaningful

```
 1   questions about those documents, and the Court can simply

 2   decide the matters of privilege at trial.  And that, it seems

 3   to me, is the only way to move this process forward.  The Court

 4   should provide production of the documents and then at trial it

 5   can make individual decisions on admissibility, which is, in

 6   fact, how it's been handled in the other analogous cases I

 7   mentioned.

 8            Thanks for taking the time.

 9            THE COURT:  All right.

10            MR. FREEMAN:  If I can just respond to a few points,

11   your Honor.

12            THE COURT:  Okay.

13            MR. FREEMAN:  With regard to the burden, it's --

14   simply put, it's the United States' decision to ask Texas to

15   provide the documents that it has in its possession, and

16   whether or not the United States might wish to obtain other

17   documents that might not be in the possession of the Texas

18   Legislative Council that are in the possession of Texas

19   legislators, that -- that's our decision.  And, so, the fact

20   that they may describe the search as under-inclusive does not

21   eliminate the fact that the documents are in their possession.

22            In addition, while Exchange 2010, the software that

23   they run, does not include in-place e-discovery, as we noted in

24   a footnote, in two -- in Exchange 2010, it's called multi-

25   mailbox search.  But it does the exact same thing; and they are
```

1    perfectly capable of searching numerous in-boxes and PST files

2    and archive files all at the same time.

3            With regard to the Texas Legislative Council and an

4    attorney-client privilege, the three-judge court that heard the

5    redistricting case did decide that there was no attorney-client

6    privilege, that the relationship was described as confidential,

7    but the Texas legislature knew the difference between

8    describing a relationship as confidential --

9            **THE COURT:**  And that was both --

10            **MR. FREEMAN:**  -- and one as privileged.

11            **THE COURT:**  -- as to legal and research division?

12            **MR. FREEMAN:**  That's correct, your Honor.  The State

13    of Texas requested that that decision be vacated so long as

14    they would turn over the documents at issue, and the United

15    States did consent.  But the United States believes that the

16    logic contained in that case is completely valid in this case

17    as well.

18            **THE COURT:**  So, documents were turned over there, but

19    they're not being turned over here, some of them, correct?

20    Based on privilege?  Or no --

21            **MR. SCOTT:**  That's not right.  We've turned over

22    every document that was produced last time.  We did that as

23    part and parcel of the -- from the get-go --

24            **THE COURT:**  And that included --

25            **MR. SCOTT:**  -- to avoid --

1          THE COURT:  -- legislators' claims of --

2          MR. CLAY:  But --

3          THE COURT:  -- of documents that would be claimed as

4    privileged?

5          MR. CLAY:  Your Honor, he's referring to the

6    redistricting case in Washington, D.C., and, so, obviously,

7    those --

8          THE COURT:  Okay.

9          MR. CLAY:  -- those documents are not in issue in

10   this case.

11         THE COURT:  Okay.  So, regarding the --

12         MR. CLAY:  It's very confusing.

13         THE COURT:  I know it is.  The *Texas v. Holder*, I

14   believe, was the voter -- voter I.D. case, right?

15         MR. FREEMAN:  Yes, your Honor.

16         THE COURT:  That's not the court that decided the TLC

17   issue.

18         MR. FREEMAN:  No, your Honor.

19         THE COURT:  Okay.  So, documents that were produced

20   by the defendants in the *Texas versus Holder* case have not been

21   produced in this case?

22         MR. CLAY:  No, they have.

23         THE COURT:  They have.

24         MR. CLAY:  Yeah, for the redistricting --

25         THE COURT:  And those -- some of those documents

1   included documents that were privileged -- previously claimed

2   as being protected by the legislator privilege?

3            **MR. CLAY:**  To the extent that the D.C. court

4   disagreed with our analysis of legislative privilege --

5            **THE COURT:**  And it set out --

6            **MR. CLAY:**  -- and any claim (indiscernible) those

7   documents.

8            **THE COURT:**  -- specific things to turn over?

9            **MR. CLAY:**  Yes.

10           **THE COURT:**  And you all did that.

11           **MR. CLAY:**  Yes.

12           **THE COURT:**  And that's --

13           **MR. CLAY:**  Yeah, part of our --

14           **THE COURT:**  -- good for here, too.

15           **MR. CLAY:**  Yes.

16           **THE COURT:**  Those documents.

17           **MR. CLAY:**  We have agreed in our joint conference,

18   the 26(f) conference, that those would be authenticated, and we

19   have turned those over and provided them to all parties in this

20   case.

21           **MR. FREEMAN:**  Your Honor, at issue here are the

22   documents that were withheld in *Texas v. Holder* that we believe

23   should be turned over in this case.  And we believe --

24           **THE COURT:**  So, is that what I'm dealing with?

25           **MR. FREEMAN:**  Yes.  Yes, your Honor.

```
 1              THE COURT:  Okay.

 2              MR. FREEMAN:  You made a small circle.  It's --

 3              THE COURT:  Well, I --

 4              MR. FREEMAN:  -- actually a very big circle.

 5              THE COURT:  Well, it was bigger.

 6         (Laughter)

 7              MR. FREEMAN:  Yes.  But we would argue that it wasn't

 8    much bigger, that the core documents at issue were never turned

 9    over, and they are the documents at issue here.

10              And just to clarify with regard to the research

11    division, there were claims of attorney-client privilege made

12    with regard to communications between attorneys employed by the

13    research division and legislators.  And if this Court were able

14    to make a categorical ruling that the attorney-client privilege

15    does not apply to any attorney employed by the research

16    division, that would address a large number of the documents --

17              THE COURT:  And those were not turned over in Texas

18    v. Holder.

19              MR. FREEMAN:  Yes, your Honor.  Those --

20              THE COURT:  Yes, they were, or, no, they weren't?

21              MR. FREEMAN:  The documents were not turned over in

22    Texas v. Holder --

23              THE COURT:  Okay.

24              MR. FREEMAN:  -- both because of the assertion --

25    because of the assertion of state legislative privilege, and so
```

 1    the court did not reach attorney-client privilege issues in

 2    most instances.

 3            With regard to *Arlington Heights*, Texas has

 4    repeatedly stated that *Arlington Heights* is limited to public

 5    materials.  There is no language in *Arlington Heights* that

 6    states that, and numerous cases applying the *Arlington Heights*

 7    framework have looked at documents that were not released to

 8    the public.  The Fourth Circuit in *Smith v. Town of Clarkton*

 9    put this pretty succinctly, that it is very unlikely that a

10    legislator with a discriminatory intent is going to publicly

11    state that they have discriminatory intent.  And that is why it

12    is necessary to look -- to engage in a searching and sensitive

13    inquiry to all documents that could be looked at.

14            Finally, with regard to the legislators, as I stated

15    before, the difference between the cases that Texas is relying

16    upon and this case is the United States is a plaintiff, and in

17    most cases, because of that, the United -- because of that, the

18    legislators have been subpoenaed because they were not parties,

19    because they cannot be sued by private parties.  But here they

20    are part of -- they are part of Texas.

21            And that -- that's all I wanted to respond to, so

22    thank you so much.

23            **THE COURT:**  Okay.  Can I just ask:  How can we figure

24    out which legislators are asserting a privilege?  You all have

25    already kind of done a preliminary letter reaching out to them.

1    Can we follow up with another letter, as suggested?

2           **MR. SCOTT:**  We will do anything the Court asks us to

3    do with regard to contacting the legislators.  It is a process,

4    and because a lot of them are gone.  And timing is the issue,

5    probably more than anything else, but we're -- we will call

6    them all, we'll write letters to them, whatever you would have

7    us do.

8           **THE COURT:**  Send another letter, as suggested by

9    counsel here, and giving them, you know, two weeks to respond,

10   a deadline, that if they don't let you know that they're going

11   to be asserting that privilege, Court's going to take that as a

12   waiver --

13          **MR. SCOTT:**  And I guess --

14          **THE COURT:**  -- of the privilege.

15          **MR. SCOTT:**  -- from a procedural standpoint, we don't

16   want to get in a position of waiving arguments we might have

17   with regard to that it's their obligation to at least tee up

18   something that would make that universe smaller.

19          **THE COURT:**  I know, but at least we can get something

20   moving in the meantime.

21          **MR. SCOTT:**  Absolutely.

22          **MR. CLAY:**  Your Honor, the only thing I would say is

23   I'm not sure what the difference is between a subpoena from

24   them, which would clear up the legal problems that would be

25   involved with a letter from us, and a letter from us.  I'm

1    not -- I fail to understand how in four months that they

2    haven't been able to issue a single subpoena.  I'm just not

3    sure what the difference between a letter from us, which we

4    have already done, which --

5              THE COURT:  Okay.  Well, you're going to do another

6    one, it sounds like.  Right?

7              MR. SCOTT:  If the Court instructs, we will.

8    Absolutely.

9              THE COURT:  So instructed.

10             MR. CLAY:  I just don't think that resolves the

11   waiver issue at all, because it's not our privilege to assert.

12             THE COURT:  I know, and you're not waiving it, and it

13   is an issue, and it's been briefed, and I'm going to --

14             MR. CLAY:  Okay.

15             THE COURT:  -- look at it a little bit further.

16             MR. CLAY:  I would quickly want to just kind of clear

17   up the record on my phrase "run of the mill."  When I say "run

18   of the mill," I refer not to mean that it lacks some importance

19   or it wasn't of paramount importance to the leadership, the

20   Texas leadership, or Texas voters.  I simply mean that it's --

21   it is a -- it perceives through like -- the redistricting

22   litigation, as I said before, is generally parceled out to

23   various coalitions, usually, you know, among the counties

24   because of the Texas county line rule, which requires districts

25   to be wholly contained within a county.  And, so, counties will

1    draw their own maps amongst themselves, amongst the

2    representatives from those various counties, making countless

3    decisions about neighborhoods and streets that ultimately they

4    know about and no one else really does; not even the other

5    legislators when they go to vote on it.  And, so, by "run of

6    the mill," I mean it's -- it's not like that.  I don't mean

7    that it lacks some importance to the Texas leadership or lacks

8    importance to the Texas voters, which clearly voter I.D. had.

9            The next -- the next I would -- the next point I

10   would respond to is the relevance.  I think the case law is

11   clear that the type of intrusive documents that they seek and

12   discovery that they seek about the thought processes and

13   deliberations have some modicum of relevance to the issues in

14   this case.  When placed in the balancing test, almost

15   universally the case law says that it is -- it is not to be

16   turned over and that the privilege outweighs the other

17   interests at stake.  So, it's not that it isn't relevant.  It's

18   that it's only marginally relevant, and when placed in the

19   balancing test, that of the cases that the plaintiffs cite, it

20   is protected by privilege.

21           The next thing I would say about that -- we haven't

22   identified witnesses at all, we have I.D.'d persons who may

23   have knowledge relevant to this case.  I mean, that's just kind

24   of a minor point about --

25           **THE COURT:**  And why as to those witnesses should they

1    not be able to -- to get this information to cross examine them

2    on?

3           **MR. CLAY:**  Because the legislature doesn't waive its

4    privilege by testifying about nonprivileged subjects.

5           **THE COURT:**  But if they're going to get up here and

6    say:  We did this for this reason, not for discrimination or to

7    have any sort of -- no racial motive or -- why can't they cross

8    examine them, or what's the testimony going to be?

9           **MR. CLAY:**  They can cross examine them on the non --

10   on the unprivileged documents and data that's out there.

11          **THE COURT:**  How many legislators are you planning to

12   call or might be witnesses in this case?

13          **MR. CLAY:**  I mean --

14          **THE COURT:**  Just a rough idea.  I'm not --

15          **MR. CLAY:**  It's --

16          **MR. SCOTT:**  I have no earthly idea at this point.

17          **MR. CLAY:**  No idea.

18          **THE COURT:**  What did you all do in the other case?

19          **MR. CLAY:**  I don't remember that either.  I'm sorry,

20   your Honor.  I'm happy to --

21          **THE COURT:**  Approximately?

22          **MR. CLAY:**  -- provide that information.

23          **MR. SCOTT:**  Happily, I was not a part of it.

24          **MR. CLAY:**  Four or five maybe?

25          **MR. FREEMAN:**  Your Honor, they've named seven

1    legislators and three legislative aides in their initial

2    disclosures.

3             **MR. ROSENBERG:**  And, your Honor, several of them did

4    testify in the Section 5 case.

5             **MR. CLAY:**  Yeah, I would say it was around three to

6    five, six, somewhere in that range --

7             **THE COURT:**  Okay.

8             **MR. CLAY:**  -- that testified in the preclearance

9    case.

10             **THE COURT:**  And in that case you all had some

11    documents, just not the extent of the documents you're

12    requesting here, correct?

13             **MR. ROSENBERG:**  That's correct, your Honor.

14             **MR. CLAY:**  Correct.

15             **THE COURT:**  Okay.

16             **MR. CLAY:**  The last point I would bring up is this

17    idea -- actually, it's not -- I'm sorry; there might be an

18    ultimate point -- is this idea that somehow the State of Texas

19    is playing a delay game by insisting on -- in invoking the

20    privileges and protections afforded by both the common law and

21    the Federal Rules of Procedure.  The other side has known about

22    our position on this issue -- for the parties who have been a

23    part of this case, even at the preclearance stage, they've

24    known about this issue for a couple of years.  For the parties

25    who are new to this case, this issue was directly addressed at

1    the 26(f) conference, and any delay that is involved with the

2    assertion of our rights and privileges under the common law and

3    the federal rules is solely on them, and it should not be

4    foisted on the State.

5              **THE COURT:**  Okay.

6              **MR. CLAY:**  The last point I would bring up is TLC.

7    We've got some affidavits that we provided to the Court that

8    make it clear that the type of search that they want us to do

9    is simply overly burdensome and is unlikely to produce -- it's

10   unlikely to be the only type of search we need to do.  We're

11   going to have to go ahead and probably end up doing individual

12   searches of the legislators' office.  And that way of searching

13   is likely to produce a fulsome -- a more fulsome and complete

14   response to the requests that they seek.  They also would have

15   this Court make categorical statements about the attorney-

16   client privilege and legislative privilege simply by the

17   division of TLC and where attorneys are located within the

18   council.  But that's not the federal common law.  The federal

19   common law is communications between an attorney and a client

20   that involves legal opinions or legal representation.  To the

21   extent that an attorney in the research division is providing

22   legal advice to a legislator who is a client of TLC, that is

23   protected by attorney-client privilege.

24             **THE COURT:**  I wonder on what basis the court in

25   the -- the redistricting court in D.C. said no attorney-client

1    privilege here.  Do you know?

2            MR. CLAY:  They almost completely relied on -- if my

3    memory is serving correctly -- on Chapter 323 of the Texas

4    Government Code, which talks about TLC, and the provision which

5    makes those communications confidential.  Of course, the fact

6    that it makes -- that Texas law makes it confidential says

7    nothing about its status under the federal common law.  In

8    fact, all that does is prove that one element of the attorney-

9    client privilege under the federal common law is present with

10   respect to at least some communications -- no, all

11   communications between TLC and the legislators.  The question

12   becomes, under the facts of a particular communication:  Are

13   the other elements of the federal common law there to establish

14   attorney-client privilege?

15           THE COURT:  All right.

16           MR. CLAY:  Thank you.

17           THE COURT:  Anything else from anyone?

18           MR. ROSENBERG:  Just one thing, your Honor.  Your

19   Honor solicited whether any of us would like to file any short

20   legal statement on the issue of individual subpoenas.  We've

21   also not had a chance to respond to the State's brief in terms

22   of the protocol.  We'd like to consider it, and whatever

23   deadline your Honor sets we would file something by, if we file

24   anything.

25           THE COURT:  Okay.  Because I think that's our

1    preliminary hurdle, is whether this is premature because they

2    haven't been subpoenaed individually.  So, there was some

3    briefing on that already.  I believe the defendants said they'd

4    like to review what's before the Court to see if they're going

5    to provide anything further?

6           MR. SCOTT:  Yes, your Honor.

7           THE COURT:  Okay.  So -- what is today?  Wednesday.

8           MR. ROSENBERG:  And we have not responded to what

9    they filed.

10          THE COURT:  Right.  So, how much time do you all need

11   for some briefing on that issue?

12          MR. ROSENBERG:  Whatever your Honor wants in terms of

13   what works for her schedule.

14          MR. SCOTT:  May we get seven days --

15          THE COURT:  Let me see.

16          MR. SCOTT:  -- not including today?

17          THE COURT:  Yeah, I'm trying to see where we are.

18   So, within seven days, which will put us mid next week.

19          MR. SCOTT:  Maybe seven days from tomorrow?  Would

20   that be okay with the Court, like next Thursday?

21          THE COURT:  That's fine.

22          MR. ROSENBERG:  That's fine.  So, simultaneous on --

23   seven days from tomorrow.

24          THE COURT:  Yes.  I think so.

25          MR. FREEMAN:  If I can just raise very quickly three

1    points.  First, in the defendants' initial disclosures they

2    stated that they were in possession of these documents.  To

3    state that the United States is now responsible to subpoena

4    documents that they have made a concession regarding, that

5    any -- any --

6              **THE COURT:**  I mean --

7              **MR. FREEMAN:**  -- and that we are responsible for the

8    delay --

9              **THE COURT:**  -- the issue is, I think, what the

10   defendants are saying is, those documents are being requested

11   from nonparties here -- and I know the Government has a

12   different position on that -- and that they should be

13   subpoenaed, in that -- one.  And, two, I believe the defendants

14   are also saying that they can't just waive that privilege for

15   the legislators.

16             What else?  Just so we can narrow everything out

17   right now so we know what the briefing needs to address.

18             **MR. CLAY:**  I think that fairly well sums up the

19   issues that we have, that the Attorney General's office -- the

20   Texas Attorney General's office is not a party to this case,

21   and neither are the legislators.  And that's hurdle number one.

22             Obviously, related to that is the fact that whatever

23   documents are in the possession of the Texas Attorney General's

24   office are subject to privilege or privileges which belong to

25   the legislators, and we're not in a position to be able to

1  waive those privileges for them.

2          **MR. FREEMAN:**  Your Honor, the State of Texas has

3  asserted that they represent these legislators.  That's why we

4  have not been able to reach out to them individually,

5  otherwise, under --

6          **THE COURT:**  And is that what you all claim?

7          **MR. SCOTT:**  Actually, they've notified us they were

8  going to reach out to these individual legislators earlier in

9  this case.  And that was an issue, and we asked that we be

10  contacted before you reach out to anybody.

11          **MR. FREEMAN:**  That was to bill opponents that we have

12  reached out to, and you have asserted that you --

13          **MR. SCOTT:**  Some of which are on the list.

14          **MR. FREEMAN:**  But -- and that is because you are in

15  possession of their documents, of documents on which they are

16  parties to that communication, that they are in a e-mail server

17  in your possession.

18          But with regard to documents at issue that they

19  conceded possession of in their initial disclosures, the issue

20  is not waiver; the issue is whether or not this Court will

21  find -- they have -- they have asserted in their privilege logs

22  the state -- a state legislative privilege.  The issue that

23  remains is whether this Court will find that that privilege is

24  overcome.  That issue is entirely teed up by their possession

25  of the documents, their assertion of the privilege on behalf of

1    the legislators.

2          **THE COURT:**  But they're saying they're not --

3          **MR. SCOTT:**  Well --

4          **THE COURT:**  Can you even assert that privilege?

5          **MR. SCOTT:**  Let's use -- let's use Representative

6    Veasey as an example.  He is on the list of 250 representatives

7    they asked us to produce the documents.  If we are to believe

8    the United States' position in this case, then it is solely our

9    decision, as the A.G. for the State of Texas, whether we go

10   back to anything and everything we can find in the State of

11   Texas, archives or anywhere else, relating to Representative

12   Veasey and make that sole decision.  I don't know whether his

13   counsel would agree to that, but I don't think that's the law.

14         **THE COURT:**  Well, I don't think so either.

15         **MR. FREEMAN:**  Your Honor --

16         **THE COURT:**  Because I thought that's what they said;

17   it's a personal privilege that the -- and each legislator can't

18   raise it for the other one or waive it for the other one.

19         **MR. FREEMAN:**  Your Honor, the United States admitted

20   the privilege logs as exhibits to its motion, and the

21   legislators who are named in those privilege logs are, I

22   believe, mostly legislators who are on that list, and I could

23   confirm it if I could see a copy of it; legislators such as

24   Senator Fraser, the senate's sponsor of the bill.  He has

25   asserted a legislative privilege in the prior case; I believe

 1   that he's on their list of people who've asked for

 2   representation in this case; they have the documents; they have

 3   asserted the state legislative privilege.  Those are documents

 4   that are ripe before this Court.  Same thing with documents

 5   from Representative Harless; same things with documents from

 6   Speaker Straus.  These are individuals who they have the

 7   documents, and this Court can rule that those documents should

 8   be turned over.

 9          Secondly, with regard to the State's contention that

10   the requests are unduly burdensome, there is a framework for

11   such claims in Rule 26(b)(2).  The State did not make those

12   types of documents.  They simply said that they were

13   technically incapable, and as the United States has explained,

14   they are simply not.

15          And, finally, the State -- with regard to the e-mails

16   at issue in redistricting, those e-mails are not simply limited

17   to instances of why a house is in one district and not another.

18   The e-mails that the Court relied on were broad, systemic e-

19   mails about the way that the State was going to go about

20   redistricting.  Perhaps the one that got the most attention

21   concerned a metric that an individual had devised called

22   "Orvis," (phonetic) which would allow the State to look at an

23   individual district, bring up the Hispanic demographics, but

24   try and grab parts of the district that would have minimal

25   Hispanic turnout, so it would look Hispanic, but never elect a

1   Hispanic representative of choice.  Those types of systemic e-

2   mails are equally as likely to be present in a case that does

3   not have to do with redistricting.  We can't assert that

4   they're present in this case, because we can't see those e-

5   mails.  But this Court should see if those e-mails exist, under

6   *Arlington Heights,* to determine whether or not SB 14 was passed

7   with a discriminatory intent.

8          Thank you.

9          **THE COURT:**  Okay.  So, we're going to get briefing

10  done by next Thursday on that issue, and then -- I would say we

11  should go ahead and set a status hearing just to make sure we

12  stay on top of this, or maybe you all have a ruling.

13         **(Pause; Court confers with the clerk)**

14         **THE CLERK:**  March 24th at 8:30.

15         **THE COURT:**  So, in the meantime the State is going to

16  go ahead and send that letter, correct?  To --

17         **MR. SCOTT:**  And to make sure I have the proper

18  contents, what would the Court ask that we ensure is contained

19  in it?

20         **THE COURT:**  I'm trying to figure out -- it sounds

21  like, in reading some of the other matters -- and I didn't -- I

22  didn't get to read them extensively, as I would like to have --

23  but that some of the legislators waived their privilege.  So,

24  I'm trying to figure out if they're -- if some of these people

25  are going to waive them, then let's turn over those documents,

87

1    and I don't need to deal with that.

2           **MR. DUNN:**  I'd like to read from the letter that was

3    sent, which I now have, if that's --

4           **THE COURT:**  That's fine.

5           **MR. DUNN:**  -- acceptable to the Court.  And, again,

6    for the record, this is Chad Dunn for the Veasey LULAC clients.

7           But in the third paragraph down, it says, "Second,

8    the legislators" -- this is the letter that the Attorney

9    General, Mr. Scott, sent to legislators.  In particular, I'm

10   reading from the one that went to State Senator Wendy Davis.

11   And it says:

12          "Second, the legislative privilege protects the

13          confidential deliberations, negotiations, and

14          communications of state and local lawmakers from

15          disclosure."

16          Then it goes on to say:

17          "This privilege was upheld by the Court on behalf of

18          several state legislators who requested OAG

19          representation in *Texas versus Holder*."

20          Here's the money sentence, in my view:

21          "If you wish to assert your legislative privilege in

22          *Veasey versus Perry*, please send written notification

23          of your assertion to me by e-mail at" -- gives

24          Mr. Scott's e-mail address -- "or via regular mail to

25          P.O. Box" -- "no later than Friday, February 7,

1       2014."

2              THE COURT:  So, it says:  "If you wish to assert your

3       privilege"?  Is that --

4              MR. DUNN:  Yes.

5              THE COURT:  I think you've done that, then.  I wasn't

6       clear as to -- when we discussed it earlier, you said -- I

7       don't remember what you stated, that left me fuzzy as to

8       whether they were clear on if you don't assert it --

9              MR. SCOTT:  Yes.  And I think --

10             THE COURT:  -- at that point.

11             MR. SCOTT:  -- the prior was about the issue of:  We

12      know the ones that were requested; if you need us to assert it,

13      you need to do it by a date certain.  What -- I think the

14      opposite -- I don't know whether that's true, whether you fail

15      to notify us and have that means that you are waiving, from the

16      perspective of the Court, that.

17             THE COURT:  What -- read it to me again, that -- just

18      that last sentence.

19             MR. DUNN:

20             "If you wish to assert your legislative privilege in

21             *Veasey versus Perry*, please send written notification

22             of your assertion to me by e-mail" --

23             THE COURT:  Uh-huh.

24             MR. DUNN:  -- "or regular mail no later than February

25      7th."

1          **THE COURT:**  So, I'm just going to take that if they

2    didn't respond, they don't wish to assert it, is the way I

3    would read that.

4          **MR. SCOTT:**  And would that be from the perspective of

5    scope of that -- a ruling like that, would that be for

6    everything that they ever did from the time that they were in

7    the legislature on anything relating to -- we can't just say HB

8    14 or SB 14, because they've requested -- the plaintiffs have

9    requested material that predates that legislature, as well.

10   So, the scope, I guess, is really, really difficult to ever

11   understand --

12         **THE COURT:**  Okay.  What's the scope here?

13         **MR. SCOTT:**  -- given the breadth and over breadth of

14   the request.

15         **MR. FREEMAN:**  Your Honor, the scope relates to prior

16   voter identification legislation.  We have only asked for

17   documents related to the 2003, 2005 -- I'm sorry -- it may be

18   2005, 2007, 2009, and then the final bill in 2011, as well as

19   any subsequent legislative action or inaction and the rollout

20   and implementation of the bill.

21         **MR. SCOTT:**  It's an enormous period of time, none of

22   which would be simply identified by, quote, "SB 14," because

23   that was not true in those prior legislatures.

24         **MR. CLAY:**  Your Honor, if --

25         **MR. FREEMAN:**  Your Honor, there are bill numbers in

 1   the -- in the -- related to the prior (indiscernible).

 2         **MR. CLAY:**  Your Honor, one other point is I'm not

 3   sure you can take that sentence out of the context of the whole

 4   letter, which is also asking those legislators whether they

 5   would like to be represented by our office.  There could be any

 6   number of reasons --

 7         **THE COURT:**  But, I mean, you specifically say:  If

 8   you wish to assert that privilege, let me know by X.

 9         **MR. CLAY:**  Through our office.  Through our office,

10   as your representative.  I mean, there's any number of reasons

11   why a legislator might not have responded to that, and I think

12   it's -- we're wading into very dangerous territory if we take

13   that to be a waiver.

14         **THE COURT:**  Well, then, send another letter and --

15   and make it clear that if they don't let this Court know,

16   through you, that they're going to assert that privilege, then

17   I'm going to assume they're waiving it.

18         **MR. SCOTT:**  And would that be over simply the

19   documents that are contained in our capacity as attorney-client

20   that we have in our possession?

21         **THE COURT:**  No, no.  It --

22         **MR. SCOTT:**  Or, again, more expansive?

23         **THE COURT:**  It would be -- right.  Now, we're going

24   to have to figure out what that scope is, because it sounds

25   like we're not agreed to there, but it wouldn't just be what's

1    in your possession.  If they're waiving the privilege, they're

2    waiving their privilege.

3            **MR. FREEMAN:**  Your Honor --

4            **MR. CLAY:**  And what about if they have other counsel

5    other than the Texas Attorney General's Office?

6            **THE COURT:**  They can let us know, or they can let you

7    know.  I mean, what --

8            **MR. CLAY:**  I just keep going back to the way for

9    them -- the subpoena process was put in place for precisely

10   this issue.

11           **THE COURT:**  We're going to research that issue, but

12   we need to get this moving --

13           **MR. CLAY:**  Okay.

14           **THE COURT:**  -- so we're going the other route, too.

15           **MR. CLAY:**  Okay.

16           **THE COURT:**  Okay?

17           **MR. FREEMAN:**  Your Honor, in the redistricting cases

18   the waiver was for -- was a subject matter waiver related to

19   the 2011 redistricting process.  I think that it would be fair

20   to have a subject matter waiver in this case related to

21   photographic voter identification bills and -- and related

22   matters.

23           **MR. SCOTT:**  Your Honor, I just want to make sure the

24   record is clear.  While we are absolutely agreeing -- I mean,

25   if you tell me to go wash your car, I'm out there tonight.

1   Okay?

2       **(Laughter)**

3           **THE COURT:**  I might get in trouble for that.

4           **MR. SCOTT:**  I would also make sure that the Court is

5   in agreement that our sending of this letter to these folks

6   does not act in any way as a waiver of any kind of our

7   privilege that we believe is validly out there on the

8   legislative privilege or any other privilege.

9           **THE COURT:**  Right.  But if some of them are not going

10  to claim that privilege --

11          **MR. SCOTT:**  Absolutely.

12          **THE COURT:**  -- then let's just get that straight

13  right now --

14          **MR. SCOTT:**  Yes.

15          **THE COURT:**  -- up front, clean it all up.  Right?

16          **MR. SCOTT:**  Yes.

17          **THE COURT:**  I mean, that's what I'm trying to do.

18          Okay.  Anything else?

19      **(No audible response)**

20          So, you all are going to do your briefing next week,

21  and then we'll have a status on March 24th at 8:30.  I am in

22  trial.  I'm supposed to start a trial that Monday, so I won't

23  have a lot of time, but we can certainly hash out some things.

24          **MR. DUNN:**  I do have one other thing.

25          **THE COURT:**  Okay.

1        **MR. DUNN:**  On the letter, since it sounds like we're

2   going to send a new one, can the Court give us direction on

3   when the deadline ought to be set in the letter?

4        **THE COURT:**  Well, I would think two weeks.  When are

5   you going to send it out?  What are we, Wednesday?  Can you

6   send it out by Friday?

7        **MR. SCOTT:**  Yes, ma'am.  We'll send it out on Friday.

8        **THE COURT:**  Okay.  And give them two weeks to

9   respond?

10       **MR. DUNN:**  And can the plaintiffs have an opportunity

11  of, say, 24 hours to look at the draft letter before it goes

12  out?

13       **THE COURT:**  Why don't -- I just don't want there to

14  be issues on the language later.

15       **MR. DUNN:**  That's what we're concerned about.

16       **THE COURT:**  So -- do you mind?

17       **MR. SCOTT:**  So, get the letter to them by Thursday,

18  sometime before the end of the day, and then we -- that gives

19  them, say, Friday by early morning, 11:00, or noon --

20       **THE COURT:**  Okay.

21       **MR. SCOTT:**  -- Central Standard Time to get any

22  proposed changes.  I guess the question is, be -- might as well

23  envision --

24       **THE COURT:**  If there is a --

25       **MR. SCOTT:**  -- that there might be a problem?

1          **THE COURT:**  If there is a problem, call me Friday

2   afternoon.

3          **MR. SCOTT:**  Okay.

4          **THE COURT:**  Right?  Brandy, are we available?

5          **THE CLERK:**  After (indiscernible), your Honor.

6          **THE COURT:**  Yeah.  Probably late afternoon, but --

7   so, you're going to do a draft of the letter by tomorrow, the

8   defendant is; send it to the plaintiffs; they'll look at it;

9   they'll have by noon on Friday to see if there's any issues or

10  problems; if you all can't come to an agreement -- I have a

11  hearing on a lengthy matter at 1:30, but you can talk to Brandy

12  as to whether you need some time.

13         Okay.  What else?  And, then, we're set for a hearing

14  on March 24th at 8:30, and at that point, hopefully, we can

15  also discuss the outstanding discovery motion that the

16  defendants were going to respond to that the Government filed

17  regarding some requests for production on the definitions of

18  "you" and "your" and --

19         **MR. SCOTT:**  Yes, ma'am.

20         **THE COURT:**  -- electronic --

21         **MR. SCOTT:**  And we anticipate there's going to be a

22  couple of other motions on some privilege logs that the DOJ has

23  provided --

24         **THE COURT:**  Okay.

25         **MR. SCOTT:**  -- that -- the (indiscernible).

95

1          **THE COURT:**  Anything else from the plaintiffs?

2     **(No audible response)**

3          Nothing else?  You're excused.

4     **(Proceeding was adjourned at 11:16 a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          <u>March 10, 2014</u>


                  TONI HUDSON, TRANSCRIBER