IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, *et al.*,

               Plaintiffs,

       v.

RICK PERRY, *et al.*,

               Defendants.

Civil Action No. 2:13-cv-193 (lead)
(consolidated w/ 2:13-cv-263)

## THE VEASEY-LULAC PLAINTIFFS' RESPONSE ON LEGISLATIVE PRIVILEGE

The Veasey-LULAC Plaintiffs agree with the United States' and the other Plaintiffs'

filings on these issues.  The Veasey-LULAC Plaintiffs offer this further response on legislative

privilege to underscore and expand upon two key points made in the United States' and the

private plaintiffs' previous briefs on these issues.  First, this response gives the Court additional

information about the importance of the requested documents, which was raised in the United

States' Motion to Compel the Production of Legislative Documents, ECF No. 162.  Second, this

response provides detail about two federal cases, cited in the Joint Supplement to the United

States' Motion to Compel, ECF No. 182, which recently dealt with Texas legislative privilege

objections in voting rights cases.

## I.      THE IMPORTANCE OF THE DOCUMENTS AT ISSUE

The documents over which the State of Texas is claiming legislative privilege could

contain evidence that will prove critical to this Court's inquiry into the effects of, and purposes

behind, SB 14.  Indeed, the types of documents at issue now, such as legislative e-mails, were

critical to a three-judge court's findings that Texas's 2011 redistricting maps—enacted by the

same legislature that enacted SB 14—were enacted with a discriminatory purpose and would

have retrogressive effects on minority voting rights.  *See Texas v. United States*, 887 F. Supp. 2d

133 (D.D.C. 2012) *vacated and remanded by* 133 S. Ct. 2885 (2013).[1]  At that time, Texas was

subject to Section 5 preclearance requirements under the Voting Rights Act because of its history

of disfranchising minority voters, and the state sought to preclear its new statewide redistricting

maps in the United States District Court for D.C.  That three-judge court ultimately denied

preclearance for all three maps.  *Id.* at 138.

Two emails, in particular, were an important basis for the court's findings that the state

senate and congressional plans were infected with a racially discriminatory purpose.  The first

(attached hereto as Exhibit A) was an email that David Hanna, an attorney for the Texas

Redistricting Council, sent to two key staffers to the Redistricting Committee's Chairman.

Hanna sent the e-mail in response to a proposal by the staffers to "precook" the Redistricting

Committee report—*i.e.*, to write the committee report before the Redistricting Committee had

even held its hearing.  *Id.* at 165.  The e-mail, produced in the course of that litigation, advised

against pre-cooking the report because it would leave a paper trail and jeopardize the plan's

approval under the Voting Rights Act.  *Id.*

The D.C. three-judge court cited the Hanna e-mail in the part of its decision addressing

whether the state senate plan was enacted with a racially discriminatory purpose.  Specifically,

---

[1]  The case was vacated and remanded in light of *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) and claims of mootness.

the court found the e-mail relevant to determining whether the sequence of events leading to the

plans' enactment—one of the potential indicia of intent under *Village of Arlington Heights v.*

*Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)—suggested that the plans had,

in fact, been adopted with a discriminatory intent. The court explained:

> Our skepticism about the legislative process that created enacted [Senate District] 10 is further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed map. The ostensible purpose of the markup was to consider amendments to the proposed plan, but the email suggests a very different dynamic at work. David Hanna, a lawyer for the Texas Legislative Council, a nonpartisan agency that provides bill drafting and legislative research to the Texas legislature, sent an email to Doug Davis and Senate Parliamentarian Katrina Davis (Doug Davis's wife). Hanna's email responded to an earlier message Texas did not produce, but which concerned "precook[ing]" the committee report, *i.e.*, writing the report before the hearing had been held. Trial Tr. 71:23-25, 72:1-7, Jan. 24, 2012 AM. With a subject line titled, "pre-doing committee report," Hanna's email read:
>
>> No bueno. RedAppl [the redistricting software Texas used] time stamps everything when it assigns a plan. Doing [the Committee Report on] Thursday [May 12] would create [a] paper trail that some amendments were not going to be considered at all. Don't think this is a good idea for preclearance. Best approach is to do it afterwards and we'll go as fast as possible.

*Texas*, 887 F. Supp. 2d at 165 (quoting Defs.' Ex. 359). The court continued:

> Although the chairman of the redistricting committee, Kel Seliger, denied knowing of any advance decision to refuse to consider amendments, he acknowledged what is apparent from the email: the boundaries of the new Senate districts would be a *fait accompli* by the time of the markup and the committee did not intend to consider any amendments to the plan. Trial Tr. 71:3-25, 72:1-16, Jan. 24, 2012 AM. We agree with Chairman Seliger that, at a minimum, this email shows that a plan was in place, at least at the staff level, such that no new proposals or amendments to the district map would be entertained at the markup.

*Id*.

The D.C. court also referenced the e-mail in relation to another indicia of intent under

*Arlington Heights*. The court noted:

3

> Finally, *Arlington Heights* states that "the legislative or administrative history may be highly relevant especially where there are contemporary statements by members of the decisionmaking body." 429 U.S. at 268. Aside from the "No Bueno" email described above, we have no evidence of contemporary statements by the majority members or their staff "concerning the purpose of the official action," *id.* But that email indicates, at a minimum, that redistricting committee staff feared their actions might create the appearance of impropriety under section 5.

*Id.* at 165.  With respect to the Senate Plan, the court concluded that Texas's failure to "ensure[] that its redistricting process was beyond reproach," given its extensive experience with Voting Rights Act litigation, and its failure to "respond sufficiently to the parties' evidence of discriminatory intent, compel[led the court] to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10."  *Id*. at 166.

The second e-mail that the D.C. court relied on (attached hereto as Exhibit B) was an e-mail sent by the Speaker's legal counsel to Geraldo Interiano, a staff person to the Speaker and one of the key people responsible for drawing the congressional redistricting plan.  The e-mail outlined a strategy for drawing one of the majority Latino districts in a manner that would harm Latino voting strength, but would camouflage this retrogressive effect.  The technique, known as the "nudge" factor, involved removing high turnout Latino precincts and replacing them with low turnout Latino precincts.  In doing so, the technique sought to weaken Latino voting power while covering up the true effect by maintaining the district's Latino voting age or citizen voting age population.  The court relied on the e-mail as evidence that the map would have the effect of diluting Latino voting power.  The court stated:

> During the map-drawing process, legislative staffers understood that drawing a map to protect Congressman Canseco while maintaining the benchmark demographic statistics would require careful uses of demographic statistics. As early in the redistricting process as November 2010, Eric Opiela sent an email to Mr. Interiano, explaining that "*certain data would be useful in identifying a nudge factor by which one can analyze which*

4

> *census blocks, when added to a particular district, especially 50-plus-1 majority-minority districts, help pull the districts total Hispanic pop[ulation] and the Hispanic CVAP up to majority status, but leave the Spanish surnamed registered voters and turnout the lowest.* This is especially valuable in shoring up Canseco and Farenthold." Defs.' Ex. 304; Trial Tr. 52-53, Jan. 17, 2012 PM (Interiano). According to Mr. Interiano, the import of this November 2010 email was to use demographic data, such as HVAP, HCVAP and SSVR, to draw a district that featured lower turnout of Spanish surname voters, while leaving the HCVAP at the benchmark level. Trial Tr. 53, Jan. 17, 2012 PM (Interiano).

*Id.* at 207 (emphasis added).

The D.C. court also cited additional communications and e-mails that reflected how the

State of Texas had crafted a strategy to harm Latino voters before the maps were even drawn:

> Mr. Opiela was not an outsider to the redistricting process and played a role in the manner in which districts were drawn.  Mr. Downton testified that he communicated with Mr. Opiela during the drawing of the Congressional Plan and understood that the latter was "speaking on behalf of the Republican Congressmen from Texas with the exception of Representative Barton." Trial Tr. 104, Jan. 18, 2012 AM (Downton); Trial Tr. 56, Jan. 17, 2012 PM (Interiano). Indeed, Mr. Downton acknowledged that he incorporated some of Mr. Opiela's ideas into the Congressional Plan. Trial Tr. 104, Jan. 18, 2012 AM (Downton).  Mr. Opiela also gave pointers to Mr. Interiano during the redistricting process. In particular, after Mr. Opiela informed Mr. Interiano in the November 2010 email that data available at the block level could be used to lower a district's turnout of voters with Spanish surnames while raising its total Hispanic population, Messrs. Interiano and Opiela requested SSVR data at the block level from the TLC. Defs.' Ex. 820; Defs.' Ex. 980.

*Id*. at 207-208.  The court referenced this evidence in denying preclearance to the congressional

plan.

It is clear from the Texas redistricting case that e-mail communications among legislators

and their staff, in addition to other legislative documents that the Plaintiffs seek in this case, may

contain evidence that is crucial to the Plaintiffs demonstrating that SB 14 was enacted with the

purpose of, and will have the effect of, denying and abridging the right of minority voters to

participate effectively in the political process.

## II.   RECENT TEXAS VOTING CASES INVOLVING LEGISLATIVE PRIVILEGE ISSUES

As has been pointed out in the Joint Supplement to the United States' Motion to Compel, ECF No. 182, two recent voting rights cases in which Texas asserted legislative privileges—*Perez v. Perry* and *Texas v. United States*—may provide useful templates for how this Court can proceed with respect to these issues.[2]  This section seeks to lay out, step-by-step, how those issues arose and how the courts responded.

### A.  *Perez v. Perry*

The statewide challenge to Texas's congressional and legislative redistricting maps in *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. filed May 9, 2011) (three-judge court) (lead case), was the first case filed in recent time that dealt with the legislative privilege issue in a statewide case in Texas.   The following numbered sections trace the high points of how these issues proceeded.

1.   Initially, the *Perez* three-judge court handled legislative privilege as this Court has thus far: it ordered the State to determine whether it intended to assert privilege and, if so, as to what documents and it further gave the State a date certain.  *See Perez*, ECF No. 118.

2.   After a hearing where the three-judge court questioned the broad privilege position the State was taking, the State informed the Court that it was not invoking privilege as it pertained to

---

[2] In *Texas v. Holder*, No. 1:12-cv-00128 (D.D.C. closed Aug. 29, 2012), the Section 5 preclearance action regarding SB 14, the U.S. District Court for D.C. used slightly different procedures for dealing with legislative privilege issues.  With respect to these issues, however, that court was concerned about limiting the intrusion into state sovereignty.  *See, e.g.*, Order on Motion to Compel at 4, June 5, 2012, ECF No. 167 ("In determining where to draw the contours of the legislative privilege in this case, the Court also recognizes that Section 5 imposes 'substantial federalism costs,' and the Court should attempt, where possible, to minimize 'federal intrusion into sensitive areas of state and local policymaking.' *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009).  As such, the applicable contours of the state legislative privilege may be drawn differently in a Section 5 case than in other contexts.").

document production responses.  *See Perez*, ECF No. 189, n.7.  The State did, however, state that

it intended to assert legislative privilege as it pertained to questions asked of legislators during

depositions.  *See Perez*, ECF No. 102 (attached hereto as Exhibit C).

3.   In response, the court held that "any sort of blanket protective order that would

insulate witnesses from testifying would be inappropriate.   As an evidentiary and testimonial

privilege, the legislative privilege is limited and qualified." *Id.* at 4-5 (citations omitted).   The

court also found that "the assertion of the privilege [wa]s premature." *Id.*  Thus, the *Perez* court

held: "The deponents may invoke the privilege in response to particular questions, but the

deponent must then answer the question subject to privilege."   *Id.* Those portions of the

transcript that contained answers given under a legislative privilege objection were then sealed

for later *in camera* review.  *Id.* at 6.  The court determined that it would rule on admissibility

later, should a party wish to introduce any of the testimony at trial.   At that time, the court

explained, it could consider whether to allow the evidence based on several factors, including

waiver and the availability of the information from other sources.  *Id.* at 5.

4.  Since it was filed in May 2011, the *Perez* case was tried in front of a three-judge court,

was the subject of numerous orders, was argued on an appeal to the U.S. Supreme Court, was

tried a second time, and resulted in new maps in advance of the 2012 elections.

5.  All of these events occurred under the privilege framework described above.  Thus, all

documents were produced and no testimony was excluded at the evidentiary hearings.

Additionally, no complaint was lodged against this framework during the U.S. Supreme Court

appeal concerning the district court's process for handling privilege.

6.  The case is now pending before the three-judge district court on remaining challenges

to the state's 2013 redistricting plans and other issues. The case is set for trial this July.

7. In late 2013, Texas asked the court to modify its earlier ruling, described above, on legislative privilege. *See Perez*, ECF No. 930.

8. On January 8, 2014, the three-judge court issued an order that denied the State's motion to modify on the grounds that it was premature. *See Perez*, ECF No. 952 (attached hereto as Exhibit D).

a. In the order, the court discussed the legislative privilege doctrine. It noted: "The privilege must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Id.* at 2-3 (internal quotation marks and citations omitted). The Court further explained that, "[w]hile the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, 'at best, one which is qualified.'" *Id.* at 3 (citations omitted).

b. The court then explained that "[t]o determine whether the legislative privilege precludes disclosure, a court must balance the interests of the party seeking the evidence against the interests of the individual claiming the privilege." *Id.* at 4. The court laid out five factors that "aid in this determination." *Id.* at 4-5.

c. Lastly, the court discussed procedures for handling legislative privilege issues that might arise in the course of future depositions.

d. The court first reaffirmed the validity of the procedures outlined in its earlier, August 1, 2011 Order—namely, that deponents would answer questions over which they asserted a privilege; that those portions of the testimony would be filed under seal; and, if a party wished to

introduce any of those portions, that party could file a motion to compel and the court could conduct *in camera* review to determine whether or not the testimony was admissible. *Id.* at 4.

e. The court then also provided an alternative way for the parties to deal with legislative privilege issues at future depositions in that case: deponents could decline to answer specific questions on the grounds of privilege and the plaintiffs could then file motions to compel. *Id.* at 4-5. The court did not offer explanation for providing the alternative at that point in the litigation, but the court did not say legislative privilege mandated that alternative, nor did the court reject or even question its earlier method for handling privilege issues.[3] *Id.*

f. *Perez* thus establishes that one way this Court can handle legislative privilege issues is to: require the defendants to produce documents and testify about issues over which they assert a legislative privilege; further require that the documents and transcripts containing allegedly privileged testimony or information be kept under seal; and require a party wishing to use potentially privileged information to file a motion to compel, so that the Court can conduct *in camera* review and determine whether a privilege exists and, if so, whether the privilege must yield. The Court can therefore deal with the issues at trial, should they arise.[4]

B. *Texas v. U.S.*

In an action to preclear the state's redistricting maps in the U.S. District Court for D.C., a three-judge court followed a similar approach. *See Texas v. United States*, No. 1:11-cv-01303

---

[3] At the time the court issued its order on January 8, 2014, the parties had considerably more time for fact discovery than they had when the court issued its August 1, 2011 Order, and considerably more time than remains in this case. Additionally, when the court issued its second order, numerous legislators had already been deposed about the 2011 maps under the procedures set forth in the 2011 order, the remaining challenges to the interim maps were significantly narrower in scope, and fewer depositions of state legislators were anticipated.

[4] Under the *Perez* court's August 1, 2011 protocol, that court was never ultimately called on to resolve objections to the admissibility of any specific deposition testimony based on legislative privilege objections.

9

(D.D.C. closed Dec. 3, 2013).

     1.  The court ordered Texas to produce "all documents as to which it claim[ed] only a legislative privilege forthwith."  *Texas*, Minute Order, Dec. 30, 2011.

     2.  The court explained in a subsequent opinion that it did not need to resolve whether a state legislative privilege applied at that time.  *Texas*, ECF No. 128.  Instead, the parties would have access to the disputed documents under seal and, if a party wanted to use one of the sealed documents at trial, the party could raise the issue "with specificity as to the document(s) at issue."  *Id.* at 17-18.

     3.  *Texas v. United States*, therefore, provides additional support for the practical solution that a court can best resolve legislative privilege issues at the time of trial, and only if those issues actually come to fruition, by maintaining documents and testimony potentially subject to that privilege under seal.  Such a procedure balances the need for complete factual development with the qualified and limited legislative privilege being asserted.

This the 13th day of March, 2014.

Respectfully submitted,

**BRAZIL & DUNN**

 /s/ Chad W. Dunn
Chad W. Dunn
State Bar No. 24036507
K. Scott Brazil
State Bar No. 02934050
Brazil & Dunn
4201 Cypress Creek Parkway, Suite 530
Houston, Texas  77068
Telephone:  (281) 580-6310
Facsimile:   (281) 580-6362
chad@brazilanddunn.com
scott@brazilanddunn.com

J. Gerald Hebert
D.C. Bar No. 447676
Emma Simson
M.D. Bar
Campaign Legal Center
215 E Street, NE
Washington, DC 20002
Telephone (202) 736-2200 ext. 12
Facsimile (202) 736-2222
GHebert@campaignlegalcenter.org
(Pro Hac Vice Motions Granted Dkt. #13, #185)

Neil G. Baron
State Bar No. 01797080
Law Office of Neil G. Baron
914 FM 517 W, Suite 242
Dickinson, Texas 77539
Telephone (281) 534-2748
Facsimile (281) 534-4309
neil@ngbaronlaw.com

11

David Richards
State Bar No. 16846000
Richards, Rodriguez & Skeith, LLP
816 Congress Avenue, Suite 1200
Austin, Texas 78701
Telephone (512) 476-0005
Facsimile  (512) 476-1513
daverichards4@juno.com

Armand G. Derfner
Derfner, Altman & Wilborn, LLC
P.O. Box 600
Charleston, S.C. 29402
Telephone (843) 723-9804
aderfner@dawlegal.com
(Pro Hac Vice Motion Granted Dkt. # 6)

*Attorneys for Plaintiffs Marc Veasey, Floyd James
Carrier, Anna Burns, Michael Montez, Penny Pope,
Jane Hamilton, Sergio DeLeon, Oscar Ortiz, Koby
Ozias, John Mellor-Crummey, Peggy Draper
Herman, Evelyn Brickner, Gordon Benjamin, Ken
Gandy, League of United Latin American Citizens
("LULAC") and Dallas County, Texas*


LUIS ROBERTO VERA, JR.
LULAC National General Counsel
State Bar No.  20546740
The Law Offices of Luis Vera Jr., and Associates
1325 Riverview Towers, 111 Soledad
San Antonio, Texas 78205-2260
Telephone (210) 225-3300
Facsimile (210) 225-2060
lrvlaw@sbcglobal.net

*Attorney for LULAC*

Craig M. Watkins
Dallas County District Attorney
State Bar No. 00791886
Teresa G. Snelson
Chief, Civil Division

Dallas County District Attorney's Office
State Bar. No. 08577250
411 Elm Street, 5th Floor
Dallas, TX 75202-4606
Telephone (214) 653-7358
Facsimile (214) 653-6134
Teresa.Snelson@dallascounty.org

*Attorneys for Dallas County, Texas*


CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of March, 2014, I served a copy of the foregoing VEASEY-LULAC PLAINTIFFS' RESPONSE ON LEGISLATIVE PRIVILEGE on all counsel of record by filing a copy of the same in this Court's CM/ECF system.

*/s/ Chad W. Dunn*
Chad W. Dunn