UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )        CASE NO: 2:13-CV-00193
                               )
            Plaintiffs,        )             CIVIL
                               )
     vs.                       )        Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )        Tuesday, April 1, 2014
                               )
            Defendants.        )        (10:27 a.m. to 12:04 p.m.)


MISCELLANEOUS HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Arlene Benavidez

Clerk:                    Brandy Cortez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>TELEPHONIC APPEARANCES FOR</u>:


Plaintiffs:                J. GERALD HEBERT, ESQ.
                           EMMA SIMPSON, ESQ.
                           191 Somervelle Street
                           #405
                           Alexandria, VA 22304


United States              ELIZABETH S. WESTFALL, ESQ.
of America:                U. S. Department of Justice
                           950 Pennsylvania Avenue, N.W.
                           NWB Room 7125
                           Washington, DC 20530


NAACP:                     MARK A. POSNER, ESQ.
                           Lawyers' Committee for Civil Rights
                           1401 New York Ave. NW, Suite 400
                           Washington, DC 20005


Texas League of Young      KELLY DUNBAR, ESQ.
Voters Education Fund:      Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Ave. NW
                           Washington, DC 20006


                           NATASHA KORGAONKAR, ESQ.
                           NAACP Legal Def and Educational
                           Funds, Inc.
                           40 Rector Street
                           5th Floor
                           New York, NY 10006


                           STEPHEN R. KEISTER, ESQ.
                           Texas Attorney General
                           P.O. Box 12548
                           Capitol Station
                           Austin, TX 78711


<u>COURTROOM APPEARANCES FOR</u>:


United States              DANIEL J. FREEMAN, ESQ.
of America:                RICHARD DELLHEIM, ESQ.
                           AVNER SHAPIRO, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Avenue, N.W.
                           NWB 7273
                           Washington, DC 20009

<u>COURTROOM APPEARANCES FOR</u>:     (CONTINUED)


United States of            PAXTON WARNER, ESQ.
America:                    Office of the U.S. Attorney

Texas League of            RYAN HAYGOOD, ESQ.
Young Voters:              NAACP Legal Def. and Educational Fund
                           40 Rector Street, 5th Floor
                           New York, NY 10006

                           SONYA LEBSACK, ESQ.
                           Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Ave. NW
                           Washington, DC 20006

Mexican American           EZRA D. ROSENBERG, ESQ.
Legislative Caucus,        Dechert, LLP
et al.:                    902 Carnegie Center
                           Suite 500
                           Princeton, NJ 08540-6531

                           CHAD W. DUNN, ESQ.
                           Brazil and Dunn
                           4201 Cypress Creek Parkway
                           Suite 530
                           Houston, TX 77068

                           NEIL G. BARON, ESQ.
                           914 FM 517 Road, W.
                           Suite 242
                           Dickinson, TX 77539

Texas Association of       ROLANDO L. RIOS, ESQ.
Hispanic County Judges     115 E. Travis
and County                 Suite 1654
Commissioners:             San Antonio, TX 78205

Oscar Ortiz, et al.:       JOSE GARZA, ESQ.
                           7414 Robin Rest Dr.
                           San Antonio, TX 78209

                           MARINDA VAN DALEN, ESQ.
                           Texas RioGrande Legal Aid
                           531 E. St. Francis
                           Brownsville, TX 78520

<u>COURTROOM APPEARANCES FOR</u>:    (CONTINUED)


State of Texas:              JOHN BARRET SCOTT, ESQ.
                             Scott, Yung, L.L.P.
                             208 N. Market Street
                             Suite 200
                             Dallas, TX 75202

                             JOHN R. CLAY, ESQ.
                             Office of the Attorney General
                             P.O. Box 12548
                             MC 001
                             Austin, TX 78711

                             DAVID WHITLEY, ESQ.
                             Office of the Attorney General
                             P.O. Box 12548
                             Austin, TX 78711

Legislators:                 ARTHUR D'ANDREA, ESQ.

1      **Corpus Christi, Texas; Tuesday, April 1, 2014; 10:27 a.m.**

2                        **(Call to Order)**

3             **MS. WESTFALL:**  Yes, this is Elizabeth Westfall and

4    others for the United States.  We will be listening and not

5    participating by phone.

6             **THE CLERK:**  Thank you, Ms. Westfall.

7             **MR. HEBERT:**  This is Gerry Hebert and Emma Simpson,

8    co-counsel for the Veasey-LULAC Plaintiffs.

9             **THE CLERK:**  Thank you, Mr. Hebert.

10            **MR. KEISTER:**  This is Ronnie Keister with the Texas

11   Attorney General's Office.  And there are some others on the

12   line, but we'll just be listening, not participating.

13            **THE CLERK:**  Thank you, Mr. Keister.

14            Do I have any other parties present?

15            **MR. POSNER:**  Yes, this is Mark Posner with the

16   Lawyers' Committee representing the NAACP involved, and I also

17   will be listening in and not participating.

18            **THE CLERK:**  What was your name, sir?

19            **MR. POSNER:**  It's Mark Posner, P, as in "Paul,"

20   O-S-N-E-R.

21            **THE CLERK:**  Thank you.  Is there anybody else present

22   on the phone?

23            **MR. DUNBAR:**  Yes, this is Kelly Dunbar and others

24   listening in with the Texas League of Young Voters Education

25   Fund.

1          **THE CLERK:**  Okay.  Thank you.  Is there anybody else

2     present on the line who has not announced?

3          **MS. KORGAONKAR:**  This is Natasha Korgaonkar from the

4     NAACP Legal Defense Fund.  I'm also going to be listening in.

5          **THE CLERK:**  We can barely hear you.

6          **MS. KORGAONKAR:**  I'm sorry.  Natasha Korgaonkar from

7     the NAACP Legal Defense fund on behalf of the Texas League.

8          I'll just be listening in.

9          **THE CLERK:**  Okay.  Thank you.  And, counsel, anybody

10    that's on the line that's going to speak, if you could just

11    announce your name before you speak so Ms. Benavidez can get a

12    clear record.

13          And I just want to confirm everybody is on a

14    landline, and not on a cell phone, and not on speaker phone; is

15    that correct?

16          **MR. SPEAKER:**  Correct.

17          **THE CLERK:**  The Judge is on the bench and she'll call

18    the case, and there's several parties appearing in the

19    courtroom.

20          **THE COURT:**  All right.  Good morning.  Court calls

21    Cause Number 2:13-193, *Veasey, et al., versus Perry, et al.*

22          We've heard from the people appearing by phone.  If

23    the Plaintiffs want to announce for the record, those present

24    in the courtroom?

25          **MR. FREEMAN:**  Thank you, your Honor.  Daniel Freeman

```
1    on behalf of the United States of America.  And with me are my
2    colleagues, Richard Dellheim and Avner Shapiro, as well as
3    Paxton Warner from the U.S. Attorney's Office.
4              THE COURT:  Okay.
5              MR. HAYGOOD:  Good morning, your Honor.
6              THE COURT:  Good morning.
7              MR. HAYGOOD:  Ryan Haygood with the Texas League of
8    Young Voters.  I'm joined by my colleague, Sonya Lebsack.
9              MR. ROSENBERG:  Good morning, your Honor.
10             THE COURT:  Good morning.
11             MR. ROSENBERG:  Ezra Rosenberg from Dechert,
12   representing Texas NAACP and the Mexican American Legislative
13   Caucus.
14             MR. DUNN:  Good morning, your Honor.
15             THE COURT:  Good morning.
16             MR. DUNN:  Chad Dunn and Neil Baron on behalf of the
17   Veasey-LULAC Plaintiffs.
18             MR. RIOS:  Good morning, your Honor.
19             THE COURT:  Good morning.
20             MR. RIOS:  Rolando Rios on behalf of the Texas
21   Association of Hispanic Judges and Commissioners and Hidalgo
22   County.
23             THE COURT:  Okay.
24             MR. GARZA:  Jose Garza, representing the Ortiz
25   Plaintiffs, with Marinda Van Dalen.
```

8

1          **MR. SCOTT:**  John Scott for the State of Texas, your

2     Honor.

3          **MR. CLAY:**  Reed Clay also from the State of Texas.

4          **MR. WHITLEY:**  David Whitley also with the State of

5     Texas.

6          **MR. D'ANDREA:**  Good morning, your Honor.  My name is

7     Arthur D'Andrea.  I have a Pro Hac Vice Motion pending.  I'm

8     here to represent the legislators.

9          **THE COURT:**  Okay.  Brandy, do we have that?

10         **THE CLERK:**  Yes, your Honor.

11         **THE COURT:**  If it's not an issue, I can go ahead and

12    get that signed.

13         All right.  Anyone else announcing for the record?

14       **(No audible response)**

15         We're going to pull that real quick, so we can

16    address the pro hac vice.

17         But just moving ahead, there were a couple of

18    unopposed motions filed yesterday, so the Court will go ahead

19    and grant those motions.

20         It was DE 217, the Unopposed Motion to File an Amicus

21    Brief, is granted.

22         And then DE 218, which was the Unopposed Motion by

23    the Defendants to file a Surreply to the Motion to Modify the

24    Scheduling Order, that's granted.

25         So we're here again on the Plaintiffs' Motion to

1    Compel the Production of the Legislative Documents.  We've

2    previously had a hearing on that.  There's been some further

3    briefing provided to the Court, and I'll let you argue

4    generally in a little bit.

5           But I do want to address a couple of questions,

6    issues, up front.

7           And, first, I want to address whether the documents

8    we're discussing here that are in the possession of either the

9    Defendant, State of Texas, or the Office of the Attorney

10   General, whose -- where are they?

11          If they're in the possession of the State of Texas,

12   that's a party subject to Rule 34.  I believe they have

13   possession.

14          If, you know, it's the Office of the Attorney

15   General, then maybe they're a subpoena -- they're a Rule 45

16   subpoena to the Office of the Attorney General.

17          So a little argument on that point, and then I'll let

18   you respond.  Okay?

19          **MR. FREEMAN:**  Certainly, your Honor.

20          Texas conceded in its initial disclosures that it had

21   possession, custody, or control over the set of documents that

22   the State of Texas collected in the Section 5 litigation in

23   response to Requests for Production that were issued by the

24   United States Attorney General to the State of Texas.

25          Counsel for the State of Texas signed those initial

1    disclosures and the United States relied upon those initial

2    disclosures for months, and including in issuing -- or, excuse

3    me -- in moving to compel the production of those documents.

4         Whether or not the State of Texas, as a legal entity,

5    or the Office of the Attorney General has physical possession

6    of those documents --

7         **MR. HENRICHSON:**  This is Preston Henrichson with

8    Hidalgo County.

9         **THE COURT:**  All right.  Welcome.

10        **MR. FREEMAN:**  -- the United States believes is

11   essentially irrelevant.

12        The State of Texas, in *The United States v. American*

13   *Express*, argued specifically that documents -- excuse me --

14   that the Office of the Texas Attorney General is subject to

15   party discovery in matters in which the Texas Attorney General

16   litigates on behalf of the State.

17        Now, they made that argument in order to argue that

18   the Office of the Governor was not subject to discovery.

19        Now, here, where there are documents that may be in

20   the physical possession of the Office of the Texas Attorney

21   General, they're arguing that the Office of the Texas Attorney

22   General is not subject to discovery.

23        Essentially, they have drawn a null set for what

24   constitutes the State of Texas --

25        **THE COURT:**  Well, I --

1          **MR. FREEMAN:**  -- for purposes of --

2          **THE COURT:**  And, actually, I think --

3          **MR. FREEMAN:**  -- discovery.

4          **THE COURT:**  -- either way, if I order them produced,

5  depending on what we do here a little bit later this morning --

6  I mean, it's either the party has possession subject to Rule

7  34; or the OAG is separate from the parties here, and then it's

8  just a Rule 45 subpoena to get documents from the OAG.  And

9  then they can raise whatever they want to raise.

10          But, I mean, I -- it's an extra step procedurally, et

11  cetera, but I'm just trying to clear up --

12          **MR. FREEMAN:**  I --

13          **THE COURT:**  -- who has possession --

14          **MR. FREEMAN:**  Your Honor --

15          **THE COURT:**  -- and what do we need to do.

16          **MR. FREEMAN:**  In *Hickman v. Taylor*, the United -- or,

17  excuse me -- the Supreme Court said that where there are

18  documents in the possession of a party's attorney and the

19  matter has been briefed completely, regardless of whether it is

20  a procedural -- whether it's procedurally appropriate under

21  Rule 34 or Rule 45, if the documents are in the possession of a

22  party's attorney, the Court could just move forward under Rule

23  34.

24          **THE COURT:**  Okay.

25          **MR. FREEMAN:**  Now, whether or not the legal

```
 1   definition of the State of Texas incorporates the Office of the

 2   Attorney General when it litigates on behalf of the State,

 3   which the United States believes it does, or whether the Office

 4   of the Attorney General is separate from the legal entity of

 5   the State of Texas, which itself has no documents, is

 6   essentially irrelevant.

 7              THE COURT:  All right.

 8              MR. FREEMAN:  Because the documents should be subject

 9   to production under the pending Motion.

10              Thank you.

11              THE COURT:  Anyone else from --

12              MR. DUNN:  Your --

13              THE COURT:  -- the Plaintiffs?

14              MR. DUNN:  Before the State responds, can I suggest

15   that comments be made at the podium?  After the last hearing, a

16   number of people on the phone said they couldn't hear what was

17   happening when people didn't speak at the podium.

18              THE COURT:  They're welcome --

19              MR. DUNN:  That's all I wanted to --

20              THE COURT:  -- to join us in person if they would

21   like next time.

22              MR. DUNN:  Yeah, that's --

23              THE COURT:  But that's fine.  If you all want to make

24   your comments from the podium to facilitate and ease the

25   process for those on the phone, that's fine with the Court.
```

13

1          **MR. ROSENBERG:**  Good morning, your Honor.  Ezra

2   Rosenberg.

3          I'll just add to what Mr. Freeman has stated, that

4   not only in their initial disclosures did Texas assert that it

5   had custody and possession of these documents, but in the joint

6   report that was issued by this Court after the Rule 26

7   Conference, Texas itself -- it has stated -- Texas has

8   indicated that it will assert several privileges, and goes on

9   to discuss the legislative privilege.

10          So it has always been the position, and this was a

11   position that went back to the Section 5 case, when Texas was a

12   party, and Texas produced these documents, or withheld

13   documents on privilege grounds, but privileges it said it was

14   asserting, and it is these documents -- those documents that

15   are listed in the same privilege log that was in the Section 5

16   case that is now in this case, which has always been Texas's

17   privilege log that is in issue.

18          And I -- there's absolutely no question that it has

19   possession, custody, and control.

20          **THE COURT:**  All right.  Any other Plaintiffs wish to

21   address that issue?

22          Okay.  Mr. -- who's going to address it?

23          **MR. CLAY:**  I will.

24          **THE COURT:**  Mr. Clay.

25          **MR. CLAY:**  Good morning, your Honor.

1          **THE COURT:**  Good morning.

2          **MR. CLAY:**  The -- with respect to the legislative

3    documents that are in the custody and control of the Attorney

4    General's Office, those documents are -- as I just said,

5    they're in the custody and control of our office and not the

6    State, writ large.

7          And we have cited several cases in our briefing, with

8    no rebuttal cases cited on the other side, that make clear that

9    simply suing the State of Texas does not bring other -- for

10   purposes of aggregating discovery, does not bring other

11   independent executive agencies unless they are also named.

12         As I just said, those cases have gone completely

13   unrebutted by the other side, and those cases make very clear

14   -- and are often made use of in similar circumstances by the

15   Department of Justice to make the argument that documents

16   within the custody and control of one independent executive

17   agency who is not a party does not mean that, just because

18   you've sued the state, that those documents are in the custody

19   or control of the Defendants.

20         The case that Mr. Freeman just brought up to you

21   assumes that party status when it says that documents in the

22   custody or control of the attorney are subject to Rule 34.

23         The problem here is the client here is the

24   legislators, and they are not parties in this case.  And so as

25   attorney to the legislators, they're not subject to a Rule 34

1  Request for Production.

2          **THE COURT:**  But didn't you get these documents in the

3  D.C. case to defend and to participate in that case on behalf

4  of the State of Texas?

5          **MR. CLAY:**  Yes, but we got it in order -- we got it

6  to defend the legislative privilege in that case, where

7  legislators were also not parties.

8          In that case, it was the State of Texas acting to

9  defend the -- to seek preclearance of SB 14, and the

10  legislators were not a party in that case either, but we

11  represent them in their capacity of asserting a legislative

12  privilege in that case, and that's why we had the documents.

13          **THE COURT:**  Okay.  Is that all?

14          **MR. CLAY:**  Yes.

15          **THE COURT:**  Do you want to --

16          **MR. FREEMAN:**  Your Honor --

17          **THE COURT:**  You want to approach the podium there?

18          **MR. FREEMAN:**  Yes.  Your Honor, if I just might

19  quickly correct the record?

20          Those documents were gathered in response to Requests

21  for Production that were issued by the United States Attorney

22  General to the State of Texas, the legal entity of the State of

23  Texas, which was the Plaintiff in *Texas* v. *Holder*.  Those

24  documents were gathered by the State of Texas and have

25  continued to be held by the State of Texas.  Now, they were not

1    produced, but they were placed on a privilege log by the State

2    of Texas.

3           And the client on the -- on whose behalf the Office

4    of the Attorney General gathered those documents was the State

5    of Texas, which received the Request for Production.

6           Now, the Office of the Attorney General would like to

7    claim that it has separate clients here, but the fact remains

8    that there's only one client at issue with respect to these

9    documents.

10          Thank you.

11          **THE COURT:**  Okay.  The Court finds that the State of

12   Texas here, the party here, has possession of these documents

13   that are subject to the Rule, Rule 34.  And that's how we'll

14   proceed.

15          All right.  We're going to go on, then, to the

16   substance of the legislative privilege, and I guess basically

17   with that ruling, then, regarding documents in possession of

18   the State of Texas, or the Defendant here, the Defendants are

19   not required to serve the individual legislators with subpoenas

20   regarding those documents.

21          Now, I do think anything outside of that -- this

22   privilege is personal and the Plaintiffs are going to have to

23   serve subpoenas on the individual legislators for anything

24   outside of what the parties here possess.

25          **MR. FREEMAN:**  Thank you, your Honor.

1          There's one separate category of documents that the

2   United States has additionally asserted are in the possession,

3   custody, or control of the State of Texas, and those are the

4   documents that are in the -- that are contained on Texas

5   Legislative Council servers or -- e-mail servers or document

6   servers.

7          The State of Texas, specifically with regard to those

8   documents, the State of Texas did not claim in their Opposition

9   to the pending Motion, or in their Surreply, that the Texas

10  Legislative Council was not a part of the State.  It only made

11  that claim in their Brief on the subpoena issue.

12          And just a month --

13          **THE COURT:**  Wait, I thought that was -- wasn't that

14  an issue before, or no?  It's become an issue since we've had

15  the hearing as to whether TLC was --

16          **MR. CLAY:**  No, no, no.  We've always claimed that the

17  legislative branch, which includes the Legislative Council,

18  along with the individual legislators, are not parties.

19          **MR. FREEMAN:**  Your Honor --

20          **THE COURT:**  Uh-huh.

21          **MR. FREEMAN:**  -- I would ask the Defendants to then

22  specifically point out where in either of those Briefs they

23  asserted that the Texas Legislative Council was not -- that

24  documents held by the Texas Legislative Council were not in the

25  possession, custody, or control of the State.

1            Defendants have repeatedly asserted that legislators

2   are not parties and need to be subpoenaed.  What they didn't

3   answer in their Briefs until this last round of briefing was

4   the actual legal question under Rule 34, which is what

5   documents are in the possession, custody, or control of the

6   State of Texas.

7            Now, regardless of when they brought up this issue,

8   the fact remains that the Texas Legislative Council is within

9   the custody -- or possession, custody, or control of the State.

10  And -- because a mere month ago, the State had an employee of

11  the Texas Legislative Council sign Responses to Interrogatories

12  on behalf of the State of Texas in *Perez v. Perry*, the ongoing

13  redistricting litigation in the Western District of Texas.

14  This established under Rule 33(b)(1)(B) that the Texas

15  Legislative Council is, quote, "an officer or agent," close

16  quote, of the State of Texas.

17            And this --

18            **THE COURT:**  That's the way they signed it?

19            **MR. FREEMAN:**  They signed it, and I'm happy to

20  provide the Court with a copy of --

21            **THE COURT:**  No, is that the way they signed it?

22            **MR. FREEMAN:**  That's the text of the Rule.

23            **THE COURT:**  Okay.

24            **MR. FREEMAN:**  And I have a copy of that signature

25  page here, if the Court would like to have it.

1           And possession, custody, or control of information

2    known to a state agency can't be limited to evidence that the

3    State believes benefits its defense.  And that is essentially

4    the game that the State is trying to play here.

5           And so the United States would continue to assert

6    that this Court should extend its ruling regarding the

7    documents that were listed in the State's initial disclosures

8    to those documents that are in the physical possession of the

9    Texas Legislative Council through its e-mail servers.

10          Thank you, your Honor.

11          **MR. CLAY:**  Your Honor, we've maintained from the

12   beginning of this case that any part of the legislative branch

13   is not a party to this lawsuit, and that Rule 45 subpoenas

14   would be necessary in order to gain these documents.

15          What the other side would have you believe runs in

16   contravention to all of the case law that we've cited, which

17   talks about both legislators and independent state agencies who

18   are not sued are not to be aggregated for discovery purpose.

19          There's an easy solution to this.  The solution has

20   been known since at least November; that a Rule 45 Subpoena is

21   the route to go for discovery from either legislators or the

22   Legislative Council.

23          **THE COURT:**  Okay.  But do you have documents in your

24   possession that are documents of the TLC?

25          **MR. CLAY:**  To the extent I guess --

1          **THE COURT:**  Because, again, we're kind of separating

2   this issue.  If the Court says, yes, they're a separate entity,

3   a Rule 45 subpoena goes to them, there's still the issue of if

4   you have documents in your possession.

5          **MR. CLAY:**  I don't know the --

6          **THE COURT:**  Right?

7          **MR. CLAY:**  I don't know the answer to that.  It -- to

8   the extent we do, it would have been produced in the same

9   documents along with the Legislature's that we gathered in the

10  *Texas versus Holder* case.

11         **THE COURT:**  Okay.  And the ruling by the Court would

12  apply the same way to the extent you have documents in your

13  possession regarding --

14         **MR. CLAY:**  Yeah, that's --

15         **THE COURT:**  -- this entity.

16         **MR. CLAY:**  That's how I understood your hearing, too.

17         **THE COURT:**  Okay.

18         **MR. CLAY:**  What I thought we were discussing was

19  additional documents that they're seeking from the TLC, which I

20  would -- I would -- I understood your previous ruling to mean

21  that they would need subpoenas for that information.

22         **MR. FREEMAN:**  I -- Mr. Clay is correct, your Honor.

23  The United States is referring to documents not in the

24  possession of the Office of the Attorney General, but in the

25  possession of the Texas Legislative Council, which is an

1   officer or agent of the Defendant, State of Texas, and thus

2   within its --

3           **THE COURT:**  Is it --

4           **MR. FREEMAN:**  -- practical control --

5           **THE COURT:**  -- really an officer --

6           **MR. FREEMAN:**  Well --

7           **THE COURT:**  -- of the State of Texas?

8           **MR. FREEMAN:**  They -- the State of Texas has

9   certainly asserted that it has --

10          **THE COURT:**  Is it?

11          **MR. FREEMAN:**  Or that it is.

12          **THE COURT:**  What does the Defense have to say about

13  that?  You all want to stand at the podium so -- you all can --

14          **MR. CLAY:**  Sure.

15          **THE COURT:**  -- both stand up here.  What's the

16  State's position on that assertion regarding --

17          **MR. CLAY:**  Whether the --

18          **THE COURT:**  -- the TLC?

19          **MR. CLAY:**  Whether the entire Council an officer --

20          **THE COURT:**  He's saying --

21          **MR. CLAY:**  -- of the State?

22          **THE COURT:**  -- there was some --

23          **MR. CLAY:**  Well, the Council --

24          **THE COURT:**  The TLC --

25          **MR. CLAY:**  -- is made up of individual legislators.

1    And, then, of course, there's a body of staff that work for

2    them.  But it's actually made up of various members of the

3    legislative branch.

4             **THE COURT:**  So --

5             **MR. CLAY:**  And so that goes to this -- the whole

6    argument we've been making all along, which is it is

7    independent of suing the State --

8             **THE COURT:**  Okay.  But he's trying to make it, or the

9    TLC, an officer of the State of Texas.

10            **MR. CLAY:**  I think that's wrong.  I mean, I think --

11            **THE COURT:**  Well, I know.  But --

12            **MR. CLAY:**  -- that what it --

13            **THE COURT:**  -- why don't you respond to his issue?

14   The reason he's bringing that up is some signature or some --

15   something that was signed in another lawsuit that indicates

16   that that's what that entity serves as.

17            **MR. CLAY:**  Well, I think what it is, is a committee

18   of individual legislator --

19            **THE COURT:**  You want to respond to what --

20            **MR. CLAY:**  -- legislative figures --

21            **THE COURT:**  -- his sheet there?

22            **MR. CLAY:**  Yeah.  Sure, I'm happy to look at it.  I

23   don't know -- I probably wasn't a member of this.

24            **MR. FREEMAN:**  Your Honor, to be clear, it's just a

25   simple signature page following a set of Interrogatory

1    Responses, and it's just that the Rule requires that an

2    individual who answers and signs on behalf of a government body

3    be an officer or agent of that body.

4            And, essentially --

5            **MR. CLAY:**  Yeah, yeah.  Yes, I mean, Clare Dyer, who

6    signed this, is an agent of the Texas Legislative Council.

7    That doesn't mean that they're an officer of the State.

8            **MR. FREEMAN:**  Your Honor, the Rule states --

9            **MR. CLAY:**  What it means is they're a representative

10   of the various -- of a Council that's made up of various

11   legislative members.

12           **MR. FREEMAN:**  Your Honor, the Interrogatories were

13   served on the State of Texas as a whole, and the State of Texas

14   determined that the Texas Legislative Council was competent to

15   sign Interrogatories on behalf of the State of Texas.

16           **THE COURT:**  I don't find that.  I think they're a

17   separate entity.

18           However, to the extent -- the same rulings I said

19   earlier.  To the extent that Defendants here have documents in

20   their possession that are documents of the TLC, they'll have to

21   be subject to the Court's ruling, Rule 34.

22           The Court finds they're in possession of those

23   documents for the purposes of Rule 34.  Okay.

24           Is there -- I'm getting ready to move to the meat of

25   the privilege, so anything else before we go there?

1        **(No audible response)**

2              And I understand -- we're going to go ahead and

3     discuss the privilege here.  I understand the Defendants here

4     and the attorneys here cannot raise that privilege for the

5     legislators, but I think, for purposes of moving this case

6     along, that we need to go ahead and flesh all that out, how

7     that's going to apply in this case and what's going to happen.

8              Now, I know at the last hearing I said this Court

9     finds privilege applies, it's qualified subject to a balancing

10    test, et cetera.  But in the meantime, we were going to -- I

11    believe the State of Texas was going to reach out to the

12    individual legislators to see who was waiving, or what we were

13    doing, or what their position was on that issue.

14           **MR. CLAY:**  And, Judge, I could not have advertised

15    for free pets and received as many phone calls over the last

16    two weeks.

17           We had -- the total numbers, I can give them to the

18    Court.  I have added them up beforehand today.

19           A hundred and eighty-nine have asserted, 37 have

20    waived, 20 were nonresponders; but, in fairness, at least one

21    of those on that list, Representative Anna Mowery, it's my

22    understanding is non compos mentis and unable -- and is in a

23    facility in Fort Worth.

24           There are also four that are confirmed deceased on

25    the list provided by the Department of Justice.

1          So that is -- we filed that document with the Court

2    yesterday.

3          **THE COURT:**  Okay.

4          **MR. FREEMAN:**  Your Honor, if I could speak for just

5    one moment before we proceed to this, just on the issue of

6    subpoenas thus far before we start discussing who may need to

7    be subpoenaed?

8          As the United States outlined in its Reply Brief

9    concerning Plaintiffs' Joint Motion to Enter an Amended

10   Scheduling Order, Defendants have entered a cycle of admissions

11   and retractions that are essentially an exercise in

12   gamesmanship.

13         And last Friday the Defendants asserted that the

14   United States had served subpoenas improperly by serving them

15   on counsel who represent Defendants and the subpoenaed

16   legislators as individuals -- notwithstanding Defendants'

17   agreement in open court to accept those subpoenas.

18         Defendants stated that they would not accept the

19   subpoenas on behalf of the legislators unless the United States

20   withdrew the pending Motion to Compel.

21         Defendants also newly claimed that legislators'

22   e-mails and documents on the TLC servers were outside of the

23   individual legislator's control.

24         This degree of gamesmanship has put both the orderly

25   discovery process and, ultimately, the schedule at issue.

1          And my colleague, Richard Dellheim, will be speaking

2     on the schedule.  I will not be.

3          **THE COURT:**  And I'm not --

4          **MR. FREEMAN:**  But to the extent --

5          **THE COURT:**  -- there yet.

6          **MR. FREEMAN:**  To the extent that this Court does

7     order that discovery of legislative documents proceed by

8     subpoenas, which no Court has ever before ordered the United

9     States to do in a Voting Rights Act case, to the knowledge of

10    the Department of Justice, I would ask that the --

11         **THE COURT:**  They're not parties here.  Just the way

12    your Congress is not a party to this case, the individual

13    legislators are not parties to this case.

14         **MR. FREEMAN:**  Thank you, your Honor.

15         **THE COURT:**  And I am -- I've -- I said that refers to

16    documents that are not in the possession of the Defendants.

17         **MR. FREEMAN:**  Thank you, your Honor.  And I

18    understand.  But I just ask that the Court please set some

19    contours and boundaries to what will happen in that subpoena

20    process, so that the remaining discovery can happen in an

21    orderly manner.

22         Thank you.

23         **THE COURT:**  Okay.

24         **MR. DUNN:**  Your Honor, I would just like to address

25    this list that the State has filed to make sure it's correct.

1        And, for the record, this is Chad Dunn for the

2   Veasey-LULAC Plaintiffs.

3        Mark Veasey is listed as a "did not respond."  He's

4   obviously one of my clients in this case.  He's now a member of

5   Congress, was in the State Legislature when Senate Bill 14 was

6   passed.

7        He was -- there was no inquiry made of Congressman

8   Veasey on legislative privilege, so I think that is inaccurate.

9   I want to make sure the Court is aware that Congressman Veasey

10  waives his legislative privilege on the Document Requests at

11  issue in this case.

12       **MR. SCOTT:**  And I did fail to tell the Court, I did

13  not -- I purposely pulled the letter to Congressman Veasey,

14  because --

15       **THE COURT:**  He was the right person --

16       **MR. SCOTT:**  -- he is a party to the case, and I

17  thought that he's supposed to plead for himself.

18       And just to briefly address Mr. Freeman's point, the

19  State of Texas was caught in a position of having Defendant --

20  of Plaintiffs say that legislators were parties, in the last

21  hearing before this Court, because they were part of the State

22  of Texas, yet then they were attempting to serve Rule 45

23  subpoenas on us.

24       I said, "You can't have it both ways.  Pick one.

25  They're either parties, at which point you don't need to serve

1   them with Rule 45 subpoenas, or we'll accept the Rule 45

2   subpoenas and pull back the issues that relate to those

3   subpoenas."

4           So just -- so that the record is completely clear on

5   the point Mr. Freeman brought up.

6           **THE COURT:**  Okay.  But if the Defense is saying

7   they're not parties, then it's done through a Rule 45, right?

8           **MR. SCOTT:**  Well, absolutely.  And we stand ready and

9   happy to accept those on behalf of those that have asked us to

10  accept them on their behalf.

11          **THE COURT:**  Okay.

12          **MR. FREEMAN:**  Your Honor, the issue is simply that

13  Texas has managed to burn weeks by not responding to the

14  subpoenas and asserting that they were improperly served, when

15  they would essentially say there is no way to get to the

16  legislators until we withdraw our Motion.

17          If it's Texas's position that they are not subject to

18  party --

19          **THE COURT:**  Well, I'm not --

20          **MR. FREEMAN:**  -- discovery --

21          **THE COURT:**  -- hearing withdraw the Motion fully

22  regarding the subpoena on these legislators.

23          **MR. FREEMAN:**  That was --

24          **THE COURT:**  Yeah, I don't --

25          **MR. FREEMAN:**  -- contained --

1          **THE COURT:** -- know.  That's what I heard.

2          **MR. FREEMAN:**  It's fine, your Honor.  And that was

3    what was contained within a letter that they sent to us.  But

4    I'm simply asking that the Court do -- I'm asking that the

5    Court do what it can to ensure an orderly process here.  That's

6    all.

7          **MR. SCOTT:**  Well, and I agree.  And we got -- just to

8    clarify again -- the Rule 45 subpoenas, on March 14th, the

9    State of Texas received unannounced subpoenas on its

10   legislators from Ms. Westfall.  They were served by e-mail to

11   me.  They were undated.  When we pointed this out a few days

12   later, they created backdated subpoenas that they then served

13   on us.

14         And then subsequent to that, they served the same set

15   the third time on the 29th, this past Saturday.

16         So I don't know about weeks burning, and I don't know

17   about gamesmanship, but the same set of subpoenas have now come

18   to us three different times.

19         **MR. FREEMAN:**  Your Honor -- Your Honor, the United

20   States called three different attorneys for the Office of the

21   Texas Attorney General and none of them returned our phone

22   calls --

23         **THE COURT:**  All right.  We're on the same page,

24   right?

25         **MR. FREEMAN:**  Yes.  Thank you.

1          **THE COURT:**  We know what we need to do regarding

2     that, individual legislators; and that, again, I'm stressing

3     does not include the documents already in the possession of the

4     Defendants.

5          So I'm going to move on.  I think we need to discuss

6     the privilege.  I understand, like I said, these Defendants

7     can't raise that privilege for the legislators, but we need to

8     flesh all this out and get this moving and this case on track

9     to be tried on September 1st.

10          So I had already said I know there's an issue and

11     there were some briefings saying there's no privilege, or --

12     but I believe I said at the last hearing the Court finds there

13     is a privilege, it is qualified, subject to the balancing

14     factors.  I would use the balancing factors set forth in the

15     *Perez* case.

16          Obviously, very significant interests and concerns on

17     both sides of this case.  I'd like to address the balancing

18     factors, and I don't need to address all of them with you,

19     because I probably touched on some of these at the last

20     hearing.

21          But regarding factor one, I don't think there's any

22     question that the evidence sought by the Plaintiffs here is

23     highly relevant to the issues here.

24          I will allow you to comment on that, either side, if

25     you would like, but I just -- I don't see how it's not

1   relevant, and highly relevant to this case.

2          Anything from the Plaintiff or the Defendants?

3          **MR. CLAY:**  Yeah, I would just make one comment on the

4   relevance, and that is that the cases that we've cited in our

5   Briefs that do apply this balancing factor, it's hard to take a

6   categorical approach to the relevance of the various types of

7   evidence that they're looking for.

8          Certain types of evidence are considered to be more

9   relevant than others just because of the legal standard.

10         One of the cases I would point your Honor to is to

11  the  *Kay versus City of Rancho Palos Verdes*, where it talks

12  about the various types of evidence that might be responsive to

13  the type of requests that are at issue here.  And noting that

14  some types of evidence are more probative of the issues than

15  others, and then a --

16         **THE COURT:**  More probative.  But we're not saying --

17  it's relevant.

18         **MR. CLAY:**  Oh, I don't think we're making some sort

19  of categorical relevance objection here.  I think, in the

20  balancing test, some of the -- some of the types of information

21  that they're seeking is of, I would say, little relevance; and,

22  therefore, the balancing factors weigh in favor of not --

23         **THE COURT:**  The --

24         **MR. CLAY:**  -- intruding on the legislative decisions

25  of individual legislators.

1          **THE COURT:**  So it depends on what the evidence is?

2          **MR. CLAY:**  Yeah, I -- and, you know, Mr. Dunn, in a,

3     you know, somewhat novel filing called an "advisory" yesterday

4     made the -- made a -- alerted the Court to a new decision that

5     came out of the North Carolina voter ID case.

6          And it looks like what they're going to do there is

7     kind of do what I think I'm suggesting here, which is look at

8     the various types of evidence in order to really apply the

9     balancing test instead of this categorical approach of, well,

10    all this stuff is relevant, and so I'm going to apply it --

11    this balancing test just globally to the -- to legislative

12    evidence and rule it's either in or it's out.

13         And I think that's probably not the way to go.  I

14    think it does -- it's not -- that way of looking at it is not

15    supported by the case law, and it doesn't look like that's what

16    our sister court -- or your sister court in North Carolina is

17    going to be doing.

18         So that's the only thing I would make on the

19    relevance thing is that some of it is more relevant than

20    others, and I think that is a -- is a big deal when you're

21    applying a balancing test.

22         So it's just something to keep in mind.

23         **THE COURT:**  Okay.

24         **MR. FREEMAN:**  Thank you, your Honor.

25         Just with regard to whether or not there can be

1    determinations made up front regarding the relative importance

2    of different legislative documents that are in the possession

3    of the State, the United States can't know until the State

4    provides something more than the privilege logs that we've

5    received what documents are going to be particularly relevant.

6              And the North Carolina Court has suggested that

7    parties come together and try to reach some kind of agreement

8    about a framework; and, simply put, we don't have the time to

9    do that kind of cooperative process here.

10             The documents here, in cases such as *Irvin*, were

11   simply turned over because of the very importance of the issues

12   -- and I believe in *Baldus* as well.  And we would recommend and

13   request that this Court treat the documents the same in terms

14   of, for disclosures purposes.

15             And if the Court wishes to make an individualized

16   determination, that the State be ordered to produce all the

17   documents in its possession under the provisions of the Consent

18   Protective Order, and then an individualized determination

19   could be made with regard to specific documents when they're

20   presented at trial.

21             **MR. DUNN:**  Chad Dunn on behalf of the Veasey-LULAC

22   Plaintiffs.  I want to address the advisory that's been raised

23   that we filed yesterday.  Counsel felt that we had a

24   responsibility to the Court to provide it Orders from other

25   Courts on similar subjects.  That's why we did so.  We stated

34

1   in the advisory we don't think it's particularly determinative.

2   I want to explain that now since it's been raised by the State

3   in support of its position.  The situation in a North Carolina

4   case was essentially at the hearing this Court held prior, it

5   was trying to determine whether there was a privilege at all,

6   which this Court has already decided.  And what the Magistrate

7   did in the North Carolina Court was order the parties, "Now

8   that you know there's going to be a qualified privilege, try to

9   sit down and negotiate over the documents."  That's a new sort

10  of situation for that case.  In this case --

11          **THE COURT:**  But now new for you-all because you-all

12  have kind of operated under that already to a certain extent

13  but yes.

14          **MR. DUNN:**  Exactly.  Since the Texas -- Since the

15  D.C. case, we have been at loggerheads over what to do with

16  these documents.  Further discussion isn't going to get us

17  anywhere.

18          **THE COURT:**  Okay.

19          **MR. ROSENBERG:**  Very briefly.  Ezra Rosenberg.  I

20  just wanted to urge the Court to consider the procedure that

21  Mr. Freeman suggested given the schedule constraints here,

22  given the number of documents that are an issue and, obviously,

23  this Court cannot possibly look at all the documents to decide

24  privilege on a document by document basis but the parties can

25  bear that burden and if and when -- and until such time as any

1  document is offered into evidence, it should be subject to the

2  highly confidential designation of the Protective Order.

3  That's what the Court in *Favers versus Quomble* (phonetic) did.

4  Other Courts have taken that attack.  It preserves a certain of

5  the interest behind the privilege.  At the same time, allowing

6  discovery to go ahead under a very constraint schedule and then

7  if and only if a party chooses to put a document into evidence,

8  the Court will then have to review the document in camera.

9         **THE COURT:**  All right.  Go ahead.

10         **MR. CLAY:**  May I talk?

11         **THE COURT:**  Yes.

12         **MR. CLAY:**  Okay.

13         **THE COURT:**  Just trying to get through the factors

14  here, but --

15         **MR. CLAY:**  Two things.  One of the reasons that the

16  North Carolina case was in a different posture is that the

17  parties in that case actually issued Rule 45 subpoenas back in

18  January to the individual legislators.  The other point I would

19  make is, we are in a little bit different posture in this case

20  because we've already had one Court who has actually ruled on

21  this privilege issue and applied a very similar balancing test

22  based upon a very thorough review of the existing case law in

23  voting rights out of cases and the documents that that Court

24  determined that were not privileged were turned over and the

25  ones that -- are -- had not been given to the other side in

36

1    that case or in this case, were already determined to be

2    privileged based on a similar balancing test.  With respect to

3    the Protective Order being some sort of safe harbor for

4    breaking privilege -- I mean, that's not necessary -- I mean,

5    the privilege is still is broken by forcing legislators to cull

6    their documents and turn that over even to a small group of

7    attorneys who are litigating this -- a statute that they've

8    passed.  So, the Protective Order is -- doesn't offer much

9    solace in terms of breaking the privilege.

10           **MR. FREEMAN:**  Your Honor, if I may just correct the

11   record?  The United States is a party to the North Carolina

12   litigation and the United States -- it is my understanding that

13   the United States moved to compel the production of documents

14   in that case and that other private Plaintiffs who did not sue

15   the State of North Carolina in its entirety issued subpoenas.

16   And, specifically, if the case that Mr. Clay is referring to is

17   *Texas v. Holder*, as the United States has mentioned before, the

18   *Texas v. Holder* Court considered concerns regarding Federalism

19   underlying Section 5 in making its analysis of privilege and

20   that simply does not apply here.  Thank you.

21           **THE COURT:**  All right.  I'm moving to factor two

22   where I do -- I think there's some question there so I am going

23   to take some argument regarding these other sources of -- or

24   availability of other evidence.  Does the government want to

25   proceed on that?

1          **MR. FREEMAN:**  Thank you, your Honor.  Essentially

2    debate in the Texas House and the Texas Senate concerning SB14

3    proceeded by talking points.  So the publicly available debate

4    -- the information that legislators have made public and, thus,

5    have not asserted a privilege over, does not reveal anything

6    more than what they calculated in the context of being subject

7    to the Section 5 preclearance provisions would be a publicly

8    acceptable discussion of the intent of the law.  More

9    critically, when minority legislators during the legislative

10   debate raised concerns regarding the effect of this law on

11   minority voters, raised concerns about the underlying intent of

12   the law. The Senate sponsor and House sponsor simply repeatedly

13   said that they were not advised as to what the effect of the

14   law would be on minority voters and refused to engage with

15   those concerns.  Because of that stonewalling, these documents

16   -- the documents at issue are the only candid discussions that

17   currently exist.  And so, the United States believes that those

18   documents are critical to understanding whether alongside other

19   purposes such as preventing voter fraud and any other

20   legitimate purposes, that the Texas legislature may have had,

21   alongside those purposes, whether there was an additional

22   purpose which was to abridge the right of minority voters to be

23   able to cast a ballot under this law.

24          **THE COURT:**  All right.  Mr. Clay, do you want to

25   respond on factor two?  And then if anyone else wants to speak,

1    just let me know because I'm going to move.

2         MR. CLAY:  I'm over here trying to remember all the

3    factors.  I think this -- the point here actually relates to

4    the relevance point that I was making earlier.  As *Arlington*

5    *Heights*, which is -- you know, kind of lays out the framework

6    for establishing a purpose case and a Voting Rights Act case,

7    makes very clear the most probative evidence of what the

8    legislature meant is not the individual deliberations or

9    individual actions of an individual legislature, but it's the

10   public record, the legislative history, the debates.  And the

11   idea that -- I mean, they say it proceeded by talking points.

12   I'm not sure what that means, and I seriously doubt that that's

13   true because I don't know any Bill passes that goes that

14   smoothly.  But even if it did, they're assuming that the

15   talking points here are somehow -- they assume that they're not

16   true or that they're not the real intent of the legislature.

17   And that's a very dangerous activity to get into here.  The

18   main point is, the *Arlington Heights* and other cases make very

19   clear that what you're supposed to look at is what's publicly

20   available, the debates, the legislative history, what happened

21   in Committee, what happened on the floor, not what an

22   individual legislator did or said and -- you know, amongst each

23   other.  The other point I would bring up is, the reason that

24   the Voting Right -- the Voting Rights Act not only allows for a

25   statute to be enjoined based on a discriminatory purpose, but

1    it also allows for -- Congress has gone further than the 14th

2    or 15th Amendment by allowing the election law to be enjoined

3    because of discriminatory impact.  And that is only -- the

4    reason that they -- Congress put that into the statute was

5    because of rulings like *City of Mobile* that made it very clear

6    that in order to enjoin a statute on the 15th Amendment, you

7    had to prove a discriminatory purpose and that is necessarily a

8    hard task because you are required to look at the publicly

9    available information -- the legislative history and the

10   individual motivations -- hidden motivations of one single

11   actor simply cannot speak for what the legislature actually

12   did.  They have no bearing on the purpose of the legislature as

13   a whole.  And there's plenty of Supreme Court cases that hold

14   that.

15          **MR. FREEMAN:**  Your Honor, if I can just speak to

16   *Arlington Heights* very quickly.  The State has, in their

17   briefs, repeatedly inserted the work "public" into the language

18   of *Arlington Heights*.  *Arlington Heights* contains no limitation

19   as to the Court -- whether this Court can look at both the

20   public statements of legislators and their private discussions

21   and numerous Courts have relied upon documents such as the

22   documents that are at issue in finding a discriminatory intent

23   underlying a voting related Bill.  Now, the United States is

24   not saying that the Texas legislators did not maintain public

25   minded purposes as well.  What is sufficient under the Voting

1    <u>Rights Act</u> is that there will be an additional purpose -- a

2    discriminatory purpose -- and that is the purpose that the

3    United States alleges exists and that is the purpose that the

4    United States should be allowed to examine evidence of,

5    including evidence that is contained in these documents.  And

6    with regard to the talking points, the United States would

7    simply address -- direct the Court to the United States'

8    opening briefs in which the House and Senate sponsors repeated

9    identical language months apart with regard to this Bill and

10   the importance of voter identification and the prevalence of

11   voter fraud.  Thank you.

12         **MR. ROSENBERG:**  Your Honor, just one quick sentence.

13   The case, the Quanton (phonetic) case, 682 F.2d 1055 from the

14   4th Circuit where the Court recognized the common sense

15   proposition that officials "seldom, if ever, announced on the

16   record that they are pursuing a particular course of action

17   because of a desire to discriminate against a racial minority."

18         **THE COURT:**  Okay.  I don't need to hear anything on

19   factors three and four, which are the seriousness of the

20   litigation, the role of the government.  I don't think there's

21   any question, this is a very serious issue case.  The issue of

22   infringement on a person's ability to exercise her right to

23   vote and then, obviously, have the government on both sides

24   here.  A substantial role the government is playing here, both

25   the Federal government in enforcing the voting right statutes

1    and then the role of Texas here defending this litigation here

2    that the challenge is being made because of motive and

3    considerations regarding Senate Bill 14.  So I don't need to

4    hear anything on that.  I think those are a given in this type

5    of case.  Now, regarding factor five, which is the possibility

6    of future timidity by the government employees, that's

7    certainly a concern -- disclosure of confidential documents,

8    how that could affect the legislative process.  Do you want to

9    comment on that for the Plaintiffs?

10         **MR. FREEMAN:**  Thank you, your Honor.  In the *United*

11   *States v. Gilley*, the Supreme Court addressed this exact

12   concern and said that in the absence of affirmative evidence,

13   it's simply speculative.  Now, what we do have in Texas is

14   evidence that legislators and their documents have been put at

15   issue in redistricting litigation for decades.  For decades,

16   legislators have taken the stand in redistricting litigation in

17   Texas and there has -- to my knowledge, and to -- with regard

18   to the evidence that the State has put forward, there has been

19   no detrimental effect on the legislative process in Texas.

20   Other Courts such as *Baldus* (phonetic), the *Baldus* case in

21   Wisconsin, have said that no public good suffers by the denial

22   of privilege when such important issues are at stake and we

23   would say that this Court, to the extent that it has concerns

24   regarding this issue, can address those concerns by either

25   placing these documents under seal or placing them under

42

1    paragraph -- I believe 2.1 of the Consent Protective Order.

2    Specifically with regard to the documents that are already in

3    the State's possession, there's no further burden on the

4    legislative process by producing those documents.  Those

5    documents have already been produced.  They've already been

6    logged.  It's simply a matter of turning them over under seal

7    to a limited group of attorneys.  And then if this Court deems

8    any particular document important enough, then the document

9    might be made public.  With regard to further documents as the

10   United States recognizes that there is some greater burden, but

11   we don't believe that the burden of search will turn Texas

12   legislators into timid actors.  To some extent, I think they

13   might take umbrage at the notion that they would suddenly

14   become timid.  Thank you.

15         **MR. CLAY:**  I think really the main point to be made

16   with respect to this factor, is you don't have to look much

17   further than the actors and the characters that are currently

18   before the Court in this case.  We have counsel for the Texas

19   Democratic party who is representing a former member of the

20   Texas legislature who opposed this Bill suing the State of

21   Texas and now asking the Court to allow them to rummage around

22   into personal legislative documents of individual legislators.

23   That is a monumental ask of this Court.  And the idea -- and I

24   also would take a little bit of issue with something

25   Mr. Freeman said earlier, that there are no Federalism concerns

43

1    here.  The Constitution squarely places the power of regulating

2    elections to the States.  And the Voting Rights Act already

3    infringes a little bit on that by allowing the United States to

4    bring an action to enjoin election laws that a -- merely

5    exhibit a discriminatory impact even if no discriminatory

6    purpose is actually proven.  When that's the case, and then on

7    top of that, you're allowing the United States government to go

8    in and rummage around in the files of individual legislators of

9    the State, you've got -- again, the ask is monumental.  And the

10   other side keeps bringing up the idea that legislators have

11   testified in other cases -- Voting Rights Act cases like

12   redistricting cases -- we've already mentioned to you before on

13   our previous hearing that redistricting litigation is somewhat

14   different because lines are drawn in a very particular way and

15   they're often done by coalitions of county members -- members

16   of different county delegations who draw their own maps and

17   then drop it into the statewide map.  The other point I would

18   make is that if you'll notice a redistricting litigation that's

19   going on right now, they're asserting privilege and they're

20   asserting it for the very same reasons that we're asserting it

21   here, which is to allow this sort of wholesale -- you know,

22   deep dive discovery into what is essentially personal

23   legislative business is just unfounded and uncalled for.  And

24   the idea that it's not going to have some sort of impact in the

25   future is -- I mean, the *Baldus* case notwithstanding, I mean, I

1    think that's just a categorical statement that it's not going

2    to have some sort of impact on legislatures in the future is

3    just simply not true.

4          **MR. FREEMAN:**  Your Honor, if I may just respond to

5    the State of Texas, it's assertion regarding the

6    Constitutionality of the issues here?  The intent claim that

7    the United States has brought is identical in the standard to a

8    14th and 15th Amendment claim.  The 14th and 15th Amendment

9    bars the State of Texas from enacting any intent -- in acting

10   and applying any intentionally discriminatory law.  The 14th

11   and 15th Amendment post-date any other Constitutional provision

12   on which the State of Texas is relying and, thus, there can be

13   no Constitutional impediment to the production of documents

14   here.  With regard to the redistricting litigation, every

15   relevant actor has waived any assertion of privilege -- in that

16   litigation with regard to the 2011 claims, the only claims

17   where the United States is participating.  And in this

18   litigation, the presence of private Plaintiffs cannot limit the

19   United States' ability to obtain the document discovery that is

20   at issue here.  Thank you.

21          **MR. HAYGOOD:**  Your Honor, we just would submit those

22   we have in the briefs.  We think that the first four factors

23   that's set out in the Paridus (phonetic) case heavily outweigh

24   any possibility that there be future timidity on the part of

25   the legislatures.  And to Mr. Clay's point, while it's true

1    that Texas is free to govern its own election, it's not free to

2    do so in a way that's discriminatory either in affect or in

3    intent as we argue the Plaintiff Interveners and the Plaintiffs

4    argue in this case.  And so, we would argue, your Honor, that

5    the first four factors here heavily outweigh any possible

6    future timidity on the part of the State legislature.  And one

7    would hope that future timidity would inhibit the ability of

8    the legislatures to adopt discriminatory measures as they have

9    here with SB14.

10            **MR. DUNN:**  Chad Dunn on behalf of the Veasey LULAC

11    Plaintiffs.  On the issue of timidity of the process, since I

12    was addressed to the Court -- I'm the lawyer that was referred

13    to and not named that represents the Democratic party -- if the

14    Court is interested, I also represent some Republicans and

15    business clients and I do have the ability to comply with my

16    standard of professional conduct to exclude activities for one

17    client from another.  But if so long as the State brings it up

18    as an issue, I think it ought to be pointed out that the State

19    has now for 18 months, at least, had in its possession the e-

20    mails from every Democratic member of the legislature that

21    relates to this issue and has had the advantage and benefit of

22    reviewing all of those, in addition to having possession of all

23    the Republican members of legislature.  And so, to the extent

24    that there is any timidity, that bell has already been rung.

25    The Democrats are already well aware of the State's possession.

1   So, equalizing the issue here will have no further affect.  But

2   I think the more prevalent and important argument is the one

3   that Mr. Freeman advanced which is in the *Perez* litigation.

4   These e-mails were handed over and, in fact, the State agreed

5   to hand them over.  There's been a legislative session since

6   then and no evidence has been advanced of any timidity of this

7   legislature of doing its job or having adequate public

8   discourse on matters of public concern.  So this issue weighs

9   in favor of disclosure.

10         **MR. CLAY:**  Your Honor?

11         **THE COURT:**  Okay.

12         **MR. CLAY:**  And I'm not exactly sure.  What I can

13  assure you is that we have not been digging through the e-mails

14  of the Democratic members of the legislature, plotting some

15  sort of nefarious defense of the voter I.D. Bill here.  In

16  fact, I'm not even -- you know, beseech Mr. Dunn to tell me

17  which documents we have from Democrats because I'm actually --

18  Democratic members of the legislature because I'm actually not

19  sure which ones they are.

20         **THE COURT:**  Well, if you let him see the documents,

21  he'll tell you.

22         **MR. CLAY:**  Well, I can go back and check but my point

23  is, what they requested in the previous litigation was

24  documents from Republican legislatures.  And that's what the

25  Office of the Attorney General has in our possession.

1        **MR. SPEAKER:**  I can --

2        **THE COURT:**  Okay.  I don't need any more.  So we've

3    discussed those factors and I think, as I said, one, three and

4    four definitely weighing in favor of the disclosure.  There was

5    some argument on both sides regarding factor two, the

6    availability of other information.  I think that, at least,

7    slightly weighs also in favor of disclosure.  So really the

8    only factor that weighs -- and can be heavily against the

9    disclosure is the factor number five, how it may affect -- or

10   the timidity of the legislators in the future and how it may

11   affect the legislative process in the future.  And the Court is

12   mindful and I understand -- you know, that is a concern and

13   issue.  I do think overall the -- most of the factors kind of

14   weigh in heavily of disclosure, too -- I think at least weighs

15   somewhat in favor of disclosure but -- you know, this

16   information is sensitive.  Although the factors weigh in favor

17   of the disclosure -- you know, I don't think the Court is

18   necessarily ready to fully pierce the privilege.  And there's

19   enough here to take this different approach that these other

20   Courts have taken in these type of suits where the Court is

21   going to order Defendants to provide those documents to the

22   Plaintiffs under seal, marked highly confidential.  Under --

23   there's Federal Rule of Evidence, I guess, 502(d).  That

24   doesn't mean the privilege is waived by any disclosure.  The

25   Court will address the privilege regarding individual documents

1    at the trial of this case if the Plaintiffs find that they want

2    to introduce any of that evidence.  I don't recall right now

3    what the Protective Order says regarding highly confidential as

4    to who would have access to these documents under your current

5    -- or the Protective Order that's in affect.  Does anyone know?

6         **(No response.)**

7              **THE COURT:**  You can take some time to look at that if

8    you need to.

9              **MR. ROSENBERG:**  No.  Your Honor, I believe it's

10   counsel only, Court only, and court reporters but we can double

11   check that.

12             **MR. SPEAKER:**  And experts.

13             **MR. ROSENBERG:**  It would be subject to the very

14   highest tier of confidential.

15             **THE COURT:**  So not the individual parties?

16             **MR. ROSENBERG:**  No.

17             **THE COURT:**  Just the lawyers?

18             **MR. ROSENBERG:**  I am almost positive there is a

19   virtually counsel only provision.

20             **THE COURT:**  Okay.  We probably should double check

21   that.

22             **MR. SCOTT:**  There is for attorney's eyes only --

23             **MR. ROSENBERG:**  Yeah.

24             **MR. SCOTT:**  -- if the Court were to order such a

25   thing and overrule, I guess, the attorney-client privilege that

 1  we believe were obtained on those.

 2          **THE COURT:**  Well, I was going to move to that next.

 3          **MR. SCOTT:**  Okay.

 4          **THE COURT:**  Because I understand the legislative

 5  privilege covered all of them.  The attorney-client privilege

 6  covers some of them, right?

 7          **MR. SCOTT:**  Well, all of the documents, your Honor,

 8  that are in the Attorney General's Office, that are listed on

 9  the privilege log which I understand that they're universal

10  documents we're discussing.  All those documents were received

11  to the Attorney General's Office as by way of the legislators

12  and are in our possession under the attorney-client

13  relationship.

14          **THE COURT:**  But that doesn't make them subject to the

15  attorney-client privilege.  You have to satisfy the elements --

16  or for the attorney-client privilege.  And just because they

17  were turned over by your client, doesn't mean they're

18  protected.

19          **MR. SCOTT:**  Okay.

20          **THE COURT:**  Right?  That's the way I see it anyway.

21  But I'm assuming the Protective Order sets forth and under

22  highly confidential, it sounds like only the attorneys can

23  review these documents.  You-all should probably double check

24  that before you leave today.  So, anything else on the

25  legislative privilege issue?

1          **MR. FREEMAN:**  Your Honor, may I just ask with regard

2     to use at depositions, would your Honor prefer that we place

3     documents before you before we use them at depositions or could

4     we simply place the depositions, themselves, under seal?

5               **THE COURT:**  Any comment on that from the defense?

6          **MR. GARZA:**  If I may, your Honor.  In the

7     redistricting case, the depositions were placed under seal.

8               **THE COURT:**  Right.  But he's talking about these

9     documents that I've just addressed, whether -- if they're going

10    to be used in a deposition, I would think they should probably

11    be cleared from the Court.  Obviously, we're getting -- you

12    know, it's going to depend on the volume as to how this Court

13    is able to handle that.

14         **MR. GARZA:**  And within the context of the deposition,

15    when a document like that is going to be used, the court

16    reporter is instructed to put that portion of the deposition

17    and that document under seal.

18              **THE COURT:**  Okay.

19         **MR. FREEMAN:**  Your Honor, the United States would

20    support that procedure as well.

21         **MR. SCOTT:**   And for the record, the State would not

22    be in agreement on that simply because the witness, then, would

23    have seen the document and while, I guess, the court reporter

24    of each of these witnesses under the same penalties of the

25    attorneys and our parties are under, I guess that would take

1    another step that we need to get to.  But even then, we now

2    have expanded the universe of who is seeing documents.

3            **THE COURT:**  Are you talking only about the witnesses

4    who may be producing these documents or authored these

5    documents?

6            **MR. FREEMAN:**  That would be a category, certainly,

7    your Honor.  And I would presume that most uses of these

8    documents would be in a deposition of their author or

9    recipient.  If this Court wanted to --

10           **THE COURT:**  Because beyond that, I can see where it

11   is a problem.

12           **MR. FREEMAN:**  No.  I understand, your Honor, and

13   that's why I raised it.

14           **THE COURT:**  Okay.

15           **MR. FREEMAN:**  If your Honor would want to, perhaps

16   craft a Rule where if a document were used at a deposition, it

17   could only be used by -- in the deposition of an author or

18   recipient of the document.  Otherwise, the document --

19   otherwise, the Court would need to specifically clear use of

20   that document.

21           **THE COURT:**  Anything else from the Plaintiffs on that

22   issue?

23           **MR. ROSENBERG:**  That makes sense, your Honor.  And

24   that deposition be under seal.

25           **THE COURT:**  The Court will allow that.

1      **MR. SCOTT:**  My concerns, I think, are all on the

2  record, your Honor.

3      **THE COURT:**  Yeah.  Okay.  Anything else before we

4  move to the attorney-client privilege?

5      **(No response.)**

6      **THE COURT:**  Then -- and I think Mr. Scott and I just

7  had a conversation about those documents on the attorney-client

8  privilege.  This Court doesn't think they would all be covered.

9  I mean, the Defendant would have to show that they meet the

10  elements or what's required to establish an attorney-client

11  privilege.

12      **MR. FREEMAN:**  Your Honor, there's a relatively small

13  universe of documents over which the Defendants have asserted

14  an attorney-client privilege on the privileged logs that they

15  incorporated by reference in their Initial Disclosures.  The --

16  in many of those cases, the United States has not challenged

17  the assertion of an attorney-client privilege.  Where the

18  United States does challenge the assertion of the attorney-

19  client privilege is where those communications were between

20  different legislative offices or where those communications

21  concerned matters that were clearly political such as polling

22  data.  Those matters -- in the first case, the privilege should

23  be waived by the disclosure.

24      **THE COURT:**  I mean, I agree with that.  Do you

25  disagree with that?

1           **MR. SCOTT:**  Well, I think we --

2           **THE COURT:**  Between legislators, political issue --

3   public matters?

4           **MR. SCOTT:**  I think I've done an incredibly poor job

5   of explaining the documents and why they're in the possession

6   of the State -- I mean, why they're in the possession of the

7   Attorney General's Office.  That's a different issue than is I

8   think the one that Mr. Freeman has raised and I think the Court

9   was looking at, which is does the document itself contain

10  information relating to the attorney-client relationship.

11  That's -- we've marked that I think -- we've identified that --

12  I think Mr. Freeman is correct.  We've identified those on a

13  privilege log those documents we believe that the document

14  itself would be a document that deals with the attorney-client

15  relationship.  What I -- I believe I'm identifying to the Court

16  is the fact that the entire universe of those documents were

17  documents that the legislator was a client or sought to be a

18  client of the Attorney General's Office was a communication to

19  us that was confidential and made for the purpose of securing

20  legal services or a legal opinion or assisting -- assistance in

21  a legal proceeding, which was the *Texas v. Holder*.  That's how

22  we got the stuff.

23          **THE COURT:**  But just because you got all of them,

24  they're not all covered by the privilege.  It has to meet all

25  of those little elements set out.

1          **MR. SCOTT:**  Well, and that's --

2          **THE COURT:**  Just because your client gives you a box

3   full of documents, they wouldn't all be privileged by attorney-

4   client or they wouldn't fit within that privilege.

5          **MR. SCOTT:**  Were that how the transaction took place,

6   I agree a hundred percent.  These documents were obtained by

7   the Attorney General's Office in a previous litigation where

8   they were given to us as a part of that litigation by potential

9   -- by our clients.

10          **THE COURT:**  How does that make --

11          **MR. SCOTT:**  They were in our offices only -- like the

12   documents that are in Deckerd's offices relating to a

13   pharmaceutical case against one of their clients.  It worked --

14          **THE COURT:**  So it wouldn't be protected.

15          **MR. SCOTT:**  I'm sorry?

16          **THE COURT:**  By this privilege, it would not be

17   covered by this privilege.  The attorney-client privilege is

18   pretty specific as to what you have to establish to meet it.

19          **MR. SCOTT:**  Yes and what I read a moment ago was from

20   the 5th Circuit.  Since 1975, was -- were the factors relating

21   to documents that are, in fact, covered by the attorney-client

22   privilege.

23          **MR. FREEMAN:**  Your Honor?  If Mr. Scott's argument

24   were correct, Rule 34 would be a nullity.  If I retained an

25   attorney and someone served a Rule 34 document request on me

55

1    and I gave a box of documents to my attorney and said, "Can you

2    look at these?  Some of them are going to be responsive.  Some

3    of them might be privileged.  Let me know what's privileged."

4    If that transaction -- if the attorney-client privilege

5    attached because of that transaction, the attorney would say,

6    "Ah-hah, the entire box is covered by the attorney-client

7    privilege because you gave me the box so that I could review

8    them.  I don't have to give anything."  That's exactly what

9    he's trying to do with the entire set of documents that your

10   Honor just said were in the possession of the office of the

11   Texas Attorney General.

12           **THE COURT:**  Well, it would be like "we have some bad

13   evidence in a box.  Well, let me give it to my lawyer so I

14   don't have to turn it over."

15           **MR. FREEMAN:**  And --

16           **THE COURT:**  I mean, it kind of --

17           **MR. SCOTT:**  And I would agree with the Court that the

18   procedural posture that we are in currently, by viewing the

19   State of Texas as having custody of these documents makes the

20   argument very difficult to conceptualize because it doesn't

21   necessarily work under that situation -- the procedural posture

22   we've got this in.  But the correct posture that the documents

23   were obtained by us were from legislators.  They continue to be

24   those individual legislators' documents.  And I understand that

25   the Court has ruled otherwise.

1          THE COURT:  And they can raise -- object and raise

2    their privilege.  But I'm talking about how are we moving

3    along?  I don't think I can sit on this any longer.  You can't

4    -- we've established -- and I don't think there's any

5    disagreement -- you can't raise that privilege for them.  But

6    these documents are in your possession and so under Rule 34,

7    you turn them over per the Court's Order.  Now, that doesn't

8    inhibit them from raising objections, I guess, to that -- how

9    we work through --

10          MR. SCOTT:  Would they need to intervene to do that?

11   I mean, I don't want to get the Court mad at us by -- once we

12   alert the hundred and eight-nine that said they want to assert.

13          THE COURT:  But -- and that's fine.  But that's why I

14   needed to finish out this process, how we'd look at this

15   privilege, because if they do, they can see how the Court's

16   probably going to respond anyway --

17          MR. SCOTT:  Yes.

18          THE COURT:  -- after we've done this and gone through

19   this exercise about how the Court's going to address that

20   privilege.  But I don't think I could keep -- say, you're

21   someone's attorney -- someone subpoenas your records, I don't

22   think there's any reason that former client can't come and

23   object and claim that privilege, too.

24          MR. SCOTT:  As long as the Court is open to that,

25   then that's a process --

1          THE COURT:  Well, yeah, I don't know how it will work

2    but I wanted to go ahead and lay out the parameters of what

3    this Court's view was going to be on that privilege and how it

4    was going to be handled.  But I don't think I can prohibit

5    that.  Do you want to address that?

6          MR. FREEMAN:  I do, your Honor, because the United

7    States needs to short circuit any further delay that Mr. Scott

8    is plotting here.  These documents were produced in response to

9    a request for production --

10         THE COURT:  Stop plotting. (Laughing)

11         MR. FREEMAN:  -- served on the State of Texas.  And

12   Mr. Scott, I believe, is contemplating that after this Court

13   orders that these documents be produced that they withhold them

14   because --

15         THE COURT:  You know --

16         MR. FREEMAN:  -- the individual legislators --

17         THE COURT:  Yeah.

18         MR. FREEMAN:  -- might claim that there is an

19   attorney-client privilege --

20         THE COURT:  He's been ordered --

21         MR. FREEMAN:  -- that attached when they turned them

22   over.

23         THE COURT:  -- to turn them over.

24         MR. FREEMAN:  Okay.

25         THE COURT:  This Court cannot prohibit whoever owns

1    those documents from filing objections.  I think that would be

2    improper.

3              **MR. FREEMAN:**  I understand, your Honor.

4              **THE COURT:**  But I will --

5              **MR. FREEMAN:**  And all I'm saying is that the Office

6    of the Attorney General has also asserted that it represents

7    numerous individual legislators in their individual capacity,

8    and I think that this issue is --

9              **THE COURT:**  It's --

10             **MR. FREEMAN:**  -- ripe to be resolved now.

11             **THE COURT:**  I think we have flushed out enough with

12   the Court's view and how the Court wants to proceed with this

13   issue, but if there is some objections filed, it could be a

14   quick phone call with everyone, a quick phone conference, so --

15             **MR. FREEMAN:**  Thank you, your Honor.

16             **THE COURT:**  Okay.  But the issue still remains that

17   the defendants are claiming an attorney-client privilege.  I

18   have not looked at the logs.  You all have a lot of documents

19   out there.  I don't know what's been established, what hasn't.

20   I've already -- I've ruled that the attorney-client privilege

21   does not cover all the documents just because they were turned

22   over from the client.  So, that being said, what are we looking

23   at?

24             **MR. FREEMAN:**  Your Honor, there are approximately

25   3,900 pages of privilege logs, I believe.

1      **THE COURT:**  But what covers the attorney-client

2  privilege now that I've gotten rid of the global privilege?

3      **MR. FREEMAN:**  There's -- there's a limited set.  And

4  what the United States would ask this Court to do is rule

5  categorically with regard to certain types of assertions, which

6  are pretty simply resolved, which are -- and I -- it may be in

7  our proposed order, as well, and those privilege logs

8  themselves were exhibits to our initial motion.  We're simply

9  asking this Court to say that there is a waiver of the

10  attorney-client privilege where there was a communication

11  between different legislative offices --

12      **THE COURT:**  Well, do you think that's privileged?

13      **MR. FREEMAN:**  They certainly asserted it --

14      **THE COURT:**  Wait, wait.

15      **MR. FREEMAN:**  -- in their privilege log.

16      **MR. SCOTT:**  I'm sorry, your Honor.

17      **THE COURT:**  Communications between different

18  legislators?  How is that attorney-client privilege?

19      **MR. SCOTT:**  I don't know the specific document.

20      **THE COURT:**  Okay.

21      **MR. SCOTT:**  And speaking in generalities, I --

22      **THE COURT:**  Do you all need to talk --

23      **MR. SCOTT:**  -- I really would love to see the -- the

24  entry and perhaps --

25      **THE COURT:**  Maybe you all need to confer further on

1  this attorney-client privilege now that you've got some -- some

2  rulings from the Court that everything is not privileged.

3         MR. SPEAKER:  One document --

4         THE COURT:  Because I do think -- I mean, it's the

5  burden of the defendant to establish the elements.

6         MR. SCOTT:  Absolutely.  (indiscernible)

7         THE COURT:  And if there is a question --

8         MR. SCOTT:  -- the responding party.  I don't

9  disagree at all, your Honor.

10         MR. FREEMAN:  So, for example, your Honor, on page

11  154 of the revised privilege log, I believe defendants asserted

12  the attorney-client privilege over a communication between

13  counsel for the lieutenant governor and counsel for the

14  speaker.  There are similar withheld communications between the

15  chief of staff to Senator Fraser and the chief of staff

16  between -- of Representative Harless, both of whom are

17  attorneys.  There's -- and those types of communications where

18  they're between different offices, and I believe they're listed

19  out in our --

20         THE COURT:  Okay.

21         MR. FREEMAN:  -- in our proposed order -- that's what

22  we're talking about.

23         MR. SCOTT:  And happy to visit with them about --

24         THE COURT:  Okay.

25         MR. SCOTT:  -- the documents --

1        THE COURT:  Maybe that's what --

2        MR. SCOTT:  -- now that we've got some guidance from

3  the Court.

4        MR. FREEMAN:  Okay.

5        THE COURT:  -- you all need to do now --

6        MR. SCOTT:  Yes, your Honor.

7        THE COURT:  -- being where we are --

8        MR. FREEMAN:  Thank you.

9        THE COURT:  -- is visit further on the attorney-

10  client --

11        MR. SCOTT:  Okay.

12        THE COURT:  -- privilege issue.

13        MR. DUNN:  Two points on the visiting further.  It

14  would be helpful if the Court could go ahead and set the

15  telephone conference --

16        THE COURT:  Well, tell me what you all can do on the

17  attorney-client privilege.  When are you all going to get

18  together and --

19        MR. SCOTT:  Our depos got canceled for tomorrow.  I'm

20  wide open.  I'll be back in Austin --

21        THE COURT:  Tomorrow, then.

22        MR. FREEMAN:  How about after lunch?

23        MR. SCOTT:  Yeah.  Today?

24        THE COURT:  Today and --

25        MR. FREEMAN:  I mean, we have a 2:30 flight, but --

1            **THE COURT:**  Today and tomorrow.

2            **MR. FREEMAN:**  If we have -- if we have time, or if we

3   change it --

4            **MR. SCOTT:**  Well, there's 30 some -- if there's 3,000

5   pages -- and I apologize; I don't know what the total number

6   is.  I don't know the --

7            **THE COURT:**  Why don't you all each --

8            **MR. SCOTT:**  Okay.

9            **THE COURT:**  -- individually look at it today, confer

10  tomorrow.  If you all were going to be in depos anyway, hash it

11  out all day tomorrow, whatever you need to do.  I am pretty

12  tied up on Friday, I think, Brandy --

13           **THE CLERK:**  Yes, your Honor.

14           **THE COURT:**  -- so, you know, it would -- we can do a

15  phone conference early next week if we have to.

16           **MR. SPEAKER:**  Okay.

17           **MR. FREEMAN:**  Your Honor, the United States would

18  request that there be some date certain set when the defendants

19  will produce those documents --

20           **THE COURT:**  Okay.

21           **MR. FREEMAN:**  -- where the only privilege asserted

22  was the state legislator privilege.

23           **THE COURT:**  Well, you already have them, so it

24  shouldn't be a problem.  Within what?

25           **MR. FREEMAN:**  Could we get seven days, your Honor?

1          **THE COURT:**  Seven days?

2          **MR. SCOTT:**  There is a -- my understanding is the

3    documents that we have in our custody -- and let me get

4    Mr. Whitley to come address this.  There is a -- talk about an

5    April Fool's joke; I'm not kidding.  There is a -- there is an

6    ESI agreement we had in this case to produce with certain

7    fields.  I do not believe all of the materials in our

8    possession, and I think a lot of them, don't have all of the

9    fields that are required under the ESI.  And I bring that up

10   simply because they are documents that were gathered in a prior

11   litigation with no idea about the current ESI agreement, but is

12   that --

13         **MR. WHITLEY:**  I don't remember the contours of any

14   ESI agreement in *Texas v Holder*.

15         **MR. FREEMAN:**  It was nearly identical, I believe,

16   your Honor.

17         **MR. WHITLEY:**  Okay.

18         **MR. FREEMAN:**  And, your Honor, we served our Rule 34

19   requests --

20         **THE COURT:**  Within seven days?

21         **MR. FREEMAN:**  -- I believe in November or December.

22         **THE COURT:**  Within seven days?

23       **(Voices and whispers off the record)**

24         **MR. SCOTT:**  If -- if there is going to be a problem

25   complying with that, is it okay if we notify the Court by the

1   end of close of business tomorrow?

2           **THE COURT:**  That's fine.

3           **MR. SCOTT:**  Okay.

4           **THE COURT:**  Now, let's go ahead and set that hearing

5   for early next week, if we need it, on the attorney-client

6   privilege.  And we can do this by phone.  I mean, you can

7   certainly appear if you want to.

8           **(The Court conferred with the Clerk)**

9           How about 8:30 on Tuesday morning?  I won't have --

10  if I'm in trial I'm not going to have a lot of time for you

11  all, but we'll at least figure out if there is an issue.  Maybe

12  we can move it along.

13          **MR. DUNN:**  Eight thirty-Tuesday morning?

14          **THE COURT:**  Eight thirty Tuesday morning?  Okay?

15          **MR. FREEMAN:**  That's fine, your Honor.  Thank you.

16          **THE COURT:**  And what else?  I thought there was a --

17  I know we've got a couple other motions to address, but

18  anything else on this motion to compel regarding the

19  legislative privilege, those documents?

20          **MR. DUNN:**  Well, you had asked before the end of the

21  hearing for us to take a look at the protective order.

22          **THE COURT:**  Uh-huh.

23          **MR. DUNN:**  And, so, my co-counsel, Mr. Hebert, sent

24  it to me.  Paragraph 2.1 includes attorneys of record, their

25  associates, staff, and assistants working on the litigation,

1   experts, expert staff, and the Court.  And that's it.

2          THE COURT:  Okay.  Did you get that?

3          MR. SCOTT:  I hear it.

4          THE COURT:  Okay.  All right.  Then, there is a

5   motion for protective order that was filed by the Government?

6   Did you all have a chance to -- what's really left?  The

7   defendant has narrowed the scope, just as the state legislators

8   we've decided are not parties; neither is congress.  I saw the

9   briefs submitted.  I'd already, you know, thought that way

10  before that in any way -- in any matter, so what is left here?

11  The DOJ has agreed to provide what's in its files, or no?

12         MR. SHAPIRO:  Yes, your Honor.  This is Albert

13  Shapiro for --

14         THE COURT:  And this is D-180, I believe.  Okay.  Go

15  ahead.

16         MR. SHAPIRO:  Yes, your Honor.  Albert Shapiro for

17  the United States.

18         The United States has indeed narrowed -- has worked

19  with defendants to narrow the scope of the requests, and now we

20  have, you know, identified entities within DOJ where they're

21  going to be directing their requests.  But there is one

22  outstanding issue that remains that needs to be addressed by

23  the Court, and that is the defendant's insistence on directing

24  requests at 22 named members of congress.

25         THE COURT:  But I think I said they have to go

1    through Rule 45 if we're going to apply the same rules.

2              **MR. CLAY:**  That's what I understood you had said

3    earlier.

4              **THE COURT:**  Correct?

5              **MR. SHAPIRO:**  So, if we have sorted that issue, and

6    we can have a protective order on that issue, or we're in

7    agreement on that issue, we are -- we are set.  I think --

8              **MR. CLAY:**  We have agreed to withdraw our request as

9    it pertains -- as it's directed at the individual members of

10   congress.

11             **THE COURT:**  Okay.  So, is there anything left?

12             **MR. SHAPIRO:**  That should be all, your Honor.

13             **THE COURT:**  From the defense?

14             **MR. CLAY:**  No.

15             **THE COURT:**  Then, we have an agreement on the

16   protective order, correct, and the Court can terminate it?

17             **MR. CLAY:**  Well, I thought if we withdraw our

18   request, then there is no pending motion for a protective

19   order.  Is that --

20             **THE COURT:**  Well, okay.  I don't know.  Is there

21   anything else left that you all may have agreed to?  I'm just

22   going to terminate the motion, then.

23             **MR. SHAPIRO:**  Your Honor, there should be nothing

24   else left at that point.

25             **THE COURT:**  Okay.

1          **MR. SHAPIRO:**  Thank you, your Honor.

2          **THE COURT:**  Then, that's terminated.

3          Then we have -- we have the motions to dismiss

4     pending, and I have -- we have been working on those, so

5     hopefully in a couple of weeks I'll have some sort of ruling on

6     those, but we also had a motion to amend the scheduling order,

7     DE-196.  And let me just say, I don't mind working with you all

8     on the deadlines.  What stood out regarding this is you all are

9     squeezing the Court out on the dispositive motions and the

10    *Daubert* challenges; even if this were the only case I was

11    working on, there is no way I would get to that.  This is a

12    bench trial.  Maybe we can carry some of that stuff through the

13    trial; I don't know.  But that's what -- self-interest here;

14    I'm not looking at your interest regarding that issue.

15         **MR. DELLHEIM:**  We understand.  Good morning, your

16    Honor.  Richard Dellheim for the United States.  We appreciate

17    the Court's patience this morning.  We very much appreciate the

18    chance to address the Court today.

19         I think, as is apparent from what we've heard

20    heretofore, your Honor, this case is at a critical juncture.

21    And while time has always been of the essence in this case, it

22    is particularly so now.  What we have understood from our prior

23    discussions with the Court is that the Court did not intend to

24    move the September 2nd trial date.  And we understand that

25    decision and we respect that decision.  We also understood that

1    there may be some willingness to adjust some of the interim

2    deadlines to ensure that discovery proceeded and that the

3    record be fully developed in time for trial.  But as we have

4    heard today and as the Court is well aware, there have been a

5    series of delays impeding access to information the U.S.

6    considers vital to its case.

7         **THE COURT:**  Okay.  But I'm not really interested in

8    argument here, you all fighting with each other the way you all

9    did in your briefing, throwing jabs at each other.  I'm really

10   just trying:  What can we do to address the concerns regarding

11   our time frame?

12        **MR. DELLHEIM:**  Well --

13        **THE COURT:**  And I'm not saying that you were going

14   there.  I just kind of wanted to cut that off before anybody

15   was going there.

16        **MR. DELLHEIM:**  I very much --

17        **THE COURT:**  About jabs:  your fault; your fault; no,

18   you're dragging your feet; no, you were.  We are where we are.

19        **MR. DELLHEIM:**  And where we are is a process that has

20   been impeded by some significant delay.

21        The proposed modification that we have before the

22   Court, in light of that delay, serves two critical purposes.

23   First, it preserves September trial date; that we think is

24   paramount.  But almost equally as important, it is necessary to

25   ensure that the record before the Court at trial is as complete

1    and meaningful and probative as possible.

2            There are two aspects to the remainder of discovery:

3    the elaborate -- number one, of course, is the elaborate,

4    highly-structured data matching that is currently under way

5    across five federal agencies.  I will address that in a moment.

6    The second, of course, is the fact discovery, particularly the

7    legislative discovery, which was addressed previously this

8    morning, and we are very appreciative of the Court's guidance

9    on those issues.

10           I'd like to address the data matching evidence, if I

11   can, for a moment, your Honor.  That evidence is absolutely

12   critical to our case.  The ability of the United States to

13   present a prima facie case on the effect of SB 14 depends on

14   that analysis.  And far from foot dragging, the United States

15   has worked feverishly to complete that enormously complicated

16   project as fast as possible.  And it is enormously complicated.

17   We are working with five federal agencies and working with

18   literally hundreds of millions of records.  And by agreement of

19   the parties, we are working on behalf of all of the parties.

20           And I'd like to be clear about something.  The delays

21   in starting that process were not the fault of the United

22   States.  We sought those data in November.  And after a --

23   the -- the -- when I say "those data," I mean the defendant's

24   voter files.  And after a series of delays and objections, the

25   defendants produced those crucial data nearly three months

1    later on February 19th, and then only in response to this

2    Court's order.  That significant delay in obtaining those

3    crucial data resulted in a commensurate delay in the beginning

4    of our ability to analyze those data.

5              And, your Honor, based on our daily conversations

6    with the five federal agencies, and due to the enormity and the

7    novelty of the task involved, there is at this point a

8    technological limit to the agencies' ability to finish their

9    work according to the current schedule.  Based on all we know,

10   we believe it is now impossible for the agencies to complete

11   their work under the current schedule.  And, moreover, we also

12   need to be mindful that the agencies are simultaneously

13   devoting their limited resources to trying to accomplish their

14   mission critical work as well.  The data matching simply cannot

15   be done under the current schedule, and that is why we have

16   asked for what we believe are reasonable adjustments to that

17   schedule.

18             Again, what the United States is doing is

19   unprecedented in its scope and by the fact that the United

20   States is doing its work on behalf of all of the parties.  It's

21   critical we have the time that we need to do the work and do it

22   right.  And the kind of data matching that we're talking about,

23   of course, is the exact procedure that the court in D.C.

24   indicated was appropriate for this kind of case.  And we're

25   doing it.  But it will take some time; and the months we have

1    lost in receiving the voter data from Texas, that time lost,

2    despite our best efforts, is simply impossible for us to make

3    up fully.  But that's, of course, just part of it.

4            Once the agencies have completed their work and

5    generated the outputs, we will need some time to analyze those

6    data and produce reports.  Under our proposed schedule we would

7    propose that the plaintiffs have four weeks from May 30th, when

8    the data will be available, to analyze those data and produce

9    expert reports.  We would propose that the defendants have a

10   full seven weeks from the day those data are produced to

11   analyze those data and produce their reports.  We would also

12   ask for a minimum amount of time to reply.  Your Honor, the

13   time is critically necessary to ensure that the effects

14   evidence presented to the Court is as meaningful and as

15   complete and reliable as possible, and our ability to present

16   such a case hinges on having the time to do the work required.

17           The other aspect, of course, of what remains before

18   us is the fact discovery.  And, again, I don't want to belabor

19   what came this -- what came before, and I won't go there.  I

20   will just simply say that we are appreciative of the Court's

21   efforts to keep this moving.  We anticipate -- I mean, there

22   has been a significant amount of motion practice heretofore.

23   We anticipate there may be even more motion practice to come.

24   We would anticipate there may be objections lodged at

25   depositions that will need to be presented to the Court for

1    immediate resolution or the depos will not be able to continue

2    effectively.

3            So, what I'm saying, your Honor, is that we will be

4    very much reliant upon the Court to help keep this process

5    moving.  The United States is doing everything it can to keep

6    things moving and to prepare a full case for this Court's

7    consideration by September 2nd.

8            And you have been very patient.  I will conclude with

9    this.  Having only just been given access to the State's

10   databases, we believe the interests of justice dictate that the

11   United States have adequate time to analyze those data.  It's

12   crucial.  It's necessary.  And the U.S. must also be permitted

13   reasonable and timely access to all of the other evidence for

14   its case, access that has been resisted to this point.  We

15   respectfully request that the Court grant the motion to modify

16   the scheduling order in this profoundly important case.

17           **THE COURT:**  All right.  Who's arguing?  Oh.

18           **MR. ROSENBERG:**  Can I just add one thing in response

19   to what your Honor raised in terms of the crunch on your

20   Honor's time, which I hate to say you ain't seen nothing yet,

21   but --

22           **THE COURT:**  Yeah.  And -- yeah.

23           **MR. ROSENBERG:**  -- you ain't seen nothing yet.  Your

24   Honor is right.  This is going to be a bench trial.  I think

25   that the parties should be able to work out a procedure at the

1    tail end that perhaps either just reserves rights on *Daubert*,

2    for example; they can be dealt with at trial; reserves rights

3    in the limine motions, perhaps even on dispositive motions.

4    There are ways for us to do it.  We fully support DOJ's

5    schedule in terms of the extension of fact discovery and the

6    extension of -- and the change in expert discovery.  On the

7    tail end, I think the parties should be able to sit down and

8    work out something that works for the Court, because there's

9    going to be a lot of paper during that period of time; it is a

10   bench trial; there is no need for that full briefing to occur

11   prior to the trial if the parties can reserve their rights to

12   proceed.

13            **THE COURT:**  Okay.

14            **MR. RIOS:**  Your Honor, Rolando Rios on behalf of the

15   Hispanic Judges and Commissioners; just make some brief

16   comments, your Honor, in strong support of the Government's --

17   United States' scheduling order.

18            In '07 and '09, the -- during those legislative

19   sessions, your Honor, the blocking bill was -- I mean the SB 14

20   was stopped by the blocking bill, which allowed one third of

21   the legislators to block any bill from getting on the floor of

22   the senate.  And they were successful in '07 and '09, and then

23   in '10 the census came out and indicated that the Hispanic

24   voting age population increased dramatically.  So, in the '11,

25   the '11 session, the Governor declared a emergency, a State

1   emergency, and vitiated the blocking bill requiring a simple

2   majority to get that bill through.  And then in '12, the

3   Section 5 stopped that bill, and the three-judge court ruled

4   that the law violated the Voting Rights Act.  And then the

5   Supreme Court knocked down the Section 5 Voting Rights Act.

6   And in '13 the legislature, even though we had the three-judge

7   court ruling, we had the blocking bill, it was vitiated again,

8   and the bill passed.

9           This has been a continuing practice of obstruction as

10  far as the State of Texas is concerned, and we, as plaintiffs,

11  over here on this side, your Honor, Hispanic Judges and

12  Commissioners, are heavily, heavily dependent on the Department

13  of Justice being able to set the record so we can stop this --

14  this nonsense that's being pushed forward by the State.  So, we

15  would strongly, strongly, urge the Court to consider the

16  rescheduling of the -- as is suggested by the federal

17  government, your Honor.  Thank you.

18          **THE COURT:**  All right.

19          **MR. SCOTT:**  Your Honor, I heard you say we weren't

20  supposed to place blame, although I heard a lot.

21          **THE COURT:**  I read about all of the blame, so --

22          **MR. SCOTT:**  Yeah.  And --

23          **THE COURT:**  -- I don't need to hear it.  I just -- I

24  think we need to adjust some things here.

25          **MR. SCOTT:**  And, your Honor, one of the big

1    difficulties I've pointed out to the other side, or attempted

2    to, was that every one of the issues that they bring up, the

3    result is to place the burden upon the defendants, by

4    compressing their time and reducing their time to respond to

5    experts that the plaintiffs will have an extended time to

6    produce reports with, and upon the Court.  And I fully

7    anticipate there will be constitutional challenges that the

8    Court will face on Section 2 in the way that these plaintiffs

9    are attempting to assert it.  I fully anticipate there is going

10   to be a whole host of motions to Mr. Rosenberg's point.  I

11   don't know that we've seen anything yet.

12           But at the end of the day, just to look at one issue

13   that they've raised in their proposed -- they've proposed that

14   the defendant's expert goes from 28 days to now we have 21

15   days, but they leave out the point that July 4th is one of

16   those weeks that they've been kind enough to give us during

17   that 21 days.  So, again, they conveniently leave out different

18   issues about their proposed schedule, all of which have nothing

19   to do with fact discovery needing an extended period of time.

20   The fact discovery issues seem like they've gone away based

21   upon what this Court has ordered today.  When we look back at

22   the DOJ's motions, they were exclusively dealing with issues of

23   needing more time because they need the ability to go subpoena

24   legislators.  That's -- that issue goes away to get those

25   documents because the Court has ordered the State of Texas to

1     turn those documents over to them.

2          So, the idea that we need another 50 some-odd days of

3     discovery for a case that was filed in June of 2013 and the

4     result of that extension of time is to compress and divest the

5     State of Texas of the ability to defend itself in this case, on

6     a perfectly proper statute that has been picture perfect when

7     applied in -- at the polls, is -- defies any kind of reason.

8          **THE COURT:**  What about the database comparison issue

9     though?  Isn't that going to get into --

10         **MR. SCOTT:**  The data --

11         **THE COURT:**  -- discovery --

12         **MR. SCOTT:**  Well --

13         **THE COURT:**  -- I mean isn't that going to --

14         **MR. SCOTT:**  -- the database issue is something that

15    seems to be related solely to expert testimony.  The database

16    results are going to be supplied to the parties' experts.  The

17    parties' experts are going to be the only one that need that.

18    That has -- and that goes to my point about the extension of

19    fact discovery.  There is no reason to extend fact discovery

20         **THE COURT:**  Okay.  Why are we trying to extend fact

21    discovery, then?  I thought that was the problem; the database

22    comparison's not ready till May 30th, so we're giving some 30

23    days after that.

24         **MR. DELLHEIM:**  Your Honor, we -- we began the -- the

25    discovery process seeking to obtain information, vital

1    information, relevant information, to the -- to the intent

2    claims, as well as the effects claims, beginning in last --

3    last November.  It wasn't until today that the State of Texas

4    has been ordered to provide us the information that we have

5    desperately sought for months and months and months.  The delay

6    is not the result or the fault of the United States.  The

7    discovery process is complex.  These cases are intricate and

8    difficult and complex.  Depositions have not even begun to

9    be -- have not even begun yet.

10            THE COURT:  But why?  Why haven't they started?

11            MR. DELLHEIM:  It did not make sense to subpoena

12   legislators when we did not have any documents.  Until the

13   issues that have been pending with the Court were resolved, it

14   did not make sense.

15            THE COURT:  Okay.

16            MR. DELLHEIM:  And that -- as the State of Texas

17   suggests, and as I attempted to foreshadow before, we believe

18   there is going to be continuing motion practice that will delay

19   this case.  We urge the Court, and we are reliant upon the

20   Court, to help us get access to the information vital to our

21   intent claim and our effects claim.

22            MR. SCOTT:  Your Honor, briefly, November 22nd, 2013,

23   letter to DOJ from my office -- or from me:

24            "In particular, your letter seeks to impose a

25            preservation obligation on Texas current and former

1          state legislators who are neither parties to this

2          litigation nor subject to our direction or control.

3          To the extent you seek discovery from nonparties,

4          including state legislators, the Federal Rules of

5          Civil Procedure govern such requests."

6          I mean, since November.  Then in December we notified

7     them that our database was ready.  We provided our matches from

8     our algorithm to them without even knowing what theirs was.  We

9     unilaterally agreed in January, as a result of an amended

10    request for production that they had that was due in January,

11    to produce our databases unilaterally to them without trying to

12    get any of the documents -- or the databases of the federal

13    government, to avoid any potential national security issues.

14    We have bent over backwards.  And, as a result of bending over

15    backwards, today we find out that we're the bad guy; and the

16    bad guy should be punished and reduced his attempt -- his

17    ability to defend themselves.

18          **THE COURT:**  Okay.  I -- I don't think you're the bad

19    guy.  But I think where we are, if there is room for movement,

20    what we can alter or specifically where the defense feels it's

21    being crunched, you know, I will address that.  I do think

22    where we are we do need some more time regarding some of these

23    matters.

24          **MR. DELLHEIM:**  Your Honor, if I may, we are

25    absolutely firm on our need to have an amended schedule with

1   respect to discovery.  We are happy to work cooperatively with

2   the defendants and with the other plaintiffs to see what room

3   there is on the back end to see what we can do to help relieve

4   some of the pressure that falls upon all of us.

5            **THE COURT:**  Okay.  Well, let me backtrack here.  You

6   all were -- changed the final pretrial conference to -- from

7   August 21st to the 27th.  I don't have a problem with that, but

8   the joint pretrial order needs to be filed probably a week

9   before that; which would put it at August 22nd, Brandy?

10           **THE CLERK:**  A week before would be the 20th, your

11  Honor.

12           **THE COURT:**  The 20th.  The findings and conclusions

13  August -- they're just moving four days; I don't have a problem

14  with that, on August 18th.

15           So, I guess the question is, where does the defense

16  think it's being put in a corner regarding discovery and

17  experts; and see what can be worked out.

18           **MR. SCOTT:**  We've -- well, we've been reduced from 28

19  days to 21 days --

20           **THE COURT:**  On the --

21           **MR. SCOTT:**  -- in the proposed order.

22           **THE COURT:**  On the --

23           **MR. SCOTT:**  On the proposed schedule that they

24  provided.

25           **THE COURT:**  For the fact discovery, expert discovery,

1    expert reports?

2         **MR. SCOTT:**  Defendant's expert reports.

3         **THE COURT:**  Okay.

4         **MR. SCOTT:**  They've extended their time from --

5         **THE COURT:**  Okay.  Then --

6         **MR. SCOTT:**  -- what would have been nine days to --

7         **THE COURT:**  Then, you all need to bump.  Plaintiffs

8    need to bump that back to give them their 30 days.

9         **(Pause)**

10        Why don't we just bump back to June 20th on

11   discovery, fact discovery; the plaintiffs put that at June 20th

12   for your expert reports; the defendants then would be July

13   18th, which is almost your month there.  I don't know; I'm

14   talking out loud; because this may bump into other problems.

15        **MR. DELLHEIM:**  Your Honor, forgive me.  Based on

16   what we know, the database that is going to be produced, the

17   outputs from the data matching, will be enormous -- enormous

18   and --

19        **THE COURT:**  Okay.  Well, you're not going to cut his

20   experts 30 days -- I mean you're not going to cut him down on

21   his expert report deadline.  So, you all try to work it out.

22   You're going to give him the time he had before, the

23   defendants.  So, you all figure it out from there.

24        What else?

25        **MR. SCOTT:**  Yeah, I think the Court has addressed

1   earlier the concern about reducing the time the Court has for

2   the dispositive motions, the *Daubert* motions.  To the extent

3   that the parties could come up with an alternate route, as

4   Mr. Rosenberg has addressed, I know the last case we were able

5   to simplify things, it was my understanding; I wasn't a

6   participant in it.  but it reduced it to -- was it a week?

7           **MR. ROSENBERG:**  Yeah, we did it in a week, and, as

8   I've said many times, you have to sit down, Mr. Scott, with

9   DOJ, all of us would be, and work out a protocol for the -- to

10  submit to the Court.

11          **THE COURT:**  Okay.  Why don't -- since you all were

12  going to -- you all are going to confer tomorrow on the

13  attorney-client privilege, why don't you all sit down and visit

14  about that also.  And then when we talk on Tuesday morning we

15  can see where you all are at.  Okay?

16          **MR. ROSENBERG:**  We'll do that, your Honor.  Thank

17  you.

18          **THE COURT:**  Anything else to address on that issue,

19  then, on the scheduling order?

20          **MR. SCOTT:**  Nothing from the defendant at this time,

21  your Honor.

22          **THE COURT:**  Anything else left?  From the plaintiffs?

23          **MR. ROSENBERG:**  No, your Honor.

24          **THE COURT:**  The defense?  And I signed the pro hac

25  vice earlier.

82

1          All right.  You're excused.  So, at this point, then,

2   we're conferring Tuesday morning, but you all are going to

3   confer further.

4          **MR. SPEAKER:**  Thank you, your Honor.

5          **MR. SCOTT:**  And by telephone at 8:30.

6          **THE COURT:**  That's --- uh-huh.  That's fine.  Thank

7   you.

8          Maybe you all can kind of lay out, also, when you all

9   visit, what motions you all anticipate being filed, what the

10  Court's going to be looking at.  You know, I'm in a situation

11  where we've had a vacancy for almost three years now, so I'm

12  carrying most -- pretty much all of the civil, as well as the

13  criminal docket.  And it just puts me in a crunch, too, so I --

14  I know you're working hard, but know that I am, too.  So --

15  you're excused.

16         **MR. SPEAKER:**  Thank you, your Honor.

17        **(Proceeding was adjourned at 12:04 p.m.)**

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    <u>April 2, 2014</u>


                    TONI HUDSON, TRANSCRIBER