UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )      CASE NO: 2:13-CV-00193
                               )
             Plaintiffs,       )           CIVIL
                               )
      vs.                      )      Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )      Thursday, May 15, 2014
                               )
             Defendants.       )      (9:11 a.m. to 9:57 a.m.)


HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:   Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

<u>COURTROOM APPEARANCES FOR:</u>

| | |
|---|---|
| Mexican American<br>Legislative Caucus,<br>et al.: | EZRA D. ROSENBERG, ESQ.<br>Dechert, LLP<br>902 Carnegie Center, Suite 500<br>Princeton, NJ 08540-6531 |
| | CHAD W. DUNN, ESQ.<br>Brazil and Dunn<br>4201 Cypress Creek Parkway, Suite 530<br>Houston, TX 77068 |
| | NEIL G. BARON, ESQ.<br>914 FM 517 Road, W.<br>Suite 242<br>Dickinson, TX 77539 |
| United States<br>of America: | ANNA BALDWIN, ESQ.<br>U. S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>NWB Room 7125<br>Washington, DC 20530 |
| Texas League of Young<br>Voters Education Fund: | NATASHA KORGAONKAR, ESQ.<br>NAACP Legal Defendant and Educational<br>Funds, Inc.<br>40 Rector Street<br>5th Floor<br>New York, NY 10006 |
| Oscar Ortiz, et al.: | MARINDA VAN DALEN, ESQ.<br>Texas Rio Grande Legal Aid<br>531 E. St. Francis<br>Brownsville, TX 78520 |
| State of Texas: | JOHN BARRET SCOTT, ESQ.<br>Scott, Yung, L.L.P.<br>208 N. Market Street<br>Suite 200<br>Dallas, TX 75202 |
| | JOHN R. CLAY, ESQ.<br>Office of the Attorney General<br>P.O. Box 12548<br>MC 001<br>Austin, TX 78711 |
| | BEN DONNELL, ESQ. |

<u>TELEPHONIC APPEARANCES FOR</u>:


Plaintiffs:                   J. GERALD HEBERT, ESQ.
                              EMMA SIMPSON, ESQ.
                              191 Somervelle Street
                              #405
                              Alexandria, VA 22304

                              ARMAND DERFNER, ESQ.
                              P.O. Box 600
                              Charleston, SC 29402

United States                 ELIZABETH S. WESTFALL, ESQ.
of America:                   U. S. Department of Justice
                              950 Pennsylvania Avenue, N.W.
                              NWB Room 7125
                              Washington, DC 20530

NAACP:                        MARK A. POSNER, ESQ.
                              Lawyers' Committee for Civil Rights
                              1401 New York Ave. NW, Suite 400
                              Washington, DC 20005

                              SONIA K. GILL, ESQ.
                              Lawyers' Committee for Civil Rights
                              Under Law
                              1401 New York Ave. NW, Suite 400
                              Washington, DC 20005

Texas League of              RYAN HAYGOOD, ESQ.
Young Voters:                NAACP Legal Def. and Educational Fund
                              40 Rector Street, 5th Floor
                              New York, NY 10006

Mexican American             KEMBEL SCOTT BRAZIL, ESQ.
Legislative Caucus,          Brazil and Dunn
et al.:                      4201 Cypress Creek Parkway
                              Suite 530
                              Houston, TX 77068

Texas Association of         ROLANDO L. RIOS, ESQ.
Hispanic County Judges       115 E. Travis
and County                   Suite 1654
Commissioners:               San Antonio, TX 78205

Oscar Ortiz, et al.:         JOSE GARZA, ESQ.
                              7414 Robin Rest Dr.
                              San Antonio, TX 78209

4

<u>TELEPHONIC APPEARANCES FOR</u>:    (CONTINUED)


Oscar Ortiz, et al.:        ROBERT W. DOGGETT, ESQ.
                            Texas Rio Grande Legal Aid
                            4920 North IH 35
                            Austin, TX 78751


State of Texas:             DAVID WHITLEY, ESQ.
                            Office of the Attorney General
                            P.O. Box 12548
                            Austin, TX 78711


Legislators:                ARTHUR D'ANDREA, ESQ.

1     <u>**Corpus Christi, Texas; Thursday, May 15, 2014; 9:11 a.m.**</u>

2                       <u>**(Call to Order)**</u>

3         **THE CLERK:**  Good morning.  This is Brandy with Judge

4 Ramos's court.  Who do I have present on the line for the

5 Individuals, Veasey, et al., and LUAC?

6         **MR. HEBERT:**  This is Gerry Hebert.

7         **THE CLERK:**  Thank you, Mr. Hebert.  Are you the only

8 one present on the line for that plaintiff?

9         **MR. HEBERT:**  We have Ms. Simpson, Mr. Brazil, and

10 Mr. Derfner also on the line.

11         **THE CLERK:**  Thank you.  Mr. Hebert, will you be doing

12 the speaking on the phone, or Mr. Dunn, who's in the courtroom

13 -- Mr. Dunn?

14         **MR. HEBERT:**  Mr. Dunn in the courtroom will be

15 speaking for us.

16         **THE CLERK:**  Thank you.  And then for the United

17 States we have Ms. Baldwin present in the courtroom.  Do we

18 have anybody appearing by phone?

19         **MS. WESTFALL:**  We have Elizabeth Westfall for the

20 United States and others, but we will not be participating.

21 We'll only be listening.

22         **THE CLERK:**  Thank you.  And then for the Mexican

23 American Legislative Caucus we have Mr. Rosenberg present in

24 the courtroom.  Is anybody appearing by phone?

25         **MR. POSNER:**  Yes.  This is Mark Posner.

1           **THE CLERK:**  Thank you, Mr. Posner.

2           **MS. GILL:**  And Sonia Gill.

3           **THE CLERK:**  Thank you, Ms. Gill.  And then for the

4  Ortiz, et al., we have Ms. Van Dalen present in the courtroom.

5  Do we have anybody appearing by phone?

6           **MR. GARZA:**  Yes.  This is Jose Garza and Robert

7  Doggett.

8           **THE CLERK:**  Thank you.

9           **MR. GARZA:**  Ms. Van Dalen will speak for Ortiz.

10          **THE CLERK:**  Okay.  Thank you.  And then for the Texas

11 Association of Hispanic County Judges, do we have Mr. Rios or

12 Mr. Henderson present?

13          **MR. RIOS:**  Mr. Rios is here, and I think

14 Mr. Henderson's on as well.

15          **THE CLERK:**  Okay.  Who will be doing the speaking for

16 that party?

17          **MR. RIOS:**  We will be listening.

18          **THE CLERK:**  Okay.  Thank you.  And then for the Texas

19 League of Young Voters we have Ms. Korgaonkar in the courtroom

20 and Ms. Eisenberg.  Is there anybody present on the line?

21          **MR. HAYGOOD:**  Good morning.  This is Ryan Haygood for

22 the Legal Defense Fund.

23          **THE CLERK:**  Thank you, Mr. Haygood.

24          **MR. HAYGOOD:**  Ms. Korgaonkar will be speaking for the

25 Texas Defense Fund.

1          **THE CLERK:**  I'm sorry, who was that last person?

2          **MR. HAYGOOD:**  Sorry.  I said that Ms. Korgaonkar will

3    be speaking for the --

4          **THE CLERK:**  Oh, okay.

5          **MR. HAYGOOD:**  (Indiscernible)

6          **THE CLERK:**  Thank you.  And then for the Defendant

7    State of Texas, we have Mr. Scott, Mr. Clay, and Mr. Donnell

8    present in the courtroom.  Do we have anybody on the line for

9    the State of Texas?

10          **MR. WHITLEY:**  Yes, ma'am.  This is David Whitley for

11    the Defendant.

12          **THE CLERK:**  Thank you, Mr. Whitley.  The Court will

13    call the case.

14                         **(Call to order)**

15          **THE COURT:**  All right.  The Court calls Cause Number

16    2:13-193, *Veasey, et al. versus Perry, et al.*  I think

17    everyone's already announced for the record, or Brandy

18    announced for you.  So when we were here last, the Court had

19    addressed the motion to quash that was filed by the Defendants

20    partially, and there was the issue regarding campaign materials

21    that were left.  And there was a little bit of briefing

22    provided after that hearing.  Does Defendant want to proceed on

23    that?

24          **MR. SCOTT:**  I believe that, your Honor, that's going

25    to be mister -- Arthur.

1          **THE COURT:**  Okay.

2          **MR. SCOTT:**  I didn't hear him announce.

3          **THE COURT:**  Okay.  Is he on?

4          **MR. D'ANDREA:**  This is -- hi, your Honor, this is

5    Arthur D'Andrea.

6          **THE COURT:**  Okay.

7          **MR. D'ANDREA:**  I'm appearing for the Third Party

8    legislators.

9          **THE COURT:**  So do you want to proceed on that issue

10   that was left from the last hearing on the motion to quash

11   regarding the campaign material?

12         **MR. D'ANDREA:**  Certainly, your Honor.  The campaign

13   material -- I take it from their (indiscernible) they are no

14   longer asking for the internal campaign communications.

15         **THE COURT:**  I took it that way, too.  So let us --

16         **MR. D'ANDREA:**  So I'm not (indiscernible) to those.

17   So what is left is the external campaign communications.  And

18   as we said in both our original motion and in the supplement,

19   this is both irrelevant to the intent of the legislator and it

20   imposes a large and unexpected burden on a largely volunteer

21   organization to dig up information that is elsewhere publically

22   available to DOJ.  We ask the Court to ask DOJ to go to these

23   media sources directly instead of asking the legislators to dig

24   through storage sheds or ask their volunteers to do so, if

25   their volunteers are even around.  Most of this information

1    they're not going to be able to access.  And it's not just for

2    (indiscernible) I think a legislator would expect to assume by

3    virtue of office for voting on bills that even though that bill

4    might one day be challenged, they would not expect to have to

5    dig through old campaign communications and fliers to defend

6    their actions.  And it's certainly an irrelevant point given

7    that many courts have held that private musings of a legislator

8    as a private party have no bearing on the intent of the

9    legislature as a whole.  Thank you, your Honor.

10          THE COURT:  All right, thank you.  Mr. Dunn or Ms. --

11    who's going to proceed here?  Ms. Baldwin?

12          MS. BALDWIN:  Yes, ma'am.

13          THE COURT:  Okay.

14          MS. BALDWIN:  Good morning, your Honor, Ms. Baldwin

15    for the United States.  The regional campaign appeals are

16    critically relevant to the United States' Section 2 claim.

17    Counselor for the legislators has argued that they're

18    irrelevant to intent and we've, you know, cited a case in our

19    brief, *Busby* (phonetic), showing where the statements of

20    individual legislators can well be relevant to intent.  But

21    more directly to a results claim under Section 2 of the *Voting*

22    *Rights Act*, decades of well-established case law show that

23    racial appeals are critically relevant evidence on this issue.

24    Racial campaign appeals are relevant to understanding the

25    barriers to equal access to the political process that minority

1    voters in Texas have faced and continue to face.  Racial

2    appeals and campaigns are specifically listed in the Senate

3    Report to the 1982 amendments to the VRA as a factor that's

4    potentially probative of whether the minority group enjoys

5    equal access to the political process.  The Fifth Circuit looks

6    to those Senate factors in analyzing under the totality of the

7    circumstances a Section 2 results claim.

8            In this case, we intend to prove that Texas's

9    implementation and enforcement of SB 14 will interact with the

10   social and historical legacy of intentional discrimination in

11   Texas to deny African American and Hispanic voters equal

12   opportunity.  The materials that the United States is seeking

13   here, campaign materials, can illuminate whether political

14   campaigns in Texas have featured racially-charged rhetoric

15   specifically about voter ID.  Racial appeals specifically

16   related to voter ID would be highly probative of the fact that

17   SB 14 developed in a political context that remains marred by

18   the effects of discrimination.

19           In addition to the issue about campaign materials

20   specifically related to voter ID, we also raised in our brief a

21   request that the Court reconsider its oral ruling at the last

22   hearing on the issue of campaign materials specifically related

23   to immigration.  Under relevant Section 2 case law, the

24   substance of the campaign materials don't have to be related to

25   the challenged practice specifically in the litigation.  So you

1    have cases that we cited in our brief, for example, that

2    consider in the context of challenging at large elections, you

3    know, campaign materials tying crime and vandalism to

4    immigration and, you know, the courts looking to the kind of

5    hostility that those materials raise towards Hispanic non-

6    English speakers.  And that's in the *City of Hoyo* (phonetic)

7    case.  Or the Los Angeles County case, again, an at large

8    election case where the court looked at campaign mailers

9    linking a Hispanic candidate to support for undocumented

10   immigrants.  So we would say that under Senate Factor 6, those

11   immigration materials are relevant here under the totality of

12   circumstances analysis.

13        Your Honor, briefly on the point about these items

14   being publically available, it's just not the case that mailers

15   to individual voters are publically available, or that campaign

16   ads are necessarily stored indefinitely and available through,

17   you know, newspapers and other media outlets.  The place to get

18   this highly relevant evidence is directly from the legislators

19   themselves.  And then that way we avoid, you know, any disputes

20   later on down the road about whether these materials were, in

21   fact, truly linked to the campaigns by getting them from the

22   campaigns themselves.

23        **THE COURT:**  All right, ma'am.

24        **MR. DUNN:**  Your Honor, Chad Dunn on behalf of the

25   Veasey LULAC Plaintiffs.  What I would add to this is that both

1   in the Section 2 and Section 5 redistricting trials, those

2   three-judge panels considered considerable evidence as it

3   related to campaign materials, and the Section 5 case in

4   particular relied on that evidence.

5           THE COURT:  Where did that come from?  It -- was it

6   requested through discovery?

7           MR. DUNN:  It's -- to be honest, I don't recall

8   whether it was requested during discovery.

9           THE COURT:  Okay.  Does anyone recall if that court

10  ruled on this very issue, or where did that -- those -- that

11  campaign material come from?  It was already out there and you

12  all had it in your possession, or --

13          MR. DUNN:  I'm sure that the Court didn't rule on it.

14  That I recall.

15          THE COURT:  Yeah.  I --

16          MR. DUNN:  And there wasn't a hearing.

17          THE COURT:  -- figured you all would have told me.

18          MR. DUNN:  Yeah.

19          THE COURT:  Someone would have argued, you know, that

20  point very -- I guess we -- I would have known.  But where'd it

21  come from then, the campaign material --

22          MR. DUNN:  It's --

23          THE COURT:  -- if it was used in the D. C. cases?

24          MR. DUNN:  In some cases it was produced by parties

25  in the case, some of them plaintiffs, as I recall.  Some of

1    them came from the State's production.  I don't think this

2    issue was teed up; and for better or worse, there's a lot of

3    issues that are being brought to this Court's attention that

4    frankly hadn't been developed in those earlier cases when many

5    of the lawyers involved were new to this sort of type of

6    litigation.  But nevertheless, the test here that we think the

7    State tries to burden the Plaintiffs with of relevance is not

8    really the test.  The test is whether it might lead to

9    discoverable information or relevant evidence that can be

10   admissible at trial.  And the notion that individual supporters

11   of this photo ID bill, SB 14, utilized in their own election

12   campaigns, racial appeals, absolutely goes to show their

13   intent.  And I agree with Ms. Baldwin that in addition to using

14   those issues sort of in the baiting of elections also goes to

15   show a results-type effect.  So we think it's discoverable

16   information that will lead to admissible evidence.

17          **THE COURT:**  Mr. Rosenberg?

18          **MR. ROSENBERG:**  Yes, Ezra Rosenberg on behalf of MALC

19   and Texas NAACP, very briefly in support of what Mr. Dunn just

20   said and what Ms. Baldwin said.  In the Section 5 case, for

21   example, there was one piece of campaign literature of one of

22   the representatives who was a prime supporter of SB 14 where

23   under the phrase, something to the effect of "tighten

24   immigration laws," the subcategory was pass photo ID.  So there

25   was a direct connection.  That sort of information, sort of

14

1   evidence, as Mr. Dunn said, was admitted before the Section 5

2   panel, I believe, without objection.  So I think it is highly

3   relevant, and respectfully we support DOJ's position.

4          THE COURT:  All right.  Mr. Rios?  Anything from

5   Mr. Rios, who's appearing by phone?  Do you have anything to

6   add?

7          MR. RIOS:  No, your Honor.  I would just add that in

8   every case that I've been involved in -- we've been involved in

9   quite a few cases -- this is certainly relevant information,

10  and I would agree with the Department of Justice --

11         THE COURT:  If it's so relevant, though, why hasn't

12  it ever been requested and the Court had to rule?  I mean, I'm

13  not saying necessarily it's not relevant.  It just seems at

14  this point, is there anything out there that says that the

15  Court has ruled on this issue as to whether campaign material

16  of this nature should be turned over?

17         MR. D'ANDREA:  Your Honor, this is Arthur D'Andrea.

18  I don't recall us ever getting discovery directed at the

19  campaign office.  Courts have used it in the past, and I'm not

20  having that fight now.  I think DOJ can get this stuff

21  otherwise.  It sounds like they have a lot more than we do.  So

22  we can have that discussion later, but I certainly never recall

23  a discovery order issued to a private campaign office of a

24  legislator.

25         MS. BALDWIN:  Your Honor, if I could, in the Section

1   5 case, while the issues are similar no doubt in a Section 5

2   case and in a Section 2 case, the Senate Factors that

3   specifically list racial appeals are not a factor or really a

4   quasi-element in the same way under Section 5 of the *Voting*

5   *Rights Act* where the test is discriminatory purpose and

6   retrogression as it is under the results test.  So it's

7   uniquely relevant in a Section 2 case as opposed to Section 5.

8   And that's a large reason why it's teed up so squarely in this

9   context and not in the Section 5 context.

10          **THE COURT:**  All right.  Ms. -- I may mess this up --

11          **MS. KORGAONKAR:**  That's okay.

12          **THE COURT:**  -- help me.

13          **MS. KORGAONKAR:**  Korgaonkar.

14          **THE COURT:**  Okay.

15          **MS. KORGAONKAR:**  Good morning, your Honor.

16          **THE COURT:**  Good morning.

17          **MS. KORGAONKAR:**  I have not a whole lot to add.  I

18  just want to underscore Ms. Baldwin's point that as she

19  mentioned in Section 2 cases, racial appeals in campaigning are

20  in fact a Senate Factor, which makes this slightly dissimilar

21  from a Section 5 context.

22          **THE COURT:**  Okay.

23          **MS. KORGAONKAR:**  Thank you.

24          **THE COURT:**  Anything else from anyone?  Mr. D'Andrea,

25  anything further?

1       **MR. D'ANDREA:**  No, your Honor.  Thank you.

2       **THE COURT:**  The Court's going to grant the motion to

3  quash regarding the campaign materials, deny the Plaintiffs'

4  request to reconsider the issue on the immigration material.

5  Is there anything else on the motion to quash from the defense?

6  Okay.

7       Then there's several things that are pending.  There

8  was -- the United States had filed a request for judicial

9  notice, and I had addressed that at the previous hearing.

10  There's no response been filed; is that correct?

11       **MR. SCOTT:**  Your Honor, it's my understanding there

12  will be a -- one -- I think it's due on our calendar tomorrow.

13       **THE COURT:**  Yeah.  It's not due today.  I just didn't

14  know if we could go ahead and resolve that.  So that's still

15  pending, correct?

16       **MR. SCOTT:**  Yes, ma'am.

17       **THE COURT:**  Then there was Defendants' request for

18  judicial notice that was filed, I believe, late last week, and

19  that has been responded to.  So any -- do you all want to argue

20  that today?

21       **MR. CLAY:**  Your Honor, I hadn't even honestly -- I

22  was -- we were traveling down here yesterday afternoon --

23       **THE COURT:**  Okay.

24       **MR. CLAY:**  -- and I haven't had a chance to look at

25  it, so I'm not sure --

1          **THE COURT:**  Yeah.  I read it.  It's pretty short and

2     simple, so if you -- do the Plaintiffs want to address the

3     objection they have to -- for the Court not to take judicial

4     notice of what the Defendant is requesting, the review of

5     operations of the voting sections civil rights?

6          **MR. ROSENBERG:**  Yes.  Thank you, your Honor.  Ezra

7     Rosenberg --

8          **THE COURT:**  It does sound problematic to me, but I

9     thought we could flesh it out.

10          **MR. ROSENBERG:**  And very briefly, as your Honor

11     noted, our responses are very brief because there appears to be

12     absolutely no relevance to a report of the Inspector General on

13     the doings of the Voting Rights section, having nothing to do

14     with photo ID in Texas, having absolutely nothing to do with

15     this case, and there's no showing of relevance.  And even if

16     there were, as we also noted, there would have to be some

17     decision made as to what specifically should be included,

18     because it's full of hearsay assertions.  That sort of stuff is

19     never taken judicial notice of, so there's absolutely no reason

20     to take judicial notice of that document.

21          **THE COURT:**  Okay.  Any of the other Plaintiffs have

22     anything to add to that?

23          **MS. BALDWIN:**  Your Honor, the United States' position

24     is also that Texas's request for judicial notice is not proper

25     with respect to this document.  The bedrock requirements for a

18

1    request for judicial notice being sought under Rule 201(b) is

2    that the request clearly identify the facts for which notice is

3    being sought, and that those facts be both relevant and beyond

4    dispute.  This request fails all three of those requirements.

5           As Mr. Rosenberg referred, the OIG review discusses a

6    decade's worth of actions by individuals inside and outside of

7    the Civil Rights Division in the voting section, and discusses

8    a wide range of topics from hiring policy to records request to

9    enforcement decisions.  It contains descriptions of events,

10   contested accounts of those events from different participants,

11   findings and recommendations.  Among all of this material in

12   hundreds of pages, Texas doesn't identify which of the scores

13   and scores of facts within the review that it's seeking to have

14   noticed.  The Court has to have notice of what facts are at

15   issue before it can decide whether they're beyond dispute or

16   relevant.  Beyond that, Defendants can't establish relevance in

17   any case.

18          Again, as Mr. Rosenberg said, this is not about --

19   the review is not about SB 14.  This case does not concern the

20   enforcement decisions of the voting section.  And, you know,

21   Defendants are not entitled to judicial notice of the many

22   disputed and disputable facts within the review simply because

23   the Inspector General has accepted one version of certain

24   contested events.

25          **THE COURT:**  All right.  Does the defense want to

19

1     respond to that?

2               **MR. CLAY:**  Sure, your Honor.  These -- the OIG

3     findings report, the facts in that report are going to be

4     highly relevant to the affirmative defenses that the State is

5     likely to raise, if and when we file an Answer.  Those findings

6     document pretty clearly a long history of the (indiscernible)

7     of the enforcement of both Section 2 and Section 5.  Obviously

8     this is a Section 2 enforcement case against voter ID by the

9     Department of Justice.  And so those findings will prove to be

10    relevant to our affirmative defenses in this case should we

11    file -- need to file an Answer.

12              **THE COURT:**  At this time, the Court's going to deny

13    Defendants' request for judicial notice of that, the review of

14    the operations.  You know, I'll do it without prejudice if you

15    want to bring it up later regarding specific portions of --

16    that's my understanding that's over 200 pages.  So there's a

17    ruling on that.

18              I think the Defendants' first amended motion to

19    compel is still out there.  I've brought it up a couple of

20    times.  You all were working on particulars, or where are we on

21    that?  You all were trying to resolve some remaining issues, I

22    thought.  And that is DE 240.  It was -- I believe it was an

23    amended motion to compel, and you all had resolved some issues.

24    Then when --

25              **MR. CLAY:**  And I think --

1        **THE COURT:**  -- I asked about it at the last hearing,

2   you all said, "We've still got a couple of things going on."

3        **MR. CLAY:**  Your Honor, I think the -- at the last

4   hearing you had granted the Department of Justice an additional

5   30 days, which I think is actually -- unfortunately for this

6   hearing I think falls tomorrow or the next day.  And so I

7   think --

8        **THE COURT:**  Okay.  So that's still out there?

9        **MR. CLAY:**  Yes, ma'am.

10        **THE COURT:**  Just on Monday the United States filed a

11   motion for protective order from a deposition notice, a Rule

12   30(b)(6).  I know it was just filed.  Is there anything we can

13   address on that to try to move things along?

14        **MR. SCOTT:**  Your Honor, for clarification purposes,

15   as I was the one who got ready for the deposition and showed up

16   yesterday at the U. S. Attorney's Office, without the courtesy

17   of a call from the folks over at DOJ, just from a practical

18   standpoint, does the filing of a motion for protective order

19   stay all proceedings?  It's my understanding it does not given

20   that we're parties.

21        **THE COURT:**  Well, you should at least make you make a

22   phone call so that you don't show up to the deposition.  But I

23   don't know.  Generally when something like this is filed and

24   the deposition is so near that time, the parties are on the

25   phone with Brandy and I'm getting on the line.

1          **MR. SCOTT:**  And the notice went out over a month

2   before then.  And to wait until the day before to file it that

3   way, I showed up with a court reporter over there to take the

4   deposition -- and I know there's a motion -- there's a

5   certificate of conference on that motion, and I was not aware

6   of finding someone who spoke to those issues with anyone at

7   DOJ.  So I -- again, I -- that's a little clarification I guess

8   I need also.

9          **THE COURT:**  Okay.  Who'd you talk to for your

10   certificate of conference?

11          **MS. BALDWIN:**  We sent a detailed letter laying out --

12          **THE COURT:**  Okay.  I don't like letters when -- a

13   conference to me, to certify that on a motion, is picking up

14   the phone, because letters tend to start doing this.  And it's

15   more helpful if the attorneys get on the line and talk.  If you

16   can't work it out, you can't work it out.

17          **MS. BALDWIN:**  Your Honor, for future reference, we

18   definitely will, you know, take that and --

19          **THE COURT:**  I mean, you can start with a letter, but

20   I think for representations to the Court, in particular

21   probably on this case, you need -- you all need to talk.

22          **MS. BALDWIN:**  Understood going forward, your Honor.

23   And to be clear, our letter laid out in, you know, over two

24   single-spaced pages very specific and detailed objections with

25   each and every one of the notice topics.  We sent that not this

1   week, but mid last week asking Defendants for a response.

2          **THE COURT:**  Okay.  So -- and who was it sent to, or

3   who were you talking to?

4          **MS. BALDWIN:**  It was sent to Mr. Scott, Mr. Clay, and

5   Mr. Whitley.

6          **MR. SCOTT:**  And for clarification, the letter said,

7   "Withdraw your notice."  It didn't go into anything else.  It

8   outlined what was going on with it, and then at the bottom

9   said, "withdraw your notice."

10          **MS. BALDWIN:**  Your Honor --

11          **MR. SCOTT:**  It did not mention, to my recollection,

12  anything at all about a motion for protective order or can we

13  work out some issues on this at all.

14          **MS. BALDWIN:**  Your Honor, the letter said that it was

15  specifically being sent pursuant to the federal rule requiring

16  conferral prior to filing a protective order.  So we

17  specifically put the Defendants on notice that we were asking

18  them to withdraw the notice of deposition; and, if not, we

19  would be --

20          **THE COURT:**  And that you were going to be filing --

21          **MS. BALDWIN:**  -- filing a motion for protective

22  order --

23          **THE COURT:**  -- a motion for protective order.

24          **MS. BALDWIN:**  -- by citing that rule.

25          **THE COURT:**  I don't know.  I don't have that before

1    me but I would think it says what it says.  So you all just

2    need to work together.  I mean, there's no reason for him to

3    have shown up.  You all --

4              **MS. BALDWIN:**  Your Honor --

5              **THE COURT:**  -- you should have conferred, you all

6    should have picked up the phone, whatever it is.

7              **MS. BALDWIN:**  And --

8              **THE COURT:**  I don't know --

9              **MS. BALDWIN:**  -- I'm happy to --

10             **THE COURT:**  -- miscommunication, whatever it is.  You

11   all just need to work on that because I don't really want to

12   get involved in that type of issue.

13             **MS. BALDWIN:**  Your Honor, and we'd be happy to

14   discuss with the Defendants, but I don't want to give any

15   illusions -- it's the United States' position that each and

16   every one of the topics is improper per se for a Rule 30(b)(6)

17   deposition.  So while we're certainly willing to talk with the

18   Defendants and go over the many documents on these topics that

19   we've already produced --

20             **THE COURT:**  Which is really what should have been

21   done before that motion was filed.

22             **MS. BALDWIN:**  And, your Honor --

23             **THE COURT:**  Go over the details.  And that can't

24   really be done by a letter.

25             **MS. BALDWIN:**  Your Honor, we're happy to talk with

1    Defendants about that, but I just want to be clear that it is

2    going to be the United States' ongoing position that a

3    deposition is not appropriate, and we're happy to talk about

4    whether some of them are actually contention interrogatories

5    and not deposition topics.  But as a deposition, it's not

6    proper, and I believe we've put the Defendants on notice of our

7    intent not to go forward with the deposition.

8              **THE COURT:**  Okay.  It sounds to me like you all need

9    to sit and confer about this.  Right?  So when are we going to

10   do that?

11             **MR. SCOTT:**  I can make myself available today,

12   tomorrow.  You tell me, Ms. Baldwin, when you'd like to visit

13   about it and we will be available to visit about it.

14             **MS. BALDWIN:**  We're happy to set up a call when I'm

15   back in D. C. tomorrow.

16             **THE COURT:**  Okay.  So tomorrow.  And then when are

17   you all going -- you all are going to after that conference

18   going to let the Court know if I need to get involved?

19             **MR. SCOTT:**  Yes, ma'am.  In fact, we -- by count,

20   there's about six motions to compel that we'll be filing that

21   we've been visiting with the other Defendants on trying to work

22   through each of those issues on production and things as simple

23   as privilege logs.  They're asserting privilege and refusing to

24   do privilege logs.  They're putting arbitrary catches on

25   timeframes and saying they'll only produce documents back two

1    years, even though the Court has been clear that it was

2    relevant to go way past the 2011 enactment of this.  So we're

3    kind of in a bind trying to work stuff out and not getting much

4    at all in the way of leeway.  It's like negotiating with

5    ourselves.  And so --

6              **MR. DUNN:**  Your Honor --

7              **MR. SCOTT:**  -- I think that's one of the difficult

8    tasks we're encountering right now.

9              **MR. DUNN:**  The fact that this issue was raised is

10   quite shocking to me.  We had a long call on Monday where the

11   State -- let me first start with, the State served over 400

12   requests for production having gone through our complaints,

13   taking a sentence and saying, "Produce all the documents that

14   relate to this sentence."  We had a long discussion where I

15   thought a lot of these issues were worked out and there was an

16   agreement that it wouldn't be raised today.  The parties were

17   going to exchange their positions by email or letter.  And then

18   to have it brought up like this seems to be a setback from the

19   progress I thought we had developed on Monday.

20              But I do want to address the privilege information

21   because, as the Court's ESI order makes clear is when there are

22   communications between counsel in this case, there is no need

23   to privilege log those communications.  And that's essentially

24   what the State is asking.  The State is not only asking for me

25   to log all my communications with the Department of Justice or

1   Mr. Rosenberg or one of the other lawyers in the case.  They

2   also want them produced so they can see how we're coordinating

3   on depositions and how we're --

4           **THE COURT:**  Is that right?

5           **MR. DUNN:**  -- coordinating on interrogatories.

6           **MR. SCOTT:**  Well, I wasn't participating on the call

7   on Monday, so I don't know what Mr. Dunn references.  Was that

8   a call I was on?

9           **THE COURT:**  Okay.  Well, who was participating?

10          **MR. ROSENBERG:**  Your Honor --

11          **THE COURT:**  You know, I thought I was trying to move

12  things along here.  I may have made them worse by bringing this

13  issue up.  But, you know, any time we get a chance to get

14  together and confer, I'm trying to move whatever is pending

15  because when a motion is filed, I think for this case it's too

16  long to wait three weeks for a response and --

17          **MR. DUNN:**  Sure.

18          **THE COURT:**  -- so I was trying to move this along,

19  but I may have --

20          **MR. ROSENBERG:**  No.  In fact --

21          **THE COURT:**  -- harmed your progress.

22          **MR. ROSENBERG:**  In fact, I think we can, your Honor,

23  make progress on this very issue as Mr. Dunn --

24          **THE COURT:**  Okay.

25          **MR. ROSENBERG:**  -- has said, because Mr. Scott's

1    right, he wasn't on that call.  Ms. Wolf was on that call,

2    Kevin -- I don't remember his --

3             **MR. SCOTT:**  Hays.

4             **MR. ROSENBERG:**  -- Kevin Hays was on the call.  And

5    at the end of the call, I specifically said, "So you're not

6    looking for the logging or disclosure of attorney-to-attorney

7    communications by parties in this case in either the Section 5

8    or Section 2 litigation pertaining to litigation strategy,

9    preparation for trial, etcetera."  They said, "We agree."

10            **THE COURT:**  Okay.

11            **MR. ROSENBERG:**  We said, "Put that in writing."

12   We're waiting for that.  And if that's the privilege log issue

13   you're talking about, I think that's been resolved.

14            **MR. SCOTT:**  My understanding is we've gotten zero

15   privilege logs from anyone except for the folks over at DOJ.

16   And I -- that may be wrong, but I think that that is one of the

17   big issues.  And we can visit --

18            **THE COURT:**  Yeah.

19            **MR. SCOTT:**  -- outside the Court.  I don't want to

20   take up the Court's time.

21            **THE COURT:**  All right, because you all -- I -- sounds

22   like we're not really sure where we are.

23            **MR. DUNN:**  I think that's right, Judge.  I think this

24   needs to ripen another few days or a week.

25            **THE COURT:**  Okay.  Then the only other thing that's

1   kind of out there hanging still -- and we may need to visit a

2   little further in -- but we're getting close here, we're

3   already almost into summer -- was a trial plan.  Do you all

4   want to discuss that or set another hearing on that.

5          **MR. DUNN:**  This is Chad Dunn, your Honor.  It may not

6   be that we can resolve all of the trial protocol today, but it

7   would be helpful if the Court has already -- has a notion of

8   what time it has to devote to the trial of this case or has

9   another case set after ours, it would be terribly helpful I

10  think in the discussions between the parties to know what the

11  Court has available.

12         **THE COURT:**  Well, are the parties -- I haven't read

13  your advisories like within the last week.  I read them when

14  they were filed, so I don't remember exactly.  But both sides

15  agree that a couple weeks would be okay?

16         **MR. DUNN:**  I'm not sure --

17         **THE COURT:**  It was just how much time for each party.

18  I mean, is that what the -- and the defense can approach up

19  here, too, if you want, and say --

20         **MR. ROSENBERG:**  Your Honor, we've suggested -- we on

21  behalf of the non-U. S. Plaintiffs and Plaintiff Interveners

22  have suggested blocking out September 2nd through September

23  19th for the trial.

24         **THE COURT:**  Okay.  Which would be three weeks?

25         **MR. ROSENBERG:**  Which would be three weeks --

1          **THE COURT:**  Okay.

2          **MR. ROSENBERG:**  -- less one day because of Labor Day.

3          **THE COURT:**  Right, that Monday.  And the defense?

4          **MR. SCOTT:**  We have proposed a one-week trial, that

5     parties simply do a filing of all their basic direct through

6     the process of declarations so that we start up with the cross

7     examination of the witnesses and make it a much more shortened

8     trial --

9          **THE COURT:**  And, you know what --

10         **MR. SCOTT:**  -- to give you more information and time.

11         **THE COURT:**  -- my only problem is, because I don't

12    mind allotting the time we need for this case.  But once I get

13    off the bench on this case, I'm going to be being hit with a

14    lot of stuff on other cases.  So whatever you can give me

15    during the trial is going to be much better than giving me "go

16    read all these, you know, depositions," even if it's just

17    excerpts or declarations, because I'm going to be having to

18    deal with other cases, you know, evenings, lunch, in the

19    morning, or whatever it is.  So it's going to be -- I can say

20    okay, I'll take your declarations and go through them.  But

21    it's going to be difficult.

22         **MR. SCOTT:**  And I think one of the proposals that at

23    least -- and this is from both sides.  I think both sides are

24    envisioning a seven-hour trial day, and I don't know how

25    feasible that is, if we're --

1           **THE COURT:**  That's --

2           **MR. SCOTT:**  -- if the Court's --

3           **THE COURT:**  -- good.

4           **MR. SCOTT:**  -- able to give us that time, that's

5   great.

6           **THE COURT:**  You can have -- we have blocked that time

7   out, right, Brandy?  We --

8           **THE CLERK:**  Your Honor, we're blocked --

9           **THE COURT:**  I'm not going to be pretty -- I mean, I

10  may hear things at lunch or after hours or real early in the

11  morning, but I'm not planning to cut into your hours during the

12  day to hear other matters.  But even at that, I mean, do -- I -

13  - it would be helpful to me that what you want me to know or

14  what -- the evidence I need to hear that you tell me during

15  these seven hours as opposed to, "Here's a bunch of stuff for

16  you to read tonight, here's these declarations."  You know what

17  I'm saying?

18          **MR. SCOTT:**  Yes, ma'am.

19          **THE COURT:**  Because it just -- you know, I'm going to

20  have to be dealing with other things.  And when you're going to

21  have my attention, it's just better to get it in during that

22  time period.

23          **MR. SCOTT:**  So trial it is.  I envision -- and that's

24  what -- I think a lot of it was trying to get to the heart of

25  the dispute and get the Court the information that both sides

1    agree is relevant to the dispute.  It is a bench trial,

2    obviously, and it is something that we would, I think, both

3    sides be able to give you more time to reach a decision based

4    upon getting you as much material ahead of time as possible.

5    And also have a much more, I think, thoughtful introduction of

6    the evidence before you as a result of that process and

7    procedure.  It really is not trying to reduce any sizability to

8    get evidence before the Court.

9              **THE COURT:**  Right.

10             **MR. SCOTT:**  It's simply trying to shorten the time --

11             **THE COURT:**  Just the --

12             **MR. SCOTT:**  -- so that we don't interfere with the

13   elections.

14             **MR. ROSENBERG:**  But we --

15             **MS. BALDWIN:**  Your --

16             **MR. ROSENBERG:**  -- do have -- I'm sorry, Ms. Baldwin.

17   Go ahead.

18             **MS. BALDWIN:**  And I just wanted to clarify that we're

19   -- on the specific issue of the trial length -- in a bit of a

20   different position from the private Plaintiffs.  While we agree

21   that at a minimum 45 hours of trial time is what's going to be

22   required per side to try this case, especially given that

23   there's six different Plaintiffs groups with different claims

24   in some respects, and that this is going to be a very expert-

25   heavy case, it's the United States' position that prior to the

1   close of fact discovery and the disclosure of experts, we're

2   not fully able to say how long we think it's going to take to

3   put in evidence in this complex case.

4           **THE COURT:**  And I understand.  I mean, we're not

5   going to know until as we go along.  I have set aside probably

6   a good two and a half weeks, you know, for it.  And it may be a

7   little shorter, it may be a little bit longer, and we'll just

8   play with that.  I just -- I think the issue, as I recall from

9   the advisory, was how the evidence was going to be presented,

10  as you just said --

11          **MR. ROSENBERG:**  Right.

12          **THE COURT:**  -- as you all just discussed whether

13  filing the direct testimony with the Court and then just cross

14  examination, right of the witnesses.

15          **MR. ROSENBERG:**  Well, I think there -- what we

16  suggested is, assuming there's going to be some sort of

17  allocation of time for the Plaintiffs and for the Defendants,

18  that each side decide how they want to use that time best.

19  There may be people who want to do it by declarations.  There

20  may be people who want to do it by live testimony, and that's

21  going to just add or --

22          **THE COURT:**  Okay.

23          **MR. ROSENBERG:**  -- subtract to time.

24          **THE COURT:**  So what is -- how's the Plaintiff wanting

25  to present the case?

1      **MR. DUNN:**  Well, I think it's going to depend on a

2  witness-by-witness.  Some experts we want to do a full direct

3  on; others we might do five minutes and then do the report.

4      **THE COURT:**  Okay.  So you just need a certain amount

5  of time and then you will work with that?

6      **MR. ROSENBERG:**  Right.  There -- I'm sorry, your

7  Honor.

8      **THE COURT:**  Go ahead.

9      **MR. ROSENBERG:**  There are two issues, I think, that

10  if we can get agreement on would help things today.  One is

11  we've suggested that all of the evidence in the Section 5

12  trial--depositions, trial testimony, non-expert trial testimony

13  and depositions and exhibits--are free game here so that we

14  don't have to reinvent the wheel in that respect.

15      **THE COURT:**  Okay.  That's agreed to?

16      **MR. ROSENBERG:**  I don't know.

17      **MR. SCOTT:**  I'm sorry.

18      **MR. ROSENBERG:**  We've put that in our advisory in --

19      **THE COURT:**  Okay.  Why don't we see --

20      **MR. ROSENBERG:**  -- the Section 5 record, but

21  you're --

22      **MR. SCOTT:**  Your Honor, I'm not in a position to take

23  a position at this point, your Honor.

24      **THE COURT:**  Okay.  So you're going to look at that

25  and --

1          **MR. SCOTT:**  Yes.

2          **THE COURT:**  It's not a no, it's not a yes right now.

3          **MR. SCOTT:**  Yes, ma'am.

4          **THE COURT:**  Okay.

5          **MR. ROSENBERG:**  And the second issue is whether all

6   of the depositions in this case, whether or not within the

7   hundred mile rule, can also be used in lieu of live testimony.

8   It's really just that hundred mile difference.  And, again, I

9   think that would help things appreciably.

10          **THE COURT:**  Okay.  Mr. Scott, any comment on that?

11          **MR. SCOTT:**  As a general thought, that's going to be

12   probably file with us.  I don't think that's going to be an

13   issue.

14          **THE COURT:**  Okay.

15          **MR. SCOTT:**  But, again, I don't want to take an

16   official position at this time.

17          **THE COURT:**  Okay.

18          **MR. DUNN:**  And I appreciate Mr. Scott on that, and

19   not trying to push him to have a position today, but the

20   discovery period is going to end, and who gets deposed, in some

21   measure, hinges on --

22          **THE COURT:**  Okay.  Well, when are you all going to

23   discuss them?  How about that?

24          **MR. SCOTT:**  We are already being triple booked on

25   days, so coincidentally the dates that we have noticed up

1    30(b)(6) depositions, we're seeing that a lot of the

2    legislative depositions are now being booked for -- attempts to

3    do triple booking on when there's days available on the

4    calendar.  There's not many days going to be available on the

5    calendar.  We warned the Court this was going to be a severe

6    compression of the discovery process.  It's come.  We're now

7    going to have overlapping like motions to compel and everything

8    else going on and it's going to start speeding up, I think,

9    kind of rapidly.  But I think at least from where we stand, we

10   want to make sure we're able to get the discovery.  We know

11   that today the Department of Justice -- I anticipate we'll be

12   back in front of you because I'm hearing them say that they're

13   not going to produce a witness to testify to these issues.

14   They're key issues to the case, to the ability of the State of

15   Texas to defend itself.  So I --

16            **THE COURT:**  I get -- but it sounds to me what

17   Mr. Dunn said is you all were doing depositions.  How you all

18   are going to present the evidence at trial is kind of -- you

19   all need to know to see who you all are going to depose or call

20   or --

21            **MR. DUNN:**  Right.  We may be able to cancel some

22   depositions --

23            **THE COURT:**  Yeah.

24            **MR. DUNN:**  -- or maybe some others we need.

25            **THE COURT:**  Well, it sounds like you all need to

```
 1  talk.
 2          MR. ROSENBERG:  Right.  The only issue is the
 3  admissibility of the depositions within a hundred miles of this
 4  Court.
 5          MR. SCOTT:  Well, and we remain extremely
 6  (indiscernible) during this timeframe.  I know that we've said
 7  that, and I want to make sure the record's real clear.  I --
 8  the -- we're going to be -- when we -- if we talk about a
 9  three-week trial, we then give the Court very little time
10  before --
11          THE COURT:  Yeah.  I mean, I --
12          MR. SCOTT:  -- early voting starts.
13          THE COURT:  I was shooting for two weeks, but it
14  sounds like -- I'm not getting a lot of feedback as to -- is
15  each side asking --
16          MR. SCOTT:  I think a week's great.
17          THE COURT:  -- for 45 hours?
18          MR. DUNN:  Well, Judge, we have conferred with the
19  State, and I'm sorry to be the bearer of bad news, but I think
20  this is something we're -- not today necessarily, but I think
21  you're just going to have to tell us.  We're not going to be
22  able to reach an agreement with the State.
23          THE COURT:  I know.  But if I had a feeling as to
24  what your evidence is and what you're thinking, you know, might
25  be a -- I'm not -- just not getting a feel from you yet.
```

1    **MR. ROSENBERG:** Yeah.  Well, your Honor, we feel that

2  45 hours per side, Plaintiffs in one hand, Defendants in the

3  other hand, should be sufficient to try this case.  And that --

4  the way we worked it out mathematically came out to 14 days of

5  trial, including openings and closings.  We don't think that a

6  party should spend a lot of --

7    **THE COURT:** So if I --

8    **MR. ROSENBERG:** -- time in openings, for example.

9    **THE COURT:** If we do eight hour days and then each

10  side -- and I set you up 40 hours, then five days and five

11  days.  How about that?  That would give us our two weeks and --

12    **MR. SCOTT:** It's much better than the three weeks

13  from our position, your Honor.

14    **THE COURT:** That's where we're starting.

15    **MR. SCOTT:** Yes.

16    **THE COURT:** So --

17    **MS. BALDWIN:** And, your Honor, we would just ask that

18  once, you know, the close of fact discovery and once the number

19  of experts are disclosed, again, that, you know, would be

20  something that the United States might want to re-raise

21  depending on what our case is going to look like, because we do

22  anticipate, you know, lengthy direct examinations of a number

23  of our experts, and we fully anticipate, based on the Section 5

24  trial, lengthy cross examination.  And we think that those

25  things, while we agree with the streamlining procedures that

1    the private Plaintiffs have, you know, put forward, some of

2    those things simply can't be shortened.

3              **THE COURT:**  Okay.  That's fine.  And all I -- my

4    comments from a while ago were like you can't expect me to sit

5    here and listen all day seven or eight hours and then go home

6    and have to read another three or four hours of declarations or

7    whatever it may be --

8              **MR. ROSENBERG:**  Right.

9              **THE COURT:**  -- because then I'm going to get behind

10   and your evidence may not then make a lot of sense if I haven't

11   been able to do that.  So anything else?

12             **MR. ROSENBERG:**  I -- just as a matter of information

13   -- and I don't know if your Honor is aware that there were, I

14   think, 30 motions to quash that were filed in Austin by the

15   third party legislators.  There are also, I think, 30 motions

16   to transfer that were filed by DOJ to bring them to this Court.

17             **THE COURT:**  Okay.

18             **MS. BALDWIN:**  Your Honor, the Defendants have not to

19   this point consented to the motions to transfer.  But given

20   that the motions relate essentially in their entirety to the

21   legislative privilege issues, which this Court is well aware,

22   you know, we're hoping not to have to burden Judge Sparks in

23   the Western District with those issues but to get them very

24   quickly resolved in this Court.  And so, again, just as we're,

25   you know, anticipating additional discovery issues, as

```
 1    Mr. Scott's notice said, we are moving full steam ahead with
 2    noticing legislator depositions, but we're facing the posture
 3    where we may not have the documents that we've requested given
 4    these subpoenas.  So we intend to move ahead, but where -- if
 5    we're successful in opposing the motion to quash and we get
 6    probative documents after the case, we may -- after the
 7    deposition is taken place, that may be something if we're not
 8    able to work out with Defendants an issue that we have to bring
 9    to the Court.
10          THE COURT:  Okay.  Mr. Donnell, did you want to say
11    something?
12          MR. DONNELL:  Your Honor, if I may, as the Court
13    knows, I'm new to the case.  Mr. Scott and I have been friends
14    for over 30 years, and we were talking today about this case as
15    contrasted to the case that we were involved in many years ago
16    which involved considerable discovery and many, many
17    depositions.  And I think the elephant in the room from my
18    perspective in just getting into it, kind of looking at what
19    needs to be done, and the issue that hasn't been discussed is,
20    is the September 2nd trial date really a realistic date?
21          THE COURT:  Yes.  It is.
22          MR. DONNELL:  And --
23          THE COURT:  We have to.
24          MR. DONNELL:  I know the --
25          THE COURT:  I mean, that's what we've --
```

1          **MR. DONNELL:**  -- Court is -- wants that, and we're

2   committed to try to meet that date.

3          **THE COURT:**  Yeah.  No, we're going --

4          **MR. DONNELL:**  But there is so much out there, for

5   example -- just an example that Mr. Scott referred to the -- I

6   won't referee who's right and who's wrong about the deposition

7   yesterday where we showed up without -- but, for example, one

8   of the depositions that has been noticed is that of Dan

9   Patrick, who is -- who we don't represent who is running for

10  Lieutenant Governor.  Do you know when they have noticed that

11  deposition for?  The day after the runoff.  Now, is that

12  realistic?

13         **THE COURT:**  Probably not.

14         **MR. DONNELL:**  Didn't take rocket science to know that

15  that was not an appropriate date to --

16         **THE COURT:**  Well, just say it was inadvertent and it

17  needs to be --

18         **MR. DONNELL:**  We're going to -- you know, I just

19  think --

20         **THE COURT:**  -- that's not fair.

21         **MR. DONNELL:**  -- the Court's going to be faced --

22         **THE COURT:**  Yeah.  That's --

23         **MR. ROSENBERG:**  Every time any of the Plaintiffs have

24  sent out a notice of deposition or subpoena, it's --

25         **MR. DUNN:**  Or the State.

1          **MR. ROSENBERG:**  -- accompanied by an email that says

2  we'll be happy to work out convenient dates with the witness.

3          **THE COURT:**  Okay.

4          **MR. DUNN:**  And the State has done the same thing,

5  your Honor.  They pick a date, they issue a notice, and then we

6  talk about --

7          **THE COURT:**  Well, but, you know, this is exactly

8  stuff that I shouldn't have to be dealing with.  You all should

9  be able to work through it to set the depositions.  But, yes,

10  we're, you know, going on -- planning to go on September 2nd.

11  Everyone knew from the get-go what all that was going to

12  involve in terms of discovery and everything else.

13          **MR. SCOTT:**  Your Honor, to the extent the State does

14  -- here -- it's almost as though I (indiscernible) on the

15  situation so that we keep pushing these things off, pushing

16  them off, and the clock's going to expire on June 27th on

17  discovery.  We have not gotten anything from DOJ on some

18  documents.  We've got a huge dispute.  I anticipate it'll come

19  to the forefront tomorrow, even though they have been ordered

20  to turn a lot of that stuff over.  I think they've amended some

21  depositions -- I mean, amended some objections.  I -- will the

22  -- is the Court going to -- I'm going to make sure at least

23  that I bring it up to you that --

24          **THE COURT:**  Okay.

25          **MR. SCOTT:**  -- we will be coming back and asking for

```
 1   leave to complete some of the discovery that we timely started,

 2   but we believe if the Court rules is appropriate, we would ask

 3   that we would get leave at that time, even if it might be after

 4   June 27th --

 5            THE COURT:  Well, and I think --

 6            MR. SCOTT:  -- to complete.

 7            THE COURT:  -- because of that situation I shouldn't

 8   even have to be involved in that.  The parties should be able

 9   to work that out.

10            MR. SCOTT:  Okay.

11            THE COURT:  But if you need to come to the Court,

12   come to the Court.  I don't think I should have to step in on

13   that.

14            MR. SCOTT:  Thank you, your Honor.

15            THE COURT:  But I will.

16            MS. BALDWIN:  Your Honor, if I may.  There is one

17   other motion that there's still an open issue on that was --

18            THE COURT:  Okay.

19            MS. BALDWIN:  -- filed by the United States, and

20   that's the motion to compel at ECF 162.  It's an attorney-

21   client issue that we had, in conferring with the Defendants,

22   vastly reduced the scope of the dispute.  But essentially at

23   this point, there's still a legal dispute that's live over

24   certain documents from members of the Texas Legislative Council

25   and the Legal Division communicating to legislators.
```

43

1        **THE COURT:**  Okay.  I thought I had ruled on that,

2   that that was not protected.  No?

3        **MR. CLAY:**  I thought you had ruled that -- I thought

4   we had decided through conference that stuff from the Research

5   Division wasn't necessarily attorney-client privilege, but I

6   think the -- there's still an outstanding issue about whether

7   or not the Legal Division is attorney-client privilege with the

8   legislators.

9        **THE COURT:**  I thought I had ruled on that fully, that

10  it wasn't.  I can go back and check.  We can see.  I don't -- I

11  remember addressing it at a hearing.  There were things you all

12  were going to work out.  I don't know if we ever went back to

13  address matters.  Because I think the issue was, can that

14  legislative council really have an attorney-client privilege

15  with all these people --

16       **MS. BALDWIN:**  Yes.

17       **THE COURT:**  -- if I recall correct.

18       **MS. BALDWIN:**  That's the issue, your Honor.  And if

19  your Honor had decided it, we hadn't understood that.

20       **MR. CLAY:**  Yeah.  I'm --

21       **MS. BALDWIN:**  Essentially, you know, the dispute, as

22  I understand it, is essentially the United States take the

23  position that with 181 legislators who are going to have

24  conflicting positions, it's simply not possible under the Rules

25  of Professional Conduct without express waiver to have an

```
 1  attorney-client --
 2          THE COURT:  And I think the -- isn't that what the
 3  D.C. court ruled also?
 4          MS. BALDWIN:  Yes, your Honor, in a decision which
 5  was later vacated by agreement essentially when Texas agreed to
 6  produce the contested documents, the United States didn't
 7  contest the vacature, the Court did rule that.  And we think --
 8          THE COURT:  Okay.
 9          MS. BALDWIN:  -- the ruling is -- its reasoning is
10  wholly persuasive.
11          THE COURT:  Well, if I wasn't clear, that was
12  certainly my intent.
13          MS. BALDWIN:  Okay.
14          MR. CLAY:  Well -- okay.  The only thing I would
15  point out is that the United States government also has these
16  legislative councils who also have attorney-client privileges
17  (indiscernible)
18          THE COURT:  You know, what's good for them is good
19  for you.  I've taken that position from the beginning, even
20  with the legislators, how we're treating everyone.  Everyone
21  gets --
22          MR. CLAY:  Oh, so your position is also that -- the
23  Court's position is also that their legislative council is --
24  they don't have attorney-client privilege with their members?
25          THE COURT:  I don't have that before me to see how --
```

```
 1   exactly how it works, but if it works in the same manner, it --
 2   you know, what applies to one side applies to the other.  We
 3   dealt with this issue when you all were trying to get
 4   information from the legislators.  Right?
 5          MR. CLAY:  Yes, your Honor.
 6          THE COURT:  So --
 7          MS. BALDWIN:  Thank you, your Honor.
 8          THE COURT:  -- United States or State of Texas, same
 9   -- everyone is treated equally here.  Anything else from the
10   Plaintiffs?
11          MR. ROSENBERG:  No, your Honor.
12          THE COURT:  The defense?
13          MR. SCOTT:  I don't believe so, your Honor.
14          THE COURT:  Should we -- I know things are -- I guess
15   we'll just set hearings as things start coming in.  Or do you
16   all want to start having hearings every ten days or something?
17   Or any suggestions, I guess?
18          MR. ROSENBERG:  I think a regular call with the Court
19   perhaps if your Honor could do it once a week, once every ten
20   days, I think would be very helpful.
21          MR. CLAY:  I mean, the State of Texas is agreeable to
22   that.
23          THE COURT:  Okay.
24          MR. CLAY:  The only thing that might be helpful is if
25   we can get some sort laundry list of the items that the Court
```

1  thinks it will address at the hearing just so we can have the

2  proper people on the call or in the courtroom.

3          THE COURT:  Okay.  And generally, I'm going to --

4  even if it's not ripe yet, I'm not going to push it if you all

5  are asking for more time to respond or so.  But I'm --

6  generally anything that's pending, I'm going to try to at least

7  see where are we, can we narrow something --

8          MR. CLAY:  Understood.

9          THE COURT:  -- can we rule on it; or, if you need

10  time to respond and it's not ripe, I'll -- you know, I'll give

11  you that time.  So how about Brandy will send out some dates

12  for every ten days, and then if there's issues with that date,

13  just let her know.

14          MR. ROSENBERG:  That would be great.  Thank you, your

15  Honor.

16          THE COURT:  Okay.  Nothing further, you're excused.

17      (This proceeding was adjourned at 9:57 a.m.)

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    **May 16, 2014**


                    TONI HUDSON, TRANSCRIBER