UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,         )      CASE NO: 2:13-CV-00193
                         )
          Plaintiffs,   )         CIVIL
                         )
     vs.                 )     Corpus Christi, Texas
                         )
RICK PERRY, ET AL.,        )     Friday, June 6, 2014
                         )    (2:54 p.m. to 2:56 p.m.)
          Defendants.   )    (3:01 p.m. to 4:01 p.m.)


TELEPHONE CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:           See Next Page

Court Recorder:       Genay Rogan

Clerk:               Brandy Cortez

Transcriber:          Exceptional Reporting Services, Inc.
                       P.O. Box 18668
                       Corpus Christi, TX 78480-8668
                       361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiffs:                     J. GERALD HEBERT, ESQ.
                                EMMA SIMPSON, ESQ.
                                191 Somervelle Street
                                #405
                                Alexandria, VA 22304

                                ARMAND DERFNER, ESQ.
                                P.O. Box 600
                                Charleston, SC 29402

                                CHAD W. DUNN, ESQ.
                                Brazil and Dunn
                                4201 Cypress Creek Parkway, Suite 530
                                Houston, TX 77068

                                NEIL G. BARON, ESQ.
                                914 FM 517 Road, W.
                                Suite 242
                                Dickinson, TX 77539

Mexican American               EZRA D. ROSENBERG, ESQ.
Legislative Caucus,            Dechert, LLP
et al.:                        902 Carnegie Center, Suite 500
                                Princeton, NJ 08540-6531

Texas League of Young          NATASHA KORGAONKAR, ESQ.
Voters Education Fund:         NAACP Legal Defendant and Educational
                                Funds, Inc.
                                40 Rector Street
                                5th Floor
                                New York, NY 10006

State of Texas:                JOHN BARRET SCOTT, ESQ.
                                Scott, Yung, L.L.P.
                                208 N. Market Street
                                Suite 200
                                Dallas, TX 75202

                                JOHN R. CLAY, ESQ.
                                Office of the Attorney General
                                P.O. Box 12548
                                MC 001
                                Austin, TX 78711

3

<u>APPEARANCES FOR</u>:      (CONTINUED)


State of Texas:              DAVID WHITLEY, ESQ.
                             Office of the Attorney General
                             P.O. Box 12548
                             Austin, TX 78711

                             WHITNEY DEASON, ESQ.
                             BEN DONNELL, ESQ.
                             ARTHUR D'ANDREA, ESQ.


United States               ELIZABETH S. WESTFALL, ESQ.
of America:                 ANNA BALDWIN, ESQ.
                            DANIEL FREEMAN, ESQ.
                            U. S. Department of Justice
                            950 Pennsylvania Avenue, N.W.
                            NWB Room 7125
                            Washington, DC 20530


Mexican American            KEMBEL SCOTT BRAZIL, ESQ.
Legislative Caucus,         Brazil and Dunn
et al.:                     4201 Cypress Creek Parkway
                            Suite 530
                            Houston, TX 77068


Texas Association of        ROLANDO L. RIOS, ESQ.
Hispanic County Judges      115 E. Travis
and County                  Suite 1654
Commissioners:              San Antonio, TX 78205


Oscar Ortiz, et al.:        ROBERT W. DOGGETT, ESQ.
                            Texas Rio Grande Legal Aid
                            4920 North IH 35
                            Austin, TX 78751

4

1           **Corpus Christi, Texas; Friday, June 6, 2014; 2:54 p.m.**

2                          **(Call to Order)**

3           **THE CLERK:**  Good afternoon, counsel.  This is Brandy

4    with Judge Ramos's court.  Do I have parties on the line for

5    the individuals, Veasey, Mr. Dunn, Mr. Derfner, Mr. Baron?

6           **MR. DUNN:**  Yes.  Good morning, Ms. Cortez.  This is

7    Chad Dunn.  I have with me Armand Derfner and Neil Baron, and

8    the three of us will be speaking depending upon the topics.

9    Also on are Scott Brazil, Gerry Hebert, and Emma Simson.

10          **THE CLERK:**  Thank you.

11          And for the United States, Ms. Baldwin, Ms. Westfall,

12   Mr. Freeman?

13          **MS. WESTFALL:**  Yes.  This is Elizabeth Westfall.  We

14   have Anna Baldwin also and Dan Freeman on the line, who will be

15   speaking, and others who are counsel for the United States who

16   will be listening but not participating.

17          **THE CLERK:**  Thank you.

18          And for the Mexican American Legislative Caucus,

19   Mr. Rosenberg?

20          **MR. ROSENBERG:**  Yes.  I'm on.  Thank you.

21          **THE CLERK:**  Thank you, Mr. Rosenberg.

22          For Ortiz, et al., Mr. Doggett, Ms. Van Dalen?

23          **MR. DOGGETT:**  This is Robert Doggett.  Thank you.

24          **THE CLERK:**  Thank you, Mr. Doggett.

25          For the Texas Association of Hispanic County Judges,

5

1   Mr. Rios?

2        **(No audible response)**

3            **THE CLERK:**  For the Texas League of Young Voters,

4   Mr. Haygood?

5        **(No audible response)**

6            Mr. Dunbar?

7            **MS. KORGANKAR:**  He won't be joining us.  This is

8   Natasha Korgankar.  I'm here.

9            **THE CLERK:**  Thank you.  Will you be the only one

10  speaking?

11           **MS. KORGANKAR:**  I will be.

12           **THE CLERK:**  Okay.  Thank you.

13           And, then, for the State of Texas, Mr. Whitley,

14  Mr. Donnell, Mr. D'Andrea, Mr. Scott?

15           **MR. SCOTT:**  John Scott and Reid Clay on one phone.

16           **THE CLERK:**  Thank you.

17           **MR. D'ANDREA:**  This is Arthur D'Andrea on another

18  phone.

19           **THE CLERK:**  Thank you.  And will you three be doing

20  the speaking?

21           **MS. DEASON:**  This is Whitney Deason on another phone,

22  and I will be speaking as well.

23           **THE CLERK:**  Thank you.

24       **(Off the record from 2:55:38 until 2:55:43)**

25  //

1        **MR. HEBERT:**  We will not be speaking for the Veasey

2   LULAC plaintiffs, just listening.

3        **THE CLERK:**  Thank you, Mr. Hebert.

4      **(Pause)**

5        **THE CLERK:**  Mr. Rios, are you present on the line for

6   the Texas Association of Hispanic County Judges?

7        **MR. RIOS:**  I am, and I'm also on behalf of Hidalgo

8   County.

9        **THE CLERK:**  Thank you.

10       **MR. RIOS:**  But Mr. Henderson cannot make it.

11       **THE CLERK:**  Okay.  Thank you.

12       I'm going to place you all on a brief hold.  We've

13  got an attorney representing each of the parties on the line,

14  and the judge should be taking the bench in just a moment.

15      **(Recess was taken from 2:57 p.m. until 3:01 p.m.)**

16       **THE COURT:**  Court calls Cause Number 2:13-193,

17  *Veasey, et al. versus Perry, et al.*  And Ms. Cortez will take

18  role here.

19       **THE CLERK:**  Your Honor, Mr. Dunn, Mr. Derfner,

20  Mr. Baron, Mr. Hebert, Mr. Brazil, and Ms. Simson are present

21  for the individuals.  Ms. Baldwin, Mr. Freeman, Ms. Westfall

22  are present for the United States.  Mr. Rosenberg is present

23  for the Mexican American Legislative Caucus.  Mr. Doggett is

24  present for Ortiz, et al.  Mr. Rios is present for the Texas

25  Association of County Judges and Hidalgo County.  Ms. Korgankar

1    is present for the Texas League of Young Voters.  Mr. Scott,

2    Mr. Clay, Mr. Whitley, Mr. Donnell, Mr. D'Andrea, and

3    Ms. Deason are present for the State of Texas.

4            **THE COURT:**  All right.  We've got several matters

5    pending.  Let me just go through a couple of the old matters

6    before we discuss the motions to quash.  But there was a

7    defendant's amended motion to compel that I believe the

8    remaining issue was the common interest doctrine and the

9    parties submitted a brief on that, or a joint -- not a joint

10   statement that you all agreed, but it was a one -- one document

11   submitted.  Anything else on that, Mr. Scott?

12           **MS. DEASON:**  Your Honor, this is Whitney Deason with

13   defendant.  I'll be speaking to that issue.

14           **THE COURT:**  Okay.

15           **MS. DEASON:**  The issue here can really be broken down

16   into two -- two issues.  The first issue is a more global

17   issue.  It's really whether the common interest doctrine

18   applies in the Fifth Circuit, and the law is clear here that

19   the Fifth Circuit does not recognize common interest doctrine

20   for plaintiffs.  We've cited numerous cases in both the

21   statement that was submitted Monday, as well as even the motion

22   to compel, that notes that the application of the common

23   interest doctrine is specifically limited in the Fifth Circuit

24   to co-defendants and potential co-defendants and that Fifth

25   Circuit recognizes the doctrine as narrowly construed because

1   it's an obstacle (indiscernible).  And the reason that courts

2   have exhibited such restraint in applying this doctrine is that

3   it excludes documents and communications from discovery.

4          The defendant's current stance is that -- is

5   consistent with the law in the Fifth Circuit, that this common

6   interest doctrine does not apply to the plaintiff.  And as

7   such, we believe that the documents currently being withheld on

8   this basis should be produced.

9          The second issue, which hinges on your Honor's ruling

10  on the first issue, but I'd like to address is very quickly,

11  is, you know, whether the Court -- if the Court decides to go

12  ahead and grant this protection to plaintiffs in this circuit

13  and essentially create new law in the Fifth Circuit, then we

14  need to address the fact that plaintiffs need to provide logs

15  documenting the communications that they're withholding on this

16  basis.  To date, plaintiffs -- plaintiffs and plaintiff

17  intervenors have not provided any logs documenting the

18  communications they're withholding on this basis.  They've

19  essentially flatly refused to log thousands of communications

20  they claim to be withholding on this basis.  And I think it's

21  important to note that in logging this information the common

22  interest doctrine is not a privilege in and of itself; it is,

23  instead, an extension of an underlying privilege, such as

24  attorney-client or work product.  And, so, what happens is the

25  common interest doctrine simply prevents a waiver of that

1    foundational privilege when a communication occurs with the co-

2    parties.  And, so, in logging any communications that they may

3    be able to protect under this doctrine, they need to identify

4    that -- the foundational evidence for that underlying privilege

5    that they're seeking to extend.

6         You know, it's also important to note that Rule 26 of

7    the Federal Rules of Civil Procedure places the burden on the

8    party withholding documents based on privilege to show that

9    those documents are, in fact, privileged.  Otherwise, other

10   parties, in this case, defendants, can't adequately assess

11   whether those privileges apply.  So, if your Honor is -- is

12   going to extend this doctrine in this case and potentially

13   create new law in this circuit and allow for these documents to

14   be protected, they need to be logged.

15        And I think it's important to note that to the extent

16   plaintiffs and plaintiff intervenors suggest that the agreement

17   concerning production format supports the existence of a common

18   interest doctrine or allows them to not log the communications

19   that they have with one another, between parties, which was

20   suggested in the -- the agreement or the joint statement

21   submitted on Monday, that suggestion is incorrect.  On its

22   face, paragraph 25 of that agreement is expressly limited to

23   the United States Department of Justice and the Texas Attorney

24   General's Office.  And I just want to read an abbreviated

25   version of it quickly, because I think the language is very

1    important.  It says:

2           "The parties need not note on a privilege log any

3           document exchanged solely among counsel, individuals

4           working directly on behalf of counsel in connection

5           with this litigation, or supervisory staff of the

6           United States Department of Justice or the Texas

7           Attorney General's Office."

8           I think the language here shows that this provision

9    does not address communication between both parties.  It simply

10   addresses intra-agency communications; so, communications

11   within these two government agencies.  So, for example, you

12   know, an attorney with DOJ who may have to correspond with

13   various support staff or who may have to send something up and

14   down the chain, we're not -- we don't think that those

15   communications should be logged, and that's what this specific

16   provision goes to.  It doesn't go towards any communications

17   that may occur between the co-parties.

18          The last (indiscernible) note here is -- I'm going to

19   sort of -- we're in a different boat with DOJ because they have

20   provided privilege logs to this point.  However, after three

21   chances to provide an adequate privilege log, they continue to

22   fall short in that their most recent supplemental privilege log

23   contained numerous entries that claimed multiple privileges,

24   including common interests and work product.  Instead of

25   actually establishing the elements of those privileges claimed

1    and showing how the documents that were withheld based on those

2    privileges were properly held on the basis of those privileges,

3    they simply provided document description of e-mails, so one --

4    the one-word description.  That does not allow us to adequately

5    assess whether the privilege is properly applied.

6            So, you know, to sum up, essentially, our stance is

7    that the law in the Fifth Circuit is very clear --

8            **THE COURT:**  Okay.  Let me ask you about that.  When

9    you say that the doctrine has not been recognized by the Fifth

10   Circuit, does -- does -- is there a case from the Fifth Circuit

11   specifically say that, or the cases before the Fifth Circuit

12   have been regarding co-defendants and potential co-defendants,

13   or has the Fifth Circuit specifically said it does not apply to

14   plaintiffs?

15           **MS. DEASON:**  The Fifth Circuit has recognized time

16   and again that it does not apply to plaintiffs.  You know, I --

17   I believe in the April 15th hearing we had asked the Department

18   of Justice to point to a case where it could, and it couldn't.

19   Uh --

20           **THE COURT:**  But I am now asking you to point me to a

21   case that says it does not apply to plaintiffs, that expressly

22   says that.

23           **MS. DEASON:**  And --

24           **THE COURT:**  Can you point me to that case?

25           **MS. DEASON:**  Okay.  So, *In re Santa* -- excuse me?

12

1          **THE COURT:**  Can you point me to that case?

2          **MS. DEASON:**  *In re Santa Fe* is a case, Fifth Circuit

3   case, that says -- specifically limits the application of the

4   common interest doctrine to co-defendants and potential co-

5   defendants.

6          **THE COURT:**  And did that case involve plaintiffs

7   trying to take advantage of that doctrine?

8          **MS. DEASON:**  No, ma'am.  That -- that case involves

9   defendants.

10          **THE COURT:**  Okay.  Has there been any case before the

11   Fifth Circuit where the plaintiffs have tried to take

12   advantage, I guess, of that -- of that privilege and the Fifth

13   Circuit has said, no, it does not apply to plaintiffs?

14          **MS. DEASON:**  Not in a -- not in the same -- not in an

15   analogous situation to what we have in this case.

16          **THE COURT:**  Any -- any situation where the Fifth

17   Circuit has said this common interest doctrine does not apply

18   to plaintiffs?

19      **(Pause)**

20          **MS. DEASON:**  Um, yes, your Honor.  One -- one minute.

21          **THE COURT:**  Okay.

22      **(Pause)**

23          **MS. DEASON:**  All right.  Your Honor, we believe that

24   even though *In re Santa Fe* does involve defendants --

25          **THE COURT:**  Okay.  Ma'am --

1        **MS. DEASON:**  -- on the (indiscernible) --

2        **THE COURT:**  -- please answer my question.  I'm trying

3   to narrow the issue here so that it will -- I don't have to do

4   as much research as we've already done on this end, because

5   you're arguing very generally, and that's kind of not what I've

6   seen the law necessarily to say.  So, what I'm trying to figure

7   out, when you say the Fifth Circuit has not recognized the

8   common interest doctrine for plaintiffs, has that court

9   actually said that?  Has there been a case where they ruled

10  that on, or are you just analogizing?  And if you are, that's

11  fine.  That's just all I'm trying to pinpoint here.

12       **MS. DEASON:**  I -- I can't point you to a specific

13  case.  The best example I could give you would be a decision

14  out of the Eastern District of Louisiana, 2012, *Crosby versus*

15  *Blue Cross Blue Shield*.  They said:

16            "The Court has found no authority in this circuit

17            which extends common legal interest principles to

18            plaintiffs."

19       And that case specifically involved -- specifically

20  says that because Crosby is the plaintiff in this suit, there

21  is no indication -- and there is no indication that she will be

22  occupying defensive posture in this case, the -- the other

23  group involved does not fall under the rule; and that other

24  group is not necessarily the plaintiff (indiscernible), but

25  that -- that's the best --

1           **THE COURT:**  Okay.

2           **MS. DEASON:**  That's the best response I can give you

3    (indiscernible).

4           **THE COURT:**  All right.  Who's going to argue the

5    motion on the plaintiff's side?

6           **MR. ROSENBERG:**  Your Honor, Ezra Rosenberg on behalf

7    of Texas NAACP and the Mexican American Legislative Caucus, and

8    I'll begin.  I think Mr. Derfner will have a few words after I

9    speak, if that's okay with your Honor.

10          **THE COURT:**  Yes.

11          **MR. ROSENBERG:**  I will be brief, because we think

12   that we have laid this out.  And your Honor asked the right

13   question, which was:  Is there any such Fifth Circuit law that

14   holds in the manner that Texas has said it holds, and the

15   answer is clearly no.  Matter of fact, no court in the country

16   has ever ordered discovery of this kind.  And just briefly,

17   the -- the case that Texas just relied on, *Crosby versus Blue*

18   *Cross*, we dealt with in footnote three of our brief.  It's a

19   magistrate's decision that quoted dicta from another case,

20   which was *Stanley*, which is another magistrate's decision, and

21   there the person seeking to invoke the doctrine had a financial

22   interest in the litigation but was neither a co-plaintiff nor a

23   potential co-plaintiff.  So, you have dicta based upon dicta,

24   not Fifth Circuit level; we have other circuits which have

25   applied the doctrine to plaintiffs, and no case -- and, your

1    Honor, I -- when I'm not doing pro bono work, I do mass tort

2    defense.  And in those sorts of cases we have numerous cases

3    where there are numerous plaintiffs represented by different

4    counsel, and I'm not aware of any instance where even in those

5    cases the defendants have sought to intrude upon attorneys'

6    work product, which is what this is all about.  That's the one

7    area where we do agree with Texas, because that's what they're

8    trying to do, is get attorneys' work product by piercing the

9    common interest protection.  And there is even less basis here

10   where, first of all, the same plaintiffs here were defendants

11   in the Section 5 suit where Texas expressly stated on the

12   record that such communications were protected by the common

13   interests of the defendants there and asserted its own common

14   interest protection even though they were plaintiffs.

15           Second, here the parties agreed -- and I'm going to

16   quote the full sentence from the agreement concerning

17   production format, which is ECF 61-6.  In paragraph 25 it says:

18           "However, the parties" -- not just Texas and the

19           Department of Justice, but -- "the parties need not

20           note on a privilege log any document, including but

21           not limited to draft documents, exchanged solely

22           among counsel, individuals working directly on behalf

23           of counsel in connection with this litigation,"

24           parens, "(e.g. paralegals, analysts, and litigation

25           support staff)," end parens, and then there is a

```
 1              comma, "or supervisory staff of the U.S. Department

 2              of Justice or the Office of the Texas Attorney

 3              General."

 4              So, the limitations that DOJ and the Texas A.G. only

 5  have to do with supervisory staff, because the private

 6  plaintiffs don't have supervisory staff in their counsel, but

 7  the sentence as a whole applies to all parties, including the

 8  private plaintiffs and plaintiff intervenors, and was a clear

 9  recognition by -- in this agreement that even though these are

10  privileged communications, they don't have to be logged,

11  because otherwise every party would be logging thousands upon

12  thousands of internal e-mails because all of us deal with work

13  product virtually every minute of every day.

14              And, third, this Court has ordered, and Texas has

15  expressly requested, that counsel for the plaintiffs coordinate

16  their efforts.  In the number of depositions, we're supposed to

17  coordinate with the DOJ and all of the private plaintiffs; the

18  number of interrogatories; and, as your Honor recently

19  indicated, the number of hours it filed.  And you can't do that

20  without coordination.  Now, I want to emphasize what that has

21  meant here.

22              First of all, as your Honor knows, we have not

23  burdened this Court with redundant and duplicative pleadings,

24  because we've coordinated among ourselves and with the

25  Department of Justice.  And that's taken a boat load of
```

1    coordination.  I tried to count up briefly -- for example, just

2    in preparing this submission, the joint submission, I counted

3    about 100 to 150 e-mails between and among counsel.  And

4    according to Texas, they have a right to see those e-mails.

5    And there's just absolutely no justification for that.  If they

6    want to know who our fact witnesses are going to be, they're

7    going to get that at the appropriate time in accordance with

8    what the rules that this Court sets down.  If they want to know

9    who our experts are going to be, there's going -- there is a

10   procedure for that.  And if they want to know, as they say in

11   their brief, how intervenors and plaintiffs choose to interpret

12   Section 2 of the Voting Rights Act and why Texas has been

13   targeted with this litigation -- that's their words on page

14   three or four of their brief -- well, first of all, they can

15   read the complaint; they can propound -- they have the right to

16   propound appropriate contention interrogatories, or they can

17   wait for the findings of fact and conclusions of law.  What

18   they can't do is intrude on our work product or force the

19   plaintiffs to log thousands upon thousands of e-mails dealing

20   with pretrial discovery and trial strategy.

21           **THE COURT:**  All right.  Mr. Derfner, were you going

22   to say anything?

23           **MR. DERFNER:**  Yes.  I'm going to be very brief, your

24   Honor, although, frankly, my (indiscernible) may be a little

25   strong.  I want to -- I think we all need to apologize to the

18

1    Court for wasting your time, and, frankly, I feel like wasting

2    my time, because the issue we have here is claims that the

3    common interest rule applies to defendants but not to

4    plaintiffs.  It is not just frivolous; it is utter nonsense.

5              Over the past several weeks I have asked three

6    times -- three separate times -- I have asked counsel,

7    different counsel for the State of Texas, to find me a case --

8    and I used the phrase "in the length and breadth of the United

9    States of America" -- a case where lawyers for co-plaintiffs in

10   a actual case, making communications out of that case, have

11   been ordered to turn that in.  Never got a case.  Didn't get a

12   case like that on Monday when the paper was filed, and we,

13   obviously, didn't get one just now.  They've never offered a

14   case; they've never offered even a reason, a policy reason or a

15   legal reason, why courts would conjure up such a bizarre one-

16   way rule that they (indiscernible).

17             This is a complex case with a lot to do.  Your Honor

18   is overburdened; we are all overburdened.  If we keep having to

19   take junk issues like this -- and I use that term advisedly --

20   we will never get to the trial date.  And I think we all know

21   what we're facing.  But we need to get -- to deal with the real

22   issues, not issues like this.

23             **THE COURT:**  All right.  Any --

24             **MR. DERFNER:**  I apologize again to the Court, and I

25   thank (indiscernible).

**EXCEPTIONAL REPORTING SERVICES, INC**

1          **THE COURT:**  All right.  Anyone from the Government or

2    anything further from any other plaintiff?

3          **MS. WESTFALL:**  Yes.  This is Elizabeth Westfall for

4    the United States.  We strongly support everything that has

5    been argued by Mr. Rosenberg and Mr. Derfner, and we would add

6    from the outset, I mean, that Texas did not even fulfill the

7    threshold issue of seeking -- of -- of stating any basis and

8    that -- for seeking this discovery from the outset.  These

9    requests fall outside the scope of permissible discovery

10   allowed by Rule 26(b).  Under that rule discovery is confined

11   to information that's relevant to actual claims and defenses,

12   and the only thing that Texas has argued as to why it's

13   relevant is that they are seeking information about plaintiffs'

14   motivation in suing Texas over its photo I.D. law.  In other

15   words, defendants are seeking mental impressions, opinions, and

16   legal theories of they're opposing counsel, so that is not

17   appropriate under Rule 26(b).

18          I would add that the United States did not need to

19   log any of these communications because the requests sought

20   information that's simply not relevant.  We do not need to

21   amend our logs.  And for that reason alone this discovery

22   should be -- should be denied.

23          **THE COURT:**  All right.  Anything final, Ms. Deason?

24          **MS. DEASON:**  Yes, I'd like to touch on a few points

25   that remain.  First, with respect to the agreement concerning

1   production format, I think the language is pretty clear that it

2   is specifically tailored to the DOJ and the Texas Attorney

3   General's Office.

4           Furthermore, on -- I believe it was Mr. Rosenberg's

5   point about work product.  You know, we -- we are primarily

6   concerned here with communications that -- that show the

7   underlying facts of why plaintiff has decided to litigate this

8   issue.  And, so, to the extent that, you know, these

9   communications that may reflect trial strategy or coordination

10  of discovery efforts are more appropriately deemed work

11  product, which is a qualified privilege, than common interests,

12  we -- we're okay with that.  However, those documents need to

13  be logged.  That's something that plaintiffs have failed to do

14  to this point.

15          Finally, let's see, with respect to the relevance

16  issue, you know, we -- we're slowly but surely developing a

17  picture of what has gone on and the efforts of, you know,

18  (indiscernible) create litigation where perhaps none should

19  exist.  And, you know, just recently through, you know,

20  deposition testimony that we took the last few weeks, you know,

21  we've learned of an individual plaintiff who was never informed

22  by anybody that she could form -- she could obtain a form of

23  free identification to vote under SB 14, and she specifically

24  said that, having learned of such an option, she would probably

25  go get one.  You know, so we believe that these types of

1  communications are relevant to the allegations that plaintiffs

2  have made in their complaint, and, you know, they're relevant

3  to any affirmative defenses we might make.

4          THE COURT:  All right.  Court finds the common

5  interest doctrine applies to the communications between -- or,

6  I guess, among the plaintiffs and their counsel.

7          So, is the next issue the log, Ms. Deason?

8          MS. DEASON:  Yes, your Honor.

9          THE COURT:  Okay.  Anything further on that, Counsel?

10         MR. ROSENBERG:  Just the tremendous burden of logging

11  thousands upon thousands of e-mails that have absolutely no

12  relevance to the -- and are not relevant for purposes of

13  discovery, and in light of the agreement which, as I read, and

14  if your Honor looks at it you'll see, that the -- it applies to

15  the parties; not all the parties, not just DOJ and Texas,

16  except the supervisory staff provision.

17         And, by the way, this is Ezra Rosenberg.  Excuse me.

18         THE COURT:  Court's not going to require that those

19  documents be, I guess, set forth in the privilege logs.

20         Anything else on that issue?

21         MS. DEASON:  Your Honor, this is Whitney Deason for

22  defendants.  I would just like to state that, you know,

23  defendants have gone through hundreds of thousands of documents

24  themselves and logged in the tens of thousands of documents in

25  privilege logs.

1          **THE COURT:**  But are you talking about documents

2    regarding this common interest doctrine?  Because that's what I

3    thought was left; and that's the only thing I'm addressing

4    right now.  You can certainly argue something else, but I'm

5    just trying to close out this remaining issue on the common

6    interest doctrine.

7          **MR. SCOTT:**  Your Honor, John Scott for the Texas

8    defendants.  That's all on this.

9          **THE COURT:**  Okay.  So, that's all on that matter.

10         Another thing -- as far as I know, then, there is

11   nothing left on that amended motion to compel?  Ms. Deason or

12   Mr. Scott?

13         **MS. DEASON:**  I don't believe so.

14         **THE COURT:**  Okay.

15         **MR. SCOTT:**  That's all at this time.

16         **THE COURT:**  All right.  Then, the other thing you all

17   were still negotiating -- I'm just following up on the United

18   States' motion for a protective order regarding the Rule

19   30(b)(6) deposition.  And I don't have anything right now

20   before me.  I know you all were still negotiating.  So, do we

21   need to address anything today on that?

22         **MR. SCOTT:**  Your Honor, John Scott for the Texas

23   defendants.  We are still in the process of formulating some

24   proposed stipulations.  In addition, the person that

25   actually -- we've got a portion of that stuff we're going to

1    bring forward to the Court, but she's out of the country today,

2    and that's not going to be ripe till next week.

3              **THE COURT:**  Okay.  Then -- but anything that's going

4    to be ripe for our, I guess, ten-day status conferences, or

5    whatever, I need a little bit of a heads up if you all want me

6    to try to make a ruling at the time of the hearing.  Otherwise,

7    you know, if I'm getting hit with it at that point, I may need

8    a little bit of time.  But that's something you all can talk to

9    between yourselves and with Brandy about when maybe you can get

10   a joint statement in or a little bit of briefing; whatever is

11   required, I'm sure you all can visit about.

12             So, the next thing I have is what we had discussed

13   regarding the document production by the defendants and we

14   had -- that last hearing we had and the Court had ordered that

15   produced to the -- to the private plaintiffs.  There's some

16   competing orders that have been provided to the Court.  So, is

17   there anything else that you all want to discuss with the Court

18   on that?  I really think that the proposed order by the

19   Government that was attached to 297 reflects the Court's ruling

20   at that hearing.  I understand, Mr. Scott, that you all want to

21   discuss federal databases.  But for purposes of my ruling at

22   that hearing, I think what was submitted by the Government

23   properly reflects the Court's order.

24             **MR. SCOTT:**  And, your Honor, the portion that relates

25   to us -- the Texas defendants being able to pursue those

1   databases, we did not want to be viewed as being in violation

2   of any court order.  And, so, I understood the Court to say

3   that's (indiscernible) still go forward with that; we're just

4   not going to do it at this time.

5           **THE COURT:**  Okay.  So, then, I'm going to, then,

6   enter the Government's proposed order attached to DE-297.  The

7   State can still proceed at some point if you're going to argue

8   the issue with the federal databases, correct?

9           **MR. SCOTT:**  We do want those federal databases.  And,

10  again, your Honor, without those we're not -- we've been -- I

11  think I've asked for the ability to refer to, I guess, provide

12  a defensive strategy.

13          **MS. BALDWIN:**  Your Honor, if I could speak to, you

14  know, the issue of the federal databases -- this is not an

15  issue that needs to be reopened at this juncture, and I'm happy

16  to put in context of the threat that it would raise to this

17  litigation.  Essentially, yielding to defendants' eleventh-hour

18  threats as far as the parties' prior agreement and this Court's

19  prior orders seeking to obtain the federal databases that are

20  fundamentally properly protected from disclosure under federal

21  law can be virtually certain to do two things.  The first is

22  that -- and the time to pursue these databases would blow off

23  the trial discovery schedule.  Any order to produce that data

24  would be subject to immediate appellate review by the United

25  States, as we would seek all possible legal remedies to protect

1    the databases from improper (indiscernible).

2          **THE COURT:**  I'm going to stop you just real quickly.

3    Somebody's breathing very heavily into the phone, and it's

4    affecting the sound on this end.  So, you can proceed.

5          **MS. BALDWIN:**  Okay.  Hopefully that wasn't me, your

6    Honor.  Second, your Honor, we would say that defendants, even

7    were they granted access to the databases, would not have

8    access to any more meaningfully relevant information than they

9    already have.  The database comparisons that defendants already

10   derived through this process allowed them to query the federal

11   databases, to have them searched in exactly the manner that

12   defendants wanted, and they've already received those results.

13   Having already gotten those results last Friday, defendants

14   don't need access to the entire underlying databases and the

15   tens of millions of underlying records that are totally

16   unconnected to this case, to the SB 14, and to any Texas

17   resident.

18          Defendants have argued in the pleadings last week

19   that they would be disadvantaged if they're unable to obtain

20   the federal databases.  That argument presumes that the United

21   States has full access to the federal data and that without the

22   federal data the defendant can't prepare the defense.  That's

23   just not true, your Honor.  The Department of Justice has no

24   more access to the federal agencies defendants -- to the

25   federal agencies' data than defendants or private plaintiffs

1    do.

2           We set up a process in this case where everyone set

3    out the searches that they wanted to have done with the federal

4    databases.  We did the searches -- we provided the Texas data

5    to the federal agencies, and they conducted those searches.  At

6    no time has the Department of Justice been able to conduct its

7    own private comparisons of federal data in this action.  And,

8    in fact, the Court's order prohibits the United States from

9    doing any data comparisons using Texas's data to the federal

10   databases that aren't disclosed.  The only comparisons using

11   Texas data to federal data that have been and will be done in

12   this case have already been done and disclosed in accordance

13   with ECF Number 174.

14          So, to reopen at this issue at this point is just

15   (indiscernible).  Texas is unable to show that they are

16   prejudiced in any way.  No party has, based on the information

17   that's been disclosed, your Honor, and -- and we went ahead and

18   disclosed because there was an agreed-upon -- the portions of

19   the proposed order last week that were agreed upon between

20   defendants' proposed order and the United States' proposed

21   orders recognized the same amount of the Texas voter

22   registration database should be disclosed.  We agreed on that

23   as to the private plaintiffs.  And, so, the United States has

24   already gone ahead and disclosed that data, which, in our view,

25   we were required to under this Court's scheduling order absent

1    another ruling from this Court.

2         So, having disclosed that information, the place

3    we're in is that all parties have equal access to the same

4    information on who is a registered voter in Texas from the

5    Texas voter registration database, save for what that voter's

6    full social security nine is, and whether they match on a

7    search requested by either plaintiffs or the defendants, from

8    the federal data as well as the Texas data.  No party has the

9    ability to generate new search results for which Texas voters

10   lack any form of acceptable SB 14 I.D.  And that's because only

11   defendants and DOJ have access to the state issued data, and

12   the -- the state-issued I.D. data, and the private plaintiffs

13   have no access to that.  And no party, not DOJ, not Texas, and

14   not the private plaintiffs, have any access to the raw data on

15   who holds federally-issued forms of I.D.

16        Your Honor, this process was necessary to protect the

17   sensitive federal data issue, data that involves millions of

18   passport holders and members of the military, who have no

19   connection to this litigation.  The vast majority of the people

20   in the databases that Texas is now seeking, they aren't Texas

21   residents, much less Texas registered voters.  They have no

22   connection to this litigation.  Because of this, we sought to

23   protect that sensitive information, which is subject to a host

24   of other federal statutes that haven't even been briefed.

25   Again, any process that seeks to undo the delicate agreement

1    that the parties struck is going to make a September trial

2    schedule impossible and for no benefit.  Defendants can't show

3    any prejudice, and we would respectfully request that the Court

4    not allow this issue to be reopened at this juncture.

5            To the extent that the Court is inclined to consider

6    allowing defendants access federal data, we would just say that

7    it's far too important of an issue to be decided on an oral

8    motion and that defendants should be required to set out in

9    writing why they believe that they're entitled to the federal

10   data, what information of any possible relevance they hope to

11   glean from it that they don't already have from the results

12   that they have that we've produced, and what prejudice that

13   they're suffering without it, given that no other party has the

14   access that they're seeking.

15           The United States believes that it is important to

16   fully respond in writing because of the critical national

17   security interest and data security interests that are

18   implicated in this effort by defendants.

19           **THE COURT:**  All right.  Anything further, Mr. Scott?

20           **MR. SCOTT:**  Your Honor --

21           **MR. SPEAKER:**  Your Honor --

22           **MR. SCOTT:**  -- it appears there's a common thread --

23   this is John Scott; very briefly.  There is a common thread in

24   DOJ's arguments.  One, that there was some -- they

25   (indiscernible) today that we had some agreement that was

1    operating beforehand, that was the subject of Order Number 174

2    of this Court.  That was true up until May 28th when they

3    enticed this Court to blow that agreement up.  There are no

4    agreements anymore between the parties to avoid trying to get

5    these databases.  That was done away with when our position on

6    what we had -- well, I really believe it was truly very well

7    thought out -- had entered into an agreement that we thought

8    foreclosed their ability to prove some vital issue up to this

9    Court.  The Court was able to give them a lifeline on May 28th,

10   and we now have to overcome that.

11          Now, it's never been the standard in federal

12   discovery that the person seeking it has to show how they're

13   prejudiced if they don't get that discovery.  So, this add-on

14   aspect, that they would like to add as a burden we have under

15   trying to -- on trying to obtain those databases, it just

16   simply does not exist in the law.

17          From a more practical standpoint, we're dealing

18   with -- just one example.  We have a plaintiff that has

19   testified in this case who goes to school down in South Texas;

20   she was outside of Houston; she registered to vote in Texas;

21   she will come up on the list as a no-match person because she

22   has no Texas form of I.D. that would be acceptable under SB 14.

23   Yet we have also found out that that same person is -- has

24   registered to vote in Indiana and has applied for a driver's

25   license, a learner's permit, up there.  So, now we're dealing

1   with a situation that had we had -- if we had access to their

2   database, we could cross-reference that to all the different

3   people who show up on the no-match list, who now will have

4   histories of how they voted in the case as a result of that

5   lifeline, and we will be able to find out how many more of

6   those people are out there.  I mean, and what we don't know,

7   unfortunately, is all of the other material that's out there in

8   those databases that might also help our case.

9           **THE COURT:**  Okay.  It --

10          **MR. SCOTT:**  So --

11          **THE COURT:**  Let me -- let me do this.

12          **MR. SCOTT:**  (indiscernible)

13          **THE COURT:**  Let me just --

14          **MR. SCOTT:**  (indiscernible) prejudice is not correct.

15          **THE COURT:**  Let me do this.

16          **MR. SCOTT:**  Thank you.

17          **THE COURT:**  I do think it's an important issue that

18  probably needs to be set forth in a written motion instead of

19  oral.  So, would you want to file a motion, Mr. Scott?

20          **MR. SCOTT:**  That would be great, your Honor, and may

21  we get an expedited --

22          **THE COURT:**  Okay.

23          **MR. SCOTT:**  -- basis so that we're not waiting 20 or

24  10 days for their response given the discovery cutoff is here?

25          **THE COURT:**  Okay.  Well, let -- when can you get your

31

1    motion on file?

2              **MR. SCOTT:**  Uh, David?  Whitley?

3              **MR. WHITLEY:**  Your Honor, we would ask -- this is

4    David Whitley with the defendants.  Is Monday okay with your

5    Honor?

6              **THE COURT:**  But --

7              **MR. SCOTT:**  How about Tuesday?

8              **THE COURT:**  Yeah.  That's fine.  I'm supposed to be

9    in trial, so -- Ms. -- is it Baldwin that was speaking for

10   the --

11             **MS. BALDWIN:**  Yes, ma'am.  This is Ms. Baldwin.  I

12   apologize for not identifying earlier.  But we would request,

13   given the complexity of the issues, the number of federal

14   agencies involved, no less than a week to respond.

15             **THE COURT:**  How about by Friday?

16             **MS. BALDWIN:**  We will absolutely do our best, your

17   Honor.

18             **THE COURT:**  Okay.  And you --

19             **MR. SPEAKER:**  (indiscernible)

20             **THE COURT:**  -- you all need to limit your -- your

21   briefing, remember, per the Court's order.

22             **MR. SCOTT:**  Ten pages.  Ten pages, right, your Honor?

23             **THE COURT:**  Right.

24             **MR. DERFNER:**  Your Honor, the private plaintiffs will

25   want to have something to say, too, on this, because,

1    frankly --

2              THE COURT:  That's fine.

3              MR. DERFNER:  -- I have not --

4              THE COURT:  Can you get it done by Friday also?

5              MR. DERFNER:  Yes, ma'am.  We will.

6              THE COURT:  All right.

7              MR. DERFNER:  But I have not heard one word from --

8    from the defendants about what on earthy they propose to do

9    with federal databases or why they want them and what they

10   really --

11             THE COURT:  And that's why we're going to get it in

12   writing, in a brief writing, so we can all be on the same page

13   as to what people are claiming and what needs to be argued.

14             Okay.  Anything, then --

15             MR. DERFNER:  Well --

16             THE COURT:  Go ahead.  I'm sorry; I think I cut

17   someone off.

18             MR. DERFNER:  This is Mr. Derfner.  (indiscernible)

19             THE COURT:  All right.  Then, the -- regarding, then,

20   the hearing we had and the Court's ruling, I am entering the

21   order as I stated as the Government had proposed; Mr. -- the

22   defendant, Mr. Scott, is going to be filing a motion regarding

23   the federal databases, which will be responded to -- sounds

24   like we should get that by next week.

25             So, anything else on the document issue, the database

33

```
1   issue?
2           MR. SCOTT:  So, will the Court be issuing an order on
3   the -- I'm sorry; this is John Scott.  Will the Court be
4   issuing an order on -- or make an order on the common interest
5   and the -- the order we're getting for parties not having to do
6   privilege logs?
7           THE COURT:  No.  I've stated it on the record, so --
8           MR. SCOTT:  Okay.
9           THE COURT:  All right?  Unless you need anything
10  further; I can clarify right now.
11          Then, the next thing I have is the motions to quash,
12  correct?  If -- who's proceeding on that from the --
13          MR. D'ANDREA:  Your Honor, this is Arthur D'Andrea
14  with the legislators.
15          THE COURT:  Okay.
16          MR. D'ANDREA:  And, first, I'd like to apologize.  I
17  think I misled Ms. Cortez when I announced.  I do not represent
18  the State.  I actually have no interest in whether or not voter
19  I.D. survives.  My only interest in this case is to protect the
20  legislators' interests.
21          THE COURT:  Okay.
22          MR. D'ANDREA:  So -- so, again, I am not here on
23  behalf of the state, but for the (indiscernible) legislators.
24          When you say motion to quash, your Honor, do you mean
25  the motion to quash the subpoena to testify or the motions to
```

1    quash the trans- -- for the subpoenas for documents that were

2    recently transferred to the Court?

3           **THE COURT:**  Well, what is before the Court for the

4    Court to address.

5           **MR. D'ANDREA:**  Okay.

6           **THE COURT:**  I'm assuming there's a lot of similar

7    issues, so whatever I have jurisdiction over, whatever is

8    before this Court, I'll be happy to address today if we can.

9           **MR. D'ANDREA:**  Okay.  Well, I'd like, then, to start

10   with document -- the subpoenas for documents that were recently

11   transferred to the Court.  The vast majority of those that were

12   transferred are identical to subpoenas this Court has already

13   ruled on.  And, so, we can just put those aside, and I assume

14   the Court will just apply its prior ruling on -- on those

15   subpoenas.  But there is one that is different, and that's the

16   one that I think merits some attention from the Court.

17          **THE COURT:**  Okay.

18          **MR. D'ANDREA:**  And that is the subpoena for e-mail

19   searches of Texas Legislative Council's e-mail address.  So,

20   this subpoena is different, because all of the other document

21   subpoenas were just asking for documents from the legislators

22   by subject matter, such as everything related to SB 14, and

23   they allowed the legislators to file a response, which is the

24   usual course of discovery.  But to TLC the plaintiffs have sent

25   broad search terms to 75 different people for TLC to run in

1   their computers.  And one problem with the subpoena is that

2   many of these people are duplicates.  So, there are 17

3   legislators listed in the TLC subpoena that are duplications.

4            So, for example, DOJ subpoenaed Speaker Straus

5   directly, and they've demanded that Speaker Straus search his

6   office for documents and that he search his e-mail computer,

7   his work computer, and work e-mail, for every document related

8   to SB 14.  And then DOJ has now turned around and asked TLC to

9   search Speaker Straus's work e-mail for every document related

10  to (indiscernible).

11          **THE COURT:**  Okay.  But isn't this something that as

12  attorneys you all should be able to get together and discuss?

13  If it's duplication, we shouldn't be having duplication.  It's

14  just inefficient.  But why am I having to step in on that

15  issue?  Who's speaking for the plaintiffs?

16          **MR. FREEMAN:**  Your Honor, this is Dan Freeman on

17  behalf of the United States.  We would be happy to discuss the

18  proper methods to search legislators' official e-mail.

19  However, due to the position taken by legislators and the State

20  of Texas in this litigation, it was necessary to subpoena the

21  legislators in their individual capacity in order to obtain the

22  private e-mails that many legislators use to (indiscernible)

23  legislation.  On the other hand, because the proper method to

24  search a large group of individuals' e-mails that are all

25  stored on the same server to ensure uniformity is to search

36

1    from the server side.  We separately subpoenaed the TLC, and

2    that's a method of search that the Perez court, you know, in

3    redistricting just permitted.

4            THE COURT:  Okay.  Mr. D'Andrea?

5            MR. D'ANDREA:  Your Honor --

6            MR. FREEMAN:  Go ahead.

7            MR. D'ANDREA:  Yeah, I -- I still don't understand.

8    I still didn't hear an answer for the duplication.  Because

9    (indiscernible) they've already asked Speaker Straus and 16

10   other legislators to search --

11           THE COURT:  Okay.  But isn't this -- isn't this

12   something that you all should be communicating on?  I feel like

13   I'm kind of baby-sitting a conversation here, that maybe you

14   all should figure out what it is.

15           MR. D'ANDREA:  We can -- we can -- we'll -- we can

16   talk about the duplication, your Honor.

17           THE COURT:  Okay.

18           MR. D'ANDREA:  I will -- I will reach out to

19   Mr. Freeman --

20           THE COURT:  All right.

21           MR. D'ANDREA:  -- after this.  And, so, we can --

22           MR. FREEMAN:  That's not (indiscernible).

23           MR. D'ANDREA:  We can bracket that.

24           THE COURT:  Okay.

25           MR. D'ANDREA:  I would like to raise one more issue.

37

1          THE COURT:  Okay.

2          MR. D'ANDREA:  And that is the second way that this

3  subpoena is overbroad.  And those are the search terms.  And

4  maybe this is something else you'd prefer that we discuss, but

5  we -- I -- (indiscernible).

6          THE COURT:  Well, have you all discussed?  Because it

7  certainly should be discussed by the lawyers before I step in.

8          MR. FREEMAN:  Your Honor --

9          MR. D'ANDREA:  We have.

10          THE COURT:  Okay.

11          MR. FREEMAN:  Sorry.

12          MR. D'ANDREA:  We have, your Honor.  But it -- do you

13  think there is value to us resolving this?  We will have

14  further discussion to see if we can work this out.

15          MR. FREEMAN:  Your Honor --

16          THE COURT:  Well, it sounds like you all think there

17  might be.

18          MR. FREEMAN:  We -- we negotiated the search terms

19  with Mr. Whitley on behalf of the State of Texas back when the

20  State of Texas -- and the State of Texas ran the search terms

21  to test whether they would be, you know, proper terms, back

22  when the State of Texas was still admitting that they had

23  control over TLC.  They then disclaimed control of the TLC and,

24  so, the subpoena contained the last set of search terms that we

25  had sent back and forth to the State of Texas.  It's our

38

```
 1   understanding that they were proper and had been tested
 2   already, and to the extent that there are specific concerns
 3   regarding the search terms, we're happy -- we're happy to
 4   change some, but these --
 5          THE COURT:  Well, have you all --
 6          MR. FREEMAN:  -- (indiscernible) forward.
 7          THE COURT:  -- discussed this, Counsel?  Have you all
 8   discussed -- did you discuss that with Mr. D'Andrea?
 9          MR. FREEMAN:  At the time, I believe, that we issued
10   subpoena to TLC Mr. D'Andrea was not yet representing them.
11          THE COURT:  And I just want a yes or no so I can tell
12   you all to go talk.
13          MR. FREEMAN:  I'm happy to go talk (indiscernible).
14          THE COURT:  Okay.  All right.  What else,
15   Mr. D'Andrea?
16          MR. D'ANDREA:  The next thing, your Honor, is
17   (indiscernible).   The next thing we have is subpoena to
18   testify, use the depositions, subpoenas.  So, DOJ has briefed
19   this and responded to our motion to quash, and their response
20   suggests that the Department of Justice was pleased with the
21   D.C. court's order in *Texas versus Holder* and if they still --
22   if that is true, then the legislators also (indiscernible) an
23   identical order that the D.C. court issued in *Texas v. Holder*,
24   which is to say this court will not quash subpoenas, it should
25   adopt the same approach as that court and allow deposition
```

EXCEPTIONAL REPORTING SERVICES, INC

1    testimony about public information and general legislative

2    purposes only.  Even the San Antonio court has walked back this

3    part of the decision compelling legislators to testify --

4          **THE COURT:**  Yeah, I can --

5          **MR. D'ANDREA:**  -- (indiscernible).

6          **THE COURT:**  I can kind of cut to the chase here, and

7    then you all can point -- you all can argue some more if you

8    want to, but I'm inclined to do exactly what the Perez court

9    said.  They provided -- their initial order said the -- I'm not

10   going to quash the depositions entirely.  I am inclined to

11   follow what the Perez court said initially saying that the

12   deponents could answer and the answer would be sealed and

13   submitted to the Court for in camera; alternatively, their

14   second order said the deponent could choose not to answer

15   specific questions, the plaintiff could then file a motion to

16   compel, and the Court would determine whether the privilege --

17   whether it had been waived or whether the Court should compel

18   an answer.  So, I will let you all, now that you all know what

19   I'm inclined to do, argue further.

20         Mr. D'Andrea?

21         **MR. D'ANDREA:**  Yes.  Yes, your Honor.  Well, thank

22   you for giving me a preview of your thoughts.  I think -- that

23   would work, (indiscernible) quash them.  You know, I would say

24   our information is, if -- if my client's trying to decide not

25   to waive the privilege, our information will probably be to

1   adopt part B and then generate motions to compel.

2           **THE COURT:**  Okay.

3           **MR. FREEMAN:**  Your Honor, this is Dan Freeman on

4   behalf of the United States.  The distinction between the two

5   Perez orders had to do fundamentally with the amount of time

6   remaining before trial in each one of those cases, so the

7   amount of time really remaining before the end of fact

8   discovery.  The first Perez order was issued imminently before

9   a preliminary injunction hearing, and they used the procedure

10  that was the only possible procedure to allow a deposition to

11  be completed prior to closing fact discovery.  Now, the second

12  Perez order was issued six months before the end of fact

13  discovery in the second phase of that case.

14          At this point we simply don't have time for the

15  United States to go to Texas, depose each of these legislators,

16  have those legislators broadly assert state legislative

17  privilege, as they did in *Texas v Holder*, come back to this

18  Court, ask for this Court to overcome that limited, qualified

19  privilege, and then go back to Texas and conduct those

20  depositions again.  (indiscernible)

21          **THE COURT:**  Well, that's what we're going to have to

22  do.  We are where we are.

23          **MR. D'ANDREA:**  I under -- will your Honor be amenable

24  to allowing the United States to pause depositions and contact

25  the Court --

1          **THE COURT:**  I --

2          **MR. D'ANDREA:**  -- in order to allow things to proceed

3     in an expeditious manner?

4          **THE COURT:**  You know, if I anticipated, it would be

5     just here and there, I would allow that.  I just don't know

6     what this is going to be like.  I have a horrendous docket.  I

7     don't mean to whine here, but I've already told you all we have

8     had a vacancy here for three years, so I don't know -- I would

9     be open to that; I just don't know if it's really feasible.

10          **MR. D'ANDREA:**  Your Honor, and -- and I don't mean to

11     be flippant in asking this question, but how -- how would your

12     Honor like us to proceed given the imminent close of fact

13     discovery?

14          **THE COURT:**  Well --

15          **MR. D'ANDREA:**  At this time --

16          **THE COURT:**  When are the depositions?

17          **MR. D'ANDREA:**  -- the State has given us --

18          **THE COURT:**  When are the depositions scheduled?

19          **MR. D'ANDREA:**  The State didn't give us dates until

20     this Wednesday, 5:00 p.m. Central.  We have asked for a few

21     changes; we have not heard back from the State yet.

22          **THE COURT:**  When -- when are the depositions

23     scheduled?

24          **MR. D'ANDREA:**  They're the last -- they're the

25     last -- well, excuse me.  Ten of them are the last two weeks of

42

```
 1    fact discovery.  Two of them have already been scheduled in

 2    July, and it's my understanding that two of the other -- two of

 3    them are also on the last two days before expert depositions

 4    are due, and the (indiscernible).

 5            THE COURT:  Well, I have given you the order.  You

 6    all need to sit down and visit about how that's going to be

 7    done, whether you're going to immediately after the deposition

 8    file some sort of brief or a joint statement with the Court and

 9    then we get on the phone.  You all can visit about that and

10    talk to Brandy.  I mean, it's not the Court's fault that we are

11    where we are.  This case has been pending almost a year.

12    Correct?

13        (Pause; No audible response)

14            THE COURT:  Is anybody on?

15            MR. D'ANDREA:  Yes, your Honor.  I'm just --

16            MR. SPEAKER:  Thank you, your Honor.

17            MR. D'ANDREA:  -- trying to figure out exactly how we

18    can (indiscernible) this before the close of fact discovery

19    (indiscernible) --

20            THE COURT:  Well, it's not going to -- I think your

21    depositions will be done before the fact discovery, but I'm

22    going to have to be hearing things after that; if we have to

23    reopen them, I'm going to allow that to be reopened after

24    the -- depositions to be reopened after the discovery deadline.

25    It's the only thing we can do at this point.
```

43

1          **MR. D'ANDREA:**  Okay.  Thank you, your Honor.

2          **THE COURT:**  Okay.  What else?

3          **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin for the

4    United States again.  I'd like to ask, with respect to our

5    opposition regarding the federal data, just given that

6    defendants are going to have four days to generate their brief,

7    and our brief, given the gravity of the issue, is going to have

8    to be --

9          **THE COURT:**  I would think you could start on your

10   brief right now.  You already know what the arguments are.

11         **MS. BALDWIN:**  Your Honor --

12         **MR. SPEAKER:**  I think we've got a copy already

13   written.

14         **MS. BALDWIN:**  Your Honor, we would just ask to have

15   until Monday because we do have to circulate it to five federal

16   agencies and up and down to the department leadership, and I

17   would expect the leadership of those agencies --

18         **THE COURT:**  That's fine.

19         **MS. BALDWIN:**  -- (indiscernible).

20         **THE COURT:**  You can have until Monday, which would be

21   the -- what's that date?

22         **THE CLERK:**  Sixteenth, your Honor.

23         **THE COURT:**  The 16th.

24         **MS. BALDWIN:**  I believe that's the 16th.

25         **THE COURT:**  Okay.  What else on the issue of the

44

1    motion to quash?  Is there anything left hanging?

2         **MR. D'ANDREA:**  No, your Honor.  It's my understanding

3    there is not.  If your Honor would find it useful, the United

4    States would be happy to provide a proposed order giving the 39

5    dockets that these various motions to quash are currently

6    sitting and (indiscernible) the order (indiscernible) -- or the

7    district court (indiscernible).

8         **THE COURT:**  Well, and -- right.  And before I start

9    getting competing orders, why don't you draft an order, send it

10   to the defense; if there is an issue, we can get on -- we can

11   address it.  You can get with Brandy.

12        **MR. D'ANDREA:**  Thank you, your Honor.

13        **THE COURT:**  What other motions are anticipated?  I

14   understand there may be -- I don't -- let me just ask this.

15   When the legislators were deposed in the other matter, did they

16   claim the privilege?  I mean, was it like repeated throughout

17   the depositions?  What -- I have no idea what to anticipate in

18   terms of --

19        **MR. SPEAKER:**  Your Honor (indiscernible) --

20        **THE COURT:**  -- being available or handling it as a

21   motion to compel.  What -- what --

22        **MR. D'ANDREA:**  And it -- it went by -- it depended on

23   the legislator.

24        **THE COURT:**  And who is speaking?

25        **MR. D'ANDREA:**  Some of them -- Arthur D'Andrea.

1           **THE COURT:**  Okay.

2           **MR. D'ANDREA:**  Some of the legislators waived the

3    privilege entirely, expressed a desire to do so, and then just

4    spoke for seven hours.  Some of them -- for example, we -- it

5    was recently a deposition, you know, (indiscernible) took of

6    Chairman (indiscernible), and in that one he asserted the

7    privilege using the second option.  So, counsel -- every time -

8    - okay, if they asked what was the general legislative purpose,

9    he answered; and if they asked about public statements, he

10   answered; but if they asked anything about his own mental

11   impressions or anything privileged, we instructed him not to

12   answer, and he did not answer, and the deposition continued.

13   And that continued throughout the deposition.  So --

14           **MR. FREEMAN:**  And, your Honor -- your Honor,

15           **THE COURT:**  Who's speaking?

16           **MR. FREEMAN:**  Your Honor, Mr. D'Andrea is referring

17   to redistricting depositions --

18           **THE COURT:**  Who's speaking?  You all need to announce

19   because --

20           **MR. FREEMAN:**  Dan Freeman.  I'm sorry.  This is Dan

21   Freeman on behalf of the United States.  In *Texas v Holder* each

22   and every one of the bill proponents asserted a state

23   legislative privilege and refused to answer broad swaths of the

24   deposition testimony.  There were pages upon pages of

25   speaking -- of speaking objections, instructing the legislators

 1    not to answer a broad array of questions, and we anticipate

 2    that a huge percentage of these depositions will be subject

 3    to --

 4            THE COURT:  Okay.

 5            MR. FREEMAN:  -- legislative privilege objections.

 6            THE COURT:  How many deponents are you all talking

 7    about?

 8            MR. FREEMAN:  Well, we're talking about 12

 9    depositions, your Honor.

10            THE COURT:  And how long do those depositions

11    generally last?

12            MR. FREEMAN:  Well, we anticipate that they will be

13    shorter than last time because we did -- we did make some

14    progress on issues that -- that the legislators --

15            THE COURT:  Which is about how long?

16            MR. FREEMAN:  I can't speak on behalf of the other

17    plaintiffs, your Honor, but I anticipate that they'll be four

18    to five hours.

19            THE COURT:  Okay.

20            MR. FREEMAN:  And I -- I can't waive other

21    plaintiffs' rights to (indiscernible) --

22            THE COURT:  And I'm not trying to pin you all down.

23    I'm just trying to get an idea as to what's ahead for the

24    Court.  So --

25            MR. FREEMAN:  I can provide your Honor with a

```
 1   transcript of some of the depositions from Texas v Holder and

 2   highlight portions of those -- of those transcripts in which --

 3   to which objections were made out of the state legislative

 4   privilege.

 5        THE COURT:  No, thank you.  I'm sure I'll be reading

 6   enough depositions from this case.

 7        MR. FREEMAN:  I was just --

 8        THE COURT:  But thank you.

 9        MR. FREEMAN:  -- (indiscernible).

10        THE COURT:  Okay.  What other motions are anticipated

11   in this case?  I'm trying to get a feel for what the Court will

12   be facing between now and September.

13        MR. CLAY:  Your Honor, this is Reid Clay of the State

14   of Texas.  You're aware of the 30(b)(6) protective order, so

15   that one's out there.

16        THE COURT:  Right.

17        MR. CLAY:  Obviously, the federal databases is also

18   out there.  We will also be filing probably a pretty broad

19   swath of motions for summary judgment based upon both some

20   substantive issues but also some jurisdictional issues based

21   upon deposition testimony from many of the plaintiffs in this

22   case.

23        THE COURT:  Okay.  I mean, what -- what about from

24   the plaintiffs?

25        MR. DUNN:  Your Honor, this is Chad Dunn on behalf of
```

1     the Veasey LULAC plaintiffs.  I can imagine that there will be

2     some motions in limine filed, and, of course, we'll have to

3     respond; the summary judgment motions have to be heard.  The

4     final thing, just to see if I can put a finer point on it, and

5     really all of the legislator -- all of the legislators that

6     were key to the development and adoption of SB 14 were deposed

7     in the Section 5 case, and at this point to reconvene at a

8     deposition and -- it's almost exclusively going to be on the

9     topics that they wouldn't answer before, so unless these

10    legislators change their position on where they think that the

11    legislative privilege lies, we can expect that the vast

12    majority of these reconvened -- or these depositions completed

13    in this cause number, you know, are going to have to be dealt

14    with.  Now, I can imagine they'll probably fall into several

15    categories, so the Court can resolve it on a category basis,

16    but I think you can expect that to happen.

17              **THE COURT:**  Okay.

18              **MR. DERFNER:**  This is Derfner.  What I would say is

19    this.  Recognizing what your Honor said about the burden, we

20    all know that, and I'm aware of it, too, obviously.  If there

21    is some way that the parties can tee this up quickly by -- and

22    possibly hear the motion -- the motions soon after the first or

23    second deposition, the others probably wouldn't be that much

24    different.

25              **THE COURT:**  Yeah.  I agree.

49

1          **MR. DERFNER:**  (indiscernible) early on.

2          **THE COURT:**  Mr. Scott?

3          **MR. SCOTT:**  And, your Honor, Mr. Derfner's suggestion

4     actually provided an idea that might allow us to resolve some

5     of these issues regarding legislative privilege before the

6     depositions occur to avoid the inefficiency to occur, fly out,

7     get the same legislative privilege objections, and then fly

8     back.  Would it be possible for us to file motions to compel

9     based on objections for -- under legislative privilege that

10    were made during the depositions in *Texas v Holder* so that you

11    could resolve some of these issues before the depositions

12    occur, since we'll be stating the exact same legislative

13    privilege objections?

14         **THE COURT:**  Mr. D'Andrea, do you want to address

15    that?

16         **MR. D'ANDREA:**  It seems -- it's efficient, but it's a

17    little bizarre.  That's an entirely different case.  I mean,

18    the *Holder* court held that -- that's what it held, is that it

19    was privileged, and it enforced the privilege pretty strongly.

20    So, you know, I guess --

21         **THE COURT:**  Yeah.  I --

22         **MR. D'ANDREA:**  -- check that Court's homework seems

23    sort of strange, especially when --

24         **THE COURT:**  But I agree with respect to we need to

25    jump on it quickly.  So, I don't know -- like, who's

1    scheduled -- when are the first depositions taking place?

2         **MR. D'ANDREA:**   The first depositions, your Honor, the

3    16th or 17th, your Honor.  We're still responding to some

4    requests to move them around.  But it's that -- that week of

5    the 16th is the first one.  I -- I like the idea of getting

6    this done quickly.  I would need to reach out to these

7    legislators and figure out are they going to waive the

8    privilege.  Now, they've -- they've asserted the privilege so

9    far, but at least in the redistricting case, some of them

10   changed their minds when faced with a deposition.

11        **MR. DERFNER:**   We couldn't just find out whether

12   they've changed their minds?  And then, based on that, there

13   would be enough material to -- not -- not going over the

14   homework of the Holder court; (indiscernible) legislators would

15   take the same position they did there, and not answer the same

16   questions.

17        **MR. D'ANDREA:**   I (indiscernible).  This is D'Andrea.

18   (indiscernible) reach out to them and see if they would still

19   assert it.  And, so, of course, they can always change their

20   mind up to the (indiscernible) deposition, but I imagine

21   sometime that week we could probably get a legislator who

22   asserts the privilege and tees this up.

23        **MR. FREEMAN:**   And, your Honor, I would just say that

24   to the extent that the legislators have claimed that the

25   privilege bars any deposition, I think that we're -- that this

1    issue is ripe.  And it would be far more efficient for us to

2    brief this based on questions already asked --

3            **THE COURT:**  Yeah, I -- I --

4            **MR. FREEMAN:**  -- and already not given.

5            **THE COURT:**  I'm not inclined to go there.  I'm

6    inclined to jump on it as soon as we can.  So, are you all

7    doing, like, one -- one legislator a day?  Or what's the plan

8    here?

9            **MR. D'ANDREA:**  Roughly, your Honor, yes.  Some of

10   them are doubling, because some of them are from Houston and

11   some are Austin.

12           **THE COURT:**  So, like, maybe one deposition on the

13   16th, one deposition on the 17th?

14           **MR. D'ANDREA:**  Yes.  Yes, your Honor.  That's kind of

15   what it looks like.

16           **COURT RECORDER:**  (indiscernible)

17           **THE COURT:**  Yeah, I'm sorry.  I keep -- I forget to

18   tell you all to identify yourselves, and it's important for the

19   record.

20           **MR. D'ANDREA:**  I'm sorry, your Honor.  This is Arthur

21   D'Andrea.  That is -- yes, your Honor.  It's roughly one a day

22   for those last two weeks of discovery.

23           **THE COURT:**  When -- Brandy, when is our next

24   conference?

25           **THE CLERK:**  Our next ten days would fall within the

1   week of the 16th, but we've got some responses due.  I'm not

2   sure if you want to hold it that week.

3           **THE COURT:**  Do you all want to have a status

4   conference, like, on that Wednesday or Thursday, which would

5   give you a couple of depositions under your belt?

6           **MR. D'ANDREA:**  At this Court's earliest convenience,

7   your Honor.

8           **MR. SPEAKER:**  Yes, your Honor.  That sounds good.

9           **MR. SPEAKER:**  That sounds good.

10          **THE COURT:**  Okay.  Let's see.  Brandy?

11          **MR. SCOTT:**  And, your Honor.  John Scott.  That's

12  June 17th or 18th?

13          **MR. ROSENBERG:**  June 18th or 19th; Wednesday or

14  Thursday.

15          **COURT RECORDER:**  (indiscernible)

16          **THE COURT:**  You're not identifying yourselves.  I'm

17  going to have to -- I'm going --

18          **MR. ROSENBERG:**  I'm sorry.  That was Ezra Rosenberg.

19          **THE COURT:**  I'm going to have Brandy be the name

20  patrol from now on out, so she can jump in any time she sees

21  necessary.

22          So, what about June 18th at 2:00 o'clock?  Because

23  I've got a full day of sentencings, but I can probably hear you

24  in the afternoon.

25          **MR. ROSENBERG:**  Ezra Rosenberg here.  That's fine;

```
 1   fine for us, your Honor.
 2           THE COURT:  And at least to just get a feel for
 3   what's going on at the depositions and how we need to proceed
 4   with the privilege issue.  At that point we should also, then,
 5   have the briefing on the federal database, correct?
 6           MR. SCOTT:  Correct.
 7           MS. BALDWIN:  Yes, your Honor.
 8           THE COURT:  And --
 9           MR. SCOTT:  John Scott.
10           THE COURT:  I'm sorry.  Anything else?  See, I know
11   you all's voices now, so I want to keep talking, so it's my
12   fault, too.  Anything else for today?
13           MR. SCOTT:  John Scott on behalf of Texas, and
14   nothing from our standpoint.
15           THE COURT:  Plaintiff?
16           MR. ROSENBERG:  Ezra Rosenberg for Texas NAACP.
17   Nothing for us, your Honor.
18           MS. WESTFALL:  Elizabeth Westfall for the United
19   States.  Nothing for us.
20           MR. D'ANDREA:  Arthur D'Andrea.  We're good, too,
21   your Honor.  Thank you.
22           THE COURT:  All right.
23           MR. DERFNER:  Armand Derfner, Veasey plaintiffs.
24   Nothing.
25           THE COURT:  Then, it sounds like that's all for
```

54

1    today.   Thank you.   You're excused.

2              **ALL:**   Thank you, your Honor.

3        **(Proceeding was adjourned at 4:01 p.m.)**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          June 9, 2014

TONI HUDSON, TRANSCRIBER