IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Actions No. 2:13-cv-193 (NGR) |
| RICK PERRY, *et al.*, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, *et al.*, | |
| Plaintiff-Intervenors, | Civil Action No. 2:13-cv-263 (NGR) |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, *et al.*, | |
| Plaintiff-Intervenors, | |
| v. | |
| STATE OF TEXAS, *et al.*, | |
| Defendants. | |

TEXAS STATE CONFERENCE OF NAACP
BRANCHES, *et al.*,

               Plaintiffs,

     v.

NANDITA BERRY, *et al.*,

               Defendants.

Civil Action No. 2:13-cv-291 (NGR)

---

BELINDA ORTIZ, *et al.*,

               Plaintiffs,

     v.

STATE OF TEXAS, *et al.*,

               Defendants

Civil Action No. 2:13-cv-348 (NGR)

## <u>DECLARATION OF DR. BARRY C. BURDEN</u>

Pursuant to 28 U.S.C. § 1746, I, Barry C. Burden, make the following declaration:

**Background and Qualifications**

1. My name is Barry C. Burden. I am a Professor of Political Science at the University of Wisconsin-Madison. I earned my Ph.D. at The Ohio State University in 1998. From 1999 to 2006 I was a faculty member in the Department of Government at Harvard University. I have been a full professor at the University of Wisconsin-Madison since 2006. A copy of my curriculum vitae is attached.

2. My expertise is in American politics with a focus on elections and voting, public opinion, representation, partisanship, and research methodology. I teach courses on these topics at both the undergraduate and graduate levels. I am author of the book *Personal Roots of Representation* (2007 Princeton University Press), co-author of *Why Americans Split Their Tickets* (2002 University of Michigan Press), and co-editor of *The Measure of American Elections* (2014 Cambridge University Press). I have also published approximately 40 articles in scholarly peer-reviewed journals such as the *American Political Science Review*, *American Journal of Political Science*, *Electoral Studies*, *Public Opinion Quarterly*, *Legislative Studies Quarterly*, *Public Administration Review*, *Election Law Journal*, and *Political Analysis*. I have served as a manuscript reviewer for

these and other academic journals. I am a member of the American Political Science Association and have been active in the profession, giving presentations at many conferences and universities. My research has been supported by grants won from sources including the Pew Charitable Trusts, the National Science Foundation, and the Dirksen Congressional Center.

3.  My scholarly research has focused on elections and election administration. I am co-founder of the Election Administration Project at the University of Wisconsin-Madison. This project has produced research on election administration around the country. I have testified before state officials and the bipartisan Presidential Commission on Election Administration. I co-conducted the first independent evaluation of the Electronic Registration Information Center (ERIC), an initiative launched by seven states to modernize voter registration systems. Working with the Pew Center on the States, I am on the advisory board for the Election Performance Index. I serve on the editorial boards of *Electoral Studies* and *Election Law Journal*, and I am frequently contacted by civic organizations and journalists to speak about U.S. politics generally and election administration in particular. I have been quoted as a source in media outlets including *USA Today*, *The Wall Street Journal*, and *The New York Times*.

4.  I testified as an expert witness on behalf of plaintiffs in the case of *League of United Latin American Citizens of Wisconsin v. Deininger*, No. 12-cv-185 (E.D. Wis.). I also serve as an expert witness in the ongoing case of *North Carolina State Conference of the NAACP v. McCrory*, No. 1:13-CV-658 (M.D.N.C.). I am being compensated by the United States at my standard rate of $250 per hour for my work in this case.

**Summary of Opinion**

5.  I have been asked to review SB 14, the voter identification (ID) law adopted by the State of Texas in 2011, as it relates to certain factors identified by the United States Senate as particularly relevant to assessing a claim brought under Section 2 of the Voting Rights Act. In this report, I consider evidence relating to these "Senate factors." I believe that applying a social scientific lens provides a richer understanding of how SB 14 operates within the larger set of historical and demographic conditions in Texas. As part of my analysis of the Senate factors, I also evaluate how SB 14 compares to strict voter ID laws adopted by other states and how well it is grounded the State's asserted interests.

6.  Based on the review that follows, it is my considered opinion that SB 14 is likely to deter, or in some cases even prevent, black and Latino voters from casting effective ballots.[1] The law operates against a historical, socioeconomic, and political backdrop in ways that

---

[1] Throughout this report I use the terms "Latino" and "Hispanic" interchangeably. In general Latinos may also identify as white, black, or another racial category. Unless otherwise stated, blacks are assumed to be non-Hispanic. I use the term "Anglo" to refer to non-Hispanic whites. I make this distinction in the analysis that I conduct and attempt to verify that the same definitions are used in data I reference from other organizations. In some cases it is possible that other organizations use somewhat different definitions, allowing Latinos to be counted among whites. Following common parlance, I also use the term "minorities" to refer to blacks and Latinos jointly, even though in combination with other traditional minority groups they have technically become a majority of the Texas population.

will unduly burden minority voters relative to Anglos. Moreover, the law is not designed to address stated needs and does not include certain ameliorative provisions common in other state voter ID laws. The harmful effects of the law could have been avoided while better serving the State's purported interest in reducing vote fraud.

## SB 14 and the Calculus of Voting

7.  Generally speaking, SB 14 requires in-person voters in Texas to provide one of seven specific categories of photo identification. The accepted types of identification are a Texas driver license, Texas Election Identification Certificate (EIC), Texas Department of Public Safety personal identification (ID) card, U.S. military ID, U.S. citizenship certificate, U.S. passport, or a Texas Department of Public Safety license to carry a concealed handgun. The ID must include a photo of the voter and (with the exception of the citizenship certificate) must be current or expired no more than 60 days before voting. The name on the ID must be "substantially similar" to the name on the list of registered voters.

8.  A voter who does not present acceptable identification may cast a provisional ballot. The voter then has until the sixth day after the election to provide acceptable identification to the voter registrar. There are only three narrow exceptions to the general requirement that the voter present one of seven prescribed forms of ID.[2]

9.  The likely effects of SB 14 may be best understood using the theory of the "calculus of voting." The "calculus of voting" is the dominant theoretical framework used by scholars to study voter turnout. Dating back at least to Anthony Downs' seminal 1957 book, *An Economic Theory of Democracy*, researchers typically view the likelihood of voting as the result of a formula: a person is likely to vote when the probability of one's vote affecting the outcome of the election multiplied by the net psychological benefit of seeing one's preferred candidate is large. However, the objective likelihood of affecting the outcomes of most elections is exceedingly small.[3] Accordingly, researchers often emphasize two other factors that affect whether a person votes.

---

[2] First, a voter may demonstrate at least a 50% disability rating from the Social Security Administration or Department of Veterans Affairs, declare that they lack a valid ID, and present a voter registration certificate showing the exemption for disability. According to the expert report of Professor Stephen Ansolabehere, as of January 15, 2014, only 18 disability applications had been processed. Second, a voter may cast a provisional ballot and then appear at the voter registrar's office within six days of the election to swear by affidavit that they have a religious objection to being photographed. Third, a voter may cast a provisional ballot and then appear at the voter registrar's office within six days of the election to swear by affidavit that they lack ID due to a natural disaster that occurred within the last 45 days of the election and was declared so by the Governor of Texas or President of the United States.

[3] For an example see Andrew Gelman, Gary King, and John Boscardin (1998), "Estimating the Probability of Events That Have Never Occurred: When is Your Vote Decisive?," *Journal of the American Statistical Association* 93(441):1-9.

10. The first additional factor represents the "consumptive" benefits of voting. These include factors such as expressing one's identity, supporting the democratic system, and fulfilling a sense of civic duty.[4] These are positive factors that make voting more likely.

11. The second additional factor represents the "costs" associated with voting. These include the effort needed to become informed about the candidates and issues. Such costs are affected by a variety of factors such as the intensity of political campaigns that are largely outside the control of policy makers. But costs also include the time, skill, financial resources, and effort required to overcome the administrative requirements and other barriers to registering to vote and successfully casting a ballot. Although they are not the only factors determining whether a person votes, this latter set of costs are unique in that they are controlled by the state.

12. This "calculus of voting" framework suggests that for many individuals the decision to vote is made "on the margins." This is because the decision is viewed as a "low cost, low benefit" calculation.[5] Small changes in costs may alter the likelihood of voting dramatically. This means that disruptions to voting practices raise costs and deter participation. Changes to election procedures such as the location of polling places and the dates and hours of their operation have been shown to deter voting.[6] Costs are especially consequential for people who suffer sociodemographic disadvantages and for non-habitual voters.

13. The expert report of Professor Stephen Ansolabehere in this case finds that over 1.2 million registered voters in Texas do not have acceptable ID to vote under SB 14. Both black and Latinos are substantially less likely than Anglos to possess acceptable ID.

**The Voting Rights Act Amendments of 1982 and the Senate Factors**

14. Section 2 of the Voting Rights Act was amended in 1982 as a direct response to the Supreme Court's decision in *City of Mobile v. Bolden* (1980).[7] The core purpose of the amendments was to clarify that Section 2 does not require proof of discriminatory purposes. Instead, proof that under the "totality of circumstances" the challenged practice "results" in minority citizens having "less opportunity than other members of the electorate to participate in the political process" is sufficient to establish a violation of the law.

---

[4] See David Campbell (2006), *Why We Vote: How Schools and Communities Shape Our Civic Life*, Princeton, NJ: Princeton University Press. Benny Geys (2006), "'Rational' Theories of Voter Turnout: A Review," *Political Studies Review* 4(1):16-35. William H. Riker and Peter C. Ordeshook (1968), "A Theory of the Calculus of Voting," *American Political Science Review* 62(1):25-42.

[5] John H. Aldrich (1993), "Rational Choice and Turnout," *American Journal of Political Science* 37(1):246-78.

[6] Henry E. Brady and John E. McNulty (2011), "Turnout Out to Vote: The Costs of Finding and Getting to the Polling Place," *American Political Science Review* 105(1):1-20. John E. McNulty, Conor M. Dowling, and Margaret H. Ariotti (2009), "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," *Political Analysis* 17(4):435-55. Moshe Haspel and H. Gibbs Knotts (2005), "Location, Location, Location: Precinct Placement and the Costs of Voting," *Journal of Politics* 67(2):560-73.

[7] *City of Mobile v. Bolden*, 446 U.S. 44 (1980).

15. The Senate report accompanying the 1982 amendments set out an illustrative list of seven enumerated factors and two additional (unenumerated) factors that are relevant to consider when evaluating the "totality of the circumstances." These are often denoted as the Senate factors.

16. The Senate factors include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

> 6. whether political campaigns have been characterized by overt or subtle racial appeals;

> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.[8]

17. The Senate also recognized the following "[a]dditional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation":

> • whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group [and]

> • whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[9]

18. I have spent considerable time examining the Senate factors, drawing upon my training as a scholar of electoral politics. These factors are important parts of the context in which

---

[8] Pages 28-29 of Senate Committee on the Judiciary, S. Rep. 97-417, 97th Congress, 2nd Sess. (1982).
[9] Page 29 of Senate Committee on the Judiciary, S. Rep. 97-417, 97th Congress, 2nd Sess. (1982).

SB 14 operates. Understanding them is consistent with the widely shared social scientific view that assessing a policy's effects must take account of the environment in which it is implemented. It is my opinion that the presence of relevant Senate factors in Texas helps to show how and why SB 14 makes it harder for the state's black and Latino voters to participate equally in the electoral process.

**Background on Voter Participation in Texas**

19. Before addressing specific Senate factors, I first document patterns of voter turnout in Texas. It is important to understand that the state has a poor record of overall voter participation. Moreover, Latino voter turnout in particular has long lagged behind that of Anglos. In the 2008, 2010, and 2012 elections, Texas ranked 48th, 49th, and 48th out of the 50 states and the District of Columbia in terms of voter turnout.[10] In recent presidential and gubernatorial elections, Latino turnout has generally been 15 to 20 percentage points lower than that of Anglos.

20. To be more precise about turnout among racial and ethnic groups is difficult because of data limitations. The State of Texas does not record the races and ethnicities of its voters. Here I present the most common measures, which are drawn from the Census Bureau's Current Population Survey (CPS). Then I explain why CPS data make racial and ethnic disparities in turnout appear smaller than they really are.

21. CPS turnout rates for the five most recent federal general elections are reported in Table 1.[11] These data suggests that black turnout actually matched or surpassed Anglo turnout in 2008 and 2012, but fell below it in 2004, 2006, and 2010. Latino turnout lagged both black and Anglo turnout by a substantial amount all five elections.

---

[10] These rankings are based on data in the Pew Election Performance Index drawn from voter turnout data provided by Professor Michael McDonald, available at http://elections.gmu.edu (last visited June 9, 2014). See http://www.pewstates.org/uploadedFiles/Flash_Library/PCS/Interactives/ElectionsPerformanceIndex/template.html#indicator (last visited May 31, 2014).

[11] Non-citizens are excluded from the calculations. Anglos are defined as "white non-Hispanic alone" and blacks are defined as "black alone." The Census Bureau's summary report on the 2012 election using CPS data follows this practice but also notes that "Use of the single-race populations does not imply that it is the preferred method of presenting or analyzing data." See footnote 2 of Thom File (2013), "The Diversifying Electorate—Voting Rates by Race and Hispanic Origins in 2012 (and Other Recent Elections)," Current Population Survey Reports, P20-569, U.S. Census Bureau.

Table 1. Estimated Voter Turnout in Texas based on the CPS (2004-2012)[12]

|         | 2004     | 2006     | 2008     | 2010     | 2012     |
|---------|----------|----------|----------|----------|----------|
| Anglo   | 64.5%    | 45.2%    | 64.7%    | 43.8%    | 60.9%    |
| Black   | 57.7%[*] | 36.7%[*] | 64.9%    | 38.7%[*] | 63.1%    |
| Latino  | 41.6%[*] | 25.4%[*] | 37.8%[*] | 23.1%[*] | 38.8%[*] |

22. The CPS is a valuable and widely used resource for understanding patterns in voter registration and turnout. However, there are systematic biases in the CPS that probably overstate black turnout in Texas relative to Anglos. In 2012 serious problems were revealed in trying to assess differences between minority and Anglo turnout rates, especially in the South. The problems appear to be a combination of two factors. First is the Census Bureau practice of coding respondents who do not answer the voting question as having not voted. Second is the phenomenon of "social desirability," or the desire of respondents to give answers that conform to community norms.

23. As initial evidence of the problem, an analysis by journalist Nate Cohn shows that the CPS overestimated 2012 turnout by the largest amounts in states with larger black and Latino populations.[13] Deeper scholarly research finds that the biases are due in part to increasing nonresponse rates to the CPS, rates that differ across racial and ethnic groups.[14] This insight builds on earlier evidence showing that self-reported state voter registration rates were inflated due to disproportionate over-reporting by black respondents in the South.[15] This conclusion conforms to research in which academic surveys have been merged with official voting records, repeatedly showing more over-reporting of turnout by blacks than by Anglos.[16] In North Carolina where the state

---

[12] Because these are survey estimates, each is accompanied by a different statistical margin of error. For example, in 2012 the margin of error is 1.6 percentage points for Anglos, 3.8 points for blacks, and 3.3 points for Latinos. As a result, not all group differences will be statistically significant. An asterisk indicates the difference between the turnout rate for blacks or Latinos and the rate for Anglos in the same election is statistically significant at the 95% confidence level using a one-tailed *t*-test. Although the 95% level is a popular convention in the social sciences, researchers are free to use a variety of standards for significance depending on their personal preferences and demands of the data.

[13] Nate Cohn, "Black Turnout in 2012 Might Not Have Been Historic: The Inherent Flaws of the Census's Population Survey," *New Republic*, May 15, 2013, available at http://www.newrepublic.com/article/113224/black-turnout-2012-census-population-survey-might-be-wrong (last visited May 29, 2014).

[14] Aram Hur and Christopher H. Achen (2013), "Coding Voter Turnout Responses in the Current Population Survey," *Public Opinion Quarterly* 77(4):985-993. Michael P. McDonald, "2012 Turnout: Race, Ethnicity, and the Youth Vote," The Huffington Post, May 8, 2013, available at http://www.huffingtonpost.com/michael-p-mcdonald/2012-turnout-race-ethnict_b_3240179.html (last visited May 29, 2014). Michael P. McDonald (2014), "What's Wrong with the CPS?," paper presented at the annual meeting of the Midwest Political Science Association, Chicago, IL, April 3-6.

[15] Robert A. Bernstein, Anita Chadha, and Robert Montjoy, (2003), "Cross-State Bias in Voting and Registration Overreporting in the Current Population Surveys," *State Politics & Policy Quarterly* 3(4):367-86.

[16] For example, see Paul R. Abramson and William Claggett (1991), "Racial Differences in Self-Reported and Validated Turnout in the 1988 Presidential Election," *Journal of Politics* 53(1):186-97. Stephen Ansolabehere and Eitan Hersh (2011), "Who *Really* Votes?," in *Facing the Challenge of Democracy*, ed. Paul M. Sniderman and Benjamin Highton, Princeton: NJ: Princeton University Press.

records the races of voters, I have shown that the CPS overestimated turnout in the 2012 election by only 0.8 percentage points for Anglos but 10.9 percentage points for blacks.[17]

24. These tendencies were exaggerated in 2012 due to the presence of Barack Obama's name on the ballot. Enthusiasm in the black community about Obama's candidacy would have heightened the over-reporting problem as a result of the social desirability of supporting his candidacy.[18] Research indicates that over-reporting increases when a black respondent is represented by a black office holder[19] or when a black candidate is running.[20]

25. In summary, the CPS data portray Latino turnout as substantially lower than Anglo turnout in the last five general elections. The CPS portray black turnout as lower in three of the elections and equal to or higher than Anglo turnout only in 2008 and 2012. Yet scholarly research shows that black turnout is generally overstated and would be even more so in 2008 and 2012. It is thus plausible that black and Latino turnout levels have never surpassed those of Anglos in contemporary Texas elections. Even if black turnout did manage to reach parity with Anglo turnout in two elections, it would be a fragile plateau susceptible to disruption by changes in election law.

**Senate Factor One**

26. Senate Factor One considers whether there is history in the jurisdiction of "official voting-related discrimination."

27. There is a long history of discrimination against black and Latino voters in Texas. As the Texas State Historical Association summarizes,

> Racial conflict is a basic feature of Texas history. From 1865 onward its primary political manifestation has been the struggle of African Americans to vote, have their ballots fairly counted, elect their preferred candidates, develop effective coalitions with other groups, and thereby achieve equality of opportunity in a white-dominated society that, from its beginning, relegated people of color to the state of an inferior caste.[21]

---

[17] Sur-rebuttal expert report of Barry C. Burden, May 2, 2014, *North Carolina State Conference of the NAACP v. McCrory*, No. 1:13-CV-658 (M.D.N.C.).

[18] Seth C. McKee, M.V. Hood III, and David Hill (2012), "Achieving Validation: Barack Obama and Black Turnout in 2008," *State Politics and Policy Quarterly* 12(1):3-22.

[19] McKee, Hood, and Hill (2012).

[20] Benjamin J. Deufel and Orit Kedar (2010), "Race and Turnout in U.S. Elections: Exposing Hidden Effects," *Public Opinion Quarterly* 74(2):286-318. McKee, Hood, and Hill (2012). Stephen Ansolabehere and Eitan Hersh (2013), "Gender, Race, Age, and Voting: A Research Note," *Politics and Governance* 1(2):132-7.

[21] Professor Chandler Davidson, "African Americans and Politics," *Handbook of Texas Online*, Texas State Historical Association, available at https://www.tshaonline.org/handbook/online/articles/wmafr (last visited June 24, 2014). This statement is based on an extensive bibliography of historical and academic books on race in Texas politics.

28. These discriminatory activities are undeniable. They include tactics such as voter intimidation, threats of violence, and even lynching. The conflict also played out in election laws. Rather than reiterate the lengthy history of vote discrimination in Texas, I briefly highlight some key legal examples to put recent developments in perspective.

29. For much of the state's history, Texas public officials and major party leaders were openly discriminatory toward black and Latino voters. For minority voters seeking relief in their efforts to be involved in electoral politics, federal legislation and federal courts were often the only recourse.

30. One tool used to exclude minority voters was the "white primary." Established by state law in 1923, it banned non-whites from voting in Democratic primary elections. Because Democrats were the dominant political party at the time, the party could essentially dictate who would win the general election via the primary. When the law was invalidated by the U.S. Supreme Court in *Nixon. v. Herndon* (1927), the state parties adopted rules to ban non-whites.[22] The party's rules were struck down in *Nixon v. Condon* (1932).[23] Not easily deterred, the Democratic state convention adopted a rule to keep non-whites from participating in primaries, a decision initially upheld by the Texas Attorney General and the courts.[24] The practice was eventually overturned by *Smith v. Allwright* (1944).[25] Party leaders turned to yet another alternative called the "Jaybird primary" in which a non-party association would initially screen candidates for nomination without allowing non-white voters to participate. This final gimmick was not eliminated until the case of *Terry v. Adams* (1953).[26] Thus ended a 30-year battle in which Texas officials invented a series of mechanisms for excluding minority voters, whose rights were repeatedly protected by federal courts.

31. The other tool used to disenfranchise minority voters in Texas was the poll tax. The tax was added to the Texas constitution in 1902. Under the poll tax, voters were required to pay a fee to register to vote and to present a poll tax receipt in order to cast a ballot, although even that system exempted elderly voters and permitted voters to complete an affidavit at the polling place establishing that they had paid the tax but misplaced the receipt.[27] That cost fell harder on blacks and Latinos, who had fewer financial resources than Anglos. In the midst of the civil rights era, the poll tax was nonetheless reaffirmed by Texas voters, who in a 1963 rejected a constitutional amendment to forbid it. Even after the passage of the VRA, the tax remained in place in state elections until adoption of the 24th Amendment to the U.S. Constitution and the decision in *Harper v. Virginia State*

---

[22] *Nixon v. Herndon*, 273 U.S. 536 (1927).
[23] *Nixon v. Condon*, 286 U.S. 73 (1932).
[24] *Grovey v. Townsend*, 295 U.S. 45 (1935).
[25] *Smith v. Allwright*, 321 U.S. 649 (1944).
[26] *Terry v. Adams*, 345 U.S. 461 (1953).  For a historical review of these cases, see Robert Brischetto, David R. Richards, Chandler Davidson, and Bernard Grofman (1994), "Texas," in *Quiet Revolution in the South: The Impact of the Voting Rights Act 1965-1990*, eds. Chandler Davidson and Bernard Grofman, Princeton, NJ: Princeton University Press.
[27] Donald S. Strong (1944), "The Poll Tax: The Case of Texas," *American Political Science Review* 38(4):693-709.

*Board of Elections* (1966).[28] Research shows that the lingering effects of the poll tax depressed non-white turnout until at least 1980.[29]

32. Even when the poll tax was finally eradicated, Texas lawmakers "promptly replaced the tax with an almost equally onerous annual voter registration system."[30] The system, which was eventually ended by *Beare v. Smith* (1971), required registration during a four-month window that ended almost eight months before the general election.[31] A system adopted by the state four years later would have required essentially every Texas resident to re-register, but it was halted under Section 5 of the Voting Rights Act.

33. Finally, federal courts have frequently intervened to correct discriminatory legislative redistricting efforts in Texas. As a review of voting rights litigation by Robert Brischetto and colleagues explains,

> The elimination of barriers to voting and registration in Texas did not often result in the election of minority candidates [because of] structural roadblocks, the most notable of which were multimember districts (including at-large elections), racial gerrymandering, and malapportionment.[32]

34. Following the 1970 reapportionment, the case of *White v. Regester* (1973) upheld a federal court decision finding intentional discrimination in redistricting through the use of multimember districts.[33] After the next round of redistricting, the Attorney General objected to the configurations of two congressional districts under Sections 5 of the VRA.[34] More recently, in *LULAC v. Perry* (2006) the Supreme Court rejected a congressional district for violating Section 2 of the VRA because the legislature had reduced the percentage of Latinos in the district once they were "becoming increasingly politically active and cohesive," which the Court found to "bear[] the mark of intentional discrimination."[35] Only two years ago, a three-judge federal court found in *Texas v. United States* (2012) that congressional and state legislative redistricting maps reflected intentional discrimination.[36]

35. Brief histories of the white primary, the poll tax, voter registration, and redistricting show the inventive ways in which Texas party and public officials have operated to deter

---

[28] *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966).

[29] John E. Filer, Lawrence W. Kenny, and Rebecca B. Morton (1991), "Voting Laws, Educational Policies, and Minority Turnout," *Journal of Law and Economics* 34(2):371-393.

[30] Brischetto et al. (1994), p. 240.

[31] *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971) (three-judge court), *aff'd*, *Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974) (per curiam).

[32] Brischetto et al. (1994), p. 244.

[33] *White v. Regester*, 412 U.S. 755 (1973).

[34] *Upham v. Seamon*, 456 U.S. 37 (1982).

[35] *LULAC v. Perry*, 548 U. S. 399 (2006).

[36] *Texas. v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013).

voting by blacks and Latinos. Policy makers in Texas engaged in repeated, purposefully discriminatory devices to deter minority participation and to dilute minority voting strength. Texas fought stubbornly to protect and sustain these practices, even in the face of federal legislation and judgments from federal courts.

**Senate Factor Two**

36. Senate Factor Two addresses whether voting is "racially polarized." Following the standard established by the U.S. Supreme Court in *Thornburg v. Gingles* (1986), racial polarization may be defined as a "consistent relationship between [the] race of the voter and the way in which the voter votes."[37]

37. Ethnic and racial polarization in voting patterns is an essential feature of elections in Texas. Exit polls provide insight into the substantial differences in voting preferences across racial and ethnic groups. Since 2002 exit polls have been conducted by the National Election Poll (NEP), a consortium of major television networks and the Associated Press.[38] The NEP combines surveys of voters as they leave polling places in combination with select pre-election surveys of early voters. The results are then weighted to match the actual election outcome. Despite their imperfections, exit polls are useful for academic researchers comparing demographic groups. Exit polls reduce problems associated with surveys that take place in the days following an election: misreporting of turnout by nonvoters, faulty memories by respondents, and social desirability effects that appear once it is known who won the election.[39]

38. Table 2 shows the breakdown of the votes cast for Republican candidates for President or Texas Governor by Anglos, Latinos, and blacks in recent Texas elections. The difference in partisan voting rates between Anglos and Latinos ranges from a low of 13 percentage points in the unusual 2006 election to 38 points in the 2008 election. The gap between Anglos and blacks is more severe, ranging from 28 percentage points in 2006 to a remarkable 71 points in 2008.

---

[37] *Thornburg v. Gingles,* 478 U.S. 30, 47 (1986).
[38] Before 2003 the organization was known as Voter News Services.
[39] See Samuel J. Best and Brian S. Krueger (2012), *Exit Polls: Surveying the American Electorate, 1972-2010,* Thousand Oaks, CA: CQ Press.

Table 2. Voting for the Republican Candidate in Texas (2004-2012)[40]

|  | 2004 | 2006 | 2008 | 2010 | 2012 |
|---|---|---|---|---|---|
| Anglo | 74% | 44% | 73% | 69% | 70% |
| Latino | 49% | 31% | 35% | 38% | 42% |
| Black | 17% | 16% | 2% | 11% | 9% |

39. These gaping racial and ethnic differences are much greater than among other sociodemographic groups. For example, in the 2008 election in Texas the gaps in voting preferences were only 21 percentage points between the young (18-29) and old (65 and over), seven points between men and women, 25 points between those in big cities and those in small towns, 36 points between low income (under $15,000) and high income ($200,000 or more), and 26 points between the least educated (less than high school) and most educated (postgraduate study).[41] The degree of racial and ethnic polarization in voting thus exceeds that of most other demographic group differences in Texas elections.

40. The exit polls conform with patterns found in other election data. A review of voting rights issues in Texas by Professors Charles Bullock and Keith Gaddie shows that voting preferences in congressional districts frequently differ between minority and Anglo voters by 30 to 50 percentage points.[42] In reviewing the analyses of several other experts in the case of *Perez v. Texas*, Professor John Alford, who was retained as an expert by the State of Texas, also shows that the voting preferences of Anglos and minorities in recent Texas general elections is often 30 to 70 percentage points.[43]

41. Because the voting patterns were apparent in 2004 and 2010, polarization is not simply an artifact of the 2008 and 2012 election in which one of the major party candidates was black. The degree of racial polarization also shows little sign of abating. The gaps between Anglos and minorities were of similar magnitude in 2012 as they were in 2004. Legislators would have been aware of the differing preferences of black and minority voters as they developed and enacted SB 14.

---

[40] Percentages reflect votes for the Republican presidential or gubernatorial candidate. The 2006 gubernatorial campaign featured two independent candidates who jointly received over 30% of the vote. Texas was not included in the NEP exit polls in 2012; data for that year are drawn from a pre-election survey of likely voters conducted by YouGov. See Table 1 of the YouGov October 31-November 3, 2012 survey of likely voters in Texas, available at http://cdn.yougov.com/cumulus_uploads/document/uj7wo27oq7/ ygTabs_november_likelyvoters_TX.pdf (last visited May 29, 2014). Computing statistical significance in exit polls is extremely difficult, but estimates from other experts indicate that all of the group differences in Table 2 are highly likely to be significant by conventional standards. See "What is the Sampling Error for Exit Polls" by Mark Blumenthal, available at http://www.mysterypollster.com/main/2004/12/what_is_the_sam.html (last visited June 23, 2014).

[41] These figures are drawn from NEP data reported by *The New York Times*, available at http://elections.nytimes.com/2008/results/states/exitpolls/texas.html (last visited May 29, 2014).

[42] See the chapter on Texas and especially Table 8.8 in Charles S. Bullock III and Ronald Keith Gaddie (2009), *The Triumph of Voting Rights in the South*, Norman, OK: University of Oklahoma Press.

[43] See Table 3 of the "Expert Report of John R. Alford, Ph.D.," entered for multiple cases led by *Perez v. State of Texas*, No. 5:11-ca-360 (W.D. Tex.).

**Senate Factor Five**

42. Senate Factor Five assesses the extent to which "minority group members bear effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process."

43. Blacks and Latinos suffer severe and enduring disparities in education, health, employment, income, and transportation in part due to state policies that have done little to remedy glaring inequalities. Stemming in large part from historic legacies of unequal treatment, segregation, and discrimination, Anglos, blacks, and Latinos experience markedly different outcomes in these areas. The state's history of racial discrimination and disparities bears directly on the impact that voting practices have on the ability of minority voters to participate in the political process and influence the outcomes of elections. I consider a few of the key disparities in education, income, and employment, and explain how they relate to the "calculus of voting."

44. Anglos and minorities in Texas display enduring gaps in educational attainment. Data from the U.S. Department of Education show that the high school completion rate among 25 year olds was 91.7% for Anglos, 85.4% for blacks, and 58.6% for Latinos.[44] The same data show that rates of bachelor's degree completion were 33.7% for Anglos, 19.2% for blacks, and 11.4% for Latinos.

45. Numerous studies have shown that educational attainment is usually the single best predictor of whether an individual votes.[45] This is largely because education lowers the "costs" of voting by providing a host of benefits. These include the skills to understand public affairs, direct information about the electoral process, access to social networks that facilitate political engagement, and a sense of confidence or efficacy that facilitates participation even when the rules are changed.[46]

46. There are glaring differences between Anglos and minorities in Texas when it comes to basic income and employment markers.[47] For example, Census Bureau data show that while only 12% of Anglos live below the poverty line, 29% of blacks and 33% of Latinos do.[48] Median household income in Texas is estimated at $63,393 for Anglos but only

---

[44] National Center for Education Statistics, Digest of Education Statistics, "Percent of Persons Age 25 and Over with High School Completion or Higher and a Bachelor's or Higher Degree, by Race/Ethnicity and State: 2008-2010," available at http://nces.ed.gov/programs/digest/d12/tables/dt12_015.asp (last visited June 3, 2014).

[45] Steven J. Rosenstone and John Mark Hansen (1993), *Mobilization, Participation and Democracy in America*, Macmillan. Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Harvard University Press. Rachel Milstein Sondheimer and Donald P. Green (2010), "Using Experiments to Estimate the Effects of Education on Voter Turnout," *American Journal of Political Science* 54(1):174-89.

[46] For example, see Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady (1995), *Voice and Equality: Civic Volunteerism in American Politics*, Cambridge, MA: Harvard University Press.

[47] These data are based on the Census Bureau's American Community Survey 5-year estimates for 2012.

[48] The Henry J. Kaiser Family Foundation, "Poverty Rate by Race/Ethnicity," available at http://kff.org/other/state-indicator/poverty-rate-by-raceethnicity/ (last visited June 3, 2014).

$37,906 for blacks and $38,848 for Latinos. The unemployment rate is 6.1% for Anglos, 12.8% for blacks, and 8.5% for Latinos. These are stark economic inequalities.

47. Income sharply influences voter participation. Individuals with lower household incomes are significantly less likely to vote, in part because it is more costly for them to make time to do so.[49] Education and income are predictive in large part because they lower the "costs" of voting when the voting habit is interrupted. In part because of other disadvantages they suffer, the unemployed find it much more difficult to overcome the costs of voting.[50]

48. Individuals with lower incomes are also less likely to own an automobile. Recent Census Bureau data show that the share of households lacking at least one vehicle for transportation is 3.9% for Anglos, 7.0% for Latinos, and 12.9% for blacks.[51] Other Census data show that, among workers at least 16 years of age, Anglos are 49% of the population in Texas, they constitute only 28% of those taking public transportation to work.[52] In contrast, Latinos comprise 34% of the population but 37% of public transportation users. Blacks are only 11% of the population but 27% of public transportation users. Because they are less likely to drive and own automobiles, minority populations in Texas would have less incentive to hold valid driver licenses. According to the analysis conducted by Professor Ansolabehere, the driver license is the form of SB 14 ID most commonly held by registered voters in Texas.

49. There are significant health disparities between Anglos and minorities in Texas. Based on survey data from the U.S. Centers for Disease Control, blacks and Latinos are much more likely to report being in only "fair" or "poor" health, to lack a personal doctor, to lack health insurance, to have not visited a doctor in the past year due to the cost.[53] Many of these disparities are approximately on the order of a ratio of two to one.

50. Scholarly research shows that health influences voter participation in part because it raises costs associated with voting. Research by Professors Lisa Schur, Douglas Kruse, and colleagues shows that having an illness or disability makes the typical person approximately 20 percentage points less likely to vote. Disability often isolates people from social networks that would otherwise draw them into politics, in addition to increasing the direct costs associated with the voting process.[54]

---

[49] See references in previous footnotes.

[50] Kay Lehman Schlozman and Sidney Verba (1979), *Injury to Insult: Unemployment, Class, and Political Response*, Cambridge, MA: Harvard University Press.

[51] 2010-2012 American Community Survey 3-year estimates.

[52] 2008-2012 American Community Survey 5-year estimates.

[53] See tables provided by The Henry J. Kaiser Family Foundation, "Texas: Minority Health," available at http://kff.org/state-category/minority-health/?state=TX (last visited June 3, 2014).

[54] Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner (2002), "Enabling Democracy: Disability and Voter Turnout," *Political Research Quarterly* 55(1):167-90. Lisa Schur, Douglas Kruse, and Peter Blanck (2013), *People with Disabilities: Sidelined or Mainstreamed?*, New York, NY: Cambridge University Press.

51. These glaring disparities in life outcomes have a direct bearing on the impact of state election laws on minority voting rates. Decades of political science research demonstrate that voter participation is significantly affected by the same demographic characteristics that so strongly separate Anglos from minorities in Texas. Stated in a different way, there is a strong overlap between the socioeconomic markers that separate Anglos from minorities in Texas and the markers that allow citizens to bear the costs of voting. As a result, despite the fact that the voter ID requirements imposed by SB 14 appear to be uniform, the law is in fact more burdensome for black and Latino residents because they interact with longstanding and significant disparities in areas such as education, employment, and health.

**Senate Factor Seven**

52. Senate Factor Seven evaluates "the extent to which members of the minority group have been elected to public office in the jurisdiction." Blacks and Latinos have long been underrepresented in public life in Texas. Progress has been slow in the wake of the tremendous discrimination that minorities experienced for decades in their effort to be represented in public office. While many of those overt barriers have fallen, minorities generally remain underrepresented.

53. According to 2013 data, blacks hold 11.1% of seats in the Texas state legislature.[55] Latinos hold 21.1% of seats in the state legislature. This figures fall below the groups' shares of the population. Census data from 2012 show that blacks are 13.3% and Latinos are 30.3% of the citizen population in Texas.[56] Even these achievements are recent and result largely from four decades of successful redistricting litigation and administrative enforcement under the Voting Rights Act.[57]

54. The disparities are more severe outside the state legislature. Expanding beyond the state legislature shows that minority groups remain underrepresented in public office. Taking a wide range of federal, state, and local offices into account, one analysis finds that in 2000 only 1.7% of Texas elected officials were black.[58] A similar analysis of Latinos in 2003 finds that they comprise approximately 7.1% of Texas elected officials.[59]

---

[55] The Texas state legislature has a total of 181 seats. The source for these data report only 180 filled seats in 2013, which might be due to a vacancy caused by the death of State Senator Mario Gallegos. "Race and Ethnicity in the Texas Legislature, 1937-2013," available at http://www.laits.utexas.edu/txp_media/html/leg/features/0304_02/race.html (last visited May 30, 2014).

[56] See Table 4b from the 2012 CPS voting and registration report, available at http://www.census.gov/hhes/www/socdemo/voting/publications/p20/2012/tables.html (last visited May 30, 2014).

[57] Brischetto et al. (1994), p. 240.

[58] "Number of Black Elected Officials in Texas, 1970-2000," available at http://www.laits.utexas.edu/txp_media/html/vce/features/0503_03/blacks.html (last visited May 30, 2014).

[59] "Number of Latino Elected Officials in Texas, 1974-2003," available at http://www.laits.utexas.edu/txp_media/html/vce/features/0503_04/latinos.html (last visited June 12, 2014). More recent data provided by the National Association of Latino Elected Officials suggests that the percentage has increased to about 9% in recent years: http://www.naleo.org/downloads/NALEO_Ed_Fund_TX_2011.pdf (last visited June 12, 2014).

55. This underrepresentation matters to minority voters. Political science research has identified underrepresentation as an important condition among the totality of circumstances under which voting laws operate. Such research often finds that minority representation in elective office reduces political alienation among minority constituents and increases minority turnout.[60]

**Second Unenumerated Senate Factor**

56. The second unenumerated factor identified in the Senate report is whether the policy is "tenuous." As the Senate report explains,

> If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact. But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process.[61]

57. A substantial discussion is necessary to address this factor. SB 14 is not justified by basic facts about the Texas electorate, is not well designed to improve Texas election processes, and is an abrupt change to voting practices in Texas. Following the calculus of voting theory, the law will impact Texas residents most who have a less-established voting habit and are disadvantaged by demographic characteristics that make it more difficult for them to bear the newly-imposed and unevenly-experienced costs of voting.

58. In addition, the law applies only to in-person voting, which is used more by minority voters. SB 14 does not apply at all to mail balloting,[62] which is used more often by Anglo voters. As such, the law counterintuitively imposes new burdens on voters in the domain where fraud is less likely and racial and ethnic disparities are greater.

---

[60] Lawrence Bobo and Franklin D. Gilliam, Jr. (1990), "Race, Sociopolitical Participation, and Black Empowerment," *American Political Science Review* 84(2):377-383. Claudine Gay (2001), "The Effect of Black Congressional Representation on Political Participation," *American Political Science Review* 95(3):589-602. Danny Hayes and Seth C. McKee (2012), "The Intersection of Redistricting, Race, and Participation," *American Journal of Political Science* 56(1):115-130. Adrian D. Pantoja and Gary M. Segura (2003), "Does Ethnicity Matter? Descriptive Representation in Legislatures and Political Alienation Among Latinos," *Social Science Quarterly* 84(2):441-460. Rene R. Rocha, Caroline J. Tolbert, Daniel C. Bowen, and Christopher J. Clark (2010), "Race and Turnout: Does Descriptive Representation in State Legislatures Increase Minority Voting?," *Political Research Quarterly* 63(4):890-907. Kenny J. Whitby (2007), "The Effect of Black Descriptive Representation on Black Electoral Turnout in the 2004 Elections," *Social Science Quarterly* 88(4):1010-1023.

[61] Footnote 177 of Senate Committee on the Judiciary, S. Rep. 417, 97th Cong., 2nd Sess. (1982).

[62] I use the terms "mail" and "absentee" interchangeably to indicate ballots that voters return by mail. The practice is also sometimes called "early voting by mail." In-person voters include those voting on election day and those voting at early voting locations.

*SB 14 Is a Sharp Break with Existing Practices*

59.  A brief history of recent voter ID requirements demonstrates how quickly and dramatically Texas has ratcheted up the demands on voters. SB 14 goes well beyond the minimum identification requirements in the federal Help America Vote Act of 2002 (HAVA) and lacks most of the ameliorative provisions available even in other states with strict voter ID laws.

60.  In 1997, Texas adopted HB 331. This law placed additional demands on voters to establish their identities. Under HB 331, in addition to executing and affidavit, a registered voter who lacked a registration certificate had to show an acceptable form of ID. The law allowed a wide range of documents to satisfy the ID requirement: Texas driver license, Texas personal ID card, a photo ID that "establishes the person's identity," a birth certificate, citizenship papers, U.S. passport, pre-printed checks, mail from a government entity, two other forms of personal identity, or any other ID permitted by the Texas Secretary of State.[63] Alternatively, a poll worker could vouch for the voter's identity.

61.  Before SB 331, a Texas voter whose name appeared on the registration list was required to present a voter registration certificate (a non-photo ID mailing from the county elections registrar) or to execute an affidavit stating that he or she does not have the certificate at the polling place when attempting to vote.

62.  In 2003, Texas further modified its ID requirements. HB 1549 made minor modifications to voter identification requirements, mainly to create a class of provisional ballots in compliance with HAVA. Section 303(b) of HAVA requires states to verify the identities of in-person voters who have registered by mail and either (1) have not previously voted in a federal election in the state of registration or (2) have not previously voted a federal election in the specific jurisdiction of registration if the state does not have a HAVA-compliant computerized voter registration list. For this limited set of voters, acceptable identification is defined as a current and valid photo identification (not necessarily a driver license or state ID), utility bill, bank statement, government check, paycheck, or other government document showing the voter's name and address. Repeat voters or those who registered in person are not required under HAVA to present identification to vote.

63.  As of May 2014, 19 states and the District of Columbia still operate with the minimum HAVA requirements and thus do not require most voters to produce ID to vote.[64] States that do not require ID cover a wide range of regions and demographics, including states such as New Mexico, Minnesota, Nebraska, and West Virginia. There is no evidence that vote fraud or even public belief in vote fraud is more common in these states. I return to this point later in the report.

---

[63] Texas Election Code § 63.0101.
[64] National Conference of State Legislatures, "Voter Identification Requirements," available at http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx  (last visited May 27, 2014).

64. In contrast, SB 14 represents a sharp escalation to voter ID requirements in Texas and replaces existing laws, even though they were not shown to be inadequate. SB 14 imposed substantially stricter requirements than the only two strict photo voter ID laws in place at the time that Texas enacted it: Indiana and Georgia. Even among the small set of states with strict voter ID laws now in place, Texas stands out as especially stringent.

65. The National Conference of State Legislatures (NCSL) lists seven other states as having "strict photo ID" laws and three other states as having "strict non-photo ID laws."[65] The NCSL listing also suggests that Alabama could be labeled as a "strict photo ID" state. To this list I add South Carolina because it enumerates a limited set of acceptable photo IDs for voting. This results in a set of 12 state voter ID laws that might be seen to as appropriate comparators to SB 14.

66. Reviewing the details of the laws in these 12 states reveals that a number of them have adopted a variety of provisions to mitigate the harsh impact that a strict ID law might otherwise have on voters. These states demonstrate that it is possible to have a strict voter ID regime that is much more accommodating of the costs of voting. Texas legislators were well aware of these ameliorative options and chose to exclude nearly all of them.

67. SB 14 enumerates seven specific forms of ID that may be used for voting. Some states with strict photo voter ID laws and strict non-photo ID laws instead prescribe requirements for acceptable IDs, rather than limiting voter to a small enumerated set. For example, Arizona, Indiana, Mississippi, Ohio, and Virginia require only that the photo ID be issued by the federal government or the state government. Georgia allows any photo ID card issued by the state or the federal government or an employee ID with a photograph issued by the federal government, the State, or any county, municipality, board, authority or other entity of the state. Alabama, Kansas, and Tennessee go further and allow voters to present IDs issued by other states. Arizona allows for use of two non-photo IDs with the name and address of the voter instead of a photo ID. SB 14 allows none of these options.

68. SB 14 does not permit student IDs for purposes of voting, even those issued by public colleges and universities in the state. This prohibits use of IDs certain to be held a large group of residents enrolled in postsecondary institutions. In contrast, several other strict ID states allow student IDs. Strict ID states such as Georgia, Indiana, and Mississippi allow ID from state colleges and universities. Alabama, Arkansas, Kansas, and Virginia allow student IDs from both public and private universities. SB 14 omits all of these forms of ID.

69. SB 14 requires that IDs have not expired more than 60 days before the election (allowing only the narrow exceptions described above). Other strict ID states tend to be more

---

[65] National Conference of State Legislatures, "Voter Identification Requirements," available at http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx  (last visited May 27, 2014). Virginia is included because its voter ID law is effective on July 1, 2014. New Hampshire and North Carolina are not included because their voter ID laws do not go into effect until 2015 and 2016, respectively.

forgiving. Alabama only requires that IDs have not expired more than four years before the election. Mississippi allows IDs to be expired up to 10 years. Georgia and Tennessee allow IDs to be indefinitely expired. Kansas does not require that IDs include expiration dates at all. SB 14 does not allow for any of these alternatives.

70. It is notable that SB 14 permits use of a citizenship certificate, which lacks an expiration date. Other strict voter ID states allow for IDs that are either expired or lack expiration dates. For purposes of establishing a voter's identity, there is not a consistent rationale for requiring that the ID not be expired.

71. SB 14 does not permit use of tribal IDs. This is despite the fact that there are three federally recognized tribes in Texas, as well as one tribe recognized only by the State.[66] Tribal IDs may be used for voting in strict ID states including Alabama, Arizona, Georgia, Mississippi, and North Dakota. SB 14 excludes this option.

72. Several strict ID states permit an even wider range of IDs for voting. Virginia allows use of employee ID cards from private employers. In Kansas, a voter may present a public school district employee ID, public high school student ID, city library card, emergency management card, or municipal pool pass.[67] Missouri and Ohio permit a voter to show a utility bill, bank statement, or government paycheck. SB 14 prohibits all of these alternative means to establish identity.

73. South Carolina allows a voter who faced a "reasonable impediment" to obtaining an acceptable photo ID to vote after signing an affidavit.[68] Indiana and Tennessee also have exemptions for voters who cannot obtain ID because they are indigent.[69] SB 14 does not allow for these options.

74. Alabama permits a voter to cast a regular ballot if two election officials can sign sworn statements saying that they know the voter. SB 14 does not permit poll workers to vouch for a voter who lacks ID, even if the poll workers can establish a voter's identity through personal knowledge.

75. Strict voter ID states generally have a location to obtain a free state ID for the purposes of voting in every county. For example, in Alabama, residents may generally register to vote, apply for free voter IDs, and cast early ballots at a county clerk's office. Every county in Arkansas has a county clerk. In Georgia, free voter ID cards are issued by both the Department of Driver Services and county registrars. Every county has a registrar.

---

[66] The Alabama-Coushatta, Kickapoo Traditional, and Yseta Del Sur Pueblo are recognized by the United States. The Lipan Apache tribe is recognized only by Texas. See http://www.ncsl.org/research/state-tribal-institute/list-of-federal-and-state-recognized-tribes.aspx (last visited June 19, 2014).
[67] "Photographic Identification Frequently Asked Questions," available at http://www.gotvoterid.com/pdf/FAQs_for_PhotoID.pdf (last visited June 10, 2014).
[68] The voter technically casts a provisional ballot, but the ballot will be counted with regular ballots as long as the voter presents a registration card and the county election commission does not deem the affidavit as false.
[69] In both states, the voter casts a provisional ballot, but the ballot will be counted if the voter returns to the election board and executes an affidavit to this effect.

Moreover, early voting generally takes place at the registrar's office. In Indiana, free state ID cards are distributed by the Indiana Bureau of Motor Vehicles, which has an office in every county. In Mississippi, voter ID cards are available for free at the offices of circuit clerks, where they can also verify birth certificate information from multiple states free of charge, and where absentee voters may also cast their ballots. Every county has at least one circuit clerk. SB 14 does not guarantee that each county provides access to free state IDs.

76. At present, only 189 out of 254 Texas counties have TxDPS locations. That is, more than 25% of counties lack the office that distributes state IDs for purposes of voting.[70] Sixty-one counties have voluntarily agreed to process EIC applications through other offices such as the county clerk, sheriff, or judge.[71] Affidavits from representatives in 44 of these counties indicates that they have delivered few EICs and their future participation remains voluntary.[72]

77. A somewhat unique feature of SB 14 compared to other strict voter ID laws is that it allows a voter to use citizenship papers as ID to vote. However, this accommodation is of limited value because few residents are likely to carry citizenship documentation with them in the way that other IDs are routinely carried. The U.S. Certificate of Naturalization (Form N-550) and Certificate of Citizenship (Form N-560) are printed on 8.5 by 11 inch paper, making them much larger than other IDs. This makes the forms inconvenient to carry in a pocket, wallet, or purse. In addition, the certificate is valuable and a replacement is difficult to obtain. The replacement fee is $345, and obtaining a replacement may require an interview with the Department of Homeland Security.[73] As a result, holders of these documents have an incentive to keep them secure but not necessarily easily accessible locations.

78. When SB 14 was being crafted, the legislature had the opportunity to incorporate ameliorative provisions available in other strict voter ID states. Figure 1 lists ameliorative provisions that were either omitted from SB 14 or rejected from inclusion in SB 14. Legislators tabled or rejected a series of amendments to include many of these provisions. These amendments would have waived fees for people unable to afford documents needed to acquire an EIC, funded the expenses of Texans who must travel to obtain an EIC, included student IDs and Medicare IDs as acceptable forms of ID, required TxDPS locations to be open in the evenings and on weekends, and allowed poor voters to cast provisional ballots without ID.[74] These ameliorative provisions would have been

---

[70] Texas Department of Public Safety, Search for Driver License Offices, available at http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp (last visited June 10, 2014).
[71] TxDPS, "County Locations Issuing Election Identification Certificates," available at http://www.txdps.state.tx.us/DriverLicense/documents/EICCountyrun.pdf (last visited June 19, 2014).
[72] These declarations have been included in an appendix to the report of Professor Gerald Webster in this case.
[73] Form N-565 Instructions, available at http://www.uscis.gov/sites/default/files/files/form/n-565instr.pdf (last visited June 24, 2014).
[74] See page 144 of *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) (three-judge court), *vacated and remanded*, 133 S. Ct. 2886 (2013).

especially helpful for black and Latino voters because they are disproportionately burdened by SB 14.

Figure 1:  Rejected or Omitted Ameliorative Provisions

| | |
|---|---|
| • Any Federal ID | • Employee ID |
| • Any State ID | • Tribal ID |
| • Municipal ID | • Indigence Exemption |
| • ID from Other States | • Vouching |
| • Student ID | • Reasonable Impediment Exemption |
| • Lengthier Grace Period for Expired ID | • Availability of No-Fee ID in Every County |

79. Texas legislators were aware of the many ameliorative provisions in other strict voter ID states. This was demonstrated by legislative proponents of SB 14 who stated on multiple occasions that the law was modeled after those in Indiana and Georgia.[75] Yet the law does not include the accommodations available in those two states. This further suggests that SB 14 is not well grounded. The lack of factual support for the law is addressed more extensively below.

*SB 14 in Unjustified in Creating Two Classes of Voters*

80. SB 14 only requires photo ID of in-person voters. Absentee voters face no new ID requirements under the law. This creates an inequality in how absentee voters and in-person voters are treated. Because the use of mail ballots is greater among Anglos, the seemingly race-neutral imposition of ID requirements for in-person voters falls more heavily on blacks and Latinos.

81. As Table 3 shows, Anglos have comprised a larger share of mail voters in recent general elections. As a result, a larger share of black and Latino voters are burdened by the ID requirements in SB 14. In fact, the differences between Anglo and Latino mail voting rates were not statistically significant until 2008. SB 14 was enacted just three years later.

---

[75] For example, see statements about student IDs in legislative transcripts featuring Senator Troy Fraser, Texas State Senate, Committee of the Whole Senate (January 25, 2011, p. 205) and Senator Rodney Ellis, Texas State Senate, Senate Floor Debate (January 26, 2011, p. 11).

Table 3. Voters Voting by Mail in Texas (2004-2012)[76]

|        | 2004 | 2006 | 2008 | 2010 | 2012 |
|--------|------|------|------|------|------|
| Anglo  | 5.2% | 3.9% | 6.3% | 6.1% | 6.2% |
| Black  | 4.7% | 5.5% | 2.9%[**] | 4.7% | 5.2% |
| Latino | 3.7% | 5.9% | 2.0%[**] | 3.9%[*] | 3.5%[**] |

82. The unequal treatment of in-person and mail voters under SB 14 thus compounds differences in the degree to which minority voters hold the IDs needed to vote in person. A larger share of black and Latino voters will need to secure ID under SB 14, despite the fact that they have fewer of the resources needed to do so.

83. Professor Stephen Ansolabehere's expert report shows that blacks and Latinos are less likely to possess acceptable ID under SB 14. Applying ecological regression to data from the Texas Election Administration Management (TEAM) database maintained by the State of Texas, he found that the share lacking ID was 5.1% for Anglos, 10.0% for Latinos, and 14.7% for Blacks. Applying the racial categorization algorithm used by Catalist to the TEAM database yielded similar rates of 7.3% for Anglos, 11.1% for Latinos, and 15.0% for blacks. Creating two classes of voters thus places a greater burden on minority voters because they are more likely to lack ID to vote under SB 14 and are more likely to vote in person rather than by mail.

84. Black and Latino voters are less likely than Anglo voters to possess the identification necessary to cast a regular in-person ballot. As a result, they will be more likely than Anglos to be required to apply for Election Identification Certificates (EICs). As with driver licenses and personal ID cards, EICs are distributed through the Department of Public Safety (TxDPS). To be eligible for an EIC, a person must be eligible to vote, a U.S. citizen, at least 17 years and 10 months old, and a resident of Texas. To demonstrate citizenship a person must provide a U.S. passport, birth certificate, or certification of citizenship (although possession of a valid passport or a citizenship certificate with a photograph would eliminate the need for an EIC). To demonstrate identity, a person must present (1) an expired Texas driver license or ID card, (2) two of the following: birth certificate or citizenship papers, or (3) a birth certificate or citizenship papers without a photograph along with one of 28 other supporting documents.[77]

85. These transactions must be conducted in person at a TxDPS office. The availability of these offices and the cost of documents are crucial in determining how much SB 14

---

[76] Data are drawn from the Current Population Survey (CPS) November voting and registration supplements. Percentages are weighted by the variable PWSSWGT. This "basic CPS weight" adjusts for respondent selection probabilities affected by nonresponse and demographic factors including age, race, sex, and state of residence. See "Current Population Survey, November 2012 Voting and Registration Supplement File, Technical Documentation, CPS—12." Asterisks indicate differences between the mail voting rate for blacks or Latinos and the rate for Anglos in the same election are statistically significant at either the 90% ([*]) or 95% ([**]) confidence level using a one-tailed *t*-test.
[77] A detailed list is available at http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm (last visited May 30, 2014).

deters minority voter participation. As noted above, roughly one in four counties lacks a TxDPS office. Those that do have offices may have limited availability. For example, Culberson County, which is more than 75% Latino, has one DPS location, which is only open on Wednesdays 9:00 a.m. to 1:00 p.m. and 2:00 p.m. to 5:00 p.m., or seven hours per week. The Secretary of State and TxDPS have offered mobile stations in a number of counties to provide greater access to EICs. However, many of the stations are present in a county only for one day, which appears insufficient for servicing a county population that lacks ready access to a TxDPS office.

86. A common form of documentation needed to obtain ID for voting under SB 14 is the birth certificate. The State of Texas generally charges $22.00 for a birth certificate. Texas Administrative Code, Title 25, § 181.22(t) states that non-statutory birth certificate fees shall be waived for the purpose of obtaining an EIC, although a surcharge of $2.00 may still be imposed. It thus appears that birth certificate might be available at below the $22.00 standard, but neither the state nor local officials have adopted specific provisions to publicize this option.[78] For example, the state's web sites describing how to obtain birth certificates[79] and EICs[80] fail to provide information about the partial fee waiver.

87. The applicant for a Texas birth certificate must also provide ID. Acceptable identification includes a "primary" source such as an unexpired driver license, government ID card, or military ID or two "secondary" sources such as student ID, a primary source that is expired, a signed Social Security card, passport, Medicare or Medicaid card, or employee ID card.[81] This circular set of rules will create a "Catch-22" for many people. If a voter is applying for an EIC because he or she lacks the other forms of ID needed to vote under SB 14, then the voter will also lack many of the forms of ID need to obtain the EIC. For example, one form of acceptable secondary ID is a Social Security card. To obtain a replacement Social Security card, a person must present a form of identification that includes a name, birthdate or age, and preferably a recent photograph. Examples include a driver license, passport, medical card, medical record, employee ID, student ID, and life insurance policy.[82] It would not be easy for many of the voters who lack the documentation needed to obtain a birth certificate to muster the documentation needed to obtain an EIC and vice versa.

88. Even if Texas distributed birth certificates for free, a large share of the state's population would not benefit because they were born elsewhere. Approximately 40% of Texas residents were born out of state.[83] In addition, more than 1.3 million Texans are both U.S.

---

[78] Deposition of Victor Farinelli, Electronic Registration Manager, Texas Department of State Health Services Vital Statistics Unit, May 9, 2014, p. 116.
[79] See http://www.dshs.state.tx.us/vs/reqproc/certified_copy.shtm (last visited June 13, 2014).
[80] See http://www.dps.texas.gov/DriverLicense/electionID.htm (last visited June 13, 2014).
[81] Texas Administrative Code, Title 25, § 181.1.
[82] Social Security Administration, available at https://faq.ssa.gov/ics/support/kbanswer.asp?deptID=34019&task=knowledge&questionID=3609 (last visited June 5, 2014).
[83] U.S. Census Bureau, "Lifetime Mobility in the United States: 2010."

citizens and were born in another country.[84] Acquiring a birth certificate from another state or country—if the certificate even exists—could well be more difficult and expensive than buying one from the State of Texas. Because of their greater mobility, lower rates of ID holding, and few resources, it is likely that blacks and Latinos in particular will find themselves in a sort of "revolving door" in which they lack the documentation and resources needed to procure one of the limited forms of ID to vote under SB 14.

89. Professor Ansolabehere's expert report calculates that 1.1 million registered voters in Texas lack accepted ID to vote under SB 14. That figure is even larger if one includes the additional 2.5 million people estimated to be eligible but not yet registered to vote.[85] These people not only must devote time and effort to become informed about the process. They must also pay literal financial costs to obtain necessary documentation required by SB 14.

*SB 14 is Not Well Reasoned and Will Have Little Effect on Voter Fraud*

90. SB 14 is not well-designed if its aim is to address the state's purported interest in reducing voter fraud or to boost public confidence in elections. By limiting the law's application to in-person votes, it counter-intuitively imposes new burdens on the form of voting that is least susceptible to fraud.

91. In-person voter fraud is extremely rare in Texas elections. A thorough analysis of voter fraud allegations by News21, an investigative reporting project based at Arizona State University, shows little evidence of in person voter impersonation. For the period from 2000 to 2012, the database lists only one conviction of a voter and two other pending cases.[86] Similarly, a report by Texas Attorney General Gregory Abbott listed 66 cases of "voting irregularities" investigated by his office between 2004 and 2012, but at most only six cases involved charges of in-person voter impersonation or related crimes.[87] Based on the testimony of Major Forest Mitchell from the Special Investigations Office of the Texas Attorney General's office, it is not apparent that any of those would have been prevented by SB 14.[88]

---

[84] Data are from the American Community Survey 2012. The 1-year, 3-year, and 5-year estimates range between 1.34 and 1.44 million people. Many such individuals will possess a citizenship certificate, but some may have lost the certificate and lack the resources to obtain a duplicate.

[85] Professor Michael McDonald estimates the 2012 voting eligible population to be 16,100,196 (see http://elections.gmu.edu/Turnout_2012G.html, last visited June 25, 2014). Professor Ansolabehere's expert report in this case estimates there are 13,515,671 registered voters in Texas. This leaves approximately 2.5 million people who are eligible to vote but not registered.

[86] This is based on the Texas cases listed in the "Election Fraud in America" database, available http://votingrights.news21.com/interactive/election-fraud-database/ (last visited May 29, 2014).

[87] Wayne Slater, "Few Texas Voter-Fraud Cases Would Have Been Prevented by Photo ID Law, Review Shows," *The Dallas Morning News*, September 8, 2013, available at http://www.dallasnews.com/news/politics/headlines/20130908-few-texas-voter-fraud-cases-would-have-been-prevented-by-photo-id-law-review-shows.ece (last visited May 28, 2014).

[88] Trial Testimony of Forest Mitchell, Special Investigations Office, Office of the Texas Attorney General, July 9, 2012, pp. 49-69.

92. To put these numbers in perspective, in the seven general elections in Texas between 2000 and 2012 there were over 43,000,000 ballots cast.[89] Even setting aside the millions of ballots cast in primary, municipal, and special elections, the frequency of crimes that SB 14 would address is miniscule.

93. Several elected officials who played central roles in the passage and implementation of SB 14 appear either to be misinformed about the nature of the law or to be purposely spreading false information. Misportrayals of the law by its advocates provide further evidence that its purported justifications are "tenuous" within the meaning of the Senate Factor.

94. Attorney General Gregory Abbott has misstated the effects of the law. To defend SB 14, he highlighted that federal officials "arrested a Texas woman for illegally voting five times in a state election."[90] But SB 14 would have done nothing to prevent that behavior: the person was accused of mailing multiple *absentee* ballots and nothing in SB 14 would prevent her from doing so again because SB 14 does not require ID to cast an absentee ballot.

95. SB 14 focuses on a rare form of election crime while ignoring where vote fraud more frequently occurs: through absentee ballots. Political scientist John Fortier, now at the Bipartisan Policy Center, summarizes the prevailing view among political scientists and policy analysts. His treatment of this issue is worth quoting at length:

> While there will always be disagreement over the seriousness of election fraud in general, both sides to this argument agree on one important matter: The most likely avenue for voter fraud is absentee balloting, which offers more opportunities for it than the traditional polling place. . . . At a polling place today, the ballot is secure. Voters must present themselves and at least declare who they are in person. In many states, they may have to show a form of identification. The ballot is not to be handled by poll workers, other voters, party officials, spouses, relatives, or companions of the voter. The voter casts or deposits the ballot without assistance, in a privacy booth or curtained stall that allows him or her to do so in complete secrecy. No one can influence the voter while voting, not see the completed ballot. . . . Absentee ballots have none of these protections.[91]

---

[89] See data provided by Professor Michael McDonald's United States Elections Project, available at http://elections.gmu.edu/voter_turnout.htm (last visited May 28, 2014).

[90] "Attorney General Abbott Statement on DOJ Lawsuits Challenging Texas Voter ID and Redistricting Laws," available at https://www.texasattorneygeneral.gov/oagNews/release.php?id=4507 (last visited June 9, 2014).

[91] John C. Fortier (2006), *Absentee and Early Voting: Trends, Promises, and Perils*, Washington, DC: The AEI Press.

96. Senator Troy Fraser, the chief sponsor of SB 14, appeared unaware of the effect of existing provisions in Texas law for addressing voter fraud. During the Senate debate, Fraser was asked several questions by Senator Juan Hinojosa.

| | |
|---|---|
| Sen. Hinojosa: | Do you know how many people are registered to vote here in the State of Texas? |
| Sen. Fraser: | Oh, I do—I'm sorry. I do not know. |
| Sen. Hinojosa: | Approximately, 13 million. . . . And do you know how many voted in the last election? |
| Sen. Fraser: | No. I'm not advised on that either. I'm sorry. |
| Sen. Hinojosa: | Close to 5 million voters voted this last election. And do you know how many people were arrested or prosecuted or indicted for trying to use somebody else's voter registration card? |
| Sen. Fraser: | I'm sorry, not—no. I do not have that number. |
| Sen. Hinojosa: | None? |
| Sen. Fraser: | I don't—I don't have the number, I'm sorry. I'm not advised. |

(p. 240).[92] It is probable that more knowledge about the efficacy of existing election law would have steered the legislature toward a rather different law than is represented in SB 14.

97. The stated purposes of SB 14 are unsupported by evidence. State Representative Patricia Harless, the lead House sponsor of SB 14, asserted in her opening statement in favor of the bill that "this is about restoring confidence in election process" (p. 911). She further explained that "This [bill] will increase turnout of all voters because of the restored confidence that their vote counts" (p. 919).[93] These statements are contrary to scholarly research on the relationship between strict voter ID laws and public confidence.

98. Even if public confidence in Texas elections needed to be "restored," political science research shows that there is no relationship between the strictness of state voter ID laws and voter confidence. Based on analysis of national surveys conducted in 2006, 2007, and 2008, Professor Stephen Ansolabehere concludes that:

> ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs, wherever they come from, are no different when a stricter ID law in in place and enforced than when less invasive voter-authentication methods are used.

---

[92] Senate Committee of the Whole Transcript, January 25, 2011.
[93] Texas House of Representatives Journal, 82nd Legislature.

(p. 130).[94] He summarizes that an individual's "Belief in the frequency of election fraud is uncorrelated with the propensity to vote" (p. 129). Related research Ansolabehere conducted with law Professor Nathaniel Persily similarly finds that:

> [T]here is little or no relationship between beliefs about the frequency of fraud and electoral participation. . . . Nor does it appear to be the case that universal voter identification requirements will raise levels of trust in the electoral process.

(p. 1759).[95]

99. Voter confidence is affected by factors other than ID laws. The most relevant of these is whether a person voters by mail or in person. Research by Professor Paul Gronke shows that rather than being influenced by voter ID laws, voter confidence is improved when a voter's preferred candidate won the election, when polling places appear to be well-run, and—importantly for SB 14—when a voter votes in person rather than by mail.[96] Research by Professors Michael Alvarez, Thad Hall, and Morgan Llewellyn also finds that mail voters are less confident than polling place voters that their ballots are counted properly.[97]

100. Counter-intuitively, SB 14 creates two classes of voters by imposing ID requirements on in-person voters but not on those who vote by mail, even though mail voters report less confidence in the election system. This inequality runs counter to professional understandings of where vote fraud is mostly likely to occur and imposes heavier burdens on black and Latinos voters.

101. SB 14 is lacking in a factual basis because it imposes new burdens on in-person voters but not those who vote by mail. This is despite the clear evidence that mail ballots are less secure and that mail ballot voters are less confident about the election system. This detachment from the facts about vote fraud imposes greater burdens on in-person voters who are disproportionately black and Latino.

[94] Stephen Ansolabehere (2009), "Effects of Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day," *PS: Political Science & Politics* 42(1):127-130.
[95] Stephen Ansolabehere and Nathaniel Persily (2008), "Vote Fraud in the Eye of the Beholder: The Role of Public Opinion in the Challenge to Voter Identification Requirements," *Harvard Law Review* 121(7):1737-1774.
[96] Paul Gronke (forthcoming August 2014), "Voter Confidence as a Metric of Election Performance," in Barry C. Burden and Charles Stewart III, eds., *The Measure of American Elections,* New York, NY: Cambridge University Press.
[97] R. Michael Alvarez, Thad E. Hall, and Morgan H. Llewellyn (2008), "Are Americans Confident Their Ballots Are Counted?," *Journal of Politics* 70(3):754-766.

**Conclusion**

102. I conclude that the implementation of SB 14 will likely have a differential impact on voting participation by blacks and Latinos in Texas. The law disproportionately increases the costs of voting on minority voters for whom voting is already significantly more costly. The law is not well reasoned and lacks a basis in fact. SB 14 does not include the ameliorative provisions that exist in strict voter ID laws in other states after which the law is presumably modeled. SB 14 is not designed to confront the most common forms of voter fraud and will not raise public confidence in the system. It creates two classes of voters, requiring more of in-person voters who are disproportionately black and Latino. The law thus is not realistically linked to a valid state interest and imposes unequal burdens on minorities to comply. This is precisely the kind of action that Section 2 of the Voting Rights Act was designed to prevent. For all of the reasons outlined above, it is my opinion that the law will result in minority voters being denied an equal opportunity to participate in, and influence the outcome of, elections in Texas.

I declare under penalty of perjury the foregoing is true and correct.  Executed this __27th__ day of June, 2014.

_____

Barry C. Burden

**APPENDIX A**
**Curriculum Vitae**

**Barry C. Burden**

## Contact

University of Wisconsin-Madison
Department of Political Science
1050 Bascom Mall
301 North Hall
Madison, WI 53706-1316

bcburden@wisc.edu
http://faculty.polisci.wisc.edu/bburden
phone: 608-263-6351
fax: 608-265-2663

## Academic Positions

Professor of Political Science, University of Wisconsin-Madison (2006-present)

      Associate Chair/Director of Graduate Studies (2007-2012)

Associate Professor of Government, Harvard University (2003-2006)

Assistant Professor of Government, Harvard University (1999-2003)

Assistant Professor of Political Science, Louisiana State University (1998-1999)

## Education

Ph.D.   The Ohio State University (1998)

B.A.   Wittenberg University (1993)

## Authored or Co-Authored Books

Burden, Barry C. 2007. *Personal Roots of Representation*. Princeton, NJ: Princeton University Press. [Reviewed in *Choice*, *Democratization*, *Journal of Politics*, *Legislative Studies Section Newsletter*, *Political Studies Review*, & *Polity*]

Burden, Barry C., and David C. Kimball. 2002. *Why Americans Split Their Tickets: Campaigns, Competition, and Divided Government*. Ann Arbor, MI: The University of Michigan Press. [Reviewed in *Campaigns & Elections Magazine*, *Choice*, *Journal of Politics*, *Legislative Studies Section Newsletter*, *National Journal*, *Party Politics*, *Perspectives on Politics*, *Political Science Quarterly*, *Public Choice*, & *VOX POP*.]

## Edited Books

Burden, Barry C., and Stewart, Charles III, eds. Forthcoming. *The Measure of American Elections*. New York, NY: Cambridge University Press.

Hershey, Marjorie Randon (editor), Barry C. Burden (associate editor), and Christina Wolbrecht (associate editor). Forthcoming. *CQ Guide to Political Parties*. Thousand Oaks, CA: Sage Publications.

Burden, Barry C., editor. 2003. *Uncertainty in American Politics*. New York, NY: Cambridge University Press. [Reviewed in *Choice*, *Perspectives on Political Science*, *Political Studies Review*, & *Public Choice*.]


## Refereed Journal Articles

Burden, Barry C., and Amber Wichowsky. Forthcoming. "Economic Discontent as a Mobilizer: Unemployment and Voter Turnout." *Journal of Politics*.

Burden, Barry C., Bradley Jones, and Michael S. Kang. Forthcoming. "Nominations and the Supply of Candidates: The Connection between Sore Loser Laws and Congressional Polarization." *Legislative Studies Quarterly*.

Burden, Barry C. David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58:95-109. [Featured in a variety of outlets including The Atlantic Wire, *The New York Times*. Pew Research Center FactTank, The Huffington Post, *The Deseret News*, National Review Online, *The Baltimore Sun*, *Orlando Sentinel*, and elsewhere]

Burden, Barry C. Forthcoming. "Economic Accountability and Strategic Calibration in Japan's Liberal Democratic Party." *Party Politics*.

Burden, Barry C. David T. Canon, Stéphane Lavertu, Kenneth R. Mayer, and Donald P. Moynihan. 2013. "Selection Methods, Partisanship, and the Administration of Elections." *American Politics Research* 41:903-36.

Burden, Barry C., and Jacob R. Neiheisel. 2013. "Election Administration and the Pure Effect of Voter Registration on Turnout." *Political Research Quarterly* 66:77-90.

Burden, Barry C. David T. Canon, Kenneth R. Mayer, Donald P. Moynihan. 2012. "The Effect of Administrative Burden on Bureaucratic Perception of Politics: Evidence from Election Administration." *Public Administration Review* 72:741-51.

Neiheisel, Jacob R., and Barry C. Burden. 2012. "The Effect of Election Day Registration on Voter Turnout and Election Outcomes." *American Politics Research* 40:636-64. [Featured on the *Wall Street Journal's* Ideas Market blog]

Burden, Barry C. David T. Canon, Kenneth R. Mayer, Donald P. Moynihan. 2011. "Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10:89-102.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2010. "The President and the Distribution of Federal Spending." *American Political Science Review* 104:783-99.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2010. "After Enactment: The Lives and Deaths of Discretionary Programs." *American Journal of Political Science* 54:1-14.

Burden, Barry C. 2009. "The Dynamic Effects of Education on Voter Turnout." *Electoral Studies* 28:540-9.

Burden, Barry C., and D. Sunshine Hillygus. 2009. "Opinion Formation, Polarization, and Presidential Reelection." *Presidential Studies Quarterly* 39:619-35.

Burden, Barry C. 2009. "Candidate-Driven Ticket Splitting in the 2000 Japanese Elections." *Electoral Studies* 28:33-40.

Burden, Barry C., and Gretchen Helmke. 2009. "The Comparative Study of Split-Ticket Voting." *Electoral Studies* 28:1-7. [Introduction to a Special Issue co-edited with Gretchen Helmke.]

Burden, Barry C. 2008. "The Social Roots of the Partisan Gender Gap." *Public Opinion Quarterly* 72:55-75.

Burden, Barry C. 2007. "Ballot Regulations and Multiparty Politics in the States." *PS: Political Science & Politics* 40:669-73.

Burden, Barry C. 2006. "A Tale of Two Campaigns: Ralph Nader's Strategy in the 2004 Presidential Election." *PS: Political Science and Politics* 39:871-4.

Burden, Barry C., and Casey A. Klofstad. 2005. "Affect and Cognition in Party Identification." *Political Psychology* 26:869-86.

Burden, Barry C. 2005. "Institutions and Policy Representation in the States." *State Politics and Policy Quarterly* 5:373-93.

Burden, Barry C. 2005. "Minor Parties and Strategic Voting in Recent U.S. Presidential Elections." *Electoral Studies* 24:603-18.

Burden, Barry C. 2005. "Ralph Nader's Campaign Strategy in the 2000 U.S. Presidential Election." *American Politics Research* 33:672-99.

Burden, Barry C., and Tammy M. Frisby. 2004. "Preferences, Partisanship, and Whip Activity in the House of Representatives." *Legislative Studies Quarterly* 29:569-90.

Burden, Barry C. 2004. "A Technique for Estimating Candidate and Voter Positions." *Electoral Studies* 23:623-39.

Burden, Barry C. 2004. "Candidate Positioning in U.S. Congressional Elections." *British Journal of Political Science* 34:211-27.

Burden, Barry C., and Anthony Mughan. 2003. "The International Economy and Presidential Approval." *Public Opinion Quarterly* 67:555-78.

Burden, Barry C., and Joseph Neal Rice Sanberg. 2003. "Budget Rhetoric in Presidential Campaigns from 1952 to 2000." *Political Behavior* 25:97-118.

Burden, Barry C. 2003. "Internal and External Effects on the Accuracy of NES Turnout." *Political Analysis* 11:193-5.

Burden, Barry C. 2002. "When Bad Press is Good News: The Surprising Benefits of Negative Campaign Coverage." *Harvard International Journal of Press/Politics* 7:76-89.

Burden, Barry C. 2002. "United States Senators as Presidential Candidates." *Political Science Quarterly* 117:81-102.  [Featured in David S. Broder's *Washington Post* column.]

Burden, Barry C. 2000. "Voter Turnout and the National Election Studies." *Political Analysis* 8:389-98.

Burden, Barry C., Gregory A. Caldeira, and Tim Groseclose. 2000. "Measuring the Ideologies of U.S. Senators: The Song Remains the Same." *Legislative Studies Quarterly* 25:237-58. [Reprinted in Carl Grafton and Anne Permaloff, ed. 2005. *The Behavioral Study of Political Ideology and Public Policy Formation*, Lanham, MD: University Press of America.]

Burden, Barry C., and Steven Greene. 2000. "Party Attachments and State Election Laws." *Political Research Quarterly* 53:57-70.

Burden, Barry C., and Anthony Mughan. 1999. "Public Opinion and Hillary Rodham Clinton." *Public Opinion Quarterly* 63:237-50.  [Featured in *The Chronicle of Higher Education* and Richard Morin's *Washington Post National Weekly Edition* column.]

Burden, Barry C., and Marni Ezra. 1999. "Calculating Voter Turnout in U.S. House Primary Elections." *Electoral Studies* 18:89-99.

Lacy, Dean, and Barry C. Burden. 1999. "The Vote-Stealing and Turnout Effects of Ross Perot in the 1992 U.S. Presidential Election." *American Journal of Political Science* 43:233-55.

Burden, Barry C., and David C. Kimball. 1998. "A New Approach to the Study of Ticket Splitting." *American Political Science Review* 92:533-44.  [Reprinted in Richard G. Niemi and Herbert F. Weisberg, ed. 2001. *Controversies in Voting Behavior*, 4th ed. Washington, DC: CQ Press.]

Burden, Barry C. 1997. "Deterministic and Probabilistic Voting Models." *American Journal of Political Science* 41:1150-69.

**Book Chapters**

Vidal, Logan, and Barry C. Burden. Forthcoming. "Voter Registration." In *American Governance*, ed. Stephen L. Schechter. Farmington Hills, MI: Cengage Learning.

Burden, Barry C., and Charles Stewart III. Forthcoming. "Introduction to the Measure of American Elections." In *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III. New York, NY: Cambridge University Press.

Burden, Barry C. Forthcoming. "Registration and Voting: A View from the Top." In *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III. New York, NY: Cambridge University Press.

Hillygus, D. Sunshine, and Barry C. Burden. 2013. "Mass Polarization During the Bush Presidency." In *Taking the Measure: The Presidency of George W. Bush*, ed. Donald R. Kelley and Todd G. Shields. College Station, TX: Texas A&M University Press.

Burden, Barry C. 2013. "The Nominations: Ideology, Timing, and Organization." In *The Elections of 2012*, ed. Michael Nelson. Washington, DC: CQ Press.

Berry, Christopher R., Barry C. Burden, and William G. Howell. 2012. "The Lives and Deaths of Federal Programs, 1971-2003." In *Living Legislation: Political Development and Contemporary American Politics*, ed. Jeffrey A. Jenkins and Eric M. Patashnik. Chicago, IL: University of Chicago Press.

Burden, Barry C., and Amber Wichowsky. 2010. "Local and National Forces in Congressional Elections." In *The Oxford Handbook of American Elections and Political Behavior*, ed. Jan E. Leighley. New York, NY: Oxford University Press.

Burden, Barry C. 2009. "The Puzzle of the Japanese Gender Gap in LDP Support." In *Political Changes in Japan: Electoral Behavior, Party Realignment, and the Koizumi Reforms*, ed. Steven Reed, Kenneth Mori McElwain, and Kay Shimizu. Stanford, CA: Shorenstein Asia-Pacific Research Center.

Burden, Barry C., and Philip Edward Jones. 2009. "Strategic Voting in the USA." In *Duverger's Law of Plurality Voting: The Logic of Party Competition in Canada, India, the United Kingdom, and the United States*, ed. Bernard Grofman, André Blais, and Shaun Bowler. New York, NY: Springer.

Burden, Barry C. 2009. "The Nominations: Rules, Strategy, and Uncertainty." In *The Elections of 2008*, ed. Michael Nelson. Washington, DC: CQ Press.

Burden, Barry C. 2008. "Multiple Parties and Ballot Regulations." In *Democracy in the States: Experiments in Elections Reform*, ed. Bruce E. Cain, Todd Donovan, and Caroline J. Tolbert. Washington, DC: Brookings Institution Press.

Burden, Barry C. 2005. "Laws Governing Suffrage." In *Guide to Political Campaigns in America*, ed. Paul S. Herrnson. Washington, DC: CQ Press.

Burden, Barry C. 2005. "Family Feud in Massachusetts: How Intraparty Dynamics Influence Redistricting." In *Redistricting in the New Millennium*, ed. Peter F. Galderisi. Lanham, MD: Lexington Books.

Burden, Barry C. 2005. "The Nominations: Technology, Money, and Transferable Momentum." In *The Elections of 2004*, ed. Michael Nelson. Washington, DC: CQ Press.

Burden, Barry C. 2003. "Minor Parties in the 2000 Presidential Election" In *Models of Voting in Presidential Elections: The 2000 U.S. Election*, ed. Herbert F. Weisberg and Clyde Wilcox. Stanford, CA: Stanford University Press.

Burden, Barry C. 2003. "Everything but Death and Taxes: Uncertainty and American Politics." In *Uncertainty in American Politics*, ed. Barry C. Burden. New York, NY: Cambridge University Press.

Burden, Barry C. 2001. "The Polarizing Effects of Congressional Primaries." In *Congressional Primaries in the Politics of Representation*, ed. Peter F. Galderisi, Michael Lyons, and Marni Ezra. Lanham, MD: Rowman and Littlefield.

Mughan, Anthony, and Barry C. Burden. 1998. "Hillary Clinton and the President's Reelection." In *Reelection 1996: How Americans Voted*, ed. Herbert F. Weisberg and Janet M. Box-Steffensmeier. Chatham, NJ: Chatham House Publishers.

Burden, Barry C., and Aage R. Clausen. 1998. "The Unfolding Drama: Party and Ideology in the 104th House." In *Great Theatre: The American Congress in the 1990s*, ed. Herbert F. Weisberg and Samuel C. Patterson. New York, NY: Cambridge University Press.

Mughan, Anthony, and Barry C. Burden. 1995. "The Candidates' Wives." In *Democracy's Feast: Elections in America*, ed. Herbert F. Weisberg. Chatham, NJ: Chatham House Publishers.

## Book Reviews

Burden, Barry C. 2014. Review of *Getting Primaried: The Changing Politics of Congressional Primary Challenges* by Robert G. Boatright. Ann Arbor, MI: University of Michigan Press. *Congress & the Presidency* 41:132-4.

Burden, Barry C. 2009. Review of *Minority Report: Evaluating Political Equality in America* by John D. Griffin and Brian Newman. Chicago, IL: University of Chicago Press. *Public Opinion Quarterly* 73:590-2.

Burden, Barry C. 2009. Review of *The American Voter Revisited*, ed. Michael S. Lewis-Beck, William G. Jacoby, Helmut Norpoth, and Herbert F. Weisberg. Ann Arbor, MI: University of Michigan Press. *Political Science Quarterly* 124:344-6.

Burden, Barry C. 2003. Review of *Learning by Voting: Sequential Choices in Presidential Primaries and Other Elections* by Rebecca B. Morton and Kenneth C. Williams. *Public Choice* **114**:248-51.

Burden, Barry C. 2002. Review of *Elements of Reason: Cognition, Choice, and the Bounds of Rationality*, ed. Arthur Lupia, Mathew D. McCubbins, and Samuel L. Popkin. *Journal of Economic Literature* 40:928-9.


## Reports

Burden, Barry C., and Brian J. Gaines. 2013. "Administration of Absentee Ballot Programs." Testimony and report to the Presidential Commission on Election Administration. Hearing in Denver, CO. August 8.

Burden, Barry C., and Jeffrey Milyo. 2013. "The Recruitment and Training of Poll Workers." Testimony and report to the Presidential Commission on Election Administration. Hearing in Cincinnati, OH. September 20.

Burden, Barry C. 2010. *Polling Place Incidents in the November 2008 General Election*. Report to the Wisconsin Government Accountability Board.

Burden, Barry C., David T. Canon, Stéphane Lavertu, Kenneth R. Mayer, and Donald P. Moynihan. 2009. *2008 Wisconsin Election Data Collection Grant Program Evaluation Report*. Report to the Wisconsin Government Accountability Board.

Burden, Barry C., and Janet M. Box-Steffensmeier. 1998. "Vote Likelihood and Institutional Trait Questions in the 1997 NES Pilot Study." Report to American National Election Study Board of Overseers.


## Other Publications

Burden, Barry C. 2014. "How Political Scientists Informed the President about Election Reform." The Monkey Cage blog. Posted January 23.

Burden, Barry C., and Kevin J. Kennedy. 2013. "State Ranks High on Election Performance." *Milwaukee Journal Sentinel*. February 7.

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2012. "Election-Day Registration Works Here." *Milwaukee Journal Sentinel*. December 26.

Burden, Barry C. 2012. "A Portrait of the Wisconsin Municipal Clerk." *The Municipality*. Volume 106, Number 5.

Burden, Barry C. 2011. "Polarization, Obstruction, and Governing in the Senate." *The Forum*. Volume 9, Issue 4.

Burden, Barry C., and Kenneth R. Mayer. 2010. "Voting Early, but Not So Often." *The New York Times*, October 25.

Burden, Barry C. 2009. "Representation as a Field of Study." In *The Future of Political Science: 100 Perspectives*, ed. Gary King, Kay Lehman Schlozman, and Norman Nie. New York, NY: Routledge.

Burden, Barry C. 2004. "An Alternative Account of the 2004 Presidential Election." *The Forum*. Volume 2, Issue 4.

Burden, Barry C. 2003. "Chronology of the 2000 Presidential Campaign." In *Models of Voting in Presidential Elections: The 2000 U.S. Election*, ed. Herbert F. Weisberg and Clyde Wilcox. Stanford, CA: Stanford University Press.

Burden, Barry C. 1998. "Chronology of the 1996 Presidential Campaign." In *Reelection 1996: How Americans Voted*, ed. Herbert F. Weisberg and Janet M. Box-Steffensmeier. Chatham, NJ: Chatham House Publishers.

Burden, Barry C. 1995. "Chronology of the 1992 Presidential Campaign." In *Democracy's Feast: Elections in America*, ed. Herbert F. Weisberg. Chatham, NJ: Chatham House Publishers.

## Honors and Awards

Robert H. Durr Award – *given by the Midwest Political Science Association for the best paper applying quantitative methods to a substantive problem in political science* – "Election Laws and Partisan Gains: The Effects of Early Voting and Same Day Registration on the Parties' Vote Shares," with David Canon, Kenneth Mayer, and Donald Moynihan (2014)

H. I. Romnes Faculty Fellow, UW Graduate School (2010-2015)

Licking Valley Schools "Wall of Pride" Award (2009) – *given annually to alumni who distinguished themselves professionally or made notable contributions to society*

Hamel Family Faculty Fellow, UW College of Letters and Science (2008-2013)

University Residence Hall Favorite Instructor Award (2007)

Nominated for Harvard University Everett Mendelsohn Excellence in Graduate Mentoring Award (2006)

Emerging Scholar Award (2005) – *given by the Political Organizations and Parties section of APSA for significant research by a scholar receiving her or his doctorate within the past seven years*

Wittenberg University Outstanding Young Alumnus Award (2002) – *given to a graduate of the last decade to recognize professional achievement*

Council of Graduate Schools/University Microfilms International Distinguished Dissertation Award (2000) – *given to recognize best dissertation completed nationwide in the social sciences between 1998 and 2000*

Nominated for Harvard University Joseph R. Levenson Memorial Teaching Prize (2000)

ΑΛΔ Award for superior instruction of freshman students (1999)

OSU Presidential Fellow (1998)

Francis R. Aumann Award for best OSU graduate student conference paper (1996 & 1997)

Malcolm Jewell Award (1996) – *best graduate student paper presented at the 1995 Southern Political Science Association meeting*

Ohio Board of Regents Fellow (1993-1995)

ΦΒΚ (1993)

Wittenberg University Student Leader of the Year (1992-1993)

Jeffrey Y. Mao Alumni Award in Political Science (1992)

## Grants

UW Graduate School Research Committee, "Political Participation among Older Americans" (2014-2015, co-PI with Moynihan)

Center for Demography of Health and Aging, "Political Participation of Older Americans: The Role of Social and Genetic Factors" (co-PI with Jason M. Fletcher and Donald P. Moynihan, 2013-2014)

Pew Charitable Trusts, $46,400 for "Measuring Elections Performance Project," (with head PI Charles Stewart III, 2012-2013)

Wisconsin Government Accountability Board, $43,234 for "Analysis of Polling Place Incident Logs" (head PI with Canon, Mayer, and Moynihan, 2011-2012)

UW Graduate School Research Committee, "The Consequences of Electing Election Officials" (2009-2010)

Pew Center on the States, Making Voting Work: $49,400 for "Early Voting and Same Day Registration in Wisconsin and Beyond" (head PI with Canon, Mayer, and Moynihan, 2008-2009)

U.S. Election Assistance Commission, Election Data Collection Grant Program: responsible for $212,442 of $2,000,000 grant to the Wisconsin Government Accountability Board (head PI with Canon, Mayer, and Moynihan, 2008-2010)

UW Graduate School Research Committee: "The Puzzling Geography of Federal Spending," (2007-2008)

UW Graduate School Research Committee: "The Political Economy of the Japanese Gender Gap" (2006-2007)

CAPS faculty research conference: $36,500 for "Democracy, Divided Government, and Split-Ticket Voting" (2006)

Joseph H. Clark fund award: "The Limits of Representation" (2004-2006)

Reischauer Institute of Japanese Studies: "Accountability, Economics, and Party Politics in Japan" (2004-2006)

Time-sharing Experiments in the Social Sciences: "Affect and Cognition in Party Identification" (with Casey A. Klofstad, 2004)

Harvard Faculty of Arts & Sciences Course Innovation Funds: "The Practice of Political Science" (2003)

Dirksen Congressional Center Congressional Research Award: "The Discharge Rule and Majoritarian Politics in the House of Representatives" (2002-2003)

Reischauer Institute of Japanese Studies Curriculum Enrichment Grant: "Electoral Politics in America and Japan" (2002)

CBRSS research program grant: "Affect and Cognition in Party Identification" (2001)

Joseph H. Clark fund award: "Affect and Cognition in Party Identification" (2001-2002)

Joseph H. Clark fund award: "Ideology in Congressional Elections" (2000-2001)

National Science Foundation Doctoral Dissertation Improvement Grant: "Candidates' Positions in Congressional Elections" (1997)


## Teaching and Advising

Undergraduate courses:
      Introduction to American Politics
      Elections and Voting Behavior
      Political Behavior
      American Public Opinion
      Election Reform in America
      The Politics of Congress/The Legislative Process
      Techniques of Political Analysis

Electoral Politics in America and Japan
The Practice of Political Science Research

Graduate courses:
American Politics Field Seminar
Mass Political Behavior
Congress and Legislative Politics
American Electoral Politics
Readings on Advanced Statistical Methods
Quantitative Research Design
American Political Institutions
Readings on Interest Group Politics
Research Workshop in American Politics
Political Science as a Discipline and Profession

Harvard Ph.D. advising (year and placement):
Benjamin Deufel (2006 Greenberg Quinlan Rosner Research)
Tammy M. Frisby (2006 Stanford University-Lane Center)
Michael Kang (2009 Emory University-School of Law)
Andrew Karch (2003 University of Texas & University of Minnesota)
Casey A. Klofstad (2005 University of Miami)
Robert Van Houweling (2003 University of Michigan & UC-Berkeley)
*Carl Albert Dissertation Award for best dissertation in legislative studies*

Wisconsin Ph.D. advising (year and placement):
Danna Basson (2007 Mathematica Policy Research)
Amy Bree Becker, Journalism & Mass Communication (2010 Towson University &
Loyola University Maryland)
Deven Carlson (2012 University of Oklahoma)
Amnon Cavari (2011 Interdisciplinary Center–IDC Israel)
*George C. Edwards III Dissertation Award for best dissertation in presidency research*
Meghan Condon (2012 Loyola University Chicago)
*APSA section on Experimental Research best dissertation award*
William Egar (ABD)
Erika Franklin Fowler (2006 RWJ Scholar in Health Policy & Wesleyan University)
Hannah Goble (2009 Texas Christian University)
Matthew Holleque, *chair* (2012 Obama for America)
Bradley Jones, *chair* (ABD)
Dimitri Kelly, *chair* (2013 Linfield College)
Yujin Kim, *chair* (ABD)
Paul Lachelier, Sociology (2007 Stetson University)
Ruoxi Li (ABD)

Jeremy Menchik (2011 Stanford Shorenstein Center post-doc & Boston University)
Daniel Metcalf
Jacob Neiheisel, *chair* (2013 Denison University & University of Buffalo)
Joel Rivlin (ABD MSHC Partners & Pivot)
Rajen Subramanian (2008 Abt Associates)
Amber Wichowsky, *chair* (2010 Yale CSAP Fellowship & Marquette University)
  *Carl Albert Dissertation Award for best dissertation in legislative studies*

## Reviewing Activities

Journal manuscript reviews:
  *Acta Politica, American Journal of Political Science, American Political Science Review, American Politics Quarterly, American Politics Research, American Review of Politics, British Journal of Political Science, Comparative Political Studies, Congress & the Presidency, Election Law Journal, Electoral Studies, European Journal of Political Research, International Journal of Forecasting, International Organization, Journal of Law, Economics, and Organization, Journal of Politics, Journal of Theoretical Politics, Journal of Women, Politics, & Policy, Legislative Studies Quarterly, Party Politics, Perspectives on Politics, Political Analysis, Political Behavior, Political Communication, Political Psychology, Political Research Quarterly, Political Science Quarterly, Politics & Gender, Politics and Policy, Presidential Studies Quarterly, Public Choice, Public Opinion Quarterly, Rationality and Society, Research and Politics, Quarterly Journal of Political Science, Social Science Quarterly, Sociological Forum, Sociological Methods and Research, State Politics & Policy Quarterly, Statistical Science, & World Politics*

Book manuscript reviews:
  Addison Wesley Longman, Atomic Dog Publishing, Brookings Institution Press, Cambridge University Press, CQ Press, Oxford University Press, and University of Chicago Press

Tenure and promotion reviews:
  Dartmouth College, Florida State University, Fordham University, Louisiana State University, Temple University, Texas Tech University, Tulane University, University of British Columbia, University of California-Berkeley, University of California-Riverside (twice), University of Chicago (public policy), University of Houston, University of Massachusetts-Dartmouth, University of Maryland (twice), University of Missouri-Columbia, University of Missouri-St. Louis, University of North Carolina at Charlotte, University of Notre Dame, University of Pennsylvania, University of Texas-Dallas, & Washington State University

External review committee, Union College Department of Political Science (*chair*, 2010)

Other reviews:
> Canada Research Chair College of Reviewers, Radcliffe Institute Fellows, National Science Foundation, Robert Wood Johnson Scholars in Health Policy, Time-sharing Experiments in the Social Sciences (TESS)

## Professional and University Service

Journal editorial boards:
> *Election Law Journal* editorial board (2013-present)
> *Electoral Studies* editorial board (2011-present)
> *Political Research Quarterly* (2014-present)
> *Legislative Studies Quarterly* editorial board (2011-2013)

Other boards and councils:
> Election Performance Index Advisory Board, Pew Center on the States (2010-2014)
> Elections, Public Opinion, and Voting Behavior section Communications Director (2012-2015)
> Legislative Studies section council (2009-2011)
> Political Organizations and Parties section council (2005-2007)
> Ad Hoc Committee on Member Communications (2013)
> Project Vote Smart Advisory Board (2007-)

Conference program organizer:
> Political Organizations and Parties, APSA annual meeting (2006)
> Political Methodology, SPSA annual meeting (2001)

Award committees:
> Political Organizations and Parties/*Party Politics* award committee for the best paper presented at the 2006 APSA annual meeting (*chair*, 2007)
> Political Organizations and Parties Emerging Scholar Award committee (*chair*, 2013)

Campus presentations:
> Dartmouth College, Northwestern University, Stanford University, SUNY-Stony Brook, University of Houston, University of Minnesota, University of Missouri-Columbia, University of Notre Dame, University of Rochester, University of Texas at Austin, Utah State University (twice), Wittenberg University, & Yale University (twice)

Public and community presentations:
> Boston Museum of Science, Brookings Institution, Civitas, National Legislative Program Evaluation Society, Newton Center for Lifetime Learning, Reach Out Wisconsin, Senior

13

Summer School, UW-Extension College Days, Vantage Point, Wisconsin Academy of Sciences, Arts, and Letters, Wisconsin Department of Revenue, and alumni events in Wisconsin and New York City

Affiliations:
Election Administration Project (*co-founder*, 2008-present)
Wisconsin Advertising Project team (2008-present)
La Follette School of Public Affairs, Faculty Associate (2007-present)
Center for Demography of Health and Aging (2013-present)
Political Behavior Research Group (2006-present)
Institute for Quantitative Social Science, Faculty Associate (1999-2006)
Political Psychology and Behavior Workshop (*co-founder*, 2000-2006)
Center for American Political Studies, Executive Committee (2001-2006) & Steering Committee (2003-2004)
Program on US-Japan Relations, Faculty Affiliate (2004-2006)
Weatherhead Center for International Affairs, Faculty Associate (2005-2006)
Harvard Kennedy School, Mid-Career MPA Summer Program (2001-2005 & 2007-2012)
Summer Institute in Political Psychology (1995 & 1997)

Harvard committee service:
American Politics Faculty Search (1998-1999, 2001-2002, 2002-2003, & 2005-2006)
Graduate Admissions (1999-2000)
Government Concentration/Board of Senior Examiners (2000-2001 & 2004)
Teaching Fellow Coordinator (2003-2004)
American Politics Field Coordinator (2005-2006)
Center for Government and International Studies, Subcommittee on Teaching and Conference Spaces (2003)
Truman Scholarship Nomination (2000-2001)
Eben Fiske Studentship Nomination (2004-2005)
Political Communication Faculty Search, Kennedy School of Government (2004-2005)

Wisconsin committee service:
Faculty Senate (2006-2007)
Associate Chair/Director of Graduate Studies (2007-2012)
Graduate Admissions and Fellowships, *chair*
Graduate Program Committee, *chair*
Teaching Assistant Evaluation Committee, *chair*
L&S Teaching Fellow Anniversary Symposium Planning Committee (2009-2010)
L&S C-GRS Faculty Executive Committee (2009-2010)
Graduate School Social Studies Fellowships Committee (2010-2013)
Social Studies Divisional Executive Committee (2013-2014)
Faculty Recruitment Committee (2013-2014)

14

American Politics Search Committee, *chair*
Preliminary Examination Appeals Committee (2013-2014)

Occasional source for media coverage of politics including abcnews.com, *Atlanta Journal-Constitution*, Associated Press, *The Baltimore Sun*, *The Baton Rouge Advocate*, Bloomberg News, *The Boston Herald*, cbsnews.com, *Campaigns & Elections Magazine*, *Chicago Tribune*, *Christian Science Monitor*, *Cleveland Plain Dealer*, *Congressional Quarterly Weekly Report*, The Daily Caller, *Dallas Morning News*, *Des Moines Register*, forbes.com, Fox News, *Glamour*, *The Globe and Mail* (Canada), *The Guardian* (UK), *The Harvard Crimson*, *Harvard Political Review*, *The Hill*, *International Herald Tribune*, *Kansas City Star*, *Los Angeles Times*, *The London Times*, *Le Monde*, *The New Orleans Times-Picayune*, *National Journal*, *The New Republic*, *New Scientist*, *New York Post*, *The New York Times*, *Newsday*, *Newsweek*, *el Nuevo Herald*, *Omaha World Herald*, *PBS NewsHour*, *Pittsburgh Post-Gazette*, Politico.com, Reuters, Salon.com, States News Service, *USA Today*, *Veja* (Brazil), *The Wall Street Journal*, *The Washington Post*, *The Washington Times*, *Wisconsin Law Journal*, *Yomiuri Shimbun*, *Greater Boston* on WGBH, NECN, *Nitebeat with Barry Nolan*, *Odyssey* on Chicago Public Radio, and many local television, radio, and newspaper outlets

Featured in *An Unreasonable Man*, an independent documentary film about the life and career of Ralph Nader (2006)

## Consulting

Research consultant, via Research Triangle International Institute and the Pew Charitable Trusts, for evaluation of the Electronic Registration Information Center (2012-2014)

Expert witness, *League of United Latin American Citizens of Wisconsin et al. v. Judge David G. Deininger* et al., case 12-CV-00185, U.S. District Court, Eastern District of Wisconsin (2013)

Expert witness, *North Carolina State Conference of the NAACP et al. v. Patrick Lloyd McCrory et al.*, case 13-CV-658, U.S. District Court, Middle District of North Carolina (2014)

Academic researcher, Presidential Commission on Election Administration, established by presidential Executive Order 13639 (2013)

15