IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISON

MARC VEASEY, *et al.*,

                Plaintiffs,

             v.

RICK PERRY, *et al.*,

                Defendants.

Civil Action No. 2:13-cv-193 (lead)
(consolidated w/ 2:13-cv-263)

## EXPERT WITNESS REPORT OF GEORGE KORBEL

I have evaluated the Texas voter ID statute which is at issue in this case (SB 14, codified in Texas Election Code Chapter 63) in the context of the history of discrimination in Texas.  (See Appendix 1 of this report, detailing the long history of discrimination in Texas).  In this report, I analyze and discuss the history of electoral discrimination in Texas from approximately ten years before SB 14 was first passed until the present.  The report documents numerous instances in which either the federal courts or the Department of Justice have found that voting or electoral discrimination occurred in Texas.

I have also analyzed the current social and economic conditions of Texans by race and ethnicity.  In this report, I summarize these conditions on a statewide level referring to data points that have often been used by the federal courts in considering Section 2 and constitutional litigation, as well as in cases alleging intentional unconstitutional discrimination using the "*Arlington Heights* framework."  In Appendix 2, I include charts and graphs of this data statewide and in selected Texas counties.  The data documents the fact that minorities in all parts

of Texas rank far behind non-minorities in almost every important social and economic category. The depressed socio-economic conditions of racial and ethnic minorities in Texas today are a direct result of Texas' long history of discrimination against these groups.

For example, I compare educational considerations by race and ethnic origin based on the Academic Excellence Indicator System (AEIS) published on an annual basis by the Texas Education Agency.  This data has frequently been utilized in Section 2 and constitutional litigation.  I discuss the most recent data available in 2014 on a statewide basis.  In Appendix 3, I have included charts and graphs detailing this information on a statewide basis and also in selected Texas school districts.  The data confirms that Hispanics and African-Americans in Texas still perform below non-minorities in every significant category relevant to education on a statewide basis.

I have also analyzed population growth information by race and ethnic origin in the state from 1970 through 2010.   In addition, I have analyzed projected population growth by race and ethnicity through 2050.   Appendix 4 contains charts and graphs detailing this growth data, both statewide and in selected counties or groups of counties.

I have evaluated the new Texas voter ID law in the context of the history of voter discrimination in Texas.  Based on my experience as both an attorney and an expert witness handling and testifying in election discrimination cases for the past 45 years, I have also likewise examined whether the new Texas voter ID law will effectively combat election fraud.

I have also examined logistical problems presented by the voter ID statute.  In particular, I have measured the time it would require to travel from counties which do not have a DPS office to the DPS offices that are recommended on the DPS website. (http://www.txdps.state.tx.us/administration/driver_licensing_control/rolodex/search.asp).   In

2

Appendix 5, I include a series of charts and graphs that examine the time required to travel by bus or car to the closest DPS office.

In general, I contend that Texas has a long history of electoral discrimination against African-Americans and Hispanics, and that those minorities in Texas trail non-minorities in many essential areas, including receipt of resources for education.  I further contend that minorities, particularly Hispanics, have constituted a major share of the population growth in Texas since 1970 and will continue to do so for the next several decades.  The Texas Legislature passed SB 14 utilizing an unprecedented parliamentary maneuver, and SB 14 appears to be yet another example of a Texas law that violates the Voting Rights Act.  SB 14 will make it more difficult for minorities in Texas to participate effectively in the political process and elect candidates of their choice.

## INTRODUCTION

## THE LEGAL CONTEXT FOR THIS REPORT

The fundamental question in a Section 2 vote dilution case is whether minority voters "have an equal opportunity **to participate in the political processes and to elect candidates of their choice.**" *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (emphasis added).  Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, as amended, provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members

of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion of the population.

42 U.S.C. § 1973 (emphasis in original)(2014).

In *Gingles, supra*, the Supreme Court identified the existence of racially polarized voting and the effect that this has on "the ability of minority voters to elect representatives of their choice." 478 U.S. at 48.

## I.   Totality of the Circumstances

Essentially, the *Gingles* holding requires in a Section 2 case that the plaintiffs establish the existence of certain preconditions, including racial polarization and the possibility of a remedy at equity.  Once plaintiffs meet their burden of establishing the *Gingles* preconditions, courts have been directed to consider the "totality of the circumstances" to determine whether minority voters have the same opportunities to participate in the political process and elect representatives of their choice as do other voters. (S. Rep. at 28, U.S. Code Cong. & Admin. News 1982, p.206.  See also *Clark*, 88 F.3d at 1396 ("it will be only the very unusual case in which the plaintiffs can establish the existence of the... *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances"), and in the Senate Report of the 1982 Amendments to the Act. *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ*., 4 F3d 1103, 1116 (3d Cir. 1993) ("While it would be a highly unusual case in which a plaintiff successfully proved the existence of the . . . *Gingles* factors and still failed to establish a violation , I cannot rule out that possibility entirely").   See also *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992).

## A. The Relevant Factors

In *Gingles,* the Supreme Court identified a number of factors that could intensify the potential of an election process to discriminate against minority voters.  The 1982 Senate Report on the legislation (which is the key legislative history of Section 2 of the Voting Rights Act) listed these factors, and they are frequently referred to as "the Senate Factors."  They include:

> 1.  The extent of any official history of discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or to otherwise participate in the democratic process.

> 2.  The extent to which voting in the state or political subdivision is racially polarized.

> 3.  The extent to which the state or political subdivision has used unusually large districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.

> 4.  If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

> 5.  The extent to which the members of the minority group bear the effects of discrimination in such areas as education, employment and health which hinders their ability to participate effectively in the political process.

> 6.  Whether political campaigns have been characterized by overt or subtle racial appeals.

> 7.  The extent to which the minority group have been elected to public office in the jurisdiction.

S. Rep. No. 97-417,  at 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07.

The Senate Committee was careful to stress that:

"[T]here is no requirement that any particular number of factors be proved, or that the majority of them point in one way or the other."  . . .  Rather, the Committee determined that "the question of whether the political processes are equally open depends upon a searching practical evaluation of the 'past and present reality.'" *Id*. at 30, U.S. Code Cong. & Admin News 1982 p 208. (footnote omitted), and on a "functional" view of the political process.

5

cited in ***Gingles***, *supra*, 478 U.S. at 45.

### B.  History of Discrimination

The first Senate Factor is commonly referred to as the History of Discrimination Factor.
Appendix 1 to this report contains a history of general discrimination in Texas, as well as a list of
voting cases brought against Texas jurisdictions from the late 1960s to 1999.  Since the specific
issues before this Court involve the voter ID statute and Section 3 coverage, and are heavily
dependent on voting discrimination, I will discuss the most recent findings here.  I define
"recent" as cases occurring since 2000.  These include specific findings of federal district and
circuit courts and the U.S. Supreme Court, in cases dealing specifically with Texas.  I also
include voting rights objections interposed by the Department of Justice (DOJ) pursuant to
Section 5 of the Voting Rights Act, and specific decisions by DOJ to send federal election
observers under Section 8 of the Voting Rights Act to monitor problem areas.

Since the application of the Voting Rights Act to Texas, the DOJ has sent almost 1,400
federal observers to 70 Jurisdictions within Texas.  There have been more than 200 voting rights
objections interposed by DOJ since the application of the VRA to Texas, and there have been
more than 200 federal and state court findings of election discrimination in Texas.  These have
involved approximately 70% of the state's population.

Since 2000, there have been more than 50 instances in which federal courts have found
voting or election discrimination in Texas; or the DOJ has issued a voting rights objection
finding voting discrimination under Section 5 of the Voting Rights Act; or federal observers have
been sent to Texas election locations.  In fact, since 2000, approximately 1,099 federal observers

have been sent to various Texas election locations and voting sites pursuant to Section 8 of the

Voting Rights Act.  See Appendix 1.

### C.  Recent Judicial or Administrative Determinations of Election Discriminations in Texas

In this section, I provide a listing of Texas voting discrimination cases over the last ten

years.  A more comprehensive summary extending further back in time is detailed in Appendix

1.  The cases detail the how Latino and black voters continue to be the victims of discriminatory

voting practices and procedures throughout the state:

As the Supreme Court noted less than a decade ago in *LULAC v. Perry:*

The District Court recognized the long history of discrimination against Latinos
and Blacks in Texas, and other courts have elaborated on this history with respect
to electoral processes. Texas has a long, well-documented history of
discrimination that has touched upon the rights of African- Americans and
Hispanics to register, to vote, or to participate otherwise in the electoral process.
Devices such as the poll tax, an all-white primary system, and restrictive voter
registration time periods are an unfortunate part of this State's minority voting
rights history. The history of official discrimination in the Texas election process
stretching back to Reconstruction led to the inclusion of the State as a covered
jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act.
Since Texas became a covered jurisdiction, the Department of Justice has
frequently interposed objections against the State and its subdivisions. In addition,
the political, social, and economic legacy of past discrimination for Latinos in
Texas, may well hinder their ability to participate effectively in the political
process.

It is significant to note that no decade has passed since 1970 in which Courts have

not found Texas Redistricting plans in violation of  federal, and on occasion, State law.

As the three-judge court of the District of Columbia found just two years ago when they

specifically held that the Texas congressional and state senate redistricting plans were

enacted with discriminatory intent:

In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost. See, *e.g., LULAC*, 548 U.S. 399, 126 S.Ct. 2594; *Vera*, 517 U.S. 952, 116 S.Ct. 1941; *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Terrazas v. Slagle*, 789 F.Supp. 828 (W.D.Tex.1992), *aff'd sub nom.*, *Richards v. Terrazas*, 505 U.S. 1214, 112 S.Ct. 3019, 120 L.Ed.2d 891 (1992) (mem.). While a losing streak alone does not control our decision, Texas's history of failures to comply with the VRA is one of the circumstantial factors that *Arlington Heights* instructs us to consider.

*Texas v. United States*, 887 F. Supp. 2d 133, 160-161 (D.D.C. 2012)

Texas argues that, "[a]t worst, the evidence shows that [it] was guilty of blithe indifference to the wants of certain [minority] Congressmen." Tex. Post–Trial Br. 29. But we do not find this explanation credible. Although we have already concluded that the Congressional Plan cannot be precleared under section 5's effect prong, we are also persuaded by the totality of the evidence that the plan was enacted with discriminatory intent. Texas did not adequately engage with the evidence raised by the other parties on this point, and under *Arlington Heights* we find sufficient evidence to conclude that the Congressional Plan was motivated, at least in part, by discriminatory intent.

The parties have provided more evidence of discriminatory intent than we have space, or need, to address here. Our silence on other arguments the parties raised, such as potential discriminatory intent in the selective drawing of CD 23 and failure to include a Hispanic ability district in the Dallas–Fort Worth metroplex, reflects only this, and not our views on the merits of these additional claims.

*Texas v. United States*, 887 F. Supp. 2d 133, 165 (D.D.C. 2012).

One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties' evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.

*Texas v. United States*, 887 F. Supp. 2d 133, 165 (D.D.C. 2012).

As noted above, that history of voting discrimination continues to this day.  For example, in the last five years, there have been more findings of racially polarized voting and the Attorney General has continued to determine that Federal Observers should be sent into several Counties

8

and cities to observe elections and protect the right to vote against discriminatory conduct.   By way of examples, the following is a list of Texas cases in which courts have made findings regarding the current existence of specific *Gingles* preconditions:

- ***Hubbard v. Lonestar Community College District***, No. 4:13-CV-01635 (S.D. Tex., filed June 4, 2013): After limited discovery, the parties negotiated a settlement with nine single-member districts.  The district court held a settlement hearing and approved the settlement in November of 2013.

- ***Rodriguez v Harris County***, 964 F. Supp. 2d 686 (S.D. Tex. 2013): This was a lawsuit against Harris County, alleging that the redistricting of the Harris County Commissioners' Court violated Section 2 of the Voting Rights Act.  The Court found racially polarized voting in the county, and found that significant barriers to voting remain in Harris County.  The case is on appeal to the 5th Circuit.

- ***Fabela et al v. City of Farmers Branch***, 2012 U.S. Dist. LEXIS 108086 (N.D. Tex. 2012): The court found that "the City Council elections" for Farmers Branch "in 2007, 2008, 2009, and 2011 were . . . racially polarized." *Id.* at *58. It also found: "Hispanics in Farmers Branch have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* at *61.

- ***Hernandez et al v. Nueces County***, No. 2:2012cv00047 (S.D. Tex. filed Feb. 10, 2012): This was a Section 5 enforcement action against Nueces County. It was dismissed when Nueces County made changes to the county's redistricting map. *See also* ***Nueces County v United States***, No. 1:11cv1784 (D.D.C., dismissed

Mar. 21, 2012).

- ***Vasquez-Lopez v. Medina County***, No. 5:2011cv00945 (W.D. Tex. filed Nov. 10, 2011): A number of Hispanic plaintiffs opposed Medina County's 2011 redistricting plan and filed suit.  After a period of time the county agreed to make changes in the plan, which satisfied the plaintiffs.

- ***McBride et al v. City Of Jasper***, No. 1:11cv00443 (E.D. Tex. dismissed Dec. 21, 2011): This case involved the recall of African-American councilmen who had been elected from single-member districts and who had voted for an African-American retired Texas Ranger to be the city's Chief of Police.  Although the case has been dismissed, I include some of the findings made by the federal court:

Lance Caraway, one of nine citizens who collected petition signatures, used racial epithets and made racist jokes in Facebook posts after Chief Pearson was appointed. . . .  "From the testimony elicited at the hearing, it appears that all of the citizens who spearheaded the recall effort and all of the signers of the petitions were white. Order Denying Preliminary Injunction, ***McBride*** (Oct. 20, 2011) at 4, *available at* http://s3.amazonaws.com/static.texastribune.org/media/documents /City_of_Jasper_Injunction.pdf.

The petitions for [recalling two African-American] Councilpersons . . . were signed by white citizens who did not reside in the councilpersons' districts. *Id.* at 5.

Neither the city nor the county verified the authenticity of the signatures. At the hearing on the pending motion, evidence was presented that several signatures appeared in almost identical handwriting, raising the inference that the same person signed on behalf of multiple individuals. A handwriting expert who reviewed half of the petitions testified that two people were responsible for fifteen signatures and that as many as 225 signatures warranted further investigation. *Id.* at 6.

[S]ome of the recall petitioners acted with racial animus towards [the African-American councilmen] . . . .  Lance Caraway, one of the white Jasper citizens who gathered signatures on the recall petitions, used racial epithets in Facebook posts after [the African-American] Chief [of police]

was appointed. He also posted a most distasteful picture featuring Chief Pearson, two of the African-American council members, the President of the United States, and the First Lady. Not to be outdone, at the evidentiary hearing, Mr. Caraway failed to appear pursuant to an executed subpoena.

- ***Petteway, et al. v. Galveston County, Texas, et al.***, No. 3:2011cv00511 (S.D. Tex. filed Nov. 14, 2011): This was a Section 5 enforcement action.  Galveston County agreed to remedy the vote dilution present in its Commissioner precinct plan. The county agreed to hold its elections in 2012 under this new benchmark plan, and then try the remaining Section 5 issue: the county's reduction of Justice of the Peace positions from nine to five.  The portion of the case dealing with the Justices of the Peace has now been tried and is pending decision.

### D.  Administrative Objections to Texas Election Procedures

Additionally, since 2010, there have been numerous examples of DOJ objections to various election procedures (prior to *Shelby County,* of course), as well as the assignment by the United States Attorney General of federal observers to monitor elections throughout the State of Texas to protect the right to vote.   The following list details these incidents:

- **May 13, 2013** Department of Justice sent Federal Election Monitors to monitor elections in cities of **Corrigan**, **Farmers Branch**, **Irving** and **Orange**, Texas, to ensure compliance with the Voting Rights Act of 1965.[1]

---

[1]Section 8 of the Voting Rights Act provides for the appointment of federal observers within political subdivisions certified by the Attorney General or by order of a federal court pursuant to the Voting Rights Act. The monitoring of elections by federal observers is an important aspect of the Voting Section's enforcement efforts. In some instances, there are concerns about racial discrimination in the voting process; other times monitoring is done to ensure compliance with bilingual election procedures. The United States Office of Personnel Management recruit [s],

- **April 8, 2013 Section 5** Objection Letter from the Thomas E Perez,
  Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD
  school attorney:

  Submission of referendum election to change the School Trustee election system from seven single member districts to five single member districts and two elected at-large.  ("There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents. A statistical analysis of the election confirms the extreme racial polarization that the issue created. Black voters cohesively voted to maintain the current method of election and white voters voted cohesively for the proposed change. We estimate over 90 percent of white voters, but less than 10 percent of black voters, supported the change."

  An examination of at-large elections for the Beaumont City Council also proved informative because of the overlap in population and the similarity in demographics. There, we found racial cohesion among black voters at levels similar to those identified in the school district election. More significantly, we found significant racial polarization and the same unwillingness of white voters to support a black-preferred candidate, with little evidence of crossover voting by white voters in the city's at-large council races.

  In the past ten years, numerous black-preferred candidates have sought municipal office in the city. With the sole exception of one candidate, African Americans have been unable to elect candidates of choice to the city's at-large council positions. Our analyses showed that this candidate only received about eight percent of the non-black vote in both the 2007 and 2011 elections, placing second to last among non-black voters in 2011. … [O]ur analyses demonstrate that this candidate's election was dependent on single-shot voting, in which black voters withheld their votes for the second at-large city council seat in both 2007 and 2011, voting only for this candidate. The statistical and anecdotal evidence therefore confirm that this one candidate's experience is not indicative of black-preferred candidates' prospects for success in

---

train[s], and supervise[s] these federal employees, who serve as neutral and impartial observers of election-day procedures. See http://www.justice.gov/crt/about/vot/examine/activ_exam.php

at-large elections. *See Texas v. United States*, 2012 WL 3671924, at *22-23 (D.D.C. Aug. 28, 2012) (three-judge court) (isolated electoral success by one candidate is insufficient to demonstrate that minority voters have the consistent ability to elect their preferred candidates of choice).

- **April 8, 2013 Section 5** Objection Letter from the Thomas E. Perez, Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD school attorney. (Finding that State Court Order shortening terms and ordering an election out of time violated Section 5 of the Voting Rights Act).

- **November 6, 2012 General Election.**  The Department of Justice sent 119 Federal Election Observers to **Dallas County**, **Fort Bend County** and **Jefferson County** to ensure compliance with the Voting Rights Act of 1965.

- **May 29, 2012 Primary Elections** Department of Justice sent Federal Election Observers to **Dallas** County, **Galveston** County, **Jasper** County, **Jefferson** County and Harris County per Attorney General's certification.  Federal observers sent to **Fort Bend** County, which is subject to a court order entered in 2009, which requires the jurisdiction to comply with the minority language and assistor of choice requirements of the Voting Rights Act, as well as the requirements of the Help America Vote Act.  http://www.justice.gov/opa/pr/2012/May/12-crt-677.html

- **May 12,  2012 Municipal Elections.**  The Department of Justice sent 39 Federal Election Observers to the cities of **Galveston (Galveston County) and Irving (Dallas County)** to ensure compliance with the Voting Rights Act of 1965.

13

- **March 7, 2012 Section 5 Objection Letter** from the Thomas E Perez, Assistant

  Attorney General to Keith Ingram , Director of Elections:

  [T]he state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that any specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect...

- **March 5, 2012 Section 5 Objection Letter** from Thomas E. Perez, Assistant

  Attorney General to Trey Traynor, attorney for Galveston County:

  With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.

  Our analysis of the benchmark justice of the peace and constable districts indicates that minority voters possess the ability to elect candidates of choice in Precincts 2, 3 and 5. With respect to Precincts 2 and 3, this ability is the continuing result of the court's order in *Hoskins* v. *Hannah*, Civil Action No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two districts. Following the proposed consolidation and reduction in the number of precincts, only Precinct 3 would provide that requisite ability to elect. In the simplest terms, under the benchmark plan, minority voters in three districts could elect candidates of choice; but under the proposed plan, that ability is reduced to one.

- **October 3, 2011 Section 5 Objection Letter** from Thomas E. Perez, Assistant

  Attorney General to Bob Heath attorney for the City of Galveston, Texas:

  Our review of the demographics of the current districts and the results for elections conducted since 2001 as well as the information provided by the city does not alter our earlier determination that city has not established the absence of a retrogressive effect. **Racial bloc voting continues to play a significant role in city elections.** Under the existing method of election, minority voters currently have the ability to elect a candidate of

14

choice in three of the six single-member districts. In contrast, this ability would exist only in two of the four districts and in neither of the two at-large positions under the proposed system.  Indeed, **in the course of our investigation, the city acknowledged that the proposed method of election will decrease the number of minority ability-to-elect districts.** As a result, the city has failed to establish that the proposed 4-2-1 method of election with numbered posts would not lead to a retrogression in minority voting strength prohibited by Section 5.

- **May 14, 2011 Municipal and School District Elections.** The Department of Justice sent 57 Federal Election Observers to the cities of **Beaumont (Jefferson County), La Marque (Galveston County) and Hondo (Medina County)** to ensure compliance with the Voting Rights Act of 1965.

- **November 2,   2010 General Elections** The Department of Justice sent 93 Federal Election Observers to **Dallas County, Fort Bend County, Galveston County and Williamson County** to ensure compliance with the Voting Rights Act of 1965.

- **Spanish Language Procedures for Runnels County, Texas.  June 28, 2010 Section 5 Objection Letter** from the Thomas E. Perez, Assistant Attorney General to Elise Ocker, Runnels County Clerk, Objection to changes in Bilingual Procedures:

   Under the benchmark procedures enumerated in the 1984 order, the county was required to assign one bilingual poll worker to each of its five consolidated polling places. Despite an almost fifty percent increase in the county's Hispanic population percentage since 1984, our examination of the November 2008 general and November 2009 constitutional amendment elections show that at least half of county voting precincts did not have a bilingual poll worker for the November 4, 2008, general election, and no voting precincts had a bilingual poll worker for the November 3, 2009, constitutional amendment election. Both census data and anecdotal evidence from members of the minority community indicate, however, that there continues to be a significant need for such assistance. The proposed level of assignment, moreover, is below the

15

Texas Secretary of State's recommended guidelines that bilingual poll workers be stationed in election precincts where five percent or more of the inhabitants are persons of Spanish origin.

Instead of applying the benchmark standard for the elections in question, the county implemented a practice in the 2008 and 2009 elections of having only having an on-call bilingual assistor available by phone in the event that Spanish language oral assistance was required on election day. We note that procedure has not been reviewed under Section 5. **The evidence available to us, however, demonstrates that this procedure does not provide effective Spanish language oral assistance. In fact, it appears that the on-call bilingual assistor has not received a single call for assistance in the approximately seven years that she has served in that capacity. We also note that the county does not test the Spanish language proficiency of its bilingual poll workers, or provide training for bilingual assistance. Our information suggests that one of the individuals asserted by the county to be a bilingual poll worker is not proficient in Spanish. (Emphasis added)**

- **Spanish Language Procedures for Gonzales County, Texas.  March 10, 2010**

**Section 5 Objection Letter** from the Thomas E. Perez, Assistant Attorney

General to Elise Bob Bass Attorney for Gonzales County:

The county proposes to use an internet machine translator, such as Google Translator, for the initial translation of county-produced election materials. The county indicates that the resulting translations will then be sent to the Office of the Texas Secretary of State...to confirm its accuracy. However...the Secretary of State ...has also informed us that it has had no communication with the county on this matter [and] does not offer this service....

\*       \*       \*

If anything, the current proposal is retrogressive even when measured against the 2008 bilingual program to which an objection was interposed. Moreover, even after the objection, the county continues to post English-only election notices on its website, raising concerns about its stated commitment to provide translations of all election materials.

County officials have openly expressed hostility toward complying with the language minority provisions of the Voting Rights Act. In local news articles, the county official who has direct control over the election process has expressed frustration with this Department's efforts to increase

16

the availability of bilingual poll workers, suggesting that language minority voters are not citizens if they do not speak English.

- **June 19, 2010 General Elections.** The Department of Justice sent 11 Federal Election Observers to the **City of Galveston (Galveston County)** to ensure compliance with the Voting Rights Act of 1965.

- **May 8, 2010 Municipal and School District Elections.** The Department of Justice sent 39 Federal Election Observers to the cities of **Irving (Dallas County)** and **Galveston (Galveston County)** to ensure compliance with the Voting Rights Act of 1965.

- **March 2, 2010 Primary Elections.** The Department of Justice sent 68 Federal Election Observers to **Fort Bend County, Williamson County, Galveston County** and **Wilson County** to ensure compliance with the Voting Rights Act of 1965.

- **February 11, 2010.** The Department of Justice sent 22 Federal Election Observers to **Galveston County** to ensure compliance with the Voting Rights Act of 1965.

- **January 23, 2010.** The Department of Justice sent 4 Federal Election Observers to the **City of Hondo (Medina County)** to ensure compliance with the Voting Rights Act of 1965

**A. Voting Rights Act Section 2 Cases, Recent, Pending Trial or Decision on the Merits**

In addition, there are a number of recent cases that have been filed throughout the State of Texas that are currently pending alleging violations of the Voting Rights Act. These include:

- *Williams et al v. Edwards Aquifer Authority*, No. 5:92-cv-00144-FB (W.D. Tex. 2012): This case, currently pending order on cross motions for summary judgment, involves a claim of discrimination against Hispanics in a jurisdiction of nearly 1.5 million persons that is in charge of protecting the sole water source of the City of San Antonio as well as agricultural irrigation.  The jurisdiction is governed by a sixteen-person board elected by single-member districts as a result of a series of litigation and Section 5 objections. These districts are grossly malapportioned, with some in the 10,000 person range and others upwards of 300,000.  The only district in which African Americans have the opportunity to elect their representatives of choice is more than ten times smaller than the smallest Anglo district.

- *Jones v. Beaumont Independent School District*, 1:2013-cv-00177 (E.D. Tex. filed March 27, 2013): This case, currently in discovery, was filed to enjoin the Beaumont Independent School District from reducing the number of trustee single-member districts from 7 to 5.  *See also Rodriguez v. Beaumont Independent School District*, 1:2013cv00304 (E.D. Tex. filed May 14, 2013).

- *Rodriguez v. Grand Prairie Independent School District*, No. 3:2013-cv-01788 (N.D. Tex. filed in 2013): This is a suit against a large school district that continues to elect its board members on an at-large basis.

- *Cisneros v. San Jacinto College District*, 4:2013-cv-00903 (filed April 1, 2013): In this case, currently pending trial, plaintiffs claim that at-large elections of trustees to the San Jacinto College District in South East Harris County violates Section 2 of the Voting Rights Act.  No African American or Hispanic has been elected to this nine-district board.

- *Benavidez v. Irving Independent School District*, 3:2013cv00087 (filed January 8, 2013): This is a suit against an at-large election scheme in the Irving Independent School District.

- *Roberts v. Ortega, et al,*, No. 3:2010-cv-00072 (W.D. Tex. filed February 22, 2010)

In sum, it is clear that the history of discrimination referenced by the three-judge court in *Texas v United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) continues to the present day in Texas. In that context, it is worth noting that the Texas Attorney General, Greg Abbott, announced that the state would implement the current voter ID law within hours of the issuance of the *Shelby County* decision, even though a three-judge federal court had determined that the same law was not entitled to preclearance under Section 5 of the Voting Rights Act because it would have a discriminatory effect on racial and language minority voters.

This conduct on the part of the Texas Attorney General, with regard to immediate implementation of the voter ID bill after *Shelby County* in complete disregard of the findings of the three-judge District Court in the DC Section 5 litigation, is consistent with the response of the state in years past -- when the federal courts struck down the "white primary" system in Texas, the poll tax, the annual voter registration system, and Texas' attempt at a complete purge of its voting lists.  As in the instant case, the state then also disregarded federal court decisions. Texas made every effort to enact legislation that would allow them to maintain the "white primary" system, the poll tax, the annual voter registration system, and voter purges.  Many of the federal court decisions regarding Texas' long history of discrimination prior to 2000 are discussed and/or cited in Appendix 1.

## II.   Other Factors in the Totality of Circumstances Analysis

In addition to my analysis of the history of discrimination in Texas, I have also analyzed some of the other factors that make up the "totality of circumstances" test established in ***Gingles*** for the purpose of presenting my opinions in this case.  The discussion of that analysis follows.

### A.  The Current Effects of Discrimination in Such Areas as Education, Employment, and Health, which Hinder Minority Citizens' Ability to Participate Effectively in the Political Process

Courts and political scientists have looked to current socio-economic conditions for three purposes:

> [L]ower socio-economic status gives rise to special group interests centered upon those factors.  At the same time, it operates to hinder the group's ability to participate in the political process and to elect representatives of its choice as a means of seeking governmental awareness of and attention to those interests. ***Gingles v. Edmisten***, 590 F. Supp. 345, 363 (E.D. N. C. 1984) *affirmed in relevant part sub nom.* ***Thornburg v. Gingles***, 478 U.S. 25, (1986).

The social and economic situation of minority residents of the State of Texas in general and in discrete areas is an excellent example of the current effects of past discrimination.  I have examined the available data from the most recent American Community Survey and Academic Excellence Indicator System (AEIS).   Hispanic and African-American residents, statewide and in specific geographic areas discussed in the report, rank significantly worse in the traditional areas that have been identified by the courts as important to political participation.   A series of charts showing this analysis is attached to this report.  These charts isolate the counties and districts at issue.   In every situation, the minority population performs significantly lower on all levels of social analysis.  For example, minorities comprise a disproportionate percentage of the

functionally illiterate, non-high school graduates in the state and in specific regions.  Other examples are contained in the attached charts.  See Appendices 2 and 3.

In the area of economic well-being, the minority community represents a disproportionate percentage of the impoverished population, of those who rely on food stamps, and of those who make an income of less than $25,000 per year.   The level of Hispanic and African-American poverty is several times that of Whites (or Anglos).  The per capita income of minorities is around half that of Whites.  Whites comprise roughly 80% of the families with incomes over $50,000.  Minority unemployment is approximately twice that of Whites.  The attached appendices demonstrate a vast differential in social and economic status between minorities and non-minorities.  See Appendices 2 and 3.

In general, both federal courts and legislators have recognized the relationship between low socio-economic status and reduced participation in the electoral process.  For example, the 1982 Senate report that accompanied the amendments to Section 2 of the Voting Rights Act stated:

> Courts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation.  Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

> S. Rep. No. 97-417 at 29 *reprinted in* 1982 U.S.C.C.A.N. 177, 207 n.114.

The Fifth Circuit has also recognized the same reasonable link between low socio-economic status and reduced participation in the electoral process.

> The Supreme Court and this Court have recognized that disproportionate educational, employment, income level, and living conditions tend to operate to deny access to political life…It is not necessary in any case that a minority prove that these economic and educational factors have 'significant effect' on political

access.... Inequality of access is an inference which flows from the existence on economic and educational inequalities.

*Kirksey v. Board of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977).

Congress and the federal courts have directed that, where there is clear evidence of socio-economic or political disadvantage, the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation. Rather, the burden falls on those who deny the causal nexus to show that the actual cause is something else. *Cross v. Baxter*, 604 F. 2d 875, 881-882 (5th Cir. 1979); *Kirksey*, *supra*, 554 F. 2d at 144-46; *Zimmer v. McKeithen*, 485 F. 2d 1297, 1306 (5th Cir. 1973). Appendix 2 and Appendix 3 include charts and graphs which demonstrate on a state-wide basis -- and also with regard to specific counties or school districts -- that minorities in Texas fall far behind their non-minority counterparts in areas of education, wage earning capacity, and other general socio-economic categories.

B. **Whether Political Campaigns Have Been Characterized by Overt or Subtle Racial Appeals**

This is another category which seems to have grown out of the Dallas County portion of *White v. Regester,* 412 U.S. 755 (1973). In that case, Plaintiffs demonstrated that in Dallas County, the Dallas County for Responsible Government (D.C.R.G.) slating group had utilized racial tactics to identify and defeat Black candidates that it had not slated.

Since Blacks have Anglo-Saxon-sounding surnames, those using racial appeals in elections found it important in a county the size of Dallas to identify the Black candidates in order to effectuate the racial prejudice of the White community. No similar evidence was produced in the Bexar County portion of *White v. Regester* where the minority candidates had all been Mexican-Americans who were self-identified by their surnames. Regardless, a court may

consider overt or subtle appeals to race in campaigns as a factor in the "totality of circumstances" analysis.

It is clear that many elections in Texas continue to see race and ethnicity utilized either subtly or overtly in an appeal to voters. One recent local example was the Houston Community College Board of Trustee elections when David Wilson, an Anglo anti-gay activist running against a black incumbent, issued campaign mailers featuring pictures of African Americans that said: "Vote for our friend and neighbor Dave Wilson.".. He also stated on his campaign mail piece that he was endorsed by Ron Wilson, who is a popular former African-American State Representative from Houston. In the fine print, Ron Wilson was actually identified as Dave Wilson's -- presumably Anglo -- cousin. Numerous complaints have been made that Mr. Wilson subtly, or perhaps not so subtly, pretended to be African-American in order to defeat his African-American opponent.

Even more recently on a statewide level, State Senator Dan Patrick played to his Tea Party supporters on the issue of immigration by calling the influx of undocumented immigrants from Mexico an "illegal invasion." Patrick also tied undocumented immigrants to violent crime and third world diseases. Patrick was quoted as saying: "They [presumably undocumented immigrants] threaten your life. They threaten your business. They threaten our state." Patrick swept to victory in the 2014 Republican runoff over incumbent Lieutenant Governor David Dewhurst. Other racial appeals in recent elections have appeared in campaign materials in Houston and in the Fort Worth region of the State. There is little doubt that campaigns in Texas are still characterized by both subtle and overt appeals to race.

**C. The Extent To Which the State or Political Subdivisions Have Used Unusually Large Districts, Majority Vote Requirements, Anti-single Shot Provisions, or Other Voting Practices or Procedures That May Enhance the Opportunity for Discrimination Against the Minority Group.**

The vast majority of voting discrimination cases over the last few decades have involved the issue of at-large elections and/or the majority vote requirement and anti-single shot provisions.  In each judicial determination, the remedy adopted by the court was specifically designed to either eliminate these features or remedy their discriminatory impact on minority voters.   The issue of unusually large districts is particularly common to Texas.  With the exception of Austin, at-large city council seats have been eliminated judicially in the following large Texas cities

- **Houston*: Leroy v. City of Houston***, 831 F2d 576, 578-79 (5th Cir 1987) ("[P]laintiffs-appellees, black and Hispanic voters in Houston, Texas, filed suit alleging that their votes were unconstitutionally diluted by the at-large method of electing the Houston City Council.…That plaintiffs eventually obtained the objective of their litigation is not seriously disputed.")

- **Dallas**:  ***Lipscomb v Wise***, 399 F. Supp. 782, 795 (N.D. Tex. 1975)  ("This is dilution. In other words, when all members of the city council are elected at large, … black voters of Dallas do have less opportunity than do the white voters to elect councilmen of their choice.")

- **San Antonio:  *Martinez v Becker*** (1977);

- **Waco**: ***Calderon v McGee***, 584 F.2d 66 (5th Cir. 1978) ("[T]he at-large election method, overlaid, as it is, upon the historic, cultural, economic and political realities of the black and Mexican-American communities in Waco, results in a marked dilution of black and Mexican-American votes. . . . (and) the lack of equal access by blacks and Mexican-Americans to the political processes leading to the election of school board trustees is an empirically obvious political reality. This lack of equal access, resulting from past discrimination, compels a finding that the present at-large election of school board trustees violated the Equal Protection Clause of the Fourteenth Amendment.") see also ***Derrick v. Mathias***, W-74-CA-2

(W.D. Tex 1976) (successful single member district case against the Waco City Council tried at the same time as *Calderon*);

- **El Paso:** *Sierra* **v.** *El Paso Independent School Dist.*, 591 F. Supp. 802, 806 (WD Tex. 1984); the Court's findings with respect to the … three *Gingles* factors in combination inescapably point to a result which violates the Voting Rights Act as amended in 1982. Therefore, judgment must be entered in favor of the Plaintiffs, and the Defendants must be ordered to implement single-member districts in place of the present at-large scheme.");

- **City of Lubbock***: Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.1984), ("The Lubbock at-large system aggravates the political disadvantage of the City's minorities.");

- **City of Irving**: *Benavidez v. City of Irving*, 638 F.2d 709, 731-32 (N.D. Tex. 2009)  ("The Court concludes that racially polarized voting is clear in Irving….Dr. Engstrom employed HPA, ER, and EI analysis, and the results of all three methods demonstrate that the white majority in Irving votes cohesively to defeat Hispanic preferred candidates.").

- **City of Corpus Christi**: *Alonzo v. City of Corpus Christi*, 68 F. 3d 944,946 (5th Cir. 1995). (citing court approved consent decree in *Alonzo v. Jones*)

Texas, in part because of its geographic size and its large population, has many examples of unusually large political divisions.  For example, Texas' United States Senate and Texas State Senate seats have the second largest populations of any United States Senate or State Senate seats in the country.  Local municipal governments, such as the Houston City Council, have much larger populations than, for example, city council seats in New York.  Even some of Texas' local school districts, such as the Lone Star College District, are the largest of their type in the country.  Traditionally, minorities have a much more difficult time electing candidates of their choice in such large districts because of the costs of campaigning and the difficulty of registering and turning out voters in extremely large precincts.

25

With the invalidation of Section 5 of the Voting Rights Act, several jurisdictions have begun to reinstall these sorts of problematic electoral districts.  For example, Pasadena, Texas, recently implemented a redistricting of their city council in which they eliminated two single-member districts and replaced them with at large districts.  Beaumont Independent School District is currently involved in litigation as a result of their elimination of two single-member districts which were replaced by at-large districts.

### D.  The Extent to Which Members of the Minority Group Have Been Elected to Public Office in the Jurisdiction

In the past decade, virtually no minorities have been elected to Congress and to the state legislature in Texas except in districts that are overwhelmingly (or at least majority) minority.  In the few instances where a member of a minority group has managed to win election in a district that does not contain a supermajority of minority voters, the minority elected official has been voted out of office in the next election.  My experience tells me that this is also true for local elections, including cities, school districts, Commissioners Courts, and various sorts of special districts.

For example, in Harris and Dallas Counties, minority residents comprise over half of the population.  In each county, the Anglo population has declined over the past decade.  All growth has come from the minority residents of these two counties.  It is significant that, had the minority population grown at the same rate as the Anglo population, Dallas County would have lost 3-5 members of the legislature and Harris would have lost 2-3.  In spite of this minority population growth and Anglo decline, minority representation remained the same as it was in the last redistricting plan.

In Tarrant County, although the Anglo population grew slightly, the minority population represented virtually all of the growth.  Had the minority population grown at the same rate as the Anglo population, the County would have lost at least one House seat.  Nevertheless, despite minority population growth, the number of districts in which minority voters are able to elect the representatives of their choice has also remained constant.   These growth patterns are described by charts and graphs in Appendix 4.

Texas was apportioned an unprecedented four additional congressional seats in 2010 as a result of the state's population growth of more than 5 million persons.   The minority population (with Hispanics representing the lion's share) provided nearly 90% of the state's growth.  Had the minority population in Texas grown at the same rate as the Anglo population, the state would likely have lost at least 1 and possible 2 congressional seats.  Nevertheless, the state congressional redistricting plan created no additional congressional districts where the minority voters could elect the candidate of choice.   A three-judge court in the United States District Court for the District of Columbia found the congressional plan to be the product of intentional discrimination and to violate Section 5 of the Voting Rights Act.  With no legal plan in effect, a three-judge court in Texas (*Perez v. Perry*) ordered into effect an interim plan that was the result of negotiation among the parties.  In it, the West Texas District 23 was improved and elected the minority candidate of choice in 2012.  The State also agreed to the use of one of Plaintiffs' proposed plans in the Dallas and Tarrant County area which created a new congressional district where minority voters were able to elect the candidate of choice.  The Texas Legislature has since adopted the interim Congressional Plan as its permanent plan.  It is significant that the additional minority Congressional Districts came about only as a result of judicial action, not

initially as legislative action.    On the Congressional level, additional litigation continues to this day.

The three-judge district court in the District of Columbia also found the 2011 Texas State House redistricting plan violative of Section 5 of the Voting Rights Act.  Unable to obtain preclearance, the state agreed to an interim plan with modifications that likewise increased the number of districts where minority voters were able to elect the representatives of their choice. This interim plan (with minor changes that are not relevant to the interim remedy) also adopted the interim plan as permanent in the 2013 session of the legislature.  As with the Congressional plan, the increase in minority opportunity is from judicial impetus and not legislative action. Further litigation before the Texas three-judge district court also continues and is tentatively scheduled for trial later this summer.

The three-judge district court in the District of Columbia also found that the 2011 Texas State Senate Plan was enacted with a racially discriminatory purpose and thus not entitled to Voting Rights Act preclearance.  As with the Congress and the state House, elections were held under an interim plan agreed to by the parties which restored Senate District 10 to its pre-2011 configuration and thereby restored the ability of minority voters to elect a Senator of their choice. The Legislature has also adopted this interim plan as permanent and the Plaintiffs who challenged the senate plan have indicated that they are satisfied with it.  A final judgment has been entered.  An appeal from an award of attorneys' fees in favor of Plaintiffs is currently pending in the Fifth Circuit.

### E.   Tenuousness of the Policy

In addition to the seven "Senate factors" the Senate report that accompanied the 1982 Amendments to the Voting Rights Act identified two additional areas of inquiry that courts have discretion to evaluate when determining whether a Voting Rights Act violation has occurred. One of those areas is the tenuousness of the policy at issue.   One of the main justifications for the passage of and immediate implementation of SB 14 was the contention that Texas elections were affected by in-person voter fraud.  It is my belief that this contention was a pretext to politically facilitate passage of SB 14 and that SB 14 does absolutely nothing to combat in-person voter fraud.

I have been involved in a number of cases as an attorney involving election fraud and have followed several others.  The sorts of fraud I have seen have included stuffing ballot boxes, removing or replacing votes in the boxes, spoiling votes, and over voting.   None of these sorts of fraud would be prevented or affected in any way by SB 14.

I have interviewed and examined election experts and other witnesses who have described various sorts of election machine fraud, such as printing of the ballots, hacking into the counting process and, when punch cards were used, changing the pagination order in the voting booklet.   In the more than 40 years I have practiced in this area, no one has ever referred to fraud involving impersonating voters.  The reason that impersonating voters does not work as a fraud in elections is that it extremely inefficient.  In person voter fraud only allows a person to cast one fraudulent ballot at a time.  For example, look at the last Democratic Party primary for the U.S. Senate, involving David Alameel.  There were five candidates:  Alameel, Fjetland, Kim, Rodgers, and Scherr.   There were 510,009 votes cast, which meant that, to avoid a runoff, one of the candidates would have required 255,005 votes.  Mr. Alameel received 239,914 votes, which

was 15,009 short of fifty percent needed to avoid a runoff.  This is a close election by statewide standards.

I decided to conduct an experiment to see how in person voter fraud could have been used to guarantee that Mr. Alameel would avoid the runoff.  On this past primary election day, I attempted to see how many polling places I could drive to and vote at.  I found that I could get to an average of 4 polling places per hour, allowing 7.5 minutes per polling place to actually wait in line and go through the voting process.  If that were true, in the 12 hours that the polls are open, I could have cast a total of 48 votes.   If others could do it this quickly, then I would have needed 314 people, each voting 48 times to make sure that Mr. Alameel avoided the runoff.

It is unlikely that anyone would attempt such a fraud.  Three hundred people is a very large conspiracy involving a lot of risk.  If any one of the poll workers knew me or the person I was impersonating, or if anyone of the 48 people I was trying to impersonate had already voted, it would be reflected on the sign-in sheets and I would easily be discovered.    If any of the 48 people I was trying to impersonate voted on Election Day, either before or after me, I would be discovered.   If anyone involved mentioned what was going on to their significant other or to a friend, the risk of the conspiracy would become even greater.   Remember, I would need 314 other people, who would be facing the same risks.   If anyone was discovered, I would run the risk of them disclosing that this was a conspiracy.   I know a lot of people who have very strong beliefs, but I cannot imagine even one who would take this sort of risk.   And of course, the punishment for voter impersonation fraud under the Texas Election Code is quite significant, which also deters people is another reason why in-person voting fraud rarely, if ever, occurs.

In this regard, it is significant that the example of the Alameel primary was a very close but low turnout statewide election.  If we were dealing with a general election, there would be

hundreds of thousands of votes to make up.  In 2010, for example, Governor Perry defeated the former Mayor of Houston by 632,086 votes.   At 48 illegal votes per person, it would take a conspiracy of 13,148 persons to make up that difference.

If you examine the possibility of in-person voting fraud in a smaller jurisdiction, the possibility of such a fraudulent scheme being successfully enacted becomes even less likely.  For example, let's look at the November 6, 2013 General Election for Commissioner Precinct 3 in Comal County (New Braunfels).  The Democratic candidate was Kathleen Krueger, who is married to Ambassador Bob Kruger.  He is probably the most well-known and popular person in the county.  He was a long term member of Congress representing Comal County, and also a US Senator.  His family has lived in Comal County and operated businesses there for many years. Kathleen Tobin Kruger is a successful author and long-term member of the New Braunfels City Council.  Even though she was running as a Democratic candidate in a Republican district, she was a serious contender.

Kathleen Krueger lost the race to Republican Kevin Webb 4,592 to 3,105.  In other words, there was a 1,487 vote difference.  Since there are only 5 voting precincts in Commissioners Precinct 3, someone wishing to commit voter impersonation fraud would be able to cast only 5 votes for Ms. Krueger.  This means that the person wishing to commit in-person voter fraud would need almost 300 additional conspirators to cast enough votes by impersonation to change the results of the election.   Comal County had 108,472 persons under the 2010 Census.  This means that a Commissioners precinct would contain approximately 25,000 persons.  It is virtually impossible that 300 people could get away with each casting 5 votes.   As the jurisdictions get smaller and smaller, the logistics become even more difficult to control because everyone knows everyone.

31

The enactment and implementation of SB 14 creates well-documented voting problems that fall most heavily on the minority population.   The record before the legislature is replete with this sort of evidence.   The statute is simply ineffective, and it purports to prevent election fraud that does not and could not exist.   The state was on notice that SB 14 would create burdens on voters, and that in-person voter fraud is virtually non-existent or nearly impossible to commit in a way that could change the results of an election.   Witness after witness from virtually every voting and civil rights group in the state testified against SB 14, but the state enacted it anyway. Later, the state sought approval of SB 14 under Section 5 of the Voting Rights Act before a three-judge federal court in the District of Columbia.  That Court also told the state that it had not proven its case and the statute was discriminatory.  Despite years of debate over voter ID in Texas, and hotly contested litigation in D.C., absolutely no record has ever been made justifying impersonation fraud as a problem, let alone a serious one.   In forty years of practice involving elections in Texas, I can recall no case of in-person election fraud.

### III. Logistics of Obtaining a Voter Identification Card

In addition to my analysis of the history of discrimination in Texas and certain of the other Senate factors I have also briefly reviewed the effect of SB14 on residents who reside in counties that do not have a DPS office and/or who reside in the Houston and Dallas urban areas.

Approximately a third of Texas counties have no DPS office.  I have done a study of the time it would take to travel from various counties where there is no such office to the nearest one in another county.   For the most part my results show that it would take at least an hour of travel (usually 60 to 120 miles round-trip) in addition to the time it would take waiting to obtain

identification at the DPS office.  The results of this study on rural areas are attached as Appendix 5.

I have also looked at the Dallas and Harris Counties' urban areas and determined how much time it would take for someone to travel by bus to the nearest DPS office.  In most cases, it would require from one to two hours round-trip on the bus, often involving several bus changes and numerous stops.  The results of my studies on urban areas are also attached as Appendix 5.[2]

I have a client who is disabled but sufficiently mobile to take the bus.  When she lost her car because she could not afford it on SSI, she did not renew her driver's license.  She asked me how she would be able to vote, because she had heard discussion about the voter ID statute.  I asked her if she had a birth certificate, and she carefully removed her original birth certificate from her wallet.  She currently lives in Section 8 public housing.  I asked her if she knew the bus route to get to the nearest DPS office here in San Antonio.  I asked her to keep notes and call me when she went through the process.   When she took the bus, she had to make one change and several stops, and it took her about one hour to get to the DPS office.  She then waited in line. When she presented her birth certificate, she was told that she needed a certified copy and was given a sheet of paper with the address of the place in San Antonio where she could get a certified copy.  She then had to walk a mile up a steep hill to the closest direct bus line downtown.  She took the bus and then waited for a long time to get the certified copy, which she paid for.  At that point, it was close to 4:00 pm, and she did not think that she could get back to

---

[2] I have personal experience with the process of obtaining and renewing a driver's license in Texas.  In the past, I have been to a number of DPS offices concerning my own driver's license and those of my children and spouses.  It is not unusual to spend several hours waiting in very small crowded waiting rooms.

the DPS office before it closed.   So she took a cab, which cost her $30.00.  She had intended to use that money to pay her light bill.  All told, she spent a full day and almost $60.00 to get her identification card.

These are real problems to real people.

## Conclusion

I have been involved in election issues with the Texas legislature for more than 40 years. For all of that time, the Texas Senate maintained a practice of requiring two-thirds of the vote of the Senate to bring a bill to the floor.   In 2007, this process prevented the voter ID bill from coming to the floor.  What happened is illuminating.  Senator Mario Gallegos, who was the first Hispanic senator elected from Houston, was waiting for a liver transplant when the 2007 session of the legislature opened.  When a liver became available, Senator Gallegos made a handshake deal with Lt. Governor Dewhurst: that Dewhurst would hold no vote in which Senator Gallegos' vote would make the difference.  In late May, just a few months after the agreement and transplant surgery, Lt. Governor Dewhurst welched on the deal and announced that he would bring the voter ID bill to the floor.   Although fighting organ rejection, from which he eventually died, Senator Gallegos traveled by ambulance to Austin and waited in an ante-room on a hospital bed until the Lt. Governor brought the bill up.  Senator Gallegos' vote gave the minority senators the needed vote so that the voter ID bill could not be brought to the floor due to the two-thirds rule being in effect.   After voting to effectively defeat the bill, Senator Gallegos said: "It's very important to me…. I think my constituents feel strongly about this. As long as I can stand, I need to be here." http://www.texastribune.org/2012/10/16/texas-state-senator-mario-gallegos-jr-dies/

During the 2011 legislative session, when the voter ID bill (SB 14) was passed, Senator Gallegos had recovered partially from his organ rejection problems and was not going to have to be brought by ambulance from Houston.  Since he was going to be available to cast the deciding vote, which would have blocked the bill, the senate adopted a rule -- without a single vote from a Black or Hispanic Senator -- that exempted the voter ID bill from the two-thirds requirement. The voter ID bill thus was passed using a parliamentary procedure that ignored decades of historical deference to minority interests in the Texas Senate.

The majority party of the Texas Legislature used strong-arm tactics to bring SB 14 to a vote, and ignored all proposed amendments from the minority party.  It then immediately implemented SB 14 after the *Shelby County* decision was issued by the United States Supreme Court.  SB 14 is significantly flawed.  There is a significant educational and financial gap between the racial groups.  The biggest problems in complying with the voter identification requirements will be faced by those on the lowest rungs of society.  All of the data shows that the poor and under-educated are disproportionately minorities.   The state was well aware of this and did nothing to rebut these facts during the trial in Washington, D.C.

The state was unable to preclear the voter ID bill.  It was unable to preclear its Congressional and legislative redistricting plans.  The state was roundly criticized by three three-judge district courts: two in the District of Columbia and one in Texas.   Indeed, the D.C. Court found racial intent in two of the states' redistricting plans.  Significantly, in order to pass both bills, the state had to change the rules that have been in place for decades.   This is reminiscent of old school electoral discrimination involving the right to vote in Texas.   Unfortunately, as the Attorney General showed when he announced the immediate implementation of SB14 within hours of the issuance of the *Shelby County* decision not much appears to have changed.

35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DeLEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMMEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC) and DALLAS COUNTY, TEXAS<br>     *Plaintiffs*,<br><br>v.<br><br>RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State,<br>     *Defendants*.<br><br><br>UNITED STATES OF AMERICA,<br>     *Plaintiffs*,<br><br>TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND, IMANI CLARK, AND MICHELLE BESSIAKE,<br>     *Plaintiff-Intervenors*,<br><br>TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, AND HIDALGO COUNTY,<br>     *Plaintiff-Intervenors*,<br><br>v.<br><br>STATE OF TEXAS, JOHN STEEN, in his Official capacity as Texas Secretary of State and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety,<br>     *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.:<br>Case No. 2:13-CV-00193 (NGR)<br>[Lead Case]<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Civil Action No.:<br>2:13-CV-00263 (NGR) |

37

| | | |
|---|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES, | § § § § § § | |
| *Plaintiffs* | § | |
| v. | § § | Civil Action No.: 2:13-CV-00291 (NGR) |
| JOHN STEEN, in his official capacity as Secretary of State of Texas, and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety | § § § § § § | |
| *Defendants*. | § § | |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ, JR., LIONEL ESTRADA, ESTELA GARCIA ESPINOSA, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.* | § § § § § § § § | |
| *Plaintiffs* | § | Civil Action No.: 2:13-CV-00348 (NGR) |
| v. | § § | |
| STATE OF TEXAS, JOHN STEEN, in His official capacity as Texas Secretary of State, and STEVE McCRAW, in his Official capacity as Director of the Texas Department of Public Safety | § § § § § § | |
| *Defendants*. | § | |

**Disclosure under Federal Rules of Civil Procedure/Background of Witness**

I have not written any articles in the last ten (10) years and I have testified in eight (8)

cases in the past four (4) years which are attached to this disclosure.   I have agreed to provide

my services in this matter at an hourly rate of $350.00 per hour.  I have spent approximately 94

hours on this case so far.  I anticipate that I will spend an additional forty (40) hours to complete

my work including preparing for and providing my deposition and preparing for and providing my trial testimony. I have been paid a total of $10,000.00 to date.

The facts and data considered by me in forming the opinion expressed in my report are contained in the various appendices attached to the report and/or are included in the report together with case citations and other research performed by me and/or are based on my personal experience as a lawyer and witness in numerous election law cases in the State of Texas over the last 40 years.

Although I am a lawyer, I have also been an adjunct faculty member in the Department of Political Science and Geography and have taught a course on the redistricting process. I have testified in a number of at-large vote dilution cases beginning in 1971 with the district court trial of *Graves v. Barnes*3 /. In *Graves* my testimony was used to identify the socio-economic, historical, and other such considerations that used to test for the degree of vote dilution which are sometimes referred to as *White*, *Zimmer* of Senate factors.4/ Articles I have written or testimony

---

[3]/ *Graves v. Barnes*, 343 F. Supp. 704 (Class action certified for all four districts in Texas 1972) (three judge) (*Graves I*); *Graves v. Barnes*, 405 U.S. 1201 (1972); *White v. v. Regester*, 412 U.S. 755; 93 S. Ct. 2332; 37 L. Ed. 2d 314 (1973); on remand *Graves v. Barnes*, 378 F. Supp. 640, (Class action certified for all four districts in Texas 1974) (Graves II) (three judge); *White v. Regester*, 422 U.S. 935, 45 L. Ed. 2d 662, 95 S. Ct. 2670 (1975); on remand *Graves v. Barnes*, 408 F. Supp. 1050, (Class action certified for all four districts in Texas 1976) (Graves III) (three judge); *Graves v. Barnes*, 446 F. Supp. 560  (Class action certified for all four districts in Texas 1976) (Graves IV)

[4]/  These factors were derived from the analytical framework of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.ED...2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen*, 485 F. 2d 1297 (1973) (en banc), aff'd sub nom *East Carroll Parish School Board v. Marshall*, 434 U.S. 636, 96 S.Ct. 1083, 47 L.ED..2d 296 (1976) (*per curiam*) S.Rep., at 28, n. 113.

which I have given have been cited by numerous Federal Courts including three occasions by the Supreme Court in interpreting the Voting Rights Act,

I was also called upon to prepare plans of apportionment to demonstrate various ways that a jurisdiction can be divided into districting arrangements.  Plans which I drew or collaborated upon were used in the **Graves/White** litigation to split formerly at-large legislative districts in all Texas urban areas including Bexar (San Antonio), Dallas, Travis (Austin), El Paso, McLennan (Waco), Nueces (Corpus Christi), and Lubbock counties. 5/

I was responsible for or significantly involved in negotiation which led to the drawing of single member districting plans used after litigation for a number of the Cities in Texas including Houston6/, San Antonio, and Waco.  I also testified as an expert in litigation after the 1981, and the 1991 redistricting of the Texas legislature.  In 1981, I was the expert witness for the effort which led to the invalidation of the entire Texas legislative plan on a combination of State Constitutional and Fourteenth Amendments theories.

---

5/  Although I had been named as an attorney in the case,  with the agreement of the defendants, I participated in the first trial of the case (**Graves I**) as an expert witness on issues of remedy (creation of single member districts) polarization and cohesion.  In addition I did a number of socio-economic studies on the majority and minority communities and the history of discrimination in Texas.  In later stages, (**Graves II** and **Graves III**) I functioned as the lead counsel for the Hispanic plaintiffs and intervenors.

6/  **Leroy v. City of Houston**, No. H-75-1731 (S.D.Tex. 1975)  (*Leroy I*)**; Greater Houston Civic Counsel v. Mann (GHCCO)**, 440 F. Supp. 696 (S.D. Tex. 1977)**; Leroy v. City of Houston**, No. H-78-2174 (S.D.Tex. 1979) (*Leroy II*)**; In re Houston**, 745 F.2d 925 (5th Cir. Tex. 1984)**; Leroy v. Houston**, 584 F. Supp. 653 (S.D. Tex. 1984) (Leroy III); **Le Roy v. Houston**, 592 F. Supp. 415 (S.D. Tex. 1984)**; Leroy v. Houston**, 648 F. Supp. 537 (S.D. Tex. 1986); **Leroy v. Houston**, 831 F.2d 576 (5th Cir. Tex. 1987) *cert. denied*, 486 U.S. 1008, 108 S. Ct. 1735, 100 L. Ed. 2d 199 (1988) (*Leroy IV*); **Leroy v. Houston**, 906 F.2d 1068 (1990) (*Leroy V*)

Much of the Texas House redistricting which followed was based upon plans which I drew or collaborated upon.  After the 1990 Census, I testified in state court in a successful effort to invalidate the 1991 apportionments of the House, Senate and Congress using the Texas Constitution's Equal Rights Amendment.[7]   The District Court ordered plans into effect which I offered in litigation and the 1990 redistricting plans used by Texas for the House, Senate and Congressional Districts are the result of negotiation which followed using the plaintiff's plans which I sponsored as the essential element.

I have testified in a number of cases in both State and Federal Court which have been litigated in the Southeast Texas including *Perez v. Pasadena Ind. Sch. Dist*., 958 F. Supp. 1196 (S.D. Tex. 1997).  In that case, the district court found:

> Plaintiffs also offered the testimony of George Korbel as an expert witness on the *Gingles* threshold, as well as on the Zimmer factors. Korbel is a recognized voting rights expert, whose focus is on the non-statistical analysis of elections and the factors that influence their outcome.
>
> The court finds that ...Mr. Korbel is an expert in the field of non-statistical voting rights analysis.

*Perez* 958 F. Supp.  at 1204 (S.D. Tex. 1997)

*See also* **League of United Latin American Citizens (LULAC) v. North East Ind. Sch. Dist**.,903 F. Supp. 1071(W.D. Tex. 1995).

After the 2000 Census I acted as coordinator and expert in redistricting by a number of jurisdictions including the Houston Community College District, the Houston ISD, the San

---

[7]/ During the effort to pass the Federal Equal Rights Amendment, the Texas legislature not only ratified the proposal but the voters overwhelmingly installed it a part of our Constitution.  It was argued that the rights guaranteed under our Constitution were similar to but stronger than those in Section 2 of the Federal Voting Rights Act or the Fourteenth Amendment.

Antonio ISD, the San Antonio Community College, the City of San Antonio, Webb County

(Laredo),  Gregg County (Longview), Cameron County (Brownsville), Red River County, the

San Marcos ISD, the Bexar Metropolitan Water District, Uvalde County, Bastrop County, Hays

County and Val Verde County

     I was involved as a lawyer and also as a witness before both the House and Senate

Committees in the successful effort to extend the special provisions of the Voting Rights Act of

1965 to cover Texas.  My testimony on the historical pattern of discrimination is generally

credited as forming the basis for the legal argument to include Texas and has been cited by

several federal courts including the Supreme Court in the interpretation of Sections 2 and 5 of the

Act.  In 1982, I again offered Congressional testimony in support of the adoption of the new

provisions for Section 2 of the Voting Rights Act.  As the legislative history indicates, the effort

was to install the legal analysis which resulted from *Graves/White.*

     Most recently I have testified in State Court concerning the redistricting of the Beaumont

ISD, in Federal Court concerning the Pasadena ISD, the Galveston County Commissioners and

Constables.  I was involved in drawing and negotiating the districts in the settlement of a Federal

Court Action in a case against the Lone Star Community College District (population of just

under 2,000,000 persons.   I testified at the settlement hearing held by the Court to adopt the plan

in November 2013.

     I have testified in the earlier hearings that have been held in this matter and in the parallel

case which was tried in the District Court for the District of Columbia.  I am currently acting in

the capacity of expert witness in redistricting matters in both the state and Federal Court matters

against the Beaumont ISD.  I am also acting as an expert witness in the case of *LULAC v. The*

*Edwards Aquifer Authority*.   Late last year I testified in a case against the Pasadena ISD and against Galveston County.  I was involved as a lawyer and also as a congressional witness in the successful effort to extend the special provisions of the Voting Rights Act of 1965 to cover Texas.  I declare under penalty of perjury under the laws of the United States that this report is true and correct to the best of my knowledge.

Signed this the 27th day of June, 2014.


/s/ George Korbel
George Korbel

*ATTACHMENT*

*Cases in which I have Testified and or Given Depositions in the Past Five Years*

***Rodriguez et al v. Harris County, Texas*** , (Filed: August 5, 2011 as 4:2011cv02907) Testimony at deposition and at trial.

***Cisneros v Pasadena ISD*** 4:12-CV-2579 Testimony at trial.

***Rodriguez v. Beaumont Independent School District***, E-194-295 172 District Court Jefferson County. Testimony at hearing.

***Petteway, et al. v. Galveston County, Texas, et al.***  (Filed: November 14, 2011 as 3:2011cv00511) Deposed, testimony at hearing and at trial.

***Hubbard et al v. Lone Star College System,*** (Filed: June 4, 2013 as 4:2013cv01 Testimony at hearing.

***League of United Latin American Citizens et al v. Edwards Aquifer Authority,***   (Filed: June 21, 2012 as 5:2012cv00620 deposed Cross Motions for Summary Judgment/trial on merits pending)

***Texas v United States*** United States District Court for the District of Columbia 1:11-cv-01303 Testimony at trial

***Perez v Texas***, (US District Court for the Western District of Texas *Case 5:11-cv-00360)* testimony by deposition and at trial.  Trial on merits pending.