# ACCEPTED PHOTO IDENTIFICATION

# AND DIFFERENT SUBGROUPS IN THE ELIGIBLE VOTER

# POPULATION, STATE OF TEXAS, 2014

### Expert Report Submitted on Behalf of Plaintiffs

### in *Veasey v. Perry*, *Case 2:13-cv-00193*

**Matt A. Barreto, Ph.D., University of Washington**

**Gabriel R. Sanchez, Ph.D., University of New Mexico**

**June 27, 2014**

## I.       Introduction and Question Presented

The primary objective of this research report is to determine the current rates of possession, and lack of possession, of accepted photo identification among the eligible voting population in the state of Texas.  More specifically, plaintiffs in *Veasey v. Perry*, no. 2:13-cv-00193, retained the report authors, Drs. Barreto and Sanchez, to create a research design that would allow for an examination of whether Latino and Black eligible voters in the state of Texas are more or less likely than eligible non-Hispanic White voters to possess accepted photo ID, and if any differences in possession are statistically significant.  The research design defined accepted photo ID as being the types of ID generally required by SB 14 to cast an in-person ballot in Texas that will be counted, for example certain types of ID that either are current or expired in the past 60 days, hereinafter called "accepted ID" or "unexpired ID"– to match the provision in the law. We also address certain related questions, such as whether those who currently lack an accepted photo ID correctly comprehend the types of photo ID acceptable under SB 14 and whether this population faces potential burdens in acquiring accepted photo ID, including whether the answers to these questions differ by race.  In addition to assessing differences between Whites, Blacks, and Latinos, we also assess the extent to which differences exist among other subgroups such as by gender and socioeconomic status.

Dr. Matt Barreto is currently an Associate Professor of Political Science, and Director of the Washington Institute for the Study of Ethnicity, Race & Sexuality (WISER), at the University of Washington, Seattle. He is also an affiliated faculty, and former executive committee member, of the Center for Statistics and the Social Sciences (CSSS) at UW, and an adjunct Associate Professor at the UW School of Law. Dr. Barreto completed a Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the U.S., political behavior, and public opinion, at the University of California, Irvine in 2005.

Over the past eight years, Dr. Barreto has collaborated closely on research related to voter identification laws with Professor Gabriel R. Sanchez.  Dr. Sanchez is currently an Associate Professor of Political Science at the University of New Mexico, Albuquerque, and Executive Director of the Robert Wood Johnson Center for

Health Policy at UNM.  Dr. Sanchez received his Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the U.S., political behavior, and public opinion, at the University of Arizona in 2005.

In 2012, Drs. Barreto and Sanchez co-authored an expert report on possession of voter ID in the state of Wisconsin for the *Frank v. Walker* lawsuit. The two scholars also co-authored a second expert report in 2012 on possession of voter ID in the state of Pennsylvania in *Applewhite v. Commonwealth of Pennsylvania*. In both instances, the presiding judge relied on the data presented in our expert reports in declaring voter ID laws unlawful under state (Pennsylvania) and federal (Wisconsin) legal provisions.

Dr. Barreto and Dr. Sanchez have together designed multiple surveys about voter ID, and co-authored conference papers and published research on voter ID laws in peer-reviewed academic journals.  We have implemented more than 100 public opinion surveys and have, in total, published 5 books and well over 60 peer-reviewed academic research articles, over 20 book chapters in academic research volumes between the two of us.

We were assisted in our research by Ms. Hannah Walker, a Ph.D. student at the University of Washington.  Ms. Walker has previously served as our research assistant on two prior surveys and expert reports on possession of voter identification. Both of our full CV's are included as appendices C and D.

While the full methodology, statistical analysis and findings are detailed throughout this report, a short overview of the most relevant findings are offered first:

- As compared to eligible non-Hispanic White voters, Black and Latino eligible voters in Texas are less likely to possess a photo ID (state or federal) acceptable under SB 14 which requires that the ID is unexpired. These differences between White voters and each minority group of voters are statistically significant. More specifically, while only 4.7% of non-Hispanic White eligible voters lack an accepted ID, 8.4% of Black eligible voters, and 11.4% of Latino eligible voters lack accepted ID.   Thus, eligible Black voters are 179 percent more likely to lack an accepted photo ID than are non-Hispanic Whites.

Eligible Latino voters are 242 percent more likely to lack an accepted photo ID than are non-Hispanic Whites.  Applying the results of the survey to the Texas citizen voting age population (as of 2012), there are approximately 1.2 million total eligible voter in Texas who lack accepted voter ID.

- Black and Latino eligible voters are less likely than non-Hispanic Whites to have heard of an EIC. Among those who lack an unexpired photo ID, 18.2% of Whites have heard of an EIC, compared to only 13% of Blacks for whom the same is true.

- As compared to eligible non-Hispanic White voters, eligible Black and Latino voters are more likely to lack an accepted photo ID <u>and</u> report facing potential burdens in obtaining an Election Identification Certificate (EIC) ID, creating a potential <u>double- burden</u> for Blacks and Latinos.  While 4.5% of non-Hispanic Whites lack an accepted ID and will face at least one major potential burden in obtaining an ID, 6.1% of Blacks lack an accepted ID and will face at least one potential burden, and 9.1% of Latinos lack an ID and will face at least one potential burden in obtaining an ID.  The difference between Whites and Latinos is statistically significant.

To test these questions a survey was designed specifically focused on the Texas photo ID law which went into effect in 2013. This research approach has three critical advantages for the purpose of identifying potential disparities in access to accepted forms of identification: 1) the use of a survey provides the opportunity to directly ask residents of Texas whether they are in possession of accepted photo ID and the underlying documents that may be used to obtain an accepted ID, 2) this study is focused on eligible voters and has sizable samples of non-Hispanic Whites, Blacks, and Latinos appropriate for statistical analysis, and 3) the survey also measured knowledge among respondents of the Texas identification law, and other potential barriers to access to obtaining an EIC. This approach is an ideal way to assess rates of possession of accepted photo ID because eligible voters were contacted directly and asked what types of identification and other documents they currently possess.  Other methods, such as examining existing large public databases, also may be used to

provide information on the types of ID that individuals possess, depending on factors such as whether each type of relevant ID is recorded in a database and whether the relevant databases are available for review. While very useful, a database review may be limited to assessing ID possession among individuals included on the list of registered voters (if there is no database list of all eligible voters), whereas this research was able to assess how the Texas voter ID law affects all eligible voters. Finally, a survey can ask more specifically about current physical possession of the relevant ID to capture any instances where IDs has been lost, stolen, misplaced, destroyed, etc. When combined with other approaches aimed at identifying the impact of the new law, the survey research discussed in this report helps provide a clear picture of the individuals across race, ethnicity, and other demographic factors who lack accepted ID.

In sum, the data obtained through this survey provides an accurate and reliable depiction of the rates of possession of accepted photo ID in Texas, and of certain related matters.  Because the percentage figures set forth in this report were obtained from a survey, these figures should be interpreted as estimates and not exact numbers.  However, using standard and well-accepted statistical techniques, the margins of error associated with the percentage estimates were all evaluated and determined to be well within conventional standards, and we likewise determined whether the differential rates between groups (most importantly, between non-Hispanic Whites, Blacks, and Latinos) are statistically significant.

## II.    Survey Methodology

### A.  Survey Research is a Reliable and Trusted Method in the Social Sciences

Within social science research, public opinion and political behavior have been longstanding areas of significant consequence and interest.  The primary reason for using survey research to study possession of accepted photo ID is simple: if you want to know if the population has the required ID, just ask them. Early on, "pollsters" learned that you could learn a great deal about voter attitudes, and possibly even predict election results, through large quantitative surveys of the public.  Over the past decades, the science of public opinion

surveys has expanded greatly and great expertise has been developed in how to accurately sample, construct, implement and analyze survey data.[1]  Survey research has become a hallmark of social science research, such that at a typical Political Science academic conference more than 500 different research papers using survey data are regularly presented.  When surveys are implemented accurately, results generated from a sample of the population can be inferred to the larger population from which the sample is drawn, given the appropriate sampling error, or confidence interval that must always be accounted for.[2]  Survey research is a standard and widely accepted practice in social science and government research.  The U.S. government regularly relies on survey methodology exactly like that relied upon in this expert report, in its collection of data and statistics, such as the U.S. Census American Community Survey and Current Population Survey, the Bureau of Labor Statistics Unemployment Survey, and surveys by the National Institutes of Health, the Department of Defense, and the Internal Revenue Service. In fact, the Office of Management and Budget has a division called the "Federal Committee on Statistical Methodology" which has reviewed best practices in survey research and recommended random digit dial ("RDD") as a method to avoid non-coverage bias because it samples all known telephone numbers.[3] According to Michael Link, formerly a research scientist for the Centers for Disease Control and Prevention, "For more than three decades, RDD telephone surveys have been the predominant method for conducting surveys of the general public."[4]

The most important starting point for sound survey research is to acquire an accurate sample frame from which to draw the eventual sample of people interviewed.  If the sample is reflective of the larger population, and the survey is administered randomly, without bias, and with an adequate sample size and response rate the

---

[1] For example, see Harold Lasswell, *Democracy Through Public Opinion*. 1941; Harry Alpert, "Public Opinion Research as Science." Public Opinion Quarterly. 20(3). 1956; and Robert Groves et. al. *Survey Methodology*, 2nd ed. 2009.
[2] Claes-Magnus Cassell et. al., *Foundations of inference in survey sampling*. 1977; Barry Graubard and Edward Korn, "Survey inference for subpopulations." *American Journal of Epidemiology*. 144(1). 1996.
[3] Federal Committee on Statistical Methodology. Statistical Working Paper 17 – Survey Coverage. 1990. http://www.fcsm.gov/working-papers/wp17.html
[4] Address-Based Versus Random-Digit Dial Sampling: Comparison of Data Quality from BRFSS Mail and Telephone Surveys. 2005. http://www.fcsm.gov/05papers/Link_Mokdad_etal_IIB.pdf

results of the eventual survey can be considered as statistically reliable estimate, at least for those questions directed at all persons sampled.[5] According to Henry Brady, Professor of Political Science at the University of California, Berkeley, "Scientific surveys are one of these tools, and they have been widely used in the social sciences since the 1940s. No other method for understanding politics is used more, and no other method has so consistently illuminated political science theories with political facts… They provided the gold standard for measuring citizen opinions… No other social science method has proven so valuable."

**B.  Principal Focus: Racial Disparities in Possession of ID in Texas**

Specifically, the current study is focused on whether eligible Latino, eligible Black and eligible non-Hispanic White eligible voters in Texas have statistically different rates of possession of accepted photo ID, and the survey was designed to address the provisions of the Texas law. For example, when respondents were asked to confirm that they had an "up-to-date" driver's license or other accepted form of photo ID, survey interviewers confirmed that, for those types of ID that expire, the ID was either current or had expired within the last 60 days – to match the provision in the law. Respondents were also asked to indicate whether they were in possession of any of the accepted forms of photo ID[6]: a Texas driver's license, a Texas personal ID card that was issued by the DPS, a Texas Election Identification Certificate card, a Texas concealed handgun license, a U.S. passport, a U.S. military ID card with photograph, or a U.S. citizenship certificate containing their photograph. This information provided directly by respondents was utilized to create our measure of accepted ID that is used throughout the report.

This study was designed to assess if there were any statistically significant differences in rates of possession, or lack of possession, of accepted photo ID based on race and ethnicity. To assess this, the survey started by asking respondents to provide their race/ethnicity (see Appendix B for full survey questionnaire).

---

[5] Richard Scheaffer et. al. *Elementary Survey Sampling*, 7th ed. 2012; Robert Groves, *Survey Errors and Survey Costs*, 2nd ed. 2004.
[6] Photo ID Required for Texas Voters: information guide posted online: http://votetexas.gov/wp-content/uploads/2013/09/poster-8.5x14-aw.pdf

Respondents could self-report their racial or ethnic group, and like the Census, respondents were allowed to select one or more racial groups.[7] After establishing eligibility to participate in the survey, all respondents were asked: "Just to make sure we get a representative sample of people here in Texas, can you tell me what your race or ethnicity is?" Respondents could select White or Anglo, Black or Black, Hispanic or Latino, Asian American, Native American, or Other.

To assess the differential rates of possession of accepted photo ID, in-group percentages are presented for individuals who do not possess the various forms of photo ID as well as for potential burdens faced for White,[8] Latino, and Black respondents to the survey. In addition to the frequencies associated with possession of accepted forms of ID, results from a series of statistical tests are presented to determine whether eligible Latino and Black voters in Texas are disproportionately impacted by the Texas voter ID law. In this case, logistic regression was utilized to determine whether or not different groups (racial groups in this case) are distinct from each other when observing binary outcomes, such as possession of acceptable photo ID.  Logistic regression is the most appropriate statistical analysis to test these relationships for two reasons: first, because the outcome variable of interest, possession of an accepted photo ID, is binary and logistic regression is best at estimating a 0,1 binary dependent variable, and second, because the regression provides a more precise, accurate, and strict test of statistical significance than does a chi-square or t-test comparison of means. Although we find similar results for the chi-square and t-tests in our analysis, the results of the regression analysis provide a direct test of whether possession rates of acceptable ID vary in a statistically significant manner for Blacks or Latinos, as compared to Whites.

As is the norm in the social sciences, standard levels of significance are utilized of .001, .010, .050, and .100 to determine if a result is statistically significant. The following symbols in the tables provide an indication

---

[7] Out of entire sample of 2,344 respondents there were 5 respondents who said they were both Hispanic and white.  In this case, we included these as part of the Hispanic group and not as white, consistent with the United States Census.  In total, there were 21 respondents who stated more than one race/ethnicity which accounted for less than 1 percent of all cases analyzed.

[8] Hereinafter in this report, the category/label "White" is used to refer to non-Hispanic Whites.

of the confidence level and degree of statistical significance for the observed difference between minority groups and whites:

\*\*\* Pr < .001 \*\* Pr < .010 \* Pr < .050 ‡ Pr < .100. For example, if a relationship is marked with a \*\* symbol, we can say that the observed difference between Latinos and whites would achieve statistical significance at 99% certainty – that is, we have 99% statistical certainty that the difference we observe is real and not the result of sampling error.  Similarly, if the pr value is .050, then we can say that the observed difference would achieve statistical significance at 95% certainty. The statistical significance, or confidence interval, essentially takes into account the survey margin of error, and degree of difference in results to determine if the differences observed are real and true.

We also occasionally present raw number estimates of the number of persons affected.  These estimates are included to provide further insight into the scope of the effects of SB 14, and are not used to assess the presence or extent of differential effects by group since that differential analysis necessarily depends upon comparisons of the rates among the different groups.  The raw number estimates are extrapolations based on applying the survey's percentage estimates to the Census data for the citizen voting age population of Texas.

Finally, it was critical that respondents to the survey were both residents of Texas and eligible to vote. The survey therefore started with the following question that was used as a screener for eligibility to participate in the study:

> "Okay, just to make sure you are eligible to take part in our survey about voting, can you confirm that you are 18 or over, and currently a U.S. citizen, and are not currently on probation, parole, or extended supervision for a felony conviction, and you have lived here in Texas for more than 30 days?"

At the end of the survey, respondents were asked to confirm they were a resident of the state of Texas, and any individual who provided a response to these items that would make them ineligible to vote were excluded from the study, ensuring that the analysis is focused on eligible voters in Texas. Therefore, any relationships between

race and ethnicity and possession of accepted photo identification are specific to the voting eligible population of the state.

### C.   The Additional Questions: Differences by Other Demographic Indicators

In addition to race and ethnicity, our analysis includes a focus on the demographic indicators of gender, age, income, and education. Similar to the approach with race, percentages for individuals who do not possess the various forms of photo ID are presented for each category of these other demographic variables. For example, rates of possession for the following income categories are presented: less than $20,000, $20,000 to $40,000, $40,000 to $60,000, $60,000 to $80,000, $80,000 to $100,000, $100,000 to $150,000 and greater than $150,000 annual household income. Likewise, similar categorical break-outs for age and education groupings are presented, as are comparisons between men and women. A series of logistic regression analyses were also conducted for these additional demographic indicators to assess whether there were statistically significant differences in possession of accepted forms of ID due to gender, income, age, and educational attainment. This additional information will provide a more comprehensive picture of how the Texas law could impact voters from the state, with a specific focus on assessing statistically significant differences in possession rates of accepted forms of ID across race, ethnicity, gender and socio-economic factors.

### D.   Texas Demographics

Previous studies focused on other states indicate that voter ID laws have the potential to disproportionately affect specific segments of the population, including racial and ethnic minorities, the elderly population, and those of low socio-economic status.[9] Given the diversity of Texas, it is relevant to extend a similar analysis to this state.

---

[9] Barreto, Matt, Stephen Nuño, and Gabriel Sanchez. 2009. "The Disproportionate Impact of Voter-ID Requirements on the Electorate—New Evidence from Indiana." *PS: Political Science & Politics*. 42 (January)

According to data from the US Census Bureau, among the citizen adult population in Texas, 37.9% is Hispanic or Latino, 11.5% is Black and 44.8% is non-Hispanic White. In terms of age, one-third of the population is 18-34, and another 14.5 percent are over the age of 65. Moreover, 18.9% have not completed high school, and when coupled with those with *only* a high school degree or equivalent, nearly 45 percent of the adult population in Texas has just a high school degree or less. Finally, a full quarter of the households in Texas earn less than $25,000 per year.  Thus, the demographic portrait of Texas is one that is diverse along racial and ethnic bounds, as well as socioeconomically.  As one of the largest states in the country, with more than 16.5 million adult citizens as of the 2012 Census ACS, voter identification laws have the potential to impact a large number of individuals in Texas. Further, as discussed in the next section, census demographics are used in weighting the sample to help ensure that the survey data are accurately reflective of the demographics of Texas.

### E.  Survey Design

In designing a survey, researchers must consider three important topics to ensure their project is of the highest quality and follows social scientific standards.  Two of the three relate to the design of the survey, and are discussed in this subsection of the report.

The first issue concerns the population for which inferences will be made and the method of interacting with that population.  In this case, inferences will be made about the rates of possession of accepted photo identification for the eligible voting population in the state of Texas (and related matters).  With this in mind, the most accurate and efficient way to contact this population should be determined. The most common approaches are through the use of (1) random digit dial and (2) household listed samples.

Random digit dial, or RDD, takes the known area codes and prefixes for a given geographic area, and randomly generates the last four digits of phone numbers and calls those numbers entirely at random.  This increases the likelihood that every possible phone number in Texas has an equal chance of being called.

A second approach that is also used quite extensively is randomly calling listed household samples. Rather than calling randomly generated phone numbers (some of which may not exist), a listed sample starts with the known universe of actual phone numbers for landline and/or cell phone subscribers that currently reside in a geographic area (Texas in this case). Listed samples are far more efficient than pure RDD because they greatly reduce the number of "dead numbers" dialed and allow interviewers to focus on known working phone numbers. Listed samples are especially useful if researchers are interested in drilling down into a particular sub-group within the population such as racial or ethnic minorities, or registered voters. Sample vendors can sell a listed sample of all households in a particular area, or they can provide sample records for just Hispanic households. Likewise, sample vendors sell lists of known cell phone/wireless phone numbers for particular geographic areas, and those can then be randomly dialed as part of a survey. One of the advantages of using a survey firm with extensive experience purchasing lists is that the firm is able to secure these lists from the most reputable vendors available. This includes being able to secure cell-phone users who may have cell-phone numbers from outside of Texas but who actually reside within the state.

For this particular survey, several sample components were used. First, an RDD sample of 800 eligible voters representative of the full demographics of Texas was targeted (the survey ended up contacting 804 such eligible voters). This initial sample provides the survey power to analyze internal variation within the state's overall population. Second, in order to reach a reliable sample of Black and Latino eligible voters, two separate listed-sample oversamples of Black and Hispanic eligible voters were undertaken, so that when point estimates are provided for these two groups they each surpass n=800 in the sample. These robust samples provide the ability to explore variation within each population as needed, and ensure that the margins of error associated with our results are well within accepted levels. In both instances, the survey reached eligible voters in landline

and cell-phone-only households.[10] Sample sizes and configurations are set forth in table A, and further discussed below.

Table A: Sample composition

|  | RDD | Listed |
|---|---|---|
| White | 532 | 135 |
| Black | 77 | 724 |
| Latino | 136 | 666 |
| Other | 59 | 15 |
| Total | 804 | 1,540 |

The second issue to ensure that a survey meets all social science standards concerns the design and construction of the survey questionnaire itself.  In designing the questionnaire, researchers should follow best practices established by existing social science research, as well as groups such as the American Association of Public Opinion Research (AAPOR).  It is important that questions are direct, objective, and neutral, not meant to lead respondents to give one particular answer over another, and should give respondents an appropriate range of available answer choices.  With modern survey technology, questionnaires should always be programmed to rotate question wording, randomize answer choices, rotate options forward-to-back and more, to ensure that no priming takes place whereby respondents lean towards one type of answer because it is always read as the first option.  For example, if a survey always led with the negative option for a question assessing approval of the President – strongly disapprove – researchers might end up with an over-estimation of respondents who pick strongly disapprove because they hear that first. For this project, we strictly followed the best social science practices for designing and implementing a survey.

The full questionnaire is included as an appendix to this document (Appendix B) so that readers can see that all of these criteria were followed in designing and implementing this survey. In this instance, the survey

---

[10] Cell phone respondents may also include current residents of Texas who have a non-Texas area code, but who appear on a listed sample of Texas households.

questionnaire contained five main sections: first, screening questions to establish eligibility to participate in the study; second, questions focused on accepted photo ID; third, questions that probed rates of possession of documentary proof of citizenship, identity, and residency; fourth, questions about possible burdens to acquire an EAC; and fifth, demographic questions concerning the sample.

### F.   Survey Execution

The third issue to ensure that a survey meets social science standards concerns the implementation of the survey instrument.  In executing a survey, all possible respondents must have an equal chance to respond, participate, and be included.  For example, if potential respondents were only called at home at 1:00 pm in the afternoon on Fridays, this would result in a sample that would be distinct from the overall population of Texas since many would not be able to participate in the study because they would have been at work during the call time. Instead, researchers should take an approach that gives each potential respondent an equal opportunity to be included in the survey.

The actual phone calls and implementation of the current survey was handled by Pacific Market Research (PMR), a market research firm in Renton, Washington, under our supervision and direction.  This is a highly reputable survey firm that has implemented many surveys for applied, legal and academic research[11] including surveys implementing similar designs as that used here for the purposes of exploring differences in public opinion and voting behavior. Further, Pacific Market Research implemented the surveys we performed for similar voter ID studies in the litigation noted above in Pennsylvania and Wisconsin, and the courts in those cases found the survey data to be reliable and consistent with accepted social science practices.

---

[11] The surveys conducted by Pacific Market Research include surveys for the U.S. Internal Revenue Service and the U.S. Department of Defense, surveys to study juror pool knowledge of pending cases and to study public opinion and voter participation among Whites, Hispanics, Blacks, and Asian Americans, and proprietary market research for firms such as Microsoft, AT&T, and T-Mobile.

As discussed above, two sampling approaches were used in this survey.  First, PMR implemented a pure RDD approach obtaining an overall sample of 804 Texas eligible voters. Numbers were randomly generated, and then randomly selected phone numbers were dialed.  To target Latino and Black eligible voters for separate oversamples, PMR procured a listed sample of Black and Hispanic households in Texas, and then randomly selected phone numbers to be dialed.  An additional sample list, of known cell/wireless-only households, also was used to ensure that residents who do not have a landline telephone were still included in the survey. This step was important, as more and more people are moving toward cell phone usage and cancelling their land-line telephones. Adding a cell-phone sample ensures that the data can speak to all aspects of the Texas population. In all cases, calls were made from 4pm – 9pm central time Monday through Friday, and 12pm – 8pm central time Saturday and Sunday, beginning on March 16, 2014, and continuing until April 18, 2014.  Landline numbers were auto-dialed and wireless numbers were manually dialed. If a respondent completed the survey, or refused to participate, that respondent was taken off the call list for future calls.  Phone numbers were dialed and re-dialed up to five times in order to avoid any possible non-response bias that may result from only making one or two attempts per number.  A full analysis of the data indicates that non-response bias did not present any problems in this study, given that up to five call-back attempts were used, and thus did yield hard-to-reach respondents. Phone numbers were "released" in batches of 100, and dialed until all numbers were exhausted, and then a second batch was made available, and so on.

Respondents had the choice of completing the interview in English, or in Spanish, and among self-identified Hispanic respondents, 60% took the survey in English, and 40% in Spanish.  Among Whites and Blacks, 100 percent took the survey in English. Making the survey available in both English and Spanish is critical, as many Latinos in Texas prefer to take surveys in Spanish even if they are able to do so in English. This ensures that the responses provided by respondents are accurate and not biased by communication issues related to language effects.

Overall, Pacific Market Research reported a Response Rate-3 of 26.3 percent and a Cooperation Rate-3 of 39.2 percent, calculated as per the American Association of Public Opinion Research (AAPOR) guidelines.[12] In the field of survey research, response rates between 20 and 30 percent are considered to be accurate and in an accepted range, and this project falls within that range.[13]

After collecting the data for the main Texas sample, and the Black and Hispanic oversamples, underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each from the 2012 U.S. Census, *American Community Survey* for Texas.  Where there were any discrepancies, a weighting algorithm was applied to balance the sample, called raking ratio estimation,[14] so that the final samples that were tabulated for the analysis were in line with the U.S. Census estimates for Texas.  For example, it is well known in survey research that people under 25 years old are harder to reach than older people who are over age 65.  If 8% of survey respondents are age 18-24 years old, but census data tells us they are actually 14% of the eligible voting population, then each young person needs to be "up-weighted" so that collectively they represent 14% of the sample.  Overall, the discrepancies between the collected data and the Census population estimates were quite small, and therefore the resulting weights that were employed were also quite small.  Still, by weighting the data to known ACS demographics for each group, or for the state at large, this helps to ensure that the sample generated for the report is reflective of the overall population of Texas and, consequently, that the inferences made regarding possession rates of accepted ID (and related matters) are reflective of that target population as well.  Weighting of survey data is a very common and accepted approach in social science research, especially when inferences are made to the larger population.[15]

---

[12] For more on AAPOR guidelines: http://www.aapor.org/Response_Rates_An_Overview1.htm. The response rate refers to percent of individuals who agreed to take the survey out of the overall number of cases in the sample. In contrast, the cooperation rate refers to the percent of individuals who agreed to take the survey out of the overall number of individuals actually reached by researchers.
[13] Scott Keeter et. al. 2006. "Gauging the Impact of Growing Nonresponse on Estimates from a National RDD Telephone Survey," *Public Opinion Quarterly*. 70(5)
[14] Michael Battaglia et. al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.
[15] Eun Sul Lee and Ronald Forthofer. 2006. *Analyzing Complex Survey Data.* Sage Publications.

### III.   Impact of the Texas Photo ID Law

As of 2014, Texas now generally requires that individuals provide accepted photo identification before they are issued a regular ballot when seeking to vote in person on election day or as part of in-person early voting. Acceptable identification includes a Texas driver's license, a Texas personal ID card that was issued by the DPS, a Texas Election Identification Certificate, a Texas concealed handgun license, a U.S. passport, a U.S. military ID card with photograph, or a U.S. citizenship certificate containing photograph.  All forms of identification, aside from a U.S. citizenship certificate, must be current or have expired within 60 days of the election.  The ID must have the individual's name printed on it and that name must be substantially similar to the name in the voter registration file.

#### A.  Impact of SB 14 on the Overall Population of Texas Eligible Voters

Among the overall population of eligible voters in Texas a sizeable portion do not possess an acceptable form of photo ID. According to the estimates obtained from the survey, 7.2 percent of eligible voters do not possess an accepted photo ID. In terms of a raw number extrapolation, approximately 1.2 million eligible voters currently do not possess an accepted ID in Texas.

The survey further found that a lack of accurate information may affect the ability of eligible voters lacking an acceptable photo ID to obtain the required photo ID.  While 92.8 percent have an accepted photo ID, 97.2 percent of Texas eligible voters believe they currently have an accepted photo ID. If they believe they currently possess an accepted ID, these eligible voters with an expired or incorrect type of ID may be less likely to go to obtain a new or corrected ID than those who know they lack accepted ID simply because they believe they are already in compliance with the law.  Further, we find a large number of eligible individuals do not possess documentary proof of citizenship and documentary proof of identity used to acquire an accepted form of photo ID . Among those who currently lack ID and thus generally not eligible to vote in person, 26.5 percent do not currently possess underlying documents used to obtain an EIC.

Finally, when asked how easy or difficult it will be to visit a DPS or County Clerk office to obtain an EIC, an overwhelming 91 percent of Texans who currently lack an ID state they will face at least one potential burden in doing so. Such burdens might include not being able to visit the office during limited operating hours, getting a ride or public transportation, or paying the costs associated with underlying documents, any of which independently present problems when attempting to access and EIC.

This initial overview indicates that there is a significant segment of the Texas population that lacks the accepted forms of identification.  The next section of the analysis focuses specifically on whether possession rates of accepted ID vary significantly across racial and ethnic groups.

### B.  Disparate Rates by Race/Ethnicity

#### 1.  Rates of possession of accepted photo ID for eligible voters by race/ethnicity

We find differences in possession rate by race/ethnicity. Eligible Black and Latino voters disproportionately lack an accepted photo ID in Texas. In fact, the relationship between race/ethnicity and possession of an accepted photo ID is statistically significant at a very rigorous level utilized in social science research (Table 1). Among Latino eligible voters, 11.4 percent lack an accepted form of photo ID, and 8.4 percent of Black eligible voters lack an accepted form of photo ID, compared to only 4.7 percent of White eligible voters (Table 1). This means that Blacks are 1.78 times more likely *to lack* accepted ID, and Latinos are 2.42 times more likely *to lack* accepted ID than are Whites.[16] In terms of raw numbers, we may extrapolate that 180,000 Black and 555,000 Latino eligible voters do not possess accepted photo ID (Table 1). Taken together, more than 730,000 Black and Latino citizens, who are otherwise eligible to vote do not possess any of the photo ID generally required under Texas law for in-person voting.

---

[16] We arrive at this by dividing the rate of Latinos who lack ID (11.4) by the rate of Whites who lack ID (4.7) to get 1.78; and likewise for Blacks who lack ID (8.4) divided by 9.3 to get 1.42



** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

### 2. Rates of possession of accepted ID for registered voters and actual voters by race/ethnicity

The next step in the analysis was to examine the relative rates of possession, or lack of possession, of ID among those already registered to vote, by race and ethnicity. This analysis builds on the previous section and provides an assessment of the impact of the new law on both eligible voters as well as those who were already registered to vote at the time of the survey interview. Similar to the patterns among the overall population of eligible voters, possession of accepted photo ID among registered voters also varies significantly by race and ethnicity. While 2.1 percent of white registered voters do not possess an accepted photo ID, 4.9 percent of Black and 6.8 percent of Latino registered voters lack accepted photo ID (Table 2). Further, both difference between Black and White registered voters, and Latino and White registered voters are statistically significant at the 99% level.

### 3. Public knowledge of voter ID Law in Texas by race/ethnicity

As noted above, one challenge facing eligible voters in Texas without an accepted photo ID is that they correctly understand the voter ID law.  In this regard, we find that Blacks and Latinos will be disadvantaged as compared to Whites: 7.0% of Blacks and 9.1% of Latinos indicate in the survey that they believe they have an

accepted photo ID when in fact they do not have an accepted photo ID, compared to 3.8% among Whites (Table 5).



** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

4. **Rates of possession of documentary proof of citizenship and identity among eligible voters who do not possess a photo ID**

The next step in the analysis was to determine the proportion of voters who not only lack possession of an acceptable form of ID, but who may lack documents used to acquire an accepted photo ID. In this case, we specifically focused on the regulations and requirement to obtain an EIC for purposes of voting. More specifically, questions were asked focused on the possession of documentary proof of citizenship and documentary proof of identity – which are both used to acquire an EIC.

Overall, the data show that about one out of four (26.4%) Texans who lack an unexpired ID also lack the underlying documents required to obtain an ID (Table 7). Among Blacks who lack an unexpired ID, 30.4% do not have underlying documents used to obtain an ID, while 23.4% of Latinos lack these underlying documents (Table 7).

5.     **Are Latinos and Blacks who lack a photo ID disproportionately lower in socioeconomic status than Whites?**

Among those who lack a photo ID, some amount of resources are likely needed to obtain an accepted ID.  For example, citizens without accepted ID and without the requisite underlying documents will have to have the proper information and know-how to navigate the bureaucratic systems to obtain copies of birth certificates, naturalization records, social security cards, marriage or divorce certificates and so on.  In addition, those without accepted ID may have to take time off work or school to visit the appropriate state or county office, and find a means of transportation to and from.  Under any scenario, eligible voters who lack ID will face some potential burdens in attempting to obtain an accepted ID.

As compared to the population who already has an unexpired ID, Texas eligible voters who lack ID are disproportionately low-income, with 44.7% of those who lack ID reporting an annual household income of less than $20,000 in 2013 (compared to only 12.8% of those who have an ID for whom the same is true). As socioeconomic and demographic research has extensively documented, Latinos and Blacks in Texas are far more likely to be in the lowest income bracket than are Whites.  Looking just at respondents who lack an unexpired ID, 61% of Blacks earn less than $20,000 annual household income, as do 51% of Latinos – compared to 23% of Whites who earn less than $20,000.  Thus, any burdens related to obtaining underlying documents that involve direct or indirect financial costs will disproportionately affect Black and Latino eligible voters in Texas.



*** statistically significant difference from Whites at 99% confidence level

Beyond income, we find other major discrepancies between minorities and Whites in terms of socioeconomic status (Figure 4). For example, among eligible voters who lack and unexpired ID, 39% of Whites are homeowners compared to just 29% of Blacks and just 33% of Latinos. And in terms of educational attainment, just 10.2% of Whites who lack ID did not complete a High School degree, compared to 27.6% of Blacks and 61.4% of Latinos who do not have a High School degree. These significant socioeconomic disparities will create real world differences in the burdens faced by Blacks and Latinos in attempting to obtain an accepted photo ID.

**Figure 4: Summary Socioeconomic Characteristics of Eligible Voters who Lack an Unexpired ID by Race**

|  | White | Black | {B - W} | Latino | {L - W} |
|---|---|---|---|---|---|
| Own their own home | 39 | 29 | -10 | 33 | -6 |
| Lived 2 years or less at current address | 14.6 | 36.5*** | +21.9 | 14.7 | +0.1 |
| Did not complete HS | 10.2 | 35.6 | +25.4 | 51.6*** | +41.4 |
| Less than $20K annual income | 22.9 | 61.5** | +38.6 | 51.4*** | +28.5 |

** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

### C.  Possession of Accepted photo ID and Other Demographic Indicators

Although the primary focus of this report centers on race and ethnicity, a secondary question of interest is whether rates of possession of required forms of ID vary due to other demographic factors. The next section of the report examines the relationship between gender, age, education, and income with possession of accepted forms of photo ID among eligible voters in Texas.

#### 1.   Rates of possession of accepted ID by age

The analysis by age cohort indicates that younger eligible voters disproportionately lack an accepted photo ID.  Overall, just 85.2% of eligible voters in Texas age 18-24 have a proper photo ID that can be used for voting, while 14.8% lack an ID.   This is over three times the rate of lacking an ID of middle-age voters, age 35-54. What's more, these younger eligible voters are the most likely to wrongly believe that a Texas state university ID would count for purposes of voting – 73.8% of those age 18-24 who lack an unexpired photo ID think a university ID can be used to comply with the voter ID law.

#### 3.   Rates of possession of accepted ID by educational attainment

Exhibiting one of the clearest direct relationships among all demographic categories, the level of educational attainment of eligible voters is strongly related to possession of an accepted photo ID. Eligible voters who have not earned a high school degree are statistically less likely to possess an acceptable photo ID. Among those without a high school degree, 14.7% lack an accepted photo ID, compared to only 1.6% of college graduates who lack an accepted photo ID. What's more, we find that eligible voters without a high school degree are the least likely to have heard of an EIC – at just 13% who lack an unexpired photo ID and say they know about the EIC. Finally, those in the lowest educational category also have the highest probability of lacking underlying documents that may be used to obtain an EIC with 36% stating they do not these underlying

documents. The relationship between education and possessing underlying documents necessary to obtain an EIC among those who lack an unexpired ID is statistically significant.

### 4. Rates of possession of accepted photo ID by income

Across all categories, individuals who make less than $20,000 a year are less likely than their wealthier counterparts to possess an accepted photo ID, at the strictest level of statistical significance in the social sciences (99%). Just over 21% (21.4%) of eligible voters who earn less than $20,000 annually do not have an accepted ID. On the other end of the income scale, just 2.6% of eligible voters who earn $100,000 to $150,000 lack photo ID and just 2% of those who earn over $150,000 lack photo ID. This means that the poorest citizens in Texas are over four times more likely to lack an accepted photo ID than the wealthiest citizens in Texas. What's more, there continues to be a lack of accurate information as we find that 22.5% of those earning less than $20,000 annually believe they have a proper ID, but in fact they do not. Finally, the data demonstrates that lower income respondents are the most likely to lack underlying documents that may be used to obtain an EIC.

**Summary of Section IV: Impact of the Texas ID Law on Eligible Voters**

In sum, Texas's voter ID law, which generally requires individuals to possess an accepted form of photo ID in order to cast an in-person ballot that will be counted, disproportionately affects racial and ethnic minorities. The results indicate that approximately 11.4 percent of Latino eligible voters and 8.4 percent of Black eligible voters lack an accepted form of photo ID, compared to only 4.7 percent of White eligible voters. This means that Blacks eligible voters are 1.78 times more likely *to lack* accepted ID, and Latino eligible are 2.4 times more likely *to lack* accepted ID than are Whites. When assessing the estimates of the number of people who will be impacted by the voter ID law in Texas, more than 180,000 Black and 555,000 Latino citizens in Texas, who are otherwise eligible to vote, will not have access to the ballot box because they do not possess an

accepted photo ID as defined by current Texas law. Beyond possession of accepted photo ID, racial and ethnic disparities were identified in knowledge and familiarity with the voter ID law.

 In addition to Latinos and Blacks, the analysis indicates that other demographic groups are less likely to possess the required forms of ID generally needed to vote in person under the new law. Those with a lower socio-economic level see statistically significant disparities when compared to voting-eligible persons with a high socio-economic level. Statistically significant differences in rates of possession of accepted photo ID also were found by age groups among eligible voters.

## V.   Potential Burdens Faced in Acquiring an EIC

In addition to directly investigating the percentage of eligible voters in Texas who currently lack the photo-identification generally required for in-person voting by the new law, our study included the potential impact of increased costs or barriers to voting more broadly on voter participation. This additional analysis was motivated by the consideration that the new law could increase the cost of electoral participation by increasing the financial, time, and information costs of this activity; this, in turn, could impact turnout rates of eligible voters in Texas. More specifically, eligible voters who lack an ID may face costs such as the following to obtain an EIC:  (1) learning where to go to obtain an EIC; (2) gathering all necessary documents to present to the issuing official; (3) obtaining transportation to obtain an EIC; and (4) taking time to visit an appropriate office during business hours. We asked a battery of questions aimed at assessing whether respondents who lack a driver's license or ID card feel as though a number of increased costs or burdens associated with acquiring the ID would pose a problem for them if they attempted to obtain an EIC.

### A.  Political Science Research Shows That Added Costs May Decrease Participation

In his seminal work, *An Economic Theory of Democracy* (1957), Anthony Downs articulated a rational choice theory of voting behavior that predicts individuals will vote when the benefits of doing so outweigh the

costs.[17] This theory has been verified over time by political scientists who have identified institutional

constraints (e.g. registration and voting requirements) as the chief source of cost imposition to voters.[18]  For

example, Rosenstone and Wolfinger found that strict registration laws, including deadlines and limited office

hours, reduce overall turnout.[19]  It is important to note that, with relatively low perceived benefits to voting

among the electorate, even small increases to barriers to the ballot box can have a marked impact on turnout.

Beyond the resource-based cost-benefit analysis that voters confront in a Downsian environment, it is

relevant to take into account the history of overt racial exclusion at the ballot box in the United States that

researchers have found has restricted voting rates among non-White citizens.  Voting rules and regulations have

been directly tied to the exclusion of Blacks, Latinos, and Native Americans, primarily in the South and

Southwest, since the 15th Amendment proclaimed the right to vote shall not be denied on account of race or

color.  Some scholars who study voting rights have argued that a high percentage of changes to voting

requirements in the South from 1870 to 1964 were intended to limit or deny Blacks the right to vote (Davidson

1992; Grofman and Handley 1991). This history implies that institutional requirements for registration and

voting have both direct and indirect racial effects, which indicates a need to explore whether the potential

burdens associated with the new law in Texas differ by race and ethnicity.

Despite the passage of the VRA the relationship between obstacles to voting and race remains relevant

today. Research has shown that several voting practices –  including drawing district lines that fragment

minority voting populations, holding at-large elections, and changing city boundaries in order to manage the

---

[17] Downs, Anthony. 1957: *An Economic Theory of Democracy*. New York: Harper & Row.
[18] See for example: Piven, Frances Fox, and Cloward, Richard A. 1988. *Why Americans Don't Vote*. New York: Pantheon Books. Verba, Sidney, Kay Schlozman, and Henry Brady. 1995. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge, MA: Harvard University Press.
[19] Rosenstone, Steven and Raymond Wolfinger. 1978. "The Effect of Registration on Voter Turnout." The American Potlitical Science Review, 72 (1), 22-45.

racial composition of the population – can negatively impact minority voters.[20]  Recently, for example, extensive analysis by Herron and Smith (2012; 2013) found that efforts to curb early voting in Florida disproportionately affected Blacks and Latinos.[21]

Not only do increased barriers to the ballot box decrease turnout among the electorate (and particularly those with fewer resources), removing barriers to voting has been found to increase turnout among these segments of the population.  For example, research following the passage of the 1965 Voting Rights Act found that this major legislation along with other reforms that eliminated policies like white primaries in the South and other discriminatory practices such as poll taxes and literacy tests significantly increased participation among groups targeted by the laws.[22]  By 1967, the registration gap between Blacks and whites in Alabama had closed by nearly 12 percentage points; in North Carolina it closed by nearly 20 percentage points; and, in Mississippi Black registration jumped form 6.7 percent in 1965, to 59.8 percent in 1967.[23]  Similarly, with the extension of the VRA to language minorities in 1975, Hispanic registration and turnout rates increased.[24]  Additional empirical analysis of the effect of a wider set of reforms supports the hypothesis that reducing institutional barriers to voting may expand participation among groups that tend to turnout at low rates.[25]

---

[20] See, *e.g.*, Davidson, Chandler. 1992. "The Voting Rights Act: A Brief History." In Controversies in Minority Voting, ed. Bernard Grofmanand and Chandler Davidson. Washington, DC: Brookings Institution.

[21] Michael Herron and Daniel A. Smith. 2013. "House Bill 1355 and Voter Registration in Florida," *State Politics and Policy Quarterly.;* Michael Herron and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," *Election Law Journal* 11 (3): 331-47.

[22] Davidson, Chandler. 1992. "The Voting Rights Act: A Brief History." In Controversies in Minority Voting, ed. Bernard Grofmanand and Chandler Davidson. Washington, DC: Brookings Institution.; Grofman, Bernard and Handley, Lisa. 1991. "The Impact of the Voting Rights Act on Black Representation in Southern State Legislatures." *Legislative Studies Quarterly,* 16(1): 111-128.

[23] Grofman, Bernard and Handley, Lisa. 1991. "The Impact of the Voting Rights Act on Black Representation in Southern State Legislatures." *Legislative Studies Quarterly,* 16(1): 111-128.

[24] Rosenstone, Steven J., and Hansen, John Mark. 1993. *Mobilization, Participation, and Democracy in America.* New York: Macmillan Publishing.

[25] See: Rosenstone, Steven and Raymond Wolfinger. 1978. "The Effect of Registration on Voter Turnout." The American Political Science Review, 72 (1), 22-45.;  Campbell, Angus, Converse, Philip E., Miller, Warren E., and Stokes, Donald E. 1960. *The American Voter.* Chicago: University of Chicago Press.; Katosh, John P., and Traugott, Michael W. (1982). Costs and values in the calculus of voting. *American Journal of Political Science* 26: 361.; Jackson, Robert A. 1993."Voter Mobilization in the 1986 Midterm *Election." Journal of Politics,* 55:1081-1099.; Kim, Jae-On, Petrocik, John R., and Enokson, Stephen N. 1975. "Voter turnout among the American states: Systemic and Individual components." *American Political Science Reiew,* 69: 107-131.

Similar to the role of race for increased costs, the positive effects associated with decreasing costs of participation also vary by race and ethnicity. For example, the National Voter Registration Act (NVRA) passed in the early 1990's increased registration among minorities more significantly than among whites.[26] The NVRA was designed to ease voter registration by incorporating registration into the activities of the department of motor vehicles and public assistance agencies, thereby increasing access. As a result, public assistance agencies registered three percent of new white registrants, seven percent of new Black voters and six percent of new Latino voters. These findings suggest that institutional rules related to voting impact minorities more than Whites.  The section below provides discussion of the results from our survey that explores the reported obstacles associated with obtaining the required ID by race in the state of Texas.

## B.  Reported Obstacles to Acquiring an EIC by Race/Ethnicity

We begin our discussion of the burdens issue with the results from our survey items on this topic among eligible voters. Here we focus on two groups: eligible voters who lack an accepted ID, and eligible voters who reported they lacked an accepted type of photo ID that is both unexpired and has a name that matches that on the voter rolls.[27] We present results by race and ethnicity to assess how minority eligible voters will be impacted and whether or not a substantial proportion will face additional potential burdens. Our findings indicate that a high percentage of Black and Latino eligible voters will encounter potential burdens in their pursuit of an accepted photo ID.

---

[26] Wolfinger, Raymond, and Jonathan Hoffman. 2001. "Registering and Voting with Motor Voter." *PS Political Science and Politics,* 34 (1), 85-92.

[27] By "name match," we mean instances where survey respondents reported that the name on their accepted  SB 14 photo identification does not exactly match their name as it appears on the registration rolls.  The ability of these voters to cast an in-person ballot that counts will depend on whether election officials determine that the two name versions for each voter are "substantially similar" or not.  The survey data relating to name matching therefore represent an outer boundary of persons who may face an obstacle in voting in person notwithstanding their possession of accepted ID.  In order to fully resolve the name mismatch issue, some voters may have to visit a DPS facility to update their identification.  Accordingly, in reporting survey data regarding potential burdens involved in going to a DPS office, we separately report data for: a) those who lack an accepted ID; and b) a combination of those who lack accepted ID and those who have a name mismatch issue.

When we look at the percentage of eligible voters who view getting time off of work as a problem we see marked differences by race and ethnicity. More specifically, among those who lack an accepted ID, while 38.7% of White eligible voters report that getting time off from work would be a problem, 40% of Blacks and 54.2% of Latinos report that this would be a problem (Table 14). Getting time off from work to attain an EIC is therefore a burden for nearly a third of White, a third of Black, and over half of Latino eligible voters who lack an unexpired photo ID. We also explored the potential burdens associated with obtaining an EIC among eligible voters who do not possess an unexpired ID without name match and see similar patterns. More specifically, while 31.2% of White eligible voters without an ID with a matching name report getting time off from work or school to be a problem, 36.1% if Black and 53.8% of Latinos in this situation report this to be a burden (Table 15). We see a sizable percentage of eligible voters across racial and ethnic groups also indicating that using or paying for public transportation would be a problem for them. Among those who lack an unexpired ID, 37.7% of Whites, 38.1% of Blacks and 36.1% of Latinos would be burdened by having to use public transit to get an EIC (Table 16). Among the broader group of individuals for whom a name match would also be a problem, 34.9% of White, 32.4% of Black, and 39.7% of Latino eligible voters without an appropriate ID would be burdened by having to use public transportation to obtain the EIC to vote (Table 17). Finally, we were interested in learning whether being able to make to the DPS office during their normal business hours would be a problem for eligible voters. Here we find that a large percentage of eligible voters, regardless of race, would be burdened by having to get to the office during their normal office hours. Among those who lack an unexpired ID, 55.7% of Whites, 45% of Blacks and 43.4% of Latinos report that this issue would be a problem for them (Table 18). Similarly, among those for whom a name match would be a problem, 44.4% of White, 37.8% of Black, and 40% of Latino eligible voters say that getting to the DPS office during their normal business hours would be burdensome (Table 19). This segment of our analysis reveals that a substantial segment of eligible voters would be burdened by the need to acquire the accepted ID.

### C.  Reported Obstacles to Acquiring an EIC by Other Demographic Groups

Potential burdens to accessing an accepted ID additionally vary by gender, age, education and income. In terms of gender, we find that women without an unexpired photo ID (52.9%) are more likely to have problems using or paying for public transportation than their male counterparts (24.5%). There are also marked differences in perceived burdens based on age. For example, the youngest cohort of eligible voters will have the most difficult time getting time off from work to acquire the accepted ID, as 82.1% of 18-24 year olds without an unexpired ID report that this will be a problem compared to 53.1% among those in the next age bracket, 25-34 year olds. Finally, we see that education has a marked impact on perceived burdens associated with acquiring the accepted ID. For example, while over 39.4% of eligible voters regardless of education level view using or paying for public transportation to obtain an ID as a problem, this burden is great for those with less than a high school education, as 42% of respondents who lack an unexpired ID, and who have the lowest educational attainment report that this would pose a problem.

### D.  Implications of the Texas Voter ID Law

The disparate impact of the Texas Voter ID law that we have documented in this report have important implications for electoral outcomes. The implication for those who lack a valid photo ID on Election Day is that they will be unable to vote.  Thus the law has the potential to make the vote less effective, for certain protected classes of citizens. Here, we assess whether or not voting preferences of minorities and Whites in Texas are polarized or not. Evidence from Texas suggests a political environment characterized by racially divergent voting interests.

First, public opinion surveys in Texas indicate that policy attitudes towards immigration laws are racially divergent. When asked about their perspective on whether or not local law enforcement should enforce

federal immigration law, 46 percent of white survey respondents said local law enforcement should be required to enforce it, compared to only 18 percent of Hispanic respondents who said the same and 32 percent of Blacks.[28] Further public opinion data demonstrate racially polarized policy interests in Texas, beyond issues of immigration. When asked about their support for ending bilingual education, 55 percent of whites strongly supported an end to bilingual education, compared to only 22 percent of Hispanics and 30 percent of Blacks.[29] Similarly, when asked whether they favored repealing the section of the 14th amendment of the Constitution that establishes citizenship by birthright, 63 percent of whites favored ending birthright citizenship, compared to only 34 percent of Hispanics and 32 percent of Blacks[30]. Thus, public opinion data that suggest Whites diverge in their policy interests from Hispanics in Texas.

Second, exit polls from the last several presidential races in Texas indicate clearly that the voting preferences of Texans varies significantly by race. For example, in the 2010 election, 69 percent of Whites voted in favor of Rick Perry for Governor, compared to 11 percent of Blacks and 19 percent of Hispanics[31]. In the 2008 presidential election, 26 percent of Whites voted for Barack Obama compared to 98 percent of Blacks and 63 percent of Hispanics[32]. Also in 2008, election results for U.S. Senate reveal stark differences in voting patterns by race with 27 percent of Whites voting for Noriega, 89 percent of Blacks for Noriega and 61 percent of Hispanics for Noriega[33].  In the 2006 election for U.S. Senate in Texas, 68 percent of Whites voted Hutchison, compared to 26 percent of Blacks and 44 percent of Hispanics.[34] In 2004, just 25 percent of Whites voted for John Kerry in the presidential contest, compared to 83 percent of Blacks and 50 percent of

---

[28]  UT-Austin/Texas Tribune Poll (a). May 2011. "Local Law Enforcement of Federal Immigration          Law." Texas Politics Project. http://texaspolitics.laits.utexas.edu/11_6_0.html
[29]  UT-Austin/Texas Tribune Poll. May 2010. "Support for Ending Bilingual Education." Texas    Politics Project. http://texaspolitics.laits.utexas.edu/11_6_0.html
[30] UT-Austin/Texas Tribune Poll (b). February 2011. "14th Amendment Repeal." Texas Politics    Project. http://texaspolitics.laits.utexas.edu/11_6_0.html

[31] www.cnn.com/ELECTION/2010/results/polls/#TCG00p1 and also http://latinodecisions.files.wordpress.com/2010/12/tx_nov21.pdf
[32] www.cnn.com/ELECTION/2008/results/polls/#TXP00p1
[33] www.cnn.com/ELECTION/2008/results/polls/#TXS01p1
[34] www.cnn.com/ELECTION/2006/pages/results/states/TX/S/01/epolls.0.html

Hispanics.[35] In the 2000 presidential election, a clear majority of Whites supported Bush, while an overwhelming majority of Blacks[36] and 66 percent of Hispanics[37] supported Gore. And in the 1996 presidential election, 31 percent of Whites voted for Bill Clinton compared to 88 percent of Blacks and 75 percent of Hispanics.[38]

Furthermore, recent court cases associated with the state-wide redistricting cases in Texas have found evidence of racially polarized voting. In LULAC v. Perry the court found "severe" racially-polarized voting in Texas, according to an analysis by Kristen Clarke-Avery.[39] Indeed, the court wrote in the LULAC decision, "The District Court found 'racially polarized voting' in south and west Texas, and indeed 'throughout the State.'" Because nearly all elections in Texas are partisan, some argue that the differences between whites and minorities are simply driven by partisanship and not race.  However this is irrelevant to the inquiry of whether or not whites and minorities vote differently.  The question is here is just simply whether or not Blacks and Latinos – who are less likely to possess a valid photo ID – have different voting preferences than Whites.  The reason for their preferences are not relevant. In *Teague v. Attala County*, 92 F.3d 283, 285 (5th Cir. 1996), the court held that the plaintiffs did not have disprove other factors other than race affect voting patterns, rather just focusing on the results of elections and showing Blacks and Whites had substantially different voting patterns was enough to meet the Gingles standards.  That is, other factors can be associated with voting, but the only standard is whether or not different racial groups are voting differently.

This ideal is based in the key opinion by Brennan in *Thornburg v. Gingles*, 478 U.S. 30, 44-45, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986). Specifically Brennan wrote that "it is the difference between the choices made by black and white voters and not the reason for the difference that leads to blacks having less

[35] http://edition.cnn.com/ELECTION/2004/pages/results/states/TX/P/00/epolls.0.html
[36] http://www.ropercenter.uconn.edu/CFIDE/cf/action/catalog/abstract.cfm?type=&start=&id=&archno=USVNS2000-STELEC-TX&abstract=
[37] http://wcvi.org/latino_voter_research/polls/tx/2000/latino_vote_for_candidates.html
[38] http://cgi.cnn.com/ELECTION/TXPxp.html
[39] http://writ.news.findlaw.com/commentary/20060724_clarke-avery.html

opportunity to elect their candidates of choice." Justice Brennan advanced his evidentiary standard regarding racially polarized voting by repudiating certain arguments made by the state of North Carolina (and the United States as amicus). The state argued that statistical evidence must demonstrate not only that there is a correlation between race of the voters and their choice of candidates but also that race (as opposed to other factors such as socioeconomic status or party affiliation) is the principal reason for the voters' selections. According to the plurality, however, the proper inquiry under Section 2 is to ask *whether* voters of different race favor different candidates, not *why* they do so. Exploring the reasons for the relationship between race and votes cast interjects intent into the analysis, and "the legal concept of racially polarized voting incorporates neither causation nor intent," according to Justice Brennan (p. 62).

Further, a clear and consistent finding in political science research proves that discriminatory attitudes and racial prejudice are the driving factor behind White party identification, and this is especially strong in Section 5 covered jurisdictions[40].

Even before the Obama elections, political scientists had amassed data, with a particular eye towards Section 5 covered jurisdictions and concluded that racial attitudes were driving partisanship and voting. Professor Jonathan Knuckey writes, "These findings suggest that race and racial attitudes continue to shape southern party politics in the early twenty-first century… racial attitudes will have been woven into the partisan fabric that now characterizes the 'New South's' party system."[41]  In subsequent analysis of race and partisanship, Knuckey concludes that "the increase in the effect of racial resentment should give pause to those

---

[40] Knuckey, Jonathan. 2005. "Racial Resentment and the Changing Partisanship of Southern Whites." *Party Politics,* 11(1): 5-28; Carmines, Edward G., and Stimson, James A. 1989. *Issue Evolution: Race and the Transformation of American Politics.* Princeton: Princeton University Press; Morales, Dana Ables. 1999. "Racial Attitudes and Partisan Identification in the United States, 1980-1992." *Party Politics,* 5(2): 191-198; Valentino, Nicholas A., and Sears, David O. 2005. "Old Times There Are not Forgotten: Race and Partisan Realignment in the Contemporary South." American Journal of Political Science, 24(3): 672-688.
[41] Knuckey, Jonathan. 2005. "Racial Resentment and the Changing Partisanship of Southern Whites." *Party Politics,* 11(1): 5-28;

who would diminish the role that racial conservatism played as an explanation for Republican gains among southern whites in the 1990s."[42]

Following the election of Barack Obama in 2008 a number of political scientists took up the issue of racial prejudice and the White vote for Obama, relying on nationally reputable data sources and cutting edge research methodologies. Political Scientists Michael Tesler and David Sears find a very similar pattern to what Knuckey documented in the 1990s.  Even after controlling for conservative ideology, they find "the most racially resentful were more than 70 percentage points more likely to support McCain in March 2008 than were the least racially resentful."[43] In other research, Professor Michael Lewis-Beck summarizes the data succinctly when he writes, "The roots of Obama's relative underperformance electorally can be laid at the feet of race prejudice." Indeed, Political Scientist Ben Highton concludes his analysis of White vote for Obama in Southern states by noting, "at the state level, the influence of prejudice on voting was comparable to the influence of partisanship and ideology. Racial attitudes explain support for Obama and shifts in Democratic voting between 2004 and 2008."[44]

---

[42] Jonathan Knuckey, 2006. "Explaining Recent Changes in the Partisan Identifications of Southern Whites." Political Research Quarterly. Vol 59
[43] Michael Tesler and David Sears. 2010. Obama's Race: The 2008 Election and the Dream of a Post-Racial America. University of Chicago. pp61.
[44] Highton, Ben. 2011. "Prejudice Rivals Partisanship and Ideology When Explaining the 2008 Presidential Vote across the States." PS: Political Science & Politics. July.