**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS, | ) ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:13-CV-193 (NGR) |
| RICK PERRY, Governor of Texas; and JOHN STEEN, Texas Secretary of State, | ) ) ) | [Lead case] |
| *Defendants.* | ) ) | |
| | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Plaintiffs,* | ) ) | |
| TEXAS LEAGUE OF YOUNG VOTERS EDUCATION FUND AND IMANI CLARK, | ) ) ) | |
| *Plaintiff-Intervenors,* | ) ) | |
| TEXAS ASSOCIATION OF HISPANIC COUNTY JUDGES AND COUNTY COMMISSIONERS, AND HIDALGO COUNTY et al, | ) ) ) ) | |
| *Plaintiff-Intervenors,* | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:13-CV-263 (NGR) |
| STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety, | ) ) ) ) ) ) | [Consolidated case] |
| *Defendants.* | ) ) | |

| | |
|---|---|
| TEXAS STATE CONFERENCE OF NAACP BRANCHES; and the MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE TEXAS HOUSE OF REPRESENTATIVES,<br>　　　　*Plaintiffs,*<br>v.<br><br>JOHN STEEN, in his official capacity as Secretary of State of Texas; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br>　　　　*Defendants.*<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> CIVIL ACTION NO.<br> 2:13-CV-291 (NGR)<br> [Consolidated case] |
| BELINDA ORTIZ, LENARD TAYLOR, EULALIO MENDEZ JR., LIONEL ESTRADA; ESTELA GARCIA ESPINOSA, LYDIA LARA, MARGARITO MARTINEZ LARA, MAXIMINA MARTINEZ LARA, AND *LA UNION DEL PUEBLO ENTERO, INC.*<br>　　　　*Plaintiffs,*<br>v.<br><br>STATE OF TEXAS, JOHN STEEN, in his official capacity as Texas Secretary of State; and STEVE McCRAW, in his official capacity as Director of the Texas Department of Public Safety,<br>　　　　*Defendants.*<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br> CIVIL ACTION NO.<br> 2:13-CV-348 (NGR)<br> [Consolidated case] |

## DEFENDANTS' ADVISORY REGARDING THE UNITED STATES' MOTION FOR A PROTECTIVE ORDER FROM DEFENDANTS' RULE 30(B)(6) <u>NOTICE OF DEPOSITION TO THE UNITED STATES OF AMERICA</u>

Defendants file this Advisory Regarding the United States' Motion for a Protective Order from Defendants' Rule 30(B)(6) Notice of Deposition to the United States of America ("Motion"), as requested by the Court on June 18, 2014.  For the reasons explained below, Defendants respectfully request the Court to order the United States to produce a deponent or deponents on Topics 1, 2, 5, 6, 7, 8, 10, 11-30 and a below-identified portion of Topic 37 of the Defendants' Corrected Notice of Intention to Take Oral Deposition of the United States of America ("30(b)(6) Notice") (Ex. 7).  Defendants further respectfully request that the Court deny the remainder of Motion as moot pending resolution of issues by Defendants and the United States.[1]

## I.    The Deposition of Plaintiff the United States is Appropriate

Deposition testimony is a uniquely binding and limiting discovery device, which an ordinary litigant is entitled to utilize.  *See F.D.I.C. v. Hays*, CIVASA92CA653EP, 1998 WL 1782547 (W.D. Tex. Jan. 9, 1998) (noting that "interrogatory responses and third-party expert reports do not "bind[] or limit[] the party/corporation in the same manner as 30(b)(6) deposition testimony.") (internal quotation marks omitted). Government agencies "embroiled in litigation are subject to the same discovery rules as private litigants, regardless of the level of government to which the agency belongs…", and, accordingly, are to be treated as

---

[1] As indicated in Defendants' June 16, 2014 Statement to the Court (Docket No. 332), Defendants replaced 3 Topics (Topics 3, 4, and 9) with interrogatories. Defendants are also attempting to work towards stipulations with the United States which should eliminate the need for a Fed. R. Civ. P. 30(b)(6) deponent on 8 full Topics (Topics 31-36, and Topics 38-39) and 1 subpart of Topic 37.  Should the stipulation process fall through, Defendants reserve their rights to bring disputes relating to those Topics to the Court.

"ordinary litigants." *S.E.C. v. Merkin*, 283 F.R.D. 689, 696, *objections overruled*, 283 F.R.D. 699 (S.D. Fla. 2012).  "The mere fact that it might be an [an agency] attorney preparing a government investigator as the designee instead of a private attorney preparing the client's current or former employees is not a meaningful distinction." *Id*.

Moreover, deposition of the United States in Voting Rights Act cases is not unprecedented.  *E.g., Smith v. Beasley*, 946 F. Supp. 1174, 1185 (D.S.C. 1996) (referring to the deposition testimony of Deval Patrick, Assistant Attorney General in charge of the Civil Rights Division of the Department of Justice, in a redistricting case involving both Section 5 and Section 2 of the Voting Rights Act).  The United States Department of Justice has specifically been the subject of a Fed. R. 30(b)(6) deposition before.  *E.g.*, *In re Rossman*, 487 B.R.18, 35 (Bankr. D. Mass. 2012).

## II.    The Topics in the 30(b)(6) Notice Are Reasonably Calculated to Lead to Admissible Evidence

### A.    The Topics Relate to Relief Sought, Allegations Made By, and Discovery Propounded By Plaintiffs

As to Topic 1, concerning the administrative preclearance process under Section 5 of the Voting Rights Act, a Section 5 file is properly discoverable in a Section 2 case, as "both the files and the pending litigation involve analysis of the present . . . method of election and proposed changes"; for purposes of discovery, "[t]he test of relevance…is not a stringent one."  *Cofield v. City of LaGrange, Ga.*, 913 F. Supp. 608, 614-15 (D.D.C. 1996).  Additionally, the case cited by the United States in its Motion, *Morris v. Gressette*, 432 U.S. 491, 505-07 and n. 24 (1977),

4

concerns the appropriateness of judicial review of an administrative preclearance decision, but has nothing to do with discovery or the relevance of documents or testimony to claims brought under  Section 2 of the Voting Rights Act.  The United States argument confuses two distinct issues: whether an entity may seek judicial appeal of an administrative preclearance determination; and, whether relevant information regarding the facts and procedures employed during the preclearance process are discoverable from a party Plaintiff in a Section 2 proceeding.

Even assuming that the Section 5 preclearance process was not independently discoverable in a Section 2 case, the Plaintiffs have put the process directly at issue in their Complaints.  (*See, e.g.*, Ex. 1, Complaint of the United States of America (hereinafter, "Complaint") at ¶¶ 43-60.)  All Plaintiffs seek "bail-in" as a remedy under the Voting Rights Act, requesting this court to subject Texas to administrative preclearance for any future voting laws.  (*See, e.g.*, Complaint at ¶ 65 and Prayer for Relief at (5).).[2]

Also, the process employed by the Department of Justice in monitoring and observing elections (Topics 5 and 6), is similarly relevant to the relief sought by the United States.  (*See* Ex. 1, Complaint at Prayer for Relief at (4).)   Defendants should be afforded an adequate opportunity to investigate and respond to the United States' request to impose continued election monitors in Texas through

---

[2] *See also* Ortiz *et al* Plaintiffs' First Amended Complaint ("Ortiz Complaint"), at Prayer for Relief at (c); Veasey-LULAC Plaintiffs' Second Amended Complaint ("Veasey-LULAC Complaint") at ¶ 70 and Prayer for Relief; Texas State Conference of NAACP Branches *et al* Complaint for Declaratory and Injunctive Relief ("NAACP Complaint"), Prayer for Relief at (c); Amended Complaint in Intervention of Plaintiff-Intervenors The Texas League of Young Voters Education Fund, *et al* ("TLYVEF Complaint") at ¶128; First Amended Complaint in Intervention of the Texas Association of Hispanic County Judges and County Commissioners *et al* ("HCJCC Complaint") at ¶ 78 and Prayer for Relief at (c).)

deposition testimony.  The Plaintiffs also allege in their complaints that the history of alleged voting discrimination in Texas and the alleged necessity of federal intervention pursuant to Section 2 of the Voting Rights Act to combat Texas' history of alleged voting discrimination supports their claims' that SB 14 was enacted with a discriminatory purpose, thereby rendering the United States' enforcement of Section 2 of the Voting Rights Act (Topic 2) relevant.  (*See, e.g.*, Ex. 1, Complaint at ¶¶ 15, 43-60; 64.)[3]  As to Topic 10, which is "[t]he Voting Section of the Civil Rights Division of the United States Department of Justice complaint in-take phone logs and data, as well as the Interactive Case Management (ICM) system…", as noted *supra*, Defendants are entitled to probe a witness on the same topic with respect to which other forms of discovery were requested or provided.  *See F.D.I.C.*, 1998 WL 1782547 at * 2.  The pattern and priorities employed by the United States in responding to this data bears on how the United States would administer the relief sought by the Plaintiffs in the future.[4]  If the United States and the other Plaintiffs did not wish to subject themselves to discovery on their historical enforcement of Sections 2 and 5 of the Voting Rights Act and the appointment of Federal Election Observers and Monitors, they should not have specifically raised the issues in their affirmative allegations and prayers for relief.[5]

---

[3] *See also* Veasey-LULAC Complaint at ¶ 38; NAACP Complaint at ¶¶ 19-26; TLYVEF Complaint at ¶¶ 69-85; HCJCC Complaint at ¶¶ 64-72.

[4] The United States also objects to the inclusion of "including but not limited to" language in Topic 10.  (Motion at 11.)  Defendants are willing to delete that language from the Topic, as it understands communications to and from vot1973c@usdoj.gov would be included in the Topic regardless of whether they are specifically referenced.

[5] Moreover, as indicated by the relief sought by the non-United States Plaintiffs, and in the United States' Motion, enforcement of Section 2 of the Voting Rights Act is not limited to the Department of

As to Topics 7, 8, 11-30 and the remaining portion of Topic 37, in Paragraph 29 of the Complaint, the United States alleges that "the stated purpose of SB 14 was to ensure the integrity of elections…" In Paragraph 40, it alleges "[t]he policies proffered in support of the particular restrictions contained in SB 14 are tenuous and unsupported in the legislative record or *by other evidence."* (emphasis added). Accordingly, the United States has put such "other evidence" of threats to the integrity of elections in issue (including Election Crimes and Voter Fraud) [6], beyond the Texas Legislature's potential knowledge. (*See, e.g.*, Ex. 1, Complaint at ¶¶ 29, 40; Motion at 9.) [7]

████████████████████████████████████████████

████████████████████              ████████████████████

---

Justice, so any attempt to hold back these documents as to Topic 2 on the grounds that they reflect "prosecutorial discretion" is improper. (*See* Motion at 10 ("in the case of Section 2, [enforced] by private parties in countless more cases").)

[6] The 30(b)(6) Notice defines "Election Crimes" as "intentional acts or willful failures to act, prohibited by state or federal law, that are designed to cause ineligible persons to participate in the election process; eligible persons to be excluded from the election process; ineligible votes to be cast in an election; eligible votes not to be cast or counted; or other interference with or invalidation of election results," and defines it to include "any criminal form of Voter Fraud." The 30(b)(6) Notice defines "Voter Fraud" as "fraudulent or deceptive as fraudulent or deceptive acts committed to influence the act of voting, and includes both criminal and civil offenses and violations," and defines it to include (though not limited to) "(1) making or knowingly possession a counterfeit of an official election ballot; (2) signing a name other than one's own to a petition proposing an initiative, referendum, recall, or nomination of a candidate for office; (3) knowingly signing more than once for the proposition, question, or candidate in one election; (4) signing a petition proposing an initiative or referendum when the signer is not a qualified voter; (5) voting or attempting to vote in the name of another person; (6) voting or attempting to vote more than once during the same election; (7) intentionally making a false affidavit, swearing falsely, or falsely affirming under an oath required by statute regarding one's voting status, including when registering to vote, requesting an absentee ballot or presenting to vote in person; (8) registering to vote without being entitled to register; (9) knowingly making a materially false statement on an application for voter registration or re-registration; (10) voting or attempting to vote in an election after being disqualified or when the person knows that he/she is not eligible to vote; and/or (11) knowingly soliciting or encouraging a person who is not qualified to vote in an election."

[7] *See also* Veasey-LULAC Complaint at ¶¶ 43-45, 48; Ortiz Complaint at ¶¶ 8 and 92;  NAACP Complaint at ¶¶ 69, 74, 76; TLYVEF Complaint at ¶¶52-53; HCJCC Complaint at ¶35.



The United States also has unique institutional knowledge of Election Crimes and Voter Fraud nationwide. For example,

> [R]eports…must be filed by every District Election Officer (DEO) to the Public Integrity Section of the Criminal Division of the Department of Justice. The DEOs *play a central role in receiving reports of voting fraud and investigating and pursuing them. Their reports back the Department would likely provide tremendous insight into what actually transpired during the last several elections.*

*See* United States Election Assistance Commission, Election Crimes: An Initial Review and Recommendations for Future Study, December 2006, at p. 17 (available http://www.eac.gov/assets/1/workflow_staging/Page/57.PDF) ("EAC Election Crimes Report") (emphasis added). In fact, Defendants crafted their definitions of Election Crimes and Voter Fraud directly from the EAC Election Crimes Report.

Courts that have upheld laws requiring photographic identification for voting have specifically determined that states have legitimate interests in deterring and detecting voter fraud. *E.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191, 128 S. Ct. 1610, 1617, 170 L. Ed. 2d 574 (2008); *Gonzalez v. Arizona*, 624 F.3d

1162, 1197 (9th Cir. 2010) *on reh'g en banc,* 677 F.3d 383 (9th Cir. 2012) *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.,* 133 S. Ct. 2247, 186 L. Ed. 2d 239 (2013).  Accordingly, one of the factors in a Section 2 analysis is the balancing test, that weighs any alleged burden the law imposes against the state's legitimate "interest in deterring and detecting voter fraud" and Election Crimes.  *See Crawford,* 553 U.S. at 191 ("The State has a valid interest in participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient…Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology… While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear."); *Gonzalez,* 624 F.3d at 1197 ("The lead opinion in *Crawford* held that the burden imposed on citizens who must obtain a photo identification document was not sufficiently heavy to support a facial attack on the constitutionality of the state's law, in light of the state's legitimate interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence.  The same reasoning is applicable here.")(internal citations omitted).  The occurrence and frequency of Election Crimes and Voter Fraud nationwide is thus also relevant to the Section 2 effects test, separate and apart from the legislature's intent when it passed SB 14.  *See Crawford,* 553 U.S. at 195 ("It remains true, however, that flagrant examples of such fraud in other parts

of the country have been documented throughout this Nation's history by respected historians and journalists…")

In many cases in recent history, Texas has reacted to instances of Voter Fraud or Election Crimes in other states by enacting laws to try and prevent those occurrences from happening in Texas.  *See, e.g., Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 901 (5th Cir. 2012) (referring to Texas' "legitimate interest in preventing fraud" including addressing "an incentive for fake voter registration applications such as those made through the Project Vote scandal…") (internal citation omitted).  In-person voter impersonation is not the only type of fraud that can be prevented or deterred by SB 14.  Defendants are entitled to probe the United States Department of Justice's unique institutional knowledge in order to present factual evidence which justifies the Texas Legislature's actions in enacting SB 14 to prevent Election Crimes and Voter Fraud, and instill integrity in the Texas election system.

Certain Plaintiffs have also sought information regarding voter fraud from the Texas Office of the Attorney General ("OAG").  (*See* Ex. 2, 30(b)(6) Notice to the OAG ("OAG 30(b)(6) Notice").) Defendants are working diligently with Plaintiffs to respond to the OAG 30(b)(6) Notice.  Among the information Plaintiffs are seeking from the OAG is that relating to  "alleged voter impersonation (including in-person voter impersonation), mail-in ballot fraud, voting by non-citizens, or other instances of illegal voting or obstruction of voting in violation of the Texas Election or Penal Code, or any other applicable law",  as applied to "complaints, allegations, referrals

10

for investigation, investigations, charges, and/or prosecutions, either through the Texas Attorney General's office or in conjunction with local, county, or municipal law enforcement and prosecutorial authorities, concerning alleged, actual, or attempted voting and/or election fraud occurring within the State of Texas…from January 1, 2000 *to the present*…" as well as "analyses, manuals, studies, databases or spreadsheets concerning voting and/or election fraud" (without a date range) (*See* Ex. 2 at  Ex. A, 1(a) and 4.) (emphasis added).  To preclude Defendants from inquiring of the United States' unique institutional knowledge of Voter Fraud and Election Crimes, while Defendants work in good faith to provide Plaintiffs similar information from OAG in response to much broader requests, does not treat Defendants fairly.

B. **The United States' Document Production Is Incomplete on The Topics**

The documents produced (which do not constitute the responsive universe of documents in the United States' possession) do not provide a complete picture of either the preclearance process (Topic 1), the Department of Justice's enforcement of the Voting Rights Act (Topic 2, 5, 6, and 10), or the Department of Justice's knowledge of Election Crimes and Voter Fraud (Topics 7, 8, 11-30 and the remaining part of Topic 37). (*See* United States' Amended Responses and Objections ("R&Os") to Defendants' First Request for Production to Plaintiff United States of America ("RFP") at Request Nos. 8 and 9; United States' R&Os to Defendants' Fourth RFP at Request Nos. 8 and 9 (Exs. 3 and 4; Motion at 5.) ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



As to the final topic, the portion of Topic 37 which seeks a deponent concerning "calculations, reports, audits, estimates, projections, or other analyses . . . relating to the effect of SB 14 or any other law which requires photographic identification for voting . . . (1) on instances of Voter Fraud; and/or (2) on instances of Election Crime," while such studies may not exist (and were not produced to Defendants), Defendants are entitled to such a representation from a witness.

C.     **The Topics Will Relate to Affirmative Defenses and/or Counterclaims Defendants May Propound**

The United States has repeatedly claimed that the Topics are not relevant to any counterclaim or affirmative defense because none "exist" yet.  Defendants filed motions to dismiss nearly seven months ago, but the Court has yet to rule on the them.  Therefore, Defendants have not filed Answers.  Under the United States' argument, the Defendants would be forced to prematurely make an appearance in this case or else forego any discovery on potential counterclaims and/or affirmative defenses.  But the Rules do not require a defendant to sacrifice its legal rights in order to engage in discovery.   The discovery standard is not, as the United States repeatedly states, "relevance" as the United States interprets it; rather, it is "reasonably calculated to lead to admissible evidence." *See Cofield*, 913 F. Supp. At 614 ("The relevancy threshold is not high: material sought need not be admissible at trial, but must be relevant to the subject matter of the litigation and reasonably calculated to lead to admissible evidence.").  Defendants' Topics easily meet that burden, even without considering potential counterclaims or affirmative defenses.

D.     **Defendants Have Proposed Reasonable Date Limitations**

Defendants have also offered to limit Topics 1, 2, 5, 6, and 10 to a date cutoff of 2004. [9]  The Election Crimes and Voter Fraud topics (with the exception of Topic 8, which goes to 2002, and part of Topic 37) are also limited to 2004.  As the Complaint's allegations regarding Texas' voting laws date back nearly a century, without a time limitation, and the Plaintiffs' requests for information regarding voter fraud go back to 2000 or contain no limitation at all, the 2004 limitation is generous.[10]  (*See* Ex. 1, Complaint at ¶ 15 (citing a case decided in 1927 which challenged a law enacted in 1923); Ex. 2, OAG 30(b)(6) Notice.)

## III.    **Testimony on the Topics is Not Protected by Privileges**

A government agency cannot "claim privilege preemptively, before any deposition question has been propounded."  *S.E.C.*, 283 F.R.D. at 696 (quoting *Elkins v. District of Columbia*, 250 F.R.D. 20, 27 (D.D.C. 2008) (granting a motion to compel a government 30(b)(6) deponent)); *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Commissioners*, 4:10-CV-2163 CEJ, 2011 WL 1899211, *3 (E.D. Mo. May 19, 2011) (Rejection invocation of the privilege in "a conclusory manner in

---

[9] Plaintiffs, including the United States, have consistently sought discovery dating prior to 2005. *See, e.g.* United States First Set of Requests for Production at Request Nos. 22, 27 (Ex. 5) (seeking "[a]ll documents related to any and all allegations concerning instances of voting in Texas by persons who are not United States citizens from January 1, 2004, to the present" and "[a]ll documents related to the schedule, price structure, routes, availability and funding sources of all public or regional transportation systems in Texas, including shared ride services for individuals residing in rural areas.").

[10] This Court has also previously upheld discovery requests served by the United States on nonparty legislators for documents and information dating back to 2005. (*See, e.g.* U.S. Subpoena of Sen. Dan Patrick at Appendix A, Request No. 19 (seeking "All documents related to correspondence, including but not limited to correspondence with constituents, other members of the public, lobbyists, groups, and organizations, on the subject of voter identification requirements; Senate Bill 14, 82nd Leg. (Tex. 2011); Senate Bill 362, 81st Leg. (Tex. 2009); House Bill 218, 80st Leg. (Tex. 2007); or House Bill 1706, 79th Leg. (Tex. 2005).) (Ex. 6).)

an effort to avoid all discovery," and determining that a "mere assertion that the privilege applies, without more, is not sufficient to meet their burden.").

Permitting the United States to reject a Deposition Notice in its entirety based on global privilege assertions enables it to use the Voting Rights Act as a double-edged sword, piercing privileges for its own discovery purposes while simultaneously shielding itself from a Fed. R. Civ. P. 30(b)(6) deposition or other discovery techniques to which any "ordinary litigant" would be subject. The United States has already argued vigorously for the production of privileged legislative documents and sought testimony on topics that are squarely covered by legislative privilege. The United States has already broadly asserted deliberative process privilege with respect to requested documents, and now it seeks to quash any deposition testimony with respect to topics that are clearly germane to the allegations raised in the Complaints in this case on the basis that they are privileged. Like the legislative privilege, the deliberative process privilege is qualified. Despite the Supreme Court's admonishment that legislators should only be forced to testify in "extraordinary instances," *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977), legislators have been forced to sit for depositions in this case. What's good for the goose is good for the gander. That some questions may implicate deliberative process cannot serve as the basis for quashing a deposition regarding subjects that were put at issue by the Department when it brought this lawsuit.

In addition, the "working law" of the Department of Justice is excepted from the deliberative process privilege:

> The reasons for a decision made by an agency, or a policy actually adopted, however, constitute the working law of the agency. Therefore, the exemption properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.

*Brennan Center for Justice at New York University School of Law v. U.S. Department of Justice*, 697 F. 3d 184, 196 (2d Cir. 2012) (internal citations and quotation marks omitted). The United States' policies governing implementation of the preclearance process, its administration of the Voting Rights Act, and it how it chooses to respond to complaints and information regarding Voter Fraud and Election Crimes are not shielded by the deliberative process privilege. Moreover, where a governmental agency's motives and intent may be at issue (for example, here, vis-à-vis the administrative preclearance process and enforcement of the Voting Rights Act), the deliberative process privilege does not apply. *See, e.g., Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, 2:11-CV-02101-SHM, 2012 WL 6003540 (W.D. Tenn. Nov. 30, 2012) *supplemented*, 2:11-CV-02101-SHM, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012) (internal citations omitted).

Nor is raw factual data regarding Voter Fraud and Election Crimes nationally protected under the deliberative process privilege. *See Liuzzo v. U.S.*, 508 F. Supp. 923 (E.D. Mich. 1981). Nor is such data protected by the law enforcement privilege, which requires consideration of several factors, and is bound by strict time constraints. *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570-71

(5th Cir. 2006) (citing *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa. Mar.13, 1973) (unpublished) (developing the factors).   As the Court in *In re U.S. Dep't of Homeland Sec.* pointed out:

> The oft-cited *Frankenhauser* test consists of weighing the following ten factors: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case....Although a district court has considerable leeway in weighing the different factors, ... the failure to balance at all requires remand ... to consider the respective interest....*Several types of information probably would not be protected, including documents pertaining to: (1) people who have been investigated in the past but are no longer under investigation, (2) people who merely are suspected of a violation without being part of an ongoing criminal investigation, and (3) people who may have violated only civil provisions. Furthermore, the privilege lapses after a reasonable period of time… Therefore, the privilege lapses either at the close of an investigation or at a reasonable time thereafter based on a particularized assessment of the document.*

(emphasis added) (internal citations and quotation marks omitted).   *See also Am. Civil Liberties Union v. Finch,* 638 F.2d 1336, 1344 (5th Cir. Mar.1981) ("Even the files of active law enforcement agencies lose their privileges after particular investigations become complete.") Moreover, "[a]ny such issues must in any event be raised by an affidavit or declaration on personal knowledge by a responsible person

within the agency (*i.e.,* not the litigation attorney) who has personally reviewed the documents and states the specific interests of law enforcement or public concern that would be injured by disclosure." *Jean D. v. Cuomo*, 90 CIV. 0861 (SS), 1993 WL 276067, *1 (S.D.N.Y. July 20, 1993) (internal citations omitted).

Here, applying the *Frankenhauser* factors, the data sought by Defendants is largely historical, and likely relates to investigations already completed. Defendants are not actual or potential defendants in any criminal proceeding likely to follow from the incident in question.   Since the information Defendants seek concerns final determinations as to priorities and patterns in prosecuting Election Crimes and Voter Fraud, as well as factual data, government self-evaluation and consequent program improvement will not be affected, much less harmed.   Nor have the Defendants received a sworn statement from anyone regarding the specific interests of law enforcement which would allegedly be injured here.

IV.   **CONCLUSION**

For the reasons explained above, Defendants respectfully request the Court to deny the US Motion for a Protective Order as to Topics 1, 2, 5, 6, 7, 8, 10, 11-30 and above-identified portion of Topic 37, and order to produce a deponent on those topics.   Defendants further respectfully request that Court deny remainder of Motion as moot pending resolution of issues by Defendants and the United States.

Dated:        June  30, 2014

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

J. REED CLAY, JR.
Special Assistant and Senior Counsel
to the Attorney General
Southern District of Texas No. 1160600

JOHN B. SCOTT
Deputy Attorney General for Civil Litigation
Southern District of Texas No. 10418
Texas State Bar No. 17901500
ATTORNEY-IN-CHARGE

G. DAVID WHITLEY
Assistant Deputy Attorney General
Southern District of Texas No. 2080496

STEPHEN RONALD KEISTER
Assistant Attorney General
Southern District of Texas No. 18580

JENNIFER MARIE ROSCETTI
Assistant Attorney General
Southern District of Texas No. 224780

*/s/ Lindsey Elizabeth Wolf*
LINDSEY ELIZABETH WOLF
Assistant Attorney General
Southern District of Texas No. 2292940

FRANCES WHITNEY DEASON
Assistant Attorney General
Southern District of Texas No. 2302872

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

19

BEN A. DONNELL
Donnell, Abernethy & Kieschnick
555 N. Carancahua, Suite 1770
Corpus Christi, Texas 78401-0853
Southern District of Texas No. 5689

COUNSEL FOR THE STATE OF TEXAS, RICK
PERRY, JOHN STEEN, and STEVE MCCRAW

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2014, a true and correct copy of the foregoing document was served via electronic mail to all counsel of record.

*/s/ Lindsey Elizabeth Wolf*
LINDSEY ELIZABETH WOLF