UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al*, | § | |
| | § | CIVIL ACTION NO. 13-CV-00193 |
| Plaintiffs, | § | |
| VS. | § | |
| | § | |
| RICK PERRY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER ON MOTIONS TO DISMISS

These consolidated cases address the voting rights claims of Plaintiffs and Intervenors (collectively referred to as "Plaintiffs" unless otherwise noted)[1] against the State of Texas, Rick Perry in his official capacity as Governor of the State of Texas (Perry), John Steen in his official capacity as Texas Secretary of State (Steen), and Steve McCraw in his official capacity as Director of the Texas Department of Public Safety (McCraw).  Specifically, Plaintiffs are challenging the Texas Voter Photo Identification Law, Texas Senate Bill 14 (2011) (S.B. 14).

Before the Court are motions to dismiss filed by Defendants against all Plaintiffs and Intervenors—an effort that spans 5 motions:  D.E. 52, 116, 175, 130 in 13-cv-193

---

[1]   In **No. 13-cv-193 (Veasey Case)**, the **Veasey Plaintiffs** are Marc Veasey, Floyd James Carrier, Anna Burns, Michael Montez, Penny Pope, Jane Hamilton, Sergio DeLeon, Oscar Ortiz, Koby Ozias, John Mellor-Crummey, Peggy Draper Herman, Evelyn Brickner, Gordon Benjamin, Ken Gandy, League of United Latin American Citizens (LULAC), and Dallas County.  D.E. 109.  Intervenors in the Veasey Case include Texas Association of Hispanic County Judges and County Commissioners (HJ&C) and Hidalgo County (Hidalgo County Judge Ramon Garcia and Commissioners A.C. Cuellar, Hector Palacios, Jose Flores, and Joseph Palacios) (**HJ&C Intervenors**) (D.E. 153) and Texas League of Young Voters Education Fund (TLYV) and Imani Clark (**TLYV Intervenors**) (D.E. 73).  In **No. 13-cv-263 (US Case)**, the Plaintiff is the United States of America.  D.E. 1.  In **No. 13-cv-291 (NAACP Case)**, the Plaintiffs are Texas State Conference of NAACP Branches (NAACP) and Mexican American Legislative Caucus of the Texas House of Representatives (MALC).  D.E. 1.  In **No. 13-cv-348 (Ortiz Case)**, the Plaintiffs are Belinda Ortiz, Eulalio Mendez Jr., Lionel Estrada, Lenard Taylor, Estela Garcia Espinoza, Margarito Martinez Lara, Lydia Lara, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc. (LUPE).  D.E. 4.

and D.E. 8 in 13-cv-348.  The motions challenge:  (1) whether Plaintiffs have standing to sue; (2) whether the complaints state a claim upon which relief can be granted; and (3) whether Defendants are properly named as subject to this suit.

For the reasons set out below, the Court GRANTS IN PART the motions to dismiss (D.E. 52, 130, 175) with respect to the claims of Dallas County and Hidalgo County and GRANTS IN PART the motion to dismiss (D.E. 8 filed in 13-cv-348) with respect to the claims based on the Texas Constitution.  In all other respects, the motions to dismiss are DENIED.

## THE TEXAS PHOTO IDENTIFICATION LAW

Governor Perry signed S.B. 14 into law on May 27, 2011.  Effective January 1, 2012, Texas registered voters are required to present a specified type of photo identification when voting at the polls in person.  S.B. 14, § 26 (effective date).  The law has a number of provisions placed in issue in this case, described generally as follows.

The only acceptable forms of photo identification are:  (1) a driver's license, personal identification card, and license to carry a concealed handgun, all issued by the Department of Public Safey (DPS); (2) a United States military identification card containing a photo; (3) a United States citizenship certificate containing a photo; and (4) a United States passport.  *Id.*, § 14.  All of these forms of photo identification must be current or, if expired, they must not have expired earlier than sixty days before the date of presentation at the polls.  *Id.*

If a voter does not have such photo identification, that voter may obtain an election identification certificate (EIC) which is issued by the Texas Department of

Public Safety (DPS) on presentation of proof of identity.  *Id.*, § 20.  While there is, by statute, no charge for the issuance of the EIC, Plaintiffs allege that voters may incur costs in obtaining the required proof, such as a birth certificate or passport; in taking time off of work; and getting transportation to a DPS office. According to Plaintiffs' allegations, DPS offices generally provide services only Monday through Friday during ordinary business hours.  Some Texas counties have DPS offices that are open fewer days or have limited hours per week and some counties have no DPS office, requiring voters to travel significant distances beyond their polling place to satisfy the S.B. 14 requirements.

Persons with a verifiable disability may obtain an exemption from the photo identification requirement, but must provide required documentation of the disability to the voter registrar.  *Id.*, § 1.  The sources of that documentation are limited to the United States Social Security Administration and United States Department of Veterans Affairs. *Id.*, § 1.

When the voter appears at the polling place, the law requires that the voter's registered name and name on the photo identification be exactly the same or "substantially similar."  *Id.*, § 9(c).  If they are exactly the same, the voter may cast a ballot without further complication.  If they are not exactly alike, but are deemed by the poll workers to be "substantially similar" under the Secretary of State's guidelines, the voter is permitted to vote, but must first sign an affidavit that the actual voter and the registered voter are one and the same.  *Id.*

If the registered name and the name on the photo identification are not deemed by the poll workers to be "substantially similar," or if the voter does not have any of the

necessary photo identification, the voter may cast a provisional ballot, which will be counted only if the voter, within six days of the election, goes to the voter registrar with additional documentation to verify his or her identity. *Id.*, §§ 15, 17, 18. Those who have a religious objection to being photographed or who lost their photo identification in a natural disaster may also cast a provisional ballot subject to later proof of identity within six days of any election in which that person votes. *Id.*, § 17.

The law requires each county voter registrar to provide notice of the photo identification law when issuing original or renewal registration certificates. *Id.*, § 3. The registrar must post a notice in a prominent location at the county clerk's office and include notice in any website maintained by that registrar. *Id.*, § 5. The Secretary of State is required to include the notice of this law on his website and must conduct a statewide effort to educate voters regarding the new requirements. *Id.*, § 5. He must also issue training standards for poll workers regarding accepting and handling the photo identification cards. *Id.*, § 6. The county clerks are directed to provide training pursuant to the Secretary of State's standards for their respective poll workers. *Id.*, § 7.

Plaintiffs allege that the law imposes substantial burdens on the poor, who are more likely to be African-American or Hispanic and who are more likely to have impediments to compliance (such as taking off of work to obtain a compliant form of photo identification) because of past discrimination. They also allege purposeful discrimination on the basis of race. In their various pleadings, they challenge this law under one or more of the following claims:

- Section 2 of the Voting Rights Act (VRA), 42 U.S.C. § 1973, et seq., alleging a denial or abridgment of the right to vote on the basis of race and language minority and denial of an equal opportunity to participate effectively in the political process;

- First Amendment to the United States Constitution,[2] alleging denial of free speech and association through voting and participation in the election process (asserting that strict scrutiny applies);

- Fourteenth Amendment to the United States Constitution, alleging:

  o  denial of equal protection in registering and voting on account of race and ethnic origin; and

  o  mandating arbitrary and disparate treatment of voters and denying equal access to the right to vote to all eligible citizens;

  o  deprivation of due process in failing to provide adequate standards of uniformity in the treatment of voters, vesting excessive discretion in local officials, arbitrarily selecting the forms of photo identification that will be accepted, and failing to provide adequate notice prior to implementation;

  o  imposing an undue burden on Texas citizens to exercise the right to vote without adequate justification;

- Fifteenth Amendment to the United States Constitution, alleging purposeful denial or abridgment of the right to register and vote on account of race and ethnic origin;

- Twenty-Fourth Amendment to the United States Constitution, alleging that the photo identification requirement constitutes a poll tax;

- Texas Constitution, Article I, § 3, alleging denial of a free and equal vote in Texas elections to Hispanics, African-Americans, and women; and

- Texas Constitution, Article I, § 3a, alleging denial of equality under the law based on race, sex, color, creed, or national origin.

---

[2]  The constitutional claims are made variously with and without reference to the Civil Rights Act, 42 U.S.C. § 1983.

## DISCUSSION

### I.     STANDING

#### A. Standard of Review

Defendants have challenged the standing of each of the Plaintiff organizations and certain of the individual Plaintiffs. Article III of the United States Constitution's case-or-controversy provision requires that a plaintiff plead sufficient facts to establish standing, which is an injury in fact, "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2752 (2010). A motion under Rule 12(b)(1) challenging any of the factors required for standing may be considered on its face, as supplemented by undisputed facts, or as supplemented by undisputed facts and the Court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). Dismissal is appropriate only if it appears certain that plaintiffs cannot prove any set of facts that would entitle them to relief. *Id.*

Plaintiffs argue that the Court need not reach this issue because there can be no dispute that the United States Attorney General has the right to sue to enforce Section 2 of the VRA. They suggest that, where one party has standing, the standing of other parties is inconsequential to Article III jurisdiction. While one plaintiff with standing may satisfy the Court's Article III jurisdiction, the Court still has the obligation to police its docket and dismiss parties who do not have standing. *Nat'l Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 344 n.3 (5th Cir. 2013).

**B. Associational Standing:   LULAC, HJ&C, TLYV, NAACP, MALC, and LUPE**

"Associational standing" is a multi-faceted issue.  Two methods are available to satisfy Article III issues.   However, Defendants argue that Article III is only a preliminary issue to that which they dispute:  the federal court's prudential limitations on its exercise of Article III jurisdiction.  *See*, *Ass'n of Community Organizations for Reform Now (ACORN) v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).  As set out below, the Court finds that the organizations have satisfied all Article III and prudential standing requirements.

**1.  Associational Standing, Generally**

The threshold inquiry is Article III justiciability—whether a party has made out a "case or controversy."  A litigant must have a personal stake in the outcome of the case:

> This "irreducible constitutional minimum" of standing requires: (1) that the plaintiff have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spahr*, 520 U.S. 154, 162 (1999).

There is "no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  This is

sometimes referred to as "organizational standing" under the umbrella of associational

standing.  The pleadings reflect the following with respect to organizational standing:

- LULAC's mission includes voter registration for people of color and especially Latinos.  It will have to divert resources away from other activities such as registering new voters to instead educate already-registered members about S.B. 14's requirements, determine whether the registered voters have adequate photo identification, assist registered voters to get photo identification that they do not have, and assist with efforts to secure the vote of those who have to cast provisional ballots within the six day period allotted to validate such ballots.  D.E. 109, pp. 10-11.

- HJ&C states that it includes elected officials from counties that do not have DPS offices that can issue EICs.  S.B. 14 will require them to shift their energies from traditional efforts to register new voters to ensuring that existing registered voters will be able to cast ballots on election day.  D.E. 153, pp. 3-4.

- TLYV pleads that its mission is to empower young people, particularly those of color, including ensuring their right to vote with new registrations.  S.B. 14 requires TLYV to divert its resources from efforts directed toward unregistered college-enrolled young people of color to non-college-enrolled young people and low-income young people who are already registered to vote but who lack the necessary photo identification.  It anticipates having to provide financial assistance to get registered voters transportation and funding to pay fees for underlying documents so that they will have photo identifications at the time of the election.  D.E. 73, pp. 5-6.

- Texas NAACP is an organization formed to promote and protect the civil rights of African-Americans in Texas.  Support of the VRA has been central to its mission and it has participated in litigation to enforce its provisions.  S.B. 14 is causing Texas NAACP to divert its resources from its ordinary voter registration and get-out-the-vote efforts to educating its members about the S.B. 14 photo identification requirement and assisting voters to cast ballots in compliance with its requirements.  D.E. 1 in 13-cv-291, pp. 2-3.

- MALC is a legislative caucus formed to serve the members of the Texas House of Representatives in matters of interest to Texas' Latino community.  S.B. 14 will require MALC to divert its resources to

educating citizens about the photo identification requirement and assisting already registered voters in casting ballots in compliance with the new law.  D.E. 1 in 13-cv-291, p. 3.

- LUPE is an organization of farm workers and other low wage workers that serves as an advocacy group for the working poor.  S.B. 14 has required LUPE to divert its resources to educating its members and the larger public on the photo identification requirements in order to minimize the number of registered voters who will be prevented from voting by the new requirements.  D.E. 4 in 13-cv-348, p. 3.

In situations where a violation of individuals' rights will cause a drain on the resources of an association committed to the individuals' rights, the association has stated a case or controversy sufficient to confer standing on the association.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982).   Thus Plaintiffs assert that each of the organizations has stated its standing under the organizational standing branch of associational standing.  The Court agrees.

Such an organization may also have associational standing to assert the claims of its members, even where it has suffered no injury from the challenged activity.  *Warth, supra* at 515.  This is referred to as "representational standing."  *ACORN*, 178 F.3d at 365.  More specifically,

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).  Generally, such standing is limited to requests for prospective injunctive relief because

individual damage claims would require joinder of the individual members.  *Warth, supra*.

According to the respective complaints:

- TLYV states that its constituents are aggrieved because S.B. 14 abridges their right to vote on account of their race and denies them equal participation in the political process.  D.E. 73, p. 7.  Its constituents, students and low-income young people, do not have the financial resources that litigation requires.  *Id.*

- Texas NAACP alleges that its membership includes registered voters who do not possess the required photo identification required by S.B. 14.  D.E. 1 in 13-cv-291, p. 3.

- LUPE pleads that its members may be rendered unable to vote because of the requirements of S.B. 14.  D.E. 4 in 13-cv-348, p. 3.

These pleadings, in the context of the entirety of the respective pleadings, show that these organizations, TLYV, Texas NAACP, and LUPE, have also stated representational standing on behalf of voters who do not have the required photo identification.

## 2.  Prudential Standing

### a.  Third-party standing

Defendants do not dispute that the organizations have satisfied the first requirement of Article III standing—injury in fact.  Defendants' reply, D.E. 108 in the Veasey Case, p. 11; Defendants' motion, D.E. 8 in the Ortiz Case, pp. 8-9.  Instead, Defendants argue that there are prudential barriers to the organizations seeking the relief that they pray for—barriers that Congress did not, or did not intend to, eliminate through its statutes.  *See generally, ACORN v. Fowler, supra*.  More specifically, they press their prudential standing challenge in terms of the second and third requirements of standing—

causation and redressability—and also refer to it as "third-party standing" or as Plaintiffs having "no cause of action."  In short, Defendants contend that the associations cannot predicate their own claim to relief on rights owed to third parties.

The Supreme Court has described the elements for third-party standing as follows:

> We have recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied:  [1] The litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; [2] the litigant must have a close relation to the third party; and [3] there must exist some hindrance to the third party's ability to protect his or her own interests.

*Powers v. Ohio*, 499 U.S. 400, 410-11 (1991) (citations omitted).   These elements illustrate that third-party standing runs parallel to representational standing.  It does not add a layer of prudential concerns to the requirements for associational standing.

Where representational standing requires that "the interests it seeks to protect are germane to the organization's purpose," third-party standing requires a "close relation to the third party."  Where representational standing provides "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," third-party standing provides that there be "some hindrance to the third party's ability to protect his or her own interests."   There are no independent interests that third-party standing must trigger that associational standing does not already satisfy.

The two prime examples of the third-party standing analysis supplied by Defendants lack the involvement of any associations.  In *Powers*, a white criminal defendant was permitted to raise the right of an African-American to serve on a jury

11

without being eliminated on a peremptory challenge on the basis of race alone.  *Powers* was a case where one individual's injury was so interrelated with another individual's rights that the injured party could raise the rights of the other.

In *Kowalski v. Tesmer*, 543 U.S. 125 (2004), the litigants were two attorneys who took court appointments to represent criminal defendants.  They challenged a Michigan statute by raising the right of hypothetical indigent defendants who pled guilty to have court-appointed appellate counsel.  The Supreme Court held that the attorneys did not have a close relationship with the indigent criminal defendants because they had not been appointed to represent them and had no attorney-client or other type of relationship to support standing.  Additionally, the Court held that the criminal defendants had adequate incentive and capacity to bring the claims themselves.

Here, the successful assertion of associational standing (both organizational and representational) fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing as to the associations.

### b.  Whether there is "no cause of action."

Defendants argue that the associations and the voters do not have private rights of action under Section 2 of the VRA, the Civil Rights Act, or the Declaratory Judgment Act.  For this proposition, Defendants rely on *Alexander v. Sandoval*, 532 U.S. 275 (2001).

*Alexander* held that a statutory provision not at issue here—§ 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*—did not support a private cause of action because its enforcement powers (against federal funding of programs with racially

12

disparate impact) were conferred only on federal agencies engaged in the distribution of public funds. *Alexander, supra* at 289. The Court rejected the idea that an implied right of action permitted individuals to enforce that provision. The fact that § 601 of the same act allowed individual private actions to redress intentional discrimination had no impact on the interpretation of § 602 because it was worded differently.

Defendants assert that the Supreme Court is taking a new hard line against implied rights of action. They argue that all of the causes of action involved here are, at best, merely implied with respect to private individuals, and thus leave the litigants without a specific claim on which to predicate their standing. In particular, they note that one provision delegates enforcement powers of Section 2 of the VRA to the United States Attorney General. 42 U.S.C. § 1973j(d).

Defendants read § 1973j(d) too narrowly and in isolation.

> Originally, the Voting Rights Act expressly conferred standing only upon the Attorney General. However, in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Supreme Court recognized that a private litigant attempting to protect his right to vote was a proper party to effectuate the goals of the Act, and therefore granted standing to aggrieved voters "seek[ing] judicial enforcement of the prohibition" against the infringement of the right to vote on account of race. *Id*. at 557, 89 S.Ct. at 827. In recognition of the Supreme Court's holding in *Allen*, Congress amended the Voting Rights Act in 1975 to reflect the standing of "aggrieved persons" to enforce their right to vote.

*Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989) (footnote omitted). The plain meaning of § 1973j(d) is to give the Attorney General the power to enforce the voting rights of others because the Attorney General does not otherwise have organizational or

representational standing to enforce voters' rights. The individual voter's power to enforce those rights does not need any additional provision after the 1975 amendments.

Defendants have not supplied any cases in which aggrieved persons have been denied the right to enforce Section 2 of the VRA. In fact, Defendants do not challenge the standing of many of the individual Plaintiffs to enforce Section 2 as such aggrieved persons. The challenge is asserted as to the organizations and counties. To the extent that Defendants seek to defeat the standing of the organizations by arguing that only the Attorney General can enforce this provision, the argument fails.

Organizations and private parties have been permitted to enforce Section 2 of the VRA, both before and after the 2001 *Alexander* case on which Defendants rely. For instance:

- *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) (United Senior Action of Indiana, Indianapolis Resource Center for Independent Living, Concerned Clergy of Indianapolis, Indiana Coalition on Housing and Homeless Issues, the Indianapolis Branch of the NAACP, the Indiana Democratic Party, and the Marion County Democratic Central Committee were all parties to this Section 2 challenge of a photo identification law; Petition for Writ of Certiorari, 2007 WL 1957762);

- *LULAC v. Perry*, 548 U.S. 399 (2006) (LULAC challenged Texas redistricting plan under Section 2);

- *Johnson v. DeGrandy*, 512 U.S. 997 (1994) (The State Conference of NAACP Branches sued on a voter dilution challenge under Section 2);

- *Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (the Louisiana Voter Registration/Education Crusade challenged voter dilution under Section 2; see Brief at 1990 WL 10013123);

- *LULAC v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012) (LULAC challenged voter dilution under Section 2).

Defendants have failed to supply any case in which organizations or private persons were denied standing to bring a Section 2 challenge on the argument that only the Attorney General had the necessary enforcement powers.

Defendants argue that the other statutory claims asserted here—under the Civil Rights Act, 42 U.S.C. § 1983 and the Declaratory Judgments Act, 28 U.S.C. § 2201— also inure only to the benefit of the party injured and cannot support third-party standing. The Court has rejected the application of third-party standing to the organizational parties here.  There is some question whether a party needs any statute to provide a remedy where the complaint is the unconstitutionality of legislation.  *LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011).  As observed, however, associational standing allows enforcement of the individual member's rights.  This is not a third-party standing case as to the organizations.  Thus Defendants' arguments do not defeat claims based on these other two statutes.

### c.  Abstract questions:  whether the Plaintiffs lack a specific injury.

Last, Defendants argue that Plaintiff associations and the voters from whom they derive their claims are complaining about something that affects everyone.  In other words, "the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens," which "normally does not warrant exercise of jurisdiction." *Warth, supra* at 499.

The standard of review requires the Court to accept the Plaintiffs' allegations as true.  According to the Plaintiffs, the burdens of S.B. 14 fall primarily on African-Americans and Latinos in a manner that is intentionally discriminatory or has the result of

denying or abridging the right to vote on the basis of race, color, or language minority. These are not allegations of a generalized grievance and Defendants' argument that S.B. 14 is race-neutral cannot be accepted as true so as to foreclose the Plaintiff associations' lawsuits.

The Court DENIES the motions to dismiss with respect to the challenge to standing leveled against LULAC, HJ&C, TLYV, NAACP, MALC, and LUPE.

### C. County Standing:  Dallas County and Hidalgo County

Defendants, using the same arguments applied to the organizations, challenge the standing of the two counties that have joined this action.  Those counties have alleged their standing as follows:

- Dallas County asserts that it operates a voter registration system within its County Elections Department that must comply with state and federal law.  D.E. 109, p. 7.  S.B. 14 prevents the County from providing all documents required to register persons to vote, and substantially increases the County's election costs because of the need to notify voters of the law and its effect on their respective registrations. S.B. 14 will require the expenditure of additional sums for training and supervising poll workers, and increases the number of provisional ballots and the processing costs associated with them.  The State has not provided the County with funding to offset these costs.  Furthermore, Dallas County is required to comply with federal law so it anticipates having to defend against litigation when it enforces S.B. 14 in contravention of federal law.  Such litigation will involve the cost of defense and potential monetary damages.  D.E. 109, pp. 9-10.

- Hidalgo County alleges that it will incur considerable expense to enforce S.B. 14.  D.E. 153, p. 3.  It further alleges that it has one of the highest poverty rates in Texas, and a high number of minorities and low income persons.  It anticipates significant voter suppression, long lines at the polls, and extensive administrative expenses associated with the implementation of S.B. 14.  D.E 153, p. 6.

These pleadings state an injury in fact which, as noted above, Defendants do not dispute, and this injury is traceable to the State's enforcement of S.B. 14.  However, the more difficult question is that of redressability, the third element of standing.

### 1.  First-Party Standing

The counties' pleadings indicate injuries with respect to (1) administrative costs and unfunded mandates; and (2) voter suppression and potential liability to voters.  The legal theories alleged are limited to Section 2, and constitutional amendments that guarantee rights to individuals.  D.E. 109, 153.  The legal theories do not confer a right of action within this Court's jurisdiction in favor of the counties on a first-party basis.

With respect to unfunded mandates, this Court generally cannot concern itself with the state's budget priorities because the Eleventh Amendment protects the state's fiscal autonomy from federal court interference.  *See generally, United Carolina Bank v. Board of Regents of Stephen F. Austin State University*, 665 F.2d 553, 560-61 (5th Cir. 1982).  The counties have not supplied the Court with any theory or authority that allows the Court to breach the State's sovereign immunity.  Therefore, the counties' standing cannot be maintained based on unfunded mandates.

The voter suppression issue, likewise, does not trigger redressability in favor of first-party standing.  The right to vote implicated by the pleadings is a right afforded to voters who claim discrimination because of race, color, or language minority status or who, because of socio-economic status, do not have the resources to comply with the S.B. 14 requirements.  *Roberts, supra* (denying standing to unsuccessful electoral candidate because he was not an aggrieved voter).  The counties have not supplied the Court with

17

any authority for extending the voting rights conferred by Section 2 or the constitutional amendments to local governmental bodies as first-party litigants.

### 2.  Representational and Third-Party Standing

With respect to representational standing, the counties' problem is that they do not exist to advance certain individual voting rights.  The counties may be aligned with the voters in this litigation; but their reason for joining the litigation is not because they work for those particular voters (as opposed to all voters), but because the voter suppression issue is one that the counties fear will be the basis for an adversarial relationship with voters.

Dallas County fears legal action by voters against the County and the risk such action poses to its coffers with respect to defense costs and, perhaps, damage awards. Hidalgo County was actually sued by voters.  D.E. 187, p. 3 n.1.  The counties cannot borrow the cause of action of their adversaries (the voters) for representational standing which requires a common mission sufficient to consider the county to effectively represent the voters' issues.  The counties cannot claim representational standing.

The counties have shown that the Supreme Court permits third-party standing when a state law allegedly conflicts with the requirements of the United States Constitution.  The counties are caught between the voters and their associations seeking to enforce the constitution on one side and the state and its officials seeking to enforce S.B. 14 on the other side.  This type of no-win situation supported standing in *Craig v. Boren*, 429 U.S. 190 (1976) (when a state law prevented a vendor from selling beer to males on a gender-discriminatory basis that allegedly violated constitutional guarantees

of equal protection) and *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982) (when a state law that was allegedly racially motivated prevented a school board from addressing racial integration to prevent unconstitutional discrimination).   The Court appreciates the dilemma of the counties and their requirement to follow both state law and the United States Constitution where the two allegedly conflict.

However, the final requirement for this type of third-party standing is that the third party is hindered in its ability to enforce its own interests.   In *Craig*, the third party was a man who was unable to buy beer because he was between 18 and 21 years of age and male.   As the case progressed, he reached the age of 21, mooting his claim.   The Court held that the vendor could represent the interests of that class of purchasers because the vendor remained subject to future liability from like purchasers and those purchasers would always risk aging-out before the case was completed.   In *Washington*, while the issue was not expressly addressed, the third parties were the school children who had the right to be free of racial discrimination but who could not participate in the case and were not represented by another party.

In contrast, the body of affected voters in this case are present through the claims of individual voters and several representational organizations.   It is not necessary to confer on the counties the rights of a portion of their citizens who are potentially adverse to them in order to get this case through trial.

The counties do not have first-party standing because the legal theories on which their claims are based do not inure to their benefit.   They do not have representational standing because they do not have an organizational purpose to represent particular

voters.  And they do not have third-party standing because nothing is preventing the third party (or more closely aligned representatives) from participating in this case.  The motions to dismiss are GRANTED with respect to the challenge to the standing of Dallas County and Hidalgo County.

### D.   Individual Plaintiff Standing[3]

#### 1.   Carrier and the disability exemption.

Plaintiff Floyd James Carrier (Carrier) has alleged that he does not have one of the forms of identification permitted under S.B. 14.  While he has a Veteran's Administration identification, it does not bear his photo.[4]   Defendants argue that Carrier is disabled, which exempts him from having to show photo identification.  S.B. 14, § 1; Tex. Elec. Code § 63.001(h).  Moreover, the steps he needs to take to get the disability notation on his voter registration are minor inconveniences.  Tex. Elec. Code § 13.002(i).

Defendants do not address whether Carrier's disability is sufficient to qualify under the statute for the disability exemption.  Plaintiffs argue that the hurdles for taking advantage of that exemption are not insignificant.  Carrier must get the voter registration certificate with the disability notation, which requires written documentation from the United States Social Security Administration or from the United States Department of Veteran's Affairs evidencing the disability, and he must complete the Texas Secretary of

---

[3]   Defendants challenged the inclusion of John Doe and Jane Doe Plaintiffs in their original motion to dismiss.  D.E. 52, pp. 15-17.  However, when Plaintiffs amended their complaint, they substituted new individuals so the John and Jane Doe issue is moot.

[4]   Carrier originally failed to specify in his pleading that his Veteran's Administration ID did not bear his photo. Defendants argued that the photo ID fell within the Secretary of State's authoritative interpretation and was acceptable.  Carrier responded that his voting rights should not be governed by the discretionary and changeable interpretation of the Secretary of State but should be guaranteed by law.  This argument was rendered moot by Carrier's amended pleading.

State form representing that he does not have an S.B. 14 identification.   Being able to overcome the injury does not eliminate it for standing purposes.   *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).   The Defendants' challenge to Carrier's standing is DENIED.

### 2.   Burns, Ozias, and Mellor-Crummey and the statute's treatment of "substantially similar" names.

Defendants also challenge the standing of Plaintiffs Anna Burns, Koby Ozias, and John Mellor-Crummey.   These Plaintiffs allege that the names on their voter-registration certificate and the names on their respective photo identification cards are not exactly alike, but they have not addressed whether the names are "substantially similar," which would allow them to vote under S.B. 14 after signing an affidavit that states they are the registered voter.   According to Defendants, it is only if the names are not alike and are not substantially similar that Plaintiffs state an injury.

According to S.B. 14, election officers at the polls are to determine whether the voter's name on the photo identification is also on the registered voter list.

> If in making a determination under this subsection the election officer determines under standards adopted by the secretary of state that the voter's name on the documentation is substantially similar to but does not match exactly with the name on the list, the voter shall be accepted for voting under Subsection (d) if the voter submits an affidavit stating that the voter is the person on the list of registered voters.

S.B. 14, § 9(c).   Currently, discrepancies caused by the addition or omission of a middle name, or the use of a middle initial or a former name, are considered within the bounds of "substantially similar."   1 Tex. Admin. Code § 81.71(c) (promulgated pursuant to S.B.

14, § 9(c), Tex. Elec. Code § 63.001(c)).   Defendants want to eliminate individual Plaintiffs from this case if they fall within the current regulatory interpretation of "substantially similar."

> The Plaintiffs have alleged, with reference to the Fourteenth Amendment:
>
>> On its face, S.B. 14 deprives Plaintiffs and other Texans of the right to vote without due process in a variety of ways, including, among other ways, failing to provide adequate standards of uniformity in the treatment of voters, vesting excessive discretion in local officials, and arbitrarily picking and choosing which photo IDs would be valid and which would not.

Veasey Second Amended Complaint, D.E. 109, p. 30.   Plaintiffs assert that the law's usage of the term "substantially similar" is vague and provides no guidance.   Poll workers with little training are given incredible power and discretion to decide whose "substantially similar" identifications to accept or reject.   Election officers and the secretary of state regulations may change from year to year, rendering any S.B. 14 violation of voter rights a moving target that Plaintiffs should be permitted to challenge.

While the Veasey Plaintiffs assert First Amendment claims with respect to S.B. 14 in Count 6 of their complaint, the claims that relate to the term "substantially similar" are in Count 5, which alleges a violation of the Fourteenth Amendment.   D.E. 109, p. 30.   It is only in the First Amendment context that courts relax the standing requirements and allow a party to complain about a law's vagueness as it may be applied to others.   *E.g.*, *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1215 (5th Cir. 1982), *abrogated on other grounds*, *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).   Thus Plaintiffs must establish standing with their own alleged injury.

Plaintiffs cannot satisfy standing requirements and invoke the Court's subject-matter jurisdiction with an injury that is merely conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). An abstract injury is not enough; it must be real and immediate. *Id*. Defendants contend that Plaintiffs are concealing the facts necessary to determine whether their claimed injury is real and immediate.

Plaintiffs argue that, even if their registered names and the names on their photo identification cards are "substantially similar," the fact that they will be subject to an election officer making an ad hoc decision and then having to sign an affidavit of identity is sufficient to confer standing. Additionally, the process will cause delays in the voting process during high turnout elections—delays that will primarily affect voters who do not have an exact match of names.

These burdens are sufficient to confer standing. "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14 (1973) (quoting Davis, *Standing: Taxpayers and Others*, 35 U.Chi.L.Rev. 601, 613). *See also, Save Our Community v. U.S. Environmental Protection Agency*, 971 F.2d 1155, 1161 (5th Cir. 1992).

The Defendants' challenge to the standing of Anna Burns, Koby Ozias, and John Mellor-Crummey is DENIED.

## II. STATEMENT OF A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A. Standard of Review

Motions to dismiss under Rule 12(b)(6) are generally viewed with disfavor and are rarely granted.  *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).  The test of pleadings under Rule 12(b)(6) is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  As discussed in *Twombly, supra* and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Furthermore, "[p]leadings must be construed so as to do justice."  Rule 8(e).

The requirement that the pleader show that he is entitled to relief requires "more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Factual allegations are required, sufficient to raise the entitlement to relief above the level of mere speculation.  *Twombly*, 550 U.S. at 555.  Those factual allegations must then be taken as true, even if doubtful.  *Id*.  In other words, the pleader must make allegations that take the claim from conclusory to factual and beyond possible to plausible.  *Id*. at 557.  The *Twombly* court stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

### B. Photographic Identification Does Not Have Automatic Approval From the Supreme Court.

Defendants argue that states have exclusive power to determine the qualifications of voters, and the Supreme Court held that state voter-identification laws are constitutional in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S.Ct. 2247, 2253-54, 2257-58 (2013) and *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).  Defendants overstate the Supreme Court's approval of voter identification laws.

### 1.    *Inter Tribal* did not address a photo identification requirement.

In *Inter Tribal*, Arizona state law required documentary proof of citizenship when a voter registered, and presentation of identification when the voter appeared at the polls. No complaint regarding photo identification was presented in the case; the Supreme Court addressed only the registration requirement.  At issue was the rejection of voter registration applications that were not accompanied by documentary proof of citizenship, such as a birth certificate, passport, tribal identification, or other evidence that a state or federal governmental agency had reviewed and approved the applicant's citizenship.

Arizona's documentation requirement conflicted with the National Voter Registration Act (NVRA), 42 U.S.C. § 1973gg-4(a)(1).  Under the NVRA, all states must accept and use a federally-prescribed form as a voter registration application.  The federal form required the applicant to sign an oath to demonstrate citizenship and did not require Arizona applicants to supply any corroborating documentation.  Arizona rejected all applicants who used the federal form without also submitting the state-required evidence of citizenship.

The Supreme Court acknowledged the state's exclusive right to prescribe the qualifications of its voters to include citizenship.  However, it upheld the NVRA's requirement that Arizona treat the federally-prescribed registration form as submitting adequate and complete information upon which to trigger the right to vote.  The Supreme Court acknowledged Arizona's complaint that a citizenship oath was not enough.  But it held that Arizona's remedy was not to reject applicants but to insist on inclusion of its documentation requirement in the NVRA registration form.  Arizona was referred to administrative procedures to request that its documentation requirement be added to the NVRA form.

While Arizona was within its constitutional prerogative to establish the eligibility requirements of voting to include citizenship, it would have to show in the administrative proceeding that the current NVRA form's oath requirement was insufficient to ensure that Arizona's voters are citizens.  Upon such a showing, the responsible agency would be required to add the documentation requirement to the form.  The *Inter Tribal* case did not approve any particular photo identification law.

> ### 2.   *Crawford* involved only a Fourteenth Amendment challenge that was not supported by evidence.

While a photo identification law was squarely at issue in *Crawford*, the terms of that law, the nature of the claims, and the specific holding fail to produce any Supreme Court preclusion of the claims made here.  The *Crawford* challenge was to an Indiana photo identification law that permitted the use of any state or federal ID that contained the voter's name and photograph and that was valid or had an expiration date after the

most recent general election.  The law here, S.B. 14, allows significantly fewer forms of ID and requires a much later expiration date, if the ID is expired.

The Indiana law further permitted indigent voters to cast their ballots after filing an affidavit with the circuit court clerk or county election board.  Under S.B. 14, there is no exception for indigents.  While they may cast a provisional ballot, they must still present the identification required within six days of voting.  And while a Texas EIC is available free of charge, the Plaintiffs argue that there are still costs to obtain underlying documentation and for transportation to retrieve and submit that documentation—not to mention time off work to travel the necessary distances—that will be difficult if not impossible for some indigents to overcome.

Defendants argue that the Texas law is less restrictive than the Indiana law in that it allows the reduced charge of only $3.00 for a birth certificate (if needed for an EIC) and provides an exemption for the disabled.  Plaintiffs submit that officials have not altered websites to reflect any reduced charge for birth certificates, that the cost is still prohibitive, and that the disability exemption is equally plagued with practical difficulties.  The Court further observes that the Indiana law contains a nursing home resident exemption.  Regardless of whether the Texas law is more or less restrictive in certain provisions, it cannot be disputed that there are some material differences that preclude *Crawford's* treatment of the issue of a photo identification law as a one-size-fits-all proposition.

More importantly, the *Crawford* holding does not apply because the Court was not asked to adjudicate the issues that these Plaintiffs have pled.  The only challenge in

*Crawford* was that the Indiana law imposed a substantial, unjust, and arbitrary burden on the right to vote in contravention of the Fourteenth Amendment.  No claim was made under Section 2 of the VRA; the First, Fifteenth, or Twenty-Fourth Amendments; or the Texas Constitution.  And no claim was made that the law discriminated on the basis of race, ethnic origin, or sex.

The *Crawford* Court acknowledged that the Fourteenth Amendment challenge required "weigh[ing] the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford, supra* at 190 (Stevens, J., lead opinion; quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) and *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); internal quotation marks omitted).  Applying this balancing test, the Court discussed the state's stated interests in detecting, deterring, and preventing voter fraud, modernizing elections, and safeguarding voter confidence.  *Crawford, supra* at 192-97 (Stevens, J., lead opinion).  While the opinion expresses some skepticism regarding whether a photo ID law truly addresses the issue of voter fraud in practical terms,[5] the Court did agree that voter fraud was a legitimate state concern.

The *Crawford* court did not fully address the Indiana law's ability to address voter fraud because it found that there was no evidence presented by the petitioners to balance

---

[5]  "The only kind of voter fraud that [the Indiana law] addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history." *Crawford, supra* at 195 (Stevens, J., lead opinion).  Instead, the only instance of voter fraud was in the use of absentee ballots, a matter that the Indiana law did not address.  *Id*.  "While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Id*. at 196.  "Without a shred of evidence that in-person voter impersonation is a problem in the State, much less a crisis, Indiana has adopted one of the most restrictive photo identification requirements in the country."  *Id*. at 236 (Souter, J., dissenting).

against the legitimate state interest of preventing voter fraud.  For instance, the *Crawford*

plurality opinions contain the following remarks:

- District Judge Barker "found that petitioners had '***not introduced evidence*** of a single, individual Indiana resident who will be unable to vote as a result of [the Indiana law] or who will have his or her right to vote unduly burdened by its requirements.'"  *Crawford, supra* at 187 (Stevens, J., lead opinion; emphasis added);

- "We are . . . persuaded that the District Court and the Court of Appeals correctly concluded that ***the evidence in the record is not sufficient*** to support a facial attack on the validity of the entire statute, and thus affirm."  *Id.* at 188-89 (emphasis added);

- "***[O]n the basis of the evidence in the record*** it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified."  *Id*. at 200 (emphasis added);

- "[T]he ***evidence in the record*** does not provide us with the number of registered voters without photo identification . . . ."  *Id*. (emphasis added)

- "[T]he deposition evidence presented in the District Court ***does not provide any concrete evidence*** of the burden imposed on voters who currently lack photo identification."  *Id*. at 201 (emphasis added);

- "***The record says virtually nothing*** about the difficulties faced by either indigent voters or voters with religious objections to being photographed."  *Id*. (emphasis added);

- "In sum, ***on the basis of the record that has been made in this litigation***, we cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters."  *Id*. at 202 (emphasis added);

- "***Without proof*** of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional."  *Id*. at 207 (Thomas, J. concurring; emphasis added);

The Fourteenth Amendment challenge involves a balancing of interests that must be

supported by evidence on both sides.

Therefore, the *Crawford* holding, which was based on a lack of evidence, does not preclude the prosecution of this action and the parties' respective rights and obligations to develop and present the necessary evidence.  Instead, the *Crawford* case illustrates that a Fourteenth Amendment challenge may be successfully prosecuted against a photo identification law.  *Crawford* did not address claims under Section 2 of the VRA; the First, Fifteenth, and Twenty-Fourth Amendments; or the Texas Constitution.  *Crawford* does not immunize Defendants from Plaintiffs' claims.

## C.  State's Constitutional Prerogative to Enact Race-Neutral Laws

Defendants assert that the right to establish the qualifications of voters is the exclusive prerogative of the individual states, and this Court is not empowered to issue any orders interfering with that prerogative.  UNITED STATES CONSTITUTION art. I, § 4, cl.1.  *See also, Inter Tribal, supra*.  Plaintiffs respond with three arguments:  (1) the voter identification law is not a matter of voter qualification; (2) constitutional amendments prohibit the exercise of any state prerogative in a discriminatory manner; and (3) Section 2 of the VRA, with its results test, is an appropriate statute to enforce the voters' constitutional right to be free of discrimination and the states' right to determine qualifications.

### 1. Photo identification is not a matter of voter qualification

The Texas NAACP Plaintiffs state, "S.B. 14 does not establish the qualifications for voting.  It sets forth a protocol for identifying those who have already met the qualifications to vote."  D.E. 88, p. 33.  A qualified voter in Texas is defined by Texas Election Code § 11.002, a provision that was not amended by S.B. 14.  It provides that a

qualified voter is a person who is 18 years of age or older, a United States citizen, a Texas resident, and who has registered to vote. *Id*. The only disqualifications are for specified mental incapacity and convicted felons. *Id*.

The Court agrees with Plaintiffs. Because S.B. 14 does not affect voter qualification, it does not enjoy any constitutional protection under Article I of the United States Constitution.

### 2. Plaintiffs have stated cognizable constitutional claims.

Even if Texas enjoyed Article I protection for S.B. 14, the exclusive right to determine voter qualification is tempered by constitutional anti-discrimination provisions. The state may not deny or abridge the right to vote on the basis of race, color, previous condition of servitude, sex, or age, and it is not permitted to charge a poll tax. U.S. CONST. amend. XIV (privileges and immunities, due process, and equal protection guaranteed as against the states), amend. XV (discrimination based on race, color, previous condition of servitude prohibited); amend. XIX (discrimination based on sex prohibited); amend. XXIV (poll taxes prohibited); amend. XXVI (discrimination based on age prohibited).

Defendants argue that the photo identification law is race-neutral and color-neutral because it applies to everyone across the board. It is used only to ensure that the person voting is the state citizen that he or she purports to be. They argue that the constitutional amendments only prohibit purposeful discrimination and Texas has not purposefully discriminated when its law is race- and color-neutral. They rely on *City of Mobile v. Bolden*, 446 U.S. 55 (1980) and *Washington v. Davis*, 426 U.S. 229 (1976).

Section 2 was amended to address the *City of Mobile v. Bolden* decision and to expand the methods for demonstrating unconstitutional discrimination.  Nothing in the law insulates the Defendants from the claims made in this case.  Given the factual allegations and the standard of review, the Court holds that Plaintiffs have stated a cause of action upon which relief may be granted under Fed. R. Civ. P. 12(b)(6).  Plaintiffs have alleged purposeful discrimination consistent with the Fourteenth and Fifteenth Amendments.

### 3.  Plaintiffs have stated cognizable Section 2 claims.

Defendants seek dismissal of the Section 2 claims because the results test that Plaintiffs seek to apply exceeds the scope of the constitution's anti-discrimination provisions.  Defendants argue that the anti-discrimination constitutional amendments prohibit only intentional discrimination.  They contend that a facially neutral law that happens to have a discriminatory impact on African-American or Hispanic voters is constitutional.

Defendants argue that the Court must construe Section 2 so as to avoid a constitutional clash unless that construction is plainly contrary to Congressional intent. *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001).  Defendants thus seek to limit any Section 2 challenge to a showing of intentional discrimination, rejecting the results test to the extent that it relies on any evidence that does not reveal a purposeful discriminatory motive.

Defendants are incorrect.  "By passing the 1982 amendment [to Section 2 of the VRA], Congress rejected the purpose standard in voting dilution claims and substituted in

32

its place a results test under the totality of the circumstances." *Velasquez v. City of Abilene, Texas*, 725 F.2d 1017, 1021 (5th Cir. 1984). The results test has been held to be consistent with the scope of the Fifteenth Amendment. *E.g., League of United Latin American Citizens, Council No. 4434 (LULAC) v. Clements*, 986 F.2d 728, 759-60 (5th Cir. 1993) (citing *Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002 (1984)).

Defendants concede that Supreme Court summary affirmances "reject the specific challenges presented in the statement of jurisdiction." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). However, they suggest that the summary affirmance and rejection of jurisdiction in *Brooks* should be viewed narrowly and specifically in the context of all of the issues. They argue that *Brooks* does not control the issues in this case because it stands only for the proposition that Section 2 was properly applied to redistricting decisions, and it did not reach the issue of whether anything other than intentional discrimination exceeds the power vested in Congress by the Fifteenth Amendment.

The Court does not read the Fifth Circuit's treatment of this issue so narrowly. *LULAC v. Clements* and *Jones v. City of Lubbock*, 727 F.2d 364, 373 (5th Cir. 1984) have both indicated that Section 2's methods are constitutional. "Congressional power to adopt prophylactic measures to vindicate the purposes of the fourteenth and fifteenth amendments is unquestioned." *Jones, supra*. Congress's legitimate enforcement of Fourteenth and Fifteenth Amendment restrictions are not an invasion of state sovereignty. *See, Ex parte Virginia*, 100 U.S. 339, 346 (1880) (discussing the Thirteenth and Fourteenth Amendments). *See also*, *Lopez v. Monterey County*, 525 U.S. 266, 283

(1999) ("under the Fifteenth Amendment, Congress may prohibit voting practices that have only a discriminatory effect.") (quoting *City of Rome v. United States*, 446 U.S. 156, 173 (1980)), *abrogated on other grounds*, *Shelby County, Alabama v. Holder*, 133 S.Ct. 2612 (2013) (rejecting Section 5 preclearance requirements).

### 4.  Conclusion

For these reasons, the Court holds that Defendants are subject to claims based on the Fourteenth and Fifteenth Amendments and Section 2 despite the State's Article 1 constitutional right to determine the qualifications of voters.  The Court DENIES the motions with respect to the claim of Article 1 immunity from this action.

### D.  Standard of Review for Voting Rights Act Cases

Section 2 of the Voting Rights Act prohibits any state or political subdivision from imposing or applying a voting qualification, prerequisite to voting, or standard, practice, or procedure that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race[,] color[, or language minority status]."  42 U.S.C. § 1973(a).  Proof of a violation requires a review of the totality of the circumstances to determine whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b).  This does not require proof of intentional discrimination.  S. Rep. No. 97-417, 97th Cong., 2d Sess., at 2 (1982).

The totality of the circumstances test requires "a searching practical evaluation of the past and present reality and [] a functional view of the political process." *Thornburg v. Gingles*, 478 U.S. 30, 45 (1986) (quoting from S. Rep. 97-417, p. 30).  Factors include, but are not limited to:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[8.]    Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;

[9.]  Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Thornburg v. Gingles*, 478 U.S. at 36-37 (quoting from S. Rep. No. 97-417's non-exhaustive list, at pages 28-29).

Defendants assert that the results test is unconstitutional and Plaintiffs must prove intentional discrimination.  On that basis, they challenge the Plaintiffs' statement of a claim upon which relief can be granted.  As set out above with respect to Defendants' claim of Article 1 protection, the legislative history and case opinions issued since the 1982 amendments to Section 2 make it clear that Plaintiffs may bring a claim based on discriminatory voting practices using either the results test or an intentional discrimination test.  42 U.S.C. § 1973(a); S. Rep. No. 97-417; *Velasquez, supra*; *LULAC, supra*.

### 1.  Whether Plaintiffs state a discriminatory results claim

Defendants lodge three challenges to Plaintiffs' discriminatory results claims:  (1) they are nothing but disparate impact claims, which are insufficient; (2) S.B. 14 does not deny or abridge anyone's right to vote; and (3) S.B. 14 is facially neutral and thus does not require anything on account of race, color, or language minority.  Each of these challenges is addressed in turn.

### a.  Disparate impact versus discriminatory results

Plaintiffs describe disparate impact as a highly relevant starting point, but argue that it is not the entirety of their claims.  *Washington v. Davis*, 426 U.S. 229, 242 (1976) (disparate impact is relevant to a determination of discriminatory purpose, especially

where the impact is difficult to explain on non-discriminatory grounds); *Mississippi State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400, 409 (5th Cir. 1991) (acknowledging use of disparate voter registration rates as some evidence of discriminatory results); *United States v. Blaine County*, 363 F.3d 897, 909 (9th Cir. 2004) (describing the multi-faceted aspects of the results test that make it appropriate).  A disparate impact may be considered along with other issues arising from the Senate Report factors, which Plaintiffs have pled, to demonstrate that S.B. 14 interacts with social and historical conditions to cause an inequality in the political opportunities enjoyed by persons of different races, colors, or languages.  *Gingles*, 478 U.S. at 47.

Plaintiffs have alleged that Hispanic and African-American voters are disproportionately without photo identification and without the resources to easily obtain EICs.  Plaintiffs have alleged that this disproportionality is related to past intentional discrimination and its lasting socio-economic effects.  Thus they do not rely on disparate impact alone.  Instead, they incorporate Senate Report 97-417 factors.  Defendants' challenge to the Plaintiffs' action on the basis that it is nothing more than a disparate impact case fails.

### b.  Denial of the right to vote

Defendants claim that S.B. 14 cannot be read as a denial or abridgment of the right to vote because even those without an approved method of photo identification can get an EIC free of charge, thus enabling them to vote.  Those with disabilities can get an exemption.  Those with a religious objection or who lost their ID in a natural disaster may cast a provisional ballot, subject to verification.  Tex. Transp. Code § 521A.001;

Tex. Elec. Code §§ 63.001(b), 63.0101(1).   Given the various ways to satisfy the requirements of S.B. 14, Defendants argue that a failure to comply is simply an individual's choice to refuse to bear the ordinary and insignificant burdens associated with voting. *Crawford, supra.*

The argument that the failure to overcome a burden to voting is nothing more than the individual's choice was refuted in *United States v. Marengo County*, 731 F.2d 1546, 1556 (11th Cir. 1984) (rejecting the argument that Section 2 only ensures access to the political process without formal barriers) and *Kirksey v. Board of Supervisors of Hinds County*, 554 F.2d 139, 145 (5th Cir. 1977) (*en banc*; failure to register cannot be considered a matter of voter apathy without specific supporting evidence).

Plaintiffs have pled that the S.B. 14 requirements, including the free EIC process is a significant impediment to exercising the right to vote.   Those who do not already have a photo ID must get one or get an EIC.   The EIC requires time, monetary resources for underlying documents, and logistics above and beyond those ordinarily necessary for voting.   The voter must obtain underlying documents (which is anticipated to involve some expense—at least $3.00 for a Texas birth certificate) and apply in person at a DPS office.   Plaintiffs argue that this requires taking time off of work for many people, especially African-Americans and Latinos, given their demographics.   Also, some counties have no DPS office, the office is far away, and/or the office is open limited hours each week.

Our jurisprudence recognizes that the distance of polling places affects voter turnout.   *E.g.*, *Perkins v. Matthews*, 400 U.S. 379, 388 (1971).   There is no reason to

believe that the distance of DPS offices would not affect voters' ability to obtain an EIC. Plaintiffs assert that the burden imposed on voting need not be impossible to overcome in order to be actionable and Defendants do not dispute this. However, Defendants argue that the burden must be insurmountable to someone. D.E. 108, p. 16. Defendants claim that Plaintiffs must show that someone's vote will not be counted because of the provisions of S.B. 14. *Id.*

Defendants' argument is incorrect. Plaintiffs are required to show a denial ***or abridgment*** of the right to vote. 42 U.S.C. § 1973. Whether the right to vote is completely prevented or partially restricted, the matter is actionable under Section 2. Plaintiffs have alleged that their right is restricted by obstacles that make it more difficult for them to vote. This is enough to state a claim upon which relief may be granted under Rule 12(b)(6). Defendants' argument that there is no Section 2 claim without someone being denied the ability to vote fails.

### c.    Action on account of race, color, or language minority

Defendants seek dismissal of the claims because the photo identification law is facially race-neutral and is permissible as long as it is enforced in a race-neutral and color-neutral manner. Treating the discriminatory results pleading as a disparate impact allegation, Defendants argue that there is no discrimination in this law, symmetrical impact is not required by law, and other disparate impact claims have failed. They argue that any effect on anyone's right to vote is not on account of or because of race, color, or language minority. They argue that a person's choice to not meet the S.B. 14 requirements is not actionable.

The Court has rejected Defendants' argument that the claim at issue amounts to nothing more than the individual's choice not to vote.  The Court has rejected the argument that Plaintiffs' claims are bare disparate impact claims.  The issue of a causal link to discriminatory practices is a matter of fact, not to be adjudicated under Rule 12.  Thus any analogy to felon disenfranchisement laws or voter-purge statutes being upheld despite disparate impact challenges is not relevant.  *E.g., Wesley v. Collins*, 791 F.2d 1255, 1261 & n.8 (6th Cir. 1986) (collecting authorities; holding that convicted felons do not have a fundamental right to vote and the right to vote may, constitutionally, be denied them); *Ortiz v. City of Philadelphia Office of City Commissioners Voter Registration Division*, 28 F.3d 306, 308 (3d Cir. 1994) (Section 2 claim failed as a factual matter based on evidentiary review of totality of the circumstances balanced against the policy reasons underlying the statute at issue).

The Court rejects Defendants' argument that the claim must be dismissed for failure to plead the causal requirement that the denial or abridgment of the right to vote be on account of or because of race, color, or language minority.  The pleadings have alleged the causal connection and the survival of the claim is a matter of fact to be evaluated under the totality of the circumstances.  Thus, the Court DENIES the motions to dismiss with respect to their challenge to the Section 2 claims stating causes of action based on discriminatory results.

### 2.   Intentional Discrimination

Defendants challenge the factual allegations of intentional discrimination as not plausible under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007) and *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).   The *Twombly/Iqbal* standard requires only that Plaintiffs state sufficient facts to support their cause of action.   The Supreme Court has identified a nonexclusive and nonexhaustive list of factors to consider in determining racially discriminatory intent.   Those factors include:

- Whether the impact of the decision bears more heavily on one racial group than another;

- Contemporaneous statements by the decisionmakers;

- The historical background of the decision;

- The sequence of events leading up to the decision; and

- Whether the decision departs from the normal practice.

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977) (equal protection challenge to zoning laws).

These factors and the Senate Report 97-417 factors apply to Section 2 challenges. *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009); *Terrazas v. Clements*, 581 F.Supp. 1329, 1343, 1347 (N.D. Tex. 1984).   Normal inferences from those factors may also be considered.   *McMillan v. Escambia County*, 748 F.2d 1037, 1046-47 (5th Cir. 1984) (quoting S. Rep. No. 97-417, at 27 n.108).   Racial discrimination need not be the primary purpose of the official act for a violation to occur as long as it is one purpose. *Brown*, 561 F.3d at 433 (citing *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984)).

With these standards in mind, the complaints clearly allege specific facts relevant to the *Arlington Heights* and S. Rep. 97-417 factors.   While Defendants dispute the truth

or significance of those facts and their weight with respect to the policy behind S.B. 14, the resolution of those questions is a matter for trial that cannot be disposed of in the context of a Rule 12 motion.  The motions to dismiss are DENIED with respect to their challenge to the claims of intentional discrimination under the Fourteenth and Fifteenth Amendments.

### E.    Veasey Additional Claims

In a single paragraph (D.E. 52, pp. 39-40), Defendants challenge three aspects of the Veasey complaint (D.E. 109):  (1) evaluation of the Fourteenth Amendment claims under the strict scrutiny test; (2) interpretation of the requirements of S.B. 14 as a poll tax; and (3) treatment of voting as a right to free speech under the First and Fourteenth Amendments.  Defendants suggest that the first two issues are governed by *Crawford* and the last is governed by *Inter Tribal*.

As previously noted, *Crawford* did not involve any challenge on the basis of discrimination on account of race, color, or language minority.  More importantly, it did not create an automatic bar to the use of the strict scrutiny test.  Instead, the lead opinion endorsed the flexible standard of *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). *Crawford*, 553 U.S. at 190 n.8; *cf.* 553 U.S. at 204 (Scalia, J., concurring, advocating "a deferential 'important regulatory interests' standard for nonsevere, nondiscriminatory restrictions, reserving strict scrutiny for laws that severely restrict the right to vote").

The *Anderson* opinion described the court's task as follows:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.

> Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

*Anderson, supra* at 789 (citations omitted). This case is not yet at a posture that sufficiently informs the Court of the "character and magnitude of the asserted injury." Thus no decision may be made at this juncture regarding the level of scrutiny to be afforded to S.B. 14's restrictions.

Likewise, the Supreme Court's *Crawford* decision does not foreclose the Veasey Plaintiffs' allegation that S.B. 14 constitutes a prohibited poll tax. The *Crawford* case involved a different photo identification law with different restrictions. While the statute in *Crawford* was not found to constitute an unconstitutional poll tax, the differences of opinion between the plurality and the dissenters is indicative that the issue requires a determination of facts with respect to the specific statute that is before the Court and involves an inquiry that is not foreclosed by the multiple opinions in *Crawford*.

Last is the challenge to the Veasey Plaintiffs' pleadings treating voting as constitutionally protected speech. Citing *Inter Tribal*, Defendants assert that "[v]oting is

not speech, and the Supreme Court has recognized that States may determine the qualifications of their voters, even though States cannot decide who may and may not speak." As set out above, the state's right to determine the qualifications of voters is not at issue here. And any right to qualify voters must be executed in a nondiscriminatory manner, given the various constitutional amendments that apply. The *Inter Tribal* opinion does not address the right to free speech. Defendants have not satisfied their burden to demonstrate that Plaintiffs cannot predicate a cause of action on asserting their right to free speech under the First and Fourteenth Amendments.

### F.    Ortiz Additional Claims

Defendants argue that the Ortiz Plaintiffs' allegations regarding violations of the TEXAS CONSTITUTION (TEX. CONST. art. I, section 3, 3a (equal rights amendment)) are not cognizable because this Court has no jurisdiction to enjoin state officials from violating state law. *See, Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 106 (1984). The Eleventh Amendment limits federal judicial power over individual state-law claims against states because states enjoy sovereign immunity.

The Ortiz Plaintiffs state that there is precedent for considering Texas constitutional claims together with United States constitutional claims, citing *Hang On, Inc., v. City of Arlington*, 65 F.3d 1248 (5th Cir. 1995) and *Allison v. City of Fort Worth*, 60 F.Supp.2d 589 (N.D. Tex. 1999). Both of those cases were against municipalities rather than states. Neither addressed any issue of sovereign immunity or the Eleventh Amendment.

The Ortiz Plaintiffs claim that Defendants urged the court to consider the Texas state-law causes of action in *Mexican American Legislative Caucus, Texas House of Representatives v. State of Texas*, No. 7:11-cv-00144 (S.D. Tex.).[6]  While Plaintiffs did not supply any documentation to support this claim, it is irrelevant.  The state may waive sovereign immunity by an unequivocal consent to suit if it so desires.  *Pennhurst, supra* at 99.  However, any such waiver, to be unequivocal, would have to state that it applies to all such actions or to the specific action before this Court.  No such unequivocal consent appears here, where the State has asserted its Eleventh Amendment rights.

The Court GRANTS the motion to dismiss (D.E. 8 in 13-cv-348) with respect to the Eleventh Amendment challenge to the claims brought by the Ortiz Plaintiffs pursuant to the Texas Constitution.

### G.  DEFENDANTS PROPERLY NAMED

#### 1.  Director McCraw

Plaintiffs seek injunctive relief against Steve McCraw in his official capacity as Director of the Texas Department of Public Safety.  In particular, the contemplated injunctive relief would prevent implementation of S.B. 14, which authorizes DPS to issue EICs based on specific criteria.  Defendants argue that Plaintiffs have not identified a single remedial action that they are seeking from McCraw.  Plaintiffs counter that, under S.B. 14, McCraw is responsible for imposing substantially burdensome measures on registered minority voters seeking to obtain an EIC.  As Director of DPS, he controls the

---

[6]  This case was transferred to the Western District of Texas by order dated March 28, 2013, and assigned No. 5:13-cv-00261.

application and issuance process, including requirements of application, determination of eligibility, and provision of locations and hours of operation of DPS offices capable of handling EIC applications.

Defendants focus on the elections, arguing that McCraw is not in a position to enforce the state election laws and the issuance of EICs is a ministerial task.  Because he does not have authority to administer elections, Defendants claim that he is not specially charged with enforcing any allegedly unconstitutional law and thus there is no Article III standing to sue him.  For this proposition, Defendants cite *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (*en banc*).  In *Okpalobi*, the state officials were not subject to suit because the controversy involved the application and enforcement of a private tort statute, which was not within the state officials' jurisdiction.  The *Okpalobi* holding thus does not apply here.

Yet the Fifth Circuit, in *Okpalobi*, recognized the principle that Plaintiffs apply here:  the *Young* exception to state sovereign immunity applies "when the named defendant state officials have ***some connection*** with the enforcement of the act and 'threaten and are about to commence proceedings' to enforce the unconstitutional act." *Okpalobi*, at 416 (emphasis added; referring to *Ex parte Young*, 209 U.S. 123, 155-56 (1908)).  The Court is satisfied that McCraw has some connection with the enforcement of S.B. 14 and is thus properly joined in this action.  Defendants' motions to dismiss are DENIED in this respect.

### 2.  Governor Perry

Citing *Okpalobi*, Defendants argue that Governor Perry has no connection with the enforcement of S.B. 14.  Instead, the Secretary of State is the chief election officer, specially charged with administering elections.  TEX. CONST. art. IV, §§ 1, 21; TEX. ELECTION CODE, § 31.001(a).  Defendants argue that Plaintiffs have not shown that Governor Perry has any particular authority to enforce S.B. 14.

Plaintiffs note that the Governor is the State's chief budget officer under TEX. GOV'T CODE § 401.041, who requests and allocates funding for the Secretary of State and DPS.  As previously observed, this Court is not interested in managing the State's budget, as the State's sovereign immunity entitles it to fiscal autonomy.  U.S. CONST. amend. XI. Furthermore, nothing in the budget statute specially charges the governor with the execution or enforcement of S.B. 14.

Plaintiffs state that Perry, as Governor, appoints the Secretary of State, who serves at his pleasure and who has broad authority over all aspects of elections and S.B. 14's implementation—as expressly set out in S.B. 14.  *See* TEX. CONST. art. IV, § 12.  Perry, as Governor, also appoints the members of the Public Safety Commission, who serve at the Governor's pleasure and, in turn, select the director of the Department of Public Safety.  *See id.*; TEX. GOV'T CODE §§ 411.003, 411.005.  As noted above, that director plays a role in overseeing the issuance of EICs and other photographic identification approved for use under S.B. 14, including drivers' licenses and licenses to carry a concealed firearm.  Plaintiffs also point out that a state governor is a proper defendant, as

shown by other election law cases.  *See e.g., Perez v. Perry*, 132 S.Ct. 934 (2012); *LULAC v. Perry*, 548 U.S. 399 (2006).

The Court determines that Governor Perry has some connection with the enforcement of S.B. 14 sufficient to make him a proper Defendant.  The motions to dismiss on this basis are DENIED.

## CONCLUSION

For the reasons set out above, the Court ORDERS as follows:

- The motions to dismiss (D.E. 52, 130, and 175) are GRANTED IN PART with respect to all claims alleged by Dallas County and Hidalgo County.

- The motion to dismiss (D.E. 8 filed in 13-cv-348) is GRANTED IN PART with respect to the state-law claims based on the Texas Constitution.

In all other respects, the motions to dismiss (D.E. 52, 116, 130, 175, and D.E. 8 in 13-cv-348) are DENIED.

ORDERED this 2nd day of July, 2014.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE