# Exhibit 6

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                      CORPUS CHRISTI DIVISION




MARC VEASEY, ET AL.,          )      CASE NO: 2:13-CV-00193
                              )
            Plaintiffs,       )            CIVIL
                              )
      vs.                     )      Corpus Christi, Texas
                              )
RICK PERRY, ET AL.,           )      Thursday, May 1, 2014
                              )
            Defendants.       )    (3:58 p.m. to 4:41 p.m.)


                     CIVIL MOTION HEARING

           BEFORE THE HONORABLE NELVA GONZALES RAMOS,
                 UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988
```

**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

<u>APPEARANCES FOR:</u>


Plaintiffs:                   CHAD W. DUNN, ESQ.
                              Brazil and Dunn
                              4201 Cypress Creek Parkway
                              Suite 530
                              Houston, TX 77068


United States                 ELIZABETH S. WESTFALL, ESQ.
of America:                   U.S. Department of Justice
                              950 Pennsylvania Avenue, N.W.
                              NW NWB 7125
                              Washington, DC 20530

                              DANIEL J. FREEMAN, ESQ.
                              U.S. Department of Justice
                              950 Pennsylvania Ave. NW
                              NWB 7123
                              Washington, DC 20009


Texas Association of          ROLANDO L. RIOS, ESQ.
Hispanic County Judges        115 E. Travis
and County                    Suite 1654
Commissioners:                San Antonio, TX 78205


Oscar Ortiz, et al.:          ROBERT W. DOGGETT, ESQ.
                              Texas Rio Grande Legal Aid Inc.
                              4920 North IH 35
                              Austin, TX 78751


State of Texas:               JOHN REED CLAY, JR., ESQ.
                              ARTHUR D'ANDREA, ESQ.
                              Office of the Attorney General
                              P. O. Box 12548
                              MC001
                              Austin, TX 78711-2548


Texas League of Young         RYAN HAYGOOD, ESQ.
Voters Education Fund:        NAACP Legal Def and Educational
                              Fund, Inc.
                              40 Rector Street
                              5th Floor
                              New York, NY 10006

                              SONYA LEBSACK, ESQ.
                              Wilmer Cutler Pickering, et al.
                              1875 Pennsylvania Ave. NW
                              Washington, DC 20006

3

<u>APPEARANCES FOR (Cont'd)</u>:


Mexican American            EZRA D. ROSENBERG, ESQ.
Legislative Caucus,         Dechert, LLP
et al.:                     902 Carnegie Center
                            Suite 500
                            Princeton, NJ 08540-6531

Also present:               BEN DONNELL

1      **Corpus Christi, Texas; Thursday, May 1, 2014; 3:58 p.m.**

2            **THE CLERK:**  Good afternoon.  This is Brandy with

3      Judge Ramos's court.  Do I have Mr. Dunn or Mr. Derfner on the

4      line for the individuals and LULAC and Veasey?

5            **MR. DUNN:**  This is Chad Dunn, good afternoon.

6            **THE CLERK:**  Mr. Dunn, I can barely hear you.

7            **MR. DUNN:**  This is Chad Dunn, good afternoon.

8            **THE CLERK:**  Thank you, Mr. Dunn.  And then for the

9      United States, do I have Mr. Freeman or Mr. Westfall, or who

10     will be speaking for the U. S.?

11           **MR. FREEMAN:**  Good afternoon.  This is Dan Freeman.

12     I'll be speaking on behalf of the United States.  And

13     Ms. Westfall is also on the line.

14           **THE CLERK:**  Thank you, Mr. Freeman.  And then for the

15     Mexican American Legislative Caucus, do I have Mr. Rosenberg?

16           **MR. ROSENBERG:**  Yes, I'm here.  Thank you.

17           **THE CLERK:**  Thank you, Mr. Rosenberg.  And then for

18     Ortiz, et al., do I have Mr. Garza or Mr. Doggett or Ms. van

19     Dalen?

20           **MR. DOGGETT:**  Yes, Robert Doggett is here.  I don't

21     believe Jose Garza can make it.

22           **THE COURT:**  Okay, thank you.  And then for the Texas

23     League of Young Voters, Mr. Haygood or Ms. Korgaonkar?

24           **MR. HAYGOOD:**  (Indiscernible) for the Texas League.

25     Also joined by my colleague Sonya Lebsack.

1        **THE CLERK:**  Sonya Lebsack?

2        **MR. HAYGOOD:**  Yes, ma'am.

3        **THE CLERK:**  Okay.  And then for the Texas Association

4   of Hispanic County Judges and Commissioners, Mr. Rios or

5   Mr. Henrichson?

6        **MR. RIOS:**  This is Rolando Rios.

7        **THE CLERK:**  Thank you, Mr. Rios.  And then for the

8   State of Texas, Mr. Scott, Mr. Clay, Ms. Roscetti?

9        **MR. CLAY:**  This is Reed Clay.

10       **THE CLERK:**  Thank you, Mr. Clay.  And then we also

11  have Mr. Donnell present in the courtroom.  Your Honor, that's

12  a representative from each party.

13       **THE COURT:**  Okay.  So we're ready to proceed?

14       **THE CLERK:**  Yes, your Honor.

15                    **(Call to order)**

16       **THE COURT:**  The Court calls Cause Number 2:13-cv-193,

17  *Veasey, et al., versus Perry, et al.*  And we've already taken

18  roll.  So what's before the Court is the Defendants' motion to

19  quash the subpoenas of the current and former legislators.

20  Mr. Clay, are you going to proceed on that?

21       **MR. CLAY:**  Actually, your Honor, Arthur D'Andrea from

22  the Attorney General's Office is representing the non-party

23  legislators --

24       **THE COURT:**  Okay.

25       **MR. CLAY:**  -- who have filed the motion to quash, so

1    he will be presenting their arguments.

2            **THE COURT:**  Okay.  You can proceed.

3            **MR. D'ANDREA:**  Good afternoon, your Honor.  This is

4    Arthur D'Andrea for the third party legislators.  DOJ has in

5    its possession every SB 14-related document from every

6    legislator who mattered in crafting the voter ID law.  They

7    have all the documents from the Governor, the Lieutenant

8    Governor, the Speaker of the House, former Speaker Craddick,

9    the bill offered in the Senate, the bill sponsor in the House,

10   every single member of a relevant House committee, and every

11   other legislature in the House and Senate who played any role

12   whatsoever crafting the voter ID law.  These official subpoenas

13   are an unnecessary intrusion aimed at members who are on the

14   sidelines for voter ID.  None of the legislators authored the

15   amendment; and, in fact, only one of them, Representative Jose

16   Aliseda, even spoke on the bill.

17           I'd like to offer the Court a few quick examples to

18   highlight the expansiveness of these subpoenas.  First, DOJ is

19   demanding legislative communications from Dr. Greg Bonnen.  He

20   was a freshman in 2013, two years after voter ID passed.  While

21   voter ID was being debated, he was performing brain surgery

22   down in Friendswood (phonetic).

23           Next they're asking for documents of Robert Hall

24   (phonetic).  He retires from the legislature in 2007, four

25   years before voter ID passed.  Even if the DOJ found something

1    in his files, the documents would have no relevance because it

2    would shed no light on the purpose of different legislators in

3    a different legislative session.

4            They're also asking for documents from Joe Crab, who

5    also retired before voter ID passed in 2010.

6            They're asking for documents from Brandon Creighton

7    and Glenn Hegar.  Neither had any role in passing voter ID.  In

8    fact, I have no idea why they have any interest in these

9    legislators.  My best guess is because they were joint authors

10   of a fresh water supply district bill that received no

11   opposition and all of the legislature later on (indiscernible)

12           The first factor of this Court's balancing test is

13   relevance, and these documents have none.  More importantly,

14   the second factor is the availability of other evidence.

15   Plaintiffs have listed reasons why they'd like to have the

16   documents, but they've given this Court no reason why the

17   documents are absolutely necessary.  In *Hall versus Louisiana*,

18   the district court quashed the Rule 45 subpoena based on the

19   second factor.  And because the Department of Justice has

20   thousands of pages of documents already, we urge the Court to

21   do the same.  If the Court places no limits on DOJ's demands,

22   this (indiscernible) type discovery will only continue.

23   Even --

24           **MR. HENRICHSON:**  Your Honor, excuse me.  I meant not

25   to interrupt counsel.  This is Preston Henrichson for Hidalgo

1   County, and I apologize for the interruption, counsel.

2           **THE COURT:**  All right, thank you.

3           **MR. D'ANDREA:**  No problem at all.

4           Even if the Court does not quash the subpoenas, it

5   should heavily modify them.  Not only do the subpoena demand

6   documents from sideline legislators, they request documents

7   wholly unrelated to SB 14.  First, the request includes topics

8   like immigration, on which there are countless bills every

9   session dealing with routine coordination between state and

10  federal authorities.

11          Second, the request dates all the way back to 2003,

12  eight years before the passage of SB 14.

13          And third, the request demands documents from

14  campaign offices seeking documents that were created in some

15  instances before the legislature even took the oath of office

16  (indiscernible)

17          We have one final concern, your Honor.  I'm not sure

18  the scheduling order even if amended can accommodate the

19  expansiveness --

20          **THE COURT:**  I'm sorry.  We're getting some static

21  here or something --

22          **MR. D'ANDREA:**  All right.

23          **THE COURT:**  -- interference.  So let -- can you try

24  again?  You were starting with the scheduling order.

25          **MR. D'ANDREA:**  I -- yes, your Honor.  Thank you.  I'm

1   not sure the scheduling order, even if amended, can accommodate

2   the expansiveness of these requests.  DOJ has issued waves of

3   similar subpoenas around the state in other courts demanding

4   documents from dozens of additional legislators.  We are

5   working long hours to get the documents, but legislators don't

6   stay in their offices when the legislature is not in session.

7   They're at home in Amarillo and Longview and El Paso.  Some

8   legislators shut down their capitol offices entirely, and some

9   of them have only part-time staff who show up once a week to

10  check mail.  It takes a long time to get a decade's worth of

11  documents from legislators scattered throughout the state.  And

12  because the Attorney General's Office is acting as a

13  clearinghouse for these documents, it takes us a long time to

14  gather, upload, and review them.  If DOJ wanted to subpoena all

15  these documents, I don't understand while they waited until

16  five months into the discovery (indiscernible)

17          **THE COURT:**  Okay.

18          **MR. D'ANDREA:**  Thank you, your Honor.

19          **THE COURT:**  Mr. Freeman, are you going to take the

20  lead for the United States?

21          **MR. FREEMAN:**  Yes, your Honor.  Thank you for the

22  opportunity to speak.

23          **THE COURT:**  Okay.  Can I just ask --

24          **MR. FREEMAN:**  Your Honor --

25          **THE COURT:**  -- are you on a landline?

1           **MR. FREEMAN:**  I am, your Honor.

2           **THE COURT:**  You sound -- we're getting a lot of --

3           **MR. FREEMAN:**  I'm hearing myself and a delay.

4           **THE COURT:**  And we're getting a lot of echo from you.

5     It's hard to understand.  So what did you say?  You're on the -

6     - you are on a landline.  You're not --

7           **MR. FREEMAN:**  I am on a landline, your Honor.  I'm at

8     on my office --

9           **THE COURT:**  Okay.  Are you on speaker?

10          **MR. FREEMAN:**  I'm not, your Honor.

11          **THE COURT:**  You have a --

12          **MR. FREEMAN:**  I don't know if there's an issue with

13    the conference line, but I am hearing myself back at myself

14    after about a few seconds delay.

15          **THE COURT:**  Yeah, exactly.  And it's -- yeah, it's

16    giving us -- we're having problems.  Yeah.  You want to try

17    calling back?

18          **UNIDENTIFIED MALE:**  I was going to say, Dan, maybe

19    you could just try hanging up and calling in again --

20          **THE COURT:**  Yeah.

21          **UNIDENTIFIED MALE:**  -- if there's time for that.

22          **THE COURT:**  Right.  Why don't we do that?

23          **MR. FREEMAN:**  Your Honor --

24          **THE COURT:**  Go ahead and hang up and then call back

25    in, and we'll just be on standby.

1      **MR. FREEMAN:**  Thank you so much, your Honor.  I'll

2    call back in just one second.

3           **THE COURT:**  Okay.

4           **MR. DUNN:**  This is Chad Dunn, your Honor.  If I could

5    intrude, I could recommend to the others on the call that if

6    they're not speaking, to leave their lines (indiscernible)

7         **(Judge/Clerk confer)**

8         **(Pause)**

9           **MR. FREEMAN:**  Dan Freeman.

10          **THE COURT:**  Yeah.  You're still -- we're still

11   hearing an echo.

12          **MR. FREEMAN:**  I can try calling from a cell phone,

13   your Honor, or calling from someone else's office in my office.

14   I apologize.  I don't understand why this is happening.

15          **THE COURT:**  Can you try another office maybe?

16   Because we won't -- they won't be able to --

17          **MR. FREEMAN:**  I can just find another office,

18   although another attorney from my office has told me that they

19   were hearing the same echo.  I'm happy to try, and I'll call --

20   or I'll just pick up the phone in someone else's office, your

21   Honor --

22          **THE COURT:**  Yes, because we won't be able to

23   transcribe what you're saying, even if I figure out what you're

24   saying.  So why don't you try that.

25          **MR. FREEMAN:**  I'm so sorry about this.

12

```
 1              THE COURT:  Okay.

 2              MR. FREEMAN:  Give me just one second.  Thank you.

 3      (Judge/Clerk confer)

 4      (Pause)

 5              MR. FREEMAN:  Hello, your Honor?

 6              THE COURT:  Yes.

 7              MR. FREEMAN:  Is this better?

 8              THE COURT:  Much better.  Is that Mr. Freeman?

 9              MR. FREEMAN:  This is Mr. Freeman.

10              THE COURT:  Okay.

11              MR. FREEMAN:  I'm in Ms. Westfall's office, I've

12      kicked her of her phone.

13              THE COURT:  Okay.  Well, we can --

14              MR. FREEMAN:  I appreciate your understanding.  Thank

15      you so much.

16              THE COURT:  All right.  Well let's proceed.

17              MR. FREEMAN:  Thank you, your Honor.  Your Honor, the

18      legislator's motion to quash is mere window dressing on a

19      motion for reconsideration.  This Court's adopted a five-factor

20      balancing test to address the qualified nature of any state

21      legislative privilege.  And the procedural vehicle through

22      which the United States seeks discovery is not relevant to any

23      of those factors.  Specifically, factor five addresses any

24      chain (phonetic) effect on legislative business that might

25      result in disclosure of legislative deliberations; not the time
```

1    needed to gather documents or the desire to withhold campaign

2    materials.  The legislators have provided no valid reason for

3    this Court to adjust the sensitive balance that has been

4    described.  The subpoenas seek a range of materials that are

5    relevant to both intent and (indiscernible) claim that the

6    United States has brought under Section 2 of the *Voting Rights*

7    *Act*.  Documents gathered in *Texas v. Holder* cannot set the

8    (indiscernible) of discoverable materials in this case, as

9    discovery in *Texas v. Holder* is limited by time, a streamlined

10   legal standard, a shifted burden of proof, and an inability on

11   behalf of the United States to expect the State of Texas to

12   search for responsive documents due to a different balance

13   applied to a state legislative privilege in that case.  Nor

14   would production of responsive documents imposing undue burden

15   on the legislators.  The legislators merely suggest that any

16   effort to gather documents is incompatible with their status as

17   state officials.  This Court has rejected similar absolute

18   privilege claims in the past, and the legislators have provided

19   no valid basis for the Court to revisit that decision here.

20          Therefore, this Court should order the legislators to

21   comply with the subpoenas and produce responsive documents

22   under seal within seven days.  The legislators had a

23   substantial amount of notice regarding the subpoenas, and they

24   should likely have knowledge of where those materials are, as

25   well as the ability to search for the email, private emails,

14

1    that have not yet been produced electronically.

2         With regard to those legislative -- that the State of

3    Texas claims are not relevant to the claims in this case,

4    Representative Aliseda, for example, was the key witness in the

5    *Texas v. Holder* preclearance proceeding.

6         **THE COURT:**  Documents weren't requested from him, but

7    he appeared as a witness?

8         **MR. FREEMAN:**  Documents were requested, your Honor

9    (indiscernible) --

10        **THE COURT:**  I thought the State's argument was that

11   these were extra legislators whose -- there was no discovery

12   directed at them in the D. C. case.  Is that not correct?

13        **MR. FREEMAN:**  It's my -- I'm sorry for interrupting.

14   It's my understanding that we did ask for documents from

15   Representative Aliseda.  And the purpose of these subpoenas is

16   simply to seek any additional documents that the legislator

17   might have that were not previously produced.  If there are no

18   further documents, there's no need to quash a subpoena.  The

19   legislator need simply state that they have no further

20   documents.  And the same is true with the other legislators

21   that counsel for the legislators claims have had nothing to do

22   with any photographic voter identification bill.  If they have

23   no documents, there's no need to quash the subpoena.  They can

24   merely comply with the subpoena by providing an explanation of

25   what they do or do not have.  What this -- what the legislators

15

1   are asking for rather, is a blanket order saying that they are

2   immune from discovery in this case, and they have provided no

3   basis under Rule 45 or under the five-factor framework that

4   this Court has laid out with regard state legislative privilege

5   to deny all discovery from them.

6          **THE COURT:**  Well, tell me how our immigration-related

7   documents relevant in this case?

8          **MR. FREEMAN:**  Your Honor, there are two reasons for

9   that.  First, under Section 2, whether or not there are racial

10  campaign appeals, both explicit and subtle, is relevant to

11  whether or not a voting procedure interacting with the totality

12  of the circumstances to deny or bridge the right to vote on

13  account of race.  Specifically with regard to this bill, many

14  legislators suggested that photographic voter ID was somehow an

15  immigration-related law; notwithstanding the fact that several

16  forms of identification are required to vote under the bill are

17  easily attainable by a non-citizen.  And so the United States

18  has suggested, and will advance evidence at trial, that this

19  was a form of a (indiscernible) racial appeal stating that it

20  would prevent certain types of people from voting.  And that's

21  why the immigration-related appeals tie into the way the

22  legislators presented the bill to vote -- to each other, to

23  constituents.  And so we think that immigration-related

24  documents are key to understanding all underlying attempts

25  behind SB 14.

16

1          **THE COURT:**  All right.  Mr. Rosenberg, are you going

2     to say anything?  They're on mute maybe, Brandy?

3          **THE CLERK:**  Your Honor, they're -- you should be able

4     -- Mr. Rosenberg?

5          **MR. ROSENBERG:**  Sorry.  I had followed Mr. Dunn's

6     suggestion --

7          **THE COURT:**  Yes.

8          **MR. ROSENBERG:**  -- and put myself on mute.

9          **THE COURT:**  I thought so.

10         **MR. ROSENBERG:**  But thank you, and I'll be very

11    brief.  We fully support DOJ's opposition.  Just to add a

12    couple of points in response to your Honor's question.  Several

13    of these legislators were heavily involved in SB 14, not just

14    Representative Aliseda, but Senator Tommy Williams (phonetic)

15    and Representative Harless, Senator Patrick.  Also --

16         **THE COURT:**  Well, I guess the representation by the

17    state, I thought in reading the briefing and hearing their

18    argument, was right now that these people, these -- how many

19    were they?  However many other legislators were not --

20    discovery was not requested from them in the D. C. case.  So

21    here -- I'm getting I guess conflicting messages, because the -

22    - what the Plaintiffs seem to be saying, yes, they were part of

23    that case, yes, we did seek documents from them.  Is that

24    correct?

25         **MR. ROSENBERG:**  Four of them at least:  Aliseda,

17

1    Williams, Harless, and Dan Patrick.  And actually, I think the

2    state does concede that.  But at least those four.

3              **MR. FREEMAN:**  Your Honor, this is Dan Freeman.  If I

4    can just provide a little bit more information.  The United

5    States, during the preclearance proceedings, provided an

6    extensive list of legislators concerning whom it sought

7    documents.  It is my understanding that most of the legislators

8    to whom we've issued subpoenas were on that list as well.  The

9    state's concern, if I understand it correctly, is that this is

10   seeking additional information from those same legislators; not

11   that we expanded the universe of --

12             **THE COURT:**  Okay.

13             **MR. FREEMAN:**  -- legislators from --

14             **THE COURT:**  All right.

15             **MR. FREEMAN:**  (Indiscernible)

16             **MR. D'ANDREA:**  Your Honor, this is Arthur D'Andrea.

17   May I -- I've already tracked down the answer to this, and I

18   think --

19             **THE COURT:**  Okay.

20             **MR. D'ANDREA:**  -- not quite what we're saying.  But

21   if I may, there are 13 legislators listed on the subpoena.

22   Four of them participated in the last lawsuit.  Those are:

23   Tommy Williams, Harless, Dennis Bonnen, and Dan Patrick.  We

24   turned over all of those documents.  And so with respect to

25   those four legislators, the current subpoena is only asking for

18

1   documents that were produced after the stuff we turned over in

2   the preclearance lawsuit.

3           THE COURT:  So that's what you're objecting regarding

4   those four?

5           MR. D'ANDREA:  That's a tiny objection.  Our chief

6   objection is there are nine legislators who are:  Brandon

7   Creighton, Glenn Hegar, Greg Bonnen, Joe Crab, Larry Taylor,

8   Mike Jackson, Robert Hall, and Todd Hunter, who were never

9   involved in the prior lawsuit, who DOJ never sought to get

10  documents from.  And as I said, a lot of them retired before SB

11  14, one of them wasn't around yet.  And those are -- our

12  principal objection is there's no reason to go after all of

13  those legislators when they had everything they wanted before.

14  And -- but on that, there's also -- because they had everything

15  up to SB 14 from the preclearance lawsuit, there's no reason to

16  ask Harless (indiscernible) to go back and search her office

17  for things that are voter ID-related after SB 14 passed.  And

18  that is both because on the second factor, I would say the DOJ

19  has access to all the important documents they need.  And on

20  the fifth factor, I think it really matters -- there's a big

21  difference between telling a legislator, "You are going to be

22  subject to discovery for a law under challenge" and telling a

23  legislator, "You will be subject to discovery in perpetuity,

24  even after the law passed, for other things you may do in the

25  future."

1          **MR. FREEMAN:**  Your Honor, if I may respond.  I would

2     be happy to provide the Court with a list of all those

3     legislators from whom we have previously obtained discovery.

4     And with regard to the scope of materials that are sought, the

5     legal standard under Section 2 is far more curative (phonetic)

6     than the legal standard under Section 5.

7          **THE COURT:**  Well, I mean, I don't necessarily agree

8     that just because things weren't discovered or asked for in the

9     D. C. case -- this is a different case.  I mean, this is -- I

10    don't agree with the state's argument on that issue.  Well, if

11    you didn't request it then, why do you need it now?  But

12    anyway, so go ahead.

13         **MR. FREEMAN:**  And with regard to those prior

14    legislators, each of those prior legislators supported

15    predecessor ID bills.  And it was clear that there was a

16    process throughout several sessions in which the state -- in

17    which legislators promoted a series of bills that became

18    stricter and stricter and had fewer and fewer opportunities for

19    voters to be able to pass a ballot, and so the intent to carry

20    over between their session.  So to say that a legislator who

21    wasn't around in 2014 could have no understanding of what the

22    ultimate voter ID bill was doesn't take into account the fact

23    that there was a bill that almost passed in a prior session,

24    and that legislators resorted to an extraordinary procedure to

25    prevent that.  Two years before that, there was a bill that

20

1    almost passed that was filibustered.  And so this is not simply

2    restricted to legislative proceedings in 2011.

3              THE COURT:  Okay.  Mr. Rosenberg, I cut you off.  Do

4    you want --

5              MR. ROSENBERG:  Thank you very much.  And I'll just

6    make a couple more points.  One, in terms of whether or not all

7    documents Mr. D'Andrea has represented have been produced for

8    these -- from these legislators, we don't know that's the case.

9    As the Department of Justice has (indiscernible) in its brief,

10   there is evidence that many of these legislators used their

11   personal email accounts for official business.  And I'm not

12   sure if Mr. D'Andrea is representing that those documents have

13   been turned over.  I have a feeling --

14             THE COURT:  Okay.  Well, let's ask him.  What's your

15   position, Mr. D'Andrea?

16             MR. D'ANDREA:  I don't believe the DOJ asked for

17   personal emails in the prior lawsuit.  Usually --

18             THE COURT:  Well, I think the problem is if they

19   requested certain information and it's in the personal email, I

20   mean, they should have access to that.

21             MR. D'ANDREA:  We respond -- I don't know what they

22   asked for, so I can't really tell whether it's in there or not.

23   I don't think their --

24             THE COURT:  Well, then how do you want me to help you

25   then?  If you all don't even know, how can I figure it out?

1          **MR. D'ANDREA:**  We responded to -- I can -- I will

2    find out.  We responded in preclearance.  We gave them

3    everything they asked for.  So --

4          **THE COURT:**  But they're saying there may be a

5    question --

6          **MR. D'ANDREA:**  (Indiscernible)

7          **THE COURT:**  -- regarding whether there was

8    information in personal emails that was relevant.  Is that the

9    issue, Mr. Rosenberg?

10         **MR. ROSENBERG:**  That's correct.

11         **MR. D'ANDREA:**  If they asked for that, we gave it to

12   them.  I don't know that they have.  But I don't think this --

13   DOJ assumed this notion that just because they don't have

14   anything, it must be the legislators were using personal email.

15   And I think the better assumption is that a lot of these people

16   are people --

17         **THE COURT:**  Well, I thought there was something in

18   the briefing that there was some testimony that there was some

19   --

20         **MR. D'ANDREA:**  Your Honor --

21         **THE COURT:**  -- personal emails being used --

22         **MR. D'ANDREA:**  -- Representative Harless testified

23   that -- her chief of staff testified that she sometimes uses

24   personal email.  But that is one of dozens of legislators

25   they're going after.

22

         1          **MR. FREEMAN:**  Your Honor, this is Dan Freeman, and I

         2   think I can probably clear up a couple of these issues.  First

         3   off, we negotiated search terms with (indiscernible) during the

         4   preclearance proceedings based on searches that we conducted in

         5   Microsoft Outlook.  That was our understanding, that that was

         6   the legislators' official email, and we provided a string of

         7   search terms that would interact with the search syntax with

         8   Microsoft Outlook, and we were (indiscernible) that they would

         9   search their official email.  The State of Texas then provided

        10   those search terms to legislators, I believe, with instruction

        11   to search their official email.  And I do not believe, although

        12   I cannot say for certain, that they did not do -- that they

        13   instructed the legislators to search their private email as

        14   well.  However, during depositions, the chief of staff to

        15   Representative Harless, who's the House sponsor of SB 14,

        16   testified that she primarily uses her private email.  And the

        17   chief of staff to Senator Fraser, who is the Senate sponsor of

        18   SB 14, testified that he uses his private email for legislative

        19   business.  And to the extent that legislators candid

        20   communications are contained within those email accounts, those

        21   are highly probative documents that we would -- that we seek

        22   through these subpoenas.  To the extent that there are other

        23   documents that have already been turned over, they're outside

        24   the scope of this subpoena.  The subpoena is only asking for

        25   those documents that have not already been turned over.

23

 1          THE COURT:  All right.  And Mr. Rosenberg, I cut you

 2  off again, and everybody jumped in.

 3          MR. ROSENBERG:  That's fine, your Honor.  I guess

 4  just the last point is Mr. D'Andrea seems to have conceded the

 5  campaign communications are not really subject to the qualified

 6  legislative privilege as he said that many of them -- many of

 7  those communications were made before the legislators even took

 8  the oath of office.  So that isn't even implicated by any

 9  privilege issue.  And other than that, I think that Mr. Freeman

10  has covered all the points we wanted to make.  Thank you, your

11  Honor.

12          THE COURT:  All right.  Mr. Doggett, anything?

13          MR. DOGGETT:  No, your Honor.  Thank you.

14          THE COURT:  Okay.  Mr. Haygood?

15          MR. HAYGOOD:  Yes, your Honor, thank you.  I just

16  want to address one point that you raised earlier about the

17  reality of the scope of discovery of Section 5, soon to be the

18  --

19          THE COURT:  Yeah, hold on because you're not coming

20  in very well.

21          MR. HAYGOOD:  Is this better?

22          THE COURT:  You're echoing very much, too.

23          MR. HAYGOOD:  Oh.

24          THE COURT:  Try --

25          MR. HAYGOOD:  Can you hear me better now?

24

1          **THE COURT:**  No.

2          **MR. HAYGOOD:**  (Indiscernible) but I will.  Is it

3     better now?

4          **THE COURT:**  No, it's worse.

5          **MR. HAYGOOD:**  Okay.  How about now?

6          **THE COURT:**  That's still catching an echo.  Maybe if

7     you just talk slowly, we might be able to work through that.

8     Go ahead.

9          **MR. HAYGOOD:**  Okay.  No, I just was stating, your

10    Honor, that I would underline a point you made earlier about

11    how the scope of discovery under Section 5 (indiscernible)

12    should not be the standard.

13         **THE COURT:**  No, I'm sorry.  The recorder can't take

14    you.

15         **MR. HAYGOOD:**  (Indiscernible) I have nothing further.

16         **THE COURT:**  Go ahead and try --

17         **MR. HAYGOOD:**  Is it still difficult to hear me?

18         **THE COURT:**  It's a little bit better.  It sounds --

19    there's an echo, but we can at least hear you.  Try that.  I

20    don't know what you did.

21         **MR. HAYGOOD:**  I'm not sure either.  I -- your Honor,

22    I was just making a quick point that you made earlier actually,

23    which is that the scope of the discovery in the Section 5 case

24    should be the standard by which we set the scope of discovery

25    in this case.  Standards are different.  Here the burden is on

25

```
 1   us.

 2              THE COURT:  Okay.

 3              MR. HAYGOOD:  There is evidence we seek --

 4              THE COURT:  Yeah, we -- I can figure out what you're

 5   saying.  The problem is there's not going to be a record

 6   because the --

 7              MR. HAYGOOD:  Fair enough --

 8              THE COURT:  -- recorder can't --

 9              MR. HAYGOOD:  Okay.

10              THE COURT:  -- take it.

11              MR. HAYGOOD:  That was the (indiscernible) point that

12   I wanted to make, your Honor.

13              THE COURT:  Okay.  It sounds to me what you said was

14   just my comment earlier about we're not confined to the

15   discovery that was done in the D. C. case, the Section 5 case,

16   correct?  Was that what you said?

17              MR. HAYGOOD:  That's correct, your Honor.

18              THE COURT:  All right.  I'm going to move on.

19   Mr. Rios?

20              MR. RIOS:  No comment further, your Honor.  We just

21   support the position of the government.

22              THE COURT:  Okay.  Mr. Clay -- I'm sorry,

23   Mr. D'Andrea?

24              MR. D'ANDREA:  Yes, your Honor.  I just want to say

25   that we're not -- our argument is not simplistically the
```

26

1    discovery in this case is limited to the last case.  DOJ is

2    seeking discovery on all fronts that it didn't seek before.

3    Our point is, there is no justification to subpoena Greg

4    Bonnen, who was a freshman in 2013.  And to go down the list in

5    the subpoena, you get that answer over and over again.  So the

6    DOJ has sort of made this a case about personal emails of

7    Representative Harless, but there are pending in courts all

8    around the state dozens of requests to subpoena documents from

9    legislators who have nothing to do with voter ID.  And so to

10   the extent it's relevant what happened in the preclearance is

11   only to say the second factor of this Court's balancing test is

12   can they get the documents elsewhere, and do they have access

13   to other evidence?  And they do.  They have access to all the

14   important evidence that they could possibly need.

15              **THE COURT:**  Okay.

16              **MR. D'ANDREA:**  Thank you.

17              **THE COURT:**  So you're saying that they have nothing

18   to do with the Senate Bill 7, then you -- I'm sorry.  I'm going

19   back to my criminal days in state court, Senate Bill 7.  With

20   SB 14, you're saying those legislators, some of those had

21   nothing to do with that, so then you wouldn't -- they wouldn't

22   have any documents; is that what your position is?

23              **MR. D'ANDREA:**  Well, certainly they wouldn't.  Joe

24   Crab, for instance, retired in 2007 --

25              **THE COURT:**  Wouldn't -- is that your answer, though,

27

1   would not -- they would not --

2           **MR. D'ANDREA:**  (Indiscernible)

3           **THE COURT:**  -- have SB 14 information?

4           **MR. D'ANDREA:**  (Indiscernible) Joe Crab and his wife

5   spent their entire (indiscernible)

6           **THE COURT:**  Wait, wait, wait, I'm sorry.  I didn't

7   hear.  Was that a yes or a no.

8           **MR. D'ANDREA:**  Yes, it is (indiscernible)

9           **THE COURT:**  Yes, they would -- they do have SB 14

10  information?

11          **MR. D'ANDREA:**  No.  They don't have SB 14 --

12          **THE COURT:**  Okay.  Then why are we even bothering

13  with this?

14          **MR. D'ANDREA:**  So they still have to search

15  (indiscernible) Joe Crab retired in 2007, four years before SB

16  14 passed.  But he was still served with the DOJ subpoena that

17  asked him about immigration documents.

18          **THE COURT:**  Well, I'm not talking about immigration

19  right now.  I'm just talking about SB 14.  It sounds like --

20          **MR. D'ANDREA:**  Just SB 14, he has nothing.  But if

21  it's voter ID-related stuff, he does, because there was other

22  voter ID proposals back in -- I think it was '03 --

23          **THE COURT:**  Okay, I see.

24          **MR. D'ANDREA:**  -- or '05 he was involved.  So he

25  still has to search for those.  But if it's just SB 14, then

28

1   that solves the problem for him.

2          THE COURT:  Okay, I see.  Okay.  Anything else from

3   anyone?

4          MR. ROSENBERG:  Just quickly.  This is Ezra Rosenberg

5   again.  On that last point, as we said in the brief, as the

6   legislative record shows, photo ID legislation throughout the

7   legislative session leading up to SB 14 became increasingly

8   restrictive, and that evidence is going to be very, very

9   important in this case dealing with the intent behind SB 14

10   itself.

11          THE COURT:  Okay.  And Mr. Dunn, I think I left --

12          MR. ROSENBERG:  (Indiscernible) Arlington Heights

13   talks in terms of the complete legislative or administrative

14   history and the historical background of the legislative

15   decisions would be relevant to the determination of

16   discriminatory purpose.

17          THE COURT:  Okay.  And I think I left Mr. Dunn out.

18          MR. DUNN:  Thank you, Judge.  Nothing more to add.

19          THE COURT:  Okay.  Let's see.  I'm not convinced that

20   immigration-related documents should be produced here.  So the

21   Court's going to grant the motion to quash as to that category

22   of documents.  And then -- so then is the issue regarding --

23   because I'm getting some conflicting information here.  Pre-

24   enactment documents and post-enactment documents of SB 14 --

25          MR. D'ANDREA:  Yes, your Honor.  That's the remaining

29

1    issue.  Pre-enactment, post-enactments, and campaign offices.

2          **THE COURT:**  Well, and campaign offices, I mean,

3    that's not going to be covered by the legislative privilege,

4    correct?

5          **MR. D'ANDREA:**  Correct.  I don't think in most cases

6    it will be, but I -- and certainly if they haven't been sworn

7    in yet.  But I do think that it's just -- it's both unduly

8    burdensome and approaching irrelevant to ask for campaign

9    fliers and campaign commercials that they were in.

10         **MR. FREEMAN:**  And, your Honor, if I could just speak

11   to that.  It is directly relevant to one of the tenant factors

12   under Section 2 whether or not there were racial campaign

13   appeals (indiscernible) subtle, and so we would strongly oppose

14   any suggestion that those documents would be irrelevant or that

15   they could be considered even marginally relevant (phonetic)

16   under the undue burden framework of the Fifth Circuit.

17         **THE COURT:**  And what is it you're looking for from

18   these campaign offices?  I mean, anything regarding Senate Bill

19   14, or what's your -- voter ID?  What is it you've requested?

20         **MR. FREEMAN:**  I'm finding that right now, your Honor.

21   Your Honor, we specifically asked for all documents related to

22   campaign communications including but not limited to mailings,

23   ads, websites, fliers, correspondence related to voter

24   identification requirements or SB 14.  And then we also asked

25   for all documents related to campaign communication, including

30

```
 1   but not limited to those same categories related to

 2   immigration.

 3            THE COURT:  Okay.  I've already made my ruling on

 4   immigration.  Anything else from anybody?

 5            MR. DUNN:  (Indiscernible)

 6            THE COURT:  Yes, but we can barely hear you.

 7            MR. DUNN:  Is that better?

 8            THE COURT:  Yes.

 9            MR. DUNN:  On the campaign-related issue, in the

10   redistricting case that was tried, a number of exhibits came

11   about of advertisements for candidates.  And for example there

12   was a state House race in Tarrant County where a democratic

13   nominee who was Anglo was colored in darker skin and his teeth

14   were separated to make it look African American and placed in

15   ads with President Obama and others.  And these types of racial

16   appeals, especially involving members of the legislator that

17   highly support Senate Bill 14, often accompanied communications

18   about voter ID and why we need it.  So that's why those issues

19   seem so relevant to us in the case.

20            MR. RIOS:  Your Honor, this is Rolando Rios.  May I

21   add something, your Honor?

22            THE COURT:  Yes.

23            MR. RIOS:  We've been involved in a lot of Section 2

24   cases.  There are direct campaigns that when somebody's running

25   for office use keywords that send a message.  For example, so-
```

 1    and-so will fight to make sure that no illegal voters -- or no

 2    immigrants voted in the election, or we'll keep the elections

 3    clear, make sure there's no voter fraud.  There's certain

 4    keywords that are used that an expert can look at and say,

 5    these type of words are used to appeal to a person's race, and

 6    that sends a message.  And that's usually what's used and

 7    creates the effect of racial (indiscernible) it's a very

 8    significant factor in most Section 2 cases that racial appeals

 9    are made through campaigns and that's how messages are

10    communicated.  So I would strongly support the position of the

11    United States on this.

12            **THE COURT:**  Okay.  I've already stated that

13    immigration-related documents I do not find to be relevant.  I

14    do think the pre-enactment and post-enactment documents are

15    relevant.  In looking at the balancing factors, the Court finds

16    they should be produced under the same order the Court

17    previously provided regarding the protective order -- should be

18    produced in that fashion.  So what's left?  The campaign office

19    material?

20            **MR. D'ANDREA:**  Yes, your Honor.

21            **MR. FREEMAN:**  And, your Honor, to be specific, the

22    only remaining topic concerning campaigns is communication

23    related to voter identification requirements, or SB 14.

24            **THE COURT:**  Right.

25            **MR. RIOS:**  And, your Honor, my comment -- this is

32

1  Mr. Rios.  And my comment when I mentioned the word

2  "immigration," wasn't directed at seeking the Court to

3  reconsider the issue on immigration.  It was a comment directed

4  at seeking production of the campaign materials.  The word

5  "immigration" is just a word -- keyword that they use in the

6  campaign.  That's all I was saying, your Honor.

7         **MR. D'ANDREA:**  Your Honor, the campaign stuff is

8  personal business, and they're forbidden by state law to even

9  mingle this with their official state business.  And we would

10 have to go through an entirely separate channel to even get to

11 stuff like that.  And it -- I don't see it's relevant to this.

12 And to the extent that they have this sort of stuff that goes

13 out in public and they get -- they have access to it from other

14 sources, right, which is the second element.  Is there another

15 way to get this?  Well, yes.  You can go to newspapers, you

16 have stuff online (indiscernible) internet still available.  I

17 don't see why they have to go through the campaign offices to

18 get it.

19        **THE COURT:**  Yeah.

20        **MR. FREEMAN:**  Your Honor, there may be internal

21 campaign communications, there may be mailings that were only

22 sent to particular voters that are not publically available.

23 There are all sorts of materials that are not available to the

24 United States with regard to campaign communication that may

25 explain, you know, to a legislator's particular constituency

33

1    why that legislator supported SB 14.  And in the world of

2    targeted communication, we may see a very different message

3    marched in front of some voters than one a legislator

4    (indiscernible) more broadly to the public.

5              THE COURT:  Okay.  I'm having a little more problem

6    on the campaign office information.  But let me look at that

7    further and then probably by early next week I'll let you know

8    my ruling on it.

9              MR. D'ANDREA:  Your Honor, may we file -- this is

10   Arthur D'Andrea, I'm sorry.  May we file a brief, an advisory,

11   discussing the campaign issue further?

12             THE COURT:  That's fine.  When can you get that on

13   file?

14             MR. D'ANDREA:  Do it -- can we do it tomorrow?

15             THE COURT:  Okay.  And I suspect the Plaintiffs are

16   going to want to file something.  Mr. Freeman?

17             MR. FREEMAN:  Most likely, your Honor.

18             THE COURT:  I'm sorry?

19             MR. FREEMAN:  Most likely, your Honor.

20             THE COURT:  Okay.  So by Tuesday?  Actually, the

21   Court's kind of going to be tied up late next week, so

22   Mr. D'Andrea, if you want to file something by Monday and the

23   Plaintiffs by Thursday, probably be early the next week when I

24   get to it.

25             MR. D'ANDREA:  That's fine, your Honor, thank you.

34

1          **THE COURT:**  Okay.  Was there anything else left to

2    address on this motion to quash?

3          **MR. FREEMAN:**  Your Honor, with regard to those

4    materials that your Honor has ordered produced, the United

5    States would appreciate a date certain by which those materials

6    should be produced as we will likely want to use those

7    materials in future depositions that we (indiscernible)

8          **THE COURT:**  Mister --

9          **MR. FREEMAN:**  -- before the end of discovery.

10         **THE COURT:**  Mr. D'Andrea, any timeframe?

11         **MR. D'ANDREA:**  Your Honor, seven -- they asked seven

12   days earlier.  That's entirely too quick.

13         **THE COURT:**  What are you looking at?

14         **MR. D'ANDREA:**  They just got a 30-day extension on

15   something we asked for in December.  I can -- I have some other

16   colleagues on the phone who might be able to speak to that

17   better.

18         **THE COURT:**  Okay.

19         **MR. D'ANDREA:**  Kevin -- Mr. Hays (phonetic), would

20   you like to talk about it?

21         **MR. HAYS:**  Your Honor, this is Kevin Hays with the

22   State of Texas.  It's probably going to take us a few days to

23   get the documents in a proper configuration the DOJ has

24   requested and that we agreed to in the agreement concerning

25   production of electronic information.  If we could have at

35

1     least two weeks, it would really help the --

2               **THE COURT:**  That's fine.  I don't have a problem with

3     two weeks.  So 14 days?

4               **MR. HAYS:**  Yes, your Honor.

5               **THE COURT:**  Okay.  What else on this motion to quash?

6     What about -- there was a judicial notice request filed.  Is

7     there anything that needs to be done on that?  Sound like it

8     was partly agreed to but not to the summaries.  I'm just not

9     sure.  Is there anything the Court needs to do on that?

10              **MR. FREEMAN:**  This is Dan Freeman on behalf of the

11    United States, your Honor.  There is a slight disagreement with

12    regard to the summary of documents with a cover.  It's my

13    understanding that Texas not disagree with regard to the Court

14    taking judicial notice of the underlying exhibits.  The United

15    States would request that this Court in direct order make a

16    judicial note of both of the summaries and of the exhibits.

17    It's the United States' position that those summaries will make

18    the information much more useful to the Court and there's --

19              **THE COURT:**  Well, I meant --

20              **MR. FREEMAN:**  -- no reason that the Court can't --

21              **THE COURT:**  Yeah.

22              **MR. FREEMAN:**  -- take judicial notice of them.

23              **THE COURT:**  It's not right, but I just thought if we

24    could finalize it today, we would.  But I'm assuming then the

25    State is going to want to file something on that, mister --

1          **MR. CLAY:**  Your Honor, this is Reed Clay for the

2     State of Texas.  I don't necessarily think that we need to file

3     something.

4          **THE COURT:**  Okay.

5          **MR. CLAY:**  I think the documents -- the underlying

6     reports from the Census Bureau are something the Court can

7     certainly take judicial notice of.

8          **THE COURT:**  Right, and I will.  But I thought there

9     was an issue on some summaries maybe that --

10         **MR. CLAY:**  Yeah.  I don't think that summary

11     documents quite -- is not something the Court can take judicial

12     notice of, and so to the extent that the order is just taking

13     judicial notice of the reports, we have no problem --

14         **THE COURT:**  That's granted.  Okay, so I will grant

15     that.  So what's the government's position on the summaries

16     then?  They're urging that for the Court to rule on that also?

17         **MR. FREEMAN:**  Yes, your Honor.  The summary documents

18     simply make it much easier for the Court to --

19         **THE COURT:**  Right.  But it's not about what's easier.

20         **MR. FREEMAN:**  Okay.

21         **THE COURT:**  This is not about what's easier.  It's

22     what about the Court's -- what the Court can take judicial

23     notice of.

24         **MR. FREEMAN:**  Yes, your Honor.  And the courts in

25     both *Texas v. United States* and *Texas v. Holder*, a preclearance

37

1    action in the District Court for the District of Columbia

2    concerning redistricting and voter ID respectively, both

3    granted judicial notice of nearly identical documents --

4              **THE COURT:**  The summaries?  Specifically the

5    summaries?

6              **MR. FREEMAN:**  As well, yes, your Honor.

7              **THE COURT:**  Okay.  Mr. Clay, anything on that?

8              **MR. CLAY:**  Well, we want to file something to address

9    that.  We just don't think that's the type of thing that a

10   Court can take judicial notice of.  So if that's still on the

11   table, then we'll have to file an objection within the

12   timeframe.

13             **THE COURT:**  Okay.  It sounds like it's still on the

14   table, so that's what I was trying to figure out.  So that's

15   still pending.  Now, on the Defendants' motion to compel, I

16   think you all resolved the issues there that we addressed last

17   time; is that correct?  You all were going to -- I thought we

18   had set that for hearing and then Brandy said that you all had

19   come to an agreement on the remaining issues.

20             **MR. CLAY:**  Your Honor, this is Reed Clay for the

21   State of Texas.  I think that we had pushed out a deadline for

22   DOJ to respond and to continue to look for some documents, so I

23   think that technically the motion hasn't been completely

24   decided because we have yet to reach the end of those 30 days

25   to see what the government --

38

1          **THE COURT:**  Okay.  That's fine.

2          **MR. CLAY:**  -- may come up with.

3          **THE COURT:**  I was just seeing what we could finalize

4    and clean out.  So that's still pending then.  Is there

5    anything else to address from the Plaintiffs?

6          **MR. FREEMAN:**  Not from the United States, your Honor.

7          **THE COURT:**  Okay.  The defense?

8          **MR. FREEMAN:**  Not from the third party legislators,

9    your Honor, thank you.

10          **THE COURT:**  Okay.  So the only issue right now is the

11   campaign material issue, and I'm going to await a briefing on

12   that.  And if nothing else, you can be excused.

13      **(All attorneys affirm thank you)**

14          **THE COURT:**  Thank you.

15      **(This proceeding was adjourned at 4:41 p.m.)**

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          <u>May 5, 2014</u>


                    TONI HUDSON, TRANSCRIBER