# Exhibit A

**U.S. Department of Justice**
Office of the Inspector General

# A Review of the Operations of the Voting Section of the Civil Rights Division



Office of the Inspector General
Oversight and Review Division
March 2013

## Table of Contents

CHAPTER:  ONE INTRODUCTION ....................................................1

I.      Background ........................................................................1

II.     Prior Related OIG Reviews .................................................5

III.    Methodology of the Investigation ........................................6

IV.     Organization of this Report ................................................6

CHAPTER TWO:  BACKGROUND.................................................9

I.      Organization of the Civil Rights Division and the Voting Section...............9

II.     Voting Rights Laws ...........................................................11

        A.      Voting Rights Act of 1965 ........................................11

                1.      VRA Section 2 ................................................11
                2.      VRA Section 5 ................................................12
                3.      VRA Sections 3 and 8.......................................15
                4.      VRA Section 11(b) ...........................................15
                5.      VRA Sections 203 and 4(f)(4) .............................16

        B.      National Voter Registration Act.................................16

        C.      Uniformed and Overseas Citizens Absentee Voting Act..................17

        D.      Help America Vote Act of 2002 .................................17

CHAPTER THREE:  ENFORCEMENT OF SELECTED VOTING RIGHTS
        LAWS OVER TIME ....................................................19

I.      Introduction .....................................................................19

II.     Overall Review of Enforcement Actions................................20

III.    Enforcement of Sections 2 and 11(b) of the VRA.....................23

        A.      Data Regarding Enforcement Trends in Sections 2 and 11(b)
                Cases ................................................................24

        B.      Examination of Selected Cases Involving the Enforcement of
                Sections 2 and 11(b)................................................32

                1.      Selected Cases during the Period from 2004 to 2006............33
                2.      The New Black Panther Party Case........................45
                3.      Selected Cases Since 2009 .................................73

i

C.     Conclusions Regarding Enforcement of Sections 2 and 11(b) Over Time ..................................................................80

IV.     Preclearance of Voting Changes under Section 5 .....................................81

A.     Data Regarding Submissions to the Voting Section Pursuant to VRA Section 5 ..........................................................81

B.     Examination of Selected Cases and Events Related to the Enforcement of Section 5.............................................82

1.     2001 – 2008.......................................................82
2.     2009 – 2012.......................................................87

C.     OIG Analysis of Section 5 Preclearance Review Activities over Time..................................................................91

V.     Enforcement of the National Voter Registration Act (NVRA) .....................93

A.     Data Regarding Enforcement Trends in NVRA Cases .....................94

B.     Enforcement of the NVRA during 2001 – 2008..............................95

C.     Enforcement of the NVRA during 2009 – 2012..............................99

1.     Division Leadership Declines To Act on Voting Section Proposal for Section 8 Investigation...................................99
2.     Drafting of NVRA Guidance...................................99
3.     Comments by DAAG Julie Fernandes Regarding NVRA Enforcement at a November 2009 Section Meeting .............100
4.     Approval of List-Maintenance Investigations.......................102

D.     OIG Analysis of Enforcement of NVRA over Time .........................106

VI.     Language-Minority Provisions (Sections 4(e), 4(f)4, and 203) ................108

VII.     The Uniformed and Overseas Citizens Absentee Voting Act ...................112

VIII.     Conclusions..........................................................113

CHAPTER FOUR:  HARASSMENT OR MISTREATMENT OF VOTING SECTION EMPLOYEES FOR THEIR POLITICAL IDEOLOGY OR POSITIONS THEY TOOK ON PARTICULAR MATTERS...........................117

I.     Introduction ..........................................................117

II.     Allegations of Peer-to-Peer Harassment between Career Staff................118

A.     Staff Conduct during Georgia Voter ID (2005)..............................118

B.     Treatment of Members of the Noxubee Case Team (2006-07) .......121

C.     Conflict during Election Monitoring in County D (2006)..............124

D.    Harassment of a Non-Attorney Employee by Section Attorneys (2007) ................................................... 126

E.    Internet Postings by Voting Section Employees (2007) ................ 126

F.    Ostracism of Career Employees ................................................... 132

G.    Actions To Address and Prevent Harassment ............................. 133

H.    Conclusions about Harassment .................................................... 134

III.    Disclosures by Voting Section Employees of Non-Public Voting Section Information .............................................................................. 135

IV.    Allegations of Retaliation by Managers against Career Employees ......... 138

A.    Assignment of OIL Briefs (2005-06) ............................................ 140

B.    Alleged Retaliation against Certain Members of the Georgia Voter ID Team (2005) ................................................................. 142

C.    Consideration of Ideology in the Composition of the Honors Program Hiring Committee (2009) ................................................ 144

V.    Allegations of Removal or Marginalization of Career Section Managers by Political Staff .................................................................... 149

A.    Marginalization of Voting Section Chief Joseph Rich (2004-05) .... 149

1.    Facts ................................................................................. 149
2.    Analysis ............................................................................ 153

B.    Involuntary Reassignment of Voting Section Deputy Chief Robert Berman (2006) ................................................................. 154

1.    Facts ................................................................................. 154
2.    Analysis ............................................................................ 156

C.    Treatment of Voting Section Chief Christopher Coates (2009) ...... 156

1.    Facts ................................................................................. 157
2.    Analysis ............................................................................ 175

CHAPTER FIVE:  THE VOTING SECTION'S RECENT HIRING OF TRIAL ATTORNEYS ................................................................................ 181

I.    Introduction ........................................................................................ 181

II.    Background ......................................................................................... 182

A.    Legal Standards for Hiring Career Attorneys ............................. 182

B.    Expedited Hiring of Career Employees Throughout the Division during the 2000-2001 Transition .................................... 184

C.    Prior OIG Investigations of Politicized Hiring in theDepartment .... 188

iii

III.   CRT Hiring Procedures from 2002 to 2011 ............................................190

IV.   Hiring of Career Trial Attorneys in 2010 in the Voting Section...............194

     A.   Hiring Procedure ............................................................194

          1.   Recruiting Preparations and Formation of the Voting Section's Hiring Committee ..................................194
          2.   Evaluation of Applications.......................................200
          3.   Qualifications of the Newly Hired Attorneys........................204

     B.   Statistical Evaluation ..................................................204

          1.   Characteristics of the Applicant Pool ..................................205
          2.   Hiring Outcomes................................................208

V.   Analysis..................................................................213

VI.   Conclusion ...............................................................222

CHAPTER SIX:  INVESTIGATION OF ALLEGED POLITICITIZATION OR BIAS IN RESPONSE TO REQUESTS FOR RECORDS ......................223

I.   Introduction ..............................................................223

II.   Background................................................................224

     A.   Relevant Standards of Ethical Conduct........................................224

     B.   Overview of Records Requests Received by the Voting Section......225

          1.   Requests for Pending Section 5 Submission Files ...............225
          2.   Requests under the FOIA ....................................226

     C.   Organizational Responsibilities for Responding to Records Requests ...............................................................228

          1.   Responses to Requests for Pending Section 5 Submission Files.....................................................228
          2.   Responses to FOIA Requests ..............................229

     D.   Voting Section Creates Procedures To Respond to Records Requests (2003) ........................................................230

     E.   Designation of New Manager to Oversee Records Requests in 2006 ................................................................231

          1.   Systemization of Records Requests and Responses............232
          2.   Response to Incidents of Potential Favoritism from 2006-2008 ................................................233

III.   Factual Findings...........................................................234

     A.   Role of Request Type in Response Times ......................................235

B.    Role of Increase in Backlog in Differences in Response Times ......237

C.    Examination of Particular Comparisons......................................240

    1.    Ashby/Somach/Hebert......................................................240
    2.    Media Requests for New Hire Resumes:  Boston Globe
        and Pajamas Media (PJM): ..................................................241
    3.    National Public Radio (NPR)/PJM.......................................243

D.    Other Requests from Alleged Conservative Requesters ................244

E.    OIG Review of Internal Voting Section E-mails for Evidence
    of Ideological Bias in FOIA Responses.......................................246

    1.    League of United Latin American Citizens ...........................247
    2.    Mexican American Legal Defense and Education Fund.......248

IV.    Analysis.................................................................................248

CHAPTER:  SEVEN CONCLUSION...............................................251

**PAGE INTENTIONALLY LEFT BLANK**

# CHAPTER ONE
# INTRODUCTION

## I.    Background

On November 4, 2008 (Election Day), two African-American men stood outside of the entrance to a polling site on Fairmount Street in Philadelphia, Pennsylvania.  The men were members of the New Black Panther Party (NBPP) and wore matching paramilitary clothing, such as trousers tucked into their boots and berets adorned with the NBPP insignia.  One of the men carried a nightstick.  Witnesses videotaped the men standing outside the polling place and uploaded the videos to the Internet.

Shortly thereafter, the Voting Section of the Department of Justice's Civil Rights Division (the Division or CRT) initiated an investigation into the matter. On January 7, 2009, days before the inauguration of President Barack Obama, the Division filed a civil action against the two NBPP members in the videos, the NBPP's national chairman, and the organization itself.  The complaint filed by the Division alleged violations of Section 11(b) of the Voting Rights Act, which in general terms prohibits intimidation or attempted intimidation of voters or other individuals assisting voters.[1]

None of the four defendants in the NBPP case answered the complaint in the time period required by the Federal Rules of Civil Procedure.  As a result, the Department moved the court for an entry of default as to all four defendants and, on April 2, 2009, the clerk of the court entered a default against all of the defendants.  The entry of default, however, did not conclude the civil proceeding.  It also was necessary for the Department to obtain from the Court a default judgment against the defendants, including an order for the injunctive relief that the Department was seeking.  On April 17, 2009, the Court ordered the government to file formal motion papers seeking the default judgment and injunctive relief, and the clerk of the court indicated to the Department that the Court would likely hold a hearing regarding the Department's motion.

On May 15, 2009, the Division moved the court to dismiss the complaint against three of the four defendants – namely, the NBPP, its chairman, and one of the two members that were present at the polling station in Philadelphia on Election Day.  The Division continued the action against the fourth defendant, the individual who stood outside the polling site holding a nightstick, and

---

[1] *See* 42 U.S.C. 1973i(b).

1

sought a default judgment and an injunction prohibiting him from bringing a weapon to a polling place in Philadelphia through 2013.  The court granted the Division's requested relief on May 18, 2009.

The Division's handling of the NBPP case attracted attention from Congress and national media.  For example, several members of Congress sent letters to Department personnel, including Attorney General Eric Holder, requesting information about the NBPP matter.  Similarly, in June 2009, the U.S. Commission on Civil Rights (USCCR) initiated an investigation into the Department's handling of the NBPP case.

In addition, this office received several letters starting in July 2009 from Members of Congress, including Representatives Lamar Smith and Frank R. Wolf, who requested that the Office of the Inspector General (OIG) investigate the Department's decision-making in the NBPP matter.  In his responses to those congressional requests, then-Inspector General Glenn A. Fine declined to initiate such an investigation, noting that the OIG's governing statute did not authorize the OIG to investigate allegations of misconduct relating to Department attorneys' exercise of their authority in handling of litigation or legal decisions and that the allegations raised in their letters therefore fell within the exclusive jurisdiction of the Department's Office of Professional Responsibility (OPR).  The OIG also referred the matter to OPR for its review. In August 2009, OPR told the House Judiciary Committee in a letter that it had initiated a review into the NBPP matter.

On July 6, 2010, a former trial attorney in the Department's Voting Section who had worked on the NBPP case testified at a USCCR hearing concerning the case and the Voting Section's enforcement of voting laws.  In that appearance, the attorney stated that he perceived that there was an "open hostility [in the Division] toward equal enforcement in a colorblind way of the voting rights laws."  In addition, the attorney testified that he was told that CRT leadership had instructed Voting Section management that the Voting Section would not pursue cases against Black defendants for the benefit of White victims, and that CRT leadership told the Voting Section that the new administration had "no interest in enforcing" a statutory provision regarding the removal of ineligible voters from voter rolls because those provisions purportedly are more strongly supported by Republicans and remove more potential Democratic voters from the voting rolls.[2]

Following the attorney's appearance before the USCCR, Representatives Smith and Wolf wrote to the OIG to request an investigation into the NBPP matter and various aspects of the Voting Section's enforcement of civil rights

---

[2]  For purposes of this report, we have adopted the terminology typically employed by the Division, namely "Blacks," "Hispanics," and "Whites."

laws.  On September 13, 2010, then-Inspector General Fine sent a letter to Representatives Smith and Wolf notifying them that the OIG planned to initiate an investigation, stating:

> In your recent letters you have also identified broader issues that go beyond the Department's handling of the New Black Panther Party litigation.  Through this letter I want to inform you that the OIG plans to initiate a review of the enforcement of civil rights laws by the Voting Section of the Department's Civil Rights Division.  This review will examine, among other issues, the types of cases brought by the Voting Section and any changes in these types of cases over time; any changes in Voting Section enforcement policies or procedures over time; whether the Voting Section has enforced the civil rights laws in a non-discriminatory manner; and whether any Voting Section employees have been harassed for participating in the investigation or prosecution of particular matters.

The letter also stated:  "While our review will include information about cases such as the New Black Panther Party matter and others, our review will be focused more broadly on the overall enforcement of civil rights laws by the Voting Section rather than a single case."

Also on September 13, 2010, then-Inspector General Fine sent a memorandum to CRT Assistant Attorney General Thomas Perez, informing him that the OIG had initiated an investigation.  The memorandum to Perez stated:

> The Office of the Inspector General (OIG) is initiating a review of the enforcement of civil rights laws by the Voting Section of the Department's Civil Rights Division.  Our preliminary objectives are to examine the types of cases brought by the Voting Section and any changes in the types of cases over time; any changes in Voting Section enforcement policies or procedures over time; whether the Voting Section has enforced the civil rights laws in a nondiscriminatory manner; and whether any Voting Section employees have been harassed for participating in the investigation or prosecution of particular matters.

On December 3, 2010, the USCCR released an interim report concerning its investigation into the NBPP matter, which stated:

> The nature of these charges [concerning the handling of the NBPP matter and allegations of hostility in the Division to enforcing civil rights laws on behalf of White citizens] paints a picture of a Civil Rights Division at war with its core mission of guaranteeing equal protection of the laws for all Americans.  During the Bush administration, the press reported ideological conflict within the

Division.  If the testimony before the Commission is true, the current conflicts extend beyond policy differences to encompass allegations of inappropriately selective enforcement of laws, harassment of dissenting employees, and alliances with outside interest groups, at odds with the rule of law.

On March 17, 2011, OPR issued a report concerning its investigation into the NBPP matter. A redacted version of the OPR report was subsequently released publicly on the House Committee on the Judiciary Democratic website.[3]  OPR concluded that Department officials did not commit professional misconduct or exercise poor judgment in connection with the NBPP matter, but rather acted appropriately in the exercise of their supervisory duties.  OPR further found that the Department's decision to dismiss three of the four defendants and to seek more narrowly tailored injunctive relief against the fourth defendant was based on a good-faith assessment of the law and facts of the case and had a reasonable basis.  According to its report, OPR found no evidence that partisan politics was a motivating factor in reaching the Department's decision or that the decision-makers were influenced by the race of the defendants or any considerations other than an assessment of the available evidence and the applicable law.  OPR also stated that it had concluded that the decision to initiate the NBPP case was based upon a good-faith assessment of the facts and the law, that it found no evidence that partisan politics was a motivating factor in authorizing the suit against the four defendants.

In February 2011, the former Voting Section attorney who appeared before the USCCR in July 2010 wrote an article on an Internet website that stated that that he had obtained a log of the Civil Rights Division's Freedom of Information Act (FOIA) data and alleged that "[t]he documents show a pattern of politicized compliance within the Department's Civil Rights Division."  In particular, the attorney wrote, "FOIA requests from liberals or politically connected civil rights groups are often given same day turn-around by the Department.  But requests from conservatives or Republicans face long delays, if they are fulfilled at all."[4]  Congressman Wolf wrote a letter to the OIG requesting that it investigate the allegations in the attorney's article.  On April 29, 2011, the OIG responded to Congressman Wolf indicating that we intended to broaden the scope of our review of the Voting Section to include an examination of whether requests for records submitted to the Voting Section

---

[3]  http://democrats.judiciary.house.gov/letter/department-justice-opr-report-new-black-panther-party-matter (accessed on March 8, 2013).  In addition, Assistant Attorney General Thomas Perez discussed the findings of the OPR report in public testimony in July 2011.

[4]  The attorney later testified before the Senate Judiciary Committee concerning his FOIA allegations.

4

were treated differently based upon the perceived political affiliation or ideology of the requester.

In August 2011, the former Voting Section attorney mentioned above and another former CRT attorney wrote a series of Internet articles alleging that, based on their review of Civil Rights Division documents, the Division had engaged in politicized or ideological hiring since the beginning of the current presidential administration. The attorneys asserted that the Civil Rights Division since January 2009 had hired attorneys that were liberal "activists who [had] embraced radical political agendas far outside of the legal mainstream," and that the improper hiring occurred in all of the CRT sections, including the Voting Section.  On August 11, 2011, U.S. Senator Charles Grassley wrote to the OIG requesting that it investigate the allegations concerning politicized hiring in the CRT.  In October 2011, the OIG informed Senator Grassley that it would include a review of the Voting Section's hiring practices since January 2009.

This report describes the results of the OIG's review.

## II.     Prior Related OIG Reviews

In 2008, the OIG, together with OPR, released three reports concerning improper hiring practices in the Department.[5]  One OIG-OPR report revealed that former Assistant Attorney General for Civil Rights Bradley Schlozman considered political and ideological affiliations in several personnel actions, including the transfer of CRT career employees, case assignments, and performance awards.  A second OIG-OPR report concluded that Monica Goodling, the Department's White House Liaison and Senior Counsel to the Attorney General, also considered political and ideological affiliations in Department personnel actions, including hiring career personnel and approving details of career staff, in violation of federal law and Department policy.  Some of the personnel mentioned in this report worked in the Civil Rights Division.  A third report addressed allegations of politicized hiring in the Department Honors Program and Summer Law Intern Program.

---

[5]  *See* OIG-OPR Report, *An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division*, July 2008 (released publicly January 13, 2009); OIG-OPR Report, *An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General*, July 2008; OIG-OPR Report, *An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program*, June 2008.

### III.    Methodology of the Investigation

As described in the OIG's initiation memorandum, the OIG's review initially examined several main issues:  the types of cases brought by the Voting Section and any changes in the types of cases over time; any changes in Voting Section enforcement policies or procedures over time; whether the Voting Section has enforced the civil rights laws in a non-discriminatory manner; and whether any Voting Section employees have been harassed for participating in the investigation or prosecution of particular matters.  The review was subsequently expanded to address allegations about the processing of FOIA requests by the Voting Section, and the hiring practices by the Voting Section from 2009 to 2011.

To investigate these issues, the OIG conducted more than 135 interviews with more than 80 individuals currently or previously employed by the Department.  Over the course of our inquiry, we interviewed several senior officials in the Department, including Attorney General Eric H. Holder Jr., Associate Attorney General Thomas Perrelli, former Associate Deputy Attorney General (and current Solicitor General) Donald Verrilli, Counsel to the Attorney General Aaron Lewis, Deputy Associate Attorney General Samuel Hirsch, and Assistant Attorney General Thomas Perez, and former Acting Assistant Attorney General Loretta King.  The OIG also interviewed senior Department personnel from the prior presidential administration, including Assistant Attorneys General for Civil Rights Ralph Boyd, Alex Acosta, Bradley Schlozman, and Wan Kim, as well as Acting Assistant Attorney General for Civil Rights Grace Chung Becker.

We received more than 100,000 pages of documents during the course of our review from the Department that we relied upon in drafting this report. These included materials related to Voting Section cases and matters, Division enforcement policies and procedures, and Division personnel matters.  In addition to the documents received from the Department, we reviewed hundreds of thousands of e-mails from the accounts of current and former Department personnel, as well as court decisions and filings in numerous cases.

### IV.    Organization of this Report

This report is divided into seven chapters, including this Introduction. Chapter Two provides relevant background information about the Civil Rights Division, the Voting Section, and the voting rights laws within the Voting Section's enforcement jurisdiction.

Chapter Three examines the Voting Section's enforcement of selected voting rights laws over time.  This chapter includes an analysis of whether the enforcement priorities of the Voting Section have changed over time and

whether the Civil Rights Division has enforced voting rights laws in a non-discriminatory fashion.

In Chapter Four, we address allegations we received that Voting Section employees were harassed, mistreated, marginalized, or removed due to their political ideology or the positions they advocated in connection with Voting Section matters.  We describe in detail a number of events we uncovered over the course of the investigation and then provide our analysis of the evidence.

In Chapter Five, we describe the results of our investigation into whether CRT staff considered the political affiliations or ideology of applicants for Voting Section career attorney positions advertised between January 20, 2009, and December 31, 2011.

Chapter Six describes the results of our investigation into whether Civil Rights Division staff, primarily the Voting Section, treated responses to requests for records differently based upon the political affiliation or ideology of the requester.

In Chapter Seven, we summarize our overall conclusions regarding the Civil Rights Division's enforcement of voting rights laws.

Appendix A contains the Department's response to our report.  Appendices B through E contain material described in the body of our report.

**PAGE INTENTIONALLY LEFT BLANK**

# CHAPTER TWO
# BACKGROUND

## I.   Organization of the Civil Rights Division and the Voting Section

Created by the enactment of the Civil Rights Act of 1957, the Department's Civil Rights Division (the "Division" or "CRT") enforces a wide array of laws that protect the civil rights of all individuals, including the enforcement of federal statutes prohibiting discrimination on the basis of race, color, sex, disability, religion, familial status, and national origin.  During the time period of our review, the CRT was organized into 11 separate sections, one of which is the Voting Section.

The Voting Section is responsible for enforcing federal voting laws, including investigating and litigating civil matters throughout the United States and its territories, conducting administrative review of changes in voting practices and procedures in certain jurisdictions, and monitoring elections in various parts of the country.  The Voting Section is staffed with approximately 100 employees, comprising attorneys, social scientists, civil rights analysts, and support personnel.  Since 1995, the Voting Section has generally employed 35-40 attorneys at any given time, although the number of Section attorneys in that period has fluctuated between 31 (1998) and 45 attorneys (2010).  The structure of the Section's management team has varied over time, but Section leadership has generally included a Section Chief and several Deputy Section Chiefs and Special Litigation Counsels.  The Section's staff, including its management team, is comprised entirely of career employees.

Table 2.1 shows the management of the Civil Rights Division and the Voting Section during the period from 2001 to 2011.

**PAGE INTENTIONALLY LEFT BLANK**

**Civil Rights Division and Voting Section Management**
**January 2001-December 2012**



## II.     Voting Rights Laws

### A.     Voting Rights Act of 1965

President Lyndon B. Johnson signed the Voting Rights Act (VRA) into law on August 6, 1965.  The VRA prohibited voting practices by states and municipalities that had historically discriminated against Blacks and were designed or implemented to disenfranchise Black citizens.  In particular, the statute prohibited voting practices that were imposed with the intent or effect of denying or abridging the right of any U.S. citizen to vote on account of race or color, such as literacy tests.

In addition, the VRA provides for enhanced federal oversight of voting practices in certain states, counties, and other political subdivisions that meet specific criteria.  For instance, under Section 5 of the statute, the political subdivisions subject to these special provisions, commonly called "covered jurisdictions," are required to submit any proposed changes to voting practices or procedures to the Department or federal district court for review before the proposed changes can be implemented.  Other provisions in the VRA authorize the federal government to send election observers to polling places in covered jurisdictions to monitor election-day practices.

Congress has renewed the VRA and expanded its scope multiple times since its original enactment in 1965.  In 1970 and 1975, Congress extended the provisions concerning enhanced oversight over covered jurisdictions for five and seven years, respectively.  Congress renewed those special provisions for an additional 25 years in 1982 and again in 2006.

These and other voting-related statutes are discussed in greater detail below.

### 1.     VRA Section 2

Section 2 is widely considered to be the cornerstone of the VRA and prohibits voting practices and procedures, including redistricting plans, at-large election systems, and voter-registration procedures, that discriminate on the basis of race, color, or membership in a language-minority group.

The language of Section 2 enacted in 1965 provided:  "No voting qualifications or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."  The 1975 amendments to the VRA expanded the scope of this provision to prohibit practices or procedures that deny or abridge the right of any citizen of the United States to vote because of membership in a language-minority group.  In 1982, Congress amended the provision to provide that a plaintiff could establish a Section 2 violation if the evidence established that, in

11

the context of the "totality of the circumstance of the local electoral process," the standard, practice, or procedure being challenged had the result of denying a racial or language minority an equal opportunity to participate in the political process.

Section 2 prohibits election-related practices and procedures that are intended to be racially discriminatory, as well as those that have a racially discriminatory impact.  In general terms, there are two types of practices prohibited by Section 2:  vote denial and vote dilution. Vote-denial practices, including literacy tests, poll taxes, and language barriers, are designed or implemented to prevent people from voting or having their votes counted on the basis of race or language.  Vote-dilution practices diminish minorities' political influence where they are allowed to vote, such as at-large elections and redistricting plans that have the intention or effect of reducing the political influence of minority groups.  Unlike some other provisions of the VRA, Section 2 is permanent and applies throughout the United States.

The Voting Section enforces Section 2 by initiating civil litigation, as well as filing amicus briefs in Section 2 cases initiated by private plaintiffs.  The Voting Section has also participated in Section 2 matters brought by private plaintiffs through the submission of statements of interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in any pending suit.

## 2.    VRA Section 5

The VRA contains special provisions that impose restrictions on certain jurisdictions, particularly states and counties that have a history of racial discrimination in voting.  Under the current VRA formula, all or parts of 16 states are subject to these special restrictions.  Those entities are commonly called "covered jurisdictions."

The most prominent of the special provisions is Section 5, which freezes changes in election practices or procedures in covered jurisdictions until the new procedures have been determined to have neither discriminatory purpose nor effect.[6]  Covered jurisdictions can submit proposed voting changes for

---

[6]  Section 5 states in pertinent part that, whenever a covered jurisdiction seeks to enact a voting change, including enacting or seeking to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure:

> (a) . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such

Cont'd

administrative review by the United States Attorney General, or a declaratory lawsuit before the United States District Court for the District of Columbia. The Department's administrative review is described in greater detail below.[7]

### a.    Submissions

As noted above, the Voting Rights Act requires certain covered jurisdictions to submit all voting changes to the Department or the Federal District Court in Washington, D.C. for preclearance review before such changes can become effective.  Voting changes that have not been reviewed under Section 5 are legally unenforceable.  More than 99 percent of proposed changes are submitted to the Department for administrative review, rather than the federal district court, largely because the Department's administrative reviews are less expensive for the covered jurisdiction and generally result in a faster outcome.

Upon receiving changes submitted pursuant to VRA Section 5, the Voting Section reviews the proposed change to determine whether the change is free of discriminatory purpose and effect. The legal standard for the Section 5 review is whether the new plan has the purpose or the effect of denying or abridging the right to vote on account of race or color.

---

judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure:  Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made.[]

(b) Any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting that has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, to elect their preferred candidates of choice denies or abridges the right to vote within the meaning of subsection (a) of this section.

42 U.S.C.A. § 1973c.

[7]  On November 9, 2012, the U.S. Supreme Court granted certiorari in the matter of *Shelby County* v. *Holder* on the question of "Whether Congress' decision in 2006 to reauthorize Section 5 of the Voting Rights Act under the pre-existing coverage formula of Section 4(b) of the Voting Rights Act exceeded its authority under the Fourteenth and Fifteenth Amendments and thus violated the Tenth Amendment and Article IV of the United States Constitution."  The Court heard argument in the case on February 27, 2013.

In evaluating whether a proposed voting change has a discriminatory purpose, the Department examines the circumstances surrounding the submitting authority's adoption of the change to determine whether direct or circumstantial evidence exists of any discriminatory purpose of denying or abridging the right to vote on account of race or color, or membership in a language-minority group.[8]  With regard to the discriminatory effect prong of the Section 5 analysis, a proposed voting change will be deemed to have a discriminatory effect if the change would leave members of a racial minority group in a worse position than they had been before the change with respect to "their effective exercise of the electoral franchise."  *See Beer* v. *United States*, 425 U.S. 130, 141 (1976); *see also* 28 C.F.R. Part 51.54, Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as amended Subpart F, Determinations by the Attorney General, Discriminatory Effect. This discriminatory effect is commonly called "retrogression" or a "retrogressive effect."  *See id.*

The submitting jurisdiction bears the burden of establishing that the proposed change is non-discriminatory.  If the Department determines that the proposed change satisfies Section 5's requirements, it will generally issue a letter to the submitting jurisdiction indicating that it has no objection to the proposed change, which is generally called "preclearing" the voting change. Such preclearance then authorizes the jurisdiction to implement the proposed change.  If the Department determines that the submitting jurisdiction has not satisfied its burden of establishing that the proposed change is free of discriminatory purpose or effect, however, the Department will issue a letter to the jurisdiction interposing an objection, which pursuant to the VRA blocks the jurisdiction from implementing the proposed change.  If the Department interposes an objection, a submitting jurisdiction may seek preclearance in federal court.  If a covered jurisdiction seeks to implement a voting change without preclearance from either the Department or a federal court, the Department is authorized to pursue a civil suit to prevent the implementation of that change.  The Department's enforcement authority is described in greater detail below.

Under Section 5, the Department must review the submission within 60 days.  If the Department does not interpose an objection to the proposed change within 60 days, the change is precleared as a matter of law.  The Voting Section is authorized to request additional information from the submitting jurisdiction, which is generally called a "more-information request" and tolls the Department's 60-day deadline until the jurisdiction provides the requested information.

---

[8]  For instance, the Voting Section will generally review public statements of members of the adopting body or others who may have played a significant role in the process for evidence of an intent to deny or abridge the right to vote of a racial minority group.

14

### b.   Enforcement

As noted above, voting changes in covered jurisdictions that have not been reviewed under Section 5 are legally unenforceable.  If a covered jurisdiction implements such a change without obtaining preclearance from the Department or a favorable ruling from the federal district court, the Department is authorized under the VRA to sue the jurisdiction in federal court to enjoin the Section 5 violation.  Such lawsuits are commonly called Section 5 enforcement actions, and they are heard by a three-judge panel in federal district court.  If a panel determines that the jurisdiction is violating Section 5, the typical remedy includes an injunction against further use of the voting change at issue.

### 3.   VRA Sections 3 and 8

Sections 3 and 8 of the VRA authorize the federal government to dispatch observers to monitor voting-related procedures in political subdivisions that have been certified by either a federal court or the Department.  The Voting Section is responsible for investigating whether federal observers are needed in a particular jurisdiction, by determining whether it is likely that minority voters will not be allowed to cast a ballot without interference in particular polling places on Election Day.[9]  If the Section concludes that federal observers are needed in a particular jurisdiction, it will notify the Office of Personnel Management (OPM) of that determination.  Approximately 160 counties and parishes in 15 states are currently certified for federal observers.  *See id.*  OPM then recruits observers to monitor the jurisdiction's voting practices and write reports of the activities they witness, which are then provided to the Voting Section.  The Voting Section uses the observers' reports to determine whether further enforcement of the Voting Rights Act is needed in the jurisdiction.

### 4.   VRA Section 11(b)

Section 11(b) of the VRA prohibits intimidation or attempted intimidation of voters or other individuals assisting voters, stating:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 3(a), 6, 8, 9, 10, or 12(e).

---

[9]  *See* Department of Justice, Civil Rights Division, "About Federal Observers and Election Monitoring," http://www.justice.gov/crt/about/vot/examine/activ_exam.php (accessed on March 8, 2013).

The Voting Section has pursued only a handful of Section 11(b) cases since its enactment in 1965, almost always in conjunction with Section 2 enforcement, as discussed above.  Two of the most prominent cases involving 11(b) claims are the Noxubee, Mississippi (2006) and New Black Panthers Party (2009) cases, which are described in Chapter Three of this report.

### 5.      VRA Sections 203 and 4(f)(4)

In 1975, Congress amended the VRA, expanding its scope to protect language-minority citizens.  Under VRA Sections 203 and 4(f)(4), certain jurisdictions must provide bilingual written materials and other assistance for non-English-speaking citizens.  The language minorities covered under the VRA are American Indians, Asian Americans, Alaskan Natives, and Spanish-heritage citizens. The Census Bureau determines which jurisdictions are covered under the language-minority provisions, based upon a formula set out in the VRA.  Following the 2010 census, the Director of the Census Bureau determined that more than 300 jurisdictions in 24 states were subject to the VRA Section 203.  *See* "Voting Rights Act Amendments of 2006, Determinations Under Section 203," 76 Fed. Reg. 198 (October 13, 2011), p. 63602, http://www.justice.gov/crt/about/vot/sec_203/2011_notice.pdf (accessed on March 8, 2013).

### B.      National Voter Registration Act

The National Voter Registration Act, also known as the NVRA or the Motor Voter Act, was enacted in 1993.  The general purposes of the NVRA are two-fold:  to increase the number of eligible citizens who register to vote in federal elections and to protect the integrity of the electoral process.  With respect to its purpose of increasing voter registration, the NVRA requires states to provide voter registration opportunities at a wide range of state facilities, including motor vehicle offices (Section 5) and public assistance and disability offices (Section 7).  In addition, the NVRA mandates that states accept voter registration forms submitted through the mail (Section 6) and register voters whose applications are received at least 30 days before an election (Section 8).  Section 8(a)(4) of the NVRA is the primary provision addressing the purpose of protecting electoral integrity.  Section 8(a)(4), which is commonly referred to as the list-maintenance or list-purging provision, requires states to employ a reasonable effort to remove ineligible voters from their voter rolls, such as those who have died or moved outside the jurisdiction.  Section 8 also includes certain safeguards to which states must adhere in conducting their list-maintenance efforts, in order to prevent improper list purging and the removal of eligible voters.

### C.    Uniformed and Overseas Citizens Absentee Voting Act

The Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) was enacted by Congress in 1986 and requires that the states and territories allow certain groups of citizens to register and vote absentee in elections for federal offices.  The citizens covered under UOCAVA include military personnel and their families, and citizens residing outside the United States.  In 2009, Congress amended UOCAVA to establish new voter registration and absentee ballot procedures with the enactment of the Military and Overseas Voter Empowerment Act (commonly called the "MOVE Act").

### D.    Help America Vote Act of 2002

The Help America Vote Act of 2002 (HAVA) is designed to improve the administration of elections in the United States by establishing minimum standards for states to follow in several key areas of election administration.

**PAGE INTENTIONALLY LEFT BLANK**

# CHAPTER THREE
# ENFORCEMENT OF SELECTED VOTING RIGHTS
# LAWS OVER TIME

## I.    Introduction

In this chapter we examine the Voting Section's enforcement of selected voting rights laws over time.  Our focus is to determine how the enforcement priorities of the Voting Section have changed over time and to determine whether the voting rights laws have been enforced in a non-discriminatory fashion.

The OIG utilized the following methodology in this chapter.  First, we collected and analyzed extensive data regarding the activities of the Voting Section, going back as far as 1993 where appropriate.  We interviewed current and former employees of the Voting Section and the Civil Rights Division in order to obtain greater insight into the overall activities and enforcement priorities of the Section and to identify particular case decisions or other incidents that have given rise to allegations that improper racial, political, or ideological considerations drove actions taken by CRT managers or Voting Section staff in the enforcement of voting rights laws.  From these interviews, we selected a group of cases and incidents for deeper investigation.

We then reviewed thousands of e-mails and internal documents relating to the selected cases or incidents, and interviewed numerous witnesses who were involved in the matters.  During our investigation, we looked for direct evidence of improper considerations, such as contemporaneous statements in e-mails, memoranda, or other documents that would support an inference of an improper racial bias or political agenda.  We also analyzed the positions taken in the cases, and the stated reasons for case decisions, to determine whether they were, as some have alleged, a pretext for improper but unstated considerations.  We reviewed evidence across multiple cases and incidents to assess their cumulative significance and to determine whether the evidence revealed a pattern of decisions supporting an inference of discriminatory enforcement of the voting rights laws.

In reviewing selected cases, we considered a large volume of information that the Department informed us it considers to be pre-decisional deliberative materials or otherwise subject to claims of privilege, including the contents of many internal Division e-mails, memoranda, and other communications in which career attorneys and Division leadership set forth preliminary analyses and advocated positions on particular issues. In an effort to protect, where appropriate, the integrity and candor of the confidential pre-decisional process,

19

in many cases in this report we did not describe in full detail all the materials we reviewed, as well as the underlying debates and analyses, where we were able to fairly describe the issues and the reasons for our analyses and decisions without doing so. Moreover, in some cases discussed in this report, the Department previously had made public some details of the pre-decisional process, which enabled us to address the facts in those cases in a more detailed and specific manner. As a result, the degree to which we discuss particular decisions in detail varies widely from case to case. Lastly, in some matters that never became filed cases, we believed it was appropriate and fair to take steps to conceal the identity of the potential defendants.

In Section II of this chapter we provide an overall review of enforcement actions, focusing on data regarding the changing mix of court cases filed under the various voting rights statutes within the Voting Section's jurisdiction over time. We then move to a more detailed examination of the Voting Section's activities with respect to the primary statutory provisions that it enforces. In Section III, we address litigation under Sections 2 and 11(b) of the Voting Rights Act; in Section IV, we examine the Section's activities in connection with preclearance of voting changes under Section 5 of the VRA; in Section V, we address enforcement of the NVRA; and in Section VI, we examine the Voting Section's enforcement of several language-minority provisions of the VRA. In Section VII, we discuss the Section's enforcement of UOCAVA. In Section VIII, we present our conclusions. In summary, we found that, while there were variations and trends in enforcement of the voting rights statutes over time, and that these sometimes reflected varying enforcement priorities, there was not sufficient evidence to conclude that these changes were based on discriminatory or other improper bases.

## II.    Overall Review of Enforcement Actions

Figure 3.1 presents the number of enforcement actions that the Voting Section brought or participated in for selected statutory provisions during each calendar year from 1993 through 2012. The statutes reflected in Figure 3.1 include Sections 2, 4(e), 4(f)(4), 5,[10] 11(b), 203, and 208 of the VRA, as well as the NVRA, HAVA, and UOCAVA.[11] This list includes all of the significant efforts by the Voting Section to enforce the voting rights laws through litigation. For

---

[10]  The OIG's analysis includes the Section's affirmative actions to enforce VRA Section 5, including filing claims in court and amicus briefs in private litigations, but does not include its review of voting change submissions for preclearance under VRA Section 5, the numbers of which are beyond the Section's control and hence do not reflect a choice to emphasize that particular statute. In addition, Section 5 preclearance submissions number in the thousands and would overwhelm the other data in this figure.

[11]  The analysis of UOCAVA enforcement includes actions taken to enforce provisions of the MOVE Act, which was enacted in 2009.

purposes of this figure, we defined enforcement actions to include the Section's affirmative efforts to enforce voting-related laws against specific jurisdictions and defendants, including filing lawsuits or counterclaims in court, submitting statements of interest or briefs as amicus curiae in third-party litigation, and executing out-of-court settlement agreements.[12]

**Figure 3.1 New Enforcement Actions by the Voting Section, 1993-2012**



This chart is not intended to represent the complete workload of the Voting Section, and year-to-year variations in the total number of cases initiated by the Section should not be interpreted to represent variation in the quantity of work performed by the Section's personnel.  The purpose of this chart is solely to provide a graphic representation of changes in the mix of enforcement activities that reflect the exercise of enforcement discretion by Division leadership.  The chart omits many activities that do not involve the exercise of affirmative enforcement discretion, including:  (1) administrative determinations on submissions from jurisdictions seeking Section 5 preclearance for voting changes; (2) defensive litigation initiated by jurisdictions seeking judicial preclearance under Section 5 for voting changes such as redistricting plans; (3) constitutional challenges to statutes

---

[12]  We note that the Section submitted briefs as amicus curiae in several cases from 1993 to 2012 that advocated legal positions that we did not include as enforcement actions, such as defending the constitutionality of a statute.

administered by the Voting Sections, especially Section 5; and (4) "bailout" lawsuits under Section 4 of the VRA initiated by jurisdictions seeking to be removed from Section 5 coverage.[13]  We found that these non-discretionary activities consume a large portion of Voting Section time and resources.[14]  For example, the Voting Section typically addresses thousands of Section 5 preclearance submissions each year.

In addition, in recent years the number of new cases in the Section's defensive docket (categories (2) through (4) above) has exceeded the number of new enforcement cases that the Section has brought.  Surges in the number and complexity of these matters from year to year inevitably affect the availability of Voting Section resources for affirmative litigation of cases. According to information provided by the Department, there have been a total of 24 bailout actions (category (4) above) filed in the District of Columbia since 2009, representing more than a three-fold increase in the frequency of such cases.  The Department also reported that there has been a similar increase in the rate of declaratory judgment actions under Section 5 (category (2) above) since 2010, and in the number of constitutional challenges to Section 5 (category (3) above).  Statistics provided by the Department indicate that the Voting Section's defensive litigation docket did not begin exceeding its affirmative docket until FY 2010.

Figure 3.1 also does not capture some activities by the Voting Section personnel that do not result in formal litigation or settlement agreements. Examples include numerous investigations of potential violations of voting rights laws that do not yield sufficient evidence to support filing a lawsuit.  For example, Assistant Attorney General (AAG) Thomas Perez stated in April 2012 that based on 2010 census data, the Voting Section has opened more than 100 new Section 2 investigations.  He also has noted that there were four complex Section 5 trials in 2012, which affected resources available for other work.

We found that enforcement activity that does not ripen into formal litigation, such as new investigations or pre-litigation negotiations, have not been recorded in a sufficiently consistent manner to permit meaningful

---

[13]  Figure 3.1 does include the small number of Section 5 judicial enforcement actions that the Voting Section files when covered jurisdictions fail to obtain Section 5 pre-clearance prior to implementing a voting change.

[14]  Our exclusion of defensive litigation from Figure 3.1 (as well as our use of calendar rather than fiscal years) is the reason the numbers in Figure 3.1 vary significantly from the numbers given in public testimony describing the number of cases "handled" by the Voting Section in recent years.  *See* Statement of Thomas E. Perez, Assistant Attorney General, Civil Rights Division, before the Subcommittee on the Constitution, Committee on the Judiciary, United States House Of Representatives, Oversight Hearing on the U.S. Department of Justice Civil Rights Division (July 26, 2012).

comparisons across years or administrations and, therefore, such actions are not reflected in the statistics presented in this report.[15]

Figure 3.1 reveals a very wide variation from year to year both in the number of total lawsuits filed and in the mix of cases.  Such year-to-year variations do not necessarily reflect a change in enforcement priorities.  Some kinds of voting rights cases are extremely complex and can consume significant resources and take several years to resolve.  A large number of complex cases filed one year may lead to a very small number of new cases filed the next, due to the need to devote resources to litigate existing cases rather than develop new ones.  Other factors that may affect numbers from year to year include the occurrence of federal elections and the release of new census data.

In the remainder of this chapter we examine trends and significant individual cases relating to particular statutes within the Voting Section's purview, including Sections 2 and 11(b) of the VRA; Section 5 of the VRA; the NVRA; the language minority provisions of the VRA; and UOCAVA.

## III.   Enforcement of Sections 2 and 11(b) of the VRA

In this section we examine the Voting Section's enforcement of Sections 2 and 11(b) of the VRA.  We grouped these provisions together for several reasons.  They relate to conduct that directly impairs the ability of persons to vote for their candidates of choice; they are sometimes enforced in the same cases; and the enforcement decisions relating to them have been the subject of a debate about whether the statutes should be used only or primarily for the benefit of minority victims, or whether they also should be used on behalf of White victims and against minority defendants.  Finally, the number of Section 11(b) cases that have ever been filed is extremely small, so we determined it did not make sense to treat Section 11(b) as a separate category for purposes of analyzing available data.

---

[15]  AAG Perez has testified that the Voting Section opened 172 new investigations in Fiscal Year 2011, exceeding the number of investigations opened in any fiscal year during at least the last 2 dozen years.  *See* July 26, 2012, testimony cited above in footnote 14.  As noted, we did not find that the available records were sufficient to support a comparison of this type.

Although we have excluded investigative activity from Figure 3.1, we note that investigative activity itself may be resource and time-intensive and, thus, that significant numbers of investigations, especially when driven by periodic events such as the census, could skew year-to-year comparisons of enforcement activity filed.

### A.  Data Regarding Enforcement Trends in Sections 2 and 11(b) Cases

According to data provided by the Division, the Voting Section has participated in 63 actions to enforce Sections 2 and 11(b) since 1993.  Of these actions, the vast majority were Section 2 cases only.  The Voting Section brought only two Section 11(b) actions during this period and in one of those cases the Voting Section also brought Section 2 claims.  Figure 3.2 below reflects the breakdown of these enforcement actions by year.

**Figure 3.2 Sections 2 and 11(b) Enforcement Actions, 1993-2012**



We found that this data concerning the enforcement of Sections 2 and 11(b) reflected several trends regarding the overall volume of enforcement actions since 1993, as well the racial classes protected in those matters.

**Volume of Cases:**  The data reflected a noteworthy difference in the number of cases filed from 1993 through 2000, and from 2001 through 2012. In particular, from 1993 through 2000 the Voting Section filed 35 Section 2 lawsuits and 4 briefs as amicus curiae, which far outpaced the filings during both the subsequent 8 years (17 lawsuits and 1 out-of-court settlement)[16] and

---

[16]  Former Counsel to the AAG Hans von Spakovsky noted in his OIG interview that during his tenure in the CRT front office (2002-2005), Division leadership approved two additional Section 2 cases that are not reflected in Figure 3.2 because the Voting Section subsequently withdrew its recommendation to pursue the matters due to changes in the underlying factual circumstances.

the 4-year period from 2009 through 2012 (only 1 complaint filed, as well as amicus curiae or statement-of-interest submissions in 3 other cases).[17]

Some current or former career employees in the Voting Section told us that they believed that some Civil Rights Division leaders during the 2001 to 2008 period were reluctant or resistant toward bringing Section 2 cases. Witnesses who worked in Division leadership during that period denied this allegation and said they believed the Division developed a strong record of enforcing Section 2 during that span of time.  In that regard, Hans von Spakovsky, who worked with Division leadership as Counsel to the CRT AAG from 2002 to 2005, told the OIG that the number of opportunities to bring Section 2 cases has decreased considerably over time.  For example, according to von Spakovsky, situations involving vote-denial have been rare since the 1960s and 1970s, and there are few opportunities to assert vote-dilution claims because those typically arise from the creation of at-large election districts and such districting is increasingly uncommon.  Joseph Rich, who was Chief of the Voting Section from 1999 through April 2005 (and who we found sometimes clashed with von Spakovsky on enforcement issues), made similar statements in his OIG interview, observing that the opportunities to bring Section 2 cases, particularly vote-dilution claims, were declining at the time.  Rich told the OIG that he believed those opportunities were decreasing because numerous vote-dilution cases had been brought in the 1980s and 1990s; there were fewer remaining at-large districts, which were traditional targets of Section 2 claims; and the Section 5 preclearance process had "weeded out" other situations that might given rise to a Section 2 claim.

Moreover, we found it significant that following the change in administrations in 2009, there was no surge in new Section 2 cases as might be expected if valid cases had been suppressed or discouraged in the prior administration.  Indeed, the number of Section 2 enforcement actions dwindled to just four matters from 2009 through 2012.

Julie Fernandes, who was Deputy Assistant Attorney General (DAAG) between 2009 and 2011, addressed the small number of Section 2 cases brought during this time period by the current administration when she was interviewed by the OIG in early 2011.  She indicated that the Section was working on Section 2 lawsuits initiated during the prior administration, including cases involving Euclid, Ohio, and Port Chester, New York.  According to Fernandes, the Division had not initiated new Section 2 cases because she believed Division leadership had inherited a highly dysfunctional section,

---

[17]  The Department submitted a Statement of Interest in third-party litigation in 2011 pursuant to 28 U.S.C. § 517, which authorizes the Attorney General to attend to the interests of the United States in any pending suit.  We included that submission as an enforcement action because the Voting Section argued that the court should find that a specific jurisdiction, which was a party to the lawsuit, had violated Section 2.

which she largely attributed in her OIG interviews to management failures by Christopher Coates, who was Voting Section Chief from January 2008 until January 2010 (we discuss this topic in detail in Chapter Four).  She stated further that the Section had several cases "in the hopper," including Section 2, Section 203, and NVRA cases.  AAG Perez also has stated in public statements that the Voting Section initiated numerous investigations into Section 2 matters from 2009 through 2011.[18]  Despite these claims, and the blame leveled by Fernandes towards Coates, only one new Section 2 enforcement action was brought by the Voting Section in 2010 and 2011, and we noted that, through the end of 2012, the Section had not filed any new Section 2 actions.[19]

We did not receive allegations during our review that the Division leadership since 2009 has been hostile or reluctant with respect to the enforcement of Section 2 cases, and we did not find evidence to suggest that. The current Division leadership told us that the increase in the defensive docket, as described above, along with a large number of new enforcement cases under UOCAVA, as described in Section VII of this chapter, have severely limited the resources available for new Section 2 enforcement cases. Nevertheless, we found the recent decline in Section 2 enforcement actions notable because of the fact that some of the same people who made allegations to us about the prior administration's handling of Section 2 cases had supervisory authority over the Voting Section during a time when few Section 2 cases were filed.

**Racial Demographics of Section 2 and Section 11(b) Cases:**  Figures 3.3, 3.4, and 3.5 below present the racial composition of the protected classes in the Sections 2 and 11(b) matters pursued from 1993 through 2000, from 2001 through 2008, and from 2009 through 2012, respectively.  The data reflect considerable differences between the number of Sections 2 and 11(b) matters pursued in those periods, with wide variances between the

---

[18]  *See*, *e.g.*, Statement of Thomas Perez, National Association of Secretaries of State 2012 Conference, Washington, DC, January 30, 2012, http://www.justice.gov/crt/opa/pr/speeches/2012/crt-speech-1201301.html (accessed on March 8, 2013) (stating:  "We've opened more than 100 Section 2 investigations in the past year"); Prepared Remarks of Thomas Perez, Rutgers Law Voting Symposium, http://www.mainjustice.com/2012/04/13/prepared-remarks-by-assistant-attorney-general-for-civil-rights-thomas-perez-on-voter-rights/print/ (accessed on March 8, 2013), April 13, 2012.

[19]  According to an October 23, 2012, letter to the OIG from Jocelyn Samuels, Principal DAAG for CRT, in fiscal year 2012 the Voting Section filed one brief in a Section 2 matter that was initiated in 1986 and several statements-of-interest in Section 2 litigation.  We also note that in October 2012 the Division filed a statement of interest in a Section 2 case in Montana that was initiated by private parties.

enforcement of those provisions on behalf of African-Americans, Hispanics, and Native Americans.

**Figure 3.3 Sections 2 and 11(b) Enforcement Actions, by Class Protected (1993-2000)**



**Figure 3.4 Sections 2 and 11(b) Enforcement Actions, by Class Protected (2001-2008)**



27

**Figure 3.5 Sections 2 and 11(b) Enforcement Actions, by Class Protected (2009-2012)**



According to the OIG's review of Voting Section enforcement data, the number of Section 2 enforcement actions on behalf of African-American voters decreased from 22 (1993-2000) to 5 (2001-2008) to 2 (2009-2012).  Similarly, the number of Section 2 enforcement actions on behalf of Native Americans decreased from 8 (1993-2000) to 0 (2001-2008) and 1 (2009-2012).  The number of Section 2 enforcement actions on behalf of Hispanics, however, increased from 9 (1993-2000) to 12 (2001-2008), which subsequently decreased to 1 in the current administration.

In addition, the Division under the previous administration filed two cases enforcing these provisions against minority defendants and on behalf of White victims.  (The latter of these two cases was filed in early 2009, shortly before the change in administrations, which is why it appears in Figure 3.5.)  Some career employees we interviewed cited these two cases, together with other decisions by Division leadership during the prior administration that rejected career staff proposals for enforcement action on behalf of minority victims, as evidence that Division leadership during this period was more interested in enforcing the voting laws on behalf of White voters or against minority defendants than on behalf of the historical victims of discrimination.  Table 3.1 summarizes the cases approved for litigation by the Voting Section under Sections 2 and 11(b) from January 2001 to January 2009.  The "class protected" column shows the racial or minority status of the class whose voting rights were being protected in each case.

**Table 3.1**
**Sections 2 and 11(b) Matters January 2001 – January 2009**

| Year | Defendant or Jurisdiction | Type of Matter | Class Protected | | | Brief Description of Allegations |
|------|---------------------------|----------------|--------|-----------|--------|----------------------------------|
| | | | Blacks | Hispanics | Whites | |
| 2001 | Charleston County, SC | Complaint filed | X | | | The county's at-large method of electing members of the county commission violated VRA Section 2 by diluting the voting strength of African-American voters. Complaint was filed immediately prior to change in administration in January 2001, but the following CRT Division leadership supervised trial and appeal, both of which were successful. |
| 2001 | Crockett, County, TN | Complaint filed | X | | | The method of electing the county's board of commissioners diluted the voting strength of African-American voters in violation of Section 2. |
| 2001 | Alamosa County, CO | Complaint filed | | X | | The at-large method of election of the Alamosa County Board of Commissioners violated Section 2 because it diluted the voting strength of Hispanic voters. |
| 2001 | City of Lawrence, MA | Complaint filed | | X | | In 1998, the Section brought a complaint against Lawrence in 1998, alleging that the City presented barriers to entry for Hispanic voters.  The parties settled the case, and the matter was closed.  In 2001, the City adopted new election plans and the Section brought a Supplemental Complaint that introduced new claims, alleging dilution of Hispanic vote resulting from the newly adopted voting plans. |
| 2002 | Osceola County, FL | Complaint filed | | X | | Complaint alleged violations of Section 2 by discriminating against Hispanic voters through hostile treatment at the polls and failing to provide adequate language assistance, as well as violations of VRA Section 208 by not permitting Hispanic voters to bring assistors of their choice into the polling places. |
| 2004 | Township B | Lawsuit Approved | X | | | The at-large method of election of the governing board violated Section 2 because it diluted the voting strength of Black voters. |
| 2003 | Berks County, PA | Complaint filed | | X | | The county discriminated against Hispanic voters through hostile treatment at the polls, |

29

|  |  |  |  |  |  | failure to provide adequate language assistance, and by not permitting Hispanic voters to bring assistors of their choice into the polling place, in violation of VRA Sections 2, 4(e), and 208. |
|---|---|---|---|---|---|---|
| 2003 | Locality F | Lawsuit approved |  | X |  | CRT Front Office approved Voting Section recommendation to pursue Section 2 action against the locality's police jury and school board on behalf of Black citizens, but the Section later withdrew its recommendation after two Black citizens were elected to both of those entities and the matter was closed. |
| 2003 | City of Chelsea, MA | Out-of-court settlement |  |  | X |  | Department's investigation concluded that the city's method of electing members to its school committee violated Section 2 because it diluted the voting strength of Hispanic voters. |
| 2005 | Noxubee County, MS | Complaint filed |  |  |  | X | Various practices of county election and party officials, including absentee ballot fraud and improper voter assistance, discriminated against whites in violation of Sections 2 and 11(b). |
| 2005 | Osceola County, FL | Complaint filed |  |  | X |  | Lawsuit challenged the county's at-large system for electing its Board of Commissioners, arguing that it violated Section 2 by diluting Hispanic voting strength, and that the county had adopted and maintained the at-large method of election with a discriminatory purpose. |
| 2005 | City of Boston, MA | Complaint filed |  |  | X[20] |  | The city's election practices and procedures discriminated against members of language-minority groups, specifically persons of Hispanic, Chinese, and Vietnamese heritage, by denying and abridging their right to vote. |
| 2006 | Long County, GA | Complaint filed |  |  | X |  | Defendants' conduct effectively denied Hispanic voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2. |
| 2006 | City of Euclid, OH | Complaint filed | X |  |  |  | The city's mixed at-large/ward system of electing city council |

---

[20] The complaint in this case also raised claims on behalf of Asian communities.

| | | | | | | members dilutes the voting strength of African-American citizens in violation of Section 2. |
|---|---|---|---|---|---|---|
| 2006 | Village of Port Chester, NY | Complaint filed | | X | | The Village's at-large system of electing its governing board of trustees violated Section 2 by diluting the voting strength of the jurisdiction's Hispanic citizens. |
| 2007 | City of Philadelphia, PA | Complaint filed | | X | | Defendants' conduct has had the effect of denying Hispanic voters an equal opportunity to elect candidates of their choice in violation of Section 2. |
| 2008 | Georgetown County School District, SC | Complaint filed | X | | | The defendants' at-large methods of electing the school board diluted the voting strength of African-American citizens. |
| 2008 | Osceola County, FL | Complaint filed | | X | | Lawsuit challenged the districting plan for electing the county's school board, alleging that the boundaries of the existing single-member districts diluted Hispanic voting strength in violation of Section 2. |
| 2008 | Salem County/ Borough of Penns Grove, NJ | Complaint filed | | X | | Defendants violated Section 2 by enforcing standards, practices, or procedures that denied Hispanic voters opportunity to participate effectively in the political process on an equal basis with other members of the electorate. |
| 2008 | Euclid City School District Board of Education, OH | Complaint filed | X | | | The at-large system of electing members of the city's school board diluted the voting strength of African-American citizens due to racially polarized voting. |
| 2009 | New Black Panther Party (NBPP) | Complaint filed | | | X | The NBPP, its president, and two members were sued under Section 11(b) for intimidating and attempting to intimidate voters and poll watchers in Philadelphia, PA. |
| 2009 | Town of Lake Park, FL | Complaint filed | X | | | The Town's at-large system of electing commissioners effectively violated Section 2 by diluting African-American voting strength; investigation commenced under previous administration and complaint was filed under current administration in March 2009. |

As reflected in the table, from January 2001 through January 2009, Division leadership approved or prosecuted 22 matters that included claims under VRA Sections 2 or 11(b).  This total included one matter that was approved by the prior administration but litigated and defended on appeal during this period, two matters that were initially approved but later determined to be moot for a

31

variety of reasons unrelated to the race of the victims, and one matter that was initiated during the period in question but was not filed until after the change in administrations.  Of these 22 matters, 8 matters were on behalf of Black voters, 11 were on behalf of Hispanics or Asian populations, and 2 (Noxubee and the New Black Panther Party case, discussed in detail below) were on behalf of White victims or against minority defendants.[21]  In light of the fact that the number of cases brought on behalf of White voters constituted a small fraction of the total number of cases brought by the Voting Section during this period, and the fact that the total number of cases brought far exceeded the number of cases brought during the current administration from 2009 to 2012, we concluded that the statistical evidence did not support the claim that Division leadership during this period was hostile to the enforcement of Sections 2 or 11(b) on behalf of Blacks or other minority populations or pursued cases on behalf of White voters at the expense of racial minorities.

### B.     Examination of Selected Cases Involving the Enforcement of Sections 2 and 11(b)

In addition to looking at the statistical data, we selected several specific Section 2 and 11(b) matters for a detailed examination, based on witness testimony alleging that positions taken in these cases by political appointees or career staff were driven by improper racial or political considerations, or that the reasons given by Division management for those decisions were pretexts for such improper considerations.  We address these cases in three groups.  First, we address a series of decisions made by Division leadership during the prior administration that were cited to us by some witnesses as reflecting the Division leadership's alleged hostility toward enforcing Sections 2 or 11(b) on behalf of minority defendants or an undue preference for enforcing these statutes on behalf of White voters and against minority defendants.  These cases also have been the subject of counter-allegations by former Division leaders and some former career staff that the positions taken by some career staff reflected hostility toward "race-neutral" enforcement of these statutes.  Second, we examined the New Black Panther Party case – the Section 11(b) case that bridged two administrations and that triggered accusations that improper racial and political considerations drove both the decision to bring the case and the subsequent decision to dismiss it against three of the four defendants.  Third, we examine two cases considered and rejected by Division leadership in 2009, as well as related incidents, which became the focus of allegations that the current administration's leadership was hostile to "race-neutral" enforcement of Sections 2 and 11(b).

---

[21]  The New Black Panther Party case involved Black defendants but did not involve allegations of intimidation against known White voters.  However, some of the alleged victims of intimidation in that case were White poll watchers.

We found no direct evidence in any e-mails, documents, or testimony of any improper racial or political considerations in connection with the decisions of Division management in these particular Section 2 or 11(b) matters.  We next looked at these cases to determine if they were handled in such a way as to support an argument that the reasons given were pretexts for improper considerations.

### 1.   Selected Cases during the Period from 2004 to 2006

In this section we address several controversial decisions made by Division leadership with respect to the enforcement of Sections 2 and 11(b) during the period from 2004 to 2006.  Most of these decisions were made during the period that Bradley Schlozman had supervisory authority over the Voting Section in his capacity as the Division's Principal DAAG or as the Division's Acting AAG.  As detailed below, we found that the decisions in these cases were generally within the enforcement discretion of Division leadership, and in at least one case was vindicated by a district court and court of appeals.  We found that one of these decisions was based on an interpretation of Section 2 that was inconsistent with the interpretations of prior and subsequent Division leadership, and that in another case Division leadership failed to respond to a career staff recommendation for action in a potential Section 11(b) case.  However, we found an insufficient basis to conclude that these decisions were motivated by improper racial considerations.

### a.   Factual Summaries

**Rejected Vote-Dilution Action against "Township A" (2004):**  Several current or former career attorneys alleged that the Division leadership's decision not to file a Section 2 vote-dilution action against a political jurisdiction ("Township A") exemplified leadership's hostility to enforcement of voting rights laws on behalf of Black voters.

The Voting Section submitted a proposed action against Township A to Division leadership in January 2004.  In March 2004, before Division leadership reached a decision on the possible action against Township A, the Voting Section proposed a similar Section 2 lawsuit on behalf of Black voters in another jurisdiction ("Township B").  At the time, DAAG Bradley Schlozman reviewed Voting Section matters, and Schlozman ultimately approved the Township B case but rejected pursuing the Township A matter.

Both cases involved majority-White jurisdictions with a substantial minority of Black residents of voting age.  Both jurisdictions utilized staggered annual at-large elections for their seven-member governing bodies.[22]  In each

---

[22]  Staggered at-large elections to multi-member entities such as those in Township A and Township B (as contrasted with single-member district systems, for example) have

Cont'd

election, the two or three candidates who received the most votes were elected for staggered three-year terms.  In Township B, no Black candidate had ever been elected to the governing body.  In Township A, only one Black candidate had been elected to the governing body in several decades.  The issue in both cases was whether these at-large systems were being used to dilute the voting strength of Black citizens in violation of Section 2.

We examined contemporaneous documents and interviewed witnesses to determine whether Division leadership's decision not to file an action against Township A reflected hostility to enforcing Section 2 on behalf of minority voters.  In making this assessment, we found it was important to compare the circumstances of Division leadership's approval of the Township B case.  We concluded that although many of the facts in these cases were similar, there were important differences that were relevant to two of the three preconditions for a Section 2 vote-dilution case:  that the minority group is politically cohesive (it tends to vote together), and that the majority group votes as a bloc, usually defeating the minority voters' preferred candidate.[23]

The Voting Section's memoranda to Division leadership (known as "J-Memos") regarding the possible Township A and Township B matters were prepared by different case teams, but both were reviewed and approved by the Section Chief  before being sent to Division leadership.  We found the evidence relating to cohesiveness among Black voters was markedly different in the two cases.  For Township B, there was strong evidence of cohesion, at a rate far above the threshold for cohesiveness used by most experts.  By contrast, the J-Memo for Township A did not explicitly address the cohesiveness issue, and the data in the memo indicated that Black voters typically split their votes among several candidates and very rarely supported any single candidate at a rate above the threshold used by most experts.

The evidence also differed between Township A and Township B with respect to the question of whether bloc voting by the majority usually operated to defeat the minority's preferred candidate.  In Township B, notwithstanding the extremely strong cohesion among Black voters, Black-preferred Black candidates always lost due to bloc voting by Whites, and Black-preferred White candidates almost always lost.  This led Division leadership to conclude that

---

historically been the subject of scrutiny by the Voting Section under Section 2 of the VRA because they have been seen as a means for the racial majority to prevent a racial minority from electing any candidates of choice, even if the racial minority is large and tends to vote cohesively.

[23] *See Thornburg* v. *Gingles*, 478 U.S. 30, 50-51 (1987).  The third precondition, which was not at issue in these cases because it was clearly present, is that the minority is sufficiently large and geographically compact to form a majority in a district if there were single-member districts.

the Township B facts satisfied the requirement that bloc voting by Whites usually resulted in the defeat of Black-preferred candidates.

By contrast, Township A exhibited more complicated patterns in the voting data. The available evidence showed that a substantial minority of the candidates elected from 1996 to 2003 were candidates who received the highest percentage of Black votes.  In many of these elections there were no Black candidates on the ballot.  Division leadership concluded that the success rate of Black-preferred candidates precluded a finding that bloc voting by Whites usually operated to defeat Black-preferred candidates.

Division leadership declined to pursue a Section 2 action against Township A but approved the filing of a Section 2 action against Township B. However, shortly thereafter, a Black candidate was elected to the Township B governing body.  In light of this result, the Voting Section withdrew its request to Division leadership to file the case and no Section 2 lawsuit was filed against Township B.

**Termination of a Section 2 Investigation of "County C":**  In December 2004, Division leadership instructed the Voting Section that it could not initiate a limited preliminary investigation into whether the system of staggered at-large elections for the governing body of a jurisdiction ("County C") violated Section 2 by diluting the voting power of Native Americans.[24]  Some current and former Voting Section career attorneys, including three Section managers, told the OIG that the Division leadership's decision in this matter was evidence of its hostility towards enforcement of Section 2 on behalf of minorities.

The rejected request for a limited preliminary investigation was made after the Voting Section conducted Internet research that suggested that none of the five members of County C's governing body were Native American, even though Native Americans comprised approximately 20 percent of the population in the county and were geographically concentrated.  The Voting Section proposed to follow up on this research with limited additional

---

[24]  Prior to April 2003, Voting Section attorneys were permitted to conduct preliminary investigations without advance approval from Division leadership.  In approximately 2003, Division leadership learned that a Voting Section attorney had contacted a jurisdiction to request information in connection with one such preliminary investigation.  The attorney allegedly told a local official that the jurisdiction was under investigation, which led to a complaint that reached Division leadership.  In response, Division leadership initiated a policy requiring that a short Investigation Memo ("I-Memo") describing the proposed investigation be submitted to Division leadership prior to contacting local officials.  The purpose of the I-Memo was to provide Division leadership with information about the proposed investigation and the information that would be sought from local officials and members of the community.  In August 2009, new Division leadership eliminated the I-Memo requirement, and the Voting Section Chief is now authorized to approve investigations.

investigative steps to develop information relevant to the issue of vote dilution. Division leadership instructed the Voting Section to terminate the investigation on the ground that County C as a whole was overwhelmingly Republican and that this fact, rather than race, explained the failure of a Native American candidate running as a Democrat to be elected to an at-large seat on the governing body.

This rationale by the Division's leadership was contrary to the position that the Voting Section had argued successfully in 2002 – before Schlozman assumed his leadership position over the Voting Section – in another Section 2 case on behalf of Black voters against Charleston County, South Carolina.[25]  In that case,  Charleston County raised a defense similar to the Division leadership's argument in the County C matter, namely that the requirement that the minority's candidates of choice usually were defeated due to White bloc voting was not satisfied because the observed pattern of minority candidate defeats was the product of partisan voting, not racial voting.  In response, the Voting Section argued, and the district court agreed, that the cause of cohesive White voting – specifically the question of whether such voting reflected party affiliation rather than racism – is not a relevant consideration when determining whether the government satisfied the precondition.

In deciding not to pursue the County C matter, Division leadership concluded that the intent of the voters (in other words whether the voters were motivated by partisanship rather than race) should be a consideration under Section 2, notwithstanding the argument accepted by the court in the Charleston County case.

A private action under Section 2 was subsequently filed on behalf of the county's Native American voters.  The Department later intervened in the action for the limited purpose of defending the constitutionality of Section 2. The district court ultimately ruled that the at-large system for electing the county commission violated Section 2.

**Noxubee County/Ike Brown:**  In February 2005, the Voting Section filed a civil action against the Noxubee County (Mississippi) Democratic Election Committee (NDEC), and its Black chairman, Ike Brown, alleging violations of Sections 2 and 11(b) of the Voting Rights Act.  The Noxubee litigation was the Department's first lawsuit under Section 2 of the VRA alleging denial or abridgment of the rights of White voters to vote on account of race by Black defendants.

---

[25]  *United States* v. *Charleston County*, 318 F. Supp. 2d 302, 307-8 (D.S.C. 2002).

Noxubee County is in east-central Mississippi and, according to the 2000 Census, had a voting age population of 8,697, of whom 32.5 percent were White and 65.7 percent were Black.  According to Voting Section documents, in June 2003, NDEC Chairman Ike Brown published in a local newspaper a list of approximately 170 White voters who he said "will be subject to challenge if they attempt to vote in the Aug. 5 Democratic Primary in Noxubee County."  Brown claimed that most of these voters were in violation of the party-loyalty provision of the Mississippi Code, which he stated disqualified them from voting in the Democratic primary.  The Voting Section received complaints from local residents and county officials and requests for a "federal presence" at the election.  Division leadership sent a team of eight attorneys, including then-Special Litigation Counsel Christopher Coates, to monitor the August 2003 Noxubee County primary election.  According to their post-election report, the attorneys did not observe any voters who were challenged on the basis of party loyalty, but they did observe absentee balloting irregularities and unsolicited voter assistance.

Following completion of an investigation, in February 2005, the Department filed a complaint alleging that Ike Brown and the NDEC discriminated against White voters and against White candidates and those who supported them, in violation of Section 2 of the Voting Rights Act, and engaged in voter intimidation, in violation of Section 11(b), by, among other things, publishing the names of White voters who would be challenged at the polls.  The case against Brown proceeded to trial and, in June 2007, the district court entered judgment for the United States.

The district judge ruled that Section 2 of the Voting Rights Act protected the rights of all voters, regardless of race.  *United States* v. *Brown*, 494 F. Supp. 2d 440 (S.D. Miss. 2007).  The court determined that "Brown and the NDEC have administered and manipulated the political process in ways specifically intended and designed to impair and impede the participation of white voters and to dilute their votes, in violation of Section 2."  *Id.* at 486.  Among other things, the court found that the defendants manipulated the absentee balloting process in a discriminatory manner and provided improper, unsolicited "assistance" to Black voters at the polls on Election Day.  *Id.* at 455-471.  The court, however, rejected the Section 11(b) claim, stating:  "Although the court does conclude that there was a racial element to Brown's publication of this list, the court does not view the publication as the kind of threat or intimidation that was envisioned or covered by Section 11(b)."  *Id.* at 477, n.56 (citations omitted).  The court also stated that "the Government has given little attention to this claim, and states that it has found no case in which plaintiffs have prevailed under this section."  *Id.*  On August 27, 2007, the court entered a remedial order in which it enjoined Brown, the NDEC, and their agents from violating the Voting Rights Act.  The court appointed a referee-administrator to act as superintendent of all Democratic primary and runoff elections through November 2011.

Coates told us that during the flight to Mississippi to observe the primary, then-Deputy Chief Robert Kengle said to him:  "Can you believe we are going down to Mississippi to protect white voters?"  When we interviewed him, Kengle denied making such a comment or making any reference to White voters, and said that all he recalled telling Coates was that "he could not believe they were doing this."[26]  Kengle told us that his conversation with Coates was about Division leadership repeatedly rejecting cases on behalf of minorities and that he believed those cases were more meritorious than the Noxubee matter.

Numerous witnesses told us that there was widespread opposition to the Noxubee case among the Voting Section career staff.[27]  Some career employees told us they believed that the decision to bring the Noxubee case while rejecting others involving Black voters or White defendants reflected a preference by Division leadership for enforcing Section 2 on behalf of White voters and against minority defendants.  Some Voting Section personnel also told us that they objected to the Section's pursuit of the Noxubee case when they perceived that Division leadership had rejected or stalled other Section 2 cases involving Black victims.  These witnesses also told the OIG that they believed that the Noxubee case, while justifiable on a legal basis, was a misallocation of resources and that the Voting Section should have been focusing on cases involving Black victims.[28]

---

[26]  In response to Coates's testimony about this incident to the U.S. Commission on Civil Rights, Kengle also filed an affidavit with the Commission denying that he complained to Coates about protecting White voters. http://www.usccr.gov/NBPH/USCCR_NBPP_report.pdf (accessed on March 8, 2013) at 52 n.187.

[27]  The strong opposition of some career attorneys led them to engage in inappropriate harassment of another Section employee who worked on this case.  These incidents are discussed in Chapter Four of this report.

[28]  Coates told the U.S. Commission on Civil Rights that a Voting Section social scientist "flatly refused to participate in the investigation" of Noxubee County, and cited this incident in support of his claim that there was hostility within the Voting Section to the "race-neutral enforcement of the VRA."  The social scientist told the OIG that he told Coates he did not want to participate in the investigation phase of the matter because he had other things he was working on at the time.  Coates agreed with this account of the conversation, but told us that he concluded that the social scientist had other reasons because this was the first time in their 20-year history of working together that the social scientist declined to work with Coates on anything, and that during previous conversations the social scientist had told Coates that the Department should not investigate cases with White victims.  However, we found that the social scientist later participated in the litigation of the Noxubee case by hiring and managing the government's expert witness during the trial, and that in 2006 Coates signed a performance assessment of the social scientist rating him as "outstanding" in all categories and describing, among many other things, his assistance in working with the Section's expert witness in the Noxubee case.  Coates did not acknowledge the social scientist's work on the Noxubee case in his testimony to the Commission.

Coates and other career attorneys told the OIG that they were aware of comments by some Voting Section attorneys indicating that the Noxubee case should have never been brought because White citizens were not historical victims of discrimination or could fend for themselves.  Indeed, two career Voting Section attorneys told us that, even if the Department had infinite resources, they still would not have supported the filing of the Noxubee case because it was contrary to the purpose of the Voting Rights Act, which was to ensure that minorities who had historically been the victims of discrimination could exercise the right to vote.

Coates and other career attorneys who supported the Noxubee case told us that it presented a clear violation of the voting rights laws, and that their belief that a violation had occurred was vindicated by the district court's judgment.  These witnesses also indicated that the opposition to the case among many of the Voting Section's career staff reflected hostility to "race-neutral" enforcement of the voting rights laws.

**Investigation of Section 2 Violations in a Majority-Black County:**  In 2005 and 2006, the Voting Section conducted an investigation of allegations similar to those in the Noxubee case in a county ("County D") with a majority-Black population.  The County D investigation became controversial within the Voting Section for essentially the same reasons as the Noxubee case.[29]

According to Voting Section documents, County D had a historical record of racial discrimination in which Black citizens were denied the right to vote through an array of illegal voting practices.  The Department had sent election monitors to observe elections in County D on numerous occasions since passage of the Voting Rights Act.  A Voting Section attorney familiar with County D told us that in recent years, Black citizens had become more organized and succeeded in electing their candidates of choice to some political offices, although White politicians still held several important county offices.

In May 2005, a then-Special Litigation Counsel in the Voting Section began working on an investigation focusing on allegations that Black leaders of a local political organization in County D were engaged in activities similar to those that the Voting Section pursued in the Ike Brown case, including absentee ballot fraud and improper voter assistance.  Some of these allegations were the subject of an investigation by the State Attorney General's office.

The County D investigation did not ultimately result in the filing of an enforcement action.  Following the primary, the State Attorney General

---

[29]  As discussed in Chapter Four, the Voting Section sent election monitors to County D in the Spring of 2006, and two Voting Section attorneys had heated arguments about the purpose and scope of their activities.

continued its investigation of absentee ballot fraud in County D. According to the Special Litigation Counsel, the Voting Section chose not to pursue a Voting Rights Act case in County D because of the state investigation. The state investigation resulted in several people associated with the local political group described above pleading guilty to crimes relating to illegal absentee balloting.

**The Mississippi Section 11(b) Cases:** The Mississippi cases were cited to us as exemplifying a failure of the prior administration to enforce Section 11(b) on behalf of minorities. In both 2005 and 2006, the Voting Section received complaints that agents from the Mississippi Attorney General's office, who were investigating allegations of absentee ballot abuse, were intimidating Black voters. The agents were allegedly questioning the voters while wearing badges and weapons, and were asking the voters to identify for the agents the candidates for whom they had voted. The stated purpose of the agents' questioning was to help them determine whether the individuals who had assisted the voters in marking their absentee ballots had done so consistently with the voters' wishes. The Voting Section, however, believed that alternative questions were available for the investigators to ask in order to learn whether the person assisting the voter with the absentee ballot had marked the ballot contrary to the voter's desire and recommended that the Section contact the Mississippi Attorney General's Office and advise them that questioning voters in this manner may violate Section 11(b).

The first matter arose in 2005, and involved allegations of intimidation in connection with a voter fraud investigation in a city in Mississippi. Acting AAG Bradley Schlozman rejected a proposal from the Voting Section to contact the Mississippi Attorney General's Office and advise them that questioning voters in this manner may violate Section 11(b). Division leadership stated in an e-mail to the Voting Section that they declined to take action in response to these allegations because the state agents were making the inquiries as part of a legitimate fraud investigation.

Allegations of similar conduct by Mississippi investigators arose again a few months later, in 2006, in connection with a state investigation of alleged voter fraud in another county. The Voting Section again recommended to Division leadership that it meet with the Mississippi Attorney General to discuss concerns about violations of Section 11(b). By this time, Schlozman had left the Division. We found that CRT Division leadership took no action with respect to the recommendation. Former AAG Wan Kim told the OIG that he could not recall the matter. We were not able to determine the reasons, if any, that no action was taken.

In March 2010, with the approval of Division leadership, Voting Section attorneys met with representatives from the Mississippi Attorney General's Office. According to a letter to the OIG from AAG Perez, the attorneys informed the state that if the 2006 conduct occurred again, the Department would

immediately open an investigation and take appropriate action.  The Mississippi Attorney General's representatives assured the Department that it would take steps to ensure that its investigators understood the sensitivity of questioning voters about for whom they voted.  Furthermore, they agreed to instruct the investigators to only ask such questions if it was necessary and no alternative means to gather the information existed.

Current AAG Thomas Perez told the OIG during this review, as well as the U.S. Commission on Civil Rights during testimony on May 14, 2010, that the Mississippi cases and the Pima case (discussed below) were examples of cases involving minority victims of voter discrimination that were not prosecuted during the prior administration.

**Pima, Arizona:**  The Pima case was another example cited to us as indicative of the prior administration's failure to enforce Section 11(b) on behalf of minorities.  For example, one career Voting Section attorney told us that the Pima case was a "clear example" of intimidation of Hispanic voters that was not pursued, contrasting that decision with Division leadership's decision to pursue a Section 11(b) case on behalf of White victims in the New Black Panther Party matter, discussed below.

On Election Day 2006, the Voting Section received reports that three men and one woman dressed in camouflage fatigues appeared outside a polling place in Pima County and remained there for two hours.  According to the reports, one man was wearing a holstered pistol, another man was making "constitutional arguments," and the third man was videotaping their activities, while the woman stood by watching.  The Voting Section did not receive reports of these individuals appearing at any other polling places that day.

In July 2007, after reports of the incident in Pima surfaced in the news media, the Voting Section obtained photographs of the individuals that had been taken on Election Day, which showed a man with a gun on his hip, but it was not evident from the photograph whether the individuals were at a polling place.  The Section took steps to locate and interview eyewitnesses to determine whether anyone would testify that they were intimidated by these individuals.  According to Voting Section documents, none of the witnesses claimed that they were intimidated by the individuals; instead, the witnesses indicated that they viewed them "as a joke" and ignored them.  The Section also was informed in the course of the investigation that people could lawfully carry firearms in Arizona and that the individuals had stationed themselves outside of the polling place's exclusionary zone.  The Voting Section did not make a recommendation to the Division's leadership that it take any action regarding the matter.

41

### b.    OIG Analysis

As noted above, the OIG received allegations from some current and former career Voting Section attorneys that during at least part of the prior administration – particularly the time that the Section was under the supervision of Bradley Schlozman – the Division's leadership was reluctant or resistant to enforce Section 2, particularly in "traditional" cases on behalf of the historical victims of discrimination.  We also received related allegations from these witnesses that the Division's leadership during this period exhibited a disproportionate preference for enforcing Sections 2 and 11(b) against minority defendants or on behalf of White voters.

We found insufficient evidence to conclude that improper racial or political considerations affected Division leadership's enforcement decisions. To begin with, we found no evidence of an explicit policy decision by Division leadership or the administration to change the criteria for approving Section 2 or 11(b) cases, and our review of e-mails and other documents provided no support for a claim that there had been discriminatory enforcement.

As detailed above, cases involving White victims or minority defendants comprised a very small percentage of Voting Section work during this period. Based on the data, we found no evidence of a disproportionate preference for enforcing cases against minority defendants or on behalf of White voters. Moreover, the Division leadership's decision to pursue Ike Brown for voting rights violations in the Noxubee case was found by a federal district judge to be supported by the law and the facts, and the district judge's decision was affirmed on appeal.  Likewise, the Voting Section's decision to investigate the events in County D in 2005 and 2006 involved alleged conduct that ultimately resulted in criminal guilty pleas in state court.  We also took note of the fact that the Division's management, rather than rushing to bring a case against minority defendants in County D, decided to defer bringing a federal enforcement case under the Voting Rights Act because of the state investigation.

In addition, the decisions we reviewed in which Division leadership declined to pursue particular Section 2 or 11(b) enforcement actions did not establish that leadership was unreceptive to enforcement actions on behalf of minority voters, particularly in light of the data discussed above demonstrating that leadership during the prior administration approved the Voting Section's participation in a significant number of Section 2 cases on behalf of Black or other minority voters.  For example, we found that Division leadership's decision not to file a vote-dilution case against Township A resulted from a finding that sufficient evidence to establish two critical elements in the Section 2 analysis was not present, and not from a generalized hostility to cases on behalf of Black voters.  Importantly, we found that the parallel Township B case was approved at essentially the same time because Division leadership

42

believed that evidence establishing the same critical factors was present in that case.[30]

In the Pima case, we found that the Voting Section investigated the alleged intimidation and did not pursue the case after determining that none of the witnesses claimed that they were intimidated and that the alleged conduct occurred outside the polling place's exclusionary zone.  We did not find evidence to suggest that there was a discriminatory motive behind the Voting Section's decision.  We further found that Division leadership was not asked to render a decision regarding a possible enforcement action.

We found that the stated reason for the Division's leadership's termination of a Voting Section investigation in the County C case was inconsistent with arguments that the Division had made in 2002 in a similar Section 2 matter.  Moreover, a district court ultimately found that the County C election system violated Section 2.  We found that the Division leadership's termination of the County C investigation was the product of a narrow legal interpretation of the voting rights laws by Schlozman – a legal interpretation that was not followed by the Division in litigation decisions made before or after that time.  We did not find evidence to conclude, however, that the reason stated for this single decision to terminate a preliminary investigation was a pretext evidencing generalized hostility to enforcing Section 2 on behalf of minority voters.

We also examined the responses of Division leadership to the Voting Section's recommendations in the Mississippi cases that the Department convey its concerns to the State Attorney General about possible violations of Section 11(b).  Both cases involved allegations of conduct by state investigators toward Black voters that the Voting Section believed could be intimidating.  In the first matter, Division leadership rejected this recommendation because the state investigator's questioning took place as part of a "legitimate fraud investigation."  The existence of a legitimate fraud investigation does not necessarily compel the conclusion that Section 11(b) was not violated, particularly in light of the Voting Section's belief that less intimidating and intrusive questions were available that could have yielded the information needed by the state.  However, we found insufficient evidence to conclude that Division leadership's position was motivated by hostility to enforcing Section

---

[30] We believe that an important factor contributing to the allegations we received concerning the Township A decision was the subjective nature of the *Gingles* factor analysis under the relevant case law.  For example, both Division leadership and critics of the Township A decision could use the same evidence to argue for opposite conclusions as to the significance of the percentages with which Black-preferred candidates won to support their position as to the presence or absence of bloc voting, and we are not aware of any case law precluding either's position.

11(b) on behalf of Black voters.  In the second matter, we were unable, six years after the fact, to determine the reasons that the Division leadership at the time did not respond to the Voting Section's recommendation that the Division take action in the matter.

Most of the allegations we received concerning decisions by the Division's leadership during this period involving Section 2 and 11(b) matters were made by current or former Voting Section career staff who opposed the use of any Voting Section resources to pursue cases like Noxubee, County D, and the New Black Panther Party.  Many of those individuals told the OIG that they believed that the reason the voting-rights laws were enacted was to protect historic victims of discrimination and therefore the Section should prioritize its resources accordingly.  Additionally, some of these individuals, including one current manager, admitted to us that, while they believed that the text of the Voting Rights Act is race-neutral and applied to all races, they did not believe the Voting Section should pursue cases on behalf of White victims.  Indeed, our review of Voting Section e-mails revealed widespread and vehement opposition among career employees to the prosecution of the Noxubee matter precisely because the defendants were Black.  Some career employees also asserted that allegations of absentee ballot fraud of the type pursued in the Noxubee and County D matters could and should be pursued by criminal authorities (both state and federal) and criminal penalties are a more effective remedy than the type of injunctive relief generally available under the VRA.

Despite these concerns and allegations, we did not find evidence to conclude that the decisions made by Division leadership during the period from 2001 to 2009, including the period during which Bradley Schlozman was supervising the activities of the Voting Section, reflected improper discriminatory enforcement under Sections 2 and 11(b).  We concluded that the decisions on whether to pursue these cases were within the enforcement discretion of the Division's leadership.  In sum, we found that the position the political leadership in the Division took – that these laws could and should be used in these matters to protect White voters from discrimination or harassment in voting – was within its exercise of discretion and, in at least one case, was supported by decisions in both the district and appellate court.

## 2.   The New Black Panther Party Case[31]

In this section we examine the New Black Panther Party (NBPP) case, a Section 11(b) action filed in January 2009, days before the inauguration of the new administration.  In May 2009, the new Division leadership (then comprising career Division employees serving in an acting capacity) ordered that three of the original four defendants be dismissed from the case, despite the fact that the three defendants had defaulted, and that the proposed injunction against the fourth be significantly narrowed.  This case became the focus of allegations that improper racial or political considerations had affected decisions at both the outset and the conclusion of the case.

### a.   Factual Summary

### (1)   Events Leading to the NBPP Complaint

On November 4, 2008 (Election Day), an incident occurred at a polling site on Fairmount Street in Philadelphia, Pennsylvania.  Two African American individuals, later identified as King Samir Shabazz (KS Shabazz) and Jerry Jackson, both members of the NBPP, stood outside the entrance to the polling station.[32]  They were wearing matching black clothing, trousers tucked into

---

[31] As noted in Chapter One, the OIG referred to the Department's Office of Professional Responsibility (OPR) allegations of misconduct that we received from Congress relating to Department attorneys' exercise of their authority in the handling of this matter.  Thereafter, OPR conducted an investigation of the New Black Panther Party case and issued a report dated March 17, 2011, which found that the attorneys did not commit professional misconduct or exercise poor judgment, but rather acted appropriately in the exercise of their supervisory duties; and that the decision to dismiss three of the four defendants and to seek more narrowly-tailored injunctive relief against the fourth was based on a good faith assessment of the law and facts of the case and had a reasonable basis.  Although the OIG's review addressed many of the same facts examined by OPR, the nature of our review was different.  As described in Chapter One, we considered the NBPP matter in response to several requests from members of Congress, as part of a broader policy review of the Department's enforcement of the voting laws over time, and whether the Voting Section has enforced those laws in a non-discriminatory manner.  The NBPP represents a single (albeit highly publicized) data point in this review.

Many of the facts underlying the NBPP case, including pre-decisional documents and internal deliberations, have previously been made public in connection with the OPR report and the U.S. Commission on Civil Rights Report described in Chapter One.  As a result, we are able to discuss the deliberations relating to this matter with much greater specificity than most of the other cases analyzed in this report.

[32] The NBPP is a Black separatist group active in several cities, including Philadelphia, Pennsylvania.  Southern Poverty Law Center, *Intelligence Report:  Snarling at the White Man* (2000).  The NBPP is not affiliated with the original Black Panther Party.  *Id.*  Over the years, NBPP leaders have been quoted using violent anti-White and anti-Semitic rhetoric on numerous occasions.  *Id.*; *see also, e.g.*, Dana DiFilippo, *New Panthers' War on Whites,* Phila. Daily News, Oct 29, 2008, at 4;
http://www.adl.org/main_Extremism/new_black_panther_party.htm (accessed on March 8,

Cont'd

45

their boots, and berets adorned with NBPP insignia.  KS Shabazz carried a nightstick with a lanyard wrapped around his wrist.  A Republican poll watcher recorded KS Shabazz and Jackson on a cell-phone video camera, and the recording appeared on television news broadcasts the same day and on YouTube.[33]  The 81-second video shows KS Shabazz and Jackson standing in front of the polling place entrance, a few feet apart, facing toward the street in a position resembling guards or sentries.  Other people can also be seen standing outside of the polling place, although no interaction between them and the cameraman or the Black Panthers is shown.  On the video, KS Shabazz identifies himself as "security."  When KS Shabazz asks why he is being photographed, the cameraman states:  "It might be a little bit intimidating that you have a stick in your hand."

In response to a complaint from a Republican poll watcher, two Philadelphia policemen arrived at the polling station and interviewed KS Shabazz and Jackson.[34]  According to a police report, officers allowed Jackson to stay at the polling station because he was a credentialed poll watcher, but instructed KS Shabazz to leave.  There is no evidence that KS Shabazz returned to the polling site that day, and no evidence of any subsequent complaints about Jackson's conduct.

At some point (the exact date of posting became a matter of significant dispute, as we discuss below), the national NBPP posted an announcement (the "disclaimer") which was dated November 4, 2008, about the Philadelphia incident on its website, stating that the NBPP "does not now nor ever has, engaged in any form of voter intimidation," and that:

> Specifically, in the case of Philadelphia, the New Black Panther Party wishes to express that the actions of people purported to be members do not represent the official views of the New Black Panther Party and are not connected nor in keeping with our official position as a party.  The publicly expressed sentiments and actions of purported members do not speak for either the party's leadership or its membership.

---

2013).  As recently as August 13, 2012, in an NBPP radio broadcast, the group's National Field Marshal from Philadelphia King Samir Shabazz (a defendant in the NBPP case, as detailed below) reportedly advocated bombing white churches and killing white babies. http://blog.adl.org/extremism/king-samir-shabazz-bomb-white-churches-and-kill-white-babies (accessed on March 8, 2013).

[33]  http://www.youtube.com/watch?v=neGbKHyGuHU&feature=related (accessed on March 8, 2013).

[34]  http://www.eusccr.com/nov4footage.htm (accessed on March 8, 2013).

On November 7, 2008, the Chairman of the NBPP, Malik Zulu Shabazz (MZ Shabazz), was interviewed on Fox News.  MZ Shabazz stated that there had been more than 300 members of the NBPP deployed in several cities on Election Day to ensure that voting went smoothly.  MZ Shabazz stated:  "After my investigation into that case [referring to the Philadelphia incident] I have found those [NBPP] members were responding to members of the Aryan Nation and Nazi party who were voting Republican and who were at those polling stations intimidating black voters."  He also said:  "Obviously we don't condone bringing billy clubs to polling sites, but when we found out that this was an emergency response to some other skinhead and white supremacist activity at that polling site then there was some explanation for that. . . .  That's not that we normally do, but it was an emergency response."  The Voting Section's trial team would later describe the comments of MZ Shabazz in the Fox News interview as a specific endorsement of KS Shabazz's use and display of the nightstick.

Reports of the incident in Philadelphia were communicated to the Department and relayed to the Voting Section on Election Day.  Voting Section Chief Coates and Deputy Chief Robert Popper assigned a trial attorney and a law clerk to investigate the NBPP matter, which was authorized by the Division's leadership.  Popper told us that around the time he began working on the NBPP matter, two attorneys in the Voting Section approached him about it.  One suggested it would be "insane" for Popper to work on the matter because he would be "despised" like the lawyers who worked on the Noxubee case.[35]  Another lawyer told him that politically it was a bad move for him to work on this case.

Over the next few weeks, the Voting Section case team interviewed numerous witnesses, including 11 individuals who worked for or were employed by the Republican Party as poll watchers, many of whom had been summoned to the scene of the incident on Election Day; one of the Philadelphia police officers who responded to the scene on Election Day; an FBI special agent who was familiar with the activities of the NBPP in Philadelphia; and the NBPP Chairman MZ Shabazz.  None of the case-related documents reviewed by the OIG provided any indication that the case team had interviewed voters or individuals working for the Democratic Party, such as Democratic poll-watchers.  They did not locate any voters who stated they had been intimidated by the Black Panthers.

On December 22, 2008, Voting Section Chief Coates sent a J-Memo to Acting AAG Grace Chung Becker recommending that the Division file a complaint under Section 11(b) against the NBPP, its Chairman MZ Shabazz,

---

[35]  We outline in Chapter Four the harassment that was faced by a Voting Section employee who worked on the Noxubee case.

and NBPP members KS Shabazz and Jerry Jackson.  The J-Memo described some of the videos recorded at the scene in Philadelphia and summarized the evidence provided by the witnesses interviewed by the case team.[36]

According to the J-Memo, KS Shabazz tapped the nightstick in his hand and pointed it at individuals.  It also stated that one Republican poll-watcher "heard the Black Panthers call him and his poll watching colleagues 'white supremacists' and that KS Shabazz said 'f*** you cracker.'"  The J-Memo stated that one Republican poll watcher, Christopher Hill, reported that, when he sought to enter the location, KS Shabazz and Jackson "stood side by side to create a larger obstacle to Hill's entry into the polls," but that Hill nevertheless successfully entered the building.  The J-Memo also related the impressions of several Republican poll watchers that voters appeared "apprehensive" in response to the Panthers.  It did not state that any voters were prevented or dissuaded from voting.

Among other things, the J-Memo described various witness accounts of the effect the two Panthers had on Larry and Angela Counts, husband and wife poll-watchers employed by the Republican Party.  It stated that one witness described Larry Counts as "scared and worried about his safety" and that he "huddled away" from the Panthers and kept looking over his shoulder at them. It stated that "Larry and Angela Counts confirmed that they were afraid to leave the polling place until the Black Panthers had departed," and that Angela Counts said "she wondered if someone might 'bomb the place.'"  According to the J-Memo, one poll watcher "noted that he received a report that the Black Panthers had confronted [Larry] Counts and called him a 'race traitor.'"  The J-Memo, however, did not include certain information that the case team learned during an interview of Larry and Angela Counts on December 20, 2008, as reflected in an e-mail that the trial attorney sent the same day.  The e-mail stated that Counts told the team that he had no interaction with the Panthers, and that he did not confirm that they called him a "race traitor."[37]  The e-mail also stated that Larry and Angela Counts gave "equivoc[al]" accounts of whether the Black Panthers frightened them.  It stated that Larry Counts "emphasiz[ed] that the black panthers did not scare him," but that Larry and Angela Counts said "they were afraid to leave the building until the panthers were gone."[38]

---

[36]  A copy of the J-Memo has been made available by the U.S. Commission on Civil Rights at http://www.usccr.gov/NBPH/NBPH.htm.

[37]  The e-mail gave plausible reasons as to why the interviewer doubted that Mr. Counts was being candid, but neither the statements nor the interviewer's assessment of them were mentioned in the J-Memo.

[38]  In January 2010, Larry and Angela Counts gave sworn testimony to the U.S. Commission on Civil Rights in which they stated that they were aware that the police and

Cont'd

The J-Memo described statements made by NBPP Chairman MZ Shabazz in the Fox News interview and in a telephone interview by the Voting Section.[39] It stated that MZ Shabazz said that there were more than 300 Panthers deployed to various cities to ensure that the voting process went fairly and smoothly, and that MZ Shabazz "specifically endorsed the use and display of the weapon at 1221 Fairmount Street by Samir Shabazz."

The J-Memo recommended against what it referred to as the Voting Section's "usual practice" of sending a notice letter and a proposed consent decree to the four defendants in advance of filing the lawsuit.  We understand that the Voting Section normally followed this procedure in an attempt to make it possible to resolve a violation before the Section formally commenced litigation.  In this case, the J-Memo stated:  "The nature of the NBPP is such that the letter and consent decree may not be received seriously or addressed in good faith by the defendants, who may instead seek to gain favorable publicity by publishing these documents and/or characterizing their contents in a tendentious manner."

On or about January 5, 2009, Acting AAG Becker approved the filing of the civil complaint without sending a notice letter to the four defendants, and the complaint was filed by the Division in the U.S. District Court for the Eastern District of Pennsylvania on January 7, 2009.  Becker told us that this was the only Voting Section case she could remember in which she had approved filing the complaint without sending a notice letter and proposed consent decree in advance of filing.  She also told us that, if she had followed the usual practice, the complaint would not have been filed before January 20, 2009, when the new administration took office.  However, Becker said this was not a factor in her decision.  Instead, she said she approved the recommendation to file the complaint without sending out a notice letter in advance because she believed that, in light of the violent and threatening nature of the conduct at issue, the defendants would not settle.

The complaint alleged violations of Section 11(b) of the VRA by defendants KS Shabazz, Jerry Jackson, MZ Shabazz, and the NBPP.  It alleged that KS Shabazz and Jackson were deployed at the Philadelphia polling place in military-style uniforms associated with the NBPP, that KS Shabazz brandished a deadly weapon (the nightstick) 8 to 15 feet from the entrance to the polling place, including tapping the nightstick menacingly and pointing it at individuals, and that Jackson accompanied KS Shabazz and stood in

---

television cameras came to the polling site, but that they did not see the Black Panthers or what was happening outside.  Larry Counts testified that he had "no reason to be afraid."

[39] No notes or memoranda documenting what NBPP Chairman MZ Shabazz said to the trial team during its telephone interviews were contained in the case records provided to the OIG.

apparent formation with him during this deployment.  It also alleged that KS Shabazz and Jackson made racial threats and racial insults at Black and White individuals at the polling place, and that they made menacing and intimidating gestures, statements, and movements at individuals who were present to aid voters.  The complaint further alleged that MZ Shabazz and the NBPP "managed, directed and endorsed" the behavior of KS Shabazz and Jackson.  The complaint alleged that the defendants thereby violated Section 11(b) in four respects:  by intimidating voters, by attempting to intimidate voters, by intimidating persons who were present to assist voters, and by attempting to intimidate persons who were present to assist voters.

### (2)   Transition Period

Acting AAG Becker left the Division on January 19, 2009.  The Obama administration took office on January 20, 2009, which was prior to the date by which the four defendants were required to file their answers to the Department's civil complaint.  Following the change in administrations, career DAAG Loretta King served as Acting AAG for the Civil Rights Division through mid-October 2009, and career Housing Section Chief Steven Rosenbaum served as Acting DAAG for the Division through mid-July 2009.  Although the NBPP case was listed among the Voting Section's active cases in briefing materials that were provided to King and Rosenbaum in the first few months of the new administration, there is no evidence that this case was the subject of substantive communications between Division leadership and the Voting Section until late April 2009.  Prior to that time, the Voting Section case team continued to develop evidence relating to the case.

### (3)   Witness Declarations and the Defendants' Failure to Answer the Complaint

On March 31 and April 1, 2009, the NBPP trial team obtained signed declarations from four poll watchers who had observed KS Shabazz and Jackson at the Philadelphia polling station on Election Day:  Bartle Bull, Christopher Hill, Michael Mauro, and Wayne Byman.[40]  The four declarations included essentially identical language to describe KS Shabazz and Jackson, in particular the "black uniforms" and insignia they wore, their location at the entrance, and the fact that the shorter man (KS Shabazz) had a billy-club or nightstick.  Three of the declarations (Bull, Hill, and Mauro) stated that the shorter man pointed the nightstick at individuals and slapped or tapped it in his hand.  Three of the declarations (Bull, Hill, and Byman) expressed the opinion that the two uniformed men created a "menacing" or "intimidating" presence at the entrance to the poll.

---

[40]  Complete copies of the four declarations have been made available by the Commission on Civil Rights at http://www.usccr.gov/NBPH/NBPH.htm.

In addition to these common elements, the declarations provided various individualized details.  The Bull declaration stated that Bull had extensive experience in politics and voting procedures, including working to help enforce the voting rights of Mississippians in the mid-1960s.  Bull stated that KS Shabazz and Jackson confronted and attempted to intimidate voters and attempted to intimidate and interfere with the work of other poll observers whom they "apparently believed did not share their preferences politically."  He said he heard the shorter man (KS Shabazz) make a statement directed toward White poll observers that "you are about to be ruled by the black man, cracker."  He further described the conduct as "the most blatant form of voter intimidation that I have encountered in my life in political campaigns in many states, even going back to the work I did in Mississippi in the 1960's."

The Hill declaration became significant because of its statement that KS Shabazz and Jackson worked in unison to attempt to impair Hill's access to the polling place.  It stated, in relevant part:

> When I attempted to exercise my rights as a credentialed poll watcher, and enter the polling place, the two men formed ranks and attempted to impair my entrance into the polling place.  They formed ranks by standing in such a way to make them a significant obstacle to my entrance.  I also then observed that the nightstick contained a lanyard which was wrapped tightly around the shorter man's wrist.  I am an Army veteran.  I knew that use of the lanyard would make the nightstick a more effective weapon because it could be swung more aggressively without fear of dropping the weapon, and by leveraging the firmer grip into a more severe blow on any victim.  I was forced to avoid their formation in order to enter the polling location.  I did not make physical contact with either of them, but it was without question that they sought to intimidate me from entering the polling place and exercising rights I had as a credentialed poll watcher.[41]

The Hill declaration also stated that KS Shabazz made racially charged statements, including terms such as "cracker" and miscellaneous profanity.

The Byman and Mauro statements contained somewhat less detail about the conduct of KS Shabazz and Jackson.  The Mauro declaration described the discussion between the men and the Philadelphia police officers, and stated:

---

[41] On Election Day, a television reporter interviewed Hill, who stated among other things that when he approached the two men, they "closed ranks next to each other.  You know, I'm an Army veteran, that doesn't scare me.  So I walked directly in between them, went inside, ...." http://www.youtube.com/watch?v=kOtGllNk2Gk&feature=related (deleted subsequent to viewing by OIG).

"As the shorter man departed, he belligerently yelled a statement at me and other white poll watchers which contained racial terms."

None of the four defendants in the NBPP case answered the complaint in the time period required by the Federal Rules of Civil Procedure.  On April 1, 2009, the Division, with the knowledge of Acting DAAG Rosenbaum, filed a motion with the court for an entry of default as to all four defendants for failing to timely file an answer to the Department's complaint.  The next day, the clerk of the court entered a default as to all four defendants.  On April 17, the federal district court, *sua sponte,* ordered the Department to file its motion for a default judgment by May 1, 2009.  According to an e-mail from a Voting Section trial attorney who was working on the case team, the court's deputy clerk informed the trial attorney that Judge Dalzell would "almost certainly" hold a hearing on the merits of granting a default judgment against each of the defendants.

### (4)     April 15 Meeting Regarding Coates

As detailed in Chapter Four, on April 15, 2009, King and Deputy Associate Attorney General Samuel Hirsch (a political appointee in the new administration) met with Attorney General Holder concerning the potential removal of Voting Section Chief Christopher Coates.  Because the motion for default judgment in the NBPP case had not yet been presented to anyone in the new Division leadership for review, it is unlikely that the NBPP case was discussed at this meeting.  However, for reasons discussed below, we believe that the meeting affected later decisions made in the case.

Attorney General Holder told us that he understood from what others told him that Coates was a divisive and controversial person in the Voting Section and that one concern about Coates was that he "wanted to expand the use of the power of the Civil Rights Division in such a way that it would take us into areas that, though justified, would come at a cost of that which the Department traditionally had done, at the cost of people [that the] Civil Rights Division had traditionally protected," specifically "reverse-discrimination" cases.  He also stated that he had been told that Coates "was not a person who [] believed in the traditional way in which things had been done in the Civil Rights Division" under Republican and Democratic administrations, and that Coates's view on civil rights enforcement was "inconsistent with long-time Justice Department interpretations and policies."  As further discussed in Chapter Four, following their meeting with the Attorney General, King and Hirsch consulted with personnel in the Department's Justice Management Division as part of an unsuccessful effort (at that time) to remove or reassign Coates as Section Chief.

### (5)   The Draft Motion for Default Judgment

On April 28, Coates forwarded a draft motion for default judgment to Rosenbaum for review.  The draft memorandum summarized the evidence as follows:

> On election day, November 4, 2008, Defendants King Samir Shabazz and Jerry Jackson stood, side by side, at the entrance to an open polling place, in the military-style uniforms of the Defendant New Black Panther Party for Self-Defense, brandishing a weapon, and making racial and other hostile comments.  This conduct was widely witnessed and documented by means of video recorders. Defendants New Black Panther Party for Self-Defense and Malik Zulu Shabazz made statements that a nationwide effort was underway to post party members in a similar fashion at polling locations throughout the country.

The draft motion stated that the United States would present evidence at a default hearing that NBPP Chairman MZ Shabazz "announced, on national television, a nationwide effort to deploy '300 party members' at polling locations throughout the country."  The draft also stated the United States would present evidence of statements of MZ Shabazz and KS Shabazz on Election Day and at other times, "establishing their racial animus and intent."  The draft contained a general description of evidence that would be presented at the hearing regarding the conduct of KS Shabazz and Jackson at the polling location, which was consistent with the content of the Bull, Hill, Byman and Mauro declarations set forth above, including the statement that KS Shabazz and Jackson "attempted to block physical access to the polls to one individual authorized to aid voters."  However, the draft did not identify these witnesses or attach their declarations.[42]  The draft stated that NBPP Chairman MZ Shabazz "first endorsed and defended the behavior (though later he appeared to disclaim it)."

The draft injunction that the trial team proposed for presentation to the court provided:

> Defendants, their agents and successors in office, and all persons acting in concert with them, are permanently enjoined and restrained from deploying at the entrance to polling locations in the United States either with weapons or in the uniform of the Defendant New Black Panther Party for Self-Defense, or both, and

---

[42]  Popper stated that the reason the draft did not provide the declarations was that the trial team expected the court to schedule a hearing on the default judgment, and the trial team would call the witnesses then.

from otherwise engaging in coercing, threatening, or intimidating behavior at polling locations during elections.

It also enjoined the defendants from appearing within 200 feet of a polling location in the NBPP uniform, or appearing within 200 feet or within sight of a polling place with a weapon.  It enjoined defendants from "organizing and deploying or posting armed individuals to polling locations," and from "making statements or taking actions which intimidate, threaten or coerce voters, or those aiding voters."

### (6)   Events of April 29-May 1

On April 29, Rosenbaum sent Coates an e-mail stating:  "I have serious doubts about the merits of the motion for entry of a default judgment and the request for injunctive relief.  Most significantly, this case raises serious First Amendment issues, but the papers you've submitted make no mention of the First Amendment."  The e-mail asked Coates to identify the evidence that MZ Shabazz or the NBPP managed or directed the behavior or actions of the other defendants.  Rosenbaum also asked:  "Did any of the defendants make any statements threatening physical harm to voters or persons aiding voters?  On this issue, there is a body of case law on what constitutes 'true threats.'"  The e-mail also questioned the proposed injunction, including its nationwide scope and its prohibition on wearing the NBPP uniform.  Rosenbaum forwarded this e-mail to Acting AAG King, stating he had "serious doubts about the case and the papers that were submitted for review."

Later that same day, Coates responded to Rosenbaum's e-mail, explaining why the First Amendment was not a concern with respect to using evidence of the statements of the defendants for the purpose of establishing liability.  The e-mail also stated:

We have no direct statements by the defendants threatening or promising physical harm.  (1) We do not think we need it, given the nightstick, the brandishing of it, the confrontational language used, and the physical blocking of Hill.  The context suggests the threat of violence in a most basic way.  Any of us might hesitate to walk into that polling station. We believe the court will look at this behavior from the objective point of view of a reasonable voter coming to vote.  (2) We also have an "attempt" claim, which should obviate the need for any direct showing of successful intimidation.

For both of these reasons we do not believe we need "true threats." Indeed, the Department has never taken the position that Section 11(b) requires a "true threat."  As recently as the early 90s, we brought US v. NC Republican Party to enjoin a prospective voter challenge program under Section 11(b).  There was no threat of violence in that case.  It was ultimately settled with a consent

decree.  Given that the statute enjoins not just threats, but intimidation and coercion, this makes sense.

Coates's e-mail also raised the issue of statements on the NBPP's website, but did not reference the disclaimer described above that had been posted (at some point) on the NBPP website.  Coates stated that the evidence that MZ Shabazz managed and directed the incident "consists of statements on the NBPP's website before the election as to what the NBPP planned to do, and the on-air statements by [MZ Shabazz] after the election as to what the NBPP had done."

The e-mail also addressed the nationwide scope of the injunction, stating that it was justified by the "announced intent [of the NBPP] to have a nationwide program."  The e-mail further stated that an injunction against the wearing of the NBPP uniform "makes sense because of the implicit threat the uniform implies," noting that many jurisdictions bar the wearing of partisan attire near a polling place.  It stated that the 200-foot distance feature was "necessarily somewhat arbitrary," and that "[a]nother number might work."

On April 30, in response to further inquiries from Rosenbaum about the "manage and direct" allegation and the scope of the proposed injunctions, the NBPP team sent Rosenbaum three witness declarations and a discussion of case law relating to injunctive relief.

Also on April 30, at a weekly meeting with Associate Attorney General Thomas Perrelli and Deputy Associate Attorney General Samuel Hirsch, Rosenbaum described the NBPP matter and the upcoming deadline, and stated that he had concerns about liability and relief.  According to Hirsch, Rosenbaum or King stated that the case was "so extraordinarily weak that it never should have been filed in the first place."[43]  The participants in this meeting agreed that the government should seek an extension of the deadline for the motion for default judgment the next day if Division leadership and the Voting Section did not reach a consensus about the case.  Perrelli told Rosenbaum to keep Hirsch informed about the case going forward.

Later that afternoon, Rosenbaum met with Coates and Popper to discuss various concerns that Rosenbaum had about the case.  King joined the meeting and, after further discussion, told Coates and Popper to submit revised motion papers to her and Rosenbaum addressing the scope of the injunction and the

---

[43]  Rosenbaum told us he does not believe he made the quoted statement during the April 30 meeting, but that he said something to the effect that the evidence he had seen to date was "extraordinarily weak."  It is not clear that King attended this meeting, so we believe that Hirsch was recalling a statement made by Rosenbaum.  Both King and Rosenbaum told OPR investigators that they eventually held and expressed the opinion that the case should not have been filed in the first place.

First Amendment, and to seek an extension from the court.  According to Coates, during this meeting King stated that the NBPP complaint raised Rule 11 issues and should not have been brought against any of the defendants. King told us that she said that the case was an action that she probably would not have brought, although she did not specify whether she made this statement at the April 30 meeting.

After the meeting ended, Rosenbaum forwarded the trial team's draft motion papers to Hirsch, along with his prior e-mail exchanges with Coates. Rosenbaum described the meeting to Hirsch in a separate e-mail.  He stated, "I've seen videos of the activity at the polling place and continue to have the reservations I discussed this morning.  (According to the videos, the defendant with the nightstick was at the polling place for only an hour and then left when the police asked him to leave.  The other defendant was a resident of the apartment building that served as the polling place.)"  Hirsch called Rosenbaum to discuss Rosenbaum's concerns about the case further, and then e-mailed him thanks for "doing everything you're doing to make sure that this case is properly resolved."

On the morning of May 1, Coates forwarded revised motion papers to King and urged that the motion be filed that day to avoid the risk of dismissal. While reviewing the revised papers, King looked at the NBPP website and discovered the NBPP's disclaimer statement quoted above, dated November 4, 2008, disavowing the actions of KS Shabazz and Jackson in Philadelphia.  She also discovered a statement suspending the Philadelphia Chapter as of January 7, 2009 (the day the complaint was filed).  King consulted with Rosenbaum and then Hirsch, and the three agreed that the Division should seek an extension of time from the court to file its papers.

King and Rosenbaum then summoned Coates and Popper to a meeting, at which Rosenbaum accused Coates and Popper of intentionally withholding information about the NBPP website and the disclaimer from Division leadership.  Popper and Coates vigorously denied this allegation, and Coates raised his voice and used profanity.[44]  Popper and Coates argued that the website statements carried no weight because they were not credible, were made in anticipation of litigation, and were probably backdated, and because

---

[44] In a later e-mail to King and Rosenbaum, Coates and Popper stated that the draft memorandum of law that was provided to King and Rosenbaum on April 29 contained the following language, which they said refuted any claim that they had intentionally withheld information about the NBPP website content:  "After accounts and video of this behavior were broadcast nationwide on Election Day, the [NBPP] and Chairman [MZ] Shabazz first endorsed and defended the behavior (though he later appeared to disclaim it)."  The e-mail concluded with a request by Coates for an apology from King and Rosenbaum for accusing Coates and Popper of intentionally misleading management.  Neither Rosenbaum nor King responded to the e-mail.

there was other evidence that KS Shabazz continued to be affiliated with the NBPP.

King instructed Coates and Popper to request a 2-week extension from the court and to prepare a supplemental memorandum for Division leadership regarding the appropriate remedy. The court extended the deadline for the motion for default judgment to May 15, 2009.

### (7)    May 5 Meeting with Attorney General Holder

On May 5, 2009, Acting AAG King and Deputy Associate Attorney General Hirsch met with Attorney General Eric Holder and some of his senior advisors to discuss personnel matters in the CRT, including whether to remove Coates as Section Chief. As detailed in Chapter Four, King told the Attorney General that the Justice Management Division had stated that they would not support a performance-based removal of Coates at that time without further documentation and discussion. Witnesses told the OIG that they recalled the Attorney General urging King to do what was proper with respect to Coates and to let the chips fall where they may.

According to several witness accounts and a confirming document, during this meeting King and Hirsch also briefed the Attorney General on the NBPP matter, and there was a discussion of the possible dismissal of some of the defendants. Attorney General Holder told the OPR that at the time of the meeting he thought King was reporting an action that they had taken or were about to take, that King was not seeking his approval for the decision, and that King was simply notifying him of it because it could attract media attention and possibly create controversy in the Division. The Attorney General also told investigators that he believed King's decision to dismiss some defendants was correct and that he tried to convey that in the meeting. Several witnesses confirmed that the Attorney General conveyed his approval and that he also acknowledged that a decision to dismiss some of the defendants would be criticized by some people who would say that the Attorney General was helping the NBPP, which had supported President Obama in the election.

Attorney General Holder told OPR investigators he did not talk to anyone at the White House about the NBPP case, and that he had no basis to believe that the decision to dismiss three of the defendants in the case was based on partisan or racial considerations. Our review of the Attorney General's e-mails during this time period did not reveal any communications with the White House about the NBPP case.

### (8)    Further Development of the Disclaimer Controversy

Following the contentious meeting on May 1, the NBPP case team worked on preparing the supplemental memorandum requested by Division leadership.

During this period the team attempted to determine the timing of the posting of the disclaimer language on the NBPP website, which was dated November 4, 2008. On May 5, a law clerk on the case team sent an e-mail to Popper and Coates (and another case team member) stating that he was "reasonably sure" the disclaimer language regarding events in Philadelphia was posted on the NBPP website after the complaint was filed in January 2009. However, on May 6, the case team received a chronology from the Anti-Defamation League (ADL) stating that the disclaimer language had, in fact, been released by the NBPP late in the day on Election Day (November 4).

Coates sent a supplemental memorandum prepared by the case team to Rosenbaum and King on the evening of May 6, after the case team had received the information from the ADL. The supplemental memorandum did not reference the information from the ADL, and it stated unequivocally that the disclaimer language had been added to the NBPP website "after this lawsuit was filed on January 7, 2009." The supplemental memorandum also addressed several issues that had been raised in prior discussions with the front office, including an explanation of why the disclaimer and suspension language on NBPP's website did not preclude injunctive relief, and a discussion of First Amendment issues. Rosenbaum forwarded the supplemental memorandum to Hirsch.

On May 7, Rosenbaum sent an e-mail to Coates and Popper asking how the team knew when the disclaimer language had been posted on the NBPP website. Popper responded that a law clerk had pulled language from the NBPP website in November or December that did not contain the disclaimer language, that the case team had periodically monitored the website since mid-November, and that the disclaimer language was not added until after the complaint was filed. The law clerk told us that although he does not now recall whether he saw the disclaimer on the website in November 2008, based on his review of e-mails from January 2009 between himself and the trial attorney on the case team, he believes that the disclaimer had not been posted at that time.

Following a discussion with the ADL on May 8, Popper reported to the case team that the ADL "firmly recollect[s] that the statement was added after 11/04/08 but well _before_ this lawsuit was commenced. They have convinced us that they are probably right. We believe now that we cannot in good faith represent to the court that the [statement] was added to the website after this lawsuit commenced" (emphasis in original). After further inquiries from Rosenbaum about the timing of the disclaimer, on May 11 Coates e-mailed Rosenbaum, reporting the information from the ADL and stating "we don't have enough information to know for sure" when the disclaimer was added to the NBPP website. Rosenbaum forwarded this new information to King and Hirsch, stating to King that "[t]his exchange renews my serious concerns about the Voting Section's handling of this case and the representations it makes to the front office about the case."

58

### (9)    Review by the Appellate Section

On May 7, Rosenbaum forwarded various materials from the NBPP trial team, including the supplemental remedial memorandum (which included the incorrect information about the posting date of the disclaimer) and revised proposed order, to Diana Flynn, Chief of the Civil Rights Division Appellate Section, and requested the Appellate Section's views on the proposed order. Flynn assigned the matter to an attorney in the Appellate Section.  On May 11, Rosenbaum forwarded to Flynn a copy of Coates's e-mail of the same day, described above, in which Coates reported the information from the ADL and stated "we don't have enough information to know for sure" when the disclaimer was added to the NBPP website.  On May 12, the appellate attorney provided her views in a long e-mail to Flynn.  Among other things, the attorney questioned whether the government had a sufficient factual basis for alleging violations by NBPP Chairman MZ Shabazz and the NBPP, or for requesting an injunction against the two of them.  The attorney stated that the Voting Section's arguments appeared to be sufficient to support some kind of injunctive relief against KS Shabazz and Jackson, but that she had concerns that the specific wording of the case team's proposed injunction might raise First Amendment concerns.

On May 13, Flynn forwarded the appellate attorney's views to Rosenbaum and Coates.  Flynn's e-mail stated that the attorney's comments "reflect my views."  However, Flynn's e-mail differed with the attorney's comments with respect to the claims against the NBPP and its chairman, MZ Shabazz, in that she stated:  "We can make a reasonable argument in favor of default relief against all defendants," and that "we generally concur in Voting's recommendation to go forward."  Although she stated that the case against MZ Shabazz and the NBPP was "a bit of a reach," she also stated that, given that the complaint had already been filed, "[w]e probably should not back away from these allegations just because defendants have not appeared."  Flynn also wrote:  "Voting does seem to have evidence in support of these allegations." Flynn's e-mail does not identify the evidence to which she was referring.  Both the appellate attorney and Flynn stated that the court might require further evidentiary proceedings before granting the requested relief, despite the defendants' failure to answer.  Rosenbaum forwarded the Flynn and the appellate attorney comments to King and Hirsch.

Rosenbaum told investigators that the appellate attorney's comments confirmed his concerns about defendants MZ Shabazz and the NBPP, and that he disagreed with Flynn's conclusion that there was evidence in support of the allegations against them. Rosenbaum said he understood that the evidence to which Flynn was referring was a statement on the NBPP's website that the party was sending 300 members to polling places around the country, which Rosenbaum did not consider to be evidence that the party or its Chairman managed and directed the alleged activities in Philadelphia that violated

59

Section 11(b). King stated that "when you read [the appellate attorney]'s e-mails compared to [Flynn]'s, that they really were not saying the same thing and [the attorney]'s was a little equivocal," and that after looking at them she thought "they are totally opposite each other."

### (10)   Perrelli Provides Guidance

King and Rosenbaum advised Perrelli of the status of the NBPP case on May 7, during a regularly scheduled weekly meeting.  Perrelli and Hirsch discussed the case at a staff meeting on May 11 and, on May 12, Hirsch instructed Rosenbaum to prepare an options memorandum for consideration in the event that the Division did not reach a consensus.

On May 14, Perrelli told Hirsch and Rosenbaum that, if the CRT leadership could not reach consensus on the case, they should seek another extension rather than presenting the dispute to Perrelli and Deputy Attorney General Ogden for resolution with a deadline of May 15.  Perrelli told Hirsch and Rosenbaum that if Division leadership agreed on some kind of "middle ground" resolution that fell between two outer limits, it would be supported by Perrelli so long as it was consistent with the law and the facts, and it could be filed with the court immediately.  The witnesses provided slightly different accounts of the outer limits that Perrelli said would require an additional extension of time for further consideration by Department leadership.  According to Perrelli, the extremes were dismissing all four defendants without obtaining any relief, versus an injunction so broad it violated the First Amendment.  According to Hirsch and Rosenbaum, Perrelli's second outer limit was an injunction against all four defendants.

### (11)   The Decision to Dismiss Three Defendants and Limit the Scope of Relief Against KS Shabazz

The deadline for filing the Motion for Default Judgment was May 15.  On May 14 or 15, Rosenbaum raised new questions about the evidence pertaining to Jerry Jackson, the taller defendant who was present at the polling station in Philadelphia on Election Day but who did not carry the nightstick.  Rosenbaum told investigators that his decision to take an additional look at the case against Jackson "admittedly came late," and that it was based on his review of the J-Memo (which he did not see until May 14), and was made "against the backdrop of a lack of candor in the [case team's] presentations to us, …."  On the morning of May 15, Rosenbaum asked Coates to identify the evidence relating to the allegations in the complaint that "Jackson made statements containing racial threats and insults" during voting hours, and that "Jackson made menacing and intimidating gestures, statements, and movements" directed at poll watchers.  In response, Coates forwarded an e-mail from Popper that cited the following facts:

- The declaration of poll watcher Chris Hill stated that Jackson had formed up side-by-side with KS Shabazz to attempt to block Hill's entrance to the polling station.  Hill's account was confirmed by another poll watcher.

- A Republican poll watcher reported that he received complaints that other Republican poll watchers were "approached and harassed" by Jackson (although these other poll watchers were not identified by Coates).

- A Republican poll watcher described poll watcher Larry Counts as scared and worried about his safety.[45]

- Larry Counts said that he and his wife Angela were afraid to leave the polling place while the NBPP members were present, and Angela said she was afraid the NBPP members would bomb the place.

- Another poll watcher reported that the NBPP members (without differentiation) were chanting "black man will rule white man."

- The witness statements generally did not differentiate between the conduct of Jackson and that of KS Shabazz, and suggested the men were operating in conjunction with each other.

Also on the morning of May 15, Rosenbaum told Hirsch that he was considering, among other things, whether the Division should file an amended complaint against KS Shabazz and Jackson but omitting the NBPP and its Chairman MZ Shabazz as defendants and correcting other allegations for which he believed the Voting Section had insufficient evidence.  Rosenbaum also consulted with Flynn and the Appellate Section attorney who had previously given advice on the case, about the filing of an amended complaint and they supported the idea.  Hirsch, however, opposed the idea because "it could only postpone or even frustrate entirely the goal of declaring [KS] Shabazz's actions as illegal and enjoining him from repeating them."  After consulting with Perrelli, Hirsch e-mailed Rosenbaum that the amended complaint proposal struck both of them (Hirsch and Perrelli) as "a bad one."[46]

---

[45]  Coates's response did not mention that Larry Counts specifically denied that he was frightened by the Black Panthers when he was interviewed by Voting Section attorneys.

[46]  Hirsch also stated in his e-mail that Perrelli "seemed puzzled" by another option that Rosenbaum had apparently raised, which involved pursuing default judgment at that time and reserving the issue of injunctive relief for later.  According to Hirsch's e-mail, Perrelli did not understand why the Department could not resolve the entire case at the time, especially in light of the 14-day extension the court had already granted.

On the afternoon of May 15, King and Rosenbaum discussed the NBPP case with the CRT Chief of Staff and an Acting DAAG in CRT.  Hirsch also participated in part of the discussion.  Rosenbaum recommended, and King agreed, that the national party and its chairman MZ Shabazz should be dismissed from the action because of the lack of evidence that they had managed and directed the incident.  Rosenbaum also recommended that Jackson be dismissed from the case.  Rosenbaum told investigators that although Hill's testimony about Jackson moving to obstruct his entry provided some evidence of a violation of Section 11(b), the other evidence presented by the NBPP trial team was not persuasive.  Rosenbaum noted that the allegation that Jackson attempted to intimidate Hill was undercut by Hill's public statement that he was not frightened.  He noted that Jackson did not carry a weapon; that there was insufficient evidence that Jackson made verbal threats to anyone; and that, as a credentialed poll watcher, Jackson was entitled to be present.  He also noted that the local police had permitted Jackson to remain at the scene, and that there was no evidence of any subsequent conduct of Jackson that violated Section 11(b).  King agreed that Jackson should be dismissed as a defendant, for the same reasons, but she stated the decision about Jackson was "probably a much closer call" and something about which "reasonable minds can disagree."[47]

Rosenbaum and King also agreed that KS Shabazz should be kept in the case and enjoined from bringing a weapon to a polling place.  However, they decided to limit the proposed injunction to polling places in Philadelphia (because there was no evidence KS Shabazz had traveled to engage in similar behavior outside of Philadelphia), to eliminate any prohibition on the wearing of the NBPP uniform (because of First Amendment concerns), to reduce the radius of the injunction to 100 feet from the polling entrance (deemed appropriate in a city environment), and to limit the duration of the injunction to three years (sufficient to last through several election cycles).  Hirsch reported the results of the meeting to Perrelli.  King told us that as a result of her discussions with senior Department personnel, she understood she had their "tacit approval" for her decisions.

Rosenbaum instructed Coates to revise the motion papers to be consistent with these decisions.  Coates requested that the dismissal of the three defendants be without prejudice (in the event additional evidence came to light), and that the injunction be extended to 2013 (so as to encompass the next presidential election).  King agreed to these changes.  Later that day, Coates forwarded revised motion papers to the front office.  King, Rosenbaum,

---

[47]  Hirsch told the OPR and the OIG that he would have not dismissed Jackson from the case if it were up to him, but that the Office of the Associate Attorney General deferred to the decision by the Civil Rights Division leadership because he thought the decision was not unreasonable.

and Hirsch edited the documents.  In a contemporaneous document, Hirsch wrote that he sent Rosenbaum a "few minor line edits to the proposed order" and later provided Rosenbaum with handwritten edits to other papers submitted by Coates.  He further stated that his edits were "designed to shorten and streamline the papers."  The revised papers were filed with the court on time and, on May 18, 2009, the court granted the requested relief without an evidentiary hearing or oral argument.

### (12)   Perrelli's White House Meetings

During the period March through May 2009, Associate Attorney General Perrelli attended several meetings at the White House relating to a variety of matters within his portfolio unrelated to the NBPP case.  Because of their timing, these meetings later became the subject of speculation regarding White House involvement in the NBPP matter.  Perrelli told OPR that he never discussed the substance of the NBPP case with anyone at the White House or with anyone else outside the Department.  Our review of Perrelli's e-mails and other documents uncovered no evidence of any discussions between Perrelli or anyone at the White House or anyone else outside the Department regarding the NBPP case.

### (13)   Public Statements about the Involvement of Political Appointees in the Decision to Dismiss Some Defendants

Senior Department personnel have made public statements minimizing the extent of the involvement of political appointees in the decision to dismiss some of the defendants from the NBPP case.  In response to a document request to the U.S. Commission on Civil Rights ("the Commission"), the Department stated:

> Career supervising attorneys who have over 60 years of experience at the Department between them decided not to seek relief against three other defendants after a thorough review of the facts and applicable legal precedent.  The Department implemented that decision.  Political considerations had no role in that decision and reports that political appointees interfered with the advice of career attorneys are false.  Consistent with the Department's practice, the attorney serving as Acting Assistant Attorney General for Civil Rights informed Department supervisors of the Division's decisions related to the case.  The Department supervisors did not overrule that attorney.

The Department used identical language in a letter dated September 9, 2009, responding to an inquiry from Senator Jeff Sessions.

63

On April 16, 2010, in a supplemental response to an interrogatory from the Commission, the Department gave additional information about the role of political appointees in the NBPP decision, stating:

> As is customary with complex or potentially controversial issues, the then-Acting Assistant Attorney General for Civil Rights [King] advised the Associate Attorney General [Perrelli] that she was making a case-based assessment of how to proceed in this case, engaged in discussions with the Associate Attorney General's staff about how to proceed, and informed the Associate's office of her decision before it was implemented.

AAG Perez testified before the Commission on May 14, 2010, concerning the NBPP matter. Although Perez had not yet been confirmed as AAG and was not present in the Division at the time of the events in question, he appeared before the Commission on behalf of the Department in his capacity as AAG. Concerning the NBPP decisions, he testified as follows:

> COMMISSIONER KIRSANOW:  Was there any political leadership involved in the decision not to pursue this particular case any further than it was?
>
> ASST. ATTY. GEN. PEREZ:  No.  The decisions were made by Loretta King in consultation with Steve Rosenbaum, who is the Acting Deputy Assistant Attorney General.

Later, in response to a line of questions about whether political leadership has responsibility and "ownership" of decisions in the Department, Perez described the briefing process in CRT, noting that the CRT leadership regularly briefs senior political appointees on specific cases and that:

> If indeed they have an objection or a concern about a decision that we are about to make, it is obviously their prerogative to weigh in and to say no, I don't want -- I would like to go in a different direction.
>
> So that happens.  That happened when I was in Bush I.  And that happens now.  I think that's kind of been the standard operating procedure.

On June 1, 2011 (after the OPR report was issued), Perez testified before the U.S. House of Representatives Committee on the Judiciary, Subcommittee on the Constitution, as follows:

> Mr. King:  [T]he decision to drop the cases against the other individuals, you testified, was made not by political, but by career employees. And I think the names were Loretta King and Mr.

Rosenbaum.  Does that still remain the case, or would you wish to clarify that before the Committee?

Mr. Perez:  The decision was made by Loretta King and Steve Rosenbaum, two people who are career attorneys in the Division with combined experience of roughly 60 years or so.

Mr. King:  And it was not overruled or reviewed with input from political appointees, Perrelli and Hirsch?

Mr. Perez:  Well, again, as I have described before the commission, any time you make a decision--I have a regular Thursday meeting with the Associate Attorney General and other people on the leadership chain.  When you are making a decision, I am about to do something, an issue in case A.  We are about to----

Mr. King:  But the question was, it was not overruled by or influenced unduly by political appointees?

Mr. Perez:  No.  And, again, the OPR report concluded, and they did not say that there was scant evidence or insufficient evidence of political interference.  They said there was no evidence of political interference.

The OIG questioned Perez about the specific instances in which political appointees participated in the decision-making about the NBPP case in a manner that was more active than merely being briefed by King and Rosenbaum, including the following incidents:  (1) Perrelli told Hirsch and Rosenbaum that if Division leadership agreed on some kind of "middle ground" resolution that fell between two extremes, it could be filed with the court immediately, but that any decision outside these guidelines would require an additional extension of time for further consideration by Department leadership; (2) Hirsch rejected Rosenbaum's idea about filing an amended complaint to omit the NBPP and its Chairman as defendants and to correct certain other allegations for which the Voting Section had no evidence; and (3) Hirsch edited the motion papers that were ultimately filed with the court.

Perez told us that he was not previously aware of these instances of participation by political appointees.  However, Perez stated that these incidents were not inconsistent with his testimony to the Commission.  He stated that the context of his testimony was responding to allegations that political appointees had exercised "undue influence" or "put a thumb on the scales of justice" during deliberations over the NBPP matter, and that these incidents did not reflect conduct of that type.  Perez stated that these incidents were not involvement in the decision to dismiss three defendants and limit the injunction, because King made the decision in consultation with Rosenbaum and it was not changed by Hirsch or Perrelli.  Perez also cited the Department's April 16, 2010, supplemental response to an interrogatory from the Commission (quoted above) as making clear to the Commission that the

decision-making process included discussions with the Associate Attorney General's staff (specifically Hirsch) about how to proceed.

Perez told us that he anticipated he would receive questions about the involvement of political appointees during his testimony to the Commission. He stated that when he asked King and Rosenbaum early on who made the decision, they told him it was King in consultation with Rosenbaum, and that the decision was not made by any political appointees. Perez told us that he did not ask King and Rosenbaum about their dealings with political appointees, and that after they told him that it was their call, he did not question them further. Perez told us he did not ask anyone in the Associate Attorney General's Office, including Perrelli or Hirsch, about the involvement of political appointees in the NBPP matter as part of his preparation for the hearing because of the pendency of the OPR inquiry, which he viewed as focused on the role, if any, of Department leadership in the case. Perez also stated that he did not recall any substantive conversation about the case with the Attorney General.

### b.    OIG Analysis of the NBPP Case

The decisions by the prior administration to bring the New Black Panther Party case and by the current administration to later dismiss three defendants who had already defaulted have proven to be controversial. We analyzed these decisions as part of our review of whether improper political or racial considerations affected the Voting Section's enforcement of the civil rights laws. We also analyzed public statements made by AAG Perez regarding the role of political appointees in the NBPP case.

### (1)    The Decision to File the Complaint

We first considered the actions of the Division in approving the NBPP complaint in January 2009 just prior to the new administration's inauguration, and the contention that the outgoing Division's leadership was motivated by improper racial or political considerations in bringing the case. We found no direct evidence, such as testimony or contemporaneous e-mails, and insufficient indirect evidence, suggesting such improper motivation.

We took note of the Section's recommendation to Division leadership that the Division file the complaint without following the Voting Section's "usual practice" of issuing a notice letter and proposed consent decree – and AAG Becker's approval of this recommendation. Absent this decision, the case would not have been filed prior to the change in administrations. Even if there was little chance that the defendants would agree to a settlement for the reasons suggested by Becker or otherwise, we were unable to identify any compelling need to file the complaint before the change in administrations, and we found no basis to conclude that the case would be harmed materially by

66

following the usual practice for Voting Section cases.[48]  Adhering to the usual process would have given the incoming administration an opportunity to make its own decision about whether to file the case.[49]  Instead, the outgoing Division leadership's decision to move forward immediately with the complaint, and not follow the usual process, created the perception that the decision was made in order to deprive the new administration of the opportunity to make its own assessment of the proposed litigation.  However, we did not find sufficient evidence to conclude that the stated reason for this decision was pretextual or that the decision was motivated by improper racial or political considerations.

### (2)   The Decision to Dismiss the Complaint and Limit Relief

Critics of the decisions made in the NBPP case have alleged that the decision to dismiss three of the four defendants after the entry of default, and to narrow the scope of the proposed injunction against the fourth defendant, reflected hostility in the current administration to enforcing the voting rights laws on behalf of White victims or against Black defendants, a desire to protect the political allies of the Obama administration, or both.  As detailed below, we did not find sufficient evidence to conclude that King, Rosenbaum, or the political appointees who approved the decision were so motivated.

**The Entry of Default:**  Some members of the NBPP case team have contended that because the four NBPP defendants had failed to respond to the complaint and default had been entered against them, the case was essentially won and the decision to dismiss some of the defendants was legally unnecessary and unprecedented, reflecting a partisan or other improper motive.  While the court's entry of default meant that the defendants were deemed to have admitted to the well-pleaded factual allegations of the Division's complaint, Rule 55 of the Federal Rules of Civil Procedure still required the United States to satisfy the court that it was legally entitled to the

---

[48]   In comments submitted after reviewing a draft of this report, Becker told the OIG that she believed the alleged threats of violence in the NBPP matter set this case apart from other Voting Section cases and that the NBPP case was more like criminal matters filed by the Division's Criminal Section, which did not follow the practice of giving prior notice to defendants before filing.  We do not question Becker's authority to waive the notice letter procedure in this or any case.  However, for the reasons stated in the text, we believe that the decision to do so in the unusual circumstances of the NBPP matter left the impression that the case was filed quickly in order to prevent the new administration from making its own assessment of the strength of the action.

[49]   In comments submitted after reviewing a draft of this report, former Voting Section Chief Christopher Coates recounted a decision made a few days before the inauguration of the new administration in January 2001 to file a Section 2 action against Charleston County, South Carolina.  Coates acknowledged that, unlike the NBPP case, a notice letter was sent to Charleston County before the case was filed.

injunctive relief it was requesting.[50]  Fed R. Civ. P. 55(b)(2).  The court's deputy clerk told the trial team that the court would likely hold a hearing on this matter, and the trial team had begun preparing to present evidence to establish the defendants' liability and the government's entitlement to relief.  There was at least a possibility of an adverse judgment, and we believe it was reasonable and consistent with their supervisory obligations for the leadership of the Division to undertake to satisfy themselves that the injunction sought by the NBPP trial team was supported by the evidence and the law.

**Dismissal of the NBPP and Its Chairman:**  We first examined the decision to dismiss the case against the NBPP and its Chairman, MZ Shabazz. In order to obtain the requested injunctive relief against these two defendants, the Division was required to establish that they "managed and directed" the conduct in Philadelphia that allegedly violated Section 11(b).  This was a primary focus of the hard questioning of Coates and Popper by King and Rosenbaum during late April and early May 2009.  The support offered by the trial team for "managed and directed" was that:  (1) that the NBPP website stated before the election that 300 members in 15 cities would be ensuring the rights of people of color to vote and "provid[ing] security" against white supremacist threats; (2) that MZ Shabazz "endorsed" the actions in Philadelphia in interviews with the media and with the trial team after the election; and (3) that MZ Shabazz and KS Shabazz had a "long relationship through the NBPP."

We do not believe that this evidence was so strong that improper motives can be imputed to King and Rosenbaum for having found it insufficient to obtain a default judgment and the requested injunctive relief after they undertook what appeared to be a careful review of the evidence, which included consultation with appellate lawyers in the Division.  We found that the legal and factual reasons outlined to us by King and Rosenbaum as the basis for their decision to not seek a default judgment and injunction against defendants NBPP Chair KZ Shabazz and the NBPP were well-considered.  Among the reasons outlined were the following:  neither the statements on the website nor those of MZ Shabazz in the post-election FOX News interview established that he or the NBPP instructed anyone to commit the acts in Philadelphia that allegedly violated Section 11(b), such as displaying a weapon at the polling place, directing racial threats or insults at poll watchers, or attempting to obstruct poll watchers from entering polling sites by standing shoulder-to-shoulder and moving in unison; the NBPP, like other organizations, was entitled to send persons to polling places for the purpose of assisting voters, and its stated intent to do so was not obviously evidence of a plan to intimidate voters or poll watchers; and there was no evidence that NBPP members appeared at any other polling sites on Election Day with weapons (or for that

---

[50]  *See Comdyne I, Inc.* v. *Corbin*, 908 F.2d 1142 (3d Cir. 1990).

matter without them).[51] This last fact undermined the suggestion that KS Shabazz's conduct in bringing a nightstick to the polls was managed or directed by NBPP leadership pursuant to a coordinated strategy of intimidation.

Given their belief that there was an absence of sufficient evidence to establish the liability of the NBPP or its chairman, King and Rosenbaum concluded that the grounds for seeking an injunction against them were lacking.[52] We did not find sufficient evidence to conclude that this decision was the result of improper racial or political considerations.

**Dismissal of Jerry Jackson:**  We next considered the decision to dismiss the case against Jerry Jackson, in order to determine whether the reasons given for that decision were a pretext for racial or political considerations.

We found that the evidence against Jackson, which was captured on video, was considerably stronger than it was against the NBPP or its Chairman MZ Shabazz.  By dressing in the same manner as KS Shabazz in black clothing with Black Panther insignias and standing with KS Shabazz in front of the polling place entrance while KS Shabazz brandished a weapon, Jackson communicated that he was acting with KS Shabazz as part of a concerted activity.  Moreover, there was no evidence that Jackson made any effort to disassociate himself from KS Shabazz when the latter displayed his weapon or directed racially hostile rhetoric at White poll watchers.  Jackson contributed the presence of a second, similarly outfitted individual standing side-by-side in front of the doorway with his baton-wielding companion.  Invariably, two individuals working together are more intimidating than one, even if only one is speaking or carrying a weapon.  Moreover, there was no dispute that the evidence regarding KS Shabazz's actions were sufficient to establish a violation of Section 11(b); Division leadership did not dismiss the case against him and the district judge entered judgment against him.

The earliest evidence that Division leadership began explicitly distinguishing between the liability of Jackson and that of KS Shabazz that we were able to locate was late on May 14 or on the morning of May 15 - the same day that the Motion for Default Judgment was due and more than two weeks after King and Rosenbaum became deeply involved in reviewing the NBPP matter.  Indeed, on the morning of May 15, Rosenbaum told Hirsch that he was

---

[51]  Although MZ Shabazz defended the conduct of the Philadelphia defendants after the fact during his FOX News interview, we are not aware of any evidence that MZ Shabazz admitted to directing them in advance to bring weapons or make racial threats toward anyone.

[52]  We found the input provided by the Appellate Section on the liability of the NBPP and its Chairman was equivocal, due the fact that Flynn argued that relief should be sought against them while the appellate attorney questioned the basis for holding them liable.

considering the option of filing an amended complaint that would include both Jackson and KS Shabazz as defendants, but that would omit the NBPP and its Chairman and correct other allegations for which he believed the Voting Section had insufficient evidence.  We found no evidence that anyone who had reviewed the case prior to that date, including the Division's appellate attorneys, found any basis for distinguishing between the conduct of Jackson and KS Shabazz in terms of their individual liability.  Most of the discussions during that period were focused on the ability of the Division to seek injunctive relief regarding the charges against the NBPP and its Chairman.

We believe that, in making the decision on May 15 to dismiss Jackson, King and Rosenbaum inevitably were affected by their loss of confidence in the accuracy of the information that had been provided by the Section to Division management about the case.  When Rosenbaum questioned the basis for the allegation made in the J-Memo and the complaint that Jackson had made racially threatening statements, he discovered that it was lacking.  This discovery, which occurred shortly before a decision had to be made on the motion for a default judgment, and which was on top of the earlier discovery regarding the website disclaimer, led Rosenbaum and King to question the accuracy of the case team's representations despite the fact that objective evidence was available against Jackson on video and the fact that Jackson was a defendant who had already defaulted.  The result, we believe, was a last-minute decision to dismiss the charges against Jackson.  Indeed, Division leadership, on May 15, went from raising the possibility of filing an amended complaint against Jackson to deciding to dismiss the charges against him just several hours later.  We found that this timing may have affected the quality, and certainly affected the appearance, of the decision to dismiss Jackson.[53]

We also took note of the fact that the controversy arose in the context of the contemporaneous discussions about removing Coates as Chief of the Voting Section, which was motivated at least in part by the belief that Coates would pursue "reverse-discrimination" voting cases (like the NBPP case) at the expense of more "traditional" cases.  We believe that the larger concerns Division leadership had about Coates inevitably colored their view of the case he was advocating at the same time.

For purposes of this report, our assessment of the merits of Division leadership's judgment is relevant to the question of whether the reasons given for dismissing Jackson were a pretext for a decision based on improper racial or political considerations.  Given the confluence of the factors that we outline

---

[53]  After reviewing a draft of this report, Rosenbaum commented that "Division leadership often has to make decisions close to a filing deadline and in that decision-making process often solicits additional information from a Section."  Rosenbaum noted that he argued an *en banc* appeal in a major fair housing case on May 13 and that he did not receive revised motion papers from the Voting Section until May 14.

in the preceding paragraphs, we found that there was insufficient evidence to conclude that the decision to dismiss Jackson from the suit was based on hostility to enforcing the civil rights laws against a Black defendant, or that it was made for improper political reasons.

**Limiting the Injunction's Scope:**  We also considered whether the decision to limit the scope of the injunction against KS Shabazz was the product of an improper motive, and concluded that it was not.  Rather, we found that decision was driven by concerns, informed by advice from the Appellate Section, that the nationwide relief proposed by the case team, which was unlimited in duration, was unduly broad in the absence of evidence of prior violations or activity outside the City of Philadelphia.

We also considered whether the fact that Acting AAG King and Acting DAAG Rosenbaum overruled the recommendations of career staff in the Voting Section was so extraordinary that it, by itself, suggests an improper motive.  Some critics of the decision have asserted that King and Rosenbaum, as Acting AAG and Acting DAAG, were serving as political appointees, and have alleged that when political employees overrule career staff, this suggests some kind of partisan political motivation.  We do not infer an improper motive by the leadership of a Division, without substantially more evidence, simply because the Division's leadership disagreed with a recommendation from career staff.

**The Role of Higher Level Political Appointees:**  Higher level political appointees, including Associate Attorney General Perrelli and Deputy Associate Attorney General Hirsch, participated to the extent described above in important decisions in the NBPP case.  We found that they set broad outer limits on the discretion of Division leadership to dismiss all of the defendants, rejected the idea of amending the complaint, and edited motion papers submitted to the court.  In addition, Attorney General Holder was briefed on and generally indicated his approval of the decision by King and Rosenbaum to overrule the case team's recommendation and dismiss some of the defendants.[54]  However, we do not infer an improper motive, without more, from these acts.  Senior officials in the Department obviously are not required to recuse themselves from cases with potential political implications merely because they are political appointees.  Based on our review of documents and the testimony, we did not find evidence to conclude that the political appointees approved the decision for improper partisan or racial considerations.[55]

_____

[54]  We found no evidence that the Attorney General was specifically briefed on the proposal to dismiss the claims against Jackson.  That proposal was not made until May 15, the same day the motion was due.

[55]  We note that similar accusations were made regarding the overruling of career staff by political appointees in the prior administration, including in connection with the Mississippi

Cont'd

Based on our review of Department e-mails and the interviews we conducted, we found no evidence of involvement in this matter by political appointees outside the Department.  Associate Attorney General Perrelli attended White House meetings near the time of the decision to dismiss some defendants, which some critics have claimed indicates White House involvement in the decision.  Perrelli explained the purposes of his White House meetings and stated that the NBPP was never discussed.  We are aware of and found no evidence to the contrary.

### (3)      Public Statements Regarding the Involvement of Political Appointees

As detailed above, AAG Perez testified to the U.S. Commission on Civil Rights, as a witness on behalf of the Department, that political leadership in the Department was not "involved" in the decision to dismiss three of the four defendants from the NBPP case, and that this decision was made by Acting AAG Loretta King in consultation with Acting DAAG Steve Rosenbaum.  Perez also made it clear that King's decision was briefed to political appointees, who had the authority to overrule it but did not do so.  Nevertheless, we found that Perez's testimony did not reflect the entire story regarding the involvement of political appointees in NBPP decision-making.  In particular, Perez's characterizations omitted that Associate Attorney General Perrelli and Deputy Associate Attorney General Hirsch were involved in consultations about the decision, as shown in testimony and contemporaneous e-mails.  Specifically, they set clear outer limits on what King and Rosenbaum could decide on the NBPP matter (including prohibiting them from dismissing the case in its entirety) without seeking additional approval from the Office of the Associate Attorney General.  In addition, Perrelli and Hirsch advised against a course of action that Acting DAAG Rosenbaum said he was considering – namely, submitting an amended complaint to address certain factual assertions – and Hirsch edited the motion papers to be submitted to the court.

To be clear, there are no rules prohibiting political appointees like Perrelli and Hirsch from participating in such decision-making.  To the contrary, involvement by senior Department officials in decision-making on specific matters, particularly potentially sensitive cases like NBPP, is both routine and appropriate.

We note that AAG Perez had not been confirmed at the time of the decisions at issue and we found that he did not know about these incidents at the time of his testimony to the Commission on May 14, 2010.  Therefore, we

---

and Texas redistricting cases and the Georgia Voter ID case and, as detailed in the section of this chapter dealing with Section 5, we found no basis to infer improper political considerations there either.

did not find that Perez intentionally misled the Commission.  Nevertheless, given he was testifying as a Department witness before the Commission, we believe that Perez should have sought more details from King and Rosenbaum about the nature and extent of the participation of political employees in the NBPP decision in advance of his testimony before the Commission.  The issue of whether political appointees were involved in this matter had already engendered substantial controversy, and Perez told us he expected questions about it would arise during his testimony.

In his OIG interview, Perez said he did not believe that these incidents constituted political appointees being "involved" in the decision.  We believe that these facts evidence "involvement" in the decision by political appointees within the ordinary meaning of that word, and that Perez's acknowledgment, in his statements on behalf of the Department, that political appointees were briefed on and could have overruled this decision did not capture the full extent of that involvement.[56]

### 3.    Selected Cases Since 2009

In this section we address two Section 2 and 11(b) matters since January 2009 as well as related incidents that became the focus of allegations that the Division leadership in the current administration was hostile to "race neutral" enforcement of the voting rights laws.

### a.    Factual Summaries

**The Small Business Matter (2008-09)**  On November 13, 2008, roughly one week after the 2008 presidential election, the Voting Section received allegations of possible voter intimidation by the proprietor of a small business against her employees.  In particular, the Section learned that the White owner of the business wrote a memorandum given to the staff in October 2008 that included the following paragraph:

> Thanks for all you do & remember to ensure job security here we are asking for you to support McCain/Palin.  This is not a threat but I promise if Obama gets elected and starts implementing his economic plan - I will be forced to let some go.  I will start with those that voted for Obama!

---

[56] We note that the U.S. District Court in the District of Columbia stated in a July 2012 opinion in a NBPP-related FOIA litigation that:  "The documents reveal that political appointees within the Department were conferring about the status and resolution of the New Black Panther Party case in the days preceding the Department's dismissal of claims in that case, which would appear to contradict Assistant Attorney General Perez's testimony that political leadership was not involved in that decision." *See Judicial Watch, Inc.* v. *U.S. Dept. of Justice*, --- F. Supp. 2d ----, 2012 WL 2989945, D.D.C. July 23, 2012.

Two of the business's employees – a Black woman and a White woman – had previously expressed support for then-Senator Obama in a public manner, such as placing an Obama bumper-sticker on a car and wearing an Obama campaign button at work.

Upon learning of the allegations, the Voting Section conducted an investigation into the matter as a potential voter-intimidation claim under VRA Section 11(b).  The evidence established that the proprietor admitted writing the memorandum and making similar threats in meetings with her staff; that she subsequently apologized to her staff for the statements, including personal apologies to the two Obama supporters on her staff; and that she gave spending money to one of the Obama supporters who travelled to Washington, D.C. to attend the Obama inauguration and later included pictures of the employee at the inauguration in the business's periodic newsletter.  Division leadership declined to pursue a civil action or an out-of-court settlement in that matter.

At least two former Section attorneys alleged to the OIG that Division leadership's decision not to pursue any action against the business proprietor was motivated by political considerations, exemplified current Division leadership's hostility to enforcement of voting rights laws on behalf of White voters, or both.  We examined contemporaneous documents, including e-mails, and interviewed witnesses to evaluate those allegations.

Former Acting AAG Loretta King told us that she believed the elements of a Section 11(b) violation were present, but she identified several factors that were the basis for her decision not to take enforcement action against the small business owner.  First, King told us the proprietor's conciliatory actions toward the employees after the election was relevant to her assessment of the seriousness of the potential violation and the need for federal action.  Second, King told the OIG that she felt, after the dismissals in the NBPP case, that Section 11(b) cases could be "very explosive, politically explosive and that if we brought one, we better be sure that it was a case worthy of a federal lawsuit."  She stated that she declined to bring a lawsuit as a matter of prosecutorial discretion.

As an alternative to initiating a lawsuit, King proposed that the Voting Section draft a letter to the proprietor proposing an out-of-court settlement of the potential Section 11(b) action.  Newly-installed Deputy Assistant Attorney General Julie Fernandes decided not to pursue this measure.[57]  Fernandes told the OIG that she believed this matter was outside the Division's jurisdiction because she understood that CRT has authority under Department regulations

---

[57]  Fernandes had joined the Department on July 13, 2009, three days after King declined to pursue a lawsuit in this matter.

only over Section 11(b) matters that involve racial targeting, and that if the allegations involve voter intimidation without racial implications then only the Criminal Division or the U.S. Attorney's Office would have jurisdiction.[58] Fernandes told the OIG that the presence of White and Black victims would undermine evidence of a race-based motivation and therefore remove the matter from CRT's jurisdiction. In addition, Fernandes believed that the underlying allegations in the matter were "nickel-and-dime" issues, and that writing a letter to the owner of this type of small business was "awfully weak" and "just didn't seem right."

**DAAG Fernandes's Comments at a Voting Section Meeting (September 2009):** The Voting Section held a meeting with DAAG Fernandez on September 16, 2009, which included a wide-ranging discussion concerning the Section's work. Allegations later arose about comments by DAAG Fernandes at that meeting regarding Division leadership's priorities related to enforcement of Section 2.

The OIG's review of available evidence – which included interviews of several attorneys who attended the lunch and two sets of handwritten notes of the meeting written by career attorneys – established a consensus concerning the following facts. During the meeting, a Voting Section trial attorney asked Fernandes for guidance on whether Division leadership would pursue a Section 2 case in which both the anticipated defendants and victims were racial minorities – specifically, a matter in which a Black majority population was allegedly diluting the votes of a Hispanic minority.[59] Witnesses agreed that Fernandes's response to the question included statements to the effect that the Voting Section should focus on "traditional civil rights" cases and focus on political equality for racial and ethnic minorities.

According to Fernandes, the attorney asked a question about a hypothetical case involving a jurisdiction composed of racial or ethnic minorities, specifically Blacks and Hispanics. She stated that she gave a "professorial response," saying that it was a critical question and that they needed to develop a strategy. Fernandes said that her response also included statements that the Section should focus on "traditional civil rights enforcement" and that their core mission is providing equal opportunity to racial and language minority voters.[60] She told the OIG that the Noxubee and

---

[58]  28 C.F.R. § 50.50(a)(2) provides, in relevant part, that the Criminal Division is responsible for the enforcement of Section 11(b) "insofar as [it] relate[s] to voting and election matters not involving discrimination or intimidation on grounds of race or color."

[59]  Several witnesses told us that they understood that the attorney had been developing such a case, although the attorney apparently presented the question as a hypothetical.

[60]  Handwritten notes taken by Voting Section Deputy Chief Robert Popper and a trial attorney at the meeting substantially corroborate Fernandes's recollection of her comments.

NBPP cases were not on her mind in answering that question and that she did not instruct the Section to not bring certain types of cases.

When asked what she meant by "traditional civil rights enforcement," Fernandes told the OIG that she believed that CRT had shifted during the prior administration from "regular" civil rights cases in favor of what she believed were more peripheral matters, such as writing advisory opinions on HAVA and sending election observers to jurisdictions without evidence of problems with voter intimidation.  In addition, she told the OIG that she believed that for eight years there was a wholesale neglect of cases involving African-Americans. Fernandes told the OIG that she believed the Division would approve a reverse-discrimination case involving a Black defendant and White victim, and that no reasonable person could have interpreted her support for equal opportunity in voting to mean that she would reject cases in which there is discrimination against White people.

Although there was general agreement among the attendees regarding what Fernandes said, there was a sharp disagreement about what attendees believed her comments meant.  Several Voting Section attorneys stated that they understood Fernandes's response to the Section 2 hypothetical question to mean that Division leadership would not approve Section 2 cases against Black defendants and/or in favor of White voters, such as the Noxubee or NBPP cases.  Other attorneys who attended the lunch, however, interpreted Fernandes's response to the hypothetical differently or did not recall the exchange at all.  For instance, Voting Section Deputy Chief Timothy Mellett said in his OIG interview that he did not interpret Fernandes's statement to mean that Division leadership would not pursue cases like the Noxubee matter, but rather that she meant cases pursuing "traditional" claims would not "get[] memo'ed to death and delayed."[61]

**Territory D Section 2 Vote-Denial Matter (2009-10):**  In March 2009, the Voting Section received allegations and initiated an investigation regarding a non-binding plebiscite in a United States territory (Territory D).  The statute enacted by the Territory D legislature stated that the plebiscite in question was intended to present three options "to the Native Inhabitants of [Territory D] to ascertain their future political relationship with the United States of America, namely, Independence, Free Association or Statehood."  The law establishing

---

[61]  With a few exceptions, we found that the attorneys' interpretations of what Fernandes meant by her statements divided along ideological lines:  attorneys who understood Fernandes to be expressing hostility toward enforcing the voting laws to protect Whites or against minority defendants were typically those commonly perceived as conservatives who had been hired or promoted during the prior administration.  Those who disputed this interpretation were generally the attorneys perceived as liberal, many of whom had been hired prior to 2001 or promoted during the current administration.

the plebiscite provided that only "Native Inhabitants" of Territory D – defined to include only citizens who were residents of the territory as of a particular date or their descendants – were eligible to vote in the plebiscite.  The statute's definition of "Native Inhabitants" of Territory D effectively limited voters eligible to participate in the plebiscite to individuals of a particular ethnicity, who comprise a plurality of Territory D's voting-age population.  The rest of Territory D's residents, which included a mix of Asians, Whites, and a very small number of Blacks, would not be entitled to register to vote in the plebiscite. The statute further provided that the plebiscite would be held on the date of a general election at which 70 percent of eligible voters are registered.

The Voting Section's leadership apparently discussed the inquiry with Acting AAG King in the spring of 2009.  However, the evidence is unclear as to whether the Voting Section submitted a memorandum to the Division's leadership regarding the investigation at that time.  Voting Section records indicate that an investigation was opened in March 2009, the same month the allegations were received.

In May 2010, the Voting Section attorney assigned to the matter proposed filing a Section 2 action against Territory D.  This proposal was not approved by Section Chief Herren and no such proposal was forwarded to Division leadership.  Herren described several factual and legal impediments to such an action, including significant jurisdictional concerns.  In particular, Herren indicated that he believed the law was unclear about whether the Section could sue Territory D under the VRA.  Herren also identified several other matters that were consuming Section resources at the time, including a series of "crisis situations," such as the post-2010 Census redistricting and the planning for the November 2010 elections, that resulted in belated handling of numerous proposals across the spectrum of the Section's work.  Herren stated that several proposals to pursue other Section 2 matters, including investigations and lawsuits involving traditional minority victims, as well as investigations to enforce other VRA provisions, were stalled for comparable lengths of time in roughly the same period.  Additionally, Herren indicated that the matter was not ripe given that the 70-percent threshold of registered voters required to hold the plebiscite had not been reached, and that it did not seem likely that the threshold would ever be reached.

No action was ever filed by the Voting Section. At least three current or former Voting Section attorneys told the OIG in substance that they believed that Division leadership and some Voting Section employees opposed pursuing the Territory D matter because it was perceived to assert a reverse-discrimination claim on behalf of Whites or against traditional minority classes.

In 2011, a private citizen of the territory filed a private action against the Government of Territory D challenging the plebiscite statute.  The court

dismissed the private citizen's complaint without prejudice on the grounds that the controversy was not ripe.

### b. OIG Analysis of Enforcement of Sections 2 and 11(b) Since January 2009

The OIG received allegations that Division leadership between 2009 and 2012 was hostile to "race neutral" enforcement of the voting rights laws and that the Voting Section would enforce Sections 2 and 11(b) of the Voting Rights Act only in "traditional" circumstances – namely, to protect minorities as historical victims of discrimination – and not against minority defendants or to protect White victims. We found insufficient evidence to conclude that Division leadership during this period had such a policy, or that the laws were enforced in a discriminatory manner to achieve that result.

First, we found no direct evidence, such as e-mails or memoranda, that the Division considered or espoused a policy of that nature. In addition, every witness from Division leadership during that time denied that such a policy existed or that they believed the VRA should be interpreted in such a rigid manner.

Further, our review of relevant matters did not provide sufficient evidence to establish a policy prohibiting cases against Black defendants or in support of White victims. As a threshold matter, we note that witnesses identified only a small number of potential "reverse-discrimination" cases during the relevant time period that allegedly evidenced a policy prohibiting the bringing of such claims, which provided a scant record to evaluate the allegation. Moreover, the conduct of Section and Division leadership in the matters identified by witnesses did not prove such an allegation.

For instance, several witnesses alleged that DAAG Fernandes's refusal to seek an out-of-court settlement in the small business matter evinced a policy against enforcing the statute in favor of White victims. We found no direct evidence establishing that her decision was based on improper racial considerations. Moreover, Fernandes's assertion that she declined to proceed with the case because of her belief that the Section did not have jurisdiction over such a claim was compelling, as the Department's regulations appear to carve out such claims from CRT's jurisdiction. We therefore did not conclude that Fernandes's actions in that matter were evidence of a policy prohibiting enforcement of Section 11(b) to protect White victims.

Some witnesses told us they believed King initially declined to bring a case against the small business proprietor out of concern that she would be accused of partisan bias for bringing a Section 11(b) case against a McCain supporter so soon after ordering the dismissal of three defendants in the NBPP case (involving an organization that had supported Obama). King admitted to

the OIG that the NBPP dismissals influenced her views of Section 11(b) and that bringing this case could be "politically explosive."  However, King provided several additional reasons for not pursuing the matter.  We believe that it was within the exercise of King's prosecutorial discretion to conclude, taking into account the small business operator's apparent contrition and conciliatory behavior after the election, that this matter did not merit a formal complaint in federal court even if the elements of a Section 11(b) violation could be established.[62]

Although we found no evidence of a policy prohibiting enforcement of Sections 2 or 11(b) to support White victims, the relevant evidence established or at a minimum suggested that some CRT leadership personnel and career Voting Section personnel disfavored non-traditional and reverse-discrimination cases.  Specifically, we believe the statements by DAAG Fernandes at the September 2009 lunch meeting that the Voting Section should focus on "traditional" civil rights enforcement and that the Section's core mission is to provide equal opportunity to racial and language minority voters conveyed to Section employees that non-traditional claims would be a lower priority for Division leadership.  We also found that the discussions about removing Section Chief Christopher Coates, which are addressed in Chapter Four, were based at least in part on his purported desire to bring reverse-discrimination cases, which supports an inference that such matters were disfavored by those seeking to remove him.

The Territory D Section 2 matter was cited to us as demonstrating that Voting Section and Civil Rights Division leadership disfavored reverse-discrimination cases.  The Territory D matter was not a "traditional" Section 2 matter because many of the alleged victims were White and the potential defendants were not.  Voting Section management identified to us several nondiscriminatory concerns about the viability of a VRA case against Territory D and reasons why the matter was a lower priority for the Section at that time. We took note of the fact that a court later dismissed a private action against Territory D, finding that the controversy was not ripe, which was one of the reasons cited to us by Section management for not pursuing the matter.  From our review of the evidence, including the memoranda prepared by Section staff, internal Section e-mails, and witness interviews, we did not find evidence to establish that the Division's decision not to pursue a lawsuit against Territory D was motivated by improper racial considerations.

---

[62]  King did not identify the issue that Fernandes later identified, namely that the Voting Section lacks authority under Department regulations to enforce Section 11(b) in cases where there is insufficient evidence of racial discrimination.

### C.   Conclusions Regarding Enforcement of Sections 2 and 11(b) Over Time

As detailed above, we found that the number of new Section 2 actions filed by the Voting Section has decreased dramatically in recent years. However, we do not believe that this change can be attributed to a hostility toward or reluctance to enforce Section 2.  We also found insufficient evidence to support allegations that inappropriate racial considerations have affected Section 2 or 11(b) enforcement decisions made by Division leaders since 2001.

We found no evidence in any e-mails, documents, or testimony of any improper racial or political considerations in the decisions of Division management in Section 2 or 11(b) matters.  We next looked at the most significant and controversial cases to determine whether they were handled in such a way as to support an argument that the reasons given were pretexts for such improper considerations.  In general, we found that Division leadership made enforcement decisions based on the legal merits as they assessed them, and that there was insufficient evidence to conclude that these assessments were pretexts for politically or racially discriminatory decision-making.  We found that during the prior administration, Division leadership supported the filing of two Section 2 or 11(b) cases on behalf of White voters against Black defendants, which was unprecedented, but that there was no evidence that these choices came at the expense of valid Section 2 or 11(b) cases on behalf of minority victims.  We found that Division and Department leadership since 2009 has expressed a desire to emphasize "traditional" cases to protect the voting rights of members of groups who have historically been the victims of discrimination, but that there was insufficient evidence to conclude that this preference has come at the expense of valid Section 2 or 11(b) cases on behalf of White voters or against minority defendants.

We were critical of the process followed in connection with a small number of the decisions we reviewed, including the way the decisions were made to move forward with filing the NBPP case without following usual practice days before a new administration was inaugurated, and to dismiss one of the defendants later at the last minute with no change in the underlying evidence.  However, we did not find that the reasons given for these decisions were a pretext for improper racial or partisan considerations.  In general we found that throughout the period of our review and through different administrations, Division leadership acted within its enforcement discretion with respect to the enforcement of Sections 2 and 11(b).

## IV.    Preclearance of Voting Changes under Section 5

In this section we examine the Voting Section's activities under Section 5 of the Voting Rights Act, relating to the preclearance of voting changes in certain jurisdictions.[63]

### A.    Data Regarding Submissions to the Voting Section Pursuant to VRA Section 5

Figure 3.6 displays the number of Section 5 submissions received by the Department on an annual basis from 1993 through 2012.  As reflected in Figure 3.6, the total number of submissions received by the Section generally ranges from 4,000 to 7,000 submissions in any given year.[64]  The Voting Section does not control the volume of Section 5 submissions received and addressed in any particular year.

**Figure 3.6**



Because the VRA requires preclearance of all voting changes, the overwhelming majority of submissions involve routine changes that are precleared with minimal scrutiny.  As a result, the Section has historically interposed an objection regarding only a small fraction of submissions; in fact, since Section 5 was enacted, the Department has objected to roughly one percent of submitted voting changes that have been submitted.  Likewise, in the period of time examined in this report (1993 through 2012), the number of

---

[63]  As noted above in n 7, on February 27, 2013, the Supreme Court heard arguments on the constitutionality of Section 5 in *Shelby County* v. *Holder*.

[64]  Submissions may involve multiple voting changes, and according to the Division, the Section reviews a total of between 14,000 and 20,000 voting changes in a typical year.

objections interposed by the Department typically amounts to less than one percent of submissions every year.

Thus, we were unable to draw any conclusions regarding changes in enforcement priorities under Section 5 from the available statistical data. Similarly, as with Sections 2 and 11(b), we found no evidence in any e-mails, documents, or testimony of any improper racial or political considerations in the decisions of Division management in Section 5 matters. We next looked at the most significant and controversial cases to determine if they were handled in such a way as to support an argument that the reasons given were pretexts for such improper considerations.

### B.  Examination of Selected Cases and Events Related to the Enforcement of Section 5

Although many election changes submitted for Section 5 preclearance relate to routine and uncontroversial matters, some high-profile matters, such as congressional redistricting plans, have obvious and significant implications for future elections and therefore become the subject of intense scrutiny and controversy. Some of these matters have become the subject of allegations that Division leaders or career staff made choices for the purpose of benefitting a particular political party, or that the reasons given for the Department's decisions were pretextual in nature. We selected those events that have been the subject of the most significant such allegations, and have grouped them according to the administration in which they occurred.

### 1.  2001 – 2008

Some high-profile preclearance decisions made by Division leadership during the prior administration were the subject of bitter disagreements between career staff and Division leadership, and became the focus of allegations that decisions were made on the basis of improper partisan considerations. In this part we examine several cases that became the subject of controversies of this nature.

**Mississippi Redistricting:**  Following the 2000 census, Mississippi's congressional delegation was reduced from five members to four, and the Mississippi state legislature was unable to enact a redistricting plan. In December 2001, a Mississippi State Chancery Court ordered the implementation of a plan proposed by the Democratic Party. *Branch* v. *Clark*, No. G-2001-1777 (Miss. Chancery Ct. Dec. 21, 2001). Asserting that the chancery court lacked jurisdiction, Republican intervenors appealed the chancery court decision to the Mississippi Supreme Court and, in the meantime, continued to pursue an action in the U.S. District Court asking it to enjoin the chancery court from issuing a plan and to issue its own plan. On January 15, 2002, the District Court issued an order indicating that, because

it was unclear whether the State would have a plan in place by the March 1 deadline for qualifying candidates for that year's midterm elections, it would begin preparing its own plan.  *Smith* v. *Clark*, 189 F. Supp. 2d 503, 504-07 (S.D. Miss. 2002).

The Mississippi Attorney General submitted the plan that had been approved by the State Chancery Court to the Department for preclearance under Section 5, requesting a decision by January 31, 2002, so that the State could implement the plan by the March 1 deadline.  Essentially, if the Department precleared the plan by March 1, then it would become the official plan of the state (though there was a possibility the federal court could still enjoin its implementation); if the Department objected to the chancery court plan or deferred decision by requesting more information, the federal court would implement its own plan.

The Mississippi submission raised several legal issues.  Among these was whether the Department, in evaluating the submission, should consider whether the chancery court had jurisdiction under state law to fashion a redistricting plan for the entire state and whether Article 1, § 4 of the United States Constitution precluded the chancery court from doing so.[65]  A related issue was whether the Department should leave the issue of the chancery court's jurisdiction for resolution to the courts, and instead limit itself to analyzing whether the plan had a discriminatory purpose or retrogressive effect.  A third issue was whether the Department's Section 5 regulations relating to "premature submissions" precluded the Department's review of the chancery court plan while it was being appealed to the Mississippi Supreme Court.[66]

Division leadership concluded that the chancery court plan was not ripe for Section 5 review and declined to act on it.  Instead, the Voting Section issued a "request for more information" letter to the Mississippi Attorney General on February 14, 2002.  The focus of the request for information was not whether the chancery court plan was retrogressive but rather whether the chancery court had jurisdiction to create and implement a statewide

---

[65]  Article 1, § 4 of the Constitution provides, in relevant part, that:  "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof . . . ."

[66]  28 C.F.R. § 51.22 – Premature submissions.  The Attorney General will not consider on the merits:  (a) Any proposal for a change affecting voting submitted prior to final enactment or administrative decision; or (b) Any proposed change which has a direct bearing on another change affecting voting which has not received Section 5 preclearance.  However, with respect to a change for which approval by referendum, a State or Federal court or a Federal agency is required, the Attorney General may make a determination concerning the change prior to such approval if the change is not subject to alteration in the final approving action and if all other action necessary for approval has been taken.

redistricting plan.  The request letter also raised concern about whether the Department should review the plan while it was on appeal to the Mississippi Supreme Court.  We found that Division leadership drafted the request letter and directed Section Chief Joseph Rich to sign it.

Under the Department's preclearance regulations, 28 C.F.R. § 51.37(b), the effect of the letter was to extend the deadline for decision until 60 days after the state responded to it.  Because of the litigation posture of the matter, the practical effect of the decision not to preclear the chancery court plan was that the plan was not approved by the March 1 deadline.[67]  On February 26, 2002, shortly after the Department sent its request, the plan favored by the Republican Party was ordered into effect by the United States District Court. Several months later, the United States Supreme Court affirmed the District Court's decision and found that the Department's request for additional information was "neither frivolous nor unwarranted."  *Branch* v. *Smith*, 538 U.S. 254, 263-64 (2003).  Ultimately, in 2003, the Mississippi Supreme Court held that the State Chancery Court did not have jurisdiction to formulate a state-wide redistricting plan, *Mauldin* v. *Branch*, 866 So.2d 429, 433 (Miss. 2003), and the plan adopted by the U.S. District Court remained in effect.

**Texas Redistricting:**  Republicans took control of both houses of the Texas state legislature in 2002 and in October 2003 the state legislature passed, and the Governor signed, a congressional redistricting plan.  The plan was submitted to the Department for preclearance under Section 5, and the Voting Section assigned a team of lawyers, a civil rights analyst, and a statistician to review the plan.  In December 2003, the Voting Section recommended that the Department object to the proposed redistricting plan.[68]

---

[67]  We were told that, as the March 1 deadline approached, there was a meeting involving a member or members of the Congressional Black Caucus and Division management. According to a Voting Section Deputy Chief, after the meeting, a Counselor to the AAG told the Deputy Chief, "we're with you on this, but it's out of our hands."  Similarly, we found a January 29, 2002, e-mail sent by Section Chief Rich to Division leadership recommending that review of the plan be expedited in order to avoid confusion that would result if the federal court ordered a different plan while the chancery court one was still pending.  The Counselor to the AAG responded, "[J]oe – we are with you in spirit on this, but the speed of the review is out of our hands on this one now."  We asked AAG Boyd and the Counselor to the AAG if politics played any role in the Mississippi redistricting decision in light of e-mail and the reported conversation.  Both Boyd and the Counselor to the AAG told the OIG that no one instructed them on how the Division should resolve the submission and that politics did not play any role in the decision.  The Counselor to the AAG also told us that he had no recollection of ever speaking to the Voting Section Deputy Chief about the Mississippi redistricting matter.

[68]  As noted in Section III of Chapter Four, in December 2005 a confidential internal memorandum prepared by the Voting Section's career staff transmitting its recommendation with regard to the Texas redistricting plan was leaked and became the basis for an article describing this incident as an incident of conflict between political employees in Division leadership and career employees in the Voting Section.

The Texas submission presented retrogression issues regarding whether certain redrawn districts in the proposed plan had previously been "safe" districts where minority voters could elect their candidates of choice.  For example, available data suggested that Black voters previously had determined the outcome of the Democratic primary in District 24 and that the Democratic candidate (who was not Black) thereafter won the general election, indicating that District 24 had been a "safe" Black district.  We found that, in evaluating whether to object to the proposed redistricting plan, the Division's leadership also considered data which showed that the Democratic candidate had run unopposed in every Democratic primary since 1986.  Further, recent primary results for other offices in this district, which paired a Black non-incumbent candidate against a White non-incumbent candidate, showed that the Black candidate was usually defeated.  Additional data indicated that White and Hispanic voters in this district rarely supported Black candidates in the primary, suggesting that the opportunities for success of Black candidates were limited.  Taking this evidence into account, Division leadership concluded that District 24 was not a "safe" Black district.  Because the elimination of a different "safe" Black district was balanced by the creation of a new "safe" Black district under the Texas plan, leadership concluded that the plan as a whole was not retrogressive as to Black voters.

After the redistricting plan was precleared by the Department on December 19, 2003, numerous plaintiffs challenged it in court, alleging various constitutional and statutory violations.  This challenge raised numerous issues not addressed in the Section 5 preclearance review, but there was some overlap.  Among other things, the plaintiffs alleged that Texas's redistricting plan caused vote dilution in some districts, including District 24, in violation of Section 2 of the VRA.  On appeal, a plurality of the Supreme Court concluded that there was no vote dilution in District 24, in essence because (as Division leadership had concluded in connection with the Section 5 submission) Black voters did not have effective control of that district.  However, the Court found dilution of Hispanic voting power in another district in violation of Section 2.  *See LULAC* v. *Perry*, 126 S. Ct. 2594 (2006).  Following the adjustments to the lines in that district, the Texas plan remained the legal districting plan until February 28, 2012, when a new plan was ordered into effect by the U.S. District Court for the Western District of Texas.[69]

**Georgia Voter ID:**  In 2005, the Georgia legislature passed a voter identification law that reduced the number of acceptable forms of identification from 17 to 6.  For most Georgians, the only acceptable form would be a driver's license.  Georgia's Attorney General submitted the law to the Department for preclearance pursuant to Section 5 and the Voting Section assembled a team to review the submission.  When the team requested additional help, Section

---

[69]  http://www.tlc.state.tx.us/redist/redist.html (accessed March 8, 2013).

Chief Tanner assigned to the team a new attorney who had been hired directly from a clerkship six weeks earlier, and who was known in the Section to be politically conservative.  Tanner told investigators that he chose the attorney because he "wanted to get to a decision expeditiously," and the review process provided a "training opportunity" for the attorney.  Tanner said that he believed that Division leadership wanted a "diversity of viewpoints" on the review team because they lacked confidence in the Section 5 review process.  Division leadership confirmed to us that they did not trust the original review team to act in a non-partisan and unbiased manner and believed that the review team was predisposed to recommending an objection to the Georgia Voter ID law.

The team proceeded under the assumption that there would be two recommendation memoranda prepared for Division leadership:  one written by the new attorney and one written by the original case team.  However, Tanner later agreed with Schlozman that there would be a single memorandum listing all of the team members as authors of the "factual review and analyses (sic)" and that Tanner would prepare a "separate covering memo with the Section recommendation."  Tanner told OPR that the decision to have a single preclearance recommendation was motivated both as a managerial matter and by a fear that it would be leaked to the press.[70]

Based on our review of Voting Section documents, we determined that the evidence relevant to the Georgia submission was complex and at times contradictory.  The available data from the State Department of Motor Vehicles about the race of approximately 60 percent of Georgia driver's license holders indicated that Black voters might actually be more likely to possess acceptable forms of photo identification than White voters, which suggested that the Georgia law would not disproportionately exclude Black voters.  However, census data showed that a higher percentage of Blacks than Whites lacked access to a motor vehicle, suggesting that Black voters might be less likely than White voters to possess photo identification.

---

[70]  This change to the Section 5 recommendation procedure was controversial within the Voting Section.  Critics expressed the belief that the purpose of the revised policy was to eliminate a paper trail of opposition to Division leadership's decisions and thereby to insulate it from public criticism.  Tanner stated that "in hindsight" the change in policy immediately before a controversial matter like the Georgia submission might have been a mistake.  In 2009, this policy was reversed.  According to AAG Perez, current policy requires that when Division leadership disagrees with Voting Section staff recommendations, it sets forth the reasons for such disagreements in writing.  Current policy also requires each staff member who works on a Section 5 submission to state whether they concur with the Voting Section's recommendation.  Perez stated that he believes this procedure is particularly important given the quasi-judicial nature of the Division's pre-clearance reviews under Section 5 and what he feels was the importance of hearing a full range of views in making such decisions.

On the morning of August 26, Tanner submitted a single staff recommendation memorandum to Schlozman recommending preclearance. Schlozman directed Tanner to send the preclearance letter that same day.[71]

The Georgia Voter ID law was invalidated by a federal district court on other grounds in *Common Cause/Ga.* v. *Billups*, 406 F. Supp. 2d 1326 (N.D. Ga. 2005).  The court found that the fee associated with obtaining the requisite photo ID was a poll tax and unduly impinged the fundamental right to vote.  In 2006 the Georgia legislature passed a replacement bill, eliminating the fee and providing resources to create voter ID cards.  The court subsequently dismissed the legal challenges to the Act and, when the amended Act was submitted to the Department for review, it was precleared.

## 2.    2009 – 2012

We reviewed two of the more controversial Section 5 preclearance decisions made by the Voting Section since 2009.[72]  We also reviewed the Division's current interpretation of one element of the Section 5 legal analysis, which some witnesses alleged reflects hostility to enforcing Section 5 on behalf of White voters.

**Kinston, NC:**  In November 2008, 63.8 percent of the voters in the city of Kinston, North Carolina  approved to a referendum to switch from partisan to non-partisan municipal elections.  The city submitted the proposed voting change to the Department for preclearance under VRA Section 5 in February 2009.  In August 2009, Division leadership issued a letter objecting to the proposed change.  In its letter to the city, the Department noted that Kinston was a majority-Black jurisdiction in terms of total population (62.6 percent), voting-age population (58.8 percent) and registered voters (64.6 percent).  However, the letter stated that the city's Black community should be viewed as the minority population for analytical purposes because Blacks comprised a minority of voters in several previous municipal elections.  The letter stated that there was racially polarized voting in Kinston and that its Black voters could elect their candidates-of-choice only with support from a small number of White Democratic voters who crossed over racial lines and voted on the basis of partisan cues.  The letter concluded that switching to nonpartisan elections would remove the "partisan cue" and mean that the White cross-over

---

[71] As discussed in Section III of Chapter Four, in November 2005 one of the internal memoranda relating to the Georgia submission was leaked and became the subject of a news report that the review team's recommendation had been overruled by higher-ranking officials in the Justice Department.

[72] The OIG's investigation covered the Voting Section's enforcement through 2011.  We note that, although the Section became involved in several high-profile Section 5 matters during the pendency of this investigation in 2012, those matters fell outside the scope of our investigation and were not addressed in our review.

Democrats would be less likely to vote for Black candidates.  It also noted that nonpartisan elections would eliminate the Democratic Party's campaign support and other assistance to Black candidates, including campaign funding.  The letter concluded that under these circumstances, the city had not carried its burden of showing that the change had neither a discriminatory purpose nor effect.  Some witnesses asserted that the objection was issued in order to protect the political power of Democrats rather than to protect racial minorities.

In April 2010, five Kinston residents filed a lawsuit in U.S. District Court against the Department to challenge the constitutionality of Section 5.  On February 10, 2012, roughly two weeks before the Kinston case would be heard by the court, the Division informed the city that it was withdrawing its objection to Kinston's voting change because the Black electorate in Kinston had become large enough to successfully elect its preferred candidates in either partisan or nonpartisan municipal elections in Kinston.  The Division stated that newly available information indicated that the Black portion of Kinston's voting-age population and registered voters had increased to 65.0 and 65.4 percent, respectively; that Blacks constituted a majority of voters in the November 2011 elections; and that Black candidates-of-choice won a majority of seats on the Kinston City Council in the November 2011 elections.  In its letter informing the city that it was withdrawing its objection, the Department stated that the basis for the withdrawal was the "shift in electoral pattern" since the Division's August 2009 objection.

**Noxubee County:**  As noted earlier, the Department sued the Noxubee County Democratic Executive Committee (NDEC) and its Chairman, Ike Brown, in 2007 for violations of VRA Sections 2 and 11(b) on behalf of White voters, a case that the Section won at the trial court and on appeal at the Fifth Circuit.  In ruling for the Department, the district court found that Brown and the NDEC had violated VRA Section 2 (but not Section 11(b)) by administering and manipulating the political process in ways "specifically intended and designed to impair and impede participation of white voters and to dilute their votes."  In its ruling, the court found that Brown had previously attempted to impose a party-loyalty requirement, which would exclude voters who were believed to be Republicans from Democratic primaries, "in part because of party loyalty concerns, but also as an attempt to discourage white voters from voting."

The court later issued an order that included the appointment of a Referee-Administrator to supervise the Noxubee Democratic primary elections through November 20, 2011.  The order gave the Referee-Administrator authority over "all electoral duties" of the NDEC and expressly prohibited the enforcement of party-loyalty requirements on racially discriminatory bases.

In March 2010, roughly 20 months before the expiration of the court's order, Brown and the rest of the NDEC unanimously adopted a resolution to

exclude from Democratic primary elections in Noxubee any voter who had held office as a Republican, served on the Republican Executive Committee, or voted in any Republican primary election in the previous 18 months.  The NDEC submitted its resolution to the Department for Section 5 preclearance in May 2010.

On July 12, 2010, the Department issued a no-determination letter in response to the Noxubee submission, stating that it would be inappropriate for the Department to address the submission because the NDEC failed to establish that it was authorized to submit such a change under the court's 2007 order.  The no-determination letter did not interpose an objection to the proposed change, but nevertheless had the effect of preventing its implementation, unless the NDEC obtained preclearance from the Federal District Court in the District of Columbia.  The next day, the Department moved the district court in Mississippi that presided over the 2007 trial for additional relief under its previous order – namely, that the court enjoin the NDEC and its agents from implementing the party-loyalty resolution, order that all requests for preclearance for voting changes while its order was in effect be submitted by the court-appointed Referee-Administrator, and extend its order for an additional two years, until November 20, 2013.

In March 2011, the district court granted the Department's motion to enjoin the NDEC from implementing the party-loyalty resolution and to direct that, as long as the court's order was in effect, only the Referee-Administrator had authority to submit requests for Section 5 preclearance of voting changes for Democratic Party primary elections. The court denied, for reasons not relevant to our analysis, the Department's request to extend its order for an additional two years.

Critics of the current administration have pointed to CRT's handling of the 2010 NDEC submission as evidence of the administration's hostility to "race-neutral" enforcement of voting laws.  At the same time, CRT leadership has stated that its response to the Noxubee submission constitutes evidence of its commitment to evenhanded enforcement of the civil rights laws.

**Section 5 Policy Regarding Coverage of White Voters:**  The Civil Rights Division's current leadership has stated that it interprets the "retrogressive effect" test under Section 5 not to be applicable to White voters who are in the numerical minority in a particular jurisdiction.  This position has triggered allegations that the Division has refused to enforce Section 5 in a "race-neutral" manner.

As noted in Chapter 2 above, upon receiving a proposed voting change submitted by a jurisdiction covered under Section 5, the Voting Section reviews the proposed change to determine whether the change is free of discriminatory purpose and effect.  In evaluating whether a proposed voting change has a

discriminatory effect, the Voting Section examines whether a proposed voting change would leave members of a "racial or language minority group" in a worse position than they had been before the change with respect to "their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U.S. 130, 141 (1976); *see also* 28 C.F.R. Part 51.54, Procedures for the Administration of Section 5 of the Voting Rights Act of 1965, as amended Subpart F, Determinations by the Attorney General, Discriminatory Effect. This discriminatory effect is commonly called "retrogression" or a "retrogressive effect." *See id.*

In both public filings and statements to the OIG, the Division has stated that it interprets the non-retrogression principle of Section 5 to be "race-conscious," in that it does not cover White citizens when they are in the numerical minority in a covered jurisdiction. *See e.g., LaRoque* v. *Holder,* Case 1:10-cv-00561-JDB, Defendant's Motion For Summary Judgment, Document 55 Filed August 11, 2011, at pg. 41, n.11 (stating: "the non-retrogression principle of Section 5 has always been race-conscious in that it denies preclearance only to voting changes that 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise,'" quoting *Beer*, 425 U.S. at 141; *see also LaRoque* v. *Holder*, USCA Case #11-5349, Brief for the Attorney General as Appellee, Document #1358195 Filed February 13, 2012).[73]  In a February 2011 letter to the OIG and in his OIG interview, CRT AAG Perez stated that interpreting Section 5's retrogressive-effect standard to not cover White citizens was consistent with the Division's longstanding practice, as well as case law interpreting the provision and the intent behind its enactment. Perez also told the OIG that he believed interpreting the retrogressive-effect prong of the analysis to cover White citizens would be inconsistent with the history of and intent behind Section 5, which he stated was enacted to remedy the specific problem of discrimination against racial minorities.[74]  Perez's letter stated that the precise question of whether the retrogressive-effect prong of Section 5 protects White citizens has arisen "exceedingly rarely," but asserted that a series of Supreme Court opinions "has consistently recognized that Section 5 was enacted to deal with a particular historical problem of racial discrimination against minorities."[75]

---

[73]  In his letter and OIG interview, Perez also stated that the Division interpreted Section 5 to protect every racial group, including White citizens, from voting changes animated by intentional racial discrimination.

[74]  In his February 2011 letter, Perez noted that the Division has always understood the term "minority" to mean not numerical minority, but rather "an identifiable and specially disadvantaged group."

[75]  Perez's letter stated that no court had squarely addressed the issue and that the Division determined that the issue had arisen in only a handful of submissions over the 45 years since the enactment of Section 5, noting that the Section conducted some analysis of the

Cont'd

In addition, according to Perez, applying Section 5's retrogressive-effect protections to White citizens would create "dramatic complications." In particular, Perez stated in his letter and OIG interview that he believed interpreting Section 5's retrogressive-effect prong to cover White citizens would be infeasible as a practical matter, noting that "many voting changes…will almost always have some racial effect in some direction," and if the retrogressive-effect standard protects everyone, then virtually no proposed voting changes would ever be approved.[76]

### C.    OIG Analysis of Section 5 Preclearance Review Activities over Time

As noted above, the Voting Section processes thousands of Section 5 preclearance submissions every year.  The large majority are routine, and over 99 percent of the voting changes submitted to the Department by covered jurisdictions are precleared.  Nevertheless, since 2001 there have been a small number of very high profile Section 5 matters that have become the subject of heated controversy.

Several witnesses alleged to the OIG that Division leadership's decisions in the Section 5 cases during the period from 2001 to 2008 were driven by improper political considerations.  Specifically, some witnesses told us that they believed that Division leadership's decisions in the Mississippi, Texas, and Georgia Voter ID matters described above were made in order to benefit Republican candidates and interests.

We found no evidence in the form of contemporaneous documents or witness testimony to support a conclusion that improper partisan considerations drove these decisions by Division leadership.  Moreover, our examination did not reveal evidence indicating that the reasoning given for the decisions in these cases constituted a pretext for a hidden partisan agenda.  In that regard, we found it significant that in the Mississippi and Texas matters the bases for Division leadership's decisions were subsequently adopted in large part by several courts, including the United States Supreme Court.  In the Georgia Voter ID matter, the critical question for Division leadership was whether minority voters possessed photo IDs in lower percentages than White voters sufficient to conclude that the requirements of the law would have a retrogressive effect.  Division leadership relied on driver license data for

---

impact of a proposed voting change on White citizens in connection with two submissions, occurring in 1981 and 1989.

[76]  In his OIG interview, AAG Perez stated in substance that the Division's interpretation was the same as that of the prior administration.  However, at least three AAGs from the previous administration told the OIG that Division leadership at that time did not have a policy to interpret Section 5's retrogressive-effect prong such that it would not cover White citizens.

approximately 60 percent of Georgia's driver's license holders suggesting that Black voters were more likely to possess acceptable identification than White voters. Although the conclusions were based on a somewhat incomplete data set, we cannot say that this was a pretext for improper discriminatory or partisan motivations.

Over the course of our investigation, other witnesses pointed to the Division's handling of certain Section 5 matters between 2009 and 2012 as evidence of improper considerations in Division leadership's decision-making. In particular, witnesses alleged that Division leadership refused to enforce or, at a minimum, was hostile to enforcing Section 5 on behalf of White citizens. Our review did not identify evidence to support such a finding. We note at the outset of our discussion that we did not identify direct evidence in e-mail or other documents to support such a conclusion, and that we found the indirect evidence identified by witnesses involving a small handful of Section 5 matters was insufficient to support such a broad conclusion.

One Section 5 matter to which critics of current Division leadership cited was the Noxubee Section 5 submission in 2010, in which the NDEC attempted to impose a party-loyalty requirement in Noxubee's Democratic Party primary elections. We concluded that the Section's response to that submission – namely, issuing a no-determination letter and seeking to enjoin the NDEC from implementing the proposed change and to extend the duration of the trial court's order – did not support a finding that Division leadership was hostile to the enforcement of Section 5 on behalf of Whites. Critics of current Division leadership argue that it should have taken a stronger position, such as objecting outright to the NDEC's proposed change. However, the Section's response of issuing a no-determination letter had the identical practical effect, *i.e.*, barring the NDEC from implementing the proposed change. We also note that, even though the Section effectively blocked the NDEC from implementing the change, it took the extra step of moving the district court in the 2007 Noxubee case to enjoin the NDEC from implementing the change and to extend the duration of the court's remedial order, which would have kept the Referee-Administrator in control of Noxubee's Democratic Party electoral matters for an additional two years. Those actions undercut the allegation that the handling of this matter evidenced hostility by Division leadership to enforcing Section 5 on behalf of White citizens.

With regard to the Division's handling of the Kinston submission, some witnesses and critics of the current administration asserted that the initial objection to the submission was designed to benefit Democratic politicians in the jurisdiction, and that the objection was withdrawn only when a judicial challenge posed the possibility of an adverse decision on the constitutionality of Section 5. We found no direct evidence indicating that the decision in the Kinston matter was based on improper partisan considerations. We are aware of no legal precedent that precluded the Division's analysis of the Kinston

submission and cannot conclude that it was a pretext for an improper political motivation. The possibility that fear of an adverse court ruling on the constitutionality of Section 5 may have been a factor in the decision is not relevant to the question before us, which is whether improper partisan considerations drove the decision. We found an insufficient basis to conclude that they did.

Finally, we did not conclude that current Division leadership's policy that the Section 5 retrogressive-effect prong does not cover White voters constituted evidence that Division leadership refused to enforce Section 5 to protect Whites. We found that their policy reflected their genuine view of how the statute must be interpreted under the law and their belief that Section 5's retrogressive-effect standard simply could not be administered in a way that would protect White voters. In making this finding, we emphasize that evaluating the merits of this policy, including Division leadership's legal interpretation of Section 5 and its assertion as to the feasibility of administering the retrogressive-effect analysis to cover White populations, is beyond the scope of this review. Nevertheless, we believe that Division leadership's policy reflects an interpretation of the law that is well within the discretion of senior management to hold.

In light of Perez's views on nonapplicability of the Section 5 retrogressive-effect prong to White voters, we asked him about his public statements about the Division's "race-neutral" enforcement of the voting rights laws. For example, during a hearing before the U.S. Commission on Civil Rights on May 14, 2010, Perez was asked: "Do you agree that the voting rights laws should always be enforced in a race neutral manner?" Perez responded: "Yes, sir." Perez told us that he "should have been more precise" in his answer, and he explained that his general public remarks were intended to convey that the Division enforced the laws in an "even handed" manner, and should not be understood to apply to specific provisions, like Section 5, Section 203, and Section 4(e), that he believed are inherently incapable of being applied in a "race-neutral" fashion.

## V.    Enforcement of the National Voter Registration Act (NVRA)

In this section we review the Voting Section's history of enforcing the National Voter Registration Act, the so-called motor-voter law. Enacted in 1993, the NVRA has two primary purposes: to increase the number of eligible citizens who register to vote in federal elections and to protect the integrity of the electoral process. 42 U.S.C. § 1973gg(b). Critics have alleged that CRT leadership during the prior administration favored enforcement of the list-maintenance (electoral integrity) provisions because those provisions purportedly are more strongly supported by Republicans and remove more potential Democratic voters from the rolls. Conversely, critics of the current

CRT leadership allege that it has neglected the electoral integrity provisions of the NVRA in favor of enforcing the voter access provisions, because these provisions purportedly are supported by Democratic constituencies and lead to the registration of more voters who are likely to support Democrats.  Without opining on the underlying political assumptions, we examine both of these allegations in this section.

### A.    Data Regarding Enforcement Trends in NVRA Cases

Figure 3.7 below displays the number of NVRA enforcement actions initiated by the Voting Section on an annual basis since January 1995, when the statute became effective in most states.  Figure 3.7 is broken down by actions that enforced the statute's list-maintenance provision (Section 8(a)(4)), actions that enforced the voter registration provisions (Sections 5, 6, 7, and the improper purging paragraphs of Section 8), and actions that brought both types of claims.

**Figure 3.7 Number of NVRA Matters, by Type and Year**



The most noteworthy trend in the Department's enforcement of the NVRA relates to the statute's voter list-maintenance provision, Section 8(a)(4).  In the 17 years since the statute became effective, the Department has asserted list-maintenance claims on 7 occasions, 6 of which occurred in a 3-year span between 2004 and 2007.[77]  According to Hans von Spakovsky, CRT leadership

---

[77]  The only list-maintenance claim pursued outside of that 3-year period occurred in 1995, in response to the state of Virginia's constitutional challenge to the NVRA.  Shortly after the NVRA became effective in January 1995, a flurry of litigation arose between the Voting Section and seven states regarding the constitutionality of the statute.  In connection with each of these cases, the Department brought affirmative claims alleging that the states were violating the statute.  The Department's claims in these cases alleged violations of numerous NVRA requirements, particularly Sections 5, 6, 7, and the improper-purging or failure-to-

Cont'd

initiated an effort to enforce Section 8's list-maintenance provision in late 2004.  Von Spakovsky told the OIG that he recommended to Division leadership exploring those cases because he believed that the Department had never conducted a systematic review of states' list-maintenance compliance in the 10 years since the NVRA became effective.[78]  This effort ultimately resulted in the filing of a complaint alleging list-maintenance claims in 2005 and 2006.  According to witnesses involved in the four other matters involving list-maintenance claims brought between 2004 and 2007, those claims arose when the Section obtained evidence suggesting a failure to comply with the list-maintenance provision during the course of ongoing investigations into other voting-related matters.

### B.     Enforcement of the NVRA during 2001 – 2008

We received allegations that the only NVRA cases that Division leadership wanted to pursue during this period were Section 8(a)(4) list-maintenance claims, at the expense of cases to protect or increase voter registration under other provisions of the NVRA.  Critics further alleged that the Division's leadership was particularly focused on bringing such list-purging cases in political swing states and large Democratic jurisdictions.  The Division's leadership denied any such focus and identified several cases approved by Division leadership to controvert the suggestion that NVRA enforcement decisions were driven by a partisan agenda.  We examined the entire range of NVRA cases pursued during January 2001 to January 2009 in order to address this issue.

From January 2001 through January 2009, the Department was involved in 12 NVRA enforcement matters, summarized in Table 3.2.

---

register provisions of Section 8.  One of the Department's complaints, filed in the action defending Virginia's challenge, asserted a claim concerning voter list-maintenance procedures, stating that the defendant jurisdiction would not have procedures in place when the NVRA became effective for the removal of names of ineligible registrants from registration rolls.

[78] Although the Section included a list-maintenance claim in one 1995 case, the OIG did not find any evidence of any effort to enforce NVRA Section 8(a)(4) on a systemic basis prior to 2004.

**Table 3.2 – NVRA Matters January 2001- January 2009**

| Year | Jurisdiction | Type of Matter | List Maint. Claims | Ballot-Access Claims | Brief Description of Allegations |
|------|-------------|----------------|-------------------|---------------------|-------------------------------|
| 2002 | City of St. Louis, Missouri | Complaint filed | | X | Defendant's procedures effectively removed eligible voters from registration rolls, in violation of NVRA Section 8's improper-purging provisions. |
| 2002 | State of Tennessee | Complaint filed | | X | The state failed to ensure that driver's license applications would serve as voter registration applications and to implement voter registration opportunities in state public assistance offices, in violation of NVRA Sections 5 and 7. |
| 2004 | State of New York | Complaint filed | | X | The state's public university system violated NVRA Section 7 by failing to offer voter registration opportunities at offices serving disabled students. |
| 2004 | Pulaski County, Arkansas | Complaint filed | X | X | Defendants failed to implement requisite voter registration procedures, failed to conduct an adequate Section 8(a)(4) list-maintenance program, and failed to ensure that any list-maintenance activities were conducted in a uniform and nondiscriminatory manner. |
| 2005 | State of Missouri | Complaint filed | X | X | A number of local jurisdictions allegedly failed to conduct effective list-maintenance programs, and some jurisdictions in the state employed list-maintenance procedures that did not comply with the NVRA's voter removal requirements concerning notice and timing. |
| 2006 | State of Indiana | Complaint filed | X | | The state allegedly violated NVRA Section 8(a)(4)due to inadequate list-maintenance procedures. |
| 2006 | State of Maine | Complaint filed | X | | Complaint, which arose from alleged violations of the Help America Vote Act (HAVA), included claim that the state failed to conduct adequate list-maintenance activities required under Section 8(a)(4). |

96

| Year | Jurisdiction | Type of Matter | List Maint. Claims | Ballot-Access Claims | Brief Description of Allegations |
|---|---|---|---|---|---|
| 2006 | State of New Jersey | Complaint filed | X | | Complaint, which arose from a HAVA investigation, included a claim that the state had failed to conduct an adequate Section 8(a)(4) list-maintenance program. |
| 2007 | City of Philadelphia, PA | Complaint filed | X | | Complaint brought claims under several voting-related statutes, including a claim under NVRA Section 8 for failing to remove deceased voters from registration rolls. |
| 2007 | Cibola County, NM | Complaint filed | | X | Complaint included claims under HAVA and the NVRA, alleging violations of NVRA's voter-registration and improper-removal provisions by failing to ensure proper handling of voter registration applications, including hundreds of applications from residents of the Laguna Pueblo, and improperly removing voters' names from the voter registration list. |
| 2008 | State of Arizona | Out-of-court settlement | | X | The state was allegedly not in compliance with NVRA Section 7 by failing to provide the required voter registration services at certain state aid offices. |
| 2008 | State of Illinois | Out-of-court settlement | | X | The state was allegedly violating NVRA Section 7 by failing to provide the required voter registration services at certain state aid offices. |

As reflected in Table 3.2, the Voting Section began filing list-maintenance cases in 2004.  As noted above, von Spakovsky confirmed that Division leadership initiated an effort in 2004 to enforce Section 8's list-maintenance provision on a systemic basis.  Von Spakovsky told the OIG that he recommended exploring those cases because he believed the Department had never conducted a systematic review of states' list-maintenance compliance in the 10 years since the NVRA's enactment.

Division leadership directed the Voting Section to conduct the research effort, to review the census data and voter registration data for all 50 states to determine which states had more people registered to vote than the voting-age population, as reflected in the census data.  Based on the results of this research, the Section sent letters to 12 states, stating that the Section's review of relevant data indicated that the state may not be complying with Section 8's

list-maintenance provision and requesting information on their efforts to remove ineligible voters from their registration lists.

Von Spakovsky told the OIG that some of the targeted states responded to the Department's letter, explained why there was a discrepancy in the data, and established that they were complying with the NVRA's list-maintenance requirements.  He also stated that a number of states failed to show that they were in compliance with Section 8(a)(4) and that the Section proceeded toward enforcement actions against those non-compliant states.

Division leadership approved the filing of two complaints as a result of this enforcement initiative.  In November 2005, the Section filed a lawsuit against the state of Missouri alleging both improper purging and failure-to-purge violations.  In June 2006, the Section filed a complaint against Indiana alleging that the state failed to conduct list purging as required by Section 8(a)(4).  The Indiana case was resolved by a settlement agreement, but the Missouri case continued until early 2009, when the Division voluntarily dismissed the case.[79]

In 2006 and 2007, Division leadership approved three additional complaints containing Section 8(a)(4) list-maintenance claims, against the States of Maine and New Jersey and the City of Philadelphia.  According to the Voting Section attorney supervising those efforts, these complaints did not arise out of the enforcement initiative described above.  Instead, the complaints were brought as a result of investigations under the Help America Vote Act (HAVA) that uncovered evidence of both HAVA and NVRA violations.  The Section ultimately settled the lawsuits with Maine, New Jersey, and Philadelphia.  In each settlement agreement, the jurisdiction agreed to implement specific steps to satisfy its list-maintenance obligations.

In August 2007, Voting Section Chief John Tanner initiated a program to enforce Section 7 of the NVRA, requiring states to provide voter registration opportunities in public assistance and disability offices.  Section attorneys reviewed federal Election Assistance Commission (EAC) data to identify states that were not meeting Section 7's requirements and discovered 18 states that reported registering 0 voters in offices providing public assistance over the previous 2-year period.  Following further investigation, the Section entered into settlement agreements with Arizona and Illinois to resolve Section 7 violations.

In 2007 and 2008, Voting Section teams reviewed EAC data and census information to identify states that might not be in compliance with the NVRA's

---

[79]  The circumstances surrounding the dismissal of the Missouri NVRA matter are discussed in Chapter Four of this report.

Section 8(a)(4) list-maintenance requirements.  The teams identified states in which a significant percentage of the counties or electoral jurisdictions had more registered voters than voting-age population.  The teams recommended to Division leadership that the Voting Section initiate investigations into the states that failed to meet the relevant criterion.  The states that were the subject of these recommendations included some states that historically have consistently favored one party in presidential elections as well as political "swing states."  The 2007 recommendation was approved and the Section later issued requests for information to the relevant states.  Ultimately, however, no further enforcement action was taken arising out of this effort.  The investigations that were proposed in late November 2008 were never approved by either the outgoing or the incoming administrations.

### C.   Enforcement of the NVRA during 2009 – 2012

#### 1.   Division Leadership Declines To Act on Voting Section Proposal for Section 8 Investigation

In February 2009, shortly after the new administration took office, the Voting Section submitted a memorandum to Division leadership requesting approval to initiate investigations into the list-maintenance procedures of a State ("State E").  According to the State E memorandum, voter-registration data indicated that roughly 22 percent of State E's counties had more registered voters than either the voting-age population or the citizen voting-age population.  The memorandum stated that the Section had been alerted to State E's potential list-maintenance failures in connection with an unrelated Section 5 investigation.  We were told that the Section never received a response from Division leadership to the proposal memorandum.[80]

#### 2.   Drafting of NVRA Guidance

In the spring of 2009, a few months after the inauguration of the new administration, the Department commenced an effort to draft public guidance concerning the requirements of NVRA Section 7.  Samuel Hirsch, who joined the Department in March 2009 as a Deputy Associate Attorney General and led the NVRA guidance effort, described the project as rewriting the NVRA in plain terms and posting it on the CRT website to assist those running state governmental offices in complying with the NVRA's requirements.  Hirsch told the OIG the original scope of the NVRA guidance project was limited to Section 7 because the administration believed that Section 7 had been somewhat ignored by state government officials.  According to Hirsch, there was a sense

---

[80]  The Voting Section also prepared a memorandum proposing a similar investigation with respect to another state's list-maintenance procedures in 2009.  However, we found no evidence that this memorandum was ever forwarded to Division leadership for approval.

in the administration that NVRA Section 8 and other provisions were working fairly well, but that Section 7 "was slipping through the cracks."

DAAG Julie Fernandes and AAG Thomas Perez became involved in the NVRA guidance project after they joined the Department in July and October 2009, respectively. According to Fernandes, she expressed concern to Hirsch that the project was limited to Section 7 and proposed broadening the guidance to include other NVRA provisions, such as Sections 5 and 8. Perez also told the OIG that in early 2010 he instructed that the guidance include a discussion of all NVRA provisions, including the list-maintenance provisions. Hirsch told the OIG that he did not oppose expanding the guidance to include Section 8, but stated that he may have been opposed to holding up the release of the Section 7 guidance while preparing the Section 8 segment. The Division ultimately posted guidance concerning NVRA Sections 5, 6, 7, and 8 on its website in June 2010.

### 3. Comments by DAAG Julie Fernandes Regarding NVRA Enforcement at a November 2009 Section Meeting

DAAG Julie Fernandes told the OIG that she urged Voting Section Chief Christopher Coates to hold section-wide meetings shortly after she joined the Department in July 2009. As a result, the Voting Section held several brown-bag lunches. In addition to the September meeting at which Section 2 enforcement was discussed as outlined above, another session devoted to NVRA matters was held on November 10, 2009.

At some point during the November meeting, the discussion turned to the enforcement of the NVRA's voter list-maintenance provision in Section 8. Witnesses who recalled Fernandes's statements uniformly remembered that she said something to the effect that she was more interested in pursuing cases under NVRA Section 7 than Section 8 because Section 8 does not expand voter access. Witnesses' recollections of the context of Fernandes's statements, her precise wording, and the meaning of her comments, however, varied widely.

Thirteen witnesses told the OIG that Fernandes stated that she "did not care about" or "was not interested" in pursuing Section 8 cases, or similar formulations. For instance, Chris Herren, who was later promoted by current Division leadership to Section Chief, told the OIG that Fernandes made a controversial and "very provocative" statement at this brown bag lunch. In particular, Herren stated that Fernandes stated something to the effect of "[Section 8] does nothing to help voters. We have no interest in that." Herren told the OIG that he winced when he heard Fernandes's response because he believed it would raise a controversy. Two other Section attorneys took

handwritten notes at the meeting, both of which quoted Fernandes saying that she did not "care" about Section 8.[81]

Ten attorneys who attended the meeting told the OIG that they interpreted Fernandes's comments to be a clear directive that Division leadership would not approve Section 8 list-maintenance cases in the future. One Section attorney told the OIG that he understood Fernandes's statements to mean that proposing a Section 8 case would be futile and that he believed proposing Section 8 could be detrimental for the attorneys.

Seven Voting Section attorneys told the OIG, however, that they did not believe Fernandes said that the Division would not enforce Section 8 of the NVRA. Among these were three Deputy Chiefs who told the OIG that they believed Fernandes meant that Section 7 cases would be prioritized over Section 8 matters, but that they did not construe her statement to mean that Section 8 cases would not be approved. Those attorneys who were generally identified as being more conservative tended to recall that Fernandes took the more extreme position, while those generally identified as being more liberal tended to recall her statements as being more limited.

Fernandes told the OIG that she did not recall exactly what she said at the November brown bag lunch regarding enforcement of Section 8 of the NVRA. She said that she and the Section staff discussed the NVRA and what their approach, goals, and strategy should be. She said that she talked about how Division leadership is interested in creating equal opportunity for minority voters. Fernandes further told the OIG that she talked about wanting the Section to focus on voter access, which would involve NVRA Sections 5, 7, and 8, all of which are in the vein of ensuring that jurisdictions have a fair and accessible process for all voters. She stated that she recalled being asked about Section 8 and that her response included something to the effect that Division leadership's focus is on the provisions of the NVRA pertaining to voter access.

With respect to the comments attributed to her that she did not care about enforcing Section 8, Fernandes told the OIG that she did not think she said the words "don't care" about enforcing Section 8 because that is not her position. Fernandes denied saying that she or Division leadership had no interest in pursuing Section 8 cases. Fernandes said that she believed her comment about not caring was in the context of how to determine what jurisdictions they should target for enforcement, given that she believed there is widespread noncompliance with the NVRA.

---

[81] One set of notes stated: "Julie – doesn't care about Sec. 8," and the second indicated: "Sec 8 – list is too big – not an access issue – 'don't care'."

Fernandes noted that the list-maintenance provision of Section 8 requires jurisdictions to employ reasonable, non-discriminatory measures to ensure that people who are eligible can vote and those who are ineligible cannot.  Therefore, Fernandes stated, she does not care whether a jurisdiction's voter list is big, but rather whether it has a list-maintenance program that does not work.  She explained that the fact that a jurisdiction's voter list is too big means that the Section may want to inquire about the jurisdiction's list-maintenance program, but that alone would not justify bringing a lawsuit.

Roughly one year later, in September 2010, allegations concerning Fernandes's comments at the brown bag lunch regarding NVRA enforcement surfaced in news media.  Fernandes and other Division leadership personnel assisted other Department officials in preparing talking points to address the allegations and Fernandes stated in one of the relevant e-mails:  "If we are o.k. with having priorities, we should say that we have a priority on the enforcement of the NVRA, with a focus on the parts of the statute that require states to provide voter registration opportunities in a variety of settings."

### 4.    Approval of List-Maintenance Investigations

In September 2009, the Section submitted a memorandum to DAAG Fernandes requesting authority to initiate formal investigations into the list-maintenance procedures of eight states.  The recommendation was based on the Section's review of an EAC report that contained voting-related data from each of the 50 states covering the period from November 2006 to November 2008.  A Deputy Section Chief supervised a team of Section attorneys that reviewed the EAC report for anomalous entries, particularly states that reported that throughout the 2-year period they did not remove any voters from their rolls due to death or that they had not issued any voter-removal notices related to citizens who were believed to have moved out of the state.  The team identified eight states that met one of those criteria, four of which reported removing zero ineligible voters from their rolls over the 2-year period for any reason, including death, change of address, disqualifying criminal conviction, or mental incapacity.

The team presented the relevant data in its memorandum to DAAG Fernandes and stated that the information suggested that the eight states in question were not fulfilling their list-maintenance obligations under Section 8. As a result, the team recommended initiating formal investigations of the states in question and directing inquiries to relevant state officials.

Fernandes told the OIG that, after receiving the proposal for the Section 8 investigations, she told Section Chief Coates that he needed to "hold off" because she was not ready to decide whether this was the proper approach for NVRA enforcement.  Fernandes told the OIG that she believed the Section's

NVRA work when she became DAAG in July 2009 was disorganized and that its process for evaluating NVRA matters was "random, unstrategic, [and] not very well thought-out." She said that Division leadership and Voting Section management were therefore engaged in a process of identifying what their NVRA enforcement strategy should be by reviewing where the Section had focused its enforcement efforts in the past, determining which areas had been neglected, and developing an analytical model to bring NVRA cases.

According to Fernandes, she and Division leadership believed that the NVRA enforcement efforts from January 2001 through January 2009 had focused on Section 8's list-maintenance cases, largely to the exclusion of the voter-registration provisions in Section 7, which she believed had been under-enforced and neglected. While we found no evidence that she examined any data to support this belief, it was consistent with what we found to be the prevailing belief about the prior administration's efforts in this area. Fernandes stated further that she believed the way to "rectify this imbalance" was to determine what Section 7 efforts were in process, whether they were being performed correctly, and whether the Section should expand its Section 7 enforcement further. Fernandes stated that her supervisors were pressuring her to move forward on Section 7 enforcement and that she received a clear message that they viewed enforcing Section 7 as a higher priority than Section 8.[82] She told the OIG that she believed she had to "scratch the Section 7 itch" before turning to Section 8 matters and that her supervisors would have criticized her if she had approved Section 8 efforts first. She also noted that there was significant criticism of the Department from civil rights groups that their Section 7 enforcement efforts had been inadequate, saying they had gotten – and continued to get – "beat up all the time by [their] lefty friends on not doing enough on Section 7."

On November 10, 2009, two months after the team submitted the recommendation memorandum, the Section held the brown bag lunch concerning the NVRA, which is described above. Deputy Section Chief Robert

_____

[82] The evidence established that CRT leadership repeatedly emphasized their desire to pursue NVRA Section 7 matters to Fernandes. Perez told the OIG that he made clear that enforcing Section 7 of the NVRA was a priority and that he exerted pressure on Fernandes to "pick up the pace" of the Section's NVRA enforcement efforts. In an e-mail following a June 2010 meeting with voting rights advocacy groups, Perez told Fernandes, Section Chief Chris Herren, and others: "I must candidly admit that I was also really pissed off during much of that meeting because I wholeheartedly agree with the sentiments offered by many in the group. I agree, for instance, that simply agreeing that section 7 enforcement is important, and sharing their desire to move forward, no longer cuts it. We said that last time and still have nothing to show and nowhere near having anything to show." In that e-mail, Perez directed Fernandes and Herren to present to him a J-Memo and draft complaint for a Section 7 case by Labor Day of that year. Similarly, in a July 2010 e-mail, former Division Principal DAAG Samuel Bagenstos wrote to Perez indicating that he had had "a lot of conversations with Julie" in recent weeks about various enforcement issues, one of which was NVRA enforcement.

Popper and the trial attorneys who proposed the list-maintenance investigations told the OIG that, based on Fernandes's comments at that brown bag lunch, they believed Division leadership would not approve the proposed investigations.  Nevertheless, Popper told the OIG that he asked Section Chief Herren about the status of the proposal multiple times over the ensuing year, without receiving any response.

AAG Thomas Perez and Section Chief Herren told the OIG that they discussed the proposed list-maintenance investigations in the summer or fall of 2010, months after the proposal to Fernandes in September 2009.  Perez told the OIG that the first time he discussed the list-maintenance proposals was in mid-2010.  Herren stated that he recalled mentioning the list-maintenance proposal in a fall 2010 meeting with Perez, and Perez made it clear to him that he wanted to pursue those investigations.  Herren told the OIG that he recalled that Perez said in the meeting that he wanted to live up to his public statements that the Voting Section under the current Division leadership would enforce all of the statutes under its jurisdiction and they discussed how to accomplish that goal.  According to Herren and Perez, Herren cautioned Perez that it would not be appropriate to send out the list-maintenance letters that close to the November 2010 elections.  Perez told the OIG that the Division waited to issue the letters after the elections in order to avoid the perception that the Department was improperly influencing the elections.[83]  In an e-mail dated November 30, 2010, Perez specifically requested that the Voting Section provide him with an update on the status of those letters and indicated that he expected the letters to go out in early December 2010.[84]

On December 15, 2010, a former Voting Section attorney who had published articles and blog postings highly critical of current Division leadership, authored an editorial that criticized the Voting Section for allegedly failing to bring new cases.  On December 20, 2010, Section Chief Herren e-mailed the trial team who had proposed the investigations to inform them that the list-maintenance proposals had been approved and requested comments on letters that he had drafted to the eight targeted states.  Popper and the lead attorney on the investigations told the OIG that they never received an explanation regarding why there was a 15-month delay in approving the inquiries.  The Section subsequently sent letters to the eight target states to

---

[83]  Perez stated in his OIG interview that they were also discussing sending letters to a number of states concerning Section 7 compliance around the same time and he ultimately decided to wait until after the November 2010 elections to initiate those efforts as well, in order to avoid the appearance of "tipping the balance" in the election.

[84]  Perez told us that he has repeatedly stated to both the Voting Section and to external audiences that the Division would enforce the entirety of the NVRA, including the list-maintenance provision.  Perez further told us that this support was evidenced not only by his urging the issuance of the Section 8 letters in December 2010, but also by his instruction in early 2010 that the NVRA guidance should be expanded to include Section 8, as noted above.

request relevant information.  According to Popper and the lead attorney, the team evaluated the states' responses to determine which states should be investigated further and ultimately concluded that the investigations were moot due to the expected release of updated EAC data in June 2011.

The attorneys working on this project stated the 15-month interval before the investigation was approved was unusually long, if not unprecedented, and that there was no change in the factual or legal issues that would have caused such a delay.[85]  In addition, the Section attorneys stated that the handling of this proposal was unusual because notice letters like those sent to the target states in December 2010 are typically drafted by trial attorneys, not the Section Chief.

Herren told the OIG that he did not recall Perez mentioning the former attorney's article in discussing the Section 8 proposal and that Perez never indicated to him that the Section 8 proposal was approved as a result of the OIG investigation.  Herren told the OIG that he believed the delay in approving those investigations was not a result of hostility to list-maintenance cases. Herren stated further that, while he understood Section 7 was a higher enforcement priority for the current administration, he believed they would consider Section 8 investigations as well.

Herren stated that he believed the delay in approving the proposed list-maintenance investigations was largely attributable to the "chaos" that surrounded the Voting Section and the fact that they "lurched from one crisis to another" throughout 2010.  In fact, Herren stated that he could be blamed for delays in a wide range of matters because he was fully occupied on "crises" involving the Section.  Herren said that there were numerous other cases and proposed investigations that were stalled during that timeframe, including investigations under VRA Sections 2, 4(e), and 203, and he was unable to address those matters with Perez as well.

Perez denied that the approval of the investigations in December 2010 resulted from public criticisms of Division leadership.  Perez stated that he first discussed the proposed list-maintenance investigations roughly at the same time as the Section 7 proposal, which occurred several months before they were approved in December 2010, and that they waited to move forward on those proposals until after the November 2010 elections, per Herren's recommendation, in order to avoid an impression that the Department was attempting to influence the election.

---

[85]  Popper stated that he recalled other proposals that were approved after extended periods of time, but those instances involved extensive discussion between Division leadership and Section personnel concerning relevant facts or law.  In contrast, Popper stated, there were no questions or comments from Division leadership for 15 months until the team was notified that the investigation had been approved.

Fernandes told the OIG that certain Section 7 investigations were approved before the Section 8 proposal. According to Fernandes, the difference in approval time reflected Division leadership's enforcement priorities, but she denied that the Section 8 decision was delayed pending the resolution of the Section 7 proposals. Fernandes also denied that she was stalling the Section 8 proposals and said that the 15-month delay in the approval of those investigations did not reflect a lack of interest in enforcing the Section 8 list-maintenance requirements. Instead, Fernandes stated that the delay resulted from the "chaos" in the Section, such as selecting and transitioning to a new Section Chief and conducting large attorney hiring and budget-related efforts. As a result, Fernandes stated, launching a new program under one provision of the NVRA was not high on her priority list at that time. Fernandes told the OIG that Division leadership and Voting Section management eventually stabilized the Voting Section and began moving forward on cases and matters.

Fernandes stated that the initiation of the OIG investigation (in the fall of 2010) was not a precipitating or contributing factor in the approval of the Section 8 investigations. Fernandes said further that the Voting Section generally faces "a heavy amount of scrutiny," and that she believed the current administration has received such attention from the outset.

### D.    OIG Analysis of Enforcement of NVRA over Time

We found that there was insufficient evidence to conclude that Division leadership enforced the NVRA in an improper partisan manner during the period from January 2001 to January 2009. A shown on Table 3.2, Division leadership approved eight enforcement actions (including settlements) relating to ballot-access violations compared to six actions to enforce the list-maintenance provisions of Section 8(a)(4).[86] This record does not support an inference that Division leadership was pushing list-maintenance cases at the expense of ballot-access cases for improper political purposes. No improper motive can be inferred from Division management's decision to pursue enforcement initiatives under Section 8(a)(4), especially given that so little enforcement of this provision had occurred previously.

We also found insufficient basis to conclude that Division leadership during the period from January 2001 to January 2009 was targeting swing states or Democratic-leaning jurisdictions for list-maintenance enforcement in order to benefit Republicans. We found no evidence, such as contemporaneous e-mails or documents, to support this belief and the criteria that were used to identify states for investigation or legal action appeared to be impartial and objective, and included jurisdictions with a variety of historical voting patterns.

---

[86] As noted, the actions against Missouri and Pulaski County, Arkansas included both list-maintenance and ballot-access claims.

Moreover, Division leadership's selection of jurisdictions for enforcement of ballot-access provisions of the NVRA also undercuts any inference of partisan motivation.  Division leadership approved actions to enforce the NVRA's voter-registration provisions – which are commonly viewed as benefitting the Democratic Party and its candidates – in Missouri and New Mexico.

The evidence established that Division leadership between 2009 and 2012 clearly placed a higher priority on the enforcement of NVRA's ballot-access provisions, particularly Section 7, than the enforcement of the statute's list-maintenance provision.  The Section engaged in five NVRA enforcement activities in that time period, all of which enforced the NVRA's ballot-access provisions.  This prioritization is also reflected in several statements concerning NVRA enforcement from senior Department officials, including Deputy Associate Attorney General Hirsch's comments regarding drafting of the NVRA guidance; DAAG Fernandes's statement in the September 2010 e-mail concerning talking points regarding the Division's priorities; and Fernandes's statement to the OIG that she believed she had to "scratch the Section 7 itch" before turning to Section 8 matters and that her supervisors would have criticized her if she had approved a Section 8 matter before a Section 7 one.  We also found that, although Fernandes's comments at the Section's November 2009 brown bag lunch may not have amounted to a clear rejection of list-maintenance enforcement, they at a minimum conveyed that such cases were a lower priority than the voter-registration provisions.  We also believe that Division leadership's handling of the Section 8 list-maintenance investigation recommendations, including the failure to respond to the State E proposal and the 15-month delay in the approval of the eight list-maintenance inquiries, also conveyed this message.

We found, however, that the evidence did not support a conclusion that the decision to send out the Section 8 letters in December 2010 was triggered by an editorial criticizing the Department.  Contemporaneous evidence shows that AAG Perez urged the Voting Section to issue these inquiries before the editorial was published.  Moreover, we note that in early 2010 Perez instructed that the NVRA guidance project be expanded to address Section 8.

Although we found that current Division leadership has a clear priority structure for NVRA enforcement, we found insufficient evidence to conclude that they enforced the NVRA in a discriminatory manner.  We found no direct evidence, such as e-mails, indicating or implying a racial or partisan motive for such prioritization.  Moreover, the states in which the Section took enforcement actions during this time period (Georgia, Rhode Island, and Louisiana) are of varied geographies and political histories.  It was within the discretion of senior management to prioritize enforcement efforts, particularly based on what appeared to be genuinely held perceptions about the need to redress previous enforcement imbalances.

## VI.    Language-Minority Provisions (Sections 4(e), 4(f)4, and 203)

The provisions of the Voting Rights Act that protect language-minority voters are contained in Sections 4(f)4, 203, and 4(e).  These provisions require that in certain states that contain sizeable language-minority populations, all election information that is available in English must also be available in the minority language so that all citizens will have an effective opportunity to register, learn the details of the elections, and cast a free and effective ballot.[87]

Some witnesses, including two Voting Section attorneys and one other Section employee, told the OIG that they believed, or heard allegations from other employees, that the Division leadership during the previous administration prioritized enforcement of the language-minority provisions over other voting rights cases for political reasons.  In general terms, these witnesses asserted that Division leadership at the time emphasized language-minority cases to give themselves "political cover" for their failure or refusal to bring "traditional" Section 2 cases or to garner goodwill for the prior administration among the Asian and Hispanic populations, who would benefit most from the language-minority cases.

Figure 3.8 reflects the Section's efforts to enforce the language-minority provisions from 1993 through 2011.  The enforcement actions noted in the figure include complaints filed by the Division bringing a language-minority claim, amicus briefs submitted by the Division in support of private plaintiffs' actions to enforce one or more of the language-minority provisions, and out-of-court agreements between the Division and local jurisdictions that enforce those provisions.

---

[87] Language minorities covered under the Act are limited to groups that Congress found to have faced barriers in the political process, namely American Indians, Asian Americans, Alaskan Natives, and Spanish-heritage citizens.

108

**Figure 3.8**



The OIG identified several trends in the enforcement of the language minority provisions, which are discussed below.

**Increased Volume of Cases from 2001-2008:**  As reflected in Figure 3.8, the Section's enforcement activity related to the language-minority provisions increased dramatically beginning in 2004 and reached a peak between 2004 and 2007.  In the three and one-half years between March 2004 and September 2007, the Section participated in 27 matters to enforce the language-minority provisions, which is more than the combined total of all other language-minority enforcement efforts since those provisions were enacted in 1975 (26 matters).  This increased language-minority activity corresponds with the period in which John Tanner assumed managerial authority over language-minority claims and his subsequent promotion to Voting Section Chief.  Although the Section has continued to enforce the language-minority provisions following Tanner's departure from the Voting Section in late 2007, the number of new cases of this type declined substantially.

Witnesses who worked in Division leadership during that period consistently told the OIG that the language-minority provisions were a clear enforcement priority.  According to DAAG Bradley Schlozman and Hans von Spakovsky, who was Counsel to then-CRT AAG Alexander Acosta during the relevant time period, Acosta took a particular interest in the language-minority provisions and wanted to increase the Section's efforts to enforce those provisions.

Schlozman and von Spakovsky told the OIG that they believed the language-minority provisions had been neglected by previous administrations and that Section managers, particularly former Section Chief John Tanner, had successfully developed a more systematic process to identify targets for investigation and marshal evidence for such cases.  In addition, Division leadership witnesses told the OIG that part of the motivation behind the increased focus on those provisions was that such cases were highly efficient, meaning that they required substantially fewer resources to develop and prosecute than other cases, particularly Section 2 matters, and that they could benefit a larger number of voters.[88]

Von Spakovsky told the OIG that he did not approach the language-minority cases from a political standpoint, and that no one that he worked with ever said anything to him to the effect that the increased enforcement of language-minority cases was designed to attract such voters to the Republican Party.  Von Spakovsky also noted that he believed that the likely outcome of the increased enforcement of the language-minority provisions was to harm the prior administration and the Republican Party because those cases increased Hispanic voting and the vast majority of Hispanics do not vote for Republican candidates.

Schlozman also denied to the OIG that he had a political motivation for enforcing the language-minority provisions, noting that Acosta made it an enforcement priority and that he executed that directive.  Schlozman stated further that he personally did not believe Section 203 was "a good statute" and would not have emphasized its enforcement.  Schlozman also told the OIG that he did not believe there was a political motivation behind the prioritization of those cases and that he did not recall any specific discussion of the fact that such cases could garner goodwill for the Republican Party among the populations at issue.  Schlozman told the OIG that, although he never heard any discussion that benefiting the Republican Party was the purpose behind the increased enforcement, he recalled some conversations in which others observed that increased goodwill among Hispanic populations would probably be "an added benefit to these cases."

Tanner also commented on allegations of politicized enforcement of Section 203 in his 2007 OIG interview.  Specifically, Tanner stated that he had heard an allegation that the Section was pursuing language-minority cases to

---

[88]  We also note that Andrew Lelling, who was a Counsel to AAG Ralph Boyd from mid-2001 to mid-2003, before the increase in language-minority cases, told the OIG that the enforcement of language-minority provisions complemented the administration's view of voting rights enforcement, which focused on ensuring an equal opportunity to vote.  Lelling also stated that the increased effort to enforce those provisions was in conjunction with the Voter Integrity Project, which the administration launched in response to alleged voting irregularities in the 2000 election.

sue Democratic jurisdictions and dismissed that assertion by noting that the Section during his tenure had taken action against three "big Republican count[ies]."

As noted above, some witnesses told the OIG that they believed Division leadership during the previous administration emphasized language-minority cases for political reasons.  We did not find any direct evidence to support such allegations.  We believe that it was within Division leadership's discretion to make Section 203 enforcement a priority for the Voting Section.

**Changing Demographics of Language-Minority Cases:**  The OIG also identified two trends related to the minorities protected by the Section's enforcement of the language-minority provisions.  Figure 3.9 below compares the composition of the populations protected in new enforcement actions filed by the Section during three different periods:  1993-2000, 2001-2008, and 2009-2012.

**Figure 3.9**



As depicted in Figure 3.9, while the number of cases is small, the OIG's review of the Section's language-minority matters indicates a decrease in the volume of enforcement actions taken on behalf of Native Americans.  In fact, of the Section's 42 actions to enforce the language-minority provisions since early 1998, only one has protected the rights of a Native American population.  Over

the same timeframe, the Section's enforcement has focused overwhelmingly on Hispanic populations, with all but three enforcement actions since early 1998 containing some claims on behalf of Hispanic voters.[89]  Again, it is difficult to draw conclusions given the small number of cases at issue, and the OIG did not receive any allegations that any change in these numbers was motivated by improper racial or political motivations, so we did not examine them further.

## VII.   The Uniformed and Overseas Citizens Absentee Voting Act

Figure 3.1 reveals that from 1993 through 2012, the Section initiated 44 actions to enforce the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA).  Fourteen of those actions were initiated in a single year, 2010, and eight more were initiated in 2012.  UOCAVA enforcement was the single largest focus of new enforcement matters for the Voting Section in which the United States was a plaintiff from 2009 to 2012.  According to the Department, the increase in the volume of the Section's UOCAVA work over the past several years was triggered by the passage of the Military and Overseas Voter Empowerment Act of 2009 (MOVE Act), which significantly expanded UOCAVA – including by imposing a requirement that jurisdictions transmit ballots to voters covered by the Act at least 45 days before a federal election.

Perez told the OIG that protecting service members' civil rights was "one of [his] top priorities" and that, in addition to the large volume of new cases filed under the MOVE Act, the Section invested considerable resources in education about and implementation of the new law.  Current Voting Section Chief Christian Herren stated that the Section exerts significant effort to enforce UOCAVA in every federal election year, but that they were spending even more time in 2010 on such matters because of the newly enacted amendments from the MOVE Act.  According to the Department, election cycles that follow enactment of a new federal voting rights law typically require a greater expenditure of Voting Section resources both to ensure that jurisdictions understand the demands of the law, and to take enforcement measures where necessary.  The Department has informed us that these efforts, by necessity, reduced the resources available for other voting rights activities.

After reviewing a draft of this report, the Department stated that the beneficiaries of the Voting Section's UOCAVA enforcement are service members, their dependents, and overseas citizens – a group that is classed without regard to race and that includes large numbers of White voters.  The Department commented that the Voting Section's comprehensive, resource-

---

[89]  Four of the enforcement actions sought to protect both Asian-American and Hispanic voters.

intensive, and nationwide enforcement of UOCAVA since 2010 is inconsistent with allegations that the Civil Rights Division has been unwilling to enforce voting rights laws to assist White voters.

## VIII.  Conclusions

Numerous witnesses told us that they believed that improper partisan or racial considerations have infected enforcement decisions in Voting Section cases at various times since 2001.  We believe that these allegations can be traced in considerable part to the fact that many Voting Section cases have actual or perceived impacts on political interests.  The Section reviews redistricting cases that can change the partisan composition of congressional delegations and voter ID laws have actual or perceived impacts on the partisan composition of the eligible electorate.  Division leadership makes choices on Voting Section enforcement priorities – such as whether to give greater emphasis to statutory provisions intended to increase voter registration or those intended to ensure the integrity of registration lists and prevent voter fraud – which are widely perceived to affect the electoral prospects of the political parties in sharply different ways.

Our examination of the mix and volume of enforcement cases brought over the past ten years by the Voting Section revealed some changes in enforcement priorities over time, corresponding to changes in leadership.  However, our review generally did not substantiate the allegations we heard about partisan or racial motivations and did not support a conclusion that the Voting Section has improperly favored or disfavored any particular group of voters in the enforcement of the Voting Rights laws.

For example, we found no persuasive support for the allegation that Division leadership during the prior administration (2001-2008) was hostile to bringing Section 2 or 11(b) enforcement actions on behalf of Black or other minority voters, or that it gave less support for such cases than for so-called "reverse-discrimination" cases.  Although the number of new Section 2 cases declined overall during that period, the number of new Section 2 cases brought since 2009 (under leadership that has not been accused of hostility toward Section 2 enforcement) has declined even more dramatically.  Moreover, only 2 of the 13 Section 2 or 11(b) cases approved by Division leadership from 2001 up to the inauguration in January 2009 involved White victims of discrimination, a ratio that does not support any suggestion that leadership pursued such cases at the expense of cases on behalf of racial minorities.

When we examined individual Section 2 or Section 11(b) cases, we found that in most cases the leaders of CRT or the Voting Section responsible for these decisions – sometimes overruling the recommendation of career attorneys – were generally acting within their enforcement discretion and in several cases

113

were vindicated by subsequent judicial decisions.  The only case cited to us that we found raised any serious question about Section 2 enforcement was the decision by leadership to prohibit a preliminary investigation in the County C case.  Although this decision was inconsistent with prior and subsequent decisions by different Division leaders, we did not find it sufficient to support the larger ideological conclusion for which it was cited to us.

We also found that, although there was evidence to suggest that some personnel in Division leadership since 2009 felt that the Section's highest priority should be enforcing the voting rights statutes to protect "traditional" victims of discrimination – racial and ethnic minorities – there was no policy prohibiting enforcement of these statutes to protect White victims, and that the decisions that Division or Section leadership made in controversial cases did not substantiate claims of political or racial bias.  In the New Black Panther Party matter, we found that there were well-considered reasons for dismissing the action against the two "national" defendants.  While we found that the objective evidence to support an injunction against Jackson was substantially stronger than the evidence against the two national defendants, we did not find sufficient evidence to conclude that the decision to dismiss Jackson was driven by improper racial or political considerations.  We found that there were legitimate non-discriminatory reasons for the Voting Section leadership to decline to pursue a case against the small business proprietor and to hesitate to devote resources to the Territory D matter.  We could not from these cases, or any others cited to us, infer that leadership had a blanket policy against using the voting rights laws to protect White voters in appropriate cases.

We also found that allegations of politicized decision-making in Section 5 decisions were not substantiated.  In the controversial 2002 Mississippi and 2003 Texas redistricting matters there were strong differences of opinion expressed during deliberations involving the Voting Section career attorneys and political appointees.  After careful review we could not conclude that the positions taken by the participants were inconsistent with applicable law or that they were offered as a pretext for advancing partisan objectives.  Although there were also differences of opinion among attorneys involved in the 2005 Georgia Voter ID matter, the decision recommended by the Section Chief and approved by Division leadership did not support a conclusion that it was improperly motivated.  Likewise, the evidence did not establish discriminatory decision-making in Section 5 matters since 2009.  The decisions made in the Noxubee and Kinston Section 5 matters and the Division leadership's interpretation of Section 5 retrogressive effect prong were within the discretion of management and did not reflect an improper refusal to enforce Section 5 on behalf of White voters.

We found that the allegations that Division leadership during 2001-2008 focused on list-maintenance provisions of the NVRA to the detriment or exclusion of voter-registration provisions of the statute were not supported by

114

the evidence.  We also found insufficient evidence to conclude that leadership during that period targeted jurisdictions for enforcement of the NVRA for political purposes.  We found that current leadership has exhibited a clear preference or priority for enforcing the voter registration provisions of the NVRA, but that there was inadequate evidence to conclude that this prioritization reflected improper racial or political considerations.  Similarly, we found insufficient evidence to conclude that the Division leadership during 2001-2008 favored enforcement of the language-minority provisions of the Voting Rights Acts over other voting rights laws for political reasons.

In sum, we found that there were legitimate, non-discriminatory bases for the substantive enforcement decisions made by Division leadership in the high-profile, controversial cases handled by the Voting Section since 2001, and that these reasons were not a pretext for improper racial or political considerations.  This does not mean that the Voting Section was functioning smoothly or well during that period.  As detailed in the next chapter, we found that deep ideological polarization, both among career attorneys on different ends of the partisan spectrum and between some career attorneys and political appointees in Division leadership in both administrations since 2001, has at times been a significant impediment to the operation of the Section and has exacerbated the potential appearance of politicized decision-making.

**PAGE INTENTIONALLY LEFT BLANK**

# CHAPTER FOUR
# HARASSMENT OR MISTREATMENT OF VOTING SECTION EMPLOYEES FOR THEIR POLITICAL IDEOLOGY OR POSITIONS THEY TOOK ON PARTICULAR MATTERS

## I.    Introduction

In this chapter we address allegations we received that Voting Section employees were harassed, mistreated, marginalized, or removed due to their political ideology or the positions they advocated in connection with Voting Section matters.  These allegations fell into three general categories:  (1) peer-to-peer harassment of career employees; (2) Voting Section or CRT managers or leadership retaliating against career non-supervisory employees, and (3) CRT leadership removing, marginalizing, or mistreating some career Voting Section managers.

The OIG received a large volume of allegations in these categories, particularly regarding retaliation or other mistreatment by Section managers against career employees due to ideological views.  As described in greater detail below, we concluded that it was impractical to investigate the majority of these allegations in this review due to the passage of time and the nature of the evidence we would have needed to examine.  Instead, we focused on several incidents in each category for in-depth review.  We selected incidents that related to the broader issues explored in this report, namely allegations of improper political or racial considerations in case decisions.  We also selected episodes that multiple witnesses cited as having a significant impact on the Section.  A third criterion was whether sufficient evidence was available to support a conclusion about the allegations in question.  To examine the allegations related to the selected case-studies, we reviewed thousands of pages of e-mails and internal documents and interviewed numerous witnesses who were involved in the matters.

In Section II of this chapter, we review the evidence pertaining to several incidents in which career employees allegedly harassed or mistreated other career employees due to their political ideology or their positions on Voting Section matters.  Section III of this chapter examines several incidents of disclosure of confidential or non-public information about Voting Section matters or personnel to media outlets that we found exacerbated mistrust among Voting Section employees or between career employees and Division leadership.  Section IV of this chapter examines allegations Voting Section or CRT managers or leadership retaliated against career non-supervisory employees because of their political affiliations or positions they took in Voting Section matters.  Section V of this chapter we examine evidence related to

117

allegations that senior Department and Division personnel took actions or otherwise mistreated Voting Section managers due to their ideological views or positions on Voting Section cases or matters.  Each section presents our conclusions about the incidents at issue.  In many cases, we obtained sufficient evidence to establish that the allegations of harassment or mistreatment were supported, while in some we concluded that the evidentiary record was mixed or did not support the allegations.

## II.    Allegations of Peer-to-Peer Harassment between Career Staff

In this section we describe the results of our investigation of incidents involving the alleged harassment of career employees by other career employees for their political ideology or their positions on Voting Section matters that were ideologically inconsistent with what their peers thought the Division should be doing.

### A.    Staff Conduct during Georgia Voter ID (2005)

In Chapter Three, we described the decision by Division leadership in 2005 to preclear the Georgia Voter ID law under Section 5 of the Voting Rights Act.  As detailed in that chapter, the Georgia statute reduced the number of forms of voter identification that would be acceptable at the polls, and was the subject of sharp disagreements among career attorneys in the Voting Section.  In this section we address allegations that one employee was subjected to harassment for his political ideology and the positions he advocated during deliberations over the Georgia Voter ID matter.

Deputy Chief Robert Berman assembled a team to review the Georgia submission, consisting of a trial attorney, a civil rights analyst, and a member of the professional staff.[90]  When Berman requested additional help for reviewing the Georgia submission, Section Chief John Tanner assigned a recently hired attorney, Arnold Everett, to the matter.[91]  According to the Department, Everett had not yet received formal Section 5 training and had virtually no experience in such matters.  As we discussed in Chapter 3, Tanner told investigators that he chose Everett because he "wanted to get to a decision expeditiously" and the review process provided a "training opportunity" for Everett.  Tanner said that part of the basis for his decision was his belief that Division leadership wanted a "diversity of viewpoints" on the review team because he understood that they lacked confidence in the Section 5 review

---

[90]  An Attorney-Reviewer from the Section 5 group provided guidance to the review team, but was not engaged in the day-to-day review of the Georgia Voter ID submission and played a very minor role in the review.

[91]  Arnold Everett is a pseudonym.  We used pseudonyms throughout this report to protect the privacy of non-supervisory employees.

process.  Division leadership confirmed to us that they did not trust the original review team to act in a non-partisan and unbiased manner and believed that the review team was predisposed to recommending an objection to the Georgia Voter ID law.

Witnesses told the OIG that the rest of the team viewed Everett and his assignment to the review team with suspicion for a number of reasons, such as the fact that Everett was a new attorney and just hired into the Department, knowledge that Everett was a conservative hired by Bradley Schlozman, who at the time was the Acting Assistant Attorney General for the Civil Rights Division, and a belief that Everett would be "skeptical about the need for an objection."[92]

E-mails revealed that shortly after Everett was assigned to the team, Hans von Spakovsky – then serving in Division leadership in a career capacity as Counsel to the AAG – began communicating directly with Everett about his views of the case without including the other team members.  For example, von Spakovsky gave Everett an unpublished article that von Spakovsky had written on a different state's voter ID law that he told Everett not to share with the other team members.  In an interview in a different investigation, then-Section Chief Tanner stated he was not aware of these communications at the time they were happening.

Everett, however, told the other members of the review team about his contacts with von Spakovsky, and we found that the knowledge of those contacts further strained the team's relationship with Everett.  One review team member told the OIG that, after learning of Everett's communication with von Spakovsky, the team made it a point to be careful about discussing issues within earshot of Everett that they did not want Division management to know about.  The review team also excluded Everett from various e-mails and meetings about the review, and did not share with him the first draft of the recommendation memorandum for the Section's leadership.  One team member described Everett in an e-mail as a "hand-picked Vichyite" who was assigned to the review to produce data in support of preclearing the Georgia submission.  Witnesses told us that that the office politics at the time was such that certain members of the career staff resorted to black humor when describing working in the Voting Section, including comparing the Voting Section to Vichy-controlled France during the Nazi occupation of World War II.  One member of

---

[92]  One team member told us, after reviewing a draft of this report, that "the problems between the team members stemmed from an almost total lack of leadership from Voting Section management, and [arose] in a climate of real distrust among staff members."  He stated that many of the actions described in the report "were largely the result of trying to deal with the frustrations created by the Section chief and ultimately the political appointees in that period."  Two other team members expressed similar sentiments to the OIG.

the Georgia review team told us that he considered himself part of the "resistance" and that he and others used the term "guerilla war" to describe their actions in the Voting Section.

Everett told the OIG, and contemporaneous e-mails confirm that, after disclosing to the review team that he and von Spakovsky had been in contact, Everett did not communicate with von Spakovsky or Schlozman for a few weeks.  Everett told us, however, that he then discovered that the rest of the review team had left him out of the process of drafting the recommendation memorandum and that, when he saw the draft, he had concerns about its completeness and accuracy.  Everett then informed von Spakovsky of the situation, and they resumed communicating regularly about the case.

Von Spakovsky advised Everett that, if he disagreed with the draft recommendation memorandum, he should speak with Section management and discuss drafting a dissenting opinion.  He also suggested arguments and analysis to Everett regarding the Georgia statute and warned him to password-protect any documents that he did not want the other attorneys on the case team to read.  Going forward, Everett expressed to other team members his view – and that of von Spakovsky – that the Georgia Voter ID law should be precleared. We found that, as Everett expressed his views on preclearance, the other review team members became outwardly hostile towards him, in the form of arguments, refusals to assist him, and increasingly snide e-mails to him.[93] One team member told us he refused to assist Everett with a statistical analysis because he believed that Everett would not use the evidence honestly.  Unbeknownst to Everett, another team member accessed his document directory on the Section's shared drive, copied a memorandum Everett had drafted about the case, and forwarded it to others on the team in an e-mail stating "lookie what I found in [Everett's] directory.  Let's discuss amongst ourselves."[94]  We further found that members of the original case team made

---

[93] Some of the comments and actions directed at Everett were insulting.  For instance, Everett and the original team members engaged in a lengthy e-mail debate about a State mobile voter registration program known as a Georgia Licensing on Wheels ("GLOW").  After the Georgia matter was over, one of the original review team members distributed mugs with a picture of the GLOW bus to other team members and others in the office.  A review team member told us that the mugs mocked Everett.  The team leader admitted to the OIG that it was inappropriate to use a photograph submitted as part of the state's preclearance submission in this manner.

[94] Although there was no prohibition in the Section on employees accessing documents on each other's directories, the purpose of this access was not to enable attorneys to retrieve and distribute each other's work without the author's permission.  Access was typically used to enable attorneys to find information in each other's files, such as sample briefs or legal research, relevant to their own cases.  Several months after the Georgia ID review, in the course of reviewing employee e-mails pursuant to an internal investigation relating to a different matter, Division leadership apparently discovered that one of the career employees on the Georgia team had accessed Everett's document and distributed it to other team members.

Cont'd

unprofessional and disparaging remarks about Everett to each other and to other employees in the Section, mocking his intelligence, his legal acumen, and his personal beliefs.

In September 2005, after Division leadership pre-cleared the Georgia submission, Tanner held individual meetings with the three members of the original review team.  According to the team members, Tanner criticized their recommendation memorandum and accused them of not being "team players" and engaging in unprofessional conduct toward Everett.  Division leadership gave Everett a $450 "on-the-spot" award for his work on the Georgia Voter ID review.  The other team members did not receive awards.

## B.    Treatment of Members of the Noxubee Case Team (2006-07)

As discussed in detail in Chapter Three, in 2006 the Voting Section filed a complaint under Sections 2 and 11(b) of the Voting Rights Act against the Noxubee County (Mississippi) Democratic Election Committee and its chairman, Ike Brown.  The Noxubee case was developed and litigated by then-Special Litigation Counsel Christopher Coates along with two trial attorneys and an intern.  This was the Department's first lawsuit under Section 2 of the VRA against Black defendants alleging denial or abridgment of the rights of White voters on account of race.  Numerous witnesses told us that there was widespread opposition to the Noxubee case among the Voting Section career staff because it was being brought against Black defendants on behalf of White voters.  We found that as a result of their hostility to the Noxubee case, some career staff harassed a Black Voting Section intern who volunteered to travel to Mississippi to assist the trial team, and mocked Coates for his work on the case.

The intern told the OIG that two career Voting Section employees made disparaging comments directly to him about his involvement in the trial.  In particular, the intern recalled being questioned directly and indirectly about why he participated in this trial and told the OIG that Voting Section personnel made comments like:  "You know why they asked you to go down there," "They used you as a token," and "People are saying, 'Why did you go down there?'"  According to a memorandum drafted by Section management summarizing the incidents, the intern told a Section manager that the Voting Section employees informed him that someone who was attending the trial was reporting his activities and, therefore, the employees knew exactly where he was sitting in the courtroom and what he did at the trial.

---

Section Chief Tanner subsequently announced that files on one of the drives would be locked to prevent employees from accessing such documents without permission.  It appears that the decision to lock the computer files most likely resulted from the discovery of what the team member had done.  However, we were unable to question Tanner regarding this matter because he refused to be interviewed by the OIG.

The intern stated that those employees also told him about disparaging comments by other career CRT career employees who questioned why he would work on the case and insinuated that he was assigned to the matter because he was Black and that he had been used as a "token." The intern told the OIG that he understood that those employees included Pat Tellson, an attorney in the Voting Section, and Ellen Sydney, an attorney in a different CRT section who used to work in the Voting Section.[95] The intern stated that he understood from one or more Voting Section employees that Sydney had stated words to the effect that: "They only wanted you down there because you are a black face. How would it look for four white men down there prosecuting all these black people? They wanted you down there to show that it is not white against black. They used you because you were black and they needed a black face." The intern said that similar comments were directed at his mother, who was employed in a different component of the Division. For instance, the intern stated that one of the Voting Section employees approached his mother and said something to the effect that: "They got [the intern] down there working on this case on behalf of white voters. Why did you let them go down there?"[96] According to the intern, he perceived a broader "whisper campaign" in the office about his participation in the Noxubee case after returning from the trial, and he told us that this campaign continued for roughly one year.

The intern told the OIG that the remarks angered and insulted him by suggesting that he was duped into working on the matter. He stated the assertion that he was being used by the Noxubee team was incorrect, noting that he requested to work on the case numerous times. He said the comments affected his ability to do his job because they made him feel ostracized in the office. He said that as a result he kept to himself and stayed in his cubicle to avoid questions about the case. The intern stated that, although he never felt like he was a "token" while working on the case, those statements made him feel as though his participation in the case was wrong.

Sydney denied to the OIG that she made disparaging comments about the intern and his involvement in the Noxubee trial, but stated that she witnessed comments of that nature, including that Tellson had called the intern something to the effect of a "turncoat" in front of his mother. Tellson told the OIG that she believed the intern was being used in the Noxubee matter so that "they could have a black face at counsel table," but did not recall making comments about the intern's involvement in the trial. Tellson stated, however, that she told the intern's mother that it was "just wrong" that the

---

[95] Pat Tellson and Ellen Sydney are pseudonyms.

[96] Likewise, Sydney e-mailed an article concerning the Noxubee trial to the intern's mother, with the statement: "Your federal tax dollars at work...." The intern's mother forwarded the e-mail, along with Sydney's comment, to her son shortly after he returned from the trial.

intern was sent to the trial because she did not believe interns were permitted to travel like that and because the intern was working on a project for her and it would stall while he was at the trial. She stated further that she believed the intern understood that CRT personnel "felt some opprobrium" about his work on the Noxubee matter.

We found that shortly after returning from the trial in early 2007, the intern grew so upset about the incessant comments that he reported them to Voting Section management, who in turn reported the incidents to the CRT Division leadership. The intern's mother also raised concerns about the matter with Loretta King, then a career DAAG in CRT Division leadership.

CRT management then investigated the incidents, including interviewing the intern and his mother. Christopher Coates, then a Deputy Chief, interviewed the intern and wrote up a lengthy e-mail detailing his allegations. Loretta King also interviewed the intern. King told us she told the intern that "he was a valued employee in the division, that I was very proud of him, that the work he was doing was important to the division, and he should not let people get him down." She told the OIG that she asked him whether he wanted her to take any action but that the intern told her: "No, I have it under control you know, everything is fine. Don't worry about it."

King also interviewed the intern's mother about the incident and, according to King's contemporaneous memorandum of the interview, the intern's mother said that Sydney made statements to her to the effect that the reason her son was working on Noxubee was that the trial team "need[ed] a black face" at their reverse-discrimination trial. The mother also told King that two career non-attorneys later made similar statements to her. The mother told King that she declined to file a formal complaint about these incidents at the time the comments were made because she thought the people were just "being nosy." In an e-mail about the incidents to the attorney's supervisor, however, King described the conduct as "quite egregious."

We found that the Division leadership orally reprimanded Sydney for making inappropriate comments to the intern's mother, as well as additional inappropriate but unrelated statements to other CRT personnel. According to Division records, Voting Section management orally counseled the two career Voting Section employees for making comments to the intern. We found no evidence that Tellson was disciplined.

The OIG also uncovered e-mails in which current and former Voting Section attorneys criticized and mocked Coates's work on the Noxubee case. For instance, in an e-mail sent to four former Voting Section attorneys after the Noxubee complaint had been filed but before the trial began, Sydney referred to Coates as a "klansman." Likewise, a non-attorney employee in the Voting Section wrote in an e-mail to a Section attorney: "[P]ersonally i think that the

architects of the [Voting Rights Act] and those who fought and died for it are rolling over in their graves with that perversion of the act ... im sorry, but [White people] are NOT covered for a reason." During the course of the Noxubee trial, a group of current and former Section attorneys exchanged e-mails that celebrated perceived setbacks for the Department's case and appeared to express hope that Coates and the Department would lose the Noxubee trial.[97] We found as a result of our e-mail review that after the Noxubee case concluded, current and former Section attorneys who were opposed to the case continued to make derisive comments about Coates and his prosecution of the matter.[98] We found no evidence that Division leadership or Coates were made aware of these particular messages at the time, although Coates has on numerous occasions stated that he was the subject of overt hostility in the Section because of his role in the Noxubee case.

### C.    Conflict during Election Monitoring in County D (2006)

As we discuss in Chapter Three, the Voting Section sent election monitors, including observers from the Office of Personnel Management (OPM), to observe a primary election in County D in 2006. This decision arose out of two separate investigations of voting irregularities in County D, one of which examined allegations that White political leaders were engaging in illegal voting practices targeting Black voters, and another that examined allegations that Black leaders of a local political organization in County D were engaging in absentee ballot fraud and improper voter assistance.

Voting Section Chief John Tanner sent trial attorneys Carl Mannett and Arnold Everett to participate in the election monitoring.[99] Mannett focused on the allegations of abuses by White political leaders and argued strenuously in a memorandum to Tanner that the election monitors should not be investigating absentee ballot fraud because: (1) such an investigation would take the Voting Section away from its traditional right-to-vote and access-to-the-polls focus; (2) voting fraud is a criminal matter outside the Voting Section's jurisdiction; (3) such an investigation would undermine the willingness of members of the Black community to cooperate with the Voting Section; and (4) the Department

---

[97]  In one such e-mail, a Voting Section attorney wrote to another CRT attorney who had previously worked in the Voting Section that "Your man [Chris Coates] is going down on this."

[98]  For example, after a court issued a ruling in favor of five Native American plaintiffs in an unrelated Section 2 case, CRT attorney Sydney, who previously worked in the Voting Section, wrote in an e-mail to two former Voting Section employees: "Never fear. I'm sure that after his resounding success in the Noxubee case, Mr. Coates and his loyal sidekick will pick up the mantle and fight the good fight against the five American Indians in this case!" One of the former Voting Section attorneys responded to this e-mail, stating: "Mr. Coates' success in Noxubee is simply outstanding - he is, after all, one of the best at what (?!$@$#) he does."

[99]  Carl Mannett is a pseudonym.

would be severely criticized if its first investigation into voting fraud in County D pursued allegations against Black politicians that were popular with the Black community.  Tanner rejected Mannett's arguments and authorized Everett to collect information relevant to the allegations of absentee ballot abuse and improper voter assistance by the Black political organization during the election monitoring.

Over the course of the election monitoring, Mannett and Everett had several disagreements and engaged in shouting matches.  One illustrative disagreement involved Everett's presence in a County D polling station.  Everett told us that he observed apparent improper assistance of voters and, according to contemporaneous notes written by Everett, he directed the OPM observers to take notes about the incidents.  Mannett, on the other hand, told us that he heard from an OPM observer that Everett had been in the polling station for two hours and was asking voters improper questions.[100]  After receiving this information, Mannett called Everett and told him that it was against state law for anyone other than OPM observers to enter polling places and that he should leave the polling place, but with the caveat that Everett could enter for a short period of time if there was an emergency.  Mannett then called a Voting Section manager stating that Everett was violating the law, and the Voting Section manager directed Everett to leave the station.

That evening, Everett and Mannett engaged in a heated argument.  Everett told the OIG that Mannett shouted at him:  "[y]ou think I want to mess with some Federalist Society attorney under a Republican administration?" Mannett told us that he said this in frustration because he viewed Everett as a deeply conservative attorney who was protected because he and Coates shared the same political ideology as the Division's political leadership.[101]  Everett told the OIG that he believed Mannett's comments were evidence of his bias against those he perceived to be conservative and an animosity to those who wanted to enforce the VRA in a race-neutral manner and on behalf of White citizens. Everett reported the incident to Section Chief John Tanner, who he said advised him to go to the CRT Ombudsman.  Everett told us he expressed an initial desire to file a formal complaint with the Ombudsman, but later withdrew it because he did not want to draw additional attention to himself.

---

[100]  Mannett told the OIG that he received a written report from an OPM poll watcher discussing Everett's behavior, which he provided to us.  In the handwritten notes, the poll watcher states that Everett told the poll watchers to report on the "assistance problem" and to find out from the voters the reasons for their assistance. The notes further indicate that Everett had been inside the polling station for over two hours and that the OPM Captain advised the observers not to talk with the voters about why they needed assistance.

[101]  After reviewing a draft of this report, the Department told us that, according to Mannett, he tried to talk to Everett in a "diplomatic" way that evening and that Everett lied to him, saying that he was only in the polling site for a few minutes.

### D.   Harassment of a Non-Attorney Employee by Section Attorneys (2007)

In February 2007, Voting Section management received a complaint that three male trial attorneys, who were perceived to be conservatives, had a conversation with a non-attorney male employee in which the three attorneys made inappropriate and harassing comments about a female non-attorney employee, who was perceived to be a liberal.  Contemporaneous documents indicate that the attorneys made highly offensive and inappropriate sexual comments about the employee, including her sexual orientation, and remarks about how she was "pro-black" in her work.

Division leadership told us that Section Chief Tanner counseled the three attorneys and instructed them to apologize to the employee, and that the attorney who had engaged in the most egregious conduct was required to attend one-on-one anti-harassment training and sign a written acknowledgement that he understood and would comply with the Division's policies regarding harassment in the workplace.  Additionally, Division leadership indicated that it took more general corrective measures in response to this incident, including developing a mandatory Division-wide anti-harassment training program.

### E.   Internet Postings by Voting Section Employees (2007)

We were told that the atmosphere in the Voting Section was especially contentious in the spring of 2007, in part because some Section employees believed Division leadership had politicized the Section's work and acted in a manner that was inconsistent with the Section's mission by, for example, preclearing the Georgia Voter ID submission, filing the Noxubee complaint to protect White citizens, and allegedly ignoring cases that would defend minority victims.[102]  The politicized hiring during this period that was documented in the 2008 OIG/OPR Report added further tensions to the Voting Section.  The relations between personnel in the Section 5 unit and Division leadership were particularly acrimonious at the time, largely due to the staff's resentment over the removal of the popular Voting Section Deputy Chief who had been in charge of the unit (which was perceived to be politically motivated because the Deputy was a liberal), and increasing antagonism towards the new Acting Deputy Chief.[103]  Other events added to the ill will in the Voting Section, such as the incident discussed in the prior section in which Voting Section attorneys made highly offensive and inappropriate sexual and political comments concerning a Section employee in February 2007, and the changes to the procedures for Section 5 recommendation memoranda and hiring decisions

---

[102]  These allegations are addressed in substance in Chapter Three.

[103]  The removal of this Deputy Chief is discussed in Section V.B. of this chapter.

that employees told us they believed were ideologically based, discussed elsewhere in this report.[104]

During this period, at least three career Voting Section employees posted comments on widely read liberal websites concerning Voting Section work and personnel.[105]  The three employees who we were able to identify with certainty included three non-attorney employees.[106]  Many of the postings, which generally appeared in the Comments section following blog entries related to the Department, included a wide array of inappropriate remarks, ranging from petty and juvenile personal attacks to highly offensive and potentially threatening statements.  The comments were directed at fellow career Voting Section employees because of their conservative political views, their willingness to carry out the policies of the CRT division leadership, or their views on the Voting Rights Act.  The highly offensive comments included suggestions that the parents of one former career Section attorney were Nazis, disparaging a career manager's physical appearance and guessing how he/she would look without clothing, speculation that another career manager was watching pornography in her office, and references to "Yellow Fever," in connection with allusions to marital infidelity involving two career Voting Section employees, one of whom was described as "look[ing] Asian."

We found other postings by career Voting Section employees that contained intimidating comments and statements that arguably raised the potential threat of physical violence.  For instance, one of the employees wrote the following comment to an article concerning an internal Department investigation of potential misconduct by a Section manager:  "Geez, reading this just makes me want to go out and choke somebody.  At this point, I'd seriously consider going in tomorrow and hanging a noose in someone's office to get myself fired, but they'd probably applaud the gesture and give me a promotion for doing it…."  Some postings by Section employees contained statements that could be viewed as disturbing, such as comments that monitored managers' movements in the office and described their actions.

---

[104]  We were informed by the Department that other career employees raised additional allegations in early 2007, regarding the atmosphere in the Voting Section, including through informal complaints to management and HR, and through formal EEO complaints.

[105]  The authors of the comments used pseudonyms, but frequently identified themselves as Voting Section employees and included non-public information in their posts indicating that they were Section employees.  As discussed below, two Voting Section employees admitted to the OIG that they published the comments in question.

[106]  Although the OIG was able to determine that at least three employees posted comments, many other posts which likewise contained non-public information and an undeniable familiarity with the Section's personnel and operations strongly suggest that other Voting Section employees posted comments as well.  The OIG was unable to establish the identity of other commenters, however, to the same level of certainty.

In addition, we found postings by Section employees that contained heated political and even racist commentary, frequently attacking Republicans, particularly administration officials, and those Democrats who were perceived to support the Republican administration in order to promote their own careers.  Multiple comments asserted that administration officials or Voting Section managers who implemented their policies were bigoted against Blacks or other racial minorities, and one used the expression "po' Niggrahs" in describing a manager's attitude toward Blacks.  In one posting, one of the employees that we identified characterized the ideal neighborhood of one reportedly conservative career Section attorney as "everyone wears a white sheet, the darkies say 'yes'm,' and equal rights for all are the real 'land of make believe.'"  Several posts by Section employees criticized the administration's enforcement priorities, particularly the Voting Section's decision to sue Black defendants in Noxubee, Mississippi.  Another post by a career Section employee asserted that "a good, ethical Republican" is a "seeming oxymoron."

Our review also established that Section employees posted non-public information about sensitive personal matters relating to perceived Republican or conservative career Voting Section attorneys and career Voting Section managers who implemented Division leadership's priorities.  For instance, career Section employees posted information about ongoing internal investigations by OPR and the OIG, and confidential personal information, such as EEO complaints and internal disciplinary proceedings.  The posts also contained mocking and taunting statements toward political appointees in the Division, perceived conservative career attorneys in the Voting Section, and the career Voting Section managers appointed by Division leadership.  Some of the comments were posted by Section employees while the employees were at work using their government computers.

As noted, the OIG found that at least three career Voting Section employees posted objectionable comments.  Two of the three employees eventually admitted to us that they commented on the websites, stating that they posted the messages for a variety of reasons, including "blow[ing] off steam" about their frustrations regarding the Section, embarrassing certain Voting Section managers (particularly Tanner and the new Acting Deputy Chief who supervised the Section 5 unit), calling attention to perceived mismanagement and abuses by Voting Section management, and ultimately for the purpose of getting Tanner and the new Acting Deputy Chief removed from their positions.[107]  Indeed, the frequency of the postings peaked in late 2007

---

[107] The third individual we identified is no longer employed by the Department and was unavailable to be interviewed.  Overwhelming evidence established that he had posted on Internet sites concerning Voting Section matters, including testimony by multiple witnesses who told the OIG that this former employee unequivocally claimed credit for posting comments on multiple websites under a particular pen name.  In fact, one of the two employees who admitted posting comments called the third employee the "ring-leader" of their "cyber-gang."

and largely dissipated following the announcement of Tanner's resignation in December 2007.

Karen Lorrie, a non-attorney employee in the Voting Section, initially denied under oath to us that she had posted comments to websites concerning Voting Section personnel or matters.[108]  Later in her second OIG interview she admitted that she had posted such comments, identified several of the statements that she had posted, and acknowledged that she had lied under oath in her first OIG interview.  She also told the OIG that she understood that the comments she had posted would remain on the Internet and follow the targets in the future.  Lorrie told the OIG that she posted comments online as a way of "relieving the never-ending stress on the job."  Lorrie stated that she believed Section management, particularly the Acting Deputy Chief of the Section 5 unit at that time, had created "severely oppressive atmosphere" and "an atmosphere of fear and retaliation day in and day out."  Lorrie also cited to the February 2007 incident in which she was the target of harassing comments, which we discussed in the prior section.  According to Lorrie, she sought to address those problems through Section and Division management and other official channels, but she believed nothing was being done to redress them.[109]  As a result, she stated, she posted comments to vent her frustrations and as "a last ditch call for help."  Lorrie stated that she did not regret posting comments online, except to the extent that it resulted in questioning from the OIG.

The second individual who admitted to the Internet postings was Gerald Crenshaw, another non-attorney employee in the Voting Section.[110]  Crenshaw stated that he and other employees constituted a "cyber-gang" that was engaged in "cyber-bullying."  He told the OIG that, for his Internet postings, he selected as his alias the name of the protagonist of a well-known novel because he represented "the archetype angry black guy."  According to Crenshaw, he understood that the character had killed at least one person in the novel and stated that the fact that others who were familiar with the character might be afraid of the name could have played a "small part" in his selection of that pseudonym.  Crenshaw, who admitted posting the comment quoted above mentioning choking someone and placing a noose in a Section office, told the OIG that he understood how posting such a comment under the character's name could be threatening and intimidating, but stated his comments were not intended to be serious and were not directed at anyone in particular.  Crenshaw further told the OIG that, while he did not regret posting the

---

[108]  Karen Lorrie is a pseudonym.

[109]  As noted above, the Section counseled all three attorneys and required them to apologize, and took additional steps with respect to one of them.

[110]  Gerald Crenshaw is a pseudonym.

comments, he "should've made a better choice of words" on some of them.  In particular, he stated that he believed several of his statements "crossed the line" because they included "racist" and "intimidat[ing]" language.

Crenshaw stated further that his direct non-attorney supervisor, Harley Pross, knew that he was posting comments concerning career Voting Section employees on Internet sites shortly after he started doing so, adding that he believed his supervisor was "probably" aware of his post regarding leaving a noose in the office and his purported desire to choke someone.[111]  According to the Crenshaw, Pross was "indifferent" toward his postings, talked about them with other Section employees, and did not discourage him from such conduct. In fact, in one e-mail exchange with Pross, Crenshaw made a direct reference to his pseudonym and joked about Pross hiding his identity from Voting Section management, to which Pross responded favorably.

Pross told the OIG that he was aware of his subordinate's Internet postings about other career Section employees and that he had indeed prodded him to continue posting comments, even after a more senior Section manager had counseled the employee against posting similar comments in the future. Pross admitted to the OIG that condoning his subordinate's actions and encouraging further postings was inappropriate.

According to several Voting Section employees, the Internet postings described above had a negative impact on their performance and created considerable anxiety, including concerns for their personal safety.  For instance, one frequent target of the blog comments told the OIG that he feared physical violence due to the vitriolic nature of the postings.  Another of the primary targets of the comments contacted the Department's Security and Emergency Planning Staff out of concerns about physical violence following the posting of the comment about the noose and the desire to choke someone.

Witnesses told the OIG that some former Voting Section personnel stated that they left the Section or requested a detail out of the Division at least in part due to the Internet postings.  In addition, career Voting Section attorneys told the OIG that the blogging created a chilling effect – namely, that they were hesitant to work on perceived non-traditional matters, such as reverse-discrimination cases – or that they became more cautious when speaking with other Section employees out of fear that they would be attacked on the Internet.  The employees who were mentioned in these Internet postings told the OIG that they were concerned about the impact of the postings on their future employment prospects.

---

[111]  Harley Pross is a pseudonym. According to the Department, Pross was an administrative supervisor and was not a part of the Voting Section's management team.

Although many Section employees told the OIG that the postings had a negative impact on the Section, two current career Voting Section attorneys stated that they viewed the comments favorably.  One of those two Section attorneys, who was a trial attorney at the time and has since been promoted to the position of  Section manager, described the blogging to the OIG as "cathartic" because he believed the comments shed light on how the Section was being managed at that time.  The other attorney, who is a trial attorney, stated that he believed the postings by one particular Section employee – whose comments were regularly identified by Section employees as the most caustic among the prominent posters – were "witty" and "largely fair and accurate."  We also found that one Voting Section employee wrote e-mails to several current and former Voting Section employees, celebrating the blog postings.

Several Voting Section employees complained to Voting Section managers or CRT Division leadership about the blog postings.  Division leadership told us that they contemplated addressing the postings and consulted with CRT human resources, ethics, and EEO officials about possible courses of action.

The only response by the Division concerning the Internet postings was an e-mail from Principal Deputy Chief Christopher Coates, which had been drafted by the Division's Employment Section, to the employee (Crenshaw) who had written the post mentioning a noose and other comments containing racist and offensive language.  In that e-mail, Coates stated that he recognized Crenshaw's right to express his opinions, but counseled Crenshaw to refrain from using racially offensive language and making statements that created an implication of intimidation or a disruption of the workplace.

Despite the admonition from Coates, the very next day Crenshaw's supervisor, Harley Pross, told Crenshaw in an e-mail that Coates's e-mail was simply a "scare tactic," Crenshaw's job was not in jeopardy, and the Internet posting would not affect Crenshaw's performance evaluation at all.  Crenshaw told the OIG that, even after receiving Coates's e-mail, he continued to post comments on the Internet, including statements that mocked the e-mail itself and speculated that a career Section manager was watching pornography at work.  Pross told the OIG that he was aware of these postings and that in fact he had encouraged Crenshaw to post additional comments even after management's counseling e-mail.

Division leadership did not take additional action with respect to the blog posts because they were unable to identify with certainty who was posting the comments, were concerned about the appearance of the Civil Rights Division seemingly spying on its own employees, and were apprehensive about implicating the employees' First Amendment rights.[112]  As a result, beyond the

_____

[112] In its comments to the OIG's draft report, the Department noted several additional factors regarding the Division's ability to address the Internet postings, including:  (1) the vast

Cont'd

e-mail admonition to Crenshaw, no meaningful action was taken to identify the individuals responsible for the offensive postings or to address the conduct.

Lorrie and Crenshaw, the two employees who admitted to the OIG that they had posted inappropriate Internet comments, remain employed in the Section.  As noted above, the third employee who we determined posted inappropriate comments is no longer employed by the Department.  Pross (Crenshaw's supervisor who encouraged him to continue this activity) is no longer employed by the Department.

### F.    Ostracism of Career Employees

Several career Voting Section attorneys told the OIG that they and other employees were subjected to pervasive mistreatment by other career Voting Section employees due to their conservative political views or their work on particular Section matters.  We described above the examples most commonly cited to us of this mistreatment – namely, the "whisper campaign" about the student intern who worked on the Noxubee trial, the improper behavior of the original Georgia Voter ID review team towards Arnold Everett, and the inappropriate postings on Internet websites about self-identified or perceived conservative employees, Section managers, and Division leadership.  Beyond these incidents, witnesses cited to the OIG other instances of alleged mistreatment.

For example, several career attorneys noted that some of the purportedly liberal career Voting Section employees would ostracize conservatives in the office, exclude them from meetings on cases or matters, or make derogatory comments about their involvement in cases.  At least two witnesses who identified themselves as conservatives told the OIG that, when they worked on controversial matters, attorneys who were perceived to be liberal would interrogate them about the matters and exert significant pressure on them to arrive at conclusions that fell in line with traditionally liberal views.  Several conservative Section personnel told the OIG that, soon after they joined the Section, perceived liberal employees questioned them in a persistent manner about political issues and their views on civil rights matters, which they believed were thinly veiled attempts to determine the employees' political ideology.

---

majority of the Internet postings were made outside of work hours and, presumably, from personal computers; (2) pursuant to DOJ Order 2740.1A, the Division may not search the Internet activities of its employees on their government computers, even to investigate possible misconduct, absent approval from the Justice Management Division (JMD); (3) CRT sought guidance from JMD about available options for addressing the Internet comments in light of that DOJ Order 2740.1A and concerns about the First Amendment implications; and (4) CRT followed JMD's advice, including the decision to counsel Crenshaw.

The conduct manifested itself in petty ways as well.  For instance, when one well-known conservative attorney was leaving the Section, another employee wrote on his commemorative Department seal: "Bad Luck."  Years later, when Chris Coates was preparing to leave the Section and his commemorative seal was available for signatures (a long-standing tradition for departing Department employees), a conservative Section employee hid the seal out of fear that it would be "vandalized."

Several Voting Section employees told the OIG that the mistreatment of one group of career employees by another group of career employees because of their perceived ideology or political beliefs had a detrimental impact on the work environment in the Voting Section.  For instance, employees stated that the harassment had a chilling effect in which they would not discuss their personal beliefs or their views on Section work with others in the office, out of fear that they would be isolated, mocked on the Internet, or mistreated in other ways.

### G.    Actions To Address and Prevent Harassment

According to the Department, in April 2007, in direct response to complaints about harassment in the Voting Section Division leadership began the process for developing a mandatory Division-wide anti-harassment training program.  In September 2007, the Division held mandatory anti-harassment training for all CRT managers and employees. That training focused on maintaining a respectful workplace and preventing harassment, including race-based harassment, and provided information about the EEO complaint process.  According to CRT records, this was the first anti-harassment training held by the Division.  The Division also posted its EEO and harassment policies, including complaint procedures, on the Intranet in 2007.  In June 2007, AAG Wan Kim issued a memo to all employees reiterating that CRT is an equal employment opportunity employer and discrimination will not be tolerated.

The Department has described additional steps taken by Division leadership under the current administration to prevent inappropriate or harassing conduct, including:  providing annual EEO and anti-harassment training to all employees and managers; issuing EEO, prohibited personnel practice and anti-harassment policies that are available to all employees on the CRT Intranet and that set forth the various procedures for reporting misconduct; and sending periodic reminders to all employees about their obligations to conduct themselves in a professional matter at all times.  In January 2011, for instance, AAG Perez reiterated to all CRT employees – via posting on the CRT Intranet page and via e-mail message to all CRT employees – the prohibitions against discrimination and harassment in the workplace, including specific language that "[a]ll employees must conduct themselves in a professional manner at all times and refrain from engaging in conduct that

133

may be viewed as hostile or offensive to others in the workplace, including making derogatory comments about other employees because of their membership in a protected category, such as race, sex or religion, or because of their actual or perceived political affiliation."

### H.    Conclusions about Harassment

We found that numerous career Voting Section employees engaged in highly inappropriate and hostile conduct toward other career Section employees.

In the Georgia Voter ID matter, we believe it was problematic to add an inexperienced attorney to the case team because of his perceived ideology and that of the other members of the team.  This assignment, and the subsequent direct communications between Division leadership and the inexperienced attorney, created the perception among other team members that the attorney had been placed on the team for political or ideological reasons.  However, these circumstances did not excuse the conduct that followed.  The new attorney was ostracized and ridiculed, and had his work product copied from his computer files and distributed without his knowledge or permission, at least in part because of the perception that he was conservative and because of the legal positions he advocated while working on the submission.  In the Noxubee matter, a student intern and his mother were subjected to offensive questions and racially motivated comments due to his willingness to assist in a Section 2 case against Black defendants, and Coates was the subject of abusive and inappropriate e-mail comments.  In the County D matter, conflict between two attorneys erupted into a shouting match in which one attorney's perceived conservative affiliation was highlighted.

In 2007, antagonism within the Section fed a series of Internet postings by Section employees, containing a wide array of highly inappropriate remarks ranging from petty and juvenile personal attacks to racist and potentially threatening statements.  Some of the comments were posted from work computers, which we believe constituted a misuse of office resources and reflected extremely poor judgment.  Likewise, some of the Internet postings contained non-public information about internal Department matters, generally personnel and disciplinary issues, which reflect exceptionally poor judgment and may have constituted a violation of federal regulations or Department policies.[113]  We are especially troubled that a non-attorney Voting Section supervisor, who knew of a subordinate's improper conduct, not only suggested that the employee disregard counseling and admonishment from

---

[113]    *See, e.g.*, 5 C.F.R. § 2635.703, which prohibits the use of nonpublic information by government employees to further the "private interests" of himself or others.  Example 5 in the regulation makes clear that "private interests" need not be monetary, and that disclosing nonpublic information for political or ideological reasons may also be prohibited.

Division leadership, but also encouraged the subordinate to continue the improper conduct.

We also are troubled by the failure of Division leadership to take meaningful action to address some of these issues at the time they arose.  The willingness of career Section employees to post highly inappropriate and even racist comments on the Internet, in some instances with their identities only thinly disguised and in one instance with the support and encouragement of a supervisor, was indicative of a lack of concern that they might be subjected to discipline by the Division or the Department.  Together with other incidents described in this chapter, it reflected a culture of intolerance that existed in the Voting Section.  Particularly given that some of the employees involved in this behavior remain in the Voting Section, we believe that current Division leadership must be vigilant in expeditiously responding to and addressing future incidents of this nature.

### III.   Disclosures by Voting Section Employees of Non-Public Voting Section Information

Another category of conduct that we learned about during this review that contributed to partisan rancor within the Voting Section was the disclosure of confidential or deliberative information for publication by a third party.  Determining the source of these disclosures – some of which occurred as long as 10 years ago – was beyond the scope of this review.  Nevertheless, in most cases it was apparent that a voting Section employee was the most likely source of the information based upon its content or statements in the publication. This conduct, which occurred in the Voting Section with a frequency that is not typical for a Department component, exacerbated ideological conflicts within the Voting Section and between career employees and Division leadership.

For example, in February 2002, the Department received inquiries from a reporter who had obtained information about the contents of an internal Voting Section memorandum regarding the controversial Mississippi Section 5 submission (discussed in Chapter Three).  Division leadership suggested to Section Chief Joseph Rich that this disclosure likely came from career staff in the Voting Section, which Rich disputed.  Soon after, an article was published stating that political appointees had rejected career lawyers' recommendation in the Mississippi matter.[114]

---

[114]  Ellen Nakashima and Thomas Edsall, "Ashcroft Personnel Moves Irk Career Justice Lawyers," *The Washington Post* (March 15, 2002).

On another occasion, in November 2005, an article was published describing the contents of the internal memorandum submitted by those members of the review team who had recommended an objection to the Georgia Voter ID law (discussed in Section IV.B. of Chapter Three), and reporting that the review team's recommendation had been "overruled the next day by higher-ranking officials at [the] Justice [Department]."[115]  This disclosure fueled allegations that the decision to reject the staff memorandum and pre-clear the Georgia law was politically motivated.  One member of the review team told us that he had forwarded the memorandum to numerous other employees so that Division leadership could not accuse the review team of being responsible for any subsequent leak of the memorandum.

Shortly thereafter, in December 2005, the Section's career staff memorandum recommending an objection to the Texas redistricting plan (discussed in Chapter Three) was the basis for an article describing the incident as "another example of conflict between political employees and many of the division's career employees."[116]

More recently, in 2011, the following statement appeared in a political blog on the Internet:

> Justice Department sources familiar with Voting Section tactics tell me that DOJ has been sending investigators wearing wires and electronic surveillance equipment into state welfare and food stamp offices across the country to see if state officials are pushing voter registration on investigators posing as recipients. They have stung Louisiana, Georgia, Rhode Island, and potentially more states with these tactics.[117]

In 2012, the National Review Online Internet site described the contents of two purported internal Civil Rights Division reports and quoted at length from a purported internal Voting Section memorandum recommending preclearance of certain voting changes under Section 5.[118]

---

[115]  Dan Eggen, "Criticism of Voting Law Was Overruled, *The Washington Post* (Nov. 17, 2005).

[116]  Dan Eggen, "Justice Staff Saw Texas Districting as Illegal," http://www.washingtonpost.com/wp-dyn/content/article/2005/12/01/AR2005120101927.html (accessed March 8, 2013).

[117]  Christian Adams, "Millions of Dead Voters, Brought to You By Eric Holder," PJ Media, February 14, 2012, http://pjmedia.com/jchristianadams/2012/02/14/millions-of-dead-voters-brought-to-you-by-eric-holder/?singlepage=true (accessed March 8, 2013).

[118]  Hans A. von Spakovsky, "Crooked Justice," http://www.nationalreview.com/articles/334688/crooked-justice-hans-von-spakovsky# (accessed March 8, 2013).

In the course of our review, we also learned about the efforts of an outside attorney, who was a former Voting Section manager, to obtain internal Voting Section documents. In 2008, a Voting Section non-attorney employee provided information to this outside counsel about the legal reasoning of Section attorneys underlying the remedy that the Voting Section proposed in a Section 2 vote-dilution case. This same outside counsel, in 2003, had sought a copy of the Voting Section career staff's recommendation memorandum relating to the review of Texas's congressional redistricting submission (discussed in Chapter Three). We found that the outside counsel unsuccessfully attempted to obtain the 2003 memorandum from at least three Section attorneys, a Section analyst, and a Deputy Section Chief.

We were told by three witnesses that the outside counsel's attempt to obtain the memorandum in 2003 failed after the outside counsel stated to Section employees, in substance, that the document had substantial monetary value. One of the Section attorneys whom the outside counsel approached told the OIG that the outside counsel's request seemed "kind of offensive." This Section attorney stated further that, although the outside counsel's comment had a "sort of corrupt tinge," the Section attorney did not report the incident to any supervisors. Another Section attorney that the outside counsel approached for the memorandum told the OIG that she was not sure whether the outside counsel's comment was a joke, but that she was shocked and scared by the comment and she promptly ended their meeting. She told the OIG that although she believed his comment was improper, she did not report the incident to her supervisors because she had no further discussion with him about it, she was scared at the time, and she did not want "to get in the eye of any storm."

Although the outside counsel did not obtain the memorandum, he indicated in subsequent filings regarding the case that he had learned from "sources inside the Department of Justice" that career staff had recommended that the Department object to the Texas redistricting plan, which was not public information at that time. In our interview of the outside counsel, the counsel stated that he did not offer any money for the memorandum, though he acknowledged in written comments responding to this portion of the report that he did tell Section employees that the memo would have substantial value in pending litigation. In his interview, he further indicated that he tried to obtain a copy of the memorandum because he wanted to "show that the voting rights of minorities had been violated and that the Section 5 process would have protected them, but [that] instead [the career staff's recommendation] was overruled [by the Bush administration]."

We also found incidents in which Voting Section career staff shared confidential Section information with outside civil rights attorneys, some of whom were working on matters where they were adverse to the Department. For example, in 2005, a Voting Section attorney sent an internal "weekly

report," which provided the Section's staff with case status updates, to a civil rights attorney who used to work in the Section and was representing clients in private practice on voting matters.[119]  The weekly report included arguably attorney-client-privileged and confidential work-product information, including summaries of three matters in which the Department had notified jurisdictions that the Department was planning to file complaints in the immediate future (including the allegations that would be asserted in the respective complaints), a description of a meeting between Voting Section attorneys and jurisdiction officials concerning a Section 5 submission, and a summary of a telephone conference concerning discovery matters between Voting Section attorneys and defense counsel in the ongoing Noxubee litigation.

Division leadership indicated to us that it has taken a variety of steps to address the improper disclosure of confidential information and remind employees of their obligations.[120]  Several CRT leadership and Section managers told us that the unauthorized release of confidential information about internal Voting Section deliberations negatively affected their ability to manage the Voting Section and was bad for morale.  Additionally, CRT and Section managers told the OIG that their concerns about unauthorized disclosures of confidential information resulted in management sharing less information with the career staff regarding Section matters.

## IV.   Allegations of Retaliation by Managers against Career Employees

In this section we address allegations that managers in the Civil Rights Division and in the Voting Section took actions against career employees because of their political views or positions they took in controversial cases.

The OIG received a large number of allegations in this category.  For example, some witnesses told us that they or other employees had received adverse comments or ratings in their performance assessments or had been

---

[119]  The Voting Section attorney has since left the Department.

[120]  In December 2005, AAG Wan Kim reported several unauthorized disclosures of privileged and confidential internal documents from the Voting Section to the OIG and to OPR. Kim's request was referred to the Office of the Deputy Attorney General, which declined to initiate a leak investigation.  More recently, on December 14, 2012, CRT leadership, after consulting with JMD General Counsel, issued an e-mail to all CRT staff with the subject line: "Responsibilities of CRT Employees to Maintain the Confidentiality of Internal Division Documents and Information."  That e-mail "reiterate[d] to all Division employees their responsibility to maintain the confidentiality of internal Division documents and information," and listed the Department rules and practices that require the confidentiality of internal documents and information.  Similar memoranda were issued by Division leadership in prior administrations.

unfairly deprived of bonuses or awards because of their ideologies or political affiliations.  Some attorneys complained that they received undesirable case assignments or that Division leadership refused to approve cases that they proposed for investigation or filing because of political or ideological bias.  We even received an allegation that one career employee was given a less desirable office because of his or her perceived political affiliation.  We received these types of allegations with respect to both the current administration (employees alleging they were mistreated because they were conservatives or Republicans) as well as the prior administration (employees complaining they were mistreated because they were liberals or Democrats).

In our prior investigation of improper hiring and other improper personnel actions in the Civil Rights Division, we concluded that former Deputy Assistant Attorney General Bradley Schlozman explicitly stated his desire to remove attorneys from the Voting Section because of their political views.  As we outlined in our earlier report, as part of an e-mail exchange with a former colleague in 2003, Schlozman described Voting Section attorneys as "mold spores" and wrote, "My tentative plans are to gerrymander all of those crazy libs right out of the section."  We determined that the Voting Section was typically staffed with approximately 35 attorneys at the time, and that a total of 20 attorneys left the Section during Schlozman's tenure.  Our prior report did not include an investigation of the reasons for the departure of each individual attorney during that period.

We found it impractical in this review to investigate most of the allegations of political discrimination in the treatment of career attorneys due to the passage of time and the nature of the evidence we would have needed to examine.  For example, in order to determine whether performance reviews were based on the merits or tainted by ideological bias, the OIG would have had to evaluate the performance of a large number of employees over a lengthy period in the past and then compare each employee's performance with the comments and ratings in each employee's annual assessment.[121]

However, we identified three incidents or allegations of Voting Section management mistreatment of career employees for ideological reasons that were sufficiently discrete and for which relevant evidence was sufficiently

---

[121] An additional complicating factor in reviewing these allegations was the fact that some disagreements between employees and managers over positions advocated in Voting Section cases may raise legitimate issues of performance.  If an employee's ideology results in resistance or obstruction of legitimate management priorities, or advocating for positions in cases that are not adequately supported by fact or law, this could be a performance issue justifying a critical performance assessment.  Distinguishing between such performance issues and purely ideological disputes with respect to incidents that occurred years ago would have been very difficult, particularly with respect to some voting rights matters for which the applicable case law provided highly flexible or subjective standards.

available to enable us to investigate them.  First, several witnesses told us they believed that in 2005 and 2006 then-Section Chief John Tanner assigned certain work from the Civil Division's Office of Immigration Litigation (OIL) – which many employees found to be an undesirable assignment – to Voting Section attorneys on the basis of their perceived partisan or ideological affiliations.  Second, witnesses told us that they believed Tanner retaliated against career employees who recommended that the Voting Section interpose a Section 5 objection to the Georgia Voter ID law (discussed in Chapter Three and in Section II.A of this chapter) in their performance assessments because they took a position contrary to the wishes of political appointees in the Division, and that these employees were driven out of the Voting Section as a result of Tanner's actions.  Third, we received an allegation that in 2009 DAAG Julie Fernandes explored removing a career Voting Section employee from a Division hiring committee because of the employee's political views.  We examine each of these matters in turn below.

### A.      Assignment of OIL Briefs (2005-06)

In late 2004, a backlog of tens of thousands of immigration appeals had swamped OIL.  As a result, the Department issued a directive that attorneys in other Department components, including CRT, were expected to work on OIL matters in order to reduce the backlog.

From September 2005 through May 2007, the Voting Section received approximately 17 OIL cases, which Section Chief John Tanner assigned to approximately 10 different attorneys.  At least eight current and former Voting Section attorneys, including some widely perceived to be conservatives, told the OIG that they believed Tanner targeted the OIL briefs to specific attorneys who he did not like personally or who disagreed with him or Division leadership on cases, and used the assignments to drive those disfavored attorneys out of the Section.[122]

Tanner assigned at least 6 of the approximately 17 OIL briefs to perceived conservative Section attorneys, including 2 attorneys who volunteered for the assignments.  The remaining approximately 11 matters were assigned to a handful of perceived liberal Section attorneys.[123]  Tanner

---

[122]  Tanner is no longer employed by the Department and declined to be interviewed by the OIG for this investigation.  Tanner was interviewed by the OIG in 2007 in connection with its investigation into Civil Rights Division personnel actions and in 2006 and 2007 in connection with another review, but these interviews did not include an in-depth exploration of the personnel decisions discussed here.

[123]  An exact accounting was not feasible because we found no centralized records regarding these assignments and because some briefs were reassigned to multiple attorneys within the Section.  We pieced together the available evidence to construct the estimates given in the text.

directed 6 of those approximately 11 OIL cases to Pat Tellson, who was, according to many Section employees, a well-known and outspoken liberal. Tellson was assigned to the Section 5 unit and did not typically work on litigation matters.  According to an e-mail written to Tanner by the CRT coordinator of the OIL assignments, Tellson was given "more [OIL assignments] than anyone else in any trial section."  Tellson told us that she believes the OIL assignments were harassment and punitive.

Tanner issued multiple OIL assignments to three other perceived liberal Section attorneys.  One of those attorneys had vigorously disagreed with Tanner on the 2005 Georgia Voter ID matter, while another of the attorneys had clashed with Tanner on an ethics-related concern.  Tanner assigned an OIL case to another perceived liberal Section attorney who worked in the Section 5 unit, but she requested that the matter be reassigned due to her stated moral objections to such immigration appeals, which Tanner agreed to do.

Certain incidents involving Tanner bolstered the impression among Section personnel that he assigned OIL briefs in a punitive manner.  For instance, one Section attorney told the OIG that Tanner told her on her first day at the Voting Section that, if she "behaved herself," he would try to shield her from OIL assignments.  The attorney further stated that she believed Tanner's comment was a threat.  However, this attorney was not perceived to be liberal, and there is no evidence that Tanner was referring to ideological or partisan considerations when he made this comment.  In another instance, Tanner reassigned an OIL brief at the request of a Section attorney who was perceived to be conservative and gave the matter to another attorney who was perceived to be liberal and with whom he had clashed on a high-profile case.

Although Tanner did not appear to have distributed the OIL brief assignments in an equitable manner, with nearly two-thirds being assigned to perceived liberal attorneys, we ultimately did not find sufficient evidence to conclude that he made the assignments on the basis of ideology.  We did not find evidence in our review of Tanner's e-mails to indicate that there was an ideological basis for his decision-making in assigning these briefs.  Rather, a handful of his contemporaneous e-mails suggested there were non-ideological reasons for his assignments.  For example, in an e-mail to the CRT coordinator of OIL assignments (who worked in a different Section of CRT), Tanner stated that he had chosen Tellson to be the "primary specialist" for the Section on OIL cases, citing the CRT coordinator's previous advice to Tanner that attorneys prepare OIL briefs more quickly as they gain experience with them and noting that the CRT coordinator indicated that attorneys in his section handled six such cases simultaneously.  Tanner's e-mail also noted that the Voting Section had an "extraordinarily heavy and time-sensitive caseload" at the time and that "everyone else [is] up to their ears" on cases involving the Help America Vote Act.  In addition, when Tellson complained to Tanner that the burden of writing

the OIL briefs was impeding her ability to complete her Section 5 work and exacerbating a shoulder injury from "excessive use of the [computer] mouse," Tanner told her that he had not realized that it had become a problem and agreed to stop assigning her OIL briefs, at least temporarily.

Additionally, we noted that one of Tanner's first OIL assignments was to a perceived conservative Section attorney that Tanner seemed to regard highly, and Tanner subsequently assigned at least one OIL brief to a perceived conservative Section attorney that he had nominated for a performance award. Likewise, although Tanner assigned more OIL briefs to perceived liberal attorneys, based on what we were told by interviewees during our review, it appeared that there were more attorneys in the Voting Section at the time (and all other times relevant to this review) who were perceived to be liberal than were perceived to be conservative. Taking all of the evidence together, we did not find sufficient basis to conclude that Tanner used the OIL brief assignments as a means to retaliate against career employees for their partisan affiliations or because of positions they had previously taken in controversial cases.

### B.   Alleged Retaliation against Certain Members of the Georgia Voter ID Team (2005)

Several current and former Voting Section employees told the OIG that they believed Tanner retaliated against the three review team members who recommended that the Section object to the Georgia Voter ID Section 5 submission discussed above in Section II.A. of this chapter and in Chapter Three. All three left the Voting Section within 14 months after the conclusion of the Georgia Voter ID matter. Several witnesses told us they believed that these three employees were ultimately forced out of the Section because of the positions they took in the Georgia Voter ID review.

We learned that all three employees were reprimanded by Tanner in meetings held in September 2005. The three employees told us that a significant focus of the admonishment was the way the team had treated Arnold Everett, the attorney who had been assigned to the team by Division leadership and who had recommended preclearance. Two members stated that Tanner also criticized their substantive performance on the review, but that his criticisms were not specific.

Section management, at Tanner's request, inserted a negative comment concerning the Georgia matter into the annual performance evaluation score of the analyst who worked on that submission, but made other positive comments about the analyst's work. The analyst received a lower overall performance score than in the prior year. The other two members of the team who recommended an objection – an analyst and an attorney – left the Section before their performance evaluations were prepared. By contrast, Division

142

leadership gave Arnold Everett, the review team member who recommended preclearance, a performance award for his work on the matter.

Although Tanner declined to be interviewed for this review, he has discussed some of these issues in other contexts.  In an interview in another review and in an e-mail to Division leadership, Tanner identified several specific problems with the team members' data analysis, stating that he believed their analysis was biased, repeatedly omitted key facts, skewed relevant data, and had to be "jettisoned" because it could not be replicated.  In addition, in response to questions that the Division leadership received from a reporter asserting that Tanner had retaliated against those employees, Tanner told the Division's leadership:

> There were no reprisals against any staff . . . .  Where there is room for improvement in the performance of federal employees, any good manager will point it out and offer opportunities [for] training or other improvement of performance. Telling someone that [their] work needs improvement and offering them guidance on improvement does not constitute reprisal.

We interviewed all three employees about the reasons for their departure. The employee who was an attorney told us that she had long planned to leave the Voting Section because she wanted more professional development, including trial experience, than she was getting in the Voting Section.  She said she had applied for the job that she later accepted before the Georgia Voter ID matter happened, and that she did not leave because of the case.  The second employee was more uncertain about the reason for his departure, telling us that he did not know whether the Georgia matter caused him to leave.  He also said that his work in the Section was cyclical and he knew it would wane in 2006, and that this was a factor in his departure.  The third employee told us that she left when managers would not agree to let her switch from full-time to part-time status.  We did not find evidence that her managers refused this request in an effort to get her to leave the Section.  We also did not find evidence in the e-mails we reviewed indicating that Tanner was attempting to force the three employees to leave the Section.  Taking all of the evidence into account, we did not find sufficient evidence to support the widely-held perception among Voting Section employees that the three Section employees who advocated an objection to the Georgia Voter ID law were forced out of the section.

Finally, as to Tanner's oral admonishment of the three employees at the conclusion of the Georgia Voter ID matter for their treatment of Everett and for their substantive work on the case, as noted above we found that the treatment

of Everett by these employees was indeed inappropriate in several instances.[124] We further found no basis to conclude that the Tanner's negative comment in the performance assessment for one of the employees and reduction in the employee's overall rating from the previous year was in retaliation for any positions the employee took in the Georgia matter.

### C. Consideration of Ideology in the Composition of the Honors Program Hiring Committee (2009)

In late August and early September 2009, the CRT began preparing for the annual hiring process for the Attorney General's Honors Program and Summer Law Intern Program.  Pursuant to the CRT procedures established in 2008, the CRT leadership created a CRT Honors Program/Summer Law Intern Program Hiring Committee, comprising representatives from each CRT section.[125]  Each section chief was responsible for appointing one or two representatives to the committee, depending on Section resources.  The deadline for the Section Chiefs' appointments for the 2009 committee was August 28, 2009.

Voting Section Chief Christopher Coates was out of the office on leave when the committee appointments were due, and could not be reached.  In his absence, the Acting Chief appointed career Trial Attorney Carson Poole and another long-tenured career attorney to the committee.[126]  Shortly after Coates returned from leave on September 1, 2009, he replaced the other Voting Section attorney with a different career attorney, Gregory Milner.[127]  Coates told the OIG that he believed both of the Voting Section's initial delegates to the committee were liberal and that Milner was conservative.[128]  Coates explained that his practice regarding appointments to hiring committees and other projects was to intentionally pick a conservative and a liberal representative because he believed this was the best approach to get a broad perspective and

---

[124]  In making these findings, we emphasize that we did not attempt to confirm Tanner's assessment of the substantive work product generated by the employees who recommended an objection.  As discussed in Chapter Three, we reviewed the positions taken by all the attorneys involved in the Georgia Voter ID matter, and did not find a basis to conclude the positions advocated in their analyses lacked support in law or fact.

[125]  According to CRT human resources personnel, the Division had initiated a comprehensive review of its hiring policies before the release of the OIG's 2008 report concerning the Department's Honors and Summer Law Intern Programs and, following the release of the OIG's report, incorporated the OIG's recommendations into their policies.

[126]  Carson Poole is a pseudonym.

[127]  Gregory Milner is a pseudonym.

[128]  We note that the replaced attorney had served on the Honors Program hiring committee the previous year at Coates's request.  Coates also appointed an attorney he perceived to be ideologically conservative to that prior Honors Program hiring committee.

144

a diverse point of view on the subject matter at hand.  Coates also stated that he believed it was important for the Voting Section to have ideological diversity because its actions affect the political process.

On September 2, 2009, Acting AAG Loretta King issued a memorandum to the CRT section chiefs reiterating the rules governing the CRT's selection process for the Attorney General's Honors Program.  King's memorandum stated that the Section representatives to the hiring committee "may be members of management (Chiefs, Deputy Chiefs, or Special Litigation Counsel), or attorneys with at least five years in the Division."

On September 3, 2009, Milner and Poole received an e-mail with the upcoming committee schedule.  Poole forwarded the e-mail at 4:50 pm to DAAG Julie Fernandes, alerting her to Milner's appointment on the committee and stating:  "If this is not the fox guarding the henhouse, I don't know what is."  Poole also stated in his e-mail that he assumed Coates replaced the original delegate with Milner and concluded:  "It just continues."

Poole told the OIG that he believed Milner had worked on behalf of the Republican Party in the past and that he had viewed Milner as having a particular ideology.[129]  He said that, based on Milner's previous work and his work in the Voting Section, he thought Milner might err on the side of imposing ideological requirements on certain applicants and he had a concern about Milner acting fairly on the hiring committee.  When asked what he meant in stating "it just continues," Poole responded that Milner was one of the attorneys hired during the previous administration and had worked with Coates on a controversial case, and he believed that Milner's selection was an attempt by Coates to make sure that the applications were being viewed by someone who Coates viewed as "an ideological compadre."[130]

Fernandes wrote back to Poole at 8:04 pm that evening, stating:  "I need to speak to [the CRT Human Resources staffing supervisor] about this."  Four minutes later, at 8:08 pm, Fernandes e-mailed Acting AAG Loretta King and the Acting Chief of Staff for the Division, stating:

> I understand that Chris Coates has recommended [Poole] and [Milner] to serve on the honors hiring committee from voting.  However, I also understood that you had to have a certain number

---

[129]  As noted later in this chapter and in Chapter Five of this report, our investigation revealed that Poole sent numerous messages on the Department's e-mail system that expressed views that were hostile to Republicans and political conservatives.

[130]  The issues concerning the New Black Panther Party case and the dispute between Coates and Division management (including King) about the dismissal of certain defendants, which we discuss in detail in Chapter Three, occurred a few months earlier, in April and May 2009.

of years in the Division in order to be on this committee and that [Milner] does not meet that qualification.  Please let me know the status of this and whether we need to find a replacement for [Milner].

As noted above, King's memorandum governing the hiring committee stated that committee members must either be Section managers *or* attorneys with five years of experience in the CRT.  Because Milner held a position that qualified as a Section manager, the five-year requirement did not apply to him.

At 8:52 pm that night, Poole forwarded Fernandes's 8:04 pm e-mail to Chris Herren, then a Deputy Section Chief, and stated:  "[Fernandes] said to be open and let her know what's going on if it was important.  Let's keep this between us."

The next morning, September 4, 2009, King responded to Fernandes's 8:08 pm e-mail concerning Milner's eligibility under the five-year requirement, saying:  "This gets complicated.  You should either discuss this with [a CRT leadership official] or we can discuss when you return."

It is unclear whether Fernandes or anyone else took any further action regarding Milner's appointment to the hiring committee.  Fernandes told the OIG that she did not recall taking any actions with regard to Milner's selection to the committee beyond these e-mails. She stated further that she did not know whether she communicated any further with King or the other CRT leadership official about this issue.  Fernandes stated that she vaguely recalled speaking with Coates about the matter, but that she "must have" discussed it with him.

Fernandes stated that she probably spoke with the Human Resources (HR) supervisor referenced in her e-mail and another administrative employee about the hiring committee, but she did not recall doing so.  She also said that she did not learn about the five-year eligibility requirement until someone told her about it in connection with this incident.  (As noted, even after being told about the rule, Fernandes did not understand that it was inapplicable to Section managers like Milner.)  The OIG was unable to determine when or how Fernandes learned about the five-year eligibility requirement for trial attorneys. The HR supervisor referenced in Fernandes's 8:04 pm e-mail told the OIG that she did not speak with Fernandes or anyone else regarding the composition of the 2009 committee or the relevant eligibility requirements.

Furthermore, despite Poole's 8:52 pm e-mail, which appears to reference some additional communication with Fernandes, neither Fernandes nor Poole recalled in their OIG interviews any communication aside from the e-mail exchange.  Poole also told the OIG that he did not know whether Fernandes took any action in response to his initial e-mail.

Fernandes told the OIG that Milner served on the committee and that she believed the issue was resolved and that her concerns were assuaged, either because Milner was eligible to serve on the committee or because Coates persuaded her that there was a good non-ideological reason for waiving the eligibility requirement in this case.  Poole stated in his OIG interview that there were no problems with Milner's performance on the committee and that Milner "made some good recommendations" as a member of the committee.  Furthermore, he stated that he expected that Milner was going to be reappointed to the committee for the 2010 cycle and that he no longer had any concerns about Milner's involvement on the committee.  However, Milner was not reappointed to the Honors hiring committee in 2010 by new Voting Section Chief Chris Herren.  (As described later in this chapter, Coates departed as Voting Section Chief in early 2010.)  Milner told the OIG as of October 2011 he had been given certain administrative duties like Safe Room Coordinator and Intern Coordinator.

When asked about the meaning of the e-mail exchanges concerning Milner's appointment to the committee, Fernandes stated that she understood that Poole was concerned about Coates and the politicization of the Section and that his e-mail was likely an allusion to those concerns.  Fernandes later acknowledged that she understood that Poole was raising the question because he thought Milner's appointment was due to political considerations.

Fernandes initially told the OIG that her concern was whether Milner met the eligibility requirements and whether Coates followed the rules in selecting Milner.  Later, she told the OIG that her concern was whether Coates selected Milner because of his political orientation.  She stated further that assessing whether the selection followed the rules was one piece of evidence in determining whether it was politically motivated.

Fernandes also initially told the OIG that she doubted that she would have raised her concern about Milner's appointment to King if she believed that he satisfied the committee eligibility requirements.  Later, she added that, even if Milner had sufficient tenure in the Division, it would be improper for Coates to select him if the reason he did so was because Milner was conservative, and that this was her concern.

Fernandes stated that she knew at the time that Milner described himself as a political conservative, but she stated that Milner was not her concern.  To the contrary, Fernandes stated that she believed at the time – and continues to believe – that Milner could satisfactorily fulfill his obligations on the committee and that he would do "a fine job" in that capacity.  According to Fernandes, her concern was more about Coates's motivations for appointing Milner, specifically whether Coates was selecting Milner because of his political orientation.  She said that she believed Coates had an "us-versus-them" mentality concerning Voting Section personnel, and that he wanted to make sure that a liberal and a

147

conservative served together.  She stated further that there is a history of politicization in the Voting Section and in CRT, and that Coates spent time in those circles of people.  She said that Coates needed to understand that they "don't roll that way."  She also told the OIG that she knew of Coates's practice of assigning a liberal and a conservative for such assignments.

According to Fernandes, she knew that Coates was a conservative who she thought favored other conservatives who he believed were on "his side." She said that if Coates had appointed a known liberal to the committee rather than Milner, she would probably not have raised an objection because she would not have been concerned about politicization of the hiring process.  She said that, if Coates had made a different choice and there was no reason to think that the choice was not based on anything but the merits, she would not have cared.

We believe that this incident demonstrates that problems of polarization within the Voting Section continued after the change in administrations.  The participants all viewed this incident through starkly ideological lenses.  Coates substituted Milner for another attorney on the hiring committee who he perceived to be "liberal," and said that it was his practice to "balance" the assignments of liberals and conservatives to projects in order to ensure a diversity of viewpoints.  Poole objected to Fernandes about the assignment of Milner on the grounds that he was the "fox guarding the henhouse," a clear reference to Milner's perceived ideological views.  Fernandes responded to Poole by telling him that she would look into the matter and then immediately e-mailed the Acting AAG of the Division about the appointment.  Fernandes told us that she believed Coates frequently acted to advance his conservative ideological allies, and that she was concerned that he did so in this instance, even though she had no doubt about Milner's fitness for the job.

We believe that it was inappropriate to consider ideology in selecting Voting Section employees to serve or remain on committees such as the Honors Hiring Committee, even if the motive was to achieve or restore "balance."  We found that the focus on ideological considerations with respect to Milner's appointment to the hiring committee was troubling considering that the OIG, together with OPR, released 3 reports concerning improper political considerations in Department hiring in the 14 months preceding these events.[131]  One OIG-OPR report specifically examined improper political considerations in the Department's Honors Hiring Program, the very committee

---

[131]  *See* OIG-OPR Report, An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program, June 2008; OIG-OPR Report, An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General, July 2008; OIG-OPR Report, An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division, July 2008 (Released Publicly January 13, 2009).

at issue here.  We believe that this incident illustrates that polarization and mistrust persisted in the Voting Section and infected even routine non-case-related decisions like the composition of a hiring committee.

## V.   Allegations of Removal or Marginalization of Career Section Managers by Political Staff

In this section, we examine the events surrounding the departures of three senior Voting Section managers – former Section Chief Joseph Rich, Deputy Section Chief Robert Berman, and former Section Chief Christopher Coates – which became the subject of controversy and allegations of dysfunction, misconduct, mismanagement, or inappropriate behavior.

### A.   Marginalization of Voting Section Chief Joseph Rich (2004-05)

#### 1.   Facts

Rich was Acting Chief of the Voting Section when the administration changed in January 2001. In the fall of 2001, shortly after being confirmed as the new AAG of the Division, Ralph Boyd selected Rich to be the permanent Section Chief.  However, Rich's relationship with certain members of the Division's leadership soured over time.  Rich's relationship with Bradley Schlozman, who became a DAAG in the Division in the spring of 2003, was particularly antagonistic.  At the time, Schlozman was Deputy AAG and AAG Alexander Acosta (who had replaced Boyd) had given Schlozman broad authority to manage the Voting Section.  Schlozman eventually transferred much of Rich's supervisory authority to others in the Voting Section.  In the spring of 2005, Rich accepted an early retirement offer and left the Department.  Shortly thereafter, Schlozman became Acting AAG of the Division and named Tanner Section Chief and promoted Coates to Principal Deputy Chief.

Rich told investigators that he accepted the Department's early retirement offer because he believed there was a political atmosphere in the Department, Division leadership exhibited personal hostility toward him, and his responsibilities as Chief had been reduced.  We were told by several Voting Section employees that Rich was a popular chief among many career employees in the Voting Section, and that they believed Rich was marginalized because of positions he took on Voting Section matters that were contrary to the political desires of Division leadership.

Division leaders we interviewed told us that they lost confidence in Rich because they believed he often advanced a particular view influenced by his political ideology, which they thought was driven by information he received from civil rights advocacy groups.  These witnesses stated further that Rich often resisted or refused taking on assignments with which he disagreed, held

149

pre-determined conclusions on cases and matters, and would not relay to Division leadership relevant legal or factual information that undermined those views.[132]

Over the course of our investigation, we learned about several incidents that contributed to the antagonism and distrust between Rich and Division leadership.  We describe several of these below.

**Mississippi Redistricting Letter:**  As described in detail in Chapter Three, in 2002, the Division considered a redistricting plan submitted for Section 5 preclearance by the State of Mississippi.  AAG Boyd decided to issue a letter to the state to request additional information concerning the submission.  Andrew Lelling, Counsel to the AAG during the Mississippi matter, told the OIG that letters of this type were usually drafted by the Voting Section and signed by the Section Chief, but that Rich refused to draft or sign the letter.  Lelling said that Division leadership believed that Rich wanted to force political appointees to sign the letter in order to make it appear politically motivated.  He said Rich ultimately signed the request for more information, after Division leadership personnel prepared the text and insisted that he sign the document.  Boyd told us that Lelling probably asked Rich to draft the letter, and that Lelling relayed Rich's displeasure with this assignment.

Rich told us he did not refuse to prepare or sign the letter. He told us that Lelling and then-Principal DAAG Michael Wiggins asked him to sign the letter, which he told us he agreed to do despite disagreeing with their decision.

**Rich's Efforts To Appeal Schlozman's Decisions:**  Rich acknowledged to the OIG that he tested some of Division leadership's decisions and instructions.  For instance, Rich stated that, when Alex Acosta became AAG in August 2003, then-Principal DAAG Schlozman told Rich that Division leadership was modifying their previous practice of permitting the Voting Section to appeal decisions by the DAAGs to the AAG and that Rich should not appeal every decision to the new AAG.  Rich said he decided to "try it out a few times" and continued to request meetings with AAG Acosta to appeal Schlozman's decisions.  Rich stated that after Acosta rejected one of his appeals in a dismissive manner, he realized that such appeals were fruitless, and the Section thereafter stopped appealing Schlozman's decisions to Acosta.[133]  Schlozman told us that during the period that Ralph Boyd was AAG,

---

[132]  We have summarized the view of Division leaders and Rich regarding each other to illustrate the level of distrust and animosity, not because we found evidence to substantiate the perceptions described here.  Both sides of this dispute vigorously disputed each other's allegations.

[133]  After reading a draft of this report, Rich told us there was only one instance in which he tested Schlozman's rule by asking for a meeting with Acosta.  During his OIG interview, however, Rich stated there might have been "a couple of times" when he appealed

Cont'd

Rich regularly appealed intermediate decisions to Boyd, which created frustrations and tensions between Schlozman and Rich.  Schlozman said that when Acosta became AAG he decided he would not automatically consider all appeals from the Section Chief.

**"Flexiplace" Incident:**  In October 2003, Division leadership decided to terminate a "flexiplace working arrangement" for a Voting Section attorney that had been established under the prior administration, in which the attorney was permitted to work full-time outside of the Section's office.  This decision was communicated to Rich in a voicemail from an employee in the Division's Administrative Section.  Rich stated that he understood from the message that he would get a follow-up phone call about the decision, but that he did not.  Rich did not contact Division leadership about the matter.  Rich did not terminate the arrangement for several months, and did so only after a Human Resources manager asked him about the matter.  As a result of Rich's failure to implement the directive on a timely basis, Schlozman issued a written reprimand to him.  Rich told us that he appealed the reprimand, that no action was ever taken on his appeal, and that at the time he left the Department he was told the reprimand was not official and would not be part of his personnel file.  According to the Department, the Principal DAAG agreed with Rich's appeal, and the reprimand was removed from his file.

**Section 2 Recommendation Memoranda:**  As detailed in Chapter Three, in early 2004, Rich submitted two memoranda to Division leadership in which the Voting Section recommended the authorization of separate Section 2 lawsuits against Township A and Township B.  We found that the Voting Section's treatment in the two memoranda of one essential element in the relevant legal standard (whether Black voters in the school districts voted "cohesively") was inconsistent.  Division leadership witnesses told the OIG that the inconsistent treatment of that element in the two memoranda contributed to Division leadership's perception that the Voting Section, under Rich's supervision, applied the relevant legal standards inconsistently in order to support preferred recommendations.  We also determined that in rejecting the recommendation to sue Township A, Schlozman made inconsistent arguments and used abusive language toward Rich, stating:  "Do you do any editing of these memos at all?  I sometimes wonder if you are even capable of exercising supervision on these type of cases."  Rich told us that Schlozman used abusive language toward him constantly and was "the most vindictive and difficult person" with whom Rich has ever worked.  Rich stated that Division leadership took various actions against him resulting from "the unprecedented level of hostility toward career managers that permeated the leadership of the Civil Rights Division at that time."

---

Schlozman's decisions to Acosta before a third time when Acosta was so dismissive that Rich decided not to go to him anymore.

**Deletion of Coates's Noxubee Recommendation:**  As described in Chapter Three, in February 2005 the Voting Section filed a civil action against the Noxubee County (Mississippi) Democratic Election Committee (NDEC), and its chairman, Ike Brown, alleging violations of Sections 2 and 11(b) of the Voting Rights Act.  The Noxubee case was the first time the Department of Justice had ever filed a civil action against Black defendants under the VRA alleging denial or abridgment of the rights of White voters on account of race.

In May 2004, then-Special Litigation Counsel Christopher Coates submitted a draft memorandum to Rich that recommended the Department conduct parallel criminal and civil investigations of the voting practices in Noxubee County.[134]  Before forwarding Coates's memorandum to Division leadership, Rich deleted Coates's recommendation regarding an investigation of civil claims by the Voting Section.  Rich told us that he informed Coates of the reasons for Rich's opposition to the civil investigation at that time.  Upon learning of the deletion, Coates contacted Hans von Spakovsky – then counsel to the AAG – and sent him the omitted portion of his memorandum.  Von Spakovsky, copying Schlozman, then e-mailed Rich to ask about the omission, and Rich responded that it was Department practice for civil investigations to be put on hold pending completion of criminal investigations.

Upon receiving Rich's e-mail, Schlozman sent Rich an e-mail response stating: "you WILL pursue the section 2 case, and you will initiate it immediately."  Following the completion of an investigation, Coates prepared a J-Memo recommending that a Section 2 case be filed in the Noxubee matter.  Rich forwarded it to Division leadership with his concurrence, and the complaint was filed in February 2005.

Schlozman told the OIG that when he discovered that Rich had deleted the recommendation portion of Coates's memorandum he became angry at Rich and that this event eroded all trust that CRT leadership had in Rich.  Schlozman characterized the incident with the Noxubee memorandum as the "final straw" and that he went "apoplectic" and "screamed" at Rich over the telephone.

**Rich's Authority Is Transferred to Coates and Tanner:**  Schlozman told the OIG that, as a consequence of his concerns and frustrations with Rich, he transferred all of Rich's supervisory authority over Section 203 and Section 2 cases to then-Special Litigation Counsels (SLCs) John Tanner and

---

[134]  The memorandum submitted by Coates was not a J-Memo and was entitled "Recommendation to Conduct Civil and Criminal Investigations into the Voting Practices in Noxubee County, Mississippi."  In the conclusion, which Rich did not send to Division leadership, Coates made a specific recommendation to initiate an investigation into potential civil violations of the VRA resulting from election practices in Noxubee County.

Christopher Coates, respectively.  Thereafter, the two SLCs had approval authority over all decisions relating to Section 2 and language-minority matters, and they reported directly to Division leadership, bypassing Rich. Schlozman and von Spakovsky told the OIG that they trusted the two SLCs, as opposed to Rich, to provide them with all the information they would need to make correct litigation decisions.

### 2.    Analysis

We believe that Division leadership, particularly Schlozman, acted at times inappropriately or unfairly with Rich.  We found that Schlozman repeatedly used intemperate and sometimes unfair rhetoric in communicating with Rich.  We also found Schlozman's reaction to Rich's deletion of a staff recommendation to initiate an investigation in Noxubee to be extreme, as it is not necessarily inappropriate for a Section Chief to modify or delete staff recommendations once the Section Chief has made a final decision on what to recommend to leadership (in the absence of a practice or rule to the contrary).[135]

However, we also found that some incidents reflected conduct by Rich that undermined Division leadership's confidence in him.  For instance, Rich admitted to the OIG that he tested or resisted some of the instructions from Division leadership, such as attempting to appeal decisions by DAAG Schlozman to AAG Acosta, despite being told that such appeals would no longer be routinely considered.  Rich also failed to implement Division leadership's direction to terminate the "flexiplace" arrangement for a staff attorney in a timely manner.  In addition, the inconsistent analyses concerning a critical element of the Section 2 legal standard in the Township A and Township B recommendation memoranda in 2004 undermined Division leadership's confidence in Rich's management and legal judgment.  On the basis of these incidents, we found that at least some of the reason the Division leadership marginalized Rich was that it had lost confidence in Rich's willingness to implement legitimate management decisions and priorities promptly.[136]

---

[135]  We note that Schlozman later approved Section Chief John Tanner's modifications to the procedures for submitting recommendations in Section 5 preclearance reviews in connection with the Georgia matter, whereby dissenting staff recommendations were henceforth excluded from the memorandum conveying the Voting Section's views to Division leadership. We believe that whatever practice is chosen for dealing with situations in which there is disagreement between the Section Chief and the career staff, the practice should be communicated clearly and implemented consistently from case to case.

[136]  In light of the conflicting testimony about whether Rich refused to sign the Mississippi redistricting letter, and the fact that this incident occurred prior to Schlozman's tenure in the Division, we did not conclude that this incident contributed to the poor relationship between Rich and Schlozman.

Taking all of the evidence together, we concluded that Rich and his supervisors both contributed to the antagonistic relationship between them. However, in the absence of evidence more specifically linking Schlozman's treatment of Rich to Rich's perceived ideological views, we did not find sufficient evidence to conclude that partisanship or ideology were the primary factors in the Division leadership's treatment of Rich.

### B.    Involuntary Reassignment of Voting Section Deputy Chief Robert Berman (2006)

In this section, we review the circumstances surrounding the involuntary transfer of Voting Section Deputy Chief Robert Berman out of the Section in early 2006 and allegations that he was reassigned for ideological reasons.

### 1.    Facts

Berman joined the Civil Rights Division under the Honors Program in July 1978 and was promoted by Joseph Rich to the position of Deputy Chief of the Voting Section in October 2001, with responsibility for the Section 5 unit. Berman entered the Department Senior Executive Service Candidate Development Program in 2004.  Pursuant to that program, Berman served on a 5-month detail to the Administrative Office of the U.S. Courts starting in September 2005, at which point John Tanner was the Section Chief.

During Berman's detail, Tanner placed Special Litigation Counsel Yvette Rivera as Acting Deputy Chief in charge of the Section 5 unit and asked her to review how the Section 5 unit was doing its work.  According to Rivera and Tanner, Rivera identified several problems relating to management and workflow inefficiency in the unit.

Berman told the OIG that he was planning to return to the Voting Section after his detail ended in January 2006.  In late December 2005, however, Tanner told Berman that he could not return to the Section and that he would have to find a different position.  According to Berman, Tanner told him that he was not welcome back in the Section because Section management had conducted an assessment of the Section 5 unit during Berman's detail and had uncovered serious problems in the unit's operations.  Berman also told the OIG that Tanner stated that the decision had been made by the Division leadership and that it was final.  Berman then took a position training newly hired attorneys at the CRT Office of Professional Development and remained in that office until August 2008, when he transferred back into the Voting Section and resumed his duties as Deputy Chief in charge of the Section 5 unit with the approval of Acting AAG Grace Chung Becker.

154

Schlozman told the OIG that Berman's reassignment in 2006 was his (Schlozman's) decision, although he stated that incoming AAG Wan Kim assented to the move.[137]   According to Schlozman, Berman had been in the Voting Section for an extended period of time and the Section 5 unit had become Berman's "little fiefdom."   Schlozman stated that he believed moving Berman and installing a new Deputy to supervise the unit would be "good and healthy."   Schlozman stated that he was also aware at the time of the decision of the alleged deficiencies uncovered by Section management's assessment of the Section 5 operations.

Schlozman acknowledged that he and Berman had frequent disagreements on Section 5 matters and other substantive issues, but denied that those differences were the motivation behind the move or that the decision was made in retaliation for Berman's actions on any Voting Section matters. Schlozman told the OIG that, while the disagreements with Berman "didn't help his case," he often believed Berman was a "generally honest broker" and did not believe Berman was attempting to deceive him.

In a 2007 interview with the OIG, Tanner acknowledged that Berman was transferred involuntarily, but stated that he did not believe that Berman or any other employee was involuntarily transferred based on the employee's political ideology.[138]   Tanner stated he was dissatisfied with Berman's performance and that Schlozman had also expressed dissatisfaction with Berman's performance.   Tanner also stated that he believed there were serious performance deficiencies in the Section 5 unit and problems in the unit's operations, and that Berman was not the proper person to implement changes in the unit.

Berman told the OIG that, although he did not believe that he was transferred because of his actions on a particular case, he believed he was reassigned because he "was not giving them [Division leadership] the answers that they wanted."

According to one Voting Section attorney who was hired by Schlozman, Schlozman stated as he was preparing to leave the Division that the "good Americans" (a phrase Schlozman used to describe his ideologically preferred hires) that remained in the Voting Section were his legacy and jokingly noted that Berman was no longer in the Section.   According to witness testimony and other evidence obtained by the OIG, there was a perception among some Voting

---

[137]  Upon Kim's confirmation in November 2005 as AAG of the Division, Schlozman moved from being Acting AAG of the Division to being the Principal DAAG of the Division.

[138]  Tanner was interviewed by the OIG in 2007 in connection with its joint investigation with OPR into Civil Rights Division personnel actions.

Section staff that Berman was transferred because he was perceived to be ideologically liberal.

### 2.    Analysis

We were unable to independently assess the validity of the criticisms that Tanner and Rivera made of the management of the Section 5 unit under Berman's leadership.  Nevertheless, we found that perceived ideology or the positions Berman took in Voting Section matters likely were among the motivating factors in Schlozman's decision to transfer Berman involuntarily out of the Section.

First, we note that the OIG's 2008 report concerning Schlozman's actions concluded that he considered political and ideological affiliations in several personnel actions, including the transfer of other CRT career employees, as well as case assignments and awards.  Although the specific cases discussed in that report did not involve Voting Section personnel, these transfers occurred in roughly the same timeframe as Berman's reassignment.

Second, we found one of Schlozman's stated motivations for transferring Berman – namely, that Berman had been in the Section "forever" – to be unpersuasive.  Although Berman initially joined the Section in 1978, he worked in the Housing Section for roughly nine years (1991-2000), and had served as Deputy Chief for less than six years at the time of his transfer.  Moreover, other employees served in the Section for comparable lengths of time, including Tanner, who Schlozman had previously promoted to Section Chief.

Third, we found the manner in which Berman was informed that he could not return to the Section following his detail to support a finding that the involuntary transfer was based on reasons other than performance.  The decision to remove Berman appears to have been made suddenly, with no effort to improve Berman's performance.  Furthermore, Schlozman and Tanner did not give Berman an opportunity to respond to Rivera's findings concerning the claimed deficiencies in the Section 5 unit's performance; in fact, according to Berman, they never gave him a copy of Rivera's memorandum.  Finally, we found it significant that a subsequent Acting AAG, Grace Chung Becker, restored Berman to his position as Voting Section Deputy Chief in charge of Section 5.  We doubt that the Acting AAG would have reinstated Berman to his former position if his prior performance in that position had been  so problematic.

### C.    Treatment of Voting Section Chief Christopher Coates (2009)

In this section, we address the treatment of Voting Section Chief Christopher Coates by CRT leadership during the period from January 2009 until January 2010, when Coates left the Voting Section and was detailed to the U.S. Attorney's Office for the District of South Carolina.  Coates and others

alleged that he was stripped of his responsibilities and effectively forced out as Section Chief because of his perceived conservative political views or because he favored "race-neutral" enforcement of the voting rights laws.

### 1.   Facts

Coates was hired into the Voting Section in 1996.  Coates was named Principal Deputy Chief of the Voting Section by Acting AAG Schlozman in mid-2005, shortly after John Tanner took over for Joseph Rich as Section Chief.  Acting AAG Grace Chung Becker promoted Coates to Acting Section Chief in late 2007 upon Tanner's departure, and promoted him to Section Chief in 2008.

Coates told the OIG that he did not favor President Obama being elected, and that he anticipated that he would have problems with the people that the new administration would put into positions of authority, because he did not expect them to favor the enforcement of voting rights laws against minority defendants or on behalf of Whites.

### a.   The November 2008 Election and the Presidential Transition Period

During the transition to the new administration following the November 2008 election and continuing through the initial months of the new administration, several events occurred that laid the foundation for the fractious relationship between Coates and the incoming Division leadership, including Loretta King (a career Deputy Assistant Attorney General who was temporarily designated as Acting Assistant Attorney General from January 2009 to October 2009) and the administration's political appointees.

According to one former Voting Section manager who is now in private practice, many people in the Civil Rights Division and the civil rights community at large questioned Coates's commitment to civil rights and his judgment as a result of his involvement in the Noxubee case.  These concerns were exacerbated by the OIG-OPR report concerning former Acting AAG Schlozman's personnel practices, which was released publicly in January 2009 (during the transition period) and found that Schlozman had inappropriately considered political and ideological affiliations in hiring and other personnel actions in the Division.  The report revealed an e-mail from Schlozman concerning a candidate for an Immigration Judge position, in which he vouched for the candidate's political ideology, saying:  "[D]on't be dissuaded by his ACLU work on voting matters from years ago.  This is a very different man, particularly on immigration issues, he is a true member of the team."[139]

---

[139]  Coates worked on voting matters for the ACLU prior to joining the Voting Section.

157

According to e-mails involving Division personnel and several witnesses, including Acting AAG Loretta King, it was widely understood in the Division that the Immigration Judge candidate Schlozman referenced was Coates.

As detailed below, we found evidence that, during the transition period and in the first few months of the new administration, some CRT attorneys expressed concerns on various grounds about Coates to members of the presidential transition unit and incoming Division political appointees. Some of those employees urged the transition team or the incoming political appointees to remove Coates as Section Chief. For instance, Pat Tellson, the former Voting Section attorney who at the time worked in a different CRT Section, wrote a memorandum to the leaders of the presidential transition unit overseeing CRT to express concerns about Coates. Tellson stated in the memorandum that, although her comments "may be carrying coals to Newcastle," she believed Coates's "views and actions reflect a contempt toward the mission of the Civil Rights Division…." The memorandum quoted Schlozman's statement in the OIG-OPR report regarding Coates and cited among other items Coates's work on the New Black Panther Party and Noxubee matters.

In a memorandum prepared by President-elect Obama's transition team overseeing the changeover in the Civil Rights Division, the transition team referenced the possibility of making changes in the Division's leadership. The undated memorandum stated in a section entitled "Assessing Career Leadership":

> There should be a careful review of the capabilities and commitment of current career leadership and changes should be made as necessary, particularly in light of past abuses that led to politicization of the Division's work, lost expertise and wrongful political hiring, and other personnel moves. However, care should be taken to insure that any changes will protect the integrity and professionalism of the Division's career attorneys and will not be perceived as the politicization pendulum just swinging in a new direction.

Attorney General Holder told the OIG that he believed he reviewed the memorandum during the transition period, but that he did not think the transition team's recommendation referred specifically to Coates or any other specific career manager.[140]

---

[140] Loretta King, who became Acting AAG of CRT at the start of the Obama Administration, told the OIG that she recalled receiving something related to the transition team from Thomas Perez, who worked on the transition team and would later serve as CRT AAG. According to King, she recalled putting it in a pile of documents, but did not recall reading it.

### b.   Complaints about Coates in 2009

Loretta King served as Acting AAG of the Division from January 21 through October 6, 2009, and Steve Rosenbaum served as Acting DAAG of the Division from January 21 through July 17, 2009.  King and Rosenbaum told the OIG they had experiences with Coates early in the new administration that they cited in April and May 2009 as problems with his leadership in discussions about removing Coates as Section Chief.  King told the OIG that she also heard complaints about Coates's management from Voting Section personnel.  For example, she mentioned that a Deputy Chief in the Section complained to her that Coates was not keeping other managers sufficiently well informed of Section business.

### (1)   The Missouri Litigation

One early incident involved a pending action against the State of Missouri filed in 2005 under NVRA Section 8.  As discussed in Chapter Two, Section 8 requires states to maintain accurate voting lists by, among other things, purging the names of deceased or ineligible voters.  By 2008, the Missouri case had been appealed and remanded for further proceedings on a narrow issue.  The Voting Section submitted a brief on the remanded issue, which the district court struck in January 2009 because the brief contained data that fell outside the court's discovery parameters.  After the new administration took office in January 2009, the Voting Section submitted a new proposed brief to Rosenbaum that was similar to the original but omitted the offending data.  The Voting Section did not provide any case history or explanation of the circumstances surrounding the proposed brief, which was due to be filed two days later.  For instance, the Voting Section did not tell Rosenbaum that the court had rejected a similar brief a few weeks earlier and did not explain what changes had been made to comply with the court's order.  Rosenbaum discovered these facts when he attempted to reach Coates with questions about the brief.  Coates was not in the office, and Rosenbaum learned from Voting Section Deputy Chief Rebecca Wertz that the court had rejected a similar prior brief.

Rosenbaum had a conference call with Coates and the attorney who prepared the brief, Deputy Chief Robert Popper, in which they told Rosenbaum about the circumstances of the case.  Rosenbaum told the OIG that he explained to Coates and Popper that they should have provided background information prior to sending the brief, so that Rosenbaum could conduct a meaningful review.  According to Rosenbaum, Coates, and Popper, the call grew heated when Rosenbaum learned about the case history.  Rosenbaum told the OIG that he forcefully expressed his concerns that they had failed to provide him with essential background information.  Both Coates and Popper told the OIG that Rosenbaum, who was on a speakerphone during the meeting, shouted so loudly that people in the hallway and in nearby offices heard him.

159

Rosenbaum later cited this incident in a performance review of Coates, described below.

Coates told the OIG that he did not attempt to hide the history of the Missouri litigation from Rosenbaum, and that he assumed that the incoming Division leadership had access to the outgoing administration's files for ongoing matters, including the Missouri litigation.[141]

### (2)    Complaints about Coates's Questions to Job Candidates

In early 2009, Acting AAG King received complaints about Coates from one or more former Voting Section lawyers who were working elsewhere in the Department and had applied to transfer back into the Section. According to King, the attorneys complained that Coates asked them whether they would be willing to work on a case like the Noxubee matter – specifically, a case involving White victims or Black defendants. King told the OIG that she viewed Coates's questions to be racially charged and inappropriate "political-barometer" or "hot-potato" questions, that she instructed Coates not to ask such questions in the future, and that Coates complied. King told the OIG that she would not have objected to comparable questions phrased in a less provocative manner, such as whether a candidate would enforce the voting rights laws in a race-neutral manner or whether they would work on a matter that they disagreed with.[142]

Coates acknowledged to the OIG that he asked applicants whether or not they would be capable of enforcing the Voting Rights Act in a race-neutral

---

[141]  The history of the Missouri litigation is complex. Before the change in administrations, Coates and the Voting Section trial team briefed Acting AAG Grace Becker about the unfavorable prospects for the litigation and recommended that the case be dismissed. It is not clear from the evidence whether Becker had given a clear instruction on this matter at the time the administration ended and she left office. Although the case team did not provide this background information to Rosenbaum at the time he was asked to review the draft brief, we did not find any evidence to suggest that this omission was part of an intentional effort to conceal information from Rosenbaum or to induce him to make a decision with respect to the litigation that he would not have made if more fully informed. Rosenbaum told the OIG that he ultimately agreed with the case team's recommendation to dismiss the matter, and the Department subsequently dismissed the case on a voluntary basis.

[142]  During Acting AAG King's tenure, the Division drafted hiring guidance that included the following statements concerning interview questions: "(1) As a general rule, interviewers must avoid asking questions that may be construed as eliciting the applicant's political affiliation or views. (2) Interviewers may inquire, for legitimate non-discriminatory reasons, about an applicant's ability/willingness to work on certain types of cases, such as abortion clinic access, reverse discrimination or death penalty cases. If such questions are asked, they should be asked of all applicants." The Division's final hiring guidance, which contained this language, was issued in January 2010, after AAG Perez took office. *See* Guidance for Civil Rights Division Managers Regarding Hiring for Career Experienced Attorneys (Jan. 20, 2010).

manner, using the Ike Brown case as an example.  Coates stated that his motivation for asking the question was not to weed out people of liberal orientation, but rather "to weed out people who would not fairly enforce the law."  Coates stated that he believed his questions were appropriate in light of the previous incidents in which he believed Voting Section employees refused to work on matters with which they disagreed, particularly the Noxubee matter.[143]  Coates stated further that he did not believe he could effectively manage the Section if employees were refusing to work on cases.[144]  Coates told us he believed King was opposed to such questions because she was opposed to the race-neutral enforcement of the VRA.  As noted above in footnote 142, the Division issued hiring guidance allowing questions to applicants about whether they would be willing to work on reverse discrimination cases.

### c.    CRT Leadership's Concerns about Coates's Management of the Voting Section

King and Rosenbaum told the OIG that they believed Coates was a poor manager of the Voting Section, alleging that:  (i) Coates regularly submitted materials for Division leadership approval at the last minute, leaving King and Rosenbaum insufficient time for review before the applicable deadline; (ii) materials submitted from the Section under Coates's supervision were of poor quality; (iii) Coates failed to coordinate and collaborate with some of his Deputies; and (iv) Coates employed a laissez-faire approach toward the initiation of investigations and did not have a plan for enforcing the VRA.  They also told the OIG that they viewed Coates as a divisive figure in the Section and that they had serious concerns about Coates's trustworthiness, citing the incident described above in which Coates submitted a proposed brief in the Missouri NVRA litigation without important background information and their concerns that Coates might unwittingly facilitate the leaking of information outside the Department.[145]

---

[143] As noted in Chapter Three, there was widespread opposition to the Noxubee case within the Voting Section.  The extent to which Voting Section employees actually refused to work on this case was disputed.  *See* footnote 28 in Chapter Three.

[144]  One of the persons who Coates asked this question of was Pat Tellson, the Voting Section attorney who had made comments to the mother of an intern who worked on the Noxubee matter, which is described above in Section II.B of this chapter.  Coates told the OIG that he understood that Tellson did not agree with filing Noxubee and NBPP cases and, therefore, had a more particularized reason to ask this question of Tellson.

[145]  During the course of our investigation, we did not find any evidence that Coates himself had leaked such information or was likely to do so.

161

Associate Attorney General Thomas Perrelli told the OIG that, at some point after he arrived at the Department in March 2009, King raised concerns about Coates's performance. Perrelli stated that, over the course of his discussions with King, she never provided details about Coates's performance problems other than stating in general terms that Coates did not manage the Voting Section well. He told the OIG that he distinctly remembered telling her that if she had specific problems, she needed to treat them like a manager, such as addressing the problems with the employee and including them on a performance evaluation.

King told the OIG that she and Rosenbaum took steps to improve Coates's management practices, such as insisting that he employ a case-management strategy and hold regular meetings with his management staff. King acknowledged that Coates was "an obedient public servant" and never refused an order, although he sometimes took a long time to comply. For instance, King told the OIG that she instructed Coates to discontinue the policy on Section 5 matters that the Section would present a single preclearance recommendation to Division leadership, but she believed his implementation of that change was slow.

These criticisms of Coates contrast with the assessments of Coates by the immediately preceding leadership of the Division. Acting AAG Grace Chung Becker, who promoted Coates to Section Chief and supervised him for more than a year, told the OIG that she believed Coates performed well in that position. Becker stated that she believed Coates was a strong manager and that Coates was very good about making sure that if there was a disagreement within his team about what the Section's recommendations should be, they all met with her to discuss their opinions.

### d.   Discussions by Senior Department Officials about Removing Coates as Voting Section Chief

Contemporaneous documents show that in April and May 2009, Department officials, including Acting AAG Loretta King and Deputy Associate Attorney General Samuel Hirsch explored options for removing Coates as Chief of the Voting Section.[146] Witness accounts differed as to who was the primary advocate of exploring these options, but it is clear that the idea was shared with Attorney General Eric Holder, who generally supported the idea. As detailed below, the deliberations about removing Coates slowed when career personnel officials in the Justice Management Division objected because

---

[146] The timing of these discussions was significant because they began just before King and Rosenbaum became involved in a dispute with Coates over the prosecution of the New Black Panther Party case, which we discuss in detail in Chapter Three.

removal based on the record that had been documented at the time would not have been appropriate under government personnel rules.

According to Counsel to the Attorney General Aaron Lewis, Attorney General Holder was scheduled to visit the Voting Section early in the new administration as part of an effort to boost morale in the Division. Lewis stated that prior to the visit, which occurred in early March 2009, King told the Attorney General that Coates was mentioned in one of the OIG reports concerning politicization in the Division. Lewis said that AG Holder noted the information, but had no other comment in response to King's comment.[147] Lewis told the OIG that in the meeting with Coates and other CRT section chiefs Holder declared that the past was past and he would not tolerate any politicized enforcement or hiring in the Division, including retaliation from his own political staff.

King told the OIG about another interaction the Attorney General early in the new administration in which she discussed Coates. According to King, following a meeting with the Attorney General early in her tenure as Acting AAG, he asked her how things were going at the Division. According to King, she informed the Attorney General that she was having problems with the Chief of the Voting Section, as well as one other section chief. She stated further that she probably mentioned Coates's lack of candor and may have mentioned Coates's inability to manage the Section. King told the OIG that she did not remember the Attorney General's specific response, but recalled that he expressed concern and may have told her to let him know if she needed any help with it.

On April 7, 2009, Attorney General Holder e-mailed his chief of staff and scheduler requesting a 30-minute meeting with Loretta King and stating: "Need someone to be designated as follower of revitalization effort." King told the OIG that this meeting, which appears to have occurred on April 15, 2009, and is described below, was a result of her earlier conversation with the Attorney General.

On April 10, 2009, a Voting Section trial attorney Carson Poole wrote in an e-mail to Acting AAG Loretta King: "When will the Section be free from enemy hands?" Poole stated in his OIG interview that the term "enemy" referred to Coates, and King also told the OIG that she understood Poole's comment to mean Coates, although she stated that that she would not view Coates as the enemy. Acting AAG King responded to Poole, stating: "LOL! No comment."

---

[147]  King told the OIG that she did not think the reference to Coates in the OIG report arose in any meeting with the Attorney General.

At Poole's request, King met with him three days later, on April 14, 2009. Poole stated in his OIG interview that he and King discussed the state of the Voting Section, particularly his perspective on what had occurred in the Section over the previous eight years.  He told the OIG that he explained to her that there had been numerous problems and explained to her about the rifts in the Voting Section and the cliques involving people in conservative groups and people in non-conservative groups.  Poole told the OIG that he did not urge King to remove, replace, or reassign Coates, but also stated that he understood that with a new administration coming in, that it was "a no-brainer" that Coates was not going to remain as Chief.  King told the OIG that she did not recall whether she met with Poole following his e-mail on April 10, 2009, and stated that, if they did meet, the meeting was inconsequential.  She stated further that she did not recall what she said to Poole or what he said to her.

On April 15, 2009, Hirsch and King met with Attorney General Holder and his Counsel, Aaron Lewis, concerning Coates.  In his OIG interview and in contemporaneous e-mails, Hirsch stated that he was called into the meeting and did not know the purpose of the meeting.  King told us that the primary purpose of the April 15 meeting was to discuss the available options in dealing with Coates.  King stated that the bulk of the conversation focused on whether they should move Coates and what the options would be, and that she did not recall any discussion in the meeting about improving Coates's performance and leaving him as Section Chief.  King told the OIG that she did not recall anyone explicitly proposing the idea of removing him from the Section Chief position at the meeting, although she stated that she felt Hirsch had been pushing that idea in general.  King said that she did not favor removing Coates at that time, because a decision to remove a career manager should be made by a confirmed AAG rather than by an acting AAG.  She said that the Attorney General was "open to" the idea of removing Coates, and that if she had proposed removing Coates the Attorney General would have agreed.

Within an hour of the conclusion of the April 15 meeting, King e-mailed Hirsch at 1:57 pm to let him know that the Division's Executive Office "is checking on the rules for removal now."  That same afternoon King received an e-mail from the Division's Executive Office staff on the subject "Christopher Coates," indicating his 1-year probationary period as Section Chief had commenced on May 25, 2008, describing the rules regarding removal of Senior Executive Service (SES) officials, and attaching a document entitled "SES Removals and Suspensions."

Hirsch told us that he had very little specific recollection of the April 15 meeting with the Attorney General. We found that he was substantially involved in subsequent communications and meetings regarding the possibility of removing Coates as Section Chief.  Hirsch told us he believed that King had concerns about Coates's management and that she thought it would be easier

to remove Coates before his probationary period as an SES employee expired, which was creating, for King, a sense of urgency in taking action on Coates.[148]

In her comments to the OIG concerning the draft report, King stated that Hirsch's assertion that she had a sense of urgency in taking action on Coates is "untrue." King stated that she was very clear in the meeting that she did not favor removing Coates at the time because she believed a decision to remove a career manager should be made by a confirmed AAG rather than by an Acting AAG. She stated further that she believed at the time and continues to believe that it was not her role to remove Coates.

At 7:56 pm on the evening of April 15, Hirsch wrote an e-mail to Associate Attorney General Thomas Perrelli and Associate Deputy Attorney General Donald Verrilli describing the April 15 meeting as follows:

> As you know, from 12:30 to about 1:10 today, I met with the AG, Loretta King, and Aaron Lewis. Although I did not know in advance what would be on the agenda, the meeting ended up focusing on personnel issues primarily involving the current and past leaders of CRT's Voting Section. As of now, the four of us are scheduled to meet again tomorrow from 1:00 to 1:30, to discuss specific options for taking decisive and relatively quick action to resolve these personnel issues. My understanding is that Loretta has been working hard this afternoon with her Executive Office to flesh out those options.

> These issues, however, are complex and not easily resolvable. While I fully appreciate the AG's desire to move boldly and speedily to fix these important problems, my sense is that the meeting tomorrow is premature. Is it possible, in your morning meeting tomorrow, for you and [Deputy Attorney General David Ogden] to suggest postponing the 1:00 meeting and instead setting up a more orderly process for researching and evaluating all our options here?

---

[148]  As a general rule, an SES appointee serves under a probationary period for one calendar year from the date of appointment, during which time the standards for removing the appointee are lower than for a post-probationary SES appointee. Coates was appointed to the Senior Executive Service on May 25, 2008, and therefore his probationary period ended on May 25, 2009. However, a different federal law prohibits the involuntary removal of an SES appointee during their probationary period for 120 days following the appointment of the head of the agency (in this case, the Attorney General), and the imposition of the 120-day moratorium does not extend the appointee's probationary period. In this case, given that Attorney General Holder was confirmed on February 7, 2009, the 120-day moratorium began on that date and expired on June 7, 2009. Therefore, although Coates was in his SES probationary period through May 25, 2009, federal law prohibited his removal for performance reasons until after June 7, 2009.

Perrelli responded by e-mail at 8:10 pm that "[w]e can try to cut this off," and Verrilli concurred one minute later, at 8:11 pm, stating: "Right.  That is what we should try to do.  Thanks very much."  The meeting that was initially to have taken place the next day was later cancelled.  We found no evidence that this meeting was rescheduled, although Coates was discussed in a meeting with the Attorney General on May 5, 2009, as described below.

Attorney General Holder told the OIG that he did not specifically recall the April 15 meeting, but that he recalled discussions in early 2009 with King about Coates's performance deficiencies and his views on civil rights enforcement.[149]  Attorney General Holder told the OIG that King told him that Coates was a controversial and divisive force in the Voting Section.  The Attorney General told us that he understood based on what King conveyed to him that:

> [Coates] wanted to expand the use of the power of the Civil Rights Division in such a way that it would take us into areas that, though justified, would come at a cost of that which the Department traditionally had done, at the cost of people [that the] Civil Rights Division had traditionally protected.  [Y]ou can do both, but my sense was that the degree to which he wanted to do this, for lack of a better term, new stuff, would mean it would have a really negative impact on our capacity to [do] the traditional [cases].

Attorney General Holder told the OIG that the new type of cases he understood Coates wanted to pursue were "reverse-discrimination" cases.  According to the Attorney General, he understood that King believed Coates "was not a person who [] believed in the traditional way in which things had been done in the Civil Rights Division" under Republican and Democratic administrations and that Coates's view on civil rights enforcement was "inconsistent with long-time Justice Department interpretations and policies."  Attorney General Holder stated that there was no discussion about Coates's "party affiliation or his association with certain people," such as former CRT Acting AAG Schlozman.

Attorney General Holder stated that he recalled receiving an oral recommendation that Coates should be removed as Section Chief.  The Attorney General stated that King made clear to him that Coates was not "a

---

[149]  The Attorney General told the OIG that he believed that Acting DAAG Rosenbaum may have been involved in these discussions and that he may have shared King's views concerning Coates.  After reviewing a draft version of this report, however, Rosenbaum told the OIG that he did not participate in the April 15 meeting or the May 5 meeting (discussed below), and that he does not recall discussing his views about Coates's performance with the Attorney General at any time.  The relevant evidence indicates that Rosenbaum did not attend the April 15 or May 5 meetings with the Attorney General.  Rosenbaum also stated that he did not share the views concerning Coates's enforcement priorities described in the text.

good fit for the office, given what we wanted to do with the office, which was to bring it back to where it was prior to [] the Bush years," and that Coates would at a minimum find it difficult to implement the Obama Administration's policies.

In addition, the Attorney General stated he was told that management issues were "a big part" of the concerns regarding Coates's performance, noting that he understood that the Voting Section was particularly divided in ideological camps.  He said there was no discussion or consideration of alternative personnel actions beyond removing or reassigning Coates, such as counseling or training, because he believed, based on what King and Rosenbaum told him, that previous efforts to improve Coates's leadership and alleviate the Section's factionalization had failed.  The Attorney General stated that it was his impression from the meeting that "a lot of stuff had been tried" to improve Coates' performance but "there was no possibility of redemption."

Attorney General Holder stated that he told King that, if she believed a change was necessary, she was in charge of the Division and he authorized her to make such changes.  King and Hirsch likewise told us that Holder assured King that, although she was the AAG in an acting capacity, she was the head of the division and that, if there was a personnel problem and there was an appropriate way to fix it, she should act on it rather than leaving the problem until the confirmed AAG arrived.

Although the initial follow-up meeting was cancelled, in the days following the April 15 meeting with the Attorney General, King and Hirsch continued to consult with Department HR personnel, particularly the CRT HR staff and senior officials in JMD, to explore options for removing or reassigning Coates.  Late at night on April 16, King sent Hirsch an e-mail with a subject line "our task" indicating that she would call JMD the following day "to see if JMD can provide further guidance to us" and to possibly arrange a meeting with JMD.  The next day, Friday, April 17, King arranged a meeting with career JMD officials for Monday, April 20, and circulated a calendar appointment to Verrilli and Hirsch entitled "Meeting to discuss SES Separation Rules."  King and Hirsch attended the April 20 meeting, and a few days later, on April 23, Hirsch sent the JMD officials an e-mail with a subject line "Human resources issue" and asked the officials if they could send him and King "the basic description of relevant policies, which we discussed at our meeting earlier this week . . . ."

The next day, April 24, the career JMD officials sent King and Hirsch an e-mail, stating that based on their understanding of Coates's performance history from the previous and current performance cycles, "we do not support a performance-based action at this time.  Further documentation and discussion should occur."  According to the JMD officials who wrote the e-mail, they arrived at this conclusion because the Division had not sufficiently

167

documented a performance problem for Coates in the 2008 and 2009 performance cycles, during which Coates had received the highest possible performance rating – "outstanding" – in 2008, and he had received a substantial performance bonus and pay increase that year.[150]  The JMD officials also noted that Division leadership had not conducted a mid-year performance appraisal for Coates in 2009 that documented performance deficiencies, and in the e-mail they recommended that such an appraisal be completed immediately.  The JMD officials also recommended to King and Hirsch that they consider offering Coates a reassignment to a temporary SES position with meaningful duties.  In the e-mail, the JMD officials also described the relevant statutory and regulatory provisions governing the removal procedures for SES officials following a presidential transition.

As discussed in Chapter Three, during this same period that there were serious discussions among senior officials in the Division and the Department about removing Coates as Section Chief, a tense dispute between King, Rosenbaum, and Coates arose in connection with the New Black Panther Party (NBPP) case.  During a meeting on May 1, 2009, that concerned whether the Department should seek a default judgment against all four defendants in the NBPP case, a heated argument erupted between Rosenbaum and Coates, in King's presence, concerning Rosenbaum's accusation that Coates and the NBPP trial team had hidden information about the NBPP website from Division leadership.  Hirsch noted that he was not present for the incident but that he viewed this entire episode as important in evaluating Coates's performance as the Chief of the Voting Section, which has been heavily criticized.  So I asked both Loretta and Steve to take the time to write down exactly what had happened on Thursday night [April 30] and on Friday morning [May 1], so that there would be a contemporaneous record for their files."

Shortly after that meeting on May 1 regarding the NBPP case, an appointment entitled "CIVIL RIGHTS REFORM MEETING" was scheduled for Attorney General Holder with Perrelli, King, Hirsch, Verrilli, and Aaron Lewis, the Attorney General's Counsel.  Later on May 1, Lewis e-mailed the Attorney General's chief of staff, stating:  "After the morning meeting, the Attorney General asked [his assistant] to schedule a meeting today with the Associate Attorney General, Sam Hirsch, and Loretta King from CRT."  Lewis's message stated further that King would not be able to attend the meeting as then scheduled and he proposed moving the meeting because "[King's] participation is necessary to provide the Attorney General the information he wants."  The meeting was subsequently rescheduled to May 5, 2009.

---

[150]  One JMD official also noted that Coates's supervisors had requested a waiver of a standard 12-month moratorium on pay raises following his selection for the SES in order to give Coates a raise in salary.  The JMD official further estimated that such waivers are sought for only 10-25 of the 400 employees selected for SES annually.

According to witnesses and documents, the central subject of the May 5 meeting with the Attorney General was Coates's removal.  During the meeting, King updated the Attorney General about the advice JMD had given regarding Coates's removal.  In addition, King told the Attorney General about the status of the NBPP case, discussed the possible dismissal of some of the NBPP defendants, and described Coates's conduct in the NBPP matter.  Hirsch and Verrilli told the OIG that they recalled the Attorney General urging King to do what was proper with respect to Coates and to let the chips fall where they may.

Aaron Lewis, the Counsel to Attorney General Holder who attended more than one meeting at which Coates was discussed, told the OIG he did not recall events at specific meetings, but he recalled general discussion of Coates's ability to enforce the law.  Lewis stated that the bulk of the conversations were about Coates's willingness to enforce the laws evenhandedly.  Lewis told the OIG that he did not have any recollection of discussions on Coates's management abilities, with the exception of conversations about how Coates's lack of willingness to enforce all civil rights laws could affect his ability to manage the Section.

According to Lewis, he recalled that Hirsch, and perhaps others, held the view that Coates would not be willing to enforce all the civil rights laws and that "he would still kind of have a political bone to pick."  Lewis stated further that he recalled that the resolution to that situation discussed among the Attorney General, King, Hirsch, and Lewis was to, "tell him [Coates] to do it [equally enforce the civil rights laws], and if he doesn't do it, then we'll deal with it at that point."  Lewis stated it was reported to the Attorney General during the consideration of the NBPP matter in May 2009 that the Voting Section had low morale and that "convincing those folks that it was safe to do their jobs" was going to be a challenge.  Lewis stated that he believed Coates was pushing the NBPP case against King's recommendation, and it seemed to CRT leadership that Coates "might not have been as interested in [] traditional voting rights cases and that he wasn't really pushing those cases the way he was pushing this one.  If this was reflective of his prioritization in management, then that wasn't [] a great reflection."

### e.    Coates's Mid-Year Performance Review

Pursuant to JMD's guidance, starting in May 2009, King and Rosenbaum began preparing a written mid-year performance review for Coates.[151] According to King, the purpose of the review was to document Coates's

---

[151]  In his comments concerning the OIG's draft report, Hirsch told us that the preparation and presentation of the mid-year review was done solely by CRT and that his involvement in this matter had concluded in early May, long before the performance review was prepared and presented.

performance deficiencies and put Coates on notice about those deficiencies. Rosenbaum drafted the 3-page document and King edited it.  The document included some of the complaints concerning Coates's management style that Voting Section employees had made, such as Coates's failure to hold meetings with his Voting Section deputy chiefs.  King told the OIG that she believed at this time that removing Coates was a decision for Perez, whose nomination for CRT AAG was pending, and she was laying a foundation for Perez to remove Coates, if he wanted to do so.  King stated that Coates's review was probably the only written mid-year performance evaluation for CRT SES personnel at the time.  King presented the document, entitled "Performance Deficiencies since January 20, 2009," to Coates on June 19, 2009.

The document identified roughly one dozen management failures and incidents in which Coates allegedly acted improperly, ranging from serious accusations to minor incidents.  For instance, it stated that Coates:  (i) did not have an effective system in place to track litigation deadlines, which forced the Department to seek extensions of deadlines on a regular basis; (ii) failed to provide Division leadership with requisite background information necessary to review his recommendations, citing specifically the Missouri NVRA Section 8 litigation and the NBPP matter; (iii) failed to promote collaboration in the Voting Section or hold regular Section-wide meetings or meetings with Section management beyond the biweekly management meetings with Division leadership; (iv) did not implement an effective plan to enforce VRA Section 2 with respect to vote-dilution; (v) took actions that "could fairly be seen as retaliatory" against a Section supervisor who disagreed with Coates on a case (involving ongoing litigation in New Mexico); and (vi) approved the detail of a Voting Section attorney to a U.S. Attorney's office without informing CRT leadership.  The document concluded that "Mr. Coates has been an ineffective leader of the Voting Section, has failed to provide candid and complete briefings for Division management, has failed to ensure that proposed briefs address critical issues and are well-written and has responded to criticism with contumacious behavior."

Coates told the OIG that he believed the document contained "a number of half-truths or false allegations," and that he refused to sign it because he believed it would be used as an admission of the asserted deficiencies.  Roughly one week later, Coates sent King a 9-page memorandum containing a point-by-point rebuttal of the allegations in the performance deficiencies document.  For example, in response to the allegation that Coates "ha[d] not implemented an effective plan to enforce the vote dilution prohibitions of Section 2" and that he had "not assigned a manager the responsibility for developing Section 2 investigations," Coates stated that he had previously provided to King and Rosenbaum a written explanation of the plan already in effect governing Section 2 enforcement.  Coates's rebuttal memorandum also identified a Deputy Chief of the Section as having been tasked with overseeing the implementation of the Section 2 plan for identifying investigative targets.  In

addition, Coates defended the Section's record on Section 2 enforcement during his tenure as Chief, asserting that the Section had filed four Section 2 vote-dilution cases, three of which had settled favorably; that three vote-dilution investigations had been approved during Rosenbaum's tenure as Acting DAAG, with more investigations in development; and that his record on Section 2 matters was better than every comparable time-period during the Clinton Administration.  Coates concluded his rebuttal with a lengthy attack on Rosenbaum's motivations, accusing Rosenbaum of targeting Coates because he was a conservative and a Republican, and of attempting to "endear himself" with the civil rights groups and CRT personnel who opposed Coates due to his involvement in the Noxubee and NBPP cases.

Coates stated that he heard nothing more about his mid-year evaluation after he gave King the rebuttal, and that he never received an annual performance evaluation for 2009.  King told the OIG that she did not recall the specifics of Coates's response, taking any action based on it, or asking Rosenbaum for his reaction to it.  Rosenbaum told us he never saw Coates's response.  King told us that the mid-year performance evaluation was not changed.  Coates told the OIG that, following the presentation of his mid-year review, he concluded that he was in an impossible situation and would likely not be able to remain in the Division.  Coates said he asked King about transferring to another position, but that she told him he would have to discuss it with Perez once he was confirmed as AAG.  King told the OIG that she took no further action regarding Coates's position as Section Chief.

### f.    Exclusion of Coates from Some Voting-Related Projects

During the period from January 2009 until he left the Voting Section in January 2010, we found that Coates was excluded from, and kept uninformed about, several sensitive projects of importance to the Voting Section, in which political appointees worked directly with Coates's subordinates.  These projects, which were largely led by Hirsch and the Principal DAAG in the Office of Legal Policy, Spencer Overton, included consideration of voting-related legislative proposals and a group working on a sensitive legislative project related to a provision of the Voting Rights Act ("Sensitive Working Group").[152]

In connection with each of these projects, Hirsch had extensive communications directly with career staff of the Voting Section, often without Coates's knowledge or input.  In fact, Hirsch repeatedly instructed the Voting Section staff, as well as others involved in the various projects, that information concerning those efforts were "close hold," "confidential," or

---

[152]  In describing this project, Section Chief Chris Herren told us it involved both legislative strategy and litigation strategy.

171

statements to that effect.  The OIG's review of relevant documents indicated that Hirsch instructed the people involved in those projects about the confidentiality of these matters on at least 20 occasions.  Several witnesses told the OIG that they understood Hirsch's instructions to mean not telling anyone about the existence or substance of the projects.[153]

Our review of the relevant evidence established that these projects, which started in general terms in March or April 2009 and continued through December 2009, varied in sensitivity and the extent to which Coates was excluded.  For at least two of the matters, , Coates was apparently never informed about the existence of the project, even though they involved matters that could affect the Voting Section's enforcement responsibilities and members of his staff were working on them.  Coates apparently was not initially informed about other projects, but he eventually learned about them from Section staff or others in the Department, who mistakenly or intentionally disregarded Hirsch's close-hold instructions.[154]  Coates knew about the existence of another group of projects, but was at various times and to varying degrees left out of substantive discussions between political appointees and the career staff he supervised.

Julie Fernandes, who joined the Division as a DAAG on July 13, 2009, characterized Hirsch's projects as "cloak-and-dagger" and said these efforts existed in a "cone of silence," which excluded anyone not invited to work on the matter, but particularly Coates.  She told the OIG that she remembered being told explicitly that Coates could not be included in discussions regarding these projects, saying that her understanding of the confidentiality instruction was "[d]on't tell anybody and don't tell Coates."  Fernandes stated that she resisted the exclusion of Coates from such projects because she believed that Coates, as the Section Chief, should be involved or at least informed about the Department's voting-related efforts.  Fernandes stated that she did not believe there was any reason to not trust Coates and that she pushed vigorously over Hirsch's objections to "open up" the Division's decision-making process.

Hirsch told the OIG that Coates was indeed excluded from some of the projects (for instance, the Sensitive Working Group) and not informed of the

---

[153]  In its comments to the draft report, the Department provided information concerning, Coates's involvement in several other voting-related projects during this same period that the Department told us were led by Hirsch.

[154]  For instance, one Section manager who worked on one of these sensitive projects told the OIG that he/she believed that he/she should not tell Coates about the project, but eventually decided that it was appropriate to tell Coates about the existence of the project, the substantive issues involved, and where the project was going.  In another instance, a trial attorney told Hirsch in an e-mail:  "Chris [Herren] has advised me that he let Chris C. know that I was doing some work on this, so I apparently am out of the closet.  Looks like we are ever so close."

involvement of others from the Voting Section.  Hirsch said that this was done in consultation with Overton and on at least some occasions at the request of the Section personnel (namely, Coates's subordinates) who were working on the matters and who indicated that Coates would either be upset at their involvement with Division leadership or would engage in endless debates that would slow down the work to "a snail's pace."  Hirsch told the OIG that he was "a little dumbfounded" that the employees believed their relationship with the Section Chief was so bad that they did not want him to know about their work on those projects.  Hirsch stated further that he was most interested in getting the substantive experts in the Section involved and, therefore, although he was uncomfortable with excluding Coates, he and Overton acquiesced to the staff's requests.

However, none of the four Voting Section employees that Hirsch identified as making those requests told the OIG that they requested to Hirsch that their involvement in the special projects be kept confidential from Coates. Two of the employees denied that they made such a request and stated further that they would had no reason to do so; a third told us he does not recall anything like that and that he believed Coates was aware of his involvement on those projects; and the fourth said that he did not think that he made that request, or that he would have had a reason to make that request. Additionally, three of the employees, as well as Fernandes, told the OIG that it was Hirsch who expressed the need for confidentiality on those projects. Likewise, the OIG's review of relevant e-mails established that Hirsch repeatedly raised the confidentiality of the projects and exhorted others to keep the information "close-hold" or "confidential."  Further, Overton told us that he did not recall any conversation with Hirsch in which Hirsch told him of concerns raised by Voting Section personnel regarding Coates.  Nor could Overton recall any instances where Section personnel requested that their involvement be kept from Coates.

Hirsch also told the OIG in substance that another reason Coates was excluded from some of the projects was because Hirsch wanted to keep the groups small and was concerned that Coates would fail to exercise discretion in keeping things within the group if he disagreed with the outcome on a particular issue.  In explaining why Coates was excluded from the Sensitive Working Group, Hirsch stated that Coates's perceived ideology with respect to the enforcement of voting rights laws "may have been in the air as part of the mix," though he said that the central concern was that things be kept within a small, cohesive group.  Hirsch stated further that he believed that there was a general sense that, if Coates were involved, the group would slow down considerably and end up in endless debates about principles and timing, because that was Coates's style.  He said that a lot of members in the group shared a certain amount of common ground about voting rights and election law and that Coates may have been out of sync with those views.

### g.  Coates's Departure from the Voting Section

As noted previously, Julie Fernandes joined the Department as a DAAG in the CRT on July 13, 2009.  Among her responsibilities was overseeing the Voting Section and, as a result, Coates reported directly to Fernandes.  Soon thereafter, and just weeks following Acting AAG King's presentation to Coates of his poor mid-year performance review, Fernandes offered Voting Section personnel the opportunity for one-on-one "listening sessions" with her about conditions in the Voting Section.  According to Fernandes, she held meetings with 20-30 Section employees and heard consistent complaints regarding the management of the Section, such as a lack of Section-wide meetings, limited communication and collaboration among managers, and insufficient transparency in case assignments and other decision-making.  Fernandes stated that she believed the Section had no formal assignment process, a poor case management system, and no periodic reviews of attorneys' dockets.  Fernandes stated that she perceived a "lock-down mentality" and a "culture of fear" among Section personnel.

Fernandes told the OIG that she concluded that Coates was a "terrible" manager.  Fernandes stated that she pushed Coates to make the Section more transparent and collaborative, conduct regular attorney docket reviews, communicate more effectively with his management team, and hold more Section-wide meetings.

In light of these interactions with Fernandes, Coates told us that he believed the hostile relationship with Division leadership that began with Rosenbaum and King would continue with Fernandes as DAAG.  Coates stated that, although the Voting Section Chief position was the most important he had ever held and that he did not want to leave at that time, he believed that it was not going to work out.  Therefore, shortly after Perez was confirmed as AAG in October 2009, Coates raised to Perez the idea of a transfer away from the Voting Section.  According to Coates, he mentioned to Perez that he had conflicts with individuals in Division leadership, and that he believed people in CRT leadership, other CRT Section Chiefs, and some in the civil rights community did not want him to be Voting Section Chief any longer.  He told us he did not go into detail on those problems.  Coates said that he told Perez that he could live without being section chief and that he would very much be interested in transferring to the U.S. Attorney's Office in Charleston, South Carolina.  Coates told the OIG that, although he believed he had been mistreated, he did not present a litany of complaints to Perez because he wanted Perez to help him secure a detail in South Carolina.  He said that he made the presentation in that way because he wanted Perez to feel that there was something in the move for him as well.

According to Perez, during this October 2009 meeting Coates stated that he was tired of managing the Section and told Perez that he was a "lousy"

manager.  Perez stated that Coates told him that the new administration should have the freedom to do what it wanted to do.  Perez stated that Coates expressed a strong interest in transferring to Charleston for personal reasons.

Perez agreed to pursue Coates's request, and within several weeks, an arrangement was reached with the U.S. Attorney's Office in Charleston.  Pursuant to that agreement, Coates's title was changed to Counselor to the Chief of the Voting Section, which was still an SES position, and then detailed from the Counselor position to be an Assistant U.S. Attorney in South Carolina from January 2010 until May 31, 2011.  Under the terms of the detail agreement, which was memorialized in a Memorandum of Understanding, Coates agreed to relinquish his SES position following the completion of the detail in May 2011.[155]  We found e-mails from CRT personnel, including DAAG Fernandes, Voting Section managers, and at least one attorney, expressing happiness over Coates's departure from the Section.  After the detail ended in May 2011, Coates retired from the Department.

## 2.    Analysis

Section Chiefs within components of the Department of Justice are generally career employees, not political appointees, and many are members of the SES.  Federal regulations prohibit the involuntary removal of any SES employee for 120 days following the appointment of a new Attorney General and a new supervising AAG.  As noted earlier, under federal regulations even probationary SES appointees may not be involuntarily removed for 120 days following the appointment of the head of the agency.  We believe that these practices and rules result in a continuity in management at the Department of Justice at the outset of a new administration that promotes consistency in the enforcement of laws and helps avoid the perception that the enforcement of the nation's laws depends on the outcome of an election.

---

[155]  We note that Coates's detail to South Carolina to serve as an Assistant U.S. Attorney appears to have violated regulations governing SES employees.  For example, 5 C.F.R. § 317.903(b) requires agencies to obtain approval from the Office of Personnel Management for details of SES personnel to non-SES positions for more than 240 days.  Although CRT notified JMD about the detail, we found no evidence that the Department notified OPM or that OPM approved Coates's detail, which lasted for approximately 18 months.  In its comments to the draft report, the Division stated that the longstanding practice has been that any contact with OPM regarding SES employees comes from JMD HR, not from the component's HR staff, which is consistent with DOJ Order 1920.1 Senior Executive Service (Oct. 1979), and that the failure to obtain OPM approval appeared to be an administrative oversight.

We also note that the Senior Executive Service is defined as positions with executive, supervisory, or managerial responsibilities, *see* 5 U.S.C. § 3132(a)(2) and 5 C.F.R. § 214.201, and Coates told the OIG that he served as a trial attorney in the U.S. Attorney's Office in South Carolina.

The evidence established that, starting very early in the new administration, there were serious discussions among senior Department officials about removing Coates, a probationary SES appointee, from the Voting Section Chief position.  These discussions were more than theoretical.  In a contemporaneous e-mail written immediately after the first meeting on this topic on April 15, 2009, Hirsch noted that there were plans to have immediate discussions about "taking decisive and relatively quick action to resolve these personnel issues," which we concluded referred to moving quickly to replace Coates as Section Chief.  The evidence indicates that removal or reassignment of Coates were the predominant options considered and that few, if any, alternatives were discussed.

We could not determine whether Deputy Associate Attorney General Hirsch or Acting AAG King was the primary advocate for removing Coates, as each of them identified the other as the driving force behind these discussions.[156]  There is no dispute, however, that both King and Hirsch had significant involvement in the discussions about removing Coates and that the discussions about doing so began no later than April 2009.

Attorney General Holder stated that the polarized condition of the Voting Section was a significant management failure and "a big part" of the rationale for the discussions about removing Coates, and that he understood that "a lot of stuff had been tried" to improve Coates's performance but "there was no possibility of redemption."  However, he also described the other reasons that were given to him by King and others for Coates's removal in ideological terms: that Coates had a "very conservative view of civil rights law" and wanted to make "reverse-discrimination" cases such a high priority in the Voting Section that it would have a negative impact on the Section's ability to do "traditional" cases on behalf of racial and language minority voters, and that Coates "had a view of the law that was inconsistent with long time Justice Department interpretations and policies."  Significantly, the heated disagreement between Coates and Division leadership over the NBPP case had not yet occurred when the discussions about removing Coates began.  King and Rosenbaum both denied criticizing Coates to Holder on the basis of ideology.

We recognize that if a career Section Chief's ideology affected his or her willingness or ability to implement Division leadership's legitimate enforcement priorities that might be sufficient evidence of a performance issue that could support corrective action against the Section Chief.  While Coates himself

---

[156]  King told the OIG that she believed Hirsch was "very interested" in moving Coates from the Chief position and that Hirsch made statements about the necessity of removing Coates.  King stated that she thinks Hirsch probably arrived at that conclusion because she and Rosenbaum were complaining to Hirsch about Coates.  Hirsch told the OIG that he assumed the idea of Coates's removal came from King and noted that it was King who brought the matter to the Attorney General's attention.

acknowledged that he held conservative views and openly favored expanding the enforcement of the voting rights laws on behalf of White voters even if it meant pursuing cases against minority defendants, we found no evidence that Coates had declined to implement any administration directive or otherwise failed to implement the policies of Division leadership.  There is no evidence that Coates had proposed even one new case on behalf of White voters or against Black defendants to Division leadership at the time they began the serious discussions about removing him, or that he had opposed the filing of any "traditional" cases that the Department's leadership wanted to pursue.  To the contrary, we found that Coates supported several Section 2 cases and investigations on behalf of minority voters throughout his career, including during his tenure as Section Chief under the new administration.  Indeed, King told the OIG that although Coates was sometimes slow to implement her directions, he was an "obedient public servant" and never refused an order (and, in fact, she indicated that he complied with her direction regarding appropriate questioning of applicants).

We concluded that the allegation that Coates's ideology was undermining the enforcement priorities of the new administration was inadequately supported, particularly at the time the high-level discussions about removing Coates began.  Nevertheless, this was part of the rationale that had been provided to the Attorney General and it was cited by the Attorney General in explaining his support for Coates's removal.  We did not find evidence indicating that the Attorney General knew that there was no support for the suggestion that Coates had declined to implement administration directives or otherwise failed to implement the policies of Division leadership.

After career officials in JMD told King and Hirsch that the JMD officials would not support a performance-based removal of Coates based upon the documented record as it existed in April 2009, King and Rosenbaum began documenting Coates's performance deficiencies for the acknowledged purpose of creating an adequate record to support Coates's removal in the future.  This culminated in the presentation of the "Performance Deficiencies" document by King to Coates in June 2009.  We noted that King told the OIG that she did not recall reading Coates's response, taking any action based on his comments, or telling Rosenbaum about it.  Moreover, there was no effort to follow up on the mid-year performance review as would be expected if those deficiencies were, indeed, the driving force for the desired personnel action.

We found that Division leadership held genuine beliefs about Coates's weaknesses as a manager, and we recognize that Coates was not without fault in his management of the Section and his relationships with Division leadership.  For example, we believe that at times Coates took insufficient steps to ensure that relevant and accurate information was provided to Division leadership in connection with seeking their approval of court submissions, and that he did not always ensure that materials were provided them early enough

to permit an adequate review.  According to Perez, Coates himself admitted he was not a good manager.  We also note that a substantial number of Voting Section career employees, including more than one manager, expressed dissatisfaction with Coates as a manager in interviews and contemporaneous e-mails, although we cannot determine to what extent such views may have been influenced by the sharp ideological divides within the Section.

We did not attempt to resolve whether all of the criticisms were justified. We note that Division leadership in the prior administration spoke highly of Coates's management.  More significantly, the serious discussions about removing Coates began very early in the new administration – in April 2009 – which we believe was too early to have been based entirely on a conclusion that extensive efforts to improve Coates's management had been tried and failed and that further attempts to improve his performance would be pointless.  We found it significant that the predominant solution that Division leadership explored following the initial meeting with the Attorney General concerning Coates was removal or reassignment.  The evidence established that there was little consideration of alternatives to improve his performance, such as counseling, training, mediation, or a Performance Improvement Plan.  In short, although Division leadership clearly had concerns about Coates's management, the timing and urgency of the discussions about removing him in April 2009 suggests to us that another factor was also at play:  the belief, which was conveyed to the Attorney General and his Counsel, Aaron Lewis, that Coates's ideology drove a desire to pursue reverse-discrimination cases that would come at the expense of the traditional cases that were the administration's priority.

We concluded that Coates's ideology was a factor in the discussions among senior Department and Division officials about removing or reassigning Coates.  We believe, however, that the Division's leadership had not established that Coates's ideology was creating an uncorrectable obstacle to the implementation of the administration's enforcement priorities at the time they began exploring efforts to remove him.  Based on all the evidence, we believe that Division leadership's assessment of Coates was influenced by Coates's high-profile association with the Noxubee and NBPP cases and by the fact that Coates had been promoted to Principal Deputy Chief of the Voting Section by former Acting AAG Schlozman (who as noted above had a documented record of making appointments on partisan or ideological bases).[157]  Based on our

---

[157] The perception about Schlozman's possible motivation in promoting Coates may well have been a fair one.  As detailed in our prior report, Schlozman had a documented record of making hiring decisions on improper partisan bases.  He referred to Coates in an e-mail using terminology that was very similar to other phrases he commonly used to describe other conservative candidates for employment that he favored for selection because of their partisan or ideological affiliations.  Nevertheless, even if ideology was a consideration in Schlozman's selection of Coates as Principal Deputy Chief, absent a demonstrated impact that his ideology

Cont'd

review of employee e-mails and interviews of several witnesses, we found that some employees in the Voting Section and some civil rights activists considered Coates to be hostile to "traditional" voting rights enforcement for the same reasons.  The new administration had pledged to make major changes in the Civil Rights Division, including returning the focus of the Voting Section to "traditional enforcement efforts."  We concluded that the retention of Coates was likely perceived by Division leadership as an obstacle to the promised change, including a renewed focus on "traditional" civil rights enforcement, and that the discussions about removing Coates were based in part on his view of the voting laws.

Regardless of whether federal law permitted a career SES official in the Executive Branch to be removed under the circumstances present here, we believe that officials at the Department of Justice must be particularly careful when exercising removal authority in order to protect the integrity and professionalism of federal law enforcement.  We do not believe that the removal of career Section Chiefs when administrations change should become a routine event based on the mere expectation, in the absence of something more, that the incumbent will not be able or willing to implement the new administration's priorities.  In this case, we concluded that the Department's consideration of removing or replacing Coates was based in part on the unsupported belief that Coates could not be trusted to faithfully implement the new administration's policies and that he would not do so if he was allowed to remain in his position.

Finally, we had deep concerns about the fact that Coates was excluded from, and kept uninformed about, several sensitive projects of importance to the Voting Section, in which political appointees worked directly with Coates's subordinates.  Our concerns are similar to our concerns about the consideration of removing him as Section Chief.[158]  These projects sometimes involved direct communications between a political appointee and career employees who were subordinate to Coates, without Coates's participation or knowledge.  As with the communications between von Spakovsky and Everett discussed above and in Chapter Three, such surreptitious communications between political appointees and career personnel that exclude certain Section managers are highly problematic.  The exclusion of a career Section Chief by political appointees from matters so closely related to his Section's expertise

---

had on his ability to implement Division and administration priorities, it should not have been a factor that was considered in deciding whether to remove him.

[158] We note that if the concerns about Coates had been limited to his managerial abilities, such concerns would not have been a compelling reason to exclude him from substantive projects relating to the work of the Voting Section, in which Hirsch utilized attorneys from the Section.  Nor has any persuasive reason been given to us to suspect Coates was likely to leak sensitive information.  These circumstances indicate that the exclusion of Coates from some projects was based on ideology.

and jurisdiction, and from communications with attorneys under his supervision, is indicative of a dysfunctional management chain, and it inevitably feeds the perception that the administration of justice is politicized. Particularly given the significant political ramifications of the work of the Voting Section, we believe that Division and Department leadership should exercise great caution to avoid such a perception.  Instead, in this case, the exclusion of Coates only served to exacerbate the perception.

# CHAPTER FIVE
# THE VOTING SECTION'S RECENT HIRING OF TRIAL ATTORNEYS

## I.    Introduction

In this chapter we describe the results of our investigation into whether members of the Voting Section's hiring committee and the leadership of the Voting Section and CRT considered the political affiliations or ideology of applicants for Voting Section experienced trial attorney positions advertised between January 20, 2009, and December 31, 2011.  We undertook this portion of our review after receiving a letter request from Senator Charles Grassley, dated August 10, 2011, in which Senator Grassley asked the OIG to update the joint OIG-OPR review in 2008 of politicized hiring in the Civil Rights Division.

To complete its investigation, the OIG requested detailed information about the Voting Section's hiring of experienced trial attorneys.  We examined thousands of pages of documents and e-mails concerning the Voting Section's hiring procedures and selection decisions.  During the period relevant to our investigation the Voting Section received 482 applications for vacant experienced trial attorney positions.  We collected information on each applicant's education, work history, and political affiliations and analyzed the resulting data to determine whether trends were apparent indicating bias.  We also conducted interviews of members of the Voting Section's hiring committee, CRT Human Resources (HR) staff, and leadership of the Voting Section and Division, including AAG Perez.

In Section II of this chapter we provide background information, including a description of the legal standards for hiring career attorneys.  We also describe an incident involving expedited hiring of career attorneys during the transition period before the inauguration of a new administration in 2001, which forms a significant historical backdrop to this chapter, and we summarize the results of our prior investigations of politicized hiring in the Department.  In Section III we describe the hiring procedures used in CRT during 2002 to 2011.

In Section IV of this chapter we present our factual findings regarding the hiring of experienced career trial attorneys in the Voting Section during the period from January 2009 to the end of December 2011.  Nine new attorneys were hired into trial attorney positions in the Voting Section during that period pursuant to an external job announcement published in January 2010.  We describe the recruiting preparations, the formation of the hiring committee, the evaluation of applications, and the qualifications of the newly hired attorneys.

181

We also present a detailed statistical evaluation of the hiring decisions, examining the characteristics of the 482 applicants for Voting Section positions as well as the hiring outcomes.  In Section V we present the OIG's analysis, and in Section VI we present our conclusions.

## II.   Background

### A.   Legal Standards for Hiring Career Attorneys

The legal standards for hiring career attorneys differ from those that apply to political positions.  Federal civil service law and Department policy prohibit discrimination based on political affiliation in hiring for career positions.  In contrast, it is not improper to consider political affiliations when hiring for political positions.

The Civil Service Reform Act of 1978 (CSRA) establishes merit system principles for federal agencies to use when making personnel decisions.  The CSRA requires agencies to adopt hiring practices for career employees so that "selection and advancement [are] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  5 U.S.C. § 2301(b)(1).  In support of these principles, the Act prohibits consideration of political affiliation in hiring for career positions:

> All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.

5 U.S.C. § 2301(b)(2).

In addition, CSRA Section 2302 forbids "[a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action" from engaging in enumerated "prohibited personnel practices."  *Id.* at 2302(b).  The use of political affiliation as a criterion for considering applicants for career attorney appointments may violate several prohibited personnel practices.  Section 2302(b)(1)(E) prohibits "discriminat[ing] for or against any employee or applicant for employment... on the basis of... political affiliation, as prohibited under any law, rule, or regulation."  Section 2302(b)(12) of the CSRA also makes it unlawful to "take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title."  As noted above, that section prohibits discrimination based on "political affiliation."  5 U.S.C. § 2301(b)(2).

182

A Department regulation also prohibits discrimination based on political affiliation:

> It is the policy of the Department of Justice to seek to eliminate discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, political affiliation, age, or physical or mental handicap in employment within the Department and to assure equal employment opportunity for all employees and applicants for employment.

28 C.F.R. Part 42.1(a), Subpart A.

The laws and regulation cited above do not define "political affiliation." Nonetheless, as the OIG stated in a prior review that examined politicized hiring practices within the Department:

> [I]dentifying candidates as "liberal" or "conservative" by the activities or organizations with which they are affiliated can be used as a proxy for political affiliation and thus can violate the CSRA's prohibition.  Using ideological affiliation can also create the appearance that candidates are being discriminated against based on political affiliation.  In addition, using ideological affiliation can violate the requirement that the government use hiring practices for career positions that ensure it identifies the best qualified applicants through fair and open competition.

*See* 5 U.S.C. §§ 2301 (b)(1) – (2).[159]

In a related review of politicized hiring within the Department, the OIG recommended that the Department amend its HR policies to clarify that career employees' political affiliations cannot be considered in hiring and that ideological considerations cannot be used as a proxy to discriminate on the basis of political affiliations.[160]  In response the Department amended its HR Order to provide:

> [P]olitical affiliation may not be used as a criterion in evaluating candidates, and ideological affiliation or other factors cannot be used as proxies to discriminate on the basis of political affiliation.  Illegal discrimination on the basis of political affiliation violates the merit-based

---

[159]  U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division* (July 2008, publicly released on July 13, 2009) 6.

[160]  U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program* ("SLIP Report")(June 2008) 102.

principles governing federal employment for career employees, and undermines public confidence in the Department's mission.

DOJ Order 1200.1.

Consequently, the CSRA and Department policy prohibit using political affiliations, and Department policy prohibits using ideological affiliations as a proxy for identifying political affiliations, in assessing candidates for career attorney positions.

### B.    Expedited Hiring of Career Employees Throughout the Division during the 2000-2001 Transition

During the course of our larger investigation of the Voting Section for this review, we received allegations regarding the expedited hiring of attorneys and other career employees that took place in the Voting Section as well as other sections of CRT during the transition period between the contested election of November 2000 and the installation of the new administration's political appointees in CRT in 2001.  Several witnesses told the OIG that in late 2000, following the contested presidential election, Division leadership in CRT communicated to the Sections that an expedited effort should be made to fill approximately 90 vacancies for career positions across the Division.  These vacancies had become available in large part as a result of an increase in funding for CRT in the 2000 budget, but had not been filled as of the time of the election.  Although events occurring more than a decade ago were not a central focus of our investigation, we found that widely held perceptions regarding these hiring decisions throughout the Division in late 2000 and early 2001 affected some witnesses' interpretations of the context of hiring decisions that were made more recently by the Voting Section.  We therefore looked at these events as an important background to our investigation of more recent hiring decisions in the Voting Section.

On December 15, 2000, Voting Section Chief Joseph Rich stated in an e-mail to CRT's Director of HR and the Division's Executive Officer that the Voting Section had been allocated eight new positions and that "the front office wants our recommendations by 1/8."  Rich indicated that the Voting Section wanted to fill its eight new positions with four attorneys and four non-attorneys.  On December 19, CRT issued a vacancy announcement for attorney positions in the Voting Section, with a closing date of January 3, 2001.  On December 23, the Saturday before Christmas and before the announcement closed, Rich interviewed 2 applicants for the positions, and Voting Section management interviewed at least 12 more attorney candidates during the period January 2 through January 5, 2001.  On January 11, 2001, Rich made

his final decisions and extended offers to four attorney candidates, three of whom accepted.[161]

Several CRT officials involved in the hiring effort that occurred between November 2000 to January 2001, including the CRT Chief of Staff, two Voting Section managers, and two CRT HR executives, told the OIG that there was a concerted effort to hire personnel before the new administration began on January 20, 2001. Rich told us that although the hiring process had started "well before the election, . . . once the election came, probably the decision-making was speeded up so that people coming through the pipeline could [] get jobs before the new administration came out." Rich said he suspected that the Division leadership wanted to expedite the hiring process in order to fill the positions before the Republicans got into office. He also stated, however, that: "It wasn't all 'Just do it before the Republicans got in.'" Rich told the OIG that he wanted to fill the vacant positions before the change in administration because hiring usually pauses after a change in administration as the appointed personnel become acclimated to the Division, and the Voting Section had already commenced the hiring process and he did not want to start over again. Rich stated that he wanted to fill the positions because he anticipated a substantial amount of redistricting work coming to the Section in 2001 as a result of the 2000 census and therefore the Voting Section needed to "beef up" its personnel, particularly its non-attorney staff.

Rich also told us that there was a concern about what would happen with the unfilled positions in the new administration. He stated that Republican administrations typically did not enforce civil rights laws as vigorously as Democratic administrations and that the Voting Section wanted "to get good, strong civil rights enforcement people in there." Rich stated that candidates' political affiliations did not play a role in their selection, but he believed the incoming administration may not have liked the candidates the Section selected because some of them came from civil rights advocacy groups. Rich stated that the Voting Section "liked the people we had picked and we did not know what would happen to them in the next round."

Deputy Chief Robert Berman, who was a member of the Voting Section hiring committee at the time, also told the OIG that there was an effort to complete the candidate-selection process before the new administration began. He stated that the process was accelerated out of concern that Acting Division leadership in the first weeks of the new administration would be reluctant to make significant decisions like hiring selections. Berman stated that he never

---

[161] On January 12, 2001, then-Deputy AAG Loretta King e-mailed then-AAG Bill Lann Lee and Lee's Chief of Staff William Yeomans about her discussion with a Chief of a different CRT Section and his hiring efforts. King stated in her e-mail: "With respect to his atty [sic] hires, he won't have a recommendation to put forward until the end of next week. I told him that he risked losing his atty [sic] hires if he didn't get recommendations to us sooner."

got the impression that there was a concern about the type of candidate that the new administration would hire.

William Yeomans, who served as Chief of Staff in CRT at the time, and as Acting AAG during the first few months of the new administration until AAG Ralph Boyd was confirmed, told us that the Division was understaffed at the time and filling the positions before the new administration was "good government" because there was uncertainty about the positions with the change in administration, as the new administration could have issued a hiring freeze and moved the funds elsewhere.  Yeomans told the OIG that he believed that the hiring at that time was based on merit and that there was a strong case for moving the hiring along during the transition period, given the concerns that the slots would be lost under the new administration.

The former Executive Officer of CRT who participated in the 2000-01 hiring process told the OIG that she believed that there was a rush to fill the slots before the change in administration, saying:  "[B]ack during that time, the message was to push forward and hire as many – recruit and get them on board as fast as we could."  When asked why there was a rush to fill the positions, she stated:  "My conclusion was let's get them here before the new Administration comes on board."  She also told the OIG that she concluded that the rush to fill the vacant slots arose from a concern about the difference in ideology between the outgoing and incoming administrations regarding the enforcement of civil rights laws, particularly that Democratic administrations tend to focus more on "traditional" civil rights enforcement, while Republican administrations had usually directed resources away from civil rights enforcement.  She stated that she believed there was a push to bring in attorneys who were committed to enforcing the civil rights laws and had "demonstrated experience in supporting civil rights."  She stated that "[i]t was a push to get the best people in that they could find that was [sic] committed to the mission of civil rights," and that in leadership's view the new administration might have a different idea of who would be the "best person."

The former Director of HR for CRT, who participated in the 2000-01 hiring, told the OIG that she also believed there was a rush to hire people into CRT before the end of the administration.  She stated that during a management retreat after Election Day in 2000, a political appointee from Division leadership – she wasn't sure who – "threatened" to take control over the hiring if the Section Chiefs failed to fill the slots quickly and that the Section Chiefs "got the message loud and clear."[162]  According to the Director,

---

[162]  During her OIG interview, the former Director told us the management retreat was on the day after the election, but also stated that she thought the meeting took place in the context of "disappointment" over the results of the election, which might suggest that it occurred as late as December 2000.

CRT hiring "had never happened like that before," and she believed that those hiring efforts were improper because "[r]eally, what I think they wanted to do was just, you know, fill the division with people who would continue the fight, and knowing full well that those weren't the kind of people that the new front office would want to hire."  She said that she felt obligated to tell Division leadership that although filling all of the vacant positions before the inauguration was not illegal, it was not a good idea.  She stated:

> I don't remember who I talked to, but I remember saying, you know, I don't think we should fill every vacancy because that's going to leave no flexibility for the new administration and that's going to cause – it's going to cause hardship on the section chiefs – when – because the new administration is going to come in and not trust anybody because they're going to know what happened – which is exactly what eventually happened, you know.

She told the OIG that no one paid attention to her concerns.

The new administration's AAG, Ralph Boyd, was confirmed by the Senate and took office with his Deputy AAG, Robert Driscoll, in mid-2001.  Boyd and Driscoll told the OIG that they learned about the expedited hiring that occurred in the late days of the prior administration.  Driscoll stated that he concluded from his review of materials collected in response to a congressional inquiry that the CRT career personnel were trying to "stack the deck" with employees who held progressive views on civil rights enforcement.[163]  Driscoll stated that he recalled that the Division's Section Chiefs and possibly Yeomans "blanketed" civil rights advocacy groups with e-mails stating that the Division was hiring.  Boyd told the OIG that he was irritated at the pre-inauguration hiring, which he considered to be "gaming the system."  He said it bothered him because the career staff did not trust the new administration to make "honest calls" on who should work in the Division, and it was evidence of an "existing orthodoxy," which he opposed irrespective of its orientation.  In addition, Boyd stated that those hiring efforts reinforced Boyd's concern about the lack of ideological diversity in the Division.

---

[163]  In April 2001, Representative James Sensenbrenner wrote a letter to then-Attorney General John Ashcroft expressing concern about reports of expedited hiring in CRT during the transition period and requesting information from the Department.  The Department's response, which was prepared prior to Boyd and Driscoll taking office, reported that in total, between November 7, 2000, and February 15, 2001, the Division made employment offers to 31 individuals, including 17 attorneys and 2 civil rights analysts, who were not working in the Department at the time.  The response attributed the expedited hiring to the CRT budget increase in Fiscal Year 2000 and 2001.

Despite Boyd's and Driscoll's concerns about the transition-period hiring, the Division leadership did not conduct further further investigation or take further action regarding those events.  Driscoll stated that he concluded that CRT could hire staff to fill vacancies, that rushing to fill positions prior to the end of an administration violated no policies or procedures, and that "you were not going to get any traction with the career staff by re-litigating these issues."  He also told the OIG that he never discussed this 2000-01 hiring with Yeomans, Rich, or other section chiefs because he was a new political appointee and had not previously worked in Washington, D.C., and therefore he assumed that "this was the way the game was played."

We concluded that there was an effort by the outgoing Division leadership in CRT during the 2000-2001 transition period to fill vacant positions in various CRT Sections, including the Voting Section, on a highly expedited basis so as to be completed prior to the change in administrations. In the Voting Section, this effort was supported by Section Chief Joseph Rich and others.  The way this hiring effort proceeded created the perception, shared by senior career administrative officials in CRT as well as the incoming political leadership of the Division, that at least part of the motivation for this activity was to hire attorneys who favored the enforcement philosophy of the outgoing administration and to keep the hiring decisions out of the hands of the incoming administration because of concerns about its enforcement philosophy.[164]

## C.   Prior OIG Investigations of Politicized Hiring in the Department

The OIG previously investigated allegations of politicized hiring in the Department, including in the Division.  In 2008 and 2009, the OIG and OPR jointly issued three reports substantiating allegations that Department officials unlawfully relied upon political and ideological considerations when making

---

[164] After reviewing a draft of this report, the Department stated that the increase in hiring in late 2000 and early 2001 "was consistent with efforts over several years to secure additional funding for CRT and then make use of available budget resources and to fill vacancies where possible."  The Department stated that the accelerated hiring process was not motivated by fears about the ideology of the incoming administration but rather as a "necessary component to secure additional resources" for the Division.  We do not question the longer-term effort of Division leadership to obtain resources for CRT, which apparently began significantly before the election.  After the election, however, Division leadership had reason to believe that incoming leadership might not share its views on the appropriate level of resources to be devoted to the Division or its individual Sections.  Yet the Division accelerated the effort to complete the hiring during the transition period, which created the perception that the outgoing administration sought to restrict the ability of incoming leadership to make changes in priorities and resource allocations.  We believe this perception likely exacerbated distrust between the incoming Division leadership and the career staff.

employment decisions for the Department's Honors Program and SLIP, CRT, and other career attorney positions.[165]

Our investigation of CRT focused on allegations that Bradley Schlozman, former DAAG and Acting AAG, inappropriately considered political and ideological affiliations when making hiring and other personnel decisions affecting career attorneys in the Division.

Our statistical review of Schlozman's hiring decisions, based on data gathered from resumes, application materials, e-mails, and interviews, showed that of the 99 attorneys he hired, 63 had identifiably Republican or conservative affiliations, 2 had identifiably liberal affiliations, and 34 had unknown affiliations.[166]  These ratios were similar in the subset of 18 attorneys that Schlozman hired into the Voting Section:  11 had identifiably Republican or conservative affiliations, none had identifiably Democrat or liberal affiliations, and 7 had unknown affiliations.[167]

---

[165]  These reports are:  U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program* (June 2008); U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division* (July 2008, publicly released on July 13, 2009); and U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring by Monica Goodling and Other Staff in the Office of the Attorney General* (July 2008).  The reports are available at:  http://www.justice.gov/oig/reports/index.htm (accessed March 8, 2013).

[166]  We explained the classification methodology for analyzing the ideological makeup of the attorneys analyzed in the SLIP Report as follows:

> We recognize that these determinations are not precise and that categorizing organizations as liberal or conservative can be somewhat subjective. . . . For example, we categorized as "liberal" organizations promoting causes such as choice in abortion issues, gay rights, defense of immigrants, separation of church and state, and privacy rights.  Examples of organizations we considered liberal include Earthjustice, the American Civil Liberties Union, Planned Parenthood, Lambda Law Association, and Ayuda. We categorized as "conservative" groups promoting causes such as defense of religious liberty, traditional family values, free enterprise, limited government, and right to life issues.  Examples of groups we considered conservative include the Federalist Society, the Alliance Defense Fund, the Christian Legal Society, and the Family Research Council.  In reviewing candidates' applications, we considered a candidate's affiliations to be "neutral" if the organizations listed did not have an apparent liberal or conservative viewpoint, or if the candidate listed affiliations with both liberal and conservative organizations.

SLIP Report at 19, n.18.

[167]  Schlozman provided the OIG with the names of several individuals he hired into the Voting Section who he said he "knew or strongly suspected" were liberals.  We compared the names Schlozman provided with the information developed in our prior investigation and determined that it was not apparent from these individuals' resumes, applications, or other available information that they were liberals or Democrats.  One of the individuals identified by
Cont'd

189

This statistical evidence was supported by extensive e-mails documenting Schlozman's preference for hiring conservative attorneys and his desire to marginalize attorneys he perceived to be liberal or move them out of the Sections he was supervising.  These e-mails included discussions about personnel in the Voting Section.  For example, in an e-mail on July 15, 2003, to a former colleague, Schlozman wrote, "I too get to work with mold spores, but here in Civil Rights, we call them Voting Section attorneys."  As part of the same e-mail exchange, on July 16, 2003, Schlozman wrote, "My tentative plans are to gerrymander all of those crazy libs right out of the section."  Schlozman and Tanner (during an earlier review) told the OIG that they believed that the quality of the Voting Section's work suffered from the fact that the staff, in their view, was overwhelmingly liberal, and that Schlozman's hiring decisions reflected his desire to create more ideological diversity within the Voting Section.[168]

Based on the statistical evidence combined with the overwhelming corroborating documentation, we concluded that politicized hiring had occurred in the Division during Schlozman's tenure in the Division from 2003 to 2006.  We concluded that Schlozman considered political and ideological affiliations when hiring and taking other personnel actions relating to career attorneys, in violation of federal law and Department policy, and that his actions constituted misconduct.

## III.  CRT Hiring Procedures from 2002 to 2011

Over the past 10 years, CRT has modified its hiring procedures for experienced attorneys several times.[169]  Prior to 2002, career staff in the various CRT Sections managed the hiring process with the assistance of the Division's HR Office.  While authorization was needed from the Division's Office

Schlozman was a self-described Republican who listed Republican affiliations on her resume. Schlozman also listed three individuals he described as liberals who he promoted to management positions in the Section:  Section Chief John Tanner, Principal Deputy Chief Christopher Coates, and Special Litigation Counsel Chris Herren.  We did not review these individuals' resumes or applications to determine how they would have been classified in the prior investigation.  However, we note that in another context, Schlozman identified Coates as a "true member of the team" which we believe was intended to convey that Coates was conservative.  *See* Chapter Four, Section V.C.1.a., page [155].

[168]  Schlozman told us in a letter written in response to a review of a draft portion of this report that his low opinion of some Voting Section career attorneys was based upon his view that some were unprofessional and insubordinate and had engaged in partisan conduct.

[169]  The Department hires career attorneys either as entry-level attorneys through the Honors Program, or laterally as experienced attorneys.  According to the website of the Department's Office of Attorney Recruitment and Management (OARM), experienced attorneys must have no less than one year of experience following graduation from law school, though individual positions may require more years of experience.

of the AAG to fill a vacant position, once that approval was obtained, the Section Chief or his designee reviewed the applications and decided which candidates to interview without Division leadership involvement.  After completing interviews, the Section Chief made a hiring recommendation to the Division leadership.  According to CRT staff, these recommendations typically proved non-controversial and the Division leadership routinely approved them.

Beginning in 2002, the Division leadership became more involved in the hiring process.  Witnesses told us that this increased involvement was prompted at least in part by concerns about hiring practices during the 2000-2001 transition period, as discussed above.  In a memorandum dated February 25, 2002, CRT announced a "new attorney hiring process" designed to "create a centralized system of recruitment and selection for experienced attorney positions."[170]  Under the new policy, instead of allowing Section Chiefs to select which candidates to interview, DAAGs made this decision.  The Section Chiefs interviewed the applicants that the DAAGs selected.  In some cases the Section Chiefs were permitted to identify and interview other candidates from the applicant pool.  Section Chiefs made their hiring recommendations to their supervising DAAG, who forwarded the Section Chief's and the DAAG's own recommendation to the AAG for review and approval.

In December 2003, the AAG further centralized Division hiring procedures, adding a requirement that DAAGs obtain the concurrence of the Principal DAAG (a political appointee) when seeking approval to hire from the AAG and when selecting candidates for the Section Chief to interview.  In addition, Section Chiefs were prohibited from obtaining their own copies of resumes and had to review applications in the Division's HR Office.

Our earlier investigation of politicized hiring in CRT, which examined all Sections in CRT from 2001 to 2007, found that political and ideological considerations did not influence hiring and personnel decisions except in those sections that Schlozman supervised.  Our report found that Schlozman relied upon political and ideological considerations when making hiring and other personnel decisions in the Voting Section and the four other sections he supervised.[171]  The evidence developed during our earlier investigation also showed that the AAGs and Principal DAAGs who supervised Schlozman failed to exercise sufficient oversight to ensure that Schlozman did not engage in inappropriate hiring and personnel practices.

---

[170]  Executive Officer, Civil Rights Division, memorandum to Section Chiefs, New Attorney Hiring Process, February 25, 2002.

[171]  Schlozman also supervised the Special Litigation, Employment Litigation, Criminal, and Appellate Sections.  This report focuses on the Voting Section, and thus this chapter concerns hiring practices in the Voting Section and does not examine hiring practices in other sections of CRT.

The issues identified in CRT's hiring process eventually resulted in the implementation of numerous reforms.  In March 2009, CRT formed a working group of Section Chiefs and the Director of its Office of Professional Development to draft new policies for hiring experienced attorneys for career positions and to govern attorney promotions.  The group issued a report in September 2009 that recommended returning primary decision-making on hiring matters from the Division leadership to the career staff.  This recommendation was accepted by AAG Perez, who issued a new policy on hiring experienced attorneys in December 2009.[172]

The new hiring policy stated that it was formulated "[t]o ensure a fair, transparent, and merit based hiring process," and required each Section Chief to establish a hiring committee of at least three members, including the Section Chief and at least one non-manager attorney, for each vacancy announcement.  Under the policy, hiring committee members must review applications relative to the qualifications identified in the vacancy announcement and recommend candidates for interviews to the Section Chief.  Applicants that the Section Chief selects for interviews must be interviewed by no fewer than three hiring committee members.  After interviews conclude, the policy requires the Section Chief to submit hiring recommendations, with input from members of the hiring committee, to the AAG or his designee for review and approval.  If the AAG or designee opts to reject recommended candidates, the decision must be made in writing.

The hiring policy also emphasized that hiring in CRT is based on merit-based principles and should never involve discrimination based on race, age, political affiliation, or other prohibited factors.  Members of CRT hiring committees are required to attend training on merit system principles, prohibited personnel practices, and hiring and interviewing policies, and must certify that they will comply with applicable requirements.[173]

In January 2010, AAG Perez supplemented the new hiring policy with a lengthy guidance memorandum on Division hiring procedures for career experienced attorneys that was sent to Section managers and hiring committee members.[174]  The memorandum addressed numerous hiring issues, such as sensitive interview questions concerning disabilities and confidentiality when conducting reference checks.  The memorandum specifically instructed

---

[172]  Thomas E. Perez, Assistant Attorney General, memorandum to Civil Rights Division Employees, Civil Rights Division Experienced Attorney Hiring Process, December 3, 2009.

[173]  CRT also provides training on merit system principles and EEO during its Supervisor and Professionalism training courses.

[174]  Thomas E. Perez, Assistant Attorney General, memorandum to All OAAG Attorneys, et al., Guidance for Civil Rights Division Managers Regarding Hiring for Career Experienced Attorneys, January 20, 2010.

interviewers "as a general rule" to avoid asking questions that could be construed to seek information about the applicant's political affiliation or views.  It also identified desirable skills and experience for use in establishing qualifications to guide the Sections' selection criteria.  These include "[d]emonstrated academic achievement," "[d]emonstrated interest in the enforcement of civil rights laws," and "[s]ubstantive knowledge and expertise in the laws, rules and regulations applicable to the work of the section," among 10 other factors.[175]

AAG Perez also issued guidance to the Division on December 10, 2009, and July 13, 2010, on the need to follow merit system principles in hiring and avoid "prohibited personnel practices."[176]  We found that comparable guidance was issued by AAG Wan Kim in June 2007, by Acting AAG Grace Chung Becker in August 2008, and by Acting AAG Loretta King in early 2009.

In our interview of AAG Perez, he said that his main concern with hiring when he returned to the Department in October 2009 was to reestablish the role of career staff.[177]  In testimony before the Senate Judiciary Committee in September 2011, Perez said that he was "quite confident" that merit-based hiring had been restored in CRT, and that the Division hires attorneys with civil rights backgrounds because relevant experience is very helpful.

---

[175]  The 10 factors are:  (1) skill and experience developing and handling matters of complexity and significance; (2) written and oral communication skill and experience, including producing written work product that is accurate, well organized, thorough and free of typographical and grammatical errors; (3) oral advocacy, trial and presentation skill and experience, including effectively representing agencies and/or clients in court, administrative and regulatory proceedings, and/or as part of outreach efforts, training or other presentations; (4) research skill and experience; (5) negotiation skill and experience, including effectively representing agencies and/or clients in mediation and settlement negotiations; (6) skill and experience working cooperatively and productively with third parties, including charging parties, witnesses, respondents, opposing counsel, court personnel and the staff of other agencies; (7) skill and experience working cooperatively and productively with supervisors, colleagues, and staff; (8) level of supervision required, including the ability to complete tasks with the level of supervision commensurate with the GS-level of the vacant position; (9) skill and experience supervising the work of attorneys and staff; and (10) availability and willingness to travel.  According to the guidance memorandum, these factors were not listed in order of importance and may not apply to every attorney vacancy in CRT.

[176]  In response to a draft of this report, the Department stated that CRT has implemented additional safeguards, including:  issuing written hiring policies that require public and Section-specific postings of all positions and that make clear the minimum qualifications; instituting hiring committees; requiring that written hiring recommendations be submitted to the Office of the Assistant Attorney General (OAAG); requiring written explanations if the OAAG overrules a recommendation; prohibiting Internet searches of applicants; creating a system that allows any interested person or organization to sign up to receive attorney vacancy announcements automatically; and requiring mandatory training for all employees involved in the hiring process.

[177]  Perez previously served in CRT at the Department as a prosecutor in the Criminal Section from 1989 to 1995, and as a DAAG from 1998 to 1999.

Attorney General Holder told the OIG that he has taken a "hands off approach" to hiring other than to set out general terms to restore hiring procedures to the way they existed when he was Deputy Attorney General.[178] He said that he believes that hiring is something that the career staff should oversee, subject to directives such as his diversity initiative.

## IV.   Hiring of Career Trial Attorneys in 2010 in the Voting Section

### A.   Hiring Procedure

The Voting Section hired nine experienced attorneys for career trial attorney positions between January 20, 2009, and December 31, 2011, all of whom were hired following a single external job announcement that opened for one month starting on January 22, 2010.[179]

#### 1.   Recruiting Preparations and Formation of the Voting Section's Hiring Committee

According to CRT and Voting Section managers, by the end of 2009 the Section was critically short-staffed and needed to hire additional attorneys.[180] DAAG Fernandes told the OIG that she recalled that the staffing situation in the Voting Section was "stark" due to the previous loss of many mid-level attorneys and that she believed that only four trial attorneys remained who had the necessary experience to "run cases." We determined that the average number of attorneys from 2003 through 2008 was approximately 36.  During

---

[178]  Attorney General Holder served as Deputy Attorney General of the Department from June 1997 to January 2001.

[179]  Our review focused on the hiring of experienced trial attorneys into the Voting Section between January 20, 2009 and December 31, 2011, in response to an external job announcement.  These made up the substantial majority of all attorney hires during that period and they were all hired according to a common procedure, described in this section. Our analysis excluded attorneys who transferred to the Voting Section from other components of CRT.  We did not evaluate the hiring of entry-level attorneys through the Honors Program. Hiring decisions under this program are made at a Division-wide level using a different procedure than the one that the Voting Section used for hiring experienced trial attorneys. Two Honors attorneys selected by CRT during 2009-2011 were assigned to the Voting Section. (Two other Honors attorneys who were hired in 2008, prior to the period of our review, began working in the Voting Section in 2009.)  In addition, our review did not evaluate the selection of Deputy Chiefs and Special Litigation Counsels during this period.  Most of these appointments were promotions of attorneys already employed by the Voting Section, although two (one Deputy Chief and one Special Litigation Counsel) were hired from outside the Section.

[180]  A hiring assessment that the Voting Section completed in November 2009 supported this view and provided justification for the assignment of additional attorneys to the Section. By that time, CRT had obtained funding for 102 new positions in the Division.

194

that period the Voting Section lost 31 trial attorneys, including 9 in 2005.  In November 2009, the Voting Section had 38 attorneys.[181]

We were told that concerns over expected increases in workload related to redistricting and anticipated litigation further amplified the perceived need among CRT managers to hire attorneys in the Voting Section.  Section Chief Herren said that he expected "a crush" of litigation following completion of the census in 2010.  A Voting Section Deputy Chief, SaraBeth Donovan, also told the OIG that the demands on the Section were escalating due to redistricting and other initiatives and therefore it was necessary to hire experienced attorneys who could "hit the ground running" and handle trial work.

Fernandes told us that in light of these circumstances, she worked to create new attorney positions in the Voting Section and asked Herren to develop a list of alumni who had left the Section in the recent past as a way to demonstrate to AAG Perez that substantial talent had been lost that needed to be replenished.  Fernandes stated that she remembered thinking to herself that there may be former staff who wanted to return to the Section now that the environment was not so "toxic."  Herren told the OIG that he believed that Fernandes used the term "diaspora" to describe the departure of staff during the eight years of the last administration.  He also stated that staff in the Section prepared a list of alumni for Fernandes but he could not recall its purpose, though he believed it could have been to persuade AAG Perez that the Section needed more attorneys.

Our review of the list that Herren provided to Fernandes in November 2009 showed that it included 25 former Voting Section attorneys who previously had left the Section.  The list, however, omitted 29 former Section attorneys who had left the Section since January 2001, including 8 attorneys who were widely perceived to be conservatives.[182]  A Voting Section Deputy Chief, Rebecca Wertz, said that she may have worked on the list and that it included former experienced attorneys who were still in the Washington, D.C., area and who might have been interested in coming back to the Voting Section.  Wertz stated that she was "fairly sure" that the "conservative" alumni that the OIG asked about would not have been interested in returning and therefore were not included on the list.

---

[181]  Three of these attorneys were serving details outside of the Voting Section.

[182]  These attorneys were members of organizations such as the Federalist Society and the Republican National Lawyers Association.  In response to a draft of this report, Herren stated that the list he provided to Fernandes included one self-identified Republican.  This attorney was hired during the second Bush administration and worked in the Voting Section for only a few months.

Fernandes told the OIG that she never would have directed that conservatives or staff hired during the prior administration be excluded from the list. However, she felt that staff who had been "pushed out" by the prior administration would have been more likely to return to the Section if the "environment" in the Section were different. She described the individuals who left as those that the prior administration thought were not "good Americans," a phrase Schlozman used to describe his preferred hires, or people that they could trust, and so the prior Division leadership wanted to make their lives "hell" and push them out of the Section.

Another Deputy Chief, Berman, contributed to the list and said that it identified attorneys who had worked in the Section during a 5-year redistricting cycle (such as 2000-2004). Herren stated that the list "never went anywhere" and was somewhat of a "pointless exercise." Two attorneys on the list applied for the 2010 trial attorney positions and both were hired. We also found that Voting Section staff contacted persons outside the Section to notify them of the vacancies, including former Voting Section attorneys who were on the list. However, we did not find sufficient evidence to conclude that the list Herren provided to Fernandes was actually used in recruiting or selecting new attorneys in the Voting Section.

By early January 2010, AAG Perez approved Fernandes's and the Voting Section's request to hire additional trial attorneys and to post a hiring advertisement. Herren told the OIG that he received a draft advertisement from the Division's HR Office and that Division staff revised it. The final announcement identified a limited number of "required qualifications": three years post-J.D. experience, excellent professional judgment and interpersonal skills, and "substantial litigation experience." The announcement also set forth "preferred qualifications" that described other skills related more particularly to voting litigation:

> (1) substantive knowledge of the Voting Rights Act (VRA) and other statutes enforced by the section; (2) familiarity with the various analytical approaches utilized to review voting changes under Section 5 of the VRA; (3) experience investigating and/or litigating voting rights or civil rights cases; (4) federal judicial experience; (5) experience serving as the lead attorney in federal court cases; (6) familiarity with statistical methodologies used in civil rights cases; and (6) fluency in Spanish, Chinese, Korean, or Vietnamese languages.

Academic achievement was not identified as a required or preferred qualification. Herren told the OIG that he did not purposefully omit academic achievement from the hiring announcement, and he could not think of a circumstance where it would not be a preferred qualification.

The hiring announcement was published on the USAJOBS website on January 22, 2010.  It also was posted on the Department and CRT Internet and Intranet sites.  According to the Division's HR staff, organizations or persons who had notified HR that they wanted to receive notification of CRT job announcements, or organizations or persons who otherwise had been identified to HR for this purpose, received e-mail messages alerting them to the experienced trial attorney advertisement.  An HR staff member told the OIG that the Division created this "outreach" list in 2009 based on a contacts list that OARM developed for its Department-wide recruiting efforts, and the Division has maintained its own "outreach" list since that time.  CRT also added an invitation on its employment website for organizations to sign up to receive e-mail announcements of job advertisements, and requested staff to recommend groups to include on the list.[183]  The Division's HR Department updated its "outreach" list over time.[184]  CRT staff told us that if they received a request to add an organization to the list, the organization would be added.

We conducted an analysis of CRT's "outreach" list, which in February 2010 contained contacts at approximately 150 organizations.  The large majority of the organizations on the list were bar associations and law schools.  We determined that most of the organizations on the list were neutral or non-ideological.  Approximately 10 of the organizations on the list are generally considered to be "liberal" and only 1 (the Becket Fund for Religious Liberty) is generally considered to be "conservative."[185]

In addition to the notifications sent by the HR Department, AAG Perez sent a Division-wide e-mail in December 2009 requesting staff to "inform your friends and networks" about vacant positions.  Our review of Voting Section e-mails and information provided by Herren revealed that Herren sent e-mail notifications to a variety of individuals and organizations, many of whom had no readily apparent ideological or partisan affiliation.  Herren sent notifications to at least 11 individuals from "liberal" civil rights organizations, including the American Civil Liberties Union (ACLU), the Mexican American Legal Defense and Education Fund (MALDEF), the National Association for the Advancement

---

[183]  The invitation for organizations to enroll in this service is found at: http://www.justice.gov/crt/employment/ (accessed March 8, 2013).

[184]  The HR staff member who maintained CRT's outreach list told us that organizations with outdated contacts were removed from the CRT outreach list if efforts to update the contact proved unsuccessful or if the organization was not interested in being included on CRT's list.

[185]  A copy of the 2010 outreach list is attached to this report as Appendix B.  In evaluating whether an organization was "conservative" or "liberal," we followed the same procedures we utilized in our SLIP Report, described above in footnote 165.  We also used this classification methodology for analyzing the ideological makeup of the applicant pool.  As we recognized in our prior report, these determinations are not precise and categorizing organizations as liberal or conservative is subjective.  Therefore, the statistics included in this chapter are rough approximations as opposed to precise statistical measurements.

of Colored People Legal Defense and Education Fund (NAACP LDF), and the Lawyers' Committee for Civil Rights under Law (LCCR).[186]  We found that Herren did not send any e-mail notifications to "conservative" civil rights organizations.  Herren told us he attempted to reach a wide audience and that he did not pick to whom he sent the ads based on ideology.[187]

Herren told the OIG that staff from the Division's HR Department and the Division's Employment Counsel instructed him to circulate the announcement broadly and he sent it to the "normal contacts for the work that we do."  Herren stated that he was striving to follow the directions he received from the Division and to widely circulate the hiring announcement, which he said he did by contacting persons who did election work and by sending it to persons who maintained the blogs that they read.  Herren stated that circulating the announcement was intended to broaden the applicant pool and that his goal was simply to ensure that people knew about the job openings and that it got wide distribution among the people that the Section regularly dealt with.

Shortly following publication of the hiring announcement, the Voting Section formed a 7-person hiring committee to evaluate applications, conduct interviews, and make hiring recommendations.  It consisted of Herren, two deputy chiefs, two senior attorneys, and two junior attorneys.  During our interviews of the hiring committee members, we learned that one member previously was active with a local Republican Party organization, and another had paid dues to the American Constitution Society and had worked for a Democratic Congressman.[188]  Another told us he was a Democrat.  Three of the hiring committee members did not identify partisan or ideological affiliations.[189]

Our review of Voting Section documents also revealed that, prior to becoming hiring committee members, two of the seven members had used the Department's e-mail system to express views that were hostile to Republicans and political conservatives, although they were not related to hiring or other

---

[186]  In the interest of full disclosure, and as indicated in his nomination filings, we note that during the period from November 2009 to April 2012, Inspector General Horowitz served on the Board of the LCCR.  The position was not compensated.  He resigned from the board upon becoming Inspector General.  During his tenure on the board he did not refer or recommend any LCCR employees for positions in the CRT or elsewhere in the Department.

[187]  The CRT website states "Sections may also distribute announcements to additional organizations who may know of qualified candidates for a particular vacancy announcement." *See* http://www.justice.gov/crt/employment/ (accessed March 8, 2013).

[188]  We indicated in the SLIP Report that the American Constitution Society is generally considered to be a liberal organization.  SLIP Report at 20.

[189]  The seventh hiring committee member retired before we asked about these affiliations.

personnel decisions within the Voting Section.  For example, one of these two attorneys, Carson Poole (the member who told the OIG he was a Democrat) wrote:  "[S]omehow whenever a republican says he or she is doing something because of a concern about a disadvantaged group, my antennae go up.  [I] can't help it."  Poole sent numerous other e-mails reflecting his political views prior to becoming a committee member.

We asked Poole whether, based on the totality of his e-mail commentary, he believed someone could question his objectivity.  Poole stated that he did not believe so.  He told the OIG that he did not "take action" based on ideology or political affiliation.  He said that if a Republican applies for a job, you review the applicant's qualifications and consider what the law requires.  He stated that the views expressed in the e-mails he sent had to be evaluated in the context of how Schlozman and others in Division leadership during the prior administration had politicized the Voting Section and had done things that he felt were not appropriate for Department attorneys.  He also discussed his admiration of CRT's leadership during the Reagan Administration, which he described as "very conservative," and said that they conducted themselves professionally.

When we asked Herren about Poole's e-mails (he was a recipient of some of them), he said that Poole had a lot views that are hostile to a lot of people and that Poole had a "fair amount of disdain" for both conservatives and liberals.  Herren said, however, that he still had confidence that Poole would treat applicants fairly and that Poole's prior dealings with Republican and Democratic elected officials in very sensitive cases did not raise concerns about his judgment.

We did not find any e-mails, notes, or other evidence that any of the members of the hiring committee discussed their political views or the political views of applicants in connection with their work on the hiring committee.

Before commencing their work, each of the hiring committee members completed mandatory training on the Division's hiring policies.  They also signed a certification agreeing to abide by the Division's policy on merit system principles and prohibited personnel practices, which provides in pertinent part:

> [P]olitical affiliation cannot be considered as a criterion in evaluating candidates, and ideological affiliation or other factors cannot be used as proxies for determining political affiliation. Discrimination based on political affiliation violates the merit-based principles governing federal employment for career employees, and undermines public confidence in the Division's mission.

## 2.   Evaluation of Applications

The hiring announcement closed on February 22, 2010, and resulted in the submission of 482 applications.  The hiring committee members began their evaluation of the applications by arranging them alphabetically and dividing them into 6 groups of approximately 80 each, with each hiring committee member (except Herren) being assigned 1 of the groups of 80 for initial review.  Herren told the OIG that he asked the hiring committee members "to make the first cut" by identifying applicants who "had a background in the work of the Section." He said he did not believe that he defined this background in a particular way.

The hiring committee used a spreadsheet to record information about the applicants that reflected in part the qualifications from the hiring announcement.  Herren said that the purpose of the spreadsheet was to try to come up with a set of criteria that would tell hiring committee members something about applicants who might be interested in the Section's work and would remain with the Section for an extended period.  The final version of the spreadsheet included 10 criteria:  graduation year, language fluency, years of litigation experience, judicial clerkships, voting experience, prior work for the Department, prior work for the Civil Rights Division, election monitoring experience, experience with Voting Rights statutes, and "general civil rights/public interest experience."

Four of the seven hiring committee members told the OIG that the most important factor in their consideration of applications was litigation experience, especially experience involving the statutes that the Voting Section enforces, and a fifth described this factor as "very important."  Herren stated that voting litigation experience was "extremely important" to the hiring committee's evaluation of applications because the work that the Section performs is some of the most complex in the Division and that it was helpful to have staff who were experienced working with the statutes that the Section enforces.

We asked hiring committee members about their use of the "general civil rights/public interest experience" criterion in their evaluation of applications.  Herren stated that its purpose was to identify people who had some background or interest in civil rights or public interest work that might be helpful.  Herren said that the Section received applications from tax lawyers, investment bankers, and others "who are clearly just looking to get into government," and that he could not see how they would have an interest in the Section's work.[190]  Another hiring committee member told the OIG that the fact

---

[190]  In response to a draft of this report, Herren elaborated that some of the people who applied "had submitted an application without anything indicating any experience, interest or background in voting, civil rights or public interest work and without crafting something tailored to our job (including no cover letter tailored to our job)."  According to Herren, he "most

Cont'd

that an applicant had experience in or had shown an interest in civil rights work was "a plus," but it was not "the beginning and the end." Two committee members told us that attorneys with "civil rights/ public interest" experience may be better able to work with the communities that Voting Section staff meet with in their work.

Our examination of the hiring committee's spreadsheet showed that "general civil rights/public interest experience" was used by the hiring committee to capture a diverse array of experiences, including policy and/or legal work on behalf of American Indians, prisoners, criminal defendants, immigrants, pro bono clients, and disadvantaged persons. We found, however, that "public interest experience" and "general civil rights experience" unrelated to the investigation or litigation of cases were not criteria in the Section's vacancy announcement. CRT's hiring policies require that the Section's selection criteria must "parallel" the qualifications identified in the vacancy announcement.

Two other hiring committee members responded that they looked for work experience in the applications that reflected "a commitment to civil rights" or public service. We asked how this commitment contributed to the success of a litigator in the Voting Section. Three of the hiring committee members said that they believed that such an applicant would be more committed to the Section's work and would be more likely to remain in the Section for a longer period of time. They also stated that prior civil rights and public interest work made an applicant better suited to work in sensitive situations with citizens from minority communities or those who had been disenfranchised. However, one hiring committee member stated that he was not sure that having such a commitment to civil rights made the applicant more qualified or capable of successfully performing voting litigation work.

We also asked hiring committee members about how they viewed experience working for civil rights groups such as the ACLU. One member stated that he viewed the experience as "generally positive." Four other members stated that it depended on the work the applicant performed for the organization, and that prior experience that involved litigation was especially helpful.

Additionally, we asked about the hiring committee's review of applications that indicated Republican or conservative affiliations. Herren told the OIG that he would not review an application that included Federalist Society membership differently than other applications, and that he had

---

definitely did not seek to make a categorical point that persons who start out as tax attorneys (or any other kind of attorneys) are just looking to get into government when they apply for our job announcements."

previously recommended hiring one attorney who "was as Federalist Society as they come," and that he was pleased to work with the person.  He said that he is confident based on what he knows about the hiring committee members and their deliberations that they did not consider political or ideological factors when they made their hiring recommendations.

Other hiring committee members unanimously stated the same belief and that the resumes of Republicans or conservatives were treated fairly.  The sole self-identified Republican on the hiring committee told the OIG that in this person's view, the hiring committee functioned in an ideologically neutral way and that politics and ideology were not part of the hiring committee's deliberations.

Poole also stated that he would not review an application that included Federalist Society membership differently than other applications.  Poole also said that an application from someone who is known to be a Republican would not be viewed in the Voting Section with skepticism.  He said "there are people in the section who are Republicans and who are good lawyers and write good briefs and who take good positions."

After hiring committee members completed inputting data for the 482 applicants into the spreadsheet in early March 2010, they each identified their preferred candidates from the roughly 80 resumes they had individually reviewed, designating them "top applicants."  All hiring committee members then reviewed the applications in the "top applicant" pool, which totaled 77.  Members then prioritized these applications and further narrowed the field to the 24 candidates who were invited for interviews.[191]  Three of the candidates who were invited to interview withdrew from consideration, so that a total of 21 candidates were actually interviewed.

Before and during the period when the hiring committee was preparing to conduct interviews of these 21 candidates, members of the hiring committee received unsolicited resumes for several candidates who already had applied as specified in the hiring announcement, as well as recommendations on behalf of certain candidates from representatives of liberal civil rights organizations and other acquaintances, such as judges and attorneys in the Department.  According to CRT's Employment Counsel, CRT policies do not prohibit hiring committee members from receiving unsolicited resumes or recommendations on behalf of candidates who have applied for posted vacancies.  CRT hiring policies require experienced attorneys to be hired in response to vacancy announcements and prohibit receipt of unsolicited resumes in the absence of

---

[191]  Hiring committee members identified 23 applicants to interview from the 77 identified as "top applicants."  One additional applicant who was not included in the list of the 77 "top applicants" was also invited to be interviewed.

such announcements.  Recommendations also must be based upon personal knowledge of the applicant's abilities.

Herren and other hiring committee members who received the unsolicited resumes or recommendations forwarded the communications to all other hiring committee members for their consideration.  Herren and another hiring committee member also saved unsolicited resumes and recommendations with the name of the submitter on a computer shared drive that the hiring committee established for use during the hiring process so that the other committee members could review these materials.

Herren told the OIG that he sent the resumes and recommendations that he had received to all of the hiring committee members because he wanted to be transparent with them.  He said that it was not his intention to give any of these candidates elevated consideration, and that he did not believe that the hiring committee's receipt of this information affected their deliberations.  We determined that the hiring committee received unsolicited recommendations for approximately 30 applicants.  Three of these applicants were eventually hired.  These candidates submitted applications according to the instructions provided in the Voting Section's hiring announcement.  The recommendations highlighted their voting litigation experience and were received from a representative of a liberal civil rights group, a supervisor in another component of the Department, and an attorney in the Voting Section.  We found no evidence that the hiring committee's procedures for dealing with unsolicited recommendations violated any CRT policies or introduced any partisan bias into its recommendations.

The hiring committee started interviews of the 21 applicants in mid-March 2010 and concluded them in June.  Candidates met with a panel consisting of three members of the hiring committee, and separately with Herren and Wertz.  Prior to starting interviews, the hiring committee developed a common set of interview questions.

Our review of notes taken during the hiring committee's deliberations following the interviews showed that the hiring committee was keenly focused on the candidates' voting litigation experience and substantive knowledge of voting rights.  The notes included entries such as "great litig experience", "good background, voting not focus", and "litig background good."  The notes also reflected substantial consideration of language abilities and discussion of the likelihood that the candidates would remain interested in the Section's work and not resign.  Consistent with the hiring committee members' descriptions to us of their deliberations, the notes did not reflect consideration of the candidates' ideology or political affiliation.

After the hiring committee members completed deliberations on the 21 candidates that had been interviewed, Herren considered their suggestions and

determined which candidates to recommend to AAG Perez.  Herren told the OIG that he remembered disagreeing with one committee member and refusing to recommend one of the member's preferred candidates.  After considering the hiring committee's recommendations, Herren then prepared hiring approval memoranda for AAG Perez that discussed the candidates' qualifications.

AAG Perez approved all of Herren's proposed hires.  The Voting Section made the last of its nine trial attorney hiring offers in July 2010, all of which were accepted.

### 3.    Qualifications of the Newly Hired Attorneys

Our review of the backgrounds of the Voting Section's new attorneys revealed a high degree of academic and professional achievement.  Of the nine attorneys hired, five had a degree from Harvard or Yale including two with law degrees from those universities, two had graduate degrees in addition to their law degrees, one was a Fulbright Scholar, and one was a Truman Scholar. With regard to work experience, eight of the nine attorneys had voting litigation experience, including seven who had two or more years of such experience; three previously had worked for the Voting Section at the Department; four had other litigation experience within the Department; five had eight years or more of general litigation experience; and one was a former legal advisor in Iraq and Afghanistan.  In addition, five of the nine previously worked as attorneys for law firms that were included in The American Lawyer's top 100 law firms for 2010, which identifies the nation's most profitable law firms.[192]  These firms handle highly complex legal matters and are known to recruit and hire some of the most skilled attorneys available.

Below we provide statistical information about the applicant pool and the Voting Section's hiring decisions.

### B.    Statistical Evaluation

We analyzed the applications of all of the Voting Section trial attorney candidates for the nine attorney positions and CRT's hiring selections to determine whether differences were apparent in the rate at which CRT selected or rejected candidates with differing political and ideological affiliations.  When making these classifications we followed the methodology used in our prior review of politicized hiring in the CRT. As we stated in our earlier report:

> [W]e reviewed the applicants' resumes and application credentials. We examined whether a hired attorney's resume or application

---

[192]  Given the list's focus on profitability, we recognize that it is an imperfect measure of the skill of the lawyers who work at the ranked firms.

listed work experience with a Republican or Democratic politician or membership in an organization specifically affiliated with a political party, such as the Republican National Lawyers Association.  We also considered whether an attorney's application materials cited membership in or employment by any organization generally considered to be conservative or liberal.[193]

We started by examining the overall applicant pool, paying particular attention to the applicants' ideological or party affiliations as expressed on their resumes, their level of relevant experience, and their academic qualifications.  We then compared the qualifications and affiliations of the applicant pool with those of the nine selected candidates in order to determine whether any inferences could be drawn about ideological or partisan bias in the selection process.  We paid particular attention to subsets of the rejected applicants who possessed qualifications that members of the hiring committee considered to be valuable.  These qualifications related primarily to work experience, especially as concerns voting litigation.

### 1.    Characteristics of the Applicant Pool

The most striking fact about the overall applicant pool was that an extremely small number of applicants submitted materials that indicated they had Republican or conservative affiliations.  Figure 5.1 shows the breakdown of applicant affiliations.  As reflected in this figure, we determined that of the 482 applications that the Voting Section received, roughly 237 (49 percent) listed Democratic/liberal affiliations.  The resumes of 235 applicants (49 percent) did not allow us to classify them either way.[194]  Only 10 (2 percent) of the 482 applicants were identifiable as Republican or conservative by their listed affiliations.[195]

---

[193]  U.S. Department of Justice Office of the Inspector General, *An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division* (July 2008, publicly released on July 13, 2009) 32 n.27.  As noted above in footnotes 165 and 184, the classification of organizations as generally "liberal" or "conservative" is inevitably an imperfect and subjective assessment and therefore the statistics that we cite are rough approximations and not precise measurements.  However, we determined that given that there were nearly 500 applicants for the attorney positions, the shifting of a handful of organizations or applicants to different categories would not have materially affected our analysis and conclusions.  Appendix C is a list of the organizations that appeared on the applicants' resumes that we classified as "liberal" and "conservative."

[194]  One applicant had both Democratic/liberal and Republican/conservative affiliations on her resume.  For analytical purposes in the numbers, figures, and tables in this chapter, we have treated this candidate as part of the group of candidates with "unknown" affiliations.

[195]  Of these 10 applicants, 5 worked for Republican politicians, and 6 were affiliated with 1 or more conservative organizations.  These were the Alliance Defending Freedom, American Enterprise Institute, Americans United for Life, Campus Crusade for Christ,

Cont'd

**Figure 5.1 – Affiliations of All Applicants**



We found that when the pool of applicants was limited to applicants with substantial general litigation experience or applicants with some voting litigation experience, the ideological makeup of the groups changed significantly.  Figure 5.2 shows the affiliations of applicants with eight or more years of litigation experience.

---

Christian Legal Aid, Christian Legal Society, Federation for American Immigration Reform, and the Pacific Justice Institute.  One applicant was a member of the Federalist Society and the Republican National Lawyers' Association.

We recognize that some Republican or conservative applicants may have chosen to leave all references to their affiliations off their resumes because such affiliations should be irrelevant to an application for federal employment, or out of concern that including such an affiliation would work against their chances for selection.

**Figure 5.2 – Affiliations of Applicants with Eight or More Years of Litigation Experience**



We determined that 112 of the 482 applicants had 8 or more years of general litigation experience.  As shown on Figure 5.2, approximately 39 of those 112 (35 percent) had Democratic/liberal affiliations, only 2 (2 percent) had Republican/conservative affiliations, and 71 (63 percent) were unknown. Thus, an overall applicant pool that was evenly split between applicants with Democratic/liberal affiliations and those with unknown affiliations became a refined applicant pool that was majority unknown when the requirement of substantial general litigation experience was applied to it.

Applying the qualification of voting litigation experience to the overall applicant pool resulted in an even more dramatic change to the ideological makeup of the applicant pool.  Figure 5.3 shows these results.

**Figure 5.3 – Affiliations of Applicants with Voting Litigation Experience**



We determined that only 38 of the 482 applicants had some amount of voting litigation experience.  Of those 38 applicants, approximately 33 (87 percent) had Democratic/liberal affiliations, none (0 percent) had Republican/conservative affiliations, and 5 (13 percent) had unknown affiliations.  Attached as Appendix D is a listing of the affiliations for these applicants and the source of their voting litigation experience.  These percentages remained essentially unchanged when we refined the analysis even further, to consider only those applicants with at least 2 years of voting litigation experience.  Of the 22 applicants with at least 2 years of voting litigation experience, roughly 19 (86 percent) had Democratic/liberal affiliations, none had Republican affiliations, and only 3 (14 percent) had unknown affiliations.  Thus, focusing attention on those applicants with voting litigation experience (regardless of whether the experience was minimal or extensive), as opposed to those applicants with substantial general litigation experience, had the effect of making the applicant pool overwhelmingly Democrat/liberal.

## 2.    Hiring Outcomes

We next examined the hiring outcomes, comparing the characteristics of the 9 candidates who were hired with the 473 applicants who were not.  The purpose of our comparisons was to determine which characteristics appeared to be most important in the selection process, and to examine whether applicants with similar qualifications were treated differently depending on their partisan or ideological affiliations.

208

We determined that eight of the nine new hires had one or more liberal affiliations, and two of them also had an affiliation with the Democratic Party. In addition, five of the hires had an affiliation with one or more of the following five civil rights groups:  ACLU, La Raza, LCCR, MALDEF and the NAACP.  None of the 10 candidates with Republican/conservative affiliations were hired, and only 1 of the 235 candidates with unknown affiliations was hired.

We further evaluated differences between the 9 applicants who were hired, and the 473 applicants who were rejected, taken as a group and subdivided by ideological affiliations.[196]  Table 5.1 presents data for several factors related to work experience, language abilities, and academic achievement for these groups.

---

[196] We use the term "rejected applicants" to describe all candidates who were not hired. In fact, some of these candidates may have removed themselves from consideration prior to a decision being made on their applications.

209

## Table 5.1 - Attributes of Hired and Rejected Applicants[197]

| Attributes | All Applicants | Hired | Rejected | Hired Applicants, by Affiliation | | | Rejected Applicants, by Affiliation | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Democrat or Liberal | Republican or Conservative | Unknown | Democrat or Liberal | Republican or Conservative | Unknown |
| **Number of Applicants** | 482 | 9 | 473 | 8 | 0 | 1 | 229 | 10 | 234 |
| | | | | | | | | | |
| **Experience Qualifications** | | | | | | | | | |
| Highly Experienced | 10 (2%) | 5 (56%) | 5 (1%) | 4 (50%) | 0 | 1 (100%) | 5 (2%) | 0 | 0 |
| 8+ Years Total Litigation | 112 (23%) | 5 (56%) | 107 (23%) | 4 (50%) | 0 | 1 (100%) | 35 (15%) | 2 (20%) | 70 (30%) |
| At least 2 Years Voting Litigation | 22 (5%) | 7 (78%) | 15 (3%) | 6 (75%) | 0 | 1 (100%) | 13 (6%) | 0 | 2 (1%) |
| Some Voting Litigation | 38 (8%) | 8 (89%) | 30 (6%) | 7 (88%) | 0 | 1 (100%) | 26 (11%) | 0 | 4 (2%) |
| DOJ Litigation Experience | 23 (5%) | 3 (33%) | 20 (4%) | 2 (25%) | 0 | 1 (100%) | 8 (3%) | 1 (10%) | 11 (5%) |
| Worked for Top 100 Law Firm | 163 (34%) | 5 (56%) | 158 (33%) | 5 (63%) | 0 | 0 | 86 (38%) | 2 (20%) | 70 (30%) |
| | | | | | | | | | |
| **Academic Qualifications** | | | | | | | | | |
| Highly Qualified Academically | 52 (11%) | 2 (22%) | 50 (11%) | 2 (25%) | 0 | 0 | 27 (12%) | 1 (10%) | 22 (9%) |
| | | | | | | | | | |
| **Other Attributes** | | | | | | | | | |
| Spanish Language Fluency | 20 (4%) | 2 (22%) | 18 (4%) | 1 (13%) | 0 | 1 (100%) | 11 (5%) | 0 | 7 (3%) |
| Political Affiliation | 100 (21%) | 2 (22%) | 98 (21%) | 2 (25%) | 0 | 0 | 92 (40%) | 6 (60%) | 0 |
| Ideological Affiliation | 202 (42%) | 8 (89%) | 194 (41%) | 8 (100%) | 0 | 0 | 187 (82%) | 6 (60%) | 1 (1%) |

---

[197] We identified "Top 100 Law Firms" from The American Lawyer's top 100 law firms for 2010 which, as noted previously, ranks law firms based on their profitability and is an imperfect measure of the skill of the lawyers who work at them. The criteria we used to designate an applicant as "highly qualified academically" are described in the text below.

As Table 5.1 demonstrates, the new hires as a group had significantly more litigation experience than the candidates who were not hired. For example, 56 percent (5 of 9) of the new hires had 8 or more years of litigation experience. By comparison, only 23 percent (107 of 473) of the rejected applicants as a whole had this much experience. The differences are even greater with respect to *voting* litigation experience: 78 percent of the new hires (7 of 9) had 2 or more years of voting litigation experience, compared to 3 percent of all rejected candidates (15 of 473). In addition, 33 percent of the new hires (3 of 9) previously worked as trial attorneys in the Voting Section.

We also examined hiring *rates* among applicants in various categories, which demonstrated that the hiring process was extremely selective and focused on candidates with substantial voting litigation experience. Among all applicants, 9 of 482 (2 percent) were hired. Among those with Democratic/liberal affiliations, 8 of 237 applicants (3 percent) were hired. None of the 10 applicants with Republican/conservative affiliations and only 1 of the 235 applicants with "unknown" affiliations were hired. We examined hiring rates among candidates with voting litigation experience, which we found was the greatest predictor of hiring outcomes of the factors we reviewed. In all, there were 38 applicants with some voting litigation experience; 8 of them (21 percent) were hired. We also examined hiring rates among candidates who had 8 or more years of general litigation experience and found that this factor did not explain much about the hiring outcomes. There were a total of 112 applicants with such experience, of which 5 were hired (4 percent). However, all five of those applicants also had some voting litigation experience.

Figure 5.4 illustrates the prevalence of voting litigation experience in the hiring committee's identification of "top applicants," the selection of interviewees, and hiring recommendations.

**Figure 5.4 – Voting Litigation Experience of the Applicant Pool**



As the figure reflects, of the 77 candidates designated by the hiring committee as "top applicants," 32 percent (25 of 77) had voting litigation experience, while of the 24 applicants selected to be interviewed from the 77 "top applicants," 75 percent (18 of 24) had voting litigation experience.  Thus, 72 percent (18 of 25) of the "top applicants" who had some voting litigation experience made it through the next cut and were asked to interview for the new positions, while only 12 percent (6 of 52) of the remaining "top applicants" were asked to interview.

Table 5.1 and Figure 5.4 corroborate the statements of members of the hiring committee that they weighed voting litigation experience very highly.  They also show that there was a dearth of applicants with Republican or conservative affiliations or with unknown affiliations who also had voting litigation experience.

We next examined candidates who met high academic standards to determine whether this was a significant factor in hiring and whether there were differences in rejection rates for these candidates based on affiliation status.  We considered candidates to be "highly qualified academically" if they met at least three of the four following criteria:  (1) attended a top 20 ranked law school;[198] (2) were in the top 20 percent of their law school class; (3) had a

---

[198]  We relied upon *U.S. News and World Report's* rankings for 2010:  Yale, Harvard, Stanford, Columbia, New York University, Berkeley, Chicago, University of Pennsylvania,

Cont'd

judicial clerkship; and (4) were a member of the law review.  As shown on Table 5.1, academic qualifications do not appear to have been a major factor in the selection of new hires.  Only 22 percent (2/9) of the new hires were "highly qualified academically," compared to 11 percent (50/473) of the rejected applicants as a whole, 12 percent (29/237) of the applicants with Democratic/liberal affiliations, 9 percent (22/235) of the applicants with "unknown" affiliations, and 10 percent (1/10) of the applicants with Republican/ conservative affiliations.[199]  Because only one applicant with Republican/conservative affiliations was "highly qualified academically," we could not effectively analyze whether highly qualified Republican/ conservatives were treated differently than their Democratic/liberal counterparts.

The rejected applicants included a Rhodes Scholar with significant litigation experience and a former partner in a prestigious law firm who had worked at the Department previously and received a John Marshall Award – the Department's highest award presented to attorneys for contributions and excellence in legal performance.  Both applicants were eliminated in the first round of application reviews and were not "top applicants"; one had liberal affiliations and the other had unknown affiliations.

## V.    Analysis

Although the focus of our investigation was hiring in the Voting Section since January 2009, in the course of our review we found evidence that an unusual effort was made during the transition period before the new administration took office in January 2001 to hire a significant number of new attorneys into the various CRT sections, including the Voting Section, on a highly accelerated schedule, with the effect of limiting the ability of the new administration to make its own decisions about hiring or staffing levels.  We found no basis to conclude that this effort violated any law or Department policy.  However, it created the perception, shared by senior career administrative officials in CRT as well as the incoming political leadership of the Division, that part of the motivation for this activity was to hire attorneys who favored the enforcement philosophy of the outgoing administration and to keep the hiring decisions out of the hands of the incoming administration.  This perception undermines the public's confidence that career attorneys in the Division are selected in a non-partisan and non-ideological manner.  We believe this effort harmed the relationships between incoming political leadership who

---

University of Michigan, Duke, Northwestern, University of Virginia, Cornell, Georgetown, UCLA, Texas, Vanderbilt, USC, Washington University, Boston University, Emory, and Minnesota.

[199]  Most of the hiring committee members told us they considered academic achievement in assessing candidates; two said they did not.

discovered the hiring campaign and the career leadership who participated in the effort, and generated mistrust between Division leadership and career staff in the Voting Section.  The Department should ensure that this expedited hiring practice on the eve of an impending change in administration is not repeated.

In connection with our review of the hiring of career attorneys in the Voting Section since 2009, we did not identify any e-mails, documents, or testimony indicating that CRT staff purposely considered political or ideological affiliations when hiring experienced trial attorneys for the Voting Section.  The overall applicant pool was evenly split between those with Democratic or liberal affiliations and those with unknown affiliations, but that there were only 10 applicants with identifiably Republican affiliations out of 482 total applicants.  Our evaluation of CRT documents and witness statements and assessment of hiring statistics showed that CRT staff focused primarily on litigation experience related to voting rights when making hiring selection decisions, and that the subset of applicants with such experience was characterized by a high concentration of applicants with Democratic Party or liberal affiliations.

We determined that since publication of our earlier report on politicized hiring in CRT, the Division implemented numerous reforms to address the issues in the hiring process that our report described.  CRT established new policies that limit the role of political appointees in the hiring process and that require mandatory training on merit system principles for members of CRT hiring committees.[200]  CRT staff utilized these new policies when it recruited attorneys to the Voting Section in 2010.  Accordingly, we found that each member of the Voting Section hiring committee signed a certification expressly committing to abide by merit system principles and not to consider political affiliation when evaluating applicants, or to use ideological affiliation as a proxy for determining political affiliation.

Our review of thousands of internal CRT documents, including e-mails, hand-written notes, and interviews of CRT staff who participated in the selection of the Voting Section's experienced attorneys did not reveal that CRT staff allowed political or ideological bias to influence their hiring decisions.  All members of the hiring committee, including the one member who was a self-identified Republican, told us that politics and ideology were not part of the hiring committee's deliberations.

We also found that after the hiring committee was formed, its members identified selection criteria that were based largely on voting rights work

---

[200]  We recognize that limiting the role of political appointees in hiring does not guarantee that hiring decisions will be free of partisan or ideological considerations, because career employees also may have strong partisan views and affiliations and may act on them in making hiring decisions.

experience.  Our interviews with hiring committee members, review of contemporaneous notes taken during the hiring committee's deliberations, and assessment of its recommendations showed that litigation experience involving voting rights and the statutes that the Voting Section enforces were highly important to the hiring committee's review of applications.[201]

Our statistical assessment of the Voting Section's hiring process confirmed that members of the hiring committee considered voting litigation experience to be highly important.  We found that 75 percent (18 of 24) of the applicants who were invited for interviews by the hiring committee and 89 percent (8 of 9) of those hired had at least some voting litigation experience.  In comparison, only 6 percent (30 of 473) of the rejected applicants had such experience, and only 1 of 444 applicants without it was hired.  (This applicant was "highly qualified academically" and fluent in Spanish.)  The difference was similarly pronounced with respect to applicants who had at least two years of voting litigation experience.  We determined that 78 percent of the new hires (7 of 9) had 2 or more years of voting litigation experience compared to only 3 percent (15 of 473) of all rejected applicants.  Three of the nine new hires previously had worked as trial attorneys in the Voting Section.

Our assessment also revealed that roughly 33 of the 38 applicants (87 percent) with voting litigation experience had Democratic/liberal affiliations, and that the other 5 applicants had unknown affiliations.  In contrast, the entire applicant pool contained only 10 candidates whose resumes indicated Republican or conservative affiliations, and of that group none had any voting litigation experience and none were hired.  Eight of the 38 applicants with voting litigation experience were hired, 7 of whom had Democratic/liberal affiliations and 1 who had unknown affiliations.  None of the other four applicants with voting litigation experience and unknown affiliations were hired.  We found that all four of these applicants worked for private law firms and government entities, and that two of the four had comparatively little

---

[201]  We found an analogous situation with other Department components when we evaluated hiring in our earlier reviews of the Honors and Summer Law Intern Programs.  As we noted at the time, while the components placed far less emphasis on experience given that they were drawing from a candidate pool of law school students and recent graduates, some components nevertheless indicated a preference for candidates with a demonstrated expertise related to the component's area of work:

> [S]ome components looked for experience that indicated an interest or expertise in the type of law practiced by that component.  For example, the Antitrust Division valued a background in economics, [the Environment and Natural Resources Division] a background in environmental issues, and the Civil Division's Office of Immigration Litigation (OIL) or [the Executive Office of Immigration Review] a background in immigration law.

SLIP Report at 11.

voting litigation experience, such as working on a single voting case.  Neither of those two applicants were interviewed.  Of the remaining two applicants, the hiring committee interviewed one of them and concluded that he would require substantial guidance.  The committee was not impressed with the background of the fourth applicant and he was not designated a "top applicant."  We found that this data was not sufficient to conclude that the conservative and unaffiliated candidates were purposely rejected because they lacked Democratic or liberal affiliations, particularly in the absence of any documentary or other information to indicate otherwise.

Witnesses told us they weighted voting litigation experience heavily because the Section had lost many experienced attorneys and was expecting a large volume of new litigation.  The hiring decisions were consistent with this explanation.  Eight of the nine candidates who were hired had such experience (the ninth was highly qualified academically and was fluent in Spanish).  The pool of applicants having such experience was made up almost entirely of applicants with Democratic/liberal affiliations.  However, we did not find documentary or other evidence to indicate that the Voting Section used voting litigation experience as a surrogate to identify and select candidates with Democratic/liberal affiliations.

Witnesses told us that the Voting Section valued voting rights litigation experience very highly in the selection process.  This was a legitimate criterion, particularly in light of the Voting Section's stated need for experienced attorneys who would be ready to "hit the ground running" by leading complex voting rights cases immediately.  However, we note that the use of this criterion created an applicant pool that was highly skewed toward applicants with liberal affiliations since the vast majority of the organizations that provided the voting rights experience that the hiring committee was able to consider were liberal organizations.  The Department observed, and at least one prominent conservative witness confirmed, that there are few if any conservative organizations that provide voting rights experience to their employees.

One factor that we could not assess with precision was the impact of the outreach list, which was predominantly neutral but included approximately 10 liberal organizations and one conservative organization.  We did not have data to indicate which applicants learned about the vacancies through the outreach list and what their ideological affiliations were.  We recognize, however, the possibility that the use of such a list could tend to bias the applicant pool toward persons affiliated with the organizations on the list.

Our investigation identified several instances in which two hiring committee members expressed views that we found would lead a reasonable person to question their ability to evaluate job applications free from political or ideological bias.  These included e-mails sent by Poole on the Department's e-mail system, before the hiring committee was formed, that were highly critical

of Republicans or conservatives.  However, we did not find any evidence that Poole or other Voting Section staff allowed their political views to compromise their duty to apply merit system principles when evaluating job applications, and we note that each member of the hiring committee signed a certification attesting to abide by those principles.[202]  Moreover, other hiring committee members, including one who was Republican, told us they did not detect any bias in the hiring-related conduct of the two attorneys who had previously sent e-mails reflecting their political views.

We believe that Poole's selection by Herren to serve on the hiring committee created a risk that the Committee's judgments and the Section's hiring would be subject to future charges of partisanship, particularly in light of the recent high-profile issues in the Division with regard to politicized hiring and the efforts by the Division to modify its hiring protocols to ensure that future hiring decisions were free from actual or perceived politicization.  Herren was a recipient of some of the most partisan e-mails that Poole had disseminated on the Department's e-mail system.  Poole's use of Department resources in this manner potentially called into question his ability to objectively evaluate applications free from political bias.  In addition, Poole's practice of expressing his partisan views in Department e-mails was widely known.[203]  However, as noted above, we found no evidence that Poole's conduct in making hiring recommendations was infected by his partisanship.

---

[202]  This circumstance stands in contrast to the evidence we found in our prior review of CRT hiring practices.  We found numerous e-mails and witness statements establishing that Schlozman considered candidates' political and ideological views.  Schlozman's e-mails, for example, showed that he spoke with an applicant "to verify his political leanings and it is clear he is a member of the team," inquired whether another applicant was "conservative?", and that with respect to the Voting Section his "tentative plans are to gerrymander all of those crazy libs right out of the section."  CRT Report at 21-23.

[203]  In response to a draft of this report, Herren objected to our criticism.  In written comments he stated that Poole was only one of three attorneys in the Section in early 2010 who had experience hiring and managing experienced attorneys, and that Poole's criticisms of others were not limited to conservatives.  Although Herren stated that he could not defend Poole's e-mailing practices, he explained that he retained confidence in Poole.  According to Herren:

> I personally worked closely with [Poole] on a number of projects in his time in the Voting Section.  I saw firsthand his work with attorneys and election officials around the country on very sensitive and high profile matters, including Democratic and Republican attorneys, election officials, and statewide elected officials.  [Poole] was exceptionally competent and professional in his work dealings, particularly with persons outside the office.  I had confidence, based on my extensive personal work experience with [Poole], [that] he could separate any personal views from his work.  Based on my experience, [Poole] had high ethical standards, independent judgment, and he handled highly sensitive matters with discretion (in the sense that I never saw any evidence that he would leak details about our work).  I trusted him. . . .  I saw nothing during the hiring process that indicated [Poole] did anything wrong.  Your draft
> Cont'd

We received inconsistent responses from CRT staff to our questions concerning the purpose of the list of former Voting Section attorneys that DAAG Fernandes requested in late 2009 – a list that ultimately included 25 former Voting Section attorneys but omitted several former Section attorneys who were widely perceived to be conservatives.  Fernandes stated that she requested a list of attorneys who had left the Section since 2005 and did not seek a list that excluded conservatives.  Herren told the OIG that he could not remember how the list of attorneys was compiled, but believed it should have included attorneys who left during the prior administration, primarily those who departed the Section due to improper practices like those described in the prior OIG report.  Wertz told us she believed that she may have worked on the list and said that she thought that Fernandes was looking for staff with extensive voting rights experience who might be interested in returning.  However, when we pointed out that some attorneys on the list did not have extensive voting experience, she could not explain why they were included.  She also could not explain why conservatives were left off the list even though they had significant voting litigation experience.  She said that they may not have been interested in returning, though we found that Voting Section staff did not make any attempt to gauge the interest of the conservative attorneys.  Berman said that the list was made up of attorneys with redistricting experience.

Although we did not receive a consistent explanation for the purpose of this list, we did not find sufficient evidence to conclude that the list was actually used in the recruitment and selection of new attorneys for the Voting Section.  However, we found the explanations we received about the list troubling because it appeared that the list was prepared in part for recruiting purposes (Fernandes said she thought that there may be former staff who wanted to return to the Section), people widely perceived to be conservatives were omitted from it, and staff in the Voting Section failed to provide a consistent explanation as to why that was the case.

We believe these incidents point to ongoing risks within the Voting Section for future violations of merit system principles, as well as for creating perceptions that CRT engages in favoritism based on ideology and politics.  We believe that the Division should consider instituting several additional protections that will minimize the risk of prohibited personnel practices, as well as the perception of favoritism.

---

report finds nothing wrong in what [Poole] actually did during the hiring process.  I do not believe that the alleged perception that [Poole] was partisan or ideological should trump the reality that I had reasonable basis for believing he had something of value to offer to the process and I honestly believed he could be fair.

Case 2:13-cv-00193   Document 422-1   Filed on 07/18/14 in TXSD   Page 228 of 300

We found that the Voting Section's use of the "general civil rights/public interest experience" criterion in its evaluation of applicants, without any greater specificity or definition, was problematic.  We recognize why reviewers might look favorably upon applicants with "general civil rights experience" and/or "public interest experience" in the context of the Section's work.  However, we believe that criterion lacked sufficient connection to the qualifications required for the experienced trial attorney position and, due to its broad scope and use to assess the degree of applicants' "commitment" to civil rights, was vulnerable to misuse to determine applicants' ideological leanings.[204]  The reasons the committee members gave us for using this criterion were not persuasively connected to the job skills needed to be a successful voting rights litigator.  We did not understand what this criterion added beyond the other criteria that the hiring committee employed, such as experience with the statutes that the Voting Section enforces.[205]  Most committee members stated that it provided some assurance that the applicant would be interested in the Section's work and not leave prematurely, and would have experience interacting with communities that had a history of being disenfranchised.  Two members told us its purpose in part was to gauge the applicant's "commitment to civil rights."  One hiring committee member told us, however, that he was not sure that having such a commitment made the applicant more qualified or capable of successfully performing voting litigation work.

We also found that the "general civil rights/public interest experience" criterion was not included in the list of sample criteria contained in CRT's guidance document for hiring experienced attorneys or the Voting Section's job announcement.  The guidance emphasizes the importance of specificity in defining job duties and desired skills and experience:

> Because the type of work, and the skills and experience needed to perform that work varies from section to section, CRT does not utilize Division-wide selection criteria/qualifications for hiring experienced attorneys.  Instead, section managers should <u>tailor</u> vacancy announcements to reflect the <u>specific duties</u> of the position and the <u>specific skills and experience</u> sought by the section (emphasis added).

We believe that the "general civil rights/public interest experience" criterion is not sufficiently "tailored" and the explanations provided to us regarding the practice of assessing the degree of applicants' civil rights "commitment" were inadequate.  Although we find it unremarkable that staff in the Civil Rights Division would look favorably upon applicants with relevant civil rights experience when filling job vacancies (such as voting rights litigators

---

[204] The criterion was not limited to litigation or investigation experience, for example.

[205] The one committee member retired before we asked about this issue.

to fill voting litigation positions), our interviews highlighted the risk that poorly defined or overly broad hiring criteria can create opportunities to bypass skills legitimately required or preferred for a particular position in favor of inappropriate considerations.  Evaluating the degree of applicants' civil rights "commitment" creates the possible appearance that CRT is searching for applicants who share political or ideological views common in the liberal civil rights community.  This perception is compounded by the fact that the "commitment" that passes muster often is demonstrated through work with a small number of influential civil rights organizations.  We found that 43 percent of the "top applicants" (33 of 77), 71 percent of those invited to be interviewed (17 of 24), and 56 percent of those hired (5 of 9) had an affiliation with one or more of the following five organizations:  ACLU, La Raza, LCCR, MALDEF and the NAACP.  We believe that civil rights organizations, as well as private law firms, the military, state and local government, and others, can provide applicants with experiences that are highly relevant to job duties in the Voting Section.

If the Voting Section in fact prefers candidates with experience working with disenfranchised communities, for example, it should establish such work as one of its hiring criteria rather than subsuming it into a broad experience criterion that readily can be manipulated to assess one's commitment to political or ideological objectives and that adds marginal value to the hiring process.  We believe the same applies for the assessment of applicants' civil rights "commitment" as a gauge of their willingness to remain with the Section. If CRT is concerned that applicants will leave prematurely, they can ask applicants to commit to stay with the Section for a defined period of time.  For example, the Tax Division requires its new hires to sign a form committing to four years of continuous service.

We therefore recommend that the Voting Section better adhere to the guidance that CRT already has developed for hiring experienced attorneys and use hiring criteria that are better tailored to the specific duties of the position and that appear in the Section's vacancy announcement.

We also encourage the Voting Section to reevaluate its hiring criteria to better account for the significant contributions that applicants with limited or no civil rights experience could make to the Section, especially those with defensive litigation backgrounds.[206]  Our review of the rejected applicant pool showed that the Voting Section passed over candidates who had stellar academic credentials and litigation experience with some of the best law firms in the country, as well as with the Department.

---

[206]  CRT's guidance for hiring experienced attorneys includes a lengthy list of potential criteria.  CRT sections are not required to use these criteria, however.

Given the extremely high academic performance and professional achievement that was reflected in the resumes of these applicants, we are not persuaded that they would be significantly less capable voting rights litigators than applicants with civil rights backgrounds in disciplines other than voting (such as employment or housing law).[207]  We do not believe that attorneys who start their careers as tax lawyers or in some other area of the law and who apply for a position in CRT necessarily lack a sufficient interest in the Section's work.  For example, financial circumstances may have caused some highly qualified law school graduates to start their careers in higher-paid law firm associate positions rather than in the public sector.  Moreover, when we asked Attorney General Holder about the importance of bringing staff to the Department who have defensive litigation experience, he stated that "[t]here is value in bringing people in from those different places because . . . career lawyers don't have that private practice experience. . . .  And I think that mix makes for a better, healthier Division."

We concur with this view and therefore recommend that CRT not place primary emphasis on a "demonstrated interest in the enforcement of civil rights laws" as a hiring criterion.  As with the assessment of candidates' "commitment to civil rights," we believe that this criterion says little, standing alone, about one's litigation skills and adds minimal additional insight about a candidate beyond what is already provided through use of the criterion that assesses the candidates' "substantive knowledge and expertise in the laws, rules and regulations applicable to the work of the section."  We are hard pressed to identify a situation where an applicant who has taken the effort to apply for a position and has such "knowledge and expertise" would at the same time lack a bona fide "interest" necessary to be successful, and that does not also entail evaluation of the candidate's ideology.  To the extent that the "demonstrated interest in the enforcement of civil rights laws" criterion refers to civil rights litigation experience on behalf of plaintiffs, we believe this criterion overlooks the value of defensive litigation experience and risks skewing the qualified applicant pool to candidates having experience of a type that is typically found with a limited number of civil rights groups.

In sum, we make the following recommendations.  Our first three recommendations apply specifically to the Voting Section:

(1) That the Voting Section use hiring criteria that are based on the specific skills, duties, and experience that are required or preferred for vacant positions and that appear in the Section's vacancy announcement;

---

[207]  Wertz told the OIG that the Section was presented with a wealth of voting experience in the last applicant pool that may not repeat itself, and that if the Section had to make selections based on general litigation experience it would have to develop additional ways to rank applicants.  We agree with this assessment.

(2) That the Voting Section refrain from relying on the "general civil rights/public interest" criterion in the future; and

(3) That the Voting Section adopt hiring criteria that better account for the significant contributions that applicants with limited or no civil rights backgrounds can make to the Section, including those with defensive litigation experience.

Our fourth recommendation relates to a criterion that is used Division-wide, and therefore applies to all of CRT:

(4) That the Civil Rights Division not place primary emphasis on "demonstrated interest in the enforcement of civil rights laws" as a hiring criterion.

## VI.    Conclusion

We did not find sufficient evidence to conclude that CRT staff considered applicants' political or ideological affiliations when hiring experienced trial attorneys for the Voting Section in 2010.  Nevertheless, the primary criterion used by the Voting Section hiring committee in assessing the qualifications of applicants, namely prior voting litigation experience, resulted in a pool of select candidates that was overwhelmingly Democratic/liberal in affiliation.  We were told that few if any conservative organizations provide voting rights experience to their employees, which could have contributed to this effect.  We found that prior voting litigation experience was a reasonable criterion to use. Additionally, our investigation identified several hiring practices that we believe increased the risk of violating merit system principles and creating perceptions that the Voting Section engaged in prohibited personnel practices, including use of a general civil rights/public interest criterion.  We therefore made four recommendations that the Voting Section and CRT should implement to mitigate these risks.

# CHAPTER SIX
# INVESTIGATION OF ALLEGED POLITICITIZATION OR BIAS IN RESPONSE TO REQUESTS FOR RECORDS

## I.    Introduction

This chapter describes the results of our investigation into whether Civil Rights Division staff, primarily the Voting Section, treated responses to requests for records differently based upon the political affiliation or ideology of the requester.

On February 10, 2011, the OIG received a request from Congressman Frank R. Wolf to investigate whether the political or ideological position of the requester may have influenced the timing and nature of the Civil Rights Division's responses to requests for records from the public.  Congressman Wolf's request to the OIG referred us to an attachment to his letter, which contained a blog post by J. Christian Adams, a former attorney in the Voting Section, on the blogsite Pajamas Media (renamed PJMedia in October 2011).[208] In his blog post, Adams alleged that CRT provided preferential treatment when responding to records requests from civil rights groups or individuals alleged to support "liberal" issues in comparison to requests from Republicans or individuals or organizations alleged to support "conservative" issues.[209] Adams's blog post first provided two different examples where requests from Republicans or conservative media allegedly received slower responses than those from liberal organizations for similar types of records.  Adams's blog post then listed 16 separate incidents where "liberals" allegedly received fast response times, and 10 separate incidents where "conservatives, Republicans, or political opponents" allegedly received slow response times. The vast majority of the incidents described in Adams's blog post related to requests for Voting Section records.[210]

On April 29, 2011, the OIG notified Congressman Wolf that we intended to broaden the scope of our review of the Voting Section to include an

---

[208]  Appendix E to this report contains a copy of Congressman Wolf's request to the OIG and the attached blog post from Mr. Adams.

[209]  For purposes of this chapter, we used the same characterizations of individuals or groups, such as "liberal" and "conservative," that Adams used in his blog post.

[210]  Adams also made these same allegations in a written submission to a hearing before the Senate Judiciary Committee in March 2011.  *See* U.S. Senate Committee on the Judiciary, The Freedom of Information Act:  Ensuring Transparency and Accountability in the Digital Age, 112th Cong., 1st sess., March 15, 2011, 63-69.

examination of whether requests for records submitted to the Voting Section were treated differently based upon the perceived political affiliation or ideology of the requester.[211]  Our investigation of the allegations of disparate treatment of records requests based on political affiliation of the requesters included both a review of the particular comparisons identified in Adams's blog post as well as a comprehensive review of Voting Section records and internal Voting Section e-mails to identify other potential instances of disparate treatment or interference in the records response process.

To conduct this review, we examined applicable laws, regulations, and policies governing requests for Voting Section records, and applicable regulations and standards barring preferential treatment in the performance of official work.  We also examined tens of thousands of Voting Section documents related to records requests, including records regarding all the instances of alleged preferential treatment cited in Adams's blog post; records regarding requests by the same individuals, organizations or political parties listed in the article; and thousands of Voting Section e-mails relating to records requests.  We conducted interviews with current and former managers in the Voting Section, the Division, and the Division's FOIA Office.  We also interviewed relevant managers and staff in the Voting Section who oversaw and handled requests for Voting Section records, as well as Mr. Adams.

Section II of this chapter provides relevant background information, including an overview of the different kinds of records requests that the Voting Section receives from the public, and a description of the Voting Section's procedures for responding to such records requests and the evolution of those procedures since 2003.  Section III provides our factual findings.  Section IV provides our analysis regarding the allegations, summarizes our conclusions, and provides a recommendation.

## II.   Background

### A.   Relevant Standards of Ethical Conduct

All Department employees are subject to the Standards of Ethical Conduct for Executive Branch Employees, codified at 5 C.F.R. Part 2635.  *See* 28 C.F.R. § 45.1. These Standards provide that "employees shall act impartially and not give preferential treatment to any private organization or individual."  5 C.F.R. § 2635.101(b)(8).  Therefore, with respect to our review here, the Standards of Ethical Conduct would bar any disparate treatment by Voting

---

[211]  In March and April 2011, the Department reported in correspondence to members of Congress that these allegations appeared to be unfounded, after it conducted an initial review of them in response to several congressional oversight requests in February and March 2011.

Section employees in response to requests for Voting Section records on the basis of ideological or political considerations, or personal friendships or affiliations.[212]

### B. Overview of Records Requests Received by the Voting Section

The requests for information that the Voting Section receives fall into two main categories:  requests for copies of pending Section 5 submission files, and requests for information pursuant to FOIA, 5 U.S.C. § 552.

### 1. Requests for Pending Section 5 Submission Files

Many records requests received in the Voting Section relate to preclearance submissions made under Section 5 of the Voting Rights Act.  As discussed in Chapter Three, Section 5 requires certain states and jurisdictions to obtain approval from the Department or the U. S. District Court for the District of Columbia prior to implementing changes in their election procedures.  The Department has promulgated regulations, referred to as procedures, that govern the administration of Section 5.  *See* 28 C.F.R. Part 51.  Under these procedures, the public may submit written comments on a proposed voting change for which preclearance is sought – known as a Section 5 submission – during the 60-day period when the submission is pending before the Division.  *See* 28 C.F.R. §§ 51.1(a)(2) and 51.29-30.  To aid the public-comment process, the Department's procedures permit the public to obtain copies of pending Section 5 submission files upon written request through regular mail, facsimile, or electronic mail.  28 C.F.R. § 51.50(d).  However, the Department's procedures also permit portions of pending Section 5 submission files to be withheld to the extent they are exempt from inspection under FOIA, 5 U.S.C. § 552(b).[213]  *Id.*

---

[212]  Additionally, these Standards provide that "an employee shall not use his public office . . . for the private gain of friends, relatives, or persons with whom the employee is affiliated in a nongovernmental capacity."  5 C.F.R. § 2635.702.  An expedited response to a request for records may be a "private gain" or "benefit" within the meaning of 5 C.F.R. § 2635.702.  Therefore, for a Voting Section employee to expedite a response to a request for records on behalf of a friend would potentially violate 5 C.F.R. § 2635.702.  *See* 5 C.F.R. § 2635.702(a) (example 2).  While Congressman Wolf's request for an OIG investigation focused on alleged ideological or political bias in response to records requests, our review examined materials and witnesses for any kind of bias, including one based upon personal ties to the Voting Section.  Other than some general anecdotes discussed below, we did not find specific instances of bias in responding to records requests based upon personal ties to the Voting Section since 2009.

[213]  Responsive materials typically withheld involve privacy issues, such as home addresses, phone numbers, or voter registration data, which may be part of a pending Section 5 submission file.  *See* 5 U.S.C. § 552(b)(7)(C).

Public requests for pending Section 5 submission files are time-sensitive, given the limited 60-day period to submit comments on a proposed voting change under Department consideration.  *See* 28 C.F.R. §§ 51.1(a)(2), 51.9.  Materials responsive to a request for a pending Section 5 submission file are usually easily located and gathered by:  (1) reviewing the records for the Section 5 submission that have been loaded on a computer database, referred to as Submission Tracking and Processing System (STAPS); (2) confirming that STAPS contains the complete file by reviewing the original paper file for the particular submission; and (3) conferring with the personnel in the Voting Section assigned to review the pending Section 5 submission to ensure all relevant materials are included.

Due to the time-sensitivity of such requests, we were advised that the Voting Section gives first priority to responding to requests for records concerning pending Section 5 submission files.  The Department's procedures codify this priority by expressly stating that it is the Department's "intent and practice to expedite, to the extent possible, requests pertaining to pending submissions."  28 C.F.R. § 51.50(d).

## 2.    Requests under the FOIA

Public requests for all other Voting Section records, including closed Section 5 submission files relating to voting changes no longer under review, fall under the provisions of FOIA, 5 U.S.C. § 552.  The Department's implementing regulations for FOIA are set forth in 28 C.F.R. Part 16.

Absent exigent circumstances, the Voting Section gives second priority to responses to FOIA requests for Voting Section records that do not involve pending Section 5 submissions.  However, it is Voting Section policy to expedite requests for closed Section 5 files if the Voting Section determines that those files are necessary to review in order to be able to provide comments on a pending Section 5 submission file.

Under Section 552(b), FOIA sets forth several exemptions that permit an agency to withhold records in their entirety or in part.  5 U.S.C. § 552(b).  These exemptions provide protections to nine specific categories of records.  *Id.*  These categories include inter-agency or intra-agency documents that would be unavailable by law to a person or entity in litigation with the agency; and records compiled for law enforcement purposes if, among other things, disclosure "could reasonably be expected to" interfere with enforcement proceedings, or constitute an unwarranted invasion of privacy.  *See id.* §§ 552(b)(5), (b)(7)(A), and (b)(7)(C).

We were told that public requests for Voting Section records under FOIA are highly variable with respect to the complexity of the request, the volume of responsive materials, and the difficulty involved in gathering such materials.

Such requests have ranged from those seeking a single letter to others seeking, for example, records regarding a state's history of compliance with provisions of the NVRA, or records regarding the total number of Section 5 submissions and objections interposed by the Department over several decades.  We further were told that some FOIA requests for Voting Section records require extensive review to determine if certain records should be withheld because they are exempt from disclosure.  *See* 5 U.S.C. § 552(b).  This document screening process can be time-consuming, even if all responsive materials may be withheld, because the Department FOIA regulations require an estimate of withheld responsive materials by page-count or some other form of reasonable estimation, and a determination of the exemption category that applies to each withheld responsive document or categories of documents.  *See* 28 C.F.R. § 16.6(c).

Following receipt of a FOIA request, the Voting Section logs it in and places it in a queue, which we were told the Voting Section generally endeavors to address in the order of receipt.  However, we were also told that in order to minimize the number of and processing time for pending requests, the Voting Section responds promptly to simple requests such as a request for a determination letter issued by the Department regarding a Section 5 submission or a print-out from the STAPS database.[214]  If possible, the Voting Section also will try to respond promptly to requests involving time constraints such as a litigation deadline, a request related to a pending Section 5 submission file, or other demonstrated pressing need, provided that such requests are relatively narow and not time-consuming.  In contrast, complex requests involving large amounts of time or work will receive slower responses, even if such requests were received earlier.

Such "multi-track" processing of FOIA requests is expressly authorized under FOIA and Department implementing regulations.  *See* 5 U.S.C. § 552(a)(6)(D)(i); 28 C.F.R. § 16.5(b).  We were told that the Division's FOIA Office and the Voting Section staff notify FOIA requesters that they may receive faster processing of their requests if they are willing to the narrow the scope of their requests.

The Voting Section's overall prioritization of responses to requests for Voting Section records was first summarized on November 13, 2003, in a chart form for inclusion in a Section 5 guidance manual on the Voting Section's

---

[214] Witnesses told us that it usually takes a short time (as little as one hour) to locate responsive information to requests of this type and to send out a response.  In addition, according to managers in the FOIA Office and Voting Section staff, this pragmatic approach prevents simple requests that may take a short time and involve a few pages of responsive material from "sitting" in the queue for a very long duration until staff can complete earlier, voluminous, and time-intensive requests.  It also prevents unnecessary increases in the number of pending requests while complex requests are processed.

Intranet.  The prioritization of responses, as discussed above, has generally remained the same since 2003.  However, other procedures for processing requests for Voting Section records have changed over time.  The current procedures are generally summarized on the Voting Section's Intranet and in training session handouts for all Section employees.  The development of these procedures is discussed below.

### C.    Organizational Responsibilities for Responding to Records Requests

#### 1.    Responses to Requests for Pending Section 5 Submission Files

Voting Section personnel oversee responses to requests for pending Section 5 submission files.  For such requests, Voting Section personnel search for, gather, and respond directly to the requester for records that can be released in their entirety.[215]  Voting Section personnel send any responsive materials that may require redaction to the Division's FOIA Office for final determination, processing, and expedited response to the requester with any redacted materials.

Three Voting Section employees are assigned to work on requests for pending Section 5 submission files:

- a Deputy Section Chief, SaraBeth Donovan, who reviews and oversees draft responses in addition to other Voting Section responsibilities;[216]

- an analyst (the "Records Analyst") who has worked on Voting Section records requests for more than 13 years and currently does so exclusively due to the backlog, which is discussed in more detail below; and

- a full-time contract-attorney who was hired in August 2010 for the sole purpose of helping to reduce the large backlog of records requests in the Voting Section.

---

[215]  The Voting Section also sends a courtesy copy of these requests and direct responses to the Division's FOIA Office, which assigns a FOIA number to such direct responses from the Voting Section for recordkeeping purposes.

[216]  Another Voting Section attorney acts as a back-up reviewer to Donovan when needed.

### 2.      Responses to FOIA Requests

The Division's FOIA Office oversees responses to FOIA requests for Voting Section records and records in the 10 other Division sections and Division leadership offices.  The FOIA Office is responsible for ensuring the Division's compliance with FOIA, providing guidance and training to Division employees on FOIA-related issues, and formally responding to requests for records from the public.

Upon receipt of a FOIA request for records within the possession of the Division, the FOIA Office sends a referral to the relevant section and requests that it search for responsive materials and provide a recommendation regarding disclosure of any responsive materials.[217]  After searching for and collecting responsive records, Division sections provide these materials to the FOIA Office to process a response to the requester.  In addition, sections provide their recommendations to the FOIA Office as to what materials can be released in their entirety, what materials should be withheld fully or partially under a FOIA exemption, and what materials may be released as discretionary disclosures even though they could be withheld under FOIA exemption.[218]  Once a response is completed, the FOIA Office will issue a formal response to the requester.

Within the Voting Section, the same three employees who are responsible for responding to requests for pending Section 5 submission files are also responsible for searching, reviewing, and making recommendations for the release or non-release of materials responsive to FOIA requests for Voting Section records.

---

[217]  The public can request Voting Section records (pending Section 5 submission files or records under FOIA) directly by sending an e-mail request to Voting.Section@usdoj.gov, or by clicking on this e-mail address link on the Section's Web site, and specifying the records requested.  *See* http://www.justice.gov/crt/about/vot/ (accessed March 8, 2013).  However, the Voting Section sends a copy of each FOIA request that it receives directly from the public to the FOIA Office, which logs in the request and refers it back to the Voting Section for a recommended response.

[218]  The FOIA Office generally makes the final determination on the release or non-release of responsive materials.  However, any disagreements between the FOIA Office and a section can be resolved by the Division's leadership or at higher levels within the Department.  In response to a Presidential Memorandum declaring that agencies should adopt a presumption in favor of disclosure on FOIA matters, the Attorney General issued a memorandum to all heads of agencies in which he, among other things, "strongly encourage[d] agencies to make discretionary disclosures of information" whenever possible.  *See* Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 26, 2009); Attorney General Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act (Mar. 19, 2009).

### D.     Voting Section Creates Procedures To Respond to Records Requests (2003)

The Records Analyst told the OIG that she believed that prior to August 2003 it was common practice for Section staff to provide Voting Section records directly to requesters whom they knew personally without the knowledge of staff who were responsible for records requests.  We were told by the Records Analyst that an incident in approximately August 2003 triggered the adoption of more formal Section-wide procedures.  According to the Records Analyst, sometime during the summer of 2003, two individuals on opposite sides of private litigation made separate requests for the same records to the Voting Section.  One requester sought the records directly from Section personnel whom he knew and received a response immediately outside of the FOIA process, without the knowledge of Section personnel assigned to handle FOIA requests.  The other requester went through the FOIA process and did not receive an immediate response.  When the other requester discovered that his opponent in litigation received an immediate response, he lodged a complaint to the Division's leadership about disparate treatment.

In late August 2003, the Division's leadership held a meeting with Division FOIA managers, Voting Section managers, and Voting Section personnel who worked on records requests to discuss this incident of perceived disparate treatment.  Voting Section staff who attended the meeting told the OIG that Division leadership was obviously displeased about this episode. Division leadership learned that it was not uncommon for career staff to provide records directly to requesters whom they knew personally, without following the FOIA process.

Following Division leadership directives and the meeting with Division leadership, the Voting Section took several measures to change the way records requests would be handled in the future.  Voting Section managers issued a Section-wide directive, "effective immediately" on August 22, 2003, that staff should not respond to any public requests for Section 5 related materials that may be used in litigation.  In addition, Voting Section managers issued Section-wide instructions in November 2003 that set forth the procedures and priorities for responding to records requests, as generally described above in Section II.B. The Section-wide instructions stated that requests for Voting Section records were to be handled only by Section personnel assigned to responding to these matters.  Voting Section staff told the OIG that the policy set forth in these instructions on prioritization of requests is still generally consistent with how records requests are handled today, although other procedures for processing requests have changed.  According to Voting Section staff, these instructions represented the first time that policies were distributed to the entire Section for the various categories of requests for Voting Section records.

As an additional measure, the Division's leadership instructed the Division's FOIA Office to start assigning FOIA tracking numbers for all records requests, including pending Section 5 file requests, to ensure better recordkeeping of all responses.  Voting Section staff also were instructed to log all requests and the action taken in response to the request.

In July 2004, Division leadership requested that the Voting Section provide immediate notice of requests from major civil rights groups.  Hans von Spakovsky, former counsel to the Division's AAG, told the OIG that requests from major civil rights groups warranted immediate notification at the time to ensure that they were handled appropriately and not being delayed given past criticism of the Division from these groups.  In response, the Voting Section began providing a monthly chart to Division leadership that summarized all records requests received, including the identity of the requesters.  Mr. von Spakovsky told the OIG that these procedures were designed to provide Division leadership with periodic notice and a general picture of the requests received on particular topics.  He also said the procedures were implemented because of concern over past incidents where staff handled requests without the FOIA Office's or Division leadership's knowledge, and because of the general perception among some in Division leadership that some Voting Section staff might show favoritism to advocacy groups with which they had past ties.

In September 2004, the Voting Section disseminated its first monthly chart to Division leadership.  Voting Section staff told the OIG that the chart listed the identity of requesters exactly as they identified themselves on their requests; the date the request was received, a summary of the request, the status of the request, and the FOIA tracking number for the request.  The Voting Section sent such monthly charts to Division leadership as a routine matter from September 2004 until at least October 2010.[219]

### E.   Designation of New Manager to Oversee Records Requests in 2006

In May 2006, Voting Section Chief John Tanner designated Donovan to oversee and manage records requests after the Deputy Section Chief who previously served in this role left the Department.  Donovan has managed records requests since 2006 and was promoted to Deputy Section Chief in 2010.  During her tenure, Donovan has systematized the process of records

---

[219] According to Donovan, the Voting Section stopped sending monthly charts to the Division leadership because the Division leadership was no longer specifically requesting them, "not because of an express policy change" by anyone.  The Records Analyst added that, as time passed, new Division leadership personnel did not seem to have a frame of reference for why they were receiving the charts.  However, the Records Analyst stated that the Voting Section still maintains its own internal charts.

requests to prevent potential abuse and has intervened on several occasions to address individual efforts to circumvent the formal process.

### 1.    Systemization of Records Requests and Responses

Donovan told the OIG that early in her tenure as the attorney overseeing records requests she discovered that the Voting Section lacked a coherent system for processing records requests despite the prior measures.  For example, Voting Section staff rarely retained copies of the requests, the responses recommended to the FOIA Office, or the final responses, and the few copies that were retained were not organized by date or requester.  Donovan also discovered that Voting Section personnel who were not assigned to FOIA matters were receiving and forwarding records requests to the FOIA Office without proper routing memoranda and without notifying her or the Records Analyst.  Donovan attributed the weaknesses in compliance with prior records management directives to the significant staff turnover during this period.  Donovan told the OIG that prior to her tenure "there was nobody really playing the cop" regarding compliance with procedures for handling records requests.

Donovan took several steps to rectify these problems.  In April 2007, in response to her concerns, Voting Section Chief Tanner issued a Section-wide e-mail emphasizing that all requests for information other than in active cases should be treated as records requests and be routed immediately to the Voting Section FOIA team for proper processing.  Donovan sent two similar Section-wide e-mails in August 2007, which further emphasized that records requests must be in writing and staff should not make any commitments on a response time.  Donovan told us that emphasizing the records procedures was necessary to ensure that requests were tracked properly and handled consistently.

Since 2008, the Voting Section has followed formal procedures established by Donovan for tracking FOIA requests.  Each request is memorialized in a log-in memorandum within a few days of receipt, and the request and memorandum is then forwarded to the Division's FOIA Office.  Each record request is retained electronically together with the log-in memorandum, copies of any material collected in response to the request, and copies of any subsequent memoranda created in connection with preparing the response.  The Voting Section follows similar record retention procedures to track responses to pending Section 5 submission files.  We confirmed that the Voting Section had created these electronic records consistent with the procedures that had been described to us.

In January 2009 and October 2010, Donovan held training sessions for Voting Section staff to ensure that they knew how to properly handle records requests.  Donovan held the January 2009 training on Voting Section records requests procedures for Section 5 staff because she had received several questions on FOIA procedures from Section 5 analysts.  She also told the OIG

that training for Section 5 staff was important because the majority of records requests involve Section 5 file materials (open or closed), and thus Section 5 staff had the greatest potential to mishandle requests or send them directly to requesters if they were not familiar with the records requests procedures. Donovan worked with other Voting Section managers to place her written guidance from the January 2009 training session on the Section's Intranet for all Section employees to observe.  In October 2010, Donovan held a similar training session for Section 5 staff and new attorneys to further ensure that Voting Section staff were aware of and observed proper procedures for records requests.

### 2.    Response to Incidents of Potential Favoritism from 2006-2008

Donovan told the OIG that early in her tenure as the attorney overseeing records requests she had to clamp down on Voting Section personnel because of periodic incidents in which some records requesters used their contacts in the Section to receive records outside the FOIA process.  For example, she told the OIG that she heard occasionally from 2006 to 2008 that determination letters or STAPS reports had been sent out without her knowledge.  As these incidents came to her attention, she addressed them with staff.

In addition, at Donovan's request, Voting Section managers and FOIA Office managers addressed efforts by former Voting Section managers to obtain records directly from staff.[220]  For example, we were told that former Voting Section Chief Tanner (who had left the Section in December 2007) asked various staff in 2008 to send records to him directly.  In response, Section Chief Christopher Coates stated in an e-mail in July 2008 to Voting Section managers and staff handling records requests that Tanner "needs to go through the FOIA and take his place in line" just like any other requester.

Additionally, Donovan told the OIG that she took similar action with regard to another former Voting Section manager who sought records directly from Section employees.  According to Voting Section staff, this former manager also routinely requested expedited responses by claiming that the responsive materials were needed for litigation.[221]  Donovan said that she initially expedited these requests but realized after she gained more experience with Department FOIA regulations that this claim was being used improperly to

---

[220]  In Chapter 4, Section III, we discuss the issue of unauthorized disclosures by Voting Section employees of confidential Voting Section information, including to outside counsel who was a former Voting Section manager.

[221]  Under the Department's FOIA regulations, a FOIA request may qualify for an expedited response where it is found that the subject matter of the request involves, among other things, "the loss of substantial due process rights."  *See* 28 C.F.R. § 16.5(d).

receive expedited treatment.  When the former manager persisted in these requests, Donovan consulted with the FOIA Office, which sent the former manager a letter to formally notify him that his request for a priority response due to anticipated, fast-track litigation did not qualify for expedited treatment under Department FOIA regulations.

## III.    Factual Findings

The allegations contained in the blog post by former Voting Section attorney Christian Adams identified 18 individuals who had allegedly received faster compliance with their records requests than had individuals or organizations allegedly with conservative backgrounds.  Adams's blog post identified these 18 requesters as individuals that supported "liberal" issues or were "politically connected civil rights groups."  The list of "liberal" groups identified by Adams included requesters affiliated with such organizations as NAACP LDF, MALDEF, the ACLU, and the Native American Rights Fund, and the alleged response times ranged from same-day service to 20 days.  Adams's blog post provided few details about these requests beyond the requester's name, any affiliated organization, and alleged response time.  It provided little to no information regarding the type or scope of the request.  Adams's blog post asserted that the alleged quick response time for these requesters was due to their political affiliation or ideology.

Adams's blog post also described 12 requesters who it identified as "well-known conservatives, Republicans, or political opponents" of the current administration.  Adams's blog post stated that these requesters had to wait for long periods of time before getting responses from the Division.  This list included Republican office-holders and other requesters affiliated with such organizations as the Washington Times, the Center for Individual Rights, and Judicial Watch.  The alleged response times for these requesters were at least four months or longer.  As with the 18 "liberal" requests, Adams's blog post provided few details about the 12 "conservative" requests beyond the requester's name, any affiliated organization, and alleged response time.  It similarly provided little to no information regarding the type or scope of the request. Adams's blog post asserted that the alleged slow response time for these requesters was likewise due to their political affiliation or ideology.

Our review investigated the issue of differential response times for Voting Section records requests from several angles.  In subpart A, we examine how the type of records being requested affected the response times.  In particular, we investigated whether the allegedly faster response times reported in Adams's blog post for some requesters were associated with requests for high priority, easily assembled records, while the longer response times were associated with complex or non-priority requests under Voting Section policies.  In subpart B, we examine the impact of a rapidly increasing backlog of record requests

234

contributing to the differences in response times reported in Adams's blog post. In subpart C, we examine three of the particular comparisons made in Adams's blog post.  In subpart D, we examine the Voting Section's responses to other record requests made by organizations identified as conservative in Adams's blog post.  In subpart E, we describe the results of our review of tens of thousands of Voting Section e-mails in evaluating whether there is evidence of ideological bias in responses to records requests.

## A.    Role of Request Type in Response Times

Our review of Voting Section records revealed that much of the difference in response times for the requests cited in Adams's blog post was attributable to the type of request made.  We determined that 15 or 16 of the 18 requests identified as receiving preferentially expedited treatment sought pending Section 5 submission files (or records related to pending submission files).[222] As discussed in detail above, an expedited response for a pending Section 5 submission file request is consistent with Department regulations and Voting Section policy due to the limited period to comment on a proposed voting change.

Our review also determined that none of the 12 requests from conservatives described in Adams's blog post sought files related to pending Section 5 submissions.  Indeed, our review of the larger population of requesters since January 2009 did not identify any conservative requesters seeking records in this category.  Hans von Spakovsky, former Counsel to the AAG, provided information to the OIG that may help explain this data.  He told the OIG that in his experience the Heritage Foundation, where he has been employed after leaving the Department, does not comment on pending Section 5 submissions and such activity is usually not an issue of importance to conservative organizations.  He told the OIG that "there's probably a dozen liberal advocacy groups that work on voting issues," that "specialize in looking at voting issues and they comment a lot on Section 5 submissions when they get [to the Department]."  By contrast, von Spakovsky said that he could "not think of a single conservative organization that concerns itself or concentrates on voting issues."  However, von Spakovsky told the OIG that conservative

---

[222]  The uncertainty regarding whether the number is 15 or 16 stems from the following: Adams's blog post lists a request from Jenigh Garrett of the NAACP which allegedly received expedited treatment of "same day service."  Garrett made multiple requests to the Voting Section since 2009, two of which received expedited responses because they were for pending Section 5 submission files, and one of which was for a *closed* Section 5 file.  The latter request was shown as receiving same-day service in Voting Section records, although we determined the response was in fact sent out approximately one month after the request was originally made.  We do not know which of Garrett's submissions was referred to in Adams's blog post, which is why the number of responses relating to pending Section 5 submission files may be 15 or 16.

organizations are spending more time recently on voting issues as a result of Voting ID proposals.

Moreover, our review of Voting Section records revealed many instances where the requesters identified in Adams's blog post as being affiliated with "liberal" organizations received slow responses from the Division when they made requests for records not related to pending Section 5 submissions.  For example:

- Raul Arroyo-Mendoza (Advancement Project):  Arroyo-Mendoza typically received pending Section 5 submission files within 5 days after he requested them.  However, the Voting Section required 18 months to respond to his March 2009 request for a closed Section 5 submission file.

- Jenigh Garrett (NAACP):  Garrett has made multiple records requests to the Voting Section.  We found that Garrett waited more than two and a half years for a response to a request made in January 2008 for records regarding state compliance with Section 2 of the NVRA.

- Laughlin McDonald (ACLU):  McDonald requested records regarding two closed Section 5 submission files in August 2009.  Despite the fact that it had not yet responded to his request, on May 1, 2012, the Division FOIA Office sent a notice letter to McDonald to inform him that his request would be closed unless he contacted the Office within 30 days and expressed a continued interest in obtaining the requested records.  The FOIA Office did not receive a response from McDonald to the notice letter and his request was administratively closed on June 28, 2012.

We further found that, as of July 2010, when the Division FOIA Office began a push to complete the 10 oldest pending requests, the NAACP had 2 of the oldest unaddressed FOIA requests pending with the Voting Section, 1 since January 2008 and another since July 2008.

Our review also revealed examples of expedited responses for requests involving the Republican Party or offices run by a Republican.  For example:

- South Carolina Attorney General's Office:  The South Carolina Attorney General's Office received a response in August 2009 five days after its request for a 1988 closed Section 5 file, which required retrieving and reviewing materials from the Federal Records Center and on microfiche.  The Voting Section processed the response expeditiously after the state said it needed materials quickly because it had been sued under Section 5 of the Voting Rights Act.

236

- Rick Boyer (Attorney in Virginia):  In January 2012, Boyer received a response 15 days after his request for records regarding closed Section 5 files in which the Department approved the procedures used by the Republican Party of Virginia to certify candidates who can appear on primary ballots for the presidential election.  The Voting Section expeditiously processed the response, in conformance with the request, due to the then upcoming Republican presidential primary election in Virginia in early March 2012.

These response times are consistent with Voting Section policy, as discussed above, to expedite where possible requests involving time constraints, provided that such requests are relatively narrow and records can be located and processed quickly.

### B.    Role of Increase in Backlog in Differences in Response Times

We determined that another factor in the differences in response times has been the dramatic increase in the number of records requests made to the Voting Section in recent years, which has resulted in a growing backlog of non-priority requests.  We found that this backlog has disproportionately affected the "conservative" requesters referenced in Adams's blog because, unlike the "liberal" requesters he referenced, those requesters generally had not made requests for documents in any priority categories.

Donovan told the OIG that the Voting Section has experienced a large increase in the backlog of pending records requests in recent years.  She also stated that the current backlog will take more than one year to address.  Therefore, she instructed the Records Analyst to call every requester who made a request during the last year to inform them of the substantial backlog and determine if a narrower response, such as providing a determination letter or STAPS report, will resolve their request.  The requesters are informed that if they still wish to receive something other than a priority pending file or a simple request, the response may take more than one year.

The data regarding demand for Voting Section records and backlog of unfilled requests showed a significant increase since 2006.  In September 2006, for example, the Voting Section only had four pending records requests.  By comparison, in January 2012 the Voting Section had more than 170 outstanding records requests.  Since 2008, the number of unfilled requests has increased as follows:

- As of January 1, 2008 – 24 outstanding requests;

- As of January 1, 2009 – 46 outstanding requests;

- As of January 1, 2010 – 62 outstanding requests;

237

- As of January 1, 2011 – 63 outstanding requests; and

- As of January 1, 2012 – 172 outstanding requests.

This trend was largely unchanged at the end of Fiscal Year (FY) 2012 (September 30, 2012).  At that time, the Voting Section had 156 of the 209 pending records requests in the Division, or 75 percent of the pending records requests.[223]

Witnesses told us that this backlog is attributable to a rapid increase in the number of requests made for Voting Section records since 2008.[224] According to Division records, the Voting Section received 264 records requests in 2011, comprising approximately 46 percent of all records requests made to the Division.  As shown in the table below, the total number of requests for Voting Section records has increased since FY 2009 and has represented a high percentage of all requests made to the Division.

**Table 6.1 – Approximate Number of Requests Since FY 2009**

| FY | Total Division Requests | Voting Requests | Percent Voting |
|---|---|---|---|
| 2009 | 475 | 166 | 35% |
| 2010 | 446 | 165 | 37% |
| 2011 | 569 | 264 | 46% |
| 2012 | 513 | 191 | 37% |

The Chief of the Division's FOIA Office, Nelson Hermilla, told the OIG that the Voting Section has received the most records requests among the 11 Division sections and the Division's leadership since 2009.[225]

---

[223]  In FY 2012, the Voting Section closed 170 requests, or 29 percent of the Division's 580 FOIA requests.

[224]  The Chief of the Division's FOIA Office, Nelson Hermilla, told the OIG that the Division's FOIA backlog is "higher than it's been . . . for at least 16 years" due to the large accumulation of requests in the Voting Section.

[225]  The data in Table 6.1 is for fiscal years, ending on September 30.  The Division received more records requests in FY 2011 than all but the largest components or offices within the Department (such as the Federal Bureau of Investigation, Bureau of Prisons, Executive

Cont'd

We were told that several factors account for the increase in records requests and the resulting growth in the backlog.  First, the Voting Section experienced significant demand for pending Section 5 submission files involving redistricting submissions after the 2010 census, as reflected in the substantial growth in voting requests from 165 in 2010 to 264 in 2011 shown in Table 6.1.  Donovan told the OIG that the heavy redistricting load is a significant reason for the recent backlog increase.  In addition, the Voting Section Records Analyst told the OIG that they are spending virtually all of their time now on pending Section 5 submission file requests.  Donovan also told the OIG that responding to these priority requests for pending redistricting submissions has increased processing time because the Voting Section must perform a line-by-line file review for potential privacy or other required redactions.

Second, the Voting Section adopted technological improvements that made it easier for individuals to request records, particularly pending Section 5 submission files.  For example, since 2009, records requests can be submitted by e-mail as discussed above.  In addition, individuals can now sign up to receive electronic notices of Section 5 activity from the Voting Section, which generates additional requests for pending Section 5 submission files.

Third, the Voting Section has received several priority requests from Congress and the U.S. Commission on Civil Rights since 2009 pursuant to their oversight authority.  Such requests are not FOIA requests.  However, Voting Section Chief Chris Herren told the OIG that these requests cannot "just be put in a queue."  Herren also told the OIG that responding to the oversight requests on the New Black Panther Party case from the U.S. Commission on Civil Rights "completely consumed" Voting Section staff for a significant period.  Herren said to us that the multitude of oversight requests as a whole created the "perfect storm" for the increase in their backlog, which has been compounded by the 2010 census and demand for pending redistricting submissions.

Based on the foregoing, we found that the large increase in demand for priority record requests since 2008 has been a significant factor in longer response times for all requests, except priority requests for pending Section 5 submission files or requests for records that are very easily collected.  The increasing backlog has exacerbated the differences in response times between priority requests and non-priority requests.

---

Office for Immigration Review, Executive Office for United States Attorneys, United States Marshals Service, and the Criminal Division) according to data from the Department of Justice Office of Information Policy.

### C.     Examination of Particular Comparisons

In his blog post, Adams also examined what he considered to be similar requests made by individuals with ideologically different backgrounds, and highlighted what he believed was disparate treatment by the Voting Section in responding to those requests.  We summarize our findings on these items below.

### 1.     Ashby/Somach/Hebert

In Adams's blog post and his interview with the OIG, he alleged that Chris Ashby, a Republican election attorney, received a slower response ("nearly eight months") to his December 2008 request for 5 submissions made under Section 5 of the VRA, while Susan Somach of the Georgia Coalition for the Peoples' Agenda received "the same type of records" for 23 submissions in just 20 days.  In his interview with the OIG, Adams also compared the treatment of Ashby with that of Gerry Hebert, a former Voting Section manager who in February 2009 sought comments submitted in a 1-month period for a pending Section 5 submission file.  Our review of these examples revealed that Somach and Hebert's requests related to *pending* Section 5 submission files (which were given the highest priority for response) while Ashby's request related to *closed* Section 5 submission files (which were not).

Additionally, Adams told the OIG that Ashby (who he described as a Republican) and Hebert (who he described as a "partisan liberal") sought "virtually identical information."  He also stated to the OIG that this identical information was at the Voting Section's "fingertips" and "not off in some archive."  In fact, our review revealed the opposite to be the case.

Donovan told the OIG that responding to Ashby's request for five closed submissions files required time to determine the breadth of responsive information and where it was located.  Contemporaneous documents regarding Ashby's request showed that some of the five closed files for Ashby's request had to be retrieved from the Federal Records Center, and one of the closed files in the Federal Records Center could not be located.  In addition, contemporaneous documents showed that Division staff had difficulty locating one closed file that was not in the Federal Records Center and had not been entered into STAPS.  Ashby was sent a response to his request for five closed Section 5 files approximately 8 months after his request was made, once all the responsive materials could be located, reviewed, and processed.

Donovan told the OIG that Hebert represented a jurisdiction that submitted a Section 5 submission to the Department for preclearance.  In February 2009, Hebert requested any comments from the public on the then-pending submission received during the past month in order to be able to respond to them on behalf of the jurisdiction.  Contemporaneous documents

regarding Hebert's request showed that records responsive to his request for any comments during the 1-month period were easily located by reviewing the file for the pending submission and checking with Division staff assigned to the submission.  Donovan also told the OIG that it required less than one day, and possibly just one hour, to gather the responsive materials and send out a response to the Hebert request.

Therefore, in addition to Ashby's request being for non-priority materials while Hebert's was for priority materials, we found that the Ashby request was not comparable to the Somach or Hebert requests in difficulty of processing.

### 2.   Media Requests for New Hire Resumes:  Boston Globe and Pajamas Media (PJM):

Adams's blog post also alleged that Charlie Savage, then a reporter for the *Boston Globe*, received a prompt response ahead of the statutory deadline for a request seeking the resumes of new hires in the Division during the Bush Administration.  It also alleged that Pajamas Media (PJM) had to file a lawsuit to try to obtain the "exact same information" for new hires during the Obama Administration.  Our investigation revealed that these requests were not comparable in scope or timeframe.

In February 2006, Savage sought the resumes of new hires for three sections in the Division during the period from 2001 to 2006.  The Division FOIA Office, not the Voting Section, was responsible for obtaining the responsive materials to this request from the HR Office and responding to the request.  We found that the FOIA Office did not substantively respond to the Savage request ahead of the statutory deadline as stated in Adams's blog post.  Rather, the FOIA Office sent its standard form letter to Savage approximately one week after receiving his request.  The letter acknowledged receipt of Savage's request, provided a FOIA tracking number, and stated that there may be some delay in processing his request.

The FOIA Office provided Savage with a substantive response containing most of the responsive resume material on March 29, 2006, over one month after his request.  A follow-up response was provided on June 28, 2006, over four months after his initial request, which largely furnished all remaining responsive and releasable materials.[226]

---

[226] The FOIA Office's June 28 response notified Savage that there were a few additional responsive documents that contained potentially sensitive information regarding applicants' work products with other Department of Justice components and the Department of State. The FOIA Office informed Savage that it would consult with these other offices and the Department of State regarding a release recommendation for these documents.  On June 14, 2007, the FOIA Office provided one additional document to Savage that the Department of State agreed to release.

In October 2010, Richard Pollock of PJM sought the resumes of all new hires for all 11 sections in the Division during the period from 2001 to 2010.[227] As with the Savage request, the Division's FOIA Office was responsible for obtaining the responsive materials to this request from the HR Office and formally responding to the request.  As with the Savage request, the FOIA Office sent a form letter to Pollock approximately one week after receipt of his request.  The letter, like the letter to Savage, stated that there may be some delay in processing his request because of the large number of requests received by the Division.

Hermilla told the OIG that the request from PJM was broader in scope and timeframe than that of the Savage request.  In addition, Division records showed that the backlog of pending Voting Section requests was far greater in 2010 than in 2006, as noted above.

According to Adams's blog post, PJM filed a lawsuit against the Department regarding its FOIA request in January 2011.  Hermilla told the OIG that PJM sued the Department "primarily on the basis of delay" in receiving a response to its request.  On April 21, 2011, PJM and the Department reached an agreement whereby PJM agreed to significantly narrow the scope of PJM's request.  PJM's narrowed request, as memorialized in a letter from the Division's FOIA Office to counsel for PJM on May 13, 2011, sought the resumes of new hires in all 11 sections in the Division from January 21, 2009, to April 21, 2011.  The FOIA Office provided counsel for PJM with responsive resume materials on May 13, 2011.[228]

Based upon the foregoing, the total response time to the PJM request was essentially seven months (October 6, 2010 to May 13, 2011), while the total response time to the Savage request was essentially four and a half months (February 6, 2006 to June 28, 2006).  However, after PJM agreed to narrow the scope of its request, it received a response less than one month later, which was faster than the initial response to Savage on March 29, 2006.

---

[227] Adams's blog post indicated that PJM initially submitted its request in the spring of 2010, and that it renewed its request by certified mail on October 13, 2010, after not receiving a response from the Division to its initial request.  According to Hermilla, no record of a request from PJM for Division resumes exists prior to a request dated October 6, 2010, which was date-stamped as received on October 13, 2010.

[228] Sometime between July 2011 and September 2011 in PJM's lawsuit proceedings, the Department provided PJM with a 3-page document that contained an itemized list of personal interest/hobby information that was redacted on privacy grounds from the resumes provided on May 13, 2011, without disclosing any identities.  On September 1, 2011, PJM and the Department stipulated to the dismissal of PJM's complaint.

### 3.   National Public Radio (NPR)/PJM

Adams's blog post also alleged that National Public Radio (NPR) received a prompt response to its request, while journalists from "conservative media" received no responses at all.  In his interview with the OIG, Adams further stated that Ari Shapiro of NPR and Jennifer Rubin of PJM sought "similar sorts of requested information," but NPR was sent a response in five days and PJM was still waiting for a response.  Our review revealed that these requests were not comparable in complexity or breadth.

On February 23, 2009, NPR requested copies of public settlement agreements filed with courts by the Division during two 1-month periods: January 19, 2008, through February 19, 2008; and January 19, 2009, through February 19, 2009.  Contemporaneous e-mails relating to this request showed that virtually all responsive material was retrievable in less than five minutes merely by printing a report from a Division database.  The FOIA Office then conferred with Division sections to ensure that no information was missing from the computer report.  Donovan told the OIG that she spent approximately 10 minutes on the NPR request.  On March 25, 2009, the Division responded to the request.

On May 28, 2009, Jennifer Rubin of PJM sent a letter to the Division's FOIA Office that contained 21 separate requests for records of communications from or to certain managers, attorneys, and analysts in the Voting Section on numerous topics, such as hiring decisions, travel requests, investigations, outside publication of articles, and interaction with certain advocacy groups.  Hermilla told the OIG that Rubin's request was "clearly complex" based on the number of separate requests and the likely potential for a significant volume of records.  He said that Rubin's request was "among a select . . . 5 percent" of requests that have involved over 20 separate requests for records in his 27 years in the FOIA Office.  He also said that many of the requests targeted individual attorney communications, thus raising potential personal privacy issues and issues of Voting Section enforcement sensitivity.  Therefore, a "line-by-line" review of responsive materials would be required.

On October 4, 2010, Hermilla sent a letter to Rubin asking if she would consider narrowing the scope of her request to fewer than 21 items to possibly receive a quicker response.  Hermilla told us that Rubin never responded to this letter.

Donovan told the OIG that the review of the sensitive material responsive to this request has been "very time-consuming."  For example, she told us that one Voting Section attorney alone had 8,000 e-mails that had to be reviewed in processing Rubin's request.  Additionally, Donovan told us that she has devoted significant time to address this broad request, but must review and

process responsive materials by herself because of the sensitive personal and managerial information targeted by the request.

On September 27, 2012, the Division's FOIA Office closed the Rubin request by providing Rubin with the responsive materials to her request. We are concerned that a FOIA request took over 3 years to complete. Nevertheless, we found that the NPR and PJM requests were not closely comparable with regard to the difficulty of finding and processing the responsive material. The bulk of the NPR request could be completed in minutes without the need to review sensitive information. The PJM request was the opposite.

Similarly, we found that the requests by journalists from other organizations that are referenced as conservative in Adams's blog post (*The Washington Times, Human Events,* and the group Judicial Watch) were also not comparable to the NPR request. The requests by most of those journalists, which are discussed below, sought records relating to the NBPP case (much of which was privileged). By contrast, the NPR request was for public settlements that had been filed in federal court during a 2-month period.

### D.    Other Requests from Alleged Conservative Requesters

We also examined the Voting Section's responses to other record requests made by organizations identified as conservative in Adams's blog post. None of these requests sought pending Section 5 submission files or were otherwise eligible for expedited processing under the Voting Section's procedures. For example, 6 of the 12 individuals or organizations cited in Adams's blog post as receiving slow response times because they were "conservatives, Republicans, or political opponents" of the current administration made requests in the summer of 2009 related to the NBPP case.[229] With one exception, the FOIA Office sent responsive materials to each of these requesters on the same day (February 9, 2010), after a 7- to 8-month wait.[230] These requests were voluminous and involved sensitive materials, such as evidence collected and records regarding the dismissal of the matter and decisions not to bring criminal charges, requiring line-by-line review for exempt information. Donovan told us the requests also were considered sensitive because there was a pending OPR investigation of the NBPP case.

---

[229]  These six requesters cited in Adams's blog post were:  Congressman Wolf, State Representative Stephen Barrar (R-PA), Jed Babbin (editor at *Human Events*), Jerry Seper (reporter for *Washington Times*), Jenny Small (researcher for Judicial Watch), and Michael Rosman (General Counsel for Center for Individual Rights).  The NBPP case was a high-profile matter, which is discussed in Chapter Three.

[230]  Congressman Wolf was sent an earlier response, on September 11, 2009, by the Office of Legislative Affairs.

We found four other requesters in the summer of 2009 who sought materials related to the NBPP case in addition to the six cited in Adams's blog post.  Three of these requesters were private citizens and one was the Director of the Equal Opportunity Office at the University of Georgia.  Each of these four requesters also received a response on February 9, 2010, after a 7- to 8-month wait.  Given the extensive nature of the requests, which encompassed large amounts of privileged materials, and the consistency in response times for all requesters, we found that a 7- to 8-month response time did not reflect ideological or political bias.

Additionally, Adams's blog post identified a request from Ben Conery of *The Washington Times.*  On November 11, 2009, Conery requested records pertaining to the Department's objection to the Kinston, North Carolina Section 5 submission.  As discussed in Chapter Three, by that date, the Section 5 matter was no longer pending, as the Department had interposed its objection to the proposed change in August 2009, and the subsequent lawsuit was not filed until April 2010.  Accordingly, the request was not subject to priority treatment by the Section.  Voting Section records and witness statements demonstrated that the Conery request was processed and sent by the Voting Section to the Division FOIA Office on April 16, 2010, the same day as six other requests that sought records pertaining to the same matter.

Adams's blog post also identified a request from Jason Torchinsky, who he described in his post as an "ace GOP lawyer," alleging that as of February 2011, Torchinsky received no response at all to his request (which was for a closed Section 5 submission file from 2005).  Our review of Voting Section records indicated that Torchinsky requested the closed Section 5 submission file on August 19, 2009, and withdrew his request on August 30, 2010, after Torchinsky had obtained the submission from the locality that submitted it.

Adams's blog post also stated that as of February 2011, Jim Boulet of the English First Foundation had received no response to his request for Division records.  Voting Section records showed that on October 22, 2008, Boulet submitted a request to then-Attorney General Michael Mukasey for materials and information from a Department symposium on voting rights enforcement that had been held at the National Advocacy Center.  The letter requested materials including audio and video recordings and e-mails relating to "the Department's interpretation of the statement 'you must be a citizen to vote' to be voter suppression" purportedly made at these meetings.

Boulet's request was forwarded to the Division on December 8, 2008.[231] The request did not seek information concerning a pending Section 5

---

[231] The date stamp on the letter and the date on the routing slip seem to reflect that the Department did not actually receive the Boulet request until December 8, 2008.

submission and did not qualify for expedited treatment under Voting Section policy. Donovan told the OIG that the nature of the request was challenging because it took her time to discern the specific statement Boulet referenced, let alone the Department's interpretation of it, and construct searches to find responsive materials. Further, Donovan told us, and contemporaneous e-mails showed, that the request required coordination with and a search of responsive materials from Division leadership offices in the Division, the Criminal Division, and others, which increased the time required for a response. Voting Section records show that Boulet received a response to his request in September 2010, which stated that the Division was unable to locate responsive documents.

**E.    OIG Review of Internal Voting Section E-mails for Evidence of Ideological Bias in FOIA Responses**

In addition to examining the particular record requests and responses identified in Adams's blog post, the OIG reviewed tens of thousands of e-mails relating to FOIA responses in the Voting Section between 2001 and 2010, and conducted follow-up interviews in instances where we had questions regarding the timing of the responses. We did not find any evidence during this process of ideological bias in handling FOIA requests. We did find that some "liberal" civil rights groups complained to Division leadership about the speed of Voting Section responses to their records requests, but we did not find evidence that these complaints resulted in treatment for these groups that was inconsistent with the priority system established in the Voting Section, as described above. We summarize the general complaints we observed from civil rights groups and two specific cases below.

Voting Section Chief Herren told the OIG that "liberal" civil rights groups met with Division leadership early in this administration to "complain quite bitterly" that the Voting Section was not being as responsive as it had been in the past to their records requests. Herren summarized their complaints to the OIG as follows:  Civil rights groups complained that the Voting Section had "gone backwards" in terms of general openness. They were critical of the Voting Section's policy on privacy redactions, which they perceived unduly slowed the pace of responses to their requests. They claimed that in the past they could merely call the Voting Section records staff with their requests and they would receive them promptly without delay for redactions or a queue process.

Herren said to the OIG that these groups put "a lot of pressure" on the Voting Section to be more responsive and make information more available. However, Herren told the OIG that it was not possible to address most of their complaints. Referring to the changes to Voting Section procedures described in Section II, above, Herren said that Donovan had transitioned the Section's records response process away from an ad hoc system to one that was

246

systematic and tracked with institutional controls.  Herren told the OIG that he explained to Division leadership the system and controls that had been put in place to prevent troublesome incidents, like the 2003 incident involving disparate treatment of identical requests as described in Section II.D., above. Herren told the OIG that he informed Division leadership that Donovan had refined the process with the FOIA Office to institute the proper controls to track requests, train employees on proper procedures, and treat requesters consistently.  Herren said to the OIG that he did not recall any "push back" or "pressure [being placed on the Voting Section] to do things differently" from Division leadership after this process was communicated to them.

Two specific cases of individuals from civil rights groups complaining to Division leadership about their perception of slow responses to their requests for Voting Section records are highlighted next.

### 1.    League of United Latin American Citizens

In August 2009, an attorney for the League of United Latin American Citizens (LULAC), complained to Julie Fernandes, then a DAAG in the Division, about slow responses to requests for Section 5 files.  The LULAC attorney claimed that he was able to obtain these records "very quickly" from the Voting Section in prior administrations simply "by placing a phone call" to Voting Section staff handling Section 5 issues.  In response, Fernandes asked Herren for the background and status regarding the pending LULAC requests.  Herren provided Fernandes the background on the request, which Donovan compiled for Herren.

The LULAC requests in question were made on June 29, 2009, and August 10, 2009, and sought Section 5 submission files.  The August 10 request was for a pending submission and as such was entitled to expedited treatment.  Voting Section personnel were able to complete that request for the pending Section 5 file request within three weeks.  The second requested file was for a closed Section 5 submission.  Donovan told us that she had originally placed this request in the regular, non-priority queue because it was for a closed Section 5 file.  After the status inquiry and her re-review of the request, she determined that the request was related to the pending Section 5 submission, as it involved the same county, and was needed in order for LULAC to comment on the pending Section 5 submission.[232]  As discussed above, expediting a closed Section 5 file request in these circumstances would be consistent with Voting Section policy.  However, it still took the Voting Section over three months to complete and send a response to LULAC, even though the LULAC attorney significantly narrowed the request in early

---

[232] Donovan told the OIG that the closed file request would have "sat in queue" in accordance with policy if it had been unrelated to the pending Section 5 submission file.

September 2009.  We found no evidence to conclude that LULAC obtained preferential treatment as a result of contacting Fernandes.

## 2.   Mexican American Legal Defense and Education Fund

In January 2010, counsel for MALDEF complained to Fernandes about a slow response by the Voting Section to a request for Section 5 files, which were requested by MALDEF on October 26, 2009, and were not fully sent out until January 5, 2010.  By the date of the complaint to Fernandes, MALDEF had already received the response to the records request.

Contemporaneous documents and follow-up interviews with Voting Section staff revealed that the request in question was for a file that could have been processed quicker because a response had been prepared for another requester a year earlier.  In responding to Fernandes's inquiry, Voting Section staff explained to Fernandes at the time that demand for Voting Section records had increased significantly, including time-sensitive pending requests, and that staff were trying to address voluminous FOIA requests on the NBPP case.  According to contemporaneous Voting Section e-mails, Fernandes agreed that MALDEF's complaints were unwarranted and the response time was "more than reasonable" once she understood the background regarding the request and response and the existing demand for Voting Section records.  We did not find any evidence that the complaint from the counsel for MALDEF to Fernandes resulted in any future preferential treatment for MALDEF or political interference in subsequent records requests by MALDEF.

Donovan told the OIG that in no case did she feel pressured by Division leadership to expedite requests simply because managers wanted it done.  She told us that "there needed to be a business reason to expedite [requests]," and that requests were not expedited on the basis of a requester being a friend of Division leadership or having access to Division leadership that others did not have.

## IV.   Analysis

As noted above, the Standards of Ethical Conduct for Executive Branch Employees require employees to "act impartially and not give preferential treatment to any private organization or individual" in the performance of official government business.  5 C.F.R. § 2635.101(b)(8).  We did not find evidence that differences in response times to record requests made to the Voting Section were attributable to preferential treatment based on the ideological affiliations of the requesters.

As detailed above, the vast majority (15 or 16 out of 18) of the alleged expedited record responses cited in Adams's blog post were made in response to requests for pending Section 5 submission files.  Requests for pending

248

Section 5 submissions have been given the highest priority under Voting Section implementing regulations and longstanding policy due to the need to provide the information in time to enable the requester to file public comments within the 60-day period permitted under law.  Based on our review, it appears that numerous organizations commonly perceived to be liberal have submitted requests for records of this type over the years.  By contrast, we were unable to identify any conservative organizations that submitted such requests during the period of our review.  This imbalance among requesters explains the vast majority of the apparent discrepancies in response time cited in Adams's blog post.

We also examined several comparisons of individual responses highlighted in Adams's blog post.  As detailed above, in each case we found a valid, non-ideological explanation for differences in the response times.  Often, the requesters identified as "conservative" submitted requests for records that were more voluminous and difficult to locate, and required time-consuming reviews to protect private personal information or privileged material.  For example, in his blog post and interview, Adams compared quick response times for two requesters he described as liberal (Susan Somach and Gerry Hebert) with a slow response time for a requester he deemed conservative (Chris Ashby).  The former requests were for readily available, easily assembled materials as they related to pending Section 5 submission files; the latter was for many closed files, some of which had to be retrieved from the Federal Records Center, and some of which could not be readily located.  Similarly, the request for new hire resumes from the Boston Globe reporter was substantially narrower and more limited in time than the subsequent request for resumes from PJM, at least until the latter was narrowed as to years, and then it was responded to relatively quickly.  Moreover, as discussed in Section II.B., "multi-track" processing of FOIA requests, depending on scope and complexity, is expressly authorized under FOIA and Department implementing regulations. *See* 5 U.S.C. § 552(a)(6)(D)(i); 28 C.F.R. § 16.5(b).  In sum, we found no evidence supporting the allegation that differences in response times were the result of partisan or ideological favoritism.

We also reviewed tens of thousands of e-mails relating to FOIA responses in the Voting Section between 2001 and 2010, and conducted follow-up interviews where we found communications suggesting the possibility of ideological bias or political interference in a records response from the Voting Section.  Our review did not find any substantiation of ideological favoritism or political interference in such responses.

The procedures for responding to requests for Voting Section records were substantially regularized beginning in 2003, and these procedures were strengthened beginning in 2006 with Donovan's appointment to oversee records requests.  We found that these procedures have helped to protect against bias in responding to records requests.

We are concerned by the fact that the Voting Section currently has a substantial backlog of records requests.  A main factor in the current backlog is the large increase in requests for pending Section 5 submission files, which receive first priority in response under Department regulations and policy.  *See* 28 C.F.R. § 51.50(d).  As noted above, these requests tend to come almost exclusively from individuals associated with liberal organizations or advocacy groups.  As the Voting Section continues to work through this backlog, the dearth of requests in this priority category coming from conservative groups or individuals could create a deceptive appearance, without more information, that the Voting Section favors liberal requesters over conservative requesters.  Again, we concluded that any such appearance would likely be the result of differences in the types of records that have typically been requested by liberal and conservative requesters, and that no inference of political or ideological favoritism should be drawn from it where this key difference exists.

**Recommendation:**

To address the mounting backlog for non-pending Section 5 file requests, we recommend that the Voting Section consider devoting at least temporarily more resources to handling such requests.  We are mindful of the fact that most components are pressed for resources to fulfill their many obligations and that budgets have shrunk.  However, the Voting Section and Division leadership should consider temporarily assigning additional staff and managers to help process the increased demand for Voting Section records, in order to reduce the current backlog.  Such a stopgap measure is consistent with past measures taken by other agencies under similar circumstances, according to findings and guidance from the Department's Office of Information Policy.[233]

---

[233]  *See* Office of Information Policy, 2010 Summary of Agency Chief FOIA Officer Reports, Section II.D.4., and Section V.F., (noting how other agencies utilize non-FOIA staff to assist on a temporary basis during peak workload periods and to address backlogs) (http://www.justice.gov/oip/foiapost/2010foiapost23.htm (accessed March 8, 2013)).

# CHAPTER SEVEN
## CONCLUSION

This review examined several issues:  the types of cases brought by the Voting Section and any changes in the types of cases over time; any changes in Voting Section enforcement policies or procedures over time; whether the Voting Section has enforced the civil rights laws in a non-discriminatory manner; and whether any Voting Section employees have been harassed for participating in the investigation or prosecution of particular matters.  We focused on the period since 2001, addressing enforcement decisions made during the last two administrations and allegations of harassment during the same period.  Our review was subsequently expanded to address allegations about how the Voting Section processed information requests, and about hiring practices in the Voting Section from 2009 to 2011.

As detailed in Chapter Three, our examination of the mix and volume of enforcement cases brought by the Voting Section revealed some changes in enforcement priorities over time, but we found insufficient support for a conclusion that Division leadership in either the prior or current administration improperly refused to enforce the voting rights laws on behalf of any particular group of voters, or that either administration used the enforcement of the voting laws to seek improper partisan advantage.  Although we had concerns about particular decisions in a few cases, we found insufficient evidence to conclude that the substantive enforcement decisions by Division leadership in Voting Section cases were made in a discriminatory manner.  Our conclusion encompasses our review of some of the more controversial enforcement decisions made in Voting Section cases from 2002 through 2011, by Division leadership in both the prior and current administrations.

Notwithstanding this conclusion, our investigation revealed several incidents in which deep ideological polarization fueled disputes and mistrust that harmed the functioning of the Voting Section.  As detailed in Chapter Four, these disputes arose at various times both among career employees in the Voting Section and between career employees and politically appointed leadership in CRT.  On some occasions the incidents involved the harassment and marginalization of employees and managers.

We believe that the high partisan stakes associated with some of the statutes that the Voting Section enforces have contributed to polarization and mistrust within the Section.  Among other things, the Voting Section reviews redistricting cases that can change the composition of Congressional delegations and voter ID laws that have actual or perceived impacts on the composition of the eligible electorate.  Moreover, the Division's leadership makes choices on Voting Section enforcement priorities – such as whether to

give greater emphasis to provisions intended to increase voter registration or those intended to ensure the integrity of registration lists and prevent voter fraud – that are widely perceived to affect the electoral prospects of the political parties differently.  We found that people on different sides of internal disputes about particular cases in the Voting Section have been quick to suspect those on the other side of partisan motivations, heightening the sense of polarization in the Section.  The cycles of actions and reactions that we found resulted from this mistrust were, in many instances, incompatible with the proper functioning of a component of the Department.

Polarization within the Voting Section has been exacerbated by another factor.  In recent years a debate has arisen about whether voting rights laws that were enacted in response to discrimination against Blacks and other minorities also should be used to challenge allegedly improper voting practices that harm White voters.  Views on this question among many employees within the Voting Section were sharply divergent and strongly held.  Disputes were ignited when the Division's leadership decided to pursue particular cases or investigations on behalf of White victims, and more recently when Division leadership stated that it would focus on "traditional" civil rights cases on behalf of racial or ethnic minorities who have been the historical victims of discrimination.

The scope of our review did not permit us to trace the source of mistrust and polarization within the Voting Section back to a single event or decision, if that were even possible.  One significant event, and the earliest one we address in this report, was the decision by the outgoing Division leadership during the transition period in December 2000 and January 2001 to greatly accelerate the hiring procedure for new attorneys in the Section and elsewhere in the Division.  We were told that this surge in hiring took place in the context of a longer-term increase in Division resources made available by Congress.  However, as we discuss in Chapter Five, we concluded that the acceleration of this activity during the 2000-2001 period at a minimum created the perception, both among long-time senior career professionals who were involved in the process and among the political appointees in the incoming Division leadership, that it was done in order to hire attorneys perceived to favor the enforcement philosophy of the outgoing administration and to limit the ability of the incoming administration to make its own hiring and resource allocation decisions.  We found that these actions generated mistrust between the incoming political leadership in the Division who discovered that the hiring campaign had occurred and the holdover career leadership who participated in the hiring effort.

The polarization and suspicion became particularly acute during the period from 2003 to 2007, including when Bradley Schlozman supervised the Voting Section in his capacity as Principal DAAG and Acting AAG.  As detailed in a prior report by the OIG and OPR, Schlozman illegally recruited new

attorneys into the Voting Section and other parts of the Division based on their conservative affiliations. As was evident from the e-mails we cited in our earlier report, Schlozman's low opinion of incumbent career attorneys in the Voting Section was based in significant part on their perceived liberal ideology and was not a well-kept secret. During this review, we found that Schlozman's decision to transfer Deputy Section Chief Berman out of the Voting Section in 2006 was motivated at least in part by ideological considerations.

We also found that some career employees in the Voting Section contributed significantly to the atmosphere of polarization and distrust by harassing other career employees due at least in part to their political ideology or for positions taken on particular cases. As detailed in Chapter Four, some career staff assigned to the Georgia Voter ID Section 5 preclearance matter in 2005 behaved in an unprofessional manner toward one attorney who was perceived to be ideologically close to Division leadership. The behavior included outward hostility, snide and mocking e-mails, and accessing the attorney's electronic documents on the Voting Section shared drive without his permission. In 2007, some career employees made offensive and racially charged comments to and about a student intern who volunteered to assist the trial team in the controversial Noxubee matter, which was the first Section 2 case brought against minority defendants on behalf of White voters. Division leadership reprimanded one career attorney and counseled two others for this conduct. We also found that some Voting Section employees criticized and mocked the trial team in e-mails to each other at work, sometimes using inappropriate and intemperate language.

In 2007, three male attorneys who were widely perceived to be conservatives were counseled for making highly offensive and inappropriate sexual remarks about a female employee, together with remarks that she was "pro-black" in her work. Later that year, during a period of high tension in the Section, at least three career Voting Section employees posted comments on widely read websites concerning Voting Section work and personnel. Some of the postings included a wide array of inappropriate remarks and attacks, as well as highly offensive and potentially threatening statements. The postings included non-public information about attorneys, managers, and internal Department matters. They reflected exceptionally poor judgment and may have constituted a violation of Department regulations or policies. We do not believe that Voting Section or Division managers responded adequately to some of these incidents. We were especially troubled that a non-attorney Voting Section supervisor, who knew of a subordinate's improper conduct, not only suggested that the employee disregard counseling and admonishment from Section leadership, but also encouraged the subordinate to continue the improper conduct.

The functioning of the Voting Section and the relationship between political appointees in the Division's leadership and career employees was

further undermined by unauthorized disclosures of confidential information about internal deliberations and debates in several controversial matters, including the Mississippi and Texas redistricting matters and the Georgia Voter ID matter, which we also discuss in Chapter Four. Managers responded to the threat of further disclosures by limiting career staff access to information and imposing stricter secrecy on more sensitive projects. Despite these efforts, unauthorized disclosures of sensitive and confidential Voting Section information, apparently for political purposes, have continued to the present time. We believe that these disclosures and the responses to them came at a cost to trust, collegiality, and cooperation, and increased the appearance of politicization of the Voting Section's work. While it was beyond the scope of our review to determine the specific source of these unauthorized disclosures, the impact that they had on the relationship between Division leadership and career staff and the operation of the Voting Section was readily apparent to us.

In January 2009, a new President was inaugurated and, soon after, new leadership took office in the Department and the Division. A transition team memorandum that was provided to the incoming Department leadership advised them that, in reviewing the career leadership in the Division, "care should be taken to insure that any changes will protect the integrity and professionalism of the Division's career attorneys and will not be perceived as the politicization pendulum just swinging in a new direction." Despite this admonition, we found that the polarization in the Voting Section continued, as evidenced by several events.

For example, we found that starting in April 2009, there were serious discussions among senior leadership in the Division and the Department about removing Christopher Coates as Chief of the Voting Section, at least in part because of a belief that Coates had a "very conservative view of civil rights law" and wanted to make "reverse-discrimination" cases such a high priority in the Voting Section that it would have a negative impact on the Section's ability to do "traditional" cases on behalf of racial and language-minority voters. However, we found no evidence that Coates had declined to implement the decisions or policies of the new administration at the time of this effort, despite his admittedly conservative views and his acknowledged willingness to pursue "reverse-discrimination" cases. Division leaders also believed, based in part on complaints from career employees, that Coates was a flawed manager and a divisive figure whose removal would improve the functioning and morale of the Voting Section. After career officials in JMD told Division leadership that the then-existing record would not support a performance-based removal, an effort was then undertaken by Division leadership to document Coates's performance deficiencies. Ultimately, however, Coates requested and was granted a transfer out of the Division. We found the manner in which the Coates matter was handled further increased the appearance of politicization of the Voting Section.

We also found that in 2009, then-Section Chief Coates placed a career Section manager on the Honors Program Hiring Committee in order to "balance" the political views of a different committee member who Coates considered to be liberal.  Almost immediately thereafter, DAAG Fernandes explored removing the manager from the committee due at least in part to his perceived conservative ideology, although she abandoned this effort.  We found that considering the political or ideological leanings of employees in determining the composition of a hiring committee was inappropriate.

The continued polarization within the Voting Section also came into focus during "brown bag" meetings between Section personnel and DAAG Fernandes in 2009.  During one meeting about Section 2 enforcement, in September 2009, Fernandes made comments about Division leadership's intention to prioritize "traditional civil rights enforcement" on behalf of racial or ethnic minorities.  Some career staff interpreted her comments to signal that Division leadership had a blanket policy of not pursing Section 2 cases against Black defendants or on behalf of White voters.  At another meeting later in 2009, Fernandes made comments about Division leadership's intention to focus on enforcing the "voter access" provisions of the NVRA that some career staff interpreted to mean that the administration would take no steps to enforce the "list-maintenance" provisions of the statute, the former of which are perceived to be supported by liberals while the latter are perceived to be favored by conservatives.  Fernandes told the OIG that her comments at both meetings were not intended to convey the absolutist positions that some witnesses attributed to them, but rather reflected her understanding of Division leadership's legitimate enforcement priorities.  At a minimum, these incidents reveal that the politically charged atmosphere and polarization within the Voting Section continued even after the 2009 change in the Division's leadership.

During the course of our investigation, we received additional allegations about the unfair treatment of perceived liberals by Section or Division management from 2003 to 2008, and additional allegations about the unfair treatment of perceived conservatives by Section or Division management from 2009 to the present.  These included allegations that career attorneys received undesirable assignments or unfavorable performance reviews and that Division leadership refused to approve cases that the attorneys proposed because of political or ideological bias.  We could not investigate many of these allegations, but we were struck by the perception within the Voting Section that this sort of conduct has continued across administrations.  Again, we believe that the perception that some career employees are disfavored by management due to their political views is unusual in the Department, and that it hampers Section operations and undermines the perception of impartial law enforcement.

We did not find sufficient evidence to substantiate allegations about partisanship in hiring.  As detailed in Chapter Five, our review did not

255

substantiate allegations that the Voting Section considered applicants' political or ideological affiliations when hiring experienced trial attorneys in 2010. Nevertheless, we found that the primary criterion used in assessing the qualification of the 482 applicants, namely prior voting litigation experience, resulted in a pool of 24 candidates selected to be interviewed (9 of which were ultimately hired) that had overwhelmingly liberal or Democratic affiliations. Although we found that the composition of the selected candidates was the result of the application of objectively neutral hiring criteria, this result contributed to the perception of continued politicization in the Section. We recommend steps that the Section should take to avoid creating perceptions of ideologically biased hiring.

Our investigation also found no support for allegations that partisan allies of the current administration received preferential treatment in the Voting Section's responses to requests for records, including FOIA requests. As detailed in Chapter Six, we found that differences in the time it took for the Voting Section to respond to records requests were attributable to variance in the time-sensitivity of the requests, the complexity and size of the requests, and the difficulty of locating responsive documents. We found that the Voting Section regularized and strengthened its procedures for responding to records requests in 2003 and since 2006, and that these procedures have helped protect against favoritism in responding to records requests. Nevertheless, we are concerned about the increasing backlog of requests in the Voting Section, which may be contributing to the appearance of politicization in responding to such requests, and we made a recommendation to address the issue.

Although we did not conclude that substantive enforcement decisions in the Voting Section during the period of our review were infected by partisan or racial bias, we believe that the perception remains that enforcement of the voting laws has changed with the election results. Much of this perception is a byproduct of legitimate shifts in enforcement priorities between different administrations. However, some of it has been fed by the incidents of polarization, discord, and harassment within the Voting Section described in this report. It is precisely because of the political sensitivity of the Voting Section's cases that it is essential that Division leaders and Voting Section managers be particularly vigilant to ensure that enforcement decisions – and the processes used to arrive at them – are, and appear to be, based solely on the merits and free from improper partisan or racial considerations.

In the highly controversial NBPP matter, we found that the decisions that were reached by both administrations were ultimately supportable on non-racial and non-partisan grounds. However, we also found that the manner in which the outgoing administration filed the case without following usual practice and the new administration's dismissal of Jackson as a defendant at the eleventh hour, particularly viewing the latter in the context of the contemporaneous discussions about removing Coates as Section Chief, both

risked undermining confidence in the non-ideological enforcement of the voting rights laws.

We do not believe that ideological polarization and bitter controversy within the Section are an inevitable consequence of the high political stakes in some Voting Section cases. Other Department components – including components that specialize in subject areas that are also politically controversial, such as environmental protection – do not appear to suffer from the same degree of polarization and internecine conflict. We believe the difference is largely a function of leadership and culture, and that steps must be taken to address the professional culture of the Voting Section and the perception that political or ideological considerations have affected important administrative and enforcement decisions there.

Given the troubling history of polarization in the Voting Section, Division leadership needs to promote impartiality, continuity, and professionalism as critical values in the Voting Section, and leadership and career staff alike must embrace a culture where ideological diversity is viewed as beneficial and dissenting viewpoints in internal deliberations are welcomed and respected. We also believe that leadership and career staff must be continually mindful of the need to ensure the public's confidence in the Voting Section's impartiality. We were surprised and dismayed at the amount of blatantly partisan political commentary that we found in e-mails sent by some Voting Section employees on Department computers. We recognize that Voting Section employees, no less than other Department employees, are entitled to their individual political views. However, the importance of separating such views from Section work is paramount. Government e-mails are readily forwarded and reproduced, and political commentary that is intended to be private may quickly become public, which could further exacerbate the appearance of politicization in the Section and undermine the public's confidence in the Department.

The Department's leadership also should avoid the use of direct communications with staff attorneys with the explicit or implicit understanding that intermediate supervisors who are not trusted by management will not be included in or informed about the communications. We saw this practice during the prior administration in the Georgia Voter ID case in 2005 and during the current administration in the exclusion of Section Chief Coates from some voting-related projects in 2009. We believe that communications of this type between Division or Department leadership and career personnel that intentionally exclude the career employees' supervisors are indicative of a dysfunctional management chain and can only feed mistrust and polarization.

Employees in the Voting Section have a critical role to play in improving the Section's culture. Employees must appreciate the importance of public confidence in the impartial enforcement of the voting rights laws. They must also be prepared to implement legitimate enforcement priorities set by Division

management even if the employees disagree with them.  The pattern of undermining Division management and other career employees through personal attacks in blog posts and the unauthorized disclosure of confidential and privileged information must stop.  Department employees have several options for addressing instances of actual or perceived misconduct or mismanagement, including reporting them to the OIG and OPR.

Many of the career and political employees who were involved in the most troubling incidents described in this report have left the Department and are no longer subject to administrative discipline.  However, several of the incidents involved conduct by current Department employees and we are referring those matters to the Department for a determination of whether discipline or other administration action with respect to each of them is appropriate.

The conduct that we discovered and document in this report reflects a disappointing lack of professionalism by some Department employees over an extended period of time, during two administrations, and across various facets of the Voting Section's operations.  In the Department, professionalism means more than technical expertise – it means operating in a manner that consciously ensures both the appearance and the reality of even-handed, fair and mature decision-making, carried out without regard to partisan or other improper considerations.  Moving forward, the Department's leadership should take steps consistent with the findings and recommendations contained in this report to ensure that the actions and decisions of the Section and its employees meet the standards of professionalism and impartiality that are rightly expected and demanded by the public of the Department of Justice.

# APPENDIX  A



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

MEMORANDUM

TO:        Michael E. Horowitz
            Inspector General

FROM:    Thomas E. Perez
            Assistant Attorney General
            Civil Rights Division

DATE:    March 11, 2013

RE:        Response to the Office of the Inspector General's report entitled *Review of the Operations of the Voting Section of the Civil Rights Division.*

Thank you for the opportunity to provide this response to the report by the Office of the Inspector General entitled *Review of the Operations of the Voting Section of the Civil Rights Division.*

The report examines the Voting Section's enforcement of the federal voting rights laws over time. We agree with your conclusion that since 2009, "the decisions that Division or Section leadership made in controversial cases did not substantiate claims of political or racial bias." Report at 114.

The report also examines the hiring process for selecting experienced trial attorneys in the Voting Section in 2010. You reviewed "thousands of internal CRT documents, including e-mails, hand-written notes, and interviews of CRT staff," and concluded that this review "did not reveal that CRT staff allowed political or ideological bias to influence their hiring decisions." Report at 214. We agree with this conclusion, and with your findings that "the backgrounds of the Voting Section's new attorneys revealed a high degree of academic and professional achievement," Report at 204; that "the new hires as a group had significantly more litigation experience than the candidates who were not hired," Report at 211; and that "prior voting litigation experience was a reasonable criterion to use" in selecting experienced trial attorneys. Report at 222.

In addition, the report examines the Division's and the Voting Section's process for responding to Freedom of Information Act requests and other public requests for records. We agree with your conclusions that since 2009, there is "no evidence supporting the allegation that

differences in response times were the result of partisan or ideological favoritism," and that your review "did not find any substantiation of ideological favoritism or political interference in such responses."  Report at 249.

Finally, the report examines complaints of staff mistreatment based on actual or perceived political ideology, directed at both conservative and liberal employees.  The complaints you examined were concentrated in the period from 2004 to 2007, but included two instances in 2009.  We agree that mistreatment of Division employees based on their political ideology is never appropriate, and in the past several years we have implemented a number of measures to ensure that the Division and the Voting Section continue to maintain a professional and collegial work environment.  Notwithstanding our agreement that you have identified several instances of unacceptable conduct, we do have concerns about other aspects of your examination of these issues, which we describe further below.

In the remainder of this letter, we address some of the conclusions in your report with which we concur, while noting some aspects of the report with which we do not agree.

**The Division's Enforcement of Voting Rights Laws**

Chapter Three of the report examines trends in the Voting Section's enforcement activity over time.  We agree with the conclusion in this chapter that substantive enforcement decisions since 2009 were not motivated by improper partisan or racial factors and did not improperly favor or disfavor any particular group of voters.  Report at 114.  Regarding the *New Black Panther Party* litigation, we agree with the conclusion you have reached – as the OPR also found in its 2011 report – that the decisions to dismiss three of the defendants and limit the injunctive relief sought against the fourth were not the result of improper racial or political considerations.  Report at 114.  We agree as well with the finding of both the OIG and the OPR that political leadership did not direct the outcome of the case.  Report at 71.

Because your investigation did not include a review of our enforcement activities since the end of 2011, your report does not fully capture one of the most significant trends in the Voting Section's enforcement activity over time – namely, that the Voting Section's workload and productivity in the past two years increased to what we believe are among the highest levels ever.  The Voting Section began participation in 43 new cases in fiscal year 2012 – the largest number of new litigation matters in any fiscal year ever, to the best of our knowledge.  This number of new matters exceeded the prior year's activity level by a significant margin, and that year was itself a record fiscal year, with 27 new cases.  During this time period, we expended considerable resources litigating declaratory judgment actions under Section 5 of the Voting Rights Act that blocked discriminatory voting changes from taking effect (including four cases that went to trial in the D.C. District Court in 2012); defending the constitutionality of Section 5; and aggressively enforcing the statute that protects the rights of servicemembers and overseas citizens to participate in our democracy.[1]  The Voting Section also dramatically expanded its

---

[1] In 2012 alone, the Voting Section participated in the following cases that resulted in published judicial decisions, not including consent decrees, amicus participation, or appellate cases: *South Carolina v. United States*, No. 12-cv-203, 2012 WL 4814094 (D.D.C. Oct. 10, 2012) (three-judge court) (Section 5 preclearance for South Carolina voter ID law granted in part and denied in part); *Texas v. Holder*, No. 12-cv-128, 2012 WL 3743676 (D.D.C. Aug. 30, 2012) (three-judge court) (denying preclearance for photo identification requirement for in-person voting); *Texas v.*

2

amicus practice, filing more amicus briefs in the last fiscal year than in the previous nine years combined.

**The Voting Section's Process for Hiring Experienced Trial Attorneys**

Chapter Five of the report examines the Voting Section's hiring of experienced trial attorneys in 2010.  We agree with the report's conclusions in this chapter that the Voting Section's selection process for these attorneys was based on legitimate criteria, "particularly in light of the Voting Section's stated need for experienced attorneys who would be ready to 'hit the ground running' by leading complex voting rights cases immediately."  Report at 216.  The report also confirms that politics and ideology were not considered in making hiring decisions, *see* Report at 203, 214, 216, 255-56; that the successful candidates had "a high degree of academic and professional achievement," Report at 204; and that the successful candidates had significantly more voting litigation experience than the candidates who were not hired.  Report at 215 ("78 percent of the new hires (7 of 9) had 2 or more years of voting litigation experience compared to only 3 percent (15 of 473) of all rejected applicants.").

The Division took seriously the findings of the 2008 OIG/OPR report on politicized hiring and other personnel practices in the Division.[2]  One of my first priorities after being confirmed as Assistant Attorney General in October 2009 was to adopt significant reforms to the Division's hiring process to implement the recommendations in the 2008 OIG/OPR report.  The Division also put in place additional safeguards beyond those recommended by the 2008 OIG/OPR report, as you note.  Report at 193 n.176.  Our goals in implementing these significant reforms were to restore merit-based, career-driven hiring, and to ensure that the hiring practices from 2003 to 2006, which the 2008 OIG/OPR report found to be illegal, are not repeated.

The OIG's conclusions in this report demonstrate that the safeguards the Division created were effective in ensuring that political and ideological affiliations were not considered during the career hiring process.  In its investigation, the OIG reviewed "thousands of internal CRT documents, including e-mails, hand-written notes, and interviews of CRT staff who participated

---

*United States*, No. 11-cv-1303, 2012 WL 3671924 (D.D.C. Aug. 28, 2012) (three-judge court) (denying preclearance for statewide redistricting plans); *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (three-judge court) (denying preclearance for early voting changes, and granting preclearance for change-of-address procedures); *Chisom v. Jindal*, No. 86-cv-4075, 2012 WL 3891594 (E.D. La. Sept. 1, 2012) (holding that an earlier consent decree entered into by the United States, private plaintiffs, and the State of Louisiana to resolve a Section 2 lawsuit determined the process for who would become the next chief justice of the state supreme court); *United States v. Alabama*, 857 F. Supp. 2d 1236 (M.D. Ala. 2012) (granting motion for preliminary injunction in UOCAVA lawsuit); *United States v. Alabama*, No. 12-cv-179, 2012 WL 642312 (M.D. Ala. Feb. 28, 2012) (order); *United States v. Georgia*, No. 12-cv-2230, 2012 WL 4336257 (N.D. Ga. July 05, 2012) (granting preliminary injunction in UOCAVA lawsuit); *United States v. New York*, No. 10-cv-1214, 2012 WL 254263 (N.D.N.Y. Jan. 27, 2012) (granting motion for permanent and supplemental relief in UOCAVA lawsuit); *United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012) (finding that Florida's list maintenance program likely violated Section 8 of the NVRA, but denying temporary restraining order on the ground that Florida had voluntarily suspended that program).

[2] *See* Report of the Office of the Inspector General and the Office of Professional Responsibility, *An Investigation of Allegations of Politicized Hiring and Other Improper Personnel Actions in the Civil Rights Division* (July 2008), *at* www.justice.gov/opr/oig-opr-iaph-crd.pdf.

in the selection of the Voting Section's experienced attorneys," and this review "did not reveal that CRT staff allowed political or ideological bias to influence their hiring decisions."  Report at 214.  Instead, merit-based considerations such as voting litigation experience governed the 2010 hiring decisions that the OIG examined.  Report at 215 ("Our interviews with hiring committee members, review of contemporaneous notes taken during the hiring committee's deliberations, and assessment of its recommendations showed that litigation experience involving voting rights and the statutes that the Voting Section enforces were highly important to the hiring committee's review of applications.").  Indeed, the hiring committee's emphasis on voting litigation experience has proven to be tremendously valuable in light of the heavy litigation demands the Voting Section confronted in 2011 and 2012, which were among the Section's busiest years ever in terms of trial practice.

Although the report concludes both that the hiring process complied with federal laws and Department policies, and that the selection criteria were appropriate, the OIG includes several recommendations to mitigate any residual risks of violating merit system principles in the future and to avoid any perception of prohibited personnel practices.  These recommendations include that the Division and the Voting Section "refrain from relying on the 'general civil rights / public interest' criterion in the future'"; "not place primary emphasis on 'demonstrated interest in the enforcement of civil rights laws' as a hiring criterion"; and better account for the "significant contributions that applicants with limited or no civil rights backgrounds can make to the Section."  Report at 222.  We appreciate the OIG's focus on further prophylactic steps the Division may be able to take to continue refining its hiring practices.  We also agree that attorneys with a wide range of substantive backgrounds can make – and have made – important contributions to the work of the Division and the Voting Section.  Attorneys from a diverse array of legal backgrounds were in fact hired across the Division in 2010.

We believe, however, that it is both usual and appropriate for a litigating component within the Department to value experience in the subject matter of that component when making hiring decisions.  Recent vacancy announcements in other components, for instance, include a trial attorney position in the Indian Resources Section of the Environment and Natural Resources Division stating that "[e]xperience in litigation, in particular water rights litigation, and knowledge of Indian, administrative, and water law is highly desirable"; and a trial attorney position in the Asset Forfeiture and Money Laundering Section (AFMLS) of the Criminal Division listing "experience with financial investigations and tracing money" as a preferred qualification.  Just as it is understandable for the Indian Resources Section to value a background in Indian law, and for AFMLS to value a background in tracing money, we believe that it is appropriate in selecting attorneys for litigating positions in the Civil Rights Division to consider whether applicants have experience with and a demonstrated interest in civil rights litigation.[3]

We have a number of concerns about the report's description of the hiring decisions made in January 2001.  The report does not fully describe the totality of the circumstances surrounding a two-year effort to secure additional resources for the Civil Rights Division.  In addition, although we agree with the finding that there is "no basis to conclude that [the 2000-2001 hiring]

---

[3] Specifically minimizing civil rights experience was one practice used in the 2003-2006 period as a proxy for making ideological hiring decisions.  *See* 2008 OIG/OPR Report 17 (noting that Bradley Schlozman minimized the importance of prior civil rights experience).

effort violated any law or Department policy," Report at 213, we believe that describing the 2000-2001 hiring as a "significant historical backdrop" to subsequent personnel practices, Report at 181, may give the misimpression that this hiring helps to explain or minimize the severity of the subsequent illegal conduct in hiring and other personnel practices from 2003 to 2006.  In the more comprehensive joint review by the OIG and the OPR that examined these personnel practices from 2003 to 2006, and which was based in part on interviews of several former Assistant Attorneys General, the 2000-2001 hiring is not described as a backdrop to the subsequent illegal conduct you identified.

**The Voting Section's Process for Responding to Records Requests**

Chapter Six of the report examines allegations that the Voting Section's responses to public records requests displayed favoritism based on the ideology of the requester.  The OIG conducted an exhaustive review of evidence, including reviewing "tens of thousands of e-mails relating to FOIA responses in the Voting Section between 2001 and 2010," and "did not find any substantiation of ideological favoritism or political interference in such responses."  Report at 249.  You also concluded after reviewing the response times for records requests that there was "no evidence supporting the allegation that differences in response times were the result of partisan or ideological favoritism."  Report at 249.  The report also found that the Voting Section instituted additional procedures beginning in 2006, and "that these procedures have helped to protect against bias in responding to records requests."  Report at 249.  We agree with the report's conclusion that the Voting Section did not give preferential treatment to requesters based on political or ideological affiliation.

The report notes a concern regarding the Voting Section's current backlog of pending records requests.  We have accepted the OIG's recommendation to assign additional staff to help process the increased demand for Voting Section records.  In response to this report, two managers in the Voting Section will devote additional time to handling the backlog of records requests.  In addition, the Division recently authorized the Voting Section to hire an additional full-time contractor to assist in reducing the large backlog of records requests.  We will also provide training to additional paralegal contractors who are already on staff so that they can devote time to records requests as well.  We currently anticipate that these additional staffing assignments will be short-term (three- to six-month) assignments, although we are prepared to retain this level of resources longer than that if necessary to continue addressing the backlog.

**Treatment of Voting Section Staff and Managers**

Chapter Four of the report examines complaints regarding mistreatment of Voting Section employees because of their political ideology, including incidents involving both perceived conservatives and perceived liberals.  These complaints are concentrated in the period from 2004 to 2007, but include two examples that occurred in 2009.  The Department takes very seriously any allegations of harassment, mistreatment, unauthorized disclosure of internal information, and other unprofessional conduct.  The OIG has documented in this chapter a number of troubling incidents that have no place in the Department, and we have taken steps to prevent similar incidents from recurring.

As the report notes, the Civil Rights Division took steps to address a number of these specific incidents of improper conduct at the time they arose in the period between 2004 and 2007.  The report also notes many of the broader measures the Division implemented to train all staff on their anti-discrimination and anti-harassment obligations, including "providing annual [equal employment opportunity (EEO)] and anti-harassment training to all employees and managers; issuing EEO, prohibited personnel practice and anti-harassment policies that are available to all employees on the CRT Intranet and that set forth the various procedures for reporting misconduct; and sending periodic reminders to all employees about their obligations to conduct themselves in a professional manner at all times."  Report at 133.

The Division has continued to remind employees of these obligations.  For example, as your report notes, in January 2011, I "reiterated to all CRT employees – via posting on the CRT Intranet page and via e-mail message to all CRT employees – the prohibitions against discrimination and harassment in the workplace, including specific language that '[a]ll employees must conduct themselves in a professional manner at all times and refrain from engaging in conduct that may be viewed as hostile or offensive to others in the workplace, including making derogatory comments about other employees because of their membership in a protected category, such as race, sex or religion, or because of their actual or perceived political affiliation.'"  Report at 133-34.  The Division has also investigated, in consultation with the Justice Management Division (JMD), the recent unauthorized disclosures of internal Voting Section information and documents, and issued a Division-wide email in December 2012 to reiterate to staff that they must maintain the confidentiality of internal documents and information.

In addition to these efforts, Division leadership since 2009 has sought to promote effective and respectful decision-making by ensuring that career attorneys and professionals have every opportunity to provide their considered views and advice.  For example, as you note, the "change to the Section 5 recommendation procedure was controversial within the Voting Section" when it was implemented in 2005.  Report at 86 n.70; *see also* Report at 153 n.135.  This change was controversial because senior leadership dramatically re-engineered the longstanding process by which decisions in Section 5 matters were made to deny career staff a full opportunity to express their position, and to obscure the appearance of staff dissent.  I agree with you that "it is essential that Division leaders and Voting Section managers be particularly vigilant to ensure that enforcement decisions – and the processes used to arrive at them – are, and appear to be, based solely on the merits and free from improper partisan or racial considerations."  Report at 256.  That is why, in 2009, the Division restored the prior practice of allowing each staff member who works on a Section 5 submission to state his or her views in writing so that those views can be considered in the decision-making process, and I reiterated the importance of this process in a 2011 memorandum to Voting Section staff.  Report at 86 n.70.

We believe these and other efforts have improved the atmosphere and professional culture within the Voting Section considerably over the past several years.  The Voting Section is a far different place in 2013 than it was in 2005 or 2007.  Nonetheless, we acknowledge, as your report notes, that voting rights enforcement is a particularly important area in which to assure professionalism and impartiality, and we recognize the need to continue taking additional steps to maintain and strengthen the culture of the Voting Section and to foster a work environment that is as collegial and healthy as possible.  In response to this report, we will reiterate to all

Division staff their professionalism obligations, including the prohibition on harassment based on perceived political ideology.  We also have begun the process of developing a written policy to further address the continuing challenge of unauthorized disclosures of internal and enforcement-related information.  Continuing the work of strengthening a collegial, professional work environment in the Voting Section is one of our highest priorities, and we expect these steps to assist us in this effort.

This chapter examines the staffing of the Honors Program Hiring Committee in 2009, and finds that "this incident demonstrates that problems of polarization within the Voting Section continued after the change in administrations."  Report at 148.  As described in the report, former Voting Section Chief Chris Coates decided in September 2009 to assign a manager to a hiring committee because Coates perceived that manager to be conservative.  Report at 144-45.  You concluded that Coates's decision to do so was inappropriate.  Report at 148.  Then-Deputy Assistant Attorney General Julie Fernandes received a complaint about Coates's staffing decision; investigated her options for addressing that complaint; and concluded that she should take no action because she became satisfied that the manager could perform the duties on the hiring committee effectively and properly.  Report at 145-47.  To the extent this incident demonstrates that ideological polarization continued into 2009, we believe it does so only through Coates's improper staffing decision.  Fernandes's response – to investigate the complaint she received, and to make no further staffing changes after concluding the manager would serve effectively on the committee – was itself perfectly appropriate.

The report also examines discussions among Division and Department leadership in early 2009 to address serious concerns regarding Coates's performance.  These concerns are documented throughout your report, which notes, "Division leadership held genuine beliefs about Coates's weaknesses as a manager, and . . . Coates was not without fault in his management of the Section and his relationships with Division leadership."  Report at 177.  Incoming Division leadership heard consistent complaints in early 2009 from career staff in the Voting Section about Coates's management deficiencies.  Report at 159-60, 174, 178.  By his own account, Coates was not a good manager.  Report at 174-75.  Among the concerns for Division leaders at the time was the recurrent problem, which your report documents, that Coates "took insufficient steps to ensure that relevant and accurate information was provided to Division leadership in connection with seeking their approval of court submissions."  Report at 177; *see also* Report at 56, 58, 61 n.45, 159-60.

It was these and other management and performance problems that prompted the Department's examination of its personnel options.  In light of these documented concerns, Division and Department leadership engaged in appropriate conversations in the spring of 2009 regarding their options for addressing these serious management and performance problems; consulted with JMD and followed JMD's guidance to document any performance shortcomings before taking action; and then ultimately chose not to take any action to remove or reassign Coates involuntarily.  Moreover, we do not agree that Department policy projects were improperly staffed, or with the suggestion that this staffing was part of an effort to remove Coates from his position.

**Conclusion**

Without question, the Voting Section in January 2009 had low morale and an unacceptable degree of staff conflict, which we believe were largely a product of the illegal hiring, transfers, case assignments, and other personnel practices that occurred in the Division from 2003 to 2006 and that are documented in the 2008 OIG/OPR report, as well as the management deficiencies that existed at the time.  Since 2009, the Civil Rights Division and the Voting Section have undertaken a number of steps to improve the professionalism of our workplace and to ensure that we enforce the civil rights laws in an independent, evenhanded fashion.  For example, as noted above, the Voting Section restored its review process under Section 5 of the Voting Rights Act to allow each staff member working on a submission the opportunity to state his or her view, a practice that had been followed for decades until it was changed in 2005.  In late 2009 and early 2010, the Division finalized and implemented its reformed hiring procedures to restore merit-based and career-driven hiring across the board, including in the Voting Section.

The selection in 2010 of Section Chief Chris Herren, a career Voting Section attorney who joined the Section in 1992, was a critical step in the Voting Section's development.  Herren has a deep knowledge of and experience in enforcement of the federal voting rights laws, and enjoys the respect of Section employees, election administrators around the country, and other key external stakeholders.  He has assembled a strong management team of experienced voting rights attorneys.  Under his leadership, in 2011, the Voting Section implemented a number of structural reforms to better manage its litigation efforts, including the creation of subject-matter teams to allow for effective strategic planning as well as opportunities for professional development for all staff.  Your review has identified additional measures that may allow us to accomplish our mission even more effectively in the future, and we will of course consider those recommendations.  We recognize that although significant progress has been made, additional work remains.

We are pleased that the conclusions following your review are that the Voting Section has not, since 2009, considered improper or partisan factors in its enforcement, hiring, public records request response times, and other functions.  We look forward now to turning our full attention to the critically important work of enforcing our nation's voting rights laws.

Thank you for the opportunity to provide this response.

# APPENDIX  B

**Attorney Outreach List**
**Status of Updates as of February 5, 2010**

List of Current Organizations

ADAPT
Alexander Graham Bell Association for the Deaf and Hard of Hearing
American Arab Anti-Discrimination Committee
American Association of People with Disabilities
American Bar Association – Commission on Mental and Physical Disabilities Law
American Bar Association – Commission on Racial and Ethnic Diversity in the Profession
American Civil Liberties Union
American Council of the Blind
American Diabetes Association
American Foundation for the Blind
American Speech-Language-Hearing Association
American Translators Association
American University – Washington College of Law
Anti-Defamation League
Arab American Bar Association of Illinois
Asian American Bar Association of Houston
Asian American Bar Association of New York
Asian American Justice Center
Asian American Lawyers Association of Massachusetts
Asian Bar Association of Washington
Asian Pacific American Bar Association of Pennsylvania
Asian Pacific American Bar Association of the Greater Washington, D.C. Area
Asian Pacific American Legal Resource Center
Asian Pacific Bar Association of the Silicon Valley
Association of American Law Schools – Indian Nationals & Indigenous People
Association of American Law Schools – Minority Section
Autistic Self Advocacy Network
Bar Association of the District of Columbia
Barristers' Association of Philadelphia, Inc.
Bazelon Center for Mental Health Law
Bill of Rights Defense Committee
Black Women Lawyers of Greater Chicago, Inc.
Boston University
Brain Injury Association of America
Brigham Young University Law School
Burton Blatt Institute
Cambodian-American Asian American Civic Organizations
Catholic University, Columbus School of Law
Columbia University
Constance List, Listserv (discussion group of African American Attorney)

Council of Shia Professionals
Council of State Administrators of Vocational Rehabilitation
Deaf and Hard of Hearing in Government
Department of Defense Operation Warfighter
Department of Justice Association of Black Attorneys
Department of Justice Association of Hispanic Employees for Advancement and Development
Department of Justice AG's Committee on the Employment of Persons with Disabilities
Department of Justice Equal Employment Opportunity Staff (Disability Program Manager)
Department of Labor Office of Disability Employment Policy, Workforce Recruitment Program
Department of Labor Federal Disability Workforce Consortium
Department on Disability Services, D.C. Government
Department of Rehabilitation Services, Virginia
Disability Rights Education and Defense Fund
Equal Employment Opportunity Commission
Fairfax Bar Association
Federal Bar Association
Federal Bar Association, Indian Law Section
Federal Emergency Management Agency
Florida Legal Services
Florida State University College of Law
Fordham University
Fulton County, GA Office of the Child Attorney
Gate City Bar Association
Gay, Lesbian, Bisexual and Transgender Attorneys of Washington, D.C.
George Mason University Law School
George Washington University School of Law Development Office
Georgetown University Law Center
Georgia Asian Pacific American Bar Association
Georgia Association of Black Women Attorneys
Hispanic Bar Association of Orange County
Hispanic National Bar Association
Howard University Law School
Immigration Project of the Wisconsin Coalition Against Domestic Violence
Jack & Jill of Greater St. Louis
Korean American Bar Association of Northern California
Language Access Consultants
Lawyers Committee for Civil Rights Under the Law
Lewis and Clark Law School
Loyola Law School, Los Angeles
Maryland Division of Rehabilitation Services
Mental Health America
Mexican American Bar Association of Los Angeles County
Minnesota Hispanic Bar Association
Multi-cultural Committee Service
Muslim Bar Association of Southern California (MBASC)

National Alliance for the Mentally Ill
National Asian Pacific American Bar Association
National Association of the Deaf
National Association of Judiciary Interpreters & Translators
National Bar Association (national African American bar association)
National Coalition for Disability Rights (NCDR)
National Coalition of Mental Consumer/Survivor Organizations
National Coalition on Health Care
National Conference of Women's Bar Associations
National Council on Disability
National Council on Independent Living
National Disability Rights Network
National Federation of the Blind
National Hispanic Prosecutors Association
National Immigration Law Center
National Indian Justice Center
National Organization on Disability
National Policy and Advisory Council on Homelessness
National Spinal Cord Injury Association
Native American Bar Association of Washington, D.C.
New York School of Law
New York State Association of Criminal Defense Lawyers
North American South Asian Bar Association
Office of Child Attorney, Fulton County, Georgia
Pakistan American Public Affairs Committee (PAKPAC)
Paralyzed Veterans of America
Pan Asian Lawyers Association of San Diego
Pennsylvania Association of Criminal Defense Lawyers
Project EARN
Public Interest Law Center of Philadelphia
Self Advocates Becoming Empowered
Sikh Coalition
Skadden Arps Fellowship
South Asian Bar Association of Washington, D.C.
South Asian Bar Association of Northern California
Southwestern Law School
Stanford Law School
Texas Southern University, Thurgood Marshall School of Law
The ARC of the United States
The ARC and United Cerebral Palsy Public Policy Collaboration
The Becket Fund for Religious Liberty
U.S. Attorney's Bulletin
United Cerebral Palsy
United Spinal Association
University of California – Berkeley School of Law

University of California – Davis
University of California – Hastings College of Law
University of California – UCLA School of Law
University of Chicago Law School
University of Connecticut School of Law
University of Dayton School of Law
University of the District of Columbia – David A. Clarke School of Law
University of Idaho College of Law
University of Illinois College of Law
University of Maryland School of Law
University of Miami School of Law
University of Michigan - Ann Arbor
University of Missouri School of Law
University of Pennsylvania Law School
University of Tulsa College of Law
Vietnamese American Association of the Greater Washington, D.C. Area
Villanova University
Virginia State Bar Association
Washington & Lee School of Law
Washington Lawyers' Committee for Civil Rights and Urban Affairs
William and Mary School of Law
Wolverine Bar Association
Women's Bar Association of D.C.

E-Mails Bounced Back

Alexandria Bar Association
American Bar Association – Commission on Women in the Profession
American Corporate Counsel Association
Assistant United States Attorneys Association
Association of Black Lawyers of Westchester County, New York
California Association of Black Lawyers
Colorado Hispanic Bar Association
Connecticut Hispanic Bar Association
Cornell University
Dallas Asian-American Bar Association
Federal Bar Association – Federal Litigation Section
Filipino Bar Association of Northern California
Hispanic Bar Association of D.C.
Houston Lawyers Association
J. L. Turner Legal Association
Korean American Bar Association of Washington State
Metropolitan Black Bar Association
National Association of Protection and Advocacy Systems
National Association of Deaf Law Center
National Association of Women Lawyers

National Lesbian and Gay Law Association
Native American Bar Association
Oklahoma Indian Bar Association
Organization of Chinese Americans
Philippine American Bar Association
Prince George's County, Maryland Bar Association
San Francisco Law Raza Lawyers Association
South Asian Bar Association of New York
The California Minority Counsel Program
U.S. Department of the Air Force – Judge Advocate General's Department
University of Baltimore School of Law
University of Nevada Las Vegas –William S. Boyd School of Law
University of Richmond – T.C. Williams School of Law
University of Wisconsin – Madison
Utah Minority Bar Association

No Response From E-Mail

Alliance of Black Women Attorneys
American Bar Association – Government and Public Sector Lawyers Division
American Bar Association – Section of Litigation
American Bar Association – Section of Litigation, Minority Trial Lawyers Committee
American Bar Association – Young Lawyers Section
American Judges Association
Anne Arundel Bar Association
Asian American Bar Association of the Greater Chicago Area (AABA)
Asian American Bar Association of the Greater Bay Area
Asian Pacific American Legal Center of Southern California
Asian Pacific American Bar Association of Colorado
Asian Pacific American Bar Association of Los Angeles County
Asian Pacific American Lawyers Association of New Jersey
Association of American Law Schools – Litigation Section
Association of Black Women Attorneys
Association of Black Women Lawyers of New Jersey
Baltimore County Bar Association
Bar Association of Baltimore City
Bar Association of the District of Columbia – Young Lawyers Section
Black Lawyer's Association of Cincinnati
Black Women's Bar Association of Suburban Maryland, inc.
Black Women Lawyers Association of Los Angeles
Blind Veterans Association
Chicago Committee on Minorities in Large Law Firms
Connecticut Asian Pacific American Bar Association
Cook County Bar Association
Cuban American Bar Association
Dallas Hispanic Bar Association

D.C. Bar Association
Department of Justice Pam Asian Employees Association
Dominican Bar Association
D.W. Perkins Bar Association, Inc.
Fairfax, Virginia Bar Association – Young Lawyers Section
Federal Bar Association – Federal Career Service Division
Federal Bar Association – D.C. Chapter
Federal Bar Association – Capitol Hill Chapter
Federal Bar Association – Pentagon Chapter
Federal Bar Association – Maryland Chapter
Federal Bar Association – Northern Virginia Chapter
Federal Research Services, Inc.
Florida A&M University College of Law
Filipino American Lawyers of San Diego
Greater Washington Area Chapter, Women Lawyers Division of the National Bar Association
Harvard University
Hispanic Bar Association
Hispanic Bar Association of the Commonwealth of Virginia, Inc.
Hispanic Bar Association of Michigan
Hispanic Bar Association of Pennsylvania
Hispanic Employment Program Managers
Hispanic Lawyers Association of Illinois
Indian American Bar Association – Chicago
Indian Law Resource Center - Washington, D.C. Office
Inter-American Bar Association
Japanese American Bar Association of Los Angeles
John M. Langston Bar Association of Los Angeles
Korean American Bar of Southern California
Lawyers for One America
Los Abogados Hispanic Bar Association of Maricopa County
Local Government Attorneys of Virginia
Loren Miller Bar Association
Maryland Hispanic Bar Association
Maryland State Bar Association
Maryland State Bar Association – Young Lawyers Section
Maryland State's Attorneys' Association
Maryland Trial Lawyers Association
Massachusetts Association of Hispanic Attorneys
Massachusetts Black Lawyers Association
Minnesota American Indian Bar Association
Minnesota Association of Black Lawyers
Minority Corporate Counsel Association
Montgomery County, Maryland Bar Association
Monumental City Bar Association
National American Indian Court Judges Association
National Asian Pacific American Legal Consortium

National Association for Public Interest Law
National Association of Assistant United States Attorneys
National Association of Black Women Attorneys
National Association of Blind Lawyers
National Black Prosecutors Association
National Congress of American Indians
National Legal Aid & Defender Association
National South Asian Bar Association
Nativeamericanlaw, Listserv
North Carolina Central University School of Law
Northwestern University
Northwest Indian Bar Association
Orange County Japanese American Lawyers' Association
Old Dominion Bar Association
Puerto Rican Bar Association of Illinois
Puerto Rican Bar Association, Inc.
Regent University School of Law
Sam Cary Bar Association
South Asian Bar Association of Southern California
Southern California Chinese Lawyers Association
St. Mary's University School of Law
University of Arizona, James E. Rogers College of Law
University of Florida Frederic G. Levin College of Law
University of North Carolina at Chapel Hill
University of Southern California
University of Texas at Austin School of Law
University of Virginia School of Law
Virgil Hawkins Florida Chapter National Bar Association
Virginia Bar Association
Virginia Commonwealth's Attorneys Services Council
Virginia Trial Lawyers Association
Washington Bar Association
Washington Council of Lawyers
West Virginia Bar Association
West Virginia Prosecuting Attorneys Institute
West Virginia Trial Lawyers Association
West Virginia University College of Law
Women's Bar Association of Maryland, Inc.

# APPENDIX   C

## Applicant Organizations

### **Liberal Organizations**

American Civil Liberties Union
Amnesty International
Advancement Project
Alliance for Justice
American Constitutional Society
Appleseed Foundation
Asian American Justice Center
Asian American Legal Defense and Education Fund
Ayuda
Baltimore Public Justice Center
Brennan Center for Justice
Carter Center
Center for Constitutional Rights
Center for Death Penalty Litigation
Center for Reproductive Rights
Clean Water Action
Common Cause
Community Legal Services Immigration Clinic
Death Penalty Clinic
Demos
EarthRights International
Equal Justice Society
Equality Florida
Equality Michigan
Environmental Defense Fund
Environmental Law Center
Fair Elections Legal Network
Florida Immigrant Advocacy Center
Gay and Lesbian Victory Fund
Gaylaw
Greenpeace
Human Rights Campaign
Human Rights First
Human Rights Watch
Illinois Coalition for Immigrant and Refugee Rights
Immigrant Rights Coalition
Innocence Project
Irish Center for Human Rights
Irish Refugee Services
Lambda Legal Defense and Education Fund
Law School Civil and Human Rights Clinics and Organizations (various)
Law Students for Choice

Lawyers' Committee for Better Housing
Lawyers' Committee for Civil Rights
Legal Aid Organizations (various)
Legal Momentum [formerly National Organization for Women Legal Defense and Education Fund]
Mexican American Legal Defense and Education Fund
Migrant Legal Action Program
National Association for the Advancement of Colored People (NAACP)
NAACP Legal Defense Fund
National Abortion Rights Action League (NARAL)
National Association for Public Interest Lawyers
National Council of La Raza
National Immigration Justice Center
National Law Center on Homelessness and Poverty
National Wildlife Federation
National Women's Law Center
New Mexico Lesbian and Gay Lawyers Association
New York Civil Liberties Union
Oliver W. Hill Foundation
Open Society Institute
People for the American Way
Poverty & Race Research Action Council
Prisoner Legal Services
Prisoners and Families Clinic
Project Vote
Puerto Rican Legal Defense and Education Fund
Southern Center for Human Rights
Southern Coalition for Social Justice
Southern Environmental Law Center
Southern Poverty Law Center
Texas Civil Rights Project
Working People's Law Center
World Organization Against Torture
World Organization for Human Rights

## **Conservative Organizations**

Alliance Defending Freedom
American Enterprise Institute
Americans United for Life
Campus Crusade for Christ
Christian Legal Aid
Christian Legal Society
Federalist Society
Federation for American Immigration Reform
Pacific Justice Institute

Republican National Lawyers Association
Young Christian Society

# APPENDIX  D

**Applicants with Voting Litigation Experience – Affiliations and Source of Litigation Experience**

| Applicant Name | Affiliations | Source of Voting Litigation Experience |
|---|---|---|
| Applicant 1* | Advancement Project, Lawyers' Committee for Civil Rights (LCCR), worked for Democratic member of Congress | Advancement Project |
| Applicant 2 | LCCR | LCCR |
| Applicant 3 | LCCR, member of state Democratic Party | LCCR |
| Applicant 4 | LCCR, American Civil Liberties Union (ACLU) | ACLU |
| Applicant 5* | National Association for the Advancement of Colored People (NAACP) | NAACP |
| Applicant 6 | ACLU | National Association of Latino Elected and Appointed Officials (NALEO); former Voting Section attorney |
| Applicant 7* | None | Former Voting Section attorney |
| Applicant 8 | American Constitution Society (ACS), Brennan Center for Justice, ACLU, worked on campaigns for two Democratic candidates | Brennan Center for Justice |
| Applicant 9 | ACS, ACLU | State Public Advocate's Office |
| Applicant 10 | Campaign Legal Center, Common Cause | Campaign Legal Center |
| Applicant 11* | Advancement Project | Advancement Project |
| Applicant 12 | Brennan Center for Justice, interned for Democratic member of Congress | Brennan Center for Justice |
| Applicant 13 | Worked on or volunteered for campaigns for four Democratic candidates, | Solo practice (portfolio included election law cases) |
| Applicant 14* | Volunteered for campaign of Democratic candidate | Former Voting Section attorney |
| Applicant 15 | ACS, Mexican American Legal Defense and Educational Fund | MALDEF, LCCR |

| | (MALDEF), Equal Justice Society, LCCR | |
|---|---|---|
| Applicant 16 | LCCR | State Office of Legislative Counsel, Elections and Litigation Office |
| Applicant 17* | NAACP | NAACP |
| Applicant 18 | LCCR, NAACP, ACLU | Solo practice (worked on voting rights case) |
| Applicant 19 | Worked for state Democratic party | Solo practice (worked on two voting rights cases) |
| Applicant 20 | Worked for campaign of Democratic candidate, Fair Elections Legal Network | Fair Elections Legal Network |
| Applicant 21* | MALDEF, Southern Coalition for Social Justice | Former Voting Section attorney |
| Applicant 22 | Project Vote, worked for Democratic member of Congress | Project Vote |
| Applicant 23 | People for the American Way, volunteered for campaigns of two Democratic candidates | People for the American Way |
| Applicant 24 | ACS, Urban Justice Center, Brennan Center for Justice, Center for Reproductive Rights, worked on campaign for Democratic candidate | Brennan Center for Justice |
| Applicant 25 | LCCR | LCCR |
| Applicant 26 | Interned for Democratic state representative | State Board of Elections and Ethics |
| Applicant 27 | Fair Elections Legal Network, Greenpeace | Fair Elections Legal Network |
| Applicant 28* | Equality Florida | Private law firm (drafted amicus brief on NVRA) |
| Applicant 29 | MALDEF | MALDEF |
| Applicant 30 | ACS, LCCR, member of college Democratic society | Private law firm (represented various civil rights advocacy groups in HAVA lawsuit against state) |
| Applicant 31 | NAACP, worked on campaign for Democratic candidate, worked for Democratic member of Congress | Private law firm (pro bono work on election law issues) |
| Applicant 32 | ACLU, interned for Democratic member of Congress | Private law firm  (drafted brief in defense of citizens' right to vote) |

| | | |
|---|---|---|
| Applicant 33 | Interned for Democratic member of Congress | Private law firm (prepared amicus brief on constitutionality of VRA Section 5) |
| Applicant 34 | Advancement Project | Private law firm (pro bono work contributing to amicus brief on the constitutionality of VRA Section 5) |
| Applicant 35 | None | Asian American Justice Center |
| Applicant 36 | None | State Board of Elections |
| Applicant 37 | None | Private law firm (contributed to amicus brief on the constitutionality of VRA Section 5) |
| Applicant 38 | None | State Attorney General's Office (litigation on ballot access and voters' rights cases) |

* Applicant was hired.

Note:  One of the nine applicants hired did not have prior voting litigation experience and therefore does not appear on this chart.

# APPENDIX  E

**FRANK R. WOLF**
10TH DISTRICT, VIRGINIA

COMMITTEE ON APPROPRIATIONS

SUBCOMMITTEES:

RANKING MEMBER—COMMERCE-JUSTICE-
SCIENCE

TRANSPORTATION-HUD

CO-CHAIR—TOM LANTOS
HUMAN RIGHTS COMMISSION



**Congress of the United States**

**House of Representatives**

February 10, 2011

241 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-4610
(202) 225-5136

13873 PARK CENTER ROAD
SUITE 130
HERNDON, VA 20171
(703) 709-5800
(800) 945-9653 (IN STATE)

110 NORTH CAMERON STREET
WINCHESTER, VA 22601
(540) 667-0990
(800) 850-3463 (IN STATE)

wolf.house.gov

Ms. Cynthia Schnedar
Acting Inspector General
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington DC 20530

Dear Ms. Schnedar:

I appreciate your testifying before my subcommittee yesterday to help the Congress identify waste, fraud and abuse at the Department of Justice. However, this morning I was made aware of the enclosed report detailing a disturbing type of "abuse" that was not raised during our hearing: the possible politicization of Freedom of Information Act (FOIA) requests within the department.

According to the enclosed information, a review of recent responses to FOIA requests by the department showed potential political and ideological factors may have influenced how quickly responses were provided. If accurate, this would reflect an abuse of the department's authority and, potentially, a violation of federal FOIA law.

As you will read in the enclosed document, the American Civil Liberties Union (ACLU), the National Association for the Advancement of Colored People (NAACP), and National Public Radio (NPR) received immediate responses to FOIA requests while journalists from *The Washington Times, Human Events* and the group Judicial Watch waited five to six months for responses from the Justice Department. Other requests from conservative organizations were reportedly never responded to.

I have firsthand experience with the FOIA office at the Justice Department. In May 2009, I made a FOIA request to the department requesting information pertaining to the attorney general's efforts to secretly release a number of Guantanamo Bay detainees and re-settle them in northern Virginia. I made the FOIA request after the attorney general stonewalled my official requests for this information. However, the department, again, failed to provide the information that I requested after many months.

The enclosed information demonstrates a troubling inconsistency in the department's treatment of FOIA requests, potentially based on the requester's political or ideological position. All FOIA requests should be answered in accordance with the law. This inconsistency serves only to decrease public confidence in government and in direct conflict with President Obama's pledge for greater transparency.

Ms. Cynthia Schnedar
February 10, 2011
Page 2

     I ask that you open an immediate investigation into this matter to determine whether the political or ideological position of the FOIA requester may have influenced the timing and nature of the department's responses. Additionally, I will be inserting this letter with my questions for the committee record relating to yesterday's hearing. I look forward to your prompt response.

     Best wishes.



Sincerely,

Frank R. Wolf
Member of Congress

# Bombshell: Justice Department Only Selectively Complies with Freedom of Information Act (PJM Exclusive)

According to documents PJM has obtained, FOIA requests from liberals or politically connected civil rights groups are often given same day turn-around by the DOJ. But requests from conservatives or Republicans face long delays, if fulfilled at all.

February 10, 2011 - by J. Christian Adams

Eric Holder's Justice Department has even politicized compliance with the Freedom of Information Act. According to documents I have obtained, FOIA requests from liberals or politically connected civil rights groups are often given same day turn-around by the DOJ. But requests from conservatives or Republicans face long delays, if they are fulfilled at all.

The documents show a pattern of politicized compliance within the DOJ's Civil Rights Division. In particular, I have obtained FOIA logs that demonstrate as of August 2010, the most transparent administration in history is anything but. The logs provide the index number of the information request, the date of the request, the requestor, and the date of compliance.

For example, Republican election attorney Chris Ashby of LeClair Ryan made a request for the records of five submissions made under Section 5 of the Voting Rights Act. Ashby waited nearly eight months for a response. Afterwards, Susan Somach of the "Georgia Coalition for the Peoples' Agenda," a group headed by Rev. Joseph Lowery, made requests for 23 of the same type of records. While Ashby waited many months for five records, Somach waited only 20 days for 23 records.

Under the Obama DOJ, FOIA requests from conservative media never obtained any response from the Civil Rights Division, while National Public Radio obtained a response in five days.

In 2006, Charlie Savage, then at the not-yet-insolvent *Boston Globe*, requested all of the resumes of the recently hired attorneys in the Bush Civil Rights Division — including mine. DOJ leadership was convinced rushing out the resumes of dozens of lawyers far before the deadline was a good thing.

Savage apparently has never made a similar request to the Obama Justice Department, even though the inspector general has opened an investigation into political payback and discrimination under Eric Holder. I wrote at PJM:

Savage could bolster his credibility by making the same inquiries of this Justice Department as he did to the Bush DOJ. For starters, he could examine the preposterous hiring practices in the Civil Rights Division since Obama's inauguration. The more time that passes without an inquiry from Savage and the *New York Times*, the more partisan his badgering of the Bush DOJ appears.

Yet Savage won the Pulitzer for attacks on the Bush administration.

In spring of 2010, Pajamas Media requested the exact same information from the DOJ that Charlie Savage requested in 2006 — except for hires made in the Obama DOJ. Recall the Bush administration turned over all the resumes of attorneys as fast as they could, and well before the statutory FOIA deadline.

PJM's request was ignored. Then on October 13, 2010, the request was renewed by certified mail. Still, no response as required by law.

So on January 18, 2011, the case of *Pajamas Media v. United States Department of Justice* was filed in the United States District Court in D.C. The most transparent administration in history? Hogwash.

Don't be fooled thinking that anyone was congratulating the DOJ's 2006 zeal in rocketing resumes to the *Boston Globe*. The Bush DOJ's eagerness to speed attorney resumes to the *Boston Globe* was rewarded with savage attacks. Republicans mistakenly bet that being champions of good government would earn them kudos. The only thing it earned was a kick in the teeth.

That's not to say that anyone should have violated the FOIA, as the Obama DOJ has done with PJM's request. But why would you grant favors to political opponents who plan to cut your throat? I suspect the current leadership of the DOJ takes that for granted. Notice they have not suffered a whiff of scrutiny until now.

The data in the FOIA logs I obtained reveal the priorities of the Civil Rights Division — transparency for friends, stonewalls for the unfriendly. Those enjoying speedy compliance with their Freedom of Information Act requests include:

– Gerry Hebert, noted free speech opponent, partisan liberal, and former career Voting Section lawyer who testified against now-Senator Jeff Sessions when he was nominated to the federal judiciary. Same day service.

– Kristen Clarke, NAACP Legal Defense Fund. Clarke sought the dismissal of the voter intimidation case against the New Black Panther party. Same day service.

– Ari Shapiro of National Public Radio. Five day service.

– Nicholas Espiritu of the Mexican American Legal Defense Fund. Next day service.

– Eugene Lee of the Asian Pacific American Legal Center. Three day service.

– Edward DuBose, president of Georgia NAACP. Same day service.

– Raul Arroyo-Mendoza of the Advancement Project. Same day service.

– Nina Perales of the Mexican American Legal Defense Fund. Two day service.

– Tova Wang of Demos. Three day service.

– Mark Posner and Robert Kengle of the Lawyers Committee for Civil Rights Under Law. Kengle is the same former DOJ attorney who <u>did not want</u> to do election coverage in Mississippi where a federal court found that white voters were being discriminated against. Same day service.

– Brian Sells, formerly of the ACLU and now of the DOJ Voting Section. (Paging Charlie Savage). One day service.

– <u>Natalie Landreth</u>, Native American Rights Fund. Same day service.

– Fred McBride, ACLU redistricting coordinator. Same day service.

– Jenigh Garrett, NAACP Legal Defense Fund. Same day service.

– <u>Joaquin Avila</u>, well-known election law professor in Seattle who <u>advocates</u> for the rights of illegal aliens to vote in American elections. Next day service.

In contrast, well-known conservatives, Republicans, or political opponents had to wait many months for a response, if they ever got one:

– <u>Michael Rosman</u>, Center for Individual Rights. Six month wait.

– <u>Jennifer Rubin</u> (seeking records relating to employees, like Charlie Savage did). No reply at all.

– Congressman Frank Wolf. Five month wait. Wolf now chairs the Appropriations Subcommittee in charge of the DOJ budget. Oops.

– Jed Babbin, editor at <u>Human Events</u>. Six month wait.

– Jerry Seper, *Washington Times*. Six month wait.

– Jim Boulet of the <u>English First Foundation</u>. No reply at all.

– Jenny Small of <u>Judicial Watch</u>. Five month wait.

– Republican Pennsylvania state Representative <u>Stephen Barrar.</u> Four month wait.

– <u>Jason Torchinsky</u>, former DOJ and now ace GOP lawyer. No reply at all.

– <u>Ben Conery</u>, *Washington Times*. Five month wait.

It should be noted that the logs reveal plenty of mundane compliance to requestors of no particular note. Other times, very short delays mark a request from an administration friend. But in no instance does a conservative or Republican requestor receive a reply in the time period

prescribed by law. The logs demonstrate an unmistakable pattern — friends zoom in the express lane, while foes are stuck waiting on the shoulder.

Politicized compliance with FOIA might be an administration-wide pattern. The revelation that the Obama Department of Homeland Security has politicized the FOIA process may be just the tip of the iceberg.

If so, what should we make of patterns of lawless noncompliance with the FOIA? If nothing else, it exposes the rank hypocrisy of those heady days in 2008 when transparency was a campaign promise. In the worst case, we have an administration willing to violate the law to conceal details about their governance.

Even this should outrage members of the mainstream media — unless of course they already zoom along in the DOJ information fast lane.