**EXHIBIT 3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Wednesday, June 18, 2014 |
| | ) | |
| Defendants. | ) | (3:01 p.m. to 4:08 p.m.) |


STATUS CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:               See Next Page

Court Recorder:            Genay Rogan

Clerk:                     Brandy Cortez

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                    ARMAND DERFNER, ESQ.
                               P.O. Box 600
                               Charleston, SC 29402

                               CHAD W. DUNN, ESQ.
                               Brazil and Dunn
                               4201 Cypress Creek Parkway, Suite 530
                               Houston, TX 77068

Mexican American              EZRA D. ROSENBERG, ESQ.
Legislative Caucus,           Dechert, LLP
et al.:                       902 Carnegie Center, Suite 500
                              Princeton, NJ 08540-6531

Texas League of Young         RYAN HAYGOOD, ESQ.
Voters Education Fund:         NAACP Legal Defendant and Educational
                              Funds, Inc.
                              40 Rector Street
                              5th Floor
                              New York, NY 10006

State of Texas:               JOHN BARRET SCOTT, ESQ.
                              Scott, Yung, L.L.P.
                              208 N. Market Street
                              Suite 200
                              Dallas, TX 75202

                              LINDSEY WOLF, ESQ.
                              CLAY COALSON, ESQ.
                              ARTHUR D'ANDREA, ESQ.

United States                 ANNA BALDWIN, ESQ.
of America:                   DANIEL FREEMAN, ESQ.
                              U. S. Department of Justice
                              950 Pennsylvania Avenue, N.W.
                              NWB Room 7125
                              Washington, DC 20530

Mexican American              KEMBEL SCOTT BRAZIL, ESQ.
Legislative Caucus,           Brazil and Dunn
et al.:                       4201 Cypress Creek Parkway
                              Suite 530
                              Houston, TX 77068

3

**APPEARANCES FOR:      (CONTINUED)**


Texas Association of        ROLANDO L. RIOS, ESQ.
Hispanic County Judges      115 E. Travis
and County                  Suite 1654
Commissioners:              San Antonio, TX 78205

Oscar Ortiz, et al.:        MARINDA VAN DALEN, ESQ.
                            Texas Rio Grande Legal Aid
                            4920 North IH 35
                            Austin, TX 78751

4

1    __Corpus Christi, Texas; Wednesday, June 18, 2014; 3:01 p.m.__

2                        **(Call to Order)**

3          **THE COURT:**  The Court calls Cause Number 213-193,

4    *Veasey, et al versus State of Texas, et al.*

5          Ms. Cortez will take roll here.

6          **THE CLERK:**  Your Honor, for the individual Veaseys,

7    we have Mr. Dunn and Mr. Derfner will be speaking.  For the

8    United States of America, Ms. Baldwin and Mr. Freeman will be

9    speaking.  The Mexican American Legislative Caucus, r.

10   Rosenberg will be speaking.  For Ortiz, et al, Ms. Van Dalen

11   will be speaking.  For the Association of County Judges,

12   Mr. Rios.  For the Texas League of Young Voters, Mr. Haygood

13   will be speaking and for the State of Texas, Mr. Whitley,

14   Ms. Wolf and possibly Mr. Scott will be speaking.

15         **THE COURT:**  All right.  Counsel, there's a couple of

16   matters, I guess, pending before the Court and I'd like to

17   address first.  It's D324, Defendants' Motion to Compel

18   Production of the Federal Databases.  Who's going to proceed on

19   that, Mr. Scott or Ms. Wolf or who?

20         **MR. WHITLEY:**  Your Honor, this is David Whitley for

21   the Defendants.

22         **THE COURT:**  Okay.

23         **MR. WHITLEY:**  The *Crawford versus Marion County*

24   *Election Board* case was clear that the inconvenience of making

25   a trip to the BMV, gathering up the required documents and

1    posing for a photograph surely does not qualify as a

2    substantial burden on the right to vote or even represent a

3    significant increase from the usual burdens of voting.  Yet the

4    Plaintiffs in this case still insist on making matches between

5    the Secretary of State's TEAM database and the acceptable forms

6    of ID on Election Day.

7            The last time the Department of Justice was able to

8    play puppeteer and do those matches themselves, the Court threw

9    out the expert reports of both sides in the case and that was

10   in *Texas v Holder*.  Now, both the U.S. and the Defendants

11   requested each other's databases.  To date, only the United

12   States and the private Plaintiffs have received information

13   from the State of Texas.  The State has not received anything

14   from the federal government other than what they used to make

15   matches.

16           Now, the standard has never been that the other side

17   thinks that it would be useful to have the information but

18   rather, Rule 26 is clear it should be reasonably calculated to

19   lead to the discovery of admissible evidence.  And we should

20   also not be required to disclose our expert trial strategy in

21   this case to show --

22           **THE COURT:**  Wait, wait -- are you addressing the

23   Motion to Compel -- the Defendants' Motion to Compel the

24   Production of Federal Databases?

25           **MR. WHITLEY:**  Yes, ma'am.

1           **THE COURT:**  Okay.  Proceed.

2           **MR. WHITLEY:**  Was that -- can I elaborate for you in

3    a specific way that will make it more useful for you, your

4    Honor?

5           **THE COURT:**  Sure.

6           **MR. WHITLEY:**  The United States has asked us explain

7    to them why the federal databases would be useful to us and

8    that is not the standard.  That's what I was explaining earlier

9    but here's something that we've learned while taking

10   depositions in this case.  In the deposition of Michele

11   Bessiake, she admitted that she was at the time of her

12   testimony registered to vote in both Texas and Indiana.  She's

13   also in possession of an Indiana -- the State of Indiana

14   learner's permit to drive which she obtained after registering

15   to vote in Texas.  She also plans to get a driver's license in

16   Indiana.

17          Now, Ms. Bessiake would most likely show up as a

18   non-match because she doesn't have the acceptable forms of ID

19   to vote in Texas yet she will have an Indiana driver's license

20   and without access to the federal databases, we would have

21   never known that and without having the opportunity to depose

22   her, which depending on the number of non-matches, we certainly

23   wouldn't have time to depose each and every one of these

24   people, we would never know.

25          Under the current agreement, which is ECF 174 which

1   is now arguably been blown up, we were prepared for the cross

2   examination of their experts under the agreement that they

3   would not have the TEAM database but now they do.   Now

4   everybody has TEAM and we need access to the federal databases

5   to be situated similarly.

6         **THE COURT:**  All right.   Who is going to speak for the

7   United States?

8         **MS. BALDWIN:**  Your Honor, this is Anna Baldwin for

9   the United States.

10        **THE COURT:**  Okay.

11        **MS. BALDWIN:**  The Defendants' request for massive

12  amounts of sensitive, legally-protected information about tens

13  of millions of U.S. citizens with no connection to this

14  litigation threatens the real information (indiscernible).   As

15  counsel has essentially admitted, the request disregards the

16  Court's protective order.   It unnecessarily compromises the

17  privacy interests of millions of Americans and it triggers

18  profound data security issues for multiple federal agencies

19  that maintain a great deal of highly sensitive medical and

20  national security information.

21        I just want to say out -- up front when the idea that

22  the State hasn't received anything from the federal government

23  is simply incorrect.   The Defendants have already received

24  precisely what they bargained for and what the other parties

25  bargained for and precisely what this Court ordered in

1    accordance with ECF Number 174.  They have data from five

2    different federal agencies, the federal agencies that either

3    issue a form of SB 14 allowable ID or make disability

4    determinations relevant for applying for an exemption from

5    showing ID.

6            To be very concrete, your Honor, from the State

7    Department, Defendants have a data set with information

8    supplied directly by the State Department showing person by

9    person for every one of the more than 13 million registered

10   voters in Texas which of those registered voters have the same

11   social security number as a passport number -- as a passport

12   holder as well as which Texas voters have the same name or date

13   of birth as the passport holder.

14           From the Department of Defense, the Defendants and

15   all other parties have the same thing.  They have, again, a

16   list of information supplied directly from the Defense

17   Department of exactly which of Texas' more than 13 million

18   registered voters have the same social security number as the

19   holder of military ID or the same name and date of birth as the

20   military ID holder.  And the same is true for the other federal

21   agencies involved, the SSA, the VA and USCIS.

22           Defendants know down to the individual voter whether

23   the agencies involved have records that match with the search

24   criteria that Defendants supplied it on which were the social

25   security number and certain combinations of the name and date

1    of birth.

2            In this process, Defendants got to decide exactly how

3    they wanted the federal databases to match.  They provided

4    their list of matching criteria to the United States which the

5    United States counsel in turn provided to the agencies.  The

6    agencies executed that list and provided match results to all

7    parties.  Along with match results, the United States produced

8    sworn declarations from staff at each agency telling exactly

9    what steps they took in conducting the matches.

10           Defendants' request for more information is just

11   actually (indiscernible).  Of the two samples that we just

12   heard about whether a voter could be registered in another

13   state, there is no federal database that shows voter

14   registration nationwide and we told Defendants that.  That's

15   certainly not information the State Department, Defense

16   Department, SSA, VA or USCIS maintains.  The same thing is true

17   about driver's licenses.  There is no master data set that we

18   are aware of and especially from any of these agencies involved

19   that have a list of everybody who has a driver's license in any

20   state and at any rate, that's all beside the point because

21   having an Indiana driver's license, of course, doesn't entitle

22   you to vote under SB 14.

23           The Defendants already have all of the relevant

24   information that was derived from the federal databases at

25   issue.  Their (indiscernible) demand violates the supplemental

10

1  protective order of the federal confidentiality statutes and

2  the federal rules.  As to the protective order, your Honor,

3  again, Defendants have essentially conceded that the request is

4  totally inconsistent with ECF Number 174 which provides that

5  federal data directly from the databases, the raw field

6  contents were not going to be provided to any party.

7          That order set out the procedure that all parties

8  have been operating under in this case, namely that each party

9  was going to come up with match results which the federal

10 agencies would execute and all parties would receive the

11 results.  That process has already occurred.  There's no basis

12 for nullifying that order, especially after Defendants have

13 received the match results.

14         **THE COURT:**  All right.

15         **MS. BALDWIN:**  And --

16         **THE COURT:**  Mr. -- are you finished?

17         **MS. BALDWIN:**  I was going to talk about the specific

18 confidentiality statutes but those were in our briefing of the

19 United States.  So if the Court doesn't have questions on that,

20 I'm --

21         **THE COURT:**  No, I've already looked at that.

22 Mr. Dunn?

23         **MR. DUNN:**  We have nothing to add, your Honor.

24         **THE COURT:**  Okay.  Mr. --

25         **MR. DUNN:**  Well, I was just going to say -- no,

```
 1    that's fine.

 2              THE COURT:  Mr. Rosenberg?

 3              MR. ROSENBERG:  We will rely on what DOJ has said.

 4    Thank you.

 5              THE COURT:  Okay.  Ms. Van Dalen?

 6              MS. VAN DALEN:  Nothing to add, your Honor.

 7              THE COURT:  Mr. Rios?

 8              MR. RIOS:  Nothing to add, your Honor.

 9              THE COURT:  And Mr. Haygood?  Nada?  Okay.

10              Mr. Whitley, I'll let you have the last comment.

11              MR. WHITLEY:  Thank you, your Honor.  David Whitley

12    with the Defendants.  I'm glad Ms. Baldwin brought up the ECF

13    Number 174 because that document stated clearly that the TEAM

14    would be in the possession of the United States solely and now

15    the TEAM is in the possession of all the private Plaintiffs in

16    this case.

17              Furthermore, we're not looking for a nationwide

18    registration database.  Rather, we are looking for ways that

19    the federal databases will allow us to further narrow down our

20    match lists by the access that they have to other states'

21    information.  That's why I brought up the Indiana example.  And

22    the Texas v Holder Court talked extensively about the matching

23    process done by the federal government in the last case.  It

24    involved dead people, duplicates, simply incorrect, no matches.

25    We're in the exact same situation in this case.  The data was
```

1    scrubbed incorrectly last time and we would like to know

2    whether or not it has been scrubbed incorrectly this time.  The

3    matching process is fundamentally flawed.

4            And lastly, your Honor, the protective order protects

5    the information from the Texas databases.  It would also

6    protect the information from the federal databases.  They --

7    the Department of Justice has never provided an explanation as

8    to why sensitive, personal information in the federal database

9    could not be turned over under the same confidentiality

10   agreement.  Thank you, your Honor.

11           **THE COURT:**  All right.  The Court's going to deny

12   Defendants' motion to compel production of the federal

13   databases.

14           The next thing I have is I believe yesterday was

15   filed the Secretary of State's mission for protection regarding

16   the deposition of Coby Shorter (phonetic).  Where are we on

17   that?

18           **MR. WHITLEY:**  Your Honor, this is David Whitley.  I

19   can speak briefly to that as well, hopefully with a little bit

20   more success.  But we are still in negotiations with the United

21   States.  The reason I was filing it is because the time for

22   compliance on the subpoena had come and we wanted to make sure

23   that that was on file to protect Mr. Shorter's rights.  We are

24   still discussing with the United States dates for his

25   deposition and working on the time and topics for that.

1          **THE COURT:**  Okay.  So nothing to discuss on that

2    today?  That's what it sounds like.

3          **MR. WHITLEY:**  No, your Honor, not from the standpoint

4    of the Defendants.

5          **THE COURT:**  Then --

6          **MR. SCOTT:**  Your Honor, John Scott for Texas.  One

7    quick thing --

8          **THE COURT:**  Okay.

9          **MR. SCOTT:**  -- in terms of, I guess, what you ruled

10   on the databases.  And I want to throw this out.  There is a --

11   it appears we're going to be needing a lot of time during trial

12   for our offer of proofs and I don't know how that's going to be

13   accounted for on time with regard to the weeks that's been

14   allotted to Texas.  Is that something the Court would prefer we

15   arrange that we going to do after hours?  Just, again, the

16   priority because we're starting to get a whole lot of stuff

17   that it doesn't look like we're going to get a chance to ever

18   put on any evidence in defense of the case.

19         **THE COURT:**  Wait.  What --

20         **MR. SCOTT:**  I need to know how we're going to proceed

21   to do that and --

22         **THE COURT:**  Proceed doing with your -- I'm sorry --

23   with your evidence?

24         **MR. SCOTT:**  Well, we have a -- yes, your Honor.

25   We've got an enormous amount of things.  This simple issue that

14

1   you just raised by not giving us access to those databases, the

2   information that we believe would have been obtainable by

3   finding those, we'll be having to at least make an offer of

4   proof in the record during the time of trial.  I'm trying to

5   get a grasp --

6             **THE COURT:**  Okay.  I see what you're saying.  I see.

7   You're wondering if that's going to be part of your trial time?

8             **MR. SCOTT:**  Yes, ma'am.

9             **THE COURT:**  I don't -- I guess we can do that after

10  hours so we don't count it as part of your trial time.

11            **MR. SCOTT:**  Thank you, your Honor.

12            **THE COURT:**  Okay.  All right.  We were -- did we

13  finish the issue on Shorter, Coby Shorter?  Because you-all are

14  going to be conferring, so there was nothing for the Court to

15  address there.

16            Then on Monday there was a filing by the Defendants

17  regarding the United States' motion for protective order on the

18  Rule 30(b)(6) notice.  I've not gone back to look at the

19  initial briefing on that.  So I don't know what we can do

20  today.  The Defendants filed a statement on that.

21            Ms. Baldwin, do you have anything on that?

22            **MS. BALDWIN:**  Your Honor, we have been working

23  diligently with Defendants to try and not have to burden the

24  Court with this but there are a number of disputes that are

25  topics that are still in dispute.  Well, I would say at the

1    outset, however, your Honor, is that Defendants have waived

2    their opposition and it's our position that, you know, this

3    motion should be granted as a matter of law.

4         **THE COURT:**  Right.  Why have they waived anything?

5    We've been at this for a while now.  Every time we have a

6    status, I ask about it and you-all are still conferring.  So

7    what have they waived?

8         **MS. BALDWIN:**  Under Local Rule 7.4, your Honor, the

9    motion was filed on May 2nd and absolutely we've been

10   conferring but there was still a return date set on the docket

11   per the Local Rules of June 2nd and no written opposition has

12   been filed to date.

13        **THE COURT:**  I'm sorry.  I'm not going to do that.  We

14   have been dealing with this and -- for a while now.  So let's

15   not do that.

16        **MS. BALDWIN:**  As to the merits, your Honor, there are

17   a number of issues that are sufficiently weighty that, again,

18   because Defendants haven't briefed it, we would ask that the

19   Court set a briefing schedule wherein the Defendants would

20   respond to, you know, the positions that we've already set out,

21   let's say, by Wednesday of next week and we would propose to

22   quickly respond by June 30th.

23        **THE COURT:**  Mr. Scott, do --

24        **MR. SCOTT:**  Your Honor, John Scott.  There is an

25   enormous of briefing already done.  It simply requires the --

1          **THE COURT:**  Right.  I think this statement by the

2    Defendant has kind of narrowed it down for the Court; is that

3    correct -- what was filed on Monday as to what's still an issue

4    or no?

5          **MS. BALDWIN:**  Yes.  Your Honor, this is Ms. Baldwin.

6    It has narrowed the number of topics and I'm happy to address

7    the merits of those if that would be of assistance to the

8    Court.

9          **THE COURT:**  I guess you can proceed, Ms. Baldwin, to

10   address what's outstanding.

11         **MS. BALDWIN:**  Okay.  The first topic that is listed

12   is administrative preclearance under Section 5 of The Voting

13   Rights Act.  Deposition testimony on this topic should be

14   barred for at least four weeks.  It's irrelevant.  It's wildly

15   overbroad as stated.  Any discovery of the information is

16   privileged (indiscernible) for exercising its discretion

17   (indiscernible) information would (indiscernible) decades that

18   failed to (indiscernible) and for accumulative and non-

19   published information that has already been produced by the DOJ

20   in an effort to avoid unnecessary discovery disputes.

21         Your Honor, first on relevance, there is absolutely

22   no relevance to this topic in this case even as limited by

23   Defendants to Section 5 preclearance admission being made in

24   2004.  For the 16 states that were subject to Section 5 of The

25   Voting Rights Act from 2004 until 2013, there were more than

1    2,100 submissions on that topic.  Either it's laws that have

2    nothing to do with SB 14 and it's under -- being reviewed under

3    an entirely separate section of <u>The Voting Rights Act</u>.

4         Defendants are asking about many, many different laws

5    with no explanation for what relevance is here in this case,

6    again, on, you know, over-breadth.  Again, we're talking about

7    more than 2,000 submissions.  There is no way to designate a

8    deponent on these topics who could be reasonably well-prepared

9    to talk about all of them.  The topic on its face fails to

10   comply with Rule 30(b)(6), it reasonable particularity

11   requirement.

12        On the argument of general discoverability, if

13   (indiscernible) topic which is improperly (indiscernible) on

14   its face, what Defendants are really try to get at is that they

15   want to explore why the Attorney General pre-clears some laws

16   and not others.  That is absolutely inappropriate.  *Morris v*

17   *Gressette*, a Supreme Court decision, held that Congress

18   intended to preclude judicial review of all of the Attorney

19   Generals who exercise discretion in the preclearance

20   determination.  As such, there's no basis for Defendants to

21   seek this sort of discovery which would raise attorney-client,

22   work product and deliberative process issues.

23        And last, your Honor, where a Section 5 preclearance

24   file could possibly have any relevance, we already provided the

25   underlying non-privileged document.  Defendants have the

18

1    entirety of the preclearance file, the non-privileged portion

2    for SB 14.  They know every witness that the Department of

3    Justice talked to in the preclearance process and they even

4    have the witness interview notes.  In *Texas v Holder*, they also

5    received preclearance files for two other federal laws.  While

6    we certainly don't concede that those files are relevant,

7    Defendants already have them.

8            I have had many, many conversations with Defendants

9    about this topic.  They haven't identified a single non-

10   privileged area that they want to explore, much less explained

11   how it's relevant in any of the (indiscernible).

12           **THE COURT:**  All right.  Who's covering that issue

13   from the Defendants on the administrative preclearance?

14           **MS. WOLF:**  Your Honor, this is Lindsey Wolf and I

15   will be covering that issue for the Defendants.

16           **THE COURT:**  Okay, go ahead.

17           **MS. WOLF:**  Your Honor, I think one point to point out

18   at the beginning is that it seems to me that the United States

19   is seeking to be treated as a special kind of litigant and I

20   think that the case law is clear that 30(b)(6) depositions of

21   federal agencies are not inappropriate.  Government agencies

22   are to be treated as if they're ordinary litigants and they

23   must abide by the Federal Rules of Civil Procedure and that's a

24   case out of the Southern District of Florida involving the FCC.

25           The Department of Justice representative in other

1   cases has been the subject of 30(b)(6) depositions.  There's a

2   bankruptcy case out of the District of Massachusetts where that

3   was the case.  And on top of that, there's a Voting Rights Act

4   case involving both Section 5 and Section 2 out of the District

5   of South Carolina which doesn't elaborate very much but refers

6   to the deposition testimony of Duval Patrick who

7   (indiscernible) charges of the Civil Rights Division of the

8   Department of Justice.

9           And so I think the first point he made is that this

10  is not -- seeking the deposition of a DOJ representative is not

11  unprecedented and I think that what we're running into is an

12  issue where it seems that the Department of Justice is using

13  The Voting Rights Act as a double-edge sword which essentially

14  allows them to pierce certain privileges at least for discovery

15  purposes but in turn shield can them from a 30(b)(6) deposition

16  or other ordinary discovery techniques.

17          And in terms of the topic -- in respect to the

18  administrative preclearance topic, it seems that the United

19  States -- you know, the (indiscernible) by Ms. Baldwin deals

20  with judicial review of preclearance position.  It did not

21  discuss discovery.  It did not discuss the ability of a

22  litigant to obtain discovery upon providing a Section 5 file.

23  It dealt with judicially reviewing a preclearance position.

24          I think that in a case -- another case which was a

25  State Department defendant -- I'm sorry -- (indiscernible) the

1    United States in response to a request for production

2    propounded by Defendant, *Cofield versus City of LaGrange*, the

3    Court determined that the Section 5 file was properly

4    discoverable in a Section 2 case.

5            And, you know, in terms of the assertion of

6    privileges, there's an exception for the delivery of process

7    privilege.  The delivery of process privilege is a qualified

8    privilege, particularly where the purpose of the Government's

9    action in a particular case is at issue.

10           In addition, the delivery of process privilege, there

11   is an exception which is referred to as the "working law

12   exception" which is if there are opinions and interpretations

13   which the bind the agency's effective law and policy, you can't

14   withhold the papers which essentially reflect the agency's

15   group thinking and the process of working out its policy and

16   determining what its (indiscernible) shall be and that's a

17   Second Circuit case from 2012.

18           And, you know, so we're placed in a position where

19   we're not entitled to seek discovery through this vehicle and

20   in terms of the breadth of the topic, I think what the United

21   States has pointed to and what we reiterate is that we're

22   seeking information regarding the process of how the

23   preclearance submissions are submitted and the document

24   production on this standing alone are not sufficient.  Mostly

25   they only relate to the preclearance in SB 14.  It doesn't

1    relate to the larger preclearance process and how the DOJ

2    handles that process.

3           And in connection with that, one of the remedies that

4    both the Department of Justice and every other Plaintiff who

5    filed a complaint in this action is seeking is veiled in --

6    under Section 3C of The Voting Rights Act which is essentially

7    obtaining preclearance of the voting changes that the State of

8    Texas would seek to annex going forward.

9           So in terms of that remedy, this particular type of

10   discovery is appropriate because we are entitled to probe into

11   how this process is done.  And I think we have tried to work

12   with them.  We have tried to limit this temporally going back a

13   decade in order to, you know, not make it apply to every single

14   administrative preclearance admission that they've ever

15   received but we've got to know where they're at, your Honor.

16          The final point I would make in terms of relevance is

17   both the United States and the other Plaintiffs have made

18   numerous allegations in their complaints regarding the

19   intervention which they've alleged has been necessary dating

20   back centuries.  The United States cites a case dating back to

21   1927 regarding Texas' voting practices and so they put this

22   historical evaluation of Texas' voting practices into issue.

23   They made it relevant in our complaint and, in turn, we would

24   argue that we are entitled to probe as to how those decisions

25   have been made, your Honor.

1          **THE COURT:**  All right.  Anything further,

2    Ms. Baldwin?

3          **MS. BALDWIN:**  If I could respond just very briefly.

4    First, we're not making a categorical argument that the

5    Department of Justice should never be subjected to 30(b)(6),

6    only that these topics are inappropriate.

7          Second, the relevance point, I've heard no argument

8    for why this is relevant to the claim that SB 14 violates

9    sections of The Voting Rights Act or any of the other private

10   Plaintiff's Constitutional claims.  How the -- what remedy we

11   may be seeking, how the DOJ's process is in the past are even

12   relevant as to afford a remedy seems to have no relevance but

13   at any rate, that's absolutely not relevant to the claim.

14         And in terms of what information Defendants already

15   have, again, they have all the facts that the Department

16   considered as to SB 14.  They don't have the privileged

17   information that the Supreme Court has said is not reviewable,

18   that decades of case law, unquestioned case law says is not

19   reviewable.  *Cofield v LaGrange,* which was just cited as to how

20   contrary this position is, is absolutely not.  That is about

21   discovery of the underlying preclearance documents which we've

22   already produced.

23         The only, you know, broad sweep on relevance that's

24   been argued is the purpose of the Government's action where the

25   Government here is the United States but the Government's

1    actions as the United States' actions in this case are not at

2    issue.  That's not at all relevant to the claim that's being

3    brought to the extent that the Defendants are making an

4    argument about some counterclaim that they may get but there's

5    no counterclaim asserted.  There's no counterclaim pending.

6    Discovery on any such future counterclaim is absolutely not

7    proper under the scope of Rule 26 and the 2000 comments make

8    that clear.

9          **THE COURT:**  All right.  Let's go to Topic 2.

10   Ms. Baldwin?

11         **MS. BALDWIN:**  Topic 2 is the enforcement of Section 2

12   of The Voting Rights Act.  Again, this is incredibly overbroad.

13   How the Attorney General has exercised his discretion in

14   enforcing Section 2 is irrelevant here and the topic is even on

15   its face limited to the Attorney General's enforcement.  It

16   would need to encompass what private parties have done.  We

17   began to ask what facts the (indiscernible) attempted to get

18   at, asked that these documents stipulate the facts but that's

19   not what we understand has been sought here.

20         Again, this appears to be another improper attempt to

21   oppose opposing counsel about the nature and scope of the

22   Department's enforcement of priorities and its exercise of

23   prosecutorial discretion.  None of that is relevant to the

24   claim.  Again, if this is a counterclaim issue, 26(b) can find

25   discovery is an actual claim.

24

1        If and when Defendants raise a counterclaim, the

2   United States would incur all appropriate cautions in

3   responding to it, including (indiscernible) discovery or

4   bifurcate considerations that counterclaim so as to preserve

5   the Court's scheduling orders and trial but unless and until

6   Defendants actually assert any counterclaim, discovery cannot

7   be extended beyond the claims that they actually allege.

8        **THE COURT:**  All right.  Ms. Wolf?

9        **MS. WOLF:**  Your Honor, while the Defendants do not

10  disagree that this discovery would be relevant or may be

11  relevant to counterclaims and affirmative defenses that they

12  may assert in the future, that not where the limit of the

13  relevance is.  Again, this particular complaint -- all of the

14  complaints of the other Plaintiffs have sought remedies

15  regarding, you know, continued involvement of the Department of

16  Justice and the review of Texas' voting procedures and I think

17  that it's relevant at least for purposes of discovery for the

18  Defendants to be able to probe as to how that process is

19  enforced in the Department of Justice.

20       Again, the documents which have been produced by the

21  Department of Justice do not provide a sufficient picture for

22  Defendants in order to assess the evaluation of that process

23  nor even if the documents differ by complete picture should the

24  Defendants be precluded from using the deposition form of

25  testimony which several cases have held is a unique form of

1    discovery in and of itself.  And so, you know, the argument

2    that because you don't -- you have a document and should be --

3    you should be able to take that position we don't think should

4    stand.

5              Furthermore, again, we sought to limit this.  We

6    sought to limit this going back to 2004 and we think that

7    that's a reasonable time -- limitation on it and finally, in

8    the complaint, several of the Plaintiffs have, again, not just

9    limited their complaint to allegations regarding the

10   administrative preclearance of Texas' voting practices in the

11   class.

12             They've also incorporated several -- by a Court

13   decision, they've incorporated Section 2 of The Voting Rights

14   Act and, for example, in the complaint of the NAACP and

15   (indiscernible), they've asserted that in the past three

16   decades, they were more successful suits against Texas by

17   jurisdiction filed under Section 2 of The Voting Rights Act

18   challenging discriminatory election methods and redistricting

19   plans than any other state in the country.  And that in and of

20   itself -- that puts into issue why were those suits brought in

21   Texas in particular and I think it's very (indiscernible)

22   entitled to probe into that particular area.

23             THE COURT:  All right.  Let's move on to Topic 5.

24             MS. BALDWIN:  Topic 5 which I believe is the federal

25   observers, again, you would say -- or examiners.  This is,

1    again, about what the Department does nationwide and even the

2    observers and monitors to enforce a variety of federal

3    statutes.  They're just not relevant here.  These topics,

4    again, seem to be aimed at discovering DOJ's enforcement

5    priorities and for no proper reason.  Again, this is very

6    overbroad.  It's impossible to know what is being sought here

7    to do a proper designation even if this were relevant.

8              **THE COURT:**  Okay.  Ms. Wolf?

9              **MS. WOLF:**  Your Honor, I think this is particularly

10   relevant because the United States in its complaint has sought

11   the appointment of federal observers pursuant to Section 3A of

12   The Voting Rights Act to observe elections in Texas.  I don't

13   know what remedies that they are seeking in our complaint and

14   for the same reason that it was relevant for us to probe

15   because the (indiscernible) by various Plaintiffs.

16             This is also a relevant subject of probing in terms

17   of depositions in terms of how the process is handled, when

18   federal observers are actually appointed, why they're appointed

19   and in terms of the deliberative process privilege, again I

20   would argue qualified privilege in here where for purposes of

21   the remedy, the purposes of the Government's actions in these

22   particular areas would be relevant.  We should be entitled to

23   probe at least in discovery as to the general processes and

24   procedures that the United States undertakes when deciding to

25   appoint federal observers or when the federal observers are

27

1    actually appointed and conducting the work that they're

2    directed to do by this Court.

3            **THE COURT:**  All right.  Let's move to Topic 6.

4            **MS. BALDWIN:**  Your Honor, that's essentially

5    duplicative of Topic 5, election monitoring.  Again, it's just

6    not relevant.  This department does a variety of election

7    monitoring, none that has anything to do with does SB 14

8    violate Section 2 of The Voting Rights Act because it has

9    discriminatory results or a discriminatory purpose.

10           **THE COURT:**  Okay.  Ms. Wolf?

11           **MS. WOLF:**  Your Honor, for many of the same reasons

12   we asserted in response to the Government's response to Topic

13   5, we would also, again, assert that this is relevant to the

14   remedy sought by the United States and we think that the

15   processes and the procedures under which state government

16   observes elections in Texas or elsewhere are relevant to the

17   issue of production.

18           **THE COURT:**  All right.  We're moving on to Topic 10.

19           **MS. BALDWIN:**  Your Honor, this is asking for various

20   intake laws and complaint systems.  This topic is completely

21   cumulative.  We have produced in document discovery every

22   complaint that we have received related to photo ID or SB 14

23   from Texas or regarding Texas and we've also produced every

24   allegation of voter fraud related to Texas that, you know, is

25   from -- came in through the email address listed as a topic.

1    No further discovery is warranted on this.

2              **THE COURT:**  All right.  Ms. Wolf?

3              **MS. BALDWIN:**  They have all the facts.

4              **MS. WOLF:**  Your Honor, I'd just like some

5    clarification from the United States on one point, because my

6    understanding was (a) that they'd only produced complaints

7    relating to in-person voter impersonation as a form of voter

8    fraud as opposed to every form of voter fraud, so that would be

9    one point that we would make, is that the complaints that they

10   received in terms of other forms of election crime would also

11   be relevant information.  And since we don't have the

12   documents, we're at least entitled to probe a witness as to

13   those complaints.  But notwithstanding that distinction, while,

14   again, we have received some documents, you know, relating to

15   what this email address was used in terms of SB14, we think as

16   a larger point, we're entitled to inquire into the process as

17   to how does the United States choose, you know, which

18   complaints to investigate?  How does the United States choose

19   which individuals to respond to.  Just as a general matter from

20   our review of the document production, in fact, you know, some

21   inquiries are followed up on by the United States, some are

22   not.  And these inquiries are coming in from various entities.

23   They're coming in from political parties and they're coming in

24   from the (indiscernible).  There's also sorts of different

25   interest groups that are submitting submissions in terms of a

```
 1   preclearance submission or just generally in terms of
 2   complaints.  And we think that given that deposition testimony
 3   is a unique vehicle, we are entitled to probe as to the
 4   processing of those complaints, as to the priority given to
 5   those complaints, and as to whether there are procedures in
 6   place which determine how the United States chooses to respond.
 7   They're a very busy agency and cannot respond to all complaints
 8   at the same time, and so how do they choose to respond to those
 9   complaints?  And to the extent that the United States were to
10   assert (indiscernible) privilege in terms of that process, we
11   would again argue that that's subject to the working law
12   exception, which is iterated in the (indiscernible) case out of
13   the Fifth Circuit in terms of the fact that that
14   (indiscernible) responding is basically a (sic) unwritten law
15   that provides how they prioritize and address these particular
16   type of complaints.
17           **THE COURT:**  Okay.  So now we're jumping where?  To --
18   I'm going down through the statement that Defendants provided
19   on Monday, and I guess we're kind of back into topic seven?
20           **MS. WOLF:**  Yes, your Honor.  This is Lindsey Wolf.
21   If the United States is okay, we would argue that basically
22   topics seven, eight, and 11 through 30, as well as part of 37,
23   are all relating to various iterations of facts relating to
24   election crimes and voter fraud.  So we would be prepared to
25   address those topics in bulk if the United States would be
```

30

1    agreeable to that.

2              THE COURT:  Okay.  Ms. Baldwin?

3              MS. BALDWIN:  I think that I'm, you know, happy to

4    proceed.  I would probably address 11 through 30 and break out

5    seven and eight, with the Court's permission.

6              THE COURT:  That's fine.

7              MS. BALDWIN:  Taken together, topics 11 through 30

8    testimony on literally every allegation, investigation,

9    prosecution, or potential prosecution for any instance of

10   "election crime or voter fraud" which Defendants have very,

11   very broadly defined nationwide.  These topics are incredibly

12   overbroad, incredibly burdensome, and fundamentally irrelevant

13   and seeks to pierce well-established government privileges.

14   Your Honor, this case is about a single type of voter fraud,

15   in-person impersonation in Texas.  It's not about literally any

16   kind of conduct of which one or more federal law enforcement

17   officials nationwide may be aware that may violate some state

18   or federal law related to an election anywhere in the nation,

19   which is essentially the breadth of testimony the Defendants

20   are asking that we designate witnesses on.  It's incredibly

21   overbroad, your Honor, because to prepare for this topic, it

22   would involve seeking information from literally every single

23   U. S. Attorney's office and FBI field office in the country.

24   And on instances of law breaking that have absolutely nothing

25   to do with SB14, such as double voting or (indiscernible) or

1   absentee ballot fraud or countless other election

2   irregularities.  SB 14 has nothing to do with those sorts of

3   crimes.  This case, as I said, your Honor, is about whether the

4   State of Texas knew when it enacted a law; not what anyone else

5   knew, including the federal government, much less what the

6   federal government noticed years after the law was enacted.  To

7   try and work through this impasse, we've offered to explore

8   giving Defendants a declaration with the only potentially

9   relevant facts of which we are aware, namely -- because of the

10  period of time that we've located information for, which is

11  approximately 2007 to the present, there have been no federal

12  prosecutions anywhere in the country for in-person voter

13  impersonation fraud -- none.  We've asked Defendants what facts

14  more than this they could possibly be seeking and why they need

15  them, and they haven't been able to explain any reasons.  The

16  manner in which Defendants are seeking information not just

17  about public prosecutions, but about investigations of a wide

18  variety of totally unrelated crimes raises very serious

19  information for the department in light of the law enforcement

20  privilege.  There is no reason for this Court to consider

21  requiring DOJ to give testimony on topics that are going to

22  invade that privilege.  And, again, because of the seriousness

23  of that, we would seek all options to block any such testimony

24  before it happened were that to be ordered.

25          **THE COURT:**  Okay.  So that was on 11 through 30.  Do

32

1    you want to go ahead and address seven, eight, and 37?

2         **MS. BALDWIN:**  Sure.  On seven, this is -- it's

3    related because it is, again, on voter fraud, but seven is

4    about publically available reports from the --

5         **THE COURT:**  Okay.  I was going to ask about that.

6    Why, Ms. Wolf -- it -- can you -- do you not have access to

7    that?  Is that not a publically -- a public report?

8         **MS. WOLF:**  No, your Honor.  The Department has

9    produced the public report -- the public integrity reports

10   going back from at least to the 1990s until 2010.  And I

11   understand that there's one poll from 1995 that they didn't

12   produce which we got before, but just from a documentary

13   statement.  And then also there's the 2013 report's not yet

14   available online.  So --

15        **THE COURT:**  Okay.

16        **MS. WOLF:**  -- overall we do have those actual

17   reports.  But the problem is, again, a document versus a

18   deposition issue in that at the end, for example -- I looked

19   for the reports today -- at the end of the report, it indicates

20   where there have been prosecutions for election crimes, but

21   it's not clear from the face of the report whether that is the

22   entire universe, whether that only applies to actual

23   prosecution --

24        **THE COURT:**  So you're just trying to --

25        **MS. WOLF:**  -- versus whether that --

1       **THE COURT:**  You're just trying to clear up the

2   information in the report on that issue?

3       **MS. WOLF:**  In respect to topic seven, yes, your

4   Honor.

5       **THE COURT:**  Okay.  Anything else on seven,

6   Ms. Baldwin?

7       **MS. BALDWIN:**  We would just state, your Honor, these

8   are reports which they speak for themselves.  Designating a

9   witness on them is, again (indiscernible) contain many, many

10  prosecutions on things like bribery and other corruption that

11  has no relevance to the claims here.  We don't see how we can

12  possibly produce a witness on this and what relevance it has

13  given that as to this and every topic, how DOJ exercises its

14  prosecutorial discretion is simply privileged and not relevant

15  to any claim.

16      **THE COURT:**  All right.  What about topic eight?

17      **MS. BALDWIN:**  Eight is similar to seven in that it

18  relates to what's called the Ballot Access Voting and Integrity

19  Initiative, which is a long-running law enforcement effort,

20  that involves trainings and prioritization and coordination of

21  certain election crimes.  We produced documents, over a

22  thousand pages of training documents, and, again, it's

23  cumulative, it's a topic that's vague.  What more Defendants

24  are looking for on this, they haven't been able to tell us any

25  non-privileged facts that they would be looking for.  There's -

1  - it would be hopelessly impossible for us to designate anyone

2  as the topic is currently formulated, and it's just not

3  relevant.

4          **THE COURT:**  Ms. Wolf?

5          **MS. WOLF:**  Just as to topic eight, your Honor, we've

6  looked at the Ballot Access and Voting Integrity Initiative

7  reports that the Department has produced; and, unfortunately,

8  there are holes in data that are attached to those reports.

9  And while some of those reports do contain specifics relating

10 to voter fraud and election fraud -- and off the top of my head

11 I there's one, it was a 2002 to 2005 -- it's an incomplete

12 picture and we don't have, to my understanding, reports from

13 every year that detail that particular type of information.

14 And even assuming that we did have those -- that information,

15 which I don't believe we do, it's again a question of these

16 election crime cases, which are included in these training

17 materials, are perhaps examples or are perhaps representative,

18 and they don't represent the entire universe of the information

19 related to prosecutions or allegations or other issues that go

20 beyond just the case that was decided and then summarized and

21 attached possibly as an example to the back of the report.  So,

22 again, as to topic eight, we would argue that we are entitled

23 to probe a witness relating to how the reporting is done,

24 what's put in those reports, why certain cases are selected and

25 others are not, particularly because it's dealing with training

1    materials.  And I think that that -- it's a similar argument

2    that we would have with respect to the public integrity

3    reports.  We're entitled to probe a witness as to the contents

4    of those particular documents.

5            **THE COURT:**  Okay.  So what's left, 37?

6            **MS. WOLF:**  And, your Honor, we haven't addressed 11

7    through 30 from the defense yet, but I'll be happy to let --

8            **THE COURT:**  You can proceed --

9            **MS. WOLF:**  -- Ms. Baldwin address 37 before I turn

10   back to that.

11           **THE COURT:**  You can proceed to address 11 through 30.

12           **MS. WOLF:**  Okay.  Your Honor, with respect to 11

13   through 30, I think it's incorrect to start by saying that the

14   only issue that's been put into (indiscernible) this allegation

15   relates to in-person voter fraud.  In the United States'

16   complaint, they challenged Texas to present evidence on the

17   election integrity, which was the stated purpose of the

18   legislator in passing SB14.  I believe that they specifically

19   said that the voter ID proponents cite virtually no evidence

20   during or after -- actually, I started reading the wrong one --

21   they state the policies proffered for this particular

22   restrictions contained in SB14 are tenuous and unsupported in

23   the legislative record or by other evidence.  And in turn, in

24   paragraph 29, they do provide that the stated purpose was to

25   ensure the integrity of the election.  The Defendants would

1  argue that, you know, the integrity of the elections is broader

2  than just in-person voter fraud.  But notwithstanding that, I

3  don't think that the Defendants have a complete picture of the

4  amount of in-person voter fraud or, for that matter, the amount

5  of various other election crimes that have been prosecuted or

6  investigated or brought to the attention of the United States'

7  Department of Justice.  And I would also argue that not only

8  the Defendants -- or not only the United States, but the other

9  Plaintiffs have also put into issue issues regarding

10  allegations in our complaint which concern the fact that the

11  State has not produced evidence of election fraud, and they

12  have not produced evidence showing that election fraud was --

13  the integrity of elections was addressed by the legislature.

14  On top of that, the Defendants have been served with discovery

15  by some of the other Plaintiffs for -- the Office of the

16  Attorney General related to very, very broad allegations and

17  the Attorney General's knowledge of voter fraud, which goes

18  beyond just voter impersonation and goes into complaints or

19  allegations for (indiscernible) investigation, investigation

20  charges, prosecution, which she stated going back to January of

21  2000 in some instances and other instances has no date range.

22  And my understanding is that those issues in terms of the OAG

23  producing (indiscernible) being worked out with the Plaintiff.

24  But the point is that those issues have been brought and that

25  Plaintiff clearly thinks that they are relevant, and so we

37

 1    argued that we are entitled to that source of information in

 2    terms of the unique institutional knowledge that the Department

 3    of Justice has.  In terms of the documents that they've

 4    produced, we don't have complete logs of voter fraud complaints

 5    that it's received.  I know they were discussing the public

 6    integrity reports and the (indiscernible) reports.  We don't

 7    have a complete picture of the statistics for what's a

 8    representative example versus the complete universe of the

 9    complaints or allegations that we receive.  And, again today,

10    raw factual data is not protected by (indiscernible) process or

11    other privilege.  There's a case (indiscernible) *versus the U.*

12    *S.*, which is (indiscernible) Michigan case, which does not --

13    which protects communications -- which does not protect

14    communication, the raw data on which decisions can be

15    formulated.  In terms of law investigation privilege, the data

16    the Defendants are seeking is largely historical data.  And I

17    think that the courts in the Fifth Circuit (indiscernible)

18    Frankenhauser (phonetic) factors, which is the case out of the

19    Eastern District of Pennsylvania, and several of the

20    Frankenhauser factors involve whether the party seeking

21    discovery is an actual or potential Defendant in any criminal

22    proceeding either pending or reasonably likely to follow from

23    the incident in question; whether the police investigation has

24    been completed; whether any intradepartmental disciplinary

25    proceedings have arisen or may arise from the investigation;

1  and the importance of the information sought to the plaintiff's

2  case.  And those are just some of the factors.  And at the same

3  time (indiscernible) *U. S. Department of Homeland Security* case

4  out of the Fifth Circuit that determines the law enforcement

5  privileges founded by relevance and time constraints.  And, you

6  know, most of the data that we're seeking going back to 2004 is

7  historical data, I'm assuming it's related to investigations

8  which have already been completed, or (indiscernible) which

9  have already been found or allegations which have already been,

10  you know, acted upon and investigated.  And so we don't think

11  that the law enforcement privilege in and of itself is a

12  relevant exception here.  And I think that -- again, we think

13  that these topics are relevant in the sense that it's not just

14  limited to the State of Texas.  I think integrity of elections

15  could apply nationwide in terms of the universe of voter fraud

16  or election crimes that have happened nationwide.  I think the

17  definition, while Ms. Baldwin referred to it as broad, the

18  definition that we used in our 30(b)(6) notice was derived

19  directly from a 2006 report of the Election Assistance

20  Commission -- the United States Election Assistance Commission,

21  and we tried to, at least in terms of the definition of "voter

22  fraud," narrow it to particular topics which we thought were

23  relevant to the integrity of elections as it relates to SB14.

24  And so I think, your Honor, to preclude us from discovery on

25  this topic while, you know, we're working with the Plaintiff to

1    allow this type of discovery for them, and also while this is

2    the stated purpose of this bill -- and, finally, while the

3    Department of Justice has very unique institutional knowledge

4    of these particular types of crimes and instances would just

5    not be fair, and I think that the -- if we're working in good

6    faith to try to get this information to the other side, I think

7    we, too, should be entitled to it as well.

8            THE COURT:  Do you want to say anything further on 11

9    through 30, Ms. Baldwin?

10           MS. BALDWIN:  Just in brief, your Honor.  What is at

11   issue here is what the State of Texas knew when it passed the

12   statute that is alleged to be racially discriminatory.  What is

13   not at issue is what various people in the federal government

14   may know about a host of unrelated election crimes throughout

15   the country.

16           THE COURT:  All right.  And so what's left, 37?

17           MS. BALDWIN:  Yes, your Honor.  Thirty-seven is,

18   again, calculations, reports, audits, relating to the effect of

19   SB14 or any other photo ID law on-hand in instances of voter

20   fraud or election crime.  This topic is overbroad and vague.

21   And as we discussed thus far with Defendants, we're not --

22   counsel is not currently aware of any such reports; and to the

23   extent that they relate to other state laws, they would be

24   irrelevant.  Anything that relates to SB14 has been produced in

25   this case.

40

1          **THE COURT:**  All right.  Ms. Wolf?

2          **MS. WOLF:**  Your Honor, in terms of the study point,

3     what I would argue is that while counsel may represent that no

4     such study exists, that's not the same as a deponent coming in

5     and saying the Department of Justice has not examined the

6     effects of photo ID laws on eliminating election crimes or

7     voter laws, and we think that those are two very different

8     animals.  So while the response may be to the witness that no

9     such studies exist, we believe that we are entitled to probe as

10    to that type of information.

11         And just -- your Honor, I just want to revisit one

12    point that Ms. Baldwin raised with respect to topics 11 through

13    30.  I think the issue in a Section 2 analysis is that we need

14    to balance the burden of the particular photo ID law with the

15    state's interest.  And so we need to be able to see, you know,

16    whether or not the legislature knew of these particular

17    instances of voter fraud or election crime is not necessarily

18    the only issue that's relevant.  If there was a significant

19    amount of election crime and voter fraud, that also goes to the

20    balancing test that is relevant under Section 2.  So I just

21    wanted to add that as respect to topics 11 through 30.

22         **THE COURT:**  Okay.

23         **MR. CLAY:**  Your Honor, this is Reid Clay for the

24    State of Texas.  If I can just elaborate on that for one

25    second.

**EXCEPTIONAL REPORTING SERVICES, INC**

1              THE COURT:  Yes.

2              MR. CLAY:  There are many different claims in this

3    case, and one issue certainly is what the purpose of the

4    legislature was in enacting SB14.  Another issue is whether or

5    not the burden imposed by SB14 is justified by some sort of

6    state's interest.  Texas has, in many cases in recent history,

7    reacted to instances of election fraud or election crimes in

8    other states, enacted laws in order to try and prevent those

9    from happening in Texas.  So part of our purpose in asking for

10   some deposition testimony from the Department of Justice on

11   things other than in-person voter fraud -- which, by the way,

12   is not the only type of fraud that can be prevented or deterred

13   by SB 14 -- is to see what the State of Texas could be -- could

14   use to justify its actions in enacting SB14 based upon

15   preventing other types of election crimes and instilling

16   integrity in the election system in Texas, which is a valid

17   purpose under Supreme Court case law for enacting voter

18   identification law.  So the idea that voter impersonation is

19   the only thing that's at issue here or what the legislature

20   knew about voter impersonation is the only thing at issue here,

21   is flatly wrong and is the reason that we've requested the

22   information that we have.

23             THE COURT:  All right.  I think those were all that

24   were left, at least according to the statement that was filed

25   by the Defendants on the day -- I need to look at those issues

1    a little more, so I don't know if I'll either get you all back

2    on a conference call or issue a short order or -- when -- let

3    me address some other matters and then I'll figure out when I

4    can have rulings on those issues on the protective order filed

5    -- motion for protective order filed by the government.  Let's

6    see.

7            I know today there was a motion to compel regarding

8    some interrogatories that was filed by the Defendants.  It was

9    just filed today.  I guess we'll have to address that at

10   another time, Mr. Scott -- or who wants to address that?

11           **MS. WOLF:**  Your Honor, this is Lindsey Wolf.  I'm

12   happy to address that.  I think where we are on that particular

13   motion -- and I do understand it was just filed today -- is

14   that we're just seeking -- we didn't receive answers to our

15   interrogatories from either the Ortiz group of Plaintiffs or

16   the LULAC Plaintiffs.  They did kind of serve objections.

17   However, there were no answers that were contained in those

18   interrogatories.  And we tried to confer and see if they would

19   produce answers to those interrogatories.  They've indicated

20   that they are going to stand on their objections and not

21   provide sworn statements by their clients.  One point of

22   verification, it appears that LULAC had actually submitted what

23   looked like an answer beneath their objections, but no one has

24   actually verified that answer.  So Defendants are essentially

25   seeking to compel the Ortiz (indiscernible) group and also the

43

1  Veasey-LULAC group to provide sworn answers by their clients to

2  the interrogatories that were served on them.

3          THE COURT:  Mr. Dunn, I know it was just filed today,

4  but do you want to say anything on that issue?

5          MR. DUNN:  Sure.  Thank you, Judge.  This is Chad

6  Dunn for the court reporter.  I think the representation of the

7  issue by the State as just laid out, we strongly disagree with,

8  and we're -- we have objected to the interrogatories.  I

9  actually believed that this issue had been resolved in a

10  conference call and then I saw the motion today.  So I think

11  without taking it point-by-point would be wasting the Court's

12  on how I think the issue is different than has been relayed so

13  far.  I'd recommend we take this up after the parties can

14  confer again about it.

15          THE COURT:  That's fine.  Ms. Van Dalen?

16          MS. VAN DALEN:  I agree --

17          THE COURT:  Okay.

18          MS. VAN DALEN:  -- with the proposal (indiscernible)

19          THE COURT:  Did you all start depositions this week?

20  Anybody wants to speak on that.

21          MR. ROSENBERG:  Ezra Rosenberg.  Yes, we did, your

22  Honor.  We've had, I believe, three depositions taken this week

23  so far.

24          THE COURT:  Any issues on any privileges at this

25  point?

1        **MR. SCOTT:**  Your Honor, John Scott.  One of the

2   things that came up in our deposition -- it's my understanding

3   it also came up in the deposition yesterday -- was the use of

4   documents which had previously been ruled as privileged.  You

5   ordered us to turn those documents over to the Plaintiffs so

6   that they could review them.  It limited in your order, which

7   was Document 226, it limited the use of those and who could

8   make use of any portion of those.  It also set forth the way

9   that they could be used, which was bring them to you before

10  they were introduced at trial.  What has happened is they're

11  now being used on the legislators, and we have set up a process

12  at least to handle the first two systems whereby we're putting

13  those under seal and trying to keep those remaining under seal

14  in addition to, I guess, the way we're dealing with the

15  question and answer process on those documents.

16        **THE COURT:**  Okay.

17        **MR. SCOTT:**  But it sure would be helpful to have a

18  little more guidance in the form of a written order that both

19  sides I think would agree would be nice to fall back on to say

20  this is why we're doing it and the way we're doing it.

21        **THE COURT:**  Okay.

22        **MR. SCOTT:**  Because I think the existing order does

23  not --

24        **THE COURT:**  Address it.

25        **MR. SCOTT:**  -- allow for such a use of them.  I don't

45

1    think it prevents the use, but I sure don't think it provides

2    for it.

3          **THE COURT:**  Okay.  I --

4          **MR. ROSENBERG:**  And, your Honor -- Ezra Rosenberg, if

5    I may, just to add to that.  The example today is, of course,

6    very simple.  We were questioning Representative Riddle and we

7    questioned her with the documents that she produced; not with

8    any other documents.  And we put on the record they were highly

9    confidential, which meant that they are under seal, and we

10   think that's an appropriate way to deal with it.  And --

11         **THE COURT:**  It seems like -- and there is no definite

12   order -- but it seems like we kind of addressed it at one of

13   our conferences how that might be handled.  But if you want a

14   written order, that's fine, but I'm going to suggest you all

15   propose maybe what you all have been doing, if it's agreed to,

16   or where the issues are as to what I need to clear up.

17         **MR. SCOTT:**  That's great, your Honor.  And this is

18   John Scott for Defendants.  We'll take a first draft at it and

19   get it over to Mr. Rosenberg and to the DOJ and all those

20   parties.

21         **THE COURT:**  Okay.  Are there any other issues for

22   today?

23         **MR. FREEMAN:**  Your Honor, this is Dan Freeman on

24   behalf of the United States.  We've happily cleared up almost

25   all of the motions to quash the subpoenas that are in front of

46

1  the Court.  Just to give the Court a status update, there's

2  still one motion to quash a deposition subpoena that remains in

3  front of Judge O'Connor of the Northern District of Texas.

4  That motion has -- there's a motion to quash that's been fully

5  briefed and as has the motion to transfer, but Judge O'Connor

6  has not yet ruled on either of those motions.  There's also

7  still one document subpoena that remains before the Court, and

8  I emailed Ms. Cortez about this I believe yesterday, saying

9  that we would like to try to resolve that single motion to

10 quash today if the Court is looking to --

11          **THE COURT:**  I'm sorry --

12          **MR. FREEMAN:**  -- hear the very limited part that's

13 left.

14          **THE COURT:**  Brandy is shaking her head.  We may have

15 missed that, so --

16          **MR. FREEMAN:**  Oh.

17          **THE COURT:**  Do you know what DE it is?

18          **MR. FREEMAN:**  If you'll give me just one moment, I

19 can tell you.

20          **THE COURT:**  Okay.

21          **MR. FREEMAN:**  This was just the motion to quash the

22 deposition subpoena -- or the deposition subpoena that was

23 served on the Texas Legislative Council, and that is currently

24 in Docket Number 2:14-cv-226.  It's one of the motions to quash

25 that was transferred into the Western District.

1          **THE COURT:**  Okay.  So what do we need to do on that?

2    I have not looked at that, but if you all want to discuss it.

3    What's the --

4          **MR. FREEMAN:**  Mr. D'Andrea and I have conferred and

5    we've substantially narrowed the issues, I believe, and I'll

6    Mr. D'Andrea speak first on that.

7          **THE COURT:**  Okay.  We had discussed this before, but

8    there were some matters you all were going to discuss further,

9    right?  I remember that now.

10          **MR. FREEMAN:**  Yes, your Honor, and we did get

11    together and --

12          **THE COURT:**  There was like search terms and --

13          **MR. FREEMAN:**  -- reached an agreement about the

14    search terms --

15          **THE COURT:**  Right.

16          **MR. FREEMAN:**  -- but I think probably Mr. D'Andrea

17    should probably speak first because it's his motion, so I'll

18    pass that over to him if that works.

19          **THE COURT:**  Okay.

20          **MR. D'ANDREA:**  Good afternoon, your Honor, this is

21    Arthur D'Andrea for the state -- third party legislators.  The

22    only part remaining is the cumulative complaint objection we

23    had, and that is the TLC subpoena requests documents from 85

24    different people, and we're asking the Court to cut 28 people

25    from that list.  Cutting those people we think it'll shorten

48

1    the time it takes us to gather and review all of these TLC

2    documents.  And it's already going to take a long time.  And

3    cutting the people will not harm the Plaintiffs because these

4    people are all duplicate; because these people, these are the

5    very same people who DOJ have already issued direct subpoenas.

6    So, for example, DOJ asked Speaker Straus to search his work

7    email for everything related to voter ID.  And they asked

8    Representative Jose Aliseda to do the same, to search work

9    emails for everything related to voter ID.  And they did this

10   for 28 legislators.  And now, among the people they want --

11   they've gone to TLC and asked TLC to search Speaker Straus's

12   work email for voter ID --

13            **THE COURT:**  Okay.

14            **MR. D'ANDREA:**  -- related documents.  They --

15            **THE COURT:**  Let me ask Mr. Freeman -- let me ask

16   what's the purpose of that, Mr. Freeman?

17            **MR. FREEMAN:**  Your Honor, the server -- these

18   subpoenas were all served at the same time, and (indiscernible)

19   searches are generally used with large organizations --

20            **THE COURT:**  No, what -- they sound duplicative and --

21   to me.  So what's the purpose of doing that?

22            **MR. FREEMAN:**  The reason for doing (indiscernible)

23   search essentially are uniformity, completeness of the

24   search --

25            **THE COURT:**  No, I don't think that's appropriate.

49

1          **MR. FREEMAN:**  -- (indiscernible) D'Andrea --

2          **THE COURT:**  I don't think that's appropriate.

3          **MR. FREEMAN:**  Okay, your Honor.

4          **THE COURT:**  So I'm sustaining --

5          **MR. FREEMAN:**  We would simply -- we can submit a

6    proposed order that would limit that subpoena to individuals

7    who have not separately received a personal subpoena.  Would

8    that be the best interpretation of the Court's order?

9          **THE COURT:**  That -- yes.  I'm sustaining the

10   objection.  Mr. D'Andrea, is that it on that issue?

11         **MR. D'ANDREA:**  Yes, your Honor, thank you.

12         **THE COURT:**  Okay.  Anything else left on that motion

13   to quash regarding the TLC?

14         **MR. FREEMAN:**  I believe that's all, your Honor.

15         **THE COURT:**  Okay.  So --

16         **MR. D'ANDREA:**  That's all.

17         **THE COURT:**  -- you all are going to submit an order

18   based on that ruling and that will take care of that motion,

19   correct?

20         **MR. D'ANDREA:**  This is Arthur D'Andrea.  Yes, it

21   will, your Honor.

22         **THE COURT:**  Okay.  Anything else that's left hanging?

23         **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin for the

24   United States.  The Court is still considering the motion for

25   the protective order, if there are particular topics that are

50

1    still at issue, we would just request that there be written

2    briefing on those before there would be any such order to have

3    that deposition proceed.

4           THE COURT:  You're talking about what we were

5    discussing?

6           MS. BALDWIN:  Yes, your Honor.

7           THE COURT:  Okay.  Because what I have so far -- I

8    know there was some earlier briefing.  Well, there was the

9    motion for protective order that was filed, and then there was

10   a joint statement I believe just kind of let me know what your

11   progress was on conferring.  I believe that's the one we had an

12   issue on regarding the parties conferring.  And then what was

13   filed today was just really another statement telling me what

14   categories were left; is that right?

15          MS. BALDWIN:  Yes, your Honor, that's correct.  And

16   just what we would request is that on any of these, given both

17   the gravity of the issues and the burden, that Defendants -- if

18   the Court is considering denying the request as to any of the

19   topics, the Defendants be required to put up a reason as to

20   their basis for why they're entitled to this --

21          THE COURT:  Yeah.

22          MS. BALDWIN:  -- and for (indiscernible) a response.

23          THE COURT:  I think that would be helpful to the

24   Court.  Ms. Wolf, do you have any comments on that?

25          MS. WOLF:  No, your Honor.  I mean, we'll do whatever

```
 1    the Court --
 2            THE COURT:  Okay.
 3            MS. WOLF:  -- requests us to do.  I mean, I think
 4    we've explained --
 5            THE COURT:  How --
 6            MS. WOLF:  -- some of it today, but if the Court
 7    would like us to do that, we will do what the Court directs.
 8            THE COURT:  How much time do you need to get a
 9    response on file to that motion -- regarding what's left, what
10    was discussed today?
11            MS. WOLF:  Your Honor, I would ask for ten days, if
12    possible.  But one sort of housekeeping matter is we will then
13    be approaching the end of fact discovery, so if we can just
14    agree with the United States that that's not going to preclude
15    us any and that your Honor does allow us to proceed with a
16    deposition from actually proceeding with a deposition.
17            THE COURT:  Or I will order that if they don't agree.
18    So -- okay, so within ten days we'll get that and then I'll
19    look at it again and see if I have any further questions.
20            MS. BALDWIN:  And, your Honor, within say five days
21    thereafter permitting us to file a short reply.
22            THE COURT:  That's fine.
23            MS. BALDWIN:  Okay, thank you, your Honor.
24            THE COURT:  Okay.  So you all are still -- so we
25    addressed the Defendants' motion to compel the production of
```

52

1    federal databases.  You all are conferring regarding the

2    deposition of Coby Shorter.  There's going to be some briefing

3    on the motion -- United States' motion for protective order on

4    the Rule 30(b)(6) deposition.  You all are going to confer

5    further the Ortiz-LUPE (phonetic) Plaintiffs and Veasey-LULAC

6    Plaintiffs regarding the motion to compel that was filed today.

7    And I think that's it, counsel.  So --

8               **MS. WOLF:**  Thank you, your Honor.

9               **THE COURT:**  All right.  You're -- well --

10              **MR. SPEAKER:**  Thank you, your Honor.

11              **THE COURT:**  -- I guess we should discuss --

12              **MR. SPEAKER:**  Thank you, your Honor.

13              **THE COURT:**  -- do we need another conference -- no, I

14   guess not.

15          **(This proceeding was adjourned at 4:08 p.m.)**

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

June 19, 2014

TONI HUDSON, TRANSCRIBER