**EXHIBIT 4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Thursday, July 24, 2014 |
| | ) | |
| Defendants. | ) | (9:00 a.m. to 10:19 a.m.) |

STATUS CONFERENCE (TELEPHONIC)

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:   Adolph Castillo

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                    ARMAND DERFNER, ESQ.
                               P.O. Box 600
                               Charleston, SC 29402

                               CHAD W. DUNN, ESQ.
                               Brazil and Dunn
                               4201 Cypress Creek Parkway, Suite 530
                               Houston, TX 77068

                               NEIL G. BARON, ESQ.
                               914 FM 517 Rd. W., Suite 242
                               Dickinson, TX 77539

                               J. GERALD HEBERT, ESQ.
                               191 Somervelle Street, Suite 405
                               Alexandria, VA 22304

                               EMMA SIMPSON, ESQ.


Mexican American              EZRA D. ROSENBERG, ESQ.
Legislative Caucus,           Dechert, LLP
et al.:                       902 Carnegie Center, Suite 500
                               Princeton, NJ 08540-6531


Texas League of Young         NATASHA KORGAONKAR, ESQ.
Voters Education Fund:        KELLY DUNBAR, ESQ.
                               NAACP Legal Defendant and Educational
                               Funds, Inc.
                               40 Rector Street
                               5th Floor
                               New York, NY 10006


State of Texas:               JOHN BARRET SCOTT, ESQ.
                               Scott, Yung, L.L.P.
                               208 N. Market Street
                               Suite 200
                               Dallas, TX 75202

                               JOHN REED CLAY, JR., ESQ.
                               Office of the Attorney General
                               P.O. Box 12548
                               MC001
                               Austin, TX 78711

**APPEARANCES FOR:**          (CONTINUED)


State of Texas:              LINDSEY WOLF, ESQ.
                             BEN DONNELL, ESQ.
                             JOHN CRAWFORD, ESQ.
                             ARTHUR D'ANDREA, ESQ.


United States               ANNA BALDWIN, ESQ.
of America:                 BRADLEY HEARD, ESQ.
                             U. S. Department of Justice
                             950 Pennsylvania Avenue, N.W.
                             NWB Room 7125
                             Washington, DC 20530


Texas Association of         ROLANDO L. RIOS, ESQ.
Hispanic County Judges       115 E. Travis
and County                   Suite 1654
Commissioners:               San Antonio, TX 78205

Oscar Ortiz, et al.:         MARINDA VAN DALEN, ESQ.
                             ROBERT W. DOGGETT, ESQ.
                             Texas Rio Grande Legal Aid
                             4920 North IH 35
                             Austin, TX 78751

4

1          **Corpus Christi, Texas; Thursday, July 24, 2014; 9:00 a.m.**

2                          **(Call to Order)**

3          **THE COURT:**  Okay.  The Court calls Cause Number

4    2-13-193, *Veasey, et al., versus Perry, et al.*

5          **THE CLERK:**  And, your Honor, for the individual

6    Veaseys, we have Mr. Dunn and Mr. Derfner on the line.

7          For the United States of America, we have Anna

8    Baldwin and Bradley Heard on the line.

9          For the Mexican American Legislative Caucus,

10   Mr. Rosenberg.

11         For Ortiz, et al., Mr. Doggett and Ms. Van Dalen.

12         For the Association of Hispanic County Judges,

13   Mr. Rios.

14         For the Texas League of Young Voters, Ms. Korgaonkar

15   and Mr. Dunbar.

16         For the State of Texas present in the courtroom, we

17   have Mr. Scott, Mr. Clay, and Mr. Crawford; and then on the

18   line, we have Ms. Wolf, Mr. Donnell, and Mr. D'Andrea.

19         **THE COURT:**  All right.  There's various matters

20   pending before the Court.  We haven't really reconvened, I

21   guess, in about a month.

22         So the first thing I'd like to take up is Docket

23   Entry Number 276, which is the United States' Motion for a

24   Protective Order from the Defendants' Rule 30(b)(6) Notice of

25   Deposition.

1          Let's see.  The parties had been conferring for some

2    time on that Motion.  The Court heard argument the last time we

3    convened.  The parties provided further briefing on that

4    Motion, so I'm ready to make some rulings.

5          Regarding Topic 1, which was the administrative

6    preclearance of the law of any state, et cetera, since 2004,

7    the Court is going to sustain the objection, finding that

8    request is overly broad and burdensome regarding any state laws

9    and any laws, basically -- not just those that might have some

10   relation to the subject matter of this suit.

11         And the Court also finds that why some cases were

12   prosecuted and others were not are not relevant or reasonably

13   calculated to lead to the admissible evidence for the issue

14   that is before this Court.

15         And then to the extent that the -- we're dealing with

16   preclearance as a remedy, I believe that would be per a

17   separate phase, if liability is established.

18         Anything else on that topic?

19         **MS. BALDWIN:**  No, your Honor.  Not for the United

20   States.

21         **THE COURT:**  Okay.  Then Topic 2, the enforcement of

22   Section 2.

23         The Court is going to sustain the objection also,

24   finding that comparing prosecutions among the states is not

25   relevant for purposes of the issue before this Court.

6

1          Now, there's been some matters produced under that;

2     is that correct, Ms. Westfall -- I mean, I'm sorry --

3     Ms. Baldwin?

4          **MS. BALDWIN:**  Your Honor, we've produced, you know,

5     documents that have been requested.

6          **THE COURT:**  Yeah, and I think the --

7          **MS. BALDWIN:**  And --

8          **THE COURT:**  -- documents should be --

9          **MS. BALDWIN:**  And they're, of course, publically

10    available documents.  You know, the cases that have been

11    litigated under the Voting Rights Act are, you know,

12    (indiscernible).

13         **THE COURT:**  All right.

14         **MS. BALDWIN:**  But --

15         **THE COURT:**  Anything further on topic two?

16         **MS. BALDWIN:**  Not from the United States, your Honor.

17         **THE COURT:**  Topics 5 and 6, I'm going to sustain

18    those objections against that -- again, that looks to appear to

19    go toward remedial phase, if any -- if we get there.

20         Any questions on that?

21         **MS. BALDWIN:**  No, your Honor.

22         **THE COURT:**  Okay.  Topic 10, there's a little bit of

23    clarification I think that needs to be -- it looks like the

24    State is saying we need some clarification what exactly was

25    produced -- not just voter impersonation information, but all

1   Texas voter complaints.

2            What was produced, Ms. Baldwin?

3            **MS. BALDWIN:**  Yes, your Honor.  In our Reply, on Page

4   6, Footnote 3 goes through the search terms that were used in

5   the category, so, you know -- explaining, for example, that

6   VotingSection@USDOJ.gov was searched from 2009 to 2014 using

7   the search term "fraud," and all documents related to voter

8   fraud in Texas to and from this e-mail address were produced.

9            And had the search turned up any documents related to

10  in-person voter impersonation fraud nationwide, those documents

11  would have been produced, but there were none.

12           The same e-mail address was also searched using

13  relevant Texas photo voter ID bill numbers, and Section 5

14  submission numbers for documents relating to voter ID bills in

15  Texas.  And the Voting Section reviewed files from this e-mail

16  correspondence from 2004 to 2014 by hand to search for all

17  documents related to voter fraud in Texas, which were

18  produced --

19           **THE COURT:**  I guess I had a --

20           **MS. BALDWIN:**  -- as well as (indiscernible) documents

21  for voter impersonation fraud nationwide, which yielded no

22  responsive documents.

23           **THE COURT:**  I had a question on that footnote,

24  because it says, "All documents related to voter fraud in

25  Texas," then it goes on, "If the search had turned up any

     1   documents related to in-person voter impersonation fraud

     2   nationwide, those documents would have been produced."

     3            **MS. BALDWIN:**  Yes, ma'am.

     4            **THE COURT:**  So you all did a nationwide search?

     5            **MS. BALDWIN:**  Yes, so we searched comprehensively the

     6   -- for example, the paper files and the e-mail addresses

     7   nationwide.  And anything that would have hit, for example, the

     8   word "fraud" related to Texas was produced, even if it didn't

     9   appear to be an allegation that was related to in-person voter

    10   impersonation at the polls in Texas.

    11            For nationwide, if, for example, in another state the

    12   word "fraud" hit an e-mail, if that e-mail didn't have anything

    13   to do with in-person voter impersonation at the polls, that was

    14   not produced, because it was not relevant.

    15            **THE COURT:**  Mr. Clay?

    16            **MS. WOLF:**  Your Honor, this is Lindsey Wolf.

    17            **THE COURT:**  All right.

    18            **MS. WOLF:**  I'd just like for the Government -- I

    19   mean, I think we have some serious concerns with the documents

    20   that were produced by the United States, or not produced by the

    21   United States, relating to voter fraud.

    22            And I think what I heard Ms. Baldwin just say was

    23   that while documents for voter fraud may have been searched --

    24   and I'm only talking about within the (indiscernible) 1973(c)

    25   address -- they were only produced if they were relating to in-

1   person voter fraud, and I don't think that the Defendants have

2   ever sought only documents relating to in-person voter fraud,

3   and, you know, limited to that universe.

4            And I just -- and on top of that, we learned in a

5   conference call with the United States -- and I think this is

6   more relevant to Topics 7, 8, 11 through 30, and 37 -- but that

7   no documents in the Public Integrity Section, which is the

8   section which deals with voter fraud and prosecutes voter

9   fraud, have been searched or produced to us at all.

10           And so I think we're dealing with a very limited

11  search range.  And so to say that there aren't any documents,

12  when, in fact, the right repositories for documents have not

13  been searched --

14           **THE COURT:**  Okay.  And let me --

15           **MS. WOLF:**  -- (indiscernible).

16           **THE COURT:**  -- backtrack a little bit.  This is for a

17  deposition.  I guess -- and I think my point on some of this is

18  I don't know that it's appropriate for a deposition.  If some

19  documents have been turned over, these might be some records,

20  facts, you know, historical data -- I think the records are

21  what they are, and you don't necessarily need a deposition for

22  that.

23           But I -- we're kind of going off a little bit into

24  what records have been produced versus -- I know what's before

25  the Court is the deposition, the 30(b)(6) deposition.

1          But I guess, Ms. Baldwin, if the Defense had asked

2   for not just in-person voter impersonation, but just fraud

3   generally, why -- why was that a problem to be able to --

4          **MS. BALDWIN:**  Well --

5          **THE COURT:**  -- produce that?

6          **MS. BALDWIN:**  -- related to the State of Texas, we

7   did produce that, your Honor.

8          It's our position that any complaint related to

9   totally unrelated kinds of fraud anywhere in the nation has

10  nothing to do with whether SB 14 had a racially discriminatory

11  purpose or effect in this case.

12         And just to briefly respond to Ms. Wolf's point about

13  the Public Integrity Section, while we didn't search

14  individual, you know, e-mail account users in the Public

15  Integrity Section, as we've explained in the Declaration of

16  Richard Pilger, there's no discoverable information to be found

17  there.

18         There are no prosecutions that the Public Integrity

19  Section or any U.S. Attorney's Office, any Department of

20  Justice attorney anywhere in the country has done for in-person

21  voter impersonation fraud at any time from 2004 to the present.

22         So searching for documents related to allegations

23  that have never come to fruition, there's just -- there's no

24  there there.  There is no reason to have done a more thorough

25  search.

1         And at any rate, you know, we are just talking about

2    depositions.

3         These Document Requests were served long, long ago.

4    The Defendants -- we've continually told them what -- what it

5    is that we've searched for.  You know, we're weeks from trial.

6         The United States stands by the fairness and

7    reasonableness of its, you know, search and the production in

8    this case.

9         **THE COURT:**  Okay.  Regarding Topic 10, for a

10   deposition, I think it would be appropriate for the Defense to

11   inquire as to how those records that are discussed there in 10,

12   how they're maintained, how they were searched, to be able to

13   respond to the discovery request.

14        But I don't think beyond that -- I mean, they are

15   what they are.

16        So I guess sustained in part, overruled in part.

17        Yeah.  Any questions on that?

18        **MS. BALDWIN:**  Your Honor, could you state what it is

19   that you're finding to be the topic --

20        **THE COURT:**  On Topic --

21        **MS. BALDWIN:**  -- (indiscernible)?

22        **THE COURT:**  -- 10?

23        **MS. BALDWIN:**  Yes, ma'am.

24        **THE COURT:**  It's what you all set forth, the phone

25   logs, the ICM system e-mail communications --

1      **MS. BALDWIN:**  So the topic would be how the United

2  States searched the items for production in this case, your

3  Honor?

4      **THE COURT:**  Yeah, how those records are maintained.

5  The Defense asked for records -- or those records, how the

6  Government searched to be able to respond to that discovery

7  request.

8      And you all may have exchanged this information

9  already, but I think that would be appropriate, those

10 parameters, for a deposition; but not into the subject matter

11 themselves about these records.

12     I mean, these are kind of, like, records, facts, and

13 I guess some historical data, that I don't think is appropriate

14 for deposition.

15     **MS. BALDWIN:**  Okay, your Honor.  Thank you for that

16 clarification.

17     **THE COURT:**  Is that clear to the Defense?

18     **MS. WOLF:**  Yes, your Honor.

19     **THE COURT:**  Okay.  So shall we move, then -- I'm

20 looking at -- I may have taken 10 out of order -- looking at

21 Topics 7 and 8.

22     I think -- I'm viewing that pretty much the same way

23 as 10.  The Defense could inquire as to how those records are

24 maintained, how they're used to compile reports, how they were

25 searched -- how those records are searched to be able to

1   compile these reports, but you -- the Defense -- the deposition

2   doesn't go into the substance of any of the matters reported or

3   excluded.

4           Does that make sense?

5           **MS. WOLF:**  Your Honor, for the Defendants, just a

6   question in terms -- because I think there's a little bit of

7   grey area between --

8           **THE COURT:**  Uh-huh.

9           **MS. WOLF:**  -- substance and compilation.

10          Part of our objection to -- or questions regarding

11  the Ballot Access and Voting Integrity Initiative Reports and

12  the Public Integrity Reports is that there's a lot of summary

13  information in there, and we don't know how that summary

14  information was gathered, or how it was accumulated, or what

15  data was relied upon in coming to those summaries.

16          For example, there's -- in the Ballot Access Reports,

17  there's summary specifics regarding election fraud --

18          **THE COURT:**  I think --

19          **MS. WOLF:**  -- and would that be something that we

20  would be entitled to inquire as to what the sources were for

21  those summaries, and what was searched in terms of the report

22  itself?

23          **THE COURT:**  Yes.  Okay.  Any other questions?

24      **(No audible response)**

25          Okay.  Then I'm moving on to 11 through 30.

14

1              So let me just -- and I read through this, but -- so

2    the United States has produced some factual information

3    regarding these election crimes and voter fraud, correct,

4    Ms. Baldwin?

5              **MS. BALDWIN:**  Yes, your Honor.  To the extent that it

6    was possessed by the Voting Section, we produced --

7              **THE COURT:**  Okay.  So what's --

8              **MS. BALDWIN:**  -- (indiscernible) --

9              **THE COURT:**  -- the issue from the Defense?  I mean, I

10   would think that the United States saying, "Here, this is what

11   we have," why is that not sufficient?

12             **MS. WOLF:**  Your Honor, it's not -- it's not

13   sufficient because it -- they're basically searching in the

14   wrong repository.  It would -- it would be as if they were

15   searching a civil docket for a criminal indictment.

16             They're looking in the Voting Section, and they've

17   represented that, and we just know from publically available

18   information that it's the Public Integrity Section of the

19   Department of Justice which handles the voter fraud and

20   election crimes.

21             And I think our intention is to move to compel those

22   documents, because, frankly, we weren't fully aware of the

23   limits of the United States' search in not searching the Public

24   Integrity Section until the call that we had with the United

25   States earlier this month.

1            And so now we're in a position where we don't have

2    any documents from the Public Integrity Section, and I

3    understand that an individual from the Public Integrity Section

4    provided a Declaration in connection with the United States'

5    Reply to our Response to the Motion; however, the Declaration

6    is very general.  And, again, it only concerns in-person voter

7    impersonation.  And we've never limited our discovery requests

8    only in that manner.  And we've been asking consistently in

9    depositions -- and for documents relating to voter fraud

10   generally and election crimes generally.

11           And, basically, it's a self-imposed limitation that

12   the United States has imposed on us without us asking or

13   agreeing to that particular limitation.

14           I think the United States' basis, for example, for

15   not searching the documents relating to voter fraud in the

16   Public Integrity Section was based on some earlier discussions

17   regarding the definition of "you" and "your" in a -- in a

18   Request for Production that didn't even concern voter fraud.

19           And, you know, we just learned that they decided, you

20   know, to basically limit their searches in that way going

21   forward, and we had never agreed to that.

22           So I think that the -- the Defendants are in a

23   position where we just don't have enough information.  We don't

24   have information from the right source.  We're not

25   (indiscernible) a witness.  We're not being given documents.

1          And I think that the stated purpose of SB 14, which

2    we've said in our, you know, in our counter (indiscernible) and

3    -- or, I'm sorry -- in our Answer, and we've also said it --

4    you know, it's also been asserted in the United States'

5    Complaint itself is the integrity of elections.  And the

6    integrity of elections is broader than in-person voter

7    impersonation.  It goes to broader issues of fraud and

8    (indiscernible) that just, you know, fraud nationwide is

9    relevant in that the Texas Legislature has responded to

10   allegations of fraud in the past nationwide, and I think that

11   this particular topic area is relevant, and it's just not fair

12   the way that we've been denied access to this information --

13         **THE COURT:**  Okay.  And --

14         **MS. WOLF:**  -- in a very (indiscernible) --

15         **THE COURT:**  And let me just butt in.  I think we

16   talking again about more production of documents versus the

17   appropriateness for a deposition.

18         I think this kind of falls back in line with the

19   other rulings I've already made.

20         I can, again, see how there might be some questioning

21   on how the records were maintained, how they were searched for

22   inclusion in and for compilation of the reports; but, beyond

23   that, I don't know that it's appropriate for deposition.

24         Ms. Baldwin, do you want to respond to the argument

25   by the Defense regarding what's been produced?

1          **MS. BALDWIN:**  Yes, your Honor.  I mean, as the

2    Declaration from Richard Pilger, who's the director of the

3    Elections Crime Branch in the Public Integrity Section, makes

4    clear, there is nothing to produce related to in-person voter

5    impersonation.

6          **THE COURT:**  Okay.  But they're not just --

7          **MS. BALDWIN:**  (Indiscernible) --

8          **THE COURT:**  -- limiting it to in-person issues.

9          **MS. BALDWIN:**  Your Honor, and we would respectfully

10   state that that is the only information that's relevant here.

11   The bill sponsors of SB 14 have repeatedly testified, up to and

12   including yesterday, that the purpose of SB 14 was to stop in-

13   person voter impersonation.

14          There's -- any kind of election crimes that the

15   Department enforces anywhere in the nation is simply not

16   relevant to the purpose and effect of SB 14.

17          **MR. CLAY:**  Your Honor --

18          **MS. BALDWIN:**  And --

19          **MR. CLAY:**  -- this is Reed Clay for the State of

20   Texas.

21          Even in deposition testimony yesterday, although in-

22   person voter fraud is, according to the testimony of Senator

23   Fraser, was one of the stated purposes of SB 14, the other

24   stated purposes and the more broad purpose was the -- to ensure

25   the integrity of Texas elections.

1        More problematic, from Ms. Baldwin's perspective, is

2   the language in *Crawford* that's sustained Indiana's voter ID

3   law looks specifically to not only election crimes -- not only

4   election crimes that weren't in-person voter fraud, but

5   election crimes that weren't in-person voter fraud that

6   occurred outside of Indiana.

7        So they're trying to exclude a broad base of evidence

8   that could be used to support and sustain Texas's voter ID law.

9        **THE COURT:**  Yeah, I think the Government -- the

10  United States is looking at this too narrowly.

11       So I'm sustaining, I guess, the Defendants' -- well,

12  it's the United States' --

13       **MS. BALDWIN:**  Your Honor --

14       **THE COURT:**  -- Protective Order.  We're getting a

15  little confused here, because we're talking about records.  But

16  this is a Protective Order regarding a deposition.

17       I'm going to allow the Defense to look further than

18  -- or to ask for documents beyond just the in-person voter

19  fraud.

20       But that's still -- I mean, we need to go back and

21  address this issue of the deposition.  I -- that's just going

22  to records.  I don't know that a deposition regarding the

23  substance of those records themselves is appropriate, which --

24       **MS. BALDWIN:**  Your Honor, the deposition would raise,

25  you know, many governmental privileges about investigations

19

1    that are ongoing --

2              **THE COURT:**  Well, didn't I just say we're not going

3    to get into the subject matter in a deposition?

4              **MS. BALDWIN:**  Okay.  Thank you, your Honor.  I'm just

5    understanding -- so there will be no deposition on Topics 11

6    through 30, if I'm understanding?

7              **THE COURT:**  I think it would be appropriate, if

8    there's questions regarding how those records are maintained

9    and searched for inclusion into whatever reports are being

10   produced, would be appropriate, which kind of goes back in line

11   with my other rulings.

12             But beyond that, and to any substance of what -- of

13   the records or -- no, that would not be appropriate.

14             **MS. BALDWIN:**  Okay.  Okay.  Your Honor, so just,

15   again, I'm just trying to make sure that I understand.

16             The records that are compelled -- compiled by the

17   Public Integrity Section are the records that the Public

18   Integrity Reports that are submitted to Congress that are the

19   topic of matters that -- that the Court has already ruled on.

20             So I'm just trying to understand -- my understanding

21   of your ruling is that you're not adding anything additionally

22   in these topics.  This topic is already set, because you've

23   already made a ruling on --

24             **MR. SPEAKER:**  And --

25             **MS. WOLF:**  Your Honor, I would just interject that I

1    believe that the Declaration submitted by the Public Integrity

2    Section itself actually refers to records beyond those Public

3    Integrity Reports, so I would just like to refer the Court to

4    that, because I don't think (indiscernible) universe.

5         **MS. BALDWIN:**  Well, the records that it refers to is

6    a public document that's attached that talks about the way in

7    which investigations are to be reported to the Public Integrity

8    Section, and that no such investigations have been reported to

9    the Public Integrity Section related to in-person voter

10   impersonation anywhere in the country.

11        **MS. WOLF:**  I would just argue -- I mean, I think it

12   refers to the Legal Information Office Network System, and I

13   think it refers to the Automated Case Tracking System.  I think

14   there are two systems that DOJ (indiscernible) --

15        **THE COURT:**  I'm sorry.  I'm not catching any --

16        **MS. WOLF:**  -- that are referred to --

17        **THE COURT:**  I'm sorry.  I'm not catching any of that.

18   If you can kind of backtrack, slow down.

19        Some of you come in very soft.  We have to pick up

20   the volume.  Some of you come in very loud.  And whether you

21   come in soft or loud, it's kind of hard to hear on this end.

22   We have to adjust that.

23        So if you can just repeat that?

24        You need some help?

25        **THE CLERK:**  Yeah, if we can ask them to --

1          **THE COURT:**  I --

2          **THE CLERK:**  -- identify themselves -- if you'd please

3     identify yourselves each time you speak, it would help.

4          **MS. WOLF:**  Sure.  I'm sorry.  This is Lindsey Wolf

5     for the Defendants.

6          **THE COURT:**  Okay.  If you want to repeat what you

7     said?

8          **MS. WOLF:**  Sure, your Honor.

9          I was just referring to the Declaration of

10    Mr. Pilger, who's the director of the Election Crimes Branch of

11    the Public Integrity Section.  And I think what Ms. Baldwin had

12    just told the Court was that the only records were the Public

13    Integrity Reports.

14         However, if you look at the Declaration, Mr. Pilger

15    is referencing his review of an automatic case -- Automated

16    Case Tracking System, a Legal Information Office Network

17    System, which is managed by the Executive Office for the United

18    States Attorney of the DOJ.

19         And so I don't think that the limited universe is the

20    Public Integrity Reports.  I think there are records -- case

21    tracking records that DOJ maintains that allow it to keep this

22    sort of case data.

23         And so I would argue that it's not just limited to

24    topic -- I believe it's 7 and 8.

25         **THE COURT:**  Ms. Baldwin?

1          **MS. BALDWIN:**  Your Honor, the topics that we're

2    talking about are that Texas's notice -- they're asking about

3    instances of election crime.  They haven't noticed topics

4    related to the internal software that the Public Integrity

5    Section uses.

6          On the substance of the -- these prosecutions,

7    they're publically available documents where there have been

8    prosecutions, where there have been investigations.  To get

9    into that raises an inordinate number of government privileges,

10   and it's just not relevant.

11         So we believe that the information that's relevant

12   has been -- already been presented in the form of the

13   Declaration and that there is no further information that is

14   needed to discover.

15         I understand the Court's ruling on the publically

16   available reports that the Public Integrity Section compiles,

17   and the United States will work to comply with that ruling.

18         There's nothing further on these topics as the

19   Defendants have drafted (indiscernible) --

20         **MS. WOLF:**  And, again, your Honor, I would just

21   respectfully, you know, point out that, again, the Declaration

22   and the searches that are referred to in the Declaration are

23   only limited to in-person voter impersonation.

24         And my understanding of your Honor's statement a

25   couple of minutes ago was that that is too narrow.

1           So even standing on the legs of the Declaration

2    alone, the Declaration is too limited.

3           **THE COURT:**  All right.  Ms. Baldwin, well, you

4    understand my ruling.  The Court has expanded what the

5    Government is saying was relevant, correct?

6           **MS. BALDWIN:**  I understand that ruling, your Honor.

7    But just in terms of complying with what it is that we're

8    expected to have a deponent on, I'm not -- if you've ruled on

9    Topics 11 through 30, I'm not understanding what the scope of

10   that ruling is.

11          **THE COURT:**  What I said was -- I think I started out

12   by asking -- the Government has produced some matters, and then

13   we got off on whether it was just regarding the in-person voter

14   fraud, impersonation, or, as the Defense is requesting, more

15   than that -- other allegations of fraud.

16          So we got off talking about that.

17          And then I said any reports, any compilation, any

18   things of that nature, again, I don't think is appropriate to

19   have to produce someone to testify regarding the substance

20   matters -- substance matters of those reports, compilations,

21   records, whatever it may be.  But they can be questioned about

22   how those records are maintained, how they're searched, so that

23   -- to compile the reports.

24          **MS. BALDWIN:**  Okay.  Again, reports of any kind of

25   election law criminality, any kind of tracking system, any --

24

1  this just seems very broad, and I'm not --

2          **THE COURT:**  Well, I don't think --

3          **MS. BALDWIN:**  I (indiscernible) --

4          **THE COURT:**  -- they're making it -- the Government --

5  the United States wants to limit it to in-person voter

6  impersonation, or in-person voter fraud.  It's not going to be

7  limited to that.

8          I think the Defense has asked for -- and I'll have to

9  go back and look at exactly what -- or, Ms. Wolf, do you want

10  to address that?

11          **MS. WOLF:**  Sure, your Honor.

12          I mean, we've asked for -- in terms of deposition

13  topics relating to election crimes and voter fraud, and we've

14  defined voter fraud in the 30(b)(6) notice to include

15  fraudulent or deceptive acts committed to influence the act of

16  voting, including both criminal and civil offenses in

17  violation, and then -- and I'm happy to go over them for the

18  record, but there are 11 sort of subcategories within the

19  definition of voter fraud that we've asked for on top of that.

20          In addition to that, we've also defined election

21  crime in the notice as an intentional act or willful failure to

22  act prohibited by state of federal law that is designed to

23  cause ineligible persons to participate in the election

24  process, eligible persons to be excluded from the election

25  process, ineligible votes to be cast in an election, eligible

1    votes not to be cast or counted, or other interference with or

2    invalidation of election results, and that includes any

3    criminal form of voter fraud as also defined.

4             And I would just note that those definitions were

5    drawn directly from a report by the Election Assistance

6    Commission.

7             **THE COURT:**  Okay.  And I think, again, we're going

8    back to documents that have been requested and produced, and I

9    am sustaining this Motion for Protective Order regarding the

10   deposition -- Rule 30(b)(6) deposition as to any substance,

11   subject matter of what's in the documents that have been

12   produced other than -- I mean, I know we can get into some grey

13   areas, but I really don't know how else to say this other than

14   how I've presented it.

15            And we're going off onto what documents have been

16   requested, what has been produced, what should have been

17   produced, or the parameters of that.  And that's kind of

18   outside of this Rule 30(b)(6) notice.

19            **MS. WOLF:**  Your Honor, this is Lindsey Wolf for the

20   Defendant.

21            Just as sort of a clarifying question, would the

22   Defendants be entitled to ask as to generally what happens when

23   the Public Integrity Section prosecutes a voter fraud crime, or

24   how they determine which voter fraud crimes they've prosecuted

25   in the past --

1      **THE COURT:**  No.  No.

2      **MS. WOLF:**  -- or those sorts of general questions?

3      **THE COURT:**  No, that would not be appropriate.

4      **MS. BALDWIN:**  So, your Honor, if I understand, then,

5   to sum up, what the Court is requesting is that the Department

6   produce a deponent about recordkeeping related to election

7   crimes that have been prosecuted by the Department of Justice?

8      **THE COURT:**  I agree with that.  Ms. Wolf?

9      **MS. BALDWIN:**  Okay.

10      **MS. WOLF:**  And, your Honor, I would just ask would we

11   be entitled to the type of information that's in Mr. Pilger's

12   Declaration as to broader -- to things broader than in-person

13   voter impersonation -- for example, how many have shown up in

14   the database -- and to inquire at a deposition as to that?

15      **THE COURT:**  I'm sorry.  I didn't catch that.

16      **MS. WOLF:**  Sure.  So Mr. Pilger's Declaration is

17   limited to talking about he searched records and he only --

18   then he determined that there were no records of in-person

19   voter impersonation.

20      Since your Honor has -- I think has said that we --

21   you know, we would be entitled to a topic area broader than

22   that, would we be able to inquire of a witness generally as to

23   whether in those records there were instances of election

24   crime, what the numbers of those instances were, in a

25   deposition?

1        And I understand there's some separate issues with

2 documents which we can address with a Motion to Compel, but

3 this is just related to depositions.

4        **MS. BALDWIN:**  Your Honor --

5        **THE COURT:**  I think that would be appropriate.

6        Ms. Baldwin?

7        **MS. BALDWIN:**  Your Honor, that's getting substantive

8 in terms of, you know, how many investigations, what sort of

9 investigations --

10        **THE COURT:**  But isn't --

11        **MS. BALDWIN:**  -- (indiscernible) --

12        **THE COURT:**  -- that what the records are going to

13 show?

14        **MS. BALDWIN:**  Well, I understood the Court to be

15 about how these records are organized.  Again, to get into the

16 substance of how many investigations there have been, the

17 results, that's very substantive and it's likely to involve --

18        **THE COURT:**  But --

19        **MS. BALDWIN:**  -- (indiscernible) --

20        **THE COURT:**  -- that's just going to be what the

21 records are showing, right?

22        **MS. BALDWIN:**  (Indiscernible) --

23        **THE COURT:**  To that extent, I don't have a problem

24 with that.

25        **MS. BALDWIN:**  -- privileged records, your Honor.  To

1    the extent that these are not public prosecutions, those

2    records -- the substance of those records would likely, in

3    fact, be privileged.

4              **THE COURT:**  I thought she said about the number, not

5    the substance and what they involved.

6              That was the way I understood what Ms. Wolf said.

7              **MS. WOLF:**  Yes, your Honor.  This is Ms. Wolf.

8    That --

9              **THE COURT:**  Okay.

10             **MS. WOLF:**  That was my question.

11             **MS. BALDWIN:**  Again, your Honor, and even talking

12   about beyond recordkeeping when the Defendants -- they don't

13   even list specific crimes.  They say any crime under federal or

14   state election law.  To come up with tallies of those, I have

15   no idea not only, again, of the relevance -- which the United

16   States respectfully, you know, continues to press that to be

17   asking about campaign finance crimes, which are included in

18   what the, you know, Department does and what the Public

19   Integrity Section does, that, you know, double voting, absentee

20   ballot fraud -- these are all -- none of this is defined.

21             I don't know how to even prepare a deponent to be

22   able to testify to the exact numbers of crimes that the

23   Defendants haven't bothered to even define what are relevant.

24   They just say anything under state or federal law that could

25   affect --

1              THE COURT:  Okay.  But --

2              MS. BALDWIN:  -- (indiscernible) --

3              THE COURT:  -- normally the way this would work is

4    documents would be produced, and then that deponent would talk

5    about what I've discussed about the records.

6              Isn't that the way this works?

7              MS. BALDWIN:  Even if, your Honor --

8              THE COURT:  No?

9              MS. BALDWIN:  The -- we're at an odd juncture here,

10   where there is no Motion to Compel.  The United States is

11   standing by --

12             THE COURT:  Okay.  Well, just with the records that

13   have been produced at this point.

14             MS. BALDWIN:  Okay.  Then --

15             THE COURT:  I mean --

16             MS. BALDWIN:  -- (indiscernible) can, you know, be

17   prepared to talk about the records that have been produced at

18   this point, your Honor.  I understand that ruling.

19             THE COURT:  Well, I -- like I said, we're -- this

20   conversation is getting a little tricky, because we're here on

21   the Motion for Protective Order on a 30(b)(6) depo, but we're

22   also then talking about documents that have been produced and

23   what one side wanted produced, what the other side thinks

24   should be produced.

25             So that's, I think, why we're having some problems

1    here.

2            **MR. SCOTT:**  And --

3            **THE COURT:**  Mr. Scott?

4            **MS. BALDWIN:**  And, your Honor, the Defendants have

5    had the United States' documents on fraud.  Those were produced

6    on May 15th.

7            So it's very late for the Defendants to be

8    threatening to file some Motion to Compel, where we're here at

9    the end of July --

10           **THE COURT:**  Well, I'm not addressing that.  I opened

11   probably this area up, because I was just trying to clarify a

12   little bit what would be appropriate for the deponent to

13   testify about.

14           **MR. SCOTT:**  And, your Honor, it's my understanding

15   that we would be able to -- at least be able to quantify as a

16   result of these depositions what the universe of documents are

17   and where those documents would be located, not any substance

18   within those documents.  But that -- then we would be able to

19   look back at our Document Request and know whether they have,

20   in fact, produced all of those documents or not.

21           We've got a control in place, if I'm understanding

22   the Court right?

23           **THE COURT:**  Correct.

24           **MR. SCOTT:**  Okay.  Thank you, your Honor.

25           **THE COURT:**  Okay.  Anything else on that issue?

31

1          **MS. SPEAKER:**  No, your Honor.

2          **THE COURT:**  Okay.  Then we're moving to 37.  And it

3   appears the Government is saying there is nothing.  What has

4   been requested does not exist.

5          Is that correct, Ms. Baldwin?

6          **MS. BALDWIN:**  Your Honor, yes.  To the extent that

7   we're talking about --

8          **THE COURT:**  I'm showing calculation reports, audits

9   relating to the effect of photo ID laws is the way I read that.

10         **MS. BALDWIN:**  Right, to the extent that those aren't,

11  you know, expert reports in litigation, that's correct, your

12  Honor.  If they, you know, existed, they would have already

13  been produced.  There's nothing more.

14         **THE COURT:**  Okay.  So what does the Defense want?  If

15  they've told you, "We don't have those," what's the deal here?

16         **MS. WOLF:**  Your Honor, I think that it -- just in the

17  theme of being able to get sworn testimony from a witness

18  saying that they don't do or maintain those particular studies

19  is all we want on that topic, if they don't exist.

20         So it would literally be a one -- you know, a couple

21  questions, just do they exist --

22         **THE COURT:**  I don't --

23         **MS. WOLF:**  -- or not.

24         **THE COURT:**  -- think that's necessary.  If the lawyer

25  is making a representation that that has not been done and that

32

1    does not exist, that is sufficient.

2            That was it, I believe, because you all did have some

3    agreements on the rest of that Motion for Protective Order,

4    correct?

5            **MS. WOLF:**  Your Honor, this is Lindsey Wolf.

6            I think we haven't actually had a chance to firm

7    those up.  But, yes, we've discussed trying to come to, I

8    believe, stipulations to deal with those.  So those,

9    apparently, aren't before the Court.

10           **THE COURT:**  So nothing else on DE 276 before the

11   Court.

12           Then we had the issue regarding Coby Shorter's

13   deposition, DE 335.  That was the Secretary of State's Motion

14   for a Protective Order regarding that deposition.  I know you

15   all had been conferring --

16           **MR. CLAY:**  Your Honor, I think that -- and

17   Ms. Baldwin can correct me if I'm wrong -- but I think that

18   we've reached an agreement on how to proceed with that, and

19   that would moot out that Motion.

20           **THE COURT:**  All right.  Ms. Baldwin?

21           **MS. BALDWIN:**  Yes, your Honor.  This is Ms. Baldwin.

22           That's correct.

23           **THE COURT:**  Okay.  Then we have the United States'

24   Motion for Protective Order from the Defendants' Rule 30(b)(6)

25   Deposition Notice to the DOJ's Office of the Inspector General.

1          I don't know if you all have conferred on that or

2     where we are.

3          **MR. HEARD:**  Yes, your Honor.  Good morning.  This is

4     Bradley Heard for the United States.

5          **THE COURT:**  Okay.

6          **MR. HEARD:**  We had -- we have not conferred further,

7     to my knowledge, on the Motion subsequent to our filing of the

8     Motion.  It was --

9          **THE COURT:**  Well, let me just --

10         **MR. HEARD:**  -- (indiscernible) and pending before the

11     Court --

12         **THE COURT:**  Okay.  Let me just ask --

13         **MR. HEARD:**  -- (indiscernible) --

14         **THE COURT:**  -- are the findings in there disputed in

15     that report that's at issue?

16         **MR. HEARD:**  I'm sorry, your Honor?  I didn't hear the

17     question.

18         **THE COURT:**  Are the findings in that report disputed?

19         **MR. HEARD:**  Well, the findings are -- not from the

20     perspective of the United States, your Honor.  And our position

21     is the findings in the OIG report are not relevant to any issue

22     in this -- in this case, in any event.

23         **THE COURT:**  I just -- I mean, the report --

24         **MR. HEARD:**  I think --

25         **THE COURT:**  -- says what it says.  So I'm not -- let

34

1    me go back and look at that --

2              **MR. HEARD:**  And they do have the --

3              **THE COURT:**  -- report --

4              **MR. HEARD:**  -- report, your Honor, because it's

5    publically available.

6              **THE COURT:**  So what does the Defense need?

7              **MS. WOLF:**  Your Honor, there's a couple of points.

8              The first is the -- we moved for judicial notice of

9    those reports, and that request was not granted.  And I

10   understand the Court didn't grant it without -- I'm sorry --

11   without prejudice so that we could raise it at a later date as

12   to certain portions of that report.

13             I also think that the report itself is a summary of

14   various interviews, and e-mail correspondence, and several

15   different forms of documentation that the OIG reviewed in order

16   to draft the report.  And Defendants believe that they are

17   entitled to inquire as to a witness as to what went into that

18   report.

19             On top of that, that report is a centerpiece of the

20   affirmative defenses and allegations that the Defendants have

21   now asserted in the Answers that were filed a month ago, I

22   believe.  And we think that it's relevant, because we should be

23   able to inquire as to, you know, the report since it is -- it

24   is a main component of the affirmative allegations that we've

25   asserted.

1        **THE COURT:**  Ms. -- Mr. Heard?

2        **MR. HEARD:**  Your Honor, as we argued in the motion,

3   first, discovery happens by (indiscernible) relevance relating

4   to claims and defenses that are asserted in the litigation.

5   They're -- the defendants' 11 pages of so-called affirmative

6   allegations and defenses doesn't change our original argument

7   that they're -- that the OIG report is not relevant to any

8   claim or defense even now, after the 11 pages, simply because

9   the 11 pages do not come close to stating a dismissible

10  counterclaim against the United States, nor do they state any

11  affirmative defense that would be available to a Section 2

12  claim, as has been alleged in this -- in this case.  Therefore,

13  there is still the basic question of relevance of the DOJ

14  report.  As the Court indicated, the DOJ report is published;

15  it is already available to the defendants; it speaks for

16  itself; it says what it says.  So, the 11 pages of so-called

17  affirmative allegations and defenses is exactly the kind of

18  material, your Honor, that would be subject to the motion to

19  strike under Rule 12(f) because it is immaterial and

20  impertinent to any issue in the case.

21        Texas attempts to -- to bring in the department's

22  alleged lawlessness in enforcing the Voting Rights Act and make

23  it somehow germane to this lawsuit because the Government and

24  the private plaintiffs have requested bail-in relief under

25  Section 3(c).  But, as the Court was discussing earlier, bail-

1   in is simply a remedial element of relief.  It is -- it is more

2   properly dealt with after a finding of liability for

3   intentional race discrimination under Section 2.  It seems that

4   the Court has already indicated that that's the approach it

5   seems would be appropriate here.  So, any discovery relating to

6   Section 3(c) relief, bail-in relief, preclearance is premature

7   at this stage, and the Court need not even address any such

8   discovery issues now.  But even if the Court were called upon

9   to address the issue, it would still remain the United States'

10  position that discovery relating to the OIG report is still

11  irrelevant and improper because, to the extent that any

12  discovery related to preclearance remedies under 3(c) is

13  required, such discovery will be focused not on the OIG report,

14  not on the Department of Justice's conduct, but, rather, on

15  Texas's conduct related to its enactment of voting laws and

16  whether that conduct counsels in favor of reimposing

17  preclearance requirements on the State.

18          The Department of Justice's past conduct in enforcing

19  the Voting Rights Act is simply not an issue for this Court's

20  review in this case.  And, additionally, the preclearance

21  remedy under Section 3(c) of the Voting Rights Act does not

22  even require Texas to submit any voting change to the

23  Department of Justice for administrative preclearance.  Texas

24  may always choose, and subject to 3(c) relief, to submit any

25  voting changes directly to this Court.  So, that fact alone

37

1    just clarifies how irrelevant the Department of Justice's past

2    enforcement of the Voting Rights Act is to consideration of a

3    forward-looking remedy as in D.C., as is -- as in 3(c).

4            Finally, your Honor, it bears noting, as we did in

5    our brief, that the OIG report at issue does not even support

6    Texas's claim that the DOJ enforced the Voting Rights Act in a

7    politicized and unconstitutional matter.  No amount of

8    selective cherry-picking on Texas's part escapes the clear

9    conclusion of the Inspector General's report, which found no

10   evidence of any improper racial or political consideration in

11   connection with the Civil Rights Division's enforcement of

12   Voting Rights Act matters over a ten-year period.

13           And, so, for all of these reasons, your Honor, we ask

14   the Court to enter a protective order prohibiting this

15   deposition of the DOJ's Office of Inspector General.

16        **MR. DERFNER:**  Your Honor, this is Armand Derfner for

17   the Veasey plaintiffs.  Could I be heard for a second on this

18   motion?

19        **THE COURT:**  Yes.  Yes.

20        **MR. DERFNER:**  I would just say that this -- this is a

21   case about certain statutes of Texas that Texas has responded

22   with these answers that talk about 3(c) relief, but in terms of

23   the case we're trying right now, putting the -- the IG's report

24   in would send us, you know, down trails that will really divert

25   attention from this case.  I want to give you one example.

1        Texas says -- one of the things Texas says in defense

2   of this statute is:  Well, you know, Georgia has a statute, and

3   that statute was precleared by the Department of Justice under

4   Section 5.  We haven't dealt with that issue.  If we dive into

5   that issue, then we'd have to get into the last IG's report

6   that talked about the politicization of the department at the

7   time when the Georgia statute was precleared.  So, this is --

8   this is really doing to take us way, way in a direction that

9   has nothing to do with getting to the heart of this case.

10        **THE COURT:**  All right.  Who's going to respond for

11   the defense?

12        **MR. CLAY:**  Your Honor, this is Reed Clay for State of

13   Texas.  A couple of things here.  One is there is no question

14   that that OIG report is relevant to this case.  They have made

15   3(c) a possible remedy in this case, which deals directly with

16   Department of Justice oversight of state election law changes.

17   That's an equitable remedy, and it's dependent on the State's

18   ability to get a fair shake either from a court or from DOJ.

19   The Department of Justice's position that, well, the State can

20   always go to a court and get it approved is -- is -- it's just

21   not right.  I mean, in order for that statute -- in order for

22   the preclearance regime to be constitutional, congress added

23   preclearance by administrative preclearance so that -- so that

24   states like Texas and other covered jurisdictions didn't have

25   to go through the long and expensive process of a lawsuit in

1    order to have their election changes validated.  Without the

2    possibility of administrative preclearance, the whole regime is

3    simply -- would likely be found unconstitutional.

4            With respect to Mr. Derfner's claim that this would

5    send us down rabbit trails that maybe we don't want to go down,

6    we've been trying to get testimony and evidence in this

7    related -- evidence related to the OIG report into evidence and

8    into the record in this court for several months.  They have at

9    every turn tried to block it.  If we had done this in the

10   timeline that Texas had wanted to do it in, then if Mr. Derfner

11   or his other plaintiffs had wanted to go down these other

12   trails, then they could have.  It is not Texas's fault that

13   now, only now, are they allowing us to, you know, make it

14   relevant to the case because of the affirmative defenses that

15   we pled.  It was relevant back when the -- when the case was

16   filed last summer, because they pled bail-in.

17           That notwithstanding, your Honor, if -- if the plan

18   is to have a remedial phase, I do think that a majority of this

19   goes towards the remedy of 3(c).  That is the real relevance of

20   this stuff.  And, so, if -- if your Honor plans to, intends to,

21   open up discovery if a remedial phase is necessary, then I

22   don't think the State of Texas would object to postponing his

23   deposition until that time.  But the idea that it's not

24   relevant and not likely to lead to relevant information and

25   admissible evidence in this case that's related to bail-in is

1    just incorrect.

2              **THE COURT:**  All right.  Court's going to --

3              **MR. SPEAKER:**  (indiscernible) --

4              **THE COURT:**  Hold on.  Court's going to grant the

5    motion for protective order at this time.  But I also think,

6    besides whether we get into the remedial phase or not, let's

7    say we get there, I'm just not sure -- I mean, the report is

8    what it is.  As they said -- the plaintiff, or the Government,

9    someone argued -- the report speaks for itself.  So, I wasn't

10   real sure about the appropriateness of a deposition as to what

11   would be proper in terms of the request for that 30(b)(6).

12             **MR. CLAY:**  All right.  If I -- if I may address it

13   now, and with the caveat that we -- you know, if we reach the

14   remedial phase, we may, you know, have a longer discussion

15   about this, but I think one of the main reasons that the

16   deposition became necessary was the DOJ's refusal to agree to

17   the Court taking judicial notice of this.  They claimed it was

18   irrelevant, and they claimed that -- and, unfortunately, I

19   don't have the transcript in front of me, but Ms. Baldwin

20   actually -- I believe it was Ms. Baldwin -- actually described

21   the report as not -- you know, not standing on its own, that

22   there were things in there that maybe were disputed and maybe

23   we could take issue with, and so --

24             **THE COURT:**  Well, and that's why my first question

25   was, is -- is this disputed.  I mean, it's a public record;

1    it's a public document.  That's kind of where I started, and --

2         **MR. CLAY:**  I think that's a very valid question.

3         **THE COURT:**  -- we're kind of beyond that, but --

4         **MR. CLAY:**  And we believe it is.  But I think the

5    Department of Justice has at least raised the specter that they

6    think that it's not.  And, so, I think that's why -- that's the

7    genesis of the deposition notice.

8         **THE COURT:**  All right.  So, Court has granted DE 355

9    at this time.

10        The next matter is the defendants' motion to compel

11   some of the plaintiffs' answers to interrogatories.  I'm

12   showing DE 343.

13        **MS. WOLF:**  Your Honor, this is Lindsey Wolf for the

14   defendants.  We're in the process of trying to resolve that by

15   using sworn deposition testimony, but we're not there yet

16   because we still have depositions left, so we just ask that we

17   sort of table that for now and keep that on but don't really

18   address it at this point.

19        **THE COURT:**  All right.  Mr. Dunn or Mr. Derfner?  Or

20   who's going to speak to that for the plaintiffs?

21        **MR. DUNN:**  This is Chad Dunn, your Honor, for the

22   Veasey/LULAC plaintiffs, and I'm sorry to interrupt the flow of

23   things, but I just want to make sure I don't inadvertently not

24   disclose that my co-counsel is on this call to the court, so

25   Mr. Hebert and Mr. Brazil, Ms. Simpson, Mr. Baron are also on

42

1   this call.  But as to the State's proposal to deal with,

2   interrogatory by deposition, that's fine with us.  We're fine

3   with the issue tabled.

4         **THE COURT:**  All right.  What about the -- I believe

5   this also involved the plaintiffs -- the Ortiz, Lupe

6   plaintiffs.

7         **MR. DOGGETT:**  Yes, your Honor.  This is Robert

8   Doggett for the Ortiz plaintiffs, and that's acceptable to us

9   as well.

10         **THE COURT:**  Okay.  Then, we're going to pass on that

11   for now.

12         Then we have the Texas League of Young Voters and

13   Clark's motion to compel the Attorney General of Texas to

14   comply with the subpoena for documents and for testimony, and I

15   believe this involved a Mr. Mitchell.  Who's going to argue

16   that, Mr. Haygood or Ms. Korgaonkar?

17         **MR. DUNBAR:**  Your Honor, this is Charlie Dunbar.

18   I'll be arguing --

19         **THE COURT:**  Okay.

20         **MR. DUNBAR:**  -- for the Texas League.

21         **THE COURT:**  You can proceed.

22         **MR. DUNBAR:**  Thank you, your Honor.

23         The issue with this motion is whether Major Forrest

24   Mitchell, who, the Court may know, is the head of the special

25   investigations unit within the Office of the Attorney General

1    that deals with voter fraud, someone who testified on behalf of

2    the State in the Section 5 litigation and someone who the State

3    listed on their initial Rule 26 disclosures here, should be

4    made available to testify about topics relating to in-person

5    voter fraud in Texas.  And I think the remaining issue before

6    the Court is narrow, but -- but very important.  I understand

7    from the responses by the -- made by the Office of Attorney

8    General at footnote two that the defendants have committed that

9    they will not object to the use of the trial and deposition

10   testimony of Major Mitchell from the Section 5 litigation.  And

11   we're fine with that, your Honor.  We think that will eliminate

12   the need for a lengthy deposition that retreads ground that's

13   already been covered.

14          The only question left for the Court, then, is

15   whether Mr. Mitchell, or Major Mitchell, should be made

16   available for a limited, targeted deposition about in-person

17   voter fraud since the enactment of SB 14.  As your -- as your

18   Honor undoubtedly knows, SB 14 has a bit of an unusual

19   enforcement history.  It was signed by Governor Perry May 27th,

20   2011, but did not actually go into effect until June 27th,

21   2013.  So, particularly in this context, for the reasons we've

22   laid out in our papers, we think evidence about what has

23   happened since SB 14 was enacted and what has happened since SB

24   14 was enforced will likely lead to the discovery of admissible

25   evidence relating to our Section 2 claim and also relating to

1    our constitutional claims.  And we've explained those reasons

2    in our papers, your Honor, and if the Court has questions about

3    them, I'd be happy to answer them.

4              What I would like to address here, if I may, briefly,

5    is just why I think the approach that I -- that the Court

6    understandably took with respect to the 30(b)(6) deposition

7    issues with respect to the Department of Justice, that is,

8    relying largely on documents on lieu of deposition testimony,

9    wouldn't be a sufficient resolution of this issue.  And I think

10   there are three -- three reasons for that.

11             The first is that I think Major Mitchell is simply a

12   critical witness here.  He's someone who testified in

13   Section 5, someone who's disclosed in the State's initial

14   Rule 26 disclosures, and especially if there is a possibility

15   that he may testify at trial, we think that we have the right

16   to depose him, in particular on this question of post-enactment

17   developments.

18             Second, throughout the course of the party --

19   throughout the course of the parties' discussions on this

20   issue, we have largely agreed to stand down on our document

21   requests to the Office of the Attorney General.  In fact, the

22   Office of the Attorney General has not produced a single

23   document in direct response to our subpoena.  We did that on

24   the idea that we could use a deposition to hopefully get at the

25   information -- the limited category of information we need

1    about post-enactment development.  So, I don't think the same

2    option of just relying on documents in lieu of deposition

3    testimony here makes sense.

4           And, third, and finally, I'd just stress that I do

5    think there is a qualitative difference between the discovery

6    we're seeking here, which is limited information about in-

7    person voter fraud since the enactment and since the

8    enforcement of SB 14 in Texas, is simply qualitatively

9    different from the discovery that Texas is seeking from the

10   Department of Justice.

11          So, for those reasons, we'd ask that the Court -- for

12   those reasons and the reasons explained in our papers, your

13   Honor, I'd ask that the Court grant our motion to compel on the

14   limited deposition topics and the limited document requests

15   that we have.

16          **THE COURT:**  All right.  Mr. --

17          **MR. CLAY:**  Your Honor, Reed Clay for the State of

18   Texas.  I would agree with Mr. Dunbar about one thing, is that

19   there is a qualitative difference between what we're seeking

20   from the Department of Justice and what -- and what the

21   plaintiffs are seeking from us, and that difference is summed

22   up by relevance.

23          The stuff that we are -- I don't think anybody in

24   this case believes, other than perhaps the Department of

25   Justice, based upon their testimony earlier -- their arguments

1    earlier today, that believes that voter fraud, particularly

2    pre-enactment voter fraud, in particular, is relevant to this

3    case.  The dispute here -- and that is precisely what we're

4    seeking from the Department of Justice, is pre-enactment voter

5    fraud, and not limited to just in-person voter fraud.  What

6    they're asking for here is post-enactment voter fraud, which

7    cannot possibly inform the decision of this Court with respect

8    to the two claims that they say that it's relevant to.

9            First of all, they can't -- stuff that has happened

10   since the enactment of SB 14 cannot possibly have any -- any

11   probative value about what the purpose of the legislature was

12   in 2011 when it enacted SB 14.  Pre-enactment voter fraud

13   evidence can.

14           With respect to their -- what I'll call their

15   "*Crawford* claim," because it's essentially an invitation to

16   this Court to overrule *Crawford*, is they -- their argument

17   boils down to an absurdity, because what they would -- a

18   perfectly -- suppose -- we say this in our brief.  Suppose

19   voter fraud is rampant, in-person voter fraud is rampant in

20   Texas in 2011, or 2010.  The legislature comes into session in

21   2011, enacts a voter I.D. bill.  And then three years later the

22   trial is still going on and evidence is produced that there --

23   all voter fraud has ceased and there is no more voter fraud.

24   What they would have -- what their argument seems to be is that

25   in that case, three years after it has been enacted, somehow

47

1    the constitutionality of that statute has changed.  What was

2    once, at least under *Crawford*, definitely constitutional when

3    it was enacted, is no longer constitutional precisely because

4    it has worked to eradicate voter fraud.  That can't be right.

5         Post-enactment voter fraud simply is not relevant to

6    either claim that they're asking for, and that's the reason

7    that we've asked for the deposition to be quashed.

8         **THE COURT:**  Okay.  Anyone else going to weigh in on

9    that?

10        **MR. DUNBAR:**  Yes, Judge.  Your Honor, this is

11   Mr. Dunbar.  May I respond?

12        **THE COURT:**  Yes.  Yes.

13        **MR. DUNBAR:**  Thank you, your Honor.  Just to quickly

14   respond to Mr. Clay's point; with respect to the relevance of

15   the Section 2 claim, I think the State mischaracterizes the

16   nature of the Section 2 inquiry.  Of course discriminatory

17   purpose is part of the calculus, but, as the Court is aware and

18   spelled out in your decision on the motion to dismiss, congress

19   has specified that Section 2 should be applied according to

20   various senate factors.

21        One of those expressed senate factors is whether the

22   policy justification the State has for voting restriction is,

23   quote-unquote, "tenuous."  We think that evidence of what

24   happened after SB 14 -- evidence of what happened after SB 14

25   was enacted but before it was enforced, as well as evidence of

1    what happened after SB 14 was actually enforced, is directly

2    relevant to whether the State has legitimate policy

3    justification for deciding that in-person voter fraud was a

4    problem in Texas and whether photo I.D. was a reasonable means

5    of accomplishing the State's stated objectives.  So, wholly

6    aside from intent or purpose, we believe that the post-

7    enactment evidence is directly relevant.

8         With respect to our, quote-unquote, "*Crawford* claim,"

9    which deals with the question of whether the State has a

10   legitimate interest in restricting the franchise of potentially

11   hundreds of thousands of voters in Texas, we do think that

12   evidence of whether voting fraud -- in-person voting fraud

13   remained a problem in Texas after SB 14, increased in Texas

14   after the enactment of SB 14, or increased or decreased between

15   the time that SB 14 was enacted and it was actually in force,

16   is relevant to the reasonableness of the State's purported

17   interest in enacting and enforcing SB 14.

18        In fact, if -- if voter -- if in-person voter fraud

19   just skyrocketed after SB 14 had been enacted but before it was

20   enforced, I'm sure you would hear the State taking a different

21   position.  And part of the reason why we need this discovery is

22   not simply for offensive purposes, but for defensive purpose.

23   The State could very well intend to show at trial, using

24   documents or the testimony of other witnesses, that in-person

25   voter fraud actually remained a problem after SB 14 was enacted

1    but before it was enforced, and we need to be able to have

2    testimony from Major Mitchell, the State's institutional

3    warehouse of knowledge about in-person voter fraud, to be able

4    to prepare to rebut that type of testimony.

5              Thank you.

6         **MR. CLAY:**  Your Honor, with respect to Mr. Dunbar's

7    last point, we have offered to stipulate that we will not call

8    Major Mitchell to testify with respect to anything that has

9    happened after SB 14.  That has been refused.  So, the concern

10   that somehow we're going to spring post-enactment voter fraud

11   on them at the trial by using testimony from Mr. Mitchell is

12   just -- is not right.  I mean, we do not plan to do that.

13        **MR. DUNBAR:**  And, your Honor, just a quick point on

14   that.  Even -- even Mr. Clay's proposed situation I think

15   suggests a problem, which is that they're only willing to say

16   that Major Mitchell won't testify about post-enactment voter

17   fraud elements, which says nothing about whether other

18   documents or other witness testimony might very well venture

19   into that area, which is, again, not to repeat myself, the

20   reason why I think we need this deposition to have a complete

21   evidentiary record for this case.

22        **MR. CLAY:**  Your Honor, the stipulation we proposed

23   would apply to anyone within the Attorney General's office, who

24   is the only one from the State who is able to investigate and

25   prosecute voter fraud.

1          **MR. DUNN:**  Your Honor, this is Chad Dunn on behalf of

2     the Veasey/LULAC plaintiffs.  I think Mr. Dunbar has ably

3     stated our position, but there is just one sort of area I'd

4     like to seek out in relation to the deposition of Mr. Mitchell.

5     But what could be going on here -- which there is no way for us

6     to know without getting the deposition -- but what could be

7     going on here is that post-enactment and enforcement of Senate

8     Bill 14 there haven't been any discovered incidents of in-

9     person voter fraud; there haven't been any incidents where SB

10    14 will serve the purported purpose the State advances in this

11    case.  And I could understand where the State wouldn't want to

12    then avail themselves of Mr. Mitchell's testimony in that

13    regard, because it wouldn't be helpful to their positions in

14    the case.  It could be terribly helpful to the plaintiffs'

15    positions in the case.  And, of course, I'm not making these

16    allegations, because without the deposition I don't know the

17    answers.  And that's why we think, the plaintiffs think, it's

18    terribly important that we get Mr. Mitchell's testimony.  When

19    Mr. Mitchell's testimony advanced the State's interest in the

20    Section 5 case, he was front and center and there was no

21    argument about his relevancy.  When the testimony may now

22    damage the State's case, all of a sudden it's -- you know,

23    Mr. Mitchell (indiscernible) concern.  So --

24          **THE COURT:**  All right.

25          **MR. DUNN:**  The question, again, is discoverable -- of

1    potentially admissible evidence, and that's -- that's where

2    we're headed.

3              **THE COURT:**  Yeah, the Court -- Court's going to grant

4    that motion to compel.

5              **MR. CLAY:**  Your Honor, will it be limited in the same

6    respects that our requests to the Department of Justice were

7    limited?  I mean, in particular, the method in which we

8    compile, record these things, and just the numbers of incidents

9    of voter fraud?  Or are they going to be able to inquire into

10   the case, into the substance of these cases?

11             **THE COURT:**  Okay.  Let me just see where we are.  So,

12   you all aren't going to get into what he's already testified

13   to.  It's my understanding when the -- I believe it was

14   Mr. Dunbar said that the plaintiffs have not yet received

15   documents regarding this issue, the post-enactment matters.  Is

16   that correct, or not?  Mr. Dunbar?

17             **MR. DUNBAR:**  That's correct, your Honor.  We have

18   not -- the OAG has not directly produced any documents

19   responsive to our subpoena.

20             **THE COURT:**  So, I'm assuming that's going to be done

21   through the deposition?

22             **MR. CLAY:**  That's right, your Honor.

23             **THE COURT:**  Okay.  So, I guess Mr. -- Mr. Clay is

24   wanting to limit the questioning, and, Mr. Dunbar, do you want

25   to respond to that?

1        **MR. DUNBAR:**  Yes, your Honor.  I think that the --

2   the three reasons I think I highlighted at the outset of why

3   the approach the Court, understandably, took with respect to

4   the Department of Justice simply won't work here, in part

5   because we don't -- we don't -- one of the reasons we

6   highlighted is we don't have any documentary evidence to talk

7   about during the deposition.  During -- Mr. Clay and I have

8   been back and forth over the months in our attempts to meet and

9   confer about this.  We agreed to a general approach, that we

10  would use the deposition largely in lieu of document production

11  to get the information that we thought we need, subject to a

12  few discrete categories of documents the Office of the Attorney

13  General would produce.  So, I think it would be -- I actually

14  don't think it would accomplish any of the ends that we've

15  been -- we've been talking about to simply limit the deposition

16  to the method by which records are kept in -- kept and

17  collected, even though we don't -- we don't have any of those.

18       **MR. CLAY:**  Well, your Honor, and I'm not -- I'm

19  actually not suggesting we limit it quite that much.  If we're

20  going to have testimony on and document production on post-

21  enactment voter fraud, which it sounds like we are, I think

22  it's legitimate for the other side to understand the universe

23  of incidents or allegations of voter fraud.  What we're

24  concerned about, and I think what the Department of Justice was

25  at least partly correct in being worried about, is divulging

 1   any sort of law enforcement privilege stuff.  We just don't

 2   want to get into the substance of these cases.

 3           **THE COURT:**  Right.  And I think there was some -- in

 4   the motions I read or the response, they were not seeking to

 5   get into anything that's currently pending, correct?

 6   Mr. Dunbar?

 7           **MR. DUNBAR:**  Your Honor, this is Kelly Dunbar.

 8   That's -- that's correct.  We made -- we made clear to the

 9   State from the beginning that we have no interest in piercing

10   any privilege associated with ongoing investigations.  And I

11   think in terms of the scope of what you're ordering, I think --

12   I believe Exhibit 4 to our motion lays out the list of topics

13   for which previously OAG had designated Mr. Mitchell to

14   testify, and I've laid this out in some detail in an e-mail to

15   Mr. Scott and Mr. Clay.  That was largely an agreed-upon

16   approach, subject to our disagreement about post-enactment,

17   pre-enactment.  Now that the Court has resolved that, I think

18   that Exhibit 4 should -- should serve as a template for -- for

19   the topics of what would be discussed at the deposition.

20           **THE COURT:**  Mr. Clay?

21           **MR. CLAY:**  I think we're -- it's a good start that

22   we're not going to have testimony about pending cases.  But

23   that doesn't fully solve the problem that I'm trying to address

24   here.  And, again, I don't want to interfere.  If we're going

25   to have testimony on post-enactment voter fraud, I don't want

1    to interfere with his ability to get a full universe of the

2    incidents and allegations of voter fraud.  But even in past

3    cases, the divulging of substantive investigatory tactics or

4    prosecutorial methods that were used in that case can be very

5    damaging to the Attorney General's office to not only enforce

6    and investigate voter fraud, but all other types of crimes.

7    And, so, I just want to make sure that, even with respect to

8    cases that are now closed, we aren't getting into the substance

9    of the cases, but still giving them the ability to understand

10   what has -- in terms of numbers, in terms of the universe of

11   what has happened since 2011 or '12.

12            **THE COURT:**  All right.  Mr. Dunbar, I tend to agree

13   with that.  What are your comments?

14            **MR. DUNBAR:**  My only comment, your Honor, is that we

15   have no intent of piercing any legitimate privilege course

16   without knowing the scope of the privilege that the State may

17   assert; it's difficult to address the abstract.  My suggestion,

18   respectfully, would be that if the Court grants the motion to

19   compel along the terms as we outlined in our fourth exhibit, to

20   the extent the OAG feels that any of our questions of

21   Mr. Mitchell veer into privileged territory, they're perfectly

22   entitled to make those objections and we'll  respect -- respect

23   those objections assuming that there is, you know, a predicate

24   laid for the invocation of the privilege.  But, as I think I

25   stated at the outset, we have no intention of wanting to pierce

1    any legitimate law enforcement privilege.

2         THE COURT:  Okay.  It kind of sounds like we're on

3    the same page, and that -- that can just be addressed through

4    objections at the deposition.

5         MR. CLAY:  So long as Mr. Dunbar is okay with us

6    instructing him not to answer at the deposition.

7         THE COURT:  I'm okay with it, so --

8         MR. CLAY:  Thank you.  That's -- that's even better.

9         MR. SCOTT:  And, your Honor, not to trying to open

10   that previously closed box --

11        THE COURT:  Okay.

12        MR. SCOTT:  -- related to the DOJ's issues --

13        THE COURT:  Yes.

14        MR. SCOTT:  -- but, so we will be able to understand

15   the universe of all claims up to today, what -- that universe

16   of investigations that they have had going on with regard to

17   voter fraud as well.

18        THE COURT:  Yes.

19        MR. SCOTT:  Thank you.

20        THE COURT:  All right.  I think there is one more --

21   if we're -- if we're finished on that, one more matter, which

22   was the plaintiffs', the Veasey/LULAC plaintiffs' motion to

23   compel the interrogatory responses.  That was just filed on

24   Friday.  I don't know if you all have had a chance to confer on

25   that issue regarding --

1      **MR. DERFNER:**  Your Honor, this is Armand Derfner.

2  Can you hear me?

3      **THE COURT:**  Yes.

4      **MR. DERFNER:**  Thank you, because I'm not always sure

5  if my mute is on or not.  I think we have an agreement on that.

6  I think we have an agreement on that.  There were nine

7  interrogatories at issue.  The agreement is that the plaintiffs

8  will withdraw two of them and the defendants will respond to

9  the other seven within 10 days from now.  So, I would say --

10  ask the Court to just table that motion, and, presumably, we

11  hope it will go away.

12      **THE COURT:**  All right.  Is that correct?

13      **MR. SCOTT:**  That's correct, your Honor.

14      **THE COURT:**  Now, it's my understanding there were

15  some non-party motions pending that the parties were not going

16  to proceed on today.  Is that right?

17      **MR. SCOTT:**  Your Honor, there were two.  There were

18  motions to -- there were motions to quash subpoenas that were

19  filed by various groups of legislators.  One group is a set of

20  senators; the other motion to quash was filed by a group of

21  representatives.  I think Mr. Talbot is the lawyer on behalf of

22  the house of representative members, and they have filed a

23  motion to quash; Ms. Alice London is representing the senators.

24  It is my understanding that both of those -- Mr. Talbot called

25  me yesterday and wanted those taken off of the docket for

1    today, and I agreed to that -- or Tuesday, I'm sorry -- and

2    asked if it was okay to put them on the Court's submission and

3    just have the Court rule on them by the submissions of the

4    parties.  He has subsequently said that the senate is not --

5    Ms. London is not comfortable with that.  She's out of the

6    country currently --

7              **THE COURT:**  Okay.

8              **MR. SCOTT:**  -- and would like, I think, to have her

9    voice heard on those issues.  He is still comfortable with that

10   issue of having the house of representatives' motion to quash

11   on those subpoenas served upon those representatives decided on

12   the pleadings --

13             **THE COURT:**  Okay.

14             **MR. SCOTT:**  -- I mean decided on the submissions.

15             **THE COURT:**  We'll just confirm.  I'll have Brandy

16   reach out to -- to both of them just -- just to be sure.

17             So, the last -- I believe the last matter pending,

18   then, was regarding the advisory that was filed by the

19   defendants yesterday or the day before, and there were some

20   responses filed yesterday.

21             **MR. SCOTT:**  Yes, ma'am.  And, so, on the 22nd, almost

22   about noon, I learned that there were a number of records which

23   were not afforded over back in January as a result of a data

24   processing error that excluded the -- attempted to comply with

25   the request on drawing the status out, but in order to get an

```
 1   accurate picture of the status, there was a qualifier placed
 2   in; that qualifier excluded a fairly significant amount of
 3   records.  We then reached out; we notified the Court on that
 4   same day and notified all of the other parties.  We were
 5   notified yesterday by the Department of Justice how they wanted
 6   those records.  We delivered those records to the Department of
 7   Justice yesterday.
 8             THE COURT:  Okay.
 9             MR. SCOTT:  And that is where we find ourselves
10   today.  We believe that there will be a significant number of
11   individuals on the plaintiffs' no-match list that they will
12   find are on that list.  And that was one of the -- the reasons
13   that we ended up doing a little more of a due diligence to find
14   out this can't be right; there can't be this many people that
15   have licenses.  Even though it sounded like it was going to be
16   a great cross.
17             THE COURT:  Okay.
18             MR. SCOTT:  So, that's -- that's where we are.  We
19   found out about it two days ago; we reached out to them to see
20   how to rectify it; and we have gotten them that information on
21   the same day that they requested it in the form that they
22   requested it.
23             THE COURT:  All right.  Ms. Baldwin?
24             MS. BALDWIN:  Your Honor?  Yes, thank you, your
25   Honor.  As Mr. Scott reflected, the data that was produced many
```

1    months ago and which was represented to us as complete at the

2    time regarding who the holders are of various State-issued

3    forms of SB 14 I.D., drivers' licenses and I.D.'s, defendants

4    have represented at this eleventh hour is now incomplete.  We

5    have requested the data.  They did turn over a file yesterday.

6    That file hasn't yet made its way to D.C.  We will be reviewing

7    that file as soon as it's here.  It -- this is -- does raise

8    serious issues.  We've let the defendants know that we will

9    likely seek an expedited deposition next week of one or more

10   representatives of DPS once we're able to review the data.  At

11   this point, until we understand ourselves, to be able to see

12   the data and understand through some discovery exactly what

13   these records are, why they weren't produced initially, why

14   they're being produced now, we're not in a position to entirely

15   know what the ramifications will be.  We are absolutely working

16   as hard as we can to figure that out and to preserve this

17   Court's trial date.

18            So, what I would suggest at this point is that, you

19   know, we will do our work; this will affect the -- many of the

20   expert reports that we've already submitted, but once we've

21   been able to review the data and have a deposition next week,

22   we would ask the Court to go ahead and schedule another hearing

23   to see if there is any further adjustment or relief that needs

24   to be taken; if the Court has time, for example, on Thursday,

25   to just put that on the calendar to make sure that if there are

60

1    any other issues that need to be addressed we're able to do so.

2         **THE COURT:**  Right.  Is anyone going to make any

3    comments on that at this time?

4         **MR. DUNN:**  Your Honor, this is Chad Dunn on behalf of

5    the Veasey/LULAC plaintiffs.  And we -- we, obviously, take

6    Mr. Scott and the lawyers for the State at their word that this

7    was inadvertent, but it's, nevertheless, incredibly impactful

8    to the case at this point.  And we agree with what Ms. Baldwin

9    has said, and, of course, we're even at a further disadvantage

10   because the United States got the data but not the individual

11   plaintiffs; the United States will need to look at it to

12   determine what needs to be done with it and what can be

13   outputted or provided in the confines of this Court's

14   protective order; and then we, the Veasey/LULAC plaintiffs,

15   have an expert, and I noticed the other private plaintiffs have

16   an expert, who have spent considerable amounts of time working

17   on this data to come up with their expert reports, which were,

18   as you know, provided (indiscernible) weeks ago.

19        So, there's a number of concerns that were raised

20   now, and maybe it's the case none of them can be resolved

21   today, but I still think they ought to be under the Court's

22   radar; the first of which is that even if the inadvertent

23   failure to produce (indiscernible) records was, in fact,

24   inadvertent, it, nevertheless, could have the effect of

25   providing the State an advantage, and we certainly don't think

1  the State should come out with an advantage from this error.

2  We definitely -- obviously, this -- this shouldn't strike the

3  Court as any surprise, but at least as far as my client, his

4  primary concern is that this doesn't somehow alter the trial

5  date.  As we know, in the most recent hearings the Court's

6  held, the State was asking for the -- you know, for the trial

7  to be moved.  So, we don't think this issue ought to result in

8  the trial moving, and we don't think this issue ought to change

9  the deadline by which the State needs to submit its expert

10  analysis.

11       The State's already now had the advantage of

12  potentially seeing all of our work product and our expert's

13  work product and, as Mr. Scott seems to have recognized today,

14  worked backwards from it in a way to try to undermine it.  And,

15  of course, I don't fault them for that; that's what any defense

16  counsel would do in a case of this nature, but, in so doing,

17  now wants to alter the fundamental data that this database

18  match process was going to be held under.  And that -- that

19  could potentially, once we see this data, be something that we

20  object to.  It could also be something we're ready to deal with

21  and work through.  But if we deal with it and work through it,

22  there is going to be, at least for my clients, an economic

23  impact.  You know, we have budgeted and spent a great deal of

24  money on the analysis that we did, and we're essentially going

25  to have to redo one of them and a portion of another.  And

1    that's going to cost us money that, frankly, we don't have in

2    the budget for, because we relied upon the State's

3    representation that they fully produced this record.

4          So, (indiscernible) -- you know, we just learned

5    about this a little more than 24 hours ago.  Perhaps we could

6    confer with the State and reach an agreement to offset our

7    costs on having to essentially re-perform analysis through no

8    fault of our own.  But those are the issues we want to make

9    sure is on the Court's radar.

10         **THE COURT:**  All right.  We're just going to see

11   where -- where we end up.  Once the plaintiffs have a chance to

12   review those records, see where we are, you all can certainly

13   confer further.  I can give you a hearing date for Thursday.  I

14   may have to move that to Friday or bump it up or down, just

15   kind of depending, but if you all want to go ahead and set

16   something just so that we have a hearing set, I may have to

17   bump it around a little bit next week.  But -- Brandy, do you

18   want to give them just a hearing date so we can reconvene?

19         **THE CLERK:**  August 31st at 10:00 a.m.?

20         **THE COURT:**  Okay?

21         **MR. DONNELL:**  Pardon me, your Honor.  This is Ben

22   Donnell.  What time did she say?

23         **THE COURT:**  Ten a.m.  August 31st --

24         **MR. DONNELL:**  Ten a.m. on -- on the thirty -- on

25   Thursday?

1          **THE COURT:**  On Thursday, subject to --

2      **(Voices and whispers off the record)**

3          **MR. DONNELL:**  To your schedule?

4          **THE COURT:**  I'm sorry; July 31st.  Well, you know, we

5   could wait till August 31st.

6      **(Laughter)**

7          But -- so --

8          **MR. DONNELL:**  Wishful thinking, Judge.

9          **THE COURT:**  -- Thursday.  One week.  We'll just carry

10  everything to the trial and deal with it all.  No.

11     **(Laughter)**

12         No.  We are reconvening July 31st, Thursday, at

13  10:00 a.m.  I, you know, am going to let you know in advance I

14  may have to bump that around a little bit, but we will see

15  what -- where we are.

16         So, is there anything else to address?  How are the

17  depositions going?

18         **MR. ROSENBERG:**  Your Honor, Ezra Rosenberg on behalf

19  of Texas NAACP.  One quick issue.  The scheduling order made no

20  provision for transcript designations.  I have spoken with the

21  State and with DOJ.  I have a proposal.  I don't know if --

22  we've not heard back from the State on it, but it would be to

23  have transcript designations submitted concurrently with the

24  findings of fact on August 18th, and counter designations and

25  objections on August 25th, and then objections to counter

1    designations on August 27th, which is the date of the pretrial.

2              **MR. SCOTT:**  And, your Honor, I apologize to

3    Mr. Rosenberg, wherever you are.  I -- we have been kind of

4    busy the last couple days since I got his proposal.  We'll look

5    at that and be in a position to have already agreed to that or

6    worked out any details before our next hearing.

7              **THE COURT:**  Okay.  So, you all are going to --

8              **MR. ROSENBERG:**  Thank you.

9              **THE COURT:**  -- confer further on that --

10             **MR. SPEAKER:**  Yes.

11             **THE COURT:**  -- but it sounds like you all can come to

12   an agreement.

13             **MR. SPEAKER:**  Absolutely.

14             **THE COURT:**  Any other matters?  Is there still a lot

15   of depositions set?  Or --

16             **MR. SCOTT:**  They were going at 8:00 o'clock last

17   night, I think was when we left last night, and I think we've

18   got at least three or four scheduled most days, so it's full

19   employment for most.

20             **THE COURT:**  Okay.  Anything on trial or anything else

21   to address from anybody?

22        **(No audible response)**

23             Doesn't sound like it, so we will just reconvene on

24   Thursday unless you hear otherwise.  Thank you.  You're

25   excused.

65

1          **MR. SPEAKER:**   Thank you.

2          **MR. SPEAKER:**   Thank you, Judge.

3          **MR. SPEAKER:**   Thank you.

4       **(Proceeding was adjourned at 10:19 a.m.)**

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>July 25, 2014</u>


                    TONI HUDSON, TRANSCRIBER