UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,            )        CASE NO: 2:13-CV-00193
                               )
             Plaintiffs,       )               CIVIL
                               )
    vs.                        )        Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )        Wednesday, August 6, 2014
                               )
             Defendants.       )        (3:00 p.m. to 4:03 p.m.)


STATUS CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:   Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiffs:                ARMAND DERFNER, ESQ.
                           P.O. Box 600
                           Charleston, SC 29402

                           CHAD W. DUNN, ESQ.
                           KEMBEL SCOTT BRAZIL, ESQ.
                           Brazil and Dunn
                           4201 Cypress Creek Parkway, Suite 530
                           Houston, TX 77068

                           J. GERALD HEBERT, ESQ.
                           191 Somervelle Street, Suite 405
                           Alexandria, Virginia 22304

                           EMMA SIMPSON, ESQ.

Mexican American           EZRA D. ROSENBERG, ESQ.
Legislative Caucus,        Dechert, LLP
et al.:                    902 Carnegie Center, Suite 500
                           Princeton, NJ 08540-6531

Texas League of Young      RYAN HAYGOOD, ESQ.
Voters Education Fund:     KELLY DUNBAR, ESQ.
NAACP Legal Defendant and Educational
                           Funds, Inc.
                           40 Rector Street
                           5th Floor
                           New York, NY 10006

State of Texas:            JOHN BARRET SCOTT, ESQ.
                           Scott, Yung, L.L.P.
                           208 N. Market Street
                           Suite 200
                           Dallas, TX 75202

                           JOHN REED CLAY, JR., ESQ.
                           Office of the Attorney General
                           P.O. Box 12548
                           MC001
                           Austin, TX 78711

                           LINDSEY WOLF, ESQ.
                           BEN DONNELL, ESQ.

**<u>APPEARANCES FOR:</u>**          (CONTINUED)


United States              ANNA BALDWIN, ESQ.
of America:                BRADLEY HEARD, ESQ.
                           U. S. Department of Justice
                           950 Pennsylvania Avenue, N.W.
                           NWB Room 7125
                           Washington, DC 20530


Texas Association of       ROLANDO L. RIOS, ESQ.
Hispanic County Judges     115 E. Travis
and County                 Suite 1654
Commissioners:             San Antonio, TX 78205

Oscar Ortiz, et al.:       ROBERT DOGGETT, ESQ.
                           Texas Rio Grande Legal Aid
                           4920 North IH 35
                           Austin, TX 78751

4

<u>**Corpus Christi, Texas; Wednesday, August 6, 2014; 3:00 p.m.**</u>

<u>**(Call to Order)**</u>

**THE COURT:**  The Court calls Cause Number 2-13-193,
*Veasey, et al., versus Perry, et al.*

**THE CLERK:**  Your Honor, for the individual Veaseys,
we have Mr. Dunn, Mr. Derfner, Mr. Hebert, Mr. Brazil, and
Ms. Simpson.

For the United States, we have Ms. Baldwin and
Mr. Heard.

For the Mexican American Legislative Caucus,
Mr. Rosenberg.

For Ortiz, et al., Mr. Doggett.

For the Association of Hispanic County Judges,
Mr. Rios.

For the League of Young Voters, Mr. Haygood and
Mr. Dunbar.

For the State of Texas present in the courtroom,
Mr. Scott, Mr. Clay, Mr. Donnell; and present on the line,
Ms. Wolf.

And nobody is appearing for the nonparty senators or
representatives.

**THE COURT:**  All right.  What is that?

Okay.  I guess first before the Court is the
Defendants' Motion to Compel Documents Regarding Election
Crimes and Voter Fraud, and that was DE 441.

1          Mr. Scott?  I don't know.  I think you all were

2    conferring on that still.  I did get a response from the

3    Government.

4          **MR. SCOTT:**  I don't believe it got worked out, but

5    Lindsey Wolf is going to take the first part of that argument

6    for the State of Texas, your Honor.

7          **THE COURT:**  Okay.

8          **MS. WOLF:**  Your Honor, this is Lindsey Wolf.  I'm

9    appearing telephonically.

10          We've had some conversations with the United States

11    regarding that particular Motion.  Unfortunately, we haven't

12    been able to come to a resolution on that Motion.  And there

13    are some issues which were related to that Motion, which are

14    also tied in to some clarity I think both parties may be

15    seeking with respect to your Honor's ruling on the 30(b)(6)

16    Motion, because I think the issues are kind of tied in

17    together.

18          So if it works, what I may do is just sort of lay out

19    what clarity we're seeking on the 30(b)(6) Motion and then

20    segue into --

21          **THE COURT:**  Okay.  And I do see --

22          **MS. WOLF:**  -- the Motion --

23          **THE COURT:**  -- that as a different -- deposing

24    someone versus some document production -- I mean, I -- I do

25    think there's some difference there.

```
1              But you can proceed.

2         MS. WOLF:   Okay.   So, basically, the clarity that

3    we're seeking is I think that D.O.J. has an understanding that

4    your Honor's ruling limited us -- originally had an

5    understanding that your Honor's ruling limited us to asking

6    questions regarding the Public Integrity Reports that were

7    submitted to Congress.

8              And our reading of your ruling and also some comments

9    that were made at the July 24th hearing was that, instead, we

10   would be able to inquire as to generally factual and

11   ministerial information regarding records or information that

12   the United States kept regarding voter fraud and election

13   fraud.

14             And I've had some conversations with Mr. Heard on

15   this particular topic area, and I kind of think -- and I don't

16   want to put words into his mouth -- but I think we're both kind

17   of at the place where it -- with the documents that we have in

18   our possession so far, such as the Declaration from Mr. Pilger,

19   who's the chief of the Election Crime Section of the Public

20   Integrity Section -- well, and for example, the ballot

21   integrity training materials -- that we would be able to

22   inquire as to where the numbers were derived from in the type

23   of information that was in those particular reports.

24             And the clarity that we're seeking from your Honor is

25   in the event that we were to get more documents from the United
```

1   States as a result of any resolution, or however the Court

2   rules regarding the Motion to Compel, that your Honor's ruling

3   regarding our ability to inquire generally into factual and

4   ministerial information regarding voter fraud and election

5   crime would extend to, for example, those documents or those

6   particular topic areas, and would not just be limited to the

7   Public Integrity Reports themselves.

8           **THE COURT:**  That would be my understanding, but I'll

9   certainly hear from Mr. Heard, if he has a different take on

10  that.

11          **MR. HEARD:**  Good afternoon, your Honor.  This is Brad

12  Heard for the United States.

13          I don't think (indiscernible) Ms. Wolf and I did have

14  a conversation earlier this morning, or maybe it was earlier

15  this afternoon, about this topic.

16          Our understanding of the Court's Order with respect

17  to the 30(b)(6) deposition is reflected in the exhibit that is

18  attached to our Response to this pending Motion.

19          And we did contemplate that if additional documents

20  were ordered by the Court in regard to Defendants' Motion to

21  Compel, that, of course, the Defendants would be able to

22  inquire into the record keeping related matters that the Court

23  had identified earlier in its July 24th Order with respect to

24  those additional documents.

25          So I don't -- I don't know that there's a fundamental

1   misunderstanding as between what's set forth in our letter of

2   August 1st, which is an exhibit to the Motion, and what

3   Ms. Lindsey just -- I mean, what Ms. Wolf just described.

4       **THE COURT:**  Okay.  So can we get to the Motion, then?

5       **MS. WOLF:**  Yes, your Honor.  We can move on to the

6   Motion.

7       I think generally (indiscernible) -- I apologize for

8   the echo.

9       I think generally where we are (indiscernible)

10  Motion --

11      **THE COURT:**  Yeah, hold -- hold --

12      **MS. WOLF:**  -- is that we --

13      **THE CLERK:**  Ms. Wolf, you're echoing.

14      **MS. WOLF:**  I apologize.  I'm trying to figure out --

15      **THE COURT:**  You're fine now.  I think you're fine

16  now.

17      **MS. WOLF:**  Okay, your Honor.  I won't move from this

18  spot.  I apologize for that.

19      The United States, which they've laid out in their

20  Response to our Motion to Compel, has offered to do what we

21  view as a very limited search in order to give us some

22  information regarding information that they maintain on

23  election crimes and voting fraud.

24      And what they've offered to do is search two

25  databases that are maintained by the Criminal Division of the

1    Department of Justice, and then another which is maintained by

2    the Executive Office of the United States Attorney's Office.

3           And the key concern the Defendants have with the

4    search that the United States has offered to do is that,

5    despite the fact that I understand that those databases contain

6    information regarding investigations of election crimes and

7    voter fraud that, for example, the United States Attorney's

8    Offices or the Criminal Division of the Department of Justice

9    have done, the United States is not willing to give us any

10   information regarding the investigations.  They're only willing

11   to give us information regarding the actual prosecuted, filed,

12   docketed cases that have been completed.

13          And that does not provide us with a complete picture

14   of the total universe of the incidence and the allegations of

15   voter fraud.

16          Separate and apart from the limits that the United

17   States intends to impose on those -- what I'll refer to as the

18   LINES (phonetic) and ACTS (phonetic) databases, separate and

19   apart from those limits, that includes a very, very large body

20   of information, which we understand would come from the FBI.

21          For example, I know we attached to our Motion a

22   couple of exhibits regarding FBI investigations into voter

23   fraud and election crimes.  And my understanding is that those

24   databases would not cover FBI investigations and -- again,

25   which would limit severely the universe of information we would

1   be able to receive in regards to voter fraud and election

2   crimes.

3            Since we aren't able to -- since there are

4   limitations on our inquiries with respect to a deponent,

5   basically all we're seeking is we want to know, you know, how

6   many prosecutions, the type and location of those prosecutions

7   that are currently taking place, how many prosecutions and the

8   type that have taken place in the past, and we'd like to know

9   the universe of the allegations regarding election crimes and

10  voter fraud, including the type, the place, and the time.

11           And with respect to investigations that were

12  currently ongoing, the only detail we would need is type and

13  place.

14           We don't need any other information.  We don't need,

15  you know, the substance of the particular allegations

16  themselves.  And I think, from a starting point, the fact that

17  that information -- we understand, at least as respects the

18  Criminal Division and the U.S. Attorney's Offices -- is

19  available in LINES and ACTS, and the United States has

20  represented in its Pleadings that searches of LINES and ACTS

21  are not overly burdensome for the do -- for them to do; and, in

22  fact, seem pretty easy for them to do just in terms of what

23  they've offered to do with respect to the filed cases.

24           And I think also it's not clear, you know, whether

25  the database that's maintained by the Executive Office of the

1    United States Attorney actually, you know, contains all of the

2    information which would be regarding the stuff that United

3    States Attorney's Offices may get but don't necessarily open a

4    case file for that's then reported to a national database.

5            And I think there's just information out there that

6    wouldn't necessarily be captured by these databases.  I think

7    the FBI is probably the biggest sort of nucleus for that, but

8    there could be other information that's just not captured.

9            And I think an important thing to note is the O.A.G.

10   subpoena that was served by the Texas League of Young Voters,

11   that had asked from Mr. Mitchell -- Commander Mitchell, who is

12   the O.A.G. designee, information regarding complaints,

13   allegations, referrals, or investigations, charges, and/or

14   prosecutions --

15           **THE COURT:**  Wait, wait.  Who are you talking about

16   now?  Are you still directing this to the United States?

17           **MS. WOLF:**  Yes, your Honor.  I'm --

18           **THE COURT:**  Okay.

19           **MS. WOLF:**  I'm trying to refer your Honor -- your

20   Honor granted the Texas League's Motion to Compel the O.A.G. to

21   produce a deponent, and the point I'm trying to make is that

22   the subject matter in the subpoena for that particular

23   deponent, which were relating to voter fraud, regarded things

24   beyond actual files, prosecuted cases.  It also involved

25   referrals for investigations and investigations.

1            And so I think, you know, they've asked for that

2    universe of documents.  The Court has granted that universe of

3    documents and testimony.  And so, you know, we're basically

4    asking for the same thing.  We don't want to be limited to

5    prosecuted and filed cases.  I think there are several reasons

6    that a case could not be prosecuted.  It may be a resource

7    issue.  It's not necessarily that the fact that the cases were

8    not -- were not strong or were not, you know, worthy of proof.

9            And so I think that we would be entitled to that type

10   of information, especially because we're not getting deposition

11   testimony on these substantive matters.  We don't have a

12   complete universe of documents.  We don't have a complete

13   universe of numbers.

14            I understand that, you know, a witness, you know, may

15   not be able to testify to specific numbers, and so we're just

16   asking for, you know, the broadest universe of information

17   really on a very basic level, but we do need to get a handle on

18   the particular universe of all of the types of investigations

19   or information that the United States maintains regarding voter

20   fraud and election crime.

21            And I think, you know, turning now to the point --

22   they make an argument that it would be unduly burdensome to run

23   a broader search than what they're offering to do, but the fact

24   that it's unduly burdensome to run that search to me indicates

25   that that does mean that there's evidence out there that is

1   relevant and that would be -- to which the Defendants would be

2   entitled to.

3           And I just -- you know, so we're kind of in a

4   position where we can't get the information from a deposition.

5   We're not being offered the information from a database that's

6   at least very searchable.  And, on top of that, the United

7   States has not offered to search anything beyond those two

8   particular databases.

9           And on top of that, the searches that they proposed

10  to do of those two databases are only going back, I believe, to

11  2004.  So it's only going back a decade.

12          **THE COURT:**  But isn't that what you all asked for, to

13  go back to '04, or no?

14          **MS. WOLF:**  We asked for '04 with respect to the

15  30(b)(6) notice, but actually our RFPs did not (indiscernible)

16  limitation on them.

17          **THE COURT:**  All right.  Mr. Heard, are you speaking

18  for the Government, or Ms. Baldwin?

19          **MR. HEARD:**  Yes, ma'am.  Yes, your Honor.  I'm

20  handling this particular Motion.

21          Your Honor, as we -- as we admitted in our filing,

22  the original Document Request that's the subject of this Motion

23  is -- was hopelessly overbroad and unlimited in time or

24  (indiscernible) --

25          **THE COURT:**  Tell me what the Government is willing to

1   do, and what that covers, and what would not be covered by what

2   the Government is agreeing to produce, I guess.

3          **MR. HEARD:**  What we've offered in our letter of

4   August 1st is to provide the Defendants -- there are two

5   litigating components of the Department of Justice that

6   specifically bring election crimes other than sort of voter

7   intimidation-like crimes.  But anything related to election

8   crimes and election fraud are brought by either the Criminal

9   Division, Public Integrity Section, or the Office of the United

10  States Attorney.

11         We have offered to search the databases for those two

12  components of the Department of Justice and provide to them

13  information relating to the prosecution -- the election crime

14  related prosecutions that have occurred from 2004 to the

15  present.

16         What we have said that we are not willing to provide

17  -- the databases in question do provide information on ongoing

18  and closed investigations, because the Department needs that

19  information for its own internal purposes.  But we're -- but

20  that information related to the ongoing -- particular the

21  ongoing investigations, but even as to closed investigations,

22  touches off a whole bunch of privileges related to

23  investigations and related to prosecutorial --

24         **THE COURT:**  We're not --

25         **MR. HEARD:**  -- discretion --

1          **THE COURT:**  I don't know -- I don't know that we're

2     now started looking at privileged information here, and then

3     that may be another fight between you guys.

4          I'm just trying to figure out what's the Government

5     trying -- or agreeing to produce, what would be excluded?  I

6     mean, I'm not getting into privileges right now, because --

7          **MR. HEARD:**  Okay.

8          **THE COURT:**  -- obviously, they shouldn't get

9     privileged material.

10         Now, if you all are going to fight about --

11         **MR. HEARD:**  Okay.

12         **THE COURT:**  -- what's privileged and what's not,

13    that's -- I don't think that's for right now.

14         **MR. HEARD:**  Okay.  Well, what we have offered to

15    produce to them is for the previous ten years, from 2004 to the

16    present, which is the -- which is the limitation that they had

17    offered for their deposition testimony --

18         **THE COURT:**  Which I think is appropriate.  Is there a

19    problem -- is there a reason we need to go past '04, Ms. Wolf

20    or Mr. Scott?

21         **MR. SCOTT:**  Well, your Honor, I think if we can limit

22    the O.A.G.'s deposition so that we know that we're dealing

23    apples to apples, that's fine.

24         **THE COURT:**  What, and it wasn't limited, or what?

25    Or --

1          **MR. SCOTT:**  I don't believe it was limited --

2          **THE COURT:**  Or can we agree --

3          **MR. SCOTT:**  -- to 2004.

4          **THE COURT:**  -- to limit it?  Who would that be,

5    Mr. Haygood, I guess?

6          **MR. SCOTT:**  It's -- theirs go back to 2000 is on the

7    depo notice.  So if we can get it to 2004 --

8          **THE COURT:**  Okay.

9          **MR. SCOTT:**  -- I think that cures the problem, at

10   least to that extent on the time frame.

11         **THE COURT:**  I don't know.  Can we agree on going back

12   to '04?  I believe, Mr. Haygood, your -- when I ruled on your

13   Motion, your request was going back to 2000?

14         Do you recall, or do you want to --

15         **MR. HAYGOOD:**  That's right, your Honor.

16         **THE COURT:**  -- speak on that?

17         **MR. HAYGOOD:**  It's back -- it's back to 2000.

18         **THE COURT:**  Okay.  I guess they're just saying they

19   want what the other parties are getting to 2000 -- or everybody

20   '04 or everybody 2000.

21         Can we have an agreement or not?

22      **(No audible response)**

23         Anybody can --

24         **MR. HEARD:**  The United States would agree to 2004 is

25   relevant.  I hope a decade is enough.

1           **THE COURT:**  Mr. Haygood?

2           **MR. HAYGOOD:**  Your Honor, we had asked for 2000.  I

3    think that we -- I think that we could agree to 2004.

4           **THE COURT:**  Okay.  I think so, too.  If there's a

5    particular problem you think about, we can certainly get back

6    on the phone.

7           **MR. SCOTT:**  And, your Honor, would we have the same

8    scope, I guess, agreement?

9           What we're trying to do is make sure that we have the

10   ability to defend, I guess, any of the representations, so I

11   think the scope that the folks over at -- let's see who

12   actually sent this -- it was Mr. Haygood's folks that sent this

13   depo notice.  That's really the scope of documents that we're

14   trying to get from D.O.J.

15          **THE COURT:**  Well, and --

16          **MR. SCOTT:**  And I think Ms. Wolf identified that

17   already in our -- in her argument to the Court.

18          **THE COURT:**  No, and I'm trying to figure out -- and

19   he had gotten started, and I keep interrupting him.  But,

20   Mr. Heard, you had started on what the Government is agreeing

21   to produce, what would be excluded, what can we do.

22          So you can proceed.  I'm sorry.

23          **MR. HEARD:**  That's okay, your Honor.  So what the

24   United States has agreed to produce to the Defendants is a list

25   of the prosecutions that have been initiated, whether by

1    indictment or information, from 2004 to the present; and to

2    provide certain details with respect to those prosecutions, you

3    know, basic details, the case name, case number, the district

4    that the case arises in -- that type of thing.

5            The matters -- the only matters that would be

6    excluded from that list are matters that are under seal with a

7    respective court.  But, otherwise, the charged cases between

8    '04 and the present are what the United States has agreed --

9    both for the Criminal Division, Public Integrity Section, and

10   for the Executive Office for United States Attorneys.

11           So they would get all of that information, which does

12   comport with the broadened scope that the Court had identified

13   in its July 24th Order.  In other words, we're not just talking

14   about in-person voter impersonation.  We're talking about any

15   type of election crime other than voter intimidation, that

16   stuff, which is not a fraud issue.

17           And so those things would be produced to the

18   Defendants.

19           What we are not agreeing to produce is information

20   relating to investigations, closed or open, that did not result

21   in the initiation of a prosecution by the United States.  And

22   we're not producing -- we're not willing to produce that.  We

23   believe it's privileged, which the Court has put a pin in.  So

24   I won't go further there.

25           But that's the universe that we've agreed to -- that

1   the United States has agreed to.

2           **THE COURT:**  Okay.  So in the defense -- so that this

3   is including -- this is -- will be excluding information from

4   the FBI, et cetera, and so we're not getting a whole big

5   category of documents that would be relevant.  What's the

6   Government's response?

7           **MR. HEARD:**  Well, the only -- the only two components

8   of the Department of Justice that are authorized to prosecute

9   -- the FBI is not a litigating component of D.O.J.

10          **THE COURT:**  Well, they're saying --

11          **MR. HEARD:**  (Indiscernible) --

12          **THE COURT:**  Right, you're agreeing to produce some

13  prosecuting documents, or whatever it may be, and the Defense

14  is saying, "We need more than that."

15          What the Government is seeking to produce, what is

16  that going to do in terms of what's -- it's just going to

17  provide information on prosecutions?

18          **MR. HEARD:**  What the Government is seeking to produce

19  would provide information on prosecutions only, not -- not

20  investigations, closed or open -- again, because investigations

21  are privileged under a variety of government privileges.

22          And so we are trying to be as cooperative as possible

23  without running into, you know, privileged matters and

24  prosecutorial discretion matters.

25          And so those -- I mean, so if Defendants want a

1  picture of what types of election crimes the Government has

2  prosecuted over the past decade, the real relevant information

3  to that is what we have already offered to provide --

4          **THE COURT:**  I know, but you --

5          **MR. HEARD:**  -- them, which is --

6          **THE COURT:**  -- keeping using the word "prosecution."

7  That's what they're taking issue with.  It sounds like the

8  Defendants are wanting more than prosecution, correct?

9          **MS. WOLF:**  Yes, your Honor.  That's correct.  I think

10 we would like allegations, referrals, and investigations --

11 frankly, we'd like everything that the Plaintiffs are getting

12 from the O.A.G., which is -- it has the same governmental

13 privileges as the United States.

14          And I would just add to that that we're not

15 necessarily seeking substantive information that would reveal

16 privilege.  I think there's a way that you could report

17 information in a very general manner, which would lay out the

18 number of instances and a very, very general description of

19 what the type of incidence is while still protecting the

20 privilege, your Honor.

21          **MR. HEARD:**  I mean, your Honor, it's certainly

22 possible for the United States.  We would still object to it.

23 It's certainly possible for the United States to run a report

24 of raw numbers of open and closed investigations.

25          But if you get much further than that -- if you get

1   into the type of election crimes, where they're being

2   investigated, you know, that type of information -- whether

3   current or past -- it intrudes upon the prosecutorial function

4   of the Department.  And that is why we have been so vehemently

5   objecting to producing information related to investigations.

6           Again, investigations that don't result in

7   prosecutions -- if the Government investigates something and

8   closes it, it's made a determination -- a prosecutorial

9   determination that the charge should not be brought.  And that

10  element of prosecutorial discretion is, again, an element

11  that's not typically before the Court, and one that is not

12  probative of anything regarding the election crimes that are

13  brought by the United States.

14          **THE COURT:**  All right.  Ms. Wolf?

15          **MS. WOLF:**  Your Honor, I think my response to that

16  would be that there are several -- sorry.  It's echoing again.

17          There are several reasons why a prosecution could not

18  go forward, and we're not seeking to inquire as to why those

19  decisions were made.  We're simply stating that there could be

20  a prosecution or an investigation that had, you know, actual --

21          **THE COURT:**  Okay.  I'm sorry.  We're not being able

22  to take the record.  You're -- there's an echo --

23          **MS. WOLF:**  Oh, I'm so sorry.  I'm trying to shuffle

24  some things around so that I can avoid -- is it okay now?

25          **THE CLERK:**  Well, there's still an echo.

1          **MR. SCOTT:**  Your Honor, since we're having technical

2   difficulties, I'll try and explain what Ms. Wolf is explaining.

3          I think, at bottom, what we want is an apples-to-

4   apples comparison.  And what they have asked of the O.A.G. is

5   complaints, referrals, and investigations.  What we're being

6   offered -- in addition to, you know, closed files and

7   prosecutions that are currently public.

8          What we're being offered from them is only those

9   latter two categories.

10          And I think it boils down to two things:  they're not

11   looking in all the right places within the Department of

12   Justice and they're not looking for all the right things.

13          They're not looking in the various U.S. Attorney's

14   Offices, which are likely to be the sort of locus for referrals

15   and complaints.  They're just searching the Executive Office of

16   the U.S. Attorney's Office, which is at Main Justice in D.C.,

17   where the status of ongoing matters is located.

18          And so with respect to the types of things we're

19   looking for, it's the complaints, and referrals, and

20   allegations that are -- and investigations -- that seem to be

21   missing.

22          And that's why searching the U.S. Attorney's Office

23   and the FBI is so important.

24          **THE COURT:**  All right.  Mr. Heard --

25          **MR. HEARD:**  Sure.

1      **THE COURT:**  -- why shouldn't they have access to the

2  same information that the Plaintiffs have requested?

3      **MR. HEARD:**  Your Honor, the -- let me clarify one

4  point first.  The -- Mr. -- I don't know who that was speaking.

5  But the database searches that we've offered to run cover all

6  United States Attorney's Offices, and --

7      **THE COURT:**  But that's just for prosecution, correct?

8      **MR. HEARD:**  Right.  Well, the --

9      **THE COURT:**  Okay.

10      **MR. HEARD:**  -- database in question covers all United

11  States Attorney's Offices, whether we're talking investigations

12  or prosecutions.  The database in question covers all United

13  States Attorney's Offices and the Public Integrity Section --

14  well, the entire Criminal Division, but --

15      **THE COURT:**  So what you're agreeing --

16      **MR. HEARD:**  -- (indiscernible) --

17      **THE COURT:**  -- to produce is prosecutions and

18  investigations?

19      **MR. HEARD:**  No, no.  (Indiscernible) --

20      **THE COURT:**  Okay.  Well, then answer my question.

21  Why should the Defendants not get what the Plaintiffs have

22  requested?

23      **MR. HEARD:**  Your Honor, from the United States'

24  perspective, the requests for investigatory materials is a

25  privilege request --

1          **THE COURT:**  And it's not --

2          **MR. HEARD:**  -- (indiscernible) --

3          **THE COURT:**  -- a privilege for the State?

4          **MR. HEARD:**  I'm not -- I'm not familiar with the

5     State's arguments or whether they've challenged -- whether

6     they've raised those privilege issues.

7          **THE COURT:**  I think they did.

8          **MR. HEARD:**  However, the United -- well, I'm not --

9     I'm probably the newest --

10         **THE COURT:**  Okay.  You --

11         **MR. HEARD:**  -- member of (indiscernible) --

12         **THE COURT:**  -- know what?  It sounds like --

13         **MR. HEARD:**  And --

14         **THE COURT:**  I've told you all this from the

15    beginning.  What's good for one side is good for the other.

16         **MR. HEARD:**  And -- and I --

17         **THE COURT:**  So I think privilege --

18         **MR. HEARD:**  -- (indiscernible) --

19         **THE COURT:**  -- is applied to all sides, the State --

20    I don't recall specifically.  I remember addressing or reading

21    -- and we never addressed them -- some issues that the State

22    raised as privileges.  So --

23         **MR. HEARD:**  Your Honor, I don't believe the United

24    States has asked for that type of information

25    (indiscernible) --

1         **THE COURT:**  Well, somebody did.  Who asked for it?

2         **MR. DUNBAR:**  Your Honor, this is Kelly --

3         **MR. HEARD:**  I'm not sure --

4         **MR. DUNBAR:**  Your Honor, this is Kelly -- Kelly

5    Dunbar for the Texas League of Young Voters.  I argued the

6    Motion, that Motion to Compel, I believe, that your Honor was

7    referring to last week or two weeks ago.

8         And I just wanted to clarify two quick points for the

9    record.

10        The first is that although our initial subpoena

11   request for documents of O.A.G. did go back to the early part

12   of 2000, that we have -- you may also recall that we agreed to

13   the State's offer to stipulate that we would rely on

14   Mr. Mitchell's previous testimony in lieu of any document,

15   discovery, or deposition discovery pre the enactment of SB 14.

16        The second point I just wanted to add with respect to

17   the state of the record on this point is that the Office of the

18   Attorney General to date has not produced to us a single

19   document --

20        **THE COURT:**  Well, and that's --

21        **MR. DUNBAR:**  -- that relates to --

22        **THE COURT:**  -- a different issue --

23        **MR. DUNBAR:**  That relates to --

24        **THE COURT:**  -- that I don't mind addressing.  I --

25   certainly, we need to.  We're about a month out from trial.

1          But I'm just saying why shouldn't the Defendants get

2    the same type of information that the Plaintiff has requested

3    and the Court has allowed?

4          **MR. HEARD:**  Well, again, your Honor, the Plaintiff,

5    the United States, has not requested that information from

6    Texas.  And the Plaintiff, the United States --

7          **THE COURT:**  Okay.  Well, tell me then anyway.  Why,

8    if I've allowed certain Plaintiffs -- because you all are going

9    to be on one side trying this together, so I'm sure you'd have

10   access to whatever the other Plaintiffs have received -- why

11   shouldn't the Defendants then have that same information?

12         **MR. HEARD:**  So as an initial matter, your Honor,

13   the --

14         **THE COURT:**  No, no.  Answer my question, because I've

15   been at this for a little bit, and nobody is really answering

16   that.

17         **MR. HEARD:**  Right.  So, your Honor, I -- I don't know

18   that I could answer the Court's question as far as why a

19   request that the United States hasn't made of Texas, why the

20   Court -- I mean, the -- we -- the United States has a

21   governmental interest in protecting its investigatory --

22         **THE COURT:**  As does Texas.

23         **MR. HEARD:**  -- files.

24         **THE COURT:**  As does --

25         **MR. HEARD:**  And -- and --

1      **THE COURT:** -- Texas.

2      **MR. HEARD:** And -- well, and -- and I have not heard

3 Texas's arguments, or -- and I don't know whether the Court has

4 ruled on that.

5      **THE COURT:** I thought I --

6      **MR. HEARD:** But from the United --

7      **THE COURT:** -- did.

8      **MR. HEARD:** But from the United States' perspective,

9 I mean, we have an obligation to protect our own governmental

10 interest, and this is the Motion before the Court.

11      And so -- and so for this -- and it's not as if we

12 are asking for comparable information from the State of Texas,

13 from one government to another.  We are not asking for that

14 information, and we don't believe that we should be required to

15 provide that --

16      **THE COURT:** Okay.  I'm going to backtrack.  Let me

17 backtrack.

18      What did the Plaintiffs, and tell me which ones,

19 request of the Defendants in terms of this -- prosecutions,

20 referrals, investigations -- what was requested?  What did the

21 Court do?  Who requested it?  What's been provided or going to

22 be provided, per the Court's Order, and then we'll work

23 backwards.

24      **MR. CLAY:** Your Honor, I've got their 30(b)(6) before

25 us, and the Document Request is also here, and I'd have to comb

```
 1    through it to find the exact language.

 2             But what they're seeking is:

 3             "Any and all complaints, allegations, referrals for

 4             investigation, investigations, charges, and/or

 5             prosecutions either through the Texas Attorney

 6             General's Office or in conjunction with local,

 7             county, or municipal law enforcement and

 8             prosecutorial authorities concerning alleged, actual,

 9             or attempted voting and/or election fraud occurring

10             within the State of Texas from January 1st, 2000,"

11             which has been amended, "to the present, including,"

12    and then, you know, they go on to list the --

13             THE COURT:  And did Texas assert some privileges?

14             MR. CLAY:  Yes.

15             THE COURT:  Which ones?

16             MR. CLAY:  Mostly the law enforcement privilege, but

17    I think that we worked with -- this is the Texas League of

18    Young Voters Education Fund that has made the request.  And

19    just as sort of an interjection here, it's a -- and this was in

20    our Motion -- it's a -- I think this is obviously a

21    coordinated, you know, move on their part to not have the

22    United States ask for it, because the United States is going to

23    have to give it up.

24             This Court has ruled that they have a common interest

25    privilege.  And so as you just pointed out, your Honor, this
```

1    stuff is going to be -- whatever we give them is equally

2    available to everyone on the other side, including the United

3    States.  And that -- as far as I understand the common interest

4    privilege, that's how it's going to work.

5             And so for them to suggest that they haven't asked

6    for it is, you know, I'm -- they have, and they're going to get

7    it.

8             And so all we're asking for is that we have access to

9    the same stuff, and I think that there's a way to do it.  And I

10   think that this is what we worked on with the Texas League to

11   where we give it at a level of generality that doesn't

12   implicate the law enforcement privilege, or sensitive

13   prosecutorial, or investigatorial information.

14            And that's providing reports -- even if generated

15   solely for the purpose of this litigation -- that explained

16   what is happening, where the referrals are, what the referrals

17   are about, when they were, what type of crime it was, and

18   that's it.  Nothing more.

19            **MR. HEARD:**  Your Honor, Brad Heard for the United

20   States.

21            It seems that, from -- and, again, I don't know who

22   was speaking, but it seems from Texas's position they have

23   asserted the same law enforcement objections that we have, but

24   they are apparently willing to waive them (indiscernible) --

25            **THE COURT:**  No, no.  They're not waiving them.

```
 1    They're working with the other party to make sure whatever is

 2    produced doesn't cross that line.

 3            MR. CLAY:  Yeah, we're definitely not waiving them.

 4    Just for the record.

 5            MR. HEARD:  Well, I believe I indicated to the Court

 6    before that it is certainly possible to -- to determine a

 7    number of investigations that have been opened and closed over

 8    the relevant time frame, if that's the type of information that

 9    the Defendants are looking for.

10            But what -- but what we are trying to preserve, your

11    Honor, is getting into the weeds of the where these

12    investigations are, how many investigations happened in, you

13    know, you know, X state versus Y state between, you know, for

14    what presidential elections or what congressional elections.

15            That kind of information is the type of sensitive

16    information that could reveal other ongoing investigations that

17    could, you know, lead into strategies about the Government's

18    prosecution efforts.

19            And I think again all of that --

20            THE COURT:  Look --

21            MR. HEARD:  -- is cabined by prosecutorial

22    discretion, by investigatory files privileges, all of which

23    we've asserted, and --

24            THE COURT:  I think you all need to sit down and talk

25    about this further, understanding where the Court is coming
```

1    from on this issue.  And as Mr. Clay -- he's the one that's

2    been speaking here -- said --

3              **MR. HEARD:**  Okay.

4              **THE COURT:**  -- I think he's reached out to

5    Mr. Haygood.  They're going to try to work it out so that

6    privileged information, or whatever it may be that needs to be

7    protected, is going to be addressed.

8              I mean, I don't think you all have even gotten there

9    regarding this issue.  I think that the Government was just

10   basically saying, "We're just going to produce these two

11   areas," correct or not?

12             **MR. HEARD:**  Well, we've talked a number of times,

13   your Honor.  But we're certainly willing to talk again and try

14   to come to some agreement.  But, you know, we're certainly

15   willing to do that.

16             **THE COURT:**  Mr. Clay?

17             **MR. CLAY:**  We've certainly been trying.  We've been

18   trying for about six months to get to --

19             **THE COURT:**  And -- and --

20             **MR. CLAY:**  -- an agreement, so --

21             **THE COURT:**  -- specifically addressing how this --

22   some of this information can be produced without crossing, you

23   know, these privileges now that the Government knows kind of

24   where the Court is coming from on this issue.

25             **MR. CLAY:**  Absolutely.

```
 1          THE COURT:  So --

 2          MR. SCOTT:  For clarity, if -- so if we show them

 3   what we're doing, it would be instructive from I think

 4   everybody's understanding that if they do what Texas is doing

 5   with regard to the discovery, that's generally what probably

 6   the Court would have in mind for the parties to reach?

 7          Is that --

 8          THE COURT:  Well, I would like that.

 9          MR. SCOTT:  Okay.  I just wanted to make sure --

10          THE COURT:  But we'll see what you all can do --

11          MR. HEARD:  Obviously, your Honor, the United States

12   can't agree to that wholesale, but --

13          THE COURT:  I know.  That's why --

14          MR. HEARD:  -- (indiscernible) take a look --

15          THE COURT:  -- you all are going to talk, see what

16   you all can agree to.

17          MR. HEARD:  We're happy to take a look at whatever

18   Texas provides.

19          MR. CLAY:  Your --

20          THE COURT:  Okay.

21          MR. CLAY:  And, your Honor, I'm not trying to cause

22   more ripples.  I just wanted to correct one thing for the

23   record, and I'm not trying to nitpick.

24          But we have produced documents related to voter fraud

25   from the Attorney General's Office.  We did that, I believe,
```

1    with our initial disclosures.  They're documents that we

2    produced in the last litigation.

3            It is also true that we are -- some more documents

4    are forthcoming.

5            So that's just for the record, your Honor.

6            **THE COURT:**  Okay.  Well, you all --

7            **MR. CLAY:**  Thank you.

8            **THE COURT:**  -- can discuss that further.  If it's an

9    issue, you can bring it to the Court.

10           Does anyone else -- any other lawyer who's on the

11   phone need to, or want to weigh in, or say anything about this

12   issue?

13           **MR. DERFNER:**  This is Mr. Derfner on behalf of the

14   Veasey Plaintiffs.

15           It's not my issue, but -- and I don't want to waste

16   the Court's time -- but I'm not sure I see a parallel between

17   prosecutions or investigations and issues in Texas versus

18   issues in Wyoming, Vermont, or North Carolina, which is where

19   the requests from the United States would go to.

20           **THE COURT:**  Mr. Clay?

21           **MR. DERFNER:**  That's all I want to say on that.

22           **MR. CLAY:**  Your Honor, I -- you know, I respect his

23   opinion, but the Supreme Court in *Crawford* said that this stuff

24   is relevant to the claims in this case.  And so I think the

25   Supreme Court disagrees with Mr. Derfner.

1          **THE COURT:**  Okay.  Anybody else?

2      **(No audible response)**

3          Because I'm getting ready to -- do you all want to

4  confer -- what's today?

5          **MR. HEARD:**  The Government is -- the United States is

6  happy to confer further with Texas on this to see if we can

7  reach an agreement --

8          **THE COURT:**  Okay.

9          **MR. HEARD:**  -- your Honor.

10          **THE COURT:**  Then you all will let the Court know if

11  the Court needs to do anything else on this issue.

12          So I know there was another Motion to Compel filed by

13  the Defendants.  That was just filed today.  So I don't know if

14  you all have -- I'm assuming you all are going to confer

15  further, or do -- is the Government -- Plaintiffs ready to

16  address that, or do we need to set another --

17          **MR. SPEAKER:**  (Indiscernible) --

18          **THE COURT:**  -- hearing later this week or early next

19  week?

20          **MR. ROSENBERG:**  Your Honor, Erza Rosenberg for Texas

21  NAACP and MALC.

22          We did talk to the State after we saw their Motion.

23  We told them that we would like to brief it and have -- brief

24  the -- that part of the Motion as directed to the Veasey

25  Plaintiffs and to our clients, and that deals with the survey,

35

1   the respondents' identities in surveys, and we think there's

2   very strong law on the issue, so we'd like to brief that.

3           And we suggested that we file our brief by Tuesday,

4   if that's okay with your Honor, and have a conference as soon

5   thereafter as is convenient for your Honor.

6           **THE COURT:**  Okay.  Let --

7           **MS. BALDWIN:**  And for the United States, your Honor,

8   this is Ms. Baldwin.

9           We've talked about these issues repeatedly with

10  Texas, and repeatedly explained that, you know, the contents of

11  everything that Dr. Ansolabehere has relied on in his report

12  has been produced.  And we would also request to respond in

13  writing.

14          **THE COURT:**  Okay.  By Tuesday also?

15          **MS. BALDWIN:**  Yes, your Honor.

16          **MR. CLAY:**  And, your Honor, the only thing we would

17  point out is the time line before trial starts.  And it's

18  material we need to get to our experts for them to amend their

19  reports.

20          **THE COURT:**  Okay.  Well, I'm going to let them brief

21  the issue.  Provide something to the Court on Tuesday.  We can

22  probably reconvene on Thursday, the 14th.

23          Brandy?

24          **THE CLERK:**  Yes, your Honor.  10:30.

25          **THE COURT:**  Can you all file that, the briefing, by

1    Tuesday at noon?

2              **MR. ROSENBERG:**  Yes, your Honor.  Ezra Rosenberg.

3              **THE COURT:**  Okay.

4              **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin.  Yes,

5    we can do that.

6              **THE COURT:**  Okay.  Then I'm going to move on from

7    that.

8              There was still that issue of the D.P.S. records.  Is

9    there any -- I think you all were still conferring on that, and

10   I wasn't sure if there was anything else for this Court to do

11   on that Advisory that was filed and then we discussed it some

12   last week.

13             **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin for the

14   United States.

15             We have taken some additional discovery on that.  We

16   have produced an amended no match list based on both the data

17   itself; and then once we subsequently also received written

18   Answers from D.P.S. related to the contents of the meaning of

19   some of the data, we provided a further update to our no match

20   list.

21             We are conferring with Defendants and all parties

22   about some agreed-upon dates for dealing with scheduling issues

23   around that.  But that (indiscernible).

24             **THE COURT:**  Okay.  So nothing --

25             **MR. ROSENBERG:**  Yes, your Honor.  And Mr. Rosenberg

1    here, your Honor.

2              And we do have -- we're getting close to

3    (indiscernible) some changes on -- in this schedule that,

4    again, do not affect the pretrial or the trial date.

5              There are a couple that I could just float by your

6    Honor with everyone's consent, which we talked right before

7    this call, which would change the date for the submission of

8    the findings of fact -- if this is okay with your Honor -- to

9    August 22nd instead of August 18th.

10             And to have transcript designations due the same day,

11   August 22nd.

12             Objections to designations and counterdesignations on

13   August 27th.

14             And objections to counterdesignations on September

15   2nd.

16             And, in the meantime, we have a few other dates we're

17   working on dealing with supplementations and corrections to

18   expert reports because of the data issues and some other

19   issues, which we've been -- we talked as recently as 2:00

20   o'clock this afternoon, and we're going to be continuing

21   talking over the next couple days.

22             **THE COURT:**  Is that agreed to?

23             **MR. CLAY:**   The dates are -- the dates are absolutely

24   fine with the State of Texas, your Honor.

25             The one, I guess, caveat from the State of Texas

1    position, if I heard Ms. Baldwin correctly, she's saying that

2    the new no matches are exclusively out of the data that was

3    provided out of the D.P.S.

4              **THE COURT:**  Is that --

5              **MR. CLAY:**  And that's -- I wanted to make sure of

6    that at least on the record.  There's -- we just got some

7    notice yesterday of an additional 180,000 people they believe

8    should be on the no match list.  And I guess the source of

9    where those 180,000 people came from is important to

10   understanding, I guess, any delays occasioned through the

11   D.P.S. SNAFU.

12             **MS. BALDWIN:**  Your Honor, and to be clear, the

13   additional supplementation the United States provided was based

14   off written answers that D.P.S. provided in a 30(b)(6) that was

15   taken as a result of the data error.  And the changes affect

16   both records produced initially in February as well as records

17   that were produced in the July 23rd supplement that had not

18   been previously provided.

19             **MR. CLAY:**  And in order to avoid any more complaints,

20   I guess, we answered 303 questions that they submitted to us

21   last week by last Friday.  Many of them had nothing to do with

22   the data SNAFU.  They were an explanation of some additional

23   information on some status issues.  It looks like they may have

24   gone back in and reworked some numbers, and added some things,

25   and just amended the report.

1          That's only important, because from our expert's

2    standpoint, they provided the report and response to that

3    report that existed a month ago, or I guess six weeks ago.

4          And so what we wanted to make sure of is that if they

5    come back and we figure out we need to file an amended report

6    to the Court, or to the other side, that everybody understands

7    the basis of that.

8          **THE COURT:**  Okay.

9          **MR. CLAY:**  And so that's -- I guess the ask is that

10   -- well, I guess the ask is that we're working on trying to do

11   a simultaneous, perhaps, reports based upon the D.P.S. SNAFU

12   that would -- I think that's the State of Texas position for --

13   which would be, I guess, Friday a week, and I think that's --

14   that's the 15th?

15         **THE COURT:**  Yes.  Yes.

16         **MR. CLAY:**  The 15th.  That would be the proposal of

17   Texas for issues of experts related to that new information, so

18   that everybody has had it for a significant of time.

19         **THE COURT:**  Let me hear from the Plaintiffs on that.

20         Is that fine, Ms. Baldwin and the rest of the

21   Plaintiffs?

22         **MS. BALDWIN:**  Your Honor, we -- this, that -- the

23   issue that Mr. Scott is mentioning, the simultaneous, was

24   literally just raised an hour before the call with the Court

25   and we just need to talk --

1    **THE COURT:**  Okay.  Well, then you all talk further on

2   that issue.

3    **MS. BALDWIN:**  Thank you, your Honor.

4    **THE COURT:**  All right.

5    **MR. DERFNER:**  Your Honor, this is Mr. Derfner.

6    There's a side issue on the -- related to the SNAFU.

7   Am I on voice or --

8    **THE COURT:**  Yes, you're good.

9    **MR. DERFNER:**  Okay.  And this is one where we have

10   agreement.  We've talked with Mr. Scott about the expenses that

11   we're going to run into with Dr. Herron for revising his data

12   in his report because of the new data that came out because of

13   the SNAFU, and I think we have an agreement there.

14    So we're going to be presenting an Order

15   (indiscernible) State and send it to (indiscernible) say they

16   agree to pay his reasonable expenses based on the agreed rate,

17   and that we'll submit an invoice to them showing what Dr.

18   Herron had to do on this and a total amount of payment.

19    And they, of course, would have the right to review

20   the invoice, and assuming if the amounts, the time is agreed

21   to, then they'll go ahead and pay it.

22    **MR. CLAY:**  And, your Honor, that is correct.  We're

23   trying to make sure that, to the extent somebody has been --

24   produced something that we, the State, properly steps up and

25   takes care of that bill.

1          In order to get something like that paid, we have the

2  -- have to have the obligation of looking through the bill to

3  make sure it relates to that, and then an order from the Court

4  facilitates the payment of that bill so that the comptroller

5  will actually write a check for it.

6          **THE COURT:**  Okay.

7          **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin.

8          If I could, I'd like to bring up one issue that we've

9  been attempting to resolve with Texas that we've been unable

10 to, related to expert disclosures that has a very pressing time

11 line.

12         **THE COURT:**  Okay.  Go ahead.

13         **MS. BALDWIN:**  Your Honor, in Dr. Hood's report that

14 Texas filed last Friday, Dr. Hood relies on some additional

15 turnout data from TEAM, the Texas voter registration database,

16 from 2014, which was after the date of the snapshot of the TEAM

17 data that was previously produced to the United States.

18         You know, again, that's data from the Secretary of

19 State that Dr. Hood is exclusively relying on in his report,

20 and we've requested that Texas produce that to us.  We

21 requested last Friday that any data go ahead and be produced,

22 and we didn't receive it.

23         When we read the report and realized that there was

24 TEAM data that we hadn't received, we went ahead and requested

25 it.  That's, you know, data that is clearly discoverable under

1  Rule 26(e)(2) in terms of facts that are included and relied on

2  in the expert's report.

3         Texas, in response, sent the United States

4  (indiscernible) data that is literally from a party Defendant a

5  public information request form, and told us that we could send

6  the public information request form to the Texas Secretary of

7  State to receive data that their expert is explicitly relying

8  on.

9         That public information request form on its face has

10  a 15-day turnaround (indiscernible) --

11         **THE COURT:**  Okay.  Well, let's figure that out.

12         Mr. Scott, that doesn't make sense, if that, in fact,

13  is what happened.

14         **MR. SCOTT:**  Well, and would -- so did we tell them

15  that the information is publically available?  Absolutely,

16  because that's what we were told --

17         **THE COURT:**  But you have it, or your expert has it --

18  somebody has it where it can be turned over --

19         **MR. SCOTT:**  Yes, and that's --

20         **THE COURT:**  -- because of the --

21         **MR. SCOTT:**  And so that we're clear, that's the basis

22  of our Motion to Compel that we've now set up for briefing for

23  Tuesday.  And so --

24         **THE COURT:**  Well --

25         **MR. SCOTT:**  -- if we could do this on a briefing

43

```
 1   schedule, we would absolutely love to, because this is --

 2            THE COURT:  Well, that's fine but --

 3            MR. SCOTT:  -- this is exactly --

 4            THE COURT:  -- that's exactly --

 5            MR. SCOTT:  -- apples to apples --

 6            THE COURT:  -- what I was thinking when we're talking

 7   about what experts are -- have relied on.  When I just briefly

 8   read this latest Motion to Compel, that's exactly what that

 9   resolves.

10            So I'm just going to let you all know, you know,

11   wherever the Plaintiffs want to go, the Defendants are probably

12   going to be entitled to go.  You know, vice versa -- whatever

13   it may be.

14            But I don't think we should be telling people, "Well,

15   go do a public request for information," or whatever it is, if

16   you have the information, because of the time lines we're

17   operating on.

18            MR. SCOTT:  And --

19            THE COURT:  That's another thing you're saying

20   they're not entitled to it, like they're saying you're not

21   entitled to some things, and then maybe you need to brief it,

22   but it --

23            MR. SCOTT:  We've received links --

24            THE COURT:  If you have it and it needs to be

25   produced, don't send them to do the public request.
```

1      **MR. SCOTT:**  We received links to the locations, and

2  so we went a step above.  We didn't do the public links

3  available.  And I think it goes back to the other thing.  We're

4  attempting to get Catalist documents, which is one of their

5  experts, to find out the underlying -- where he gets his

6  presumptions on the racial makeup of the state, why it's

7  likely, unlikely, what the percentage a person is, who they

8  believe they are -- all of that, that's one of their experts,

9  and they've told us it's proprietary.  It's not available from

10  that standpoint.

11      **THE COURT:**  Okay.

12      **MR. SCOTT:**  It's in their expert's custody.

13      **THE COURT:**  So you're --

14      **MR. SCOTT:**  They have it.

15      **THE COURT:**  -- saying what they want, they shouldn't

16  have, and you're going to brief on it as to why they shouldn't

17  have it?

18      **MR. SCOTT:**  That -- oh, yes.  We'll absolutely make a

19  legal argument that it's publically available to all parties --

20      **THE COURT:**  Well --

21      **MR. SCOTT:**  -- equally available to all parties.

22      **THE COURT:**  But that's kind of -- do you get what I'm

23  saying?

24      **MR. SCOTT:**  I get what you're saying --

25      **THE COURT:**  If you have it --

1          **MR. SCOTT:**  I -- and, Judge, I --

2          **THE COURT:**  -- give it to them.  And --

3          **MR. SCOTT:**  I --

4          **THE COURT:**  -- you're not going to object to it, and

5     your expert has it, and you're not saying they shouldn't have

6     it for whatever reason.  Why are you going to make them go

7     through hoops?

8          **MR. SCOTT:**  I guess, your Honor, it's -- what we're

9     faced with on the other side -- and I've practiced law a long

10    time in this state and done stuff and stepped the extra mile

11    for folks all the time.  And in this case, we've been told

12    repeatedly we can't have something.  I thought that --

13         **THE COURT:**  Well, and I'm going to address that.  But

14    I don't play like that.

15         **MR. SCOTT:**  I -- but --

16         **THE COURT:**  You know, I don't play --

17         **MR. SCOTT:**  But we're giving them --

18         **THE COURT:**  -- "Well, go through some hoops to get

19    this, that, and the other."  I don't do that well, I should

20    say.

21         But I'm going to address what they're trying to keep

22    from you when they brief it, and we're going to talk about it

23    next week.

24         **MR. SCOTT:**  But a week delay in that gives it -- a

25    week advantage to their experts, is I guess the problem on

1    this.  And we're finding --

2              **THE COURT:**  Okay.  If you want --

3              **MR. SCOTT:**  And, your Honor, I'll get it to them --

4              **THE COURT:**  -- to make that argument next week about

5    how you're just going to make them go through the public

6    information -- you know, go right ahead.

7              **MR. SCOTT:**  I -- no, I --

8              **THE COURT:**  Go right ahead.

9              **MR. SCOTT:**  Your Honor, I -- I take your words of

10   wisdom and I will follow your words of wisdom.  I -- but I

11   would also ask that the Court ask the folks on the other side

12   to abide by that golden rule, because I --

13             **THE COURT:**  I have been trying to tell them for a

14   long time that generally what's good for one is good for the

15   other, and sometimes they don't listen.

16             But, you know, we are where we are, and I got your

17   number on all sides here, and we can only trudge ahead.

18             **MR. SCOTT:**  Okay, your Honor.

19             **MS. BALDWIN:**  Your Honor -- thank you, your Honor.

20   This is Ms. Baldwin.

21             Just one more issue related to the expert disclosures

22   in addition to this information (indiscernible) Texas Secretary

23   of State, there's also provisional ballot data that Dr. Hood

24   collected from the states of South Carolina and Mississippi

25   that were requested that it's not in our possession, which the

1   same argument that it was publically available is we were

2   welcome to go ask Mississippi and South Carolina

3   (indiscernible).

4         **THE COURT:**  Well, same thing I already said.

5         **MR. SCOTT:**  So, your Honor, this brings up something

6   I think we're -- the Court is going to run into at the trial.

7   And it came up and it was a huge issue in the last trial.

8         There was a thing called the "no match list."  And

9   right now we're dealing with this -- this program that people

10  come back and they say, "Well, you've got the data."  Well,

11  there's not a specific list that people print out.  And I

12  understand this list may have 800,000 names on it.  But at some

13  point in time, the parties need to get into an agreement over

14  what the no match list is.

15        It is a burden that is on the Plaintiffs in this case

16  to show that there is a no match.  It's one of the

17  preconditions to even get to the point where they can start

18  making a legitimate argument about the case.

19        It seems like it would be a great point at this point

20  for the parties' experts to get together and agree this is the

21  no match list, so we're comparing apples to apples.

22        **THE COURT:**  Okay.

23        **MR. SCOTT:**  What's going to end up happening is

24  people are going to say, "Well, you've really got the wrong

25  information there.  That is really sliced and diced this other

1   way."

2        **THE COURT:**  Okay.  Well, let me ask, who is going to

3   speak on that for the plaintiffs?

4        **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin for the

5   United States, and I'm happy to speak to that.

6        We have repeatedly represented that the data that

7   Dr. Ansolabehere has relied on regarding (indiscernible) --

8        **THE COURT:**  Okay.  I'm sorry.  We can't hear you.

9   Maybe slow down and speak up.

10        **MS. BALDWIN:**  Sure.  I repeatedly explained to Texas

11   that the data that Dr. Ansolabehere has relied on in his report

12   regarding the no match data has been produced to the State of

13   Texas in its entirety with a code book that explains exactly

14   how to reproduce --

15        **THE COURT:**  So we're all working off one no match

16   list.  Is that what you're saying?

17        **MS. BALDWIN:**  Yes, your Honor.  And, in fact, to

18   quote from Dr. Hood's report (indiscernible) this no match list

19   (indiscernible) he was able to replicate it in almost identical

20   form from the aggregate numbers presented in Dr. Ansolabehere's

21   report.  He identifies the other files which Professor

22   Ansolabehere used in his analysis.

23        There's no question that Dr. Hood, Texas's own

24   expert, understands what the no match is and has been able to

25   replicate it.  We've produced the data that Dr. Ansolabehere

1    has relied on --

2           **THE COURT:**  Okay.  Hold on, because my question was

3    so we're all working on one no match list.

4           Mr. Scott, was that your issue, that you don't know

5    what that is -- or which one?  Or what --

6           **MR. SCOTT:**  Your Honor, we -- from our position, I

7    promise you I was not bringing this up as an issue to you.  I

8    brought it up -- and we've brought it up a number of times to

9    D.O.J.

10          If we really, heart of hearts, thought that the

11   lawyers had a list that we could go to our -- whatever witness

12   is sitting up there and saying, "You've got John Smith on here,

13   and you say that he is -- does not have a proper ID to vote, we

14   found that he has a driver's license."

15          What we don't -- that's great.  We're not at that

16   point.

17          What we've done is backtrack, and try and match up

18   numbers, and go through the code that they did not provide us a

19   data dictionary in order to be able to do.  So we've made some

20   assumptions.  Our expert has made some assumptions.  And we

21   have spent an enormous amount of -- a number of sleepless

22   nights trying to figure out where they got to where they got --

23   all unnecessary, because each one of these folks has a voter ID

24   number that someone could provide that list as a separate,

25   standalone document that we could all be working off of.

1             In fact, the document they sent us said the --

2    something like the "U.S.A's no match list."  What it had was 13

3    million names on it, which is the same number of people that

4    they got on the TEAM database from the Secretary of State's

5    Office in Texas.

6             And so we're -- it's a semantics game.  There should

7    be a separate file that is all by itself that there is no

8    mistake that the State of Texas says these are the 300,000, or

9    200,000, or 100,000 names on its no match list, and the party

10   Plaintiffs have a list that has 600 or 800,000 names on their

11   list.  And then at least we can be able -- be assured -- or the

12   Court can be assured that we're arguing about the same thing.

13           **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin.

14           The list -- when Mr. Scott represents 13 million,

15   that's because we've provided them a complete list that says,

16   "Did you match to this form of ID?  Did you match to that form

17   of ID?  Are you an overall match for each and every voter in

18   the State of Texas?"

19           So it is both a complete match list and a complete no

20   match list.

21           It -- you know, the example we talked about on the

22   phone yesterday, a peanut butter and jelly sandwich or a BLT,

23   it has all of the complete ingredients that go into something,

24   and Texas is asking us, "Well, make it easier for us.  Cut the

25   data in a different way.  Have your expert go and make

1    something else."

2          The point is the document that our expert relied upon

3    is the document that we've already produced.  That's the data

4    set that's been produced.

5          It -- there's not some other draft that he's relying

6    on.  He's coming to all of his conclusions based on that data

7    set, which their expert, Dr. Hood, has, in fact, been able to

8    replicate.

9          We are not obligated to prepare, you know, additional

10   helpful cheat sheets for the State that makes their job easier.

11         Our expert compiled -- compiled the data in a certain

12   way that's relied upon in District Court, and that's what we've

13   provided.

14         **MR. SCOTT:**  We're going to provide them the documents

15   that the Court has asked us to provide -- I mean not asked, but

16   has given the wisdom to do so.

17         We're going to give them the stuff from Dr. Hood that

18   he's relied upon in his report.

19         And if the Court believes we're best to go on a path

20   where there's not a single list that there's no --

21         **THE COURT:**  Well, that's not --

22         **MR. SCOTT:**  -- mistake that these are --

23         **THE COURT:**  -- going to be good for the Court.  But,

24   you know, that again goes to how parties are going to try this

25   and how that's going to play into the evidence, I guess, and

1    how the Court sees it.

2              **MR. SCOTT:**  And so the -- we fast-forward, at least,

3    in the crystal ball a little bit to the trial, I anticipate

4    there is going to be an enormous amount of going line by line

5    on that that could otherwise have been taken care of early on.

6              **THE COURT:**  And I'm not going to appreciate that one

7    bit, because it's not just about you all being opponents, but I

8    am the fact finder here.  So if you can make -- you, and I'm

9    not saying you, just the State, but if both the Plaintiffs and

10   the Defendants can make it easier for the fact finder, then so

11   much better for you all.

12             And if not, you know, then not.

13             **MS. BALDWIN:**  Your Honor, this is -- this is

14   Ms. Baldwin.

15             And I just want to clarify that Mr. Scott appears to

16   have pivoted a little bit in his presentation to the Court,

17   where previously Mr. Scott has been assuming in our

18   negotiations that we have such a preexisting list that we're

19   not providing.  And we've explained, no, that what

20   Dr. Ansolabehere relied on is what Dr. Ansolabehere relied on.

21             If Mr. Scott is making another proposal that the

22   parties come up with some kind of different thing, that's --

23   that doesn't already exist, that's not something that Mr. Scott

24   has spoken with us before.

25             **THE COURT:**  Well --

1          **MS. BALDWIN:**  And I would just point out that for

2   Dr. Hood, we haven't received (indiscernible) --

3          **THE COURT:**  Okay.  Let me just say, if you all are

4   willing to do that, then so ordered by the Court.

5          **MR. SCOTT:**  Right.

6          **THE COURT:**  Because I can only see where that would

7   be helpful to the Court.

8          **MR. SCOTT:**  Right.

9          **THE COURT:**  Any comment on that?

10         **MR. SCOTT:**  That's right with the State of Texas,

11  your Honor.  We're --

12         **THE COURT:**  Ms. Baldwin?

13      **(No audible response)**

14         Ms. Baldwin?

15         **MS. BALDWIN:**  With the understanding that the list

16  that we've already produced is the list that Dr. Ansolabehere

17  has relied on.  We're certainly happy to talk with the State of

18  Texas about what that final list is --

19         **THE COURT:**  Well --

20         **MS. BALDWIN:**  -- (indiscernible) in some way that

21  makes it easier for the fact finder.

22         **THE COURT:**  Talk about it.  And I think everyone

23  should be on board about that, unless other counsel wants to

24  discuss that further.

25      **(No audible response)**

1          I don't hear anything.  So can I move on from that?

2          **MR. SCOTT:**  Yes, ma'am.

3          **THE COURT:**  Okay.  I know you all were conferring on

4    a couple other issues.  I just -- every time we meet, I try to

5    see what motions can be knocked out.

6          So I don't know if there's anything further on the

7    Defendants' Motion to Compel the Plaintiffs, both Ortiz Lupe

8    (phonetic) and Veasey-LULAC, Answers on some Interrogatories.

9          I believe I still have that as you all conferring.

10         **MS. WOLF:**  Yes, your Honor.  This is Lindsey Wolf for

11   the Defendants.

12         Unfortunately, I just haven't had a chance to talk

13   with them about that, so --

14         **THE COURT:**  Okay.  I --

15         **MS. WOLF:**  -- we haven't resolved it, but that

16   doesn't necessarily mean that it won't be.  We just need some

17   time --

18         **THE COURT:**  Then I --

19         **MS. WOLF:**  -- to talk with them.

20         **THE COURT:**  Okay.  I'm not going to discuss that.

21         Then the only other thing I think you all were going

22   to continue discussing was maybe Dallas's Motion to Participate

23   as an Amicus.  I don't know if there's anything else that needs

24   to be addressed there.

25         **MR. DUNN:**  Your Honor, this is Chad Dunn on behalf of

1    the Veasey-LULAC Plaintiffs.

2         We, in getting caught up on all the multiple other

3    issues, haven't gotten back with the State to talk about that.

4    I think it's something we're going to work out, so if we can

5    postpone it --

6         **THE COURT:**  That's fine.

7         **MR. DUNN:**  -- that would be great.

8         **THE COURT:**  Okay.  Anything else from the Plaintiffs?

9         **MR. DERFNER:**  Yes.  This is Mr. Derfner, your Honor.

10        **THE COURT:**  Yes.

11        **MR. DERFNER:**  And this is just -- I just want to let

12   you know about another issue that I think we're probably going

13   to resolve.  And that has to do with we have asked the State

14   for -- to compensate the expert witnesses for deposition-

15   related expenses, including time and expenses, for appearing at

16   the depositions, for travel, and for a reasonable amount of

17   time to prepare for the deposition in line with the rule and I

18   think in line with the Court's Order in a case called

19   (indiscernible) against Wells Fargo.

20        And we haven't had a definitive response from the

21   State, but I believe we'll be able to work that out.  But I

22   just wanted to --

23        **THE COURT:**  Okay.  You all --

24        **MR. DERFNER:**  -- (indiscernible).

25        **THE COURT:**  -- can discuss that further.  I just --

1   if you all don't have specific agreements, then I just follow

2   the rules --

3          **MR. SCOTT:**  And -- and --

4          **THE COURT:**  -- as is.  But sometimes the parties come

5   to an agreement to pay their own, or whatever it may be.

6          **MR. SCOTT:**  And we just -- I think they brought it up

7   now, and what the -- the one issue that they've I think listed

8   16 different experts and provided 16 different expert reports,

9   and what we don't want to encounter is somebody that's

10  irrelevant to the case that they just did as a delay tactic,

11  doesn't show up to testify at trial, because we're doing -- I

12  think the Court has ordered *Daubert* Motions to take place after

13  the testimony of the witness here in trial.

14          And so we're not really going to have the guidance

15  about whether it's relevant or not to the case until after that

16  point.  So I would urge the Court, I guess, to hold off on

17  deciding the payment of how much is relevant to that testimony

18  until after the witness has appeared and testified, and the

19  Court has made a decision that their testimony is relevant.

20          **MR. SPEAKER:**  We don't --

21          **MR. SCOTT:**  I think that was the take-away of that

22  case we -- they provided me that you had.

23          **THE COURT:**  Yeah.  I mean, that's fine.  If you all

24  -- we're just going to follow the rule.  Certainly, at the end

25  of the trial, or whatever it may be, this Court may have to

1    address some issues regarding costs and expenses.

2            Correct, Mr. Derfner?

3            **MR. DERFNER:**  Correct.

4            **THE COURT:**  Okay.  What -- anything else from --

5            **MR. DERFNER:**  (Indiscernible).

6            **THE COURT:**  -- the Plaintiffs?

7            **MR. HEARD:**  Your Honor, Brad Heard for the United

8    States.

9            Just to -- just to make the Court aware, we are

10   preparing to file a Motion to Strike today related to a portion

11   of the Defendants' Answer.

12           In addition, we are in discussions with the

13   Defendants regarding Requests for Admissions that we believe

14   have not been properly answered.  We're hoping to hear back

15   something on that today.  And if we're not able to resolve

16   that, that Motion will also be filed.  And we anticipate we

17   would like to have it heard by the Court at whatever Status

18   Hearing is scheduled for next week.

19           **THE COURT:**  Okay.  Have you all discussed the Motion

20   to Strike, conferred on that also?

21           **MR. SCOTT:**  I've not visited with him.

22           **THE COURT:**  Okay.  You all need to just talk about

23   everything before you start filing matters, because sometimes

24   some --

25           **MR. HEARD:**  We have --

1      **THE COURT:**  -- some --

2      **MR. HEARD:**  We have conferred on the RFAs.  We did

3    confer on the Motion to Strike (indiscernible) rules that

4    requires referral, but we're certainly happy to talk with him

5    about it if the Court wishes.

6      **THE COURT:**  No, I wish that you all always talk and

7    confer, because every once in a while, you all do come to

8    agreements.

9      So --

10      **MR. HEARD:**  Happy to try, your Honor.

11      **THE COURT:**  Yeah, okay.  Anything else from the

12   Plaintiffs?

13      **(No audible response)**

14      Then anything from the Defendants?

15      **MR. SCOTT:**  There's still the pending Motion to

16   Compel of the House reps, not --

17      **THE COURT:**  Right.

18      **MR. SCOTT:**  Not the senator one, because I think

19   that's the one we're waiting for Ms. London to come back from

20   England.

21      **THE COURT:**  But I think I was -- I think the Court

22   was taking the position I was going to address them --

23      **MR. SCOTT:**  Wait on both of them --

24      **THE COURT:**  -- together.

25      **MR. SCOTT:**  -- at the same time.  Okay.

1          **THE COURT:**  Since they involve really the same thing.

2          And do we know, Brandy?  Did we set that?  Or --

3          **MR. SCOTT:**  And, again, to the extent that ends up --

4     I know we had testimony develop yesterday in one of their

5     experts that he admitted helping Senator Gallegos come up with

6     talking points early on in 2005 throughout the voter ID

7     process.

8          I don't know what other documents are out there.  I

9     know that it's part and parcel of their experts' opinions, at

10    least some of this.  And so that's the other, I guess, urgency.

11         And as long the Court, again, is aware, so if we file

12    such a Motion to Amend our expert report based upon this newly

13    discovered evidence, that --

14         **THE COURT:**  Did we set it?

15         **THE CLERK:**  Your Honor, Ms. London returns from out

16    of the country tomorrow, so it can be addressed at next week's

17    hearing on the 14th.

18         **THE COURT:**  Okay.

19         **MR. SCOTT:**  Okay.

20         **THE COURT:**  So we'll do that.

21         **MR. SCOTT:**  Thank you.

22         **THE COURT:**  Anything else, counsel?

23       **(No audible response)**

24         If you have nothing further, then you can be excused.

25    Thank you.

60

1          **MR. SCOTT:**  Thank you, your Honor.

2          **MS. BALDWIN:**  Thank you, your Honor.

3          **MR. SPEAKER:**  Thank you, your Honor.

4          **MR. SPEAKER:**  Thank you, your Honor.

5      **(This proceeding was adjourned at 4:03 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          <u>August 8, 2014</u>


TONI HUDSON, TRANSCRIBER