IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| MARC VEASEY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> RICK PERRY, *et al.*, <br><br> Defendants. | Civil Actions No. 2:13-cv-193 (NGR) |

## SUPPLEMENTAL DECLARATION OF DR. BARRY C. BURDEN

Pursuant to 28 U.S.C. § 1746, I, Barry C. Burden, make the following declaration:

1. The purpose of this reply report is to respond to the reports of defense experts M.V. Hood III and Jeffrey Milyo and to reflect new analysis conducted by Stephen Ansolabehere based on corrected data provided by the State of Texas. I limit my response to areas of their reports that touch upon my expert report submitted to the court on June 27, 2014, and amended on July 1, 2014. I address five areas of disagreement.

**Dr. Ansolabehere's Analysis**

2. Dr. Milyo observes that I refer to Dr. Ansolabehere's estimates of the number of registered voters who lack ID to vote under SB 14 "without caveats or concerns" (¶¶ 50-51). It was not within the scope of my report to analyze those data directly or to engage in comprehensive scrutiny of the analyses. Dr. Ansolabehere's estimate that approximately 9% of registered voters in Texas lack suitable ID did not appear out of line with estimates from expert analyses conducted in other states.[1] Likewise, I was aware of other research by Dr. Ansolabehere reporting that "deadwood" on registration rolls was quite low in Texas.[2]

3. After my report was submitted, the State of Texas revealed that it had delivered incomplete data to Dr. Ansolabehere.[3] Dr. Ansolabehere's updated estimates based on corrected data from the state produce lower "no match" rates between the state voter registration file and

---

[1] For example, *Frank v. Walker*, No. 11-cv-1128, 2014 WL 1775432, at *12 (E.D. Wis. 2014), observed that approximately 9% of registered voters in the state lacked suitable ID.

[2] See Figure 3.6 of Stephen Ansolabehere and Eitan Hersh (2014), "Registration and Voting: A View from the Top," in *The Measure of American Elections*, eds. Barry C. Burden and Charles Stewart III, New York, NY: Cambridge University Press. Dr. Milyo cites an older, working paper version of what became the Ansolabehere and Hersh publication (Milyo footnote 28).

[3] Declaration of John W. Crawford, July 22, 2014.

1

DMV records. But in every analysis he conducts using the new data—whether using Catalist racial classifications, ecological regression, or homogeneous Census blocks—blacks and Latinos remain significantly less likely than Anglos to possess ID for voting. Indeed, racial and ethnic disparities persist even after applying the many weights and adjustments introduced by Dr. Hood and Dr. Milyo.

4. As I explained in my initial report, matching of DPS and voter registration files is a conservative methodology for estimating how many Texas residents lack ID (¶ 89). Approximately 2.5 million citizens in Texas who would otherwise be eligible to vote do not even appear in the voter file because they are currently not registered to vote. Unregistered individuals are almost certainly much more likely to lack ID than registered individuals. Dr. Hood's reanalysis of the Barreto-Sanchez survey verifies this. Generalizing across the many estimates that Dr. Hood provides indicates that the share of the electorate without ID is roughly twice as high when the population is expanded from registered voters to all eligible citizens.[4]

**Dr. Milyo's Dismissal of Costs**

5. Dr. Milyo is correct in his suggestion that voter turnout is affected by each of the factors included in the calculus of voting model. Dr. Milyo has rightly set out the model as predicting that an individual will vote when $(p \times B - C) + D > 0$, where p is the probability that a voter casts a decisive vote, B is the benefit to the voter of having his or her preferred candidate win, C is the cost of voting for the individual, and D is the non-instrumental value of voting (including factors such as expressing one's identity and fulfilling a sense of civic duty) (¶ 133). This formulation is widely used in political science and is a common way for scholars to understand the turnout decision. As the Aldrich article Dr. Milyo discusses explains, "This model has been tested extensively, all tests find that the C, D, and B terms are strong predictors of turnout" (p. 252).[5]

6. That field experiments Dr. Milyo describes show some effects on turnout when people are given messages about civic duty (D), but this does not render the cost term irrelevant. One of the early studies of this type found that a "civic duty" message has an effect of 9.1% on turnout. A message that the "election is close" (p) found an even larger 12.1% effect.[6] This suggests that the p×B combination is not necessarily "extremely small" or that the "theory is falsified," as Dr. Milyo asserts (¶ 132). Moreover, the civic duty term does not necessary dominate cost considerations or other factors in the model. In more recent field experiments, a civic duty message had a mere 1.8% effect and was less impactful than three other messages.[7] But the question in this case is not where cost ranks relative to the many other factors.

---

[4] See Hood Report tables 10A, 10B, 10C, 10D, 11A, and 11B.
[5] John H. Aldrich (1993), "Rational Choice and Turnout," *American Journal of Political Science* 37:246-278.
[6] Alan S. Gerber and Donald P. Green (2000), "The Effects of Canvassing, Telephone Calls, and Direct Mail on Voter Turnout: A Field Experiment," *American Political Science Review* 94:653-663.
[7] Alan S Gerber, Donald P. Green, and Christopher W. Larimer (2008), "Social Pressure and Voter Turnout: Evidence from a Large-Scale Field Experiment," *American Political Science Review* 102:33-48.

7. The decision to vote is sensitive enough to costs that even Election Day weather has been shown to depress turnout, as demonstrated in a study by Gomez and Hansford.[8] The authors of the study reference the Aldrich article and point out that while many observers believe costs of voting to be low, "we find that voters seem to be rather sensitive to what is presumably a minor increase in participation costs—the weather" (p. 659). It would thus not be surprising that more direct costs imposed on voters by the state would also have sizable effects on participation.

8. Many recent studies have demonstrated the effects of state-imposed costs on turnout, particularly with regard to travel costs. Haspel and Knotts show that increasing the distance from one's residence to the polling place by just two-thirds of a mile decreased turnout in an Atlanta mayoral election by five percentage points for those with a vehicle available and 25 points for those without a car available.[9] Dyck and Gimpel's study of Clark County, Nevada in 2002 finds that an increase in distance from one's residence to the precinct polling place dropped turnout by between 1.4 and 4.5 percentage points.[10] Brady and McNulty show that relocating polling places in California in 2003 reduced overall turnout by a net of 1.85 percentage points.[11] McNulty, Dowling, and Ariotti show that consolidating polling places for a voter in a school district election in upstate New York reduced participation by about seven percentage points.[12] As another example, the burden of voter registration has been shown to decrease overall voter turnout by anywhere from two to 14 percentage points.[13] Leighley and Nagler's analysis shows that state laws that allow Election Day registration or absentee voting may reduce costs and increase turnout in nontrivial ways.[14]

9. Given these studies and other contemporary scholarship, Dr. Milyo's assertion that simply by "referencing" Aldrich's landmark article I am "reaching backward into the past and skipping over the fundamental lessons from much more recent empirical scholarship on the determinants of voting" (¶ 140) is baseless. In summary, this research, which Dr. Milyo largely omits from his rebuttal report, shows that while the precise effects vary by the

---

[8] Thomas G. Hansford and Brad T. Gomez (2010), "Estimating the Electoral Effects of Voter Turnout," *American Political Science Review* 104:268-88.

[9] Moshe Haspel and H. Gibbs Knotts (2005), "Location, Location, Location: Precinct Placement and the Costs of Voting," *Journal of Politics* 67:560-73.

[10] Joshua J. Dyck and James G. Gimpel (2005), "Distance, Turnout, and the Convenience of Voting," *Social Science Quarterly* 86:531-548.

[11] Henry E. Brady and John E. McNulty (2011), "Turnout Out to Vote: The Costs of Finding and Getting to the Polling Place," *American Political Science Review* 105:1-20.

[12] John E. McNulty, Conor M. Dowling, and Margaret H. Ariotti (2009), "Driving Saints to Sin: How Increasing the Difficulty of Voting Dissuades Even the Most Motivated Voters," *Political Analysis* 17:435-55.

[13] For example, see Barry C. Burden and Jacob R. Neiheisel (2013), "Election Administration and the Pure Effect of Voter Registration on Turnout," *Political Research Quarterly* 66:77-90; Raymond E. Wolfinger and Steven J. Rosenstone (1980), *Who Votes?* Yale University Press; G. Bingham Powell Jr. (1986), "American Voter Turnout in Comparative Perspective," *American Political Science Review* 80:17-43.

[14] Jan E. Leighley and Jonathan Nagler (2014), *Who Votes Now? Demographics, Inequality, and Turnout in the United States*, Princeton, NJ: Princeton University Press.

electoral context, the election parameters controlled by the government do in fact shape the costs of voting in significant ways. Dr. Milyo does not dispute these studies.

10. In the face of this research, Dr. Milyo asserts that "post-registration election procedures . . . have fairly modest, insignificant or even perverse effect on voter turnout" (¶ 14). Even if this statement were true, it does not bear on the relevant question in this case: whether SB 14 imposes a heavier burden on minority voters. Indeed, research by Wolfinger, Highton, and Mullen establishes that an array of "post-registration" procedures impose costs on voters that translate into disparate effects on their participation. The authors' analysis of the 2000 election showed that increasing the costs of voting by shortening polling hours and not mailing sample ballots decreased turnout by 4 percentage points among whites, but by 4.8 points among blacks and 6.8 points among Latinos.[15] Dr. Milyo is certainly aware of this research, as he participated in a reanalysis of the underlying data, but he failed to address these findings in his report. Moreover, Dr. Milyo's reanalysis of the Wolfinger, Highton, and Mullen data in a later article does not investigate the critical racial and ethnic differences.[16]

11. In general, disruptions to voting habits also raise costs and deter participation. It is little surprise, then, that changes to election procedures can deter voting. SB14 is likely to exacerbate differences in political participation by Anglos on the one hand and by blacks and Latinos on the other because blacks and Latinos have fewer of the socioeconomic resources necessary to pay the costs imposed on the voting process by SB 14.

12. Of the four terms in the calculus of voting model, cost is the only one that is set by law and controlled by the state. Both classic and contemporary research has shown that government-controlled costs affect electoral participation once other factors are taken into account. But turnout is not the determinative consideration for judging the impact of SB 14. As my initial report contended, the law imposes a disproportionate burden on blacks and Latinos because the ability to meet costs varies by race and ethnicity. As I discuss further below, turnout cannot measure the impact of SB 14 unless a researcher is able to control for the other terms in the calculus of voting. None have been able to do so thus far.

**Dr. Hood's Comparison of State ID Laws**

13. Dr. Hood contends that SB 14 is "very similar" to the voter ID laws in Georgia and South Carolina (p. 6). In rating the relative strictness of the laws, he describes Texas as being "in the middle" of the other two states (p. 9). Table 1 is offered as summary evidence of this assertion. Dr. Hood's portrayal of the laws is misleading in important ways.

14. Dr. Hood describes the exception for absentee voters as an "accommodation" (p. 5). My initial report showed that the absentee exception, in combination with limitations on who may vote absentee, in fact inappropriately creates two classes of voters (¶¶ 83and 100). Without a factual justification, SB 14 imposes a heavier burden on in-person voters, who are

---

[15] Raymond E. Wolfinger, Benjamin Highton, and Megan Mullin (2005), "How Postregistration Laws Affect the Turnout of Citizens Registered to Vote," *State Politics & Policy Quarterly* 5:1-23
[16] David Primo, Matthew L. Jacobsmeier, and Jeffrey Milyo (2007), "Estimating the Impact of State Policies and Institutions with Mixed-Level Data," *State Politics & Policy Quarterly* 7:446-459.

4

disproportionately black and Latino, than on absentee voters, who are disproportionately Anglo (¶¶ 80-82 and Table 3).

15. Not imposing the ID requirement on those 65 and over may be seen as a courtesy to senior citizens, but it also imposes a disproportionate burden on minority voters. Anglos in Texas are twice as likely as blacks to be 65 or older and nearly three times as likely as Latinos to be 65 or older.[17] Likewise, the allowance for a select group of people with disabilities or who have recently experienced a natural disaster may technically be accommodations, but these two exceptions are narrowly defined and seldom used. Such narrow exceptions will have little ameliorative effect on the disproportionate burden of SB 14.

16. Dr. Hood's Table 1 suggests that a free ID is as easy to get in Texas as in South Carolina. That is not so. Registered voters in South Carolina who lack one of the approved forms of ID may get one for free at the voter registration and elections office in every county. In Texas counties, the office may be a DPS office, a county office, or a temporary mobile unit, and Texas counties are far larger than those in South Carolina. In South Carolina, all one needs to do to obtain a voter ID is to provide date of birth and the last four digits of his or her Social Security Number. Unlike in Texas, no documents are needed.

17. Dr. Hood's Table 1 also suggests that Georgia and Texas allow about the same number of IDs for voting; each of the states' columns has the same number of Xs. But the final row conceals a great number of options that are allowed in Georgia under the heading of "Federal/State/Local Government Employee ID," including forms of ID that have nothing to do with employment. As Dr. Hood acknowledges (p. 7), this includes "any 'valid photo ID from any branch, department, agency, or entity of the U.S Government, Georgia, or any county, municipality, authority or other entity of this state" including state universities and colleges. Acceptable sources thus include a wide range of federal employee IDs, Georgia employee IDs, county employee IDs, municipal employee IDs, and 62 state universities and colleges' IDs.[18] Thus, Table 1 would more accurately contain many Xs to indicate the various IDs that are accepted in Georgia but are not allowed in Texas. In addition, unlike in Texas, in Georgia a voter's driver's license may be used regardless of how long it has been expired.

18. Dr. Hood's Table 1 also omits the critical failsafe created by South Carolina's "reasonable impediment" provision. In South Carolina a voter without ID may bring a non-photo registration card to the polling place and sign an affidavit explaining that he or she faced a "reasonable impediment" to procuring ID. Valid impediments include such things as illness, work, transportation, lack of a birth certificate, family duties, or "any other obstacle you find reasonable."[19] As the opinion of a federal court addressing the South Carolina ID law explains, "Any reason that the voter *subjectively* deems reasonable will suffice, so long as it is not false" and allowing "the sweeping reasonable impediment provision in Act R54

---

[17] According to 2010 Census data, 15.4% of Anglos in Texas are 65 or older, whereas only 5.6% of Hispanics and 7.6% of non-Hispanic blacks are 65 or older. Notably, these data do not distinguish between citizens and non-citizens.

[18] http://sos.ga.gov/admin/files/acceptableID.pdf

[19] South Carolina State Election Commission, http://www.scvotes.org/2012/09/24/photo_id_requirements.

5

eliminates any disproportionate effect or material burden that South Carolina's voter ID law otherwise might have caused." Therefore, "all voters in South Carolina who previously voted with (or want to vote with) a non-photo voter registration card may still do so, as long as they state the reason that they have not obtained a photo ID."[20]

**Relevance of Scholarly Literature**

19. Dr. Hood and Dr. Milyo refer to a scholarly literature examining the effects of voter ID laws, but the research they cite is not a reliable guide in this case. They contend that studies of voter ID laws find their overall effects on turnout to be near zero. However, the studies in question are limited by the short time period and the small and non-comparable set of states being analyzed. The studies they cite rely on data collected from elections mostly conducted between 2000 and 2010. Most of those studies do not differentiate between strict voter ID laws such as SB 14 and less strict versions, such as those in many states that allow use of non-photo ID or permit a voter without an ID to cast a valid ballot after signing an affidavit affirming his or her identity. Lumping these heterogeneous types of ID requirements together obscures the potential for rather different effects.

20. Few states had strict voter ID laws in the 2000s. Georgia and Indiana enacted strict photo voter ID laws in 2005.[21] The next wave of adoptions did not take place until Kansas, Mississippi, and Tennessee were added in 2011.[22] Having only two states provides little statistical "leverage" because of the sizable generalizations that must be made from a small number of unusual cases to the much larger set of hypothetical cases. Furthermore, many of the studies of voter ID effects that Dr. Milyo cites predate the recent expansion and do not account for the significant differences among ID laws across the states. SB 14 is stricter than the Georgia and Indiana laws that were the focus of those studies and has more potential to depress voter turnout.

21. The best scholarly guide to this literature is by Erikson and Minnite.[23] Erikson and Minnite's article demonstrates that the inability to establish the statistical significance of voter ID laws is largely an artifact of limited statistical power. In particular, they remind researchers that there are simply too few states with comparable laws to produce reliable estimates. As they warn, "Until we have more experience with restrictive voter ID laws that are already on the books, and therefore, more data to analyze, survey findings and database matching showing thousands, perhaps millions of citizens lacking government-issued photo ID should raise red flags for policy-makers and voting rights advocates alike that these laws could prevent eligible voters from voting" (p. 98). They go on to recommend relying instead on survey and

---

[20] *South Carolina v. United States*, 898 F. Supp. 2d 30, 34, 36, 40 (D.D.C. 2012) (three-judge court).
[21] Georgia's implementation was delayed until a federal court injunction was removed in 2007.
[22] See the NCSL's compilation of voter ID laws (http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx) and Rene R. Rocha and Tesuya Matsubayashi (2014), "Politics of Race and Voter ID Laws in the States: The Return of Jim Crow?" *Political Research Quarterly* 67:666-679 (cited as a 2013 article by Dr. Hood in footnote 34).
[23] Robert S. Erikson and Lorraine C. Minnite (2009), "Modeling Problems in the Voter Identification-Voter Turnout Debate," *Election Law Journal* 8:85-101.

database matching methodologies, precisely the sort of evidence plaintiffs have placed before the court in this case (p. 98).

**Analyses of Voter Turnout**

22. Perhaps realizing the limitations of existing studies, Dr. Hood attempts to analyze the effects of SB 14 on voter turnout by examining recent elections in Georgia, Mississippi, and Texas that took place before and after implementation of voter ID laws. At first blush, this seems like a useful approach. However, familiarity with research on different types of elections and voters shows that it is not. Even setting aside the point in the previous paragraph about the noncomparability of voter ID laws in these three states, and even if turnout were a useful standard for judging the result of SB 14 on minority voters, Dr. Hood's approach is uninformative. The reason is that the elections he examines are the ones least likely to be influenced by a voter ID law.

23. The elections Dr. Hood analyzes are the 2013 special primary, special primary run-off, and special general elections in South Carolina's first congressional district; the 2014 primary election and primary election run-off in Mississippi; and the 2013 constitutional amendment election and 2014 primary in Texas. These elections involve highly selective participation by a small number of voters relative to a federal general election, let alone a presidential election. By my rough calculations, none of these elections saw turnout higher than 20% among eligible voters and several were below 10%. It is risky to generalize about how SB 14 will operate in a statewide general election based on several elections in three states where 80% to 90% of voters did not participate.

24. Dr. Hood's comparison is not productive for assessing the effects of the law because it could easily result in faulty conclusions. Voters who participate in a primary election or a low salience constitutional referendum vote are unrepresentative of the general electorate and are the voters least likely to be affected significantly by a voter ID law. The voting habits of primary voters should not be generalized to other elections because these elections differ from general elections in several important ways. Primary voters are a select set of motivated individuals who wish to participate in an intra-party nomination contest. Political science research shows that—compared to general election voters—primary election voters are often more partisan, more educated, have higher incomes, have a greater sense of efficacy, and have more consistent histories of voter participation.[24] The same skew is true in other low turnout elections such as the 2013 constitutional amendment election in Texas, but is even evident in midterm elections when they are compared to presidential elections. Voters in lower profile elections tend to possess the traits that make them least likely to have their voting habits interrupted by a change in the law. Put in terms of the calculus of voting, voters in low turnout elections have more of the resources needed to overcome the "costs" of voting

---

[24] For a brief summary of research on presidential primaries, see the following reviews of research: Brian F. Schaffner (2011), *Politics, Parties, and Elections in America*, 7th ed., Boston, MA: Cengage Learning. p. 174; Karen M. Kaufmann, John R. Petrocik, and Daron R. Shaw (2008), *Unconventional Wisdom: Facts and Myths about American Voters*, New York, NY: Oxford University Press, p. 197. State and congressional primaries are likely to be even less representative and typically generate lower levels of voter turnout.

and see more benefit from participating. In contrast, the electorate in a presidential contest includes voters who do not participate in other elections, who are by definition marginal and more likely to be influenced by costs imposed by election laws.

25. In addition, most of the electoral activity in this select set of elections was focused on Republican candidates and the Republican Party. Latino voters are more likely to vote in Democratic primaries; this is even truer for black voters.[25] They are unlikely to comprise many of the participants that Dr. Hood examines. In all three states, the primaries either saw higher participation in the Republican balloting or were exclusively for Republicans. Participants in these unrepresentative, idiosyncratic, low-turnout races involve mostly highly resourced Anglos. They thus have little to say about the burdens of SB 14 or its likely effects on turnout in a general election.

26. Dr. Hood also investigates the effects of Georgia's voter ID law by comparing the 2004 and 2008 elections (Figure 1). This initially seems like a reasonable approach because 2004 and 2008 are the two presidential elections that bracketed the adoption of the law. Similarly, an unpublished report by Dr. Milyo attempts to estimate the effects of Indiana's law on turnout by comparing the 2002 and 2006 midterm elections.[26] However, this simple method suffers from what social scientists called a "confound," specifically the problem of history.[27] This makes the analysis unreliable for determining the causal effects of the law.

27. In the case of Dr. Hood's study, the 2008 election differed from 2004 in two important ways that do not involve the presence or absence of a voter ID law. First, Barack Obama was on the ballot in 2008, but not in 2004. As the first black candidate to be nominated by a major party, he generated unusually high levels of enthusiasm and participation among black voters. Second, Georgia was more politically competitive in 2008 than in 2004. The final vote share margin between the two parties fell from 16.6 percentage points in 2004 to 5.2 percentage points in 2008. This made Georgia the seventh most competitive of the 50 states and was connected to increased campaign activity and voter participation. Due to Obama's presence on the ballot and a more competitive campaign environment, it is unsurprising that black registration and turnout rates in Georgia increased between 2004 and 2008, notwithstanding the introduction of Georgia's voter ID law. Dr. Hood's inference from these data that voter ID did not impose a significant barrier to participation is unwarranted.

28. Dr. Milyo contends that the 2002 and 2006 elections "offer a nearly ideal natural experiment for identifying the effects of photo ID on turnout. This is because there were no other major changes in Indiana election laws during this time period, so the impact of photo ID will not

---

[25] As but one reminder of the overall preference among these groups for Democratic candidates, the 2012 national election exit polls indicate that the share voting Democratic for president was 41% among Anglos, 71% among Latinos, and 93% among blacks.

[26] Jeffrey Milyo (December 2007), "The Effect of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis," Institute of Public Policy Report 10-2007.

[27] Concerns about the "history" threat to causal inference and related confounds are standard topics covered in courses on empirical research design. The classic statement appears in the textbook, Donald T. Campbell and Julian Stanley (1963), *Experimental and Quasi-Experimental Designs for Research*, Chicago, IL: Rand McNally.

be confounded with other changes in state election administration" (p. 4). While it is true that there were no other major changes in Indiana's elections laws in this period, Dr. Milyo overlooks any number of other confounding historical factors that bias the estimates. Among the many confounding factors he ignores are changes in the candidates, issues, and competitiveness of races between the two elections. In 2006, three incumbent members of Indiana's congressional delegation were defeated, and a U.S. Senate seat was on the ballot, albeit in a weakly contested race. By contrast, in 2002 no House incumbent was successfully challenged and there was no U.S. Senate seat on the ballot, although there was one congressional contest for an open seat. Dr. Milyo's simple before-and-after analysis in a single state cannot distinguish between the effects of voter ID and those due to other changes in the state's electoral environment.

29. Beyond the methodological flaws in the approach used by Dr. Hood and Dr. Milyo is the broader question of whether turnout analysis is the correct way to measure the burden that SB 14 places on minority voters. Voter turnout is affected by many factors, so a focus on that metric obscures the differential burden imposed by the law that must blacks and Latinos must overcome to participate in the electoral process. Putting the discussion in terms of the calculus of voting, the appropriate analysis should not simply count up what share of each racial and ethnic group paid the costs of voting. Rather, the questions are whether the state effectively charged each group a different rate and whether groups are equally able to pay the rate charged. Dr. Hood's statement that "ID disparity only matters, however, if it ultimately causes a disparity in voter turnout" is a misguided standard for assessing the impact of SB 14 on blacks and Latinos.

I declare under penalty of perjury the foregoing is true and correct. Executed this 15th day of August, 2014.

_____

Barry C. Burden