UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,       )     CASE NO: 2:13-CV-00193
                       )
         Plaintiffs,   )       CIVIL
                       )
    vs.               )    Corpus Christi, Texas
                       )
RICK PERRY, ET AL.,      )   Thursday, August 14, 2014
                       )
          Defendants.  )  (10:28 a.m. to 11:29 a.m.)


STATUS CONFERENCE

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE


Appearances:         See Next Page

Court Recorder:      Genay Rogan

Clerk:             Brandy Cortez

Court Security Officer:  Adolph Castillo

Transcriber:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**

Plaintiffs:     ARMAND DERFNER, ESQ.
         P.O. Box 600
         Charleston, SC 29402

         CHAD W. DUNN, ESQ.
         KEMBEL SCOTT BRAZIL, ESQ.
         Brazil and Dunn
         4201 Cypress Creek Parkway, Suite 530
         Houston, TX 77068

         J. GERALD HEBERT, ESQ.
         191 Somervelle Street, Suite 405
         Alexandria, Virginia 22304

         EMMA SIMPSON, ESQ.

Mexican American   EZRA D. ROSENBERG, ESQ.
Legislative Caucus,  Dechert, LLP
et al.:       902 Carnegie Center, Suite 500
         Princeton, NJ 08540-6531

Texas League of Young DANIELE CONLEY, ESQ.
Voters Education Fund: KELLY DUNBAR, ESQ.
         1875 Pennsylvania Avenue NW
         Washington, DC 20006

State of Texas:    JOHN BARRET SCOTT, ESQ.
         Scott, Yung, L.L.P.
         208 N. Market Street
         Suite 200
         Dallas, TX 75202

         LINDSEY WOLF, ESQ.
         BEN DONNELL, ESQ.
         DAVID TALBOT, ESQ.

United States     ANNA BALDWIN, ESQ.
of America:      BRADLEY HEARD, ESQ.
         U. S. Department of Justice
         950 Pennsylvania Avenue, N.W.
         NWB Room 7125
         Washington, DC 20530

Oscar Ortiz, et al.:  MARINDA VAN DALEN, ESQ.
         Texas Rio Grande Legal Aid
         4920 North IH 35
         Austin, TX 78751

3

1    <u>Corpus Christi, Texas; Thursday, August 14, 2014; 10:28 a.m.</u>

2    (Ms. Wolf, Ms. Baldwin, Ms. Conley and Messrs. Heard, Dunn,

3        Rosenberg, Freeman and Tatum Appeared Telephonically)

4                        (Call to Order)

5            **THE COURT:**  The Court calls Cause Number 2:13-193,

6    *Veasey, et al versus Perry, et al.*

7            **THE CLERK:**  Your Honor, for the individuals we have

8    Mr. Dunn, Mr. Derfner, Mr. Hebert, Mr. Brazil and Ms. Simpson

9    present.  For the U.S., Ms. Baldwin and Mr. Heard.  For the

10   Mexican American Legislative Caucus, Mr. Rosenberg.  For Ortiz,

11   et al, Ms. Van Dalen.  For the League of Young Voters,

12   Mr. Dunbar and Ms. Conley.

13           For the State of Texas present in the courtroom is

14   Mr. Scott and Mr. Donnell, and on the line is Ms. Wolf.

15   Mr. Rios is on a plane and will not be attending, and we don't

16   have anybody present on the line for the non-party senators.

17   And Mr. Talbot should be also present on the line for the

18   United States.

19           **THE COURT:**  All right.  There are several matters

20   pending.  Some are carry-overs.  It's my understanding there

21   was an agreement reached on the non-party senators' motion to

22   quash.  Is that correct, Mr. Scott?

23           **MR. SCOTT:**  That is correct, your Honor.  And we also

24   in reaching out to Mr. Talbot it's my understanding -- and I

25   think he's supposed to be on line for this or someone from his

4

1    section-division.  But there is an agreement to allow the Court

2    to rule on those pending House representatives -- House of

3    Representatives' issues related to their subpoenas on the

4    submissions that we've already made to the Court.

5              THE COURT:  Okay.  So agreement on the senators' but

6    not the state reps.

7              MR. SCOTT:  Well, and my understanding is he's still

8    trying to get complete agreement.  One of them is up in -- one

9    of the representatives is up in New York --

10             THE COURT:  Okay.

11             MR. SCOTT:  -- and another one is in another place

12   and --

13             THE COURT:  So still working on that.

14             MR. SCOTT:  We're still working on that but we've

15   also -- he does not have any further assurances that anybody is

16   going -- everybody is going to be in agreement from their

17   standpoint or any of them I think at this point in time.

18             THE COURT:  Okay.  I think I'm going to set that one

19   for a hearing.

20             MR. SCOTT:  Okay.

21             THE COURT:  Because I don't want to do a whole lot of

22   extra work if I don't need to.  So, Brandy, we'll go ahead and

23   just set that for a hearing.  See if there are some agreements,

24   then what do I need to address --

25             MR. SCOTT:  Okay.

1          **THE COURT:**  -- or we'll do it that way.  I think it

2  will be more efficient for the Court.  So we'll just set that

3  one.

4          Now, will everyone need to be on the line for that or

5  just -- well, we'll just get everyone on the line I guess.

6  I'll have Brandy work on that.

7          So the next matter was the Defendants' motion to

8  compel the documents regarding the election crimes, voter fraud

9  issues or documents.  We briefly addressed that at the last

10  hearing.  The parties were conferring on that.  I'm showing

11  that as DE441.  Is there anything further on --

12          **MS. WOLF:**  Your Honor, this is Lindsey Wolf for the

13  State.  And we've conferred with the Department on this

14  particular issue.  However, we've been unable to come to an

15  agreement.  We are -- the United States has offered to search

16  the Acts and the LIONS databases, which there --

17          **THE COURT:**  I'm sorry, I'm sorry, I didn't hear that.

18  I'm sorry, to search the what?

19          **MS. WOLF:**  The Acts and LIONS databases, which are

20  the databases that were explained to your Honor at the last

21  hearing, which one is maintained by the executive offices of

22  the United States Attorneys, and other database is maintained

23  by the Criminal Division of the Department of Justice.

24          And they've agreed to search in terms of open and

25  closed matters.  And our understanding from our conversations

1    with Mr. Heard and also from some correspondence that we

2    received from the Department is that a matter -- for purposes

3    of the Acts database only includes investigations which were a

4    minimum of 30 minutes.  And on the LIONS database, which is the

5    database which is maintained for the U.S. Attorney's Offices,

6    that only includes matters which goes on for more than an hour.

7              And they have not agreed to search the FBI database,

8    which we understand from the correspondence is referred to as

9    Sentinel.  And that's where we're kind of running into some

10   issues because they use a lot of qualifying language in their

11   correspondence.  They refer to bona fide instances of voter

12   fraud.  They refer to substantive FBI investigation because

13   they claim that if it's a substantive FBI investigation, then

14   the FBI would have been required to consult with the Criminal

15   Division or the U.S. Attorney's Office.

16             But the problem the Defendants are facing, again,

17   this is not the same level of information that we provided in

18   conjunction with major officials' depositions in terms of --

19             **THE COURT:**  Okay.  You know what?  You're going to --

20   I'm sorry.  You're going to have to slow down.  I'm really not

21   catching a lot of what you're saying.  Part of it may be just

22   you coming over the phone but --

23             **MR. SPEAKER:**  It's too loud.

24             **THE COURT:**  Partly it's too loud but I --

25             **(Voices heard off the record)**

7

1          **THE COURT:**  The recorder is having a problem, too.

2    It's not just the Court so --

3          **MS. WOLF:**  No, I apologize, your Honor.  Is this

4    better?

5          **THE COURT:**  Not really.  We're going to try to lower

6    the volume and see what we can do.

7          **MR. SCOTT:**  And your Honor -- Lindsey, let me try and

8    step in here momentarily.

9          Your Honor, Major Mitchell from our office was

10   presented to the other side for deposition.  We provided -- if

11   I may turn this over to the Court -- basically a three-part

12   summary.  And that's the materials that we provided to the

13   party Plaintiffs in this case, which is -- includes all the

14   referrals since 2002, even though I think 2004 was the time

15   period.  It includes all of the prosecutions that have been

16   completed and it includes the matters that were resolved while

17   charges were pending.

18         What we've done on the referrals is break it down by

19   county, by date of referral and the type of matter that was at

20   bottom in the dispute.  And that is the material that we're

21   simply asking the Department of Justice.  If they can produce

22   it in such a way, in such a summary format that we did, that

23   would be great and I think that resolves the issue.

24         **THE COURT:**  Okay.  Is it Ms. Baldwin?  Are you going

25   to speak --

1           **MR. HEARD:**  Your Honor, this --

2           **THE COURT:**  Mr. Heard?

3           **MR. HEARD:**  Yes, your Honor.  Good morning.  This is

4    Brad Heard for the United States.  I'll be addressing this

5    motion.

6           Your Honor, we have worked diligently with the

7    Defendants' counsel since the time of our last hearing to try

8    and work out a resolution to this issue.  And we believe we

9    have agreed to provide information that is comparable to what

10   the State has provided but, moreover, that the United States is

11   comfortable with in order to protect its privileges related to

12   open and closed investigations.

13          We have reaffirmed our willingness to search the

14   Department's Acts and LIONS databases -- that's A-c-t-s and

15   LIONS, L-i-o-n-s databases for non-sealed election fraud

16   related prosecutions filed by the Department of Justice between

17   2004 to the present and to provide the Defendant with a list of

18   those cases and the election crimes alleged in those.

19          We have also informed the Defendants that the

20   Department is willing to search Acts and LIONS to determine the

21   number of election fraud investigations that have been opened

22   and closed between 2004 to the present and to provide the

23   Defendants with those numbers.  And those numbers will include,

24   but not be limited to, any investigation in which the FBI was

25   tasked with conducting a field investigation.  Because as we've

1 explained to the Defendant, the Department of Justice

2 regulations require the FBI to consult with either the Criminal

3 Division or the U.S. Attorney's Office before conducting a

4 field investigation relating to an election fraud case.

5      We've also explained to the Defendants that the

6 Sentinel database that the FBI maintains is not as easily

7 searchable for -- it's not organized like Acts and LIONS and

8 it's not as readily ascertainable which investigations relate

9 to the election related crimes.

10      But the two reports that we have offered to give

11 Defendants give them all the information that they reasonably

12 would need to make whatever related arguments they believe are

13 necessary to support the State of Texas' action in pursuing it

14 and enacting SB14.

15      Now, the Court explained at last week's hearing the

16 Defendants should not be asking for, and the United States is

17 not required to provide, privileged information relating to the

18 investigation.  And in our estimation that includes information

19 that would reveal confidential investigatory file information,

20 provide clues to the government's deliberative process, reveal

21 any prosecutorial focus on election crime or election

22 jurisdiction or interfere in any way with the Attorney

23 General's prosecutorial discretion.

24      Information relating to judicial district in which

25 investigations have occurred or attending more specific charges

1    that are being investigated could allow potential targets, your

2    Honor, to discover that their activities are being investigated

3    for possible prosecution.  In extreme circumstances it could

4    be -- it could put potential informants or witnesses at risk

5    for bodily injury or even death.  The broad statistical data

6    regarding the number of election investigations commenced and

7    closed nationwide carried less of that risk.  And the United

8    States has consulted with the Criminal Division with the

9    Executive Office of the U.S. Attorneys, believe it's able to

10   provide that information without risking its privileges.  And

11   we've offered to do that to the Defendants.

12           We believe, in sum, that those reports are more than

13   sufficient to provide the Defendants with the discovery they

14   seek.  And in accordance with our cross motion we would ask the

15   Court to enter a protective order to limit discovery by the

16   Defendant into this -- into nationwide election crime to the

17   searches that the United States has described to the Court and

18   has described in written correspondence to the Defendants.

19           **THE COURT:**  Okay.  Let me just ask the Defense, then.

20   What is it the Defense is requesting outside of what's being

21   offered at this point?

22           **MR. SCOTT:**  And -- go ahead, Lindsey.  I'm sorry.

23           **MS. WOLF:**  Yeah, if there's technical issues I will

24   defer to John.  But I think where we're going is we need

25   referral investigation, which is what we gave in spreadsheet

1  form, without waiving any of our privileges and we're not going

2  to get that from Acts and LIONS.  Acts and LIONS, I think, as I

3  said, did not include the FBI information beyond, you know, if

4  there's an investigation that the FBI has consulted with the

5  U.S. Attorney's Office with for less than an hour, it's not

6  going to be in that particular database, your Honor.

7           **THE COURT:**  You didn't get that?

8       **(Voices heard off the record)**

9           **THE CLERK:**  Ms. Wolf, can you maybe slow down?  I

10  think that may be, also, some of the issues.  It's too loud,

11  and then if you could just slow down so Genay can get an

12  accurate record.

13          **MS. WOLF:**  Sure.

14          **THE CLERK:**  Thank you.

15          **MS. WOLF:**  I think the issue, your Honor, is that the

16  LIONS database, which they're proposing to search, which

17  Mr. Heard has represented that when the FBI opens an

18  investigation they have to consult with the U.S. Attorney's

19  Office.  And but nothing gets into the LIONS database unless an

20  Assistant U.S. Attorney is consulted on a matter for more than

21  an hour.  And so that's not going to cover all of the FBI's

22  investigations that would be maintained in the separate FBI

23  database.

24          So we're in a position where we're not getting the

25  complete amount of information which we provided to the United

1   States in the form of a summary spreadsheet, which also

2   included referral investigations into very general categories

3   of documents that Mr. Scott described.

4          **THE COURT:**  Well, has the Defense -- has Mr. Heard

5   seen that summary that was just given to me by Mr. Scott?

6   Mr. Heard?

7          **MR. HEARD:**  I have seen -- I don't know if I've seen

8   the most recent summary, your Honor.  I have seen similar

9   summaries that they've produced.

10         **THE COURT:**  Well, I don't know what you've seen --

11         **(Voices overlapping)**

12         I don't know what you've seen.  I'm asking have you

13   seen what was just turned over to me?  And I don't know how to

14   describe it to him, Mr. Scott, so he knows.

15         **MR. SCOTT:**  There were three different spreadsheets.

16   One includes referrals that were made by different outside

17   entities, mostly Secretary of State.  It lists the county on

18   that document where the act was alleged to have taken place,

19   the date of the referral, the entity that made the referral and

20   a very brief summary of the category or type of referral that

21   it related to.  That's the one on the referral sheet or

22   spreadsheet.

23         There are two other sheets.  One involves

24   prosecutions that are complete.  The other is a very short

25   spreadsheet that includes prosecutions -- or while charges were

1      pending the matter was resolved.  But I think for sure that all

2      three of them have been produced.

3             **THE COURT:**  Okay.  And so, Mr. Heard, you're saying

4      that the Government is not willing to do the summary type

5      production?

6             **MR. HEARD:**  That's not quite what I'm saying, your

7      Honor.  What I'm saying is that we may not be willing to

8      produce the level of detail on their referral spreadsheet that

9      they have indicated they --

10            **THE COURT:**  Well, tell me where the issue is.  I

11     can't help you all.  And if you all are going to be just

12     arguing generally -- it's not just you, Mr. Heard.  But I need

13     to get down to the bottom line.  Where is the detail, where is

14     the rub, what's the problem, what's the defense asking for that

15     the Government is not willing to provide?

16            **MR. SCOTT:**  We want the --

17            **MR. HEARD:**  Well, I'll try to do my best to explain

18     that, your Honor.  We are providing referral investigations --

19            **THE COURT:**  Okay, I'm going to do this.  You all need

20     to sit down, look at that summary that's been provided by the

21     State of Texas by the Defendant here, and tell me exactly what

22     the United States is not willing to produce, and I'll take it

23     from there.  We're going in circles here.  So you all are going

24     to sit down, and you all can do it right after we finish this

25     hearing, and we can get right back on the phone and the

1  Government can say, "I've looked at these summaries and this is

2  what we can do, we can't do this or we're not willing to do

3  this."  And I'm not going to waste my time on this for now any

4  more, okay?

5       **MR. HEARD:**  I'm happy to do that, your Honor.

6       **THE COURT:**  And I don't mind getting right back on

7  the phone with you all so we can resolve this issue.  You know,

8  when I get on when we're having these status hearings, we need

9  to get right to the point.  Here's the issue and this is what

10  we're willing to do and not do.  And I don't need to get in the

11  middle of you all going back and forth on that.

12       So I'm going to move on.  The next thing I have that

13  we had briefly discussed, and there was some further briefing

14  provided, was the Defendants' motion to compel the production

15  of expert disclosure.  And that was DE454.

16       **MR. SCOTT:**  Your Honor, what we've been given so far

17  to date is an enormous amount of data.  The data continues to

18  change.  We received new data this week.  Mr. Donnell gave me a

19  great analogy of what's going on.  We've been told what the

20  symptoms of ebola are, we've been given a phone book that has

21  13 million different names in it and we've said we have all the

22  data; you know how we got the data; it's there for you to find.

23       So what we started this process about exchanging all

24  this information long ago and far away was so that the parties

25  could work off basically the same set of information to come up

1    with their perspectives on why the no-match list was one way or

2    the other so that the Court could be able to make an informed

3    decision, something that the D.C. court did not have before it.

4            So all those efforts to accomplish that have been for

5    naught.  We've been played as the state.  I guess I'm the fool

6    in the whole game because I've gone along with this.  But at

7    the end of the day we don't have the materials we need in order

8    to be able to attack the foundation that their experts have.

9    We are not being provided that information.

10           This week we found out on Tuesday that

11   Dr. Ansolabehere, who the Department of Justice has represented

12   in the last hearing, had not created these no-match lists, had

13   provided a spreadsheet of specific individuals who were located

14   in a census track, which is a subpart of the county, and

15   identified those individuals, or at least the number of

16   individuals in that census track, who did not possess the

17   adequate amount of I.D. to vote in order to vote under SB14;

18   and who Dr. Webster, who will be offering an opinion in this

19   case, will say that those people have been divested of their

20   right to vote as a result of SB14.

21           What we want is simply the ability to make sure that

22   we're talking about the same group of people.  So we want

23   those -- we want the identity of those individuals who are part

24   of the census tracks.  We want the no-match list from

25   Dr. Herron, from Dr. Ansolabehere and from Dr. -- oh, what's

1  the guy's name?  Hold on one second.

2         **MR. SPEAKER:**  Bazelon.

3         **MR. SCOTT:**  Bazelon.  All three of which have come up

4  with their own no-match lists.  None of them have produced

5  anything.  They say it's in the data, this 13 million person

6  phonebook.

7         **THE COURT:**  Wait.  So you're saying the experts --

8  these experts have produced these lists.

9         **MR. SCOTT:**  They have produced a report that

10 identifies their take on the list.  They have produced data.

11 Now, the newest data contains fields that's never -- did not

12 exist in the very first data pool.  We had agreed on the fields

13 that were going to be produced as far as the fields that were

14 going to be contained that the Department of Justice was going

15 to create for everybody to work off of.  The latest one -- and

16 we've actually asked our expert on his report for Friday to

17 identify the different changes that have taken place throughout

18 the field materials.  And so what we're trying to get is that

19 data.

20        There's also this subset, which is the survey

21 results.

22        **THE COURT:**  Okay, I'm hearing two things.  I'm

23 hearing data; I'm hearing lists.  And I think the Government in

24 their responses are saying we've given them all the data --

25        **MR. SCOTT:**  Yes.

1          **THE COURT:**  -- from what I -- the way I read the

2    motion to compel, the Defendants' motion to compel, is we need

3    these no-match lists.

4          **MR. SCOTT:**  Yes.  And for the record, your Honor,

5    Dr. Ansolabehere in his report on Page 7 of that report and

6    Page 8, he says, the match -- produces a no-match list.  Then

7    later on he says, "Each record on this list is treated as an

8    individual registered voter who lacks acceptable photo I.D."

9    That sounds like there's a list there.

10         **THE COURT:**  Okay.  Is there a list?

11         **MS. BALDWIN:**  Your Honor?

12         **THE COURT:**  Is there a list?

13         **MS. BALDWIN:**  Your Honor, this is Ms. Baldwin.  The

14   data that's been produced is this --

15         **THE COURT:**  I'm not talking about data.  Is there a

16   list?  Is there such a list that Mr. Scott is referring to?

17         **MS. BALDWIN:**  There has been for Dr. Ansolabehere.

18         **THE COURT:**  Is there a list?

19         **MS. BALDWIN:**  Your Honor, we've --

20         **THE COURT:**  Yes or no?

21         **MS. BALDWIN:**  Not that Dr. Ansolabehere has yet

22   created --

23         **THE COURT:**  Ma'am, ma'am, ma'am, answer my question.

24   Is there a no-match list?  And if you didn't understand my

25   question, let me know.

1          **MS. BALDWIN:**  Yes, ma'am.  I just want to clarify --

2          **THE COURT:**  No, no.  Yes, there's a list is the

3    answer, correct?

4          **MS. BALDWIN:**  There is a list of people --

5          **THE COURT:**  Stop right there.  Is there a list?

6          **MS. BALDWIN:**  Yes, ma'am, there's data that we

7    produced that includes who is considered to be not matched.

8          **THE COURT:**  Okay.  Has that been produced to

9    Mr. Scott?

10          **MS. BALDWIN:**  Yes, ma'am.  It has not been produced

11   in a stand-alone form.  So there are 13 million registered

12   voters in --

13          **THE COURT:**  Wait, wait, wait.  You said there is a

14   list, and my question was has that been produced?  Yes or no.

15          **MS. BALDWIN:**  There's not a stand-alone list that

16   exists for Dr. Ansolabehere's prior report.  We're going to

17   produce at Defendants' request something that we're asking him

18   specifically to create, because we want this to be a

19   transparent process, just out of the whole universe of

20   13 million voters only the people who are literally not

21   matched, an actual stand-alone no-match list.

22   Dr. Ansolabehere's prior use of the term "no-match list" was a

23   term of art in that it was people identified out of the overall

24   13 million --

25          **THE COURT:**  I'm sorry, I need to go back.  My

1    question was is there a list and you said "yes," correct?

2         MS. BALDWIN:   There are voters who've been

3    identified.   There wasn't a stand-alone document.   To the

4    extent, your Honor, that you mean list as is there a list where

5    it's just the people who are considered by Dr. Ansolabehere not

6    to have any form of I.D. and there's nothing else on that

7    document, that is not something that Dr. Ansolabehere has

8    previously made in that format for his --

9         THE COURT:   So you're going to make the fact finder

10   at trial pick through all that?

11        MS. BALDWIN:   No, ma'am.

12        THE COURT:   What are you going to do?

13        MS. BALDWIN:   It is something that Dr. Hood

14   (phonetic) has been able to replicate from the data before.

15   But as we wrote in our motion, we are happy to create that list

16   and to provide it to Defendant --

17        THE COURT:   So then why are we discussing this?

18        MS. BALDWIN:   Your Honor, we said in our motion -- in

19   our response to the motion that we would do that.   We are

20   committed to making sure that this process is as transparent as

21   possible.   And if there are questions that Defendants have --

22   Mr. Scott e-mailed a question about the data set to me

23   yesterday.   I responded with further clarification.   I talked

24   with Mr. Whitley (phonetic)this morning.   If there is anything

25   that the Defendants don't understand about the data productions

20

1    that we've made at this point, we are happy to clarify and

2    anything that --

3         THE COURT:  Okay.  Mr. Scott is asking for some

4    lists.

5         MS. BALDWIN:  Yes, ma'am.  And I --

6         THE COURT:  And I can't get a straight answer from

7    you.

8         MS. BALDWIN:  There wasn't a pre-existing stand-alone

9    no-match.

10        THE COURT:  I get that.  But you're saying you're

11   willing to create something, or what is it?

12        MS. BALDWIN:  Yes, ma'am.  I'm willing -- we are

13   willing --

14        THE COURT:  Where is it?  It hasn't been created yet?

15        MS. BALDWIN:  Dr. Ansolabehere has a reply report

16   that's due tomorrow.  And so we are going to be providing that

17   report tomorrow.

18        THE COURT:  Mr. Scott?

19        MR. SCOTT:  That's great, your Honor, as long as on

20   that list we can identify the individuals who he has also

21   identified, passed on to Dr. Webster, and we have the ability

22   on these lists to know apples and apples.  I just don't want to

23   get in a situation where we come before the Court trying to

24   compare apples to oranges.  So the fact that we -- the list

25   sounds great.  So that resolves that issue with

1    Dr. Ansolabehere.

2            So that leaves Dr. Bazelon and Dr. Herron to also

3    have their lists so that who -- all three of which come up with

4    different percentages in their reports on their take on the

5    lists which --

6            **THE COURT:**  Do you want to address those other

7    experts, Ms. Baldwin?

8            **MR. DUNN:**  Your Honor, this is Chad Dunn on behalf of

9    the Veasey LULAC Plaintiffs.  If I may be permitted to speak --

10           **THE COURT:**  Yes.

11           **MR. DUNN:**  -- on the Dr. Herron issue?

12           **THE COURT:**  Yes.

13           **MR. DUNN:**  This is the first I've heard that the

14   Defendants want some additional information from Dr. Herron.

15   In fact, my cocounsel, Ms. Simson, sent the State an e-mail on

16   July 16th saying we understand you have some issues with

17   Dr. Ansolabehere's list; please let us know immediately if you

18   need additional data from us.  We got a response from the State

19   saying I'll get back to you if we have any problems with

20   Dr. Herron.

21           **THE COURT:**  Okay.  Well, let me say this.  If this

22   has not been discussed, you all need to do that.

23           **MR. SCOTT:**  Okay.  So --

24           **MR. DUNN:**  Let me just -- and I understand that.  And

25   let me just add where I think the rub is, what I think is

1    causing the confusion.  These experts have produced the data

2    set that they analyzed, and they added a column in that data

3    clearly identifying who was a match and who wasn't a match.  So

4    when Ms. Baldwin is talking about has this been produced, it's

5    been produced from day one when the reports were produced,

6    where it's clearly identifiable by the State who actually

7    matched the database and who didn't.

8             Apparently what the State wants is an output of just

9    the names of no-matches.  And the Department of Justice is

10   committed to doing that.  And now that I hear that they want

11   that from Herron, despite our request back on July 16th to see

12   if they need something else from Herron, we'll commit to doing

13   that.  I haven't talked to Herron to figure how many days -- a

14   day or two or however long it would take to do that, but we'll

15   get it done.

16            **THE COURT:**  All right.

17            **MR. SCOTT:**  Great.

18            **THE COURT:**  Who is going to address -- is it Bazelon

19   then?

20            **THE CONLEY:**  Yes, your Honor.  This is Danielle

21   Conley for the League and Ms. Clark.  We're in a similar

22   position.  This is the first time that we've heard that they

23   wanted any additional information from Mr. Bazelon.  We're more

24   than happy to talk with the State about whatever it is that

25   they want.

1           **MR. SCOTT:**  Super.

2           **THE COURT:**  All right.  Then you all will discuss

3   that further.

4           **MR. SCOTT:**  So then the next --

5           **THE COURT:**  I guess maybe I should get angrier a

6   little more often.

7           Anyway, so the other part of this 454DE was the list

8   of those individuals who responded to a survey, correct?

9           **MR. SCOTT:**  Yes, ma'am.  And that's the Barrera

10  Sanchez (phonetic) survey.  And what they have done is come up

11  with results from their survey, and they are saying there is a

12  percentage of people in the state of Texas who are prevented

13  from voting because they don't have access to proper photo I.D.

14  What we want would be the results of the survey to be able to

15  check the validity of it, their foundation.

16          This is a unique situation that we don't -- that to

17  my knowledge has never really existed from the standpoint of

18  being able to evaluate the underlying opinion -- or the survey

19  results of these respondents.  At the very least we should be

20  entitled to get that group, that subgroup of the survey where

21  the respondents have said that they do not have the proper I.D.

22  in order to be able to vote.  That way we can track to find out

23  if those results are proper or not.  We can attempt to attack

24  or not the foundation of this expert's opinion.

25          **THE COURT:**  Okay.  Who is going to address it?

1    Mr. Dunn, Mr. Rosenberg or --

2              **MR. ROSENBERG:**  This is Mr. Rosenberg, your Honor.

3    And we have fully briefed this issue and explained why this

4    sort of discovery is never had.  The Defendants have been given

5    the results of the survey.  They have all the data, they have

6    each individual answer, they've been able -- they know the full

7    methodology.  They know how the universe of respondents was

8    chosen, which is under the Fifth Circuit law all they need to

9    attack the validity of the survey.

10              The surveys, as we set forth in our brief, are

11   conducted with an expectation of confidentiality.  This is why

12   the courts allow these sorts of surveys without requiring the

13   disclosure of the survey respondents because that would

14   underlie the efficacy of these surveys.  And the Defendants

15   simply do not need this sort of evidence in order to do exactly

16   what the Fifth Circuit says we're supposed to which, which is

17   look at the methodology, look at the manner in which the survey

18   was conducted, look at the adequacy of the universe of the

19   survey and look at the focus of the format in question.

20              **THE COURT:**  All right.  Mr. --

21              **MR. ROSENBERG:**  The --

22              **THE COURT:**  Go ahead, I'm sorry.

23              **MR. ROSENBERG:**  No, I'm sorry, your Honor.

24              **THE COURT:**  No, I was just going to ask Mr. Scott if

25   he wanted to address the briefing provided --

25

1          **MR. SCOTT:**  Your Honor --

2          **THE COURT:**  -- by the Plaintiffs on that.

3          **MR. SCOTT:**  Our position is that this is simply

4    discovery sought for the purpose of potentially leading to

5    discoverable evidence, the cross examination of these witnesses

6    before us who say these people responded in the following way.

7    We have already before us, the parties do, a database of

8    information related to whether someone is registered to vote,

9    whether someone has proper I.D.  We can cross check every one

10   of these people --

11         **THE COURT:**  Right.  But I guess --

12         **MR. SCOTT:**  -- who say they don't have proper I.D.

13         **THE COURT:**  The response was pretty specific in

14   citing some matters that, you know, appear to be right on

15   point.  So I didn't know if the Defendant had anything to say

16   on what was provided by the Plaintiffs.

17         **MR. SCOTT:**  Your Honor, I do not think we have our --

18   any further briefing on this matter yet.

19         **THE COURT:**  Okay.  The Court is going to deny the

20   Defendants' motion to compel with respect to that matter, list

21   of the respondents or the individuals who responded to the

22   survey taken by Barrera and Sanchez.

23         Okay, what else is left on DE454?

24         **MR. SCOTT:**  The last thing is the underlying data on

25   the Catalist information.  So Catalist provided information

1   which the Plaintiffs have provided to us that was provided to

2   Dr. Ansolabehere.  What they have not provided is the

3   underlying basis or foundation of any of that information.  So

4   they have an expert who worked up some numbers in a black box.

5   He provided that over to Dr. Ansolabehere, and Dr. Ansolabehere

6   then used that information to come up with his opinions.

7           And Dr. Ghitza -- or I don't know how you pronounce

8   his last name.  Hold on a second, I'll give you a spelling.

9   G-h-i-t-z-a.  Is the individual who works with or for Catalist

10  and is the one that provided the opinions or the information

11  that Dr. Ansolabehere is depending on.

12          One of the real important parts about this is

13  Dr. Ansolabehere is making ultimately his opinion based upon

14  the effect of SB14 based upon the analysis of whether someone

15  is white, Hispanic or black; based upon the information, at

16  least in part, of what he received from Catalist.

17          What we know is that Catalist has qualified the

18  percentage of accuracy that they think it is for any of these

19  individuals.  We don't know how they come to those numbers, yet

20  we know that Dr. Ansolabehere, at least in part on his report,

21  has relied upon those numbers.  And so we think it's perfectly

22  proper discovery to be able to be -- to have the foundation for

23  which Dr. Ghitza comes up with his opinion.

24          **THE COURT:**  Okay.  Who is responding?  Mr. Heard?

25          **MS. BALDWIN:**  Ms. Baldwin for the United States, your

1    Honor.   This Catalist information that is referred to in

2    Mr. Ghitza's report, Mr. Scott accurately states that we have

3    produced to the State everything that Catalist gave to us and

4    to Dr. Ansolabehere.   The way that Catalist's race estimations

5    work is that they take some underlying data like the voter's

6    name, census information and age, and they input that into a

7    computer program and they get results.   Catalist has

8    independently validated those results by looking at other

9    states that had self-reported race information and comparing

10   the accuracy of those results with the states that have self-

11   reported race information from their voter rolls.

12           The only data that Catalist literally has in its

13   possession is the information that's input into the computer

14   program, which we've already provided, which is all of the

15   census location information and name and age information.   We

16   provided that.   Catalist has the output of the computer

17   program, and Catalist has the validation data.   As we wrote in

18   our motion, we are happy to discuss with Texas providing

19   validation data that Catalist also has, but there is no other

20   data to provide.

21           **THE COURT:**   Okay.   The Government's representing

22   other than the validation data there's nothing else to provide,

23   Mr. Scott.

24           **MR. SCOTT:**   So if we could make sure that at trial

25   that Dr. Ghitza admits that he just did this out of the blue

```
 1   and there is nothing that he is relying on other than what the

 2   Government has provided, that's great.  But if he is relying

 3   upon those opinions of something else, I think we're entitled

 4   to it.

 5         THE COURT:  Well, I agree.  But the Government is

 6   representing whatever he is relying on has already been

 7   produced except maybe this validation data.  Is that correct,

 8   Ms. Baldwin?

 9         MR. SCOTT:  That's perfect.

10         MS. BALDWIN:  Yes, your Honor.  As Mr. Ghitza

11   explained in his report that, you know, the validation that

12   they've done and there's the additional academic literature

13   that validates it, that Catalist in the report there isn't any

14   other data that Catalist has that we'll be relying on.

15         THE COURT:  Okay.  That's the representation; it is

16   what it is.  And you all are going to discuss the validation

17   data further?

18         MR. SCOTT:  It sounds like if she's willing to give

19   that --

20         THE COURT:  Yeah.

21         MR. SCOTT:  -- that will resolve that issue.

22         THE COURT:  I think she wants to talk to you about

23   some parameters on that.  Is that right, Ms. Baldwin?

24         MS. BALDWIN:  Yes, your Honor.

25         MR. SCOTT:  That's great.  And then the last thing,
```

1    again, is on Dr. Webster the geo track.  The reason that's

2    important is, we've brought it up, it's the census -- it's the

3    material that Dr. Ansolabehere provided to Dr. Webster and that

4    we found out about this past week.  We found out on Tuesday

5    that there was a spreadsheet received.  And so our expert

6    reports are due on that issue tomorrow, except that's not much

7    time for our man to be able to respond to this information

8    because he can't find the identity of those people.  So I

9    wanted to make sure from a clarification standpoint the

10   Department of Justice is providing the I.D.s of those

11   individuals that they provided on the census track information

12   that Dr. Ansolabehere gave to or was provided to Dr. Webster.

13           **THE COURT:**  Ms. Bald --

14       **MR. FREEMAN:**  Your Honor, this is Dan Freeman on

15   behalf of the United States.  And the United States did not

16   provide the identities or I.D.s of individual voters, in

17   particular census tracks to Dr. Webster but --

18           **THE COURT:**  Okay.  I'm sorry.  Did he say that the

19   expert -- I'll just call him Dr. A -- Ansolabehere, I guess,

20   produced something to this other expert?

21       **MR. FREEMAN:**  Yes, that's been provided to the State.

22   What Dr. Ansolabehere provided was an aggregation by census

23   track the number of valid voters in each census track and the

24   number of voters who had matched in that census track to an

25   SB 14 I.D.  And from that simple subtraction yields the number

1    of voters who are not matched -- valid voters who are not

2    matched to SB14 in the census track.  That is the entirety of

3    the no-match related cases that Dr. Webster relied upon, and

4    that is the entirety of data that is provided.  And we have

5    provided that to the State.

6            The State seems to be requesting that we -- and we've

7    also provided to the State -- I'm sorry.  Included in that are

8    all the tracking numbers for all the tracks in Texas that each

9    of those sets of voters are assigned to.

10           The State seems to be requesting a separate list that

11   was never created and never provided of all of the no-match

12   voters throughout the state with their tracks number assigned

13   to them as well.  That was never -- it's not relied upon by

14   Dr. Webster.  If the State wants us to create that as a

15   separate list on top of the separate list that we are already

16   creating for the State and created for the State, we can

17   discuss that.  That is not something that Dr. Webster relied

18   upon.

19           **MR. SCOTT:**  And your Honor, again, the representation

20   may kill it.  Because ultimately I just want to make sure the

21   record is clear.  So that if they're saying all that

22   Dr. Webster has is a brown sack with a number on it and he has

23   no earthly idea what's inside that sack other than somebody

24   gave him that sack with a number on it, that's great.  We can

25   live with that and we can cross examine him on that, and the

1    record will be clear that he had no basis for his opinion on

2    that other than what -- the trustworthiness of

3    Dr. Ansolabehere.  That's something we can live with.

4            But I just don't to be surprised at trial that they

5    say, yes, there is the individuals who were there and now all

6    of a sudden he has the identification of these individuals,

7    which they clearly possess, and he is able to track how far,

8    for instance, they would go travel from Point A to Point B to

9    go get a driver's license.  That would be  --

10           **MR. FREEMAN:**  Your Honor, I --

11       **(Voices overlapping)**

12           **MR. SCOTT:**  -- that would be absolutely unfair.

13           **MR. FREEMAN:**  -- asked cocounsel repeatedly to

14   explain exactly what information was provided.  And to the

15   extent that those assurances are not sufficient for Mr. Scott,

16   he can ask Dr. Webster questions about what was provided at the

17   deposition.  But I assure you that there is no other

18   information we are withholding from the Defendants.

19           **THE COURT:**  Okay.  Well, if that's the

20   representation, it is what it is.  And again, then nothing will

21   be sprung at trial outside of what we've discussed and what has

22   been represented was produced.  And everyone is operating under

23   the same situation there.

24           **MR. FREEMAN:**  Absolutely, your Honor.

25           **THE COURT:**  Okay.

32

1          **MR. SCOTT:**  That's great.

2          **THE COURT:**  So is there anything else on 454, the

3    Defendants' motion to compel?

4          **MR. SCOTT:**  No, your Honor.

5          **THE COURT:**  Okay.  Other than you all are going to

6    discuss the no-match list further and we may need to get

7    together -- not the no-match list, I'm sorry.  I'm sorry I'm

8    going back.  I'm jumping back to another matter.  So we're okay

9    on 454.

10          **MR. SCOTT:**  I think it's the Catalist material that

11   we're going to be --

12          **THE COURT:**  Right.

13          **MR. SCOTT:**  -- discussing with DOJ.

14          **THE COURT:**  It's a different matter.  So nothing left

15   remaining on DE454, correct, the way I see it?

16          **MR. SCOTT:**  I believe that's correct,  your Honor.

17          **THE COURT:**  Okay.  There was just on, I guess,

18   Thursday the Plaintiffs filed -- there were two documents filed

19   but from the different Plaintiffs.  The motion to strike the

20   Defendants' affirmative allegations and defenses, I don't have

21   any briefing, honestly, on that yet from the Defense.  But what

22   is the plan, to brief that and then we --

23          **MR. SCOTT:**  Our plan is to hope the Court denies it

24   out of hand because it's dilatory and harassment, I guess, for

25   lack of a better thing.  If not, we'd like at least the 21 days

1  that's under the rules.

2        **THE COURT:**  Well, you can't have 21 days because

3  we're coming up on trial.

4        **MR. SCOTT:**  Well, I think the issue though relates

5  back to it's the Section Three issue.  And so it may be

6  something if the Court were willing is to carry it -- to find

7  out if we're going to get to that point or not.  And if we are,

8  then let's take it up at that time.  Failing that then we would

9  like at least, I guess, the eve of whenever we're talking about

10 having a hearing on that matter.

11       **THE COURT:**  Who wants to address that?

12       **MR. HEARD:**  Your Honor, this is Brad Heard for the

13 United States.  We had advised the Court that we had intended

14 to file a motion to strike, which is docket entry 456, as well

15 as the motion to determine the sufficiency of their responses,

16 which is docket 459.  We had advised the Court that we intended

17 to file those motions and we had requested that the Court hear

18 those motions at this hearing.  We had assumed that the

19 Defendants would be filing their responses to those motions on

20 Tuesday at noon, as they had with the other motions that the

21 Court --

22       **THE COURT:**  Well, the thing is until they're actually

23 filed, you know, it's a little bit different than when

24 something is already filed and we say and I tell you I'm going

25 to address it at the next status hearing and I order some

34

1    responses.  But we were in a little bit different situation I

2    think with --

3              **MR. HEARD:**  I understand, your Honor.  We would just

4    appreciate a hearing on that, as we would appreciate the

5    Court's direction on the responses as soon as possible.

6              **THE COURT:**  Okay.

7              **MR. HEARD:**  That would be great on both of those

8    motions.

9              **MR. SCOTT:**  And from a logistics standpoint, your

10   Honor, starting Monday we'll be in Washington, D.C. as a

11   concession to the -- as to the Plaintiffs on taking a number of

12   their experts up there.  I think we're doing about ten or

13   eleven of them next week so -- experts.  And so we've scheduled

14   very long days.  This is, obviously, a huge motion to try and

15   strike somebody.  It's very unusual, very frowned upon by every

16   research thing I can recall from any point in my practice.  But

17   at least the time period to get back from Washington, D.C. to

18   be able to address those.  That next week we've got pretrial

19   conference on that Wednesday.  Could we have until that

20   Tuesday?

21             **THE COURT:**  You're talking about next week?

22             **MR. SCOTT:**  Well, next week --

23             **THE COURT:**  The following.

24             **MR. SCOTT:**  The following week, yes.  Yes, ma'am.

25             **THE COURT:**  Okay.

1          **MR. SCOTT:**  I think that's the 26th.

2          **THE CLERK:**  The 26th, your Honor.

3          **THE COURT:**  Does the Plaintiff have any issue with

4    just -- when are we having the final pretrial, that Wednesday,

5    Brandy, or --

6          **MR. SCOTT:**  Yes, ma'am, I think it's the 27th.

7          **THE CLERK:**  On the 27th, your Honor, at 9:00 o'clock.

8          **THE COURT:**  Is this a matter than can be addressed at

9    the final pretrial or anything further on that from the

10   Plaintiffs?

11         **MR. HEARD:**  Your Honor, we would request -- we would

12   request a briefing --

13         **THE CLERK:**  I'm sorry.  I don't mean to interrupt,

14   but who is speaking?

15         **MR. HEARD:**  I'm sorry.  This is Brad Heard for the

16   United States.  We would request a briefing deadline of next

17   week.  That would have given them --

18         **THE COURT:**  I don't mind doing that.  I'm just

19   talking about can we just hear it at the final pretrial

20   conference.

21         **MR. HEARD:**  Uh, I --

22         **THE COURT:**  It sounds like you all are going to be

23   pretty tied up next week.  We can certainly have a status

24   hearing like we've been doing, but is that going to be feasible

25   with you all's schedule?

1          **MR. HEARD:**  Your Honor, I think it's fine to have

2    that motion heard at the pretrial conference.  We would like

3    the response next week.

4          **THE COURT:**  Okay.  How about by a week from today, by

5    next Wednesday a response on file?

6          **MR. SCOTT:**  Okay.  Could we have --

7          **THE COURT:**  Okay?

8          **MR. HEARD:**  By Wednesday, the 20th?

9          **MR. SCOTT:**  May I have until Friday, your Honor?  The

10   reason I --

11         **THE COURT:**  That's fine.  The 22nd?

12         **MR. SCOTT:**  Yes.

13         **THE COURT:**  August 22nd.

14         **MR. SCOTT:**  Thank you.

15         **THE COURT:**  Okay.  So that's going to be in regards

16   to the motion to strike the Defendants' affirmative allegations

17   and defenses.  And would that also then pertain to the

18   sufficiency of the responses on the request for admissions, or

19   do we take that up separately?

20         **MR. HEARD:**  Your Honor, Brad Heard.  We would

21   appreciate a response to that motion by next week as well and

22   to take that up.  Again, the responses to the request for

23   admission is an evidentiary issue and all these issues need to

24   be resolved.

25         **THE COURT:**  Okay.  So same thing then, response to be

37

1   filed by a week from Friday?

2          **MR. SCOTT:**  Yes, ma'am.

3          **THE COURT:**  And then we will address the issues at

4   the final pretrial the following week.

5          Hold on.  Give me just a couple of minutes here.

6       **(Pause)**

7          There was a matter that was filed late last night by

8   the Defendants.  And I mean obviously I don't think the

9   Plaintiffs would be ready to respond by that, but there was

10  Defendants' motion to compel production of documents and

11  additional deposition testimony.  Mr. Scott?

12         **MR. SCOTT:**  I --

13         **MR. TATUM:**  Your Honor, this is Steve Tatum for the

14  Defendants.  I'll be addressing that motion.

15         **THE COURT:**  Okay.

16         **MR. TATUM:**  Your Honor, this motion concerns a

17  document that the Defendants have sought through discovery for

18  almost six months now.  Those documents are:

19         One, documents from individual Plaintiffs which could

20  be used to get a birth certificate, a birth certificate could

21  be used to get an acceptable form of I.D. under SB14.

22  Therefore, the existence of those documents is certainly

23  relevant to any allegation of harm by an individual Plaintiff.

24  I'll refer to those as simply birth certificate documents.

25         The second category of documents are documents from

1    individual Plaintiffs that could be used to obtain a PID or a

2    Texas driver's license or personal I.D. card.  Those PID or

3    Texas driver's license or personal I.D. card, are acceptable

4    forms of I.D. under SB14 and, thus, the documents that could be

5    used to get them are certainly relevant to Plaintiffs' alleged

6    harm under SB14 for not having those documents.  I'll refer to

7    those as identification documents.

8            The third category of documents are documents related

9    to the membership of the organizational Plaintiffs.  These are

10   relevant to the issue of standing and whether the organizations

11   have suffered a legally cognizable injury on account of SB14.

12   I'll refer to those as membership documents.

13           So that's the universe of documents that this motion

14   concerns.  Now, Defendants sought these documents through

15   normal discovery means, i.e. RFPs, back in April.  Both the

16   individual and organizational Plaintiffs expressed any

17   objection to those requests for production and Defendants

18   subsequently met and conferred with them, in turn, to see if a

19   resolution could be reached.

20           With regard to the individual Plaintiffs, as a result

21   of those discussions and in an attempt to address their

22   concerns, we circulated a draft checklist of the specific birth

23   certificate and identification documents we believe were

24   relevant to the individual Plaintiffs and the ones we were

25   seeking to be produced.

1          Counsel for the Veasey LULAC Plaintiffs then

2     expressed concerns or objections to those lists.  And

3     subsequent discussions on those objections through the course

4     of those discussions Defendants were led to believe that the

5     Plaintiffs were agreeable to using a fact stipulation in lieu

6     of producing documents covered in our request.

7          Now, pursuant to those discussions, Defendants went

8     back to the drawing board and on August 11th circulated draft

9     stipulations which were painstakingly compiled and which

10    addressed each of the concerns expressed by the individual

11    Plaintiffs in the various meet and confers that had been held

12    up to that point and which limited the scope of the information

13    sought accordingly.  And the specifics of how we limited those

14    stipulations are detailed in the motion on Pages 4 and 5.

15         With respect to the organizational Plaintiffs, all of

16    which refused to provide any responsive membership information

17    requested in our request for production, an agreement was

18    reached through various meet and confer conferences in which

19    counsel for Plaintiffs would either, one, identify the member

20    or members of who the organization is aware had been or may be

21    injured by SB14 or, in the alternative, state that it is either

22    unaware of the identity of a particular member who has or may

23    be injured, or that it did not maintain sufficient information

24    to identify any such member.  That agreement is detailed in

25    full on Page 7 in our motion.

40

1          So at this point Defendants were -- you know,

2   understood that we had reached a certain agreement that we

3   would provide fact stipulations in lieu of specific document

4   production by both the individual and organizational

5   Plaintiffs.  However -- and this would be precipitated and give

6   rise to our motion -- we have been made aware that no

7   individual or organizational Plaintiff is willing to enter into

8   any fact stipulation.  And we know that because some of the

9   individual and organizational Plaintiffs have flatly told us

10  they are not willing to enter into any fact stipulation, while

11  others have simply ignored our e-mails requesting a conferral

12  on the draft stipulations that we sent them on August 11th.

13         So we're 18 days before opening argument, and

14  Defendants kind of find themselves hung up and dry despite our

15  lengthy and repeated efforts to address my concerns with

16  respect to these clearly relevant documents.  And we request

17  that the Court -- we request an order from the Court compelling

18  them, the individual and organizational Plaintiffs, to produce

19  the birth certificate documents, the identification documents

20  and the membership documents and to permit us to reopen

21  depositions as we deem necessary in Austin to inquire about

22  these documents.

23         Now, I will say that counsel for the Texas NAACP has

24  reached out to us and we are in the process of working out some

25  kind of resolution to this that would look like, you know, a

1    supplemental answer to our request for production.  We're still

2    working that out though.  We haven't finalized it yet.  So I

3    will say there's no update on their part with regard to this

4    motion.  But we have not heard from anyone else.

5              **THE COURT:**  All right.  Does anyone else want to

6    comment?  I know this motion was filed late last night, but any

7    other --

8              **MR. ROSENBERG:**  Your Honor, this is Ezra Rosenberg on

9    behalf of the Texas NAACP and MALC.  And just one -- well,

10   there are a couple of corrections I can make with Mr. Tatum's

11   presentation.  But I think the key here is that during the meet

12   and confer that we did have last night for about a half hour,

13   which I followed up with a couple of e-mails suggesting

14   resolution, I suggested that this was a premature motion.  But,

15   in any event, we're not ready to respond other than to say we

16   are negotiating in good faith.

17             I do want to add one thing to that.  There was never

18   a suggestion that there would be stipulations of fact that

19   would be set forth as a result of the agreement that we reached

20   on June 3rd.  Rather, that the agreement itself says that the

21   Plaintiffs can respond to requests for production by making the

22   certain representations.

23             And, in fact, on Page 7, Footnote 8 of the brief that

24   was filed last night, as to Texas NAACP it specifically says

25   because this agreement was reached a day or two before the

1    depositions that we bring our response to tomorrow's

2    deposition.  At the deposition my colleague, Amy Rudd, put on

3    the record the representation saying that at that time we did

4    not -- we were not aware of anyone -- any member who had been

5    injured.  That was we thought was compliance and no one told us

6    otherwise.  That representation was amended about a month later

7    when other information came to us.  And again, we were not told

8    that wasn't sufficient.  It was only last week when all of a

9    sudden we were sent the stipulations of fact.

10           But I'm not going to really burden the Court with

11   this any more because I think we can resolve this simply by

12   revising our supplements to -- by supplementing our responses

13   to the request for production.

14           **THE COURT:**  Okay.  Does anyone else want --

15           **MR. DUNN:**  Your Honor, yes, this is Chad Dunn on

16   behalf of the Veasey LULAC Plaintiffs.  And I just feel like I

17   need to respond to this, although I agree the parties probably

18   ought to discuss it further before the Court makes a ruling on

19   it.

20           But I do want to note that the State had sent -- I

21   want to note some corrections to what I think has been recited

22   in the facts and the background of this matter.  The State had

23   sent some 600 requests for production to the individual

24   Plaintiffs asking for things like their tax returns and credit

25   reports and every type of personal document anybody wouldn't

43

1    want to turn over, especially to the State.

2            And we objected to those and said that they were

3    unnecessary.  The State came to us and explained that the

4    reason they wanted to actually look at each and every one of

5    these highly private documents was so they can demonstrate that

6    each of these individuals might have two or four or five of the

7    underlying documents that would assist in obtaining your birth

8    certificate or one of these I.D.s.

9            We suggested in response that it isn't necessary for

10   the State to actually see the credit report or the tax return

11   but instead just to have an admission that it existed.  So I

12   proposed in a meet and confer back in June, early June, that

13   the State give us a list of the individual documents that they

14   want Plaintiffs to determine whether existed or not.  We would

15   prior to our Plaintiffs' deposition, which in my group's case

16   hasn't occurred yet, make sure that they search their files and

17   could confirm at their deposition which of those documents they

18   had possession of.

19           Then we didn't hear anything from the State for two

20   months.  And now the week before we're all going to be in

21   expert depositions essentially every business day between now

22   and the trial, the State filed or delivers to us an enormous

23   stipulation and all sorts of facts that go far outside the

24   bounds of which you would be entitled to at a request for

25   production.  And the State filed its motion on the eve of this

1   hearing asking us essentially to run around and get our clients

2   in the next two weeks when we have a load of things to do, such

3   as findings of fact, depositions, move the equivalent of a

4   football team's roster, people down to Corpus Christi, and have

5   us collect our private Plaintiffs' tax returns, credit reports

6   and 590 other documents.  It smacks of a time (indiscernible),

7   frankly.

8           And although we're willing to talk to the State

9   certainly about a stipulation on who is affected in the

10  individual civil rights organization Plaintiffs, and we're

11  willing to work with the State on a stipulation as to what

12  individual Plaintiffs have in their possession or did they have

13  at least a certain number of these background documents; we

14  don't have the time and it is unduly burdensome, it's totally

15  irrelevant and unnecessary for us to be running around and

16  dragging up 590 different documents for our Plaintiffs when the

17  State had an opportunity to deal with this before the

18  Plaintiffs' deposition and sat on it for two months until then.

19          **THE COURT:**  Okay.

20          **MR. TATUM:**  Your Honor, in response to that I would

21  say that the only reason --

22          **THE COURT:**  Who is speaking?

23          **MR. TATUM:**  -- we filed this motion is because we did

24  not hear --

25          **THE COURT:**  Who is speaking?  Sorry, who is speaking,

```
 1    for the record?

 2             MR. TATUM:  Oh, I'm sorry.  This is Steve Tatum for

 3    the Defendants.

 4             THE COURT:  Go ahead.

 5             MR. TATUM:  The reason we filed this motion last

 6    night is because we did not hear from any of the individual

 7    Plaintiffs, specifically the Veasey LULAC Plaintiffs, who we

 8    requested confer with us regarding these stipulations.  These

 9    were draft stipulation that were proposed.  These were not

10    merely stipulations, enter into them or no.  These were

11    stipulations which we have talked about repeatedly for all of

12    this time -- you know, counsel represents we've been doing

13    nothing for two months; that's wrong.  Here are these

14    stipulations we've been talking about all this time, these are

15    composed, here they are if we can take a look at them and

16    confer with us about them before close of business.

17             We never heard from them.  Thus, you know, we're

18    18 days from trial and we can't push this off another week.  So

19    we filed the motion last night and we're going to key this up

20    in front of you today.  So that's why we're here; that's why

21    this motion is here.

22             And all we're asking for is stipulations.  We're not

23    necessarily asking them to round up all these documents.  We're

24    asking for stipulations.  And that's what is at issue here.

25    And I think counsel is drastically overstating the burden that
```

1    exists, if any, on them and, you know, working with us with

2    regard to these stipulations.

3             **THE COURT:**  Anyone else?

4             **MS. CONLEY:**  And your Honor, this is Danielle Conley

5    for Imani Clark and the Texas League.  And as you noted, the

6    State filed its motion late last night.  We haven't had the

7    opportunity to study it in detail, but we're open to meeting

8    and conferring on the issue of the checklist.  And we told the

9    State of Texas this much, including an e-mail to them last

10   night.  And so, you know, it's our position that this motion is

11   prematurely before the Court.  We're open to meeting and

12   conferring...

13            **THE COURT:**  Okay.  Well, then you all need to confer

14   and let the Court know if I need to get involved.  Is there --

15            **MR. TATUM:**  Your Honor?

16            **THE COURT:**  Yes.

17            **MR. TATUM:**  I'm sorry.

18            **THE COURT:**  Go ahead.

19            **MR. TATUM:**  Your Honor, Steve Tatum for the

20   Defendants.  Again, I would just reiterate that we're

21   requesting an order on this motion today because --

22            **THE COURT:**  Okay.  Well, I'm not going to do it today

23   because you filed your motion late last night.  What's today?

24   It's Thursday.  You know, I thought you all were going to be

25   busy next week, but I can certainly -- we can hear it, you

1   know, next week.

2           **MR. TATUM:**  And your Honor, we will be busy next

3   week.  And I just say an order as soon as possible.  Not

4   necessarily today but the reason --

5           **THE COURT:**  Well, no.  Then you all are going to

6   confer.  I'm not going to do any extra work that I don't

7   need -- that I don't have to do, because I have a lot to do

8   already.  So you all are going to confer this afternoon and we

9   can get on the phone tomorrow morning if we need to about this.

10          **MR. SCOTT:**  That's great, your Honor.  Thank you.

11          **THE COURT:**  Anything else on that issue?

12          **MR. SCOTT:**  Not at this time.

13          **MR. SPEAKER:**  No, your Honor.

14          **THE COURT:**  Brandy, I know I have some sentencings

15  tomorrow.  What time would the Court be available?

16          **THE CLERK:**  Eleven thirty, your Honor, or in the

17  afternoon.

18      **(Court confers with the Clerk)**

19          **THE COURT:**  So you all have got a hearing scheduled

20  tomorrow morning at 8:30.  If this matter is not resolved, we

21  can flush it out then.

22          **MR. TATUM:**  Thank you, your Honor.

23          **THE COURT:**  All right.  Is there anything else from

24  the Plaintiffs that needs to be discussed today?

25          **MR. ROSENBERG:**  Just very briefly, your Honor.  This

1   is Rosenberg.  One suggestion I have perhaps to reduce the

2   burden on both the parties and the Court, if it's acceptable to

3   the Court, in the pretrial order there's a provision in your

4   standard pretrial order for a statement of disputed facts.

5   Given that the parties are filing detailed findings of fact and

6   conclusions of law commensurate with the filing of the pretrial

7   order, I was wondering if that could take the place of the

8   statement of disputed facts.

9           **THE COURT:**  I'm okay with that.

10          **MR. SCOTT:**  We're absolutely agreeable, your Honor.

11          **THE COURT:**  Yeah.

12          **MR. ROSENBERG:**  Thank you, your Honor.

13          **THE COURT:**  What else?  What else?  From the

14  Plaintiffs?

15      **(No response)**

16          From the Defendants?

17          **MR. SCOTT:**  Your Honor, is it possible -- make I

18  speak to Ms. Baldwin via the Court?

19          **THE COURT:**  Yes.

20          **MR. SCOTT:**  Is it possible to get that list from

21  Dr. Ansolabehere since it sounds like it's ready?  Can we get

22  it today so our expert can review it before his report is due

23  tomorrow?  So if we could get it today it would be great.

24          **MS. BALDWIN:**  I would be happy to talk and see if we

25  can do that.  I'd just have to check with our litigation

1    support since we may, you know, want to use (indiscernible)

2    previously.

3                **MR. SCOTT:**  That would be absolutely fine.

4                **THE COURT:**  Okay.  So it's my understanding then the

5    parties are going to confer on DE441 regarding the documents

6    that were requested by the Defendants regarding the election

7    crimes and voter frauds, specifically you all were going to

8    look -- or Government was -- the United States was going to

9    look at the summary provided by the Defendants to let me know

10   what the Government was willing to do and not do so I could --

11   we could get to the bottom line on that.

12               You all are going to confer on the motion by the

13   Defendant that was just filed last night.  And I think that's

14   it.  We'll have a hearing in the morning if we need to,

15   correct?  And if you all --

16               **MR. HEARD:**  Your Honor, Brad Heard for the United

17   States.  Just for the record, we have made a request of the

18   Defendants just shortly after you encouraged us to confer,

19   consultation on the fraud documents.  We have made a request of

20   them to supply us with the exact source that they were

21   referencing before the Court today, and we are awaiting that

22   response.

23               **THE COURT:**  Okay, very good.  All right.  Anything

24   else for now?

25           **(No response)**

50

1          Okay.  Then you are excused.  Thank you.

2     **(Counsel thank the Court)**

3          **THE COURT:**  Thank you.

4     **(This proceeding was adjourned at 11:29 a.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>August 18, 2014</u>

TONI HUDSON, TRANSCRIBER

1