# BARRETO AND SANCHEZ REBUTTAL REPORT
# RESPONDING TO HOOD AND MILYO

**Expert Report Submitted on Behalf of Plaintiffs**
in *Veasey v. Perry*, *Case 2:13-cv-00193*

**Matt A. Barreto, Ph.D., University of Washington**
**Gabriel R. Sanchez, Ph.D., University of New Mexico**

**August 18, 2014**

1. On June 27, 2014 we submitted an expert report in Veasey v. Perry regarding Texas SB 14 which instituted a voter photo identification requirement for in-person voting in the state of Texas. On August 1, 2014 M.V. Hood III and Jeffrey Milyo submitted rebuttal declarations on behalf of the State of Texas that, in part, provided criticisms and responses to our report. In this brief declaration, we respond to Hood and Milyo and demonstrate why our initial report and public opinion survey of eligible voters in Texas is true and accurate, and most importantly, abides by all principles of accepted social science research.

2. In summary, there are three clear takeaways from reviewing the rebuttal declarations by Hood and Milyo.

   First, the reconstituted analysis that each offers relies on numerous errors in both (a) recoding respondents as having an accepted photo ID who they cannot prove actually have an unexpired photo ID, and (b) making assumptions about respondents that go against the norms of social science survey research.

   Second, both Hood and Milyo include extensive commentaries on issues that are not pertinent to the case. Hood for example provides analysis conducted in other states which is not helpful in this case given the nuances specific to the Texas law, and also attempts to re-define the issue to be about overall aggregate turnout, which is, methodologically incorrect. Similarly, Milyo discusses at length a debate in the academic literature surrounding the costs of voting without directly addressing the data on costs of voting presented in our report.

   Third, and perhaps most important, even in the reconstituted analysis offered by Hood, he finds that Latinos are statistically less likely to possess accepted ID than are Anglos. Quite simply, Hood concludes that there is a statistically significant racial disparity in possession of SB 14 accepted ID in Texas.

We now turn to a more detailed discussion of each of the points raised by Hood and Milyo.

3. Hood offers extensive commentary on research he has conducted in other states such as Georgia and South Carolina. This discussion is not relevant to the case at hand, as the laws in each state vary, and more importantly, the demographic profile of each state and possession rates within each state's population are unknown and potentially different from Texas. None of this prior research has any direct bearing on whether or not eligible voters in the State of Texas lack SB 14 accepted photo ID. The entirety of this portion of his rebuttal (Section V) is irrelevant to the question before the court in this case and further this section offers no specific or direct response to our initial expert report findings about possession rates in Texas.

4. Hood and Milyo both attempt to re-focus the question on overall aggregate voter turnout rates rather than possession rates of accepted photo ID. However this is an incorrect area

of focus which ignores the very real evidence that existing registered voters who have a right to vote are denied the opportunity to vote if they lack a photo ID, or the means to obtain a photo ID. By focusing on aggregate voter turnout Hood and Milyo are effectively saying – as long as the overall voter turnout rate does not decline under voter ID regimes there is no harm. Rather than a direct disparity in turnout, the threshold has been whether eligible voters have equal access to the *opportunity to vote*. If there are unequal possession rates of the required identification across the population in the state of Texas then many voters would be disenfranchised. Consequently, the discussion of the academic literature focused on the relationship between voter ID laws and turnout is irrelevant to the question addressed in our report. Regardless of aggregate turnout rates, harm is still being faced by the hundreds of thousands of individuals who lack ID and will not be able to vote in future elections. It is irrelevant if *other* individuals who do possess a valid ID start to vote at higher rates now. We illustrate this with a simple example:

5. Table 1: Example how turnout can increase but eligible voters remain disenfranchised

|  | Year 1 | Total Voted | Turnout Rate |  | Year 2 | Total Voted | Turnout Rate |
|---|---|---|---|---|---|---|---|
| Registered voters have valid photo ID | 850 | 700 | 82% |  | 950 | 900 | 95% |
| Registered voters LACK valid photo ID | 150 | 100 | 67% | 100 register | 150 | 0 | 0% |
| Eligible, but not registered have valid photo ID | 200 | 0 | 0% |  | 100 | 0 | 0% |
| Eligible, but not registered LACK valid photo ID | 200 | 0 | 0% |  | 200 | 0 | 0% |
| Overall | 1400 | 800 | 57% |  | 1400 | 900 | 64% |

6. The example in Table 1 is a very close approximation of what happened in the state of Georgia between 2004 and 2008. It is also demonstrates that the overall aggregate voter turnout rate can increase, but this does not prove voter ID laws do not have a disenfranchising effect. In the example above in Table 1 the jurisdiction goes from an overall turnout rate of 57% in year 1 to an increased turnout rate of 64% in year 2. However the turnout increase is only among those who have a valid photo ID. In year 2 after implementation of voter ID, it is likely that any registered voter who does not possess a valid photo ID on Election Day will not be able to vote – even if they had voted in year 1. Further, other eligible voters who were previously not registered to vote but have a valid ID now enter the electorate for the first time in year 2, and because they have an ID they are able to vote. Witnessing a higher voter turnout rate among those who already have a valid ID does not prove at all that voter ID laws are preventing other voters who lack ID from voting, and this is the critical question we must answer – are eligible voters being disenfranchised?

Aggregate voter turnout analysis as suggested by Hood and Milyo does not allow for us to possibly answer the question.

7. The analysis of voter turnout rates by race in Georgia across the 2004 and 2008 elections are particularly flawed because the 2008 election marked a dramatic increase in African American voter registration and voter turnout among those who had a valid photo ID in Georgia. Hood notes that he conducted research testing whether registration and turnout among Blacks in Georgia increased or decreased between 2004 and 2008. As depicted in his Figure 1, he argues that because Georgia's voter identification law was implemented in 2007, this analysis allows for a direct test of whether the law had an impact on turnout among this population. While this seems intuitive, it ignores an important and obvious factor: the candidacy of Barack Obama in 2008 which led to truly historic. [1]

8. A key standard in social science research that compares two points in time is that every other factor is held constant, or identical, except the one variable in question – for Hood that is voter ID law. However the 2004 and 2008 elections are far from identical due to the Obama candidacy. Thus, while registration and turnout may have increased between 2004 and 2008, this surge was not driven by the implementation of a more stringent voter ID law, but the mobilization of African American voters by the Obama campaign. Several academic publications have shown the huge impact President Obama's candidacy has had on the civic engagement of Blacks.[2] Our report's findings and those from our academic research suggest that the registration and turnout levels of Blacks in Georgia would have been *even higher* in 2008 if it were not for the voter ID law put in place in 2007. Thus, the fact that more African Americans who voted in Georgia in 2008 does not prove voter ID laws had no effect, it only proves that among African Americans who had valid photo ID, they voted at much higher rates.

9. Hood makes clear on page 27 of his rebuttal that he did not like our weight variable and states, "I constructed my own weight variable to bring the survey data into line with known population parameters as related to race and ethnicity." Throughout the rest of his report, he then attempts to re-analyze our survey data using his reconstructed weight. However, the weight variable he created provides a very biased portrait of Texas eligible voters. He does not attempt to match the socioeconomic demographics within each racial group to ensure that the weighted data for each group has the correct socioeconomic balance.

---

[1] http://www.pewhispanic.org/2009/04/30/dissecting-the-2008-electorate-most-diverse-in-us-history/
[2] See the following publication for example that was part of a larger special issue focused on the Obama effect during the 2008 election: http://poq.oxfordjournals.org/content/73/5/995.abstract, and the following news article which is indicative of the general recognition of the massive mobilization efforts of Obama In 2008: http://colorlines.com/archives/2012/03/hans_von_spakovskys_false_conclusions_about_georgias_voter_id_impacts.html

10. As we discuss in our initial expert report, weighting the data to match the Census estimates of the population are critical to being able to generalize the findings to the entire population. The weighting must be done within each racial group, one by one, as we originally explained on page 16 of our initial report:

> "After collecting the data for the main Texas sample, and the Black and Hispanic oversamples, underlying demographic characteristics of the respective samples were examined and compared to the known universe estimates for each from the 2012 U.S. Census, *American Community Survey* for Texas. Where there were any discrepancies, a weighting algorithm was applied to balance the sample, called raking ratio estimation,[3] so that the final samples that were tabulated for the analysis were in line with the U.S. Census estimates for Texas. For example, it is well known in survey research that people under 25 years old are harder to reach than older people who are over age 65. If 8% of survey respondents are age 18-24 years old, but census data tells us they are actually 14% of the eligible voting population, then each young person needs to be "up-weighted" so that collectively they represent 14% of the sample."

11. Hood states that our weight variable does not match the Census estimate for race/ethnicity in Texas and he cites our review of Texas demographics on the top of page 11 of our report. In that review, the narrative summary at the top of page 11 of our report is based on the total population of Texas – not the citizen adult population. This is a typographic error on our part, which, however, has nothing to do with our weighting scheme or our data. Rather, this paragraph is just a summary of the diversity within the state of Texas by race, age, education and income. In fact, our weight variable is based on the Census estimates for the adult citizen population of Texas and Hood acknowledges as much in his Table 8 on page 26 of his rebuttal, where he identifies our actual weighted data in column five of his table.

12. More importantly, the critical nature of the weight is to ensure that within each racial group included in the study, the findings can be generalized to the larger population. Because the principal aim of our study was to compare across Anglos, Hispanics and African Americans it is essential that the samples of each group are weighted to reflect the Census demographics of each group, thereby enabling an accurate cross-group comparison, as we explained clearly on page 16 of our initial report and reiterate in paragraph 10 above.

13. Hood's attempt to reconstruct the weight fails to take into account the correct age distribution, educational achievement, income distribution or gender parity within each racial group. In fact, if we tabulate the survey data using Hood's reconstructed weight the respondents are severely biased and unrepresentative of the actual population of Texas. We

---

[3] Michael Battaglia et. al. 2004. "Tips and Tricks for Raking Survey Data (a.k.a. Sample Balancing)" Proceedings of the Survey Research Methods Section, American Statistical Association.

*Barreto and Sanchez rebuttal report / Veasey v. Perry / August 18, 2014*                                                                 4

illustrate this in Table 2 below in which we compare the age, education, income and gender.

14. Table 2: Comparison of Census demographics to Hood-weighted demographics by Race

|  | Anglos | | | African Americans | | | Hispanics | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Age | Census | Hood | Diff | Census | Hood | Diff | Census | Hood | Diff |
| 18 to 29 | 19.1 | 5.4 | -13.7 | 25.8 | 4.7 | -21.1 | 32.3 | 13.1 | -19.2 |
| 30 to 44 | 23.9 | 10.4 | -13.5 | 29.8 | 11.1 | -18.7 | 29.5 | 10.5 | -13.9 |
| 45 to 54 | 19.9 | 14.8 | -5.1 | 20.2 | 13.8 | -6.4 | 16.5 | 13.7 | 1.8 |
| 55 to 64 | 17.4 | 24.1 | 6.7 | 13.4 | 24.3 | 10.9 | 11.4 | 18.8 | 7.6 |
| 65 and over | 19.6 | 45.3 | 25.7 | 10.8 | 46.1 | 35.3 | 10.3 | 24.4 | 23.6 |
|  |  |  |  |  |  |  |  |  |  |
| Education |  |  |  |  |  |  |  |  |  |
| Grades 1-8 | 2.1 | 1.5 | -0.6 | 3.4 | 1.5 | -1.9 | 23.6 | 20.9 | -2.7 |
| Some HS | 5.5 | 3.3 | -2.2 | 9.8 | 7.3 | -2.5 | 15.9 | 9.2 | -6.7 |
| HS grad only | 25.0 | 17.1 | -8.0 | 29.9 | 24.9 | -4.9 | 25.9 | 22.3 | -3.6 |
| Some College | 32.6 | 26.7 | -5.9 | 36.2 | 33.6 | -2.7 | 22.7 | 22.6 | -0.1 |
| College grad | 23.2 | 28.3 | 5.1 | 14.0 | 18.6 | 4.6 | 8.6 | 16.7 | 8.1 |
| Post-grad | 11.6 | 23.1 | 11.5 | 6.7 | 14.1 | 7.4 | 3.4 | 8.4 | 5.0 |
|  |  |  |  |  |  |  |  |  |  |
| Income |  |  |  |  |  |  |  |  |  |
| Less than $20K | 13.9 | 10.5 | -3.4 | 27.5 | 27.8 | 0.3 | 23.7 | 33.6 | 9.9 |
| $20 to $39K | 17.9 | 15.4 | -2.5 | 24.4 | 17.0 | -7.4 | 27.6 | 17.9 | -9.8 |
| $40 to $59K | 16.3 | 10.9 | -5.4 | 17.4 | 13.2 | -4.2 | 18.7 | 11.9 | -6.9 |
| $60 to $79K | 10.4 | 18.9 | 8.5 | 9.1 | 14.9 | 5.9 | 9.5 | 8.9 | -0.7 |
| $80K to $99K | 13.2 | 9.0 | -4.2 | 9.6 | 5.5 | -4.1 | 9.5 | 5.2 | -4.2 |
| $100K to $149K | 15.5 | 12.9 | -2.6 | 8.5 | 5.1 | -3.4 | 7.6 | 6.0 | -1.6 |
| $150K and over | 12.9 | 11.2 | -1.6 | 3.6 | 1.7 | -1.9 | 3.4 | 3.8 | 0.4 |
|  |  |  |  |  |  |  |  |  |  |
| Gender |  |  |  |  |  |  |  |  |  |
| Male | 51.1 | 44.8 | -6.3 | 47.1 | 29.3 | -17.8 | 50.0 | 43.8 | -6.2 |
| Female | 48.9 | 55.2 | 6.3 | 52.9 | 70.7 | 17.8 | 50.0 | 56.2 | 6.2 |

15. It is immediately apparent that Hood did not employ a raking weighting scheme for each individual racial group when he created his reconstructed weight. The racial groups in Hood's weighted data are statistically different from what the U.S. Census reports for Texas and therefore we cannot generalize his findings to the state of Texas. For example, in his weighted data 32.7% of African Americans have a college degree or higher when the Census informs the correct percentage is 20.7% among Texas African Americans. Likewise, Hood's weighted data reports 25.0% of Hispanics with a college degree – over double the correct rate of 11.9% for Hispanic citizen adults in Texas. His data show statistically significant differences from the Census when it comes to age, income and gender as well. This means that when Hood tabulates the data with his reconstructed weight, the data are not at all reflective of the real eligible voting population in Texas. For this reason, his entire analysis should be rejected.

16. Despite this enormous error, we still reviewed Hood's reconstructed analysis of our possession of ID variable and found his claims to be without warrant. Upon closer inspection of our original report, we find that Hood is incorrect in his attempt to reclassify some of our respondents as having a valid unexpired photo ID when their answers to the survey indicate that they do not currently possess a valid unexpired photo ID. In several instances he incorrectly classifies someone as having a valid ID when in fact the respondent does not affirm that their ID is unexpired. In other instances our respondents indicated that their ID was lost or stolen and not in their possession, yet Hood counted them as having ID because they originally answered they had obtained a driver's license. Throughout, we found many irregularities in the efforts by both Hood and Milyo to reclassify respondents as having a valid unexpired photo ID when their answers to the survey did not confirm this. Thus, the court should not accept either Hood's or Milyo's criteria for classifying respondents as actually possessing an ID.

17. Hood indicates that twelve of our respondents appear to have an accepted photo ID because they reported having proof of citizenship, such as a naturalization certificate. However, the only accepted ID is one with a photograph and each respondents was directly asked if they had a U.S. Citizenship certificate with their photograph at question 10 on our survey. Later, foreign born respondents were asked if they had a naturalization certificate or other proof of citizenship, however this did not include a specific reference to an ID with a photograph and not all naturalization certificates contain a photograph.

18. Regardless of the errors in Hood's weighting scheme and classification scheme, it is very important to note that he still finds statistically significant differences in possession of valid photo ID by race. Throughout his own reconstructed analysis, Hood reports that Latinos are statistically less likely to possess a valid photo ID than are Anglos among all eligible voters, as well as among registered voters. This can be found in his tables 10B,

10C, and 10D where he indicates with an asterisk (*) that Latinos are less likely to possess valid ID than are Anglos at the 95% confidence level according to his reconstructed analysis.

19. Hood and Milyo both raise questions about our survey that are not plausible. For instance Hood asks why we did not cross-reference our survey respondents against the TEAM voter registration database to validate their identity. However, it is common knowledge in the field that no personal identifying information is available in the random digit dial (RDD) sample upon which the baseline survey is based and it is therefore impossible to cross-reference the respondents.

20. Likewise, Milyo in comment 55 suggests that respondents to our survey are unable to confirm if they are over the age of 18 or have lived in Texas for over 30 days. This critique is not supported with any evidence at all that respondents would somehow not know the answer to these basic questions, and further, this critique is not within the bounds of accepted social science research. The totality of survey research operates from the assumption that respondents are able to answer basic screening questions about themselves and that respondent confidentiality and anonymity is the cornerstone of collecting accurate survey data. In fact, ensuring confidentiality of respondents is one of the twelve best practices defined by the American Association for Public Opinion Research[4], the leading organization for researchers who conduct survey research. Many academic publications stress the importance of confidentiality to ensure that respondents not only are willing to participate in surveys when asked to do so by researchers, but that they also provide honest answers to the questions posed in the interviews. [5]

21. In comment 57 of his rebuttal Milyo states that social desirability could bias our results. He claims that respondents might lie and provide the response that they feel is most socially accepted, however he does not point to any specific research that indicates this would be an issue on the topic of government issued photo identification. The idea of social desirability is that respondents want to see themselves fitting in and going along with accepted group norms. If we actually think about the social desirability issue that Milyo raises, if anything, it would seem that respondents have more incentive to over-report having an accepted photo ID. Respondents may not feel comfortable admitting that they do not possess an ID, or that they let their ID expire, and thus they may incorrectly report having an accepted ID.

---

[4] See link to the AAPOR best practices:: http://www.aapor.org/Best_Practices1.htm#best11
[5] See for example: Czaja, Ronald and Blair, Johnny. 2005. "Designing Surveys: A Guide to Decisions and Procedures." Thousand Oaks: Pine Forge Press. Tourangeau, Roger, Rips, Lance J., Rasinski, Kenneth. 2000. "The Psychology of Survey Response." Cambridge: Cambridge University Press.

In short, the concept of social desirability would support the notion that our report under-reports the true number of people who lack ID.

22. Milyo also argues that respondents could strategically misrepresent their answers to the questions we pose due to their lack of support for the law. This seems highly unlikely and inconsistent with any of the norms that drive the work of the survey research community. First, it presumes that respondents know that the survey is being used as part of the current lawsuit – which they did not. Also, it assumes that supporters of the law are not similarly misrepresenting their answers.  Milyo does not substantiate any of these claims with evidence or citations to published academic research.

23. Also inconsistent with the general standards and approach within the social sciences, Milyo argues that we "subject respondents to a lengthy and repetitive set of questions regarding multiple forms of ID" that could push respondents to misrepresent that they do not have a form of ID to terminate the survey. This claim is not only without any evidence, but is essentially a critique of the thorough and comprehensive rigor of our survey which promotes the accuracy of the results. The survey was designed specifically so it could ask about all the different types of ID referenced as part of SB 14.

24. Milyo argues that our use of 2012 ACS data is now two years older than the current 2014 Citizen Voting Age Population (CVAP) in Texas. However 2014 census data is not available. If anything, his point actually strengthens the argument against the voter ID law, because in terms of raw numbers, there are more voting eligible Texas residents who are negatively impacted by the law in 2014 than in 2012. If we extrapolate the linear growth in voter registration in Texas from 2004 – 2012 according to the U.S. Census, there would be an additional 500,000 new registered voters in Texas in 2014 than in 2012, including an additional 25,000 who lack a valid photo ID.

25. The basis of Milyo's reconstituted analysis is that he attempts to reclassify persons with ambiguous answers such as "don't know" as not necessarily lacking ID. The more accurate interpretation however is that we cannot accurately classify persons who indicate "don't know" as being in the "yes, has valid ID" category. It would be highly problematic and outside of the norms of social science research to code these ambiguous responses in the affirmative suggesting that they do in fact possess ID. In fact, published research in the social sciences clearly indicates that ambiguous responses including "don't know" should not be classified as an affirmative response.[6] When given multiple chances to indicate that

---

[6] See for example: Osborne, Jason W. 2013. "Best Practices for Data Cleaning: A Complete Guide to Everything you need to do before and after collecting your data." Thousand Oaks: Sage Publications;  Czaja, Ronald and Blair, Johnny. 2005. "Designing Surveys: A Guide to Decisions and Procedures." Thousand Oaks: Pine Forge Press.

they currently possessed an unexpired ID, these respondents failed to say "yes" and therefore we cannot count them as having ID. Thus the primary reason Milyo is reporting lower rates of people who lack ID is that he is counting anyone who said "don't know" as actually having a valid ID, which is entirely inconsistent with the standard practices in social science survey research.  Further, if Milyo dropped the ambiguous cases from the data and analyzed a smaller sample of data, he would have needed to reconstruct the weights of the new smaller dataset before running any new analysis – which he did not. We have serious concerns in the methodology employed by Milyo in his effort to recode the various respondents as having SB 14 ID possession but even were the Court to accept some of his highly questionable methods, many of the fundamental conclusions of our initial report concerning racial disparity in ID possession would hold.

26. Milyo also makes unsubstantiated assumptions that some respondents would not have to comply with SB 14 and show a valid ID because they had previously voted absentee or they have a disability. He has no way of knowing whether these respondents would vote absentee or in-person in a future election, and he has no way of knowing whether persons with a disability have applied for, and been granted an exemption from SB 14, which they must do according to the law.  It is very problematic to assume future behavior on the part of the survey respondents.

27. Hood's concluding section included some analysis focused on the number of provisional ballots cast in recent 2013 and 2014 elections in Texas. His argument here is that if the implementation of the voter ID law was detrimental, we would have seen a greater number of provisional ballots cast. First of all, this critique assumes there is a reliable and uniform system in place to collect the number of provisional ballots across 254 counties and smaller jurisdictions.  Second, Milyo assumes any person who showed up to vote without proper ID was offered the chance to voter provisionally or otherwise availed themselves of that option but Milyo offers no evidence for these assumptions, which to us, are inappropriate.  Third, an eligible voter with a valid ID may end up casting a provisional ballot for a variety of reasons, such as being in the wrong polling place. Not having an ID is not the only reason provision ballots may have been cast in previous elections, and not having a photo ID could never have been the reason pre-implementation of SB 14. Further, this criticism is flawed and again based on Hood's narrow focus on the impact of the law on turnout rates. By focusing only on the number of provision ballots in Harris County, he ignores how many eligible voters in Texas refrained from even attempting to vote in the first place because they were not able to vote due to lacking a required ID. As our survey results indicate clearly, there are a large number of eligible voters in Texas who do not have a valid ID and therefore cannot vote. For Hood's analysis to be complete he would need to give an

indication of how many people did not show up at the polls – not how many provisional ballots were cast.

28. The discussion of other Texas survey data indicating that there is support for the voter ID law among the Texas population is irrelevant to whether or not the law will impose unreasonable burdens on hundreds of thousands of eligible voters. Further, neither Hood or Milyo implemented the surveys themselves and therefore cannot confirm the methodological accuracy of the surveys they reference. Indeed, almost no details are given about the surveys such as the sample frame, margin of error, mode of data collection, field dates, question order, or response rate. Without these important details it is not possible to verify the methodological accuracy of the surveys Hood and Milyo reference. Further, the question wording on Tab 033 from the June 2009 survey does not fully explain the actual SB 14 law that was passed, and the question is also leading the respondent to agree with voter ID laws. The question wording on Tab 036 is extremely vague and does define for the voter what a "valid photo ID" is. The question wording on three surveys in Tab 031, Tab 037, and Tab 038 does not indicate which government-issued photo ID is acceptable. Some respondents may assume that state of Texas or federal government employee IDs are acceptable, or that state university IDs are accepted because they are government issued – however these IDs are not accepted.  More important, Hood failed to acknowledge that the data he cites still reveals a statistically significant gap in support for the voter ID law of almost 20 percentage points between Anglos and African Americans in Texas.

29. Section VIII of Milyo's report discusses the concerns he has with our section on the cost of obtaining a free ID. First, neither Milyo or Hood provide any re-analysis or different data to refute the tables and findings we present which clearly show that eligible voters who lack ID will face considerable burdens in obtaining a free ID. In short, the issues raised by Milyo in his section VIII are not based on the data generated in our report, but rather his disagreement with our interpretation of the academic literature regarding the costs and benefits of voting. Instead of providing any counter evidence that said burdens do not exist, Milyo goes to considerable length to summarize theoretical research from 1957 (Downs) and 1968 (Riker and Ordeshook) which has nothing to do with the factual answers provided by our survey respondents. Very clearly, our survey respondents indicate that obtaining the free ID will involve many burdens and barriers – some of which they cannot overcome. Whether or not Milyo has a new interpretation of a decades old debate is entirely irrelevant. The hypothetical scenarios he provides to estimate differential costs by race and ethnicity are unnecessary and unfounded. Our report provides direct data – not hypothetical – on the perceived costs of obtaining a valid ID by race, ethnicity, and other demographic factors so these hypothetical tests are not helpful to the court in determining if there is a racial or ethnic difference in costs associated with obtaining an ID.