**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MARC VEASEY, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-00193 |
| | § | |
| RICK PERRY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

PROPOSED FINDINGS OF FACT ........................................................................................ 1

I.      Texas's Voter Identification Requirements Prior to Senate Bill 14 ........................ 1

II.     Senate Bill 14 .......................................................................................................... 3

III     Senate Bill 14 Was Not Enacted for the Purpose of Denying or Abridging the
        Right to Vote on Account of Race, Color, or Membership in a Language
        Minority Group ........................................................................................................ 6

        A.      The Texas Legislature Has a Genuine Interest in
                Addressing Voter Fraud ................................................................................. 8

        1.      Voter Fraud Exists in Texas .......................................................................... 8

        2.      Inflated Voter Rolls Create a Risk of Voter Fraud ..................................... 10

        3.      Non-Citizens on the Voter Rolls Create a Risk of Fraud ........................... 12

        4.      Voter Fraud is Difficult to Detect and Prosecute ....................................... 14

        B.      The Texas Legislature Has a Valid Interest in Maintaining Confidence
                In the Electoral Process ............................................................................... 15

        C.      Texans Overwhelmingly Support Voter ID Laws ....................................... 17

        D.      The Record Contains No Evidence that SB 14 Was Enacted for the
                Purpose of Denying or Abridging the Right to Vote .................................. 19

IV.     SB 14 Will Not Have the Effect of Denying or Abridging the Right to Vote on
        Account of Race or Color, or Because of Membership in a Language Minority
        Group ...................................................................................................................... 20

        A.      SB 14's Photo ID Requirement Does Not Impose a Legally Significant
                Burden on Any Voter ................................................................................... 20

        B.      SB 14 Will Not Decrease Voter Turnout Among Lawfully Registered
                Voters ........................................................................................................... 25

C.      There Is No Racial Disparity in Possession of
        ID Required by SB 14 ...................................................................... 31

D.      SB 14 Will Not Have a Disproportionate Impact on any Group of
        Registered Voters. .......................................................................... 33

PROPOSED CONCLUSIONS OF LAW ......................................................................... 34

I.      Plaintiffs' Fourteenth Amendment Right-To-Vote Claims Are
        Dismissed ...................................................................................... 34

II.     Plaintiffs' Fourteenth Amendment Claims Alleging Intentional
        Discrimination Are Dismissed ....................................................... 43

III.    Plaintiffs' Fifteenth Amendment Claims Are Dismissed ........................ 47

IV.     Plaintiffs' Claims Brought Under Section 2 of the VRA Fail as a Matter
        of Law ............................................................................................ 54

V.      SB 14 Does Not Violate The First Amendment ........................................ 84

VI.     Even If The Plaintiffs Could Show That SB14 Violates The
        Constitution Or Federal Law, They Cannot Obtain Facial Invalidation
        of the Statute Because They Cannot Show That the Statute Is Invalid in
        Every Single One of Its Applications ............................................... 87

VII.    Plaintiffs Cannot Obtain Facial Invalidation Because State Law
        Requires This Court To Sever Every Application Of SB14 To Every
        Individual Voter And Uphold The Applications That Do Not Impose
        Unlawful Burdens On The Right To Vote .................................................. 89

VIII.   Any Relief Awarded By This Court Must Be Limited To The Named
        Parties To This Litigation, And Cannot Extend To Non-Parties .............. 91

<u>PROPOSED FINDINGS OF FACT</u>

## I. TEXAS'S VOTER IDENTIFICATION REQUIREMENTS PRIOR TO SENATE BILL 14

1.     Texas Election Code Section 63.001(b) provided that an in-person voter may cast a regular ballot upon presentation of his voter registration certificate.  TEX. ELEC. CODE §63.001(b).

2.     Registered voters who did not present a voter registration card at the polls could vote upon executing an affidavit stating that they do not have a voter registration certificate at the polling place and presenting an acceptable form of identification.  TEX. ELEC. CODE § 63.008(a). If a voter appearing at the polls failed to execute an affidavit or provide acceptable identification, then the voter could cast a provisional ballot.  *Id.* §63.008(b).

3.      The law recognized several acceptable forms of identification for voting:

> (1) a driver's license or personal identification card issued to the person by the Department of Public Safety or a similar document issued to the person by an agency of another state, regardless of whether the license or card has expired;
> (2) a form of identification containing the person's photograph that establishes the person's identity;
> (3) a birth certificate or other document confirming birth that is admissible in a court of law and establishes the person's identity;
> (4) United States citizenship papers issued to the person;
> (5) a United States passport issued to the person;
> (6) official mail addressed to the person by name from a governmental entity;

1

    (7) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

    (8) any other form of identification prescribed by the secretary of state.

TEX. ELEC. CODE § 63.0101.

4.    In some circumstances, voters were required to present identification even if they presented their voter registration certificate at the polls. For example, if a voter did not provide a Texas driver's license number, a Texas personal identification card number, or the last four digits of their social security number on the voter registration application, the voter could receive a voter registration card, but was later required to present a qualifying form of identification when voting. *See* http://votetexas.gov/register-to-vote/need-id. If the voter provided a driver's license, personal identification card, or social security number that does not match DPS or Social Security Administration records, the voter was registered to vote, so long as the voter confirmed that the information was correct, but the voter was required to submit proof of identification to vote. *See* http://www.sos.state.tx.us/elections/laws/advisory2010-11.shtml.

5.    Existing law permits qualified voters who expect to be absent from their county of residence on election day, who are disabled, who are 65 or older on election day, or who are confined in jail to vote early by mail without presenting identification. *See* TEX. ELEC. CODE §§ 82.001–004.

6.      Existing law allows eligible voters to register at a DPS office.

**II.   SENATE BILL 14**

7.      Senate Bill 14 (SB 14) amended the law to require that voters present one of the following forms of identification when voting in person:

(1) a driver's license, election identification certificate, or personal identification card issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation;

(2) a United States military identification card that contains the person's photograph that has not expired or that expired no earlier than 60 days before the date of presentation;

(3) a United States citizenship certificate issued to the person that contains the person's photograph;

(4) a United States passport issued to the person that has not expired or that expired no earlier than 60 days before the date of presentation; or

(5) a license to carry a concealed handgun issued to the person by the Department of Public Safety that has not expired or that expired no earlier than 60 days before the date of presentation.

Acts 2011, 82nd Leg., R.S., Ch. 123 § 14.

8.      SB 14 requires the Department of Public Safety to issue an election identification certificate to a registered voter who does not have another form of identification required by the bill to vote.  SB 14 prohibits the DPS from charging a fee for an election identification certificate.  *Id.* § 20.

9.      Persons determined to have a disability by the United States Social Security Administration or determined to have a disability rating of at least 50 percent by the U.S. Department of Veterans Affairs may continue to vote at the polls by presenting a voter registration certificate.  *Id.* §§ 1, 9.

3

10.   Voters who do not present the required identification may cast a provisional ballot if they execute an affidavit stating that the voter "(1) is a registered voter in the precinct in which the person seeks to vote; and (2) is eligible to vote in the election." *Id.* § 15 (JA 003111–12).  For the provisional ballot to be counted, the voter must present identification or execute an affidavit within six days of the election.  *Id.* § 18.

11.   Under SB 14, a provisional ballot is counted if the early voting ballot board determines that the person is eligible to vote, the person has not already voted, and the person (a) presents the required identification, (b) executes an affidavit stating that "the voter has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief," or (c) executes an affidavit stating that the voter does not have the required identification "as a result of a natural disaster that was declared by the president of the United States or the governor, occurred not earlier than 45 days before the date the ballot was cast, and caused the destruction of or inability to access the voter's identification." *Id.* § 17.

12.  SB 14 does not amend the provisions of the Texas Election Code that permit qualified voters to vote early by mail if they are over 65, disabled, confined in jail, or expect to be absent from their county of residence on election day.  *See* TEX. ELEC. CODE §§ 82.001–004.

4

13. SB 14 mandates a statewide effort led by the Secretary of State to educate voters concerning SB 14's new requiring.  Tex. Elec. Code § 31.112. SB 14 also increases funding for voter registration activities.  SB 14, § 24.

14. The central change made by SB 14 to existing law is the requirement that in-person voters provide a government-issued photo ID when voting.

15. SB 14 is similar to photo voter identification laws passed by Georgia, Indiana, and South Carolina.

16. Georgia's voter ID law requires voters to present one of the following forms of identification to vote: a Georgia driver's license; an identification card issued by any Georgia state entity or the United States; a valid United States passport; an employee identification card issued by any Georgia state entity, the United States, or a local political entity; a United States military identification; or a tribal identification card.  *See* GA. CODE ANN. § 21-2-417(a). Like SB 14, Georgia law provides for free voter identification cards. *See id.* § 21-2-417.1(a).  Georgia voters who fail to present the required identification may cast a provisional ballot, which will be counted if the voter presents identification to the voter registrar within three days of the election. *See id.* § 21-2-419(c)(1).

17. Before the preclearance-coverage formula was struck down, the United States Department of Justice pre-cleared Georgia's voter

identification law after concluding that it complied with section 5 of the Voting Rights Act.

18. Indiana's voter ID law requires in-person voters to present identification that contains the person's name, photograph, and an expiration date. *See* IND. CODE. ANN. §§ 3-5-2-40.5(a), 3-10-1-7.2(a). The identification must be issued by the State of Indiana or the United States, and it must be current or have expired after the most recent general election. *See id.* § 3-5-2-40.5(a). A voter who does not present qualifying identification may cast a provisional ballot, which will be counted if, within 10 days of the election, the voter provides proof of identification, attests to indigency, or attests to a religious objection to being photographed. *See id.* § 3-11.7-5-2.5(a)–(c).

19. The United States Supreme Court upheld Indiana's voter identification law against constitutional challenge. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008).

### III. SENATE BILL 14 WAS NOT ENACTED FOR THE PURPOSE OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE, COLOR, OR MEMBERSHIP IN A LANGUAGE MINORITY GROUP.

20. The legislative record establishes that SB 14 was enacted for the purposes of detecting and deterring voter fraud, as well as preserving public confidence in the electoral system. Senator Troy Fraser, the sponsor of Senate Bill 14, and the bill's supporters in the House and Senate, repeatedly stated that their purposes in supporting Senate Bill 14 were to deter and

detect voter fraud, and safeguard voter confidence in the electoral system. *See* Fraser Depo 122:20-21 ("The purpose was to protect the integrity of the ballot box."); Dewhurst Depo 69:3-8; 122:14-23; 222:2-12; 208:22-209:6 ("It was the intent of the Legislature, it was the intent of the Lieutenant Governor, to pass . . . a photo voter ID bill which reduced fraud, and not to repeat myself, I apologize, but to improve the confidence by the voters in Texas in our election process.  Because I warrant to you, most voters didn't have a lot of confidence in the validity of their vote. . . . . Because in Texas, we have a real problem with low voter turnout."); Harless Depo 85:19-22 ("to provide for the integrity of the in-person voting by showing a photo ID"); Patrick Depo 56:6-9 ("[T]he purpose of the bill was to protect the integrity of the ballot box."); Straus Depo 49:14-15 ("to be certain that those who were casting votes were doing so legitimately"); Dewhurst Depo. 48:22-51:17; 106:6-15; McCoy Depo. 37:14-39:18; 138:13-22; *cf.* McCoy Depo. 37:23-38:5 ("Q.  [W]ere you ever part of or did you ever hear of any conversations about whether the bill would give either party a partisan advantage in elections?  . . . A.  No.").  Indeed, the legislators and their staff uniformly denied that the bill was enacted for the purpose of decreasing the number of voters from any racial, ethnic, or language minority group.

21.  After deposing numerous state legislators and legislative staff members, and after reviewing the record of this case, DOJ is unable to

identify any statement made by any Texas legislator or staffer that evinces a desire to harm racial minorities.  Not a single legislator or staff member recalls hearing any statement suggesting that SB 14 was enacted to harm racial minorities or to give a partisan advantage to the Republican Party.

22.  After reading through every relevant legislators' bill books and office files, and after reading thousands of confidential email communications between legislators, their staff, and their constituents, including emails from legislators' personal accounts and work accounts at their personal places of business outside the Legislature, the plaintiffs are unable to identify any statement made by any legislator or staff member that evinces a desire to harm racial minorities or that evinces a desire to suppress voter turnout in any political or demographic group.  *Compare* Hr'g of May 1, 2014, at 28:4-10 (Doc #263) ("Mr. Rosenberg: That evidence is going to be very, very important in this case dealing with the intent behind S.B. 14 itself."); U.S. Opp'n to Mtn to Quash, at 1 (Doc # 254) (demanding this "vital discovery from current and former legislators").

## A.   THE TEXAS LEGISLATURE HAS A GENUINE INTEREST IN ADDRESSING VOTER FRAUD.

### 1.  VOTER FRAUD EXISTS IN TEXAS.

23.  The legislative record further demonstrates that voter fraud is a well-recognized problem in Texas.  SB 14 was designed to help detect illegal

conduct at the polling place, deter those who attempt to illegally interfere with the democratic process, and prevent election fraud in the future.

24.  Under *Crawford*, States are not required to present evidence that in-person voter impersonation has occurred at the polls to justify a photo-identification requirement.  *See Crawford*, 553 U.S. at 194–96.

25.  Nevertheless, Texas has provided ample evidence that voter fraud has been documented in Texas, and outside of Texas.

26.  Multiple instances of election fraud have been referred to the Texas Attorney General and the United State Attorney General for investigation and multiple instances of election fraud, including cases involving in-person voter fraud, have been successfully prosecuted.

27.  In-person voting fraud is very difficult to detect.  Indeed, the only way to detect in-person voter fraud is if someone inside the polling place recognizes the individual attempting to cast a fraudulent ballot.

28.  In 2011, the House Select Committee on Voter Identification and Voter Fraud heard testimony from individuals who had personally witnessed instances of people voting more than once at a single polling place.  Tex. Leg., House Select Committee on Voter ID and Voter Fraud Hr'g (82d Leg.) (Mar. 1, 2011) at Vol. II, pp. 181-83, 260-61.

29.   The House Select Committee heard testimony in 2011 that the Office of the Attorney General had investigated approximately 12 cases of voter impersonation since 2002.  *Id.* at 323-26.

30.   This evidence of in-person voter fraud meets the evidentiary standard the Supreme Court held to be sufficient in *Crawford*, which held that photo ID legislation is justified by evidence of other types of voting fraud in the enacting state and instances of in-person ballot fraud in other states.  *See Crawford*, 553 U.S. at 194–95 (holding that Indiana's law, which addressed only in-person voter fraud, was justified by the threat of voter fraud even though the record contained "no evidence of any such fraud actually occurring in Indiana at any time in its history"); *id.* at 195 n.12 (alluding to "scattered instances of in-person voter fraud" in other states as justification for Indiana's in-person voter identification requirement).

31.   The record in this case shows multiple cases of election fraud in Texas. Accordingly, under *Crawford*, the Texas Legislature had more than an adequate factual basis to determine that there was a need to deter such activity.

## 2. INFLATED VOTER ROLLS CREATE A RISK OF VOTER FRAUD.

32.   The Supreme Court has held that finding ways to deal with inflated voter rolls is a neutral, nondiscriminatory state interest in passing voter identification laws.  *See Crawford*, 553 U.S. at 196–97 ("[T]he fact of inflated

voter rolls does provide a neutral and nondiscriminatory reason supporting the State's decision to require photo identification.").

33.  The National Voter Registration Act (NVRA) hinders the ability of States to promptly remove persons who have moved out of state from the list of registered voters.  Under the NVRA, a State "shall not" remove a person from the list of registered voters on the ground that he has moved unless the registrant "confirms in writing" that he has moved outside the jurisdiction in which he is registered, or unless the registrant fails to respond to a notice mailed to him and fails to vote in two consecutive federal elections following the notice.  *See* 42 U.S.C. § 1973gg-6(d).

34.  Although the Secretary of State's list of registered voters is the State's official voter-registration rolls, voter registration is conducted at the county level.  Counties must update voter registrations, both to add new registrants and remove dead people.  Communications between SOS and counties are electronic in most cases, but not all, so this process creates the potential for inaccuracies on the State's official list of registered voters.

35.  The Texas voter-registration rolls include names of persons who have died, persons who have moved out of the State, and felons and noncitizens ineligible to vote.  *See, e.g.*, Tex. Leg., Senate Committee of the Whole (81st Leg.) (Mar. 11, 2009) at 564-67 (Testimony of Harris County official); Tex. Leg., House Committee on Elections (82d Leg.) (June 14, 2010) (Testimony of

11

Ann McGeehan).  Moreover, Travis County, for example, refused for many years to remove dead registrants from its voter rolls.

36.  When voter-registration rolls contain names of persons who have died and persons who have moved out of the State, this situation presents opportunities for persons to fraudulently impersonate another voter when appearing to vote at the polls, absent a requirement that the voter present photo identification when appearing to vote at the polls.

37. A voter-identification law that permits poll workers to accept non-photo identification, such as utility bill or the voter registration certificate that the Secretary of State mails to each voter's residence, does not detect or deter voter impersonation as effectively as a photo-identification requirement, as it offers opportunities for voters to impersonate other members of their household.

### 3. NON-CITIZENS ON THE VOTER ROLLS CREATE A RISK OF FRAUD.

38.  Texas has a large non-citizen population comprising persons from all over the world and of many races.  Today, Texas is experiencing unprecedented immigration—both legal and undocumented.

39. The presence of non-citizens on the voting rolls also creates the opportunity for voter fraud for the obvious reason that non-citizens are not eligible to vote.

40.  There is evidence that non-citizens register to vote in Texas and of non-citizens voting in Texas (and outside of Texas).

41.  Texas law does not require anyone to provide documents proving his U.S. citizenship when registering to vote.  Instead, Texas requires that a persons registering to vote sign a statement, under penalty of perjury, declaring that they are U.S. citizens, and provide either a Texas driver's license number or the last four digits of their social-security numbers.

42.  At least one federal court of appeals has held that the National Voter Registration Act (NVRA) prohibits States from requiring proof of citizenship from persons seeking to register to vote.  *See Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (holding that the NVRA preempts Arizona law requiring prospective voters to provide documentary proof of citizenship).  The United States Election Assistance Commission has recently denied the requests of Arizona and Kansas to require proof of citizenship when registering to vote.

43.  Texas law requires proof of citizenship from persons seeking a state driver's license, consistent with the requirements of the federal REAL ID Act.

44.  Texas law permits legal, noncitizen residents to obtain driver's licenses, but these licenses expire on the same day as the noncitizen's visa.

45.  Texas law prohibits undocumented immigrants from obtaining any type of driver's licenses, including those who entered the country but have overstayed their visa.

46. Senate Bill 14 prohibits noncitizens from obtaining election identification certificates available to citizens free of charge who register to vote but cannot afford to obtain a driver's license or other form of government-issued photo identification.

47. Senate Bill 14 will deter and prevent many noncitizens who register to vote from illegally voting at the polls, because undocumented immigrants are unable to obtain driver's licenses and noncitizens' driver's licenses expire along with their visas.

### 4. VOTER FRAUD IS DIFFICULT TO DETECT AND PROSECUTE.

48. In-person voter fraud is inherently difficult to detect. Absentee ballot fraud is easier to detect and prosecute because it leaves a paper trail. Tex. Leg., House Committee on Elections (81st Leg.) (April 6, 2009) at Vol. I, pp. 162-63 (Brennan Center testimony).

49. Voter fraud is also difficult to prosecute. Elderly voters, for instance, may be reluctant to testify against vote harvesters—individuals who influence elderly people in filling out mail-in ballots—which leaves prosecutors to rely on third party witnesses.

50. Local prosecutors may choose not to prosecute voter fraud because it is a low priority compared to other crimes. Tex. Leg., House Committee on Elections (81st Leg.) (April 6, 2009) at Vol. I, pp. 133-35 (prosecution of voter fraud is the lowest priority for prosecutors); Tex. Leg., House Committee on

14

Elections (81st Leg.) (April 7, 2009) Vol. I, at p. 30 ("Local prosecutors—it's true local prosecutors don't do this, because they've got rapes and murder and all this other stuff.").

51. Local prosecutors may not prosecute voter fraud for political reasons. *Id*. at Vol. I, pp. 48-50 (political sensitivity of voter fraud prosecution prevents district attorneys from prosecuting voter fraud).

### B. THE TEXAS LEGISLATURE HAS A VALID INTEREST IN MAINTAINING CONFIDENCE IN THE ELECTORAL PROCESS.

52. Voter fraud has the potential to reduce public confidence in elections and, as a result, in government itself. *See Crawford*, 553 U.S. at 194.

53. Maintaining voter confidence is a valid, nondiscriminatory reason for enacting voter identification laws. *See id*. at 197 ("[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process.").

54. The bipartisan Carter-Baker commission has endorsed photo-identification requirements as a means of inspiring public confidence in the electoral system. *See* Commission on Federal Election Reform, Building Confidence in U.S. Elections § 2.5 (2005) (noting that the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.").

55. Texas voters have expressed their concern with the integrity of the electoral system to their elected representatives, and there is evidence that election fraud in Texas has diminished voter confidence to the point that some individuals have been discouraged from voting at all.  Dewhurst Depo. 55:23-57:3 ("When we first looked at passing voter ID, the reason I did that is because I had been concerned for many, many years about low voter turnout in Texas, and I have heard consistently over the last 10 to 12 years that --- that many Texans either hesitate to vote or don't vote because they don't think their vote will count because they are concerned about voter fraud.").

56. Legislators who had heard concerns about the integrity of elections understood that their constituents wanted the Legislature to take measures to combat corruption and voter fraud.  Tex. Leg., House Floor Debate (82d Leg.) (Mar. 23, 2011), at Vol. III, pp. 116-18.  Statements on the floor of the House of Representatives indicate that supporters of the bill were motivated by a desire to combat corruption in the electoral system.  *Id.* at Vol. III, pp. 112-16.

57. The legislative record shows that preserving public confidence in the electoral system was a purpose underlying the passage of SB 14.  Indeed, the Legislature received evidence that passing a voter identification law could increase participation in the electoral process by enhancing public confidence in elections.

16

### C.    TEXANS OVERWHELMINGLY SUPPORT VOTER ID LAWS.

58.   Both the legislative and public records are replete with evidence that the majority of Texans favor laws that require photo ID to vote.

59.   Polling data considered by the Texas Legislature indicated that voter identification requirements were very popular among Texas voters.    Tex. Leg., House Committee on Elections (81st Leg.) (Apr. 6, 2009) at Vol. II, p. 322 (testimony regarding Rasmussen report stating that 57% of Americans favor voter identification laws); *see also* Lighthouse Poll; University of Texas/Texas Tribune Poll.  Senator Patrick described the support for SB 14 among Texas voters as "overwhelming" based on "all the people I talked to over a period of time" and "looking at all the polls."  Patrick Depo. 313:14-17; 312:12-13 ("[I]t seems to me I remember a number where 96 percent of the Republicans and 74 percent of Democrats supported photo voter ID."). Legislative opponents of SB 14 did not cite any polling to the contrary.  *Cf.* Patrick Depo. 313:18-25 ("Very often, if we have a contentious issue where --- not the legislators, because legislators will sometimes be divided --- but the citizens, where the citizens are divided on an issue, they show up at the Capitol and rally for and against. . . .  I don't recall anyone."); *see also* McCoy Depo. 37:14-39:18;  Dewhurst Depo. 55:11-22;  Patrick Depo. 34:22-35:19; 37:19-38:9; 55:16-62:9.

60.  The evidence indicates that voter ID legislation is supported by a majority of Texans regardless of race, language minority status, or political affiliation.  *See, e.g.*, Patrick Depo. 312:16-313:6.   In a February 2011 YouGov/Polymetrix poll of 800 registered Texas voters, for example, 75% of respondents agreed "that registered voters should be required to present a government-issued photo ID at the polls before they can be allowed to vote[.]"  The survey showed that eighty percent of Anglo respondents, 63% of African-American respondents, and 68% of Hispanic respondents agreed.  *See id.*  It also showed that 59% of Democrats, 70% of independents, and 92% of Republicans agreed with the statement.  *Id.*    Representative Angie Chen Button testified during floor debate on SB 14 that constituents in her district who had come to Texas from Mexico, China, Taiwan, South Korea, Pakistan, India, and other regions "wanted a more secure voting method in place and strongly supported the voter ID bill."  Tex. Leg., House Floor Debate (82nd Leg.) (Mar. 23, 2011), at Vol. I, p. 38.  Widespread and overwhelming support for photo Voter ID laws persists today.

61.  Support for voter ID legislation in the Texas Legislature was divided among political, not racial, lines.   Republicans in the Senate uniformly supported SB 14; Democrats uniformly opposed it.  Tex. Leg., Senate Journal, (82d Leg.) (May 9, 2011), at 2084.  SB 14 was supported by all Republican members of the Texas House, including Hispanic and African-American

members.  *Id.* (reporting that Representatives Aaron Pena, Jose Aliseda, John Garza, Dee Margo, James White, and Stefani Carter voted for SB 14). Democrats overwhelmingly opposed the bill, though one Democratic House members voted for the bill—Representative Joe Pickett of El Paso.

## D. THE RECORD CONTAINS NO EVIDENCE THAT SB 14 WAS ENACTED FOR THE PURPOSE OF DENYING OR ABRIDGING THE RIGHT TO VOTE.

62.  In contrast to the substantial evidence that SB 14 was enacted with a legitimate, nondiscriminatory purpose, there is no evidence that the Legislature enacted the bill for the purpose of denying or abridging the rights of minority voters.

63.  No witness was aware of any evidence that the Legislature enacted SB 14 for the purpose of preventing minority voters from voting.

64.  Despite its vocal opposition to the bill itself, the *Dallas Morning News* editorial board published an editorial contending that SB 14 was not enacted with a discriminatory purpose:

> The legislative process that produced the law in Texas was very open — the public debate included hearings and testimony.  No one can argue that Texans did not know what drove legislators to enact the law.  The record of deliberation is there for all to read.

*See* Editorial, *Abbott is right, Holder is wrong*, DALLAS MORNING NEWS (April 19, 2012), *available at*

http://www.dallasnews.com/opinion/editorials/20120419-editorial-abbott-is-right-holder-is-wrong.ece.

65. In all events, even if the plaintiffs had been able to prove that a racially discriminatory intent or purpose was a substantial or motivating factor behind enactment of SB14, the State successfully demonstrated that the law would have been enacted without that factor.

IV.   **SECTION 2 OF THE VOTING RIGHTS ACT PROHIBITS ONLY VOTER RESTRICTIONS WITH DISCRIMINATORY PURPOSE; IT DOES NOT INVALIDATE LAWS ON THE BASIS OF RETROGRESSIVE EFFECT. REGARDLESS, SB 14 WILL NOT HAVE THE EFFECT OF DENYING OR ABRIDGING THE RIGHT TO VOTE ON ACCOUNT OF RACE OR COLOR, OR BECAUSE OF MEMBERSHIP IN A LANGUAGE MINORITY GROUP.**

A.   **SB 14'S PHOTO ID REQUIREMENT DOES NOT IMPOSE A LEGALLY SIGNIFICANT BURDEN ON ANY VOTER.**

66. Requiring a photo ID to vote does not impose a legally significant burden because proving one's identity with a photo ID is a routine feature of modern life. *See, e.g.*, Commission on Federal Election Reform, Building Confidence in U.S. Elections § 2.5 (2005) ("Photo identification cards currently are needed to board a plane, enter federal buildings, and cash a check. Voting is equally important."), *quoted in Crawford*, 553 U.S. at 194.

67. By offering a free photo ID, SB 14 ensures that any voter who is potentially affected by the photo ID requirement can obtain a free photo ID from the DPS.

68.   Furthermore, the State has taken additional steps to reduce any burden imposed by the need to obtain an election identification certificate. State regulations waive the fees charged for a certified copy of a birth certificate for an individual who requires a certified copy to obtain an EIC. 25 Tex. Admin. Code § 181.22; Farinelli Depo. 27:2-8.   These EIC related birth certificates cost between $2 and $3 instead of the normal fee of $22.  *Id.* at 181.22(t); Tex. Health & Safety Code § 191.0045

69.   The Texas Department of Public Safety currently has 225 driver's license offices.   Free election identification certificates will be available at every DPS driver's license office.   The Secretary of State's office, the Department of Public Safety, and the Counties themselves have implemented a mobile EIC unit program, to issue EICs on a full-time basis in counties that do not have a DPS office.   Ingram Depo. 47:1-48:13; Cesinger Depo. 15:13-19. Because of these efforts, every county in the State has had a physical location where a voter could obtain a free EIC.  *Id.*   These locations were publicized extensively through press releases, media interviews, social media, and local press statements.   Cesinger 56: 7-13; 56:25-57:2 ("[T]he goal is to make sure that everyone who is eligible for one of these EICs knows about the availability.")

70.   The Texas Legislature appropriated $63 million to improve driver's license services.   The Driver's License Division of the DPS has increased its

staff by hundreds of employees, and the DPS has opened six new Mega Centers, five in September 2012 and the sixth in January 2013.

71.  There is no evidence that the need to present photo ID at the polls or to obtain a free election identification certificate has prevented or will prevent any registered Texas voter from voting.  No party has identified any registered voter who lacks qualifying photo ID, who will be unable to obtain the free election identification certificate, and who is ineligible to vote by mail.

72.  There is no evidence that refusing to accept student IDs or IDs issued by local governments has prevented or will prevent any registered Texas voter from voting.  There is no evidence that local county employees, for example, have employee ID cards but not driver's licenses.  And there is evidence that accepting numerous forms of ID would cause confusion among poll workers.

73.  Texas already has conducted two general elections and three primary elections using the photo ID requirements of SB 14 and reports of voters being unable to present ID or experiencing other problems have been "vanishing small."  Ingram Depo. 53:25-54:2; 55:8-24 ("We have realtime feedback from the public, and we get thousands of phone calls every month, and there has been absolutely almost no phone calls, emails, problems related to lack of an ID.  The few we have had primarily related to elderly

22

folks who have been using an expired driver license but don't drive anymore. That has been --- we've had maybe three or four of those who have been unable to have an ID, and obviously they can vote by mail. But as far as a pattern of people who said, 'I don't have an ID, I don't know what to do, how can I get one,' doesn't exist. Thousands of phone calls every month. We've got a public hotline that is on the back of every voter registration card, and we get all kinds of calls. We get calls because my name doesn't match. We get calls for lots of reasons. But not that I don't have an ID."). Patrick Dep. 87:12-19 ("When voters aren't happy, you hear from them. They call your office. They find a reporter. They show up on a news station. And, again, there may have been a report somewhere, or a news story --- or, you know, somewhere, but I'm just not aware of any. And, again, we're talking about millions of people. Could there have been a handful? I mean, I don't know, but I'm certainly not aware of anyone."); Patrick Depo. 84:6-85:23; 114:6-115:3; 115:14-118:17; 253:3-254:5.

74. Plaintiffs deposed several county clerks, probing for the number of voter complaints concerning SB 14's requirements, but these clerks reported almost no complaints whatsoever. *See, e.g.*, Newman Depo. 33:14-15 (Jasper County) ("Q. Have you ever had complaints from constituents about the photo ID law? A. No."); Guidry Depo. 127:10-131:10 (Jefferson County); Stanart Depo. 109:19-24 (Harris County). Jefferson County, Texas, for example, is a

23

diverse county whose seat is Beaumont, Texas.   Its population is over 10 percent Latino and over 30 percent African American.   The county clerk of Jefferson County was elected to office as "a Democrat," Guidry Depo. 9:14, and testified that she was formerly "a union official" who was "very, very involved" in politics and political campaigns from "a very, very young age." *Id.* 9:6-24.   Furthermore, as county clerk, her office is responsible for administering elections, and if something goes wrong, she is often the first to know.   *See id.* 11:10-14:25.   Under questioning from plaintiffs, Guidry reported that she received only one complaint about the implementation of SB 14, and it concerned an election worker's *failure* to check someone's photo ID:

> Q.  Alright, now did you hear any complaints from anyone that they were not allowed to vote in the March 2014 primary because of a similar name issue?
>
> A. No, sir.
>
> Q. And I guess it would be more a dissimilar name.
>
> A. Right.
>
> Q. Did anyone complain to you, "Hey, I was not allowed to vote because my name did not match my ID"?
>
> A. No, no.
>
> Q. Okay. Did anyone complain to anyone in your office that they were not allowed to vote in the March 21, 2014 primary because the name on the voter roll did not match exactly the name on their -- the ID that they presented?

A. No.

Q.   Okay.   Did anyone complain to you after the 2014 March primary that for any reason S.B. 14 prevented them from being able to vote?

A.  No, sir.

* * *

Q.  Okay.  So that letter is the only complaint you're aware of in March for the 2014 primary related to S.B. 14, correct?

A. Yes.

Q.   And the gentleman who made that complaint was not complaining that he was not allowed to vote because of the photographic requirement, correct?

A.  No, he was allowed to vote.  He was complaining why was he not asked for his photo ID.

Guidry Depo. at 127:10-131:10; *see also id.* at 72:6-16; 73:4-11. Guidry also testified that she attends the county commissioners meetings every Monday.  *Id.* at 11:22-25.   Guidry reported that no citizen has ever complained to the county commissioners about SB 14's requirements and that, in fact, the issue has never come up.  *Id.* at 112:3-12.

## B.   SB 14 WILL NOT DECREASE VOTER TURNOUT AMONG LAWFULLY REGISTERED VOTERS.

75.  The available evidence indicates that SB 14 will not decrease voter turnout in Texas among lawfully registered voters.  Existing social science

evidence indicates generally that photo ID laws do not decrease voter turnout.

76. Voter turnout was generally unaffected in the two general elections conducted under the requirements of SB 14. Ingram Depo. 54:1-20; Ingram Depo. 54:9-11 ("[T]here's not any evidence we've seen in the turnout pattern that indicates anybody has been deterred from voting. To the contrary."); Patrick Depo. 84:6-85:23 (testifying that a purpose of SB 14 was to increase turnout, and that turnout has indeed increased).

77. In addition, voter turnout statistics in both Indiana and Georgia show that turnout did not decrease—and instead happened to increase—after those states' photo ID laws were implemented.

78. Aggregate-level analyses examining the relationship between countywide or statewide turnout and voter ID laws have determined that photo voter ID requirements do not affect turnout. A multistate study of aggregate data from the 2000, 2002, 2004, and 2006 elections, for instance, found that identification requirements had no affect on turnout when controlling for contextual variables, such as population size and demographic factors, or political variables, such as the presence of high-profile races and the level of spending. *See* Rebuttal Declaration of M.V. Hood at 10 (citing Jason D. Mycoff, et al., *The Empirical Effects of Voter-ID Laws: Present or Absent?*, 42 PS: POL. SCI. & POL. 121 (2009)); Rebuttal Declaration of Milyo

26

32-35.  An aggregate analysis of county-level turnout data in Indiana in 2002 and 2006—before and after implementation of that state's voter ID law— found an average turnout increase of two percentage points but no statistically significant increase in turnout at the county level.  Rebuttal Declaration of Jeffrey Milyo at 32 (citing The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis, Institute of Public Policy, University of Missouri (Nov. 2007)).

79.  Existing individual-level analyses similarly indicate that photo ID requirements have, at most, a negligible impact on individual voters.  A 2008 study by Stephen Ansolabehere examined the impact of voter ID laws using the 2006 Cooperative Congressional Election Study (CCES), a 36,500-person national sample.  Ansolabehere found that only 23, or .1%, of the 36,500 respondents reported that they were prevented from voting on account of their decision not to obtain and present the required identification.  Stephen Ansolabehere, *Access Versus Integrity in Voter Identification Requirements*, 63 N.Y.U. ANN. SURV. AM. L. 613 (2008)).  In a subsequent analysis based on a 4,000-respondent survey conducted in 2008, 3 of 2,564 voters reported that they were prevented from voting on account of their decision not to obtain and present the required identification, and 7 of 4,000 cited identification requirements as one of multiple reasons for not voting.  *See* Rebuttal Declaration of M.V. Hood at 11 (citing Stephen Ansolabehere, *Effects of*

*Identification Requirements on Voting: Evidence from the Experiences of Voters on Election Day*, 42 PS: POL. SCI. & POL. 127 (2009)).   Dr. Ansolabehere concluded that "the actual denials of the vote in these two surveys suggest that photo-ID laws may prevent almost no one from voting." *Id.* at 129.   And even those who claim to have been "prevented" from voting would have been able to vote had they taken the simple steps of obtaining and presenting the required identification. Dr. Ansolabehere ultimately reported that "voter ID does not appear to be a significant barrier to voting . . . . Although the debate over this issue is often draped in the language of civil and voting rights movements, voter ID appears to present no real barrier to access." *Id.* at 129.

80.   But even if a racial disparity in ID possession did exist, *see* infra, that disparity would matter only if a racial disparity in ID possession caused a racial disparity in voter turnout.   *See* M.V. Hood Rebuttal Declaration at 9. Some academic studies report a racial gap in ID possession, but they are statistically inconclusive as to whether that gap in ID possession leads to a racial gap in turnout.   *Id.* at 9-10; 12-15

81.   Indeed, the existing political science literature indicates further that a change from a non-photo ID requirement to a photo ID requirement—the type of change effected by SB 14—does not have a race-based impact on turnout.   To the extent that the literature has identified any negative impact

on turnout, that impact was limited to states that changed from requiring no identification at all to requiring either photo or non-photo ID.   Milyo Rebuttal Declaration at 33-35.

82.  Moreover, the authors of that study concluded: "We can reject the hypothesis that there is a substantial racial difference in the impact of voter identification requirements."  Milyo Rebuttal Declaration at 33-34 (citing R. Michael Alvarez, et al., The Effect of Voter Identification Laws on Turnout, Caltech Social Science Working Paper No. 1276R (2008) 18, *available at* http://jkatz.caltech.edu/research/files/wp1267R.pdf ).; *see also id.* at 33-34 (quoting Alvarez (2008)) ("This is an important result . . . we see no evidence that strict voter identification requirements are racially discriminatory.").

83.  Post implementation evidence from South Carolina and Mississippi tend to confirm that ID disparities, if any, do not result in turnout disparities.  M.V. Hood Declaration 16-17.

84.  The legislative record includes evidence that voter ID laws would not in fact reduce turnout or disenfranchise voters.   In 2009, the House Committee on Elections heard testimony from the elections division director for the Secretary of State of Georgia about the 16 elections that Georgia had held since implementing its voter ID law in August 2007.  Tex. Leg., House Committee on Elections (81st Leg.) (Apr. 6, 2009), at Vol II., pp. 664-65.  He testified that his office has never received a single complaint that anyone was

29

disenfranchised or turned away from the polls because they lacked photo ID. *Id.* He also testified that, despite four federal lawsuits, no single individual had alleged that he was burdened by Georgia's voter ID law. *Id.* at 366-67. Data from the 2008 CCES indicate that Texas is similar to other states, specifically Georgia and Indiana, in voting habits and in the reasons given by voters for not voting. This similarity suggests that the effect of voter ID laws on turnout in those states—that is, no significant effect at all—will obtain in Texas, too.

85. Georgia, like Texas, has a large minority population and until recently was covered by section five of the Voting Rights Act. Rebuttal Declaration of M.V. Hood at 12-14. Unlike Texas, the Georgia voter registration database contains data on ethnicity and race. *Id.* A published study of this data, along with voter turnout data after Georgia's voter ID law took effect, confirms the observations of the Georgia Secretary of State: "The Georgia voter ID law did not disproportionately affect minority registrants." Rebuttal Declaration of M.V. Hood at 14.

86. In 2009, the Texas Legislature heard testimony regarding a University of Missouri study indicating that Indiana's voter ID law had no effect on turnout in counties with higher concentrations of minorities, poor, hourly, or less educated voters. *Id.* at Vol. II, p. 307.

87.   In 2009, the House Committee on Elections heard testimony from a representative of the Brennan Center indicating that there was no evidence that voter ID requirements adversely affect voter turnout for minorities, indigent, or elderly voters.  *Id*. at Vol. I, p. 88.

88.   Legislators relied on these empirical studies and others in passing SB 14.  *See, e.g.*, Dewhurst Depo 97:1-98:22 ("I categorically oppose that statement.  All the empirical data that I have seen has shown that there is no --- no example that I am aware of where any jurisdiction with a photo voter ID requirement that individuals have not been able to obtain access to acceptable documents."); McCoy Depo. 76:12-17 ("[W]e did not have the resources to do an analysis of Texas voters.  What we did have, as we entered the 2009 session, were three studies that were done about Indiana and Georgia that showed there was no impact after those photo ID laws were implemented.").

### C.   THERE IS NO RACIAL DISPARITY IN POSSESSION OF ID REQUIRED BY SB 14.

89.   Plaintiffs failed to prove a racial disparity in the possession of IDs required by SB 14.   The "no match" list created by Dr. Ansolabehere is unreliable because it contains too many false negatives, which overstate the number of non matches.  Dr. Ansolabehere's no-match list is unreliable for at least 6 reasons:  (1) There is no unique identifier for individuals in the TEAM

31

database because over fifty percent of the TEAM entries do not have a full social security number, M.V. Hood Rebuttal Declaration at 19; (2) Data across the fields is inconsistent, *e.g.*, Kathryn Bailey Hutchison could be reported as a "non match" with Kay Bailey Hutchison, *id*. at 20; (3) The TEAM database contains numerous data-entry errors for "date of birth," which is one of the fields that plaintiffs used for matching, *id*. at 20 (reporting that over 18,000 registrants have a birthday of 1/1/1900); (4) Dr. Ansolabehere did not remove deceased or ineligible registrants from the TEAM database; *id*. at 21; (5) Texas does not record the ethnicity of voters, so Dr. Ansolabehere was forced to guess, introducing error, *id*. at 21; (6) Dr. Ansolabehere made no attempt to estimate the number of false no-matches, even though techniques to do so are widely available, *id*. at 21; Supp. Milyo Rebuttal Decl. at ¶ 102.

90.    More than 96% of Texas registrants will be unaffected by SB 14.  *See* Suppl. Rebuttal Decl. of M.V. Hood; Supp Milyo Rebuttal Decl.   The best evidence that Dr. Ansolabehere's no-match list overstates the number of affected registrants is the fact that nearly 38,000 registrants listed as not having an ID voted in the last two general elections (where an SB 14 compliant ID was required).

### D.   SB 14 WILL NOT HAVE A DISPROPORTIONATE IMPACT ON ANY GROUP OF REGISTERED VOTERS.

91.   The preponderance of the evidence indicates that SB 14 will not have a disproportionate impact on any group of Texas voters because the statute provides for photo identification at no charge; the photo ID requirement will not affect voter turnout; and the evidence shows that there is no material disparity in possession of qualifying photo ID by different groups of Texas voters.

92.   The plaintiffs have failed to produce evidence of any Texas voter who does not have the identification required by SB 14, is not eligible to vote by mail, and cannot obtain a free election identification certificate.  Indeed, witnesses have generally been unable to identify a single registered Texas voter who lacks the required identification and is not eligible to vote by mail.

93.   Voters without a required identification can obtain one. In fact, registered voters that were identified by the Department of Justice in the Section 5 case have since obtained photo identification allowing them to vote in Texas' elections.

## PROPOSED CONCLUSIONS OF LAW

I. **PLAINTIFFS' FOURTEENTH AMENDMENT RIGHT-TO-VOTE CLAIMS ARE DISMISSED.**

94. *Crawford* requires courts to uphold "evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189–90 (2008) (opinion of Stevens, J.) (quoting *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 788 n.9 (1966)); *see also id.* at 207–09 (concluding that the "Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*," and that the "universally applicable" photo-ID requirement there at issue was "eminently reasonable" (Scalia, J., concurring)).

95. Like the photo-ID requirement upheld in *Crawford*, Texas's photo-identification requirement does not run afoul of the Fourteenth Amendment because it is a justified and evenhanded restriction that scarcely exceeds the usual burdens of voting.

96. The test for whether a law is invidiously discriminatory is whether the burden imposed by the restriction is supported by relevant and legitimate state interests "sufficiently weighty to justify the limitation." *Id.* at 191 (Stephens, J., opinion); *see id.* at 205 (Scalia, J., concurring).

97.   "Given the fact that petitioners have advanced a broad attack on the constitutionality of [SB 14], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion" that the balance is in their favor. *Id.* at 200 (Stephens, J., opinion).

98.   Plaintiffs have not distinguished SB 14 from the Indiana statute upheld in *Crawford*. Plaintiffs' argument would effectively overrule *Crawford* by holding that the usual burdens of voting are sufficiently weighty to strike down any voting law that results in the usual burdens falling more heavily on disadvantaged socioeconomic groups, whenever a state's demographics are such that racial minorities fall disproportionately within the disadvantaged socioeconomic groups. Given the increased ubiquity of photo identification since *Crawford* and Texas's statutory and regulatory measures alleviating even mild impediments to procuring that identification, *Crawford*'s reasoning controls.

99.   Turning to the *Crawford* analysis, three substantial State interests support Texas's adoption of SB 14.

100.   First, as Indiana demonstrated in *Crawford*, the State of Texas has a profound interest in preserving electoral integrity and combatting voter fraud. 553 U.S. at 194–97. *Crawford* recognized the significance and legitimacy of this interest, declaring that "[t]here is no question about the legitimacy or importance of the State's interests in counting only the votes of

35

eligible voters." *Id*. at 196. The Court reached this conclusion despite Indiana's failure to produce *any* evidence that in-person impersonation voter fraud actually had occurred in Indiana.

101.  The "State's interest in preserving electoral integrity is not limited to combating fraud. That interest extends to efforts to ferret out" the denial of a person's right to vote "by simple mistake" as well as fraud. *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010).

102.  Defendants have proven that in-person voter fraud exists in Texas. Even though such proof is unnecessary under *Crawford*, Texas has produced evidence of voter impersonation. *See id*. at 194–96 (opinion of Stevens, J.); *id*. at 204 (Scalia, J., concurring in the judgment).

103.  The undisputed evidence is that non-citizens have registered to vote in Texas, and that the presence of non-citizens on the voting rolls creates a significant opportunity for fraud since non-citizens are ineligible to vote.

104. SB 14's photo-identification will deter noncitizens from illegally registering to vote and prevent illegally registered noncitizens from illegally voting at the polls by preventing non-citizens from obtaining many of the most easily available forms of photo identification while simultaneously providing election identification certificates to registered U.S. citizens free of charge.   These safeguards are important given the recognized, inherent difficulties in detecting and prosecuting in-person voting fraud.

105.   Like the defendants in *Crawford,* Defendants have proven that the risk of voter fraud in Texas is exacerbated by its drastically inflated voter rolls, which are a consequence of the National Voter Registration Act's dictates and the State's decentralized registration and election administration systems. This "fact of inflated voter rolls does provide a neutral and nondiscriminatory reason supporting the State's decision to require photo identification." *Crawford,* 553 U.S. at 196-97 (opinion of Stephens, J.); *see id.* at 204, 209 (Scalia, J., concurring in the judgment) (applying the "important regulatory interests" standard and finding that the "State's [aforementioned] interests . . . are sufficient to sustain that minimal burden,").

106.   Texas's second state interest—inspiring confidence in the integrity and legitimacy of its democratic elections—dovetails with its first interest and is equally legitimate. *Crawford* recognized that this interest in legitimacy and confidence "is closely related to the State's interest in preventing voter fraud, public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Id.* at 197 (opinion of Stevens, J.); *see id.* at 204, 209 (Scalia, J., concurring in the judgment). As in *Crawford*, Texas has proven that the electoral system cannot "inspire public confidence

37

if no safeguards exist to deter or detect fraud or to confirm the identity of voters." *Id.* at 194 (opinion of Stevens, J.).

107. Photo identification is "needed to board a plane, enter federal buildings, and cash a check. Voting is equally important." *Id.* at 194 (citing Building Confidence in U.S. Elections § 2.5 (Sept. 2005), App. 136–37 (Carter–Baker Report) (footnote omitted); *see* Transportation Security Administration, Acceptable IDs http://www.tsa.gov/traveler-information/acceptable-ids (listing the accepted IDs required for persons over 18) (last visited Aug., 6, 2014); Mandi Titus, Photo ID Requirements for Air Travel Within the United States, http://traveltips.usatoday.com/photo-id-requirements-air-travel-within-united-states-100317.html (listing acceptable IDs as photo IDs) (last visited Aug. 6, 2014). Persons with lost or forgotten IDs may be permitted to fly only if their identity can be otherwise verified from public databases.

108. The government does not impose unlawful burdens on the constitutional right to travel by requiring photo identification to board an airplane. If this is a constitutional burden to impose on the right to travel, then it is a constitutional burden to impose on the right to vote.

109. Texas has also submitted evidence on this point beyond that available in *Crawford*, including evidence that Texans overwhelmingly

38

support voter-identification legislation, and that this support spans the spectrum of race, language minority status, and political affiliation.

110.   Given that photo identity is a requirement for most civic participation activities and transactions, Texas's decision to require such identification for voting is eminently reasonable.

111.   Third, Texas has a strong interest "in deterring and detecting voter fraud" by "participating in a nationwide effort to improve and modernize election procedures that have been criticized as antiquated and inefficient." *Crawford,* 553 U.S. at 191 (opinion of Stevens, J.); *id.* at 204, 209 (Scalia, J., concurring in the judgment).

112.   *Crawford* interpreted federal photo-identification requirements as an indication that photo identification is an effective means of establishing reliable voter registration lists in the modern era, explaining that although

> neither HAVA nor NVRA required Indiana to enact [its Voter ID law], . . . they do indicate that Congress believes that photo identification is one effective method of establishing a voter's qualification to vote and that the integrity of elections is enhanced through improved technology. That conclusion is also supported by a report issued shortly after the enactment of SEA 483 by the Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, which is a part of the record in these cases. In the introduction to their discussion of voter identification, they made these pertinent comments: "A good registration list will ensure that citizens are only registered in one place, but election officials still need to make sure that the person arriving at a polling site is the same one that is named on the registration list. In the old days and in small towns where everyone knows each

> other, voters did not need to identify themselves. But in the
> United States, where 40 million people move each year, and in
> urban areas where some people do not even know the people
> living in their own apartment building let alone their precinct,
> some form of identification is needed."

*Id.* at 193-94 (opinion of Stevens, J.) (citing Building Confidence in U.S.
Elections § 2.5 (Sept. 2005), App. 136–137 (Carter–Baker Report) (footnote
omitted)).

113.  Like Indiana, Texas has produced ample evidence supporting its
interest in modernizing elections so as to deter and discover voter fraud.

114.  Petitioners have failed to carry the heavy burden of proving that the
burdens allegedly resulting from SB 14 outweigh these strong State interests,
or that the burdens are severe enough as to any class of voters so as to justify
the sweeping remedy that they seek.

115.  The problems asserted here by plaintiffs are the same as those
which *Crawford* held to be the "usual burdens" of voting—burdens that are
not substantial and do not warrant invalidating the statute. *See id.* at 198
(opinion of Stevens, J.) ("[T]he inconvenience of making a trip to the BMV,
gathering the required documents, and posing for a photograph surely does
not qualify as a substantial burden on the right to vote, or even represent a
significant increase over the usual burdens of voting."); *id.* at 209 ("The
burden of acquiring, possessing, and showing a free photo identification is
simply not severe, because it does not even represent a significant increase

40

over the usual burdens of voting." (Scalia, J., concurring in the judgment) (citation and internal quotation marks omitted)).

116. *Crawford* holds that such usual burdens do not constitute a substantial burden on the right to vote, and that holding resonates more strongly today given the increased ubiquity of photo identification in everyday life. *See id.*

117. Texas mitigates even these minor burdens by providing qualifying election identification certificates free of charge. Although Plaintiffs have complained that not every county in Texas has a DPS office, Texas has ameliorated that burden by creating standing or mobile DPSs in every county that can provide a photo-identification.

118. These diminished usual burdens do not overcome Texas's substantial state interests that support SB 14.

119. Like the petitioners in *Crawford*, Plaintiffs urge this Court to "perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests." *Id.* at 200 (opinion of Stephens, J.).

120. *Crawford* refused to endorse or apply such a test. The Court instead concluded that "on the basis of the evidence in the record it is not possible to

quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified." *Id.* at 201.

121.   This Court should not apply that test given *Crawford*, but should find in the alternative that the evidence here is insufficient to satisfy such a test as to any of the alleged specially burdened groups that Plaintiffs have identified, particularly where Plaintiffs have not identified the portion of the burden on those groups that is fully justified.

122.   Finally, "even assuming that the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish petitioners' right to the relief they seek in this litigation." *Id.* at 199-200.

123.   "[The] petitioners have not demonstrated that the proper remedy— even assuming an unjustified burden on some voters—would be to invalidate the entire statute." *Id.* at 203.

124.   When evaluating a neutral, nondiscriminatory regulation of voting procedure, "[w]e must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Id.* (citation omitted).

125.   Plaintiffs here have not carried the heavy burden of establishing that SB 14 must be invalidated.  Accordingly, this Court dismisses Plaintiffs' invidious discrimination claims.

## II. PLAINTIFFS' FOURTEENTH AMENDMENT CLAIMS ALLEGING INTENTIONAL DISCRIMINATION ARE DISMISSED.

126. Plaintiffs have not proven that the Texas Legislature was motivated by a racially discriminatory purpose in passing SB 14. This Court therefore dismisses Plaintiffs' Fourteenth Amendment claims.

127. A violation of the Equal Protection Clause of the Fourteenth Amendment is established only where there is proof of a racially discriminatory intent or purpose. *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. at 252, 265 (1997).

128. Even if one assumes arguendo that Plaintiffs have proven that SB 14 has a disparate impact on racial minorities (and they have not), the next step is to apply the two-step test set out in *Hunter v. Underwood* to determine whether a Fourteenth Amendment violation exists. 471 U.S. 222 (1985). First, the court must determine whether Plaintiffs have proven that "racially discriminatory intent or purpose" was a "substantial or motivating factor behind enactment of the law." *Id.* at 227–28 (citations omitted). If Plaintiffs meet this burden, then the "burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* (citations omitted).

129. To establish that racial discrimination was a substantial or motivating force behind the law's passage, Plaintiffs must prove that the

43

challenged legislation must have been pursued "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [racial] group." *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

130.   Plaintiffs have not met their step-1 burden: they have not proven that racial discrimination was a substantial or motivating factor behind the enactment of the law.

131.   "In equal protection analysis, this Court will assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they could not have been a goal of the legislation." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7 (1981) (citation and internal quotation marks omitted); *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) ("Judicial inquiries into Congressional motives are at best a hazardous matter, and when that inquiry seeks to go behind objective manifestations it becomes a dubious affair indeed."); *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) ("[W]e ordinarily defer to the legislature's stated intent."*); see also Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 387-88 (6th Cir. 1996).

132.   Because the author and other legislative supporters of SB 14 publicly stated that the purposes of the law were to deter and detect voter fraud and safeguard public confidence in the election system, this Court accepts the publicly stated purposes as the actual purposes of the law.

44

133. This Court also concludes that these publically stated purposes cannot be overcome by Plaintiffs' speculative evidence as to the motivations of individual legislators. *Clover Leaf Creamery*, 449 U.S. at 463 n.7; *see also Two Guys from Harrison-Allentown, Inc. v. McGinle*y, 366 U.S. 582, 595, 598 (1961) (concluding that Pennsylvania's Sunday-closing law had not been enacted with the purpose of promoting religion, and basing this conclusion on its analysis of publicly available legislative history without taking any testimony from legislators).

134. This Court must "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces [this Court] to conclude that they could not have been a goal of the legislation." *Clover Leaf Creamery*, 449 U.S. at 463 n.7 (citation omitted). No such circumstances exist here. *See Village of Arlington Heights*, 429 U.S. at 266-68 (noting that such circumstances may exist in "rare" cases in which there is a "stark" pattern of state action, "unexplainable on grounds other than race").

135. Plaintiffs' alleged disparate effects are easily explained on socioeconomic grounds. Because Plaintiffs have failed to prove that the Texas Legislature was motivated by a desire to intentionally discriminate against Plaintiffs on account of race or color in passing SB 14, Plaintiffs' Fourteenth Amendment claims are dismissed.

45

136.   Alternatively, even if Plaintiffs had satisfied their step-1 burden, the State has proven that it would have enacted SB 14 in absence of any racially discriminatory motive. *Hunter*, 471 U.S. at 228.

137.   There is also no merit to Plaintiffs' allegations that SB 14 is an unconstitutional poll tax.

138.   Poll taxes prohibited by the U.S. Constitution are capitation taxes.

139.    The requirement to show photo-identification prior to voting is not a tax.

140.   SB 14 provides eligible voters with photo identification documents that may be obtained free of charge. It bears no similarity to those laws recognized as poll taxes by the Supreme Court. *Harper*, 383 U.S. at 686 (invalidating   Section 173 of Virginia's Constitution, which directed the General Assembly to levy an annual poll tax not exceeding $1.50 on every resident of the State 21 years of age and over (with exceptions not relevant here)).

141.   Incidental economic costs do not constitute a tax, and even if they do, they are not a poll tax prohibited by the U.S. Constitution, which prohibits capitation taxes.

142.   Were Plaintiffs correct, then in-person voting requirements would also be unconstitutional poll taxes, since most voters incur costs for gasoline

or public transportation to travel to the polls. This interpretation of *Harper* is untenable.

143. This Court concludes that Plaintiffs have not proven a violation of the 14th Amendment, much less a violation that would warrant invalidating the statute as a whole.

### III. PLAINTIFFS' FIFTEENTH AMENDMENT CLAIMS ARE DISMISSED.

144. This Court finds that Plaintiffs have not proven a violation of the Fifteenth Amendment. *See* U.S. CONST. amend. XV, § 2; U.S. CONST. amend. XIV, § 5.

145. The Fifteenth Amendment prohibits only the denial or abridgment of the right to vote because of intentional discrimination on account of race, color, or previous condition of servitude. *See* U.S. CONST. amend. XV, § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.").

146. The Fifteenth Amendment does not prohibit the enactment of laws which have merely disparate effects, which are not motivated by purposeful discrimination. *City of Mobile v. Bolden,* 446 U.S. 55 (1980) (plurality opinion).

147. To establish a 15th Amendment violation, Plaintiffs must prove that SB 14's passage was "motivated by a discriminatory purpose." *Id.* at 62

47

(finding that the Court's prior decisions "have made clear that action by a State that is racially neutral on its face violates the Fifteenth Amendment only if *motivated by a discriminatory purpose*," and confirming "the principle that racially discriminatory motivation is a necessary ingredient of a Fifteenth Amendment violation." (emphasis added)); *id*. at 65 ("That Amendment prohibits only purposefully discriminatory denial or abridgement by government of the freedom to vote 'on account of race, color, or previous condition of servitude.'").

148.  So interpreted, Plaintiffs can establish a Fifteenth Amendment violation only by proving that (1) Defendants denied or abridged Plaintiffs' right to vote, and (2) the denial or abridgment was motivated by a discriminatory purpose.  They have not carried their burden.

### A.  PLAINTIFFS HAVE NOT PROVEN THAT THEIR RIGHT TO VOTE HAS BEEN DENIED OR ABRIDGED

149.  Plaintiffs have not proven a denial or abridgment of their right to vote, or even a substantial burden upon that right.

150.  *Crawford* held that the steps required to procure a photo ID in that case did not substantially burden the right to vote, much less deny or abridge that right. *Crawford*, 533 U.S. at 198 (opinion of Stevens, J.) ("For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does

48

not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."); *id.* at 209 (Scalia, J., concurring in the judgment) ("The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not even represent a significant increase over the usual burdens of voting." (citation omitted)).

151. Although *Crawford* does not hold that every state photo ID requirement is constitutional, Plaintiffs have not proven any facts warranting a departure from *Crawford,* given that Texas mitigates even these burdens by ensuring that a DPS ID-issuing office was available in every county, and by permitting eligible voters to cast a provisional ballot, which will be counted if Plaintiffs sign an affidavit stating a statutory excuse or follow up with the required ID within six days. *Cf. id.* at 199 (opinion of Stevens, J.) ("The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."). Such burdens are not "wholly unjustified" so as to trigger a "constitutional problem," much less one that would justify invalidating the statute in its entirety. *Id.* at 199-200.

152. Moreover, Plaintiffs do not even allege that they—or anyone else—will be unable to obtain the election-identification certificates that the State offers free of charge.

153. On these facts, Plaintiffs have not established that their right to vote has been abridged or denied.

154. Plaintiffs' argument amounts to a request to overrule *Crawford* and find that the "usual burdens of voting"—such as registering and traveling to the polls—also constitute a "denial" or "abridgement" of the right to vote under section 2. But on this reasoning, Plaintiffs would have to concede that laws requiring in-person voting at polling stations violate section 2 because minorities are disproportionately poor and/or disproportionately lack access to motor vehicles.

155. Taken to its logical conclusion, Plaintiffs' argument that minorities' disproportionate lack of access to motor vehicles would require every State to abolish in-person voting and allow everyone to vote by mail, as Oregon has done. The Fifteenth Amendment requires no such thing. Plaintiffs thus have not established a denial or infringement of their right to vote.

**B.   PLAINTIFFS HAVE NOT PROVEN THAT ANY DENIAL OR INFRINGEMENT OF THE RIGHT TO VOTE IS "ON ACCOUNT" OF RACE OR COLOR.**

156. As explained in the findings of fact, even if Plaintiffs had demonstrated a denial or abridgement of their right to vote, they have not proven that such a denial or infringement was on account of race or color. *City of Mobile,* 446 U.S. at 62, 64. *City of Mobile* is clear that Fifteenth

50

Amendment violation requires that Plaintiffs prove that SB 14 was motivated by intentional discrimination.

157.   This Court finds that Plaintiffs have not carried this burden for two reasons.   First, Plaintiffs' evidence at best proves a disparate impact on minority voters—not intentional discrimination.

158.   Disparate impact and intentional discrimination are not one and the same. *Village of Arlington Heights*, 429 U.S. at 264–65 (holding that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact").

159.   SB 14 is well within the bounds of those fraud-prevention voting statutes that have been upheld as constitutional, despite challenges that such laws have a disparate impact on minorities.

160.   Numerous appellate courts have dismissed challenges to felon-disenfranchisement laws as not resulting in a denial or abridgement of the right to vote on account of race or color. *See, e.g., Hayden v. Paterson,* 594 F.3d 150, 165-66 (2d Cir. 2010) (holding that felons had failed to state a plausible claim of intentional racial discrimination, and that amendments to New York's felon disenfranchisement statute were rationally related to a legitimate state interest).

161.   Similarly, the Third Circuit upheld a voter-roll-integrity statute that removed "African-American and Latino voters . . . at disproportionately

higher rates than their white counterparts," reasoning that the statute was a legitimately motivated fraud-prevention mechanism that did not "result[] in" a denial or abridgement of the right to vote on account of race or color. *See Ortiz v. City of Phila. Office of City Comm'rs Voter Registration Div.*, 28 F.3d 306, 308 (3d Cir. 1994).

162.   Although both felon disenfranchisement laws and voter roll integrity statutes have disparate impacts on minorities, they do not abridge or deny the right to vote on account of race.  So, too, to the extent that SB 14 would prevent any person from voting—and Plaintiffs had not shown that it would—it does not do so on account or because of race.

163.   Aside from this disparate impact evidence, Plaintiffs' Fifteenth Amendment violation claim is supported only by speculation as to improper legislative motive and evidence going to the intent of individual legislators.  Neither can prove a Fifteenth Amendment violation.

164.   The Supreme Court held in *Myers v. Anderson*, 238 U.S. 368 (1915), that a law will not violate the Fifteenth Amendment so long as "there is a reason other than discrimination on account of race or color discernible upon which the standard may rest."  238 U.S. at 379. So, too, in *Guinn v. United States*, 238 U.S. 347 (1915), the Supreme Court reasoned that the Fifteenth Amendment inquiry turns on whether it is "possible to discover any basis of reason for the standard thus fixed other than the purpose" to circumvent the

52

Fifteenth Amendment."  238 U.S. at 365.  A State law will not violate the Fifteenth Amendment if it "possible to discover any basis of reason for the standard" other than the purpose of circumventing the Fifteenth Amendment, *id.*, or if "there is a reason other than discrimination on account of race or color discernible upon which the standard may rest," *Myers*, 238 U.S. at 379.

165.  This approach requires an objective inquiry into the purpose of Senate Bill 14, and does not turn on the subjective thought processes of legislators or constituents who may have supported the law. The Supreme Court and federal appellate courts have consistently held that motivations of individual legislators may not be attributed to the legislature as a whole.  *See Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810); *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996).

166.  As explained in Part ___, this Court accepts Texas's three "bas[es] in reason" that can explain the Texas Legislature's decision to enact Senate Bill 14:  The ineligible voters that appear on the State's voter-registration rolls, the desire to deter and detect voter fraud, and the desire to safeguard public confidence in the integrity of the electoral process.

167.  Defendants are not required to prove that any individual legislator who supported SB 14 was actually motivated by these "bas[es] in reason" for

the law.  It is enough that they present a reasonable explanation for the legislature's decision to enact SB 14.

168.  Defendants have presented a reasonable explanation for the legislature's decision to enact SB 14. Plaintiffs have not proven intentional discrimination, so their Fifteenth Amendment claims are dismissed.

## IV.  PLAINTIFFS' CLAIMS BROUGHT UNDER SECTION 2 OF THE VRA FAIL AS A MATTER OF LAW.

169.  The claims brought under section 2 of the Voting Rights Act fail for numerous independent reasons. First, Senate Bill 14 does not "deny" or "abridge" the right to vote, because anyone who lacks photo identification can get an election identification certificate that the State offers free of charge. *See* TEX. TRANSP. CODE § 521A.001(a)-(b); *see also* TEX. ELEC. CODE §§ 63.001(b), 63.0101(1).

170.  Second, section 2 prohibits only laws that "result[] in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*," or "*because* he is a member of a language minority group." Mere claims that Senate Bill 14 will have a disparate impact on minorities fail to establish a section 2 violation. Section 2 requires discrimination "on account of" race or color of "because" of membership in a language minority group—not "on account of" or "because" of some other factor that happens to be correlated with race or color or language-minority status.

54

171. Third, Plaintiffs' proposed "totality of the circumstances" test for section 2 of the VRA exceeds Congress's Fifteenth Amendment enforcement power under the controlling congruence-and-proportionality inquiry exemplified in *City of Boerne v. Flores*, 521 U.S. 507, 530 (1997).

172. Fourth, Plaintiffs' proposed "totality of the circumstances" test for section 2 of the VRA is unconstitutionally vague.

173. Fifth, even if Plaintiffs' proposed "totality of the circumstances" construction of section 2 does not violate the Constitution, it is at the very least constitutionally questionable and must therefore be rejected under the canon of constitutional doubt.

174. Sixth, the plaintiffs have not established a violation of section 2 even under their proposed "totality of the circumstances" test.

### A.   SB 14 Cannot Violate Section 2 of the VRA Because It Does Not "Deny" Or "Abridge" Anyone's Right to Vote.

175. Senate Bill 14 does not "deny" or "abridge" the right to vote, because anyone who lacks photo identification can get an election identification certificate. *See* Tex. Transp. Code § 521A.001; *see also* Tex. Elec. Code §§ 63.001(b), 63.0101(1). Plaintiffs have failed to establish that anyone in Texas is unable to obtain this identification. They claim only that the "burden" of obtaining photo identification will cause some people to *choose*

not to obtain it. That is not sufficient to establish a "denial" or "abridgment" of the right to vote.

176.   Citizens who are capable of complying with the requirements for voting, but choose not to do so because they would rather spend their limited time and resources on other endeavors, have not had their right to vote "deni[ed] or "abridg[ed]."

177.   Laws requiring voters to present photo identification are no more a "denial" or "abridgment" of the right to vote than laws that require voter registration or in-person voting at polling stations.   The Supreme Court specifically held in *Crawford* that the inconvenience associated with obtaining a photo identification is no more significant than "the usual burdens of voting."   *See* 553 U.S. at 198 (opinion of Stevens, J.) ("[T]he inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."); *id.* at 209 (Scalia, J. concurring in the judgment) ("The universally applicable requirements of Indiana's voter-identification law are eminently reasonable.   The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not even represent a significant increase over the usual burdens of voting.   And the State's interests are sufficient to sustain that

56

minimal burden.") (internal citations omitted).  The plaintiffs defy *Crawford* by asserting that a voter-identification requirement "deni[es]" or "abridg[es]" the right to vote—especially when SB 14 mitigates the inconvenience by offering election identification certificates free of charge, *see* TEX. TRANSP. CODE § 521A.001, and by allowing voters to cast provisional ballots if they appear at the polls without photo identification, *see* TEX. ELEC. CODE § 63.001(g).

178.  Plaintiffs complain that some voters may need a copy of their birth certificate to obtain an election identification certificate, but Texas charges only $2 or $3 to those who need a birth certificate for this purpose—a fee that compares favorably with the $3 to $12 fee that Indiana assessed for birth certificates in *Crawford*.  *Compare See* 25 TEX. ADMIN. CODE § 181.22(c); 38 Tex. Reg. 7307–10 (2013) (to be codified as an amendment to 25 TEX. ADMIN. CODE § 181.22) *with Crawfor*d, 553 U.S. at 198 n. 17 (opinion of Stephens, J.).

179.  The only way that Plaintiffs can reconcile their argument with *Crawford* is to acknowledge that the "usual burdens of voting"—such as registering and traveling to the polls—also constitute a "denial" or "abridgement" of the right to vote under section 2.

### B. SENATE BILL 14 DOES NOT "RESULT" IN A DENIAL OR ABRIDGEMENT OF THE RIGHT TO VOTE "ON ACCOUNT OF RACE OR COLOR," OR "BECAUSE OF" ONE'S MEMBERSHIP IN A LANGUAGE-MINORITY GROUP.

180.   Section 2 prohibits only laws or practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*," or "*because* he is a member of a language minority group." *See* 42 U.S.C. § 1973(a) (emphasis added); *id.* § 1973b(f)(2) (emphasis added).

181.   The language of section 2 tracks the language of section 1 of the Fifteenth Amendment. *Compare* U.S. CONST. amend. XV ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."), *with* 42 U.S.C. §§ 1973(a), 1973b(f)(2) (prohibiting voting laws that "result[] in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color," or the effect of "deny[ing] or abridg[ing] the right of any citizen of the United States to vote because he is a member of a language minority group").

182.   The text of section 2 therefore extends only to laws that "result" in violations of the Fifteenth Amendment.

183.   Section 2 requires only that States enact facially neutral voting laws and enforce those laws in a race-neutral manner. Section 2 would, for example, prohibit racially biased enforcement of a facially neutral law that

denied minorities the right to vote.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312–13 (1966).  That would amount to the denial or abridgment of the right to vote *on account of* or *because of* their race.

184.  Persons who cannot vote because they are unable or unwilling to obtain photo identification have not had their right to vote denied or abridged *on account of* their race or color, or *because* of their membership in a language-minority group.  It does not matter whether the racial makeup of affected voters mirrors the racial makeup of the citizen voting-age population.

185.  Felon disenfranchisement laws have been repeatedly attacked on the ground that they disproportionately affect racial and language minorities. Yet courts have uniformly held that felon-disenfranchisement laws do not to "result[] in" a denial or abridgement of the right to vote on account of race or color, or because of one's membership is a language-minority group.  *See, e.g.*, *Wesley v. Collins*, 791 F.2d 1255, 1261 & n.8 (6th Cir. 1986) (collecting authorities).   To the extent that felon-disenfranchisement laws deny or abridge the right to vote, they do so on account of one's past criminal convictions, not on account of race or color or membership in a language-minority group.  The same logic applies to voter-identification laws:  Persons unable to vote under Senate Bill 14 are affected on account of their lack of photo identification, not their race.  If felon-disenfranchisement laws do not

"result[] in" a denial or abridgement of the right to vote on account of race or color, then neither do voter-identification laws.

### C. THE PLAINTIFFS' "TOTALITY OF THE CIRCUMSTANCES" INTERPRETATION OF § 2 OF THE VRA EXCEEDS CONGRESS'S AUTHORITY TO ENFORCE THE FIFTEENTH AMENDMENT.

186. Any construction of section 2 that precludes Texas from implementing its voter-identification law is unconstitutional. Laws exercising Congress's Fifteenth Amendment enforcement power must be congruent and proportional to the underlying violation (which entails intentional discrimination), and Plaintiffs' interpretation of section 2 is not congruent or proportional to any underlying constitutional violations.

> **1.** *Laws Enforcing the Fifteenth Amendment Must Be Congruent and Proportional to the Scope of the Underlying Fifteenth Amendment Violation.*

187. The Supreme Court held in *City of Boerne* that any law passed by Congress pursuant to its Fourteenth Amendment enforcement powers must be congruent and proportional to the underlying constitutional violations the statute targets, lest they become unconstitutional burdens upon the system of federalism. *Id.* at 530.

188. This requirement is equally applicable to an exercise of Congress's Fifteenth Amendment enforcement powers.

189. *City of Boerne* enunciated the congruence-and-proportionality requirement in the context of holding that the Religious Freedom Restoration

Act (RFRA) was not a constitutional use of Congress's Fourteenth Amendment § 5 enforcement power.

190.  RFRA explicitly abrogated *Employment Division, Department of Human Resources of Oregon v. Smith*, which interpreted the Fourteenth Amendment to hold that "[t]he government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on *measuring the effects* of a governmental action.'" 494 U.S. 872, 885 (1990) (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988)) (emphasis added). RFRA supplanted this test with a sweeping statute requiring that any law with the effect of substantially burdening the free exercise of religion pass strict scrutiny, regardless of the intent or general applicability of the law. *City of Boerne*, 521 U.S. at 514-15

191.  Striking down RFRA as applied to the States, the Supreme Court held that "[w]hile preventive rules are sometimes appropriate remedial measures," there must be a "congruence between the means and the ends to be achieved." *Id.* at 530.

192.  Far from simply enforcing the Free Exercise Clause as interpreted in *Smith*, the Court found that RFRA's standard was "out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears,

61

instead, to attempt a substantive change in constitutional protections." *Id.* Congress thus had overstepped its bounds where the "stringent test RFRA demands" had "far exceed[ed] any pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in Smith." *Id.* at 533-34.

193.   The Supreme Court has subsequently reaffirmed the applicability the congruence-and-proportionality test on many occasions. *See Tennesee v. Lane*, 541 U.S. 509, 520 (2004) (applying test); *Nev. Dep't of Human Res. v. Hibbs,* 538 U.S. 721, 728 (2003) ("Valid § 5 legislation must exhibit congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." (quotation omitted)) (quotation omitted); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (holding that legislation enforcing Fourteenth Amendment guarantees must exhibit congruence and proportionality between the harm sought to be prevented and the means adopted to achieve that end); *United States v. Morrison*, 529 U.S. 598, 625–26 (2000) ("[P]rophylactic legislation under § 5 must have a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 82–83 (2000) ("Applying the same 'congruence and proportionality' test in these cases, we conclude that the ADEA is not 'appropriate legislation' under § 5 of the Fourteenth Amendment.").

62

194. Although *Boerne* and its progeny addressed Congress's enforcement power conferred by the Fourteenth Amendment, *Boerne*'s congruence-and-proportionality requirement applies equally to an exercise of Congress's Fifteenth Amendment enforcement power. There are two reasons for this.

195. First, the Supreme Court has recognized that the nature of the enforcement power conferred by section 5 of the Fourteenth Amendment is "virtually identical" to that conferred by section 2 of the Fifteenth Amendment. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 n. 8 (2001); *see also Boerne*, 521 U.S. at 518 (comparing Congress's Fourteenth Amendment enforcement authority to its "parallel power to enforce the provisions of the Fifteenth Amendment"); *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966) ("Section 2 of the Fifteenth Amendment grants Congress a similar power to [that of § 5 of the Fourteenth Amendment] . . . ."); *James v. Bowman*, 190 U.S. 127 (1903*); see also Lopez v. Monterey County*, 525 U.S. 266, 294 (1999) (Thomas, J., dissenting) (reasoning that the Court had treated the "powers conferred by the Fourteenth and Fifteenth Amendments" as "coextensive" (citations omitted)), *abrogated by Shelby County, Ala. v. Holder*, 133 S. Ct. 2612 (2013); *Hibbs*, 538 U.S. at 742 n.* (Scalia, J., dissenting).

196. Second, when the Supreme Court in *Katzenbach* initially considered whether the enactment of the Voting Rights Act went beyond Congress's

power to "enforce" the Fifteenth Amendment "by appropriate legislation," the Court turned to the analysis in *Ex Parte Virginia*—an opinion addressing Congress's coextensive enforcement power under section 5 of the Fourteenth Amendment. *See Katzenbach*, 383 U.S. at 326–27 (*citing Ex Parte Virginia*, 100 U.S. 339, 345–46, (1879)). Any act of Congress's Fifteenth Amendment enforcement powers, including VRA section 2, must therefore be congruent and proportional to the Fifteenth Amendment violation that it remedies.

> **2.** *VRA § 2 Is Neither Congruent Nor Proportional to the Constitutional Violation that it Purports to Remedy.*

197.  The 1982 Amendments to § 2 are not congruent and proportional to any underlying Fifteenth Amendment violation that they could purport to remedy.

198.  The 1982 Amendment to § 2 of the VRA was enacted in response to *City of Mobile*, which interpreted the Fifteenth Amendment to require proof of intentional discrimination, and interpreted the 1965 enactment of Section 2—which tracked the language of the Fifteenth Amendment—to require the same. *City of Mobile,* 446 U.S. at 61-62; Indeed, the express legislative purpose was overruling *City of Mobile* for statutory voting rights claims. *See* Pub. L. No. 97-205, 96 Stat. 134 (codified at 42 U.S.C. § 1973(a) (1982)); S. Rep. No. 97-417, 97th Cong., 2d Sess. (hereinafter S. Rep. 97-417).

199.  The 1982 amendments accomplished this intended result by radically transforming Section 2(b)—which had previously tracked the language of the Fifteenth Amendment—by supplanting *City of Mobile*'s "intent" test with a loose and indeterminate "results" test. Section 2(a) thus prohibits certain state actions that "result[] in a denial or abridgement" of the right to vote regardless of discriminatory intent. 96 Stat. 134.

200.  The results test requires the court to determine, "based on the totality of circumstances," whether a State practice results in members of a minority group "hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).

201.  Notably, this "political history of the 1982 Act, and the structural relationship of the statutory and constitutional standards, are indistinguishable from RFRA," which was struck down as an inappropriate use of Congress's parallel enforcement power. Douglas Laycock, *Conceptual Gulfs in City of Boerne v. Flores*, 39 WM. & MARY L. REV. 743, 749 (1998).

202.  Both statutes were direct congressional responses to the Supreme Court's interpretation of constitutional rights. As with RFRA, the legislative history of the 1982 Amendments demonstrates that Congress was primarily motivated by an intention to break from the Fifteenth Amendment's purposeful discrimination requirement, as opposed to easing the evidentiary

burden for proving intentional discrimination. S. Rep. 97-417, at 2 (stating that the amendment of Section 2 "is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2").

203. The Senate Report on the 1982 Act explicitly states that "during the hearings, there was considerable discussion of the difficulty often encountered in meeting the intent test, but that is not the principal reason why we have rejected it. The main reason is that, simply put, the test asks the wrong question." S. Rep. 97-417, at 36 (1982); *see also* H.R. Rep. No. 97-227, at 29 (1981) (amending VRA to "restate Congress' earlier intent that violations of the Voting Rights Act, including Section 2, could be established by showing the discriminatory effect of the challenged practice."(footnote omitted).

204. As to the structural similarities, both acts are extraordinarily broad in scope—RFRA applying to nearly the entire Free Exercise Clause, and the 1982 Act covering the entire scope of the Fifteenth Amendment. *See id.*

205. So, too, the alteration of the underlying right is substantial. In both cases, the Congressional enactment substituted an easily satisfied statutory standard in place of a different and much more demanding constitutional standard requiring intentional discrimination. *See* Laycock, supra, at 749.

206. In light of this history, Section 2 as amended (like RFRA) "cannot be considered remedial, preventative legislation, if those terms are to have any

meaning." *City of Boerne*, 521 U.S. at 532. It is not congruent and proportional to the underlying constitutional violation that it must be designed remedy, if Section 2 is to be a legitimate exercise of Congressional power.

207. As for the evidence of constitutional violations, the legislative history supporting the 1982 amendments to section 2 is bereft of evidence of widespread Fifteenth Amendment violations that could support the remedy that Congress adopted. *See id.* at 508-09 (focusing on absence of "examples of any instances of generally applicable laws passed because of religious bigotry in the past 40 years," as opposed to evidence of laws that were not "based on animus or hostility" and did not evidence any "widespread pattern of religious discrimination").

208. The record supporting the 1982 Amendments contained almost no instances of Fifteenth Amendment violations as interpreted in *City of Mobile*, but focused nearly exclusively upon voting *systems* with alleged discriminatory effects. *See Voting Rights Act: Hearings Before the Senate Subcomm. on the Constitution of the Comm'n. on the Judiciary*, 97th Cong. 1184, at 1201-1703 (1982) [hereinafter Senate Hearings]; Jennifer G. Presto, Note, *The 1982 Amendments to Section 2 of the Voting Rights Act: Constitutionality After* City of Boerne, 59 N.Y.U. ANN. SURV. AM. L. 609, 620-24 (2004) ("Without question, Senator Hatch's primary concern at the

hearings was not finding an evidentiary basis for past discrimination, but determining whether the proposed amendments to section 2—those reinstating a results test for vote dilution rather than requiring a finding of discriminatory intent—would effectively mandate proportional representation."). Indeed, the 1982 Voting Rights Act was not even "aimed at efforts to prevent blacks from voting; those efforts had largely ended by 1982. Instead, it was aimed at second and third generation voting rights problems, especially the inability of minority groups to elect representatives either in at-large elections or in elections in which the minority vote was dispersed across a number of single-member districts." Laycock, *supra*, at 751; Samuel Issacharoff, *Polarized Voting and the Political Process: The Transformation of Voting Rights Jurisprudence*, 90 MICH. L. REV. 1833, 1838-53 (1992) (analyzing the evolution of voting rights cases).

209.   Here, a record containing few instances of Fifteenth Amendment violations—defined interpreted by the Supreme Court to mean intentional discrimination resulting in a denial or abridgment of the right to vote—cannot support the all-encompassing remedy of Section 2. Senate Hearings, supra at 1677, 1703 (testimony of Hon. William Bradford Reynolds, Assistant Attorney General, Civil Rights Division, Department of Justice) ("The concern that one would have from a constitutional standpoint is that a standard is being put in place not unlike the 'effect' test in section 5 without

68

the kind of evidentiary basis or record that normally you would expect to be developed to show the need for this departure from the constitutional norm of the [Fifteenth] amendment."); *see* S. Rep. 97-417, at 38 (finding that *City of Mobile*'s standard had been satisfied only in "rare instances"); Presto, *supra*, at 624 ("[T]he primary focus of the hearings was on the meaning of the amendments rather than evidence of the specific behavior to be remedied. This could potentially call the constitutionality of the Act into question, especially after the Court's decision in *City of Boerne*.").

210.   Turning next to the legislative remedy, like RFRA, section 2's most serious shortcoming is the fact that it is so "out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 509.  Instead, it attempts a "substantive change in constitutional protections, proscribing state conduct that the [Fifteenth Amendment] itself does not prohibit." *Id.*

211.   Section 2's scope is extremely broad. Just as RFRA threatened to invalidate innumerable laws at all levels of government having the effect of burdening religious exercise regardless of discriminatory intent, Section 2 as interpreted by Plaintiffs would invalidate a host of state and local voting laws on the basis of disparate impact, regardless of whether intentional discrimination can be proven.  *Id*. at 532 (finding that RFRA "ensure[d] its

intrusion at every level of government, displacing laws and prohibiting official actions").

212.   This intrusion into States' affairs is significant, given that the States retain "broad powers to determine the conditions under which the right of suffrage may be exercised," and "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Shelby County,* 133 S. Ct. at 2623 (citations and internal quotation marks omitted).

213.   As explained in Part III, voting laws that would be invalidated under Plaintiffs' reading of Section 2 would include, but are not limited to: (1) virtually all State photo ID requirements; (2) felon disenfranchisement laws, which have been upheld as constitutional by numerous courts throughout the country despite a disparate impact; and (3) the in-person voting requirements adopted by every State except for Oregon, given that Plaintiffs allege that the necessity of travel more than walking distance has a disparate impact on racial minorities.

214.   "The bottom line is that virtually every decision by a state as to voting practices will be vulnerable, no matter how unrelated to race." *Farrakhan v. Washington*, 359 F.3d 1116 (9th Cir. 2004) (Kozinski, J., dissenting from order denying en banc hearing) (explaining that interpreting §2 to prohibit voting practices creating a disparate impact on minorities could

invalidate Tuesday in-person voting laws, stunt technological advancement in voting, and create "endless" permutations of lawsuits based upon socioeconomic disparities that lead to disparities in minority turnout). Yet there is simply no proof that "many of the[se] laws affected by the congressional enactment have a significant likelihood" of denying or abridging minorities' right to vote based upon a discriminatory intent. *City of Boerne,* 521 U.S. at 532.

215. Aggravating matters, section 2's extensive sweep is not even limited by time or geographical location—restrictions which had legitimized other laws intruding into the legislative spheres of autonomy reserved to the States. Like RFRA, Section 2 "has no termination date or termination mechanism." *Id.*

216. Also, Section 2's prohibition of legislative "changes that have a discriminatory impact" is not limited to jurisdictions with a contemporaneous and "demonstrable history of intentional racial discrimination." *Id.* (comparing RFRA to the seven-year enactment of VRA Section 5 upheld in *City of Rome v. United States,* 466 U.S. 156, 177 (1980)).

217. Whereas *City of Boerne* recognized the 1965 VRA enactment—which included time and geographical limitations on the VRA's Section 5 remedy— as an example of an appropriate remedy supported by a voluminous record of widespread and contemporaneous instances of intentional discrimination in

the covered jurisdictions, the opinion is silent as to the constitutionality of the 1982 Amendments. *Id* at 532-33.; *cf. Chisom v. Roemer*, 501 U.S. 380, 418 (1991) ("I write to add only that the issue before the Court is one of statutory construction, not constitutional validity. Nothing in today's decision addresses the question whether Section 2 of the Voting Rights Act of 1965, as interpreted in *Thornburg v. Gingles,* 479 U.S. 30 (1986), is consistent with the requirements of the United States Constitution." (Kennedy, J., dissenting)).

218.   This Court therefore finds that amended section 2 of the VRA is unconstitutional. The "substantial costs" it imposes—both in the "practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional" power in this area—"far exceed any pattern or practice of unconstitutional conduct" under the Fifteenth Amendment "as interpreted" in *City of Mobile. City of Boerne,* 521 U.S. at 534. Section 2 simply "is not designed to identify and counteract state laws likely to be unconstitutional." *Id.*

### 3.   *Alternatively, VRA Section 2 Does Not Pass* Katzenbach's *Rational Means Test.*

219.   Assuming *arguendo* that the "rational means" test controls our inquiry, this Court finds that section 2 nevertheless does not pass constitutional muster.  *See Nw. Austin Mun. Util. Dist. No. One v. Hold*er,

557 U.S. 193, 204 (2009) (reserving decision whether *City of Boerne* or *Katzenbach* controlled challenge to VRA section 5 as exceeding Congress's Fifteenth Amendment enforcement power).

220.  The Supreme Court in *Katzenbach* upheld the sweeping § 5 preclearance remedy as a "rational means" to combat the "insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution" in those States that had employed discriminatory tests and devices in the previous presidential election. *Katzenbach,* 383 U.S. at 309, 324; *see also id.* at 329 ("Congress began work with reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act").

221.  The Court in *Katzenbach* did not simply accept Congress's assertion that the severe measure was necessary to enforce the Fourteenth Amendment, but rather parsed the legislative history closely to determine that section 5 was "appropriate" remedial legislation. The record supporting the legislation was replete with significant evidence of rampant intentional discrimination in voting in the covered jurisdictions.

222.  For those reasons, the Court concluded that in these "unique circumstances," Congress had "responded in a permissibly decisive manner." *Id.* at 335.  The Court cautioned, however, that section 5 was an "uncommon

exercise of congressional power" that would not have been "appropriate" but for the "exceptional conditions" and "unique circumstances" in the covered jurisdiction as evidenced in the congressional record supporting the enactment. *Id.* at 334-35.

223. No such "unique circumstances" justify section 2's uncommon exercise of congressional power, which intrudes significantly into the States' prerogative to enact facially neutral voting laws. There is no evidence of any Fifteenth Amendment violations in the record supporting the 1982 Amendments, much less evidence of the rampant discrimination that justified § 5's original enactment.

224. Moreover, section 2 cannot be considered a rational means of enforcing the Fifteenth Amendment because Congress did not even justify its prophylaxis with any findings that Section 2 was necessary to prevent future violations of the Fifteenth Amendment. *See, e.g., Oregon v. Mitchell,* 400 U.S. 112 (1970) (invalidating a VRA amendment that would have extended the right to vote to 18-year-olds in state and local elections based upon an absence of findings that the 21-year-old requirement was used to disenfranchise voters on account of race)*; see also Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (holing that the ADA was an invalid attempt to enforce the Fourteenth Amendment against the states because Congress made no findings establishing a pattern of unconstitutional

74

irrational job discrimination by the states); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000).

225.   The record reveals that Congress instead sought to legislate a substantially different right than that conferred by the constitution. *Cf. Johnson v. Governor of State of Florida*, 405 F.3d 1214, 1233-34 (11th Cir. 2005) (en banc) ("In revising [Section 2 in 1982], Congress intended to depart from the intent-based standard of the Supreme Court's Equal Protection jurisprudence and establish an effects-based standard. S. Rep. 97–417, 15–17, 1982 U.S.C.C.A.N. 177, 192–94 (1982). After the 1982 amendment, a state practice could survive Equal Protection Clause scrutiny but fail Section 2 Voting Rights Act scrutiny.").

226.   Congress cannot change the substance of a constitutional right in an attempt to enforce it.

227.   There is no support in the in the legislative history for a conclusion that a ban on photo ID requirements or other facially neutral voting laws that have a disparate impact on minorities is a rational means to protect against violations of the Fifteenth Amendment.  This Court therefore finds that section 2 is not a "rational means to effectuate the constitutional prohibition" at issue. *See Katzenbach*, 383 U.S. at 324.

### D.   THE "TOTALITY OF THE CIRCUMSTANCES" TEST FOR SECTION 2 OF THE VRA IS UNCONSTITUTIONALLY VAGUE.

228.   Fourth, the plaintiffs' proposed "totality of the circumstances" test for section 2 of the VRA is unconstitutionally vague.

229.   The "totality of the circumstances" test is so vague and indeterminate that a State has no way of knowing how it can demonstrate compliance with section 2 to the satisfaction of a federal court. A State that enacts a voter-identification law can only guess as to how a federal court will decide to apply the "totality of the circumstances" test.

230.   The "totality of the circumstances" test is not a legal standard at all, but a license for judges to strike down any law with a disparate racial impact that they oppose (such as voter-identification laws) while upholding voting laws with a disparate racial impact that they approve (such as felon disenfranchisement).

231.   Because the "totality of the circumstances" test is so vague and ill-defined, it cannot qualify as a congruent and proportional remedy for enforcing actual violations of the Fifteenth Amendment.

232.   To the extent that there is vagueness and ambiguity in section 2's "totality of the circumstances" test, that ambiguity must be construed in favor of the State, because any interpretation of section 2 that extends

beyond actual violations of the Fifteenth Amendment is constitutionally dubious and must be rejected under the canon of constitutional doubt.

### E.   ALTERNATIVELY, SB 14 DOES NOT VIOLATE VRA §2.

233.   Alternatively, this Court finds that SB 14 does not violate § 2 of the VRA.

234.   It is well established that "[w]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909).

235.   In recent years, the Supreme Court repeatedly has rejected broad interpretations of the VRA, obviously troubled by the constitutional implications that those interpretations create. *Nw. Austin*, 557 U.S. at 205 (employing "principle of constitutional avoidance" and resolving VRA section 5 challenge on statutory interpretation grounds as opposed to constitutional grounds); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320 (2000); *Miller v. Johnson*, 515 U.S. 900, 927 (1995) (rejecting the Justice Department's interpretation of section 5 of the VRA and holding that "[t]here is no indication Congress intended such a far-reaching application of § 5, so we reject the [proposed] interpretation of the statute and avoid the constitutional problems that interpretation raises.").

236.  Applying these principles to §2, judges and scholars have recognized the consequences of interpreting § 2 as expansively as Plaintiffs advocate. *See, e.g., Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476, 502 n. 4 (2d Cir.1999) (Leval, J. concurring in result) ("Requiring discriminatory intent to prove vote dilution [claims under section 2] reduces the otherwise serious tension between section 2 and constitutional principles."); Theane Evangelis, *The Constitutionality of Compensating for Low Minority Voter Turnout in Districting*, 77 N.Y.U. L. REV. 796, 798 (2002); Heather K. Gerken, *Understanding the Right to an Undiluted Vote*, 114 HARV. L. REV. 1663, 1737 (2001); Laycock, supra, at 749-52.

237.  Interpreting VRA section 2 to invalidate SB 14 raises serious doubt about its constitutionality. Invalidating laws based upon disparate impact could invalidate a whole host of state and local election laws.  This would extend far beyond the command of the Fifteenth Amendment, and sweep far beyond what is needed to "enforce" the Fourteenth and Fifteenth Amendments.

238.  Because the Fifteenth Amendment would not invalidate SB 14 or such other voting laws, this Court "should avoid such an interpretation" that would bar a practice that the Fifteenth Amendment "permits [Texas] to maintain." *Johnson*, 405 F.3d at 1234.

78

239.   Section 2 therefore should be construed not to apply to Texas's photo identification law. "Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect." *Id.* at 1228; *Chisom*, 501 U.S. at 383-84 ("Congress amended § 2 of the Voting Rights Act to make clear that certain practices and procedures that *result* in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." (footnote omitted)).

240.   Nothing in the legislative history of the 1982 Amendments—which was concerned with vote dilution—suggests that section 2 was intended to apply to voter identification requirements, which were certainly in existence at that point in time. The record contains no indication that such laws were being used for discriminatory purposes.

241.   Because interpreting section 2 to not apply to Texas's photo ID law is not clearly contrary to Congressional intent, this Court adopts the State's interpretation of the scope of the Voting Rights Act and hold that Congress never intended section 2 to reach photo identification requirements. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1998).

242. Alternatively, assuming that section 2 can constitutionally be applied to SB 14, this Court finds that Plaintiffs did not prove a section 2 violation.

243. Section 2 requires that Plaintiffs "demonstrate that specific and relevant racial biases in society interact with [SB 14], resulting in a denial of the franchise '*on account of race or color*'"—not simply disparities that also correspond with socioeconomic factors. *Johnson*, 405 F.3d at 1230 n. 31 (emphasis added); *Muntaqim v. Coombe*, 366 F.3d 102, 117 (2d Cir. 2004) ("Congress did not wholly abandon its focus on purposeful discrimination when it amended the [Act] in 1982."), *reversed on other grounds*, 449 F.3d 371 (2d Cir. 2006) (en banc) (per curiam); *Nipper v. Smith*, 39 F.3d 1494, 1515 (11th Cir. 1994) ("The existence of some form of racial discrimination remains the cornerstone of Section 2 claims . . . ."); *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) ("The scope of the Voting Rights Act is indeed quite broad, but its rigorous protections . . . extend only to defeats experienced by voters 'on account of race or color.'").

244. This interpretation of section 2 accords with the statutory text, which states in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color* . . . .

80

> (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that . . . . members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973 (emphasis added).

245. Applying this interpretation, multiple courts have found no violations of section 2 based upon evidence stronger than that at issue here. For example, in considering a section 2 challenge to Florida's felon disenfranchisement law, the Eleventh Circuit concluded that such a challenge would fail even if section 2 could constitutionally be applied to the statute. The Court reasoned that although there was "some evidence of a statistical difference in the rate of felony convictions along racial lines," "these disparities do not demonstrate racial bias." *Johnson,* 405 F.3d at 1230 n.31. On the contrary, there was a "myriad of factors other than race that may explain the disparity," including an "individual's socioeconomic status" and "age." *Id.*

246. Similarly, the Third Circuit upheld Pennsylvania's voter-roll integrity statute under section 2(b)'s "totality of the circumstances" analysis, even though it disproportionately impacted minority voters. *Ortiz v. City of Philadelphia Office of City Com'rs Voter Registration Div.*, 28 F.3d 306, 314 (3d Cir. 1994).

81

247.   The *Ortiz* plaintiffs produced evidence of racially polarized voting, racial appeals in elections, unresponsiveness by elected officials, lower minority voter turnout and disparities in employment and other non-voting areas. *Id*. at 312. The Third Circuit nevertheless found no violation where "there was no evidence of historical voting-related discrimination . . . no evidence of discrimination in the candidate slating process that denied minority candidates equal access to the political process. . . . [and no] evidence that minorities experience difficulty in electing representatives of their choice," *Id*. at 312-13.

248.   Here, too, Plaintiffs have not proven any causal link to any State practices which themselves are motivated by a desire to discriminate based upon race.  The same result reached in *Ortiz* and *Johnson* should follow here.

249.   Plaintiffs' evidence does not establish any disparities that are on account of race or color.

250.   Plaintiffs attempt to "pass off evidence of disparities as evidence of intentional discrimination, but the two have entirely different consequences for vote denial claims." *Farrakhan v. Washington*, 359 F.3d at 1119 (Kozinski, J., dissenting from denial of rehearing en banc). "Intentional discrimination" in the photo identification dispensation system, "if it interacts with a standard, practice, or procedure with respect to voting, could amount to illegal vote denial on the account of race." *Id*.

82

251.   Plaintiffs have not produced evidence of such intentional discrimination within that system, and instead seek to prevail based upon a disparate impact—an impact that has not been proven on any level to exist on "account of" race or color.

252.   The nine factors taken from the Senate Judiciary Committee's majority report on the 1982 amendment are not substitutes for evidence of discrimination on "account of" race. *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (listing the nine factors included in S. Rep. 97-417's non-exhaustive list, at pages 28-29).   Those factors are not part of §2 and so do not carry statutory force; they are included only in the Senate Report and were not passed by the House of Representatives or signed by the President.

253.   The Supreme Court has never authorized consideration of such factors in this context or in any context other than redistricting. The Supreme Court's approval in *Gingles* of those factors in the redistricting context does not mandate or even authorize this Court to consider them here, particularly where the Senate Report gives no indication that the Senate envisioned them to be applicable to voting laws having nothing to do with redistricting.   Daniel P. Tokaji, *The New Vote Denial: Where Election Reform Meets the Voting Rights Act*, 57 S.C. L. REV. 689, 707-08 (2006) ("The legislative history of the 1982 amendments thus shows that Congress was almost exclusively focused on vote dilution claims [as opposed to vote denial

claims], and particularly on whether courts would read the amendments to require proportional representation. Although the amended statute's plain language clearly indicates that the results test applies to both vote denial and vote dilution claims, Congress's overwhelming concern was with the latter.").

254.   This Court finds that the "Supreme Court's seminal opinion in *Gingles*, as important as it is for vote dilution cases, is of little or of no use" in this vote denial case because "the preconditions the Supreme Court emphasized in *Gingles* are tangential at best in assessing whether vote-denying practices violate Section 2." *Id*. at 709.

255.   Alternatively, if consideration of those factors is appropriate or mandated, this Court finds that Plaintiffs have not proven that those factors favor a finding of a Section 2 violation in this case. Accordingly, Plaintiffs have not proven, as they must, that "under the totality of circumstances, . . . the political processes . . . are not equally open to participation by [members of a protected class] . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b).   This Court therefore dismisses Plaintiffs' section 2  claims.

## V.    SB 14 DOES NOT VIOLATE THE FIRST AMENDMENT.

256.   Finally, Plaintiffs have not proven that SB 14 violates their First Amendment Rights.

257.   The substance of Plaintiffs' claims is that their right to vote has been denied or abridged.  Plaintiffs have cited no authority holding that the First Amendment prohibits such a denial or abridgment. This right is instead protected by the Fifteenth Amendment, and the right to equal protection in casting a vote is protected by the Fourteenth Amendment. Were this not so, then minors—whom the Supreme Court has held maintain some First Amendment protections—could also claim entitlement to vote.

258.   Assuming arguendo that such a First Amendment right—as opposed to a Fifteenth Amendment right—to cast a vote exists, the act of voting involves both speech and non-speech elements. When both such "elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

259.  Where both elements are involved, a regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *See O'Brien*, 391 U.S. at 377.

260.   The *O'Brien* test is "little, if any, different from the standard applied to time, place, or manner restrictions." *Clark v. Community for Creative Nonviolence*, 468 U.S. 288, 298 (1984). As a result, "'content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47 (1986).

261.   Here, there is no doubt that SB 14 meets that standard. SB 14 is content-neutral. Plaintiffs here do not argue that that the statute is being applied "as a result of the message presented." *Hoffman v. State of Md.*, 928 F.2d 646, 648-49 (4th Cir. 1991) (rejecting First Amendment challenge to voter-roll integrity statute). On the contrary, SB 14 is designed to serve the substantial government interests of deterring voter fraud, insure election integrity, and modernize elections.

262.   Finally, the statute does not unreasonably limit alternate avenues of communication. There is not a suggestion that the statute blocks other means of communicating whatever message that Plaintiffs intend to communicate— such as support for a particular candidate.  Accordingly, this Court dismisses Plaintiffs' First Amendment claims.

**VI.** **EVEN IF THE PLAINTIFFS COULD SHOW THAT SB14 VIOLATES THE CONSTITUTION OR FEDERAL LAW, THEY CANNOT OBTAIN FACIAL INVALIDATION OF THE STATUTE BECAUSE THEY CANNOT SHOW THAT THE STATUTE IS INVALID IN EVERY SINGLE ONE OF ITS APPLICATIONS.**

263. Outside of First Amendment, the law of the Supreme Court and the Fifth Circuit prohibits courts from facially invalidating a statute across the board unless the plaintiff shows that the law is invalid in every single one of its applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid."); *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 514 (1990) ("[B]ecause appellees are making a facial challenge to a statute, they must show that no set of circumstances exists under which the Act would be valid.") (citation and internal quotation marks omitted); *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) ("With the exception of First Amendment cases, a facial challenge will succeed only if the plaintiff establishes that the act is invalid under all of its applications."); *Barnes v. Miss.*, 992 F.2d 1335, 1342 (5th Cir. 1993) ("A facial challenge will succeed only where the plaintiff

shows that there is *no* set of circumstances under which the statute would be constitutional").

264.   When a plaintiff brings a facial challenge, a Court is "bound to assume the existence of any state of facts which would sustain the statute in whole or in part." *Ala. State Fed'n of Labor, Local Union No. 103 v. McAdory*, 325 U.S. 450, 465 (1945) ("When a statute is assailed as unconstitutional we are bound to assume the existence of any state of facts which would sustain the statute in whole or in part.").

265.   A facial challenge to a voter-identification law must fail when the statute has a "plainly legitimate sweep," even if it imposes unconstitutional burdens on a subset of voters. See *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) ("[A] facial challenge must fail where the statute has a plainly legitimate sweep.") (citation and internal quotation marks omitted); *Crawford*, 553 U.S. at 202 (opinion of Stevens, J.) ("A facial challenge must fail where the statute has a plainly legitimate sweep.") (citations and internal quotation marks omitted).

266.   A federal court may not facially invalidate a statute by relying on "hypothetical" or "imaginary" cases. *See Wash. State Grange*, 552 U.S. at 449–50 ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

88

267.  SB 14 has a "plainly legitimate sweep" under *Crawford*. The vast majority of voters in Texas possess photo identification, and SB 14 does not abridge their right to vote in the slightest. Whatever burdens the law may impose on a subset of voters does not permit facial invalidation under *Salerno*, *Washington State Grange*, *Crawford*, and *Voting for America*.

## VII.   PLAINTIFFS CANNOT OBTAIN FACIAL INVALIDATION BECAUSE STATE LAW REQUIRES THIS COURT TO SEVER EVERY APPLICATION OF SB14 TO EVERY INDIVIDUAL VOTER AND UPHOLD THE APPLICATIONS THAT DO NOT IMPOSE UNLAWFUL BURDENS ON THE RIGHT TO VOTE.

268.  Texas law provides that valid *applications* of a statutory provision are severable from the statute's invalid applications. The Texas Code Construction Act provides: "In a statute that does not contain a provision for severability or nonseverability, if any provision of the statute *or its application to any person or circumstance is held invalid*, the invalidity does not affect other provisions *or applications of the statute that can be given effect without the invalid provision or application*, and to this end the provisions of the statute are severable." Tex. Gov't Code § 311.032(c) (emphasis added).

269.  Texas law therefore requires both text severability (by severing the "provision[s]" of a statute) and also application severability (by severing the "applications of the statute"). *Id.*

270. Federal courts must enforce state-law severability clauses. *See Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law."); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (holding that a state court's "decision as to the severability of a provision is conclusive upon this Court."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 589 (5th Cir. 2014) ("Even when considering facial invalidation of a state statute, the court must preserve the valid scope of the provision to the greatest extent possible. Later as-applied challenges can always deal with subsequent, concrete constitutional issues."); s*ee Voting for Am.,* 732 F.3d at 398 ("Severability is a state law issue that binds federal courts.").  The Supreme Court enforces severability provisions that require reviewing courts to sever unconstitutional applications of state statutes, while leaving valid applications in force. *See, e.g., Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 501 & 506 n.14 (1985); *Wyoming v. Oklahoma*, 502 U.S. 437, 460–61 (1992).

271.  Because the severability clause in the Texas Code Construction Act requires reviewing courts to sever not only the statutory provisions, but also the applications of those provisions to each individual and circumstance, a court cannot invalidate SB 14 across the board unless it is invalid in every single one of its applications. Any valid applications of SB 14 to any person,

group of persons, or circumstances must be severed and allowed to remain in force.

272.   SB 14 must, at the very least, remain in effect as applied to voters who already possess the requisite photo identification, because the statute does not in any way "deny" or "abridge" their right to vote.

## VIII. ANY RELIEF AWARDED BY THIS COURT MUST BE LIMITED TO THE NAMED PARTIES TO THIS LITIGATION, AND CANNOT EXTEND TO NON-PARTIES.

273.   The plaintiffs in this case are only a subset of registered voters in Texas, and this case has not been brought as a class action. This court lacks authority to enjoin the enforcement of SB 14 against anyone other than the named plaintiffs in this case. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the statute."); *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) ("[T]he question at issue [is] whether a court may grant relief to non-parties. The right answer is no.").

274.   This court cannot enjoin the State from enforcing SB 14 against voters who are not parties to this lawsuit—even if this Court concludes that provisions of SB 14 are facially unconstitutional. *See Doran*, 422 U.S. at 931;

*McKenzie*, 118 F.3d at 555. The scope of any injunction may extend no further than the named plaintiffs.

   Dated: August 22, 2014

                              Respectfully submitted,

                              GREG ABBOTT
                              Attorney General of Texas

                              DANIEL T. HODGE
                              First Assistant Attorney General

                              JONATHAN F. MITCHELL
                              Solicitor General

                              J. REED CLAY, JR.
                              Special Assistant and Senior Counsel
                              to the Attorney General
                              Southern District of Texas No. 1160600

                              /s/ John B. Scott
                              JOHN B. SCOTT
                              Deputy Attorney General for Civil
                              Litigation
                              Southern District of Texas No. 10418
                              Texas State Bar No. 17901500
                              ATTORNEY-IN-CHARGE

92

G. DAVID WHITLEY
Assistant Deputy Attorney General
Southern District of Texas No. 2080496

STEPHEN RONALD KEISTER
Assistant Attorney General
Southern District of Texas No. 18580

JENNIFER MARIE ROSCETTI
Assistant Attorney General
Southern District of Texas No. 224780

LINDSEY ELIZABETH WOLF
Assistant Attorney General
Southern District of Texas No. 2292940

FRANCES WHITNEY DEASON
Assistant Attorney General
Southern District of Texas No. 2302872

STEPHEN LYLE TATUM, JR.
Assistant Attorney General
Southern District of Texas No. 2338090

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 475-0131

BEN A. DONNELL
Donnell, Abernethy & Kieschnick
555 N. Carancahua, Suite 1770
Corpus Christi, Texas 78401-0853
Southern District of Texas No. 5689

COUNSEL   FOR   THE   STATE   OF
TEXAS,  RICK  PERRY,  JOHN  STEEN,
and STEVE MCCRAW

93

CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2014, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.


/s/ John B. Scott
JOHN B. SCOTT