UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, ET AL.,           )       CASE NO: 2:13-CV-00193
                               )
              Plaintiffs,      )              CIVIL
                               )
     vs.                       )       Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )   Tuesday, September 2, 2014
                               )
              Defendants.      )    (7:58 a.m. to 9:43 a.m.)

MOTION HEARING

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:  Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                     CHAD W. DUNN, ESQ.
                                KEMBEL SCOTT BRAZIL, ESQ.
                                Brazil and Dunn
                                4201 Cypress Creek Parkway, Suite 530
                                Houston, TX 77068

                                ARMAND DERFNER, ESQ.
                                P.O. Box 600
                                Charleston, SC 29402

                                J. GERALD HEBERT, ESQ.
                                Attorney at Law
                                191 Somervelle Street #405
                                Alexandria, VA 22304

                                NEIL G. BARON, ESQ.
                                914 FM 517 Rd. W, Suite 242
                                Dickinson, TX 77539

                                LUIS ROBERTO VERA, JR., ESQ.
                                111 Soledad, Suite 1325
                                San Antonio, TX 78205

                                EMMA P. SIMSON, ESQ.
                                Campaign Legal Center
                                215 E. Street NE
                                Washington, DC 20002

Mexican American                EZRA D. ROSENBERG, ESQ.
Legislative Caucus,             Dechert, LLP
et al.:                         902 Carnegie Center, Suite 500
                                Princeton, NJ 08540-6531

                                MARK A. POSNER, ESQ.
                                AMY L. RUDD, ESQ.
                                LINDSEY COHAN, ESQ.
                                JENNIFER CLARK, ESQ.
                                Lawyers' Committee for Civil Rights
                                1401 New York Ave. NW, Suite 400
                                Washington, DC 20005

<u>**APPEARANCES FOR:**</u>        (CONTINUED)


United States            RICHARD DELLHEIM, ESQ.
of America:              ELIZABETH S. WESTFALL, ESQ.
                         ANNA BALDWIN, ESQ.
                         PAMELA CARLIN, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530

                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006

Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209

                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751

                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

Texas League of Young    RYAN HAYGOOD, ESQ.
Voters Education Fund:    NATASHA KORGAONKAR, ESQ.
                         NAACP Legal Def. and Educational Fund
                         40 Rector St., 5th Floor
                         New York, NY 10006

Also present:            Imani Clark

                         DANIELLE CONLEY, ESQ.
                         KELLY DUNBAR, ESQ.
                         Wilmer Cutler Pickering, et al.
                         1875 Pennsylvania Avenue, NW
                         Washington, DC 20006

**APPEARANCES FOR:**          (CONTINUED)


Texas Association of          ROLANDO L. RIOS, ESQ.
Hispanic County Judges        115 E. Travis
and County                    Suite 1654
Commissioners:                San Antonio, TX 78205

Also present:                 ROGER GALVAN, County Commission
                              Calhoun County

State of Texas:               JOHN BARRET SCOTT, ESQ.
                              Scott, Yung, L.L.P.
                              208 N. Market Street
                              Suite 200
                              Dallas, TX 75202

                              JOHN REED CLAY, JR., ESQ.
                              LINDSEY E. WOLF, ESQ.
                              JENNIFER ROSCETTI, ESQ.
                              G. DAVID WHITLEY, ESQ.
                              STEPHEN L. TATUM, JR., ESQ.
                              STEPHEN R. KEISTER, ESQ.
                              Office of the Attorney General
                              P.O. Box 12548
                              MC001
                              Austin, TX 78711

                              ARTHUR D'ANDREA, ESQ.
                              Office of the Attorney General
                              209 W. 14th Street, 7th Floor
                              Austin, TX 78701

                              BEN A. DONNELL, ESQ.
                              Donnell Abernethy Kieschnick
                              555 N. Carancahua, Suite 400
                              Corpus Christi, TX 78401

                              WHITNEY DEASON, ESQ.

1    **Corpus Christi, Texas; Tuesday, September 2, 2014; 7:58 a.m.**

2                          **(Call to order)**

3          **THE COURT:**  Good morning.  It's a little warm in

4    here, but I think they're working on that.  Court calls Cause

5    Number 2-13-193, *Veasey, et al. versus Perry, et al.*  The

6    Plaintiffs will announce.

7          **MR. DUNN:**  Good morning, your Honor.  Chad Dunn on

8    behalf of the Veasey/LULAC Plaintiffs.  With me at counsel

9    table is Armand Derfner.  Also with me in the case is Jerry

10   Hebert, Emma Simson, Luis Vera, Scott Brazil, and Neil Baron,

11   who is dealing with a witness out of court.

12         **THE COURT:**  Okay.

13         **MR. ROSENBERG:**  Good morning, your Honor.  Ezra

14   Rosenberg from Dechert on behalf of the Texas State Conference

15   of NAACP Branches and the Mexican American Legislative Caucus,

16   Texas House of Representatives.  With me are Mark Posner, Amy

17   Rudd, Lindsey Cohan, Jenn Clark, and I think I have everyone

18   right now.

19         **THE COURT:**  Okay.

20         **MR. DELLHEIM:**  Good morning, your Honor.  Richard

21   Dellheim for the United States.  With me at counsel table is

22   Elizabeth Westfall, Anna Baldwin, Pamela Carlin (phonetic), we

23   have Bruce Gear and more to come.

24         **THE COURT:**  I'm sure.

25         **MR. DELLHEIM:**  Thank you very much.

1          **THE COURT:**  Okay.

2          **MR. GARZA:**  Jose Garza for the Ortiz Plaintiffs, and

3    with me is Mr. Robert Doggett and Ms. Marinda Van Dalen.  And

4    I'm also here on behalf of the Mexican American Legislative

5    Caucus.

6          **THE COURT:**  All right.

7          **MR. HAYGOOD:**  Good morning, your Honor.  Ryan Haygood

8    for the Texas League of Young Voters, and Imani Clark who joins

9    me at counsel table with my colleague, Danielle Conley, Natasha

10   Korgaonkar, and Kelly Dunbar.

11         **THE COURT:**  Okay.

12         **MR. RIOS:**  Good morning, your Honor.  Rolando Rios

13   for the Texas Association of Hispanic Judges and Commissioners.

14   And along with me today is Commissioner Roger Galvan.  He's the

15   County Commissioner of Calhoun County.

16         **THE COURT:**  Okay.  Is that everyone on the

17   Plaintiffs' side?  All right.  Defense?

18         **MR. SCOTT:**  Your Honor, John Scott for the

19   Defendants.  We announce ready, along with Mr. Reed Clay,

20   Arthur D'Andrea, Lindsey Wolf, Jennifer Roscetti, Whitney

21   Deason (phonetic), David Whitley, Stephen Tatum, Ben Donnell,

22   and Ron Keister.

23         **THE COURT:**  All right.  I guess that's everyone.  I

24   think the only thing we really need to address before we get

25   going is there was a motion to compel filed by the Defendants

1    regarding a deposition of a Mr. Taylor.  You all want to

2    address that?

3           **MR. WHITLEY:**  Good morning, your Honor.  David --

4           **THE COURT:**  Good morning.

5           **MR. WHITLEY:**  -- Whitley for the Defendants.

6    Mr. Taylor was deposed about a month ago, maybe two months ago.

7    The Defendants accommodated his request to delay his

8    deposition; and after he sat for that deposition -- he sat for

9    about two hours and then he walked out early after becoming

10   highly agitated and actually hostile towards me.  And frankly,

11   I was surprised that he would be called as a witness at trial.

12   And we feel strongly that he should be compelled to sit for the

13   remainder of his deposition.

14          **THE COURT:**  All right.  Who's going to respond from

15   the Plaintiffs?

16          **MR. DOGGETT:**  Robert Doggett, Mr. Taylor.  Your

17   Honor, first of all, Mr. Taylor is a Plaintiff in this case.

18   His testimony has been designated.  The State has cross-

19   designated.  This deposition occurred on July 18th.  They have

20   not requested that it be rescheduled until the day before.

21   And, in fact, on page 65 of his deposition, the attorney for

22   the State said they had two more questions.  And now here we

23   are the day before trial, they want to re-depose him.  And

24   obviously he's in a nursing home right now.  He's going to

25   appear at trial day after tomorrow, or I believe tomorrow.

8

1          **THE COURT:**  Yeah, I guess why wasn't the deposition

2     able to continue?

3          **MR. DOGGETT:**  Well, your Honor, I mean, we can blame

4     Mr. Taylor for that, but obviously I believe that the State,

5     you know, in part provoked him and, you know, told him there

6     was only two more questions.  And, your Honor, all we're saying

7     is that the State has known that he was going to testify in

8     this case from the get-go.  He was on the witness list.  And

9     Mr. Scott said in open court last week they had no objections

10    for any of the witnesses, and here we are the day before trial

11    and now they want to depose him again.

12         **THE COURT:**  Okay.  If the Plaintiffs plan to present

13    him, then the Court's going to grant the motion to compel the

14    deposition.  You all need to figure out when you all are going

15    to do that.

16         **MR. DOGGETT:**  Your Honor, would it be two more

17    questions or two more hours?

18         **THE COURT:**  What do you need?

19         **MR. WHITLEY:**  Just to clarify the record, your Honor,

20    I believe the deposition testimony referenced a couple more

21    questions.  I was doing my best to calm Mr. Taylor and to put

22    him at ease.  A couple more questions should not be interpreted

23    as two exactly.  It was at that point that he chose to walk out

24    of the deposition.  So, your Honor, it --

25         **THE COURT:**  How much time do you anticipate in the

 1    deposition taking?

 2              **MR. WHITLEY:**  He sat for less than two hours.  I

 3    believe that we are due seven under the rules.  I do not

 4    believe that we need another five, but --

 5              **THE COURT:**  How much time do you need?

 6              **MR. WHITLEY:**  I think that another two hours would be

 7    great.

 8              **MR. SCOTT:**  Your Honor, probably less than an hour,

 9    easily less than an hour.  So if we could have another hour to

10    finish up his deposition, we'll be through.

11              **THE COURT:**  We're going to cap it at an hour then.

12              **MR. WHITLEY:**  Thank you, your Honor.

13              **MR. SCOTT:**  Thank you.

14              **THE COURT:**  All right.  Okay, you all filed -- or

15    provided an email to the Court regarding how objections were

16    going to be addressed.  If you all can just put that on the

17    record just so that I am sure I understood that memo.

18              **MS. WOLF:**  Good morning, your Honor.  Lindsey Wolf

19    for the Defendants.  We've been engaging in lengthy good faith

20    discussions with the Plaintiffs in terms of objections to

21    exhibits and transcript designations, and we basically agreed

22    that the Court need not address in advance of trial the bulk of

23    the objections to the exhibits.  We're going to present a few

24    objections to the Court today.  Some of those we're just going

25    to put on the record that the documents are not being used for

1   the truth of the matter asserted.  But Mr. Rosenberg would like

2   to continue this statement.  Go right ahead.

3             **MR. ROSENBERG:**  Yeah, I'll put on the record, I don't

4   have the -- with me the email that we sent to Ms. Cortez, but I

5   do have an email that Ms. Wolf and I exchanged last night.  Oh,

6   I all of a sudden have the email that I sent to Ms. Cortez, so

7   I'll read that one first and then read the email that was sent

8   last night.  The parties have conferred -- well, I should just

9   preface -- the parties --

10            "number one, the parties agree that all exhibits and

11            depositions/trial testimony designations on any party

12            (indiscernible) are admitted into evidence with the

13            opposing party's filed objections, except for those

14            that are submitted to the Court for decision on

15            Tuesday, as per paragraph 3 below.  The parties will

16            confer over the weekend to narrow the list of

17            objections to those deemed to be central by the

18            parties.  Any -- number two --"

19            **THE COURT:**  And can I just ask?  So --

20            **MR. ROSENBERG:**  Sure.

21            **THE COURT:**  -- when you all are saying that's agreed

22   to be admitted into evidence, you all are going to let the

23   Court know or you all are going to read that into the record or

24   present it or something, right?  It's not just presenting --

25            **MR. ROSENBERG:**  I think that will happen today is

1    that there are a handful of exhibits that will be either

2    clarified as to the nature of the objections or the nature of

3    the reservation of rights, and there are a dispute of -- as to

4    another handful of exhibits.  Other than that, everything would

5    be deemed admitted, subject to the objections.  And I think the

6    best way to do this -- also in consideration of a couple

7    supplemental trial exhibit lists that the parties haven't

8    finalized, is that today I'm certainly prepared to move into

9    evidence everything up to now, and then we will put together

10   for the Court a complete list that takes out withdrawn exhibits

11   and make sure that the Court has one final list.  But that's

12   going to take a few days, I think, to finalize.

13          **MS. WOLF:**  And, your Honor, there is another issue

14   which I think --

15          **THE COURT:**  Can I just --

16          **MS. WOLF:**  Of course.

17          **THE COURT:**  -- follow up on that?  I just want to be

18   sure you all aren't going to say, okay, all this is admitted

19   into the evidence and I'm not -- I'm going to have to read

20   through all that.  Or you all are going to present it during

21   the trial?

22          **MR. ROSENBERG:**  During the -- as per your Honor's

23   instructions, during the trial we are going to highlight those

24   exhibits that we believe are of particular importance.  I think

25   both sides have a fairly large group of exhibits that go beyond

1    what is going to be shown to the Court, just because of the

2    time.

3              THE COURT:  Okay.  And I understand that.  The

4    problem is it's -- as I've said before, it's not really fair to

5    the Court for you all just to admit, even if it's by agreement,

6    a bunch of exhibits or a bunch of testimony and expect the

7    factfinder to sort through that.  That's not normally the way

8    you would try your case to a jury.  And I am the factfinder

9    here.  And as I said at the pretrial, as that case says, judges

10   are not pigs looking for truffles --

11             MR. ROSENBERG:  Certainly.

12             THE COURT:  -- buried in evidence.

13             MR. ROSENBERG:  And that's why we also, throughout

14   our findings of fact, we identified with specificity those

15   exhibits that we feel are of particular importance.

16             THE COURT:  Okay, all right.  You can proceed.

17             MR. ROSENBERG:  "Number two, any objections made in

18             open court or filed with the Court pretrial will be

19             reviewed by the Court when it reviews the evidence

20             with the obligation placed on the parties to

21             highlight to the Court in open court any objections

22             to specific exhibits or deposition/trial testimony

23             that the party believes are of particular importance

24             to it.  Number three, the parties may raise with the

25             Court such particular objections prior to the start

13

1          of evidence on September 2nd or the objection to the

2          extent noted shall be carried.  Number four, the

3          above procedure would not apply to the deposition

4          designations of the United States 30(b)(6) deposition

5          or the deposition of Senator Robert Duncan, both of

6          which were taken this past week, which the parties

7          will raise with the Court to the extent necessary

8          during the second week of trial.  Nor does this

9          procedure apply to certain fact stipulations.

10          Defendants are in the process of working out with the

11          Veasey, LULAC, Ortiz, and Young Voter Plaintiff

12          groups to which the parties do not anticipate

13          objections."

14          Pursuant to this, over the weekend the parties met

15  and engaged in lengthy good faith discussions of their

16  objections to exhibits and transcript designations and have

17  agreed that the Court need not address in advance of trial

18  almost all of them, those objections which we're not presenting

19  to the Court in open court today, with the exception of

20  objections the parties understand the Court has already ruled

21  on, including for example Plaintiffs' Exhibit 817 and

22  Plaintiffs' Exhibit 490 and certain exhibits, the parties have

23  agreed they will not seek to introduce at trial or preserve.

24  The parties are comfortable with the Court giving whatever

25  weight, if any, it deems appropriate to any such exhibit or

1   transcript designation in light of said objections, including

2   curing a hearsay objection on the basis that the document may

3   be relevant other than for the truth of the matters asserted

4   therein.   There are a couple of categories of objections which

5   the parties want to highlight.   Number one, the parties have

6   agreed that declarations set forth on the exhibit list may be

7   admitted into evidence, so long as the witness, lay or expert,

8   appears live at trial so as to be available for cross

9   examination as to anything in the declaration.   And this is not

10  applied, of course, to the declarations that your Honor

11  admitted into evidence last week.   "Number two, the parties

12  have agreed that academic literature may be admitted into

13  evidence to the extent that an expert in his or her declaration

14  or testimony indicates reliance on that academic literature,

15  but not for the truth of the matters set forth in the

16  literature."   And I think with that, that takes care of the

17  Geschtalt (phonetic) agreement.   And there are a few particular

18  exhibits which Ms. Wolf and others may address.   And I think I

19  have one or two clarifications that we discussed.   Thank you,

20  your Honor.

21          **THE COURT:**  All right.

22          **MS. WOLF:**  And, your Honor, before I jump into the

23  specific exhibits, I have a point of clarity which I think the

24  Plaintiffs will also appreciate some clarity on in terms of how

25  your Honor would like to proceed with documents that the

1    parties wish to submit under seal.  There are some documents

2    which contain personally identifying information which I can

3    represent Defendants have gone through and redacted to the best

4    of their ability that information.  But I understand there's

5    other exhibits for example that the United States has asked be

6    submitted under seal.  And so would your Honor prefer a

7    separate drive that has the exhibits under seal, or how would

8    your Honor like us to keep track of that for you so that you

9    know --

10          THE COURT:  Okay.

11          MS. WOLF:  -- which exhibits we're seeking to seal?

12          THE COURT:  Anything from the Plaintiffs on that?

13          MS. WESTFALL:  I think a separate drive would be

14   preferable.

15          THE COURT:  Okay, that's fine.

16          MS. WOLF:  And with that, your Honor, I will turn to

17   the individual exhibits.  I will address exhibits first that

18   the Plaintiffs are seeking to get into evidence that the

19   Defendants are taking -- would ask that your Honor address.

20   And the first exhibit would be Exhibit PL-650.  And we're not

21   asking your Honor to rule on that exhibit.  The caveat there,

22   we would just like to note for the record that counsel for the

23   Plaintiffs has represented that PL-650 will not be used for the

24   truth of the matters asserted therein.  It will be used to go

25   to motive and state of mind.

1          **MR. HEBERT:**  And, your Honor, we can confirm that's

2    correct, 650.

3          **THE COURT:**  Okay.

4          **MS. WOLF:**  Your Honor, the next exhibit in the

5    Plaintiffs exhibits would be the declaration of Mr. Buck Wood.

6    And in connection with our objection to the admission of this

7    particular affidavit, we also take objection to Mr. Wood

8    presenting testimony in this matter.  And the issues that we

9    have -- and for your Honor's reference, this is PL-776 -- and

10   for your Honor's reference, Mr. Wood gave a deposition in this

11   case, and in that deposition, he testified to certain

12   conversations that he had with members of the Texas legislature

13   regarding the purpose of SB14.  And in his declaration, he

14   opined that it was the legislators purpose with SB14 to

15   discourage turnout among minority citizens.  When counsel for

16   Defendants asked Mr. Wood to identify the specific legislators

17   with whom he had spoken in order to form those opinions,

18   Mr. Wood asserted the attorney-client privilege.  And when

19   counsel in the deposition pointed out to Mr. Wood that case law

20   in the Fifth Circuit, under normal circumstances, does not

21   protect the identity of an attorney's clients, Mr. Wood

22   endeavored that he would sit on that and think about it and

23   possibly provide the Defendants with the list of individuals he

24   had spoken with.  And the Defendants at that time reserved

25   their right to reopen the deposition.  We're sitting here at

```
 1    the beginning of trial, we haven't received the list from
 2    Mr. Wood, and there's various case laws which state that the --
 3    we -- the courts are entitled to examine the reliability of
 4    sources, and if an expert fails to disclose the sources on
 5    which his opinion is based, the court is unable to conduct the
 6    necessary reliability review.  And that's a Fifth Circuit case,
 7    Viterbo versus Dow Chemical Co., 826 F.2d 420.  And he also
 8    testified in his deposition that he was not relying on any
 9    documents; he was only relying on his personal knowledge.  And
10    so we would start with, your Honor, to ask that he not -- he be
11    precluded from testifying at all because we don't have any data
12    on which he relied.
13              MR. DUNN:  Your Honor, good morning.  Chad Dunn on --
14              THE COURT:  Good morning.
15              MR. DUNN:  -- behalf of the Veasey/LULAC Plaintiffs.
16    Mr. Wood testifies to two basic topic areas, and I think it's
17    important to keep that --
18              THE COURT:  Okay, and who is he?
19              MR. DUNN:  He -- Randall Buck Wood is an election
20    lawyer from Austin, used to be Director of Elections in the
21    late sixties and early seventies, and has practiced election
22    law since then.  He -- his two categories of testimony will be
23    that there is essentially none -- or there is none voter
24    impersonation that Senate Bill 14 would prevent.  He testifies
25    from the standpoint of somebody who has handled scores and
```

1    scores of election contests and investigations searching for

2    voter fraud.  On that subject, this discussion that Ms. Wolf

3    raises before the Court is not even relevant as to his

4    testimony and purpose.  So we don't think he should be excluded

5    there for any reason.  He has unique experience, his training

6    and education, experience make him an expert.

7              **THE COURT:**  Okay.  Is there an issue with the defense

8    on that point?  Because I didn't see where your objection would

9    cover that issue.

10             **MS. WOLF:**  Your Honor, I think there's a general

11   objection given that he's not relying on any documents.

12   However, our primary objection is with paragraph three of his

13   report which relates to his experience with the Texas

14   legislature.

15             **MR. DUNN:**  And so turning to paragraph three -- and I

16   should have mentioned the Section 5 court in D. C. heard from

17   Mr. Wood, so this isn't new testimony to the State.  But

18   turning to paragraph three, Mr. Wood states that it's his

19   opinion that Senate Bill 14 was adopted with a discriminatory

20   intent, and he has several bases for that opinion.  And one of

21   the bases for that opinion was communications he had with

22   members of the legislature that were only raised, frankly,

23   because the State asked him about those communications.  We

24   have stipulated to the State that we will not ask Mr. Wood

25   about his communications with legislators.  And to the extent

1    he gets into testimony about intent behind SB14, the only

2    rationale or examples he will give for having formed such an

3    opinion will be other rationales that were asked about at the

4    deposition; not his communications with his clients.  So we

5    thought that was sufficient to resolve the issue.

6            THE COURT:  All right, Ms. Wolf?

7            MS. WOLF:  Your Honor, our understanding is that in

8    terms of this particular subject area, Mr. Wood primarily

9    relied on those particular conversations, and so we don't think

10   that it would be fair for Mr. Wood to be able to make a general

11   statement or opinion and only provide certain sources which

12   clearly he testified factored into his decision on this

13   particular paragraph three in his affidavit.

14           THE COURT:  Okay, Defendants' objection is overruled.

15           MS. WOLF:  Thank you, your Honor.  Your Honor, the

16   next group of Plaintiffs' exhibits which are before the Court

17   are exhibits PL-1086 and PL-1087, and I was able to confer

18   again with counsel this morning on those exhibits.  Those I

19   understand are summary documents which were attached to an

20   expert report in the last case which is not being submitted in

21   this case.  And it's my understanding that counsel would like

22   to revisit those issues with us, so if it's okay with your

23   Honor, we'd like to address that, if at all, at a later date.

24           THE COURT:  Okay.

25           MS. WOLF:  And moving on to Defendants' exhibits that

1    we are still seeking to admit into the record, the first of

2    those exhibits is Defendants' 456.  This is a file from one of

3    the county commissioners, Ms. Carolyn Guidry (phonetic).  And

4    for your Honor's sake, this is a 600-page document so -- and in

5    the interest of avoiding the Court having to review 600 pages,

6    I've agreed with Mr. Hebert that we're going to, again, try and

7    cull down what exactly it is we want to use from that document,

8    so we'd also like to table our objections with respect to that

9    document.

10            **MR. HEBERT:**  That's correct, your Honor.

11            **THE COURT:**  Okay.

12            **MS. WOLF:**  The next document that we have on our list

13   before the Court is Defendants' 992.  This is a document which

14   we understand was from one of Senator Patrick's employees'

15   files, and it's entitled Criminal Prosecutions Regarding

16   Information On Prosecution of Voter Fraud.  We've conferred

17   with the Plaintiffs this morning.  We've represented to the

18   Plaintiffs that we will not be offering this document for the

19   truth of the matter asserted, but instead as reflective of the

20   state of mind or motive of intent of what was being considered

21   in SB14.  And it's my understanding that the Plaintiffs are

22   amenable to the admission of that evidence subject to that

23   caveat.

24            **MR. ROSENBERG:**  That's correct, your Honor.

25            **THE COURT:**  Okay.  So that --

EXCEPTIONAL REPORTING SERVICES, INC

1                MS. WOLF:  The next --

2                THE COURT:  Now, let me just ask, the very first

3     exhibit --

4                MS. WOLF:  Sure.

5                THE COURT:  -- PL-650 --

6                MS. WOLF:  Yes, ma'am.

7                THE COURT:  -- was that something the Court still

8     needs to rule on?

9                MS. WOLF:  No, ma'am.

10               THE COURT:  No.

11               MS. WOLF:  That's --

12               THE COURT:  That -- okay.

13               MS. WOLF:  -- that was just for the record to reflect

14    that it's not being offered for the truth of the matter

15    asserted.  The next exhibit is an exhibit that we would ask the

16    Court to rule on.  This is DEF-1515.  This is a document which

17    we understand was in a DPS employee's file relating to things

18    that require valid ID.  And we would ask that the Court admit

19    this.  I don't think -- we're not seeking to admit it for the

20    truth of the matter asserted.  It's more in terms of what, you

21    know, DPS had in its files.  And so on that ground, we'd ask

22    that the Court admit this particular document.

23               MR. ROSENBERG:  I -- if I can take one quick look?

24    And I'm not sure if that's the --

25               MS. WOLF:  Sure.

1          **MR. ROSENBERG:**  -- one you and I discussed this

2     morning.

3          **MS. WOLF:**  We didn't discuss that one this morning.

4     Unfortunately I'm sure I have a hard copy of that one.  Your

5     Honor will excuse me for just one second.  I need to pull up

6     that electronic --

7          **THE COURT:**  Okay, that's fine.

8          **(Pause)**

9          **MR. HEBERT:**  So, your Honor, one -- I guess I'll

10    start.  This is a page that was circulated on Facebook.  We

11    don't know whose it is.  It may have been in somebody's file at

12    DPS.  We believe that it's not self-authenticating.  There's no

13    indication who --

14         **THE COURT:**  We don't know who it came from?  It was

15    just --

16         **MS. WOLF:**  We understand that it came from

17    Mr. Bottash's (phonetic) files, who's a DPS employee.  However,

18    I can't confirm that Bottash actually authored the document.  I

19    don't know that.

20         **MR. HEBERT:**  And then Mr. Freeman's going to talk

21    about some of the inaccuracies.

22         **MR. FREEMAN:**  Certainly, your Honor.  This document,

23    to the extent that it purports to be a list of things that

24    require valid ID, is factually inaccurate, and the Defendants

25    have offered no factual basis on which to authenticate the

23

1  exhibit, on which to state that it is what it purports to be,

2  which is a list of things that require a valid ID, such as

3  boarding an airplane, for example, does not require a

4  photographic ID, which is what this document implies.  It has

5  no actual factual relevance to this case insofar as it is not a

6  factually accurate document and does not reflect the intent of

7  any legislator.

8         **THE COURT:**  The Court's going to sustain Plaintiffs'

9  objection.

10        **MS. WOLF:**  Thank you, your Honor.

11        **MR. FREEMAN:**  Thank you, your Honor.

12        **MS. WOLF:**  Turning to the next exhibit, it is

13  Defendants' 1825.  This is an analysis of lawful status and

14  driver license identification card expiration dates.  This was

15  contained also in a DPS employee's file.  And, again, we would

16  not be offering this for the truth of the matter asserted, but

17  instead would seek to offer it in terms of the fact that it was

18  in a DPS employee's file and, you know, was among the things

19  that could have been considered by DPS in implementing SB14.

20        **MR. HEBERT:**  Could we take a look at that one?  We

21  haven't conferred on this one before.

22        **THE COURT:**  Yes.

23        **MS. WOLF:**  And unfortunately -- sorry, that's the

24  other one I don't have a copy of -- 1825, I apologize.

25        **(Pause)**

1          (Judge/Clerk confer)

2          **MR. HEBERT:**  This suffers from the same disability as

3   the previous exhibit in the sense that it appears to be a

4   summary written by someone unknown about lawful status and

5   driver's license identification card expiration.  There's no

6   indication, even if it was in somebody's file, that they either

7   read it or wrote it, and it's not authenticated for that reason

8   and is hearsay.  Giving -- my counsel want to add anything to

9   my objection?

10         **MR. FREEMAN:**  Well said.

11         **THE COURT:**  The Court's going to sustain the

12  objection.

13         **MS. WOLF:**  And moving on to the next exhibit, which

14  is Defendants' 1836, this also is a document from the DPS file.

15  And this one I do have a paper copy of so we can look at this

16  one together.  This is a listing from I believe the American

17  Association -- AAMDA, which is a motor vehicle association,

18  documenting various legal presence requirements in various

19  states.  Again, the Defendants would not be seeking to

20  introduce this exhibit for the truth of the matter asserted.

21  This would instead be used to the extent that it was in a DPS

22  employee's file and was considered during the implementation of

23  SB14.

24         **MR. ROSENBERG:**  So long as it's not for the truth of

25  the matter asserted, we're fine with that.

1          **THE COURT:**  All right, that's agreed to then.

2          **MS. WOLF:**  Thank you, your Honor.  Moving on to the

3     next exhibit, which is DEF-2271, this is a photo ID legislation

4     PowerPoint from what we understood to be Senator Taylor's file.

5     We have conferred with Plaintiffs this morning.  We have

6     represented to them that this again will not be offered for the

7     truth of the matter asserted but will just be offered in the

8     sense that it's part of the file.  And my understanding is that

9     Plaintiffs are amenable to its admission on that basis.

10          **MR. ROSENBERG:**  That's correct, your Honor.

11          **THE COURT:**  All right.

12          **MS. WOLF:**  The next group of exhibits, and I believe

13     the last group of exhibits we are asking your Honor to consider

14     this morning, is a series of documents, DEF-2279 through DEF-

15     2282, so that's four exhibits.  These are what we understand to

16     be memoranda of telephonic communications between the

17     Department of Justice with Representative Harless, Senator Troy

18     Fraser, Representative Larry Gonzales, and Representative Aaron

19     Pena.  And we would argue, your Honor, that these are relevant

20     in the sense that they are from the Section 5 file and are

21     contemporaneous recordings of conversations with these

22     particular legislators.  And on top of that, they are business

23     records which are contained in the government's files regarding

24     conversations that representatives of the United States

25     government had with these legislators regarding SB14 back in

```
 1    August and September, 2011.

 2              MR. FREEMAN:  And, your Honor, the United States

 3    doesn't contest that they are authentic.  However, they are

 4    double-hearsay because these are the notes of individual

 5    employees of the Department of Justice that were taken

 6    concerning conversations that they had during the preclearance

 7    process, and there is no ability to test or cross examine the

 8    accuracy of what the individuals were speaking to the

 9    Department of Justice employees were actually saying.  And to

10    the extent that they are now trying to put forward these as

11    truthful statements, they are certainly hearsay and should not

12    be admitted.

13              THE COURT:  Overruled.

14              MS. WOLF:  And, your Honor, with that, I believe that

15    that addresses each of the exhibits that we needed the Court to

16    rule on, so --

17              THE COURT:  Okay.

18              MS. WOLF:  -- thank you.

19              THE COURT:  Anything from the Plaintiffs then?

20              MR. ROSENBERG:  Your Honor, in light of what you've

21    heard, would this be an appropriate time for us to move into

22    evidence then everything that's not been objected to, and then

23    we will provide your Honor with a comprehensive list?  So on

24    behalf of Plaintiffs and Plaintiff Intervenors, we move into

25    evidence all of the exhibits that are not objected to or to
```

1    which objections are reserved, as per our agreement.

2            THE COURT:  Okay.  If there's no objection from the

3    defense, those will be admitted then.

4        **(Exhibits received)**

5            MR. SCOTT:  No objection, your Honor.

6            THE COURT:  They're admitted then.

7            MS. WOLF:  Thank you, your Honor.

8            THE COURT:  Okay, is that all?  We're ready to

9    proceed to opening?  Who's -- and you all have discussed with

10   Brandy about time?  She's going to be -- so we're ready to

11   proceed then.

12           MS. WESTFALL:  Thank you, your Honor.  Before we

13   begin, I would like to advise the Court that we will be running

14   collectively over 30 minutes, and we would ask that any time be

15   taken out of our 40 hours, if that is acceptable to the Court?

16           THE COURT:  That's fine.

17           MS. WESTFALL:  Good morning, and may it please the

18   Court, Elizabeth Westfall for the United States.  Before I

19   begin, I would like to recognize all of my counsel at the

20   Department of Justice and staff, whose heroic efforts have led

21   to preparation for this trial.

22           The Plaintiffs and Plaintiff Intervenors raise a

23   number of legal challenges to SB14, and I will address the

24   challenge brought by the United States and all other Plaintiffs

25   and Plaintiff Intervenors, that Senate Bill 14 violates Section

```
 1  2 of the Voting Rights Act because it has a discriminatory

 2  result and because it was enacted with a discriminatory

 3  purpose.  I will summarize the evidence the United States

 4  intends to introduce in support of our claim.  Counsel for the

 5  other Plaintiffs will then summarize their claims and their

 6  evidence.

 7            First, a brief overview of Senate Bill 14.  And could

 8  I have the ELMO on, please?  Senate Bill 14 requires Texans who

 9  vote in person to present one of a limited list of photo ID in

10  order to have their ballot counted.  Senate Bill 14 also

11  creates a new form of ID called an election identification

12  certificate, or EIC, that may only be used for voting.  Texas

13  trumpets the fact that the EIC is free, but to get an EIC, a

14  voter needs underlying documentation that is not free and,

15  indeed, can be quite expensive to obtain in terms of time and

16  out-of-pocket cost.  Moreover, the Department of Public Safety,

17  which is charged with issuing EICs, has done little to

18  publicize their availability or to make them available to those

19  Texas voters who need them.  And while SB14 allows voters

20  without ID to cast a provisional ballot, that opportunity is

21  virtually meaningless for any voter who does not have ID.  The

22  evidence will show that the State's implementation and

23  enforcement of Senate Bill 14 will deny Hispanic and African

24  American voters an equal opportunity to participate in the

25  political process.  First, expert testimony will demonstrate
```

1    that Hispanic and African American registered voters in Texas

2    are less likely than Anglo voters to possess a form of

3    qualifying Senate Bill 14 photo ID and that this difference is

4    statistically significant.  The analysis performed by

5    Dr. Stephen Ansolahehere, a Professor of Government at Harvard

6    University, will show that approximately 787,000 Texas

7    registered voters lack acceptable Senate Bill 14 ID.

8    Dr. Ansolahehere used four different widely-accepted

9    methodologies to reach his conclusion, and each confirmed the

10   same thing:  Hispanic and African American voters make up a

11   disproportionate share of the 787,000 Texas registered voters

12   who lack SB14 ID.  Indeed, African American voters are

13   approximately twice as likely as Anglo voters to lack SB14 ID,

14   and Hispanic voters are 25 to 50 percent more likely than Anglo

15   voters to lack SB14 ID.

16          Second, the evidence will show that the exceptions to

17   SB14's photo ID requirements are extremely narrow and do not

18   mitigate the racially disparate burdens imposed by the law.  As

19   of January, 2014, only 18 voters had successfully obtained a

20   disability exemption from SB14's photo ID requirements.

21   Although SB14's ID requirements do not apply to voters who vote

22   by mail, Texas limits the availability of voting by mail under

23   its Election Code.  Moreover, the evidence will show that

24   African American and Hispanic voters in Texas are less likely

25   than Anglo voters to cast their ballot by mail.  Lay witnesses

1   will testify that voting by mail does not provide the same

2   opportunity to participate in elections as an in-person ballot,

3   and that some minority voters, particularly African Americans,

4   prefer to vote in person.  Dr. Barry Burden, a political

5   scientists from the University of Wisconsin and an expert in

6   election administration, will explain that SB14 is much

7   stricter, both than Texas's prior voter ID bills and than voter

8   ID requirements in other states.  Indeed, the Texas legislature

9   that enacted and has maintained SB14 rejected numerous

10  ameliorative provisions contained in other states' voter ID

11  laws.  Dr. Burden will also explain why Texas's ID requirement

12  is far more draconian than any ID law needs to be in order to

13  serve legitimate state interests.

14          Third, with respect to those voters who do not

15  already have an ID, a group that is disproportionately African

16  American or Hispanic, the evidence will show that Hispanic and

17  African American voters are less likely than Anglo voters to

18  have the necessary underlying documentation, time,

19  transportation, or means to obtain an SB14 ID.  Several

20  Hispanic and African American voters will testify to the

21  obstacles they faced and the money they were forced to spend in

22  order to get an EIC, including difficulties in obtaining

23  required documents such as a Texas birth certificate.

24  Deposition testimony and documents from Texas State agencies

25  will show that the State has failed to effectively implement

1    either the EIC program or its program to issue reduced-cost

2    birth certificates.  So not surprisingly, as of May, 2014, the

3    month of the last statewide election in Texas, DPS had issued

4    only 266 EICs to the at least 787,000 registered voters who

5    lacked SB14 ID.  Dr. Jane Henrici of the Institute for Women's

6    Policy Research at George Washington University, a scholar who

7    has conducted extensive research among low income Texans, and

8    other experts, will testify about the special burdens that low

9    income voters face in general and minority low income voters in

10   particular in obtaining SB14 ID.  Dr. Gerald Webster, a

11   Professor of Geography at the University of Wyoming, will

12   explain his analysis of the travel burdens imposed on Hispanic

13   and African American voters who need to get an EIC.  He will

14   show that lack of access to a motor vehicle is a primary factor

15   underlying travel burdens, and that Hispanic and African

16   American voters disproportionately lack access to a motor

17   vehicle.  Finally, the United States will show that SB14

18   interacts with social and historical conditions in Texas to

19   cause an inequality in the opportunities enjoyed by Anglo and

20   minority voters to participate in the political process.

21   Dr. Ansolahehere and Dr. Burden will show that Hispanic and

22   African American voters participation rates lag behind the

23   Anglo rate.  Expert testimony from Dr. Chandler Davidson, a

24   sociologist from Rice University, and others will show that

25   Texas has a long history of official discrimination in voting

1    that has continued up to the present.  Dr. Burden and the other

2    experts will show that Hispanics and African Americans bear the

3    effects of discrimination in education, employment, housing,

4    and health, and that they continue to be underrepresented at

5    all levels of government.  They will explain how these

6    socioeconomic disparities interact with SB14 to result in

7    denying minority voters an equal opportunity to participate.

8    Elections throughout the State of Texas are characterized by

9    racially polarized voting.  While the racial polarization is

10   particularly relevant to the intent claim, to which I will turn

11   in one moment, it also helps to explain why majority

12   legislators were unresponsive to the problems SB14 caused

13   minority voters.

14          Finally, the United States will show the tenuousness

15   of the purported bases of Senate Bill 14.  In sum, the evidence

16   will demonstrate that the disparities caused by SB14 and the

17   State's failure to mitigate the burdens of obtaining state-

18   issued Senate Bill 14 ID will interact with the ongoing social,

19   electoral, and historical conditions in Texas, and result in

20   denying African American voters and Hispanic voters an equal

21   opportunity to participate in the political process.  The

22   evidence will also show that the enactment of Senate Bill 14

23   was motivated at least in part by a racially discriminatory

24   purpose.  Legislative testimony and documents concerning SB14

25   and predecessor voter ID legislation will show that these bills

1    became progressively more onerous over several legislative

2    sessions, notwithstanding acknowledgment that the failure to

3    permit a broader set of ID would exacerbate the burden on

4    minority voters.  This testimony will also establish that bill

5    supporters consistently rebuffed amendments that could have

6    alleviated the discriminatory effect of the bill, particularly

7    related to access to DPS driver license offices, with no harm

8    to the stated goals of Senate Bill 14.  The evidence will also

9    show a legislative process infected by numerous procedural

10   irregularities that are probative of an invidious purpose.

11   Given the evidence of racial polarization across Texas, it is

12   no defense to a claim of discriminatory purpose to say that the

13   harms inflicted by Senate Bill 14 are purely partisan.  At the

14   close of evidence, the United States will return and ask this

15   Court to enter a judgment concluding that SB14 violates Section

16   2 of the *Voting Rights Act* and permanently enjoining

17   implementation of this discriminatory law.  We will also ask

18   the Court, under Section 3(c) of the *Act*, to retain

19   jurisdiction and require Texas to obtain approval from either

20   this Court or the Attorney General for future changes in its

21   election laws.  Thank you, your Honor.

22              **MR. ROSENBERG:**  Good morning, your Honor.  Ezra

23   Rosenberg on behalf of Texas NAACP and MALC.  And I also

24   obviously would acknowledge my team and also the entire team of

25   Plaintiffs with whom I've had the honor of working, and to

1   acknowledge the Court for its expert handling and also its

2   staff, in particularly Ms. Cortez, for helping to herd these

3   cats.  I think for a lot of us, we think that summer is not

4   going to begin for another two weeks, and we really appreciate

5   the time and effort that the Court has taken to bring us to

6   this day.

7           I'm the first of the private Plaintiffs and Plaintiff

8   Intervenors who is going to address the Court.  Each of us is

9   going to focus on a different part of the case.  But

10  ultimately, together with the narrative that Ms. Westfall

11  delivered, we are going to be telling this Court a single

12  story, a story of a statute that need not have been enacted

13  because it was designed to address a problem that did not

14  exist; a story of a statute that should not have been enacted

15  because it was enacted at least in part with the purpose of

16  minimizing the opportunities for blacks and Hispanics to

17  participate in the political process.  We begin the discussion

18  of discriminatory intent with the narrative that Ms. Westfall

19  has just presented to the Court, the disproportionate impact in

20  terms of possession of SB14 IDs and the burden that blacks and

21  Hispanics have that whites do not have in terms of getting IDs;

22  because that in itself is reflective and evidential of

23  discriminatory intent.  But the story then continues with the

24  long, unfortunate history of discrimination in voting against

25  blacks and Hispanics in this state, a history that includes in

1    the 20th century all white early primary days, poll taxes,

2    tactics which experts like Dr. Barry Burden and Dr. Vernon

3    Burton will explain to this Court were justified as SB14 is

4    justified as ways of preventing fraud.  And tactics like this

5    have continued through the present day.  Since the 1970s, in

6    each decade, redistricting plans that were enacted by the Texas

7    legislature have been struck down as racially discriminatory.

8    Perhaps one of the most significant pieces of evidence your

9    Honor will hear in this trial will be that this very same

10   legislature that enacted SB14, enacted statewide redistricting

11   plans that were struck down by two different courts as racially

12   discriminatory in 2012.  But there will be more.  There may not

13   be a single smoking gun of discriminatory purpose, but we

14   submit that the proofs will show a veritable arsenal of heavy

15   artillery that are reflected in the legislative choices that

16   the Texas legislature made each and every time -- virtually

17   each and every time the legislature was confronted with a

18   decision relating to photo ID, whether or not it will impact

19   minorities more heavily than whites.  It shows the tact that

20   impacted minorities adversely more heavily than whites.  And we

21   can begin with the first question of, why a photo ID law at

22   all?  There's a lot of truth to the adage, "If it ain't broke,

23   don't fix it."  And there was nothing wrong with the voter ID

24   law that was in place in Texas prior to SB14.  Virtually every

25   witness that your Honor will hear in this trial, including the

```
1    State's witnesses, will testify unequivocally that SB14 was
2    designed to deal with only one sort of voter fraud, and that is
3    in-person voter impersonation.  And the proofs will be
4    overwhelming at court, your Honor, that in-person voter
5    impersonation is virtually nonexistent.  You will hear that
6    from Buck Wood, the election official as Mr. Dunn explained a
7    few moments ago.  He's been searching for voter fraud.  He's
8    never seen this.  You're going to hear from Dr. Lorraine
9    Minnite, who is a nationwide expert on voter fraud.  She's
10   hardly ever seen this after having studied voter fraud for
11   years and years.  And you will also hear this from the
12   testimony of Major Mitchell, the person who is charged by the
13   Texas Attorney General to sleuth out voter fraud.  And he's
14   identified perhaps two cases of voter fraud in the last 12
15   years out of tens of millions of votes that might have been
16   addressed by SB14.  Now, there is a sort of voter fraud that
17   the proofs will show is a concern in Texas, and that's absentee
18   ballots.  But the proofs will show that SB14 is not designed to
19   deal with the prime of absentee ballots.  In fact, it kind of
20   encourages it.  And, as Ms. Westfall just pointed out, absentee
21   ballots are a mechanism that are used more by whites than by
22   blacks or Hispanics.  So at the end of the proofs, your Honor
23   may very well be asking herself, why did the legislature choose
24   to deal with photo ID and not absentee ballots, and why did the
25   proponents of SB14 continuously press a nonexistent problem of
```

1    in-person voter fraud as the basis for SB14?   Something else

2    was going on.   Similarly, throughout the legislative process

3    that led to the enactment of SB14, the legislators who were

4    proponents of the bill looked to other states--Georgia and

5    Indiana--as models for their statute.   But Georgia and Indiana

6    included in their statutes significant groups of

7    identification, specifically federal and state identifications

8    and student identifications, that were not -- that the

9    legislature of Texas made a decision not to include in SB14.

10   And you will hear from Dr. Lichtman that those specific modes

11   of identification that were excluded from the Texas statute are

12   forms of identification that are more likely to be held by

13   blacks and Hispanics than by whites in Texas.   On the other

14   hand, Texas did decide to include in SB14 a form of

15   identification not included in other states:   that's the

16   license to carry.   And you will also hear from Dr. Lichtman

17   that that is a form of ID that whites are more likely to

18   possess in Texas than are blacks and Hispanics.   All of this

19   was done despite the fact that the legislature was on notice

20   time and time again by opponents of the bill, minority

21   legislators, that the decisions they were making would impact

22   more heavily and more adversely on blacks and Hispanics than on

23   whites.   And they heard this not only as the proofs will show

24   from the minority legislators, but from at least one highly

25   placed staff member.   They ignored those warnings.   They not

1    only ignored them, but they made the bill progressively worse,

2    more and more stringent, with each passing day.  And ultimately

3    the legislature steamrolled over the minority, deviating from

4    established procedures in the legislature, doing away with the

5    hallowed tradition of the two-thirds rule in the Senate,

6    referring the bills to special committees, and ultimately

7    concocting a legislative emergency which would allow the bill

8    to be offered, considered, and passed with unprecedented speed.

9    Something else was going on, your Honor, and we submit that at

10   the end of this case, the proofs will show that the something

11   else was a discriminatory intent to minimize the opportunities

12   of blacks and Hispanics in the political process.  Thank you.

13          **(Pause)**

14          **MS. CONLEY:**  Good morning, your Honor.  My name is

15   Danielle Conley and I, along with my colleagues, Kelly Dunbar,

16   Ryan Haygood, Natasha Korgaonkar, represent the Texas League of

17   Young Voters Education Fund, a nonprofit, nonpartisan voter

18   advocacy group based in Houston, and Imani Clark, a registered

19   black voter and student at Prairie View A and M University.  On

20   behalf of our clients we join the Department of Justice and our

21   fellow Plaintiffs and Intervenors in urging this Court to

22   strike down SB 14.

23          Your Honor, the evidence in this case will establish

24   overwhelmingly that SB 14's strict photo ID requirements impose

25   unjustified discriminatory burdens on the voting rights of

1    hundreds of thousands of registered Texas voters.  And the

2    evidence will show that SB 14 disproportionately and

3    substantially burdens the voting rights of African Americans,

4    and even worse hits hardest the most vulnerable members of that

5    population.  The law's unmistakable purpose and effect is

6    racial exclusion.

7             Every generation of Texans faces new civil rights

8    challenges, and SB 14 is emblematic of this generation's

9    struggle to secure equal and meaningful access to the ballot.

10            As several experts will testify, SB 14 effectively

11   disenfranchises over 100,000 registered black voters in the

12   State of Texas who, for a number of complex, historic, and

13   socioeconomic reasons do not possess any of these limited forms

14   of ID.

15            Now the State of Texas has argued that this burden is

16   minimal because voters can obtain a so-called "free election

17   identification certificate" or an EIC, but the expert testimony

18   of Dr. Coleman Bazelon, among others, will establish that EICs

19   are not, in any meaningful sense, free and, indeed, they are

20   quite expensive for many of the voters who actually need them.

21            The time and resources needed to secure an EIC impose

22   real concrete costs on all voters, but these costs fall the

23   hardest on black voters in Texas who, because of Texas's long

24   and enduring legacy of historical and ongoing racial

25   discrimination, are disproportionately poor.

1            Dr. Bazelon will testify that not only are African

2    Americans more likely to need to acquire an EIC to retain their

3    right to vote, but that also the travel cost portion of the

4    burden created by SB 14 alone requires African Americans to

5    expend a share of their wealth that is more than four times

6    higher than the share required for a white Texan.

7            And while the expert testimony in this case will

8    demonstrate the total aggregate impact of SB 14 on African

9    Americans, it's the testimony of the affected individuals that

10   will really illustrate the precise harm that SB 14

11   disproportionately imposes upon the voting rights of black

12   Texans.  It's the testimony of these individuals that will

13   demonstrate that the impact of SB 14 is in no way hypothetical.

14   It is palpable and the law is a tragic continuation of a

15   history of State sanctioned efforts to silence the voices of

16   people of color.

17           For example, today you will hear from Elizabeth

18   Gholar, a retired school cook who was borne by a midwife in

19   rural Louisiana in 1938.  Ms. Gholar, who has lived in the

20   South for most of her life, will testify about her experience

21   coming of age in a not too distant era where racial

22   discrimination was simply a part of her daily routine.  She

23   will testify about a time when black people struggled for

24   inclusion in America's democracy.  To Ms. Gholar that past is

25   now present, it's now front and center because SB 14 prevents

41

1    her from voting in person in Texas.

2         You will hear testimony that Ms. Gholar, who is

3    registered to vote in Texas, who wants to vote in Texas, went

4    to great lengths to try and acquire one of the IDs required by

5    SB 14 so that she could vote in person.  She went to the DPS on

6    two separate occasions and each time Texas refused to issue her

7    one.  Both times DPS cited a clerical error on her birth

8    certificate as the reason why.

9         Ms. Gholar will testify that voting in person is

10   precious to her, that it's a right that she's earned, and that

11   the effect of SB 14 is to deprive her of her political voice.

12   And Ms. Gholar's case is illustrative of the foreseeable and

13   inevitable effect that SB 14 has had and will continue to have

14   election after election on the voting rights of the most

15   vulnerable segments of the Texas population.

16        Unfortunately, SB 14's racial exclusion is nothing

17   new.  Texas has a long and sordid history of State-sanctioned

18   discrimination against African Americans and has previously

19   enacted laws with the purpose and the effect of excluding black

20   voters from the political process.

21        As the expert testimony of Dr. Vernon Burton will

22   show, discriminatory voting devices whose racial motivations

23   are beyond dispute, such as the poll tax and the re-

24   registration requirement, were all enacted against the

25   pretextual backdrop of preventing voter fraud.

1              In addition, while segregation, restrictive covenants

2    and other methods of official discrimination stretch back over

3    a century, the legacy of such discrimination persists today in

4    severe and enduring disparities for African Americans in

5    education, in health, employment, income and transportation.

6              You will hear expert testimony that African Americans

7    are less likely than white Texans to graduate from high school

8    or to own a car, and that they are more likely to be unemployed

9    and to live below the poverty line.  These disparities interact

10   with and amplify the burdens imposed by SB 14 denying the

11   ability of black voters to participate effectively in the

12   political process.

13             But African Americans living in Texas in these

14   socioeconomic conditions are not the only black Texans who face

15   formidable obstacles set in place by SB 14.  Even for African

16   Americans who have overcome certain educational hurdles such as

17   college students, the burdens of SB 14 are heavy.

18             You will hear from the Texas League of Young Voters

19   Fund in this case.  They are a grass roots advocacy group that

20   educates young voters of color in Texas about the electoral

21   process and encourages and empowers these young people to

22   become leaders in their community and to participate fully in

23   the political process.  Through their work, particularly at

24   historically black colleges and universities like Prairie View

25   A and M University, the League knows firsthand that SB 14

1    disenfranchises young black student voters in Texas who may not

2    have the means or the ability to obtain an SB 14 compliant ID.

3    These students do, of course, have student IDs, but a student

4    ID is one of the many forms of identification that Texas has

5    now inexplicably determined as insufficient to demonstrate who

6    you are at the polls, never mind the students have been voting

7    with student IDs in Texas for years without the slightest

8    evidence of a problem.

9         You will also hear testimony from Dr. Bazelon that

10   students at historically black colleges and universities are

11   disproportionately affected by SB 14 as compared to the

12   registered voter populations statewide.  One such college

13   student is Imani Clark, a student at Prairie View A and M whom

14   SB 14 has disenfranchised.

15        Imani Clark and other students of color who lack one

16   of the few forms of ID that Texas has determined is acceptable,

17   are now fighting the very same battles that their parents and

18   their grandparents fought.  Sure, the Texas law at issue here

19   looks a little different now.  Instead of a literacy

20   requirement or a required fee to register to vote, it's an

21   unduly restrictive ID requirement.  But SB 14 shares a kinship

22   with Texas's racially discriminatory laws of the past.  All of

23   these laws were intended to and do keep a population that is

24   already on society's margins from having a voice.  In 2014 we

25   should not still be here.

1          At bottom, your Honor, SB 14 imposes an intolerable

2     and a wholly unnecessary burden on the right to vote of

3     hundreds of thousands of registered voters, and SB 14 imposes

4     these burdens without any meaningful countervailing benefit.

5          The evidence will show that SB 14 response to a

6     phantom problem, in person voter fraud, despite any evidence --

7     excuse me, despite the absence of any reliable evidence that in

8     person voter fraud poses any threat to Texas elections, the

9     State is effectively disenfranchising hundreds of thousands of

10    voters who are disproportionately black supposedly in the

11    interest of preventing a problem that simply does not exist.

12    Such an egregious violation of the fundamental and personally

13    essentially right to vote countermands the 14th and 15th

14    Amendments of the United States Constitution, the Voting Rights

15    Act and common sense.  It should not be countenanced by this

16    Court.  Your Honor, SB 14 must be enjoined.  Thank you.

17          **MR. GARZA:**  Jose Garza on behalf of the Ortiz

18    Plaintiffs, and may it please the Court, over the last several

19    decades this State's Latino population has been growing at a

20    dramatic rate.  Just within the last decade from 2000 to 2010

21    the State had significant population growth of over 20 percent.

22    Latinos accounted for about 65 percent of that growth, and

23    together with other minority populations, over 90 percent of

24    the State's growth.  This growth pattern has been widely

25    discussed in Texas and anticipated in the Latino community.

1          In response to this growth the State's leadership had

2     a choice, embrace the new reality and this growth and the

3     aspirations of the Latino community and compete for its vote,

4     or it could limit the political weight of the Latino vote.   In

5     its adoption of SB 14 the State chose voter suppression.

6          In addition to the evidence that this Court will hear

7     from the experts and the evidence that's been described by my

8     colleagues, statistical evidence and the uneven impact of SB

9     14, the Plaintiffs will present numerous witnesses who have

10    been disenfranchised by SB 14.  Some of these witnesses will

11    tell of having paid poll taxes before they were abolished.

12         There will be testimony from witnesses who have

13    faithfully voted for decades, their parents having instilled in

14    them the importance of the exercise of the franchise.

15         There will be testimony from witnesses about their

16    distrust of voting by mail and their practice and preference

17    for voting in person.

18         There will be numerous witness who, to this day, do

19    not have the identification necessary to vote under SB 14.

20    Some of these don't have original or certified copies of their

21    birth certificates without which they cannot get the EIC.

22         Plaintiffs Margarito Lara and Maximina Lara, brother

23    and sister, will testify that their births were never

24    registered and, thus, there are no birth certificates for them.

25    They will testify to difficulties getting to distant DPS

46

1    offices and long waits there.

2              Others will tell of the difficulties they faced in

3    obtaining ID, making hard financial choices and long trips to

4    remote offices.  Many of these witnesses live below the poverty

5    line with no savings for emergencies.  They make hard choices

6    each month about what they will do without.

7              Would it be impossible for them to spend the money

8    necessary for them to get the ID?

9              Certainly for some the answer is no, but impossible

10   is not the standard.  They are poor people who have not have --

11   do not have extra money and who need to prioritize their

12   expenses.  The Court will see that these are regular, real

13   people.  They are not professional witnesses.  Some may not

14   have ever gone to school, many have a very minimal education,

15   yet they are proud and perhaps reluctant to admit just how

16   tight their budgets really are.  Who wants to admit that they

17   can't afford to spend on an ID what many of us spend at

18   Starbucks?

19             Who wants to admit that they can't get a ride

20   somewhere or that they want to have -- to save those rides for

21   when they really urgently need them?

22             Texas may try to impeach these witnesses with

23   testimony from their depositions about their ability or plans

24   to get SB 14 ID; yet most of these witnesses still today do not

25   have SB 14 ID.  The burden of SB 14 is too heavy for them to

1    have gotten a new ID.  They come to give testimony in this case

2    because they believe that their right to vote is important.

3    They may not understand the provisions of SB 14 or how to get

4    the limited forms of SB 14 ID.  They may get confused when

5    questioned about the documents that they have, even whether

6    they are for or against SB 14.

7            But, of course, this isn't truly what this case is

8    about.  As the Court listens to the testimony of those who

9    voted prior to the enactment of SB 14 and who, afterwards, are

10   unable to do so, the Court will see that these votes -- these

11   voters have been disenfranchised by SB 14.

12           **MR. RIOS:**  May it please the Court, Rolando Rios for

13   the Hispanic Judges and Commissioners.  And, again, I want to

14   acknowledge County Commissioner Roderick Galvan who is going to

15   be the new President of the Texas Association of Hispanic

16   Judges.

17           And I first point out to the Court that this is the

18   first type of lawsuit that the Association has participated in.

19   And they are concerned because they do have a unique position

20   in Texas, voter registration in Texas Government.  Before SB 14

21   County Government and the Commissioners supervised voter

22   registration and issued voter registration cards.

23           Now because of SB 14 that responsibility has to be

24   shared with the Department of Public Safety.  They also

25   supervise and conduct elections.  As such they have a front row

1   seat on how elections vote in -- work in Texas, and they have

2   seen no evidence of any in person voting fraud, none

3   whatsoever.

4          Their concern, your Honor, and this is why they are

5   here, is because SB 14 is having the intended effect, the

6   intended effect that the Bill was passed for.  It was intended

7   to suppress the Hispanic vote in violation of the Constitution

8   and the effect it's having is violating Section 2 of the

9   Federal Voting Rights Act.

10          As of today with the application of SB 14 we have

11   seen 90 percent of provisional ballots have never been cured;

12   in other words, 90 percent of some of the voters that came to

13   vote, provisionally that would have voted, and their vote would

14   have counted before SB 14, now those votes have been

15   eviscerated.

16          One comment on partisan politics.

17          I've been involved in registering against the State

18   of Texas for 25, 30 years and they always use the excuse, "Oh,

19   this is partisan.  When we draw the districts we want to

20   minimize the impact of the Democratic vote."  It doesn't

21   matter, it doesn't matter what the intent is if the effect is

22   to discriminate against minorities when it violates Section 2

23   of the Voting Rights Act.  Thank you, your Honor.

24          **MR. DUNN:**  May it please the Court, my name is Chad

25   Dunn, I'm here on behalf of the Veasey-LULAC Plaintiffs, and it

49

1    is both my duty and honor to present to this Court the last one

2    of the opening statements on behalf of the Plaintiffs.

3           I speak in terms of duty because as Americans and as

4    Texans it's something that we live by.  We talk about duty and

5    honor.  We talk about meaning what you say and saying what you

6    mean, and in this case it is my awesome responsibility, as well

7    as these men and women behind you -- behind me, to put on the

8    evidence that supports the claims in this case.  My friends

9    with the State, I have no doubt, will honorably and ably

10   present their position.

11          And, of course, I don't have to tell the Court about

12   duty, it deals with it every day.  It has the awesome

13   responsibility of looking at defendants accused of a crime and

14   determining their freedom.  It decides the economic future of

15   plaintiffs and defendants.  But in perhaps no other case

16   presented to this Court does it hold in the balance the future

17   and the rights of so many.

18          What Senate Bill 14 has done and what this State and

19   State Legislature have done, as it has done so many despicable

20   times before, is sack up the seeds of democracy, stack them in

21   a barn and put them away so that they don't see the light of

22   day.  At the end of this case we're going to ask the Court to

23   tear open that bag of seeds of democracy, tear open the

24   hundreds of thousands of voters and let them have a voice.

25          Now so much has been said about the racial

1    discrimination claims in this case, of course, my clients bring

2    those claims as well.  I'll try not to repeat much of what has

3    been said there.  Instead what I will focus on are two other

4    claims that have not received attention.

5            One we refer to as the "Crawford claim."  Of course,

6    it refers to *Crawford versus Marion County,* the US Supreme

7    Court case where Justice Stevens issued a limited opinion

8    finding that Indiana's photo ID law was constitutional.

9            And in that case the Supreme Court stated that the

10   test that this Court must weigh is whether the burden on the

11   right to vote is offset by a State interest that is

12   sufficiently weighty to justify that burden.

13           We start with determining what was the State interest

14   and, of course, the State takes the position that it was

15   attempting to resolve in person voter fraud, and we know, as

16   you've heard from others, there is no in person voter fraud in

17   the State of Texas.

18           You're going to hear from Mr. Wood, you're going to

19   hear from other experts, you're going to hear from Major

20   Mitchell with the State of Texas, the person responsible, as

21   Mr. Rosenberg said, for investigating this type of fraud.

22           So there isn't a sufficiently weighty State interest,

23   and though the State may come here in moments hence and tell

24   this Court that in *Crawford* the Supreme Court found that the

25   mere suspicion of voter fraud was sufficiently weighty.

1          The limited record in *Crawford* on Cross Motions for

2     Summary Judgment, a record that was lamented in its respects by

3     the Supreme Court and Courts in between, is going to be offset

4     by the tremendous record put forth in this Court about voter

5     fraud and its lack of existence.

6          So once we determine that there's not a sufficiently

7     weighty State interest we then turn to how many people are

8     affected?

9          And you've heard that Dr. Ansolahehere and Dr. Herron

10    will testify that approximately 800,000 registered voters lack

11    an SB 14 approved ID.  That's not the only evidence you'll

12    hear.

13         You'll also hear from Dr. Barreto and Sanchez who

14    performed an extensive survey on Texans and determined that

15    there were hundreds of thousands of people who reported to not

16    have an SB 14 approved ID.

17         Now the State will quibble with these numbers and it

18    might find an example here or there that show up wrong in the

19    survey or show up wrong in some other piece of evidence, but at

20    the end of the day it will be indisputable that more than half

21    a million Texans will lose the right to vote under Senate Bill

22    14.

23         And we'll likely hear from the State its lament about

24    its supposed bruised sovereignty as a result of these Federal

25    laws.  But it is important to note that over half a million

1   people is more than the voting age population in six States,

2   and the State sovereignty means very little when it excludes a

3   number of people that themselves would make up their own State

4   in this great Union.

5           They will also be here about other State laws and how

6   they had various requirements, and how they were fair and how

7   the Department of Justice approved them and how Courts approved

8   them, but what the State won't focus on is that in Indiana one

9   merely needs to sign an affidavit of indigency to vote, an

10  affidavit that was proposed as an amendment here and rejected.

11          In South Carolina one can register to vote and

12  they'll receive their photograph at the same time, again an

13  option Texas elected not to include.

14          In Georgia other documents other than a birth

15  certificate can be used to obtain a photo identification, again

16  an option Texas chose to ignore.

17          So what happens to these people who don't have an ID?

18          Well, you'll hear their stories as they've been

19  described here.  You'll hear about the trouble, the time, the

20  money spent.  But how do they get these IDs or what did the

21  State Legislature consider about what was necessary to obtain

22  an ID?  And what you'll hear is very little.

23          The Legislature punted these requirements to various

24  State agencies who, over time, have adopted one regulation

25  after another, some inconsistent with others, some

1    inconsistently enforced from one city and county to another.

2              You'll hear about the Department of Public Safety at

3    various times requiring fingerprints, potentially doing

4    criminal background checks on people who want to exercise the

5    right to vote, and whether these are true, whether these things

6    occur in every instance, the perception is there, the

7    perception that was designed to scare people away from

8    exercising their Constitutional rights.

9              We have DPS requirements and the Department of Health

10   and Human Services requirements.  They can't offset the

11   sufficiently weighty State interest, they're not even rational.

12             Finally, the birth certificate.

13             This State had an opportunity to provide birth

14   certificates for free, as other States have done in this

15   context.  They chose not to.  Instead, it reduced the rate for

16   a birth certificate to $3, but interestingly in order to obtain

17   a $3 birth certificate, one must show up at the office in

18   person; whereas the more expensive birth certificates that

19   others of us are fortunate enough to hold, can be obtained by

20   mail.  Again, no rational basis for the distinction other than

21   to further your cause of preventing the right to vote.

22             This Court can't just enjoin the Department of Public

23   Safety or the State at this point to fix this law because

24   there's no time for this election.  These issues have to be

25   enjoined and the State, if it wants to exercise its opportunity

1   to make adjustments to the law, must do so after the election.

2          Now the next point I'd like to discuss is the poll

3   tax.

4          The poll tax, of course, was a lamentable history

5   after *Smith v Allwright* when the United States Supreme Court

6   had to strike down Texas's efforts to exclude blacks from the

7   Democratic Primary, Texas came up with the idea that so many

8   other states in the South used, of charging people to vote,

9   testing them to see if they could read.

10         Texans would be all too lucky to go back to the poll

11  tax after Senate Bill 14 because paying a dollar and a half or

12  $3 to get the ballot, although disgusting and rightfully struck

13  down by the Supreme Court in the *Allen* case in 1966 is nothing

14  compared to the burden that these people now face in order to

15  obtain an EIC, a driver's license or some other

16  photographic ID.

17         The statute, again, on poll tax, says nothing about

18  the birth certificate cost, but we know that the Health and

19  Human Services regulations this Court will hear charged $3 so

20  at a minimum to vote in Texas one has to pay $3 to get a birth

21  certificate and for so many others who live in other States,

22  it's tremendously more.

23         Again, the State can't cure this in time for this

24  election, too much time has gone by, too much -- too little

25  effort has been put forth in getting IDs in the hands of people

1    who require them.

2          And, again, it's been stated that there are a number

3    of amendments that have been offered that were -- that would

4    have ameliorated the burdens on poor people and on Latinos and

5    blacks and, again, they were ignored.

6          And then we may hear the State say, "Look, most of

7    these people can vote by mail."

8          Now if we went out to the public and told them that

9    green people can vote until noon, and red people can vote until

10   4:00, and white people could vote until 7:00 p.m., there would

11   be no question that this Court and those above it would find

12   that distasteful, but more importantly unconstitutional.

13         That's essentially what the State has done to its

14   elderly.  They have essentially said if they cannot obtain IDs

15   then they can vote by mail, earlier than everyone else, through

16   a more complicated procedure than everyone else.

17         The last thing I would like to make a few comments

18   about the race claims, before I conclude.

19         This State has not passed a redistricting law in over

20   40 years that have survived Constitutional and Federal Court

21   muster, and as Mr. Rosenberg ably pointed out, the State has

22   recently passed a redistricting plan that has been challenged

23   and those challenges, at least, partially affirmed by six

24   different Federal judges.

25         In *LULAC v Perry*, the so-called re-redistricting

1   case, the US Supreme Court had to refashion Congressional

2   District 23 which heads out San Antonio to West Texas, because

3   it was intentionally discriminatory against Latinos and now, in

4   this most recent case, the State is back in Court having

5   dismantled CD 23 again.

6          Right here, where this Court and its staff lives,

7   Congressional District 27, whereas Nueces County used to anchor

8   its own congressional district that went to the south, several

9   hundred thousand people, most of them Latino, have been severed

10  from their traditional district and taken north to places like

11  Bastrop and Caldwell County where their votes and voices will

12  no longer be heard.

13         A lot has been said here in the media about Senate

14  Bill 14 being a solution without a problem, and that's true.

15  Unless one views the problem of the emerging majority in this

16  State beginning to exercise its Constitutional rights, if one

17  views that as a problem, Senate Bill 14 is one effective

18  solution.

19         So I'll return to where I started to talk about duty.

20  At the end of this case we're going to ask the Court to look at

21  the history, look at the facts here, look at the law, and

22  enjoin Senate Bill 14.

23         I'm honored to have as co-counsel two people who have

24  spent their lifetime fighting for voting rights, Mr. Hebert and

25  Mr. Derfner.  Mr. Derfner, of course, tried *Light versus*

1    *Register (phonetic)*, the 1970s era case that struck down Texas

2    Legislatures at large districts.  Mr. Hebert has worked has

3    worked for the voting section and has handled cases in Texas

4    and beyond for 40-plus years.

5             They talk about how history will look back on this

6    moment.  They talk about how history will look back at the

7    decisions that we make here as attorneys, as Courts, as staff,

8    and what we do at this important moment in this case.  And they

9    talk about how when this final chapter of history is written on

10   voting rights in Texas, how is it going to come out?

11            And in some ways the Court has a benefit because this

12   chapter has already begun.  We already know Justice Stevens has

13   walked back from what his opinion in *Crawford* has been read to

14   be said.

15            Judge Posner has walked back what he thought was

16   going on when he heard on the Seventh Circuit the Indiana case.

17            And we know instinctively that this law was designed

18   to prevent people to vote, we know instinctively it has nothing

19   to do with fraud.

20            So at the end of this case we're going to ask this

21   Court to tear open that bag of seed, to tear open those votes

22   because the law requires it, because of the facts requirement,

23   and more importantly, because the sacred social contract among

24   us as Americans, the (indiscernible) that we live with as a

25   country, as the Constitution require it.  Thank you, your

 1    Honor.

 2          **THE COURT:**  All right.  So that's all from the

 3    Plaintiffs, and who is going to open for the Defense?

 4          **MR. CLAY:**  May it please the Court, good morning,

 5    your Honor.

 6          **THE COURT:**  Good morning.

 7          **MR. CLAY:**  Now before I get started I was wondering

 8    if I could switch from the Elmo to the computer screen back

 9    there.  You all set, Brian?

10       (No audible response)

11          **MR. CLAY:**  Your Honor, my name is Reed Clay and I'm

12    representing the State of Texas and the various state agencies

13    that are defendants in this case.  Like my plaintiff counsel, I

14    would like to thank the hard work of our very valuable team and

15    assets that we have here.  They have worked endless hours to

16    bring us to this point and have represented the State of Texas

17    with great honor and great duty.

18          This case, your Honor, is about Texas commonsense

19    requirement that voters present a photo identification to prove

20    that they are who they say they are before they cast a ballot.

21    This requirement is one that Americans comply with every day to

22    -- in order to engage in many mundane activities such as

23    cashing a check, opening a bank account, boarding a plane, and

24    also to engage in activities which implicate important

25    constitutional rights like gun ownership and even gaining entry

1   and access into this very courtroom in which we stand today.

2          More importantly, this requirement is one that has

3   been precleared by the Department of Justice and upheld by the

4   Supreme Court of the United States and not surprisingly, your

5   Honor, given how commonsensical it is, a majority of Texas

6   voters have supported this bill for years.  This is a poll

7   conducted in February of 2011, the date is up there near the

8   top, by the Texas Tribune and the University of Texas and it

9   was -- as you can see it shows that 75 percent of registered

10  voters in Texas agree with the proposition that a voter should

11  present a photo ID before casting a ballot.  This poll, among

12  many others, show the same thing and this poll, among many

13  others, were possessed by the legislatures at the time that

14  they enacted this bill.

15         This bill shows something else important however.  It

16  shows that not only do a majority of Texas voters approve the

17  law but a majority of Texas minority voters approve the law.

18  That includes a majority of -- 80 percent of white voters, 63

19  percent of African American voters, and 68 percent of Latino

20  voters around the time that this bill was being considered in

21  the legislature supported the proposition that one should show

22  an ID before casting a ballot.

23         Although there are many claims in this case and it

24  would take me virtually all day to quibble with the various

25  arguments presented by my -- effectively presented by my co-

1    counsel here today there really are two types of evidence that

2    will be presented, your Honor.

3            The first is evidence that purports to show the

4    effects or lack thereof of SB 14 on Texas voters.  The second

5    is evidence regarding the purpose of the legislature in

6    enacting SB 14.  Most of the claims -- most of the plaintiff's

7    claims require that they show evidence of a substantial burden

8    on the right to vote.  The Section 2 claim requires that the

9    burden be so great that it denies or bridges the right to vote

10   on account of or because of race.  The 14th Amendment claim or

11   what I will call the *Crawford* claim requires the plaintiffs to

12   prove that the substantial burdens placed upon voters by SB 14

13   outweigh the legitimate interests that the legislature had in

14   enacting SB 14 that are recognized by the Supreme Court in

15   *Crawford versus Marion County.*

16           Speaking of *Crawford*, it wasn't until the very end

17   that the plaintiffs brought up *Crawford* and I suspect that's

18   because they don't like what they find there.  They find the

19   Supreme Court upholding a law that looks a lot like Texas' law

20   and the Supreme Court upholding a law that it is a decision

21   that the Texas legislature refers to when crafting the law that

22   was enacted by the legislature in 2011.  As such, I would like

23   to use *Crawford* as guidance because I believe it is instructed

24   both for the parties and for the Court and so I -- and I

25   believe it supplies the framework for analyzing most of the

1    plaintiffs' claims in this case.  So I'm going to flash up a

2    series of quotes here from the opinion and walk through the

3    various --

4        **(Pause)**

5        **MR. CLAY:**  For example, a voter may lose his photo

6    identification, may have his wallet stolen on the way to the

7    polls, or may not resemble the photo in the identification

8    because he recently grew a beard.  Burdens of that sort arising

9    from life's vagaries however are neither so serious, nor so

10   frequent, as to raise any question about the constitutionality

11   of Indiana's voter ID law.  The availability of the right to

12   cast a provisional ballot provides an adequate remedy for

13   problems of that character.  From this Court we understand that

14   burdens that arise from the vagaries of life are neither so

15   serious nor so frequent to raise any question about the

16   constitutionality of voter ID.  That's particularly true in the

17   availability to cast a provisional ballot as offered by the

18   state.  Texas, like Indiana, offers the ability to cast a

19   provisional ballot.

20       So what are the relevant burdens?  The burdens that

21   are relevant, the Supreme Court tells us, to the issue before

22   us are those imposed on persons who are eligible to vote but do

23   not possess a current photo identification that complies with

24   the requirements of Indiana's voter ID law.  The fact that most

25   voters already possess a valid driver's license or some other

1    form of acceptable identification would not save the statute

2    under our reasoning in *Harper* if the state required voters to

3    pay a tax or fee to obtain a new photo identification but just

4    as other states provide free voter registration cards the photo

5    identification cards issued by Indiana's DMV are also free.

6    Here, the Supreme Court tells us that the relevant burdens are

7    those imposed on registered voters who lack an acceptable form

8    of ID.  However, where a state provides a free ID, the burden

9    is not so great as to undermine the state's law.  At least, the

10   Supreme Court continues, with respect to most voters.  For most

11   voters who need them the inconvenience of making a trip to the

12   DMV, gathering the required documents, and posing for a

13   photograph surely does not qualify as a substantial burden on

14   the right to vote or even represent a significant increase over

15   the usual burdens of voting.  So several aspects of Texas' law

16   make this statement equally true for most Texas voters; you've

17   already heard about some of them.

18          First is the reduced price of the birth certificate.

19   It is true that the birth certificate is one of the forms of

20   identification that might be used to gain a free VIC.  Well,

21   Texas has reduced the price of a birth certificate for those

22   persons who need one for the sake of obtaining a VIC to two or

23   three dollars.  In Indiana, and *Crawford* discusses this, the

24   price of a birth certificate was thirteen dollars.

25          The state has also entered into MOUs or Memorandums

1   of Understanding with local county officials to ensure that

2   rural counties without a DPS office have a permanent VIC

3   issuing authority in that county.  In addition, the Department

4   of Public Safety and the Secretary of State have partnered

5   together to create what is called a mobile VIC program.

6   Essentially this is a mobile VIC issuing office that moves

7   around the state.  It has targeted areas with high

8   concentrations of -- areas that are believed to have high

9   concentrations of registered voters who lack requisite ID and

10  it has targeted rural areas without a permanent DPS office.

11  These measures show that for most voters without an ID, SB 14

12  does not prevent an increase over the usual burdens of voting.

13  In fact, they help ensure that voters without an ID can obtain

14  one with little trouble or expense.

15          The Supreme Court continues however to further refine

16  the relevant class of persons that we must look at in

17  determining whether SB 14 survives legal muster.  Both the

18  evidence in the record and facts of which we may take judicial

19  notice however indicate that a somewhat heavier burden may be

20  placed on a limited number of persons.  They include elderly

21  persons born out of state who may have difficulty obtaining a

22  birth certificate, persons who because of economic or other

23  personal limitations may find it difficult either to secure a

24  copy of their birth certificate or to assemble the other

25  required documentation to obtain a state issued identification,

1     homeless persons, and persons with a religious objection to

2     being photographed.  If we assume as the evidence -- I'm sorry,

3     it stops there.

4          What this -- this passage instructs the parties and

5     the Court because it tells us that setting aside their purpose

6     claim about the legislature's purpose in enacting SB 14 there

7     are other claims really about identifying registered voters who

8     lack an acceptable form of ID but whose particular

9     circumstances require that they bear a heavier burden to obtain

10    the free ID offer by Texas.  All this, despite the

11    (indiscernible) measures instituted by the state and indeed

12    this appears to be what the plaintiffs undertake to do but are

13    ultimately unsuccessful at doing.

14         Before examining the plaintiffs attempts let me point

15    out several features of Texas law that attempt to accommodate

16    the specific categories enumerated by the Supreme Court in

17    *Crawford.*

18         First is the free ID which we've already talked

19    about.  The second is the availability for elderly persons over

20    the age of 65 to cast their ballot without going to the polls,

21    without showing an ID, by casting a mail-in ballot.  The third

22    is disabled persons.  The Supreme Court recognizes that

23    disabled persons could find it difficult to get a free ID.

24    However, disabled persons can apply for and gain an exemption

25    that allows -- that exempts them from the photo ID requirements

1   in SB 14.  Finally, persons with a religious objection are also

2   not required to comply with Texas' voter ID -- photo ID

3   requirement.

4             So if I could and it would be impossible for me to

5   address the 18 or so different experts that the plaintiffs will

6   present to your Honor, I would like to try and boil down the

7   evidence and the steps that they take in order to try to prove

8   up that a certain subset of registered voters without an ID do

9   bear a heavier burden when it comes to obtaining the free ID.

10             The first step is one that your Honor is very

11  familiar with; that is, attempting to identify the registered

12  voters without ID.  This is the matching process that was

13  undertaken by the Department of Justice and Dr. Ansolahehere.

14  This is the keystone of their case.  This is the infamous no

15  match list.  This was the focus of the administrative

16  preclearance proceeding.  This was the focus of the DC core

17  litigation that ensued after the administrative preclearance

18  and indeed many of the plaintiffs that you will hear from --

19  many of the plaintiffs experts from who you will hear from

20  directly rely on Dr. Ansolahehere's matching efforts.

21  Plaintiffs offered this list and they described it in the terms

22  of hundreds of thousands as an accurate picture of the

23  registered voters who lack acceptable ID, but problems abound,

24  your Honor.

25             First, there's the reliability of the underlying data

1    itself.  Like Indiana, Texas suffers from bloated voter polls

2    and churn, an inevitable churn in its database.  Evidence will

3    show that there are an unknowable number of records that are

4    not valid that are contained within Texas' team database or its

5    registration roles.  There's an unknowable number of voters who

6    are dead, an unknowable number of voters who have moved, and an

7    unknowable number of voters who for other reasons are

8    ineligible to vote.  Just one quick vignette that is offered by

9    one of the plaintiffs' experts that will drive this point home.

10   She tells of a puppet that was registered to vote in a bar I

11   believe in Dallas County named Yippy (phonetic).  This puppet

12   remained on Texas' voter registration roles for four years

13   before it was removed and this is just to speak of the

14   reliability of Texas' team database.  The United States has

15   refused to share its databases so there's no way to know the

16   reliability of their data when they keep it hidden.  We do know

17   however that getting the team database to talk to the federal

18   database has proved difficult.  Evidence will show that nearly

19   9,000 team records could not be compared to a Veterans Affairs

20   database.  That means that these 9,000 -- there's no way -- no

21   way for us to know whether these 9,000 people have a Veterans

22   Affairs ID.

23          The second problem is that the no match list is not

24   actually a single list.  There are a number of interpretations

25   and manipulations of that list that exist even within

1   Dr. Ansolahehere's own report.  For instance, the overall list

2   that he provides contains numerous voters over the age of 65.

3   It contains voters who are eligible for a disability exemption

4   and it contains an unknown number of voters who are registered

5   but hardly ever, if ever, actually vote.  The propriety of

6   including these voters in any analysis is dubious.  For voters

7   who are over the age of 65 they can vote by mail.  For disabled

8   voters they can get an exemption from SB 14's photo ID

9   requirement, and for registered voters who are disinclined to

10  vote it would be dubious to conclude that a continued pattern

11  of not voting is attributable to SB 14 and not simply a

12  continued desire not to vote.

13          This brings us to step two in the process and this is

14  imputing or inferring race to the list of registered voters who

15  lack an acceptable form of ID.  Even assuming a valid list of

16  registered voters without acceptable ID could be created;

17  plaintiffs are next forced to guess as to the race of these

18  individuals.  They pursue primarily two different methods.

19          First, the Department of Justice hired catalysts --

20  again hired catalysts, a partisan consulting group that limits

21  its use of its product to progressive projects.  The evidence

22  will show that its proprietary data which the state has not

23  been allowed to examine is much more reliable in its prediction

24  that voters are white than in its prediction that voters are

25  either African American or Hispanic.  In fact, when predicting

1  that a voter is a racial minority catalyst isn't much better

2  than flipping a coin.  This evidence -- the evidence will show

3  that catalyst data may actually overstate the number of

4  minority voters on the no match list while understating the

5  number of white voters on the no match list.

6          Plaintiffs also employ something called ecological

7  regression.  In short, plaintiffs attempt to use estimates

8  regarding the racial and ethnic makeup of the citizen voting

9  age population in Texas to estimate the racial makeup of the no

10  match list.  Whereas catalysts (indiscernible) virtue was its

11  attempt to assign race and ethnicity at the individual level,

12  ecological regression can never tell you the race or ethnicity

13  of individual voters on the no match list.  To do so would

14  commit the ecological fallacy.  Basically, this means that you

15  cannot use group averages to infer particular characteristics

16  of individuals.  Let me provide an example.

17          Let's assume that 90 percent of lawyers who practice

18  law in Austin graduated from a Texas law school.  From that,

19  you could not infer that I graduated from a Texas law school

20  and in fact you'd be wrong to infer even that 90 percent of our

21  trial team graduated from a Texas law school.

22          Other problems with ecological egression in this case

23  is -- another major problem with the ecological egression

24  analysis provided in this case by numerous experts is that it

25  is essentially an estimate built upon an estimate.

1   Dr. Ansolahehere and others experts rely on what is called the

2   American Community Survey.  These are running estimates that

3   estimate aspects of the population in Texas over a five -- one,

4   three, or five year average.  These estimates contain their own

5   inaccuracies and errors with an error rate to go along with it.

6   Basing an estimate of the racial makeup on the no match list on

7   an estimate simply compounds the inaccuracies in this baseline

8   data.

9         In short, your Honor, for a number of reasons, not

10   the least of which is the apparently poor quality of the team

11   database, it is a difficult enterprise to examine the data for

12   correlations between race and photo identification ownership.

13   Even with good data on both sides and by that I mean an

14   accurate list of registered voters who lack an ID on the one

15   hand and a perfect grip of the current citizen voting age

16   population in Texas on the other hand, it would be a

17   considerable task to derive conclusive relationships on an

18   ecological basis.

19         Even if the plaintiffs could prove that certain

20   voters lack an acceptable ID and even if they could show that

21   these persons are disproportionally racial and ethnic

22   minorities *Crawford* says that there's still work to be done.

23   That's because *Crawford* makes clear that even for most of these

24   voters obtaining one of the three VIC offered -- identification

25   cards offered by the State of Texas does not even represent a

1    significant increase over the usual burdens of voting.

2           So under their Section Two claim, your Honor, they

3    must show that the necessity to get an ID interacts with the

4    remnants of past discrimination to such a degree that it denies

5    or bridges their right to vote.  Under their *Crawford* claim the

6    plaintiffs must show that the burden associated with obtaining

7    a free ID is so high for certain registered voters that it's

8    not justified by the state's legitimate interests in promoting

9    election integrity, preventing and deterring voter fraud and

10   not just in person voter fraud, and modernizing the election

11   systems in Texas.  All three of these interests that are all

12   over the legislative record in this case are interests that the

13   Supreme Court has deemed legitimate.

14          Plaintiffs attempt to do this in three general ways.

15   The first is estimating travel times and distances to various

16   DPS offices.  The second is estimating the economic costs

17   associated with getting to and from a DPS to get the free VIC,

18   and the third is estimating that minorities tend to be poor and

19   they tend to lack access to vehicles to a greater extent than

20   white voters but there are several problems with this approach.

21          First, as mentioned earlier, most rely on

22   Dr. Ansolahehere's no match list.  Thus, the usefulness of

23   these calculations are limited by the unreliability of

24   Dr. Ansolahehere's match list.  The unreliability will become

25   more evident later today.

1           When making the travel times and distances

2    calculations the experts made assumptions that bias the

3    results.  Just to name one, they calculate generalized travel

4    times.  So average travel times across -- from a single

5    arbitrary geographic point and at no time do they attempt to

6    actual -- to calculate actual travel times for the individual

7    voters that Dr. Ansolahehere has identified as lacking a

8    required ID.

9           In addition, estimates of poverty and vehicle access

10   are estimates based upon estimates and they do not show whether

11   or which voters on the no match list are poor and they do not

12   show whether or which voters on Dr. Ansolahehere's no match

13   list lack access to a vehicle.

14          So allow me to summarize.  Plaintiffs first attempt

15   to identify persons without ID and then use estimates to

16   estimate the race and ethnicity of these persons.

17          Second, plaintiffs attempt to make generalized

18   estimates regarding travel times and distances, not from the

19   individuals -- individual voters' homes who they have

20   identified but from the midpoint of the relevant census

21   geography unit.

22          Third, plaintiffs attempt to estimate at a general

23   level the economic costs opposed to the actual dollars and

24   costs -- dollars and cents spent per whites and African

25   Americans and Hispanics to obtain an ID.  As an aside, at least

1   one expert determines that the cost is actually greater for

2   white voters than it is for African Americans.

3            Lastly, plaintiffs attempt to estimate at a general

4   level the relative access of minority voters -- access to

5   vehicles of minority voters and white voters but nowhere in

6   this analysis did plaintiffs show, if ever, where these circles

7   overlap.  Per (differently) the plaintiffs never complete their

8   VIN diagram.  They never estimated the number of registered

9   voters who lack even an acceptable form of ID, and are racial

10  and ethnic minorities, and suffer the hardship of having to

11  travel long distances and times to the DPS.  They never

12  estimate the number of registered voters who lack acceptable

13  forms of ID, and are racial or an ethnic minority, and lack

14  access to a vehicle, and they never estimate or identify

15  registered voters who lack acceptable forms of ID, are racial

16  or an ethnic minority, or -- and are poor, and despite being

17  given Texas voter registration rolls and ID databases there's

18  no real face put on this stuff.  The very -- the analysis that

19  they do is done in various silos and it is never connected

20  together.

21            These generalized differences which build estimates,

22  upon estimates, upon estimates only serve to obscure the most

23  telling fact in this case and that is that plaintiffs after

24  years of searching and even literally shouting their requests

25  through a loud speaker are having immense difficulty producing

1   a single voter for whom SB 14 represents a heavy burden who

2   would have difficulty getting in the -- the free VIC.

3          Many of the voters you will hear from can vote by

4   mail or by applying for a disability exemption.  Others have or

5   could easily obtain the underlying documents to obtain the free

6   ID offered by the state.  This evidence sheds light -- sheds

7   the light of day on their statistical shell game and it

8   bolsters the academic literature that demonstrates that voter

9   ID laws appear to have a dampening -- appear to have no

10  dampening effect on voter turnout.  Moreover, they corroborate

11  the numerous news reports from the -- after the various

12  elections in which SB 14 has been implemented that show that SB

13  14 has been implemented without glitches and without trouble.

14         In short, your Honor, the plaintiffs' evidence

15  regarding the effects of SB 14 do not show that some voters are

16  heavily burdened by SB 14 and thus they cannot show that some

17  voters are heavily burdened on account of or because of their

18  race or ethnicity either.

19         Next comes the purpose evidence or lack thereof.  The

20  massive legislative record that has been compiled over

21  successive legislative sessions is clear -- is as clear as it

22  is consistent.

23         Texas' voter ID law was enacted to improve the

24  integrity of Texas' election process, to prevent and deter

25  voter fraud including in person voter fraud and other types of

1    fraud, and act as a backstop for the state's willfully

2    inaccurate and bloated voter rolls.  Each of these purposes was

3    recognized in *Crawford* as a legitimate purpose that justified

4    the minor burden it posed for the vast majority of voters but

5    the evidence will demonstrate yet another explanation for the

6    enactment of SB 14 and again I would return to the poll that I

7    showed your Honor earlier this morning.

8            Texas voters overwhelmingly supported the enactment

9    of voter ID and the testimony will show that the legislature

10   was aware of this fact and was responding to it.

11           Despite the massive legislative record that spans

12   several legislative sessions, plaintiffs have gone fishing in

13   the privileged files of the legislators who supported voter ID.

14   Plaintiffs have taken an untold number of hours of deposition

15   testimony from legislators and their staff and have received

16   thousands of documents that are privileged.  In asking for this

17   unprecedented level of discovery the plaintiffs assured this

18   Court that such discovery was vital and very, very important to

19   proving that the law was passed with a discriminatory intent.

20           This week, your Honor, the plaintiffs return to this

21   courtroom with empty nets.  The vital evidence uncovered by the

22   plaintiffs' month long fishing expedition confirms rather than

23   contradicts the legislative record.  This evidence includes

24   communications with constituents that do not mention a racially

25   discriminatory purpose, talking points that confirm the

1    purposes explained in the legislative record, and the most

2    farfetched of this evidence does not originate from the

3    legislators, does not mention voter ID, or does neither.  In

4    fact, in these documents race is not even evident on the face

5    of the documents.  Rather, race is found only if one is intent

6    on finding it there in the first place.

7              Once the door was opened evidence gathered from the

8    opponents of SB 14 tell a story not of races run amuck at the

9    state house but of partisan politics that typify nearly all

10   public policy disagreements.  The state uncovered evidence of

11   the contested -- of the concerted coordinated effort by

12   opponents of SB 14 to not only defeat voter ID in the

13   legislature but also lay the foundation for this very lawsuit.

14   These documents which are still sealed by this Court provide a

15   simple, nonracial explanation for the legislative procedures

16   used to pass voter ID and the many individual decisions made by

17   the lawmakers that supported it.

18             **THE COURT:**  All right.  Why don't we take about a 15

19   minute break and then we'll get started with the evidence?  I

20   will probably be standing a lot.  It's just there's long days.

21   So don't mind me when I do.

22             **THE CLERK:**  All rise.

23        **(Hearing concluded at 9:43 a.m.)**

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          September 2, 2014_


TONI HUDSON, TRANSCRIBER