UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Tuesday, September 2, 2014 |
| | ) | (9:58 a.m. to 12:10 p.m.) |
| Defendants. | ) | (1:09 p.m. to  6:15 p.m.) |


BENCH TRIAL - DAY 1

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:            See Next Page

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Adrian Perez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                     CHAD W. DUNN, ESQ.
                                KEMBEL SCOTT BRAZIL, ESQ.
                                Brazil and Dunn
                                4201 Cypress Creek Parkway, Suite 530
                                Houston, TX 77068

                                ARMAND DERFNER, ESQ.
                                P.O. Box 600
                                Charleston, SC 29402

                                J. GERALD HEBERT, ESQ.
                                Attorney at Law
                                191 Somervelle Street #405
                                Alexandria, VA 22304

                                NEIL G. BARON, ESQ.
                                914 FM 517 Rd. W, Suite 242
                                Dickinson, TX 77539

                                LUIS ROBERTO VERA, JR., ESQ.
                                111 Soledad, Suite 1325
                                San Antonio, TX 78205

                                EMMA P. SIMSON, ESQ.
                                Campaign Legal Center
                                215 E. Street NE
                                Washington, DC 20002

Mexican American               EZRA D. ROSENBERG, ESQ.
Legislative Caucus,            Dechert, LLP
et al.:                        902 Carnegie Center, Suite 500
                                Princeton, NJ 08540-6531

                                MARK A. POSNER, ESQ.
                                AMY L. RUDD, ESQ.
                                LINDSEY COHAN, ESQ.
                                JENNIFER CLARK, ESQ.
                                Lawyers' Committee for Civil Rights
                                1401 New York Ave. NW, Suite 400
                                Washington, DC 20005

**APPEARANCES FOR:**          (CONTINUED)


United States              RICHARD DELLHEIM, ESQ.
of America:                ELIZABETH S. WESTFALL, ESQ.
                           ANNA BALDWIN, ESQ.
                           PAMELA CARLIN, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Ave. NW
                           Washington, DC 20530

                           BRUCE I. GEAR, ESQ.
                           Department of Justice
                           1800 G Street NW
                           Washington, DC 20006

Ortiz Plaintiffs,          JOSE GARZA, ESQ.
et al.:                    7414 Robin Rest Dr.
                           San Antonio, TX 78209

                           ROBERT W. DOGGETT, ESQ.
                           Texas Rio Grande Legal Aid, Inc.
                           4920 North IH 35
                           Austin, TX 78751

                           MARINDA VAN DALEN, ESQ.
                           Texas RioGrande Legal Aid, Inc.
                           531 E. St. Francis
                           Brownsville, TX 78520

Texas League of Young      RYAN HAYGOOD, ESQ.
Voters Education Fund:      NATASHA KORGAONKAR, ESQ.
                           NAACP Legal Def. and Educational Fund
                           40 Rector St., 5th Floor
                           New York, NY 10006

Also present:              Imani Clark

                           DANIELLE CONLEY, ESQ.
                           KELLY DUNBAR, ESQ.
                           Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Avenue, NW
                           Washington, DC 20006

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


Texas Association of          ROLANDO L. RIOS, ESQ.
Hispanic County Judges       115 E. Travis
and County                   Suite 1654
Commissioners:               San Antonio, TX 78205

Also present:                ROGER GALVAN, County Commission
                             Calhoun County

State of Texas:              JOHN BARRET SCOTT, ESQ.
                             Scott, Yung, L.L.P.
                             208 N. Market Street
                             Suite 200
                             Dallas, TX 75202

                             JOHN REED CLAY, JR., ESQ.
                             LINDSEY E. WOLF, ESQ.
                             JENNIFER ROSCETTI, ESQ.
                             G. DAVID WHITLEY, ESQ.
                             STEPHEN L. TATUM, JR., ESQ.
                             STEPHEN R. KEISTER, ESQ.
                             Office of the Attorney General
                             P.O. Box 12548
                             MC001
                             Austin, TX 78711

                             ARTHUR D'ANDREA, ESQ.
                             Office of the Attorney General
                             209 W. 14th Street, 7th Floor
                             Austin, TX 78701

                             BEN A. DONNELL, ESQ.
                             Donnell Abernethy Kieschnick
                             555 N. Carancahua, Suite 400
                             Corpus Christi, TX 78401

                             WHITNEY DEASON, ESQ.

<u>INDEX</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| SAMMI BATES | | | | |
| (EXCERPTS OF VIDEO DEPO) | 7 | 7 | | |
| CALVIN CARRIER | 8 | 35 | 74 | 74 |
| FLOYD CARRIER | 75 | 81 | | |
| TREY FISCHER | 92 | 114 | | |
| STEPHEN ANSOLABEHERE | 126 | 180 | 222 | 229 |
| MARC VEASEY | 231 | 255 | | |
| ELIZABETH GHOLAR | | | | |
| (EXCERPTS OF VIDEO DEPO) | 264 | | | |
| LINDA LYDIA | | | | |
| (EXCERPTS OF DEPOSITION) | 267 | 273 | | |
| MARTIN ANTHONY GOLANDO | 275 | 290 | | |
| (EXCERPTS OF DEPOSITION) | | | | |

1    <u>**Corpus Christi, Texas; Tuesday, September 2, 2014; 9:58 a.m.**</u>

2                         <u>**(Call to Order)**</u>

3              **THE COURT:**  Are you ready?

4              **MR. DUNN:**  Your Honor, one housekeeping.

5              **THE COURT:**  Okay.

6              **MS. WOLF:**  Your Honor, I realize I forgot to move the

7    Defendants' exhibits into evidence so I'd like to do that.

8              **THE COURT:**  Okay.  No objection?

9              **MR. SPEAKER:**  No objection.

10             **THE COURT:**  As discussed, those are admitted then.

11        **(Defendants' exhibits were received in evidence)**

12             And we're ready then for the Plaintiff to start their

13   evidence.

14             **MS. RUDD:**  Good morning, your Honor.

15             **THE COURT:**  Good morning.

16             **MS. RUDD:**  I'm Amy Rudd representing the Texas NAACP

17   and MALC.  And on behalf of Plaintiffs and Plaintiffs-

18   Intervenors I'd like to present our first witness, Sammi Luis

19   Bates, who will be testifying by video deposition.  I have for

20   the Court, if I may approach, a copy of the excerpt that you'll

21   be seeing on the screen.

22             **THE COURT:**  Okay.

23             **MS. RUDD:**  And the video cuts have been admitted into

24   evidence as Exhibit PL1090.

25   //

Bates - By Excerpts of Video Deposition                    7

1        **(Portion of transcript from 9:59:38 to 10:14:40 a.m. was**

2    **omitted / Plaintiffs' excerpts from video deposition of Sammi**

3    **Bates)**

4             **MS. RUDD:**  And that concludes Ms. Bates' testimony

5    from the Plaintiffs.  I just want to mention also, your Honor,

6    at the close of evidence we intend to give the Court full

7    deposition designations from all the witnesses we're

8    presenting.  There are no objections to those, and you'll be

9    getting a set of those at the end of the case.

10            **THE COURT:**  Okay.

11            **MS. RUDD:**  Thank you.

12            **MS. ROSCETTI:**  Good morning, your Honor.  Jennifer

13   Roscetti with the Defendants.  And we're going to proffer our

14   cuts of Ms. Bates' testimony, and I have a courtesy copy of the

15   page and line.

16       **(Portion of transcript from 10:15:29 to 10:29:58 a.m. was**

17   **omitted / Defendants' excerpts from video deposition of Sammi**

18   **Bates)**

19            **MS. ROSCETTI:**  Your Honor, that concludes the

20   Defendants'.  And we will also be proffering the depo cuts, the

21   entirety, at the conclusion of trial.  Thank you.

22            **THE COURT:**  Okay.

23            **MR. DUNN:**  Chad Dunn again on behalf of the Veasey

24   LULAC Plaintiffs.  We now call Calvin Carrier.

25       **(Pause / Voices heard off the record)**

Calvin Carrier - Direct / By Mr. Dunn                    8

1          **THE COURT:**  Good morning, sir.  If you'll approach

2   over here and raise your right hand, the Clerk will swear you

3   in.

4          **CALVIN CARRIER, PLAINTIFFS' WITNESS, SWORN**

5          **THE CLERK:**  Please be seated.

6          **MR. DUNN:**  All right, Mr. Carrier.  Are you settled?

7          **THE WITNESS:**  Yes.

8                   **DIRECT EXAMINATION**

9   **BY MR. DUNN:**

10  Q    Please tell us your name.

11  A    Calvin Gerard Carrier.

12  Q    Mr. Carrier, my name is Chad Dunn.  I'm going to ask you

13  some questions today.  I suspect the lawyer for the State will

14  ask some questions and her Honor, the Judge, may interrupt and

15  ask some questions.

16          You understand it's important for you to tell us the

17  truth today; is that right?

18  A    Yes.  Yes, I do.

19  Q    For our written record could you identify your race?

20  A    Black.

21  Q    Okay.  And your age?

22  A    Fifty-one in two weeks.

23  Q    Okay.

24  A    So I'm 50.

25  Q    Give us the benefit of your background where you grew up,

1   went to high school, that sort of thing.

2   A     I grew up in a small rural community called China, Texas,

3   population about 1,080 people.  Went to kindergarten all the

4   way up through high school in that general area.  Graduated

5   from Lamar University in Beaumont, bachelor's degree, bachelor

6   of science in biology, a minor in chemistry.  And right now I'm

7   current Deputy Fire Chief, City of Beaumont.

8   Q     And what is involved with being Deputy Fire Chief?

9   A     Currently I directly supervise 70 personnel, scheduling

10  vacation, payroll, general fire scene command.  I run the

11  gamut.

12  Q     And you were born and raised in Jefferson County; is that

13  right?

14  A     Yes.  Born and raised in Jefferson County.

15  Q     And where do you live now?

16  A     Currently I reside in Harris, County, Houston, Texas.

17  Q     So in being a fireman in Beaumont living in Houston I

18  assume you commute?

19  A     Yes, I do every third day.

20  Q     And what type of shifts do you work?

21  A     Twenty-four on, forty-eight off.

22  Q     Who is your father?

23  A     Floyd James Carrier.

24  Q     And how old is he?

25  A     He was born January 13, 1931, so that would make him 83.

1   Q    Of course, he's going to have some time before the Court

2   today.   But is your father the gentleman in the wheelchair here

3   in the courtroom gallery?

4   A    Yes, he is.

5   Q    Okay.   Where does your father live?

6   A    He still resides in China, Texas.

7   Q    And that's Jefferson County?

8   A    Yes, Jefferson County.

9   Q    Now, at some point you got involved in assisting your

10  father to obtain an I.D.; is that right?

11  A    That's correct.

12  Q    And before we get into the events of your efforts I'd like

13  to know what identifications does your father possess to have a

14  photograph on, if any?

15  A    He has a state of Texas issued driver's license from the

16  Texas Department of Public Safety.

17  Q    Okay.   Anything else?

18  A    He has a Veterans Administration I.D. card.

19  Q    Do you have these with you?

20  A    Yes, I do.

21  Q    Would you remove them and hand them up to your Honor -- or

22  her Honor?

23          **MR. DUNN:**   And for the record the State has this --

24  they're in the record as Defendants' Exhibit 224 and 221.   I

25  won't publish those since they have personal information in

1    them.

2    Q    Now, with respect to -- and just to make sure this is

3    clear in the record, are there any other identification that

4    your father has that has a photo or purports to have a photo on

5    it?

6    A    Not that I know of.

7    Q    Okay.  And what he does have is a driver's license that

8    expired and a veteran's I.D. that has the remnants of a

9    photograph on it; is that right?

10   A    Correct.

11   Q    On the veteran's I.D. that has the remnants of a

12   photograph are you able to make out whether it's your father or

13   not?

14   A    Right now, no.

15   Q    And are you able to make out whether it's a man or a woman

16   in the photo?

17   A    Not by the photo.

18   Q    Is it your understanding your father has had this

19   veteran's I.D. for many, many, many years?

20   A    As long as I can remember.

21   Q    Okay.  Now, at some point you went about assisting your

22   father in obtaining an I.D., as you've stated.  Do you remember

23   about when that was?

24   A    February of 2013.  My mother died the end of January, so

25   in the process of getting all my father's affairs in order we

Calvin Carrier - Direct / By Mr. Dunn                    12

1   discovered that his driver's license was expired.

2   Q    And what was it about your mother passing on that affected

3   how Floyd needed an I.D.?

4   A    At the time she was handling all the finances because my

5   father has a stroke and was disabled and he can't get around

6   good.  So my mom would drive and take care of all the business

7   for him.

8   Q    What sort of challenges, if any, does Mr. Carrier, your

9   father, face in terms of dealing with the bank and other

10  institutions without an I.D.?

11  A    Currently he has no access to his personal finances.  I do

12  all of his banking electronically through my bank account, and

13  I transfer money back and forth.  He cannot access his own

14  money because he does not have a valid Texas I.D.

15  Q    When you set out to obtain an I.D. were you or your father

16  also concerned about his ability to vote?

17  A    At that particular time, no.  We were concerned about

18  getting all his affairs in order.

19  Q    Did you come to learn later that state requirements had

20  been instituted that would require a photo identification to

21  vote?

22  A    Yes, I was aware through the media.

23  Q    When that -- when you gained that information did

24  obtaining an I.D. in order to have the right to vote become the

25  primary motivation in getting this identification?

**EXCEPTIONAL REPORTING SERVICES, INC**

Calvin Carrier - Direct / By Mr. Dunn                    13

1   A     It was the top two.

2   Q     Okay.  Now, just a little bit about your father.  Is he

3   somebody who votes habitually?

4   A     As far as I know he has voted throughout my lifetime.

5   Q     And what did he do for a living?  Give us sort of his

6   short biography.

7   A     My father was a carpenter and a cement finisher.  He would

8   remodel homes, build homes, pour concrete slabs.

9   Q     Did he also serve in the U.S. Armed Forces?

10  A     Yes.  He's a veteran of the Korean War.

11  Q     In what branch?

12  A     Army.  He was a paratrooper.

13  Q     So turning to your first efforts in February 2013 to

14  obtain an I.D. what -- did you participate along with your

15  father in all these steps to receive his I.D.?

16  A     Yes.

17  Q     What did you do first?

18  A     Our first step was going to the local DPS office in

19  Beaumont, Texas to see if we would get him a Texas I.D. card.

20  Not a driver's license because he can't drive.

21  Q     Okay.  And does he own a vehicle?

22  A     Yes.  The vehicle that he and my mother co-owned.

23  Q     Is he having a hard time letting that go along with

24  letting her go?

25  A     Letting her go, yes.  We keep the vehicle so that if he

1  has to ask a neighbor or someone in the neighborhood for a

2  ride, he already has a vehicle they can use.

3  Q    All right.  So you asked for a state I.D. card, not an

4  election identification certificate; is that right?

5  A    Correct.  I didn't know what an election identification

6  certificate was.

7  Q    Okay.  And we'll come back to that.

8         When you approached DPS with your father to obtain a

9  DPS I.D. what happened?

10 A    I brought my father to the local DPS office in person.  I

11 wheeled him -- we waited in line, I wheeled him up to the

12 window and told the lady what we were trying to do, we were

13 trying to obtain a Texas issued I.D. card.  She asked for --

14 she asked if we had his driver's license.  I presented the

15 driver's license.  She looked at it and said, "It's over three

16 years expired; do you have a birth certificate?"

17        I said, "No, my father was born in a rural area and

18 we don't have a birth certificate.  But we have a state issued

19 driver's license that your office issued.  Why isn't that good

20 enough?"

21 Q    And what was the response?

22 A    Do you have a birth certificate?

23 Q    Was there any discussion about the veteran's

24 identification?

25 A    No.

1  Q    Did the clerk there at DPS advise you of any other

2  potential identifications that might be affected?

3  A    No.  She told me that the birth certificate or a passport

4  was the primary form of identification.  And she mentioned some

5  other secondary forms of I.D., but at that time she did not say

6  that an expired driver's license was a secondary form of I.D.

7  Q    Now, did your father at that point have a birth

8  certificate?

9  A    At that time, no.

10 Q    And what was the issue, if any, in obtaining a birth

11 certificate for your father?

12 A    My father was born in a rural area where Liberty, Hardin

13 and Jefferson County meet up.  So we were unsure the exact

14 location of his birth.

15 Q    Was he born at home?

16 A    Yes.

17 Q    As far as you know?

18 A    With a midwife.

19 Q    So after you left the DPS office what's the next thing you

20 did to attempt to obtain an I.D.?

21 A    My next step was I personally drove to the Jefferson

22 County courthouse and did a search.  There was nothing found.

23 Q    Did a search for what?

24 A    His birth certificate.  I gave them his name and date of

25 birth.

Calvin Carrier - Direct / By Mr. Dunn                    16

1   Q    Was there any cost associated with the search?

2   A    Other than gas, no.

3   Q    What next did you do?

4   A    My next step was driving to the Liberty County courthouse

5   in Liberty, Texas and I did the same thing.  We did the search

6   and the search for the delayed filing.  Nothing was found.

7   Q    Again, any cost associated with your efforts at Liberty

8   County?

9   A    Other than gas and time, no.

10  Q    What next did you do?

11  A    Next I got smart and called the Chambers County courthouse

12  in Anahuac and they couldn't find anything.

13  Q    Then what?

14  A    Someone at the Chambers County courthouse advised me to

15  contact the Texas Department of State Health Services, their

16  Vital Statistics Unit and get them to do the search.  So I

17  looked up the number and got all of the applications for the

18  birth certificate.

19  Q    And did you call the state number?

20  A    Yes.

21  Q    What happened then?

22  A    They directed me to the website where I could download the

23  application for the birth certificate.  We filled out all the

24  information that we knew and we sent it in.

25  Q    What did you have to send in with the application or what

Calvin Carrier - Direct / By Mr. Dunn                17

1  did you send in that first go round?

2  A    I think it's $24.

3  Q    Anything else other than $24 that you included with the

4  application?

5  A    With the application we also had to get it notarized.

6  Q    Where did you do that?

7  A    In China, Texas.

8  Q    Was there a cost associated with that?

9  A    Ten or twelve dollars.  I'm not sure.

10 Q    When you sent the application in did you at some point

11 hear back?

12 A    I didn't hear back from anyone until we received -- the

13 application was returned to us with the original documentation

14 and a letter advising us of what areas of the application that

15 needed correcting.

16 Q    Before we get to the correction, how long was it

17 approximately from when you mailed in the application to when

18 you got the rejection letter back?

19 A    I can't give you exact, but it was 12 to 16 weeks, I

20 think.

21 Q    When you received the application with information about

22 its defects, what were you told needed to be corrected?

23 A    The agent handling the case, Linda Cisneros, she sent a

24 letter saying that by correcting my father's last name it would

25 make it spell different than his father's last name and that

Calvin Carrier - Direct / By Mr. Dunn                    18

1   they needed to match in order for it to be approved.  I

2   called -- after reading the letter I called her and asked her

3   did I miss that on the application or what -- you know, I

4   wasn't trying to be smart.  I was just trying to make sure that

5   I was covering all the bases.  And she informed me that

6   everyone knows that.  And I replied, "Everyone in your office

7   may know it but it's nowhere on your website or on the

8   application."

9   Q    What is it that was told -- that you were told everyone

10  knows?

11  A    That the father's -- the spelling of the father's last

12  name and the spelling of the child, which would be my father's,

13  last name has to match in order for that amendment to the birth

14  certificate to be granted.

15  Q    And so just to make our record clear, I'm going to call

16  grand dad and dad, all right?

17  A    Okay.

18  Q    Does that make sense to you?

19  A    Okay.

20  Q    How is it that government records show grand dad's last

21  name spelled?

22  A    C-a-r -- wait.  When you say "government records," are you

23  talking about that particular birth certificate?

24  Q    Yes, sir.

25  A    That certificate showed C-a-r-r-y-e-r.

Calvin Carrier - Direct / By Mr. Dunn                    19

1   Q    And how is it that your dad spells his last name?

2   A    C-a-r-r-i-e-r.

3   Q    And how is it you spell your name?

4   A    C-a-r-r-i-e-r.

5   Q    Now, your father has an accent; does he not?

6   A    Yes.

7   Q    How would you describe it?

8   A    Cajun.

9   Q    Okay.  And so when he says his name can you see how some

10  people might hear it as a Y instead of an I?

11  A    Yes.

12  Q    So why not -- just to get past all this issue, why not

13  just tell the government we'll live with the Y instead of the

14  I?

15  A    Because the Y does -- because first of all, he spells his

16  name C-a-r-r-i-e-r.  Second, it does not match any other

17  documentation he has, including his DD214.

18  Q    We'll get back to the DD214 in a moment.

19           But were there any other defects shown on that

20  initial rejection other than the name match issue?

21  A    The -- okay, can you repeat that?

22  Q    Sure.  As best as you can recall, were there other issues

23  raised other than the name match issue with that first letter

24  you got?

25  A    The race of his father was wrong, was incorrect.

1  Q    What had it shown for the race, the government record?

2  A    At that time it said "negro."

3  Q    And what was your understanding of his father's race?

4  A    White.

5  Q    What was your father's mother's race?

6  A    Negro.

7  Q    All right.  So what did you do to set about fixing the

8  application issues, if anything?

9  A    At that time I called her back, asked her, "Ms. Cisneros,

10 what did I need to send in?"  And well, I skipped a step.  I'm

11 sorry.

12 Q    That's fine.  What step did you skip?

13 A    We sent in the application for the birth certificate.

14 They sent the birth certificate back and it had misspellings.

15 And then when we sent to get it corrected along with the

16 notarized application, then we got the letter back stating

17 the -- you know, the errors on the application to amend.

18 Q    Okay.  And was -- in addition to the name issue was the

19 date of birth also wrong?

20 A    Oh, yes.  The date of birth was showing January 7th, 1931.

21 I asked my father about that, and he told me he was positive it

22 was January 13th, 1931 because he was born on his mother's

23 birth date.

24 Q    So I think we might have gotten a little fouled up.  Let

25 me see if I can clear it up.

1        You first sent in an application for birth

2   certificate; you got one back with some errors on it.

3   A     Correct.

4   Q     Including the race, spelling of your father's last name

5   and his date of birth.

6   A     Correct.

7   Q     And then you submitted an application to have it amended;

8   is that right?

9   A     Correct.

10  Q     When you got the amended application back is when you

11  found out that the names needed to match and you needed to do

12  some additional work; is that right?

13  A     Yes.  The additional work they said we needed a certified

14  copy of his army discharge papers, which were the Form DD214.

15  Q     Anything else you were told you needed to get at that

16  point?

17  A     At that time, no.

18  Q     All right.  Did you set about obtaining your father's

19  DD214?

20  A     We already had it.  We had sent the DD214 in with the

21  original application to amend.  And they told us that it was

22  not valid because the county -- the clerk at the Department of

23  Veteran Affairs in the Jefferson County Courthouse had stamped

24  it on a separate slip of paper that she stapled to the copy of

25  the DD214.  So I was told that was not a valid copy.

Calvin Carrier – Direct / By Mr. Dunn                          22

1    Q    So at some point prior to this you had gone down to the

2    County Clerk's Office to get the certified DD214?

3    A    Yes.  I did that in person.

4    Q    And your trip to do that was that in relation to trying to

5    obtain an I.D. for your father?

6    A    Yes.

7    Q    Did you have to pay a fee in order to obtain that?

8    A    No.  They do it free.

9    Q    Okay.  Now, when you submitted that DD214, the State's

10   initial response was because the clerk stamped another page

11   instead of the actual record, it couldn't be used; is that

12   right?

13   A    Correct.

14   Q    What did you do about that?

15   A    I went back to the Department of Veteran Affairs, told her

16   what I was told.  So she shrank it down and put it on one page

17   so that she would have enough room to put their stamp on the

18   front.

19   Q    And did you then submit that back to the Department of

20   Health?

21   A    Yes.  I submitted a new application to amend, which I had

22   to get notarized again.  I submitted the original application

23   because I was told to.  I submitted the original DD214 that I

24   had sent in and the new DD214 that I had obtained.

25   Q    Did you have to again pay the fee, the $24?

Calvin Carrier - Direct / By Mr. Dunn                    23

1  A    The fee to the State, no.  That's why I had to keep

2  submitting the originals.

3  Q    Did you ultimately hear back on that application?

4  A    Yes.

5  Q    About when was that?

6  A    About two months ago, maybe three months ago.

7  Q    And what was the response then?

8  A    The response -- the letter that they sent saying -- said

9  that the requirements had changed and now I needed a hospital

10 record of birth if he had it, a passport if he had it, or an

11 original birth certificate showing the correct information.

12 Which I don't understand.

13 Q    And what did you do in response to that letter?

14 A    At that point we were disgusted and we kind of put the

15 search on hold for a while.

16 Q    Did you place some phone calls to HHS ultimately to try to

17 solve the issues?

18 A    I called the agent three times, left voice mails, never

19 received a phone call back.

20 Q    Now, at some point your father went down and tried to

21 vote; is that right?

22 A    Correct.

23 Q    When was that?

24 A    November of last year, 2013.

25 Q    So tell us how that occurred.  Who got your father to the

Calvin Carrier – Direct / By Mr. Dunn                    24

1   polls?

2   A    I got him -- we used his vehicle.  I drove him to the

3   local polling place, which is at our county barn.  I walked in.

4   Q    Hold on.  Before you get there.  At the county barn,

5   that's in Jefferson County, I assume?

6   A    Correct.  I'm sorry.

7   Q    And how far from his house?

8   A    About five miles.

9   Q    Is this where he has typically voted in the past?

10  A    They used to -- typically it was at the elementary school.

11  But I think in the past seven to ten years it's been at the

12  county at that particular location.

13  Q    Are you the person that most often takes him to vote?

14  A    I think I'm the only person that has taken him.

15  Q    Is it something that is important to him?

16  A    Yes.

17  Q    Does he vote on a particular day?

18  A    On election day.

19  Q    And is that important to him?

20  A    Yes.

21  Q    So when you get in November of 2013 down to the county

22  barn to vote, what documents or identification have you brought

23  with you or has your father brought with him to vote?

24  A    We brought the two items of documentation that I handed to

25  your Honor, and we brought his voter identification card.

Calvin Carrier - Direct / By Mr. Dunn                    25

1    Q    Do you mean the expired driver's license?

2    A    As far as the pieces of documentation?  Okay.  We brought

3    the expired driver's license, the Veteran Administration I.D.

4    and his voter's registration card.

5    Q    I see, okay.  Now, does your father actually go into the

6    polling location to vote?

7    A    We pull up to the polling location and someone will come

8    outside and take your vote.

9    Q    And again for our written record, is that because your

10   father is in a wheelchair?

11   A    Yes, because he is in a wheelchair.

12   Q    And how did he get in a wheelchair?

13   A    He had two strokes.

14   Q    So when you pull up what happens first?

15   A    We pull up.  I walk inside.  The ladies inside, they're

16   elderly about my father's age.  They look at me and they ask,

17   "Are you here to vote or are you bringing your dad?"  I told

18   them, I said, "I'm bringing my dad because I no longer live out

19   here."

20        So at that point they open the ledger, found his name

21   and was about to scratch his name off when they ask, "Can we

22   see his I.D.?"  I showed them the I.D.  They looked at it and

23   they said, "Well, we can't let him vote."

24        And I asked them, I said, "Are you serious?"  They

25   said, "No, we can't let him vote because his I.D. is expired.

1   And they pointed to the -- they had posters inside the polling

2   place explaining the new law.  And they wouldn't let him vote.

3   And they knew who he was.

4   Q    Was it apparent -- that was going to be my question.  Was

5   it apparent to you that the election clerks knew who your

6   father was?

7   A    Oh, yes.  They never asked his name.  They went straight

8   to his name in the ledger because they knew me from growing up

9   there and they knew my dad from being in China for at least

10  60 years.

11  Q    So, you showed them the expired driver's license and the

12  Veterans Administration card.

13  A    And the Veterans Administration card, and I told them he

14  has his voter registration with him.  I'm unsure whether we

15  showed it to them at the time or not.

16  Q    And, to be clear, these two documents that you gave to

17  those election clerks are the same ones that have been handed

18  up to her Honor today.

19  A    Yes, they are.

20  Q    Did anybody, while offering -- or while you were

21  attempting to get your father enrolled to vote, did anybody

22  offer him a provisional ballot?

23  A    No.

24  Q    Did anybody say to him:  You can cast a ballot today, and

25  if you come back in so many days with the right I.D. we'll

Calvin Carrier – Direct / By Mr. Dunn                27

 1  count it?

 2  A    No.

 3  Q    So, is it fair to describe the information you were

 4  provided as:  These I.D.'s are insufficient; your dad cannot

 5  vote; period?

 6  A    That's what we were told.

 7  Q    And then I assume you left the polling location?

 8  A    Yes, I did.

 9  Q    Now, you and your dad were called to give a deposition in

10  this case; is that right?

11  A    Correct.

12  Q    And I believe the record reflects that was in July 25th of

13  this year?  Does that sound right to you?

14  A    Correct.

15  Q    At the deposition you were informed of some things or

16  asked some questions about the State.  Do you remember the

17  State's attorney asking you about an election identification

18  certificate?

19  A    He mentioned it by name.

20  Q    Is that something that you had heard about just then at

21  the deposition?

22  A    That was my first time hearing about it.

23  Q    So, nobody at the county clerk's office where you got the

24  DD-214 told you anything about it.

25  A    No.

Calvin Carrier – Direct / By Mr. Dunn                    28

1  Q    Nobody at your multiple trips to DPS told you anything

2  about it.

3  A    No.

4  Q    Nobody with the Department of Health and Human Services

5  told you anything about it.

6  A    No.

7  Q    Okay.  The first you find out about it is when a lawyer in

8  this case brings it up at your deposition.

9  A    Yes, during the deposition.

10  Q    Were you told at your deposition that to get an EIC your

11  father would still need a birth certificate?

12  A    I don't recall him explaining the details of it at all.

13  Q    Do you recall asking for the details and not getting an

14  explanation?

15  A    Yes.  I asked him for the details, and he told me he

16  didn't exactly know, and I replied, "If you don't know, how do

17  I know?"

18  Q    Now, on -- were you also asked about the possibility of

19  your father voting with his Veterans Administration card?

20  A    We were unaware of that.

21  Q    In fact, you had tried to use the veterans card; is that

22  right?

23  A    Oh, as a form of I.D.?

24  Q    Yes.

25  A    Yes.

Calvin Carrier - Direct / By Mr. Dunn                29

1   Q    Were you asked about mail voting?

2   A    No.

3   Q    For your father.

4   A    No, we were not.

5   Q    Now, you -- you were told by the State at the deposition,

6   though, that your father could vote by mail; is that right?

7   A    Correct.

8   Q    Is that the first you had heard about voting by mail as an

9   option for your dad?

10  A    For my dad, yes.  Up until that time I thought only

11  service personnel or U.S. citizens out of the country at the

12  time could use mail-in votes.

13  Q    So, again, with all your trips and conversations with

14  Government offices that was never a piece of information

15  provided you.

16  A    No.

17  Q    Now, let's talk about your dad's mail service for a

18  minute.  Does he have trouble with lost pieces of mail?

19  A    There has been times.

20  Q    Where is his mailbox?

21  A    His mailbox, along with everyone else in China, is at the

22  local post office.

23  Q    So, it's not the case that he has a box at the corner of

24  his sidewalk at the street where the postman brings his mail.

25  A    No.  He has to get someone to pick up his mail for him.

EXCEPTIONAL REPORTING SERVICES, INC

Calvin Carrier - Direct / By Mr. Dunn                    30

1   Q    Does your father have a computer and a printer and ability

2   to take things off the internet and print them out?

3   A    No.

4   Q    Okay.

5   A    I have a computer at his house, but my father does not

6   even know how to text message.

7   Q    But I assume, if need be, you could find what was needed

8   on the internet and print it out for him.

9   A    I could.

10  Q    Yeah; just like you did the application for the birth

11  certificate.

12  A    Correct.

13  Q    Okay.  And, so, if your dad wanted to send in a vote by

14  mail application, you could do that for him.

15  A    Yes, I could.

16  Q    Okay.  And you'd have to print it out, take it to him, and

17  then he'd fill it out.

18  A    I would have to fill it out for him.

19  Q    Okay.

20  A    The stroke affected his right -- his dominant hand, so he

21  has a lot of problem writing.

22  Q    And do you know what the legal requirements are and the

23  criminal -- potential criminal violations are for assisting

24  somebody with --

25          **MR. KEISTER:**  Your Honor --

Calvin Carrier – Direct / By Mr. Dunn                    31

1         **MR. DUNN:**  -- to vote by mail?

2         **MR. KEISTER:**  I've been patient, but I'm going to

3    object to the continuing leading of this witness.  I'm also

4    going to object now to him asking him about criminal penalties.

5         **THE COURT:**  Sustained as to leading.  Overruled as to

6    the other matter.

7    **BY MR. DUNN:**

8    Q    Okay.  So, what, if anything, do you know about potential

9    crimes that can be prosecuted against people who help other

10   submit mail applications?

11   A    Nothing.

12   Q    Then, I assume you would be the person to take your father

13   to the mailbox?

14   A    Uh --

15   Q    To the post office?

16   A    If I helped him fill it out, yes, I would.

17   Q    Do you know how many trips it might take in order to send

18   in the application, receive back the ballot, fill it out, and

19   mail it back in?

20   A    At least two.

21   Q    Setting aside the location of the post office, does your

22   dad want to vote by mail?

23   A    No.

24   Q    Does he think voting on election day is important?

25   A    Yes.

1    Q    Now, after your deposition in July, on July 25th, has

2    anything else happened, insofar as your father's birth

3    certificate?

4    A    We gave the deposition July 25th.  On August 1st I

5    received a phone call from the State registrar saying that my

6    father's application for the amendment of the birth certificate

7    just happened to land on her desk and she would do what it took

8    to get a correct birth certificate.

9    Q    Well, and let's be precise.  I assume you mean the deputy

10   registrar in Texas.

11   A    She told me she was the State registrar.

12   Q    And she told you that your father's issue had come up?

13          MR. KEISTER:  Your Honor, once again I'm going to

14   object to leading at this point.

15          MR. DUNN:  I'll withdraw.

16          THE COURT:  Sustained.

17   BY MR. DUNN:

18   Q    What did you do at that point, then, in order to obtain

19   the birth certificate?

20   A    I asked her what documentation that I needed to supply.  I

21   sent all the original documentation back to her that we had

22   previously sent, and nothing extra.

23   Q    Did you receive a response?

24   A    Yes.  We've had several phone conversations.

25   Q    And what ultimately occurred as a result of these efforts?

1  A    I haven't seen it in person, but my father told me he got

2  his corrected birth certificate in last week.

3  Q    And for the State -- or for the Court and our record,

4  that's admitted as Exhibit -- Defendants' Exhibit 2521.

5           The amended certificate; does it still contain

6  errors, as you understand it?

7  A    Yes, it does.

8  Q    For example?

9  A    The race of the father and the date of birth is still not

10 correct.

11 Q    Now, when you had earlier gone to DPS to try to get an

12 I.D., what, if anything, were you told about your documents

13 needing to match in order to get an I.D.?

14 A    They told me the names had to match and the dates of birth

15 had to match.

16 Q    So, based on that understanding, if you take your father

17 down to DPS now with his birth certificate as amended and his

18 V.A. card and --

19           **THE COURT:**  I'm sorry.  I think there's -- is it

20 leading?

21           **MR. KEISTER:**  Leading; yes, your Honor.

22           **THE COURT:**  Yeah.  You need to watch your questions.

23           **MR. DUNN:**  I'm sorry, Judge; I didn't hear you.

24           **THE COURT:**  He was standing up.  I assumed he was

25 going to object to leading, because you're leading.

Calvin Carrier – Direct / By Mr. Dunn                    34

1          **MR. DUNN:**  Okay.  I'll rephrase.

2          **THE COURT:**  So, I just told you to watch your

3     questions.

4     **BY MR. DUNN:**

5     Q    With these new documents, what, if anything, do you think

6     will occur when you go to DPS?

7     A    I called DPS.  The agent I talked to said they had to

8     match or else we still couldn't get the state I.D.

9     Q    Okay.  And have you gone down there and actually tried at

10    this point?

11    A    No.

12    Q    Why not?

13    A    I'm frustrated; and I can only go by what she told me,

14    that it -- they wouldn't issue it, so we haven't gone yet.

15    Q    Since you found out this information have you been in town

16    to take your father?

17    A    No.

18    Q    Where have you been?

19    A    I've been in Emmitsville – Emmitsville [sic], Maryland, at

20    the National Fire Academy for the last two and a half weeks.

21    Q    And have you been there since you found out this

22    information from the State?

23    A    To my father or to the DPS office?

24    Q    Have you been in Maryland at your conference?

25    A    Oh, yes.  I was there when I was informed by my father.

Calvin Carrier – Cross / By Mr. Keister                    35

1   Q    So, returning just for a moment to the attempt to vote,

2   what did you observe about your father after he wasn't

3   permitted to vote that day?

4   A    He was angry.

5   Q    Was it something you talked about?

6   A    Yes.

7   Q    Was it something that he mentioned in the context of his

8   military service?

9   A    He stated to me that he couldn't believe that after

10  serving his country in the war, all the social security and

11  everything else that he's paid working his entire life, that he

12  would be denied the right to vote because of a simple card.

13           **MR. DUNN:**  No further questions.

14                        **CROSS EXAMINATION**

15  **BY MR. KEISTER:**

16  Q    Good morning, Mr. Carrier.

17  A    Good morning.

18  Q    Good to see you again.  We last spoke on July 25th, I

19  believe, correct?

20  A    Yes.

21  Q    And that was the same day that your father was deposed; I

22  believe we were in Beaumont, correct?

23  A    Yes.

24  Q    How long have you resided in Houston?

25  A    Approximately 12 years.

Calvin Carrier - Cross / By Mr. Keister                    36

1    Q     Okay.  And you commute to Beaumont to -- to your job?

2    A     Yes.

3    Q     And how long have you been employed with the Beaumont Fire

4    Department?

5    A     Eighteen years.

6    Q     Okay.  So, you've been commuting for 18 years from --

7    well, from 12 years from Houston to Beaumont.  How far is it

8    from your home in Houston to your work station in Beaumont?

9    A     Ninety-eight miles.

10   Q     Ninety-eight miles.  And you've done that for 12 years on

11   a -- on a regular basis, correct?

12   A     Correct.

13   Q     And I take it you drive when you go to your job?

14   A     Yes.

15   Q     You have a driver's license?

16   A     Yes.

17   Q     And I believe when we talked before you told me that

18   everyone who works at the Beaumont Fire Department is required

19   to have a current driver's license, correct?

20   A     A current and Class B.

21   Q     Okay.  So, everyone you work with -- and how many people

22   are there in the fire department?

23   A     I think we have 235 uniformed personnel and about seven

24   civilian.

25   Q     Okay.  Are the civilian employees also required to have a

1   driver's license?

2   A    I would not know that.

3   Q    Okay.  Is that something that's unique to Beaumont Fire

4   Department, the requirement that the firefighters have driver's

5   licenses?

6   A    Not that I'm aware of.

7   Q    Are all firefighters in Texas required to have a driver's

8   license?

9   A    I don't know.  I can only speak for my department.

10  Q    Okay.  And that's what I was trying to ask, if you knew if

11  that was unique to your department or not.

12  A    No, I -- I don't -- I don't know that it's unique.

13  Q    Okay.  Do you associate with firefighters of fire

14  departments in other areas of the state?

15  A    Yes.

16  Q    Is it your understanding that, generally speaking, most of

17  them have driver's licenses?

18  A    I can't -- I can't answer, because I would be assuming

19  that they did.  I don't know.

20  Q    Okay.  That's not something --

21  A    Okay.

22  Q    -- in your training that you found out?

23  A    Well, it's nothing that comes up in casual conversation.

24  Q    Okay.  Now, you have a driver's license; you also have a

25  concealed handgun license, correct?

Calvin Carrier - Cross / By Mr. Keister                    38

1   A     Yes, I do.

2   Q     All right.  So, those are -- have you used either one of

3   those when you've gone to vote?

4   A     The driver's license.

5   Q     You use your driver's license.  Okay.  Now, we talked

6   about, in the deposition, about your family.  To your

7   knowledge, your ex-wife has a driver's license?

8   A     I really don't know.

9   Q     Okay.  When you were married to her she had a driver's --

10  A     When we were married, she did.

11  Q     All right.  And I think you told me that you have two

12  children, grown children now, and to your knowledge they both

13  have driver's licenses, correct?

14  A     Yes.

15  Q     You told me you had a 16-year-old who was anxious to get

16  into driver's ed., correct?

17  A     Correct.

18  Q     Is she there yet?

19  A     Not yet.

20  Q     Okay.  Getting ready to start with the school year?

21  A     Yes.

22  Q     All right.  And, then, you told me you had a 14-year-old

23  who also is anxious to -- to get into the driving situation,

24  correct?

25  A     Correct.

1  Q    All right.  So, people having driver's licenses in your

2  family are not unusual at all, correct?

3  A    No, it's not unusual.

4  Q    And people having driver's licenses in your -- in your

5  employment is required, so that's certainly not unusual,

6  correct?

7  A    No, it's not unusual.

8  Q    And I believe we talked about during the deposition

9  whether or not you knew anyone, be it friends, neighbors,

10 associates of any type, who do not have a driver's license, and

11 you told me that you're not aware of anyone, correct?

12 A    I am not aware of anyone.

13 Q    Okay.  And as we sit here today, the only person that

14 you're aware of that -- personally, that has had a problem with

15 getting the I.D. is your father, correct?

16 A    Yes.

17 Q    Okay.

18 A    No.  No.  That's incorrect.

19 Q    Okay.  Well, correct me.

20 A    I'd like to correct that I do know some persons that do

21 not have a driver's license, and I know some that have been

22 getting -- having problems.  As you were speaking a couple of

23 people popped into my head that were employees of my brother

24 when he was alive, and one of them is from Louisiana, and he

25 was having the same problem as the lady that testified before

1    my dad was.  He's having problems obtaining his birth

2    certificate and a Texas driver's license.

3    Q    Okay.  When did you speak to him?

4    A    The last time I talked to him was in February --

5    Q    Okay.

6    A    -- of this year, when my brother died.

7    Q    Okay.  When we took your deposition last month or two

8    months -- not quite two months, but July 25th -- you did not

9    bring him to my attention, did you?

10   A    Correct.  Correct.

11   Q    All right.  Nor did you bring anyone else to my attention,

12   correct?

13   A    No.

14   Q    Has anyone suggested to you that, after that deposition,

15   that perhaps you should try and find somebody?

16   A    Oh, no.  No.

17   Q    It just -- it just (indiscernible) --

18   A    No; it just popped in my head as you were speaking.

19   Q    Okay.  After your deposition did you discuss the

20   deposition with anyone in this case?

21   A    No.

22   Q    Okay.  Have you discussed it with any of the lawyers on

23   this case?

24        **MR. KEISTER:**  Your Honor, we object to the extent

25   he's inquiring about attorney-client communications.

Calvin Carrier – Cross / By Mr. Keister                41

1          **THE COURT:**  Sustained.

2          **MR. DUNN:**  I'm not going to ask about specific

3    conversations, your Honor.  I'm just inquiring as to whether or

4    not he had any conversations.

5          **THE COURT:**  That's fine.

6    **BY MR. KEISTER:**

7    Q    With -- have you had any conversations with Mr. Dunn or

8    any other lawyers after your deposition in this case?

9    A    Am -- am I allowed to answer?

10         **THE COURT:**  You can answer that.  Don't talk about

11   what was said or anything.

12         **MR. KEISTER:**  Right.

13         **THE WITNESS:**  Yes.

14   **BY MR. KEISTER:**

15   Q    Okay.  And when were those conversations?  Without telling

16   me what they were, just tell me when those conversations were.

17   A    I don't know the exact dates.

18   Q    Okay.  But it was after the deposition?

19   A    As far as -- concerning what?  I want to make sure I'm

20   answering correctly.

21   Q    I'm just asking a very simple question.  Have you had any

22   conversations --

23   A    Yes.

24   Q    -- with the attorneys in this case after your deposition

25   in July?

Calvin Carrier - Cross / By Mr. Keister                    42

1   A    Yes.

2   Q    Okay.  Thank you.  Now, your father's -- is Mr. Carrier,

3   correct?

4   A    Yes.

5   Q    And Mr. Carrier had a stroke in 1996, correct?

6   A    I -- I'm not positive on the dates, but, yes, he did have

7   a stroke.

8   Q    Okay.  But it's been many, many years that he's had to be

9   in a wheelchair, correct?

10  A    Yes.

11  Q    And Mr. -- your father's driver's license, which you

12  handed to the Court, expired in 2006, correct?

13  A    Yes.

14  Q    Okay.  And do you know if after your father had his stroke

15  at some point he renewed his driver's license that expires in

16  2006?

17  A    Not that I know of.

18  Q    Okay.  All right.  And your mother died in -- on

19  January 31st, 2013, correct?

20  A    Twenty twelve.

21  Q    Twenty twelve.  Okay.  And at that point your father found

22  out that he needed some identification, correct?

23  A    Correct.

24  Q    All right.  Why did your father need identification when

25  your mother passed away?

Calvin Carrier – Cross / By Mr. Keister                    43

1   A    Because -- at that time he -- well, we were trying to get

2   all his affairs in order, and we -- we couldn't get access to

3   his bank accounts or any other items that needed a form of I.D.

4   Q    Okay.  Were there insurance issues that he was having

5   problems with?

6   A    Yes.  It took us a while to get the insurance.

7   Q    Were there social security problems that he was having

8   problems with?

9   A    Yes.

10  Q    And, of course, the banking problems he was having

11  problems with.

12  A    Correct.

13  Q    Or the banking issues --

14  A    Correct.

15  Q    -- he was having problems with.  And -- and before your

16  mother passed away, she had handled all of the business since

17  your father had his stroke?  Is that what it amounted to?

18  A    Correct.

19  Q    All right.  Now, when you father began looking for an

20  I.D., was voting an issue at that time?

21  A    At that time it was less than a week after my mother died.

22  No.

23  Q    Okay.  So, he wanted an I.D. to -- to help him start

24  handling his personal business, correct?

25  A    Correct.

Calvin Carrier - Cross / By Mr. Keister                    44

1  Q    And that was something that he found out he had to have.

2  How did he find out he needed an I.D.?

3  A    When we went to the bank.

4  Q    Okay.

5  A    And they told him that they would cash a check that one

6  time but he needed to get a -- an I.D. that was not expired in

7  order to continue his banking.

8  Q    Okay.  So, he showed them his expired driver's license

9  that you handed the Court, correct?

10  A    Correct.

11  Q    And they allowed him to have one transaction, but they

12  told him he needed to get a current driver's license, correct?

13  A    Correct.

14  Q    Okay.  Did he take any other identification to the -- to

15  the bank?

16  A    I'm unsure.  That's all we showed them.

17  Q    Okay.

18  A    I don't know what else he had in his pocket.

19  Q    Okay.  Were there any other issues other than the bank

20  that led your father to realize that he needed a current photo

21  I.D.?

22  A    We -- vehicle registration, license; you know, vehicle --

23  to get a new vehicle registration.

24  Q    Okay.  So, was he attempting to change the -- your

25  mother's car into his name?  Was that what the issue was?

Calvin Carrier - Cross / By Mr. Keister                    45

1   A    No; just get a new license tag.

2   Q    Okay.  Just to re-register.

3   A    Yeah, re-register.

4   Q    Okay.  Any other issues that brought to his attention the

5   fact that he needed a photo I.D.?

6   A    Not that I'm aware of.

7   Q    Okay.  Now, your father lives in a rural country town,

8   correct?

9   A    Correct.

10  Q    All right.  And same place you grew up, correct?

11  A    Yes.

12  Q    And your father's lived at that home for 60 years,

13  correct?

14  A    At least.

15  Q    At least that address.  I think you said the house has

16  been rebuilt, correct?

17  A    Yes.

18  Q    Okay.  Now, and China, Texas, is close to Beaumont,

19  correct?

20  A    About 10 miles.

21  Q    Okay.  And is there any public transportation that you

22  know of that --

23  A    No.

24  Q    -- that's in -- let me finish the question.

25  A    Oh, I'm sorry.

Calvin Carrier – Cross / By Mr. Keister                46

1  Q    I know.  We had this problem --

2  A    I'm sorry.  Sorry.

3  Q    -- with the depos.  We'll try and keep it -- for the court

4  reporter's sake, let me finish my question.

5  A    Okay.

6  Q    To your knowledge, is there any public transportation in

7  China, Texas?

8  A    No.

9  Q    Okay.  What does your father do for transportation when he

10 needs to go somewhere?

11 A    He will call neighbors, friends, or relatives and see if

12 they can come pick him up.

13 Q    Okay.  And does he -- does the neighbors accommodate him

14 when he asks?

15 A    Sometimes.

16 Q    Okay.  Has he told you there's been a problem when they

17 haven't?

18 A    Yes, there has been problems to where I've had to come

19 from Houston --

20 Q    Okay.

21 A    -- to bring him somewhere.

22 Q    But, generally speaking, when he needs to go to the

23 grocery store or go to the post office, somebody is there to

24 help him with those.

25 A    As far as I know.

Calvin Carrier – Cross / By Mr. Keister                    47

1    Q    Okay.  And, then, you will come if there is a special

2    event or something he needs to go to; then you will come and

3    drive him to that, you know, to the medical office or whatever

4    he needs to do.

5    A    Correct.

6    Q    All right.  And does your family also assist him in

7    transportation needs?

8    A    As of now I'm -- I'm the only one.

9    Q    Okay.  So, your father cannot drive, correct?

10   A    Correct.  He cannot drive.

11   Q    Does drive a lawnmower; am I correct?

12   A    Correct.

13   Q    Okay.  He drives that around the neighborhood?

14   A    Not so much so anymore.

15   Q    Okay.  But he -- but he did?  I think you told me that

16   when we took your depo, correct?

17   A    Correct.

18   Q    Okay.  All right.  Now, your father receives treatment in

19   Beaumont, medical treatment in Beaumont, correct?

20   A    Correct.

21   Q    And he receives his medical treatment in Beaumont at the

22   Veterans Administration clinic, correct?

23   A    As far as I know.

24   Q    Okay.  And you're aware that you gave or handed to the

25   judge your father's Veterans Administration card, correct?

Calvin Carrier – Cross / By Mr. Keister                48

1    A    Correct.

2    Q    And you're aware that that card has a photograph on it,

3    but it's worn away with age, correct?

4    A    Correct.

5    Q    Are you aware that your father testified that all he has

6    to do is ask for a new card at the clinic and they will provide

7    him one?

8    A    No, I was unaware.

9    Q    Okay.  All right.  Have you ever inquired as to whether or

10   not your father could get a new card with his -- with a

11   photograph on it?

12   A    No, I haven't.

13   Q    Okay.  Do you ever take your father to his clinic

14   appointments?

15   A    No.  The V.A. will pick up veterans and bring them back

16   and forth to the medical facility.

17   Q    Okay.  You know today that -- that -- that one of the

18   I.D.'s that can be used to vote is a Veterans Administration

19   I.D. with a photograph, correct?

20   A    I am aware since you told me during the deposition.

21   Before that, no.

22   Q    Okay.  And -- and after the deposition, has there been any

23   attempt, to your knowledge, to go ahead and get your father a

24   new Veterans Administration card with a photograph?

25   A    No.

Calvin Carrier - Cross / By Mr. Keister                    49

1    Q    Any reason why not?

2    A    Time.

3    Q    Okay.  All right.  Your father was a plaintiff in this

4    lawsuit long, long before he went to vote in November of 2013,

5    correct?

6    A    I'm unaware.

7    Q    Do you know when he -- do you know when he became a

8    plaintiff?

9    A    No, I do not know the exact date.

10   Q    Was it in the summer of 2013?

11   A    Yeah, I -- I would agree.

12   Q    Was it before --

13   A    No.  I'm sorry.  I'm sorry.  I was thinking you were

14   saying summer --

15   Q    Twenty thirteen.

16   A    I don't think he was before the election.

17   Q    Okay.  You don't think --

18   A    No.  I would say no.

19   Q    You don't think your father was part of the lawsuit before

20   you took him to vote in 2013?

21   A    Not that I was aware of.

22   Q    Okay.  When did you become aware of your father becoming

23   part of this lawsuit?

24   A    Early two thirteen.

25   Q    Okay.

Calvin Carrier - Cross / By Mr. Keister                    50

1    A    Early 2013.

2    Q    Okay.

3    A    No, of '14.  Of this year.

4    Q    Okay.

5    A    I'm sorry.

6    Q    Okay.  But as we sit here today, you don't know exactly

7    when he became --

8    A    No.

9    Q    Did you -- did you speak to the attorneys in the case

10   before your father signed up as a plaintiff in this lawsuit?

11   A    I have no way of knowing that.

12   Q    Did your father tell you that he was going to become a

13   plaintiff in this lawsuit before he actually became a plaintiff

14   in the lawsuit?

15   A    Yes, he did.

16   Q    Okay.  And when was that?

17   A    I really -- I really don't know.

18   Q    Okay.  Well, let's get back on the timeline, then, and

19   maybe it will -- maybe it will come back to you.

20              When did you take your father to the DPS office to

21   try and obtain an I.D.?

22   A    The first week of February, 2012.

23   Q    Okay.  And are you sure on that, it was '12, or was it

24   '13?  Because I believe you told me in the depo --

25   A    Thirteen.

Calvin Carrier – Cross / By Mr. Keister                    51

```
1   Q    All right.

2   A    Thirteen.

3   Q    I know the years get confused.

4   A    No; '13.  Thank you.

5   Q    Okay.  All right.

6             THE COURT:  So, your mother died in '12

7   (indiscernible) --

8             THE WITNESS:  My mother died --

9             THE COURT:  -- a year later you all --

10            THE WITNESS:  -- January, 2012.  Yes.

11  BY MR. KEISTER:

12  Q    I thought you told me in the depo she died in --

13  A    Oh -- wait.  Wait.

14  Q    -- January 31st, 2013.

15  A    Wait.  Wait.  I'm -- I'm getting mixed up.

16  Q    I know.  Okay.  So --

17  A    My years.

18  Q    Okay.

19  A    I mean, my brother died February of this year, which is

20  two fourteen; my mother died January of 2013.

21  Q    Right.  Okay.

22  A    Yes.

23  Q    All right.

24  A    Yes.

25  Q    So, at that -- and then you went through the process of --
```

EXCEPTIONAL REPORTING SERVICES, INC

1  of your father discovering he needed some photo I.D., correct?

2  A    Correct.

3  Q    All right.  Now, you drove your father to the DPS office

4  in Beaumont, correct?

5  A    Correct.

6  Q    All right.  And when your father testified, he stated

7  that -- that when you all went to Beaumont that it didn't take

8  long at all to be waited on; is that correct?

9  A    No; the line was not long.

10 Q    Okay.  So, and actually your father testified that he

11 stayed in the car first and you went in.  I think you testified

12 you both went in at the same time.  Is that --

13 A    No, I pushed him into the office.

14 Q    Okay.  So --

15 A    I may have gone in to see what the lines were like, but I

16 pushed him into the office.

17 Q    Okay.  All right.  So, you may have went in, then went

18 back out to the car to bring your father in?

19 A    Correct.

20 Q    All right.  But how long do you think the wait was before

21 you actually got someone waiting on you?

22 A    Ten minutes.

23 Q    Okay.  All right.  And at that point were you aware that

24 there was going to be a cost for the -- for the I.D. if you

25 were able to get one?

Calvin Carrier - Cross / By Mr. Keister                    53

1    A    Yes.

2    Q    Was the cost of an I.D. an issue at all at that point?

3    A    No.

4    Q    Okay.  You expected to pay and intended to pay, correct?

5    A    I -- we expected to pay the same as, you know, you would

6    for renewing a driver's license.

7    Q    Okay.  Now, you went in and -- and you showed your

8    father's expired license, and that license had expired in 2006,

9    correct?

10   A    Correct.

11   Q    So, at that point it was seven years old, thereabout; or

12   it had been expired seven years.

13   A    Correct.

14   Q    Okay.  And -- and the DPS representative told you that

15   that was too long, that your father would have to go through

16   the -- through a whole new application, correct?

17   A    Yes, he told me that was not a valid form of ID.

18   Q    Okay.  And she told you that you would need a -- or, she

19   told you or told your father or told both of you, I guess,

20   right, that she would need a birth certificate?

21   A    Yes, she said a birth certificate or a passport.

22   Q    Okay.  And did she also talk about a Social Security card?

23   A    No.

24   Q    Okay.  That never came up?

25   A    Not with her.

Calvin Carrier – Cross / By Mr. Keister                    54

1   Q    Okay.

2   A    No.

3   Q    All right.  So how long were you in the DPS office do you

4   think?

5   A    Ten minutes plus the time to have the conversation with

6   the clerk that was at the window.

7   Q    Okay.  And then you left and began the search for the

8   birth certificate, correct?

9   A    Yes, that next week I started the search for the birth

10  certificate.

11  Q    Okay.  Now, the problem with the location of the county

12  was the fact that the area where your father was born bordered

13  on what; three or four different counties, correct?

14  A    Three counties in that general vicinity.

15  Q    And your father wasn't sure exactly which county he was

16  actually born in, correct?

17  A    That's correct.

18  Q    And so that's why, as you told the Court earlier, you went

19  to each one of those counties looking for a birth record?

20  A    Correct.  I went to two and called the third.

21  Q    Okay.  And you were never able to find one in any of

22  those?

23  A    No.

24  Q    Okay.  Now, when you got the birth certificate back from

25  the State originally, did you ever go back to the county that –

Calvin Carrier – Cross / By Mr. Keister                    55

1   - I believe it was -- what county does the birth certificate

2   show; is it Liberty?

3   A    It shows Liberty County.

4   Q    Okay.  Did you ever go back to Liberty and see if they had

5   records based upon the spelling of his name?

6   A    No, I did not.

7   Q    Okay.  All right.  Now, how long did it take to get that

8   birth certificate?  After you found out you couldn't get it

9   from the counties and then you applied for it through the

10  State, how long did it take to get that birth certificate?

11  A    At least 12 weeks.

12  Q    Okay.  And when that birth certificate came in, there was

13  a whole lot of problems with it, correct?

14  A    There were some problems.

15  Q    Okay.

16       **(Pause)**

17          **MR. KEISTER:**  Brian, would you pull up Defendants'

18  Exhibit 0221, please?

19       **(Pause)**

20          0221.  Is that the birth certificate?

21       **(Pause/Discussion held off the record)**

22          The birth certificate.

23          **(Pause/Discussion held off the record)**

24          Defendants' Exhibit 0221.

25       **(Pause)**

1          Can we make that any more clear?  There we go.

2     BY MR. KEISTER:

3     Q    Now, does that appear to be a copy of the birth

4     certificate that you received from the State?

5     A    Yes.

6     Q    Okay.  Now if we look through that birth certificate,

7     Mr. Carrier, what name appears on that birth certificate?

8     A    It's hard to see, but --

9     Q    Do we need a better copy?  Let me see if I can --

10         MR. KEISTER:  Brian, can you try pulling up

11    Exhibit 2521?  I think it may be easier to read.

12    BY MR. KEISTER:

13    Q    Is that better?

14    A    Yes, I can read it now.

15    Q    All right.  Let's stay there.  All right.

16         What does it have as the name of the child?

17    A    Florida Carryer [sic].

18    Q    Okay.  And does your father pronounce that Floreda?

19    A    I've never heard him pronounce it.

20    Q    Okay.  But your father's name is not Florida nor Floreda,

21    correct?

22    A    No.

23    Q    Okay.  Your father's name, according to him, is Floyd

24    James Carrier, correct?

25    A    Correct.

Calvin Carrier – Cross / By Mr. Keister                    57

1  Q    So we've got a problem with the first name, correct?

2  A    Correct.

3  Q    And the absence of a middle name, correct?

4  A    Yes.

5  Q    And then we've got a problem with the spelling of the last

6  name, correct?

7  A    Yes.

8  Q    Your father spells his name C-A-R-R-I-E-R, whereas this

9  particular birth certificate has it as Y-E-R, correct?

10 A    Yes.

11 Q    Okay.  So that's just the beginning problems.  And when we

12 go to the second line it has as his date of birth January 7th,

13 1931, correct?

14 A    Correct.

15 Q    And your father claims that his birth date is

16 January 13th, 1931, correct?

17 A    Yes.

18 Q    All right.  And then we go to the father's name, which is

19 Batson Carryer [sic].  Was Batson your grandfather's name; is

20 that correct?

21 A    Yes.

22 Q    But his last name is spelled incorrectly, correct?

23 A    Yes.

24 Q    It's spelled with a "y" instead of an "ier," right?

25 A    Correct.

Calvin Carrier – Cross / By Mr. Keister                    58

1  Q    All right.  Now, we go across to your grandmother's name

2  and what's the problem with that one?

3  A    From what I've been told, her last name was Ledet, L-E-D-

4  E-T.

5  Q    Okay.  All right.  So her first name was Mable, but the

6  last name is incorrect on this birth certificate?

7  A    Correct.

8  Q    And then we go down to the second -- or, below that line

9  and -- actually, two lines below, with respect to your father's

10  race.  Back then they put "color," and it has "Col." Correct?

11  A    Correct.

12  Q    And I think we assume that means colored, correct?

13  A    Yes.

14  Q    Okay.  And we know that that is incorrect; that your

15  father was actually white -- I mean, your grandfather was

16  actually white?

17  A    Grandfather.

18  Q    Okay.  And then, is there a problem with the ages of your

19  grandfather and your grandmother?

20  A    Not that I'm aware of.

21  Q    Okay.  We'll ask your dad about that.

22      And then we come down and we see the occupation of your

23  grandfather is listed as a farmer.  Do you know if that's

24  correct?

25  A    I do not know.

Calvin Carrier – Cross / By Mr. Keister                    59

1   Q    Okay.  Has your father told you that your grandfather was

2   a carpenter and not a farmer?

3   A    Yes, my father said that his dad was a carpenter.

4   Q    Okay.  And then we come down and we see that it was signed

5   by a midwife by the name of, it looks like, Martha Campbell,

6   correct?

7   A    Yes.

8   Q    Okay.  So Mr. Carrier, there's a whole lot more problems

9   with this particular birth certificate than just the spelling

10  of your father's name, correct?

11  A    Yes.

12  Q    Yeah.  I mean, there's more wrong on that birth

13  certificate than there is correct, at least according to your

14  father, correct?

15  A    I hadn't compared them.  I couldn't say if there's more

16  wrong or right, but there are problems.

17  Q    Okay.  Well, just what we went through today; most lines

18  up there are wrong aren't they.  At least were incorrect with

19  terms of spelling and dates and that type of thing, right?

20  A    There are misspellings and things that need to be

21  corrected.

22  Q    Right.  And so, considering all the inaccuracies on that

23  document, is it somewhat understandable how there may be some

24  issues with respect to getting it corrected since we're not

25  just talking about correcting the spelling of your father's

Calvin Carrier – Cross / By Mr. Keister                    60

1    last name?

2    A    That's not a simple answer.

3    Q    Okay.  But it's a reasonable answer, isn't it?

4    A    It's a reasonable answer, yes.

5    Q    Okay.  And I know that you've expressed some opinions

6    about, perhaps, other people having problems with birth

7    certificates and I know we're going to hear it in this trial

8    because we heard it with the first witness.  But have you been

9    told of anybody in your involvement in this case or just in

10   your review -- looking for your father's birth certificate,

11   have you come across any birth certificates that were as

12   inaccurate as your father's birth certificate?

13   A    This is the only one I've seen.

14   Q    Okay.  And have you seen your father's brothers and

15   sisters' birth certificates?

16   A    Seen with my eyes?  No.

17   Q    Okay.  Do you know if your father has those birth

18   certificates?

19   A    If he has them?  No.

20   Q    Okay.  All right.  Have you made any attempt to find out -

21   - and your father was the oldest of nine children, correct?

22   A    Correct.

23   Q    Have you made any attempt to find out if any of your

24   father's sibling's birth certificates were as messed up as his?

25   A    Yes, I talked to -- the lady I talked to, Geraldine

Calvin Carrier – Cross / By Mr. Keister                    61

1   Harris, who identified herself as the State Registrar, she told

2   me she looked up all the other children of this paring of

3   Batson and Mable and my father's was the only one that was

4   misspelled.

5   Q    Okay.  Now, did there come a time when you took your

6   father to the Social Security office?

7   A    Yes.

8   Q    Okay.  And was there also problems at the Social Security

9   office with respect to your father not having a birth

10  certificate?

11  A    I'm not sure what you're asking me.

12  Q    Okay.  Your father testified that he went to the Social

13  Security Administration to try and get a copy of his Social

14  Security card, correct?

15  A    Yes.

16  Q    And he said that they told him he had to have a birth

17  certificate, correct?

18  A    That's what he told me.

19  Q    Okay.  Were you with him?

20  A    I was not with him when he spoke to the Social Security

21  representative.

22  Q    Okay.  Were you there when the Social Security rep told

23  him that his name was Floreda and that he was a female?

24  A    I don't recall them ever telling him his name was that,

25  but I do recall them telling him that it listed him as female

1   on the Social Security records.

2   Q    Okay.  That didn't make your father happy, did it?

3   A    No, it did not.

4        **(Laughter)**

5   Q    Okay.  And, somehow, they had his name the same as on his

6   birth certificate, correct?  Or do you know that?

7   A    No, they had his name as Floyd James Carrier.

8   Q    Okay.  And you don't -- well, you don't know that your

9   father testified they had his as Floreda?

10  A    I wouldn't know.

11  Q    Okay.  Has your father been able to get a copy of his

12  Social Security card?

13  A    I thought he had a copy of his Social Security card.

14  Q    Okay.  Have you ever seen it?

15  A    I've seen it in the past.

16  Q    Okay, because he testified in his deposition that they

17  would not send him one because he didn't have a birth

18  certificate.

19  A    Well, I've seen his birth certificate [sic] when he had

20  his stroke because it had to match his VA -- I mean, his --

21  Q    Social Security?

22  A    Yeah, I saw his Social Security card when he originally

23  had his stroke and we went to the VA hospital, because it

24  matched the Social Security number on that VA card.

25  Q    Okay.

Calvin Carrier – Cross / By Mr. Keister                    63

1   A    And other than that, I cannot -- I couldn't tell you if

2   I've seen it since then.

3   Q    Okay.  You haven't seen it since the time that he went to

4   the Social Security Administration looking for a new copy,

5   correct?

6   A    Correct.

7   Q    And you weren't part of the conversation that he had with

8   the Social Security rep, correct?

9   A    Not all the conversations, no.

10  Q    Okay.  Now, those efforts were all made in order to get

11  your father a photo ID so that he could handle his personal

12  business, correct?

13  A    That's how it started off, yes.

14  Q    Okay.  It had nothing to do with any concerns about

15  voting, correct?

16  A    We became concerned leading to the election that he would

17  not be able to vote.

18  Q    Okay.  And at that point you recall now that he was

19  already a Plaintiff in the lawsuit?

20  A    I still do not know if he was a Plaintiff.

21  Q    Okay.  Do you recall speaking to anyone about what type of

22  identification your father would need in order to vote?

23  A    I never spoke to anyone in person.  I looked it up on the

24  internet and just the news, you know.  They publicized it that

25  you would need a valid ID card to vote.

Calvin Carrier - Cross / By Mr. Keister                64

1  Q    Okay.  But all the time that your father was in the

2  lawsuit, up until the time I took his deposition and your

3  deposition on July 25th, no one had ever told your father that

4  he could vote with that Voters [sic] Administration ID that you

5  handed the judge, did they?

6            MR. DUNN:  Your Honor, I object.  This is a thinly

7  veiled attempt to get into communications between counsel and

8  his client.

9            MR. KEISTER:  Well, it's just a fact, your Honor.

10            THE COURT:  I'm going to sustain it if it pertains to

11  any attorney-client privilege.

12            MR. KEISTER:  Okay.

13  BY MR. KEISTER:

14  Q    Not speaking about attorneys in this case, up to the time

15  that I took your deposition and your father's deposition on

16  July 25th, 2014, you were not aware that your father could vote

17  using a Veteran's Administration ID card with a photograph,

18  correct?

19  A    No, I was not aware.

20  Q    Okay.  And, likewise, up until the time I took your

21  deposition on July 25th, 2014, you were not aware that your

22  father could apply for an election identification certificate,

23  correct?

24  A    No, I was not aware.

25  Q    Okay.  Now I want to correct you here on something you

Calvin Carrier – Cross / By Mr. Keister                    65

1  said earlier, because you said that I told you I didn't know

2  the requirements for the EIC.  Weren't we talking about mail-in

3  ballots when I told you I didn't know what the time limits

4  were?

5  A    Correct.

6  Q    Okay.  All right.

7  A    Now, since you said it, correct.

8       **(Laughter)**

9  Q    You disparaged me so I wanted to make sure we got that

10 correct.

11      In fact, we went through the EIC at the very end.  I think

12 we did it more than once, but I informed you about it and

13 encouraged you to perhaps look into getting one, didn't I?

14 A    Yes, you did.

15 Q    Okay.

16      **MR. KEISTER:**  And, Brian, can you pull up Calvin

17 Carrier's deposition, Page 54, beginning on Line 19 and ending

18 on Page 55, Line 20?

19      **(Pause)**

20 Q    And you see this was at the very end of the depo.  I began

21 asking you if it was possible to use the documentation that

22 you've been working with for your father in order to obtain an

23 Election Identification Certificate from the Department of

24 Public Safety; is that something you would be willing to do.

25 And you said, "a what?" correct?

Calvin Carrier – Cross / By Mr. Keister                66

1    A    Correct.

2    Q    Meaning you didn't know what that was, correct?

3    A    Correct.

4    Q    And I told you an Election Identification Certificate,

5    which is stamped "for voting purposes only"; is that something

6    you would be willing to do to help your father be able to vote,

7    correct?

8    A    Correct.

9    Q    And you said, "I would be willing to help him do that to

10   help him vote but it still would not alleviate the problem of

11   getting a photo ID," correct?

12   A    Correct.

13   Q    Because that's what your father wanted, wasn't it?  He

14   wanted a photo ID to help him in his daily life, correct?

15   A    He wanted the photo ID to help him with his daily life and

16   to be able to vote.

17   Q    Okay.  And then I said, "Right.  A photo ID for other

18   purposes, not."  You said "yes" and then you said "you

19   understand."  And I said, "you understand the Election

20   Identification Certificate is a photo ID."  And you said,

21   "you're telling me that.  I was unaware that that even

22   existed."  And I said, "Okay.  All right.  And as of today, you

23   have not attempted to take -- well, since you're not aware that

24   it existed then the answer is no."

25        You haven't attempted to go to DPS with this particular

1   type of documentation and request an EIC for your father,

2   correct?

3   A    Correct.

4   Q    So all the time that your father had been in this lawsuit

5   as a Plaintiff no one had ever educated him that that

6   possibility was there, correct?

7   A    I can't speak for him.  No one told me anything about it.

8   Q    Okay.  And have you ever tried to take the information

9   that you had, the original birth certificate that you had,

10  along with the other items of identification to DPS and see if

11  they would look at that information and issue an EIC?

12  A    No, because I called them and they told me that it would

13  not be issued, so we didn't waste a trip up there.

14  Q    Okay.  How much information did you give them when you

15  talked to them?

16  A    I told the -- the person I talked to, I told them my

17  father had his expired ID.  I mistakenly told them that he had

18  his Social Security card.  I told them he had his VA card.  I

19  told them he had a copy of his marriage certificate.  I told

20  them he had the Deed and title to his house and land.  I told

21  them he had the DD-214 and I told them he had his baptismal

22  papers.  And the representative told me that if the birth

23  certificate name and dates did not match up that we could not

24  be issued an ID because the birth certificate or passport were

25  the primary source of identification.

Calvin Carrier – Cross / By Mr. Keister                    68

1   Q    Okay.  And did you ever ask to speak to a supervisor?

2   A    No.

3   Q    Okay.  So you never physically had anyone examine the

4   documents and make a determination at DPS as to whether or not

5   they could, in fact, issue an EIC?

6   A    No.  I had no reason to distrust what she told me.

7   Q    Okay.  And as of today, even with the corrected EIC [sic]

8   -- the corrected birth certificate, that attempt hasn't been

9   made as of today to see if your father can get an ID, correct?

10  A    I've been physically unable to.

11  Q    Okay.  But you haven't inquired yet as to whether or not

12  your father can get a photo ID, correct?

13  A    No.

14  Q    After he received the correct birth certificate?

15  A    No.  I got home Saturday and we came up here yesterday.

16  Q    Okay.

17  A    So no state offices have been opened --

18  Q    Okay.

19  A    -- since I found that out.

20  Q    Okay.  And if, in fact, your father can obtain an

21  identification with this corrected birth certificate, what type

22  of identification do you intend to get him?

23  A    A state-issued ID.

24  Q    Okay.  Not an Election Identification Certificate?

25  A    I still don't know what that is.

1       (Laugher)

2  Q    Okay.  So he wants a state-issued personal ID, correct?

3  A    Yes.

4  Q    Okay.  Did your father tell you he was going to seek legal

5  advice to help with the birth certificate issue?

6  A    The birth certificate?

7  Q    When you were having --

8       MR. DUNN:  Your Honor, I'd like to lodge two

9  objections.  First, it's getting dangerously close to invading

10 the privilege.  And, second, it's completely irrelevant what

11 legal advice he sought and when.

12      THE COURT:  What's the point?

13      MR. KEISTER:  Well, the point is, your Honor, there's

14 a big question in this case about who are the Plaintiffs, if

15 any, in this case and how the Plaintiffs have been found and

16 the origin of that.  And in this situation, your Honor,

17 Mr. Carrier did not go out seeking to become a part of this

18 lawsuit.  Mr. Carrier went out seeking to obtain help in

19 getting the birth certificate and he was recruited into

20 becoming a part of this lawsuit.  And I think that's relevant

21 in terms of what his motivations were in terms of whether he

22 was seeking to have the statute ruled unconstitutional, as

23 opposed to he was simply seeking help to get a photo ID so he

24 could live his life like everybody else.

25      THE COURT:  Sustained.

Calvin Carrier – Cross / By Mr. Keister                70

1          **MR. KEISTER:**  Okay.

2    **BY MR. KEISTER:**

3    Q    Now, do you know when the last time was your father voted

4    before the time you took him?

5    A    I do not know.

6    Q    Okay.  Before your mother passed away, she would take your

7    father to vote, correct?

8    A    I think so.

9    Q    Okay.  And would it surprise you to know that your father

10   did not vote in every election that came up?

11   A    No.

12   Q    Okay.  Your father would, like many of us, and there's

13   nothing wrong with it, he would pick and choose the elections

14   he was interested in, correct?

15   A    Talking to him, it wasn't a picking and choosing, it was

16   whether or not he was available to go to the polls.

17   Q    Okay.  But he like to vote for the President; is that

18   correct?

19   A    Yes.

20   Q    And those type of races?

21   A    Yes.

22   Q    But he didn't necessarily go and vote for bond elections

23   or those type of things, correct?

24   A    I think he would vote for the local elections in our

25   community.

1    Q    Okay.  Did it surprise you that your father was going to

2    vote for the constitutional amendment elections?

3    A    What is that?

4    Q    That was the election on November 5th in 2013.  There was

5    constitutional amendments to the Texas Constitution.

6    A    No.

7    Q    Did you-all ever discuss what those amendments were that

8    were being voted on and what your father's interest was in

9    voting on those particular amendments?

10   A    Are you talking about the November 2013?

11   Q    Yes, sir.

12   A    If that's the one that had anything about the voting

13   qualification changes, yes we did speak of that.

14   Q    Okay.  But that one had -- during that election, your

15   father was required to show a photo ID.  But, no, that issue

16   was not on the ballot.  What was on the ballot was the various

17   constitutional amendment issues.  Do you recall that?

18   A    As far as I can recall, I thought he was going to vote on

19   that plus I thought there were some county and state and local

20   items on the ballot also.

21   Q    Okay.  Now, you took your father to vote on election day,

22   correct?

23   A    Correct.

24   Q    Do you know if he had made any previous trips to the

25   polling place before you took him?

Calvin Carrier – Cross / By Mr. Keister                    72

1   A    For that election?

2   Q    Yes, sir.

3   A    No.

4   Q    Okay.

5        **(Pause)**

6        You are aware that your father can vote by mail, correct?

7   A    That's what you're telling me.

8   Q    Okay.

9   A    I haven't researched it and I don't know.

10  Q    Okay.  But when we talked at your deposition, you said

11  that you had become aware that he could vote by mail, correct?

12  A    Yes.

13  Q    And I think that's when we got into the question about

14  when it had to be mailed in and that type of thing, and that's

15  where I told you I didn't know the exact time, correct?

16  A    Among other things.

17  Q    All right.  So your father has the option to vote by mail

18  since he's over 65, correct?

19  A    Can he without an ID?

20  Q    Yes, sir.

21  A    Well then, yes.

22  Q    Okay.  And your father has the ability to apply for a

23  disability exemption where he would not have to use his photo

24  ID, correct?

25  A    I don't know, so if you're telling me, yes.  Yes.

Calvin Carrier - Cross / By Mr. Keister                    73

1   Q    Okay.  Has your father attempted to apply for a disability

2   exemption?

3   A    He did not know that it -- well, I didn't know it existed

4   so I can't answer for him, but probably not.

5   Q    All right.  But he's treated on a regular basis at the

6   Veteran's Administration clinic, correct?

7   A    Yes.

8   Q    And your father is definitely disabled, correct?

9   A    Yes.

10  Q    All right.  And you now know that if your father gets a

11  new VA ID card, with a good picture on it, that he can vote

12  with that, correct?

13  A    According to what you're telling me, yes.

14  Q    Okay.  And if all else fails, you now know that your

15  father can go down to DPS and apply for a free EIC, correct?

16  A    I do not know that.

17  Q    Okay.  If you had known any of these things before

18  November the 5th, 2013, would you have helped your father take

19  one of those options?

20  A    If I was aware of it, yes.

21  Q    Okay.  All right.  Thank you, sir.

22       **MR. KEISTER:**  Pass the witness.

23       **(Pause)**

24  //

25  //

Calvin Carrier - Redirect (Mr. Dunn)/ Recross /(Mr. Keister)  74

1                       **REDIRECT EXAMINATION**

2    **BY MR. DUNN:**

3    Q    Mr. Carrier, I just have a question I forgot to ask you

4    earlier.  Do you know whether the veteran's access card that

5    your father has, if that's one of the veteran's cards that the

6    State lists as acceptable veterans ID's?

7    A    After the deposition, I looked up the qualifications and,

8    from what I understand, the veteran's card is a military card,

9    not for the VA hospital.

10   Q    Okay.  And if it's acceptable to you, I'm going to let the

11   Court hang on to those ID's while your father testifies.  Is

12   that acceptable?

13   A    Yes.

14   Q    All right.  Thank you again.

15                       **RECROSS EXAMINATION**

16   **BY MR. KEISTER:**

17   Q    Just one thing, and I don't want to ask you about anything

18   you discussed with the attorneys.  But, after our deposition,

19   has anyone told you that a Veteran's Administration ID with a

20   photo can be used to vote in Texas?

21   A    No.

22   Q    Okay.  Thank you.

23           **THE COURT:**  Okay.  Is that all for this witness?

24           **MR. DUNN:**  Yes, your Honor.

25           **THE COURT:**  All right.  Sir, you can step down.

1          **THE WITNESS:**  Thank you.

2          **MR. DUNN:**  Plaintiffs now call Floyd Carrier.

3       **(Pause)**

4          **THE COURT:**  Good morning.  All right, sir, the

5    clerk's going to swear you in if you'll raise your right hand.

6           **FLOYD CARRIER, PLAINTIFFS' WITNESS, SWORN**

7          **MR. DUNN:**  Your Honor, may I stand over here?

8          **THE COURT:**  Yes.

9                      **DIRECT EXAMINATION**

10   BY MR. DUNN:

11   Q    Please tell us your name.

12   A    My name is Floyd James Carrier.

13   Q    How do you spell that, Mr. Carrier.

14   A    Floyd, F-L-O-Y-D, James, J-A-M-E-S, Carrier, C-A-R-R-I-E-

15   R.

16   Q    I'm sensing a bit of an accent.  Do you have an accent?

17   A    Probably have -- French.

18   Q    Okay.  French from where?  Other than France, of course.

19   A    Louisiana.  My parents come from Louisiana.

20   Q    All right.  Tell us when you were born.

21   A    What they told me and what I know now is January 13, 1931.

22   Q    So, when they bring out the cakes with candles is it on

23   January 13?

24   A    Man, I ain't never had no cakes with no candles.

25       **(Laughter)**

1   Q    Where were you born?

2   A    That's what we're trying to get straight now.

3   Q    Okay.  Well, what did you always understand where you were

4   born?

5   A    Well, they told me I was on the borderline of Jefferson

6   and Liberty.

7   Q    And did you grow up in that area?

8   A    No.

9   Q    Where did you end up growing up?

10  A    To tell the truth about it, I'd say six or seven places in

11  the United States -- not in the United States, in Texas I

12  growed up.

13  Q    Where have you been the last many years?

14  A    China.

15  Q    And that's in Texas, Jefferson County?

16  A    It is Jefferson County.

17  Q    About how long have you lived there?

18  A    I've lived there, let's see, since '48.

19  Q    Now, you heard us talking about you the last hour or so, I

20  assume.  You were in the courtroom.

21  A    I did.

22  Q    Okay.  You were in the Army as I understand it.  Is that

23  right?

24  A    Right.

25  Q    Give us a little understanding of your military service.

1    A     Well, I was a paratrooper is what I was.

2    Q     In the U.S. Army?

3    A     It was the Army.  The Army -- paratrooper is the Army.

4    Q     How long did you serve?

5    A     Two years.

6    Q     Were you involved in any conflicts?

7    A     No, sir, I wasn't.  What do you mean?  What you -- the

8    word you say, what that mean?

9    Q     I'm sorry.  Were you involved in any military -- wars,

10   fighting?

11   A     No, no, I was in the states.  I stayed in the states.

12   Q     All right.  Now, after you got out of your military

13   service, what kind of work did you do?

14   A     I went to work for (indiscernible) Canal Company --

15   irrigated water.

16   Q     What kind of work did you do with them?

17   A     I was a (indiscernible) over there with them -- checks and

18   stuff like that.

19   Q     And what have you done -- how would you describe your

20   career work for most of your life when you were working?

21   A     My career like?  It was beautiful because I was really a

22   working man and I had two kids and I wanted them to have

23   everything they needed and my wife, too.

24   Q     Were you contracted out --

25   A     So I worked the day and night.  No, I didn't go to

Floyd Carrier - Direct / By Mr. Dunn                    78

1    contract.  I stayed at (indiscernible) 15 years.  The money

2    wasn't good enough for me so I went with the big money.

3    Q    And where was that?

4    A    (Indiscernible)

5    Q    Is that a union?

6    A    Yes, a union.  From there I went in business for myself.

7    Q    What kind of business for yourself did you operate?

8    A    Building homes, turnkey, everything.

9    Q    Did you retire at some point?

10   A    Can I finish telling you --

11   Q    Oh, yes, sir.

12   A    All right.  Okay.  And then later on when my son -- he

13   stayed -- eight months ago -- he finished college and me and

14   him went into business.  And we went in concrete business,

15   nothing but concrete.  Pouring everywhere, all over,

16   everywhere, all over the United States we poured.

17   Q    When did you stop working?

18   A    Oh, '96.  I had a stroke.

19   Q    Is that what caused you to stop?

20   A    Uh-huh.

21   Q    Is that a yes?

22   A    Yes, sir.

23   Q    I just do that for our record.

24   A    Well, I know you can't understand that -- uh-huh.

25   Q    Did you come to have a stroke again later?

Floyd Carrier - Direct / By Mr. Dunn                    79

1   A    Yes, I had a mini stroke later on.  It wasn't nothing that

2   bad.

3   Q    And you live in China today?  Is that right?

4   A    Yes, still live in China.

5   Q    We've heard something about your wife passing on from your

6   son.  Is that right?

7   A    Right.

8   Q    You live by yourself?

9   A    Part time.

10  Q    So, tell me about voting.  Is voting something that you

11  thought was important or you think is important as a citizen?

12  A    Yes, I was disappointed.

13  Q    What were you disappointed about?

14  A    'Cause all I did for this country and everything and that

15  day I couldn't vote.  I guess they threw me to the bushes and I

16  wasn't no good no more.

17  Q    What day was this?

18  A    That was in 2013 is when it was.

19  Q    You went down and tried to vote?

20  A    Yeah.  I had went -- voted the year before that, but they

21  came to the car and I voted, see, so I thought they going to do

22  the same thing.  So, my son carried me down there, see, and

23  that's when all this happened, you know.  So, we didn't know

24  nothing about that, see.

25  Q    And what were you told about whether you could vote when

Floyd Carrier - Direct / By Mr. Dunn                    80

1   you tried to go down there in 2013?

2   A    They told my son to tell me that I couldn't vote because I

3   need a birth certificate.

4   Q    Had you tried to get a birth certificate?

5   A    Yes, sir.

6   Q    What was the problem, if any, for doing that?

7   A    In the first place they couldn't find where I was born at,

8   see, or what county I was in -- Jefferson County or Liberty

9   County, see.  That was the first problem.  The next problem the

10  name was spelled wrong, see.  And the next problem spelled

11  wrong, I'm a man.  It's spelled like a girl name and on my card

12  I'm a female, see.  And I know I ain't.

13  Q    Now, you heard your son in here testify about --

14  A    Yes, sir.

15  Q    -- what you've been going through.

16  A    Uh-huh.

17  Q    Did he testify accurately as to the --

18  A    Everything he told you that's what we talk about it.

19  Q    Okay.  And that's what happened --

20  A    I turn everything over to him because he had better

21  educated than I did, see.

22  Q    He mentioned some dollars and cents having to be paid to

23  some government agencies for some documents.  Do you remember

24  that?

25  A    Some what?

Floyd Carrier - Cross / By Mr. Keister                          81

1   Q    Some money having to be paid for some of your documents?

2   Do you recall your son talking about that?

3   A    Some money paid to me or who?

4   Q    To the government -- to the clerk's office and to the

5   Department of Health and Human Services.

6   A    Oh, yeah, we had to pay for fee, you know, when you file

7   for something you have to pay the fee, you know.

8   Q    Who paid that fee?

9   A    My money paid it.

10  Q    And just one last thing, Mr. Carrier.  When you drove away

11  from the polling location, having been rejected from voting,

12  how did you feel?

13  A    I felt terrible because all I did for the country and they

14  turn me down, see, so I just felt like I wasn't a citizen any

15  more.

16  Q    Are you going to give up being a citizen?

17  A    No, sir, I'm here today.  I ain't give up yet.

18  Q    Thank you for your service, Mr. Carrier.

19  A    Okay, sir.

20                         **CROSS EXAMINATION**

21  **BY MR. KEISTER:**

22  Q    Good morning, Mr. Carrier.

23  A    Good morning.

24  Q    I'm going to stand over here so I can see you if that's

25  all right -- trip and kill myself.

Floyd Carrier - Cross / By Mr. Keister                    82

1   A    I think you got your hours wrong.

2   Q    Oh, is it afternoon?

3   A    Yes, sir.

4   Q    Oh-oh, it's lunch time.

5   A    All right.  Okay.

6   Q    Okay.

7   A    I don't mean no harm.

8   Q    I understand.  I'm hungry, too.  We'll go quickly.  You

9   saw me go through your birth certificate with Calvin, correct?

10  A    Yes, sir.

11  Q    And you saw the problems that we outlined --

12  A    Oh, yes.

13  Q    Okay.  And do you agree that everything that we talked

14  about, all the problems that were on your birth certificate,

15  are true problems?

16  A    Yes, because my son talked to me to tell me about

17  everything, you know?

18  Q    Okay.  And a couple of things your son wasn't aware of is

19  that your parents ages were wrong on there.  Correct?

20  A    Yes, their age was wrong.

21  Q    Okay.  So, almost everything on that birth certificate was

22  wrong, correct?

23  A    I tell you it was, man.

24  Q    It was.

25  A    Since I got big enough to understand things and know now,

Floyd Carrier - Cross / By Mr. Keister                    83

1   that was a terrible thing, wasn't it?

2   Q    Yeah, and I think you told me at the depo that you have

3   seen your brothers' and sisters' birth certificates, correct?

4   A    Yeah, I did see them.

5   Q    And were those as messed up as your birth certificate was?

6   A    They laughed at me 'cause I was a girl, you understand?

7   And I'm a boy, you know?

8   Q    So, you're the only one in your family that had such a

9   messed up birth certificate?

10  A    Yes.

11  Q    All right, good.  Now, when your wife passed away you

12  needed to get a photo ID, correct?

13  A    That's when all hell started.

14  Q    All right.

15  A    Excuse me for (indiscernible)

16  Q    I understand.  You may want to watch it, though.  The

17  Judge may be mad at you.  You wanted it because you needed to

18  take care of banking issues and Social Security issues and that

19  type of thing, correct?

20  A    Well, he told you what I told him but anyway, the first

21  thing started is when I started to collect the death

22  (indiscernible) on my wife, you know, the $250.  They said you

23  had to show your ID and they started looking in the thing and

24  they say that -- that's when they find that, you know, all that

25  -- I had the wrong thing.  All my paper was wrong, see.

Floyd Carrier - Cross / By Mr. Keister                84

1    Q    Okay.  And so you had problems with Social Security.  You

2    had problems with the bank.  Did you have insurance problems?

3    A    Oh, the bank problem was they wouldn't cash my check

4    'cause, see, it was on me and my wife name, but still she tend

5    to all the business, you know?  And then when before I had the

6    stroke she tended to business 'cause, see, I had to work to

7    make a living and I work from state to state, different places.

8    I didn't work in the same place all the time, see.  So, that's

9    how I missed lots of my voting, see, I wasn't in a town -- you

10   know, you can't vote if you're not in that town, see.  So, that

11   why I didn't vote every time.

12   Q    Okay.  So, you went to the DPS office to try and get an ID

13   and they told you you needed a birth certificate, correct?

14   A    Yes, sir.

15   Q    And they also told you --

16   A    No, the bank told me first.

17   Q    Okay.

18   A    The bank say you have to get your driver's license

19   straight before we can give you -- cash some money, see.

20   Q    Okay.

21   A    That's when I went to them people, see.

22   Q    Okay.

23   A    But I went to see them before me and my son with it, see -

24   - I called them when I did and they started to tell me that it

25   had expired at two or three years they expire, you know, and

Floyd Carrier - Cross / By Mr. Keister                    85

1   the thing about it, see, make a long thing short.  When the

2   storm came we was out of town and we came back, went to the

3   mailbox to get the mail out and somebody had pulled the bottom

4   part of my driver's license off and I had to have that to get

5   my driver's license, see.  That's when we started on that deal,

6   see.

7   Q    Okay.  And that was back in 2006, I believe?

8   A    Yes, sir.  I can't remember when it was, 'cause we had two

9   storms since (indiscernible).

10  Q    Right.  Okay.  All right.  So, you went to DPS to try to

11  get a personal ID after your wife died, correct?

12  A    Yes, sir.

13  Q    And they told you you needed a birth certificate.

14  A    That's right.

15  Q    And the bank had already told you that?

16  A    Well, see, the thing I had -- they didn't believe that was

17  my wife, you know?  So, I had to show proof that that was my

18  wife, so that's when I had to get the birth certificate, see.

19  Q    Okay.  And then who told you you needed the Social

20  Security card?  Remember us talking about that today?

21  A    I can't remember that, how that come in the deal, the

22  Social Security card.  I can't remember that, see.

23  Q    But you did go and try to get one?

24  A    But now -- well, I did try to get a Social Security card

25  and that was before my wife died, a long time ago.  When I went

Floyd Carrier - Cross / By Mr. Keister                86

1   to get a driving license so I had to show a Social Security

2   card, see, and that's where I didn't have no Social Security

3   card.  I had an Army, you know, card.  That's what I'd been

4   using Social Security off of that all the time, see.  And then

5   the thing about it is -- what we just talking about?  'Cause I

6   forget things quick.

7   Q    Social Security card.

8   A    Okay, Social Security card.

9   Q    Who told you you needed to go get a Social Security card?

10  A    Okay.  I can't remember, but I don't know if it was them

11  or the Social Security card people.  I think the Social

12  Security card people did.  'Cause see, I had to show a Social

13  Security card to identify that that was me for my wife -- for

14  me to draw -- (indiscernible).

15  Q    The death benefit.

16  A    Yeah, the death -- that's how it started off like that,

17  you know?

18  Q    Okay.

19  A    Yes, sir.

20  Q    So, you went in the Social Security office and they also

21  wanted your birth certificate, correct?

22  A    Oh, yeah.

23  Q    And you told them you didn't have a birth certificate,

24  right?

25  A    Yes, sir.

Floyd Carrier - Cross / By Mr. Keister                87

1   Q    And they also had your name as Florida, correct?

2   A    They had it Floyd James Carrier.  They had it right.

3   Q    Okay.

4   A    And the Social Security number right, too.

5   Q    But didn't you tell me that they had your name as Florida

6   and they told you that you were a female?

7   A    No, they didn't tell me that.  They didn't tell me I was a

8   female.

9   Q    Okay.

10  A    I think I (indiscernible) for a card.  I said, you know,

11  to get my wife -- I had to turn in some papers -- my son turned

12  all the papers in.  First, I would draw the money off her

13  death, in other words, see.  And that's when the thing started

14  about the name Florida, you know.  That was about it.  My name

15  not Floyd, is Florida.

16  Q    Right.

17  A    And that was a female, see.  That's what the Social

18  Security people start me off with.

19  Q    Okay.  That's what the Social Security people --

20  A    And then we filed for it.  And that's was why we seen that

21  on that paper, you know, all that stuff like that.

22  Q    Okay.  So, Social Security tells you that your name is

23  different and that you were a female, correct?

24  A    Yeah, if I am mistaken, that's who told me that.

25  Q    And they also told you in order to get a new card you had

Floyd Carrier - Cross / By Mr. Keister                    88

1   to have a birth certificate, correct?

2   A     I had to get a birth certificate.

3   Q     All right.

4   A     And to get the birth certificate I had to get the right

5   name.

6   Q     Okay.  Now, as of today you have Social Security

7   Administration send you a Social Security card.

8   A     No.

9   Q     Okay.

10  A     No, they ain't send me no Social Security card 'cause I

11  ain't file for none yet, see.  I just got my information, I

12  think, was last week it was.  But I had tell all my papers I

13  have not to go get my Social Security card and get the driver's

14  license, you know, everything again I had to go -- my son came

15  the other day.  We get back home and next week sometime we're

16  going to go up there and get all that straight.

17  Q     Okay.  But now, all of that work you did back in early

18  January or early 2013 to get an ID and get a birth certificate,

19  all of that was for the purposes of you trying to get a

20  personal ID to take care of your personal business, correct?

21  A     My business, yeah.  Un-huh.

22  Q     It wasn't because you're not aware of this lawsuit that's

23  going on --

24  A     Well, I couldn't even get my own money out of the bank.

25  Q     All right.

Floyd Carrier - Cross / By Mr. Keister                89

1    A    (Indiscernible) get your money out of the bank.

2    Q    Right.  When did you decide to become part of this

3    lawsuit?

4         **MR. DUNN:**  Again, your Honor, we object on the basis

5    of relevance.

6         **(Pause)**

7         **THE COURT:**  Are you following up with that question?

8         **MR. KEISTER:**  Yes, your Honor, it's relevant in terms

9    of what he knew or didn't know going into a November 5th

10   election.

11        **THE COURT:**  I'll allow that question.

12   **BY MR. KEISTER:**

13   Q    When did you decide to become part of this lawsuit?

14   A    The lawsuit?  When -- I was talking with some lady and she

15   was telling me about the veteran this and you know how --

16   that's how I find out that I couldn't vote no more, see, in

17   '13.  And I talked to some more veterans, see, and they had the

18   same problem, too, see.  So we decided to, you know, do

19   something, see.  We did.

20   Q    Were you part of this lawsuit before you went to vote in

21   2013?

22   A    No, no, I wasn't no part of no lawsuit.  No, man, I didn't

23   know nothing about no lawsuit.

24   Q    Had somebody told you of what type of ID you needed in

25   order to vote in 2013 before you went to vote?

Floyd Carrier - Cross / By Mr. Keister                    90

1   A    Somebody told me what kind of ID I need?

2   Q    Yes, sir, to vote.

3   A    No --

4        **MR. DUNN:**  Again, we object other than -- not with

5   respect to other communications, but with respect to

6   communications with counsel.

7        **THE COURT:**  Sustained.

8   **BY MR. KEISTER:**

9   Q    How did you know to carry in your expired driver's license

10  and your veteran's card when you went to vote in 2013?

11       **MR. DUNN:**  Same objection.

12       **THE COURT:**  Sustained in terms of the attorney/client

13  privilege.

14  **BY MR. KEISTER:**

15  Q    I'm not asking about attorney/client privilege.  How did

16  you know that there was a requirement that you take a photo ID

17  to vote when you went to vote in 2013?

18  A    2013, that's when my son took it up there to vote, 'cause

19  see, now I send him up there like I did the year before, to

20  tell the lady to come, you know, come but bring a machine to

21  the car.  Now that's when we find out what happened there, see.

22  Q    Okay.  Mr. Carrier, you're aware today that since you're

23  over 65 you can vote by mail, correct?

24  A    (Indiscernible)

25  Q    You're aware you can vote by mail, correct?

1   A    Yes, sir, but I can't vote (indiscernible).  I can't go up

2   there.

3   Q    Okay.  And you told me at your deposition that if you go

4   to the VA clinic they will give you a new VA ID, correct?

5   A    They did.  They will give me a new ID.

6   Q    Okay.

7   A    See, I (indiscernible) date to go up there.  See, but

8   after this come up I have to come over here, see, today.

9   Q    Okay.  So, you know if you want to you could go to the VA?

10  A    Yeah, I'm going to go get it.  Yeah, I wouldn't -- nobody

11  didn't tell me I couldn't do it.  I know it.  'Cause I been

12  putting off to go get one.  I'm sorry to stop you.

13  Q    That's all right.  And you know you could apply for a

14  disability exemption where you don't have to show an ID to

15  vote, correct?

16  A    No, I didn't know that.

17  Q    Okay.  All right.  Thank you, sir.

18          Pass the witness.

19      **MR. DUNN:**  Nothing further, your Honor.

20      **THE COURT:**  All right.

21      **MR. DUNN:**  May I assist the witness?

22      **THE COURT:**  Yes.

23      **(Court confers with clerk)**

24          All right, counsel, we're going to be in recess for

25  lunch.  I'm showing it is 12:10, so we'll reconvene at 1:10.

 1          **THE CLERK:**  All rise.

 2      **(A recess was taken from 12:10 p.m. to 1:09 p.m.)**

 3          **THE COURT:**  You can have a seat.

 4          **THE COURT:**  Okay, are we ready to continue then?  The

 5  Plaintiff will call their next witness.

 6          **MR. GARZA:**  Yes, your Honor.  Jose Garza for the

 7  Mexican American Legislative Caucus and, your Honor, we call

 8  Representative Trey Martinez Fischer.

 9      **(Pause)**

10          **THE COURT:**  Would you raise your right hand?

11      **TREY MARTINEZ FISCHER, PLAINTIFFS' WITNESS SWORN**

12          **THE WITNESS:**  I do.

13          **THE CLERK:**  Thank you.

14                      **DIRECT EXAMINATION**

15  BY MR. GARZA:

16  Q    Would you state your name and residence, please?

17  A    Yes, Trey Martinez Fischer.  I'm a resident of San

18  Antonio, Bexar County, Texas.

19  Q    And are you currently an elected official?

20  A    I am.

21  Q    And you are currently a State Representative, is that

22  correct?

23  A    I am, I'm a State Representative from San Antonio, Texas.

24  I'm in the middle of my seventh term and I am running for an

25  eighth term this November.

1   Q    Okay.  And you represent District 116 in the Texas House

2   of Representatives?

3   A    That is correct.

4   Q    And can you briefly describe to the Court the general

5   demographic characteristics of House District 116?

6   A    House District 116 is a minority opportunity district,

7   largely Hispanic.  It begins in the west side of San Antonio,

8   just outside downtown, and runs in a northwesterly direction

9   ending at the University of Texas at San Antonio at 1604.  It's

10  a very diverse district.  It has pockets of affluence as well

11  as some of the highest and most challenging socioeconomic

12  conditions that we face in the State, and it's a district that

13  I've represented for 14 years.

14  Q    And you are currently the Chairman of the Mexican-American

15  Legislative Caucus, is that correct?

16  A    That is correct.

17  Q    And how long have you been the Chairman?

18  A    I've been the Chairman since the election of 2008 so I've

19  served as Chairman for the sessions of 2009, 2011 and I'm

20  currently the Chair.

21  Q    And would you describe for the Court what the Mexican

22  American Legislative Caucus is?

23  A    Sure.  Historically, the Caucus was formed in 1973 at a

24  time when the political environment and the Texas Legislature

25  was dominated by Democrats.  The sole purpose of the Caucus

Fischer - Direct / By Mr. Garza                        94

1    coming together was that the -- was to allow the Latino members

2    of the Texas House to leverage their voices to -- to get things

3    done, and in that instance, back in 1970, it was to capture one

4    seat on the powerful Budget Writing Committee.

5            From that time our Caucus has grown over the course

6    of several decades to not be only the oldest Caucus, Latino

7    Caucus of the United States, but also to be the largest.  We

8    are now 41 members of the Texas House.

9            The Caucus uses its institutional knowledge and our

10   By-laws to travel the company and incorporate caucuses across

11   America in places where they -- States that are also beginning

12   to realize growth in population with the Latino community, so

13   it's a very big and well-known organization.

14   Q    And beyond this initial purpose, Representative, that you

15   described, what are now the goals and purposes of the Caucus?

16   A    I like to say that we have both an internal role and

17   external role.

18            Internally we are a member services caucus, so

19   anybody who is a member of our Caucus, and to be clear, there

20   are only two ways you can become a member of our Caucus; that

21   is either you are Latino or you represent a district that is 50

22   percent voting age population Hispanic, and in some instances

23   your session is reviewed in your first term to see whether or

24   not your voting record comports with the values of our Caucus.

25            So internally we provide member services, policy

1    briefings, education to our members.  We certainly serve as a

2    public policy voice to make sure that our goals and objectives

3    are being met and, quite frankly, we are also a organizing tool

4    to make sure that public policy priorities that we support

5    receive the support; policy priorities that we oppose, we lead

6    that opposition.

7              Externally we try to be the voice for all Latino

8    Texas that is growing by the day.  We like to feel like we're

9    doing our jobs and we receive calls from across the State, from

10   Hispanics, no matter where they come from, to know that they

11   have a place where they can be heard and receive assistance and

12   guidance from the 41 members of our Caucus.

13   Q    And is the Caucus a branch of the Democratic Party?

14   A    No.  It's often a misnomer.  People seem to think that.

15   The Caucus was organized in spite of the Democratic Party.

16   It's a bipartisan caucus.  Today we do have a couple of members

17   who are Hispanic Republicans that are members of this Caucus

18   and at one point in 2011 there might have been as high as five,

19   if not six Hispanic Republicans.

20   Q    And you've been -- have you been a member of the Caucus

21   since your first election?

22   A    Since my first election in 2000, I gained admission in

23   2001.

24   Q    And, in your experience, has the membership of the Caucus

25   stayed relatively unified when it identifies particular issues

1   or legislation?

2   A    Because our criteria for admission is so tight and so

3   narrow, it's not a volunteer caucus.  We like to think that we

4   come together and we coalesce around issues.

5         Of course, the golden rule in the Texas Legislature

6   is that members are supposed to vote their districts, and so

7   there are occasions when members, even perhaps because of a

8   role distinction versus urban, or perhaps a conservative

9   principle versus a nonconservative principle, the members have

10  that freedom to vote how they're going to vote but, quite

11  frankly, you know, we do not gain -- we do not allow folks to

12  have admission to our Caucus whose views do not comport with

13  ours.

14  Q    And can you describe some of the issues that the Caucus

15  has championed over the last couple of years?

16  A    Sure.  Well, you know, being incorporated in the 1970s I

17  think you could characterize this Caucus as a civil and social

18  justice organization.  It was to deal with rampant

19  discrimination whether it be in politics or in public policy,

20  public education, voting rights and so forth.

21         As Latinos become 38 and 39 percent of the State-wide

22  population, as we represent all of the growth -- that dynamic

23  growth in the State, I think our Caucus feels like we have a

24  much larger obligation to not stray too far from our Civil

25  Rights legacy, but since we will be responsible, in part, for

1   the larger challenges in our State, whether it be

2   infrastructure, transportation, health care, complex issues,

3   our Caucus will play a role.  We are very fortunate to have a

4   member of our Caucus sit on almost every standing committee at

5   the Texas House.  Not too many caucuses can take that kind of

6   credit, and so within that structure we develop subject matter

7   expertise and we use our members and we deploy them

8   strategically so that they can share their expertise with not

9   only the Body, but with folks who are concerned about public

10  policy as in terms of stakeholders.

11  Q    And as you mentioned, Representative, with the Hispanic

12  population growth, has that been a topic that Number 1, is

13  familiar to the Caucus; and, Number 2, is familiar to the

14  Legislature?

15  A    I think it's always been familiar to the Caucus.  I think

16  this is a demographic metric that we follow very, very closely.

17           From a Legislative perspective, I think it takes a

18  census to sort of wake people's eyes up, and so in the context

19  of 2011 that we evaluated their ID and other proposals, it came

20  on the heels of a census release that showed that the State of

21  Texas grew by over 4 million people in the course of a decade;

22  89 percent of that minority; 65 percent of that Hispanic, 1

23  million children 95 percent Hispanic.  It marked the first time

24  in the history of the State of Texas that our public education

25  system became majority Hispanic.  These were astronomical

1    metrics of demographic growth.  The result of that gave Texas

2    four additional seats in Congress.  The last time that happened

3    was in the 1860s after the Civil War.

4    Q    So we're going to be talking a little bit about the

5    Caucus's position on SB 14, the voter ID Bill --

6    A    Okay.

7    Q    -- but before we get into that, would you describe for the

8    Court the atmosphere in the Texas Legislature in 2011?

9    A    Well, I would say you -- it was certainly an atmosphere

10   that was very tense.  There was a election in 2010 that had a

11   very clear result in terms of the type of politics that was

12   coming to Austin.  And in this environment we had to deal with

13   legislative re-districting, which is always a full contact

14   sport in Texas.  We were dealing with some very, very extreme,

15   I would like to consider them to be anti-Hispanic public policy

16   initiatives from English-only proposals to, you know,

17   penalizing cities or identifying cities as sanctuary cities.

18         I think there were proposals to roll back and not

19   provide relief for the Affordable Care Act where Hispanics are

20   some of the biggest numbers of the uninsured in the State.  So

21   suffice it to say that tensions were very, very high already,

22   they were very, very divisive, and what was unusual about that

23   is this sort of came off a 2009 session where everybody seemed

24   to work together, everybody had a place at the table, everybody

25   was able to negotiate and leverage and it was not necessarily

1   the best ideas that would prevail, but it was this concept of

2   sort of shared interest where everybody had a shared interest

3   in working together.  That wasn't existent in 2011.

4   Q    And was it your impression that this was, in part, fueled,

5   as you said, by the 2010 election, but also fueled by the

6   demographic changes that were happening?

7   A    Well, I've said often that given the changing demographics

8   in the State of Texas, that people have an opportunity to work

9   for and with the Hispanic community or work against the

10  Hispanic community.

11            Lots of legislative proposals we saw in 2011 were

12  very, very clear that those in the leadership had chosen to

13  work against the growing demographic, the growing Latino

14  community in the State, and there were several policy choices

15  that are evidence of that.

16  Q    And getting to the voter ID Bill, it did not have its

17  inception in the 2011 session, is that correct?

18  A    No, I believe the voter ID began to sort of become visible

19  and apparent as far back as 2005 and had been filed in some

20  form or fashion in every session, so '05, 2007, 2009 and here

21  in 2011.

22  Q    Okay.  And in each of the prior sessions beginning with

23  2005, there seemed to be a change in the sponsor for the

24  legislation.  Did that seem significant to you?

25  A    It is.  I think it's inside base law.  I've been a

Fischer - Direct / By Mr. Garza                    100

1    lawmaker now for 14 years and there are pieces of legislation

2    that I care about passionately, and if I can't pass it I'll

3    always bring it back the next session.

4           In the case of voter ID this was a subject matter

5    that just floated from author to author, and so if somebody

6    carried it in '05 and that person didn't come back somebody

7    picked it up.  And what's unfortunate about that is typically

8    in the legislative process you're building consensus, you're

9    trying to work towards a resolution, particularly in the case

10   of legislation that fails, and you try to figure out what went

11   wrong, what steps you can do to make improvements, lever some

12   coalition, build some consensus and then bring back an improved

13   product in the next session.

14          Well, what was happening here is the authors were

15   changing, but there were less and less dialogue going on over

16   the years in terms of not seeking the consensus and sort of

17   that, you know, working together to pass legislation that we

18   would all care about.

19   Q    And what was the Caucus's strategy, or how did they

20   approach the voter ID bill that was being proposed?

21   A    In what year?  I'm sorry.

22   Q    I'm sorry, in -- so over the duration of these different

23   years when the legislation was being introduced, was the Caucus

24   engaged in -- in the debates over those pieces of legislation?

25   A    Sure.  It's -- you know, it is a very similar strategy and

1    tactic that we use for all types of legislation.  In this

2    instance I think there was always an instant reaction to be

3    opposed to anything that has the ability to disenfranchise

4    voters or take away people's voting rights, and so certainly

5    you would look at legislation very suspiciously from a

6    defensive perspective.  And so if you're looking at this from

7    defensive perspective then it's engagement at the community

8    level, it's making sure that the members of MALC are allies on

9    the committee, are asking the right questions, making sure the

10   witnesses are being heard and that we're making points.

11           And while that's happening there is a number of

12   conversations happening both on line and off line as to whether

13   this is really going to happen.

14           As legislation moves down the legislative, you know,

15   pipeline, if you will, then these strategies and tactics adjust

16   so when it ends up in a Procedural Calendars Committee, which

17   is a very powerful committee, then we use our allies to find

18   ways to have time-honored tags or procedural holdup.  We're

19   making sure that the paperwork is in order before they can

20   proceed on the Bill, negotiating with the leadership to put

21   this priority down the road.  I mean, again, lots of moving

22   parts here.  It's not as if we're just -- you know, one day we

23   show up for 30 minutes and the conversation is had and it's

24   over with, this is a constant moving vehicle and as the Bill

25   then prepares to find its way set for Calendar Debate, then you

1   start all over with a very aggressive amendment strategy, a

2   very aggressive floor strategy.  The parliamentary rule

3   procedurals experts get out the rule books and start looking

4   for flaws in the Bill to send it back to Committee, and then we

5   have a whole another group of folks talking to the members of

6   the Senate to see what the Senate strategy is and what are

7   their needs and how we can assist them to make sure that our

8   points are being heard, and that they have what they need to do

9   their job in the event that this is a Bill that originates in

10  the House and is on its way to the Senate.

11  Q    So we'll go over each of those different components of the

12  road to enactment.

13  A    Okay.

14  Q    Did members of the Caucus, and you, in particular, attempt

15  to find out what the rationale was for the 2011 voter ID Bill?

16  A    Well, I think there are always discussions and, again, I

17  mean, like 2011, this is not a brand new piece of legislation.

18  So I would suffice it to say that when voter ID was filed in

19  2011, I think many of us picked up the conversation of '09

20  which was, okay, if you are insisting on having a magic

21  document that purports to be the document that protects the

22  integrity of the ballot box, then let's -- let's do this, let's

23  expand the number of opportunities people can have these IDs,

24  like in Indiana, or like a Georgia, and expand the number of

25  IDs you could use, and if somebody has that document then they

1   should be able to vote whenever, however, same day, voter

2   registration.  If this is the magic document, if this is what

3   protects the franchise, well, once they have it they can vote

4   and we don't have to go with the necessity of voter

5   registration.  That was sort of the sentiment in 2009, can we

6   get to a place where we can have this purported integrity at

7   the ballot box and at the same time expand voting opportunities

8   for everybody in Texas.

9           In 2011 -- I'm sorry --

10  Q   No, no, no.  I'm sorry, go ahead.

11  A   In 2011 those conversations not necessarily fell on deaf

12  ears, but the accelerated pace of the voter ID proposal, the

13  deviations from procedure and process made it very clear that

14  this was not a piece of legislation that was going to be

15  inviting of compromise and negotiation.  This was going to be a

16  piece of legislation that was going to arrive on the Governor's

17  desk, you know, early in the session to prevent anything from

18  happening after three unsuccessful attempts in the sessions

19  prior.

20  Q   So you mentioned that in 2009 it seemed that the rationale

21  was the integrity of the ballot.  Was that always the stated

22  purpose or the argument for SB 14?

23  A   You know, you -- there may be three general arguments.

24  The argument is, well, there is, you know, improprieties

25  occurring at polling locations and, of course, you delve into

1    the weeds and you begin to learn, well, the behavior that

2    they're speaking about deals with electioneering and poll

3    worker activity, and in some unfortunate cases election judges,

4    you know, not administering election law objectively.  And so

5    you bring that to the attention of advocates of SB 14, then the

6    rationale would shift.  They would say, "No, no, this protects

7    the integrity at the ballot box."

8            And so you get back into the weeds, you go through

9    the data and you realize that all of the voter irregularity,

10   all of the integrity issues, if you want to call it that, you

11   know most of them deal with mail ballots.  Senate Bill 14 did

12   nothing to address that.  And so then you confront the

13   advocates of SB 14 and say, "Well, if you really want to

14   protect the integrity of the ballot box let's fix the vote by

15   mail process and we're happy to work with you."

16           And then it became, "Well, no, no, no, we have to do

17   this so that undocumented citizens or undocumented immigrants

18   couldn't vote."  And, of course, then you get back into the

19   weeds and you come back and say, "Well, what about legal

20   permanent residents that have many of these forms of IDs that

21   you say are required to vote?  They're not -- if that's

22   happening, which the evidence doesn't suggest that it is, but

23   if you think that's happening this law proposal will not

24   address that."  So it was a shifting rationale to answer your

25   question.

1   Q    So as the -- so as the rationale shifted and the Caucus

2   presented evidence on each of these issues, were there also

3   formal attempts to ameliorate the concerns of the Caucus and

4   the Bill?

5   A    One thing that I learned in my course of legislative

6   session is the worst law that we passed in Austin is the law of

7   unintended consequences where we pass a measure and then

8   something bad happens and we come back in the out year, in the

9   future year, we come back and say, "Members, this proposal will

10  fix the unintended consequences of the law we passed two years

11  ago."

12          With respect to voter ID, we laid out a number of

13  scenarios.  When I say "we" I mean members of the Mexican

14  American Legislative Caucus, to say "This public policy

15  proposal isn't going to work because the identification

16  requirements are too narrow.  If you really believe that

17  Government-issued IDs work and have validity, well, let's look

18  at State employee IDs.  Let's look at" --

19  Q    So there were amendments to expand the --

20  A    A number of amendments that would -- I mean, I could go

21  on, but some very good examples of amendments were to allow any

22  -- any sub-jurisdiction ID, State employees, County employees,

23  City employees to vote with those IDs.  Students in college and

24  universities that, in my view, many colleges and universities

25  in the State of Texas are quasi-governmental entities in scope.

1   They receive funding from the State, they receive oversight by

2   the State.  Those IDs should be fair game.  We should certainly

3   look to making sure that we provide meaningful exemptions, or

4   that we have a provisional ballot system that actually works

5   where people don't have to come back the second time and prove

6   whatever they need to prove, like the incidents in Indiana.

7   All of these issues fell on deaf ears.

8             The issue with regard to the resources, deploying

9   strategic resources to deal with one-third of Texas counties

10  that lacked a DPS facility in their County, those issues fell

11  on deaf ears.

12  Q    So one of the things we've heard, Representative, is that

13  the State now employs mobile units to assist with the securing

14  of the ID.  Was this something that was raised during the --

15  during the legislative process?

16  A    I'm not as familiar with the words "mobile units being

17  used," but what was used was the fact that a third of our

18  State, in terms of Texas counties, did not have a DPS facility.

19  Lots of conversation to provide this -- this tool to local

20  Governments to have -- allow for local control.  Let County

21  Judges and County Commissioners' Courts decide, you know, how

22  the EIC process would work, it's Number 1, subject, you know,

23  to their control; and Number 2, they work with election

24  officials on the ground.  Those issues were, you know, just not

25  even negotiable.

1            The amount of money that was appropriated in Senate

2     Bill 14, it was just a little over $2 million, it was like $2

3     million and 26,000.  $2 million of that was HAVA (phonetic)

4     money, so highly restricted money, money that could only be

5     used for voter education which they certainly said in the

6     proposal that that's what the money would be used for, and

7     26,000 for technology changes to update web sites.

8            So if DPS is using Troopers or mobile units or, you

9     know, personnel to -- to do things that Senate Bill 14 doesn't

10    allow them to do, they're doing it at the expense of other

11    resources within the Department.  So, in other words, if it's

12    -- if it takes time and personnel hours to deploy a voter EIC

13    Program in a County that has no DPS presence, it's coming at

14    the expense of other DPS priorities and so -- which has not

15    been articulated to lawmakers or to me, for that matter.

16    Q    Okay.  Now were there unique procedural processes that

17    were used for SB 14?

18    A    Yes.  In general terms I think that, you know, anyone who

19    follows legislative procedure knows that this is, you know,

20    every Bill goes through the same process.  And so what -- the

21    deviations that I saw here very clearly, this Bill originated

22    in the Senate.  Immediately it was announced that the Senate

23    two-thirds rule, which has been a time-honored tradition in the

24    Texas Senate, would not be honored for this Bill.

25           Secondly, the Senate Committee met as a Committee of

Fischer - Direct / By Mr. Garza                    108

1    the Whole, and a Committee of the Whole has probably happened,

2    in my career, you know, two or three times, perhaps it could be

3    as high as five, but not a very often used strategy to use the

4    floor of the Senate for the Bill to be heard using the

5    Committee of the Whole.

6         As the Bill made it over to the Texas House, the

7    Texas House has a Standing Committee on Elections where voter

8    ID Bills would certainly go.  In the years past that's where

9    they had gone, but a brand new Committee was created by Speaker

10   Strauss, and what was unique about it, it was a Select

11   Committee.  So when you have a Select Committee in the Texas

12   House the Speaker chooses every member of the Committee;

13   whereas, for Standing Committees, seniority will take up half

14   of the Committee.  And so by having a Select Committee the

15   Speaker got to pick and choose every person he wanted on that

16   Committee.  That Committee only heard one piece of legislation.

17        The Senate Bill made it over to the House before

18   there were even committees named in the Texas House.  We're

19   talking about all due speed, we're talking about moving a

20   legislative proposal that this appeared to me that this was one

21   of the first pieces of legislation they were expecting to place

22   on the Governor's desk, and it might explain why the Governor

23   designated this to be a legislative priority or an emergency

24   matter which then -- which then circumvents the -- the 60-day

25   prohibition on taking legislative action on the floor of the

Fischer - Direct / By Mr. Garza                    109

Texas House.

Q    Were there special rules for the local calendar on SB 14?

A    Well, a matter like this, I believe, was placed on the Emergency Major State Calendar, or something to that effect, and so just looking at it from a chronology's perspective, it was very clear that the time-honored tradition of tagging was not allowed for this piece of legislation.

        The reason why I know that is I think you can just count the number of days.  Being a lawmaker, I've had several pieces of legislation tagged and the tag is usually for about a week.  I sit next to the Chairman of the House Counter Committee.  I see many members go to his desk on bended knee to get their proposals set on the Debate Calendar and, you know, you hear about tagging all the time.  It's a time-honored tradition.  This is what gives the members of the Calendar's Committee their power, it's not just power to the Chairman of the Committee.  And so but looking and judging by the way this Bill reached the floor, then that was not a tradition that was honored in this instance.

Q    And do members use points of order to try to impact legislation?

A    It is a very appropriate floor tactic and, in fact, there were two points of order that I can recall.  One that sent Senate Bill 14 back to Committee and it had to deal with the fact that the author of the Bill purported on the House floor

1    that -- that there were a number of days that, you know, some

2    action had to occur, and she couldn't remember whether these

3    were business days or calendar days.  When she had it wrong and

4    the analysis was wrong, well, then that was a flaw, they could

5    send the Bill back to Committee, correct the flaw and it could

6    be back to the House floor which, in fact, it did -- not in

7    record time, but in -- in time to make it very, very clear that

8    this was a leadership priority to come back to the floor

9    immediately.

10           The second time around I called a Constitutional

11   point order.  And the significance of a Constitutional point of

12   order is a Constitutional point of order can eliminate the

13   proposal for good, it doesn't go back to Committee, it doesn't

14   get back to the last known action and get corrected.  You

15   cannot correct a Constitutional defect, the Bill dies.  And the

16   only thing you can do to revive that proposal is to file it

17   again, and if it's after the filing period, seek a Motion to

18   introduce legislation on the floor of the House which is

19   subject to a vote.

20           The Constitutional flaw, in my view, was a valid

21   point of order because the House and Senate ultimately had to

22   go outside of the bounds and "outside of the bounds" means when

23   a conference report, when the House and Senate meet in

24   conference to discuss differences in their proposals, if they

25   adopt language that neither chamber debated, the only way it

1    can be passed is that the House and Senate have to take a vote

2    to go outside the bounds of the conference.  And so the

3    language that was voted on outside the bounds made it very

4    clear that the election information certificate or election

5    identification certificate would not cost any money, Number 1;

6    and Number 2, would not deprive our Constitutional Mobility

7    Fund of much needed revenue that was subject to credit

8    agreements that the State of Texas had with all of the bond-

9    holders for toll roads.

10          And so my Constitutional argument was by depriving

11   the Mobility Fund of these resources we are violating our

12   credit agreements to our toll road partners, and if this money

13   is not replaced it's going to be unconstitutional.  And so --

14   Q    So the point that you raised was addressed in terms of how

15   the Bill was structured, but there was never a resolution of

16   your point on the Constitutional issue?

17   A    When I raised the point of order you do it often times as

18   an objection in a courtroom.  You -- you maybe lodge one or

19   two, and you lodge some in the alternative, and so there may

20   have been a rule challenge as well as a Constitutional

21   challenge, and I remember the ruling from the Chair was a

22   decision only on the rule aspect of the point of order and a

23   statement from the Chair that he would not get into the

24   Constitutional issues which said to me that there was something

25   there and the out of bounds resolution was proof positive of

Fischer - Direct / By Mr. Garza                    112

1   that.

2   Q    And, finally, Representative, do you recall any evidence

3   presented during the debate on S -- Senate Bill 14 other than

4   anecdotal evidence, that in person fraud, voter fraud, was a

5   problem in Texas?

6   A    You know, at the time of the 2011 voter ID legislation we

7   had the elections of 2008 and 2010 for us to look back at.

8   What the evidence clearly showed that there may have been, of

9   the millions of votes cast in both of those elections, there

10  were perhaps four referrals for in person voter impersonation

11  with a result at that time one, if not two individuals that had

12  been officially charged and may have accepted responsibility

13  for impersonation.

14          I will also say that there were a number of lawmakers

15  that were asking for real evidence, asking the Attorney General

16  to provide monthly reports of this instance, members involved

17  at the Committee level asking the Secretary of State's Office,

18  Elections Office for analysis and review to show us where this

19  problem is, and -- and, you know, very little information about

20  -- in fact, I'll tell you no information with respect to in

21  person voter impersonation, and very, very little information

22  thereafter.

23  Q    On the other hand, Representative, do you know whether

24  there had been an impact study done by the Secretary of State

25  and whether that was chaired with the legislators?

1   A    I know that anything that we do that has these sorts of

2   consequences, especially at a time when Section 5 was alive and

3   well, there were always impact reports done.  It was done in

4   re-districting, it was done in voter ID and I am aware, just by

5   being a member of this litigation, that there were reports that

6   were generated and, in fact, were not presented to members of

7   the Legislature, and I think that there are instances when, you

8   know, as a lawmaker, not only do we have our Constitutional

9   right to speak and debate and have access to the information we

10  need in order to do our jobs; we also have certain privileges

11  afforded to us by law that give us information for legislative

12  purposes including attorney-client product information,

13  including any kind of work product written or created by any

14  agency.  In some instances we have to sign a confidentiality

15  agreement, but in many other instances we have access to that

16  report, and so it troubles me to know that reports are being

17  generated by the Secretary of State's Office to look at the

18  impact of SB 14, and not any of that information was ever

19  produced to the author of the Bill on the House -- excuse me,

20  the House Sponsor on the House side, members of the Special

21  Select Committee on voter ID, or any member for the House that

22  I worked with on this trying to defeat this proposal.

23          **MR. GARZA:**  Pass the witness.

24  //

25  //

**CROSS EXAMINATION**

1

**BY MR. SCOTT:**

2

Q    Hello, Representative, how are you doing?

3

A    I'm doing okay, sir.  How are you?

4

Q    I -- during your direct, you made mention of some

5

alternative forms of identification that were proposed at least

6

by your group or by other members of the Democratic Caucus; is

7

that correct?

8

A    No, sir.  By myself and members of the Mexican American

9

Legislative Caucus.

10

Q    Okay.  And some of those were student I.D.'s, for

11

instance?

12

A    Yes, sir.

13

Q    Did you ever -- were you able to capture a metric on how

14

many student I.D.'s were used prior to the passage of SB 14 in

15

elections as a form of I.D.?

16

A    I'm sorry.  Could you repeat the question?

17

Q    Sure.  Prior to the passage of SB 14 and the

18

implementation of SB 14, are you aware of how many people used

19

student I.D.'s in actual elections for purposes of proving up

20

their identifications at the poll?

21

A    Right.  Prior the enactment of Senate Bill 14, I wasn't --

22

I didn't understand that anyone had to produce an I.D. to vote

23

at an election poll.

24

Q    So, is that a no, you don't remember or came up with any

25

Fischer - Cross / By Mr. Scott                           115

1    type of metric that you know of, of any type of student I.D.

2    which was used for the purpose of identifying yourself when a

3    person didn't have a voter registration card at a polling

4    place, prior to the passage and implementation of SB 14?

5    A    I don't have any of that knowledge.

6    Q    Okay.  No information was passed out to other legislatures

7    about any of the other alternative forms of identification and

8    -- or any studies about the implementation and use of those

9    type of alternate forms of identifications, correct?

10   A    Not that I'm aware of.

11   Q    You are a party to this -- or your organization is a party

12   to this suit, correct?

13   A    Yes, sir.

14   Q    You are the chairman of that organization as we sit here

15   today, correct?

16   A    Yes, sir.

17   Q    Have you advised anybody; for instance, Representative

18   Farrar that if she doesn't have anything to hide, then to

19   produce everything she has with regard to legislative

20   materials?

21   A    In what capacity, sir?  I don't --

22   Q    Well, I'm just asking you if you have or haven't.

23   A    If I've ever asked Representative Farrar to produce

24   documents?

25   Q    If you've ever told her to produce documents if she has

1   nothing to hide.

2   A    I don't know that I've had that conversation with

3   Representative Farrar.

4   Q    Have you sent her any kind of correspondence that said

5   that?

6   A    I may have.  I don't know.

7   Q    Do you know if you told her if you have something to hide,

8   maybe she should assert the legislative privilege?

9   A    No.  I know that there is correspondence concerning

10  legislative privilege.  I don't believe that I was directing

11  those comments.  My standard practice is, whenever I receive an

12  inquiry from a colleague or a member of MALC regarding a voting

13  rights question, I will make the referral to Mr. Garza or

14  Mr. Golando or the lawyers that are assisting us in that

15  matter, depending on whether it's redistricting or voter I.D.

16  Q    You don't recall making any kind of -- sending any kind of

17  letter to Ms. Farrar giving her those kind of directions,

18  correct?

19  A    I don't.

20  Q    During the course of your direct, you used words "very

21  tense, full contact sport, builds some consensus."  It's the

22  legislative process, I guess, that you've been doing for almost

23  -- over 14 years, correct?

24  A    Yes.

25  Q    Sometimes somebody that's against you on one Bill is with

Fischer - Cross / By Mr. Scott                               117

1   you on another Bill, correct?

2   A     On occasion, yes.

3   Q     Sometimes a Representative says something either on the

4   floor or maybe at a meeting outside of the legislative body

5   that maybe wishes he could take that comment back; did you ever

6   do something like that?

7   A     Yeah.  I think that tensions flare up and -- you know,

8   people are human.  They make mistakes.  They're emotional and

9   there are always those occasions when somebody may walk back

10  something they said.  Or on the other hand, someone may stew

11  about something they want to say overnight and they'll confront

12  the member the next day.  I mean, it's a --

13  Q     Well, and I think another phrase you used during the

14  direct examination was "not inviting of compromise" was how you

15  would have described this -- the aura around SB 14.

16  A     Sure.  I can certainly explain that if you like.

17  Q     Well, no.  Just is that -- that was the term you used,

18  correct?

19  A     I believe so; yes.

20  Q     Yeah.  And there -- you found a shifting rationale,

21  correct?

22  A     Yes, sir.

23  Q     Is it possible this was -- this is all at least, at the

24  time, that the legislature was a battle between Republicans and

25  Democrats?

1   A     No.

2   Q     I mean, that's not unusual as we sit here today at the

3   trial --

4   A     Well --

5   Q     -- that Republicans and Democrats go to battle over

6   legislation because they think they can gain some political

7   advantage?

8   A     I think what's fair is that everybody in the Chamber is

9   either Republican or Democrat.  You know, the tenor and the

10  substance of the debate often deal with voting rotes and the

11  Voting Rights Act which didn't apply to Republicans or

12  Democrats.  It applied to minorities.

13  Q     Well, and so -- I'll get your comment if I could on a

14  snippet.

15       **MR. SCOTT:**  If I could get you to play that Brian?

16  Q     I'll ask you a question after this.

17  A     Sure.

18       **(Video played back from 1:44:35 to 1:44:46 p.m.)**

19       **MR. SCOTT:**  Okay.

20  Q     That's you?

21  A     That is.

22  Q     And that's you giving a speech at the Texas State

23  Democratic Convention, correct?

24  A     Yes, sir.

25  Q     And is that building a consensus in your mind --

1    A    That --

2    Q    -- with your GOP folks?

3    A    That was building a consensus with my audience, the

4    Democratic Convention; yes, sir.

5    Q    What did you mean by that?

6    A    Well --

7         **MR. GARZA:**  Objection.  Relevance, your Honor.  That

8    was not a legislative process.  That's not what he talked

9    about.  I don't know that this has any relevance except to the

10   argumentative.

11        **MR. SCOTT:**  Cross examination.  It goes to the

12   credibility of the witness.

13        **THE COURT:**  I'll allow it.  Overruled.

14   **BY MR. SCOTT:**

15   A    I will say that there are far worse exchanges on the floor

16   of the House than Gringos and (indiscernible).  And so -- and

17   that doesn't stop parties from coming together and pulling the

18   vote in the same direction to pass legislation.  We did a very

19   good job of it in 2013.  I can cite some examples of that.

20   What I was referring to in 2011 which wasn't the year that this

21   speech was given -- and so, going back two years, the

22   environment didn't lend itself to people getting in a room,

23   rolling up their sleeves and working towards a compromise.

24   I'll tell you even in the debate for sanctuary cities, which

25   was a very, very divisive debate -- in fact, it was the debate

Fischer - Cross / By Mr. Scott                    120

1   where I was noted for turning my microphone to address the

2   Speaker directly which is a clear violation of decorum of the

3   House floor but just to illustrate the level of how tense and

4   how divisive the floor was.  Even in the divisive Bill of

5   sanctuary cities, one of the most aggressive anti-Latino pieces

6   of rhetoric, the Speaker forced people from both parties to sit

7   in this conference room and try to work through amendments.

8   And so, there's a clear difference in terms of the tenor and

9   the tone of the debate and the tension on the House floor is

10  always high and things happen.

11  Q    I've said some stuff in my life. I've said some stuff in

12  this courtroom.  I think the Judge could be the first witness

13  to that affect that I wish I could take back.  Hit the rewind

14  button -- delete.  Is that one of those comments to you?

15  A    No.  I think that in the entire clip -- and to be fair, in

16  the entire 17 minute speech -- you know, of which -- you know,

17  we saw ten seconds of, the lines that would follow that if you

18  were to play the minute and seven second clip that you took

19  that piece from, talks about the extreme views of the Tea Party

20  and that the most frightening piece of legislation comes in

21  their anti-Immigration platform.  I was speaking to a platform

22  that has some very hard and negative sentiments about Hispanics

23  in the State of Texas.  And I felt like as a Hispanic leader in

24  this State, I had an obligation to not run from it, but to

25  stand up for it and that's what I did.

Fischer - Cross / By Mr. Scott                    121

1          **MR. SCOTT:**  Your Honor, may we approach?  There's a

2     document we probably want to run past.  It's from

3     Representative Martinez Fischer who is here testifying

4     Representative Farrar is not asserting any legislative

5     privilege.

6          **MR. GARZA:**  Your Honor, has the witness been provided

7     a copy of this if there's going to be --

8          **MR. SCOTT:**  Not yet.  I was making sure the Court

9     first --

10         **THE COURT:**  What -- what's the issue here?

11         **MR. SCOTT:**  He -- I think he did not recall sending

12    any writing to Representative Farrar at all about instructing

13    her on document production regarding asserting privilege or

14    producing documents in this case.  I just want to simply get it

15    into the record from this witness to prove it up.

16         **MR. GARZA:**  So, I think that the document speaks for

17    itself.  If the document can be shown to the Representative and

18    he can ask whether --

19         **THE COURT:**  That's fine.

20         **MR. GARZA:**  -- he authored the Bill or authored the

21    (indiscernible).

22         **MR. SCOTT:**  I'll offer it as an exhibit.  If no

23    objections, we'd only need to talk about it in open Court.

24         **MR. GARZA:**  I would say that I don't know how this

25    has any relevance to the issues that are pending before this

1   case.  What position the Representative took and MALC took on

2   the question of legislative privilege is not a factual issue

3   that has any relevance to this case.

4          **THE COURT:**  I agree.  There's been some testimony on

5   it.  Let's finish it up.

6          **MR. GARZA:**  Yes, your Honor.

7          **THE COURT:**  Do you want to show it to the

8   Representative?

9          **MR. SCOTT:**  May I approach, your Honor?

10          **THE COURT:**  Yes.

11  **BY MR. SCOTT:**

12  Q    Representative, if you'll take a peek at that.

13          **MR. SCOTT:**  And, your Honor, for the record, the

14  witness is looking at Farrar Exhibit 544, bates number.

15  A    I reviewed it.

16  Q    First of all, did you write that?

17  A    I did not write it, but I knew of its drafting; yes.

18  Q    And did you send it?

19  A    I didn't send it, but I knew it was being sent.

20  Q    It appears -- so for the top it says "from Trey Martinez

21  Fischer."

22  A    Yes.

23  Q    And it's got "Chairman at MALC.org," correct?

24  A    Yes, sir.

25  Q    And is that your e-mail address?

Fischer - Cross / By Mr. Scott                    123

1    A     That is my e-mail at MALC; yes, sir.

2    Q     And only persons authorized by you to send in that name is

3    persons who use that, correct?

4    A     That is correct.

5    Q     This is something you authorized to be sent to Ms. --

6    Representative Farrar, correct?

7    A     That is correct.

8    Q     And the purpose of sending this dealt with matters

9    relating to voter I.D., correct?

10   A     I believe it dealt with matters concerning legislative

11   privilege in sort of a confusion and legal advice that members

12   of MALC were receiving who are also members of the House

13   Democratic Caucus.

14   Q     And the confusion legal advice was coming from the House

15   Democratic Caucus?

16   A     I believe the e-mail, it states, is that -- if I may, it

17   says,

18              "On Friday, many of you received an e-mail from the

19              House Democratic Caucus giving legal advice

20              concerning the Texas voter I.D. case, specifically

21              House Democratic Caucus advise members not to waive

22              privilege."

23   And then it says,

24              "MALC has been a party in all phases of photo I.D.

25              litigation piercing the legislative privilege to

1            investigate the real concerns of policy makers during

2            the debate surrounding SB 14 passage is critical to

3            this case.  Waiving legislative privilege is nothing

4            new."

5   And then it goes on to say, "Then I urge you -- members do what

6   you think you need to do but if anybody wants to talk to Jose

7   Garza, I urge you to do that."

8   Q    And --

9   A    That's the sum and substance of the e-mail.

10  Q    Sure.  And (indiscernible) paragraph --

11            MR. GARZA:  Your Honor, I'm going to object to any

12  further questions along this line.  Again, the Representative

13  has identified to the exhibit.  It speaks for itself.  These

14  questions have no relevance to the matters that are pending

15  before this Court --

16            THE COURT:  Mr. Scott?

17            MR. GARZA:  -- on the positions of legislative

18  privilege.

19            MR. SCOTT:  Your Honor, I go -- this is cross

20  examination.  This is a witness that denied ever writing

21  this a --

22            THE COURT:  Yeah, I don't know that he denied.

23            MR. SCOTT:  Well, okay, so I pushed it a little far

24  there.

25            THE COURT:  You did.

1           **MR. SCOTT:**  Okay.  I think perhaps -- no, it does go

2   to the state of mind that was -- to the documents.  We have

3   sought and as part and partial of the inventory of documents

4   the Court has been provided by Republican legislatures in this

5   case, it -- are a number of documents being relied upon by the

6   Plaintiffs' experts on various Senate factors.  One of the

7   questions is whether they've had a full picture provided to

8   them by the parties of the documents that were in the

9   legislators' files.  What this document obviously shows is that

10  there has been an attempt, perhaps, to manipulate that process

11  and to allow certain documents in that are helpful and those

12  that were not helpful, to hide.  And it says so point blank.

13          **THE COURT:**  Anything else?

14          **MR. GARZA:**  I don't think that's what it says at all.

15          **THE COURT:**  Okay.  Sustained at this point.

16          **MR. SCOTT:**  Okay.

17          **THE COURT:**  Let's move on.

18  **BY MR. SCOTT:**

19  Q    So, other than this e-mail that you sent out, did you send

20  any -- or was sent out on your behalf, any other correspondence

21  or e-mails or communications you've had instructing people not

22  to turn documents over?

23          **MR. GARZA:**  Objection, your Honor.  Again, this is

24  along the same lines.  He's still talking about

25  (indiscernible).

 1          **MR. SCOTT:**  I'll withdraw.  Pass the witness.

 2          **THE COURT:**  Okay.  He's withdrawing.  Anything

 3    further, Mr. Garza, for this witness?

 4          **MR. GARZA:**  Nothing further, your Honor.

 5          **THE COURT:**  Okay.  Thank you, sir.  You may step

 6    down.

 7       **(Witness Excused)**

 8          **MS. BALDWIN:**  Your Honor, the United States calls

 9    Dr. Stephen Ansolabehere.

10          **THE COURT:**  All right.

11       **(Pause)**

12          **THE COURT:**  Good afternoon.  Would you raise your

13    right hand?

14        **STEPHEN ANSOLABEHERE, PLAINTIFFS' WITNESS, SWORN**

15       **(Pause)**

16                          **DIRECT EXAMINATION**

17    BY MS. BALDWIN:

18    Q    Good afternoon.  And would you please state your name and

19    your place of residence for the record?

20    A    Stephen Daniel Ansolabehere; spelled

21    A-n-s-o-l-a-b-e-h-e-r-e.  I live in Newton, Massachusetts.

22    Q    And where are you currently employed Dr. Ansolabehere?

23    A    I'm employed at Harvard University.

24    Q    And what's your position at Harvard?

25    A    I'm a professor in the Department of Government.

1   Q    As a professor in the Department of Government, what are

2   your areas to academic focus?

3   A    U.S. elections, American politics, generally.  Questions

4   pertaining to statistical analysis, social science data

5   especially pertaining to voting patterns.

6   Q    Dr. Ansolabehere, did you attach your C.V. to the

7   supplemental and rebuttal report that you submitted in this

8   case?

9   A    I did.

10  Q    And does that C.V. accurately summarize your professional

11  background?

12  A    It does.

13  Q    Could you tell the Court approximately how many papers

14  you've published in scholarly peer review journals?

15  A    I don't know (indiscernible) a hundred.

16  Q    And I understand from your C.V. that you're a member of

17  the Academy of American Arts and Sciences?

18  A    The American Academy of Arts and Sciences; yes.

19  Q    And when were you inducted?

20  A    2007.

21  Q    Okay.  And about how many editorial boards of peer review

22  journals in political science have you served on?

23  A    Eight or nine I guess.  Maybe more.

24  Q    In your professional or academic background outside of

25  this case, have you had occasion to perform quantitative

1    analyses on large sets of data such as voter registration

2    files?

3    A    I have.

4    Q    And could you give the Court an example or two of that?

5    A    I run a large survey consortium.  We conduct surveys of

6    around 50,000 people per year and we validate the vote

7    statements of those people and their registration.  So it's a

8    database matching of individuals for whom we have the name and

9    address, date of birth, and a gender, and we match that to the

10   voter files in all the 50 states in that process.  I've also

11   done research in conjunction with the Cal Tech MIT voting

12   technology project on the quality vote of registration lists,

13   relying primarily on the catalyst data.

14   Q    And have you served as an expert witness in any prior

15   voting cases before?

16   A    I have.

17   Q    And approximately how many?

18   A    Eight or nine, somewhere.

19        **MS. BALDWIN:**  Your Honor, based on these

20   qualifications and as more fully set out in Dr. Ansolabehere's

21   report, the United States offers Dr. Ansolabehere as an expert

22   in American electoral politics and statistical methods in

23   political science.

24        **MR. SCOTT:**  Your Honor, my understanding is we were

25   supposed to hold off on the Daubert-Jones until after the

1   presentation of evidence.  I'm happy to take the witness on

2   voir dire or we can do it at the end of my cross.

3           **THE COURT:**  What did you-all agree to?

4           **MR. SCOTT:**  I think that we agreed that after the

5   witnesses were done is when we were going to take up the

6   Daubert-Jones.

7           **THE COURT:**  Okay.  So you can just continue.  We'll

8   address it then.

9           **MS. BALDWIN:**  Okay.  Thank you.

10  **BY MS. BALDWIN:**

11  Q    Dr. Ansolabehere, what were you asked to do with this

12  case?

13  A    I was asked to take the Texas election administration

14  management database, the team database, and match it to

15  databases for the I.D. under SB 14, the Department of Public

16  Safety database and various Federal databases to determine how

17  many individuals in the State of Texas who are registered

18  voters possessed I.D. under SB 14, how many individuals may

19  qualify for an exemption under disability provisions under

20  SB 14, how many individuals might be over 65 and allowed to

21  vote by mail under SB 14 and not have to show an I.D. while

22  voting by mail, and also to ascertain whether there were racial

23  disparities in the possession of I.D., and finally to examine

24  voting data as it pertained to existing registration and voting

25  patterns in the State of Texas that might indicate a current

1    history or current pattern of racial disparities and the

2    ability to register or likely to registering and voting in the

3    State of Texas.

4    Q     On the first question on the possession of SB 14 accepted

5    forms of I.D., did you reach a conclusion on that question?

6    A     I did.

7    Q     And what did you conclude?

8    A     I concluded that approximately 787,000 people are

9    registered voters in the State of Texas don't possess SB 14

10   I.D. in the sense that we could not find a matching record

11   between the team database, the voter registration database and

12   any of the State or Federal databases corresponding to an SB 14

13   I.D.

14   Q     And on the second question of racial disparities, did you

15   reach a conclusion on that question?

16   A     I did.

17   Q     And what did you find?

18   A     I found that blacks in the State of Texas were about twice

19   as likely to not possess SB 14 as Anglos and Hispanics were

20   about 40 to 50 percent as likely to not possess SB 14 I.D. and

21   that was true across many different slices of the data that I

22   took.

23   Q     And what about rates of registration and turn out by race;

24   did you reach a conclusion on that question?

25   A     Yes.

1    Q    And what was that conclusion?

2    A    I concluded that blacks and Hispanics register at lower

3    rates than Anglos in the State of Texas and given registration,

4    they vote at lower rates than Anglos in the State of Texas.

5    Q    We'll talk in some more detail, but I'd like to turn very

6    briefly to the first question you did and ask if you could give

7    the Court just a very brief overview of the methodology that

8    you used to determine the number of people approximately who

9    have or do not have SB 14 I.D.

10   A    Very briefly, I took information on the Texas election

11   administration management database corresponding to Social

12   Security Numbers, Texas DPS I.D.'s, address, name, date of

13   birth, gender, constructed multiple identifiers and in that

14   database and in each of the matching databases, linked those

15   records and determined how many records had no matching or

16   linking record on the identification database.  From that I

17   constructed the list of matched records, a list of non-matched

18   records and was able to analyze the -- import data concerning

19   race to analyze racial disparities.

20   Q    Is database matching a generally accepted academic

21   research methodology?

22   A    Yes; it's very widely used.

23   Q    In what kinds of fields is database matching used?

24   A    All over, from political science to public health to

25   sociology.  It's a very widely used technique in social

1   sciences and --

2   Q    And --

3   A    -- even in medical research.

4   Q    And have you previously done database matching in your own

5   academic work?

6   A    I have.

7   Q    Would you explain very briefly -- and we'll get more into

8   the results in detail later -- but how you reached your

9   conclusion about black and Hispanic voters being more likely

10  than Anglo voters to lack SB 14 I.D.?

11  A    I took several different attacks on the question of

12  whether racial disparities.  The first attempt was to use a

13  technique called ecological regression which is widely used in

14  social sciences and in voting rights cases in particular to see

15  if they're using census data on race, if there was a

16  relationship between race and possession of I.D.  The second

17  approach was to use homogenous block groups, that is census

18  block groups, local areas that are highly homogenous for one

19  racial group -- say 80 percent or more Anglo, 80 percent or

20  more black, 80 percent or more Hispanic, and look at the race

21  of non-possession of I.D. across those block groups.  The third

22  thing I did was to look at data provided to me from a catalyst

23  which corresponded to their estimated race of individuals on

24  the voter files and to see whether there were (indiscernible)

25  rates of possession for -- or non-possession for I.D. for

Ansolabehere - Direct / By Ms. Baldwin                    133

1   blacks, Hispanics, and Anglos according to those estimates.

2   And finally, I looked at the Spanish surname voter registration

3   records that are on the team database to see if the Hispanic

4   numbers in the other methodologies were consistent with what

5   would come up from the SSBR.

6   Q    So, Dr. Ansolabehere, why did you have to use those four

7   different methodologies to get to the question of race?

8   A    Well, another sort of data that one might use in this

9   context would be self-reported race and in some States -- nine

10  States, race is self-reported by the individual when they

11  register to vote and is on the voter file.  It's not on the

12  voter file here so I wouldn't have that data to look at.  Even

13  still, we'd probably want to look at these different

14  methodologies.  In particular, ecological regression has been

15  accepted by the Courts since *Thornburg versus Gingles* in 1986

16  as a method for determining (indiscernible) impact of election

17  laws or (indiscernible) kinds of voting behaviors.  So, these

18  are just the standard techniques that one would use to analyze

19  race.

20  Q    Okay.  And just to walk through them again.  So your first

21  method was ecological regression.

22  A    Uh-huh.

23  Q    And so, to what extent would you say the ecological

24  regression is a widely accepted methodology in political

25  science?

1    A    It's very widely used.  It's a standard tool.

2    Q    Okay.  And you -- have you previously done ecological

3    regression in your academic work?

4    A    I have.

5    Q    And the second method that you mentioned is homogenous

6    block group analysis?  To what extent would you say that this

7    is, if any, a standard methodology in political science?

8    A    It's very widely used in political science and also in

9    other fields, especially sociology.

10   Q    And is -- to what extent is that a methodology that's also

11   used in voting rights case law?

12   A    It's also used in voting rights cases.

13   Q    And the third methodology you mentioned is catalyst data.

14   Have you published any studies in peer review journals using

15   catalyst data previously?

16   A    I have.

17   Q    Okay.  Are you aware of other scholars publishing articles

18   in peer review journals using catalyst race data?

19   A    There are; yeah.

20   Q    And the fourth way that you measured racial differences I

21   believe you said was Spanish surname voter registration?  Can

22   you say where the information about those Spanish surnames

23   comes from?

24   A    It's on the team database.  There's a field that says --

25   indicates whether the surname is Spanish surname or not.

1    Q    And what's your understanding on what information, if any,

2    that team classification is itself based on?

3    A    I -- my understanding of that comes from documents from

4    the Texas legislative counsel website.  I believe this

5    information was constructed as part of their re-districting

6    databases.

7    Q    And does the census also have a Spanish surname voter list

8    as far as you're aware?

9    A    Uh --

10   Q    A Spanish surname list?

11   A    Yes.

12   Q    Okay.  We'll talk in more detail about the results from

13   each of these specific methodologies but overall, what did

14   these four methodologies show with respect to rates of I.D.

15   possession across races?

16   A    Across all of the methodologies, I found significant

17   differences between the rates of possession or non-possession

18   of I.D. for blacks, Hispanics and Anglos and blacks across all

19   these different methods for roughly twice as likely or more to

20   not have an I.D. as the Anglos and Hispanics were 50 percent or

21   so more likely to not possess I.D.'s as Anglos.

22   Q    Did you prepare a report setting out -- one or more

23   reports setting out your analysis in this case?

24   A    I prepared two reports.

25   Q    And what's the difference between the two reports that you

1    prepared in this case?

2    A    The first report was based on data that we -- that was

3    extracted as a snapshot of the voter files in January -- for

4    January 15th, 2014.  I performed those analyses in the first

5    part of the summer and in late July, I believe, it was

6    discovered that the Department of Public Safety hadn't released

7    the 3.1 million records to us for the analysis.  I then

8    incorporated those records into the analysis and we did all the

9    analysis in the original report with that in mind.

10   Q    And to what extent did that additional 3.1 million records

11   from DPS affect the magnitude of the no match list you found

12   between the first report and the second report?

13   A    The no match list had 1.2 million records in the initial

14   analyses in my first report and it had 787,000 in the second

15   report and the secondary analysis.

16   Q    Is all of the analysis that you're relying on presently

17   for your conclusions reflected in your supplemental and

18   rebuttal report?

19   A    It is.

20        MS. BALDWIN:  And, your Honor, just so the record is

21   clear, the rebuttal and supplemental report is marked as

22   Plaintiffs' Exhibit 752.  And while that report had initially

23   been designated as highly confidential, we've since removed

24   that designation without objection from the Defendants.

25        MR. SCOTT:  That's correct; no objection, your Honor.

1              **THE COURT:**  All right.

2  **BY MS. BALDWIN:**

3  Q    So, I'd like to talk in a little bit more detail about the

4  process of the matching methodology and kind of break it out

5  into a number of steps.

6              **MS. BALDWIN:**  If we could turn on the Elmo?

7  Q    I'd like to show you the second page of a document that's

8  included as Exhibit A to your supplemental report.  What's this

9  document?

10  A    This document is a set of instructions or a description of

11  the matching process that was shared with -- or the Texas

12  Federal agencies for the purpose of their programming of the

13  methods that we developed.

14  Q    Okay.  And did you offer this document?

15  A    I did.

16  Q    And it says that the matching process proceeds in four

17  parts.  Could you walk us through what the first part is and

18  what that involves?

19  A    The first step is to take the databases and prepare them

20  by standardizing fields.  So, one field like name or date of

21  birth might be recorded differently in one database than in

22  another database.  A good example is date of birth.  In one

23  database it might be zero, three, zero, five, one-nine-five-

24  zero for March 1st, 1950 date of birth.  And in another

25  database, it might be stored as March 1, 1950 and so all of

1    those have to be standardized in order to allow for matching on

2    those fields.  Also names often have apostrophes in some

3    databases.  I think like O'Connor and then no apostrophe in

4    another database so standardization of all of the databases was

5    done first to ensure the greatest likelihood of matches.

6    Q    And was that done across all the kinds of fields that you

7    matched on; those kinds of standardizations?

8    A    Yes.

9    Q    Okay.  And is there any academic research on the effect of

10   that kind of standardization?

11   A    There is.  And taking the first step of varying the

12   standardizing databases increases matching significantly.

13   Q    Okay.  And what is the second step overall in the matching

14   process?

15   A    The second step was to construct the actual identifiers

16   used.  So, S -- Social Security 9 or SSN9 is one identifier

17   that's commonly used.  We also have Texas Department of Public

18   Safety I.D.'s on -- and those were on some of the records, not

19   all of the records.  And -- but most of the identifiers

20   constructed to link one record to other records in other

21   databases relied on address, date of birth, gender and name and

22   various combinations of those.  So across all the different

23   fields, we constructed 13 different identifiers.  Those were

24   developed in a program.  That program was shared with the

25   Federal agencies.

Ansolabehere - Direct / By Ms. Baldwin                    139

1    Q    Okay.  I'd like to direct your attention to page 87 of

2    your report.  What does this table show here?

3    A    This table shows the different combinations of fields that

4    were used to construct identifiers and what each combination

5    corresponds to in terms of which fields are being used.  So

6    combination code "A" is a match that was constructed using

7    first name, last name, gender, date of birth, residential zip

8    and residential street number.  And the reason for not using

9    street name is there are so many different variations in street

10   names that it's almost impossible to fix them to construct a

11   high match rate.  So it turns out that zip five and street

12   number is quite a good way to proceed.

13   Q    Okay.

14   A    Uh, the second --

15   Q    And why are there --

16   A    -- oh, sorry.

17   Q    Why there are 13 of these?

18   A    Uh, there are --

19   Q    Why so many?

20   A    -- 13 because I'm taking all different variations that

21   would drop out -- the first two correspond to using all four

22   kinds of information -- address, date of birth, name and

23   gender.  But then the subsequent combinations drop name or

24   gender or date of birth or address information so that I can

25   guard against a problem in one field preventing a match such as

1    a nickname.

2    Q    Okay.  And when you say a problem with a nickname, could

3    you give an example of how it -- say somebody in one database

4    being called "Jim" and another database being called "James;"

5    what is that?

6    A    Okay.  So, an example would be comparing combination codes

7    "A" and "B."  If someone is named Jim in one database -- say

8    the team database -- and named James in the driver's license

9    database, that person may not match on that first code just

10   because of the nickname being used in one database.  But

11   combination code "B" drops the first name from the match so the

12   nickname would not interfere with a match.  You would match

13   with his last name -- say, "Smith" and "Smith" and all the

14   other information.  Similarly, there's missing data in some of

15   the fields and typographical errors and that's why one would

16   drop out various fields to ensure that you could find matches.

17   Q    Okay.  So, going back to the overall process, what is the

18   third actual step of the process?

19   A    The third step of the process is to use each field -- or

20   each combination constructed and sweep through the database and

21   find every record that matched that field so it's a one to many

22   match.  And when those one to many matches are -- you know, we

23   do all 13 sweeps for each match.  There were some complications

24   with the Department of State with having to deal with how their

25   names are stored which increased the number of matches and

1   sweeps that needed to be done.

2   Q    So, when you do all of these matches, how many

3   combinations do you have to hit on between, say, team and

4   another database for your process to consider that person to

5   have matched to a form of I.D.?

6   A    Any matching on any one of those combinations counts as a

7   match.

8   Q    So you could not match on 12, but match on a single

9   combination, and what would the result be there?

10  A    That would be a match.

11  Q    This process that you've laid out, does it address -- to

12  what extent does it address all errors that would either come

13  from false positives, where somebody's matched but they not

14  actually have an ID, to false negatives where they're not

15  matched but, in fact, that person does have an acceptable ID?

16  A    The purpose of using multiple identifiers is to try to

17  minimize those errors to the extent possible using all the

18  available information.  And there will be some errors, some --

19  some records will be called a match that shouldn't have been,

20  some records will be not matched that might have been if more

21  information were available.

22          Along the way, in constructing the algorithm, I did

23  some internal tests comparing matches on Social Security

24  numbers, nine-digit Social Security number, with the matches on

25  the combination of address, date of birth, gender, and name and

Ansolabehere - Direct / By Ms. Baldwin                    142

1   discovered that matching on address, date of birth, gender, and

2   name is as good as using SSN9s.  Essentially we're using two

3   different commonly used keys to match databases.  We discovered

4   that the error rate was only about 2-1/2 percent, people not

5   found with address, date of birth, gender, and name, people

6   were found with SSN9.  Interestingly enough, people who were

7   found with -- who were not found with SSN9 but were found with

8   address, date of birth, gender, and name were about 2.5 percent

9   as well.

10          So we think that -- it appears that the two different

11  pieces of the algorithm that are being used are hitting at a

12  very high rate for social scientific standards or database

13  national standards.  Two and half percent's pretty good.  And

14  since we're using both of them, we know that we're well below

15  the 2-1/2 percent error rate.

16          So I don't know how low it is, because we've

17  exhausted all the information, but the algorithm does a fairly

18  good job minimizing it, so it's a very small error rate.

19          There will be records that are -- you know, if you

20  look really closely at the database you'll find odd things, but

21  those are going to occur with a low frequency and -- and

22  keeping in mind the inferences drawn the frequency in which

23  those errors occur is lower than the differences between the

24  racial groups and non-possession of ID.  So I don't think the

25  errors interfere with the inferences drawn.

Ansolabehere - Direct / By Ms. Baldwin                143

1   Q    Okay.  So that was going to -- can you say, based on what

2   you know about the error rate, that the error rate associated

3   with your matches is not causing or biasing the racial

4   disparities that you're finding?

5   A    It can't count for the racial disparities.

6   Q    And what's the last step of your matching process?  After

7   you've gone and compared all of the databases, what happens

8   next?

9   A    The last step is to return from the matching process the

10  information identified, the matched record indicates whether

11  there is a blank for no match, one if there was one match, two

12  if there were two or more matches.  And then also for the Texas

13  DPS data, what is it, the field indicating whether the record

14  corresponds to a deceased individual, that field is returned

15  for that match.  So that allows us to determine if for any

16  match the person showed up as deceased, then we can apply that

17  and remove that from the data.

18  Q    Okay.  So just to be clear, the deceased, is that

19  something that involves -- if somebody matched to a driver's

20  license record that had been marked as deceased, what happens?

21  A    A field is appended to the TEAM database indicating that

22  that -- this is the individual.

23  Q    And then what happens to that individual in the analysis

24  thereafter?

25  A    The deceased individuals are removed from the baseline.

1    So we started out with 13.5 million records and ended up with

2    13.4 million records because of the removal of deceased.

3    Q    Okay.  Well, let's start talking in more detail about how

4    the process actually played out.

5              So the 13.5 million records you started out with,

6    what does that correspond to?

7    A    That's the total number of records on the TEAM database as

8    of January 15th, 2014.

9    Q    Okay.  And once the matching has occurred and records

10   removed, records that matched the deceased record are removed,

11   how many people did you find out of that total universe of TEAM

12   did not match any valid SB 14 ID?

13   A    I believe the number is 786,727.

14   Q    Okay.  In writing your report, did you analyze the rates

15   of matching the different forms of SB 14 ID?

16   A    Yes.  So as part of the process of each step, I looked to

17   see how many people were matched to a driver's license, how

18   many people were matched to a passport, how many people were

19   matched to each of the forms of ID, as well as the two

20   disability databases, the federal disability databases used.

21   Q    Okay.  I'd like to draw your attention to this page from

22   your report, which is Page 89.  Could you explain what this

23   chart that we're looking at, Table V2, shows with respect to

24   people who matched to one of the SB 14 IDs?

25   A    This table indicates what -- how many and what percentage

1  of people matched to each form of ID.  They're not exclusive.

2  You can match to more than one form of ID.  For example, if you

3  have a passport and a driver's license and a concealed handgun

4  license, you would match potentially to all three.  You might

5  show up a few times.  But it does indicate the rate at which

6  people in the state -- people who are registered voters in the

7  state of Texas have different forms of ID.

8  Q    Okay.  So really kind of quickly, what does the all column

9  show and then just taking it down with respect to what can you

10 see from the all column with respect to the percentage of Texas

11 registered voters who have driver's licenses?

12 A    The all column is all records on the TEAM database and

13 what it indicates is that 83.8 percent of all records on the

14 TEAM database have a driver's license.  That is by far the most

15 common form of ID.

16 Q    Okay.  And what -- can you tell from this chart about what

17 the next most common form of ID is?

18 A    The next most common form of ID is a federal form of ID

19 from the Department of State passport, and that was about

20 42 percent of the records.

21 Q    Again, based on what you said earlier, it's not -- some of

22 the people who have driver's licenses, they may also be in that

23 42 percent, is that right?

24 A    Right, otherwise it would be 125 percent.

25 Q    Right.  Exactly.  Okay.

1          And so what about -- what can we tell from this chart

2   about the relative possession rates of the different forms of

3   ID by race?  How do you read the chart?

4   A    So I used for this chart the Catalist coding of -- or

5   estimate of race of individual records, and according to that

6   it indicates that 86.8 percent of Whites on the voter file have

7   a driver's license or match the record with a driver's license,

8   compared with 74.7 percent of Blacks and 80.3 percent of

9   Hispanics.

10  Q    Okay.  Are there some forms of ID that are more commonly

11  held by racial minorities than by Anglos, according to this

12  chart?

13  A    Yes.

14  Q    Okay.  And like what forms of ID are those?

15  A    The personal state IDs, the second row of IDs, is one

16  example, and the USCIS citizenship papers is another example.

17  Q    Okay.  Are those more or less common than some of the

18  other forms, like passports, driver's licenses, commonly held

19  overall?

20  A    Yeah, less than 10 percent of people are matched for each

21  of those.

22  Q    Okay.  So what about people who didn't match to any forms

23  of ID, are they reflected in this chart in all?

24  A    No, if you didn't match to any one of these at all you

25  ended up on a no match list.

1    Q    Okay.  Just before we get into talking about the no match

2    list, I just have a question that I wanted to ask from some of

3    the testimony that we heard this morning.

4              If the only form of government ID that a voter had

5    was something issued by the Veterans Administration called a

6    veterans universal access card, do you have an expectation of

7    whether that person would have ended up on your match list or

8    your no match list if that card was literally the only form of

9    government photo ID that they had?

10   A    So that's not a vet?

11   Q    Yes.

12   A    So we had an explicit list from the Secretary of State as

13   to which actual IDs from the federal sources would be used and

14   my recollection is the veterans card was the veterans

15   identification card or VIC.  I don't --

16   Q    Okay.

17   A    -- know about the universal access card.

18   Q    Okay.

19   A    So it would not have been in our list.

20   Q    So that's -- if it's a different card from the VIC it

21   would be your understanding that it would be a no match?

22   A    Correct.

23   Q    And that would be expected?

24   A    Correct.  And the documents we passed through the federal

25   agencies specified which IDs they were to match on.

1  Q    Here we've been talking about people likely on the match

2  list.  I'd like to switch gears and talk about the people who

3  are on your no match list and those who you determined were

4  likely to lack SB 14 ID.

5           In preparation for your testimony today did we

6  prepare a chart that went through the different methodologies

7  that you used to look at race?

8  A    Yes.

9  Q    And (indiscernible) methodology, but just to start with,

10 can you tell me for each racial group what the blue, the red,

11 and the green correspond to?

12 A    So the green bars correspond to African-Americans, the red

13 bar is Hispanic, and the blue bar is Anglos, and this is the

14 percent of each group that is estimated to be a no match.

15 Q    Okay.  So let's start on the left-hand quarter of the

16 chart with ecological regression and if you could just walk

17 through -- I'll just walk through step-by-step.

18           What does this bar graph reflect with respect to the

19 results for ecological regression?

20 A    The ecological regression analysis indicated that about

21 12 percent of Blacks, about 9 percent of Hispanics, and about

22 4 percent of Whites did not possess IDs under SB 14.

23 Q    And are these differences statistically significant?

24 A    Yes, very much so.  The probability of observing these

25 just by chance is about zero.

Ansolabehere - Direct / By Ms. Baldwin                    149

1   Q    And for the ecological regression, what's the underlying

2   race data, again, that's being used, as reflected in this bar

3   graph?  Where does the race data come from?

4   A    I did the ecological regressions two ways.  One, I used

5   the Census Bureau's American Community Survey Citizen Voting

6   Age Population estimate, so the official accepted CVAP

7   estimate.  And the other way, the other racial data I used was

8   the Voting Age Population from the Census Enumeration for 2010.

9   Q    Okay.  And you said CVAP.  So just we're defining terms,

10  is that Citizen Voting Age Population?

11  A    It is.

12  Q    Okay.  And so are these the Voting Age Population from the

13  Census Enumeration or the Citizen Voting Age Population from

14  the ACS?

15  A    I believe those numbers are the CVAP numbers --

16  Q    Okay.

17  A    -- or the Citizen Voting Age Population numbers.

18  Q    And when you looked at those Voting Age Population and

19  Citizen Voting Age Population, did it -- to what extent did

20  that make a difference in your results?

21  A    It made no difference for the conclusion, the estimates

22  were a little tiny bit different.

23  Q    Okay.  And so those are both, to be clear, Census data,

24  one is from the Enumeration and one's from the American

25  Community Service?

1  A    Correct.

2  Q    What's the next set of bar charts that we see on this?

3  A    The next set of bar charts compares the rates of non-

4  possession of ID across block groups that are at least

5  80 percent African-American and at least 80 percent Hispanic

6  and at least 80 percent Anglo and the numbers are extremely

7  close.  The ecological regression estimate is about 12 percent

8  of African-Americans don't possess ID, about 9 percent of

9  Hispanics estimated not to possess ID, and about 5 percent of

10 Anglos.

11 Q    And just so we're clear, what's a block group?

12 A    A block group is a geographic area defined by the Census

13 corresponding to a few thousand people.

14 Q    Okay.  And why did you do both the ecological regression

15 and the block group analysis?

16 A    These are standard methodologies in voting rights cases

17 for assessing voting behavior and effects of election laws on

18 racial groups.

19 Q    Is one of these numbers more accurate or more true or more

20 valid than the other, in your opinion?

21 A    No, especially given how close they are to each other.

22 They're confirming each other.  The ecological regression uses

23 all the block groups and so it uses all the data, so in some

24 sense it's preferable, it makes it a little more precise.

25 Q    Did either of the ecological regression or the block group

1  analysis allow you to say this specific person on the no match

2  list is of this race?

3  A    No, they're not -- you do not have to estimate the

4  differences as a class group.  You don't have to estimate

5  individual level race to estimate the effects on groups.  And

6  that's what these techniques are doing.

7  Q    Is the fact that they don't go down to the individual

8  level affect in any way your understanding of the validity of

9  the overall differences between the groups as shown in the

10  ecological regression and the block group analysis?

11  A    Not in this context, especially because you have other

12  data that are also confirming the same pattern.  So if you see

13  the same picture over and over again across different ways of

14  thinking about race or estimating racial differences, it's

15  confirmatory.

16  Q    Okay.  Let's take the third bar graph, the Catalist graph.

17  First tell us what that shows and then we'll talk about what

18  the Catalist data is some more.

19  A    Okay.  That shows using the Catalist estimate of race for

20  each individual in the voter files, the rate of non-possession

21  of IDs, non matching of SB -- with SB 14 IDs, was 9 percent for

22  African -- people identified as African-American by Catalist,

23  6 percent for Hispanics, and 5 percent for Whites.

24  Q    So what is Catalist?

25  A    Catalist is a data firm that assembles all of the voter

Ansolabehere - Direct / By Ms. Baldwin                   152

1   registration lists in the United States and combines that with

2   other sources of information and then sends that information to

3   candidates and parties and groups as part of their political

4   campaign organizations and get out the vote activities and so

5   forth.

6   Q    What information did you actually receive from Catalist

7   with respect to race?

8   A    Catalist provided for each record two pieces of

9   information.  One was the estimated race and the confidence in

10  the estimate.

11  Q    Okay.  And when you say "the confidence in the estimate,"

12  what does that mean?

13  A    The confidence in the estimate is their classification of

14  how likely it is that this individual is to be of a given race,

15  because it's not self-reported, it's an estimate of what that

16  individual's race is.  And there will be some errors in that by

17  virtue of being -- or misclassifications by virtue of it being

18  estimates.

19  Q    Okay.  So the confidence scores, like how is that

20  represented?  Are there different levels that you got back?

21  A    Right.  They gave us different levels, so very likely,

22  likely, that sort of thing.

23  Q    Okay.  And did you use those confidence levels in your

24  analysis?

25  A    Yes.  So the first -- the third panel, but the first panel

1   corresponding to Catalist data uses all of the estimated -- the

2   race estimates for all of the 13 million or so records.  And

3   then the second panel of Catalist data just took the data for

4   which they had the highest confidence, which is about half of

5   the records on TEAM.  And we did the analysis that way, just to

6   make sure that when we look at the data for which they have the

7   highest confidence do we see racial differences, and we do.

8   Q    And what's your take away from the fact that if it's

9   there -- you know, the African-Americans, for example, the

10  disparity goes up when it's restricted to highest confidence,

11  what significance, if any, do you place on that?

12  A    That's actually to be expected, given some

13  misclassification in the data.  The piece of the data I'm not

14  looking at is the piece where it said the least confidence was

15  the noisiest and that misclassification will actually bias the

16  estimate downward.  In other words, biased towards finding no

17  effect as opposed to finding an effect.  So -- but it got --

18  but the differences -- but the group spread out and the

19  differences got bigger was to be expected.

20  Q    Explain that some more.  How do you know that as you go to

21  highest confidence you would expect that the disparities become

22  wider versus why wouldn't you expect that they might also

23  become less wide?

24  A    It's well known in statistics that if you have measurement

25  error in a classification variable such as race it will bias

Ansolabehere - Direct / By Ms. Baldwin                    154

1    toward finding no effect, bias toward finding nothing, no

2    difference across groups.  And an example might help.

3           Suppose you have two groups and one group is Black

4    and one group is White and there are a hundred people in each

5    group and all the Whites have ID and none of the Blacks have

6    ID.  So the true difference in the actual data -- because here

7    the actual data is a hundred percent.  It's a hundred here and

8    zero here.  But suppose you misclassify some of the Whites and

9    call them Black and some of the Blacks and call them White, so

10   suppose you misclassify 20 percent of the Whites and call them

11   Black and 20 percent of the Blacks and call them White, then

12   what you've done is you've taken a bunch of people who don't

13   have ID and called them White, therefore your estimated White

14   rate is going to be 80 percent, as opposed to a hundred

15   percent, and your estimated possession of ID rate among the

16   Blacks will be 20 percent, as opposed to zero percent.  So now

17   you've got a 60 percentage point difference, as opposed to a

18   hundred percent point difference, so it's shrinking.

19          Misclassification biases away from finding the facts

20   and that's why you want to see cross different techniques,

21   where you're seeing and observe differences.  It's a very well

22   known statistical property of measurement error.  It's been

23   known since the 1940s.

24   Q    What is the -- what are the Catalist estimates actually

25   based on?  Like how does Catalist come up with the race and

Ansolabehere - Direct / By Ms. Baldwin                    155

1    those race confidence scores, as far as you're aware?

2    A    Catalist uses an algorithm developed by CPM and they use

3    their data and they put their data into that algorithm.  That

4    algorithm relies on -- primarily on local area census data

5    about the composition of those local areas.  I don't know if

6    it's block groups or block (indiscernible).  And also

7    information about names and the frequencies with which certain

8    names occur in difference racial groups.  So a name like

9    Hinojosa, that's a good guess that that's a Hispanic person,

10   because that's a very common Hispanic surname.

11   Q    Okay.  Are you aware of whether or not there are people on

12   your no match list who the Catalist estimates misclassified

13   their race?

14   A    Oh, yeah.

15   Q    Okay.  Is that to be expected?

16   A    Yeah.

17   Q    Okay.  And this morning we heard testimony from someone

18   named Sammi Bates by video.  Do you know whether her Catalist

19   race estimate is correct or incorrect?

20   A    I don't know for sure.

21   Q    Okay.  If someone had an incorrect estimate, what would be

22   the reasons that that would likely be?

23   A    Well, if they had a -- if they were in a -- if they were

24   in a local area, suppose you were a Black person living in a

25   very White area, a 95 percent White area, the best guess about

Ansolabehere - Direct / By Ms. Baldwin                156

1    the race of that individual, without knowing anything about

2    them, no name or anything, the best guess for the race of any

3    individual in an area that's 95 percent White is that that

4    individual is White.  That's the best guess.  Ninety-five

5    percent of the time you're going to be right.  When you add in

6    other information, such as surnames, you start to learn how

7    likely they are to be one group or another.

8              So if they're misclassified, it's probably that

9    they're in an area that's fairly homogenous for another racial

10   group and they have a surname that is not very distinctive or a

11   first name that's not very distinctive, like Phil Smith or

12   something like that.

13   Q    And again, if there is some misclassification looking at

14   the Catalist results and the results in general, how do you

15   know that that's not creating the disparities that you're

16   finding?

17   A    Misclassification, again, would shrink all the bars toward

18   each race, so there would be -- if I completely just randomly

19   guessed, everything was a coin toss, all the bars would be the

20   same height.  But the fact that I'm finding statistically

21   significant differences that are sizeable indicates that the

22   misclassification isn't enough to swamp any true racial

23   effects.  And also the fact that I'm seeing a similar pattern

24   in a homogenous block using ecological regression and relying

25   on the census data for racial classifications suggests that

 1  there's something real underneath the data.

 2  Q    In addition to the forms of analysis that are reflected on

 3  this chart, you mentioned that you did Spanish surname

 4  analysis.  What did that show?

 5  A    I mainly did it comparing the SSVR with Hispanic groups in

 6  the other estimates and it showed that the rate of non-

 7  possession for people with a Spanish surname from the voter

 8  records was I think around 6-1/2 or 7 percent.  I don't

 9  remember the exact number.  So it's falling right in the same

10  range as the other estimates.  It also showed that people with

11  a Spanish surname were more likely to not possess an ID than

12  others.  But the other group combines Whites and Blacks, so

13  it's not a totally appropriate comparison for drawing

14  inferences about all the effects of the ID law on all racial

15  groups.

16  Q    Okay.  So you can see Hispanics from the Spanish surname

17  analysis, but do I understand that you can't really make

18  conclusions about differences between Anglos and Blacks?

19  A    Right, or between Anglos and Hispanics, because the

20  other -- the non-Spanish surname group is Blacks plus Anglos --

21  Q    Okay.

22  A    -- plus Asians plus whatever.

23  Q    Okay.  In view of everything we've talked about, these

24  forms of analysis and the Spanish surname analysis, to what

25  extent, if any, do you have any doubt as to whether or not

 1   there are, in fact, statistically significant racial

 2   disparities in rates of ID possession between Anglos and

 3   Hispanics and African-Americans?

 4   A    I have no doubt that there are differences --

 5   Q    And --

 6   A    -- that are statistically significant.

 7   Q    I'd like to switch gears and talk about people who are -

 8        **MS. BALDWIN:** And just for your Honor, the

 9   demonstrative that I've just been showing has been marked as

10   Plaintiffs' Exhibit 1100.

11   Q    I'd like to shift gears and talk about people who are

12   eligible to apply to -- eligible to vote by mail or apply for a

13   disability exemption.

14        As far as you know, are voters over 65 eligible to

15   vote by mail in Texas?

16   A    Yes.

17   Q    And do you have to show ID in order to vote by mail?

18   A    If you're over 65 under SB 14, no.

19   Q    And your no match list, your 787,000 figure, it includes

20   people who are over 65, right?

21   A    Correct.

22   Q    And one of the State's experts has written that, you know,

23   people who are over 65, they're not affected by SB 14 because

24   they can vote by mail.  Do you agree or disagree with that

25   paraphrasing?

1  A    I disagree.

2  Q    And why do you disagree?

3  A    Well, if that person tried to vote at the polls, they

4  would be affected.  So if your neighbor called you up on

5  election day and got you to vote and you were over 65, you'd

6  still have to show ID.

7  Q    Okay.  Do you recall approximately how many people on your

8  no match list are under 65 and not eligible to automatically

9  vote by mail?  And I can point you to a page.

10  A    I think it's a couple hundred thousand.

11  Q    Okay.  So that it's not a memory test, let me --

12  A    I think the number is 580 -- 586 was the remaining number?

13  Q    This is Page 95 from your report.  What --

14  A    Okay, 589, five hundred and eighty-nine thousand --

15  Q    Okay.

16  A    -- four hundred and eighty one.

17  Q    So that's the number, to be clear, of people who are on

18  the no match list who are under age 65?

19  A    Correct.

20  Q    And did you examine what effect, if any, taking out the

21  people who are over age 65 has on the racial disparities that

22  you previously found?

23  A    So if you restricted the analysis just to people under 65,

24  the racial disparities remain across all the different ways of

25  analyzing the data, ecological regression, Catalist, and so

1    forth.

2    Q    Okay.  And so just to be clear, the ER no match under 65,

3    what are the percentages that you see there?

4    A    ER corresponds in this graph to ecological regression and

5    9 percent of African-Americans under 65 are estimated to not

6    possess relevant ID, 7 percent of Hispanics, and 3 percent of

7    Anglos.

8    Q    Okay.  And what if you look at that same group of voters

9    on the no match list, the 500 -- approximately 590,000, using

10   Catalist, what are the racial rates that you see?

11   A    7.4 percent for African-Americans, 5 percent for

12   Hispanics, and 4 percent for Anglos, and those differences are

13   statistically different from zero.

14   Q    Okay.  Is that another way, a more political science way

15   of saying statistically significant?

16   A    Yeah.

17   Q    Okay.  People who are disabled can apply for an exemption

18   from showing ID at the polls, isn't that right?

19   A    Correct.

20   Q    And do you know in that data that you examined how many

21   people actually had gone through that process and had applied

22   for and received the disability exemption?

23   A    As of the date of the day that we used, which was

24   January 15th of this year, it was 18.

25   Q    So only 18.  Are there a larger universe of people than 18

1   who would be eligible to apply but haven't?

2   A    Yeah.

3   Q    Um --

4   A    Tens of thousands.

5   Q    Do you know approximately how many people are on your no

6   match list if you take out people who are eligible to apply for

7   the disability exemption, even though they haven't?  And I

8   can --

9   A    I think it's around 80,000 or so.

10  Q    Okay.  The people left on the no match list?

11  A    Oh, after removing those.  And the elderly or --

12  Q    Just disability.

13  A    It's about 700,000.

14  Q    Okay.  And what happens when you both take out anybody who

15  could apply for the disability exemption and anybody who is

16  over 65, what effect, if any, does that have on the racial

17  disparities that you've observed?

18  A    All right, so if I further restrict the analysis just to

19  people who are under 65 and don't qualify for an exemption, I

20  still see racial disparities using either method for measuring

21  race.

22  Q    Okay.  And so the --

23  A    Ecological regression or the Catalist.

24  Q    -- the third chart shows the ecological regression

25  results?

1  A    Correct.  And the net chart, 8 percent of Blacks are

2  estimated -- in that subgroup are estimated not to possess ID,

3  versus 6 percent of Hispanics and 2 percent of Whites.

4         And using the Catalist racial estimates, the numbers

5  are 6 percent of Blacks, 5 percent of Hispanics, and 3 percent

6  of Whites.

7  Q    Professor Ansolahehere, I think I want to switch gears

8  again and talk about dead wood.

9         Could you explain what dead wood is?

10 A    Dead wood in a catchall term for obsolete data on a

11 database.

12 Q    Okay.  And with respect to voter registration, what does

13 dead wood refer to?

14 A    Dead wood consists of people who might be deceased, people

15 who might no longer be at their address or not legal voters

16 anymore.

17 Q    Okay.  And could the presence of dead wood affect the

18 number of no matches that you find?

19 A    Potentially, yes.

20 Q    Okay.  And did you do any analysis to look at how dead

21 wood might affect the racial disparities that you found?

22 A    I did.

23 Q    And did we also create a chart going through those?

24 A    We did.

25         **MS. BALDWIN:**  This one I'm putting up, your Honor, is

Ansolabehere - Direct / By Ms. Baldwin                    163

1    Page 2 of PL1100 and then I presume that this is Page 3 of

2    PL1100.

3    **BY MS. BALDWIN:**

4    Q    Let's talk about the ways that you looked for potentially

5    dead wood records on the voter file.  What methodologies did

6    you use to identify voters on the screen that might no longer

7    be actual voters?

8    A    I used three different approaches.  One was to look at

9    active voters, Texas calls them suspense voters, or the ones

10   that are not active, and those are almost entirely people who

11   have not voted in two successive federal elections.  The other

12   information I used to identify potential dead wood was expired

13   licenses on the driver's license lists.  And then finally

14   Catalist provides flags that consist of national change of

15   address flags, so if you've moved, if you file a national

16   change of address that flag is put on the database, even if

17   you've moved within county or between states or within the

18   state.  Also they have information about records that may be

19   deceased.  And then finally they have their own measure or

20   estimate of dead wood based on frequency voting and those

21   things.

22   Q    Okay.  And so taking the first screen, looking just at who

23   is an active voter, as opposed to a suspense voter, just to be

24   clear, can suspense voters still while they're in that category

25   show up on election day and legally vote at the polls?

1   A    Sure.  But suspense voters are a big category of people

2   who haven't voted in a while, might still be at their address,

3   or maybe they've moved or maybe they're deceased, so this is

4   kind of a big category that is intended to like sweep out dead

5   wood, just to see if we're -- the point is to see if the

6   results we've already seen are sensitive to potential

7   identification of dead wood.

8   Q    And when you say "sensitive to see whether," is that

9   another way -- is dead wood biasing the results, like causing

10  the results?

11  A    Right, or do the results change much if we sweep out those

12  kinds of records.

13  Q    Okay.  And so when you remove the people who are on the

14  suspense list and only look at active voters, what do you see?

15  A    What I see is if I only look at active voters the

16  disparities in possession of ID are actually somewhat bigger.

17  Ten percent of African-Americans are in the no match list among

18  the active voters, 8 percent of Hispanics, and only 3 percent

19  of Anglos.  So Blacks are three times more likely to not

20  possess ID and Hispanics are more than twice as likely.

21  Q    Okay.  And what about the parallel figures using Catalist

22  for active only in the second column?

23  A    The parallel figures are 8 percent of African-Americans

24  among the actives are found to not possess ID, 6 percent of the

25  Hispanics, and 4 percent of the Anglos.

1  Q    Okay.  And you mentioned before expired licenses.  Why do

2  you consider matching somebody who's a currently registered

3  voter matching to an expired DPS license, why could that be a

4  screen possibly for dead wood?

5  A    If someone moved, left the state, never bothered to tell

6  the DMV or the DPS that they've moved, they don't have any

7  reason to remove them, eventually that license becomes expired.

8  So that would be one hypothetical example of somebody who would

9  be dead wood and the expired license would be an indicator of

10 that.

11       But expired licenses occur for other reasons, like

12 you're no longer driving.  And so, again, this is just an

13 overly aggressive attempt to sweep out things -- records that

14 may be counted as dead wood and to see if the results change as

15 we take big steps in that direction.

16 Q    Okay.  And so then the NCOA flag to that, you could -- if

17 I moved across the street and told the post office, could I

18 have an NCOA flag?

19 A    Right.

20 Q    And would that be any different from moving out of the

21 state in terms of that flag?

22 A    No.

23 Q    Okay.  So, but you removed anybody with an NCOA flag as

24 one of the sweeps?

25 A    Right.  If you moved from Texas to Colorado and filed an

Ansolabehere - Direct / By Ms. Baldwin                166

1    NCOA, you show up.  If you moved from one side of Dallas to the

2    other, you show up.

3    Q    Okay.  And so the last two charts, what do they show?

4    A    The last two charts show that when I impose all of the

5    screens active, all the Catalist flags for dead wood, deceased,

6    or NCOA, and also expired licenses and I remove all of those

7    records, suspense voters, expired records, and all the Catalist

8    flags, I still see statistically significant differences across

9    the racial groups in their rates of non-possession of ID.

10   Q    In general, do you have an opinion of how well or poorly

11   Texas does with its list maintenance and addressing dead wood

12   as compared to other states?

13   A    So when I -- I've only studied comparatively the states

14   through the Caltech-MIT Voting Technology Project on how well

15   states are doing in performing different tasks of election

16   administration.  Texas always shows up as one of the best

17   states in terms of management of the voter files.  I think only

18   about 3 percent of the records show up as dead wood.  And if

19   you imagine that 10 percent of people move every year, that

20   means that they are able to keep up with people on a four-month

21   or less basis, which is pretty impressive.

22   Q    And are those results consistent with the results that you

23   saw from the various Catalist dead wood flags and modeling?

24   A    Yeah.

25   Q    And just under deceased flag that Catalist had that is

1   incorporated in today's last two charts, what's your

2   understanding of what the underlying data that goes into

3   whether Catalist says somebody may be deceased is based on?

4   A    I think one of the sources of data used was Social

5   Security deceased records and then other sorts of information

6   that they collect.

7   Q    And is that a definite indication of deceased or is it a

8   model of likelihood, as far as you know --

9   A    Um --

10  Q    -- the Catalist death flag?

11  A    I think it's a model, information, it takes the Social

12  Security stuff and other stuff and combines it.  It's an

13  estimate.

14  Q    Dr. Ansolahehere, did you also examine the voting history

15  of people on the no match list?

16  A    I did.

17  Q    Okay.  And why did you do that?

18  A    So the reason for modeling the voting history was to

19  understand that there were people who were actually voting who

20  would be affected.  One way to think about what the question

21  behind that analysis is, is had this law been in place in, say,

22  2012, are there actual people on the record who would not have

23  been able to vote and were there racial disparities in those

24  people --

25  Q    Okay.

1    A    -- among those people.

2    Q    And what did you -- what elections did you look at in

3    terms of elections prior to SB 14 and no match?

4    A    I looked at 2012 general election and 2010 general

5    election results.

6    Q    And what did you find in terms of racial disparities, if

7    any?

8    A    I found that there were significant racial disparities for

9    Blacks in all of the elections and for Hispanics in the midterm

10   election, I think.  No disparity for Hispanics -- between

11   Hispanics and Anglos in the general election, the presidential

12   election.

13   Q    And did you examine those using both Catalist and

14   ecological regression?

15   A    Yes.

16   Q    Dr. Ansolahehere, were you involved in the prior

17   litigation regarding SB 14, *Texas v. Holder* in the D.C.

18   District Court?

19   A    I was.

20   Q    And were an expert for the United States?

21   A    I was.

22   Q    (Indiscernible) that Texas had failed to show that SB 14

23   did not have a discriminatory affect (indiscernible) did the

24   D.C. District Court rely on any expert testimony?

25   A    No.

1  Q    Are there differences between the analysis that you've

2  done in this case and the analysis that you did in *Texas v.*

3  *Holder*?

4  A    Yes.

5  Q    Could you walk through what some of those differences are?

6  A    Well, first the basic objective was different.  The

7  objective there was to find -- because it wasn't clear at that

8  point exactly how Texas intended to implement the law.  It

9  hadn't been implemented yet.  And the purpose of that was to

10 find exactly matching records, so first name, last name, date

11 of birth, and Social Security number, thinking that that was

12 the identification that would be shown, first name, last name,

13 date of birth.  In addition, we did not have access to the

14 federal databases, so all that was matched was to the DPS

15 records, the Department of Public Safety records.  This time we

16 have the state of Texas records and access to the federal

17 records.  I didn't have direct access to the federal records,

18 so the federal agencies programmed what we provided.

19          I also -- another important difference was the

20 treatment of deceased records.  We had a different

21 understanding about how deceased records should have been

22 treated in that case and that's since been clarified.

23          And then sensitivity of the results to name

24 variations, especially nicknames.  The data analysis provided

25 here for some of the matches doesn't rely on name at all, so

1   it's not going to be sensitive to nicknames.  Some of the

2   matches with hyphenations, look for married, change of name and

3   so forth.  So sensitivity in nicknames and name variations.

4           And finally, the robustness of the analysis to the

5   racial data.  In that analysis we only relied on the Catalist

6   racial analysis and now we supplemented that with the

7   ecological regressions and the Spanish and the voter records.

8   Q    Have you had an opportunity to read and respond to --

9   reply to the rebuttal reports of Drs. Hood and Milyo?

10  A    I have.

11  Q    I'd like to talk about some of their concerns and your

12  responses and start with Professor Hood.

13          First, has Professor Hood used database matching as a

14  methodology to examine the question of possession of photo ID

15  before?

16  A    He has.

17  Q    And in what states has he done that?

18  A    He has a published article with Professor Bullock on

19  analyzing Georgia.

20  Q    Okay.  And are there any conclusions that Professor Hood

21  reached in the Georgia article that you think are relevant to

22  the things that you've done here?

23  A    Two of the conclusions that they reached were, first, that

24  in Georgia people who lack ID are significantly less likely to

25  vote than people who do not lack ID to a very large effect.

1    And second, that minorities in Georgia were less likely to

2    possess ID, in part because of economic disparities, such as

3    education and income level.

4    Q    And how did the overall rates of non-possession by race

5    that Dr. Hood found in Georgia compare to the rates of non-

6    possession by race that you found here in Texas?

7    A    They're very similar.

8    Q    And are you aware of whether Dr. Hood had also looked at

9    voter ID possession in South Carolina?

10   A    He has.

11   Q    And are your conclusions in this case similar to his in

12   South Carolina in terms of the rates of possession by race?

13   A    They are.

14   Q    Was Dr. Hood able to rely on data in Georgia and

15   South Carolina that had self-reported race?

16   A    He did.  Those are two states with self-reported race on

17   the rolls.

18   Q    Okay.  And what about a unique identifier, was that a part

19   of those matches?

20   A    Yes, they had unique identifiers.

21   Q    Okay.  And so your results, notwithstanding that you

22   didn't have self-reported race or a unique identifier, is it

23   fair to say that you still reached similar results in Texas?

24   A    Yeah, they appear -- basic rates of no match and the

25   difference across the groups and the rates of no matching

1   appear quite similar.

2   Q    And in preparation for your testimony we created a chart

3   of the seven issues that Dr. Hood identified with respect to

4   concerns about knocking the TEAM.  I'd just like to talk

5   through your responses to those.

6        The first concern is the no unique common identifier

7   that Dr. Hood raised.  How, if at all, do you think your

8   methodology addresses that concern?

9   A    I actually think it improves on it, because the use of

10  address, date of birth, name, and gender, as I discussed

11  earlier, the way we use it is as reliable at linking records as

12  Social Security number, nine-digit Social Security number,

13  which is the most commonly used unique identifier in database

14  matching.  So that combination is at least as good and then to

15  use both of those two things together, you're improving on

16  that.

17       And even with a unique identifier, you're still not

18  going to hit everybody, because of typographical errors or

19  missing data in the unique identifiers.  So really using 13

20  different identifiers improves on what one would normally get

21  even with a common identifier.

22  Q    Okay.  And so just to be explicit, you compared your

23  matching success rate with Social Security number with your

24  matching success rate with your age, date of birth, gender, and

25  name combinations?

1  A    Correct.  I took everybody who had a Social Security

2  Number 9 on the TEAM database, which was about 45 percent of

3  the records, matched those people to records on DPS, then I ran

4  the algorithm for using address, date of birth, gender, and

5  name and found that 97.5 percent of those people matched on

6  some combination of address, date of birth, gender, and name.

7  Then I re-ran it the other way and said find everybody who has

8  a Social Security Number 9, find everybody who it matches on

9  address, date of birth, gender, and name, now ask what

10 percentage of them also match on SSN9 and it was about

11 97.5 percent.  So the two approaches are as good as each other.

12 Q    And the second concern that the TEAM database, not all

13 records have state ID numbers on all records, how did you

14 respond to that concern, if at all?

15 A    That's correct and that's why one would use these other

16 sweeps to fill in and find matches for records for which there

17 is not a state identification number or a Social Security

18 number.

19 Q    Does Dr. Hood raise any concern that that concern or

20 really any of these seven concerns are related to biasing the

21 results that you've seen by race?

22 A    He provides no evidence or really no argumentation that

23 any of these concerns would affect the conclusions that I've

24 drawn about racial differences.

25 Q    What about inconsistencies between database fields, how

1    was that addressed?

2    A    So an inconsistent -- his example of an inconsistency

3    between the database fields was the example we discussed

4    earlier of a nickname on one database, Jim, and a proper name

5    on another database, James, and, again, by not using name

6    information and by not using first name information on

7    different matches we avoid that as an obstacle to not finding a

8    match.

9    Q    And erroneous information (indiscernible) it was

10   impossibly old dates of birth, how was that addressed, if at

11   all?

12   A    Again, not every match relies on dates of birth, so

13   erroneous information such as an impossibly old date of birth

14   or a typographical error was avoided.

15   Q    What about the issue of incomplete information on deceased

16   individuals?

17   A    So not every record has a deceased -- TEAM doesn't have

18   any information about deceased individuals and we use

19   information from the DPS to strip out the deceased individuals.

20   But to make sure that that is not a problem to the inferences

21   drawn I have done the analysis using the deceased information

22   from Catalist and various dead wood analyses.  So I think I'm

23   reasonably confident that this is not a concern for any

24   inferences drawn.

25   Q    Does Dr. Hood identify any additional methodology you

1    should have done to look for deceased people?

2    A    No.

3    Q    So next, the no self-reported race or ethnicity, is that

4    something that Dr. Hood points out any other way that you could

5    have addressed the lack of self-reported race?

6    A    He is not specific about what he would recommend that we

7    do in the absence of that.  I'm using the standard methods in

8    my discipline and in voting rights cases for assessing racial

9    differences when you don't have self-reported race on the voter

10   files.

11   Q    And to be clear, does the lack of self-reported race cause

12   you to have less confidence at all in the results that you've

13   seen overall in terms of the racial disparities?

14   A    No.  If I had self-reported race, I would have done that

15   analysis as well.  Again, I'd want to see it from all different

16   ways to make sure it was robust.

17   Q    Okay.  And the post-estimation validation, is that the

18   exercise that we've already talked about with comparing the

19   Social Security number and the date, gender, and name?

20   A    Correct.  And by the end of the matching process all the

21   information is used, so it's not possible to do any additional

22   post-estimation validation because you'd need some key, like

23   SSN9, that you'd judge your matching against.  So we've used

24   all the information.  It's not possible to do any further

25   analysis along those lines.

Ansolabehere - Direct / By Ms. Baldwin                    176

1    Q    Dr. Hood looked at voter participation for people on your

2    no match list in elections since SB 14 has been in effect,

3    correct?

4    A    Correct.

5    Q    And did you also look at that question of whether anybody

6    on your no match list had voted since the law has been in

7    effect?

8    A    I did.

9    Q    Okay.  What elections did you look at?

10   A    The primary in March and the runoff in May.

11   Q    Okay.  What did you find?

12   A    I found in those elections about 3 percent of people on

13   the no match list were recorded as having voted.

14   Q    And did you look at whether they were voting by mail or

15   voting in person?

16   A    I did and about 80 percent, I think, or 75 percent voted

17   in person.

18   Q    So about how many people did that come out to?

19   A    My recollection of one of the elections was 27,000 records

20   were recorded as having voted, 22,000 voted in person, 5,000 by

21   mail.

22   Q    And given that all 22,000 of those people were on your no

23   match list as not having ID, do you have any explanation for

24   how it is that they could be recorded as voting in person in an

25   election in March or May?

Ansolabehere - Direct / By Ms. Baldwin                    177

1   A    Well, there are lots of different explanations.  It could

2   be that the poll workers just let them vote, which occasionally

3   happens.  And we've seen that in various studies where people

4   are asked whether they were asked to show ID and they'll say no

5   or they were asked but they didn't have it and they were just

6   allowed to vote anyway.  Or they'll be in a state like

7   Massachusetts where you're not allowed to ask for ID and

8   they're asked for ID anyway.  So the poll workers often do

9   their own thing when it comes to implementation of some of

10  these laws.  So it could be the case that some poll workers

11  were just letting people pass.

12          It could also be that the people went out and got ID

13  in the intervening period or reregistered and it would change a

14  little bit every month, every day.

15  Q    What did you end up with, like what's the date of your no

16  match list?

17  A    January 15th.

18  Q    Okay.  So there was a time period from then until the

19  elections, you're saying that people could have --

20  A    So one election is three months later and the other is

21  fine months later, so in that intervening period those

22  circumstances might have changed and --

23  Q    Okay.

24  A    -- they got an ID, they reregistered, and stuff like that.

25  Q    Any other explanations, like could you just have been

1    wrong with some people?

2    A    Oh, yeah, some people are -- yeah, there's an error rate

3    and some people might be misclassified.

4    Q    Do you have any information that would allow you to take

5    that group of, you know, 22,000 voters and distinguish what the

6    actual reason for any particular group of them is?

7    A    No, that would involve a further study.

8    Q    Does Dr. Hood have any information that would allow him to

9    distinguish between what the reason is for that group of

10   voters?

11   A    Not in his report, sorry.

12   Q    Let's go to Dr. Milyo's report.  Did Dr. Milyo identify

13   anything in your matching protocol that he said you should have

14   done differently?

15   A    No.

16   Q    What's your understanding of what Dr. Milyo's main concern

17   with your matching process is?

18   A    His name concern was dead wood.

19   Q    And did Dr. Milyo identify any specific additional steps

20   that you should have taken but did not with respect to dead

21   wood?

22   A    No.

23   Q    I'd like to talk very briefly about the portion of your

24   report on the historical voting and registration turnout

25   patterns by race.  Can you give a brief overview of what data

1    sources you examined to look at those questions?

2    A    I examined rates of registration and voting in the voting

3    tabulation districts and the census data on those areas.    I

4    examined data from Catalist, because Catalist has a record of

5    who voted and didn't, and we had the racial data from

6    (indiscernible) and Catalist as well.   And finally I looked at

7    the current population survey of the Census Bureau, which

8    conducts every other November a registration and voting

9    supplemental survey, and I looked at their Texas data from

10   that.

11   Q    And what election years were you looking at when you were

12   looking at rates of registration and turnout?

13   A    2006 to 2012 federal elections.

14   Q    And looking at these various different sources for

15   registration and turnout rates by race, what conclusions did

16   you reach?

17   A    I concluded that minorities, Black and Hispanics, are

18   registering at lower rates than Anglos in the years leading up

19   to the passage of SB 14 and they're voting at lower rates.

20   Q    To what extent, if any, did either of Texas's experts take

21   issue with any of this portion of your analysis?

22   A    They raised no objections at all.

23   Q    What's the relevance to your mind of your conclusions

24   about background registration and turnout rates by race to the

25   analysis that you've done about disparities and ID possession

Ansolabehere - Cross / By Mr. Scott                    180

1   rates by race?

2   A    So the background factors are identified in various voting

3   rights cases as important for thinking about how an additional

4   burden potentially imposed by a law, a new law, might affect

5   different racial groups and the evidence from the background

6   factors indicates that minority groups were already registering

7   and voting at lower rates and this would be -- the ID law would

8   be a potentially other burden added on top of that.

9   Q    Dr. Ansolahehere, in light of all of the questions that

10  you've examined in this case, what is your ultimate opinion on

11  whether or not SB 14 will impose a disparate burden on minority

12  voters in Texas?

13  A    My ultimate opinion is that minority voters are

14  significantly less likely to possess the requisite ID and that

15  they will be affected more than Anglo voters.

16          **MS. BALDWIN:**  Pass the witness.

17          **(Pause)**

18                        **CROSS EXAMINATION**

19  **BY MR. SCOTT:**

20  Q    Hello, Dr. Ansolabehere.  Nice to meet you -- see you

21  again.

22  A    Good to see you.

23  Q    When last we visited it was at your deposition up in

24  Washington, D.C., a couple of weeks ago, correct?

25  A    Correct.

Ansolabehere - Cross / By Mr. Scott                181

1  Q    And we covered a lot of ground and you've -- we've covered

2  a lot of that ground today, and I've tried to -- been knocking

3  off stuff, so I'll try and be as quick as I can with you and

4  get you back on your way home.

5  A    Okay.

6  Q    The people on your -- the citizens on your -- your no-

7  match list, the one that contains approximately 787,000 names,

8  does that include the National Change of Address folks?

9  A    Yes.

10 Q    Okay.  So, in direct examination from counsel, I think you

11 said that -- that you had pulled them out of some subgroup.  Do

12 you recall how many people that was that you pulled out of

13 that?

14 A    How many had NCOA flags?

15 Q    Yes, sir.

16 A    I don't remember how many had that specific flag.

17 Q    Okay.  But it would be the entirety of the number that

18 Catalist had provided to you with a mark or with a flag that

19 said NCOA, though, correct?

20 A    Correct.

21 Q    Okay.  You originally received from the State of Texas

22 about 13,500,000 records that was the entirety of what's known

23 as the "TEAM," T-E-A-M, database, which is all registered

24 voters in the State of Texas, correct?

25 A    Correct.

1   Q     In addition to that, you received a data set of 25 plus

2   million records from the Department of Public Safety, correct?

3   A     Correct.

4   Q     And one of the first steps that you undertook was to match

5   those two databases and pull from those information that was

6   contained in the -- certain fields from the Department of

7   Public Safety records; is that correct?

8   A     Correct.

9   Q     And then you created your own sub-database, correct?

10  A     We appended -- you mean the no-match list?  Is that what

11  you're --

12  Q     Well, we're just talking in general terms right now, the

13  13 million.

14  A     Well, we appended the fields indicating whether there was

15  a matched record or not to TEAM's.  It wasn't a sub-database,

16  per se.

17  Q     Okay.  And, so, from -- from a step process, you took the

18  overall TEAM database, and when you found a match, whether it

19  be on the Texas driver's license record, the Texas photo I.D.

20  records or the concealed handgun records, anybody that matched

21  with any of those three areas would be a match, correct?

22  A     Correct.

23  Q     You then took that information and you matched it with

24  several databases that were in the custody, and still are, of

25  the United States of America, correct?

1    A    We did not send them the -- the indications of whether it

2    was a match for Texas.  We just sent them the TEAM database

3    and -- and the instructions and -- and model code.

4    Q    And you didn't actually perform those matches; those were

5    performed by someone at the various departments, correct?

6    A    Correct.

7    Q    And, so, if there was a form of photo I.D. that the State

8    of Texas was accepting for purposes of complying with SB 14,

9    that was a department within the federal government that the

10   information was sent over to see if there was a match for any

11   of the people on the TEAM database, correct?

12   A    Correct.

13   Q    And, again, if there was a match in that process, those

14   folks would then be labeled "match," correct?

15   A    Correct.

16   Q    And after you went through all of this process, you ended

17   up with -- I'll call it two lists.  One's a "match list" and

18   the other is a "no-match list," correct?

19   A    Correct.

20   Q    Now, we've had some time during the course of our case to

21   talk about no-match list.  I did pull -- I didn't see it as an

22   exhibit today from the United States Government or from the

23   plaintiffs; did you -- if I brought up something we'll mark for

24   identification purposes only today, a document that I'll call

25   your "no-match list," and if I could, we can go through and

1   maybe it's easier to look at that and cover the fields, okay?

2   A     Okay.

3            **MR. SCOTT:**  Okay.  If you'll put the -- so, will you

4   reduce that in size, I guess?  Oh, I guess right there may be

5   better.

6   **BY MR. SCOTT:**

7   Q     So, Doctor, over on the left-hand side we've got a --

8   we've got a column A, and it says "VUID."  Right?

9   A     Correct.

10  Q     And what's "VUID," I guess?

11  A     That's a field on the TEAM database corresponding to the

12  voter I.D.  They have an I.D. that they put on every record --

13  every individual.

14  Q     And, so, the next field is "last name."  Is that correct?

15  A     Correct.

16  Q     Okay.  And that's the voter's last name.

17  A     Yes.

18  Q     First name, same thing; middle name, correct?

19  A     Correct.

20  Q     And, then, let's go on down if we could, and let's look

21  for -- I tell you what; let's look for a specific VUIN.  How

22  about 1149380291?

23            Now, I want to cover something while we're getting to

24  that point.  Everybody on your voter I.D. -- on your no-match

25  list is somebody that as a result, in your opinion, from -- as

Ansolabehere - Cross / By Mr. Scott                185

1  a result of the passage and implementation of SB 14, is

2  prevented from voting because they don't possess the requisite

3  photo I.D. in order to cast a ballot in person, correct?

4  A     Correct, unless they go out and get some.

5  Q     Yes.

6  A     Yeah.

7  Q     And, so, if we pull up a name, any name on this, we should

8  be able to find people who that is the reason they're not

9  voting, right?  In general.

10  A     Potentially, yeah.

11  Q     So -- all right.  So, we've got Cargill, Kimberly Diane.

12  We've deleted her social security number, although the

13  information you sent over to our fine folks over at the other

14  federal agencies it had that information in it so that they

15  could try and find a match on that as well, correct?

16  A     Correct.

17  Q     So --

18         **MS. BALDWIN:**  Your Honor, I don't want to interrupt;

19  I just want to preserve an objection.  You know, since this is

20  a file that, while we did produce a file with that name, you

21  know, Mr. Scott's representing that certain information has

22  been deleted off of, you know, to take him at his word that no

23  other information, but we haven't had an opportunity to look at

24  the file that he's -- read out anything, so I just want to

25  preserve the right to take a break as we need to later, and if

1   we need to recall Dr. Ansolabehere to, you know, address

2   anything, once we can make sure that we're looking at the same

3   file, I just want to have that opportunity to do that.

4           **THE COURT:**  That's fine.

5   **BY MR. SCOTT:**

6   Q    And, so, let's -- can we slide the -- there we go.

7           So, then, the next is gender.  So, she's female, at

8   least on your chart.  Did the gender, was it all -- was that

9   information that was all sent over from the State or was that

10  something you received from the federal government?  Were

11  there -- how did that get there?

12  A    Gender is on the TEAM database.

13  Q    Okay.  And if there were -- are there any occasions where

14  it was not there and you had to impute what the gender might be

15  for a person?

16  A    Right; so, for about five percent or so there was no

17  gender field recorded, and the way that was treated was we

18  imputed the gender for the most common -- the most common

19  gender for the given first name.  So, if the person's name was

20  David and gender was not there, we would make that an M because

21  99 percent of people with David on the voter file had a male.

22  Q    Common sense.

23  A    Yeah.

24  Q    All right.  So, what's the official I.D. in column G?

25  What does that refer to?

1    A    The official I.D. number?

2    Q    Yes, sir.

3    A    That's a -- I think that's the DPS I.D. number.  I think

4    that's what it is.

5    Q    Sure.

6    A    Yeah.

7    Q    And -- oh -- look at that.  The State of Texas just got

8    more money, I guess.

9         **(Laughter)**

10        All right.  So, that's the official I.D. where I'm

11   circling it under there --

12   A    Uh-huh.

13   Q    -- for -- that would be her driver's license number.

14   A    Yeah, or state I.D.

15   Q    Now, at some point in time there was a lot of information

16   in the TEAM database that was provided to you and a lot of

17   these numbers were deleted, the official I.D. numbers.  Do you

18   know why that was?

19   A    Why the official I.D. numbers were deleted from the

20   database that was provided to me?

21   Q    Yes.

22   A    I don't remember.

23   Q    Okay.  It was one of the clean-up steps, in fact.  If a

24   official I.D. in the TEAM database didn't match the federal

25   record, it was to be deleted?  Do you recall that?

1  A    Oh, no, no, not -- "extracted" I think is the word.

2  That's not deleted.

3  Q    Okay.

4  A    That just says take those cases and use those cases.

5  Q    Okay.

6  A    That's not deleted.

7  Q    Okay.  So, next column is date of birth -- well, the

8  next -- what it is, is D.O.B., date of birth.  How come you did

9  it that way?

10  A    That's just the standardization.

11  Q    Okay.  Let's keep moving on over here.

12  A    It's the name -- the name of the date of birth field is --

13  is the same as in the -- in the -- in the database to which

14  we're matching, so the other database might have stored date of

15  birth in a different way, so it's just the standardization of

16  date of birth.

17  Q    Okay.  So, "V" stands for "voter," "S" stands for

18  "suspense," right?

19  A    Correct.  That's my understanding.

20  Q    Everybody on this -- in this no-match list is either a --

21  a active voter or they're an "S" for "suspense," right?

22  A    I believe that's true.

23  Q    And, so -- but all of them can still vote, correct?

24  A    Uh-huh.

25  Q    And the only reason they're not voting is because they

1  don't have proper I.D. under SB 14, right?

2  A    That's the interpretation, yeah.

3  Q    Okay.  Well, is it -- is that right?

4  A    Yeah, I think so.  Looks like, uh-huh.  Right.

5  Q    All right.  So, let's go to column K, block number.

6  That's -- so, that's somebody's address, physical address; 1804

7  Waterton, correct?

8  A    Correct.

9  Q    So, keep going over.  In Whitehouse; that's up in East

10  Texas in Smith County over by Tyler.  Next, Texas -- did you

11  find any no matches where the state wasn't Texas?

12  A    Um -- I remember looking at this, and I'm trying to

13  remember if there were any no matches with -- I don't remember,

14  but --

15  Q    I mean, part of the requirement to vote in Texas is you've

16  got to be a resident of Texas, right?

17  A    Uh -- yeah, but people put different addresses on, so

18  somebody whose mailing address was recorded or a post office

19  box, so -- I don't -- but I don't remember if that was the

20  case.

21  Q    So, with the National Change of Address database, you

22  weren't able to tell within the National Change of Address

23  database if somebody had moved across town or had moved across

24  the country, correct?

25  A    Right.  I just used the flag that was presented.

1    Q     Okay.  And for purposes of putting together this list, if

2    they were in NCOA, you assumed for those folks, however many

3    people that is, that they stayed within the confines of the

4    State of Texas and were an eligible voter in all other ways

5    other than they didn't possess adequate I.D., a proper I.D. to

6    vote under the terms of SB 14, correct?

7    A     Well, again, the sensitivity analysis has removed

8    everybody who has an NCOA flag just to make sure that, you

9    know, we're sensitive to the -- the deadwood issue.

10   Q     Okay.

11   A     So, we're not -- we're only -- at this point we're only

12   removing, like, the deceased records according to State of

13   Texas.  We're not using Catalist to tell us who's deceased;

14   we're not using Catalist to tell us who has an NCOA flag.

15   Q     Okay.  So, we've got "county file I.D."  What's that mean?

16   A     The county file I.D.?

17   Q     Yes, sir.

18   A     I don't remember what that -- what that corresponded to.

19   Q     Race, Caucasian.

20   A     Uh-huh.

21   Q     So, Ms. -- what's her name?  If you can you go back to the

22   column A for me?  Cargill.

23   A     Oh, I think -- sorry.  I think county file I.D. is that

24   the data comes from a county, and that's the I.D. that the

25   county sent over.

1  Q    So, you're highly likely this one is Caucasian.  Is that a

2  determination you made?

3  A    No, that is the -- those are the fields passed to us from

4  Catalist.  That's the Catalist racial estimate and their race

5  confidence.

6  Q    And that's done for everybody on the no-match list and

7  everybody for the match list, correct?

8  A    Correct.

9  Q    Okay.  Now, "NCO Applied"; what's that?

10  A    That's the -- the NCOA flag.

11  Q    Oh, that's the thing if they moved.  So, she has not

12  moved, so she's still active at that address, right?

13  A    Yeah; there's no NCOA flag.

14  Q    She didn't get her mail forwarded wherever she is if she's

15  not living at that address, correct?

16  A    Right.  And not everybody files an NCOA, so yeah.

17  Q    Fair enough.  Column P.  So, let's go to it.  Census

18  state.  Is Texas I.D. number 48?

19  A    It is.

20  Q    Okay.  Census county 423.  Smith County is probably 423,

21  correct?

22  A    Yep.

23  Q    And, then, census tract 2009; what's that?

24  A    Okay.  So, census has successively finer gradations of

25  geography, and a tract is bigger than a block group and bigger

Ansolabehere - Cross / By Mr. Scott                192

 1   than a block.

 2   Q    Okay.  So, where she lives is located in a tract that's

 3   known as 2009.

 4   A    Right.

 5   Q    Where do you get that from, the Census Bureau?

 6   A    Yep.

 7   Q    Okay.  And, then, "census block"; is that the actual block

 8   she lives on?

 9   A    Census block group is a group of blocks, and blocks are

10   pretty close to actual blocks, but they're -- depends on --

11   depends on the geography.  Some places the blocks are really

12   big; some places they're small.  It's not -- it's not

13   corresponding to a street block.

14   Q    Is there a certain critical mass of people that determines

15   what a census block would be?

16   A    Uh, no, they tend to be typically around eight -- 800

17   people, 500 people, depending on the state.  Some census blocks

18   have zero population.

19   Q    So, if I'm in the middle of the panhandle somewhere where

20   there's not a lot of people, it may be a very large geographic

21   area.

22   A    Right.

23   Q    So, "census block group"; what's that?

24   A    That's the cluster of blocks that are -- that's an

25   intermediary between the census tract and a -- and the block.

1   So, they take a cluster of blocks, and it's just a level of

2   aggregation.

3   Q    So, for census block 32, you went to a Census Bureau and

4   you pulled that number?

5   A    No, these --

6   Q    Or did you create that?

7   A    These data were provided to us -- the actual codes here

8   came to us from Catalist.  They had this information on them.

9   They had already done that matching for us.

10  Q    So, this is not from the Census Bureau.

11  A    It is ultimately from the Census Bureau.

12  Q    But it's got -- it's got a -- it goes by way of Catalist.

13  It takes a detour to you.

14  A    Right; they did the work of mapping every address into

15  every census area.

16  Q    Can you go to a dictionary within the census and pull the

17  same information?

18  A    If you have the longitude and latitude of every address.

19  So, you need an additional database, which they happen to have

20  already, and I don't have that.

21  Q    Okay.  Let's go over just a little bit more.  Deceased;

22  no.  Deadwood; not dead.  What's the difference in "deceased"

23  and "deadwood"?

24  A    So, their deadwood model, SY is their modeled data, so

25  this is modeled data, and this is an estimate of the likelihood

1    that this person is a deadwood record, which means is there

2    evidence of a move or is there -- is that person likely still

3    there or is there a record of deceased from and -- from social

4    security or from some other source from which they've received

5    data.

6    Q    So --

7    A    So, it's a -- the "deadwood" is a combination of, you

8    know, likely movers, individuals who are deceased, and so

9    forth.

10            **MR. SCOTT:**  Brian, would you pull up the picture of

11   the -- of -- oh, Smith County I think is the appraisal

12   district.

13            **(Pause)**

14   **BY MR. SCOTT:**

15   Q    So, this is Smith County, which is where Whitehouse is

16   located.

17   A    Okay.

18            **MR. SCOTT:**  Could you make that where we could look

19   at it.  If you can enlarge that ownership information.

20   Q    So, there is this thing, it says "Beachfront Boulevard,

21   Biloxi, Mississippi," and then it's got "James and Rachel

22   Wilson."

23            Go up a little bit more.  Let's make sure we're

24   looking at the right address, Brian, if you don't mind.

25            **(Pause; voices and whispers off the record)**

1           Oh.  Go right here.  There we go.

2    **BY MR. SCOTT:**

3    Q    Eighteen-o-four Waterton is -- I'm going to represent to

4    you that's her address.  Okay?

5    A    Okay.

6    Q    And there is a reason she's not there, and I --

7           Brian, will you bring up the Government photo of

8    Ms. Cargill.

9           So, here is Ms. Cargill.  Well, let's get her -- she

10   currently -- this is a Government I.D., I assure you.  She's a

11   resident of the state of Texas, she's boarded by the State of

12   Texas, and she is Kimberly Cargill, and this is her information

13   that -- and it is actually the same person that you have on the

14   no-match list.  In 2010 she committed a capital murder and

15   received the death penalty and she currently is sitting on

16   death row.  So, a couple of questions.

17          First of all, did you do any kind of analysis

18   whatsoever to get rid of people who are convicted -- who are

19   currently serving time in prison and might also be, like

20   Ms. Cargill, on the no-match list?

21   A    No.

22   Q    Did you attempt to pull out any of the people who have not

23   been rehabilitated under the terms of their probation so that

24   they have been -- had their right to vote reinstated?

25   A    No.

Ansolabehere - Cross / By Mr. Scott                    196

1  Q    You would agree with me if -- where you could find

2  somebody like Ms. Cargill, she -- her record and anybody that's

3  a felon or anybody that doesn't have the right to vote should

4  have -- should be pulled off your no-match list, correct?

5  A    I believe that's true under state law in Texas that felons

6  are not allowed to vote.

7  Q    And, so, anybody who is not -- does not have the right to

8  vote, would you agree you'd pull those off?  If I can identify

9  those to you, you'd be happy to pull those off, right?

10 A    If I was provided a database and I was instructed that

11 that was the proper thing to do with it.

12 Q    Well, did anybody instruct you to look for people that

13 were felons?

14 A    No.

15 Q    Did anybody tell you to look for people that were

16 potential no-matches that were otherwise in the list?  For

17 instance, NCOA's that had moved off to who knows where?

18 A    Yes, in discussions with attorneys at the Department of

19 Justice we --

20 Q    And a decision was made not to do that.

21 A    To pull NCOA's off?

22 Q    Not to pull them off.

23 A    Or to -- to flag -- to flag the NCOA's.

24 Q    Okay.  But --

25 A    Yeah, to -- to look for -- the analysis that we did

1  provide removes NCOA's at one stage.

2  Q    Well, your number, though, for your no-match is seven

3  hundred and eighty-five -- 787,000 approximately, correct?

4  A    Correct.

5  Q    That includes all NCOA's, right?

6  A    Correct.

7  Q    And it includes Ms. Cargill and anybody like her, right?

8  A    Correct.  Yeah.

9  Q    There are a category of people that don't vote.  They just

10  simply don't vote.  You and I visited in your deposition about

11  this.  For whatever reason, they just -- they're registered,

12  but they don't participate.  And we agreed, at least at the

13  deposition, that that category of person, they're not going to

14  have a large -- SB 14 and the requirements to go vote are not

15  going to have an impact on their lives, correct?

16  A    Potentially.  I don't know if their lives might change and

17  they want to vote at some later date.

18  Q    Well, but it doesn't prevent them from voting, correct?

19  A    No, they can do things to vote.

20  Q    And, then, there is another category of people, and

21  they're people it doesn't matter what you do, it doesn't matter

22  what the weather is, and I'm sure you're one of those people,

23  that duty drives them to vote all of the time.

24  A    Oh, I don't vote all of the time.

25  Q    Okay.  Well, you're going to be in the third category.

1        **(Laughter)**

2            You would agree there's that category of people out

3    there; they just -- they're great citizens.

4    A    Yeah, there are some people who vote a lot.

5    Q    And, then, there is that middle group.  Well, first of

6    all, did you undertake to identify and categorize that first

7    group that we talked about, people that don't vote?

8    A    No.

9    Q    Did you do anything to identify that other group, people

10   that vote all of the time?

11   A    No.

12   Q    And, so, then we're left with there is that other, middle

13   group, that -- we'll call them a marginal voter.  They vote --

14   maybe it's the election; maybe it's the candidate; maybe it's

15   the mood; who knows --

16   A    Uh-huh.

17   Q    -- but they vote.  And you haven't identified what that

18   group is either, correct?

19   A    No.

20   Q    Okay.

21   A    I mean, SB 14 affects everybody, so -- I mean it applies

22   to everybody.  I think the academic literature on this does

23   have, you know, a sense of, like, everybody is affected in

24   terms of burdens, so --

25   Q    Well, let's go back to our VUID list, your no-match list,

1   and I'm going to give Brian another VUID number, and that's

2   1203885376.  Let's see what -- who the lucky number belongs to.

3   Michelle Enoch Bessiake.  And that's her VUID number, and she's

4   on the no-match list.  Have you ever visited with her?

5   A    No.

6   Q    Do you know who she is?

7   A    No.

8   Q    She used to -- she used to be a plaintiff in this case.

9   She nonsuited, or dismissed her cause of action.  She also is a

10  young lady that is an out-of-state resident of Indiana who

11  moved to Texas to go to college.  And you didn't know any of

12  that.

13  A    No.

14  Q    Did you get provided a copy of the pleadings --

15  A    Uh --

16  Q    -- in this case?

17  A    At some -- at some point I --

18  Q    So, you got a copy of their complaint, the complaint that

19  the plaintiffs filed, correct?

20  A    Yeah, I believe so.

21  Q    Okay.  So, let's go back to the right here --

22  A    Uh-huh.

23  Q    -- Brian.  She's female; date of birth; we've redacted her

24  social security number as part of the agreement.  Her date of

25  birth; keep going here.  Keep going.  She lives down in

 1  Rosewood in Houston, and she is listed as race confidence,

 2  highly likely Caucasian.  And, again, that's an assignment of

 3  race that was done by you using Catalist information for this

 4  person, correct?

 5  A    Right; Catalist provided us with that information, and we

 6  used that classification when doing the analysis using the

 7  Catalist racial identification.

 8  Q    And Ms. Bessiake is a -- a registered voter on the no-

 9  match list --

10  A    Uh-huh.

11  Q    -- who the only reason she can't vote in Texas, is the

12  reason she's on the list, is because she doesn't possess I.D.

13  that would comply with SB 14; is that correct?

14  A    That's my understanding here.

15  Q    Okay.  So, if you were to find out that she had,

16  subsequent to registering in Texas, had gone back to her home

17  state and registered to vote, would that mean she's no longer

18  eligible to vote in Texas?

19  A    Um, I don't know what the state law is in --

20  Q    It's not a trick question, I don't think.

21  A    But --

22  Q    You can't vote in two places, can you?

23  A    You can't vote in two places, but --

24  Q    You get one vote per election cycle.

25  A    Well, some states you can, so I don't know what the state

1    law is.

2    Q    Which state?

3    A    There are some states that allow you to vote in local

4    elections -- I don't remember which ones -- if you're

5    registered --

6    Q    But not --

7    A    -- but it's like not -- you know, it's like --

8    Q    Not Texas, right?

9    A    I don't know what the state law is pertaining to that.  My

10   guess is probably not, but --

11   Q    Okay.  Do you know of a way -- well, let's limit it to

12   federal elections.

13   A    Uh-huh.

14   Q    Do you know of a way that somebody like Ms. Bessiake would

15   be able to vote in a federal election that's held in Texas and

16   then fly home and go vote up there?

17   A    No.  You cannot vote in two federal elections.

18   Q    Perfect.  And, so, because of this, you are highly likely

19   that Ms. Bessiake is Caucasian, correct?

20   A    That's what the classification is that we received from

21   Catalist, yeah.

22   Q    Okay.  So, let's -- let's take it -- do you -- do we have

23   a copy of her photo or her driver's license?  And we have

24   redacted the information to counsel.  I think that was part of

25   the agreement.

1          And there is Michelle Bessiake; that was a document

2   that was produced --

3   A    Uh-huh.

4   Q    -- during the course of her deposition.  And that's her

5   Indiana driver's license; actually, it's her learner's permit.

6   She's fixing to go, I guess, become a licensed driver.  Do you

7   know what the requirements, document wise, in Indiana are to

8   obtain a driver's license?

9   A    No.

10  Q    Do you know if they're any different than Texas?

11  A    I don't know what Indiana's laws are.  One thing I would

12  note is that -- what's the date on this for when she got this?

13  Q    Uh, let's look.

14  A    Is the issuing state -- it's the beginning -- it's around

15  the time that --

16  Q    Can you switch to the --

17  A    -- yeah, it's around the time that the data were -- were

18  pulled here.

19  Q    It looks like 1/9/2014.

20  A    Uh-huh.  Okay.  So, it's around the time that the data

21  were pulled, so --

22  Q    Data were pulled what?

23  A    The data for this study were pulled.

24  Q    And you --

25  A    January 15th, 2014.  So, it may have been that, I don't

1   know, maybe she filed a paper and it hadn't been processed yet.

2   Q    Well, she was a party plaintiff, right?

3   A    Yeah.

4   Q    I mean, she -- you're hired by the plaintiffs to render

5   testimony in this case, right?

6   A    Correct.

7         **MS. BALDWIN:**  Objection.  Dr. Ansolabehere, just so

8   the record's clear, is the United States' expert; he's not the

9   expert for all of the parties.

10        **MR. SCOTT:**  Okay.  Sorry.

11  **BY MR. SCOTT:**

12  Q    Did you -- she's also an out-of-state student who came to

13  the state of Texas to go to school, correct?

14  A    Uh --

15  Q    Oh, you didn't know that.

16  A    I'll take your word for it.

17  Q    It's in her pleading.  Do you know how many out-of-state

18  students are currently on the no-match list that you have

19  produced in this case?

20  A    I have no way of knowing that.

21  Q    Do you know how many out-of-state -- how many people who

22  are registered to vote in Texas who now reside -- or are also

23  registered in another state?

24  A    I have no way of knowing that.

25  Q    Well, Catalist has a 50-state database of all of the voter

1    registration, correct?

2    A    Correct.

3    Q    Now, did you do the contract with Catalist, or who did?

4    A    DOJ did.

5    Q    So, the Department of Justice had the contract with

6    Catalist, and Catalist had within its confines all 50 states

7    and all of the voter registrations of everybody in all those

8    states, correct?

9    A    Correct.

10   Q    Do you know if they ran or asked to run Ms. Bessiake

11   through the Catalist database to find out if she was registered

12   in two states?

13   A    I don't know.

14   Q    Do you know -- do you know if they did it on behalf of any

15   of the other people who are listed or registered in two states?

16   A    I don't know.

17   Q    Do you know percentage-wise how many people are registered

18   in two states at the same time?

19   A    I think it's an extremely small number.

20   Q    Do you have any estimate?

21   A    Uh, based on some of the data that's been coming out of

22   these two new projects, one from Pew and one from the

23   Secretaries of States, the numbers are extremely small, less

24   than -- less than one percent was my -- what I heard from one

25   study.

Ansolabehere - Cross / By Mr. Scott                205

1  Q    So, if she had shown up at the voting poll with her

2  student I.D., she would have been able to vote, right, in

3  Texas?

4  A    Yeah, if she --

5  Q    If that is the law.

6  A    If she had shown up at the voting booth, she's legally

7  registered, if she had her I.D.

8  Q    Did you write a paper on Indiana and the voter I.D. laws

9  in Indiana?

10  A    I wrote a paper in the Harvard Law Review on the -- on the

11  race of -- possession of -- of -- you know, of the effects of

12  I.D. laws at that time.

13  Q    As part of that paper did you have to undertake a study,

14  briefly at least, of the Indiana laws regarding what it takes

15  document wise to obtain a photo I.D.?

16  A    The part of that paper was -- that was done by my

17  colleague, Nate Persily.  He was doing that part; I was doing

18  the data work.

19  Q    That's a "no."

20  A    So, yeah, I did not do the -- the legal review.

21  Q    So, let's look at another one.  VUID 1184062007.

22      **(Pause)**

23          Sammie Louise Bates.  We watched her -- we watched

24  her deposition this morning.  Were you here when her deposition

25  was played?

1   A    No.

2   Q    And so let's cut to the chase on this.  If we can slide

3   back to the right.  Your -- you and -- you and the friends over

4   at Catalist have a possible confidence that she's Caucasian.

5   So for purposes of your opinion in all these charts that were

6   done on the database match, someone could be one of three

7   categories of a code, right?  You could be Caucasian possibly,

8   Caucasian highly likely and Caucasian likely; is that correct?

9   A    Correct.

10  Q    If I'm any of those three, does that mean that you put me

11  on the list as Caucasian?

12  A    In one of the -- in some of the analyses, we just used the

13  race category and some of the analyses, we used only the highly

14  likely race.

15  Q    Now, what's weird to me is that you had pulled the race

16  from the Department of Public Safety.  Do you remember that?

17  A    Yes.  Race was on the Department of Public Safety data.

18  Q    What happened to it?  Did anybody use it to go cross-check

19  any of the matches to find out how accurate Catalist and your

20  data were including your imputation of race confidence and race

21  of any of these individuals?

22  A    There was an inquiry about whether we should use that and

23  I was told not to use it.

24  Q    Who by?

25  A    The Department of Justice.

1   Q    Let's turn to 1121389639.  Were you here during the

2   deposition of -- I mean, I'm sorry.  It felt like a deposition.

3   Were you here during -- sorry, Ronnie.  Were you here during

4   the testimony of Floyd Carrier?

5   A    No.

6   Q    Let's slide on over to the right.  He's a Plaintiff and he

7   is highly likely Caucasian.  Again, that's a determination you

8   and Catalist made, correct?

9   A    Catalist made it and I used their data, yeah.

10  Q    And he's the guy that had a record in the Department of

11  Public Safety database, correct?

12  A    Correct.

13  Q    And he's also a guy that is part of the pleadings and so

14  we can go look at his pleadings and look at what he's

15  represented to this court.  He is bi-color, correct?

16  A    I believe that he's --

17  Q    He's --

18  A    I'll take your word for it.

19  Q    Well, and he's also got to --

20  A    I wasn't in the courtroom.  So I don't know.

21  Q    -- he gave a deposition in this case and was -- and

22  identified which race he was, correct?

23  A    Okay.

24  Q    So here's his -- I mean, I'm sorry.  Here's his complaint

25  that was filed in this case on his behalf and it says -- oh,

1   no, I broke it.  Plaintiff Floyd James Carrier is a resident of

2   China, Jefferson County, Texas.  He is African American.  He is

3   physically disabled, wheelchair bound and, quite frankly,

4   seemed like a super nice guy.  But from your standpoint, you

5   had the pleadings but you chose to input a different race than

6   what he was.  Why?

7   A    I didn't know if -- I didn't know if that was same record.

8   So --

9   Q    Okay.  Now, there's another pleading that I guess we'll --

10  well, let's -- you have admitted in your testimony today that

11  errors in classification occur, correct?

12  A    Correct.

13  Q    If I were to tell you I have found over a million errors

14  in your classification on work you did in this case as we

15  compare it to people's self-identified rate, would that mean

16  you'd be willing to pull back the opinions that you had

17  delivered on the purposes of database matches?

18  A    No.

19  Q    How about if I told you I found a million and a half

20  mistakes -- errors in the classification of race on individuals

21  in the database match?  Would that change your opinion?

22  A    No.  I mean, we validated with the ecological regression

23  as well.  So we'd slice the data using totally different

24  approaches understanding the effect of the law and different

25  racial groups.  So --

1   Q    Well, will you admit there's over 2 million records in the

2   race classification that you have placed along with Catalist in

3   the database (indiscernible) performed in this case that are

4   done incorrectly?

5   A    I don't know where those numbers are coming from.  I

6   couldn't tell you --

7   Q    Do you deny that?

8   A    Do I deny that they are 2 million?  I don't know one way

9   or the other.

10  Q    Well, as we sit here today in court with Plaintiffs trying

11  to tell Texans that there are elected officials who passed

12  SB 14 that it violates The Voting Rights Act --

13  A    Uh-huh.

14  Q    -- you can't tell this Court whether there are 2 million

15  or more errors in race classifications in the match and

16  no-match list that you have produced to this Court to support

17  that case; is that correct?

18  A    That's correct.  I don't -- I have not done a study along

19  those lines.

20  Q    Let's visit a little bit about Catalist if we could.

21  A    Okay.

22  Q    Catalist was your decision to pick?

23  A    I recommended several firms to DOJ and they picked.  I

24  have experience working with Catalist.  So I said I've had good

25  experience with them in the past.  So --

Ansolabehere - Cross / By Mr. Scott                    210

1    Q    And had you worked with them and DOJ before?

2    A    Yes.

3    Q    And had you worked with them and DOJ in a case against

4    Texas before?

5    A    Correct.

6    Q    And that was the case up in Washington, D.C., correct?

7    A    Correct.

8    Q    And that's the case that you found that approximately 10

9    percent don't match?

10   A    Correct.

11   Q    1.2, 1.3 million people?

12   A    I think it was 1.9 million records were no-match, I think,

13   on that study.

14   Q    Okay.

15   A    But that was, again, using a different approach matching

16   only first-name-last-name database and date of birth.

17   Q    Did you sit in a witness stand kind of like that to go

18   over your testimony like you did here and testify that there

19   was 1.9 million people that were no-matches in the Washington,

20   D.C. court?

21   A    Yeah, whatever the right number was.  I think it was 1.9.

22   Maybe it was 1.5, somewhere in there, yeah.

23        **MR. SCOTT:**  Ryan, would you put up the Catalist

24   excerpt?  We're going to skip Congressman Veasey's records for

25   a second.

1   Q    Catalist is an outside entity and they have -- one of

2   their key scientists is an expert who's scheduled to testify

3   here tomorrow.  Do you know that?

4   A    I didn't know when he was scheduled but --

5   Q    He -- I threw him for a loop.  I'm sorry.  With regard to

6   the other entities -- here they are.

7        So do you understand that Catalist has a website and

8   they have a client list?

9   A    Yes.

10   Q    And on that client list, they list, I guess, their

11   clients.  We'll ask this to the man tomorrow but were you aware

12   of their connection?

13       **MR. SCOTT:**  Ryan, would you slow it down for the --

14   how about keep coming down?  Ah, go back down.

15   Q    Were you here when Representative Martinez Fischer was on

16   the stand?

17   A    At the very end.

18   Q    (indiscernible) it was just -- this is all about politics,

19   Republicans, Democrats.  So here's the clients that make up the

20   folks that Catalist lists as its clients.  It's got, "Democracy

21       USA, Democratic Congressional Campaign Committee,

22       Democratic Governors' Association, Democratic

23       Legislative Campaign Committee, Democratic Senatorial

24       Campaign Committee, Democrats.com."

25       **MR. SCOTT:**  Going down.  Yeah, go to the next page.

1    I'm sorry, Ryan.  Get to the T's.  Wait a second.

2    Q    "The Texas Democratic Trust and the Texas Democratic

3    Party."  Did you raise an issue with them that there has got to

4    be some type of guarantee that there is no perception of

5    impropriety in this case?

6    A    I recommended, I think, Voter Vault and Aristotle and

7    Catalist and --

8    Q    Was that --

9    A    -- I wasn't aware that the Texas Democratic Party or the

10   Texas Democratic Trust were clients of Catalist.  I don't

11   remember seeing that before.

12   Q    It's --

13   A    It's a long list.

14   Q    It is a long list.  They seem to do well.  Do you know who

15   the general counsel of the Texas Democratic Party is?

16   A    No.

17   Q    He's sitting over there at that table.

18   A    All right.

19   Q    So when you do academic research --

20   A    Uh-huh.

21   Q    -- do you attempt to insulate yourself from outside

22   influence?

23   A    Yes.

24   Q    How do you do that?

25   A    I send out for bid for different projects.  So Catalist, I

Ansolabehere - Cross / By Mr. Scott                213

1   work with Catalist and I send out feelers to other

2   organizations and let them bid on projects.  So --

3   Q    Okay.

4   A    And I don't own stock in the companies.

5   Q    Well, one of the things that's interesting --

6        MR. SCOTT:  Hold on a second.  Don't pull that up

7   yet.

8   Q    He's going to pull up Congressman Veasey's records.  Do

9   you know how much the United States government paid for the

10  Catalist research that it received in this case?

11  A    No idea.

12  Q    The race classification of individuals in this case?

13  A    Don't know.

14  Q    Okay.  Well, I'm going to pull out a quarter and we're

15  going to play a game.  I'm going to flip it.  I'm going to take

16  -- heads, we'll take what you and Catalist have described for

17  Congressman Veasey and tails will be we'll take what

18  Congressman Veasey has described and see who's right.  Heads,

19  so let's see who --

20       MR. SCOTT:  If you'll pull up Congressman Veasey's

21  information.

22  Q    So as we look at the top, there's Congressman Veasey and

23  those people below there are also Party Plaintiffs in this

24  case.  So you've identified that he is a male.  And if we could

25  keep going over to the far right.  Fort Worth and stock.

1              **MR. SCOTT:**  Well, you can keep going.

2    Q    I've added a couple of deals to this so we can speed the

3    case up because I thought everybody would have lost their

4    patience by this time.  So it is possibly Caucasian.  He has

5    identified himself in his complaint as African American, hasn't

6    he?

7    A    Correct.

8    Q    Have you taken the time to visit -- do you know Dr. -- do

9    you know Congressman Veasey?

10   A    No.

11   Q    Do you know what city he represents -- or cities?

12   A    Dallas-Fort Worth area.

13   Q    Yes, sir.  And do you know that -- and, again, we can go

14   to the other Plaintiffs.  Would it surprise you to find that

15   you had misclassified six party Plaintiffs in this case for

16   race of those Plaintiffs?

17   A    It depends on where they live and what their last names

18   are.  That's -- the algorithm uses that and the rate of

19   classification is a function of those factors.

20   Q    Well --

21   A    So --

22   Q    -- if we wanted to be accurate, it really depends on what

23   we are, right?

24   A    Well, when you don't have race on the voter file, you try

25   to answer the racial question different ways and I'm tackling

1    this from different perspectives.

2    Q    But you had race.  You had race for 400-and-some-odd

3    thousand people that are on your no-match list.  Did you know

4    that?

5    A    What do you mean?

6    Q    I mean there's Department of Public Safety records for

7    over 400,000 people on your no-match list.  Did you know that?

8    A    The racial field that we were told -- I was instructed not

9    to use, is that what you're referring to?

10   Q    Yes.

11   A    Yes.

12   Q    And so that's why you didn't use it because you were

13   instructed not to use it, correct?

14   A    Correct.

15   Q    Okay.

16   A    We were told that -- I was told that there were concerns

17   that the State had with the data and there were problems with

18   the data.  So --

19   Q    But you did no independent research to determine that,

20   correct?

21   A    No, no.

22   Q    Now, I'm going to turn your attention, if I could, to a

23   different area.  You have testified in direct that there's

24   approximately 22,000 people on the no-match list who've also

25   voted in the last -- I'm sorry -- 27,000 people who voted in

1    the March or May Texas primary, correct?

2    A    Correct.

3    Q    Now, I don't want to get on sensitive ground here.  So to

4    the extent, let's exclude the mailing because we can assume

5    that those folks qualified either as over 65 or disabled,

6    correct?

7    Q    Okay.

8    Q    Is that --

9    A    True.

10   Q    Is there any other way they would have been able to mail a

11   ballot?

12   A    I don't think so.  I think that's it.

13   Q    Had you done anything to figure out how it is that they

14   got a hold of the mail ballots -- the 5,000 people?

15   A    No.

16   Q    I mean, you looked at a number and derived that number and

17   that was it, correct?

18   A    Correct.

19   Q    The 22,000, this is where I'm going to try to get into

20   some sensitive ground.  Did the 22,000 who you -- the paid

21   employee -- or paid experts by the Department of Justice have

22   identified did not have proper identification, that complies

23   with SB 14 and have passed a ballot in a Texas election after

24   that statute was implemented -- I don't want you to go into any

25   testimony or anything you've done with regard to law

1   enforcement in pursuing those potential 22,000 claims against

2   precinct workers who may have violated the law.  Okay, so let's

3   exclude that.

4   A     Uh-huh.

5   Q     Have you been able to identify any of those individual

6   people and find a reason why it is that they passed their

7   ballot?

8   A     No.

9   Q     And you said you had about 3 percent turnout or the

10  no-match list had about 3 percent turnout rate in the March and

11  May primary, correct?

12  A     Right, whatever the figure was, yeah.

13  Q     And so what was the overall turnout for the March and May

14  primary?  Do you know?

15  A     I don't know.

16  Q     I mean, did the no-match list do pretty well in turnout?

17  A     No.  I don't think so.

18  Q     Would --

19  A     I don't know.

20  Q     -- are we talking double digit turnout in the March and

21  May primary in Texas?

22  A     I don't remember what the numbers were.

23  Q     Okay.  Estimating -- we talked about ecological regression

24  and homogeneous block analysis that you've done in this case.

25  A     Correct.

1  Q    We're talking about estimates that you have taken and

2  other people have taken and we're applying other estimates on

3  top of those, correct?

4  A    What do you mean by that?

5  Q    Well, you're doing estimates on estimates in order to

6  analyze the data.

7  A    I don't understand what you mean by estimates on

8  estimates.

9  Q    Okay.  Well, let's --

10  A    Estimates of what?

11  Q    Well, estimates of the population you're analyzing,

12  correct?

13  A    Well, I'm using the census data and --

14  Q    The census data provided to you by?

15  A    Well, I'm using the actual census data for that.

16  Q    Well, what information were you using in the census block

17  that you used to analyze that you received -- I think you

18  testified you received it from Catalist.

19  A    Oh.  What I received from Catalist was an identification

20  of what the area was in which the person lived.  I downloaded

21  the actual census data from the census website and used that

22  and the ecological regression to measure the rate of no-match.

23  Q    So Catalist information was used to help you produce your

24  results on the ecological regression analysis, correct?

25  A    It was used to locate individuals.

1   Q     And with regard to the homogeneous block analysis you

2   performed, what information -- where did you get your baseline

3   information for that?

4   A     The blocks?

5   Q     Yes.

6   A     The data that comes from the census and the ACS, the

7   American Community Survey and from the census enumeration.

8   Q     So out of homogeneous block analysis, are you able to

9   identify any individual -- anybody out of that study that you

10  can say is unable to vote because they lack proper voter ID?

11  A     Those techniques are for measuring racial differences

12  across groups and some behavior, like possession of ID.  It's

13  not about estimating the race of individuals.

14  Q     What's ecological fallacy?

15  A     What's the ecological fallacy?  That was an observation of

16  William S. Robinson.

17  Q     And what is it?

18  A     Ecological fallacy is that ecological aggregates don't

19  always correspond to individual estimates.

20  Q     So it's tough to take a big group people and try and

21  impute something about individuals out of that big group

22  analysis?

23  A     Under assumptions, you can do that.

24  Q     Well, under assumptions, you can pick the race

25  classification of people, right?

Ansolabehere - Cross / By Mr. Scott                    220

1   A     Uh-huh, correct.

2   Q     The problem is sometimes that's wrong, right?

3   A     Correct.

4   Q     Your number is 27 percent higher than Dr. Herron's number

5   for a prediction of no-matches using ecological regression.

6   Did you know that?

7   A     I didn't know that.

8   Q     Now, you're a professor at Harvard, correct?

9   A     Yeah.

10  Q     He's a professor at Dartmouth, correct?

11  A     Okay.

12  Q     Whose result is right, yours or his?

13  A     I haven't looked very closely at the details of how he

14  implemented his ecological regression.  My specification is

15  stated.

16  Q     Do you have more confidence in your ecological regression

17  analysis, in your homogeneous block analysis or in your

18  database match or are they all viewed by you the same?

19  A     I -- mindful of the errors of the misclassification in

20  Catalist, I think that those are underestimating the

21  differences across the racial groups because of what

22  misclassification will tend to do in a situation like this.  So

23  I -- that all the tests -- that all of the data is pointing to

24  the same conclusion is underscoring the same basic conclusion

25  and so I'm confident in that conclusion.

Ansolabehere - Cross / By Mr. Scott                          221

1              Would I pick any one of them over the other?  I would

2     -- homogeneous block group and the ecological regression are

3     going to be close to each other.  So I think those are the most

4     consistent with each other and that's probably the most likely

5     estimate.

6     Q     So earlier today I thought I heard you say that they were

7     all three very similar and that gave you comfort, correct?

8     A     Yeah.

9     Q     Well, what if 2 million plus of your people on your

10    database match that you have labeled Hispanic or black are

11    actually white, would that change the results?

12    A     Again, that degree of misclassification would reduce the

13    size and that's what we're seeing when we compare the

14    ecological regression to the Catalist analysis, that is, the

15    differences across those bars are smaller than in the

16    ecological regression and that would be a consequence of

17    misclassification.

18    Q     So as a result of all your work that you've done in this

19    case and all the things that you've derived and all the people

20    that you've seen, are you able to tell this Court that there is

21    anybody that cannot cast a ballot in Texas as a result of the

22    implementation of SB 14?

23              MS. BALDWIN:  And, your Honor, I just want to have a

24    running objection to the 2-million number.  I mean, throughout

25    the entire exam -- and I didn't want to interrupt the pace of

Ansolabehere - Redirect / By Ms. Baldwin                222

1   what Mr. Scott was doing but there's been no foundation, no

2   facts offered whatsoever at all for the idea that there is this

3   amount of misclassification.

4           **MR. SCOTT:**  We'll bring a rebuttal witness on it,

5   your Honor.

6           **THE COURT:**  Okay.  I'll see.  I mean, there's nothing

7   in the record yet --

8           **MR. SCOTT:**  Yes, ma'am.

9           **THE COURT:**  -- on that?

10          **THE WITNESS:**  Could you restate your question?

11  **BY MR. SCOTT:**

12  Q    Ah-hah.  Can you, based upon all the work that you've done

13  in this case, identify one person that you believe cannot vote

14  because they are unable to obtain voter ID that complies with

15  SB 14?

16  A    That was not the task I was asked to do, to identify

17  individuals.

18  Q    Okay.

19          **MR. SCOTT:**  Nothing further, your Honor.

20          **THE COURT:**  All right.

21                      **REDIRECT EXAMINATION**

22  **BY MS. BALDWIN:**

23  Q    Mr. Ansolahehere, I want to bring up -- I'm going to put

24  on the Elmo an exhibit that I'm going to read from just for --

25  I'll show the first page just for identification purposes.

1    This is Plaintiffs' Exhibit 942 and this is a letter sent from

2    the office of the Secretary of State.  Let's see if we can see

3    a date.  What's the date on that letter, Dr. Ansolahehere?

4    A    January 12th, 2012.

5    Q    Okay.  And this letter concerns some DPS data.  I just

6    want to read you a passage of the letter and ask if this would

7    have changed your analysis in any way.  I'm going to read from

8    the second bullet.  "DPS previously used the following racial

9             classifications on all ID applications:  American

10            Indian, Alaskan Native, Asian Pacific Islander,

11            Black, Other and White.  Not until May 2010 did ID

12            applications at DPS offices across the state contain

13            a field for Hispanic."

14            If until 2010, DPS did not collect information for

15   who is Hispanic and just had those other race categories, do

16   you think that the DPS data is a reliable source of self-

17   reported race?

18   A    It had an awful lot of incomplete missing data.

19   Q    And reading on in the bullet underneath that, "It is

20            impossible to identify which classifications Texans

21            of Hispanic dissent selected on ID applications

22            completed prior to May 2010.  For this reason, DPS's

23            data for racial classifications other than Hispanic

24            are no doubt significantly distorted."  If in your

25   academic judgment, you were offered a data source of so-called

Ansolabehere - Redirect / By Ms. Baldwin                    224

1   self-reported race where the person collecting the self-

2   reported race was saying that those racial estimates were

3   significantly distorted, would you have confidence in relying

4   on that data?

5   A     No.

6   Q     We talked about -- one of the first examples that

7   Mr. Scott brought up on the no-match list was a woman who

8   appears to be a felon in another state.

9         **MS. BALDWIN:**  Could we bring up PO901 at Page 63?  If

10  we could switch to the --

11  Q     Could you read the first paragraph, if you can read that?

12  A     Is this an eye exam?

13        **(Laughter)**

14  Q     I'll read it for you if --

15  A     "Each weekday, the Department of Public Safety, one,

16              prepares an abstract of each final judgment received

17              by the department convicting a person 18 years of age

18              or older who is a resident of the state with a felony

19              and, two, files each abstract with the Secretary of

20              State.  These records are then processed against the

21              voter rolls to identify possible felons and provide

22              to the county in which the individual is registered

23              for further investigation.  That purpose has been

24              accomplished."

25  Q     Okay.  And I'm going to represent to you that this answer

1    comes from interrogatories that the State of Texas served in

2    response to the Plaintiffs.  So if the Department of Public

3    Safety gives the Secretary of State information on felons on a

4    daily base for people who have been convicted of felonies in

5    Texas, would those people based on that paragraph have likely

6    already been removed recent felons from the team data that you

7    received on January 15th?

8    A    That was my understanding, yeah.

9    Q    Do you know of any state that does a more often than daily

10   removal of felons than Texas?

11   A    Daily is the most frequent I've heard of.  So --

12   Q    We talked some about, on your direct, misclassification

13   errors in race of particular people.  When Mr. Scott pulled up

14   the big, massive spreadsheet, the race information that was

15   race estimates from Catalist, correct?

16   A    Correct.

17   Q    And do those race estimates from Catalist have anything to

18   do with your separate analysis of ecological regression?

19   A    No.

20           MR. SCOTT:  Objection, your Honor.  I think -- well,

21   I mean, he's already testified.

22           THE WITNESS:  Sorry.  Sorry.

23   BY MS. BALDWIN:

24   Q    So is -- and the ecological regression analysis -- the

25   information from Catalist that you used for that was the

Ansolabehere - Redirect / By Ms. Baldwin                226

1   geo-coded census locations, correct?

2   A     Correct.

3   Q     Is that a standard mechanical process, geo-coding census

4   locations?

5   A     Correct.

6   Q     Is there any exercise of discretion typically that's done

7   in geo-coding?

8   A     No.

9   Q     You either can locate a person where there's census data

10  or you can't, right?

11  A     Correct.

12  Q     To what extent, if any in your view, does Catalist's

13  client list have any effect on its geo-coding that was used in

14  your ecological regression?

15  A     Not at all.  It's a straightforward programming problem.

16  So --

17  Q     And we talked a bit earlier about the effects of

18  misidentification by race.  Is it surprising to you that there

19  are particular people on your no-match list who their Catalist

20  estimate is not, in fact, their actual race?

21  A     Not surprising.

22  Q     To what extent would you expect that to be the case?

23  A     I mean, it would depend -- it depends a bit on what

24  geography the people are being extracted from.  So if I -- if

25  you're taking people from the geography that's predominantly

1    white and it happens to be a black person, the most likely

2    guess would be that that person is white.  So that's the kind

3    of error that would show up.

4            Homogeneous black group helps in thinking about that

5    a contrast which is take areas that are very white, very black,

6    very Hispanic and compare race and non-possession of ID and we

7    find, you know, a big difference across those areas.  So

8    different kinds of information -- you know, different kinds of

9    geographies will be to different kinds of misclassification but

10   adding the name information and so forth improves the -- you

11   know, reduces those misclassifications within those areas.

12           So Catalist is fairly good at identifying race and

13   I've looked at their data most intensely in Florida and there

14   it's quite good because Florida has race on the voter rolls.

15   Q    And tell us about the validation you've done of the

16   Catalist data in Florida on the voter rolls.

17   A    Because race is on the voter rolls and it's a very large

18   state, compare their racial classifications and the data --

19   they're not perfectly reliable but they're very highly reliable

20   indicators of the self-identified race from the voter rolls.

21   Q    Okay.  And I want to ask you again.  Based on everything

22   that you've done, what is your basis for believing that any

23   misclassification by Catalist is not creating the racial

24   disparities that you're observing?

25   A    Um --

1  Q    And maybe we can put up a --

2  A    Okay.

3  Q    -- slide as an example if we have that on a -- feel free

4  to talk in general and if you want to use a specific example.

5  A    Okay.  And my basic conclusion is that the problem of

6  misclassification in this particular instance would actually

7  lead to reducing the differences across the grids rather than

8  expanding observed differences.

9            And the example I gave earlier is such an example and

10  here's another such example which is if you take people who

11  have ID and people who don't ID by each racial group because

12  the white bar is the truth, 80 percent of whites have ID and 30

13  percent of blacks have ID compared to 20 percent of whites not

14  having ID and 70 percent of blacks not having ID.

15            And then if 30 percent of blacks are misclassified as

16  whites and 30 percent of whites are misclassified as blacks,

17  then the proportions are reduced because the estimates are

18  muddied by misclassification of the two racial groups.  So

19  instead of estimating the true proportion of 80 percent of

20  whites having ID, the result would be 65 percent of whites

21  having ID and instead of estimating the true proportion of 30

22  percent of black having ID, the misclassification leads to an

23  estimate of 45 percent of blacks having ID.

24            So instead of seeing a 50 percentage-point difference

25  -- and in this example, you could only have a 20 percentage-

1   point difference and that's just a matter of simple

2   misclassification one way or the other and that's commonly

3   what's called "measurement error" when misclassification

4   happens in data such as these, that is, it would reduce finding

5   differences and the fact that we find significant differences

6   means that even with the misclassification, there's still

7   evidence of a racial disparity.

8   Q    So to be very clear, do you have any doubt that the

9   misclassification is creating the racial disparity that you've

10  observed?

11  A    No.  It's, if anything, biasing it downward to -- away

12  from finding a disparity.

13  Q    Okay.  And last on ecological regression, I believe you

14  testified on direct that that was an accepted methodology and

15  cited a case called "*Gingles v Thornburg*"?

16  A    *Thornburg v Gingles*, yeah.

17  Q    Thank you.  Could you just say what Court decided that

18  case?

19  A    The United States Supreme Court, 1986.

20  Q    Thank you.

21           **MS. BALDWIN:**  That's all I have.

22                     **RECROSS EXAMINATION**

23  BY MR. SCOTT:

24  Q    We've got real-world facts going on here, Doctor.  We have

25  elections taking place.  We have people who are signing up for

1  voter ID.  Why are we not focused on the outcomes of those

2  individuals and whether or not they have been impacted by this

3  statute rather than defaulting to a theoretical world that

4  seems to run counter-factual?  Why is that?

5  A    I'm not sure I get the gist of your question.  I was asked

6  to do a database match to determine whether there were

7  differences between who had ID and who didn't have ID.  That's

8  an approach followed by even the State's own expert, Trey Hood,

9  in his assessment of Georgia.  So I don't think this is a

10 hypothetical.  I think this is the technique that the social

11 scientists use to assess whether or not the different racial

12 groups are affected differently by the -- in this case, the

13 voter ID law but in other voting rights cases as well.

14 Q    So if you do an ecological regression and anybody else in

15 his case does an ecological regression, your numbers should be

16 the same, correct?

17 A    It depends on how -- what variables are being used for

18 race and it depends also on how they weighed it.  I weighed it

19 properly by voting -- by the voting age population.  So --

20 Q    Let's say you an ecological regression and another

21 Plaintiffs' expert does an ecological regression, you'd agree

22 those two, based on science, should line up and be the same

23 number, correct?

24 A    I'd have to see what that other person did.

25          **MR. SCOTT:**  Nothing further, your Honor.

1          THE COURT:  All right.  Is that all for this witness

2   then?

3          Sir, you can step down.  Let's go ahead and take a

4   15-minute break.

5          THE WITNESS:  Thank you.

6      (Witness stepped down)

7          THE CLERK:  All rise.

8      (A recess was taken from 4:15 p.m. to 4:28 p.m.; parties

9   present)

10         MR. BRAZIL:  May I proceed, your Honor?

11         THE COURT:  Yes.

12         MR. BRAZIL:  At this time the Plaintiffs would call

13  Marc Veasey.

14         THE COURT:  All right.

15         MR. BRAZIL:  Mr. Veasey, if you'd be sworn.

16         THE COURT:  Good afternoon, sir.  Would you raise

17  your right hand?

18            MARC VEASEY, PLAINTIFFS' WITNESS, SWORN

19         MR. BRAZIL:  Your Honor, for the record, Scott Brazil

20  for the Veasey, LULAC Plaintiffs.

21                  DIRECT EXAMINATION

22  BY MR. BRAZIL:

23  Q    Would you please state your name?

24  A    Marc Veasey.

25  Q    And Congressman Veasey, would you give us a brief

Veasey - Direct / By Mr. Brazil                          232

1   background of your education?

2   A    Yeah, absolutely.  I finished from the Fort Worth

3   Independent School District at Arlington Heights High School

4   and graduated from Texas Wesleyan University Methodist College

5   in Fort Worth.

6   Q    What year did you graduate?

7   A    1995.

8   Q    And your degree was in what?

9   A    Mass communication.

10  Q    Would you identify your race for the record and for the

11  State?

12  A    Black or African American, as some people will say.

13  Q    Okay.  You are currently an elected official?

14  A    That is correct, sir.

15  Q    How so?

16  A    I was elected to the United States Congress in 2012.

17  Q    And so you took office in January of 2013?

18  A    That is correct.

19  Q    Before being elected to Congress did you also serve in a

20  public capacity?

21  A    Yes, sir, I did.  I was elected in 2004 to serve in the

22  Texas State Legislature.

23  Q    And what district did you represent?

24  A    That was House District 95 that I represented until 2012

25  when I ran for Congress.

1    Q    So you were elected to four terms?

2    A    That is correct.

3    Q    And what area for the Court, what area did that district

4    encompass, generally?

5    A    Southeastern Tarrant County.

6    Q    In the four terms that you were in the House was photo

7    I.D. or voter I.D. a topic of discussion during several of

8    those sessions?

9    A    Yes, absolutely.

10   Q    And can you just briefly give us a background of that?

11   A    Well, every session that I was in there was some attempt

12   at the photo I.D. bill, whether it was an amendment or it was a

13   full-scale bill; or like the last session there was an attempt

14   each session to pass one of these photo I.D. type bills.

15   Q    And who was your desk mate during that four terms?

16   A    For every term I was in the state legislature my desk mate

17   was Trey Martinez Fischer.

18   Q    Who we heard from earlier today?

19   A    That is correct.

20   Q    And when I say "desk mate," what does that mean?

21   A    In the Texas Legislature, unlike in the U.S. House, you

22   actually have a desk that sits on the House floor with a

23   telephone and a computer and, you know, plenty of space to put

24   papers and things like that just like a typical desk.  And it's

25   basically two desks that are put together to kind of serve as

1    one desk with two chairs.  And Trey was my desk mate for the

2    entire time I was in the legislature.

3    Q    You heard him testify that some of the debate over the

4    voter I.D. bill was contentious.  Did you hear that testimony?

5    A    Oh, absolutely.

6    Q    Do you agree with that?

7    A    Oh, 100 percent.

8    Q    Did it -- was it always that way or did it get

9    progressively worse or more heated, so to speak?

10   A    It was always that way.

11   Q    So during your four terms each time it came up there was

12   heated debate.

13   A    Yes, yes.  It was probably -- I would say even at the end

14   it was probably even -- the last term it was probably more

15   heated.

16   Q    Okay.  For the Court, what was your last term?

17   A    In 2011.

18   Q    Okay.  So when Senate Bill 14 was passed, became law, you

19   were in the Texas House?

20   A    Yes.

21   Q    Okay.  Did you oppose each of the bills during your four

22   sessions?

23   A    Yes, absolutely.

24   Q    And why is that?

25   A    Because I thought that they were discriminatory bills.  I

1  thought that they were bills that --

2        **(Background noise in courtroom)**

3              **THE COURT:**  You can proceed.

4              **THE WITNESS:**  I thought that they were discriminatory

5  bills that instead of trying to prevent voter fraud, which is

6  what the Republicans said that they were purported to do, they

7  were actually preventing African Americans and Hispanics from

8  voting, making it harder for African Americans and Hispanics to

9  vote.

10 **BY MR. BRAZIL:**

11 Q    And so that's one of the reasons that you opposed it each

12 time?

13 A    Absolutely.

14 Q    In 2007, you were not on the House Elections Committee

15 were you?

16 A    In 2007, no, I was not on the House Elections Committee.

17 Q    Did you go to the hearings before that committee?

18 A    Oh, yes, absolutely.

19 Q    And why did you do that?

20 A    Because, again, I thought that the bill was very

21 discriminatory and I thought it would have had adverse impact

22 on the constituents that I represented in southeast Fort Worth.

23 And so I decided that I was going to sit in on the committee

24 hearing.  Although I was not on the committee, it's proper

25 courtesy in the Texas Legislature to allow other members other

1   than the legislature to come in and sit in on committee and ask

2   questions as long as other committee members have already asked

3   any questions that they may have.  But it was proper courtesy

4   for the Chairman or whoever was the presiding Chair at the time

5   to allow any member of the legislature to come in and ask

6   questions.

7   Q    And did you do so?

8   A    Yes, I did.

9   Q    And tell us what happened.

10  A    I was asking questions -- what I particularly remember

11  about that time that Leo Berman out of Smith County from Tyler,

12  he was the Chairman of elections during that time period.  And

13  he didn't like some of the questions that I asked, and he threw

14  me out of the committee hearing.

15  Q    What type of questions were you asking?

16  A    They were questions related to the impact that it may have

17  on African American voters.

18  Q    And who were you asking the questions of?

19  A    It would have been one of the witnesses that would have

20  come to testify before the Elections Committee.

21  Q    And is it routine to allow non members, non committee

22  members to ask questions after everyone else has had their

23  turn?

24  A    Yeah, as long as the other committee members have spoken

25  it's very common courtesy.  It doesn't have anything to do with

1   partisan -- you know, what committee you're on -- I mean what

2   political party you may happen to belong to.  It doesn't matter

3   if the Chairman is a Democrat or a Republican.  It's always,

4   you know, common courtesy to allow any member of the

5   legislature to ask questions at any given committee hearing

6   that they would like to.

7   Q    And who was the Chairman in 2007 of the Elections

8   Committee?

9   A    That would have been Leo Berman.

10  Q    And his race is what?

11  A    White.

12  Q    And did he give a reason for asking you to leave the

13  committee hearing?

14  A    He appeared to be frustrated.  He did not give me a

15  reason.  He appeared to be frustrated and he looked over at me

16  and he said, "You're out of here."

17  Q    Did you leave?

18  A    Oh, yes.

19  Q    Okay.  Did you ever serve on any election committee during

20  your four terms in the House?

21  A    I did.  My last term in the House I served on the

22  Elections Committee and I also served on the Select Committee

23  that was formed by the Speaker to pass out the voter I.D. or

24  photo I.D. bill.

25  Q    Let me ask you about that.  You said "Select Committee"?

Veasey - Direct / By Mr. Brazil                238

1   A    Yes.

2   Q    And is that different from a Standing Committee or other

3   committee?

4   A    Yes, it is.

5   Q    How so?

6   A    That is a committee that the Speaker of the House will

7   create to focus in on a certain issue or topic.

8   Q    And in this case who appointed the committee members?

9   A    That would have been Joe Straus.

10  Q    How many members?  Do you recall?

11  A    I do not remember how many committees were on the Select

12  Committee.  Maybe eleven.  I don't remember exactly.

13  Q    What was your position on that committee?

14  A    I was the Vice Chair of the committee.

15  Q    And that means what?

16  A    The Vice Chair of the committee doesn't mean a whole lot,

17  to be quite honest with you.

18      **(Laughter)**

19          But for that particular -- I mean for any particular

20  committee if the committee Chairman wants to, you know, step

21  away for some reason -- sometimes in the legislature you're

22  talking about 140 days of sheer madness.  And so there may be a

23  time where a member may have two committee hearings going on at

24  the same time.  And so let's say the committee Chairman needs

25  to go and make a vote in his other committee.  Then I would

1   just simply fill in as the Vice Chair of the committee and keep

2   the proceeding going until the Chairman gets back.

3   Q    How long did this committee sit?

4   A    The committee didn't sit long.  I think for the entire

5   140 days maybe one, two days at the most to just pass out the

6   voter I.D. bill.

7   Q    Did it consider any other bills?

8   A    No.  No, it did not.  It had a broad enough scope to

9   mean -- I believe it was called the committee -- the Select

10  Committee on Voter Integrity and Voter Fraud, or something of

11  that nature.  But it didn't look into anything else pertaining

12  to voting at all.  I mean it was just -- it was clear that it

13  was set up to just pass the voter I.D., photo I.D. bill.

14  Q    And why do you say it was set up just to pass the photo

15  I.D. bill?

16  A    Because that was the only thing that -- that was the only

17  time the committee met.

18  Q    Was one or two days?

19  A    Right.  For just that one single bill.

20  Q    Did that committee investigate any allegations of voter

21  fraud?

22  A    No, none.

23  Q    Hear any witnesses or see any studies regarding voter

24  fraud?

25  A    No.  And it was asked over and over again to produce --

1  you know, we would ask over and over, hey, you know, show us

2  proof of voter fraud.  And it was just all basically innuendo.

3  Q    And who were you asking to see this information from?  Who

4  were you seeking information from?

5  A    From colleagues that were sitting on the dais and from,

6  you know, people that will come to testify around the state on

7  why they felt this bill needed to be passed.  And again, you

8  would ask over and over again, hey, produce some fraud here.  I

9  mean this is the committee on voter fraud.  Show me the fraud.

10 And no one ever showed any fraud.

11 Q    How many select or special House committees were appointed

12 during your four terms?

13 A    That I wouldn't be able to say.

14 Q    You had told us that you gave up your gavel.  What did you

15 mean by that?

16 A    Well, it's customary for the Chair and the Vice Chair of

17 any committee to get a gavel.  You know, because in order for

18 the Chairman to run the committee smoothly and stop people from

19 interrupting and to stop, you know, witnesses from speaking

20 when they're not supposed to and what have you, each Chairman

21 is given a gavel and the board to bang the gavel on.

22       And I received a gavel that, you know, was marked VC,

23 you know, whatever, let's say it was the 82nd legislative year.

24 You know, Vice Chair, you know, Committee on Voter Fraud and

25 Voter Integrity, you know, Select Committee.  And I was just

1    really -- quite honest, I was really just kind of ashamed and

2    embarrassed for that because I was only chair -- that was the

3    only committee I was ever Vice Chair of for the four terms I

4    served in the House.  And I just didn't want that to be -- that

5    wasn't something that I would be proud to be hanging in my

6    house, that I was, you know, Chair of a -- or Vice Chair of a

7    committee.  I felt you know very strongly that their main, you

8    know, goal was to commit, you know, voter suppression.  And so

9    I gave the gavel and the board away to one of the schools in

10   southeast Fort Worth.

11   Q    By your fourth session I assume it was no secret to the

12   members of the House and Senate that you were against voter

13   I.D., photo I.D.

14   A    Correct.

15   Q    Why do you believe you were appointed as the Vice Chair to

16   a committee that was only in session one or two days and was

17   only given the duty of passing one bill?

18   A    You know, I don't know.  Probably because, you know,

19   people want it to make it look like, oh no, it was -- you know,

20   there was fairness going on here.  And that was probably, you

21   know, just some kind of, you know, game that was being played.

22   Q    In your opinion was it fair?

23   A    Oh, no.  The committee was not fair at all, no.

24   Q    During your last session during the debate and the

25   testimony on Senate Bill 14 did you offer certain amendments?

1    A    Yeah, absolutely I did.

2    Q    And before I get into the individual amendments that you

3    offered, what was the purpose generally of trying to amend

4    Senate Bill 14?

5    A    The reason why I felt strongly about amending Senate

6    Bill 14 was that, you know, if you have concerns about a bill

7    that is going to be discriminatory or that is going to have an

8    adverse impact on the district that you represent, then you'd

9    want to offer amendments to help, you know, rectify that

10   situation to the best ability, you know, possible.

11   Q    I assume other amendments were offered by other members of

12   the House?

13   A    That is correct.

14   Q    Okay.  And I think in your deposition the State inquired

15   into three of the amendments that you offered.  Do you recall

16   that?

17   A    Yes.

18   Q    Okay.  Let me show you the first amendment.

19        **MR. BRAZIL:**  And for the record, your Honor, this

20   appears in Plaintiffs' Exhibit 34, Pages 24 and 25.  I'm going

21   to use this because it's easier to read.

22   Q    Generally, what was the reason or the purpose behind

23   offering this amendment?

24   A    This amendment, the reason why I would offer this

25   amendment stating that the voter is the same person named on

1    the list of registered voters for that precinct, that's

2    basically the voter would sign an affidavit saying that I'm,

3    you know, not committing -- it was basically saying that you're

4    not committing voter fraud and that I am who I say that I am,

5    so go ahead and count my ballot instead of it being a

6    provisional ballot.

7            Because one of the areas that I had really grave

8    concern in on this law was the fact that people -- you know, in

9    voting, particularly you know after the <u>Voting Rights Act</u> was

10   passed, you know, it was a -- states and municipalities and

11   things like that, particularly in the south, it seemed like

12   they took a great -- you know, they wanted to make sure that

13   there was not a burden being put on the voter and that if there

14   was any sort of, you know, fraud or anything like that that was

15   taking place, it was really up on the local election

16   administrators and what have you to show that, hey, this is a

17   person committing fraud.

18           But, you know, one of the issues that I had with this

19   voter I.D. bill was that it kind of reverses that and you kind

20   of go back really to the 19, you know, 50's and 60's and that

21   now the burden is all of a sudden on the voter.  The voter all

22   of a sudden has to go back in time and show that he is actually

23   who he is.

24           And you can file a -- you can vote a provisional

25   ballot but it wouldn't count.  And so the odds of the voter

1    actually coming back up to the county courthouse to produce the

2    I.D. within the timeframe there to me would have been an unjust

3    burden on my district.  And so I wanted to say that, hey, you

4    know, if there's voter fraud going on, no one would come in and

5    actually sign a affidavit stating that they are -- they are who

6    they say they are if they're not that person.  And so this

7    basically makes it to where their vote would count.  And then

8    that way you actually have a -- you know, let's say that 100

9    people sign this affidavit.  You'd have 100 affidavits to go

10   through instead of going through 20,000 -- you know, going

11   through the entire voter roll in Tarrant County, and then that

12   way you would have a much smaller universe of individuals there

13   if you really thought that voter fraud was, you know, taking

14   place.

15            And I thought this was just a great way to make sure

16   that if a guy's I.D. was 61 days expired, hey, his vote would

17   still count.  You're not putting that burden on him to actually

18   figure out a way how to get back up to the county courthouse,

19   show his I.D. so his vote would count.

20   Q    So if a person's name was on the registration for that

21   precinct, on the voter rolls for that precinct, they would sign

22   an affidavit and cast a regular ballot.

23   A    Right.  Yeah, exactly.  Saying hey, my vote -- my I.D. may

24   be 61 days expired but you know what?  I am who I say I am.

25   I'm willing to sign an affidavit and say that I am, so why

1  can't my vote count?  Why do I have to take this extra burden

2  and this extra step to come back up here and jump through all

3  of those hoops just so my vote will count?  This way the vote

4  automatically counts.  And then that way if anybody wanted to

5  come in -- it could be the King Street Patriots, the NAACP, it

6  doesn't matter.  If anybody wanted to come back in and look

7  through those 100, that small stack of signed affidavits to see

8  if any voter fraud took place, they'd have a small stack of

9  affidavits to go through.  And then that way everybody's vote

10  would count; and if you find fraud, you find fraud.

11  Q    Who did you think would be most affected by casting

12  provisional ballots and having to return to the courthouse?

13  A    From my experience that would have been the constituents

14  that I represented in southeast Fort Worth, the constituents

15  like them all around the state.  You know, there were -- even

16  under the previous law people would call in and have issues and

17  they would sometimes have to file a provisional ballot.  And so

18  I wanted to make sure that this was not something that would

19  increase under this law, and so that was the reason why I filed

20  this amendment.

21  Q    What happened to this amendment?

22  A    The amendment was voted down.

23  Q    Before I forget, the Special Committee you were on, was

24  that early in the session or late in the session?

25  A    When all the committee assignments came out that's

Veasey - Direct / By Mr. Brazil                246

1   whenever it was -- the committee was announced.

2   Q    Okay.  But the committee --

3   A    So that would have been early on in the session.

4   Q    So the one or two days that you sat on this special

5   committee was early in the session.

6   A    Now, I don't remember the exact date when the session took

7   place.

8   Q    Let's turn to the second amendment that you offered.

9         MR. BRAZIL:  And for the record, your Honor, this is

10  Plaintiffs' Exhibit 34, Page 36.  But I'm going to use my copy

11  because it's easier to read.

12  Q    You offered this amendment to allow a potential voter to

13  use a valid employee identification.

14  A    Correct.

15  Q    And what was the purpose behind offering this amendment?

16  A    The purpose behind offering this amendment was, let's say

17  that -- I was thinking about like local employers in the Dallas

18  Fort Worth area.  And so if you worked for a defense contractor

19  or some other place, airline or you know something of that

20  nature that required that an individual, you know, be vetted in

21  order for them to get an I.D. to come onto an area that is high

22  secured and requires that there be a certain level of security

23  there, you ought to be able to use those same I.D.s to be able

24  to vote.  And even if it's at a -- you know, another, you know,

25  place of identification, if the employer feels strongly enough

Veasey - Direct / By Mr. Brazil                    247

1  that that I.D. protects their property and the person is vetted

2  enough to be around other people that work on that particular

3  facility, why wouldn't that person be able to use that same

4  I.D. to go and vote?

5  Q    You use an example in your deposition of American

6  Airlines.  If you can gain access to the restricted areas at an

7  airport with an I.D. that has a photograph on it, did you think

8  that should be good enough to vote?

9  A    Yeah, absolutely.  Absolutely it should be.  I see no

10 other reason why.  I mean obviously that is an area that

11 everyone in the entire American public would want to know was a

12 safe secured area.  And so if you can use those I.D.s to be

13 able to have access to planes or, again, anything of that

14 nature, then why wouldn't you be able to use those same I.D.s

15 to be able to, you know, simply cast, you know, your suffrage?

16 Q    What happened to this amendment?

17 A    It was voted down.

18 Q    Okay.  This amendment and the one that we spoke of

19 previously, did you get a consensus in the House as to why it

20 was voted down?

21 A    I think that at that point that they just were not

22 accepting any I.D. -- I mean any -- that they were not

23 accepting any amendments at all, that the people that wanted

24 this bill passed were not accepting any amendments at all.  I

25 mean there were a lot of rumors going around that ALEC, you

Veasey - Direct / By Mr. Brazil                      248

1    know, the controversial organization that you hear about in the

2    newspaper, that ALEC had actually written this bill, that it

3    was not even written by the Republican members of the

4    legislature and that they didn't want any changes at all to

5    this bill.

6    Q    Did it appear to you during the legislative process that

7    there were not going to be any changes?

8    A    Oh, yes, absolutely.  It was clear from the very

9    beginning.

10   Q    Did you offer these amendments before or after you sat on

11   the Special Committee?

12   A    I would have offered these amendments after the hearing

13   that we had on the Select Committee.

14   Q    Did you -- when you were on the Select Committee did you

15   voice your concerns or propose any changes to the bill?

16   A    Oh, yeah, absolutely.  I mean we talked a lot about

17   changes and how you could make things better.  But again, I

18   mean it was pretty much -- it was pretty clear that there would

19   be no changes to this bill, that the bill was already written,

20   it was prepackaged, it was ready to go and that they were

21   absolutely not going to be accepting any changes at all to this

22   bill.

23   Q    As far as the process, the speed of the process, this was

24   your last of four sessions, correct?

25   A    Correct.

1  Q    Was this bill on slow track, fast track, super fast track?

2  How would you describe it?

3  A    It's hard to remember back then, you know, to describe how

4  I would say where it, you know, would fall into that category.

5  And so I wouldn't want to guess on that.  But it seems like

6  that maybe it was -- that we had the hearing kind of in the

7  middle of the session or so.  But it's hard to say.

8  Q    Fair enough.  The third amendment that you offered, a

9  little longer, tell us the purpose behind offering that

10  amendment.

11  A    Well, this amendment would basically require the Secretary

12  of State's Office to come up with some sort of a system to see

13  who was casting these provisional ballots.  And I thought that

14  this was like a good bipartisan amendment.  But you know,

15  again, it was not, you know, taken seriously.

16       I mean one of the things that I always hear when I'm

17  back home and if I have it on WBAP or something like that and

18  they're having these conservative talk shows on, you hear the

19  callers call in and you often times hear the conservative talk

20  show, you know, guests call in -- I mean the host, you know,

21  say that, hey, you know, prove to me that there is

22  discrimination and I'll stand -- and I'll go out there and I'll

23  march with people that you see out marching in the street, and

24  I'll go out there with this particular national, you know,

25  African American leader if you show me that there's actual

1    discrimination.

2              And so this would -- if the Secretary of State's

3    findings would show that there was actual discrimination

4    because the people that were denied the right to vote were

5    overwhelmingly Latino or African American, then you know --

6    then it would make -- then it would, you know, reverse, you

7    know, the -- it would make it to where we could, you know,

8    figure out a way how to, you know, maybe go back and fix these

9    issues.  But you know, again, this one was voted down and I

10   thought that this was pretty -- you know, I mean if you're

11   vehemently stating on the House floor that no discrimination is

12   going to take place, then why not be for this amendment?

13   Q    Were there members standing on the House floor stating

14   that?

15   A    Oh, absolutely.  I mean the Republicans were on the House

16   floor, you know, stating that no, no, no, there's no

17   discrimination; we're not trying to discriminate against

18   African Americans or Latinos; this bill was not going to do

19   that.  Well, if it's not going to do that, then take this

20   amendment.  Because this amendment only says that there's a

21   remedy if there's actual discrimination.

22   Q    And what happened to this amendment?

23   A    It was voted down.

24   Q    Okay.  Were you surprised by how quickly the State

25   announced the implementation of Senate Bill 14 after *Shelby*

1   *County?*

2   A    I was obviously very disappointed, you know, particularly

3   because, you know, there was a federal court that was, you

4   know, if I'm not mistaken majority -- you know, Republican

5   appointees that said that there was some serious issues with

6   discrimination and discriminatory findings in this bill.  And

7   so the fact that the Attorney General that is supposed to

8   protect the entire state would say, no, we're going to

9   immediately implement this when you still have these issues

10  with this federal court, I was -- I was disappointed but not

11  surprised.  Because again, you know, had you been in the Texas

12  Legislature and you had just seen some of the discriminatory

13  things that took place as it related to voting for the eight

14  years that I was there, then no it -- I hate to say that, but

15  it was not a surprise at all.

16  Q    Shifting gears for a moment, your constituents in your

17  district, your House district -- you're in for four terms --

18  did you have a segment that wanted to vote in person versus by

19  mail or --

20  A    No, that's the -- absolutely.  I mean I was just talking

21  with my -- before this school year started at the end --

22  towards the end of last school year, so it would have been

23  earlier this spring -- I was talking with one of the teachers,

24  my son's second grade teacher who lives in the district with

25  her mom.  And she always takes her mom and aunt to go and vote.

1    Well, I mean they're well past the age where they can vote by

2    mail.  But she was telling me, she said, you know, no they want

3    to go -- you know, they've been doing this now for, you know,

4    eight, ten years; you know, they want to go and vote for you in

5    person.  And so every year I make sure that I take time and I

6    go and take them to go and vote early for you in person.  They

7    do not want to vote by mail.  Even though they're senior

8    citizens, they want to be able to vote for you in person.  And

9    I can tell you that there are a lot of people in the senior

10   citizen community in southeast Fort Worth that feel exactly

11   that way.

12   Q    And does that cross all racial lines?

13   A    Absolutely.

14   Q    The four sessions that you were in in the House, voter

15   I.D. -- the voter I.D. bill or bills did they change?  Was it

16   the same bill each time or was there a change?

17   A    This one was considered like the worst one out of all of

18   them.  Like this one was considered like the -- you know, like

19   the -- you know, the one that would be the most suppressive out

20   of all of them.

21   Q    And why did you believe this bill, Senate Bill 14, was the

22   most oppressive?

23   A    Because there were -- one of the reasons why was because

24   before the bill even made it onto the House floor it was --

25   again, the word that was going around the Capitol was that that

1   this bill was already written like even before the legislative

2   session had already started, like it was written by an outside

3   organization and that it was going to be the very worst one out

4   of all of them, that this one was going to be one that really,

5   you know, ratcheted down on minority voters and making it

6   harder for people to vote and that there wouldn't be any

7   amendments that would be accepted.  They wanted it like it was

8   and so that was like a big concern to a lot of people.

9   Q    Is that what you meant by "prepackaged"?

10  A    Yes.  Yeah, exactly.

11  Q    Okay.  Do you believe that Senate Bill 14 has a

12  discriminatory effect?

13  A    Oh, absolutely.  I don't think there's any doubt about

14  that.

15  Q    On what group or groups?

16  A    I think, you know, mostly for Latino and African American

17  voters based on my experience.  Not just as an elected official

18  but working as, you know, previous -- working on campaigns.

19          When we worked in a mall that was frequented -- I

20  mean it was a mall that was, quite honestly, it was almost

21  exclusively used by Latinos and African Americans in the

22  southern part of Fort Worth.  And I would talk with people all

23  the time that didn't have the I.D.s when we set up our Tarrant

24  County Democratic party office and people would walk by.  And

25  we would say, "Hey, you know, have you voted yet?  Do you need

1   a ride to the polls?"

2           And people would tell me all the time that they

3   didn't have the -- you know, an I.D.  I would ask them, Hey, we

4   can take you.  The voting place is just, you know, less than a

5   mile from here.  It would take less than five minutes to drive

6   on the other side of Seminary and exit Rippey (phonetic) and go

7   down to the Worth Heights Community Center to go and vote.  And

8   they would say, "Well, I don't have an I.D."  You know, or we

9   would ask them, Well, do you have, you know, water bills?  Do

10  you have, you know, something that would -- you know, a

11  Blockbuster card?  Do you have something that would show, you

12  know, who you were?

13          And so, you know, for me it was something that I

14  routinely saw.  Again, particularly as a -- as someone that was

15  working on campaigns in '98, 2000, 2002 you know cycle that I

16  experienced, you know, often.

17  Q    Were these individuals predominantly African American and

18  Latino?

19  A    Oh, yeah, yeah, yeah, easily.  And again, the mall, I mean

20  anybody that lives in Fort Worth will tell you that this

21  particular mall most of the people that use it, the consumers

22  that use that particular mall are, you know, African American

23  and even more so even Latino.

24  Q    Do you believe that Senate Bill 14 was intended to be

25  racially discriminating?

1   A    Yes, absolutely I do.  I feel very strongly about that.

2   Q    Do you believe that racial motivation underlied -- was

3   underlying the legislative process?

4   A    Yes, absolutely.

5   Q    Do you have a Congressional photo I.D.?

6   A    Yes, I do.  I do have a Congressional photo I.D.

7   Q    Can you board a plane with a Congressional I.D.?

8   A    Yes, you can board a plane with a Congressional I.D.

9   Q    Can you access restricted areas in Washington, D.C. with

10  that I.D.?

11  A    I can go into the White House with my Congressional I.D.

12  Q    Can you vote in Texas with that I.D.?

13  A    No.

14        **MR. BRAZIL:**  I'll pass the witness.

15                    **CROSS EXAMINATION**

16  **BY MR. CLAY:**

17  Q    Good afternoon, Congressman Veasey.

18  A    Good afternoon.

19  Q    Nice to talk to you again.

20  A    Good to see you.  Good to talk to you.

21  Q    Well, I just have a few questions.  I know you've been

22  around here, waiting around all day and I don't want to take

23  too much of your time, so I just have a few questions for you.

24        Now the first is I'd like to -- you mentioned earlier

25  that voter ID was taken up in several successive Legislative

1    sessions, is that right?

2    A     Yes.

3    Q     And so the Legislature considered a voter ID Bill in 2005,

4    is that right?

5    A     If -- we didn't consider a Bill again.  It came -- it may

6    have come up in some form of an amendment.

7    Q     So -- but the idea of asking someone to provide an ID in

8    order to vote was considered by the Legislature in 2005,

9    correct?

10   A     I believe so.

11   Q     Okay.  And in 2007 the Legislature considered a voter ID

12   Bill, is that right?

13   A     Yes.

14   Q     And then again in 2009, is that right?

15   A     Yes.

16   Q     And then finally voter ID was passed in the 2011

17   Legislative session, is that right?

18   A     That is correct.

19   Q     Now do you recall in 2007 whether that was a Bill or not?

20   A     I believe that it was a Bill because it seemed like there

21   was a companion Bill that Phil King had.  He is a Republican

22   from Weatherford, Texas.

23   Q     Okay.

24   A     And it seems --

25   Q     And do you recall how that Bill -- the Bill didn't

1    ultimately pass, correct?

2    A    No, it did not, no.

3    Q    And do you recall how that Bill, and I'll use the term

4    "died" in the Texas Legislature?

5    A    If -- again, it's been a while, but it seems like it was

6    on a point of order.

7    Q    Do you know what the two-thirds rule is in the Senate?

8    A    Yes, I do.

9    Q    So you don't recall whether or not it was the two-thirds

10   rule that prevented the voter ID Bill from passing the Senate

11   in 2007, do you?

12   A    I do not remember, but if it wasn't a point of order in

13   the House then it very well could have been the two-thirds rule

14   of the Senate.

15   Q    Okay, thank you.  And then, again, in 2009 the voter ID

16   Bill was filed, or perhaps several were filed in 2009, and

17   those were considered by both the House of Representatives and

18   the State Senate, is that right?

19   A    Yes.

20   Q    And do you recall how -- and, again, a voter ID Bill did

21   not pass the Texas Legislature in 2009, is that right?

22   A    That is right.

23   Q    Do you recall how voter ID died in the Texas Legislature

24   in 2009?

25   A    If I'm not mistaken the clock ran out on the Bill.  Maybe

1    -- because maybe it was like towards the end of the session

2    when a lot of Bills start to pile up.

3    Q    Yeah, I think that's right.

4         Do you know what the term "chubbing" means?

5    A    Yes, I do.

6    Q    You do?  Could you define it for me?

7    A    That is a practice that both is used in the House when

8    someone doesn't want a Bill to pass.  So let's say that I have

9    a Bill on the House floor, let's say I have a Bill on the Local

10   and Consent Calendar.  Someone may go and chub the Bills that

11   are right before mine to like stop my Bill from ever making it

12   onto the -- onto the House floor so it can go ahead and pass

13   through.

14   Q    So is it somewhat similar to a filibuster?

15   A    It -- I mean, in the sense that it's a parliamentary

16   tactic.

17   Q    It's way of sort of talking a Bill to death, is that

18   right?

19   A    I guess you could say that.

20   Q    And sitting here today do you recall whether or not the

21   House Democrats chubbed voter ID to death in the 2009

22   Legislative session?

23   A    I do not remember, but if there had been a -- and the

24   House Democrats may have chubbed voter -- done chubbing the

25   voter ID, and I probably would have participated in that.

1  Q     Thank you.  Well, if you participated, would you remember?

2  A     Not necessarily because that's a very -- I mean, it's --

3  you know, again, as I have mentioned earlier, in the Texas

4  Legislature this is 140 days and it's -- happens pretty fast --

5  everything happens pretty quickly.

6  Q     But you testified that the 2009 version of voter ID died

7  towards the end of session, right?

8  A     Right.

9  Q     Okay.  So we're talking about just the time period at the

10  end of session?

11  A     Right.

12  Q     But you don't recall whether or not you participated in

13  chubbing the 2009 voter ID Bill?

14  A     I don't remember, but I probably did.

15  Q     Next you mentioned that -- that in the 2011 session the

16  Bill seemed to be a fait accompli or a settled matter in that

17  the House Republicans were not going to take any amendments, is

18  that right?

19  A     Right.

20  Q     Do you recall whether or not the Senate accepted any

21  amendments?

22  A     I believe that the Senate did accept some amendments.

23  Q     Do you know which amendments they accepted?

24  A     I do not recall which amendments they accepted.

25  Q     Do you remember if they accepted an amendment from Senator

Veasey - Cross / By Mr. Clay                    260

1    Hinojosa?

2    A    Yes, I do, I believe that they did accept an amendment by

3    him.

4    Q    Did they also -- didn't they also accept an amendment from

5    Senator Davis?

6    A    Yes, they did.

7    Q    You're not a lawyer, is that right?

8    A    No, I'm not.

9    Q    So you understand that a State that is covered by Section

10   5, although it has a valid law on its books, is not able to

11   implement that law until it gains pre-clearance, either through

12   the Department of Justice or through a Federal court, is that

13   right?

14   A    Correct.

15   Q    Okay.  So you understand that a State that is not subject

16   to the pre -- Section 5 or the pre-clearance regime can, once

17   it enacts a law, it can immediately implement that law, is that

18   right?

19   A    That's my understanding.

20   Q    And just one last few questions, and I hate to bring it

21   back up, but -- and I promise I won't dwell on it very long

22   because this guy over here kind of stole my thunder on it, but

23   do you know what Catalist is?

24   A    To what -- what is?

25   Q    Catalist is?  They were testifying about it earlier today.

1   A    That was my first time ever hearing about the

2   organization.

3   Q    Okay.  Do you recall the testimony from Dr. Ansolahehere

4   for which you were in here for, where he said that Catalist

5   based its race classifications in part on population data in

6   very census geographic units?

7   A    I do remember slightly some -- yeah, that was a very long

8   testimony, so I don't remember every, you know, single thing

9   that was talked about there on that.

10  Q    I would agree with that.

11          You have a driver's license, correct?

12  A    Correct.

13  Q    And when you applied for that driver's license did you --

14  well, what race did you tell DPS you were?

15  A    Black.

16  Q    Okay.  And what is the address on your driver's license?

17  A    6113 Chola Drive.

18  Q    And is that in your Congressional district?

19  A    It is.

20  Q    What is the racial makeup of your Congressional district?

21  A    The racial makeup of my Congressional district is

22  definitely majority minority.  It is probably about 60 percent

23  Latino, 20 percent black, and the rest would mainly be white.

24  Q    And what is the racial makeup of your neighborhood would

25  you say?

Veasey - Cross / By Mr. Clay                    262

1   A    I would say that it's probably a third black and 15

2   percent, 20 percent Latino, and it actually -- no, it would

3   probably be the majority black.

4   Q    Let me switch to the -- thank you.

5          **MR. CLAY:**  If we could zoom in on the box here?

6   Q    I'm going to represent to you that this is the -- census

7   track 1065.15 is the census track where your house is.

8   A    Okay.

9   Q    Could you tell me the total population of that census

10  track?

11  A    A total population of the census track is 3,782.

12  Q    Okay, and can you tell me --

13         **MR. CLAY:**  Thank you, sir.

14  Q    -- and can you tell me what the black or African American

15  population of that census track is?

16  A    It is almost 2,000, 1,981 people.

17  Q    So by my math, and I'm no mathematician, but that's over

18  50 percent of the census track is black or African American, is

19  that right?

20  A    Correct.

21  Q    Okay.  Congressman, I don't have any further questions.  I

22  want to thank you for your service to the great State of Texas

23  and this country, and more importantly -- or, not more

24  importantly, but as a Fort Worth guy I appreciate your service

25  to Tarrant County as well.

Veasey - Cross / By Mr. Clay                           263

1   A    Thank you very much.  Thank you.

2            MR. HEARD:  Thank you, Congressman.  No further

3   questions, your Honor.

4            THE WITNESS:  Thank you.

5            THE COURT:  All right.  Thank you, sir, you can step

6   down.

7            THE WITNESS:  Thank you, your Honor.

8        **(Witness excused)**

9            MR. ROSENBERG:  Your Honor, just to have a preview of

10  where we are, and notice to the State, we're not going to put

11  Michael Herron on until tomorrow morning at 8:00 o'clock

12  because of the timing.

13           We do have a video clip that would run about 28

14  minutes plus whatever else the State has.

15           THE COURT:  Okay.

16           MR. ROSENBERG:  We could do that and end for the day

17  if that's okay with your Honor?

18           THE COURT:  All right.  So that will take us to about

19  6:00 o'clock maybe?

20           MR. ROSENBERG:  Thank you.

21           THE COURT:  And who is that of?  Who is that of?

22           MR. ROSENBERG:  Mr. Haygood is going to introduce it.

23           THE COURT:  Okay.  I was just wondering who the

24  witness is.

25           MR. HAYGOOD:  Oh, sure.  Good afternoon, your Honor.

1   Ryan Haygood of the Texas League of Young Voters and Imani

2   Clark.

3           Your Honor, you will now see excerpts of the video

4   deposition of Ms. Elizabeth Gholar.  She is a registered voter

5   here in Texas who cannot vote in person because of SB 14.  I'm

6   providing for you a courtesy copy of the excerpts of

7   Ms. Gholar's video deposition, as well as the video deposition

8   itself, and that's Exhibit PL-1092.

9        **(Portion of transcript from 5:12:57 to 5:37:33 p.m. was**

10   **omitted / Plaintiffs' excerpts from video deposition of**

11   **Elizabeth Gholar)**

12           **MR. HAYGOOD:**  Your Honor, that's the end of

13   Ms. Gholar's deposition expert -- excerpts.

14           **MR. WHITLEY:**  One second, your Honor.  I apologize.

15           **THE COURT:**  Okay.

16           **MR. WHITLEY:**  If it's agreeable to your Honor, we

17   would just like to submit the excerpts as opposed to playing

18   the video and we'll just put the excerpts in if that's okay

19   with you.

20           **THE COURT:**  Okay.  So I need to read that?

21           **MR. WHITLEY:**  Just a couple pages.

22           **MR. HAYGOOD:**  And, your Honor, I'll just add that

23   we're adding those full -- the full deposition transcripts at

24   the end of the case for Ms. Gholar.

25           **THE COURT:**  Okay.  But you-all are highlighting what

1    I -- what you-all want me to consider, correct --

2            **MR. HAYGOOD:**  Yes, your Honor.

3            **THE COURT:**  -- and that's what we're doing here?

4            **MR. HAYGOOD:**  Yes, your Honor.

5            **THE COURT:**  Because I'm just going to reiterate

6    again, if you-all are going to give me a bunch of documents, I

7    don't know what it relates to and where it's important unless

8    you direct me.

9            **MR. HAYGOOD:**  Sure.  And, your Honor, we'll direct

10   you to the most important parts of Ms. Gholar's deposition.

11           **THE COURT:**  Yeah.  I'm just making sure and I may

12   keep saying that because I --

13           **MR. WHITLEY:**  And, your Honor, it's only a couple

14   pages --

15           **THE COURT:**  -- I think you-all understand my concern.

16           **MR. WHITLEY:**  Absolutely.  And we're happy to play it

17   if it's easier for you --

18           **THE COURT:**  No, I can read it.

19           **MR. WHITLEY:**  Okay.

20           **THE COURT:**  I just -- I'm just --

21           **MR. WHITLEY:**  I'm --

22           **THE COURT:**  -- I will continue to reiterate that

23   through the trial.  If there's exhibits -- because there's lots

24   of exhibits in this case -- you-all need to direct me as to

25   what is important and in which manner it's important or I may

1    not consider it --

2            **MR. HAYGOOD:**  Sure.

3            **THE COURT:**  -- as you would like for me to.  So --

4            **MR. HAYGOOD:**  And so for purposes of Ms. Gholar, your

5    Honor, what we -- you're to hear the most important aspect of

6    her deposition.

7            **THE COURT:**  No, I'm good with that.  I just -- I

8    start getting concerned when you-all say we're going to give

9    you this deposition testimony and I'm, like, I could sit there

10   -- it would be inefficient for me to sit there and read all the

11   depositions, look at every single exhibit if it's not really

12   that important to what I need to consider here.

13           **MR. HAYGOOD:**  Okay.

14           **THE COURT:**  So that's all.

15           **MR. HAYGOOD:**  Thank you.

16           **THE COURT:**  All right.  Any other testimony?

17           **MR. ROSENBERG:**  Not today, your Honor.

18           **THE COURT:**  Okay.  We're a little bit short on our

19   eight hours.  So as long as you-all don't -- maybe about -- not

20   quite 30 minutes short.

21           **MR. ROSENBERG:**  Well, we can do ten minutes of

22   deposition reading.  Ms. Rudd.

23           **THE COURT:**  I mean, don't fill in time if you're not

24   going to plan to present it.

25           **MR. ROSENBERG:**  No, we were going to do this --

 1          **THE COURT:**  Okay.

 2          **MR. ROSENBERG:**  -- if we had --

 3          **THE COURT:**  Yes.

 4          **MR. ROSENBERG:**  We're just trying to move things

 5    along.

 6          **THE COURT:**  We'll do that.

 7          **MS. RUDD:**  Your Honor, we just want to read the

 8    testimony of two witnesses into the record.  They're witnesses

 9    from the Texas NAACP, Ms. Linda Lydia and Mr. Yannis Banks and

10    if I could, I can hand up transcripts with the highlighted

11    testimony that we'll be reading from.  And with the Court's

12    permission, I'll have my colleague sit in the witness box and

13    read for the witnesses.

14          **THE COURT:**  Okay.

15          **MS. RUDD:**  So the first transcript we'll be reading

16    from is the transcript of Linda Lydia which will be the first

17    one in the folder there.

18    **EXAMINATION OF LINDA LYDIA BY EXCERPTS OF DEPOSITION TESTIMONY**

19        **(QUESTIONS READ BY MS. RUDD; ANSWERS READ BY COUNSEL)**

20          "QUESTION:  Ms. Lydia, would you please state your

21          name for the record, please?

22          "ANSWER:  Linda Darden Lydia.

23          "QUESTION:  And what is your involvement with the

24          Texas NAACP?

25          "ANSWER:  I'm an elected officer of the Texas NAACP.

1    "QUESTION:  And as an elected officer, do you have an

2    official title?

3    "ANSWER:  Yes, I do.

4    "QUESTION:  And what is that?

5    "ANSWER:  Secretary.

6    "QUESTION:  Ms. Lydia, why did the Texas NAACP join

7    this lawsuit?

8    "ANSWER:  Because of the impact it will have on

9    minorities.

10   "QUESTION:  What is that impact?

11   "ANSWER:  That impact is the burden of acquiring an

12   additional piece of identification when we were

13   operating with a voter's registration card and I

14   guess in most states, they still operate with a voter

15   registration card as the only piece of identification

16   needed to vote.

17   "QUESTION:  In what way did SB 14 change the

18   activities of the Texas NAACP?

19   "ANSWER:  That not only were you getting someone to

20   fill out a voter registration card, you were also

21   giving them information about SB 14 telling them, you

22   know, that you need to make certain that the name on

23   this voter registration card that you're filling out

24   matches that name that's on your picture ID

25   identically.  Otherwise, you may be denied the right

1    to vote.  So there was a lot more -- education

2    normally came after the registration project.  Notice

3    I said voter registration, voter education.  These

4    were compartmentalized.

5    "QUESTION:  What additional resources are committed

6    to the new compartment described as voter

7    registration education?

8    "ANSWER:  We had to provide material about the

9    changes.  It's -- and obviously we were instructing

10   people, you know, that when you fill out your voter

11   registration card, make sure you pull out your

12   picture ID that you're going to be using, if you have

13   one, that it matches that card because of the

14   discretionary power that an election official has

15   when it comes time to vote.

16   "QUESTION:  So did that process involve allocating

17   resources for making printouts and handouts and

18   flyers?

19   "ANSWER:  Yeah.  We had -- we had a card.  I just

20   told you.  We created a card with another group --

21   "QUESTION:  Uh-huh.

22   "ANSWER:  -- but we handed out with voter

23   registration cards just so that people were aware of

24   the law.  Any time you have any legislative changes,

25   we try to educate our community about those

1     legislative changes.

2     "QUESTION:  And so the education of your members

3     regarding SB 14 is not the first time you've had to

4     educate your members regarding a change in voter

5     laws; is that correct?

6     "ANSWER:  No but this is the most extensive change

7     we've ever had to make.

8     "QUESTION:  Can you tell me what activities, outreach

9     activities, programming activities, any kind of

10     activity of the NAA -- of the Texas NAACP that it has

11     that it usually conducts in any given year?  Can you

12     give me examples of such activities that have been

13     allocated less resources as a direct result of SB 14?

14     "ANSWER:  The utilization of Yannis Banks, our one

15     staff person.  That has almost been -- I would say

16     he's gone from being in a position that was 60

17     percent administrative and he's now doing probably 80

18     percent legislative as a result of this bill.

19     "QUESTION:  As part of the assistance that Texas

20     NAACP provides to voters, does that include helping

21     voters gather the necessary documentation to vote?

22     "ANSWER:  Some of units may have.  I'm not -- I'm not

23     personally familiar with anyone who has one of the

24     units that has done something like that.  I'm not

25     really for sure but I know we have encouraged them to

1          assist their constituents to get the materials

2          needed, the documents needed, whether it's a driver's

3          license or whether it's their birth certificate.

4          "QUESTION:  In the election cycles that have occurred

5          after the implementation of SB 14 --

6          "ANSWER:  Uh-huh.

7          "QUESTION:  -- has Texas NAACP assisted voters during

8          those elections in the manner that you've just

9          described?

10         "ANSWER:  I'm sure we have.

11         "QUESTION:  Did those activities require more or less

12         resources

13         than for previous elections prior to SB 14?

14         "ANSWER:  Definitely more.

15         "QUESTION:  But in the Texas NAACP's activities

16         related to assisting voters --

17         "ANSWER:  Uh-huh.

18         "QUESTION:  -- to vote --

19         "ANSWER:  Uh-huh.  Okay.

20         "QUESTION:  -- have they expended more or less

21         resources for that -- those activities as a result of

22         SB 14?

23         "ANSWER:  More.

24         "QUESTION:  In what way?

25         "ANSWER:  Resources getting people to and from sites

1       I'm sure were expended by some of our units where

2       they needed to get to DPS offices.  We've had Yannis

3       who has been working exclusively on this effort.

4       That has definitely increased our expenditure,

5       printing of material, informational events to educate

6       the community.  What else?  Just a number of

7       different activities.  Example that comes to mind, I

8       know some of the units who usually do membership

9       recruitment, now as part of their membership

10      recruitment events, they do provide information and

11      they have always had the registration cards but they

12      now also have to provide -- they have to provide

13      information about SB 14 and the requirements of that

14      as a prerequisite to vote.

15      "QUESTION:  Ms. Lydia, why does the Texas NAACP feel

16      it necessary to devote time and resources toward

17      voter registration activities?

18      "ANSWER:  Because it -- because this is a right of

19      citizenship in this country, the right to vote and

20      especially it has been hard fought by African

21      Americans.  The time was we had poll taxes as a form

22      of disenfranchising.  How many bubbles in a bar of

23      soap kind of lunacy testing.  So, yeah, there is a

24      long and egregious history of African Americans and

25      other minorities being disenfranchised in this

1                country and maybe I'm a little bit outraged that I

2                even have to answer that question because it is so

3                blatantly obvious.

4           **MS. RUDD:**  Thank you.  We're now going to read from

5      the deposition of Yannis --

6           **THE COURT:**  Is the State going to present anything on

7      that witness?

8           **MS. RUDD:**  Sorry.  Do you have --

9           **MR. TATUM:**  Yes, we have some --

10          **THE COURT:**  Do you want to do it now or do you want

11     her to wrap up the other one?

12          **MS. RUDD:**  It's up to you.

13          **MR. TATUM:**  I think it would be more appropriate to

14     do it now considering we're still on --

15          **THE COURT:**  All right, go ahead.

16          **MR. TATUM:**  I'm sorry, your Honor.  One moment,

17     please.

18     **EXAMINATION OF LINDA LYDIA BY EXCERPTS OF DEPOSITION TESTIMONY**

19          **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY COUNSEL)**

20                "QUESTION:  Has the Texas NAACP in any way been

21                unable to fulfill its stated mission as a result of

22                SB 14?

23                "ANSWER:  No.  I'd like to think that we're still

24                carrying out the mission of the NAACP, maybe not to

25                the extent that we have done previously because of

1      the allocations of whether its manpower or dollars to

2      this particular effort.

3      "QUESTION:  Are you aware of any members of the Texas

4      NAACP that are registered to vote that have chosen

5      not to vote as a result of SB 14?

6      "ANSWER:  No.

7      "QUESTION:  Do you know of anyone who has registered

8      to vote that has made the conscious choice to not

9      vote because of SB 14?

10     "ANSWER:  Sort of as a protest perhaps?  No, I've

11     never even heard of that concept of someone not

12     voting because of SB 14.  I mean, that's so alien.

13     No, I've never even thought about it.

14     "QUESTION:  Does the Texas NAACP contend that a

15     person who is trying to vote should be the same

16     person who is registered to vote?

17     "ANSWER:  Of course.  We don't -- we're not fostering

18     voter fraud.

19     "QUESTION:  Ms. Lydia, does the Texas NAACP expect

20     that it will continue to be able to fulfill its

21     stated mission in the foreseeable future?

22     "ANSWER:  Yes."

23     **MR. TATUM:**  Thank you.

24     **THE COURT:**  So that was an excerpt from what you gave

25 me, right --

1              **MR. TATUM:**  Yes, ma'am.

2              **THE COURT:**  -- what she just read?

3              **MR. TATUM:**  Yes, your Honor.

4              **THE COURT:**  Okay.

5              **MR. TATUM:**  And that began on Page 8 for your record.

6              **MS. RUDD:**  And, your Honor, I may have spoken too

7      soon.  We're actually going to read from the deposition of

8      Martin Golando as our last witness of the day.  Mr. Golando is

9      from the Mexican American Legislative Caucus and I'll hand you

10     the excerpts that we'll be reading.

11             **THE COURT:**  Do you want this one back then?

12             **MS. RUDD:**  That's great.  We will read that into the

13     record later.

14             **THE COURT:**  Can you give that back to her?

15             **MR. SPEAKER:**  Yes.

16             **MR. TATUM:**  I'm sorry.  And you're doing Banks right

17     now or Golando right now?

18             **MS. RUDD:**  Golando.

19             **MR. TATUM:**  Golando.

20             **EXAMINATION OF MARTIN ANTHONY GOLANDO**

21             **BY EXCERPTS OF DEPOSITION TESTIMONY**

22        **(QUESTIONS READ BY MS. RUDD; ANSWERS READ BY COUNSEL)**

23             "QUESTION:  Would you state and spell your full name

24             for the record please?

25             "ANSWER:  Martin Anthony Golando, M-a-r-t-i-n,

1        Anthony, A-n-t-h-o-n-y, Golando, G-o-l-a-n-d-o.

2        "QUESTION:  Mr. Golando, what is your role at MALC?

3        And before you answer that question, let me just go

4        ahead and say here, when I say "MALC" I mean the

5        Mexican American Legislative Caucus.  And throughout

6        this deposition I may say "MALC" or "you" or "your".

7        And when I say that, I mean MALC, unless I

8        specifically indicate otherwise.  Do you understand?

9        "ANSWER:  I do.

10       "QUESTION:  Okay.  So getting back to my question,

11       what is your role at MALC?

12       "ANSWER:  I'm a general counsel at MALC.  That's my

13       title.

14       "QUESTION:  And how long have you held that position?

15       "ANSWER:  Since May 1st.

16       "QUESTION:  Of this year?

17       "ANSWER:  Correct.

18       "QUESTION:  Did you have any role at MALC before you

19       became general counsel?

20       "ANSWER:  Yes, it was basically the same job without

21       the title.  I weighed in on the legal consequences of

22       actions; I weighed in on the day-to-day operations.

23       I worked very closely with the executive director.

24       "QUESTION:  Can you describe the purpose and mission

25       of MALC?

Golando / By Excerpts of Deposition - Direct          277

1       "ANSWER:  The purpose of MALC is to assist the

2       members of MALC and their staffs in being prepared to

3       be a voice for the Mexican Americans of Texas.

4       That's the purpose.

5       "QUESTION:  How long has MALC been in existence?

6       "ANSWER:  Since 1973, so 40 years -- 40-plus years.

7       "QUESTION:  And how was it formed?

8       "ANSWER:  It was a caucus.  There's rumors about how

9       it was formed in the back of a closet but just

10      members of -- Mexican American members of the

11      legislature at that time formed together a group.

12      "QUESTION:  Can you approximate a percentage of your

13      annual budget that's been dedicated towards voting

14      rights litigation?

15      "ANSWER:  I can't, but I can approximate a certain

16      budget, my time.  I get paid a certain amount and 80

17      to 90 percent of my time is dedicated to voting

18      rights litigation.  So voting rights takes up 80

19      percent of my time with MALC.  So there's less time

20      for me to do policy development.  It's less time for

21      me to work with members about their own bills.  It's

22      less time for us to focus on our core mission.

23      "QUESTION:  You mentioned the core mission of MALC.

24      Can you describe generally the kinds of activities

25      that MALC regularly engages in in furtherance of its

1     core mission?

2     "ANSWER:  We try to develop policies to advance that

3     core mission.  We work with our members with their

4     own bills.  We try to pass their agenda.  We work

5     with their staffs to make sure that their staffs are

6     the best prepared that they can be.  We try to speak

7     with unanimity on issues of importance to the Mexican

8     American community and generally do everything you

9     can to try to speak with one voice about matters of

10    importance to the community as a whole, which

11    includes things like, you know, press releases,

12    policy agendas and every other public kind of

13    statements you can make so ...

14    "QUESTION:  And what kinds of resources are devoted

15    to these core activities?

16    "ANSWER:  Financial resources, staff resources and

17    time.

18    "QUESTION:  Does MALC engage in any kind of

19    activities related to voter education?

20    "ANSWER:  Absolutely.

21    "QUESTION:  Could you describe those activities?

22    "ANSWER:  We are an information hub about the law and

23    so our duty is to inform our members so they can

24    inform the constituents how various laws might affect

25    them, specifically SB 14.  Over the last -- since SB

1      14 has been -- began to be enacted last year, we have

2      received lots of requests by legislators about what

3      the law means and how they can talk to the

4      constituents about the law, what their requirements

5      are.  And so MALC has been a resource for voter

6      education for the members themselves.  And there's

7      also been members of the community who would call up

8      and ask what does the law mean and we would tell them

9      to the best of our knowledge to give them resources

10     as best as we can.

11     We have an electronic news letter that we send out

12     every week called "The Caucus."  In voter ID has an

13     SB 14 and its requirement have been a central part of

14     each of those which I think we gave to you in our

15     document productions.  Also our public statements

16     where we try to educate voters about the effects of

17     voter ID and what the requirements are in order to

18     educate them to their vote have been prominent.

19     We've also given you those things too.  So it's my

20     experience that we've devoted a lot of resources to

21     be an information hub to voter educate on this issue

22     so ...

23     "QUESTION:  So do you-all expend or commit resources

24     to educate those members of MALC about voter ID laws

25     and constituents of members of MALC about voter ID

Golando / By Excerpts of Deposition - Direct          280

1        laws?

2        "ANSWER:  I think that's right.  I think that the

3        caucus doesn't just go out to members, and our public

4        statements I believe obviously travel wherever they

5        go.  And so I think that it's for the public and for

6        the members themselves.

7        "QUESTION:  Can you tell me what kinds of resources

8        are committed toward voter education activities?

9        "ANSWER:  First you have to understand the law in

10       order to talk about it.  So much of my job is to suss

11       out the law and understand it.  So some portion of my

12       salary is dedicated to that.

13       Our public statements via press releases, Facebook

14       responses, or through our caucus, are written by

15       staff.  There is staff time devoted to that.  It

16       costs money to do those things.  The cost of

17       contacts.  I think we actually use a different email

18       platform that costs money each month to.  You have to

19       develop the words for this.  There's editing involved

20       in that.

21       Anyways, long story short, I think that lots of staff

22       time is devoted from our core purpose, which is

23       policy development and member relations, to educating

24       on this topic so ...

25       "QUESTION:  Did MALC commit resources towards voter

Golando / By Excerpts of Deposition - Direct          281

1         education purposes prior to SB 14?

2         "ANSWER:  Not to my knowledge.  There may have been

3         some resources committed to talk about the law,

4         generally, but there's been a radical uptick, a

5         logarithmic increase in the amount of money, time,

6         staff, that we spend educating our members and the

7         public at large about SB 14.

8         "QUESTION:  When you say "a radical uptick," can you

9         exemplify that by a certain percentage?

10        "ANSWER:  I think it's very difficult to empirically

11        say, X amount of time or money was spent on this

12        issue because there's lots of indirect costs that you

13        may not be aware of or you might miss.  I will just

14        say this:  When he began working as a chairman, Trey

15        had a vision for MALC to have a broad, comprehensive

16        policy horizon.  It changed the way in which MALC and

17        Latino issues were being talked about.  We've done

18        some part of that but his goal for MALC was to be

19        able to talk about roads and transportation, energy,

20        and to devote staffers to those core concepts.  We've

21        been unable to do that because of the last four years

22        with the diversion of resources in order to answer

23        the clarion call to combat this bill and its law.

24        "QUESTION:  But when you say, "a radical uptick in

25        resources," what is that based on?

1        "ANSWER:  My prior knowledge of the budget.  I just

2        know that we had a vision to hire a policy analyst

3        for complex financial transactions.  We had a vision

4        to talk about transportation and water policy in a

5        more complex and fundamental way to kind of change

6        the way in which people thought about Latino policy

7        and we've been fundamentally unable to do those

8        things because of our diverted focus to voting rights

9        issues.

10       "QUESTION:  So has MALC been engaging in voter

11       education activities related to various voter ID

12       bills since 2004?

13       "ANSWER:  I can't speak to 2004 or 2005; I can only

14       speak to the recent uptick since the bill has been

15       passed.  Voter education is probably not necessary if

16       there is -- if the bill hasn't been passed or

17       implemented, right?  Although sometimes I think

18       members receive questions or MALC receives questions

19       saying, "Do I have to bring my ID or not?"  Right?

20       That's a form of voter education.  But before the

21       passage we would say, "No;" and after the passage we

22       would say, "Yes."  I would just say generally there

23       has been a tremendous increase in the amount of

24       information requested and provided by MALC on this

25       issue so ...

Golando / By Excerpts of Deposition - Direct          283

1         "QUESTION:  And when you say "this issue," you mean

2         SB 14?

3         "ANSWER:  Correct; the implementation of SB 14.

4         "QUESTION:  Why did MALC join this lawsuit?

5         "ANSWER:  Because we believe that members of our

6         community and the legislators themselves will be

7         deeply harmed by its passage, and have been.

8         "QUESTION:  Does MALC feel that its interests are not

9         adequately represented by the United States of

10        America in this lawsuit?

11        "ANSWER:  Yes.

12        "QUESTION:  And why is that?

13        "ANSWER:  I think that there are unique requirements

14        for Latino elected officials and their constituents

15        that aren't necessarily represented by the DOJ.  I

16        say that with all respect to the DOJ so ...

17        "QUESTION:  Is MALC as an organization harmed by

18        SB 14?

19        "ANSWER:  Yes.

20        "QUESTION:  In what ways is MALC harmed by SB 14?

21        "ANSWER:  For the last four years, roughly, we have

22        diverted a tremendous amount of financial resources

23        and staff time and other resources to educate the

24        public about its effects and to combat its

25        implementation.

1        "QUESTION:  Can you tell me what portion of MALC's

2        annual budget is diverted towards educating Texans

3        specifically about SB 14?

4        "ANSWER:  The portion -- about 80 percent of my

5        salary is devoted to voting rights.  Eighty percent

6        of my time and therefore 80 percent of my salary,

7        whatever it is, has been devoted to voting right

8        issues in Texas, generally.  I think that whatever

9        space that we have in our electronic correspondence,

10       our weekly news letter, its cost, and usually one

11       third of the coffee is devoted to SB 14 or voter ID

12       or status update on litigation.  So whatever the

13       monthly cost of that is, plus the staff time itself.

14       We're not hourly, we're flat rate, and so it's hard

15       to determine what percentage but a significant

16       percentage.  It's prevented us from having lots of

17       policy convenings that we might want.  And most

18       recently I think that a good example is that we have

19       a border crisis right now for UAC's unaccompanied

20       children and it would be a traditional role of MALC

21       to play a bigger role:  have a convening and talk

22       about what the needs are for border protection and

23       how we can ameliorate this immediate situation.  And

24       we haven't been able to focus on it because of the

25       diversion of staff time and focus and financial

1          resources, unfortunately.

2          "QUESTION:  Does MALC contend that it is unable to

3          fulfill its mission because of SB 14?

4          "ANSWER:  Yes, in part.

5          "QUESTION:  In what way has MALC been unable to

6          fulfill its mission because of SB 14?

7          "ANSWER:  The mission of MALC is to have a

8          comprehensive voice about all matters of importance

9          to the Mexican-American community, to provide

10         assistance to our member legislatures and their

11         staffs in order to further that goal.  The

12         comprehensive goal is not just related to the

13         traditional civil rights issue.  Like I said before,

14         Trey's goal for the caucus was to have a diverse and

15         new policy horizon for MALC members and Latino

16         policy.  That current goal is under serious

17         constraints because of our diversion of resources.

18         It's sad, but it's true.

19         "QUESTION:  Does MALC consider its SB 14-related

20         activities as outside the scope of its mission?

21         "ANSWER:  The voter education portion -- I wouldn't

22         say it's necessarily outside the scope of the

23         mission, but it certainly has taken away from the

24         core mission, which is a comprehensive policy voice.

25         Comprehensive means more than just one thing.  Right?

1    If we wanted to talk about water or transportation,

2    complex financial transactions, other issues that are

3    considered Latino issues, we wanted to change that,

4    and we have been unable to do so because of the

5    devotion of the time and resources to this issue,

6    so --

7    "QUESTION:  Do you know specifically what portion of

8    the kind of set costs that you referenced earlier

9    have had to be diverted toward SB 14-related

10   activities?

11   "ANSWER:  Again, it's very difficult to say.  So our

12   set costs, our salary costs, rent, and other things

13   like what you pay for your newsletter distribution,

14   what you pay for your list, what you pay for your

15   copier, etcetera, what you pay for paper, what you

16   pay for, those are set costs.  Right?  Obviously my

17   salary is devoted largely to voting rights.  Summer's

18   salary in part is for handling logistical issues and

19   running litigation and SB 14 generally.  Lindsey,

20   lots of our public statements are about voter ID, so

21   lots of her content is about voter ID.  Nathan does

22   video, so I think we had some videos related to

23   voting rights generally, so some part of his

24   statement.  I can't estimate the paper.  Rent,

25   obviously some portion of their salaries is devoted

1    to that, and we've had meetings about voter ID at

2    MALC.  Obviously it's related in some way.  It's very

3    difficult to say.  I just know that we devoted more

4    resources than I can currently measure for you, and

5    it's been tremendously daunting for my caucus.

6    "QUESTION:  Can you specify what particular

7    activities that fall under the core mission of MALC

8    have had to be set aside because of MALC's devoted

9    attention to SB 14-related activities?

10   "ANSWER:  Ideas aren't one-to-one.  It's a zero sum

11   gain largely.  But I can say that specifically our

12   focus the last four weeks in trying to get these

13   documents out and trying to prepare for litigation

14   generally has prevented us from taking a more -- a

15   deeper policy look at this UAC problem on the border.

16   I discussed before how voter education efforts have

17   taken away from Trey's vision for MALC, which is to

18   have a more comprehensive and meaningful Latino

19   policy in all sectors.  Our goal was to have no issue

20   be considered a non-Latino issue.  Every issue should

21   have a Latino focus or Latino facet to it, and so our

22   policy development operation has been relatively

23   sapped because of our entry in this lawsuit.  We've

24   lost a lot of staff because we couldn't afford to pay

25   them because of our voter education efforts and our

1     litigation generally.  We lost a staffer to the TDP

2     last fall, in part because we couldn't pay him what

3     he was worth.  I left state employment in part

4     because I wanted to create budgetary space for us to

5     not lose people.  That's part of the reason I left,

6     because you can kind of have a hybrid employment

7     between the caucus and trades a capital staff.

8     Right?  And so I think that our financial troubles

9     have been exacerbated by our voter education efforts

10    and our efforts involving SB 14."

11    "QUESTION:  Is MALC able to identify a constituent of

12    a MALC member who has suffered harm at any point

13    because of SB 14?"

14    "ANSWER:  And this may be where I differ from my

15    attorney in the sense that on our discussion of harm

16    -- because I believe that every one of our

17    constituents have been harmed by the bill.  And I

18    don't mean this -- I really don't mean this

19    esoterically.  It sounds like I'm just preaching

20    platitudes.  I'm really not trying to do that.  I

21    think every person in Texas is harmed by the bill.

22    When Texas passes laws that are focused on what I

23    believe is a disfranchising intent that have a --

24    that were passed with an impermissible purpose, that

25    cheapens what it means to be a Texan.  And I'm saying

Golando / By Excerpts of Deposition - Direct                289

1       this as someone who is an adopted Texan.  I'm not

2       even from here really.  But this is a great state and

3       it is made a worse place because of bills like this,

4       in my opinion.  And so the honest answer to your

5       question is that I think everyone has been harmed by

6       it; everyone in this room, everyone in this state.

7       "QUESTION:  Can you elaborate on what you mean by

8       'impermissible purpose?'

9       "ANSWER:  I think that -- impermissible generally

10      means an unlawful purpose.  In this instance, I mean

11      a racist purpose.  I think that this bill is -- it

12      seeks to abridge the voting rights of minorities on

13      account of their race.  That's what I mean.  And I

14      think that it also unequally enforces the laws.  I

15      think that there are several provisions like that in

16      this bill that do that.  So I think that those are

17      two impermissible motives on behalf of policy and

18      decision makers that enacted this bill."

19      **MS. RUDD:**  Thank you, your Honor.

20      **THE COURT:**  All right, anything from the defense on

21 that witness?

22      **MR. TATUM:**  Yes, your Honor.  And, your Honor, just

23 for the sake of time and not to create any unnecessary overlap,

24 we're going to start in the middle of the packet I just gave

25 you, and I'll be referring to the page numbers so you can

1   follow along, if that's okay.

2          **THE COURT:**  Okay.

3          **MR. TATUM:**  We're going to be starting on page 9 of

4   the packet that I just gave you.

5          **EXAMINATION OF MARTIN ANTHONY GOLANDO**

6          **BY EXCERPTS OF DEPOSITION TESTIMONY**

7   **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY COUNSEL)**

8          "QUESTION:  Do you know a percentage of MALC's

9          financial resources have been diverted towards the

10          litigation of this lawsuit?

11          "ANSWER:  This lawsuit, we've been lucky enough to

12          have little litigation expenses associated with this.

13          We had a lot more travel during the Section 5 trial.

14          Mr. Garza's salary, some part of it has been devoted

15          to this, and obviously some portion of my salary is

16          devoted to this, although I'm not involved with the

17          litigation; more the voter education policy

18          development side of it.  I guess it's a mixed bag.  I

19          couldn't say specifically, but there's been some

20          resources, some significant financial resources

21          devoted, I guess, a bunch, I guess."

22          **MR. TATUM:**  And, your Honor, further down on that

23   page, starting on line 17.

24          "QUESTION:  So MALC does not have any kind of

25          discernible or tangible measure for the exact

1              percentage of its resources that have been diverted

2              towards SB 14-related activities.  Is that right?

3              "ANSWER:  I don't think that's fair.  I think that

4              it's really difficult to untwine employment.  Right?

5              I do a lot of things for MALC.  So does Summer.  And

6              there are hills and valleys in terms of what you're

7              focusing on.  What I can speak to is that the last --

8              since fall of 2011 and since the implementation of SB

9              14, I guess last year since the vacation, I guess

10             that would be 2012 -- no, 2013, I'm sorry.  There's

11             been a tremendous amount of focus, time and some

12             money devoting to educating our members, their

13             constituents about this issue.  Just because I can't

14             give you a percentage today, like 65 percent, what

15             would that mean, other than what you can measure -- I

16             mean, how do you measure staff time?"

17             **MR. TATUM:**  Your Honor, I'll be reading from page 12

18   of the packet, starting on line 16.  Did any members of MALC --

19   oh, sorry, David.  I'll let you get there.

20             "QUESTION:  Did any members of MALC vote for SB 14?

21             "ANSWER:  Yes.

22             "QUESTION:  Do you know which ones?

23             "ANSWER:  Joe Pickett did, I think.  I think Jose

24             Aliseda did when he was a member.  John Garza did.

25             Larry Gonzalez did.  I don't think Aaron Pena did.  I

1          could be wrong, though.  He may have, but I don't

2          think so.

3          "QUESTION:  Does MALC contend that any of its members

4          who voted for SB 14 did so with discriminatory

5          intent?

6          "ANSWER:  I don't know.  Like I said, I couldn't

7          point to a specific member and how they felt, what

8          they felt internally.  I just know -- I know there's

9          been generally -- Raul Torres I think voted for voter

10         ID as well.  I know them generally as good people.

11         Larry Gonzalez is an exceptional person.  He was a

12         great staffer.  Raul Torres was one of the kindest

13         people I ever met in the legislature.  John Garza is

14         a very nice man.  Actually, his car was my car once

15         and he was very kind about it, like super kind.  Jose

16         Aliseda is super cool.  He's a pilot and he has a

17         scuba license, which is really neat.  Anyways, my

18         point is, I know these guys personally and I can't

19         believe that they would, but I also don't know what's

20         in their hearts, and I don't know -- I don't think

21         it's also the point of the legislative intent.  It's

22         not that they're -- it could be that they're deeply

23         held racists and that they voted for it because

24         they're racists.  That's possible.  I don't think so.

25         But it's also possible that they did so with a still

Golando / By Excerpts of Deposition - Cross                    293

1    impermissible purpose because they were advocating on

2    behalf of racists or what -- or they thought a racist

3    law because they thought it made sense pragmatically.

4    Anyways, I guess what I'm saying is, I don't know

5    what's in their heart, but it's possible, but I doubt

6    it."

7    **MR. TATUM:**  Very bottom of that page.

8    "QUESTION:  Does MALC believe that Texas should make

9    sure the people attempting to vote are registered

10   voters?

11   "ANSWER:  Yes.

12   "QUESTION:  Does MALC believe that Texas should make

13   sure that people do not vote or attempt to vote in

14   the name of another person?

15   "ANSWER:  Yes.

16   "QUESTION:  Does MALC acknowledge that voter fraud

17   exists?

18   "ANSWER:  Voter fraud generally?

19   "QUESTION:  Yes.

20   "ANSWER:  Yes.

21   "QUESTION:  Does MALC acknowledge that voter fraud

22   exists in Texas?

23   "ANSWER:  Yes.

24   "QUESTION:  Does MALC believe that voter fraud should

25   be illegal?

1        "ANSWER:  Yes."

2        **MR. TATUM:**  Your Honor, skipping to the bottom of

3   that page.

4        "QUESTION:  Is MALC able to identify any constituents

5        of its members who do not have a driver's license?

6        "ANSWER:  Undoubtedly they do, but I can't give you a

7        list of names of people without a Texas driver's

8        license.

9        "QUESTION:  Is MALC able to identify any constituents

10       of its members who do not have a state-issued photo

11       ID?

12       "ANSWER:  Again, undoubtedly they do because of the -

13       - what we know about ID rates among Latinos, African

14       Americans, and the indigent, but I can't give you

15       specific names.

16       "QUESTION:  Is MALC able to identify any constituents

17       of its members who do not have a concealed handgun

18       license?

19       "ANSWER:  That's a much smaller universe of people.

20       I think there must be -- I think there's 18,000

21       people in the CHL database, I think.  There may be

22       more than that.  I may be off by an order of

23       magnitude.  But I can't give you a specific name of

24       people who don't have a CHL; although large portions

25       of MALC members probably -- constituents don't have a

Golando / By Excerpts of Deposition - Cross          295

1          CHL.  It's a very small universe of people.

2          "QUESTION:  Is MALC able to identify any constituents

3          of its members who do not have a U. S. passport?

4          "ANSWER:  No, I'm not privy to that information.

5          "QUESTION:  Is MALC able to identify any constituents

6          of its members who do not have a military ID card

7          with a photo?

8          "ANSWER:  I'm not privy.

9          "QUESTION:  When you say you're not privy to that

10         information --

11         "ANSWER:  I don't know, I don't know.

12         "QUESTION:  Is MALC able to identify any constituents

13         of its members who do not have a citizenship

14         certificate?

15         "ANSWER:  The only person I knew who ever had one was

16         Jose Aliseda, and he kept it with him.  He showed it

17         to me once in a deposition and it was -- he talked

18         about how hard it was to get and what it took for his

19         family to get it and for his brother to get it.  So

20         the answer to your question is no, but I know that

21         that's a small number, and I can't imagine showing

22         that at the polls, how hard it was for him to get

23         that.

24         "QUESTION:  Is MALC able to identify any constituents

25         of its members who do not have an EIC?

Golando / By Excerpts of Deposition - Cross                    296

1        "ANSWER:  I think there have been 12 EICs issued, or

2        something like that, some small number of EICs.  I

3        don't know the names of people who have been issued

4        EICs and I think we're talking dozens of EICs at this

5        point have been issued.

6        "QUESTION:  To constituents of MALC members?

7        "ANSWER:  No.  It's the people in Texas generally.  I

8        could be wrong with that number, but I remember at

9        some point it had been like only a few dozen had been

10       issued in last year.  Anyways, I don't have that

11       information, but it's a low number of folks who

12       qualify for that.

13       "QUESTION:  Is MALC able to identify any of its

14       members who do not have any of the documents

15       necessary to get an EIC?

16       "ANSWER:  Any of its members or --

17       "QUESTION:  Sorry.  Is MALC able to identify any

18       constituents of its members who do not have any of

19       the documents necessary to get an EIC?

20       "ANSWER:  I think some of the Intervenors that are

21       represented by Mr. Garza don't have the documents

22       necessary to get an EIC.  I think that's correct.

23       "QUESTION:  Can you identify one of them?

24       "ANSWER:  You know, I don't know them by name, I'm

25       sorry.  I know that there's a man in Nueces County,

1       or maybe it was actually -- it was in Hidalgo County

2       -- that's where it was, Hidalgo County -- who can't

3       get a birth certificate because he was born, I think,

4       by a midwife.  It was very hard for him to get an

5       actual birth certificate.  And that was the only kind

6       of document he could get to go get an EIC.  I think

7       that's correct, so --

8       "QUESTION:  Do you know how many constituents of your

9       members have attempted to get an EIC?

10      "ANSWER:  No, I don't know.  I have no knowledge.

11      "QUESTION:  Do you know if any constituents of your

12      members have attempted to get an EIC?

13      "ANSWER:  I presume it's likely, though it's -- EICs

14      are very rare apparently, but I don't know.

15      "QUESTION:  So MALC filed its complaint on September

16      17th, 2013.  Can you identify any constituent of a

17      MALC member who at that time had been unable to vote

18      on account of his or her inability to obtain an

19      acceptable form of ID under SB 14?

20      "ANSWER:  Just the affected parties that Mr. Garza

21      represents.  Those are the ones I'm aware of.  I know

22      that there's been several provisional ballots cast

23      throughout the counties, but I do not know their

24      BUIDs (phonetic), I don't know their names.  But the

25      affected people who Mr. Garza represents, I think

Golando / By Excerpts of Deposition - Cross                298

1        that's a good source of that information.

2        "QUESTION:  Well, right now, as we sit here, is MALC

3        able to identify any constituent of a MALC member

4        who, on September 17th, 2013, the date that MALC

5        filed this complaint in this case, had been unable to

6        vote on account of his or her inability to obtain an

7        acceptable form of ID under SB 14?

8        "ANSWER:  Again, I think the affected people are

9        certainly represented by MALC folks.  And to the

10       extent they couldn't vote on that day, then that's my

11       answer.

12       "QUESTION:  So you're unable to identify any one of

13       them?

14       "ANSWER:  I can't identify them by name, but I can

15       give you the category of folks that's known to you

16       because they're Intervenors.  I don't know their

17       names, I'm sorry.  But I do know that there are

18       affected people, and those people are likely

19       represented by MALC members."

20       **MR. TATUM:**  At the bottom of that page, your Honor.

21       "QUESTION:  Is MALC able to identify any constituents

22       of its members who have not been able to vote in an

23       election because of SB 14?

24       "ANSWER:  You know, I don't think so.  I don't think

25       that -- I'm not sure who that -- the people who --

1           the affected parties who are Intervenors who are

2           represented by MALC people have actually tried yet to

3           vote.  I could be wrong.  Whatever is in their

4           intervention paper, I would stipulate to, so --"

5      **MR. TATUM:**  Okay.

6      **THE COURT:**  All right.  Is that all for today then

7  from the Plaintiffs?

8      **MR. ROSENBERG:**  Yes, that's -- I'm sorry.

9      **THE COURT:**  You all have discussed the witnesses for

10  tomorrow already, correct?

11      **MR. ROSENBERG:**  Right.  We've been giving 48 hours'

12  notice both to the Court and to the State.

13      **THE COURT:**  Okay, you're excused for today.  We'll

14  see you at 8:00 o'clock in the morning.

15      **(This proceeding was adjourned at 6:15 p.m.)**

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____          September 3, 2014_


TONI HUDSON, TRANSCRIBER