UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Wednesday, September 3, 2014 |
| | ) | (7:59 a.m. to 12:11 p.m.) |
| Defendants. | ) | (1:10 p.m. to  5:49 p.m.) |


BENCH TRIAL - DAY 2

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:  Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiffs:                      CHAD W. DUNN, ESQ.
                                 KEMBEL SCOTT BRAZIL, ESQ.
                                 Brazil and Dunn
                                 4201 Cypress Creek Parkway, Suite 530
                                 Houston, TX 77068


                                 ARMAND DERFNER, ESQ.
                                 P.O. Box 600
                                 Charleston, SC 29402


                                 J. GERALD HEBERT, ESQ.
                                 Attorney at Law
                                 191 Somervelle Street #405
                                 Alexandria, VA 22304


                                 NEIL G. BARON, ESQ.
                                 914 FM 517 Rd. W, Suite 242
                                 Dickinson, TX 77539


                                 LUIS ROBERTO VERA, JR., ESQ.
                                 111 Soledad, Suite 1325
                                 San Antonio, TX 78205


                                 EMMA P. SIMSON, ESQ.
                                 Campaign Legal Center
                                 215 E. Street NE
                                 Washington, DC 20002


Mexican American                 EZRA D. ROSENBERG, ESQ.
Legislative Caucus,              Dechert, LLP
et al.:                          902 Carnegie Center, Suite 500
                                 Princeton, NJ 08540-6531


                                 MARK A. POSNER, ESQ.
                                 AMY L. RUDD, ESQ.
                                 LINDSEY COHAN, ESQ.
                                 JENNIFER CLARK, ESQ.
                                 Lawyers' Committee for Civil Rights
                                 1401 New York Ave. NW, Suite 400
                                 Washington, DC 20005

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


United States              RICHARD DELLHEIM, ESQ.
of America:                ELIZABETH S. WESTFALL, ESQ.
                           ANNA BALDWIN, ESQ.
                           PAMELA CARLIN, ESQ.
                           AVNER SHAPIRO, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Ave. NW
                           Washington, DC 20530


                           BRUCE I. GEAR, ESQ.
                           Department of Justice
                           1800 G Street NW
                           Washington, DC 20006

Ortiz Plaintiffs,          JOSE GARZA, ESQ.
et al.:                    7414 Robin Rest Dr.
                           San Antonio, TX 78209


                           ROBERT W. DOGGETT, ESQ.
                           Texas Rio Grande Legal Aid, Inc.
                           4920 North IH 35
                           Austin, TX 78751


                           MARINDA VAN DALEN, ESQ.
                           Texas RioGrande Legal Aid, Inc.
                           531 E. St. Francis
                           Brownsville, TX 78520

Texas League of Young      RYAN HAYGOOD, ESQ.
Voters Education Fund:     NATASHA KORGAONKAR, ESQ.
                           NAACP Legal Def. and Educational Fund
                           40 Rector St., 5th Floor
                           New York, NY 10006


Also present:              Imani Clark


                           DANIELLE CONLEY, ESQ.
                           KELLY DUNBAR, ESQ.
                           Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Avenue, NW
                           Washington, DC 20006

4

<u>APPEARANCES FOR:</u>            (CONTINUED)


Texas Association of        ROLANDO L. RIOS, ESQ.
Hispanic County Judges      115 E. Travis
and County                  Suite 1654
Commissioners:              San Antonio, TX 78205

Also present:               ROGER GALVAN, County Commission
                            Calhoun County

State of Texas:             JOHN BARRET SCOTT, ESQ.
                            Deputy Attorney General
                            for Civil Litigation
                            Office of the Attorney General
                            P.O. Box 12548
                            Austin, TX 78711

                            JOHN REED CLAY, JR., ESQ.
                            LINDSEY E. WOLF, ESQ.
                            JENNIFER ROSCETTI, ESQ.
                            G. DAVID WHITLEY, ESQ.
                            STEPHEN L. TATUM, JR., ESQ.
                            STEPHEN R. KEISTER, ESQ.
                            Office of the Attorney General
                            P.O. Box 12548
                            MC001
                            Austin, TX 78711

                            ARTHUR D'ANDREA, ESQ.
                            Office of the Attorney General
                            209 W. 14th Street, 7th Floor
                            Austin, TX 78701

                            BEN A. DONNELL, ESQ.
                            Donnell Abernethy Kieschnick
                            555 N. Carancahua, Suite 400
                            Corpus Christi, TX 78401

                            WHITNEY DEASON, ESQ.

<u>INDEX</u>

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MICHAEL HERRON | | | | |
|   BY MR. DERFNER | 8 | | 96 | |
|   BY MR. SCOTT | | 78/95 | | |
|   BY MS. BALDWIN | 93 | | | |
| EULALIO MENDEZ, JR. | | | | |
|   BY MS. VAN DALEN | 97 | | | |
|   BY MS. WOLF | | 110 | | |
| RAMONA BINGHAM | 112 | | | |
| (EXCERPTS OF VIDEO DEPO) | | | | |
| KRISTINA MARIE MORA | | | | |
|   BY MR. SHAPIRO | 113 | | | |
|   BY MR. SCOTT | | 134 | | |
| YAIR GHITZA | | | | |
|   BY MS. BALDWIN | 146 | | 189 | |
|   BY MR. SCOTT | | 167 | | 190 |
| RANDALL BUCK WOOD | | | | |
|   BY MR. DUNN | 192 | | 240 | |
|   BY MR. CLAY | | 213 | | |
| BLAKE GREEN | | | | |
|   BY MS. KORGAONKAR | 247 | | | |
|   BY MR. TATUM | | 260 | | |
| DAWN WHITE | | | | |
|   BY MS. RUDD | 268 | | | |

<u>INDEX (CONTINUED)</u>

| <u>PLAINTIFFS' WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| GORDON BENJAMIN | | | | |
|   BY MR. BARON | 288 | | | |
|   BY MS. ROSCETTI | | 296 | | |
| PHYLLIS WASHINGTON | | | | |
| (EXCERPTS OF VIDEO DEPO) | 299 | | | |

| | |
|---|---|
| 1 | **Corpus Christi, Texas; Wednesday, September 3, 2014; 7:59 a.m.** |
| 2 | **(Call to order)** |
| 3 | **THE COURT:**  Court calls Cause Number 2-13-193, |
| 4 | *Veasey, et al. versus Perry, et al.*  Are you ready to proceed, |
| 5 | Plaintiffs? |
| 6 | **MR. DERFNER:**  Yes, your Honor. |
| 7 | **THE COURT:**  Defense? |
| 8 | **MR. DERFNER:**  I'm Armand Derfner on behalf of the |
| 9 | Veasey Plaintiffs.  With me here is Emma Simson.  And if |
| 10 | Mr. Scott and we could approach the bench for a minute? |
| 11 | **THE COURT:**  Okay. |
| 12 | **(Begin bench conference at 7:59 a.m.)** |
| 13 | **MR. DERFNER:**  Good morning, your Honor. |
| 14 | **THE COURT:**  You all want to speak in here.  Good |
| 15 | morning. |
| 16 | **MR. DERFNER:**  You're probably aware that I have |
| 17 | severe visual impairment or whatever.  In fact, I'm legally |
| 18 | blind, although I pretend not to be.  And so for that reason, |
| 19 | if it's possible, Ms. Simson, who's a lawyer on our team, may |
| 20 | be assisting me, especially with some of the exhibits and that |
| 21 | sort of thing.  And I -- |
| 22 | **THE COURT:**  That's perfectly fine. |
| 23 | **MR. SCOTT:**  Absolutely. |
| 24 | **MR. DERFNER:**  And also -- I also -- that means I |
| 25 | can't see gestures.  If somebody makes a dirty face at me, I |

1    won't recognize it.  And if you give me a dirty look, I won't

2    know to stop, so if you -- if I'm doing something I shouldn't,

3    please say something.

4              **THE COURT:**  I will.

5              **MR. DERFNER:**  Thank you very much.

6         **(End bench conference at 8:00 a.m.)**

7              **THE COURT:**  All right.  So are we ready to proceed

8    with the Plaintiffs' next witness?

9              **MR. DERFNER:**  Plaintiffs would call Michael Herron,

10   please.

11             **THE COURT:**  Good morning, sir.  Would you raise your

12   right hand?

13             **MICHAEL HERRON, PLAINTIFFS' WITNESS, SWORN**

14                       **DIRECT EXAMINATION**

15   **BY MR. DERFNER:**

16   Q    Please give your name and your address and your position,

17   please.

18   A    My name is Michael Charles Herron.  My address is 6

19   Bridgeman Road in Hanover, New Hampshire, and I'm a Professor

20   of Government at Dartmouth College.

21   Q    How long have you been a professor at Dartmouth College?

22   A    I believe this is my eleventh year.

23   Q    And what is your department there?

24   A    The Department of Government.

25   Q    And do you hold -- what is your faculty rank?

Herron - Direct / By Mr. Derfner                    9

1    A    I hold an endowed chair at Dartmouth.

2    Q    And the name of the chair?

3    A    It's the William Clinton Story Remsen 1943 Professor of

4    Government.

5    Q    And what are your teaching or research specialties?

6    A    I teach applied statistics and I teach some game theory as

7    well.

8    Q    And have you published articles in your field?

9    A    Yes.

10   Q    Could you give me some of the journals of some of your

11   recent articles, especially the refereed journals?

12   A    Sure.  I regularly publish in referee journals.  I

13   published in the -- the general journals in my field, for

14   example, are *American Political Science Review* and *American*

15   *Journal of Political Science.*  And I also have published and

16   regularly do in the specialty journals in my field, for

17   example, *Election Law Journal.*

18   Q    And do you have a specialty in election law or elections

19   and voting?

20   A    I would say it's studying of election administration,

21   voting irregularities, and so forth.

22   Q    And in the course of your work and you research, have you

23   had occasion to deal with analysis of databases and working

24   with large quantities of database and computer records?

25   A    Yes.  I regularly do that in the course of my research.

1   Q    And do you publish -- do your publications also include

2   research which involves that kind of work?

3   A    Yes, regularly.

4   Q    And have you been involved in litigation as a consultant

5   or as a retained expert?

6   A    Yes.

7   Q    And has some of those also involved database analysis and

8   statistical methods?

9   A    Yes.

10  Q    In the area of political science?

11  A    Yes.

12  Q    And with the specialty in elections?

13  A    Yes.

14  Q    Have you been accepted as an expert in any cases in that

15  field?

16  A    Yes.

17  Q    Tell me about that.

18  A    I was accepted as an expert in an election contest in

19  Florida in 2006.

20  Q    And what was that case about?

21  A    It was about a disputed election that occurred in the --

22  in a congressional district, and one candidate was not pleased

23  with the outcome and challenged it.

24  Q    And what was your role as the -- as an expert?

25  A    I analyzed some voting data for a company that made the

1    voting machines used in the disputed election.

2    Q    And what was the purpose of your analysis?

3    A    The purpose was to see if the data was consistent with the

4    allegations that the machines were broken or was consistent

5    with an alternative explanation that the particular format that

6    voters used when they voted led to the abnormality that

7    basically caused this challenge.

8    Q    And what kind of analysis or analyses did you perform in

9    that case?

10   A    I had what are called ballot-level records, among other

11   things, which are records that explain how individuals cast

12   their votes, and I studied how patterns in these ballot records

13   varied across counties in Florida.

14   Q    And was that a federal court or state court?

15   A    I believe it was a state court.

16          MR. DERFNER:  Your Honor, I tender the witness as an

17   expert in the field of political science and statistics with a

18   specialty in elections and voting.

19          MR. SCOTT:  Your Honor, with the understanding that

20   the Court has asked that we put off *Daubert* challenges until

21   the end of the trial.

22          THE COURT:  That's fine.  I will address it at the

23   end.

24          MR. ROSENBERG:  End of the direct, I thought; not end

25   of the trial.

1            THE COURT:  After each expert.

2            MR. ROSENBERG:  Yes.

3            THE COURT:  Okay.  So we're going to proceed and then

4    the Court will address it at the end of his testimony, is my

5    understanding.

6            MR. DERFNER:  Thank you, your Honor.

7    BY MR. DERFNER:

8    Q    Professor Herron, what were you asked to look at in this

9    case?  First of all, who retained you in this case?

10   A    Plaintiffs.

11   Q    Okay.  And what were you asked to look at or analyze?

12   A    I was asked to take some data that was supplied to me by

13   the Department of Justice and study it with two goals in mind.

14   One is to assess the number of non-matches in this dataset.

15   The dataset refers to the results of an algorithm, and I was

16   asked to study the output of the algorithm and assess the

17   number of non-matches in it.  And then I was asked to perform a

18   racial analysis on the data that I received and try to

19   understand whether there are racial differences in the non-

20   matches and the data that I -- was supplied to me.

21   Q    And when you say "matches," what records were you

22   analyzing?  Were those the state team records and other what

23   you call database identification records?

24   A    Well, the data that was sent to me incorporates data from

25   the team file that you just mentioned, along with data from

1   other records, like from the Department of State -- excuse me,

2   from the Texas Department of Public Safety and federal

3   databases.

4   Q    Okay.  And what is team data?

5   A    The team database, as we heard yesterday, is the -- is an

6   election administration database maintained in Texas.

7   Q    Okay.  As far as -- you've identified two questions.  As

8   far as the number of non-matches, what was your overall result?

9   A    My overall result was that the number of non-matches is up

10  to 800,000 approximately.

11  Q    And as far as a result -- and we'll get into the details

12  later -- but as far as the result on the racial composition of

13  the non-matched group, what was your result?

14  A    Generally speaking, my result is that the possession rates

15  of forms of identification varied by racial group.  I was asked

16  to look at three different groups:  whites, Hispanics, and

17  blacks.  And my results, generally speaking, are that the white

18  identification possession rate is greater than the Hispanic

19  possession rate and the black possession -- ID possession rate.

20  And I found that these differences between the white

21  identification possession rate and the possession rates of

22  those other two minority groups, these differences are

23  statistically significant.

24  Q    Okay.  You've seen a report of Dr. Ansolabehere and you

25  heard his testimony.

1  A    Yes.  I've skimmed his report and I was in this court

2  yesterday.

3  Q    Okay.  And you know what his results were as far as the

4  racial composition of the non-match group?

5  A    Yes.

6  Q    And how did the results you found compare to the results

7  that Dr. Ansolabehere found?

8  A    They're effectively the same.

9  Q    Thank you.

10        MR. DERFNER:  Okay, what I'd like to do before we get

11 into the detail of the numbers, frankly I'd like to know a

12 little bit more -- and maybe other people -- other people may

13 be geniuses in the field, but I'd like to know a little bit

14 more about the process we went through.  So with your Honor's

15 indulgence, we'd like to take a little bit of time to go into

16 some detail and understand some of these great concepts like

17 ACS and CVAP and ecological regression and batching and so

18 forth.

19        THE COURT:  That's fine.

20        MR. DERFNER:  Pardon?

21        THE COURT:  That's fine.  You can proceed.

22        MR. DERFNER:  Thank you.

23 BY MR. DERFNER:

24 Q    Professor Herron, you started with a database matching

25 process; is that correct?

1  A    I received data that was the output of an algorithm that's

2  a -- with a database matching process, and the algorithm was

3  carried out by, as we heard yesterday, faces (phonetic) of the

4  Department of Justice and other members of the federal

5  government.

6  Q    Okay.  Now, what is a database matching process in -- just

7  in general?

8  A    Well, from the context of this case, in that particular

9  context, a database matching process is an exercise of trying

10 to understand whether individuals in one database -- in this

11 case, the team database, these are registered voters in Texas -

12 - if those individuals also appear on other -- in other

13 databases, for example, a driver's license database maintained

14 by the State of Texas.

15 Q    Okay.  And so you're trying to see if individuals in the

16 team database which is, as you said, registered voters, are in

17 some other databases.  How do you know which -- what the other

18 databases are that you select?

19 A    Well, in this case, those other databases were selected

20 based on the law, SB14.  That law specifies the valid forms of

21 voter identification useable in Texas at the present time, and

22 that law dictated that, for example, the team database should

23 be compared to a list of individuals who have passports,

24 because a passport is a valid form of identification, along

25 with driver's license -- a state driver's license and so forth.

1    Q    Okay.  Now, you said there's an algorithm, right?  A

2    wonderful word.  Tell me what an algorithm is.

3    A    Again, in the context of this case, an algorithm is a set

4    of rules that explains that -- excuse me, that specifies how

5    entries in the team database are compared to entries in the

6    other databases, the -- whether it -- called the identification

7    databases.

8    Q    So what -- so how does that work?  Give me a part of the

9    algorithm.  What are you looking to do from one database to the

10   other?

11   A    Well, for example, one might observe a record in the team

12   database of a registered voter whose named John Doe.  And this

13   record in the team database has lots of other fields.  It not

14   only says John Doe's name, it has, you know, his address,

15   mailing address, residential address, zip code, and so forth.

16   And the question is, how do we know if that particular John Doe

17   also appears in say the driver's license database where there's

18   another individual whose name is John Doe, might be spelled

19   slightly differently for example, so the algorithm is an

20   attempt to figure out how the different individuals map

21   together.

22   Q    Okay.  So if you had -- if every name in the team database

23   were entered in the same way, the exact same way in let's say

24   the passport database, it'd be pretty easy, wouldn't it?

25   A    Well, we would -- just the fact that the names matched

1   wouldn't be sufficient because there are lots of people who

2   have repeated names.

3   Q    Okay.  So does the algorithm include several different

4   ways of looking for things that might be matches?

5   A    Yes.  It includes a number of different ways.  Each of

6   these ways is called a "sweep."  And a particular sweep takes a

7   record in the team database, as I think Dr. Ansolabehere

8   explained a bit yesterday, takes a record, and from that record

9   forms some sort of identifier using fields in the team

10  database.  So, for example, one wouldn't only use a name for

11  the fact the names are repeated.  But if one were to do that,

12  one identifier might simply be the name John Doe with spaces

13  removed, for example, and then one would take that record and

14  look in the driver's license database to see if the same

15  identifier appeared.  Now, of course, one does not only use

16  names, but that's the idea.

17  Q    So if you have John Doe in the team database and there's

18  somebody named John C. Doe in the DPS database, what do you do

19  to figure out if that's a match or not?

20  A    Well, this is -- this comes to the question of what are

21  called "sweeps."  So each sweep in the algorithm that the

22  Department of Justice executed puts together a set of fields.

23  And because the names are repeated, to use that example, there

24  are no sweeps that only function on, say, first name/last name,

25  because that would lead to lots of incorrect matches.  So to

1   know if John Doe in the team database corresponds to, say, John

2   C. Doe, one would also use other identifying information such

3   as addresses or perhaps a Social Security number or a driver's

4   license number if we were talking about a driver's license

5   database and so forth.

6   Q     Could you have a sweep, for example, that said let's pick

7   up all the ones in which the last name, the house number, and

8   the last four digits of the Social Security number are the

9   same?

10  A     Sure.   In principle, that's fine.

11  Q     Okay.   And so your sweeps are different variations of the

12  data to try to figure out which things are -- which records are

13  for the same people; is that correct?

14  A     Each sweep is a different way of comparing -- a slightly

15  different way of comparing records in the team database to

16  records in an identification database, that's correct.

17  Q     And if you have more than one sweep, what's the purpose?

18  A     Well, the concern in any database matching process is that

19  typographical errors and variations in name spelling and so

20  forth make it difficult to know if one John Doe is the same as

21  another John Doe who might be -- have a middle initial.   So in

22  order to get around this problem a database matching algorithm

23  will have multiple sweeps.   Some sweeps, for example, might

24  simply ignore middle initials so that if one database doesn't

25  contain middle initials for whatever reason, that doesn't

1   contaminate the process.  So in this particular algorithm that

2   I analyzed, there are 13 different sweeps.

3   Q    Thirteen different sweeps.  If I told you that the D. C.

4   case, or what we'll call the Section 5 case, in here had three

5   sweeps and this case had 13 sweeps -- the algorithm in this

6   case had 13 sweeps, what would you say about the likelihood of

7   accuracy in this case compared to that one?

8   A    Well, any database matching process like this -- well, let

9   me -- excuse me.  I wasn't involved in the D. C. case.

10  Q    Right.

11  A    I've read a little bit about it.

12  Q    Take my word for it, it was three.  I think that's right,

13  isn't it?  Okay.

14  A    I was --

15        **MR. SCOTT:**  I wasn't involved either.

16        **MR. DERFNER:**  We may be the only two people here.

17  **BY MR. DERFNER:**

18  Q    Go ahead, doctor.

19  A    Thank you.  In this instance, I think 13 is greater than

20  three.  And so that is -- because the sweeps were not as simple

21  as what I'm describing, first name/last name, that's a good

22  thing.  So I'm pleased that the number in this -- with the

23  algorithm that I'm studying is greater than three.

24  Q    Okay.  And so the algorithm -- part of the algorithm, if I

25  understand it, is the actual sweeps are in there, right?

1    A    Yes.  That is specified in the algorithm.

2    Q    Okay.  And the algorithm, I assume, has other things in it

3    that tell the computer what to do about this or that?

4    A    Well, as I -- so an algorithm is a set of rules.  And one

5    -- in this case, whoever is executing the sweep would write

6    computer code in order to carry out the sweeps efficiently.

7    You don't need a computer.  In principle, you could do it by

8    looking, but that would take forever.

9    Q    Okay.  And, in fact, weren't there two separate algorithms

10   in this case?

11   A    There were.

12   Q    What were the two?

13   A    Well, one algorithm was called the Plaintiff algorithm,

14   and that was a set of sweeps that I've been discussing.  And

15   there's another algorithm that the Defendants used, and that's

16   called the Defendant algorithm.  And that was a set of I

17   believe four sweeps, sometimes five, because that number

18   depends on the availability of driver's license numbers.

19   Q    Now when you say, "the Defendant used," weren't both

20   algorithms used and produced for everybody?

21   A    Yes.

22   Q    So rather than used, wouldn't it be fair to say the one

23   algorithm was selected by the Plaintiffs and one was selected

24   by the Defendants, correct?

25   A    Yes.

Herron - Direct / By Mr. Derfner                    21

1   Q    Okay.  But both were used for everybody, right?

2   A    Both algorithms were applied to the team database and the

3   complete set of identification databases.

4   Q    And you, for example, got the results of the running of

5   both algorithms, right?

6   A    Yes.

7   Q    Okay.  These -- you were running through how many team

8   records in this case?

9   A    Approximately 13.4 million.

10  Q    Okay.  Will the algorithm give you precise answers for

11  whether every one of those 13.4 million is a match or not a

12  match?

13  A    The output of the -- of this algorithm in this case was a

14  set of indicators that correspond to team records.  So, for

15  example, to return to my John Doe example I gave before, the

16  results of the algorithm would say whether John Doe -- as in

17  the team database, would explain how this individual matched

18  based on every single sweep to all the identification

19  databases.  So the data that I received contained flags.  I

20  would call those precise.  They would say one or zero.  And

21  they indicated whether a particular team record matched in a

22  particular sweep, one to 13, to a particular identification

23  database.

24  Q    And tell me again, the identification databases, that's

25  DPS, State Department, Homeland Security, that correspond to

1    the different types of IDs permitted under SB14?

2    A    Yes.  The identification databases were chosen based on

3    what forms of identification are allowed -- at least, that --

4    Q    So are you saying that the results -- well, do -- did the

5    results that you got back, was it a piece of paper that said

6    there are "X" number of matches?

7    A    No.

8    Q    Okay.  Did you get back in fact millions and millions of

9    lines of code?

10   A    I received -- I didn't count the exact number.  Millions

11   of lines of data, I would say --

12   Q    Sorry.

13   A    -- and the data files reported some information from the

14   team database -- again, the record of Texas registered voters -

15   - along with various files that were the output of the

16   Plaintiff algorithm and also of the Defendant algorithm.  So

17   these files -- each file had approximately 13.4 million lines,

18   although there was one exception because of the way that some

19   of the files are handled, and what I received was all those

20   files.  So I suppose if you multiply that number by eight or

21   nine, that's how many lines I got.

22   Q    So let me see if I understand.  It sounds like -- let's

23   say from the State Department, you got back a -- from the State

24   -- well, you got back records of the State Department showing

25   for each of the 13.4 million names in team, you got in effect

1   13 results for each of the people in team, with in effect a yes

2   or a no?

3   A    Yes.  It was a little bit more subtle than that --

4   Q    I hope.

5   A    -- but that's the right idea, because when the different

6   federal agencies, as explained by Dr. Ansolabehere yesterday,

7   implemented the DOJ algorithm, there was the occasional --

8   trying to think of the right word -- the occasional hiccup and

9   -- when one agency basically I think ran the algorithm again,

10  so I think I had duplicate data from that agency, strictly

11  speaking, so I had more than 13, but I knew how to combine them

12  to make them effectively 13.

13  Q    Okay.  And to count something as a match from -- let's

14  say, a given agency had 13 sweeps for each name in the team

15  database, to count it as a match, how many sweeps did there

16  have to be a yes on?

17  A    So I chose the most conservative number, which is one.  So

18  in this instance, the Plaintiff algorithm is actually divided

19  into a set of what are called primary and secondary sweeps.

20  And I haven't really discussed that because it's not

21  particularly --

22  Q    Don't bother.

23  A    Okay.  And so if you have the set of sweeps -- we'll just

24  go with that -- as long as one -- as long as an individual in

25  the team database matches on any sweep in any particular

1   identification database, for example a passport database, then

2   I consider it a match.  So the number is one.

3   Q    Okay.  Now, in order to analyze these millions of pieces

4   of data that you got back, what did you have to do?

5   A    Well, originally in June when I received the data, it was

6   encrypted, so I used the password supplied by counsel to

7   decrypt it.  It came in a hard drive sent to me -- not a hard

8   drive but effectively a storage device -- then I looked at the

9   data to sort of see what it was, and then I started writing

10  computer code that took all the data and uploaded it into a

11  database that I was creating.

12  Q    Okay.  And when you say you started writing computer code,

13  how much of that -- how detailed or simple is that?

14  A    I'm used to writing this sort of computer code.  I do it

15  regularly.  I --

16  Q    How much computer code did you have to write?

17  A    I would say I wrote hundreds of lines.  I haven't counted

18  the number -- hundreds of lines.

19  Q    Each line is in a sense an instruction or part of an

20  instruction?

21  A    Yes.  So, for example, when I took the passport -- I

22  didn't have the actual passport database, so when I say the --

23  when I took the passport database, what I mean, I took the

24  output of applying the algorithm to the passport database.

25  When I had that data, I wrote some code to take all those ones

1   and zeroes and other numbers -- and these databases also had

2   what's called the Texas VUID.  Not all the files had this, but

3   they effectively did, I'll go with that.  And I wrote my code

4   to sort of take all these pieces of information and -- the term

5   is upload those files into a database.

6   Q    Okay.  Now -- and so when you finished writing your code

7   and running the data through that, that's when you got some

8   numbers of how many people were matches, non-matches, etcetera;

9   is that correct?

10  A    Yes.  Initially, of course, all I had was all these lines

11  of data and I couldn't tell from those who matched anywhere.

12  It's not enough.  So I took the -- I wrote code to upload all

13  the files into my database and then I wrote additional code to

14  manipulate all those results.  I had -- one step is to take the

15  different database results that I had and basically link them

16  together, or join them -- that's the technical term -- using

17  what's called the Texas VUID.  And that step I had to do first

18  before I could analyze any matched numbers.

19  Q    Okay.  Did you -- in writing your code to derive the

20  results from data, did you rely on anybody else, such as

21  Dr. Ansolabehere?

22  A    No.  All of the code I used in this process I wrote

23  myself.

24  Q    And so anybody who's analyzing would expect to write his

25  own or her own code?

1  A    I mean, I can't speak to anyone, but I wrote everything

2  myself.

3  Q    Okay.  And if the Defendants had anybody analyzing these

4  data, then that person would presumably also be writing their

5  own code, right?

6  A    Unless the -- unless this individual had mine, for

7  example, or someone else's.  But, yes, in principle, you can't

8  analyze these data in the form that I receive them without

9  writing computer code to do this other data assembly process

10  that I've just described.

11  Q    Okay.  And in terms of -- so that gave you at different

12  stages as we'll find out, it gave you the -- as a starting

13  point, the number of non-matches; is that correct?  Or number

14  of matches and non-matches?

15  A    Yes.  After the -- I mean, I've sort of summarized a lot

16  of computer code writing here, but yes, after one writes code

17  to upload the data and put the datasets together and then start

18  looking for ones and zeroes in the appropriate places, that

19  gives me numbers of matches and non-matches, that's correct.

20  Q    Okay.  Now, is this a perfect way -- is the answer going -

21  - the answer that you got going to be completely perfect in

22  telling whether every single person is a match or a non-match?

23  A    No.  I don't think it would be completely perfect.

24  Q    And why is that?

25  A    Because this database matching process, like all processes

1   in which I have been involved, is subject to some sort of

2   error.  And the databases I was working with via the Plaintiff

3   algorithm and the Defendant algorithm are very large, 13.4

4   million.  So it wouldn't be surprising to me that if you were

5   to tell me, and as I saw in court yesterday, that there are

6   some issues of errors that come up when working with a database

7   of that size.

8   Q    And if there are errors like that, does that mean that

9   somebody made a mistake?

10  A    Obviously that depends on the type of error.  But the

11  algorithm is a set of rules designed to check whether, you

12  know, names in the team database correspond to names in other

13  databases.  Those rules aren't a hundred percent perfect.  We

14  know that humans make mistakes.  There might be data entry

15  errors in unusual places.  These things crop up now and then

16  when databases are extremely large -- 13.4 million records for

17  example -- so it doesn't imply that there's an error the way

18  you're describing.

19  Q    Okay.  And does it imply that there's any error in the

20  person doing the analysis?  In other words if it turns out that

21  some thousands or whatever of people are not correctly listed

22  by this, does that mean that you or some other analyst

23  calculated wrong?

24  A    No.

25  Q    Now, in fact, do you have a --

1           **MR. DERFNER:**  Your Honor, I think the witness has a

2    handheld calculator.  May I ask him to use it for a minute?

3           **THE COURT:**  Yes.

4    **BY MR. DERFNER:**

5    Q    Do you have a calculator, Professor Herron?

6    A    Yes, sir, I do.  It's right here.

7    Q    Okay.  Well, you heard some testimony yesterday I think

8    about some -- I think it was 22,000 people in some category --

9    I'm not going to go into detail -- but if there were 22,000

10   people in some category who may have been mislabeled -- I'll

11   call it mislabeled -- by this process, in other words, called

12   no matches when they were really matches, or vice versa, how

13   would that compare to the total universe that was analyzed?

14   A    Well, if you're asking me to assess the question, is

15   22,000 large?  And the answer to that question depends on sort

16   of what we're comparing it to.  So if you were asking me right

17   now, I would, as a first thought, I would just divide 22,000 by

18   I'll say 13.4 million and see what that fraction shows.

19   Q    I'm -- yes, I am asking that.

20   A    You're asking me that, okay.  So I'm just going to type in

21   22,000 by 13.4 million, and I'm going to multiply the result by

22   a hundred, so I get around approximately .16 percent.

23   Q    Okay.  So that's between one-tenth and two-tenths of one

24   percent?

25   A    Yes, that is correct.

Herron - Direct / By Mr. Derfner                    29

1  Q    Okay, thank you.  Okay, I think we've come about to the

2  end of the -- well, let me ask it this way.  So is this the

3  process -- you said there were two questions you were asked.

4  Number one, how many matches and non-matches.  And the second

5  question had to do with assigning -- analyzing the racial

6  composition of the list, right?  So is the process you've

7  described so far, is that what you did to figure out the number

8  of matches and no matches?

9  A    Yes.

10 Q    So let's then move on to the next step.  Well, and by the

11 way -- no, I'll come back to that.  You were asked to analyze

12 the match and no match list according to race; is that correct?

13 A    I was asked to make an assessment of the extent to which

14 different racial groups -- three -- whites, blacks, and

15 Hispanics had different match rates or correspondingly non-

16 match rates.

17 Q    Okay.  And in one sentence as a summary, how do you do

18 that?

19 A    In one sentence.  I -- what I did is I took data on race

20 and ethnicity from the American Community Survey and I combined

21 those data with the matching output data that I've described,

22 and I used that combination to draw some conclusions about

23 racial and ethnic voter identification possession rates.

24 Q    Okay.  You used the word "American Community Survey."  And

25 were you looking at something called CVAP?

EXCEPTIONAL REPORTING SERVICES, INC

1  A    Yes.   The American Community Survey --

2  Q    We'll get to that.  I just want a yes or no right now,

3  excuse me.

4  A    Yes.

5  Q    And what were the methods, the statistical methods that

6  you used in doing this analysis?  Just give me the names

7  because then we're going to go through these words and names

8  one by one.

9  A    I carried out two standard approaches, standard methods,

10 to my dataset when it combined the American Community Survey

11 data and the matching algorithm data.  Those methods, which

12 I've used in my own research and in which plenty of other

13 scholars use regularly, are called homogeneous area analysis

14 and ecological regression.

15 Q    Okay.  And how about one more term.  In the area analysis,

16 were you looking at census blocks?

17 A    No.  I looked at --

18 Q    I'm sorry, go ahead.

19 A    No.  I looked at what are called census block groups.

20 Q    Okay.  So we'll take a look at that term, too.  Okay.

21 Now, tell me what -- you were trying to figure out the racial

22 composition of the no match and the match list, correct?

23 A    Yes.

24 Q    Okay.  And were you trying to figure out the CVAP figures

25 for those numbers?

1  A    Well, CVAP stands for citizen voting age population.

2  Q    Okay.

3  A    I wouldn't say I was trying to figure out the --

4  Q    Well, the CVAP, the basis of -- or the type of data that

5  you wanted to figure out, the racial composition.

6  A    Yes.  I wanted to -- when I was interested in racial

7  composition, I was only interested in using census data that

8  included information on citizens, because in the State of

9  Texas, you have to be a citizen to vote, and you also have to

10 be 18.  So CVAP includes data on eligible voters.

11 Q    And what does CVAP stand for?  What is each word in that

12 acronym?

13 A    Citizen voting age population.

14 Q    Okay.  So that's what you want to know.  And where do you

15 go for that CVAP data?

16 A    Well, the standard place to go in the academic literature

17 is the American Community Survey, so --

18 Q    What is the American Community Survey?  Is that a census -

19 - is that census data from the Bureau of the Census?

20 A    Yes, it is.  The Bureau of the Census has many products,

21 one of which is the American Community Survey.  And I'll just

22 refer to it as the ACS.  Another is the decennial census, which

23 many people simply refer to as "the census," but that's

24 slightly misleading because there are lots of censuses.

25 Q    Why didn't you use the decennial census in this research

1    project you did (indiscernible)

2    A    No, because I need CVAP.  I need information on citizens

3    and that's contained in the American Community Survey.

4    Q    So what you would call CVAP, the citizens voter age, you

5    couldn't find that in the decennial census, could you?

6    A    No, correct.

7    Q    Okay.  And the ACS, is that -- does that come from a

8    particular time or date?  Like the decennial census we know is

9    done as of the decennial year and completed or published I

10   think on April 1st of the year ending in zero or one.  What

11   about the ACS?

12   A    The ACS is a -- the one I used, the most recent one, is

13   called the 2008-2012 ACS.  It doesn't come out every ten years.

14   Well, it doesn't only come out every ten, is I should say.

15   It's more of a rolling snapshot of the country.  That's a

16   simple way to think about it.

17   Q    And so for a researcher, whether in the commercial world

18   or the university world, who wants to know about citizens and

19   voting age, etcetera, is ACS the standard way to find that

20   data?

21   A    Yeah.  I would say that in my area, that a standard source

22   is the American Community Survey.

23   Q    Okay.  Now, you -- so you're going to use that data to

24   look at census information, correct?

25   A    Yes.

1  Q    Okay.  And you mentioned the word "block" -- well, you

2  corrected me when I said "block."  Tell me what are the -- what

3  are some of the basic kinds of census units and what do they

4  mean?

5  A    Well, the census defines various geographies that cover

6  the United States.  They range from small to big, and the

7  smallest unit is basically a block.  So it's not a city block,

8  as some people think, but it's called the census block, and

9  that refers to a particular geographical area.  And then there

10  is the next unit that's larger, it's called the block group

11  which contains blocks.  I use block groups in my analysis

12  because that was the lowest -- or the smallest sort of units in

13  the American Community Survey that contain CVAP data.  So some

14  of the decennial census data is published at the block level.

15  The ACS doesn't go that low.  And when I say "low," that just

16  means smaller units.  So that's why I used block groups.

17  Another unit that's larger is a census tract.  And obviously if

18  one has block group data, you can aggregate up to a tract.  But

19  it's better to use the data at the smaller level if you can get

20  it.

21  Q    And partly because when you use a small level, you get

22  more units in the sample, don't you?

23  A    That's one consequence, yes.

24  Q    Okay.  And did they used to have something called

25  enumeration districts?

1   A    I -- the geographies used in the census have evolved, but

2   I really don't know.

3   Q    Okay.  So -- okay, so now I think we know we have the

4   building blocks.  What did you do?  You said you had two

5   methods.  Let's start with the first one.  I think the first

6   one you mentioned was the homogeneous analysis, or something

7   like that, right?

8   A    Yes, that's correct.

9   Q    Tell us what that is.

10  A    So I'll use the word "block group" now that --

11  Q    By the way, at any point along this --

12         **MR. DERFNER:**  Your Honor, if I may, at some points we

13  believe that it may be useful for Dr. Herron to actually come

14  down and do some drawing or make some -- give us some

15  illustrations to help us see.  I'm not sure if that's true now,

16  but it probably will be in the next one.

17         **THE COURT:**  That's fine.

18         **MR. DERFNER:**  Okay.

19  **BY MR. DERFNER:**

20  Q    So Professor Herron, tell us what that is.

21  A    So in a homogeneous block group analysis, what I do is I

22  look at the block groups that cover or partition Texas.  And I

23  know for each block group, from the ACS data, which block

24  groups are, for example, a hundred percent white CVAP.  So when

25  I say a hundred percent white, I mean a hundred percent white

1   CVAP.  And I'll -- I won't constantly say CVAP, but that's

2   implied.  I can tell which block groups are a hundred percent

3   white and which block groups are a hundred percent black and

4   which block groups are a hundred percent Hispanic.  That's what

5   I mean by homogeneous.

6   Q    And it might be -- these groups might be anywhere in the

7   state, right?

8   A    Sure.  Would you like me to draw this?

9   Q    Yeah, probably that would be a good idea.

10          **THE WITNESS:**  Your Honor?

11          **THE COURT:**  Sure.

12          **THE WITNESS:**  Thank you.

13       **(Pause)**

14  **BY MR. DERFNER:**

15  Q    Is that Texas?  Where's the panhandle?

16  A    I'm not an expert on drawing.  So if, for example, this

17  is --

18          **THE COURT:**  Is that Texas?

19          **THE WITNESS:**  This is Texas.

20          **THE COURT:**  Okay.

21       **(Laughter)**

22  **BY MR. DERFNER:**

23  A    If this is a state, I might know, for example --

24  Q    Let's call it Texas.

25  A    I'll call it Texas.  I'll just draw some circles in here.

Herron - Direct / By Mr. Derfner                    36

1    I'm not suggesting that block groups are circular.  That's not

2    true in general.  I might be able to say something like, well,

3    in Texas I can find in this drawing four block groups that are

4    a hundred percent white.  And so they might not -- they might

5    be scattered around as I've drawn, they might be some of them

6    that are closer, for example.  But with the census data, I can

7    tell which block groups are of that type.  And --

8    Q    Every block -- excuse me -- every block group has a number

9    or an identifier, right?  In the census.

10   A    Yes.

11   Q    Okay.  Go ahead.

12   A    So to continue your earlier question, I figure out which

13   block groups are white, a hundred percent white, and then I

14   combine them effectively and think about a subset of Texas that

15   is completely or a hundred percent white.  And I can do the

16   same exercise for a subset of Texas that is a hundred percent

17   Hispanic.  So I might also have some block groups -- and I'll

18   just -- I'll put a little line through here just to make them

19   different.  I'll just draw three up there.  I might say, well,

20   we have some that are a hundred percent white and some that are

21   a hundred percent Hispanic, and I could similarly do that for

22   ones that are a hundred percent black.  I won't draw them up.

23   But in principle, I could do that.  And that gives me an area -

24   - or in this case two areas -- in Texas that are homogenous of

25   one racial ethnic group and another area that's homogenous in a

1    different racial and ethnic group.

2    Q    And so what do you do with that data?

3    A    Well, the nice thing about these areas is that I can --

4    since -- if I have an area that's a hundred percent white and I

5    observe something occurring in that area, I know that whites

6    did it, and that's because, according to the census -- and

7    that's my data source here -- the only people who live there

8    are white.  And when I was asked to make a -- to do a racial

9    ethnic analysis of the match rates, I noticed that in my data,

10   I don't have individual level data on race.  So it's not the

11   case, for example, that when I put the data together from the

12   Plaintiffs algorithm that I could say, oh, this individual in

13   the team dataset -- in the team database, this individual is

14   white and so forth.  But I didn't have that sort of individual

15   level data.

16   Q    And -- let me just break in.  That -- is that individual

17   level data, that's not the function of a statistical analysis

18   (indiscernible) isn't it?

19   A    Well, if I have it, but not in this -- my case, no.  So

20   what I do here is I -- is this -- I don't know up front which

21   individuals in my dataset are white, for example.  I can look

22   at these areas by census blocks here and say, well, anyone who

23   lives in one of those areas must be white.  Why is that true?

24   Because the census says only white people live there.

25   Similarly I can look at these other areas, the attached three -

1  - I think I said they were Hispanic -- and if you lived in one

2  of those, then you're Hispanic.  And that must be true because,

3  according to the census, the only people who live there are

4  Hispanic.

5  Q    So you take that information -- you may have a number of

6  census block groups that are all white, and would it be fair to

7  say you add those together, you see how many -- what percentage

8  of match and non-match theories, and that's one number that you

9  have for the percentage match and non-match among white people

10  in Texas; is that correct?  That a fair way?

11  A    Yeah, that's a fair way.  So if I look at the five white

12  groups -- five white block groups, excuse me, and I combine

13  them, even though they're not, say, contiguous, that gives me a

14  white big block group, say; and then if I observe that in that

15  block group, the match rate for ID possession is, say, around

16  95 percent, then it must be true that in that area that the

17  whites -- the white identification rate is 95 percent.

18  Q    And you do the same thing for blacks, that is, the black -

19  - the homogenous, hundred percent black block groups, correct?

20  A    Yes, that's correct.

21  Q    And you do the same thing for this Hispanic?

22  A    Yes, that's correct.

23  Q    And so -- and is that what you call the homogenous block

24  group analysis?

25  A    Yes.

1   Q    Okay.  And so that's one way of figuring out what the

2   percentage rate among whites and among blacks and among

3   Hispanics in Texas there is for voter ID, right?

4   A    That's one method that I use and that is commonly used in

5   the literature.  It's a -- the homogenous area analysis is the

6   standard in the literature.

7   Q    Okay.  But it's not the only method, correct?

8   A    That is correct.

9   Q    Okay.  Is there something that's close to it?

10  A    Yes, there is.

11  Q    And what is that?

12  A    You might call --

13  Q    One quick question.  And the answer to -- when you get

14  results on the homogenous block group analysis, those answers

15  are reflected in a single percentage number for each race; is

16  that correct?

17  A    That's correct, because the block groups are homogenous.

18  Q    Okay.  What's the next method?

19  A    Well, I could take -- rather than look at completely

20  homogenous block groups, I could look at block groups that were

21  almost homogenous.  And that -- the method used to study those

22  is called the method of bounce.

23       **(Mr. Derfner/Ms. Simson confer)**

24          **MR. DERFNER:**  Your Honor, we have a couple of

25  demonstrative exhibits that I think may help; although, I think

Herron - Direct / By Mr. Derfner                    40

1   Dr. Herron is doing just fine on his own.  We've drawn some

2   pictures that may help him in explaining this next one which is

3   -- what do you call this one?

4           **THE WITNESS:**  Well, it's what the field calls the

5   method of bounce.

6           **MR. DERFNER:**  Method of bounce.  Is -- would you call

7   -- is it another -- would a colloquial person like me maybe

8   call it the nearly homogenous block group analysis?

9           **THE WITNESS:**  Yes.

10          **MR. DERFNER:**  Okay.  May we put the demonstratives

11  up?

12  **BY MR. DERFNER:**

13  Q    Okay, so tell us about this method, and feel free to use

14  the picture.

15  A    Okay.  So the previous example where I drew the State of

16  Texas involved block groups that were completely homogenous.

17  But let's suppose we wanted to relax the definition of

18  homogeneity and look at block groups that were almost

19  homogenous.

20  Q    And why would you do that?

21  A    Because the number of block groups that are completely

22  homogenous is not very large. It's --

23  Q    And you want a bigger sample.

24  A    Yes.

25  Q    Okay.

1   A    So I would relax the definition -- or this method relaxes

2   the definition of homogeneity and says, well, for example,

3   let's -- rather than looking at block groups that are a hundred

4   percent homogenous, let's look at block groups that are at

5   least 99 percent homogenous.  So we might say 99 percent is

6   very close to a hundred, but obviously it's a little bit less.

7   And so you then might take 99 and say also 98 and so forth.

8   And in this picture, I'm looking at a block group that is 90

9   percent black and -- well, 90 percent black and ten percent

10  white.  Obviously I'm using 90 because it's easier to have ten

11  people up here.  And you notice in the coloring scheme here

12  that the races and ethnicities of these individuals are

13  different.  And what's important to recognize is that if I --

14  when I look at this in the census data, I can't tell you that

15  this individual person is different.  All I know in this block

16  group is that, yes, there are nine blacks and one white.

17  Doesn't matter that I can't tell that if I were there which

18  person is which.  That doesn't matter.  So I'll continue.

19  Suppose I know in this particular block group -- suppose on

20  this particular block group -- again, there are ten people,

21  nine black, one white -- that two people lack voter ID.  So

22  notice I'm combining information from the database matching

23  algorithm with this American Community Survey data.  If the

24  algorithm says that two people lack ID and I'm looking at this

25  block group, I notice the following.  Since two people don't

1    have ID, and there's only one white person, I can say something

2    about the black ID possession rate in this block group.  So you

3    might say, you know, what is the lowest that the black ID

4    possession rate can be?  And if you think about it, the lowest

5    that the black ID possession rate will -- can be will happen

6    when this white person doesn't have an ID, because it must be

7    true that if two people lack ID, that at least one of those

8    persons is black.  The reason that at least one has to be black

9    is there aren't enough non-blacks to make up two.  So I can

10   write down one-ninth, and I know that at least one-ninth of the

11   blacks here lack ID.  That must be the case because there

12   aren't enough non-blacks to make up the number two.  Similarly

13   it's possible that both black -- excuse me, that both of the

14   people who lack ID, they could both be black.  So I could say

15   one-ninth and two-ninths, and I know that in this illustrative

16   example that the black ID -- excuse me, the black non-

17   possession rate must be between one-ninth and two-ninths.  It

18   has to be because there aren't enough non-blacks.  So in this

19   case, this person is white.  But had that person been Hispanic,

20   the same example would have applied.  All we need is that we

21   have a lot of blacks and a small number of non-blacks.

22   Q    So, Dr. Herron, when you draw conclusions from this type

23   of exercise, is your answer reflected in a number the way it

24   was with the completely homogenous block group analysis, or

25   something different?

Herron - Direct / By Mr. Derfner                    43

1   A    No.  As this indicates here, it's indicated in a range,

2   because I can't tell you here what the black identification

3   lacking -- the black non-possession rate is.  I can only put it

4   in a range.  The exercise in statistics is called binding.  So

5   I can only -- these are called -- and these are called logical

6   bounds.  One says the logical bounds are between one-ninth and

7   two-ninths.  And the only thing I can do here is bound, or

8   place in a range, the non-possession rate.

9   Q    Okay.  And have you done that in this case, Dr. Herron?

10  A    Yes.

11  Q    And does your report in fact include a showing of this

12  logical bound?

13  A    Yes.

14        **MR. DERFNER:**  Your Honor, may we post page 53 -- this

15  is Exhibit 769, which is Dr. Herron's amended reported.  Page

16  53 is what we'd like to post.

17        **THE WITNESS:**  May I sit down?

18        **MR. DERFNER:**  Yes.

19  BY MR. DERFNER:

20  Q    And -- so, Dr. Herron, did you use this method -- this --

21  I'll call it the logical bound method, or the nearly -- call it

22  my term, nearly homogenous block group analysis, did you use

23  this as a second method to analyze the racial composition of

24  the match and no-match list?

25  A    Yes.  I wouldn't call it a second method since it's very

1    related to the homogenous block groups.  But, yes, I used the

2    method of bounds, or what you're calling the nearly homogenous

3    method, to analyze the racial composition of the individuals

4    who I identified as non-matches from the Plaintiff algorithm.

5    Q    Now, you gave us an example of a 99 percent block group,

6    that is a block group that is -- or block groups that are 99

7    percent of one of the three races.  Did you go down below 99?

8    A    Well, yes.  The example I just drew I believe had 90 just

9    because it would be too difficult to draw out that many people.

10   But one can relax the definition of homogeneity as low as one

11   wants.  So one can start with a hundred and go to 99 and 98 and

12   so forth and one can just -- one can go lower.  In fact, in

13   this figure here, the definition is relaxed down to 90 percent.

14   Q    And are there pluses and minuses as you go down the --

15   from a hundred?

16   A    Yes.

17   Q    And what are those?

18   A    The lower the cutoff goes -- in other words, the more

19   relaxed one -- the definition for homogeneity becomes, the less

20   informative the analysis becomes.  And that's because when a

21   block group is very heterogeneous, in other words, it's very

22   mixed, then it's difficult to know -- it's difficult to say

23   much about the racial behavior in that block group.  So in the

24   example we had on the board a few minutes ago, I had the case

25   where there was one non-black and two missing IDs.  So we could

1  say something about the black identification rate.  But suppose

2  in that example we had something like two missing IDs and five

3  blacks and five whites.  Okay, in that -- so that example block

4  group would have been I guess completely heterogeneous, 50

5  percent white, 50 percent black.  If I had that, then I

6  couldn't say really anything about the possession rates of ID

7  based on this sort of analysis, and that's because if the block

8  group were say five whites and five blocks, it's possible that

9  the black ID possession rate is zero and it's possible that the

10 white ID possession rate is zero.  You can't -- I can't tell.

11 This method is informative -- and that's the statistical word

12 here -- typically only when the cutoff is closer to a hundred.

13 Q    So on one hand you want to come down from a hundred to

14 get more block groups in the sample to be more meaningful; is

15 that correct?

16 A    Yes.

17 Q    On the other hand, as you go down further, it becomes less

18 informative, or less precise?

19 A    Yes.  That's typical in statistics.  As we change one

20 feature of a method of analysis, there are tradeoffs.  One

21 thing gets better, one thing gets worse.

22 Q    Okay.  So that's what we'll call -- we'll call that method

23 1A, not quite a second, different method, okay.  And you used

24 this method here, correct?

25 A    Yes, it's in my report.

1  Q    Okay.  And what's the other method that you used?

2  A    I used ecological regression to study the racial and

3  ethnic composition of the non-matches and the matches in my

4  analysis.

5  Q    Okay.  I've been working with ecological regression, or

6  people who do ecological regression -- and I know there are a

7  bunch of them here in the audience -- for 40 years, and I still

8  don't know what it is.  I don't expect to learn today, but why

9  don't you tell us a little bit about what that is.

10  A    Yes.  Okay, I can do that.

11  Q    And feel free to draw if you want to.

12        **THE WITNESS:**  Okay, your Honor, may I draw?

13        **THE COURT:**  Yes.

14        **THE WITNESS:**  Thank you.

15        **MR. DERFNER:**  Maybe I will learn.

16  **BY MR. DERFNER:**

17  Q    By the way, is ecological regression a standard

18  statistical method?

19  A    In the social sciences?

20  Q    Yes.

21  A    Yes.

22  Q    And, in fact, is it something that the courts, including

23  the Supreme Court, have used again and again?

24  A    Yes.

25  Q    And, in fact -- well, you may not know this, but you may -

1   - are you aware that the Supreme Court has reversed cases where

2   statistical methods used were not ecological regression?

3   A    I haven't read those cases but I have been told that's the

4   case, yes.

5   Q    Okay.  Tell us something about it (indiscernible)

6   A    So suppose I have a plot and on the "X" axis here, I'm

7   going to label it percent white.  And I'm going to put some

8   dots on this plot.  In this diagram -- I'll just draw five dots

9   -- make that six -- each dot refers to a block group.  So the

10  location of these dots describe the percentage white of them.

11  And we know percent white ranges from, say, zero up to a

12  hundred.  So --

13  Q    When you say the "X" axis, you mean the horizontal line?

14  A    I mean this axis right here (witness indicates).

15  Q    Okay.

16  A    Okay?  So these dots represent the percentage white of a

17  particular block group.  And on this "Y" axis -- this is the

18  "Y" axis here (witness indicates) -- I will put -- I'll just

19  write down percent ID, but that's shorthand for percent of

20  individuals who have valid voter identification per Senate Bill

21  14.  So I could make a plot like this in principle with my

22  data.  And here you have percent whites and here you have

23  percent ID, and these block groups -- these six block groups

24  that I've drawn, I haven't selected because of homogeneity or

25  nearly homogeneity or something like that.  That's not relevant

1    in this particular example.  And then what I could do was I

2    could ask, using a technique called regression analysis, which

3    is a standard technique in the social sciences -- well beyond

4    social sciences actually -- I could say, well, could I fit a

5    line -- and I'll just draw --

6    Q    Let me just stop you there.  You said you're not looking

7    for homogenous block groups on this.  Are you putting in more

8    or less all of the block groups in the State?

9    A    As many as I can.

10   Q    Thousands?

11   A    Yes, and I mean, I've gone six years, in my report I use,

12   I think, around 11,000.

13   Q    11,000, and so for this purpose it doesn't matter what the

14   racial composition of the block group is?

15   A    That's right, I don't select based on homogeneity.

16   Q    Okay.

17   A    Or nearly homogeneity.

18   Q    Okay, so keep on going.

19   A    So I might use a statistical technique called "regression

20   analysis" placed a line here what's called fit a line based on

21   the locations at these points.  This -- this line would be

22   called an "ecological regression line" as opposed to just a

23   "regression line," because on the X axis and the Y axis here we

24   have percentages in groups.  So this is just a regular

25   regression.  So the term "ecologic regression" just means a

1   regression applied to ecological units or what are called

2   "aggregate units," so that's all we have here, a line that I

3   superimposed here, and there is a formula --

4   Q    (indiscernible), terms like called "bivariate analysis"

5   and multi-variate analysis," do those mean anything in this?

6   A    Yes.  When I describe it here as a "bivariate ecological

7   regression," I didn't carry this exact thing out in my research

8   for this report, but this is intuitively what's going on, and

9   one can understand ecologic regression in this case even if you

10  have what's called "multi-variate ecological regression."

11  Q    I'm not even going to ask you what those mean.  Okay, keep

12  on going.

13  A    So you have this line here, and this line, and there's a

14  mathematical formula that determines that line I -- so one uses

15  computer software to calculate it.  It's a weighted ecologic

16  regression that should be the standard way to -- to study these

17  sorts of points and this line summarizes the data.  And what I

18  mean by that is you can imagine this line here, it could be

19  further up like this, that's called north (indiscernible) slope

20  or it could be, say, down, negatively sloped, or it could be

21  flat, something like this, and the location of this line and

22  how it's sloped and where it hits this axis right here, that

23  allows me to calculate, to use this line to calculate white,

24  black and Hispanic, in this case just whites, ID possession

25  rates using a large collection of block groups.

1  Q    So are you saying that this line somehow translates into a

2  percentage?  In other words, when you cross this line, there is

3  some way that mathematically or algebraic, whatever, calculus,

4  you -- that line turns into a number that says "13.6 or 2.9,"

5  something like that?

6  A    Yes, it depends on -- as I was describing here, it depends

7  on whether the line is sloped up or sloped down, and where it

8  hits this axis, and there's standard formulas that say how to

9  do that.

10 Q    That's my question.  In other words, turning this line,

11 which is based on where all of these data points are, into the

12 number is a standard method, is that correct?

13 A    Yes.

14 Q    And if two scientists had the exact same data points and

15 put in the formula, they should, in that situation, come up

16 with the exact same answers, shouldn't they?

17 A    If everyone had the exact same data, and was interested in

18 the exact same line, then two people, using the same software,

19 would generate the same answer.

20 Q    Because the formula is the formula, correct?

21 A    Yes.

22 Q    Okay.  Now, let me ask you this question:

23          You put this line through, but sometimes these points

24 will be closer to the line and sometimes the points will be

25 further away from the line.  Is there a way that the formula

1   takes that into account?

2   A    Yes.  So I drew this so that the points are somewhat

3   scattered around the line.  It could be that some points are

4   right on the line; it could be that some points are not, and

5   that affects the ability of one to draw conclusions from the

6   lines, so the formula is about the precision that comes out of

7   these line estimates, both that, the extent to which these

8   points are clustered about this line or set up, that's part of

9   the formulas that one uses when analyzing regressions.

10  Q    Now, I'm going to ask you about a term I've heard, and I

11  don't need you to explain it much, but what's an "R square?"

12  A    An R square value is a measure of how well these points,

13  the (indiscernible) I've drawn, are clustered about this

14  regression line.  So in this case it's a squared correlation,

15  but the way to think about this is that the points could be

16  really tightly clustered, or there could be points that are

17  staying way up here -- oh, excuse me, way up here and way down

18  here, they could be scattered all over the place.  The more

19  scattered they are the less they are clustered about the line

20  and they're -- it turns out the lower the R squared value.

21  Q    So -- and you used this method, this ecological

22  regression, to also estimate the percentage black, Hispanic and

23  white for non -- for possession and nonpossession rate of SB 14

24  photo IDs?

25  A    Yes.

1    Q    Okay.  Is this a third method you used, or it's a second

2    and a half?

3    A    Yes.

4    Q    Okay.  Okay, I think -- here's the form, thank you.  Thank

5    you, Mr. (indiscernible).

6              Now tell me, what's the advantage -- let's go back to

7    homogeneous block group analysis, what's the advantage of that?

8    A    With homogeneous blocks -- excuse me, block groups, one

9    can look at a collection of block groups and know what happened

10   in them because, according to the census data -- when I say

11   "know what happened to them," I mean know what the different

12   racial rates of behaviors are, in this case ID possession,

13   because the block groups are completely homogeneous, so we

14   don't have to talk about uncertainty in a -- if I have a block

15   group that's 100 percent Hispanic, for example, and the ID

16   possession rate in that block group is 90 percent, I don't have

17   to say, "Well, maybe it's the non-Hispanics who are -- don't

18   have IDs" because there aren't any.

19   Q    Okay, and what's the disadvantage of these -- of the

20   homogeneous or logical bounds in that -- by the way, I take it

21   the logical bounds are simply something that are not quite as

22   precise (indiscernible), for example?

23   A    I wouldn't say it's not quite as precise although --

24   Q    Or wasn't precise, okay --

25   A    So -- maybe you could say that.  If there are -- there's

Herron - Direct / By Mr. Derfner                              53

1    more -- yeah, that's right, there are more uncertainty, there's

2    more uncertainty when you relax the definition of homogeneity,

3    the bounds get wider, that's what that means, so the advantage

4    is that what these bounds are what are called "accounting

5    identities," and that means when you have a set of logical

6    bounds it must be true that the behavior you are studying, in

7    my case, ID possession rate, falls within those bounds.

8    Q    So the advantage of a homogeneous block group analysis or

9    it's relative to the (indiscernible) bounds analysis if it were

10   pretty confident or very confident that these people had that

11   percentage, correct?

12   A    Well, I don't use the word "confident" here, but I would

13   say is that these -- is that the bounds, the logical bounds

14   that I have described, must capture the quantity of interest.

15   So, yes, I am confident, but it's stronger than that.

16   Q    Okay.  What's the disadvantage?

17   A    The --

18   Q    -- the limitation of this data?

19   A    The disadvantage is that the homogeneous and the nearly

20   homogeneous block group analysis relies on a smaller subset,

21   the number of block groups relies on a small subset, and that

22   subset simply depends on the geography of, in my case, Texas.

23   I can't -- I can't move people around in Texas and say let's

24   have blocks of homogeneous white ones and blocks of homogeneous

25   black ones, they are what they are, and so, you know, the

1  advantage is precision; the disadvantage is a smaller number of

2  block groups.

3  Q    Okay.  And is it also a disadvantage that, in fact, the

4  behavior or facts related to people in what I'll call

5  homogeneous (indiscernible) segregated favorably might be

6  different from the behavior of people in, I call it more multi-

7  racial areas?

8  A    Yes, that's possible also.

9  Q    Okay.  And, finally, it's a little bit technical, but how

10 many block groups in Texas -- you said there was thousands

11 (indiscernible).

12 A    There are approximately 15,000 overall.  Some of them, as

13 Dr. Ansolahehere here noted, after you don't have any within

14 them, (indiscernible) highway, so around, I believe, 15,000.

15 Q    And about how many did you use for your logical -- or how

16 many -- not did you use, how many turned up in your logical

17 bounds analysis?

18 A    Well, that number depends on how low I want to make the

19 cutoff.  I believe if I go down to 96 percent the number is

20 around 800.

21 Q    800, just a block of --

22 A    I believe so, approximately.

23 Q    And as I recall, (indiscernible) I think this is in your

24 report, there is only several hundred thousand people?

25 A    I don't remember the number off the top of my head.

1    Q    Okay.  Now, so that's an advantage and a little bit of

2    limitation, disadvantage of this homogeneous and logical bounds

3    type of analysis.

4            What about the ecological regression, what's the

5    advantage there?

6    A    So the advantage is that one can use a much larger group

7    of block -- a much larger collection of block groups.  I don't

8    have to specifically only use places that are very homogeneous,

9    and that's nice because the sample size then gets larger, and

10   also I don't have to be concerned that maybe homogeneous block

11   groups are different in other ways, so that's the advantage of

12   that approach.

13   Q    Okay, and what's the disadvantage?

14   A    The disadvantage is that it's -- it's a statistical model

15   and that -- I say it's a statistical model as opposed to a -- a

16   calculation that bounds quantities which means there's more

17   uncertainty, in general, that comes out of a regression model

18   than that comes out of a bounds analysis, so it's just the

19   typical tradeoff in statistics.  You make your sample size

20   bigger, which is good, but there are costs as well, and that's

21   -- that tradeoff is, again, very common in statistical

22   analysis.

23   Q    So what happens when you use both methods (indiscernible)?

24   A    Well, what I look for in my own academic research, and

25   what I looked for here is when I take these different methods,

Herron - Direct / By Mr. Derfner                          56

1  two and a half, do they give similar or different results?

2  That's the question I'm looking for.

3  Q    Okay, and did they?

4  A    No.

5  Q    I'm sorry.  Similar results?

6  A    Oh, excuse me.  They gave very similar results.

7  Q    That's what -- okay.  Okay.  Okay.  I think we now know

8  maybe more than we ever wanted to know, but as much as we have

9  to know for this case about the process.

10         Let's go to the results, let's go to what actually

11  happened.  How did this begin for you?  Did you get some data

12  from the database matching process?

13  A    Yes, as I described earlier, I received that encrypted

14  hard drive and wrote a lot of code to take the data and put it

15  altogether.

16  Q    And you got that around the 1st of June of this year?

17  A    I believe I got it either May 30th or the 1st of June,

18  yes.

19  Q    Okay.  And you then did some analysis and you did a

20  report, correct?  And that was handed in on June 27?

21  A    I don't remember the exact date, but I wrote a report

22  applying the methods that I have described here to the data

23  that I received on approximately June 1.

24  Q    And then it turned out that there was a problem with the

25  data, correct?

Herron - Direct / By Mr. Derfner                    57

1   A    I received an affidavit to the effect that when the Texas

2   DPS sent their data to the Department of Justice, that due to

3   some computer code error, I'm not sure what it meant, that

4   approximately 2.8 million records were not included and so that

5   was -- yes, that was the error that I was alerted to sometime,

6   I believe, in June or July.

7   Q    Okay.  And then, in fact, it turned out that even the 2.8

8   million was not correct, is that right?

9   A    I believe -- I was told by Counsel, and I believe I heard

10  yesterday in Court that the correct number was somewhere in the

11  neighborhood of 3.1 million.

12  Q    Okay.  And so you got some new records, correct?

13  A    At that point some time, I believe in July, I received an

14  updated data set from the Department of Justice, and this data

15  set incorporated -- they took all of the affidavits I received,

16  incorporated the missing approximately 3.1 million records from

17  the Texas DPS data.

18  Q    And you analyzed those data, in effect, three times that

19  you've gotten the data, and you reported in your report on how

20  many no matches you found at that point, is that correct?

21  A    Well, after I got the new data I basically just wrote the

22  report again.  I had to update most of the numbers in it based

23  on the fact that my data set had changed.

24  Q    And what was the number of no matches you found at that

25  point?

Herron - Direct / By Mr. Derfner                    58

1   A    This was my -- I guess my late July number?

2   Q    Yes.

3   A    That was approximately 619,000.

4   Q    That's 619,000 no matches, correct?

5   A    That is correct.

6   Q    Okay.  And thereafter you got some more information about

7   more no matches, or more people from the Department of Justice,

8   is that correct?

9   A    That's correct.

10  Q    And what was that data?

11  A    So I --

12  Q    What was those data?  I guess data is a pleural word.

13  A    So I believe on August 7th or August 8th I received from

14  Counsel a list of approximately 183,000 of voter IDs, these are

15  IDs that indicate -- they correspond to Texas registered

16  voters, and I was told that these IDs, for the most part, I

17  think it's (indiscernible) because I -- the vast majority of

18  these correspond to individuals whose licenses -- driver's

19  licenses had been surrendered, and this is the first time that

20  I had heard about a data source that -- that indicated who did

21  -- who had surrendered a driver's license.

22  Q    Okay.  And at this point the deadlines were fast

23  approaching, is that correct?

24  A    Yes.

25  Q    In other words, even once -- once the new data came in

1   from the State, 2.8 million, 3.1 million, we were in the middle

2   of the summer with data -- with deadlines fast approaching, and

3   very little time to do anything else, is that a fair -- a fair

4   assessment?

5   A    Yes.

6   Q    Okay.  And so were you asked -- were you told to assume

7   that all 183,000 people should be put in the no match category?

8   A    Well, Counsel told me that it was their understanding that

9   of this list of approximately 183,000 individuals, that almost

10  all of them had surrendered driver's licenses, but there was

11  some uncertainty if a small group was dead.  And I didn't know

12  if that meant dead and a surrendered license, and I'm not sure

13  that Counsel knew either, but if they were dead then,

14  obviously, they shouldn't be part of my analysis at all, but

15  Counsel didn't know and I didn't know how to take this 100 --

16  list of 183,000 and divide it into those two groups, so the

17  only thing that I was advised to do, which I think was the

18  right choice, is to treat all of those individuals as having

19  surrendered licenses.  And so I conducted another analysis

20  where I took the nonmatched individuals who were a product of

21  the July analysis, that's the post-3.1 million issue, and I

22  subtracted the 183,000 approximately individuals from my match

23  list and moved them to the no match list.

24  Q    Okay.  And so going on that assumption that all 183,000

25  should be in the no match list, what was the total number of no

1    matches that you came up with in your final version of your

2    printed report due by the deadline?

3    A    Approximately 800,000.

4    Q    Okay.  So you're not saying that you know that there were

5    800,000 matches, but that it could be up to that number subject

6    to how many of those people might be dead?

7    A    That's correct.

8    Q    Okay.  Did you analyze the 800,000 by race?

9    A    Yes.  I conducted the homogeneous and nearly homogeneous

10   and ecological regression analyses on the 800,000 -- well, on

11   the data set characterized by 800,000 nonmatches, yes.

12   Q    Okay.  And are the results in your report?

13   A    Yes, on Pages 53 and 54.

14   Q    Okay.  And I'm going to --

15       **(Counsel confer)**

16   Q    Okay, we're going to post -- we'd like to post Page 53

17   which is the example we used earlier for the logical bounds.

18            Is that where you reported your analysis of the

19   homogeneous and logical bounds analysis?

20   A    Yes.

21   Q    Of the 800,000?

22   A    Yes.

23   Q    Okay.

24       **(Counsel confer)**

25   Q    Tell us what this -- tell us what this chart or this

1  picture means?

2  A    So this chart shows the results of the homogeneous and

3  nearly homogeneous block group analysis, so you can see --

4  Q    Shows both the homogeneous and the logical bounds, right?

5  A    Yes.

6  Q    Both of those two which are related, in effect?

7  A    Yes.

8        **THE WITNESS:**  Your Honor, may I use this pointer?

9        **THE COURT:**  Yes.

10        **THE WITNESS:**  So you can see on this axis right here

11  that it's the X axis in this figure, it shows the homogeneity

12  cutoff as it goes from 100 down to 99, down to 98, all the way

13  down to 90.  And here you have what's written as the

14  "Identification for" -- excuse me, the "Identification

15  possession percentage," this is akin to the match rate, okay?

16        So -- and there are three colors of figures here,

17  there are -- and you can see in the Legend, if that's legible,

18  up here we have this cloud of points describes the white

19  identification percentage, it happens to be that those are

20  higher; and in the middle we have data on the Hispanic

21  identification percentage; and here we have data on the black

22  identification percentage.  Now I didn't choose them to be

23  ordered this way, they just are in the data, that's the way

24  things came out.

25        The top cloud of points, which is sort of pale white,

1    this is based on an analysis of homogeneous or very homogeneous

2    block groups with respect to white.  So this dot right here is

3    the identification percentage in a collection of block groups

4    that is completely white, and that rate is around 95 percent.

5    **BY MR. DERFNER:**

6    Q    That's the dot, right?

7    A    That's correct, that dot right there.

8         And then you can see, as I'm going to sort of move a

9    little bit down and I'll cutoff, you can see here that as the

10   homogeneity percentage decreases, so this is in the definition

11   of homogeneity, you start to get bounds and, you know, these

12   are akin to this one-ninth and two-ninths figure that I drew

13   earlier, these bounds captured -- capture the range of possible

14   values for white identification percentage, and those are what

15   I called the logical bounds or they are accounting identity

16   bounds.

17        And here is the exact same sort of analysis for

18   Hispanics, and you can see here that this dot is around 90

19   percent, and then this is the dot for the Hispanic

20   identification possession rate in block groups, there are at

21   least 99 percent and so forth.

22        And here's the same situation for blacks.

23   Q    Okay.  Let's turn now to the ecological regression of the

24   800,000 people.

25        Now you described earlier the general method of

Herron - Direct / By Mr. Derfner                    63

1  ecological progression.  Tell us a little more specifically,

2  what do you have to do to get to the ecological regression?

3  A    Well, I put together --

4  Q    What did you have to do in this case?

5  A    Yes, I understand.  I put together my data sets, and then

6  I used common software, which is standard in the fields, to

7  estimate this regression.

8  Q    Okay.  Now when you say "put together your data sets,"

9  what does that mean?

10  A    Well, the exercise I went through earlier.  I took the

11  data that the Department of Justice sent me and I manipulated

12  it with computer code, and I put it altogether.

13  Q    That's -- well, that's the -- that's the results from

14  match/no match process.

15        But what about -- you referred earlier to census

16  block groups.  Did you do something called "Geocoding?"

17  A    Yes.  In fact, this relates to the homogeneous previously

18  -- the homogeneous block group analysis as well.  One thing I

19  had to do was try to figure out where the various individuals

20  in the Texas -- registered voters in Texas lived, and so the

21  exercise is called "Geocoding" or "Geolocating."  And I needed

22  to Geocode the locations of each individual so that I could

23  know if each individual lived in a particular block group.

24  Q    So you're using a method that's standard, and the

25  mathematical formulas are standard in this ecological

Herron - Direct / By Mr. Derfner                    64

1    regression, is that correct?

2    A    Yes, that's correct.

3    Q    But the input, such as the Geocoding, the selection of the

4    block groups and some labeling of those, that you did, right?

5    A    Yes.

6    Q    Or --

7    A    We're using the census data.

8    Q    You used the census data.  But you had to actually code

9    for everything, and that -- and did you rely on anybody else,

10   such as Dr. Ansolahehere to do that?

11   A    I didn't rely on him for coding any addresses, no.

12   Q    And if he coded addresses for his ecological regression,

13   he didn't rely on you, did he?

14   A    Not to my knowledge.

15   Q    Okay.  So is it possible that there would be slight

16   differences between the output of results that the two of you

17   got?

18   A    Yes.

19   Q    And is that achievable?  Would that be akin, for example,

20   to asking two people to measure this room and they both have

21   the same tape measure, but two people are likely to wind up at

22   least a couple of inches different from each other in their

23   measurement?

24   A    Yes.

25   Q    Okay.

1      (Counsel confer)

2          MR. DERFNER:  We have as demonstrative exhibit, your

3    Honor, that we'd like to post, and this is -- well, we'll post

4    it in the last ==

5    BY MR. DERFNER:

6    Q    Dr. Herron, are you familiar with this chart?

7    A    Yes.

8    Q    And is this a chart that reflects data that you found and

9    data that are in your report?

10   A    Yes.

11   Q    Okay.  Tell us what this chart shows.

12   A    This chart is a summary of the ecological regression that

13   I carried out.  I fit some lines and then used standard

14   formulas from those lines to estimate the white identification

15   percentage rate, and then correspondingly the white non-

16   identification percentage rate.  Of course, those two rates

17   have to sum to 100, so if approximately 96.3 percent of whites

18   have IDs then it must be true that approximately 3.7 percent

19   don't, so one can easily talk about possession rates or

20   nonpossession rates, those are two sides of the same coin.  So

21   here we have the results that -- explained in the context of

22   nonpossession rates, so you see it's 3.7 percent approximately

23   for whites, 8.3 percent for Hispanics approximately, and 11.5

24   percent approximately for blacks.

25   Q    Okay, and tell me, what is the approximate ratio, feel

1   free to use the calculator if you like, what is the approximate

2   ratio of the nonpossession rate for Hispanic to white?

3   A    I would say it's around twice, roughly speaking.

4   Q    Okay.  And, again, what is the approximate ratio of the

5   nonpossession rate among -- compared from blacks compared to

6   whites?

7   A    I would say it's approx. -- in the range of 3.

8   Q    Three to one?

9   A    Yes, three.

10  Q    Okay.  Now I'm going to post another chart, and this is

11  another demonstrative, and this one has, on the left-hand side,

12  Dr. Herron's figures, in fact, identical to what we just saw.

13  And on the right-hand side are Dr. Ansolahehere's figures that

14  were part of one of the charts that was posted yesterday,

15  basically Dr. Ansolahehere's ecological regression results for

16  the population.  You remember that Dr. Ansolahehere had

17  separate charts for people under 65, or listed as sub-

18  categories, but for his overall figure, this was the chart.

19          And, Dr. Herron, how would you compare the numbers

20  that you found and the numbers that Dr. Ansolahehere found as

21  shown in that chart?

22  A    I would say in the context of this process where I mean

23  the data base match, manipulations of the data, the slightly

24  different approaches we took, I would say that -- I would call

25  these numbers effectively the same.

1    Q    And this is even though you each independently performed

2    the analysis yourselves, is that correct?

3    A    Yes.  I didn't consult with Dr. Ansolahehere's regression

4    analysis when I carried out mine.

5    Q    Okay.  And --

6         **(Counsel confer)**

7    Q    Okay, now, and this last -- the set on the left was what

8    was reported in your report, correct?

9    A    Yes, that is correct.

10   Q    Your amended report?

11   A    That is correct.

12   Q    Okay.  And after your amended report was issued, because

13   it had to be by the deadline, did you then do some further

14   checking on your numbers because you got a -- you were informed

15   of what Dr. Ansolahehere's final no match number was?

16   A    Yes, I did that.

17   Q    Okay.  And when was that?  Your report was handed in on a

18   Friday.  When did you do that analysis?

19   A    I believe I -- I believe I sent my report to Counsel on

20   Thursday --

21   Q    Okay.

22   A    It was due on Friday, and --

23   Q    That was nice to have it ahead of time.

24   A    And the Monday following I received more information about

25   Dr. Ansolahehere's nonmatch list; in fact, I was sent a file by

1    Counsel that contained that no match list.

2    Q    And was that 786,000 names on his no match list?

3    A    Yes, that was -- so at that point I didn't have

4    Dr. Ansolahehere's report, and the data that I received on the

5    Monday after the Thursday when I sent my report in, contained,

6    among other things, the non -- one could infer from it the

7    nonmatch list that Dr. Ansolahehere used, I believe, to

8    generate this figure on the right.

9    Q    And what was the number that was --

10   A    Again, approximately 786,000.

11   Q    Okay.  And did you, as a further check, take this 786,000

12   number and do a racial analysis of that number?

13   A    Yes, I took his nonmatch list and carried out the same

14   sort of analysis that I carried out in my data, and that means

15   I looked at the logical bounds for nearly homogeneous block

16   groups and I looked at the homogeneous block groups, and I

17   estimated an ecologic regression using his -- his nonmatch list

18   as if I -- that sort of an exercise, as if I didn't even have

19   my own, so I did his separately.

20   Q    Now, the difference between what you were working with,

21   which is the -- we'll call it the up to 800,000 number, and his

22   786,000 number, what's the difference between them?

23   A    Around 14,000.

24   Q    And what percentage is that of the -- of your no match

25   numbers?

1    A    So I'll calculate it.  This -- I'm going to divide 14,000

2    divided by 800,000, then multiply that by 100, it's around 1.75

3    percent.

4    Q    Okay, so less than 2 percent difference?

5    A    Yes.

6    Q    Okay.  And would a lay person tend to say, "Well, if it's

7    only less than 2 percent difference, I'm going to assume that

8    the racial percentages don't change," is that what a lay person

9    might say?

10   A    In principle.

11   Q    Okay, but an expert like you wouldn't say that, would you?

12   A    Well, I'd want to check.

13   Q    In fact, I tried to get you to say it looks the same,

14   doesn't it and did you agree?

15   A    I suppose.

16   Q    So you actually did a new racial analysis of the 786,000,

17   as you say, without sort of building it onto yours?  You

18   started from scratch and did a separate analysis?

19   A    Yes.  I effectively pretended I had a no match list of my

20   own.  I took his no match list and just did the analysis that I

21   did in my reports on his no match list.

22   Q    And what was the racial numbers compared to the numbers up

23   here?

24   A    Effectively the same.

25   Q    So that was a check and you came up, again, with the same

1   numbers?

2   A    Yeah, it's as if someone had shown up to me and said,

3   "Throw out your data base, just use this no match list," and I

4   said, "Okay," and then I just did the analysis on that, and

5   then what I get is the exact numbers, I don't know off the top

6   of my head.  I remember that my white figure was exactly

7   approximately 3.6 percent, which is what is in his ecological

8   regression, you can see that here.  And my Hispanic and black

9   numbers were incredibly close.

10  Q    One-tenth of a percent.

11  A    I don't remember the exact numbers, but they were very

12  close.

13  Q    And this was based -- the analysis you did was based on

14  your own Geocoding and your own programming?

15  A    Yes.  The -- just to be clear, I hired someone to Geocode

16  since I'm not a geographer, I hired someone to Geocode the

17  addresses for me.  Yeah.

18  Q    But that had nothing to do with -- you did not depend on

19  Dr. Ansolahehere or anybody outside of you and your employee to

20  do it?

21  A    No, I depended on no one else.

22  Q    Okay.  And tell me the -- measure -- tell me what the

23  percentage differences on these are?  Let's take the whites,

24  what's the percentage difference between you and

25  Dr. Ansolahehere?

1   A    So you want me to ask how much smaller is 3.6 percent and

2   3.7 percent?

3   Q    Yes.

4   A    Okay.  So I'll just divide -- I'll take 3.6 minus 3.7,

5   that's negative .01, and I'll divide this by 3.7, divide --

6   multiply by 100, that's around -- well, it's smaller, but 2.7

7   percent difference.

8   Q    Okay.  And are the percentage differences between the

9   black figures and Hispanic figures also in that range, 2 or 3

10  percent?

11  A    Sure.  I could just divide -- for Hispanics, for example,

12  I could just divide .3, that's 8.6 minus 8.3, divided by 8.3,

13  multiply that by 100 and I get 3.61.

14  Q    Okay.

15  A    So, yes, they are all of that magnitude.

16  Q    Okay.  And that's the magnitude that you might expect for

17  you and Dr. Ansolahehere did separate Geocoding, separate

18  selection of block groups, et cetera, but using the same

19  mathematical formula for the analysis?

20  A    Yes.  This doesn't -- these differences are in my

21  experience completely consistent with the idea that there --

22  that we have two different people working on a common data set.

23  There are some subtle changes in the way say I treated

24  addresses and the way Dr. Ansolahehere treated addresses but in

25  general we had the same idea and in situations like that in the

Herron - Direct / By Mr. Derfner                    72

1   past when I have worked with other scholars and we've swapped

2   data sets for example that you'll get differences of this

3   magnitude.

4   Q    And that confirms that you both really come to the same

5   result?

6   A    Well, it confirms -- yes.  I mean it confirms that there's

7   nothing idiosyncratic in what I did or what Dr. Ansolahehere

8   here did that generated this.

9   Q    You -- were you here yesterday for the examination of

10  Dr. Ansolahehere?

11  A    I was in the back row, yes, or second to back row.

12  Q    And did you hear Mr. Scott suggest that there was some

13  place where there's a 27 percent difference between your figure

14  and Dr. Ansolahehere's figure?

15  A    Yes, I heard that.

16  Q    Okay.  Did you look through your report and

17  Dr. Ansolahehere's report last night to try to find some

18  figure, figures that were comparable that were 27 percent off

19  from each other?

20  A    Yes.  Well, what I did is I basically looked at the data

21  that are behind this particular exhibit and I tried to check --

22  well, I did check whether any of these figures are 27 percent

23  off and they're not but that's all I really checked.

24  Q    Do you have any idea -- have you seen any place in your

25  report that looks like figures are 27 percent away from a

Herron - Direct / By Mr. Derfner                    73

1    comparable figure of Dr. Ansolahehere's?

2    A    Well, the only -- strictly speaking, these are the

3    comparable figures here and I don't in these figures observe 27

4    percent differences in the way you're describing them.

5    Q    They're two or three percent, correct?

6    A    Yes, much smaller.

7    Q    Okay.  So you've not seen anything that looks like a 27

8    percent difference so far?

9    A    Not so far, not comparing these.

10   Q    Maybe because (indiscernible).  Okay.

11        I think we're almost done, your Honor.

12        **THE COURT:**  Okay.

13   Q    Professor Herron, did you do anything with your no match

14   list to remove felons, dead wood, people who mean anything like

15   that?

16   A    No.  After I generated my no match list I didn't remove

17   people from it.

18   Q    Now you were here yesterday when Mr. Scott asked

19   Dr. Ansolahehere questions about convicted felons and the

20   dramatic example of the woman in I guess it's Huntsville on

21   death row.

22        How does that -- how could that potentially affect

23   your analysis?

24   A    Well, in principle it could affect my analysis if everyone

25   on the no match list was a convicted felon.

1          I noticed two things in that presentation.  One was

2    that the number of convicted felons discussed was small; I

3    believe it was one or two, and my no match list has

4    approximately 800,000 people and -- so I was pleased that that

5    number was small.  Again, small is with respect to 800,000 and

6    certainly the number discussed yesterday was small.

7          I was also pleased that I believe Ms. Baldwin at the

8    Department of Justice brought some material to

9    Dr. Ansolahehere's attention that explained that either the

10   state or counties in Texas -- I can't remember which and I

11   couldn't hear completely -- one of those agencies or agent --

12   one of those agencies or multiple daily attempt to remove

13   felons, convicted felons excuse me, from the team database.

14   And so, I was pleased to hear that that effort was done on a

15   daily basis.  Of course, it probably has some errors.  It's a

16   human process.  But the fact that it's done daily as opposed to

17   say every several years was reassuring to me.

18   Q    So do you see any reason to think that the failure to

19   remove convicted felons or find convicted felons on the no

20   match list and remove them if they haven't already been removed

21   by the process, would that likely have a significant effect on

22   the numbers?

23   A    I doubt it would have a significant effect in particular

24   because that sort of error could be present on the match list

25   as well.  So I haven't seen any evidence that removing felons

1    would dramatically change my results in a statistically

2    meaningful way.

3    Q    Okay.  There was also some discussion of people who voted

4    in elections, actual elections, subsequent to the

5    (indiscernible) deposition you were asked -- weren't you asked

6    about the fact that some 32,000 people on your -- or 32,000

7    people from your no match list had voted in the November 2013

8    election?

9         Do you remember being asked about that in your

10   deposition?

11   A    Yes, I believe I was asked in my deposition if I knew that

12   32,000 people approximately on I think Dr. Ansolahehere's no

13   match list --

14   Q    Okay.

15   A    -- but I'm not sure which no match list was the subject

16   there -- had voted in I believe November 2013.

17   Q    What does that tell you?

18   A    That tells me a couple of things.  One, it tells me that

19   it's probably true that there are individuals on my no match

20   list and Dr. Ansolahehere's no match list who probably have

21   forms of identification.  So those are errors and that's not

22   surprising.  When I began this project, meaning when I got the

23   data, I noticed there were 13,400,000 people.  It never

24   occurred to me that I would or anyone would perfectly classify

25   all of them.

1          So the fact that some people voted probably, you

2  know, suggest to me that some number of them do have forms of

3  identification.  Now of course I can't say anything about

4  precinct administration in Texas.  So I don't believe that one

5  can conclude that everyone who voted in that election had ID.

6  I don't think that logically follows but I certainly think that

7  probably some of them did.

8          I would also think that -- this also raises I think a

9  related point which is that there are two types of errors that

10 you can envision in this matching process.  In one type of

11 error or in one form of error, people who have ID are labeled

12 as non-matches but people who don't have ID could also be

13 labeled as matches.  So errors like in most statistics work --

14 work because they work in two ways or both ways.

15         So when you mentioned it, well, perhaps 33,000 people

16 might have IDs one thought that occurs to me is -- excuse me,

17 32,000 people who voted who I -- who someone considers not

18 having IDs might actually have IDs.  It occurs to me, well,

19 it's also possible that approximately 33,000 other people who

20 don't have IDs were labeled as having IDs.  So that would be

21 the other side of this error and as someone who does apply

22 statistics, my interest is not just saying, "Okay, do we have

23 an example of an error?"  But rather, "Do we have an example of

24 a process that systematically generates errors that will bias

25 results?"

1          So if we have an example where some people who have

2   IDs are labeled as not having one and some people who don't

3   have IDs are labeled as having IDs, that would sort of lower

4   all the numbers but leave percentages intact.  So as you can

5   see from this chart on the -- on the wall right here, I

6   conclude that approximately 3.7 percent of whites don't have

7   IDs and I believe this is equivalent to approximately 4 percent

8   of all registered voters not having IDs.  That 4 percent figure

9   might be completely accurate if some people -- if errors work

10  in both ways I've described.  So that thought occurred to me

11  when thinking about the possible 33,000 people.

12  Q    One last question.  I should have asked this before.

13          You referred -- you mentioned that after your report

14  was done, the last report, you did that.  You checked your

15  numbers against Dr. Ansolahehere's 786,000 (indiscernible).

16          Did you explain that -- even though it's not in your

17  report, did you explain that at your deposition?

18  A    Yes, I discussed that in my deposition because it was, it

19  was late.

20  Q    And so in fact the defendants had an opportunity to

21  examine you about that last little piece of information?

22  A    Yes.  I brought to -- or counsel brought to the deposition

23  the bounds figure that I produced and corresponding to that

24  analyses.

25          **MR. DERFNER:**  Thank you very much, Professor Herron.

1    It's been a pleasure and now I think you belong to Mr. Scott.

2              **THE WITNESS:**  Thank you.

3              **MR. SCOTT:**  Well, let's not go that far.  Hi,

4    Dr. Herron.

5              **THE WITNESS:**  Good morning.

6                         **CROSS EXAMINATION**

7    BY MR. SCOTT:

8    Q    Now you did a declaration in this case -- well, hold on a

9    second.  I'm going to leave that Elmo on for just a second.

10        **(Pause)**

11   Q    You did a declaration in this case on -- signed on August

12   14th, 2014, correct?

13   A    I believe that's the right date, yes, sir.

14   Q    So in that -- this is page seven of that report, correct?

15             **MR. DERFNER:**  Excuse me, your Honor, may I come over

16   here?

17             **THE COURT:**  Yes.

18   A    Yes, I believe that's right.

19   Q    And the summary of your main findings, number one, of the

20   13,564,410 registered voters in Texas conservatively speaking,

21   619,354 lack valid forms of voter -- of ID to vote, correct?

22   A    Yes, that's from the -- right, yes, sir.

23   Q    So you've got a calculator.  You used it a second ago with

24   Mr. Derfner.  Would you pull it out for me?

25   A    Yes, I have it.

Herron - Cross / By Mr. Scott                    79

1   Q     Will you subtract or enter 786,727?

2   A     Yes, I've done that.

3   Q     Now hit the minus key.

4   A     Done.

5   Q     Put 619,354.

6   A     Done.

7   Q     Now hit equal.

8   A     Done.

9   Q     What number do you have?

10  A     I have 167,373.

11  Q     Would you divide that by 619,354 and what number do you

12  get?

13  A     Point 270 approximately.

14  Q     Point 270 is I guess 27 percent?  Is that right?

15  A     If I multiply it by 100, yes.

16  Q     Yes.  And so your -- the difference between your number

17  and 786,727 is 27 percent, right?

18  A     When you say "your number," you're reading the number on

19  line 9.  There are other numbers in this report.

20  Q     Fair point.  We'll get to that in a little bit but when

21  we're looking at your summary of main findings and number one

22  of your summary of main findings you have 619,354, correct?

23  A     Sir, there are several other main findings here but yes,

24  if you ask me the difference between 619,000 and that, that

25  difference is approximately 27 percent.

Herron - Cross / By Mr. Scott                    80

1   Q    Sure.  And I know last night you spent a lot of time

2   trying to come up with a number that was 27 percent

3   differential based upon what I had asked some questions

4   yesterday, correct?  I think that was the colloquy between you

5   and Mr. Derfner.

6   A    I looked at my regression results and compared them to

7   his, yes.

8   Q    Okay.  So at least we've found that missing 27 percent

9   number, right?

10  A    Yes.

11  Q    Let's talk if we could a little bit about ecological

12  regression and homogeneous block analysis.

13          You did both methods in this case, correct?

14  A    Block groups to be precise.

15  Q    Block groups.  And so you were talking up there and I

16  started getting this mental image.

17          You ever been on Google Earth?

18  A    I believe so.

19  Q    You ever looked at your house from Google Earth?

20  A    I've looked at my house on some mapping program.  Whether

21  it's Google Earth I'm not sure.

22  Q    Well, on Google Earth you can put an address in there and

23  you can go all the way down and just in your mind's eye you can

24  see the outline of your house.  You can see the outside of the

25  house but you don't really get to see inside the house, right?

Herron - Cross / By Mr. Scott                          81

1   A    I understand the principle, sure.

2   Q    Sure.  And so from an ecological regression method that's

3   very similar.  You're not -- you're not telling us what's

4   actually inside any individual home, right?

5   A    That's not the purpose of an ecological regression.

6   Q    Sure, I understand that and I'm not here to debate whether

7   it's the right way or wrong way to look at stuff.  I guess what

8   I'm asking you, sir, is you're not able to really go into the

9   details of what's in that home.  That's -- you're making an

10  estimate.  You're looking at it in a macro sense, correct?

11  A    Yes.  I think it's right to say I don't know what's going

12  on in the individual house.

13  Q    And so with regard to a number of the things and the two

14  different analysis that you performed in this case, you're not

15  able to tell this court with any accuracy whatsoever on any

16  individual voter whether that individual possesses ID that

17  complies with the terms of SB 14, correct?

18  A    No.

19  Q    That's correct.  You're not here to testify about

20  individual voters, correct?

21  A    Well, I think there are two parts in this question.  I'm

22  not here to testify about individual voters.  However, in a

23  homogeneous block group I do know that if someone is registered

24  to vote and so forth and is on my no match list for example,

25  and if a homogeneous block group is 100 percent white then I'll

Herron - Cross / By Mr. Scott                              82

1   be able to say something about that person.

2   Q    Well, in the homogeneous block groups you -- you testified

3   about the homogenous block groups that you were able to derive

4   in this case, correct?

5   A    Yes, I did.

6   Q    And I think that if my recollection's right you came up

7   with about a total of 213 different block groups in this case,

8   correct?

9   A    Yes, that's correct.

10  Q    And that represents almost 104,000 voters in the State of

11  Texas, correct?

12  A    I believe that's right, yes, sir.

13  Q    And we have how many registered voters in the State of

14  Texas?

15  A    Around 13.4 million.

16  Q    And so what is the percentage that 103,585 voters is of

17  the 13.5 million?

18  A    It's small.

19  Q    Well, let's use your calculator.  So would you enter

20  103,585 and would you divide that by 13,564,000?

21  A    Excuse me, I made a mistake.  Could you tell me the first

22  number again?

23  Q    Sure, 103,585 and for clarification in the record, that's

24  the number of people you identified in your homogeneous block

25  group, correct?

Herron - Cross / By Mr. Scott                    83

1    A    There was 103,000 registered voters --

2    Q    Yes, sir.

3    A    -- or individuals?  Yes.  Those are the -- that's the

4    number of individuals, 103,000, who live in these homogeneous

5    block groups.  That is correct.

6    Q    Okay.  So you punched in 103,585, correct?

7    A    Yes, sir.

8    Q    Now divide that by 13 million --

9    A    One, three --

10   Q    Five, six, four --

11   A    Five, six, four.

12   Q    -- Zero, zero, zero.

13   A    Zero, zero, zero.  Okay.

14   Q    What do we get?

15   A    I multiply by 100 again?

16   Q    Well, what do you get right now?

17   A    Well, I got .007.

18   Q    So now times it times 100.

19   A    And it's done.

20   Q    And what number is that?

21   A    Point seven six approximately.

22   Q    And so it is seven tenths of one percent?

23   A    Yes, if we were rounding I would say eight but --

24   Q    Okay.  Well, it says round.  So less than eight percent of

25   the state's population of registered voters goes into your

Herron - Cross / By Mr. Scott                    84

1    homogeneous block analysis, correct?

2    A    Just to be clear, this is the completely homogeneous

3    because --

4    Q    Yes.

5    A    -- there was some discussion of nearly homogeneous.  That

6    is correct.

7    Q    And with regard to these groups that are 100 percent,

8    where there's a high degree of accuracy from your standpoint,

9    correct, that's the benefit of a homogeneous group, correct?

10   A    Effectively so, yes.

11   Q    So can you tell me the income makeup of those homogeneous

12   groups?

13   A    The income?

14   Q    Sure, individual income.

15   A    No, I -- I didn't look at any income figures in my report.

16   Q    Can you tell me the voting history within any of those

17   homogeneous block groups?  Again, we're talking about these

18   small groups, less than one percent, that you've been able to

19   identify and tell us specifically here is 100 percent of a

20   category, a race of people within this geographic area.  Can

21   you tell me what the voting history of that group is?

22   A    Do you mean did I do so for the purposes of this?

23   Q    Sure.

24   A    No, I did not.

25   Q    Were you asked to?

Herron - Cross / By Mr. Scott                          85

1    A     No.

2    Q     Can you tell me the rates of possession of birth

3    certificates within that homogeneous group?

4    A     Birth certificates?

5    Q     Yes.

6    A     No.  I don't believe I could do that either.

7    Q     Did you undertake to determine in these 100 percent

8    homogeneous block groups that identified specific races the

9    compliance -- I mean what percentage of those folks had the

10   documents necessary to be able to obtain a photo ID that would

11   comply with SB 14?

12   A     No, I don't have data on that.

13   Q     Did you provide the information about these groups that

14   were 100 percent homogeneous and so there's no mistake that

15   we're talking about a race specific within these groups, these

16   block groups?  Did you provide that information for any of the

17   other experts to use in this case for any reason?

18   A     That information is implicit in my data and I was asked to

19   circulate my data.  So I think the answer to that is yes.

20   Q     And who did you provide it to?

21   A     I sent four Fed Ex packages in the last -- on the Friday

22   that we were talking about earlier to various counsels I

23   believe.

24   Q     Well, you got some material from the Department of

25   Justice, about 183,000 names; is that correct?

Herron - Cross / By Mr. Scott                              86

1   A    Are we talking about the August 8th -- excuse me, I don't

2   even want to use that date.

3            Are we talking about the data that I received after

4   my amended report was complete?

5   Q    Yes.  So we're talking about information that you received

6   before August 14th, the report, the declaration that's filed in

7   this case, correct?

8   A    I have to look at my calendar.  I'm confused on the dates

9   here.

10  Q    Sure.  It's 183,000 people that you were notified were

11  suspended -- had suspended licenses?  I think that was your

12  testimony.

13  A    Right, those I received before my amended report was done,

14  correct, yes.

15           **MR. DERFNER:**  Object, that's not exactly -- not

16  suspended.  I thought the word was surrendered.

17  Q    Oh.  Well, tell me Doctor, what does a surrendered license

18  in Texas entail?

19  A    Counsel explained to me that "surrendered" means that an

20  individual has to hand over a license.

21  Q    Who told you that?

22  A    Counsel.

23  Q    Your counsel?

24  A    Yes.

25  Q    And did he tell you that was based on Texas law or did he

**EXCEPTIONAL REPORTING SERVICES, INC**

Herron - Cross / By Mr. Scott                    87

1    tell you that was based on a fact that actually happened with

2    these 183,000 people?

3    A    She, and I don't recall asking.

4    Q    Was it important to you to understand if all 183,000 or

5    any of the 183,000 people that you were identified and

6    ultimately put on the no match list had actually surrendered

7    their physical license to someone?

8    A    I was told that these were individuals who had surrendered

9    their licenses for the most part; again, subject to some of

10   them possibly being dead.

11   Q    So other than the people who are dead I think you already

12   agreed that they shouldn't be on the list to begin with but

13   those folks would be the only ones you excluded out of that

14   183,000, correct, off your no match number, your new no match

15   number?

16   A    I was given a list of 183,000 and I was told that for the

17   most part these were individuals who had surrendered their

18   licenses but it is possible -- this is what I was told by

19   counsel -- that some of these individuals were dead and it is I

20   believe possible that there might have been a very small number

21   of other individuals although I'm not sure if it was -- the

22   only exception was that.  I cannot recall for sure but I didn't

23   inquire as to the exact mechanism of handing in a license

24   because I was told that they had surrendered it and that was

25   sufficient for me.

Herron - Cross / By Mr. Scott                                    88

1         **THE COURT:**  Was that number matched to see if they

2   had other SB 14 ID or what did we do with that number?

3         **MR. SCOTT:**  That's what -- I was going to --

4         **THE COURT:**  Okay, okay.

5         **MR. SCOTT:**  I was going to try -- I agree with you,

6   your Honor.

7         **THE COURT:**  Sorry, go ahead.

8   Q     And so was there a process that was undertaken on another

9   no match process that was done with the Department of Public

10  Safety to confirm that those individuals were (a) without their

11  licenses so that they'd actually physically surrendered those,

12  those materials, before you included them in your no match

13  list?

14  A     Yes, sure, I can tell you what I was told which is that

15  these were individuals who had surrendered their licenses and

16  they didn't have other forms of SB 14 qualifying

17  identification.

18  Q     Okay.

19  A     Obviously without that last bit if for example all of them

20  had passports then this would be a different world.

21  Q     So you would agree that none of those individuals to the

22  extent they have other ID, if somebody could show that, you

23  would agree that they would not be properly included in the no

24  match list, correct?  Again, you were just given data and told

25  to believe this is true, correct?

Herron - Cross / By Mr. Scott                            89

1  A    Yes, if you could show -- I mean if you could show me that

2  some of the -- some ethogeneric to be true, if there's someone

3  on my no match list that had ID then that person shouldn't be

4  on the no match list.

5  Q    Which of the two ways that you performed your analysis,

6  the ecological regression analysis or the homogeneous block --

7  A    Group.

8  Q    -- group analysis, do you have more faith in?  Which one's

9  better?

10 A    You know in my experience as a I guess a scientist the

11 hallmark of good science is multiple methods and so the reason

12 I used two methods here was not because I didn't have faith in

13 one of them it's because every method has strengths and

14 weaknesses as I explained earlier.  And so, I think the goal of

15 any endeavor in this instance is to try to find methods that

16 complement each other and then to ask if they show different

17 things or the same things.  In my case, they show the same

18 thing effectively.  So I'm not comfortable saying that I trust

19 one more than the other because they're compliments.

20 Q    And again, when we're talking about either of those two

21 groups we're not really talking about individuals in a Section

22 Two case who we are trying to determine if they have -- if they

23 don't have the proper ID in order to actually cast a ballot,

24 correct?

25 A    I'm not sure.

Herron - Cross / By Mr. Scott                    90

1   Q    Well, I mean, again, we're talking -- you're not able --

2   you didn't do a database match, correct?

3   A    No, as I explained I didn't carry that process out.

4   Q    I mean is voter turnout important from the standpoint of

5   your analysis in this case, the effect on voter turnout?

6   A    No, you know, I was asked what I was asked to do and I was

7   asked to study the database and access non-match rates.  I

8   wasn't asked to look at turnout.

9   Q    Well, is it important to know whether any individual

10  you're identifying in your group has not had the ability to

11  vote as a result of SB 14?

12  A    If the question is who has ID then the answer's no.

13  Q    Well, the question is do you believe in your opinion that

14  any individual within your group has been deprived of the

15  ability to vote as a result of SB 14?  Do you have an opinion

16  on that?

17  A    I wasn't asked to study who's been deprived of rights to

18  vote.  I was asked to study who has IDs.

19  Q    Do you know how many cities in Texas have -- well, strike

20  that.

21          You used to teach with Dr. Ansolahehere?

22  A    I don't believe I ever taught with him.

23  Q    Oh, I thought you were at Harvard at the same time.

24  A    I visited at Harvard for a semester.  I'm not sure if he

25  was on the faculty then.

Herron - Cross / By Mr. Scott                    91

1   Q    Okay.  Have you read any of his articles that he's

2   published?

3   A    Over the course of my career I'm confident I've read some

4   of them.

5            **MR. SCOTT:**  Brian, will you put the first article up

6   from Dr. Ansolahehere?

7   Q    Have you read <u>Effects of Identification Requirements on</u>

8   <u>Voting, Evidence From Experiences of Voters on Election Day</u>

9   that was written by Dr. Stephen Ansolahehere?

10  A    I'm looking for the date on this, I'm sorry.  How can I

11  make this a bit bigger?

12  Q    Well, you and I can't.

13  A    Oh, thank you.

14           At some point I believe I've read this but I cannot

15  testify now as to all of its conclusions.

16  Q    Well, there's one conclusion I'd like to show you.

17  A    Thank you.

18           **MR. SCOTT:**  Let's see if I can't find it here.

19           **(Pause)**

20           **MR. SCOTT:**  There, it's highlighted.

21  Q    So some of the denials -- this is occasionally -- this is

22  an exceptionally low rate of (indiscernible) access to the

23  vote.  Some of these denials may have been legitimate and some

24  of them may have been erroneous but the actual analysis of the

25  vote in these two surveys suggests that photo ID laws may

1    prevent almost no one from voting.

2             Do you agree or disagree with Dr. Ansolahehere?

3    A    I didn't write this paper.

4    Q    I know, that's why I asked you do you agree or disagree.

5    A    I mean if you want me to give a scholarly opinion on this

6    you would have to give me his data and ask me to analyze it

7    which I could do but until I've done that I'm hesitant to sort

8    of say "Yes, this is right" or "No, this is wrong."

9             **MR. SCOTT:**  Okay.  Brian, can you bring up another

10   article by Dr. Ansolahehere?  Oh, I'm sorry, it's the second

11   page.

12   Q    There's another page, I'm sorry, and it goes on to say

13   "Voter ID does not appear to present a significant barrier to

14   voting."  Skip down a little.  "Although the debate over this

15   issue is often draped in the language of civil and voting

16   rights movements, voter ID appears to be -- to present no real

17   barrier to access."

18            Do you agree with Dr. Ansolahehere?

19   A    I have the same answer.  I mean this is a statement about

20   analysis of some data that I haven't done.

21            **MR. SCOTT:**  Pass the witness.

22            **MS. BALDWIN:**  I have a couple of quick questions.

23   Anna Baldwin for the United States.

24            **THE WITNESS:**  Good morning.

25            **MS. BALDWIN:**  Thank you, Dr. Herron.

1                          **DIRECT EXAMINATION**

2    **BY MS. BALDWIN:**

3    Q    The last article from Dr. Ansolahehere that was up did you

4    see very briefly on that first page -- could we take a look at

5    that again?

6         **(Pause)**

7    Q    And could we -- that really small date at the bottom,

8    could we zoom in on that?

9         **(No audible response)**

10   Q    In January 2009, do you know the number of states that

11   Dr. Ansolahehere was looking at in this article that had strict

12   photo ID laws akin to the law that we're talking about here

13   today in Texas?

14   A    I don't know the number off the top of my head but I'm

15   confident that it's very small.

16   Q    Do you know if there were any strict photo ID laws akin to

17   Texas' that were in place prior to January 2009?

18   A    I would venture to say that there is nothing as strict as

19   Texas'.  So the number is probably zero.

20   Q    I just want to pull up one other exhibit briefly,

21   Plaintiffs' 944, if we can switch --

22        **(Pause)**

23   Q    Could you read the title of this document that's

24   underlined if you can?

25   A    Could you make it a bit bigger?

1   Q    Yes, can we get that a little --

2   A    Should I read?

3   Q    Please.

4   A    DPS Responses to Written Deposition Questions Pursuant to

5   Rule 31 Regarding Specified Topics From the United States'

6   Notice of Rule 30(b)(6) Deposition of the Texas Department of

7   Public Safety.

8   Q    Great.  Could we go to the second page of this document

9   and on question number two and three -- question number two

10  lists the number of card statuses and then if we could see the

11  answer.  Can you scroll down a little farther?

12       **(Pause)**

13  Q    The answer here says if a card has a status of voluntary

14  surrender, voluntary surrender CSO, or voluntary surrender

15  insurance, or voluntary surrender medical, it means the

16  customer has voluntarily surrendered their card.

17       Do you agree that such people should be placed on the

18  no match list if that's the only form of ID that they have

19  based on this answer from DPS?

20  A    I'm going to read the complete answer.

21  Q    Sure.

22       **(Pause)**

23  A    Yes.

24       **MS. BALDWIN:**  Thank you, Dr. Herron.

25       **MR. DERFNER:**  I've got -- I don't think

Herron - Cross / By Mr. Scott                    95

1    (indiscernible).

2          **THE COURT:**  Yes.  We've -- someone else has

3    redirected.  Maybe another plaintiff we can call as a cross by

4    another party, however we want to designate that.  The state

5    gets to question again.

6          **MR. SCOTT:**  So could we pull that exhibit back down?

7          **(Voices off the record)**

8                      **FURTHER CROSS EXAMINATION**

9    **BY MR. SCOTT:**

10   Q    Do you know as we sit here today when a person physically

11   -- out of that 183,000 who surrenders a license by turning that

12   license in, do you know how many of those people get a

13   different -- a different ID card back?

14   A    Do you mean in response to handing in the license?

15   Q    Yes, sir.

16   A    Do you mean an SB 14 qualifying ID?

17   Q    Yes, why not?

18   A    So you're asking me if an individual hands in the license

19   and is handed a what?

20   Q    It sounded like we all agreed an ID that qualifies under

21   the terms of Senate Bill 14.

22   A    Well, I know that -- I know the list of IDs that qualify

23   and I don't believe -- I have no reason to believe that anyone

24   handing in a driver's license would be handed another form of

25   ID in exchange.

Herron - Redirect / By Mr. Derfner                    96

1          **MR. SCOTT:**  Perfect, thank you.  Pass the witness.

2     **(Pause)**

3          **MR. DERFNER:**  Hold on a second.

4     **(Pause)**

5                    **REDIRECT EXAMINATION**

6  **BY MR. DERFNER:**

7  Q    Do you know that any of those people, any of these 183,000

8  people, had another form of qualifying ID?

9  A    I was told that the reason they were on that list is

10 because they didn't have another form of qualifying ID.

11         **MR. DERFNER:**  Thank you.  We'll be -- you'll be

12 hearing a lot more about this in later witnesses, your Honor.

13         **THE COURT:**  All right.  Anything else for this

14 witness?

15         **MR. SCOTT:**  Nothing from the defense.

16         **THE COURT:**  You can step down, sir, and we'll go

17 ahead and take our 15 minute morning break.

18         **THE CLERK:**  All rise.

19     **(A recess was taken from 10:08 a.m. to 10:24 a.m.; parties**

20 **present)**

21         **MS. VAN DALEN:**  The Plaintiffs call Eulalio

22 Mendoza -- or Mendez.

23     **(Pause / Voices heard off the record)**

24         **THE COURT:**  Good morning, sir.  Okay.  Hold on one

25 second.  I'm going to have him sworn in so just tell him to

1    hold on one second.

2        **(Court confers with the Interpreter)**

3            Good morning, sir.  Would you raise your right hand?

4        **EULALIO MENDEZ, JR., PLAINTIFFS' WITNESS, SWORN**

5            **THE COURT:**  Okay.  You can have a seat.  Just be

6    careful.

7                        **DIRECT EXAMINATION**

8            **(Testimony Translated Through Interpreter)**

9    **BY MS. VAN DALEN:**

10   Q    Good morning, sir.  Can you please state your name for the

11   record?

12           **THE INTERPRETER:**  I think he gave a date.

13           **THE COURT:**  Okay.  Start over.

14   **BY MS. VAN DALEN:**

15   Q    Sir, can you please state your name?

16   A    Eulalio Mendez, Jr.

17   Q    Thank you.  And where do you live?

18   A    I live in the community of Sebastian in Willacy County,

19   Texas.

20   Q    Is that in the Rio Grande Valley?

21           **THE INTERPRETER:**  He's asking you to speak a little

22   louder.

23           **THE WITNESS:**  Correct.

24   //

25   //

Mendez - Direct / By Ms. Van Dalen                98

1   **BY MS. VAN DALEN:**

2   Q    And when were you born?

3   A    When was I born?

4   Q    Yes, please.

5   A    June 8th, 1931.

6   Q    And where were you born?

7   A    In Willacy County.

8   Q    And how do you describe your own race or ethnicity?

9   A    Latin American.

10  Q    And did you grow up there in Willacy County?

11  A    Excuse me?

12  Q    Did you grow up in Willacy County?

13  A    That's where I was born and raised.

14  Q    Did you go to school there?

15  A    No.

16  Q    Did you ever go to school at all?

17  A    No.

18  Q    How old were you when you started working?

19  A    I was about eight years old.

20  Q    And who do you live with now?

21  A    With my family.

22  Q    And who is that?

23  A    My wife Nonor (phonetic) Cardosa Mendez.  My children,

24  Roxanna Garza, Roxanna Falcon.

25           **THE INTERPRETER:**  I think he said "Falcon."

1            **THE WITNESS:**  And the third one is --

2            **THE INTERPRETER:**  I didn't catch the first name --

3    Falcon.

4        **(Interpreter confers with witness)**

5            **THE INTERPRETER:**  I can't tell what he said.  Leigh,

6    Neigh (phonetic)?

7            **THE WITNESS:**  Nicholas Falcon.  Nick Falcon.

8    **BY MS. VAN DALEN:**

9    Q    And Mr. Mendez, you speak English but you've requested a

10   translator because you feel more comfortable giving your

11   testimony and hearing questions in Spanish today; is that

12   right?

13   A    Correct.

14   Q    Are you now retired?

15   A    I'm disabled.

16   Q    Okay.  When did you stop working?

17   A    I stopped working in 1964.  I'm sorry.  I started speaking

18   English.

19   Q    That's all right.  Why did you stop working?

20   A    I had an accident.

21   Q    Do you remember when you started voting?

22   A    Approximately 72 years.

23   Q    How old were you when you started voting?  More or less.

24           **THE INTERPRETER:**  I'm sorry, the interpreter needs to

25   correct the record.  More or less, 22 years.

1   **BY MS. VAN DALEN:**

2   Q    Do you remember when Texas had a poll tax?

3           **MS. VAN DALEN:**  If you can try to speak louder to

4   him, I would appreciate it.

5   A    Yes.

6   Q    And did you ever pay that poll tax?

7   A    No.

8   Q    Okay.  Why?

9   A    Well, because in my opinion we don't need to pay to vote.

10  That's not right.

11  Q    And so during the time that the poll tax was in effect you

12  didn't vote in Texas?  And what happened after that it was

13  abolished?

14  A    I didn't vote.

15  Q    When there was no more poll tax did you start voting

16  again?

17  A    Yes, I did start voting but I don't recall the date when I

18  started.

19  Q    Okay.  And since then have you been a frequent voter?

20          **THE INTERPRETER:**  I'm sorry, I'll repeat.

21  A    Yes.

22  Q    And are you now registered to vote?

23  A    Correct.

24  Q    And have you ever voted by mail?

25  A    No.

```
 1   Q    Why is that?

 2   A    Well, because I don't trust in that type of voting.  I

 3   don't know where my vote is going to end up.

 4   Q    You mentioned earlier that you're disabled.  Does that

 5   interfere or prevent you from getting to the polls to vote?

 6   A    Well, no, I don't have any problems when it's time to vote

 7   because my children all vote.

 8   Q    Can you tell me please what, if any, valid photo

 9   identification you have?

10   A    I have none.

11   Q    Do you have a expired driver's license?

12   A    Correct.

13   Q    And when did that expire?

14   A    Approximately two years ago.

15   Q    And why didn't you renew that when it expired?

16   A    Well, I've had problems with my eyesight.

17   Q    So you weren't driving at that time?

18   A    No.

19   Q    Since then have you tried to get a photo identification

20   from the Department of Public Safety?

21   A    No.

22   Q    Have you been to the Department of Public Safety since

23   then?

24   A    I've been two or three times to try to renew my license.

25   Q    All right.  So you have tried to get a new photo
```

Mendez - Direct / By Ms. Van Dalen                    102

1    identification from DPS since your driver's license expired?

2    A    Correct.

3    Q    And where did you go?  What DPS office or offices did you

4    go to?

5    A    In Harlingen DPS.

6    Q    And how far is Harlingen DPS from your house,

7    approximately?

8    A    It's approximately 13 miles to the DPS office.

9    Q    And what happened when you went to the DPS office?

10   A    Well, there was a whole lot of people in line and I

11   couldn't stand very long.

12   Q    Do you know how long you would have needed to wait?

13   A    Well, my brother asked the lady how much longer and she

14   said it would still be about another hour.  And I told my

15   brother that I couldn't stand my legs any more.

16   Q    Mr. Mendez, when is the last time that you voted?

17   A    In these elections, the runoffs.

18   Q    Was that June 2014?

19   A    More or less.

20   Q    And what identification, if any, did you present when you

21   voted?

22   A    My social security number and the expired license.

23           THE INTERPRETER:  May the interpreter please inquire?

24   I think he might have said something else at the beginning?

25           MS. VAN DALEN:  Please.

1      **THE WITNESS:**  And the voter registration card.

2   **BY MS. VAN DALEN:**

3   Q    And were you told anything about whether that was adequate

4   identification to vote?

5   A    They said something about that.

6   Q    Are you concerned about whether you'll be able to vote in

7   the future?

8   A    Correct, I'm concerned.

9   Q    And why is voting important to you?

10  A    Well, I am a member of a national democratic party or

11  national democracy.  And I've been speaking to people, and I

12  realize that there's a lot of people that are against these new

13  voting requirements.

14  Q    And to you personally why is voting important?

15  A    Because I always like to make decisions when there are

16  important elections.

17  Q    Sir, do you have a original -- your original birth

18  certificate?

19  A    No.

20  Q    Do you have a certified copy of your birth certificate?

21  A    No.

22  Q    But you do have a Xerox copy of the front of a certified

23  birth certificate for yourself, correct?

24  A    Correct.

25  Q    And do you know -- how much do you believe it would cost

Mendez - Direct / By Ms. Van Dalen                              104

1    for you to get a new certified copy of your birth certificate?

2    A    Well, I don't know in reality because the prices go up.

3    But the last time I got one it cost me $22.  Twenty-two

4    dollars.

5    Q    Do you know of any way to get a birth certificate for

6    substantially less money?

7    A    No.

8    Q    Have you ever heard of a election identification

9    certificate form of identification with a photograph used to

10   vote?

11   A    I understand that line.

12   Q    So you've heard of that type of document?

13   A    Correct.

14   Q    If you wanted one do you know where you would need to go

15   to get it?

16   A    If I were to want one, yes.

17   Q    And do you know what identification would be necessary for

18   you to get one?

19   A    Correct.

20   Q    And have you ever tried to get one?

21   A    The voter identification card?

22   Q    Yes.

23   A    No.

24   Q    Why not?

25   A    Because I consider that that's not right.  Because this

1    new law is going to leave a whole lot of people without the

2    ability to vote.  I've spoken to a lot of people and they are

3    against this law.

4            **THE INTERPRETER:**  And I think he was still trying to

5    say something else but I had to cut him off.

6            **MS. VAN DALEN:**  Okay.

7            **THE WITNESS:**  And I agree with all of them.

8    **BY MS. VAN DALEN:**

9    Q    Do you know where you would go if you wanted to get one?

10   A    Correct.

11   Q    Where?

12   A    To the DPS.

13   Q    And you've already testified that you've gone several

14   times to try to get another form of ID from the DPS office in

15   Harlingen, correct?

16   A    Correct.

17           **MS. VAN DALEN:**  Your Honor, may I put a document on

18   the Elmo?

19           **THE COURT:**  Yes.

20           **MS. VAN DALEN:**  I'm going to show the document that

21   is entitled Plaintiffs' 992.  I have never used one of these.

22   This is the first page.

23           **THE INTERPRETER:**  I'm sorry, did you say "this is" or

24   "is this"?

25   //

1   **BY MS. VAN DALEN:**

2   Q    This is the first page.  And this is the second page.

3   A    That is the first page.  That's the second page.

4   Q    Do you recognize this as a declaration that you prepared

5   and signed on June 9th, 2014?

6   A    Correct.

7   Q    And does this declaration accurately reflect the finances

8   of your family on that day?

9   A    I did not understand the question.

10  Q    Is this a declaration that discusses your and your

11  family's finances?

12  A    Well, it's a very sad state.

13  Q    All right.  But the information that's contained in this

14  declaration was that accurate at the time that you signed it?

15  A    Please repeat.

16  Q    When you signed the declaration was the information

17  contained in it correct?

18  A    Correct.

19  Q    And have there been some changes in your family's finances

20  since then?

21  A    There have not been changes.

22  Q    And if there were any changes they weren't substantial?

23  A    The changes there have been -- have not been very

24  important.

25  Q    Mr. Mendez, can you describe, please, the financial

Mendez - Direct / By Ms. Van Dalen                    107

1   situation of your family now?

2   A    As I said before, it's something sad.  I don't like to

3   remember it or think upon it but I'll do it.  Each month by the

4   last week there's no food in the house and nothing with which

5   to buy any, especially milk for the children.  Then my wife has

6   to go to a place to ask for food at a place where they give

7   food to poor people.  And they give them about three or four

8   gallons of milk.

9   Q    So is your family -- you and your wife receiving social

10  security?

11  A    Correct.

12  Q    And do you have any savings?

13  A    I have no savings, just the checks that are deposited in

14  the bank.

15  Q    From social security?

16  A    Social security and supplemental.

17  Q    And when you have an expense that comes up you weren't

18  anticipating or an emergency, what do you do?

19  A    I don't understand the question.

20  Q    If you have an emergency or if something happens that you

21  weren't expecting that you need money for, what do you do?

22  A    Well, I have no answer for that.

23  Q    Are there things now that you or your family need that

24  you're unable to pay for?

25  A    There are several things that I need to do at my house.

Mendez - Direct / By Ms. Van Dalen                    108

1   We need to make some repairs already.  Since the last hurricane

2   passed through there, there was a lot of damage.  And I've

3   asked several times for assistance but I have not received any

4   help.

5           THE INTERPRETER:  And I believe he said, but I need

6   to inquire, that the windows are broken and the drains -- may

7   the Interpreter please clarify?

8           THE WITNESS:  The screens.  The screens are damaged,

9   also.

10          THE INTERPRETER:  The Interpreter needs to correct

11  that.

12          THE WITNESS:  And the house became unlevel when there

13  was not flooding with the torrential rains.

14          THE COURT:  Do you need to correct the record on

15  anything?

16          THE INTERPRETER:  Yes, I need to correct -- when I

17  said "drains" it was "screen."

18          MS. VAN DALEN:  Thank you.

19  BY MS. VAN DALEN:

20  Q    And you mentioned that you receive social security.  When

21  you first started receiving social security was that for your

22  disability?

23  A    Because of the accidents that I had.

24  Q    Okay.  When is the last time that you remember receiving

25  any sort of correspondence from the Social Security

1    Administration rating your disability?

2    A    I'm sorry I need the question again.

3    Q    Do you remember the last time you received correspondence

4    from the Social Security Administration that included your

5    disability rating?

6    A    I don't recall.

7    Q    Do you have any correspondence from the Social Security

8    Administration, including a rating of your disability?

9    A    No.

10        **(Pause)**

11   Q    Mr. Mendez, can you tell the Judge why you've traveled

12   here today from Sebastian to give testimony in her courtroom?

13   A    In order to testify about that requirement that you need a

14   voter ID with a picture or you need an ID with a picture to be

15   able to vote.

16   Q    And why do you think that's so important?

17   A    Well, as I said, I think it's important because of what I

18   said a while ago, that a lot of people will not go vote because

19   of this new law.  And we have a large amount of people

20   currently that don't vote and that amount is going to double.

21   Q    Should you pay $22 to get a new birth certificate?  Would

22   that be a burden for you and your family?

23   A    Well, truthfully I'm embarrassed to say so, but yes.

24   Q    Thank you, Mr. Mendez.

25        **MS. VAN DALEN:**  I pass the witness.

1                      **CROSS EXAMINATION**

2    **BY MS. WOLF:**

3    Q    Good morning, Mr. Mendez.

4    A    A very good morning.

5    Q    It's nice to see you again.

6    A    Thank you.

7    Q    Do you remember when we met back in June we met at the

8    Reber Memorial Library that was in Raymondville, correct?

9              **THE INTERPRETER:**  I'm sorry, the what Memorial

10   Library?

11             **MS. WOLF:**  The Reber Memorial Library.

12             **THE INTERPRETER:**  In -- where was it?

13             **MS. WOLF:**  Raymondville.

14             **THE INTERPRETER:**  In Raymondville?

15             **THE WITNESS:**  I think it was last week or the week

16   before that.

17   **BY MS. WOLF:**

18   Q    Okay.  Well, when we talked you had told me you go to

19   Raymondville a couple of times a week; is that correct?

20   A    Yes.

21   Q    And you know you told me you knew that the county seat for

22   Willacy County, that was in Raymondville, was across the street

23   actually from the library you were being deposed in; is that

24   correct?

25   A    I didn't understand the question.

1   Q    Okay.  When we had talked I think we had talked a little

2   bit about where the Willacy County offices are.  And I think

3   you had agreed with me that they were in Raymondville; is that

4   correct?  Do you remember that?

5   A    Correct.

6   Q    And do you agree that when you went to DPS in Harlingen

7   that they told you that you could obtain an election

8   identification certificate at the Willacy County offices?

9   A    Correct.

10          **THE WITNESS:**  Your Honor, I have no further questions

11  of this witness.

12          **THE COURT:**  All right.  Anything further?

13          **MS. VAN DALEN:**  No, your Honor.  Thank you.

14          **THE COURT:**  All right.  Thank you, sir.  You can step

15  down.

16      **(Witness steps down)**

17          **MR. SHAPIRO:**  Good morning, your Honor.

18          **THE COURT:**  Hi.

19          **MR. SHAPIRO:**  Avner Shapiro for the United States.

20  Your Honor, at this time the United States offers as evidence

21  excerpts of the video deposition of Ms. Ramona Bingham.  And if

22  I may approach, we have the transcript of the excerpts that

23  correlate -- excerpts of the transcript that correlate with the

24  excerpts on the video.

25          **THE COURT:**  Okay.

1          **MR. SHAPIRO:**  Thank you.

2      **RAMONA BINGHAM, PLAINTIFFS' WITNESS, BY VIDEO DEPOSITION**

3       **(Excerpts of video deposition of Ramona Bingham omitted;**

4  **played from 11:03 a.m. to 11:32 a.m.)**

5          **MS. ROSCETTI:**  Your Honor, at this time we would

6  offer Defendants' cuts and I have -- may I approach?

7          **THE COURT:**  Yes.

8      **(Pause / Voices heard off the record)**

9       **(Excerpts of video deposition of Ramona Bingham omitted;**

10  **played from 11:33 a.m. to 11:37 a.m.)**

11          **THE COURT:**  All right.  Is that it for that witness?

12          **MS. ROSCETTI:**  Yes, your Honor.

13          **THE COURT:**  Okay.  We can move on to the next

14  witness.

15          **MR. SHAPIRO:**  Your Honor, the United States calls as

16  its next witness Ms. Kristina Mora.

17          **THE COURT:**  Okay.

18      **(Pause)**

19          Good morning, ma'am.  If you'll approach over here,

20  the clerk will swear you in.

21          **THE CLERK:**  Would you raise your right hand to be

22  sworn?

23  //

24  //

25  //

1              **KRISTINA MARIE MORA, PLAINTIFFS' WITNESS, SWORN**

2              THE CLERK:  Thank you.

3                            DIRECT EXAMINATION

4      BY MR. SHAPIRO:

5      Q    Good morning, Ms. Mora.

6      A    Good morning.

7      Q    Ms. Mora, can you please state your full name for the

8      record?

9      A    Yes.  It's Kristina Marie Mora.

10     Q    And, Ms. Mora, I understand you worked until two weeks ago

11     at a non-profit in the Dallas area called The Stewpot, correct?

12     A    That's correct.

13     Q    And could you tell the Court a little bit about what The

14     Stewpot is?

15     A    Sure.  The Stewpot is a non-profit resource center that

16     helps to alleviate hunger, to help homeless individuals to be

17     able to get out of homeless situations, as well as prevent some

18     people being able -- becoming homeless.

19     Q    And does The Stewpot also provide assistance to homeless

20     individuals in obtaining ID's and other documents?

21     A    Yes, they do.

22     Q    Okay.  Now, for how long were you working for The Stewpot?

23     A    I was working there for four years.

24     Q    And what was your position there?

25     A    My position was manager of casework services.

1   Q    And could you tell us what your responsibilities were in

2   that position?

3   A    Sure.  My responsibility was to supervise five case

4   workers and two intake staff, which involved supervising their

5   caseloads and monitoring the intake process, as well as

6   completing a full caseload of my own.

7   Q    Okay.  And did you work with any other agencies in your

8   capacity as the senior case worker?

9   A    Yes, I also had the responsibility of developing and

10  maintaining partnerships with outside agencies.

11  Q    Okay.  What agencies did you work with?

12  A    Examples of agencies would be the Texas Department of

13  Public Safety, the Dallas City Hall Vital Records Office, and

14  other social service agencies.

15  Q    Why were you working with those agencies; for what

16  purpose?

17  A    One of the several services that we provide in the

18  casework service area is for Texas identification assistance.

19  And so when we would begin that process in providing

20  information to our clients, different questions and

21  clarifications would come up so I initiated developing

22  partnerships with the supervisors of several area DPS offices.

23  Q    Okay.  So, returning back to the work you did at The

24  Stewpot itself, and its clients, how many homeless individuals

25  did you and your caseworkers see typically per day?

Mora - Direct / By Mr. Shapiro                    115

1   A    We would see anywhere between 50 to 70 clients per day.

2   Q    And how many of them were seeking assistance in obtaining

3   documents and ID's?

4   A    More than half of those.

5   Q    And did your organization document how many individuals it

6   was providing assistance with documents and ID's per year?

7   A    Yes.  That information would be documented in our

8   database.

9   Q    Okay.  And roughly how many individuals or clients were

10  you providing assistance in obtaining ID's per year, roughly?

11  A    Roughly between 4,000 and 5,000 per year.

12  Q    Okay.  And what ID is your organization most commonly

13  trying to assist homeless individuals obtain?

14  A    The most common form of identification is the Texas State

15  ID.

16  Q    And why is the Texas ID the one that your organization

17  tries to help individuals obtain?

18  A    It is the one that we focus on to help with financially

19  assisting, because it is of a lower cost than other documents.

20  Q    Okay.  And what types of documents do you need to obtain

21  the Texas ID that you're helping folks get?

22  A    Sure.  In order to get the Texas ID, there is a list of

23  primary documents that the Texas Department of Public Safety

24  will accept in order to do that.  Those documents can include

25  already having a Texas ID or driver's license, a valid

Mora - Direct / By Mr. Shapiro                         116

1    passport.  If a person is an active -- in the military, having

2    an active military ID.  But those things typically are not in

3    the possession of the clients that we see.  So in that case,

4    then we look to the list that the DPS provides that describes a

5    secondary document and two supporting documents that are

6    required.  In addition to that, there is also a residency

7    affidavit that is necessary.

8    Q    Okay.  So are you helping obtain those documents as well,

9    at The Stewpot, when you are assisting homeless individuals?

10   A    Yes.

11   Q    Okay.  Now, why is it that so many of your clients,

12   homeless individuals, are in need of obtaining ID's?

13   A    Sure.  In my opinion from sitting down with the clients on

14   a daily basis, the feedback that we receive are for people that

15   are experiencing an episode of homelessness, a lot of times

16   they are experiencing a situation of crisis in their life.

17   When they describe that crisis, a lot of times they have

18   described not being able to focus on anything other than just

19   meeting their basic needs, such as shelter, food, maybe medical

20   attention.  Not all of those things require a Texas ID to be

21   able to obtain, so it's not of a higher priority when they're

22   in the midst of the crisis.

23   Q    Okay.  So those are the reasons why they may not be as

24   interested in obtaining an ID immediately; is that what you're

25   saying?

Mora - Direct / By Mr. Shapiro                    117

1   A     Correct.  And there are other barriers to them obtaining

2   the Texas ID.

3   Q     Okay.  So what are the barriers to them obtaining the

4   Texas ID?

5   A     I would say some of the barriers would be, number one,

6   being able to understand and navigate the procedures themselves

7   to be able to obtain the Texas ID, as well as the financial

8   hardships that are involved.  There is also a big investment of

9   time to obtain those things, relatively speaking, as well as

10  just the logistics of working with the DPS office in

11  coordination with law enforcement.

12  Q     Okay.  Well, let's take those one by one shall we.

13        Let's do -- first, you said that they have difficulty

14  understanding how to navigate and get these documents.  Why do

15  homeless individuals have difficulties doing that?

16  A     Sure.  For individuals that have not obtained a Texas ID

17  in a number of years or a period of time, there have been a lot

18  of changes over the past several years or several months and

19  being able to be up to date on the current procedures of what

20  is accepted, what is required, a person needs to obtain that

21  information.  A lot of times that's available online for our

22  clients, and not all homeless people are able to access the

23  internet.  Some are not able to understand the process in being

24  able to locate and find things online.  Also, being able to

25  contact, directly over the phone, the DPS office can be

Mora - Direct / By Mr. Shapiro                    118

1   challenging.  Having easy access to a phone can be quite

2   difficult sometimes, as well as being able to get a hold of a

3   representative.  They work very hard at the DPS office.

4   They're not always able to answer the phone.  So those are

5   definitely some barriers that they experience.

6   Q    Okay.  And the second issue you mentioned was costs that

7   the homeless individuals encounter.  If you could sort of spell

8   out what the costs are for the ID that you said you'd typically

9   help homeless individuals obtain the Texas ID.  What do those

10  costs look like?

11  A    Sure.  Some basic costs for getting a Texas ID if it's

12  their first one or it has been more than two years since their

13  last one expired, the cost is $16.00 for the ID itself.  If

14  they were born in the State of Texas, a Texas birth certificate

15  is going to cost $23.00 when you go through the City Hall in

16  Dallas.  Also, there are supporting documents that they'll need

17  to have.  Those costs vary.  Some are free.  Some can be more

18  than $25.00.  In addition to that, there are transportation

19  finances that are required.  The transportation cost of a day

20  pass in the Dallas area for the public transportation is $5.00.

21  I would say there is an average of two days that would be

22  required for travelling to obtain the different documents that

23  are necessary.  So that would average out to approximately

24  $45.00 would be a good estimate.  And that's just the basic

25  financial costs that would be in place.  And we would describe

1  that, as caseworkers, as two weeks of a possible stay at a

2  homeless shelter is the equivalent cost there for a person

3  experiencing homelessness.

4  Q     Okay.  And another issue you itemized there that was a

5  barrier was the expenditure of time.  Could you explain what

6  that challenge is for the homeless individuals your

7  organization is serving?

8  A     The majority of clients that we serve -- not all, but the

9  majority -- are going to be living in the downtown area, either

10  at a homeless shelter or outside.  And so that is most

11  typically the starting point to be able to get to the DPS

12  office itself.  In order to do that using the public

13  transportation system, they would use a bus, a train, and have

14  to walk in order to get to the closest DPS office.  That takes

15  approximately an hour, as verbalized from the clients, as well

16  as researched on Google, doing the map system.  Once they get

17  there, it's an average of an hour to be able to actually obtain

18  the ID itself, from waiting in the line period to meeting with

19  a representative, presenting their documents, pictures, all of

20  those things.  Then it's another hour to return back to their

21  starting point.  How that is an issue is that the clients that

22  we are serving, they have curfews at the shelters in which they

23  stay.  Those curfews vary in time but typically are early

24  afternoon.  If a client is required to do different things, as

25  well as going to the DPS office, it can impact their ability to

Mora - Direct / By Mr. Shapiro                    120

1   get into the shelter and make curfew.  If they miss their

2   curfew then they run the risk of losing their bed for that

3   night and so, therefore, they'd have to find a different

4   shelter or be sleeping outside.

5   Q    Ms. Mora, the last issue you identified was dealing with

6   DPS, which is a law enforcement entity.  Could you explain why

7   that is also a barrier for the homeless individuals you were

8   helping?

9   A    Sure.  The clients that we meet with -- when I have a sit

10  down with -- other caseworkers have sat down with them and they

11  may have all the documents that have been described that they

12  are needing to have.  They are ready to go to get their ID.

13  But when it times to go, they can experience some fear in going

14  there because of outstanding tickets that they may have or if

15  something has gone into a warrant status.  So a lot of times

16  that is a barrier from them completing the process.  Some of

17  the clients that we have are experiencing an episode of

18  homelessness and they have previously been working.  While they

19  were working, they had a vehicle, they had an apartment maybe,

20  and if they received traffic-related tickets and were not able

21  to pay that once becoming homeless then those tickets are not

22  taken care of.  So when it's time to go get their ID, then that

23  is a fear of these outstanding tickets, am I going to be able

24  to get my ID or am I going to get picked up when I go there.

25  Q    Ms. Mora, when you were telling us about the different

1   types of documents you need to get in order to get the Texas ID

2   and you identified the secondary documents and said that's

3   typically a birth certificate, correct?  Is that what you said?

4   A    Yes.

5   Q    Now, what are the challenges involved in getting -- the

6   special challenges involved in getting the birth certificate?

7   A    Well, the birth certificate in the State of Texas, as well

8   as other states, counties, and cities require documentation to

9   be able to obtain them.  Most often it is a state ID or

10  driver's license or a current valid passport, which we've

11  already determined most of the clients do not have.  So being

12  able to get those secondary documents can be challenging if

13  they don't already have them.  When we have worked with certain

14  counties or cities, and some states, they have identified that

15  they will not accept any alternative forms of identification to

16  obtain that out of state birth certificate; that they need to

17  present the ID or driver's license or passport.  So when a

18  client verbalizes that they're not able to do that, then the

19  alternative is that they need to contact a family member.  The

20  family member needs to apply for that certificate on their

21  behalf.  What the client then has verbalized frustration is

22  that they aren't in communication with family members, they've

23  lost contact due to being transient in different areas, as well

24  as not having any living members of their family, so there's

25  not a possibility to be able to have them to apply.  When that

1    has been verbalized to that department, the department also has

2    recommended that a client purchase the birth certificate

3    through a third party referred to as Vitalchek.  So when the

4    client has looked into that it requires a credit card to be

5    able to make that purchase.  Our clients typically do not have

6    access to credit cards.  Also, it is a much larger cost

7    involved to purchase that birth certificate that way.  They

8    have also said that it does alleviate not having to provide any

9    forms of identification to get it through Vitalchek; just

10   answer certain questions correctly, but the costs are

11   significantly more.

12   Q    So if I understood you correctly, if you can't do the

13   Vitalchek option, then in order to get the birth certificate

14   you would have to have a photo ID; is that right?

15   A    A state ID or drivers license.

16   Q    Okay.  So are you finding that your clients are in a

17   catch-22 on that issue sometimes?

18   A    Yes.  It becomes a significant problem for them.  The

19   state also has recommended that they go through an attorney to

20   be able to file for that certificate on their behalf, and there

21   are definitely charges involved with working with an attorney.

22   Q    And you also described earlier that, often, homeless

23   individuals have to get the supporting documents.  After the

24   secondary documents there are supporting documents, correct?

25   A    Yes.

1   Q    Now, how many of those supporting documents are there?

2   A    Approximately 30.

3   Q    Okay.  And roughly how many of those documents do they

4   need to -- strike that.

5        How many of those documents do they need to have to get

6   the Texas ID?

7   A    They need to have two supporting documents.

8   Q    Okay.  And how -- if they don't have those documents, how

9   easy is it -- strike that.

10       How much of a charge is it for homeless individuals to

11  produce those two documents from that list of 30?

12  A    Sure.  Although it appears that a person should be able to

13  obtain two documents from the supporting list of 30, would be a

14  simple task, it is -- there are many barriers in doing that.

15  Many of the items on that list are situational items; for

16  example, obtaining a marriage record.  Not all of the clients

17  that we see on a regular basis, who are needing these

18  supporting documents, have ever been married before so that

19  can't be a document that is obtained.

20       There are three documents that we do focus on in helping

21  to give information and helping them obtain because they are

22  more easy to obtain, if I may say so.  Those would be the

23  Social Security card, certified school record transcript, or a

24  voter's registration card.  The Social Security card has been a

25  difficult process to be able to provide a map for clients to be

1   able to obtain easily.  The reason I say that is that the

2   primary documents the Social Security Administration requires

3   to obtain that is going to be, again, a state ID, driver's

4   license, passport; if you're a Government employee, an employee

5   badge or just having a general employee badge, and other

6   documents.

7        Some of them on there are not an option.  They are

8   situational for our clients, such as having a marriage record

9   or having access to health insurance or having a life insurance

10  policy.  That is not typically documents or things that our

11  clients have.

12       One that is on there is hospital paperwork that is

13  certified.  So, in order to do that a client does have to go a

14  distance, which would include travel expenses to the local

15  hospital, which is Parkland in our area.  They have to go to a

16  designated area, request that record, and that record does have

17  a charge to it per page.  Some of our clients have been in and

18  out of the hospital many, many years and so it includes the

19  complete record.  You can't just purchase one sheet, so that

20  can be a cost and a barrier.

21       So those are the difficulties they experience in getting

22  the Social Security card if they do not already have one.

23       When it comes to the school record, more commonly clients

24  are able to obtain that.  What we have experienced in seeing

25  when clients apply for their school records are that not all

1    schools or the individuals who hold the record are able to

2    certify that record, so they will send a Xerox copy of the

3    record that is on their letterhead or their documentation, but

4    is not certified with the seal or the stamp.  That becomes a

5    problem for the client because the Texas Department of Public

6    Safety does require that it is a certified document.  So that

7    has created some barriers for our clients.

8         And then, thirdly, with the voter's registration card, if

9    a client hasn't already presented that they have a voter's

10   registration card then they have the ability to fill out that

11   application and to do that.  But that would leave only really

12   one easier option, the voter's registration card, but it

13   requires two documents to obtain for the supporting documents.

14   Q    Okay.  So if I understand you correctly, just with that

15   one document that a homeless person may have, they may have

16   difficulty obtaining any of the others they may need to get the

17   ID?  Is that what you're saying?

18   A    With significant challenges, yes.

19   Q    Okay.  How often in your work at The Stewpot -- you and

20   the caseworkers that you supervise -- do you have individuals

21   coming through your door at The Stewpot seeking assistance in

22   obtaining ID's who have not had any ID at all for more than

23   four months?

24   A    Yes.

25   Q    How often does that happen?

1   A    Anywhere between -- it would probably happen on a daily

2   basis that we encounter somebody who has not had their ID for

3   more than four months.

4   Q    Okay.  Now, how does The Stewpot, as an organization, --

5   what does -- how long does it take for The Stewpot to resolve

6   these issues, typically, --

7   A    In regards to the Texas ID?

8   Q    -- and to get ID's for these individuals when they show

9   up?

10  A    Sure.  It can be as simple as the same day.  We can help

11  them the same day if they have the correct documentation, they

12  fulfill our requirements, they qualify, and we're able to

13  assist them.  Or there are some clients that it can take more

14  than a year for us to help them in completing the process to

15  obtain that ID.

16  Q    Okay.  And do you have a sense from working with these

17  clients and overseeing the work of your caseworkers roughly how

18  many of these individuals it takes you more than four months to

19  help them get the ID that they're looking for?

20  A    Sure.  I would say it would take -- there are a large

21  number of clients, probably between 15, maybe 20 percent of the

22  clients that we see that it's going to take more than four

23  months to obtain the Texas ID, due to the different barriers I

24  discussed before.

25  Q    Okay.  And I probably should have asked you this earlier.

Mora - Direct / By Mr. Shapiro                    127

1   What, exactly, is the nature of the assistance you're giving

2   when you're giving them assistance in obtaining ID?  How do you

3   go about doing that as an organization, generally?

4   A    Generally speaking, we provide the financial assistance.

5   Q    Okay.

6   A    In addition to that, we will discuss with them and provide

7   the information of what the requirements are.  We will try to

8   answer questions they may have regarding that and try to

9   problem solve with them the best way to do it.

10  Q    Okay.  So even after you're walking them through this and

11  giving financial assistance, it still can take some time?

12  A    Yes.

13  Q    Okay.  So I want to move on to the issue, another issue,

14  and that is the extent to which individuals at The Stewpot are

15  registered voters.  Do you inquire of the homeless individuals

16  who come to The Stewpot whether they are, in fact, registered

17  as voters?  Is that an inquiry that is made of homeless

18  individuals?

19  A    When we get that information from the client we do -- we

20  are able to find that they are registered voters when they

21  present their voter's registration card to us during a face-to-

22  face interaction in our office, as well as when they request

23  the application to register to vote.  We witness them

24  completing that application and sending it off.

25  Q    Okay.  And what is your impression as to how many homeless

1    individuals you are helping are, in fact, registered to vote?

2    A    We would say that more than half of our clients are

3    registered to vote.

4    Q    And to what extent -- do you have any information as to

5    whether your clients are interested in voting?

6    A    I would say that they do communicate their interest in

7    being able to vote.  That can take place either at our front

8    desk area when a client comes in and they express to us a very

9    wide array of questions at the front desk that we encounter,

10   and that does include asking how am I able to vote, where am I

11   able to vote.  If they're new to the Dallas area, that can be a

12   question that is asked, as well as what are the voter ID

13   requirements for me to be able to do that.

14   Q    Okay.  And when you are observing your clients and helping

15   them, do you have an opportunity to observe what their racial

16   and ethnic composition is of the individuals that you're

17   helping?

18   A    Yes.

19   Q    Okay.  And what would you say your best estimates are of

20   what the ethnic and racial composition is of your clients?

21   A    Sure.  If I could estimate just from visually interacting

22   with our clients on a daily basis and seeing visually who walks

23   into our doors, I would say that it is predominantly African

24   American.

25   Q    Okay.  Do you serve everyone who walks in through your

Mora - Direct / By Mr. Shapiro                              129

1   door and asks for assistance in obtaining ID?

2   A    We do not.

3   Q    Okay.  Who do you not help?

4   A    There are situations where we are not able to assist

5   financially with Texas ID or state ID or other vital records

6   for individuals who are not currently experiencing

7   homelessness.  So if they do not meet those criteria, due to

8   our budgetary constraints, we are not able to assist them.

9   Also, there are --

10  Q    If I can interrupt there.

11  A    Okay.

12  Q    Do you have any -- you present yourself as an organization

13  that's helping the homeless?

14  A    Correct.

15  Q    Notwithstanding that, do you still -- are you still

16  receiving people who are trying to get ID's who are not

17  homeless?

18  A    That is correct.

19  Q    Okay.  So how often does that happen?

20  A    On a daily basis.

21  Q    Okay.  I'm sorry I interrupted.  Please continue.

22  A    That's all right.

23       So the other reason that we may not -- we are not able to

24  assist is that if we've already assisted a client three times

25  in obtaining their Texas ID in a lifetime or in the time that

Mora - Direct / By Mr. Shapiro                          130

1    they've been coming to The Stewpot.  Also, we have to --

2    Q    If I may ask you about that, Ms. Mora.  I'm sorry to

3    interrupt again, but why is it that you have homeless

4    individuals who are asking for assistance in obtaining an ID

5    more than once?

6    A    Sure.  On a daily basis, the clients who sign up to see us

7    to request the financial assistance, they communicate that

8    their items have been stolen or misplaced.  That happens on a

9    very frequent basis for the clients when they are residing in

10   their shelters; when they reside outside.  Things are

11   confiscated by law enforcement if they are in an area, and that

12   happens on a very regular basis.

13   Q    Okay.  So we were going through a list of individuals you

14   cannot help and you told us about people who don't meet the

15   criteria of The Stewpot.  You told us that individuals were

16   repeatedly coming back for help regarding fees that can't get

17   it anymore.  Are there any others who are not getting help at

18   the Stewpot?

19   A    Yes.  So our budgetary constraints are that we are only

20   able to assist meeting with 10 clients -- I'm sorry -- helping

21   10 clients in the morning for Texas ID; that means meeting with

22   them for the first time to determine if they qualify for our

23   financial assistance, and another 10 people in the afternoon.

24   So that would be 20 people per day.

25   Q    Okay.  So what does that -- what kinds of barriers does

Mora - Direct / By Mr. Shapiro                    131

1   that create?  What have you seen in terms of the barriers that

2   they may be creating; that limit?

3   A    Sure.  We have clients that will line up outside our doors

4   before we've opened for business.  They communicate to us that

5   they've been waiting as early as 5:00 in the morning outside

6   the building.  The building can be -- very frequently is lined

7   around the building, the circumference of the -- or, the

8   parameter of the building.  When we open our doors at

9   8:00 o'clock, many times the line is formed around the big open

10  area where the clients reside.  Sometimes that line can be out

11  the door.  So if we only are able to accept 10 for that morning

12  then that leaves a large number that are not able to be

13  assisted, unfortunately.

14  Q    Okay.  So I want to move on to another topic, the Election

15  Identification Certificate.  When was the first time that you

16  heard of the Election Identification Certificate?

17  A    The first time I heard of the Election Identification

18  Certificate was the first time that I met you, Mr. Shapiro.

19  Q    Okay.  And when was that?

20  A    The first time I met you was during the first week in June

21  of this year.

22  Q    Okay.  And do you recall, when I mentioned the EIC to you,

23  what happened then, after I told you about it?

24  A    Sure.  We were very excited to hear about the EIC and it

25  possibly being another official ID that our clients can be able

Mora - Direct / By Mr. Shapiro                          132

 1   to utilize if they don't already have their Texas ID.  We

 2   currently have an ID called a Stewpot ID that is used for a few

 3   purposes in the Dallas area to be able to present as a photo

 4   identification, but it certainly has its limits of what can be

 5   used.  So to have an option of another official ID was very

 6   exciting to us.  My supervisor, Reverend Buchanan, contacted me

 7   and asked me to do some research on it to find out information

 8   and to present that to our staff to communicate that.  So I

 9   looked online at the Texas Department of Public Safety website.

10   I am somewhat familiar with it.  I do use it on a daily, if

11   not, regular basis to refresh myself on the different

12   procedures with the ID's, so I am familiar with the website.

13   When trying to find the EIC on the Texas website for DPS it was

14   very challenging.  I had not come across it before.  It was not

15   easy for me to find a link to it or to find it so, therefore, I

16   Googled it.  I Googled "Election Identification Certificate"

17   and that led me to part in the DPS website of where it was.

18   But at first it was not easy for me to be able to find.

19       Once reviewing the documents that are required for the

20   EIC, it was more clear to us, as I presented it to my staff,

21   that those similarities between the requirements for the Texas

22   ID and for the EIC are very similar, if not the same as far as

23   the amount of barriers to obtaining those secondary documents.

24   And so, therefore, the value of obtaining the EIC did not seem

25   higher than using those efforts to obtain the Texas ID itself.

1    The Texas ID can be used for voting, as well as many other

2    necessities that the client would have for the Texas ID.

3    Q    Okay.  So after researching it, what are your conclusions

4    about whether this is an ID that's an attractive ID for your

5    organization to be obtaining for its clients?

6    A    It is not a first priority in advertising or communicating

7    with the clients for the EIC documents for the reason I stated

8    before, that the amount of documents that are needed to present

9    to obtain it are equivalent, or very similar, to the Texas ID.

10   There are already many barriers in obtaining the Texas ID and

11   so, therefore, the energy spent is more, in our opinion as a

12   staff at The Stewpot, to obtain the Texas ID.

13   Q    And, Ms. Mora, do you recall ever hearing anything about

14   the possibility of having defrayed costs for paying for a birth

15   certificate in order to obtain an Election Identification

16   Certificate?  Have you ever heard of that concept?

17   A    The first time I had heard about that was the same time I

18   had heard about the EIC for the first time in speaking with

19   you.  When I looked on the website to gather more information

20   or more concrete information about what that would look like I

21   was not able to find any information about defrayed costs for a

22   birth certificate or what that would look like for our clients.

23   Q    And how did you go about searching?  Did you do a Google

24   search?

25   A    The same way I went about trying to find the EIC, looking

1    at the Texas Department of Public Safety website, as well as

2    doing a Google search, and I was not able to find anything.

3    Q    Okay.  Thank you, Ms. Mora.

4         **MR. SHAPIRO:**  No further questions.  Pass the

5    witness.

6         **THE COURT:**  How long do you expect the cross?  Do you

7    have an idea?

8         **MR. SCOTT:**  Well, we were told this was probably

9    going to be a total of 30 minutes of everything, so I'll bet

10   I've probably got 20 minutes, your Honor, or 30 minutes, but

11   that puts us pretty late.

12        **THE COURT:**  Yeah.  I'd say then we go ahead and take

13   a break.  And I'm showing it's about 10 after 12, so we return

14   at 10 after 1:00 p.m.

15      **(A recess was taken from 12:11 p.m. to 1:10 p.m.; parties**

16   **present)**

17        **THE COURT:**  Ready?  You can approach, ma'am.

18                      **CROSS EXAMINATION**

19   **BY MR. SCOTT:**

20   Q    Hi, Ms. Mora.

21   A    Hello.

22   Q    Let's get a little more information out there in the world

23   about a couple of things.  You, in your work at Stewpot -- now,

24   you're not there currently, right?  You've left there.

25   A    Yes.

1   Q    Okay.  But Stewpot is part of -- it's a -- it's set up by

2   First Presbyterian Church over in downtown Dallas, correct?

3   A    Yes.

4   Q    And the generosity of the men and women of that church, as

5   well as the people in the Dallas community, fund the

6   operations, for the most part, the -- the great work that's

7   done over at Stewpot, correct?

8   A    That is correct.

9   Q    Stewpot is what's known as a day shelter, correct?  Monday

10  through Friday.

11  A    Monday through Friday, not a night -- a night shelter

12  where the homeless reside.

13  Q    Yes.  And a night shelter is a place, for those that can

14  find a spot, that are on the streets, they have a chance to go

15  and get a good night's sleep at those places.  That's not what

16  Stewpot does.  Stewpot provides a place during the daylight

17  hours for someone to come and get out of the sun, get out of

18  the weather, and maybe help them get on with their life a

19  little bit further, right?

20  A    In part, yes.

21  Q    One of the things that is very remarkable about Stewpot

22  and the work you've done at Stewpot is the efforts that you all

23  have undertaken to help people, I guess, get into that

24  transition from homeless to perhaps a transitional shelter, a

25  night shelter, a permanent home, correct?

1    A    At times it is that, making that connection; sometimes

2    they're already at the shelter and then they are referred to

3    the Stewpot.

4    Q    One of the things that you all have created to help get

5    them along that path is a Stewpot I.D. card, correct?

6    A    That's one of the items we assist with.

7    Q    And, so, the part of the process of getting a Stewpot

8    I.D., there are certain forms of supporting identification that

9    you try and do so that a person has a card that they can then

10   use to get other services, correct?

11   A    Yes, to get services, and those services are limited.

12   Q    Sure.  One of those things that you -- a person, one of

13   the homeless folks up in Dallas, can do that is lucky enough to

14   get into Stewpot and lucky enough to get a Stewpot I.D. card,

15   they, then, can use that I.D. card to go over to the Dallas

16   Vital Statistics Office in order to get a birth certificate,

17   correct?

18   A    If they were born in the state of Texas.

19   Q    Yes.  Yes.  And we can limit it to that.  But they -- and,

20   then, the folks over at the Dallas Vital Statistics, they'll

21   accept the Stewpot I.D. card, correct?

22   A    For --

23   Q    As a form of I.D.

24   A    As a form of identification for the Texas birth

25   certificate.

Mora - Cross / By Mr. Scott                    137

1   Q    Yes, ma'am.  The other thing that you all do, because it

2   forms a supporting -- and I think you talked about it with

3   Mr. Shapiro -- but one of the other efforts that you undertake

4   is to get people these voter I.D. card -- I mean voter

5   registration cards, right?

6   A    We -- we receive -- they present them when they come to

7   see us for the first time, as well as if they request the

8   application for the voter's registration card, then we provide

9   that application to them to complete.

10  Q    Yes, and -- but one of the purposes, I guess, of that

11  voter registration card, it may very well be to vote, but it

12  also serves as a supporting form of identification for the

13  homeless, correct?

14  A    It is on the list of DPS's supporting documents.

15  Q    Yes.  And part of the process that you all attempt so that

16  you can -- with each of these homeless to get them back on --

17  at least into perhaps a shelter, a full-time shelter, is to get

18  them some identification, because some of those shelters

19  require identification; is that correct?

20  A    The shelters do require identification -- I'm sorry; some

21  of the shelters require identification to get into their

22  shelter.

23  Q    Okay.  And, so, that's a large part of what we're talking

24  about when we're talking about homeless folks that you all are

25  working with, correct?  You're trying to get them some

1  identification so that they can at least be able to find some

2  respite from the elements, correct, at night?

3  A    That's part of it, yes.

4  Q    I mean, that would be -- one of the things on the voter

5  registration cards that is another part of the services that

6  you all are able to provide for the homeless is a place for

7  them to receive mail, correct?

8  A    There are general mail services available at the Stewpot.

9  Q    So, if I don't -- if I show up as a homeless person and I

10  need a voter I.D. card, you all will help me, and I am allowed

11  to use that address for purposes of having the voter I.D. card

12  come there.  In fact, there's plenty of people that do that,

13  correct?

14  A    Our -- the general mail address can be used to receive a

15  voter's registration card.

16  Q    When -- and one of the things that each of the homeless

17  people face in order to even register to vote under federal law

18  is -- it's they don't have a home; they don't have an address,

19  correct?  I mean, that's very difficult when you don't have a

20  place to have the voter registration card sent to, to be able

21  to ever receive anything in order to even undertake to vote,

22  correct?

23  A    There are a portion of the homeless who do not have a

24  residence such as a shelter or a family member or transitional

25  housing, so the ones that stay in places that are not fit for

Mora - Cross / By Mr. Scott                      139

1    habitation can use the Stewpot's address to receive a voter's

2    registration card.

3    Q     So, when a person -- when one of the homeless goes through

4    the process and they get a birth certificate and they use

5    their -- and they have a voter registration card, what else do

6    they need to go to the Department of Public Safety in order to

7    effectuate getting a photo I.D. card?

8    A     Can you clarify your question?

9    Q     Well, sure.  I'm just asking, when you go to DPS, to

10   the -- you know, if I show up at the DPS, what other

11   documentation do I need to get a photo I.D. card?  Not a

12   driver's license, but just a photo I.D.

13   A     Are you referring to a Texas state I.D.?

14   Q     Yes, ma'am.

15   A     Okay.  To receive a Texas state I.D., if it's your first

16   one or if it's been more than two years since your last one

17   expired, you have to present a primary source of identification

18   or one secondary and two supporting.  In addition to those, you

19   have to also provide the proof of residency.

20   Q     Okay.  And, so, for purposes of that primary, would that

21   birth certificate, if you were able to help them get that birth

22   certificate through the Dallas Vital Statistics, would that

23   qualify as a primary?

24   A     No, it does not.

25   Q     Okay.  What would that qualify as?

Mora - Cross / By Mr. Scott                    140

1   A    It is one of the secondary.

2   Q    Okay.  So, what other sources of primary would somebody

3   need to get their -- or the two sources of secondary?  How do

4   you get them their photo I.D. that you undertake to try and get

5   them?

6   A    As I had said before, the primary, they can present either

7   a -- already having a Texas I.D. or driver's license; or they

8   can present a valid United States passport, meaning it has not

9   expired; or if they have immigration documents, if -- as

10  specified on the list, if they were not born in the United

11  States; as well as having an active military I.D. card.  Also,

12  if the person was born abroad as a United States citizen, they

13  could present that; or if they have been a naturalized citizen.

14  Q    Well, and, so, the homeless that you encounter, they don't

15  have any documents, right, for the most part?  Or they do?  I'm

16  trying to understand the universe that you're dealing with.  It

17  sounds like you've got somebody -- a lot of folks that show up

18  there that really don't have anything in the way of

19  documentation.

20  A    There is a large number that do not have any documentation

21  when they come through our doors, but there is also a

22  significant number that do have one or two items, and then

23  there are a few that have all of their items; they just need

24  the financial assistance.

25  Q    Okay.  Well, I want to make sure I understand the process

Mora - Cross / By Mr. Scott                    141

1   that you've undertaken and why you all take the steps that you

2   do.   The idea of registering -- asking a homeless person that

3   is worried about whether they're going to live under an

4   overpass -- under an overpass, whether they will be beat up by

5   one of the predators on the street that they face on a daily

6   basis, seems that that's -- the primary purpose of that act is

7   not to get them registered to vote so they can then walk on

8   November to go vote; it's more so that they can go through a

9   process of obtaining some type of photographic I.D. and using

10  that as an alternate source of identification.   Is that right?

11  A    I would be able to say that there is a wide variety of

12  reasons why clients come into our doors for the first time or

13  for another time and asking for assistance with I.D. or other

14  vital records.   It would include reasons for wanting to vote,

15  and it would include being able to get Texas I.D. or other

16  vital records.

17  Q    And, then, the Department of Public Safety -- I think

18  during your deposition you were kind enough to acknowledge that

19  they have -- they will allow someone who's homeless to use the

20  Young Street address where the Stewpot's located as the

21  location to be able to send their identification card, correct?

22  A    They are able to use the Stewpot's general address on

23  their affidavit of residency if they are residing in places

24  that are not fit for human habitation, such as the street, and

25  they have been receiving services with the Stewpot for 30 days

1    or more.  So, we do have some specifications.  If their address

2    is eligible to be -- our address is eligible to be able to use

3    for the residence of -- the affidavit of residence, then they

4    would be eligible to have their I.D. mailed to the address at

5    our location.

6    Q    And the same thing with the Secretary of State's office

7    and voter registration.  They -- or they're perfectly fine --

8    you have not run into a problem at Stewpot with the Secretary

9    of State saying:  We can't send the voter registration cards to

10   this general address on Young Street; have you?

11   A    Can you state your question again?

12   Q    Sure.  Have you run into some time -- during the time

13   you've been at Stewpot, you have not run into a problem with

14   the Secretary of State's office, who issues the voter

15   registration cards, to them saying they will not send them to

16   the Young Street address there at the Stewpot.

17   A    To my knowledge, we have not received any communication

18   from the Secretary of State office.

19   Q    And during your time there you have received -- or members

20   of the homeless community have received their voter

21   registration cards to that address, correct?

22   A    Yes.

23        **MR. SCOTT:**  Brian, will you put the website up?

24   Q    I want to walk through just ever so briefly, if we could.

25   Is this the DPS website that you were talking about during

1  your -- during your direct examination?

2  A    Yes.

3  Q    And, so, if we go -- so, there's two ways up here.  We can

4  go to -- and let me -- well, so it's -- they didn't give me the

5  pointer.  But see where it says "search DPS" up there?  Is that

6  where you would have done your Google search where you'd

7  type --

8          Hey, Brian, will you type -- oh, thanks.  Will you

9  type EIC right there?

10          Is that where you did your Google search?

11  A    No, that's not where I did my Google search.  I looked

12  throughout the different links on this page right here and did

13  not see anything that referred to the EIC.

14      **MR. SCOTT:**  So, hit "enter."

15      **(Pause)**

16  **BY MR. SCOTT:**

17  Q    So, then, that would be the screen where it would take you

18  to.  But you -- you didn't search it this way, so let's go back

19  a screen.  I want to make sure of something here.

20          And, then, the other way to do it would be, I guess,

21  to go DPS services, driver's license, apply for election I.D.

22  cards.  Is it -- ultimately, is this the site you got to?

23  A    Yes; through using the Google search.

24  Q    Okay.  So, when the Department of Justice showed up at the

25  homeless shelter in downtown Dallas, Texas, one day you told a

1  really interesting story in your deposition.  They wanted to

2  see if there were -- they could find some of the people that

3  are homeless on the streets in Dallas and whether they had been

4  impacted by SB 14.  Do you remember that?  This would be the

5  microphone effort.

6  A    Can you --

7  Q    Sure.  Do you remember --

8  A    -- clarify what SB 14 is?

9  Q    Sure.  Do you remember a day when the -- when Mr. Shapiro

10 showed up from the Department of Justice and you all got on a

11 microphone and asked if anybody had been impacted by SB 14?

12 A    It was not phrased that way.

13 Q    What was it phrased like?

14 A    We --

15           **MR. SHAPIRO:**  Objection.  Beyond the scope.

16           **THE COURT:**  Beyond the scope of --

17           **MR. SHAPIRO:**  Beyond the scope of direct.

18           **THE COURT:**  -- of what?

19           **MR. SHAPIRO:**  Of the -- of the direct.

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  We spoke with Mr. Shapiro, and he

22 communicated that there could be an opportunity to be able to

23 have clients who are present at the Stewpot, with my director

24 and myself approval, to communicate that if there was anybody

25 who was a registered voter and had the intention to be able to

1   vote and was experiencing difficulties and was not able to due

2   to not having a Texas I.D. or acceptable form of identification

3   could have the opportunity to speak with Mr. Shapiro.

4   **BY MR. SCOTT:**

5   Q    And you got five takers, right?

6   A    Less than five.

7           **MR. SCOTT:**  Okay.  I thank you for all you've done.

8   Thank you for the community.

9           Pass the witness.

10          **MR. SHAPIRO:**  No further questions, your Honor.

11          **THE COURT:**  I'm sorry we brought you back for just

12  about 10 minutes.  I thought it was going to go a little bit

13  longer.  But thank you for your time.  You can step down.

14      **(Witness stepped down)**

15          **MS. BALDWIN:**  Your Honor, the United States calls

16  Dr. Yair Ghitza.

17          **THE COURT:**  I'm sorry; who?

18          **MS. BALDWIN:**  Yair Ghitza.

19      **(Pause)**

20          **THE COURT:**  Good afternoon.  Would you raise your

21  right hand.

22              **YAIR GHITZA, PLAINTIFFS' WITNESS, SWORN**

23          **THE CLERK:**  Thank you, sir.

24  //

25  //

**DIRECT EXAMINATION**

**BY MS. BALDWIN:**

Q    Good afternoon.  Would you please introduce yourself to the Court by stating your name and place of residence for the record?

A    My name is Yair Ghitza.  I live at 365 North Halstead Street in Chicago, Illinois.

Q    And could you please tell the Court about your educational background.

A    Sure.  I was a computer science major undergrad.  I graduated in 2003 from the University of Michigan, and I recently completed my Ph.D. in political science from Columbia University.

Q    What was the title of your dissertation?

A    *Applying Large-Scale Data and Modern Statistical Methods to Classical Problems in American Politics*.

Q    And what are your areas of academic focus in political science?

A    I mainly focus on, as is mentioned in the title, statistical methods.  I do a lot of data visualization work, and it's particularly, you know, usually in the area of public opinion research.

Q    Where are you currently employed, Dr. Ghitza?

A    A company called Catalist.

Q    And what is Catalist?

Ghitza - Direct / By Ms. Baldwin                147

1  A    Catalist is a data and technology company.  We collect --

2  regularly we collect and update and maintain lists of

3  registered voters from all 50 states and the District of

4  Columbia.  We collect that data regularly, and we append it

5  with different data sources; publicly-available data like data

6  from the Census, data from commercial vendors, data from some

7  of our private clients; and we essentially collect all that

8  data, put it into a standardized form, and make it available to

9  organizations and research institutions to do their work.

10 Q    And what's your position title at Catalist?

11 A    I am the chief scientist.

12 Q    Dr. Ghitza, did you attach your C.V. to your report?

13 A    I did.

14 Q    Okay.  And does that C.V. accurately summarize your

15 professional background?

16 A    Yes, it does.

17 Q    Have you published scholarly papers in peer-reviewed

18 journals?

19 A    Yes, I have.

20 Q    On what topics?

21 A    On topics similar to what I just described; mainly public

22 opinion, statistical methods.  I also published a paper once on

23 computer vision, artificial intelligence, that research.

24 Q    In your professional or academic background outside of

25 this case, do you have occasion to perform quantitative

1  analyses on large sets of data, such as voter registration

2  databases?

3  A    That is what I do essentially every day.

4           **MS. BALDWIN:**  Your Honor, the United States offers

5  Dr. Yair Ghitza as an expert in statistical methods in

6  political science.

7           **THE COURT:**  I think we're waiting till the end of

8  direct to address that.

9  **BY MS. BALDWIN:**

10  Q    What did the United States ask Catalist to do in this

11  case?

12  A    The United States sent over a list that I understand to be

13  the list of registered voters in Texas.  It was a list that was

14  about 13.5 million records.  They asked us to take that data

15  and append certain fields onto it and send it back to them.

16  Q    Okay.  And what were the -- just -- we'll describe in more

17  detail later on the fields, but just as an overview, what were

18  the kinds of information that was asked to be appended to the

19  Texas voter registration data?

20  A    It was mainly census data, so the, you know, census block

21  that this person lived in and race estimates, race confidence,

22  and then a couple of additional flags that we had about certain

23  things for each of these registered voters.

24  Q    And was Catalist able to complete each of the tasks that

25  were requested?

1  A    Yes.

2  Q    And did you complete a report describing the work that

3  Catalist did in this case?

4  A    Yes.

5          **MS. BALDWIN:**  And, your Honor, just for the record,

6  that -- Dr. Ghitza's report is Plaintiffs' Exhibit 766.

7  **BY MS. BALDWIN:**

8  Q    I'd like to talk about each piece of information that

9  Catalist supplied to the United States in this case.  Could you

10  describe what census information Catalist provided and how that

11  was accomplished?

12  A    Sure.  So, included in the dataset that we got from the

13  United States was the address of the person.  So, you know, the

14  data table, it's 13.5 million records, and then in each one of

15  those rows there is certain information; you know, name,

16  address, things like that.  So, we took the address and we ran

17  it through pretty standard geocoding software.  These are

18  things at -- so, at Catalist, as I mentioned, we collect this

19  type of data and other types of data regularly, so this is a

20  standard procedure that -- that we do.  So, essentially, you

21  take the address, you put it into the geocoding software, and

22  then that software returns for each record down to the census

23  block where this person lives.

24  Q    Okay.  So, the information that was the result of that

25  process would be, like, the census tract, block group, and

1    block; is that correct?

2    A     That's right; along with census state, census county.

3    Q     Okay.  And this is software that does geocoding,

4    essentially?

5    A     Yes.

6    Q     Okay.  And this geocoding software; is that something that

7    Catalist created specifically for its work for the United

8    States in this case?

9    A     No.

10   Q     Is that something that you use all the time for geocoding?

11   A     Yeah.  Yeah, this is something -- you know, as I

12   mentioned, you know, we collect this type of data and other,

13   you know, large-scale and even small-scale data sources, and

14   we'll run -- we will run that through, you know, this type of

15   geocoding software or this geocoding software --

16   Q     Okay.

17   A     -- regularly.

18   Q     And does -- if anybody correctly used the geocoding

19   software that Catalist -- the same geocoding software that

20   Catalist used, would the geocode results be the same?

21   A     Yes, I believe so.

22   Q     Okay.  And we'll talk a little bit later about the race

23   estimates, but is the geocoding process and the geocoding

24   software, is that software separate from the race coding?

25   A     Yes.  It is entirely separate.

1  Q    Less -- is it fair to say that the process of doing this

2  kind of census information is a fairly mechanical process using

3  this geocoding software?

4  A    Yes.  That is.  That is definitely fair to say.  Again, we

5  do this type of thing all the time.  It's a standard process

6  that -- that we do.

7  Q    And no exercise of discretion on Catalist's part in doing

8  this?

9  A    No.

10  Q    Does it matter who Catalist's client is in the way that it

11  applies the geocoding?

12  A    No.

13  Q    What was the other kind of -- you mentioned some flags,

14  other kinds of information other than the geocoding and other

15  than the race.  What are those other kinds of flags that

16  Catalist provided?

17  A    Sure.  So, the first one is an NCOA flag.  That's the

18  National Change of Address.  So, that is, again, a piece of

19  software.  So, in this case, the National Change of Address

20  database is updated and maintained regularly by the U.S. Postal

21  Service.  And, so, again, what we would do in this case is we

22  input certain things from the Texas -- you know, the Texas data

23  that we got, name and address.  And, so, essentially -- so, say

24  I were -- if I were to move, I would submit something to the

25  U.S. Postal Service saying:  I'm Yair Ghitza; you know, I'm --

Ghitza - Direct / By Ms. Baldwin                    152

1    I'm moving.  So, this will export, you know, that.  So, if I

2    were on file, it would say, okay, this is the person, you know,

3    that moved.  So, we would return a flag saying that we know

4    that this person moved.

5    Q    So, in just in kind of simple terms, the flag, is that

6    just an equivalent yes/no indicator for whether that person had

7    a National Change of Address on file with the U.S. Postal

8    Service?

9    A    That's right.

10   Q    Okay.  And does that flag distinguish between whether

11   somebody moved across the street or out of state or to a

12   different county within Texas?

13   A    The flag that we return does not.

14   Q    Did Catalist have to create a new program or model to

15   provide the NCOA information to the United States in this case?

16   A    No.  Again, similarly to the geocode, this is standard

17   software that we use all the time.

18   Q    Okay.  What other kind of information, other flags, or

19   indicators did Catalist provide?

20   A    Another flag is a "deceased" flag.  So, again, this is a

21   yes or no indicator that we appended on, and that comes from --

22   so, we collect the social security death master file on a

23   regular basis, and then we also get additional records from a

24   commercial firm that also keeps records of who is deceased or

25   not.  So, you know, we matched that up to the database and then

1    said, you know, for each of the people whether we have a record

2    of them being deceased or not.

3    Q    Okay.  So, the data sources in the yes/no indicator of

4    deceased would be the social security death master file and a

5    commercial list.

6    A    That's right.

7    Q    And, again, are those things that were created specific

8    for this case?

9    A    No.

10   Q    Any exercise of discretion in applying that deceased flag

11   or not?

12   A    No.

13   Q    And the same with the NCOA flag.  Any exercise of

14   discretion whether that hits?

15   A    No.

16   Q    You get the overall numbers -- actually, let me -- one

17   more.  I think there was one other set of flag before we get to

18   the race information that was provided.  What was that?

19   A    It was the deadwood model.

20   Q    Okay.  And what's that?

21   A    So, that is a statistical model that is kind of an

22   independent indicator from the deceased flag that indicates

23   whether we think that this person essentially, you know, lives

24   and is currently alive at this particular -- at the address

25   that they are currently registered at.

Ghitza - Direct / By Ms. Baldwin                    154

1   Q     Okay.

2   A     So, that takes into account things like, you know, the

3   deceased flag, the NCOA flag, age; you know, different things

4   like that.

5   Q     And is that a model that Catalist built itself?

6   A     Yes.

7   Q     Okay.  Is that a model that Catalist built for this case

8   specifically?

9   A     No.

10  Q     Okay.  And I think your report goes through the overall

11  numbers, about 320,000 with the deceased flag, 270,000 for the

12  deadwood indicator, and about 880,000 for the NCOA flag.  What

13  was your reaction to that -- those numbers on the Texas file?

14  Was that unusual given --

15  A     No.

16  Q     -- the work that you do with other states?

17  A     It was not unusual.  That is very much in line, in the

18  expected range of, you know, what -- what we would expect.

19  Q     Okay.  Let's talk about the race information.  What is the

20  race information that Catalist provided back to the United

21  States?

22  A     So, the race information, that is a statistical model.

23  So, we returned two pieces of information.  This, again,

24  it's -- it's a piece of software.  We did not build this

25  software in house.  It was built by a company called CPM

1    Technologies.  Again, like some of the other software that I

2    described, you input certain things into it, record by record.

3    In this case, you know, some of the things that are really

4    important are name, you know, census, things like that.  And

5    what that will do is it will run through, again, this standard

6    piece of software, and it will export the statistical estimate

7    of the most likely race and a confidence level for that, you

8    know, projection, for that estimate.

9    Q    Okay.  So, if I understand, it's returning two pieces of

10   information:  a race and then confidence levels.  Is that

11   correct?

12   A    That's right.

13   Q    Okay.  If Catalist didn't build this software that it uses

14   for the race estimates, how is it that Catalist knows anything

15   about the reliability of that software?

16   A    So, we do all sorts of validations on this and on other

17   data that we get, so in this case we will, you know, pretty

18   regularly validate this.  So -- so, in this case, in

19   particular, you know, at some point in the past when we were

20   trying to figure out which were the -- which were the best

21   possible race estimates, you know, we took this vendor and some

22   other vendors and we compared the accuracy levels of these

23   different vendors.  It turned out, based on our, you know,

24   internal validation statistics, that the CPM race estimate was

25   the most accurate.  And, then, since then we, you know, have

1   revalidated this in a number of ways.  One of the ways is what

2   is shown in my testimony, a table where we compare the CPM race

3   estimates to self-reported race that we get from voter

4   registration databases in certain states. So, we do that to

5   build our own internal confidence as to how, you know, accurate

6   these race estimates are, and then we do all sorts of other

7   types of internal validations as well.

8   Q    We'll get more into the validations in a moment, but I

9   just want -- so the record is clear, you said "in this case"

10  with the CPM software.  Did you mean when Catalist initially

11  selected CPM to use, in general, for its race coding?

12  A    Um -- I don't remember what I -- when I said "in this

13  case."

14  Q    When did Catalist start using the CPM race coding

15  software?

16  A    It's written in my testimony, my written testimony.  I

17  believe it was 2009.

18  Q    Okay.

19  A    Um, but then we also did the validation more recently as

20  well.

21  Q    Okay.  And, so, at the time -- and I think 2009 is what

22  your declaration says -- you did some kind of judging between

23  all of the available products; is that right?

24  A    That's right.

25  Q    Okay.  And you've continued to use CPM since that time.

1   A     That's right.

2   Q     So, the CPM race coding was not something created specific

3   for this case, right?

4   A     That's right.

5   Q     Okay.  Let's talk about some of the validation work that

6   you were discussing, and I'd like to put up on the ELMO a page

7   from your report and focus in on paragraph 15.

8            So, the validation you mentioned, in order to do a

9   validation, I assume you have to have a dataset to validate

10  against.  So, when you're validating race estimates, what do

11  you use to validate those estimates against?

12  A     So, we have the statistical estimates that were output by

13  CPM, and then we compare them, in this case, to self-reported

14  race as it came on the voter registration file from the states

15  that are listed in this paragraph.

16  Q     Okay.  And, so, I believe there are nine states listed in

17  paragraph 15.  How does Catalist acquire the voter files from

18  those states?

19  A     Well, we will regularly call the Secretary of State.  I

20  mean, it's different from state to state.  You know, some

21  states it's the entire state as a whole; some states it's

22  county by county; and we -- you know, our -- this is not me

23  personally, but, you know, at Catalist we will, you know,

24  establish a professional relationship with each one of the

25  states, and then they will regularly, you know, send their data

Ghitza - Direct / By Ms. Baldwin                    158

1   over to us.  And then we will collect it, standardize it, and

2   put it into our, you know, overall database that we make

3   available to our clients.

4   Q    Okay.  And, so, the most recent validation that you

5   completed was in 2014; is that right?

6   A    That's right.

7   Q    Okay.  And, so, with these nine states, do you know, if I

8   went to register to vote in all nine of these states currently,

9   do they all currently give self-reported race, or is this

10  some -- is it for everybody on these voter files?  What went in

11  from these nine states to your validation?

12  A    So, in some of these states they are currently collecting

13  race on the voter registration records, on the voter

14  registration file, but in Kentucky that is not the case, and in

15  Mississippi that's not the case.

16  Q    But where does the race information that you have for

17  those two states come from?

18  A    They come from older versions of the voter registration

19  file that were collected years ago, and we maintained the self-

20  reported race from those years.

21  Q    So, for people who are still currently registered who

22  historically reported their race.

23  A    That's right.  And, so, just to be clear, you know, what

24  is included in this table -- so, in the state of Kentucky, for

25  example, it's not that hundred percent of the people in the

1   state we'll have self-reported race, but for the people where

2   we do have self-reported race, that is what is included in this

3   table and in this validation.

4   Q    Okay.  So, overall, you have, you know millions of records

5   of self-reported race.  So, what's the process that you do to

6   compare self-reported race from these nine states with the --

7   the algorithm for estimating race that Catalist uses?

8   A    Sure.  So, I will, you know, make an internal table that

9   has the race estimate as output from CPM, as I described; and

10  then next to it, in the same table, it will have the actual

11  self-reported race; and then I will make a table, you know,

12  like the one shown here, that compares the two so that I can

13  see the -- you know, the accuracy rates for -- for these

14  different measures.

15  Q    Okay.  Well, let's walk through concretely in this table.

16  In the left-hand row where it says "race:  white, black Asian,

17  Native American, other, unknown," and then it gives a number of

18  numbers, what's the source --

19  A    So, that is --

20  Q    -- for all of that?

21  A    That is the CPM -- so, each row indicates the CPM

22  estimated race.

23  Q    Okay.

24  A    So -- so, in the first row what I'm looking at is

25  essentially -- you see the N size right next to it?

Ghitza - Direct / By Ms. Baldwin                    160

1   Q     Yes.

2   A     So, what I'm saying is that among these people, you know,

3   21 million 300 or so thousand people are estimated as white by

4   CPM.

5   Q     Okay.

6   A     Then when we look at the four columns right next to it,

7   you know, those four are -- are taken together, you can't see

8   it too well, but, you know, the first column says:  highly

9   likely, then likely, then possibly, then uncoded.  Those are

10  the possibilities for the confidence levels.  So, if you add

11  that up, that adds up to a hundred percent, you know, for each

12  row.  So, in this case, what that means is that 70 percent of

13  the people who were coded as white are coded as highly likely

14  as well, 21 percent as likely, 7 percent as possibly, 2 percent

15  uncoded.

16  Q     Okay.

17  A     Then, on the right-hand --

18  Q     So, just to explain, then, so the vast majority of records

19  that were coded as white were coded as highly likely; like 70

20  percent of those.

21  A     Yeah.  That's right.  Seventy percent.

22  Q     Okay.  And, so, then, what is the three columns all the

23  way to the right, the CPM percent correct?

24  A     Sure.  So, what we're looking at there is, among the

25  people who are labeled white with a highly likely confidence,

1    when we look at what their self-reported race is off of the

2    voter registration file, 97 percent of those people self-

3    reported as being white.

4    Q    Okay.

5    A    And, then, similarly, 91 percent of the people who are

6    labeled white and likely, you know, 91 percent of those people

7    self-reported as white on the voter file, and then 78 percent

8    of the people who are labeled possibly and white, you know, are

9    white on the voter file.

10   Q    Okay.  And, so, then, the respective percentages

11   essentially of, you know, accurate classification where it

12   matches to the voter file for African Americans who got highly

13   likely, it would be 93 percent, and for Hispanics would be 90

14   percent, if I'm reading the chart correctly?

15   A    Yes.

16   Q    Okay.

17   A    That's right.

18   Q    And, then, what are the likely percentages for each of

19   those groups?

20   A    So, 91 for white, 81 for black, 77 for Hispanic.

21   Q    Okay.  And how do you -- what do you -- what's your

22   takeaway from this chart in terms of your confidence in the CPM

23   estimates that you're coming up with?

24   A    Well, I mean, these, you know, make sense to me, you know,

25   the highly likelies are better than the likelies and better

1   than the possiblies.  You know, these are, I think, in the

2   expected range of, you know, what we've seen historically, both

3   in validations that are similar to this, and in other types of

4   validations that we've done.  You know, from -- from our

5   perspective -- so, for us internally at Catalist, you know,

6   when we see this sort of thing, you know, that is good, you

7   know, validation for us, you know, separate from -- you know,

8   CPM they do -- they -- they have their own description of, you

9   know, how -- you know, they have highly likely, likely,

10  possibly, they say that their model is good, but when we --

11  when we see this and we do this type of thing ourselves, it

12  raises our -- our confidence that these estimates are doing

13  what they -- what they should do.

14  Q    Okay.  And you had mentioned some other kinds of

15  validations that Catalist has done beyond just comparing to

16  self-reported race.  What are those?

17  A    Well, so, this -- what I meant was this is self-reported

18  race from the voter files.

19  Q    Yes.

20  A    But what we also have, for example, is we -- you know,

21  our -- our clients will do polling, you know, nationally

22  representative polling or, you know, different types of

23  polling, and so you can get self-reported race estimates from

24  those as well.  And when I've done these types of validations

25  of the CPM race coding on that in the past, you know, the

1    numbers are pretty similar.  You know, they're all in this --

2    in this rough range.

3    Q    Okay.  Have scholars published peer-reviewed papers

4    validating and using the Catalist race data?

5    A    Yes.

6    Q    Are you aware of any criticism of Catalist race data in

7    any peer-reviewed journals?

8    A    Not that I'm aware of.

9    Q    Okay.  When -- so, I take the percent correct -- you know,

10   that there is some misclassification that happens in these

11   Catalist race estimates.  Is that right?

12   A    Yes.  That's right.

13   Q    And when misclassifications occur, what are the reasons

14   why that would take place?

15   A    Well, I mean, this is a statistical estimate.  So, if we

16   had perfect information, you know, from some other source, then

17   we wouldn't need a statistical estimate.  But in this case, you

18   know, we're taking things like someone's name; you know, so, if

19   somebody has a name that appears highly likely to be associated

20   with being a Hispanic or being African American, you know, the

21   model will pick up on that.  Same thing with last name, and

22   then same thing, of course, with census data.  So if somebody

23   lives in an area that is very, very highly likely to be black,

24   you know, especially in combination with, you know, having a

25   name that's more likely to be black, those are the types of

1    things that will make something correctly classified, but there

2    are going to be, you know, cases that -- that are not that.

3    So, you know, if, for example, you have an African American who

4    has a name that is not, you know, particularly highly

5    associated with being African Americans, you know, when you do

6    the statistical analysis, you know, and they live in a place

7    that, you know, doesn't have too many African Americans, then

8    the statistical model may, you know, get that wrong.

9    Q    Okay.  If you're trying to measure the difference between

10   races using these estimates as your definition of race, what

11   effect, if any, is misclassification going to have on the

12   characteristic that you're trying to study?

13   A    So, generally speaking, you know, what will end up

14   happening is, you know, if you're using these types of -- of

15   estimates that have misclassification in them, what will end

16   up -- what will tend to happen is that the two groups that

17   you're trying to measure the difference between -- so, say, for

18   example, you're looking at the difference between white people

19   and black people.  When there is misclassification, you know,

20   on both sides, it will tend to make it look like those

21   differences are smaller than they actually are in reality.

22   Q    Why is that?

23   A    So, you know, if you have -- so, for example, if you

24   have -- if you have a perfect measure of something -- so, you

25   know, let's say that something happens only to white people and

Ghitza - Direct / By Ms. Baldwin                 165

1   doesn't happen at all to black people, and you have perfect

2   measures, then you can measure that perfectly.  But then, you

3   know, if there is misclassification on both sides, you know,

4   some white people will appear to us, or to whoever is doing

5   this analysis, will appear -- some of the white people will

6   appear to be black; some of the black people will appear to be

7   white.  And, so, you know, those differences will be

8   confounded.  They will -- they will look like they are more

9   similar than they actually are.

10  Q    Now, when you perform your validations, you do it using

11  self-reported race.  Where self-reported race is accurately

12  corrected, does that mean that you think that that's the

13  highest quality data source?

14  A    Um -- well, you had an important caveat; where it is

15  accurately recorded, or where it is accurately -- so -- so,

16  yes.  If it is accurately recorded and recorded in a certain

17  way, you know, then -- then, yes, I would consider that the

18  most -- the most accurate.

19  Q    If you had a so-called self-reported race data source that

20  does not provide individuals of a particular race or ethnicity

21  with the option to select and report the race that they

22  actually identify with, would that cause you any concerns about

23  using that data as a source of validating?

24  A    Uh, yes, absolutely.  I think that that would be, you

25  know, very problematic.

1  Q    Okay.  I just want to be clear.  Did Catalist have any

2  involvement in designing or implementing the database matching

3  process that Dr. Ansolabehere conducted regarding SB 14 I.D.

4  possession?

5  A    No.

6  Q    Did you --

7  A    None -- none at all.

8  Q    Did Dr. Ansolabehere have anything to do with the race

9  coding that was done here?

10  A    No.

11  Q    Did anybody at Catalist know what the results of the

12  database matching was in terms of who had I.D. and who didn't

13  have I.D. at the time it assigned race to each voter on the

14  voter file?

15  A    No.

16  Q    Did Catalist's clients have any involvement whatsoever in

17  processing the voter file that you received from the Department

18  of Justice in applying these flags?

19  A    No.

20  Q    In general, how does the ideology or political affiliation

21  of Catalist clients affect the work that you do at Catalist

22  with data as the chief scientist?

23  A    Well, I mean, the main role that I have, you know,

24  especially in a case like this, where we're appending data,

25  is -- is -- our role is to provide the most accurate and best

Ghitza - Cross / By Mr. Scott                    167

1   data possible, you know, regardless of who the client is or

2   regardless of, you know, the -- what the particular goal of the

3   client is.  You know, we are hired and continue to be hired

4   because our estimates are unbiased, you know, to the best

5   extent possible; they're accurate to the best extent possible.

6   You know, that -- that is, you know, what we do.

7   Q    And people pay you because they want good data --

8   A    Yes.

9   Q    -- at the end of the day.

10  A    That's right.

11         **MS. BALDWIN:**  Pass the witness.

12         Thank you.

13                        **CROSS EXAMINATION**

14  **BY MR. SCOTT:**

15  Q    Hello, Dr. Ghitza.

16  A    Hello.

17  Q    So, Catalist actually was hired by the Department of

18  Justice, correct?

19  A    Yes.  To my knowledge.

20  Q    And you work for Catalist.

21  A    Yes.

22  Q    Okay.  And, so, your work as an expert in this case is

23  really derivative of your work as an employee of Catalist.

24  Fair?

25  A    Yes.

Ghitza - Cross / By Mr. Scott                168

1  Q    Catalist has a management team that runs the company, and

2  you are part of it, correct?

3  A    That is correct.

4  Q    So, you are the senior scientist, but you're now the chief

5  scientist, so maybe this wasn't a correct -- quick snapshot of

6  the company.  Harold Ickes?  Is that -- pronounce his name

7  right?

8  A    Yes, you did.

9  Q    He's the president of the company?

10 A    Yes.

11 Q    What's -- so, is Mr. Ickes -- Ickes -- is he the same man

12 that used to be the chief of staff for President Clinton?

13 A    I don't think he was chief of staff.  I think he was

14 deputy chief of staff.

15 Q    Okay.

16 A    I'm not sure.

17 Q    Now, a second ago you said you all's results that you

18 send -- that you do for clients do not vary -- and I'm

19 paraphrasing -- based upon who the client is.  You have data,

20 you provide data to people, and you don't care who the client

21 is.

22 A    Right.  So, to be clear, you know, when we're providing

23 data, such as the data that's provided here, you know, we don't

24 change the way that that, you know, data is -- is processed,

25 you know, based on the client, you know, especially when it's

```
                    Ghitza - Cross / By Mr. Scott              169
```

 1  standard things like this.

 2  Q    I'm listening.

 3       **(Pause; voices and whispers off the record)**

 4            We've put one of your contracts up from your company.

 5  If you'll enlarge this.  I'll tell you what; let me borrow the

 6  pointer, too.

 7       **(Pause)**

 8            So, DOJ, when they come and they sign a contract,

 9  they have to execute an agreement with you, right?

10  A    Uh-huh.

11  Q    All clients do, correct?

12  A    That's right.

13  Q    And DOJ is no exception to that rule, correct?

14  A    That's right, as far as I know.

15  Q    Okay.  So, let's enlarge that a little and make it a

16  little clearer.

17            So, what we know is that Catalist --

18            "Catalist seeks to support all of its clients with

19            flexible, affordable, 24/7 access to the highest

20            quality and most comprehensive person level data

21            related to civic engagement.  Catalist's products and

22            services are only available to organizations pursuing

23            progressive missions through advocacy, electoral

24            participation, and civic engagement."

25            I'm sorry; I've had three hours in two nights.  But I

Ghitza - Cross / By Mr. Scott                    170

1    read that right, didn't I?

2              MS. BALDWIN:  Objection as to relevance, whether

3    this -- I don't know when this contract is from.  It's

4    certainly -- it's -- there is no foundation or basis to suggest

5    that this is what the contract with the United States would

6    say.

7              MR. SCOTT:  I would agree the best evidence would be

8    the contract from the United States.  Do you all have it?

9              THE COURT:  Overruled.

10   BY MR. SCOTT:

11   Q    Is this provision in your contract with the United States?

12   A    I have no idea.

13   Q    Any reason to doubt that it's in it?

14   A    Yeah.  I think there is.

15   Q    Why is that?  Have you seen the contract?

16   A    I have not seen the contract, but I do know, for example,

17   that, you know, there are other types of organizations like,

18   for example, the Pew Research Center, University of

19   Massachusetts, you know, Duke University; there are different

20   universities that, you know, do get access to the Catalist

21   data.  So, I don't know when this contract is from, but, you

22   know -- and I -- I mean, I do not sign those contracts; you

23   know, I don't generally review the contracts that we have.

24   But, you know, this is not -- I wouldn't say that this is

25   consistent with my understanding of -- of everybody that we

Ghitza - Cross / By Mr. Scott                    171

1   provide our data for.

2   Q    So, if you later learned that this was actually a contract

3   from a university, that would surprise you?

4   A    I don't read contracts --

5   Q    Okay.

6   A    -- very much.  I don't really know --

7   Q    Fair enough.

8   A    -- generally what's -- what's written in them.

9   Q    Let's go back over to -- let me find a clean copy of your

10  -- (indiscernible) I'll try this on the ELMO.

11          MR. SPEAKER:  I got it.  I got it.

12          MR. SCOTT:  Oh, you got this thing?

13          MR. SPEAKER:  Yeah.

14          MR. SCOTT:  Yeah.  That would be great.

15  BY MR. SCOTT:

16  Q    So, this is out of your report that was filed in this

17  case; is that correct?

18  A    That's right.

19  Q    And this is the declaration -- I'm sorry, not report;

20  declaration that you filed with the Court and that you visited

21  with Ms. Baldwin about, correct?

22  A    That's right.

23  Q    Let's cover a couple of baselines.  First, none of this

24  has to do with the State of Texas, correct, from the standpoint

25  of State of Texas data?

1    A    I would agree with the second part, not the first part of

2    your sentence.

3    Q    Okay.  Well, you -- this CPM percent correct on the CPM

4    race confidence percentage has nothing -- this -- strike that.

5    How about this.

6         This -- this number, the N size, is made up of

7    information from these states, correct?

8    A    That's correct.

9    Q    Okay.  And Texas is not listed in these states, correct?

10   A    That's correct.

11   Q    Okay.  And of this total number of universe, what was done

12   is -- in this process -- that was done by you, correct?

13   A    Yes.

14   Q    -- was to figure out when -- when the Catalist race

15   classification system that it uses from CPM -- which is where

16   the software comes from for the actual race classification,

17   correct?

18   A    That's correct.

19   Q    When that is used, those are the percentages of likelihood

20   that you're going to get of that assignment, and what you did

21   over here was double check to see how likely those -- those

22   processes are, correct?

23   A    You said a couple of things.  So, just to be clear, what

24   I'm showing here is in the states that are listed above, you

25   know, that is the N size of the race estimates provided by CPM

1    for each race; the percentages of them that came out highly

2    likely, likely, possibly, uncoded by race; and then the percent

3    correct for each of those.

4    Q    So, if I flip a coin, it's 50 percent one side, 50 percent

5    the other side, heads or tails, correct?  In general.

6    A    Um, if you flip a coin, that's the case, but, you know, if

7    you're trying to randomly decide between these races, there's

8    more than two choices.

9    Q    Okay.  But if we come over here to your highly likely at

10   least with this regard -- so, let me point to it

11   (indiscernible).  For your designation black, highly likely,

12   the highest number for -- is that eight million different

13   people over there -- is going to be 40 percent that you could

14   say with a high likelihood that that's the right race

15   classification, correct?

16   A    So, among this group, 40 percent of the people who are

17   categorized as black are also categorized as highly likely.

18   Q    And if they're not categorized -- and, again, this is --

19   this is not checking your -- your percent, because over here on

20   the right-hand side of this chart, that's the grades you give

21   these, right?

22   A    What's that?

23   Q    This is a grading process.  You're using -- the

24   93 percent, you're saying 93 percent of the time 40 percent of

25   these matches are correct for black, for the race

1   classification.  Correct?

2   A    I'm saying for those 40 percent, they are correct

3   93 percent of the time.

4   Q    When you provide data on race classification, like the

5   data that you all provided to the Department of Justice in this

6   case, do you tell them when you have someone that there's

7   only -- let's put somebody in the possible phrase that's --

8   person who's possibly black, 42 percent of the time

9   classification, and over here we find that that's only right

10  54 percent of the time.  Do you give them some instructions as

11  to how they're supposed to interpret that?  I mean, are they

12  supposed to do .54 times 42 and know that that person should

13  represent, you know, 20 percent of a -- of a body?

14  A    Well, I mean, the reason that we include the race

15  confidence estimate is to give the people who are using the

16  data an indication that we are less confident in, you know, one

17  race coding estimate than you would be if it were highly

18  likely.

19  Q    I guess, did -- well, let me ask you, first of all; did

20  you provide some guidance to the Department of Justice on how

21  much value they should be ascribing in any of the different

22  sections, for the possible, the likely, the highly likely?

23  A    Well, we gave them all of these codes in all of the data

24  saying that this is highly likely, likely, and possibly.  And,

25  you know, it was up to the researchers, who have used this --

1   you know, Dr. Ansolabehere has used this data before; you know,

2   I -- in -- you know, previously, completely independently of

3   this case, you know, I've spoken to him about, you know, these

4   race estimates, and he understands what they are; he

5   understands that, you know, there are -- there is measurement

6   error; he understands, you know, what these race confidence,

7   you know, measures are supposed to indicate.  So, to the extent

8   that we provided that data for every one of the records, you

9   know, that is an indication of, you know, our confidence level.

10  You know, I would say that this data here, this refers to

11  our -- you know, one of our internal validations of, you know,

12  how we perceive the data.  You know, but I would say that, you

13  know, this -- this does validate the idea that highly likely,

14  likely, and possibly, you know, are meaningful categorizations.

15  Q    Well, and by "meaningful," you would multiply -- at least

16  if you were sitting here trying to understand what the -- what

17  percentage is going to be correct, you would multiply -- for

18  instance, a Hispanic who's been labeled possibly Hispanic, you

19  would say that's got about a 58 percent chance of being right,

20  based on your study, correct?

21  A    Yeah, someone who is labeled Hispanic and possibly, for

22  those people, they are about 58 percent correct.

23  Q    And you can do the math using your matrix that you've set

24  up up here; you just pick one and you categorize that, and then

25  we multiply that times that, and that gives us the race

Ghitza - Cross / By Mr. Scott                    176

1   confidence, basically, that you have, based upon the work that

2   you've done.

3   A    No.  So, I mean, if you -- so, the confidence that I would

4   have -- so, you looked at white and possibly.  So, the

5   confidence that I have in people who are labeled white and

6   possibly is -- I mean, I would say that the accuracy rate is 78

7   percent.  It's not 78 percent times seven percent; it's 78

8   percent.

9   Q    Sure.  And I think we're saying the same thing.  So, it's

10  70 percent of the time, on the highly likely person, that

11  person actually turns out to be white, correct?

12  A    I'm sorry; say that again?

13  Q    If you use the CPM race confidence software to assign a

14  race to an individual --

15  A    Uh-huh.

16  Q    -- that you don't know who the -- what the individual's

17  race is --

18  A    Uh-huh.

19  Q    -- 70 percent of the time that's correct.  Is that right?

20  A    No, no, no, no, no.   No.

21  Q    Okay.

22  A    So, 70 percent -- so, of the people who are labeled white

23  by CPM for this data set, 70 percent of them are labeled highly

24  likely, 97 percent of those people are -- we expect to be

25  correct.  So, you can do a multiplication, but it's not as --

1    it's not the simple -- you know, it's not the type of

2    multiplication that you were talking about.

3    Q    Simple is a good word.  Don't -- don't --

4    A    (Laughing)

5    Q    So, for purposes of the Texas data, did you run the Texas

6    data against, for instance, known information that you had in

7    the state of Texas?

8    A    Sorry; what do you -- what do you mean?

9    Q    Well, for instance, a race field was taken from the State

10   of Texas records, and the Department of Justice had that race

11   classification for over 25 million different --

12           **MS. BALDWIN:**  Objection.

13           **MR. SCOTT:**  -- Texans --

14           **MS. BALDWIN:**  There is no foundation that Dr. Ghitza

15   ever received any race data from DPS.  Mr. Scott's welcome to

16   ask him if he received such data; he didn't.  There is no --

17           **THE COURT:**  Well, I thought that's what he's asking

18   him.

19           **MR. SCOTT:**  That's what I was doing.

20   **BY MR. SCOTT:**

21   Q    So, let's start, I guess, back at the beginning.  Did you

22   receive from the Department of Justice any information that

23   they had received from the Texas Department of Public Safety on

24   the race classification of over 25 million Texans?

25   A    No.

Ghitza - Cross / By Mr. Scott                    178

1   Q    And one of the purposes of this study that was in

2   paragraph 15 of your report is to find out how close the

3   computer is when comparing to people's self-reported

4   information; is that correct?

5   A    Yeah.  So, the purpose of this paragraph is to present

6   our -- our understanding of how accurate these are in

7   comparison to self-reported race.

8   Q    To determine what percentage you thought that your

9   system -- your use of the CPM system was correct, you used

10  self-reported data.  I guess that's what I want to get to.

11  A    We used the particular type of self-reported data that I

12  described here.

13  Q    And why is that?

14  A    Because that data has been shown in the past to be of --

15  that particular data, meaning the data that comes on the voter

16  registration files, in our experience, you know, has been high

17  quality, has been, you know, all of the different races that we

18  are interested in measuring, are all -- you know, are all --

19  are all measured here, so it's -- it's pretty high quality

20  data.

21  Q    So, there may be an error rate and some clerical -- some

22  clerical error where somebody inputs something wrong, but

23  that's -- there is less chance of that with self-reported race

24  data than there is with a computer program that comes up with

25  that same derivation, correct?

Ghitza - Cross / By Mr. Scott                    179

1   A    I mean, I would say that that's true, given that the self-

2   reported data is collected in a good way, in a proper way.

3   Q    Now, I think you said Kentucky -- how old was the race

4   data that you were collecting from Kentucky?

5   A    I'm not sure.

6   Q    Well, did you give the year?  Did you -- was it the

7   1960's?

8   A    I -- I don't know.  I didn't look into it.

9   Q    Okay.

10  A    I think I looked into it, and the most recent was in 2006.

11  Q    Okay.  Now, all nine of those states report race with

12  regard to their voter registration information?

13  A    So, currently, my understanding is that seven of them do;

14  seven of the nine.  And for Kentucky and for Mississippi, they

15  do not, but we acquired earlier versions of the file that had

16  that information on there.

17  Q    And by "earlier versions," what year was that?  Was that

18  the 2006 data you're talking about?

19  A    I'm not sure, to tell you the truth.

20       **(Pause)**

21  Q    Now -- throw something on the ELMO.  Here we go.

22  A    One thing I can say for -- for what it's worth, is that if

23  you actually take Kentucky and Mississippi out of that -- out

24  of that data set, the -- out of that table, the results will

25  look, you know, almost identical.

Ghitza - Cross / By Mr. Scott                    180

1   Q     Okay.  This is -- this is you, right?

2   A     That's my name, but I don't remember ever seeing this.

3   Q     Well, let's go through it and see what's accurate or not.

4   How about that?

5   A     Sure.

6   Q     So, that's your name spelled correctly, correct?

7   A     Yes.

8   Q     Employment history; director of special projects,

9   Democratic National Convention, correct?

10  A     Yeah, that was a short job a long time ago.

11  Q     Education; so, this was a while back, because it shows

12  computer science, University of Michigan.  Since then you have

13  successfully completed and defended your dissertation at MIT,

14  correct?

15  A     Columbia.

16  Q     Columbia.  Sorry.  Web references.  Research topics.

17  ACORN.  American Capital Research dot org?  What -- what was

18  that?

19  A     What -- what is Capital Research dot org?

20  Q     Well, how about we'll start with ACORN.  It says "research

21  topics, ACORN."  What was that?  Do you know what that is?

22  A     No.

23  Q     Okay.

24  A     I mean, I know what ACORN is, but I don't have any

25  recollection of anything that I did, research, you know, for

Ghitza - Cross / By Mr. Scott                    181

1   them or about them specifically.

2   Q    This has research topics; it's got a bunch of listings.

3   It includes Bill Clinton, President Obama, George Soros; Howard

4   Ickes?  I thought it was Harold.

5   A    Yeah, I have no idea what -- what this is or where this is

6   collected from.

7   Q    Okay.  Okay.

8   A    I mean, some of these things I don't recognize at all.

9        **(Pause; laughter)**

10  Q    What's the New York Open Statistical Programming Meetup?

11  A    Uh, so, do you know what "meetups" are generally?

12  Q    No.

13       **(Laughter)**

14  A    So, "meetups" -- there is this website, meetup.com, and

15  there maybe others, but it's basically, you know, groups, like

16  informal groups that meet and discuss different topics.

17  Q    And on these is it a -- is it a data hacker site?

18  A    What's that? **(Laughter)**

19  Q    It's got "about us," and it's got "data hackers, 3,969."

20  A    Okay.

21  Q    Are you a data hacker?

22  A    **(Laughing)**  I mean, I'm not exactly sure what -- you know,

23  what that means, but, you know, I think that that -- I would

24  guess that there are probably people who sign up and, you know,

25  may describe themselves that way.  Do you know what a data

1  hacker, like, what that would mean, sort of culturally?

2  Q     No.

3  A     So a lot of times people who are, like, good at computer

4  programming, you know, they will get together, you know, and

5  they will just talk about, like, hacking which sort of, you

6  know, means getting their answer or working out a project

7  working on it together, you know, just basically like good at

8  certain coding and doing, like, beta stuff.

9  Q     So if we can turn a little bit further in your report and

10  I believe it's Paragraph 23.  For the information that was

11  produced in this -- the Department of Justice -- or attached to

12  the information that the Department of Justice gave -- and let

13  me ask you something.  Catalist has a lot of services they can

14  provide for clients if they're willing to pay for it, correct?

15  A     Sure.

16  Q     One of those services would be access to a voter

17  registration -- well, strike that.  Does Catalist have in its

18  system the voter registration files of all 50 states?

19  A     Yes.

20  Q     How about the District of Columbia?

21  A     Yes.

22  Q     Puerto Rico?

23  A     I don't know.

24  Q     All right.  So out of all that information, do you have

25  the ability to determine if a voter is registered in one or

1   more of those states?

2   A      Uh --

3   Q      Did you dream up a way to do that?

4   A      Kind of.  We kind of do.

5   Q      And so it would be creation of a software program by which

6   you'd run to get that information; is that correct?

7   A      Um -- yeah, that's one way you could do it.

8   Q      What's another?

9   A      Well, I mean, creation of a software program.  I mean, you

10  can do an analysis that doesn't necessarily require, like, a

11  custom software program.  You know, you can try different ways

12  of trying to estimate that but, you know, it could be difficult

13  to try to estimate that accurately.

14  Q      Did the Department of Justice ask you to try and determine

15  whether any of the people who were on the no-match list in

16  Texas -- or even the match list since they were going through

17  this effort were registered in any other state?

18  A      I did not get access to the no-match list or match list at

19  all.

20  Q      So -- just so we're perfectly clear, you were not asked to

21  search such -- to do such a task; is that correct?

22  A      That's correct.  I mean, we did include the NCOA flags

23  which indicates that someone moved and that includes people who

24  moved out of state but that -- yeah, that's the extent of it.

25  Q      And number-wise, that was over 800,000 people who were on

Ghitza - Cross / By Mr. Scott                    184

1   the NCOA -- had a NCOA flag attached to them, correct?

2   A    Uh -- I believe so.  Is that what it says there?

3   Q    I can find it.  Uh, 882,113 individuals out of the

4   13,500,000 had a NCOA flag attached.

5   A    Okay.

6   Q    Does that sound right?

7   A    Yes.

8   Q    So out of all the Texas records, if we include the highly

9   likely for White, Black, Hispanic, you had a confidence level

10  of 50.2 percent that they were highly likely on the race

11  estimate or race classification; is that correct?

12  A    So just to say it exactly, 50.2 percent, about -- you

13  know, about half of the 13.5 million were labeled highly

14  likely.

15  Q    So about half were not?

16  A    Uh, yes, 22.5 were labeled likely; 25 percent were

17  possibly and 2.2 were uncoded.

18  Q    And the list speaks -- I mean, if -- well, yesterday we

19  found some examples where people were labeled highly likely

20  fill in a race and they turned out to be a little wrong.  So by

21  saying that 50.2 percent of Texas voters -- voter records had a

22  confidence of highly likely does not mean that you're saying of

23  those 50.2 percent, you're a hundred percent right that those

24  are correctly classified; is that correct?

25  A    Right.  So, I mean, to be clear, you know, if we, like,

1   refer back at least mentally to the table that we were talking

2   about before, you know, those numbers -- the accuracy numbers

3   that we presented there were not at 100 percent.  You know,

4   they were at 97 percent, you know, 93 percent, you know,

5   something like that.  So there are going to be

6   misclassifications even among people who are labeled highly

7   likely.

8   Q    And the program -- the software that allows Catalist to be

9   able to predict what race a person is -- you-all get --

10  Catalist gets that information from an entity known as CPM

11  Technologies, correct?

12  A    Um -- yes, the software is provided by CPM.

13  Q    And CPM Technologies has no connection at all to Catalist,

14  correct?

15  A    No, it's an independent -- it is an independent company.

16  Q    The man who started that company was working as the chief

17  architect for Catalist when he started that company, correct?

18  A    Um -- I don't know exactly the timing of it but, yes, at

19  one point, he was the chief architect.

20  Q    And so there is more than a little bit of a professional

21  relationship at the very least; is that correct?

22  A    Well, I mean, he doesn't work at Catalist now.

23  Q    Does Catalist still work with him on a daily basis or CPM

24  -- using CPM Technology?

25  A    We use CPM software but we -- I mean, I have not talked to

Ghitza - Cross / By Mr. Scott                    186

1    Eric.  So it's Eric Brauner (phonetic).  I have not talked to

2    him for a long time and I -- you know, I wouldn't say that we

3    maintain, you know, strong, daily, professional contact with

4    him.

5    Q    Well, do you know if you ever reached out to him to try

6    and ask if the State of Texas could make use of that software

7    to identify how it is that he comes up with his race

8    classifications that the Department of Justice was trying to

9    find SB14 violated The Voting Rights Act?

10   A    Sorry, that was a long sentence.  Can you say it again?

11   Q    The right sentence.  Did you ever contact the architect of

12   CPM, former employee of Catalist, to ask if he would turn over

13   the software or identify how software was used to be able to

14   make these race predictions?

15   A    So my job here, you know, in this process was to -- so

16   first of all, Catalist's job was to take the Texas file and

17   append the CPM race data, the CPM race confidence and the other

18   data.

19        My job here in terms of what I was trying to relay in

20   my report was our own internal levels of how confident we are

21   in the accuracy of these -- you know, of these different, you

22   know, race codings that we have.  So, you know, to the extent

23   that -- are you asking whether it is appropriate to use the CPM

24   race data for this task?  Is that the question?

25   Q    I'm just curious if you'd ask him if we could make use to

1    find out how it is that he derived the ability to classify

2    races for people in Texas that is the basis at least in part of

3    this lawsuit?

4    A    So I do know generally speaking -- I don't know all the

5    specifics but I do know generally what the methodology is, you

6    know, that CPM uses to make these estimates.

7    Q    And from the standpoint of -- as we sit here today, did

8    you ask him for the State of Texas to be allowed to make use of

9    that information?  Did anybody ever ask you to ask him?  Maybe

10   that's an easier way.

11   A    Was I asked to ask him if he should use this for Texas?

12   Q    No, sir.

13   A    Okay.

14   Q    Did anyone from the Department of Justice let you know

15   that the State of Texas was trying to obtain for purposes of

16   doing discovery in this case the underlying data and the

17   ability by which CPM Technologies was able to produce race

18   classifications that are being used in this case?

19            MS. BALDWIN:  Your Honor, we heard a whole discussion

20   with thus Court where we talked about the fact that it was

21   proprietary.  We had a colloquy.  I said we would provide the

22   validation data that we had from the client that the Department

23   of Justice actually contracted with and that resolved that

24   dispute.  So I'm not really sure what the relevance is of

25   whether Dr. Ghitza had some separate conversation about asking

Ghitza - Cross / By Mr. Scott                              188

1  to hand over the model.  That's totally separate from what was

2  done here.

3              **THE COURT:**  Overruled.

4              **THE WITNESS:**  So I personally did not ask, you know,

5  Eric specifically.  I will say that, you know, generally

6  speaking when you do have an agreement with, you know, a data

7  vendor, some of those are proprietary.  Some of those things

8  are shared.  Some of those things aren't, you know, and in this

9  case, you know, the exact specifications of what goes into the

10 CPM software, you know, that -- I don't know what the exact

11 specifications and the exact, you know, tree that was built,

12 the exact rules but, again, for my purpose, what I am most

13 interested in is how well does this data validate and that's

14 what I was testifying to.

15 **BY MR. SCOTT:**

16 Q    I think that I'm predicting you're going to see a letter

17 that the State of Texas sent to the Department of Justice

18 relating to some data from some years ago in a few minutes.

19 From the standpoint of making -- taking use or making use of

20 data that you received from the self-reported data character,

21 do you have more difficulty in identifying persons of Hispanic

22 race than any other race?

23 A    The level of our -- the classification rates, you know,

24 the accuracy rates are, you know, as described in the table

25 over there.  So I would have to refer back to that table.

Ghitza - Redirect / By Ms. Baldwin                189

1              **MR. SCOTT:**  Nothing further.

2                   **REDIRECT EXAMINATION**

3    **BY MS. BALDWIN:**

4    Q    Just one brief question, Dr. Ghitza.  And essentially

5    because Mr. Scott has promised that I'd showed you this, I

6    don't want to let you down.  This is not a document that you've

7    seen before but just so the record is clear, it's Plaintiffs'

8    Exhibit 942 and it's sent to the voting section and I'll just

9    show you the last page, the signature page, sent from Keith

10   Ingram, the Director of Elections.  So the DPS data -- to be

11   clear, the only data that the Department of Justice gave to you

12   is the team voter registration file; is that right?

13   A    Uh, yes, to my knowledge, that's true.

14   Q    Okay.  And if you were going to do a validation exercise,

15   would you have any qualms conducting a validation exercise

16   where -- with the data set where if I'm reading from the second

17   bullet, DPS previously used the following racial

18   classifications on ID applications: American Indian, Alaskan

19   Native, Asian Pacific Islander, Black, Other and White.

20              Not until May 2010 did ID applications at DPS across

21   the state of Texas and -- across the state include a field for

22   Hispanic and then it goes on.  It is impossible to identify

23   which racial classifications Texans of Hispanic descent

24   selected on ID applications prior to May 2010.  For this

25   reason, DPS's data for racial classifications other than

1    Hispanic are no doubt significantly distorted.  When the source

2    of your so-called self-reported race data described it as "no

3    doubt significantly distorted," would you have concerns about

4    using that as a separate validation source?

5    A    Yeah, I would definitely have concerns about it.

6    Q    Is that something in your professional judgment that you

7    think would be -- produce a reliable output?

8    A    I mean, I think that if you're looking at White versus

9    Black versus Hispanic people and for a really long period of

10   time people were not able to say they were Hispanic, then that

11   is -- that could be deeply problematic.

12          **MS. BALDWIN:**  That's all.

13                        **RECROSS EXAMINATION**

14   **BY MR. SCOTT:**

15   Q    What was the validation rate that you determined for

16   Paragraph 23, which I believe was 50.2 percent likelihood they

17   use your confidence level?

18   A    Uh, so what was the validation rate?

19   Q    Yeah.  You did a validation rate in that one chart.  Did

20   you do a separate validation rate of the information that you

21   provided in this case?

22   A    Uh, you're saying for the data that we brought back to

23   Texas?

24   Q    Yes.

25   A    So the validation that I was showing -- the table that I

1   was showing there relies on self-reported data from the voter

2   registration records that we have.  There was voter -- that

3   type of self-reported data from the voter registration records

4   does not exist in Texas.  So it would be impossible for me to

5   do that exact type of analysis.  The reason that we showed the

6   validation data from the other states is because in my

7   estimation, that along with the other type of internal

8   validation that we do is reflected on the general accuracy of

9   the race-coding data.

10  Q    Thank you.

11          **THE COURT:**  Anything else?

12          **MS. BALDWIN:**  Nothing further.

13          **THE COURT:**  You're not going to question this

14  witness?

15          **MR. DUNN:**  No, ma'am.

16          **THE COURT:**  Okay.  You can step down.

17      **(Witness stepped down)**

18          **MR. DUNN:**  Unless you want to hear more.

19          **THE COURT:**  No, no, I don't.  I just -- I saw you pop

20  up and he was leaving.  So -- all right, next witness.

21          **MR. DUNN:**  Plaintiffs call Randall Buck Wood.

22          **THE COURT:**  Good afternoon.  Would you raise your

23  right hand?

24  //

25  //

1              **RANDALL BUCK WOOD, PLAINTIFFS' WITNESS, SWORN**

2                  **MR. CLAY:**  Thank you, sir.

3                        **DIRECT EXAMINATION**

4    BY MR. DUNN:

5    Q    Please tell us your name.

6    A    Randall Buck Wood.

7    Q    Do you go by Buck?

8    A    I -- it's my second name.  Yes and that's what everybody

9    knows me by.

10   Q    All right, Mr. Wood.  As you know, my name is Chad Dunn.

11   I represent one of the Plaintiffs in this lawsuit.  I retained

12   you as an expert; is that true?

13   A    That's correct.

14   Q    All right.  You have in front of you the report that you

15   issued in this case; is that correct?

16   A    Yes.

17           **MR. DUNN:**  And for the Court's benefit, that's

18   Plaintiffs' Exhibit 776.

19   Q    Included in the exhibit is your CV; is that true?

20   A    It was.  Let's see if it's -- yes.

21   Q    Okay.  And I assume your representations in your CV about

22   your education, training and experience are accurate?

23   A    Yes.  I -- I'm not sure.  It seems to me that during the

24   deposition, they -- it was brought to my attention that I was

25   listed as the Executive Director of the Texas Chapter of Common

1    Cause at one time and I'm not seeing that right now but I don't

2    think there was a designation of the Executive Director.  I was

3    the chief cook and bottle washer but -- so --

4    Q    Okay.

5    A    Other than that, yes, it's -- yeah, correct.

6    Q    All right.  So let's just back up.  Tell us where you were

7    born and where you grew up and went to school and that sort of

8    thing.

9    A    I was born in Athens, Texas July 7th, 1944.  I grew up in

10   a little town called Edom, Texas which is about 20 miles from

11   Athens.  I attended a common school district, Edom Common

12   School District through the eighth grade and then I went to Van

13   High School.  All that's in Van Zandt County.

14            I then went to Tyler Junior College for two years.  I

15   transferred to the University of Texas and got an undergraduate

16   degree in history and then went to law school -- well, actually

17   I did some of it at the same time.  I went to law school and

18   graduated in '68.

19   Q    And which law school was that?

20   A    University of Texas.

21   Q    After attending law school, were you admitted to the Bar?

22   A    Yes.

23   Q    And when was that?

24   A    September of '68.

25   Q    Have you practiced law in Texas since then?

1   A    Yes.

2   Q    Okay.  Give us a sense of what kind of law you practiced

3   over your 40-plus years.

4   A    Oh, first of all, I spent some time as a lawyer in -- for

5   the State of Texas.  I was the Director of Elections for the

6   Secretary of State for some 3-something years.  I then lobbied

7   for Common Cause for two years and that involved a lot of

8   election stuff like campaign finance and things of that nature.

9   I then became the General Counsel of the Comptroller of Public

10  Accounts in '75 when Bob Bullock took office and I was then

11  promoted to the Chief Deputy Comptroller which was the Number

12  Two person in the Comptroller's office and I left in April or

13  May of '77 and went into private practice with a firm we

14  created and exists today.

15  Q    So you've practiced law as a private attorney since about

16  1977?

17  A    Yes.

18  Q    Is one of the areas of law that you focused on is election

19  law?

20  A    Yes.

21  Q    Give us a sense of the type of matters you handle in the

22  area of election law.

23  A    I don't know what type of matter I haven't handled.  Since

24  I had been Director of Elections and been involved in elections

25  all of life -- my family was a very political family -- we

Wood - Direct / By Mr. Dunn                          195

1   immediately started -- our little firm started getting clients

2   that had election problems, election contests, recounts,

3   investigations, qualifications to run for office and everything

4   and even though it didn't provide a steady stream of income, we

5   did a lot of it and I still do.

6   Q    Is it fair to say that most of the reported state

7   appellate decisions on election law in the last 30 years have

8   your name or another lawyer at your firm's name on it?

9   A    You know, I don't know the percentage but it'd be pretty

10  high.

11  Q    All right.  You've handled a number of matters at the

12  Texas Supreme Court?

13  A    I'm usually in the Texas Supreme Court every other year or

14  every year.

15  Q    On election-related matters?

16  A    Yes.

17  Q    Okay.  So let's just talk a little bit about election

18  contests.  What exactly is an "election contest" under state

19  law?

20  A    An "election contest" is a legislatively delegated lawsuit

21  that's delegated to the judiciary.  We had to pass a

22  Constitutional amendment to have election contest.  It's tried

23  almost identically to any other civil lawsuit.  There are some

24  restrictions in the election code which override certain Rules

25  of Civil Procedure and things but other than that, it's tried

1    just like an ordinary lawsuit except it can't be tried to a

2    jury.

3    Q    And in an election contest, is occasionally one of the

4    issues whether there's somebody or some group of persons have

5    lawfully voted?

6    A    Whether they were qualified to vote or voted unlawfully,

7    yes, that is true in almost every election contest.

8    Q    And, in fact, what is the ultimate legal issue the judge

9    is asked to decide in an election contest?

10   A    They've got basically three options.  They can uphold the

11   result of the election as stated -- as it's canvassed.  They

12   can declare the other person -- the challenger who didn't win

13   in the primary, they can declare that person the victor or they

14   call a new election if they can't determine the outcome.

15   Q    And what effect does discovery of illegal voting have on

16   the outcome in an election contest?

17   A    Well, I wouldn't say this is true in every case but almost

18   every case, somebody won and somebody lost by a very small

19   margin, you know.  Now, that sometimes can be a pretty good

20   size but, you know, a statewide race, let's say.  Or it can be

21   a few votes.  So whether people that voted in that election

22   were legally entitled to vote in that election and how they

23   voted is an issue in 99 percent of election contests.

24   Q    Is it fair to say that you've handled scores of election

25   contests?

Wood - Direct / By Mr. Dunn                    197

1    A    At one time, I had tried election contests in 50 counties.

2    The reason I know that I was hanging pictures on my wall of the

3    courthouses until my (indiscernible) managers told me that

4    wasn't going to work anymore.  But I'm sure I've tried election

5    matters.  Some of them would be qualifications for office and

6    things like that in a hundred counties.

7    Q    Are there many lawyers in Texas that handle election-

8    related work on a regular basis?

9    A    Not on a regular basis.  That's pretty unusual.  Some

10   people will have had maybe one or two matters.  If you're

11   talking about election contests, now there's -- like I said,

12   there's other variations on the theme, recounts and all things

13   like that.  There used to be a number of lawyers and many of

14   them in Austin -- a number of them in Austin but they've

15   retired or are deceased.  There are a few other lawyers that I

16   know that have done election contests, a few.  There's some in

17   south Texas that do some and the reason I know is they're

18   usually on the other side of the election contest from me but

19   not many.

20   Q    Is it fair to say that as far as you know, there's no

21   other attorney in the state that's handled as many of these

22   matters as you have?

23   A    I'm not sure that's the case.

24   Q    Okay.  Now, occasionally in election-related disputes,

25   does somebody raise the allegation that there was fraudulent

Wood - Direct / By Mr. Dunn                           198

1   voting or illegal voting?

2   A    Well, we've got to be -- I don't like to use the word

3   "illegal" voting.  Most people who vote who are not eligible to

4   vote are not doing it intentionally.  They don't know that

5   they're not eligible to vote.  They may have moved outside of a

6   state representative's district or something and still thought

7   they could vote for that candidate and they go ahead and vote.

8   I'd say intentional voter fraud in person is very rare.  And I

9   just don't like to use that term "illegal voter" because most

10  of them that we find that are not eligible to vote really

11  didn't commit any crime.

12  Q    Now, when you talk about intentional voter fraud in person

13  being rare, are you referring to voter impersonation?

14  A    Well, what I was really referring there is in some

15  instances -- and I have been involved in a number of election

16  contests, the election officials themselves were involved in

17  it.  So it was at the polling place -- that the election

18  officials at the polling place were actually involved in that

19  fraud.

20       If you're talking about impersonation of a voter --

21  in other words, a voter trying to vote impersonating another

22  voter, I've never seen one.

23  Q    Has it been raised though in cases you've handled?

24  A    No.

25  Q    Has somebody alleged at least colloquially or in a press

Wood - Direct / By Mr. Dunn                          199

1   release that there's illegal impersonation and then you get

2   involved in the election contest and it turns out there were

3   none?

4   A    Um, I know of one where that happens but I was not

5   personally involved in it.  Impersonation just -- it just

6   doesn't happen.  I mean, I know it could -- can happen and,

7   therefore, it probably has happened.  I've been told by lawyers

8   that they've heard of it.  It just -- it doesn't happen and it

9   doesn't happen for a very simple reason.  It almost can't

10  happen, not without being detected.

11  Q    And why is it your opinion it can't happen without being

12  detected?

13  A    Well, I can see that if someone went to some trouble --

14  I'm talking about an individual here -- and they found out that

15  -- they just decided they'd go vote under somebody else's name.

16  Let's just say they just decided to do that.  Well, they're

17  almost certainly going to get caught.  First, you'd have to

18  pick your voter out that you're going to impersonate and then

19  you would have to hope that that person hadn't already voted

20  either by mail or in person in early voting and then you would

21  have to hope that that person didn't come in and try to vote

22  later because you're going to get caught.

23          And as I said, I have been told that it's happened on

24  a very small number of people from the state because they got

25  caught.  It's just almost impossible to do.  On anything other

1    than a -- kind of a nutty situation where somebody just thinks

2    they'll go down and vote for their neighbor or something, it

3    doesn't happen.

4    Q     When a would-be voter impersonator goes into the polls, do

5    they have to be concerned if the election worker might

6    recognize them or might know the person they're trying to

7    impersonate?

8    A     Sure.  I will say this -- and this is because of my years

9    of experience.  The people that are the election officials at

10   the polling place, they generally have been doing that for

11   quite a while and they know people in that area.  It's not --

12   it's not as -- like it used to be because now we have early

13   voting in person and sometimes you can go to any polling place.

14   You can go to polling places all over but yes, you would have

15   to be concerned they wouldn't know who you were or who the

16   voter was and these are all felonies and they're multiple

17   felonies.

18   Q     And a would-be voter impersonator, do they also have to --

19   prior to SB14, wouldn't they also have to have some

20   identification or some documentation that links them to the

21   person they wanted to vote for?

22   A     Yes.  We -- I was on the -- Lieutenant Governor Hobby

23   appointed me to the Advisory Commission to revise the election

24   code back in '83 through '85 and we looked at the entire code

25   obviously but since I was mainly put on there because of

1   election issues and conduct of elections, I looked at all the

2   laws.  We changed some of the laws, quite a few, in fact.  I

3   don't think I've totally answered your question.

4   Q    Well, the question was, prior to SB14, if somebody wanted

5   to --

6   A    Oh, yes, I got it.

7   Q    -- commit voter impersonation, wouldn't they need some

8   article from --

9   A    They would.  We built into the law prior to the voter ID

10  laws, everybody calls it -- we built in an identification

11  provision and it could be satisfied a number of different ways

12  but you would had to have something indicating that you were

13  that person.

14  Q    And that could be a voter registration card under the old

15  law; is that right?

16  A    Yes.

17  Q    That could be a utility bill under the old law?

18  A    Yes.

19  Q    Driver --

20  A    Well, obviously that utility bill would have to show the

21  address that's -- that the election officials would have had on

22  the voter rolls.

23  Q    And you -- of course, you could use your driver's license

24  under the old law?

25  A    Sure.

1    Q     Okay.  On the other articles that were listed, are they

2    typically things you'd have to get out of -- let's call it a

3    victim's mail in order to impersonate them?

4    A     I'm not sure what you mean.

5    Q     Well, like a utility bill or a telephone bill.

6    A     Oh, well, you either have to get it out of their mail or

7    -- I don't know how you would do it but I guess you could rob

8    mailboxes.

9    Q     Okay.  Which -- would that also be a crime?

10   A     Yes, of course.

11   Q     All right.  Now, is there voter fraud occurring by mail?

12   A     Yes, very definitely.

13   Q     I mean, would you characterize it as a problem, the amount

14   of voter fraud by mail?

15   A     It is a serious problem.

16   Q     Explain the problem to us, please.

17   A     Well, it didn't used to be such of a problem because prior

18   to our passing legislation that let anybody over the age of 65

19   vote by mail, you had to have some doctor's excuse or something

20   in effect saying that you are unable to attend the polls.  Now,

21   that was pretty easy to get if you were elderly and you

22   normally had a doctor and they would sign one for you but what

23   really happened was when they went to, in effect, no excuses

24   over 65 mail-in voting, the -- there's nobody supervising you

25   when you have that ballot if you're the voter.  You may -- the

1    voter may never even see the ballot.

2         We have actually had evidence in election contests

3    where the people that were living the fraud knew what day the

4    ballot was being mailed out and actually went and got it out of

5    the mailbox before the person -- the voter ever even saw it.

6    And the usual system is they go to nursing homes.  They go to

7    -- and I say "they."  I'm talking people that commit this kind

8    of fraud and they're organized.

9         They go to people's houses that -- sometimes they

10   cultivate these people year-round.  I've had cases where they

11   had like a hundred or a hundred and fifty people that they knew

12   that were old that were infirm and they'd go by and see them in

13   the off-season.  They were friends and then, of course, they

14   would get them a ballot and they would generally vote the

15   ballot for them.

16   Q    You --

17   A    That's common.

18   Q    You mentioned that there's organized efforts on mail-in

19   voter fraud.  Is it easier in mail-in voter fraud to harvest or

20   turn in a number of fraudulent votes?

21   A    It's very easy.

22   Q    Is it more difficult to in person commit voter fraud to

23   the degree enough to change an election outcome?

24   A    I've never seen one and the reason being, unless the

25   election official at the polling place is in on the fraud, it's

1    just -- almost doesn't happen.

2    Q    And you were asked in your deposition by Mr. Clay a number

3    of questions in this case.  You recall that?

4    A    Yes.

5    Q    One of the answers that you gave -- you thought you had

6    seen recently -- well, strike that.  One of the answers you

7    gave is that there are often allegations that noncitizens have

8    successfully voted.  Do you remember that conversation?

9    A    Yes.

10   Q    Is it your experience that noncitizens are voting in

11   Texas?

12   A    I don't know why it is but a -- in south Texas and east

13   Texas, there are a lot of election contests, a lot of election

14   disputes and contests.  The -- it always comes up that somebody

15   says somebody's dead that voted.  I've heard that from my

16   clients and I've heard it from the other side and everything

17   and in my 42 years of doing this -- or 44 years, I've never

18   found one, not one.

19   Q    Is that the same for noncitizens?

20   A    I found a noncitizen a few years back for the first time

21   and that is -- that is always something that people -- oh, I

22   know so-and-so and they're not a citizen or I know so-and-so

23   and he's dead or that person's dead.  When you get through with

24   it, I had never found it until just by accident and it was a

25   vote by mail.

1    Q    When you -- over the course of your career, you've had an

2    opportunity to testify to the legislature; is that true?

3    A    Almost every session.

4    Q    Have you been invited to testify there by Democratic

5    members and Republican members?

6    A    Yes.

7    Q    Is it fair to say that at least in the last 20 to 30

8    years, any major piece of election law change, the legislature

9    wanted to hear what you had to say about it?

10   A    Well, I don't know about the legislature but some

11   legislators on the respective committees would want to know

12   what I had to say about it, yes.

13   Q    All right.  Is there -- you were involved in the

14   legislature and familiar with the activities of the legislature

15   as it was considering photo ID legislation; is that right?

16   A    Yes.

17   Q    And it's been stated in this case that there were photo ID

18   measures considered in 2005 and '07 and '09 and ultimately

19   adopted in 2011.  Does that comport with your recollection?

20   A    That's correct.

21   Q    Did you testify before any legislative committees as it

22   pertained to those bills?

23   A    I'm not sure I testified in 2005 and the reason is I don't

24   think that bill ever went anywhere.  2007, 2009, I testified

25   and I can't remember whether I testified both times in the

Wood - Direct / By Mr. Dunn                    206

1    House and Senate but I know I testified in the House and Senate

2    on those bills.  It may have been one in -- one of those years

3    I only testified in one House.

4    Q    And in 2011, did you testify?

5    A    No, I did not.

6    Q    Were you not asked to testify in 2011?

7    A    I think all the people that would have asked me to testify

8    had either been beaten or they weren't on the committees.

9    Q    Now, you've represented, I assume, various elected

10   officials?

11   A    Lots of them.  I'm doing it right now.

12   Q    All right.  And some of them are Democrats and some are

13   Republicans; is that --

14   A    That's true.

15   Q    And I assume you have information as it relates to those

16   clients in the context of representing them; is that right?

17   A    Sure, certainly.

18   Q    I'm going to ask you some questions about your interaction

19   with the legislature and your opinions in this case and I want

20   you to agree not to provide us any testimony or evidence or

21   opinions that are related on attorney-client communications.

22   Can you do that for us?

23   A    In other words, I won't base my conclusions or anything on

24   any of those conversations and information?

25   Q    Yes.

Wood - Direct / By Mr. Dunn                    207

1   A    No, I will not.

2   Q    All right.  Was there pressure on members of the

3   legislature in 2011 to vote for Senate Bill 14?

4   A    Oh, enormous.

5   Q    How would a member of the legislature know that they, you

6   know, needed to look real hard in supporting this bill or they

7   might face consequences?

8   A    There was pressure from political action committees.

9   There was pressure from the Republican Party.  This pressure

10  can come in a number of different ways and this is not uncommon

11  in lobbying.  I mean, this -- you know, you can be told that if

12  you don't vote for a particular bill, in this case, Senate Bill

13  14, that this political group is going to find you an opponent

14  and finance them and they have done that.

15  Q    Did that, in fact, happen to some members in 2009 that

16  either opposed the measure or weren't diligent enough in

17  getting it passed?

18  A    Todd Smith was chairman of the Elections Committee in the

19  House, I believe, in 2009 and -- it might have been 2007.  I'm

20  not sure about that but I know this.  He didn't get the bill

21  out of committee.  That drew him an opponent and a bunch of

22  money against him and he got beat.

23  Q    With respect to the legislature's consideration of Senate

24  Bill 14, was there any action that you saw, that you observed

25  where the legislature was interested in turning up actual

1   incidents or fraud or investigating whether fraud existed?

2   A    Well, I've been around -- my first legislative session

3   that I worked in was in 1967 and I've been involved in every

4   session since in some form or fashion.  I've been a lobbyist.

5   I've been invited to testify as an expert, something all during

6   that period.  The normal legislative process is that the

7   committee that the bill was assigned to attempts to determine

8   if a piece of legislation is needed.  Do we need this?

9           That is almost always -- and when I'd be testifying,

10  I would be saying, you need to change this.  You need to do

11  this or this doesn't need to be done or whatever -- or this is

12  a good way to deal with it.  In my experience on these voter ID

13  bills, there was never any attempt at all to determine if there

14  was a problem and I --

15  Q    Never any --

16  A    Go ahead.  I'm sorry.

17  Q    -- never any attempt to bring in law enforcement or other

18  state agencies to actually lay out particular instances of

19  fraud that would be avoided by this law?

20  A    If you're talking about the voter ID legislation --

21  Q    Uh-huh, yes.

22  A    -- I am unaware of any effort to determine if there was a

23  problem and I know why because there wasn't a problem.  They

24  couldn't put -- they could have called any county clerk in the

25  state of Texas and asked if this was a -- if they have ever

1    seen anything like this and they would say "No."

2    Q    Was there any effort by the legislature to analyze what

3    the effects of Senate Bill 14 would be on particular persons?

4    A    If it was, it was sub rosa.  I never heard anything.  They

5    didn't want to talk about the effects.  There was no effort to

6    -- as I view it, to determine -- generally, not only do you

7    determine that there's a need first.  Then you determine, okay,

8    is this the way to fix it.  I know of no evidence whatsoever,

9    didn't read of any, didn't hear of any from other legislators

10   of any effort to determine if it was going to solve -- what it

11   was going to do, what effect it was going to have on the voter.

12   Q    Was there an effort to inform legislators, whether in

13   committee or debate, of the fraud that was going on in mail

14   voting?

15   A    There has been in the past, yes.

16   Q    And was there any action taken by the legislature to

17   include any SB14 measures that might prevent that type of

18   election fraud?

19   A    No.

20   Q    And you've also testified in your report and in deposition

21   about discretion often held by election workers.  Do you recall

22   those opinions?

23   A    Yes.

24   Q    Okay.  And what role can discretion by election workers

25   have in enrolling somebody to vote and letting them vote?

Wood - Direct / By Mr. Dunn                          210

1   A    Well, when you go into a polling place, you're going to be

2   inquire -- you'll have inquiries as to where you live and, you

3   know, asked for some identification and things of that nature.

4   Election officials have -- in that polling place, they have a

5   lot of discretion.  Now, I'm not saying they misuse it often

6   but it can be used and I've seen it used a lot of times.  So

7   they can either let people vote they shouldn't let vote or they

8   can keep people from voting that should be allowed to vote.

9   Q    Do you have a recent example?

10  A    I do.  I get -- in election seasons, I get lots of calls

11  from lots of candidates or people that were supporting somebody

12  thinking they have some -- maybe have an election contest and

13  this last go-round, I was called by someone who had lost a race

14  for a county judge over in east Texas.  I never took the case

15  and if I were in my office, I could get all the information.

16         But what had happened was, was that there was -- it

17  was a Republican county even though it was in east Texas -- a

18  Republican county and the judge -- the person that was calling

19  me was -- ran for -- it was county judge as a Republican.

20  There was no Democratic opponent evidently and -- but they had

21  developed -- that particular individual had developed a real

22  good relationship with the African American community in that

23  county -- or at least he told -- that's what he told me and I

24  have reason to believe that it was true.

25         And so in the first election, a lot of the African

1   Americans in this county went over into the Republican primary

2   and tried to vote which they were perfectly legal -- eligible

3   to do.  In Texas we don't have affiliation by party unless you

4   vote in a primary.  So the first primary, there were a number

5   of African Americans who were not allowed to vote in the

6   Republican primary because the election official said, you're

7   not a Republican.  I know you.  You're not a Republican.

8   Wouldn't let them vote.

9   Q    Now, when it comes to having to use Senate Bill 14 IDs,

10  does that prevent -- present another level of discretion to the

11  poll worker to determine who gets to vote and who doesn't?

12  A    Well, they've got a -- what we -- you know, I still call a

13  "poll list," a list of registered voters that has a name and

14  address on it and then you come in with your driver's license,

15  assuming you have one, and you present it and if they're --

16  they don't match perfectly, then they may not let you vote or

17  they may throw you under a provisional vote which is basically

18  not something that's ever counted.

19          **MR. DUNN:**  Excuse me, your Honor, if I can consult

20  with co-counsel for a minute?

21      **(Counsel conferred)**

22  **BY MR. DUNN:**

23  Q    So, Mr. Wood, one last issue.  If there is in-person voter

24  fraud going on in Texas, what is your opinion on whether it's

25  affecting the outcome of elections?

1    A    Unless the election officials are in on it -- and I've had

2    cases where they were -- it doesn't have any impact on the

3    outcomes of election in Texas.

4    Q    When people commit voting fraud, they get caught in Texas?

5    A    If they did it in person, yeah, they'll get caught.  I'm

6    not saying they'd be a hundred percent but I'm telling you it

7    -- the few times I've run into it, it's where they've been

8    caught.

9    Q    Yeah.  You mentioned earlier Todd Smith, the chairman of

10   the elections, being defeated in a later election?

11   A    Uh-huh.

12   Q    Are you referring to when Todd Smith ran for Senate in a

13   later election, not re-election to the Senate?

14   A    No, no.  He got -- he -- there was no way he was going to

15   be elected in his -- no, that's correct.  What he did was he

16   decided he'd run for the Senate instead of running for his

17   House seat because he knew he could not be elected in the House

18   seat.

19   Q    Okay.

20          **MR. DUNN:**  Your Honor, we'd offer Mr. Wood as an

21   expert in election law and election contests and election fraud

22   in general.  And that concludes my questions.

23   //

24   //

25   //

1                      **CROSS EXAMINATION**

2    **BY MR. CLAY:**

3    Q    Good afternoon, Mr. Wood.  Good to see you again.

4    A    Good to see you.

5    Q    Before I start with questioning, did I hear you say your

6    birthday is July 7th?

7    A    It's July 8th.

8    Q    Oh, July 8th.  I heard 7th.  Mine is the 7th.  So I was

9    going to -- I was just -- I thought we had the same birthday.

10   A    Yours wasn't in '44.  So --

11   Q    No, it wasn't.  It was not.

12            **MR. CLAY:**  Could you go ahead --

13   Q    I'm going to go ahead and walk you through the Todd Smith

14   thing.

15   A    Okay.

16            **MR. CLAY:**  Could you go ahead and put that up for me,

17   please, Brian?

18   Q    You said that Todd Smith didn't get a bill out of

19   committee one session.  Do you remember what session that was?

20   A    I think it was 2007.

21   Q    Okay.

22   A    I testified, I know.

23            **MR. CLAY:**  It's the last thing I sent you.  No.

24   Sorry, your Honor.  Just a little bit further up.  Okay,

25   thanks.  Can you zoom in on the election info here?

1  Q    Your first testimony was that he got a primary challenger

2  and lost, correct?

3  A    That was my recollection but now I'm pretty sure that what

4  he did was -- that he decided he couldn't get re-elected in his

5  House seat, that it hopeless and so I think he ran for the

6  Senate.

7  Q    Okay.  And you're right.  He did.  In 2012, he ran for

8  Senate District 9 and lost.  You said just a minute ago that he

9  failed to get a committee bill out of -- a voter ID bill in

10 committee in 2007, right?

11 A    It was either 2007 or 2009.

12 Q    Okay.  And then 2008, he won the Republican primary by a

13 hundred percent of the vote, right?

14 A    Yes, that's correct.

15 Q    And then in 2010, he won 60 percent of the vote, right?

16 A    That's correct.

17           **MR. CLAY:**  Thank you, Brian.

18 Q    Other than your time at the Secretary of State's office,

19 have you ever served as an election judge or an election

20 administrator?

21 A    I've been a clerk in elections, yes.

22 Q    Okay.  And when was that?

23 A    Oh, it was -- probably I -- it may have been in the 70s,

24 the 80s.  They're always needing somebody and everybody knew

25 that I knew the laws.  So they always called me and sometimes I

1    could do it and sometimes I couldn't.

2    Q    And you testified earlier today that -- and also in our

3    deposition about a month ago that you've handled a fair amount

4    of election contests, right?

5    A    Yes.

6    Q    An election contest is essentially a disputed election; is

7    that right?

8    A    Well, a dispute over the outcome, yes.

9    Q    And what -- am I correct in remembering that what you do

10   usually in these -- your role in these election contests is

11   looking at the votes that have been cast and trying to figure

12   out which one of those are illegally cast votes; is that right?

13   A    Well, and I've tried other cases where people were

14   prevented from voted and that's another ground for an election

15   contest, that the people that were -- should have been allowed

16   to vote were not allowed to.

17   Q    Okay.  But one of the things you do do is you look for

18   illegally cast votes, right?

19   A    I look for votes that -- once again, it's a -- they didn't

20   have the capacity to vote.  The term "illegal" sort of

21   indicates it's a crime and it's generally not a crime.

22   Q    Okay.  I was trying to use the same terminology as your

23   counsel did but --

24   A    Well, I tried to tell him the same thing, that --

25   Q    Okay.

1   A    -- you know, "ineligible" voters is a better term.  They

2   were not eligible to vote.

3   Q    Okay.  We'll stick with that.

4   A    Now, there are illegal voters, too.  I'm not suggesting

5   there aren't but as a general rule, it's somebody who's not

6   eligible to vote.

7   Q    Okay.  So when we're talking about ineligible voters,

8   there's several categories that we talked about during the

9   deposition.  Do you remember that?

10  A    Yes.

11  Q    One of them was felons, right?

12  A    Yes.

13  Q    And I think you talked about a particular case in Llano

14  County that was actually decided by a coin-flip that your

15  client won, correct?

16  A    Well, my client won the coin flip.  They were tied.

17  Q    Right.  Correct.

18  A    They were tied.  So you can do a little game of chance.

19  You can draw straws or you can flip a coin.  In that case,

20  flipped a coin.  My client won and then the other client -- the

21  other candidate immediately filed an election contest.

22  Q    And so what you did in that case is you went out and

23  looked for votes -- one of the things that you did in that case

24  was went out and looked for votes that were illegally or

25  incorrectly cast in favor of your client's opponent, right?

1   A    Yes.

2   Q    Okay.  And what you found in that case is that at least

3   one felon who was not eligible to vote cast a ballot for your

4   client's opponent, correct?

5   A    Yes.

6   Q    And you also found that in that case there were two

7   mentally incapacitated voters that voted for your client's

8   opponent, correct?

9   A    Yes.

10  Q    Were those -- was the felon registered to vote in that

11  case?

12  A    Yes.

13  Q    And what about the two mentally incapacitated?

14  A    Yes, they were registered.

15  Q    And then another type that we talked about were voters who

16  were registered, but not residents or eligible to vote in the

17  polling place where they voted, right?

18  A    Yes.

19  Q    And I think the big case that comes to my mind was the

20  Bexar County case that we discussed; do you remember that?

21  A    Bexar County?

22  Q    Bexar County where, I think you told me --

23  A    Oh, oh, okay.

24  Q    -- that you disqualified over 1,200 votes in that

25  election, right?

Wood - Cross / By Mr. Clay                    218

1   A    Okay.  That was a long time ago.

2   Q    And -- and what happened in that case was, I think you

3   testified that -- and, you know, San Antonio is still this way

4   today, but back then the military installation in San Antonio

5   was a big part of Bexar County, right?

6   A    It -- it still is, but not as much as it was then.

7   Q    Right.  And so, what you did in that case, at least with

8   respect to those 1,200 votes that I was just referring to was,

9   you found out that X amount of military folks who were no

10  longer in Bexar County, voted in Bexar County, right?

11  A    The tax assessor/collector who was the registrar at Bexar

12  County at the time -- they didn't have an election

13  administrator -- sent out a -- a questionnaire to all of the

14  people that didn't have Bexar County addresses or overseas

15  addresses or -- and, in effect, had questioned them as to their

16  intent to return to Bexar County.  What had happened was is

17  that the Reagan campaign had discovered that military voters

18  weren't voting very much.  And that was true.  The turnout

19  among military voters or overseas voters -- they might be in an

20  embassy, or whatever, they weren't voting in heavy numbers.

21  And so they set out with a campaign to see if they couldn't get

22  those people to vote, and to vote, obviously, for Reagan.  And

23  they were successful.  And Bexar County had a huge increase in

24  overseas military or overseas voting.

25  Q    In the questionnaire that you sent out, was --

1  A    I didn't send it out.  I couldn't do that.

2  Q    Well, I'm sorry, that -- that was sent out --

3  A    Uh-huh.

4  Q    -- basically sought to determine whether or not some of

5  those military voters had the intent to return to Bexar County;

6  is that right?

7  A    That's right.

8  Q    And with respect to close to, I think you said 1,270, or

9  somewhere around there --

10 A    It was in the 1,200.

11 Q    Twelve hundred, then, or so, wrote back and said, "We have

12 no intention of returning to Bexar County," right?

13 A    Yes.

14 Q    But those people were still registered to vote in Bexar

15 County, correct?

16 A    The -- part of the campaign was -- was to get them to

17 register.

18 Q    Okay.

19 A    And they did register.

20 Q    And so they were registered in Bexar County, right?

21 A    Yes.

22 Q    Okay.  And then another type that you talked about with

23 Mr. Dunn just a minute ago was mail-in ballot fraud, right?

24 A    Yes.

25 Q    And -- and that's one of the types of fraud that you look

Wood - Cross / By Mr. Clay                    220

1   for, I think you testified at deposition, the first thing you

2   look for now; is that right?

3   A    Yes.  It's the most -- if I'm -- if I'm prosecuting an

4   election contest, in other words, my client lost, the first

5   thing I'm going to look at is to see how many mail-in votes

6   went to the winner.  And then I'm going to investigate those

7   mail-in votes.

8   Q    And how do you go about doing that?  I mean, do you -- do

9   you look at -- do you see -- look at the voter -- his history

10  and see who's voted by mail and then make inquiries to the

11  particular voters?

12  A    Well, both.

13  Q    Both.  What's the other -- what's the other method of --

14  A    Well, in some instances I get people on the ground and

15  they all tell me that Ms. So and So voted by mail or it comes

16  in many different ways.  I may -- and I've had to do this,

17  although generally you don't -- I've actually subpoenaed the

18  list of voters that voted by mail.

19  Q    And so once you find that person who has -- is listed as

20  having voted by mail, actually did not vote by mail, how is it

21  that you go about getting that vote that was improperly cast

22  disqualified in an election contest?

23  A    Well, I'm not sure I understood your question.

24  Q    Well, what -- what does the election judge need to -- to

25  see, in order to disqualify the vote that was cast illegally?

1   A    Okay.  You're talking about the judge at the election

2   contest.

3   Q    Yes, sir.

4   A    Okay.  Generally, what I do is call those people and put

5   them on the stand.

6   Q    Call the people who did not actually vote?

7   A    Who supposedly voted.

8   Q    But did not vote, correct?

9   A    Well, they -- they may have tried, but in many instances,

10  in many instances somebody -- somebody assisted them illegally

11  or voted the ballot for them.  And so they come in and say, "I

12  didn't" -- "I don't even remember voting."

13  Q    Okay.  And so, in order to get the vote disqualified,

14  you're not required to produce the perpetrator of the mail-in

15  ballot fraud, correct?

16  A    No.

17  Q    Okay.  And then another type of voter fraud that we talked

18  about, or maybe voter fraud is the wrong term, I mean, we've

19  had some discussion in our deposition about that, but is the

20  vote harvesting.  Do you recall talking about that at your

21  deposition, sir?

22  A    Yes.  And that's basically what I was referring to just in

23  my answer to the last question.  These people are -- there are

24  people who make thousands of dollars every election cycle

25  getting -- and they're called, generally called vote

1   harvesters.  They have relationships with people in nursing

2   homes, they have relationships with people that just --

3   invalids, people who are blind, you name it.  They keep up

4   relationships with those people.  And they basically vote them.

5   Q    And that's fairly prevalent in the State of Texas,

6   correct?

7   A    It's -- it's very prevalent because, unless there's an

8   election contest where you have somebody that really knows what

9   they're doing, it's very hard to catch.

10  Q    Okay.  And as an election law practitioner of 40-some --

11  did you say 40, 35 years?

12  A    It's about, essentially, if you count the time I was in

13  the Secretary of State's Office, it's over 40 years.

14  Q    Do you keep a -- do you make a habit of kind of keeping

15  track of election law that pops into the news?

16  A    Well, if I happen to see it.  In other words, if it's in

17  the statewide paper, I would probably see it.  But other than

18  that, I -- I might not.

19  Q    Could I ask you to take a look at one thing real quick?

20  A    Sure.

21       **(Pause)**

22  Q    Have you heard about this?  It's only a few days old, so

23  maybe you haven't.

24  A    No, I haven't.

25  Q    Okay.  Would you read that for me?

1  A    "An unnamed Hidalgo County commissioner's campaign manager

2  used cocaine to buy votes in the 2012 primary election, the FBI

3  said in court records filed last week.  The allegations came

4  after the FBI arrested two politiqueras as part of an ongoing

5  18-month investigation into paying for dozens of votes with

6  drugs and cash."

7  Q    Do you know what a politiquera is?

8  A    That's a vote harvester.

9  Q    Okay.  Thank you.

10           **MR. CLAY:**  Brian --

11  Q    Or, can you read the date on that for me, or I can have

12  Brian zoom in on it?

13  A    It -- I can't read it on -- it's real blurry on here.

14  Q    Okay.

15  A    September 1.

16  Q    Okay.  Of this year, correct?

17  A    Yes.

18  Q    Okay.

19           **MR. CLAY:**  Brian, could you pull up the Solis

20  indictment?  And if you would, Brian, zoom in on the offense

21  description right here.

22  Q    So you see this is dated August 28, 2014?

23  A    Yes.

24  Q    And it was filed in the United States District Court for

25  the Southern District of Texas, right?

1  A    Yes.

2  Q    Could you read the offense's description for me?

3  A    The offenses?

4  Q    Just this right here (indicating), where --

5  A    Oh, okay.  Okay.  I'm sorry.

6       **MR. CLAY:**  Thank you, Brian.

7  A    "Whoever knowingly gives false information as to his name,

8  address, period of residence in the voting precinct for the

9  purpose of establishing their eligibility to register to vote

10 or to conspire with another individual for the purpose of

11 encouraging his false registration to vote, illegal voting, or

12 pays or offers to pay, or accepts, either for the registration

13 or to vote, or for voting in the federal election, shall be

14 fined not more than $10,000 and imprisoned not more than five

15 years."

16 Q    Thank you, sir.

17      **MR. CLAY:**  Can we look at Paragraph 5?

18 Q    This is the second page of the indictment.  Could you read

19 this for me?

20 A    Certainly.  "Based on this information gathered here in

21 the course of the investigation, including some information set

22 forth below, it is believed that Solis worked as a politiquera

23 during the 2012 primary and the November 2012 general election.

24 Federal candidates were on the ballot for these elections.

25 Based upon my knowledge and experience, a politiquera is a

1   person who works for a candidate to encourage people to vote,

2   to bring voters to the polls, to ensure voters elect

3   appropriate candidates, and to pay for their votes."

4   Q    Next paragraph, please.  Would you read this one for me?

5   A    "The FBI has interviewed various individuals regarding the

6   Defendants' vote-buying activities in the 2012 primary and

7   general election.  On February 26, 2013, FBI has interviewed

8   another politiquera, Campaign Worker 1, who stated that he

9   worked for Hidalgo County commissioner in the 2012 primary

10  election.  Campaign Worker 1 said that he bought an eight ball,

11  $50 worth of cocaine, split it up, and gave it to two

12  politiqueras, including Solis, to give to voters to vote for

13  the Hidalgo County commissioner."

14  Q    I don't know how many grams an eight ball is, and I'm

15  assuming you don't.

16  A    I don't.

17  Q    But do you?

18  A    I -- I defend sometimes cases, but I don't know what an

19  eight ball is.  I know what a -- I know what a kilo is.

20  Q    I think an eight ball is a little bit less than a kilo, so

21  I'm not sure.

22  A    Well, if it's only $50, I can tell you it's not -- not

23  much.

24  Q    I'll take your word for that.  Do you know what the

25  penalty for possession of cocaine is?

1   A    No.  I know what the penalty for delivering cocaine is.

2   It can be 20 years, depending on how much it is.

3   Q    It's a felony, right?

4   A    Oh, yes.

5   Q    And do you know the -- a minute earlier you were talking

6   to your counsel about mail-in ballot fraud and vote harvesters

7   going -- timing their showing up at people's houses in order to

8   grab their ballots out of the mail; is that right?

9   A    Well, or to go in and illegally assist them by basically

10  marking their ballot.

11  Q    They're also grabbing them out of their mailbox, right?

12  A    That has been done, yes.  It has been witnessed.

13  Q    And is that a felony?

14  A    Oh, yes.  Taking anything out of a mailbox is a felony.

15  It's a federal felony.

16         **MR. CLAY:**  Thank you, Brian.

17  Q    I'll spare you and the Court going over the other

18  indictment, because it looks exactly like that one.

19  A    Okay.

20  Q    We also talked a little bit about -- I picked your brain

21  as a former elections director at the Secretary of State's

22  Office, a little bit about the history of Texas' voter

23  registration system.  Do you recall that?

24  A    Yes, I do.

25  Q    And you told me that registration is primarily done at the

1    local level; is that correct?

2    A     Well, the -- you don't go to the Secretary of State's

3    Office to register to vote.  You go usually if you -- if you go

4    to -- to the registrar's office, it's in a county, but you may

5    be registered in a voter registration drive.

6    Q     And so, typically, it's done at a county level, correct?

7    A     Yes.

8    Q     And either by the local county registrar or what are

9    called deputy registrars, correct?

10   A     Yes.  Those are -- those are voter registration drives,

11   yeah.

12   Q     And not until recently these were the official voter rolls

13   in those particular counties; is that correct?

14   A     Well, I'll -- you know, our great computer --

15   computerization of records made it possible for more and more

16   counties to store their information with the Secretary of

17   State's Office, and it's been centralized in the Secretary of

18   State's Office.  It was a process -- before that, you want to

19   know where a person would vote -- was registered or not, you

20   went to the county voter registrar and usually that was the

21   tax/assessor collector.

22   Q     And so not until recently was the Secretary of State's

23   list of registered voters, not until recently was it the

24   official voter rolls for the State of Texas?

25   A     That's right.

1   Q    Okay.  And do you know how often counties will upload

2   their information to the Secretary of State?

3   A    The Secretary of State has a rule on that, and I think

4   they have to get it to the Secretary of State within 30 days.

5   I could be -- I know it's not less than -- know it's not more

6   30 days after they actually come in and get their voter

7   registration application.

8   Q    And -- and you also testified that some of these counties

9   are off-line, so to speak, and that they don't directly upload

10  to the Secretary of State; is that correct?

11  A    I'm not absolutely sure whether they've completely phased

12  everybody in or not.  They were -- they had a -- initially, it

13  was the big counties that had the ability to do it.  And then

14  they just stepped it down and phased it in.  And it may be that

15  all counties now participate electronically because, you know,

16  it's so cheap and easy now that, you know, usually voter

17  registrars in small counties didn't have the equipment or so

18  forth.

19  Q    But it wouldn't surprise you if I told you that there

20  were, you know, more than a dozen counties that are still off-

21  line, would it?

22  A    No, it wouldn't surprise me.

23  Q    So that's for putting people onto the rolls.  But the

24  counties also play a big role in taking people off of the

25  rolls, correct?

1   A    That's correct.

2   Q    And -- and walk me through how that's done with, let's

3   say, convicted felons.

4   A    Well --

5   Q    Let's -- let's take Ms. Solis.

6   A:   Oh, Ms. Solis.  If she's convicted, that conviction will

7   be -- should be picked up by -- it can be picked up locally, it

8   could be picked up by the state.  They're supposed to get

9   reports of final convictions, final convictions, and they

10  should at that point -- they send a notice out and say, "We're

11  going to cancel your voter registration because you've been

12  convicted of a felony."

13          Sometimes that's not accurate because the person's

14  name, it looked like it had been a convicted felon; he is not

15  the person they send the notice to and the guy says, "Hey, I

16  haven't -- I haven't been convicted of a felony," so they

17  straighten it out.  But normally they would get data and

18  information on all convicted felons.  Now, you're only

19  disqualified from voting in Texas during the time that you are

20  either serving time or on probation.  After that you can --

21  you're eligible to vote.

22  Q    But it -- but it's primarily the responsibility of the

23  county registrar to remove felons from the voter rolls,

24  correct?

25  A    Yes.

1   Q    And that same is true for deceased voters, right?

2   A    Yes.

3   Q    Okay.  And --

4        **MR. CLAY:**  Brian, could you do the (indiscernible)

5   for me?

6   Q    Could you read that for me?

7   A    All right.  Okay.  I don't know what the context is, but,

8   "'When all nine Social Security numbers with the last name and

9   birth date are the same on the two lists, that is considered a

10  strong match.'  Buck Wood, a lawyer for the voter suing in

11  Austin says after yesterday's hearing, 'Comparing only a birth

12  date and the last four digits of a Social Security number

13  produces a weak match,' he said."

14  Q    Is that you?

15  A    That's me.

16  Q    What does -- what does that mean, "a weak match"?

17  A    Well, the Secretary of State's Office has a system when

18  they -- they ask the Social Security Administration to send

19  them a list of -- of voters who are deceased.  And they do this

20  by Social Security number.  And then they run that against

21  their data bank, but, in some instances they don't have the

22  voter and the name will work pretty much the same, and maybe

23  the last four digits of their Social Security number are the

24  same.  That's called a weak match.

25            A strong match would be where the name and the Social

Wood - Cross / By Mr. Clay                    231

1    Security number matched.

2    Q    And there are a lot of weak matches in the State of Texas

3    because the Secretary of State doesn't have full Socials for

4    most of its voters, correct?

5    A    Well, you don't have to list your Social Security number

6    on your voter registration.  And so, yes, they don't have --

7    but they have a lot.

8    Q    And -- and maybe we could, I'm hoping that this has

9    triggered your memory and that you know the case that we're

10   talking about here, so maybe a little bit of context would be

11   good here.  This was talking about a lawsuit that you were

12   involved in on behalf of some clients that sued, I believe it's

13   Harris County?

14   A    No; it was Travis County.

15   Q    No; Travis County.  Okay.  And Travis County was seeking

16   to remove deceased voters from its rolls, correct?

17   A    Well, here's how it worked:  If you got even a weak

18   match -- the Secretary of State's Office made that

19   determination and not the local registrar -- if you even got a

20   weak match, which means you -- the name is not exactly the same

21   and the last -- but the last four digits of the -- of the --

22   they do match up, then they sent out a list to each registrar

23   in the whole State of Texas, it wasn't just Travis County, and

24   said -- and then they promulgate on a form that said, "You mail

25   this to these people and you tell them if they don't contact

1   you, I believe it was within ten days, you're going to purge

2   them off the rolls so that they won't be registered voters

3   anymore."

4   Q    And you ultimately got something worked out with Travis

5   County, right?

6   A    Well, we got something worked out with the Secretary of

7   State.  I sued the Secretary of State.

8   Q    And then --

9   A    I say "I did"; my clients did.

10  Q    Did Travis County ever remove voters from its -- from

11  its -- remove voters who were registered in Travis County from

12  the voter rolls?

13  A    From -- from this?

14  Q    Well, at any time in the last last -- that you're aware

15  of, in the last four years?

16  A    Well, here's how a purge works.  We call them purges, it's

17  not particular --

18  Q    Well, I'm just asking you a simple question.

19  A    Well, yes.  Yes, they do do purges.  They do them

20  regularly.

21  Q    In fact, at one point they have removed 30,000 deceased

22  voters from the voter rolls just in Travis County, correct?

23  A    I don't know the numbers, but I know they do it routinely.

24  Q    In preparing your report in this case, you testified that

25  you didn't do any studies or rely on any, you know, data other

1   than your personal experience as a election lawyer, correct?

2   A    My training, experience, and education.

3   Q    Did you look at -- are you aware that the Department of

4   Justice has provided information regarding the investigations

5   and prosecutions of voter fraud across the United States in

6   this case?

7   A    No, I'm not.

8   Q    So you haven't looked at that?

9   A    No.

10  Q    Did you look at any information from the Office of the

11  Attorney General regarding referrals regarding voter fraud or

12  prosecutions of voter fraud?

13  A    I'm familiar with some of them.  I've actually defended

14  some of them.

15  Q    But did you look at any information, kind of a download of

16  information, regarding the universe of referrals and

17  investigations that the Attorney General's Office is --

18  A    No, I'm not even sure I'd be privy to them.  But I know

19  the Secretary of State's Office is to notify the Attorney

20  General if they find some irregularity.

21  Q    Did you look at any information from the Secretary of

22  State regarding referrals to the Office of the Attorney

23  General?

24  A    No, I didn't do any, it's just a -- I mean I've been

25  involved in cases that have been referred and cases that have

1   been prosecuted.  I've actually defended cases that have --

2   that the Attorney General actually brought.  But I haven't done

3   a study, no.

4   Q    And earlier you testified that you had been asked to

5   testify before the Legislature on a couple different occasions

6   with respect to voter ID, is that right?

7   A    It might have been all three times, but I -- I

8   specifically remember testifying in two different years.

9   Q    And I believe that your testimony, and please correct me

10  if I'm misstating it, a minute ago was that the Legislature

11  didn't undertake any analysis of the impact of the voter ID

12  legislation it was considering, is that right?

13  A    Not that I'm aware of.

14  Q    So you're not aware that they heard testimony and reports

15  regarding empirical studies regarding turnout in Indiana and

16  other places that have voter ID laws?

17  A    Well, I do recall that they got some documentation from

18  another state or two, but I don't know -- I don't know the

19  context of it, I don't know exactly what it was used for,

20  except that -- I do recall that something -- Indiana rings a

21  bell, so….

22  Q    Okay.  And the one last type of illegal voting or -- well,

23  I think this would be illegal voting, so I'll just stick with

24  that term -- that we talked about at your deposition that

25  Mr. Dunn mentioned briefly was a non-citizen voting that you

1    discovered, is that right?

2    A     I finally found one.

3    Q     Do you know how many people annually self-identify when

4    called for jury duty as non-citizens, but are also registered

5    to vote in the state of Texas?

6    A     I am very familiar with that problem, because in picking

7    juries a lot of people come in and say they're not citizens,

8    but they are.  They just don't want to be on that jury.

9    Q     So are you aware of the annual rate or the number of

10   people --

11   A     No, I'm not.

12   Q     -- that do that annually?

13   A     I'm not.  But it's a -- like I said, I have this problem

14   with them saying, oh, I'm not a citizen.

15              In fact --

16   Q     You testified --

17   A     Just let me add to that.

18   Q     Okay.

19   A     In fact, when they get their jury summons many of them

20   call in and say I'm not a citizen.  And so nobody ever checks

21   if you say you're not a citizen, because you're not going to be

22   on that panel.  That's all there is to it.

23   Q     In your Affidavit that you filed in this case you declared

24   that you were earning $450 an hour, is that right?

25   A     I was what?

1   Q    Earning $450 an hour.  Is that correct?

2   A    I believe that's correct.

3   Q    And that you've been paid as of the day of the report

4   roughly $10,000, right?

5   A    Yes, but I'm not too sure, some of that may have been an

6   advance.  I'm not sure.

7        **MR. CLAY:**  Could you bring up the --

8        **(Counsel confers with IT technician)**

9        **THE WITNESS:**  What I'm saying is I don't know whether

10  I had billed that many hours or whether or not I have that much

11  money paid in for me to bill against.

12       **MR. CLAY:**  Okay.

13       **THE WITNESS:**  I do it both ways.

14  **BY MR. CLAY:**

15  Q    But that was money that you expected to -- that's money

16  that represents your work on this report, correct?

17  A    Well, yeah, like I said, it may not have all been on this,

18  it may have been a deposit that they are going to pay me and

19  I'm going to draw against and I don't know that I've drawn that

20  $10,000.

21       **MR. CLAY:**  Okay.  Well, let's just -- let's skip to

22  the --

23       **(Counsel confers with IT technician)**

24  Q    So you filed a report in the Section 5 case also, right?

25  A    I'm sorry?

1   Q    You filed a report in the Section 5 voter ID preclearance

2   case also, correct?

3   A    Yes, I did.

4   Q    Well, I've done -- I've got both of those reports and what

5   I did was I went through and used Adobe Acrobat and I did a

6   comparison of the two.

7           MR. CLAY:  Can we zoom in on that second paragraph --

8   or let's do the third paragraph.

9           Could we see the first page, actually, the first

10  paragraph?

11  BY MR. CLAY:

12  Q    So these are the changes that you made between June of

13  2012 and June of 2014 to your report.  Is that right?

14  A    I'm assuming that this is what I filed and -- it's been

15  awhile.

16  Q    Well, let's look at the changes.  It says "in many

17  election contests" and you changed -- I'm not sure there's

18  actually a change here.  It looks like election, there's a

19  space inserted, and then election is made plural.  And then at

20  the bottom you've added "based upon my experience."  And then

21  up here it says "of the belief that more" and then you've

22  corrected a error there, a spelling error from cast to case.

23          MR. CLAY:  So let's pull up his first report.

24      (Counsel confers with IT technician)

25          So there's the two first pages and, you know, the

1   style has changed.  So let's go to the second page for the new

2   one on the left.

3           **(Counsel confers with IT technician)**

4               **MR. CLAY:**  I apologize, Judge.

5               **THE COURT:**  Okay.

6   **BY MR. CLAY:**

7   Q    Okay, so on the top we have your first report -- or your

8   report in this case and on the bottom we have your report in

9   the Section 5 case.  We've got the first three lines there that

10  says -- that are virtually identical, would you agree?

11  A    Yes, I agree.

12              **MR. CLAY:**  And let's do the second paragraph.

13              I just want Mr. Wood to know that I'm not -- I wasn't

14  pulling the wool over his eyes.

15  **BY MR. CLAY:**

16  Q    You were questioning whether the comparison was --

17  A    No, I wasn't.

18  Q    Okay.  Well, then let's go back to the comparison, because

19  this is taking too long.

20              Here we go.

21              "I have been involved in drafting -- in the drafting

22              of election laws in this state.  Careful balance was

23              struck over the years in arriving at the form of

24              identification requirements to vote (indiscernible)

25              taken into account in crafting the form of law."

1              And then that's where the paragraph stops.

2              So you've added -- it looks like you've added the

3    sentence here at the end.

4              MR. CLAY:  So let's go back to the comparison and

5    let's just scroll through and see all the changes that Mr. Wood

6    made.

7    BY MR. CLAY:

8    Q    So here are the changes you made to Paragraph 2.  And then

9    let's just look at the full page.  So in addition to that

10   sentence you've added a sentence here in Paragraph 3, correct?

11   A    It looks like that, yeah.

12   Q    And then you've added a sentence here in Paragraph 4,

13   correct?

14   A    That's correct.

15   Q    And then you've changed some language here, if we look at

16   it here, is that right?

17   A    That appears to be true, yes.

18              MR. CLAY:  Next page.

19   BY MR. CLAY:

20   Q    And then these are the three new paragraphs that you added

21   in this case, is that correct?

22   A    I can't read them on the screen, but I'm assuming you're

23   correct.

24              MR. CLAY:  Can you zoom in on the --

25         **(Counsel confers with IT technician)**

**BY MR. CLAY:**

Q    So this is the three paragraph that you've added to your

report since the Section 5 case, correct?

A    Those are -- that is definitely different, yeah, new.

Q    And you testified earlier that you have not worked as an

election poll worker or day worker since the 70s I believe, is

that right?

A    Maybe 80s.

     **MR. CLAY:**  Okay.

     Pass the witness.

                    **REDIRECT EXAMINATION**

**BY MR. DUNN:**

Q    Mr. Wood, I heard from your earlier testimony you read the

newspaper every once in a while?

A    I try to read four Texas dailies a day.

Q    Well, with all due respect to the media in the room, do

you occasionally see some things in the newspaper that aren't

true?

A    Yes.  Sometimes they're even quotes of mine.

Q    Do you sometimes see reports of voter fraud in the

newspaper that in fact you've been called upon to investigate

and they don't quite pan out --

A    Yes.

Q    -- to be what was reported?

A    Yes.

1   Q    How about a government indictment, does the government

2   every once in a while get something wrong in an indictment?

3   A    Yes.

4   Q    In fact, that's what we have a jury box for, right?

5   A    Right.

6   Q    Now, on the various types of election activities that

7   Mr. Clay talked to you about, did you hear any of them there

8   that Senate Bill 14 would have done any good with?

9   A    No.

10  Q    Is Senate Bill 14 going to keep me from handing off

11  Mr. Clay an eight ball to get him to vote for someone?

12  A    No.

13  Q    Is Senate Bill 14 going to do any good to stop the 12,000

14  voters the Reagan administration tried to get to vote by mail?

15  A    No.

16  Q    So back to what we were talking about originally in your

17  testimony, was there anything that you've seen in your

18  extensive career that Senate Bill 14 would have stopped?

19  A    No.

20  Q    Will Senate Bill 14 stop some legal voting, though, in

21  your opinion?

22  A    Senate Bill 14 has been described as a solution in search

23  of a problem, but it does have a -- it is a -- there is a

24  problem and the solution is keeping people from going to the

25  polls and most of those people that it's going to drive away

1    from the polls are going to be minorities.

2    Q    You were asked some questions about the voter rolls and

3    voter registration and list maintenance, do you recall some of

4    that?

5    A    Yes.

6    Q    Is it your opinion that Texas does a diligent job in

7    getting people off the rolls that shouldn't be there?

8    A    There was a period of time when the Bureau of Vital

9    Statistics and so forth were not sending death certificates

10   over or notices and a lot of -- because it was the state doing

11   it for the whole state.  And so there were dead people on the

12   rolls.  Like I said, everybody always thinks that somebody

13   that's dead (indiscernible).  But that's been pretty well

14   cleaned up.

15   Q    After the 2000 presidential election that got so much

16   attention, Congress passed a law called the Help America Vote

17   Act.  Are you familiar with that?

18   A    Yes, I am.

19   Q    Does that federal law have some provisions that require

20   voter registration list maintenance?

21   A    Yes.

22   Q    Does it have some provisions that require voter purges

23   from the list at regular intervals?

24   A    Yes.

25   Q    And have you found that the State's been diligently

1    complying with that federal law?

2    A    They were a little slow to begin with, but since 2005 I

3    know they've been doing a good job.

4    Q    You also heard about folks who don't want to serve on a

5    jury reporting that they're not citizens.  Do you recall those

6    questions?

7    A    Yes.

8    Q    Are there, in fact, counties that when they receive jury

9    summons forms returned reporting non-citizens that pull those

10   people off the voter rolls?

11   A    Yes.

12   Q    Are you aware that here in Texas that Texas itself has

13   represented in this very case that it purges on a daily basis

14   felons or dead -- and dead voters at least quarterly?

15        **MR. CLAY:**  Objection, that misstates the testimony of

16   the Secretary of State.

17   **BY MR. DUNN:**

18   Q    Are you familiar --

19        **MR. DUNN:**  I'll rephrase, your Honor.

20   Q    Are you familiar with the regularity that the Secretary of

21   State's Office attempts to remove people from the rolls?

22   A    I know --

23        **MR. CLAY:**  Same objection.

24        **THE WITNESS:**  I know --

25        **THE COURT:**  Overruled.

1          You can answer.

2          **THE WITNESS:**  I know that they're attempting to be

3    diligent about it.

4    **BY MR. DUNN:**

5    Q    Is there any doubt in your mind that this state wants to

6    get ineligible voters off the voter rolls?

7    A    No doubt in my mind at all.

8    Q    You were asked about a lawsuit that you handled against

9    the Secretary of State as it relates to removing dead voters

10   from the rolls.  Do you recall that?

11   A    Yes.

12   Q    And however the Secretary of State's Office did the

13   database match, was it the case there was a lot of complaints

14   by folks that they weren't in fact dead?

15   A    Well, that was a problem.  I mean I got calls from lawyers

16   in Travis County saying, hey, I just got this notice if I don't

17   notify them within ten days I'm going to be purged.  And just

18   by the way, this was very close to start of early voting.

19          And so, yeah, there was -- I could have had all the

20   clients I wanted.  And that was not just true in Travis County.

21   I just happened to be sitting in Travis County.  It was true in

22   Harris County and I'm sure in Nueces County, everywhere.

23   Because the registrars looked at that and said I'm not going to

24   send this notice out because in case they just don't get around

25   to contacting me I'll have to purge them off the rolls.  And in

1   fact, I had some registrars say I know this particular

2   individual and he's not dead.

3           So it was a real mess up.

4   Q    Premature reports of death that were untrue, I guess.

5   A    Yes.

6   Q    I guess that was Hemingway.

7           So with respect to Mr. Clay's questions to you, is

8   there anything that you've seen here today that changes your

9   opinion that Senate Bill 14 is a solution in search of a

10  problem?

11  A    It is -- there is just no problem out there.  I will

12  concede that there may have been an instance here and there.

13  If it can be done, it will be done.  I am sure that there's

14  somebody who's tried to go in and purge many of the voters, but

15  it can't be done on a large scale and it can't really be done

16  hardly at all.  You'll get caught.  And it's -- and you'll get

17  caught, even without an election contest in most instances, but

18  certainly in an election contest we look at that.  It's just

19  not a problem.

20           **MR. DUNN:**  Thank you, Mr. Wood.

21           **THE WITNESS:**  Thank you.

22           **MR. CLAY:**  Your Honor, nothing further, other than

23  just to say for the record I wouldn't have accepted the eight

24  ball from Chad.

25           **(Laughter)**

246

```
 1            MR. CLAY:  (Indiscernible)

 2            THE COURT:  All right, let's take our afternoon

 3   break.  Fifteen minutes.

 4            You can step down, sir.

 5            THE WITNESS:  Am I excused?

 6            THE COURT:  Can --

 7            THE MARSHAL:  All rise.

 8            THE COURT:  Counsel, can this witness be excused?

 9   Any objection to the witness being excused?

10            MR. SPEAKER:  No.

11            THE COURT:  I don't hear any, so you can leave.

12            THE WITNESS:  Okay, because I wanted to drive back to

13   Austin.

14            THE COURT:  Okay.

15        (Witness excused)

16        (A recess was taken from 3:41 p.m. to 3:55 p.m.; parties

17   present)

18            THE COURT:  You can have a seat.  All right.

19            MS. KORGAONKAR:  Hi.  Good afternoon, your Honor.

20   Plaintiffs call --

21            THE COURT:  Good afternoon.

22            MS. KORGAONKAR:  -- Blake Green to the stand.

23            THE COURT:  Good afternoon, sir.  If you'll raise

24   your right hand.

25   //
```

1          **BLAKE GREEN, PLAINTIFFS' WITNESS, SWORN**

2          **THE CLERK:**  You can be seated.

3                    **DIRECT EXAMINATION**

4    BY MS. KORGAONKAR:

5    Q    Good afternoon, Mr. Green.

6    A    Good afternoon.

7    Q    Could you please state your name for the record?

8    A    Blake Green.

9    Q    Mr. Green, what is your occupation?

10   A    I serve as the Deputy State Director for the Texas League

11   of Young Voters Education Fund.

12   Q    Is this a full-time position?

13   A    Yes, it is.

14   Q    And for ease of reference, I'm going to refer to the Texas

15   League of Young Voters Education Fund as either the "Texas

16   League" or the "League."  Is that okay?

17   A    That's fine.

18   Q    All right.  How long have you been with the League?

19   A    I've been with the League since 2010, so about four years.

20   Q    And can you explain what the Texas League of Young Voters

21   is?

22   A    Sure, the Texas League of Young Voters is a nonprofit,

23   nonpartisan organization which engages young people of color

24   between the ages of 18 to 35 in the democratic and electoral

25   process.

1    Q    Which city is the League based in?

2    A    We're based in Houston.

3    Q    Okay.  And are you all a membership organization?

4    A    No, we're not.

5    Q    Does the League operate with a particular mission?

6    A    Yes, our mission is to engage and educate about the

7    democratic and electoral process in respect to voter

8    registration, get out the vote, as well as leadership

9    development and training.

10   Q    And you started to mention this a little bit earlier, but

11   can you tell me does the League have a target demographic?

12   A    Yes, our target demographic is young people of color

13   between the ages of 18 to 35.  We focus primarily on noncollege

14   students as well as college students as well.

15   Q    Okay.  So I'd like to talk about the two different groups

16   you mentioned, the college students of color and then the young

17   noncollege enrolled people of color in two different parts.

18          First, with respect to the noncollege enrolled young

19   people of color, can you tell me a little bit about them?

20   A    Sure.  So the noncollege students of color are the ones

21   that are in the -- sort of the inner cities.  Usually, they're

22   communities where I come from.  They are low income.  They have

23   -- they're from the socioeconomic background, and they're

24   generally in the cities of Houston, Dallas, San Antonio, and

25   Austin.

1  Q    How does the League encourage these young people of color

2  to engage in the political process?

3  A    So we engage this demographic in several different ways.

4  One is we canvass their neighborhoods.  We go door to door to

5  either register them to vote, get them out -- to get them out

6  to vote, or to just talk about issues within their community.

7           We do voter registration drives, particular in their

8  community where they are -- so either be at their local

9  barbershop, the beauty shops, local grocery store -- so we make

10 it convenient for them.

11          And, in addition, we do what we call "Hip-Hop

12 Summits."  And Hip-Hop Summits are we bring in celebrities and,

13 you know, guest DJs that could sort of speak this message in

14 their language and meet them where they are so that they can

15 clearly understand why it's important to vote and why they

16 should become active participants in this democratic society.

17 Q    Okay.  The second group that you mentioned is students of

18 color.

19 A    Uh-huh.

20 Q    Can you tell me about the students of color whom the

21 League works with?

22 A    Sure.  So the students of color we work with are --

23 they're on HBCU campuses, Texas Southern University and Prairie

24 View A&M University, but we also work with students who are

25 from other universities, such as University of Texas,

1    University of Houston, Texas A&M; and then we have a number of

2    community colleges, such as the Houston Community College and

3    the Lone Star Community College, just to name a few of those

4    students that we work -- work on.

5    Q    How does the League encourage these students of color to

6    engage in the political process?

7    A    So with this set of students, we do a number of things.

8    But just to give you some examples, we do voter registration on

9    the campuses as well and get out the vote events -- generally,

10   once or twice in the fall and spring semesters.

11             We do have a leadership development program, where we

12   train student leaders to pretty much serve as the ones on their

13   campuses to take the charge in registering their peers as well

14   as getting their peers out to vote as well.

15             So we teach them leadership and organizing skills.

16             Also, we do -- we're called upon on a number of

17   occasions to speak to students about voting, so we're called

18   upon to speak at, you know, their student conferences, speak

19   with their student clubs, just to talk to them about, you know,

20   voting and why it's important as well.

21   Q    Does the League offer any types of services to the target

22   demographic that you all serve?

23   A    Yes, our service is to register voters, get them out to

24   vote; and we do, as I said before, leadership training.

25   Q    So you mentioned that the League focuses on historically

1  black colleges and universities.  Can you tell me why the

2  League does that?

3  A    Well, HBCUs, historically black colleges and universities,

4  are the target demographic of the young people that, you know,

5  we intend to serve; and, also, HBCUs have a long history of

6  being disenfranchised in the electoral process.

7          And two universities we work with is Texas A&M

8  University and also Prairie University in particular, in which

9  we call it as "ground zero" for student voting

10 disenfranchisement.

11 Q    Why do you call Prairie View A&M University "ground zero"?

12 A    Well, we call Prairie View A&M University as ground zero

13 because they have a longstanding history of voter -- of student

14 voter disenfranchisement.  These students have been suppressed

15 for many years from their right to vote.

16         And just to give you some examples, there have been

17 instances where, you know, students register thousands of young

18 people on their campuses, and when they got to the polls to

19 vote, their names were not listed on the voting rolls.  There

20 was a big Supreme Court case where the students pretty much

21 sued Waller County because they were wrongfully interrogated by

22 having to fill out a long questionnaire that the county had

23 them to fill out before they were even eligible to register.

24         And then there have been cases of pretty much student

25 voter disenfranchisement, where students were wrongly informed

Green - Direct / By Ms. Korgaonkar                    252

1   that they couldn't register where they attend school; and if

2   they did register where they attend school, they would, you

3   know, face some sort of prosecution.

4   Q    Has the League done any work at Prairie View A&M

5   University in light of that history?

6   A    Yeah, so Prairie View is, you know, is very dear to the

7   League, and we focus on them greatly because of the

8   longstanding history that they have experienced.  So what we do

9   is we do a -- we have a close relationship with the university

10  officials as well as their student government leaders just to

11  make sure that -- that there's a line of communication so that

12  if they need sort of some assistance or some resource, we can

13  provide that to them.

14          We, you know, education is essential, so we educate

15  them about their rights as a voter; you know, we speak to their

16  student groups; and we do a number of educational seminars and

17  stuff on their campuses just to make sure that they know their

18  rights as a voter when they go to the polls.

19  Q    Do you register voters at Prairie View as well?

20  A    Right, we do voter registration and get out the vote.

21  Q    Switching gears --

22  A    Uh-huh.

23  Q    -- just a bit, are you familiar with SB 14?

24  A    Yes.

25  Q    What is SB 14?

Green - Direct / By Ms. Korgaonkar                    253

1   A    So SB 14 was a law that was passed requiring voters to

2   present a photo ID when they go to the polls to vote.

3   Q    And how did the League first become familiar with SB 14?

4   A    We became familiar with SB 14 just in our regular

5   monitoring of the legislative session.  This was a bill that

6   was proposed and it draw interest to us of a bill that we

7   wanted to follow.

8   Q    Did the League have any concerns about SB 14 prior to its

9   enactment?

10  A    Yes.  Uh-huh.

11  Q    Can you tell me what some of those concerns were about

12  that law before -- or that bill, rather, before it was enacted?

13  A    Sure.  So when we learned about the law, we knew that it

14  would do two things.  One, it would sort of negatively impact

15  the constituents that we serve, which is young people of color;

16  and, also, it would sort of change the game in which, you know,

17  the League operates moving forward.

18  Q    Okay.  So I want to take that answer again in two

19  different parts.

20  A    Uh-huh.

21  Q    First, you mentioned that the League was concerned that

22  the population that you serve may face a negative impact at the

23  hands of SB 14.  Why is that?

24  A    Okay.  So the students that we serve, as I said before,

25  are, you know, noncollege and college students.  In respect to

Green - Direct / By Ms. Korgaonkar                254

1   the noncollege students, you know, these are young people, you

2   know, as I said before, who come from these low-income, you

3   know, communities, you know, some of them may not have one of

4   the forms of IDs, some of them may not even have, you know, a

5   driver's license, a lot of them, you know, haven't traveled

6   abroad, so they probably wouldn't have one of the, you know,

7   the passport.

8             And then, you know, with the -- in respects to those

9   college students, you know, college students previously voted

10  in previous elections with their student IDs, and now they're

11  not able to vote with a student ID.

12  Q    In the course of the League's work on college campuses,

13  did you meet students who didn't have any of the forms of ID

14  required by SB 14?

15  A    Yes.

16  Q    Could you tell me about that?

17  A    Sure.  So in the course of our work, we did visit, you

18  know, a number of college campuses and talk to students about,

19  you know, the law and -- just to get a sense of how it would

20  impact them.

21            And we came across at Texas Southern a group known as

22  the "California Club," and this is a group of students who

23  moved to Texas to attend school at Texas Southern.  And when we

24  started talking about the law, they told us that they didn't

25  have one of the forms of ID.  So they didn't have -- well, they

1    had a student ID.  And the other form of ID that they had was,

2    you know, their California, you know, state ID.

3            And we know under the new proposed law -- well, under

4    the new law, that, you know, neither one of those forms of ID

5    is permissible.

6            So that sort of raised us -- raised a red flag to us

7    to let us know that, you know, if this group is affected,

8    there's so many more students that are affected as well.

9    Q    You also mentioned a concern that SB 14 would have an

10   effect on the League.  Can you tell me about that concern?

11   A    Sure.  So, as I said, it would generally, you know, change

12   the game in which how we operate.  So, you know, our core

13   mission is to register voters, get them out to vote, and, you

14   know, do leadership training.

15           And now we are deviating from our mission to educate,

16   you know, about this new law.

17   Q    Has the League, in fact, engaged in activities --

18   A    Yes.

19   Q    -- to counteract the effects of SB 14?

20   A    Yes, we have.  Uh-huh.

21   Q    Can you tell me what work the League has done specifically

22   in reaction to --

23   A    Right.

24   Q    -- SB 14 and its -- now that it's become enforceable?

25   A    Right, so we have engaged in a number of activities.  One,

1   we joined a coalition called "Got ID Texas Coalition," which

2   developed a Got ID campaign.  It was a campaign that was

3   created to sort of, you know, come up with a clear message on

4   how we want to articulate this new law to the demographics that

5   we serve.

6          We monitored polling locations on election day and

7   during early voting to ensure that before people stood in long

8   lines, that they had one of the forms of ID.  We made phone

9   calls to our existing base, which we thought we secured and

10  thought that they were okay with voting, so we're now going

11  back to, you know, make sure that those people who we've

12  secured and had the, you know, the required ID, you know, are

13  now able to vote using, you know, one of the forms of ID.  So

14  we had to reassess that.

15         There have been other, you know, we've -- you know,

16  we do, you know, visits to college campuses and universities to

17  educate young people, and I know on occasions we did take some

18  of our constituents to obtain an election identification

19  certificate at a local DPS station.

20  Q    When did the League take some of your constituents to a

21  local DPS in order to get an EIC --

22  A    Last fall --

23  Q    -- if you recall?

24  A    Uh-huh.

25  Q    I'm sorry?

1   A    Last fall.

2   Q    Last fall.  And do you know how many students the League

3   took?

4   A    I can recall about two to three.

5   Q    Okay.  And was that a new activity for the League as well?

6   A    Yes.

7   Q    Okay.  Did conducting all of these activities that you

8   just laid out for us require resources of the League?

9   A    Yes.

10  Q    Can you tell me about some of the resources that it

11  required?

12  A    So, as I said before, it sort of shifted the way we

13  operate as an organization.  And a lot of the stuff we're doing

14  now is educating, you know, about the new law and assessing our

15  base to see if they have one of the forms of ID.

16           So now the League, rather than, you know, focusing on

17  what we normally focus on, which is voter registration, get out

18  the vote, and, you know, leadership development, we're now sort

19  of using a lot of time to actually, you know, pretty much

20  educate about this new law, and, you know, assessing our base

21  to see if they have one, and helping them, you know, get the

22  information that they need to obtain one.

23           So it -- that's been a lot of time resource.

24           Then we've, you know, we've printed a lot of

25  marketing materials to communicate this message in all aspects

1   of our work, and that's -- you know, we all know that printing

2   and all that have, you know, have some financial costs to it as

3   well.

4   Q    Are you able to quantify those financial costs?

5   A    No, I'm not able to quantify the financial costs.

6   Q    How about the time?

7   A    No, I can't quantify the time, but I know it was -- it was

8   a significant amount of work.

9   Q    What would the League have been doing with those resources

10  if not for SB 14?

11  A    Well, I mean, we would be doing what we're known to do,

12  and that is to register voters, get them out to vote, and

13  continue training leaders to continue this work moving forward.

14  Q    Mr. Green, you've been at the League for four years, you

15  testified?

16  A    Uh-huh.

17  Q    Have you ever heard of an instance where a student

18  committed in-person voting fraud using a student ID?

19  A    No.

20  Q    My last question for you right now --

21  A    Uh-huh.

22  Q    -- is could you tell us why you do the work that you do?

23  A    Sure.  I do this work because -- for one, I've been doing

24  it for a very long time.  I've been doing civic engagement work

25  when I was a student in high school, even before I could vote.

Green - Direct / By Ms. Korgaonkar                     259

1        You know, I was one of those people, you know, from

2   the inner city, from urban, you know, I guess Fifth Ward

3   Houston, who, you know, was taught at an early age that, you

4   know, if you want to make change in your community, it starts

5   at the ballot box.

6        And, you know, I experienced that firsthand with, you

7   know, with my voting.  And that's one of the things that I do

8   now, I communicate that message to the people that I go back

9   into the community as to where I'm from, and tell them that

10  message.  And, you know, a lot of them are starting to get

11  that, you know, you want to make change in your community, it

12  starts at the ballot box.

13       And, you know, we all know that, you know, you know,

14  getting young people involved at a very early age will sort of,

15  like, allow them to, you know, continue to be civic --

16  civically engaged just moving forward, and, you know, that's

17  something that motivates me.  That's something that, you know,

18  you know, motivates me to do the work that the League is doing,

19  and that's the central driving force on why the League is here

20  and why, you know, I do the work that I do.

21  Q    Well, thank you for your testimony and thank you for doing

22  the important work that you do.

23  A    All right.  You're welcome.

24  //

25  //

1                    **CROSS EXAMINATION**

2  **BY MR. TATUM:**

3  Q    Good afternoon, Mr. Green.

4  A    Good afternoon.

5  Q    It's good to see you again.  I just got a few questions

6  for you.

7  A    Okay.

8  Q    You talked a lot about the mission of the Texas League and

9  generally described it as encouraging young people of color to

10  engage in civic participation through the electoral process; is

11  that right?

12  A    That's correct.

13  Q    Okay.  And that means, as you testified, registering

14  people to vote and getting them out to the polls to cast their

15  ballot, right?

16  A    Correct.  Uh-huh.

17  Q    Okay.  And you talked about some of the various activities

18  that the Texas League engages in in furtherance of that

19  mission.  I believe you mentioned canvassing neighborhoods,

20  voter registration drives, get out the vote, that kind of

21  thing; is that right?

22  A    That's correct.

23  Q    Okay.  You also engage in an activity, I believe it's

24  called "tabling"; is that right?

25  A    Tabling, it's a form of voter registration.

1  Q    Okay.  And can you kind of describe more what that is?

2  A    Well, you can register them to vote at their door or you

3  can register to vote behind a table.

4  Q    Okay.  And you all do that on college campuses?

5  A    College campus, malls --

6  Q    High schools?

7  A    High schools.  Uh-huh.

8  Q    Now, all of those activities that you described, they're

9  geared towards engaging people in the voting process; is that

10  right?

11  A    Correct.

12  Q    Okay.  And the Texas League now contends that it has had

13  to divert its resources, both financial and otherwise, to other

14  activities because of SB 14; is that correct?

15  A    That's correct.

16  Q    Okay.  And the Texas League feels that they are harmed

17  because these new activities constitute a pivot of source -- of

18  sorts from the Texas League's core mission; is that right?

19  A    That's correct.

20  Q    Okay.  And you just testified a minute ago about these new

21  activities taking some amount of time, resources, and some

22  amount of financial resources that are kind of hard to

23  quantify; is that right?

24  A    That's correct.  Uh-huh.

25  Q    And is it safe to say they're hard to quantify because

1    they're kind of commingled -- the resources that are

2    attributable to these new activities are kind of commingled

3    with the resources that are used for your original, more common

4    activities; is that fair to say?

5    A    Correct.  Uh-huh.

6    Q    Mr. Green, does the Texas League have an official Twitter

7    account?

8    A    We do.

9    Q    And is that Twitter account found on your main web page of

10   the Texas League?

11   A    It has an icon that leads to our Twitter.  Uh-huh.

12   Q    Okay.  And who maintains that Twitter account?

13   A    Who maintains it?

14   Q    Yes.

15   A    We have several people who maintain it from the League.

16   Q    And they update it pretty regularly?

17   A    When they can, yes.

18   Q    Okay.  And if I looked on the Twitter feed at the Texas

19   League, would I find a tweet or two publicizing that members of

20   the Texas League were registering voters this summer in Dallas

21   and Houston in conjunction with a major musical tour?

22   A    Yes.

23   Q    Okay.  And if I looked on the Twitter feed, would I see

24   tweets about how this summer the Texas League has been

25   registering new voters at various high schools across the

Green - Cross / By Mr. Tatum                              263

1    state?

2    A     Correct.

3    Q     Okay.  And these are all voter registration activities,

4    correct?

5    A     They are.

6    Q     Okay.  So despite these -- the new voter ID activities

7    that you've been talking about, these new activities that you

8    all have been forced to devote resources towards, despite those

9    new activities, the Texas League is still able to conduct

10   baseline voter registration activities that kind of form the

11   bedrock of your core mission; is that right?

12   A     Right, but not in the same capacity.  So although we do

13   voter registration at these sort of events -- we still do voter

14   registration, but now we're incorporating -- we've incorporated

15   it, because that's what we have to do.

16            So we are now, you know, registering voters, but

17   we're also talking about, you know, voter ID while we're

18   registering them.  So that's sort of -- like, so it's limiting

19   the time that we're, you know, we -- you know, we could be

20   registering more people, which is our essential message, to,

21   you know, add more people to the voter registration rolls.

22            But now, since we're expending this sort of, you

23   know, time and effort, you know, one on one with the people

24   that we're registering now, it sort of has -- but it's

25   something, like I said, we've never done before.  That's -- has

```
 1  diverted, you know, our core mission of our organization.

 2  Q    I want to get back on these new activities just a little

 3  bit.  And you briefly described and you talked about the Got ID

 4  campaign.

 5  A    Uh-huh.

 6  Q    You talked about -- I'm not sure if you did, but do you

 7  all engage in any kind of community forums?

 8  A    We do.

 9  Q    Okay.  Do you all engage in any kind of community voter ID

10  clinics?

11  A    We did.

12  Q    You don't do those anymore?

13  A    No, that was a one-time thing.

14  Q    Okay.  Now, these new activities -- the Got ID campaign,

15  the community forums -- those activities primarily involve

16  educating Texas League constituents on voter requirements; is

17  that right?

18  A    Yes, that's a form of education.  Correct.

19  Q    Okay.  And is the Texas League required by law to educate

20  its constituents about voter ID requirements?

21  A    Are we required by law?

22  Q    Yes.

23  A    I mean, it's -- I mean, it's a law that affects our -- I

24  mean, it's a law that affects our constituent base, and I think

25  we should educate them in some way about it.
```

Green - Cross / By Mr. Tatum                                    265

1   Q    So it's something you all choose to do as an organization?

2   A    Well, that's something we have to do.

3   Q    And why do you feel that you have to do it?

4   A    Because it greatly impacts a lot of people who are, you

5   know, who are constituent base.

6   Q    Is it to ensure that registered voters who you call your

7   constituents, as well as those constituents who may not be

8   registered but are planning to, is it to ensure that they're

9   more knowledgeable about the voting process?

10  A    Well, yes.  But, also, you know, as I said, you know, we

11  do -- we do voter registration.  So if we didn't educate them

12  about, you know, the SB 14 law, then, you know, a lot of people

13  who we register probably wouldn't able -- wouldn't -- I mean,

14  they'll put -- it will put the work that we did prior -- prior

15  to registering them sort of, like, you know, no use, because,

16  you know, they wouldn't -- you know, a lot of them when they

17  register now probably won't be able to actually vote because

18  they don't have one of the forms of ID.

19  Q    So the Texas League seeks to make its constituents, those

20  that it serves, more knowledgeable about the requirements

21  imposed by SB 14 through all these new activities; is that

22  correct?

23  A    Correct.

24  Q    Okay.  And would you agree that someone who is more

25  knowledgeable about the voting process is better able to

1   participate in that process?

2   A    Well, yes.

3   Q    Might someone who is more knowledgeable about the voting

4   process become more engaged in the voting process?

5   A    I could say that they -- that they would be more engaged.

6   Q    Okay.  So by undertaking all these efforts to educate its

7   constituents about SB 14, a very necessary and worthy cause, is

8   that not the same reason -- does it not do so for the same

9   reason that it strives to get young voters registered in the

10  first place?

11  A    Well, we get them -- we're not -- let's take a step back.

12  So voter -- the voter education piece that we normally do is

13  educating them about the -- why they should vote and the impact

14  voting has.

15           You know, we've -- you know, this new form of

16  education is slightly different than, you know, the education

17  that we're normally, you know, accustomed to.

18  Q    Now, Mr. Green, the Texas League has stipulated that it is

19  not a membership organization; is that correct?

20  A    That's correct.

21  Q    Okay.  But as we've discussed a lot here today, the Texas

22  League does serve its constituent base, correct?

23  A    Correct.

24  Q    Okay.  And it keeps a list of those constituents in some

25  kind of database somewhere, right?

1   A    That's correct.

2   Q    Okay.  And how does one get on that list?  How does one

3   become a constituent of the Texas League?

4   A    Well, it's through either they volunteered with us or

5   either they signed, you know, a pledge card to vote.  That's

6   generally -- or they sign up to be a part of our mailing list.

7   Q    Okay.  Now, at your deposition, I asked if you could

8   identify any of your constituents who had been unable to vote

9   because of SB 14.  Do you recall that?

10  A    I do recall that.

11  Q    Okay.  And I believe you answered that you could not; is

12  that correct?

13  A    That's correct.

14  Q    Okay.  And, in fact, the Texas League does not keep any

15  kind of information indicating whether or not your constituents

16  have voted at all; is that correct?

17  A    That's correct.

18  Q    Okay.

19          **MR. TATUM:**  I have nothing further.  Thank you.

20          **MS. KORGAONKAR:**  We have no further questions, your

21  Honor.

22          **THE COURT:**  All right.  Thank you, sir.  You can step

23  down.

24      **(Witness Excused)**

25          **MS. RUDD:**  Your Honor, we'd now like to call Dawn

1    White.

2              THE COURT:  Kind of a step up -- slant there.  Would

3    you raise your right hand.

4              DAWN WHITE, PLAINTIFFS' WITNESS, SWORN

5              THE CLERK:  Thank you.  Have a seat.

6                        DIRECT EXAMINATION

7    BY MS. RUDD:

8    Q    Good afternoon, Ms. White.  How are you this afternoon?

9    A    Good.  Thank you.

10   Q    Could you start by telling the Court where you're from?

11   A    I'm from San Antonio, Texas.

12   Q    How long have you lived in San Antonio?

13   A    I've lived there about 16 years now.

14   Q    I understand you do a little comedy improv on the side in

15   San Antonio?

16   A    I do.  I'm in a comedy improv troupe there, so yes.

17   Q    That's not your day job, right?

18   A    No.

19   Q    What's your day job in San Antonio?

20   A    I'm the Executive Director of Christian Assistance

21   Ministry.

22   Q    What is Christian Assistance Ministry?

23   A    It's a local San Antonio nonprofit.  I like to say that

24   we're the emergency room of social services.  You don't come

25   there for a program to resolve the long-term social issue that

White - Direct / By Ms. Rudd                           269

1   you might have; but, rather, we try to resolve critical

2   emergent issues so that you can either avoid further crisis or

3   gain access to other community supports.

4   Q     Okay.  So what types of specific services do you provide

5   in -- as part of your crisis management program?

6   A     Sure.  Number one, we try to be access-available to

7   clients.  You don't have to have an appointment.  You don't

8   have to be in any demographic.  You don't have to represent a

9   particular ZIP code.  You can come in any time when you're

10  facing that crisis and receive help with food, clothing,

11  financial assistance for things like rent or utilities,

12  prescription assistance, and ID recovery.

13  Q     Okay.  I want to come back to the ID recovery part of what

14  you do, but it sounds like you provide a full range of services

15  for clients in crisis.

16  A     Absolutely.

17  Q     What is your role at CAM specifically?

18  A     I'm the executive director.

19  Q     As executive director, what do you do on a day-to-day

20  basis?

21  A     Well, it's kind of an unusual executive director job.  It

22  sounds a little bit higher level than it might be.  There's a

23  lot of direct service.  We're a small nonprofit.  We accept no

24  government support.  We have over 200 volunteers that help us

25  serve our clients.  And as the executive director, I'm involved

White - Direct / By Ms. Rudd                                    270

1    in the administration of the organization, supervision of

2    employees, our board of directors, fundraising, but also client

3    services.

4             I'm likely to answer the phone on any given day that

5    you call or one of our clients calls.  My office is right next

6    to our client services office, and I am actively participating

7    in how we support those in need.

8    Q    Do you also manage a staff at CAM?

9    A    Yes, we have seven full-time employees and three part-time

10   employees, and we serve 56,000 people on an annual basis.

11   Q    Wow.  That's quite a number of people.  Are most of those

12   people from the San Antonio area?

13   A    They are, absolutely.

14   Q    Let's back up a little bit.  Can you tell the Court a

15   little bit about the history of CAM and how it got started?

16   A    Sure.  CAM was founded 37 years ago by nine downtown

17   churches who saw clients sort of coming in and out of their

18   door, people asking for help, and they figured that they

19   weren't really doing a very good job individually, but what

20   would it look like if they pooled their resources, their

21   parishioners as volunteers, the money they had, clothing

22   donations, and created this nonprofit?

23            Today, we have 74 churches that support us.  We have

24   individuals, grants.  We have the 200 volunteers that are not

25   just volunteers that drop in; these people work day in and day

White - Direct / By Ms. Rudd                    271

1    out.  They've been there for 20 years, some of our volunteers.

2              And we don't pay for any property, so that our

3    financial contributions be really be meaningful services to our

4    clients.

5    Q    Okay.  Well, let's come back to those clients now.  Let's

6    talk a little bit about the demographics of the people that you

7    serve.

8              First of all, can you tell the Court what percentage

9    of the clients you serve are minorities?

10   A    I would say probably 80 percent of our clients are

11   minorities.

12   Q    And when you say "minority," what do you mean?

13   A    I mean nonwhite, Hispanic, and African-Americans.

14   Q    And what are the age ranges of the clients that you

15   typically serve?

16   A    The age range of our clients can be from birth to 90 years

17   old, because we see families that come in with all sorts of

18   children.  But our average age range of clients are obviously

19   adults between the ages of 18 and about 60 years old.

20   Q    Okay.  So most of your clients are voting age; is that

21   right?

22   A    Yes.

23   Q    And then talk to me about the socioeconomics of most of

24   you clients.  Where do they fall?

25   A    Sure.  All of our clients really fall into some kind of

White - Direct / By Ms. Rudd                           272

1    very severe poverty category.  We're talking about families who

2    have six or seven who may be living in a one-bedroom apartment

3    and haven't had water for six, or seven, or eight months;

4    people who have fallen into that financial crisis due to loss

5    of job, or illness, or mental health issue, or people who have

6    been in long-term economic crisis just due to their family and

7    life experience.

8    Q    Are your clients homeless?

9    A    No, that's a very small population.  We have about 20, 25

10   percent of our clients who are homeless, but we typically serve

11   that level of client with a daily sack lunch, we provide them

12   things like hygiene items, a place to receive their mail.

13        They are not the clients that are typically coming in

14   to talk about their long-term crisis issues.  They're not the

15   ones we're paying -- you know, helping with rent, or with

16   prescriptions, or with ID recovery.

17   Q    Would you describe most of your clients as working poor?

18   A    Oh, absolutely.  All of our clients are working in some

19   capacity.

20   Q    Let's talk about the clients that seek ID recovery

21   services from you.  First of all, can you tell the Court a

22   little bit about your ID recovery services program?

23   A    Our ID recovery services program is probably the tightest

24   program that we offer.  A lot of the other programs will let

25   you come in and out and get some food and we'll help you.

1          Because we have limited resources, and because ID

2   recovery is so arduous and hard, we want to ensure those we

3   help can have success.  We don't want to just be writing checks

4   and someone gets halfway through the process and they never get

5   their ID.

6          So, first of all, individuals have to have a referral

7   from another agency that demonstrates that the -- that when

8   they get their ID, that they're getting it to get a job or to

9   get into some kind of housing.

10         That also lets us know that the person probably has a

11  caseworker that will probably be helping them with some of the

12  steps.  Just because you can't afford an ID because you're a

13  senior citizen, or you're a young person who's been kicked out

14  of your house, or you're fleeing a domestic violence situation,

15  that doesn't mean that we will be able to help you with ID

16  recovery.

17         You must have some kind of a referral, and we must

18  believe that it's going towards achieving some long-term

19  success.

20  Q    Okay.  So it sounds like with this process of referral

21  you're requiring your clients to come in the door with at least

22  some level of ID or ability to get ID; is that right?

23  A    Absolutely.  They have to have some form of photo ID.  It

24  does not necessarily mean it needs to be super official.  We

25  have lots of people that come in with paper IDs that they've

White - Direct / By Ms. Rudd                                274

1    copied, with old IDs they've been using for a long time and

2    have been able to work with that old ID, and now there's some

3    kind of a crisis, and they need an official ID.

4    Q    Do you also accept clients on referral just by word of

5    mouth if someone can identify the person?

6    A    That occasionally can happen.  Usually, that's a

7    caseworker who says they're coming in with a client and that

8    particular agency -- often a state agency -- will have some

9    kind of ID and photo process that they do for clients.

10   Q    Let's talk about what types of ID you try to recover for

11   people.  What are you generally trying to get?

12   A    It can be a renewal of an ID that's just been lost.  It

13   can be that they just need a new ID; they've had an old expired

14   one for several years that would be a typical Texas type of ID.

15        Lots of our clients, though, need other extensive

16   forms of ID in order to even get to that kind of photo ID

17   process.

18        So the greatest thing that we help people with is

19   birth certificates.  And we work extensively with clients who

20   have big issues -- they were born at home, they were born out

21   of state, they come from families where there is no other forms

22   of ID, and they have no records.

23        All of my staff members are notaries.  We often have

24   to apply online and notarize the documents in order to try to

25   help the client just first claim that birth certificate.

1    Q    Okay.  So it sounds like there are several layers of ID

2    that you're actually helping clients to obtain; is that right?

3    A    That is true.

4    Q    And sort of the top layer is the official Texas photo ID;

5    is that right?

6    A    Yeah.

7    Q    A second layer is birth certificates, which I think you

8    just said you're --

9    A    Yeah.

10   Q    -- helping people with quite a bit?

11   A    Yes.

12   Q    And then do you also help people obtain supporting

13   documentation so that they can get their birth certificate?

14   A    Sometimes, we do.  There are individuals that we have to

15   try to get high school records on as a form of identification.

16   And, typically, that is looking things up online, making

17   requests formally, having it notarized, having a place for it

18   to be mailed back to.

19        Lots of things go into the process.

20   Q    Let's talk a little bit about the types of clients who

21   come in to CAM needing ID.  What types of clients typically are

22   living without ID and come in for your assistance?

23   A    Sure.  I would say that probably 90, 95 percent are people

24   who have been working.  They may have worked in their

25   neighborhood, they may have worked in construction, they may

1   have worked for other family members, and they had either lost

2   their ID and it's just a temporary situation, they've been

3   robbed, they've had a fire in their home and lost it, a woman

4   escaping a violent situation, or they may have just not had an

5   ID for a long time and haven't really needed it, because they

6   might have married into a family where there was a working

7   arrangement, they live in a neighborhood -- almost all of our

8   clients do not drive.  So there's never a reason to get a

9   driver's license, like we might traditionally think that people

10  get.

11  Q    Okay.  Let's talk a little bit about your intake process.

12  When a client initially comes in to CAM asking for your help

13  with ID recovery services, what does that process look like?

14  A    Typically -- hopefully, they made a phone call to us,

15  because we deny a lot of people.  So they're -- that's

16  basically our greatest phone call sort of intake process.

17          We explain our process, how we will help people.

18  We're one of the only places in town that do it, so we field

19  probably 500 to 700 calls at least every couple of weeks just

20  on ID recovery.

21          If they've made it through that process, they get to

22  our offices, we verify that they have something so that we can

23  tell who they are, and they begin an interview process with a

24  volunteer interviewer who provides various materials explaining

25  to the client that we are not actually providing them the ID --

White - Direct / By Ms. Rudd                    277

1   a lot of clients actually think that we create IDs and give it

2   to them -- but that we're actually writing a check to the birth

3   certificate office, or to the driver's license place, or the

4   Texas State ID, and we walk them through what it's going to

5   take for them to get an ID.

6            Even in doing that process, for many of our clients,

7   it's a very arduous undertaking -- knowing where to go, what

8   forms they have to fill out, having the transportation to get

9   there, the days and hours it might take off of work, just sort

10  of explaining all that it's going to take for them to actually

11  reclaim their ID is a part of our intake and our process.

12  Q    Okay.  So it sounds like initially education is a lot of

13  what you do, because people may not know --

14  A    Yes.

15  Q    -- what they need?

16  A    Yes.

17  Q    You mentioned that you field about 500 to 700 phone calls

18  a day.  Could you estimate how many clients you have to turn

19  away that you don't think you can help in recovering ID?

20  A    Well, I've -- we feel like -- we do calculate and we do

21  track clients minimally.  We think that we see about 10,000

22  clients that we think might be at the level where we can help.

23  We only help about 5,000 initially, and those that actually

24  recover their ID or some piece of it is only about 2,500.

25            What I mean by that is there are many others that we

White - Direct / By Ms. Rudd                    278

1    actually write a check for and are -- we think we're helping

2    them on their way, and they're never able to gain the

3    additional documents they need to even get their birth

4    certificate or their driver's license, and that check is never

5    cashed.

6    Q    Okay.  You made an important point there.  In terms of the

7    financial assistance that you provide, writing those checks for

8    people --

9    A    Uh-huh.

10   Q    -- to obtain ID, does CAM write multiple checks if people

11   need multiple layers of identification?

12   A    We do not.  We are only -- if you walk in our doors and

13   you have everything together and you only need, say, that $11

14   renewal or something, then you're in great shape.  Your help

15   will probably work.

16          But for those clients that need their birth

17   certificate, then they need their Social Security card, then

18   they need their driver's license, or their Texas ID, we're only

19   helping with one part of that.  And we will only help you one

20   time a year financially.

21   Q    Okay.  So many of the clients who you help actually walk

22   out still needing additional things in order to get the photo

23   ID?

24   A    Absolutely.  They will often have to go to our

25   organization and multiple organizations around town, all the

White - Direct / By Ms. Rudd                               279

1    while they don't have money for transportation, bus tickets, or

2    bus passes.  They're working, you know, hard jobs and they're

3    having to take off work in order to even sort of solve these

4    situations.

5    Q    I want to come back to some of those other burdens that

6    you're seeing with your clients, but first could you just tell

7    the Court about what the average time is to obtain any layer of

8    ID for one of your clients?

9    A    It's typically about four to six weeks.  That includes, if

10   I was just averaging out the people who have a pretty easy task

11   -- and what I mean by "easy" is they maybe only one form and

12   they have most of their things.  There's still a process of

13   going there, getting it, having it mailed back to them.

14            Other clients, it can take three, four months because

15   of out-of-state birth certificates and other issues that are

16   involved in them getting the ID.

17   Q    And how much would you say that CAM spends a year as an

18   organization on its ID recovery program?

19   A    We know that we spend $50,000 in just cash in aid, as we

20   like to call it, for ID items.  That does not include the fact

21   that I have to pay for staff members to be notarized, that I

22   hire staff to interview and walk clients through the process,

23   nor does it cover the cost of just running our business and

24   making this a priority in our services.

25   Q    Have you ever estimated what it costs CAM on an individual

White - Direct / By Ms. Rudd                              280

1  basis, so per client, to get someone an ID?

2  A    Sure.  We think that it would cost about a hundred dollars

3  per person if we have to do the entire ID process.  And that is

4  sort of one of our goals, as we head into 2015, so we've really

5  been strongly looking at what that would take and what the

6  burden would be on us as an agency to allow clients to not just

7  come in for that one-time check, but then to come back and get

8  a secondary check.

9           We almost always have to provide them extra financial

10 assistance for bus tickets, or bus passes, or even gas

11 vouchers.  That is often a big part of the process.

12 Q    Do you know any other organizations in San Antonio that

13 provide the type of services, ID recovery services, that CAM

14 provides?

15 A    No, there are a few small organizations that serve

16 particular populations, and they might fund something for a

17 particular population if you fit in their demographic.

18           There's one other small organization called

19 "Chrisliss (phonetic)," but they send a lot of their clients to

20 us.  They do far less than we do.

21           There is a Saint Mary's Law School that also helps

22 people with long-term ID recovery issues that are much more

23 extensive and involved legal issues, but they might see three

24 or four clients a week.

25 Q    Okay.  So would you say that there is a big population in

1   San Antonio that needs ID that isn't getting services anywhere?

2   A    Oh, absolutely.  We turn those away constantly.

3   Q    Okay.  I want to come back briefly to just the burdens

4   that you think are associated with ID recovery for your

5   clients.  Could you just walk the Court through the list of

6   burdens that you think clients experience --

7   A    Sure.

8   Q    -- when they try to obtain ID?

9   A    Certainly, there's the financial burden.  That's the

10  number one.  Secondary is just the -- a process and

11  understanding what is required in order to get that ID.  A lot

12  of our low-income clients have very little education, very

13  little experience.  There's a lot of ignorance.  They are

14  afraid of sometimes the processes and the people that are

15  supposed to be helping them.  They may be afraid of past, you

16  know, tickets or something and be scared to go to the DPS

17  office, and that may be preventing them from getting the ID and

18  getting a job that they really want.

19        Lack of access to computer systems, which is really

20  how you find out how to get a birth certificate or to order one

21  online.  They often don't have credit cards, for which you

22  would have to pay online in order to make that application.

23        Many of our clients do not have a phone, and so

24  making phone calls becomes an issue, and then obviously

25  transportation is a huge issue.

1          All the while, they are trying to work, make a

2     living, make ends meet for their families and themselves.

3     Q    Do clients that you see often have to make a choice

4     between going to their job and going through this ID recovery

5     process?

6     A    Oh, absolutely.  That's one of the huge burdens is the

7     time off from work when someone might have to travel on a bus

8     two to four hours in order to make many stops in order to get

9     their ID.

10    Q    Well, you've mentioned public transportation a couple of

11    times.  What is the public transportation system like in San

12    Antonio?

13    A    Well, it's utilized heavily.  There are a lot of people

14    without cars that aren't driving, which is highly unusual in

15    Texas.  It's not a very good system.  There aren't appropriate

16    sidewalks.  They make individuals have to do multiple stops,

17    drive all around town.

18         And your average person, to go anywhere on the bus,

19    has to allot about two hours.

20    Q    What about an average person having to go to the DPS for

21    ID?  How much time would they spend?

22    A    Oh, that would definitely be a two-hour bus ride, unless

23    they just happen to live next door to it.

24    Q    Let's talk a little bit about the lawsuit and why we're

25    here today.  Are you generally aware of what this lawsuit is

White - Direct / By Ms. Rudd                    283

1    about?

2    A    I am now, but I know little about it.

3    Q    You don't have a stake in the outcome of this lawsuit?

4    A    Absolutely not.

5    Q    Are you being paid for your testimony today?

6    A    No.

7    Q    Why are you here giving testimony today, other than I

8    politely asked you?

9    A    Really, I had -- just the ID recovery is an issue for me

10   personally and my agency.  My volunteers, the clients we serve,

11   we see that they're low-income individuals in great poverty,

12   who need to have IDs as our country and nation states that they

13   must have one in order to do certain things, and yet we seem to

14   want to make it impossible for them to achieve that simple goal

15   in order to move forward.

16        I just wanted to testified to the great burden it is

17   for those we serve.

18   Q    One issue that's come up in this lawsuit is this issue of

19   obtaining election identification certificates to vote.  Prior

20   to learning about this lawsuit, had you ever heard of an

21   election identification certificate?

22   A    No.

23   Q    Do you know what the requirements are for obtaining an

24   EIC?

25   A    Not really.

White - Direct / By Ms. Rudd                           284

1   Q    Does your organization facilitate people obtaining EICs?

2   A    No, we would not.

3   Q    Why wouldn't you?

4   A    Well, we have such difficult decisions to make.  The level

5   of crisis and poverty, we have to pick the things that we can

6   spend our money on, and that just would not be one that we

7   could help clients for, when we're trying to decide on whether

8   we can give a family the food they need, or putting the water

9   on, or helping them get their driver's license in order to get

10  a job.

11       Those would be our top priorities.

12  Q    What about an EIC as opposed to other forms of ID?  Is

13  there any reason for CAM to facilitate its clients obtaining an

14  EIC as opposed to, say, a Texas ID?

15  A    No.

16  Q    And why is that?

17  A    Well, once again, the only reason that we're helping with

18  ID recovery is that these are usually very crisis situations,

19  individuals who may need an ID in order to get housing,

20  individuals who have just lost a job and they could obtain a

21  new job -- those are our priorities.  We're helping people with

22  very almost life-and-death scenarios.

23       And, unfortunately, as much as we want our clients to

24  experience a full and rich life in our country, whether they

25  vote or not is not a part of our mission.

EXCEPTIONAL REPORTING SERVICES, INC

White - Direct / By Ms. Rudd                      285

1    Q    Are you a voting organization?

2    A    Do I vote, or --

3    Q    No, is your -- is CAM a voting --

4    A    Oh, no.

5    Q    -- organization?

6    A    No, we don't -- we're not involved in anything political.

7    Q    Okay.  You're not a partisan organization, I gather?

8    A    No.  Uhn-uh.

9    Q    Let's talk a little bit about the population you serve for

10   ID recovery.  You said earlier that the majority of the clients

11   you serve are either Hispanic or African-America; is that

12   right?

13   A    That's right.

14   Q    Does that also apply to your ID recovery program?

15   A    Yes.

16   Q    Do you think in your experience and with the clients that

17   you see that the burden of ID recovery falls more heavily on

18   minorities than it does on, for example, white people?

19   A    I would say yes and I would say that is evidenced by the

20   fact that we actually operate two locations.  The downtown

21   location where I work daily is in a heavily poor neighborhood

22   that is mostly minority and those are our clients.  We do have

23   another location on the north side of San Antonio that is an

24   unusual spot, it is a much more wealthy part of town, and those

25   clients typically are working for -- they're more than often

1  Caucasian individuals.  That particular location does almost no

2  ID recovery.  It's so unusual that the director or the

3  volunteers from that location will often give us a call if

4  somebody makes that request, because they're so not used to

5  that as a daily service.

6  Q    By contrast, at your downtown location what portion of

7  your services does ID recovery make up?

8  A    I think I said that there is about one-third of the

9  financial component.  I would say if I divided that up as far

10  as our energy and the amount of phone calls and the discussion,

11  it's probably half or more.

12  Q    We've heard a lot about -- in this lawsuit about the

13  burdens of everyday life and how ID and photo ID in particular

14  is necessary for everyday life.  Do you at CAM see clients on a

15  daily basis that are living without ID?

16  A    Oh, absolutely.  Most of our clients are living without

17  ID.  In these cases where they're coming in now and trying to

18  obtain an ID, they either have an old or expired one and it's

19  enough to get by.  I see women who were married at very young

20  ages who never got IDs raise families, didn't go to work, take

21  the bus, and now maybe escape an abusive situation but have

22  never gotten an ID and really had no reason to.  Other

23  individuals do construction with their family, work at a family

24  restaurant, babysit, and they just live in a small -- even

25  though San Antonio is a big city, their world is sort of a

White - Direct / By Ms. Rudd                     287

1   small town block that they live on and they're able to

2   function.  It's a very poor level and financially they don't

3   have a lot, but they don't need their ID in order to feed their

4   family and pay their rent and work.

5   Q    And just coming back to this briefly, in the thousands of

6   people that you serve in your ID recovery program on an annual

7   basis, how does it make you feel to see some of your clients

8   struggling so heavily with the burdens of obtaining ID?

9   A    Well, that, as I said just a little bit earlier, that's my

10  only reason for testifying here.  I don't really have a dog in

11  the game of voter rights and that sort of thing.  We really

12  struggle and I struggle with the fact that we have to turn away

13  so many people who simply want to get an ID, and even those

14  that we serve we see how difficult it is for them to get the

15  ID.  So I feel really passionately about this issue.  I don't

16  understand why we would want to make something that is required

17  so difficult.

18          **MS. RUDD:**  Thank you.

19          **MR. SCOTT:**  No questions, your Honor.

20          **THE COURT:**  You can step down, ma'am.  Thank you.

21      **(Witness excused)**

22      **(Pause)**

23          Good afternoon.  Would you raise your right hand?

24  //

25  //

1            **GORDON BENJAMIN, PLAINTIFFS' WITNESS, SWORN**

2            **THE COURT:**  You can have a seat.

3            **MR. BARON:**  Thank you, Judge.

4                          **DIRECT EXAMINATION**

5    **BY MR. BARON:**

6    Q    Please tell us your name once you get yourself situated.

7    A    My name is Gordon M. Benjamin.

8    Q    Where were you born, Gordon?

9    A    I was born in Alexandria, Louisiana.

10   Q    And where do you currently live?

11   A    I currently live at 902 Nevada Street in San Antonio,

12   Texas.

13   Q    How long have you lived there?

14   A    Tomorrow it will be five years.

15   Q    Where did you live before that?

16   A    Prior to returning to San Antonio, I was living in

17   Phoenix, Arizona.

18   Q    And how long did you live in Arizona?

19   A    From May of 1988 until September of 2009, about 21 years.

20   Q    Why did you move back to Texas?

21   A    At my mother's request to help her maintain her household.

22   Q    When you were in Arizona did you have a driver's license?

23   A    Yes, I did.

24   Q    Was it issued from the state of Arizona?

25   A    Yes, it was.

Benjamin - Direct / By Mr. Baron                289

1   Q    Had you moved to Arizona from Texas?

2   A    Yes.

3   Q    When you were in Texas, before you went to Arizona, before

4   you came back to Texas, did you have a driver's license from

5   Texas?

6   A    I had a Texas driver's license when I left here in 19 --

7   when I left San Antonio in 1988.

8   Q    And how did you get an Arizona driver's license?

9   A    I was able to present my still valid Texas driver's

10  license and I obtained an Arizona driver's license.

11  Q    And did you keep an Arizona driver's license for the

12  entire time you lived there?

13  A    Yes.

14  Q    Were you registered to vote in Arizona?

15  A    Yes, I was.

16  Q    And were you able to vote in Arizona with your voter

17  registration?

18  A    Yes.

19  Q    When you moved back to Texas in late 2009, or sometime in

20  2009, were you able to register to vote here in Texas?

21  A    Yes, I was.

22  Q    Were you able to vote?

23  A    Yes, I was.

24  Q    When did that change?

25  A    That changed as a result of the passage of SB 14, the

Benjamin - Direct / By Mr. Baron                    290

1    voter ID law, in June of 2013.

2    Q    Did you attempt to vote in 2013?

3    A    I attempted to vote in November of 2013 and I had to cast

4    a provisional ballot.

5    Q    What did you take with you when you went to vote?

6    A    I took a copy of my valid Arizona driver's license, a copy

7    of my original Social Security card, and my voter registration

8    card.

9    Q    Was that accepted?

10   A    No.

11   Q    Were you able to cure your provisional?

12   A    No, I wasn't.

13   Q    Have you tried to obtain a Texas driver's license?

14   A    I tried to obtain a Texas driver's license in the fall of

15   2013, as well as in January of 2014 -- well, early in 2014.

16        MR. BARON:  Can you do me a favor and put up 128?

17        (Counsel confers with IT Technician)

18   BY MR. BARON:

19   Q    Where did you go to get an SB 14 ID?

20   A    On two occasions I went to the Department of Public Safety

21   offices at South -- on South New Braunfels in San Antonio and

22   on a third occasion in 2014 I went to the office on South

23   Cupples Road.

24   Q    What did you take with you?

25   A    I took a copy of the unexpired Arizona driver's license

Benjamin - Direct / By Mr. Baron                    291

1   and I took a copy of my original Social Security card and the

2   voter registration.

3   Q    Do you have a senior transit -- senior citizen transit

4   card from San Antonio?

5   A    Yes, I have a transit card from the VIA Metropolitan

6   Transit of San Antonio which allows me to ride during the hours

7   of 9:00 a.m. to 3:00 p.m. for 25 cents and on Saturdays and

8   Sundays on the weekends you ride for free.

9   Q    Is that a photo ID?

10  A    It's a photo ID.

11  Q    Now, you see I put up the EIC.  Do you know what an EIC

12  is?

13  A    Yes, that's I think an election identification card.

14  Q    Is that one of the IDs you would have attempted to try to

15  get at DPS?

16  A    Yes.

17  Q    Were you successful in any of your occasions?

18  A    No.

19  Q    Do you see where that ID says for election purposes only,

20  cannot be used as identification?

21  A    Yes.

22  Q    Is that an ID that would be very useful to you in your

23  daily life?

24  A    I would have taken it.

25  Q    You turned 65 when?

Benjamin - Direct / By Mr. Baron                             292

1    A    June 22nd of 2014.

2    Q    Congratulations.  You are now eligible to vote by mail, is

3    that correct?

4    A    That's correct.

5    Q    How do you feel about voting by mail?

6    A    Well, I feel it's a limitation, only being able to vote

7    within a certain time or during that process, and I don't

8    really trust voting by mail because mail ballots have a

9    tendency to disappear.

10   Q    Would you classify yourself as a regular voter?

11   A    A regular voter, whether I vote early or vote on election

12   day.

13   Q    Do you prefer to vote in person?

14   A    I prefer to vote in person.

15   Q    Why?

16   A    It's exercising your right to participate in the process.

17   Q    Now, coincidentally, now that you are eligible to vote by

18   mail, have you been able to obtain a copy of your birth

19   certificate?

20   A    Yes.

21   Q    How did you do that?

22   A    I contacted a relative in New Orleans, because I found

23   that the Department of Hospital and Statistics, I think that's

24   the name of it, was responsible for issuing copies of your

25   birth certificate or certificates certifying that you were, you

1    know, born live and well, and she told me that she wasn't able

2    to get it and that only my sister or an immediate relative

3    would be able to obtain that for me.  Subsequently, if I may?

4    Q    Well, let me ask you another question and then I'll let

5    you keep going.

6            Had you looked into getting a birth certificate from

7    while you were in Texas previously?

8    A    Yes.

9    Q    What did you do?  Did you go online?  What did you do?

10   A    I went online and I found that that department used a

11   third party to accept online applications and the cost to me

12   was going to be prohibitive in the amount of $81.32.

13   Q    Was that something you could afford?

14   A    No, not at the time.

15   Q    Tell me how your sister got you your copy of your birth

16   certificate.

17   A    My sister was traveling to a family reunion in Atlanta and

18   she was stopping in New Orleans to help drive down there and

19   between my cousin and myself, we let her know that I needed to

20   get a copy of that birth certificate in order to be able to get

21   a driver's license or an identification card to participate in

22   elections, and she said when she got to New Orleans she would

23   also go in and get a copy of that birth certificate.

24   Q    Okay, and was she able to do that?

25   A    She was.

1   Q    And do you now have a copy of your birth certificate?

2   A    I do have a copy of my certificate of birth.

3   Q    And I think we produced it to the State in this case, you

4   understand that?

5   A    Yes.

6   Q    And it is -- is it your intent to go get some type of

7   SB 14 ID?

8   A    It is my intent to get either a driver's license or a

9   Texas identification card or whatever is required in order that

10  I can vote in the general election this November.

11  Q    And with regard to the SB 14 IDs, do you have a concealed

12  handgun license?

13  A    No, I do not.

14  Q    Do you have a passport?

15  A    No, I do not.

16  Q    You have an Arizona license but no Texas license?

17  A    My Arizona license is expired as of June 22nd when I

18  turned 65 and I have no Texas license.

19  Q    How many elections did you vote provisionally in?

20  A    I voted in November of 2013 and I voted again in the

21  primary and the runoff in 2014.  The primary was March of this

22  year and the runoff was in May of this year.

23  Q    You have, I think, previously testified that you had

24  served as a deputy -- volunteer deputy voter registrar?

25  A    Yes.

1   Q    How long have you done that for?

2   A    I believe I started doing that around 2011.

3   Q    How many people do you think you've registered to vote?

4   A    In person, about 50, and by handing out cards I think I

5   counted a total of 139.

6   Q    And is that a nonpartisan --

7   A    Nonpartisan.

8   Q    -- concession you --

9   A    Yes.

10  Q    -- register, because you're not allowed to even ask them

11  whether they're Democrats or Republicans?

12  A    I was not interested and I'm not allowed to ask.  All I

13  ever wanted to make sure was that they understood how to fill

14  out the information, either send it in or have me submit it for

15  them, and that they get a card and go vote.

16  Q    Why did you become a Plaintiff in this lawsuit, Benjamin?

17  A    I think that the law is unnecessary and it creates a

18  burden for people who may not be able to afford a driver's

19  license or a birth certificate or any other form of the ID and

20  it hinders some groups of people from participating in the

21  voting process.

22  Q    And let me ask you, do you own a car?

23  A    No.

24  Q    Do you drive?

25  A    No.

Benjamin - Cross / By Ms. Roscetti                    296

1   Q    In fact, you took a bus from San Antonio to Corpus Christi

2   this morning at, I think, 4:00 a.m. --

3   A    I --

4   Q    -- to come here?

5   A    The bus hit the freeway at about 4:07 this morning and I

6   got here at 6:29.

7            MR. BARON:  Thank you very much.

8            I pass the witness.

9            THE CLERK:  Counsel, if you'll announce your name

10   when you start your examination, just so we can be sure we have

11   a clear record.

12            MR. BARON:  Sorry about that.  Neil Baron.  Better

13   late than never, right?

14            THE CLERK:  Thank you, Mr. Baron.

15            MS. ROSCETTI:  Jennifer Roscetti for the Defendant.

16                        CROSS EXAMINATION

17   BY MS. ROSCETTI:

18   Q    Good afternoon, Mr. Benjamin, how are you doing?

19   A    Good afternoon, Ms. Roscetti.  How are you doing?

20   Q    Pretty good.  I'm going to try and get you in and out as

21   quick as I can.

22   A    All right.

23   Q    I just have a few questions about how you got involved in

24   this case.

25   A    Okay.

Benjamin - Cross / By Ms. Roscetti                    297

1   Q    You testified at a House Legislative hearing in

2   San Antonio regarding redistricting, correct?

3   A    In June of 2013 I signed up to speak at that hearing as a

4   citizen to be heard on the redistricting laws that were being

5   considered.

6   Q    And that's where you met a woman named Sandra Haltom

7   (phonetic), is that correct?

8   A    Yes.

9   Q    And she used to work for the Texas Democratic Party, is

10  that correct?

11  A    Well, at the time I knew of no affiliation she had with

12  the Texas Democratic party and she had emails that were going

13  out as a project called Empower the Vote.

14  Q    And she actually put you in contact with a Chad Dunn, is

15  that correct?

16  A    After I told her --

17          **MR. BARON:**  Objection, Judge, this goes to attorney-

18  client.

19          **MS. ROSCETTI:**  I'm not asking about any

20  conversations.  It's actually my question that he was just

21  simply put in contact with Mr. Dunn.  There's no communication

22  involved, no privilege waived.

23          **MR. BARON:**  Relevancy.

24          **THE COURT:**  Overruled.

25          You can answer, sir.

1      **MS. ROSCETTI:**  Thank you, Mr. Gordon -- or thank you,

2  your Honor.

3  **BY MS. ROSCETTI:**

4  Q    Mr. Gordon, can you continue?

5  A    Mr. Benjamin.

6  Q    I'm so sorry, Mr. Benjamin.  Could you --

7  A    I'm accustomed to people confusing me with a guy named

8  Benjamin Gordon.  I've been hearing that since the fourth

9  grade.

10      **(Laughter)**

11      Just a little levity.

12  Q    Ms. Haltom, she put you in contact with Mr. Dunn, is that

13  correct?

14  A    After I informed her that I was having difficulty with the

15  driver's license issue and I wanted to be able to participate

16  in the voting project she gave me information.

17  Q    Regarding Mr. Dunn?

18  A    Yes.

19      **MS. ROSCETTI:**  Thank you.

20      **THE WITNESS:**  Uh-huh.

21      **MS. ROSCETTI:**  Pass the witness.  No further

22  questions.

23      **MR. BARON:**  Nothing further, your Honor.

24      **THE COURT:**  All right.  Thank you, sir.  You can step

25  down.

1          **THE WITNESS:**  Thank you, your Honor.

2      **(Witness excused)**

3          **MS. WESTFALL:**  Your Honor, we call Phyllis Washington

4  via video.

5              May I approach?

6          **THE COURT:**  Yes.

7   **PHYLLIS WASHINGTON, PLAINTIFFS' WITNESS, BY VIDEO DEPOSITION**

8      **(Excerpts of video deposition of Phyllis Washington played**

9  **from 5:02 p.m. to 5:36 p.m.)**

10          **MS. WOLF:**  Your Honor, the Defendants will present

11  portions of Ms. Washington's testimony.

12      **(Excerpts of video deposition of Phyllis Washington played**

13  **from 5:36 p.m. to 5:49 p.m.)**

14          **THE COURT:**  Is that all for this witness?

15          **MS. WESTFALL:**  Nothing further, your Honor.

16          **THE COURT:**  Okay.

17          **MS. WOLF:**  Nothing further.

18          **THE COURT:**  All right.  Shall we recess then and

19  reconvene at 8:00 o'clock in the morning?

20              You can be excused.

21      **(This proceeding was adjourned at 5:49 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    _September 4, 2014_ _

                    TONI HUDSON, TRANSCRIBER