UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Thursday, September 4, 2014 |
| | ) | (7:58 a.m. to 12:03 p.m.) |
| Defendants. | ) | (1:05 p.m. to  6:10 p.m.) |


BENCH TRIAL - DAY 3

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:  Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                         CHAD W. DUNN, ESQ.
                                    KEMBEL SCOTT BRAZIL, ESQ.
                                    Brazil and Dunn
                                    4201 Cypress Creek Parkway, Suite 530
                                    Houston, TX 77068

                                    ARMAND DERFNER, ESQ.
                                    P.O. Box 600
                                    Charleston, SC 29402

                                    J. GERALD HEBERT, ESQ.
                                    Attorney at Law
                                    191 Somervelle Street #405
                                    Alexandria, VA 22304

                                    NEIL G. BARON, ESQ.
                                    914 FM 517 Rd. W, Suite 242
                                    Dickinson, TX 77539

                                    LUIS ROBERTO VERA, JR., ESQ.
                                    League of United Latin American
                                    Citizens (LULAC)
                                    111 Soledad, Suite 1325
                                    San Antonio, TX 78205

                                    EMMA P. SIMSON, ESQ.
                                    Campaign Legal Center
                                    215 E. Street NE
                                    Washington, DC 20002

Mexican American                    EZRA D. ROSENBERG, ESQ.
Legislative Caucus,                 Dechert, LLP
et al.:                             902 Carnegie Center, Suite 500
                                    Princeton, NJ 08540-6531

                                    MARK A. POSNER, ESQ.
                                    AMY L. RUDD, ESQ.
                                    LINDSEY COHAN, ESQ.
                                    JENNIFER CLARK, ESQ.
                                    Lawyers' Committee for Civil Rights
                                    1401 New York Ave. NW, Suite 400
                                    Washington, DC 20005

3

**APPEARANCES FOR:**          (CONTINUED)


United States              RICHARD DELLHEIM, ESQ.
of America:                ELIZABETH S. WESTFALL, ESQ.
                           ANNA BALDWIN, ESQ.
                           PAMELA CARLIN, ESQ.
                           AVNER SHAPIRO, ESQ.
                           U.S. Department of Justice
                           950 Pennsylvania Ave. NW
                           Washington, DC 20530

                           BRUCE I. GEAR, ESQ.
                           Department of Justice
                           1800 G Street NW
                           Washington, DC 20006

Ortiz Plaintiffs,         JOSE GARZA, ESQ.
et al.:                   7414 Robin Rest Dr.
                          San Antonio, TX 78209

                          ROBERT W. DOGGETT, ESQ.
                          Texas Rio Grande Legal Aid, Inc.
                          4920 North IH 35
                          Austin, TX 78751

                          MARINDA VAN DALEN, ESQ.
                          Texas RioGrande Legal Aid, Inc.
                          531 E. St. Francis
                          Brownsville, TX 78520

Texas League of Young     RYAN HAYGOOD, ESQ.
Voters Education Fund:     NATASHA KORGAONKAR, ESQ.
                          NAACP Legal Def. and Educational Fund
                          40 Rector St., 5th Floor
                          New York, NY 10006

                          DANIELLE CONLEY, ESQ.
                          KELLY DUNBAR, ESQ.
                          Wilmer Cutler Pickering, et al.
                          1875 Pennsylvania Avenue, NW
                          Washington, DC 20006

4

**APPEARANCES FOR:**          (CONTINUED)


Texas Association of         ROLANDO L. RIOS, ESQ.
Hispanic County Judges       115 E. Travis
and County                   Suite 1654
Commissioners:               San Antonio, TX 78205

Also present:                ROGER GALVAN, County Commission
                             Calhoun County

State of Texas:              JOHN BARRET SCOTT, ESQ.
                             Deputy Attorney General
                             for Civil Litigation
                             Office of the Attorney General
                             P.O. Box 12548
                             Austin, TX 78711

                             JOHN REED CLAY, JR., ESQ.
                             LINDSEY E. WOLF, ESQ.
                             JENNIFER ROSCETTI, ESQ.
                             G. DAVID WHITLEY, ESQ.
                             STEPHEN L. TATUM, JR., ESQ.
                             STEPHEN R. KEISTER, ESQ.
                             Office of the Attorney General
                             P.O. Box 12548
                             MC001
                             Austin, TX 78711

                             ARTHUR D'ANDREA, ESQ.
                             Office of the Attorney General
                             209 W. 14th Street, 7th Floor
                             Austin, TX 78701

                             BEN A. DONNELL, ESQ.
                             Donnell Abernethy Kieschnick
                             555 N. Carancahua, Suite 400
                             Corpus Christi, TX 78401

                             WHITNEY DEASON, ESQ.

5

**INDEX**

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETER JOHNSON | 6/14/15 | -- | -- | -- |
| MATT BARRETO | 22 | 85 | 121 | 127 |
| LIONEL ESTRADA | 129 | 136 | 144 | |
| LENARD TAYLOR | 145 | 151 | | |
| JUANITA COX | 153 | 174 | | |
| (VIA DEPOSITION) | | | | |
| JANE HENRICI | 179 | 193 | | |
| CARLOS URESTI | 200 | 225 | 240 | 250 |
| T. RANSOM CORNISH | 251 | 266 | 287 | 288 |
| BARRY BURDEN | 293 | 332 | 354 | |
| DANIEL GUZMAN | 357 | 376 | 380 | |

| PLAINTIFFS' EXHIBIT | RECEIVED |
|---|---|
| 753.1 | 41 |

Johnson - Direct / By Mr. Rosenberg                    6

1   **Corpus Christi, Texas; Thursday, September 4, 2014; 7:58 a.m.**

2                          **(Call to order)**

3          **THE COURT:**  Good morning.  Court calls Cause Number

4   2-13-193, *Veasey, et al. versus Perry, et al.*  Are you ready to

5   continue with the witnesses?

6          **MR. ROSENBERG:**  Thank you, your Honor.  Ezra

7   Rosenberg, and Plaintiffs calls their first witness of the day,

8   the Reverend Peter Johnson.

9          **THE COURT:**  Good morning.  If you'll approach over

10  here, sir, and raise your right hand.  Good morning.

11           **PETER JOHNSON, PLAINTIFFS' WITNESS, SWORN**

12         **MR. ROSENBERG:**  Good morning, Reverend Johnson.

13         **THE WITNESS:**  Good morning, sir.

14                       **DIRECT EXAMINATION**

15  BY MR. ROSENBERG:

16  Q    Could you state your full name for the record, please?

17  A    My full name is Vasiel Peter Jerome Johnson.

18  Q    And where do you live today?

19  A    I live in Dallas, Texas.

20  Q    And today, what do you do in Dallas?

21  A    Well, I have a project called the Peter Johnson Institute

22  For Non-Violence.  I do a lot of work --

23  Q    I'm sorry, the Peter Johnson Institute --

24  A    Peter Johnston Institute For Non-Violence.  I do a lot of

25  work with street gangs.  I do gun buybacks right now.  Over the

 1   last 29, 30 years, I've bought more than 20,000 guns off the

 2   streets, and I have them melted down and made into religious

 3   sculptures.  And I work with ex-offenders.  I have over 1,200

 4   ex-offenders, and they're Black, they're White, they're brown,

 5   and they're Hispanic, they're Asian.  And these are men who've

 6   been in the Texas penal systems and I'm trying to get them

 7   skills so I can put them to work and they don't go back to

 8   jail.  So I am retired, but I spend about 12 hours a day, seven

 9   days a week in my office.

10   Q     Thank you, Reverend.  And if I could bring you back a few

11   years at least, what year were you born?

12   A     Oh, 1945.

13   Q     And where were you born?

14   A     In a foreign country, Louisiana.

15   Q     And when you were in Louisiana, did you become involved

16   with the civil rights movement?

17   A     I grew up in a civil rights household --

18   Q     And did --

19   A     -- in a civil rights church.

20   Q     And tell me what you mean by that.

21   A     My father was president of the local NAACP, and he was

22   head of the Prince Hall Masons.  He was called a Wishful

23   Master.  So I grew up in a household that was deeply committed

24   to social justice in the fifties.  I grew up in a church, the

25   Plymouth Rock Baptist Church in Plaquemine.  It became known in

1    the civil rights movement as the Freedom Rock Baptist Church.

2    In 1963, the church I grew up in was bombed four times that

3    summer, so I grew up in the civil rights movement.

4    Q    Did you -- did there come a time when you, yourself,

5    became involved in the civil rights movement?

6    A    I was never not involved because of my father's

7    activities.  I was president of the NAACP youth chapters in

8    Louisiana.  I went to work for the Congress of Racial Equality

9    under James Farmer and became a student -- national student

10   leader for James Farmer and the Congress of Racial Equality in

11   the sixties -- early sixties.  Because of my father's

12   relationship with Dr. Young, Andrew Young's father -- I called

13   him Papa -- and with Dr. King and Dr. King's daddy -- we call

14   him Daddy King -- I had to make a deal with my father to stay

15   in the civil rights movement.  I had to work -- go to work for

16   Martin King in the Southern Christian Leadership Conference

17   under Andrew Young or my daddy was going to take my car back.

18   Q    And what did you do for Dr. King and the SCLC?

19   A    Started off as a national student organizer, organizing

20   students around the south primarily.  Then eventually I

21   traveled all over the nation organizing students.  But our big

22   emphasis for 1962 was voter registration and political

23   education and the fight for the right to vote.

24   Q    And that -- you were doing that in Louisiana?

25   A    Absolutely.

Johnson - Direct / By Mr. Rosenberg                9

1   Q    And what sort of activities did you do in Louisiana in

2   connection with voter registration and the right to vote?

3   A    Well, in the State of Louisiana, you had to -- in order to

4   vote, you had to take a literacy exam.  But also if you were a

5   part of the negro citizens in Louisiana, you have to overcome

6   the intimidation, the terrorizing, and the fear just to go to

7   the courthouse and take the test.  We set up freedom schools in

8   Black churches in the south and taught people in Louisiana how

9   to pass the literacy exam.  And we would take them to the

10  courthouse and watch them be insulted, abused, and

11  disrespected, just to vote.  The first voter registration

12  campaign that I led myself was in 1963, in which I had two

13  churches in Baton Rouge, Louisiana, where we done political

14  education, teaching people how to pass the literacy exam.  And

15  a lot of this was just we had to teach people how to read and

16  write.  You could take this literacy test and have every

17  question right and have a comma in the wrong place and be

18  failed.  So it was always an ongoing struggle.  I don't

19  remember the numbers, but the summer of 1963, we brought over

20  1,200 White and Black and Jewish students to the south to spend

21  that summer registering voters.  The United Auto Workers under

22  Walter Reuther raised a lot of money to help get this done.

23  Once that summer was over, the results was unbelievably bad in

24  terms of how many people we were able to register, not just in

25  Louisiana, but this was in Louisiana, Mississippi, and Alabama.

Johnson - Direct / By Mr. Rosenberg                     10

1   So, for 50 years I've been involved with the struggle for the

2   right to vote.

3   Q    Did there come a time when you made your way to Texas?

4   A    Reluctantly.

5   Q    How so?

6   A    Well, Texas, inside the civil rights movement, had a

7   terrible, terrible reputation.  John Kennedy was killed in

8   Dallas.  Out of all of the southern states, Texas was the only

9   southern state without movement towns in the State of Texas.

10  You can say, well, Birmingham in Alabama is a civil rights

11  movement town.  They had no civil rights towns or cities in the

12  State of Texas because of the brutal, violent intimidation and

13  terrorism that still exists in the State of Texas; not as overt

14  as it was yesterday.  But east Texas is Mississippi 40 years

15  ago.

16  Q    So you mentioned that you came to Texas reluctantly.  Can

17  you tell me what you meant by that?

18  A    I didn't want to come.  Texas -- the only state in the

19  Union and only city in the nation to boycott Martin Luther King

20  was the Black community in the City of Dallas.  So inside the

21  civil rights movement there were some anger at the State of

22  Texas in general, and in the City of Dallas in particular.  So

23  when I was assigned to Dallas, no, I did not want to come.

24  Q    And who assigned you?

25  A    Dr. Martin Luther King sent assignment to Dallas.

1    Q    And what --

2    A    I didn't come until 1969 because of the Poor People's

3    Campaign and the Resurrection City, and our commitment to

4    finish Dr. King's last commitment on earth.

5    Q    He had died the year before.

6    A    Died in 1968, August -- no, April 4th, 1968.

7    Q    And what was the assignment that Dr. King gave you to do

8    in Texas?

9    A    We wanted to take a close look at at-large systems in

10   cities like Dallas and Houston and where you had a decent

11   percentage of African American potential voters, but because

12   they had at-large systems, they could not elect people to

13   represent them.  So that's basically what it -- and there was

14   other issues dealing with employment and other problems that

15   existed throughout the south and throughout the nation.  But in

16   Texas, we were looking at can -- because of the -- just come --

17   you know, looking at Resurrection City and the Poor People's

18   Campaign, we were just beginning to organize coalitions between

19   poor Hispanics, poor Blacks, poor Whites, and looking for ways

20   to use those coalitions politically.

21   Q    And you mentioned -- you started to talk a little bit

22   about what the atmosphere in Texas was.  Can you describe a

23   little more when you got to Texas what the state of racial

24   relations was?

25   A    I started receiving threats on my life the night I arrived

1    at the hotel in Dallas.  It's kind of unbelievable.  I would

2    visit communities, say in east Texas, and Black people would

3    tell me, "You can't come to my house.  I don't want your car

4    parked in front of my house.  We can't meet at the church

5    because I don't want people to know we're meeting with you all.

6    We'll meet you late at night in the woods and we'll draw you a

7    map how to get there."  This is the intimidation that -- and

8    we're not talking about a hundred years ago now.  There's a

9    town in east Texas called Cuney, C-U-N-E-Y.  It's a former

10   Freedmen Town in east Texas founded by an African American

11   former slave named Wright Cuney.  The lady who was the Black

12   mayor of Cuney, I invited her to come to a program in east

13   Texas where Martin Luther King's son was going to speak, and I

14   had some entertainers from Hollywood coming down.  And she told

15   me, she said, "You know, Reverend Peter, I would love to come,

16   but it's too dark and there's White people out here.  It's too

17   dangerous, I can't come."  This is the United States of

18   America.  This is the mayor of a town.

19   Q    Specifically in terms of voting, what was the atmosphere

20   in terms of racial relations in terms of voting when you got to

21   Texas?

22   A    Very -- first, a very small percentage of African

23   Americans, called negroes at that time, participated in the

24   political process because it was foreign to them.  And it had

25   been embedded in them for years and years that this was

Johnson - Direct / By Mr. Rosenberg                    13

1   something that you should not participate in.  I refer -- I

2   look at that historically regarding even once the Voting Rights

3   Act was passed, how much work and how much effort and how many

4   years it took to get to a level where elected officials had to

5   respect the Black vote.  And I kind of look at -- this come

6   prior to that wonderful little lady from Montgomery, Rosa

7   Parks, when Ms. Parks goes on to jail, and 360 some days later

8   and the United States Supreme Court ruled that public

9   accommodations had to be desegregated, which meant based on

10  Rosa Parks' fight, you could sit anywhere you wanted to sit on

11  the bus.  Once that ruling came down, it took another four and

12  a half years to convince negro citizens that you could sit at

13  the front of the bus, because they had been so programmed --

14  they would get on the bus, all of the front seats would be

15  empty, the back would be full, they'd walk straight to the back

16  and stand up.  It took almost five years' working, using music

17  and scripture, to convince people that you could do this, that

18  you could sit at -- same thing with voting rights.  It -- we

19  still have not finished teaching people and getting people

20  committed to voting because talking about hundreds of years of

21  intimidation, fear, churches being bombed and burned down,

22  people dying.  So none of this has been easy, have come at the

23  blink of an eye.

24  Q    You mentioned that when you got to Texas, you were working

25  on opposing at-large elections, correct?

1   A    Yeah.

2   Q    What other activities did you engage --

3            THE COURT:  I'm sorry, hold on one second.

4        (Judge/ERO confer)

5            THE COURT:  I'm sorry, we're going to need to take

6   about a five minute break.  There's some issues we need to get

7   Systems in to address that.

8            MR. ROSENBERG:  Sure.

9            THE COURT:  You can step down if you'd like, sir.

10        (Recess taken from 8:11 a.m. to 8:16 a.m.)

11            THE COURT:  All right, we're ready to proceed.

12                    DIRECT EXAMINATION (CONTINUED)

13   BY MR. ROSENBERG:

14   Q    Thank you, Reverend Johnson.  I think when we broke, I'd

15   asked you other than the activities dealing with at-large

16   elections, what sort of activities had you been participating

17   in when you first came to Texas in terms of voter rights?

18   A    Well, one of the things working for the Southern Christian

19   Leadership Conference and Martin Luther King during those years

20   is we were trained to -- Dr. King said, "Pay attention to the

21   community, pay attention to people."  So when I first came to

22   Texas, one of the things that we were not interested in looking

23   at that kind of just fell in my lap was the problem of hunger

24   and malnutrition.  Who would think that one of the richest

25   states in the nation would have this huge, ugly problem of

1    hunger and malnutrition?  So we had a program called Operation

2    Bread Basket, and that was the urban program for SCLC that

3    dealt with -- dealing with urban problems.  When people in

4    Dallas and in Houston would hear about Operation Bread Basket,

5    they would come to my office looking for a basket with some

6    bread and food with it.  And we were put in touch with the

7    problems of hunger and malnutrition in this state.  And so we

8    had to shift coast and pay attention to that and develop a

9    strategic plan to force the State of Texas in general and

10   cities like Dallas to address this program.  Some of the

11   national programs that exist today dealing with hunger and

12   malnutrition, we started in this state and fought for that in

13   this state and made that happen here.  So we can never go into

14   no state or no community and say, this is what our goal --

15          **THE COURT:**  I'm sorry, hold on one second.

16      **(Judge/ERO confer)**

17          **THE COURT:**  Sorry.

18      **(Pause to address audio buzzing problem)**

19      **(Recording stopped from 8:19 a.m. to 8:21 a.m.)**

20          **THE COURT:**  Okay.

21      **MR. ROSENBERG:**  Great, thanks.

22              **DIRECT EXAMINATION (RESUMED)**

23   **BY MR. ROSENBERG:**

24   Q    Reverend Johnson, did you participate in specific

25   activities like voter education, Get Out The Vote, those sorts

Johnson - Direct / By Mr. Rosenberg                    16

1   of things, in Texas?

2   A    Yes, absolutely.  When I first came here, every summer we

3   would take high school and college students, hired them and

4   paid them what was called a stifeland (phonetic), trained them,

5   and we would target certain communities with specific goals and

6   objectives.  For instance, we'd say, okay, in these precincts

7   over in Oak Cliff, our goal is to register 600 people this

8   summer.  And we would assign "X" amount of students, and that's

9   our goal, that's that community, and we would -- over the

10  years, we were able to get people to register, but it didn't

11  happen overnight.  You know, it was very difficult to convince

12  people.  And then once you convinced them to do it, got them

13  registered, then the big challenge is to get them to go and

14  vote.

15  Q    Why was that such a challenge?

16  A    Historically voting is foreign to us.  This is something

17  that White people done.  So we had to overcome the historical

18  patterns of not participating in the political process, to

19  explain to people in certain communities that your colored

20  schools are suffering because you've got an all-White school

21  board.  To deal with this, you must register and vote.  It took

22  time and patience and overcoming fear and intimidation.  And

23  you could get fired for registering to vote.

24  Q    If you were Black?

25  A    Yes.

1   Q    Today, over the last few years, what -- how would you

2   describe the state of racial relations in Texas?

3   A    Awful.

4   Q    Why so?

5   A    There is a history of brutal bigotry here in this state,

6   worse than any other state in the Union.  And I didn't know

7   this until I came to Texas because I came to Texas with the

8   experience of having worked in Mississippi, you know, Alabama

9   and Georgia, both of the Carolinas, so I know the south like

10  the back of my hand.  But Texas, God, Texas.  Texas -- more

11  lynchings in Texas than all the southern states put together.

12  Did you know that?

13  Q    I did not.

14  A    Yeah.

15  Q    How about today?  What's the state today?  Has it

16  improved?

17  A    Well, give you an example.  There's an election coming up

18  here in about 60 days.  I can guarantee you in certain high-

19  voting Black precincts in Houston and in Dallas, in some places

20  in east Texas, you have White men, kind of poll-watching White

21  men, intimidating Black voters who come in to vote, asking them

22  questions about who they are, their identifications, have they

23  ever been in jail.  You know, well, you can't vote if you been

24  in jail, but if you went to jail where you didn't pay your

25  traffic ticket.  But if you tell somebody that's 75 years old,

1    you been in jail?  Well, you know you're not supposed to vote.

2    You can go to prison for voting, and you have a White man with

3    a suit and a tie on, this Black man's likely to turn around,

4    get out of that line, and go back home because he know he went

5    to jail.  So the sophistication of the intimidation has

6    changed, but the intimidation is still intimidation.

7    Q    You're familiar with what's been called SB 14?

8    A    Absolutely.

9    Q    And do you oppose it, favor it, have a position on it?

10   A    Well, it's like trying to put out a fire that does not

11   exist.  So it's -- first, nobody could take -- should take the

12   Texas legislature seriously.  Nothing that comes out the Texas

13   legislature should be taken seriously when you consider, you

14   know, the realities of the State of Texas.  So a handful of

15   very wealthy, conservative White men nationally decided to

16   create obstacles to stop people from voting.  This is a

17   national conspiracy.  A lot of the money for this conspiracy

18   comes out of Texas.

19   Q    By the way, I just want to go back for a second in terms

20   of poll watchers that you mentioned.  Have you ever seen poll

21   watchers who wear uniforms that make them look like immigration

22   officers?

23   A    Well, khaki uniforms and, of course -- look like uniforms,

24   but I don't -- I wouldn't say immigration officers.  But, yeah.

25   Q    I want to talk a little bit about some of the aspects of

1  SB 14.   One of the things that's been said is that, well,

2  voters over 65 can vote absentee ballots.   Does that cure the

3  problems that you see with SB 14?

4  A     Well, that let you know how naïve the State of Texas

5  legislature is, because if you want to deal with voting fraud,

6  that's where you would go.   You see, that's -- if there's

7  voting fraud and illegal voting, it's from people gathering old

8  people's votes and manipulating them absentee ballots.   But if

9  you understand Black America in the terms of Blacks in the

10 south, that's my age and older, going to vote and standing in

11 line to vote is a big deal.   It's much more important for an

12 80-year-old Black woman to go to the voting poll, stand in

13 line, because she remembers when she couldn't do this.   So take

14 the City of Dallas, Dallas County.   On election day, I've spent

15 a lot of my time running all over the Black community picking

16 up old people, "Rev, got to come get us to go vote," because

17 they want to vote, and they want to stand in line and vote

18 because they know when they couldn't do this, and this is real

19 important to old Black people.   And, of course, in terms of

20 Black people voting illegally, it's hard as hell to get them to

21 vote legally.   So that's just the evidence that the Texas

22 legislature is not as wise as they think they are.

23 Q     How would young people -- you mentioned before that your

24 institute of non-violence deals with young, African American

25 males.   How important is it from your perspective for young,

1   African American males to vote, and how does SB 14 play into

2   that?

3   A    Well, it -- there's some ongoing ugly problems dealing

4   with young African Americans and young Hispanics in terms of

5   voting.  One is that in the blink of an eye, they can have a

6   criminal record.  So there are thousands and thousands of young

7   African Americans and young Hispanic men and women who cannot

8   vote because when they were 19 years old, they got caught with

9   a couple of joints of marijuana and went to the Texas

10  Penitentiary.  I had a friend named Leotis (phonetic) from

11  Houston.  He got busted with a -- what was called a roach in

12  his shirt pocket, about that much marijuana in a half a

13  cigarette.  He got seven years in the Texas penal system.  So

14  that in itself limits and inhibits the power of our political

15  participation.  Nobody has explained to this generation of

16  Black kids who I call it a generation who can't figure out what

17  size pants they wear, but nobody has really explained to them

18  the relationship between voting and who gets what, when, and

19  where and how.  That relationship does not exist.  They do not

20  understand that, and nobody's explained this to them, that if

21  you go to court and you have a jury of your peers, but if all

22  your peers got criminal records, none of your peers are on the

23  jury.  So they -- getting that generation of Blacks registered

24  is a challenge.  But I can tell you this, I am very deeply

25  grateful to the Ferguson, Missouri Police Department.  They're

1  waking them up for us.

2  Q     How important is it to you -- how important is this case

3  to you?

4  A     I have friends in the graveyard for the right to vote,

5  died too young, too bloody.  Blacks, Whites, Jews came to the

6  South to help us, lost their lives.  So this is not just about

7  who gets elected for me.  This is about a commitment that we

8  made years ago.  Andrew Goodman, and Michael Schwerner -- we

9  call Michael "Mickey" -- and James Chaney, they died in

10 Mississippi, young men, young, young men.  Viola Liuzzo,

11 beautiful White, Italian lady from Detroit decided to come to

12 Selma to help us, got shot in the head on Highway 59 between

13 Selma and Montgomery.  We call it the bloody path because so

14 much blood was shed on that highway.  James Reeb was a young

15 White boy from Boston, a divinity student, studied Homiletic

16 preaching, came to Selma, got separated from us one day, and

17 the Klu Klux Klan beat him to death with ax handles and pipes.

18 Jimmy Lee Jackson.  So, for me this is not just about whether

19 or not you can get an ID.  This is about an attack on the most

20 precious, precious piece of democracy that America has, that's

21 one man, one vote, the right to vote.  And we ought not allow a

22 bunch of silly politicians to dirty up this tremendous,

23 precious,  precious tool that America has for all of its

24 people.

25 Q     Thank you.

1          **MR. ROSENBERG:**  I pass the witness.

2          **MR. SCOTT:**  Reverend, the State of Texas has no

3     questions, but I'm honored to consider myself a fellow citizen

4     of this great state with you.  I'm glad you're here and I'm

5     glad you're part of my great state.  Thank you.

6          **THE WITNESS:**  Thank you, brother, and God bless you.

7     May I go?

8          **THE COURT:**  Yes.  Can he be excused then?

9          **MR. SCOTT:**  Yes.

10          **THE COURT:**  You can step down, sir.

11          **MR. ROSENBERG:**  Thank you, Reverend.

12       **(Witness steps down)**

13          **MR. ROSENBERG:**  Plaintiffs call Dr. Matt Barreto.

14       **(Pause)**

15          **THE COURT:**  Good morning.  Would you raise your right

16     hand?

17          **MATT BARRETO, PLAINTIFFS' WITNESS, SWORN**

18          **THE COURT:**  You can have a seat.  You can proceed.

19                    **DIRECT EXAMINATION**

20     BY MR. DUNN:

21     Q    Please tell us your name.

22     A    My name is Matthew Alejandro Barreto.

23     Q    And, for the record, my name is Chad Dunn.  Could you

24     spell that name for us?

25     A    My last name is B-A-R-R-E-T-O.

1   Q    All right.

2           **MR. DUNN:**  Your Honor, for the record, Dr. Barreto is

3   being offered as an expert witness on behalf of the

4   Veasey/LULAC Plaintiffs, and also on behalf of NAACP and MALC.

5           **THE COURT:**  Okay.

6   Q    Dr. Barreto, introduce yourself to the Court, where were

7   you born, where'd you go to school, that sort of thing.

8   A    I was born in San Juan, Puerto Rico in 1976.  Family then

9   moved to the Kansas City area.  I went to primary school and

10  high school in Topeka, Kansas.  I went to college in the State

11  of New Mexico.  Then I moved to the State of California where I

12  went to graduate school at the University of California at

13  Irvine, earned a Ph.D. in political science.  I'm currently a

14  professor of political science at the University of Washington

15  in Seattle.

16  Q    And I'm going to embarrass you for a minute.  Your father

17  is hear watching you testify for the first time today?

18  A    That's right.

19  Q    All right.  So you have a Ph.D. in political science and

20  you're at the University of Washington; is that right?

21  A    That's correct.

22  Q    Have you had some discussions about potentially moving to

23  a different university?

24  A    Yes.

25  Q    And where is that?

1  A    I'm currently having negotiations with the University of

2  California at Los Angeles.

3  Q    When you began to study political science, describe for us

4  how many people in your field were Latino.

5  A    In -- when I was in graduate school, there was very, very

6  few Hispanic or Latino fellow students or professors.  I

7  believe there was one at the University of California at Irvine

8  where I attended.  And there continue to be a very, very small

9  number, perhaps two percent or something like that.

10  Q    And as a result of that, or at least in consequence to

11  that, did you choose to focus a particular area of your

12  political science study?

13  A    Yes.  I was always interested in and had been a part of

14  Latino political participation, and so I continued that as an

15  area of study as a graduate student, and I continued to have

16  that as my primary area of research as a professor.

17  Q    And what type of research, more specifically, do you

18  undertake in your academic work?

19  A    I would say my training is broadly in statistical methods,

20  American politics, and public opinion.  And then very

21  specifically in racial and ethnic politics comparing different

22  race and ethnicities in the United States and what their

23  different trends or rates of political participation are, the

24  majority of my research focusing on Hispanics or Latinos in the

25  United States.

1   Q    Is there a particular tool that you often turn to to

2   answer some of these questions you're asking?

3   A    Yes.  I would say the most common statistical tool or

4   methodology that I employ is public opinion survey research.

5   Among other things, this would be the thing that most of my

6   published research relies on and most of my applied work relies

7   on as a social scientist.

8   Q    Is this a cutting-edge technique or this is a tried and

9   true method that political scientists have used?

10  A    Well, I would say it's a little bit of both.  It's

11  something that has been around for a long time.  It's one of

12  the most well-known and reliable social science techniques,

13  public opinion survey research.  At the same time, it continues

14  to be updated every year so that it does remain on the

15  forefront of research.

16  Q    How many of these surveys would you estimate that you have

17  directed?

18  A    I believe in our expert report we indicate that Professor

19  Sanchez and I together have combined to direct over a hundred

20  public opinion surveys.

21  Q    Have you been published on a number of these surveys?

22  A    Yes.

23  Q    Give us a sense of some of the academic journals that have

24  accepted your work.

25  A    We've published research with public opinion survey data

1   and specifically looking at racial and ethnic politics quite

2   similar to some of the inquiries in this case in journals such

3   as the *American Political Science Review*, *Public Opinion*

4   *Quarterly*, *Political Research Quarterly*, *Social Science*

5   *Quarterly*, and a number of other well-respected journals in the

6   social sciences.

7   Q    Now, I'm going to make you brag on yourself for a minute.

8   Was there a prediction that you made in advance of the recent

9   presidential elections that was somewhat controversial but it

10  ended up panning out as true?

11  A    Yeah.  In anticipation of the elections, I conducted a

12  series of public opinion polls and did some statistical

13  analysis of voting patterns across the different states with a

14  specific eye towards looking at the propensity for a turnout

15  and the candidate choice of Latinos.  We looked at a handful of

16  states that were expected to be very, very close, states such

17  as Florida and Colorado, etcetera.  And we published

18  predictions in advance of the election that the Hispanic voting

19  rates would be quite high and that that would swing the

20  election in those states based on our forecast which, after

21  election day, each of the states that we estimated were

22  correct.

23  Q    And, in fact, your study showed a higher turnout among

24  Hispanic voters that swayed the election in a few states; is

25  that right?

Barreto - Direct / By Mr. Dunn                    27

1  A    Yes, that's correct.  Our conclusion was that many of the

2  traditional analyses, or the traditional polling practices or

3  survey practices, were actually missing, or ignoring, the

4  Hispanic vote that would be particularly large in states like

5  Colorado, Florida, and elsewhere -- Nevada -- and that with a

6  proper approach that emphasized really rigorous social science

7  methods, that we could capture this community and we could

8  forecast accurately what the turnout would be.

9  Q    Now, have you had an opportunity to use your skills in

10 conducting surveys to study photo identification laws in

11 various states?

12 A    Yes, I have.

13 Q    In which states have you done that?

14 A    I think one of the earliest studies that I co-authored

15 with Professor Sanchez was a 2006 study that focused on three

16 states:  Washington, California, New Mexico.  After that, we

17 conducted a study on the State of Indiana.  Since then, we've

18 conducted studies in the State of Pennsylvania, Wisconsin.

19 We've also conducted national studies that did not focus on a

20 particular state, but national trends.  And, of course, we

21 conducted original research here in the State of Texas now.

22 Q    With respect to the case in Pennsylvania, did you

23 ultimately -- or were you ultimately called upon to give

24 testimony to a court there in that state considering a

25 challenge to its photo ID law?

1    A    Yes, I was.

2    Q    And was that testimony related to this insofar as you

3    conducted a survey?

4    A    Yes.  It was quite similar.

5    Q    Now, ultimately when that case was finally decided, did

6    the court rely at least in part on your survey?

7    A    Yes, they did.

8    Q    With respect to Wisconsin that you mentioned, did you also

9    perform a survey there in relation to a challenge of the Voting

10   Rights Act to a photo ID law?

11   A    Yes.

12   Q    And were you called upon to testify there?

13   A    I was.

14   Q    Ultimately when the court entered its opinion in that

15   case, was your testimony and opinions relied upon at least in

16   part by the judge?

17   A    Yes.

18   Q    In addition to the survey work and testimony that you've

19   described, have you also testified in other voting rights

20   cases?

21   A    Yes, I have.

22   Q    Are these -- do these run the gamut from redistricting

23   cases and other sort of election regulation cases?

24   A    Yes.  I would say primarily related to redistricting,

25   whether they are existing at-large systems or whether they are

1    existing districted systems that there are questions about the

2    representation, I have done research and appeared as an expert

3    in those cases.

4              **MR. DUNN:**  At this point, we offer Dr. Barreto as an

5    expert in survey research in racial and ethnic politics.

6              **THE COURT:**  I think we're --

7              **MR. SCOTT:**  With the continuing understanding, your

8    Honor.

9              **THE COURT:**  Yes.  You can proceed.

10   **BY MR. DUNN:**

11   Q    All right.  I'd like to turn to what we've asked you to do

12   in this case.  And who is it that you principally dealt with in

13   your project in this case?

14   A    You, Mr. Dunn.

15   Q    All right.  Early on, what is it that I contacted to see

16   what you could do for this Court?

17   A    My recollection is that you asked us if we were available

18   and interested to do an inquiry to assess the possession rates

19   of photo identification across different racial ethnic groups

20   here in the State of Texas.

21   Q    And did I leave it to your expertise to develop the method

22   you would use to try to develop evidence and to answer that

23   question?

24   A    Yes.

25   Q    What was your recommendation?

Barreto - Direct / By Mr. Dunn                    30

1   A    Our recommendation was to conduct a public opinion survey

2   of eligible voters in the State of Texas and to inquire as to

3   their possession of different SB 14-approved IDs and to ensure

4   that we had adequate samples by race and ethnicity.

5   Q    So are surveys like most other products, you can spend a

6   lot or you can spend a little to conduct a survey?

7   A    Oh, certainly.  There's a wide range in the quality and

8   the type of survey that can be conducted.

9   Q    Initially did I ask you to give me a bare bones estimate

10  for a survey and also a deluxe estimate?

11  A    Yes.  We provided a couple of different options that could

12  be conducted, yes.

13  Q    And which of those options did I ultimately authorize you

14  to perform?

15  A    My recollection is that you asked us to perform the option

16  that was more expensive, that Professor Sanchez and I indicated

17  that we were the most comfortable with in terms of being

18  reliable and following the norms of social science.

19  Q    Did we ultimately come back to you and ask if there was

20  additional funds, if we could make the survey even more robust?

21  A    Yes.

22  Q    Did you develop some ideas to do so?

23  A    Yes, we did.

24  Q    And as a result of that, did we ultimately authorize you

25  to undertake those additional steps?

Barreto - Direct / By Mr. Dunn                    31

1    A    Yes, that's correct.

2    Q    Now, is it the case that when you conduct a survey that

3    you actually get on the phone and make all the calls to the

4    respondents?

5    A    No.

6    Q    All right.

7    A    Certainly not.  That would be very time consuming.

8    Q    How is that done?

9    A    In almost all cases the implementation of the phone calls

10   are conducted by a professional market research public opinion

11   firm, and that's what we did in this case.

12   Q    And who decided which firm to use?

13   A    Professor Sanchez and I made a recommendation to work with

14   a firm called Pacific Market Research.  It's a firm we had

15   worked with before and had very high confidence in.

16   Q    And where are they located?

17   A    They're located in Renton, Washington, which is  suburb of

18   Seattle.

19   Q    And what advantages to using Pacific Market Research did

20   you see despite the fact they were in Washington and you were

21   studying Texas?

22   A    Well, they had conducted many national studies before,

23   studies across each of the 50 states.  They had a very strong

24   reputation in that regard.  They've been called upon by courts

25   to conduct legal change of venue studies.  And, for our

1   purposes, they had also worked with us quite successfully, in

2   our opinion, on collecting data in prior photo identification

3   research, and so we had a very high degree of confidence in

4   their data collection efforts.

5   Q    Is Pacific Market Research a firm that is relied upon by

6   the United States government and other local governments?

7   A    Yes.  They -- to the best of my knowledge, they have

8   contracts and do research projects for both the federal

9   government and state governments.

10  Q    And in your opinion, are they a reliable contractor for

11  the type of work you asked them to do?

12  A    Yes, absolutely.

13  Q    Ultimately, how much money was paid to Pacific Market

14  Research to conduct the survey that you designed?

15  A    I believe it was about 145,000, somewhere right around

16  that number.

17  Q    And then you and Dr. Sanchez were paid in addition to that

18  for your analysis; is that right?

19  A    Correct.  That figure, 145,000, is just the cost of

20  implementing a large survey such as this.

21  Q    Now, I suppose one of the first things you've got to do

22  when you start a survey is to figure out who you're going to

23  call; is that right?

24  A    Yes, that's correct.

25          **MR. DUNN:**  And if I could call up Plaintiffs' Exhibit

1    753 and go to page 13 of the report, but page 17 in the PDF.

2    And zoom in to Table A, please.

3    Q    So in relation to looking at Table A of your report,

4    explain to us how you determined who it was you wanted to

5    receive survey responses from.

6    A    Oh, we decided that we would survey the voting-eligible

7    population, or the citizen voting age population, as has been

8    discussed in previous testimony.  These are the folks who are

9    eligible to vote and could be potentially impacted by SB 14.

10   Q    And were these surveys conducted in a language other than

11   in English?

12   A    Yes.  The survey was available on either English or in

13   Spanish at the discretion of the respondents.  If the

14   respondents were more comfortable taking the survey in Spanish,

15   then the survey takers at Pacific Market Research would switch

16   to Spanish and provide that option.

17   Q    How did you obtain the phone numbers for -- to call?

18   A    Well, there's two general approaches that we took.  The

19   first that we identify here in Table A as RDD is called random

20   digit dial in which essentially every possible phone number in

21   the State of Texas is randomly generated by computer and put

22   into a basket to be called and is dialed by --

23   Q    Why do you do that instead of looking up listed numbers or

24   looking at a government record?

25   A    Well, the random digital dial is really a gold standard

1   starting point in survey research, and that is because one of

2   the most important principle in survey research is that every

3   possible respondent has an equal opportunity to participate.

4   And so by starting with a random digit dial, it allows us to

5   leave no stone unturned.  Anybody who has a telephone number

6   could potentially have their phone ringing and be included in

7   the survey.  And, thus, it leads to very, very reliable

8   estimates with small errors.

9   Q    Does that also mean that cell phones, for example, would

10  be reached?

11  A    Yes, that's correct.  There are now in today's age

12  techniques to conduct RDD to cellular phones, to cell phone-

13  only households as are sometimes referred.

14  Q    Was there any concern put to the issue that some Texans

15  may be holding phones with phone numbers from other states?

16  A    Yes.  This is now an increasing question mark for survey

17  research as people sometimes move across state lines and prefer

18  to keep their area code from a different state.  And so in

19  order to address that, we also included some lists of samples

20  of people who appear on residents lists but who do not have

21  area codes from the State of Texas.  That allows us to say that

22  every possible eligible resident of the State of Texas had an

23  opportunity to be interviewed by this study.

24  Q    And you also, in addition to the random digit dialing,

25  used some listed samples; is that true?

1   A    Yes, that's correct.

2   Q    And what was the purpose of the listed samples?

3   A    The purpose of the listed samples was to more efficiently

4   target what is called an "over sample," or a "separate sample"

5   of African Americans and Latinos here in the State of Texas.

6   Q    So if you set out to test ID possession by African

7   Americans and Latinos versus Whites then don't you skew the

8   results by calling more African Americans and Latinos?

9   A    Well, you actually do the exact opposite, you can produce

10  very reliable results.  We should really think of these as

11  three separate surveys in a sense.  There is a Statewide survey

12  in which we draw most of the Anglo respondents from than there

13  are surveys of African Americans and a survey of Hispanic

14  Americans, and this allows us to have a very nice robust and

15  reliable sample size of each of those three racial groups so

16  that we can do a cross racial group comparisons.

17  Q    And turning back to Table A, which you should have on the

18  screen there in front of you?

19  A    Yes, I do.

20  Q    Okay.  Tell us what's depicted in the RDD column?

21  A    This figure is just indicating how many total completed

22  interviews came from different sample types and breaking them

23  out by different race and ethnicity of our respondents to our

24  survey.

25  Q    And on the listed side?

Barreto - Direct / By Mr. Dunn                          36

1   A    The same thing, only these come from various listed

2   samples.

3   Q    So if we went to the total and added the 804 we see with

4   the 1,540, what number would we have then?

5   A    I believe the total number of interviews was 2,344.

6   Q    So in a State with a population as large as Texas, can you

7   really learn much from 2,300 respondents?

8   A    Well, 2,300 respondents is actually quite large in a

9   survey, larger than many other surveys.  If you pick up a Texas

10  newspaper and are looking at a statewide poll, you might see

11  1,000, maybe 1,200 respondents, so if you're in that range of

12  1,000 or 1,200 that's generally considered fairly reliable.  So

13  in this case we have, you know, almost double, perhaps, what

14  other survey takers may have, and the 2,344 is a quite large

15  and acceptable number.

16  Q    Now I notice in Table A you have "White, Black and Latino"

17  listed, and then you have an "Other" column, do you see that?

18  A    Yes.

19  Q    Why not have a column for Native Americans?

20  A    Well, we certainly asked in the survey for respondents to

21  indicate their precise race or ethnicity as they wanted to, but

22  for purposes of making this table, because there were a small

23  number of respondents from other racial or ethnic groups, we

24  just have collapsed them into a category that we call "Other."

25  Q    Is that also true for Asian Americans?

Barreto - Direct / By Mr. Dunn                    37

1    A     That would be true for anyone who indicated a racial group

2    besides the three of the largest racial ethnicity groups here

3    in the State of Texas, which are listed.

4    Q     Does the fact that you didn't include those categories

5    specifically alter your conclusions about disparities between

6    ID possession from Anglos to Blacks and Latinos?

7    A     Oh, no, not at all.  I mean, those folks are still

8    included in the survey.  Everyone could take the survey, but as

9    you can see there the sample size is not large enough to draw

10   conclusions about that "Other" category has no bearing on the

11   three categories in which we do have a very large sample size.

12   Q     And then, lastly, on your sample composition, what, if

13   anything, did you do to ensure that you were getting responses

14   from people geographically disbursed around the State?

15   A     So there is two important things, I think, that we should

16   note about the way the survey was implemented, and that is that

17   it was implemented in a completely randomized fashion, and so

18   the sample that was originally drawn is completely reflective

19   of the State of Texas; that is, phone numbers are drawn in

20   proportion to the entire State, and then phone calls are made

21   completely at random to those numbers, and so that ensures that

22   phones in all parts of the State ring at the correct

23   proportion.

24         The second is that there was a large number call

25   backs done, we did up to five call backs per number so if

1   someone didn't answer on the first call we scheduled four

2   additional call backs to those numbers to ensure that

3   respondents had an opportunity to participate in the survey.

4   Q    And, lastly, a question I meant to ask you on the list

5   that you obtained to do the listed calls, where did you obtain

6   those lists?

7   A    Well, Pacific Market Research, the firm that implemented

8   the project, they purchase and procure these lists of samples,

9   this is something they do thousands of times per year, and in

10  which they have extensive expertise.

11         In my discussion with them they expressed to me that

12  they purchased the list from a company called MSG, and this is

13  a company that is considered to be one of the most reputable

14  sample vendors in the Nation.

15  Q    So are you able to pull up your data set, for example, and

16  check to see if James Washington was a respondent to your

17  survey?

18  A    No, I'm not able to do that.

19  Q    Why not?

20  A    Well, there's two reasons.  The first is that the random

21  digit dial component literally makes up the last four numbers

22  on the fly and implements them.  They have known area codes and

23  known prefixes, those first three numbers of your phone number

24  are known and published in lists, and then it just randomly

25  generates the last four so it would not say we're calling the

 1   household of James Washington and here's his number; the

 2   computer would just randomly generate it.

 3            The second reason is that I do not possess or was

 4   never given any names or addresses or information for any other

 5   respondents where a name might have existed.  That was

 6   something that was all kept confidential by Pacific Market

 7   Research.

 8   Q    Well, why did you just ask them for it?

 9   A    It had no bearing on my conclusions whatsoever.  And

10   further, given my history of working in survey research I felt

11   that they would not have provided that to me.

12   Q    Why not?

13   A    That would be a very unusual request for me to make to the

14   survey firm.  They have an obligation of confidentiality and

15   anonymity to their respondents, and so they are never going to

16   turn over the names of the people they interviewed without

17   prior consent.

18   Q    Is there an organization or organizations that people like

19   you are experts in doing survey research join that lay out

20   standards for these types of things?

21   A    Oh, absolutely.

22   Q    And did -- are there any standards as it relates to

23   someone like you actually knowing the identities of folks who

24   answered a survey response?

25   A    Well, yes, absolutely.

1    Q    What are those standards?

2    A    Well, not only governed by professional associations like

3    the American Association of Public Opinion Research or

4    commercial associations like the Market Research Association,

5    but the Social Science university research boards, as well,

6    that Professor Sanchez and I are, of course, members of, these

7    all govern that as researchers, regardless of the inquiry, we

8    cannot reveal or be aware of the confidentiality of our

9    respondents without giving them prior consent that they

10   verbally agree to or physically sign a consent form.  This is a

11   very common and standard practice in research.

12   Q    Is there a scientific value for you and Dr. Sanchez being

13   blind, for example, of the respondents?

14   A    Certainly.  On both ends there's a value in us not trying

15   to leap to any conclusions by looking up information about a

16   particular respondent, as well as it's extremely important for

17   the respondent to feel that they have confidentiality and

18   anonymity in giving their answers.  If they didn't and they

19   believed that they were being monitored, perhaps, they might

20   give different answers.

21   Q    All right.  I'd like to shift gears now and talk about the

22   actual survey instrument that you prepared.

23        **MR. DUNN:**  And, your Honor, we noted that we

24   inadvertently left the survey instrument out of Plaintiffs'

25   Exhibit 753, so I've conferred with the State and I have the

1    survey instrument which I've marked as Plaintiffs' Exhibit

2    753.1, which I'll note for the record was produced at the time

3    of Dr. Barreto's first report, and I move its admission, which

4    I believe is unopposed.

5         **MR. SCOTT:**  No objections, your Honor.

6         **THE COURT:**  It's admitted.

7         **(Plaintiffs' Exhibit Number 753.1 was received in**

8    **evidence)**

9         **MR. DUNN:**  May I approach the witness to provide a

10   copy?

11        **THE COURT:**  Yes.

12        **MR. DUNN:**  And I'll also hand one up to the Court.

13        **MR. SCOTT:**  Thank you.

14        **MR. DUNN:**  May I have the ELMO?

15        **(Pause)**

16   **BY MR. DUNN:**

17   Q    I have placed on the screen and, of course, you have in

18   paper in front of you, the survey instrument, which is marked

19   and entered as 753.1.

20        Tell us, generally -- well, I don't want to go

21   through each question, but just give us a sense of how many

22   questions you asked and the categories of questions that you

23   asked?

24   A    Sure, it's somewhere in the range of 25 to 30 substantive

25   questions followed by demographic information.  The sections

Barreto - Direct / By Mr. Dunn                    42

1   are generally broken up into basic knowledge about the SB 14

2   law, possession itself of different types of identification

3   that would qualify, and then any possible burdens or barriers

4   that people may encounter in attempting to comply with the law.

5   Q    Somebody who received a phone call from Pacific Market

6   Research performing the survey, would they have answered every

7   single question here?

8   A    That's unlikely.  Some respondents could have answered

9   every question, but it's set up to be in what we commonly refer

10  to as a "skit pattern" or a "branching survey" in that if you

11  -- I'll give you just a quick example, if I may?

12         If you indicate on one of the very early questions

13  that you do have a Texas driver's license, that it is current

14  and up-to-date, you would not need to then receive any of the

15  follow-up questions about all of the other identifications

16  because we've already qualified you as someone who has that

17  identity -- identification card, and so many of the respondents

18  would have received only some of the questions, and then other

19  respondents may have received more questions.

20  Q    So starting on Page 1, I notice that the questions are

21  numbered and they begin with the letter S, is that right?

22  A    Yes.

23  Q    And what does that mean?

24  A    On Page 1 these questions with the letter S, we use that

25  to denote screening questions to screen the eligibility of

Barreto - Direct / By Mr. Dunn                    43

1    respondents to participate.  If they don't give affirmative

2    answers here we would hang up and not include them in the

3    survey.

4    Q    I'd like to take you to Question S2, and you recall at

5    your deposition you were asked about whether there was a screen

6    for felons, is that right?

7    A    Yes, that's correct.

8    Q    And was there?

9    A    Yes, there was.

10   Q    Where was it?

11   A    It was in the form of S2, and I believe this was a

12   question that Mr. Scott asked Professor Sanchez in which

13   Professor Sanchez pointed him to our report in which we very

14   clearly lay out the language of the screening questions.  It's

15   a very important component to get at the outset of a project.

16   And in there we lay out the detailed language in which we asked

17   respondents if they were eligible to vote in the State of

18   Texas.

19   Q    And was that issue of whether a person was a felon, was

20   that included in Question S2 that was actually used by Pacific

21   Market Research?

22   A    Yes, that's correct, as we indicate very clearly in our

23   report.  I believe it is not indicated here on this page which

24   would just be a typographical error, but in the report itself

25   we include, I believe it's Page 9, very, very clearly the

Barreto - Direct / By Mr. Dunn                          44

1   language that was used there.

2              **THE COURT:**  You said there was more questions under

3   S2, not just the one that's set forth there?

4              **THE WITNESS:**  No, it was just the question that was

5   set forth there, it just had slightly different wording and we

6   laid that out on Page 9 of our report.  It included a clause

7   that asked whether or not the person had been on probation or

8   parole for a felony.

9              **MR. DUNN:**  Can you take us back to Plaintiffs'

10  Exhibit 753 and go to PDF Page 13?  Zoom into the blocked

11  paragraph at the bottom, please?

12             **(Pause)**

13  **BY MR. DUNN:**

14  Q    Is this where you lay out the actual S2 question?

15  A    Yes.  This, I believe, is Page 9 of our report in which we

16  describe the exact question that was asked to respondents, and

17  you can see there it does have a phrase that says, "Not

18  currently on probation, parole or extended supervision for a

19  felony."

20  Q    And without getting into the details and, again, going

21  through each question, but walk us through the steps that a

22  respondent would have faced when they got called for this

23  survey.

24  A    Well, sure.  So when the respondent answered the phone,

25  first our survey taker would assess whether or not the

1   respondent wanted to continue the survey in English or Spanish.

2   Depending on the language preference of the respondent they

3   would switch to that language or remain in that language,

4   presumably English for most of the respondents.

5            They would then ask them a few short screening

6   questions as to their eligibility to vote in the State of

7   Texas, ask them their race and ethnicity.  And once they

8   qualified for the survey they would then continue to Page 2 of

9   the survey, which we have labeled as the main questionnaire,

10  and that's where they would start giving us their responses.

11  Q    And when you get to the main questionnaire, what were the

12  sort of steps of questions you were asking?

13  A    Well, we start out here on the main questionnaire by

14  asking just some basic questions about patterns and habits of

15  voters.  We asked questions about knowledge of SB 14, questions

16  about knowledge about what's called the "Election

17  Identification Certificate" or card, the EIC.

18            And then after those questions we then moved directly

19  into a line of inquiry on possession rates of different types

20  of ID that would qualify.

21  Q    And what was the next step in the survey if a respondent

22  made it that far?

23  A    Well, once they answered all of the questions on the

24  different types of ID that might qualify and indicated whether

25  or not they had that type of ID, for respondents who did not

Barreto - Direct / By Mr. Dunn                46

1    have the identification necessary to vote in person in Texas,

2    we asked questions about the underlying documents that you

3    would need if, in fact, you went to the office to obtain an

4    EIC, and these are things such as proof of identity and proof

5    of citizenship, and we wanted to assess whether or not these

6    respondents who did not have an ID would be able to even obtain

7    one.  So that was the next section.

8              And then the final sort of section of the survey was

9    related to any possible barriers or burdens that they might

10   encounter in attempting to acquire their EIC and the survey

11   concluded with a standard battery of demographic questions

12   about the respondents.

13   Q    Now you have mentioned a few times a Dr. Sanchez.  Could

14   you introduce him to us?

15   A    Yes.  My co-author on this report, as well as in other

16   voter photo identification projects, is Professor Gabriel

17   Sanchez, who is an Associate Professor of Political Science at

18   the University of New Mexico and he's here in the courtroom

19   today.

20   Q    Did he participate with you on the survey from start to

21   finish?

22   A    Yes, that's correct.

23   Q    Was there an area of questions that he particularly

24   focused his attention?

25   A    Yes.  Professor Sanchez focused more of his attention

1    about the development and analysis of the questions at the end

2    of the survey related to the possible burdens that eligible

3    voters might encounter in attempting to obtain an EIC.

4    Q    And then, lastly, were there a set of questions at the end

5    of the survey?

6    A    Yes, the demographic questions.

7    Q    And what's the purpose of these?

8    A    Well, the demographic questions are -- are quite important

9    because they allow us to assess the reliability and the

10   generalizability of the survey; that is, can we say that this

11   survey is reflective of the voting eligible population in

12   Texas?  And so we asked demographic questions that we can

13   compare to different census data points to ensure that our

14   sample is reflective of the State of Texas.

15   Q    Now before we get into the steps you did to ensure, as you

16   said, that the sample was reflective of the State, how long was

17   it that this survey was in the field, so to speak?

18   A    I believe we laid that out in our report.  My recollection

19   was that it was about four weeks.  I would have to look at the

20   exact page number, but I know we described the exact field

21   dates that was there, but my recollection was that it was about

22   four weeks that we attempted to contact respondents.

23   Q    Is that a reasonable amount of time in your expert

24   opinion?

25   A    Yeah, I think that's a very healthy amount of time.  In

1   fact, if you look at sometimes polls that are published in the

2   paper you might find that they were only in the field three

3   days which, in my opinion, is far too short of a period of

4   time.  By leaving the survey in the field a bit longer it

5   allows respondents who are busier or harder to reach an equal

6   opportunity to participate.

7   Q    What time of year was it that this survey was in the

8   field?

9   A    The survey was in the field earlier this year, in 2014, I

10  believe in the Spring.

11  Q    Now when it comes to survey research or survey results,

12  there's something called a "response rate," is that true?

13  A    Yes.

14  Q    And what is that?

15  A    The response rate, there are actually two, if I may.

16  There is the response rate and the cooperation rate.  These are

17  both indicators that were established by the American

18  Association of Public Opinion Research that allow us to assess

19  the generalizability or the validity of the survey.  The

20  response rate is literally telling us what percentage of

21  respondents that qualified did we actually -- were we actually

22  able to interview.

23  Q    And what were the response -- well, are there bounds or

24  suggested brackets of what a response rate ought to be for a

25  quality survey?

Barreto - Direct / By Mr. Dunn                        49

1   A     Yes, there are.

2   Q     What are those?

3   A     I believe we indicate in the report citing some published

4   research in the Social Sciences on surveys specifically that

5   something between the 20 and 30 percent range is considered

6   quite acceptable and robust in today's survey research world.

7   Q     What did your survey have as far as response rates?

8   A     Our survey was right in that range, I believe it was

9   around 26 percent for a response rate.

10  Q     Now turning back to your efforts to ensure that the

11  responses were reflective of the citizens in Texas, what is it

12  that you do, or what is the technique you used to ensure that

13  result?

14  A     Well, as I said, we started out by, you know, relying on

15  these demographic questions in which we have asked people their

16  age, their income, educational background, et cetera, and we

17  take the characteristics of our survey and we compare them

18  directly to the most recent and published estimates from the

19  United States Census ACS, or American Community Survey, which I

20  know we've heard a little bit about in -- yesterday, and we

21  compare within each racial group, now that's very critical

22  because we're doing a cross-racial group comparison here, and

23  so we compare the published census data for eligible Anglo

24  voters, eligible Latino voters, and eligible Black voters to

25  the demographics of our survey.  And where there are any

1    discrepancies we can adjust the survey through a process called

2    "weighting" so that when we tabulate the results and we create

3    the percentages we can be confident that the demographic

4    profile of our sample matches exactly to what the census tells

5    us the population parameters are for each racial group in the

6    State of Texas.

7    Q    Well, this sounds like fiddling with the data.  Can't you

8    push this to get what you want out of it?

9    A    No.  It has nothing to do with the responses to the

10   substantive questions on the survey, it only has to do with the

11   demographic characteristics of the respondents, and it is

12   considered one of the most important and reliable parts of

13   survey research is weighting the data to match the known census

14   estimates.  That way when you tabulate the results, the results

15   can be generalized to the public at large.

16   Q    Is weighting a particularized area of study?

17   A    Oh, yes, it can get quite complex and sophisticated.

18   Q    In your experience, are there folks out there, whether

19   they're doing it for newspapers or other purposes, who do

20   surveys that don't pay enough attention to weighting?

21   A    Absolutely.

22   Q    And, in your opinion, in the 100 or so surveys that you've

23   done, have you done the weighting as Social Science would

24   require it in this case?

25   A    Yes, absolutely.  This is something that takes practice,

1    it takes a while to perfect and understand the formula.  It's

2    something I've been doing for an extremely long time and I have

3    a very high degree of confidence in the weights that we apply

4    to our surveys so that when we interpret the results they are

5    reflective of the population we are interested in.

6    Q    Did Dr. Sanchez separately develop a weighting scheme?

7    A    My recollection is that both Dr. Sanchez and I assessed

8    the demographics and came up with strategies to weight, and

9    then when we discussed those we were happy to learn that we had

10   taken the exact same approach and reached the same conclusions.

11   It's one of the advantages of having a co-author or a partner

12   in research is that you can combine two separate individual

13   perspectives to -- to make a better end product.

14   Q    Did you use that collaborative effort in other parts of

15   the survey as well where you would separately develop ideas and

16   then compare them?

17   A    Certainly.

18   Q    Now with regard to this weighting, is it a formula?  For

19   example, like the circumference of a circle?  I mean, can I lay

20   something in front of you and just have you write out the

21   formula on how this worked?

22   A    I would say that it's more of an approach than a formula.

23   There certainly is calculations involved, but it would change,

24   and it's very dynamic in that it's continued to be updating.

25          The approach that we used is called "raking" and what

1   that means is that there are multiple different demographic

2   indicators that we're attempting to balance, and it's very

3   similar to, you know, raking dirt, that you might have a pile

4   of dirt that's not even.  You throw the rake out and pull it,

5   it still needs to be leveled out in some places, you throw it

6   out and pull it, and so after a couple of passes the final

7   thing is nice and perfectly balanced, and we followed the

8   traditional practices of survey weighting in that approach.

9   Q    Now ultimately you produced an original report in this

10  case that summarized your opinions and conclusions, is that

11  true?

12  A    Yes, that is.

13  Q    What else did you produce with that report?

14  A    We produced the survey instrument, as you indicated.  We

15  produced a set of tables.  We produced the data set itself

16  which we consider part of the report, and we produced our CVs,

17  I believe.

18  Q    In your report did you lay out the -- the particularized

19  data on every single question?

20  A    No, that would have taken maybe 10,000 more pages to lay

21  out every possible interpretation of the data.  We attempted to

22  lay out the most critical and relevant summary points.

23  Q    And with respect to the weighting, how is it, if at all,

24  that the State or the Court or someone else could analyze or

25  double-check that what you tell us about your weighting is

Barreto - Direct / By Mr. Dunn                    53

1   accurate?

2   A    Well, a couple of ways.  First of all, we turned over the

3   data set with the weights included.  So they can very easily

4   pull those up and look at them.  Separately, we described the

5   weighting process in the report.  We describe that we weight to

6   the known census indicators for these demographics such as

7   education and income and age.  And we provided footnote

8   references to the appropriate published social science research

9   on weighting practices.

10  Q    Now, you mentioned using the ACS, the American Community

11  Survey, and you suggested that you heard some about it in the

12  testimony yesterday?

13  A    Yes.

14  Q    And were you able to watch some of the testimony

15  yesterday?

16  A    Yes, most.

17  Q    Did you see Dr. Herron's testimony?

18  A    Yes, I did.

19  Q    And Dr. Herron gave some explanation of the ACS and he

20  mentioned it was a five-year average.  Do you recall that

21  testimony?

22  A    Yes.

23  Q    But tell us, give us a little bit of sense of how the ACS

24  is actually performed over the course of those five years.

25  A    Sure.  There's actually a couple of different products

1    that the census ACS puts out.  The starting point is that the

2    census has evolved and so instead of only taking a population

3    estimate or survey every ten years, they now do it on an annual

4    basis with an extremely large sample size so that they may

5    infer down to local communities and states.

6              In some instances you can look at single year ACS

7    data.  That's called one-year data.  They also then allow you

8    to pull three years of data.  And if you're getting down to

9    very small levels of geography such as census tracks, census

10   blocks or census block groups, you would most certainly want to

11   pull five years worth of data so that your estimates are more

12   robust.  And so those are a couple of the different products

13   that you can download or access on the ACS website.

14   Q    Will ACS give you numbers for the citizen voting age

15   population in various places around the state and statewide?

16   A    Yes, that's correct.

17   Q    And which ACS did you use to perform your weighting?

18   A    I believe we relied on the 2012 one-year ACS, because

19   we're interested in statewide numbers.  There was no need for

20   the five-year data because at the level of aggregation of the

21   state, in this case the state of Texas, would have the second

22   largest sample of any state in the ACS because it's such a

23   large state.

24   Q    Why not use the 2010 decennial census?

25   A    Well, the 2010 decennial census doesn't have the

Barreto - Direct / By Mr. Dunn                    55

1    appropriate information or questions about citizenship that we

2    can access.  And it also would have been two years older so not

3    quite as relevant.

4    Q    Now, I've also heard an acronym CPS.  Are you familiar

5    with that?

6    A    Yes.

7    Q    What is that?

8    A    That is another product of the census that is referred to

9    as the Current Population Survey.

10   Q    And how is it different from the ACS?

11   A    The Current Population Survey is an older product, just

12   meaning that the census has been doing it longer, more

13   consistently.  And this is a monthly survey that they do during

14   different months.  One of the most known products of the CPS

15   for political scientists is what's called the November

16   Supplement.  And that is a survey that they conduct in November

17   to assess voter registration and voter participation rights.

18   Q    How, if at all, did you use CPS in your study?

19   A    Well, the CPS can also be useful in trying to estimate the

20   number of registered voters or voters there are by race and

21   ethnicity.  Because it's done closer to the election it might

22   be considered a little more reliable.  To the best of my

23   knowledge the ACS does not ask questions about voter

24   participation because it may be conducted in April or other

25   months.

1   Q    In your opinion, the way you weighted this case and the

2   public census data that you used was that the standard that's

3   required by the best social science available in the field

4   today?

5   A    Yes.

6   Q    All right.  Now I'd like to turn to the results if I can.

7          **MR. DUNN:**  And I'd like to pull up Plaintiffs'

8   Exhibit 753, Page 19 of the report but Page 23 of the PDF.

9   Zoom in to Figure 1, please.

10  Q    All right.  Tell us what is depicted here in Figure 1.

11  A    Figure 1 is the sort of overall punch line summary of our

12  report; and that is, our estimate for the percent of eligible

13  voters in Texas who lack a accepted photo ID broken out by race

14  and ethnicity for the three racial or ethnic groups that we

15  studied.

16  Q    And these results that are shown here that applies to

17  people who are registered and people who are unregistered but

18  are still eligible to register; is that right?

19  A    Correct.  All persons who are eligible to vote in the

20  state of Texas.

21  Q    And what were the results?

22  A    Over all we found that 4.7 percent of non Hispanic Whites

23  or Anglos lack an accepted photo ID, we found that 8.4 percent

24  of Blacks lack an accepted photo ID, and 11.4 percent of

25  Latinos lack an accepted photo ID here in the state of Texas.

1    Q     Now, I notice asterisks here next to Black and Latino.  Do

2    you see that?

3    A     Yes.

4    Q     Explain those to us.

5    A     Well, as we indicate underneath the graph, here we have

6    depicted the degree of statistical significance, which is a

7    very common practice in social sciences.  And what that allows

8    us to do is to compare those differences that we observe for

9    Blacks as compared to Whites or for Latinos as compared to

10   Whites.  And we can determine whether or not that difference

11   that we observed is real and what the confidence level we have

12   in that.  In this case we've indicated that both Blacks and

13   Latinos have a statistically significant different possession

14   rate than do Whites.

15   Q     At what percent of confidence level do you need to be

16   before you as a social scientist are comfortable reaching some

17   conclusions?

18   A     Well, I would say a general norm in the social sciences is

19   95 percent confident.  You may see, depending on the inquiry --

20   some studies rely on 90, a 90 percent confidence level.  And in

21   this case we have indicated with asterisks or in the text of

22   our report whether or not the difference that we observe is

23   either proven at the 95 percent, or in many cases as you see

24   here with Latinos, at the 99 percent confidence range.

25   Q     Now, did you also prepare or calculate data for disparity

1    among registered voters?

2    A    Yes, we did.

3         **MR. DUNN:**  And can you go down to the bottom of the

4    page, please?  I'm sorry, into that paragraph right below

5    paragraph number two.

6    Q    Now, what were the percentages that you were able to

7    calculate for registered voters?

8    A    Among those who are currently registered to vote in the

9    state of the Texas we found that 2.1 percent of White

10   registered voters do not possess an accepted unexpired

11   photo ID, that 4.9 percent of Black registered voters do not

12   possess an unexpired photo ID and that 6.8 percent of Latino

13   registered voters do not possess an unexpired photo ID.

14   Q    And yesterday since you were here for Dr. Herron you may

15   have seen a demonstrative that compared Dr. Ansolabehere's

16   database matching results with Dr. Herron's database matching

17   results on these very questions that we've been analyzing here.

18   Do you remember seeing that?

19   A    Yes, I recall that.

20   Q    And what is your opinion as to how your racial disparity

21   results compare to the results these other two experts have

22   reached using different methodology?

23   A    Well, based on what I saw in the court yesterday, not

24   having reviewed the reports, I would say that the results are

25   all quite consistent; that even though they rely on different

Barreto - Direct / By Mr. Dunn                          59

1   approaches and different methodologies, they all point in the

2   same direction in finding statistically significant differences

3   between Whites and minorities in possession rate of an accepted

4   photo ID in this point among registered voters.

5   Q    Now, to be sure, to be clear, have you looked at what

6   Dr. Herron or Dr. Ansolabehere have done?

7   A    No.

8   Q    Are you here today to critique or testify about that one

9   way or the other?

10  A    No.  I had absolutely no involvement with either of those

11  two gentlemen.

12  Q    Now, these percentages that we pulled up here, what do

13  those translate to in raw numbers?

14  A    I believe in Appendix A we also indicate some numbers.

15  There's approximately statewide 516,000 persons affected.

16  Among Latinos it's 230,000, among African Americans it's

17  100,000 and among African Americans it's 162,000.

18  Q    You may have misspoke or I may have misheard you, so let's

19  do that one more time.  Could you run through those numbers

20  again?

21  A    Certainly.  Statewide, the statewide numbers are 516,000.

22  The estimate for Latinos is 230,000.  The estimate for Whites

23  is -- excuse me -- Blacks is 100,000, and the estimate for

24  Whites is 162,000.

25  Q    And when you provide those numbers, are those eligible

1    voters or registered voters?

2    A    I'm sorry, registered voters.  I thought we were talking

3    about registered voters.

4    Q    Okay.  What are the figures for eligible voters?

5    A    The figures for eligible voters I believe overall --

6    again, if we go to Table 1 in the appendix.

7    Q    Sure.

8         MR. DUNN:  Can you take us back to Table 1 on this

9    page?

10   Q    Oh, on the appendix?

11   A    Uh-huh.

12        MR. DUNN:  That would be Page 40 of the PDF.  Oh,

13   you're there, excellent.  Would you zoom into Table 1 if you're

14   able?

15   Q    All right.

16   A    So the numbers I gave were for registered voters.  I

17   thought that's what we were talking about.  But for all

18   eligible voters, everyone eligible to vote, the numbers would

19   be:  395,000 Whites do not have an accepted unexpired ID;

20   180,000 in Blacks do not have an accepted unexpired ID; and

21   555,000 Latinos do not have an accepted photo ID.

22   Q    Now, your study also asked some questions about name

23   matching issues; is that right?

24   A    That's correct.

25   Q    And you investigated the degree to which respondents might

1   have issues with their names not matching?

2   A    That's correct.

3   Q    The figures that you've just provided us for both eligible

4   and registered citizens do they include the folks who may also

5   have a name match problem?

6   A    No.  These only include the people who are not in

7   possession of an unexpired ID card that would comply with

8   SB 14.  This does not take into account any name similarity

9   issues.

10  Q    So if we added back in name mismatch issues, people who

11  might have a name match problem, how many more people should we

12  be considering?

13  A    I believe in Table 2 just below this in the Appendix we

14  have some information on that.  We asked a follow-up question

15  to all of our respondents to indicate whether or not their name

16  had changed in any way or if there was an error or if the name

17  on their ID card would not match the name on the registration.

18          And here we estimate that an additional 4.6 percent

19  of Whites, an additional 5.4 percent of Blacks and an

20  additional 5.3 percent of Latinos have some degree of a name

21  issue, name match issue.  And we enumerate that just in the

22  line below.

23  Q    I assume as a social scientist that doesn't live or work

24  in Texas you don't have any way of knowing which or how many of

25  those people would face rejection at the polls for names not

1    matching.

2    A    No.  Obviously, that's beyond my area of control.  I'll

3    leave that up to the Court to decide, you know, which people's

4    name is so dissimilar that they would probably be excluded.

5    Q    Next I'd like to take you to Page 20 of your report,

6    Page 24 of the PDF.

7              **MR. DUNN:**  And I'll call the Court's attention to

8    Figure 2.

9    Q    Tell us what it is that you've depicted here.

10   A    One of the first questions we asked in our survey was

11   whether or not respondents believed that they have a valid ID.

12   The reason we asked this question is that if respondents

13   believe that they're currently in possession of a valid ID, we

14   suspect they would have very little interest in going and

15   getting a different ID, because in their mind they have a valid

16   ID.  So we asked respondents whether or not they think they

17   comply with the SB 14.  We then walked them through the series

18   of questions to say, okay, what kind of ID do you have?

19              And here in Figure 2 we're depicting the number or

20   the percentage of people who think that they have a valid SB 14

21   ID but, in fact, their responses to the questions indicate that

22   they do not actually possess an unexpired valid photo ID.

23   Q    And what were the percentages that you ultimately

24   calculated?

25   A    What we found statewide among eligible voters was that

Barreto - Direct / By Mr. Dunn                              63

1    3.8 percent of Whites think they have a valid ID but, in fact,

2    they do not; 7.0 percent of African Americans think they have a

3    valid ID but do not; and 9.1 percent of Latinos think they have

4    a valid ID right now but, in fact, they do not.

5    Q    I note here that you have referenced a statistically

6    significant difference for only Latinos.  Do you see that?

7    A    Yes.

8    Q    You've not done that for Blacks or African Americans have

9    you?

10   A    No.

11   Q    Why is that?

12   A    It's not quite at the 95 percent statistical confidence

13   level.  It's closer to the 90 percent statistical confidence

14   level in terms of the difference.  And so in this case we have

15   only denoted with asterisks where things fall above the 95 or

16   99 percent difference level.

17   Q    So if I give you the instruction that this Court has to

18   decide issues in this case based upon a preponderance of the

19   evidence, the greater weight and degree of the evidence, are

20   you able to conclude as a social scientist looking at this data

21   that African Americans have a disparity from Anglos in terms of

22   knowledge about whether they have an ID?

23   Q    Well, certainly.  Not only this chart but, you know, I

24   would use the word preponderance that you just used, of our

25   data set in the questions we asked we did consistently find

Barreto - Direct / By Mr. Dunn                          64

1   that both African Americans and Latinos in the state of Texas

2   would be disproportionately affected, whether it was through

3   knowledge, burdens or actual possessionry.

4   Q    Now, I'd like to turn in Plaintiffs' Exhibit 753 to

5   Page 27 of the PDF, Page 23 of the report.

6         **MR. DUNN:**  And zoom in on paragraph one.

7   Q    Did you also study the rates of ID possession by age

8   group?

9   A    Yes.  We studied the possession rates of ID by a number of

10  our demographic indicators:  age, gender, education, income and

11  those sorts of things.

12  Q    And what did you determine on age?

13  A    When it came to age we found that there were statistically

14  significant differences here.  In particular, people age 18

15  to 24, younger people, were much more likely to lack an

16  unexpired ID.  Here we indicate 14.8 percent of people in that

17  18 to 24 age group lacked the ID, which was three times higher

18  than the rate of middle age voters, age 35 to 54.

19  Q    Why is it that disparity of ID possession by age might be

20  important to what the Court has to consider in this case?

21  A    Well, I think there's a number of reasons.  The first is

22  the follow-up line that we have here.  Not only were these

23  younger people more likely to lack ID but they are also

24  significantly more likely to believe that a university ID would

25  count.  And so they may be very reluctant to go and get an ID

Barreto - Direct / By Mr. Dunn                    65

1    if they believe that they already have one, that a state issued

2    university ID would count.  And so they may be particularly

3    vulnerable.

4              Also because a disproportionate number of people age

5    18 to 24 are Black and Hispanic.  Both African Americans and

6    Hispanics in the state of Texas are comparatively much younger

7    than Whites.  And so while this finding here is just related to

8    age as a whole, we know that these younger voters are

9    overwhelmingly minority.

10   Q    And turning if we could to what's marked here as paragraph

11   three, but I assume that's a typo and it should be paragraph

12   two?

13   A    Yes.

14   Q    All right.

15            **MR. DUNN:**  Take us to that paragraph, please.

16   Q    Did you also study the rates of possession of ID by

17   educational level?

18   A    Yes, we did.

19   Q    And what did you determine there?

20   A    Here, once again, we found a very stark difference.  As

21   you can see, right in the middle we say that among those

22   without a high school degree 14.7 percent lack an accepted

23   photo ID compared to only 1.6 percent of college graduates who

24   lack photo ID.  A very, very stark contrast between those with

25   less educational attainment and those with more.

1  Q    And why do you believe, if you do, that educational

2  attainment, these figures are relevant to the Court's inquiry

3  here?

4  A    Well, I would give, you know, similar reasons as before.

5  We know that the socioeconomic status of persons in the state

6  of Texas has very deep racial and ethnic connections.  That is,

7  people with less educational attainment are more likely to be

8  minority.

9          Not only that, we found that these folks without a

10  high school degree had virtually not heard of this EIC.  And so

11  because, as other folks yesterday testified, it does take a

12  certain amount of knowledge and information to navigate any

13  public bureaucracy, these folks would be at an extra

14  disadvantage perhaps not having graduated college and been more

15  familiar with those systems.

16          And that was verified by our question on the survey.

17  We indicate there that only 13 percent of these folks without a

18  high school degree had ever heard of an EIC, suggesting

19  87 percent of them are not even aware of that.

20  Q    Now, turning to the next page, which numbered paragraph

21  four, which really ought to be paragraph three, did you also

22  study ID possession by income level?

23  A    Yes, we did.

24  Q    And what did you determine there?

25  A    Here we found an extremely large disparity here where we

1    indicate that over 21 percent of eligible voters who earn less

2    than $20,000 a year annually do not have an accepted unexpired

3    photo ID.  And that compared to just 2.6 percent of higher

4    income voters between the 100 and 150 or even over the $150,000

5    mark.  And so this disparity is on the order of 18 or 19 points

6    difference by income.

7    Q    And again, why do you think this might be relevant to the

8    Court's inquiry?

9    A    Well, very similar and not surprisingly consistent with

10   the educational attainment findings, we found that these voters

11   continue to have less -- access to less information and access

12   to less accurate information.  Twenty-two point five percent of

13   those earning less than 20,000 annually believe they have a

14   proper ID but do not.  So they're the most likely to

15   incorrectly believe that they're okay right now.  And that

16   creates a very big obstacle.

17            And, of course, just as consistent with the education

18   statement that I made, income is very deeply divided by race

19   and ethnicity here in Texas with African Americans and Latinos

20   being much more likely to be in this category of having less

21   than $20,000 a year annually.  So when we talk about people who

22   have lower levels of education, lower levels of income, these

23   are folks who are much more likely to be minority, have less

24   resources to be able to address that situation, to be able to

25   navigate the bureaucracies.  And they also incorrectly believe

Barreto - Direct / By Mr. Dunn                                    68

1    that they already have the right ID, and so they're unlikely to

2    perhaps even pursue that.  And so we think in that sense it

3    creates either double or even triple sort of burdens or

4    problems for them to overcome.

5    Q    So your findings on income, age and educational

6    attainment, do they help confirm the percentages you gave us

7    earlier on racial disparity?

8    A    Oh, absolutely.  They indicate that they are consistent in

9    the expected patterns of racial disparities given what we know

10   about socioeconomic status and age and minority populations.

11   But they also give us a lot of confidence in the weighting

12   system.  That is, we do find by those demographic

13   characteristics of the population quite significant differences

14   between young and middle age, between less educated and more

15   educated, between lower income and higher income, which

16   suggests that it's very, very important for the survey to match

17   the correct demographic profile of the state of Texas.

18   Q    Now, shifting gears a minute, the State has hired some

19   experts who quarrel with some of your methodology; is that

20   true?

21   A    Yes.

22   Q    Have you had an opportunity to read those reports and the

23   depositions of those experts?

24   A    I have.

25   Q    The State has two experts that address, at least in part,

1   your study.  One is Dr. Hood and Dr. Milyo.  Is that your

2   understanding?

3   A    That's my understanding.

4   Q    All right.  Let's start first with Dr. Hood.  Dr. Hood

5   makes a complaint about your weighting system.  Do you recall

6   that?

7   A    I do.

8   Q    Can you describe what his complaint is?

9   A    Dr. Hood is looking at the overall statewide data.  And he

10  felt that the percentages who were Black, Hispanic or Anglo in

11  our survey did not approximate his opinion of what the correct

12  percentages of each of those racial groups were in the survey.

13  Q    And what is your response to that criticism?

14  A    Well, we -- we don't have a focus on, and we don't have a

15  weighting system in place for statewide results.  The most

16  important focus in the weighting system is based on comparing

17  across racial groups.  And so the study design, the weighting

18  system, is all based on getting an accurate sample of Whites,

19  an accurate sample of Blacks, and an accurate sample of

20  Hispanics.

21       And so the most important and critical weights to

22  consider are those within, internal racial group weights.  And

23  that's precisely what we've done.  So we consider his comment

24  about the overall proportions to be off the mark, not relevant

25  to our inquiry.

Barreto - Direct / By Mr. Dunn                         70

1          DU:   If we could call up Plaintiffs' Exhibit 754, I

2     think it's Page 6 of the PDF, Page 5 of the report.

3     Q     All right.   This is your rebuttal for it, Dr. Barreto; is

4     that true?

5     A     Yes.

6     Q     What is it that you're showing us here in Table 2?

7     A     After Dr. Hood completed his report, he provided us with

8     the data and the weighting system that he generated to conduct

9     his analysis.   And so we looked at his weight and we compared

10    that to the census.   Just as I explained earlier, is perhaps

11    the first and single most important step of ensuring the survey

12    is reliable.   And here we report the demographic profile of the

13    different racial and ethnic groups according to his weighting

14    scheme, as compared to what the census tells us these groups

15    consist of.

16    Q     For each of these squares where it has the census, but I

17    also put the census/Barreto, because that's how Barreto

18    weighted it?

19    A     Correct, we weighted ours to the census, so those are the

20    numbers we would have approximated.

21    Q     And so in the column that's "Hood," that's what Dr. Hood

22    chose to weight?

23    A     Correct.   If you take what his data said and just tabulate

24    age by race, you will see those percentages in the Hood column.

25    Q     Were you able to determine how Dr. Hood's weighting scheme

1    resulted in figures so far off from the census actual numbers?

2    A    Yes.  We looked at his weighting scheme and he did not

3    create internal race report plates; that is, every single White

4    or Anglo in his survey has the exact same weight value.  As you

5    can see from this figure, he has far too many people who are 65

6    and over under his scheme; 45 percent of the sample, it should

7    only be 19.  And so he should have weighted those

8    appropriately.

9         He does the same thing for African Americans and the

10   same thing for Hispanics; that is, he does not attempt to

11   balance the Black sample so that it actually matches the

12   correct Black demographics of the State of Texas.  He doesn't

13   do that for any of the racial groups.

14   Q    What are the -- what is the consequence to the racial

15   disparity numbers when you weight the way Dr. Hood did?

16   A    Well, first of all, just by looking at the chart, the data

17   is completely ungeneralizable to the State of Texas.  You can

18   see very clearly that he does not have an accurate profile of

19   Whites, Blacks, or Latinos in the State of Texas.  And so the

20   tabulations that he conducted cannot be generalized to the

21   State of Texas because they just simply don't match.

22        If you look at some of the other tables you'll see he

23   has far too many people with a college degree.  We just got

24   down discussing that people with a college degree are way more

25   likely to have ID.  He has too few people who are less

1   educated.  He has incorrect proportions of people by income.

2   And these are all things that are directly rate -- or related

3   to ID. Possession.  And so it is creating an incredible skew in

4   his data when he uses his weight that he developed.

5   Q    Does Dr. Hood's weighting system have the result of

6   flattening or underestimating the racial disparity of ID.

7   possession?

8   A    Oh, absolutely.  There's no question.

9   Q    You've also faced some criticism in this case about how

10  you handled respondents who answered questions with "Don't

11  know."  Do you recall that criticism?

12  A    Yes.

13  Q    And how is it you chose to handle people who answered

14  "Don't know" to questions?

15  A    If somebody said that they didn't recall or don't know to

16  one of the questions -- well, we chose to keep them in the data

17  set and to continue asking them additional follow-up questions.

18  And so that way we could see what their responses were to other

19  items.  For example, if somebody said that they just didn't

20  have their state ID. card with them, and they just couldn't

21  remember exactly what the expiration date was, we coded them as

22  a "don't know," someone who could not verify that they have an

23  unexpired photo ID.

24        But then we asked them additional questions.  We

25  asked them if they had a military ID. card or a U.S. passport.

1    And some of those respondents could indicate, "Yes, I actually

2    do have an additional form of ID.," and we could positively

3    categorize them as either having ID. or not having ID., as

4    opposed to, say, dropping them out of the survey.

5    Q    Why not just drop them out of the survey?

6    A    Dropping them out of the survey would be, in our opinion

7    as survey researchers, the worst thing that you could do.  The

8    reason is that these people answered most of the questions, if

9    not all, but one of the questions on the survey and they should

10   be considered part of the sample.  There's no basis for

11   dropping those persons out of the survey, unless you're trying

12   to change the results.  And so these persons had given answers

13   to the survey, and the correct social science practice would be

14   to include them in the survey.

15   Q    Returning then back to the weighting issue, the state's

16   expert wanted to remove the "don't know" responses; is that

17   true?

18   A    In one of his analyses, I believe that Milyo attempted to

19   delete them from the -- from the tables, yes.

20   Q    Was there any effort to reweight after withdrawing those

21   respondents?

22   A    No.  No.  My recollection is that he omitted a large

23   number of respondents, which would have then changed the

24   composition of the data set.  If you're removing respondents

25   who are lesser educated, who are younger, now you have changed

1    the composition of the data set.  And so the very first thing

2    you would do again, the very first thing you would do, is check

3    the demographics and -- of the people you omitted and of the

4    people you included, and reweight the data so that, again, it

5    could be reflected to the State of Texas.

6    Q    Lastly, on Dr. Hood, there was a criticism on how you

7    dealt with a handful of respondents who had citizenship

8    question issues.  Do you know what I'm talking about?

9    A    Yes.

10   Q    What is that criticism?

11   A    One of the notes that Dr. Hood made was that there were

12   some individuals that he believed had a U.S. citizenship

13   certificate.

14   Q    How many?

15   A    I believe he indicates there were 12 out of the 2,344

16   respondents.

17   Q    And what does Dr. Hood say you should have done with

18   those?

19   A    He indicates that they, because they had a citizenship

20   certificate, that they should count as having an ID.

21   Q    Why didn't you count them?

22   A    We did count them as having an ID.  We believe, in

23   reviewing our data set, that Dr. Hood was wrong on two

24   accounts.  The first is that we had two different questions

25   about citizenship papers; one that asks very specifically about

1    citizenship with photo identification.  Anyone who indicated

2    "yes" there, we did count and tabulate as having an ID.  It was

3    part of our ID. battery of questions, and they had to go into

4    the "yes" category, if they said yes there.

5              The second is that, as we referred earlier, we have

6    two different types of people who have ID.  Some that have an

7    unexpired ID., others that have unexpired ID. with no name

8    matching issues.  And in this case some of the people who had a

9    proof of citizenship were women who have been married and

10   changed their name since becoming a U.S. citizen, and they

11   might have indicated in a follow-up question that their name

12   didn't match.  Now, we still counted them as having an ID.

13   because in our tables we're -- we're primarily focused on

14   people who have an unexpired photo ID.  But we believe that

15   Dr. Hood was focusing on the name match issue and saw that in a

16   name match column we had counted some of those people as not

17   having ID.  We would have only done that if they said their

18   name didn't match.

19   Q    Did you and Dr. Sanchez have an opportunity to look at the

20   specific 12 respondents and double check how you had them coded

21   in the data?

22   A    Yes.

23   Q    Are you confident they're coded correctly?

24   A    Oh, absolutely.

25   Q    Returning to Dr. Milyo, he had a criticism that you didn't

1   adequately seek to confirm the eligibility of respondents.  Do

2   you recall that?

3   A    Yes.

4   Q    And what was his critique there?

5   A    I believe that he had a couple of different critiques

6   related to that.  One, for example, I believe he said that

7   we -- we couldn't actually verify that our respondents were

8   over the age of 18 and lived in the State of Texas.  Later he

9   asked questions about their voter registration status and other

10  things that he indicated should have been verified.

11  Q    And what's your response to that criticism?

12  A    Well, you know, at a starting point, the first question

13  that -- that he raised is really unusual and outside, I would

14  say, the general practices of doing surveys, and that's because

15  there's an understanding that respondents can positively verify

16  basic facts about themselves, such as whether or not they live

17  in Texas and they're 18 years old.

18       So the entirety of survey research operates from this

19  assumption that respondents are able to screen in or screen out

20  of surveys.  And so that's not something that we would be asked

21  to validate or verify; we essentially are validating that by

22  the respondent telling us, "Yes, I am over 18.  I am eligible

23  to vote in the State of Texas."

24       The second, related to some of the other validation

25  questions, I believe we've already touched on in terms of the

1   confidentiality and anonymity of the data.  So it just wouldn't

2   be possible to take a survey that doesn't have people's names

3   and addresses and Zip codes attached to it and somehow compare

4   it against some sort of a list.

5   Q    You also -- Dr. Milyo also had a criticism as it -- as it

6   pertained to Question S-3.  Do you recall that?

7   A    Let me look at my survey.  Yes.

8   Q    What was the nature of that criticism?

9   A    Another one of his criticisms here was that he didn't like

10  the way that this question was worded.  If I recall, and I

11  might be paraphrasing a bit, he felt that we were leading the

12  respondent or providing too much information in the way that

13  the question was worded; I believe that was his criticism.

14  Q    And do you find the question to be within the bounds of

15  what's acceptable in social science?

16  A    Well, yes, absolutely.  Not only that, but this is a

17  question that has been extensively tested and retested in

18  political science, and this has found that if you ask the

19  question in this way and explain to respondents in this precise

20  manner, you will, in fact, get the most accurate information.

21  And -- and so this is -- this is a question that any political

22  scientist would be very familiar with, as it appears in many of

23  our national studies, including ones that are funded by the

24  National Science Foundation and others.  This is a very

25  standard political science question that has been very vetted

Barreto - Direct / By Mr. Dunn                    78

1    over the years.

2    Q    There was also a criticism from Dr. Milyo about motivated

3    reasoning.  Do you recall that?

4    A    Yes.

5    Q    What is that criticism?

6    A    This was a criticism in which I believe he theorized or

7    hypothesized that some respondents would somehow know that this

8    study was going to be used as evidence in a trial; and that

9    they would change their answers, depending on which side of the

10   aisle they were on, in relation to voter identification laws.

11   Q    And what is your response to that?

12   A    I mean, frankly, this is one of the most absurd things

13   I've heard about survey research; that respondents would

14   somehow know that in an anonymous survey that their

15   participating is on behalf of a trial, when it was done many

16   months ago, and change their responses.  I mean, we're asking

17   people very basic factual questions about themselves, and

18   there's no motivation here for them on those parts.

19   Q    Are respondents even told that this is -- this survey was

20   in relation to this case or a lawsuit or …

21   A    No, not at all.  Of course not.  And the evidence that

22   Milyo cites there has to do with your views on attitudes

23   towards political issues.  It has nothing to do with people

24   answering factual information about themselves.

25   Q    Next you faced some criticism about using 2008, 2012 CVAP

1    data.  Do you recall that?

2    A    Yes.

3    Q    What was that criticism?

4    A    I believe that Dr. Milyo suggested that, you know, the

5    data was perhaps out of date when we were estimating our

6    percentages or our raw numbers because the -- the census data

7    was from 2012, and that we hadn't updated it.

8    Q    What is your response?

9    A    Well, the 2012 data from the American Community Survey is

10   the most recently publicly available data.  People who work

11   with census data regularly know that there is a lag in when the

12   census puts that data out and makes it available.  In fact, the

13   2013 data is only coming on line this month, in September of

14   2014.  So we are using the most recent and available data that

15   we have at our disposal.

16        If anything, there are more eligible voters today in

17   the State of Texas.  And so if we multiply the lack of

18   possession rates towards the 2014 data than it does now, there

19   will be even more people that we estimate do not have ID.

20   Q    Next, you faced criticism for how you categorized people

21   who answered a question about race as being White and Hispanic.

22   Do you recall that?

23   A    Yes.

24   Q    What is that criticism?

25   A    I believe this criticism was that, you know, some people

Barreto - Direct / By Mr. Dunn                    80

1    were allowed to answer multiple questions about race.  They

2    could have said White, they could have said Hispanic, and he

3    felt the race wasn't clear.

4    Q    And what's your response?

5    A    Well, we used a very similar convention that the U.S.

6    Census uses and that all surveys use, in which people can self

7    report.  They can tell us what their race is, and if they

8    indicate more than one race, that's an acceptable answer.

9    Anyone who indicated that their race was Hispanic or Latino,

10   whether it was the first thing they said or the second, we

11   considered them Hispanic or Latino.  And people who we

12   considered to be White, in being consistent with the census,

13   are people who are not Hispanic, but of White race.

14   Q    So your coding of those people, is that in accordance with

15   the standards of social science?

16   A    Yeah.  The standards of the social science and the U.S.

17   Census and …

18   Q    Next you faced a criticism for how you handled people with

19   reported revoked or suspended licenses.  Do you recall that?

20   A    Yes.

21   Q    What was the nature of that critique?

22   A    Well, we had a question on the survey asking people

23   whether or not their license had ever been revoked, suspended,

24   lost, stolen, or misplaced.  And I believe Dr. Milyo, could

25   have been Dr. Hood, believed that we miscoded these people as

1    not being in possession of ID.

2    Q    And what was -- what is your response to that critique?

3    A    That's completely incorrect.  All of those people, as you

4    can see in the data set, got a follow-up question, even if they

5    said their license had been suspended, they got a follow-up

6    question of whether or not it was unexpired.  And so as long as

7    they had in their possession an unexpired ID., they still

8    counted as having an ID.

9              The only people that could be moved off the list

10   would be people who said that it was lost or stolen; that they

11   did not actually possess their ID., in which case they would

12   have then gone on to receive the follow-up questions about

13   other forms of ID.

14   Q    Lastly, Dr. Milyo did some replications off of your data;

15   do you recall that?

16   A    Yes.

17   Q    Describe those for us.

18   A    I believe he offered four different types of replication

19   in trying to estimate the percentages of people by race who

20   have or don't have ID.

21   Q    And what is -- what were the results he came out with,

22   just generally?

23   A    Generally, he found lower rates of people affected,

24   although the trends were still in a similar direction in that

25   Whites were the least affected and minorities were the most

1    affected, but he -- his rates were lower than ours when he

2    recoded the data.

3    Q    What did Dr. Milyo do with the data that resulted in

4    having lower possession rate information than you came up with?

5    A    Well, he had a number, I believe as we said, he had four

6    different efforts to recode the data.  He did not follow the

7    same coding conventions that we followed in this, in terms of

8    counting people as having ID. or not having ID.  The first

9    thing he did was that anybody who said "Don't know," he called

10   this an ambiguous response, he dropped from the data set.

11           As I mentioned earlier, this is -- really goes

12   against the sort of norms in social science that you would keep

13   those people in the data set to analyze them.  It also creates

14   incorrect misclassifications, because someone who might have

15   said "Don't know" to Question 4, might have said they "Do know"

16   to Question 5.  And so we wouldn't have wanted to drop them out

17   because he's excluding people who later proved that they did

18   not have an ID. or later proved that they did have an ID.  So

19   just because they said "I don't know" to one question on the

20   survey, doesn't mean that you would drop them out of the

21   analysis.

22   Q    What other flaws did Dr. Milyo have in his replications?

23   A    Well, further, when he dropped people from the analysis,

24   he failed to reweight the data.  So he is now excluding -- he's

25   decreasing the sample size, but he's not making an effort to go

Barreto - Direct / By Mr. Dunn                                    83

1  back and tabulate and check the data.  He should check two

2  things:  the people he omitted and the people he included, and

3  assess what the demographic characteristics are, and then to

4  reweight the data so it's reflective of the State of Texas.  He

5  did not do this, and so we would have far less confidence in

6  those results.

7  Q    Was there also a double counting issue?

8  A    Yes.  In -- in many of his tables he refers to the number

9  of people who said "Don't know."  Many of these people were the

10 exact same person who said they don't know to multiple

11 questions.  They might have said they don't know if they still

12 have a military ID.; they don't know if they have a state ID.

13 And so they're not actually separate people, and they're, in

14 fact, just the number of times any person in the survey said

15 the word "Don't know."  And so -- and those people are

16 getting -- the numbers are getting aggregated to make it look

17 like there's a lot, when there are, in fact, very few people

18 who are in these ambiguous categories.

19 Q    So, in -- to sum up, on the survey instrument that you've

20 administered here in Texas, is it similar to the one that you

21 used in Pennsylvania and Wisconsin?

22 A    Yes.

23 Q    Are the weighting systems that you have described here

24 today similar to the ones that you used in Pennsylvania and

25 Wisconsin?

1   A    Yes.

2   Q    Are the other techniques that you and Dr. Sanchez used

3   similar to what you did in Pennsylvania and Wisconsin?

4   A    Yes, they are.

5   Q    And are the results similar across those states, at least

6   insofar as showing racial disparity among ID. possession?

7   A    I would say the results are consistent.  They're not

8   exactly the same.  I believe in the Pennsylvania case we had

9   statistically significant differences for Latinos, but we did

10  not have statistically significant differences for Blacks.

11  They were more likely to not have an ID., but not statistically

12  significant, which is the case here in Texas, there is a

13  statistically significant difference.  So they're consistent,

14  but each state is different, in terms of their law and the

15  types of rates.

16  Q    Thank you, Dr. Barreto.

17          **MR. DUNN:**  I'll pass the witness.

18          **THE COURT:**  Let's go ahead and take our morning

19  break.  So we'll take 15 minutes.

20          And you can be excused, Brandi.

21      **(A recess was taken from 10:03 a.m. to 10:17 a.m.; parties**

22  **present**

23          **THE COURT:**  Okay.  Ready for cross?

24          **MR. SCOTT:**  Yes, Ma'am.

25  //

Barreto - Cross / By Mr. Scott                    85

1                        **CROSS EXAMINATION**

2    **BY MR. SCOTT:**

3    Q     Hello Dr. Barreto.

4    A     Hello.

5    Q     I'm going to -- do you have a cell phone?

6    A     I do not.

7    Q     I thought you might say that.

8          **MR. SCOTT:**  May I approach the witness?

9          **THE COURT:**  Yes.

10   Q    I'm going to loan you my state issued phone.  I've got it

11   in the calculator mode.

12   A     All right.

13   Q    I'm going to get you to do some calculations for me and

14   I'm going to write them down over here on Elmo as best I can.

15   So, let's cover something first before we even go there.  Make

16   sure that thing doesn't go dead.  It's go like a 10 digit

17   password.  So my understanding from what you testified to is

18   there are 92.8 percent of eligible voters who have an

19   acceptable form of ID.  Is that correct?

20   A    I have to have the report in front of me which I do not to

21   see that.  If you give me a copy I can verify that.

22   Q    I -- I mean I can try to --

23         **MR. SCOTT:**  Will you pull up his report, Brian?

24   A    Thank you.

25   Q    Sure.  So as we sit here -- I mean if you sit there you

**EXCEPTIONAL REPORTING SERVICES, INC**

Barreto - Cross / By Mr. Scott                86

1   don't know off the top of your head obviously.  I thought you

2   just testified to that.

3   A    We testified to the numbers by racial and ethnic group, I

4   believe.

5   Q    Okay.

6        **MR. SCOTT:**  Next (indiscernible).  Hold on a second

7   here.

8   **BY MR. SCOTT:**

9   Q    Dr., you know where those numbers are in your report?

10  A    I believe they're -- they might be summarized here in the

11  bullet points.

12  Q    Okay.

13       **MR. SCOTT:**  So, can you enlarge that a little bit.

14  Scroll on down.  Next page.  Scroll on down.  Next page.

15  Scroll on down.

16  **BY MR. SCOTT:**

17  A    You don't see them there so they must be in the findings

18  which would be page 10 or so I would --

19  Q    How about page 10?

20  A    I would guess.  You can keep paging down.  I'll tell you

21  if I see them.  Keep paging down.  Keep paging down.  Keep

22  going.  There we go.

23       **MR. SCOTT:**  How about enlarging that, Brian, please

24  sir.

25  //

1   Q    Rates of possession of IDs.  I'm trying to get to your

2   97.2 percent number for you -- you testified on the people who

3   believed they have IDs --

4   A    Correct.  I remember seeing that in here.

5   Q    -- versus the possible.

6   A    Uh-huh.

7   Q    So are we at that point yet?

8   A    It might be on the next page.  If I had a hard copy I

9   could definitely find it.

10          MR. SCOTT:  Next page.

11  BY MR. SCOTT:

12  A    I believe it's down there where it says public knowledge

13  in that section.

14          MR. SCOTT:  There we go.  Keep going.  Keep going.

15          THE COURT:  What are we looking for?

16          MR. SCOTT:  He's looking for -- we're looking for two

17  numbers, your Honor.  I'm sorry.  I--

18          THE COURT:  No, no.  I know but I'm just kind of --

19          MR. SCOTT:  I'm sorry.  It's the --

20          THE COURT:  I thought I heard one question but it

21  seems like we're looking for something different.  So, what's

22  the question?

23          MR. SCOTT:  We're looking for -- he has two numbers

24  that he identified in direct.  One is the number of persons he

25  believes have an eligible -- a proper ID.

1          **THE COURT:**  Okay.

2          **MR. SCOTT:**  And the other is the ones that in his

3    opinion are best on the survey that possess an acceptable form

4    of ID.

5    **BY MR. SCOTT:**

6    A    There you go.

7    Q    There we go.  So those are the percentages, correct?

8    A    Yes.

9    Q    All right.  So 97.2 percent believe they have one; 92.8

10   percent actually have them based upon your survey analysis,

11   correct?

12   A    That's correct.

13   Q    And so there's a differential of the eligible voters of

14   4.4 percent, correct?

15   A    That would be correct.

16   Q    All right.  So, let's -- and then in your report you say

17   there's 26½ percent of the people without -- that are without

18   documents and are unable to obtain an EIC; is that correct?

19   A    I believe that's correct.  That's in a lower section.

20   Q    All right.  So if we multiply that 26½ percent times that

21   4.4 percent we come up with a 1.17 percent.  Now round it up

22   for us.

23   A    Well, the --

24   Q    Of the eligible voters.

25   A    -- you would multiple the 26.4 times everyone who doesn't

1   have an ID, not just the ones who mistakenly believe they do.

2   Q    Okay.  And what number is that?  You get -- make you some

3   IDs.

4   A    That would be in the inverse of 92.8 so 7.2 I guess.

5   Q    So is that .072?

6   A    No.  100 minus 92.8.

7   Q    Okay.  And so that would be 7.2 is the right number there?

8   A    I think so.

9   Q    And that number would reflect the percentage of eligible

10  voters that believe they have proper ID to vote?

11  A    No, that would be the number of people who do not.

12  Q    Okay.  What percentage of the people out there in Texas

13  population believe that they have proper photo ID but in truth

14  and fact, in your opinion, based upon your survey, do not have

15  adequate documents to even go get an EIC?

16  A    Okay.  I understand your question now.  So I think if we

17  go to the figure, the bar chart.

18  Q    Sure.

19  A    I believe it was figure 2.  Just probably a couple of

20  pages before.

21       **MR. SCOTT:**  Hey Brian, figure two, please.

22  **BY MR. SCOTT:**

23  A    One more.  So here we outline for each of the groups the

24  percent who think they have a valid ID but actually do not.

25  So, 3.8 percent of Whites, 7.0 percent of Blacks and 9.1

1   percent of Latinos.

2   Q    And as a total population of those three categories, what

3   is -- well, first of all, did you do a -- did you based upon

4   your survey come to a conclusion as to the percentage of

5   Latinos who have actually executed provisional ballots and were

6   unable to cure those provisional ballots because they did not

7   have the right documentation or the right ID?

8   A    We did not assess provisional ballots in this study at

9   all.

10  Q    It doesn't matter which category we're looking at on the

11  race, correct?

12  A    Correct.

13  Q    Okay.  So, if we look at the overall number there is there

14  a number that we come up with -- well, first of all, you were

15  at the deposition of Dr. Sanchez.  Maybe this is an easier way

16  to do it, correct?

17  A    Yes, I was.

18  Q    And you were there when Dr. Sanchez and I ran through the

19  numbers and we came up with a factor of 1.17, correct?

20  A    I remember that figure.

21  Q    And you believe that's the correct number for identifying

22  the overall eligible population that would fall into the

23  category of people who do not possess documentation in order to

24  be able to go get a SB 14 compliant ID if they showed up at the

25  poll, correct?

Barreto - Cross / By Mr. Scott                          91

1   A    No.   That would be the percentage of people who do not

2   possess documentation but believe they already have an accepted

3   ID.   What I'm saying is that there are other people who do not

4   have an accepted ID.   They know they don't have an accepted ID

5   and they also --

6   Q    Yes.

7   A    -- cannot get the underlying documents.

8   Q    So the third point.   So let's -- but let's talk

9   specifically about that smaller universe of people.   That is

10  that 1.17 percent number.   May we do that?

11  A    Sure.

12  Q    And that for the record, so it's crystal clear, is the

13  percent of people who believe they have proper ID to vote but

14  if they were to show up at the polls would learn that they

15  don't not only have proper ID under SB 14 but if they go home

16  and try to cure that through the provisional ballot process

17  will not have the documents in order to be able to effectuate

18  that.   Is that correct?

19  A    That is the percentage of people who we estimate cannot

20  obtain an ID because they don't underlying documents such as

21  birth certificate or other things.

22  Q    So let's take a peek at some of the numbers.   I have

23  written down the number -- how many eligible voters do we have

24  in the State of Texas currently, approximately?

25  A    I think it's 16½ Million.   I believe it's in table a.1 in

Barreto - Cross / By Mr. Scott                        92

1   our appendix.

2   Q    So Sixteen Million, Five Hundred Thousand, approximately.

    How many registered voters in the State of Texas?

4   A    I think there's about 13.6 Million.

5   Q    Thirteen Million, Six Hundred Thousand.  Now, you

6   mentioned Dr. (indiscernible) report, do you know how many

7   people he asserted were on his no match list?

8   A    I do not.

9   Q    If I represent to you it's approximately Seven Hundred and

10  Eighty-Seven Thousand, will you accept that for purposes of

11  today?

12  A    That sounds familiar from the discussion yesterday.

13  Q    So you're here with Dr. Herron and you noted that or you

14  saw his number.  I think his conservative estimate was there's

15  about Six Hundred and Twenty Thousand.  I think his exact

16  number was 619,354.  Do you recall that?

17  A    I recall that.

18  Q    What's the largest county in Texas?

19  A    I believe that would probably Harris County.

20  Q    And do you know what the approximate number of registered

21  voters in Harris County is?

22  A    I don't know the exact number, no.

23  Q    Are you okay if we use about Two Million?

24  A    If you say so.

25  Q    All right.  So with your handy calculator and by now I bet

1    it's locked.

2    A     Yeah.

3          **MR. SCOTT:**  All right.  May I approach the witness,

4    your Honor?  Oh, thank you.

5    Q     (indiscernible).

6    A     All right.  No password, huh?

7    Q     No.  I'm going to get you to help me do the math.  So,

8    we've got the real world versus survey, correct?  I mean, your

9    survey is not -- let's clean that up.  We have what has

10   actually happened in a November, 2013 election in Texas,

11   correct?

12   A     Yes there was an election in November, 2013.

13   Q     And there were people who were unable to vote because they

14   didn't possess proper ID, correct?

15   A     Presumably.

16   Q     There were people who showed up at the March and May

17   primaries that were run in Texas.  You know that.

18   A     Yes there were primaries on those dates.

19   Q     And those were conducted under SB 14, correct?

20   A     Yes.

21   Q     So, let's take your percentage of people who think they've

22   got everything they need to show up to go vote but when they

23   realize they don't have it they don't have sufficient

24   information to even go -- or documents to even go cure that.

25   Let's use that 1.17 percent number if you would and multiply

1   that times 16½ Million.

2   A     Okay.

3   Q     Tell me what you've got.

4   A     One Hundred and Ninety-Three Thousand.

5   Q     Okay.  Let's do the same exercise.  Do the 1.17 times

6   Thirteen Million, Six Hundred Thousand.

7   A     Okay.

8   Q     Yes, sir.  Number.

9   A     One Hundred and Fifty-Nine Thousand.

10  Q     Now if you'll multiply 1.17 times the Seven Hundred and

11  Eighty-Seven Thousand that Dr. Ansolabehere identified as no

12  matches.

13  A     Okay.

14  Q     What number did you get?

15  A     Nine Thousand, Two Hundred.

16  Q     Now if you'll do Dr. Herron's Six Hundred and Twenty

17  Thousand times the 1.17.

18  A     Okay.

19  Q     And number?

20  A     Seventy-Two, Fifty.

21  Q     Seven Thousand, Two Hundred and Fifty.  And then if you'll

22  do Harris County, Two Million.

23  A     Okay.

24  Q     And the number you get.

25  A     Twenty-three Thousand, four hundred.

1    Q    Twenty-three Thousand, four hundred.  So if we extract

2    laid out your survey to these numbers, those would be the

3    number of individuals, theoretically, that might fall into that

4    category, right?

5    A    Into the category you described.

6    Q    Yes.  So -- and you don't know how many people have past

7    provisional ballots but at best those people under the results

8    of your survey would have been able to cast a provisional

9    ballot, correct?

10   A    I --

11   Q    Because they didn't have no photo ID?

12   A    I don't know what they would have been able to cast.

13   Q    Okay.  Well, can you think of a scenario -- are you

14   familiar with SB 14?

15   A    Yes.

16   Q    And SB 14 has a requirement, correct that people have --

17   A    About what?

18   Q    In order to cast a ballot are supposed to show appropriate

19   photo ID, correct?

20   A    Yes.

21   Q    So, at least based on my understanding of what you've

22   testified too, none of those individuals have proper ID to

23   comply with the terms of SB 14, correct?

24   A    Well, this is just a fraction.  There's a lot more who

25   don't have the proper ID.

Barreto - Cross / By Mr. Scott                                     96

1    Q    Yes, sir.  There's a lot more than this that don't have it

2    but at least these are people that you have identified as

3    thinking they had the right ID in order to be able to cast a

4    ballot.  So they're not staying home because they don't think

5    they don't have the right ID, right?

6    A    I don't know whether or not they'll stay home or not.

7    These are the percentage of people who think they have a proper

8    ID but in fact they lack the ability to even remedy it.  There

9    are many, many more people who just incorrectly think they have

10   the proper ID and could potentially vote.

11   Q    Fair point.  So if we look -- I'll tell you what.

12        **MR. SCOTT:**  Brian, will you pull up Stan Standard's

13   deposition?

14   Q    Do you know who Stan Standard is?

15   A    Yes.

16   Q    Who is he?

17   A    He's the registrar of Harris County.

18   Q    Have you looked at -- he's the County Clerk.  Have you

19   looked at his deposition in this case, his documents?

20   A    No.

21   Q    Let's see here.  Let's go to line 16 on page 152 which is

22   already lined up there and of those let's break it back down by

23   election.  We know in the primary -- oops, slow down.

24        "QUESTION:  We know in the primary elections which

25        were held back in March of this year, the Republican

Barreto - Cross / By Mr. Scott                    97

1    primary, there were approximately 25 people who

2    presented without proper ID and were asked to cast a

3    provisional ballot.

4    "ANSWER from the county clerk in Harris County:  That

5    is correct.

6    "QUESTION:  And of those at least none of those

7    people -- I'm sorry, four of those people came back

8    and provided adequate identification.

9    "ANSWER:  Yes.

10   "QUESTION:  And those four ballots were then counted;

11   is that correct?

12   "ANSWER:  Correct.

13   "QUESTION:  The other 21 were not?

14   "ANSWER:  Correct.

15   "QUESITON:  Okay.  On the democratic side of the

16   primary there were ten ballots cast provisionally

17   because they did not present proper photo ID?

18   "ANSWER:  Right.

19   "QUESTION:  One of those people came back and

20   presented a proper ID and that ballot was in fact

21   counted?

22   "ANSWER:  Correct.

23   "QUESTION:  Then back in November of 2013, I think

24   you said there were 105 provisional ballots that were

25   cast because the person did not have proper ID?

Barreto - Cross / By Mr. Scott                98

1          "ANSWER:  Right.

2          "QUESTION:  Of those, six of them did not, were not

3          even registered to vote?

4          "ANSWER:  Correct.

5          "QUESTION:  And then we you-all did a research or a

6          further analysis you found about two-thirds of 66 of

7          the remaining 99 people actually did in fact have

8          photo ID through the Department of Public Service?

9          "ANSWER:  Yes, and eight of them actually came in and

10         cured?

11         "QUESTION:  Okay.  So 8 out of that 99" --

12         **MR. SCOTT:**  It gets confusing here 'cause I was

13    asking a question so let's skip down a little bit."

14         **MR. DUNN:**  Your Honor, obviously I don't mind

15    representing a deposition but are we just going to read it or

16    are we going to question this witness?

17         **MR. SCOTT:**  Well, no, I -- so it appears -- you said

18    you hadn't read it and I didn't want to -- I wanted you to be

19    informed on what the basis of my next set of questions are and

20    so one of the -- one of the things that's very clear is that --

21    and Brian, could you pull that down and get the --

22         **(Pause)**

23         **MR. SCOTT:**  If you'll do the Elmo.

24    //

25    //

1   **BY MR. SCOTT:**

2   Q    So Harris County, the largest county in this great state

3   of Texas, they've got about 2 million registered voters in it.

4   Looking at your numbers at any given time there's 23,400 people

5   that at best could cast a provisional ballot and yet when we

6   look at the real world results we count up no more than 150

7   over the course of 3 elections in a county of 2 million people

8   and that -- how is it possible?  How is it possible, using your

9   survey extrapolations that you could be so wrong?

10       **(Laughter)**

11            **MR. SCOTT:**  Okay, strike that.  All right.

12            **THE WITNESS:**  I'd be happy to answer that.

13            **MR. SCOTT:**  Yes, I'm not going to let you now.

14       **(Laughter)**

15   Q    And I think you've also testified today that you assumed

16   there may even be a larger group of people who might want to

17   vote but are inhibited from going out there and casting a

18   ballot because they know they don't have a proper ID, right?

19   A    Correct.

20   Q    Do you know what number of people that you ascribe that to

21   be?

22   A    Well, we describe that very clearly in the report.  These

23   numbers that you have here are a very small sliver of the

24   people we believe to be affected.  So I believe it was 516,000

25   registered voters statewide and 1.1 million eligible voters

Barreto - Cross / By Mr. Scott                    100

1    statewide who do not have an unexpired ID.

2    Q    In this -- in your report you identify -- right.

3         **(Pause)**

4    Q    In your report you identify two different groups that you

5    pull the survey universe respondents from, correct?

6    A    Two general groups, yes.

7    Q    One was an RDD or a random digital dial and the other was

8    a group that was out of a list; is that correct?

9    A    More or less, yes.

10   Q    And so -- and I think your testimony here today is that

11   you did not know the identity of either of those groups of

12   individuals.

13   A    I did not know.

14   Q    And in order to be able to maintain or keep that

15   information you felt that you would have had to design a survey

16   that started from the beginning and ensured that each of the

17   respondents knew that they were going to be given a survey that

18   the results of their identity were going to be passed on,

19   correct?

20   A    That's the general practice, yes.

21   Q    And so you've done surveys like that before?

22   A    I have done some interviews, what are called qualitative

23   interviews, exactly like that were you sit down and have a one-

24   on-one discussion and you have to get the person to sign a form

25   informing them that you would use their name and identity in

the discussion of the results.

Q So a decision was made in this case not to pursue that type of survey but instead do a survey that kept the identity of the survey respondents confidential, correct?

A We certainly wanted to keep the survey in practice with social science which is to keep the respondents confidential, yes.

Q I mean there is no -- there was nothing that prevented you at all from being able to do a survey in this case or recommend a survey be taken in this case where the identity of the people who were the respondents was captured, correct?

A Yes, there was.

Q Well, what was that? Did the lawyer say you couldn't do one like that?

A Well, the -- no, the first is that we recommended a random digit dial in which we would not be able to capture accurately the identity and full information of the respondents because it's not available on the database and, secondly, because we were very interested in having a reliable survey, we recommended not capturing the identity of the respondents so that they would have a more honest and comfortable survey experience.

Q Well, you had a lot of control over how Pacific Market Research did the survey, correct?

A We recommended the general guidelines but then they

Barreto - Cross / By Mr. Scott                    102

1    actually made the phone calls.

2    Q    Well, you could have told them to capture the information

3    however they need to do it, correct?

4    A    Capture what information?

5    Q    The information to who's being dialed.

6    A    It's possible to capture that information, yes.

7    Q    And had you told them to do it before the survey was done

8    we'd have that information, correct?

9    A    Well, we would have had to inform the subjects.  Pacific

10   Market Research would have had to get clearance from the Market

11   Research Association as well as APOR before they turned that

12   information over to us, the researchers.  And so, it would have

13   been quite difficult and we believe it would have made the

14   survey results less reliable.

15   Q    Well, we could have done a lot with that information

16   though, right?  We could have checked that information about

17   those respondents against perhaps the Ansolahehere match and no

18   match list, correct?

19   A    I don't know what you would have done with the data.  You

20   could have fielded your own survey.

21   Q    So do you know in the list that was purchased from MSG --

22   I think that's who you said you purchased it from.

23   A    I believe so, yes.

24   Q    Do you know where they got the names?

25   A    Where who got the names?

EXCEPTIONAL REPORTING SERVICES, INC

Barreto - Cross / By Mr. Scott                    103

1  Q    MSG got the names that were on the list.

2  A    I did not have any discussions with them.  That was

3  Pacific Market Research.

4  Q    So that was Pacific Market Research that got that

5  information for you?

6  A    They got it for themselves.  I mean they're regularly in

7  the practice of purchasing lists and generating an RDD sample

8  for their projects.

9            **MR. SCOTT:**  Okay.  Brian, would you bring up the

10  Pacific Market Research?

11  Q    Now Latino Decisions is a division of Pacific Market

12  Research; is that correct?

13  A    Yes.

14  Q    And Pacific -- will you scroll up for me, Brian?  Let me

15  read from this.

16            "Latino Decisions is a" --

17            "Latino Decisions, a division of Pacific Market

18            Research, is the leader in Latino political opinion

19            and public policy research.  Latino Decisions is a

20            joint effort between Pacific Market Research and

21            Dr. Gary Segura and Dr. Matt Barreto."

22            So are you the "Dr. Matt Barreto" that is involved in

23  the joint venture between Pacific Market Research?

24  A    Yes.

25  Q    Okay.  Did you receive any portion of the money that was

Barreto - Cross / By Mr. Scott                    104

1   paid by the attorneys to Pacific Market Research for the survey

2   that was done?

3   A    No, that's their -- they have an entire separate business.

4   Q    So your operation or your ownership in this entity is

5   completely different than your work you do as an expert in this

6   case?

7   A    I don't understand.  You mean the Latino Decision part?

8   Q    Yes, sir.

9   A    Yes, entirely separate.

10  Q    Do you maintain an office over there?

11  A    No.

12          **MR. SCOTT:**  Brian, could we bring up the questions?

13  I think it's Exhibit -- their Exhibit 4.  It's the last

14  exhibit.  There we go.  Would you enlarge that please?

15          **(Pause)**

16  Q    So this is the study that -- Dr. Sanchez's deposition and

17  your deposition that we understood was the script that was

18  provided to the surveyors who conducted the survey that gave

19  you the results that you have derived and based your opinion on

20  in this case, correct?

21  A    Yes.

22  Q    We also now know that this has an additional part to

23  question -- was it question one that you covered with --

24  A    S2.

25  Q    S2.

Barreto - Cross / By Mr. Scott                    105

1      **MR. SCOTT:**  Will you bring that up; enlarge that one

2   for me, Brian?

3   Q    It says:

4            "Okay, just to make sure you are eligible to take

5            part in our survey about voting can you confirm that

6            you are 18 or over and currently a U.S. citizen and

7            have lived here in Texas for than 30 days?"

8            So what version of the survey is this that we're

9   looking at that's now an exhibit in this court?

10  A    This is -- I don't know what you mean by "version."

11  They're not numbered.

12  Q    The information you covered during direct examination with

13  Mr. Dunn did not have -- you said there was an initial part of

14  this question that was not listed on the survey.

15  A    What we -- what I indicated was that there was just a

16  typographical error in this that we very clearly identify in

17  the report itself on page nine where we give the full question

18  wording and we state that that was the question wording that we

19  used for the screener.

20  Q    So I'm sorry.  I'm tired and I'm probably not smart enough

21  to keep up with this but is this the question that was asked of

22  the people that got a call from the people at Pacific Market

23  Research?

24  A    The question is the question that was -- that is referred

25  to in the report in which we state in the report "This is the

1    question that we used to start the survey."

2              THE COURT:  Well, where did this come from?

3              THE WITNESS:  This is the script that we send to

4    Pacific Market Research.  We use this as the placeholder and

5    we're verifying exactly what needed to go into that section of

6    who is eligible to vote and that's properly indicated in the

7    report and et cetera.  At the point at which we verified

8    exactly what that sentence needed to say "currently on extended

9    supervision, for parole," or whatever the wording was, that is

10   the script that was delivered.  The only error that was made

11   was that that was not then copied and pasted into this hard

12   copy that Professor Sanchez and I had because it was right at

13   the last minute when it was implemented.

14   BY MR. SCOTT:

15   Q    Well, how long ago was that that you discovered that

16   mistake?

17   A    It's not a mistake.  It's very clearly indicated in the

18   report which we filed over a month ago or June 27th what the

19   question was.

20   Q    Well, I think it was last week that you and I had a

21   deposition and myself and Dr. Sanchez had a deposition.

22            Do you recall that?

23   A    Yes.

24   Q    And do you recall what Dr. Sanchez's answer was?

25            MR. SCOTT:  Will you pull up Dr. Sanchez's

1   deposition?  I'm sorry.

2       **(Pause)**

3           **MR. SCOTT:**  How about 6111?

4       **(Pause)**

5   **BY MR. SCOTT:**

6   Q    Well, we'll go ahead and cover that.  That's not the

7   question I was going to ask you but --

8           "And so how many percent -- what percent of the

9           population of those surveyed were felons and

10          ineligible to vote?

11          "ANSWER:  We didn't ask that question in the survey."

12          I'll tell you what.  Go to page 172, line 25, for me

13  please, sir.  It's going to carry you over to the next page I

14  think; 172, line 25.  I'm sorry?

15      **(Voices off the record; pause)**

16          **MR. SCOTT:**  Huh, that isn't it.  I'll tell you what.

17  I'll find it in a little bit for us.

18  Q    Do you recall in the deposition that I asked Dr. Sanchez

19  if this was the report that was actually used to ask the

20  questions, right?  We talked about that a second ago.

21  A    Yes.

22  Q    How did the information, this additional information you

23  identify in your sworn declaration get over to the folks who

24  were asking the question?

25  A    So do you want me just to explain that process of how a

1    survey is implemented?

2    Q     I'm just really looking for an answer to that question.

3    A     Okay, yes, I'll be happy to.

4            So we developed the survey.  We write the survey

5    which appears in the paper.  The survey takers are not holding

6    pieces of paper in front of them and reading it.  There's a

7    person at the survey firm who programs the survey so that it

8    comes up on a computer screen.  The person has a headset on and

9    they can type in responses directly back into the computer

10   screen.

11           That particular question, we wanted to verify that we

12   had the correct eligibility on.  So the question that is on the

13   PDF is the version of the question that we had while we were

14   waiting to verify that.

15           As we very clearly indicate in the report, we asked a

16   question that added up a phrase about "Are you on probation, or

17   extended supervision for a felony?"  When we verified that that

18   was the -- our understanding of the requirement, we sent that

19   to the survey firm.  They enter it into the programming guide.

20   It did not get entered, as I mentioned with Mr. Dunn.  It was

21   just a typographical error to copy and paste it into the PDF.

22           At that point, when you're implementing a survey, the

23   PDF version is not the live version.  The live version is the

24   one that's in the programming system that the interviewers are

25   reading aloud to the persons on the other end of the phone

1    which is why we indicated very clearly in the report on page

2    nine that that was the question that was asked.

3    Q     And so you could have had anything implemented into this

4    survey because it goes into a computer screen and we don't have

5    the actual computer screens that were used by the surveyors,

6    correct?

7    A     No.

8    Q     No, I'm sorry, we do?

9    A     No.  You asked two questions there.  You said I could have

10   implemented anything and you don't have the computer screens.

11   So I was answering the first question.

12   Q     Oh and what about the second one?

13   A     You do not have the computer screens I don't believe, no.

14   Q     Well, you're again much sharper than me.

15          Do we have as part of your report the actual

16   questions in the form that were on the computer screens that

17   the surveyors were asking the respondents?

18   A     Yes.

19   Q     And where is that in your report?

20   A     That's the survey appendix.  The only change is the copy

21   and paste error which we identified and we have the full script

22   in the report on page nine.  All the other questions are

23   exactly as read on the screen.

24   Q     Why didn't you just print off a copy of this last report?

25   When was this -- strike that.

Barreto - Cross / By Mr. Scott                    110

1          When was this survey actually performed?

2    A    I believe it's in our report we indicate the days.  It was

3    earlier in 2014.

4    Q    And so January, February, March?

5    A    I think it was in March.  I'll have to look at the dates

6    that are listed here.

7    Q    So in March 2014 the survey as performed and was in the

8    computer databases of those places, correct?

9    A    Yes.

10   Q    And today is September something, 4th, and we're still

11   sitting here with something that's not the version that was in

12   those computer screens, correct?

13   A    Incorrect.  I just --

14   Q    Is it your testimony that this Exhibit 7 -- Plaintiffs'

15   Exhibit 753.1 is what was actually given, administered by the

16   surveyors?

17   A    Everything except the phrase that's missing on S2.

18   Everything else, yes.  The full wording of S2, because we found

19   it very important, is listed up front on page nine of our

20   report.

21        MR. SCOTT:  So, Brian, will you pull this

22   questionnaire back up on the thing for us?

23        (Pause)

24        MR. SCOTT:  If I could ask a couple of questions

25   about it, sir.  Let's roll down to 7B.  If you'd enlarge that

1    please, sir.

2    Q    Question 7B:

3              "If you can take your driver's license out real quick

4              and check the expiration date.  Is the expiration

5              date after January 15, 2014 or like some people we've

6              talked to did it expire before January 15, 2014?"

7              So let's go down to question 9A.  Again, the phrase:

8              "Is the expiration date after January 15 or like some

9              people we've talked to did it expire before January

10             15th, 2014?"

11             So when you drafted up this survey question no

12   questions had been asked, correct?

13   A    I don't understand the question.

14   Q    Well, you hadn't done any surveys before you did the

15   survey, right?

16   A    I've done hundreds of surveys.

17   Q    Well, let's take it piecemeal.  The survey with questions

18   we're looking at up here on the screen --

19   A    Uh-huh.

20   Q    -- are -- were those questions written the way they were

21   before any of those questions were asked of the first survey

22   respondent?

23   A    Yes.

24             **MR. SCOTT:**  Brian, will you turn to question 16?

25   It's that bottom question down there.  If you could enlarge

1    that please, sir.

2         **(Pause)**

3    Q         "Think about the last time you had to use or show

4              your birth certificate.  Some of the people we've

5              talked to have lost or misplaced their official birth

6              certificate.  How about you?  Do you have your

7              original or an official certified copy, not a

8              photocopy, of your birth certificate with you or like

9              some people do you not have your original or

10             certified copy of your birth certificate?"

11             Now when I asked Dr. Sanchez at the deposition you

12   sat next -- sat over there by him, did -- he said there wasn't

13   any -- he could think of no scholarly words to point to for the

14   inclusion of these suggestive phrases.

15             Did you agree or disagree with that decision he took

16   that day?

17   A    I don't believe that's what he stated.

18   Q    Okay.  Do you believe there's scholarly words that support

19   the inclusion of this?

20   A    Certainly.  This is a very standard --

21   Q    What are they?

22   A    -- question wording as is the other one.

23   Q    Right.  What are they?

24   A    I mean there's thousands if not hundreds of other surveys

25   that use this exact sort of question wording.

1   Q     How about two or three?

2   A     Well, the American National Elections Study which is one

3   of the most notable, longest running studies, has been testing

4   over time how to ask people sensitive questions and has

5   developed an array of understanding that you use phrases like

6   this to get a better, more accurate response.

7   Q     How about a couple of more?

8   A     I mean virtually every survey uses this type of wording.

9   Q     But scholarly words that support the inclusion of this

10  kind of information?

11  A     Right.

12  Q     No, I know.  I've got one from you of the hundreds.

13  A     I mean --

14  Q     Is there another?

15  A     Virtually every survey that asks people about these types

16  of information uses these types of questions to elicit the

17  information.

18  Q     In your -- in your declaration, did you include all these

19  survey results that you've identified a second ago --

20  A     We --

21  Q     -- of these hundreds?

22  A     -- did not because it is so commonplace that it goes

23  without saying in our discipline.

24  Q     Did you include one?

25  A     We did not.

1   Q    Okay.  Did you -- can you direct me in your declaration to

2   where the weighting variables you used in this case to

3   adjust -- I think you said based upon census data -- the survey

4   results that you used to base -- to make the predictions you've

5   made in this case?  Are they in your survey -- are they in your

6   document?

7   A    The weights, yes.

8   Q    Yes.  Where are they?

9   A    They're in the dataset.

10  Q    And are they identified, the steps **(recording cut out)** you

11  undertook in the declaration?

12        Hey, Brian, will you pull up the declaration of

13  Dr. Barreto?

14     **(Pause; voices and whispers off the record)**

15        So, is it in the written portion of the document that

16  we can find these weightings, the process, the procedure you

17  undertook to weight?

18  A    Yes.

19  Q    Okay.  Where do we go to?

20  A    In the written document we describe that we used a raking

21  weighting system to weight each individual racial group to the

22  known census estimates.

23  Q    So, if we were able to pull up one of the respondents, was

24  that done to each respondent on a separate basis, or was that

25  done --

1   A    Correct.

2   Q    -- just globally?

3   A    Correct.  Each respondent would have a separate weight

4   value based on their demographics.

5   Q    And, so, what section is the section that directs us for

6   each one of those respondents which one we go to?

7   A    I don't understand your question.

8   Q    Sure.  I -- I understand that you applied a weighting

9   variable to your results in order to make -- to adjust them.

10  And I think your testimony was that that is critical to the

11  process, correct?

12  A    Yes.

13  Q    In fact, you have some questions about Dr. Hood's work in

14  this case because you disagreed with the weighting variable he

15  used, correct?

16  A    Correct.

17  Q    Now, what I am trying to identify, I guess, is, other than

18  just globally, raking process, the steps that you used on an

19  individual person or individual results.

20  A    Okay.

21  Q    Where is that?

22  A    Well, we described what the process is that we used; we

23  described which variables we weighted to; and we described the

24  source, the census that we weighted to.

25  Q    And what page do we need Brian to go to?

1   A    If you give me a hard copy, I can find it.

2   Q    I don't have one.  Did you bring one?  I'm not trying to

3   be cute.  I just -- I don't have one.

4            **THE COURT:**  Why is he -- why is he up here without

5   that?  We can't give him a report to look at?

6            **MR. SCOTT:**  Have I got one?

7            **MR. DUNN:**  I'm happy to give it to him, but I also

8   don't have a printed version of it.

9            **MR. SCOTT:**  We've gone electronic.

10            **THE COURT:**  Well, you all certainly don't want him to

11   give him mine, do you all?

12            **MR. SCOTT:**  No.  But -- anybody have a hard copy?

13   Anybody out there in the crowd have a hard copy?

14       **(Laughter)**

15            **THE COURT:**  There's thousands of pages in this

16   courtroom, and we don't have a report?

17            **MR. SCOTT:**  Over there, your Honor.

18       **(Pause; voices and whispers off the record)**

19            **MR. SCOTT:**  June 27?

20            **THE WITNESS:**  That sounds right.

21            **MR. SCOTT:**  Okay.  Thank you, Ezra.

22            **THE WITNESS:**  Thank you, Mr. Scott.

23       **(Pause)**

24            **THE WITNESS:**  Okay.  I believe it's found on page 16.

25            **MR. SCOTT:**  Page 16, Brian.

1        **(Pause)**

2    **BY MR. SCOTT:**

3    Q    Could you direct me to a more specific paragraph we can

4    turn to?

5    A    Sure.  The second full paragraph, which is the lengthy

6    paragraph that starts with "after collecting," that paragraph

7    that you have on the screen, yes.

8    Q    Well, I'm -- will you read into the record that portion, I

9    guess, that displays the specific steps you undertook for each

10   category that you applied a weighted variable for in your

11   results?

12   A    Certainly.

13   Q    Sure.

14   A    It says here:

15            "After collecting the data for the main Texas sample

16            and the Black and Hispanic over samples, underlying

17            demographic characteristics of the respective samples

18            were examined and compared to the known universe

19            estimates from the 2012 U.S. Census American

20            Community Survey for Texas.  Where there were any

21            discrepancies, a weighting algorithm was applied to

22            balance the sample called 'raking ratio estimation.'"

23            There we have a footnote number 14; that refers to a

24   paper that has the full description.  Would you like me to

25   continue reading?

Barreto - Cross / By Mr. Scott                          118

1   Q    Well, so, maybe my question wasn't clear.  There's --

2   you've not identified the formula you actually used.  I'm

3   trying to understand how it is two Ph.D.'s, you and Dr. Hood,

4   can't look at the same data and get the same result.  And, so,

5   I want to make sure I understand, because I understood from

6   somebody in this case, whose name I won't now mention, that you

7   can't derive from your report the weighting variable you

8   applied in this case.  And, so, that's why I'm trying to get

9   you to identify on page 16 that variable that was applied in

10  this case.  And is this the only reference you have in that

11  report?  I want to make sure we're not missing it.

12  A    This is the reference that, for anybody who knows how to

13  or has experience creating weights and applying weights, this

14  reference would be extremely clear.  They would say, okay, you

15  used a raking algorithm to match to the ACS.  They could look

16  at the Battaglia article if they wanted to; presumably they

17  would not need to; and they could very easily replicate the

18  weights.  The weight variable itself is listed in the dataset,

19  which I know that Dr. Hood found, because he has a lengthy

20  discussion of it.  So, this is a quite clear explanation for

21  people who do create survey weights.

22  Q    Okay.  So, Brian, will you pull up the -- I think you made

23  reference in your direct to the *AppleWhite* decision over in

24  Pennsylvania.  I think it was *AppleWhite*.

25  A    That was Pennsylvania, I believe, yes.

Barreto - Cross / By Mr. Scott                        119

1   Q    And you did a survey similar to the one in here.  You

2   conducted a survey for some attorneys out there, or over on the

3   East Coast, correct?

4   A    Yes.

5   Q    And, Brian, I think I've highlighted this one, if you'd

6   turn to the highlighted portions.

7        So, this is the judge, and this is as a result of the

8   preliminary injunction hearing, who found, for the most part,

9   that your opinions were not credible or were given only little

10  weight.  There were numerous reasons -- numerous reasons for

11  this, including demeanor, bias, lack of knowledge of

12  Pennsylvania case law regarding conformity, and he lists a

13  whole bunch of other things there.

14       If you'll keep on going up.  Keep on going.

15            "It is also noteworthy that Dr. Barreto's survey

16            would be of little practical use to those charged

17            with implementing Act 18.  This is because his survey

18            is incapable of identifying individuals who need to

19            be contacted for public outreach and education

20            purposes, beyond the state's survey" -- "beyond the

21            survey's 2,300 respondents.  For this important

22            reason, his approach was given significantly less

23            weight than the approach employed by DOS and Penn

24            Department of Transportation."

25            In fairness to you, there was -- the data was

Barreto - Cross / By Mr. Scott                    120

1   reworked by some folks later on in the case and used at least

2   in part in that case.  And I think that must have been what you

3   were referring to during your direct examination.  Is that

4   correct?

5   A    I don't understand that question.

6   Q    Well, ultimately, some of the survey and information that

7   you pulled was made use of in this case, correct?

8   A    I believe all of it was made use of.

9   Q    Well, it was all made use of in the preliminary hearing,

10  correct?  The judge discounted it.

11  A    In --

12  Q    He found your opinions were very difficult to follow.

13  A    Correct.

14  Q    In fact, you didn't provide the underlying data that was

15  necessary for them to be able to replicate that which you were

16  doing.

17  A    Incorrect.

18  Q    You didn't -- in this case, have you provided the

19  weighting variables?  You said you did, but did you?

20  A    We provided the exact same information as we did in this

21  case.

22          **MR. SCOTT:**  Okay.  I thank you for your time.

23          I'll pass the witness.

24          **THE WITNESS:**  Thank you.

25  //

**REDIRECT EXAMINATION**

1

**BY MR. DUNN:**

2

Q    Let me take a look a the cover page of that Pennsylvania

3

opinion, if you don't mind.

4

**(Pause; voices and whispers off the record)**

5

     **MR. SCOTT:**  Oh, yeah.  Absolutely.

6

Q    This opinion here, Dr. Barreto, was it reversed by the

7

Texas -- by the Pennsylvania Supreme Court?

8

A    Yes, it was.

9

Q    And was the case remanded for a new trial?

10

A    That's correct.

11

Q    In the new trial, was your survey credited as one of the

12

findings to grant an injunction in the case?

13

A    Yes, it was.

14

Q    In fact, was there not another expert, a Dr. Shaw, that

15

was called, who testified that your survey administration was

16

top flight?

17

A    There was another expert; I didn't speak with him.  And --

18

Q    Dr. Marker, I believe.  I'm sorry.

19

A    -- and I believe he testified to the validity of the

20

survey, yes.

21

Q    And ultimately it was found persuasive by the Court; is

22

that true?

23

A    Yes.

24

Q    And, then, you testified in Wisconsin, and your opinions

25

1   were credited by that judge.  Is that true?

2   A    Yes.

3   Q    So, as far as you giving testimony in court on photo I.D.,

4   so far, by my count, you're two to -- two to zero?

5   A    Both the final decisions that we have at this point, and

6   both have -- have relied on our survey, yes.

7   Q    Let's go back to the survey instrument for a minute.  We

8   don't need to pull it up.  Are you lying to us about what you

9   asked in the survey?

10  A    Absolutely not.

11  Q    Are you sitting here in federal court under oath telling

12  this judge that you asked these questions but you really asked

13  some different ones?

14  A    Absolutely not.

15  Q    What would happen to you if that -- if that was borne out

16  to be true?

17  A    Well, I -- I would be discredited, and the research

18  wouldn't be taken seriously.  I felt that we were very honest

19  about pointing out that there was a typographical error and

20  that we had included it very clearly on page nine of our

21  report.

22  Q    Now, the first set of disclosures you made in this case

23  was back in June; is that right?

24  A    Yes.

25  Q    What all did you provide that was produced to the State in

1   this first set of disclosures?

2   A    We produced the report of June 27th.  We produced the

3   survey instrument.  We produced the Table A appendixes, the

4   appendix of tables.  We produced the full entire dataset with

5   weights, and I believe we produced our C.V.'s, as well as any

6   other small pieces of information we relied on.

7   Q    The -- you were asked a series of questions about hiding

8   the ball on your weighting.  Do you remember those?

9   A    Yeah.

10  Q    Okay.  And Dr. Hood, which you mentioned earlier, made

11  some criticism of your weighting and did his own; is that

12  right?

13  A    Yes, he did.

14  Q    Tell us how you found out what the magic formula was that

15  Dr. Hood used for weighting.

16  A    Well, it's quite simple for anyone who does weighting to

17  look at; you just pull the weight variable up and look at it.

18  Q    Where is that at?

19  A    It's in the dataset and it has the label called "weight."

20  Q    So, the way you got Dr. Hood's weighting formula was by

21  looking at his dataset?

22  A    Yes.

23  Q    Can you tell from reading Dr. Hood's opinions how he knew

24  what your weighting was to begin with?

25  A    Yes.

1  Q    How was that?

2  A    He explains that he tabulated the data using our weight

3  and that he examined our weight variable and that he just

4  didn't find it credible, and so he decided to create his own.

5  Q    Where would he have found the weight variable?

6  A    It was in the dataset labeled "weight."

7  Q    And the dataset that you're referring to; was that

8  produced with your report?

9  A    Yes.  We consider it really part of the report.  The

10 report is just really the tables of the dataset.

11 Q    So, you were also asked a series of questions about a few

12 of the inquiries in the instrument where you had phrases,

13 something similar to, "like some other people we've talked to."

14 Do you remember those questions?

15 A    Yes.

16 Q    So, it sounds like you were pushing the needle to me.

17 You're trying to get the data you want?

18 A    Absolutely not.  We're trying to do just the opposite,

19 trying to get the most objective, honest answers from

20 respondents.

21 Q    Why would you do that?  Why would you do it this way?

22 A    Well, there's -- it's well known and has been well studied

23 in public opinion that sometimes respondents might be

24 uncomfortable admitting that they don't have something that

25 they should, in this case their birth certificate or a piece of

Barreto - Redirect / By Mr. Dunn                    125

1    identification.  And research has found that when you tell

2    them, you know, other people may not have this, you're not the

3    only one, that they're much more likely to give you their

4    honest and accurate answer.  And, so, this question wording is

5    all based on decades of public opinion and research that

6    suggests this is the most accurate way to ask these questions.

7    Q    If you hadn't have asked questions -- if you hadn't

8    included that phrase in the question, is it -- is there

9    research that demonstrates that some people won't just be

10   honest about their fallibilities?

11   A    Yes.  It's called social desirability.  I believe it's

12   actually discussed in our rebuttal report, as well as one of

13   the other State experts.

14   Q    And, again, these phrases, were they used in the

15   Pennsylvania and the Wisconsin survey?

16   A    Yes.  This is very similar question wording.

17   Q    All right.  So, now I'm going to ask the question

18   Mr. Scott asked but then decided he didn't want the answer.  Do

19   you remember the -- the inquiry about your percentages and

20   Harris County and these things?

21   A    Yes.

22   Q    So, how could you be so wrong, Dr. Barreto?  First, are

23   you?

24   A    No.

25   Q    Why not?

1   A    What we're attempting to do is to isolate the number and

2   the percentages of people who do not possess qualifying I.D.

3   under SB 14.  The point of our inquiry is not to assess how

4   many people passed a provisional ballot.  So, the comparison of

5   provisional ballots in Harris County to the number of people

6   who don't have an I -- who don't possess an I.D., it's not even

7   comparing apples and oranges.  They're just completely separate

8   studies.  Our study was attempting to look at how many people

9   do not possess this I.D., and we've enumerated both the

10  percentages and the raw numbers in our report.

11  Q    Do you have any sense -- did you study what percentage of

12  people showed up for these two elections since Senate Bill --

13  the two main elections since Senate Bill 14 has been in effect?

14  A    We did not attempt to look at voter turnout or provisional

15  ballots because a number of people who don't have the

16  documentation are not going to be eligible to vote and may not

17  vote at all.  And, so, our sense was that looking at

18  provisional ballots is asking the wrong question.  Many people

19  don't have this I.D., and they will not go and vote.  And, so,

20  the provisional ballots don't tell the full story.

21  Q    Despite not having studied it, what -- if I were to tell

22  you that the elections at issue were for constitutional

23  amendments to the Texas constitution and some local county

24  officers, in one respect, and then political primaries for

25  statewide officers, would you expect turnout to be high or low

1    in those?

2    A    Well, as compared to November of even-numbered-year

3    elections, such as 2012 or 2014, we would expect those other

4    elections to have very low voter participation in them.

5    Q    So, is there anything about the analysis that you've

6    presented to this Court that deviates in any regard from

7    accepted social science in regards to surveys of political

8    issues, political and election issues?

9    A    No, not at all.

10            **MR. DUNN:**  Thank you, Dr. Barreto.

11            **THE WITNESS:**  Uh-huh.

12                        **RECROSS EXAMINATION**

13   **BY MR. SCOTT:**

14   Q    You said you wanted honest and accurate answers, right?

15   A    Yes.

16   Q    Why would you use a company -- strike that.  You used a

17   company you had a connection with, a financial connection,

18   correct?

19   A    I --

20   Q    To do the survey.

21   A    I don't have a financial connection with them; we have

22   a -- a joint effort that results in -- in other research

23   projects, correct.

24   Q    Why did you not identify your relationship that Latino

25   Decisions was a division of the entity that did the survey that

1   you are asking this Court to rely upon?

2   A    It's -- I didn't not identify it.  I'm the principal

3   investigator of Latino Decisions.  It's very clearly identified

4   on my C.V.

5   Q    Did you identify you had a business relation and joint

6   venture with the folks over at Pacific Market Research in

7   your -- in your C.V., sir?

8   A    No.  That's not listed in my C.V.

9   Q    Did you at any time attempt to determine the impact on

10  voter turnout as a result of your survey?

11  A    No.

12          **MR. SCOTT:**  No questions.

13          **MR. DUNN:**  Nothing further.

14          **THE COURT:**  All right.  Thank you, sir.  You can step

15  down.

16          **THE WITNESS:**  Thank you.

17      **(Witness stepped down)**

18      **(Pause)**

19          **THE COURT:**  You can approach over here.

20          Is this your next witness?

21          **MR. DOGGETT:**  Yes.

22          **THE COURT:**  Okay.  Would you raise your right hand.

23  //

24  //

25  //

1        **LIONEL ESTRADA, PLAINTIFFS' WITNESS, SWORN**

2            **THE COURT:**  You can have a seat.

3                        **DIRECT EXAMINATION**

4  **BY MR. DOGGETT:**

5  Q    Good morning, Mr. Estrada.  Could you state your name for

6  the record?

7  A    Lionel -- my name is Lionel Estrada.

8  Q    And, for the record, my name is Robert Doggett.

9            Could you state your date of birth, sir?

10 A    January 24 of 1973.

11 Q    How old are you?

12           **THE COURT:**  Hold on.  Can you pull that mike up to

13 you a bit?  It will move over.  There you go.

14           **THE WITNESS:**  What was the question?

15 **BY MR. DOGGETT:**

16 Q    How old are you, sir?

17 A    Forty-one.

18 Q    And what's your ethnicity?

19 A    Hispanic.

20 Q    And what's your current address?

21 A    Five eighteen West Main Street in Kenedy, Texas.

22 Q    Now, did you move recently?

23 A    Yes.

24 Q    How far away did you move?

25 A    A mile.

1    Q    A mile?

2    A    A mile away from where I was living.

3    Q    And you were living with your wife prior to that?

4    A    Yes, I stayed with her.

5    Q    You stayed with her?

6    A    I was staying -- yeah, we're separated.

7    Q    I see.  And this was fairly recent; is that right?

8    A    Yes.

9    Q    Okay.  Do you have a car?

10   A    No.

11   Q    Did your wife have a car?

12   A    Yes, she did.

13   Q    When you were staying with your wife, did your wife take

14   you where you needed to go in her car?

15   A    No.  She didn't.

16   Q    Do you know why that was?

17   A    Um, she's just -- she's had mental health issues, and she

18   was controlling about my status.

19   Q    Now, do you work, sir?

20   A    Yes.

21   Q    What do you do?

22   A    Um, odd jobs.

23   Q    So, it's not regular work?

24   A    No.  I have --

25   Q    If we could pull up Plaintiffs' 998.  I'm showing you, up

1    on the screen there, your declaration.  Do you recognize it?

2    A    Yes, sir.

3    Q    Do you see the second page?  Is that your signature?

4    A    Yes, sir.

5    Q    It looks like this was signed on June 26th of this year,

6    2014?

7    A    That's right.

8    Q    So, was this declaration, when you signed it, was the

9    information in it correct?

10   A    Yes.

11   Q    But -- but -- then, when this was signed, you were still

12   living with your wife; is that right?

13   A    I was back and forth from my mother's to my wife's house,

14   yes.

15   Q    So, some of the information has changed, at least with

16   regard to where you're living.

17   A    Yes.

18   Q    Now, have you voted several times in the past?

19   A    Yes, sir.

20   Q    And how did you get to the polls to vote?

21   A    Walked.

22   Q    Now, do you want to keep voting?

23   A    Yes, sir.

24   Q    Do you think you're going to be able to vote anymore?

25   A    Um, I should -- I don't know.  Yes.

Estrada - Direct / By Mr. Doggett                    132

1   Q    Well, do you think you need a photo I.D. to vote?

2   A    Yes.

3   Q    All right.  Now, did you bring the only photo I.D. you

4   have here in court today?

5   A    Yes, sir.

6   Q    Could you show the Court, show her Honor?

7            **THE COURT:**  Has the defense seen this?

8            **MR. DOGGETT:**  Yes.  It's Defense Exhibit 0345, I

9   believe, actually.

10           **THE COURT:**  Okay.

11  **BY MR. DOGGETT:**

12  Q    Now, what is this thing, this piece of paper?

13  A    This is a permit of my I.D.

14  Q    It's a -- it's a photocopy --

15  A    Expired permit of -- photocopy of my I.D.

16  Q    Is it -- it's an expired permit?

17  A    Yes.  Right.

18  Q    And it's a photocopy of it; it's not the official permit

19  or anything.

20  A    No.

21  Q    Now, do you have any other identifying documentation?

22  A    No.

23  Q    Like a social security card?

24  A    Social security card; yes, I do.

25  Q    Okay.  Do you have any other documentation with your name

1   and address on it?

2   A     No, sir.

3   Q     What about workers' compensation maybe from 2004?  Do you

4   remember that?

5   A     Yes, I have.

6   Q     So -- so, other than the piece of paper you've given her

7   Honor and the social security card, which you have, and old

8   workers' compensation documents, do you have any other

9   documents with your name and address on them?

10  A     No, sir.

11          **THE COURT:**  So, he actually has a card of social

12  security, not just this copy here?

13          **MR. DOGGETT:**  Yes; I should clarify.

14  **BY MR. DOGGETT:**

15  Q     You actually have the actual social security card in your

16  wallet right now; is that right?

17  A     Yes, sir, I do.  Yeah.  That's right.

18  Q     So, there -- I think what her Honor was referring to is

19  that on the piece of paper that you've -- that you provided,

20  it's a photocopy of the permit and also has a copy on the same

21  piece of paper of your social security card.

22  A     That's right.  Yes.

23  Q     Now, do you have a birth certificate of any kind?

24  A     No.

25  Q     So, how do you get around Kenedy, Texas, which is where

Estrada - Direct / By Mr. Doggett                    134

1    you're from?

2    A    Mainly walk around.

3    Q    Now, have you ever had any kind of I.D. in the past?

4    A    Yes.

5    Q    What happened to it?

6    A    It expired.

7    Q    And what happened after it expired?  Did you try to get a

8    new one?

9    A    Yes, I tried; I renewed my license, and I -- I got the

10   permit, but I never received the -- the original.

11   Q    You never got a copy of the actual license in the mail?

12   A    Yes.

13   Q    Now, how did you get -- I assume you went to DPS to try to

14   get this?

15   A    Yes, I went to --

16   Q    Where is the DPS office?

17   A    In Beeville, Texas.

18   Q    How far away is that from your house?

19   A    Thirty minutes.

20   Q    By car?

21   A    By car.  Thirty miles.

22   Q    Now, how did you get there?

23   A    A friend of my mother's.

24   Q    How much did you have to pay to try to get this I.D.?

25   A    I paid $60.

1    Q    So, you paid $60 and you never actually got it later in

2    the mail or anything?

3    A    Right.  No.

4    Q    Now, have you tried anything else to try to obtain your

5    I.D.?  Have you called to find out where it is?

6    A    Yes, I have.

7    Q    And what's -- what's happened?  What have they told you?

8    A    To pay surcharges in order to get it back, for them to

9    send it back to me.

10   Q    So, how much is that going to cost?

11   A    It's $260 a year for three years.

12   Q    Is that for a commercial driver's license?  Is that right?

13   A    Yes.

14   Q    Do you have, by the way, the money that they're

15   requesting?

16   A    No, sir.

17           THE COURT:  But what is that for?  Tickets?  What's

18   the surcharge?

19           THE WITNESS:  No insurance ticket.

20           THE COURT:  No insurance ticket.  Yeah.

21   BY MR. DOGGETT:

22   Q    Now, if you get the money, are you going to try to get --

23   get back to Beeville and get your commercial driver's license

24   or any license?

25   A    Yes, definitely.

Estrada - Cross / By Ms. Wolf                              136

1   Q    How will you get there?

2   A    That I don't know.

3   Q    Do you know what else you're going to need in order to get

4   the license?

5   A    Birth certificate, possibly.

6   Q    And where are you going to go to get the birth

7   certificate?

8   A    Courthouse in Karnes City.

9   Q    And how far away is that?

10  A    About six, seven miles from Kenedy.

11  Q    And how will you get there?

12  A    That I don't know.

13  Q    And do you know how much it's going to cost to get your

14  birth certificate, sir?

15  A    Not really.  No, sir.  I've gotten it before; it was,

16  like, $24 ten years ago.

17         **MR. DOGGETT:**  I'll pass the witness.

18         **THE COURT:**  I'm going to return this.

19                         **CROSS EXAMINATION**

20  BY MS. WOLF:

21  Q    Good morning, Mr. Estrada.

22  A    Good morning.

23  Q    I remember we met back in June.

24  A    Yes.  I remember you.

25  Q    And we talked a little bit about your commercial driver's

1   license, and you talked a little bit about that today with

2   Mr. Doggett, correct?

3   A    Yes.

4   Q    Okay.  And you had a commercial driver's license since

5   1997; is that correct?

6   A    Yes, ma'am.

7   Q    Okay.  So, about, give or take, 16 years.

8   A    Yes.

9   Q    Okay.  And as part of that commercial driver's license,

10  that came with what's referred to as a hazmat endorsement; is

11  that correct?

12  A    Yes.

13  Q    And we talked a little bit about this at your deposition,

14  but as part of maintaining that hazmat endorsement, the

15  Transportation Security Administration, federal agency,

16  requires you to verify your citizenship or residency with

17  documentation.  Is that correct?

18  A    Yes.

19  Q    So, in the past you provided verification of the

20  citizenship or residency with a -- with a birth certificate,

21  correct?

22  A    Yes.

23  Q    And also your baptismal papers?

24  A    Uh-huh.

25  Q    Okay.  And the last time you did that was in 2011; is that

Estrada - Cross / By Ms. Wolf                          138

1   correct?

2   A    Yes.

3   Q    Okay.  And you obtained that birth certificate -- I think

4   you talked about this with Mr. Doggett -- from the Karnes

5   County courthouse; is that correct?

6   A    Yes.

7          **MS. WOLF:**  Brian, can you pull up Plaintiffs' 497,

8   please?  And if you'd take paragraph six, please, Brian?

9   **BY MS. WOLF:**

10  Q    And if you'd take a look at paragraph six of that exhibit,

11  210 West Calvert Street in Karnes City; is that approximately

12  where the courthouse you got your birth certificate from is

13  located?

14  A    Yes.

15  Q    Okay.  So, that's about six miles from your home?

16  A    Yes.

17  Q    And, Brian, if you'd just go up to the first page of this

18  declaration, or the page before this.  Okay.  And if you'd go

19  to paragraph three.

20          Are you aware -- are you aware that that's also where

21  the -- the Karnes County elections office is located?

22  A    No, I didn't.

23  Q    Okay.  So, if -- if -- okay.  So, the Karnes County

24  election -- from -- from just reading from paragraph three, you

25  see that the -- that address that's referenced in this

Estrada - Cross / By Ms. Wolf                    139

1    declaration, they issue what's called an "election

2    identification certificate."  Do you see that?

3    A    Yes.

4    Q    Okay.  And I think we had talked about this a little bit

5    at your deposition.  You're familiar with what an election

6    identification certificate is.

7    A    Yes, ma'am.

8    Q    Okay.  And you -- previous to 2013, when you paid the $61

9    that you discussed with Mr. Doggett, you had paid a bunch of

10   fees over the years in order to maintain your commercial

11   driver's license, correct?

12   A    Yes.

13   Q    Okay.  And those fees ranged anywhere from $11 or $10 to

14   get a replacement copy of the license all the way up to $100 to

15   maintain the license.

16   A    Right.

17   Q    Okay.  And you paid those fees out of your own pocket;

18   your employer didn't pay those fees, correct?

19   A    Right.

20   Q    And there was a time, I think at the time of your

21   deposition -- and I think it's also referenced in your

22   declaration, which I don't know the exhibit number, but the

23   declaration that Mr. Doggett referred to -- that you had a copy

24   of your -- or you had your original voter registration card,

25   correct?

Estrada - Cross / By Ms. Wolf                                          140

1    A    Yes.

2    Q    Okay.  And you're aware that you could -- are you aware

3    that you could replace your voter registration card for free?

4    A    No.

5    Q    Have you tried to replace your voter registration card at

6    all?

7    A    No.

8    Q    You currently don't have a copy of voter registration

9    card, correct?

10   A    Right.

11   Q    Okay.  And was there a time during this year when you had

12   a copy of the actual driver's license that you had that expired

13   in January of 2013?

14   A    Yeah.

15   Q    Okay.  Was that prior to when you moved out of the home

16   that you were living in with your wife?

17   A    Uh-huh.  Yes.

18   Q    Okay.  And you had talked a little bit with Mr. Doggett

19   about the work that you do.  I think when you testified at your

20   deposition you said you work construction three, four, or five

21   times a week; is that correct?

22   A    Yes.

23   Q    Is that still the case today?

24   A    Yeah; sometimes I work less when I'm in pain, back pain.

25   Q    Okay.  And when you go to work those construction sites,

1   you get a ride from your dad's friend; is that correct?

2   A    Yes.

3   Q    Okay.  So, you don't walk to work.

4   A    I still walk to work though, yeah.

5   Q    But sometimes you get a ride from your dad's friend?

6   A    Yes.

7   Q    Okay.  Have you ever considered surrendering your driver's

8   license in order to be able to obtain an election

9   identification certificate?

10  A    No.

11  Q    Is that something you would consider?

12  A    No.

13  Q    Did you say -- I'm sorry?

14  A    No.

15          **THE COURT:**  Is that a "no"?

16          **THE WITNESS:**  Yeah.

17          **THE COURT:**  Okay.

18  **BY MS. WOLF:**

19  Q    And why would you not consider doing that?

20  A    I'd rather have my license.

21  Q    And why do you want to have a license?

22  A    So I can continue driving one day.

23  Q    And we talked a little bit about your deposition, and I

24  understand you had previously said that in the -- strike that.

25  In the past you'd use your driver's license for other

Estrada - Cross / By Ms. Wolf                    142

1   activities, and those were taking books out of the library,

2   checking into a hotel, purchasing tobacco and alcohol, renting

3   a car, and opening a bank account.  Is that correct?

4   A    Yes.

5   Q    Okay.  So, you've used your driver's license in the past

6   as identification for all of those activities.

7   A    Yes.

8   Q    Okay.  And we also talked about a Texas personal

9   identification card.  Do you understand what that is?

10  A    No.

11  Q    I'm sorry.  You don't understand what that is?

12  A    Yeah.

13  Q    Okay.

14          THE COURT:  Yes --

15          THE WITNESS:  Yes.

16          THE COURT:  -- yes, you understand or no, you don't

17  understand?

18          THE WITNESS:  Yes, I do understand.

19          THE COURT:  We're having a little trouble picking you

20  up.

21          THE WITNESS:  Yeah, I'm --

22          THE COURT:  If you can say "Yes" or "No."

23          THE WITNESS:  Yes.

24  //

25  //

1   BY MS. WOLF:

2   Q    Okay.  And that's something you can obtain from DPS -- I

3   think we had talked about this -- for $16 if it's your first

4   one, correct?

5   A    Yes.

6   Q    Okay.  And at the time of your deposition, you told me

7   that you could afford to purchase that particular card; is that

8   correct?

9   A    Yes.

10  Q    Okay.  And you had stated that you -- I think you'd stated

11  that you were interested in obtaining a personal identification

12  card, correct?

13  A    Yes.

14  Q    Okay.  And if you were to obtain that personal

15  identification card, for what purposes would you be using that

16  personal identification card?

17  A    Um, for purchases at a store.  I don't know, yeah.

18  Q    So showing it at the store?

19  A    Yes.

20  Q    Okay.

21          MS. WOLF:  Your Honor, I pass the witness.

22          THE COURT:  So does he have a birth certificate or

23  not?

24          MR. DOGGETT:  Your Honor, I'll --

25          THE COURT:  Okay.

**REDIRECT EXAMINATION**

**BY MR. DOGGETT:**

1

2

3  Q    Do you have a certified copy of your birth certificate?

4  A    No, I do not.

5  Q    So the only documents with your name on them, official

6  court documents -- or I'm sorry -- any documents at all with

7  your name on them -- you brought to court this piece of paper

8  that you've shown the Court and your original social security

9  card; is that right?

10  A    Yes, that's all I have.

11  Q    And then you have some other documents related to a

12  workers' compensation claim you made in 2004 back at your home;

13  is that right?

14  A    Yes.

15  Q    Do you know if you're even eligible for an EIC, an

16  Election Identification Certificate?

17  A    No.

18  Q    So in other words, if DPS has shown you as having a

19  license or having a license recently, you could go and ask for

20  an EIC and you may not even know if they would give it to you

21  or not; is that right?

22  A    Yes.

23          **MR. DOGGETT:**  Pass the witness.

24          **MS. WOLF:**  Your Honor, I have --

25          **THE COURT:**  Nothing further?

1          **MS. WOLF:**  -- no further questions.

2          **THE COURT:**  All right, thank you, sir.  You can step

3   down.

4      **(Witness stepped down)**

5          **MR. DOGGETT:**  Your Honor, we also call Mr. Lenard

6   Taylor to the stand.

7          **THE CLERK:**  Counsel, to remind you, please announce

8   your name before you --

9          **MS. WOLF:**  I apologize.  That was Lindsey Wolf.

10         **THE CLERK:**  Thank you.

11         **THE COURT:**  Good morning.

12         **THE WITNESS:**  Good morning, your Honor.

13         **THE COURT:**  Would you raise your right hand?

14          **LENARD TAYLOR, PLAINTIFFS' WITNESS, SWORN**

15         **THE CLERK:**  Thank you, sir.

16                        **DIRECT EXAMINATION**

17  **BY MR. DOGGETT:**

18  Q    First for the record, my name is Robert Doggett.

19   Mr. Taylor, could you say your name for the record?

20  A    Lenard Arthur Taylor.

21  Q    Maybe you could pull that microphone a little closer to

22  you.

23  A    Lenard Arthur Taylor.

24  Q    Sir, I see you're wearing sunglasses today in this

25  courtroom.  Why do you --

Taylor - Direct / By Mr. Doggett                146

1   A    I've got a cataract and so I find it's sensitive to light.

2   It kind of bothers my eyes a little bit.

3           **MR. DOGGETT:**  Your Honor, with your permission, could

4   he retain those?

5           **THE COURT:**  That's fine.

6   **BY MR. DOGGETT:**

7   Q    Mr. Taylor --

8   A    Yes.

9   Q    -- what's your date of birth, sir?

10  A    2/2/49.

11  Q    How old are you, sir?

12  A    Sixty-five.

13  Q    What's your race or ethnicity?

14  A    Beg your pardon?

15  Q    What's your race or ethnicity?

16  A    I'm Black.

17  Q    What's your current address?

18  A    Let me look here.  606 Coyote Trail, Alice, Texas.

19  Q    And, sir, you're retired; is that right?

20  A    Yes.

21  Q    All right.  So do you remember doing a declaration that's

22  Plaintiffs' 1000, I believe?  Sir, do you remember signing a

23  declaration with regard to your income and expenses?

24  A    Yes.

25  Q    All right.

1          **MR. DOGGETT:**  On the second page, if you don't mind.

2    Thank you.

3    Q    It looks like that was dated April 1st of this year, 2014.

4    Do you remember signing that, sir?

5    A    I see a signature.

6    Q    Now, was that accurate as to the day you made that on

7    April 1st?

8    A    Yes.

9    Q    Now, I think your income though has changed since then; is

10   that right?

11   A    It has.

12   Q    For better or for worse?

13   A    For worse.

14   Q    Now, do you have a car, sir?

15   A    No, I don't.

16   Q    All right.  How do you get around town?

17   A    Well, I -- somebody usually carry me.

18   Q    Have you ever voted in the past?

19   A    Yes, I have.

20   Q    All right.  And what did you use to vote with in the past?

21   A    Beg your pardon?

22   Q    What did you use to vote with in the past?  Do you

23   remember?

24   A    ID, Texas State ID.

25   Q    All right.  And what happened to your ID?

Taylor - Direct / By Mr. Doggett                    148

1    A    It got stolen or misplaced.  I don't know which but I

2    don't have it.

3    Q    Well, did you try to replace it?

4    A    I did.

5    Q    And what happened?  Where did you go to replace it?

6    A    I went to Texas Department of Public Safety and tried to

7    obtain one.

8    Q    And what did they tell you you needed in order to do that?

9    A    Social security card.

10   Q    And did they tell you you needed anything else, like a

11   birth certificate or voter registration card?

12   A    Yes.

13   Q    So all three of those they'd like you to have?  Is that

14   what they told you?

15   A    Exactly.

16   Q    Okay.  And so what did you do next after they told you you

17   needed those three things?

18   A    I went to the social security office.

19   Q    And what did they tell you?

20   A    That I had to have a Texas State ID in order to get a

21   social security card.

22   Q    So wait, let me get this straight.  You went to the DPS

23   office?

24   A    Yes.

25   Q    And they said if you want to get a new state ID, you need

1    a birth certificate --

2    A    I need a birth certificate.

3    Q    -- social security card and --

4    A    Social --

5    Q    -- voter registration card?

6    A    And voter registration card.

7    Q    And so the next thing you did, you took the bus somewhere

8    else, I assume?

9    A    Yes.

10   Q    Social Security Administration and they told you in order

11   to get a social security card, you needed an ID?

12   A    Yes.

13   Q    And you didn't have one of those?

14   A    And I didn't have one.

15   Q    Okay.  So what did you do then?

16   A    I went to Vital Statistics and I obtained a birth

17   certificate.

18   Q    How much did that cost you?

19   A    Twenty-three dollars.

20   Q    Now, at the end of the month, do you have very much money

21   every month at the end of the month after you're done paying

22   your bills?

23   A    No.

24   Q    So $23 meant something to you?

25   A    It meant something to me, yes.

1    Q      Now, do you have any of the other documents right now, the

2    social security card or the voter registration card?  Do you

3    have any of those other things?

4    A      I have my birth certificate.

5    Q      Right.  And you don't have the other things yet that the

6    person told you?

7    A      No.

8    Q      You hope to get those soon?

9    A      I hope to.

10   Q      And then you hope to take all those things back to DPS and

11   get your ID; is that right?

12   A      That is true.

13   Q      Now, sir, have you ever voted by mail or do you want to

14   vote by mail?

15   A      No, sir.

16   Q      Why not?

17   A      I'd rather vote in person.

18   Q      Why?  Don't you trust the mail service?

19   A      Not that much.

20   Q      Sir, do you know anything about being able to vote

21   disabled without a photo ID?  Do you know anything about any of

22   that?

23   A      No.

24   Q      All right.  Do you know what you would need in order to be

25   eligible to do that?

Taylor - Cross / By Mr. Whitley                     151

1   A      No, I don't.

2   Q      Do you know what you need to prove that you're disabled

3   enough in order to get out of showing your photo ID, anything

4   like that?

5   A      No.

6   Q      Do you know where you need to go in order to find out any

7   of that information?

8   A      No.

9              **MR. DOGGETT:**  Pass the witness.

10                          **CROSS EXAMINATION**

11  **BY MR. WHITLEY:**

12  Q      David Whitley for the Defendants.

13  A      Morning.

14  Q      Mr. Taylor?

15  A      Yes, sir.

16  Q      Just a couple of questions.  First, you recently moved

17  from Corpus Christi to Alice; is that correct?

18  A      Correct.

19  Q      And Corpus Christi is in Nueces County, correct?

20  A      Corpus Christi is in Nueces County, yeah.

21  Q      And Alice is in Jim Wells County, correct?

22  A      Correct.

23  Q      And your current voter registration card shows you as

24  registered in Nueces County, correct?

25  A      Correct.

1   Q     And you stated previously that you had plans to vote in

2   the next November election, correct?

3   A     Hopefully.

4   Q     And have you changed your voter registration from Nueces

5   County to Jim Wells County yet?

6   A     No, I haven't.

7   Q     You have plans to, correct?

8   A     Yes, I do.

9   Q     Okay.

10          **MR. WHITLEY:**  No further questions.

11          **MR. DOGGETT:**  Nothing further.

12          **THE COURT:**  All right.  Thank you, sir.  You can step

13   down.

14          **THE WITNESS:**  Oh, thank you.

15      **(Witness stepped down)**

16          **MR. DOGGETT:**  Your Honor, with your permission --

17          **THE COURT:**  Go ahead.

18          **MR. DOGGETT:**  With your permission, we would like to

19   read in deposition testimony from Juanita Cox of LUPE.

20          **THE COURT:**  Okay.

21          **MR. DOGGETT:**  And I hope it's on the way.

22      **(Counsel conferred)**

23          **MR. DOGGETT:**  Do you have a copy for the Court or is

24   it me?

25          **MS. SPEAKER:**  I think you have an extra copy.

1       **(Counsel conferred)**

2              **MR. DOGGETT:**  Okay.  I don't think I have but one

3    copy.

4              **THE COURT:**  You can proceed to read it if you want --

5              **MR. DOGGETT:**  Okay.

6              **THE COURT:**  -- and give that to me later.

7              **MR. DOGGETT:**  Your Honor, I'll be happy to provide

8    you with my copy when I'm finished, of course.

9              My name is Robert Doggett for purposes of the record.

10   And so we called Ms. Cox to the stand.  Have you got it?

11          **EXAMINATION OF JUANITA COX OF DEPOSITION TESTIMONY**

12       **(QUESTIONS READ BY MR. DOGGETT; ANSWERS READ BY COUNSEL)**

13                     **DIRECT EXAMINATION**

14             "QUESTION:  Ms. Cox, will you state your full name

15             for the record and spell it for the record, please?

16             "ANSWER:  Juanita, J-u-a-n-i-t-a, Valdez,

17             V-a-l-d-e-z, hyphenate, Cox --

18             "QUESTION:  Thank you and --

19             "ANSWER:  -- C-o-x.

20             "QUESTION:  Sorry.  Thank you and where do you

21             reside?

22             "ANSWER:  In Donna, Texas.

23             "QUESTION:  Ms. Cox, what is your educational

24             background?

25             "ANSWER:  I went to school here in Donna and I am --

Cox / Via excerpts of Deposition - Direct                 154

1        "QUESTION:  What -- was that high school?

2        "ANSWER:  Through the tenth grade because I am a

3        former migrant farm worker.  So then I went back and

4        got my GED and then I went back and got my associate

5        degree at the local university.

6        "QUESTION:  What university is that?

7        "ANSWER:  Here at UTPA, Pan American.

8        "QUESTION:  And aside from your associates degree, do

9        you have any other professional qualifications, any

10       kind of certifications at all other than your degree?

11       "ANSWER:  No, not certifications or anything.  I can

12       -- I can teach people how to harvest a lot of

13       different crops because that's what we did but

14       there's no certification for that.

15       "QUESTION:  Understood.  Are you currently employed?

16       "ANSWER:  Yes.

17       "QUESTION:  Where?

18       "ANSWER:  Here at this organization, Le Union del

19       Pueblo Entero.

20       "QUESTION:  And that is LUPE?

21       "ANSWER:  Yes, uh-huh.

22       "QUESTION:  And what is your role at LUPE?

23       "ANSWER:  I'm the executive director of this

24       organization.

25       "QUESTION:  How long have you held that position?

1      "ANSWER:  As executive director since 2000 and I

2      believe it's 2003 if I recall correctly.

3      "QUESTION:  And what are your official duties and

4      responsibilities?

5      "ANSWER:  There are a lot of different ones.  We have

6      -- we have a staff of, I think, 25 or 26 and we have

7      to -- I have to be in charge of, you know, the

8      different programs that we offer here at LUPE, make

9      sure that our yearly operational goals are met by the

10     staff and the services that we provide.  It's making

11     sure that the funding we get goes to the growth of

12     the organization which is really important to growing

13     the base.

14     This is an organization where people pay a fee to

15     belong and pay for their services and so we need to

16     make sure that the funding that is used and that

17     funding is used in the best way possible to continue

18     with the programs.  Servicing the needs of the

19     community and that is -- that is really, really an

20     important goal that we have.  Also making sure that

21     those members that live in the colonias, they are

22     low-income areas that are out in the community that

23     have certain needs that realize that also have the

24     power to make change in those needs, that they can

25     and work together.  And if it's a lack of street

Cox / Via excerpts of Deposition - Direct        156

1        lights in the colonia or lack of water or whatever

2        services or needs that they have that they can

3        address them, that through our community organizing,

4        training, leadership development that we can all --

5        that was all our responsibility.

6        At the end of the day, we are the ones that have to

7        live if we don't have water or street lights or

8        things like that and so that's one of the -- one of

9        our main -- my main goals here that I have to keep an

10       eye on, that is -- that that is always being

11       achieved.

12       "QUESTION:  Every year do you come up with a new

13       budget?

14       "ANSWER:  Yes.

15       "QUESTION:  When you present that budget, what line

16       item costs the most money as you're estimating what

17       you're going to spend money on?

18       "ANSWER:  Salaries.

19       "QUESTION:  Salaries?

20       "ANSWER:  Uh-huh.

21       "QUESTION:  Do you know about what percentage?

22       "ANSWER:  No, I don't.

23       "QUESTION:  What --

24       "ANSWER:  But it is the biggest chunk.

25       "QUESTION:  What other items make up a big chunk of

1    that budget?

2    "ANSWER:  Probably benefits.  We have really

3    excellent benefits for the staff and then -- I think

4    that's the next one.

5    "QUESTION:  And how much of the chunk does LUPE's

6    programming and voter outreach make up of the budget?

7    "ANSWER:  Well, that falls under organizing and we

8    have a budget for our community organizers that are

9    the people that work out in the communities.  I don't

10   know how much of it is for that but we have the

11   social services in the organizing.  So between those

12   two, it's a big chunk of our budget.

13   "QUESTION:  How many organizers do you guys have?

14   "ANSWER:  We have -- we have -- I think it's four and

15   one coordinator, so five total.

16   "QUESTION:  Are they paid?

17   "ANSWER:  Oh, yes, uh-huh.

18   "QUESTION:  Are they salaried employees of LUPE?

19   "ANSWER:  Uh-huh, yes.

20   "QUESTION:  And how many people do you have on the

21   social services team?

22   "ANSWER:  Oh, that's a lot because we have -- we have

23   three or four in each office and here we have maybe

24   five or six.  I can't -- I don't know.

25   "QUESTION:  Would it be fair to say somewhere between

Cox / Via excerpts of Deposition - Direct                158

1      15 and 20?

2      "ANSWER:  Yes, uh-huh, well, maybe, maybe 12 to 15,

3      yeah.

4      "QUESTION:  Okay.

5      "ANSWER:  Because we have other staff also.

6      "QUESTION:  So the organizers and those that help out

7      with social services are -- and -- are who performs

8      other outreach for LUPE?

9      "ANSWER:  The social service providers and the

10     organizers, yes.

11     "QUESTION:  What other activities do organizers

12     perform other than voter outreach?

13     "ANSWER:  Well, that's included in their -- in their

14     community organizing which is -- includes the voter

15     outreach, includes, you know, the geo-TV, the

16     different events with political candidates that are

17     running for office, you know, like candidates'

18     forums.  They have media events to announce to the

19     community what's coming down that might have an

20     impact on the community.  They have -- they organize

21     marches, you know, different kinds of protests that

22     need to happen against, you know, different issues

23     that we're working on.

24     They have a lot of meetings with what we call 'house

25     meetings' which are small meetings in the communities

Cox / Via excerpts of Deposition - Direct          159

1          in the home of a family that wants to discuss certain

2          issues.  And, of course, a really important job is

3          also the enrollment of members into the organization.

4          "QUESTION:  Can you tell me what you understand this

5          case to be about?

6          "ANSWER:  The voter ID, the SB 14?

7          "QUESTION:  Yes, ma'am.

8          "ANSWER:  My understanding of it is that the voter ID

9          was created or was passed to have -- but it has a

10         negative impact on the people that we work with, with

11         the community that we work with, that it -- that it

12         placed unneeded obstacles to people that already

13         have, that are living in very difficult situations.

14         It just added more difficulties to deny them the

15         right to vote.

16         "QUESTION:  And what do you understand the case to be

17         addressing -- this case to be addressing?

18         "ANSWER:  That's what -- that's what it is.  This

19         case, we're trying to put a stop to the denying of

20         voters' rights to vote.

21         "QUESTION:  And you mentioned earlier that you made

22         the decision to get involved?

23         "ANSWER:  Yes.

24         "QUESTION:  Based on something that you had learned

25         from somebody you had in the field?

EXCEPTIONAL REPORTING SERVICES, INC

Cox / Via excerpts of Deposition - Direct                160

1       "ANSWER:  From the meetings that the organizers have

2       and from the clients that come here, from reading the

3       news, from -- you know, it's not just one thing, of

4       course.  You know, this is a decision where you want

5       to spend your limited time that's very busy, you

6       know, on a lawsuit or in depositions, right?  So it's

7       not an easy decision.

8       So it's looking at the impact that it's going to have

9       on a community, the community where I live, the

10      community that I represent in my sole role -- in my

11      role as an executive director, a community that I

12      know very well.  And so through all of those

13      different things, I decided, right, with some of the

14      staff that this is the thing we should do.

15      "QUESTION:  Has anyone from LUPE offered to tell

16      anyone what forms of identification are needed to be

17      able to vote in Texas?

18      "ANSWER:  Has anyone from LUPE offered to -- yeah.

19      "QUESTION:  And who would LUPE have given this

20      information to?

21      "ANSWER:  To the community.  And that's a lot of

22      staff at LUPE, not just one staff because remember, I

23      said we have five organizers that work out in the

24      community plus the social service providers.

25      "QUESTION:  Through those two groups of people, the

Cox / Via excerpts of Deposition - Direct          161

1      requirements to vote on election day are communicated

2      to LUPE's members and the general community?

3      "ANSWER:  Yeah because we want to make sure that they

4      -- that they vote, right, and we communicated that

5      and that's what we found out, that it would have a

6      negative impact because many of them didn't have

7      that.

8      "QUESTION:  And there are specific places of

9      information that LUPE uses to get that message across

10     when those two groups of LUPE agents are out in the

11     field?

12     "ANSWER:  Yeah, like a flyer.  We put it on paper and

13     hand it out.

14     "QUESTION:  Is that the voter ID flyer that we

15     mentioned earlier in the deposition that's already

16     been produced?

17     "ANSWER:  Yes.  We have a flyer that we give out --

18     we gave out.

19     "QUESTION:  Okay.  Has anyone from LUPE offered to

20     take anyone to get one of the forms of identification

21     to be able to vote in Texas?

22     "ANSWER:  No, we can't.  We're really very busy and

23     when you go to the -- like when I go to renew my

24     license, it's like an all-day thing.  There's lines.

25     There's always lines, right, and so it takes a long

Cox / Via excerpts of Deposition - Direct                 162

1      time.  So we don't have the staff or the resources to

2      be able to do that.  It would be good but we just

3      can't.

4      "QUESTION:  I do -- I do want to just kind of move

5      along in the deposition by being able to cover these

6      categories of supporting identification so you can

7      confirm whether or not you know that somebody can use

8      that to get an EIC.

9      "ANSWER:  Well, you know, you can go through the list

10     if you want but that's not the only objection we have

11     to the voter ID or the ability to get -- to be able

12     to vote.  You know, the transportation issue, the

13     very remote areas where the colonias are at.  You

14     know, the elderly, you know, that might do this and

15     in the -- then the bottom line is I just don't -- I

16     just don't understand.  I don't understand and I

17     don't see any reason why you need to go -- why this

18     list was established in the first place, you know.

19     So I -- I just don't understand why we need this list

20     of things when we can vote with a simple -- our voter

21     card.

22     "QUESTION:  So you -- can you describe the purpose

23     and mission of LUPE?

24     "ANSWER:  Well, the purpose is to -- or the mission

25     is to, you know, help -- to help create a more just

1              society and just to create a more society that

2              respects the rights of human beings.

3              "QUESTION:  And I think you mentioned earlier that

4              LUPE has been in existence since 2003?

5              "ANSWER:  Here in Texas, uh-huh.

6              "QUESTION:  Where did it exist before that?

7              "ANSWER:  In California.

8              "QUESTION:  What -- sorry.

9              "ANSWER:  It was formed by Cesar Chavez and Dolores

10             Huerta in 1989 to -- because they already had the

11             United Farm Workers that was dealing with grievances

12             in the fields for farm workers but they needed a

13             nonprofit organization to deal with some of the

14             issues in the community, like education or, you know,

15             health, housing, immigration, those community issues

16             and that's why they created LUPE.

17             "QUESTION:  And is LUPE here that you -- that you're

18             in charge of, does it have regular meetings of the

19             membership?

20             "ANSWER:  Oh, yes, uh-huh.

21             "QUESTION:  How often?

22             "ANSWER:  Every first Friday of the month.

23             "QUESTION:  Where do they meet?

24             "ANSWER:  Here.  Not here in the hall, in the union

25             hall back here.

Cox / Via excerpts of Deposition - Direct                164

1        "QUESTION:  So how many members does LUPE have?

2        "ANSWER:  Seven thousand plus.

3        "QUESTION:  And the cost for membership is $40 a

4        person?

5        "ANSWER:  Forty dollars per person, $60 for a married

6        couple and the students are $20.

7        "QUESTION:  And so do you renew -- does a member

8        renew that membership every year?

9        "ANSWER:  We sure love that.  Some don't.  Some do

10       and some don't but we do try to have them renew, try

11       to get them to renew.

12       "QUESTION:  How does one become a member?

13       "ANSWER:  You just walk into the front and you get --

14       and you get, like, an application and you fill out

15       the application and you present -- and you pay $40

16       and you present something to identify you.

17       "QUESTION:  What kind of documentation is provided

18       that identifies the people that want to become

19       members?

20       "ANSWER:  There's different kinds.  You know, there's

21       a number of different kinds of documents that you can

22       bring.

23       "QUESTION:  Do you know which ones?

24       "ANSWER:  Some of them, like a school ID or a birth

25       certificate from any country or a license also.

Cox / Via excerpts of Deposition - Direct                165

1        "QUESTION:  So you mentioned earlier that you would

2        like everybody to renew every year?

3        "ANSWER:  Right.

4        "QUESTION:  But they don't always renew?

5        "ANSWER:  Right, that's correct.

6        "QUESTION:  What happens when somebody doesn't renew?

7        Do they get dropped?

8        "ANSWER:  No.  We -- not right away.  I mean, we try

9        to get them back.  We call them and we visit them and

10       we give them information.

11       "QUESTION:  Is it true when you renew, you -- do you

12       get a discount?

13       "ANSWER:  Yes.

14       "QUESTION:  Now, is LUPE a partisan organization?

15       "ANSWER:  We are 501(c)(3).

16       "QUESTION:  Do you represent any given party,

17       Republican or Democrat?

18       "ANSWER:  As a 501(c)(3), you can't.

19       "QUESTION:  Okay.  Does LUPE accept African American

20       members?

21       "ANSWER:  Yes, of course.

22       "QUESTION:  Are there any African American members of

23       LUPE currently?

24       "ANSWER:  I don't think so.  We don't have a very

25       large African American community here in the Valley.

1      I think it's -- I don't think we have very many.

2      It's mainly Mexican.

3      "QUESTION:  Does LUPE accept White members?

4      "ANSWER:  Definitely.

5      "QUESTION:  Does LUPE currently have any White

6      members?

7      "ANSWER:  We do actually.  Not -- of course, not very

8      many because, again, the Valley is mainly

9      predominantly Mexican American but we do.

10     "QUESTION:  So besides how you would define Hispanics

11     or Latinos -- besides those two, White, African

12     Americans, are there any members of any other

13     ethnicity of LUPE right now?

14     "ANSWER:  Maybe some Native Americans.

15     "QUESTION:  How about voter registration?  Does LUPE

16     help people register to vote?

17     "ANSWER:  Yes, that's very, very important.  We do

18     that a lot, yes, uh-huh.

19     "QUESTION:  How often?

20     "ANSWER:  All the time.  We have stacks of voter

21     registration cards.  So if you're not registered, we

22     can do it for you, like, really quick.  We do that a

23     lot in all of the offices, inside, outside with the

24     organizers, year-round, yeah.  That's very important

25     to us.

Cox / Via excerpts of Deposition - Direct        167

1    "QUESTION:  Will you read the first sentence in

2    Paragraph 90?

3    "ANSWER:  'Plaintiff Le Union del Pueblo Entero has

4    citizen members who lack the necessary identification

5    to vote under the requirement of SB 14 and who are

6    unable to and who are unable to make the financial

7    sacrifices required to obtain or correct -- or

8    correct such identification documents.'

9    "QUESTION:  What would LUPE define as 'financial

10   sacrifice'?

11   "ANSWER:  That our membership -- many of our 7,000

12   members are very, very low-income people and any --

13   any kind of this requirement would place an extra

14   burden on their family, you know, on very, very low-

15   income people.

16   "QUESTION:  And, again, just to be clear, do you know

17   specifically what amount of resources, financial

18   resources LUPE has had to divert for this purpose?

19   "ANSWER:  I don't know the amount but I know that we

20   -- we all put a lot of time into it because, again,

21   as I've stated earlier, it's a very important issue

22   to our membership to have the right to vote.

23   "QUESTION:  Does LUPE contend that SB 14 was enacted

24   with a discriminatory purpose?

25   "ANSWER:  We do.  I do.

1    "QUESTION:  What is that based on?

2    "ANSWER:  Again, it's based on our -- the history of

3    Mexican Americans in south Texas, of minorities in

4    south Texas.  It's based on, for example, my dad had

5    to pay for a poll tax when that made it difficult and

6    harder for him to vote.

7    I think that, you know, the difficulties of the

8    situation in south Texas with the members that we --

9    that we represent, I think that it does.  It does

10   deny them.  It does deny them the right to vote and

11   because they're all Mexican American, I think that

12   that is discriminatory.

13   And, again, there was no basis in LUPE's opinion --

14   our opinion for the change in the law.  There was no

15   basis for obstacles to be placed on people to vote

16   and, you know, just the many obstacles that this law

17   places on them, it discriminates their right to vote.

18   "QUESTION:  Is it LUPE's position that SB 14 is a

19   poll tax?

20   "ANSWER:  It's very -- it's -- it's an obstacle like

21   the poll tax was and it's -- it's something that the

22   poll tax was done to keep low-income people to make -

23   - well, actually to make it harder for them to vote

24   because you shouldn't have to pay to vote.

25   "QUESTION:  Does LUPE contend that a significant

1    portion of its members lack any of the acceptable

2    forms of ID under SB 14?

3    "ANSWER:  We contend that they do lack them.

4    "QUESTION:  Do you know about what portion?

5    "ANSWER:  A percentage you're saying?

6    "QUESTION:  Sure.

7    "ANSWER:  No.

8    "QUESTION:  Do you know how many specifically?

9    "ANSWER:  Out of 7,000, no, I don't know.

10   "QUESTION:  Can you identify one member of LUPE that

11   does not have any of the acceptable forms of ID under

12   SB 14?

13   "ANSWER:  I know -- I know of them but I don't think

14   I can give you that information.

15   "QUESTION:  But you can identify one member?

16   "ANSWER:  Yes, uh-huh.

17   "QUESTION:  Do you know how many of your members have

18   attempted to get an EIC?

19   "ANSWER:  No, I don't.

20   "QUESTION:  Do you know of anybody who's attempted to

21   get an EIC?

22   "ANSWER:  That's the same question.

23   "QUESTION:  Well, the first one was, do you know many

24   and you said you didn't know how many.  But do you

25   know of anybody at all of your members who have

Cox / Via excerpts of Deposition - Direct                170

1    attempted to get an EIC?

2    "ANSWER:  I don't know.  I don't know how many but I

3    do remember a conversation from the organizers about

4    some of the people in their meetings that had tried

5    but they were -- I don't really know what the issue

6    was, why they couldn't, whether they lacked how many

7    pieces of documents they needed or if they weren't

8    accepted or what happened.

9    "QUESTION:  So you're not sure what the issue was?

10   "ANSWER:  I know that they couldn't get it but I

11   don't know, like, specifically based on if it was

12   that they didn't have -- they didn't have the -- all

13   of the documents that are required or the ones that

14   they had were outdate or they -- you know, I don't

15   know what the issue was.

16   "QUESTION:  Is LUPE able to identify any Texas

17   registered voter who, as of the filing of your

18   complaint which is November 5th --

19   "ANSWER:  Of 2013?

20   "QUESTION:  -- 2013 had been unable to vote on

21   account of his or her inability to obtain an

22   acceptable form of ID under SB 14?

23   "ANSWER:  They have not -- that they have not been

24   able to vote?

25   "QUESTION:  On account of an inability to obtain one

Cox / Via excerpts of Deposition - Direct        171

1        of the acceptable forms of ID under SB 14.

2        "ANSWER:  We've heard -- we've heard that they were

3        not going to be able to vote.  Like when we were

4        knocking on doors to get them out to vote, some were

5        saying that they didn't have any documentation.  So

6        they didn't

7        -- they probably were not going to go vote.  They

8        didn't have the documentation that was required to

9        get the photo ID and so they were not going to go

10       vote.

11       "QUESTION:  Were you able to identify somebody

12       specifically?

13       "ANSWER:  If we look at the precincts that we worked

14       this last election, maybe the organizers could.

15       "QUESTION:  Well, can you?

16       "ANSWER:  No, myself, I can't but I could ask.

17       "QUESTION:  Well what -- was that person or people

18       who are identified, were they members of LUPE?

19       "ANSWER:  One -- some were.  Others were not.

20       "QUESTION:  So that was in November?

21       "ANSWER:  No, in March.

22       "QUESTION:  Is LUPE able to identify a -- sorry -- is

23       LUPE able to identify a LUPE member who has suffered

24       harm at any point because of SB 14?

25       "ANSWER:  There are many.  There are many within LUPE

1        that were hurt by SB 14.

2        "QUESTION:  Are you able to identify a specific

3        member?

4        "ANSWER:  That were harmed by this bill?

5        "QUESTION:  Uh-huh.

6        "ANSWER:  Yes.

7        "QUESTION:  Does LUPE contend that any of its SB 14-

8        related activities fall outside the scope of its

9        organizational mission or goals?

10       "ANSWER:  Outside of it?

11       "QUESTION:  Uh-huh.

12       "ANSWER:  We didn't expect it to be -- to be spending

13       time on something like this.  So it wasn't like we

14       put it in a specific line item in -- like the budget,

15       right?  It was something that came out that has an

16       impact on the community that we felt we had to -- we

17       had to deal with it.  We had to work on it.

18       "QUESTION:  So SB 14 is not a line item on the

19       budget?

20       "ANSWER:  No, it's part of the expenses from the

21       budget but not a line item.

22       "QUESTION:  And does LUPE contend that it's unable to

23       fulfill its mission because of SB 14?

24       "ANSWER:  Oh, no.  Our mission includes -- it's broad

25       and it's not specifically -- our mission is not just

Cox / Via excerpts of Deposition - Direct                        173

1              on voter ID, on voter registration or -- it's more

2              than just on voter -- on voting, right, but that's

3              part of it.  LUPE's mission to help to have a fair

4              and just society includes that but there's others.

5              "QUESTION:  So because of SB 14, is LUPE -- even

6              though SB 14 is in place, is LUPE still able to

7              fulfill its mission?

8              "ANSWER:  Not completely because if it continues this

9              way, then it's not creating a more fair, just

10             society."

11             **MR. DOGGETT:**  Pass the witness.

12             **MR. WHITLEY:**  Your Honor, I'll be skipping around

13     some in the interest of time where there's duplication and I

14     just want to add context to the designations.  On September

15     1st, ECF Number 550 was entered and it lays out the following

16     stipulation.  "LUPE alleges standing in the above-captioned

17             actions solely based upon alleged harm to the

18             organization.  LUPE does not base its allegations of

19             standing in whole or in part on any alleged injury to

20             any of its members."  And that ends the stipulation.

21     And we begin by reading from Page 55, Line 18.

22     //

23     //

24     //

25     //

Cox / Via excerpts of Deposition - Cross                174

1    (QUESTIONS READ BY MR. DOGGETT; ANSWERS READ BY COUNSEL)

2                      CROSS EXAMINATION

3           "QUESTION:  Before SB 14 was passed, did you

4           communicate with your state senator or state

5           representative about the bill?

6           "ANSWER:  Not that I recall that we did or didn't.

7           "QUESTION:  Have you done that for other bills?

8           "ANSWER:  Yes, uh-huh.

9           "QUESTION:  Do you remember specifically what bills

10          you have?

11          "ANSWER:  In -- I think it was in the session -- I

12          don't remember if it was 2011 session or 2010

13          session.  There were over a hundred pieces of anti-

14          immigrant legislation that was introduced by some

15          very conservative people, representatives, and so I

16          did -- I did that then.

17          "QUESTION:  And it was you representing LUPE?

18          "ANSWER:  Yes, it was.

19          "QUESTION:  Opposing those anti-immigrant bills?

20          "ANSWER:  Correct, yes.

21          "QUESTION:  So how many members does LUPE have?

22          "ANSWER:  Seven thousand plus.

23          "QUESTION:  And the cost for membership is $40 a

24          person?

25          "ANSWER:  Forty dollars per person, $60 for a married

Cox / Via excerpts of Deposition - Cross                          175

1       couple and the students are $20.

2       "QUESTION:  And so do you renew -- does a member

3       renew that membership every year?

4       "ANSWER:  We sure love that.  Some don't.  Some do

5       and some don't but we do try to have them to renew --

6       try to get them to renew.

7       "QUESTION:  How does one become a member?

8       "ANSWER:  You just walk into the front and you get --

9       and you get like an application and you fill out the

10      application and you present -- and you pay $40 and

11      you present something to identify you.

12      "QUESTION:  What kind of documentation is provided

13      that identifies the people that want to become

14      members?

15      "ANSWER:  There's different kinds.  You know, there's

16      a number of different kinds of documents that you can

17      bring.

18      "QUESTION:  Do you know which ones?

19      "ANSWER:  Some of them, like a school ID or a birth

20      certificate from any country or an -- a license also.

21      **MR. WHITLEY:**  Now we're going to jump ahead to Page

22      93, Line 21.

23      "QUESTION:  Does LUPE receive donations?

24      "ANSWER:  Yes, uh-huh.

25      "QUESTION:  Individual -- from individuals?

Cox / Via excerpts of Deposition - Cross                    176

1       "ANSWER:  Yes.

2       "QUESTION:  Does it receive sponsorships?  Do people

3       sponsor events that LUPE puts on?

4       "ANSWER:  Yes.

5       "QUESTION:  And LUPE engages in some fund-raising,

6       you mentioned before?

7       "ANSWER:  A little bit, yeah, we're just starting

8       that,

9       uh-huh.

10      "QUESTION:  Do you know generally how those funds are

11      allocated?

12      "ANSWER:  How they are allocated?  In our budget?

13      No, I can't -- the money that comes in -- you asked

14      earlier, you know, about the money that comes in and

15      how we use

16      it.  Is that -- I said for salaries and benefits.

17      "QUESTION:  So a member of LUPE for the first time

18      would pay $40 to become a member?

19      "ANSWER:  Uh-huh.

20      "QUESTION:  And then there are some services that

21      LUPE provides that's an additional fee?

22      "ANSWER:  Oh, yes, uh-huh.

23      "QUESTION:  What are those fees?

24      "ANSWER:  That's a big part of it.  It depends.  For

25      example, in the tax preparation, it depends if you're

Cox / Via excerpts of Deposition - Cross                177

1    doing a 1040EZ, a 1040 or 1040X.  You know, it just

2    depends on what kind of income tax you're filing.

3    The cost is based on that.

4    "QUESTION:  Is it based on the complexity of the

5    filing and how many forms are required by the IRS?

6    "ANSWER:  Yes.

7    "QUESTION:  And then if I wanted LUPE to help me with

8    my taxes --

9    "ANSWER:  That's extra.

10   "QUESTION:  -- I would come in and pay -- if it was

11   only a 1040EZ --

12   "ANSWER:  Right.

13   "QUESTION:  -- I would pay $25?

14   "ANSWER:  Between 20 and 30.  I'm not exactly --

15   yeah, 20, 25 or 30.

16   "QUESTION:  Do any of the other services provided by

17   LUPE require an additional fee to be paid?

18   "ANSWER:  All of those that are listed here -- there.

19   "QUESTION:  In Exhibit 3?

20   "ANSWER:  Yes.

21   "QUESTION:  Do you know how much LUPE would charge

22   for a notary service?

23   "ANSWER:  Those are only like $5.  You know, like $5,

24   uh-huh."

25   **MR. WHITLEY:**  Then we're going to skip ahead -- no,

EXCEPTIONAL REPORTING SERVICES, INC

1   that's all of it.  Everything else was duplicative.

2           **THE COURT:**  All right.  So that's all.  Should we go

3   ahead and break for lunch then?  So we'll return about 1:05.

4       **(A recess was taken from 12:03 p.m. to 1:05 p.m.; parties**

5   **present)**

6           **MR. SCOTT:**  Before we start, your Honor, is it all

7   right, after we finish with a witness and we don't think we

8   have any more for that day, for any of our counsel to come and

9   go, as long as we don't disturb the proceedings or would you

10  rather us --

11          **THE COURT:**  That's fine.

12          **MR. SCOTT:**  Okay.

13          **THE COURT:**  The less of you there are, the less

14  problems for the Court.

15      **(Laughter)**

16          All right.

17          **MS. MARANZANO:**  Good afternoon.

18          **THE COURT:**  Good afternoon.  Go ahead.

19          **MS. MARANZANO:**  Jennifer Maranzano on behalf of the

20  United States.  The United States calls Dr. Jane Henrici.

21      **(Pause)**

22          **THE COURT:**  Good afternoon, ma'am.  Would you raise

23  your right hand?

24  //

25  //

1      **DR. JANE HENRICI, PLAINTIFFS' WITNESS, SWORN**

2                    **DIRECT EXAMINATION**

3    **BY MS. MARANZANO:**

4    Q    Can you please introduce yourself to the Court?

5    A    Yes.  My name is Jane Henrici.

6    Q    And what are your current positions?

7    A    I am professorial lecturer with George Washington

8    University and I am senior research affiliate with the

9    Institute for Women's Policy Research.

10   Q    What do you do as a professorial lecturer at George

11   Washington University?

12   A    I teach graduate seminars in economic development for the

13   Elliot School of International Affairs primarily.  I focus on

14   mixed methods in research.

15   Q    And what do you do as senior research affiliate at the

16   Institute for Women's Policy Research?

17   A    I direct research studies.

18   Q    Very briefly, what is your educational background?

19   A    I have my bachelors from the University of Texas at Austin

20   and my masters from the University of Chicago, and I returned

21   to Austin for my doctorate.

22   Q    Have you testified before in Federal Court?

23   A    No.

24   Q    As we go along, if there is anything you're unfamiliar

25   with, please feel free to stop me.

1   A    Thank you.

2   Q    What is your main area of expertise?

3   A    Issues of poverty.

4   Q    Have you worked with low income communities in Texas?

5   A    Yes.

6   Q    Can you briefly describe that work?

7   A    So I've conducted research with poor persons in Palestine,

8   Laredo, communities south of Austin, San Antonio, and Houston.

9   And my work primarily focuses on how low income people -- what

10  sort of strategies they use to get by and also how they might

11  be affected by different programs and policies.

12  Q    Would it be fair to characterize your work generally as

13  focused on research?

14  A    Yes.

15  Q    In your work in Texas, did you come across information

16  about low income individuals' access to documentation?

17  A    Yes.

18  Q    What sorts of documentation?

19  A    The types of documentation that were mentioned included

20  marriage certificates, military service records and discharge

21  papers, adoption papers, custody papers, birth certificates,

22  educational records, medical certification, and hospital

23  records.

24  Q    Did any of these individuals seek to obtain these

25  documents?

Henrici - Direct / By Ms. Maranzano                    181

1    A      Yes.

2    Q      Can you provide an example of what sorts of obstacles, if

3    any, they encountered when they tried to obtain these

4    documents?

5    A      So, just to focus on one, there is the issue that, among

6    low income Texans, that wages are typically rather low.  And at

7    the same time, the types of jobs that they are often able to

8    get when they are employed is work that doesn't have benefits,

9    and so that means that there is no paid time off.  So if they

10   take time off or if they use time to go and try and either get

11   a documentation or replace one or renew one, they're

12   essentially spending money; it costs them.

13   Q      What was your approach to studying low income households

14   in these Texas communities?

15   A      So, primarily the work that I've done is what is called

16   mixed methods research.  And with mixed methods, we combine

17   statistical surveys of larger quantities of people with in-

18   depth interviews with relatively smaller groups of people.  And

19   the purpose of putting two sources together is to have two

20   different perspectives, but it's also because the two sources

21   can buttress each other; they can supplement each other.  And,

22   at the same time, one of the things that's really interesting

23   about mixed methods is that one can sometimes answer questions

24   or fill gaps that the other might leave unanswered or empty.

25   Q      Do you have a specialty within mixed methods research?

1    A      Yes.

2    Q      And what is that?

3    A      I conduct ethnographic research.

4    Q      Can you tell us what ethnographic research is?

5    A      The type of ethnographic research that I do, or I train

6    and direct others to do, involves in-depth interviews with

7    people over a period of time.  And the in-depth interviews we

8    conduct within their communities, within their homes, and where

9    they work, and where they go to school.  We also conduct in-

10   depth interviews with people in the neighborhoods and with

11   their community leaders and social workers, agency workers, so

12   that we can get a fuller context of the poor people's lives in

13   the day-to-day experience.

14   Q      Can you provide the Court with an example of how you have

15   used this methodology in a study in Texas?

16   A      So one example that's pertinent is called Welfare Families

17   and Children, a Three City Study, and it's one of the largest

18   projects that has ever been conducted in the United States.  It

19   involved teams of researchers representing different

20   disciplines and over a dozen universities, and we worked

21   together to study the effects of welfare reform on families in

22   Boston, Chicago, and San Antonio.

23   Q      What was your role in the Three City Study?

24   A      So the Three City Study was mixed methods and I was,

25   first, a post-doctoral research fellow and then was hired as a

 1   research scientist.  I was the project manager for the San

 2   Antonio site and I worked with the teams who were doing the

 3   surveys and I was responsible for the ethnographic components

 4   in San Antonio, for coordinating them.  I trained and did the

 5   day-to-day supervision of the field ethnographers, the people

 6   that went into the homes and into the neighborhoods to do the

 7   interviews.  I also conducted some of the interviews, in

 8   English and in Spanish, in the homes and with the different

 9   neighborhood representatives.  In addition, I was responsible

10   for the qualitative, the ethnographic materials, data

11   management and its coding, as well as some of the analysis, and

12   I participated in the publications.

13   Q    Who funded the Three City Study?

14   A    So the project had a range of funders, and representing

15   the Federal Government there was the Department of Health and

16   Human Services and the Social Security Administration.  Among

17   private foundations, those included the Robert Wood Johnson

18   Foundation, the Kaiser Family Foundation, the MacArthur

19   Foundation and a range of others.

20   Q    Did you co-write a book about the findings of the Three

21   City Study?

22   A    Yes.

23   Q    What book was that?

24   A    So I co-authored it with Dr. Ronald Angel and Laura Lein

25   and it's called Poor Families in America's Health Care Crisis.

1    Q    And who published that book?

2    A    Cambridge University.

3    Q    Was it peer reviewed?

4    A    Yes.

5    Q    Did you also edit and write sections of another book about

6    the San Antonio findings in the Three City Study?

7    A    Yes.

8    Q    And what book was that?

9    A    Doing Without.

10   Q    And who published that book?

11   A    University of Arizona Press.

12   Q    Was that book peer reviewed?

13   A    Yes.

14   Q    Is the mixed methods approach considered a reliable

15   methodology within your discipline?

16   A    It's considered reliable in a range of disciplines,

17   including my own.

18   Q    Is an accurate copy of your CV attached to the Declaration

19   that you submitted in this case?

20   A    Yes.

21          MS. MARANZANO:  For the record, that is Plaintiffs'

22   Exhibit 767.  And at this time, your Honor, we'd like to

23   proffer Dr. Henrici as an expert on the impact of public policy

24   on low income individuals.

25          THE COURT:  Okay.  You can proceed.

1    **BY MS. MARANZANO:**

2    Q     Have you been retained as an expert in this case?

3    A     Yes.

4    Q     What were you asked to examine?

5    A     I was asked to assess, using existing research on Texas,

6    whether the requirements of SB 14 placed a burden on low income

7    Texans and, since Blacks and Hispanics are disproportionately

8    represented among low income Texans, whether the burden would

9    be disproportionate on them.

10   Q     Now, we'll discuss your analysis in a moment but before we

11   do that, did you reach a conclusion in your report?

12   A     Yes.

13   Q     And what was the conclusion that you reached?

14   A     That the expectations, the requirements for certifications

15   and documentations of SB 14, place a burden on low income

16   Texans, and particularly those who are Black and Hispanic.

17   Q     And when we discuss "low income Texans," who are we

18   talking about?

19   A     So, "low income" is a term that describes relatively low

20   monetary income, as well as assumes a relative lack of access

21   to resources.

22   Q     And how are low income individuals affected by SB 14?

23   A     The challenges that low income persons and Texans

24   experience bundle together; they tangle together.  And just to

25   name them very briefly, they include unreliable income, the

1   unavailability or the unavailable time, the prevalence of poor

2   health; also, relative isolation.  And then there's a stigma

3   associated with poverty, with being low income.

4   Q    Okay.  So let's talk about each one of those.  What did

5   you mean when you said "unreliable income"?

6   A    As I mentioned, the types of jobs that, when people are

7   able to find work, are often available are those that might be

8   part-time or seasonal or opportunity permitting and they are

9   irregular hours often, so that makes it very hard for someone

10  to plan ahead in terms of a schedule.  Part-time seasonal work

11  also, because it's often low wage, low paying, means that it

12  doesn't -- it's not enough to sustain a family.  So the person

13  who's the primary caregiver or the person who is trying to

14  bring in money for the household often might have to work more

15  than one job, so that makes it even harder to juggle in terms

16  of income and it's unreliable.

17  Q    And how would this problem interact with the requirement

18  to get ID under SB 14?

19  A    As I mentioned, the difficulty comes in part because these

20  jobs often don't pay for time off.  So if you are taking time

21  to do something that isn't directly relevant or directly

22  related to bringing in food to helping ends meet, it's really

23  an added expectation on your time and it's a cost because

24  you're not paid, you're losing money.  Furthermore, if you're

25  not making good wages, you can't subsidize that time with your

1   income.  You're really taking a loss.

2   Q    So when you said that unavailability of time was another

3   obstacle, is that what you meant?

4   A    Actually, that is what I mean but it goes further.  So,

5   again, all of these issues work together; they bundle, as I

6   said, or tangle together.  The fact of the matter is that many

7   people are trying to raise children or care for someone in

8   their home who might not be able to do so independently.  So

9   they're trying to juggle; these working Texans are trying to

10  juggle taking care of family members, all the responsibilities

11  that requires, as well as working, say, multiple jobs.  Putting

12  all of that together means that, then, if something isn't

13  really relevant, again, directly to feeding the household or

14  helping their children it can be a cost, it can be a burden.

15  Q    Now, you also said that there was a prevalence of health

16  problems among low income individuals; is that right?

17  A    Yes, disproportionately.

18  Q    And can you describe what you meant by that?

19  A    Just a range of indicators.  The health issues that low

20  income Texans experience are disproportionate to those who have

21  better incomes, so that they struggle with issues that --

22  diabetes and all sorts of different kinds of conditions --

23  asthma -- that can restrict their mobility.  Not necessarily

24  cut it off, but really affect their opportunities -- again,

25  working together with these other issues -- to take time off

Henrici - Direct / By Ms. Maranzano                188

1   and to travel and to do so.

2   Q    And can you give us an example of how health problems

3   might interact with the requirements of SB 14?

4   A    So if a woman has children that she's taking care of and

5   she has health issues, but of course she's still working, so

6   she's still dealing with her job and with raising her kids but

7   she needs to focus on doing that and keeping her health up,

8   perhaps getting prescriptions filled might be the only types

9   of, you know, transit other than getting groceries that she can

10  take time to do.

11  Q    Now, I think you also mentioned that low income

12  individuals face relative isolation; is that right?

13  A    Yes.

14  Q    And can you describe what you meant by that?

15  A    So in this sense there are different types of isolation.

16  And the relative isolation of something means that the

17  communities might have -- the people might engage with one

18  another.  So on the one hand it can be something good that, you

19  know, you might get your paycheck cashed at the local grocery

20  store where you don't need an ID, but on the other that means

21  you probably don't necessarily have access to a bank, because

22  there is no branch in your neighborhood.  So that curtails some

23  of the opportunities that, perhaps, a bank could provide in the

24  way of loans or something else.

25       In addition, transit; most of the people that I've worked

1  with that I've studied do not own cars, they walk to get

2  around, they take the bus -- busses, by the way, because in

3  many parts of Texas to get from one place to another it takes

4  multiple bus trips.  And so all of these things, again,

5  combined with the issues of health, combined with standing in

6  the heat or the rain or the -- and dealing with taking care of

7  your children, interact with one another, so it can really make

8  it hard to move outside of your normal sphere of activity.

9  Q    And how would that isolation impact an individual who

10 needed an ID under SB 14?

11 A    Quite simply, it adds, again, to the burdens -- to the

12 expectations on that person's time.  When people were trying to

13 seek different -- for example, different kinds of

14 certifications such as, say, a housing voucher they would have

15 to undergo multiple trips and find, if they could, help with

16 child care.  Often, they had to bring the children with them,

17 which has its own challenges.  And, again, this involved either

18 taking time away from seeking work, itself expensive, or from

19 work itself.

20 Q    Finally, I think you mentioned stigma; is that right?

21 A    Yes.

22 Q    Can you describe what you meant by that?

23 A    There is a stigma associated with not having enough to get

24 by, with being poor, and a lot of people who are poor are very

25 aware of this.  They are made aware of it in multiple contexts,

1   even by very well meaning people trying to provide services or

2   determine eligibility.  There are indications in offices where

3   people go to seek help that if they are there that they are,

4   themselves, -- that this is somehow making them less of a good

5   Texan.  And the problem is that any kind of attitude about

6   that, even if somebody's dignity and pride is affected by this,

7   chances are they're going to have a disincentive to seek help,

8   even if it's for their kids.

9   Q    And how would this stigma interact with the requirements

10  of SB 14?

11  A    There is simply an effect that adding all of these

12  together, if someone has an expectation that's not part of

13  their daily life that's not part of getting by or helping to

14  feed themselves and their children, it's going to not be

15  something that is easily dealt with.

16  Q    If a community is disproportionately poor, will its

17  members face barriers that more affluent individuals don't

18  face?

19  A    Absolutely.

20  Q    Can you tell us about the poverty level among Black and

21  Hispanic Texans as compared to White Texans?

22  A    So, roughly the percentage of Whites, according to poverty

23  measures, is about half that of Blacks and Hispanics.

24  Q    So how do you assess the impact of SB 14 on Black and

25  Hispanic individuals?

1  A    Well, in part, because Blacks and Hispanics -- the

2  percentage of Blacks and Hispanics who are poor is greater, the

3  impact is greater, but it also relates to other issues as well.

4  Q    And I want to talk about that, because you've also said in

5  your report that even among low income individuals Black and

6  Hispanics are especially burdened, right?

7  A    Yes.

8  Q    And can you explain that conclusion?

9  A    So what we found is that -- and what we continue to find

10  is that Blacks and Hispanics tend to have even less likelihood

11  of getting stable long-term employment, for one thing.  For

12  another -- which would make for the regular income.

13       For another, in terms of relative isolation and the

14  prevalence of health issues, the indicators are much more

15  pronounced for those who are Black and Hispanic.  At every age

16  level, there are a lot more problems with respect to health --

17  different kinds of health problems.  And in terms of relative

18  isolation, unless Blacks and Hispanics are above low income,

19  you see their isolation to be greater than those of low income

20  Whites.

21  Q    Dr. Henrici, have you heard voters testify in this trial

22  about their attempts to obtain ID that would satisfy the

23  requirements of SB 14?

24  A    I've heard -- I've had the opportunity to hear many of

25  them.  I haven't heard all of them.

1  Q    What is your reaction to their testimony?

2  A    So, I was very impressed and have enormous respect for the

3  struggles that they've gone through.  It was very compelling.

4  At the same time, I couldn't help but note that most of them

5  have somewhat more fortunate situations than the majority of

6  the people with whom I've conducted research.  They have family

7  and friends and people that are able, on occasion -- granted,

8  only on occasion, but to give them rides.  Most of them have

9  literacy and they can have someone help them with the

10 confusing, sometimes misinformation, the bouncing back and

11 forth in terms of different kinds of information that was being

12 given them.  Also, they didn't lose their documents in the

13 mail.  I have, on more than one occasion, had people with whom

14 I was conducting interviews, their documents were lost.

15      Having said all of that, in general there were a lot of

16 overlaps:  the issues with health, the issues with having to

17 walk and get around, the issues -- like Mrs. Bates, I believe

18 it was, said that she just felt like she was going around in

19 circles.

20      So this tangle, as I call it, this bundle of problems,

21 this conundrum that all of these different issues working

22 together was very evident to me in all of those testimonies

23 that it's not just one issue alone that creates this challenge

24 for low income Texans, especially those who are Black and

25 Hispanic who are also low income.  It's these different issues

Henrici - Cross / By Mr. Scott                                193

1    working together, because one of them alone might be a problem

2    but when you put them together and you ask someone to do yet

3    one more thing with their time, it's a hardship.

4    Q     Thank you very much.

5          **MS. MARANZANO:**  I have nothing further.

6          **(Pause)**

7                        **CROSS EXAMINATION**

8    **BY MR. SCOTT:**

9    Q     Hello Dr. Henrici.

10   A     Hi.

11   Q     Good to see you again.

12         You have identified a number of issues relating to

13   additional hardships as a result of poverty that a person who

14   has barely enough money to feed their family deals with in

15   everyday life, correct?  I mean, -- I'm sorry.

16         I want to use tired as the excuse, Judge.

17         **(Laughter)**

18         I'll try it again.

19         You have rendered some opinions in this case that relate

20   to the effects of poverty on certain races in their ability to

21   acquire photo ID that complies with SB 14, correct?

22   A     Yes.

23   Q     And as part and parcel of that you said you were asked to

24   render an opinion on whether the burdens of SB 14 placed an

25   undue burden on low income minorities; is that correct?

Henrici - Cross / By Mr. Scott                    194

1   A    A particular burden on those who are Black and Hispanic.

2   Q    Okay.  And from a standpoint of a person who is poor and

3   Asian, for instance, or poor and White -- poor is poor, right?

4   A    No.

5   Q    You agree with that?

6   A    No.

7   Q    Okay.  So we can establish that you do not believe that

8   someone who is poor and White has the same disadvantages that

9   someone who is poor and an American Indian, correct?

10  A    That has not been our finding in the research.

11  Q    Okay.  And that's not an opinion you hold here today,

12  correct?

13  A    Correct.

14  Q    Okay.  So there are certain -- you believe a specific race

15  -- it's your opinion that a specific race that has a person

16  that is poor equal -- let's assume a fact for a moment.  You've

17  got a White person here that has two dollars to his name.  You

18  have a Black person here who has two dollars to their name.

19  They both live under the same overpass.  Do you believe the

20  hardships on the White person are less than the Black person

21  under that overpass?

22  A    What I said, and what I'm trying to make clear, is that

23  for one individual versus another I can't speak.  In general,

24  we know that for low income Whites -- and this is what we have

25  found in our research -- the opportunities to get a job that

Henrici - Cross / By Mr. Scott                                195

1    pays better and that lasts longer, with more regular pay, are

2    greater than for low income Blacks.

3    Q    Well, and I'm not sitting here asking that question,

4    ma'am.  I'm asking about these two hypothetical individuals

5    that are both living under an overpass.  One is White; one is

6    Black.  They have two dollars each to their name.  Is the

7    impact of being poor different between those two people?

8    A    I really couldn't answer about those two individuals.

9    Q    Okay.  You have rendered an opinion that SB 14 does, in

10   fact, impact certain minority groups more than other minority

11   groups, correct?

12   A    Yes.

13   Q    You did not rely on Dr. Ansolahehere's work product to

14   form your opinion; is that correct?

15   A    That is correct.

16   Q    And so you drew the opinions based upon the information

17   you provided in your Declaration and I guess your testimony

18   here today, correct?

19   A    Yes.

20   Q    When I took your deposition you had completed your report,

21   correct?

22   A    Yes.

23   Q    And rendered all the same opinions, at least, that the

24   Declaration that has been submitted to the Court for its

25   decision here today, correct?  And there has been no revisions

1   of your report?

2   A     No.

3   Q     And at that point in time you did not know how much an EIC

4   cost, correct?

5   A     Correct.

6   Q     As we sit here today, you understand that an EIC is free,

7   correct?

8   A     If you go to an office; once you are there to obtain it, I

9   assume so.

10  Q     Well, you read the statute.  You have analyzed the statute

11  and you've rendered an opinion in this case about the statute,

12  so please don't assume.

13  A     So there is no charge on the part of the State for the

14  person, correct.

15  Q     And as we sit here -- or, I mean, as you sit here today,

16  you are -- or have attempted to do your research that you've

17  conducted in this case like you do any of your academic

18  research, correct?  You start it neutral and you try and stay

19  fair and impartial throughout the process, correct?

20  A     Yes.

21  Q     With regard to whether it was Texas or any other state's

22  law that you were attempting to analyze the effects of being

23  poor, it does not matter from the standpoint of how your

24  mindset of what you undertook as your job in this case; is that

25  correct?

1   A    Yes.

2   Q    You didn't come into this case with a preconceived notion,

3   correct?

4   A    No.

5   Q    Do you have a Twitter account?

6   A    Yes.

7   Q    Is it "janehenrici"?

8   A    Henrici.

9   Q    Henrici.  I'm sorry.  You taught me that that day and I'm

10  doing a poor job.

11       So here's a tweet from you, right?

12  A    Yes.

13  Q    "U.S. Supreme Court strikes down key parts of Voting

14  Rights Act."  Which part was that it struck down that you were

15  tweeting about?

16  A    I've had that explained to me by the attorneys, but -- and

17  I'm embarrassed to say I can't remember how you describe it.

18  Q    Next tweet:  "Supreme Court ruling in U.S. Voting#Rights

19  Act [sic] holds major implications for immigrants."  Did you

20  tweet that?

21  A    It looks like it.

22  Q    When did you get hired in this case?

23  A    February.

24  Q    This year?

25  A    2014.

Henrici - Cross / By Mr. Scott                                  198

1   Q    Do you know what year this is from:  "U.S. Federal

2   Government to sue State of North Carolina over new voter ID

3   law, calling it discriminatory"?

4   A    That must be 2013.

5   Q    "How voter ID laws disproportionately impact women and

6   what we're doing about it."  Is that your tweet?

7   A    Yes.

8   Q    What are you doing about it?

9   A    It's a re-tweet.

10  Q    And this is in January before you were hired in this case,

11  correct?

12  A    Yes.

13  Q    "In denial, the U.S. Supreme Court thinks racism is dead.

14  It isn't."  Who is Gary Younge -- Young?  I'm sorry.

15  A    He is a columnist with The Guardian.

16  Q    You teach in academia?

17  A    Yes.

18  Q    It is harder for a poor kid, whether he's White, Black, or

19  Hispanic, to go to college, correct, versus a kid that comes

20  from a middle or upper income family?

21  A    I'm going to hesitate on that one, only because I've seen

22  some recent research about race that indicates that there are

23  differences, even among poor -- between poor Whites and poor

24  Blacks.  But I'm not an expert on that topic.

25  Q    Well, there is an expert that the Plaintiffs have hired in

1  this case that has identified that there are more student ID

2  cards amongst African American and Hispanic college kids then

3  there are amongst Anglos.  Do you know that?

4  A    I'm not sure that I heard that testimony.

5  Q    Well, there's burdened society places and there is no

6  question that if a burden has landed on the plate of someone

7  who has less resources, they're poor, that person bears -- it's

8  more difficult for that person to accomplish a task, right?

9  A    I would say so.

10  Q    Okay.  Thank you, ma'am.

11        THE COURT:  Hold on.  I don't know if there's going

12  to be further questions.

13        MS. MARANZANO:  Your Honor, we have nothing further.

14        THE COURT:  Okay.  Thank you.  Ma'am, you can step

15  down.

16     (Pause)

17        MR. GEAR:  Good afternoon, your Honor.

18        THE COURT:  Good afternoon.

19        MR. GEAR:  The State would call its next witness,

20  Senator Uresti, Carlos Uresti.

21     (Pause)

22        MR. GEAR:  Oh, I have to correct the record on that.

23  My name is Bruce Gear on behalf of the United States, and the

24  United States would call its first witness, Senator Carlos

25  Uresti.

1          **THE COURT:**  Okay.  All right, you can face over here

2    and raise your right hand.

3          **SENATOR CARLOS URESTI, UNITED STATES WITNESS SWORN**

4          **THE WITNESS:** I do.

5          **THE CLERK:**  Thank you, sir.

6                        **DIRECT EXAMINATION**

7    **BY MR. GEAR:**

8    Q    Senator Uresti, would you state your full name and spell

9    your last name for the record, please?

10   A    Yes, sir, my name is Carlos Uresti, U-R-E-S-T-I.

11   Q    And are you currently a member of the Texas State Senate?

12   A    Yes, sir.

13   Q    And how long have you been a member of the Texas State

14   Senate?

15   A    A little over a eight years.

16   Q    And which District do you represent?

17   A    I represent Senate District 19.

18   Q    Was there a time when you also served the Texas House of

19   Representatives?

20   A    Immediately before that I served for about nine years as a

21   House Representative for District 118, which is in San Antonio.

22   Q    And I also understand that you served in the US Military?

23   A    Yes, sir, I served in the United States Marine Corp.

24   Q    And how long did you serve in the United States Marine

25   Corp?

Uresti - Direct / By Mr. Gear                    201

1    A    About four years active duty and just a little shy of four

2    years in the Reserves.

3    Q    And were you honorably discharged?

4    A    Yes, sir, I received an Honorable Discharge in 1989.

5    Q    And did you receive a military card?

6    A    Yes, sir, I was given -- I was issued a Military ID by the

7    US Government that indicated my service, my rank, I achieved

8    the rank of Captain, and my discharge date.

9    Q    And that was for your honorable service in the United

10   States Military?

11   A    Yes, sir.

12   Q    And does that Military card have a photo on it?

13   A    No, sir, it does not.

14   Q    And you were a Senator in the -- in 2011, correct?

15   A    Yes, sir.

16   Q    And you were involved in the consideration of SB 14,

17   correct?

18   A    Yes, sir.

19   Q    Do you understand, based on your experience actually

20   debating SB 14, that a Military card without a photo on it

21   would not be acceptable at a polling place?

22   A    That's correct.

23   Q    And how do you feel about that?

24   A    It offends me and I think on behalf of the many veterans

25   that are represented it's offensive that somebody who served in

1  the Military, either enlisted or drafted, as an enlisted

2  soldier or Marine, male or female, or as an officer and

3  receives an Honorable Discharge cannot use their Government-

4  issued ID that does not have a photo on it, but nonetheless is

5  a valid Government ID, and I think it's offensive for those

6  that have served our country.

7  Q    And you have that feeling even though you have other valid

8  ID that you could use to vote at a polling place, is that

9  correct?

10  A    Yes, sir, because I'm very proud of my service to my

11  country.

12  Q    Now I understand that your District went through some

13  changes during the most recent re-districting process, is that

14  correct?

15  A    Yes, sir.

16  Q    And can you describe -- first, are you still in District

17  19?

18  A    Yes, sir.

19  Q    And can you describe what your current District looks like

20  for the Court?

21  A    Well, roughly, your Honor, I represent District 19 which

22  starts on the southeast part of San Antonio, Bexar County.  It

23  includes all or part of 17 counties.  It heads south to Crystal

24  City and Carrizo Springs.  It heads all the way over to west

25  Texas where Fort Stockton is and Pecos.  It includes about

Uresti - Direct / By Mr. Gear                    203

1   800,000 people, half of the Texas-Mexico borders, so about 400

2   miles of that border and about 35,000 square miles.  It's

3   larger than eight states in the country.

4   Q    And so in 2011 you were the Senator of District 19,

5   correct?

6   A    Yes, sir.

7   Q    And can you describe, thinking about Senate Bill 14, the

8   time that you were debating this Bill, that would that have

9   been before the re-districting process?

10  A    In 2011?

11  Q    Yes.

12  A    Yes, sir.

13  Q    Can you describe what that District looked like for the

14  Court?

15  A    It was actually larger.  At that time geographically it

16  was the largest district in the country.  It went from San

17  Antonio all the way to El Paso.  It was 588 miles from one end

18  to the other.  It included two-thirds of the Texas-Mexico

19  border.  It was larger than, I forget, 23, 25 states over --

20  larger than 118 countries, and it included two time zones

21  because when you look, part of west Texas to get into El Paso,

22  you were in a different time zone.  There was no other district

23  like it in the country.

24  Q    Now, just so the record is clear, for your current

25  district, what is the population in your current district?

1   A    It's approximately 800,000 people.

2   Q    And in the district that you represented in 2011, what was

3   the population for that district?

4   A    Approximately 760,000 people.

5   Q    So is it fair to say that in your current district you

6   actually have a larger population at this point?

7   A    Yes, sir.

8   Q    I want to turn to the racial demographics of your district

9   as it existed in 2011.

10        Is it important for you to understand the racial

11   demographic of your district?

12   A    Yes, sir.

13   Q    And why is that important?

14   A    Well, I think it's very important.  As a Senator or as a

15   State Representative we're elected to represent our District,

16   and you have to be very familiar with the different individuals

17   that you represent, and in my District before re-districting

18   and in the current district that I represent I have a large

19   majority of Hispanics that reside in my district.

20   Q    And so I want the Court to understand this completely, do

21   you know the percentage of Hispanics that reside in your

22   District?

23   A    Yes, sir.

24   Q    And what percentage is that?

25   A    It's approximately 72 percent of my District that are

1    Hispanic.

2    Q    Do you know the percentage of African Americans that

3    reside in your district?

4    A    Yes, sir, it's approximately 4 percent of my District, so

5    a total of about 75, 76 percent are either Hispanic or African

6    American.

7    Q    And do you know the percentage of Anglos that reside in

8    your District?

9    A    Yes, sir, it's approximately 23 percent.

10   Q    Now you said something in your testimony that I want to

11   discuss for a minute.  You talked about the experience of being

12   in your District.

13            Can you describe for the Court how it is you came to

14   understand this information about your District, the racial

15   demographics?

16   A    Yes, sir.  Your Honor, I've lived there since I was about

17   8 years old, I'm 50, so I've lived there for four decades.  I

18   grew up in -- in the District.  I was elected, again, about 17

19   years ago as a State Rep and now as a Senator.  Notwithstanding

20   how big the District is I have offices in West Texas -- I have

21   one in West Texas and in Pecos; I have one in Maverick County

22   which is in Eagle Pass, along the border; I have one on the

23   south side of San Antonio and, of course, I have one in Austin

24   at the Capital.

25            And the way I get to know my District is, obviously,

1    making my rounds, meeting as many people as possible.  We do

2    constant outreach through our offices.  We have Town Hall

3    meetings.  I participate in as many events as possible.  We do

4    newsletters.  Every month I do 5,000 -- what we call a "5,000

5    mail piece" where we try to target certain areas of our

6    District to talk to them about different issues.

7              I have an annual Christmas party.  We invite about

8    1,000 of our constituents.  I do back to school events every

9    summer and visit almost all of my counties and give out

10   backpacks so it gives me an opportunity meet a number of my

11   families and the working families in my District.

12   Q    And do you -- do you walk your District?  Do you go to the

13   various counties personally to communicate with your

14   constituents?

15   A    Yes, sir, I've block walked my District many times.

16   Q    Now, is it important for you to understand the effects of

17   poverty on your District?

18   A    It's extremely important.

19   Q    And in 2011, at the time you were considering SB 14, what

20   was the percentage of constituents in your District that you

21   would have considered that lived at or below the poverty line?

22   A    Approximately 23 percent that live in poverty.

23   Q    And based on your experience living in the District,

24   growing up in your District and walking and communicating with

25   the constituents of your District, in your District are African

Uresti - Direct / By Mr. Gear                    207

1    American residents more or less likely than Anglos to own a

2    vehicle?

3    A    Less likely.

4    Q    Are Hispanic residents in your District more or less

5    likely than Anglos to own a vehicle?

6    A    Less likely.

7    Q    Now I've spoken to you a little bit about SB 14 and we've

8    established that you were present during the consideration of

9    SB 14.

10            During the debate on SB 14 did you speak publicly on

11   the Senate floor regarding your concerns related to your

12   constituents and poverty?

13   A    Yes, sir, I did, before -- actually, before the debate

14   and, of course, during the debate as well.

15   Q    And what did you say?

16   A    Well, generally I talked about the size of my District,

17   and there's not a Senator in the Texas Senate or the 31

18   Senators that don't know how large my District is as I would

19   always boast about it before the re-districting and, of course,

20   even recently.

21           Too, I talked about how poor my District was.  It's

22   the third poorest District in the State of Texas, and I've said

23   this on the Senate floor, the per capita income of my District

24   is approximately $18,000 per year.

25           We have a number of colonias in my District, and

1    approximately 180 colonias just in District 19, there's

2    thousands -- there's about 2,300 in the State of Texas.

3    Q    And can I stop you there?

4    A    Yes, sir.

5    Q    I've that term before, but it's not really a term that's

6    specific to Washington DC or the New York area.  Can you

7    explain for the Court what a colonias is?

8    A    Yes, sir.  Colonia is generally -- it's -- I hate to even

9    call it a development because it's lacking the basic

10   infrastructure, but you have many times these developers that

11   will come in, they'll buy a plot of land, they'll plot it out,

12   they'll build these substandard homes.  These folks that move

13   in, they're very modest homes, but they lack the basic

14   infrastructure.  They lack water, they lack sewer, they lack

15   roads many times, sidewalks, driveways.  Again, the homes are

16   substandard.  Many of these individuals buy them on a contract

17   for deed, and if they miss one payment, you know, a lot of

18   these folks live paycheck to paycheck, they may be out of a

19   house.  And it's a terrible situation that Texas faces.  Again,

20   there's about 2,300 in the State of Texas, mostly along the

21   border areas.  There's some here in Nueces County.

22   Q    Were you done, I'm sorry?

23   A    I was going to say there's about 180 in my District.

24   Q    180 in your District?

25   A    Yes.

Uresti - Direct / By Mr. Gear                          209

1   Q    And how does that relate to your concerns, if any,

2   regarding SB 14?

3   A    It's a serious concern of mine, and not just for my

4   District, but I would submit to you for the rest of Texas.

5   These are families that, again, are living in substandard homes

6   and lack proper transportation.

7             In Maverick County, for example, where the city of

8   Eagle Pass is located, there are about 60 colonias.  These

9   folks are living paycheck to paycheck and to have -- if they

10  have transportation they're very fortunate, so it plays a large

11  part in how I feel about Senate Bill 14.

12  Q    And have you personally visited these areas that you are

13  describing?

14  A    Absolutely.

15  Q    And your testimony previously regarding the lack of

16  vehicle ownership, would that apply to these areas as well?

17  A    Well, outside of Bexar County, outside of where the city

18  of San Antonio is, the other 16 counties have zero public

19  transportation.  There are no buses in Maverick County, no

20  buses in Eagle Pass, and I'm talking about public

21  transportation.  You can catch a Greyhound bus, perhaps, to go

22  from one part of the District to San Antonio or elsewhere.  But

23  as far as within the city, there's zero buses that run in Eagle

24  Pass or Del Rio or Uvalde or Crystal City or Carrizo Springs.

25  Q    And how does that factor into your concern about Senate

Uresti - Direct / By Mr. Gear                              210

1    Bill 14?

2    A    Well, it's a big concern to begin with simply because the

3    infrastructure is lacking, but as far as Senate Bill 14 is

4    concerned, given the fact that I have six counties in my

5    District that have no DPS office, it's a big concern because

6    there, again, there's no transportation for those that are

7    lacking a personal vehicle.  It becomes challenging for them to

8    travel from Dimmit County, for example, or Zavala County to

9    Maverick County.

10   Q    And would you consider that an obstacle in obtaining one

11   of the necessary qualifying SB 14 forms of ID?

12   A    Well, it's a huge obstacle to begin with without having

13   the proper transportation, coupled with the fact that having to

14   take off from work to try to do it, schedule it during your

15   lunch hour, to travel to another County to try to get that ID,

16   and in almost every one of my counties those County offices are

17   closed during the lunch hour so it becomes a huge obstacle for

18   them.

19   Q    So you talked about the obstacle of getting to the

20   driver's license offices.  Are you aware of any Department of

21   Public Safety offices that are open three or less days per week

22   in your District?

23   A    There are some out in West Texas.  Again, there are about

24   six counties that do not have a DPS office.  Those that do have

25   DPS offices, the hours are limited, or even if they are open

Uresti - Direct / By Mr. Gear                              211

1   from 8:00 to 5:00 out in West Texas, those Troopers, if they

2   get a call, they're not going to be in that office, they have

3   to make a call, so it's very limited.

4   Q    So you are testifying to this today, and let's put it into

5   context.

6            In 2011, during the consideration of SB 14, did you

7   testify to this on the Senate floor, these issues?

8   A    Yes, sir.

9   Q    And what did you say?

10  A    Well, I talked about the different offices that were

11  located in my District.  At that time, you know, I'm speaking

12  about back in 2011, there were certain counties that did not

13  have DPS offices.  There were certain counties that if they did

14  have a DPS office, they were only open a couple of days a week.

15  There were certain counties that had a DPS office that was open

16  one day a week, and so I talked about that on the Senate floor.

17  I asked the Senate sponsor, Senator Fraser, if he was aware of

18  that fact.  He used to represent part of it and so I knew he

19  was, but I asked him on the Senate floor, and I made it clear

20  to all of my colleagues the concerns that I had about the Bill,

21  particularly with regard to the DPS offices and the lack

22  thereof.

23  Q    And so you mentioned Senator Fraser, correct?

24  A    Yes, sir.

25  Q    And was Senator Fraser the author of SB 14?

Uresti - Direct / By Mr. Gear                                          212

1    A    Yes, sir, the Senate.

2    Q    And do you recall the types of response you received when

3    you expressed concerns about the lack of transportation within

4    your District or the levels of poverty from your District?

5    A    Yes, sir.  The responses were not substantive, they were

6    mostly "I'm not advised" was the most stated response that I

7    received to my questions, or "You need to ask that question of

8    the Secretary of the State."

9    Q    Were you able to ask the question of the Secretary of

10   State?

11   A    No, because once a Bill comes to the Senate floor no

12   witnesses are allowed on the Senate floor and the questions are

13   only asked of the other Senators.

14   Q    So you were unable to ask that question of the Secretary

15   of the State, correct?

16   A    At that time, correct.

17   Q    So Senate Bill 14 has been implemented, correct?

18   A    Yes, sir.

19   Q    Has Senate Bill 14 had an impact on your constituents?

20   A    I believe it has.

21   Q    And can you describe for the Court what that impact has

22   been?

23   A    Well, I think it has disenfranchised a number of my

24   constituents and a number of the voters that live in my

25   District because they are now -- they either lack the photo ID

1    that is required, or they are lacking the certain documents

2    that are required in order to get a photo ID, and -- and that

3    has disenfranchised them and/or prevented them from being able

4    to vote in the last election and then the election that's

5    coming up in November.

6    Q    Now I'd like to transition to an issue that we've heard

7    from -- a bit about in this courtroom, and it's related to

8    mobile EIC stations.

9            Are you familiar with the term "mobile EIC stations?"

10   A    Yes, sir.

11   Q    And has the Texas Department of Public Safety made mobile

12   EIC stations available in your District?

13   A    I believe in -- yes, they have, but I believe in just two

14   counties.

15   Q    And have you or your staff personally visited the mobile

16   EIC stations that were available in the two counties?

17   A    When they were there my staff has.

18   Q    So let's -- let's flesh out when they were actually

19   available.  You said two counties.

20           What two counties were the mobile EIC stations

21   available?

22   A    I believe they came to Maverick County and Val Verde

23   County last year which would be the city of Eagle Pass and the

24   city of Del Rio.

25   Q    And do those counties have driver's license offices?

1    A     Yes, sir, they do.

2    Q     And were you made aware that those mobile EIC stations

3    would be available in those two counties in your District?

4    A     We discovered that they were coming, yes, sir.

5    Q     And how did you discover that?

6    A     I have a very active staff that is always trying to get

7    information given, again, the geography of my District.  I

8    charged them with getting as much information about any issue

9    that is helpful to my constituents, so we discovered it

10   sometime last year and then we tried to disseminate it, you

11   know, to our constituents, but that's a challenge in itself.

12   Q     And I just want to be clear for the record, when you say

13   you "discovered," how did you discover that information?

14   A     We went on their web site and discovered that they were

15   going to be coming to those two counties.

16   Q     And "their web site," you are referring to whom?

17   A     The Secretary of State.

18   Q     Did you hear that information, that they would be coming

19   to the counties from the counties themselves?

20   A     No, sir.

21   Q     Did you have an opportunity to determine if there was any

22   advanced advertisement or publications as to the availability

23   of these EIC stations in those two counties?

24   A     I don't believe there was.

25   Q     Has the availability of EIC mobile stations in your

Uresti - Direct / By Mr. Gear                    215

1    District been effective in addressing the failures that you've

2    spoken to about on the stand regarding your constituents?

3    A    No, sir.  They were only there for, I believe, a couple of

4    hours last -- last Fall.

5    Q    So I want to transition to another issue which is HB 218.

6             Are you familiar with that particular piece of

7    legislation?

8    A    Yes, sir.

9    Q    And was that a photo ID legislation in 2007?

10   A    Yes, sir.

11   Q    And were you present in the Senate in 2007 during the

12   consideration of HB 218?

13   A    Yes, sir.

14   Q    So I'd like to understand the process for HB 218.  Can you

15   describe for the Court what, if any, practices or procedures

16   does the Senate following in the morning at the beginning of

17   each legislative session?

18   A    Every morning in the Texas Senate we have what's called

19   the "morning call."  We open, the presiding Officer of the

20   Lieutenant Governor will gavel us in.  We'll open with a

21   prayer.  We recognize the doctor of the day, who a doctor

22   volunteers every day to serve at the leisure of the Texas

23   Senate if someone falls ill.  We do congratulatory resolutions

24   and memorial resolutions.  For example, we might honor a

25   soldier that has returned from combat, so we go through all of

Uresti - Direct / By Mr. Gear                    216

1    those traditions and customs, and we do that.  Sometimes it

2    takes an hour, sometimes it takes three hours, it just depends.

3    Q    So you are familiar with the concept of a blocker bill?

4    A    Yes, sir.

5    Q    And what is a blocker bill?

6    A    A blocker bill is a Bill that is typically not a

7    controversial Bill, it's a simple little Bill that the

8    Presiding Officer will place ahead of every other Bill, and

9    it's intended to require the Texas Senate or a majority of them

10   to work together, to be deliberative, and compromise on Bills

11   that will affect and assist the majority of Texans.

12            So in order for a Bill to come up for consideration

13   on the Senate floor, two-thirds of the Texas Senate have to

14   agree to suspend the rules to go outside the ordinary course of

15   business.  So you have the blocker bill that's in place, and if

16   I have a Bill that I want to bring up for consideration I have

17   to move to suspend the rules.  It takes two-thirds of the Texas

18   Senators to agree, then my Bill can be taken up out of line of

19   the blocker bill, and that's what, again, makes the Texas

20   Senate the most deliberative body in the US.

21   Q    So you testified that a Motion to Suspend would need to be

22   brought to the floor and in order to move in front of a blocker

23   bill, did I understand that correctly?

24   A    Yes, sir.

25   Q    And during the consideration of HB 218, do you recall a

1   time when there was a Motion to Suspend the regular order of

2   business to take up HB 218?

3   A     Yes, sir.

4   Q     And can you tell me what happened?

5   A     Well, this was -- I was not present when it came up

6   initially, I had left the day before, I was ill, I had the flu.

7   I was feeling very sick and I was actually behind the chambers

8   in the Members Lounge, what we call the "Members Lounge," and I

9   didn't want to leave because we were concerned that the Bill

10  would come up, and two of my colleagues insisted that I leave

11  and one was a doctor and one was a pharmacist, one was a

12  Republican and one was a Democrat and, you know, I said, "I

13  can't leave," and they said, "Don't worry, we're not going to

14  bring up voter ID Bill," and I left.

15         The following morning, the day that the bill -- House

16  Bill 218 was brought up, I was ill.  Again, I called to the

17  Secretary of the Senate, the Secretary of the Senate, Patsy

18  Spaw, to let her know that I would be in after the morning call

19  because, again, that takes an hour and a half, two hours,

20  depending.  I called two of the Chairs of the different

21  committees that I sit on because we meet early in the morning

22  and I wanted to let them know I would be in later.  I was a

23  freshman Senator, a Marine and, you know, never late and I was

24  just doing what I thought was the senatorial thing to do, to

25  give them notice that I would be there.

1   Q    Is that a requirement, to call in and let them know in

2   advance that you would not be there in the morning?

3   A    It was just a senatorial thing to do.

4   Q    Okay.  What happened after that?

5   A    Well, then I got a call from Senator Hinojosa, one of my

6   colleagues.  I told him I was ill.  He said he -- I can't

7   repeat what -- exactly what he said, but basically he was a

8   Marine, he basically said "You need to get over here right

9   away," so I immediately got dressed, I rushed over to the

10  Capital, and as I was walking onto the Senate floor, the

11  Secretary of the Senate was calling the roll, and as they

12  called my name I walked up to the Senate floor and I voted --

13  held my two fingers up and voted no against consideration of

14  suspending the two-third rules for House Bill 218.

15  Q    And you indicated in your testimony that you didn't really

16  know what was going on.

17       Was there a time when you learned what happened prior

18  to your arrival on the Senate floor?

19  A    Yes, sir.  I learned from some of my colleagues that the

20  bill had actually been brought up before I arrived on the

21  Senate floor.  There was a roll call that was conducted.  Of

22  course, I wasn't present.  Dean Whitmire was not present --

23  Senator Whitmire was not present, Senator Hegar was not

24  present, and so they had the votes to suspend and pass the

25  Bill.

1          At the urging of some of my colleagues the Lieutenant

2   Governor agreed to call a second roll call and, again, I was

3   able to make it to the Senate floor.  So after that vote the

4   Lieutenant Governor came up and apologized to me for what had

5   happened and I heard from some of my other colleagues what had

6   happened, as well, which was what I just explained to you.

7   Q    Now you said Senator Whitmire was not present.  What do

8   you mean by that?

9   A    Well, it's very common.  You check in in the morning with

10  the Secretary of the Senate, Patsy Spaw, and then you go to

11  work.  And so you'll have members, Senators that will either be

12  in the back with the Lieutenant Governor working on a bill,

13  sometimes some of the Senators are in the Members Lounge

14  discussing a bill.  It's not uncommon to go over to the House

15  of Representatives, the floor of the House of Representatives,

16  to find out what's the status of your bill in the House, and

17  that's common practice every day, so when I say Senator

18  Whitmire was not present, it was my understanding he was

19  working the floor, both in the Senate and then in the House.

20  Q    So you indicated that he had "checked in."  What do you

21  mean by that?

22  A    With Whitmire, I've been there eight years, rarely misses

23  a day.  And every morning, he's one of the first ones to arrive

24  at the capitol and will check in with the Secretary of the

25  Senate, Patsy Spaw, to let her know I'm here, that I'm going to

1    work.

2    Q    So would it be unusual or is the normal course of business

3    to consider a senator absent once they've checked in with the

4    Secretary of the Senate?

5    A    It's highly unusual.

6    Q    And why do you say that?

7    A    It just doesn't happen.  Unless the Secretary of the

8    Senate knows that you have left and if you're leaving for the

9    day -- sometimes senators have to go back to their districts

10   for different events -- you usually check out with the

11   Secretary of the Senate.  Otherwise, you're -- once you've

12   checked in, you're accounted for.  So it's highly unusual for

13   them not to include you in the vote.

14   Q    So prior to the votes that were taken on HB 218, had you

15   made your position known regarding photo ID legislation?

16   A    Absolutely.  It was very clear that I opposed House Bill

17   218.  It was very clear that my Democratic colleagues opposed

18   that bill.  It was a very controversial bill during the

19   legislative session.  There was no question about it.

20   Q    And why did you oppose HB 218?

21   A    Because I felt it would affect my constituents and it

22   would have an adverse effect against my constituents and their

23   ability to vote.

24   Q    So what would you say if someone said this was all about

25   partisan politics, that this had nothing to do at all with

1    race?  What would you say to them?

2    A    I'd say that's not true.  I voted against that bill

3    because of what I explained to you about my district and the

4    makeup of my district and the poverty rates and lack of

5    infrastructure and transportation and DPS offices, and the fact

6    that it's 400 miles from one end to the other of the current

7    district.  That's why I voted against the bill.  It had -- for

8    me it had nothing to do with politics.  Plus, I was offended by

9    the fact that I couldn't use my military ID as well.

10   Q    And your position is based on your experience, both

11   living, growing up, and knowing the constituents in your

12   district?

13   A    Yes, sir.

14   Q    So, again, I'd like to transition to another issue, which

15   is Senate Bill 14.  And I believe we've established, but I'll

16   do it again, you were a senator involved in the public debates

17   on SB 14, correct?

18   A    Yes, sir.

19   Q    And in 2011, was SB 14 exempted from the requiring support

20   of the two-thirds rule?

21   A    Yes, sir.

22   Q    And, if you know, how did that occur?

23   A    Right before -- I think it's either the first day or the

24   second day of the session, it just depends, the Senators as a

25   whole will caucus in what we call the Betty King room behind

1  chambers, the Senate chambers, and we discuss the rules that

2  will be applied for the session.  And for at least five decades

3  the two-thirds vote has been in place.  This was the first time

4  that -- and it only takes a majority to change the rules --

5  that the Republicans essentially voted to change and

6  essentially eliminate the two-thirds rule when it came to the

7  voter ID bill.

8  Q    Would you consider that usual or unusual?

9  A    Considering the thousands of bills that have come through

10 the Texas Senate where the two-thirds rule has applied, and

11 this being the one time from my knowledge and my experience

12 there, highly unusual.

13 Q    Was the two-thirds rule waived for any other bill other

14 than SB 14?

15 A    No, sir.

16 Q    During the consideration of SB 14, did you testify

17 regarding the effect of SB 14 on minority voters?

18 A    On the Senate floor, yes, sir, I did.

19 Q    And what did you say?

20 A    Well, again, I talked about my district and I talked about

21 the makeup of my district and how I felt, that it would have an

22 adverse effect and disenfranchise my voters.  I was very

23 concerned about that.  I tried to have a dialogue with the

24 Senate sponsor about those issues but did not seem to have any

25 success.

Uresti - Direct / By Mr. Gear                     223

1    Q    So I'd like to talk about discriminatory purpose,

2    specifically related to Senate Bill 14.  Was Senate Bill 14,

3    the bill that was considered in 2011 and passed by the Senate,

4    was that passed with a racially discriminatory intent?

5    A    In my opinion, yes.

6    Q    And what's the basis for your contention?

7    A    Well, again, speaking just about my district, the makeup

8    of my district, over 70 percent Hispanic, and total population,

9    75 percent African American/Hispanic makeup, the poverty rates

10   -- Maverick County, we have a poverty rate of 12 and a half

11   percent.  Zavala County, 13 and a half percent.  Again, I have

12   a number of (indiscernible) outside of San Antonio, Bexar

13   County, there's no infrastructure to speak of.  There are DPS

14   offices that are closed in six of my counties, so given all of

15   that and my colleagues knowing that concern that I expressed on

16   many occasion, not just on the Senate floor but in my dialogues

17   with them as well, and the fact that the bill still passed and

18   the impact it would have on my constituents, to me led me to

19   the opinion that it had that discriminatory effect.

20   Q    Let me take you back again to -- we actually did not

21   discuss 2009.  Did the Senate waive the two-thirds rule in

22   2009?

23   A    Yes, sir, they did.

24   Q    And, again, same question:  would that be usual or

25   unusual?

1   A    Well, it was highly unusual.

2   Q    And why was it highly unusual?

3   A    Well, again, for at least half a century, the two-thirds

4   rule has been in place.  And you're going to make this one bill

5   -- make an exception for this one particular bill?  I mean,

6   that's highly unusual if it had applied to any other bill.  I

7   mean, forget it was that bill and pick one bill, I would -- and

8   you would ask me that question, I would tell you it's highly

9   unusual to do that because that's not how the Texas Senate

10  operates.

11  Q    So let me make sure that the testimony is clear, they

12  waived the two-thirds rule in 2009, correct?

13  A    Yes, sir.

14  Q    And do you recall that piece of legislation being SB 362?

15  A    Yes, sir.

16  Q    And they waived the two-thirds rule in 2011 for SB 14,

17  correct?

18  A    Yes, sir.

19  Q    Do you recall them waiving the two-thirds rule for any

20  other piece of legislation?

21  A    Not that I recall, no, sir.

22  Q    So is it your position that Senate Bill 14 would have a

23  discriminatory -- a racially discriminatory effect on African

24  American voters in Texas?

25  A    Yes, sir.

1   Q    And is it your position that SB 14 will have a racially

2   discriminatory effect on Hispanic voters in Texas?

3   A    Yes, sir.

4   Q    Are indigent voters more or less likely to possess an

5   allowable form of SB 14 ID, based on your experiences?

6   A    Less.

7            MR. GEAR:  I pass the witness.

8            MR. CLAY:  Good afternoon, Senator Uresti.  How are

9   you?

10            THE WITNESS:  Good afternoon, thank you.

11            MR. CLAY:  My name is Reed Clay, and I'm representing

12   the State of Texas today.  We've never met before, but I did

13   review your testimony that you provided in the preclearance

14   case.  Do you recall that?

15            THE WITNESS:  Yes, sir.

16            MR. CLAY:  Okay.

17                        CROSS EXAMINATION

18   BY MR. CLAY:

19   Q    You -- talking with Mr. Gear here, you expressed -- you

20   testified that you expressed some concerns about the lack of

21   DPS offices in your district; is that right?

22   A    Yes, sir.

23   Q    Do you recall -- are you aware that the Department of

24   Public Safety has contracted with -- entered into memorandums

25   of understanding with various counties in order to provide an

1    EIC-issuing facility in each county?

2    A    Yes, sir.

3             **MR. CLAY:**  Could you bring up his district -- the

4    counties in his district?

5    Q    I got this off of TLC's -- or the legislative counsel's

6    lovely website.  And can you just verify for me that these are

7    the counties in your district?

8             **(Pause)**

9    A    Yes, sir.

10   Q    And judging by this, it looks like that over half of your

11   district is in Bexar County; is that right?

12   A    That's correct.

13            **MR. CLAY:**  Can I switch to the ELMO real quick?

14   Q    I don't know how clearly you can see that.  Can you see

15   the pink line?

16   A    Yes, sir.

17   Q    Is this the boundary of Senate District 19?

18   A    Yes, sir.

19   Q    Does that look right?  And this is a DPS office, correct?

20   A    Yes, sir.

21   Q    Okay.  So Bexar County has a DPS office, right?

22   A    Absolutely.

23   Q    And the Bexar -- the part of Bexar County that's in your

24   district has a DPS office, correct?

25   A    Yes, sir.

1    Q    And you also testified, I believe, in your previous

2    testimony that you were very complimentary of San Antonio's

3    transit system, mass transit system, correct?

4    A    Yes, sir.

5    Q    You said it was a very, very good transit system, correct?

6    A    It is, yes, sir.

7    Q    And then are you aware that --

8              **MR. CLAY:**  Can we put the counties back up?

9    Q    -- Atascosa County has a DPS office?

10   A    Yes, sir.

11   Q    Are you aware that its hours are 8:00 to 5:00, Monday

12   through Friday?

13   A    Yes, sir.

14   Q    Okay.  And what about Brewster County?  Are you aware that

15   there's a DPS office in Alpine, Texas?

16   A    Yes, sir.

17   Q    Are you aware that it's open from 8:30 a.m. to 5:00 p.m.,

18   Monday through Friday?

19   A    Yes, sir.

20   Q    And Crockett County, are you aware that the Department of

21   Public Safety has entered into an MOU with Crockett County?

22   A    Yes, sir.

23             **MR. CLAY:**  Could you pull up Plaintiffs' Exhibit 43,

24   please?  Is that 483?  Yes.  Go to the second page, please.

25   And could you zoom in on the --

1   Q    Do you know Michelle Medley?

2   A    No, sir.

3   Q    Do you see here where it says she is the tax

4   assessor/collector?

5   A    Yes, sir.

6   Q    And as part of her responsibility, she accepts and

7   processes applications for election and identification

8   certificates?

9   A    Yes, sir.

10          **MR. CLAY:**  And could we go to the second page,

11  please?

12  Q    Do you see the hours are Monday through Thursday, 8:30

13  a.m. to noon, and then 1:00 to 5:00 p.m.?  And then on Friday,

14  8:30 a.m. to noon and 1:00 to 4:00 p.m.?

15  A    Yes, sir.

16          **MR. CLAY:**  And then could you bring up Plaintiffs'

17  Exhibit 485?

18  Q    Are you aware that the Department of Public Safety has

19  entered into an MOU with Dimmit County?

20  A    I'm not exactly sure, but I'm assuming they have.

21  Q    Do you know who Mario Garcia is?

22  A    No, sir.

23  Q    It says here he serves as a county clerk; is that right?

24  A    I don't know.

25  Q    Well, is that what it says there?

1   A    Yes, sir.

2            **MR. CLAY:**  And the second page.

3   Q    It says his office is open from 8:00 a.m. to 4:30 p.m.,

4   correct?

5   A    That's what it says, yes, sir.

6            **MR. CLAY:**  And 487 next, Brian.

7   Q    And this is Edwards County Sheriff, David Ortiz is the

8   dispatcher and temporary jailer it says.  And it says as part

9   of his responsibilities, he accepts and processes applications

10  for election identification certificates, correct?

11  A    Yes, sir.

12  Q    And the hours here are from 8:00 a.m. to 4:00 p.m.,

13  correct?

14  A    That's what it says, yes, sir.

15           **MR. CLAY:**  And let's go to -- Brian, let's go to Frio

16  County, but let's not do 490.  Let's do Defendants 1218,

17  because I believe 490 is the declaration that was not admitted.

18  It's Defendants' 1218.  And could you zoom in on the parties

19  here?

20  Q    You see here there's a contract between Frio County and

21  the Department of Public Safety, and the purpose is to issue --

22  or process applications for election identification

23  certificates?

24  A    Yes, sir.

25  Q    So you're aware that Frio County has also entered an MOU

Uresti - Cross / By Mr. Clay                                230

1    with DPS?

2    A    Yes, sir.

3    Q    Okay.  Are you aware that Kinney County has entered into a

4    DPS -- agreement with DPS to process EIC applications?

5    A    I'm not certain, but I can assume they have.

6    Q    And do you know whether Maverick County has a DPS office?

7    A    Yes, sir, they do.

8    Q    Are you aware that their hours are 8:00 a.m. to 5:00 p.m.,

9    Monday through Friday?

10   A    Yes, sir.

11   Q    And are you aware that there is a DPS office in Hondo,

12   Texas, which is in Medina County?

13   A    I believe so.

14   Q    Are you aware the hours are -- there are 8:00 to 5:00,

15   Monday through Friday?

16   A    Yes, sir.

17   Q    Okay.  And in Pecos County, are you aware that there is a

18   DPS office there?

19   A    Yes, sir.

20   Q    And that it's open from 8:30 a.m. to 5:00 p.m.?

21   A    Yes, sir, I think so.

22   Q    And then in Reeves County, are you aware that there's a

23   DPS office in Reeves County in Pecos, Texas?

24   A    Yes, sir.

25   Q    And that it's open from 8:30 a.m. to 5:00 p.m., Monday,

1    Tuesday, Wednesday, and Friday?

2    A    I think so.  I don't remember exactly.

3    Q    And are you aware that Terrell County has entered into an

4    MOU with the Department of Public Safety to provide and process

5    EIC applications?

6    A    Yes, sir.

7              **MR. CLAY:**  Your Honor, that's Defendants' Exhibit

8    1808.

9    Q    And are you aware that there is a DPS office in Uvalde

10   County?

11   A    Yes, sir.

12   Q    And that it is open from 8:00 to 5:00, Monday through

13   Friday, correct?

14   A    I think so, yes, sir.

15   Q    And there's a DPS office in Val Verde County, correct?

16   A    Yes, sir.

17   Q    And it's open from 8:00 to 5:00, Monday through Friday,

18   correct?

19   A    Yes, sir.

20   Q    And there's also a DPS office in Zavala County; is that

21   right?

22   A    I believe so.

23   Q    And it's open from 8:00 to 4:30, Monday through Friday,

24   correct?

25   A    I think so.

1    Q     Okay.  A minute ago you were testifying that it's your

2    belief -- and I -- if I'm misstating your testimony, please

3    correct me -- that based upon your testimony in the Senate that

4    -- about the impact that SB 14 would have on your district, it

5    was your belief that the legislature acted with a

6    discriminatory purpose when it enacted SB 14; is that right?

7    A     Yes, sir.

8    Q     Is there any other -- well, in fact, you testified other

9    than that, you don't have any evidence whatsoever that the

10   proponents of SB 14 were acting with a discriminatory intent

11   when they passed SB 14; is that right?

12   A     Correct.

13   Q     And you also testified you had some conversations with

14   some senators that you did not name, and I'm not asking to do

15   so here, who expressed their concerns about voter fraud in

16   Texas, correct?

17   A     Yes, sir.

18   Q     And also their concerns about ineligible voters voting; is

19   that right?

20   A     Yes, sir.

21   Q     Before testifying to the Senate, you -- well, in the last

22   -- in the preclearance case you testified that before

23   testifying in the Senate, you did not conduct any study

24   regarding ID possession rates in your district; is that right?

25   A     That's correct.

1   Q    Nor did you conduct a survey of that sort either, correct?

2   A    Correct.

3   Q    And you had not seen a study that had analyzed the

4   possession of ID rates in your district, correct?

5   A    That's correct.

6   Q    Nor had you seen a survey to that effect, right?

7   A    Correct.

8   Q    You also testified that moving bills up and down is done

9   all of the time in the Senate; is that right?

10  A    I don't remember exactly what I said about that.  I don't

11  remember if I said it like that.

12  Q    Okay.

13       **MR. CLAY:**  Could you pull up -- this is his first

14  deposition.  Poor guy had to sit through two in the last case.

15  It's page 63, 1 through 9.

16  Q    It says, "Can you recall any other time during your

17  membership" -- oh, that's not it.  Yeah, it is.  I'm sorry.

18  "When a bill was passed without the presence of all members?"

19       "ANSWER:  Sure, it's done all the time.

20       "QUESTION:  Can you recall any other instance besides

21       the one you described in paragraph six when a bill

22       was moved up or taken out of order for a vote while a

23       member was gone?

24       "ANSWER:  Yes."

25  Does that ring a bell?

1   A     Yes, sir.

2   Q     Is that your testimony here today also?

3   A     Yes, sir.

4   Q     And you also testified in the last case that during your -

5   - at your deposition, you could not identify how many of your

6   constituents didn't have the documents necessary to get an

7   SB 14 ID, correct?

8   A     Correct.

9   Q     Nor could you identify the number of constituents in your

10  district that didn't have -- already have the photo

11  identification acceptable under SB 14, correct?

12  A     It would be impossible to.

13          **MR. CLAY:**  Your Honor, I'd like to -- may I approach?

14          **THE COURT:**  Yes.

15          **MR. CLAY:**  This is a declaration that -- it came from

16  the agreement that we have with Ms. London regarding the use of

17  some of the documents from the legislators that you previously

18  -- well, you haven't looked at these because they didn't object

19  to them.  This is a declaration that authenticates the

20  documents.  And so with your permission, I'd like to go ahead

21  and show Senator Uresti a few of those documents here.

22          **THE COURT:**  Okay.

23          **MR. CLAY:**  Could you do the amendments?

24  //

25  //

1   **BY MR. CLAY:**

2   Q    Do you recall whether or not the Senate accepted any

3   amendments to SB 14?

4   A    I think they may have accepted a couple.  I don't remember

5   exactly.

6             **MR. CLAY:**  Can you zoom in on the -- this looks like

7   a forward, so maybe you could --

8   Q    This is a document that you produced in this case to us.

9   Do you recognize it?

10  A    Yes, sir.

11  Q    Okay.  Who is Amber Hausenfluck (phonetic)?

12  A    I have no idea.

13  Q    Okay.  And she is emailing -- who's Jason Hossay or

14  Hassay?

15  A    Jason Hassay is my chief of staff.

16  Q    Is he still your chief of staff?

17  A    Yes, sir.

18  Q    And was he during the 2011 legislative session?

19  A    Okay.

20  Q    And here he's a recipient of this email that says,

21  "Attached is a list of the vote ID amendments presented

22  yesterday.  Those that were accepted are in bold.  Thanks to

23  Ida for completing the list yesterday on the Senate floor."  Do

24  you see that there?

25  A    Yes, sir.

Uresti - Cross / By Mr. Clay                    236

1          **MR. CLAY:**  Can you scroll down to the actual list

2    that was attached?  And let's look at the ones in bold.

3    Q    So I think they've attempted to bold some of them but not

4    all of them, but -- so number three from Gallegos, Lucio, and

5    Hinojosa -- I think Hino means Hinojosa, yes?

6    A    Yes, sir.

7    Q    Was accepted and adopted, correct?

8    A    Yes, sir.

9    Q    And also an amendment from Zaffirini that requires photo

10   notice to be separate from other notices was accepted and

11   adopted, correct?

12   A    Yes, sir.

13   Q    Okay.

14         **MR. CLAY:**  And scroll down a little bit more?

15   Q    And then there's one from Senator Hinojosa that I assume

16   that this was the amendment that made concealed handgun

17   licenses an acceptable form of ID, correct?

18   A    Yes, sir.

19   Q    And it was also adopted?

20   A    Correct.

21         **MR. CLAY:**  And then the next page.

22   Q    And then Senator Lucio presented an amendment for a

23   license that had been expired less than 60 days was an

24   acceptable form of ID; is that right?

25   A    Yes, sir.

Uresti - Cross / By Mr. Clay                      237

1   Q    And it was accepted and adopted, correct?

2   A    Correct.

3   Q    And then we won't go over all of these, but it looks like

4   also Senator Watson provided an amendment that was accepted and

5   adopted, and it says 30 to nothing in that case; and then

6   Senator Patrick for disabled persons who wanted to be exempt,

7   they could send a letter to SOS and not have to comply with the

8   photo identification requires of SB 14; is that right?

9   A    Yes, sir.

10  Q    And that was accepted and adopted?

11  A    Correct.

12  Q    Okay.  And then there's also at the very bottom here

13  another one that's not in bold that talks about substantially

14  similar names that was presented by Senator Davis.  Do you see

15  that?

16  A    Yes, sir.

17  Q    And that was accepted and adopted 30-0, correct?

18  A    Correct.

19  Q    Okay.  Do you know who Harold Cook is?

20  A    Harold Cook used to be -- I think he was general counsel

21  to the Senate caucus at one point.  I think that was his title.

22  I don't remember exactly.

23  Q    What does he do now?

24  A    I think he's a lobbyist.  I'm not sure.

25  Q    Do you remember him telling you that if you were going to

Uresti - Cross / By Mr. Clay                    238

1   lose on voter ID, it was important to be right because the law

2   would end up in federal court or before the Department of

3   Justice?

4   A    Telling me?

5          **MR. GEAR:**  I'm going to object to the lack of

6   foundation on that question.

7          **MR. CLAY:**  Asking him what --

8          **THE COURT:**  Overruled.

9          **MR. CLAY:**  -- his recollection is.

10         **THE COURT:**  Overruled.  But he said he -- I don't

11  know what the response was.

12         **THE WITNESS:**  Can you -- I'm sorry, can you ask it

13  again, please?

14  **BY MR. CLAY:**

15  Q    Do you ever recall Harold Cook saying to you that it was

16  important that if you were going to lose, that you do it right,

17  because some day SB 14 would be in federal court or before the

18  Department of Justice?

19  A    I don't recall him saying it.  I'm not going to say he

20  didn't.  I just don't recall it.

21         **MR. CLAY:**  Could you pull up the working together

22  email, please?

23  Q    Here's an email that also came from your files that was

24  produced in this case.  And, again, your chief of staff is the

25  recipient here.  And it looks like I'm guessing Harold Cook

1    sent it.

2              **MR. CLAY:**  And then could we zoom in on this

3    paragraph right here?

4    Q    You see where it says, "I'm always saying that if you

5    can't win, you have to lose right.  That is even more important

6    in this situation which is sure to end up in the federal courts

7    and at the Department of Justice for serious review."  Do you

8    see that?

9    A    Yes, sir.

10   Q    Do you recall seeing this email?

11   A    The first time I saw this email was when I produced it,

12   which was recently.

13   Q    Do you recall Harold Cook ever sending you draft questions

14   for questioning Republicans on the floor in the Senate?

15   A    He might have sent them to my staff.

16             **MR. CLAY:**  Okay.  Can you pull up the next one,

17   please?

18   Q    And, again, this is your chief of staff, correct?

19   A    Correct.

20   Q    And then that's an email from Harold Cook that came from

21   your files, correct?

22   A    Yes, sir.

23   Q    And then it's titled "Suggested Questions and Answers for

24   Republican Witnesses," right?

25   A    I'm sorry, I didn't hear you.

1   Q    Do you see the subject line here?

2   A    Yes.

3   Q    And then it lays out several questions that were suggested

4   for you guys to ask Republican lawmakers; is that right?

5   A    Yes, sir.

6           **MR. CLAY:**  I have nothing further.

7           **(Pause)**

8           **THE COURT:**  I think there might be some more

9   questions.

10                      **REDIRECT EXAMINATION**

11  **BY MR. GEAR:**

12  Q    I didn't see the exhibit number on one of the documents

13  that was pulled up for you, but it essentially said that as

14  Democrats, we did the best that we could do, and I believe it

15  was referencing the photo ID legislation, and it ended with,

16  "We made our bosses proud."  Did you see that particular email?

17  A    I just read it, yes, sir.

18  Q    What was that referring to?

19  A    I'm not exactly sure.  I mean, I guess it -- communication

20  between staff, it happens on a daily basis, that we're not

21  always privy to.

22  Q    During the consideration of SB 14, did you communicate

23  with your staff?

24  A    Yes, sir.

25  Q    Were there attempts -- he flashed on the screen the

1    amendments to SB 14.  Were there attempts to pass amendments

2    that would address the concerns that you and other Senators had

3    related to SB 14?

4    A    Yes, sir.

5    Q    And that was part of the communication with your staff,

6    correct?

7    A    Of course.

8    Q    And that was part of the communication with the other

9    Senators who oppose SB 14, correct?

10   A    It happens on almost every single bill between both

11   Democrats and Republicans where the staff -- chiefs of staff

12   typically -- will get together, discuss the bill, they'll kind

13   of preapprove amendments, they'll leave some for the boss to

14   decide, they'll talk about whether or not their senator, their

15   boss, will vote for the bill.  They meet regularly, chiefs of

16   staff, both Democrats and Republican Senators' chiefs of staff

17   -- I want to say on a weekly basis -- to kind of keep things

18   moving forward.  So it's not unusual.

19   Q    He showed you emails related to your chief of staff and

20   other chiefs of staff.  Were there attempts to communicate with

21   the supporters of SB 14 regarding the amendments that you were

22   -- that you and other Senators were attempting to offer on the

23   floor?

24   A    I'm sure there was.

25   Q    And how would you describe your attempts to communicate

1    with the supporters of SB 14 regarding amendments?

2    A    You know, again, we rely on our staff tremendously because

3    this was not the only bill before the Texas Senate.  It did

4    take up a lot of time.  But we're handling bills that deal with

5    transportation, health and human services, child protective

6    services, higher ed, public ed.  So we rely on our staff

7    tremendously to help reach out -- to do the reach out, if you

8    will, to those that are in support of the bill and also to find

9    out who's opposing a particular bill.

10   Q    And in your efforts to reach out to the supporters of

11   SB 14, did you find that their responses were responsive?

12   A    Yes.

13   Q    Did they respond to the amendments that you offered?

14   A    Generally, yes.

15   Q    Did you offer an amendment?

16   A    I joint authored an amendment.

17   Q    And what did that amendment have to do with?

18   A    I believe the amendment that I joint authored had to do

19   with Secretary of State preparing a report -- if the bill

20   passed -- to talk about the effects that this bill would have

21   on the voters and if it would -- if there was any showing of

22   them being disenfranchised, etcetera.  I thought it was a

23   pretty good amendment.

24   Q    And why did you offer that amendment?

25   A    Well, again, given my district and everything we've talked

1    about this afternoon and the serious concerns I have about the

2    lack of infrastructure, DPS offices, even though there are

3    these EIS's in my district, they're closed during lunch.  So my

4    constituents, if they're trying to make arrangements to go

5    during their lunch hour, they're closed in almost every one of

6    them, except San Antonio.  So given all of that, that was my

7    concern.

8    Q    So the EIC offices that you're referring to that are

9    closed on -- during lunch hour, did you hear any question

10   related to are these offices open on Saturdays?

11   A    I'm sorry, ask your question again?

12   Q    Are these offices open on Saturdays?

13   A    No, sir, no.  And they're -- and San Antonio, of course,

14   is different, but -- and they may be -- but out in the rest of

15   my district they are closed during the lunch hour and they are

16   closed on the weekends.

17   Q    He showed you a number of declarations related to counties

18   that offer EICs, correct?

19   A    Yes, sir.

20   Q    And did he indicate that any of those county offices that

21   offer EICs were open on Saturdays?

22   A    No, sir.

23        **MR. GEAR:**  If I could have permission to approach the

24   witness, I'd like to give him a calculator.

25        **THE COURT:**  Yes.

Uresti - Redirect / By Mr. Gear                    244

1    BY MR. GEAR:

2    Q    So I'm handing you a calculator, and what I'd like to do

3    is I'd like to walk through the declarations that you were just

4    shown, and I'd like you to calculate the total number of EIC

5    cards that were issued by these particular county

6    administrations.

7              MR. GEAR:  So if you could pull up PL-485 for me,

8    please?

9    Q    And this is related to --

10             MR. GEAR:  If you could blow it up a little bit more,

11   particularly number three.

12   Q    And this is related to Dimmit County, correct?

13   A    Yes, sir.

14   Q    And apparently the Dimmit County Clerk's office has

15   authority to accept and process applications for election

16   identification certificates; do you see that?

17   A    Yes, sir.

18             MR. GEAR:  And if you could go to number six and blow

19   that up for me.

20   Q    And just to confirm the question I asked you previously,

21   do you see that Dimmit County Clerk's office is not open on

22   Saturday?

23   A    Correct.

24   Q    And they're only open until 4:30, correct?

25   A    Correct.

1  Q    And what real life impact does that have on your

2  constituents who work during the week?

3  A    Well, the real life impact it has on a number of my

4  constituents that live particularly in these areas and these

5  counties, they work more than 8:00 to 5:00.  If they can

6  arrange to go during their lunch hour, I know for a fact that

7  these offices are closed during the lunch hour.  The weekends

8  are not available so it's going to be very difficult, assuming

9  they have transportation, to get there.  It's going to be very

10  difficult for them to arrange to go and try to get this

11  document.

12  Q    So here's the first calculation for you.

13          **MR. GEAR:**  If you go to number eight and blow that up

14  for me, please.

15  Q    So it says, "Between the dates of June 25th, 2013, to the

16  present, my office received a total of zero incomplete or

17  otherwise incorrect EIC applications."  Do you see that?

18  A    Yes, sir.

19          **MR. GEAR:**  And if you blow up number seven for me,

20  please.

21  Q    It says, "Between the dates of June 25th, 2013, to the

22  present, my office has received a total of three complete EIC

23  applications."  Do you see that?

24  A    Yes, sir.

25  Q    So could you punch in the number three?

1    A    Yes, sir.

2         **MR. GEAR:**  Could you go to PL-1050 for me, please?

3    And blow up number three.

4    Q    It says, "I'm employed by the Terrell County where I serve

5    as the Sheriff and tax collector," and they are also authorized

6    to issue EICs.  What, if any, concerns would you have with a

7    Sheriff's office issuing election identification certificates

8    to constituents in your district?

9    A    I would be very concerned.  I'm very concerned given that

10   they are law enforcement, and I think a lot of us can get

11   intimidated just simply by law enforcement or a DPS trooper,

12   you know, with all due respect to them.  But the fact that my

13   constituents might have to go into a sheriff's office, some of

14   them may have outstanding warrants for tickets that they

15   haven't been able to afford to pay.  They're not going to walk

16   into that sheriff's office and risk the possibility of being

17   arrested for some ticket that they haven't paid.

18        **MR. GEAR:**  So if you go to number eight, please, and

19   blow that up?

20   Q    It says, "Between the dates of June 25th, 2013, to the

21   present, my office received a total of zero incomplete or

22   otherwise incorrect applications."  Do you see that?

23   A    Yes, sir.

24        **MR. GEAR:**  And if you go to number seven.

25   Q    "Between the dates of June 25th, 2013, to the present, my

Uresti - Redirect / By Mr. Gear                    247

1    office received a total of zero complete EIC applications."  Do

2    you see that?

3    A    Yes, sir.

4    Q    So I'd like you to put the number zero into the

5    calculator.

6            **MR. GEAR:**  If you could go to PL-483?

7    Q    And you gave some testimony about Crockett County,

8    correct?

9    A    Yes, sir.

10           **MR. GEAR:**  And if you go to number seven and blow

11   that up for me, please?

12   Q    "Between the dates of June 25th, 2013, to the present, my

13   office received a total of zero complete EIC applications."  Do

14   you see that?

15   A    Yes, sir.

16   Q    Add that to your calculations.

17           **MR. GEAR:**  If you go to PL-487, please?

18   Q    Is Edwards County in your district?

19   A    Yes, sir.

20           **MR. GEAR:**  Can you go to number seven and blow that

21   up?

22   Q    "Between the dates of June 25th, 2013, to the present, my

23   office received a total number of zero EIC applications."  Do

24   you see that?

25   A    Yes, sir.

1   Q    Are you aware of any other counties that are authorized to

2   issue EIC applications -- process EIC applications in your

3   district?

4   A    I believe there's one more.

5   Q    And do you know if that particular office has issued any

6   EICs?

7   A    I'm not aware of it.  But I can tell you that they're not

8   open on the weekends and they're closed during the lunch hour.

9   Q    So what's the total number of EICs that have been

10  processed based on the declarations that were provided?

11  A    Based on those declarations, the number is three.

12  Q    And I'll ask you the question again, do you believe that

13  allowing the local election officials, or local officials, to

14  issue EICs has been effective for your constituents?

15  A    Absolutely not.

16  Q    And do you know if SB 14 requires that EICs be available

17  in every county?

18  A    I believe so.

19  Q    And have you looked at SB 14 recently?

20  A    Not recently.  I mean, I -- no.

21  Q    And so let me make sure we're clear on that.  Under the

22  provisions of SB 14, does it allow for election identification

23  certificates -- does it require election identification

24  certificates to be available in every county?

25  A    Does it allow for them to be available?

1    Q    Does it require that EIC, election identification

2    certificates, be available in every county?

3    A    I don't believe it does, but it's been a while since I've

4    looked at it.

5    Q    Do you know if DPS has a discretion to terminate its

6    agreements with the counties at any time that are authorized to

7    issue EIC applications?

8    A    I believe it does.

9    Q    Do you know if your constituents are aware that they can

10   obtain and process EIC applications at the county level -- at

11   the county offices?

12   A    Knowing my district the way I do, I doubt very seriously

13   that they even know what an EIC is, much less that they can

14   apply for one or where they're located.

15   Q    So other than the three EIC applications that we saw based

16   on the declarations, are you aware of whether any other EIC

17   applications have been processed and completed within your

18   district?

19   A    No, sir.

20   Q    Do you know or are you aware of the number of EIC

21   applications that have been processed and completed at the DPS

22   office --

23   A    No, sir.

24   Q    -- within your district?

25   A    No, sir.

1          **MR. GEAR:**  I have nothing further.

2          **THE COURT:**  All right, anything else for this

3    witness?

4                    **RECROSS EXAMINATION**

5    **BY MR. CLAY:**

6    Q    You testified earlier that you didn't know how many of

7    your constituents needed an SB 14 ID, correct?

8    A    I'm sorry.  I can't hear you.

9    Q    You testified earlier that you didn't know how many of

10   your constituents needed an SB 14 ID, correct?

11   A    Correct.

12   Q    And so you don't know how many of those needed an EIC,

13   correct?

14   A    Of course not.

15   Q    You don't know how many of those want an EIC, right?

16   A    Of course not.

17   Q    Do you know how many driver's licenses have been issued in

18   your district since June of 2013?

19   A    I have no idea.

20   Q    What about state IDs?

21   A    No, sir.

22          **MR. CLAY:**  Nothing further.  Thank you, Senator.

23          **THE WITNESS:**  Yes, sir.

24          **MR. GEAR:**  I have nothing further.

25          **THE COURT:**  All right.  Thank you, sir.  You --

Cornish - Direct / By Mr. Brazil                    251

1          **THE WITNESS:**  Thank you, your Honor.

2          **THE COURT:**  -- may step down.

3          **MR. BRAZIL:**  Your Honor, the Plaintiffs call Ransom

4    Cornish.

5          **THE COURT:**  Good afternoon.  Would you raise your

6    right hand.

7          **T. RANSOM CORNISH, PLAINTIFFS' WITNESS, SWORN**

8                        **DIRECT EXAMINATION**

9    BY MR. BRAZIL:

10   Q     Please state your name and spell your last name.

11   A     Tom Ransom Cornish, C-o-r-n-i-s-h.

12   Q     Mr. Cornish, where do you reside?

13   A     Sugar Land, Texas.

14   Q     How old a man are you?

15   A     Just turned 60.

16   Q     Would you give us a brief background of your education.

17   A     I attended the University of Houston and got a BBA degree,

18   sat for the CPA exam and started working, not as a CPA, but

19   started working as an accountant in November of 1977.  Got my

20   CPA certificate in '79 and I've been practicing as a CPA since

21   that time.  In addition, in '86 I went back to school and --

22   law school and became a Texas lawyer in 1991.

23         **THE CLERK:**  (Indiscernible)

24         **MR. BRAZIL:**  Yes, I'm sorry.  Scott Brazil for the

25   Veasey Plaintiffs, your Honor.

1    BY MR. BRAZIL:

2    Q    So have you practiced law in Texas since 1991?

3    A    Yes, I have.

4    Q    Have you also practiced accounting, your CPA, since 1979?

5    A    That's right.

6    Q    And so you do both of them at the same time?

7    A    Yes, sir, I do.

8              MR. BRAZIL:  For the record, your Honor, Plaintiffs'

9    Exhibit 763 is Mr. Cornish's CV, his Declaration, his report,

10   and all the attachments.

11   BY MR. BRAZIL:

12   Q    Mr. Cornish, you were retained in this case by the

13   Plaintiffs, correct?

14   A    That's correct.

15   Q    And you were retained to do several things because you are

16   both a CPA and an attorney?

17   A    That's correct.

18   Q    And have you testified in State and Federal Court before?

19   A    Yes, I have.

20   Q    Have you been qualified in State and in Federal Court

21   before?

22   A    Yes, sir.

23   Q    Tell the Court what your assignment was, so to speak, in

24   this case, what your -- what you were asked to do in the very

25   beginning.

1  A    Well, early on I was asked to try to make an analysis of

2  the provisional ballots cast in elections in Texas where the

3  voter ID law had been in effect.  In addition, I was asked to

4  review documents, make a determination as to the amount of

5  funds which had been appropriated and spent educating the

6  general public on the effects or the mandates under SB 14 and

7  then make a comparison of the actions of the State of Texas

8  with other states that had passed voter ID laws.

9  Q    Let's talk about the provisional ballot issue first.

10        Did you become familiar with Senate Bill 14 before

11  you engaged that area?

12  A    Yes, I did.

13  Q    And tell us generally what you did in the beginning with

14  regard to the provisional ballots in the state of Texas.

15  A    Primarily I became familiar, a little more familiar with

16  the casting of provisional ballots, determined which elections

17  I wanted to look at and selected those counties which I felt

18  would be representative of a significant portion of the

19  population of Texas, and that turned out to be 17 counties.

20  Q    And what did you do with regard to these 17 counties?  Did

21  you contact all counties?

22  A    Fifteen of them I contacted by either a letter or an

23  email, based upon what the county indicated that they wished to

24  have.  On two of the counties, because I live in Fort Bend

25  County I went to that county registrar, and in Harris County I

1   visited their office.

2   Q    And what was your purpose, what was the reason for

3   contacting these 17 counties?

4   A    I wanted to get as much information as I possibly could on

5   the number of provisional ballots cast in various elections.

6   Q    And summarize for the Court your findings in that regard.

7   A    My findings are inconclusive, at best.

8   Q    Why so?

9   A    Because in Texas, in the counties that I contacted, the --

10  there is no systematic method to tabulate or analyze the

11  provisional ballots which were cast in the elections and the

12  specific reasons that those ballots were cast, whether they

13  were related to an improper -- they were the improper precinct

14  or whether it was a similar name or whether it was because of a

15  lack of photo ID.

16  Q    Did all 17 counties have a different manner in which they

17  reported or did not report provisional ballots?

18  A    The number of counties that I contacted, basically first I

19  wanted to determine the number of provisional ballots, a

20  significant number of them had websites where the -- where

21  there was information which indicated the number of provisional

22  ballots which had been cast.  A couple of them, the -- were

23  outdated, they no longer had the 2010 or 2012 information on

24  their website.  Some counties had no information at all on the

25  website as to the number of provisional ballots.  They had

Cornish - Direct / By Mr. Brazil                     255

1    total ballots, but not the number of provisional ballots.

2    Q    Did any of the counties provide you hard copies or copies

3    on a CD or flash drives of the provisional ballots cast?

4    A    Two counties did.

5    Q    Do you recall which two counties?

6    A    I believe Harris County did, because I picked those up and

7    paid for them myself, and I believe Collin County actually

8    provided copies of the redacted provisional ballots.

9    Q    To your knowledge, is there any requirement under Senate

10   Bill 14 for the counties to report to the Secretary of State or

11   to any other agency the number of provisional ballots?

12   A    No.

13   Q    Did that surprise you?

14   A    Yes.

15   Q    Why so?

16   A    Well, when I originally began I thought that there would

17   be a centralized analysis of the effect of SB 14 on voters

18   having to cast a provisional ballot because of a lack of photo

19   ID.

20   Q    So is there any central database or central recording of

21   provisional ballots in the state of Texas?

22   A    No.

23   Q    So from the 17 counties that you contacted, did any two or

24   three handle their provisional ballots the same way?

25   A    No.

1    Q    Is there any provision of Senate Bill 14 that mandates

2    that the counties handle their provisional ballots in any

3    certain manner?

4    A    Not that I know of, no.

5    Q    Now, provisional ballots that you saw, that you visibly

6    saw, what did you discover?

7    A    Harris County, I was able to actually look at the

8    provisional ballots.  I could not see the name of the person,

9    because that had been stricken out.  But those ballots were

10   fairly good in indicating why the provisional ballot had been

11   cast and I was able to determine the number, and I believe it's

12   in my report, the number of provisional ballots which were cast

13   due to a lack of photo ID.

14   Q    Do you recall how many?

15   A    Twenty-five percent, approximately.  Approximately a

16   quarter of the ballots were photo ID related.

17   Q    Could you determine how many people went to cure their

18   provisional ballot that they cast?

19   A    In Harris County I could, because the provisional ballots

20   were broken down between rejected and accepted, and I believe I

21   did have something in my report relating to the number of

22   provisional ballots which had been later accepted.  But after a

23   significant amount of time and trying to construct this

24   information related to provisional ballots, I gave up on that

25   task.

1  Q    One last question on the provisional ballot issue.  Is

2  there any way for you or anyone else to determine how many

3  provisional ballots were cast in a general election, a

4  statewide election?

5  A    Well, I think you can determine the number of provisional

6  ballots, but it's very difficult to actually look at them and

7  see why the provisional ballot was cast, and that's because

8  each county has their own rules or they have their own method

9  of storing provisional ballots.

10       For example, in a couple of the counties where I

11  requested information on the provisional ballots they

12  indicated, well, they had already been locked up and they would

13  request a Court order to open them up.

14  Q    Would you have to go to all 254 counties after a general

15  election to determine the number?

16  A    I think you'd have to timely make a specific request for

17  information and request the actual provisional ballots be sent

18  to you or have them digitized and -- for example, in Fort Bend

19  County, where I went specifically to talk to them, the -- they

20  said, well, we would have to have payment for researching and

21  redacting the provisional ballots and we really don't know how

22  many there are and so we kind of would have to get a check up

23  front.  I mean it's -- there was no systematic method, there

24  was no systematic manner in which someone can determine that

25  statewide what the provisional ballot cast due to photo ID is.

Cornish - Direct / By Mr. Brazil                    258

1   Q    Okay, let's turn to the other area that you were tasked

2   with.

3   A    Yes, sir.

4   Q    The financial area.  What did you do in the beginning to

5   prepare for that?

6   A    Became familiar with SB 14, the 2,024,000 fiscal note

7   attached to it, read it --

8   Q    Do you 00

9   A    -- and then I researched basically the request for

10  proposal that the State of Texas issued for the 2012 election

11  cycle, reviewed the response of the firm engaged for the

12  proposal and the firm engaged to perform that advertising

13  campaign, and then did additional research after that on

14  additional monies that had been spent by the State of Texas.

15  Q    Did you review some of the deposition testimony that was

16  taken in this case?

17  A    Specifically Mr. Ingram and Mr. Peters, yes.

18  Q    Who is your understanding, what agency was given the task

19  of educating the public on the new photo ID law?

20  A    Secretary of State's Office.

21  Q    Okay.  Any other agency, to your knowledge, given that

22  responsibility?

23  A    No, sir.

24  Q    Any other agency funded for that responsibility?

25  A    No, sir.

1  Q    What was your understanding that the task of the DPS was

2  in implementing Senate Bill 14?

3  A    To assist in the issuance of the EICs through the use of

4  the mobile EIC units in the beginning.

5  Q    Was there any funding, to your knowledge, specifically for

6  that issue to the DPS?

7  A    Mr. Peters testified that DPS received no additional

8  funding relating to the issuance of the EICs.

9  Q    So was it taken from their general budget, from their

10  general funds?

11  A    I believe that was his testimony, yes.

12  Q    Do you recall the testimony of Mr. Ingram relating to the

13  voter education program for 2014?

14  A    Yes, sir.

15  Q    And were you able to determine from his testimony the

16  amount of money that was allocated for the educational process?

17  A    It's very confusing to determine where the money has come

18  from and what money has been spent for the education of Texas

19  voters related to SB 14.

20        The first election cycle, the contract was left with

21  the advertising firm.  It was a $3 million contract.  It was

22  all HAVA funds.  And there was no mention during that

23  $3 million campaign as to the voter ID because the State of

24  Texas was precluded from implementing the voter ID.

25        After Texas began implementing the voter ID there

Cornish - Direct / By Mr. Brazil                    260

1    have been three separate advertising blitzes conducted to

2    educate Texas voters on SB 14.  The first one, Phase One, was

3    fall of 2013.  That occurred after the primary elections.

4    There was $400,000 of non-HAVA money.  Of the money spent,

5    approximately 300,000 of it was related specifically to

6    advertising.  The other hundred thousand was production costs

7    and profits for TKO Advertising, which handled that process.

8            The next spending was $4000,000 of HAVA money that

9    was in 2014, early 2014.  Very difficult to find any

10   information on that.  I was unable to find the contract.  I was

11   unable to find any information as to the payments of it, when

12   it was spent, how it was spent, other than the exhibit that

13   Mr. Ingram provided which indicated it was $400,000.

14           The last issue, the current advertising campaign that

15   the State of Texas is endeavoring to do, is $1,627,000 and it

16   is HAVA money.  So I've seen the purchase order on that and

17   I've seen their timeline where they were going to begin

18   advertising.  The contract began January the 21st of this year

19   and it required or it called for the spending of approximately

20   $400,000 between January 21st, when the contract was signed and

21   the purchase order was issued, and March 4, which were the

22   primary elections.  The contract, the information I was able to

23   seek to review or find does not indicate anything specifically

24   that was related to photo ID.

25   Q    You mentioned HAVA money a couple of times --

1   A      Correct.

2   Q      -- Help America Vote Act.  What's your understanding of

3   that funding?

4   A      Well, the understanding that I have received from reading

5   depositions and talking with people is, is that the HAVA funds

6   cannot be used specifically for any particular focus, but has

7   to be used for general voter education, voter awareness,

8   polling place determination, to get out the vote.

9              And so the -- even though the advertising materials

10  during these campaigns do specifically mention photo ID and

11  what photos are acceptable, the advertising is not focused on

12  photo ID, except for the $400,000 which was the Phase One.

13  Q      Were there any follow-up studies by any agency or entity

14  to determine if, in fact, the educational programs were

15  working?

16  A      The initial $3 million contract that the State of Texas

17  issued required that the servicer of the contract provide at

18  the end of the contract a analysis of the effect of the

19  advertising scheme which they had proposed.  I was unable to

20  find any analysis which was performed at the end of that

21  $3 million contract.  I have not seen the proposal of the

22  current $1,600,000 contract to see whether they're going to do

23  anything.

24             I have only seen one follow-up report that analyzed

25  various issues concerning the Vote Texas website and that

1    follow-up study analysis market survey was done by the same

2    people that ran the advertising campaign.

3    Q    So the study to determine if the campaign was successful,

4    the study to determine if it was successful was conducted by

5    the same company that did the advertising?

6    A    That's my understanding.  I just received the document the

7    day before my deposition.

8    Q    What happened between the time your report was due and

9    time of your deposition?

10   A    My understanding is the State of Texas provided a

11   significant amount of documents after my report date, which

12   was, I believe, June 26th.

13   Q    Did you bring some of those documents to your deposition

14   and testify regarding those documents?

15   A    I brought them to my deposition, but I don't think we

16   really got into the documents, no, sir.

17   Q    Okay.  And did it modify or change any of your opinions or

18   your report at your deposition?

19   A    Well, my report indicated that, even though Mr. Ingram

20   testified that there was a contract for one million six, I had

21   never seen anything.  And I guess I wasn't really questioning

22   his integrity, but I said I've never seen the documents.  And

23   so the day before my deposition I saw the evidence that there

24   was a $1.6 million contract.

25   Q    Did you find conflicting testimony in some of the

Cornish - Direct / By Mr. Brazil                           263

1   depositions on how you could use HAVA money?

2   A     Well, the SB 14 fiscal note says if the Secretary of State

3   needs to determine to the extent how much of the $2 million

4   fiscal note can be covered by HAVA money, but I've never seen

5   any kind of analysis on whether or not the State of Texas would

6   get credit for any of the $2 million fiscal note for how the

7   money is spent and I have not seen any -- I've only seen

8   $400,000 being spent of the $2 million.

9   Q     What's your understanding of the testimony by Ann McGeehan

10  which this bill was being considered?

11  A     When this bill was being considered her testimony was

12  we're going to spend $2 million, the fiscal note.  It's

13  2,024,000, but the 24,000 is for disabled issues, I believe.

14  And then her indication was, well, we're going to spend another

15  $3 million of HAVA money.  And so the $3 million did occur.

16  That was the $3 million that was spent but there was no

17  advertising on the $3 million related to photo ID.

18  Q     And just for the record, do you recall who Ann McGeehan

19  is?

20  A     She was the representative of the Secretary of State.

21  Q     Did you do any investigation or studies of what other

22  states have spent with regard to similar type photo ID bills?

23  A     Yes, I did.

24  Q     Okay.  Can you give us your conclusion in that regard?

25  A     Well, my report kind of lays out the amount of dollars

1   spent by the other states on education issues relating to photo

2   ID.  And I believe one state -- well, I think I looked at

3   Minnesota and Georgia primarily.  My report indicates that.

4   Well, one state, which, I think, spent $1.25 per registered

5   voter.  I forget how much Georgia spent, but I know it was a

6   significant amount of money, a lot more than Texas.

7   Q    Did some of the --

8   A    And Texas --

9   Q    I'm sorry, go ahead.

10  A    Texas, based upon only spending $400,000 of their own

11  money, that's less than 5 cents per registered voter.

12  Q    Did some of the states spend money on placing cameras in

13  county offices?

14  A    Well, the state which, I guess, took the most active role

15  in publicizing information was Georgia and their tactic or

16  their plan was significantly different from Texas.  Georgia

17  primarily decided to have a central location to process the

18  election identification certificates, but put cameras and

19  trained personnel in all of their 139, I believe, county

20  offices to take the applications, take the photos, and then

21  transmit them to the central location to process the

22  certificates and they would be mailed out to the individuals.

23  So it was more of a centralized philosophy on issuing election

24  identification certificates and it resulted in a significant

25  number of certificates.

```
1   Q    Do you recall, I know it's in your report, do you recall

2   the cost to that state of doing that?

3   A    It was 700,000, I believe.

4   Q    Texas do anything similar to that?

5   A    Texas started out with these mobile EIC units.  Twenty-

6   four of them, I believe, was the testimony.  And they were

7   taken about the state to various locations so that EICs could

8   be issued.  And then I think -- Joe Peters was -- could not

9   recall how many units the DPS actually was able to provide for

10  themselves or build for themselves, but he did testify as to

11  the cost the DPS incurred in operating the EIC units.

12  Q    In your opinion, for the cost of operating the EIC units

13  could the State of Texas put cameras into all 254 counties?

14  A    Well, the counties -- or the cameras are a little over

15  $4,000 each, the whole setup.  That was the testimony of

16  Mr. Peters.  And with 254 counties, you're looking at slightly

17  over a million dollars for a camera in each county.  Mr. Peters

18  testified that the DPS alone spent over $800,000 in staff time,

19  staying open on a few weekends, people traveling back and forth

20  to various locations.

21  Q    So a little over $200,000 worth of cameras in all 254

22  counties?

23  A    Well, that's just the cost of the DPS.  The Secretary of

24  State spent a significant amount of money in developing their

25  EIC units.
```

1          But that's another thing, there's no documentation as

2    to how much was spent.  It's just all testimony of various

3    people and how much they thought had been spent.

4          **MR. BRAZIL:**  Thank you, Mr. Cornish.

5          We'd offer Mr. Cornish as an expert on the two areas

6    he's testified to on the provisional ballots and the fiscal

7    considerations of Senate Bill 14.

8          I'll pass the witness.

9          **THE COURT:**  All right.

10          **MR. KEISTER:**  Your Honor, pursuant to the original --

11    the previous agreement, we do not agree at this point that

12    Mr. Cornish is qualified and we'll raise that issue.

13          Ronnie Keister for the Defendants, your Honor.

14                      **CROSS EXAMINATION**

15    **BY MR. KEISTER:**

16    Q    Good to see you again, Mr. Cornish.

17    A    How you doing?

18    Q    Not as good as last time I saw you, but I'm hanging in

19    there.

20    A    Why is that?

21          **THE COURT:**  Everybody's tired.

22          **THE WITNESS:**  Everybody's tired.

23    Q    Mr. Cornish, you were retained by the Plaintiffs in this

24    case, correct?

25    A    Yes, sir.

Cornish - Cross / By Mr. Keister                    267

1    Q    And you're being paid for -- to provide expert opinions in

2    this case, correct?

3    A    Correct.

4    Q    And you were originally contacted by Chad Dunn, I believe.

5    Is that right?

6    A    Yes, sir.

7    Q    And I believe you testified in your deposition that was in

8    December of 2012 or January of -- no, wait --

9    A    '13.

10   Q    '13.  And then you prepared your report in this case on

11   June 27th, 2014?

12   A    That is correct.

13   Q    And then I believe I came to visit you and we took your

14   deposition on August 20 -- August 7th.

15   A    Yes, sir.

16   Q    All right.  Now, Mr. Cornish, you're a certified public

17   accountant, correct?

18   A    Yes, sir.

19   Q    And you also have obtained your law degree and you're an

20   attorney, correct?

21   A    Yes, sir.

22   Q    And you currently practice both as a CPA and as an

23   attorney, correct?

24   A    That's correct.

25   Q    Okay.  Now, your normal practice does not involve

Cornish - Cross / By Mr. Keister                    268

1   representing governmental agencies, correct?

2   A    That's correct.

3   Q    And, in fact, you have never represented the federal

4   government in a case under the Voting Rights Act, correct?

5   A    That's correct.

6   Q    Nor have you ever been employed by the federal government

7   to consult with a case under the Voting Rights Act, correct?

8   A    Correct.

9   Q    Nor have you ever been employed or retained to consult

10  with the federal government on issues of elections or just

11  voting in general, correct?

12  A    Correct.

13  Q    Likewise, you have never been employed by the State of

14  Texas or any other state with respect to issues involving the

15  Voting Rights Act or issues involving elections or just voting

16  in general, correct?

17  A    That is correct.

18  Q    And you have served as an expert witness on a few

19  occasions, correct?

20  A    Yes.

21  Q    But isn't it true, Mr. Cornish, that you have never served

22  as an expert witness on issues involving the Voting Rights Act?

23  A    Correct.

24  Q    And you've never served as an expert witness on issues

25  involving elections or voting issues, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Cornish - Cross / By Mr. Keister                    269

1   A    Like I said in my deposition, I did in Galveston County to

2   a much lesser degree when it came to the JP Courts.

3   Q    Okay.  That was an issue of redistricting with respect to

4   JP Courts in Galveston --

5   A    That is --

6   Q    -- correct?

7   A    That's the one that did that, yes, sir.

8   Q    But beyond that, it had nothing to do with election issues

9   or voting issues, correct?

10  A    Correct.

11  Q    Okay.  Now, you have never published any type of scholarly

12  literature concerning Voting Rights Act issues, correct?

13  A    Correct.

14  Q    And you've never published any type of scholarly

15  literature with respect to elections or voting issues, correct?

16  A    Correct.

17  Q    And, in fact, Mr. Cornish, prior to being retained in this

18  case you have never done any type of research or investigation

19  with respect to election issues or voting issues, correct?

20  A    Correct.

21  Q    And you've never performed any type of research or

22  investigation of any type with respect to photo voter ID issues

23  prior to being retained in this case, correct?

24  A    Correct.

25  Q    And, in fact, prior to being retained in this case you had

Cornish - Cross / By Mr. Keister                    270

1   not even followed the issue of SB 14 in Texas, correct?

2   A    I think in my deposition I said I knew about it, but I had

3   not followed it actively.

4   Q    Okay.  It was not an issue that you had studied or looked

5   at or formed opinions on prior to becoming an expert in this

6   case, correct?

7   A    I did not -- I didn't express an opinion on it, that's

8   correct.

9   Q    Okay.  And at the time that you accepted this case, to be

10  retained in this case, did you do any type of research or

11  investigation before you told Mr. Dunn you'd do this case to

12  try and see if you felt like you were qualified to handle the

13  issues in this case?

14  A    Well, I think that they way that Mr. Dunn indicated what

15  my involvement would be and the scope of my involvement, I

16  thought I was qualified to do it.  A CPA shouldn't take on

17  something that he's not qualified to do.  That's kind of

18  what -- that's one of our deals, you know.

19  Q    Right.

20  A    But I felt I was qualified to look at provisional ballots

21  and see what -- why they were issued and review state budgets

22  and look at discovery, read depositions, try to determine how

23  much had been spent.

24  Q    But before you were retained in this case you had no

25  expertise with respect to the Texas Election Code, correct?

1   A    Correct.

2   Q    And you had no expertise with respect to SB 14, correct?

3   A    Correct.

4   Q    And in order for you to begin your investigation of this

5   case you had to educate yourself on the Election Code, correct?

6   A    Somewhat, yes, sir.

7   Q    And you had to educate yourself on Senate Bill 14,

8   correct?

9   A    The specific requirements of it, yes.

10  Q    Right.  And at that point in time you had done no research

11  or found any type of scholarly information wherein your looked

12  for comparisons between Texas's photo voter ID law and how

13  photo voter ID is being handled in other states, correct?

14  A    Well, that's true, but the Texas photo ID law was a new

15  law, so I had not had in the past the opportunity or the

16  calling to do that --

17  Q    Okay.

18  A    -- correct.

19  Q    But you did not -- you did not have baseline when you

20  began this case, correct?  You did not have a baseline of

21  knowledge on photo voter ID cases in the United States, in

22  Texas and in other states, correct?

23  A    Well, I understand -- I had a baseline knowledge of what

24  law is and a baseline of what accounting is and what

25  provisional ballots were, but I had not done any work on --

1    specifically on the Texas photo ID law.

2    Q    Okay.  Did you, before you began your research in this

3    case, make any attempts to determine what the proper

4    methodology would be to go about trying to make a determination

5    of how -- or going about trying to determine how many

6    provisional ballots were cast in the state of Texas and how to

7    determine whether or not those were cast because of SB 14

8    issues?

9    A    Before I began?

10   Q    Yes.

11   A    Well, I wouldn't -- as soon as I started thinking about

12   it, that was the beginning of it.  And so, yes, I did a

13   planning where I did research on provisional ballots and

14   information on where I could get information on provisional

15   ballots and which counties I wanted to contact.

16   Q    Okay.  Did you find any literature with respect to public

17   accountants that set out the methodologies for a certified

18   public accountant to go about making a determination of how a

19   state -- how one would go about calculating the number of

20   provisional county -- provisional ballots cast in the state and

21   making a determination as to whether or not they were cast for

22   a particular reason, such as SB 14 in the state of Texas?

23   A    Well, there's not going to be anything specific.

24   Q    Okay.

25   A    But there's going to be generalized accounting principles

1   or issues when it comes to, you know, developing a strategy and

2   seeing what it is and then reevaluating it.  Yes, sir.

3   Q    Okay.  You bring two professions to this case, public

4   accountancy and the law, correct?

5   A    Yes, sir.

6   Q    With respect to the legal aspects of the case, are any of

7   your opinions that are in your report based upon accepted legal

8   standards?

9   A    Well, I don't really understand what that would be, other

10  than as a lawyer I feel like I'm capable or more -- have more

11  capability than the average lay person in reading a deposition

12  and understanding the effects of what people are testifying to

13  and then trying to apply those to the law and to what my -- and

14  be able to form opinions after that.

15  Q    You --

16  A    So I think the law degree is helpful.

17  Q    Did you make any opinions in this case, Mr. Cornish, that

18  are based upon accepted legal standards and principles?

19  A    I don't know.  I don't -- I can't think of a -- what an

20  accepted legal principle is.  Did I express a legal conclusion?

21  Q    Do you recall telling me in your deposition that you did

22  not?

23  A    Probably said that.

24  Q    Okay.  And did you make any opinions in this case based

25  upon accepted principles or standards of public accountancy?

1  A    I don't think there's any specific principles related to

2  photo ID cases.

3  Q    And, in fact, you made no opinions in this case based upon

4  acceptable standards and principles in public accountancy,

5  correct?

6  A    Correct.

7  Q    Okay.  Now, that covers the legal and that covers the

8  certified public accountancy.  Is there another area of

9  expertise that you're bringing into this case, other than those

10 two, that you relied upon your expertise to make your

11 determinations in this case?

12 A    Well, I think the -- your understanding of what a CPA is

13 is off.

14 Q    No, sir, that's not my question.  My question is do you

15 have any other expertise in this case that you're bringing into

16 it as an expert, other than being a certified public accountant

17 and being a lawyer?

18 A    Yes.

19 Q    Okay.  And what is that expertise?

20 A    Well, the basis of being a CPA is I have a degree in

21 accounting.

22 Q    I understand that.

23 A    A CPA is only the ability to express an opinion on a

24 financial statement.  And on this one I was not expressing an

25 opinion on a financial statement, being -- but being a CPA

1    provides you with the basic training of understanding what

2    systems are to understanding what controls are to understanding

3    how to write reports, how to review reports, and how to develop

4    proper work papers.  So as an accountant, as a degreed

5    accountant that's been working for over 30-something years, I

6    felt like I do have the expertise, more than a specific lay

7    person, to review fiscal notes, to review the law, to review

8    depositions, to review information posted by counties, to

9    review provisional ballots, and to be able to develop a

10   cohesive report which would be helpful to the Court in

11   determining whether or not the State of Texas spent $2 million.

12   Q    But those items could be conducted by anybody else.  That

13   does not require either a legal expertise or accounting

14   expertise in order to make those determinations, correct?

15   A    I don't agree with that.

16   Q    Okay.  You have never been employed or elected or served

17   as a County Clerk, correct?

18   A    Correct.

19   Q    And you've never been employed or served as the Secretary

20   of State of Texas, correct?

21   A    Correct.

22   Q    And you've never been employed or served with the Texas

23   Department of Public Safety, correct.

24   Q    Correct.

25   Q    Nor any other state agency, correct?

Cornish - Cross / By Mr. Keister                    276

1   A     Except for auditing.

2   Q     I'm sorry?

3   A     Except for auditing a quasi governmental entity.  That was

4   it.

5   Q     Okay.  But that was not a state agency, correct?

6   A     Well, it's a semi-state agency.

7   Q     Okay.  Now, when you made your determination to check or

8   to go to 17 counties in Texas, did you find some methodology,

9   some published methodology that said that was the proper way to

10  go about conducting your review of provisional ballots in

11  Texas?

12  A     A published methodology?

13  Q     Yes, sir.

14  A     No.

15  Q     Okay.  This was something you simply decided was a good

16  idea or the best way to approach it?

17  A     It was my opinion the best way to approach it.

18  Q     Yes, sir.  Well, sir, are you aware of any published

19  methodologies of any sort that would say the manner in which

20  you decided to pursue your endeavor in this case was the way

21  that other certified public accountants would approach it in

22  this case?

23  A     Anything published?

24  Q     Yes, sir.

25  A     No, sir.

1    Q    Any unpublished?

2    A    Not that I saw, no, sir.

3    Q    Okay.  Did you -- from the legal aspects, did you find any

4    published literature which told you that as a lawyer

5    undertaking this endeavor in this case that the appropriate

6    methodology to pursue in determining the number of provisional

7    ballots that were cast in Texas and whether or not they were

8    based on SB 14 issues, that the methodology you were developing

9    was the appropriate methodology to do that?

10   A    No.

11   Q    Once again, this was something that -- and I'm not saying

12   it's bad, but it's something you just considered the logical

13   way to pursue it, correct?

14   A    A logical way to start with the largest counties --

15   Q    Okay.

16   A    -- evaluate your results, see where you stand, and then

17   make a determination as to whether you're going to proceed

18   further, yes.

19   Q    Okay.  And you did not go to any other certified public

20   accountants and say I'm about to undertake this project, I'm

21   about to try and determine the number of provisional ballots

22   that were cast in Texas and I'm about to try and determine

23   whether or not they were cast based upon SB 14 issues, this is

24   my methodology, this is the way I'm going to go about it, do

25   you, as another professional, think I am pursuing the right

Cornish - Cross / By Mr. Keister                    278

1    course?

2    A    You mean did I get a peer review on my methodology?

3    Q    A peer review or just consult another --

4    A    No, I did not.

5    Q    Okay.  And the same thing on the legal side, did you

6    consult any other lawyers and say I'm about to undertake this

7    project and this is what I'm going to do, do you think this is

8    the best way to do it?

9    A    Did not do that.

10   Q    Okay.  Now, so you decided to go to 17 counties and I

11   think you said in your deposition you made that decision

12   because you thought that was -- those were larger counties that

13   you had chosen, correct?

14   A    Correct.

15   Q    But being 17 counties is not going to tell you the number

16   of provisional ballots cast in the entire state, correct?

17   A    That was not my -- the intent of the -- that was not the

18   scope of my investigation, no.

19   Q    You didn't tell me that the scope of the investigation was

20   to determine the number of provisional ballots cast in the

21   state?

22   A    No.  I may have misspoken.  It was -- my intent was to

23   determine the provisional ballot rate for photo ID, so that I

24   would get some type of, as you said, baseline as to this --

25   this was the number of votes and these were the ones that were

1    related to photo ID.

2    Q    Okay.  Now, before you began this project did you make any

3    investigation of the Election Code to determine whether or not

4    the provisional ballots were going to be in the hands of the

5    counties or in the hands of the Secretary of State?

6    A    Well, I knew they were going to be in the hands of the

7    counties.

8    Q    Okay.  Why is that?

9    A    Because that's what I know.  I know the counties keep the

10   ballots.

11   Q    And then why did you say you were surprised that the

12   Secretary of State, that you could not get those ballots from

13   the Secretary of State?

14   A    I was surprised I couldn't get information, that the

15   Secretary of State had not requested information relating to

16   the issuance of provisional ballots because of lack of photo

17   ID.  I believe we talked about this in my deposition, that it's

18   such a significant change that that would be the best

19   information available to see where they would be able to do the

20   advertising, to target their advertising, we have a problem

21   here, we have a problem there.  There was no information like

22   that.

23   Q    Okay.  And, in fact, Mr. Cornish, you had no backup plan

24   to meet the other counties, as you ran into a problem with one

25   county you did not have any type of backup plan to go to

1    another county and try to obtain information from another

2    county in order to make up for one of the counties that did not

3    cooperate, correct?

4    A      Well, when I contacted the largest 17, if one of the

5    largest 17 dropped out, let's say Fort Bend County, which I was

6    unable to get information from, it was like seven or eight on

7    the list, so I go to County Number 18 or County Number 18, I'm

8    still not advancing the theory of being able to get information

9    from the counties relating to the photo ID.  Because it's not

10   like I was able to get specific information from 14 counties

11   and three counties were not providing the information or unable

12   to provide it, I was able to get information from two of the 17

13   counties.  And so that would include Dallas County, Tarrant

14   County, Bexar County, those counties were not able to provide

15   any information as to basic information relating to provisional

16   ballots cast and the reason that they were cast.

17   Q      Okay.

18   A      And so I dropped the issue.  I said I'm not going to be

19   able to do this in a timely fashion.

20   Q      Okay.  And if you had known prior to beginning your study

21   that these were potential issues, you may have been able to

22   plan accordingly and perhaps survey more than just 17 counties,

23   correct?

24   A      I don't understand that.

25   Q      Well, in fact, you didn't realize or didn't know what

1  problems were out there when you began this case because you

2  had never done this type of work before, correct?

3  A    That's -- nobody's done this type of work before in

4  Texas --

5  Q    Okay.

6  A    -- so now I know.

7  Q    Okay.  Now you know this is a unique issue and it's an

8  issue that you undertook, but it's not an accepted method in

9  either the legal field or in the area of public accountancy to

10 take your methodology and pursue that to try and get the

11 answers you tried to get in this case, correct?

12 A    Well, I disagree with that.

13 Q    Well, do you know of anybody else that would agree to do

14 it the way you did it?

15 A    Well, no one's ever done it.

16 Q    Okay.

17 A    And so I just did the method that I felt was the best.

18 Q    Okay.

19 A    And so for you to say that it's not accepted or not the

20 best way, that's your judgment versus my judgment.

21 Q    Well, we can agree it didn't work out for you, right?

22 A    Because of the counties, I agree with that.

23 Q    Okay.  Now, your other criticism was with respect -- I

24 think it's a criticism, is with respect to the monies that were

25 spent for education in this case, correct?

1    A    Yes, sir.

2    Q    Now, if I understand what you were saying, if I wrote it

3    all down correctly, I'm seeing here the total amount of money

4    having been spent that you were saying was going to be spent or

5    represented would be spent in the Legislature when SB 14 was

6    being debated, correct?

7    A    I'm sorry, I didn't understand that.

8    Q    Okay.  You said that $2.4 million was the amount of the

9    fiscal note for SB 14, correct?

10   A    No, it's 2,024,000.

11   Q    Two million twenty-four thousand.

12        And from what I'm seeing, there is a $1.6 million

13   contract that you've seen, correct, that's for the 2014 year,

14   correct?

15   A    Correct.

16   Q    And before that there was, I believe, two $400,000

17   contracts, correct?

18   A    Correct.

19   Q    So we're up to 2.4 million, which is more than the fiscal

20   note that was set out during the debate on HB -- SB 14,

21   correct?

22   A    Well, the debate, in the testimony given by the Secretary

23   of State's Office, was 2 million the State was going to spend

24   and we're going to spend HAVA money to supplement it.

25   Q    Okay.

1    A    Because the SB 14 was specifically a half a million

2    dollars for research on getting out the information on photo

3    ID, not only general voter awareness, and then one and a half

4    million dollars on specifically photo ID issues.  And the --

5    Q    So the --

6    A    And the HAVA money has not specifically -- has not been

7    specifically accounted for as how much of it was specifically

8    for photo ID.

9    Q    Okay.  The fiscal note called for 2,024,000?

10   A    Yes, sir.

11   Q    And there's been 2,400,000 either spent or obligated at

12   this point to be spent this year for SB 14, correct?

13   A    I disagree with that.

14   Q    Why do you disagree with that?

15   A    Because in the $1,627,000 contract, it's not this contract

16   is to educate the voters on SB 14.  It doesn't say that.  It

17   says this -- specifically it says we're going to spend HAVA

18   money for voter education and awareness.  It doesn't

19   specifically say SB 14 in it.

20   Q    Does SB 14 set out specifically how the education is to be

21   conducted by the Secretary of State?

22   A    One point five million direct advertising.

23   Q    Is that set out in the actual bill --

24   A    Yes, it is.

25   Q    -- SB 14?

1   A    Yes, not tweeting and Facebooking and stuff like that,

2   direct advertising, print media, radio, television.

3   Q    Okay.  And you saw Mr. Ingram's testimony in this case,

4   correct?

5   A    I read it.

6   Q    You read it.  And he testified that this is -- these

7   amounts have been spent or have been obligated to be spent,

8   correct, the 2.4?

9   A    The 2 -- I agree that there's 2.4 being spent.

10  Q    Okay.  And with respect to the $3 million HAVA money, that

11  was spent after 2011, correct?

12  A    I believe so.

13  Q    And that was spent on education, election education,

14  correct?

15  A    Correct.

16  Q    And it was not spent on SB 14, correct?

17  A    None of it was SB 14 issues, correct.

18  Q    And it was not spent because SB 14 had not been pre-

19  cleared, correct?

20  A    Yes, sir.

21  Q    And if that money had been spent educating people that

22  they needed to go -- that they had to produce a photo ID when

23  they went to vote, that would have been wrong information,

24  correct?

25  A    Yes, sir.

1  Q    And at that point in time we didn't even know whether or

2  not it was going to be pre-cleared or what the result of the

3  legal case was going to be, correct?

4  A    I believe so.

5  Q    So surely you cannot criticize the State for not spending

6  that money on photo ID issues --

7  A    Oh, I'm --

8  Q    -- or advertising, correct?

9  A    I'm not criticizing the State on that, no, sir.

10 Q    Okay.  All right.

11        You are aware, are you not, Mr. Cornish, that the

12 Secretary of State did engage in some education efforts prior

13 to the preclearance or prior to the implementation of SB 14,

14 correct?

15 A    I'm not aware of that.

16 Q    Have you ever looked at the back of your voter

17 registration card?

18 A    What now?

19 Q    Did you ever look at the back side of your voter

20 registration card?

21 A    I have looked at the back side of my voter registration

22 card --

23 Q    Okay.

24 A    -- that's correct.

25 Q    And the current card tells you what the requirements of

1   SB 14 are, correct?

2   A     I believe so.

3   Q     Did you ever look at the previous card before SB 14 was

4   cleared?

5   A     I don't recall doing that.

6   Q     Okay.  And you never looked to see if they told you that

7   if SB 14 was pre-cleared that these issues, these items would

8   be required to vote?

9   A     I don't recall that.

10  Q     Okay.  Are you aware that the Secretary of State engages

11  in education of the counties?

12  A     I am not aware of that.

13  Q     Okay.  Would it surprise you to know that before this law

14  was -- came into -- was implemented that the Secretary of State

15  actively engaged in the training of county officials with

16  respect to the requirements of SB 14?

17  A     I saw emails sent by the Secretary of State's Office to a

18  lot of different recipients at all the counties.

19  Q     Okay.

20  A     And it did look like it had, you know, information in

21  there about SB 14, yes.

22            **MR. KEISTER:**  Okay.  Thank you for your time,

23  Mr. Cornish.

24            **THE WITNESS:**  Thank you.

25            **MR. BRAZIL:**  I have some follow-up, your Honor.

**REDIRECT EXAMINATION**

**BY MR. BRAZIL:**

Q    Mr. Cornish, do you need any specific peer review group report, program, procedure or any accounting methodology to count provisional ballots?

A    I don't believe so.

Q    Do you need any of that methodology, it could be a CPA methodology, an accounting methodology, or a study, to determine how many were cast, how many were accepted by a county, how many were rejected?

A    No.  You just ask the information.

Q    Do you know if the advertising campaign by the Secretary of State's Office told people that you need a photo ID to vote or whether or not instructed them or educated them on how you get a photo ID if you don't have one?  Do you know one way or the other?

A    You mean the advertising done by the Secretary of State?

Q    Or through the entity that they hired.

A    Well, I saw a lot of their advertisements.  There are pictures and stuff like that that related to photo ID.

Q    Did it tell people that you need certain photo IDs to vote or did it educate the public on how obtain a photo ID if you don't have one, do you know?

A    Just what the requirements are.

Q    You were not hired as a Voting Rights Act expert, were

1    you?

2    A    No, sir, I was not.

3    Q    You were hired to use your legal expertise and your

4    accounting or your CPA background to do several things,

5    correct?

6    A    That is correct.

7    Q    And do you need any methodology or peer review study to

8    determine that you will not be able to determine how many

9    provisional ballots were cast statewide for an election?

10   A    No, sir, you don't need that.

11   Q    You just need to do the investigation and the legwork?

12   A    You just need to do the work and try to reach the best

13   conclusion you can.

14   Q    And since this law was new, was there any way to have a

15   baseline on how many had been cast under a law that just went

16   into effect last year?

17   A    No, there was not.

18        **MR. BRAZIL:**  Thank you, Mr. Cornish.

19        **THE WITNESS:**  Yes, sir.

20                    **RECROSS EXAMINATION**

21   BY MR. KEISTER:

22   Q    Mr. Cornish, what methodology did you use to determine the

23   number of provisional ballots cast in Harris County?

24   A    I asked them and they gave me the -- they gave me the

25   actual redacted provisional ballots and on the disk, on the

1    digital media that they provided there was a number at the --

2    so it would say -- for example, it would say Republic Primary

3    and it would be a disk and you would open the disk up and it

4    was PDF files and on the bottom it said 852, or whatever the

5    number was of files that were contained, drag the window open,

6    drag the window down, count the number crossing down and see if

7    it was accurate.  So I tested to make sure that was the number

8    of files, went through and looked at them.

9    Q    And how many number of provisional ballots did you

10   determine was cast in Harris County?

11   A    I don't recall as I'm sitting here right now.  It's in my

12   report.

13   Q    Well, sir, we're here in court and we're not going to talk

14   about this again, so if we need to --

15   A    Well, if I have a copy of my report, I'll be glad to tell

16   you.

17   Q    Well, I don't have a copy of your report.

18        **(Counsel confer)**

19           **MR. KEISTER:**  We're going to have to view an

20   electronic version.

21           Frank, can we --

22           **THE WITNESS:**  I can walk over to my desk and get it.

23           **MR. KEISTER:**  If you can get it, that would be

24   better.

25        **(Pause)**

1          We've got to start bringing back paper.

2          **THE COURT:**  I saw earlier lots of paper in the

3     courtroom.  Nobody can find the report?

4     **(Pause)**

5          **THE WITNESS:**  Yes, sir.

6     **BY MR. KEISTER:**

7     Q    All right, how many provisional ballots did you determine

8     were cast in Harris County for the November 5th, 2013

9     constitutional elections and then I think the next one you did

10    was the March 4th, 2014 primary elections, correct?  Were those

11    the two that you checked?

12         **(Pause)**

13    A    Well, I added them together, so in the two election cycles

14    in Harris County was -- total votes were 219,000 votes were

15    cast, the number of rejected provisional ballots for those two

16    elections was 579.  And a review of the election held for

17    November 5th, 2013, that was a constitutional election, of the

18    provisional ballots for that election 22.5 percent were

19    rejected.  And for the primary election held recently here in

20    March it was 18.8 percent.

21    Q    Okay.  So what would be the number of provisional ballots

22    that were cast based upon SB 14 in the November 5th, 2013

23    election?

24    A    If I just average the 18 percent and 22 percent to get

25    20 percent, I don't have the exact number here, you would have

Cornish - Recross / By Mr. Keister                    291

1   to extrapolate and say a fifth of the 579 or 120 approximately.

2   Q    Okay.

3   A    A hundred and twenty provisional ballots due to lack of

4   photo ID.

5   Q    Okay.  And do you know who Stan Stanart is?

6   A    Sure, I see his picture all the time.

7   Q    Okay.  And who is Stan Stanart?

8   A    He's the County Clerk.

9   Q    Right.  And did you have any conversations with

10  Mr. Stanart when you were doing your investigation in this

11  case?

12  A    No.  My contact was a young lady that was in the elections

13  office there.

14  Q    Okay.  Did you read Mr. Stanart's deposition in this case?

15  A    No, sir.

16  Q    So as we sit here today, you don't know the numbers that

17  Stan Stanart gave in this case, correct?

18  A    I don't recall.  I heard some of the testimony, but I

19  don't --

20  Q    Okay.

21  A    -- didn't see it.

22  Q    Okay.  And as we sit here today -- well, did you hear the

23  part where Mr. Stanart talked about the number of provisional

24  ballots where the people actually had a DPS ID?

25  A    I did not hear that.

EXCEPTIONAL REPORTING SERVICES, INC

1  Q    Okay.  All right.

2         Would that surprise you to know that of that number,

3  I believe 99 of those, Mr. Stanart testified, they determined

4  actually to have a DPS ID?

5  A    Ninety-nine of the hundred and nineteen here?

6  Q    Yes.

7  A    Oh, I don't -- I don't have any information on that at

8  all, but it would be surprising that it would be that high.

9  Q    Okay.  That was not an issue you were checking in this

10 case?

11 A    I didn't go down the road, no, sir.

12         **MR. KEISTER:**  Okay.  Thank you, Mr. Cornish.

13         **THE WITNESS:**  Yes, sir.

14         **THE COURT:**  Is that it?

15         **MR. BRAZIL:**  Nothing, your Honor.

16         **THE COURT:**  All right.  Let's take a 15 minute break.

17         **THE MARSHAL:**  All rise.

18     **(A recess was taken from 3:53 p.m. to 4:08 p.m.; parties**

19 **present)**

20         **THE COURT:**  All right.  Next witness.

21         **MR. FREEMAN:**  Thank you, your Honor.  Dan Freeman on

22 behalf of the United States, and the United States would next

23 like to call Dr. Barry Burden to the stand.

24         **THE COURT:**  All right.  Sir, would you raise your

25 right hand.

1              **BARRY BURDEN, PLAINTIFFS' WITNESS, SWORN**

2              **THE CLERK:**  Thank you, sir.

3              **MR. FREEMAN:**  And, for the record, I will be using a

4    set of demonstratives that have been labeled as Plaintiffs'

5    Exhibit 1107.

6                          **DIRECT EXAMINATION**

7    BY MR. FREEMAN:

8    Q    Good afternoon, Dr. Burden.

9    A    Good afternoon.

10   Q    Would you please introduce yourself to the Court?

11   A    My name is Barry C. Burden.

12   Q    Dr. Burden, what is your educational background?

13   A    I have a PhD in political science from Ohio State

14   University.

15   Q    And what is your present employment?

16   A    I'm a professor of political science at the University of

17   Wisconsin in Madison.

18   Q    Dr. Burden, you have in front of you a document that's

19   been marked as Plaintiffs' Exhibit 1098.  Is that a copy of

20   your most recent CV?

21   A    Yes.

22   Q    And does your DV accurately respect -- reflect your

23   experience?

24   A    Yes.

25   Q    Dr. Burden, in what fields have you published peer-

1   reviewed articles?

2   A    I've published generally in the field of American politics

3   with a focus on elections and voting, election administration,

4   congressional representation, and public opinion.

5   Q    And in what fields have you authored or edited books?

6   A    In many of those same fields, in American politics, again,

7   election administration, congressional representation, voting,

8   and elections.

9   Q    And have you testified as an expert witness or offered

10  written testimony in any other federal litigation?

11  A    Yes.

12  Q    And have decisions in those cases relied on your

13  testimony?

14  A    Yes.

15  Q    And what were those cases?

16  A    I testified or was involved in three cases, one in

17  Wisconsin, which was a voter ID Section 2 case, I testified; a

18  case in North Carolina where I testified, had to do with a

19  variety of election law changes there; and then a case in Ohio

20  dealing with early voting and same-day registration, I provided

21  an expert report.

22  Q    And did all three of those courts rely on your opinion?

23  A    Yes, they did.

24          MR. FREEMAN:  Your Honor, the United States would

25  offer Dr. Burden as an expert in political science, American

Burden - Direct / By Mr. Freeman                295

1   government, representation, electoral politics, election

2   administration, political research methodology, public opinion,

3   and voter participation.

4        **THE COURT:**  (Indiscernible).

5   **BY MR. FREEMAN:**

6   Q    Dr. Burden, what were you asked to do in this case?

7   A    I was asked to apply my knowledge of and the techniques

8   used in political science to analyze the Senate factors as they

9   apply to SB 14 in Texas.

10  Q    And we'll proceed step-wise through your findings, but

11  what was the ultimate conclusion that you reached in this

12  matter?

13  A    My ultimate conclusion was that SB 14 imposes new costs on

14  voters, and that those costs fall more harshly or more heavily

15  on Black and Latino voters than they do on Anglos, and that is

16  likely to deter or dissuade Blacks and Latinos from

17  participating in the electoral process.

18  Q    And did you produce any written reports in this case?

19  A    Yes.

20  Q    And, Dr. Burden, you also have in front of you two

21  documents that have been marked Plaintiffs' 758 and 759.  Could

22  you identify them for the record?

23  A    These are two reports I provided in this case, an initial

24  report and then a later follow-up report.

25  Q    Thank you.  Dr. Burden, is there a general framework used

1    in political science to assess an individual's likelihood of

2    participating in an election?

3    A    Yes.

4    Q    And what's that called?

5    A    It's known as the "calculus of voting."

6    Q    Can you tell the Court in a common sense way how political

7    scientists use the calculus of voting?

8    A    The calculus of voting is a framework for understanding

9    how individual voters or groups of individuals make decisions

10   about whether to vote or not.

11   Q    And among political scientists who study electoral

12   participation, how widely accepted is the calculus of voting?

13   A    I would say it is the dominant way that political

14   scientists understand the voting decision.  It's a well-

15   understood and heavily researched topic that goes back at least

16   50 or 60 years.

17   Q    And is the calculus of voting ever presented as an

18   equation?

19   A    Yes.

20   Q    How would you state that equation?

21   A    That equation has four parameters, or terms.  They are

22   represented by four letters of the alphabet.  The letters are

23   P, B, C, and D to represent those terms.

24   Q    Dr. Burden, what is the P term?

25   A    The P term represents the probability that a voter will be

1    decisive or be the deciding vote in an election.

2    Q    Is that a subjective probability or an objective

3    probability?

4    A    It's been understood both ways.  In some applications,

5    it's considered an objective probability of affecting an

6    election outcome.  In other applications, it's considered a

7    subjective probability on the part of the voter.

8    Q    And what is the B term?

9    A    The B term represents benefits; and, more specifically,

10   the benefits that a voter would receive from seeing his or her

11   preferred candidate or party elected to office relative to the

12   benefits of the opposing party or candidate being elected to

13   office.

14   Q    And what is the C term?

15   A    C represents a variety of costs.  These costs can be

16   either tangible or intangible.  They encompass a variety of

17   different expenditures a voter would have to undertake.

18   Q    So tangible and intangible, you mean -- so it's not just

19   money?

20   A    That's right.  Costs could include financial expenses.

21   They could include expenditures of time, of effort, of the need

22   to gather information about candidates or about the electoral

23   process, the administrative process of voting.

24   Q    And what is the D term?

25   A    D generally represents duty.  That's a sense that the

1    voter has an investment in democracy and feels an obligation or

2    an adherence to the norm of voting.

3    Q    And do political scientists actually compute this equation

4    mathematically for a universe of voters?

5    A    No, that's now how the formula is applied.

6    Q    How is it applied?

7    A    Instead, these four parameters are viewed as factors that

8    can vary, and they change the likelihood of voting.  So take,

9    for example, the duty term.  If duty were to be increased, a

10   voter or a group of voters would be more likely to participate.

11   If the duty term were decreased, they'd be less likely to

12   participate.

13   Q    And did you focus on a particular term in this case?

14   A    Yes, I did.

15   Q    Which term?

16   A    I focused on the C term, the costs term, because it's the

17   only parameter in this equation that is controlled by the

18   state.

19   Q    And what are some examples that political science research

20   has shown when you change the C term?

21   A    So there are plenty of examples of research showing that

22   an increase or decrease in costs in that C term can affect the

23   likelihood of turnout.  Examples would include things like the

24   hours in which polls are open.  The shorter those hours are,

25   the less likely it is that individuals will vote.  It would

1    also include things like the location of polling places.  The

2    further that polling place is from one's residence, the less

3    likely the person is to vote.

4    Q    Thank you.  Which voters has political science research

5    shown to face the most challenges in meeting an increased cost

6    of voting?

7    A    The individuals who would have the most difficult time are

8    those who have the fewest resources in order to pay those

9    costs.

10   Q    And why did you not focus on the duty term in your report?

11   A    Well, all of these terms are important; but, again, the

12   duty term is not one that's controlled by the state or is part

13   of the electoral system; and it's one that does vary across

14   individuals.

15   Q    Have you reached an opinion as to the likely effect of

16   SB 14 under the calculus of voting framework?

17   A    Yes.

18   Q    And what is that opinion?

19   A    It's my opinion that SB 14 increases the cost of voting by

20   increasing the C term; that it's likely to deter or dissuade

21   voters; and, in particular, it will limit the opportunities of

22   minority voters relative to Anglos in Texas.

23   Q    Dr. Burden, did you analyze voter participation rates in

24   Texas prior to implementation of SB 14?

25   A    Yes.

Burden - Direct / By Mr. Freeman                                300

1    Q    And why are participation rates important?

2    A    Well, a political scientist would say it's part of the

3    backgrounds to understand how the law is likely to operate and

4    how voters view elections in the state.

5    Q    And, overall, how do participation rates in Texas compare

6    to the other states?

7    A    They are low.  Compared to other states, Texas is often

8    ranked 48th or 49th among states in turnout.

9    Q    Did you prepare a table in your report to address voter

10   participation in Texas?

11   A    Yes.

12   Q    Within Texas, how do Latino voter participation rates

13   compare to Anglo participation rates?

14   A    In these five federal elections that I examined, Latino

15   turnout was well below that of Anglos.  In both presidential

16   and midterm elections, the gap is often on the order of 20 or

17   30 percentage points.

18   Q    And is that statistically significant?

19   A    Yes.

20   Q    And how do Black participation rates compare to Anglo

21   participation rates in Texas?

22   A    Black turnout rates also typically fall below those of

23   Anglos.  In three of the five elections examined here, Black

24   turnout lags on the order of between 5 percentage points and 10

25   percentage points.  Only in 2008 and 2012 does it appear that

1   Black turnout approached that of Anglos.

2   Q    And do you have any concerns regarding the reliability of

3   the estimates that you used for Black participation rates in

4   '08 and 2012?

5   A    I do.

6   Q    What are those concerns?

7   A    So the data in this table are drawn from the CPS, the

8   current population survey.  That's a high-quality national

9   survey conducted by the Census Bureau.  It's probably the best

10  source of data on voter turnout and registration among various

11  groups; but as a survey it suffers from some liabilities, and

12  there are two in particular that matter here.

13          One is there's a well-known pattern in political

14  science of overreporting of turnout because of social

15  desirability.  And that tendency is greater among Blacks than

16  among Anglos.  Again, research has shown that again and again.

17  So we know that Black turnout is inflated in a way relative to

18  Anglo turnout.

19          The --

20  Q    Dr. Burden -- oh, I'm sorry.

21  A    I was --

22  Q    I didn't mean to interrupt you.

23  A    There's a second factor, which is specific to 2008 and

24  2012, and that's the presence of Barack Obama on the ballot as

25  the Democratic nominee, the first African-American nominated by

1   a major party.

2          Again, survey evidence has shown that Black voters

3   were enthusiastic about his candidacy, and that made them even

4   more likely to overreport their voting behavior.

5   Q    Thank you.  Dr. Burden, I'd next like to turn to your

6   analysis of the Senate factors.  First, broadly speaking, what

7   are the Senate factors?

8   A    The Senate factors were laid out in a report issued by the

9   Senate Judiciary Committee in 1982 related to the amendments

10  made to the Voting Rights Act at that time.

11  Q    And did you set out the Senate factors in your report?

12  A    Yes.

13  Q    Dr. Burden, what can political science contribute to our

14  understanding of the Senate factors?

15  A    Political science can identify how these background

16  factors interact with demographics of the state and voting

17  patterns in the state, and help us assess how the effect of a

18  law might materialize.

19  Q    And does your report address all of the Senate factors?

20  A    No.

21  Q    Why not?

22  A    I focused on the Senate factors that were most accessible

23  and where I felt as though I could document them most

24  confidently.

25  Q    I would like to turn, then, to Senate factor one, the

1    history of official discrimination.  What is the empirical

2    question that you answered when addressing the first Senate

3    factor?

4    A    The question is really whether there is a history in the

5    state of official discrimination against voters who are

6    minorities.

7    Q    And is there a history of official discrimination against

8    minority voters in Texas?

9    A    Yes, a well-documented history.

10   Q    Now, I'm not going to ask you to testify comprehensively

11   concerning that history, but are there any particular aspect of

12   -- aspects of Texas's history of discrimination in voting that

13   you find particularly important in this case?

14   A    Yes, and I highlighted three of those in my report.

15   Q    What was the first such historical incident of

16   discrimination against minority voters that you discussed in

17   your report?

18   A    It's something known as the "White primary."

19   Q    Could you explain what a "White primary" is, how it

20   functioned?

21   A    Well, there were several variants of it, but essentially

22   it was a way to prohibit minority voters from participating in

23   primary elections.  At the time, the dominant party was the

24   Democratic party, and so the Democratic primary was the de

25   facto election choosing who would hold office.  By keeping

1   minority voters from participating in the primary, they were

2   locking them out of the electoral process.

3   Q    And when was the last form of the White primary struck

4   down in Texas?

5   A    After about a 30-year battle between the state and the

6   courts, it was ended in 1953.

7   Q    Did Texas ever require voters to pay a poll tax to vote?

8   A    Yes, they did.  That was implemented in the state

9   constitution in 1902.

10  Q    And how did the poll tax work at a practical level?

11  A    Well, it essentially required voters to pay a tax, to pay

12  a fee when they registered to vote, and then bring the receipt

13  showing that they had paid that fee to the polls in order to

14  cast a ballot.

15  Q    So it was a physical document that they had to present at

16  the polls prior to being allowed to vote?

17  A    Exactly.

18  Q    And how would you describe the poll tax in the calculus of

19  voting framework?

20  A    Well, it's very literally a cost, in that a person has to

21  pay an expense, and then there's a time and effort cost

22  involved in collecting that receipt and bringing it to the

23  polls on election day.

24  Q    And how did this requirement affect Black and Latino

25  voters?

1   A    Black and Latino voters had lower incomes and less wealth.

2   They were less able to pay the tax.

3   Q    Were some Black and Hispanic voters able to overcome that

4   burden?

5   A    Sure.

6   Q    Just not all?

7   A    Correct.

8   Q    Okay.  When did Texas voters last express majority support

9   for the poll tax?

10  A    There was a state-wide referendum on whether the poll tax

11  ought to remain in the constitution in 1963, and Texas voters

12  rejected the idea of removing it from the constitution.

13  Q    So how was the poll tax eliminated?

14  A    It was finally stopped by a Supreme Court case in the mid-

15  1960s.

16  Q    Following the elimination of the poll tax, did Texas enact

17  other restrictions on voter participation?

18  A    Yes, very quickly thereafter, there were efforts to

19  implement a new registration regime.

20  Q    And how did Texas try to justify that new registration

21  regime?

22  A    The purported purpose was to eliminate voter fraud.

23  Q    And how would you describe re-registration requirements in

24  the calculus of voting framework?

25  A    Well, these were onerous requirements asking people

1    actually who were registered before to re-register in a

2    specific way, specific time; and so that imposed new costs on

3    those individuals.

4    Q    And what became of these requirements?

5    A    Those were eventually stopped under Section 5 of the

6    Voting Rights Act.

7    Q    And so how does political science connect this history of

8    discrimination to the opportunity for voters to participate

9    today?

10   A    Well, we know that these kinds of practices have lasting

11   effects.  One article in particular that was published in the

12   1980s showed that at that time there were still lasting effects

13   of the poll tax on minority turnout.

14   Q    Thank you.  Dr. Burden, I would like -- next like to turn

15   to the second Senate factor, the existence of racially

16   polarized voting.  What is the empirical question that the

17   Senate factor asks you to answer -- that political science can

18   help to answer here?

19   A    The question is essentially whether there is a correlation

20   between the race or ethnicity of the voter and the way in which

21   he or she votes.

22   Q    And, Dr. Burden, did you prepare a table in your report to

23   address racial polarization in voting in Texas?

24   A    Yes.

25   Q    And what did Table 2 of your report show?

Burden - Direct / By Mr. Freeman                    307

1    A    Table 2 demonstrates, again, for the last five federal

2    elections, that Anglo preferences are different than those of

3    Latinos and Blacks.  In each of these elections, Anglos were

4    much more favorable towards the Republican candidate; Latinos

5    and especially Blacks were much more favorable towards

6    Democratic candidates.

7    Q    And how do you explain the aberrational outcome in 2006?

8    A    2006 is really unusual.  That was a governor's race in

9    which there were two independent candidates who together earned

10   about 30 percent of the vote, and so that one doesn't look like

11   the other elections.

12   Q    And how did the different outcomes that you observed with

13   regard to racial groups compare to the differences between

14   other types of demographic or socioeconomic groups?

15   A    Well, just examining the gaps in this table, between

16   Latinos and Anglos, the gap is often on the order of 30 to 40

17   percentage points.  Between Anglos and Blacks, the gap is much

18   larger, maybe 60 or 70 percentage points.

19        Those dwarf the differences we see among other

20   demographic groups in Texas -- between those of low income and

21   high income, between men and women, between people with low

22   education and high education -- all of those differences are

23   smaller than the polarization we see between races and

24   ethnicities.

25        THE COURT:  Is this one in the report --

1          **MR. FREEMAN:**  It is, your Honor.

2          **THE COURT:**  -- this slide?  What page?

3          **MR. FREEMAN:**  It's Table 2.  I apologize that I don't

4    have --

5          **THE COURT:**  But -- yeah, it didn't look like my Table

6    2 is like that Table 2.

7          **MR. FREEMAN:**  It's differently formatted, but it's

8    the same information, your Honor.

9          **THE COURT:**  Okay.

10         **THE WITNESS:**  Page 13 is what I have.

11         **THE COURT:**  Okay.

12   **BY MR. FREEMAN:**

13   Q    And, Dr. Burden, did you rely on any other materials with

14   regard to racially polarized voting?

15   A    Yes.

16   Q    What other materials did you rely on?

17   A    Beyond these five elections, I examined expert reports in

18   other cases in Texas, as well as academic analyses of other

19   elections in Texas.

20   Q    And how did those materials compare with the materials

21   that you displayed in Table 2?

22   A    Very similar.  The differences between the races, the

23   degree to which they were different, was very much the same,

24   even across different kinds of elections in different years.

25   Q    And so, in sum, what is your opinion regarding racially

1  polarized voting in Texas?

2  A    There is quite strong evidence of racially polarized

3  voting, and that polarization does not seem to be abating or

4  reducing over time.

5  Q    And how does political science connect racially

6  polarization in voting to the effects of election

7  administration rules or changes in those rules?

8  A    Well, any rule or practice, law, that affected one group

9  more than another would be likely to change the outcomes of

10 elections if those groups have different preferences.

11           In this case, we see that Latinos and Blacks have

12 different preferences from Anglos, and so a law that affected

13 one group more than the other could have consequences for the

14 outcomes of those races.

15 Q    And so just to close the loop, how does racially

16 polarization affect your assessment of SB 14?

17 A    Well, I believe that SB 14 imposes additional costs on

18 Blacks and Latinos in a way it does not on Anglos, and is more

19 likely to deter minority participation than Anglo

20 participation.  Because those minority groups have different

21 preferences, it's likely that SB 14 could affect the outcome of

22 elections.

23 Q    I would next like to turn to the fifth Senate factor, the

24 effects of discrimination hindering participation.  Dr. Burden,

25 what is the empirical question political science can help to

Burden - Direct / By Mr. Freeman                          310

1   answer with regard to Senate factor five?

2   A     The question is whether there are socioeconomic

3   differences between members of different racial and ethnic

4   groups that represent at least in part historical legacies of

5   discrimination.

6   Q     And what socioeconomic factors have the greatest effect on

7   a voter's sensitivity to the costs of voting?

8   A     Many socioeconomic factors affect the likelihood of voting

9   and the ability to pay costs.  Near the top of that list would

10  be education, formal levels of education; but we could also

11  examine things like income, unemployment, health, and so on.

12  Q     Okay.  And what is the connection between discrimination

13  and the socioeconomic -- oh, sorry -- socioeconomic differences

14  that you observed here?

15  A     There's a well-documented history of discrimination

16  against minority voters in Texas.  We know that discrimination

17  plays out over a long period of time, because those cycles are

18  slow to fade from communities, and families, and neighborhoods.

19  And so at least some of the differences we observe today must

20  be attributable to those earlier periods of discrimination.

21  Q     And have you prepared a table summarizing racial

22  disparities described in your report?

23  A     Yes.

24  Q     What are the effects of differing education levels on the

25  costs of voting?

Burden - Direct / By Mr. Freeman                    311

1   A     Education has a tremendous effect on the likelihood of

2   voting for a variety of reasons.  Education conveys skills that

3   a person would need to navigate the electoral process, both the

4   administrative process of actually voting but also learning

5   about candidates and politics; it provides a sense of

6   confidence or efficacy in how the system works and that a

7   person's vote matters; it also, frankly, puts them in a network

8   where they connect with other people who are likely to recruit

9   them into politics.

10          So education has probably the largest effects of any

11  demographic marker.

12  Q     And did you see differences in educational attainment

13  between racial groups in Texas?

14  A     Yes.

15  Q     And one of these numbers sort of jumped out at me.  I was

16  wondering if you could maybe comment on the differences

17  observed between Latinos and Anglos in this chart?

18  A     Yes.  In the report, I actually examine a variety of

19  educational measures.  There's one in this table, which is the

20  percentage of each group who have not earned a high school

21  degree by age 25.  You could see that Latinos have a much

22  higher rate than the other two groups.  That's surely due in

23  part to Latinos who have immigrated to the U.S. and earned --

24  and had educational experiences in other countries.

25  Q     And what are the effects of employment and income

1   disparities on the costs of voting?

2   A    Again, very sizable, detectible, and consistent effects on

3   the likelihood of voting.  Those with higher levels of

4   unemployment, lower incomes, are less likely to participate.

5   Q    And did you see employment and income differences between

6   racial groups in Texas?

7   A    Yes, unemployment rates are lower for Anglos than they are

8   for Blacks and Latinos.  The table shows that household incomes

9   are close to twice as high -- twice the level for Anglos that

10  they are for Blacks and Latinos.

11  Q    And what are the effects of vehicle access disparities on

12  the costs of voting?

13  A    A person has to travel from their residence or place of

14  work to the polling place on election day.  A vehicle is a

15  common way to do that.

16        We know from this survey that Anglos are more likely

17  to have access to vehicles than are Blacks and Latinos.  So

18  there would be additional costs for Blacks and Latinos to pay

19  in order to make their way to the polls.

20  Q    And what are the effects of health disparities on the

21  costs of voting?

22  A    There's also well-documented studies showing that health

23  has very strong effects on participation.  People with

24  illnesses or disabilities are inhibited from participating.

25        It's not in the table here, but we -- from evidence I

Burden - Direct / By Mr. Freeman                    313

1   offered in the report -- show that Blacks and Latinos are in

2   poorer health than are Anglos.

3   Q    And so looking at the chart that we've put on the screen,

4   how will the lingering effects of discrimination affect your

5   assessment of SB 14?

6   A    On these and a variety of other socioeconomic indicators

7   that I examined, Blacks and Latinos are lagging behind Anglos.

8   That means that they have fewer of the resources that a voter

9   would normally use -- that are known to be used to participate

10  in electoral politics.  That will make it more difficult for

11  minorities to pay the costs of SB 14.

12  Q    I would like to discuss some of those specific costs that

13  SB 14 imposes on individual voters.  First, what is your

14  understanding of the registered voters?  Among the set of

15  registered voters, who is most likely to incur substantial

16  practical costs as a result of SB 14?

17  A    Well, I've examined Professor Ansolabehere's analysis, and

18  I've heard analyses of other experts in this courtroom this

19  week, and they all provide a pretty compelling portrait,

20  suggesting that Blacks and Latinos are less likely to have ID

21  among those who are registered.

22  Q    And to be clear, did you research this question

23  independently?

24  A    No.

25  Q    Based on your knowledge of political science and the

1    disparities that you've heard discussed in this courtroom, were

2    those findings at all surprising?

3    A    No, they're very much in line with data I've seen at the

4    national level and in other states.

5    Q    Does the study of the effects on registered voters capture

6    all of the individuals who are likely to be effected by SB 14?

7    A    No, that's a conservative approach.  It leaves aside about

8    2 1/2 to 3 million individuals in Texas who are not currently

9    registered, but may become registered and try to participate.

10   Q    And based on political science research, are eligible

11   citizens who are not registered to vote more likely or less

12   likely than registered voters to be members of minority groups?

13   A    The nonregistered voters are even more likely to be

14   members of minority groups.

15   Q    And for those individuals who lack SB 14 ID, what is the

16   lowest cost form of SB 14 ID?

17   A    That would be the election identification certificate, or

18   EIC.

19   Q    Do you know where a voter needs to travel to to get an

20   EIC?

21   A    In most counties, that would be the DPS office.

22   Q    How would you compare the number of DPS offices to, say,

23   the number of polling places in an average county in Texas, or

24   in any county in Texas?

25   A    It's not close.  Many counties have one DPS office or just

1   a few.  In contrast, there are polling places -- literally

2   thousands of them across the state embedded in people's

3   neighborhoods.

4   Q    And we've discussed this a little bit already, but what

5   has political science research shown regarding travel costs

6   just to reach a polling place?

7   A    Well, several studies have documented that the distance a

8   person has to travel from their home to the polling place

9   affects their likelihood of voting, with longer distances

10  deterring participation.

11  Q    And have any of those studies discussed specifically

12  individuals who lack access to vehicles?

13  A    Yes, that general effect of distance deterring

14  participation is even greater among those who lack ready access

15  to a vehicle.

16  Q    And based on this research and the disparities that we've

17  already discussed, how do you expect travel costs to reach a

18  DPS location or another location that accepts EIC applications

19  to affect the opportunity for minority voters to participate in

20  the political process?

21  A    Well, the cost will be felt more heavily by minorities in

22  Texas than by Anglos, and minorities will be less able to pay

23  those costs to overcome that imposition.

24  Q    Dr. Burden, I'd like to turn to another subject.  Does an

25  application for an EIC require that an individual submit other

1    documents?

2    A    Yes.

3    Q    Do you know, does every state that requires photo ID to

4    vote in person require more than just a voter registration card

5    to get the photo ID that you need to vote?

6    A    No, other states often require less.

7    Q    What's an example?

8    A    In the State of South Carolina, for example, a voter can

9    report that they were unable to get the proper documents, they

10   faced an impediment, and by signing an affidavit, would be

11   allowed to get a state ID for the purposes of voting.

12   Q    Does Texas require proof of citizenship to obtain an EIC?

13   A    Yes.

14   Q    Are any of the documents used to establish citizenship

15   free?

16   A    Not to my knowledge.

17   Q    How will these actual monetary costs affect the

18   opportunity for minority voters to participate in the political

19   process?

20   A    The monetary costs will be felt more sharply by people who

21   have lower incomes and less wealth.  In Texas, the data I've

22   analyzed suggests that those will be disproportionately Black

23   and Latino individuals.

24   Q    And to get documents needed to apply for an EIC, will a

25   voter have to present other documents?

1    A     Yes.

2    Q     Were you in the courtroom today for Mr. Taylor's

3    testimony?

4    A     I believe so.

5    Q     And did that illustrate this issue at all to you?

6    A     Yes, and it also demonstrated that the kinds of people who

7    had -- would have difficulty having ID under SB 14 would also

8    have difficulty obtaining the documents in order to obtain ID

9    to vote under SB 14.

10   Q     Thank you.  I would next like to turn to the seventh

11   Senate factor, the extent of election to public office.  What's

12   the empirical question that political science can help to

13   answer here?

14   A     The question is whether members of minority groups

15   relative to majority groups have been elected to public office

16   in the jurisdiction.

17   Q     And have you set out data in your report summarizing the

18   extent of minority officials being elected to public office in

19   Texas?

20   A     Yes.

21   Q     How does the share of Black legislators at the state-wide

22   level compare to the Black share of U.S. citizens in Texas?

23   A     Blacks hold about 11 percent of seats in the Texas State

24   Legislature, but occupy about 13 percent of the citizen

25   population.

1   Q    And how about Latinos in the State Legislature?

2   A    About 21 percent of legislative seats, about 30 percent of

3   the citizen population.

4   Q    And what were the most recent data available concerning

5   cumulative representation at the federal, state, and local

6   level?

7   A    For Blacks, I was able to obtain data from 2000 on

8   representation at a variety of offices, from federal down to

9   local.  For Latinos, I was able to find equivalent data from

10  2003.

11  Q    And how did the amount of representation compare for Black

12  and Latino elected officials at the cumulative level to their

13  share of the citizen population in Texas?

14  A    It fell below their citizen population numbers.

15  Q    But, of course, these aren't apples to apples comparisons,

16  because the citizen population numbers are a little bit later

17  in time; isn't that right?

18  A    That's right.

19  Q    Okay.  How do political scientists refer to the fact that

20  representatives share the racial or ethnic characteristics of

21  their constituents?

22  A    There's a concept known as "descriptive representation."

23  Q    And why does descriptive representation matter?

24  A    Well, again, research has shown that descriptive

25  representation affects the attitudes and behaviors of members

1    of the public.  When a person is represented by someone of

2    their racial or ethnic group in office, again, research has

3    shown that they are more trusting of government, they feel more

4    efficacious, and they're more likely to vote.

5    Q    And how -- so how does underrepresentation that we just

6    discussed affect your opinion concerning SB 14?

7    A    It would negatively affect each of those things, like,

8    it's likely to decrease trust in efficacy, and likely to

9    dissuade people from participating in the electoral process.

10   Q    I would next like to turn to the second additional Senate

11   factor, tenuousness.  What are the empirical questions that

12   political science can help to answer with regard to the second

13   additional Senate factor?

14   A    The question here is really whether the law is well

15   designed to meet the goals that it is set out to achieve, and

16   whether it's well grounded in the facts of the situation.

17   Q    First, Dr. Burden, does SB 14 apply to all ballots cast in

18   the State of Texas?

19   A    No.

20   Q    What types of voting does SB 14 not apply to?

21   A    It does not apply to absentee ballots sent in by mail.

22   Q    Dr. Burden, what election crime is an in-person voter

23   identification requirement capable of preventing?

24   A    It can probably only prevent voter impersonation at the

25   polls.

1    Q    Why does SB 14 not prevent noncitizen voting?

2    A    Because the forms of ID that are permitted under SB 14 can

3    be acquired by noncitizens.

4    Q    How common has political science found in-person voter

5    impersonation to be?

6    A    Research has found it to be close to nonexistent.  It's a

7    trivial number of votes.  I think I describe it in my report as

8    being minuscule relative to the number of votes that are cast.

9    Q    And what is more common based on the research that you

10   have seen, in-person voter impersonation or crimes related to

11   mail-in ballots?

12   A    Crimes related to mail-in ballots would be much more

13   common.

14   Q    And based on your research on election administration,

15   what conclusions have you reached regarding the purported

16   targeting of SB 14 on voter fraud?

17   A    The law is misguided if the effort is to reduce voter

18   crimes, because it imposes new limits on in-person voting,

19   where we know that crimes are rare, and does not impose new

20   requirements on mail balloting, where we know that fraud is

21   more common.

22   Q    According to political science research, what is the

23   effect on voter confidence of imposing heightened voter

24   identification requirements?

25   A    So studies have put together surveys of voters by state

1    and assessed their level of confidence in the electoral system,

2    and then matched those up with the laws in those states in

3    terms of whether they require a strict voter ID or not, and it

4    turns out there's no relationship between those two things.

5    There's no evidence that having a voter ID law in a state makes

6    voters in that state more confident in the electoral system.

7    Q    And what is the effect on voter confidence of promoting

8    voting my mail?

9    A    That has different effects.  Voters who vote by mail

10   express in surveys less confidence that their ballots will be

11   counted correctly, and I would say for good reason.

12   Q    What are those good reasons?

13   A    We know that ballots that are distributed by mail are more

14   likely to be lost, less likely to be counted -- you know, a

15   variety of concerns.

16   Q    What conclusions have you reached regarding the overall

17   effect of SB 14 on voter confidence?

18   A    I don't believe that SB 14 will have any effect on voter

19   confidence.

20   Q    How accurately did supporters of SB 14 describe the

21   efficacy of Texas's prior voter ID requirements and the need

22   for tighter ID requirements?

23   A    The statements that I saw from public officials in Texas

24   did not seem to be well grounded in the facts about prior

25   election law or about what was contained in SB 14.

1  Q    And what conclusions have you reached regarding bill

2  supporters' representations regarding SB 14?

3  A    The assertions that were offered for what SB 14 would do

4  are not well matched to the actual design of SB 14.

5  Q    Now, in Texas, what voters are eligible to vote by mail?

6  A    There are a small number of voters who are permitted to

7  vote by mail.  One set of voters would be those who are 65 and

8  older.

9  Q    And did you prepare a table in your report to address

10 rates of voting by mail among different racial groups?

11 A    Yes.

12 Q    What patterns did you observe in rates of voting my mail?

13 A    Again, looking at the last five federal elections, rates

14 of voting by mail are higher by Anglos in all but the 2006

15 election, which, again, is an unusual one.

16 Q    Overall, what conclusions have you reached regarding SB 14

17 and the policy justifications that were advanced by supporters

18 of the bill?

19 A    It's my opinion that SB 14 will do little to deter vote

20 fraud, will do nothing to affect voter confidence, but does

21 create two classes of voters, creating an exception for those

22 who are over 65, who are more likely to be Anglo, and so it

23 imposes additional costs on Blacks and Latinos because they are

24 more likely to vote in person.

25 Q    Having studied SB 14 and Texas's prior ID requirements,

Burden - Direct / By Mr. Freeman                    323

1   how would you characterize the change to SB 14's new rules?

2   A    Well, the Senate factors ask whether there has been a

3   dramatic or sudden change in the policy, and it's my opinion

4   that SB 14, in fact, is a dramatic break with earlier practices

5   in Texas.

6   Q    And according to political science research, what is the

7   effect of a marked departure from past election administration

8   practices on opportunities for voter participation?

9   A    A variety of studies have shown that when election

10  practices are changed -- in particular, when they become more

11  stringent or stricter -- they deter voter turnout.

12  Q    And what voters are most likely to be affected by dramatic

13  changes in election procedures?

14  A    It would be voters who are least able to pay the costs of

15  those new election laws.

16  Q    And so in Texas, what effects would you anticipate

17  regarding minority voters when there's a dramatic change in

18  election law?

19  A    Well, I've shown through the analysis of sociodemographic

20  factors that Blacks and Latinos lag behind Anglos on a number

21  of them -- all of them, in fact -- and so they're less able to

22  provide the resources needed to overcome costs imposed by

23  SB 14, and their participation would be deterred.

24  Q    Does your report summarize changes in Texas voting

25  requirements due to SB 14?

1   A     Yes.

2   Q     And did we put those changes into a chart?

3   A     Yes.

4   Q     How would you describe Texas's prior voter ID law?

5   A     It was a more accommodating law relative to SB 14.  It

6   permitted a wide variety of identification, including things

7   that are covered by SB 14, such as a U.S. passport or a

8   driver's license; but also other kinds of ID, a piece of mail

9   from the U.S. Government, a printed check, or even allowing a

10  poll worker to vouch for the identity of a voter.

11  Q     And what are the changes that SB 14 made to ID

12  requirements?

13  A     Well, it removed many of those options that had been

14  available to voters.

15  Q     And what opinions have you reached based on these changes?

16  A     Well, the new law imposes new costs on voters who had been

17  accustomed to relying on these other options.  It's a dramatic

18  change from existing practices and places Texas among the most

19  strict ID laws in the country.

20  Q     Dr. Burden, approximately how many states have -- strictly

21  require presentation of some kind of documents to establish

22  identity at the polls?

23  A     Roughly speaking, about a dozen states have such laws.

24  Q     And so how does SB 14 compare to those other states?

25  A     It is stricter than most.

1   Q     Okay.  Did you prepare a chart in your report to address

2   ameliorative provisions that are found in some of the other

3   strict voter ID laws?

4   A     Yes.

5   Q     And what ameliorative provisions were either rejected

6   during consideration of SB 14 or otherwise omitted?

7   A     So the table lists a number of things that were offered in

8   the Legislature as the bill was being considered, amendments

9   that were either voted down or tabled, set aside.

10          Those amendments would have allowed things like the

11  use of student IDs, which is a common practice in other strict

12  ID states; the option for a poll worker to vouch for the

13  identity of a voter; or the use of tribal IDs.

14  Q     I'd like to ask a few quick questions about a few things

15  on this report -- or on this chart.

16          First, what voters are most likely to rely on these

17  types of ameliorative provisions?

18  A     These would be voters who are lacking in resources, who

19  have lower levels of education, lower levels of income, higher

20  levels of poverty, and they are disproportionately minorities.

21  Q     What is an indigence exception?

22  A     An indigence exception is a provision in the law that

23  allows a person who is in poverty or unable to pay for the

24  costs of documents needed to get an ID to simply sign an

25  affidavit attesting to that fact, and then cast a regular

1   ballot.

2   Q    And which of the strict ID states have this type of

3   provision?

4   A    Indiana would be one.

5   Q    Have you reached any conclusions based on the absence of

6   these provisions from SB 14?

7   A    The absence of these provisions makes SB 14 a rather

8   strict law that imposes steep costs on voters.  And, you know,

9   to restate what I've said before, those costs fall more sharply

10  or more heavily on minority voters who lack the resources to

11  pay them.

12  Q    Next, I'd like to ask a few questions concerning

13  comparisons to laws in place when Texas enacted SB 14.

14           First, which states had voter ID -- photo voter ID

15  laws in place when Texas enacted SB 14?

16  A    There were really just two, Indiana and Georgia.

17  Q    And Texas has argued in this case that SB 14 is similar to

18  Indiana and Georgia's voter ID laws.  Do you agree?

19  A    It's different in some important ways.

20  Q    Does your report set out some of those differences?

21  A    Yes.

22  Q    And did we prepare a chart to summarize that?

23  A    Yes.

24  Q    And so how does SB 14 differ from Georgia and Indiana's

25  voter ID laws?

1    A    The table shows that there are a smaller number of IDs

2    that are permitted in Texas than in these other states.  Texas

3    doesn't permit, for example, other federal IDs to be used under

4    SB 14 or for state university and college IDs to apply.

5    Q    And those -- is there -- are there any IDs that Texas

6    allows that Georgia and Indiana don't allow?

7    A    There's one, and that's the citizenship certificate with

8    photo.

9    Q    And is that document useful or normal as a form of ID?

10   A    One might think that that provision would be helpful, but

11   I think it has limited value because of the things that make

12   that citizenship certificate different from other forms of ID.

13          The certificate is an 8-1/2-by-11-inch piece of

14   paper.  It's a valuable document.  It's one that's not easily

15   folded and kept in a purse or a wallet the way a driver's

16   license might be.  To replace that certificate may cost

17   hundreds of dollars and involve an interview with the

18   Department of State.

19          It's a piece of valuable property that a person is

20   likely to keep in a safe place at home rather than to have on

21   their person at the polling place.

22   Q    Dr. Burden, we are nearing the end.  But, first, I'd like

23   to ask about prior political science research on the effect of

24   voter ID laws on voter turnout.  Are you familiar with that

25   research?

Burden - Direct / By Mr. Freeman                          328

1    A    Yes.

2    Q    An expert in this case has suggested that this research

3    establishes that voter ID laws are not likely to harm minority

4    voters.  Are you aware of those claims?

5    A    Yes.

6    Q    Do you agree?

7    A    No.

8    Q    Has political science research arrived at any kind of

9    consensus regarding the effects of voter ID laws?

10   A    No.

11   Q    And what has prevented more effective or definitive

12   studies?

13   A    These are mostly what I would call methodological

14   limitations of the research.  Until recently, only two states

15   had strict voter ID laws.  Those were Indiana and Georgia, as I

16   just mentioned.

17             So there are a number of studies that try to

18   extrapolate from those two states to say something about the

19   country as a whole or what might happen if ID laws were adopted

20   in other states.  But that's problematic, because those states

21   are different in some important ways, and their laws are not

22   the same as SB 14.

23   Q    Dr. Burden, did you analyze any recent elections in which

24   SB 14 has been in effect?

25   A    No.

1  Q    And why didn't you?

2  A    I don't think that approach would be useful or very

3  informative.

4  Q    And why not?

5  A    Well, in Texas, there have been three state-wide elections

6  since SB 14 went into effect.  Those elections, I believe, were

7  a constitutional amendment vote last November, and then two

8  primaries this spring.  All three of those elections had very

9  low turnout.

10          That means that it's a small number of people who

11  participate, and the ones who do are unrepresentative of the

12  larger electorate.  They are active voters, they have high

13  levels of education, they're quite partisan, high levels of

14  income, and they're more likely to be Anglo.

15          And so to try to generalize from that to what might

16  happen, say, in this November's governor's race I think would

17  be a challenge.

18  Q    Did you analyze any individual elections in South Carolina

19  to assess the impact of voter ID laws as a general matter?

20  A    No.

21  Q    Why not?

22  A    Many of the same reasons.  There have only been a few

23  elections in South Carolina since its law went into effect.

24  Those are low-participation events with a small number of

25  voters.  A couple of those elections are primaries -- mostly

1   Republican primaries, and those are races in -- where there

2   simply aren't many minority voters participating.

3   Q    In most cases, would comparison of a single set of

4   elections, one before, one after an election administration

5   change went into effect, be a valid research design?

6   A    It could be, and it might seem like an appealing approach

7   to simply do a before and after comparison.  But that approach

8   requires that the before and after elections are identical in

9   every other respect.  So all else constant, we could observe

10  the effect of the law; but, of course, in reality, other things

11  are not constant.

12  Q    Other than implementation of a voter ID requirement, what

13  could account for changes in voter turnout in Indiana from 2002

14  to 2006, when their ID law was in effect?

15  A    Well, those two midterm elections were rather different.

16  In 2006, there were several competitive open congressional

17  seats and a U.S. Senate seat.  Those factors were not present

18  in 2002.

19  Q    Just to clarify, were they open seats?

20  A    They were competitive seats.

21  Q    And other than implementation of a voter ID requirement,

22  what could account for changes in voter turnout in Georgia from

23  2004 to 2008?

24  A    Well, a couple of things happened in Georgia.  One is that

25  it became a much more competitive state politically.  You know,

1    the race between the two parties was closer in 2008 than it was

2    in 2004.   That drew candidates, and money, and voter interest,

3    and boosted turnout.

4            The other is that Barack Obama was on the ballot in

5    2008, and that generated a lot of enthusiasm among Black voters

6    in particular, whose turnout increased pretty significantly in

7    Georgia.

8    Q    Dr. Burden, as a political scientist, does voter turnout

9    measure the opportunity for voters to participate in an

10   election?

11   A    No.

12   Q    How are they different?

13   A    Turnout is a behavior, and it's the product of a number of

14   factors -- one of which would be cost, but the others are

15   things captured in that calculus of voting, a sense of duty for

16   a person, their feeling that their vote matters, and the value

17   they see in one candidate being elected over another.

18   Q    Is it possible for SB 14 to harm minority voters even if

19   turnout levels don't change after the law is implemented?

20   A    Yes.

21   Q    How's that?

22   A    Well, what SB 14 does is change the costs or burdens that

23   have to be borne by voters.  But, again, turnout is a behavior

24   that's reflective of many things going on in the environment,

25   things that happen with individuals.  Whether they're able to

1    pay those costs or choose to pay those costs is a separate

2    question.

3    Q    In sum, how will SB 14 affect the costs of voting for

4    minority voters in comparison to Anglo voters?

5    A    So SB 14 imposes new costs by requiring a specific set of

6    IDs and a process to go through to get those IDs.  It will be

7    more difficult for Blacks and Latinos to pay those costs.  They

8    are lacking in those IDs at a higher rate today, and have fewer

9    of the resources needed to acquire them.

10   Q    Thank you, Dr. Burden.

11             **MR. FREEMAN:**  I pass the witness.

12        **(Pause / Voices heard off the record)**

13             **THE COURT:**  I'm not sure.  Do we have more questions

14   or --

15             **MR. FREEMAN:**  No.

16             **THE COURT:**  -- you pass?

17             **MR. FREEMAN:**  I pass the witness.

18                         **CROSS EXAMINATION**

19   BY MR. SCOTT:

20   Q    Hello, Dr. Burden.

21   A    Hello.

22   Q    One moment, I'm sorry.  I work for the State.  We work on

23   scrap pieces of paper.

24        **(Pause)**

25             Through the process of your analysis of Senate

1   Bill 14 and rendering the opinions you've rendered today as

2   well as in your declaration, did you determine what number of

3   in-person fraud associated with voting was the correct number

4   at which point a bill, a law such as SB 14, should go into

5   effect?

6   A    Could you restate the question for me?

7   Q    Were you able to determine what number is the correct

8   number of in-person voter fraud instances when a bill, a law

9   such as SB 14, is proper?

10  A    Is your question my assessment of whether there were --

11  the number of in-person voter fraud cases before the law was in

12  effect or after it was in effect?

13  Q    You said that your opinion is that SB 14 does not have --

14  there is insufficient cases of in-person voter fraud to have a

15  bill such as SB 14.  But what is the correct number of -- at

16  which point a bill such as SB 14, a law such as SB 14, should

17  be applied?

18  A    I don't have a legal standard in mind.  I reviewed the

19  evidence on the prevalence of voter fraud in the form of voter

20  impersonation and found very few cases particularly relative to

21  the millions of votes that were cast in those elections.

22  Q    Would 100 cases of voter fraud be sufficient in your mind

23  to justify SB 14?

24  A    I don't have a threshold in mind.

25  Q    A million cases?

Burden - Cross / By Mr. Scott                    334

1   A    That would be very unlikely.

2   Q    Well, but would that -- that would justify it at that

3   point in time in your mind?

4   A    I think every law has to account for the costs and

5   benefits.

6   Q    And one of the costs that you have raised today in the, I

7   think, Downs formula that you raised early on was different

8   costs that are associated or controlled by the State.

9            Is the fact that someone can do a mail-in ballot,

10  does that reduce the cost for voting for that person?

11  A    It provides an opportunity for voters who are eligible to

12  do that.

13  Q    And it reduces the cost of voting versus having to go to a

14  polling place and cast the ballot, correct, under the analysis

15  that you've done in this case?

16  A    It's an option that may lower the cost for some voters.

17  Q    It would lower the cost for all voters, correct?

18  A    For voters who are eligible to take advantage of that

19  option.

20  Q    You rendered some opinions about the distance that people

21  would have to drive to get an EIC to a DPS station.

22            You were sitting through Senator Uresti's testimony,

23  correct?

24  A    At least part of it.

25  Q    I'll tell you what.  Let's pull up -- first of all, what

Burden - Cross / By Mr. Scott                    335

1    did you undertake to determine the locations of DPS stations

2    that citizens would have to go and get a SB 14 compliance ID?

3    A    I did not do a comprehensive survey of all the DPS

4    locations in the state.

5    Q    Let's pull up for a second Defendants' 1170.  So let me

6    point out, this is -- have you seen this document?

7    A    Have I seen this figure before?

8    Q    Yes.

9    A    No, I don't believe so.

10   Q    So you didn't -- well, let's go to the -- so this is

11   approximately 98.7 percent of the total population in the state

12   of Texas is within 25 miles of a driver's license office.  Did

13   you know that?

14   A    I did not.

15       **MR. SCOTT:**  Let's go to the next page of this one,

16   Brian.

17   Q    Ninety-nine point five percent, 99.95 percent of the total

18   population of the state of Texas is within 50 miles of a

19   driver's license office.  Did you know that?

20   A    No.

21   Q    How many other states have driver's license offices -- and

22   lets' exclude Rhode Island because that's not fair -- have this

23   much accessibility for the citizenship at this level in this

24   country?

25   A    I don't have data here to compare states on that

Burden - Cross / By Mr. Scott                              336

1    criterion.

2    Q    When you're looking at making an analysis and rendering

3    the opinions you've rendered in this case did you not want to

4    determine what the effect on the total population of the

5    driving distances were?

6    A    My assessment was whether minority individuals were as

7    able as Anglos to pay the cost of voting.  So if one has to

8    drive 25 or 50 miles to a DPS, my assessment would be that

9    Blacks and Latinos would have more difficulty doing that on

10   average.

11   Q    Well, so you said that you had some information -- and I

12   think you said you got the report of Dr. Ansolabehere, right?

13   A    I reviewed that report.

14   Q    And part of that report had a list, a no match list that

15   was attached to it, correct?

16   A    I didn't see the list.  I saw estimates of the number of

17   people on that list.

18   Q    Did you undertake or did you ask that one be undertaken an

19   analysis of those identified people, the people the Department

20   of Justice paid to identify to find out what the socioeconomic

21   situation of each of those people was?

22   A    No.

23   Q    Did you sit through Catalist -- the deposition of

24   Dr. Ghitza?

25   A    Yes.

Burden - Cross / By Mr. Scott                     337

1    Q    And did you hear Dr. Ghitza identify that Catalist

2    actually has -- oh, he may not have testified to that; he did

3    in his deposition, I'm sorry -- that Catalist has the ability

4    to identify the socioeconomic abilities of any of the

5    individuals that someone would ask to do.  Did you know that?

6    A    No.

7    Q    Would it have been important from your evaluation to

8    actually have real world information about the people on the

9    largest list, which was 785,000 of Dr. Ansolabehere; would it

10   have been important from your position to be able to actually

11   know the socioeconomic situation of that group of people?

12   A    I'm confident in the conclusions I reached based on the

13   evidence that I provided.

14   Q    Now, were you able to -- were you able to determine how

15   many additional registered voters that don't have an ID or

16   driver's license or other forms of identification that are

17   SB 14 compliant, have student IDs?

18   A    I didn't do that sort of calculation.

19   Q    How about same question but with government -- other

20   governmental IDs like a County ID badge, a City ID badge?

21   A    No.

22   Q    You gave some testimony on racial polarization in voting.

23   One of the charts you brought up pointed out that during the

24   2012 election the Republican vote broke down, I believe,

25   70 percent for Anglos, 42 percent for Latinos and 9 percent for

Burden - Cross / By Mr. Scott                              338

1   Blacks in Texas; is that correct?

2   A    Yes.

3   Q    For that same election across the U.S. did that break down

4   that it was 59 percent of the United States voted -- Anglos

5   voted for the Republican candidate?

6   A    I don't know for certain what happened in other parts of

7   the country.

8   Q    Okay.  How about in your home state of Wisconsin?  Do you

9   know what happened there?  You teach political science at the

10  University of Wisconsin, right?

11  A    Which question are you asking?

12  Q    Well, let me ask the last one first.  We'll set it up.

13  A    Yes, I teach at the University of Wisconsin.

14  Q    And how long have you taught there?

15  A    Since 2006.

16  Q    And part of that as your duties is you teach political

17  science, right?

18  A    Yes.

19  Q    That's your job.  Did you keep up with the election

20  results from the 2012 election in Wisconsin?

21  A    Yes, I follow those.

22  Q    Would it surprise you to find out that the Black vote in

23  Texas voted 50 percent higher for the Republican candidate than

24  they did in Wisconsin?

25  A    Sir, I think we discussed this at my deposition.  These

1   numbers are estimates drawn from surveys.

2   Q    Yes.

3   A    I think the numbers you're referring to in Wisconsin are

4   also drawn from surveys.

5   Q    Yes.

6   A    And so to treat those as truth, absolute truth, and create

7   a proportion like that is misleading.

8   Q    So surveys mislead sometimes, right?

9   A    These are the best estimates from the surveys.  I'm just

10  saying there's some uncertainty associated with them.

11  Q    Well, who did these surveys?

12  A    These are mostly from national exit polls.

13  Q    Well, these are national exit polls that they run after

14  every presidential campaign; is that correct?

15  A    Yes.

16  Q    And one of the theories is that if we can get to a person

17  as they walk out of the voting booth or out of the place where

18  they cast their ballot, we don't get the influence of them

19  seeing Monday morning and saying I really -- I cheered for the

20  Cowboys yesterday because they won, right?  You get rid of some

21  influences.

22  A    That's a benefit of using exit polls.

23  Q    And so exit polls have been a part of this nation for a

24  very long time and political science for a very long time,

25  correct?

Burden - Cross / By Mr. Scott                340

1    A    I would say for some time, a couple of decades.

2    Q    Do you think an exit poll conducted at the end of a

3    presidential election is more accurate than a survey done over

4    the course of a lawsuit by one of the party opponents?

5    A    It would depend very much on the details of those two

6    surveys.

7    Q    Now, you've stated that Texas had a -- that the process by

8    which SB 14 came through the system in your mind raised issues,

9    correct, through the legislative process?

10   A    Can I ask you to be more specific?

11   Q    I'll be as specific as you want me to.  Did it raise any

12   concerns the way SB 14 passed through the legislature?

13   A    I documented in my testimony here many of the amendments

14   that were tabled or set aside that would have made the law more

15   understanding or more flexible.

16   Q    Well, did you -- so were you provided any of the

17   documents, let's say, that were subpoenaed from the Republican

18   legislators that voted in favor of this bill?

19   A    Not to my knowledge.

20   Q    Now, did you get ahold of any of the Democratic documents

21   of party opponents who voted against SB 14?

22   A    I don't believe I received anything that was subpoenaed if

23   that's what you're asking.

24   Q    So did you get your entire record, your entire

25   information, from the public record?

Burden - Cross / By Mr. Scott                        341

1  A    I think the sources I draw on are mostly -- are entirely

2  public sources.

3  Q    And you were able to come to a conclusion in this case not

4  drawing on any documents that were -- got into specific

5  legislative privileges, correct?

6  A    I was able to draw a conclusion about the likely effects

7  of SB 14.

8        **MR. SCOTT:**  Brian, would you put up the little

9  excerpt from this case?  Well, we'll take this one; it's up.

10 And it's late.

11 Q    So you said that there weren't any amendments that were --

12 what did you say?  There were only two amendments or there were

13 a lot of amendments that weren't accepted?

14 A    I didn't give a number.

15 Q    Do you know how many were accepted and how many weren't?

16 A    No.

17 Q    So you don't know how many were accepted or not and you're

18 here testifying that there was something wrong with the

19 legislative process?

20 A    I don't think I testified about the quality of the

21 legislative process.  I did say there were a number of

22 amendments that were set aside that would have offered

23 ameliorative provisions in the law.

24 Q    So if we went through all those -- well.

25        **THE COURT:**  Remind me what we're doing with the

1    exhibits from the non-party legislators.

2            **MR. SCOTT:**  It was my under --

3            **THE COURT:**  I know these were agreed to, to be -- by

4    Ms. London.

5            **MR. SCOTT:**  Yes.

6            **THE COURT:**  That you could use them.

7            **MR. SCOTT:**  These were all things that Ms. London had

8    agreed to.

9            **THE COURT:**  So they're part of the Defendants'

10   exhibits.

11           **MR. SCOTT:**  They will be, your Honor.

12           **THE COURT:**  Okay.

13           **MR. SCOTT:**  So these are the ones that she did not

14   raise any kind of objection to.

15           **THE COURT:**  Okay.  But we don't have numbers right

16   now to refer to.

17           **MR. SCOTT:**  No numbers yet, your Honor.  That was --

18   I think Mr. Clay provided the Court just the --

19           **MR. DUNN:**  Can I just have a clarification that the

20   only such documents that will be shown for any witness are ones

21   that have been ruled on or Ms. London has agreed to?

22           **THE COURT:**  Right.  And it's my understanding this

23   one has been agreed to.  It's the second time it's come up and

24   I'm not really sure that we've gotten an exhibit number or --

25   that's why I asked.  I don't know if it's --

1              **MR. SCOTT:**  Well.

2              **THE COURT:**  -- going to be in evidence or not or

3    what.

4              **MR. SCOTT:**  It does not have an exhibit number.

5    We're going to do a supplemental exhibit list on the ones that

6    we've gotten.  We're receiving the declarations back in kind of

7    a piecemeal basis and we're trying to wait for them all to get

8    here and submit them to the Court at the same time.  But we can

9    go ahead and throw the things in.

10             **MR. CLAY:**  If it would help we can start referring to

11   their Bates numbers that are listed in exhibit --

12             **THE COURT:**  It's probably better for the record.

13             **MR. CLAY:**  Yes.

14             **MR. SCOTT:**  Okay.

15             **THE COURT:**  I mean I didn't know if this was coming

16   in or not, what you all are doing with it or not.  But I just

17   needed to clarify.

18         **(Counsel confer off the record)**

19             **MR. SCOTT:**  Brian, if you roll her up, I'll throw

20   this one in there.  So for the record, your Honor, we're

21   looking at CU-PRIV000009.

22             Okay, Brian, let's go to --

23   **BY MR. SCOTT:**

24   Q    Did you have an opportunity to look at any of the

25   testimony of any of the senators; for instance, Troy Fraser's

1   testimony?

2   A     Testimony where?

3   Q     In this case in a deposition.

4   A     I don't remember specifically.

5   Q     Okay.  It was taken by the Department of Justice.  And

6   they are the entity that retained you, correct?

7   A     They are.

8   Q     Did you look at Senator Duncan's testimony?

9   A     I'm sorry.  I have some references to the legislative

10  debate in my report, but I'm not going to remember the details

11  of which documents I would have seen over the last several

12  months.

13  Q     If it was important to your decision you would have put it

14  in your declaration, right?  As far as the document you looked

15  at --

16  A     Items that help me form my opinion are cited in the

17  declaration.

18          **MR. SCOTT:**  Will you bring up the part from the

19  opening from past hearings, Brian?  Of Ms. Baldwin.

20  Q     The United States has represented in this court that the

21  legislative documents which are documents that are at the heart

22  of the United States' claim that the law was passed, in part,

23  based upon a discriminatory intent.  You knew that was what

24  their position was, right?  That's why they were trying to get

25  these documents.

Burden - Cross / By Mr. Scott                        345

1    A    I don't know what dispute over documents you're referring

2    to.  This wasn't part of the analysis I did.

3              **MR. SCOTT:**  Pull up the motion to quash.

4    Q    So the Defendants, the State of Texas, John Steen and

5    Nandita Berry demanded that the United States issue subpoenas

6    to obtain vital discovery from current and former legislators

7    who had supported photographic voter identification legislation

8    in Texas.

9              So did you know they were trying to subpoena -- and

10   they did subpoena a bunch of documents from us?

11   A    It's not -- what happens --

12   Q    You didn't get them.

13   A    -- in the case outside my analysis is not really a concern

14   to me.

15             **MR. SCOTT:**  Brian, will you bring up Troy Fraser's

16   deposition, Page 310?

17   Q    So let's get you a little more information.  Page 18:

18             "Senator, okay.  Floor Amendment Number 12.

19             "I'm there.

20             "Who proposed that Amendment Number 12?

21             "Appears Senator Davis.

22             "Was there ever a cost estimate given on how much

23             money would it cost the state of Texas to implement

24             Floor Amendment Number 12?

25             "ANSWER:  Not only was not a estimate of that, which

Burden - Cross / By Mr. Scott                    346

1          is required on amendments, but the general rule in

2          the Senate and the rule that we placed on this bill

3          was that all amendments had to be given to the author

4          of the bill 24 hours in advance.  One of the purposes

5          of doing that is so we get a fiscal note on any

6          amendments to determine what the cost would be to the

7          state if the amendment is put in.  Of the amendments

8          offered basically, all the amendments that were

9          offered by the Democrats usually I had about five

10         minutes to look at it.  This is one of the ones that

11         was offered at the last minute.  He stuck the

12         amendment in.  We had no chance to look at it.  We

13         had no way to determine by fiscal note what the

14         impact of the budget to the state would be, which

15         is -- was fairly typical of the amendments that were

16         offered.

17         "Had you seen or known about this regarding the

18         amendments that you believe were not given full

19         thought by the State Senate?"

20         **MR. FREEMAN:**  Objection, your Honor.  This is well

21   beyond the scope of Dr. Burden's testimony.  Dr. Burden has

22   offered no opinion as to the purpose of SB 14.  He's only

23   offered an opinion as to the results of the law.  And this

24   lengthy questioning concerning the intent of the law is simply

25   irrelevant and outside the scope of his direct.

Burden - Cross / By Mr. Scott                                347

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  Could you restate the question?  Not

3    re-reading from the transcripts.

4          **(Laughter)**

5          There was a question in there somewhere.

6          **MR. SCOTT:**  I knew we'd get you trued up on that.

7    BY MR. SCOTT:

8    Q    When you rendered your opinion about the process that took

9    place in the State Senate on SB 14, did you attempt to

10   determine if the amendments had complied with the Senate rules?

11   A    That was not part of my analysis.

12   Q    Did you undertake to determine whether the amendments had

13   a fiscal note attached to them that would comply with state

14   rules?

15   A    No.

16   Q    Did you look at how long the amendment was -- how long it

17   was before the amendment was provided where a -- before a vote

18   was taken on it?

19   A    No.

20   Q    Did you watch the public debate that is available for free

21   at the Texas Legislature website?

22   A    I don't think so.

23         **MR. SCOTT:**  So let's go to Page -- just keep it going

24   down here.  Stop there for a second.

25   Q    Continuing to read on Page 311 of Senator Fraser's

1    testimony:

2                "QUESTION:  Did any state agency raise concerns to

3                you regarding Floor Amendment Number 12?

4                "ANSWER:  Yes.  There -- because there had not been a

5                fiscal note done on this, not knowing the impact of

6                it, this actually could have impacted several places

7                in the budget."

8          So did you -- were you provided any information about

9    the participation of any state agency as far as their input as

10   a resource to any of the proposed amendments that you have

11   analyzed in this case?

12   A    No, I don't believe so.

13         **MR. SCOTT:**  Brian, flip over to Page 316.

14   Q    Who proposed -- Question, line 19 on Page 316:

15               "QUESTION:  And who proposed Floor Amendment 19?

16               "ANSWER:  It appears it's Senator Ellis.

17               "QUESTION:  And was this -- when was this Floor

18               Amendment 19 presented to you for the first time?

19               "ANSWER:  I had, you know, five to ten minutes before

20               the amendment was offered for me to look at the

21               amendment.

22               "QUESTION:  Would that -- was that in compliance with

23               Senate rules?

24               "ANSWER:  No.

25               "QUESTION:  And one of the things -- what was the

Burden - Cross / By Mr. Scott                    349

1          purpose of Floor Amendment 19?

2          "ANSWER:  I don't have the full amendment but the

3          Cliff notes that appear -- that are here appears it

4          was addressing a person who's in -- a student who was

5          in an accredited public university a student ID card.

6          "QUESTION:  Can you be a non-citizen and go to a

7          Texas university?

8          "ANSWER:  Yes.

9          "QUESTION:  Would this -- would the passage of this

10         amendment have allowed a non-citizen of the state of

11         Texas or the United States to be able to present

12         identification and vote in the state of Texas where

13         they have a mind to do so?

14         "ANSWER:  There would have been no tool or ability of

15         the election official to determine if that person was

16         a citizen of the United States."

17         Did you take into consideration at all the situation

18  by which Floor Amendment 19 was presented?

19  A    I did not take account of the situation by which the

20  amendment was presented.

21  Q    Were you here when we were going through Michelle Bessiake

22  and her registration in the state of Texas?

23  A    I'm not sure that I was.  You'll have to remind me about

24  that.

25  Q    She's a student at a state university here in our state,

Burden - Cross / By Mr. Scott                              350

1   and she's a resident and a registered voter in the state of

2   Indiana.  Did you know that?

3   A    Yes, I think I saw that.

4   Q    And did you know that she registered to vote in the state

5   of Indiana -- registered to vote in the state of Indiana after

6   she had registered to vote in the state of Texas?

7   A    I think I heard something to that effect.

8   Q    Okay.  Would a amendment like this have allowed

9   Ms. Bessiake to be able to vote had this amendment passed?

10  A    I don't know.

11       **MR. SCOTT:**  Brian, will bring up Governor Dewhurst's

12  testimony?  Specifically, let's go to Page 270 at line 3.  All

13  right.

14  Q    This is Page 270, line 3, Governor David Dewhurst's

15  deposition.  Answer --

16       **MR. SCOTT:**  Well, you may want to move that up a

17  little so we can at least see the question.

18       **(Pause)**

19  Q    Okay.  There's the question, line 18.  Question by me:

20            "And so can you answer if you can, Senator, I mean --

21            let me re-ask the question.  I don't know if I even

22            finished the question, so let's go with a couple of

23            different parts."

24  This is why I cut it out.

25            "So specifically, let's take the individual senators

1     that you recall speaking to prior to the passage of

2     SB 14.  So specifically, do you recall the names of

3     any specific senators that you spoke to with -- prior

4     to the passage of SB 14 about these discussions that

5     you heretofore described in your testimony?

6     "ANSWER:  Well, some of the conversations took place

7     during the 2009 session and the discussion of Senate

8     Bill 362 but they -- and some took place during the

9     interim leading up to the 2011 session where we took

10    up Senate Bill 14.  But I had numerous conversations

11    with Senator Eddie Lucio.  I had numerous

12    conversations with Senator John Whitmire.  I had

13    numerous conversations with Senator Eliot Shapleigh

14    before he stepped down from the Senate.  I had

15    numerous conversations with Senator West that I can

16    remember about the fact that they were upside down as

17    far as their voters were concerned and why don't we

18    work together.

19    "A number of them I can remember, even with Eliot

20    Shapleigh, trying to negotiate with him what -- what

21    exceptions we needed.  He focused on elderly voters

22    meeting the exception.

23    "In the case of Senator Mario Gallegos, who I talked

24    to repeatedly, he focused on his grandmother and

25    wanting to have the exception for elderly people,

1          also.

2          "On the case of John Whitmire, Senator Whitmire he

3          was not as optimistic that anything could be worked

4          out on a consensus basis because it would probably,

5          in his words, generate a primary opponent for him.

6          "So I understood that.  I understood that.  But,

7          but -- and I don't know if -- if the three opposing

8          counsel will understand this, but at least in Texas

9          it's such a different state from Washington that I

10         consider all these Democratic senators friends of

11         mine.  And that's why I'm glad you asserted privilege

12         and I'm glad this is confidential.

13    **(Laughter)**

14         "Because I really don't want to hurt anyone.  And but

15         none of them voted for any of our bills, but I -- I

16         went out on a limb and told the Republican Caucus

17         in -- I believe it was the 2009 session that I was

18         optimistic we could work out a consensus.  And I was

19         wrong.  I could not work it out.

20         "QUESTION:  But, nevertheless" --

21    **MR. FREEMAN:**  Is that a question?

22    **MR. SCOTT:**  I'm sorry.

23    **MR. FREEMAN:**  Is there a question for the witness?

24    **THE COURT:**  You --

25    **MR. SCOTT:**  Yes.

1   BY MR. SCOTT:

2   Q    So did you take into consideration the cooperation that

3   was clearly being displayed or clearly that Lieutenant Governor

4   Dewhurst believed existed in the State Senate both in the 2009

5   session and in 2011 session as it relates to SB 14?

6   A    I did not take Mr. Dewhurst's beliefs into account.

7   Q    Did you attempt to determine whether there was any kind of

8   evidence like what I've been reading to you before you made

9   your analysis that the state of Texas in your opinion had

10  somehow failed certain citizens in allowing the passage of

11  SB 14?

12  A    I compared the provisions of the law to provisions in

13  other strict ID states.

14          MR. SCOTT:  One minute, your Honor.

15          THE COURT:  Okay.

16      (Pause)

17  BY MR. SCOTT:

18  Q    When we were talking a moment ago about student IDs and

19  County IDs and government IDs, did you take into consideration

20  at all any thought that the legislators may have had about

21  worrying about confusion of IDs at the ballot -- when citizens

22  came to cast ballots?

23  A    I saw that that concern was expressed at some point.

24  Q    And from the standpoint of -- what's a roll call analysis?

25  A    I think by that you mean offering a quantitative study of

Burden - Redirect / By Mr. Freeman                          354

1    votes on the floor of the legislature.

2    Q    And have you ever done a roll call analysis evaluation?

3    A    I've done an analysis of that sort, yes.

4    Q    Was one done by you in this case of the votes on Senate

5    Bill 14?

6    A    No.

7    Q    To your knowledge did any of the party Plaintiffs or

8    Intervenors have any experts that conducted a roll call

9    analysis or evaluation of the votes as they took place on

10   Senate Bill 14?

11   A    Not to my knowledge.

12        **(Pause)**

13   Q    Thank you for your time.

14        **MR. SCOTT:**  Pass the witness.

15                     **REDIRECT EXAMINATION**

16   BY MR. FREEMAN:

17   Q    Dr. Burden, have you offered any opinion in this case as

18   to whether SB 14 was enacted with a discriminatory intent?

19   A    No.

20   Q    And outside of whether the justifications offered for

21   SB 14 matched with the actual effect of the law have you

22   offered any opinion as to the quality of the legislative

23   process?

24   A    No.

25        **MR. FREEMAN:**  If we can pull up Defendants' 1170.

1        **(Pause)**

2            Oh, if the Defendants would do us the courtesy.

3            **MR. SPEAKER:**  Sure.

4    **BY MR. FREEMAN:**

5    Q    Dr. Burden, if I were to make a similar map that showed

6    every single polling place in the state of Texas, what would

7    that map look like?

8    A    My guess is there would be so many dots you wouldn't be

9    able to see the county lines.

10   Q    And if polling places were 25 miles away from the average

11   voter's house, what would be the effect on turnout?

12   A    Turnout would be much lower.

13   Q    And if they were 50 miles away, what would you expect the

14   effect would be on turnout?

15   A    It would be far lower.

16   Q    If a voter prefers to vote in person or needs assistance

17   at the polls, will voting by mail reduce the cost of voting for

18   that voter?

19   A    Not if they're not inclined to use that option, no.

20   Q    Do you know if there's some federal forms of ID that are

21   allowable under SB 14 that don't establish Texas residency?

22   A    I believe the citizenship certificate doesn't establish

23   state residency.

24   Q    Do passports establish residency?

25   A    I don't know.  There's an address in the passport.  I'm

1    not certain.

2    Q    Do you know if a military ID establishes residency?

3    A    I don't know.

4    Q    And are there some state IDs that are acceptable under

5    SB 14 that don't establish U.S. citizenship?

6    A    Yes.

7            **MR. FREEMAN:**  That's all I have.  I pass the witness.

8            **MR. SCOTT:**  No further questions, your Honor.

9        **(Voices heard off the record)**

10           **THE COURT:**  Nothing further?

11           **MR. SCOTT:**  No.

12           **THE COURT:**  Okay.  You can step down.  Thank you.

13           **THE WITNESS:**  Thank you.

14       **(Witness steps down)**

15           **MR. SHAPIRO:**  Good afternoon, your Honor.

16           **THE COURT:**  Good afternoon.

17           **MR. SHAPIRO:**  Or should I say good evening.  Avner

18   Shapiro for the United States.  At this time the United States

19   calls Daniel Guzman as our next witness.

20       **(Pause)**

21           **THE COURT:**  Good afternoon.  Would you raise your

22   right hand.

23   //

24   //

25   //

1          **DANIEL GUZMAN, PLAINTIFFS' WITNESS, SWORN**

2          THE CLERK:  Thank you, sir.

3                         **DIRECT EXAMINATION**

4    BY MR. SHAPIRO:

5    Q    Good evening, Mr. Guzman.

6    A    Good evening.

7    Q    Could you state your full name, please.

8    A    Daniel Angel Guzman.

9    Q    And, Mr. Guzman, where do you live?

10   A    I live in Ed Couch, Texas.

11   Q    Is that -- Ed Couch is in Hidalgo County?

12   A    Yes, sir.

13   Q    Okay.  And have you lived there most of your life?

14   A    Yes, I have.

15   Q    Okay.  What do you do for a living, sir?

16   A    I'm a right-of-way agent for the County of Hidalgo.

17   Q    And what is a "right-of-way agent"?

18   A    We -- we acquire land when a county road is going to get

19   widened, a drain ditch is going to be built or widened.  We go

20   to the property owners and negotiate the acquisition of, you

21   know, the property we need.

22   Q    And in addition to working that job as the -- as the -- as

23   the agent for the County, do you also hold a position in

24   elected office, local elected office?

25   A    Yes, I do.

1   Q    Okay.  And what is that position?

2   A    I'm a city council member with the City of Ed Couch.

3   Q    Okay.  And how many council members are there?

4   A    There's a total of six; five council members and one

5   mayor.

6   Q    And for how long -- how many terms have you served?

7   A    I've been elected four times.

8   Q    Okay.  And how many times have you actively campaigned to

9   be elected?

10  A    Three out of the four times.

11  Q    Okay.  Ed Couch, the town you represent, has how many

12  residents?

13  A    According to the 2010 Census, we have around 3,500.

14  Q    What is the ethnic makeup of the people who live in that

15  town?

16  A    Approximately, in my opinion, like 95 percent are

17  Hispanic, Latino.

18  Q    Okay.  And what are the economic circumstances of the

19  residents of Ed Couch?

20  A    Below -- below poverty level, very heavily distressed

21  area.

22  Q    And how do their economic circumstances affect the rate of

23  car ownership in Ed Couch?

24  A    I would -- I would estimate that maybe half of the

25  residents don't have means of transportation.

1  Q    Now, actually, what's public transport like in Ed Couch?

2  A    We don't have any -- we don't have any public

3  transportation in Ed Couch.

4  Q    So, how do the residents who don't have cars get around?

5  A    Either ask their family members, ask a friend for a ride.

6  Q    How easy is that?

7  A    Well, it depends on that.  I think it's hard.  I mean, if

8  I had to be asking for a ride every day to go to the grocery

9  store or go to the post office, I -- I think it's kind of hard.

10 Q    Okay, Mr. Guzman.  I'd now like to discuss your most

11 recent election campaign.  That was in November, 2013, correct?

12 A    Correct.

13 Q    Okay.  Now, in that election, how many voters participated

14 in that election, to your knowledge?

15 A    We had around 1,200 voters that voted.

16 Q    Okay.  And I understand there is just one polling site in

17 your town; is that right?

18 A    Yes.  Yes, correct.

19 Q    And what is that polling site?

20 A    It's -- the polling site is our local volunteer fire

21 department station.

22 Q    And for how long a period were voters voting in that

23 election?

24 A    We had two weeks of early voting and then election day.

25 Q    Okay.  During that election period, that two-week period,

Guzman - Direct / By Mr. Shapiro                    360

1    what were you doing, Mr. Guzman?

2    A    I was at the polling site campaigning, greeting voters

3    that would come in to vote, and asking them for their support.

4    Q    Did you take time off to do that from work?

5    A    I took around between seven to 10 days off from work.

6    Q    Okay.  So, you took seven to 10 days off from work; the

7    election was two weeks; so, were you there for the whole

8    election or only for most of it?

9    A    I'd have to say most of it.

10   Q    Okay.  Okay.  And you said that you were greeting voters

11   at the polling site.  Where exactly were you in relationship

12   to, let's say, the entrance of the polling site?

13   A    I was a hundred feet from the entrance.

14   Q    Okay.  And you're being very specific, a hundred feet.  Is

15   that because Texas election law allows you to get no closer

16   than a hundred feet to the entrance of a polling site?

17   A    Correct.

18   Q    Okay.  And were you standing or sitting?

19   A    Standing most of the time.

20   Q    Okay.  And were you on your own or were you with

21   supporters?  Who were you with, if anyone?

22   A    We had supporters and we had other running mates that were

23   also on the ballot there with me.

24   Q    Okay.  And you mentioned that you were a hundred feet from

25   the entrance.  Was there also an exit to this location?

Guzman - Direct / By Mr. Shapiro                    361

1   A    Yes.  The -- the polling place has an entrance where

2   voters walk in, and as soon as they vote they get directed by

3   the election clerks to exit through another door.

4   Q    Okay.  Now, Mr. Guzman, could you tell the Court, what did

5   you see in this election that was different from what you had

6   observed in prior elections?

7   A    I saw a lot of voters walking in and walking out through

8   the same entrance door that I hadn't seen in the past.

9   Q    Okay.  And how did those voters -- well, the ones who were

10  coming in and out of the same entrance, were they happy?

11  A    Most of them were frustrated, looked -- had a frustrated

12  look.  Some were angry; some were disappointed.

13  Q    That's how they looked.

14  A    Correct.

15  Q    Okay.  And what did you -- what did you conclude was

16  happening when you saw these voters going in the entrance and

17  coming out of the same entrance?  What did you conclude was

18  happening?

19  A    My assumption was that they weren't being allowed to

20  vote --

21  Q    Uh-huh.

22  A    -- because -- because voters, as a -- voters that were

23  being allowed to vote were being exited through a different

24  door.

25  Q    Okay.  So, in other words, we're not talking about all the

1    voters; this is -- this is some of the voters who were --

2    A    Right.

3    Q    Okay.  Okay.  And when you say you saw these voters who

4    were frustrated, angry, upset, were some of these folks people

5    that you knew because they were friends, supporters, relatives?

6    A    Yes; friends, supporters, relatives.  Yes to all three.

7    Q    And when you -- when these friends, supporters, and others

8    came out of the polling site and they were angry and

9    frustrated, did any one of them say anything to you?

10         MS. ROSCETTI:  Objection, your Honor.  This is

11   hearsay.  He's asking for what people not in court said to

12   Mr. Guzman.

13         MR. SHAPIRO:  Your Honor, this is textbook present-

14   sense impressions.  It's the -- these are statements that they

15   are making immediately after, that the declarant is making

16   immediately after they leave the polling site, immediately

17   after the event, and it's descriptive.  It's textbook.

18         THE COURT:  Do you want to respond?

19         MS. ROSCETTI:  If he can identify the people, who

20   they were, maybe a range of the individuals, to where we could

21   actually cross-reference who these people were.  We deposed

22   Mr. Guzman, and he never mentioned any of these individuals.

23   There is no way for us to verify what they're saying.  It's

24   hearsay; it was made out of court.

25         MR. SHAPIRO:  Actually --

1          **THE COURT:**  Sustained.

2          **MR. SHAPIRO:**  -- that's not true, for the record.

3          **THE COURT:**  Sustained.

4          **MR. SHAPIRO:**  If Mr. Guzman were to give the names of

5     these individuals, would that be helpful, your Honor?

6          **THE COURT:**  I think it's still hearsay.  Sustained.

7     **BY MR. SHAPIRO:**

8     Q    So, these individuals -- did any of these individuals

9     approach you?

10    A    Yes, they did.

11    Q    Okay.  On the first day, can you tell me the names of some

12    of the individuals who approached you?

13    A    Victor Guzman is an uncle of mine; Leonel Gonzalez; Raul

14    Palomin (phonetic).  Those are the three -- one of the three

15    persons that I can remember that -- right now.

16    Q    Okay.  And -- and just for the record, these are the names

17    that you provided during your deposition, correct?

18    A    Yes, I did.

19    Q    Okay.  So, and what was your impression when you

20    interacted with these individuals of how they -- they appeared

21    on that first day?

22    A    Frustrated, angry, because they were denied to vote.

23    Q    Okay.  And were any of them excited in terms of being

24    anxious, emotional?

25    A    Well, I mean, angry or frustrated; to me, it's emotional.

1    I mean, they weren't happy about it, so --

2           MR. SHAPIRO:  Your Honor, at this time I'd like this

3    witness to be able to testify as to what these voters said on -

4    - on the excited utterance exception, also textbook under 803.

5           MS. ROSCETTI:  Your Honor, in Mr. Guzman's deposition

6    he said he spoke to 30 to 40 people.  He identified four

7    individuals.  If they're only offering these three to four

8    people and they're not going to offer the rest of the 37 to 36

9    people, we would still argue it's hearsay.  They're statements

10   made out of court.  He was not right there at the polling

11   places right after.  He was outside; he was a hundred yards.

12   It wasn't a present-sense impression because time had elapsed,

13   and so we would still argue that this information is hearsay;

14   it was made out of court; these people are not here.

15          THE COURT:  Sustained.

16   BY MR. SHAPIRO:

17   Q    Okay.  So, what was your impression as to -- strike that.

18          Based on what -- what your interactions were with

19   these individuals that you saw, say, on the first day, what did

20   you do then?

21   A    We offered to give them a ride to the local DPS office so

22   they could try and obtain a identification card or renew their

23   license or -- or Texas I.D.

24   Q    Okay.  And is that all you did, or -- strike that.

25          What did you do vis-à-vis what was happening in the

1   polling site?

2   A    On -- like I mentioned, on Mr. Guzman, Victor Guzman, he's

3   an uncle of mine.  He was frustrated because he wasn't allowed

4   to vote.  And I went inside and spoke to the election judge,

5   asked her why.  She told me that he had an expired driver's

6   license.  I responded:  Why would the expired driver's license

7   have anything to do with it?  You want to identify the person.

8   So, we -- she said that the law had to -- the I.D. or driver's

9   license had to be a current identification.  So, then I asked

10  her can he vote by provisional ballot.  She advised me that,

11  no --

12          MS. ROSCETTI:  Objection, your Honor.  He's going

13  through what he spoke to the election judge with.  Everything

14  the election judge said to Mr. Guzman is all hearsay.  It's all

15  out of court.

16          THE COURT:  Well, who do they work for?

17          MS. ROSCETTI:  Who did the election judges work for?

18  It's my understanding the city or the county that run the

19  election.

20          THE COURT:  Any response?

21          MR. SHAPIRO:  Yeah.  This, again, is -- first of all,

22  it's -- it's from the -- (indiscernible) that's making the

23  statement, but the more immediate issue is that this is, again,

24  textbook present-sense impression.  It's no different from what

25  we hear in courtrooms every day in this country where officers

1   are testifying to what they hear from witnesses that comes into

2   court because it's a present-sense impression; it's happening

3   immediately there, he was right there --

4           THE COURT:  So --

5           MR. SHAPIRO:  -- and it has all the indices of

6   reliability that present-sense statements have.

7           THE COURT:  -- because I'm listening to you speak

8   right now to me, and if I go testify about what you told me,

9   that's not hearsay?

10          MR. SHAPIRO:  It is -- it isn't --

11          THE COURT:  It only extends to a certain, you know,

12  point.  But I have a little concern about election workers

13  making representations and what they're saying to these people

14  who are trying to vote.  And it seems like somehow that

15  that's -- should come in.

16          MS. ROSCETTI:  Well, I understand it, of what they're

17  saying to the individuals who voted, but Mr. Guzman was not the

18  individual voting.  He was actually someone campaigning and

19  went in and spoke to that person.  He can testify to what he

20  observed, what he did, what he said, because he's here in

21  court.

22          MR. SHAPIRO:  Mr. Guzman is explaining his actions

23  here, your Honor.

24          THE COURT:  And what someone else told him.

25          MR. SHAPIRO:  But he's also explaining his actions.

1          **THE COURT:**  And I -- I have allowed that.  That's

2    not --

3          **MR. SHAPIRO:**  Okay.

4          **THE COURT:**  -- been objected to.  The issue right now

5    is what this -- I think what this election worker told him when

6    he went in, because these people were walking out frustrated.

7    So, how does that come in?

8          **MR. SHAPIRO:**  It comes in because it is directly

9    related to what his actions were, why he was doing what he was

10   doing, and it comes in really because of the present-sense --

11         **THE COURT:**  Sustained.

12         **MR. SHAPIRO:**  -- exception.

13         **THE COURT:**  Objection sustained.

14   **BY MR. SHAPIRO:**

15   Q    So, Mr. Guzman, if you could tell us; you were telling us

16   that you were in the polling site, and what did you do -- what

17   was your -- what was your understanding based on what happened

18   in the polling site about whether voters would be able to

19   actually cast a ballot in that election?

20   A    I didn't understand your question.  Can --

21   Q    Voters who did not have an I.D.; what was your

22   understanding as to whether they would be able to cast a

23   ballot?

24   A    They needed to get a photo identification, go to their

25   local DPS office.  They were being --

Guzman - Direct / By Mr. Shapiro                    368

1    Q    And was it your understanding that they would not be able

2    to vote provisionally at that point?

3    A    Correct.

4    Q    Okay.  And, so, what did you do at that point, Mr. Guzman?

5    A    We started offering people rides to the local DPS office

6    so they can try and obtain a identification card.

7    Q    Okay.  And when you made that offer to voters, the voters

8    who were frustrated and angry, the voters who were your

9    supporters, to what extent were they willing to go with you to

10   the DPS office?

11   A    Half of the -- half of the people that I know that were

12   rejected, half of the people didn't want to go; half tried to

13   go or were interested in going, but a lot of people didn't want

14   to go.

15   Q    Now, what was your understanding as to why they were

16   unwilling to go?

17   A    Some people are hesitant to step into a Department of

18   Public Safety office where you have state troopers.  Some

19   people are afraid that they might owe citations.  Some people

20   are afraid that they owe child support and their names are

21   going to get run once they go get an I.D. card and get arrested

22   on the spot, so --

23   Q    Okay.  And were there also any -- was time an issue at all

24   for voters, in your opinion, in terms of their ability to come

25   with you?

Guzman - Direct / By Mr. Shapiro                          369

1    A    Yes.  There was a couple of persons that expressed that

2    they weren't -- they didn't have time to -- to go to the local

3    DPS office.  They stopped to vote on their way to work, and

4    they didn't have time.

5    Q    Okay.  And to the extent that individuals were willing to

6    go and you were able to transport them, did you -- did you --

7    strike that.

8         Did you -- how did you transport them?

9    A    By car.

10   Q    Okay.  And -- and, so, who was transporting them by car,

11   precisely?

12   A    I -- I personally did, like, five trips, five different

13   trips, and then there was other occasions that we had campaign

14   volunteers driver people to the local DPS office.

15   Q    Okay.  And, so, you did five trips.  Is that during the

16   course of the seven to 10 days that you were there?

17   A    Correct.

18   Q    And you said you had supporters also doing transporting?

19   A    Yes.

20   Q    And were they doing that because you were asking them to

21   transport individuals?

22   A    Yes.

23   Q    Okay.  And how many times did supporters transport people

24   for you?

25   A    Between 20 or 25 times.

1  Q    Okay.  And how many individuals were in the car at any one

2  time?

3  A    Between one to three persons on any occasion.

4  Q    So, roughly how many people did you transport?

5  A    Between 30 to 40 persons.

6  Q    Okay.  And had these individuals not gotten a lift from

7  you -- strike that.

8          How long did it take you during that seven to 10-day

9  period to generally transport folks to the DPS and have them do

10 whatever they needed to do, or tried to do, and then transport

11 them back?  How long was that process each trip?

12 A    Each trip I estimate probably between 35 minutes to an

13 hour, maybe a little more, depending on the -- the line or the

14 people waiting at the local DPS office.

15 Q    And had these individuals had to get to DPS without a ride

16 from you or your supporters, and had they not had a car --

17 because you mentioned that half the individuals in your

18 community do not have cars -- how long would it have taken them

19 to get to the DPS office?

20 A    Well, I think that's a hard question to answer, because, I

21 mean, it depends on the person.  If they have to, I guess,

22 relatives, call friends, ask their friends to take them to a

23 DPS office and then wait there for them, for them to go in and

24 out of the DPS office, who knows how -- how long that would

25 take, so -- I mean, say, if they walk, I'm assuming four hours

1  to walk eight miles and back.

2  Q    Four hours.

3  A    If they walk.

4  Q    Okay.

5  A    If they go in a vehicle, I'm assuming between 35 minutes

6  to an hour.

7  Q    Okay.  So let's talk about the five rides that you did, if

8  I may.  You did five rides.  When you went to the DPS location,

9  did you -- did you go into the polling site with the voter?

10 A    No, I did not.

11 Q    Okay.  So, what, you stayed outside in your car?

12 A    Yes, I was.

13 Q    Could you describe what the DPS facility looks like in

14 your community?

15 A    It's a -- I mean, a normal office building with very

16 minimal windows.  It's got -- next to it or adjacent to it,

17 it's got the Regional DPS Headquarters which is a two-story --

18 two -- or three-story building behind it.  So you have a lot of

19 DPS troopers in and out -- or vehicles in and out all day long.

20 Q    And the troopers are in the DPS office where people are

21 getting IDs?

22 A    Yes.

23 Q    Okay.  And they're wearing uniforms?

24 A    Yes.  I believe so, yes.

25 Q    And do they have guns?

Guzman - Direct / By Mr. Shapiro                           372

1    A    I believe so.

2    Q    Okay.  And how -- and if I can ask in your community, how

3    do folks perceive that DPS office, as someone who represents

4    that community?

5    A    Some people expressed to me that they're hesitant to go to

6    the local DPS office.  I guess they're hesitant to -- they get

7    intimidated by state troopers or something with -- somebody

8    with guns.  So they're hesitant to go and visit their local DPS

9    office.

10   Q    Okay.  So you said that you took these individuals to the

11   DPS on this project of yours.  When those individuals came out,

12   what was their reaction to the experience they had in the DPS

13   office, if you can describe how they appeared?

14   A    Some were just frustrated.  Some were upset that they

15   weren't allowed -- that they were being asked to provide more

16   documentation to get an ID and identification card to go vote.

17   Q    And when you discovered that individuals were frustrated

18   and they needed to get more documents to get an ID, what did

19   you do then?

20   A    We would, I mean, take them back obviously to our city but

21   on one occasion, I helped one of the gentlemen.  I took -- gave

22   him a ride home to pick up his birth certificate and took him

23   back to the DPS office so he can obtain his ID.

24   Q    Okay.  And what did you do at the polling location, if

25   anything, when you heard that people would need to have such

Guzman - Direct / By Mr. Shapiro                     373

1    documents like birth certificates?

2    A    I was advising people that trying to get your birth

3    certificate and people's responses were, well, I don't have my

4    birth certificate and I ain't going to go to my local county

5    courthouse to get a birth certificate.  Well, my next advice

6    was, well, take any type of documentation that you have --

7    legal documents with you.  Hopefully, you know, you'll get

8    lucky and get an identification card because I really -- I

9    didn't know the exact documents that DPS was asking for.

10   Q    So you didn't really understand what documents were

11   required?

12   A    No, I did not.

13   Q    Okay.  Did you attempt to look at any records as to -- or

14   review any records as to who was, in fact, voting at the end of

15   the day?  Let me rephrase that.  You described to us that you

16   witnessed a lot of individuals who were not voting.  Would any

17   records in -- specifically offered during the early period,

18   were there any records that you could review that allowed you

19   to determine whether these individuals, in fact, voted before

20   the end of the election?

21   A    Yes.  We're obtaining -- excuse me.  We were obtaining

22   copies of the people that were being -- voting.  We would get a

23   copy the following day from the election department of the

24   people that voted the previous day.  We had a voter registered

25   list of all the voters in Ed Couch.  So we were just

1   highlighting every person that voted and by the second week

2   which -- of the early vote which is a lot slower the first

3   week, it just -- we were going down the registered list that we

4   had and calling people or visiting people's homes.

5   Q    And what could you see as you would do that as to whether

6   people were actually voting at the end, the ones who were

7   originally prevented from voting because they didn't have an

8   ID?

9   A    There were some people there that actually never voted.  I

10  mean, the election ended and that I know were rejected because

11  they didn't have an identification card that did not vote.

12  Q    Okay.  And did you recognize all the people who were

13  prevented from voting?

14  A    Most of them.  I mean, we're a small town.  So we --

15  Q    Uh-huh.

16  A    -- mostly we know each other.

17  Q    Okay.  And I want to talk now, if I can, Mr. Guzman, about

18  what you knew about this ID requirement before the election or

19  going into it.  Did you know about the new ID requirement?

20  A    Yes.

21  Q    Did you know that there was such a document as EIC going

22  into that election?

23  A    No.

24  Q    Did you know that there was a special voter ID going into

25  the election?

Guzman - Direct / By Mr. Shapiro                         375

1   A     No.

2   Q     Did you know there was a disability exemption going into

3   the election?

4   A     No, I did not.

5   Q     Had you heard from anyone that there was a opportunity to

6   vote by provisional bond if you were -- would show up without

7   an ID?  Did you hear that?

8   A     Absolutely not.

9   Q     Okay.  So, Mr. Guzman, at the end of the day, you saw how

10  this played out.  What's your view as to whether this law

11  affects election outcomes in small towns like the town you live

12  in, Ed Couch?

13  A     I didn't understand -- you're asking me if I think it

14  affects it?

15  Q     Yes.  Does it affect --

16  A     Affects the election outcome?

17  Q     Yes.

18  A     I think it does tremendously.

19  Q     Explain, please.

20  A     Our November election, we had all six members of the city

21  council, the mayor and five council members on the ballot.

22  Four out of those six council members won by 50 votes or less.

23  I mean, in my opinion, there's probably more people that left

24  without voting due to the ID law.  So I got re-elected but if

25  maybe those people vote, maybe I wouldn't have been re-elected.

1    I don't know, you know.  So I -- in my opinion, I think -- in a

2    small city like where I am from, I think it affects it

3    tremendously.

4    Q    And, Mr. Guzman, what's your view on how this law affects

5    the types of voters who live in your community?

6    A    I think it puts a big burden on our citizens and elderly

7    people or maybe not even people that are elderly.  I mean,

8    there's a lot of people that have no means of transportation in

9    our city.  Our local DPS office is eight miles -- eight and a

10   half miles away.  You know, if you need a birth certificate to

11   get an identification, you need to go to a local courthouse.

12   That's 15 miles away.  It's going to cost you to get a birth

13   certificate.  So people are not going to go to the expense or

14   time to get all those records.  That's my opinion.

15   Q    Thank you, Mr. Guzman.

16        MR. SHAPIRO:  No further questions.  Pass the

17   witness.

18                      CROSS EXAMINATION

19   BY MS. ROSCETTI:

20   Q    Jennifer Roscetti with the Defendants.  Good evening,

21   Mr. Guzman.  I'll try to make this quick.  I know you guys got

22   to get home.

23   A    Thank you.

24   Q    You just spoke with Mr. Shapiro about how you didn't know

25   the requirements for an EIC.  You had never heard that before;

1    is that correct?

2    A    Correct.

3    Q    Do you remember giving a deposition in this case roughly

4    about three weeks ago?

5    A    Yes, I do.

6    Q    I think it was August 13th we first met, correct?

7    A    Correct.

8    Q    Do you know your local Elections Administrator Yvonne

9    Ramon?

10   A    I know who she is, yes.

11   Q    And do you remember talk -- that we talked about her and a

12   presentation she did during your deposition?

13   A    Yes.

14   Q    And in that, you told me how she gave a presentation and

15   it was video recorded.  Do you recall that?

16   A    Correct.

17   Q    And then that video recording was played on Tuesday

18   evening?

19   A    Yes.

20   Q    And it was televised on a -- on -- not cable but the local

21   channel there; is that correct?

22   A    Correct.

23   Q    And the content of her presentation was about SB 14, the

24   new voter ID law; is that correct?

25   A    Correct.

Guzman - Cross / By Ms. Roscetti                        378

1    Q    And you saw that, correct?

2    A    Yes.

3    Q    And you also testified that she discussed the IDs that

4    could be used to vote under SB 14; is that correct?

5    A    Yes.

6    Q    And you saw that, correct?

7    A    Correct.

8    Q    And she also discussed about how to obtain those IDs that

9    voters would need to use to vote under SB 14; is that correct?

10   A    I don't recall that.  I just know she made a presentation

11   about the law that had just passed.  I don't recall exactly if

12   she went into details -- what details she went into.  I just

13   know she did the presentation.  I remember the ID law where

14   it's being presented to Commissioner's Court.

15   Q    So when I asked you, "And did she discuss anything about

16   how to get those IDs, any types of those IDs," do you recall

17   what you said?

18   A    I think she said you have to go to your local DPS office

19   or birth certificate or something like that.  I'm -- I don't

20   recall correctly what I told you.

21        **MS. ROSCETTI:**  Page 21.

22   Q    And that's the question I just asked you.  "And did she

23   discuss anything about how to get those IDs, any type of those

24   IDs?"

25        "I believe she did, yes."

Guzman - Cross / By Ms. Roscetti                              379

1   A     Yes.

2   Q     Did I read that correctly?

3   A     Yes.

4   Q     And do you recall saying that?

5   A     Yes.

6   Q     Okay.  And earlier you talked about, I think, the 2013

7   election where you were running.  You had about 1,200 voters?

8   A     Correct.

9   Q     Did you -- what were the -- you last ran for election in

10  2010, correct?

11  A     Correct.

12  Q     How many voters turned out in that election?

13  A     I don't recall honestly.  I don't recall.

14  Q     So sitting here today, you can't tell us if it's any less

15  than the 1,200 from the 2013 election?

16  A     I think it was a little less than 1,200.

17  Q     So in 2010 before SB 14 was enacted, there was less voter

18  turnout is what you're telling me?

19  A     Yes.

20  Q     And you also said you transported 30 to 40 people to DPS

21  stations to the -- excuse me.  Strike that.  You transported 30

22  -- transported 30 to 40 people to DPS -- to the DPS station in

23  Ed Couch to try and get IDs to vote; is that correct?

24  A     I personally transported nine persons and then I directed

25  campaign volunteers --

1  Q    Okay.  I --

2  A    -- total -- a total between 30 or 40 persons.

3  Q    Okay.  I misunderstood that.  I just wanted to clarify

4  because I was thinking you or your supporters and you together.

5  Mr. Guzman, you have a driver's license, correct?

6  A    Correct.

7  Q    And have you had any trouble voting?

8  A    No, I haven't.

9  Q    Thank you, Mr. Guzman.

10        **MS. ROSCETTI:**  Pass the witness.

11        **MR. SHAPIRO:**  Just one moment, your Honor.

12                    **REDIRECT EXAMINATION**

13  **BY MR. SHAPIRO:**

14  Q    Just to clarify a few matters.  The -- you mentioned that

15  you took 30 or 40 individuals to the DPS, either you or your

16  supporters, correct?

17  A    Correct.

18  Q    Okay.  And all those individuals you were taking because

19  they were trying to get an ID; is that right?

20  A    Correct.

21  Q    Okay.  So I'm going to clarify.  This election, the

22  November election, was turnout higher there because that was an

23  unusual election that you had a number of people running for

24  office at the same time?

25        **MS. ROSCETTI:**  Objection, your Honor.  That calls for

Guzman - Redirect / By Mr. Shapiro                    381

1   speculation.  Unless he polls every single person, he doesn't

2   know why voter turnout is more or less.

3              THE COURT:  Overruled.

4              MR. SHAPIRO:  Okay.

5              THE COURT:  Overruled.  He can answer.

6              You can answer, sir.

7              THE WITNESS:  Actually, I was going to add that to my

8   answer when she asked me the question.  I'm glad you're asking

9   me this.

10  BY MR. SHAPIRO:

11  Q    Okay.

12  A    Because that is exactly my opinion.

13  Q    Okay.

14  A    That -- I'm under oath.

15  Q    That's right.

16  A    Okay, I'm under oath.  So I'm not lying.  That's exactly

17  my opinion.  There was -- like I mentioned earlier, there was

18  six -- the entire city council was on the ballot.  That's why I

19  think the high turnout came out in our city that -- on November

20  13th.  Usually -- in 2010 when I ran, it was only me and two

21  other council persons that ran.  So it's usually three persons

22  every election.  We have an election coming up in November and

23  three members of the city council are up for election.  So

24  that's -- that's how it is, not -- you never have six, the

25  entire city council on the ballot.

1  Q    Okay.  And you -- when you testified earlier that you

2  weren't clear on all the documents that were required, right?

3  A    Correct, correct.

4  Q    And now you've been reminded that you heard a presentation

5  by a Ms. Ramon?  Was that her name?

6  A    Correct.

7  Q    Okay.  And at your deposition or now, is it your view that

8  you heard anything about such differences between secondary and

9  primary documents and those types of issues were explained to

10 you by Ms. Ramon?

11 A    She -- let me -- like I mentioned, I remember her doing

12 the presentation.  I don't remember the exact details that she

13 went into as far as what documents were needed.  Until recently

14 or maybe even to now, I don't know exactly what documents you

15 need to get a voter ID --

16 Q    Uh-huh.

17 A    -- from DPS.  So --

18 Q    And do you recall Ms. Ramon saying anything about EIC?

19 A    No, I don't recall.

20 Q    And at your deposition, did you recall at that time?  Did

21 you say anything about Ms. Ramon telling you something --

22 A    No.

23 Q    -- about EIC then?

24 A    No, I did not.

25 Q    Okay.

1          **MR. SHAPIRO:**  No further questions for this witness.

2    Thank you.

3          **MS. ROSCETTI:**  No further questions, your Honor.

4       Thank you.

5          **THE COURT:**  Thank you, sir.  You can step down.

6    Thank you.

7          **THE WITNESS:**  Thank you.

8       **(Witness stepped down)**

9          **THE COURT:**  Okay.  So that's it for today and I know

10   this is our third full day of testimony.  Where are we with the

11   evidence?

12          **MR. ROSENBERG:**  Your Honor --

13          **THE COURT:**  I mean, how are we progressing?  Are we

14   kind of on track with your witnesses?

15          **MR. ROSENBERG:**  I think we're on -- we probably went

16   a little more slowly today than we had anticipated.  Maybe

17   we're a witness behind what we had predicted.  It looks as if

18   we will definitely close by morning on Tuesday.  We may even --

19   we have two witnesses as of now who have to be -- can't be

20   there until Tuesday.  There's some chance that we'll be

21   finished otherwise sometime on Monday.  We're trying to --

22          **THE COURT:**  Yeah.  And then you-all can start up

23   and --

24          **MR. ROSENBERG:**  It's just --

25          **THE COURT:**  -- we'll just do their other witnesses on

1    Tuesday.

2              **MR. ROSENBERG:**  It's just right now if I were to

3    predict, I'd say we're going to go into at least Monday

4    afternoon but it depends -- we'll obviously have a better idea

5    tomorrow.

6              **THE COURT:**  Okay.

7              **MR. SCOTT:**  And then we'd do probably just written

8    presentation -- I mean, the reading stuff if that's okay.

9              **THE COURT:**  Okay.  All right.  Then you're excused.

10        **(Proceeding adjourned at 6:10 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    September 5, 2014 _


TONI HUDSON, TRANSCRIBER