UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Friday, September 5, 2014 |
| | ) | (7:58 a.m. to 12:08 p.m.) |
| Defendants. | ) | (1:08 p.m. to  6:16 p.m.) |

BENCH TRIAL - DAY 4

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE

Appearances:               See Next Page

Court Recorder:            Genay Rogan / Lori Cayce

Clerk:                     Brandy Cortez

Court Security Officer:  Adrian Perez

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiffs:                          CHAD W. DUNN, ESQ.
                                     KEMBEL SCOTT BRAZIL, ESQ.
                                     Brazil and Dunn
                                     4201 Cypress Creek Parkway, Suite 530
                                     Houston, TX 77068

                                     ARMAND DERFNER, ESQ.
                                     P.O. Box 600
                                     Charleston, SC 29402

                                     J. GERALD HEBERT, ESQ.
                                     Attorney at Law
                                     191 Somervelle Street #405
                                     Alexandria, VA 22304

                                     NEIL G. BARON, ESQ.
                                     914 FM 517 Rd. W, Suite 242
                                     Dickinson, TX 77539

                                     LUIS ROBERTO VERA, JR., ESQ.
                                     League of United Latin American
                                     Citizens (LULAC)
                                     111 Soledad, Suite 1325
                                     San Antonio, TX 78205

                                     EMMA P. SIMSON, ESQ.
                                     Campaign Legal Center
                                     215 E. Street NE
                                     Washington, DC 20002

Mexican American                     EZRA D. ROSENBERG, ESQ.
Legislative Caucus,                  Dechert, LLP
et al.:                              902 Carnegie Center, Suite 500
                                     Princeton, NJ 08540-6531

                                     MARK A. POSNER, ESQ.
                                     AMY L. RUDD, ESQ.
                                     LINDSEY COHAN, ESQ.
                                     JENNIFER CLARK, ESQ.
                                     Lawyers' Committee for Civil Rights
                                     1401 New York Ave. NW, Suite 400
                                     Washington, DC 20005

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


United States           RICHARD DELLHEIM, ESQ.
of America:             ELIZABETH S. WESTFALL, ESQ.
                        ANNA BALDWIN, ESQ.
                        PAMELA CARLIN, ESQ.
                        AVNER SHAPIRO, ESQ.
                        U.S. Department of Justice
                        950 Pennsylvania Ave. NW
                        Washington, DC 20530

                        BRUCE I. GEAR, ESQ.
                        Department of Justice
                        1800 G Street NW
                        Washington, DC 20006

Ortiz Plaintiffs,       JOSE GARZA, ESQ.
et al.:                 7414 Robin Rest Dr.
                        San Antonio, TX 78209

                        ROBERT W. DOGGETT, ESQ.
                        Texas Rio Grande Legal Aid, Inc.
                        4920 North IH 35
                        Austin, TX 78751

                        MARINDA VAN DALEN, ESQ.
                        Texas RioGrande Legal Aid, Inc.
                        531 E. St. Francis
                        Brownsville, TX 78520

Texas League of Young   RYAN HAYGOOD, ESQ.
Voters Education Fund:   NATASHA KORGAONKAR, ESQ.
                        NAACP Legal Def. and Educational Fund
                        40 Rector St., 5th Floor
                        New York, NY 10006

                        DANIELLE CONLEY, ESQ.
                        KELLY DUNBAR, ESQ.
                        Wilmer Cutler Pickering, et al.
                        1875 Pennsylvania Avenue, NW
                        Washington, DC 20006

4

<u>APPEARANCES FOR:</u>          (CONTINUED)


Texas Association of        ROLANDO L. RIOS, ESQ.
Hispanic County Judges      115 E. Travis
and County                  Suite 1654
Commissioners:              San Antonio, TX 78205

Also present:               ROGER GALVAN, County Commission
                            Calhoun County

State of Texas:             JOHN BARRET SCOTT, ESQ.
                            Deputy Attorney General
                            for Civil Litigation
                            Office of the Attorney General
                            P.O. Box 12548
                            Austin, TX 78711

                            JOHN REED CLAY, JR., ESQ.
                            LINDSEY E. WOLF, ESQ.
                            JENNIFER ROSCETTI, ESQ.
                            G. DAVID WHITLEY, ESQ.
                            STEPHEN L. TATUM, JR., ESQ.
                            STEPHEN R. KEISTER, ESQ.
                            Office of the Attorney General
                            P.O. Box 12548
                            MC001
                            Austin, TX 78711

                            ARTHUR D'ANDREA, ESQ.
                            Office of the Attorney General
                            209 W. 14th Street, 7th Floor
                            Austin, TX 78701

                            BEN A. DONNELL, ESQ.
                            Donnell Abernethy Kieschnick
                            555 N. Carancahua, Suite 400
                            Corpus Christi, TX 78401

                            WHITNEY DEASON, ESQ.

5

**INDEX**

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WENDY DAVIS | | | | |
|   (BY DEPO) | 6 | 32 | | |
| ALLAN LICHTMAN | 41 | 100 | | |
| RODNEY ELLIS | 156/182 | 187 | | |
| KEN GANDY | 207 | 213 | | |
| MARGARITO LARA | 219 | 226 | 232 | 233 |
| MAXIMINA LARA | 235 | 246 | 248 | |
| GERALD R. WEBSTER | 249 | 283 | 310 | |
| RAFAEL ANCHIA | 314 | 343 | 365 | |
| ANA HERNANDEZ | 366 | | | |
| NAOMI EAGLETON | | | | |
|   (BY VIDEO DEPO) | 375 | | | |

Davis / By excerpts of Deposition - Direct                6

1    **Corpus Christi, Texas; Friday, September 5, 2014; 7:58 a.m.**

2                        **(Call to order)**

3         **THE COURT:**  Good morning.  Court calls Cause Number

4    2-13-193, *Veasey, et al. versus Perry, et al.*  We're ready to

5    proceed.

6         **MR. DUNN:**  Good morning, your Honor.

7         **THE COURT:**  Good morning.

8         **MR. DUNN:**  Chad Dunn on behalf of the Veasey/LULAC

9    Plaintiffs.  We'd like to spend a few minutes this morning

10   reading the testimony from Senator Wendy Davis in the Section 5

11   trial that was undertaken in Washington, D.C.  I have handed a

12   highlighted copy to the State.  I'm handing one up to the Court

13   now.  Ms. Simson's in the witness box to read on behalf of the

14   Senator.  I'll proceed when ready.

15        **THE COURT:**  You can proceed.

16               **DIRECT EXAMINATION OF WENDY DAVIS**

17              **BY EXCERPTS OF DEPOSITION TESTIMONY**

18     **(QUESTIONS READ BY MR. DUNN; ANSWERS READ BY MS. SIMSON)**

19        "QUESTION:  Please state your name.

20        "ANSWER:  Wendy Davis.

21        "QUESTION:  Senator Davis, would you introduce

22        yourself to the Court?

23        "ANSWER:  Yes.  I'm a State Senator representing

24        District 10 in Tarrant County.

25        "QUESTION:  How would you describe District 10 and

Davis / By excerpts of Deposition - Direct                    7

1          the people who make it up?

2          "ANSWER:  District 10 is a majority minority

3          district.  It's a very diverse district

4          socioeconomically and ethnically.

5          "QUESTION:  We'll come back to your district.  But

6          could you give us a brief summary of your background?

7          "ANSWER:  Yes.  I was raised in Tarrant County.  I

8          was a single parent, very young at 19.  I put myself

9          through community college working two jobs and

10          through TCU.  I graduated valedictorian of my TCU

11          class and then graduated from Harvard Law School with

12          honors.  I clerked for a federal judge and then

13          practiced law for a number of years.  I'm still

14          practicing law, but I served on the city council in

15          Fort Worth for nine years before I was elected to the

16          Texas Senate in 2008."

17          **MR. DUNN:**  Moving to page 15, line 22.

18          "QUESTION:  Describe where your district is in the

19          state.

20          "ANSWER:  It's in Tarrant County, which is in north

21          Texas, the Dallas-Fort Worth metroplex area is north

22          Texas.  This district is wholly contained within

23          Tarrant County.  It includes most of Fort Worth,

24          about half of Arlington, and then it goes south to

25          the Johnson County, Tarrant County line.  And it

Davis / By excerpts of Deposition - Direct                    8

1      takes in a tremendous amount of minority growth that

2      has been occurring in those southern areas and

3      traditionally minority neighborhoods in the Fort

4      Worth urban communities that have been there for

5      generations, both Latino and African American.

6      "QUESTION:  Is that a growing population in Texas?

7      "ANSWER:  Yes, it is.

8      "QUESTION:  Is it a growing population in your

9      district?

10     "ANSWER:  Yes, it is.

11     "QUESTION:  I would like to turn your attention now

12     to the 2011 legislative session which you were

13     present for; is that true?

14     "ANSWER:  Yes.

15     "QUESTION:  Were there issues of race that came up

16     often in that session?

17     "ANSWER:  We had several deeply divisive bills that

18     were debated in that session, all of which revolved

19     around what we believed to be racially discriminatory

20     intended motives.  The redistricting bill, of course,

21     my district, as some in this courtroom are familiar,

22     was the target of redistricting.  The people that I

23     represent were carved apart to decimate the minority

24     vote there.  The voter ID bill, of course, we all

25     believed was a racially motivated bill.  There was a

Davis / By excerpts of Deposition - Direct                    9

1       bill that would have removed the in-state tuition for

2       students who were undocumented and who were brought

3       to this country when they were young children.  And

4       those things collectively really I think formed a

5       great deal of acrimony in the Senate.  Also, there

6       was a very divisive Arizona-style sanctuary city bill

7       that was debated and ultimately defeated, but it was

8       a very, very difficult battle.

9       "QUESTION:  I think our record here reflects that the

10      photo ID bill was one of the first ones that came up

11      in the session; is that true?

12      "ANSWER:  The first bill, yes.

13      "QUESTION:  How did that come about that it was

14      first?

15      "ANSWER:  It came about in an extraordinary manner.

16      I don't believe any other bill has ever been brought

17      forward in the same manner as this one.  It received

18      two special designations.  One was it was a special

19      order bill, so it was placed outside of the regular

20      order of business and did not have to be taken under

21      the two-thirds rule as all of our other bills do to

22      come to the Senate floor.  And then secondly, it was

23      named an emergency item by the Governor's office.

24      And those two things in combination I don't believe

25      had ever occurred before.  We asked our colleagues

Davis / By excerpts of Deposition - Direct          10

1          what the emergency was and no one could seem to

2          define that for us, but it was an emergency item.  It

3          didn't have to go through the normal procedures and

4          the time lag that typically a bill would take before

5          it's brought to the floor for debate.  It was brought

6          for debate within the first few days of the session.

7          Normally under our rules it's 60 days before a bill

8          can be brought to the Senate floor for debate.

9          "QUESTION:  Was there something abnormal about the

10         hearing notice and hearing process?

11         "ANSWER:  There was.  The hearing notice actually

12         went out three days before the bill and had even been

13         referred to committee, and I don't believe that's

14         ever happened in the history of Texas.

15         "QUESTION:  Just describe for us in the record what

16         the hearing notice is and what its purpose is.

17         "ANSWER:  The hearing notice's purpose is to inform

18         the public committee of a hearing that will take

19         place on an issue that they may be concerned about

20         and may want to provide input on.

21         "QUESTION:  And the hearing notice, how many days if

22         you can recall did it come out before the actual

23         debate was undertaken?

24         "ANSWER:  It came out four days -- well, no, actually

25         three days before the actual bill was undertaken.

Davis / By excerpts of Deposition - Direct          11

1      "QUESTION:  Despite the notice, did you have some

2      time to prepare for the Senate Bill 14 debate?

3      "ANSWER:  Well, we had debated this bill in prior

4      sessions so yes, in that sense.  We certainly

5      understood and had had testimony in prior sessions

6      about the pros and cons of such a bill and were

7      prepared from that perspective.

8      "QUESTION:  Did you review anything this session to

9      get ready, court decisions, past history, anything of

10     that sort?

11     "ANSWER:  I personally did.  I went through the --

12     back through the records of prior sessions and

13     refreshed my memory about the fiscal notes that were

14     attached to the bills in prior sessions, what the

15     bills included in prior sessions, and how this bill

16     was unique.  And then I also read the Supreme Court's

17     opinion that had been fairly recently rendered in the

18     Indiana voter ID law so that I could understand what

19     it was about that bill that the court found to allow

20     it to be sustained under the Constitution.

21     "QUESTION:  And in that work and in reviewing the

22     Crawford opinion, did that help you prepare some

23     amendments on this matter?

24     "ANSWER:  Yes, it did.

25     "QUESTION:  We'll come back to those, but first I

Davis / By excerpts of Deposition - Direct               12

1    want to get to this mention of the fiscal note.

2    Would you describe what that is to the Court?

3    "ANSWER:  Yes.  For every bill that comes through the

4    Senate or the House, a fiscal note is prepared by the

5    legislative budget board.  And that is to inform us

6    when we're making decisions on legislation what the

7    possible cost to the State might be and whether we

8    have the resources to cover those costs.

9    "QUESTION:  Who are the members of the budget board?

10   "ANSWER:  The board itself is made up of the

11   Government, Lieutenant Governor, Speaker of the

12   House, Land Commissioner, and I believe the

13   Comptroller.

14   "QUESTION:  And are fiscal notes typically prepared

15   on every bill?

16   "ANSWER:  Every single bill.

17   "QUESTION:  Was there something special or unique

18   going on in this legislative session about the State

19   budget?

20   "ANSWER:  Yes.  We actually had a rule.  We were

21   instructed by the Lieutenant Governor and the Speaker

22   in both chambers that we were not to advance any bill

23   with a fiscal note attached to it in this session.

24   And the reason for that was that we were facing a $27

25   billion shortfall and we couldn't afford to add any

Davis / By excerpts of Deposition - Direct                    13

1        extra costs to burden the State.

2        "QUESTION:  Before the session began, had the

3        Governor, Comptroller, Finance Committee members, or

4        other leaders of the State instructed agencies about

5        their budget?

6        "ANSWER:  They had.  Probably about six months prior

7        to the start of the session, all state agencies were

8        instructed to cut their budgets by five percent and

9        then another five percent within the days preceding

10       the session.  And those cuts were very, very deep.

11       So by the time we started, a significant number of

12       cuts had already been made and yet we were still

13       looking at a $27 billion shortfall and deeper cuts

14       that were going to have to be made.

15       "QUESTION:  But why were you concerned then about the

16       fiscal notes specifically on Senate Bill 14?

17       "ANSWER:  I was concerned because I didn't feel like

18       the fiscal note accurately represented what the true

19       cost of the voter ID bill would bring to the State if

20       indeed the State complied with its commitment that it

21       was going to provide an adequate public education and

22       election worker education program for this dramatic

23       change, and also for the cost of the State IDs

24       themselves that could be issued now for free if

25       persons needed them for purposes of voting.

Davis / By excerpts of Deposition - Direct                 14

1    "QUESTION:  In trying to investigate your concerns

2    over the fiscal impact of the bill, did you look at

3    the fiscal notes in this session and the ones past?

4    "ANSWER:  I did.

5    "QUESTION:  What did you learn?

6    "ANSWER:  What I learned was that in the 79th

7    session, the first session that this bill was taken

8    up, the fiscal note that attached to it was 130,000

9    per year, and that was based on an estimate of the

10   number of persons who might be indigent who would be

11   seeking free state ID cards for purposes of voting.

12   In the 80th session --

13   "QUESTION:  Let me stop you right there.  Was there

14   an estimate in that fiscal note of how folks -- the

15   LBB thought --

16   "ANSWER:  That one, it was just a vague reference to

17   the fact that they looked at the poverty guidelines

18   and determined out at a $15 cost per ID, that's what

19   they expected.

20   "QUESTION:  All right, so what else did you learn?

21   "ANSWER:  In the 80th session $171,000 per year note

22   was added and it was added based on an estimate that

23   11,000 people per year would seek the free ID based

24   on indigency status.  So in a state of multimillions

25   of people, the estimate was that 11,000 people would

Davis / By excerpts of Deposition - Direct          15

1          ask you for those.

2          "QUESTION:  Let me stop you.  Let's be frank, do you

3          think that 11,000 estimate was accurate?

4          "ANSWER:  No, absolutely not.

5          "QUESTION:  Do you think it was over representative

6          or under?

7          "ANSWER:  Under.

8          "QUESTION:  What else did you learn?

9          "ANSWER:  Also in that session, about a week later

10         the fiscal note was amended or changed.  And the

11         fiscal note increased to a cost of $670,000 a year,

12         and that change was based on the fact that the way

13         the bill was written was to allow any person who

14         wanted a state ID for purposes of voting to request

15         that for free.  There was no language in the bill

16         that limited it to persons who were indigent.  So

17         that $670,000 cost per year was based on looking at

18         the number of people in the State of Texas who

19         currently have non-driver's license, state photo IDs

20         that have been issued to them, and the belief that

21         approximately 50 percent of them would be interested

22         in renewing that.  It didn't accommodate any new

23         requests for them.  And it looked out over a six year

24         period of time of renewals and came up with a total

25         of about $4 million for that six-year renewal period.

Davis / By excerpts of Deposition - Direct                16

1      "QUESTION:  Then did you follow up in the later

2      fiscal notes?

3      "ANSWER:  Yes.  Then in the 81st session, when the

4      bill was first generated from the Senate rather than

5      from the House, suddenly there was no fiscal note

6      attached for the cost of the IDs themselves.

7      "QUESTION:  Let me make sure it's clear.  There was a

8      fiscal note with no impact or there just wasn't one

9      prepared at all?

10     "ANSWER:  There was a fiscal note with no impact.

11     Then later after we questioned that on the Senate

12     floor, it was suggested that HAVA funds that the

13     State had to use in the amount of $2 million would be

14     the funds that would be the funds that would be used

15     to provide better education and election worker

16     training.

17     "QUESTION:  Now, that HAVA money that was left, was

18     it your understanding that's all of the HAVA money

19     that was remaining from the fund?

20     "ANSWER:  That was my understanding.

21     "QUESTION:  Had the State been spending its HAVA

22     money on election-related matters?

23     "ANSWER:  Yes.  I asked that question of the

24     Secretary of State on the Senate floor when we were

25     debating the bill.  How had the State spent that

Davis / By excerpts of Deposition - Direct          17

1          money in the past?  And what was indicated to me was

2          that in 2008, the State had spent $3 million just on

3          normal better education efforts."

4          **MR. DUNN:**  Continuing to page 25, line 7 for the

5    continuation of the answer.

6          "A $2 million note was added which I found unusual

7          that such an extraordinary change in our voter

8          requirements was only going to cost or could be

9          possibly adequately funded with a $2 million number

10         when in 2008, just in the ordinary course of election

11         administration and voter education, $3 million had

12         been spent from that fund.

13         "QUESTION:  Was there any money budgeted in the

14         fiscal note past the $2 million?

15         "ANSWER:  There was not.  There was a single

16         expenditure, a one-time expenditure, of $2 million.

17         Again, as I said, nothing in the 81st or 82nd

18         legislative session that covered the cost of the IDs

19         that would be issued.

20         "QUESTION:  Let's move to the next and final fiscal

21         note, the 82nd.  What did it reflect?

22         "ANSWER:  Again, that same $2 million number which

23         had been maintained for this purpose from the prior

24         session.

25         "QUESTION:  What would -- how was that $2 million to

Davis / By excerpts of Deposition - Direct                    18

1        be spent as proposed in the fiscal note?

2        "ANSWER:  Well, it was interesting.  It was broken

3        down purely for voter education.  There was no money

4        set aside at all for election worker education

5        according to the fiscal note.  And the fiscal note

6        said that $500,000 would be spent on researching what

7        the education effort needed to be; $750,000 of it was

8        going to the television market for purposes of

9        informing voters about it, and the remainder was

10       through internet and radio and newspaper.

11       "QUESTION:  Are you familiar with the media markets

12       in Texas?

13       "ANSWER:  Yes, I am.

14       "QUESTION:  Why are you familiar with it?

15       "ANSWER:  Because of my elections and running

16       campaign ads on television.

17       "QUESTION:  Is the amount of money proposed in the

18       fiscal note in the latest legislative session enough

19       to get out the word throughout the State, in your

20       opinion?

21       "ANSWER:  Well, just to give you an example, when I

22       ran for election in 2008, I bought what was

23       considered a very weak media buy for a campaign and

24       the air time alone just for the Dallas-Fort Worth

25       market cost $1.1 million.  The $750,000 that was set

Davis / By excerpts of Deposition - Direct                19

1       aside in the fiscal note to inform voters by

2       television in the entire State of Texas wouldn't have

3       bought 30 seconds of airtime in one county let alone

4       the entire state.

5       "QUESTION:  Now, I'd like to sidestep for a minute

6       and talk about the Department of Public Safety.  Had

7       there been budget cuts in that agency recently?

8       "ANSWER:  There had been and it was part of that

9       overall budget cut that had been requested prior to

10      the session.  Before we came into the 82nd session,

11      81 driver's license offices were closed as a

12      consequence of the five percent previous budget cut

13      which was about a 14 and a half million dollar cut to

14      the agency.

15      "QUESTION:  Have those offices been reopened?

16      "ANSWER:  No, they have not.

17      "QUESTION:  Has the reopening of those offices or

18      replacement of them been funded by this bill or any

19      other action in the last legislature?

20      "ANSWER:  There was funding that was set aside for

21      the creation of supercenters that would be built.  It

22      was about a $65 million number, and it was recently

23      announced that two of those would be in Dallas-Fort

24      Worth, two to be in Houston, one in San Antonio, and

25      one in Austin.  But none of the rural areas where so

Davis / By excerpts of Deposition - Direct                    20

1      many of those officers were closed have reopenings

2      under that funding.

3      "QUESTION:  So as you prepared for -- or actually

4      just one more question about the HAVA money.  Did you

5      do some inquiry into what HAVA money was left and

6      what it could be lawfully used for under federal law?

7      "ANSWER:  Yes, I did.

8      "QUESTION:  And what did you discover?

9      "ANSWER:  I discovered as I was looking at the

10     provisions of law in terms of how HAVA money was to

11     be spent was that there was a particular constraint

12     upon spending HAVA monies for purposes of any type of

13     change in voter law that might not be consistent with

14     what had been done in the past.

15     "QUESTION:  All right.  Now I'd like to turn your

16     attention to some amendments that you offered.  Can

17     you just identify to the Court how many amendments

18     that you offered?

19     "ANSWER:  I offered a total of 13.  One of them was

20     duplicative because I had pulled one down and then

21     reoffered it.

22     "QUESTION:  Do these amendments fall into some

23     reasonable categories?

24     "ANSWER:  Yes.  I think you could essentially say

25     they fell into two categories.  One was where people

Davis / By excerpts of Deposition - Direct                    21

1        were indigent and trying to accommodate making sure

2        that we were providing the best opportunity for

3        voting for those persons as possible.  And the other

4        was for instances where there were discrepancies in

5        information that might be on someone's voter ID card

6        versus their driver's license, say an address

7        discrepancy or a name discrepancy and because of

8        marriage or divorce, etcetera.

9        "QUESTION:  And I should clarify for the record,

10       these amendments were offered in the debate on Senate

11       Bill 14?

12       "ANSWER:  Yes, they were.

13       "QUESTION:  In the first category of amendments that

14       you discussed indigency, why were you concerned about

15       indigent impact for the bill?

16       "ANSWER:  Well, we had some testimony in both

17       sessions from experts who had looked at the overall

18       impact of voter ID laws.  The concern that as much as

19       ten to 11 percent of persons who currently legally

20       were exercising their right to vote would be impacted

21       by such a bill because of their inability to get a

22       new ID.

23       "QUESTION:  And in your district in your state, have

24       you looked into the types of folks that predominantly

25       make up the indigent citizen rate?

Davis / By excerpts of Deposition - Direct                22

1           "ANSWER:  Yes.

2           "QUESTION:  What did you -- what have you discovered?

3           "ANSWER:  Well, what is the case in the State of

4           Texas, as I suppose it is elsewhere, is that our

5           indigent population is primarily made up of persons

6           who are minority.

7           "QUESTION:  Now, I want to go through some of your

8           amendments. But is it fair to say that all of your

9           amendments except one were rejected or tabled?

10          "ANSWER:  Yes.

11          "QUESTION:  And when those amendments were tabled,

12          who were the folks voting in favor of keeping the

13          amendments?

14          "ANSWER:  The Democrats or the persons who

15          represented minority communities.

16          "QUESTION:  All right.  I want to start -- and I'm

17          just going to move through these somewhat quickly and

18          stop on a few.  What did your floor amendment number

19          two do?  And for the record, that's at joint appendix

20          1239.

21          "ANSWER:  Floor amendment number two would have

22          required when people come into the driver's license

23          offices, that they be informed that they could be

24          provided with a state voter photo ID card free of

25          charge.  If the card was to be free of charge, I

Davis / By excerpts of Deposition - Direct          23

1          wanted to make sure that we were informing the public

2          community that that was the case.

3          "QUESTION:  And so it had no other impact other than

4          making sure that people knew when they showed up at

5          DPS, the card would be free?

6          "ANSWER:  It was a simply communication, yes.

7          "QUESTION:  Was that rejected?

8          "ANSWER:  Yes, it was.

9          "QUESTION:  I'd like to move now to floor -- move

10          down to amendment -- floor amendment 12, which for

11          the record is at joint appendix 1243.  Can you

12          explain that amendment to us?

13          "ANSWER:  Yes.  On the Senate floor I talked about

14          the Indiana case.  And one of the things that the

15          Supreme Court looked at in Indiana was that they had

16          made special provisions for persons who might be

17          indigent, not only in the provision of their ability

18          to get a free federal photo ID voting card, but also

19          in order to get that card, underlying documents that

20          might be needed should also be offered for free.  And

21          in Indiana, that was part of the voter ID law that

22          was adopted.  This amendment would have allowed those

23          underlying documents that would have been required to

24          be offered to an indigent voter for free."

25          **MR. DUNN:**  And I'm going to interrupt here to let the

1  Court know that the Senate amendments are contained in

2  Plaintiffs' Exhibit 13 in this case.  Continuing at page 31,

3  line 7.

4          "QUESTION:  During the debate on that amendment, did

5          you prepare a demonstrative for the Senate about the

6          various costs that could go into getting an ID?

7          "ANSWER:  I did.

8          "QUESTION:  I'm going to show this to you.  This is

9          joint appendix 1165.  Is this the demonstrative that

10         you prepared?

11         "ANSWER:  Yes, it is."

12         **MR. DUNN:**  And can we have Plaintiffs' Exhibit 650 on

13 the screen?

14         "QUESTION:  For our record, can you verbalize what

15         you are trying to describe here graphically?

16         "ANSWER:  Two things.  Number one, I wanted to show

17         the circularity of ID requirements.  In order to get

18         a driver's license or a state photo ID, other forms

19         of ID are needed, but often times they rely on the

20         very ID that you're trying to get in order to get

21         that ID.  The other thing I wanted to do was show the

22         costs of the underlining (sic) documents because the

23         argument had been made that if we were to offer these

24         free state IDs, it wouldn't impose any problem on a

25         person who might be indigent.  But I argued that

Davis / By excerpts of Deposition - Direct                25

1     because the underlying documents did cost money, that

2     essentially it was like going back to the days of

3     having a poll tax, that there was this hidden cost

4     that would be there for persons who were indigent who

5     would not be able to afford their underlying

6     documents to get the photo ID.

7     "QUESTION:  One of the things that you have on this

8     chart is that a birth certificate costs $23.  Have

9     you since learned that is correct?

10    "ANSWER:  Yes.  I think it may have been correct at

11    the time we prepared this chart, but it is $22 today,

12    plus the cost of sending out the certificate if you

13    can't come to Austin to pick it up yourself, and

14    that's an $8 cost.  So for persons who can't come

15    personally, it's a $30 cost to get a birth

16    certificate from the State.

17    "QUESTION:  Now has DPS regulatorily changed the

18    requirements to get identification in the past?

19    "ANSWER:  Yes.

20    "QUESTION:  And what concern, if any, do you have

21    over that?

22    "QUESTION:  Well, administratively they make changes

23    that I personally believe should come through the

24    legislative process because they can have an impact,

25    a very serious impact, on what the qualifying

Davis / By excerpts of Deposition - Direct                26

1              documents are to receive a State ID.  And those have

2              been limited administratively over time."

3         **MR. DUNN:**  The direct examination was interrupted by

4    Judge Tatel, who asked the following question:

5              "JUDGE TATEL:  Senator Davis, you said that you could

6              get a birth certificate by name.  Can you just -- how

7              do you -- you mean you don't have to go to the office

8              to get it, you can have it sent to you?

9              "**THE WITNESS:**  Correct.  You can send in the

10             underlying documents that are required to get your

11             birth certificate to the State Vital Statistics

12             Office and then have it sent to you for $8."

13        **MR. DUNN:**  Returning to the direct examination.

14             "QUESTION:  So we're clear, you pay the $22 for the

15             birth certificate and then $8 for the delivery, for a

16             total of $30?

17             "ANSWER:  That's correct.

18             "QUESTION:  On your amendment to make the underlying

19             documents to obtain the election ID for free, how was

20             it handled?

21             "ANSWER:  I'm sorry, will you repeat your question?"

22        **MR. DUNN:**  Judge Tatel again interrupts with a

23    question.

24             "JUDGE TATEL:  I'm sorry.  Can you then get the

25             election identification certificate by mail or do you

1          have to get that?

2              "**THE WITNESS:**  I believe you have to go to get that,

3          yes.  You have to appear in person for that."

4              **MR. DUNN:**  Returning to the direct examination.

5              "QUESTION:  How was your amendment resolved by the

6          Senate?

7              "ANSWER:  It was tabled.  But then Senator Duncan,

8          who listened intently as I was describing the reasons

9          for laying out the bill and what the bill would

10         include -- actually, it was a different one that

11         Senator Duncan brought back.  This one was tabled and

12         it was not brought back.

13             "QUESTION:  Let's move through this quickly and I'll

14         get to Senator Duncan's affidavit before we are --

15         because we are short on time.  Amendment 13 would

16         have done what?

17             "ANSWER:  It would have allowed the use of an ID that

18         had expired and it was in keeping with the Indiana

19         law.

20             "QUESTION:  It was tabled?

21             "ANSWER:  Yes.

22             "QUESTION:  What about Amendment 15?

23             "ANSWER:  Amendment 15, same thing, a little bit of a

24         limit on the expiration date on the ID that it could

25         have expired since the last general election.

Davis / By excerpts of Deposition - Direct          28

1          "QUESTION:  And for the record, Amendment 13 is in

2          the joint appendix.  Both of these were tabled; is

3          that right, ma'am?

4          "ANSWER:  Correct.

5          "QUESTION:  Then on Amendment 21, what would it have

6          done?

7          "ANSWER:  It would have allowed also in keeping with

8          the Indiana law that a federal government ID, a state

9          ID, or a student ID from a state education

10          institution, higher education institution, could be

11          used.

12          "QUESTION:  Let's move on to floor Amendment 39 that

13          I think ultimately became floor Amendment 40.  What

14          would that have done?

15          "ANSWER:  That would have allowed an indigent voter

16          to swear an affidavit to their indigency and to be

17          allowed to vote a provisional ballot, and it was

18          modeled after the Indiana law.

19          "QUESTION:  What happened to your version of the

20          amendment?

21          "ANSWER:  My version of the amendment was tabled, and

22          actually I agreed to withdraw it after working with

23          Senator Duncan.  And Senator Duncan reoffered and it

24          passed when he reoffered it.

25          "QUESTION:  Why would it need to come from Senator

1       Duncan?  Why could your amendment not been offered?

2       "ANSWER:  During the debates of that day, amendments

3       that were being offered by Democrats were being

4       summarily tabled with very, very little discussion,

5       if any discussion at all was occurring on them.  And

6       Senator Duncan supported the amendment and wanted to

7       see it go on the bill, so he urged it himself and

8       allowed me then to sign on after his colleagues

9       agreed that they would pass it.

10      "QUESTION:  Senator Duncan is a Republican from the

11      panhandle of Texas?

12      "ANSWER:  Correct.

13      "QUESTION:  How was the amendment offered?  I mean,

14      was it uniform support in the Senate?

15      "ANSWER:  yes, it was unanimously supported.  It did

16      two things as did mine.  It allowed an indigency

17      affidavit and it also allowed one where a person

18      might object to having their photograph taken for

19      religious reasons.  Again, which was modeled after

20      the Indiana voter ID law.

21      "QUESTION:  What happened to the amendment when the

22      bill went to the House?

23      "ANSWER:  When the bill went to the House, that

24      amendment which included both of those that I just

25      spoke of was stripped by a Republic House member and

Davis / By excerpts of Deposition - Direct                    30

1          on a Republican to Democratic vote, it was taken out.

2          "QUESTION:  When the bill went to conference

3          committee, did the issue reinsert itself into the

4          bill in some way?

5          "ANSWER:  The conference committee of course is made

6          up of a number of Senators and a number of House

7          members who come together to talk about conflicts and

8          versions of the bill as they came out of each

9          chamber.  Interestingly put back into the bill was

10         the exception for allowing the swearing of an

11         affidavit for a person who was objecting to having

12         their photograph taken for religious reasons.  Also

13         added into it was something that hadn't come from

14         either chamber, and that was for persons who might

15         not have their voter ID because of a natural

16         disaster.  But not added back into it was the

17         indigency clause.

18         "QUESTION:  So the bill ultimately allowed for some

19         affidavits to step around the ID requirements, but

20         not for indigents?

21         "ANSWER:  That's correct.

22         "QUESTION:  The final category of amendments you had

23         were -- and for the record, Amendment 39 and 40 are

24         in the appendix -- the -- just briefly describe what

25         those two amendments were trying to address.

Davis / By excerpts of Deposition - Direct          31

1        "ANSWER:  Just those situations where you might have

2        a minor discrepancy between your voter ID card and

3        your driver's license.  For example, my personal

4        driver's license has my maiden name and married name

5        on it.  My voter ID has only my previous married name

6        on it.  Those situations where an election worker

7        could use their discretion in determining that that

8        person was the same person.

9        "QUESTION:  Senator, have you developed an opinion

10       whether or not Senate Bill 14 would adversely impact

11       minorities in Texas disproportionate to Anglos?

12       "ANSWER:  Yes, I have.

13       "QUESTION:  What is that opinion?

14       "ANSWER:  I believe that it absolutely will have that

15       impact and I believe it was intended to.

16       "QUESTION:  Do you have an opinion whether Senate

17       Bill 14 was adopted by the legislature as a whole

18       with a discriminatory intent?

19       "ANSWER:  Yes, I do.

20       "QUESTION:  And what is that opinion?

21       "ANSWER:  I believe that it was."

22       **MR. DUNN:**  The direct examination concluded.  Judge

23  Tatel asked the following question:

24       "JUDGE TATEL:  Who did you clerk for?

25       "**THE WITNESS:**  Judge Jerry Buchmeyer in the Northern

Davis / By excerpts of Deposition - Cross                    32

1              District of Texas."

2          MR. DUNN:  And there was no cross examination.  That

3      concludes the reading, your Honor.

4          MR. HEBERT:  Do you -- oh, sorry.

5          THE COURT:  Okay, I'm sorry.  I didn't know the

6      defense was going to present anything on Ms. Davis.

7          MS. WOLF:  Your Honor, we're going to present some

8      designations from Senator Davis's deposition.  And I'll note,

9      at the trial there was no cross examination because it was read

10     into the record that they would rely on their designations from

11     the deposition.

12          **(Pause)**

13          MR. TATUM:  Stephen Tatum for the Defendants, your

14     Honor.

15              **CROSS EXAMINATION OF WENDY DAVIS**

16              **BY EXCERPTS OF DEPOSITION TESTIMONY**

17      **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY MS. WOLF)**

18          "QUESTION:  Are you currently registered to vote?

19          "ANSWER:  Yes.

20          "QUESTION:  Do you have a current Texas driver's

21          license?

22          "ANSWER:  Yes.

23          "QUESTION:  Do you have a passport?

24          "ANSWER:  Yes.

25          "QUESTION:  Are there other members of your household

```
              Davis / By excerpts of Deposition - Cross        33

   1          who are voting age?
   2          "ANSWER:  Yes.
   3          "QUESTION:  Are the voting age individuals in your
   4          household registered to vote?
   5          "ANSWER:  Yes.
   6          "QUESTION:  And do those individuals have a current
   7          Texas driver's license?
   8          "ANSWER:  Yes.
   9          "QUESTION:  Did you talk to any lobbyist about SB 14
  10          either before or during the 2011 session?
  11          "ANSWER:  Not that I recall.
  12          "QUESTION:  Did you speak to any advocacy group about
  13          SB 14 either before or during the 2011 session?
  14          "ANSWER:  Not independent of hearing testimony on the
  15          Senate floor.
  16          "QUESTION:  Do you recall whether you spoke to any
  17          lobbyist or advocacy group about the previous 2009
  18          voter ID bill?
  19          "ANSWER:  I don't recall.
  20          "QUESTION:  To the best of your knowledge, do any of
  21          your constituents support photo ID requirements for
  22          voting, generally?
  23          "ANSWER:  I believe that many of my constituents do.
  24          "QUESTION:  Did anyone outside of the legislature
  25          prepare talking points for you on SB 14?
```

```
                Davis / By excerpts of Deposition - Cross          34

  1            "ANSWER:  No.

  2            "QUESTION:  Did anyone outside the legislature at any

  3            time provide you with talking points about voter --

  4            photo voter ID legislation?

  5            "ANSWER:  No.

  6            "QUESTION:  Did anyone outside of the legislature

  7            provide you with any kind of background materials on

  8            photo ID legislation?

  9            "ANSWER:  Not that I recall.

 10            "QUESTION:  Do you know whether anybody outside the

 11            legislature provided your staff with materials on

 12            photo ID legislation?

 13            "ANSWER:  I don't know.

 14            "QUESTION:  And I can hear myself kind of going back

 15            and forth.  When I say 'photo ID legislation' or

 16            'voter ID legislation,' what I intend to refer to is

 17            legislation that would require a photo ID to vote.

 18            "ANSWER:  Yes, I understand your question that way.

 19            "QUESTION:  Can you recall anyone providing you with

 20            materials about SB 14 or voter ID legislation?

 21            "ANSWER:  I don't recall.  We have a Democratic

 22            caucus, a Senate caucus, and we have a caucus staff

 23            person who sometimes sends emails to us prior to

 24            working on particularly controversial issues.  I

 25            don't recall him having sent anything to us for that,
```

Davis / By excerpts of Deposition - Cross                35

1          but he may have.

2          "QUESTION:  Okay.  Did the Senate Democratic caucus

3          provide any material that you can recall specific to

4          SB 14?

5          "ANSWER:  I do not recall.  It's possible, but I

6          don't recall anything specific.

7          "QUESTION:  Did you, your staff, conduct any studies

8          about the potential impact of SB 14?

9          "ANSWER:  No, not personally, no.

10         "QUESTION:  Did you or your staff review any studies

11         about the potential impact of SB 14?

12         "ANSWER:  Information was introduced in each of the

13         two sessions where the bill was debated as part of

14         our hearing.  I don't recall whether anything

15         independent of that was provided to me.

16         "QUESTION:  And when you say that 'information was

17         provided,' is that information that was either

18         discussed or introduced into the official record?

19         "ANSWER:  Yes, both oral testimony and I believe some

20         written testimony as well.

21         "QUESTION:  So in some sense, the -- what's thought

22         of as the normal Senate procedure is to suspend the

23         regular order of business?

24         "ANSWER:  Yes.

25         "QUESTION:  Do you recall seeing any studies about

Davis / By excerpts of Deposition - Cross                36

1          the impact of a photo ID law on voter turnout?

2          "ANSWER:  I recall there being testimony about that.

3          And there was likely written testimony introduced,

4          but I don't recall specifically what it said.

5          "QUESTION:  Is it accurate to say that in the

6          Committee of the Whole, any Senator has the right to

7          introduce evidence into the record?

8          "ANSWER:  Yes.

9          "QUESTION:  Is it accurate to say that in the

10         Committee of the Whole, any Senator has the right to

11         question a witness?

12         "ANSWER:  Yes.

13         "QUESTION:  In talking about the rural minority

14         communities that have problems with access to public

15         transportation and vehicles, is it your understanding

16         that an Anglo voter living in that kind of community,

17         say a rural community in the Valley, would be

18         affected less than a Latino member of that community

19         by SB 14?

20         "ANSWER:  My distinction is not whether someone is

21         Anglo or Latino or African-American.  The distinction

22         is income level, poverty, and the ability to access

23         transportation.  I believe it's the case that

24         disproportionately that impacts persons in the

25         minority community.  It certainly, I am sure, impacts

Davis / By excerpts of Deposition - Cross                    37

1     persons who are Anglo as well who fit within that

2     category of being low income and having no access to

3     transportation.

4         "QUESTION:  Did you ever attempt to survey your

5     constituents to see who lacked a photo ID required by

6     SB 14?

7         "ANSWER:  No, I don't.

8         "QUESTION:  Can you identify any one of your

9     constituents who lacks one of the IDs required by

10    SB 14?

11        "ANSWER:  No, I cannot.

12        "QUESTION:  Are you aware or can you identify any

13    specific Texas registered voter who lacks one of the

14    forms of ID required by SB 14?

15        "ANSWER:  No, I cannot.

16        "QUESTION:  Do you know how many of your constituents

17    do not have the underlying documents necessary to get

18    a photo ID?

19        "ANSWER:  No, I don't.

20        "QUESTION:  Can you identify any specific

21    constituents who lacks the documents necessary to get

22    a photo ID?

23        "ANSWER:  No, I cannot.

24        "QUESTION:  Can you identify any particular Texas

25    registered voter who lacks the documents necessary to

1          get a photo ID?

2          "ANSWER:  No.

3          "QUESTION:  Are you familiar with the levels of photo

4          ID possession by different racial and ethnic groups

5          in Texas?  And by levels, I mean the proportion of ID

6          possession.

7          "ANSWER:  No, I don't have particular information

8          about that.

9          "QUESTION:  You mentioned earlier that you were --

10         that you had read the *Crawford* case out of Indiana.

11         Are you familiar from that or any other source of --

12         are you familiar with the levels of photo ID

13         possession by voters in Indiana?

14         "ANSWER:  No.

15         "QUESTION:  So you don't know whether African

16         American voters, for example, in Indiana possess

17         photo IDs at a higher rate than African Americans in

18         Texas?

19         "ANSWER:  No, I don't.

20         "QUESTION:  And would the same be true for Anglo and

21         Asian and Hispanic voters?

22         "ANSWER:  That's correct.

23         "QUESTION:  Did any of the bill's authors ever say

24         anything to you that expressly stated their intent to

25         harm any minority voter?

1      "ANSWER:  No.

2      "QUESTION:  Did any member of the legislature ever

3      make a statement to you or to anybody else that

4      you're aware of that they supported SB 14 because

5      they wanted to harm minority voters?

6      "ANSWER:  No.

7      "QUESTION:  Would you agree that members of the Texas

8      legislature have a duty to represent their

9      constituents?

10     "ANSWER:  Yes.

11     "QUESTION:  Would you consider that an important duty

12     of any elected official to represent constituents and

13     represent policy that constituents favor?

14     "ANSWER:  Yes.

15     "QUESTION:  Is there anything wrong with a

16     representative voting for a policy that's favored by

17     his or her constituents?

18     "ANSWER:  No.

19     "QUESTION:  So it's not your contention that the

20     majority of people in Texas who support voter ID

21     support it for an illegitimate reason?

22     "ANSWER:  Absolutely not.

23     "QUESTION:  And you don't contend that the majority

24     of people in Texas who support voter ID believe it

25     will have a disproportionate impact on racial

1    minorities?

2    "ANSWER:  No, I do not believe that.

3    "QUESTION:  And it's accurate to say, isn't it, that

4    the majority of voters in Texas support voter ID

5    legislation; is that right?

6    "ANSWER:  I don't know.

7    "QUESTION:  Do you have any basis to dispute the

8    majority of voters in Texas support voter ID

9    legislation?

10   "ANSWER:  No, I don't.

11   "QUESTION:  Did you speak with anybody at the

12   Department of Justice about Senate Bill 14?

13   "ANSWER:  Yes, I did.

14   "QUESTION:  With whom did you speak?

15   "ANSWER:  I don't recall.

16   "QUESTION:  Did you talk to the DOJ over the

17   telephone?

18   "ANSWER:  Yes, I did.

19   "QUESTION:  How many times did you speak to the DOJ?

20   "ANSWER:  Twice.

21   "QUESTION:  Do you remember roughly when that was?

22   "ANSWER:  Within the last six months.  That's as best

23   as I can tell you.

24   "QUESTION:  Despite the notice, did you have some

25   time to prepare for the Senate Bill 14 debate?

Lichtman - Direct / By Mr. Hebert                    41

1              "ANSWER:  Well, we had debated this bill in prior

2              sessions, so yes, in that sense.  We certainly

3              understood and had had testimony in prior sessions

4              about the pros and cons of such a bill and were

5              prepared from that perspective."

6         MR. TATUM:  Nothing else, your Honor.

7         THE COURT:  All right.  So that's all for this

8    witness then?

9         MR. DUNN:  Yes, your Honor.

10        MR. HEBERT:  Good morning, your Honor.

11        THE COURT:  Good morning.

12        MR. HEBERT:  I'm Gerry Hebert.  I'm one of the

13   attorneys representing the Veasey/LULAC Plaintiffs, and I call

14   Dr. Allan Lichtman.

15        ALLAN LICHTMAN, PLAINTIFFS' WITNESS, SWORN

16        THE COURT:  Good morning.

17        THE WITNESS:  Good morning, your Honor.

18        MR. HEBERT:  Morning, Dr. Lichtman.

19        THE WITNESS:  Good morning, Mr. Hebert.

20                  DIRECT EXAMINATION

21   BY MR. HEBERT:

22   Q    Would you give the Court your name and address?

23   A    My name, your Honor, is Allan J. Lichtman.  I reside at

24   9219 Villa Drive in Bethesda, Maryland.

25   Q    And, Dr. Lichtman, you -- could you give us a brief

 1   description of your educational background?

 2   A    Yes.  I graduated from Brandeis University in 1967 with a

 3   B. A. in history.  I graduated from Harvard University in 1973

 4   with a Ph.D. in History with a specialty in Quantitative

 5   Analysis.

 6   Q    Now, what is your current position of employment?

 7   A    I'm a Professor of History at American University in

 8   Washington, D.C.

 9   Q    Now, do you hold the title of Distinguished Professor?

10   A    I do.

11   Q    All right.  And what is a Distinguished Professor?

12   A    That's the university's highest academic honor.  It's one

13   notch above the rank of professor.  There are about four or

14   five distinguished professors in the university out of many

15   hundreds.

16   Q    In the course of your professional experience, have you

17   authored any books?

18   A    Yes.  Depending exactly how you count, I've authored or

19   co-authored about nine books.

20   Q    Have any of those books won any awards?

21   A    They have.

22   Q    My next to most recent book, *White Protestant Nation:  The*

23   *Rise of the American Conservative Movement*, was one of five

24   finalists for the National Book Critic Circle Award in General

25   Nonfiction.  That's all nonfiction books published in the U. S.

Lichtman - Direct / By Mr. Hebert                    43

1   My most recent book, *FDR and the Jews*, was a *New York Times*

2   Editor's Choice.  It won the National Jewish Book Award in

3   American Jewish Studies.  It was a finalist for the *Los Angeles*

4   *Times* Book Prize in History, and won the Tichen-Olen (phonetic)

5   prize for Holocaust Studies.

6   Q    In those books that you just cited -- and I'm glad you

7   just gave us two examples -- did those books that you authored

8   involve any inquiry into the decision-making intent of certain

9   individuals?

10  A    Yes.  That's quite commonly a practice of historians.

11  Q    Have you also authored numerous scholarly articles in your

12  field?

13  A    I've authored many scholarly articles in historical,

14  political science, and forecasting journals.

15  Q    And a number of those have been refereed journals?

16  A    Many of them have been refereed journals.

17  Q    Give the Court two examples if you could of areas where

18  you've published in that respect.

19  A    I've had an article in the *American Historical Review*, the

20  leading journal in the field of history, not just American

21  history.  I've had two articles in the proceedings of the

22  United States National Academy of Sciences, widely regarded as

23  one of the three leading scientific journals in the world, as

24  well as many other prestigious journals.

25        **MR. HEBERT:**  Now, for the record, your Honor,

1  Dr. Lichtman's report, which includes his curriculum vitae, is

2  Plaintiffs' Exhibit 772.

3  Q    Dr. Lichtman, your vitae lists a number of lawsuits and

4  cases over the years that you've been involved in; is that

5  correct?

6  A    That is correct.

7  Q    And you've been involved, we can say and agree, among

8  dozens of cases; is that correct?

9  A    Probably about 80 or more cases over my entire career.

10  Q    Now, this is not the first time that I, as a legal

11  counsel, have retained you as an expert witness, is it?

12  A    It is not the first time.

13  Q    All right.  I retained you in a case back in Selma,

14  Alabama, many, many years ago, correct?

15  A    That's right, the birthplace of the Voting Rights Act.

16  Q    And you were retained as an expert by the United States

17  when I was an attorney for the United States in a case called

18  *Johnson versus DeGrandy* that went to the Supreme Court; is that

19  correct?

20  A    That is correct.

21  Q    And the court actually in that case and in the Selma cases

22  agreed with your testimony and findings, correct?

23  A    Yes.

24  Q    And you also testified in a case that I was involved in in

25  my private capacity called *LULAC versus Perry*; do you remember

1    that case?

2    A     I do.

3    Q     Was that a case that also went to the U. S. Supreme Court?

4    A     It did.

5    Q     Did that case come out of Texas?

6    A     It did.

7    Q     What was your involvement in that case, quickly?

8    A     My involvement in that was to analyze racially polarized

9    voting and its implications in congressional districts for the

10   ability of minority voters to elect candidates of their choice.

11   Q     Did Justice Kennedy, in his opinion for the court in that

12   case, cite you?

13   A     He did.  He cited my work in his opinion which invalidated

14   I believe it was congressional district 23 for failing to

15   provide opportunities for Hispanic voters to elect candidates

16   of their choice.

17   Q     And you've also been retained by me in connection with a

18   case in San Antonio, correct?

19   A     That is correct.

20   Q     And those are the redistricting cases that still remain

21   pending in that Court?

22   A     I think they are still indeed pending.

23   Q     All right.  In some of those cases that we've just

24   discussed and other cases where you've been an expert witness,

25   have you had the opportunity to look behind the purpose of a

1   particular statute and look at the intent of decision makers

2   with respect to the law?

3   A     I have in my scholarship and in my testimony.

4   Q     Give me two examples from cases where you've actually

5   looked at legislative motivation.

6   A     There are two recent examples.  One is in the recent

7   redistricting case that was before the D.C. court in which I

8   testified about discriminatory intent in the development of the

9   State Senate bill in Texas.  My testimony was that indeed this

10  bill was enacted with discriminatory intent.  Earlier, I

11  believe it was in 2011, I testified on behalf of defendants in

12  the Illinois congressional case, and in that case I testified

13  that the congressional plan was not enacted with discriminatory

14  intent.

15  Q     As an expert witness in voting rights cases, have you --

16  you've just indicated you've testified on behalf of both

17  plaintiffs and defendants, correct?

18  A     Plaintiffs and defendants, that is correct.

19  Q     And you've testified on behalf of Republican entities and

20  Democratic entities?

21  A     That is correct.

22  Q     You've testified on behalf of state and local governments?

23  A     That is correct.

24         MR. HEBERT:  Your Honor, we offer Dr. Lichtman as an

25  expert in quantitative and qualitative historical analysis of

1   voting, political, and statistical data, with a particular

2   emphasis on motivation of decisions.

3              **THE COURT:**  You can proceed.

4   **BY MR. HEBERT:**

5   Q    Now, Dr. Lichtman, what were you asked to do in this case?

6   A    Yes.  What I was asked to do in this case, as indicated in

7   my report, was to examine the passage of the 2011 Texas voter

8   ID bill to investigate whether or not that bill was enacted

9   with the intent to discriminate against minorities in Texas,

10  specifically focusing on the two largest minorities in the

11  state, African Americans and Hispanics.

12  Q    Now, you are not drawing any legal conclusions here today,

13  are you?

14  A    No.  I was very careful to spell out in my report that I

15  am not drawing legal conclusions.  As in my other cases, what I

16  am doing here is performing a substantive analysis based on

17  information and my analysis of that information in reaching

18  substantive conclusions.

19  Q    And what methodologies did you employ in reaching your

20  conclusions?

21  A    I employed the standard methodologies in historical work,

22  the examination and study of documents, and statistical sources

23  of information.

24  Q    And you said these are standard historical methods?

25  A    Yes, similar to what I've used in my scholarly work and in

1    previous testimony on the issue of intent.

2    Q    Now, on page 1 of your report --

3              MR. HEBERT:  And if we could bring up Plaintiffs'

4    772, page 1.

5    Q    -- could you give the Court just a brief snapshot of what

6    data or records you relied on in conducting your factual

7    opinions as set forth in your report?

8    A    Yes.  I looked at scholarly books, articles, reports,

9    newspapers, and other journalistic articles, demographic

10   information, election returns, court opinions, briefs, reports,

11   government documents including legislative transcripts and

12   legislative journals.  I was also supplied by the government of

13   the State of Texas quite a wealth of many hundreds of emails,

14   and I also drew upon scientific surveys.

15   Q    Now, what was your particular focus with respect to

16   analyzing the intent behind SB 14?

17   A    Yes.  I think it's important to understand that I was not

18   looking at the passage of a generic photo ID bill.  Rather, I

19   was looking at the specific decisions and choices made by the

20   Texas state legislature with regard to the precise bill, SB 14,

21   that was passed and looking at the justifications for those

22   decisions and how those decisions may or may not have had a

23   disparate -- placed a disparate burden upon African American

24   and Latinos in the State of Texas as compared to Anglos.

25   Q    Now, let's get one issue out of the way quickly and then

1   so we can move on, and that is there has been arguments and

2   testimony in this case about partisan motives behind SB 14.

3   Was this just a partisan issue or did it have any racial

4   implications?

5   A    It wasn't just a partisan issue, although partisanship was

6   certainly involved, as I explain later in my report, because

7   the Republican base in Texas is Anglo and the Democratic base

8   in Texas is African American and Latinos.  So while indeed

9   partisanship was involved, as it always is in politics, the way

10  in which that manifested itself in these particular decisions

11  that I looked at was by placing, in my view, quite knowingly

12  and intentionally disparate burdens on the voting of African

13  Americans and Hispanics in Texas as compared to Anglos.

14  Q    Now, it's true, isn't it, that in your report in page 5

15  through 7, you put the context of the SB 14 bill within the

16  framework of the historical and -- discrimination against

17  minorities in Texas?

18  A    Yes.

19  Q    Would you give the Court just a very brief description of

20  what that section states?

21  A    Yeah.  It just goes through the longstanding history going

22  back to the 19th century of discrimination against minorities

23  when it comes to voting and carries that forward to recent

24  times, including matters of redistricting.

25  Q    And speaking of which, let's stick with redistricting.

1   The -- you've testified in the D.C. court in connection with

2   redistricting of the Texas Senate back in 2012?

3   A    Yes.

4   Q    All right.  And what did you -- what was the subject

5   matter of your testimony in that case?

6   A    With respect to the Senate, as I explained previously, I

7   was looking at the issue of intentional discrimination.  I also

8   examined polarized voting and the implications of polarized

9   voting for minority electoral opportunities.

10  Q    And I guess I didn't ask my question precisely the way I

11  wanted.  What was it that you found with respect to intent?

12  A    With respect to what?

13  Q    To intent behind --

14  A    Yes.

15  Q    -- the Senate plan in --

16  A    I found that indeed there was intentional discrimination,

17  and so testified, behind the enactment of the State Senate plan

18  in Texas.

19  Q    And did the court in -- the three-judge court in that case

20  ultimately declare that the State had failed to meet its burden

21  of proof of showing that the Senate map was not enacted with a

22  racially discriminatory intent?

23  A    That's correct.  And I believe in my reading of it, it

24  went beyond that to find affirmatively -- including citations

25  of my testimony -- that affirmatively the State had adopted the

1    Senate map with discriminatory purpose.

2    Q    Now, on page 8 of your report, Exhibit 772, you have a

3    sequence of events that led up to the adoption of the photo ID

4    law.  The part I want to focus here is on the demographic

5    changes in the second full paragraph that's noted from 2000 to

6    2010.  Can you tell us essentially what that observation was

7    that you made?

8    A    Yeah, very briefly, that the recent population growth in

9    Texas has been overwhelmingly minority with African Americans

10   and Latinos accounting for nearly 80 percent of the total Texas

11   population growth between 2000 and 2010.  So the result is in

12   terms of percentages, you have an expanding minority population

13   in Texas and a shrinking Anglo population.

14   Q    And what are the political implications of that?

15   A    The political implications are profound given not only

16   that you've had this population change but, as my report

17   indicates, it's projected to continue that minorities are

18   projected to continue to expand their representation,

19   particularly Latinos.  That is of political importance in Texas

20   because voting is highly polarized along racial lines in the

21   State of Texas.

22   Q    And let's get to that topic, because I think that's on

23   page 10 of your report where you go into the issue of racially

24   polarized voting.  And you've indicated before that you had

25   done a study of racially polarized voting in the San Antonio

1   cases that are ongoing.

2   A    I've done several studies including the San Antonio case

3   and the earlier congressional case, *LULAC versus Perry*, that

4   you've alluded to.

5   Q    And briefly summarize for the Court the kind of two-part

6   findings you make about racially polarized voting in your

7   report.

8   A    Yes.  I found that typically Whites overwhelming black --

9   backed White candidates in Texas.  Most of those White

10  candidates are Republicans whereas African Americans and

11  Latinos overwhelmingly back minority candidates, most of whom

12  were Democrats.  But I found something else that's of

13  importance here.  That is, this structure of Anglos voting for

14  Republicans and minorities voting for Democrats is deeply

15  embedded within the structure of state politics, that

16  Republicans cannot get around this pattern by recruiting

17  minority candidates to run.  Even when Republicans recruit

18  minority candidates, whether they're running against minority

19  Democrats or Anglo Democrats, you get this precise same pattern

20  of Anglos voting for Republicans and Latinos and Hispanics

21  voting for Democrats.  I also cited the report of the Texas's

22  expert, Dr. John Alford, who came up with the same findings,

23  that this pattern of the Republican base being Anglo and the

24  Democratic base being minority, particularly Hispanic and

25  Latino, is embedded into the structure of Texas politics and

Lichtman - Direct / By Mr. Hebert                    53

1    does not depend upon the race of particular candidates.  So

2    this links together the demographic changes with the structure

3    -- racial structure of Texas politics.

4    Q    And did you look at the issue of whether the Republicans

5    could get around this by recruiting more minority candidates?

6    A    As I mentioned in my testimony, they can't.  Even when

7    they run minority candidates, whether it's against Anglo

8    Democrats or other minority Democrats, the basic patterns of

9    voting still hold.

10   Q    Now, we've had testimony in this case -- and there's

11   numerous documents about the photo ID bill that was originated

12   in 2005, 2007, 2009.  I'm not going to take you through all

13   those.  That's all set out in your report.  But I first want to

14   talk about -- and I want to talk about the 2011 SB 14.  But

15   before we do, tell us about the elections that took place

16   between the 2009 session and the 2011 session where the bill

17   was enacted.

18   A    Yeah.  You have the 2010 elections in which not just in

19   Texas but across the nation these were overwhelming Republican

20   victories, and in particular the House of Representatives

21   shifted in Texas from being closely divided between Republicans

22   and Democrats to being overwhelmingly Republican and the State

23   Senate remained overwhelmingly Republican.  I think I have some

24   -- a couple of typos in the exact numbers I put in there.

25   Q    Go ahead.  Well, I'm going to -- we're going to correct

1    those right now.

2    A     Yeah.

3         MR. HEBERT:  If you would highlight for me the --

4    after the elections of 2010.

5         THE WITNESS:  Yeah.

6         MR. HEBERT:  That's the second paragraph from the

7    bottom.

8         THE WITNESS:  Yeah.

9    BY MR. HEBERT:

10   Q     Let's make a couple of corrections.

11   A     Yeah.

12   Q     By the way, are these the only corrections, except the one

13   name was supposed to be Mary and it was Lois somewhere else

14   that you found?

15   A     The only corrections I could find -- obviously, in a 72-

16   page report, one never knows what one might find -- but I'm

17   confident that there wouldn't be any changes that would affect

18   any substantive conclusions.

19   Q     Okay.  And just for the corrections, I believe the 79

20   Republicans --

21   A     Should be 76.

22   Q     -- should be 76.  The Senate shifted from 19 Republicans

23   and 12 Democrats in the second sentence -- because there's only

24   31 members, correct?

25   A     Yeah.  It should be 19 and 12 and 19 and 12.

1    Q    Okay.  So let's talk about the 2011 bill.  And was the

2    2011 session itself -- you've testified about the redistricting

3    plans that came out of the 2011 session and other bills that

4    were considered during that session -- was that a racially

5    charged session, in your view?

6    A    It was a racially charged session in my view and

7    commentators much closer to Texas politics indicated it was the

8    most racially charged session they had seen in recent history.

9    Q    Now, I'm not going to belabor this point, but your D.C.

10   testimony where the court found intentional discrimination on

11   the Senate map, you understand that's not legal precedence,

12   correct?  And you're not citing it for that reason, are you?

13   A    Oh, no.  I understand it's not legal precedent because of

14   the *Shelby* decision.  Again, I'm citing it for the substance.

15   And, indeed, my entire report is focused on substantive

16   analysis, not legal analysis, as I made clear in the report.

17   Q    Okay.  Well, Dr. Lichtman, tell the Court if you would how

18   the 2011 photo ID bill differed from the predecessor voter ID

19   bills that had been introduced in the '05, '07, and '09

20   sessions.

21   A    Yeah.  It differed in many fundamental ways.  First of

22   all, all of the previous bills, while including photo ID, also

23   included a second option, that is, voters could still vote at

24   the polls if they did not have an acceptable photo ID if they

25   presented one of -- presented at least two non-photo IDs from a

Lichtman - Direct / By Mr. Hebert                          56

1    very large list of non-photo IDs.  About 15 or non-photo IDs

2    were acceptable in previous bills.  That option was eliminated,

3    yes, in the 2011 bill, and that has important implications.

4    Q    And we've brought up on the screen from your report, page

5    12, in which we have listed here at least with respect to HB

6    1706, the non-photo identification bills that you're referring

7    to now.

8    A    Yes.

9    Q    Give the Court some examples of those.

10   A    Yes.  I think some of the important examples that are

11   relevant to the inquiry here about racial intent are those non-

12   photo identification that don't cost anything, such as a

13   current utility bill, a bank statement, a paycheck, a

14   government check, official mail, a library card.  These are

15   readily available types of non-photo ID that don't cost the

16   voter.  And that's important in our inquiry.

17            **MR. HEBERT:**  All right.  If we could stay on that

18   page (indiscernible) and bring up a paragraph at the bottom

19   where we have -- where -- just below the list in response to

20   criticism and the quote from Representative Denny.

21   A    Yes.

22   Q    What did Representative Denny -- what was her role in this

23   bill from a prior session?  Not the 2011 session.  But what did

24   she stress with regard to having the -- both the photo ID and

25   the non-photo IDs in her bill?

Lichtman - Direct / By Mr. Hebert                    57

1    A    Yeah.  She was a very important figure in this 2005.  She

2    was head of the Election Committee and the main sponsor of HB

3    1706.  And she indicated in response to criticisms that this

4    bill might disenfranchise some voters, that in fact the option

5    to have both photo and non-photo ID assured that no one would

6    be disenfranchised while at the same time meeting the goal of

7    ensuring voter integrity at the ballot, that is, you could

8    verify the voter's identity.  I think it's worth quoting

9    directly.  She says that her bill created, "a very long and

10   liberal bill."  And she affirmed that it met the goal, "to make

11   sure that you are the person that is voting on the ballot and

12   you are who you are."

13   Q    And I believe you said "bill," but the word is actually

14   "list," "a very long and liberal list."

15   A    Very long and liberal list.

16   Q    Okay.

17   A    I'm a little dyslexic in my old age.

18   Q    All right.

19        **MR. HEBERT:**  Now, while we're at it, if we could

20   bring up page 26, Table 2.

21   Q    I want you to look at Table 2 --

22        **MR. HEBERT:**  And if we could just have the table

23   blown up.

24   Q    Tell us what Table 2 in your report was intended to

25   convey.

1    A    Yeah.   Table 2 conveys the well-known fact that as

2    compared to Whites, Hispanics and African Americans in Texas

3    have much lower levels of income and much higher degrees of

4    poverty.   And that ties into the elimination of the non-photo

5    IDs.

6    Q    All right.

7    A    And here's how it does.   As I indicated, this was

8    eliminated, even though it had previously been affirmed by not

9    just Representative Denny, but by others in the other debates,

10   that this much more inclusive bill was sufficient to meet the

11   goal of ensuring voter identity.   But by eliminating these free

12   options and keeping photo ID options which cost money, this has

13   a clear disparate impact on Latinos and African Americans.

14   Because of their much lower incomes and much lower -- much

15   higher poverty rates, they're going to have less access to

16   forms of ID that cost money and more access to forms of ID like

17   those I mentioned that are free.

18   Q    All right.   Now, we've gone through the non-photo IDs that

19   were eliminated in the 2011 bill.   Let's talk about the photo

20   IDs within the 2011 bill and how they compare to previous

21   sessions.

22   A    Yes.   In previous sessions, in one form or another you had

23   concealed carry license as an acceptable form of photo ID, as

24   well as some form of government employee ID--federal, state, or

25   local--and some form of student identification.

1  Q    All right.  And you said that eliminating government IDs

2  and student IDs was actually part of the 2011 bill?

3  A    I didn't say that.  It's in my report, yes.  In the 2011

4  bill, it retained concealed carry as an acceptable form of

5  photo ID but eliminated both government employee photo IDs and

6  student photo IDs.

7  Q    Did it also change the expiration dates from prior bills?

8  A    Yes.

9  Q    In what way?

10  A    It changed the expiration date by very sharply narrowing

11  it from two years to just 60 days, and it also extended the

12  narrow expiration date from just driver's licenses to all other

13  forms with the exception, I believe, of naturalization

14  certificates.

15  Q    Well, we're going to look at each one of these

16  individually.  Let's pull up the license to carry information

17  first.  And let me ask you as we're doing that, doctor, if you

18  could -- and this is on page 25, Table 1 -- is this decision to

19  keep a license to carry within the bill in 2011, could you tell

20  us what the racial implications are of such a thing?

21       **MR. HEBERT:**  And if we could blow up Table 1.

22  A    Yes.  As this chart indicates, it does have racial

23  implications.  The State keeps data by race on concealed carry

24  permits.  It does not separately break out Hispanics.  It does

25  separately break out African Americans.  And it's quite clear

Lichtman - Direct / By Mr. Hebert                          60

1   from this table that the percentage of African Americans among

2   permit holders is much lower than the percentage of African

3   Americans in the voting age population, 49 percent lower, and

4   almost a six percentage point difference.  And we're talking

5   about large numbers here, I think more than 1.3 million handgun

6   licenses -- concealed carry licenses issued.

7   Q    All right.

8   A    And this is information available at the time of the

9   debate.  You see, I cut it at 2010 to make sure that this was

10  information available.  And it's available right on the DPS

11  website.

12  Q    So the sponsors of SB 14 have this information at least

13  available to them if they chose to use it?

14  A    This information was readily available to them if they

15  chose to use it.

16  Q    And it came from the DPS website?

17  A    Yes.

18  Q    Okay.  Now let's look at the choice of eliminating

19  Government IDs.  You have a Table 3 on Page 27.

20         MR. HEBERT:  And if you could blow up the table for

21  us, please?

22  Q    What does this Table 3 say with respect to the

23  Legislature's choice of eliminating Government IDs?

24  A    Yes, this is based on census data, the American Community

25  Survey from 2008 to 2010 thus, again, information available at

1    the time of the debates over SB 14.  And this shows quite a

2    different pattern from that of the concealed carry which is

3    retained.  The eliminated Government employee IDs also has

4    racial implications in the opposite direction.  This shows that

5    African Americans and Latinos, based on census data, are over-

6    represented among Government employees and Anglos are under-

7    represented, so based on this data African Americans and

8    Latinos would have more access to Government employee IDs than

9    Anglos, opposite of the retained concealed carry.

10   Q    Okay.  Let's look at the -- Page 29, Table 4.

11   A    Yeah.

12   Q    And if you could tell the Court what -- how this differs

13   from your total number of employees -- Government employees by

14   race category that you were just talking about in Table 3.

15   What's the difference?

16   A    Well, the substantive inquiry is the same to see the

17   breakout of Government employees among African Americans,

18   Latinos and Anglos.  The difference is I drew on an entirely

19   different source of data.  This is the 2006 CCES Cooperative

20   Congressional Election.

21   Q    And, sir, what is that?

22   A    What?

23   Q    What is that "CCES?"

24   A    Yeah, the Cooperative Congressional Election Survey, which

25   is a very standard survey used in the History of Political

Lichtman - Direct / By Mr. Hebert                    62

1    Science, and what's useful about this survey, it's a very large

2    sample, tens of thousands, so you actually can have

3    statistically significant results like we do here for

4    individual states, particularly a state as large as Texas.

5            The other thing that this survey does is it focuses

6    on registered voters so I can look at the breakdown of

7    Government employees not just in the voting age population, but

8    among registered voters, those most directly impacted by SB 14.

9    Q    And what does this Table 4 show?

10   A    This shows an even larger disparity between African

11   Americans, Latinos and Anglos with respect to those who are

12   Government employees, very significant differences.

13   African Americans more than twice as likely as Latinos, almost

14   twice as likely as Anglos, to be Government employees and,

15   again, we're talking about large numbers, well upwards of one

16   and half million Government employees at every level in the

17   State of Texas.

18   Q    And let's turn to the choice of eliminating student IDs,

19   Dr. Lichtman, and on this you have two tables on Page 31.

20   A    I do.

21   Q    And let's go to the top table, Table 5 first, and tell us

22   what that table is intended to depict?

23   A    That's a similar table to the one I compiled from the US

24   Census for Government employees.  In this case it's students

25   and, again, it shows that African Americans and Latinos

1    relative to Anglos are over-represented among students, again

2    in contrast to the difference in concealed carry, but similar

3    to the finding for Government employees.

4              The second table, Table 6 on the same page, again

5    draws upon the CCES survey.  In this case we had information

6    from both 2006 and 2008, again always looking at information

7    available at the time of the debates over SB 14, and this,

8    again, zeros in on registered voters, and it shows even bigger

9    disparities between African Americans, Latinos and Anglos than

10   the previous table from Census data.

11             It shows that with respect to both African Americans

12   and Latinos the percentage of students among registered voters

13   is more than twice as high as the percentage of Anglos.

14   Q    All right.  Now I asked this question with respect to the

15   concealed weapons permits, and I'm going to ask you the same

16   question with regard to Government IDs and eliminated student

17   IDs, was all of this information that you put up in these

18   tables, was that available to the Legislature in 2011?

19   A    It was all available to the Legislature in 2011 if they

20   chose to look at it.

21   Q    Right.  Now did you also look at the effect of reducing

22   the expiration date within the photo IDs?

23   A    I think there's one more table on college and university

24   students, Table 7, Page 32.

25   Q    Okay.  Did I skip over that?

1  A    Yeah, you skipped over a table.

2  Q    Maybe in the interest of time I was just trying to move

3  this along.

4  A    Okay.

5  Q    So let's just finish up and talk about the public schools

6  in Texas.

7  A    Yeah.

8  Q    Because this is a subset of the earlier one, correct?

9  A    Right, and it's important because in some of the previous

10 iterations student IDs would have been limited to those issued

11 by public institutions, not issued by State.  And, again, it

12 shows, very briefly, that African Americans and Latinos are

13 over-represented relative to the Anglos in the public school

14 population using 2010 enrollment data by race in the State of

15 Texas.

16 Q    And public college and university students in the schools

17 of Texas, that's considered a Government ID, correct?

18 A    That's correct.

19 Q    Okay.  So let's look at the effect of reducing expiration

20 dates that you had in your report.

21        Could you give the Court some idea of what effect

22 reducing the expiration times for photo ID would have that was

23 set forth in SB 14?

24 A    Yes, several implications.  First of all, it costs money

25 to renew a driver's license, I believe $25.  That might not

1    sound like a lot of money, but when you're dealing with a very

2    substantial population of Latinos and African Americans that

3    are in poverty any amount of money that one has to pay can be a

4    deterrent.

5            There are also some special programs in Texas that

6    have to do with the suspending and confiscation of licenses

7    that have very important racial implications as well.

8    Q    Which -- which are what?

9    A    There are two programs:  One is the Driver's

10   Responsibility law that adds on surcharges to various kinds of

11   traffic offenses.

12           The other is the ALR law, the Automatic License

13   Revocation that automatically revokes your license for certain

14   kinds of drunk driving violations.

15   Q    All right.  We're going to come back to that a little

16   later.  So we've gone through these various forms of photo ID

17   and their racial implications.

18           What is your testimony with regard to each of these

19   choices that were made by the Texas Legislature in 2011 with

20   regard to expiration dates, student ID elimination -- excuse

21   me, Government ID elimination, and maintaining the concealed

22   weapon permit?

23   A    Well, there's more than that.

24   Q    Yes.

25   A    First of all, the elimination of nonphoto IDs, many of

1   which are free; then there was the retainment of concealed

2   carry; the elimination of student and Government IDs; and the

3   narrowing of the period for expiration -- and extension of the

4   expiration to other documents.

5           Each one of these individually points in the same

6   direction of imposing disparate burdens when it comes to voting

7   on African Americans and Latinos as compared to Anglos, and

8   clearly taken together those decisions impose disparate burdens

9   on African Americans and Latinos as compared to Anglos.  So you

10  can look at them individually and you can look at them

11  collectively, and they all point to the same direction.

12  Q    All right.  Another topic I'm going to move to now and

13  Dr. Burden testified about this a little bit yesterday, looking

14  at voters who vote by mail in Texas, and did you do a review of

15  those data?

16  A    I did.

17  Q    Is it reflected on Table 11, Page 53?

18  A    It is.

19  Q    And tell us -- tell the Court what that Table shows with

20  respect to mail absentee ballots by race only?

21  A    Yeah.  Yeah.  Briefly put I drew upon two independent

22  surveys of how voters voted in Texas, the CCES, which we've

23  already discussed, and the current population survey of the

24  United States Census which I believe was discussed in other

25  testimony.  That's a huge sample taken by the Census that also

Lichtman - Direct / By Mr. Hebert                67

1    enables you to look at individual States, particularly a State

2    as large as Texas.

3              They are conducted completely independently.  Again,

4    I used the information available at the time and this

5    information shows, regardless of which study you use, that

6    Whites, as compared to African Americans and Latinos, are more

7    likely to vote by mail as opposed to voting in person.  So

8    voting by mail is disproportionately Anglo in both of those

9    surveys.

10   Q    Was this information available to sponsors of SB 14 when

11   it was enacted?

12   A    Yes, it was if they chose to look at it.

13   Q    Now did you also look at information about whether the

14   sponsors or backers of SB 14 in the Legislature were aware of

15   issues with respect to mail in ballot fraud?

16   A    I did and I found considerable information on that.

17   Q    Give the Court a snapshot of what you found.

18   A    Yeah, very briefly, what I found was there was a report by

19   a Republican-controlled committee on voter fraud, and that

20   report indicated that the main problem with voter fraud is not

21   voter impersonation, but mail in ballot voter fraud.

22             There was also an independent analysis by the Texas

23   Conservative Coalition that included Republican Legislators

24   that came to the same conclusion.

25             I also extensively examined the testimony in the DC

1   trial of Representative Jose Aliseda who was designated by the

2   State to explain how SB 14 met the State's goal of ensuring

3   ballot integrity and deterring voter fraud, and what he spoke

4   about was mail in ballot voter fraud.  He said the voters were

5   clamoring to deal with the problem of mail in ballot fraud and

6   did not, in his testimony at all, discuss voter impersonation

7   at the polls and, in fact, that was so evident in his testimony

8   that even one of the three Judges, Judge Collyer, remarked upon

9   it.

10  Q    Is that at Page 50 of your report?

11  A    Yes.  And as you can see here --

12       **MR. HEBERT:**  If you could go to top of 50 for me,

13  Bonnie, and highlight maybe the first half of the page?  That's

14  enough.

15  A    Yeah, is all based on mail fraud, but he described as some

16  large male, ballot fraud involved with balloting, right,

17  Mr. McKenzie, attorney for Texas, yes.

18  Q    And then when he was prompted to testify about voter fraud

19  at the polls, what was Representative Aliseda's testimony with

20  regard to that issue?

21  A    He did not present examples of voter impersonation at the

22  polls; he simply said that some of his noncitizen clients had

23  told him privately that they had voted and were worried about

24  their legal status.  Of course, that's not a public matter and

25  no way of verifying it, but since noncitizens can obtain

                    Lichtman - Direct / By Mr. Hebert                69

 1   driver's licenses, Representative Aliseda testified that, yes,

 2   these noncitizens had driver's licenses and, therefore, SB 14

 3   would have done nothing about that issue.

 4   Q    Did the backers or sponsors of SB 14 address mail in

 5   ballot fraud?

 6   A    They did not, even though back in 2005 Representative

 7   Denny, the head of the Election Committee, had said, "Yes, we

 8   understand there's an issue with ballot fraud and we intend to

 9   do something about it."  They didn't.

10   Q    All right.  Now, did the sponsors of SB 14 point to other

11   States as model photo ID laws that they wanted to model SB 14

12   after?

13   A    They did, in particular, two states.

14   Q    What two are those?

15   A    Indiana and Georgia.

16   Q    All right, let's start with Indiana.  What did the

17   supporters of SB 14 say about how they modeled their Bill after

18   Indiana?

19   A    They were very explicit about it.  They said they modeled

20   their Bill directly upon the Indiana law.  They brought in

21   authority from Indiana to testify about how well the Indiana

22   law worked, and when pressed about whether there was a

23   difference between the Indiana law and SB 14, I believe it was

24   Troy Fraser who said very, very small change.

25   Q    And that's here on Page 37, the paragraph being

                    Lichtman - Direct / By Mr. Hebert                70

 1   highlighted, Senator Fraser's "very, very small change"
 2   language?
 3   A    Yes.  Yes.
 4   Q    All right.  And did Senator -- or Representative Harless
 5   make a similar observation?
 6   A    Yes, and that was -- you know, a pretty common thread
 7   among backers of SB 14, that it was based on the Indiana law
 8   which had received the informata of the United States Supreme
 9   Court.
10   Q    Now how was the Indiana law different from the Texas law
11   that was passed?
12   A    It differs fundamentally.  First of all, there's a
13   fundamental difference in approach.  Indiana does not establish
14   specific forms of acceptable Government-issued photo ID; rather
15   it allows a voter to present any ID that's issued by the State
16   of Indiana or the US Government.
17        The Texas law is based on a fundamentally different
18   principle.  It spells out quite explicitly those forms of photo
19   identification that are acceptable, and unless your ID fits one
20   of those categories it doesn't work for voting.
21   Q    Does Indiana permit a license to carry ID?
22   A    It does not.
23   Q    So that makes it different from Texas.
24   A    Yes.
25   Q    And why doesn't it allow a license to carry, if you know?

                    EXCEPTIONAL REPORTING SERVICES, INC

Lichtman - Direct / By Mr. Hebert                    71

1   A    It doesn't have a picture, I believe.

2   Q    Okay.  Does Indiana also allow public university students'

3   IDs?

4   A    Yes, any ID that is issued by the State of Indiana, so

5   that would include public universities which are part of the

6   State.

7   Q    The distinction -- the differences -- I'm sorry, go ahead.

8   A    It would also include, obviously, Government-issued IDs,

9   both for the Federal Government and for the State Government.

10  Q    Right, you made that point and I slipped over it.

11       Now the differences between Indiana and Texas, talk

12  about that with respect to the particular impact on minorities.

13  A    Yeah.  All of these differences, as we've explained

14  previously --

15  Q    And by "minorities" I mean African Americans and Latinos.

16  A    I understand, that's what I studied.  All of these

17  differences, as I explained previously, have very important

18  implications for African Americans and Latinos.

19       The concealed carry identification very substantially

20  under-represents African Americans, which is retained; the

21  Government and student IDs, which are included in Indiana, but

22  not in the State of Texas over-represent Latinos and African

23  Americans.

24       There's also a distinction in expiration.

25  Q    Which is what?

1   A    Indiana has a two-year expiration -- expiration

2   essentially to the last general election, but Texas narrowed

3   that down to 60 days and we explained the racial implications

4   of that.

5   Q    Earlier, correct.

6           So Georgia was another State that they claimed to

7   model their photo ID law in Texas, correct?

8   A    That is correct, saying that the Georgia law was pre-

9   cleared, it met muster under the Voting Rights Act and,

10  therefore, their law modeled on the Georgia law should meet

11  muster as well.

12  Q    Let's turn to Page 41 of your report where we can get into

13  the specifics a little bit of Georgia.

14          Can you tell me what Georgia's photo ID law, how that

15  compares to Texas's?

16  A    Yeah.  It's much more similar to the Indiana law.  The

17  Georgia law also doesn't cite specific forms of photo

18  identification, but rather, again, authorizes forms of photo

19  identification issued by Government entities.  That would

20  include student photo identification issued by public

21  institutions and Government worker photo identification.

22  Q    And Georgia, like Indiana, does not authorize concealed

23  weapons permits as IDs, correct?

24  A    That's my understanding, correct.

25  Q    And it also doesn't limit driver's licenses to Georgia --

Lichtman - Direct / By Mr. Hebert                    73

1   the State of Georgia, does it?

2   A    No, and it enables you to use expired driver's licenses

3   and it doesn't -- you know, it doesn't have expirations on

4   other forms of ID.

5   Q    Is there any evidence, though, that Texas lawmakers or

6   sponsors of SB 14 were actually informed that SB 14, while

7   being claimed to being modeled after Georgia and Indiana, was

8   really not?

9   A    Yes, there's some very explicit evidence here.

10  Q    Is that in your report?

11  A    It is.

12  Q    All right.

13  A    Page 41 to 42.

14  Q    All right.

15        **MR. HEBERT:**  And, just for the record, your Honor,

16  even though the gentleman being quoted here has the same last

17  name as me, he is of no relation.

18        **THE COURT:**  Okay.

19  BY MR. HEBERT:

20  Q    Would you tell the Court, in your own words, what Page 41

21  of your report finds?

22  A    Yeah, I think this is a very important email finding.

23  You're not going to get, in this day and age, emails or

24  anything written that says "We intend to violate the Voting

25  Rights Act or intend to place disparate burdens upon

EXCEPTIONAL REPORTING SERVICES, INC

1    minorities."  That's not going to be found.

2            But, I think this email comes as close as one can

3    come in this day and age to a smoking gun with respect to

4    intentional discrimination in Texas.

5    Q    How so, Dr. Lichtman?

6    A    This is by Ryan Hebert, who I believe pronounces his name

7    differently from you, although I'm not sure, Deputy General

8    Counsel in the Office of the Lieutenant Governor who, of

9    course, presides over the State Senate.  And Counsel Hebert was

10   asked -- was assessing the prospects for pre-clearance of

11   SB 14, and remember, proponents had cited Georgia which had

12   been pre-cleared as their model.

13           He says something quite different.  With respect to

14   the prospects of pre-clearance, he says, "The bottom line

15   doubtful," in other words, it's doubtful that SB 14 would meet

16   muster under the Voting Rights Act.

17           But he didn't stop.  He went on to recommend that the

18   Republican leadership very substantially revised SB 14 by

19   "using the language in Georgia's law, i.e., any ID issued by

20   the Federal Government, State Government or Local Government

21   within the State."

22           He then went on to be even more specific.  He said,

23   "At a minimum -- minimum we might use the language used in our

24   Bill passed last session, a valid identification card that

25   contains the person's photograph and is issued by A, an agency

1   or institution of the Federal Government; or, B, an agency,

2   institution or political subdivision of the State."

3              In other words, he said at a minimum he would

4   recommend a fundamental change in the law to bring it closer to

5   the Georgia law and closer to what had been proposed in the

6   previous session in Texas itself.

7   Q    And did the Legislature adopt or enact either of those

8   recommendations?

9   A    It did not, it stuck to the specific form of SB 14 which

10  fundamentally differed from the Georgia law and the previous

11  State of Texas proposals.

12  Q    Let's go to -- okay.  Let's go and compare SB 14 to other

13  photo ID in other States, or voter ID laws in other States, and

14  let's pull up Table 10.

15             And, Dr. Lichtman, have you done a comparison of the

16  State of Texas's photo identification laws compared to laws in

17  effect in other States prior to 2011?

18  A    Prior to the enactment of the Bill, I did.

19  Q    Let's go to the far column first where you have a column

20  there of labeling either "strict or nonstrict photo ID laws,"

21  do you see that?

22  A    I do.

23  Q    Describe for the Court what you mean by "strict" and

24  "nonstrict," how that differential was made.

25  A    Yeah.  Very quickly, as defined by the National Conference

Lichtman - Direct / By Mr. Hebert                    76

1    of State Legislatures, a "nonstrict" law enables the voter,

2    even if they don't have an acceptable form of photo ID, to vote

3    by an Affidavit of Identity or, in some cases, by being vouched

4    for by a poll worker.

5           A "strict" law does not provide that option.  If you

6    don't have an acceptable photo ID you have to cast a

7    provisional ballot and then come back at a later time to

8    present an acceptable photo ID if that ballot is to be counted.

9    Q    And what does Table 10 show?

10   A    It shows that essentially there are only three strict

11   photo ID laws, Georgia, Indiana and Texas, and Indiana has some

12   provisions that make it less strict with respect to voters who

13   are indigent; all the rest are nonstrict.

14   Q    And so even those states with "strict," and you mentioned

15   Georgia and Indiana, I see that you have "Yeses" under

16   "Government ID" and "Yes" under "Student IDs," and "Yes" for

17   expiration dates longer than 60 days, and "Yes" even for

18   (indiscernible) don't allow concealed carries.  But in Texas

19   all of those answers are "No," correct?

20   A    Right.  It's the only state that does not allow either

21   some form of Government ID or student ID, and the only state

22   that has narrowed all of its identifications to expirations of

23   60 days or less, of course, with the exception of

24   naturalization certificates.

25   Q    So of the strict states, Texas is the strictest?

Lichtman - Direct / By Mr. Hebert                    77

1  A    Yes, far and away.  Both Georgia and Indiana allow some

2  form of both Government and student ID and have much more

3  expansive expirations.

4  Q    Now you also have in your report a review of some the

5  polls that have been taken in Texas with respect to photo ID

6  laws, correct?

7  A    I do.

8  Q    And what did you conclude from reviewing those polls in

9  support among the Texas public for its voter ID laws?

10  A    Very quickly, two things.  One, it is absolutely correct

11  that if you ask a generic poll about voter ID or Government-

12  issued ID you will get a majority in Texas and most other

13  places saying they're for it.

14         But as I mentioned at the beginning of my testimony,

15  I am not looking at a generic photo ID, I'm looking at the

16  particular decisions made by the Texas State Legislature, and

17  none of the polls refer to, that I've seen or seen cited, refer

18  to that particular form of voter photo ID.

19         Secondly, I looked at polls on the important issues

20  in the State of Texas, again, information available at the

21  time, and voter fraud or ballot integrity or voter ID did not

22  register among the top 13 concerns.

23  Q    And why is all of that important?

24  A    That's important because supporters of the Bill had cited

25  polling information in justification of SB 14 when, in fact, it

1    doesn't justify SB 14, it applies the generic Bill as not a

2    salient issue for voters.

3    Q    Now I'm going to switch topics here and continue to stick

4    with your report somewhat in chronological order page-wise, and

5    I want to pull up Page 54.

6            We've heard a lot of testimony about EICs, Election

7    Identification Certificates, but we really haven't gone into

8    the facts about what documents you need in order to get an EIC.

9    And you looked at that issue very specifically, didn't you,

10   Dr. Lichtman?

11   A    I did.

12   Q    And tell us what the requirements are with respect to the

13   documentation needed to get an EIC, and don't -- we're not

14   going to go into each and every one, but I want you to give the

15   Court a feel for what the documentation requirements are.

16   A    No.  I understand.  The documentation requirements take a

17   full two pages of my report just to list.  They are very

18   substantial and very complex.

19           Critically, to get an EIC you have to fulfill the

20   five criteria outlined here:  documentation to verify US

21   citizenship, documentation to verify identity, documentation

22   showing you are eligible to vote in Texas, to show you're a

23   Texas resident and 17 -- and that you are at least 17 years and

24   10 months or older.

25           I then go into the documentation required for proof

Lichtman - Direct / By Mr. Hebert                        79

1   of citizenship and other elements within these five basic

2   requirements, and they are quite extensive and quite complex.

3   Q    All right.  So you've gone through, I think, what are the

4   first five requirements, and then you have in your report what

5   documents you actually need to do to establish proof of

6   citizenship, is that correct?

7   A    That's correct and you don't quite have the whole thing,

8   you start with B there.

9   Q    Well, right, the first one is A.

10  A    Right.

11  Q    On Page 54 --

12  A    And that carries over to Page 55.

13  Q    Right.

14  A    The first one is a US passport, book or card.

15  Q    Okay, and that proves citizenship, and what are the other

16  proof of citizenship documents that are listed on Page 55.

17  A    Yeah, right.  A birth certificate issued by a US State, a

18  US territory or the District of Columbia.

19        For US citizens born abroad a certificate of report

20  of birth or a Consulate report of birth issued by the US

21  Department of State, or US certificate of citizenship, or

22  certificate of naturalization, or US Department of Justice

23  Immigration and Naturalization Service US citizen ID card.  And

24  I didn't go through all the particular names of these forms.

25  Q    Thank you for not doing that.

1          What -- do you also have to produce documents to

2   establish your identity?

3   A    Yes, you do.

4   Q    And is that a complex process?

5   A    Yes.

6   Q    All right.  Let's, if we could, and this is Page 55, tell

7   us what you need to do to establish your identity here in the

8   United States.

9   A    It's complicated.  You may include one primary document or

10  two secondary documents, or one secondary document and two

11  additional supporting documents, and I include extensive lists

12  of what these documents are.

13  Q    So you have on Page 55 you have to establish either one

14  primary document or two secondary documents, or one secondary

15  document and two supporting documents, correct?

16  A    Correct.

17  Q    Okay.  And that's on 55, 56 of your report?

18  A    Correct.

19  Q    Did SB 14 contain any provisions to ensure that the

20  process for obtaining this EIC would not impose an economic

21  burden on Texans?

22  A    No.  A lot of these forms of identification cost money,

23  some of them substantial amounts of money.  There's no

24  appropriation in SB 14 to assist counties in training for

25  issuing EICs.  There's no requirement in the budget for any

Lichtman - Direct / By Mr. Hebert                    81

1   extensive publicity campaign or extensive traveling mobile

2   units for issuing EIC and nothing to help Texans born outside

3   the state who would have to both pay for birth certificates and

4   go through the bureaucracy of another state, and they have not

5   eliminated fees for these documents, many of which cost money.

6   Q    Now on page 57 of your report you have an area that -- at

7   the last full paragraph that talks about unique burdens

8   associated with traveling to DPS offices.

9              Do you remember that part of your report?

10  A    I do.

11  Q    Were there any facts that the legislature was aware of

12  those burdens that were associated with traveling to DPS

13  offices?

14  A    Yes.  If you look at page 58 the legislature actually made

15  some specific inquiries and statements that indicated they're

16  very much aware of burdens associated with traveling and of

17  course wait time.  In response to a direct question from the

18  speaker a DPS official said "It depends on the office and where

19  it is located but the times can range from 25 minutes in our

20  smaller cities to as long as 3 hours just to get waited on in

21  our largest city, particularly Houston."  DPS went on to say

22  "It has been over 10 years since we hired an additional DL

23  employee or built additional DL space while the state's

24  population has increased by 5 million people and we have

25  imposed more stringent requirements which increases the time."

Lichtman - Direct / By Mr. Hebert                          82

1          The second memo circulated among Republicans at the

2   time refers to difficulties that disabled people might have in

3   traveling.   The memo says "77 counties in Texas do not have a

4   DPS office.   Therefore, a disabled person may be able to get a

5   ride to their local precinct but not a ride over 75 miles if

6   they live in one of those counties to get the photo ID.  It

7   could even be a burden in a suburban or urban area; e.g., there

8   is not a single DPS office inside the loop," referring to the

9   Houston loop.  "Although discussed in the context of disabled

10  persons this would also apply to minorities who we have already

11  established have much lower incomes and much more likely to be

12  in poverty than Anglos," and there is also census data on page

13  40 of my report if you want to pull that up which shows that as

14  compared to Anglos minorities have substantially less

15  availability of vehicles in their households.

16          So these difficulties of which the state was well

17  aware apply with particular force to minorities based upon

18  census data readily available at the time.

19  Q    And for the record, your report indicates that when you

20  were talking about the quotation, about the 77 counties in

21  Texas that don't have a DPS office and disabled people may be

22  able to get a ride to their precinct but not 75 miles if they

23  live in one of these counties without --

24  A    And the problems in the cities.

25  Q    Who is the author of that statement?

1   A     Dan Patrick.

2   Q     And he was a state senator at the time?

3   A     Yes.

4   Q     Okay.  So I want to ask you about EICs, continuing down

5   that road, just a little bit, Doctor, and tell us what

6   significance if any is there to the fact that EIC rules and

7   procedures and requirements are vested in the Texas Department

8   of Public Safety?

9   A     That is quite significant.

10  Q     In what ways?

11  A     The Texas Department of Public Safety deals with public

12  safety issues and as the previous memo that I read indicates

13  has to administer a very large driver's license program as well

14  as the concealed carry program.  It is also an office with no

15  history or mission to provide access to voting.

16  Q     Did you review documents and e-mails of DPS managers and

17  officers regarding the administration of the EIC program?

18  A     Yes.  I reviewed e-mails both about their concerns about

19  resources and e-mails about their implementation of the EIC

20  program.

21  Q     Now turning to your report at page 59, you indicate that

22  there were some -- in your report that these e-mails contained

23  some concern about how the EIC program could harm DPS' mission,

24  correct?

25  A     Yes.  I believe this is not an e-mail but a deposition

1    statement.

2    Q    Okay.

3    A    There are other e-mails later.

4    Q    All right.  Tell the Court what this -- what this was

5    about.

6    A    This was from Joe Peters, the DPS Assistant Director for

7    the Driver's License Division, who is questioned that there was

8    no specific line item in the DPS appropriation for the EIC

9    unit.  The answer is "That is correct."

10             "So if they were unexpected needs in some of the

11             quote, unquote DL mission you would face resource

12             constraints like any agency; is that correct?"

13             "ANSWER:  Yes, sir."

14             Then on the next page I go to an e-mail --

15   Q    If you could, could you name the people involved in this

16   e-mail and what their titles are?  I think that's important for

17   the Court to hear.

18   A    The next e-mail I will.

19   Q    Yes.

20   A    This is an e-mail from Robert Bodisch, Assistant Director

21   to the Chief of Staff of the Homeland Security.

22   Q    Texas Homeland Security?

23   A    Yes.  To McGregor Stevenson, Deputy Chief of Staff in the

24   Texas Governor's Office.  So it's going to pretty high level

25   people.

1   Q    And what does Mr. Bodisch express in that?

2   A    He expressed a concern that the EIC program would

3   "severally degrade our DL mission," DL meaning --

4   Q    And what's DL?

5   A    -- driver's licenses.

6   Q    And did Mr. Peters testify in his deposition that since

7   the time of that e-mail that those fears had been alleviated?

8   A    Yes, and he said one of the reasons it had been alleviated

9   is the low volume of people applying for EICs.  So the fewer

10  people that apply for EICs the less the resource constraint

11  that they worry about on DPS.

12  Q    Now did you review other DPS communications regarding that

13  agency's position on administering EICs?

14  A    Yes.  I reviewed an extensive series of e-mails from Tony

15  Rodriguez, the DPS official, who was their EIC coordinator.

16  They refer to him as the EIC czar in fact.

17  Q    And is page 61 a representative sample of some of those e-

18  mails that you're referring to?

19  A    Yes.

20  Q    And tell us -- tell the Court what those say.

21  A    There's a series of them about the implementation of the

22  EIC.  At the time when it was beginning to be implemented he

23  said, "I will need negative activity reports to feed the

24  machine up here."  The next day in another e-mail to his

25  supervisor he said, "Sir, we continue our clean sweep.  No EICs

1    issued.  We had a close call on Vantage Park but the customer

2    opted out and left the office."

3    Q    Before you go on to the next one, I want to go back

4    because Mr. Rodriguez in his earlier e-mail where it says "I'll

5    need negative activity reports," he also said "Expect to be

6    peppered with requests regarding the number of certificates

7    we've issued and if there are any problems with issuance," does

8    he not?

9    A    Correct.

10   Q    Okay.

11   A    And then added that he -- he needed the negative activity

12   reports.

13   Q    Okay.  Let's go to the next e-mail that's below that.

14   A    Yeah.  This is an e-mail in response to an e-mail from a

15   regional DPS manager which indicated that his employees had

16   zero requests for EICs.  Mr. Rodriguez responded, "Zero is a

17   good number."

18   Q    And he's talking about EICs when he's talking about zero,

19   correct?

20   A    Correct.

21   Q    And what does -- and there's another e-mail --

22   A    Then we have a next --

23   Q    -- there from a DPS manager --

24   A    Yeah.

25   Q    -- Tom Carter.

Lichtman - Direct / By Mr. Hebert                    87

1   A     Yeah.

2   Q     Tell the Court what that states.

3   A     Yeah.  In response to another e-mail from Tom Carter,

4   Rodriguez wrote "No inquiries either.  This is getting better

5   by the day."

6   Q     And when they say "No inquiries either," they're talking

7   about inquiries to get EICs; correct?

8   A     This is all about EICs.

9   Q     Okay.

10  A     Then there's another e-mail in response to an e-mail from

11  Dallas County requesting the deployment of EIC mobile units to

12  events that might attract large numbers of people.  Rodriguez

13  forwarded the memo with the comment "Mission Creep" and as

14  testimony from another EIC official indicates, units were sent

15  to Dallas County over -- only over Mr. Rodriguez's objections

16  to that.  So "Mission Creep" certainly meant that he objected

17  to this outreach program for the EICs.

18  Q     And --

19  A     So this isn't just one e-mail.  This is e-mail, after e-

20  mail, after e-mail.  The cumulative impact is all essentially

21  the same, a negative approach to the EIC program.

22  Q     And, your Honor, just for the record, all of these e-mails

23  are in evidence as part of different exhibits.  When his report

24  was prepared exhibits hadn't been numbered yet but -- so I want

25  to go back to the e-mail from the Governor's Office if you

1  could.

2  A    Which one?

3  Q    That was the one on page -- where the Deputy Chief of

4  Staff expressed concerns.  This is on the top of page 60.

5  A    This is the Bodisch memo, the Bodisch e-mail?

6  Q    Sixty, yes, the Bodisch memo.

7  A    I have it.

8  Q    All right.  Now --

9  A    Page 60.

10  Q    The top of page 60.

11  A    Yes.

12  Q    Okay.  Now what I want to ask you about this with respect

13  to degrading the driver's license mission, with respect to

14  this, do these kinds of e-mails and concerns that are being

15  expressed, does that reflect in your mind whether or not

16  there's an interest on DPS' part to give out EICs?

17  A    I think it clearly shows that it is in the interest of the

18  DPS to minimize the EIC program.  Indeed, as we saw the

19  immediate follow-up was, "Well, those fears have been allayed

20  because there are so few applicants" and then all those e-mails

21  from Mr. Rodriguez indicating an interest in keeping down, not

22  expanding, the EIC program.

23  Q    Last question on this issue of EICs at least on this part

24  of it, does all this relate to race or ethnicity because after

25  all everybody presumably can get an EIC?

1  A    All this very much relates to race and ethnicity because

2  as we've already established African Americans and Latinos have

3  lower levels of income, lower -- more likely to be in poverty,

4  less access to vehicles to which you could drive to DPS

5  offices, and so outreach programs as we know are especially

6  important for minorities, in this case African Americans and

7  Latinos, because of the very large socioeconomic gap that

8  exists and because of the transportation gap that exists.

9  Q    Now you started to get into an issue earlier and I said we

10 would come back to it and that's the issue of surcharges

11 imposed by DPS.

12        Do you remember that?

13 A    I certainly do.

14 Q    There are two special laws I think you've indicated that

15 are administered by DPS and you said that they had burdens on

16 minorities or those people who had valid IDs.  Is that what you

17 basically said?

18 A    I did.

19 Q    Okay.  Well, did you study the issue of surcharges imposed

20 by DPS?

21 A    Yes, and that is on I believe pages 33 through --

22 Q    We brought -- we brought that up Dr. Lichtman here --

23 A    Yes.

24 Q    -- so if you need to refer to it it's on the screen.

25 A    Okay.  The surcharge program is the so-called driver's

1   responsibility law in Texas that adds on surcharges to various

2   traffic offenses.  Since the law was adopted in 2003 over 2

3   million Texans have been assessed surcharges which can range

4   from a few hundred to even more than a thousand dollars.

5   Unless you pay your surcharge your driver's license is

6   suspended and somewhere around 1.2 to 1.3 million persons in

7   Texas have had a driver's license suspended because of the

8   surcharge program and this has very important racial

9   implications.

10  Q    Well, let's bring up table 8 on page 35.

11  A    Yeah.

12  Q    All right.  Talk about the racial implications of this

13  issue.

14  A    Yeah.  Obviously, again the racial implications can flow

15  from the fact that African Americans and Latinos have much

16  lower incomes than Whites, much more likely to be in poverty,

17  and therefore, it is a much greater burden to pay these

18  surcharges which are quite substantial and unless you pay it

19  your license is suspended and can't be renewed.

20        Table 8 also provides direct evidence of the

21  disparate racial burden on African Americans and Hispanics of

22  the drivers surcharge program.  The DPS released the ten zip

23  codes with the largest number of surcharges and --

24  Q    And Table -- and Table 8 reflects this?

25  A    Yes.

1   Q    And what does it show, Dr. Lichtman?

2   A    Well, it shows if you look at the last column that these

3   zip codes are overwhelming Latino and Black.  On average, the

4   Latino and Black population here voting age is 81 percent

5   compared to the middle 40's for the state as a whole.  Not one

6   of these zip codes is anything less than 57 percent Latino and

7   Black.  Some of them are 95 percent or more Latino and Black.

8   And so, it's quite striking, the correlation between the top 10

9   zip codes and the minority population providing direct

10  corroboration of the circumstantial facts of differentials in

11  income and poverty.

12  Q    So the evidence that you have of this surcharge racial

13  impact, is there any evidence out there that you've found that

14  the legislators or their staffs were aware of the problems

15  stemming from surcharges?

16  A    Yes.  I found direct evidence indicating that they were

17  aware of this.

18  Q    Let's turn to page 44 and then it will spill over to 45

19  and look at Mr. Blifford who's at the bottom, B-L-I-F-F-O-R-D.

20       Tell us what that memo --

21  A    Yes.  This memo came out from Andrew Blifford to Republic

22  Staffer Meredith Fowler after the Justice Department had denied

23  preclearance to SB 14.  Blifford is the budget director for the

24  Republican Speaker of the House and he referred to a blog in

25  which the blogger said because of the surcharge program, the

Lichtman - Direct / By Mr. Hebert                           92

1    driver's responsibility program, that could account for some

2    1.2 to 1.6 million persons who had ID when they registered to

3    vote but do not have it today because of the suspended license

4    program.   The blogger said "It appears that the surcharge is a

5    major contributor to Texas' voter ID law being challenged."   In

6    other words, a major contributor to it not being able to pass

7    muster under the Voting Rights Act and Meredith Fowler's

8    response was "Ah, yeah, this came up in the debate.   Thanks for

9    passing it along."   So clearly the legislatures were aware of

10   this at the time of the debate but didn't address it.

11   Q    And that was widely distributed was it not, that

12   information in that -- in Blifford's forwarding?

13   A    Yes, and the driver's responsibility program, the

14   surcharges, is well-known within Texas because it's been

15   written up in the press.   It's been debated.   It's a

16   controversial issue.   Certainly legislators had every reason to

17   be aware of it.

18   Q    All right.   Let's go to page 45 because I think another

19   issue you studied, and this is the last area I'll ask you

20   about, Dr. Lichtman, until we get to your conclusions.

21        Was another issue you studied the issue of suspended

22   driver's licenses?

23   A    Well, this is another issue related to both suspended and

24   confiscated driver's licenses.

25   Q    And did you also study how that might impact a person's

1  ability to have an ID in order to vote?

2  A    Yes.  This is what's called the ALR program or

3  Administrative License Revocation Program.  If you're convicted

4  of certain -- not convicted, arrested for certain drunk driving

5  offenses, you can have your license confiscated or at a minimum

6  suspended.  The requirement is confiscation but from the memos

7  I read it's not clear that all licenses falling under the ALR

8  program are going to be confiscated and this is a very

9  significant program.  According to an e-mail from DPS official

10  Tom Vinger (phonetic), in 2008, 112,250 licenses were suspended

11  under the ALR process and this was explicitly brought up in the

12  debates over SB 14.

13  Q    All right.  And is that the Ron Burnham citation you have

14  on page 45?

15  A    Yes, that's on page 45.  Representative Burnham

16  specifically pointed out that "100,000 Texans a year have had

17  their driver's licenses suspended.  They've had that driver's

18  license taken from them" and there's a response from the

19  sponsor, Republican Representative Harless.  She said, you

20  know, not all of them may be registered voters, which is a fair

21  point.  She said hypothetically maybe 75,000 and then "if they

22  don't have an alternative form of photo ID such as a passport

23  or citizenship paper with their photo on it, or a CHL, which is

24  a concealed handgun license, they'd have to cast a provisional

25  ballot and this program, like the surcharge program, has racial

1   implications."

2   Q    Let's go to page 46 and just let me ask you one final

3   question on this topic.

4           Did DPS weigh in on this issue?

5   A    Yes, DPS said there were 112,250 licenses under the ALR

6   program suspended although it indicated not all of them may be

7   confiscated and DPS information indicates it requires a fee of

8   $125 to reinstate your license under the ALR program,

9   especially burdensome for African Americans and Hispanics.

10  Q    Now link this if you would to the right to vote.  If

11  someone has a suspended license and they show up -- are they

12  going to show up to vote?

13  A    Well --

14  Q    What are the options here?

15  A    -- several things.  One, if their license is confiscated

16  obviously they don't have it but even if their license is

17  suspended they can't renew it and, you know, they have a very

18  narrow expiration date.  If it doesn't meet that they can't

19  vote and the truth is, you know, I've studied politics for 50

20  years, people are fearful to present things to official

21  government agents and there's going to be in my view a

22  deterrent factor of going to the poles and presenting a license

23  that has been suspended under the ALR program.  You might be

24  afraid your license will get confiscated.

25  Q    Sure.  Now let's put these two things together and the two

1    things I mean are the surcharges issue that you talked about

2    and this suspended license, driver's license.

3              When you put those together what is the racial impact

4    when you do that?

5    A    The racial impact is extremely large.  You're talking

6    about substantially more than a million persons in Texas being

7    affected by it and you're talking about those effects falling

8    very sharply along racial lines.  We have it circumstantially

9    from the socio-economic data for both programs and we have

10   direct evidence of disparate racial impact from the surcharge

11   program and because the issue in both of them is money you

12   would, therefore, likely infer that you'd have similar racial

13   differences for the administrative license revocation program.

14   Obviously there's going to be some overlap between the two

15   programs so you can't just add up the numbers but regardless,

16   the numbers are very, very large.

17   Q    All right.  And one final area, Dr. Lichtman, and, your

18   Honor, I neglected to point this out but it was up on the

19   screen and I wanted to call your attention to it but in the e-

20   mail from Mr. Bodisch on page 60 it was to McGregor Stephenson,

21   Deputy Chief of Staff in the Texas Governor's Office, and I

22   neglected to specifically note that for your attention.

23             So, Dr. Lichtman, you have towards the end of your

24   report you start -- you have a number of quotes of different

25   politicians in Texas with regard to the intersection of race

1   and politics and I only want to go through two of them.  Let's

2   go with Congressman Kenny Marchant and a gentleman by the name

3   of Ken Emanuelson.  It's on pages 66 and 67.

4           If you could pull those, that page up and it's the

5   first full paragraph on 66, other Texas Republican

6   representatives, I believe.

7   A    Yes, that is the correct paragraph.

8   Q    Just below the quote.

9   A    Yeah.

10  Q    Thank you.  And what does Mr. Marchant say?

11  A    Yeah, I was actually surprised to find these quotes

12  because again in this day and age you don't expect to find

13  politicians making racially charged statements linking politics

14  and race but I did find it, first of all, with Representative

15  Kenny Marchant, an Anglo Republican, who was talking about his

16  opposition to overhauling the immigration laws and said, "If

17  you give the legal right to vote to ten Hispanics in my

18  district, seven to eight of them are going to vote Democrat."

19  Q    All right.  Let's go to the -- let's now continue with the

20  other one.  Let's move quickly here because I want to wrap

21  up --

22  A    Yeah.

23  Q    -- to page 67 with a quote at the very top of the page.

24  It actually begins on the bottom of 66, the last full

25  paragraph.

Lichtman - Direct / By Mr. Hebert                    97

1  A    Yes.  This is a quote from Ken Emanuelson.  He's not an

2  elected official but he's one of the leaders of the Tea Party

3  in Texas, a very important movement, and he has close links to

4  the Dallas County Republican party.  In fact, when he made

5  these remarks he was leading a meeting of Battlefield Dallas

6  County, a group dedicated to turning out Republican voters.

7          He was asked by a pastor, "What are the Republicans

8  doing to get Black people to vote?"

9          Emanuelson responded, "Well, I'm going to be real

10 honest with you.  The Republican party doesn't want Black

11 people to vote if they're going to vote nine to one for

12 Democrats."

13 Q    Now these two gentlemen that you've just quoted here

14 weren't members of the Texas legislature so why are their

15 comments relevant to your inquiry?

16 A    Well, you have not just members of the Texas legislature

17 but it was a pretty solid Republican foulince (phonetic) behind

18 the voter ID bills and while I'm not saying either of these

19 figures had any role in the passage of voter ID, I am

20 indicating that both a Congressman, an important elected

21 official, and a major grassroots leader were sustaining one of

22 the points analytically made in this report and that is

23 partisanship manifests itself here racially with respect to the

24 interests of the Republican party politically in holding down

25 the votes of Hispanics and African Americans.

1    Q    And we've covered a lot of ground.  Have you formed an

2    opinion about what all this information in your report shows

3    with respect to whether SB 14 was enacted with a discriminatory

4    purpose?  Have you formed an opinion?

5    A    Yes.

6    Q    What is that opinion and what is it based on if you could

7    summarize that for the Court?

8    A    Yeah.  Let me summarize the basis of the opinion as

9    quickly as I possibly can.

10            When you look at the specific decisions with regard

11   to SB 14 made by the Texas legislature as compared to previous

12   bills and as compared to bills in other states on which they're

13   modeled, you see in every instance those decisions operated to

14   place a disparate burden on African Americans and Hispanics

15   relative to Whites based on data readily available at the time.

16   You also see that the Texas State Legislature was warned that

17   this bill would likely not pass muster under the Voting Rights

18   Act and there were recommendations that it turn to the actual

19   bills on which it was supposedly based in Georgia, not the very

20   different Texas bills.

21            When one looks at the way in which the goals were

22   justified with respect to voter impersonation and deterrence we

23   see that Republican leaders had indicated much more expansive

24   bills and included nonphoto IDs were acceptable; that

25   Republican leadership affirmed that it was mail-in ballots that

1    were the main problem.  But they didn't address mail-in ballots

2    and mail-in ballots are disproportionately White.

3            When you look at the assignment to the DPS, the

4    implementation of the DPS, the problems with getting EIC, all

5    of this and many other pieces of data that I analyzed all point

6    in the same direction; that SB 14 was knowingly and

7    intentionally adopted with the purpose of placing a disparate

8    burden on the voting of African Americans and Latinos relative

9    to Anglos.  In other words, with a racially discriminatory

10   purpose.

11           The bottom line here is that SB 14 was not passed

12   despite race but was directly and knowingly passed because of

13   race.

14           **MR. HEBERT:**  Thank you.  I have nothing further.

15           **THE COURT:**  Okay.  Let's go ahead and take our 15

16   minute morning break.

17           **COURTROOM DEPUTY:**  All rise.

18       **(A recess was taken from 9:59 a.m. to 10:16 a.m.; parties**

19   **present)**

20           **MR. KEISTER:**  Good morning, your Honor.

21           **THE COURT:**  Good morning.

22           **MR. KEISTER:**  Ronnie Keister for the defense.

23   //

24   //

25   //

1                          **CROSS EXAMINATION**

2    **BY MR. KEISTER:**

3    Q    Good morning, Dr. Lichtman.

4    A    Good morning.  Good to see you again.

5    Q    Good to see you.  Dr. Lichtman, you're a historian,

6    correct?

7    A    Correct.

8    Q    And then do you consider yourself a social scientist?

9    A    Yes.

10   Q    Could you tell the Court what social science is?

11   A    Social science is the application of formal methodologies

12   to information about human -- human beings, either in a group

13   or individually.  It's also the development of theories about

14   human beings, either individually or in a group.

15   Q    Okay.  And in your profession, how do -- how do you

16   utilize social science?

17   A    I utilize social science because I do extensive

18   quantitative analyses of social science-type of information,

19   primarily election returns and other forms of political

20   information.  This is reflected in many of my books, including

21   Prejudice And The Old Politics, The Presidential Election of

22   1928, The Keys To The White House, The Thirteen Keys to the

23   Presidency, many of my articles, including articles that I

24   referenced in the United States National Academy of Sciences.

25   I've published numerous articles in social science journals,

Lichtman - Cross / By Mr. Keister                101

1   such as *Political Methodology* and *Evaluation Review*.  I've also

2   examined theories of social science, such as critical election

3   theory that apposites regular cycles of American political

4   history.  I've written about that.  I've written a review of a

5   book on critical election theory.

6   Q    Okay.  And scientific method is important to your -- to

7   your work?

8   A    I would call it social scientific method.  I don't pretend

9   to be a hard scientist.

10  Q    Okay.  And do you strive to -- to incorporate recognized

11  best practices in your work?

12  A    Yes, but, of course, you know, we're academics and there's

13  always disputes about what is recognized best practices.

14  Q    Okay.  And --

15  A    There's not some bible out there.

16  Q    Okay.  Can you give us some examples of what would be

17  considered best practices for a social scientist doing the type

18  of work that you do?

19  A    Using recognized statistical methodologies and being

20  transparent about those statistical methodologies, and

21  striving, whenever possible, to look at direct contemporaneous

22  evidence, as opposed to later reconstructions of that evidence,

23  would be a couple of examples.

24  Q    Okay.  And is it important to look at all the details

25  surrounding an issue, pros and cons, to try and come up to

Lichtman - Cross / By Mr. Keister                    102

1   the -- to the appropriate issue or resolution of the issue that

2   you're looking at?

3   A    That's a nice ideal.  Nobody, but nobody, looks at all of

4   the evidence, or we would never complete a single project.

5   Q    Fair point.  But do you try to at least get an overall

6   view of what -- what an issue is, how it's considered by the

7   other people looking at it from different aspects?

8   A    You try to get a sufficient picture to provide an

9   underpinning for your conclusions; that does not by any means

10  indicate you've looked at everything.  Nobody does, ever.

11  Q    Okay.  Now, you've testified that you've served as an

12  expert witness in various cases, more than 80 cases, over the

13  years, correct?

14  A    Something like that, expert witness or consultant, yes.

15  Q    Okay.  And, of course, you're compensated for

16  participating in those cases, correct?

17  A    Yes.

18  Q    And that's an ongoing part of your income, correct?

19  A    Correct.

20  Q    And you mentioned that Mr. Hebert was the first attorney

21  that got you involved in -- as being an expert witness,

22  correct?

23  A    He wasn't quite the first.  Actually, the first case I

24  ever worked on was a landmark Supreme Court case, *Anderson*

25  *versus Celebrezze*, in which I was contacted by the lawyer for

1    independent candidate, John Anderson, in 1980, to write an

2    historical analysis of the role and importance of third parties

3    in political history of the United States.  And that case

4    became the pivotal ballot access case, *Anderson v. Celebrezze*,

5    I believe it was back in 1980.  And then I began working for

6    the Justice Department in the early 1980s.

7    Q    And Mr. Hebert, at that point, was with the Justice

8    Department, correct?

9    A    That's my recollection, but he was not the first person

10   who contacted me --

11   Q    Okay.

12   A    -- from Justice.  It was a guy by the name of

13   Mr. Rosenbaum.

14   Q    Now, over the years you've had many cases that you've

15   worked on with Mr. Hebert, correct?

16   A    Quite a number.  I've never counted, but, you know, maybe

17   10 percent or 12 percent of my 80 cases, something like that.

18   Q    So maybe ten or thereabouts?

19   A    Maybe.  I've never counted.

20   Q    Okay.  And you've established a good relationship with

21   Mr. Hebert, correct?

22   A    I would hope so.  One never knows.

23   Q    I mean, to the point -- well, I think you do, because you

24   told me in your deposition that while you do contracts for most

25   of your clients, you don't do contracts with Mr. Hebert,

1   correct?

2   A    Sometimes I don't, that's right.

3   Q    Okay.  All right.

4   A    There are others I don't do contracts with, who I worked

5   with over many years and who I trust.

6   Q    Okay.  But Mr. Hebert, you didn't do a contract in this

7   case with him, correct?

8   A    I got an advance payment in this case actually --

9   Q    Which is --

10  A    -- so I didn't have to do a contract.  $30,000.

11  Q    Which is probably better, but you didn't --

12  A    I always like a bird in the hand --

13  Q    Okay.

14  A    -- like anyone else.

15  Q    Okay.  And you didn't do a contract with him in the

16  redistricting case, correct?

17  A    I got an advance payment on that, too.

18  Q    Okay.  And you didn't do a contract with him in the -- in

19  the D.C. cases, correct?

20  A    I don't recall.

21  Q    Okay.  I believe you --

22  A    I do recall these two, because they're recent and I got

23  advance payments, but --

24  Q    I believe you told me in your deposition that you didn't?

25  A    That's very possible.

1  Q    Okay.  All right.

2  A    I'm not going to argue that.

3  Q    Okay.  And so you know Mr. Hebert, Mr. Hebert knows you,

4  and Mr. Hebert knows generally what type of areas you work on

5  and what type of issues that he can come to you for support on,

6  correct?

7  A    I didn't catch the last part of your statement.

8  Q    I'm sorry.  I've caught a cold this week, so…

9  A    You've got a cold, I know.  And I'm old, so…

10  Q    Yeah, just stop me anytime.  You know Mr. Hebert and he

11  knows you in a working relationship, and Mr. Hebert knows the

12  type of issues that you can help him on -- or give him expert

13  opinions on in the cases he's working on, correct?

14  A    He and many other people around the country know that,

15  because as I told you in deposition, I don't advertise, so

16  people come to me.

17  Q    Right.  Okay.  But I'm concentrating on Mr. Hebert right

18  now.

19  A    Oh, sure.  Absolutely.

20  Q    All right.  So he -- Mr. Hebert knows that he can come to

21  you and expect that you will give him certain opinions on

22  certain issues, correct?

23  A    Incorrect.

24  Q    Well, does Mr. Hebert come to you for opinions that

25  doesn't support his cases?

Lichtman - Cross / By Mr. Keister                 106

1    A    Mr. Hebert does not come to me for opinions.  Mr. Hebert

2    comes to me like everyone else I've ever worked with for my --

3    Q    Okay.  Now I don't want to know --

4    A    Let me finish.

5    Q    -- about everybody else you ever worked with.

6    A    All right.

7    Q    I want to know about Mr. Hebert.

8    A    All right.  Mr. Hebert --

9    Q    Okay.

10   A    But let me give you a little context.

11   Q    Well, then, Mr. -- we have a limited time frame here, and

12   I'd appreciate it if you'd answer the question.

13   A    I will answer your question.

14   Q    Okay.  Now, my question is:  Did Mr. Hebert come to you or

15   does he come to you when he needs help on issues on cases that

16   he's working on?

17   A    That I can answer yes, not to your previous question which

18   was quite different, that he comes --

19   Q    Okay.  I don't -- let's stick with one question at a time,

20   please, sir.

21   A    But I haven't finished answering your previous question,

22   because you interrupted me.

23   Q    All right.  You did answer my question.  You wanted to go

24   beyond it.

25   A    No.

EXCEPTIONAL REPORTING SERVICES, INC

Lichtman - Cross / By Mr. Keister                    107

1    Q    So let's stick with one question.

2    A    Okay.

3    Q    Okay.  Now, in this case the issue Mr. Hebert wanted you

4    to work on was to find whether or not there was intentional

5    discrimination with respect to the passage of SB 14, correct?

6    A    Yes.

7    Q    And he specifically wanted you to look for the issue of

8    intentional discrimination, correct?

9    A    To look at that issue, correct.

10   Q    Okay.  But he wanted evidence -- for you to present him

11   evidence of intentional discrimination, correct?

12   A    He never told me that.  He told me to examine the issue of

13   intentional discrimination.  I always do with Mr. Hebert my own

14   independent analyses and come up with my own conclusions.

15   Q    Did you answer anything different to me in the depo in

16   Washington?

17   A    Not that I can recall.

18   Q    Okay.

19        MR. KEISTER:  Brian, would you pull up Page 13 of the

20   deposition?  It's here…

21   A    I have a copy, too.

22   Q    Okay.

23   A    I have trouble reading that from here.

24   Q    Well, I'll read it to you.  This is from your deposition,

25   and I asked you the question:

Lichtman - Cross / By Mr. Keister                     108

1          "QUESTION:   Okay.   Now, I notice that you specifically

2    state intentional discrimination.   Was that specifically what

3    you were requested to look for in this case?"

4          And you answered:   "Yes," correct?

5    A    Yes, but you've got to put that in the context, that he

6    did not set out -- if you look at the previous questions:

7          "Okay.   Did Mr. Hebert set out any particular parameters

8    of methods of research that he wanted you to engage in?"

9          "No."

10          "Okay."

11          "He left that to me."

12          So I was, in answering your question, I was not answering

13   that I was looking to find anything one way or another, but

14   just looking at the issue of intentional discrimination, the

15   same as I've answered you today.

16   Q    Now you would agree, sir, that somebody in your position,

17   it's important, just as you're saying not to look for just

18   evidence of intentional discrimination, it's important to look

19   at the whole context of a case or an issue and try and

20   determine whether or not the whole context shows

21   discrimination, correct?

22   A    Yes.

23   Q    Okay.   Now, what did you look at in this case to determine

24   that there was not discrimination in the passage of SB 14?

25   A    Well, that's not the way it works.

EXCEPTIONAL REPORTING SERVICES, INC

Lichtman - Cross / By Mr. Keister                    109

1   Q    Well, answer my question, though, sir, what did you look

2   at in this case to try and make a determination there was not

3   discrimination with --

4   A    I looked at many things that could have shown that there

5   was not discrimination.

6   Q    Did you set any of those out in your report, sir?

7   A    Many of them.

8   Q    Okay.  And then we'll go through those.

9   A    Okay.

10  Q    Did you -- did you review the deposition of -- of

11  Lieutenant Governor Dewhurst in this case?

12  A    I don't recall.  As I said, my preference as best

13  practice, is to look at contemporary evidence, not later

14  reconstructions, particularly later reconstructions by parties

15  of interest.

16  Q    So you did not consider any of the testimony that

17  Lieutenant Governor Dewhurst gave in this case concerning his

18  rationale and intentions behind the passage of SB 14, correct?

19  A    No.  I was much more concerned with the rationales given

20  at the time, not later reconstructions of rationales which are

21  unprovable and undetectable.

22  Q    Did you look at -- did you look at the deposition of

23  Senator Frazier in this case?

24  A    I think I did, actually, and it was -- yeah, I think I

25  did.

Lichtman - Cross / By Mr. Keister                    110

1   Q    Did you set out in your report any statements or

2   rationales that Senator Frazier gave for the passage of SB 14?

3   A    No.  I didn't find them useful, and the deposition I saw

4   he quoted privilege so many times that it was very difficult.

5   And, again, I'm looking for best evidence, which is --

6   Q    How about --

7   A    Let me finish -- which is not later reconstruction, but

8   evidence at the time.

9   Q    How about Senator Tommy Williams, did you look at his

10  deposition?

11  A    I think I looked at his testimony in the trial, but not

12  his deposition.

13  Q    Did you set out in your report any of the explanations

14  Senator Williams gave for the passage of SB 14?

15  A    I'll answer your question simply:  I did not set out any

16  after-the-fact reconstructions of explanations.  I set out

17  explanations given at the time.

18  Q    Well, sir, it's a fact that in your reports you set out

19  everything negative that you could find about SB 14, but you

20  set out nothing that supports the fact that SB 14 was not

21  passed with racial intent; isn't that true?

22  A    No.  I set out explicit justifications given by the

23  backers and supporters of SB 14.  I examined the specific

24  provisions of SB 14.  I compared the justifications for SB 14

25  with justifications given for previous bills that were much

Lichtman - Cross / By Mr. Keister                              111

1   more expansive in terms of their photo ID. and nonphoto ID.

2   options.  So, absolutely, if those statements and rationales

3   and decisions had borne scrutiny, I would have concluded

4   something very different than I did.

5   Q    So the rationales for nondiscrimination did not warrant

6   consideration in your -- for you, correct?

7   A    No.  I looked at them.  I looked at the rationales that

8   were given --

9   Q    They just --

10  A    -- for nondiscrimination, at the time --

11  Q    They just did not warrant being placed in your report; is

12  that correct?

13  A    I did place them in my report.  I quoted many statements

14  from actors at the time in the actual debates saying, you know,

15  "Our bill is like Indiana, which passed muster under the

16  Supreme Court"; "Our bill is like Georgia, which meets the

17  requirements of the Voting Rights Act."  I quoted many

18  statements to that effect on SB 14, but, like any analyst, of

19  course, I subject those statements to scrutiny.

20  Q    Yeah.  You -- you quoted statements that you felt like you

21  could -- you could beat (indiscernible) in your report,

22  correct?

23  A    Incorrect.  I quoted the key statements in support of

24  SB 14 by key players at the time.

25  Q    Okay.  The Judge has your report and she'll review your

Lichtman - Cross / By Mr. Keister                112

1   report.  Can you -- can you direct her to any specific pages in

2   your report where you have referred to positive testimony, as

3   opposed to negative testimony --

4   A    Absolutely.

5   Q    -- about the passage of SB 14?

6   A    I'll have to find the section on -- a long report, I've

7   got to find specifics here.  Yes.  Representative Harless on

8   Page 37 of my report, "SB 14 is similar to George's photo ID.,

9   which was approved by the Department of Justice, and Indiana's

10  photo ID. which was upheld by the United States Supreme Court."

11  Clearly, that is a very positive statement in support of SB 14

12  saying it should meet muster under the Voting Rights Act and

13  muster under the Supreme Court.  It would be hard to find a

14  more positive statement.

15  Q    Okay.

16  A    On that same page, if you want me to go on, "Senator

17  Frazier, the sponsor of the bill said, 'Very, very small change

18  from the Indiana model.'"  "Representative Harless said, 'The

19  bill that we filed is modeled on the Georgia and Indiana

20  legislation.'"

21  Q    Okay.  Anything other than Georgia and Indiana cases or

22  laws, any other statements that they made, positive statements

23  in your report in support of SB 14?

24  A    Yes.  Here's a statement -- another statement by Senator

25  Frazier.  And, by the way, on earlier bills I also quote lots

EXCEPTIONAL REPORTING SERVICES, INC

Lichtman - Cross / By Mr. Keister                    113

1    of positive statements for them.  "The four types of

2    identification we are offering up, we believe are less

3    confusing, they're simpler for both voters and election voter

4    [sic], everyone knows what they look like.  There is a

5    standardization of those, and they all look alike.  It will be

6    less confusing for the systems who are accepting the voter ID."

7              This is in defense of not including student and

8    government workers.  I then subject that to scrutiny showing

9    that the Indiana bill, which they solicited testimony from the

10   Secretary of State that it had worked so well, that there was

11   no confusion, in fact, had student and government workers.  I

12   can go on.

13   Q    Did you support any statements that were positive, that

14   you did not cite for the purposes of trying to -- trying to

15   discredit them?

16   A    There are hundreds of statements, obviously.

17   Q    Did you ever -- did you ever have a section in your report

18   where you gave a positive statement summary of the proponents

19   of SB 14, their reasons for passing it, without -- without

20   subjecting it to the criticisms?

21   A    I think I first presented the statements -- I've given you

22   several examples here and then, of course, you subject to

23   critical scrutiny, that's the job of an independent analyst.

24   Q    All right.  Well, on Page 4 of your declaration, you state

25   that your focus is on intentional discrimination against

Lichtman - Cross / By Mr. Keister                114

1   minorities who achieve partisian [sic] political advantage, not

2   on racial animus, per se?

3   A    That's right.

4   Q    Okay.

5   A    Although, I also say the evidence indicates that such

6   animus is present as well.

7   Q    Okay.  Do you believe that voter ID., photo voter ID.,

8   SB 14, was passed for partisian [sic] purposes?

9   A    For what?

10  Q    Partisian [sic]?

11  A    I don't know what partisian [sic] means.  Partisan?

12  Q    Partisan.

13  A    There was, as I explained in my direct, obviously there is

14  partisan politics involved, but the way in which partisan

15  politics was manifest in SB 14 was through intentional

16  discrimination against the African American and Latino

17  democratic base and their ability to vote.

18  Q    Okay.  Are you aware of what the Supreme Court has said

19  about discriminatory purpose in the case of *Personnel*

20  *Administrator of Massachusetts versus Feeney*?

21  A    I don't know that case, but if you want to enlighten me,

22  I'd be happy to listen.

23  Q    Okay.

24        **MR. KEISTER:**  Brian, if you'd pull that up, please?

25  Q    Can you read that to the Court, please, sir?

1    A    "Discriminatory and purpose implies more than intent as

2    volition or intent does awareness of consequences.  It implies

3    that the decision-maker selected or reaffirmed a particular

4    course of action, at least in part, because of, not merely in

5    spite of its adverse affects on an identifiable group."

6    Q    Okay.  And you were not aware of that passage of the

7    Supreme Court when you prepared --

8    A    Actually, I was, I just wasn't aware of the particular

9    case.  And I think I testified about that very issue, that it

10   was passed, not in spite of, but because of race, and all of

11   the evidence points in that direction.

12   Q    Okay.  Did you take this case and the passage into

13   consideration when you wrote your report in this case?

14   A    No, I didn't.  I actually wrote my report independent of

15   that, letting the chips fall where they may.

16   Q    Now you've spoken a little bit about history in this case,

17   correct?

18   A    A little bit.  It's not a focus of my report.

19   Q    Okay.  And we're not going to go through the whole process

20   that we went through in Washington on this.

21   A    I hope not.  There was a lot of confusion in that.

22   Q    But you -- we talked about in Washington the fact that

23   Texas was a one-party state, for the majority of its history,

24   correct?

25   A    I have no dispute with that.

Lichtman - Cross / By Mr. Keister                    116

1   Q    Okay.  And we talked about the fact that it was, and up

2   until ultimately 2003 before the Republican party had a

3   majority in the House, the House of Representatives, as well as

4   the Senate, correct?

5   A    I don't dispute any of that.

6   Q    And -- and at that point in time, they also took the

7   governorship, lieutenant governorship, and the Attorney

8   General's Office, correct?

9   A    I think they took every -- eventually, every statewide

10  office in the State of Texas.

11  Q    Okay.  In all of the history before that dealt with the

12  time period when the Democratic party was in control of the

13  government of the State of Texas, correct?

14  A    I believe that's right.  There may have been some minor

15  exceptions, but that is basically correct.

16  Q    Okay.  Now, are you familiar with the case of -- with the

17  Shelly [sic] case, came out of Springport?

18  A    Do you mean the *Shelby* case.

19  Q    *Shelby* case.  Thank you.

20  A    The *Shelby* case, yes.

21  Q    That's the case that struck down the Section 4 of the

22  Voting Rights Act case?

23  A    Yes, the formula section.

24  Q    Okay.  And did you consider what that court said in making

25  your historical analysis in your report?

EXCEPTIONAL REPORTING SERVICES, INC

1   A    I did not.

2   Q    Okay.  Do you believe that -- that after *Shelby*, that the

3   more important issue with respect to the history of

4   discrimination is the more current history, as opposed to

5   history a hundred years ago?

6   A    Yes, but the current history, like the history a hundred

7   years ago, shows evidence of racial discrimination.

8   Q    Well, that wasn't my question to you, sir.  My question

9   is:  Do you agree that under *Shelby*, that when we're looking at

10  history discrimination, we should be looking at relevant

11  history, recent history, as opposed to history from the 1965s

12  back into the 1800s?

13  A    I'm not a lawyer, so I won't parse to you what is legally

14  indicated in *Shelby.*  I think, as an historian, I would not

15  dismiss the earlier history.  I think it's important, but

16  obviously, recent events are more -- the most relevant.

17  Q    All right.  And so, as interesting as all the previous

18  history is, at least according to the Supreme Court in *Shelby,*

19  we can almost not totally disregard it, but we can pretty much

20  put that aside in trying to determine what's relevant in this

21  case as to the history of discrimination with respect to the

22  passage of SB 14, correct?

23  A    I think I answered that.  I would, as an historian, I

24  would not put it aside, but obviously, you want to see if in

25  recent times discrimination continues.  It's not just a relic

1   of the past.

2   Q    Okay.  Now you spoke about polarized voting in this state?

3   A    Correct.

4   Q    And I want to ask you, just to get some baseline numbers,

5   how many -- what percentage of the Democratic party is African

6   Americans in Texas?

7   A    I don't think you register by party in Texas, and

8   certainly not by race, so that's an unanswerable question.

9   Q    So you don't know the answer to that question?

10  A    It's not an answerable question, for the reasons I just

11  told you.

12  Q    Well, when you make a determination that -- that -- that a

13  certain race votes for the Democratic party, based upon race,

14  isn't it important to know the number or percentage of that

15  party that is, in fact, that race?

16  A    That percentage I do know.  The percentage of African

17  Americans that vote Democratic is over 90 percent in Texas.

18  Q    Okay.  Do you know what percentage of the Republican party

19  is African American?

20  A    Again, you do not register by party in Texas and you do

21  not register by race, but I do know, based on my polarization

22  studies, that votes for Republicans by African Americans is

23  under 10 percent, and often well under.

24  Q    So the answer is you don't know the number or percent of

25  African Americans in the Republican party in Texas?

1   A    My answer is, for the reasons I explained, that's not an

2   answerable question.

3   Q    Do you know the percent in the -- of the Republic party

4   that is Hispanic?

5   A    Same answer.

6   Q    Okay.  Do you know the number of -- of Republican

7   officials that's been elected to office that are minority?

8   A    In the whole State of Texas?

9   Q    Yes, sir.

10  A    I don't have that figure, but I do know in the legislature

11  there are very, very few.

12  Q    Okay.

13  A    Just a handful, maybe a very small percentage, if at all.

14  Q    Have you made any attempt to look from the -- from the

15  state offices, governor, lieutenant governor, statewide elected

16  offices, as well as federal offices, such as congressman and

17  senator, to see what the distribution is?

18  A    No.  I know there was some, but I've not worked out

19  percentages.

20  Q    Okay.  And, of course, you're aware that Senator Ted Cruz

21  is -- is Hispanic?

22  A    Of course I am.

23  Q    And you're aware that he is a Republican?

24  A    I am aware.

25  Q    And you're aware that he was elected to the Senate, I'm

Lichtman - Cross / By Mr. Keister                    120

1  assuming by Republicans, correct?

2  A    Correct.

3  Q    Okay.  So your statement is not always true with respect

4  to polarization, correct?

5  A    I've got to explain my statement, because when you say "my

6  statement" --

7  Q    Well, I don't -- I'm just -- the statement that you made

8  here in court with respect to the fact that the races vote

9  for -- minorities vote for Democrats and Republicans vote for

10 Anglos.  That's not always true, correct?

11 A    I carefully qualify that by saying Republicans do

12 sometimes run minorities, like Ted Cruz or like the railroad

13 commissioner in 1998, or the Supreme Court Justice in 2008.

14 But even when they do that, they are still tied to the Anglo

15 base, and the Democrats are still tied to the African

16 American/Hispanic base.  So recruiting Republican candidates

17 does not change the structure of politics along racial lines in

18 Texas; that is critical to understanding the implications of

19 SB 14.

20 Q    So Ted Cruz was recruited by the Republican party, is that

21 your testimony?

22 A    He ran as a Republican.

23 Q    Correct.  Correct.  So racial polarization, while that may

24 be interesting, is not always correct?

25 A    Well, I think it is always correct, even in those

1   elections, as I explained, where the Republicans have a

2   minority, you still get the same pattern of racially polarized

3   voting of Anglos voting for Republicans and Democrats voting --

4   and Hispanics and African Americans voting for Democrats, which

5   helps explain the motivation here.  You can't change the

6   demography of Texas, but you can pass laws that place disparate

7   burdens for voting on African Americans and Latinos.  And in my

8   view, that's what was done here.

9   Q    Okay.  But you haven't made any determination, and let's

10  say the Appellate Courts in the State of Texas, have you made

11  any determination of how many minorities for the Republicans

12  are on the Appellate Courts in the State of Texas?

13  A    No.

14  Q    Okay.  Well, wouldn't that be important to know whether or

15  not this racial -- racially polarized voting thing is correct

16  is to see whether or not in practice it is correct?

17  A    Absolutely not, because as I explained, even when

18  minorities run as Republicans and get on positions like

19  railroad commission or the State Supreme Court or U.S. Senate,

20  they are being elected by Anglos, and the African Americans and

21  Latinos are voting for their Democratic opponents, regardless

22  of the race of the candidate, the patterns of the race of the

23  voter, which is what's critical here, and tied to SB 14 does

24  not change.  I specifically studied that in my racial

25  polarization analysis.

Lichtman - Cross / By Mr. Keister                    122

1   Q    So regardless of what -- what may or may not be the

2   reality amongst elected officials, you're going to stick with

3   that analysis --

4   A    My analysis --

5   Q    -- without -- without looking at -- at the true numbers?

6   A    I did look at racism involving -- I'll repeat myself

7   again -- I did look at elections involving minority

8   Republicans; and the same structure of Texas politics prevails.

9   And that is the structure that's relevant here, not whether or

10  not Anglos can elect some Republican office holders, and

11  overwhelmingly also the Republican office holders are Anglo.

12  Q    Okay.  But as you said here today, you have no -- no true

13  knowledge of what the numbers are with respect to minority

14  office holders who are Republican in the State of Texas,

15  correct?

16  A    I don't have specific quantitative knowledge but I do know

17  from my election analysis and from my examination of the state

18  legislature and the congress that the great majority of those

19  office holders are who are republican are also Anglo.

20  Q    But as you sat here today, you can't give us any names of

21  those people, correct or offices?

22  A    Names of who, Anglo --

23  Q    Other republican minority members of the republican

24  parties who are in fact in office today.

25  A    I think I mentioned some.  There is Ted Cruz.  There is a

Lichtman - Cross / By Mr. Keister                    123

1    Supreme Court Justice.  There's a railroad commissioner but

2    there's a few of them, very few of them.  I'm not sure I can

3    think of a single congressman in the State of Texas who is a

4    republican and a minority, maybe one but there's either none or

5    very, very few.  And very, very few in a very large state

6    legislature.

7    Q    Okay.

8         **MR. KEISTER:**  Brian, would you pull up a table three

9    of the doctor's report, page 27.

10   **BY MR. KEISTER:**

11   Q    Do you recognize this table Dr.?

12   A    I do.

13   Q    Okay.  Now at the bottom of this table you have a

14   asterisk, what is that asterisk?

15   A    Yeah.  There's a problem in using voting age population

16   with respect to Government employee's for Latinos because there

17   is a substantial undocumented immigrant population among

18   Latinos that not anywhere similarly present among African

19   Americans and Anglos.  So, I did two things to for adjust of

20   that.  One I directly adjusted conservatively an estimate for

21   illegal or undocumented immigrants and I also presented a

22   second table based on registered voters which takes out

23   entirely the issue of undocumented immigrants.

24   Q    Okay.  And then you set out in footnote three, on page on

25   38, what you did in that case.

Lichtman - Cross / By Mr. Keister                    124

1          **MR. KEISTER:**  Brian, do we have that?  Do you have

2    footnote three?

3    **BY MR. KEISTER:**

4    A    I think it's -- I think you're wrong.  I think it's --

5    Q    Am I wrong?

6    A    -- footnote 33 on page 28.

7    Q    I think you're right.  Yeah.  Can you just tell us what or

8    tell the Court what that footnote is?

9    A    Sure.  Should I just it or explain it?

10   Q    You can read it if you will.

11   A         "The Latino voting age population is adjusted to

12             eliminate undocumented immigrants who are not

13             eligible for Government employment.  According to the

14             PEW Hispanic Center, there were between One Million,

15             Four Hundred and Fifty Thousand and One Million,

16             Eight Hundred and Fifty Thousand undocumented

17             immigrants in Texas in 2010.  Although age

18             distribution is not available individually for the

19             states nationally, an estimated 87 percent of

20             undocumented immigrants who were of voting age.

21             Taking conservatively the lower bound of One Million,

22             Four Hundred and Fifty Thousand estimate and

23             multiplying by .87 yields a reduction of One Million,

24             Two Hundred and Sixty-one Thousand, Five Hundred from

25             the Latino voting age population."

Lichtman - Cross / By Mr. Keister                    125

1   Q    Okay.  Now Latinos are not the only group that has

2   undocumented immigrants in it, correct?

3   A    Yes but they are overwhelmingly the group that does in

4   Texas.

5   Q    Did you do any --

6   A    Certainly not Anglos and Blacks.

7   Q    Okay.  In your charts, that we're going to look at and I

8   believe you referenced this or have this asterisk several

9   times, did you adjust the African American and Anglo

10  percentages to account for undocumented immigrants that would

11  fall in those groups?

12  A    No, because the citizen voting age population is so close

13  to the overall voting age population that there's no necessity

14  to make that kind of adjustment.

15  Q    Okay.

16  A    It would be -- if anything changes in the small tenths of

17  a percentage.

18  Q    Have any you done any work to actually determine what

19  those percentages would be?

20  A    I did.  I looked at the citizen voting age population and

21  found that it was very, very close to the voting age

22  population.

23  Q    Okay.  And undocumented immigrants are not the only

24  immigrants living in the United States who are not eligible to

25  vote, correct?

1    A    Oh, yes.  That's of course correct.

2    Q    Okay.  What other immigrants would not be eligible to

3    vote?

4    A    Immigrants who are not citizens.

5    Q    Okay.  All right.

6    A    And who may be lawful residents, not undocumented.

7    Q    All right.  Now did you take those into consideration in

8    your adjustment in these tables?

9    A    No, because we're looking at the voting age population,

10   not the population eligible to vote because the Census data on

11   Government employees does not limit it to Government employees

12   who are citizens.  So if I took that out then I would be making

13   an apples to oranges comparison.  But I did take that out in my

14   next table where I was able to do so because I was dealing

15   there which I can't do with the Census, only with registered

16   voters.

17   Q    Okay.

18        **MR. KEISTER:**  Brian, would you pull up table five on

19   page 31, please?

20   **BY MR. KEISTER:**

21   Q    Now this table deals with voting age college students,

22   correct?

23   A    Yes.

24   Q    Okay.  And in this table, you show that percentage wise

25   there's more African Americans and Latinos attending college

Lichtman - Cross / By Mr. Keister                    127

1   than there are Anglos, correct?

2   A    Percentage wise, correct.

3   Q    Percentage wise.

4   A    Not numbers wise.

5   Q    And obviously, that does not indicate discrimination,

6   racial discrimination in Texas, correct?

7   A    No.  What does indicate racial discrimination is the

8   elimination of the option to include student IDs in SB 14 even

9   though such student IDs were in previous bills that republicans

10  had vouched for and are in the Indiana and Georgia laws that

11  republicans had said SB 14 was based on.

12  Q    Okay.  Well, wouldn't you agree that the fact that there

13  are percentage wise more African Americans and more Latinos in

14  the State of Texas attending college tends to show more of the

15  lack of racial discrimination than it does discrimination,

16  putting aside SB 14 for a minute?

17  A    Yeah I didn't look at that issue one way or the other --

18  Q    Okay.

19  A    -- as to why.  There can be many reasons for this

20  distribution of students.  I did not go behind it to look at

21  it.

22  Q    It's a fairly enlightening statistic though, isn't it?

23  A    If you say so.

24  Q    Well, wouldn't you think so?  I mean --

25  A    I didn't look at it for that purpose.  I think that's

1  typical of what's happened and it reflects the age distribution

2  as well.  Anglos tend to be older.  If you look at the

3  population of Anglos in my senior citizen category, it's about

4  double that of African Americans and Latinos so this further

5  reflects the changing demography of Texas with a lot of young

6  African Americans and Latinos.  Whether or not there is

7  discrimination in higher education in the State of Texas, I've

8  not studied that issue.

9  Q    Okay.  And once again on this chart did you take into

10 consideration the percentage of immigrants who are not -- who

11 are college students but are not allowed to vote because of

12 lack of citizenship?

13 A    Again, that would not be appropriate because then you'd be

14 having apples and oranges comparison.

15 Q    Okay.

16      MR. KEISTER:  All right, Brian, would you pull up

17 table seven on page 32.

18 BY MR. KEISTER:

19 A    And let me add to that answer.  Again as with employment,

20 I also drilled down to registered voters eliminating all of

21 those issues that you laid out.

22 Q    You have again the asterisk at the bottom but on that one,

23 you have footnote 27.

24 A    I think that's just a typo.  It's the same footnote.

25 Q    So it should be the same one --

Lichtman - Cross / By Mr. Keister                    129

1   A     Yeah.

2   Q     -- that you had previously.

3   A     Same analysis.

4   Q     All right.  So on this table; once again did you only make

5   adjustments with respect to Latino students?

6   A     Yes, for the reasons I've already explained.

7   Q     Okay, you did not make adjustments with respect to African

8   Americans or Anglos, correct?

9   A     No, and even if I had it would not change the comparison

10  at all.  You'd have the same distributions.

11          **MR. KEISTER:**  Brian, would you go to table six,

12  please?

13  **BY MR. KEISTER:**

14  Q     And can you tell us what this table represents, sir?

15  A     Yeah.  This is a different analysis of the distribution of

16  the student population using survey data from standard CCES

17  survey 2006 and 2008 so it was available at the time of the

18  debate over SB 14 showing that among registered voters, those

19  most directly impacted by SB 14 that the percentages of

20  students who are African Americans and Latino are more than

21  double the percentages of Anglos.  And these results as I

22  explained are statistically significant.

23  Q     Yeah, okay.  Without considering whether or not the ratio

24  to the Anglos, wouldn't you agree that that's a fairly small

25  number, 4.7 percent --

Lichtman - Cross / By Mr. Keister                    130

1    A     Not at all.

2    Q     -- of the college students?

3    A     If you look at the disparities, they're 2.5 and 2.4

4    percent.  And you're talking about a student population of well

5    upwards of one and a half million in the State of Texas so

6    you're talking about disparities affecting hundreds of

7    thousands of registered voters.

8    Q     And I'm not referring to -- once again, I'm not referring

9    to the differences of ratio between them.

10   A     Not hundreds of thousands but --

11   Q     Right.

12   A     -- Tens of thousands.  Excuse me.

13   Q     Okay.  All right.  Now, do you contend, is it your

14   position of this case that because of SB 14, 4.7 percent of the

15   African American students are no longer going to be able to

16   vote?

17   A     No, that's not what I suggest at all.  What I'm suggesting

18   is because of SB 14 the decision to eliminate student IDs that

19   places a disparate burden on African Americans and Latinos who

20   have more access to those kinds of IDs than the concealed carry

21   IDs that are retained in the State of Texas.  I am not anywhere

22   stating it as you stated it.

23   Q     Okay.  And the only way you can determine whether or not

24   that 4.7 percent is going to be able to vote despite SB 14

25   requirements is by making the determination of who or what

Lichtman - Cross / By Mr. Keister                131

1   percentage has one of the SB 14 IDs, correct?

2   A    Right and when the State Legislature passed SB 14 they had

3   no idea who did or didn't have one of their acceptable IDs

4   because they didn't study that issue.  But they did have

5   available to them this information that shows regardless, you

6   know, of this unknown distribution eliminating student IDs

7   poses a disparate burden on African Americans and Latinos.

8   Q    Okay.  Now we're several years past the implementation of

9   the bill of SB 14 and several years past the debate on SB 14,

10  correct?

11  A    Of course.

12  Q    Okay.

13        **MR. KEISTER:**  Can I get the ELMO turned on, please?

14  **BY MR. KEISTER:**

15  Q    I'm going to try this.  I'm challenged but we will see how

16  it -- I want you to help me fill out some information if we

17  can.  Now, back to your chart, 4.7 percent of African American

18  students is what was referenced in your chart, correct?

19  A    No.  My chart says 4.7 percent of African Americans who

20  are registered voters are also students.  It says nothing about

21  whether they have photo ID or not.

22  Q    Okay.  Well, can you tell me what percentage of that 4.7

23  percent that are registered to vote have a student ID with a

24  photo on it?

25  A    That I don't know.

EXCEPTIONAL REPORTING SERVICES, INC

Lichtman - Cross / By Mr. Keister                    132

1   Q    Okay.  So we are four years, three years past the passage

2   of that, of SB 14 and you don't know the answer for that,

3   correct?

4   A    Not to that particular question.

5   Q    All right.

6   A    But they would all have potential access to such photo

7   IDs.  I know in my institution we all have photo

8   identification.

9   Q    But your institutions not in Texas.

10  A    No, no.  I don't know how many do or don't but potentially

11  they would -- all these students would have access to photo

12  IDs.

13  Q    Well, potentially.  Have you done any studies to see if

14  the community colleges --

15  A    No, no.

16  Q    -- are of a -- okay.  So really and truly you don't know

17  whether or not all the colleges and universities issued photo

18  IDs in Texas, correct?

19  A    I don't know two things.  One, whether all of them issue

20  it and whether in fact if student IDs have been authorized

21  under SB 14 they would have been motivated to issue photo --

22  Q    Yeah.

23  A    -- ID's so their students can vote.  That would have been

24  a changed condition.

25  Q    All right.  Well, let's fill in the rest of it.  All

Lichtman - Cross / By Mr. Keister                    133

1    right, over here about -- under yes is SB 14 IDs.  And can you

2    tell us the percentage of that 4.7 percent of African American

3    students that have Texas driver's licenses?

4    A    I'll answer your question by saying neither myself nor

5    anyone else including the Texas State Legislature can answer

6    that question.

7    Q    Have you made any attempt to answer that question?

8    A    No and it's not necessary for my analysis.  I wasn't

9    tiering on that.

10   Q    How about Texas ID issued by DPS?

11   A    I think you're cutting off the top.

12   Q    Oh, I'm sorry.  Let me see what the top is.

13   A    I'll answer all your questions with the same response.

14   Nobody knows how to fill in those blanks without population

15   you've listed.

16   Q    Okay.  Well, we know how to fill in the blanks.  We don't

17   know the information; is that -- that's what you're saying,

18   correct?

19   A    Correct.

20   Q    Yeah.  So as far as you know the entire 4.7 percent may

21   very well have an SB 14 photo ID, correct?

22   A    And none of them may have and that's the point.  The State

23   Legislature when it passed SB 14 which is the focus of my

24   analysis, did pass SB 14 with an intent to discriminate didn't

25   know either and they afore quite clearly eliminating this

Lichtman - Cross / By Mr. Keister                    134

1    option when you don't know whether they have it or not was part

2    of the ways in which SB 14 imposed disparate burdens upon

3    minorities.

4    Q    So basically all you're telling the Court in your report

5    is there's 4.7 percent of African Americans who are in colleges

6    or universities, correct?

7    A    No.

8    Q    That's all that chart shows?

9    A    No.  That chart shows that whereas there were 4.7 percent

10   of African Americans, registered voters who are college and

11   university students, there are only 2.2 percent who are Anglo.

12   So the percentage of African Americans based on information

13   available to the State Legislature when they excluded the

14   student IDs was 136 percent higher than Whites, a 2.5 percent

15   percentage point difference which given the large number of

16   college students translates into tens of thousands of students

17   Q    And we have the larger number of African Americans and

18   Latinos here in colleges.  And those are a good thing but my

19   question to you is are you presenting this information to the

20   Court or the information in your chart, trying to represent to

21   the Court that that population of African Americans do not or

22   cannot get SB 14 IDs?

23   A    I'm not saying one way or the other because that is

24   unknown and was unknown and admitted as unknown at the time

25   they passed SB 14 excluding these kinds of IDs to which African

1   Americans and Latinos would have greater access than Anglos.

2   Q    Well, we're several years and several elections passed the

3   implementation of SB 14.  Based upon that, have you found

4   anything to help the Court to understand what part in this 4.7

5   percent of African Americans who are in colleges and

6   universities cannot get an SB 14 ID?

7   A    That's an unknowable question.  You can't isolate a

8   population that small and divide it into all of these

9   particular categories.  And my report is focused on what the

10  legislature knew and understood at the time.  What someone

11  might find three or four years later doesn't change the intent

12  of the legislature in 2011 which is why I limited myself to

13  information available to them at the time.  And at the time,

14  they had information showing full well that this form of ID

15  which is present in Georgia, present in Indiana, present in

16  previous bills and was eliminated has a disparate burden on

17  African Americans and Latinos.  And there was no justification

18  for them claiming that well all of these African Americans and

19  Latinos have other types of voting ID anyway because despite

20  being pressed they never studied that.

21  Q    Okay.  So you've reviewed all these documents.  You've

22  reviewed some statistics.  You haven't interviewed anybody in

23  this case, correct?

24  A    No, as I said --

25  Q    You haven't done any original statistics or research.

Lichtman - Cross / By Mr. Keister                    136

1   You've taken other people's statistics in this case, correct?

2   A    Well, I wouldn't say other people's statistics.  I've

3   taken statistics from the most standard sources used in social

4   science, namely the United State Census, Official State of

5   Texas statistics and two of the most extensive and respected

6   scientific surveys.

7   Q    Okay.  But now you've made up your mind in your report

8   that you think there's racial discrimination in 2011 and you

9   haven't made any efforts to look at the implementation today to

10  see whether or not the implementation of SB 14 bears out your

11  suspicions that there's racial discrimination when it was

12  passed?

13  A    Racially discriminatory intent --

14  Q    Yes, sir.

15  A    -- and I did in fact look at intent with respect to the

16  discretion provided to DPS showing that by providing this

17  discretion to DPS that was also a decision made that had racial

18  implications for African Americans and Latinos.

19  Q    Okay.  Now, wouldn't you agree that the universe of

20  colleges and universities in Texas, well there's more than

21  other states because of the size of our state.

22  A    A very large student population --

23  Q    Yes.

24  A    -- that's had more than 1.5 Million.

25  Q    But wouldn't you agree that those are somewhat isolated

1    places in the state, isolated institutions, from the standpoint

2    that if you wanted to determine college students and what SB 14

3    IDs they possess it would be fairly easy to do, wouldn't it?

4    A    It would be one of the most difficult undertakings you

5    would imagine for the very reasons you said.  You've got

6    students scattered.

7    Q    Well, but we --

8    A    Let me finish.  You have students scattered all over a

9    huge state.  It would be very difficult, very time consuming

10   and extremely expensive to do.

11   Q    Do you know whether or not the administration of those

12   universities and colleges would have that type of information

13   available?

14   A    From what I know about colleges and universities, they

15   certainly would not have all of this information that you've

16   laid out available.

17   Q    Well, what about some of it?  What about Texas driver's

18   licenses?

19   A    I don't know whether they do or don't.

20   Q    Okay.

21   A    I can only speak to my institution.  They have no idea

22   whether students have driver's licenses or not, I don't think,

23   except for those who park on campus.

24   Q    You're in a private university, correct?

25   A    Yes.

Lichtman - Cross / By Mr. Keister                    138

1  Q     Okay.

2  A     But I don't see why that would be fundamentally different.

3  Q     Well, I'm not sure it would be either, but it seems to me

4  like, if we're going to come in here and start talking numbers

5  and we want to try and represent things to the Court, that it

6  might be worth an effort to find out whether or not, in

7  reality, these 4.7 percent of African-American students do or

8  do not have one of the SB 14 I.D.'s.

9  A     In terms of other inquiries, that might be, but not in

10 terms of my inquiry, which is focused on the understanding and

11 intent of the state legislature in adopting this SB 14.

12 Q     Okay.  So, you -- you've established the position on the

13 intent of the legislature, and you've done -- you haven't gone

14 beyond that to try and do any research and find out whether or

15 not the actual turnout numbers in the elections and actual

16 things such as the possession of I.D.'s, whether or not that

17 supports your determination, correct?

18 A     I have not gone beyond the adoption of the legislation,

19 and there isn't yet an election that would enable you to make

20 reliable determinations because you've only had primaries and

21 municipal elections, which are not good samples for this

22 because they're very low turnout elections, and the most

23 motivated, dedicated, most informed voters are those who turn

24 out.  But all of that is beyond the scope of my study.  Others

25 have, as I sat and listened, undertaken that.

Lichtman - Cross / By Mr. Keister                    139

1   Q    Yeah.  Well, are --

2   A    And that's not part of my inquiry.

3   Q    Are you sure about -- about your statement that there

4   hasn't been statewide elections?

5   A    Oh, statewide general election.  There's been primaries

6   and local elections; hasn't been a statewide general election

7   since the implementation of this, as far as I know, with

8   statewide, top-of-the-ticket candidates.

9   Q    So, you're not aware of a 2013 general election in this

10  state?

11  A    I think that was a local election; it did not have

12  statewide candidates running.  But if you want to correct me,

13  I'm willing to be corrected.

14  Q    Well, I don't want to correct you, sir.  It's just -- but

15  you're not aware that there has, in fact, been a statewide

16  general election on November 5th --

17  A    I believe it was a statewide local election, not one that

18  had senatorial, gubernatorial, or those kinds of high-profile

19  candidates that spark turnout.

20  Q    So, you haven't spent a whole lot of time looking at how

21  SB 14 has actually been implemented in terms of the elections

22  in Texas because you're not aware that we actually had a

23  statewide election.

24  A    No, I was aware.  You're putting words in my mouth.  What

25  I said was it wasn't a general election with statewide, top-of-

Lichtman - Cross / By Mr. Keister                              140

1    the-ticket candidates.  The kinds of elections you've had so

2    far are low-turnout elections, and the most motivated and

3    informed voters turn out.  That's what I said, not what you

4    said I said.

5    Q    Okay.  Well, I won't hammer the point, but do you know

6    what the November 5th, 2013, election was?

7    A    Pardon me?

8    Q    Do you know what the November 5th, 2013 --

9    A    I didn't study that election, but I believe it was -- it

10   did not have the top-of-the-ticket, statewide candidates.

11   Q    Well, do you know what was on it, on the ballot, in 2013?

12   A    No.  I didn't study the election.

13   Q    Okay.  All right.  Now, if we were to go through this

14   process for the other races on -- on your chart, Latinos and

15   Anglos, would your answer be the same?  You don't know the

16   answer to any of these questions?

17   A    I don't, the legislature didn't, and I don't think it's

18   possible to answer those questions for this particularized

19   group.

20   Q    Because you haven't tried.

21   A    You can infer things, because it's a very small and

22   specific group, and, as we explained, how difficult it would be

23   to canvass every single college and university in the State of

24   Texas scientifically.

25   Q    Well, sir, when you try to strike down a duly passed law

1    enacted by the State of Texas legislature and signed into law

2    by the governor, don't you think that's -- that merits some

3    attention?

4    A    I'm not trying to strike down anything.

5    Q    Okay.

6              THE COURT:  I'm sorry; I didn't catch that.

7              THE WITNESS:  I said I'm not trying to strike down

8    anything.

9              THE COURT:  Okay.

10             THE WITNESS:  I'm just giving you my report.  So, you

11   know, those decisions are up to others.

12   BY MR. KEISTER:

13   Q    All right.  Brian, would you pull up Table Four, page 29,

14   please?

15             Now, this is similar to the table we've been looking

16   at for students, only this is for government employees,

17   correct?

18   A    Correct.

19   Q    Now, what have you done, sir, to make a determination as

20   to whether or not every government voter -- voter -- every

21   government employee in the state of Texas is issued a photo

22   I.D.?

23   A    I haven't made --

24   Q    By -- by the employer.

25   A    Yeah.  I haven't made that determination.  They all have

Lichtman - Cross / By Mr. Keister                    142

1    potential access to it, and if SB 14 had been passed, including

2    a provision to allow government employee photo I.D.'s, that may

3    well have affected the policies with regard to the issuing of

4    such I.D.'s for employees.

5    Q    Okay.  So, you're telling me that you really don't know

6    how many government employees in the state of Texas today have

7    photo I.D.'s issued by the employer, correct?

8    A    No, and, as I said, it might be quite different if SB 14

9    had been passed authorizing --

10   Q    Okay.

11   A    -- government employee I.D.'s.  But I do know every one of

12   these folks that we've listed here has a potential access to a

13   government employee photo I.D.  But I have not gone through

14   every employment in Texas to check out their photo I.D., and,

15   as I said, it wouldn't be relevant anyway because it would be

16   quite different if SB 14 had included this type of I.D.

17   Q    So, you don't -- when you're talking about government

18   employees, are you talking about government employees from a

19   municipal level --

20   A    Yes.

21   Q    -- all the way up through the state, all the way up --

22   A    Yes.

23   Q    -- to the judge here today?

24   A    Yes.

25   Q    Okay.  And --

Lichtman - Cross / By Mr. Keister                    143

1   A     And from the federal employees I know, being in

2   Washington, they do have picture I.D.'s.

3   Q     Okay.  But as we sit here today, you don't know from the

4   municipal level up at what point -- municipal, county, on up

5   the chain, which ones are issued photo I.D.'s and which ones

6   are not, correct?

7   A     No.  And, as I said, that inquiry is only of limited

8   value, because I believe that would change if SB 14 had

9   included government employee photo I.D.'s.  There would then be

10  an incentive to -- if, in fact -- and we don't know that --

11  there were some that didn't have photo I.D.'s, there would be

12  an incentive to have photo I.D.'s.

13  Q     Okay.  So, you aren't saying that the legislature should

14  have realized that every government employee in the state of

15  Texas has a photo I.D.  What you are saying is that, well, if

16  they had passed SB 14, then maybe the employers would start

17  issuing photo I.D.'s.

18  A     No.  What I'm saying is, what the legislature perfectly

19  knew based on information available to them, is that African

20  Americans and Latinos, because they had so much higher rates of

21  being in government as compared to Anglos, had a much greater

22  access to government I.D.'s, either because they already had

23  them, or because, if SB 14 was passed, there would be an

24  incentive.  The state employees I know do have picture I.D.'s,

25  but I'm not saying I studied this in Texas.

Lichtman - Cross / By Mr. Keister                        144

1   Q    Yeah.  I mean, (indiscernible) have no idea about

2   municipal, county, district, those type of things, correct?

3   A    No.  But the legislature certainly knew that there were

4   stark differences and that African Americans and Latinos had

5   much greater access to government photo I.D.'s, and I am

6   saying, had SB 14 passed, that would have been a very strong

7   incentive to make sure that these employees had not just

8   I.D.'s, but photo I.D.'s.

9   Q    But wouldn't you think that, considering all the

10  municipalities, all the counties, all the districts in the

11  state of Texas, that all of those would probably outnumber --

12  the employees in all those governments would probably outnumber

13  the employees in state government?

14  A    Uh, I don't know.  We could check that --

15  Q    Right.

16  A    -- but it's hard to know.

17  Q    Yeah.  But you -- you don't know.

18  A    No.

19  Q    And you're speculating, for some reason, that the state

20  legislature knew whether or not all those people had photo

21  I.D.'s when they passed SB 14.

22  A    Incorrect.  That's never what I said.  What I said was the

23  state legislature, had they looked at information available to

24  them at the time, would have known that African Americans and

25  Latinos, as compared to Anglos, are much greater, percentage-

Lichtman - Cross / By Mr. Keister                    145

1   wise, government employees and, therefore, had much greater

2   access to government employee photo I.D.'s, either those

3   existing at the time or those that would have been issued in

4   response to the state legislature passing this very important

5   bill, which included government photo I.D.'s as a means of

6   getting you authorized to vote.

7   Q    Okay.  So, to make a long story short, you don't know how

8   many government employees had photo I.D.'s when SB 14 was

9   passed, correct?

10  A    No.

11  Q    And all you're suggesting is that if -- if the legislature

12  had included government employee I.D., then maybe government

13  employers would decide to issue photo I.D.'s, correct?

14  A    Incorrect.  That's part of what I'm suggesting --

15  Q    Okay.

16  A    -- but the other part was there are also those who already

17  had government employee photo identifications, and if that was

18  not everybody, then the passage of SB 14 would then be an

19  additional incentive for government employees to have not just

20  I.D.'s, but photo I.D.'s.

21  Q    Okay

22  A    So, I'm saying two things that are related but distinct.

23  Q    Yeah.  Now, if we went back to --

24       Can you take that down, Brian?

25       **(Pause; voices and whispers off the record)**

Lichtman - Cross / By Mr. Keister                146

1          Yeah.  There you go.

2          If we go back to this and we were to substitute in

3   government employees instead of students, if we went through

4   the same exercise, how many government employees have

5   government I.D.'s, your answer would be you don't know,

6   correct?

7   A    I don't know --

8   Q    Okay.

9   A    -- and the legislature did not know at the time they

10  adopted SB 14, and they certainly could not have presumed,

11  since they didn't study it, that either all or even a majority,

12  or a great majority, of government employees or students had

13  other forms of I.D.

14  Q    I understand, but we're three years past the passage.

15  Now, going down the list of these I.D.'s on the right, can you

16  tell the Court the percentages of the government employees that

17  have each one of these SB 14 photo I.D.'s?

18  A    No, and I think it may be unknowable.

19  Q    Okay.  We had a gentleman --

20  A    Like with the students.

21  Q    We had a gentleman testify in here on Tuesday who was

22  with -- with the Beaumont (indiscernible) Fire Department, who

23  is deputy chief, and he testified that -- that in the fire

24  department they're required to have driver's licenses.  Were

25  you aware of that?

Lichtman - Cross / By Mr. Keister                    147

1   A      No; but it's possible.

2   Q      Would that surprise you?

3   A      No.

4   Q      Okay.  Have you made any attempt to determine how many

5   government employees in Texas, that their job would require

6   them to have a driver's license in order to be in that job?

7   A      No.  I have already answered those questions.

8   Q      Okay.

9          **(Pause)**

10         What is the difference between a university or an

11  employer issuing an I.D. to a person as opposed to an I.D.

12  being issued by the Texas Department of Public Safety?

13  A      Issued by different agencies; they may have different

14  formats.

15  Q      What about procedures?

16  A      Procedures may be different.

17  Q      Okay.  And what is the purpose of an identification?

18  A      An identification is so you know who you are and someone

19  else knows who you are.

20  Q      Okay.  And do you understand -- and I think you do because

21  of the testimony we've heard in this case -- that DPS goes

22  through a fairly stringent identification process before they

23  issue somebody a driver's license or an I.D., correct?

24  A      I'm not sure that's true for concealed carry, which --

25  Q      Well, let's -- I didn't ask you about concealed carry.

Lichtman - Cross / By Mr. Keister                148

1  A    Oh, you said DPS.  That's a DPS I.D.

2  Q    Okay.  Well, let's -- let's -- let's stick with driver's

3  licenses and I.D.'s, because we've heard a lot about that --

4  A    Sure.

5  Q    -- and concealed carries are even stricter, but we won't

6  go there.

7  A    All right.

8  Q    All right.  You understand that DPS goes through a fairly

9  stringent identification process before they issue a driver's

10 license or a Texas I.D., correct?

11 A    Sure.

12 Q    And what is the purpose of that?

13 A    The purpose of it is, when you're driving you're in a

14 position of responsibility, and they, therefore, go through an

15 identification procedure for you.

16 Q    And it goes further than just driving, correct?

17 A    Correct.  It could be used for other -- other purposes.

18 Of course.

19 Q    Yeah, and, in fact -- in fact, it is.  Wouldn't you agree

20 that the most common used form of identification in Texas is a

21 Texas driver's license?

22 A    I haven't studied that, but I wouldn't dispute that,

23 because it is the most commonly used form of identification

24 generally in the United States.

25 Q    Right.  And wouldn't that be one of the reasons, because

Lichtman - Cross / By Mr. Keister                    149

1    when people see a Texas driver's license in this state, they

2    recognize that as being identification that's reliable?

3    A    I'm not sure everyone thinks driver's licenses are

4    reliable.  I teach at a university, and lots of underage

5    students have fake driver's licenses.

6    Q    Well, are you aware of the efforts that DPS has taken

7    to -- to minimize the ability to forge driver's licenses?

8    A    You know what?  Every agency, including the ones I'm

9    familiar with, have undertaken such efforts, and students and

10   others who want fake I.D.'s are infinitely resourceful.

11   Q    Okay.  Would you agree that the university and an employer

12   does not go through the same identification process that DPS

13   does?

14   A    The employer might actually go through a more rigorous

15   process because you're employing someone, and I know when we

16   employ someone, we go through a very rigorous process, well

17   beyond anything that DPS would do to go through their

18   processes.  So, absolutely not for employers.

19   Q    Well, we're not talking about you, sir.  We're talking

20   about Texas and we're talking about -- we're talking about all

21   levels of society, not just college professors --

22   A    Understood.

23   Q    -- and my question -- hold on.

24   A    Okay.

25   Q    Have you done any studies to determine whether or not the

1    typical employer in Texas will do the same type of

2    identification process that the Department of Public Safety

3    does before it issues a driver's license or a personal I.D.?

4    A    I haven't studied that, but from extensive experience with

5    employment, it could well be that they undergo more extensive

6    checks.

7    Q    It could be, but have you done anything to study that?

8    A    No, no.  No, no.  I haven't studied that issue

9    specifically.

10   Q    Did you see anything in the legislature where that was

11   discussed?

12   A    Oh, absolutely.

13   Q    Okay.

14   A    It was discussed as to why --

15   Q    My question is:  Was there anything in the legislature

16   discussed about the reliability of a driver's license as

17   opposed to the reliability of a -- of a government -- not a

18   government, but of an employer I.D. or a student I.D.?

19   A    What I do recall being discussed, and it may not be

20   exactly on point, but it's close, is that driver's licenses are

21   pretty standard in format, whereas student I.D.'s and

22   government employee I.D.'s might vary in format.  And, so,

23   there might be some confusion in verification.

24   Q    Okay.

25   A    I do recall that being discussed, and I examined that

1    issue in my report.

2    Q    Yeah.  Verification is a different -- that's a valid

3    issue, but it's a different issue.  That was one of the

4    rationales for limiting the number of SB 14 I.D.'s, correct?

5    A    Right.  And I found that rationale did not hold.

6    Q    Well, I understand.

7    A    Yeah.

8    Q    But my question is -- we're not going towards the

9    recognition of it; we're going towards the underlying

10   identification process.

11   A    Right.

12   Q    Okay.  Was there any -- anything that was brought out by

13   the opposition in the legislature of SB 14 about whether or not

14   the underlying process of identification for the issuance of a

15   student I.D. --

16   A    Yeah.

17   Q    -- or an employment I.D. was the same as that of the DPS?

18   A    Only indirectly in that Indiana authorizes student I.D.'s,

19   and there was considerable testimony brought forth by the

20   supporters of SB 14 that Indiana had no problems whatsoever in

21   verifying identities and administering their law despite

22   authorizing both student and government I.D.'s.  So, we

23   actually have a laboratory to test whether that has caused

24   problems.

25   Q    Okay.  And you were a supporter of the Indiana photo I.D.

1    law?

2    A    I did not take a position supporting or against it, one

3    way or the other.

4    Q    Well, today are you a supporter of the Indiana photo I.D.

5    law?

6    A    I don't live in Indiana and have not thought about it

7    enough to take a position one way or the other.

8    Q    Were you a supporter of the Georgia I.D. law?

9    A    Same answer.

10   Q    Okay.  You're not going to tell us?

11   A    No.

12            **MR. KEISTER:**  All right.  Thank you, sir.

13            **THE COURT:**  Thank you.

14            **MR. HEBERT:**  I have no redirect.

15            **THE COURT:**  All right.  Thank you, sir.

16            **THE WITNESS:**  Thank you, your Honor.

17            **THE COURT:**  You can step down.

18        **(Witness stepped down)**

19            **MR. DUNN:**  Your Honor, consistent with your

20   admonishment not to send you looking for truffles, I have a

21   couple of interrogatories I want to bring to the Court's

22   attention.

23            **THE COURT:**  Okay.

24            **MR. DUNN:**  If I could see Plaintiffs' Exhibit 901.

25   And go with me, please, to page 75.  And zoom the bold

1  paragraph, please.  Since there is not a jury, I didn't intend

2  to read this; I was just going to bring it to the Court's

3  attention.

4         All right.  So, the essence of the question is to

5  identify the state and local agencies that issue authorized

6  identification.  If we go down to page 76, the list begins, and

7  it lists some of the I.D.'s we've talked about, and then it

8  begins below with various agencies.  Now, if you can tab down

9  to the next page, and the next page, and the next page, and the

10 next; so, those are the state agencies the State has identified

11 can issue identifications.

12        The next exhibit -- oh, excuse me, your Honor.

13        **MR. KEISTER:**  That the DPS issues identifications,

14 your Honor.

15        **MR. SPEAKER:**  Yeah, yeah, right.

16        **THE COURT:**  That D -- I'm sorry.

17        **MR. KEISTER:**  That these are the agencies to which

18 the DPS issues identifications.

19        **THE COURT:**  Okay.

20        **MR. DUNN:**  Now, to Plaintiffs' Exhibit 1033; and go

21 to page four, please.  So, the essence of the question here is

22 to identify holders of DPS identification cards that have

23 proven their U.S. citizenship.  And after the objection we'll

24 go to answer -- now, I'm sorry, Judge.  I meant to go to

25 Interrogatory Number Two on page eight.  So, this is a question

1    that asks about who's proven citizenship that has these

2    identifications.  And, then, answer 2A says that as of May 18th

3    there were 4,134,370 persons with an unexpired license --

4    driver's license, occupational license, or identification cards

5    who have -- are identified in the database as being U.S.

6    citizens.

7         The answer to 2B is that 14,039,884 is the number of

8    persons with an unexpired license, occupational license, or

9    identification cards who are identified as U.S. citizens in the

10   DLS database and who have provided DPS with proof of identity

11   that is not one of the following:  citizenship certificate,

12   naturalization, passport, birth certificate, et cetera; the

13   others mentioned.

14        Then, on 2C, the figure is 211,167, is the number of

15   persons with an unexpired license, occupational license, and/or

16   identification card who do not have citizenship identified in

17   the driver's license database.

18        And, then, 2D is 2,120,288, is the number of persons

19   with an unexpired license, occupational license, or

20   identification card who are identified as non-U.S. citizens in

21   the driver's license database.

22        That concludes the offer at this time.  Excuse me.

23   Maybe it doesn't.

24        **(Pause)**

25        That's it with that interrogatory.  On Plaintiffs'

155

1    Exhibit 901, that list of DPS issued I.D.'s are I.D.'s that are

2    not valid but are, nevertheless, issued by DPS.  I wanted to

3    make sure that was clear.  Mr. Derfner thought my -- my

4    comments were somewhat ambiguous in that regard.

5            **THE COURT:**  Right.  Okay.

6            **MR. DUNN:**  All right.  I will move on and call a live

7    witness.

8            **THE COURT:**  I got it.

9            **MR. DUNN:**  Okay.

10           **THE COURT:**  It was (indiscernible).

11           **MR. SCOTT:**  What is that bus, Chad?

12           **MR. DUNN:**  What bus is that?

13           **MR. SCOTT:**  The one you just threw him under.

14           **MR. DUNN:**  Oh.

15        **(Laughter)**

16           I thought I threw myself under it.  I intended to.

17           All right.  Plaintiffs call Senator Rodney Ellis.

18        **(Pause)**

19           **THE COURT:**  Good morning.

20           **MR. ELLIS:**  Good morning.

21           **THE COURT:**  If you'll raise your right hand, please.

22            **RODNEY ELLIS, PLAINTIFFS' WITNESS, SWORN**

23           **THE CLERK:**  Thank you, sir.

24    //

25    //

**DIRECT EXAMINATION**

**BY MR. DUNN:**

Q    All right.  Please tell us your name.

A    My name is Rodney Ellis.

Q    Senator Ellis, would you introduce yourself to the Court;
where you grew up, where you're from, that sort of thing?

A    I'm from Houston, and I grew up in a working-class family.
My father was a yardman; my mother was a maid.  And I'm the
second or third in my family to get a college degree.

Q    Where did you go to school?

A    Public schools in Houston, Xavier University in New
Orleans, Texas Southern, University of Texas to get a couple of
degrees.

Q    And one of those was a law degree; is that right?

A    Yes, sir.

Q    And a master's of public administration?

A    I think we called it public policy, but I'm not sure.
It's been a long time.

Q    Are you a licensed attorney?

A    I am.

Q    For how long?

A    Since 1979, '80.

Q    You represent a senate district from Houston; is that
true?

A    I do.

1    Q    Could you --

2    A    Senate District 13.

3    Q    Could you describe it for us?

4    A    It's an inner-city district, about 750,000 people,

5    predominantly minority, about 90 percent minority; I'd say

6    about 40 percent African American, 30 percent Hispanic, and,

7    you know, a growing Asian, South Asian population as well.

8    Q    And, then, how long have you represented that district?

9    A    It will be 25 years in February.  But who's counting?

10        **(Laughter)**

11   Q    As part of your representation, do you attend community

12   events and get to know your constituents?

13   A    I do.

14   Q    And what is the impression you've taken from getting to

15   know your constituents in terms of whether they want to vote by

16   mail, for example?

17   A    In the African-American community, there is a strong

18   tradition of showing up on election day.  And I try to break

19   that, but the mailing ballot program is -- you know, we

20   politicians like it, but it's expensive to go and do.  But

21   there is a tendency, even in my own household, to want to go to

22   the polling place on election day.

23   Q    Since you've been in the -- prior to joining the

24   legislature, what sort of roles did you play in politics in

25   Texas?

Ellis - Direct / By Mr. Dunn                                    158

1    A    Well, I was student body president in high school, and --

2    and I have worked for a number of the key elected officials in

3    the state.  I worked for Bill Hobby, who was lieutenant

4    governor a number of years; Buddy Temple, who was a railroad

5    commissioner; late Congressman Mickey Leland; and I'd say those

6    three would be my mentors.  So, I've been around politics a

7    long time; since high school, in fact.

8    Q    Have you had to deal with racial issues as it pertains to

9    redistricting, really since you've been an elected official?

10   A    I have, every cycle, regardless of whether the people in

11   power were Democrats or Republicans.

12   Q    And regardless of who was in power, what were the effects

13   on the minority community in one redistricting after another

14   that you've experienced?

15   A    Well, there's always been a big struggle.  Obviously,

16   we've made progress in Texas, but people don't like giving up

17   power easily.  You know, I can go back to even before I was in

18   office, working around the capitol, and my predecessor, Barbara

19   Jordan, and Craig Washington would have to fight with their

20   Anglo colleagues, who were Democrats at the time, in order

21   to -- to get them to share that power.

22   Q    Do you have some legislative accomplishments that you --

23   you know, you really hold out as some of the great things

24   you've accomplished?

25   A    Well, that would probably be in the mind of the holder,

Ellis - Direct / By Mr. Dunn                                   159

1    but I'm real proud of the Texas Grants Bill.  I think it is the

2    largest state-funded student financial aid program in the

3    country.  I'm real proud of my hate crimes bill.  I'm proud of

4    a budget that I was the lead author on in 2001, in part because

5    it was a Republican body.  I happen to be a Democrat and Black,

6    if you hadn't noticed, and I chaired the finance committee and

7    passed that budget unanimously on my side in the senate

8    chamber, and I think -- I think we funded a lot of things that

9    had been sorely underfunded for a long time.  And I'm real

10   proud of a number of the criminal justice reforms I've passed,

11   although I'm not -- certainly not a criminal lawyer.

12   Q    On the hate crimes bill, what brought that about?

13   A    There were a number of swastika painting instances on

14   synagogues in Houston and a horrific hate crime in which a

15   young man was targeted because he was gay.  And, so, the Jewish

16   community and some leaders in the GLBT community came to me and

17   asked me to put this bill in, and it was bubbling up around the

18   country nationally, the issue of hate crimes legislation.  So,

19   the initial bill that I put in, that's why I put it in, and I

20   passed two hate crimes bills; one that was probably

21   unconstitutional, but it had a strong reporting requirement in

22   it, so that's why I took the compromise and passed it.  It had

23   broad categories in it; the law requires you be specific if

24   you're going to charge someone with a criminal offense.  And,

25   then, the James Byrd Hate Crimes Act, which is the one we

Ellis - Direct / By Mr. Dunn                           160

1   operate under today, you know, that deal got a lot of national

2   attention, but I was the lead author on that bill.  But it took

3   about a decade.  You know, we meet every two years, so every

4   session the hate crimes bill was like that atomic bomb that

5   would blow up at some point.  So, I'm -- I'm not proud of the

6   fact that I had to water the bill down so much that it really

7   has rarely been used, but I am proud of the fact that it had

8   all those categories -- race, religion, sexual orientation --

9   but we eventually did come to a consensus and pass the bill.

10  Q    Well, I want to talk a little bit about how you were able

11  to do that, but first could you tell us who James Byrd was?

12  A    He was a victim of one of the most horrific racial hate

13  crimes in contemporary Western history.  A Black man was

14  dragged down the street in Jasper, Texas, targeted because he

15  was Black, and, you know, got a lot of media attention.  And,

16  now, I mentioned earlier the bill had been around, but when

17  that hate crime occurred, we asked the family if we could name

18  that bill in honor of Mr. Byrd, and that is the language that's

19  on the books today.

20  Q    Do you know about when that occurred?

21  A    I don't want to perjure myself, so don't make me guess,

22  but if it passed in 2001, maybe --

23  Q    Actually, I wasn't asking about the bill.  When the

24  drag --

25  A    Oh, the crime occurred.

                    Ellis - Direct / By Mr. Dunn                    161

1    Q    Yeah.

2    A    I want to say maybe nineteen -- well, Governor Bush was --

3    was in.  I'm not -- it was in the -- it was -- I'll just say

4    the mid-nineties; '97, '98, somewhere in there.

5    Q    Now, it's been -- it's been urged here that racial issues

6    in Texas are resolved.  Have you been to East Texas recently?

7    A    I have.

8    Q    What happened to Mr. Byrd in Jasper, is it your assessment

9    that Jasper's purged of its racial tension?

10   A    No, there are still problems.  You know, I -- I haven't

11   been to Jasper the last several years, but I keep up with,

12   obviously, that community since one of their more high-profile

13   citizens I named a bill after; I knew the family.  But they --

14   it was -- it's interesting how far we've come in a little East

15   Texas town like that two hours from Houston.  They ended up

16   with a African-American police chief named Rodney somebody,

17   some years after the James Byrd tragedy, and then, in part, I

18   think, as a reaction to people just not adjusting to the times,

19   this -- this guy had a pretty distinguished background; I think

20   he might have been a Texas Ranger or a trooper, firefighter --

21   they had to recall the election over the town having -- a

22   couple of the Black city council members having spearheaded the

23   effort to name this African American as police chief.  And a

24   strange quirk in that law, you could recall someone from a

25   district council seat by having a at-large vote.  Just a

                    EXCEPTIONAL REPORTING SERVICES, INC

Ellis - Direct / By Mr. Dunn                            162

1    strange quirk in their local ordinance.  But -- and I'm

2    familiar with that because that case got a lot of attention.  I

3    think it even hit the New York Times.  But, you know, Jasper

4    made tremendous strides; I thought after that tragedy things

5    were really going in a good direction.  I think that death

6    brought out the best in some people in that town, but it didn't

7    last too long.

8    Q    Is that something that's occurred in this century, those

9    events you just described?

10   A    Yes.

11   Q    Now, have you been to public government --

12   A    This -- this decade.

13   Q    This decade.  Excuse me.  Have you been to public meetings

14   in East Texas, like school board meetings or county

15   commissioner meetings or things of that nature?

16   A    I have.  I've been to some in Jefferson County and other

17   rural parts of Texas.

18   Q    Describe how the audience sets up for their government

19   meetings.

20   A    You know, I don't know if it's a -- I just sense -- and I

21   hope it's not because I'm a city guy, but I sense a difference

22   on the part of African Americans, in particular.  Sort of like

23   they go in and, you know, sort of head bowed, and the Blacks on

24   one side, the Whites on one side.  I mean, it's just the

25   strangest thing in the world.  I would -- unlike the -- a

Ellis - Direct / By Mr. Dunn                                   163

1    number of my urban constituents would have a sense you want to

2    go where -- you want to open it up a little bit.  You know, I

3    don't want to be accused of always going to my side.  But

4    that's just not the dynamic when I'm in a --

5    Q    And you're not suggesting that these governmental agencies

6    are requiring Whites on one side and Blacks on the other.

7    A    No.

8    Q    It just happens.

9    A    I just think it's hard to break -- to break tradition.

10   There's still a lot of tension.  I mean, I just sense more --

11   in East Texas, I just sense more -- of people not adjusting to

12   things, hopefully, having changed.  I remember that old sign in

13   Vidor, Texas, about the N word; don't let the -- don't let the

14   sun set on you in -- in this particular little town.

15   Q    And going back to the hate crimes legislation, about how

16   many years did it take you from when you first filed that bill

17   to when you were able to get it passed?

18   A    I went to the senate in 1990, filed a bill during the

19   early filing session, so from 1990 until 2001, and it was

20   awarded -- that was a unconstitutional one that I did pass.  I

21   knew it, and everybody else knew it; 1993.  But it had the

22   reporting categories there, and I knew that would -- I hoped

23   that would set the stage once the data was there to make the

24   case to help bring my colleagues along to pass the bill

25   eventually.

1   Q    On the final bill that you passed, what were some of the

2   obstacles you faced in the legislature to get it over the

3   finish line?

4   A    You know, the biggest tension, by the way, was, I think,

5   to be honest with you, over the term "sexual orientation";

6   although people wouldn't admit it.  You know, they'd hide

7   behind other things.  Hate is hate; crime is crime.  Because

8   you can make the argument it was really a law-and-order bill.

9   I was enhancing the penalty, as opposed to some of my

10  constituents say I should have been spending time trying to un-

11  enhance some penalties.

12  Q    Were there legislative rules that -- that you had to

13  overcome in order to get that bill passed?

14  A    Yeah.  There was no question that Texas would -- that my

15  colleagues would make sure that we respected the two-thirds

16  tradition before bringing a bill up in the Texas legislature,

17  even to the extent -- and the year the bill did pass, a number

18  of my colleagues were telling me that they would be out of

19  town.  One, in particular, who is a dear friend, I was

20  wondering, was I expected to buy the ticket?  Then it dawned on

21  me this member wanted to give me a window when the member would

22  be out of town and could justify being out of town so it would

23  be easier for me to get my votes.  And, then, one of the votes

24  that I had, who's one of my closer allies in life, happens to

25  be a Republican, decided although he committed to vote for the

1   bill, he wouldn't vote for it unless all of the members were

2   present.  I remember thinking it's because the governor asked

3   him to do that.  And if we operated under that rule, I could

4   just shut the place down.  I could just decide to be absent,

5   get sick every week, if I didn't want a bill to come up.  So,

6   clearly, that was a -- I mean, look; it was a -- it was a

7   long -- it was a long and interesting journey.

8   Q    So, we've heard quite a bit about the two-thirds rule.  Is

9   there a book we can go open up and find the two-thirds rule in

10  it?

11  A    Textbooks.  I mean, it's a tradition, very much based on

12  the tradition in the United States senate to have culture, to

13  shut down a filibuster.  I think --

14  Q    How does it work?

15  A    Well, you put a blocker bill up, a meaningless bill, to

16  change the name of a river or a dam or something, and you just

17  leave it there so that in order to bring up another bill you

18  would have to suspend the rules, which would require a two-

19  thirds vote.  And, you know, I'm -- I'm -- you know, it's been

20  in place for over a hundred years.  You know, it's probably a

21  good thing.  You know, in some ways I could make the case that

22  it helps you -- you know, we meet every year for 140 days;

23  several thousand bills are filed; you know, a little over a

24  thousand, maybe two thousand pass out of 5,000 -- whatever the

25  number is, don't hold me to it.  You know, it's a game for the

1    swift.  It's a $600 a month job; you're moving quick.  On that

2    two-thirds tradition in the senate, sort of serves the way a

3    calendars committee operates in the state house.  It slows

4    stuff down until the issue is ripe, until at least you do your

5    best to find consensus.  And if you can't find consensus, you

6    know, maybe -- maybe -- maybe it shouldn't pass.  Now, I

7    wouldn't always feel that way when it's my bill, but the truth

8    of the matter is, even with my hate crimes bill, you know,

9    maybe -- maybe the bill was ahead of its time.

10   Q     Did the two-thirds rule ultimately result in you having to

11   make changes to the hate crimes bill as you wanted to pass it?

12   A     Sure.  It meant that I had to -- you know, to -- it meant

13   I had to water it down and -- you know, I -- I would never use

14   the state's -- the public's money to pass my bills, but I

15   suspect the fact that I chaired the finance committee in 2001

16   may have -- may have had some subliminal impact on some of the

17   votes, but -- but I would never have -- have used that position

18   in order to pass my bills.

19   Q     Have there been some recent examples where the two-thirds

20   tradition has been ignored?

21   A     Yes.  My reading of history would be on insignificant

22   bills -- with all due respect, I assume that there are rules of

23   procedure in the court, but nobody raises them; they may not

24   get observed.  Same way with any legislative body, particularly

25   one like the Texas legislature, one that's moving so quick.

1    So, if it's a insignificant bill, you know, we don't have a --

2    a board on the wall in the senate; we do voice votes.  And if

3    nobody challenges you -- you know, sometimes I say the best

4    votes I've cast would be the ones when I'm over on the house

5    side trying to pass my bills and I leave my vote with the vote

6    counter; and sometimes they probably do a better job than I

7    would do.  But, you know, if it's a insignificant bill or if

8    nobody's paying attention.  But when we have changed to two-

9    thirds tradition, you know, my reading of history was during

10   the "Segregation Forever" special session in '50 something,

11   when they had all of this poll tax stuff and couldn't file a

12   lawsuit against the state, over -- over school integration, and

13   it was called the "Segregation Forever" special session, those

14   bills passed, you know, in which -- you know, you -- you only

15   had one minority member, Henry B. Gonzalez, but he couldn't

16   get -- the good news is that they couldn't get to a third --

17   they couldn't get two-thirds of the Anglo members at that

18   time -- they were all Democrats -- to vote for a lot of that

19   trash.  So, they had to do it without the two-thirds tradition.

20   That's a good thing, I mean, that they ended up having -- they

21   couldn't get all of them, two-thirds of them, to do it.

22        But then over redistricting, when I was a baby

23   senator, some of my colleagues in the opposite party,

24   Republican Party, we'd worked up a bill, and we agreed, but

25   they didn't want to get the heat for voting for it, so we

Ellis - Direct / By Mr. Dunn                    168

1   didn't do the two-thirds tradition then.  And, then, over these

2   racially explosive issues, like voter I.D. and redistricting,

3   in contemporary times.

4   Q    Was there a time where you had the opportunity to pass a

5   measure in the senate and get past the two-thirds rule?

6   A    Not a bill.  I know the issue came up in a -- in a

7   deposition over integrating the judiciary.  I think the Legal

8   Defense Fund filed a lawsuit challenging the Texas at-large

9   system of electing state, district, or county court at law

10  judges.  And, so, I took that issue up when Dan Morales was

11  attorney general and advocated that he settle that lawsuit the

12  way the attorney general of Mississippi and Louisiana did, and

13  much to my surprise, he did settle it.  And he put in some

14  language that said you have to get the governor, the lieutenant

15  governor, the speaker to sign off on it, both houses of the

16  legislature.  And the three state -- the governor and

17  lieutenant governor signed it and speaker signed it; the house

18  passed it saying we agree to the settlement; and the senate --

19  this was a resolution, not a bill.  I couldn't have gotten a

20  new resolution through, and someone told me:  You've got some

21  old resolution of yours saying the state ought to do a

22  proportionate judicial redistricting when you change these

23  courts of appeals so the population is similar.  It's just

24  luck.  Beginner's luck.

25  Q    What was lucky, that that resolution was next up in the

Ellis - Direct / By Mr. Dunn                            169

1   order?

2   A    Yeah.  It was -- you know, it was just -- it was one -- it

3   was just one sitting there that I probably wouldn't have

4   thought about passing, to be honest with you, until this issue

5   came up, and so I decided when it comes up I'll get recognized;

6   I'll just substitute this language.  It is germane; it is about

7   judicial redistricting; and -- so, some of my colleagues, both

8   Democrats and Republicans --

9   Q    Well, let me stop you.  So, what would -- what was the

10  vote you would need there if you had gone --

11  A    If it's a resolution, you need a simple majority of a

12  quorum.  You need 16 votes.

13  Q    And how enthused were your colleagues about you using this

14  opportunity you found?

15  A    They were not too happy with it.  And -- but, you know, it

16  was -- it was beginner's luck.  And, so, the -- you know, it

17  was -- there was a joke.  They had a -- they had a deal where

18  members broke the quorum when I was working for Bill Hobby over

19  changing the date of the Texas presidential primary so John

20  Connally would have the advantage in the Republican primary.

21  It was a Democratic legislature then, by the way, '75, '76, so

22  they broke the quorum.  And they called it the "Killer Bee"

23  incident.  Killer bees.  So, you could hear this buzz on the

24  senate floor when I was about to get recognized.  Bzzz.  And --

25  and, so this is -- this is another Killer Bee incident.  So,

1    the lieutenant governor said:  Rodney, you -- you're well

2    within the rules, but you're going to rip the heart out of this

3    senate.  And I know you're ambitious; you won't last long.  You

4    won't be here.  If he sees me now, after 25 years -- but he

5    said:  It's your choice, but you -- it's a mistake if you do

6    it.

7             So, we went in the back room and talked, and, you

8    know, I worked up a compromise with my colleagues.  Most of

9    them were Republicans; all of them were not.  They happened to

10   have been White.  It was a racial issue.  And, so, the

11   compromise was, if I'd back off and not push forward and get my

12   vote, which I was entitled to, by a simple majority vote, we

13   could meet in committee of the whole, and then I could try to

14   persuade the attorney general to let that be his mandate.

15   That's the senate expressing its consent to his settlement,

16   which was not needed, by the way.  No attorney general in

17   America, state attorney general, expects the legislature or the

18   governor to decide whether or not they can settle a lawsuit,

19   but that's what we did.  And we settled the lawsuit, and then

20   the judges went to federal district court and gave me a

21   spanking.

22       **(Laughter)**

23            So, then, maybe -- maybe -- maybe that's why they

24   agreed to my compromise; they knew they'd get me in the

25   courthouse.

1  Q    Now, transitioning to Senate Bill 14, you understand that

2  to be the 2011 photo identification bill that passed?

3  A    Yes.

4  Q    You were in the courtroom earlier to hear Senator Davis's

5  testimony.  You recall that?

6  A    Yes.

7  Q    She testified that there was just a handfuls of days'

8  notice from when the bill was filed to when the hearing and

9  debate was had in the senate.  Is that your recollection?

10 A    That is.

11 Q    I want to ask you; you proposed some amendments.  Is that

12 true?

13 A    I did.

14 Q    And I'll get to those in a moment, but when you -- would

15 you explain to the Court how it is that you or your staff

16 prepare an amendment?

17 A    Well, you know, we get ideas from people.  You know,

18 sometimes it's seat of the pants.  You know, this issue had

19 been around; the previous sessions, you know, at least two

20 cycles.  So, you know, when -- I get together with people that

21 I agree with.  You know, in our senate, it really hurts your

22 feelings real bad when you don't get your votes.  I mean, this

23 is a fairly -- historically, it's been a collegial body.  So,

24 it doesn't help one's career to bring something up and you

25 don't have the votes.  So, I knew I wouldn't have the votes,

1   but, you know, I probably had a list of a good 30, 40

2   amendments.  You know, my staff and I called around to other

3   states to see when the issue came up in Georgia and Indiana

4   what -- what happened, what was happening as people talked

5   about it in other places, you know, from press accounts.  You

6   just get ideas and you try to think of stuff that would make

7   the bill better and also to make a point, hopefully to

8   persuade -- in my case, you know, some of my amendments were to

9   persuade some of my colleagues that they were going -- that

10  they would not get a good feel -- reading about what they did

11  20 years after they leave the body.

12  Q    In terms of the actual language of the amendment, who will

13  write that up?

14  A    My staff will help me.  You know, I'll call and try to get

15  as much expert advice as I can; leg. council if you have time.

16  The best thing to do is to try to get leg. council to write it

17  up.  On these amendments, during that session, this thing was

18  on a spaceship.  I mean, it was moving quick.  So, I mean, I'd

19  be hard pressed to go say that I took these amendments to leg.

20  council or anybody did.

21  Q    How about -- I'm sure you're familiar with fiscal notes;

22  is that right?

23  A    Yes.

24  Q    Is it the regular practice in the Texas senate for

25  amendments to have fiscal notes?

1    A    No.

2    Q    How many bills have you passed?

3    A    I'm well over 600 now.

4    Q    Now, have you got a general estimate of how many

5    amendments you've been able to move on to some legislation?

6    A    Well, sometimes my bills come in the form of amendments.

7    Q    How --

8    A    Quite a few.

9    Q    How often do you see a fiscal note associated with an

10   amendment that's offered?

11   A    Well, you can't get an official fiscal note until a bill

12   has been set for hearing.  You know, you've got 140 days.  I

13   have 6,000 bills, you know, how many amendments.  So, the

14   system just would collapse if you gave everybody a fiscal note.

15   So, sometimes the way you kill somebody's bill is you never set

16   it for a hearing, because if it is set for a hearing, before

17   it's heard, they'll have to come in with a fiscal note from

18   LBB.  But if it's simply an amendment, unless it is an

19   amendment that was heard somewhere else as a bill, turning a

20   bill into an amendment, you won't have a fiscal note --

21   Q    Have you accept --

22   A    -- unless you make up your own.

23   Q    Have you accepted countless amendments from other senators

24   on your bills without having a fiscal note?

25   A    Oftentimes.

                    Ellis - Direct / By Mr. Dunn                    174

1    Q     With regard to the amendments that were advanced by

2    members of the legislature that represent the minority

3    community, was there coordination of that, to some degree?

4    A     Not enough, based on the success we had.

5          **(Laughter)**

6    Q     But there was some --

7    A     But there was coordination.

8    Q     I mean, is it fair to say that the various Democratic

9    members were attempting to organize a unified effort to defeat

10   the bill?

11   A     Yes, but with this caveat.  Not because they were

12   Democrats.  Look, on some of my amendments I would go -- you

13   know, as I said, it really hurts your feelings.  When you look

14   at those amendments, I think in some ways Senator Davis may

15   have offered so many because she hasn't been around as long.

16   You know, when people just get accustomed to voting you down,

17   bad habits are hard to break.  So, you know, I go -- I talk to

18   my colleagues in both parties trying to get my votes and trying

19   to see if there's a level to which I can compromise and it's

20   still meaningful but it doesn't go so far that it's

21   meaningless.  So, look, on my amendments, you know, I talk to

22   my colleagues who happen to be in the opposite party, and they

23   talk to me about -- and there's a lot of stuff of theirs that I

24   voted for and then hope to God it didn't stay in the law.

25   Q     As a way to try to get votes on your amendments.

Ellis - Direct / By Mr. Dunn                    175

1   A    Well, as a way to try to get votes and sometimes as a way

2   to just try to get along.  Small body.  You know, you're going

3   to -- I've been there 25 years.  You've got to live with

4   people, you know.  You have to live with people a long time.

5   They don't fall over dead that often in the senate.

6   Q    In 2011, in terms of the number of -- in terms of the

7   Democrats that were there, how many of the Democrats or what

8   percentage of the Democrats there represented communities that

9   were majority minority?

10  A    All of them.  Unfortunately, we pack these districts, or

11  some would say ghetto-ize these districts so much, you know,

12  unfortunately, virtually all of them minorities.  You know,

13  hey, I've got a 90 percent minority district.

14  Q    Let me show you a document, if I could have the ELMO,

15  please.  For the record, this has been -- it's not an exhibit

16  as of yet, but it's marked as CU-PRIV, five leading zeroes, and

17  then a nine, and then the next page is a ten.

18         All right.  This is a document that's been stated

19  here summarizes the senate amendments that were offered on the

20  photo I.D. legislation, and actually let me just give you a

21  copy if that would help you.

22         May I approach, your Honor?

23         **THE COURT:**  Yes.

24  //

25  //

1    **BY MR. DUNN:**

2    Q    All right.  So, it's been the testimony, or it's been

3    suggested here, that there was a rigorous and fair debate in

4    the senate where many Democratic amendments were accepted.  Is

5    that your recollection?

6    A    No.  You know, if it was rigorous -- you know, this bill

7    took a couple of days, I mean, early on in the session.  This

8    is -- this thing was on a spaceship.  I mean, it -- was trying

9    to rocket this bill out of there.

10   Q    Now, you could see that there were some amendments that

11   were accepted that were offered by Democrats; is that true?

12   A    Yes.

13   Q    I'd like to walk through some of these, if I could,

14   starting with number five.  Do you see that amendment?

15   A    The one by Zaffirini.

16   Q    And that requires a photographic notice or the photo I.D.

17   notice to be posted separately from other election notices?  Do

18   you see that?

19   A    Yes.

20   Q    Was that something that was adopted because there was an

21   understanding in the senate the federal law already required

22   that?

23   A    You know, I don't remember, but, hey, to me it's pretty

24   non-controversial.  I mean, how could anybody be against an

25   amendment that says what you're saying you want the bill to do?

1    You don't want people to vote unless they have a appropriate

2    photo I.D., so you're putting a public notice up that's

3    separate from all of those other notices that may be around a

4    polling place.

5    Q    The next one that's in bold is number 18.  I assume that

6    references Senator Hinojosa on the concealed gun offering.

7    That was an amendment to allow concealed handgun permits to be

8    used as I.D.'s; is that right?

9    A    That's correct.

10   Q    And how did you vote on that?

11   A    You know, I -- I -- I'm -- I think I voted for it, because

12   I -- you know, I looked at the -- the -- my old deposition when

13   somebody asked about that, and I think I said something -- I

14   had a joke about, you know, I'm not a big gun guy, but I think

15   I would have been expected to vote against it.  I knew it had

16   the votes; I think I voted for it.

17   Q    Why so?

18   A    Well, in part, I knew it was going to pass, and I was

19   trying to set the stage to, you know, show that I'm a -- my --

20   I had one that's the next one, so I was trying to curry a

21   little favor.

22   Q    What's the next amendment that was offered, then, by you?

23   A    Number 19 was a student I.D. amendment.

24        **MR. DUNN:**  Your Honor, for the record, that's at

25   Plaintiffs' Exhibit 13, page 21.

1    **BY MR. DUNN:**

2    Q    And what would -- in short, what would that amendment have

3    done?

4    A    It would have let people at public universities use their,

5    I would argue, state-issued I.D. because they're public

6    universities.  Now, my recollection is I did not include

7    private universities.  I'm not sure; that's my recollection.

8    But I do remember going around talking to people on the floor,

9    some of -- trying to get some votes from some of my Republican

10   colleagues saying, hey, it's a state-issued I.D.  You know, if

11   we want to change the rules on it, you all are with the state,

12   do it.

13   Q    Were you able to get enough support for it to pass?

14   A    No.

15   Q    Why not?

16   A    In my mind, I think it was a foregone conclusion that they

17   were going to do what they were going to do, and they knew the

18   bill had a disparate impact, and intended for it to have a

19   disparate impact.  And, look, they know that -- you know, look,

20   it's no secret; you don't get to where my colleagues are in

21   government without having a pulse of your community and the

22   state, the demographics.  So, they -- you know, I think they

23   knew that a driver's license is something that a good number of

24   minorities would not have.  Student I.D. would be one easier to

25   get, and the growth in Texas indicates, you know, those young

                    Ellis - Direct / By Mr. Dunn                    179

1    people, more and more, who are at our universities happen to be

2    minorities.

3    Q    I'm going to turn now to the same document with -- ending

4    in Bates Number 10.  And you'll see there number 23, Senator

5    Lucio, a Democrat, offered an exhibit about expired license,

6    giving a 60-day window.  That one was accepted; is that right?

7    A    That's correct.

8    Q    Now, there's number 32.  Senator Watson, a Democrat from

9    Austin, offered the Ogden Amendment; is that right?

10   A    That's correct.

11   Q    Now, tell us what an "Ogden Amendment" is.

12   A    Senator Ogden was chair of the finance committee that go-

13   around, and -- you know, I -- I think that the notion -- the

14   Ogden Amendment is what used to be called the "Ratliff

15   Amendment" when I was finance chair and Bill Ratliff, a state

16   senator, was the presiding officer.  And he had -- he had us

17   adopt language that said if you add something to a bill that

18   costs money, it does not go into effect until the money is

19   appropriated.  Now, you know, I don't know; I'm guessing when I

20   was finance chair they wanted to make sure I didn't pull

21   anything slick.  So, which is why they called it a "Ratliff

22   Amendment" instead of "Ellis Amendment," since I was the

23   finance chair.  But just in case I let something go in to the

24   budget or in a bill, usually you'll turn to the finance chair

25   if we don't know what an amendment costs, and that person will

Ellis - Direct / By Mr. Dunn                    180

1   object, or if somebody else says your amendment is going to

2   cost a million dollars, usually they'll look over to the

3   finance chair, because this is a game for the swift and moving

4   fast, and that person will give the nod or not --

5   Q    So --

6   A    -- sometimes even if they don't know.  So, that -- that

7   was to make sure if something got on and it cost money, it

8   would not go into effect until it was appropriated.  So, it's

9   really -- it's a polite way of letting the system work, so you

10  could put stuff on, and it wouldn't mean anything if the money

11  was not appropriated.

12  Q    And the Ogden Amendment passed?

13  A    Sure did.

14  Q    So, does that have the effect of freeing up the senate to

15  accept any amendments it thought were appropriate that might

16  have a fiscal impact and later dealing with it in the budget

17  bill in terms of funding that amendment?

18  A    That's correct, and that's why even people who knew it

19  would likely gut their amendment would vote for it, because it

20  gave you the ability to make your case at a later point during

21  the 140-day session.

22  Q    You also offered an exhibit -- or I mean an amendment,

23  Amendment 28, that offered same-day registration.  Is that

24  right?

25  A    I did.

Ellis - Direct / By Mr. Dunn                    181

1   Q    And, for the record, that's Plaintiffs' Exhibit 13, page

2   26.  And what was your -- what was your purpose with that

3   amendment?

4   A    You know, Texas is a -- you know, not -- the --

5   virtually -- we're virtually at the bottom in terms of voting

6   participation.  People just don't -- they don't vote.  So, I

7   figured if you're going to put these barriers up to make it

8   more difficult to vote, when we already have such low

9   participation levels, I could offer something on the other side

10  of the equation to help increase voter participation, and

11  knowing this bill was going to pass, you know, same-day

12  registration ought to be easier to implement, because you'd

13  have to have all these new requirements in order to do same-day

14  voter registration, which I think they do in -- I saw it in

15  Iowa when I went up for the presidential primaries, and I

16  think -- it might be Minnesota is one of the leaders in this

17  space.

18          **THE COURT:**  Shall we break?

19          **MR. DUNN:**  Sure.

20          **THE COURT:**  I suspect he may take a while, even on

21  cross, or --

22          **MR. SCOTT:**  There will be, your Honor.

23          **THE COURT:**  Right.  So, let's go ahead and break for

24  lunch and return at 1:10.

25          **MR. DUNN:**  Thank you, Judge.

1          **THE COURT:**  You all can be excused.

2          You can step down, sir.

3          **THE WITNESS:**  Thank you.

4       **(Witness stepped down)**

5       **(A recess was taken from 12:08 p.m. to 1:08 p.m.; parties**

6  **present)**

7          **THE CLERK:**  Please be seated.

8          **THE COURT:**  Yes.

9          **THE CLERK:**  Counsel, if you could please announce

10  your name each time you speak.  Ms. Cayce is -- she's filling

11  in for Genay this afternoon so she may not be as familiar with

12  you-all.

13          **MR. DUNN:**  This is Chad Dunn for the Veasey

14  Plaintiffs, continuing examination of Senator Ellis.

15                **DIRECT EXAMINATION (CONTINUED)**

16  **BY MR. DUNN:**

17  Q    All right, Senator.  There's one more amendment that you

18  offered that I'd like to discuss.  It had to do with some

19  information reporting.  Do you recall that?

20  A    Yes, I do.

21  Q    And for the Court, that's Plaintiffs' Exhibit 13, page 28.

22  What would that amendment have done?

23  A    This is an amendment that would have required the

24  collection of all of the data related to who has whatever kind

25  of I.D.  It was a combination of all of the questions that I

Ellis - Direct / By Mr. Dunn                                183

1    could think of that were asked during the debate and it would

2    go forward so that at least if one would say that they don't

3    know it has a district impact or argue it does not have a

4    district impact, we would have someone collect the data and

5    know.  And, you know, that's -- sometimes that's expensive to

6    get.  So the State would have -- the Secretary of State would

7    have compiled that data for us.

8    Q    Would that information have revealed one way or the other

9    whether Senate Bill 14 was having a discriminatory impact had

10   it been accepted, the amendment?

11   A    I think it would have.  I think we knew that.  I mean,

12   most reasonable people knew it.  But, you know, this would have

13   documented it.

14   Q    Okay.  And what was the result of that amendment?

15   A    It failed.

16   Q    Would that amendment have done anything to delay the

17   implementation of Senate Bill 14?

18   A    No.

19   Q    Would it have done anything to water down, so to speak,

20   the requirements of Senate Bill 14?

21   A    No, sir.

22   Q    Do you think it would have had any fiscal impact to it?

23   A    I think most of that data is readily available.  It would

24   not have had any fiscal impact because of the so called

25   (indiscernible) amendment we talked about earlier.  So, unless

Ellis - Direct / By Mr. Dunn                            184

1    it was -- if the argument would be made that it would cost

2    money, well don't fund it and it would not have gone into

3    effect.

4    Q    Now, while you were debating Senate Bill 14, were you

5    asking questions from State agencies or from the Bill sponsor

6    about what effect it might have?

7    A    I'd ask questions during the debate, ask questions

8    privately, and throughout the process.  As I stated earlier,

9    this thing was on a fast pace.  And I think we had an agreement

10   on both sides.  Everything that was in the record from the

11   previous debate two years earlier would be in the record again.

12   And I'm just saying that because I don't want someone to go

13   look at the record and say I don't see you asking this, that,

14   but -- you know, so everything was included, but --

15   Q    What was the response you would receive when you'd ask for

16   specific data on what the effects of Senate Bill 14 would be?

17   A    My (indiscernible) and friend Senator Frazier would say

18   something to the effect, "I'm not advised, ask the Secretary of

19   State."

20   Q    And when you'd ask the Secretary of State, what would you

21   learn?

22   A    Nothing.

23   Q    And you mentioned earlier on the James Byrd Hate Crimes

24   Bill that as you worked it through the process, it had to

25   become watered down, I think you said?

Ellis - Direct / By Mr. Dunn                        185

1   A     That's correct.

2   Q     What was the situation with the Photo I.D. Bill over the

3   sessions it was considered?  Did it become less restrictive or

4   more?

5   A     It became more restrictive.

6   Q     Now, at some point in time during the debate, Senator

7   Frazier made some comments about it wasn't his intent to have a

8   discriminatory affect or something in that regard?

9   A     That's correct.

10  Q     And what was your response to that?

11  A     You know, when I was laying out one of my amendments, you

12  know, I was polite.  You know, you normally don't on the Senate

13  floor -- you know, rarely have I lost my temper, so to speak,

14  even on an emotional Bill like this one.  I can only think of

15  one time that I've done that, might have lost my temper.  But I

16  made some language about -- you know, "Senator Frazier, I know

17  your intent was not" -- you know, it's kind of like being nice.

18  I made the analogy that if you watch debates on C-Span, if

19  you're an insomniac, you hear somebody refer to somebody as the

20  general Congresswoman to distinguish Congressman and then

21  proceed to rip them apart in a not so gentle way.  I mean, it's

22  just one of the things that we do.  And my colleagues do it as

23  well, sometimes the ones who are most adamantly opposed to

24  something I would do, will pay me the -- just the nicest

25  compliments before killing my legislation.

Ellis - Direct / By Mr. Dunn                    186

1  Q    Did you have the impression that Senator Frazier didn't

2  have his heart in the Bill?

3  A    I did because he's a very intelligent colleague.  You

4  know, there's windmills out there that you look at here is in

5  part of a legislation that he did.  It gave us so much wind

6  energy in Texas.  Well read.  Reads a lot.  I know him.  I'm

7  very close to him.  It was out of character for someone to have

8  a major Bill and just say you're not advised, almost to the

9  point of being embarrassing.

10 Q    Did you ever talk to Senator Frazier to the effect of why

11 are you carrying this Bill?

12 A    I have some comments in a deposition so I don't want to

13 get into -- you know, revealing somebody else's private

14 conversation to have somebody object but there's language in a

15 deposition where he made a passing comment.  I asked the

16 question, "Why are you --"  He made a passing comment about,

17 you know, it was my turn.  I drew the bean.  You know, I got

18 the straw.  Something often times other members will say or

19 somebody -- he was asking me who's a friend -- you know,

20 Rodney, why are you -- I'll say, "My turn."

21 Q    Now, there's been some testimony shown here for Senator

22 Frazier and Lieutenant Governor Dewhurst where they assert that

23 both of them were trying to work out a consensus on Senate Bill

24 14; is that your recollection?

25 A    It's not my recollection.

Ellis - Cross / By Mr. Clay                187

1  Q    And was there an effort to work with you or other members

2  who represented minority communities to address your concerns

3  about the Bill's impact?

4  A    No.

5  Q    But based upon your experience -- extensive experience in

6  legislature and in this Bill in particular, do you have an

7  opinion on whether or not Senate Bill 14 will have a

8  discriminatory effect?

9  A    I'm convinced that it will.

10  Q    Do you have an opinion on whether or not Senate Bill 14

11  was adopted by the legislature as a whole with a discriminatory

12  purpose?

13  A    I'm convinced that it was.

14  Q    Thank you, Senator.

15       **MR. DUNN:**  I pass the witness.

16                          **CROSS EXAMINATION**

17  **BY MR. CLAY:**

18  Q    Senator, how are you today?

19  A    Fine.  How are you?

20  Q    I think we've met a couple of times, but I know you meet

21  and know a lot of people so you may not remember me.  My name

22  is Reed Clay.  I'm here for the Attorney General's Office today

23  and just want to ask you a few follow up questions.  Were you

24  present this morning when there were some testimony from

25  Senator Davis that was read into the record?

1    A    I was here for some of it.

2    Q    Do you recall the testimony where she was asked if she

3    agrees that members of the Texas legislature have a duty to

4    represent their constituents, and she replied "yes?"

5    A    I don't recall that part specifically.  I may have been in

6    (indiscernible).

7    Q    Do you recall if when asked, "Would you consider that an

8    important duty of any elected official to represent

9    constituents and represent policy in constituent's favor," she

10   replied, "yes?"

11   A    I think so.

12   Q    Okay.  I give you Defendants' -- it's 0987.  This -- her

13   deposition was taken in June of 2012.  You'll see here, the

14   title of this article is "Democrat Wendy Davis Not Representing

15   Senate District 10 Voters by Fighting the Voter I.D. Law in

16   Court."  This was in the midst of the Section 5 preclearance

17   case, right?

18   A    I think it was.

19   Q    Okay.  And you see here --

20        **MR. CLAY:**  Can you scroll down just a little bit,

21   Brian?

22   Q    Do you see where it says that, "State Senate District 10

23   General Election Voter Survey?"  The question asks --

24   A    Yes.

25   Q    -- "do you favor or oppose requiring voters to provide a

Ellis - Cross / By Mr. Clay                              189

1   valid photo I.D. to vote?"

2   A     Yes, I do.

3   Q     And it was asked of the folks there in Senate District 10

4   which is Senator Davis' district, correct?

5   A     That's correct.

6   Q     And you see where it says, "We're broken down along party

7   affiliation and we have 89 percent of Republican primary voters

8   that favor voter I.D."  Do you see that?

9   A     I see it.

10  Q     "And 57 percent of Democratic primary voters approve of

11  voter I.D.?"

12  A     I see it.

13  Q     "And then 77 percent of independent voters," correct?

14  A     That's correct.

15  Q     And then they break it down along racial lines and it says

16  that among Black voters, 62 percent favor voter I.D.; do you

17  see that?

18  A     I see it.

19  Q     And among Hispanic voters in Senate District 10, 69

20  percent of voters favor voter I.D.; do you see that?

21  A     I do.

22  Q     And then down here at the bottom, White voters in Senate

23  District 10, 79 percent of them were in favor of voter I.D.,

24  right?

25  A     Yes, sir.

1  Q    Okay.  Do you know who Stan Stanart is?

2  A    I think he's a Harris County Clerk or was a Harris County

3  Clerk.

4  Q    Are you aware that he gave deposition testimony in this

5  case?

6  A    No.

7  Q    So, you didn't know that when he was asked about if there

8  were any complaints regarding implementation of voter I.D.,

9  that he had received few?

10 A    I don't think I've read his deposition.

11          **MR. CLAY:**  Can we put that up?

12 Q    The question, "Have you had any complaints from citizens

13 about the voting photo I.D. requirement?"

14          "ANSWER:  I'm sure there's some, yeah.  There some

15          small people that complain about it, yes.  But not

16          very many.  I mean, in the big picture, I thought

17          the election went well.

18          "QUESTION:  Would you have lodged these complaints

19          by phone or mail or e-mail or all three?

20          "ANSWER:  I've got probably -- I've got -- probably

21          got a few e-mails and a few by phone but like I said,

22          pretty small numbers."

23 Do you see that?

24 A    I see it.

25 Q    And earlier, you were testifying about Jasper, Texas,

1    right?

2    A     Yes.

3    Q     Is that in Jefferson County?

4    A     It was east Texas.  I'm not sure of the county.

5    Q     Okay.  Do you know who Debbie Newman is?

6    A     No.

7              MR. CLAY:  Could you put up her deposition testimony?

8    Q     She's the County Clerk there.  And when asked about if she

9    had had any complaints from constituents about the photo I.D.

10   law, she replied, "No."  Were you aware of that?

11   A     No, I was not.

12   Q     And you represent Harris County, correct, or part of it,

13   correct?

14   A     Correct.

15   Q     Do you know how many DPS offices you have in Harris

16   County?

17   A     I know we don't have enough.

18             MR. CLAY:  Could you put up the DPS web site here and

19   would you go down to County -- there you go.

20   Q     So, here -- do you see here we've got all of the -- it

21   says -- actually gives you the number right here -- 12

22   locations in Harris County.

23             MR. CLAY:  And could you scroll down so we can see

24   the hours of the Spring Mega Center?

25   Q     And you see it's open from -- at 7:30 in the morning until

1  6:00, Monday through Thursday, from 7:30 until 5:00 on Friday;

2  do you see that?

3  A    I do.

4            THE COURT:  Where is the mega center?

5            MR. CLAY:  It's -- this one is in Spring.  And

6  there's another one in Gessner.  I'll go through all of these

7  tabs and we can see the hours for all of them if you like, your

8  Honor.

9            THE COURT:  No, no.  I just had a question.

10 BY MR. CLAY:

11 A    Are these hours at the bottom?

12           MR. CLAY:  Okay.  I didn't think you did.

13           THE COURT:  (indiscernible).

14 A    Are those hours at the bottom, the business hours?

15 Q    Yeah.  Days and hours open.

16 A    So, we (indiscernible) working hours.

17 Q    Yeah.  Earlier you testified about student I.D.'s, right?

18 A    That's correct.

19 Q    Were you aware that at the University of Texas a student

20 I.D. cost ten dollars?

21 A    No, I was not.

22 Q    Were you aware that you have to provide some other form of

23 photo identification in order to get a student I.D. of Texas?

24 A    No, I was not.

25           MR. CLAY:  Can you pull up the I.D. --

1  Q    This is the I.D. center at the University of Texas; do you

2  see that?

3  A    I see it.

4  Q    Let's look at getting a new I.D. or EID upgrade; do you

5  see that?

6  A    I do.

7  Q    It requires a valid government issued photo I.D. as proof

8  of identify; do you see that?

9  A    I see it.

10       MR. CLAY:  And can you scroll down to the bottom,

11  please?

12  Q    Do you see the cost?

13  A    (No response.)

14  Q    "A ten dollar fee is billed to the users, what I owe,

15  paid," for each I.D. card issued except for first time employee

16  cards where the fee is exempt.

17  A    I assume that could be included in your scholarship or

18  your Texas grant, too.  But I'm sorry -- you didn't ask that.

19  Q    I didn't.  Do you know what the cost of an election

20  identification certificate is?  Do you know how much DPS

21  charges for that?

22  A    I know what it costs to get a birth certificate because I

23  had to get one recently.

24  Q    And it -- what does it cost to -- well, first of all, can

25  you answer my first question?  Do you know what the cost of an

Ellis - Cross / By Mr. Clay                    194

1    EIC is from the Department of Public Safety?

2    A    I think the actual certificate -- the actual EIC is free.

3    Q    It is?

4    A    But you have to submit information that does cost money to

5    get it.

6    Q    And you were -- one of those pieces of information you

7    said was a birth certificate, correct?

8    A    That's correct.

9    Q    And you're aware that the vital Department of -- excuse me

10   for a minute --

11   A    Vital statistics.

12   Q    I call it by the -- yes, it's vital statistics and it's a

13   part of (indiscernible).  I always call it (indiscernible) so

14   I'm forgetting what it stands for at the moment.  But are you

15   aware that they have changed the rule for persons who need a

16   birth certificate in order to get an EIC such that a birth

17   certificate only costs two or three dollars, correct?

18   A    I've been told it costs about the same as the poll tax

19   costs when we had one.

20   Q    Are you aware of the rule change?

21   A    I am.

22   Q    Okay.  Do you know what the costs of the -- well, do you

23   know that Indiana had a voter I.D. law that was considered by

24   the Supreme Court?

25   A    I'm aware of that.

                    Ellis - Cross / By Mr. Clay                    195

1    Q    Do you know what a birth certificate cost in Indiana at

2    the time the Supreme Court validated its law?

3    A    No, I don't.

4           MR. CLAY:  Your Honor, consistent with what we did

5    yesterday with Senator Uresti, I've got some declarations here

6    that authenticate the documents that no privileged ruling was

7    needed but they waived the privilege on it.  They allowed us to

8    use.  May I approach?

9           THE COURT:  Yes.

10   BY MR. CLAY:

11   Q    Here you go.  So, do you remember being asked to cull

12   through your legislative files and produce documents regarding

13   voter I.D. in this case?

14   A    Yes, sir.

15   Q    And you did that, right?

16   A    I had my staff do it.

17   Q    Okay.

18           MR. CLAY:  Could you put up RE Priv 03422?

19   Q    This was a document that was produced by you in this

20   litigation and it said -- who is Harold Cook?  Do you know who

21   Harold Cook is?

22   A    He was a --

23   Q    I actually do know who he is so I'll ask you if you know

24   who he is.

25   A    Yeah.  He is a young staffer who worked for the Senate

1   Democratic Caucus.

2   Q    And do you see where it says "Questions for Democratic

3   Expert Witnesses?"

4   A    Yes.

5   Q    And the date is 1-25?

6   A    Yes.

7   Q    When was SB 14 considered by the Senate in 2011?

8   A    Reed, I have to look at my notes, sir, to remember your

9   name so I certainly wouldn't remember what day that Bill came

10  up four years ago.

11  Q    Oh, no, you took down my name?

12  A    I did.

13  Q    Oh, no.  Well, does this -- does January 25th sound about

14  right for when the Senate as a committee whole considered

15  SB 14?

16  A    If you say so.

17  Q    Okay.  Do you recall whether Mr. Bledsoe from the Texas

18  NAACP testified before the Senate?

19  A    I don't.

20  Q    Okay.

21           MR. CLAY:  Can you scroll down?  Is that the last

22  page?

23           MR. SPEAKER:  No.  You want the next page?

24           MR. CLAY:  Yes.  Sorry.  I forget that they're --

25  Q    What about Louis Figueroa?

1    A    I certainly know who he is.  But, I mean, I'll trust for

2    the record, whoever you say testified.  I mean, I'd have to

3    pull the record and go and see.

4         **MR. CLAY:**  And then the next page?

5    Q    And Chase Bearden, do you recall if he testified?

6    A    I don't remember.

7    Q    Okay.

8         **MR. CLAY:**  And could we go to the Republican

9    questions?

10   Q    And then this is the e-mail from Harold Cook that we

11   talked about yesterday.  And do you know who Jason Hassay (per

12   the log) is?

13   A    I don't.

14   Q    Uh, he was or is Senator Uresti's chief of staff.  But

15   here's a bunch of e-mail -- who is David Edmundson?

16   A    He's my chief of staff.

17   Q    Okay.  And so, he was the recipient of this -- this

18   January 24th e-mail from Harold Cook, correct?

19   A    That appears to be the case.

20   Q    Okay.  And then this lists a bunch of question and answers

21   for the Republican witnesses that are going to be appearing

22   before the Senate, correct?

23   A    That's correct.

24   Q    Okay.  And then ultimately SB 14 passed the Senate and the

25   House and was signed into law, correct?

1   A    That's correct.

2           **MR. CLAY:**  Could you put up (indiscernible) -- yes,

3   this one.  Thank you.  And then scroll in right --

4   Q    So, again, this is an e-mail that we saw yesterday that

5   was received by Senator Uresti's chief of staff.

6           **MR. CLAY:**  And can you zoom in on the -- you were

7   doing it.  Thank you.

8   Q    And it's from Harold Cook again.  It says,

9           "I'm always saying that if you can't win, you have to

10          lose right.  That is even more important in a

11          situation which is sure to end up in the Federal

12          Courts and the Department of Justice was serious

13          reviewed."

14  Do you see that?

15  A    I do.

16  Q    Okay.  Do you think Mr. Edmundson ever received this

17  e-mail?

18  A    You know, I don't know.  I know I hadn't seen it.  You

19  know, this -- I classify this as busy work.  Being a former

20  staffer myself, you know, we -- the way we legislate is not all

21  these e-mails that go back and forth between staff, with all

22  due respect.  You know, I don't want to hurt their feelings.

23  You know, sometimes I'll tell them to take their briefing notes

24  and post them on the internet so at least somebody will get to

25  look at them.

Ellis - Cross / By Mr. Clay                          199

1   Q    Understood.  So, you -- I gather from that testimony that

2   you don't look at every e-mail that comes through your inbox?

3   A    I don't look at most e-mails that come into my inbox.

4   Q    Understood.  I wish I had that ability to do that

5   sometimes.

6   A    Try it.

7         **MR. CLAY:**  Can we pull up next RE Priv 004607?

8   Q    And this was produced from your files.  And it's a -- it

9   says "talking points" -- well, the date is April 5th, 2012,

10  right?

11  A    (No response.)

12  Q    And it says, "talking points, conversations with DOJ

13  regarding voter I.D."  It says "who -- you will be following

14  Jennifer Maranzano (per the log), the Department of Justice,

15  Voting Rights Division."  And then it's -- gives it -- do you

16  see here where it says "(indiscernible) will be discussed."

17  She's (indiscernible) talking generally about the history of

18  voter I.D. legislation in Texas in her particular role?

19  A    Yes.

20  Q    Did you receive this document?

21  A    You know, I don't know.  But I do know this, I don't read

22  well.  People write great speeches for me and I post those on

23  Twitter and Facebook on a regular basis, but you'd be hard

24  pressed to think I follow somebody's talking point.

25  Q    Did you ever talk with Ms. Maranzano?

1  A    Hopefully more than on whatever date this is.  I talk to

2  the Justice Department all the time.

3  Q    Okay.  I want to talk a little bit about the last

4  amendment that Mr. Dunn walked you through which was the -- it

5  was number 30.

6        **MR. CLAY:**  Can we switch to the Elmo just for a

7  second, please?

8  Q    And it was a -- I guess a joint amendment between you and

9  Senator Uresti and Senator Rodriguez; is that right?

10 A    Yes.

11 Q    And it's -- was asking for an annual report from SOS

12 regarding district impact?

13 A    Yes.

14 Q    Do you know who Coby Shorter is?

15 A    I think Reverend Coby Shorter is someone who was working

16 for the Governor or the Secretary of State.

17 Q    Yeah, he's the director of elections at the Secretary of

18 State, right?

19 A    I don't -- maybe he is now.

20 Q    Actually, he's the Deputy Chief of the Secretary of State,

21 correct?

22 A    Well, he got a promotion.  I didn't know that.

23 Q    He did.  Yes, sir.  Do you -- were you aware that he gave

24 testimony in this case?

25 A    No, I was not.

Ellis - Cross / By Mr. Clay                      201

1    Q    Were you aware -- so you're not aware that he gave

2    testimony regarding this particular amendment?

3    A    No.

4            **MR. CLAY:**  Could you put up Mr. Shorter's deposition,

5    please?

6    Q            "QUESTION:  Would it surprise you to learn that

7            Ms. McGeehan testified that she sent this?"

8    And this was a comparison -- "this" refers to a comparison

9    between the voter registration rolls and the Department of

10   Public Safety's driver's license database to you and that she

11   discussed it with you.

12           "ANSWER:  It may have been discussed with me -- I

13           mean, the matching exercises.  I remember visiting

14           with our staff about the matching exercises and I

15           remember the staff consistently telling me that we

16           were trying to match apples and oranges and that it

17           wasn't giving information that the staff was

18           comfortable with or had confidence in."

19   A    Now, what is this?  Is this Coby Shorter's?

20   Q    Yes.  This is his deposition regarding the type of his

21   (indiscernible) impact study that you had requested in that

22   amendment.

23   A    So this was regarding my amendment or just him asking for

24   it separate?

25   Q    No, it was regarding the study that your amendment was

Ellis - Cross / By Mr. Clay                                202

1    requesting be done between the registration rolls and the

2    Department of Public Safety's database.  Do you see that?

3    A    Oh, I do see it.

4    Q    And you never heard that from the Department of Public --

5    or the Secretary of State's Office?

6    A    Well, I don't recall -- I do know this -- all of the stuff

7    that I asked for in the amendment struck me as imminently

8    reasonable.  And if you're passing a major change in how you

9    vote in a State with such low voting numbers, well, why

10   wouldn't you -- it's always an issue if it's added to a Bill

11   and it comes in as opposed to some member asking for it.

12   Q    Uh-huh.  Are you aware that Harold Cook is actually the

13   person responsible for recommending that this amendment be

14   done?

15   A    I would be surprised because -- you know, in this

16   business, it's -- you know, it's amazing how everybody is

17   responsible for passing a Bill in the legislature other than

18   the people who carry it and vote on it.

19        **MR. CLAY:**  Put up CU Priv 00007, please.  Scroll down

20   to -- the next page, please.  I don't think that's it.  That

21   was talking about Dancing with the Stars so I'm pretty sure

22   that's not it.

23        **(Laughter)**

24   A    He might be responsible for that.

25        **(Laughter)**

Ellis - Cross / By Mr. Clay                          203

1        **MR. CLAY:**  Well, let's try -- let's try the -- yes,

2   this is it.  And this -- the bottom half of this, please.

3   Q    "As of right now, Senator Ellis is (indiscernible) up

4   three amendments," and here's the district impact report that

5   we're referring to that you propose that was ultimately tabled,

6   right?

7   A    Yes.

8        **MR. CLAY:**  And then could you go to the e-mail just

9   above it.  It's from --

10  Q    So, this is an embedded e-mail -- I guess it was sent from

11  your chief of staff and then here's Harold Cook replying --

12  "Actually group number two on David's list," and that's

13  referring again to the district impact amendment that you

14  proposed.

15  A    Yes.

16  Q         "When the Republicans vote against that amendment,

17            whoever takes the lead in opposing preclearance,

18            we'll be able to show what the exact sort of data DOJ

19            would most want to know about could have been

20            gathered but the legislature rejected gathering it."

21  Were you aware that he said that?

22  A    No, but I would say this to you.  As a former staffer

23  myself, you know, you want to stay busy and if you think you

24  can figure out what goes on in a legislature just by reading

25  e-mails, you get a very jaded view of what goes on.  It's just

**EXCEPTIONAL REPORTING SERVICES, INC**

1  simply not that simple.

2  Q    Do you know who Jerry Hebert is?

3  A    I do.

4  Q    Did he ever advise the Democratic Caucus on voter I.D. in

5  2009?

6  A    Well, I would assume that we called Jerry Hebert that

7  we -- or I called Chad Dunn -- I mean, you call whatever legal

8  expert you can just as I'm sure my colleagues who don't

9  represent minority populations will call in legal advisors and

10 other advisors on something as important as this piece of

11 legislation.

12 Q    Were you aware that he may have made himself available to

13 staffers and/or Senators during the debate in 2009?

14 A    I would hope so.

15 Q    Were you aware that he testified on voter I.D. before the

16 Senate?

17 A    I don't remember all of the witnesses, but he would have

18 been a good one.

19 Q    Do you know who -- I won't disagree with that.  Do you

20 know who Chandler Davidson is?

21 A    I think he's a -- but, you know, why don't you read

22 (indiscernible) -- I can't remember all of their names.  I meet

23 so many wonderful people.

24 Q    So, no?

25 A    But I know who he is.  I think he's a professor.  I just

1   can't remember if he's at Rice or if he's at SMU.

2   Q    Do you know that he was retained by the Department of

3   Justice, an expert in this case?

4   A    If he's the one I'm thinking about who's the author of a

5   number of books who has looked at racial impact going back to

6   when the Democrats controlled it, he'd be a good one.

7   Q    Did you know that he testified before the Senate on voter

8   I.D.?

9   A    I don't recall.

10  Q    Did you receive draft questions to ask Mr. Davidson?

11  A    I wouldn't be surprised.  Did I ask him?  I'm just making

12  a point.

13  Q    Did you?

14  A    I get a lot of e-mails.  I get a lot of requests to do a

15  lot of things.  It doesn't mean that you do it.

16  Q    Did you -- one last question -- do you know who Toby Moore

17  is?

18  A    That's a name that escapes me.

19  Q    Okay.

20          MR. CLAY:  I have nothing further.  I do have the

21  offer of proof that we promised you last week containing the

22  legislative documents that are still privileged that we'd like

23  to do as an offer of proof.

24          THE COURT:  Okay.

25          MR. CLAY:  It was filed earlier today.  I had a paper

1    copy here but I think it's already been filed earlier today,

2    so --

3              THE COURT:  Okay.  But, it's not -- are we finished

4    with this witness?

5              MR. DUNN:  I have no further questions, but I would

6    like to see said offer of proof.

7              THE COURT:  Right.  But I -- are we finished with

8    him --

9              MR. CLAY:  Understood.

10             THE COURT:  -- so he can step down?

11             MR. CLAY:  I have no further questions.

12             THE COURT:  Okay.  Then you can step down, sir.

13             THE WITNESS:  Thank you.

14       (Witness Excused)

15             THE COURT:  So you-all will discuss that and I'm

16   assuming the offer of proof that's coming in is going to be on

17   documents I ruled on pretrial?

18             MR. SPEAKER:  That is correct.

19             MR. CLAY:  Yes, that you ruled were privileged;

20   that's correct.

21             THE COURT:  Yes.  Okay.  But you-all can look at

22   those.  So, I guess we can proceed with our next witness.

23       (Pause)

24             MR. BRAZIL:  Scott Brazil for the (indiscernible)

25   Plaintiffs, your Honor.

1      **THE COURT:**  Good -- okay -- sorry.  Good afternoon,

2  sir.  Would you raise your right hand?

3          **KEN GANDY, PLAINTIFFS' WITNESS, EXCUSED**

4      **THE CLERK:**  Thank you, sir.

5      **THE COURT:**  You can have a seat.

6                  **DIRECT EXAMINATION**

7  BY MR. BRAZIL:

8  Q    Would you state your name?

9  A    Ken Gandy.

10 Q    Mr. Gandy, how old of a man are you?

11 A    Seventy-four.

12 Q    And where do you reside; where do you live?

13 A    203 Richard Street on Corpus Christi.

14 Q    And how long have you lived in the State of Texas?

15 A    In the State of Texas, about 43, 44 years.

16 Q    And are you registered to vote in the State?

17 A    Yes, sir.

18 Q    How long have you been registered to vote in the State of

19 Texas?

20 A    Ever since I've lived here.

21 Q    Do you own a car?

22 A    I did.

23 Q    How long has it been since you've owned a automobile?

24 A    1990.

25 Q    Do you have a current Texas driver's license?

Gandy - Direct / By Mr. Brazil                    208

1   A    No, sir.

2   Q    How long has it been since you held a current Texas

3   driver's license?

4   A    1990.

5   Q    Does your wife drive?

6   A    No, sir.

7   Q    Is she retired also?

8   A    Do what?

9   Q    Is your wife also retired?

10  A    She's never worked.

11  Q    Okay.  Are you retired?

12  A    Yes; yes, sir.

13  Q    Okay.  Where were you born?

14  A    New Jersey.

15  Q    What is your primary means of transportation?  How do you

16  get around town?

17  A    On the bus.

18  Q    And do you have a I.D. that allows you to get on that bus?

19  A    Yes, sir.

20  Q    And you get a discount because you have a senior

21  citizen --

22  A    I get a discount because I'm over 60 years old.

23  Q    Do you possess a certified copy of your birth certificate?

24  A    No, sir.

25  Q    And do you have a copy of your birth certificate?

1   A    Yes, sir.

2   Q    And you were born in what State?

3   A    New Jersey.

4   Q    Okay.  Do you have a passport?

5   A    No, sir.

6   Q    Have you ever held a passport?

7   A    No, sir.

8   Q    Have you ever held a position in the military?

9   A    No, sir.

10  Q    Do you have any current form of identification that

11  qualifies you to vote in Texas in person?

12  A    No.

13  Q    Have you voted in person all of your life?

14  A    Yes, sir.

15  Q    Until Senate Bill 14 became law, did you always vote in

16  person?

17  A    Yes, sir.

18  Q    Since Senate Bill 14 became law, have you voted?

19  A    Yes, sir.

20  Q    How did you vote?

21  A    By mail.

22  Q    And how did you obtain your mail-in ballot?

23  A    I applied for it at the courthouse.

24  Q    And how did you get to the courthouse?

25  A    On the bus.

1   Q    Okay.  And you got an application at the courthouse?

2   A    Yes.

3   Q    Took that home?

4   A    Do what?

5   Q    Took the ballot home with you?

6   A    Yes.

7   Q    Filled it out, mailed it in?

8   A    No.  Actually, I didn't even take it home.  I filled it

9   out at the County Clerk's Office and handed it to them right

10  there.

11  Q    Okay.  And how many times have you voted by mail since

12  Senate Bill 14 became law?

13  A    Three or four.

14  Q    Do you serve on any type of ballot board or election type

15  committee?

16  A    Yes.

17  Q    What do you serve on?

18  A    I'm precinct chair for Precinct 56 and I'm on the ballot

19  board.

20  Q    And how long have you been on the ballot board?

21  A    Six, eight years.

22  Q    And how did you obtain that position?  How do you -- how

23  does one get on a ballot board?

24  A    You volunteer for it.

25  Q    And what does the ballot board do?

1   A    They take all the -- all the mail-in ballots, open them

2   up, approve them, and confirm that it's a valid vote.

3   Q    How long does the ballot board meet?

4   A    Starting on the first day of early voting and until two

5   weeks after -- no, one week after the election date.

6   Q    And what are you counting?

7   A    What?

8   Q    What are you counting?

9   A    After election, military and provisionals.

10  Q    Are those -- some of them are mail-in ballots?

11  A    Yes.

12  Q    Are you counting your own ballot?

13  A    No.

14  Q    How does that work?

15  A    They find my ballot and they pull it out and they make

16  sure it goes to another board member.

17  Q    So, you're serving on a ballot board that counts mail-in

18  ballots?

19  A    Right.

20  Q    But you cannot vote in person?

21  A    No.

22  Q    Have you ever tried to obtain one of the photo

23  identification --

24  A    Yes.

25  Q    -- documents to vote in person?

Gandy - Direct / By Mr. Brazil                    212

1   A     Yes, sir.

2   Q     And what did you do to obtain that document?

3   A     Went down to the DHS and --

4   Q     DPS you mean?

5   A     D -- yeah.

6   Q     Okay.  And what did you do at the DPS office?

7   A     I went in and I gave her all my papers and told her I

8   wanted a voter I.D. card.

9   Q     What did they tell you?

10  A     They told me they couldn't give it to me and to go down to

11  Horn Road and apply for my birth certificate.

12  Q     Go down to what road?

13  A     Horn Road.

14  Q     And what --

15  A     The Health Department on Horn Road to get my Texas birth

16  certificate.

17  Q     But you were born in New Jersey?

18  A     Yes.

19  Q     Okay.  Did you go down to Horn Road and get a New Jersey

20  birth certificate?

21  A     No.

22  Q     Okay.  I assume if you wanted to, you could pay the money

23  and get a certified copy of your New Jersey birth certificate?

24  A     Yes.

25  Q     Okay.  Are you living on a fixed income?

1    A    I'm on Social Security.

2    Q    Okay.  Would you rather vote in person or by mail?

3    A    In person.  I voted in person all my life.

4    Q    Do you still serve on the ballot board?

5    A    Yes, sir.

6    Q    Will you be serving on the ballot board this November?

7    A    Yes.

8    Q    And will you have to vote by mail?

9    A    Yes, sir.

10   Q    Thank you, Mr. Gandy.

11        **MR. WHITLEY:**  David Whitley for the Defendants.

12                       **CROSS EXAMINATION**

13   **BY MR. WHITLEY:**

14   Q    Mr. Gandy, good to see you again.

15        **MR. WHITLEY:**  I'd like to read very quickly, your

16   Honor --

17   A    Could you speak up a little bit?

18   Q    Yes, sir; I will.

19        **MR. WHITLEY:**  Your Honor, I'm going to read a

20   Stipulation of Fact regarding Plaintiff Ken Gandy that was

21   entered in this case.  And I'm not sure which ECF number but

22   it's been one of the last couple.

23             "Stipulation of Fact Regarding Plaintiff Ken Gandy.

24             Plaintiff Ken Gandy and Defendants stipulate to the

25             following.  Plaintiff has in his possession, custody

1              or control two or more supporting identification

2              documents listed on the Department of Public Safety's

3              election identification EIC documentation

4              requirements web page."

5    And it lists the web page, www.txdps.state.tx.us/driver

6    license/eic doc reqmnts.htm.  And that's dated September 5th.

7    I'm not sure when that was entered, your Honor, but it has been

8    entered.

9              **THE COURT:**  All right.

10   **BY MR. WHITLEY:**

11   Q    Mr. Gandy, just a couple of quick questions and I'll get

12   you back on your way.  You mentioned earlier that you live on

13   Richard Street here in Corpus; is that correct?

14   A    Yes, sir.

15   Q    And during your deposition when you and I were discussing

16   your birth certificate from Indiana, you mentioned that you

17   were familiar with the requirements for getting a birth

18   certificate from Indiana because you had visited the web site.

19   Do you remember that?

20   A    Indiana?

21   Q    I'm sorry.  Not Indiana; New Jersey.

22   A    New Jersey, okay.

23   Q    I apologize.  So, during your deposition we visited about

24   your New Jersey birth certificate; do you remember that?

25   A    Yes.

1  Q    And you mentioned that you understood the requirements for

2  getting that birth certificate because you had visited the

3  vital statistics web site, correct?

4  A    Yes.

5  Q    And are you still familiar with the requirements to get a

6  New Jersey birth certificate?

7  A    I forget exactly how much it cost, but it's quite a bit of

8  money.

9  Q    So at your house on Richard Street, do you have any

10  utility bills there?

11  A    Yes.

12  Q    Do you keep copies of those bills once you receive them?

13  A    Oh, I don't get the bill by mail.  It comes in on the

14  computer.

15  Q    Okay.  Do you save any of those, the ones that come to

16  your computer?

17  A    I guess I still have a couple there.

18  Q    Do they come via e-mail?

19  A    Uh-huh.

20  Q    And are any of them in your e-mail inbox that are less

21  than 90 days old?

22  A    I don't know.

23  Q    Okay.  And we mentioned in your -- during your deposition

24  before that you had opened a bank account many years ago,

25  correct?

Gandy - Cross / By Mr. Whitley                216

1    A    Yes.

2    Q    Do you still have that bank account?

3    A    Yes, sir.

4    Q    And do you get statements for that bank account?

5    A    No.  I'm notified by -- I'm notified by e-mail when it is

6    available and I have to go to their web site to pick it up.

7    Q    Do you go to the web site to pick them up?

8    A    Only when I want to know my balance.

9    Q    So on that web site are there any bank statements that are

10   less than 90 days old?

11   A    Yes.

12   Q    And you mentioned before that you voted in each of the

13   three elections that have taken place since SB 14 went into

14   effect, correct?

15   A    There have been primaries and runoffs since then --

16   Q    So there has been --

17   A    -- in addition.

18   Q    But you have voted in each one, correct?

19   A    Yes.

20   Q    And you plan to vote in the November election by mail?

21   A    Yes, sir.

22   Q    And you work for the ballot board; is that correct?

23   A    Yes, sir.

24   Q    Is that a paid position?

25   A    Is that a what?

1    Q    Paid position?

2    A    Yes.

3    Q    And how much do you get paid to do that?

4    A    I think it's something like $11 an hour now.

5    Q    How often do you work on a ballot board?  Is it every

6    election?

7    A    Every election; yes.

8    Q    And you take the bus to get there?

9    A    Yes.

10   Q    And how long does it take to get there on the bus?

11   A    From my house, about 20 minutes.

12   Q    And that's at the county courthouse, correct?

13   A    Yes.

14   Q    And you mentioned that you're Precinct 56 chair; is that

15   correct?

16   A    Yes.

17   Q    And that's for the Nueces Democratic Party?

18   A    Yes.

19   Q    And we mentioned during your deposition you produced some

20   e-mails that you had searched for in advance of the deposition

21   that you had e-mailed with Sondra Halton (phonetic).  Do you

22   remember that name?

23   A    Yes.

24   Q    And at the time you e-mailed with her, do you remember

25   what her position was?

1  A    I don't remember, but she was -- she left the -- a deal on

2  a newsletter that I read and I called her up about -- or I

3  e-mailed her about it.

4  Q    Do you remember what you e-mailed about?

5  A    The fact that I could not get a voter I.D. card.

6  Q    And did she personally e-mail you back?

7  A    Yes.

8  Q    And you-all discussed your situation?

9  A    Uh-huh.

10  Q    Via e-mail?

11  A    Yes.

12  Q    Do you know what she's doing now?

13  A    Well, she's working with some -- it's not a political

14  party.  It's a -- I don't know what you call it.  It's one of

15  these -- uh -- I don't know what you call it but she has a

16  letter she puts out every so often.

17  Q    All right.  That's good enough.

18        MR. WHITLEY:  I don't have any further questions,

19  your Honor.

20        THE COURT:  All right.

21        MR. BRAZIL:  Nothing further, your Honor.

22        THE COURT:  Thank you, sir.  You can step down.

23     (Witness Excused)

24        MS. VAN DALEN:  Your Honor, the Plaintiffs' next

25  witness is Mr. Margarito Lara.

1        THE COURT:  Okay, he can step over here.  Just watch

2   the incline.

3        MS. VAN DALEN:  And I am Marinda Van Dalen.

4        THE COURT:  Would you raise your right hand?

5         MARGARITO LARA, PLAINTIFFS' WITNESS SWORN

6        THE WITNESS:  Yes, ma'am.

7        THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9   BY MS. VAN DALEN:

10  Q    Sir, can you please state your name for the record?

11  A    My name is Margarito M. Lara.

12  Q    And where do you live?

13  A    I live in a little town, Sebastian, Texas.

14  Q    Is that in Willacy County in the Valley?

15  A    North -- south of Corpus Christi, south of Raymondville.

16  Q    Okay.  And who do you live with?

17  A    I live there with my wife.

18  Q    And when were you born?

19  A    I was born December 20th, 1936.

20  Q    And where were you born?

21  A    I was born in a farm ranch in about Cameron County, about

22  two, three miles from Sebastian.

23  Q    Okay.  And were you born in a hospital or in a home?

24  A    No, in a home.

25  Q    Okay.  Do you know whether your birth has ever been

EXCEPTIONAL REPORTING SERVICES, INC

1   registered?

2   A    No, I don't know, ma'am.

3   Q    Since this -- can you tell us, what is your -- what do you

4   consider your race or your ethnicity to be?

5   A    I don't understand, like --

6   Q    How would you describe yourself, your race or your

7   ethnicity?

8   A    Oh, well, Latin American.

9   Q    And are you retired or do you still work?

10  A    No, I'm retired.

11  Q    And how far did you go in school?  How long did you go to

12  school, sir?

13  A    Seven years.

14  Q    Do you remember when you started voting?

15  A    I started voting when the poll tax was on sale for a

16  dollar and 75 cents.

17  Q    Okay, and have you voted regularly since then?

18  A    Regularly.

19  Q    Have you ever voted by mail or do you vote in person?

20  A    At the polls house, it's not by the mail.

21  Q    I'm sorry, could you repeat your answer?

22  A    I didn't vote by mail, at the polls house.

23  Q    Why do you prefer to go vote in person?

24  A    Well, everywhere there's was a poll so you can vote,

25  either walk or go by bike if I vote.

```
1   Q    Do you plan to keep voting in the future?

2   A    I hope so.

3   Q    And when did you vote last, do you remember?

4   A    Last year.

5   Q    How come you haven't voted more recently?

6   A    On account that I couldn't get my -- I had to

7   (indiscernible) go my driver's license and I couldn't get my --

8   I couldn't vote without my driver's license whenever they

9   needed it.

10  Q    Do you -- did you have a driver's license in the past?

11  A    Yes.

12  Q    And did that expire?

13  A    Expired.

14  Q    How long ago?

15  A    Ten years.

16  Q    And since your driver's license expired, have you tried to

17  get another photo ID from DPS?

18  A    Yes, ma'am, I tried it in Harlingen, Texas.  They asked me

19  for the birth certificate and they -- when they asked me for

20  the birth certificate I told them I didn't have it.  Well, then

21  she told me, "Well, you can't -- you have to bring your birth

22  certificate so you can't apply for your driver's license."

23  Q    Have you ever had a birth certificate?

24  A    No, ma'am.

25  Q    Have you ever tried to get a birth certificate?
```

1   A    We tried it, we couldn't locate it nowhere.

2   Q    What did you do to try to get a birth certificate?

3   A    Well, my daughter took me to Brownsville located somewhere

4   in Cameron County.  No trace at all.  We went to Harlingen, the

5   same thing, and then at last I went to Raymondville Courthouse

6   and I finally went to -- we called to Austin, there was no sign

7   of it.

8   Q    How long have you been trying to get a birth certificate

9   for?

10  A    Oh, it's quite a few years back.

11  Q    More than 20 years, less than 20 years?

12  A    Yeah, something like that, ma'am, or more.

13  Q    Do you know how to get a birth certificate?

14  A    If I know how to get a birth certificate I hoped I could

15  get it, find it, so I can vote.

16  Q    Is there -- is there anything that you know of to do to

17  get one yourself?

18  A    To do what?  Myself?

19  Q    Is there anything that you haven't done that you know of

20  that you could do to get one?

21  A    Just try it again.

22          **MS. VAN DALEN:**  I want to pull up, please,

23  Plaintiffs' Exhibit 989.

24  Q    This is a letter that I received from the Texas Department

25  of State Health Services in response to an inquiry as to

Margarito Lara - Direct / By Ms. Van Dalen                223

1   whether your birth had been registered, and it states that it

2   has not -- had not been registered in response, and that you

3   would have to apply for a delayed birth certificate paying a

4   fee of $25, an additional fee of $22 and also noting that $22

5   had already been paid just to confirm that there was no birth

6   registered for you.

7          Are you aware of any way of getting a birth

8   certificate without paying this money?

9   A    No, I'll try (indiscernible) I can do to try to get it,

10  ma'am.

11  Q    Okay.  Do you -- you do have as Social Security card,

12  right?

13  A    Yes, ma'am.

14  Q    And do you have a voter registration card?

15  A    Yes, ma'am.

16  Q    And who do you live with, Mr. Lara?

17          **MS. VAN DALEN:**  You can turn that off, please.

18  A    Huh?

19  Q    Who do you live with?

20  A    With my wife.

21  Q    And do you and your wife have a car?

22  A    No, ma'am.

23  Q    How do you get around?

24  A    Sometime with my daughters, sometime with my daughter's

25  girls, my sister, they'll help me out to catch a ride to go to

1   the grocery store or whatever.  I give them some money gas to

2   help them if I can.

3   Q    If they give you a ride you try to give --

4   A    To take me, yeah, on the ride.

5   Q    -- them some gas money?

6   A    That's right.

7   Q    Okay.  And if you're not able to get a ride, what do you

8   do?

9   A    If I'm not able to get a ride, well, I'll walk or go on

10  the bike.

11  Q    Okay.  How do you feel about asking folks for rides when

12  you need to get places?

13  A    I don't like it at all, it's hard.

14  Q    And you and your wife receive Social Security, is that

15  right?

16  A    Yes, ma'am.

17          **MS. VAN DALEN:**  I want to put up, please, Plaintiffs'

18  Exhibit 990.  Can you show the second page for a second,

19  please?  And now back to the first.

20  Q    Mr. Lara, this is a Declaration that -- that describes you

21  and your wife's finances and that you signed.  At the time you

22  signed that was that information correct?

23  A    Yes, ma'am.

24  Q    Has your financial situation changed since then?

25  A    No, ma'am.

1   Q    Okay.  And can you -- do you have any savings?

2   A    No, ma'am.

3   Q    Okay.  And can you -- can you describe for us what your

4   and your wife's personal finances are, what your financial

5   situation is, please?

6   A    Well, we got each our little -- a small amount of cash,

7   both of us now, and we try to, you know, stretch it out as

8   possible by the end of the month, and sometime we'll make it

9   and sometime we won't.  Yep, that's about it.

10  Q    Okay.  I know you've been trying to get a birth

11  certificate for a long, long time?

12  A    Oh, yes, ma'am.

13  Q    I know you really want one.  If you had to -- if you had

14  to pay for it, is that something you would do?

15  A    Oh, yeah, I'll sacrifice to get it done, or borrow money,

16  whatever, but I'll try to get it.

17  Q    Okay, thank you, sir.  I have no further questions at this

18  moment.

19          **MS. WOLF:**  Your Honor, before I start the Cross

20  Examination, we have also filed a stipulation as to this

21  Plaintiff.  I don't know, would you prefer that I read it into

22  the record.

23          **THE COURT:**  Go ahead.

24          **MS. WOLF:**  So it was just filed at ECF 571.

25          "Plaintiff, Margarito Martinez Lara and Defendants

1              stipulate to the following:

2              In addition to certain other documents produced in

3              discovery, Plaintiff Margarito Martinez Lara has

4              possession or access to the following documents:

5              1.  A baptismal certificate.

6              2.  A signed Social Security card.

7              3.  The birth certificates of two of his children.

8              4.  An expired Texas driver's license.

9              5.  A Medicare and/or Medicaid card; and

10             6.  A utility bill dated within the last 90 days."

11                          **CROSS EXAMINATION**

12   **BY MS. WOLF:**

13   Q    Good afternoon, Mr. Lara.

14   A    Hi.

15   Q    Nice to see you again.

16   A    I remember you.

17   Q    You've had a birthday since we last met, is that correct?

18   A    Right.

19   Q    So you are 78 now?

20   A    Uh-huh (yes.)  Right.

21   Q    And when we met back in Raymondville I think you told me

22   you have an older sister, is that right?

23   A    I've got an older sister -- right.

24   Q    Is that Frances?

25   A    No --

Margarito Lara - Cross / By Ms. Wolf                    227

1    Q    Or Maxine?

2    A    No, it's --

3    Q    Maximina.

4    A    Lupe -- Guadalupe.

5    Q    Okay.  Okay.  Is she still living?

6    A    She's still living.

7    Q    Okay.  And we had talked a little bit about we met in

8    Raymondville, correct?  Do you remember our meeting in

9    Raymondville?

10   A    Yes.  Yes, ma'am.

11   Q    We met -- I can't remember which building we met in, but I

12   think it was -- was it close to the library?  Do you know where

13   the (indiscernible) Memorial Library is in Raymondville?

14   A    Where the library is?  Yes, ma'am.

15   Q    Uh-huh (yes.)  Okay.  And I think you had said that in --

16   I think we talked a little bit, in 2012 that library was your

17   polling place, is that correct?

18   A    Exactly, right.

19   Q    And at that time, in 2012, you were living in Sebastian

20   where you live now?

21   A    Yes, ma'am.

22   Q    So that's about 10 miles, give or take, from your home?

23   A    Nine or 10 miles.

24   Q    Okay.  And you told me you like to take your bike to go to

25   the polling place?

Margarito Lara - Cross / By Ms. Wolf                    228

1   A    Right.

2   Q    Okay.  And I think we also talked about the County offices

3   for Willacy County.  You knew that those were in -- in

4   Raymondville, near the library as well, right?

5   A    Right.

6   Q    Okay.  And do you still -- you said you travel into

7   Raymondville about once or twice a week, is that true?

8   A    It's true.

9   Q    Okay, so (indiscernible) you have some time to go in to

10  deliver lumber or --

11  A    Oh, yeah, right.

12  Q    And you also travel to Harlingen -- and I'm sorry if I

13  pronounce the cities the wrong way, but you travel into

14  Harlingen about two to three times a week, is that correct?

15  A    That's correct.

16  Q    And when you go does your daughter or your grandkids, they

17  take you?

18  A    Uh-huh (yes.)

19  Q    Okay.

20  A    Correct.

21  Q    And I think you also said your sister, she gives you rides

22  a couple of times a week to go to the fruit stand in Sebastian

23  or to go get groceries, is that right?

24  A    Right.  Correct.

25  Q    Okay.  So you get rides a couple -- a few times a week to

1  go to Raymondville --

2  A    Yes, ma'am.

3  Q    -- Harlingen?

4  A    Yes, ma'am.

5  Q    Okay.  I think we had also talked about voting, and I

6  think you said you prefer to vote early as opposed to on

7  Election Day, correct?

8  A    Exactly right.

9  Q    Okay, and that's because sometimes you forget the day

10 you're supposed to vote, and you care about the early voting?

11 A    Right.

12 Q    Okay.  I'm going to ask --

13          **MS. WOLF:**  Brian, can you bring up PL-518, please?

14 And if you can go to the -- I guess (indiscernible) and zoom in

15 on Paragraph 6.

16 Q    Mr. Lara, do you know where 190 North 3rd Street is?

17 A    Ma'am?

18 Q    Do you know where the -- do you see the address up there,

19 190 North 3rd Street in Raymondville?  Do you know where that

20 is?

21 A    Yes, ma'am.

22 Q    Okay, and is that close to the library?

23 A    Yes, ma'am.

24 Q    Okay.  And we had talked the last time we met about the

25 fact that they issue a form of ID that you can use to vote

1    there, is that correct?

2    A    Correct.

3    Q    And so since we met in May have you tried at all to go to

4    that office to try to get an ID in order to vote?

5    A    Have I tried it lately?  No.

6    Q    Okay.  And do you know why you haven't tried?

7    A    I'm going to try, I'll go and try it again.

8    Q    And I think if you take a look at a document that Ms. Van

9    Dalen had shown you --

10         **MS. WOLF:**  Brian, can you pull up PL-989?  If you can

11   turn to -- Brian -- I'm sorry, Brian, if you can go Bates

12   Number ORT00019748, which should be the -- about the 10th page,

13   that one, okay.

14   Q    So you have -- you have an older sister, correct?  Right?

15   A    Right.

16   Q    Okay.  And so do you think she could fill out an Affidavit

17   saying that she's your older sister?

18   A    Yes.

19   Q    Okay.

20         **MS. WOLF:**  And, Brian, if you could just focus on a

21   list of documents up above this one, where it starts with

22   "Birth certificates of adult children."

23   Q    Okay.  And we -- we -- you didn't answer a question about

24   it, but when we got on the record you said you have the birth

25   certificates of two of your children, correct?

1   A    Uh-huh (yes.)  Yes.

2   Q    Okay, and your kids are over 18?

3   A    Yes, ma'am.

4   Q    Okay.

5        **MS. WOLF:**  And then, sorry, Brian, if you could go

6   back down to the records that may show the parents' names.

7   Q    And you have your baptismal certificate, correct?

8   A    Right.

9   Q    Okay.  So you have the three documents on this page?

10  A    Yes, ma'am.

11  Q    Have you ever tried to take those documents to -- to that

12  address, the 190 North 3rd Street address in Raymondville to

13  try to get a delayed birth certificate?

14  A    I tried it twice, yes, ma'am.

15  Q    Have you brought all of those documents?

16  A    Uh-huh (yes.)

17  Q    And your wife, we talked a little about your wife.  She

18  currently has a Texas personal ID card, is that correct?

19  A    She's got it, right.

20  Q    And she got it in December of 2013?

21  A    Uh-huh (yes.)

22  Q    Do you know why she got that personal ID card?

23  A    No, I don't.

24  Q    Okay.

25       **MS. WOLF:**  I have no further questions, your Honor.

1          **MS. VAN DALEN:**  You are almost done.  I saw you

2    yawning.

3                    **REDIRECT EXAMINATION**

4    **BY MS. VAN DALEN:**

5    Q    Mr. Lara, where does your older sister live?

6    A    She lives in a little town west of Raymondville, about

7    nine or 10 miles, (indiscernible), Texas.

8    Q    And do you -- you don't actually have a statement from her

9    about where or when you were born, do you?

10   A    No, ma'am.

11   Q    Okay.  And do you actually have your children's birth

12   certificates yourself?

13   A    Yes.

14   Q    You have copies at your home?

15   A    Yes, ma'am.  Yes, ma'am.

16   Q    The original?

17   A    At home, yes, ma'am.

18   Q    And you testified that your wife has a driver's license,

19   is that right?

20   A    **(No audible response)**

21   Q    Is she driving these days?

22   A    No.  We don't have no automobile.

23   Q    Okay.

24   A    No, she don't drive no more.

25   Q    Okay.  And why isn't she driving anymore?

Margarito Lara - Recross / By Ms. Wolf                    233

1   A    Well, you know, she's been having this sickness of cancer,

2   you know that?  And she quit driving, she didn't feel like

3   driving anymore.

4   Q    Okay.  Thank you, sir.  I have no further questions.

5   A    Thank you.

6          MS. WOLF:  I just have a couple, your Honor.

7                      **RECROSS EXAMINATION**

8   **BY MS. WOLF:**

9   Q    Mr. Lara, did any of the Plaintiffs' lawyers offer to help

10  you get any affidavit or any letter from your sister regarding

11  your birth?

12         MS. VAN DALEN:  I'm going to object.  This is

13  completely irrelevant, your Honor.

14         THE COURT:  Sustained.

15  Q    Your Honor (sic), did any of the Plaintiffs' lawyers

16  attempt to assist you in obtaining a form of identification in

17  order to vote?

18         MS. VAN DALEN:  I'm going to object to that as well

19  on the same grounds, plus it's infringing on attorney-client

20  privileged communication.

21         THE COURT:  Sustained.

22  **BY MS. WOLF:**

23  Q    Has anyone offered to assist you in obtaining any form of

24  identification in order to vote?

25         MS. VAN DALEN:  Your Honor, same objection.  This has

 1   no relevance.

 2   **BY MS. WOLF:**

 3   Q    Other than your lawyers.

 4           **THE COURT:**  I'm sorry, the question is -- what was

 5   your question?

 6           **MS. WOLF:**  Has anyone besides your attorneys offered

 7   to assist you in obtaining a form of identification in order to

 8   vote.

 9           **THE COURT:**  Sustained.

10           **MS. WOLF:**  No further questions, your Honor.

11           **THE COURT:**  All right.  Are we finished with this

12   witness?

13           **MS. VAN DALEN:**  Yes, your Honor.

14           **THE COURT:**  You can step down, sir.

15           **THE WITNESS:**  Thank you.  Thank you.

16       **(Witness excused)**

17           **MS. VAN DALEN:**  Your Honor, the next witness will be

18   Maximina Lara.

19           **THE COURT:**  Good afternoon.  Would you raise your

20   right hand.

21       **(Clerk administers oath)**

22       **(No audible response)**

23           **THE COURT:**  Did you hear the opening?

24           Can you hear?

25           **THE WITNESS:**  Yes.

1       **MAXIMINA LARA, PLAINTIFFS' WITNESS, SWORN**

2              **THE COURT:**  All right, you can have a seat, but

3    you're going to need to speak up, okay, so we can all hear.

4                        **DIRECT EXAMINATION**

5    **BY MS. VAN DALEN:**

6    Q    Good afternoon, ma'am.  Can you state --

7    A    Good afternoon.

8    Q    Ma'am, can you please state your name for the record?

9    A    Can't hear you.

10   Q    Can you tell me your name, please?

11   A    Sure.  Maximina M. Lara.

12   Q    And are you the sister of Margarito Lara?

13   A    Yes.

14   Q    And do you also live in Sebastian?

15   A    Right.

16   Q    And do you live alone or with anybody?

17   A    I live alone.

18   Q    And where were you born?

19   A    I was born in Combes, Texas.  It's a little town about ten

20   miles from Harlingen, Texas.

21   Q    Were you born at home or in a hospital?

22   A    No, on the farm.

23   Q    Okay.  And are you, like your brother, Latino?  Is that

24   how you describe yourself?  Or how would you describe yourself?

25   A    I can't hear you.

1   Q   What is your race or your ethnicity, please?

2   A   Hispanic.

3   Q   And are you working or are you retired?

4   A   I'm retired.

5   Q   What type of work did you use to do?

6   A   I was a waitress for over 35 years and a cook.

7   Q   And did you go to school?

8   A   Yeah, I went through eighth grade and then I got my GED.

9   Q   And do you remember when you started voting?

10  A   I would say around the 60s.

11  Q   And have you been a regular voter since then?

12  A   Oh, yeah.

13  Q   Have you ever had to pay to vote?

14  A   Yes, I did.

15  Q   And when you vote, do you vote in person or do you vote by

16  mail?

17  A   No, in person.

18  Q   And why do you do it that way?

19  A   Well, I always think it's better to go over there in

20  person.  That's why.

21  Q   Are you currently registered to vote?

22  A   Yes, ma'am.

23  Q   And what is your name on your voter registration card?

24  A   Maximina M. Lara.

25  Q   Okay.  You say "emmay" (phonetic), in English that's "M"?

1    A     "M".

2    Q     And you have a Texas driver's license, is that right?

3    A     Oh, yes.

4    Q     And do you know when that expires?

5    A     It will expire in 2015.

6            MS. VAN DALEN:   Okay.  Can you please put up

7    Defendants' (sic) Exhibit 593 for me?

8    BY MS. VAN DALEN:

9    Q     Is this a copy of your driver's license?

10   A     That's right.

11   Q     And what's your name as it -- what's the name that appears

12   on your driver's license?

13   A     Maxim M. Lara.

14   Q     Okay, so you just said that on your voter registration

15   it's Maximina M. Lara, but on your driver's license it's Maxim

16   Martinez Lara, is that right?

17   A     The right one is Maximina M. Lara.

18   Q     And the last time you voted did you have to show your

19   driver's license?

20   A     Oh, yes.

21   Q     Do you remember when that was?

22   A     It was the last election, probably in May or something

23   around there.

24   Q     And did you have a problem voting with that document, with

25   your driver's license?

```
 1  A    Excuse me?

 2  Q    Did you have a problem voting?  Were you allowed to vote?

 3  A    Oh, no, I haven't had no problem with that.

 4  Q    Okay.  Have you ever tried to correct the name on your

 5  driver's license?

 6  A    I want to.

 7  Q    You want to do that?

 8  A    Uh-huh.

 9  Q    Do you know how to do that?

10  A    Well, for that I have to go to the Texas Highway

11  Department for it.

12  Q    And where is that?

13  A    In Harlingen, Texas.

14  Q    How far is that from you?

15  A    It's about 12 miles from where I live.

16  Q    Okay.  And you have a car, right?

17  A    Yes.

18  Q    But if they want your birth certificate in order to change

19  your name on your driver's license, do you have a birth

20  certificate to show them?

21  A    No.

22  Q    Do you plan to renew your driver's license next year?

23  A    Yes, ma'am.

24  Q    And when you go to renew, if they require you to give them

25  a copy of your birth certificate would you be able to do that?
```

Maximina Lara - Direct / By Ms. Van Dalen                    239

1    A    No, ma'am.

2    Q    Okay.  So you don't have, actually have a birth

3    certificate, is that right?

4    A    Excuse me?

5    Q    Do you have a birth certificate?

6    A    An old one.

7    Q    You have an old birth certificate for yourself?

8    A    I don't have it with me.

9    Q    Have you -- do you have a birth certificate that shows

10   when you were born and where?

11   A    I don't have it.

12   Q    Do you know whether your birth, whether your parents ever

13   registered your birth with Texas, with the State of Texas?

14   A    No.

15   Q    No, they didn't, is that your testimony?

16   A    Well, they never mentioned it, so I don't know along the

17   years), but I don't think so.

18   Q    Have you ever tried to get a birth certificate for

19   yourself?

20   A    Yes, I have.  I wrote over there about 30 years ago, but

21   they couldn't find me over there in Austin, Texas.

22            MS. VAN DALEN:  Okay, I'm going to pull, please,

23   Plaintiffs' Exhibit 985.

24   //

25   //

**BY MS. VAN DALEN:**

Q    Ma'am, this is a letter that I received from the Texas
Department of State Health Services saying that you -- that no
birth certificate was ever registered for you and indicating
that you would need to obtain a new birth certificate, a
delayed birth certificate, and that the fee for that would be
$25 plus $22 in addition to the $22 that had already been paid
by our offices to confirm that there was no birth certificate.

        Are you aware of any way to get a birth certificate
for less than $47?

A    Yes, probably so.

Q    Do you know how to -- do you believe that's the amount
that you would have to pay if you were able to get a birth
certificate?

A    Yeah.  Yes, ma'am.

Q    Do you believe there is a way to get it for less?

A    Beg your pardon?

Q    Could you get it for less than $47, that you know of?

A    No.  I don't think so.

        **MS. VAN DALEN:**  And could we go to the ninth page of
that document, please?  The ninth page.

Q    I'm going to review the documents that would need to be
submitted in order for you to apply for a birth certificate and
you can let me know if you have them.

        The first thing is a birth certificate of adult

Maximina Lara - Direct / By Ms. Van Dalen                241

1    children.

2            Do you have any children?

3    A    No, ma'am.

4    Q    The next one is school enrollment records and transcripts.

5            Do you have any documents like that?

6    A    Just from the hospital.

7    Q    Okay, that's a little later in the list.  But do you have

8    any school enrollment records or transcripts?

9    A    No.

10   Q    Okay.  Were you ever in the military?

11   A    No.

12   Q    And have you ever been married?

13   A    No.

14   Q    Were you ever in the Selective Service, did you ever apply

15   for Selective Service or register for Selective Service?

16   A    No, ma'am.

17   Q    Do you have a copy of the application you made to get a --

18   to register to vote?

19   A    Yes, I have that one.

20   Q    Do you have a -- I know you have a copy of your voter

21   registration card.

22   A    Yes.

23   Q    Do you have a copy of the application you filled out, the

24   form you filled out to get that card?

25   A    No.  But I can get it.

1   Q    How would you get that?

2   A    Probably go over there where we vote and tell them about

3   it so I could get it.

4   Q    Do you have a -- do you have the application for a

5   driver's license or --

6   A    Uh-huh.

7   Q    -- a State ID that you filled out, the form itself?

8   A    Oh, that one too.

9   Q    Do you have that now?

10  A    No.

11  Q    But you do have your baptismal certificate, is that right?

12  A    (Indiscernible)

13  Q    Your baptismal certificate, do you have that document?

14  A    Oh, yeah.  I have a --

15  Q    Okay.

16  A    -- copy.

17  Q    Okay.  So right now the only documents you have on this

18  page would be perhaps some hospital records and your baptismal

19  certificate, is that right?

20  A    Uh-huh.

21  Q    How long have you wanted to have a copy of your birth

22  certificate?

23  A    A long, long time.  Years.

24  Q    Can you give me a guess, an estimate?

25  A    I would say more than 40 years, I guess.

1   Q    More than 40 years --

2   A    More than 40.

3   Q    -- you've wanted that document?

4   A    Uh-huh.

5   Q    Have you ever done anything to try to get one?

6   A    No, ma'am.

7   Q    Did you ever send a request or an inquiry?

8   A    Not at all.

9   Q    You never paid to find out whether you could get a birth

10  certificate?

11  A    No.

12  Q    Do you receive Social Security?

13  A    Yes, ma'am.

14  Q    Is that the only income that you have?

15  A    SSI.

16  Q    Do you have any other income that you receive?

17  A    No, ma'am.

18  Q    Do you have any savings?

19  A    About 20 or 30 dollars.

20  Q    And do you have a loan that you pay on each month?

21  A    Oh, yes.

22  Q    Is that kind of like what they call sometimes a payday

23  loan or a signature loan, where you can renew it and keep

24  paying?

25  A    Yeah, I renew it once it a while.

1   Q    And how much do you owe on that now?

2   A    About $900.

3           **MS. VAN DALEN:**  Can I show, please, Plaintiffs'

4   Exhibit 986.

5   **BY MS. VAN DALEN:**

6   Q    Ms. Lara, I'm showing you a Declaration.

7           **MS. VAN DALEN:**  If you can show the second page,

8   please.

9   Q    It has your signature and that it was signed on May 21st

10  of this year.

11          When you signed this Declaration was the information

12  in it correct?

13  A    I didn't hear.

14  Q    When you signed this Declaration, when you signed the

15  sheet of paper, were you signing that the information that you

16  were giving about your finances was true?

17  A    Right.

18  Q    Have there been any changes in your financial situation?

19  A    Do I have any what?

20  Q    Have there been any changes in your finances, in your --

21  how much money you are receiving or owe since May?

22  A    No, that's all.

23  Q    And can you describe for the Court, for the Judge today,

24  your financial situation?

25  A    What -- what did you say?

1  Q    Can you describe, using your own words, your situation of

2  your finances, your financial situation?

3  A    Well, it's the same, you know, it's the same thing all the

4  time.

5  Q    And what is that?  What is it?

6  A    Well, with the bills and all that, you know, the less

7  money left, you know, for me it is.

8  Q    Pardon?

9  A    I said to me it is less.

10  Q    Okay.  When the end of the month rolls around are you able

11  to pay your loan -- your expenses and your debt all the time,

12  or are there times that that's difficult?

13  A    Difficult.

14  Q    Can you describe what that's like at the end of the month?

15  A    Well, it's -- there's usually the same -- the bills that I

16  have to pay and maybe something else comes along and I have to

17  pay that too.  It's stressful.

18  Q    Okay.

19  A    Very stressful.

20  Q    And are there things that you need that you are unable to

21  pay for?

22  A    Oh, yes.

23  Q    Could you tell me what some of those things are?

24  A    Well, like a car or something, you know, that I want but

25  cannot afford.

Maximina Lara - Cross / By Ms. Deason                    246

1   Q    And your house?

2   A    Oh.

3   Q    Okay.

4   A    Clothing.

5   Q    Do you know what you would have to do in order to get a

6   birth certificate?

7   A    I don't know.  I don't know if it's a possibility anymore.

8   Q    Okay.  If you knew what you had to do and if you had the

9   documents and the only thing coming between you and that birth

10  certificate were $47, what would you do?

11  A    I'd just let it go by.  I would.  I would.  I wouldn't

12  have the money right there.

13  Q    You wouldn't be able to afford it?

14  A    Uh-huh.

15          **MS. VAN DALEN:**  Okay.  Thank you.

16          I have no more questions at this time.

17          **THE WITNESS:**  You're welcome.

18          **MS. DEASON:**  Whitney Deason for the Defendants.

19                  **CROSS EXAMINATION**

20  BY MS. DEASON:

21  Q    Good afternoon, Ms. Lara.

22  A    Good afternoon, ma'am.

23  Q    Are you over the age of 65?

24  A    (No audible response)

25  Q    You're over the age of 65, correct?

1    A    I can't hear you.

2    Q    You're over the age of 65, correct?

3    A    Sixty-five?

4    Q    You're over the age of 65 --

5    A    Oh, yes.

6    Q    -- correct?

7         And have you -- you voted in person with your

8    driver's license in the last year, is that correct?

9    A    Yes.

10   Q    And you haven't had any problems voting in person with

11   your driver's license in the last year --

12   A    Not at all.

13   Q    -- correct?

14        And your brother, Margarito Lara, who testified here

15   today, is he older than you?

16   A    He's older than me.

17   Q    And is it correct that you live next door to Mr. Lara,

18   your brother?

19   A    I can't hear you.

20   Q    Is it correct that you live next door to your brother,

21   Mr. Lara?

22   A    Oh, yes, brother.

23        **MS. DEASON:**  No further questions.

24   //

25   //

1                              **REDIRECT EXAMINATION**

2    **BY MS. VAN DALEN:**

3    Q    You're almost done.  The Declaration that we looked at

4    that you had signed, PL986 (indiscernible), did you -- did we -

5    - was that read to you before you signed it?

6    A    Yes.

7    Q    Yes.  Okay.

8         And do you know how to use a computer at all?

9    A    Not at all.

10   Q    Have you ever used the Internet?

11   A    I looked like 11 years ago.

12   Q    Okay.  So you couldn't use -- go to a website and check

13   for information?

14   A    Nothing --

15   Q    Thank you, ma'am.

16   A    -- to do with a computer.

17        **MS. VAN DALEN:**  Thank you, ma'am.

18        I have no further questions.

19        **THE COURT:**  All right.  Is that all for the witness,

20   then?

21        **MS. VAN DALEN:**  Yes, sir.

22        **THE COURT:**  You can step down, ma'am.

23        **MS. VAN DALEN:**  Yes, your Honor.

24        **THE COURT:**  Thank you.

25        **(Witness excused)**

1        **(Pause)**

2            **MR. FREEMAN:**  Dan Freeman on behalf of the United

3    States.  The United States would call it's next witness,

4    Dr. Gerald Webster.

5            **THE COURT:**  All right.  Good afternoon.  Would you

6    raise your right hand.

7            **GERALD R. WEBSTER, PLAINTIFFS' WITNESS, SWORN**

8            **MR. FREEMAN:**  And for the record, I will be using a

9    set of demonstratives that have been labeled as Plaintiffs'

10   Exhibit 1111 and they will be submitted along with Plaintiffs'

11   Supplemental Exhibits; however, I have a paper copy available

12   for the Court at this time.

13                      **DIRECT EXAMINATION**

14   BY MR. FREEMAN:

15   Q    Good afternoon, Dr. Webster.

16   A    Good afternoon.

17   Q    Would you please introduce yourself to the Court.

18   A    My name is Gerald R. Webster.

19   Q    And, Dr. Webster, what is your educational background?

20   A    I have a BA in political science from the University of

21   Colorado in Denver, a Master's of Science degree in geography

22   from Western Washington University, and a Ph.D. in 1984 in

23   geography from the University of Kentucky.

24   Q    And where do you work?

25   A    I'm currently professor and chair of the Department of

1  Geography at the University of Wyoming.

2  Q    Dr. Webster, you have in front of you what's been marked

3  as Plaintiffs' Exhibit 1099.  Is that a copy of your most

4  recent CV?

5  A    Yes, sir.

6  Q    And does your CV accurately reflect your experience?

7  A    Yes, sir.

8  Q    Dr. Webster, in what fields have you published peer

9  reviewed articles?

10  A    Primarily in political geography, but also in cultural

11  geography and also in geographic education.

12  Q    And have you won any awards in your field?

13  A    Two years -- three years ago I was awarded the lifetime

14  achievement award awarded by the Southeastern Division of the

15  Association of American Geographers.

16  Q    And have you given any distinguished lectures in your

17  career?

18  A    Yes, sir, a few.  Most recently I was asked to give the

19  primary lecture in political geography by the Political

20  Geography Specialty Group of the Association of American

21  Geographers in New York.  The Association of American

22  Geographers is our largest national organization of

23  professional geographers.

24  Q    Dr. Webster, have you previously provided reports or

25  testimony for litigation?

1   A    I provided reports, testimony, or both in ten different

2   states in I think 1996.

3   Q    And outside of litigation, have you ever been employed by

4   Legislatures?

5   A    Yes, sir.

6   Q    And have you been employed by Democratic controlled

7   Legislatures, Republican controlled Legislatures, or both?

8   A    Both.

9        **MR. FREEMAN:**  Your Honor, the United States would

10  offer Dr. Webster as a expert in geography, political

11  geography, and spatial analysis.

12       **THE COURT:**  All right.  You can proceed.

13  **BY MR. FREEMAN:**

14  Q    Dr. Webster, what were you asked to do in this case?

15  A    I was asked to look at the differential effects of SB 14

16  on racial and language minority groups and particularly to look

17  at whether or not there were differential effects in their

18  efforts to secure an EIC.

19  Q    And we'll move through your findings stepwise, but what

20  was the ultimate conclusion that you reached?

21  A    I did find that there were differential effects and that

22  the obstacles faced by African-Americans and Hispanics were

23  greater than they were for Anglos.

24  Q    And did you produce a written report in this case?

25  A    Yes, sir.

1    Q    And Dr. Webster, you also have in front of you a document

2    that's been marked as Plaintiffs' Exhibit 775.  Could you

3    identify that document for the record?

4    A    This is my August 15th report.

5    Q    Thank you.

6         Dr. Webster, I'd like to start by discussing just

7    some basic facts about Texas.

8         First, did we prepare a presentation containing

9    charts and maps as set out in the report you offered in this

10   case?

11   A    Yes, sir.

12   Q    And are the charts and maps in that presentation accurate

13   depictions of the charts and maps in your report?

14   A    Yes, sir.

15   Q    Thank you.

16        Dr. Webster, how did the racial makeup of the state

17   of Texas change from 2000 to 2010?

18   A    Quite dramatically.  The state grew very rapidly, about

19   20 -- or over 20 percent in total, but the Anglo population by

20   only 4 percent while the Hispanic population grew by a

21   tremendous increase.  In fact, 65 percent of the total increase

22   in the state's population was due to the growth in the Hispanic

23   population.  So in the year 2000 52.4 percent of the Texas

24   population was Anglo.  That's fallen to 45.3 percent in 2010.

25   The Hispanic population was 32 percent in the year 2000 and by

1    the 2010 census had grown to 37.6 percent.  And the African-

2    American population also grew as a percent, by two-tenths of

3    one percent.

4    Q    Dr. Webster, are there many states where Anglos or White

5    non-Hispanics make up less than 50 percent of the total

6    population?

7    A    Texas became the fourth majority minority state after

8    Hawaii, which had already been California and New Mexico.

9    Q    Thank you.

10        Among U.S. citizens residing in Texas, how do poverty

11   rates differ between racial or ethnic groups?

12   A    Very substantially.  The citizen poverty rate amongst

13   Anglos in the state of Texas is 8.6 percent, but it's nearly

14   three times higher for both Hispanics and African-Americans,

15   23.8 percent for Hispanics and 23.5 percent for African-

16   Americans.

17   Q    Dr. Webster, for purposes of the U.S. Census American

18   Community Survey, what is household vehicle access?

19   A    It means does a household have access to a car, a van, or

20   a truck or have they leased or rented one that's on the

21   premises for 30 days or more and is available for members of

22   the household.

23   Q    And among all households in Texas, how does household

24   vehicle access differ across the racial or ethnic groups with

25   regard to the household?

1  A    Amongst Anglo households as the household, only

2  3.7 percent of those households don't have access to a motor

3  vehicle.  The rate rises among Hispanics to 7.5 percent and

4  fairly dramatically to 13.4 percent among African-American

5  households.

6  Q    Dr. Webster, how is the Anglo population in Texas

7  distributed throughout the state?

8  A    In general, the counties with the highest proportioned

9  Anglo populations are in the northern and eastern portions of

10  the state.

11  Q    And as a quick aside, what are the black dots that appear

12  on this  map?

13  A    The black dots are the locations of DPS offices, but also

14  town or local government offices that agreed to process EIC

15  applications.

16  Q    How is the African-American population of Texas

17  distributed throughout the state?

18  A    Quite substantially in the eastern portion of the state,

19  and particularly along the Arkansas and Louisiana borders.

20  Q    And in what areas of the state are there

21  disproportionately high concentrations of Hispanic population?

22  A    Along the southern -- or the counties along the southern

23  border with Mexico have the highest proportion.

24  Q    And how are concentrations of poverty distributed

25  throughout Texas?

1   A     The highest proportions are along the U.S./Mexico border

2   and there also are some higher areas in the Texas Panhandle,

3   but also in the eastern portion of the state along the Arkansas

4   and Louisiana borders.

5   Q     Thank you.

6          Dr. Webster, are you familiar with SB 14, the law at

7   issue in this case?

8   A     Yes, sir.

9   Q     And what is your understanding of the geographic

10  distribution of DPS offices throughout Texas?

11  A     There are approximately 225 DPS offices and therefore

12  about 80 counties that don't have DPS offices.

13  Q     And so around what percent of the counties of the Texas is

14  that?

15  A     About a third.

16  Q     And you had mentioned that there are non-DPS locations

17  that were accepting applications for an election identification

18  certificate.  Do you know how many counties accept EIC

19  applications at county offices?

20  A     The last list I saw was 61.

21  Q     So roughly how many counties have no fixed location that

22  accepts EIC applications?

23  A     Approximately 20.

24  Q     And have you looked into whether county offices that

25  accept EIC applications have actually issued EICs?

1    A    Yes, I was provided declarations for 44 of the 61 counties

2    that agreed to process EIC applications and of that number,

3    only 11 had and in total had only produced -- or processed 40

4    applications for EICs.

5    Q    Dr. Webster, did you analyze the geographic distribution

6    of individuals that Dr. Stephen Ansolahehere estimated to lack

7    SB 14 ID?

8    A    Yes.

9    Q    Exactly what type of data did you rely on?

10   A    I was provided the data he uploaded to census tract, so I

11   had the total number of registered voters, as well as the

12   number of registered voters on the no match list.

13   Q    And to be clear, did you perform any independent analysis

14   of which voters in Texas lacked SB 14 ID?

15   A    No, sir.

16   Q    And did you conduct any independent verification of the

17   validity of Dr. Ansolahehere's analysis?

18   A    No, sir.

19   Q    Okay.  Dr. Webster, where are the most voters without

20   SB 14 ID concentrated in Texas?

21   A    Not surprisingly, they're found in the largest cities,

22   with the largest number being in Houston and San Antonio and in

23   Dallas, with secondary clusters in El Paso, Fort Worth, and

24   Austin.

25   Q    And could you point out -- do you have a laser pointer up

1    there?

2    A     Yes, sir.

3    Q     Could you point out the county that we are in now, Nueces

4    County?

5    A     (Indicating)

6    Q     And according to your map, approximately how many

7    registered voters in Nueces County, Texas don't have SB 14 ID?

8    A     A mean in that interval would indicate somewhere between

9    10,000 and 25,000.

10   Q     Dr. Webster, what areas of Texas have higher proportions

11   of voters who lack SB 14 ID?

12   A     Particularly in the southern and far western part of the

13   state along the U.S./Mexico border, but also there's clusters

14   of counties with higher proportions of registered voters

15   without appropriate ID in the eastern portion of the state

16   running along the Arkansas and Louisiana borders or slightly

17   inland from there.

18   Q     And how does that compare to the geographic distribution

19   of different racial or ethnic groups at the large scale level

20   that we discussed earlier?

21   A     Of course, the highest proportion of African-Americans by

22   county are in the far eastern portion of the state, so there's

23   overlap there.  And also the highest proportions of Hispanics

24   by county in the state are in the southern and western portions

25   of the state along the U.S./Mexico boundary.

1   Q     Thank you, Dr. Webster.

2         I'd like to ask a few questions about the

3   distribution of voters lacking SB 14 ID in specific types of

4   areas.

5         First, what is the overall percentage of Texas

6   registered voters who reside in Texas and lack SB 14 ID?

7   A     Five point eight percent of all registered voters residing

8   in the state of Texas do not have appropriate ID to vote.

9   Q     And Dr. Webster, what is a census tract?

10  A     A census tract is a geographic unit used by the Bureau of

11  the Census with average populations of possibly 4,000 people.

12  Q     And so in an urban area, approximately how large is a

13  census tract in terms of area?

14  A     Very small.

15  Q     And what have you described in your report as a low

16  vehicle access tract?

17  A     Those tracts that have more than 25 percent of their

18  households with no access to a motor vehicle.

19  Q     And what's the percentage of registered voters in low

20  vehicle access tracts in Texas who lack SB 14 ID?

21  A     Over double the statewide rate, 13.2 percent.

22  Q     Thank you.

23        Dr. Webster, did you do any other quantitative

24  analysis of the geographic distribution of voters without SB 14

25  ID?

1   A    I did a Pearson's correlation analysis.

2   Q    And are these the results of your Pearson's correlation

3   analysis statewide?

4   A    Statewide, yes, sir.

5   Q    And what does this table show?

6   A    Well, first it shows there were 5,234 census tracts in the

7   state, so that's the "N," which is sizeable.  It shows an

8   inverse relationship with Anglos CVAP, and a positive

9   relationship with African-American CVAP, Hispanic CVAP, the

10  citizen positive rate, and the proportion of households without

11  access to motor vehicles.  So in the state as a whole, as the

12  proportion of Anglo CVAP increases, the proportion of

13  registered voters without appropriate ID decreases for a

14  negative correlation or inverse correlation of negative .56.

15  Q    Is a negative point five -- well, what's the total

16  theoretical range of these correlations?

17  A    Negative 1.0 to positive 1.0.

18  Q    So is a negative 56, is that a strong inverse

19  relationship, higher Anglo CVAP means less proportion of people

20  without ID?

21  A    In social sciences, yes.

22  Q    Okay.  And how would you describe the correlations between

23  African-American CVAP and Hispanic CVAP and the percentage of

24  people without ID statewide?

25  A    It's a substantial correlation of .41.

1   Q     And how about Hispanic CVAP?

2   A     A moderately substantial correlation of .32 statewide.

3   Q     And are all those correlations statistically significant?

4   A     Highly statistically significant.

5   Q     Thank you.

6            Based on these figures, have you reached an opinion

7   regarding the areas in which there are higher concentrations of

8   voters lacking SB 14 ID?

9   A     The correlations would indicate a strong association that

10  the higher the proportion of registered voters without

11  appropriate ID are found in those areas where there are

12  concentrations of high proportions of African-Americans and

13  Hispanics.

14  Q    Dr. Webster, I would like to turn to your analysis of the

15  travel burden to obtain SB 14 ID.

16           First, what unit of measurement did you use to

17  measure the travel burden to obtain SB 14 ID?

18  A     In some cases both distance but particularly highlighted

19  and emphasized time.

20  Q     Is time an accepted metric to measure the costs associated

21  with voting in your discipline?

22  A     Yes.  Most particularly in social geography.

23  Q     In what areas of Texas did you measure the travel costs

24  associated with voting?

25  A     I selected the three largest cities.  All three are the

1    only three cities over 1 million, so Houston, San Antonio, and

2    Dallas.

3    Q    And what percentage of the low vehicle access tracts in

4    the state of Texas are in those three cities?

5    A    Fifty-five to 56 percent approximately.

6    Q    So more than half?

7    A    Yes.

8    Q    Okay.  And why did you stop after Houston, San Antonio,

9    and Dallas?

10   A    Three consistent results in the three largest cities, it

11   seemed inefficient to go on, plus one in -- nearly one in five

12   Texans resides in those three cities and nearly -- yeah, nearly

13   one in three African-American citizens of voting age population

14   resides in those three cities and one in five Hispanics

15   citizens of voting age population resides in those three

16   cities.  It's a very substantial sample of the state's

17   population.

18   Q    Within the cities you studied, what type of measurement

19   did you make with regard to all of the census tracts in that

20   city?

21   A    I calculated the distance and time from the centroid of

22   each census tract in each of the three cities to the nearest

23   DPS office, whether it was in the city or the surrounding

24   county, but it was the one that was closest.

25   Q    Let's break down how you did that.

1          So how did you -- first, could you tell us what on

2    this image is a census tract?

3    A    The census tract is very elongated.  This area here

4    (indicating).

5    Q    And for a given census tract, where did you start your

6    driving journey to DPS?

7    A    At the centroid, which is right here (indicating).  The

8    U.S. Census provides centroids for all census tracts in the

9    United States, since it's a very commonly used point to measure

10   distance or time.

11   Q    And using just the census tract, would you expect to see

12   errors based on some people living not right on top of the

13   census roll?

14   A    In some cases there's an over estimate and other cases

15   it's an under estimate, but they essentially cancel each other

16   out.  And if one looks at the fact that this is smack in the

17   center, I think that's easy to understand.

18   Q    And are estimates based on the center of a census tract

19   commonly used in the field of geography?

20   A    Yes.

21   Q    And where did you measure the driving distance to on this

22   map?

23   A    To the DPS office, which is right here (indicating), the

24   red spot.

25   Q    And after you measured driving time for all tracts in

1    Houston, did you measure driving time a subset of the tracts?

2    A    Yes.  Those are in with more than 25 percent of the

3    households do not have access to a motor vehicle.

4    Q    And did you also measure the distance -- excuse me -- the

5    time to reach a DPS office using any other modes of

6    transportation?

7    A    The bus.

8    Q    And why did you only measure bus travel time for low

9    vehicle access tracts?

10   A    The distance -- oh, well, in fact -- well, distance in

11   this particular case is much, much less relevant, because, of

12   course, a bus is a much slower means of moving over the same

13   distance than an automobile.

14   Q    But why did you not measure bus travel times for all

15   tracts in Houston?

16   A    It would have been certainly a big task to do.  And, of

17   course, what I was interested in here is accessibility and

18   accessibility in those tracts with more than 25 percent of the

19   households without motor vehicles seemed like the most relevant

20   place to look for differential effect of SB 14.

21   Q    Are those most likely bus users?

22   A    Yes, sir.

23   Q    Okay.  And how did you go about measuring the bus travel

24   time from each low vehicle access tract to a DPS location?

25   A    The time was measured from the centroid to -- from the bus

1    stop nearest the centroid -- and the centroid is right here

2    (indicating), the nearest bus stop is right there

3    (indicating) -- to the bus stop nearest the DPS office.  And,

4    of course, the DPS office is right here (indicating) and the

5    last bus stop is right there (indicating).  So it's a

6    measurement of time on the bus, but not walking from their

7    residence, or in this case from the centroid to the nearest bus

8    stop and not walking from the last bus stop to the DPS office.

9    Q    And what time -- did you start all of your bus trips at

10   the same time of day?

11   A    8:00 a.m.

12   Q    And why did you do that?

13   A    For consistency.

14   Q    Dr. Webster, after you measured the travel times to DPS

15   offices from all low vehicle access tracts, did you perform an

16   additional round of analysis regarding these tracts including

17   more than just a permanent DPS location?

18   A    Yes.  There were temporary mobile units dispatched to

19   different points in the three cities, so I added those into the

20   analysis as well.

21   Q    Why did you not include the temporary locations in your

22   initial analysis?

23   A    Because they were so temporary as to have really little or

24   no effect on the accessibility of getting to a DPS office.

25   Q    With that, I'd like to turn to your analysis of the city

1    of Houston and to begin with the same basic demographic maps

2    that we addressed earlier of the state as a whole.

3              Dr. Webster, first, how would you describe the

4    boundaries of the city of Houston?

5    A    Highly irregular.

6    Q    And so which census tracts did you include in your

7    analysis of the city of Houston?

8    A    Census tract boundaries do not follow municipal

9    boundaries, or I probably should say that in the reverse,

10   municipal boundaries don't necessarily follow census tract

11   boundaries.  Therefore, all census tracts whose centroids were

12   within the city limits were included in the analysis.

13   Q    And Dr. Webster, what are the black dots on this map?

14   A    Those are the locations of DPS offices.

15   Q    And what are the green dots on this map?

16   A    Those are the locations of the temporary mobile units.

17   Q    And does this map indicate how many days the temporary DPS

18   locations were open in Houston in 2014?

19   A    In this case there were two units that were located on two

20   different days, February 27th and 28th, at least between

21   January 1st, 2014 and approximately May 15th, 2014.

22   Q    And so how would you describe the geographic patterns of

23   Anglo population in Houston?

24   A    Tends to be in the northeastern portion, the southeastern

25   portion, and beginning or closer to the center of the city and

1    a corridor out to the western edge of the city.

2    Q    And did you also create maps of the Anglo citizen voting

3    age population for each of the cities?

4    A    Yes, sir.

5    Q    And are those also contained in your report?

6    A    They're in Appendix 2.

7    Q    Okay.  How would you describe the geographic patterns of

8    African-American population in Houston?

9    A    Quite concentrated.  You'll notice there's a large cluster

10   of census tracts with high proportions of African-Americans in

11   the northeastern portion of the city, in the north central

12   portion of the city, and in the south central portion of the

13   city.

14   Q    And how would you describe the geographic patterns of

15   Hispanic population in Houston?

16   A    In the eastern portion and the southeastern portion

17   there's a substantial number of tracts with high proportion,

18   moving up to the -- I guess that would be east central portion

19   and the northern portion of the city and the southeastern

20   portion of the city.

21   Q    And where in the city of Houston are there higher rates of

22   households without access to a motor vehicle?

23   A    In different locations, but, obviously, there's a small

24   cluster here (indicating) in the inner part of the city, in the

25   south central portion of the city, and then miscellaneous

1   blocks, not necessarily a concentration, but here and there in

2   the southeastern -- southwestern portion of the city.

3   Q    And Dr. Webster, what is the racial makeup of those tracts

4   that you determined to be low vehicle access tracts in the city

5   of Houston?

6   A    The geographic correlation, and by that I mean the direct

7   comparison of the patterns on the two maps, are that those

8   areas with high proportions of households without access to a

9   motor vehicle are generally populated by Hispanics and African-

10  Americans.

11  Q    And with regard to the specific tracts that you found to

12  be low vehicle access tracts in Houston, what was the racial

13  makeup of those tracts, those individual tracts?

14  A    There were 30 in the city of Houston, all but one were

15  either plurality or majority African-American or Hispanic, and

16  one had a plurality Anglo population.

17  Q    Dr. Webster, what did you find to be the average one-way

18  travel time by car from inside the city of Houston to a DPS

19  office?

20  A    Nine point nine minutes.

21  Q    And Dr. Webster, from those census tracts that you

22  determined to have low vehicle access, what was the average

23  one-way travel time by car?

24  A    Slightly higher, at 10.5 minutes.

25  Q    But from low vehicle access tracts in Houston, what did

1   you determine to be the average one-way travel time by bus,

2   excluding walking and waiting?

3   A    Sixty-six point seven, so approximately a five, five and a

4   half time greater amount of time to access the DPS office by

5   bus than by motor vehicle.

6   Q    And let's include the temporary DPS units.  Including

7   those units, what is the average one-way travel time by car

8   from a low vehicle access tract to a location that accepts

9   applications for EICs?

10  A    They were well placed, so it goes down to 7.9 minutes by

11  car and is reduced to 44.6 minutes by bus, but still something

12  like five times greater.  And, of course, in this particular

13  circumstance there were two mobile units that were placed for

14  two days.

15  Q    And how do you expect these differences to affect African-

16  Americans and Hispanics?

17  A    They mean that the obstacles in the inference of time are

18  significantly greater, at least those faced by Hispanics and

19  African-Americans than by Anglos.

20  Q    Dr. Webster, what areas of Houston have higher proportions

21  of voters who lack SB 14 ID?

22  A    Particularly the northeastern portion and the south

23  central portion, but also some clusters of tracts with high

24  proportions here (indicating) and in the north central portion

25  of the city.

1  Q    Dr. Webster, we've prepared some side-by-side slides

2  showing both the no match population and population

3  concentrations.

4           How do the areas with higher proportions of voters

5  lacking SB 14 ID compare to the geographic distribution of

6  African-Americans in Houston?

7  A    They match quite closely.  The geographic correlation

8  between the two maps is very substantial.  If we look up in the

9  northern part of the city here (indicating), high rates of

10 registered voters without appropriate ID.  And, of course, this

11 is a concentration of African-Americans.  There is a

12 concentration of African-Americans here (indicating) that

13 parallels high proportions of registered voters without

14 appropriate ID in the northeast portion of the city.  There's

15 also a high density of registered voters without appropriate ID

16 in the south central part.  And, of course, that is a high

17 proportion African-American population area as well.

18 Q    And Dr. Webster, how would you describe the geographic

19 correlation between voters lacking SB 14 ID and the

20 distribution of Hispanics in Houston?

21 A    There's also an overlap, though not as substantial as with

22 respect to African-Americans.  But if we look at this area here

23 (indicating) on the eastern portion of the city, of course, in

24 particular, it lines up with the high proportion Hispanic

25 census tract in the southeastern portion of the city.

1  Q    And just looking at the map of -- the map on top of those

2  without SB 14 ID, tell me, the area of the corridor from the

3  center of the city extending west, how would you describe the

4  rates of individuals lacking SB 14 ID in that corridor that we

5  talked about before?

6  A    They are much lower.  And, of course, this is the Anglo

7  portion -- or greater proportions of Anglos living in those

8  census tracts.

9  Q    With that, I'd like to turn to your analysis of the city

10 of San Antonio and begin with the same basic demographic maps

11 again.

12          First, Dr. Webster, how would you describe the

13 boundaries of the city of San Antonio?

14 A    Irregular, though not quite as irregular as the city of

15 Houston.

16 Q    And so then what census tracts did you include in your

17 analysis of the city of San Antonio?

18 A    I included all census tracts with centroids within the

19 city limits of San Antonio in the analysis.

20 Q    And how many days were temporary DPS locations open in

21 San Antonio in 2014?

22 A    Actually there was one mobile unit and it was there for

23 two days at two different locations.

24 Q    I'm seeing two mobile units?

25 A    It was the same -- the same mobile unit was at one of them

1    on one day and then at the other on the second day.

2    Q    I see.   Thank you.

3             Dr. Webster, how would you describe the geographic

4    patterns of Anglo population in San Antonio?

5    A    Heavily concentrated in the northern half of the city,

6    with also an enclave of Anglos in the southeastern portion of

7    the city.

8    Q    And how would you describe the geographic concentrations

9    of African-American population in San Antonio?

10   A    A much smaller area on the eastern -- east central margin

11   of the city.

12   Q    And how would you describe the geographic patterns of

13   Hispanic population in San Antonio?

14   A    By far the greatest concentration is the southern half of

15   the city.

16   Q    And where in the city of San Antonio are there higher

17   rates of households without access to a motor vehicle?

18   A    In the southeast or the southern part of the city, which

19   is, of course, largely Hispanic.

20   Q    Dr. Webster, what is the racial makeup of those individual

21   tracts that you found to have determined to be low vehicle

22   access tracts in the city of San Antonio?

23   A    There were 21.  Nineteen of those were either plurality or

24   majority Hispanic, and the remaining two were majority African

25   American.

1   Q    So there were no low vehicle access tracts in majority or

2   plurality Anglo areas?

3   A    No, sir.

4   Q    Dr. Webster, what did you find to be the average one-way

5   travel time by car to a DPS office from in San Antonio?

6   A    Nine point nine minutes.

7   Q    And from those census tracts that you determined to have

8   low vehicle access what was the average one-way travel time by

9   car?

10  A    Somewhat lesser, 7.5 minutes.

11  Q    And from the low vehicle access tracts in San Antonio what

12  was the average one-way travel time by bus?

13  A    Thirty-six point two minutes.

14  Q    And what conclusions did you reach based on that

15  difference?

16  A    That the low vehicle access tracts are, in large part,

17  populated by Hispanics and in two cases by African Americans.

18  And if they need to use the bus, it's a several times longer

19  trip than it is by car.  And that does not include, of course,

20  the walking time from their residence to the bus stop and then

21  at the last bus walking to the actual DPS office.

22  Q    And if we add in that one moving temporary DPS location,

23  what was the average one-way travel time by car from the low

24  vehicle access tracts?

25  A    Of course it, again, it was very well sighted.  It reduced

1   time to 4.9 minutes and also reduced the bus travel time to

2   31.3 minutes.  But again, it was one mobile unit that was

3   placed in two different locations on two different days.

4   Q    And over all what would you -- what conclusions have you

5   reached concerning the effects on African Americans and

6   Hispanics of these travel times that you found?

7   A    Well, most particularly, in the low vehicle access tracts

8   Hispanics, and to a lesser degree at least in terms of numbers,

9   African Americans faced additional obstacles, burdens in trying

10  to get to a DPS office to secure an EIC.

11  Q    Dr. Webster, what areas of San Antonio have the higher

12  proportions of voters who lack SB 14 ID?

13  A    Very much the southern portion of the city.

14  Q    And again, we've prepared some of these side-by-side maps.

15  How would you describe the cartographic correlation between

16  areas with higher rates of individuals lacking SB 14 ID and the

17  African American population in San Antonio?

18  A    Well, you can see the African American concentration for

19  San Antonio is right here, (indicating).  And, of course, this

20  correlates on the map with also high rates of registered voters

21  without appropriate ID to vote.

22  Q    And how would you describe the cartographic correlation

23  between areas of San Antonio where there are higher proportions

24  of voters lacking SB 14 ID and the Hispanic population?

25  A    Again, the Hispanic population spans throughout the city.

1   But the largest concentrations are in the southern half.  And,

2   of course, the census tracts with the largest proportion of

3   registered voters without appropriate ID to vote correlate

4   quite well cartographically.

5   Q    With that, finally I'd like to turn your analysis to the

6   city of Dallas and to begin with, again, the same demographic

7   maps.

8            First, how would you describe the boundaries of the

9   city of Dallas?

10  A    Interesting.  Irregular.  I even note that in this

11  particular case there are census tracts that are outside of

12  Dallas County that are part of the city of Dallas.

13  Q    And so, again, which census tracts did you include in your

14  analysis?

15  A    All census tracts that had centroids within the city

16  limits were included in the analysis.

17  Q    And how many days were temporary DPS locations open in

18  Dallas in 2014?

19  A    There was one mobile unit, which was located for one day.

20  Q    Thank you.  Dr. Webster, how would you describe the

21  geographic patterns of Anglo population in Dallas?

22  A    In the enclave here, obviously very, very high proportions

23  of Anglo population.  In the northern third of the city very

24  high proportions of Anglo population by census tract.  And then

25  in the southeastern portion and a bit in the southwestern

1   portion.

2   Q    Thank you.  And how would you describe geographic patterns

3   of African American population in Dallas?

4   A    Well, there is an enclave of African Americans in the

5   northeastern segment.  In general, the African American

6   population is concentrated in the approximately southern third

7   of the city with an enclave also off to the west.

8   Q    And how would you describe the geographic patterns of

9   Hispanic population in Dallas?

10  A    Also very concentrated in the eastern but particularly

11  southeastern portion of the city of Dallas, southwestern or

12  south central portion of Dallas and the northwestern portion of

13  Dallas.

14  Q    And where in the city of Dallas are there higher rates of

15  households without access to a motor vehicle?

16  A    Most particularly in the southern half of the city with

17  some concentrations in the northeast as well.

18  Q    And Dr. Webster, what is the racial makeup of those

19  tracts, those individual tracts again, that you determined to

20  be low vehicle access tracts in the city of Dallas?

21  A    There were 23, one of which had a plurality of Anglo

22  population.  The remaining 25 were either majority or plurality

23  African American in the main with a few that were plurality or

24  a majority Hispanic.

25  Q    And that one Anglo plurality district -- or excuse me,

1   plurality tract, that was still majority combined Black and

2   Hispanic; am I right?

3   A     Or other minority groups as well.

4   Q     Got it.   Thank you.   Dr. Webster, what is the average

5   one-way travel time by car to a DPS office from inside Dallas?

6   A     For all tracts 11.3 minutes.

7   Q     And Dr. Webster, from those tracts that you determined to

8   be low vehicle access tracts what was the one-way average

9   travel time by car?

10   A     In those 23 tracts it was 12.8 minutes.

11   Q     But what was the travel time from the low vehicle access

12   tracts by bus?

13   A     Nearly an hour, 59.7 minutes.

14   Q     So assuming a 15-minute waiting time and a 15-minute

15   walking time each way, how long on average would a round trip

16   by bus to DPS be from a low vehicle access tract in Dallas?

17   A     Approximately two-and-a-half hours.

18   Q     What conclusions did you reach based on the difference

19   between travel time by car and travel time by bus from the low

20   vehicle access tracts in Dallas?

21   A     Since 22 of the 23 are plurality and in these cases either

22   majority African American or majority Hispanic, Hispanic -- the

23   Hispanic citizens and African American citizens have greater

24   hurdles to overcome to get to a DPS office than Anglos to

25   secure an EIC.

1   Q    And if we add in the temporary DPS location in Dallas what

2   was the average one-way travel time by car from the low vehicle

3   access tracts to DPS?

4   A    Again there were -- the location that was well sighted was

5   7.8 minutes.  But it was only there for one day.

6   Q    And if we add in that temporary DPS location, what was the

7   average one-way travel time by bus?

8   A    Thirty-three point five minutes.

9   Q    Dr. Webster, what conclusion did you reach based on these

10  differences?

11  A    In all three cities or with respect to Dallas?

12  Q    Just with respect to Dallas.

13  A    With respect to Dallas, again, the low vehicle access

14  tracts which were not picked as a result of race but only

15  access to a motor vehicle were populated, in large part, by

16  African Americans and Hispanics.  Without access to a motor

17  vehicle having to take the bus they face additional temporal

18  obstacles by using the bus to get to a DPS office to secure an

19  EIC.

20  Q    Dr. Webster, what areas of Dallas have higher proportions

21  of voters who lack SB 14 ID?

22  A    In particular, in the southern half of the city with a few

23  tracts in the north; but overwhelmingly concentrated in the

24  southern half.

25  Q    Dr. Webster, again we've made one of these side-by-side

1  comparisons.  And could you describe the cartographic

2  correlation between the areas that have higher proportions of

3  lacking SB 14 ID and higher proportions of African American

4  population?

5  A    The geographic or cartographic correlation is quite high.

6  Notice we have a concentration of census tracts with registered

7  voters without appropriate ID up here, (indicating).  And we

8  find that those are populated, in large part, by African

9  Americans.  Over here, (indicating), we have an African

10 American concentration.  And, of course, here, (indicating), we

11 find that there are large proportions of registered voters

12 without access to appropriate ID.  And most particular in this,

13 (indicating), area of the city, south central, the largest

14 African American concentrations are located there.

15 Q    And it's also the largest concentration of voters without

16 SB 14 ID?

17 A    Yes, sir.

18 Q    And Dr. Webster, how would you describe the cartographic

19 correlation between voters lacking -- share of voters lacking

20 SB 14 ID and the Hispanic population in Dallas?

21 A    Somewhat lesser than the African American population but

22 also quite significant.  We have a concentration here,

23 (indicating), of registered voters without appropriate ID.

24 And, of course, that correlates with this, (indicating), the

25 Hispanic concentration.  We also have high proportions of

1    registered voters without appropriate ID, and to a lesser

2    extent in this part of the city also is Hispanic.

3    Q    I'm sorry to ask you to do that again but just so that we

4    have a clear record could you just describe in terms of

5    cardinal directions --

6    A    Sure.

7    Q    -- where the overlap is?

8    A    Of course.  This, (indicating), is the south central or

9    the south central western part of the city with a large

10   Hispanic concentration.  And, of course, this overlaps with

11   this, (indicating), area in the south central western portion

12   of the city.

13   Q    Thank you.  Dr. Webster, looking at Houston, San Antonio

14   and Dallas, how do rates of individuals who lack SB 14 ID in

15   low vehicle access tracts compare to the city as a whole?

16   A    In the city of Houston, 6.9 percent of registered voters

17   lack appropriate ID to vote.  But if we look at those tracts

18   that are low vehicle access tracts, the number jumps to nearly

19   double, 13.5 percent.

20          In the city of San Antonio, over all 6.8 percent of

21   registered voters lack appropriate ID.  But if we look at just

22   the 21 low vehicle access tracts, it jumps again to nearly

23   double at 12.2 percent.

24          In the city of Dallas, 8.2 percent of registered

25   voters lack appropriate ID to vote.  If we look at only the low

1   vehicle access tracts, 23 of them, the number jumps to not

2   double but close to a 15.1 percent.

3   Q    Dr. Webster, turning to your geographic correlation

4   analysis, what effect did you find on the share of voters who

5   lack SB 14 ID in all three cities when the Anglo population

6   goes up?

7   A    These are, in fact, higher than it would be for the state

8   as a whole.  They are consistently negative, they are

9   consistently .7 and above, so very consistent findings.  So

10  there's an inverse relationship.  The greater the proportion of

11  Anglo citizens of voting age population the less the proportion

12  of citizens -- I'm sorry, registered voters without access to

13  appropriate ID.

14  Q    And how about the effects on -- what did you find in

15  regard to African American citizens of voting age, those

16  concentrations across the three cities?

17  A    Most particularly, in Houston and Dallas who have the

18  larger African American populations, there's a high positive

19  correlation between African American citizens of voting age

20  population by census tract and the proportion of registered

21  voters by tract without access to appropriate ID to vote.  And

22  the correlation coefficients are .65 and .66, so very

23  substantial.

24  Q    And what did you find with regard to concentrations of

25  Hispanic citizens of voting age across the three cities with

1    regard to the concentration of individuals who lack SB 14 ID?

2    A    Well, the most substantial finding was with respect to

3    San Antonio, which has a very high proportion of Hispanics.

4    And it was a positive correlation between Hispanic citizens of

5    voting age population and registered voter -- or the proportion

6    of registered voters without access to appropriate ID to vote.

7            The correlations in the Houston and Dallas are

8    significant, but the coefficients themselves are not as

9    substantial as in San Antonio.  And you know, likewise, not as

10   high in San Antonio for African Americans but much more

11   substantial in both Houston and Dallas.

12   Q    And across all three cities what relationship did you find

13   between poverty or lack of vehicle access and the number of --

14   and the share of individuals who lack SB 14 ID?

15   A    Very substantial positive correlation between the citizen

16   poverty rate by census tract and the proportion of registered

17   voters without access to appropriate ID to vote.  So than range

18   from .699, essentially .70, up to .79, which are very

19   substantial and very statistically significant.

20   Q    Dr. Webster, as a geographer what is your ultimate opinion

21   of the effect of travel time on the ability of voters to obtain

22   an EIC?

23   A    Travel time, particularly in low vehicle access tracts,

24   differs or is much higher in the case that a registered voter

25   or a potential voter needs to secure appropriate ID.  The bus

1   travel times in most cases are five or six times greater than

2   they are if someone had access to a motor vehicle.  And since

3   those tracts, in general, are largely populated by African

4   Americans and Hispanics, African Americans and Hispanics have

5   much greater obstacles to securing an EIC than Anglos.

6   Q    And what types of communities did you find were most

7   likely to contain registered voters who require SB 14 ID and

8   don't currently have it in order to vote?

9   A    In large part, there are Hispanic communities and African

10  American communities.  Anglo communities, in general, have much

11  higher proportions of registered voters with appropriate ID to

12  vote already.

13  Q    So, in sum, what does your geographic analysis explain

14  concerning the effects of SB 14?

15  A    My analysis was looking to who, who is going to be most

16  affected.  And clearly, in a geographic sense the African

17  American community and the Hispanic communities are going to

18  much more impacted in terms of their efforts to secure an EIC

19  or other appropriate ID.

20  Q    Thank you so much, Dr. Webster.

21       **MR. FREEMAN:**  I pass the witness.

22       **(Pause)**

23  //

24  //

25  //

1                        **CROSS EXAMINATION**

2    **BY MR. CLAY:**

3    Q    Good afternoon, Dr. Webster.  How are you?

4    A    Just fine.  Thank you.

5    Q    Good to see you again.  You testified in your report that

6    Houston, Dallas and San Antonio all had well developed bus

7    systems, correct?

8    A    Yes, sir.

9    Q    Okay.  And I think I heard you a minute ago say that

10   setting aside the frequency with which the mobile EIC units

11   were in those counties that they were well situated in those

12   counties?

13   A    Yes.

14   Q    Okay.  And is it your testimony that they were situated

15   near low access vehicle tracts?

16   A    Not necessarily.  But they were located at possibly a

17   crossroad -- in highly accessible places.

18   Q    Okay.  And that's true for Harris, Dallas and Bexar

19   County?

20   A    Yes.  The locations were excellent.  The time there was

21   the limitation.

22   Q    And you testified that you were asked to determine whether

23   implementation of Texas photographic voter identification law,

24   or SB 14, will have differential effects on racial and language

25   minority groups; is that correct?

1    A    Yes, sir.

2    Q    And then you say, "with an emphasis on contrast between

3    non-Hispanic Whites or Anglos, Hispanics and non-Hispanic

4    African Americans"; is that right?

5    A    In their efforts to secure an EIC.

6    Q    And you say "with an emphasis on."  But did you look at

7    any other racial minorities or racial classes other than

8    Whites, Hispanics or African Americans?

9    A    In terms of some of the preliminary work that is found in

10   Appendix 1, there are other groups listed in terms of the

11   population diversity of the state.  But I did not calculate

12   driving time or bus time for any other group than all census

13   tracts within the city and the census tracts that had low

14   vehicle access, only two of which had significant Anglo

15   populations and the others, in large part, majority African

16   American or majority Hispanic.

17   Q    Yes, sir.

18        MR. CLAY:  Brian, could you pull up slide number

19   three from the Plaintiffs' demonstrative?

20   Q    You were talking about statewide population a minute ago,

21   right?

22   A    Yes, sir.

23   Q    So these figures here represent the percentage of the

24   total population that are Anglo, Hispanic and African American?

25   A    Yes, sir.  And the enumeration is in 2000 and 2010.

1  Q    Would these numbers be different if you were looking at --

2  I mean your other -- the rest of your analysis was done on the

3  basis of citizen voting age population, correct?

4  A    When it was available.

5  Q    So would these numbers look different if you were looking

6  at the growth between 2000 and 2010 if you're looking at

7  citizen voting age population?

8  A    The 2010 census did not ask any question pertaining to

9  citizenship, so we would not be able to calculate it based upon

10 the 2000 and 2010 census.

11 Q    But if you used the ACS survey like you did for the rest

12 of your analysis, you could get the citizen voting age

13 population in, say, the year 2000 for these three racial

14 groups, correct?

15 A    Well, the problem is we have no comparator.  But --

16 Q    Could you get the citizen voting age population for these

17 three --

18 A    We can have it for 2006 to 2010 or we can have it from

19 2008 to 2012.

20 Q    So is it --

21 A    But since those overlap we would not be able to make a

22 comparison of the population.

23 Q    Well, you looked at the 2006 to 2010 here, right?

24 A    Yes, sir.

25 Q    Okay.  And why couldn't you have compared the citizen

1   voting age population as estimated in the ACS survey that went

2   from 2006 to 2010 and compared that to the 2000 enumeration to

3   get a better idea of the citizen voting age population growth?

4   A    I don't believe that the 2010 enumeration had a question

5   about citizenship either.  But we wouldn't have a, again, a

6   baseline, a comparator.

7   Q    Okay.  So are you saying it's impossible to know the

8   growth and citizen voting age population in the state of Texas

9   between the year 2000 and 2010?

10  A    I'm not sure if it's impossible.  In the next few years it

11  will be possible as the ACS kicks in and we have more and more

12  additional five-year time periods.

13  Q    And so it's not something you looked at for this report.

14  A    No.

15  Q    Okay.  And so going back to what you were asked to do in

16  this report, which is to measure the differential effects on

17  racial and language minority groups in Texas, right?

18  A    Yes, sir.

19  Q    I found it a little bit curious that given that that was

20  your task --

21        **MR. CLAY:**  Switch to the Elmo, please.

22  Q    I found it a little bit curious that given that your task

23  was to look at the differential effects in the state of Texas

24  that you looked at, roughly, 2 percent of the number of

25  registered voters who lack SB 14 ID in Texas.

1          **MR. FREEMAN:**  Objection, your Honor.  That's not a

2     question; it's an observation.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  Could you rephrase the question?

5     **BY MR. CLAY:**

6     Q    Well, let's just do the math here.  I want to put my phone

7     here and put the calculator on, and I'll put it right next to

8     your chart here.  And it says here that -- and these numbers

9     come from Dr. Ansolabehere, correct?

10    A    Yes, sir.

11    Q    And so he calculated that the registered voters in Texas

12    that there's seven hundred eighty-four, three hundred ninety-

13    six thousand registered voters who lack SB 14 ID, right?

14    A    In the state or --

15    Q    In the state of Texas.

16    A    -- residing in the state of Texas.

17    Q    Yes.  And so you looked at -- when during your travel

18    burden comparison between buses and cars travel, you looked at

19    the low vehicle access tracts in Houston, the low vehicle

20    access tracts in San Antonio and the low vehicle access tracts

21    in Dallas; is that right?

22    A    Yes, sir.

23    Q    Okay.  And do those add up to about 26 -- if I add up

24    these numbers here, (indicating), for each of those low vehicle

25    access tracts, does that add up to about 26,262 registered

1    voters --

2    A    I can't --

3    Q    -- without SB 14 ID?

4    A    I sorry, sir.  I can't really see the table.  It's off to

5    the side so I don't know what rows are --

6    Q    You have your report in front of you, right?

7    A    Yes, sir.

8    Q    Okay.  We're looking at Table 9.

9         **(Pause)**

10   A    Okay.

11   Q    Okay.  So what I'm asking, my preliminary question is if I

12   take the number -- the total number of registered voters

13   without SB 14 ID in the low vehicle access tracts in Houston,

14   San Antonio and Dallas, do they add up to 26,262?

15   A    They should, yes.

16   Q    So all of --

17   A    No, I'm sorry.  That's low -- the second row is low

18   vehicle access tracts in Texas.

19   Q    So all of the low vehicle access tracts in Texas are not

20   in Houston, San Antonio and Dallas, right?

21   A    No.  Fifty-five percent of the low vehicle access tracts

22   in the entire state, the 138 statewide, are found in those

23   three cities.

24   Q    So I'm going to add up the number of people that -- number

25   of registered voters without SB 14 ID that are in the census

1    tract, the low vehicle access census tracts that you looked at.

2           Six four three four, plus three six four two, plus

3    five nine six five, equals 16,041; is that right?

4    A    Yes, sir.

5    Q    Now, if I wanted to know what percentage of that -- what

6    percent that is of the total number of registered voters in

7    Texas that lack SB 14 ID what would I do next?

8    A    Divide 784,396.

9    Q    So 2 percent?

10   A    Yes, sir.

11   Q    So your travel burden analysis looked at 2 percent of the

12   registered voters in Texas without SB 14 ID.

13   A    Well, I actually looked at all census tracts in all three

14   cities but drilled down on --

15   Q    Well, when doing your -- doing your comparison between

16   travel by bus and travel by car you looked at approximately

17   2 percent of the registered voters in Texas that lack SB 14 ID;

18   is that right?

19   A    That is true.

20   Q    Okay.  How many census tracts are in Texas?

21   A    It was on one of the tables.  I think it's 5,360

22   something, approximating that.

23   Q    And how many low vehicle access census tracts did you

24   analyze?

25   A    I should correct myself.  It's 5,234 total tracts in the

1    state of Texas.

2    Q    And how many low vehicle access census tracts did you

3    analyze?

4    A    Seventy-seven.

5    Q    What percent of 5,234 is 77?

6    A    I'm not sure.

7    Q    Here, let's do it again.  Seventy-seven divided by 5,234

8    did you say?

9    A    Yes, sir.

10   Q    So you looked at 1.5 percent of the total census tracts in

11   the state of Texas when you were doing your travel comparison,

12   correct?

13   A    Yes, sir.

14   Q    How did you define -- well, tell me how is "low vehicle

15   access tract" defined?

16   A    Those census tracts that have more than 25 percent of

17   their household without access to a motor vehicle.

18   Q    And is that something in the census or did you make it up?

19   A    I came to the conclusion that it was a relevant number,

20   Six percent of all households in the state of Texas don't have

21   access to a motor vehicle.  So essentially what we were looking

22   at is four times the statewide rate.

23   Q    So you made up the term low vehicle access tract, right?

24   A    I guess that's accurate.  I don't know about made up.  I

25   mean it's a very accurate label.

Webster - Cross / By Mr. Clay                              291

1    Q    And so why didn't you look at -- you said there were a

2    total of 138 low vehicle access census tracts; is that right?

3    A    Yes, sir.

4    Q    Well, I mean if we're going to look at low vehicle access

5    census tracts, why would we not look at all of them?

6    A    Because after having done the three cities, which is a

7    substantial proportion of the total population of the state of

8    Texas, they were consistent.  And essentially what I looked at

9    then is, you know, a sample of approximately 20 percent of the

10   entire state, and 56 or 55 percent of all low vehicle access

11   tracts.

12   Q    Am I right in remembering that Dr. Ansolabehere took his

13   no-match list and geocoded all of the registered voters without

14   ID into various census tracts across the state of Texas?  Is

15   that right?

16   A    I believe so.

17   Q    You believe so?

18   A    I didn't --

19   Q    You don't know whether he did or didn't?

20   A    Well, they were geocoded.  I didn't speak to him

21   specifically.

22   Q    Okay.  And then he also geocoded every registered voter in

23   Texas into a particular census tract; is that right?

24   A    Yes, sir.

25   Q    Okay.  And when you were doing your analysis you told us a

1    little bit earlier that you calculated the travel based upon a

2    star point of the centroid.

3    A    Yes, sir.

4    Q    That's kind of arbitrary isn't it?

5    A    No, sir.

6    Q    Well, it's arbitrary in the sense that you know which

7    voters lack SB 14 ID in every census tract, because

8    Dr. Ansolabehere gave you that information, correct?

9    A    I know -- I knew or I had the proportion of voters,

10   registered voters and the proportion of registered voters by

11   census tract that lacked ID.

12   Q    Oh, I see.  He gave you aggregate data.

13   A    Yes.

14   Q    So he didn't give you the actual individuals that were in

15   each census tract?

16   A    I had data for all 5,234 census tracts.

17   Q    But he didn't give you the actual individuals that were in

18   that census tract, correct?

19   A    He didn't give me the data directly.  It gave from the

20   Department of Justice.

21   Q    But you didn't know the identity of those voters that were

22   in those census tracts because he didn't give that to you,

23   correct?

24   A    Yes, sir.  It was not relevant to my analysis.

25   Q    Or you didn't ask for it.

1    A    No, sir.

2    Q    Okay.  So then your analysis because you didn't have the

3    individual voters or their addresses which were part of the

4    team database that Dr. Ansolabehere analyzed, you weren't able

5    to calculate the travel time for any particular individual who

6    lacked SB 14 ID, correct?

7    A    No, sir.

8    Q    And that's not something that you were asked to do,

9    correct?

10   A    No, sir.

11   Q    You also said a minute ago that you chose -- I think your

12   words were to be consistent 8:00 a.m. in a start time; is that

13   right?

14   A    Yes, sir.

15   Q    Have you ever driven in Houston?

16   A    I've driven through.

17   Q    What about at 8:00 a.m.?

18   A    I don't recall.

19   Q    Have you ever driven in Dallas at 8:00 a.m.?

20   A    Yes, actually.

21   Q    Oh, how did that go?

22   A    Well, I'm from Wyoming so any time in a big city is

23   difficult.

24   Q    Did you perform any sort of sensitivity analysis to

25   determine whether or not starting in the middle of rush hour

1    would have some effect on the travel times that you calculated?

2    A    I did -- we did -- I had a -- I subtracted with the

3    Cartographic Research Laboratory at the University of Alabama,

4    as you know.  And we did do some sensitivity and decided that

5    8:00 a.m. was a good time to start; because, one, it was

6    consistent but also it provided the large part of the day

7    should the trip or the stop at the DPS office take a long time.

8    And our --

9    Q    Well, that's a good point that I want to come back to.

10            **MR. CLAY:**  But first, can you pull up his deposition

11   on Page 118?  And I'm looking for line 16 through 20, please.

12           **(Voices heard off the record)**

13            It's 118, Webster Depo 118, 16 through 20.

14   Q        "QUESTION:  Did you do any sort of, we'll call it

15            sensitivity analysis, by choosing a different start

16            time to see how much travel times varied depending on

17            what time you chose?

18            "ANSWER:  No, we picked 8:00."

19   A    Well, and I do recall we picked some afternoon times, too.

20   I mean this was not a great, great amount of effort to

21   determine if there was sensitivity between 8:00 and 3:00.  In

22   general, we got the same time.

23   Q    And I think you put it in your report that you checked --

24   in preparing your report you looked at -- you examined data

25   regarding the locations of Texas Department of Public Safety

1    offices at which potential voters can secure EICs and other

2    forms of identification sufficient to cast a ballot, in-person

3    ballot, under SB 14; is that right?

4    A    Yes, sir.

5    Q    Did you look at the times they opened?

6    A    We had a list of all DPS offices and the times that all of

7    them opened, yes.

8    Q    Were you in the courtroom earlier when I pulled up -- when

9    I had Brian pull up the DPS offices in Harris County?

10   A    I was in the back of the courtroom.  I couldn't see.

11   Q    Are you aware that the DPS offices, most of the DPS

12   offices in Harris County open at 8:00 or earlier?

13   A    I knew that most of them opened at 8:00, yes.

14   Q    So if your concern was that you wanted to let the person

15   have the better part of their day, why wouldn't they leave in

16   time to get there when the DPS office opened?

17   A    We could have used 7:00 or 7:30 or 8:00 or 9:00 or 3:00 in

18   the afternoon.  But again --

19   Q    But you chose 8:00 o'clock in the middle of rush hour,

20   correct?

21   A    To pick a consistent time for all of the calculations,

22   yes.

23   Q    Let's walk back to the ACS data because I know that -- and

24   we talked a lot about it at your deposition and I'd like to

25   kind of run down some of the things that we talked about for

1    the Court's sake and then ask you some follow-up questions on

2    that.

3              You relied on -- in doing your low vehicle access

4    tracts analysis you relied on ACS data, correct?

5    A    Yes, sir.

6    Q    And you relied on the five-year estimate, right?

7    A    Yes, sir.

8    Q    And I think you told me that one of the advantages of

9    using the ACS five-year estimate over, say, the census is the

10   data tends to be more recent, correct?

11   A    Yes, sir.

12   Q    And in this case another reason that you needed to use the

13   ACS data was because the ACS data had replaced the census long

14   form and so the 2010 census no longer tracked characteristics

15   like access to vehicles, correct?

16   A    Yes, sir.

17   Q    Okay.  And you also told me that even though the most

18   recent five-year ACS data was the 2012 five-year estimate, you

19   used a 2006-2010 because you were unable to extract vehicle

20   access from the 2012 estimate, correct?

21   A    It's a 2008 to 2012.  It's always referred to in a five-

22   year period.

23   Q    Okay.  So I'll refer -- from now on I'll refer to the last

24   year and then say "five year estimate" and you'll understand

25   what I mean, yes?

1   A    Yes, sir.

2   Q    Okay.  So am I right that the reason that you used the

3   2010 five-year estimate instead of the 2012 five-year estimate

4   was because you were unable to extract vehicle access

5   information out of the 2012 five-year estimate?

6   A    Yes, sir.

7   Q    Okay.

8            **MR. CLAY:**  Can we pull up the census tract 1101?  No,

9   no.

10           **(Voices heard off the record)**

11  Q    So when we asked for the documents you relied on, we were

12  told that a lot of what you relied on was with the census and

13  so I went on --

14           **MR. CLAY:**  Is it in there?

15  Q    So I went online and I found this --

16           **MR. CLAY:**  Can you zoom in just at the top right

17  here?

18  Q    So this is a 2006-2010 American Community Survey five-year

19  estimate.  So that would have been from the survey you relied

20  on, correct?

21  A    Yes, sir.

22  Q    Okay.  And this is Census Tract 1101, Bexar County, Texas.

23  Does that ring a bell?

24  A    Yes, sir.

25  Q    Okay.  So walk me through this.  This right here, this

1   number right here, (indicating), is the total housing units in

2   this census tract, right?

3   A    Yes, sir.

4   Q    And this, (indicating), is the total number of occupied

5   housing units, correct?

6   A    Yes, sir.

7   Q    What does this, (indicating), number mean?

8   A    That is the estimate of the margin of error at the

9   90 percent confidence interval.

10  Q    So does that mean that we can be 90 percent confident that

11  the actual number of occupied housing units in this census

12  tract falls somewhere between the numbers of 1309 minus 174 and

13  1309 plus 174?

14  A    Yes, sir.

15  Q    Okay.  So is it fair to say that this is kind of an

16  inexact number?

17  A    Well, it's the center of the estimate or the interval, the

18  margin of error.  So, you know, it's unlikely that it's going

19  to be at one extreme or the other extreme.  It is an estimate;

20  that is true.

21  Q    So it is inexact, correct?

22  A    It's an estimate.  All estimates are inexact by

23  definition.

24  Q    Okay.  And so and then this number right here,

25  (indicating), is the percent margin of error, correct?

1   A    Yes, sir.

2   Q    And so using these numbers -- and by using these numbers

3   you're dealing with some amount of unavoidable error, correct?

4   I mean that's what this number means, right?

5   A    I wouldn't say error.  I would say uncertainty.

6   Q    Okay.  Unavoidable uncertainty, is that --

7   A    Yes, sir.

8   Q    Okay.  We'll use that word, although they use error.  I'll

9   just point that out.

10          So the total number of occupied housing units is 1309

11  in this census tract, correct?

12  A    Yes, sir.

13  Q    Okay.

14          **MR. CLAY:**  Can we scroll down, Brian?  Keep going.

15  It should -- you'll see vehicle -- it's on the next page or the

16  third page, I believe.  Here it is, vehicles available.

17  Q    And so, again, we see the same number from the top line,

18  occupied housing units, 1309.  And this is an estimate.

19          And now we see in this census tract that there are

20  555 housing units that lack access to a vehicle, correct?

21  A    Occupied housing units that lack access to a motor

22  vehicle, yes.

23  Q    And again, this is an inexact estimate because we've got

24  to deal with the 90 percent confidence level, correct?

25  A    Yes.

1   Q    Okay.  And again, there's some unavoidable -- you call it

2   uncertainty; they call it error that comes along with this

3   number as well, correct?

4   A    Yes, sir.

5   Q    Okay.  And so this -- you know, I'm no mathematician but I

6   do think that I'm right in thinking that this census tract must

7   have been one of the ones you analyzed.  Because if you divide

8   555 by 1309 it's more than 25 percent, correct?

9   A    Yes, sir.

10  Q    Okay.  So when you look at this number right here,

11  (indicating), is there any way to know how many people live in

12  the housing units that are represented by that number?  Let me

13  put it a different way.

14         These houses could have one person in them or they

15  could have seven people in them, correct?

16  A    Yes, sir, by definition.

17  Q    Is there any way to know the race of the people that live

18  in these houses?

19  A    Well, we know who the house holder is.  Actually, in the

20  analysis it is the total proportion of occupied housing without

21  access to a motor vehicle, and then looking at the proportion

22  of African American population, a portion of Hispanic

23  population.  So we can't drill down to know exactly who is in

24  that 550 -- or 555 I guess it is.

25  Q    So that's a no, we don't know the race of the people in

1    those households, correct?

2    A    We can -- by looking at the composition of the census

3    tract we can make some pretty logical and substantial

4    inferences if we have a largely homogeneous tract.

5    Q    And we also can't tell whether the people in these houses

6    are registered to vote, correct?

7    A    No.

8    Q    Or whether or not if they are registered whether they have

9    an ID, correct?

10   A    We don't know with respect to specific individuals, but

11   that was not part of my analysis.

12   Q    And we don't know whether the people in these houses have

13   a birth certificate, right?

14   A    No.  That was not part of my analysis.

15           **MR. CLAY:**  Can you pull up the 2012?

16   Q    Okay.  So we'll see if -- well, it went kind of fast.

17           **MR. CLAY:**  But just so they can see it.

18   Q    This is 2008-2012 ACS five-year estimate.  Do you see

19   that?

20   A    Yes, sir.

21   Q    So this is the most recent version of the ACS five-year

22   estimate, correct?

23   A    Yes, sir.

24   Q    Okay.  And then here again we have this -- this is the

25   same census tract in Bexar County, right?

1    A    Yes, sir.

2    Q    And again, we have total occupied housing units, correct?

3    A    Yes, sir.

4    Q    And a minute ago that number was -- you remember it

5    was 1309?

6    A    I don't recall but I have no reason to dispute that.

7    Q    What percentage increase is 1535 over 1309?

8    A    Excuse me.  That's 1535 isn't it?

9    Q    What did I say?  Did I -- I meant -- yes, it is 1535.

10   A    And the previous one was?

11   Q    1309.

12   A    So we're looking at a little over 200 increase.  So

13   12 percent, 10 percent?

14   Q    And so earlier you testified that one of the reasons you

15   used the ACS survey is because of the recency of the data,

16   right?

17   A    Yes, sir.

18   Q    And I guess now we're kind of seeing a little bit why.  I

19   mean there's been a fair amount of growth just in this census

20   tract alone between, at least estimated to be, between 2010 and

21   2012, correct?

22   A    Yes, sir.

23   Q    Okay.

24        **MR. CLAY:**  And can you scroll down?

25   Q    And again, this is also an inexact number because we have

1  to deal with these confidence levels, correct?

2  A     Yes, sir.

3  Q     And again, we have the margin of uncertainty/error, right?

4  A     Yes, sir.

5  Q     Okay.  And then we'll scroll down.  And this is where I'm

6  confused.  Because you told me in your deposition that you

7  didn't use 2012 data because it didn't have information

8  regarding access to vehicles.

9  A     No, I told you we were unable to find it when we were

10 looking in January of 2014.  I was explicit about that, because

11 it may well not have been available at that point in time.

12 Q     Okay.  So to do your analysis here you used data that

13 was -- the newest data was four years old and the oldest data

14 was eight years old; is that right?

15 A     No.  Because they are five-year averages, so the most

16 recent one overlaps three years with the past one.

17 Q     Oh, but you used the 2010.  So the most recent data in the

18 2010 is now about four years old, right?

19 A     Yes, sir.  Which by historical standards and the census

20 every ten years is wonderful.

21 Q     Yeah, but you testified earlier that Texas is really

22 growing fast, right?

23 A     Yes, sir, it is.

24 Q     And we've seen that this census tract has grown fast,

25 right?

1  A    Significantly so, yes.

2  Q    And the oldest data in the data set that you used to do

3  your analysis for the, roughly, 2 percent of people in Texas

4  that are registered and don't have an ID, the oldest data is

5  eight years old; is that right?

6  A    You mean the base year that the five-year --

7  Q    The first year in the 2006-2010 five-year estimate is

8  2006, correct?

9  A    Yes.

10 Q    Okay.  And so this is also the data -- I don't necessarily

11 mean this census tract up here, (indicating).  But it's the

12 2006 to 2010 ACS survey that you used to do your -- was it the

13 Pearson correlation coefficients?  Is that right?

14 A    Yes, sir.

15 Q    Okay.  Do you have any reason to believe that ID

16 possession varies by variables other than race like, I don't

17 know, age or poverty or urban or rural location?

18 A    Could you restate that?

19 Q    Sure.  Do you have any reason to believe that ID

20 possession varies by other variables other than race?  And I

21 listed a few examples like age, poverty, urban or rural

22 setting, things of that nature.

23 A    I'm fairly confident that there are differences based on

24 poverty.  And I've seen enough individual cases in terms of age

25 that at times older potential voters may not have access to the

1    documentation that they may need to register to vote.

2    Q    And you testified in your deposition that Pearson's

3    correlation coefficients do not allow you to predict one

4    variable from the other; is that right?

5    A    Well, I also said that if we have a simple R correlation

6    that if we square it, we have a simple regression coefficient

7    or result.  And that is explanation or is, in part, a

8    prediction.

9    Q    Well, let's look at those.  Let me see if it's on here.

10             **MR. CLAY:**  Forty-four, slide 44 of their

11   demonstrative.

12   Q    And you and I will be looking at a different one because

13   this is kind of a pared down version of the one that's in your

14   report.

15             Now, this is the simple Pearson correlation

16   coefficient, correct?

17   A    Yes, sir.

18   Q    Okay.

19   A    Simple R.

20   Q    So in doing the analysis you did here you're unable to

21   predict one variable is true from the other variable, correct?

22   A    Not --

23   Q    Let me put it different -- let me put it differently.

24             Doing the analysis that you've done right here I

25   can't tell that from -- given a poverty rate I can't tell that

1    somebody in Houston or certain parties in Houston is a

2    registered voter without ID, correct?

3    A    A particular individual?

4    Q    Right.

5    A    No, sir.  But that was not part of my analysis.  My

6    analysis was looking at who could be disadvantaged by SB 14.

7    And, therefore, looking at the overlap of geographic areas, or

8    in this case registered voters without appropriate ID, overlaid

9    the African American CVAP population.

10   Q    Would a regression allow -- would a regression analysis

11   allow you to do some prediction in the way that a simple

12   Pearson's correlation coefficient would not?

13   A    What type of regression are you referring to?

14   Q    Well, a multi-variable regression.

15   A    A multi-variable regression using geographic data is

16   dangerous because of the presence, almost certainly, of spatial

17   autocorrelation.  Spatial autocorrelation is essentially a

18   measure of the lack of independence of observations.  And a

19   linear model assumes, in general, that the observations that

20   are being input are independent from one another.  Therefore,

21   doing a regression is surely possible, but it would be a

22   spatial regression and not what you're probably more familiar

23   with in ordinary least squares.  But again, I was not

24   attempting to predict --

25   Q    I'm not familiar with either.

1        **(Laughter)**

2   A    I was not attempting to predict.  What I was attempting to

3   do in a descriptive way is to determine in those areas that had

4   high proportions of registered voters without appropriate ID

5   who lived in them.  And so descriptively I was able to

6   determine, in large part, it was African Americans and

7   Hispanics.

8   Q    So is that a yes or a no that a regression analysis would

9   be predicted?

10  A    Historically, social scientists have looked upon

11  regression analysis as predictive.  But there is a debate over

12  whether or not that is, in fact, the case.

13           And again, if we wanted to use in the city of --

14  well, let's say the city of San Antonio, the poverty rate as a

15  predictor of the proportion of citizens without appropriate --

16  or registered voters without appropriate ID, of course the

17  coefficient is .699; so, essentially a .7.  If you square .7,

18  you come up with .49.  What that means is that 49 percent of

19  the variance amongst the census tracts with the -- I'm trying

20  to think how to phrase this to make it as simple as possible.

21  If the dependent variable is the proportion of registered

22  voters without appropriate ID, we can explain nearly 50

23  percent -- 49 percent of the variance in that dependent

24  variable with the independent variable being percent citizen

25  poverty rate.

1   Q    Okay.  I'm not sure I ever got an answer to my question,

2   but we'll move on.

3          You were hired in September of 2013, right?

4   A    I believe that's true.

5   Q    And when did you first get -- well, first of all, how much

6   have you been paid in this case so far?

7   A    I've not added it up, sir.

8   Q    Does $47,820 sound right?

9   A    It could be in that ballpark; but, again, I've not added

10  it up.

11  Q    So here's what I found curious when I finally got your

12  billing records the other night.  You got hired in September.

13  Dr. Ansolabehere's no-match list wasn't done until the end of

14  May, and yet you billed tens of thousands of dollars between

15  September and, let's call it the first of May.  What were you

16  doing during that time?

17          MR. FREEMAN:  Objection, your Honor, to the extent

18  that this goes into Dr. Webster's graphs, discovery of which is

19  completely barred by the federal rules.

20          THE COURT:  Overruled.

21          THE WITNESS:  My analysis of the no-match list was a

22  very small proportion of the total research that was done.

23  Most of it was looking at times, whether it be bus or whether

24  it be a motor vehicle, the drafting of the cartographic

25  instruments that are in the report.  So the no-match list was a

1   comparably small proportion of the total amount of work I did.

2          MR. CLAY:  Can we pull up slide seven?

3          THE COURT:  Shall we go ahead and take a 15-minute

4   break?

5          MR. CLAY:  Well, I'm going --

6          THE COURT:  Okay.

7          MR. CLAY:  I've got five minutes, maybe.  I promise.

8       **(Voices heard off the record)**

9   BY MR. CLAY:

10  Q    So I get -- during that time did you make any effort to

11  analyze travel burdens in this part of the state that's so

12  heavily populated by Hispanics?

13  A    I think we -- I did take a look at some of the driving

14  times.  Of course, we didn't have a comparator for bus service.

15  Q    You testified that you've been a consulting or testifying

16  expert on behalf of the NAACP about nine times, right?

17  A    Yes, sir.

18  Q    And this is your second time to testify on behalf of the

19  Department of Justice; is that right?

20  A    I wrote a report in a Montana case for the Department of

21  Justice but I didn't actually testify.

22         MR. CLAY:  Nothing further.

23         THE COURT:  Nothing further?

24         MR. FREEMAN:  I do have a brief redirect, but if

25  you'd like to take a break, your Honor --

1          **THE COURT:**  No, let's finish.

2          **MR. FREEMAN:**  Okay.  It's brief.

3                    **REDIRECT EXAMINATION**

4    BY MR. FREEMAN:

5    Q    Dr. Webster, is aggregate analysis of areas standard

6    practice in your field?

7    A    For the past 200 years, yes, sir.

8    Q    And does local bus service exist in Texas outside of major

9    cities to your knowledge?

10   A    To my knowledge it's very limited.

11   Q    So would it have been possible to conduct the same type of

12   analysis that you conducted in Houston, San Antonio and Dallas

13   for the entirety of the state?

14   A    No, sir.

15   Q    Did you study -- did your study focus on individuals who

16   were most likely to need to use buses?

17   A    Yes, sir.

18   Q    During rush hour are you aware of whether mass transit

19   systems send buses out more frequently than at other times of

20   the day?

21   A    I'm not aware.

22   Q    Okay.  And when you were looking at the ACS data that

23   Mr. Clay was showing you, did you observe whether the vehicle

24   access rate had changed from the 2006 to 2010 five-year

25   estimate to the 2008 to 2012 five-year estimate?

1  A     I did not look at that so I'm not aware.

2            **MR. FREEMAN:**  Is it possible to bring that up?

3            **MR. SPEAKER:**  Which one do you want?

4            **MR. FREEMAN:**  First the 2006 to 2010 estimate.  The

5  vehicle access.

6       **(Pause / Voices heard off the record)**

7  **BY MR. FREEMAN:**

8  Q     And so in this chart it's 42.4 percent is the center of

9  the estimate?

10 A     Yes, sir.

11 Q     And if we could move to the 2008 to 2012 estimate.  That's

12 43.9 percent is the center of the estimate?

13 A     Yes.

14 Q     So would it have mattered if you'd looked at the 2008 to

15 2012 five-year estimate?

16 A     It's so close, very doubtful.

17 Q     And just a couple of more quick questions.  Mr. Clay was

18 asking you about whether you'd conducted a multi-varied

19 regression.

20            Were you studying who lacks ID or why they lack ID?

21 A     Who.

22 Q     And to answer who lacks ID do you need to know whether

23 it's -- why a community or who -- what types of communities

24 have higher rates of individuals who lack SB 14 ID, is it

25 important to know whether a poor African American community has

1    high rates of low vehicle access because it's a poor community

2    or because it's a Black community?

3    A    I think the primary thing is who lives in that community

4    and then to add in the poverty rate.  So in this case it didn't

5    start off with race.  It started off with low vehicle access.

6    And as it turns out, of course, it tended to be poor people

7    and, in large part, African Americans and Hispanics.

8    Q    And you were talking very briefly about the R squared

9    value and the explanatory power of the correlation

10   coefficients.  And I believe for San Antonio your correlation

11   between Hispanic CVAP and low vehicle access was .717.  Does

12   that sound about right?

13   A    Yes, sir.

14   Q    And so across San Antonio what percentage of all the

15   variance that you see in the lack of vehicle access is

16   explained just by the share of census tract -- of the census

17   tracts citizen voting age population that is Hispanic?

18   A    I think if I could rephrase that to make sure I -- that

19   we're looking at the dependent variable being the proportion of

20   registered voters without access to appropriate ID and the

21   independent variable being access to motor vehicles.  And if

22   the correlation is .7 --

23   Q    I was actually asking about the percentage of individuals

24   of the citizen voting age population that's Hispanic.

25   A    Oh, okay.

1  Q    In San Antonio.

2  A    Okay.  And to explain not having appropriate ID.

3  Q    Yes.

4  A    And the correlation coefficient was point --

5  Q    I believe it was .717.

6  A    Then essentially we are at 50 percent of the variance in

7  not having appropriate ID for registered voters can be

8  explained by the proportion of Hispanics.

9  Q    Only the proportion of Hispanics explains fully half of

10  the variation that we see in San Antonio on the rates of lack

11  of SB 14 ID?

12  A    Yes, sir.

13          **MR. FREEMAN:**  No further questions.

14          **MR. CLAY:**  Nothing further.

15          **THE COURT:**  All right.  You can step down and we'll

16  take a 15-minute break.

17      **(Witness steps down)**

18          **THE MARSHAL:**  All rise.

19      **(A recess was taken from 4:00 p.m. to 4:16 p.m.; parties**

20  **present)**

21          **THE COURT:**  Okay.  Ready to proceed?

22          **MR. GARZA:**  Jose Garza with the Mexican American

23  Legislative Caucus and the Ortiz Plaintiffs, and we call Rafael

24  Anchia.

25          **THE COURT:**  Good afternoon.  Would you --

1          **MR. ANCHIA:**  Good afternoon.

2          **THE COURT:**  -- raise your right hand.

3           **RAFAEL ANCHIA, PLAINTIFFS' WITNESS, SWORN**

4          **THE CLERK:**  Please be seated.

5                        **DIRECT EXAMINATION**

6   **BY MR. GARZA:**

7   Q    Would you please state your name and residence?

8   A    Rafael Michael Anchia, 1418 Yakimo Drive, Y-A-K-I-M-O,

9   Dallas, Texas 75208.

10  Q    Representative Anchia, did you grow up in Dallas?

11  A    I did not.  I'm the son of immigrants.  My mother is from

12  Mexico City.  My father is from northern Spain.  I was born and

13  raised in Miami, Florida, and immigrated to Texas in 1986 to

14  attend SMU.

15  Q    And since -- and do you have a law degree?

16  A    I do.  After SMU, I went to Tulane University School of

17  Law.

18  Q    Okay.  And then you settled in Dallas?

19  A    I did.

20  Q    All right.  And have you ever been a member of any Latino

21  or Hispanic organizations?

22  A    I have.  I'm a current member of the Mexican American

23  Legislative Caucus, and I'm a past chairman of a group called

24  "NALEAO," the National Association of Latino Elected and

25  Appointed Officials.  And I was chairman of that organization,

Anchia - Direct / By Mr. Garza                          315

1    I believe, from 2006 to 2009, and a board member before that.

2            I also serve on the Hispanic Bar Association and in

3    the Hispanic Chamber.

4    Q    And are you currently, then, a member of the Texas House

5    of Representatives?

6    A    I am.

7    Q    Okay.  And which district do you represent?

8    A    I represent District 103, which is in Dallas County.  It

9    covers a western corridor of Dallas and begins in an area

10   called North Oak Cliff, where I live, and goes all the way up

11   north to Old Downtown Carrollton, along the way picking up

12   portions of the Stemmons Corridor, South Irving, Farmers

13   Branch, and into an area called West Highland Park.

14   Q    Okay.  And many of these areas are high in Hispanic

15   concentration; is that correct?

16   A    Yes, the district I represent, if you break it down on

17   racial and ethnic demographics, is about 73.6 percent Hispanic,

18   about 16 percent Anglo, about 8 percent African American.

19   Q    And how long have you been a member of the Texas House of

20   Representatives?

21   A    I was elected in 2004 and I began serving during the 2005

22   session.

23   Q    And what are the poverty rates or the socioeconomic status

24   of your -- of the residents of your district?

25   A    So of the 176,000 people that I represent, about 25

1   percent of the families are families that are in poverty.  And

2   to put it -- to give you a further context, the per capita

3   income of the State of Texas is about $25,500, and the

4   constituents that I represent have a per capita income of about

5   $17,200, so about a third less than the state average in terms

6   of per capita income.

7   Q    And have you ever served on the House Elections Committee?

8   A    I have.

9   Q    And when were you on the Committee?

10  A    I served during my freshman session in 2005, then again in

11  2007 and 2009.

12  Q    All right.  And was voter identification legislation

13  considered in the House Elections Committee?

14  A    Yes, photo ID in order to vote has been considered in

15  every session that I've been a member of the Legislature,

16  except in 2013, the most recent session.

17  Q    And as a member of the Committee, did you attend the House

18  hearings for each of the bills during those time periods?

19  A    For the most part, I did.  I don't recall ever having been

20  absent for a photo ID hearing.  It's possible that I may have

21  been out of town on business or something else, but I

22  endeavored to attend all of the -- all of the hearings.

23  Q    So suffice it to say that voter ID was an important issue

24  for you and for the Caucus?

25  A    Yeah, for me personally, I did a deep dive on this issue,

1    spent a lot of time on it, considered it very important, and I

2    believe that the other members of the Mexican American

3    Legislative Caucus also found it important.

4    Q    Now, you didn't mention whether you were in the Elections

5    Committee in 2011.

6    A    I was not.

7    Q    Okay.  Did you nevertheless participate in hearings in the

8    2011 session on --

9    A    I --

10   Q    -- the photo ID bill?

11   A    So it is my recollection that in 2011 the photo ID

12   legislation that ultimately passed was sent to a select

13   committee, and I was not a member of that select committee, but

14   nonetheless participated.

15          The chairman of the committee, Chairman Bonnen,

16   either -- I don't recall if he either allowed me to participate

17   on a one-off basis, or made a general call to the membership so

18   that people who had an interest in the subject matter could

19   attend.

20          But I did attend the very one long -- the very long

21   hearing that occurred on the bill.

22   Q    Okay.  So whether he invited the general body or you

23   personally, you took advantage of that invitation?

24   A    I did.

25   Q    Okay.  Were you involved with any interim committees or

Anchia - Direct / By Mr. Garza                      318

1   subcommittees that addressed voter identification issues?

2   A    I did.  So each interim, the Elections Committee that I

3   sat on took testimony, worked on the photo identification

4   legislation.

5            And at one point, the chairman -- the then-chairman

6   of the committee, Leo Berman, created a special subcommittee --

7   and I'll have to refer to my notes on this -- but I believe it

8   is called the Subcommittee to Study Mail-In Ballot Fraud and

9   Incidence of Noncitizen Voting, and I was made chair of that

10  committee.

11  Q    So you were chair of that committee on that specific

12  issue?

13  A    Correct.

14  Q    Okay.  And so since you were able to participate in the

15  debate and in the discussion about the photo ID bill from its

16  inception in 2005, when the House considered voter

17  identification bills, has the -- during that time period, has

18  the public justification given for the bills been the same?

19  A    It has not.

20  Q    And could you describe for the Court why or how it's not

21  the same?

22  A    So early on, when I began to pay attention to this issue,

23  there was a narrative that voter fraud was epidemic in the

24  State of Texas, and this came from bill proponents.  And the

25  way to curb that voter fraud was to adopt a photo

1    identification standard for voting purposes.

2              So there was -- there appeared to be the creation of

3    a correlation between this alleged widespread voter fraud and

4    the need for photo identification.

5              That began to change over time, and I noticed during

6    the 2007 and 2009 sessions that two issues became conflated.

7    One was immigration and the other was voter fraud.

8              And proponents of the photo identification bill like

9    to talk about things like noncitizen voting, illegal immigrants

10   voting, including the chairman himself -- the chairman of the

11   Elections Committee himself, Leo Berman.

12             And there were a number of witnesses who were called

13   to testify by the chairman, who described the incidence of

14   noncitizen voting or illegal immigrant voting as being a large

15   problem, and that persisted until my subcommittee did some

16   extensive work on that.  And we issued a report to the

17   Legislature in 2008 that, in fact, the incidence of noncitizen

18   voting was very low.

19   Q    We'll get into that in just a minute.

20   A    Right.

21   Q    But let -- so --

22   A    And then the -- I'm sorry.

23   Q    I'm sorry.  Go ahead.

24   A    And then the rationale continued to move around.  Later,

25   it became about the integrity of elections.  The narrative went

1    something like if one -- if voter impersonation does occur and

2    one unauthorized ballot is cast, then it disenfranchises a

3    validly cast ballot.

4          And so it was -- it then became about the integrity

5    of elections.

6          And then finally -- and this occurred really at the

7    climax or culmination of when the vote -- or prior to the --

8    when the vote was taken on the first iteration of the photo ID

9    bill in the House -- I had an exchange with the bill author

10   from the back microphone -- and in the Texas House, we ask

11   questions from the back microphone, and we either lay out bills

12   or amendments from the front microphone -- and I asked her, I

13   said, "Well, what -- do you really believe that -- or don't --

14   would you not agree that turnout is going to be hurt," and I'm

15   paraphrasing here, "and that minorities are going to be

16   disenfranchised?"

17         And she said something very interesting at that

18   point.  The bill author said, "No, I believe in my heart that

19   this is going to increase turnout."

20         And, in fact, I believe at some point during the

21   debate it was offered that in Indiana before photo ID, turnout

22   was X; and then after photo ID, it was X plus, so that there

23   had been an increase.

24         And I believe that the data was used before photo ID

25   and then after the 2008 presidential election to show that

1  minority turnout had actually increased.  Now, I mean, we all

2  know Indiana was a, you know, battleground state and there was

3  our first African-American president.  So it would stand to

4  reason that minority turnout turned out.

5         But there came -- attempted to be created a

6  correlation between photo ID and minority -- increase in

7  minority turnout.

8  Q    So did the Committee then take testimony from state

9  agencies, and state officials, and advocacy groups on the

10 question of whether voter fraud was epidemic?

11 A    Yes, I mean, there were hearings on this.  The Attorney

12 General's Office would come in and testify.  Our office would

13 regularly request of the Attorney General's Office an update on

14 incidence of voter fraud in the State of Texas.

15        And we were always provided a spreadsheet -- and

16 that's when the narrative began to change from just photo

17 identification as a remedy for voter fraud generally to us

18 really being able to narrow down what kind of remedy it is

19 sought to achieve, and that is the prevention of voter

20 impersonation.

21        So we were able to drill down to this data and check

22 the incidence of voter impersonation, which, even according to

23 the Attorney General's statistics, was for the long time

24 nonexistent and, in any case, very low.

25 Q    So in the initial stages in 2005, the evidence that was

1    submitted to the Committee then was that there was not an

2    epidemic in voter fraud and that there was not a large

3    incidence of in-person voter impersonation?

4    A    Well, you know, the data that -- I was always focused on

5    impersonation.  I was trying to elevate the consciousness of

6    the body to say that, hey, it's -- you know, there may be voter

7    fraud in the State of Texas, and I do believe there is, but

8    it's typically in mail-in ballots, and it's very rarely and/or

9    never in voter impersonation.

10   Q    And that's what the evidence showed that was presented to

11   the Committee?

12   A    Correct.

13   Q    Okay.  Then in 2007, when the narrative changed to this is

14   meant to prevent noncitizens from voting, can you describe to

15   the Court how that sort of proved -- what the evidence was that

16   was presented to the Committee on those issues?

17   A    Well, it was interesting.  The allegations of noncitizen

18   voting would pop up sporadically, even before that.  There was

19   an election contest in -- for an election that occurred in 2004

20   between a Vietnamese-American candidate and an incumbent member

21   of the Legislature.  And allegations were made that -- that

22   there were noncitizen Vietnamese votes cast in that election.

23        So there was a review of all -- of, I don't remember

24   the exact number, but dozens, if not over a hundred ballots in

25   -- cast in that contest, and it was determined that there was

1   one case of noncitizen voting.  It was a legal permanent

2   resident who was Norwegian, who, in fact, when he -- when he

3   signed up to vote had checked the box that he was a noncitizen

4   and received a voter registration card anyway and voted under

5   the mistaken belief that he was able to, and also voted against

6   the Vietnamese candidate, which was interesting.

7            But that was kind of the first time that we heard

8   allegations of noncitizen voting.

9            Then later on, I recall on the House floor the bill

10  sponsor, I believe in the 2007 session, Betty Brown, presented

11  a very large stack of documents purporting to show that

12  hundreds of noncitizens were voting in Texas elections as the

13  reason for needing photo identification.

14           We did a deep dive on those as well, and --

15  Q   So at that point, the subcommittee took that issue on; is

16  that --

17  A   Correct.  Our subcommittee took that issue on in 2008, and

18  we presented our report to the Legislature --

19  Q   And --

20  A   -- in 2008.  And the bill author's assumption was -- or

21  evidence of noncitizen voting was that there were people who

22  had checked a box on their jury wheel form saying that they

23  were not citizens of the United States as one of the reasons

24  you can give to get out of jury duty.

25           Those same people had checked that they were citizens

1    on the United States -- of the United States on a voter

2    registration certificate.

3            So it was those conflicting oaths and affirmations

4    that the bill sponsor and others, including the chairman of the

5    Elections Committee, used to suggest -- and witnesses that came

6    before the Committee -- used to suggest that there was an

7    epidemic of noncitizen voting.

8            Well, as it turns out, all you had were conflicting

9    statements, but neither of them were dispositive of either

10   citizenship or noncitizenship.

11           And then so when you took that universe of persons

12   that had made those statements, I'm sure many of them had made

13   those statements just to get out of jury duty, thinking there

14   would be no subsequent ramification to that; and you looked at

15   the actual number of people who voted, the number was very,

16   very low.  So there's very little correlation.

17           I actually sent my staff out to -- and along with

18   other staffs -- to go find these people.  We called these

19   people, we sent them letters, and we went to interview them in

20   person.

21           And as it turned out, the percentage of noncitizen

22   voting was minuscule.  And during the period that we looked at,

23   I think we may have founded one -- found one or two people.

24   Those people, I think, lacked a requisite mens rea to suggest,

25   I mean, that they were illegally -- knowingly illegally voting.

1    Many of them had the mistaken supposition that they were

2    allowed to do so.  Some of them had been told by campaign

3    workers that they were allowed to vote as legal permanent

4    residents or something like that.

5          But it was such a low number, and then we contrasted

6    it to the 29 million votes that had been cast during that

7    period, it was a staggering number.

8          So we brought this -- it's a public document.  We

9    brought it before the Legislature.  And at that point, we --

10   then you stopped hearing about the illegal alien voting or the

11   noncitizen voting.

12         Then the narrative changed once again.

13   Q    And do you know if there are noncitizens that have

14   driver's licenses in Texas?

15   A    Absolutely.  Sure.  If you're a legal permanent resident

16   or a visa holder, you can absolutely have a driver's license in

17   the State of Texas.

18   Q    Well, and then with regard to the integrity of the

19   election, what -- how did the debate run on that?

20   A    So there was a -- you know, as best as I can -- as best I

21   recall, the narrative was that if photo ID was in place, that

22   was an additional tool in the toolbox that was necessary to

23   make sure elections were as -- I don't know -- as secure as

24   possible, is the -- to be redundant -- but to make sure

25   elections were as secure as possible.

Anchia - Direct / By Mr. Garza                    326

1           And once that happened, then confidence in elections

2    would increase and more people would want to vote.

3    Q    All right.  And what was the -- and following the evidence

4    that you heard in 2009, did that justification shift in 2011?

5    A    Well, it -- I discussed it earlier.  I thought that --

6    that justification continued into 2011, but then the real

7    bombshell was, no, this was -- photo ID was really a way about

8    increasing voter turnout, right -- not just preserving the

9    sanctity of the electoral process, but would be a tool used to

10   increase voter turnout.

11          And I described my exchange with the bill, the House

12   sponsor of the bill --

13   Q    Right.

14   A    -- earlier.

15   Q    And as you indicated, the source of her evidence was

16   comparing a nonpresidential election year with a presidential

17   election year --

18   A    I recall that was the case.  She may have cited some

19   Indiana data, and then she also said it was -- she believed it

20   in her heart.

21   Q    All right.  Now, during the time that it was being put

22   forward that this was a ballot integrity issue, did you

23   question DPS officers about the integrity of the devices that

24   they were using to ensure this?

25   A    Yeah, so at one point, we -- and it was funny.  One of the

1  prior witnesses talked about how resourceful 19-year-olds often

2  at college campuses are able to produce documents that make --

3  allow them to get into places where they serve alcohol.

4          Well, we thought similarly.  Those of us who thought

5  that young people are pretty darn resourceful, or anybody is

6  resourceful, and if they wanted to create a photo ID in order

7  to vote, that this -- you know, that this might not necessarily

8  stop them either.

9          And so we asked the Department of Public Safety just

10 to bring in a bunch of the photo IDs -- fake photo IDs that

11 they had harvested over time, and they were passed out in a

12 Committee hearing to the members of the Committee.  And I can't

13 remember if this was the 2007 or the 2009 session.  Don't

14 remember exactly.

15 Q    Uh-huh.

16 A    But what struck me is that members of the Committee had a

17 tough time telling the real ID from the fake ID.  In some

18 cases, it was obvious.  In others, less so.

19         And it was also interesting to note that there is a

20 frequently, and you see this when you go through TSA, a blue

21 infrared light that people use to look at watermarks to

22 determine whether IDs are fake or not.  Nowhere in any of the

23 bills that have ever been proposed was there a mechanism to

24 give that to poll workers to determine the authenticity.

25         So, you know, it was -- the photo ID standard was

Anchia - Direct / By Mr. Garza                            328

1    offered up as this -- as this almost foolproof mechanism to,

2    you know, to improve the integrity of elections, and that -- I

3    recall that Committee hearing as calling into question whether

4    or not it is a foolproof system, in fact.

5    Q    All right.  So we've discussed the justifications that

6    were offered for the passage of the photo ID bill and the

7    evidence that the Committee heard with regard to those.

8         Were there concerns that were raised by yourself and

9    other minority members of the Legislature about the impact of

10   the photo ID bill?

11   A    Yeah, repeatedly members of the African American Caucus --

12   or Black Caucus, as we call it -- the Mexican American

13   Legislative Caucus raised concerns about the propensity of this

14   type of legislation to disenfranchise Hispanic and African

15   Americans -- African American Texans, poor Texans, disabled

16   Texans, women, so all the people who could be adversely

17   impacted by this.

18   Q    Okay.  And in the debates, was the term "illegal alien"

19   sometimes used to describe what these bills were aimed at?

20   A    I'd have to go back and look at the record.  I just don't

21   recall.  I don't recall that ever -- I don't recall that term

22   being used on the House floor.  It might have been by Betty

23   Brown in the 2007 session, but I can't say for sure.  And it

24   may have been used by Leo Berman in Committee, and he was the

25   chair of the House Elections Committee in 2007 --

EXCEPTIONAL REPORTING SERVICES, INC

1   Q    All right.

2   A    -- as well.

3   Q    I'm sorry.  The term "noncitizens," though, was used as a

4   justification for the bill?

5   A    Yes.

6   Q    Did you equate that with Hispanic, being Hispanic?

7   A    Yes, not exclusively, but we know that if you look at the

8   immigrant population in Texas, it is largely Hispanic.  And so

9   I saw that as kind of a code word, if you will, for Hispanic

10   immigrant.

11   Q    All right.  And as you mentioned, as these concerns were

12   being articulated, did -- was evidence presented by advocacy

13   groups and by members of the Legislature regarding the

14   potential impact on minority voters?

15   A    Yes.

16   Q    And could you describe some of that testimony or some of

17   those groups?

18   A    Numerous studies were offered.  I recall one by the

19   Brennan Center that said African Americans -- 25 percent of

20   African Americans don't have photo ID; that people living in

21   poverty -- I think 15 percent of people living in poverty don't

22   have photo ID.

23        In our subcommittee, gosh, we went down to

24   Brownsville and we took testimony on the very issue that you

25   heard from Mr. Lara earlier, which was people -- a lot of

1    people, especially in rural areas or along the border who were

2    birthed by midwives or were born on farms, didn't have the

3    requisite birth certificates and were in limbo.  We took a ton

4    of testimony at UT Brownsville on that, and that was an issue

5    of concern.

6              You know, I thought about my own father, who was born

7    in a stable, basically, and didn't have a birth certificate.

8    And then when he did have one, it didn't match his birthday,

9    because it took a day to walk down from the mountain where he

10   was born to town and have the authorities record his birth.

11             So there were all kinds of stories like that that we

12   heard, which caused me to believe that this was going to be an

13   obstacle for a lot of people.

14   Q    And did you request during these different sessions that

15   perhaps some sort of impact study be done before the bill would

16   be implemented?

17   A    Yes, both as a member of the Committee, as a -- and then

18   on the House floor, I questioned the author of -- or, excuse me

19   -- the sponsor of the Senate bill about whether or not these

20   studies have been done.  You know, have -- has there been a

21   study related to the penetration of the necessary documents

22   needed to obtain photo identification?  What is the penetration

23   rate in Latino and African-American communities?  That question

24   was asked not only by me, but by others repeatedly.  And to our

25   knowledge, it was never done.

1  Q    So you would ask for studies that might show the number of

2  people that would be impacted and also what impact -- how the

3  impact would fall on the racial and ethnic groups in the state?

4  A    Correct.

5  Q    And you were never provided with any information regarding

6  those issues from state officials?

7  A    No, I think the best we got was we asked -- we asked to do

8  a match of the voter registration file, the state HAVA voter

9  registration file, with the DPS file for state IDs and driver's

10 licenses, and it took a long time to get that.  But,

11 ultimately, it was provided, and I can't remember if it was in

12 the 2011 or 2009 session, but it showed a pretty significant

13 delta where photographs were apparently not on file -- or I

14 should say there was not a -- there was a very poor match --

15 Q    All right.

16 A    -- among the two files.

17 Q    So in addition to the debate and the hearings that were

18 done on the bill, were there also amendments that were offered

19 by the members to try to ameliorate the concerns that were

20 being expressed by the minority members of the Legislature?

21 A    Yes.

22        MR. GARZA:  And could we bring up Plaintiffs' Exhibit

23 34, please?  And at Page 79.  Now, and could we highlight

24 Section 25 of Amendment 58?

25 Q    Representative, do you see that on your screen?

Anchia - Direct / By Mr. Garza                          332

1   A    I do.

2   Q    And could you describe that for the Court?

3   A    Let me just review it very quickly.  I think I know what

4   -- which amendment this is.

5   Q    And --

6   A    So this was an amendment to the bill that essentially

7   requested a delay in the bill's implementation until such time

8   as the Secretary of State's Office conducted a study, and I

9   believe I tasked the Secretary of State -- or it may have been

10  another -- no, it is the Secretary of State.  Sorry.

11          The Secretary of State provide an analysis to the

12  Legislature of really the penetration of -- in minority

13  communities of these documents that were needed to -- or these

14  photo identification documents that were needed to vote.

15  Q    So you were essentially asking for an impact analysis?

16  A    I was.  I was.  And really this amendment didn't even

17  quarrel, or take issue, with the substance of the bill.  It

18  said, "Hey, let's just -- this is voting.  Let's just make sure

19  we get it right.  Let's delay the implementation of this thing

20  until we have all the data, the impact on protected classes,"

21  and this ultimately was tabled.

22  Q    All right.  And there were other members of the

23  Legislature that offered amendments as well.

24          **MR. GARZA:**  Could we turn to Page 27, please?  And if

25  we could highlight Section 63.010?

1   Q    And do you see that, Representative?

2   A    I do.

3   Q    And could -- who offered this amendment?

4   A    Difficult to tell from what's highlighted here, but I

5   believe this was Armando Martinez of Weslaco.

6   Q    Okay.  And what would this amendment have done?

7   A    This amendment acknowledges that it takes ID to get ID,

8   and even if the bill proponents were suggesting that the

9   driver's license or, later on, EIC, the election document, the

10  voting ID would be free, that people needed to collect and

11  provide other forms of ID that did cost money.

12        So what Mando -- what Representative Martinez did

13  here was say if you have -- if you need to obtain these

14  underlying documents, that -- for the purpose of voting, that

15  those should be free as well so as to not constitute an undue

16  burden on members of the public.

17  Q    And would this have -- this amendment have changed SB 14's

18  identification requirements?

19  A    No, sir.

20  Q    Okay.  And what happened to this amendment?

21  A    I believe this amendment was also tabled.

22  Q    All right.  Now, there were amendments that were offered

23  by minority members of the House that were adopted by the Texas

24  House of Representatives --

25  A    I believe --

1    Q     -- correct?

2    A     -- that's right.

3    Q     All right.

4          **MR. GARZA:**  And if we could begin by looking at Page

5    17 of Exhibit 34?

6    Q     And this is an amendment, it looks like offered by

7    Representative Giddings?

8    A     This is difficult for me to read.  Regrettably, it is a

9    little blurry on the screen or my eyesight continues --

10   Q     If we could highlight from --

11   A     -- to deteriorate.

12   Q     -- where it says "Amendment 3"?

13   A     That is helpful.

14   Q     Okay.

15   A     So -- let's see.

16   Q     Do you see it now?

17   A     I do.

18   Q     And do you know who Representative Giddings is?

19   A     I do.

20   Q     And where is Representative Giddings from?

21   A     Representative Giddings is one of my colleagues in the

22   Dallas delegation.  She represents a district in southern

23   Dallas County.

24   Q     And is she African American?

25   A     She is.

Anchia - Direct / By Mr. Garza                          335

1   Q    All right.  And Amendment 3, what it -- what did it

2   propose to do?

3   A    My recollection of this amendment was that it allowed for

4   a person who had been robbed of their photo identification to

5   furnish evidence of that crime to authorities and then issue an

6   affidavit in order to vote a regular ballot.

7   Q    And did the amendment pass?

8   A    It did initially, yes.  But in the -- I -- my recollection

9   is that after the conference committee, it was stripped and

10  taken out of the final bill.

11  Q    So this is an amendment that was offered by a minority

12  member that addressed that specific issue, was passed by the

13  House, but eventually stripped from the bill?

14  A    Yes.

15          MR. GARZA:  And if we could take -- turn now to Page

16  26.  And if we could highlight Amendment 13?

17  Q    Now, this is offered by Representative Eiland?

18  A    Correct, Craig Eiland is a Democratic member of the

19  Legislature from the Galveston area.

20  Q    And he is not minority?  He's not -- he is not --

21  A    He is not.

22  Q    -- Hispanic or African American?

23  A    Not to my knowledge.

24  Q    Okay.  And what did his amendment propose to do?

25  A    In -- during the session in which this was offered,

1   Galveston had just been hard hit by Hurricane Ike, and there

2   was a -- the intent of this amendment was to allow persons in

3   areas that have been declared a natural disaster by either the

4   governor or the president to be exempt from the photo

5   identification requirements.

6   Q    All right.  And did this amendment pass?

7   A    It did.

8   Q    And do you know if it was maintained in the final bill?

9   A    It is my best recollection that it was maintained in the

10  final bill.

11  Q    Okay.  Now, do either of these first two amendments that

12  we've looked at, do either of them address the issues that were

13  raised by minority members of the House in the debates and in

14  the House hearings about the negative impact this might have on

15  minority voters?

16  A    I don't believe this one does.

17  Q    Okay.

18         MR. GARZA:  And now if we could turn to page -- the

19  bottom of Page 63 and the top of Page 64?  And let's start with

20  the bottom of the page, where it says "Amendment 45," and

21  highlight that, please.

22  Q    Representative Anchia, this is an amendment that you

23  offered?

24  A    Yes.  If you all can pick up the actual substance of the

25  amendment?

Anchia - Direct / By Mr. Garza                              337

1   Q    Yes, and if we could go to --

2   A    If this refers -- this refers to an amendment that I

3   offered, I'd like to see the --

4   Q    Right.  Right.

5   A    -- the text.

6   Q    There we go.

7   A    Okay.  Yes, this --

8   Q    And --

9   A    -- relates to an amendment that I offered.  And the

10  substance of this amendment, this sought to address an error --

11  a technical error in the bill.

12          At the time that the -- that this bill was before us,

13  the construct of the bill provided for a free driver's license

14  for persons who could not afford the -- that documentation if

15  they were obtaining it for the purposes of voting -- for the

16  purpose of voting.

17          Well, there were three different types of driver's

18  licenses that you could get, and the bill authors I just think

19  failed to include the duplicate driver's license and duplicate

20  personal identification certificate.  That's something that our

21  office caught, so we offered up this technical amendment just

22  to harmonize the bill with practice by DPS.

23  Q    And, again, this amendment passed the House of

24  Representatives?

25  A    It did.  And I would characterize this as a technical

1    amendment.

2    Q    And it certainly didn't address any of the adverse impact

3    concerns that had been expressed by minority members of the

4    Legislature?

5    A    No, it simply corrected a technical error.

6    Q    All right.  And do you know if, in the final bill, this

7    provision was included?

8    A    It was not, because the bill authors went outside the

9    bounds in conference committee and removed the -- reconstructed

10   the bill and eliminated the free driver's licenses and,

11   instead, went to a model that included a free EIC, election

12   identification card.  And that happened in conference

13   committee, and they brought that to the floor rather quickly.

14          So this did not stay in the final bill because of the

15   different approach that the authors took in conference.

16   Q    All right.  Now, at the time, then, that the House voted

17   on SB 14, how many of the questions raised by the bill's

18   potential negative impact on minority voters, if any, had been

19   answered by the bill's supporters?

20   A    In my view, very few.  There was -- it appeared to be a

21   disinterest in wanting to know the answers to some of the

22   questions that minority members were asking in terms of adverse

23   impact on minority populations.

24          And on the House floor, when I was asking the bill --

25   the House sponsor of the bill what -- in her view, what the --

Anchia - Direct / By Mr. Garza                    339

1    what were the impacts on minority populations, or had she seen

2    a study, or had she engaged in a study, the answers were very

3    evasive and not -- nonresponsive.

4    Q    And --

5    A    And I point to that as an example of what I perceived to

6    be a pattern not only on the House floor that day but also in

7    committee that session and sessions previously.

8    Q    Did any of the -- did any of these discussions, evidence

9    that was presented by the opponents of the bill, the ones that

10   -- the members of the Legislature that wanted to try to

11   ameliorate these potential negative impacts, did those have any

12   effect on the overall vote?  Did you win any votes over to your

13   side?

14   A    No, it was my view that this thing was baked.  And "baked"

15   is a colloquial term for essentially done.  This was a done

16   deal.

17           And that -- what stood out most is that in the second

18   amendment that I offered that we haven't dealt with, I pointed

19   out another flaw in the bill, which was there were provisions

20   that permitted someone -- although the bill sponsor was touting

21   this as a way to increase integrity of elections, there was a

22   provision in the bill that would permit somebody -- or would

23   allow somebody to show up and not be on the rolls, not present

24   a photo ID, not present a voter registration certificate, and

25   vote a regular ballot that was mandatory to accept if that

1   person returned six days after the election and filled out an

2   affidavit saying that they had a religious objection or were

3   indigent.

4           And when I pointed this out on the House floor, I

5   said, "Well, you know, this stands in stark contrast to your

6   claims that this is going to increase ballot integrity, because

7   this is worse than state law.  You're actually allowing someone

8   with nothing, just who shows up, allowing somebody to come in,

9   fill out an affidavit, and requiring that that vote count.

10  It's actually worse than state law in some ways."

11          And the bill author didn't believe what I was saying

12  during questioning, and then she asked me to pull down that

13  amendment and consult with her on it.  I did, and other members

14  of the body sort of huddled around and said, "You know, I think

15  he's right.  I think this is worse than state law, and, in

16  fact, creates a big problem."

17          And so I offered to work with the bill authors on a

18  solution that would not disenfranchise people and that would

19  streamline this affidavit process.  And I was working with

20  folks, I made some proposals; and then before I knew it, a

21  number -- another member of the Legislature went up without

22  mentioning to me that, you know -- and I thought I was still in

23  negotiations with my colleagues -- got up and quickly took the

24  microphone, offered up an amendment that dealt with this issue,

25  and then, you know, my proposals were ignored.

1              So I thought that that was less than evenhanded.

2    Q    And do you remember how it was dealt with, that particular

     issue?  Were the exemptions --

4    A    I think all of the exemptions were eliminated in this

5    amendment.  And it went to conference, and I'm not sure what

6    the ultimate resolution was post-conference.

7    Q    Representative, you testified that there's a high rate of

8    poverty in your district?

9    A    Yes.

10   Q    How many of your constituents do you think depend on

11   public transportation because they don't own cars?

12   A    I've looked at this issue, and it is two times the state

13   average -- in excess of two times the state average, actually,

14   or maybe 2.5 times.

15   Q    And is there a sizeable portion of your constituents who

16   hold hourly wage jobs?

17   A    I don't have the exact data on that, but to put it in

18   context, you have Dallas, which is one of the wealthiest places

19   in the state, yet the constituents that I represent earn a

20   third less than the state average in terms of per capita

21   income.  So I imagine the job mix would be heavily -- or is

22   heavily tilted towards hourly service jobs.

23   Q    And do you have an opinion about how SB 14's requirements

24   impact your constituents?

25   A    Adversely.

Anchia - Direct / By Mr. Garza                    342

1   Q    Representative Anchia, why is this issue important to you?

2   A    Well, so my mother was a public school teacher, and I --

3   was a public school teacher for about 30 years.  I consider

4   that some of the most honorable public service that you can

5   engage in.

6            I watched her go to school and walk across the gym

7   floor first at community college, where she graduated, and then

8   her four-year college, and I walked -- I watched her work very,

9   very hard.

10           My father has a seventh grade education.  In fact,

11   Mr. Lada reminded me of him a great deal.  I got very emotional

12   listening to his testimony.

13           But my mother taught me the importance of public

14   service, the importance of voting.  And she used to take me as

15   a child to go vote.

16           And my view on this is that if you're going to

17   encumber the right to vote in any way, there better be a darn

18   good reason.  And it should not be shifting rationales.  It

19   should be a very, very compelling reason.

20           Now, I do believe that increasing the integrity of

21   the ballot box is a laudable goal, no doubt.  But when people

22   call voter fraud epidemic, and then you look at the numbers of

23   voter impersonation, which this has -- which this has sought to

24   remedy, it didn't make any sense to me, and I thought it had to

25   be about something else.

Anchia - Cross / By Mr. Tatum                    343

1           And I said that on the House floor.  I said, "I

2   worry, members, that this is about something else and not about

3   integrity of the ballot."

4           **MR. GARZA:**  Pass the witness.

5                        **CROSS EXAMINATION**

6   **BY MR. TATUM:**

7   Q    Representative Anchia, good afternoon.

8   A    Good afternoon.

9   Q    My name is Stephen Tatum.  I'm an Assistant Attorney

10  General with the Texas Attorney General's Office, representing

11  the Defendants in this matter.

12          Representative, you've been a member of the Texas

13  Legislature for a while now, haven't you?

14  A    Yes, I've been a member of the Legislature since 2005.

15  Q    Okay.  So you're well versed in the legislative process

16  and what it takes to pass or defeat a proposed bill, right?

17  A    I don't know about well versed, but I do benefit from the

18  five sessions I've been in the Legislature.

19  Q    Okay.  Someone might even call you a veteran legislator,

20  right?

21  A    At this point, I believe I am a veteran legislator.

22  Q    Okay.

23  A    As much as I hate to admit it.

24  Q    Sure.  Now, Representative, in a perfect world, every bill

25  that's proposed would be passed unanimously without opposition,

1   would you agree?

2   A    No, I think that would be a bad result.

3   Q    And why is that?

4   A    Well, I don't think a lot of the bills that get filed are

5   good ideas.

6   Q    So the reality is that the Texas Legislature is no

7   different from any other law-making body in this country in

8   that there are -- it features two different parties that have

9   different philosophies on government, correct?

10  A    Well, I don't think it's a binary discussion.

11  Q    Uh-huh.

12  A    Often, it is not parties.  It is -- there are multi-

13  lateral interests at stake.  And so it is a much more subtle

14  and layered discussion than just two different parties going at

15  it.

16  Q    But you would agree that, in any given legislature, there

17  are going to be many bills that are opposed by a number of

18  legislators and supported by a number of others, correct?

19  A    Yes, that's right.

20  Q    Okay.  And you're a member of the Democratic Party,

21  correct?

22  A    I am a Democrat.

23  Q    Okay.  It's also not uncommon for the line between the

24  support and opposition of a bill to be drawn right down party

25  lines; is that right?

1   A    I would say it's uncommon.  In the Texas Legislature, we

2   work very hard to maintain comity -- M-I-T-Y -- C-O-M-I-T-Y,

3   not M-E-D-Y, although you do see some of that.

4            But --

5   Q    Sure.

6   A    But we really do try to work together a great deal, much

7   more so -- I think it stands in contrast to Washington.

8   Q    Okay.  So you try to work together, and it -- sometimes it

9   results in compromise and progress, sometimes it doesn't,

10  right?

11  A    That's right.

12  Q    Okay.  Were you here on Tuesday when Representative

13  Martinez Fischer testified?

14  A    I was not.

15  Q    Okay.  I believe he said -- he described the legislative

16  process as a full-contact sport.  Would you agree with that

17  opinion?

18  A    I don't know.  I think of the legislative process as a

19  bill-killing machine.  It is very hard -- it is very easy to

20  kill a bill and it's very hard to pass one.

21  Q    Would you agree that, in order to pass or defeat a bill,

22  sometimes you have to employ certain strategies or tactics in

23  order to gain an advantage over those who may oppose your

24  position on a bill?

25  A    Yes.

1    Q    Okay.  Now, you testified here today that -- and I think

2    you'd agree -- that voter ID is an issue that predates the 2011

3    Legislature.  You would agree with that, right?

4    A    Yes.

5    Q    Okay.  You talked about voter ID -- a voter ID bill that

6    was proposed in 2005, correct?

7    A    Yes.

8    Q    And you opposed that bill, correct?

9    A    I did.

10   Q    Okay.  And I believe that bill passed the House but it

11   died in the Senate on a two-thirds vote.  Is that your

12   recollection?

13   A    Yes, I'm not exactly sure how it died, but I think it does

14   relate to the two-thirds rule in the Senate.

15   Q    Okay.

16   A    I don't think it came up for a vote and it died without a

17   vote.

18   Q    Okay.  So that voter ID bill died in 2005.  In 2007, a

19   similar bill was introduced.  Do you recall that bill?

20   A    I do.

21   Q    And did you oppose that bill?

22   A    I did.

23   Q    Okay.  And I believe that one also got out of the House

24   and died in the Senate.  Is that your recollection?

25   A    That's my general recollection.

1    Q    Okay.

2    A    Yes, it is.

3    Q    And as has been discussed here, again, another voter ID

4    bill was proposed in 2009.  I believe that was SB 362.  Do you

5    recall that bill?

6    A    I do.

7    Q    And did you oppose that bill?

8    A    I did.

9    Q    Okay.  And can you tell me your recollection of how that

10   bill was defeated?

11   A    I believe that bill was defeated in the House.

12   Q    Okay.

13   A    If I'm not mistaken, it was initially -- and I could be

14   wrong about this, because it was a while ago -- but it was

15   initially defeated on a point of order.  And I believe it came

16   back, and then there was -- it languished in the calendar, and

17   ultimately did not come up for a vote.

18   Q    And why did it not come up for a vote?

19   A    Because there were other calendar items before it that

20   took precedence in the regular course of business.

21   Q    And is that -- are you referring to the local and consent

22   calendar?

23   A    Among others, yes.  We have two different calendars, local

24   and consent calendar and the general calendar.

25   Q    Okay.  So that bill, SB 362, is it your testimony that it

1    died on the local and consent calendar?

2    A    I don't believe it died on the local and consent calendar.

3    No, I don't believe that's the case.  I believe it was on the

4    general calendar --

5    Q    Uh-huh.

6    A    -- but that the course of -- or the order of business was

7    that the local and consent calendar came before it, and I

8    believe it fell behind the local and consent calendar.

9         That's my best recollection.  I could be wrong.

10   Q    Representative, are you familiar with the practice known

11   as "chubbing"?

12   A    Yes, I have heard of chubbing.

13   Q    Okay.  Can you explain to me what your understanding of

14   chubbing is?

15   A    Chubbing is when members from either the front microphone

16   or the back microphone take longer than is necessary to do what

17   they need to do, so that they -- so that time continues to

18   elapse and ultimately bills that are behind the bill at hand

19   don't come up, or that a bill that -- or that the bill that is

20   at hand runs up against a time constraint.

21        So you see chubbing just about every session.

22   Usually on the last night when a bill needs to be considered,

23   members will get up and -- there are ample examples even last

24   session about how members got up and talked for a long period

25   of time, asked a lot of questions, so that bills did not come

1    up.

2            It happens about every session.

3    Q    So chubbing is kind of like a filibuster, is it not?

4    A    Similar concept, yes.

5    Q    Okay.  Was SB 362 in 2009, was that defeated by employing

6    the tactic of chubbing?

7    A    One -- some might argue that.  And I think in popular

8    media reports, it was suggested that that was the case.  You

9    know, I prefer to suggest that it was -- it never made it up on

10   the calendar.

11   Q    Representative, are you -- or I believe you testified

12   you're a member of the Mexican American Legislative Caucus,

13   correct?

14   A    Yes, sir.

15   Q    Otherwise known as "MALC"?

16   A    Yes.

17   Q    Okay.  And are you aware that MALC is a party to this

18   lawsuit?

19   A    Yes.

20   Q    And were you a member of MALC in 2009?

21   A    Yes.

22   Q    We deposed a representative of MALC in this lawsuit.

23   Would it surprise you to know that that representative

24   testified at that deposition that Senate Bill 362 was, in fact,

25   defeated by a practice known as "chubbing"?

Anchia - Cross / By Mr. Tatum                           350

1   A    It wouldn't.  I don't have a basis to -- I don't know who

2   the representative is.  I have no basis to suggest that it was

3   defeated -- or what that -- let me rephrase.

4          I have no basis to know what that representative --

5   what that representative's perception is.

6   Q    Would it surprise you to know that that representative

7   testified that Senate Bill 362 was defeated by what he referred

8   to as the "chub-a-thon"?  Have you ever heard that term?

9   A    I haven't heard it quite put like that, but it's funny.

10  Q    But you have heard it before?

11  A    I don't know that I've ever heard "chub-a-thon."  No, I

12  don't know that.

13  Q    Okay.  Well, let's stick on chubbing for just a second.

14  We'll just call it that for now.

15  A    Okay.

16  Q    All right.  So was Senate Bill 362, I believe you said it

17  never made it off the calendar; is that right?

18  A    I believe that's right.

19  Q    Okay.  And would you -- do you disagree -- or do you have

20  any basis to dispute that it was defeated through the practice

21  known as chubbing?

22  A    That's fine.  I -- some people believe that, and --

23  Q    Okay.

24  A    -- I won't dispute it.

25  Q    Okay.  Has chubbing ever been used to defeat a bill on the

EXCEPTIONAL REPORTING SERVICES, INC

Anchia - Cross / By Mr. Tatum                    351

1   calendar like that?

2   A    Oh, every session, as I said.  Every session, chubbing

3   occurs.

4   Q    So you mentioned the other bills on the calendar and that

5   occurs.  When that's done, are the other bills that are south

6   of the bill that's being chubbed, are those also killed in the

7   same manner?

8   A    Yes, so any -- typically, when you're --

9   Q    Uh-huh.

10  A    -- hitting certain time frames, and the consequence of not

11  having a bill heard as of that time frame is that the bill

12  dies, there are a number of bills that die.  And you hear that

13  regularly.

14  Q    Okay.  In 2009, were you the author of any of those bills

15  that died?

16  A    I don't recall.  Probably.  There was a long calendar.  I

17  imagine a number of members of the House were authors of bills

18  that died.  In fact, every session I have bills that die at the

19  end of the session on the calendar.

20  Q    Sure.  Sticking on the nickname theme, you weren't a

21  member of the --

22  A    The chub-a-thon?

23  Q    We're moving on from that.  You were not a member of the

24  Texas House in 2003, correct?

25  A    I was not.

Anchia - Cross / By Mr. Tatum                    352

1    Q    What were you doing at that time?

2    A    I was a -- well, I was and am an attorney in private

3    practice, and I also served on the Dallas School Board.

4    Q    Do you recall in the 2003 legislative session an instance

5    where a group of House Democrats left in the middle of the

6    session and, in fact, fled the state in order to bust a quorum

7    and prevent the consideration of a redistricting bill?

8    A    I read news accounts of this.

9    Q    Okay.  And do you remember where they went?

10   A    Yes, I do.  It was widely reported that they went to the

11   Holiday Inn in Ardmore, Oklahoma.

12   Q    And they were given -- that group of House Democrats, they

13   were given a pretty cool nickname as well, weren't they?  Do

14   you remember what that was?

15   A    I don't.

16   Q    Do you recall if they were deemed the "Killer Ds"?

17   A    That sounds right.

18   Q    Okay.

19   A    That sounds right.

20   Q    And do you remember if they -- their act inspired a group

21   of Senate Democrats to do something similar?  Do you recall

22   reading about that?

23   A    I read that the Senate Democrats also fled the state.

24   Q    Okay.  But they didn't go north to Ardmore, they went west

25   to Albuquerque, didn't they?

Anchia - Cross / By Mr. Tatum                                    353

```
 1   A    Senators typically have more exquisite taste; and as a
 2   result, I believe they went to the Marriott in Albuquerque, New
 3   Mexico.
 4   Q    Okay.  You're on the record saying that, Representative.
 5   A    Yes.  Yes, sir.
 6   Q    Okay.  Would you call fleeing the state to bust a quorum
 7   like that, would you call that a pretty extraordinary tactic?
 8   A    Yes.  I would say yes.  It -- breaking quorum is among the
 9   rules, and it's not used regularly.
10   Q    Okay.  So that brings us to 2011 with the proposal of
11   SB 14, which, if my math is correct, this would have been the
12   fourth attempt to pass a voter ID bill; is that correct?
13   A    In 2011, yes, sir.
14   Q    Okay.  Representative, do you take issue with the manner
15   in which SB 14 was passed in 2011?
16   A    Yes, the two things that were difficult with respect to --
17   were -- there were a couple things, and I'll just speak
18   procedurally about a couple things that I saw that are not used
19   often when passing legislation.
20        One is, on the Senate side, that there was -- there
21   was an effort to dispense with the two-thirds rule and pass
22   legislation through that, although it had -- it is long a
23   tradition in the Senate that the two-thirds rule -- and I think
24   Senator Ellis alluded to this -- that it is long a tradition
25   that that two-thirds rule is in place to protect minority
```

1    rights -- and not minority ethnic and racial minority, just

2    minority on a particular position.

3            The second thing that was done differently is that

4    there was a select committee that was created to hear just one

5    bill.  And that's very unusual as well in the -- and I'm not

6    saying it's outside the bounds of the rules.  It's within the

7    rules, but it is very unusual to see a select committee to take

8    on just one bill.

9            And then, finally, it was unusual for the bill

10   authors to go outside of the bounds in conference committee,

11   which means -- when you go to conference committee to harmonize

12   the differences between a state -- a Senate and a House bill,

13   you have to get a resolution from the members of the State

14   House and the State Senate in order to do so.  It is unusual to

15   go outside of the bounds, and then come back with a completely

16   different concept in a piece of legislation that has not been

17   vetted through committee, that is not -- that testimony has not

18   been taken on, that has not been debated, and that was this

19   election identity card.  And that was very quickly moved

20   through the process.

21           So those are the things -- those are the very unusual

22   steps that I -- that the photo identification bill went

23   through.

24   Q    Representative, do you feel -- or do you believe that

25   SB 14 was enacted with a discriminatory intent?

1   A    Either a discriminatory intent or effect.

2   Q    Can you point to a specific comment or legislative action

3   that clearly demonstrates that intent?

4   A    I can point to the shifting rationales for the

5   legislation.  I think that is troublesome when you constantly

6   put up rationales, and then they don't stand scrutiny, and you

7   come up with another excuse or another reason, and you keep

8   bringing it back -- I think that's a concern.

9             I think the evasiveness of the bill authors, the

10  failure to act to answer questions -- the fact that a lot of

11  the bill authors -- or that the bill authors didn't really even

12  know their bill that well caused me to believe that maybe

13  somebody else was writing that bill for them.  That was a

14  concern.

15            So there were -- it was -- there were a lot of things

16  that were irregular about this bill.

17  Q    So you mention shifting rationales, evasiveness.  Is there

18  anything else -- any kind of specific comments, anything else?

19  A    Well, you know, during -- are you just talking about the

20  2011 session or previously -- or sessions before?

21  Q    I'm talking about 2011.

22  A    Okay.  No, nothing anyone said specifically.  No.

23  Q    Okay.  So your opinion, then, is -- it's more subjective.

24  It's based on inferences that you drew from these things that

25  you just mentioned?

1   A    Yeah, it's based on the totality of the circumstances.

2   Q    Representative, early -- earlier today, Senator Ellis was

3   talking about the two-thirds tradition, as he called it, and he

4   mentioned kind of what it does and how it slows things down

5   during a session so that you can build a consensus, you can

6   actually debate the bill, it -- and that kind of thing.

7        Were you here for that?

8   A    I was here, I think, for the beginning of that.  Yes.

9   Q    Okay.  Do you think that kind of accurately describes the

10  two-thirds tradition?

11  A    Yes.

12  Q    That's its purpose?

13  A    Yes.

14  Q    Okay.  And he went on to talk about how, you know, maybe

15  you get a consensus, but maybe you don't.  And if you don't,

16  your bill dies.  And maybe -- I believe he said something like,

17  you know, "If it dies, it wasn't ready and we'll try it again

18  next year," something like that.

19       Were you there for that?

20  A    I was not there for that, no.

21  Q    Okay.  Do you have any reason to dispute my summary of his

22  testimony?

23  A    I'm not sure I understand what it means, but the --

24  Senator Ellis is a very wise senator.

25  Q    You're familiar with a special session, correct?

1    A    I am.  Yes, sir.

2    Q    And what is a special session?

3    A    A special session is a session that is called by the

4    governor for an extraordinary purpose, typically to deal with

5    an emergency, an issue that the governor believes is

6    meritorious of additional work that was not engaged in during

7    the regular session.  It could deal with an appropriations

8    issue, but it is typically at the discretion of the governor to

9    call.

10   Q    Okay.  So if something doesn't pass during the regular

11   session, the governor can call a special session to kind of

12   hammer it through?

13   A    Yes, sir.

14   Q    Okay.  And does the two-thirds tradition, does that apply

15   in a special session, if you will?

16   A    It is my understanding that it does not apply.

17   Q    So back in 2005 when that iteration of the voter ID bill

18   was offered and failed to pass, was a special session called

19   that year to hammer that bill through?

20   A    I don't recall.

21   Q    In 2007 when that voter ID bill failed to pass, was a --

22   do you recall if a special session was called that year and

23   hammered through?

24   A    I don't.

25   Q    In 2009 when Senate Bill 362 was defeated, do you recall a

Anchia - Cross / By Mr. Tatum                                  358

1   special session being called that year to hammer that bill

2   through?

3   A     I do not.

4         **(Pause)**

5   Q     So going into the 2011 legislative session, if you were a

6   lawmaker trying for the fourth time to pass a bill that you

7   supported, do you think you'd be mindful of the strategies and

8   tactics that they used to defeat your previous bills?

9   A     I'm certain, sure.

10  Q     Is that a yes?

11  A     Oh, yes, sir.

12  Q     Okay.  Might you also, in preparation for that session,

13  consider the major issues coming down the pipe for that

14  session?

15  A     Yes.  I think that's what all legislators do, sort of

16  evaluate the large issues during a legislative session as

17  they're putting together their legislative package.

18  Q     Do you recall any of the issues that the Texas legislature

19  was facing as they gaveled in in 2011?

20  A     I think there was a budget shortfall that year.  I think

21  the budget was the big issue, and then the cuts to public

22  education and healthcare were big.

23  Q     I believe someone testified today about a budget shortfall

24  of roughly $27 billion; was that correct?

25  A     Yeah.  There was a big budget shortfall as I recall.

Anchia - Cross / By Mr. Tatum                          359

1   Q    Do you ever recall a budget shortfall like that in your

2   experience in the legislature?

3   A    No, sir.

4   Q    So that was a big issue?

5   A    Yes, sir.

6   Q    Okay.  Were there transportation issues that needed to be

7   dealt with?

8   A    There always are transportation issues that needed to be -

9   - that need to be dealt with, including this upcoming session.

10  Q    How was the drive down I-35?

11  A    **(Laughter)**

12  Q    Was the legislature going to be considering any healthcare

13  reforms in the wake of Obamacare?

14  A    In 2011, I don't think there was much discussion of

15  healthcare reform other than the cuts out of the budget to make

16  the budget balance.  I don't recall that that was a big issue.

17  Q    Was there a redistricting bill coming down the pipe that

18  session?

19  A    I believe so.  Yeah, it sounds like the timing is right

20  for redistricting.

21  Q    That's always a big one, isn't it?

22  A    Yeah.  And it -- you know, I always feel like we're always

23  doing redistricting.

24  Q    So it sounds like with redistricting, the transportation

25  issues that are always prevalent, and that massive budget

1   shortfall issue, that sounds like 2011 was shaping up to be a

2   pretty busy legislative session.

3   A    Yes, sir.

4   Q    Okay.  Well, Representative, you testified in a previous

5   trial on this voter ID issue; do you recall that?

6   A    In the -- if you're referring to the D.C. District Court,

7   yes, sir.

8   Q    Yes.  Do you recall sitting for a deposition in that case?

9   A    Yes, sir.

10  Q    Okay.  I believe that deposition was held on June 6th,

11  2012; does that sound about right?

12  A    That sounds about right, yes, sir.

13  Q    Okay.  Do you recall in that deposition being shown a

14  number of various polls showing -- indicating public support

15  for voter ID measures?

16  A    Yes, sir.

17  Q    And do you recall the content of those polls or the

18  results that they depicted?

19  A    I don't recall the exact content, no, sir.

20  Q    Okay.

21  A    But roughly the substance of the polls was that photo

22  identification was popular -- and I don't recall the exact

23  question that was asked -- but it was popular among Republicans

24  and Democrats and African Americans and -- you know, it spoke

25  to the popularity.  Did I get that right?

Anchia - Cross / By Mr. Tatum                          361

1   Q     That's about right, yes.

2   A     Okay.

3   Q     And there were -- I'll represent to you that there were

4   five or six different polls that you were presented with.

5   A     I recall that, yes, sir.

6   Q     Okay.  So you would agree that at least according to those

7   polls, that voter ID was a pretty popular issue amongst the

8   Texas electorate, would you?

9   A     Well, again, it always depends on how you phrase the

10  question.  I'm sure if I would have asked the question, "Do you

11  believe that we should institute a photo identification

12  requirement in order to vote that might disenfranchise half a

13  million Texans?" maybe the results of the -- the answer would

14  be different, probably be a less popular discussion -- or a

15  hundred thousand Texans or a Vietnam War veteran, I mean -- so

16  polls -- I just say that because the question you asked often

17  determines the answers that you get.

18  Q     So to kind of sum up, Representative, what we talked

19  about, in light of the various attempts to pass voter ID bill

20  in 2005, again in 2007, again in 2009, and in light of the, you

21  know, various big issues that the Texas legislature was facing,

22  basically a packed docket for that year, and in light of, you

23  know, at least potential or as evidenced in those polls, you

24  know, support amongst Texas citizens for voter ID measures, do

25  you suppose that it's possible that SB 14 was passed the way it

1   was because of all those things and not because of some

2   pervasive discriminatory intent?

3   A    You know, I believe it's possible, but I don't think it's

4   likely, and I'll tell you why.  We had a huge budget shortfall

5   that year.  That didn't get a select committee.  It didn't get

6   sort of a two-thirds exemption.  Transportation funding didn't

7   get a select committee, didn't get dispensation through two-

8   thirds.  Any number of other priorities, including priorities I

9   felt strongly about, my Republican colleagues felt strongly

10  about, didn't get this special treatment.  So I really do think

11  this was an unusual process for a bill.  I have not seen a bill

12  other than this one get that kind of procedural runway.  And

13  just to be candid, none of my bills have ever gotten that.

14  Q    Now, you testified about the committee on voter fraud

15  earlier; do you recall that?

16  A    The select committee?

17  Q    Yes.

18  A    Yes, sir.

19  Q    Okay.  And you were not on that committee, right?

20  A    That is correct, sir.

21  Q    And I believe you testified that you were allowed -- or at

22  least you think you were allowed -- to participate in the

23  debate of SB 14 in front of that committee?

24  A    Yes, sir.  And my best recollection is that Chairman

25  Bonnen (phonetic) asked me, knowing that I was an opponent and

Anchia - Cross / By Mr. Tatum                    363

1    had spent a lot of time working on this bill, I think he may

2    have asked me specifically to sit on the committee.

3    Q    And as you testified earlier, you did take advantage of

4    that invitation?

5    A    I sure did, yes, sir.

6    Q    Okay.  And you were able to question -- or ask questions

7    of witnesses that came to testify about that bill, correct?

8    A    I did.

9    Q    Okay.  Do you recall questioning Ann McGeehan, the

10   Secretary of State?

11   A    Yes.

12   Q    Do you recall questioning Rebecca Davio of the DPS?

13   A    Yes.

14   Q    Okay.  And you even questioned an attorney at the Texas

15   Attorney General's office, David Maxwell, correct?

16   A    Yes.  I don't remember his name, but yes, I do remember

17   that.

18   Q    So you were given ample opportunity to voice your concerns

19   and engage in a debate about SB 14 during its consideration,

20   correct?

21   A    Yes.  I mean, I was able to participate in the legislative

22   process, that's correct.

23   Q    And as you said, you propose an amendment that eventually

24   was accepted into the bill's language, correct?

25   A    To fix (indiscernible) along the bill, that's correct.

1  Q    Okay.  Now, did you or anyone else opposed to SB 14 in

2  2011 consider attempting to -- I'm going to say the word again

3  -- chub the bill this time around?

4  A    I don't recall, no.

5  Q    And why don't you think that that tactic was attempted

6  again?

7  A    I don't recall.

8  Q    Would it surprise you to learn that there was a House

9  resolution, I believe, passed that eliminated the practice of

10 chubbing for that legislation?

11 A    I do remember -- that's right, we passed a very large

12 rules bill at the beginning of the session and I believe there

13 was language in that rules bill to deal with the -- to try to

14 deal with the practice of chubbing.  Still happens regularly,

15 by the way.

16 Q    And in that session, what did you vote on that resolution;

17 do you recall?

18 A    I think I voted -- I typically vote in favor of all rules

19 resolutions because it's typically a large sweep of rules and,

20 you know, if you're in favor of 90 percent of them, then a lot

21 of times you just vote yes.

22 Q    Representative, just a couple more questions.

23 A    Yes, sir.

24 Q    And at risk of being repetitive, do you agree the strength

25 and the integrity of the election system is an important thing

1   to you, correct?

2   A    Yes, sir.

3   Q    Okay.  And ensuring that those who show up to the polls

4   are who they say you are, that's a laudable goal in your

5   opinion, correct?

6   A    Yes, sir.

7          **MR. TATUM:**  Okay.  Thank you very much,

8   Representative.  No further questions.

9          **THE WITNESS:**  Thank you.

10                  **REDIRECT EXAMINATION**

11  **BY MR. GARZA:**

12  Q    Representative, you were asked about the strategies that

13  were used by certain legislators in the 2003 redistricting

14  battle; do you recall those questions?

15  A    Yes.

16  Q    About certain members going to Oklahoma and other members

17  of the Senate going to New Mexico?

18  A    Yes.

19  Q    Do you know if those strategies ultimately succeeded in

20  preventing a new redistricting bill from being passed?

21  A    I believe they were unsuccessful.

22  Q    And do you know --

23  A    As far as I recall.

24  Q    And do you know if that redistricting bill was challenged

25  in the courts?

1   A     I believe it was.

2   Q     And you're aware that it was declared unconstitutional by

3   the United States Supreme Court?

4   A     I think I recall that, yes.

5              MR. GARZA:  No further questions.

6              THE WITNESS:  Thanks.

7              THE COURT:  Anything further?  Thank you, sir, you

8   can step down.

9              THE WITNESS:  Thank you, your Honor.

10       **(Witness steps down)**

11             MR. DUNN:  Your Honor, at this time we call

12   Representative Ana Hernandez which -- who will be examined by

13   my co-counsel, Emma Simson.

14             THE COURT:  Good afternoon or evening now.  Would you

15   raise your right hand?

16        **ANA HERNANDEZ, PLAINTIFFS' ATTORNEY, SWORN**

17             MS. SIMSON:  Good evening, your Honor.  Emma Simson

18   for the Veasey/LULAC Plaintiffs.  Good afternoon,

19   representative.

20                  **DIRECT  EXAMINATION**

21   **BY MS. SIMSON:**

22   Q     Could you go ahead and state your name and where you

23   reside for the record?

24   A     Ana Hernandez, Houston, Texas.

25   Q     And can you give us a bit of background about yourself,

1  where you grew up, where you went to school, that sort of

2  thing?

3  A    I was born in Reynosa, Mexico.  And when I was about one,

4  my family came to the U. S. on a visitor's visa.  We overstayed

5  our visa and were undocumented until the passage of the

6  Immigration Reform Control Act of 1986.  We were able to become

7  legal permanent residents.  And when I became 18 -- turned 18,

8  I became a U. S. citizen.

9  Q    And when you became a citizen, did you receive any sort of

10 documentation to prove your citizenship?

11 A    I received the naturalization certificate.

12 Q    And if you were to lose that document or it were stolen or

13 something happened to it, do you know how much it would cost to

14 replace that?

15 A    The fee changes over the years and I believe it's

16 currently about $345 to request a replacement of that

17 certificate.

18 Q    Do you know others who became citizens after being born

19 somewhere else and who would also have to pay $345 to replace

20 that type of document?

21 A    My family, amongst others.

22 Q    Okay.  And then did you eventually run for office?

23 A    Yes.

24 Q    And what age were you when you ran for office?

25 A    When I started to run -- started the campaign, I was 26

Hernandez - Direct / By Ms. Simson                    368

1    and elected at 27.

2    Q    Okay.  And have you been a representative ever since?

3    A    Yes.

4    Q    For what --

5    A    Since December of 2005.

6    Q    For what district?

7    A    District 143.

8    Q    And can you describe where that district is for us?

9    A    It is east Houston, east Harris County.  I have about a

10   quarter of the City of Houston.  The others include

11   municipalities of Jacinto City and Galena Park and

12   unincorporated areas of Harris County and Channelview.

13   Q    And what are the demographics of your district?

14   A    It's a majority Hispanic district.  It's 73 percent

15   Hispanic, 13 percent African American, and 13 percent White.

16   Q    And would you describe it as working class, middle class,

17   upper class?

18   A    It is.  It's a district along the ship channel in Houston,

19   along the petrochemical capital, and it is a working class

20   district.

21   Q    Okay.  And we're here today obviously talking about SB 14.

22   Do you recall when that was passed in the legislature?

23   A    2011.

24   Q    And what committees were you on in 2011?

25   A    I was on the Elections Committee.

1  Q    And did -- I presume the Elections Committee considered

2  the voter ID bill?

3  A    They did not.  As mentioned earlier, there was a select

4  committee that was created to address the voter ID issue.

5  Q    Would you normally expect the Elections Committee to

6  consider a bill like voter ID legislation?

7  A    Considering they had in previous sessions, I expected it

8  to go to the Elections Committee.

9  Q    Did you ever know why the Elections Committee was not

10  given the bill?

11  A    No.

12  Q    So can you tell us or describe for us the atmosphere of

13  the 2011 legislative session?

14  A    It was a tense session.  As was mentioned earlier, we were

15  facing a $27 billion budget shortfall and immigration was also

16  a very hot topic.  And sanctuary cities was placed on the

17  emergency items by the -- declared an emergency item by the

18  Governor.  And just the entire session we saw a lot of anti-

19  immigrant bills that were filed, including English only bills,

20  and comments that were made about immigrants.

21  Q    And can you tell us what the sanctuary cities bill was

22  about?

23  A    I'll finish the comments that were made about immigrants,

24  bringing leprosy to the country, bringing other diseases, being

25  a burden on the -- on our government.  And I took that very

1    personally because I am an immigrant.

2    Q    And can you tell us about the sanctuary cities bill?

3    A    It's a bill that in my opinion was unnecessary considering

4    that we don't have sanctuary cities in Texas.  For instance in

5    Harris County, they do inquire about your legal status when you

6    are arrested.

7    Q    Did you have any concerns about the impact of a sanctuary

8    cities-type bill on your constituents?

9    A    I did.  I mean, as an immigrant, I remember my family

10   living in fear when we were in undocumented status.  I mean,

11   fear of even going to the grocery store because there were

12   immigration raids at that time.  So we -- I believe that

13   passage of the sanctuary cities bill would eliminate that

14   cooperation between law enforcement and the immigrant

15   community.

16   Q    What about the English-only bills?  How did you feel about

17   those?

18   A    I also feel that it was sending the message that we

19   weren't welcome, that those immigrants that spoke another

20   language -- for instance, Spanish was my first language -- that

21   we're not welcomed in this country.

22   Q    When you say you felt like "we" weren't welcome, are you

23   referring to both -- people who have become citizens who are

24   immigrants?

25   A    Yes.  I mean, as a citizen, if you're -- if you can't read

Hernandez - Direct / By Ms. Simson                    371

1   English, I mean, they were basically saying you can't be in our

2   state.

3   Q    Now, in the course of being a legislator, do you talk to

4   your constituents about the issues that the legislature is

5   considering?

6   A    I try to keep in close contact with my constituents and

7   attend different events.

8   Q    Did you ever talk to constituents about voter ID

9   legislation?

10  A    I did during session -- I mean, there was a lot of

11  coverage -- news coverage, and so that was the topic of

12  conversation when I came back to the district.  And initially

13  they would ask, well, what's the big deal, you know, for asking

14  for photo identification.  But once we discussed it further and

15  I explained that it was a very restrictive list of voter -- of

16  acceptable forms of photo ID, then they changed their opinion

17  about it.

18  Q    Okay.  And what was the -- turning to the SB 14 debates,

19  what was the tone of those debates?

20  A    It seemed like there was no desire to have a discussion

21  about the issues that were being raised through amendments.

22  Q    Did you offer any amendments?

23  A    I did.

24  Q    Do you recall how many?

25  A    I believe two.

Hernandez - Direct / By Ms. Simson                          372

1   Q    Did you think at the time that you introduced those

2   amendments that either one of them would pass?

3   A    I was hoping they would.  I mean, one was dealing with

4   women that had been recently married or divorced and I was

5   going through a similar situation and changing my name and

6   making sure that when a woman had just been married or divorced

7   and was going through that name change process, that they

8   wouldn't be denied the right to vote and could vote by

9   affidavit.

10  Q    And what was the other amendment about?

11  A    The other amendment was to allow federally -- a federal

12  government-issued ID as a form of voter identification.

13  Q    So you mentioned that the tone of the debate, it seemed

14  like there wasn't really a debate.  And so did you expect that

15  either of those would pass?

16  A    I was hoping they would.  I mean, I offered them hoping

17  they would pass.

18  Q    And did they pass?

19  A    They did not.

20  Q    During the legislative debates, did you ever hear anyone

21  say that one of the purposes of photo ID legislation is to stop

22  non-citizens from voting?

23  A    There were a lot of comments made about that.

24  Q    Okay.  Did your -- were your parents here as a -- before

25  they -- did they -- you -- they ultimately obtained

EXCEPTIONAL REPORTING SERVICES, INC

Hernandez - Direct / By Ms. Simson                    373

1    citizenship, did your parents ever attempt to vote before they

2    became citizens?

3    A    No.  My parents were citizens and weren't participating in

4    elections until I became involved in politics.

5    Q    And you talked for a moment about the fear that you felt

6    when you were in undocumented status.  Do you think that non-

7    citizens are attempting to vote illegally or successfully

8    voting illegally?

9    A    No.

10   Q    Why not?

11   A    They are living in the shadows.  They don't want any

12   contact with the government for fear of being deported because

13   that -- I mean, my family was afraid to even go grocery

14   shopping much less attempt to illegally vote.

15   Q    Do you think that SB 14 was about race?

16   A    I mean, considering the information that was available and

17   the minority community and the impact it would -- negative

18   impact it would have on the minority, I do believe it was about

19   race.

20   Q    Are you aware of any other election changes, recent

21   election changes, that may harm minority voters?

22   A    I -- there -- I grew up in Pasadena and they recently made

23   a change to their city council makeup and changed two district

24   council seats and made them at-large seats.

25   Q    And do you know the demographic population of Pasadena?

1   A    It's a majority Hispanic city, but the -- there is a

2   higher voting participation among Whites.

3   Q    Why do you think that is, that there's higher voting

4   participation among the White population there?

5   A    Well, just considering, I mean, my family's situation and

6   many other families in Pasadena, they're busy working.  And,

7   for instance, my dad still works at a refinery.  He does shift

8   work and so he has 12-hour shifts, he does them five days in a

9   row, and so it makes it very difficult when you have that type

10  of work schedule to participate in elections.

11          **MS. SIMSON:**  Thank you.  I have no further questions.

12          **MR. SCOTT:**  The State has no questions for this

13  witness.

14          **THE COURT:**  All right.

15          **MR. SCOTT:**  Thank you for your service, ma'am.

16          **THE COURT:**  Thank you, ma'am.  You can step down.

17      **(Witness steps down)**

18          **MR. ROSENBERG:**  Your Honor, we have a choice.  We

19  have a video which might go a little past 6:00.

20          **THE COURT:**  Okay.

21          **MR. ROSENBERG:**  We can do some readings and we can

22  perhaps calibrate those a little better.  It's up to your

23  Honor's pleasure, so to speak.

24          **THE COURT:**  Yes.  Like how much past 6:00?

25      **(Mr. Rosenberg confers with co-counsel)**

 1          **MR. ROSENBERG:**  Oh, 28, so we would basically go

 2  about three minutes past 6:00.

 3          **THE COURT:**  Yeah, whatever you want --

 4          **MR. ROSENBERG:**  Okay.

 5          **THE COURT:**  -- to do is fine with me.  I don't have a

 6  problem with that.

 7      **(Mr. Rosenberg confers with co-counsel)**

 8          **MR. ROSENBERG:**  It would go to around ten after 6:00.

 9          **THE COURT:**  It's up to you all.  If you all want to

10  do that or the other.

11          **MR. HAYGOOD:**  Your Honor, the United States would

12  introduce its next witness as a video testimony of Naomi

13  Eagleton, and that video has been labeled as Plaintiffs'

14  Exhibit 1095.  And I have a copy of the excerpts from the

15  transcript.  And if you allow me to approach?

16          **THE COURT:**  Okay.

17     **NAOMI EAGLETON, PLAINTIFFS' WITNESS, BY VIDEO DEPOSITION**

18      **(Excerpts of video deposition of Naomi Eagleton played**

19  **from 5:38 p.m. to 6:06 p.m.)**

20          **MS. WOLF:**  Your Honor, the Defendants will also

21  present some video testimony from Ms. Eagleton.

22      **(Excerpts of video deposition of Naomi Eagleton played**

23  **from 6:06 p.m. to 6:16 p.m.)**

24          **THE COURT:**  All right.  Is that it?  That was a great

25  way to end the week.

376

1          **(Laughter)**

2              **THE COURT:**  So 8:00 o'clock Monday morning then.

3     Anything else?  Thank you, have a good weekend.  You're

4     excused.

5          **(This proceeding was adjourned at 6:16 p.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    _September 6, 2014_ _

TONI HUDSON, TRANSCRIBER