UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Monday, September 8, 2014 |
| | ) | (7:58 a.m. to 12:02 p.m.) |
| Defendants. | ) | (1:03 p.m. to  5:57 p.m.) |


BENCH TRIAL - DAY 5

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:            See Next Page

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Adrian Perez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiffs:                      CHAD W. DUNN, ESQ.
                                 KEMBEL SCOTT BRAZIL, ESQ.
                                 Brazil and Dunn
                                 4201 Cypress Creek Parkway, Suite 530
                                 Houston, TX 77068

                                 ARMAND DERFNER, ESQ.
                                 P.O. Box 600
                                 Charleston, SC 29402

                                 J. GERALD HEBERT, ESQ.
                                 Attorney at Law
                                 191 Somervelle Street #405
                                 Alexandria, VA 22304

                                 NEIL G. BARON, ESQ.
                                 914 FM 517 Rd. W, Suite 242
                                 Dickinson, TX 77539

                                 EMMA P. SIMSON, ESQ.
                                 Campaign Legal Center
                                 215 E. Street NE
                                 Washington, DC 20002

Mexican American                 EZRA D. ROSENBERG, ESQ.
Legislative Caucus,              Dechert, LLP
et al.:                          902 Carnegie Center, Suite 500
                                 Princeton, NJ 08540-6531

                                 MARK A. POSNER, ESQ.
                                 AMY L. RUDD, ESQ.
                                 GARY BLEDSOE, ESQ.
                                 SONIA K. GILL, ESQ.
                                 ERANDI ZAMORA, ESQ.
                                 Lawyers' Committee for Civil Rights
                                 1401 New York Ave. NW, Suite 400
                                 Washington, DC 20005

                                 DANIEL G. COVICH, ESQ.
                                 802 N. Carancahua, Suite 2100
                                 Corpus Christi, TX 78401

**APPEARANCES FOR:**          (CONTINUED)


Mexican American          MYRNA PEREZ, ESQ.
Legislative Caucus,       VISHAL AGRAHARKAR, ESQ.
et al.:                   JENNIFER CLARK, ESQ.
                          Brennan Center for Justice
                          161 Avenue of the Americas
                          12th Floor
                          New York, NY 10013


United States            RICHARD DELLHEIM, ESQ.
of America:              ELIZABETH S. WESTFALL, ESQ.
                         DANIEL FREEMAN, ESQ.
                         ANNA BALDWIN, ESQ.
                         AVNER SHAPIRO, ESQ.
                         MEREDITH BELL-PLATTS, ESQ.
                         JOHN SMITH, ESQ.
                         PAXTON WARNER, ESQ.
                         BRADLEY HEARD, ESQ.
                         ROBERT BERMAN, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530


                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006


Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209


                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751


                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

4

<u>APPEARANCES FOR:</u>          (CONTINUED)


Texas League of Young          RYAN HAYGOOD, ESQ.
Voters Education Fund:         NATASHA KORGAONKAR, ESQ.
                              DEUEL ROSS, ESQ.
                              NAACP Legal Def. and Educational Fund
                              40 Rector St., 5th Floor
                              New York, NY 10006


                              DANIELLE CONLEY, ESQ.
                              KELLY DUNBAR, ESQ.
                              M. HASAN ALI, ESQ.
                              LYNN EISENBERG, ESQ.
                              JONATHAN E. PAIKIN, ESQ.
                              RICHARD F. SHORDT, ESQ.
                              SONYA LEBSACK, ESQ.
                              Wilmer Cutler Pickering, et al.
                              1875 Pennsylvania Avenue, NW
                              Washington, DC 20006

Texas Association of          ROLANDO L. RIOS, ESQ.
Hispanic County Judges        115 E. Travis
and County                    Suite 1654
Commissioners:                San Antonio, TX 78205


                              PRESTON HENRICHSON, ESQ.
                              222 W. Cano
                              Edinburg, TX 78539

State of Texas:               JOHN BARRET SCOTT, ESQ.
                              Deputy Attorney General
                              for Civil Litigation
                              Office of the Attorney General
                              P.O. Box 12548
                              Austin, TX 78711


                              JOHN REED CLAY, JR., ESQ.
                              LINDSEY E. WOLF, ESQ.
                              JENNIFER ROSCETTI, ESQ.
                              G. DAVID WHITLEY, ESQ.
                              STEPHEN L. TATUM, JR., ESQ.
                              STEPHEN R. KEISTER, ESQ.
                              Office of the Attorney General
                              P.O. Box 12548
                              MC001
                              Austin, TX 78711

<u>**APPEARANCES FOR:**</u>            (CONTINUED)


State of Texas:            BEN A. DONNELL, ESQ.
                          Donnell Abernethy Kieschnick
                          555 N. Carancahua, Suite 400
                          Corpus Christi, TX 78401

                          WHITNEY DEASON, ESQ.
                          JOHN CRAWFORD, ESQ.

Non-Party Senators        ARTHUR D'ANDREA, ESQ.
& Non-Party               Office of the Attorney General
Representatives:          209 W. 14th Street, 7th Floor
                          Austin, TX 78701

                          DAVID TALBOT, ESQ.

                          JAMES B. ECCLES, ESQ.
                          Office of the AG of Texas
                          300 W. 15th Street, 11th Floor
                          Austin, TX 78701

                          ALICE LONDON, ESQ.
                          Bishop London Brophy & Dodds
                          3701 Bee Cave Rd., Suite 200
                          Austin, TX 78746

## INDEX

| PLAINTIFFS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| OSCAR ORTIZ | 9 | 22 | 29 | |
| KEVIN JEWELL | 31 | 56 | 72 | |
| DANIEL CHATMAN | 77 | 103 | 118 | |
| LORRAINE MINNITE | | | | |
|   BY MS. PEREZ | 119 | | 165 | |
|   BY MR. CLAY | | 143 | | 166 |
|   BY MS. BALDWIN | | 162 | | |
| FORREST MITCHELL | 168 | | | |
|   (BY EXCERPTS OF DEPO) | | | | |
| GEORGE KORBEL | | | | |
|   BY MR. BARON | 177 | | | |
|   BY MR. SCOTT | | 202/250 | | |
|   BY MR. FREEMAN | | 248/251 | | |
| ANN McGEEHAN | 254 | 306 | | |
|   (BY EXCERPTS OF DEPO) | | | | |
| RUBY BARBER | 319 | 320 | | |
|   (BY EXCERPTS OF VIDEO DEPO) | | | | |
| TODD SMITH | 322 | 346 | | |
|   (BY EXCERPTS OF DEPO) | | | | |
| YANNIS BANKS | 348 | 353 | | |
|   (BY EXCERPTS OF DEPO) | | | | |
| VERA LEE MILLER TROTTER | 357 | | | |
|   (BY EXCERPTS OF VIDEO DEPO) | | | | |

7

1    <u>**Corpus Christi, Texas; Monday, September 8, 2014; 7:58 a.m.**</u>

2                         <u>**Call to Order**</u>

3         **THE COURT:**  Good morning.  The Court calls Cause

4    Number 2-13-cv-193, *Veasey, et al versus Perry, et al.*

5         Are we ready to continue?

6         **MR. DUNN:**  Yes, your Honor.

7         **MS. WESTFALL:**  Yes, Elizabeth Westfall for the United

8    States.

9         The Plaintiffs have indicated that they would be

10   calling Dr. Chandler Davidson today and they will not be, and

11   we have conferred with Counsel for this date and agreed that

12   Dr. Davidson's Declaration, his Supplemental Declaration of

13   August 15th, will be admitted into evidence provided the State

14   is permitted to designate portions of his deposition and submit

15   that on Wednesday of this week.

16        **MR. SCOTT:**  As part of the -- the rest of -- that's

17   correct, your Honor.  As part of the additional -- the rest of

18   the agreement is that Dr. Milo's Declaration, corrected

19   Declaration, will also be admitted with the right of the

20   Defendants -- I mean, the Plaintiffs to submit portions of his

21   deposition as they see fit.

22        **MS. WESTFALL:**  And we agree with that.

23        **THE COURT:**  Okay.  So the report, the Supplemental

24   Declaration of Dr. Chandler then is coming in as evidence by

25   agreement?

8

1          **MS. WESTFALL:**  As is Dr. -- yes, of Dr. Davidson.

2          **MR. SCOTT:**  And along with the Declaration of

3    Dr. Milo.

4          **THE COURT:**  Okay.  All right.

5          **MS. WESTFALL:**  Thank you.

6          **MR. DUNN:**  One other housekeeping matter, your Honor.

7    The Veasey-LULAC Plaintiffs have a handful of folks that we do

8    not intend to call live and we didn't think it was a judicial

9    use of time either to read their depositions.  So what we did

10   was create short excerpts on just standing issues to hand to

11   the Court in the event it needs to look that up if that's

12   acceptable.

13         **THE COURT:**  Okay.

14         **MR. DUNN:**  All right, I'll hand that up to you.

15         **THE COURT:**  Is that agreed to?

16         **MR. SCOTT:**  And no objections.

17         **THE COURT:**  All right.

18       **(Counsel confer)**

19         **MR. DUNN:**  Your Honor, at this time the Plaintiffs

20   call Commissioner Oscar Ortiz.

21         **THE COURT:**  Good morning.  You can approach right

22   over here, and if you'll raise your right hand?

23   //

24   //

25   //

1          **OSCAR ORTIZ, PLAINTIFFS' WITNESS SWORN**

2          **THE WITNESS:**  I do.

3          **THE CLERK:**  Thank you, sir.

4                          **DIRECT EXAMINATION**

5    **BY MR. DUNN:**

6    Q    Please tell us your name.

7    A    Oscar Ortiz.

8    Q    Commissioner Ortiz, my name is Chad Dunn.  I'm here on

9    behalf Veasey-LULAC plaintiffs and one of your lawyers, is that

10   right?

11   A    Yes, sir.

12   Q    Tell us sort of who you are, where you're from, that sort

13   of thing?

14   A    I'm a County Commissioner for the past 20 years here in

15   Nueces County, born, raised here in Nueces County, Robstown-

16   Corpus Christi is my -- my area.

17   Q    How long have you been on the Commissioners Court?

18   A    I've been 20 years.

19   Q    And what is -- describe for us the area that you

20   represent, that's in your district.

21   A    It's a very diverse area.  I -- prior to the re-

22   districting -- well, after this last re-districting now I have

23   (indiscernible), Agua Dulce, Robstown, Driscoll and a large

24   area, 85 percent or more of my vote comes from the City of

25   Corpus Christi which runs from the west side of Corpus Christi

Ortiz - Direct / By Mr. Dunn                    10

1   down to -- down Padre Island Drive, down to Rodd Field Road to

2   Holly, and then I come back on Ocean Drive, back to -- almost

3   to Louisiana and cut in and go back to Baldwin, and complete

4   the circuit there.

5   Q    All right.  Can you give us a sense of what the racial or

6   ethnic makeup of your district is?

7   A    It's about 67, 68 percent Hispanic.

8   Q    In addition to yourself are there other Latino leaders on

9   the Commissioners Court?

10  A    There's one more Hispanic Commissioner.

11  Q    What is that person's name?

12  A    Joey Gonzalez.

13  Q    Have you, in the past, had another -- what district is he

14  from?

15  A    Precinct 2.

16  Q    Has there, at times, been another Precinct that was

17  competitive in the Nueces County Commissioner's Court?

18  A    Yes, there was Precinct 1.

19  Q    Did you participate in re-districting in the Nueces County

20  Commissioners Court in the recent census go-round?

21  A    Yes, I did.

22  Q    Tell us what happened there.

23  A    Well, from the start it -- there was a bad feeling of

24  things weren't going to go well because they hired -- the

25  majority of the Court is Republican and they hired an attorney,

1    Mr. Nixon, who has publicly stated that his goal in life is to

2    turn the State of Texas into a Republican State.

3    Q    Is that Joe Nixon?

4    A    Yes.

5    Q    Now had something happened in 2010, the 2010 elections to

6    change what had been the recent historical balance in the

7    Commissioners Court?

8    A    Well, the census, the census and then the -- after every

9    census there's a re-districting and, of course, it was time to

10   re-district.

11   Q    So when the -- when Mr. Nixon and the other Commissioners

12   went about drawing a plan what were some of the characteristics

13   of it?

14   A    Well, they -- they took some of my -- they diluted the

15   Anglo population in my district and put it in Mr. Pusley's

16   Precinct which made his Precinct now a safer Precinct.

17   Q    Okay, just to be clear on the record, which Precinct

18   number is that?

19   A    One.

20   Q    And so there were boxes or precincts in your district that

21   were predominantly Anglo that were taken out and put into

22   Precinct 1, did I understand that right?

23   A    That's correct.

24   Q    What was -- what was the population of your district?  In

25   other words, did you need to shed or gain population in order

1   to meet the one person-one vote principle?

2   A    No.  My advantage, if they would have left the -- the

3   districts the way that they were there would have been no need

4   for re-districting because they all complied with the law.

5   Q    So this re-districting was entirely voluntary?

6   A    In my opinion, yes.

7   Q    And did you ultimately vote against the plan?

8   A    Yes.

9   Q    Did the other Hispanic Commissioner vote against the plan?

10  A    Yes.

11  Q    Was the plan then submitted to the Department of Justice?

12  A    Yes.

13  Q    And what -- what did the Department of Justice have to say

14  about it?

15  A    Well, they -- they were in agreement that this was a -- a

16  -- what is the term, regressive, and that they had some

17  objections to it.

18  Q    And the Department of Justice issued an actual written

19  objection, is that right?

20  A    Yes.

21  Q    Was one of the things found in that objection is that the

22  County had failed to meet its burden to show the plan was not

23  discriminatory in its purpose?

24  A    Yes, I believe so.

25  Q    Now after the objection stopped the implementation of the

1    plan, how then was re-districting resolved?

2    A    There was a -- a -- I believe you are talking about the

3    lawsuit that was filed --

4    Q    Yes.

5    A    -- by -- not by the Court, but by an individual in the

6    community.

7    Q    And that was filed here in Federal Court?

8    A    Yes, it was.

9    Q    And ultimately was a settlement worked out between the

10   County and the Department of Justice on a plan?

11   A    No, it never came to -- as far as I can remember it didn't

12   come back to the Commissioners Court for approval.

13   Q    Was the plan altered, though, in light of communications

14   with the Department of Justice?

15   A    I believe it was.

16   Q    I'd like to transition for a minute and talk about voting.

17   I assume you voted in most elections, is that right?

18   A    Yes.

19   Q    Have you had an opportunity to vote since the Senate Bill

20   14, the photo ID law, came into effect?

21   A    Yes, I have.  I don't recall what election it was for,

22   it's -- because I try to vote on every election, but I did have

23   a little bit of problem because my name on my driver's license

24   and the name on my voter registration card are not exactly the

25   same.

1   Q    What's the name on your voter registration?

2   A    I'd have to look because, you know, because, you know --

3   well, one of them has Oscar Ortiz and the other one has Oscar

4   O. Ortiz, or Oscar Ochoa Ortiz.

5   Q    I see.  And were you permitted to vote though?

6   A    I had to sign a document.

7   Q    And what was that document?

8   A    I don't -- I don't recall what the name of that document

9   is.

10  Q    Now in the course of representing your district I assume

11  you go and have public meetings and meet with constituents

12  often, is that right?

13  A    Yes.

14  Q    Have you heard any complaints or concerns as it relates to

15  your constituents having identification?

16  A    Well, yes.  You know, through visits in surrounding areas,

17  especially in the rural areas, you know, the people that have a

18  hard time accessing a place to get voter registration, they

19  say, "Well, you know, I recently got divorced and my name is

20  not the same as it was before.  I don't have those documents."

21       People have come to my office, how, you know, "I want

22  to register to vote, but I need a birth certificate and I go to

23  -- to get a birth certificate at the County Clerk's office and

24  they tell me I need an ID," so it's kind of a Catch-22 there.

25  You know, you need one thing to get another, and it's difficult

Ortiz - Direct / By Mr. Dunn                                   15

1    for them to --

2              Also, there's some people that have been accustomed

3    to voting, they have been voting for a long time, elderly

4    people that have been voting for a long time, now they find

5    themselves, because they don't have the documentation to get a

6    birth certificate that they are not able to go out and vote.

7    Q    Is it -- are you familiar with people in your district who

8    don't have birth certificates or weren't born in a hospital and

9    can't obtain one?

10   A    Well, there's many people in my -- in my Precinct, this is

11   South Texas, and a lot of the people that were born here or

12   delivered by mid wives, and so those mid wives don't -- you

13   know, don't necessarily issue birth certificates.

14   Q    I want to return back to re-districting and ask you

15   something I forgot for a second.

16             You mentioned that the complaint that the Department

17   of Justice and you had against the plan was that Anglo voters

18   were taken out of your Precinct and put into Precinct 1, is

19   that right?

20   A    Right.

21   Q    Now Precinct 1 had previously been a competitive district,

22   is that true?

23   A    Yes, that Precinct had been held both by Anglo and by a

24   Hispanic, and Hispanics with Anglo surnames so, yes, the last

25   Commissioner there was Hispanic, prior to that it was a

1    Hispanic with an Anglo surname, Schwing (phonetic), and -- and

2    before that there had been several Anglo people.  Lately it had

3    been turning a little bit more to Hispanic.

4    Q    And so was the effort to take Anglo voters out of your

5    district and put it in Precinct 1 designed, in your opinion, to

6    prevent a Hispanic in this decade from winning Precinct 1?

7    A    I think it was designed to make it a safer district for

8    the incumbent Commissioner there.

9    Q    Who was?

10   A    Mike Pusley.

11   Q    An Anglo Republican, is that right?

12   A    Right.

13   Q    And had Precinct 1 remained competitive, would that have

14   presented an opportunity for the Hispanic community to elect

15   three of its representatives on that Commissioners Court?

16   A    Yes.  The -- the voter difference between -- in the

17   general elections there have been very marginal, not over 100

18   -- you know, the last incumbent Commissioner lost it by 129

19   votes so he was within reach.

20   Q    And how many members of the Commissioners Court are there?

21   A    There's four Commissioners and one County Judge.

22   Q    And so if the Hispanic community had been able to elect a

23   candidate of choice in Precinct 1, as well as in 2 and 3, he

24   would have had a majority of the Commissioners' vote, is that

25   right?

Ortiz - Direct / By Mr. Dunn                    17

1    A    Yes.

2    Q    Okay.  Now also you have a Department of Public Safety

3    office here in Nueces County, is that true?

4    A    Well, they say it's in Nueces County, it's a little bit

5    closer to San Patricio but, yes, it's -- if you follow the

6    strictest of geographical United States, yes, it's barely in

7    Nueces County.

8    Q    Okay.  The office is -- is moving, is that right?

9    A    Yes, they're shutting down the -- their -- what I've heard

10   and what has been reported is they are shutting down the office

11   there at Greenwood and Padre Island Drive and they're moving it

12   way east and north to the -- right under the Joe Fulton

13   corridor in an industrial area.

14   Q    Is there much population that lives in that industrial

15   area?

16   A    Not immediately adjacent to it.  It's a industrial area.

17   It's an area that's not conducive to every day traffic.

18   There's a lot of heavy trucks.  If you make the wrong turn

19   you're going to wind up at the Port of Corpus Christi with a

20   lot of heavy equipment over there.  It's not a good place to

21   have a -- a -- you know, especially if you're going to go

22   looking for a place to get a voter registration -- a voter

23   identification.  If you're going to get a license for a heavy

24   duty truck perhaps, but this does not bode well for voter ID.

25   Q    Is there any public transportation to the new location?

1   A    One of the first things that I asked was, "Well, what are

2   they going to do?  How are the people going to get there," and

3   just as I was asking if there was a news -- a spokesman for the

4   original Transportation Authority on television saying,

5   "They haven't talked to us, nobody has said anything to us,

6   there's no -- we haven't made any plans for any routes to that

7   area."

8   Q    And did you ultimately -- were you or the County Judge or

9   anybody at the County, to your knowledge, consulted with about

10  where the DPS location would be moved to or sited?

11  Q    We were never -- we were never told.  The first I heard of

12  it was a reporter was having lunch one time -- one day and the

13  reporter walked up to me and says, "Did you know that they were

14  moving the -- the DPS station?"  I said, "No, I didn't."

15          I said, "Where are they moving it to?"  He says

16  "They're moving it" and then they told me.  I said, "That's

17  incredible."

18          I said, "What in the world were these people

19  thinking?  How are people that are having accessibility

20  problems, how in the world are they going to get there?"  I

21  said, "Are they at least going to keep the other," and he said,

22  "No, they've announced that they are -- that they're shutting

23  the other one down."

24          I said, "Well, when is the groundbreaking?"  And he

25  says, "Well, they told me that they were not in the business of

1    groundbreaking and they didn't have to tell anybody."

2    Q    Did you, at some point, contact DPS to try to have some

3    input in this situation?

4    A    I talked to -- no, but I did get a call several weeks

5    later from -- I had -- well, I got a call from somebody, I

6    guess representing the Texas Department of Public Safety, and

7    they were informing me and they were getting input, and I don't

8    know, I guess maybe that was their Public Relations person, and

9    then I just informed them, I said, "You're -- you're just too

10   late."  I said, "Where were you when you were in the planning

11   stages when this thing was being financed, when the routes were

12   supposed to be being implemented?"  I said, "It's too late to

13   -- and if you're looking for a photo opportunity, you know,

14   you've missed the boat," I says, "because I don't think any

15   self-respecting elected official is going to want to identify

16   themselves as putting this, you know, being friendly to the

17   location that you're putting this particular place at."

18   Q    Did you mention to the DPS official the importance now of

19   the agency with regards to elections and issuing election

20   identification?

21   A    I said, "This is -- this is a terrible place," you know,

22   "in view of the fact that now the State Legislature has deemed

23   it that we all need to have voter ID," I said, "this is a

24   horrible place for that now."

25   Q    Did you ultimately, more recently, get contacted -- well,

Ortiz - Direct / By Mr. Dunn                                    20

1    actually, before we get to that.

2            So did you get the sense the Department of Public

3    Safety was taking their mission of dealing with election

4    identification seriously?

5    A    Well, I don't think that was on their agenda.  I don't

6    think the voter election had ever entered their thought --

7    their thought process, or maybe it had, which would really

8    concern me.  But I think the way that this gentleman who called

9    said, "Well, the reason we're doing this is because there's

10   some more space out there, there's going to be more windows to

11   take care of people, and so now you are going to be able to

12   bring your truck, if you need to get a certified -- a

13   certificate -- a CDL license, and so there's space over there

14   for you to come and park your truck and do your maneuvering to

15   -- to get licensed."

16           I said, "Fine, but, you know, you have put a huge

17   onus on the citizens to -- to vote and to have -- well, not to

18   vote, "but to have a voter ID, and you've made it almost

19   impossible for some of these people to be over here.  I mean,

20   it's hard enough to go to that location which is a lot more

21   centrally located than to travel, you know, miles to get to

22   this location."

23   Q    Now the -- have you been contacted just in the last few

24   weeks leading up to when this trial began again by DPS as it

25   relates to this?

1   A    No.

2   Q    Now you also mentioned -- or -- there's also been some

3   testimony here about EIC or Election Identification Certificate

4   mobile units, these are mobile units that go about handing out

5   EICs.  Have you heard anything about those?

6   A    They're a complete mystery to me.  I've never known, the

7   Court and myself have never been informed that they -- these

8   things exist.  They're -- I haven't seen any news releases,

9   public service announcements or anything of the sort.

10  Q    And so I assume that it's also true you haven't been

11  consulted on where to site a mobile unit, for example, in the

12  Hispanic neighborhoods?

13  A    No.

14  Q    Now, lastly, you joined this lawsuit as a Plaintiff, is

15  that right?

16  A    Repeat?

17  Q    You joined this lawsuit as a Plaintiff, is that correct?

18  A    Yes.

19  Q    When is it that you are up for election?

20  A    2016.

21  Q    And how is it you are concerned that Senate Bill 14 might

22  affect or harm you as it pertains to your re-election campaign?

23  A    Well, the re-districting has reshuffled the population and

24  so now many of the voters have become disenfranchised because

25  they are no longer able to vote so I have to go out and

1    research and see who those voters are that don't have a voter

2    ID.  It's -- it's going to take time, money and effort to re-

3    establish that pool of voters that is going to vote for me.

4    Q    So is it your understanding that your campaign or you,

5    individually, will have to spend some money to try to get IDs

6    issued to your supporters?

7    A    Yes, my campaign and possibly myself.

8    Q    All right.  Thank you, Commissioner, for your time today.

9    A    Yes, sir.

10              **MR. DUNN:**  I pass the witness.

11              **MS. ROSCETTI:**  Jennifer Roscetti with the Defendant.

12                        **CROSS EXAMINATION**

13   **BY MS. ROSCETTI:**

14   Q    Good morning, Commissioner Ortiz.  I'm -- haven't got the

15   chance to meet you before, but I work with the Defendants and

16   the Attorney General's office.

17              Can you -- do you know what the National Voter

18   Registration Act of 1993 is?

19   A    The National Voter Registration -- I'm -- I don't probably

20   recognize it under that name.  If you could explain it to me?

21   Q    Well, you understand that for a person to vote they have

22   to register to vote?

23   A    Yes.

24   Q    Okay.  And did you know that the National Voter

25   Registration Act mandates that each State, the motor vehicle

1  driver's license application, including any renewal

2  applications, shall be served -- shall serve as an application

3  for voter registration?

4  A    Yes, uh-huh (yes.)

5  Q    So you understand that when you go to the DMV to fill out

6  your driver's license application you can register to vote

7  there as well?

8  A    Yes.

9  Q    And do you know that Congress enacted the National Voter

10 Registration Act because it believed registering at the DMV was

11 the most cost-effective method to register voters?

12 A    I'm not going to dispute that, but I don't know that to be

13 true.

14      **MS. ROSCETTI:**  Brian, can you bring up the House

15 Committee Report 103-9?

16 Q    And can you see this, Commissioner Ortiz?

17 A    I walked out of my house this morning without my glasses,

18 but I think -- I think I can make it out.

19 Q    Do you see it says, "National Voter" -- he'll bring it up

20 bigger for you.

21 A    Yes, right.

22 Q    So it says the National Voter Registration Act of 1993,

23 and it says "Report," and down at the bottom it says,

24 "Committee on the House Administration," can you see that or

25 even right in the middle?

Ortiz - Cross / By Ms. Roscetti                    24

1    A    Yes, yes, I can see well.

2         **MS. ROSCETTI:**  Brian, will you turn to Page 4,

3    please?  And it's going to bring that up.

4    Q    Do you see the highlighted portion where it says, "The

5    Committee felt that the broadest, most effective and cost-

6    efficient method of registration would be the simultaneous

7    application procedures suggested by Washington State Secretary

8    of State, Ralph Monroe, i.e., a driver's license application

9    serving as an application for registration," did I read that

10   correctly?

11   A    Yes, ma'am.

12   Q    Okay.  Have you ever read this before?

13   A    It's -- not in this context, probably not, but, yes, I am

14   aware that -- that that is in existence.

15   Q    Okay.

16        **MS. ROSCETTI:**  Brian, can you look at Page 5?  Can

17   you bring that up?  Thank you.

18   Q    Commissioner, if we look at what Brian has just brought

19   up, it's highlighted, it says, "By combining the driver's

20   license application approach with mail and agency-based

21   registration, the Committee felt that any eligible citizen who

22   wished to register would have ready access to an application."

23        Did I read that correctly?

24   A    Yes.

25   Q    Have you ever read this before?

                        Ortiz - Cross / By Ms. Roscetti                25

1   A    I have now, yes.

2   Q    And so you do understand that they are stating here the --

3   they believe that the most efficient and reasonable way to get

4   people to register to vote is doing it at the DMV when they

5   apply for their licenses?

6   A    Right.

7   Q    Okay.

8        **MS. ROSCETTI:**  Brian, can you bring up the Senate

9   Committee Report 103-6, please?

10  Q    Commissioner Ortiz, have you ever seen this Senate

11  Committee Report?

12  A    Not in this format.

13  Q    Okay.

14       **MS. ROSCETTI:**  Brian, will you turn to Page 5?

15  Q    You said "not in this format."  Can you explain in what

16  format you've seen it before?

17  A    Well, it wasn't -- you know, it wasn't in a -- it wasn't

18  hidden in multiple pages, four or five, I don't know how many

19  pages this document is, but I know that -- that this is true,

20  you know, that --

21  Q    Okay.  So if we'd look at --

22  A    -- and I don't disagree with what it is saying here.

23  Q    Okay.  And it says that "The driver license procedure

24  appears to be ideally suited for the purpose of registering

25  voters," do you see that?

1   A    Yes.

2   Q    And you said you haven't seen it -- I'm just trying to

3   understand in the format you have seen it.  Have you seen it in

4   (indiscernible) and read it before?

5   A    Well, I just know it.  I don't know whether it's through

6   osmosis or through the -- some of the political training that

7   we get when we're about to run for office or election law or --

8   but I know that this is -- this is what is in effect, and I

9   know to tell our people that this is what is necessary.  And so

10  I don't have any disagreement with you so far on any of this.

11  Q    And so would you agree with me that both the Senate and

12  the House, when they were enacting the National Voter

13  Registration Act, believed that the cheapest way to ensure the

14  registration of voters is to conduct registration simultaneous

15  with driver's license applications and renewals?

16  A    Well, it may have been the most cost-effective, but it's

17  not the fairest and most equitable and -- way to register

18  people.  If you were looking for a way that's going to be fair

19  to everybody, you know, why not keep the system that you have

20  where you have the voter registrar go ahead and take a picture

21  of you when you go register, and they know who you are, and

22  just -- it would make it so much easier than having to have a

23  -- a birth certificate which a lot of my constituents don't

24  have.

25  Q    So is it your understanding that you need a birth

1   certificate to register to vote?

2   A    I understand that there's maybe another document, but that

3   escapes my memory right now, but it's a -- voter registration,

4   I've been under the impression that you have to have a birth

5   certificate.

6   Q    But when I asked you about --

7   A    Or a passport, I'm sorry.

8   Q    So you believe --

9   A    Which requires a birth certificate.

10  Q    So you believe you need a passport to register to vote?

11  A    Repeat?

12  Q    It's your understanding that you need a passport to

13  register to vote?

14  A    A passport or a -- a birth certificate to register -- to

15  get a -- no, not to register, to get a photo ID.

16  Q    Okay.  But do you understand the requirements to register

17  to vote?

18  A    I think anybody can register.

19  Q    Okay.

20  A    I mean, that has been the practice that, you know, if I

21  register to vote I raise my hand and say that I am who I am and

22  I'm registered to vote.

23  Q    And so back to when we were talking about the Senate and

24  the House Committee about the National Voter Registration

25  Act --

1   A      Uh-huh (yes.)

2   Q      -- do you understand that when they went through this

3   analysis they felt the most efficient way and the cheapest way

4   to ensure that everyone can register is to conduct registration

5   simultaneous with the driver's license applications and

6   renewals?

7   A      Well, I'm sure that they -- you know, this is what they

8   thought.  I mean, but the reality is something else completely.

9   This is not what it is here on the ground when you're trying to

10  take people out to vote, you get them to the polls and they

11  come back to the car and say, "Well, they said I needed a, you

12  know, a photo ID."  And I -- you know, where are they going to

13  get a photo ID?  They're going to have to go way across town

14  now.  This last election was not so bad because they could go

15  over here and there may be a waiting line, people waiting,

16  you've seen people out the door there in wheelchairs in the hot

17  sun waiting to get in the building to register to get a photo

18  ID.  Some of them wait there too long or they're weak and

19  they're elderly, and so they don't wait around to register.

20  Q      Just a follow-up to when you voted.  You said you had an

21  issue with your name.  Have you ever had to sign a provisional

22  ballot?

23  A      I think that's what it was.

24  Q      So have you ever had to sign a substantially similar name

25  affidavit?

Ortiz - Redirect / By Mr. Dunn                    29

1    A    I didn't --

2    Q    Have you ever had to sign a substantially similar name

3    affidavit?

4    A    I -- well, I may be confusing the two, but, yes, I knew I

5    had to say -- to sign something to that effect.

6    Q    Do you know the difference between a substantially similar

7    name affidavit and a provisional ballot?

8    A    I'm not sure that I do now that you're explaining it to

9    me.

10   Q    Thank you, Commissioner.

11           **MR. DUNN:**  I just have a couple follow-up questions.

12                      **REDIRECT EXAMINATION**

13   **BY MR. DUNN:**

14   Q    Commissioner, as it relates to the National Voter

15   Registration Act, is it your understanding that Congress made

16   it to where a citizen can only register at the driver's license

17   office?

18   A    Well, either there or, you know, get a gun registration.

19   I believe those are the two items that are acceptable.

20   Q    Well, I'm focused not on IDs right now, just on

21   registration.  Couldn't you go to the library and get a voter

22   registration card?

23   A    Oh, you could get a voter registration card anyplace.  I

24   mean, you could get it out in the community.

25   Q    You could mail it in, is that right?

1  A    You could mail it in, right.

2  Q    Anywhere you'll apply for Government benefits under the

3  N.V.R.A. you're supposed to be able to register, is that right?

4  A    Right.

5  Q    And so now, though, with the additional requirement of

6  photo identification, all of those extra options, the library,

7  the Government Assistance offices, you might be able to

8  register, but you're not going to be able to vote because you

9  don't have an ID, is that right?

10 A    That's correct.

11          **MR. DUNN:**  Okay, nothing further, your Honor.

12          **MS. ROSCETTI:**  No further questions, your Honor.

13          **THE COURT:**  All right, thank you.  You can step down.

14     **(Witness excused)**

15          **MR. DOGGETT:**  Good morning, your Honor.  My name is

16 Robert Doggett for purposes of the record.  We call Kevin

17 Jewell to the stand.

18          And, your Honor, I have a copy of a Motion made

19 (indiscernible).

20          **THE COURT:**  Okay.  Thank you.  Good morning, sir,

21 would you raise your right hand?

22 //

23 //

24 //

25 //

1            **KEVIN JEWELL, PLAINTIFFS' WITNESS SWORN**

2         **THE WITNESS:**  I do.

3         **THE CLERK:**  Thank you.

4      **(Counsel confer)**

5         **THE COURT:**  Go ahead.

6                    **DIRECT EXAMINATION**

7    **BY MR. DOGGETT:**

8    Q    Can you state your name and spell it for the record,

9    please?

10   A    Sure.  Kevin Jewell, J-E-W-E-L-L.

11   Q    Speak up, please, for me just because --

12   A    Certainly, Mr. Doggett.

13   Q    Thank you.  Where do you live, sir?

14   A    Austin, Texas.

15   Q    You are an expert in a variety of things and asked to

16   perform a particular task for us.  What was it?

17   A    It was to quantify and contextualize the costs the Texas

18   voter ID law places on the seven individual-named Plaintiffs in

19   the Ortiz (indiscernible).

20   Q    And the Ortiz Plaintiffs are listed there?

21   A    Correct.

22   Q    And you said "contextualize."  Can you tell us what that

23   means?

24   A    You know, we look at a single number and it doesn't

25   initially mean anything unless we came in context in which that

1  number is, so when we look at this cost, in this particular

2  instance, we want to understand what are the finances of the

3  household and what does that cost mean in the context of the

4  finances of that household.

5  Q    And how are you qualified to do that, sir?

6  A    I hold a MBA from the (indiscernible) School of Business

7  at the University of Texas at Austin, an undergraduate degree

8  in Mathematical Economics from Brown University in Providence,

9  Rhode Island, and I've applied quantitative analysis to

10 problems in business policy and litigation for the last 17

11 years.

12 Q    So this is not your first rodeo?

13 A    I've never done a rodeo.

14    **(Laughter)**

15 Q    And after performing your analysis you came to a

16 conclusion, is that right?

17 A    Correct.

18 Q    And what was it?

19 A    Examining the costs created by the SB 14 voting scheme.

20 The Ortiz Plaintiffs can expect costs on the order of $23 to

21 $163 depending on the assumptions of the individual Plaintiffs.

22        These costs get in their constrained budgets, reduces

23 their chance that they will vote compared to most Texans.

24 Q    Let's talk about the costs you examined.

25 A    Certainly.  I looked at four -- costs in four ways.  One

1   is just the out-of-pocket documentation fees.  What does it

2   cost to get the documents required to get an SB 14 ID?

3            Then there's transportation costs, either to DPS to

4   get the ID, or to a remote birth certificate location to get a

5   birth certificate.

6            And then there's opportunity costs in the sense of

7   that's primarily the time, that is how long does it take to do

8   these processes, that they could have -- the Plaintiffs could

9   have been doing other things that they value.

10           In the case of certain Plaintiffs that have loans,

11  they would have additional opportunity costs of the monetary

12  expenditures, but we'll talk about that later.

13           And then last is the information search costs, and

14  the information search costs are the costs it takes to figure

15  out the process.  You figure out what you need, how to get

16  there, how to navigate the process created by SB 14, and I

17  don't quantify these costs, but they shape the other costs

18  incurred by the Plaintiffs and so we acknowledge them when we

19  discuss them in my analysis.

20  Q    And so, for example, on information search costs, if

21  someone were to find out about some information as the sole

22  result of this litigation would they have -- would you think

23  that would be information search costs attributable to that?

24  A    Right.  They've -- they had to sue the State to find out

25  some information, and so their costs were actually fairly high

1   to get that information.

2   Q    Okay.  So before we go on, what we're going to talk about

3   now is how you got to a total cost number which is, first,

4   starting with fees for the documents; then talk about the costs

5   for a trip to DPS; then the costs for a trip in order to obtain

6   their birth certificate, and then you've looked at all of those

7   and totaled them, is that right?

8   A    Correct.

9   Q    Okay.  So let's start with that first one.  Out-of-pocket

10  documentation fee.  Tell us about it.

11  A    Right.  So the lynch pin or the joining costs for all of

12  the Plaintiffs that I analyzed is the birth certificate and

13  that costs $22 by mail.  Certain individuals have additional

14  costs.

15       Two -- several of the Plaintiffs don't have a

16  recorded birth certificate, it doesn't exist.  In order for

17  them to get -- in order for them to get a copy of the birth

18  certificate that document has to be created.  That process

19  costs $47 via the State.  That is in addition to the $22.  $47

20  to create the document, and then $22 to request it.

21       One of the Plaintiffs had a marriage and changed her

22  last name, so in order to connect her birth certificate, if she

23  was able to get it, to her voter registration name she would

24  need to get a certified copy of her name change which is an

25  additional $10.

1            One of the Plaintiffs has concerns regarding the fact

2    that the name on her driver's license does not reflect the name

3    on her birth certificate with the name on her voter

4    registration card.  The process at DPS to correct the driver's

5    license name costs $11.  Those costs would be in addition for

6    -- that don't necessarily cross all of the -- all of the

7    analyzed Plaintiffs, but accrue to a certain of them.

8    Q    Okay.

9    A    If we could go back, the one last thing is that, you know,

10   I went down one degree.  These are the costs it takes to get

11   the ID.

12           Certain individuals may have -- you have to present

13   documents to get or create the birth certificate.  Some of

14   those documents may cost -- incur costs as well and I did not

15   consider those costs in my analysis.

16   Q    And why didn't you consider the Plaintiffs obtaining an

17   EIC birth certificate; that is, a reduced fee for obtaining a

18   birth certificate that can only be used to obtain an EIC?  Why

19   didn't you consider that?

20   A    And that's the information search costs shaping the actual

21   costs that would be experienced or would be expected to be

22   experienced by these Plaintiffs.

23           The reality is that the State has hidden those birth

24   certificates from our Plaintiffs.  They didn't know that they

25   exist and that they wouldn't expect to get them, to get a $2

1  birth certificate.  When they're considering whether or not to

2  go through the voter ID process, they are expecting to pay $22,

3  that's what the web sites for DPS says, that's -- period.

4  Q    And, in fact, we've -- you put in your report in Footnote

5  9 a reference to someone from the State talking about the EIC

6  birth certificates, is that right?

7  A    Right.  There's no -- you know, there's no notice of the

8  EIC certificates to the public, and the regulation actually

9  states that the Plaintiffs would have to go in person to the

10  location and know to request the birth certificate despite the

11  fact there's been no advertising that it exists or -- and they

12  have to request it, something like request it under a certain

13  section of the Transportation Code.  You know, that's like a

14  secret code at Amazon, it's like the price says it's $22, but

15  if you know the secret code that's not publicized anywhere you

16  can get it for 2.  The reality is these people expect to pay

17  $22.

18  Q    Let's talk about the out-of-pocket travel costs to DPS.

19  A    Uh-huh (yes.)

20  Q    How did you make those calculations?

21  A    So the majority of the Plaintiffs had looked at was called

22  the "IRS variable costs."  And, in fact, every year the IRS

23  puts out a publication that estimates what it costs to drive a

24  car somewhere.  One of the estimates they make is the absolute

25  bare minimum costs and the variable costs, and that is

1    basically the costs of the gas and the costs of, you know,

2    maybe some oil changes.

3              It doesn't include the depreciation costs, the wear

4    and tear on the car.  So this is the out-of-pocket costs that

5    someone has to pay to buy gas to get you to DPS.  Those --

6    Q    So you applied that to the Plaintiffs listed there,

7    Mendez, Estrada, Espinoza and Maximina Lara, is that correct?

8    A    Right, and that was applied to the distance to DPS for

9    those individuals.

10   Q    And so that would be a more conservative figure,

11   obviously, than the IRS full costs, is that right?

12   A    That is correct, and Margarita Lara represented to me that

13   he would purchase a ride on the informal market, and if someone

14   is selling a ride they're going to want to cover their full

15   costs, they're going to want to cover their wear and tear on

16   their car and the dollar value that Mr. Lara stated to me that

17   what he would expect to pay aligned almost perfectly with the

18   IRS full cost, and so that's what I used for his individual

19   thing.

20   Q    And so --

21   A    One thing I want to point out here is this is the DPS

22   round -- this is a round trip, assuming that they can complete

23   the transaction in one trip, and the reality for several of the

24   Plaintiffs, in their experience so far, is that they've already

25   made trips to DPS and didn't come back with an ID and so

1  they're going to have to do multiple trips.  And at the

2  information search costs column is that if they had the perfect

3  information about everything they needed, they could do it all

4  in one trip.  But they don't have perfect information, they

5  have -- they have to go to DPS to find out how to navigate the

6  process, and that creates additional trips which I did not

7  calculate including the costs that I looked at here.

8  Q    So you conservatively assumed that they would know

9  everything they needed to know, and had everything they needed,

10  and be able to complete this in one trip?

11  A    Correct.

12  Q    So how come you didn't use EIC locations, besides DPS; in

13  other words, for Mr. Estrada, I believe it was pointed out he

14  could go to Karnes City and obtain an EIC.  Why didn't you use

15  those locations?

16  A    Well, certain of the individuals -- for example, first of

17  all in my conversations with the Plaintiffs and in their

18  Declarations they represented to me they would go to DPS.

19          Ms. Espinoza's Dec -- that position made it clear

20  that she was not aware that Willacy County offered an EIC,

21  which they only -- when I called Willacy County, they only

22  offer it one a day at limited hours, so would she go -- even if

23  she went there she might have to go several times because they

24  may have -- she may have continually gone the day of the week

25  -- the single day of the week that they offer EICs.

1           But for Mr. Estrada, in particular, Karnes County,

2    there's a web site on -- the DPS web site states that there are

3    EICs issued in Karnes County.  It doesn't say where they are

4    offered, it doesn't say when they're offered, it doesn't say

5    the time of day that they're offered.  They have phone numbers

6    and it says "Call for information."  I called for information,

7    no one answered.  I actually called twice.  I left a message

8    the second time following the instructions.  They said they

9    would call back according to -- they never did.  So to this day

10   I don't know if they actually do offer EICs in Karnes County,

11   it's not clear to me that they meaningfully do.

12   Q    So, again, we're back to search costs and information

13   costs.

14   A    Right.  If you don't know where to go you can't actually

15   access that option.

16   Q    So you didn't consider -- and that's why you didn't

17   consider these County locations in order to get an EIC?

18   A    They were not meaningfully available to the Plaintiffs.

19   Q    Okay.  So time -- how much for a DPS trip?  You made a

20   calculation there.

21   A    Yeah, and this is -- pardon me, similar to the travel

22   costs and when figuring out the mileage Google maps also

23   estimate the time.  I used that as a single round trip estimate

24   of time, travel time, and then for DPS wait time I very

25   conservatively used what DPS represented in a document in the

1   other Section 5 litigation that was their target time, is what

2   they hoped to offer EICs for in waiting and service time, and

3   that I used for Mr. Mendez -- for four of the individuals.

4         Two of the other individuals, Mr. Margarita Lara, in

5   particular said, "You know, I've gone to DPS, I had to wait

6   three-quarters of an hour."  And so he would expect if he goes

7   again he's going to have to wait three-quarters of an hour.

8         And Mr. Taylor who lives in Corpus, I had some

9   documents showing that in Corpus in 2011, 2012 they had

10  significantly longer waiting times than 30 minutes and relative

11  to other individuals, so I used 44 minutes, which is also the

12  result of a statewide survey from 2013 of the statewide waiting

13  time at DMVs in Texas.

14  Q    Which was 44 minutes?

15  A    Correct.

16  Q    In this -- the calculations you made on time excludes time

17  for third party drivers and other -- on all of the --

18  A    Right, it's the lost time for the individual getting the

19  ID; it doesn't include the lost time for the person who drove

20  them there if they had a third party ride.

21  Q    So, again, you picked a conservative way of doing it?

22  A    Correct.

23  Q    So looking at the DPS lost trip time, could you explain

24  the things in yellow?

25  A    Yeah.  And so this is the time that we discussed; for

1   example, Mr. Estrada would expect to spend an hour and a half

2   traveling to DPS, waiting in line and getting back to his

3   house.

4           And this is where we get into -- the next column is

5   -- getting back to the contextualization, and it's like, well,

6   what does 90 minutes mean for an individual?

7           In this case we want to compare it to -- I compare it

8   to the average voting wait time in Texas in 2012, and he has to

9   wait -- his -- just -- this is not including his actual voting

10  time, just to get his ID he would expect to spend eight -- more

11  than eight times longer getting the ID than the average Texan

12  spent voting in 2012.

13  Q    And that is, again, assuming he only made one trip, had

14  all of the information and had all of the documentation, is

15  that right?

16  A    Correct.

17  Q    So if you didn't have all of the information, had to make

18  more than one trip, and obtain other documentation, this would

19  be a lot larger, is that right?

20  A    Correct, a very conservative number.

21  Q    Okay.  So we've put all of these things together, is that

22  right, in this column, or this chart, I'm sorry?

23  A    Right.  This kind of summarizes where we've gone, where we

24  are this far in the analysis, and this is the out-of-pocket

25  costs, these are what the documentation and what the travel

1  costs are on a monetized basis that would be immediately paid

2  by somebody to get voter ID.

3  Q    Now when you say "out-of-pocket travel," for example, you

4  have Lionel Estrada there, $14.24.  What if he got a ride from

5  someone?  How can he have any out-of-pocket expenses if someone

6  gave him a ride?

7  A    This is the costs -- someone still had to pay for that

8  gas, and so this is the costs that would accrue -- that has to

9  be expended by somebody on his behalf or by him to get to DPS

10 and back.  And some may be --

11 Q    So now we'll switch over to obtaining birth certificates.

12 We've been talking about getting the EIC itself, or getting the

13 ID itself.  Now obtaining these documents.  It looks like

14 you've done some analysis there?

15 A    Right.  And so that previous analysis would be kind of if

16 they got their birth certificate by mail, which is possible.

17 However, the evidence in the case, I think, suggests that many

18 of these individuals would go to a location to navigate the

19 process.  In order to get a birth certificate right now, you

20 have to mail your primary documents to Austin.  Mr. Estrada has

21 already had experience with lost mail for important documents.

22 He may be worried in doing such a thing.  So these are called

23 the similarly calculated costs related to travel to a remote

24 birth certificate site.

25 Q    So, again, if -- if you -- you selected a more

Jewell - Direct / By Mr. Doggett                43

1   conservative way of doing it, is that right?

2   A     Correct.

3   Q     So we put all of those together and came up with a total

4   cost, is that right?

5   A     Right.  And this -- this analysis includes one more thing

6   that we haven't discussed, and that is the depreciation costs,

7   and that is an additional cost that could be monetized of the

8   travel, and that's the wear and tear on the car.  And this is,

9   again, from the IRS estimate of what the per mile depreciation

10  cost is for travel.  And this is not an out-of-pocket cost

11  because what it's doing is shortening the lifetime of your car,

12  so you may not expend that cost until you have to buy another

13  car, but it is a real cost that is recognized and burdensome

14  for the named Plaintiffs in this matter.

15  Q     So for purposes of the record, Mr. Mendez, would you

16  expect to spend $44.93, is that right?

17  A     Mr. Mendez would expect to incur $44.93 in monetized

18  costs.

19  Q     And for Mr. Estrada?

20  A     $57.40.

21  Q     And for Mr. Taylor?

22  A     $23 and -- $22.

23  Q     Ms. Espinoza?

24  A     $90.84.  For Mr. Taylor, and we'll talk about this in a

25  second, all of these analyses are as of rough -- as of the time

1   of my report as of the Declarations that they filed in this

2   matter.  It's some of their life's circumstances may have

3   changed and we'll talk about that.

4            Ms. (sic) Margarita Lara, $94.41 and Ms. Maximina

5   Lara $100.83.

6   Q    And in terms of the time lost?

7   A    Correct.  And this is combining the -- this is a kind of

8   sensitivity now because it's combining the DPS trip and the --

9   if they would choose to request their birth certificate in

10  person, then we would go -- Mr. Mendez could have spent an hour

11  and a half, Mr. Estrada 114 minutes, Mr. Taylor 104 minutes,

12  Ms. Espinoza 82 minutes, Margarita Lara 104 minutes and

13  Maximina Lara an hour and a half.

14  Q    So you already referenced that there's been some changed

15  circumstances, is that right?  Is that from your understanding

16  or reading of the transcripts from the actual trial here?

17  A    Yeah.  I've reviewed the transcript excerpts of -- of the

18  individual Ortiz Plaintiffs as they testified here in the

19  trial.  My understanding is Mr. Taylor, at the time of my

20  analysis, lived here in Corpus.  He kept his address with his

21  aunt.  He is now in a nursing home in Alice.  He went in person

22  to get his birth certificate and it cost him $23, which is what

23  we thought it would cost him.

24            You know, in my analysis I assumed he would have no

25  marginal costs.  He could get to DPS because he often had a bus

1    pass and he could take a bus to DPS.

2           There -- it is unlikely that there is a bus service

3    near his nursing home in Alice to the nearest DPS.  I haven't

4    done that analysis, but it is likely he now has additional

5    costs to get from the nursing home to the nearest DPS given his

6    new location.

7    Q    And for Mr. Estrada?

8    A    So Mr. Estrada had some major life changes in that he

9    separated from his wife who provided about two-thirds of the

10   household income and had access to a car which I assumed in my

11   analysis would be driven -- by using the variable costs for him

12   I assumed would be driven to get him to DPS.  He also moved out

13   this way, but he moved marginally -- he moved two minutes

14   closer to Beeville DPS and two minutes farther from the Karnes

15   City birth certificate location.  I don't think that's a

16   material change.

17          The important thing for Mr. Estrada which became

18   clear in his testimony is he clarified his desire not to

19   abandon his CDL license application.

20   Q    CDL?  CDL?

21   A    CDL, correct.

22   Q    Commercial Driver's License?

23   A    Correct.  And that puts him in between what I would call a

24   rock and a hard place.  In order for him to get the actual

25   physical CDL so he can use it to vote, he has to pay $260 a

Jewell - Direct / By Mr. Doggett                    46

1   year for three years.

2   Q    In surcharges, is that right?

3   A    My understanding, correct.  Whereas I had assumed in my

4   analysis he would abandon his CDL and get an EIC that was the

5   least cost route for him.

6             However, he has clarified that he wants a CDL, that

7   his future -- he wants to have a job driving, and that shows me

8   that if he abandoned his CDL application to get an EIC he would

9   lose the $60 that he spent so far because he would have to

10  spend that again when he goes back to complete the CDL process,

11  and so that adds $60 out-of-pocket to Mr. Estrada's costs in

12  order to vote under this Senate Bill 14 scheme.

13  Q    So to clarify, if he wanted to vote right now, you are

14  saying he would abandon his CDL right now --

15  A    Correct.

16  Q    And try to then obtain an EIC, and then later have to

17  reapply for his CDL and that's where your additional $60 came

18  from?

19  A    Right.  Because he -- he works as a truck driver and he

20  needs his CDL, or he hopes to.

21  Q    Right.  So, in other words, if he were to consider this

22  change it would actually raise his costs which you didn't

23  include --

24  A    I didn't include in these numbers, but it raises his cost

25  $60 clearly.

Jewell - Direct / By Mr. Doggett                    47

1    Q    And for Mr. Mendez?

2    A    So Mr. Mendez has clarified his moral objection to the EIC

3    process, which means to me that he would have to purchase an

4    alternate form of ID such as Texas personal ID to vote.  I

5    didn't just note this.  I'm still assuming that he would get

6    the EIC and that's the process that I analyzed it under.

7    Q    In other words, again, you took a conservative route.  You

8    went ahead and went for the cheapest, even though the person

9    themselves might opt for a more expensive route, is that what

10   you're saying?

11   A    Correct.

12   Q    Okay, so this was Exhibit 7 in your report.  You are

13   comparing their income, their household incomes to the State

14   median, is that right, towards the bottom?

15   A    Correct.  And this is just giving another picture of who

16   these folks are and what their household finances look like.

17   You know, they range from one-sixth to one-quarter or one-third

18   of the State median household income, which is -- "median"

19   means that half of the people -- half of the households in the

20   State make more than the median.

21   Q    And what would you -- be your comment about these

22   Plaintiffs are; in other words, are among the population?

23   A    These are low income Texans.  And so --

24   Q    Go ahead, explain to us -- you're going to do a better job

25   than I would.

1  A    Okay.  I needed -- I think I needed to have you ask me a

2  question.

3          But so on the previous slide we looked at what -- how

4  their household -- total household income compares to the

5  statewide household income.  This -- but that's misleading when

6  you're thinking about money that they have actual discretion

7  over, or actual choice over to use to choose an SB 14 ID versus

8  maintaining their household and their quality of life.

9          Five of the individual Plaintiffs had no household

10 income in excess of poverty guidelines.

11         In contrast, the median two-person household in Texas

12 has monthly income in excess of poverty guidelines on the order

13 of $3,700 and so that's $3,700 that the median household can

14 choose what to do with above the poverty level that are

15 individuals -- than the analyzed individuals do not.  And the

16 one household that had income in excess of the poverty levels

17 -- well, go to the next line.

18 Q    Okay, so if we can go to the next line, I think that's

19 where you are headed, go ahead.

20 A    I guess it's no longer the next line, but is -- is the

21 Lara household, and they have $66 a month in excess of their --

22 of the poverty guidelines.  Given the expected cost of SB 14,

23 they -- their entire income in excess of poverty guidelines

24 would be used to purchase that ID.

25         And there are -- you know, the Federal Government has

Jewell - Direct / By Mr. Doggett                    49

1    regulations that considers the poverty guidelines as a

2    reasonable estimate of what it costs to maintain your -- the

3    cost of basic needs.

4    Q    So this middle column, if you could just back up a second,

5    I think you hit it, but I want to make sure I understand.  This

6    is about monthly discretionary income, is that correct, in how

7    much of their monthly discretionary income --

8    A    Right.  So we've talked so far a little bit about the

9    left-hand column, which is that previous one, which is what the

10   household has in excess of the poverty level.

11            The next two columns look at two other metrics that

12   look at a similar issue.  One is I analyzed the households

13   income at the level of what they actually spent on rent, what

14   they actually spent on food, what they actually spent on

15   medicine, and so if you go through this list of basic needs

16   what do they have leftover at the end of the month if they

17   could have any choice about what to do with, and we can see

18   there that Mr. Taylor -- 10 percent -- his expected costs are

19   10 percent of his monthly discretionary income.

20            That monthly discretionary income, those -- in

21   analyzing those costs I was very conservative.  I did not

22   include things like saving for future emergencies, which is

23   important because it means that none of these families have --

24   none of these families have savings, so the money that they

25   expend out-of-pocket to purchase a SB 14 ID is money that

Jewell - Direct / By Mr. Doggett                    50

1   they're not saving for a future emergency.,

2   Q     And what about debt as well?  Aren't -- some of them have

3   some of these low -- or, you know, small time debt?

4   A     Absolutely, and that's the next column.  First of all, I

5   want to back up and point out that this -- out of this -- these

6   percentages are calculated using the absolute conservative out-

7   of-pocket costs, remember, that we calculated earlier which is

8   the bare minimum of it they buy it by mail and they only travel

9   to DPS.  So the monthly unobligated discretionary income is

10  recognized in the fact that in addition to their monthly

11  expenses, many of these individuals had contractual expenses

12  that they have to cover.

13          In the instance of Ms. Lara, Ms. Espinoza,

14  Mr. Taylor, they have small loans commonly called payday loans

15  which high -- which they have outstanding, which means that

16  when they're deciding whether to buy an SB 14 ID they are -- if

17  they incur costs -- out-of-pocket costs, they are expectedly

18  borrowing to do so.

19          Ms. Lara is -- I talked with Ms. Lara about her loan,

20  I looked at the documentation, she pays a 90 percent interest

21  rate on her balance monthly, so if she incurs the costs to her

22  -- the $100 cost to her to get her ID, she's borrowing that

23  money at a 90 percent interest rate; otherwise, she could use

24  that money to pay down her loan.

25  Q     Okay.  So I assume you -- you've read, is it Dr. Milo, is

1    that correct?

2              **MR. DOGGETT:**  From the gallery, is that right?

3              **MR. SPEAKER:**  Dr. Milo.

4    Q    Milo, my apologies, I've heard it several different ways,

5    I will go with that.  You've read his report?

6    A    I have.

7    Q    And he had several congratulatory remarks, I believe, in

8    it, but several complaints, I believe.  If we could go through

9    these quickly?

10   A    Yeah, so I'll recharacterize some of them which he may

11   disagree with, but it's my understanding of what is -- the

12   points he's trying to make here.

13             And his point here is that -- that, you know, there

14   may be costs associated with this, but your friends can help

15   you, your friend, your neighbor can drive you to -- to the DPS,

16   for example.

17             And my response to that is that is true, your friends

18   can drive you.  They are still going to incur the costs, and

19   are the individual analyzed Plaintiffs live in low income

20   communities, their neighbors -- their friends and neighbors are

21   also -- have limited resources, which means that their ability

22   to access that social capital to get favors to complete this

23   process may be lower, or that community may have more

24   difficulty providing those resources than a typical Texan.

25   Q    But still the costs are the costs, I believe, it's like

1    you said earlier.

2    A    Yeah, the costs are the costs, and the -- and low income

3    individuals in Sebastian -- in Sebastian live in a town with

4    other low income individuals.

5    Q    And if we could go to Complaint Number 2, I believe this

6    one has to do with this marginal versus average.  You have

7    referenced that before.  Can you explain the difference between

8    marginal costs versus sort of an average income?

9    A    Right.  So the marginal cost is what it costs you to do

10   something the first time, the average cost is what if you

11   allocate that cost over multiple times.

12         The marginal cost of voting, to get an SB 14 I need

13   is the cost to get it in the first place, and that's the cost

14   to use it the first time.  So you can -- even if you allocate

15   the average costs over a million votes, it doesn't change the

16   fact that a marginal cost of that first vote is still the full

17   cost of that ID.

18   Q    So Mr. Milyo said essentially you should have taken the

19   average because -- why?  Why would that be appropriate?  Did

20   they -- would you know how many times somebody is going to vote

21   or why would you think marginal would be the way to go?

22   A    Marginal is what you know.  You know you're getting this

23   to vote.  The first time you vote, that's your marginal cost.

24   Q    Okay.  If we could go to complaint number three, this is

25   where it looks like he says that you should have considered

1    someone making a trip to DPS and then also swinging by the

2    store and the bank and your friends, etcetera; is that right?

3    A    Right.  And there's -- I think there's several clear

4    responses to that is -- one, the experience of the Plaintiffs

5    that I analyzed clearly show that it doesn't take one trip that

6    you tack on on top of your trip to the bank, as if they had

7    bank accounts.  It's -- they had to go to (indiscernible) to

8    figure out how to do the process.  So there may be multiple

9    trips.  It's -- counting one is conservative as opposed to

10   counting zero, which I believe is what he's saying we should

11   do.  But in addition to that, there's this idea that when

12   you're combining it -- like I might drop my child off at

13   daycare on my way to work and that's -- what they call trip

14   chaining, that's combining two trips, the marginal cost.  Do I

15   allocate that cost to driving my child to work or do I allocate

16   that cost to dropping my child off?  We can argue about that.

17   But if I'm going to -- do I have to wait to get a section -- an

18   SB 14 ID until I have a convenient trip?   No, I'm going to go

19   get an SB 14 on deed.  And given the variability and DPS wait

20   time, it's like several Plaintiffs represented to me that they

21   don't know whether it's going to take 15 minutes or it's going

22   to take three hours, because it varies.  And that precludes

23   your ability to combine that with another trip.

24   Q    And also, I've noticed in his complaint number three, he

25   suggests that you should use the marginal cost here.  And it

1    seems to me the previous slide emphasized you should use the

2    average.  I'm confused.

3    A    That is an internal inconsistency in his analysis.

4    Q    If you could go to number four, I believe in here

5    somewhere it says the State of Texas offers a $3 birth

6    certificate.  I believe you've already discussed that.

7    A    Yes.

8    Q    "Offers" being the keyword.  Is -- in your mind, is a $3

9    birth certificate offered?

10   A    Right.  If no one knows about it, it's not functionally

11   available to folks.

12   Q    If we could go to complaint five, it looks like the report

13   essentially here says that it's the Plaintiffs' fault for not

14   having all the documents they need.  It's -- how would you

15   characterize this complaint?

16   A    You know, I do consider actually when examining the

17   records it's very clear why some of these individuals lack

18   basic supporting documents.  Several of them were born in

19   unrecorded births.  They --

20   Q    Well, that's their fault.

21   A    That's their fault for being born in south Texas

22   apparently.  I'm not clear what his complaint is there.

23   Mr. Taylor in particular, he's a homeless man.  He has trouble

24   keeping track of documents because he doesn't have some place

25   to put them.  I think that's a very -- expecting him to have to

1    have a stable life in order to vote is beyond the scope of my

2    analysis but seems inappropriate.

3    Q    Complaint six, appears the reports (sic) questions you

4    because you didn't consider all the wonderful benefits that

5    SB 14 is going to provide them.

6    A    Right.  And my analysis was a cost analysis, and I think

7    that's the appropriate one.  We're looking at the context of

8    their constrained budgets, and those costs have qualitatively

9    and quantitatively different meaning for these individual

10   Plaintiffs than a median Texan.

11   Q    So here we are, changed circumstances and all.  Is it --

12   what's your conclusion?

13   A    The conclusion is that these costs are out of pocket and

14   real and that the budgets that these individuals have are

15   constrained when compared to median Texans.  That means that

16   they have to make a choice that many Texans don't have to, that

17   they have to choose between using their money to buy an SB 14

18   or something else that may be very important to them.  The

19   evidence shows that lower income individuals, or individuals

20   with constrained budgets, face an opportunity cost and consider

21   it more than other individuals, and that that consideration of

22   that cost reduces the chance of them completing the process of

23   purchasing an SB 14-compliant ID.

24          **MR. DOGGETT:**  Pass the witness.  Oh, your Honor, at

25   this point, I'd like to offer Mr. Jewell as an expert in this

1   matter.

2           **THE COURT:**  Okay.

3           **MR. DONNELL:**  Good morning, Mr. Jewell.  Ben Donnell

4   for the Defendants.

5                        **CROSS EXAMINATION**

6   **BY MR. DONNELL:**

7   Q    Mr. Jewell, I'm a simple man, and I confess to you that I

8   don't think in terms of marginal costs and wait times.  I tend

9   to think how much money do I have in my pocket and how much --

10  how I'm going to spend it and what I'm going to spend it on.

11  So I want to tell you that throughout my questioning, that's

12  going to be the concept that I'm going to ask you about.  Let

13  me kind of restate what I understand you do.  You were hired by

14  who?

15  A    I was hired by counsel for the Ortiz Plaintiffs.

16  Q    Then who is -- just if I can, who is the -- that's the

17  Texas Rio League, or do you know?

18  A    I believe it's the Texas RioGrande Legal Aid.

19  Q    Okay, all right.  And they asked --

20  A    (Indiscernible)

21  Q    -- you to meet, interview, analyze the financial condition

22  of seven Plaintiffs, correct?

23  A    Correct.

24  Q    They identified them for you and it was your goal to talk

25  to them, find out what their income was, find out what their

1    expenses were; is that correct?

2    A    Correct.

3    Q    And you did so with -- before you -- at the time you wrote

4    your report, you had actually not met any of them, but you did

5    a video conference from Austin with them, did you -- all but I

6    think Mr. Estrada.

7    A    I did video conferences with several of them.  The

8    individuals are mentioned there in my report.

9    Q    I'm sorry, what?

10   A    There's a phone call to Mr. Estrada.  I don't believe that

11   I did a video conference with Mr. Taylor, for example.  But the

12   other individuals are --

13   Q    Okay, all right.

14   A    -- I -- in my report.

15   Q    And you were in Austin, they were in -- I guess most of

16   them must have been in Sebastian, correct?  Or where were they?

17   A    They were in their homes.

18   Q    All right.  And somebody representing the RioGrande

19   Association, Legal Association, was present during your

20   interview.

21   A    Correct.

22   Q    You spoke to them in English.  They responded, if they

23   needed to respond, in Spanish or needed something to be

24   responded to or discussed in Spanish, the attorneys -- their

25   attorneys translated for them, correct?

1    A    Correct.

2    Q    Now, each of them gave you a declaration; did they not?

3    A    I received a declaration from each of the Plaintiffs,

4    correct.

5    Q    And you have accepted the declaration as being true.

6    A    Correct.  And I reviewed documents and did provide those

7    interviews to confirm the information that I saw in those

8    declarations.

9    Q    I'm going to get there.  You accepted the declarations and

10   the statements contained therein as being true, correct?

11   A    Correct.

12   Q    You've testified here at length that you had talked with

13   the Plaintiffs, I guess most of it last week.  Other than the

14   interviews, did you have subsequent discussions with them?  By

15   interviews, I mean the ones by video conference?

16   A    No.  I met the Laras yesterday morning, but --

17   Q    Okay.  So -- but anyway, you accepted the declarations,

18   you asked them questions, you -- they provided you information,

19   and all of the information you accepted as true and that's the

20   -- that forms the basis upon a lot of the calculations of the

21   cost that you believe they're going to incur?

22   A    Correct.

23   Q    Correct.  You -- all right.  Now, the -- four of the

24   individuals live in Sebastian; is that correct?

25   A    I'd have to review that, but I -- it's --

1    Q    Well, let me help you.  It's not -- I didn't either.  It's

2    Mr. Mendez, Margarito Lara, and actually since his wife is no

3    longer a Plaintiff, and Maximina Laura.

4    A    Right, so three --

5    Q    There are three of them that --

6    A    -- of the individuals, correct.

7    Q    -- Plaintiffs live in Sebastian.  Sebastian is a very

8    small town in the valley, correct?

9    A    Correct.

10   Q    Do you know whether it has a pharmacy?

11   A    I -- my understanding it does not have a pharmacy.

12   Q    It does not?

13   A    That's my understanding.

14   Q    Did you inquire of anybody as to whether or not there's a

15   physician there?

16   A    I have not.

17   Q    Okay.  I want you to assume for me -- first of all, do you

18   know how big Sebastian is?

19   A    It's a relatively small town.

20   Q    Yeah.  And if I were to represent to you that it has no

21   physician, no pharmacy, and no grocery store, would you have

22   any reason to doubt those facts?

23   A    My understanding it has some kind of country store --

24   Q    Kind of a --

25   A    -- so whether you characterize that as a grocery store or

```
                    Jewell - Cross / By Mr. Donnell                60
```

 1    not --

 2    Q    But not a grocery store where you would get normal

 3    groceries on a day-to-day basis, correct?

 4    A    Not a big -- people may purchase things there on a regular

 5    basis, but not, for example, an HEB.

 6    Q    Okay.  And where did you -- did you grow up in the city or

 7    in the country?

 8    A    I grew up in a suburb.

 9    Q    Of what city?

10    A    A suburb of Buffalo, New York.

11    Q    Okay.  Well, you -- Dr. Milyo had a concern that in all of

12    -- and let me just ask you this -- in all of the calculations

13    that you've done, you have assumed that all trips with

14    reference to securing any EIC identification or complying with

15    the getting one is all a sole, single purpose, correct?

16    A    I've allocated the cost of the trip to the ID.  It --

17    Q    Attributed --

18    A    -- could be combined with another trip that you -- but the

19    cost would be allocated to the ESB (sic).

20    Q    Okay.  In other words, they might have done -- they might

21    do three things if they go "to town," as people down here kind

22    of like to say.  But even if they accomplished three tasks, for

23    the purposes of your calculation, you assigned all the costs to

24    the task of getting the EIC?

25    A    Correct.

1   Q    All right.  Would you have been able to allocate the cost

2   among the task, or would that have been kind of an

3   insurmountable problem?

4   A    That's a hypothetical, so I don't --

5   Q    My question --

6   A    If we had an example we can work with, but --

7   Q    No, I -- let's suppose that he said, well, when I went to

8   the DPS office in Harlingen, I also went to the doctor, or I

9   stopped at the Walmart to get the -- pick up some groceries.

10  How would you have allocated those costs?  Just one-third, one-

11  third, and one-third?

12  A    No.  I allocated those costs to the -- that they went to

13  the DPS.

14  Q    No, no.  If you wanted to allocate the cost among all the

15  tasks, how would you have done it?  One-third, one-third, and

16  one-third?

17  A    Well, I wanted to allocate it to the DPS.

18  Q    You -- in other words, you just -- your intent was to

19  allocate all the cost to the DPS to get the EIC.

20  A    They're going to -- the reason they're going to DPS is --

21  making the trip is to get to DPS, then we allocate the cost to

22  the trip to DPS.

23  Q    And maybe we're saying the same thing, but it's my

24  understanding that even if they'd done multiple tasks in the

25  same trip, you nevertheless, for the purpose of your

Jewell - Cross / By Mr. Donnell                         62

1   calculation, assigned all of the cost to getting the EIC -- to

2   the DPS?

3   A    Correct.

4   Q    Okay.

5        **MR. DONNELL:**  (Indiscernible) could you throw up that

6   chart?

7   Q    All right, this is a little chart that I put together, and

8   it's my intent by this to take this information -- and I took

9   it to the best of my ability, directly out of your original

10  report.  I didn't have the benefit of the information that you

11  provided yesterday, but the numbers are substantially the same.

12  And if you want to check your -- against your report, I'm happy

13  for you to do so.  You probably --

14  A    I'll accept your representation.

15  Q    One of the things you did for each of the Plaintiffs was

16  to calculate -- after you took their income and their expenses,

17  you calculated what was called a monthly, unobligated,

18  discretionary income.  That's a term you used, correct?

19  A    Correct.

20  Q    All right.  And then you had the cost of obtaining or

21  complying with SB 14 to get an EIC, correct?

22  A    Correct.

23  Q    And with reference to Mr. Mendez, your analysis of his

24  financial condition showed that he had unobligated, monthly,

25  discretionary income of $425.69, correct?

Jewell - Cross / By Mr. Donnell                    63

1  A    Correct.

2  Q    And he would -- he had an out-of-pocket cost of $27.69,

3  correct?

4  A    Correct.

5  Q    And we talked about this at your deposition and I think

6  you agreed with me that if Mr. Mendez chooses to spend the --

7  his discretionary income to get a EIC, he has the funds to do

8  it.

9  A    He has -- can -- so the monthly, discretionary income --

10 unobligated, discretionary income after his absolute minimum

11 base needs and his contractual obligations.  It doesn't include

12 other costs, such as saving for future financial

13 (indiscernible) unexpected costs.

14 Q    I'm sorry, you're -- say that again.  I'm --

15 A    It doesn't include saving for future financial emergencies

16 or unexpected costs that are regular.  And so Mr. Mendez

17 represented to me that he regularly -- that he does not

18 regularly have leftover funds after paying for gas money and

19 that he, in fact, receives financial assistance from local

20 charities on a regular basis.  But should he -- he has dollars

21 in his pocket that if he wanted to use to make the choice to

22 buy an SB 14-compliant ID, I agree, he has those dollars.  He's

23 making choices regarding those dollars that are reflected by

24 his constrained budget.

25 Q    Well, I -- it is true that your analysis of his financial

                    Jewell - Cross / By Mr. Donnell                    64

1    condition as laid out and described in your report showed that

2    he had monthly, unobligated, discretionary income of $425.69.

3    I didn't create that number, did I?

4    A    Is there a question?

5    Q    That's your number, isn't it?

6    A    I -- yeah, I believe so.

7    Q    Yeah.  And the $27.69 SB 14 cost, that's the cost you --

8    that's the out-of-pocket money that he's going to have to spend

9    to get an EIC, correct?

10   A    Correct.

11   Q    All right.  Now, there are other costs that you think are

12   associated, like the cost to wait when you go to the DPS

13   office, correct?

14   A    Right.  And we didn't -- that's non-monetary costs in my

15   analysis.

16   Q    Yeah.  And we --

17   A    It's the wear and --

18   Q    -- haven't talked about --

19   A    -- tear on the car and -- yeah.

20   Q    And we -- and this report just deals with money in and

21   money out, correct?

22   A    This chart.

23   Q    Right.

24   A    This number.

25   Q    Well, your other wait-time charges, he doesn't pay

1    somebody out of his pocket for the cost of waiting in the DPS

2    office, does he?

3    A    No.

4    Q    So in terms of dollars in and dollars out, he's got

5    $425.69 a month and he's got to pay on a one-time basis $27.69.

6    That is true?

7    A    And we discussed this at my deposition.  The one time is

8    at -- for the life span of the EIC, right, for six years.

9    Q    Yeah.  That's my point.  He --

10   A    But in --

11   Q    -- once he gets it, it's good for six years.

12   A    My understanding.

13   Q    Yeah.  And when he renews it in six years, it's free.  The

14   renewal is free.  It's not --

15   A    Right.  If he -- he still needs to travel, I assume.

16   Q    Yeah.  But in terms of having to pay something out of his

17   pocket, he's only got to pay $27.69 to get that EIC, correct?

18   A    That's my calculation.

19   Q    All right.  Now, with reference -- and I'm not going to go

20   through each one of them -- but with reference to the --

21   Mr. Estrada, I was a little confused about your discussion

22   about his cost that he's going to incur because he wants to get

23   his driver's license and the financial responsibility laws and

24   he's got to pay some surcharges.  Do you somehow mold or meld

25   that into a cost to get an EIC?

```
                      Jewell - Cross / By Mr. Donnell              66
 1   A     Is there a --

 2   Q     There is some talk about if he abandons the --

 3   A     So my understanding is that he's not eligible for an EIC

 4   given his outstanding CDL.  In order to get the EIC, he would

 5   have to abandon the CDL.  However he represents --

 6   Q     Tell me again, why would he have to abandon it?

 7   A     You can't get an EIC if you have a driver's license.  My

 8   conversations that I had with the -- actually --

 9   Q     Well, if he got the driver's license, he wouldn't need the

10   EIC, would he?

11   A     That's correct.

12   Q     Yeah.  Well, I just was -- I just couldn't understand how

13   they were somehow relating the cost to get an EIC to the cost

14   of compliance with the Financial Responsibility Act.  And that

15   was my point of clarification that I just didn't understand.

16   Would it be fair to --

17   A     So if you -- are you -- let me ask a question.

18   Q     Sure, sure.

19   A     Are you representing to me that he can get an EIC given

20   his current situation with the CDL?

21   Q     I don't know.  Are you representing that he has to abandon

22   his efforts to get his CDL in order to get an EIC?

23   A     That -- reading the transcript of his trial testimony, and

24   conversations that I had with the Raymondville County

25   Commissioner when I was discussing their hours, about the
```

1    ability to get an EIC with a driver's license, my understanding

2    is he would have to abandon it.  If I'm incorrect, then that

3    $60, which I did not include in my report, would not be

4    relevant.

5    Q    Okay.  Well, with reference to Maximina Laura, you've --

6    basically in doing your cost calculation, you have, I think it

7    would be fair to say, have assumed -- I'm hesitant to say a

8    worst case scenario -- but you sort of assumed that every

9    possible thing that could go wrong in the process does go

10   wrong, then this would be her cost.  Would that be a fair

11   characterization?

12   A    No, I don't think that's a -- I disagree.  I think I've

13   taken the conservative choice on -- across the board in my

14   analysis.

15   Q    All right.  Well, with reference to Ms. Lara, you have her

16   spending -- you've got two calculations in your report; $85.45

17   is the highest charge that you have, correct?

18   A    (No audible response)

19   Q    And -- but that's to get an EIC in order to vote, right?

20   A    No.  I believe that Ms. Lara's is correcting her driver's

21   license to vote.

22   Q    Or correct her -- but in order to be able to vote, to get

23   her driver's license, this is what you've calculated she'd have

24   to spend.

25   A    Correct.

Jewell - Cross / By Mr. Donnell                    68

1   Q    All right.  Now, are you aware she's voted with that

2   driver's license since the passage of SB 14?

3   A    I believe that was stated in her deposition testimony.

4   Q    So there's a substantial chance she won't incur any of

5   those costs, correct?

6   A    The analysis that's done of this under the understanding

7   that she wishes to ensure her ability to vote; and in order to

8   do that, she wants those means to line up.

9   Q    All right.

10  A    Because if she's -- if she was turned down and she was

11  forced to do a provisional ballot, she would have a very short

12  timeframe to do all of these things.  And it's not clear to me

13  it'd be possible for her to do all those things in that limited

14  time period.

15  Q    But your analysis for cost assumes that at some point in

16  the future, she would be challenged, and so she wants the peace

17  of mind to know that if she were challenged, that her driver's

18  license would be correct?

19  A    The second half of your statement is true.  I disagree --

20  Q    Yeah.

21  A    -- with the first.  It doesn't assume that she would be

22  challenged.  It assumes that she would wish to be -- to have

23  the documents in order because she can't be sure that she won't

24  be challenged.

25  Q    Let me -- I'd like to wrap up by just giving you a --

1   asking you a few questions, and I'm going to couch them in the

2   terms of true or false.  And you haven't probably done that in

3   a long time, have you?  But they're not hard questions.  But if

4   you need a lifeline or you want to call a friend, we can

5   probably arrange for that.  But I think you will be able to

6   answer them.  The question is this:  All of the Plaintiffs that

7   you have interviewed, with the exception of Mr. Estrada, are 65

8   or older, correct?

9   A    I believe that's true.

10  Q    All right.

11  A    I'd have to review the documents, but --

12  Q    So the answer to that is true?

13  A    What's that?

14  Q    The answer to that question is true?

15  A    As far as I know, correct.

16  Q    All right.  And because they are over 65, all of the

17  Plaintiffs, except Mr. Estrada who is not 65, are eligible to

18  vote my mail, correct?  True?

19  A    That's my understanding.  I haven't investigated that.

20  Q    So you can't say whether that's true or not true?

21  A    I don't disagree.

22  Q    Can I take that to be true?

23  A    You can take it that way.

24  Q    All right.  And the -- and none of the costs that you have

25  calculated for these Plaintiffs would be incurred if the

1  Plaintiffs voted by mail, correct?  True?

2  A    I didn't do the by mail analysis, so I'll -- but I don't

3  disagree with that.  These costs are calculated for them to do

4  in-person voting.

5  Q    So the -- none of the costs that you have calculated and

6  testified to would be incurred if the Plaintiffs voted by mail,

7  correct?

8  A    These were calculated as if they were going to do in-

9  person voting, which is what they represented to me they wished

10 to do.

11 Q    So I can take that in my statement as being true.

12 A    You'd have to go back and remind me what the question was,

13 but I think we're --

14 Q    The question was --

15 A    -- in agreement here that --

16 Q    Yeah.

17 A    -- these calculations are done as if they were going to

18 vote in person and required an SB 14 ID.

19 Q    So --

20 A    And it was done because they represented to me that they

21 wished to vote in person.

22 Q    But my question to you is none of them would be incurred

23 if they voted by mail?

24 A    I haven't done that analysis, but I don't disagree.

25 Q    All right.  I'm going to take that as true.  Senate Bill

1   14 -- and you've read Senate Bill 14 I think you told me in

2   your deposition.

3   A    I've reviewed the bill text at one point in time, correct.

4   Q    But it doesn't mandate or require the Plaintiffs who are

5   over 65 to vote in person, does it?

6   A    I don't recall the bill text, but I don't have an

7   understanding of that.  I don't disagree with that

8   characterization if you --

9   Q    All right.

10  A    -- represent it to me as true.

11  Q    So I'll take that as -- that statement as true.  So the

12  decision to vote in person is a personal decision that each of

13  the Plaintiffs that are over 65, eligible to vote by mail, have

14  decided -- have made, correct?

15  A    They have -- we are not disagreeing here that they have

16  represented to me that they wish to vote in person and that I

17  performed the calculation assuming that they were going to vote

18  in person.

19  Q    And so the Plaintiffs have elected by wanting to vote in

20  person to incur the cost that you've calculated.

21  A    I don't disagree with that, that they wish -- and, you

22  know, would they -- I don't disagree with that.

23  Q    I'll take that as being true.  And shifting gears, if all

24  of the Plaintiffs that you have analyzed in this case were

25  Black, your cost calculations would be the same, correct?

1    A    If their life circumstances were exactly the same.  I

2    didn't take race into consideration.

3    Q    Yeah.  It would be -- the calculations and testimony would

4    be the same.

5    A    Yeah.  The testimony -- the calculations are based on who

6    they are, where they live, their household finances.

7    Q    If all the conditions and all the circumstances were

8    identical, the only difference being that all of the Plaintiffs

9    were Black, your testimony would be the same?

10   A    Correct.

11   Q    Okay.  And by the same token, if all the Plaintiffs were

12   Anglo and all the facts were the same, your testimony would be

13   the same.

14   A    Correct.  I look at -- I only looked at their households

15   and the budget constraints of these individuals.

16         **MR. DONNELL:**  That's all I have.  Thank you very

17   much.

18         **MR. DOGGETT:**  Brief redirect, your Honor?

19         **THE COURT:**  Yes.

20                        **REDIRECT EXAMINATION**

21   BY MR. DOGGETT:

22   Q    Mr. Jewell, do you know how much the poll tax was?

23   A    I do not.

24         **MR. DOGGETT:**  Can we bring -- Ryan, can you please

25   put back up (indiscernible) whoever had that?

1      **(Discussion held off the record)**

2    Q    You were asked a few questions, and I just want to make

3    sure I understand.  If an individual doesn't have a car and is

4    essentially getting a ride from someone, you assumed that they

5    would go just for -- to make that one trip to DPS; is that

6    right?

7    A    Correct.

8    Q    And you did not assume that they would be able to get a

9    ride to three or four other places; is that correct?

10   A    Correct.

11   Q    Would that be a reasonable assumption if you're already

12   requesting a ride from someone?

13   A    Absolutely.  You're going -- you know, the reality is that

14   we have a limited amount of social capital.  We can only ask

15   for certain things from our community; and as we start to pile

16   those on, we reach budget constraints in favors we can ask,

17   much like we reach budget constraints in our cash.

18   Q    I believe you were asked about Ms. Lara, is that right,

19   moments ago?

20   A    Yes.

21   Q    And that she, number one, desired to continue to vote in

22   person; is that right?

23   A    Yes.

24   Q    And one of the reasons why she wanted to fix her

25   documentation was because of the name mismatch; is that

Jewell - Redirect / By Mr. Doggett                 74

1    correct?

2    A     Correct.

3    Q     And so she wanted to ensure that she could be able to

4    vote; is that right?

5    A     Correct.

6    Q     Now, was one of the other reason why her driver's license

7    was getting ready to expire; is that right?

8    A     My understanding is yes, it was going to expire maybe

9    2015.

10   Q     And she would then have to show her birth certificate in

11   order to -- because of another change in the law, she was going

12   to have to show her birth certificate in order to renew her

13   license; is that right?

14   A     I haven't done that analysis, but that is my

15   understanding.

16   Q     Okay.  Now, this demonstrative aid, could you tell us what

17   monthly, unobligated, discretionary income does not include?

18   Because these numbers don't match up.

19   A     You know, it doesn't include when Ms. Lara's AC broke.  It

20   doesn't include when her refrigerator broke.  It doesn't

21   include when Mr. Lara's lawnmower was stolen.  It doesn't

22   include anything except for the cost of eating -- the bare

23   minimum cost of eating and the cost of covering their heads

24   and, you know, basic medical costs.  It doesn't include a lot

25   of things and -- that we spend on a day-to-day basis.

Jewell - Redirect / By Mr. Doggett                    75

1   Q    So this -- that column does not give the whole picture; is

2   that right?

3   A    That column is not the entire household finances, correct.

4   Q    And, again, the "one time SB 14 cost" column, that doesn't

5   include things, right?

6   A    That is -- that cost is the out-of-pocket cost of assuming

7   the purchase by mail.  That is the bare minimum cost that

8   excludes travel to a birth certificate location, it excludes

9   wear and tear on the car, it includes -- excludes the time of

10  whoever's doing the driving.

11  Q    So, again, when we present to the Court the total cost for

12  obtaining an SB 14, that was the total cost figure per your

13  calculations; is that right?

14  A    That's the total monetized because that, for example, also

15  excludes the value of the time of the driver, for -- but it

16  conservatively excludes other costs, but it is more

17  comprehensive than this.

18          **MR. DOGGETT:**  Pass the witness.

19          **THE COURT:**  Anything further?

20          **MR. DONNELL:**  I don't have any further questions.

21  Thank you, your Honor.

22          **THE COURT:**  All right.  You can step down, sir.

23  Thank you.

24      **(Witness steps down)**

25          **THE COURT:**  Let me just clarify something.

1   Ms. Westfall, on that Dr. Davidson declaration, I just want to

2   be sure, because that August 15th is a supplemental

3   declaration, that that is all.  We're not looking at the

4   original report, correct?  It's just --

5              **MS. WESTFALL:**  Yes, your Honor.

6              **THE COURT:**  -- "supplemental" to me means --

7              **MS. WESTFALL:**  Yes.

8              **THE COURT:**  -- that you've got to take it in

9   conjunction with the other one but not --

10             **MS. WESTFALL:**  It's corrected and updated --

11             **THE COURT:**  Okay.

12             **MS. WESTFALL:**  -- your Honor.  and --

13             **THE COURT:**  All right.

14             **MS. WESTFALL:**  -- I can tell you the plaintiff

15  exhibit number if that would be helpful.  But it's --

16             **THE COURT:**  No, I've got it.

17             **MS. WESTFALL:**  -- the August 15th.

18             **THE COURT:**  Just being sure.

19             **MS. WESTFALL:**  Yes, thank you.

20             **THE COURT:**  Okay.

21             **MR. ROSENBERG:**  Your Honor, we have a couple of

22  documents --

23             **THE COURT:**  Okay.

24             **MR. ROSENBERG:**  -- demonstratives for this witness

25  who will be -- Plaintiffs call Daniel Chatman, please.  And for

1    the record, I'm Ezra Rosenberg.

2              **THE COURT:**  Good morning.  Would you raise your hand?

3              **DR. DANIEL CHATMAN, PLAINTIFFS' WITNESS, SWORN**

4              **MR. ROSENBERG:**  Good morning, Dr. Chatman.

5              **THE WITNESS:**  Good morning.

6                        **DIRECT EXAMINATION**

7    **BY MR. ROSENBERG:**

8    Q    Could you please state your full name for the record?

9    A    Daniel G. Chatman.

10   Q    And where do you live?

11   A    In Berkeley, California.

12   Q    And what do you do in Berkley?

13   A    I'm a professor at the University of California.

14   Q    In what field?

15   A    It's the Department of City and Regional Planning.

16   Q    Where did you go to college?

17   A    I went to UC-Berkeley as an undergraduate.  I was a

18   masters -- in the master's program at the Harvard Kennedy

19   School of Government, and then I did my Ph.D. at UCLA.

20   Q    And what did you get your Ph.D. in?

21   A    Urban planning.

22   Q    And I think you mentioned your field is City and Regional

23   Planning.  Can -- do you have a specific focus?

24   A    My research and teaching are on the relationships between

25   transportation and land use, on the location choices of firms

1   and of households, which is to say where firms and households

2   decide to live or to locate their establishments, and how

3   firms, workers, and how household individuals travel between

4   these locations and between non-work locations.

5   Q    And in doing that sort of research, do you study travel

6   burdens?

7   A    My research is -- deals with travel time issues and

8   accessibility and with datasets that are based on the

9   collection of travel time.

10  Q    And what sort of datasets do you use as a standard

11  practice in your work?

12  A    Well, there's a fair diversity of them, but I use census

13  data, I use travel diary datasets from the federal government,

14  from metropolitan planning organizations, and those that I

15  collect myself.  I also use data that are -- financial data

16  from the National Transit Database to the Bureau of Economic

17  Analysis.

18  Q    And by the way, are those the same sorts of tools that you

19  used in your assignment in this case?

20  A    Yes.  The assignment for this case involved tools that

21  were somewhat -- that didn't require econometric or other

22  sophisticated tools, but they were some of the more common

23  tools used in our field.

24  Q    And have you published in peer review journals?

25  A    Yes.

1    Q    And approximately how many articles have you had published

2    in peer review journals?

3    A    Around 14.

4    Q    All in the field of city and regional planning with a

5    focus on transportation?

6    A    All in either urban studies-related or transportation

7    journals.

8         **MR. ROSENBERG:**  If I may approach the witness, your

9    Honor?

10        **THE COURT:**  Yes.

11   **BY MR. ROSENBERG:**

12   Q    I'm showing you what's been marked as Plaintiffs' Exhibit

13   761.1.  Is that the most current version of your CV?

14   A    Yes.  I'm just going to get my glasses out, if you don't

15   mind, just in case I have to look at anything else.  Yes, this

16   is the most recent version.

17        **MR. ROSENBERG:**  Your Honor, we would offer

18   Dr. Chatman as an expert in transportation studies and travel

19   burden.

20        **THE COURT:**  You can proceed.

21   **BY MR. ROSENBERG:**

22   Q    Dr. Chatman, have you provided reports to the Court in

23   connection with this matter?

24   A    I'm sorry, provided what?

25   Q    Reports or declarations?

Chatman - Direct / By Mr. Rosenberg                    80

1    A    Yes.

2              **MR. ROSENBERG:**  And for the record, your Honor, there

3    is a second amended report, which is Plaintiffs' Exhibit 761,

4    and a reply report, 762.

5    Q    And are those the reports that you submitted in this

6    matter?

7    A    Yes.

8    Q    Dr. Chatman, what was the question that you were asked to

9    investigate in this case?

10   A    The question of what travel burden was created by the

11   requirement to have -- to procure a photo ID and how that

12   varied depending on race/ethnicity and how that was conditioned

13   in turn by people's poverty and other factors that might play a

14   role in those burdens becoming more difficult.

15   Q    What population did you choose to study in connection with

16   your investigation?

17   A    Well, I wanted to look at the question in general of those

18   who were eligible to vote in the State and how that population

19   would be required to travel to the locations at which an EIC

20   could be procured.  So I looked at citizens of voting age by

21   race/ethnicity.

22   Q    After choosing the population, how did you go about doing

23   your investigation?  Did you -- let me be a little more

24   focused.  Did you investigate the travel burden of the citizens

25   of voting age population?

Chatman - Direct / By Mr. Rosenberg                81

1   A    Well, sir, to -- there's a number of steps to be taken in

2   order to do this work, and one of them is to come up with an

3   understanding of what level of effort would be considered

4   burdensome.  And, you know, as a way of background here,

5   there's a lot of -- there are many different factors involved

6   in having to travel to get to a location or to get an election

7   identification certificate, and those include all kinds of

8   things from effort to out-of-pocket costs, some of the things

9   that the previous expert was testifying to.  What I focused on

10  in my report and my analysis was travel time, and the reason

11  for this is twofold.  One of them is that travel time is

12  something that is quantifiable, that is fairly well-measured,

13  and that is known to be a major component of the generalized

14  costs that people face when they travel anywhere.  So it's not

15  merely what they spend, but also how long it takes them to get

16  there.

17  Q    Did you select any specific standards as to which to judge

18  travel burden when based upon travel time?

19  A    What I did was to look at a few different definitions that

20  are considered among those of us in the scientific community to

21  be long trips.  And I also compared those trips to the average

22  amount of time that people spend traveling in the State of

23  Texas based on nationwide household transportation survey data,

24  as well as to the very longest trips found in that database and

25  the national databases.  And so the standards that I looked at

Chatman - Direct / By Mr. Rosenberg                    82

1  for a trip that would constitute a burden, something that would

2  be difficult for people to do, was a 90-minute roundtrip, a

3  two-hour roundtrip, or a three-hour roundtrip.  A 90-minute

4  roundtrip implies that you would travel more -- 20 minutes more

5  than the average amount of travel by people in the State of

6  Texas, and that your trip would be a greater duration than all

7  but less than one percent of all the trips taken by people in

8  the State.

9  Q    Now, before we get a little more deeply into your

10 methodology, did you come to general conclusions as a result of

11 your investigation?

12 A    What I found was that among this population of citizens of

13 voting age, that a much higher share of African Americans of

14 voting age and of Latinos of voting age -- in both groups, of

15 course, we're talking about those who are citizens -- would

16 have to take a trip -- undertake travel exceeding 90 minutes or

17 two hours or three hours, a much higher percentage of them

18 compared to White, non-Hispanic citizens.

19 Q    A trip to where?

20 A    A trip to the nearest -- the -- and I should say the least

21 time cost alternative that they have to get to a location where

22 they could procure an EIC, so what I call in my report an EIC

23 location, which is DPS or a county office where it can be --

24      **MR. ROSENBERG:**  And if we can have demonstrative

25 Number 1, please, up on the screen.

1    Q    Now, does this demonstrative summarize your findings?

2    A    Yes.  There is a number of different graphs in the report,

3    but what this one shows is the percentage of voting age

4    citizens in the State for whom a roundtrip to one of these

5    locations would take 90 minutes or more.  And among all

6    citizens of voting age, about five percent, 4.7 percent, of the

7    population would have to take such a long trip; 3.3 percent of

8    the White, non-Hispanic in comparison to five percent of the

9    Hispanic and Latino population; and almost 11 percent of the

10   African American population in the State who are citizens would

11   have to take such a trip.

12   Q    Okay.  We'll get back to this in a couple minutes.  Let's

13   delve a little more deeply into your methodology.  Could you

14   explain the sorts of information that you needed in order to do

15   your investigation?  And let's start with --

16   A    Sure.

17   Q    -- having you identify the households.

18   A    Well, the -- so the first question is simply where in the

19   State people are located with respect to the locations where

20   they would have to go to to procure an EIC.  And this is a

21   question of finding the best possible data on race/ethnicity,

22   citizenship, voting age, and a couple of other factors that

23   we'll get to.  And so I used Census 2010 data at the block

24   group level to get the spatial distribution of the population

25   who were of voting age by race/ethnicity.  And the 2010 Census

1   is a complete survey.  It is the very best possible data on the

2   population of the State.  There is no uncertainty as to

3   race/ethnicity in this dataset.  And I used the locations of

4   these individuals as proxy for -- estimated for, you could say,

5   by the block group centroid of which there are roughly 16,000

6   in the State.

7   Q    And let me stop you for a second.  When you say a

8   centroid, I think that's a term that some other experts have

9   used.  What is a centroid?

10  A    The centroid is defined as the mathematical center of mass

11  of a polygon.  A polygon is just a shape that is the way a

12  census block group is represented, so it's the center of that

13  shape.  And if it's an irregular shape, you can think of it as

14  the point at which if the shape were balanced, it would -- if

15  it were -- it's the point at which the shape would be balanced

16  if it were, you know, set on a pin.

17  Q    So to summarize, you selected the groups you were -- the

18  individuals you were investigating by going to the Census 2010,

19  identify race and ethnicity through the Census 2010, and then

20  used the starting point within the centroid of the block groups

21  where those individuals lived as your starting point for their

22  trips; is that correct?

23  A    That's correct, right.

24  Q    Okay.  You have to choose an endpoint for the trips, too,

25  right?

1    A    Yeah.  So the --

2    Q    Okay.

3    A    -- endpoint is obviously these locations that have been

4    identified as those where you can procure an EIC.  So I

5    identified the 226, as I recall, DPS locations in addition to a

6    large fraction of the 61 county locations where it was said

7    that such -- that the EIC could be procedure.  I and my

8    research assistants were able to find -- address this for 55 or

9    so of the 61, so I think we got up to around 280 something

10   total locations in the State, relatively small number for the

11   25 million residents of the State.  Those were geocoded, which

12   means that we found the address and identified the precise

13   location, and that was the ending point of the trip.

14   Q    So you have a starting point, the centroid of the block

15   group where the individuals lived, correct?

16   A    Uh-huh.

17   Q    You have the endpoint, which is the EIC location, correct?

18   A    (No audible response)

19   Q    What do you do next?

20   A    The analysis of determining which of these locations a

21   household or an individual would choose to go to assumes that

22   they would choose that location which is -- which requires the

23   shortest trip in terms of time.

24   Q    How do you go about deciding which of the various EIC

25   locations is the shortest trip in terms of time for the

Chatman - Direct / By Mr. Rosenberg                86

1  citizens of voting age population?

2  A    There -- what I used was the assumption that there were

3  three possible travel modes, one of them being driven, the

4  second one taking public transportation, and the third one

5  walking.  So for each of these different travel modes, there

6  was a separate determination of which of the possible EIC

7  locations was nearest in terms of time, and that involved a

8  separate analysis for each of those modes.

9  Q    Okay.  Let's start with the first one you mentioned, which

10  is being driven.  How did you determine which was the closest

11  in terms of time to be driven to?

12  A    There's quite a few technical details.  I'm not sure to

13  what extend I need to go into them here, but suffice it to say

14  that one conducts in this kind of analysis a -- what's called a

15  network distance analysis.  Selecting a subset of the more than

16  200 locations consisting of five or so of the nearest locations

17  as the crow files and determining which of those was closest in

18  terms of distance and in terms of time using two methods.  One

19  method is to use a mapping program called ROJAS, which is

20  geographical information system software, to look at the time

21  it would take given the assumption that one -- that a driver

22  that drives at the posted speed limit.  And the second way is

23  to use the Google maps API which enables you to query the real

24  time information that Google is able to get for the street

25  network in Texas.  And I ended up using the Google maps outputs

Chatman - Direct / By Mr. Rosenberg                    87

1    because they accounted for congestion, signalization, and real

2    time conditions, and so --

3    Q    So --

4    A    -- they were slight more conservative than using posted

5    speeds.

6    Q    -- the Google application that you used takes into

7    consideration traffic congestion and traffic signals, kind of

8    real life situations.

9    A    Well, what it takes into account is simply actual data on

10   people's travel, so those data are being collected by them on

11   all of you right now.

12   Q    So you chose the -- of the five geographically proximate

13   locations --

14   A    As the crow flies locations.

15   Q    -- you chose the one that by the Google application was

16   the closest in time --

17   A    Right.

18   Q    -- of those five --

19   A    Right.

20   Q    -- to each centroid; is that correct?

21   A    That's right.  And we conducted this analysis between

22   roughly 3:00 and 5:00 p.m. so that we were getting congested

23   drive times.

24   Q    All right.  And I just want --

25   A    To the extent there is congestion in Texas.

EXCEPTIONAL REPORTING SERVICES, INC

Chatman - Direct / By Mr. Rosenberg                    88

1    Q    So you chose as a start time 3:00 to 5:00 o'clock in the

2    afternoon because that was a low traffic congestion time?

3    A    No, no.  I deliberately chose it because it was a high

4    traffic congestion --

5    Q    I mean -- I'm saying high traffic congestion time.

6    A    Yes, right.  So that we were ensuring that if there was a

7    burden associated with driving, that it would be represented

8    there.  We can get to this later because it tends to overstate

9    the relative burden for Hispanic non-Whites -- sorry, non-

10   Hispanic Whites in comparison to other racial and ethnic

11   groups.

12   Q    By the way -- so you came up then with a driving figure to

13   this closest EIC location --

14   A    Right.

15   Q    -- for each of the --

16   A    For each of the block groups in the State.

17   Q    Okay.

18   A    So there'd be 16,000 block groups and getting an estimate

19   from each of those centroids to the nearest location.

20   Q    Did the time include waiting time at the DPS facility?

21   A    No.  I didn't include any assumption about the time it

22   would take to actually conduct the transaction.  I was simply

23   looking at travel time.

24   Q    And that's true as to any of the modes of transportation?

25   A    That's correct.

1  Q    Now, the second mode of transportation you discussed was

2  public transportation.  How did you figure out the public

3  transportation from the block groups to the EIC facilities?

4  A    Well, first of all, it's appropriate to point out here

5  that a fairly large percentage of the population in Texas

6  doesn't have access to public transportation.  It's around 40

7  percent of the State.  And so for the remaining 60 percent of

8  the State, this was a question of using what's called the

9  General Transit Feed Specification data, which is a form of

10  data representation which enables standard algorithms --

11  scheduling algorithm to search out what is the lowest time cost

12  option for a trip from the centroid of a block group to the

13  nearest EIC location.

14  Q    So you look at every public transportation schedule in the

15  State of Texas?

16  A    What I did was to start with publically available General

17  Transit Feed Specification data.  But unfortunately, that --

18  those data are not made available for all parts of the State

19  that do have transit service.  So roughly one-third of the

20  State's population that does have transit service does not have

21  publically available GTFS data.  So I contracted with an

22  organization called the Center For Neighborhood Technology in

23  Chicago, which is a well-known organization that maintains and

24  collects data on transit -- public transportation service

25  throughout the United States, to both use the existing data

Chatman - Direct / By Mr. Rosenberg                    90

1   that they had collected for the remaining parts of the State of

2   Texas, as well as to contract with them to collect any

3   remaining schedules.  So we think we got them all, but --

4   Q    So between the --

5   A    -- it's possible we missed a couple.

6   Q    Between the general transit feed specialization data and

7   the Chicago data, you think you actually looked at every public

8   transportation schedule in the State of Texas?

9   A    We think we've got them all, like I said.

10  Q    And what did you do next after having looked at every

11  public transportation schedule in the State of Texas?

12  A    So there's a couple different steps here.  One is to --

13  one has to keep in mind that it's somewhat more complex for

14  public transportation than it is for driving because there's

15  the problem of transferring buses, and in some instances

16  there's the problem of estimating wait times at the bus

17  stations.  And then, of course, there is often a significant

18  walk access and egress portion of the trip.  So what CNT did

19  for us was to estimate with their algorithm the travel time and

20  the waiting time portions of that package, which they did on

21  their mainframe.  And then what I did in-house was to, number

22  one, confirm and check with GTF with the Google transit outputs

23  which, in most cases were accurate.  In some cases we queried

24  them and found that our data were better because they didn't

25  have complete data.  And then we also supplemented those

1    estimates of just -- from the first bus stop to the last bus

2    stop with an estimate of the walking time on the network using

3    a separate network analysis of accessing from the centroid of

4    the block group to the bus stop, or the real stop; and then on

5    the other end of the trip, from the final stop walking from

6    there to the EIC location.

7    Q    And as a result of that analysis, did you set some rules

8    that you applied to using the mode of public transportation?

9    A    Yes.  Well, and maybe I'm getting -- we're getting ahead

10   of ourselves here, but the question as to whether one uses

11   public transportation or another mode is simply a question

12   about which is the lowest cost in terms of time.  So there is

13   another issue which you might be referring to here, which is

14   that there are a number of sort of decision rules involved with

15   the algorithm, and one of them is that we assume that if people

16   either do not have a bus stop within a mile of their home, they

17   don't use the bus, so it isn't -- the street is not available

18   to them.  Or if there is no EIC location within a mile of the

19   bus stop on the other side, then they don't make that mile-long

20   walk.  So there was a relatively small fraction of the State

21   that fell in the category of not having access for these

22   reasons.

23   Q    So none of which -- public transportation not within a

24   mile of either the starting point or the endpoint?

25   A    Right, yeah.  Are you within a mile of a trip -- are you

1    within a mile of the network at all on the home side and are

2    you within a mile of the network on the destination side.

3    Q    Did you take into consideration transfers?

4    A    So transfers, we used another rule which, again, comports

5    generally with people's behavior.  The fact is, people are

6    reluctant to walk more than about a quarter a mile in this

7    climate, and a half mile in other locations, and a mile is not

8    very common.  I mean, there are many of us who are willing to

9    walk a long distance but, in fact, that isn't the case.  So

10   there's that sort of constraint.  A similar constraint is the

11   question of transfers and how many transfers people are willing

12   to incur.  Transfers increase uncertainty.  They're considered

13   unpleasant.  People would rather not have to transfer because

14   there might be a short walk or there might be some confusion

15   about where one goes next.  So we assumed that people did not

16   do more than two transfers; and if there was an option that

17   would get them there eventually but it required three

18   transfers, that wasn't something that we did.  There is two

19   issues there.  One of them is sort of trying to mimic the

20   realistic decision-making process that people engage in, and

21   the second thing is computational tractability, because the

22   computations required to run these analyses take quite a while,

23   so this was taking a couple days to run when we ran it.

24   Q    Did you take into consideration waiting time in connection

25   with public transportation?

1   A     Waiting time was separately calculated and, yes, it was my

2   -- had that as a separate output.  It's part of the total time.

3   One typically does have to wait some portion for either -- at

4   least for the first bus and maybe for a second bus as well.

5   Q     Have we covered everything on public transportation

6   methodology?

7   A     I think so, yeah.

8   Q     And the third mode was walking.  What did you -- how did

9   you compute walking?

10  A     Walking is sort of the simplest calculation and it was

11  done by getting the nearest -- finding the nearest location

12  based on network distance.  So, again, when I say network

13  distance, just to clarify what I'm talking about, I'm just

14  talking about the distance as one measures it along the road

15  network or the sidewalks, the roads along which sidewalks are

16  available.  The network analysis for walking subtracted out

17  those roads that don't have pedestrian access.  And then to

18  that distance, I applied a 2.2 miles per hour walking

19  assumption which comes from the literature and is pretty

20  conservative.  It's conservative in the sense that it would

21  tend to underestimate the amount of time it would take somebody

22  to walk because average walking speeds over longer distances

23  are probably lower; and, of course, they're lower for people

24  who don't walk quickly or have a physical issue which prevents

25  them from walking quickly.

1  Q    And by the way, the calculation that you wound up doing,

2  were these for roundtrips?

3  A    The numbers I report are for roundtrips.  The calculations

4  were just for one-way trips.

5  Q    Now, did you make any assignments of the persons and

6  households to different modes based upon whether or not they

7  had access to an automobile?

8  A    Right.  So the next part of the analysis is to understand

9  how people are likely to actually get to an EIC location.  The

10  assumptions that I used were basically if the household -- so I

11  need to back up for a moment and just clarify about the

12  underlying data, the distribution of households in the State of

13  Texas where they're living.  An additional step here was to use

14  data from the census to estimate the portion of each racial and

15  ethnic group who are citizens of voting age who do or don't

16  have access to a car.  And I did this by using information at

17  the block group level about race/ethnicity and about voting

18  age, as well as poverty, to better estimate the auto owning

19  share of each of those populations.  With those estimates of

20  auto ownership, for each subgroup of people, those who owned an

21  auto and didn't own an auto who were of each racial and ethnic

22  group for citizens of voting age, I then followed a decision

23  rule which was fairly straightforward and sort of obvious.  If

24  you got a car in your household, somebody drives you.  If you

25  don't have a car in your household, you either take public

1    transportation or you walk.  So given that you have a car in

2    your household, the question is which of those three modes is

3    fastest:  car, public transportation, or walking.  Of course,

4    typically it would be driving. In fact, in almost all cases it

5    was.  If the person does not have a household available in

6    their -- sorry, an automobile available in their household,

7    then the question is simply which is faster:  walking or taking

8    public transportation.  And of those two, I assigned the faster

9    of those -- of the modes.

10   Q    So in terms of your conclusions, you found that driving

11   was almost always the fastest way of getting to the EIC

12   location?

13   A    Yes.

14   Q    And did you find any difference between households with

15   cars as opposed to households without cars as to where the

16   burden fell more heavily?

17   A    The burden falls almost entirely on households without

18   cars because of the fact that there are few instances in which

19   driving would take longer than 90 minutes roundtrip.  And,

20   therefore, it's almost all those who do not own cars and

21   therefore have to either rely on public transportation and

22   walking.  And a fairly large share of those have to incur trips

23   that are greater than 90 minutes roundtrip.

24   Q    And by the way, is time spent walking, or time spent in

25   public transportation, or time spent driving equivalently

Chatman - Direct / By Mr. Rosenberg                    96

1   burdensome?

2   A    I treat it as though it were in the analysis which is a

3   conservative way to treat it.  In fact, there is a fairly well

4   developed scientific literature that for purposes of trying to

5   estimate how people will travel has made very good valuations

6   of time spent in different activities.  So that literature

7   shows that time spent in a public transportation vehicle is

8   roughly 1.2 times as burdensome as time spent in a personal

9   vehicle, for example, which you can imagine is due to things

10  like crowding on vehicles, lack of privacy, perhaps it's less

11  comfortable, those sorts of things.

12           Walking and waiting times are considered more

13  burdensome than that and the estimates range.  The sort of

14  agency standard is that there's about a -- that time spent

15  walking or waiting is roughly twice as burdensome as time spent

16  in a personal vehicle.  The net analysis of this are coming up

17  with numbers more like 1.6 these days.  So it's quite a lot

18  more burdensome and that reflects -- walking and waiting

19  reflect the conditions under which you're exposed such as the

20  effort they have to put in, weather, those kinds of things.

21  Q    Let's get demonstrative number one back on the screen

22  please.

23           So looking again at demonstrative number one, does

24  this capsulize what you've been talking about thus far in terms

25  of -- is this the results of your computation?

1    A    It is and since we're -- since we have it up, it might be

2    worth pointing out that the way that these numbers would change

3    if we were to do some sort of waiting, of walking/waiting --

4    that's a homonym there -- some multiplier of walking and

5    waiting times or in transit times those bars would all

6    increase.  They would increase more, slightly more, for

7    Hispanics and Latinos and African Americans because they are

8    relying on cars less for their travel and a higher percentage

9    of the White Non-Hispanic burden is related to driving in this

10   particular exhibit.  Other exhibits in the report, just for

11   clarification, subtract out driving burdens altogether but this

12   one doesn't.

13   Q    And to walk through this chart very briefly, you found

14   that 4.7 percent of all citizens of voting age population would

15   have a trip, a round trip of 90 minutes or longer, to an EIC

16   location; is that a fair way of reading it?

17   A    That's correct, right, and which doesn't include whatever

18   time they would be spending.  So it isn't a complete accounting

19   of time burden.  It's only the travel time portion.

20   Q    And you found differences between African Americans and

21   Whites, 10.9 percent to 3.3 percent?

22   A    Right.  So it's a multiplier of in the realm of 3.3, 3.5

23   times the burden as a function of race ethnicity in that case.

24   Q    And differences between Hispanic/Latinos of 5 percent as

25   compared to 3.3 percent of Whites?

1  A    Right, which is a multiplier about 1.5, 1.5 times.

2  Q    And were those differences statistically significant?

3  A    They are statistically significant at the very highest

4  levels.

5  Q    Now you mentioned that you also did an analysis taking to

6  -- focusing specifically on income; is that correct?

7  A    Yes, that's right.

8  Q    Can we have demonstrative number two, please?

9        Can you walk through this demonstrative?

10 A    Yes.  So the scale is slightly different in the previous

11 graph for they say in our presentation of graphs we should

12 always keep the scale the same.  I should have told them.  I

13 should have talked to everybody about that.  So this is a

14 totally different scale.

15       This shows that if you look only at those who are

16 below the poverty line the percentage of those who would -- of

17 them who would be required to take a round trip that was

18 exceeding 90 minutes is much higher and this is simply because

19 those who own property are less likely to own cars.  Some of

20 them do and some of them don't but, you know, auto ownership is

21 pretty ambiguous but lots of people who are in poverty don't

22 own vehicles.  So 14 percent of everyone in that group would

23 have to take a trip more than 90 minutes primarily because of

24 their reliance on public transportation or walking.  Ten point

25 -- ten percent of the White/Non-Hispanic population; twelve

1    percent of the Hispanic/Latino population, and twenty-six,

2    twenty-seven percent of the African American population would

3    have to take a long trip to get to any EIC location.

4    Q    And again, the differences between African Americans and

5    White/Non-Hispanics, is that statistically significant?

6    A    All the differences here are statistically significant.

7    So those bars -- I teach statistics and what I tell my students

8    is that just because a bar looks like it's different doesn't

9    mean it actually is.  However, in this case, each of these bars

10   is different than the other because the numbers are still

11   large.

12   Q    Just a few more questions.  You had an opportunity to read

13   a report by Dr. Milo, did you not?

14   A    Yes.

15   Q    And he had a couple of criticisms of your report.

16        Did anything he say change your mind about what you

17   did here?

18   A    No.

19   Q    Let me just bring up a few of them and I think Mr. Doggett

20   raised each of these with his witness.

21        Dr. Milo said that, "Well, Dr. Chatman didn't take

22   into consideration the fact that when someone goes to the EIC

23   he or she could also go to the grocery [sic], go to the bank,

24   go the post office."

25        How do you respond to that?

Chatman - Direct / By Mr. Rosenberg                          100

1    A    Mr. Jewell used the term I think "trip chaining."  The

2    notion of trip chaining is that --

3    Q    Trip chain?

4    A    Trip chaining like C-H-A-I-N-I-N-G and the idea is that

5    when you -- let's say you're driving to work that you may along

6    the way do other things because it's convenient to do so and it

7    reduces your overall travel burden.  So you may stop at the

8    grocery store on the way home.  You may drive your child to and

9    from daycare.  Those kinds of trips can be chained in to the

10   commute trip and this is quite common.

11            What Dr. Milo suggested was that this sort of trip

12   would be the kind of trip that could be amenable to trip

13   chaining and I disagree with him.  With all due respect to his

14   background, he is not trained in this area and hasn't made

15   himself familiar with the literature on trip chaining which

16   shows that trips are chained into other trips primarily when

17   one is driving alone so that it is possible and not an

18   inconvenience to your passenger.

19   Q    You can't tell a bus driver to -- "Hey, why don't you make

20   a left here?"

21   A    Well, you can trip chain on transit it's just harder

22   because it means you have to stop and you have to incur waiting

23   and walking times typically.  You don't typically -- there are

24   exceptions of course.  It's possible.  It's just not likely and

25   it's not likely for a very long trip like the sorts of trips

1    that I'm talking about here.  So I don't think -- I do feel as

2    though that that comment was -- was sort of a hopeful comment

3    about what might happen but it isn't reflective of reality

4    particularly in my analysis because I'm only looking and

5    focusing on the very longest trips and those are not amenable

6    to trip chaining.  It's unlikely unless you happen to have --

7    it turns out that you're going to an EIC location.  Oh, it

8    turns out there's a grocery store next to it and it turns out

9    the person who's driving you is going to let you stop and do

10   your grocery shopping or that you are prepared to carry bags

11   back with you on the bus.

12   Q    Similarly -- another point that Dr. Milo tried to make was

13   that people without cars they can perhaps rely on neighbors, or

14   friends, or someone else to take -- give them a ride.

15            How do you respond to that?

16   A    Now it's true that there is -- certainly people without

17   cars are very creative and they work to find ways to get around

18   that involve borrowing cars or sometimes getting rides from

19   neighbors.  Those kinds of arrangements have to be negotiated.

20   They're not costless.  They typically are for habitual trips so

21   one would -- one, for example, would be likely to get a ride

22   from somebody if, you know, you're working in the same

23   location.  You might get yourself over to your coworker's house

24   and get a ride with that person.

25            This isn't the sort of trip that seems amenable to

Chatman - Direct / By Mr. Rosenberg                    102

1    that kind of arrangement or to put it another way, it's

2    possible because in fact we have heard stories about people

3    managing to get somewhere and they can get a ride from somebody

4    but it's not costless to them in terms of negotiating that

5    transaction as it were.  Sometimes it is literally not

6    costless.  Sometimes it costs money to help pay for gas and so

7    on but then there's also more -- another person's time involved

8    and in my analysis I didn't look at this question in part

9    because I would have to double value time and double count

10   time.  So I suppose one could do that but it would be similarly

11   burdensome in different ways.

12   Q    And finally, Dr. Milo suggested you should be amortizing

13   the burdens associated with getting an EIC over time.

14            How do you respond to that one?

15   A    It's certainly true that corporations and public agencies

16   amortize things in their decision-making processes.  As to

17   whether people amortize bus fares and so on I'll leave to other

18   experts to opine upon but I will say that regarding amortizing

19   travel time, there's no such thing.  People don't do that.

20   When I say "people don't do that" we're just talking about what

21   people, how people behave.  Time is not -- time cannot be

22   amortized because time is actually not money.  You can monetize

23   time but that doesn't make it into money.  Time is unlike money

24   in that it is not fungible, it's perishable.  It expires every

25   minute.

1    Q    Once it's used, it's gone?

2    A    Yes.

3              **MR. ROSENBERG:**  Thank you.  Pass the witness.

4              **MR. CLAY:**  Good morning, Dr. Chatman, how are you?

5              **THE WITNESS:**  Hi, how you doing?

6              **MR. CLAY:**  Good to see you again.

7              **THE WITNESS:**  Good to see you.

8              **MR. CLAY:**  You reminded, speaking of Google phone and

9    their collecting our data, you reminded me that when we were in

10   D.C. I had meant to take Google off my phone completely and I'd

11   forgotten.  So I'm hoping I can remember it when we leave here

12   today.

13             **THE WITNESS:**  You have to turn off location services.

14             **MR. CLAY:**  That's what I need to do.

15             **THE WITNESS:**  So good luck with that but, yeah.

16             **MR. CLAY:**  It's good to see you again.  I just have a

17   few questions for you.  A lot of it is stuff that we kind of

18   talked about in D.C. a few weeks ago.

19                         **CROSS EXAMINATION**

20   **BY MR. CLAY:**

21   Q    The first is I want to talk about the data sets you used.

22   We had a long discussion about that as you'll recall, correct?

23   A    Yes.

24   Q    And you said that you used these decennial census

25   enumeration in order to populate the block groups, correct?

1  A    Right.  The decennial census is the -- when I said 2010

2  census that's what I was referring to.

3  Q    And so those -- that -- the information you were able to

4  obtain from the 2010 decennial census is voting age population

5  by race/ethnicity; is that correct?

6  A    Right.

7  Q    Okay.

8  A    And also poverty rates.

9  Q    And you would agree that that data is now over four years

10  old, correct?

11  A    Yes.

12  Q    Does that introduce -- and I think you also agree and we

13  talked about this some in your deposition -- that that

14  necessarily introduces some amount of error into the analysis;

15  is that correct?

16  A    Yes.  I mean I think it's useful to define the term

17  "error."  In statistics, the term "error" refers to "randomly

18  distributed variation perturbations" and for the most part what

19  we're -- the kind of error we're talking about throughout here

20  is precisely that sort of error.  The aggregation of those

21  sorts of errors to the state level renders them very small.  So

22  error doesn't concern me particularly.

23  Q    But you would agree that using four year old data does

24  introduce some amount of error into the analysis, correct?

25  A    Yes.

1  Q    And you -- you would also agree I think that --

2  A    Well, I should -- if I can just amend my statement there

3  just to be clear and I'm just -- and I'm only trying to be

4  clear.  It doesn't introduce error into the question of what

5  the burden would be with that population for these locations

6  which is what -- which is the analysis that I did.

7  Q    But you would agree that the 2010 census although meant to

8  be an enumeration, in other words, an exact count of the

9  population in those groups is no longer -- it is -- at this

10 point would be considered inexact, correct?

11 A    Depending on the application, yes.

12 Q    Okay.  And then in order to get other statistical

13 information regarding the block groups you went up a level or

14 two and then obtained that information from census that survey

15 data, correct?

16 A    Right.  So the census survey that you're referring to, the

17 American Community Survey, is a probability sample, one percent

18 per year, and that information is used to give us

19 characteristics that are not collected by the decennial census,

20 such as citizenship.

21 Q    And so you were able to get the citizen voting age

22 population from the census tract level using the ACF survey,

23 correct?

24 A    That's right, yes.

25 Q    And those numbers also contain a certain amount of

1    inherent or unavoidable error in them, correct?

2    A    Yes.

3    Q    Okay.  And then using that estimate you then imputed a

4    citizen voting age population to the block groups by taking a

5    proportion at the census tract level and multiplying it down to

6    the block group level, correct?

7    A    That's correct.

8    Q    And that analysis assumes that all the block groups

9    contained in the census tract look identical, correct?

10   A    It assumes only that the percentage -- it assumes two

11   things.  The first thing is it assumes that the percentage of

12   the racial ethnic group who are citizens of voting age --

13   sorry.  It assumes that of the citizens of voting age in a

14   given racial/ethnic group, the percentage who are citizens does

15   not vary block to block within the census tract.  Now census

16   tracts can contain between two and eight block groups; probably

17   average around four.  So there could be in fact -- there

18   probably is -- some variation from block group to block group.

19   I don't consider that variation material to the question of

20   average travel time.

21   Q    And you also said that that analysis, imputing race to the

22   block group level, compounds the error that is contained within

23   the census data estimate that you actually got from the census

24   tract level, correct?

25   A    Can you say that again?

1  Q    So there's error at the census tract level --

2  A    Yes.

3  Q    -- the information you're getting there.

4  A    Yes.

5  Q    And then by imputing it down you're actually compounding

the error when you compute -- when you impute it down to the

census block group level, correct?

8  A    Let me -- I think I know what you're talking about.  I

think what you're saying is and you correct me if I'm wrong,

that when you go to smaller and smaller units errors get

greater, areas of estimation get greater.

12 Q    Right.

13 A    That's true.  So --

14 Q    And you also said that you were unable to actually --

there was no generally accepted methodology for actually

calculating those errors when you're going from the census

tract level down to the block group level, correct?

18 A    That's correct and what people do instead is they don't

report errors.  It's typical that what they do is aggregate.

20 Q    And you do not report errors either, correct?

21 A    Well, I report the following which is that aggregation to

the state level renders all of the errors extremely small

because the numbers are so large at the state level.

24 Q    You also mentioned in your deposition that when a area if

rapidly growing that the one year estimate might be preferable

Chatman - Cross / By Mr. Clay                           108

1    to the five year estimate, correct?

2    A    Only if you can get a good one year estimate at a very

3    high level.  So it wouldn't be better if you were looking at a

4    small area typically.

5    Q    And I want to -- okay.  I'd like to --

6         **MR. ROSENBERG:**  Can he finish his answer?  I don't

7    think he was finished.

8         **THE WITNESS:**  So, for example, at the state level if

9    you wanted to get the very best estimate of what percentage of

10   the population owns a car and you believe that there was a big

11   policy change that was rapidly altering the rate of car

12   ownership it'd be better to look at the one estimate because,

13   number one, it's for the whole state so it's got pretty good --

14   it's going to have some error but it's not going to be too bad

15   and then, secondly, because, you know, things were probably a

16   lot different five years ago in terms of what that particular

17   thing that you're looking at.  I don't think those kinds of

18   conditions are present in this instance but --

19   Q    And you also said in your deposition that when aggregating

20   upwards which you've done in this report there's also no

21   generally accepted method for calculating error; is that

22   correct?

23   A    Yes.

24   Q    Okay.  Now I want to talk about a few of the assumptions

25   that are contained in your analysis and the first is the 8:00

1   a.m. start time but that was just for using mass transit,

2   correctly -- correct?

3   A    Right.  So start time is relevant for two of the modes,

4   driving and taking public transportation.

5   Q    And you used two different start times depending on which

6   mode, correct?

7   A    That's correct.

8   Q    And you used 8:00 a.m. for bus transit --

9   A    Right.

10  Q    -- and you used I think you said --

11  A    Three to five p.m. --

12  Q    -- three to five p.m. --

13  A    -- for the trip for auto, right.

14  Q    Have you ever driven in Austin?

15  A    Yes, I think maybe once.  I was driven.  I wasn't driving

16  myself.

17  Q    Have you ever been driven in Austin --

18  A    I have been driven.

19  Q    -- at 3:00 p.m.?

20  A    Hard to remember exactly what time.  I was there a couple

21  of times.

22  Q    Have you ever driven in Austin at 8:00 a.m.?

23  A    There's traffic.  Is that what you're getting at, 'cause

24  there's traffic, yes.

25  Q    They're very different traffics.  There's a very different

1    level of congestion at those two different times, would you

2    agree?

3    A    Oh, sure.  So let me just speak to this because maybe what

4    you're getting at is the reason why you would look at morning

5    versus afternoon.

6              In general, afternoon traffic is worse than morning

7    traffic.  I can't speak to Austin specifically or on specific

8    roads and the reason for this is because of trip chaining

9    actually.  What people do is in the morning commute they often

10   don't have time to do their errands because they don't get up

11   early enough but in the afternoon they can -- they have the

12   rest of the evening and they have to get things done to get --

13   pick people up or get their groceries.

14   Q    When you chose the 8:00 a.m. start time --

15   A    Well, the 8:00 a.m. start time is public transportation.

16   Q    I understand, I understand.

17   A    Yes.

18   Q    When you chose the 8:00 a.m. start time did you take into

19   account what time the DPS offices opened?

20   A    No, I just assumed that they would be open.

21   Q    So you don't -- then you didn't understand when you did

22   this analysis that most DPS offices open at 8:00 a.m. or

23   earlier?

24   A    It was not relevant because the reason I used 8:00 a.m. as

25   the start time was to try to make the transit time as short as

1    possible.

2    Q    And so --

3    A    And so if I had started at 7:00 a.m. I would have had a

4    larger estimate of transit.

5         **MR. CLAY:**  I'm trying to let him finish.  I thought

6    he was done.

7    Q    And you also told me at your deposition that if somebody

8    was taking transit they would leave the centroid at 8:00 a.m.,

9    correct?

10   A    There was a little bit of confusion about this.  Here's

11   how the decision rule works and, first of all, I should be very

12   clear that the decision rule doesn't play a role in excluding

13   any transit block groups.  It doesn't play a role in excluding

14   very many transit block groups from any of this analysis.  So

15   it's not all that relevant.  It is not germane to almost all

16   the analysis that I did but that sort of issue aside, the way

17   that the analysis works is that if there isn't a transit

18   vehicle arriving between 8:00 o'clock and 8:30 in the morning

19   which is the peak transit time for all transit agencies --

20   that's their market, that's their commute market -- at the

21   nearest bus stop then we assume that there is no transit access

22   for that block group but it isn't true that if the bus arrives

23   at 8:02 that I assume that they can't get to the bus.  I assume

24   that -- I work backwards and I assume that whatever walk time

25   it takes they will make it to there by 8:02.  So they will make

1   any bus occurring between 8:00 o'clock and 8:30 in the morning.

2   If there's any bus outside that window -- sorry, I should say

3   any bus beyond the 30 minute window there, then they are not --

4   they are not accessible to bus in the out rhythm.  This is

5   again for the -- this is sort of an issue of computational

6   tractability but as I said before it's a very small percentage

7   of the population that is excluded from saying that they have

8   transit access for this reason and those that would be excluded

9   for that reason would have -- probably have more than a 90

10  minute trip because of that -- in part because of the fact of

11  the wait time.

12  Q    Well, those people are assumed to not be able to catch a

13  bus simply because a bus doesn't leave between 8:00 and 8:30,

14  correct?

15  A    They are.

16  Q    Okay.

17  A    That's the case.

18  Q    And if a bus leaves at 8:29 --

19  A    They're set.

20  Q    But they leave at 8:00, correct?

21  A    Yes, they do leave at 8:00.

22  Q    And so --

23  A    Well, they leave at 8:00.  Yes, they do.

24  Q    And so --

25  A    And let me just speak to this because I -- because

1    there's, again, an industry standard thing and it's a little

2    bit sort of hard to justify because it sounds like "Well, why

3    wouldn't somebody, if they lived two minutes away, why wouldn't

4    they leave at 8:27 to make their 8:29 bus?"  And the answer to

5    this question is simple.  It has to do with how people behave

6    in terms of their understanding of schedules and in terms of

7    their willingness to forgo -- to incur risks in terms of

8    waiting because as you know the -- as you may know, the nature

9    of bus schedules, particularly irregular bus schedules or bus

10   schedules with what are called large headways, large waits, is

11   that -- is such that there is a lot of variability and risks in

12   terms of when your bus is coming.

13            So that person would have a 29 minute wait for a bus

14   if it doesn't come until 8:29.  But again, this is a very small

15   percentage of the population and in those instances when you

16   have short headways -- sorry, long headways, what it typically

17   means it's a long wait.  I'm sorry, a long overall trip anyway.

18   Q    Did you determine how many people had more than a 15

19   minute wait simply as a result --

20   A    It's in the report I think.

21   Q    Can I finish my question?

22   A    Sorry.

23   Q    -- simply as a result of your decision that they would

24   leave at 8:00 a.m.?

25   A    No, but it's a very small percentage and the report does

1    contain an average wait time which shows that it's not, not a

2    very long time.

3    Q    And you also determined that someone who lives greater

4    than a mile from the nearest bus stop and I should -- I should

5    rephrase that question.

6              You also determined that when the centroid is more

7    than a mile away from the nearest bus stop which is of course

8    different than saying when a person lives further than a mile

9    away --

10   A    It's different because it could be much more or less.

11   Q    Correct.  When they live more than a mile away you

12   determine that they simply have no access whatsoever to mass

13   transit, correct?

14   A    That's correct, but it's a small percentage of the

15   population that falls in that category.

16   Q    And there assumed to walk to the DPS, correct?

17   A    No, only if they don't have a car in their household.

18   Q    And -- correct.  And did you make any analysis whatsoever

19   regarding the possession of bikes?

20   A    No, I didn't.  That information isn't available in the

21   census but the bike share in Texas is advanishinly small.

22   Q    And you also assumed -- but that was not part of your

23   analysis in this case, correct?

24   A    Well, I looked at the secondary data for Texas.  It's a

25   very small percentage.

1  Q    And you assume that people walk at 2.2 miles per hour,

2  correct?

3  A    Yes.

4  Q    And that was a 25 percent discount over a study that was

5  done that showed that people actually walk at about a pace of 3

6  miles per hour, correct?

7  A    It was -- so, the industry standard for -- well, I keep on

8  saying "industry standard."  What I mean is that the operating

9  assumption that transit agencies and researchers use in terms

10 of people's willingness to walk is a 2.2 mile per hour walking

11 speed which results in a travel time of, you know, around 15

12 minutes for a half mile.

13 Q    But the only study you were able to cite to me in your

14 deposition in D.C. a few weeks ago was a single study which

15 showed that people averaged 3 miles per hour, not 2.2 miles per

16 hour, correct?

17 A    I wouldn't characterize that study as saying people

18 average 3 miles an hour.  I would characterize the study as

19 saying that in an indoor study to determine average walking

20 speed, walking ability, that adults were measured over a short

21 expansive floor indoors and found to average around 3.3 miles

22 per hour which isn't a -- which are not conditions similar to

23 those experienced by pedestrians in an actual urban environment

24 over longer distances.  So --

25 Q    But that is the only study that you cited to me in your

```
 1    deposition --

 2    A     That is correct.

 3    Q     -- regarding the average walk time, correct?

 4    A     Yes, yes.

 5    Q     And then you discounted that by 25 percent for your

 6    analysis, correct?

 7    A     I did two things.  I showed that discounting that by 25

 8    percent would yield the 2.2 miles per hour assumption and I

 9    noted that this is a standard that is used in the industry that

10    everybody uses including people here at the metropolitan

11    planning organizations.

12    Q     And it takes about 27 minutes to walk a mile going 2.2.

13    miles per hour, correct?

14    A     Yes.

15    Q     Are you aware that the plaintiffs in this case including

16    those represented by your client fought very hard to obtain the

17    individual level data contained in Texas's TEAM voter

18    registration database?

19    A     I wasn't aware there was a fight.

20    Q     But your analysis does not -- looks at CVAP on an

21    aggregate level, correct?

22    A     Yes.

23    Q     So it does not look at individual travel times for

24    particular individuals, correct?

25    A     Right.
```

Chatman - Cross / By Mr. Clay                    117

1  Q    And although you were provided information from

2  Dr. Ansolahehere that information was not used in your

3  analysis, correct?

4  A    I was not provided information by Ansolahehere until after

5  I had done my report.

6  Q    So your analysis did not include any analysis whatsoever

7  of the travel burdens of particular individuals; is that right?

8  A    That's correct.

9  Q    And so your analysis does not and cannot identify the

10 various travel times for anybody who is a registered voter in

11 the state of Texas, correct?

12 A    That's correct.  Well, it could actually be used for that

13 but it's not.

14 Q    And it does not identify the travel burdens for

15 individuals who are registered to vote but lack SB 14 ID,

16 correct?

17 A    Could you say that one again?  Sorry.

18 Q    It does not identify the travel burdens for individuals in

19 Texas who are registered to vote but do not have the requisite

20 ID?

21 A    Correct.

22        **MR. CLAY:**  Pass the witness.

23 //

24 //

25 //

1                        **REDIRECT EXAMINATION**

2    **BY MR. ROSENBERG:**

3    Q    Just one question, Dr. Chatman, the various tools that you

4    used, the American Census 2010, the ACS, and the various tools

5    that you used that Mr. Clay talked about, were they the best

6    tools in your opinion that were available for you to use in

7    this project?

8    A    The best data available to look at.  The question of

9    people who were eligible to vote, yes.

10              **MR. ROSENBERG:**  Thank you.  I have no further

11   questions.

12              **MR. CLAY:**  Nothing further.

13              **THE COURT:**  All right.  Thank you, sir.  You can step

14   down.  Let's go ahead and take a 15 minute break.

15        **(A recess was taken from 10:29 a.m. to 10:45 a.m.; parties**

16   **present)**

17              **MS. PEREZ:**  Good morning, your Honor.  Myrna Perez

18   for the Texas NAACP and MALC, and we are calling Dr. Lorraine

19   Minnite.

20        **(Pause; voices and whispers off the record)**

21              **THE COURT:**  Hi, ma'am.  Would you approach over here

22   and raise your right hand.

23   //

24   //

25   //

1          **LORRAINE MINNITE, PLAINTIFFS' WITNESS, SWORN**

2          **THE COURT:**  You can have a seat.

3                          **DIRECT EXAMINATION**

4    **BY MS. PEREZ:**

5    Q    Good morning, Doctor.  Will you please state your name for

6    the record?

7    A    My name is Lorraine Carol Minnite.

8    Q    And do you mind, please, spelling that for the court

9    reporter?

10   A    Lorraine, L-O-R-R-A-I-N-E, Carol, C-A-R-O-L, Minnite,

11   M-I-N-N-I-T-E.

12   Q    And what is your educational background, Dr. Minnite?

13   A    I have a bachelor's degree in history from Boston

14   University, and I have two master's degrees and a Ph.D. in

15   political science from the City University of New York.

16   Q    And where are you currently employed?

17   A    I'm currently employed at Rutgers University in Camden.

18   Q    And what is your position?

19   A    I'm an associate professor of public policy.

20   Q    And are you tenured?

21   A    Yes.

22   Q    And you have before you the report you issued in this

23   case; is that correct?

24   A    Yes.

25          **MS. PEREZ:**  And for the Court's benefit, your Honor,

1   it's Plaintiff Exhibit 773.  Please note that we initially

2   filed this under seal, but we've removed that designation with

3   no objection from the defendants.

4   **BY MS. PEREZ:**

5   Q    Dr. Minnite, is your C.V. attached to this expert report

6   in this case?

7   A    Yes.

8   Q    And since you have filed your report, have you had cause

9   to make any updates to your C.V.?

10  A    Yes.

11  Q    Would you please explain them.

12  A    After I filed the report I also filed a report in another

13  voting rights case, and that case is *North Carolina State*

14  *Conference of NAACP v McCrory*.

15  Q    Okay.  And since completing your Ph.D., has your work and

16  your research focused on any particular subject matter?

17  A    Yes.

18  Q    And what is that?

19  A    The study of voter fraud in American elections.

20  Q    Why did you decide to focus on that?

21  A    Well, my interests and my background are in American

22  history, American political history, and I focused on that

23  subject more than 10 years ago when I became interested in

24  issues of election administration following the *Bush v Gore*

25  contested presidential election in 2000, and the question about

 1  voter fraud was interesting because, although it is commonly

 2  stated that liberalizing election rules will lead to more voter

 3  fraud, it turns out political scientists hadn't really studied

 4  the question about the incidence of voter fraud in contemporary

 5  elections.  In fact, there's very little literature in the

 6  study of American politics, scholarly literature, on the

 7  subject.  So, it was a combination of, I guess, what was going

 8  on in the world at the time and also the scholarly treatment of

 9  the subject, and it also had -- so, it had a kind of public

10  policy dimension to the question.

11  Q    Thank you.  And have you published any books?

12  A    Yes.

13  Q    Will you please describe that to the Court?

14  A    Yes.  My first book was actually co-authored.  It's called

15  Keeping Down the Black Vote:  Race and Demobilization of

16  American Voters.  My second -- that was 2009.  My second book

17  is called The Myth of Voter Fraud.  It was published by Cornell

18  University Press in 2010.

19  Q    And have you done any other scholarly writing on the topic

20  of voter fraud?

21  A    Yes.

22  Q    And what example can you provide for the Court?

23  A    I can give an example from 2012.  I did a chapter in a

24  book on Law and Election Politics on voter identification and

25  voter fraud, the controversy over voter fraud.

1  Q    And have you done any popular writing on the topic of

2  voter fraud?

3  A    Yes.

4  Q    What -- can you give an example?

5  A    Sure.  By "popular," I guess, you know, you mean maybe not

6  peer reviewed and also for the popular --

7  Q    Uh-huh.

8  A    -- popular consumption.  I've done a set of reports for

9  nonprofit, nonpartisan groups.  I also recently, this year, was

10 asked to write a policy brief for the Scholars Strategy

11 Network, which is a group of academics.  I think there are now

12 close to 500.  And the goal of that project, which is run by

13 Professor Theda Skocpol at Harvard, is to try to take scholarly

14 research and present the findings in a way that are

15 understandable to -- to the public and to the press.  So, I was

16 asked to write a brief on that, a two-page brief on the

17 question of voter fraud.

18 Q    And, Dr. Minnite, have you ever testified before congress?

19 A    Yes.

20 Q    And on what topic?

21 A    On the question of voter fraud.

22 Q    And have you ever testified in court as an expert witness

23 before?

24 A    Yes.

25 Q    How many times about?

1    A     Three.

2    Q     And did you provide written testimony in addition to that

3    oral expert testimony?

4    A     Yes.

5    Q     And have you ever provided written testimony that you were

6    not an oral -- that you did not provide oral testimony for?

7    A     Yes.  Are you referring to in -- in cases?  Yes.

8    Q     And have you been accepted as an expert --

9    A     Yeah.

10   Q     -- on the topic of voter fraud before?

11   A     Yes.

12          **MS. PEREZ:**  And at this point in time, your Honor, I

13   would offer Dr. Minnite as an expert on the incidence and

14   effect of voter fraud in America.

15   **BY MS. PEREZ:**

16   Q     Dr. Minnite, will you tell -- will you explain to the

17   Court what you were asked to do in this case?

18   A     I was asked to analyze the extent and existence of voter

19   fraud nationally and also in Texas and, I guess, somewhat

20   specifically, the kind of voter fraud that would be prevented

21   by SB 14.

22   Q     And were you asked to do any research on turnout?

23   A     No.

24   Q     If I could ask you to return back to your report; did you

25   reach any conclusions in doing your analysis?

1   A     Yes.

2   Q     And what were they?

3   A     I concluded that SB 14 would likely only prevent something

4   we call "voter impersonation" at the polling place.  I

5   concluded that nationwide and in Texas the incidence of voter

6   impersonation is very, very rare.  And those were the two

7   really major conclusions.

8   Q     Okay.  And before we delve too deeply into the

9   methodology, do you mind explaining what you mean when you say

10  the term "voter fraud"?

11  A     Yes.  I want to be very specific about it, because in my

12  testimony today, when I say "voter fraud," I have a very

13  specific meaning that's -- that comes out of my academic

14  research.  And what I mean by "voter fraud" is the intentional

15  corruption of the voting or the electoral process by voters.

16  Q     And how did you reach that definition?

17  A     Well, when I started this research somewhere around 2001,

18  I didn't know very much -- I didn't know if there was voter

19  fraud or there wasn't voter fraud; I didn't really have an

20  opinion about it.  But, as I said, that was an interesting

21  question, so I began to look into the question.  And I -- I

22  looked into all of the scholarly research I could find for kind

23  of a definition.  I looked at legal definitions, and I decided

24  that since most -- all states criminalize various things that

25  people tend to think of as voter fraud, that sort of corruption

1  around elections, the participation in elections, that I would

2  follow a kind of legal definition or a legal approach to what

3  voter fraud was.  So, voter fraud is a crime; and voter fraud

4  meaning, again, the kinds of behaviors or practices that --

5  that we think of as voter fraud are criminalized in all states

6  and also, to a certain extent, in federal law.  I looked at the

7  Justice Department's treatment of the subject, but, again,

8  there was no definition; there's no sort of statute in any

9  state law that says voter fraud.  It might say voting twice is

10  illegal; but we think of that as voter fraud.  So, I had to, in

11  a sense, derive a definition, and I tried to do it carefully

12  and paying attention to both how we think about it, but then

13  how it's defined in law and how scholars also have treated it.

14  Q    So, can you explain for the Court any distinction you make

15  between voter fraud and election fraud?

16  A    Yes.  I think I would say that election fraud would be the

17  broad category of various kinds of practices that cause illegal

18  ballots to be cast or manipulating the count or what we think

19  of as stuffing the ballot box, those sorts of terms.  So, in

20  general, election fraud could include fraud and corruption of

21  the process by campaign workers or by election officials.

22  Voting fraud -- or voter fraud focuses very specifically on the

23  voter as the actor in committing the crime.  So, it's, in a

24  sense, a subset of election fraud.

25  Q    Okay.  And can you please explain the methodology you used

1    to reach the conclusion in your report?

2    A    Yes.  First I relied very heavily on all of the research

3    that I've done since 2001 and that is reported in my 2010 book,

4    The Myth of Voter Fraud.  I relied on all of that as a

5    foundation and a basis for then turning specifically to look at

6    the question in Texas.  And, as I was saying, not only was

7    there no good definition in the literature, really even in the

8    law, and yet the popular treatment is -- is -- you know, kind

9    of speaks to our colorful political history in the United

10   States, there are also no datasets.  There are no places you

11   can turn to say -- if you wanted to just figure out how many

12   convictions, for example, are there for some -- for voter

13   fraud, you can't answer that question without going through

14   this process.

15          So, the methodology involved looking for it

16   absolutely everywhere I could, in any way that I could.  So,

17   that meant both doing -- doing case studies -- and, again,

18   I'm -- I'm talking about the research that is the foundation of

19   my book that I'm basing the Texas report on, and then I'll

20   speak very briefly about specifically what I did for the Texas

21   report, but I want to just explain what the foundation is

22   because it really was a tremendous amount of work.  It meant

23   doing case studies, archival research, interviews; there is a

24   limited dataset that collects all of the indictments brought in

25   federal court on an annual basis, and I track through that in

1    very tedious detail in an appendix in my book.  It meant

2    looking at court records and news analysis.  And I should

3    really have started with that, because that is how I began the

4    research, and that is what I then did for this analysis in the

5    report for Texas.

6                I began with scanning -- using a database of sources

7    in Texas, Texas newspapers primarily and other on-line news

8    sources, web-based news sources.  It's called NewsBank or

9    Access World News.  I had access to that database, and I went

10   back to 2000, and I scanned that database using "vote fraud,"

11   "voter fraud," "election fraud," and that produced something

12   like 3,200 hits.  I then scanned all of that and determined

13   that there maybe were about 700 articles that were actually

14   about the subject, because I got a lot of extraneous material

15   when I did the broad scanning, but that -- but looking at the

16   news analysis, the reason that I did that is because we have

17   something that we use in sociology called "event analysis."

18   And what I did wasn't exactly event analysis, but the theory of

19   it is really what is important.  That is, when you have no

20   other sources, you can look at news reports if the conflict or

21   the thing -- sorry, the phenomenon you're looking for is likely

22   to be newsworthy.  And I assume that allegations about voter

23   fraud are newsworthy.  So, I did that analysis for the Texas

24   report as well, very specifically, a Texas newspaper database.

25   I scanned that going back to 2000, and then I looked at other

1    documents.

2          I looked at documents that were provided to me by the

3    counsel in this -- this case from discovery and also from

4    discovery from the Section 5 case, *Texas v Holder*.  I looked at

5    a file that was provided to me from a researcher who worked for

6    the Texas Legislative Council and who had been tasked to report

7    on, research voter fraud in Texas.  I looked at other kinds of

8    background materials.  I looked at referrals that I actually

9    had obtained back in 2006 when I sent public records requests

10   to every secretary of state and every attorney general in the

11   United States asking for just numbers on voter fraud, and at

12   that time I had received from the Texas secretary of state a

13   box of documents that were referrals from the Texas secretary

14   of state's office to the state attorney general's office.  I

15   looked at press releases that were on the website for the state

16   attorney general.  I looked at the Texas election code, which,

17   as you all know, is, I think, 900 pages long.  I can't -- I

18   don't profess to say that I actually read the whole thing, but

19   I focused on SB 14 as well and looked at bill analysis that was

20   provided by the Senate Research Center on the Texas

21   legislature's website.

22   Q    Okay.  And is this called a "mixed method analysis"?

23   A    It would be.  It means that you -- looking at qualitative

24   and quantitative data.

25   Q    And is a mixed method analysis generally accepted

1   methodology in the social sciences?

2   A     Yes.

3   Q     And before we get to what you discovered after looking at

4   these resources, you have read SB 14?

5   A     Yes.

6   Q     And are you a lawyer?

7   A     No.

8   Q     So, you're not offering your legal opinion on the law, but

9   in your reading of the law and as a political scientist, what

10  is your understanding of what the law does?

11  A     My understanding of the law is that it requires certain

12  limited forms of photo identification issued by government,

13  current, to vote in Texas.

14  Q     And is there any kind of voter fraud that SB 14 could

15  prevent?

16  A     Well, thinking this through, it made sense to me that it

17  could possibly prevent someone presenting themselves as someone

18  they're not to cast a vote.  So, again, the definition of voter

19  impersonation at the polls, at the polling place.

20  Q     Okay.  And, so, if you look on page four of your report,

21  you reached a conclusion, am I correct, that between 2000 and

22  2010 there were fewer than 10 credible claims of impersonation

23  fraud at the polling places nationwide?

24  A     Yes.

25  Q     And how did you reach this conclusion?

1   A    Well, the period 2000 to 2010, in addition to other

2   periods, but that period, is covered in all of the extensive

3   research I did for that book, and I -- in that research I had

4   only come up with, I think, one case of voter impersonation in

5   New Hampshire involving a young man pretending to be his

6   father.  So, I knew that there were fewer than 10 from that

7   research, but I looked again carefully, and after I published

8   my book, there was a major research project undertaken by

9   journalism students at the -- at Arizona State University, and

10  they published it on line.  It's called News21.  I actually

11  presented a seminar on methodology to them via Skype on how to

12  research the question of voter fraud.  And they did more than I

13  could do, because I think there were about 10 of them; they

14  sent public records requests, again, to every state and state

15  officials and then categorized what they got back, and they did

16  interviews as well, but all of this is available on line.  You

17  can search by state.  And I searched their database by state,

18  and there were fewer -- fewer than ten -- ten or fewer that

19  they found.  And, actually, some of the ones they found I

20  wouldn't -- I wouldn't have called voter impersonation.  But

21  it's -- I'm perfectly comfortable saying fewer than 10

22  nationwide.

23  Q    And did you look at indictments as one of your indicators?

24  A    Both for The Myth of Voter Fraud and for Texas I looked at

25  the data based on indictments.

1    Q    And why did you use -- why did you look at indictments?

2    A    Well, it wasn't the only thing that I looked at, but I --

3    in the course of my research, again, I -- again, research for

4    the book -- you have to have a way of sorting through the

5    allegations to figure out what's factual.  And, as a social

6    scientist, I want to base my research on the evidence.  And,

7    so, the -- in a sense, the involvement of law enforcement or

8    election officials, even with allegations or indictments, even

9    though they haven't turned into convictions, I take that very

10   seriously.  So, in that case, indictments can stand as a solid

11   foundation for judging the incidence number, the measurement

12   problem.

13   Q    And, so, can you elaborate on why you thought -- why you

14   thought these particular claims that you saw were credible,

15   credible incidences?

16   A    Yes; again, the issue has -- of voter fraud has really

17   come to the fore over, you know, I would say since the 2000

18   election, although it's -- it appears episodically whenever

19   there are major initiatives to try to liberalize access to

20   voting.  You know, for example, it was actually raised in

21   debates around the Voting Rights Act, but it's sort of episodic

22   in the public's -- in the public discourse.  So, the

23   credibility of an allegation has to -- or comes from whether,

24   in fact, officials take it seriously; because anyone can accuse

25   anyone of anything else and they -- you can put out a press

1  release, and if a journalist doesn't check on that and simply

2  reports the allegation, it could be false.  And voter fraud is

3  a very politicized issue.  It's not uncommon in an election for

4  someone who loses an election to believe that the only way they

5  could have lost is if fraud was committed, especially if

6  there's -- if it's a very small margin in the election.

7            So, I wanted to try to figure out how am I going to

8  sort through all of these allegations.  And, in fact, I

9  undertook for my book a very, very laborious -- it took me all

10 summer, working with two students -- a very laborious process

11 to sort through allegations that had been compiled by an

12 organization called the American Center for Voting Rights.

13 They put forth a report saying:  This is the most comprehensive

14 report on voter fraud in the 2004 election.  It was a big, fat

15 report.  And I took every single one of those allegations and

16 tried to trace down what actually happened here.  And I -- I

17 found, you know, the vast majority of them are not voter fraud.

18 So, the credibility issue speaks to was there -- was it taken

19 seriously by anyone in an official capacity as an election

20 official or as a law enforcement official, because that said to

21 me there had to be some evidence for the allegation.  And,

22 again, as a social scientist, I'm trying to find the physical

23 evidence, the actual evidence, so that I can measure voter

24 fraud.

25 Q    And you've spoken about the nationwide research you did

1   for your book, and I just want to make sure it's not lost, the

2   Texas specific research that you did.  Can you go over that, as

3   well, please?

4   A     Sure.  Again, it was the news analysis, the documents that

5   were provided to me through -- that came from discovery that

6   were provided by lawyers for both this case and for the *Texas v*

7   *Holder* case that I -- that the lawyers felt were relevant; for

8   example, the deposition of Major Forrest Mitchell would be

9   something like that.  The data I already had on Texas when I --

10  I looked and I attempted to collect data on Texas twice, in

11  2002 and in 2006, and in 2006 I had been sent this box of

12  referrals that went to the attorney general; the press

13  releases, which I take to be official statements of the Texas

14  attorney general on the website concerning the investigations

15  around voter fraud, and then the Texas Election Code and SB 14.

16  Q     Okay.  And why do you believe the sources you used provide

17  a reliable indicator of the level of impersonation fraud at the

18  polls in Texas?

19  A     Well, I believe it's reliable because it's a crime, and I

20  took the spreadsheets that were presented -- or prepared, I

21  should say -- by, for example, Major Mitchell that were part of

22  his deposition.  That's a very good example.  I mean, this is a

23  person who works in law enforcement, who's keeping records of

24  what happens to referrals that are made from the secretary of

25  state's office or from local prosecutors, keeping a spreadsheet

1    itemizing each referral that had turned into an investigation,

2    and then tracking the status of that.  That is a kind of

3    official document that makes me feel confident that the

4    conclusions I'm drawing about the rare incidence of voter fraud

5    is reliable.

6    Q    Okay.  And --

7    A    I just want to say one other thing.  I mean, part of the

8    mixed methods approach is that you don't assume that any one

9    source of data is definitive, that all sources of data are

10   going to have certain kinds of limitations.  So, in a sense,

11   what you're trying to do by looking, basically, under every

12   rock and in every corner, in every way you think there would be

13   an impact, so I've got to look here for it, is that you're, in

14   a sense, triangulating the data.  You're bringing all of the

15   pieces together, and when they all align, then you have a more

16   solid basis for drawing your conclusions.  If I had only relied

17   on newspaper accounts, I think that would be a weak -- you

18   know, kind of a weak basis for drawing a reliable conclusion.

19   But I didn't do that.  I tried to look -- in the limited time I

20   had to look at Texas for this case, I tried to look in the best

21   places I thought I would find that, based, again, on my

22   experience and working on the issue for so long.

23   Q    Okay.  And can you tell the Court how many credible claims

24   of in-person impersonation fraud at the polls you found in

25   Texas from 2000 to the present?

Minnite - Direct / By Ms. Perez                              135

1   A    Yes; I focused just on four.  There were four cases.

2   Q    Okay.  And how many credible claims of voter impersonation

3   fraud did you find between 2000 and 2011 when SB 14 was

4   enacted?

5   A    Two of the four, I believe, kind of came after the

6   legislation had been signed into law.

7   Q    Okay.  And since you have submitted --

8           THE COURT:  I'm sorry.  Just repeat that real

9   quickly.

10          THE WITNESS:  Yeah.

11          THE COURT:  You said there were four from 2000 to two

12  thousand -- to the present?  And then the two came in where?

13  Or just clear that up a little bit.

14          THE WITNESS:  Sure.  From 2000 till 2012 -- or no.

15  From 2000 until current, sorry, I said four.

16          THE COURT:  Okay.  I got it.

17          THE WITNESS:  Uh-huh.  And two of them came after

18  2011.

19          MS. PEREZ:  And --

20          THE WITNESS:  Or in 2011, but later.

21  BY MS. PEREZ:

22  Q    Since you've been asked -- since you've submitted your

23  expert report, have you been asked to view any other documents?

24  A    Yes.

25  Q    And what were they?

1  A    I received some documents that had -- all these were

2  provided by lawyers and that had been, I believe, documents

3  from the Justice Department; although that was a little hard

4  for me to figure out what those documents exactly were, but

5  they looked like tables of cases with a lot of information

6  redacted.  I also looked at -- I believe, again, was the

7  deposition of Major Mitchell.

8  Q    A recent deposition of Major Mitchell?

9  A    Yes.

10 Q    And after having reviewed these materials, do they inspire

11 you to make any changes to your report?

12 A    No.

13 Q    Okay.  In your report, did you calculate a fraction or a

14 percentage of how many votes in Texas cast from 2000 to the

15 present were cast by a voter impersonating another voter?

16 A    No.

17 Q    Why were you comfortable calling the amount of in-person

18 impersonation fraud very rare?

19 A    Well, I think if you consider how many votes are cast in

20 Texas between 2000 and 2012 -- and I don't have the exact

21 number, but it's certainly well into the millions -- to have

22 only four cases emerge would mean to me it's very rare.

23 Q    Okay.  And of the four incidents of voter fraud you

24 identified, would any of them have been prevented by SB 14?

25 A    It's not clear that that would be the case, because one of

1    them involved a woman who had obtained a fake driver's license

2    or a driver's license which had her picture on it but not her

3    name.  So, she had at least two or three -- I think Major

4    Mitchell testified to this.  She had two or three different

5    driver's licenses that had her face on them.  So, if she, then,

6    used her fake identity but her real face, SB -- I don't see how

7    SB 14 would have stopped that.

8    Q     Based on your research, do you find that the public has a

9    misconception that there is more voter fraud taking place than

10   it actually is?

11   A     Yes.

12   Q     And why do you think that misconception exists?

13   A     Again, because the issue is -- is so of great interest to

14   the public, we want to believe that our elections truly reflect

15   the will of the voter and that are free of corruption.  So,

16   it's a very, very important issue that there not be any voter

17   fraud.  So, the public pays some attention to that issue, but

18   also because what is at stake is a political contest usually,

19   and that creates conflict, and that generates media, and it's

20   certainly been -- it's actually remarkable, to me, how this

21   issue has had, as they say, "legs" for so long, because when I

22   started working on it, I would get one puzzled look after

23   another from my colleagues in my field asking me why was I

24   wasting my time on that; that didn't -- didn't seem to be an

25   issue, and it also didn't seem to be of great interest.  So, it

1    is really something that is so -- has become so -- there are so

2    many stakes involved, I think, and the public is interested in

3    it.  That means that there has to be accuracy in the reporting

4    on it.

5              And the reporting, again, over this course of the

6    last 13 years, has gotten much better, but in the beginning I

7    could trace directly a press release that would be issued by a

8    political actor into a news story without any checking, without

9    any verification, just repeating allegations over and over and

10   over again.  And with the internet, these things get picked up

11   and they're repeated over and over and over again.  So, if you

12   keep saying there's a lot of voter fraud, people might believe

13   it.  They -- they don't know what to think.  They hear elected

14   officials or they hear people who they think have authority and

15   knowledge on the issue, and they think, okay, generally that's

16   probably the case.  And I think also the cynicism around

17   politics means that people are open to the idea that there's

18   corruption.

19             Again, as a social scientist, I had to drive through

20   that, and I -- I had to define the terms that I was going to

21   use precisely, and they had to -- there had to be a sort of

22   conceptual rationale for it so that I could try to actually

23   measure it.  That was the interesting challenge, to me, was to

24   try to actually measure the incidence of voter fraud.  But, to

25   answer your question -- I'm sorry for being so longwinded on

1   it -- is that I think it's just been an issue in the news and

2   it's of interest to people, but the -- the accuracy of the

3   claims is very, very questionable a lot of the time.

4   Q    And do you think there was accurate information before the

5   Texas legislature as to the numbers of in-person impersonation

6   fraud before 2011, before SB 14 was passed?

7   A    I'm sorry; could you say that again?

8   Q    Do you think there was accurate information about how much

9   in-person impersonation fraud was available to the -- before

10  the state legislature?

11  A    I don't know, because I didn't study the full process for

12  the state legislature as they were going through their

13  deliberations on it, and I know that the issue had come up in

14  the state legislature several times before 2011, but I would

15  be -- with respect to just the general -- what was in the

16  public discourse, I would think that the -- the interest would

17  be in figuring out what the reliability of the claims were.

18  So, I don't know specifically what they had in front of them

19  when they were deliberating, but, in general, I think the

20  public thinks there is more fraud than there is, so it might be

21  reasonable to assume that state legislators might have assumed

22  that, but then they -- they needed to look at the evidence of

23  it.  And there is such a gap.  There is such a gap between what

24  people think and what the data actually show.

25  Q    And what do you think is the role of leaders like state

1   legislatures in unpacking some of this gap?

2   A    Well, I -- I -- I mean, this is something that concerns

3   me, because I have watched the deliberations around addressing,

4   allegedly addressing voter fraud in other states as well, and

5   I -- I don't feel that the issue has been given enough serious

6   rational debate.  So I think the role for leaders and

7   politicians in the debate is to really get at the facts and

8   report them accurately to the public, so that the public has a

9   good understanding of what's at stake and what the issues are.

10          I don't -- I don't think, you know, we take a press

11  release and sort of run with that.  I think you want to dig

12  into it and -- and discover the facts, and then educate people,

13  if there is a misconception, you know, where the misconception

14  has come through with the media attention, for example, educate

15  them about what the actual facts are.  And I know that that

16  hasn't happened very well because it's enormously difficult to

17  get this data.  I sent public records requests, as I said, to

18  every Secretary of State, State Attorney General.  I had states

19  tell me, "We don't have to tell you because you're not a

20  citizen of Pennsylvania."  The data isn't there, and there

21  seems to be a lack of, you know, interest in looking into the

22  issue and reporting accurately on it.

23  Q    At the top of Page 15 of your report you say that, "A

24  great deal of voter fraud can be attributed to mischief."  What

25  do you -- what do you mean by that?

1  A     There are isolated incidents that have made it into the

2  press because they're humorous, I suppose, but there seem to be

3  quite isolated incidences where people who want to make a

4  political statement about how easy it is, in their mind, to

5  corrupt the registration process, or pranksters who are drunk,

6  perhaps, I don't know, but, you know, we have this stories of

7  dogs and puppets getting registered to vote.

8  Q     And would this kind of mischief be prevented by SB 14?

9  A     Well, people are going to do these things sometimes if

10 they're, in my opinion, sort of stupid about it, but would it

11 prevent it in terms of the puppet showing up to vote and then

12 having to show the ID.?  I mean, in the case I cite here, I

13 don't exactly know how the puppet was registered, but somebody

14 would have to come in and say, you know, "I'm Yippy, the

15 puppet, and here's my -- my ID."  I guess it would prevent it

16 in that respect.

17 Q     Would SB 14 stop clerical errors?

18 A     No.

19 Q     Would SB 14 stop vote buying?

20 A     No.

21 Q     Would SB 14 stop voter intimidation?

22 A     No.

23 Q     Would SB 14 stop intentional double voting?

24 A     No.  If we mean by double voting, what we've seen, which

25 is that where there have been cases, people have either been

1   confused or, I know of one case of a man who believed he was

2   allowed to cast two votes in two different states because he

3   owned property in both states, but he did it in his own name.

4   So I don't know of cases, except for the one I cited earlier in

5   Texas, with the woman who had the two -- the fake ID.  And in

6   that case SB 14 wouldn't have prevented that.

7   Q    And would SB 14 stop absentee ballot manipulation?

8   A    No.

9   Q    Would SB 14 stop voting machine errors?

10  A    No.

11  Q    If the goal of SB was to deter voter fraud, do you believe

12  that it was an effective policy response?

13  A    No, because I don't -- you know, we could take SB 14 all

14  by itself out of context, with all the other things that we --

15  checks that we have to prevent voter fraud, I don't think any

16  of us want any voter fraud at all, but we have checks in place.

17  So SB 14 doesn't add anything, in my opinion, to what we

18  already have in place.  If it were -- if it were the only thing

19  that we had in place, it could be a way of identifying voters,

20  and there were no other ways that we checked on identity,

21  perhaps, but that's a hypothetical scenario that doesn't exist.

22  Q    And if the goal was to increase the integrity of the

23  electoral system, do you believe SB 14 is an effective policy

24  response?

25  A    No.

1          **MS. PEREZ:**  Pass the witness.

2                    **CROSS EXAMINATION**

3    BY MR. CLAY:

4    Q    Good morning, Dr. Minnite.  How are you?

5    A    Good morning.

6    Q    Do you have a copy of your report up there?

7    A    Yes.

8    Q    Okay.  Then I will set this aside.

9          **MR. CLAY:**  Can I get the ELMO on, please?

10   Q    I got your book.

11   A    Okay.

12   Q    And I even -- and I even read some of it.  I've got some

13   tabs here we're going to go over.  I did find one -- I did find

14   at least one typo, though.

15   A    Oh, there are probably more than one.

16   Q    I think -- I think Morgan Kousser's name is spelled with

17   an O, isn't it?

18   A    You know what?  I'm going to have to try to -- I guess I

19   can look at it here.

20   Q    Yeah.

21   A    I have a problem where, you know, I can't see anything.

22   So I have two different pairs of glasses, but I -- I think if I

23   look at it here I'll -- that's okay.  Yeah, that's actually

24   misspelled.

25   Q    Yeah.

1    A    Yeah.  That -- that's a University Press, too.  So, what

2    can we say?

3    Q    We'll blame them.

4    A    We will blame them.  I -- I didn't do that.

5    Q    Okay.  The reason I know that is because he's testified

6    against the State in -- in several redistricting trials.  Are

7    you aware of that?

8    A    I'm aware that he has testified in a lot of redistricting

9    trials.  I don't know about the -- the Texas.

10   Q    And I also see that Mr. Chandler Davidson did a book with

11   you previous; is that right?

12   A    Yes.

13   Q    Are you aware that he's been retained in this case as an

14   expert?

15   A    Yes.

16   Q    Are you aware that he testified in front of the

17   legislature against passage of voter ID.?

18   A    No.  I would say I was very, very pleased that the

19   publisher had approached them because, in my opinion, they --

20   they are the leading scholars in the field that would be

21   relevant to the subject of that book.

22   Q    Well, you know a couple of other experts very well in this

23   case also, don't you?  You filed an amicus against Indiana's --

24   that's not very clear, is it?  Do you see this -- can you see

25   the bottom one?

1  A    Yes.

2  Q    You filed an amicus against the Indiana -- Indiana's voter

3  ID. law in the State Supreme Court that was coauthored by Matt

4  Barreto and Gabriel Ramon Sanchez; is that right?

5  A    Yes.

6  Q    In your report you -- at least this is my words, not

7  yours, so if I'm misstating it, please correct me -- you

8  essentially say that the absence of evidence of voter fraud is

9  evidence of the absence of voter fraud; is that right?

10 A    I hope I don't say that that way.  I -- I think what

11 you're getting at is -- maybe we could find exactly how I say

12 it?  Do you have it there?  I don't remember it.

13 Q    I think I do.  How about Page 12, you say, "It is simply

14 illogical to argue that a lack of evidence that a phenomenon is

15 occurring means it is widespread"?

16 A    Yes.

17 Q    Okay.

18 A    It's above the line that's underlined there.

19 Q    Yes.

20      **MR. CLAY:**  Keep it up there for …

21 Q    And one of the comparisons that you draw is between voter

22 fraud and other types of fraud in your report, correct?

23 A    Yes.

24 Q    And you mention, in terms of criminal charges in Federal

25 Courts you list a whole bunch of various types of fraud up

1   there.  And the one I'm kind of interested in right now is the

2   tax evasion, because it seems pretty low.

3   A    Yes.  That was very upsetting to see how low that number

4   is.  That's for one year, fiscal year 2005.

5   Q    Wouldn't you be glad that it's low?

6   A    Depends on whether you think that there's a lot of it, I

7   guess.

8   Q    Yeah.  So -- so you would agree then that not all tax

9   evasion is brought as a criminal charge in Federal Court,

10  correct?

11  A    I think so.  This is a -- this is just a data set of -- of

12  federal indictments.

13  Q    So it's possible and, indeed, likely, that there are many

14  more cases of tax evasion that are occurring that go unnoticed,

15  correct?

16  A    I'm sure there are other cases, yes.

17  Q    And that is true, despite the fact that the IRS has a

18  division solely devoted to the enforcement of the tax laws,

19  correct?

20  A    I assume they do.  I don't know exactly how they're

21  organized.

22         **MR. CLAY:**  Would you put up the IRS memo?

23      **(Pause)**

24         **MR. CLAY:**  Can we zoom in on the title of this?

25  Q    This is the Treasury Inspector General for Tax

1   Administration memorandum that is -- the highlights are, "There

2   are billions of dollars in undetected tax refunds which are

3   resulting from identity theft."

4          **MR. CLAY:**  Would you scroll down to the passage

5   that …

6   Q    And here's kind of a summary of the findings.  For the

7   processing year of 2011, the IRS reported that it has detected

8   938,664 tax returns involving identity theft and prevented the

9   issuance of federal tax refunds totaling 6.5 billion, which is

10  a pretty big number.  But what they also found was, they

11  identified approximately another 1.5 million additional

12  undetected tax returns with potentially fraudulent tax refunds

13  totaling in excess of 5.2 billion.  So, in other words, what

14  they were actually able to prevent and detect initially,

15  without going back and doing an audit, was less than a tenth of

16  the actual amount of fraud that was occurring.  Do you see

17  that?

18  A    You mean the 938,000?  I'm a little --

19  Q    Yes.

20  A    -- confused about which numbers you're putting together

21  there.

22  Q    I'm sorry.  Less than two-thirds of the actual amount of

23  fraud, the actual amount of known fraudulent actions that were

24  taking place?

25  A    Oh, I see.  So you're -- you're taking 938,000 out of

1   1.5 --

2   Q    Correct.

3   A    -- million.

4   Q    Were you aware --

5   A    Well, that's additional to what they -- you'd have to add

6   those two numbers.

7   Q    You're right.  My math is not very good.

8   A    Okay.  Mine, too.  But …

9   Q    But there's -- but there's many more instances of fraud

10  that occurred that were able to be identified and prevented,

11  correct?

12  A    Yes.

13  Q    Okay.  And in your book --

14       **MR. CLAY:**  And I'll switch back to the ELMO, if you

15  don't mind.

16  Q    In your book you mention that, "When considering the

17  National Voter Registration Act, there was some testimony from

18  a Deborah Phillips"; do you recall that footnote there?  It's

19  Footnote 39.

20  A    Yes.

21  Q    And she says that, "Prosecutors do not like election fraud

22  cases because they take precious resources from strained

23  budgets needed for more serious crimes."  Do you see that?

24  A    Yes.

25  Q    And you also said that in this case you reviewed Forrest

1    Mitchell's testimony, correct?

2    A    Yes.  I reviewed depositions and also his testimony at the

3    2012 trial.

4    Q    And the Court's going to hear his testimony later today,

5    but you're aware that he testified -- you're aware that he has

6    been prosecuting voter fraud for quite some time, correct?

7    A    My understanding is that he's been doing that for maybe

8    less than ten years, but …

9    Q    And so you're -- so you're also aware that he testified

10   that, "Voter fraud is extremely hard to detect," correct?

11   A    Yes.

12   Q    Okay.  And you're also -- may or may not -- are you aware

13   that another expert in this case, a Mr. Buck Wood, testified

14   that, "Oftentimes voter fraud cases were not prosecuted due to

15   budgetary and resource constraints"?

16   A    No, I'm not aware of his testimony.

17   Q    And that was before the legislature, when they were

18   considering a voter ID. bill.  And you're not aware of that?

19   A    I -- I don't remember it, if I read it, but I -- I don't

20   think -- I've heard that before.  So …

21   Q    So based upon all this information, you still maintain the

22   conclusion that voter fraud is:  one, not hard to detect; and

23   two, there's not more of it than what you've found?

24   A    No.  I don't think I said it was -- it wasn't hard to

25   detect, but -- and I -- and I think with all criminal justice

1   statistics, we know with all of that reporting there's some

2   amount of unreported crime that doesn't make it into those

3   official statistics, but I guess my point in doing the

4   comparisons with the other kinds of fraud was simply to show

5   that it is detected.  And if we were only capturing, let's say

6   in the case here in Texas, let's say four cases, and actually

7   one of them was questionable because the person wasn't

8   competent to stand trial, but let's say four cases between 2000

9   and 2012, what do we want to multiply it for?  What do we think

10  we're missing?

11          If we're missing -- if we're missing -- we're only

12  capturing half of it; that means there's eight cases.  So that

13  doesn't change my opinion that it's still rare.  If we're

14  capturing -- if it's only capturing 10 percent of what's out

15  there, what's that number?

16  Q    But is --

17  A    It's still very, very small.  So I --

18  Q    But you --

19  A    I thought about that.  I thought, what am I missing?

20  Q    But you don't know how much we're missing, correct?

21  A    I don't have a precise number.

22  Q    Okay.  And you mentioned earlier in your testimony that

23  you had a chance to look at some information from the -- that

24  was provided by the Department of Justice; is that correct?

25  A    Yes.

1  Q    And that information was given to you after your report in

2  this case, correct?

3  A    Yes.

4  Q    Was -- was that information -- did it appear to be

5  spreadsheets, spreadsheet printouts from various databases?

6  A    It was in the format of a spreadsheet, you know, rows and

7  columns.  I don't know where it came from, though.

8         **MR. CLAY:**  Zoom it out here, so we can get a full

9  picture.

10 Q    Does that look about right?  Does that look like what you

11 looked at?

12 A    Yeah.  I mean, I actually -- both places, and I think if I

13 change I won't be able to see it either, but it does look like

14 it.

15 Q    Here, I'll zoom in on the top, if that will help.

16 A    Okay.  Yeah.  Right, that would be helpful.

17        **(Pause)**

18 A    Yes, that does look like what I looked at.  There were

19 multiple pages with somewhat different headings.

20 Q    And you said it didn't change your opinion in this case,

21 correct?

22 A    Correct.

23 Q    Were you able to identify what -- do you know what this

24 chart section means?

25 A    It's -- it's related to -- it's actually one of the

1   charges that I tracked when I did my analysis of the data from

2   the Administrative Office of U.S. Courts.  I used -- they do

3   the same thing, they -- they code indictments and charges in a

4   similar way.  And this one -- I don't remember off the top of

5   my head exactly, but it refers to Section -- Title 42, I don't

6   know if I'm using the terminology correctly, 17 -- 1973i(c).

7   Q    So, I'm -- I'm just talking generally.

8   A    Oh.

9   Q    This appears to be the statutory section under which the

10  charge is brought, correct?

11  A    Yes.

12  Q    And for these highlighted portions it's 42 USC 1973i(c),

13  is that right?

14  A    Yes.

15  Q    And that's the section that is used to prosecute voter

16  impersonation, correct?

17  A    I don't remember the -- the numbers.  I mean, if you had

18  it in the statute I could see that, but I don't remember the --

19  I don't remember all of the various statutory numbers.

20  Q    So -- so you're not sure what this section means?

21  A    I know it's related to election fraud.

22  Q    So then just by looking at this spreadsheet you are not

23  aware whether or not these cases that are highlighted here, and

24  this is just one -- one of many sheets, has anything to do with

25  voter impersonation or not, correct?

Minnite - Cross / By Mr. Clay                    153

1  A    I'm not certain.  Again, I -- I don't think the federal

2  government calls it voter impersonation either in the statute

3  as it's written.  I guess I could be wrong, but I don't think

4  so.  It's usually illegal voting of some kind, like double

5  voting or voting by someone who's ineligible.

6  Q    Thank you.

7       **(Pause)**

8  Q    Yes.  You'll see this is Federal Prosecution of Election

9  Offenses, seventh edition, May 2007.  It was written by Craig

10 Donsanto, the director of the Election Crimes Branch, in the

11 Public Integrity Section, and Nancy L. Simmons, senior counsel

12 for policy in the Public Integrity Section.  Do you see that?

13 A    Yes.

14      **MR. CLAY:**  And can we look at Page, is it 41?

15 Q    You'll see that, "The false information provision of

16 Section 1973i(c) prohibits any person who furnishes materially

17 false data to an election official to establish eligibility to

18 register to vote."  Do you see that?

19 A    Yes.

20      **MR. CLAY:**  And could we go to the -- zoom in on the

21 third paragraph, please?

22 Q    "On the other hand, where the false data is furnished to

23 poll officials for the purpose of enabling a voter to cast a

24 ballot in a particular election, as when one voter attempts to

25 impersonate another, it must be shown that a federal candidate

Minnite - Cross / By Mr. Clay                    154

1   was being voted upon at the time." So you would agree, then,

2   that that section is, in fact, used to prosecute voter

3   impersonation, correct?

4   A     It -- it might be, if it were a federal election.

5   Q     And so when you reviewed these spreadsheets, you didn't

6   take any effort to try to uncover whether or not those cases

7   that were being prosecuted under this section were, in fact,

8   voter impersonation cases, correct?

9   A     Well, I -- I didn't have hardly any time to look at it.

10  And it was -- the material was very confusing to me because a

11  lot of it was redacted. I saw the charge there, and I actually

12  tried to match up this material to the document that I spoke

13  about in the deposition and also relied upon in my book which

14  was from the Ballot Access and Voting Integrity Initiative of

15  the Justice Department where indictments were made.

16        So I tried to see, well, were the -- were the people

17  on that list from 2002 to 2005, were any of them on the Justice

18  Department documents here that you're showing me. And I found

19  a couple of them, but I didn't really have the time or the

20  resources to try to interpret this information. I didn't

21  have -- nobody -- nobody explained to me -- I know it came from

22  the Justice Department, but where it came from. So I didn't --

23  I -- I saw, you know, I looked at it, but it doesn't change my

24  opinion in my report.

25  Q     Well, could you tell me whether or not -- so, long story

1   short, you don't know whether those cases being prosecuted

2   under 1973i(c) are cases of voter impersonation or not,

3   correct?

4   A    I don't know.  I think it could include a person providing

5   a false address.

6   Q    Okay.  I'd like to talk a little bit about your definition

7   of voter fraud.

8        **MR. CLAY:**  Could you put up the (indiscernible)

9   story?  No, I'm sorry.  Let's -- let's do the "code for votes"

10  story.

11  Q    So, I can't blame you for not looking at this before your

12  report came out, because it's just dated a few days ago,

13  September 1st, 2014, but this is the type of thing you would

14  have looked at, correct, in doing your report, a newspaper

15  article of this sort?

16  A    Yes.

17  Q    Okay.  And you'll notice that the -- if you could take a

18  minute just to look at it --

19  A    Okay.

20  Q    -- and I'll ask you a couple questions about it.

21       **(Pause)**

22  A    Okay.  I've read what you have up there.

23  Q    Okay.  And so, essentially, you'd agree that this is a

24  vote buying scheme that gets caught, correct?

25  A    That's what it looks like.

1  Q    Okay.  And would that be included in your definition of

2  voter fraud?

3  A    No.

4  Q    Okay.  And --

5  A    Well, let me -- let me just clarify that.

6  Q    Well, I mean, for the purposes of your report, this is not

7  not included in the definition of voter fraud, correct?

8  A    Right.

9  Q    Okay.  And do you know whether, from looking at this

10 story, whether or not the voters that were bought, whether they

11 were registered to vote?

12 A    No, I don't know from looking at the story.

13 Q    Do you know whether they were eligible to vote?

14 A    No.

15 Q    Okay.  So, in other words, this story, this newspaper

16 story is a fairly incomplete picture, correct?

17 A    Yes.

18 Q    Okay.  And a vote buying scheme could have fraudulent

19 votes on the other end, correct?

20 A    It could.

21        **MR. CLAY:**  Could you put the Wes with that story?

22 **BY MR. CLAY:**

23 Q    Now this is one you did look at, correct?

24 A    I think so.  I think so by the date and also -- is it Wes

25 -- I don't know how to pronounce that but.

Minnite - Cross / By Mr. Clay                    157

1   Q    Weslaco.

2   A    Weslaco.  It looks for familiar.

3   Q    Do you know the total number of votes that were

4   disqualified in this case?

5   A    Well it says here the judge rejected 11 ballots which were

6   undetermined in which candidate they supported.  Based on

7   testimony from voters the judge subtracted illegal votes from

8   the totals of both sides.

9   Q    So you --

10  A    So I don't know.  You know, I would want to look at this

11  more carefully but right there it's not clear to me exactly how

12  many.--

13  Q    But it's not clear how many votes this election contest

14  ultimately ruled were illegal, correct?

15  A    What you're showing me right there, no.

16  Q    And it's also not clear from this story why those votes

17  were ruled to be illegal, correct?

18  A    They were illegal.  There could be different reasons for

19  why they were illegal.

20  Q    And it could have been voter impersonation, correct?

21  A    Could be.

22  Q    So let's talk about another type of fraud that -- it's

23  unclear to me whether or not you consider it to be voter fraud

24  at least as far as this report is concerned and that's voter

25  registration fraud.  And I think, correct me if I'm wrong, that

1   the answer depends, correct?

2   A    Well, I was asked as I said earlier to analyze the

3   existence and extent of voter fraud and specifically fraud that

4   would be prevented by SB 14 so I was focusing on for the Texas

5   report, paying special attention, not exclusive but special

6   attention to fraud committed in the casting of ballots at the

7   polling place.  I have certainly included voter registration

8   fraud generally in my definition in other work.

9   Q    So for instance in this book you list at the back several

10  instances of voter registration fraud conducted by

11  organizations like Acorn, right?

12  A    I include the cases that were in those indictments that I

13  report on that were brought by the Federal Government between

14  2002 and 2005 under their special program focusing on voter

15  fraud and voter intimidation.  I think there were one or two of

16  those 95 indictments were what we would call voter registration

17  fraud.

18  Q    Just one or two?

19  A    I think so in the 95 -- in the 95 indictments.

20  Q    And do you know how many fraudulent ballots -- I'm sorry,

21  registrations that those two cases included?

22  A    I don't recall.

23  Q    Okay.  Do you know if Yippy ever voted?

24  A    I would assume that if Yippy voted it would have made it

25  into the news.

1   Q    But you're not sure if he did?

2   A    I don't -- didn't look at the records.  And that case went

3   back to 1987.

4   Q    Are you aware that during testimony before the legislature

5   on voter ID there was concerns raised by witnesses and

6   legislators alike regarding the potential connection and

7   correlation between voter registration fraud and fraudulent

8   ballots?

9   A    I think I recall that but that is also a common concern.

10  Q    So although SB 14 would not prevent voter registration

11  fraud is it fair to say that it might deter it?

12  A    No.

13  Q    Why not?

14  A    Well, in my study of this where there have been fraudulent

15  ballots -- I'm sorry, fraudulent registrations submitted,

16  there's almost no connection to the vote itself, to the

17  election.  But what's happened is when groups doing big voter

18  registration drives hire lots and lots of people and they don't

19  have enough supervision there have been cases where people have

20  submitted fraudulent applications to try to show that they are

21  doing the work that they're getting paid for as canvassers.  So

22  the intent of much of the voter registration fraud that I

23  looked at has been more, almost as if these workers are kind of

24  ripping of their employer.  And I don't -- I can -- I don't

25  know if I can think of any cases in which a fraudulent

Minnite - Cross / By Mr. Clay                    160

1    registration turned into a fraudulent vote.  So they're almost

2    like two different kinds of fraud that aren't connected very

3    tightly in terms of motivation or affect.

4    Q    But you agree that the possibility to cast fraudulent

5    ballots could be connected to voter registration fraud,

6    correct?

7    A    It's possible.

8    Q    Do you know what Project Vote is?

9    A    Yes.

10   Q    And they were a partner and subsidiary with Acorn back

11   when Acorn was still around, correct?

12   A    For a period of time.

13   Q    And they also have been caught up in some voter

14   registration scandals, correct?

15   A    Not Project Vote, no.

16   Q    They haven't?

17   A    No.

18           **MR. CLAY:**  Could you bring up the August, 2011

19   report?

20           **MR. SPEAKER:**  February or March?

21           **MR. CLAY:**  February.  Yeah, I think so.  Can you

22   scroll down?  Let's see if I put page numbers in here.  It is

23   page 12.  Can you zoom in right here, please?  No, that's not

24   it.  I'm sorry.  Go to page 50.

25   //

Minnite - Cross / By Mr. Clay                          161

1   BY MR. CLAY:

2   Q    I apologize.

3   A    Okay.

4        MR. CLAY:  To you too, your Honor.  I'm sorry.

5   Q    We'll move on.  And you've testified on behalf of Acorn,

6   correct?

7   A    I was a fact witness in a case in which they were

8   plaintiffs.

9   Q    And you also were on the Board of Directors of Project

10  Vote, correct?

11  A    Yes, for one year.

12  Q    Are you still connected with Project Vote?

13  A    No.

14  Q    Okay.  And you told me at your deposition that you needed

15  to be unbiased and objective in doing this analysis for this

16  case, correct?

17  A    Yes.

18       MR. CLAY:  Could you put up the Erickson mini D?

19  Q    You wrote an article with a Mr. Erickson, correct?

20  A    Yes.

21  Q    What year was this?

22  A    This was published in 2009.

23  Q    And the basic gist of this article was that turnout data

24  regarding the effective turnout with defect of voter ID laws on

25  turnouts was inclusive, correct?

```
 1   A     Yes.

 2              MR. CLAY:  Could you show the ...

 3   Q     In that article despite that conclusion you said in 2009

 4   "it should be evident that our sympathies lie with the

 5   plaintiffs in the voter ID cases."  Is that right?

 6   A     Yes.

 7              MR. CLAY:  Pass the witness.

 8                       CROSS EXAMINATION

 9   BY MS. BALDWIN:

10   Q     Good morning, Dr. Minnite.  My name is Anna Baldwin and I

11   represent the United States.  I just have a couple of questions

12   I'd like to ask you.  Earlier Mr. Clay asked you some questions

13   based on a chart from the United States about whether certain

14   cases and charges filed by the United States might involve

15   voter impersonation.  I'd like to show you a document that's

16   been filed with this Court at ECF Number 390-2.

17              MS. BALDWIN:  If we could pull that on the screen and

18   if we could fold in on the top half.

19   BY MS. BALDWIN:

20   Q     Could you read the title of that document for me,

21   Dr. Minnite.

22   A     Declaration of Richard C. Pilger.

23   Q     Uh-huh.  And the next few lines.

24   A     Director, Elections Crimes Branch, Public Integrity

25   Section, Criminal Division, United States Department of
```

Minnite - Cross / By Ms. Baldwin          163

1    Justice.

2    Q    Great.

3         **MS. BALDWIN:**  And if we could go to the second page

4    of this document, please.  And could we scroll in just at the

5    last line in the signature block?  And above it, I'm sorry, so

6    we can see the date.

7    **BY MS. BALDWIN:**

8    Q    And do you see that this is a sworn statement that was

9    executed by Mr. Pilger on July 3rd, 2014?

10   A    Yes.

11   Q    Okay.

12        **MS. BALDWIN:**  If we could up to paragraph five,

13   please.

14   **BY MS. BALDWIN:**

15   Q    I'm going to read you paragraph five and ask a question.

16   "To the best of my knowledge from March 2010 to the present the

17   Public Integrity Section has neither investigated nor consulted

18   in any cases of election fraud through in person voter

19   impersonation, i.e. the use of the name of another person to

20   obtain and vote a ballot while physically present at the polls

21   that have proceeded beyond a preliminary inquiry anywhere in

22   the United States including the State of Texas."  Do you have

23   any reason to question the accuracy of this sworn statement

24   that was made as of July 3rd of this year?

25   A    No.

1        **MS. BALDWIN:**  Let's go to this next paragraph,

2   paragraph six.

3    **BY MS. BALDWIN:**

4   Q    "To the best of my knowledge upon a review by myself and

5   other DOJ staff of information from the automated case tracking

6   system of the Criminal Division of DOJ and of certain

7   publically available and related court records there have been

8   no apparent cases of in person voter impersonation, i.e. use of

9   the name of another person to obtain and vote a ballot while

10  physically present at the polls charged by the Criminal

11  Division of DOJ anywhere in the United States including the

12  State of Texas from 2004 to the present."  Do you have any

13  reason to question the accuracy of this sworn statement in

14  paragraph six that was made as of July 3rd, 2014?

15  A    No.

16       **MS. BALDWIN:**  Okay.  And let's last look at paragraph

17  seven.  "To the best of my knowledge upon a review by myself

18  and other DOJ staff of information from the legal information

19  office network system maintained by the Executive Office for

20  United States Attorneys of DOJ and of certain publically

21  available and related court records there have been no apparent

22  cases of in person voter impersonation, i.e. the use of the

23  name of another person to obtain and vote a ballot while

24  physically present at the polls charged by the United States

25  Attorney's Office anywhere in the United States including the

1   State of Texas from 2004 to the present."  And Dr. Minnite, do

2   you have any reason to question the accuracy of this statement

3   made in paragraph seven that was sworn as of July 3rd, 2014?

4   A     No.

5   Q     Thank you.

6                        **REDIRECT EXAMINATION**

7   **BY MS. PEREZ:**

8   Q     Just a few questions, Dr. Minnite.  Will you again explain

9   for the Court a mix method analysis?

10  A     Mix method analysis basically means combining qualitative

11  quantitative research.

12  Q     And so that involves looking at multiple sources.

13  A     Yes.

14  Q     And so you would not find any one source of incidents of

15  say tax evasion to be definitive as to the extent of tax

16  evasion?

17  A     Correct.

18  Q     And when one is doing a mix method analysis one looks at a

19  bunch of different kinds of data sets right before reaching a

20  conclusion?

21  A     Or data sources.  It could include what I think of data

22  sets would be quantitative data but yes, multiple sources of

23  data.

24  Q     And so at this point do you feel comfortable that you

25  looked at all of the sources that are available to be able to

1  make an appropriate and scientifically reliable conclusion that

2  the incidents of in person impersonation fraud in Texas is

3  very, very rare?

4  A    Yes.

5                       **RECROSS EXAMINATION**

6  **BY MR. CLAY:**

7  Q    Just a couple more questions, Dr. Minnite.  Based upon the

8  declaration that you just had read to you do you -- is it clear

9  to you whether or not Mr. Pilger looked at anything other than

10 those spreadsheets that you and I looked at?

11 A    I think -- I don't know.  I mean I assume the spreadsheets

12 were part of reporting summary statistics from the other things

13 that he looked at.

14 Q    But that declaration doesn't make it clear whether he

15 looked at anything other than those spreadsheets, correct?

16 A    Well I actually wouldn't assume that he looked at the

17 spreadsheets.  I think he might have produced the spreadsheets

18 or produced the data that were put in the spreadsheets so I'm

19 not sure but.

20 Q    Well, he said he looked at information from the data

21 bases.  Generally that would come in the form of a print off

22 like this, correct?

23 A    Not necessarily.  It could be a lot of paper records

24 associated with cases.

25 Q    Despite your aligned interest in your -- counsel's aligned

1    interest with the Department of Justice you were not provided

2    any additional information other than these spreadsheets in

3    order to conduct your analysis in this case, correct?

4    A    From the Department of Justice?  Yes, that's correct.

5            **MR. CLAY:**  Nothing further, your Honor.

6            **THE COURT:**  Anything -- is that all?

7            All right, ma'am.  You can step down.  Let's go ahead

8    and recess for lunch.  If you'll return at 1:05 and you can be

9    excused.

10       **(A recess was taken from 12:02:10 p.m. to 1:03 p.m.;**

11   **parties present**

12           **MR. DUNBAR:**  Your Honor, Kelly Dunbar.  And we'll be

13   doing reading of Major Forrest Mitchell's deposition

14   designation.

15           **THE COURT:**  Okay.

16           **MR. DUNBAR:**  May I approach with a copy for the

17   Court?

18           **THE COURT:**  Yes.

19           **MR. DUNBAR:**  And your Honor, for the record I'll be

20   reading from Mr. Mitchell's Section 5 testimony followed by his

21   2014 deposition.  And I'll note when we make that transition.

22           **THE COURT:**  Okay.

23   //

24   //

25   //

1      **EXAMINATION OF FORREST MITCHELL BY EXCERPTS**

2            **OF DEPOSITION TESTIMONY**

3    **(QUESTIONS READ BY MR. DUNBAR; ANSWERS READ BY MS. FARANSSO)**

4          "QUESTION:  Can you introduce yourself to the Court,

5          please?

6          "ANSWER:  Yes.  My name is Forrest Andrew Mitchell

7          and I am a major with the law enforcement division of

8          the Attorney General's Office for the State of Texas.

9          "QUESTION:  Can you tell the Court what it is that

10         the Special Investigations Unit does?

11         "ANSWER:  Yes.  The Special Investigations Unit is a

12         team of --or has teams of investigators that conduct

13         criminal investigations in a wide variety of areas.

14         Some of these areas include money laundering, human

15         trafficking, public integrity, white collar crime,

16         and elections violations.

17         "QUESTION:  And how do you refer to that subgroup of

18         the SIU?

19         "ANSWER:  We refer to them as the elections team.

20         "QUESTION:  Now, what are the type of Election Code

21         violations that the election team investigates?

22         "ANSWER:   It would be illegal voting and other

23         violations of the Texas Election Code, or Penal Code

24         offenses surrounding elections.

25         "QUESTION:  Are all election violation referrals to

1            the Office of the Attorney General typically routed

2            to the SIU office?

3            "ANSWER:  Yes, sir.

4            **THE COURT:**  Hold on.

5            **REPORTER:**  I'm sorry, I don't mean to interrupt.  But

6    can she announce her name for the record so we can get an

7    accurate record, please?

8            **MS. FARANSSO:**  Yes.  It's Tania Faransso.

9            **MS. SPEAKER:**  Thank you.

10           **THE COURT:**  She's reading the depo, right?

11           **MR. DUNBAR:**  I'll start that question again.

12           "QUESTION:  Are all election violation referrals to

13           the Office of Attorney General typically routed to

14           the SIU office?

15           "ANSWER:  Yes, sir.

16           "QUESTION:  And do you keep track of all election

17           violation cases that are referred to your office?

18           "ANSWER:  Yes, sir, I do.

19           "QUESTION:  And how do you do that?

20           "ANSWER:  I maintain an Excel spreadsheet which is

21           divided into three books. The first book would be all

22           of the Election Code referrals that come into our

23           office; and the second book would be the prosecutions

24           resolved; and then the third book of the spreadsheet

25           would be the charges pending.

Mitchell / by excerpts of Deposition                170

1       "QUESTION:  Very quickly, you started in response to

2       Mr. Sweeten's questions, you said there were six

3       cases of voter impersonation.  But just to make sure

4       we all know what we're talking about, one was Ponce,

5       which was an absentee ballot case, right?

6       "ANSWER:  That is correct, sir.

7       "QUESTION:  One of them was Ms. Almanza, the mother

8       who, herself, didn't try to impersonate anyone,

9       right?

10      "ANSWER:  No, sir, she was charged as a party to the

11      offense of illegal voter.

12      "QUESTION:  Right.  But that's one of your five?

13      "ANSWER:  Yes, sir.

14      "QUESTION:  But again, so we're really dealing with

15      four allegations of individual people who went to a

16      polling booth, supposedly -- I'll get to two more --

17      and tried to impersonate someone else, not five;

18      isn't that correct?  Because Mrs. Almanza didn't do

19      that.

20      "ANSWER:  That's correct.

21      "QUESTION:  Then of the four, we have Ms. McMillan,

22      who was the election worker herself, who kind of

23      cooked the books before the polls opened, right?

24      "ANSWER:  Yes, sir, that's correct.

25      "QUESTION:  So then we're down to three.  And the

Mitchell / by excerpts of Deposition                    171

1    other one, M.C. we've been calling her, is a woman

2    who has been declared mentally incompetent and used

3    photo IDs that she had to identify herself at the

4    polling place.  So she didn't try to impersonate

5    anyone but herself, right?

6    "ANSWER:  She used multiple identities, including her

7    deceased sister.

8    "QUESTION:  But they were all photo IDs with her

9    photo on it, correct?

10   "ANSWER:  I'm not sure which type of document she

11   used at the polling place.  She had driver's license

12   and she also had voter registration certificates and

13   all the different identities.

14   "QUESTION:  But sitting here today, you can't say one

15   way or the other.

16   "ANSWER:  No, sir.

17   "QUESTION:  Then we're down to two, Crowder and

18   Mr. Almanza, correct?

19   "ANSWER:  Yes, sir.

20   "QUESTION:  And that's over ten years from 2002 to

21   2011, two people whom you're saying might have been

22   prevented from impersonating someone else by SB 14's

23   photo ID requirements, right?

24   "ANSWER:  These are the two cases of the cases that

25   have been referred to our office.

1        "QUESTION:  Just because a crime may be difficult to

2        detect doesn't necessarily mean that people are

3        committing it; isn't that correct?

4        "ANSWER:  I would agree.

5        "QUESTION:  And in fact, in-person voter

6        impersonation in the polling booth is a crime that,

7        by definition, is committed in broad daylight in

8        front of people, right?

9        "ANSWER:  In-person voter impersonation would be in

10        front of somebody, that's correct."

11        **MR. DUNBAR:**  And your Honor, we'll now be shifting to

12    the 2014 deposition.

13        "QUESTION:  I want to switch topics a little bit and

14        talk a little bit more about the nuts and bolts of

15        what SIU does and how they've done it since 2012.

16        "Can you describe to me how alleged Election Code

17        violations get referred to SIU?

18        "ANSWER:  There are a number of different ways they

19        may be referred to the Attorney General's Office.

20        Probably the largest portion of cases are direct

21        referrals from the Elections Division of the

22        Secretary of State's Office.  A portion of the cases

23        could be direct referrals from a district or a county

24        attorney in any of the jurisdictions in Texas or it

25        could be a referral from another law enforcement

1       agency such as a Sheriff's Department, the Texas

2       Rangers, FBI, any type of organization, any kind of

3       law enforcement organization.  And then finally, some

4       of the referrals that we receive are from elections

5       administrators themselves.

6       "UESTION:  All right, Major Mitchell.  We're still

7       talking about the Prosecution's resolved portion of

8       your spreadsheet, and we've identified the

9       17 different cases since your last deposition.  Of

10      those 17 how many involved charges of in-person voter

11      impersonation?

12      "ANSWER:  There's only one case that specifically

13      illegal voting, voter impersonation, was charged and

14      convicted.

15      "QUESTION:  And that's Mr. Almanza; is that correct?

16      "ANSWER:  Yes, sir.  Lorenzo Antonio Almanza, Jr.

17      "QUESTION:  And what can you tell me about that case?

18      "ANSWER:  I believe I testified in the --in my trial

19      and in the deposition, that the facts and the

20      circumstances of that case were Lorenzo Antonio

21      Almanza presented himself at the Progreso School

22      District election and utilized his brother's voter

23      registration certificate.  His brother, at the

24      time -- I believe his name was Orlando Almanza -- was

25      in custody in San Antonio in the state penitentiary

Mitchell / by excerpts of Deposition                        174

1          when that election occurred, and that Lorenzo used

2          his voter registration certificate to vote a second

3          time in that election.

4          "QUESTION:  But a poll watcher recognized him and

5          knew that was not the case, correct?

6          "ANSWER:  Correct.

7          "QUESTION:  Put differently, you were able to

8          investigate and prosecute Mr. Almanza for what he did

9          without an SB 14 photo identification requirement in

10         effect, correct?

11         "ANSWER:  Yes, sir, because we had a witness who was

12         able to positively identify the suspect.

13         "QUESTION:  And in your -- has there been a change in

14         the number of Election Code referrals that have come

15         to the -- that have come to the attention of SIU

16         since SB 14 became effective in July of 2013?

17         "ANSWER:  No.  There has been no -- no significant

18         change in the amount of referrals.

19         "QUESTION:  So I should clarify.  SB 14's photo ID

20         requirements don't apply to early voting through an

21         absentee ballot; is that correct??

22         "ANSWER:  That's correct.

23         "QUESTION:  So if I'm someone who is really intent,

24         say, on using a dead person's voter registration to

25         vote, even after SB 14's photo ID requirements were

Mitchell / by excerpts of Deposition                    175

1      in effect, I could do so just through an absentee

2      ballot, correct?

3      "ANSWER:  There is one way to impersonate a voter is

4      through mail-in ballot fraud.

5      "QUESTION:  Right.  And SB 14's photo ID requirement

6      doesn't address that problem, correct?

7      "ANSWER:  No.

8      "QUESTION:  So if I -- again, if I were someone who

9      really wanted to cast a dead person's vote after

10     SB 14's photo ID requirements, I might decide not to

11     go to the polling place, but I could do so through

12     absentee ballot fraud; is that correct?

13     "ANSWER:  That is correct.

14     "QUESTION:  And SB 14's photo ID requirements don't

15     do anything to address the other range of Election

16     Code violations other than in-person voter

17     impersonation; is that correct?  Well, does SB 14's

18     photo ID requirement do anything to address a problem

19     with voter coercion?

20     "ANSWER:  Not to my knowledge.

21     "QUESTION:  Or vote buying?

22     "ANSWER:  No, sir.

23     "QUESTION:  My question then in a hypothetical sense,

24     if you're a group that really wants to affect an

25     election outcome after SB 14, doing so through

1     in-person voter fraud is arguably harder, correct?

2     "ANSWER:  I believe so.  Yes, sir.

3     "QUESTION:  That's the intent of the law, correct?

4     "ANSWER:  I believe it is much more difficult.

5     "QUESTION:  But that same group that wanted to affect

6     an election outcome could attempt to achieve that

7     same result through a variety of other types of

8     election fraud such as vote buying, vote coercion,

9     correct?

10    "ANSWER:  I believe that mail-in ballot fraud is

11    still a means by which a person could affect voter

12    impersonation.

13    "QUESTION:  Outside the contents of absentee ballot

14    voting there are other things that this group that

15    really wants to affect an election outcome could

16    engage in such as pressuring voters to vote in a

17    certain way or buying votes, correct?

18    "ANSWER:  I believe that those are other ways that a

19    person can commit a criminal offense associated with

20    elections.

21    "QUESTION:  And SB 14's photo ID requirements --

22    requirement doesn't do anything to stop that -- those

23    types of voter fraud, correct?

24    "ANSWER:  Not specifically the photo requirement, no.

25    "QUESTION:  Okay, thank you.  And Mr. Mitchell, are

1          you aware that the penalties for voter impersonation

2          fraud in Texas is a prison sentence of 2 to 20 years

3          and up to a $10,000 fine?

4          "ANSWER:  Illegal voting, yes, ma'am.  Is a second-

5          degree felony, yes, ma'am."

6      **MR. DUNBAR:**  No further questions.

7      **THE COURT:**  Okay.

8      **MR. SCOTT:**  Your Honor, we're reserving our reading

9  in our case-in-chief.

10      **THE COURT:**  All right.

11      **MR. BARON:**  Our next witness is Mr. Korbel, your

12  Honor.  I'm going to just step outside and grab him.

13      **(Pause)**

14      **MR. BARON:**  Good afternoon.  I'm Neil Baron for the

15  Veasey LULAC Plaintiffs, and I'm calling George Korbel.

16      **THE COURT:**  Good afternoon.  Would you raise --

17      **THE WITNESS:**  Good afternoon, Judge.

18      **THE COURT:**  Would you raise your right hand?

19       **GEORGE KORBEL, PLAINTIFFS' WITNESS, SWORN**

20      **THE CLERK:**  Please be seated.

21                      **DIRECT EXAMINATION**

22  BY MR. BARON:

23  Q    Are you ready to proceed, Mr. Korbel?

24  A    Yes.

25  Q    Even though everyone in the courtroom knows your name, go

Korbel - Direct / By Mr. Baron                    178

1   ahead and state it for our record anyway.

2   A    George Korbel, K-o-r-b-e-l.

3   Q    And where do you reside, sir?

4   A    San Antonio, Texas.

5   Q    And what is your profession?

6   A    I'm an attorney.  Retired attorney maybe I should say.

7   Q    Can you briefly describe your educational background?

8   A    I have a bachelor's degree from St. John's University in

9   Minnesota and a law degree from the University of Minnesota in

10  1968.

11  Q    Have you worked as a lawyer on Texas election law cases?

12  A    Yes.

13  Q    Was one of those cases *White v Register*?

14  A    Yes, that's correct.

15  Q    Okay.  We'll come back and talk about that a little later.

16       Have you also testified as an expert witness in

17  various Texas Voting Rights Act cases?

18  A    I have, yes.

19  Q    Do you have an estimate of how many times you've testified

20  as an expert witness in state or federal court?

21  A    I was trying to count them up -- out, and I think it's

22  either 18 or 19.

23  Q    Have you been --

24  A    In voting issues.

25  Q    Yes, sir.  Eighteen or 19, is that what you said?

1  A    That's correct, yes.

2  Q    And have you been qualified as an expert by federal and

3  state courts before on Voting Rights Act and election law

4  matters?

5  A    Yes.

6  Q    How many times?

7  A    Eighteen or 19.

8  Q    Can you name some of the cases you've testified on?

9  A    Well, most recently was *Perez versus Perry,* which is the

10  State House and the congressional redistricting.  And we've

11  tried that -- we've tried those now three times or four times

12  if you deal with the issues in the three-judge court in the

13  District of Columbia.  So I was qualified on stipulation in

14  each one of those.

15          And then *Davis versus Perry,* both at the three-judge

16  court district level here in San Antonio -- over in San Antonio

17  and at the three-judge court level in the District of Columbia.

18  Q    Have federal state courts agreed with your findings and

19  analysis in cases?

20  A    Usually, yes.

21  Q    Have those findings been cited in any cases?

22  A    Yes, they have.

23  Q    Do you have any examples?

24  A    I've been cited by several district courts.  And by my

25  testimony I've given or articles that I've written I've been

Korbel - Direct / By Mr. Baron                    180

1   cited by the U.S. Supreme Court on four occasions.

2          **MR. BARON:**  Can you bring up his report, Exhibit 771,

3   at Page 41 I showed you, please?

4   Q    You included a quote from one of your cases that you

5   testified as an expert in --

6   A    Yes.

7   Q    -- in your report?

8   A    Yes.

9   Q    Makes a reference to you being a recognized voting rights

10  expert on non-statistical analysis of elections?

11  A    Yes.

12  Q    So you're here to testify today about some non-statistical

13  matters?

14  A    Non-statistical matters, yes.

15  Q    I imagine everybody will be happy to hear that.

16         **(Laughter)**

17         Before we move on, you have worked for some of the

18  lawyers in this case before?

19  A    I have.

20  Q    Including myself?

21  A    Yes.

22  Q    Chad Dunn, Jose Garza?

23  A    Yes.

24  Q    And Rolando Rios?

25  A    Yes.  And I've also been on the other side of Jose Garza

1  and Chad Dunn.

2  Q    Okay.  And you've been at this I guess about 45 years now?

3  A    Well, 44, yes.

4  Q    That's about 45.

5  A    That's about 45.

6  Q    And have you testified during those years in support of

7  election law matters, including redistricting both for and

8  against Democrats and Republicans?

9  A    Yes.

10  Q    And I guess prior to 2000 any of the redistricting plans

11  you would have been dealing with would have been Democratic

12  plans?

13  A    Yes, yes.  There were these Hispanic and Black Plaintiffs

14  were on the side of the Republicans through the time the

15  Republicans took over, and then they ended up on the side of

16  the Democrats.

17  Q    Have you ever worked for the State of Texas in an election

18  law case?

19  A    I was a consulting expert for the State in 1995, I think.

20  Q    How about for and against Texas, County and local

21  municipalities?

22  A    Well, I have a business in which I do redistricting for

23  jurisdictions.  And so we represent -- in the process of doing

24  the redistricting represent a number of jurisdictions.  I think

25  we did 70 or so in 2000.  And I also have represented the City

Korbel - Direct / By Mr. Baron                           182

1    of San Antonio, defended them in an election issue case.

2    Q    Have you testified before the State House and Senate on

3    election law and redistricting matters?

4    A    Yes, I have.

5    Q    How many time?

6    A    Dozens.

7    Q    How about before the United States Congress and Senate?

8    A    Yes.

9    Q    Did you testify before the United States Congress when the

10   Voting Rights Act was extended to Texas?

11   A    Yes.

12   Q    That was in 1975?

13   A    1975, yes.

14   Q    Can you briefly explain what happened?

15   A    Congress extended the -- Congress extended the Act to

16   Texas by determining that, in effect, English only elections

17   were a test or a device which was excluding Hispanics from

18   participating in the process.

19   Q    Did you also testify when the Voting Rights Act was

20   re-upped for Texas in 1982?

21   A    Eighty-two, yes.

22   Q    Has the state of Texas ever contested your expert

23   qualifications in any case you've participated in?

24   A    No.

25   Q    What's your hourly rate in this case?

Korbel - Direct / By Mr. Baron                              183

1   A      Three hundred and fifty dollars testifying.

2   Q      And the method of payment?

3   A      I have a retainer of $10,000.

4   Q      And that was paid by the Veasey LULAC team?

5   A      Yes.

6   Q      And your report is Exhibit 771 in the record.  You

7   prepared that report for this case?

8   A      Yes.

9   Q      Along with a number of appendices?

10  A      Yes.

11  Q      Are parts of your report and portions of those appendices

12  similar to other reports you've prepared?

13  A      Yes, they're -- we're litigating or the Plaintiffs,

14  certain Defendants are litigating in the State House in the

15  congressional case and in this case and the issues -- the facts

16  are all the same, of course.  So we've cut and pasted back and

17  forth.

18          **MR. BARON:**  I'm going to tender Mr. Korbel as an

19  expert on the history of discrimination, racially polarized

20  voting in the state of Texas, your Honor.

21          And I'm going to ask Tim if you would bring up the --

22  Page 33, 34 from *LULAC v Perry*.

23  Q      What were you asked to do in this case, Mr. Korbel?

24  A      In *LULAC versus Perry*?

25  Q      No, sir.  In this case.

Korbel - Direct / By Mr. Baron                    184

1   A    Oh, in this case.  I was asked to look at the history of

2   discrimination in the state and also initially to look at the

3   time, the logistical problems that one would have in getting an

4   election identification certificate or a ID, voter ID.  And I

5   was also asked to look at the number of cases where the courts

6   have found racially polarized voting and mostly in the history

7   and the problems with education and economics and what we

8   normally call the Gingles factors.

9   Q    Okay.  And I'll make you define that in a second.  But

10  before I do since I'm showing this, are you familiar with this

11  quote from *LULAC v. Perry* where Justice Kennedy mentions that

12  changes to District 23 undermine the progress of a racial group

13  that's been subject to significant voting related

14  discrimination?

15  A    Yes, I'm familiar with that.  I have that on the wall in

16  my office.

17  Q    Okay.  And it goes on to talk about how the district court

18  recognized the long history of discrimination against Latinos

19  and Blacks in Texas?

20  A    That's correct.

21  Q    So what's the significance of an analysis of the history

22  of voter -- of the history of discrimination in a Voting Rights

23  Act case like this brought under Section 2?

24  A    Well, it gives some indication of the level of

25  discrimination and the level of antipathy between the races and

Korbel - Direct / By Mr. Baron                    185

1    the ethnic groups.

2    Q    You mentioned *White v Register.*

3    A    Yes.

4    Q    What role did you play in that case?

5    A    I was -- that case was filed in -- on the day before

6    Thanksgiving and we went to trial on New Year's Eve.  So it was

7    a very short fuse.  And by stipulation of the State they

8    allowed me to testify to some of the factual issues and be a

9    lawyer in the case at the same time.  Not the lead lawyer at

10   that point for the Hispanics but one of the lawyers.

11   Q    What was historically significant about *White v Register*

12   such that it ends up in *LULAC v Perry* some almost 40 years

13   later?

14   A    Well, *White versus Register* as far as the state of Texas

15   is concerned is significant because at that time nobody in

16   Texas lived in a city council or school district that had

17   single-member districts.  They were all at-large.  And none of

18   the people who lived in our urban areas lived in single-member

19   districts so that there was this massive amount of dilution of

20   minority votes because of the at-large elections.  And this is

21   the first case in which the Supreme Court found that multi-

22   member districts or at-large elections could be

23   unconstitutional and was unconstitutional.

24   Q    And subsequent to *White v Register* there was a kind of a

25   long tail to that case?

Korbel - Direct / By Mr. Baron                    186

1   A    Yes.

2   Q    Do you want to give us the short version of that, *Reader's*

3   *Digest* version as they say?

4   A    Well, starting in the Twenties through the Fifties there

5   were a number of Texas laws that were found to be

6   unconstitutional in which they initially excluded African

7   Americans from voting in the Democratic primary and then

8   permitted the Democratic party to exclude them.

9   Q    Let me interrupt you there.

10  A    Sure.

11  Q    We're going to come to that.  What I'm talking about is

12  after *White v Register*.

13  A    Oh.

14  Q    Were there additional cases that came out of *White v*

15  *Register*?

16  A    Yes.  *White versus Register* has six parts, four on the

17  merits and two on the fees.

18  Q    The *Reader's Digest* version, now remember.

19  A    Yes.  The first part of the case dealt with Dallas and

20  Bexar County.  And the State initially indicated it would agree

21  that all of the at-large elections in Texas were -- in the

22  legislative districts were illegal if we won in Dallas and

23  Bexar.  And we won in Dallas and Bexar and they changed their

24  mind.  So we ended up litigating in all of the rest of the

25  urban areas that were electing representatives at large.

1  Q    And that was *Graves versus Barnes*?

2  A    *Graves versus Barnes,* one, two, three and four.

3  Q    Outcome of those cases?

4  A    Well, we were successful in all those cases.

5  Q    And those took place during the Seventies?

6  A    During the Seventies, yes.  Actually, through the mid

7  Seventies.

8  Q    And that was when the Voting Rights Act was also applied

9  to Texas for the first time?

10 A    Yes.  Well, the vote -- the effort to extend the Voting

11 Rights Act to Texas was really part and parcel of the end of

12 *White versus Register.*

13 Q    Were there other election procedures in Texas during the

14 Fifties, Sixties and Seventies that were also found

15 unconstitutional by federal courts based on discrimination?

16 A    Yes.  There was this whole history of the White primary,

17 which then devolved into the poll tax and --

18 Q    Okay.  What happened with the poll tax?

19 A    In the Twenty-Fourth Amendment in 1960 it was sent over to

20 the states in 1962, and it made poll tax in federal elections

21 unconstitutional.  And it was the thirty-eighth state that

22 approved it in '64, so it became a constitutional amendment in

23 1964.

24 Q    And what was the Texas legislative response to that?

25 A    What they did was they passed the bill providing for Texas

Korbel - Direct / By Mr. Baron                    188

1   to have two ballots so that you would vote one ballot if you

2   didn't have a poll tax for the federal government and another

3   ballot for the state government for the state if you had a poll

4   tax.

5   Q    So you still had to pay a poll tax for state elections.

6   A    You had to pay for the state elections but not for the

7   federal elections.

8   Q    And what happened to that little technique?

9   A    Well, it actually never went into effect because in 1965

10  the Voting Rights Act was passed originally, and that

11  authorized the Attorney General to bring suit against all the

12  states that had poll taxes.  Texas was one of them and in *Texas*

13  *versus the United States* it was declared unconstitutional.

14  Q    Then what did the legislature do?

15  A    They adopted a annual voter registration procedure where

16  you would register to vote several months before an election

17  and then you could vote in that election.  And then when the

18  next election came along, you had to register to vote again.

19  So the court found that that was an even worse problem than was

20  the poll tax.  And that was stricken.

21  Q    How long did it take to finally shake the poll tax out of

22  Texas politics?

23  A    Well, as soon as the -- as soon as the Supreme Court

24  decided the Virginia case, which was dispositive of the Texas

25  case, that did away with the poll tax.  Was in the early

Korbel - Direct / By Mr. Baron                    189

1   Seventies, mid Seventies -- early Seventies.

2   Q    When did Texas as a state get around to actually ratifying

3   the Twenty-Fourth Amendment, which made poll taxes

4   unconstitutional?

5   A    Texas ratified the Twenty-Fourth Amendment in 2009.

6   Q    After *White v Register* did you continue to participate in

7   redistricting in Texas?

8   A    I did.

9   Q    Were you involved in the 1980 cycle?

10  A    Yes.

11  Q    Was that the first cycle of -- well, I guess that would

12  have been the first cycle of redistricting after the

13  application of the Voting Rights Act to Texas?

14  A    Yes.  Although part of -- part of the districts that

15  were -- some of the districts that were adopted at the tail end

16  of *White* -- *Graves versus Barnes* and *White versus Register*

17  actually were covered by the Voting Rights Act.  And there were

18  objections at the end of those.

19  Q    Those that came after --

20  A    Yes.

21  Q    -- 1975?

22  A    After '75, yes.  Actually, those that came after '72.  The

23  Act was effective back to 1972.

24  Q    Got you.  Were the 1980 legislative congressional and

25  State House and Senate plans challenged in court?

1    A    They were.

2    Q    And what happened?

3    A    They're largely successful.  Almost always litigation is

4    successful in voting cases.

5    Q    Okay.  And so when you say "successful," you mean those

6    plans were found unconstitutional.

7    A    Plans were found unconstitutional and plans that were more

8    favorable to Hispanic and African American Plaintiffs were

9    adopted.

10   Q    And the factual basis based on your research for the

11   findings of unconstitutionality for the 1980 cycle?

12   A    Well, it's the same for all of them.  It's gerrymandering

13   by dividing minorities into several parts or concentrating them

14   into single districts.

15   Q    What about the 1990 cycle?  And just to make it clear, as

16   we're talking about the Eighties and Nineties and on into 2000,

17   Texas was growing.

18   A    Yes.

19   Q    And so each one of these cycles the number of

20   congressional seats increased.

21   A    That's correct.

22   Q    I think from 1980 it went up to 27; and then in 1990

23   to 30; and then in 2000 to 32; and then most recently to 34,

24   36?

25   A    Thirty-six.

1  Q    Right, thank you.  So in 1990, tell me what happened with

2  the plan that was drawn.  Was that the Frost plan?

3  A    The congressional plan, yes.

4  Q    Okay.  The congressional plan, that was sort of engineered

5  by Martin Frost?

6  A    Yes.  It was bought and paid for by Martin Frost.

7  Q    And what party was Martin Frost a member of?

8  A    He was a Democrat.

9  Q    And what happened to those plans?

10  A    Large part --

11  Q    Again, the *Reader's Digest* version.  I know we could talk

12  literally for days about that.

13  A    Well, I'd really rather look at the case books, but large

14  parts of them were declared unconstitutional or declared to

15  violate the Voting Rights Act.

16  Q    And there was a case I think in 1996, *Bush v Vera*

17  (phonetic)?

18  A    Yes.

19  Q    Are you familiar with that case?

20  A    Yes, I am.

21  Q    And that was a Supreme Court case that held those maps

22  unconstitutional?

23  A    That's correct.

24  Q    And do you recall the bases for the findings?

25  A    The basis is that the plans were drawn totally on the

1   basis of race.  And you could tell that by the looks of the

2   districts.  At least that's what the Supreme Court said.

3   Q    And I looked at those cases.  I should have probably

4   brought these quotes, but I saw references to bizarre shapes

5   and incredibly convoluted lines.  Do you recall that language

6   being used by Justice Kennedy?

7   A    Yes.

8   Q    The 2000 redistricting cycle, by that time the Democrats

9   no longer had control of the total state government; is that

10  correct?

11  A    That's correct.

12  Q    The governor was a Republican.

13  A    Yes.

14  Q    And the State Senate was, I think, a Republican majority.

15  A    Yes.

16  Q    But the House was still Democrat.

17  A    Yes.

18  Q    Was that group able to vote out a map?

19  A    They weren't able to vote out a House map, no.

20  Q    And so who drew the map?

21  A    That was drawn by the State Legislative Redistricting

22  Board, which has the authority to -- or has the responsibility

23  to redistrict if the Legislature fails to do so at the end of

24  their first regular session.

25  Q    What about for the congressional districts?

Korbel - Direct / By Mr. Baron                          193

1   A    Well, congressional districts, my recollection is the

2   states have defaulted and let the Federal Courts draw the

3   districts.

4   Q    And did that map maintain a Democratic majority?

5   A    Yes, it did.  They followed along with a plan that came as

6   close as possible to passing by the Legislature.

7   Q    When was the next redistricting effort attempted?

8   A    In 2010.

9   Q    I'm going to disagree with you, Mr. Korbel.

10  A    What year are you talking about now, 2000?  The next one

11  was 2000.

12  Q    Do you recall a gentleman named Tom Delay?

13  A    Yes.

14  Q    So when was the next redistricting effort attempted?  I

15  know we'd like to forget about that, but we can't for today's

16  purposes.

17  A    In 2003, that was the session in which Tom Delay sort of

18  ran the program like Martin Frost had run the program ten years

19  earlier, or some years earlier.

20  Q    And that is the plan that was challenged and ultimately

21  resulted in *LULAC v. Perry*?

22  A    *LULAC v. Perry*, it was what -- it was called the DNA

23  manual.

24  Q    Okay.  And I think there was a three judge Court that

25  ruled against LULAC on every issue, but then when it went to

Korbel - Direct / By Mr. Baron                    194

1    the Supreme Court Justice Kennedy addressed Congressional

2    District 23.  Do you remember that?

3    A    That's correct.  Yes, he did.

4              **MR. BARON:**  Okay.  Can we being up that second quote,

5    Tim, from Page 35 to 36?

6    **BY MR. BARON:**

7    Q    Justice Kennedy says:

8              "The State chose to break apart a Latino opportunity

9              district to protect an incumbent congressman from the

10             growing dissatisfaction of the cohesive and

11             politically active Latino community.  The State then

12             purported to compensate by creating an entirely new

13             district that combined two groups of Latinos hundreds

14             of miles apart."

15             Do you recall that?

16   A    Yes.

17   Q    Were you involved in that redistricting process?

18   A    Yes, I testified in that redistricting process.

19   Q    Did you draw some alternative maps?

20   A    I did.

21   Q    What happened after Justice Kennedy found that that map

22   for Congressional District 23 violated Section 2 of the Voting

23   Rights Act?

24   A    The case was remanded to the District Court and the

25   District Court held a hearing on the plan and it got detained,

Korbel - Direct / By Mr. Baron                    195

1   the Court drew the districts.

2   Q    And then what resulted in the election?

3   A    Well, it changed substantially District 23.  District 23

4   had been almost a district in which Hispanics could elect

5   representatives of their choice, which is what the Justice was

6   referring to, but in -- but the District Court fixed that and

7   brought the numbers back to where they were and a -- a person

8   from the Hispanic community was elected through 2010.

9             **MR. BARON:**  Can you bring up the rest of that quote

10  for me, Tim, real quick.  We can just finish on that.  Just --

11            Yeah, if you could just blow that up a little bit.

12  **BY MR. BARON:**

13  Q    And so Justice Kennedy said:

14            "Under Section 2 the State must be held accountable

15             for the effect of these choices in denying equal

16             opportunity to Latino voters."

17            And is that what you believe happened with regard to

18  the redrawing of that?

19  A    Yes.  And Justice Kennedy was saying that not only in our

20  districts which are clearly electing a choice of the minority

21  community, but districts that are about to do that, and the

22  natural progression of geography and politics is such that

23  that's going to happen, that the State may not step in and do

24  away with those districts.

25  Q    Speaking of the State stepping in, what happened to

1  Congressional District 23 in the 2010 redistricting cycle?

2  A    In the 2010 redistricting cycle the districts were almost

3  exactly the same as the ones that were found to be -- found to

4  violate the Voting Rights Act by the Supreme Court in 2006.

5  Q    Okay.

6  A    For 23, they did almost the same thing, except this time

7  the plaintiffs were able to find emails and tweets that

8  indicated that they actually -- the State's intent was to

9  prevent the choice of the minority community from being

10 elected.

11 Q    We brought for demonstrative purposes --

12       **MR. BARON:**  If you could put up that map.

13 **BY MR. BARON:**

14 Q    I brought some -- or actually you brought some maps from

15 Tarrant and Dallas County area from --

16 A    Yes.

17 Q    --the 2010 cycle?

18 A    Yes.

19 Q    Can you tell us briefly what these demonstrate --

20 A    Okay, so --

21 Q    -- from the 2010 cycle?

22 A    These are -- there are eight congressional districts that

23 touch on Tarrant and Dallas Counties.  Tarrant and Dallas

24 Counties are now about 60 percent Hispanic and African-American

25 and Asian.  And of those eight districts that touch on the

1    counties, on Dallas and Tarrant Counties, only one of them has

2    the potential to elect a representative of choice.

3           And the districts -- if the Court will look, District

4    Number 26 starts up here in suburban and then runs down into

5    the heart of Fort Worth and pulls out of part of Fort Worth and

6    then ties it in with all of these older districts.  The newer

7    my -- the harder the color, the more minority the districts

8    are.  And so you can see then there's another one that goes all

9    the way around, District 12, that's called the sheet, 26 is

10   called the lightning bolt, and then there's an arm that goes

11   through two suburban counties into the southwestern suburban

12   part of Tarrant County and then over into the Mid Cities area,

13   splits the Mid Cities area, which is a very fast growing

14   Hispanic, primarily Hispanic area, and it splits that.

15          So you can see where the minority community is

16   divided just in Tarrant County into four parts.

17   Q    What affect does that have on their ability to elect

18   candidates of choice?

19   A    They have no ability to elect a candidate of their choice

20   because they were divided up.

21   Q    What's the current status of that litigation?

22   A    That litigation, it was tried again I think two weeks ago

23   and they're waiting on a decision.  But the case was also tried

24   in 2011 and in 2011 the State agreed to do away with this plan

25   and then adopted another plan which allows the creation of

1    another district in which Hispanics and African-Americans are

2    able to elect the representatives of their choice and, in fact,

3    have been able to elect the representatives of their choice.

4    Thank God this plan was -- no election was held under this

5    plan.

6    Q    Are these the only congressional districts that are

7    challenged under that plan?

8    A    No, there are districts all over the state challenged in

9    the same way.

10   Q    This is just one of the more obvious examples?

11   A    This is the most obvious example, yes.  If you'll put up

12   that second slide.

13   Q    Oh, I'm sorry, yeah, the second is the same -- thank you.

14   A    So these are all of the counties that are tied in with

15   Dallas and Tarrant Counties and, as you can see, all of these

16   rural counties and suburban counties are very heavily Anglo.

17   So what they do is each one of them goes in and picks out about

18   a half of a congressional district out of Dallas and Tarrant

19   Counties and then pulls it out so they can dilute it by the --

20   with those counties.  And interestingly, this district runs all

21   the way through -- 25 runs all the way through Fort Worth down

22   into downtown Austin.  Splits up the Black community in Austin.

23   Q    Let me ask you briefly about racially polarized voting.  I

24   know that computer's in the way.  I think it's more important

25   that the Court hears you then I do, so don't worry about me.

1              **THE COURT:**  You can -- maybe -- if he's not using it,

2     we can flip it down.

3              **MR. BARON:**  Okay.  Careful, don't break it, George.

4         **(Laughter)**

5              **THE WITNESS:**  It don't want to break it.

6              **MR. BARON:**  That's why I didn't come anywhere near

7     it.

8     **BY MR. BARON:**

9     Q    First of all, it's been a phrase that's been battered

10    around and I think it's been defined a couple times, but tell

11    me what racially polarized voting is.

12    A    Racially polarized voting exists when racial or ethnic

13    groups vote significantly differently so that Anglos -- so that

14    Hispanics and African-Americans or Hispanics or African-

15    Americans would -- their candidate of choice would be different

16    than the Anglo candidate of choice.

17    Q    Why is it important to know about that, I mean important

18    to where the Supreme Court talks about it and you mentioned

19    Gingles report, it was one of the Gingles preconditions, right?

20    A    Yes.  Yes, it is one of the --

21    Q    So why is it so important?

22    A    It's important because it's the basis on which this whole

23    area of the law depends, because the problem is that you have

24    racially polarized voting and when you dilute the minority vote

25    by pulling Anglos who are voting -- who also have racially

Korbel - Direct / By Mr. Baron                    200

1  polarized voting into and diluting the districts in Dallas and

2  Fort Worth like this, then you have legally significant

3  (indiscernible) racially polarized voting.

4  Q    You're kind of a historian in this area.  How many Court

5  findings, Federal Court findings of racially polarized voting

6  are you aware of in Texas since say 2000?

7  A    Just Federal Court?

8  Q    Sure.

9  A    Twenty-one.

10 Q    Are they -- I think they're listed in your -- in the

11 appendix to your report?

12 A    Yes.

13 Q    That's Appendix 1?

14 A    Yes.

15 Q    And are these findings confined to one area of the state

16 or what?

17 A    Well, first of all, they're not all listed, because one

18 took place about two weeks ago.  So --

19 Q    Most of them are listed.

20 A    Most of them are.  No, they're throughout the entire state

21 and they're in all of the urban areas.

22 Q    Has the State ever admitted that racially polarized voting

23 takes place in Texas?

24 A    Yes.  When  the -- at the final argument in *Perez v. Perry*

25 case over in San Antonio the Justice -- Judge Rodriguez asked

1   the State will you stipulate that there is racially polarized

2   voting throughout the entire state so we don't have to deal

3   with that issue and they said yes, they can't deny that, except

4   in Corpus Christi and in Kingsville.

5   Q      Kleberg and Nueces?

6   A      Yes.

7   Q      So they stipulated to the other 252 counties?

8   A      The other 252 counties.

9   Q      Do you believe there's racially polarized voting in Nueces

10  and Kleberg?

11  A      Yes, it's been found several times by the Federal Courts

12  and by the Justice Department in voting rights in Texas.

13  Q      Have you personally analyzed racially polarized voting

14  yourself in cases?

15  A      Yes.

16  Q      How many times?

17  A      Many times in cases that I'm either working with another

18  expert who's going to testify statistically or where I'm the

19  lawyer putting somebody on the stand.  I almost always, in one

20  way or another, do racially polarized voting tests so that I

21  can make sure that that expert is testifying correctly and that

22  his report is correct.

23  Q      Was SB 14 passed during the same Legislative session as

24  these 2011 congressional and State and House redistricting

25  plans we've been talking about?

1    A    Yes.

2    Q    And what conclusions do you draw from that?

3    A    Well, it's -- they were passed I mean only a matter of a

4    couple days apart and they were part of the -- I think the same

5    effort to make it more difficult for Hispanics and African-

6    Americans to participate in the political process and elect

7    representatives of their choice.

8              **MR. BARON:**  Thank you, Mr. Korbel.

9              I'll pass the witness.

10                      **CROSS EXAMINATION**

11   **BY MR. SCOTT:**

12   Q    Hello, Mr. Korbel.  You submitted a Declaration, which has

13   also been submitted to the Court.  Do you recall preparing

14   that, along with the appendixes to it?

15   A    Yes.  You mean the report?

16   Q    Yes.

17   A    Yes.

18   Q    In summary, you knew that that was going to be hence a

19   sworn declaration that you presented to the Court in this case,

20   correct?

21   A    Yes.

22   Q    As part of that report you also did an analysis of

23   distances that certain people in I think approximately 12

24   counties were going to have to drive, is that correct?

25   A    Yes, in three urban areas.

1    Q    In three urban areas.  Yes, sir.

2         With regard to the counties you selected, the 12

3    counties that you selected were 12 counties that did not have a

4    DPS office is I believe your recollection -- my recollection of

5    your testimony.  Is that correct?

6    A    Yes, that's correct.  Although I might say that those were

7    the early drafts of what I was intending to testify to, but

8    then the Plaintiffs split up the effort and they hired others

9    to complete the analysis.

10   Q    Well, let's take a peek at what you worked on and what's

11   been submitted to this Court as part of your Declaration,

12   because I believe it's in the record.

13   A    Yes.

14        **MR. SCOTT:**  Brian -- well, hold on a second, Brian.

15   **BY MR. SCOTT:**

16   Q    So one of the first ones you did was an analysis of Freer,

17   correct, and that's over in Duval County?

18   A    Yes.

19   Q    Just a pretty close distance to here, right?

20   A    Yes.

21   Q    And I think you told me in your deposition you picked

22   Freer because it was a city that you'd driven through before on

23   the way through South Texas, correct?

24   A    Yes.  We had -- we did both Freer and Benavides and when

25   you were asking me the questions I was talking about Benavides

1    and not Freer.  But both of those are in the analysis.

2    Q    And I think you let me know that, as part of your report

3    at least, you analyzed how far somebody that lived in Freer,

4    whatever the center point of that town would be, to go to

5    Alice, I guess, to a DPS station, to Falfurrias, or George

6    West.  I think those were three of the towns.  Correct?

7    A    Yes.  If you were in that county and then you put in the

8    ZIP code for the county, it would tell you where the closest --

9    or where the close DPS offices are.

10   Q    Because as a part and parcel of what you built your

11   foundation on, as far as your opinions of distances that

12   someone without a photo ID that complies with SB 14 that is

13   part and parcel of your opinions that you've submitted to this

14   Court, I think you came to the conclusion that many of those

15   people would have to travel between 50 and 120 miles, is that

16   correct?

17   A    That's correct.

18   Q    And so as part of that, did you obtain from your

19   counsel -- I'm sorry -- counsel for any of the Plaintiffs any

20   other distances about which someone could obtain an EIC or any

21   kind of proper ID?

22   A    Well, the DPS website mentions that there might be ways to

23   get these identification certificates in the counties that

24   don't have DPS offices, but then it doesn't say which counties

25   those are and then it goes on to say in order to get an

Korbel - Cross / By Mr. Scott                    205

1   election identification certificate you must go to a DPS

2   office.

3   Q    And I guess let's get back to my question, which is did

4   any of the counsel for Plaintiffs provide you that information

5   about any of those locations?

6   A    No, I read it in the -- one of your expert reports.

7          **MR. SCOTT:**  Okay.  Brian, could we see Exhibit --

8   Plaintiffs' Exhibit 486, please.

9          Brian, second page, please, and if you'll zoom in on

10  location.

11         Roll on up.

12  **BY MR. SCOTT:**

13  Q    So this is a Declaration that's been filed by the

14  Plaintiffs in this case that identifies a person within -- the

15  election administrator in Duval County.

16  A    Yes.

17  Q    And --

18         **MR. SCOTT:**  Brian, if you'll go on to the next page.

19  Q    We see that her office is in San Diego and San Diego is

20  what in Duval County?

21  A    The county seat.

22  Q    Okay.  And so San Diego is not one of the cities that you

23  had somebody travel to from Freer.  How come?

24  A    Well, because there was no indication that you could get

25  an election identification certificate in the DPS website.

1   Q    Okay.  And none of your counsel representing the

2   Plaintiffs in this case provided that information to you,

3   right?

4   A    As I say, I read it in your expert report.

5   Q    Okay.  The next county you looked at was Fayette County,

6   is that right?

7   A    That's correct.

8   Q    And Fayette County you gave several different locations

9   where someone could travel to.  One was Pflugerville and that

10  was I think you put 148 miles, approximately 129 miles to

11  Austin, Brenham 80 miles, Caldwell 104, Giddings 41.  Do you

12  recall those?

13  A    That's correct.

14       **MR. SCOTT:**  Brian, will you bring up Plaintiffs'

15  Exhibit 488, and if you'll enlarge this.

16  Q    Again, this is from the -- this is the Declaration that's

17  been filed by the Plaintiffs in this case and it is from the

18  election administrator for Fayette County.

19       **MR. SCOTT:**  And Brian, if you'll go to the next page.

20  Q    And we see her office is in La Grange.  And the city that

21  you were focused on in this case was La Grange, correct?

22  A    That's correct.

23  Q    So again, the distance, if we look at how the eagle flies,

24  it is absolutely less than a mile, because this is actually in

25  the courthouse, correct?

1  A     Correct.

2  Q     And so it would be the same location that you've used for

3  your zero point?

4  A     Yes.

5  Q     Is that correct?

6  A     Except for the fact that the website says how to apply.

7  To apply for an EIC, visit a driver's license office and

8  complete the application for a Texas election identification

9  certificate.

10  Q     Okay.

11  A     That's what they tell you to do, go to a DPS office.

12  Q     So let's look at one more example that you came up with,

13  and it was for someone who might live in Hebbronville.

14  A     Yes.

15  Q     That's in Jim Hogg County?

16  A     I'm sorry?

17  Q     Is it in Jim Hogg County?

18  A     Yes.  I think so.

19  Q     And then you gave three distances for it.  One to Alice,

20  which is 110 miles, one to Falfurrias, which is 70 miles, and I

21  think one to Zapata, which is 103 miles.

22  A     Yes, those were the --

23  Q     Do you recall those?

24  A     Those were the offices that if you put in the ZIP code for

25  that county, those are the offices you were told to go to.

1    **MR. SCOTT:**  So Brian, would you bring up Plaintiffs'

2    Exhibit 496 and if you'll go to the second page.

3    **BY MR. SCOTT:**

4    Q    This is another Declaration that was filed by the

5    Plaintiffs in this case.  And again, it was not provided to

6    you, is that correct?

7    A    No.

8         **MR. SCOTT:**  And if you'll enlarge it, move along up

9    there.  This is from the tax assessor/collector, the first one.

10   The second -- go on to the next page, Brian.

11   Q    And it appears he's also located in Hebbronville and would

12   it surprise you that that's the same as your zero point that

13   you started your analysis that you found for your distances

14   that you have submitted as part and parcel of your Declaration

15   in this case?

16   A    Yes.  And once again, the reason that I was looking at it

17   was because that's what your website says to do, to go to the

18   closest DPS office and then your website gives the closest DPS

19   office.

20   Q    Now, you were hired in this case by Mr. Baron, Mr. Dunn,

21   the Veasey Plaintiffs, as I call them.  Is that correct?

22   A    That's correct.

23   Q    Who are the Veasey Plaintiffs individually?

24   A    Well, Congressman Veasey is one of the Plaintiffs.  He's

25   the only one that I'm familiar with.  And they're also working

Korbel - Cross / By Mr. Scott                    209

1    together with the LULAC Plaintiffs.

2    Q    Okay, but how about the individuals that are Plaintiffs in

3    the case that they represent?

4    A    I have never met them.

5    Q    Did you do an analysis or were you requested to do an

6    analysis, for instance, to see how far they would have to drive

7    to go get an EIC or a driver's license or some other

8    identification from a State of Texas entity?

9    A    No, I did another sort of a study, as we discussed in my

10   deposition.

11   Q    So if I gave you the name Brinker and told you that that

12   is a party that is represented by the Plaintiffs in this case,

13   have you ever heard that name before?

14   A    I have not.

15   Q    And would you know that address of that person as being

16   3608 Hidden?

17   A    No.

18        **MR. SCOTT:**  Brian, would you bring up the Babcock?

19   Q    So that's an address in San Antonio for Mr. Brinker and

20   that's the distance that they would have to travel to get an

21   election IC or a driver's license or a registration card.  Did

22   you know that?

23   A    Let me pull this up so I can see it.

24        No.

25   Q    And can you read that the distance there is 10.3 miles and

EXCEPTIONAL REPORTING SERVICES, INC

Korbel - Cross / By Mr. Scott                                210

1    I don't know if this comes through clear enough for you.

2    A    Twelve miles -- 10.3 miles.

3    Q    Well I think 12 minutes.

4    A    Ten to 12 minutes, yes, by bus.

5    Q    Maybe by car, but --

6    A    By car.  I'm sorry.

7    Q    But I'll take that one.

8    A    No, no.

9         **(Laughter)**

10        I was -- I thought this was the bus and I thought it

11   was awfully short.

12   Q    Let's now look at Plaintiff Gandy.  Do you know who

13   Plaintiff Gandy is --

14   A    No.

15   Q    -- in this case?

16   A    No.

17   Q    And let's pull up --

18        **MR. SCOTT:**  Brian, if you'll bring up -- pull up

19   Gandy.

20   Q    First of all, do you know where that is?  Do you recognize

21   that map?

22   A    Yes, that's Corpus Christi.

23   Q    It is Corpus Christi.  And do you see how far that Party

24   Plaintiff would have to travel to get an election ID card?

25   A    If you have a car, you're close.  If you have to take the

1    bus, public transportation, you're far.

2    Q    Well, at least from this map I've got a distance between

3    Point A and Point B on city streets here in Corpus Christi,

4    there is a distance that the map has come up with, correct?

5    A    Yes.  One is 4.1 miles, 3.5 miles, and 2.5 miles.

6    Q    Exactly.  Okay, so let's go -- how about

7    Plaintiff Benjamin, do you know him?

8    A    No.

9    Q    Or her?  Do you know their address of 902 Nevada Street?

10   A    No.

11   Q    Do you know what street -- what city that's in?

12   A    San Antonio.

13   Q    Well, the clue's on the map.  And so let's -- what's the

14   distance between Nevada Street, where that Party Plaintiff is

15   living, and the DPS, the closest DPS station?

16   A    It says 5.4 miles, 11 minutes by car, and I don't know, it

17   doesn't say how long by bus.  I suspect it's much longer by

18   bus.

19   Q    Okay.  How about Mr. Carrier?  Have you heard of

20   Mr. Carrier?

21   A    No.

22   Q    And do you know where he lives, like in China, Texas at

23   200 Avenue D?

24   A    No.

25   Q    All right.  And so --

Korbel - Cross / By Mr. Scott                    212

1          **MR. SCOTT:**  Let's pull that one up, if we could,

2    Brian.

3    Q    And it looks like -- would you read that distance for me?

4    It looks like 16.2 miles.

5    A    Sixteen point two miles, 16.3, and 19.1 are the three

6    distances.

7    Q    Now, what you did do in this case is you have a client

8    that you've represented through the years, is that correct?

9    A    I've only represented her for a short time, but yes, I

10   have represented her.

11   Q    Okay.  And something came about in you all's conversations

12   and somehow some way she ended up letting you know she needed

13   to get an ID of some kind, driver's license, ID card, EIC, and

14   was going to go to the -- to a Texas Department of Public

15   Safety facility in San Antonio, correct?

16   A    She asked me -- she said that she no longer had a driver's

17   license because she was -- she no longer could afford a car and

18   so she had let her driver's license go and I asked her how long

19   and she said for a long time.  And she wanted to know how she

20   could qualify to vote, because she had heard about this.  And

21   so I told her that she could get an election identification

22   certificate for free, but she didn't want to do that because

23   she said I need to have an ID.  So I said, well, they're in the

24   same place, one you're going to pay for.  And I asked her do

25   you have a birth certificate, because I wanted to make sure she

1   had a birth certificate.  She pulled out her original birth

2   certificate that her mother had given her and she keeps it in

3   her wallet, like a lot of Hispanics do because they're

4   concerned about immigration.  She keeps her birth certificate

5   in her wallet and she pulled it out and it was an original

6   birth certificate and I said you'll have no problem with it.

7   Q    Now, had you visited with her back when she had identity

8   theft?

9   A    She's -- as I told you, she's an intellectually disabled

10  person.  She has some very serious psychological problems.

11  Q    And you helped her get a disability rating with the Social

12  Security Administration, correct?

13  A    I did not, no.

14  Q    Okay.  Somebody did.

15  A    She got it herself, I think.

16  Q    But she's recognized as disabled, correct?

17  A    Yes.

18  Q    And --

19  A    She was beaten as a young woman and has no feeling in a

20  large part of her body.

21  Q    And before you put her on a bus to go get her ID renewal

22  or card, you made sure she had everything she needed to get it

23  when she went over there because you understood what an

24  undertaking it would be for someone in her situation, correct?

25  A    She's able to travel on the bus, yes, but I wanted to make

1   sure that she wouldn't have to make multiple trips.

2   Q    Do you live in San Antonio?

3   A    Yes, I do.

4   Q    And you've got a car?

5   A    Yes, I have a car.

6   Q    Why didn't you give her a ride?

7   A    I could have.

8   Q    But instead you told her to take notes on how long it took

9   her to get from Point A to Point B and back, didn't you?

10  A    Did not.  I did not ask her to do this.  She said she

11  wanted to do it.  And I think had I offered to drive her she

12  would have taken that as an insult.

13  Q    But she got over there and because of her past theft or ID

14  theft situation, where somebody had stolen her identity, and

15  she had asked the Department of Public Safety to put a

16  restriction that required photo ID to be shown before renewal,

17  do you recall that?

18  A    No, I don't recall that.  No, not that.

19  Q    Do you deny that?

20  A    I don't deny it.  No, I just -- I'm not familiar with

21  that.

22  Q    Did you know that before you set sail -- told her to set

23  sail on the bus in San Antonio?

24  A    Did not know that.

25  Q    Did she eventually get her ID?

1   A    Yes.  They wouldn't accept her birth certificate and so

2   she took another bus and went downtown in San Antonio and

3   because it was getting so late in the day, she'd been at this

4   all day, she took a cab back out to the DPS office.

5   Q    Is it your -- was it -- is it your opinion -- was it your

6   understanding that the only reason she wanted some type of ID

7   was so that she could vote?

8   A    She asked me about the voting and I told her about the

9   election identification certificate and I advised her that the

10  election identification certificate could not be used as an ID.

11  And she felt she needed an ID, which I think probably all of us

12  need an ID, and so she decided that she would pay for the ID,

13  that it was worth paying for.

14          **MR. SCOTT:**  Brian, if you'll bring up her deposition

15  please.

16  Q    So, reading on Page 37, Line 25:

17          "QUESTION:  And why did you get an identification

18          card that day?

19          "ANSWER:  Well, I needed something to prove who I am.

20          Everywhere you need it.  They ask you for ID.  If you

21          don't have one, you can't prove otherwise.

22          "QUESTION:  And can you give me some examples of

23          situations where you would need to show ID?

24          "ANSWER:  Well, if you want to go to the library you

25          have to show them ID.  If you want to get, like,

Korbel - Cross / By Mr. Scott                    216

1        maybe get a loan or -- I'm not saying I'm going to go

2        get a loan, but you're required to show ID.

3        "QUESTION:  Okay.

4        "ANSWER:  You know, everywhere they ask you for ID.

5        Even if you go to maybe a night club, they ask you

6        for an ID.  Everywhere you go you need an

7        identification.

8        "QUESTION:  And was it -- were you -- strike that.

9        Was it -- were you okay paying the $16 in order to

10       get the ID?

11       "ANSWER:  Yes, ma'am."

12       "QUESTION:  So that wasn't a deterrent from you not

13       getting the ID?

14       "ANSWER:  No, no.  No, ma'am.

15       "QUESTION:  Okay.  Are you currently registered to

16       vote?

17       "ANSWER:  Yes, ma'am."

18            So how is it that she ended up getting all this

19  information to you for the purposes of you putting in your

20  expert report that you're being paid by the Plaintiffs in this

21  case the information about this disabled person being put on a

22  bus to go undertake to accomplish getting her ID card renewed?

23  A    Because I had some concerns about her and I wanted to make

24  sure.  I asked her to call me the next day to make sure that

25  everything was all right.  As you know, sometimes they're not

Korbel - Cross / By Mr. Scott                    217

1  very polite at the DPS offices.

2  Q    Well, I don't know that but that would be even more reason

3  to accompany her, wouldn't it?

4  A    No, I think people have to -- disabled people have to

5  learn to be on their own.  That's the best thing possible for

6  them.

7  Q    Let's switch over to some of your other --

8  A    Just so it's real clear, she took a birth certificate down

9  there and they told her that that was a photocopy and it wasn't

10  a real birth certificate, and so she had to go downtown and buy

11  a new birth certificate.  She was all ready with the $12 but

12  she had to go downtown and buy a whole new birth certificate,

13  then she had to take a cab back so she didn't lose the whole

14  day.  And so it ended up costing her about $70, I think, all

15  total.

16  Q    Well, after you got her involved in this case, she asked

17  you to accompany her to her deposition, didn't she?

18  A    She did not.

19       **MR. SCOTT:**  Brian, would you go to about Page 5 on

20  her deposition?

21  A    I didn't even know her deposition was being taken.

22       **(Pause)**

23       **MR. SCOTT:**  I'm sorry, your Honor.  One moment.

24       **(Pause/Discussion held off the record)**

25       Go up one more page.  I mean, backwards to Page 4.

1   **BY MR. SCOTT:**

2   Q    Oh, here it is:

3            "QUESTION:  Are you represented by an attorney today?

4            "ANSWER:  Well, I do have an attorney, Mr. George

5            Korbel, but he's representing me in various cases,

6            but I wanted him to be; I'm persistent.  I wanted him

7            to represent me in this case, though.

8            "QUESTION:  He is not here with you today?

9            "ANSWER:  No, he's not here.

10           So she misunderstood what you-all's conversation was

11   I guess?

12   A    I'm sorry?

13   Q    Oh, forget it.

14   A    Well, no, I'm --

15   Q    No, no.  Strike it.

16   A    Well, no, I --

17           **(Laughter)**

18   Q    Let's go to -- let's switch over to your numbered

19   Department of Justice Objections.  I think you note in your

20   report, as part and parcel of your opinions -- do you have a

21   copy of your report with you?

22   A    I do.

23   Q    Page 6.

24   A    No, I'm sorry, I don't.  The report?  No.

25   Q    Oh.

1          **MS. BALDWIN:**  I have an extra copy.

2          **MR. SCOTT:**  No, we can bring one up too.  Okay.

3   Thank you.

4          **MS. BALDWIN:**  Sure.

5          **THE COURT:**  But can I ask.  The report was filed on

6   June 27th.  The Appendix was filed on August 29th.  But I don't

7   know that I have all that.  I don't think Appendix 1 came in

8   with that August 29th.

9          **MS. BALDWIN:**  It should have.

10         **THE COURT:**  So just double check that.

11         **MS. BALDWIN:**  It should have all been filed the same

12  day, Judge.

13         **THE COURT:**  Yeah.

14         **MS. BALDWIN:**  And I will check on it.

15         **THE COURT:**  Oh.  Well, it wasn't.

16         **MS. BALDWIN:**  Sure.  I understand.  Sure.  That may

17  be.

18         **THE COURT:**  But just check on that and make sure I

19  have everything.  Well, at least it didn't show up in our

20  system together.  It's separate.  And then I don't know that I

21  have everything.

22         **MS. BALDWIN:**  Okay.  I'll follow up on that and make

23  sure that everything was filed.

24         **MR. SCOTT:**  Oh, thank you.

25         **THE WITNESS:**  Yes.

1    BY MR. SCOTT:

2    Q    In your report, on Page 6, you mentioned as part and

3    parcel of it the number of objections that the State of Texas

4    has received.  There it is.  There have been -- oh, I'm sorry.

5    There's a little pointer here.  There we go.

6         There have been more than 200 voting rights objections

7    interposed by DOJ since the application of the Voting Rights

8    Act to Texas.  What relevance does that have to your opinion?

9    Any?

10   A    Well, it's part of the history of election discrimination

11   in the state.  As you know, voting rights objections are

12   Administrative Court decisions.

13   Q    And so, from your standpoint, -- first of all, did you go

14   through the different voting rights in the 200 objections?

15   A    I went through the objections and also the 70

16   jurisdictions where federal observers had been sent.  Those go

17   together.

18   Q    So to put stuff into perspective, if we could.

19            MR. SCOTT:  Brian, I'll tell you what.  Let's switch

20   over to the ELMO if we could.

21   BY MR. SCOTT:

22   Q    Do you know how many objections total there have been

23   since, say, 1975?

24   A    In Texas?

25   Q    Yes.

1   A    All of them have been since 1975.

2   Q    Well, I know.  How many total number?

3   A    I don't know what the total number is.

4   Q    Let me put up here Defendants' 2458.  So, this is letters

5   of objection sent to Texas Governments, which is an important

6   issue here in a second, from 1975 to 2013.  So there is a

7   process by which Governmental entities in Texas, when it was

8   covered under Section 4 and had to make submissions under

9   Section 5, the Federal Government would make an evaluation; the

10  Department of Justice would make an evaluation of those

11  submissions, correct?

12  A    That's correct.

13  Q    And the 200 you're talking about come from those years,

14  that timeframe, '75 up to 2013, correct?

15  A    That and the 70 jurisdictions where federal election

16  observers were sent.

17  Q    But when you talk about 200 objections to these things,

18  that's not based upon just the State of Texas as an enterprise.

19  That's all the Governmental entities that comprise the State of

20  Texas, correct?

21  A    Yes.  Well, all the Governmental entities in the State of

22  Texas are the State of Texas.

23  Q    Okay.  We can agree to disagree on that.  But what we can

24  look at on this is -- let's even pick a year.  You had talked

25  about, in your deposition, a 15 year look back is a good

 1  snapshot.

 2  A     Yes.

 3  Q     Well, why would a 15 year snapshot be good?

 4  A     Well, I told you that I thought it would be good because

 5  15 years was the horizon that we were looking at when the

 6  Voting Rights Act was originally extended to cover Texas.

 7  Q     Okay.  And so if we look at objection letters sent to all

 8  Texas Governmental entities for the last 15 years, we've got

 9  one, six, that total, eight, nine, ten, 11, 12, 13, 14, 15, 16,

10  17.  Let's stop there.  Or do you want to go ahead and go one

11  more?  We'll call it 19 for fun.  Nineteen over the last 15

12  years in the State of Texas; does that sound right?

13  A     That's 19 administrative findings of racially polarized

14  voting or other election discrimination in Texas.

15  Q     Okay.

16  A     That is a big number.

17  Q     Big number.  And so let me put up here --

18  A     It includes the State.  Yes.

19  Q     So this is a chart that's Defendants' Exhibit 2457.  This

20  is submissions from all Texas Governments from 1980 to 2012.

21  So over here we get up close to 4,000 but I don't think they

22  get there in 2006.  But do you know what the total number

23  during that same period of time of total submissions that were

24  made by the State of Texas?

25  A     It's a very large number because they were required to

Korbel - Cross / By Mr. Scott                               223

1   make -- any change in elections had to be submitted, so that if

2   you moved a polling place across the street you had to submit

3   it and get pre-clearance, and that's what the majority of those

4   are

5   Q    Well, not everybody follows that, right?  You identified

6   one company -- I mean, one entity that didn't follow that rule.

7   A    Say again?

8   Q    You said that the Texas Democratic Party failed to ask for

9   pre-clearance, during your deposition, didn't you?

10  A    The Texas Democratic Party has never complied with the

11  Voting Rights Act.

12  Q    To put stuff in perspective, this is Defendants'

13  Exhibit 2460.  2460 is the number of State and local

14  Governments.  Well, there's only one State Government but there

15  are local Governments in Texas.  From '72 to 2012.  In '72,

16  there were 3,600 entities.  Now we're up to -- at least a

17  couple of years ago, we were up to 5,148.  Does that sound

18  right to you?

19  A    Yes.

20  Q    And those entities, when it was covered under the Voting

21  Rights Act, had to all make submissions if they wanted to

22  change anything about the election process, correct?

23  A    That's correct.

24  Q    Okay.

25            **MR. SCOTT:**  And, your Honor, that's 2460.

1     **(Pause)**

2     **BY MR. SCOTT:**

3     Q     Now, it's my exhibit so I'm responsible for it, but it has

4     got a typo in here.  You'll see it real quick I'll bet,

5     Mr. Korbel.  But it's Defendants' 2459.

6         **(Pause)**

7             So this is the Department of Justice's objection

8     letters as a percent of -- that's the typo.  It should be

9     "Section 5," not "Chapter 5" up there.  And this is Exhibit

10    2459, Defendants' 2459.  And it shows that the Department of

11    Justice, on a percentage basis when we take all those

12    submissions and -- all those objections and we divide them by

13    all those submissions, we get these number, right?

14    A     Yes, if you do it that way.  Yes.

15    Q     And so, what we know is that we've got a rate of DOJ

16    objections per -- again, Section 5 submission -- and over here

17    we've got a column that says "rate of DOJ objection letters not

18    withdrawn or reversed" per -- again, Section 5 submissions.  Do

19    you know whether that compares favorably to other states that,

20    during the same time period, would have been under the same

21    Section 5 requirements as Texas?  Would Texas be at the bottom

22    or at the top of entities like that?

23    A     In terms of total number of objections, Texas is either at

24    or very near the top.

25    Q     You mean from the standpoint of being great?

1  A    No, from the standpoint of receiving administrative

2  determinations that you violate the Voting Rights Act.

3  Q    I'm going to go out of order again and I'm going to put up

4  here -- this is Defendants' 2463, and this is Department of

5  Justice objection letters as a percent of Section 5 submission

6  for states covered as a whole from 1980 to 2012.

7       **(Pause)**

8            I should have Brian do it.  Here we go.

9            So, we've got a color coding system down here.  The

10  darkest colors are where Texas was the best in the entire group

11  of, basically, the old south with the addition of Arizona.  So

12  as we look at these, this grayish color represents the second

13  lowest during that year, and then the third lowest is the

14  lightest shade.  So, from a practical standpoint, the last full

15  year, I guess, of coverage would have been 2012; is that right?

16  A    Last full year of coverage?  No.

17  Q    Full year.  2013 would have been the last full year?

18  A    Yes.

19  Q    Okay.  Well, I don't have it for us.  The way I get those

20  results -- well, they're not on this.  But what we know is that

21  Texas finished second that year, correct?

22  A    Well, I don't want to dispute with you, but you're

23  comparing apples and oranges here.

24  Q    Okay.

25  A    You're not -- you're comparing the percentage of

1    objections.  And because we have so many jurisdictions in

2    Texas, we have -- and because everything has to be submitted,

3    there is an awful lot of submissions of changes in polling

4    places, and changes in polling place usually aren't a problem.

5    But that's why it looks that way.

6    Q    So it's critical to understand -- it's critical from that

7    perspective to really get down and dig into each one of those

8    objections and understand the underlying issue there; is that

9    right?  I mean, it's not fair to call something an objection.

10   That's a pretty broad term, right?

11   A    It's a --

12   Q    You'd really need to get in and find out what all is going

13   on with that specific objection?

14   A    An objection is an Administrative Court decision that

15   there is a violation of the Voting Rights Act.

16   Q    I'll tell you what.

17        **MR. SCOTT:**  Brian, will you pull up the Georgia

18   document?

19             So let's go through -- and you've got your report now

20   in front of you.  Let me get a copy of it.  And we're going to

21   go through -- and I'll tell you what.  Let's walk through some

22   analysis here.  I'm going to get my computer, because I've got

23   it on an electronic version.

24        **(Pause)**

25             All right.  So you start your analysis of the --

Korbel - Cross / By Mr. Scott                          227

1    let's see.  You start your analysis of Section 5 cases where on

2    your report?  Would that -- does that look like Page 11?

3    A    Yes.

4    Q    So let's go to Page 11 of that report.

5         **MS. BALDWIN:**  Mr. Scott, is this marked as an

6    exhibit?

7         **MR. SCOTT:**  Is what?

8         **MS. BALDWIN:**  Is this document that you're showing

9    currently marked as an exhibit entered into evidence?

10        **MR. SCOTT:**  I don't think so.

11       **(Pause/Discussion held off the record)**

12        No, I've got the report.  And so, Brian, if you

13   could, if you'll leave that one up I'm going to use that as

14   kind of a reference point to go through Mr. Korbel's

15   information.

16   **BY MR. SCOTT:**

17   Q    So, are you familiar with a document the Department of

18   Justice -- have you ever seen a Section 5 Recommendation

19   Memorandum?

20   A    No, I haven't.

21   Q    Have you ever heard that term?

22   A    Yes.

23   Q    All right.  What is it?

24   A    A recommendation by a reviewer either to object or not to

25   object.

1  Q    And what's the process by which they come up with their

2  recommendation?  I mean, do you know?

3  A    They inquire and they take the submission that's given by

4  the jurisdiction under the law.  They then inquire from local

5  people in the community, usually Hispanic and African American

6  organizations, ask them about whether or not it's problematic,

7  and if they say it's not problematic there usually is not an

8  objection.  If they raise concerns about it and if the

9  submission letter itself shows that there are concerns,

10  newspaper articles, lawsuits being filed, and that sort of

11  thing, then they look very closely at the submission.

12  Q    Now, from a practical standpoint, is it possible to get an

13  objection where a Governmental entity simply hasn't met

14  whatever burden the Department of Justice has placed upon it?

15  You haven't jumped high enough.

16  A    They've got to comply with the statute, yes.

17  Q    Okay.  And so --

18  A    But that's why it's an administrative decision and there

19  is an appeal from that.

20  Q    Okay.  So the recommendation memorandum would just simply

21  be how the thought process or the right way to maybe look at

22  underlying evidence and say, no, that's not going to make it,

23  in our opinion as the DOJ?

24  A    I'm sorry, I didn't get that.  I'm sorry.

25  Q    Sure.  I'll try and clear it up.

1       So the Section 5 Recommendation Memorandum sounds like it

2   goes through a process of going through all of the evidence the

3   Department of Justice would acquire to make its evaluation and

4   then its recommendation.  It would analyze the law and the

5   facts and make a recommendation based on that?

6   A    There is a recommendation that's given from the initial

7   reviewer -- sometimes it's a lawyer; sometimes it's a paralegal

8   -- to the Assistant Attorney General.

9       **(Discussion held off the record)**

10  Q    So the first case that you cite in your Section 5 issues

11  is the department of -- May 13th, 2013.  Is that a Section 5

12  case that you -- or, objection that you're relying on?

13  A    No, that's a determination by the Department of Justice to

14  send federal election observers to Corrigan, Farmers Branch,

15  Early, and Orange, Texas.

16  Q    Okay.  So then let's go to the next one.  That says

17  "April 8th, 2013, Section 5 Objection Letter."  Do you see

18  that?

19  A    Yes.

20  Q    And that's on Page 12 of your report, correct?

21  A    That's correct.

22  Q    All right.  So now let's go over here and let's find --

23  let's go through the same process that the DOJ might have done

24  on this voting rights memorandum analysis of the Georgia voter

25  ID law with the analysis that was done in your underlying work,

1    okay.

2    A    Uh-huh.

3              **MS. BALDWIN:**  Your Honor?

4              **MR. SCOTT:**  Brian, if you'll go over to --

5              **MS. BALDWIN:**  We would just like to object.  The

6    Department of Justice does not release its internal memoranda.

7    I have no reason to believe that this is such a memoranda that

8    has been officially released by the Department of Justice and

9    we certainly wouldn't authenticate it.

10             **MR. SCOTT:**  Well, it's a document.  The only thing --

11   (a) it's not marked privileged, it's not marked confidential.

12             **THE COURT:**  Where did it come from?

13             **MR. SCOTT:**  It's --

14             **MS. BALDWIN:** But --

15             **MR. SCOTT:**  It was a Washington Post article had it

16   as part and parcel.  It's on the Washington Post website.  It's

17   also on the Ohio State Law School's website -- are two cites

18   that I know that has it permanently out there.  It's been out

19   there for almost a decade.

20             **MS. BALDWIN:**  Your Honor, in prior Section 5

21   litigation; specifically in the South Carolina litigation

22   regarding South Carolina's voter ID law, in which I was

23   counsel, a three-judge panel precluded the State of South

24   Carolina from bringing the document, which I believe this is

25   the same document, which they couldn't authenticate it --

Korbel - Cross / By Mr. Scott                          231

1   precluded them in a Decision from bringing this into evidence

2   precisely because it was only come through the media.  It did

3   not come from the Department of Justice and there was no basis

4   to authenticate it or to represent that it is, in fact, the

5   Department's official positions.

6           THE COURT:  Well, what is it?  Where did it come

7   from?  Is it --

8           MR. SCOTT:  It was a --

9           THE COURT:  Who did it, who made it, who created

10  that?

11          MR. SCOTT:  Well, one of the people that have been

12  here, Toby Moore.  I don't see him back there now.  He was here

13  all morning.  But he's one of the signers of the thing down

14  there, the submitters.

15          THE COURT:  But with who?

16          MR. SCOTT:  The Department of Justice.  He's with the

17  Department of Justice?

18          THE COURT:  So this is a DOJ --

19          MR. SCOTT:  Yes.

20          THE COURT:  -- document --

21          MR. SCOTT:  Yes.

22          THE COURT:  -- is what you're saying?

23          MR. SCOTT:  Yes.

24          THE COURT:  Not a media document?

25          MR. SCOTT:  Not a media document.  And --

1          **MS. BALDWIN:**  But it's a document that did not come

2     through the Department of Justice.  The Department of Justice

3     has never officially released this document.  To the extent

4     it's being represented as a DOJ document, we can't authenticate

5     that.  And this witness has no basis to know one way or another

6     as to --

7               **THE COURT:**  Well, where is the signer?  Was he here?

8               **MR. SCOTT:**  Is Toby still in town?

9               **MR. SPEAKER:**  Signer?

10              **MR. SCOTT:**  Well, he's listed on the email.

11              **THE COURT:**  See, he said he signed it, so I'm -- I

12    thought there was someone in the courtroom who had signed this

13    document.

14              **MR. SCOTT:**  It says "by," and one of the persons who

15    it's by is Toby Moore, and Toby has been here.  He was here

16    this morning.  Is he still in town?

17              **MS. BALDWIN:**  Toby Moore is not a lawyer for the

18    Department of Justice.  He is a staff member.

19              **THE COURT:**  That was not the question.  Is he still

20    here?  Where is he?

21              **MS. BALDWIN:**  I don't believe he is in the courtroom

22    currently, your Honor.

23              **THE COURT:**  Okay.  Overruled.

24    //

25    //

1    **BY MR. SCOTT:**

2    Q    So I'm going to -- so let's see if we can't walk through

3    this, and let's go to the second page first if we could.

4    A    Counsel, I have never seen this document.

5    Q    No, I know, but we're going to use this as our template to

6    go through your analysis that you did on your Section 5 cases

7    to find out, because I think we both agreed that that is part

8    and parcel to the foundation of your opinions that you have

9    asserted here in this case.  Is that correct?

10   A    This document has nothing to do with the opinions that I

11   am asserting.

12   Q    So Page 2 of this document -- and this document actually

13   deals with a voter ID statute.  Let me get to the parts over

14   here.  Actually, it's Page 3, and if you'll go down to

15   Section C.  So, what they had -- what had gone on in Georgia

16   was they were making numerous changes that weren't at issue and

17   didn't raise retrogression concerns.

18        Did you do any kind of retrogression analysis on any of

19   the -- on this -- I'm sorry -- your April 8th, 2013 Section 5

20   objection letter information that you had?

21   A    I'm familiar with the situation in Beaumont, yes.

22   Q    But did you do a retrogression analysis?

23   A    I don't know what you mean by that?

24   Q    So, did you do anything, as in any kind of type of a

25   ecological retrogression analysis?  A regression -- I'm sorry.

1   Any kind of ecological regression analysis?

2   A    What would be regressed here; what numbers would be

3   regressed?

4   Q    Well, I'm asking you if you did one on your April 8th,

5   2013 Section 5 objection letter.

6   A    I'm familiar with what has gone on and what is going on in

7   Beaumont.

8   Q    And with regard to -- I apologize.  Let me get to the --

9   over here.

10       In this case, the one before us right now, have you read

11  SB 14?

12  A    Yes.

13  Q    And it is your opinion that SB 14 has a disparate impact

14  upon minorities, correct?

15  A    That's correct and that's what the Court in the District

16  of Columbia found.

17  Q    And with regard to this case and the analysis of this law

18  by you, it is your opinion that -- let's flip over to Page 4

19  please.

20       In Georgia, they had 48 hours to provide the registrar a

21  valid photographic ID if they did not have one at court (sic) -

22  - at the -- when they went to go cast their ballot.  The Texas

23  statute provides how long for a voter to cure if they don't

24  have proper photo identification?

25  A    I would have to look at the statute.

1   Q    Okay.  But as we sit here today, you don't recall?

2   A    I don't recall, no.

3        **(Pause)**

4   Q    So if we go to Page 5, the third paragraph.  That

5   paragraph, Brian.

6        It says that Georgia submitted to DOJ the legislative

7   history of the bill.  Did you review the legislative history of

8   this bill?

9   A    Well, I participated in part of it and, yes, I am somewhat

10  familiar with the legislative history of this bill.

11  Q    You did participate in part of this legislative process.

12  You testified against the passage of this bill; is that

13  correct?

14  A    That's correct.

15  Q    And you did that before you were retained as an expert in

16  this case; is that correct?

17  A    Yes, I did that as a private citizen.

18  Q    So let's go -- let's keep rolling here.  Expert testimony,

19  witness statements, transcripts of tapes or hearings.  Have you

20  reviewed the testimony that was developed at the legislative

21  hearings on SB 14?

22  A    The ones that I was present at.

23  Q    Okay.  Other than that, have you reviewed anything else?

24  A    No.

25  Q    What days were you present at it?

1   A    I don't know.  That's many years ago.  It starts in 2005.

2   Q    Last paragraph down here on this Page 5.  What was -- so,

3   part of the analysis the Department of Justice did was it

4   looked at what the vote was on this bill.  Do you recall the

5   vote in the House on SB 14?

6   A    Which time?

7   Q    When it passed?

8   A    No, I'm not familiar with what the vote was.

9   Q    Are you familiar -- or, do you recall what the vote was in

10  the State Senate when SB 14 passed?

11  A    Well, it was 20 to 11 probably; 20 to 11.

12  Q    Okay.

13  A    All of the minorities voting with the 11 and the vast

14  majority of the minorities voting against the bill in the

15  House.

16  Q    So let's look over to Page 6.  Now, it says -- so they've

17  got Section B, "Proponents and Arguments in Favor of Free

18  Clearance."  It says:

19       "We received numerous letters from elected officials, both

20       in the State Legislature and other offices, and private

21       individuals expressing their views that the proposed

22       legislation was not retrogressive, either in purpose or

23       effect."

24       Have you been provided the materials from the legislatures

25  that was subpoenaed by the Plaintiffs in this case and has

Korbel - Cross / By Mr. Scott                          237

1   been, heretofore, marked as "highly confidential"?

2   A    I've seen some of the depositions that are marked "highly

3   confidential."

4   Q    And which of those depositions have you seen?

5   A    I don't -- I've got them in my -- one of the depositions

6   was from the fellow who didn't testify this morning.  The

7   fellow who did not testify.

8   Q    Dr. Vaganson (phonetic)?

9   A    Yes -- no, no.  The -- your man that didn't testify.

10  Q    Forrest Mitchell?

11  A    Is that what it was?  I don't know who it is.

12  Q    Anything else that you've looked at with regard to letters

13  of folks that were in favor of SB 14?

14  A    No.  I have not looked at any of the letters.

15  Q    Have you seen letters that were submitted to the

16  Department of Justice in opposition to SB 14?

17  A    I don't think the Department of Justice makes those

18  available.

19  Q    Are you aware of whether any of the Democratics who

20  opposed the passage of SB 14 made those documents available

21  through subpoenas of their records?

22  A    I'm sorry.  Would you ask that again?  I missed that.

23  Q    Sure.  So, are you aware of any of those documents

24  existing because we subpoenaed them from certain Democratic

25  legislatures?

Korbel - Cross / By Mr. Scott                    238

1  A    I'm not familiar with what you subpoenaed.

2  Q    Well, has your counsel provided you any such letters?

3  A    I have not seen any letters like that.

4         MR. SCOTT:  If you'll scroll up a little bit, Brian.

5  Let's go to the next page, Brian.

6  Q    So, at the top it says, "Members of the leadership noted

7  that citizens need identification for everything these days.

8  It concludes that the requirements did not seem arduous."

9  Representative Talton told her minorities that minorities were

10 more vulnerable to having mail such as bills and checks stolen

11 from their mailboxes.  So, did you attempt to find out from

12 anyone -- any of the party opponents -- or any of the opponents

13 to SB 14, what type of concerns they had with the

14 implementation of SB 14?

15 A    Did I ask any of the opponents; is that what you're

16 asking?

17 Q    Yes.

18 A    Well, I listened -- I listened to their testimony and I

19 listened to legislatures discuss what their problems were; yes.

20        MR. SCOTT:  Your Honor, well, this document was not

21 on that -- the exhibit list.  We would move to mark it as

22 Defendants' 2737 for identification purposes at this time.

23        MR. SPEAKER:  May I borrow --

24 Q    And so, looking at the documents what has been marked for

25 identification purposes, Defendants' 2737, Mr. Korbel, and now

1    turning our attention to page 19, what factual information did

2    you develop in performing your opinions in this case as to how

3    many different types of I.D. were being used in elections

4    before the passage of SB 14 -- an implementation of SB 14?

5    A    In order to vote, you only needed to have your voter --

6    your voter registration.

7    Q    Did you develop any independent number -- or analysis to

8    derive the number of people you believed prior to

9    implementation of SB 14 had proper I.D. under the -- that would

10   comply with the terms of SB 14?

11   A    Everyone, prior to the passage of SB 14 who had a voter --

12   a valid voter registration was allowed to vote.  They had the

13   proper -- they had the proper I.D.  After that, that wasn't my

14   -- that wasn't part of my responsibility in this case.

15   Q    Did you attempt to analyze any other State statutes and

16   compared those to SB 14?

17   A    Well, I read the comparisons that the District Court for

18   the District of Columbia makes with the other States.  And that

19   comports with my understanding -- so, what the other State laws

20   were.

21   Q    Did you do any analysis of VAP numbers, and what's VAP

22   stand for?

23   A    Voting Age Population.

24   Q    Yes.  And so, what is that term used with typically in the

25   field of social sciences or political science?

Korbel - Cross / By Mr. Scott                    240

1    A    A person that's of 18 years or older.

2    Q    And eligible to vote?

3    A    Could be; if they're a citizen.

4         **MR. SCOTT:**  So, let's go to page 24 if we could.

5    A    Once, again, counsel, I have never seen this document.

6    Q    That's okay.  I'm not saying I've seen it very long.

7         **MR. BARON:**  And just for the record, Judge, neither

8    have I.

9         **MR. SCOTT:**  We're all even.

10   **BY MR. SCOTT:**

11        **MR. SCOTT:**  Can you move up a little bit?

12   Q    Page 24 is starting with, "This is a correlation between

13   race and card ownerships as group quarters is controlled."  Do

14   you know what the term "group quarters is controlled" refers

15   to?

16   A    Yes.

17   Q    What is that?

18   A    That's any sort of a situation where there were a number

19   of people in the same -- at the same address.  It might be an

20   old people's home.  It might be a prison.  Could be a

21   dormitory.  There's a whole lot of different group quarters.

22   Q    So, split this up a little bit, if you would.  So it says,

23        "Dr. Moore stated that while there might be other

24        explanations for the emergence of this correlation,

25        his professional opinion at this point is that group

Korbel - Cross / By Mr. Scott                    241

1              quarters populations along with noise and the data

2              obscure the modest correlation between race and card

3              ownership that surfaces when counties with

4              significant group quarters populations are removed

5              from the State."

6   Can you decipher that?

7   A    You want me to say -- you want me to say what this man is

8   saying in a document I've never seen before; is that what

9   you're asking me to do?

10  Q    Okay.  That's an unfair question.  I'll strike it.  So, do

11  you know whether or not the DOJ ultimately approved the Georgia

12  voter I.D. law?

13  A    What years -- what year is this submission?

14  Q    This document is from 2005.

15  A    I think they objected in 2005, but I'm not -- I don't know

16  that for sure.

17           **MR. SCOTT:**  Let's flip over to --

18  Q    Do you -- on page 20 of this document --

19           **MR. SCOTT:**  Brian, if you'll turn to that.

20  Q    Let's see -- see if we can find the estimated potential

21  shortfalls.

22           **MR. SCOTT:**  Brian, I'm looking for this that says,

23  "DOJ states they attempted to estimate any potential shortfall

24  between voters and those who hold driver's license and the

25  racial makeup of that group."  There it is.

Korbel - Cross / By Mr. Scott                    242

1  Q    So, in this, DOJ found,

2          "We requested data from the Georgia Department of

3          Driver Services (DDS) regarding persons who hold

4          valid driver's license and/or I.D. cards to attempt

5          to estimate any potential shortfall and the racial

6          makeup of the group and examine the data provided by

7          DDS.  We have determined that it is not reliable for

8          the purposes of estimating the number of people with

9          and without DDS issued identification."

10 So, from your standpoint in looking at SB 14, did you make any

11 analysis whatsoever, the Department of Public Safety's database

12 and comparison that was performed between it and the team

13 database of registered voters?

14 A    I did not.  Others were asked to do that.

15 Q    Do you recall if they encountered any type of program

16 problem in attempting to estimate -- or the reliability of

17 using such a database match for purposes of deriving some type

18 of impact on how many people were without voter -- proper photo

19 I.D. under SB 14?

20 A    I think it's mentioned in the District Court for the

21 District of Columbia Opinion.

22          **MR. SCOTT:**  So, Brian, on page 21, highlight that --

23 "this unavoidable turn is associated with live data portion."

24 Q    First of all, what's ACS data?

25 A    Where -- is it on this -- is it in this quotation?

1   Q    Well, just in general terms.  What's ACS stand for?

2   A    Well, it might mean the American Community Survey.

3   Q    Okay.

4   A    And that's a survey that the census does each year.

5   Q    And do you know if -- do you know if one was used for

6   purposes in this case for the formation of any of your opinions

7   that you are rendering today?

8   A    On the ACS?

9   Q    Yes.

10  A    No.  I haven't -- other than looking at the ACS to see the

11  growth of Hispanic and Black citizens of voting age population.

12  Q    Have --

13  A    And the information that is attached to this record

14  showing the poverty and the educational disabilities of

15  Hispanics and African-Americans.

16  Q    Are you --

17  A    I used the ACS for that.

18  Q    Are you aware of any problems in trying to extrapolate out

19  ACS census information with results that you might get on a

20  much finer point of an individual, saying a driver's license

21  database?

22  A    I don't know what you're asking.

23  Q    Well, let's look at this for a second.  It says,

24          "This unavoidable turn is associated with a live

25          database that was not designed to be used for

1            statistical analysis or predictive purposes.  Deaths,

2            people moving from county to county in and out of the

3            State and in and out of license status all create

4            disruptions in the data, particularly in quickly

5            drawing counties of which Georgia has a significant

6            number.  As a result, of these factors, the overage

7            in DDS database is of no use in estimating the total

8            number of --

9        **MR. SCOTT:**  Roll her up.

10   Q        -- persons with a DDS card or whether a shortfall

11           exists of State residence who lack DDS cards.  A

12           second cause for concern concerning -- regarding the

13           reliability of the data for predictive purposes is

14           that it appears to show many more bad records than in

15           the two previous sets of data provided by the State."

16   Are you aware of any data problems that were encountered in the

17   Washington, D.C. litigation, the original one involving the --

18   A    It's discussed in the Opinion; yes.

19   Q    Yes.  And what -- with regard to that, were there

20   different numbers that people would derive as a result of

21   looking at those databases, doing the database matches?

22   A    Evidently, different people came up with different

23   numbers.

24   Q    And are you familiar with --

25   A    That was not part of what I was asked to do here.

Korbel - Cross / By Mr. Scott                              245

1   Q    But are you familiar with what the Court did in that

2   Washington, D.C. litigation with -- made use or not of the

3   database matching process up there?

4   A    They didn't -- the Court did not feel it was very helpful.

5   Q    Judge Taylor went a little further than that, right?

6   A    The Court didn't feel it was useful; yes.

7           **MR. SCOTT:**  Look over at page 23, please, Brian.  If

8   we could enlarge this one.

9   Q           "Correlation between race and I.D. card ownership.

10              For a number of reasons, not the least of which is

11              apparently poor quality of DDS driver's license data,

12              it is a difficult enterprise to examine the data for

13              correlation between race and card ownership.  The

14              data on both population and licensing is of poor

15              quality for these purposes and, thus, prevent a

16              conclusive finding of a clear correlation between

17              race and identification ownership."

18   From the standpoint of your evaluation in this case --

19   A    Uh-huh.

20   Q    -- and I know that you didn't look at the underlying

21   numbers, but did you go and try and investigate whether any

22   numbers that had been derived by Dr. Herron, Dr. Ansolabehere,

23   Dr. Barreto, any of the experts, the 18 experts that have been

24   retained by the Plaintiffs in this case, did you look --

25           **MR. BARON:**  Judge, this -- objection.  This is really

Korbel - Cross / By Mr. Scott                    246

1    getting pretty far outside the scope of the direct.

2            **THE COURT:**  Of his testimony.

3            **MR. SCOTT:**  How about a couple more?

4            **THE COURT:**  Sustained.

5    **BY MR. SCOTT:**

6    Q    So, let's turn your attention, if we could, I guess back

7    to your report.  With regard to the number of reports that you

8    cite in this -- in your opinions, that form the base of your

9    opinion, how many of the Section 5 disapproval objections of

10   the 200 over the history of Section 5 submissions relate to the

11   State of Texas itself?  Not the political subdivisions, but the

12   actual State of Texas?

13   A    I haven't counted them up, but most of them are to

14   subdivisions of the State of Texas.  Every ten years, though,

15   it's reliable -- reliably Texas gets an objection to at least

16   part of their redistricting.

17           **MR. SCOTT:**  Your Honor, at this time, Defendant would

18   move for entry of Defense Exhibit 2737 which is a Department of

19   Justice Section 5 recommendation on the Georgia law, not for

20   the truth of the matter asserted, but as simply to show the

21   analysis that's gone through in a proper evaluation.

22           **MS. BALDWIN:**  Your Honor, we would renew our

23   objection.  And specifically, that this appears to be a leaked

24   document and on the basis of deliberative process privilege, we

25   object to any entry whether as not for the truth of the matter,

Korbel - Cross / By Mr. Scott                                    247

1    but any entry into evidence whatsoever at all on the basis of

2    the deliberative process privilege.  The Department of Justice

3    has never consented to entry of a leaked document into evidence

4    that I'm aware of.

5            **MR. SCOTT:**  Your Honor, it's -- a deliberative

6    process is a qualified privilege.  It's been out there for over

7    a decade.  They've undertaken no effort whatsoever and (a) it

8    was leaked by them.  There's a case out there *In Re: Sealed*

9    *Case*, 877 F.2d 976, D.C. Circuit (1989) that the disclosure of

10   a government memo that was not marked as confidential waives

11   the privilege.

12           **MS. BALDWIN:**  Your Honor?  This is -- it's not marked

13   as confidential because whatever it is, it was clearly

14   attorney-client internal document to the extent that this is

15   what it purports to be.  To the extent that Mr. Scott is

16   talking about Section 5, we have specific regulations that

17   define the way the Section 5 process works.  In the balance of

18   whether the deliberative process privilege should be waived,

19   there's absolutely no showing here that this leaked --

20           **THE COURT:**  Sustained.

21           **MR. SCOTT:**  Your Honor, at this time, we would move

22   for inclusions and offer of proof in the record 2737,

23   Defendants' 2737.

24           **THE COURT:**  All right.

25           **(Defendants' Exhibit Number 2737 was received in evidence)**

EXCEPTIONAL REPORTING SERVICES, INC

1          **MR. SCOTT:**  Pass the witness.

2          **THE COURT:**  The witness has been passed.

3          **MR. SPEAKER:**  Go ahead.

4       **(Voices off the record)**

5                         **CROSS EXAMINATION**

6    BY MR. FREEMAN:

7    Q    Good afternoon, Mr. Korbel.

8    A    Good afternoon.

9    Q    Mr. Korbel, are you aware of whether the Georgia voter

10   I.D. law described in the memo that Mr. Scott put in front of

11   you was struck down as unconstitutional by a Federal Court?

12   A    That's my understanding.  I -- well, of course, I -- the

13   only part of the memo I've seen is what he was referring to.

14   Q    Are you familiar with the Phillips litigation?

15   A    Yes.

16   Q    And I heard you say before you've never seen that memo

17   before, correct?

18   A    No.

19   Q    And you've never worked for the Department of Justice; is

20   that correct?

21   A    Never worked for the Department of Justice.

22   Q    And, Mr. Korbel, are you aware of whether any Texas House

23   plan has passed Voting Rights Act scrutiny since Texas became

24   covered under Section 5 of the Voting Rights Act?

25   A    No.  And they've also been invalidated a couple times in

1   the State Courts before they actually got to you so --

2   Q    And are aware of, other than Texas, whether the Attorney

3   General objected to any statewide redistricting plan following

4   the 2010 census?

5   A    I believe Texas was the only one that you objected to.

6   Q    Mr. Korbel, do all Section 5 submissions have the same

7   potential for discrimination?

8   A    No.  As I was saying, because Texas is such a large State

9   and we have so many jurisdictions, the submissions -- there are

10  so many submissions of very minor things that never result in

11  any serious consideration of an objection.

12  Q    And are you aware of who created each of the charts of

13  objections that Mr. Scott showed you?

14  A    I have no idea who --

15  Q    Do you know who Dr. Harvey Tucker is?

16  A    No, I don't.

17  Q    Are you aware whether Dr. Tucker submitted a report in the

18  *Perez* case?

19  A    Yes; now that I think about it, yes.

20  Q    But has Dr. Tucker offered any opinions in this Court?

21  A    Not that I know of.

22          **MR. FREEMAN:**  Pass the witness.

23          **MR. BARON:**  No further questions, your Honor.

24          **THE COURT:**  Okay.  Nothing further for this witness?

25          **MR. SCOTT:**  One second, your Honor.

**FURTHER CROSS EXAMINATION**

BY MR. SCOTT:

Q    Are you aware of whether or not the I.D. card in the
Georgia litigation had a cost associated with the purchase of
it?

A    I believe it did, yes.

Q    And do you recall whether or not that is the reason the
Court held it unconstitutional?

A    I mean, costs are -- costs are not just the cost of
obtaining something.  Costs are the cost that it takes to get
there, the time you've got to spend -- all of those things are
costs -- buying another birth certificate to buying a certified
copy of the divorce decree that may be required.  All of those
things are cost -- costly.

Q    Well, maybe you can give a number that nobody else has
been able to.  How many people are out there with -- that are
in that universe of people that don't have a photo I.D. that
need to get one who don't have a birth certificate?

         MR. BARON:  I'm going to object, again, Judge, on the
scope.

         THE COURT:  Sustained.

BY MR. SCOTT:

Q    Do you agree that some Section 5 objections are not
because the law was discriminatory?  They're simply because the
State did not meet its burden of proof?

1    A    Well, I mean, all voting rights objections are because the

2    State doesn't meet its burden of proof.

3    Q    Thank you.

4              **MR. SCOTT:**  Pass the witness.

5              **MR. FREEMAN:**  One quick question, your Honor.

6                      **FURTHER CROSS EXAMINATION**

7    **BY MR. FREEMAN:**

8    Q    Mr. Korbel, have you ever heard of a more information

9    letter?

10   A    Yes.

11   Q    If a jurisdiction doesn't submit sufficient information to

12   meet its burden, will it receive a more information letter

13   letting it know specifically what information is needed?

14   A    Yes.

15   Q    And did you count more information letters as objections

16   in your report?

17   A    No, I didn't.  I didn't --

18             **MR. FREEMAN:**  I pass the witness, your Honor.

19   A    Normally when a more objection information letter is to

20   someone who is drawing a district plan is a suggestion that

21   this is not going to be pre-cleared and so you better make some

22   changes in it.

23   Q    But --

24   A    That's what the more information letter means, as far as

25   I'm concerned.

1   Q    But even if the jurisdiction received that more

2   information letter, you didn't count that as an objection?

3   A    I did not count it.  Some people do, but I did not.

4           **MR. FREEMAN:**  Thank you.

5           **MR. SCOTT:**  Nothing further, your Honor.

6           **THE COURT:**  All right.  Nothing else, Mr. Baron?

7           **MR. BARON:**  Nothing from us, your Honor.

8           **THE WITNESS:**  May I be excused, Judge?

9           **THE COURT:**  Yes.  Thank you.

10          **THE WITNESS:**  Thank you.

11       **(Witness Excused)**

12          **THE COURT:**  Now, Mr. Baron, you're going to check on

13  the appendices, right?

14          **MR. BARON:**  Yes, your Honor.  And I'll make sure that

15  if there has been a problem, just make sure (indiscernible).

16          **THE COURT:**  Okay.  I'm just not seeing appendix one

17  so I --

18          **MR. BARON:**  I will make sure it's on file.

19          **THE COURT:**  Okay.  Next?

20          **MR. BARON:**  Your Honor, I'd like (indiscernible)

21          **THE COURT:**  Yes.

22          **MS. WESTFALL:**  Your Honor, are we going to take a

23  break right now or do you want us to call another witness?

24          **THE COURT:**  Well, who is your next witness?

25          **MS. WESTFALL:**  We're going to do a reading from Ann

1    McGeehan.

2              THE COURT:  How long?

3              MR. SPEAKER:  I'd say maybe --

4              MS. WESTFALL:  About 45 minutes.

5              THE COURT:  Do you-all need a break?

6              MS. WESTFALL:  As you wish.

7              MR. SCOTT:  I can sneak out while --

8              THE COURT:  Well, yeah, let's go ahead and take a 15

9    minute break.

10             MS. WESTFALL:  Okay.  Thank you.

11             THE COURT:  Okay.

12         **(A recess was taken from 2:57 p.m. to 3:14 p.m.; parties**

13   **present)**

14             MS. WESTFALL:  Your Honor, Elizabeth Westfall for the

15   United States.  We're going to do readings from Ann McGeehan.

16   She was deposed in both 2012 for *Texas versus Holder* as well as

17   this case.

18             THE COURT:  What -- I'm sorry.

19             MS. WESTFALL:  May I approach?

20             THE COURT:  What's her name?

21             MS. WESTFALL:  I'm sorry?

22             THE COURT:  What's her name?  I'm sorry.

23             MS. WESTFALL:  Ann McGeehan.

24             THE COURT:  Okay.

25             MS. WESTFALL:  May I approach?

McGeehan / By excerpts of deposition - Direct          254

1          **THE COURT:**  Yes.

2          **MS. WESTFALL:**  Would you like to introduce yourself

3     for the record in your real -- your real name?

4          **MS. RUDD:**  Yes, my real name is Amy Rudd.

5          **MS. WESTFALL:**  Thank you.  And as -- just for the

6     record, this is two depositions from Ann McGeehan, one on May

7     31st, 2012, one from June 18th, 2014.  We have combined the two

8     deposition designations so that they flow together

9     chronologically.

10                **EXAMINATION OF ANN McGEEHAN**

11              **BY EXCEPTS OF DEPOSITION TESTIMONY**

12      **(QUESTIONS READ BY MS. WESTFALL; ANSWERS READ BY MS. RUDD)**

13            "QUESTION:  Good morning, Ms. McGeehan.  How are you?

14            "ANSWER:  Good.

15            "QUESTION:  Could you state and spell your name for

16            the record, please?

17            "ANSWER:  Ann McGeehan, A-N-N, M-C-G-E-E-H-A-N.

18            "QUESTION:  What was your first position with the

19            Election Division?

20            "ANSWER:  I was a staff attorney.

21            "QUESTION:  What year did you have that -- what year

22            did you start that position?

23            "ANSWER:  September of 1989.

24            "QUESTION:  What were your responsibilities in that

25            position?

McGeehan / By excerpts of deposition - Direct                255

1     "ANSWER:  We provided legal advice to election

2     officials across the state.  There's a toll-free

3     number.  We provided advice via phone, letter.  We

4     prepared submissions to the Justice Department,

5     presented at conferences to educate election

6     officials.

7     "QUESTION:  What was your role in preparing

8     submissions to the Justice Department?

9     "ANSWER:  As a staff attorney, I would do the initial

10    draft, and then it would go up for review.  I didn't

11    sign those.

12    "QUESTION:  Is there a time when you were promoted in

13    the Election Division after you had the staff

14    attorney position?

15    "ANSWER:  Yes.

16    "QUESTION:  When was that?

17    "ANSWER:  In July of 1991, I was promoted to director

18    of the Legal Section.

19    "QUESTION:  Could you describe your responsibilities

20    in that capacity?

21    "ANSWER:  I managed the attorneys, which there were

22    between, you know, five and seven attorneys there.

23    And was, you know, in charge of the submissions, most

24    of the written correspondence that came out of the

25    Legal Division or the Elections Division itself.  I

McGeehan / By excerpts of deposition - Direct          256

1    was responsible for testifying at legislative

2    committees, assisting with any litigation, things of

3    that nature.

4    "QUESTION:  Did you assist, as legal director, in

5    developing election bills in the State Legislature?

6    "ANSWER:  I wouldn't say we assisted, you know,

7    because we are not a legislative body.  But we would

8    serve as a resource, so if questions came up.

9    Generally, someone from our office would attend every

10   House Elections Committee meeting as a resource, and

11   then also for any election-related bills that would

12   come up in Senate State Affairs, we would usually

13   have a witness there to be available as a resource.

14   "QUESTION:  Was there a time when you were promoted

15   from legal director to another position in the

16   Division?

17   "ANSWER:  Yes, in September of 1995, I was promoted

18   to director of the Elections Division.

19   "QUESTION:  Could you describe, generally, those

20   responsibilities?

21   "ANSWER:  Those responsibilities were, you know,

22   basically being in charge of the entire division and

23   making sure that all of the sections that I mentioned

24   before were, you know, operating as they should.

25   "The big change, I guess, is that I had more direct

McGeehan / By excerpts of deposition - Direct          257

1          contact with our executive staff, with the Secretary

2          directly and Assistant Secretary general counsel.

3          "QUESTION:  And did your role include preparing

4          submissions under Section 5 of the Voting Rights Act?

5          "ANSWER:  Yes.  I mean, I oversaw that process.

6          Again, they originated through the Legal Division,

7          but ultimately, they came through me, and I would

8          read them and sign them.

9          "QUESTION:  Could you describe your other

10         responsibilities besides advising the Division,

11         supervising staff, reviewing Section 5 submissions,

12         as Election Division director?

13         "ANSWER:  I monitored legislation closely.  You know,

14         I had various folks tracking bills and writing up

15         bill analyses.  I would read those.  Again, I was

16         sort of the point of contact for legislative matters,

17         as far as being a witness at committee hearings.

18         "I would be the point of contact on any election-

19         related litigation.  I work closely with our Legal

20         Division to prepare memoranda to counties instructing

21         on new laws, and then also was responsible for

22         coordinating any -- for instance, if a law passed

23         that gave the Secretary of State new duties or we had

24         to adopt a rule, I would be in charge of kind of

25         coordinating that effort.

McGeehan / By excerpts of deposition - Direct          258

1        "QUESTION:  Is there a time when you stopped working

2        for the Election Division?

3        "ANSWER:  Yes.

4        "QUESTION:  When was that?

5        "ANSWER:  That was in November of 2011, last

6        November.

7        "QUESTION:  What prompted that decision?

8        "ANSWER:  I was offered another job at the Texas

9        County District Retirement System.

10       "QUESTION:  Were you ever involved in a Section 5

11       submission that drew an objection from the Justice

12       Department?

13       "ANSWER:  Yes.

14       "QUESTION:  Which ones were those?

15       "ANSWER:  In the '90s, there was an objection on the

16       national -- our implementation of the National Voter

17       Registration Act.  It was later withdrawn.  But there

18       was an objection regarding having agency staff check

19       the citizenship status of applicants before they

20       could register.  There was a -- I believe it was a

21       water district bill that got an objection maybe in

22       2007.  There may have been a couple of others.

23       "QUESTION:  Are you familiar with the term Spanish

24       surname analysis?

25       "ANSWER:  Yes.

1          "QUESTION:  Could you define that for us?

2          "ANSWER:  The Elections Division, I think, since the

3          mid-'80s, had used a list of Spanish surnames that

4          we've obtained from the Census Department, and we run

5          that against the list of -- the statewide list of

6          registered voters to identify Hispanic voters or

7          voters with Hispanic surnames.

8          "QUESTION:  I see.  How many times have you used a

9          Spanish surname analysis in conjunction with -- or

10         how many times did you in conjunction with submitting

11         a voting change for preclearance?

12         "ANSWER:  We routinely used it to -- in describing

13         the geographic area that was impacted, we would

14         usually send voter registration data, including a

15         breakdown of Hispanic surname as well.

16         "QUESTION:  I see.  But there's nothing that would

17         prevent you from doing it for statewide changes, is

18         there?

19         "ANSWER:  No.

20         "QUESTION:  Because you do it all the time, right?

21         "ANSWER:  Right.  It's public information.

22         "QUESTION:  Thank you.  And I believe you testified

23         earlier that as part of your responsibilities when

24         you were at the Division, you worked with legislators

25         and staff to provide them with advice pertaining to

McGeehan / By excerpts of deposition - Direct          260

1        election laws, right?

2        "ANSWER:  Uh-huh, yes.

3        "QUESTION:  Are there any other categories of advice,

4        besides how a bill would be -- how a law or a bill,

5        if enacted, would be implemented and how it sort of

6        fit into the Election Code that you would provide to

7        committees or legislators?

8        "ANSWER:  Sometimes they might ask us for data, and

9        we would supply data, you know, Hispanic surname

10       voters or other information that we might collect at

11       the Secretary of State's Office.  You know, kinds of

12       voting systems used, things like that.  So we would

13       also provide just raw data that we had.

14       "QUESTION:  Do you recall that in 2000, you were

15       quoted in the Dallas Morning News?

16       "ANSWER:  In 2000?

17       "QUESTION:   In 2000.  To the effect -- and we can use

18       an exhibit if that would help to refresh your

19       recollection -- that in the polling place you have a

20       lot of measures in place to protect the integrity of

21       the ballot but voting at home has none of those

22       safeguards.  Do you remember that?

23       "ANSWER:  Yes, I do.

24       "QUESTION:  What did you mean when you said there are

25       a lot of measures in place in a polling place to

McGeehan / By excerpts of deposition - Direct                261

1    protect the integrity of a ballot?  What measures?

2    "ANSWER:  Well, it's a public setting, and you've

3    got, you know, representatives of the government

4    essentially administering the voting process.  And

5    you may have poll watchers present and other voters

6    present, and state law controls, as opposed to a

7    voter voting by mail in the privacy of his or her

8    home, and you don't have those safeguards.

9    "QUESTION:  And how do those safeguards you've just

10   described and testified to protect the integrity of

11   the ballot in the polling place?

12   "ANSWER:  Well, I mean, the intent of those laws is

13   to make sure that only, you know, eligible voters

14   vote, that they vote only one ballot, and that, also,

15   that their rights are protected.  So I guess that's

16   how.

17   "QUESTION:  Thank you.  How are those safeguards

18   absent when voting from home?

19   "ANSWER:  There's nobody from the -- the entity

20   holding the election is not present.  You don't have

21   any representatives of that entity.  And so there

22   have been occasions where voters can be targeted,

23   especially elderly voters, where, you know, there are

24   attempts to manipulate their vote.

25   "QUESTION:  Did the Legislature hold hearings on HB

1       218?

2       "ANSWER:  I'm pretty sure they did.

3       "QUESTION:  And were you invited to testify?

4       "ANSWER:  I'm sure I was.

5       "QUESTION:  Did you accept this invitation?

6       "ANSWER:  I'm sure I did, yeah.

7       "QUESTION:  In what capacity did you testify?

8       "ANSWER:  As a resource witness.

9       "QUESTION:  You've been handed what's been marked

10      284.  Do you recognize this document?

11      "ANSWER:  Yes.

12      "QUESTION:  What is it?

13      "ANSWER:  It is a transcript of the Senate State

14      Affairs Committee hearing on April 30th.

15      "QUESTION:  Directing your attention -- for the

16      record, this is an excerpt of the hearing transcript

17      focusing on your remarks at that hearing.  I'm sure

18      your counsel won't disagree with that representation.

19      "If I could turn your attention to Page 99, do you

20      see that?

21      "ANSWER:  Yes.

22      "QUESTION:  That's where the exchange begins between

23      you and Senator Van de Putte.  Do you see that?

24      "ANSWER:  Yes.

25      "QUESTION:  And I believe you testified in response

McGeehan / By excerpts of deposition - Direct          263

1          to questions from Senator Van de Putte that in the

2          past four years, the Division had not received any

3          complaints about voter impersonation; is that

4          correct?

5          "ANSWER:  Let me take a second to read it here.

6          Okay.  Yes.  That's -- I reviewed my testimony with

7          Senator Van de Putte.

8          "QUESTION:  And did you -- you testified that the

9          Division had not received any complaints about voter

10         impersonation in the previous four years --

11         "ANSWER:  Yes.

12         "QUESTION:  -- prior to your testimony; is that

13         right?

14         "ANSWER:  That's correct.

15         "QUESTION:  Apart from this testimony at the hearing,

16         did you or the Division provide anyone with

17         additional information about complaints of voter

18         impersonation?

19         "ANSWER:  I don't think so.

20         "QUESTION:  And based on your knowledge of the

21         Election Code, would House Bill 218, if enacted,

22         prevent noncitizens from voting?

23         "ANSWER:  You know, only if they couldn't present the

24         forms of ID that are required.

25         "QUESTION:  In other words, it wouldn't -- to your

McGeehan / By excerpts of deposition - Direct          264

1     knowledge, it would not prevent noncitizens from

2     voting?

3     "ANSWER:  Well, unless a noncitizen was unable to

4     obtain one of these forms of ID.

5     "QUESTION:  But that would not be particularized to

6     having the status of being a noncitizen; is that

7     correct?  That would be related to whether they had

8     ID, allowable ID under House Bill 218?

9     "ANSWER:  Right.  That was my point.  If, as being a

10    noncitizen, they were unable to obtain one of kinds

11    -- forms of ID.

12    "QUESTION:  Thank you.  Are you aware of whether a

13    noncitizen can obtain a Texas driver's license?

14    "ANSWER:  My understanding is that a person has to

15    have legal residence in the state, so a noncitizen

16    who is here legally could get a driver's license is

17    my understanding.

18    "QUESTION:  If a noncitizen became registered to

19    vote, a photo ID requirement for voting would not

20    prevent that person from voting; is that right?

21    "ANSWER:  Well, again, I think it would be -- it

22    would relate to what ID was required, and if a

23    noncitizen was unable to obtain one of the forms of

24    ID, then that, I guess, would prevent them from

25    voting.

1     "QUESTION:  And assuming they were able to obtain one

2     of those forms of ID, a photo ID would not prevent

3     that individual from voting; is that right?

4     "ANSWER:  That's right, if they had one of the

5     permitted forms of ID.

6     "QUESTION:  There has been deposition testimony in

7     this case that enacting photo ID law requiring voters

8     to present photo ID at the polls would deter

9     ineligible voters from attempting to register to

10    vote.  Do you have any facts or information that

11    would support that statement?

12    "ANSWER:  No.

13    "QUESTION:  Was there a time after it was filed that

14    the Division was asked to provide any assistance or

15    guidance on Senate Bill 362?

16    "ANSWER:  I guess the communication that I had --

17    well, there was some communication that were at

18    public committee meetings, and any other

19    communications that I might have had, I probably

20    can't testify to.

21    "QUESTION:  Could you tell me what information you

22    provided in response to those inquiries, what factual

23    information you provided?

24    "ANSWER:  During the session, our office provided

25    information concerning, again, sort of technical

1    information on how to make certain processes work

2    within the Election Code and how if other sections

3    needed to be amended in order to make this law work.

4    "QUESTION:  Was that kind of conforming technical

5    amendments?

6    "ANSWER:  Yes.

7    "QUESTION:  Did the Division receive any request to

8    conduct any analysis of Senate Bill 362, other than

9    what you already testified to?

10   "ANSWER:  Representative Anchia, I believe, ask

11   similar questions in 2009 that he asked in 2007, and

12   so we provided that data to him and to the whole

13   House Elections Committee.

14   "QUESTION:  What did Representative Anchia ask for?

15   "ANSWER:  He asked for, you know, voter registration

16   numbers.  He asked for the number of voters that

17   registered with driver's license as opposed to social

18   security number.  He asked for information about the

19   number of referrals we had made to the Attorney

20   General's Office for Election Code for criminal

21   violations.  He may have asked -- well, there may

22   have been one or two other questions on there, but

23   that was the big part of it, I think.

24   "QUESTION:  Did he make that request in writing?

25   "ANSWER:  No.

1        "QUESTION:  Did you respond in writing?

2        "ANSWER:  Yes, I think we did.

3        "QUESTION:  Are you aware of any attempt to determine

4        the impact of Senate Bill 362 on minority voters?

5        "ANSWER:  I mean, at the hearing, there were

6        witnesses on both sides on that point.  So, I mean,

7        that's what I'm aware of.  When it was heard on the

8        Senate floor, I believe there were witnesses that

9        testified to that.

10       "QUESTION:  Are you aware of -- when you say there

11       were witnesses on both sides, you're saying there

12       were bill supporters who attempted to determine the

13       impact of Senate Bill 362 on minority voters, or is

14       it limited to bill opponents?

15       "ANSWER:  I don't know if all the witnesses stated

16       they were opposed to it, but in particular, I'm

17       trying to remember the name of the -- generally, I

18       think they were affiliated with the bill's opponents.

19       "QUESTION:  Would Senate Bill 362 ordinarily have

20       been handled by the State Affairs Committee?

21       "ANSWER:  Yes, probably.

22       "QUESTION:  And who is in charge in the Senate of

23       referring bills to particular committees?

24       "ANSWER:  Well, I believe the Lieutenant Governor.

25       "QUESTION:  Did it strike you as unusual that it had

McGeehan / By excerpts of deposition - Direct                268

1              been referred to the Committee of the Whole at the

2              time?

3              "ANSWER:  It was unusual."

4              **MS. WESTFALL:**  Could you change the control of the

5     monitor?  Thank you.

6              "Let's go to U.S. Exhibit 288."

7              Actually, we won't go to U.S. 288.  Sorry about that.

8              "QUESTION:  It's a House hearing transcript.  Thank

9              you.

10             "ANSWER:  Okay.  March 1st, 2011.

11             "QUESTION:  On Page 310, near the bottom of the page,

12             Representative Anchia starts to talk to you about

13             what he called a 'vote saving affidavit approach,'

14             and I'd like you to read through your comments on 313

15             just to yourself.

16             "ANSWER:  Okay.  Okay.  So through 313?

17             "QUESTION:  Yes.  And so what you're basically

18             talking about here, would it be correct to say, then,

19             is that -- what we would call a 'bypass affidavit,'

20             or an affidavit in which the person swears to their

21             identity and is then permitted to vote in lieu of

22             providing photo ID; is that correct?

23             "ANSWER:  Right.

24             "QUESTION:  And you say, 'We could -- we could look

25             at it.'  On Page 13, you say, 'We could look at what

1        some of the other states have done.'  And you

2        mentioned Michigan.  Representative Anchia mentions

3        Ohio.  You say you might have heard about Florida

4        doing such an affidavit.  I'm curious whether you

5        ever -- your office ever looked into that, whether or

6        not an affidavit could serve as a way to allow

7        someone to vote who lacked ID?

8        "ANSWER:  We did in 2009 a little bit, but I think

9        that's covered under this privilege.

10       "QUESTION:  Once you gathered the information, did

11       you form a conclusion that a bypass affidavit would

12       lead to voter fraud?

13       "ANSWER:  What I -- what I obtained from the

14       information I got from Michigan and Florida was that

15       they thought it was a pretty good process.  Although,

16       I think I've read that Michigan is trying to change

17       that law now.  So --

18       "QUESTION:  You mentioned this was in 2009.

19       "ANSWER:  Yes.

20       "QUESTION:  So at the time that you gathered the

21       information, you understood that those states felt

22       positively about their affidavit bypass.  Did you

23       gather any information suggesting that the affidavit

24       bypass would increase voter fraud?

25       "ANSWER:  We didn't really do much with it.  I mean,

1       we basically found out what -- what their process

2       was.  We didn't do any further analysis on it.

3       "QUESTION:  And you learned that they felt good about

4       the process?

5       "ANSWER:  I know that the Florida director felt

6       positive about the process, and I don't know if he

7       came to testify or there was -- at some point, there

8       was a discussion that he might come and testify in

9       one of the hearings.

10      "QUESTION:  And did you learn any information at that

11      time that the bypass affidavit process would lead to

12      increased voter fraud?

13      "ANSWER:  No.

14      "QUESTION:  The court reporter has handed you what's

15      been marked as Rodriguez 6.  Do you recognize this

16      document as Senate Journal from March 18th, 2009?

17      "ANSWER:  Yes.

18      "QUESTION:  Turn with me to Page 591 if you would,

19      which is the tail end of a letter that actually

20      begins on the first page, from Deputy Secretary of

21      State Colby Shorter, III.

22      "ANSWER:  Yes.  And it's really Coby, not Colby.

23      "QUESTION:  Coby.

24      "ANSWER:  Coby.  His real name.

25      "QUESTION:  So this is a letter from Mr. Shorter, and

1    he -- you have previously described the position of

2    Deputy Secretary of State as somebody in the

3    executive office; is that right?

4    "ANSWER:  They're basically number two.

5    "QUESTION:  The number two, right below Hope Andrade;

6    is that correct?

7    "ANSWER:  That's right.

8    "QUESTION:  If you would turn with me to Page 591,

9    there is a question on that page:  'Does the

10   Secretary of State track the racial status of

11   registered voters?  If not, how will the state prove

12   that Senate Bill 362 does not have an adverse impact

13   on the minority voters when the state submits the

14   bill for preclearance?'  Do you see that question?

15   "ANSWER:  Yes.

16   "QUESTION:  And is it correct, if you look at the

17   second paragraph, every submission to the U.S.

18   Department of Justice?  Do you see that second

19   paragraph there?

20   "ANSWER:  Yes.

21   "QUESTION:  The third sentence, do you see where it

22   says, 'A similar effort to obtain such demographics

23   may be required for a voter identification bill.'  Do

24   you see that?

25   "ANSWER:  Yes, I do.

McGeehan / By excerpts of deposition - Direct          272

1      "QUESTION:  So would it be fair to say, then, that

2      the number two person at the Secretary of State's

3      Office, in March of 2009, was informing the

4      Legislature that an effort would have to be made when

5      attempting to preclear a voter ID bill to identify

6      the demographics of registered voters?

7      "ANSWER:  Yeah.  He said it may be required.  He

8      offered it, but --

9      "QUESTION:  Okay.  Would it be fair to say, then, and

10     your office knew, in 2009, that having to get

11     demographics on registered voters might be a part of

12     the preclearance process for showing that a voter ID

13     bill complied with Section 5?

14     "ANSWER:  Yes, I mean, Deputy Shorter's answer

15     mentioned that, so --

16     "QUESTION:  Okay.  Following the hearing in March

17     2009, did the Division submit any analysis of the

18     racial composition of voters who don't have a Texas

19     driver's license to any members of the Legislature or

20     the Lieutenant Governor's Office?

21     "ANSWER:  No.

22     "QUESTION:  At any time after the hearing, did the

23     Division conduct or attempt to conduct an analysis of

24     the racial composition of voters who do not have a

25     Texas driver license?

McGeehan / By excerpts of deposition - Direct                273

1        "ANSWER:  No.

2        "QUESTION:  In 2010, did the House Elections

3        Committee hold a hearing about voter ID in the

4        interim session?

5        "ANSWER:  I know they held -- in 2010?  They probably

6        did.  I don't remember exactly, to be honest with

7        you.

8        "QUESTION:  Did Representative Smith chair that

9        hearing?

10       "ANSWER:  I believe so.  Yeah, I'm starting to

11       remember it a little bit.

12       "QUESTION:  Did you testify at that panel?

13       "ANSWER:  I probably did, yeah.

14       "QUESTION:  Did you testify that the Division had

15       referred 24 Election Code cases for possible

16       prosecution in the past two years?  Does that sound

17       familiar?

18       "ANSWER:  That sounds familiar.

19       "QUESTION:  And that was as of 2010; is that right?

20       "ANSWER:  If they had asked for that information, I

21       would have pulled what we had, and that sounds about

22       right.

23       "QUESTION:  And of those 24, did you testify that two

24       had involved voter impersonation allegations?

25       "ANSWER:  You know, I don't have a super clear memory

McGeehan / By excerpts of deposition - Direct          274

1          of it, but it sounds about right.

2          "MS. WESTFALL:  Could you mark this?

3          "QUESTION:  You've been handed what's been marked

4          U.S. 286.  Do you recognize this document?

5          "ANSWER:  Yes.  It appears to be an article from the

6          Houston Chronicle.

7          "QUESTION:  And if you see at the bottom of Exhibit

8          286, it refers to your testimony before the panel.

9          Do you see that?

10          "ANSWER:  Yes.

11          "QUESTION:  Could you take a look at that and let me

12          know when you've read the sentences?

13          "ANSWER:  Yes, I've finished reading it.

14          "QUESTION:  And does it indicate that you had

15          referred 24 Election Code cases for possible

16          prosecution in the past two years as of the date of

17          this testimony; is that right?

18          "ANSWER:  Yes.

19          "QUESTION:  And that two had involved voter

20          impersonation allegations; is that correct?

21          "ANSWER:  Right.

22          "QUESTION:  And that more than 20 million votes had

23          been cast in Texas general elections since 2002; is

24          that right?

25          "ANSWER:  That's what it says.

McGeehan / By excerpts of deposition - Direct          275

1          "QUESTION:  Is this article accurate about what you

2          testified to before the panel?

3          "ANSWER:  It probably is.  I just -- I don't

4          remember, you know, everything I testified to on

5          that.  But I have no reason to think it's not -- not

6          an accurate summary.

7          "QUESTION:  And could you compare how this compares

8          to Senate Bill 14 as filed with the forms of

9          allowable ID under Senate Bill 362?

10         "ANSWER:  Senate Bill 14 requires photo ID, whereas

11         the prior versions permitted photo ID or two forms of

12         nonphoto ID.

13         "QUESTION:  And would you describe that as a

14         significant change in the legislation between Senate

15         Bill 362 and Senate Bill 14?

16         "ANSWER:  Yes.

17         "QUESTION:  Do you know why Senate Bill 14 didn't

18         allow for the use of nonphoto IDs?

19         "ANSWER:  No.

20         "QUESTION:  Do you know why Senate Bill 14 only

21         allows for the use of unexpired IDs?

22         "ANSWER:  No.

23         "QUESTION:  Do you know why the forms of ID have been

24         significantly reduced between Senate Bill 362 and

25         Senate Bill 14 as filed?

McGeehan / By excerpts of deposition - Direct          276

1       "ANSWER:  No.

2       "QUESTION:  If a photo ID is expired but was validly

3       issued, why doesn't that prove or doesn't that prove

4       that the person is the same person on the ID, in your

5       view?

6       "ANSWER:  Could you restate the question?

7       "QUESTION:  Certainly.  It's after lunch.  If a photo

8       ID is expired but was validly issued, does that prove

9       the person is the same person who appears on the ID?

10      "ANSWER:  Yes.

11      "QUESTION:  Was photo ID declared to be a legislative

12      emergency?

13      "ANSWER:  I believe it was.

14      "QUESTION:  And when did you first learn about this?

15      "ANSWER:  When it was reported in the media.

16      "QUESTION:  Did the Secretary of State or Election

17      Division request this designation?

18      "ANSWER:  No.

19      "QUESTION:  And did the legislative emergency -- was

20      it declared sometime in January 2011?

21      "ANSWER:  That sounds right.

22      "QUESTION:  Did your office receive any notice of

23      this declaration before it occurred?

24      "ANSWER:  No.

25      "QUESTION:  Are you aware of any election law having

McGeehan / By excerpts of deposition - Direct          277

1          been designated as an emergency prior to photo ID in

2          January of 2011?

3          "ANSWER:  No.

4          "QUESTION:  Do you know why Senate Bill 14 needed to

5          be considered in the first 60 days of the

6          Legislature?

7          "ANSWER:  No.  I mean, I can assume it's because it

8          was declared an emergency, but I'm not familiar with

9          those rules.

10         "QUESTION:  But do you know why there was urgency in

11         considering photo ID --

12         "ANSWER:  No.

13         "QUESTION:  -- in 2011?  Can you identify, as you're

14         sitting here -- well, actually, can you identify

15         anything related to the administration of elections

16         in the State of Texas that would have necessitated

17         the Legislature to consider voter ID within the first

18         60 days of the session in 2011?

19         "ANSWER:  I don't know of any.

20         "QUESTION:  Do you why Senate Bill 14 did not provide

21         more specificity about how poll workers should

22         determine whether a voter had presented an ID that

23         proved their identity?

24         "ANSWER:  No.

25         "QUESTION:  Do you think the bill should have

McGeehan / By excerpts of deposition - Direct        278

1        provided more specificity in that regard?

2        "ANSWER:  Well, I guess from the Secretary of State's

3        point of view, it would have been nice if they had

4        done that.  It would have been one less thing that

5        the Secretary of State's Office had to do.

6        "QUESTION:  And do you believe it's a very important

7        part of the bill to determine -- to instruct poll

8        workers as to how they administer this ID requirement

9        at the polls?

10       "ANSWER:  Yes.

11       "QUESTION:  Because if they don't understand how to

12       determine someone's identity, it could be misapplied

13       and disenfranchise a voter; isn't that right?

14       "ANSWER:  Yes.

15       "QUESTION:  Does Senate Bill 14 include a provision

16       for voter ed?

17       "ANSWER:  Yes.

18       "QUESTION:  Could you describe the voter education

19       provisions, generally speaking, in the bill?

20       "ANSWER:  I think it's in Section 5 of the bill that

21       says the Secretary of State -- anyway, it sets up

22       several mandates for Secretary of State and county

23       officials that specifically requires the Secretary of

24       State to conduct a statewide effort to educate voters

25       regarding the identification requirements.

1       "QUESTION:  And so the education requirements advise

2       voters of the need or will advise if this law is

3       precleared of the need to get ID, but it doesn't in

4       any way reduce the burden that a voter might need to

5       undergo to get an election identification certificate

6       or a form of allowable ID; isn't that right?

7       "ANSWER:  Right.  This is a purely educational

8       effort.

9       "QUESTION:  In deposition testimony in this case,

10      there have been a number of purposes that witnesses

11      have talked about in terms of the purpose of Senate

12      Bill 14, and I'm going to ask you a few questions

13      about purposes of the bill.  Some witnesses have

14      testified, and I believe this was in the submission

15      letter along with the preclearance submission for

16      Senate Bill 14, which you signed, that it would

17      promote election integrity.  Do you remember that?

18      "ANSWER:  Uh-huh.  Yes.

19      "QUESTION:  Do you remember that purpose?

20      "ANSWER:  Yes.

21      "QUESTION:  Are you aware of any voters in the State

22      of Texas who did not vote because they were concerned

23      that voter fraud would cancel out or dilute their

24      vote?

25      "ANSWER:  I don't know that for a fact.

McGeehan / By excerpts of deposition - Direct          280

1          "QUESTION:  Is it possible that if a registered voter

2          did not have a form of photo ID, and he appeared at

3          the polls to vote and had to vote by provisional

4          ballot, that he might lose confidence in the election

5          system?

6          "ANSWER:  It's possible.

7          "QUESTION:  Can you describe the election

8          identification certificate provision of Senate Bill

9          14?

10         "ANSWER:  It requires DPS to develop a new form of --

11         to develop a new election identification certificate

12         that could be used to persons that didn't have --

13         that were registered voters or who -- either they

14         were registered or they were eligible to be

15         registered, and they submitted registration right

16         there at the DPS office.

17         "And it has to be free.  And it can only be used for

18         purposes of voting.  Can't be used like a regular

19         personal identification certificate issued by DPS.

20         "QUESTION:  Was the Division involved in developing

21         this provision at all?

22         "ANSWER:  No.

23         "QUESTION:  Did you do any analysis of this

24         provision?

25         "ANSWER:  No.

McGeehan / By excerpts of deposition - Direct          281

1      "QUESTION:  Did you do any drafting of this

2      provision?

3      "ANSWER:  No.

4      "QUESTION:  Are you aware of any communications

5      between the Division and anyone related to this

6      provision?

7      "ANSWER:  You mean before it was put in the bill --

8      "QUESTION:  I mean at all --

9      "ANSWER:  -- or after the bill?

10     "QUESTION:  -- at any time?

11     "ANSWER:  We were not aware of it until it -- until

12     after the Conference Committee.  After the Conference

13     Committee, we began to work with DPS to figure out a

14     way to start to implement it.

15     "QUESTION:  Does Senate Bill 14 direct DPS to collect

16     certain information from persons applying for an EIC,

17     or does Senate Bill 14 leave it to DPS to make that

18     determination as to what to collect from EIC

19     applicants?

20     "ANSWER:  The language, as I read it in Subsection F

21     on Page 14, is that the Department may require an

22     applicant to furnish information required by the this

23     -- the other provision of the Transportation Code.

24     So it appears to give DPS the discretion to determine

25     what needs to be -- needs to be furnished.

1    "QUESTION:  So the Legislature, in crafting Senate

2    Bill 14, did not specify the particular things to be

3    gathered from EIC applicants, did it?

4    "ANSWER:  That's how I read this.  I don't know if

5    other legal minds have analyzed it, but that's --

6    that's how I'm reading it today.

7    "QUESTION:  And DPS, in turn, was drafting

8    administrative rules related to EICs when you were

9    still employed with the Division; is that correct?

10   "ANSWER:  That's right.

11   "QUESTION:  And DPS had plans, at one point, to

12   collect fingerprints from EIC applicants; is that

13   correct?

14   "ANSWER:  That's what I remember.

15   "QUESTION:  Is it your testimony that you and

16   Ms. Winn discouraged the collecting of fingerprints

17   from EIC applicants; is that correct?

18   "ANSWER:  Yes.  I believe that's what we communicated

19   at a meeting on that.

20   "QUESTION:  I wanted to ask you some questions about

21   U.S. citizens and some of the types of voter ID that

22   are described in Senate Bill 14.  Our conversation is

23   going to be a little bit disjointed because I'm

24   bouncing around and going in between some of the

25   questions I have for you now.

McGeehan / By excerpts of deposition - Direct          283

1        "ANSWER:  Okay.

2        "QUESTION:  You mentioned that you're aware that non-

3        U.S. citizen legal residents can receive a Texas

4        driver license, correct?

5        "ANSWER:  Yes.

6        "QUESTION:  All right.  And that would also be true

7        for a Texas identification card from DPS?

8        "ANSWER:  Yes.

9        "QUESTION:  All right.  And you would agree with me

10       that legal permanent resident immigrants can serve in

11       the U.S. military, don't you?

12       "ANSWER:  I believe that's correct.

13       "QUESTION:  And thus, they would have a military ID,

14       correct?

15       "ANSWER:  Correct.

16       "QUESTION:  Have you received any complaints from

17       voters who said they lacked confidence in the system

18       because the voter certificate could be used for voter

19       identification?

20       "ANSWER:  No.

21       "QUESTION:  Was Senate Bill 14 referred to the

22       Committee of the Whole Senate?

23       "ANSWER:  Yes.

24       "QUESTION:  Did you testify before the Committee of

25       the Whole Senate on January 25th, 2011?

1      "ANSWER:  Yes.

2      "QUESTION:  Did you appear as a resource witness?

3      "ANSWER:  Yes.

4      "QUESTION:  At the hearing on January 25th, Senator

5      Williams asked you to conduct additional analysis of

6      which registered voters did not have a driver

7      license; is that correct?

8      "ANSWER:  Yes.

9      "QUESTION:  And at the end of your testimony, Senator

10     Williams followed up on his request for a cross-

11     reference of the driver license, DPS database and the

12     TEAM database; is that right?

13     "ANSWER:  That's right.

14     "QUESTION:  And he asked when he could expect that

15     information; is that correct?

16     "ANSWER:  Yes.  I think so.

17     "QUESTION:  And he asked you twice in one day for the

18     same information --

19     "ANSWER:  Yes --

20     "QUESTION:  Okay --

21     "ANSWER:  -- and I hadn't left the building yet.

22     "QUESTION:  Did you feel there was a certain sense of

23     urgency to his request?

24     "ANSWER:  Yes.

25     "QUESTION:  Is it fair to say that notwithstanding

McGeehan / By excerpts of deposition - Direct          285

1          the lack of a driver license number, that the

2          Division had familiarity with the DPS driver license

3          database at this time?

4          "ANSWER:  Well, we had some familiarity with it.

5          "QUESTION:  Who would actually conduct the HAVA

6          matching process for a voter who supplied a driver

7          license number?  Would that be done by DPS or by the

8          Division?

9          "ANSWER:  That was done by the Division.

10         "QUESTION:  And notwithstanding the matching concerns

11         about what fields to use, et cetera, you just

12         testified about -- you just testified about today,

13         you nevertheless told Senator Williams that you could

14         produce -- you expected to be able to produce the

15         results in one week, right?

16         "ANSWER:  Right.

17         "QUESTION:  So you did not foresee any of the

18         matching problems to be insurmountable in any sense;

19         is that right?

20         "ANSWER:  It looks like I tried to give myself a

21         little wiggle room knowing that sometimes things

22         aren't as straightforward, but I was trying to be

23         reasonable to a legislator.

24         "QUESTION:  Subsequent to the Senate hearing on --

25         Committee of the Whole hearing on Senate Bill 14, did

McGeehan / By excerpts of deposition - Direct          286

1       the Division subsequently conduct a match of the TEAM

2       voter registration database with the DPS driver

3       license database?

4       "ANSWER:  Yes.

5       "QUESTION:  Was that the first time the Secretary of

6       State's Office attempted to conduct a match of TEAM

7       to DPS?

8       "ANSWER:  Yes.

9       "QUESTION:  And when was the match conducted?

10      "ANSWER:  I think it was shortly after the hearing.

11      "QUESTION:  Was it in response to Senator Williams'

12      request?

13      "ANSWER:  Yes.

14      "QUESTION:  It was not separate and apart in any way

15      from Senator Williams' request; is that right?

16      "ANSWER:  That's right.

17      "MS. WESTFALL:  Would you mark this PL 188?

18      "QUESTION:  You've been handed what's been marked as

19      Exhibit 188."

20      **MS. WESTFALL:**  And I do not believe that is the right

21  document.  Okay.  Let's not use that document.  That's the

22  wrong document.  I'm sorry.  You can pull -- you can take that

23  down.

24      "QUESTION:  Do you recognize this document?

25      "ANSWER:  Yes.

McGeehan / By excerpts of deposition - Direct        287

1        "QUESTION:  What is it?

2        "ANSWER:  This is an e-mail from between me and Karen

3        Richards, Lee Guyette and John Mendoza as we were

4        working on Senator Williams' request to do that query

5        between the driver license database and the voter

6        registration database.

7        "QUESTION:  For the record, this document is

8        TX00107733 through TX00107735.  I believe you

9        testified Ms. Richards was the Division's head of

10       voter registration at the time?

11       "ANSWER:  Yes.

12       "QUESTION:  Looking at your e-mail, do you see it

13       refers to someone named Coby?

14       "ANSWER:  Yes.

15       "QUESTION:  Is that Coby Shorter?

16       "ANSWER:  Yes.

17       "QUESTION:  Do you see the second sentence says that

18       you have drafted a summary that you'll send to Coby

19       and John so they can distribute --"

20       **MS. WESTFALL:**  Terrific.  Thank you.

21       "QUESTION:  So they can distribute it to the

22       legislative folk?

23       "ANSWER:  Yes.

24       "QUESTION:  Are you referring to John Sepehri in

25       that?

McGeehan / By excerpts of deposition - Direct          288

1        "ANSWER:  Yes.

2        "QUESTION:  That John is John Sepehri --

3        "ANSWER:  Yes.

4        "QUESTION:  -- and Coby is Coby Shorter?

5        "ANSWER:  Correct.

6        "QUESTION:  Could you describe on page -- the second

7        page of this document, could you describe the

8        matching process that you undertook?

9        "ANSWER:  So it looks like we did six separate

10       queries with different matching criteria.  And the

11       first one was based on last name, first name, date of

12       birth and county, so if -- in same county.  And then

13       that would be considered a match between the two

14       databases.

15       "And then the second query is last name, first name,

16       date of birth, same county but they took out voters

17       70 and older.

18       "QUESTION:  Do you see that this chart indicates that

19       under the range of matching criteria you used, you

20       concluded that between 504,000, roughly, voters and

21       as many as 844,000 voters did not have a driver

22       license according to your comparisons?

23       "ANSWER:  Did you say 504?

24       "QUESTION:  504,000, yes.

25       "ANSWER:  Yes.

McGeehan / By excerpts of deposition - Direct            289

1      "QUESTION:  Did you conduct this matching process

2      using information that the Division had in its sole

3      possession?

4      "ANSWER:  Yes.

5      "QUESTION:  So the Division had in its possession all

6      the information it needed to conduct this analysis as

7      of October 2010; is that correct?

8      "ANSWER:  Yes.

9      "QUESTION:  There's nothing that prevented the

10     Secretary of State's Office from conducting this

11     analysis during the prefiling of Senate Bill 14 or at

12     any time prior to January 25th, 2011; is that

13     correct?

14     "ANSWER:  Yes.

15     "QUESTION:  What is your reaction to the finding that

16     as many as 844,000 voters may not have been issued a

17     driver license or personal ID card by the State of

18     Texas?

19     "ANSWER:  I don't -- I don't think we were surprised

20     by these numbers.  I think they're within the range

21     of what had previously been provided to

22     Representative Anchia and others.

23     "QUESTION:  Did you do any analysis of where the

24     voters resided before this Section 5 process got

25     underway?

McGeehan / By excerpts of deposition - Direct          290

1          "ANSWER:  I don't think so.

2          "QUESTION:  Did you do any analysis of where or how

3          long the voters had been on the registration rolls?

4          "ANSWER:  No.

5          "QUESTION:  Did you do any analysis of the voter's

6          voter history?

7          "ANSWER:  No.

8          "QUESTION:  Did you do any analysis before the

9          Section process submission was submitted of whether

10         these voters were Spanish surname voters?

11         "ANSWER:  No.

12         "QUESTION:  Could you have conducted that analysis?

13         "ANSWER:  Yes.

14         "QUESTION:  And, in fact, you did conduct that

15         analysis; is that right?

16         "ANSWER:  For the Justice Department.

17         "QUESTION:  What was -- turning back to Exhibit 188,

18         why did you indicate that Coby and John -- Coby

19         Shorter and John Sepehri would be distribute it to

20         the legislative folk?  What was the basis of your

21         understanding they would do that?

22         "ANSWER:  That -- that was their instruction, that

23         on, I guess on major legislative issues, that they

24         would be the primary point of contact.

25         "QUESTION:  I see.  So that was just -- that was not

McGeehan / By excerpts of deposition - Direct          291

1          anything particular to this request, it was just

2          generally how you operated in the Division?

3          "ANSWER:  Yes.

4          "QUESTION:  Is it fair to say that you yourself

5          sometimes routinely provided information for the

6          Legislature in response to requests yourself?

7          "ANSWER:  It really would depend on the

8          administration and it would depend on the kind of

9          information.

10         "QUESTION:  What made this information different,

11         such that it had to go through Mr. Shorter?

12         "ANSWER:  Well, it was the first time we had

13         conducted this analysis and we were making some

14         subjective calls on the matching criteria, so we

15         wanted to make sure Executive was on board with that.

16         "QUESTION:  What is the basis of your testimony that

17         it may be an issue of reliability that caused Coby

18         Shorter not to want to -- and Secretary of State not

19         to provide this information to the Legislature?

20         "ANSWER:  Well, we discussed that.  I mean, it was

21         when I met with Coby and John, that was the

22         discussion.

23         "QUESTION:  What did they say to you?

24         "ANSWER:  I think perhaps they were expecting a

25         single number, and we didn't feel comfortable with

McGeehan / By excerpts of deposition - Direct          292

1     that.   That's why we gave them a range.   So that's

2     how I recall the conversation going.

3     "QUESTION:   So they -- because you had used various

4     matching criteria, that created concerns for them

5     because there were different numbers that were

6     generated pursuant to those matching criteria?

7     "ANSWER:   Yes.

8     "QUESTION:   Did you try to defend the quality of your

9     analysis in that meeting?

10    "ANSWER:   I think I probably just stated this was

11    probably the best we could do based on the resources

12    within the Elections Division.   We're not

13    statisticians and don't have any other software to do

14    matching, so this was the best we could do.

15    "QUESTION:   Did you have any questions yourself about

16    the reliability of this analysis?

17    "ANSWER:   I was comfortable with what we provided

18    with the caveats that were provided.   Whether there

19    was a better way to go about that, there may have

20    been.   But based on the resources that we had, this

21    was the best we could do as far as I understood it.

22    "QUESTION:   Would you personally have felt

23    comfortable providing this to the Legislature with

24    the caveats that you included in your summary?

25    "ANSWER:   Yeah.   Yes.

1        "QUESTION:  Did Mr. Shorter or Mr. Sepehri express

2        any other concerns about the analysis besides the

3        fact that different criteria were run and different

4        numbers were generated pursuant to that criteria?

5        "ANSWER:  No, I don't think so.

6        "QUESTION:  You have been handed what's been marked

7        as Exhibit 189.  This is highly confidential.  Right

8        before the break, we were -- I had directed you back

9        to the bill history of Senate Bill 14.

10       "ANSWER:  Yes.

11       "QUESTION:  Does the bill history indicate that the

12       House received Senate Bill 14 on January 27th, and it

13       was read for the first time in the House on February

14       11th, 2011?

15       "ANSWER:  Yes.

16       "QUESTION:  Was Representative Patricia Harless the

17       House sponsor --

18       "ANSWER:  Yes.

19       "QUESTION:  -- of Senate Bill 14?

20       "ANSWER:  Yes, she was.

21       "QUESTION:  Mr. Beuck, Colby Beuck was her chief of

22       staff at the time; is that correct?

23       "ANSWER:  I think so.

24       "QUESTION:  Turning your attention to Exhibit 189, do

25       you recognize this document?

McGeehan / By excerpts of deposition - Direct                    294

1          "ANSWER:  Yes.

2          "QUESTION:  What is it?

3          "ANSWER:  It is an e-mail from me to Representative

4          Harless and Colby, and I don't know how to pronounce

5          his last name, with Representative Harless' office,

6          and I copied John Sepehri.

7          "QUESTION:  What was the purpose of the e-mail?

8          "ANSWER:  It looks like I am sending her information

9          concerning the availability of federal HAVA funds to

10         conduct a statewide education -- voter education

11         program on voter ID.  And then there is also some

12         information about the number of complaints regarding

13         voter fraud and information about the number of

14         registered voters that did not have a driver's

15         license or a personal identification card.

16         "QUESTION:  Did this e-mail arise after you met with

17         Representative Harless and Mr. Beuck or have a phone

18         call with them?

19         "ANSWER:  Yes.

20         "QUESTION:  Do you see, towards the end of your e-

21         mail, you indicate that with regard to the number of

22         voters who had not been issued a driver license or

23         personal ID card by DPS, you were still working with

24         the ID department to analyze that data?

25         "ANSWER:  Yes, I see that.

1          "QUESTION:  Why did you write that?

2          "ANSWER:  Well, I don't -- I guess, you know, I don't

3          know.  I guess we were still -- you know, I say we

4          hope to have the analysis by Monday.  So I guess in

5          my mind, it was still sort of an ongoing project.

6          "QUESTION:  The e-mail that you wrote at Exhibit 189

7          was dated what?

8          "ANSWER:  February 25th.

9          "QUESTION:  And when -- turning your attention back

10         to Exhibit 188, your e-mail, at the top of that

11         exhibit, is dated what?

12         "ANSWER:  February 1st.

13         "QUESTION:  So roughly three weeks had elapsed

14         between Exhibit 188 and 189; is that right?

15         "ANSWER:  Yes.

16         "QUESTION:  What had happened with the analysis

17         during those three weeks?

18         "ANSWER:  Well, I don't know what date I gave the

19         analysis to Coby and John.  So, you know, at some

20         point after February 1st, I gave him the analysis,

21         met with them, and so it was still -- it was still in

22         their hands as of February 25th.

23         "QUESTION:  Is there a reason you did not provide

24         Representative Harless and Colby Beuck with any

25         information about the fact that you, in fact, had run

McGeehan / By excerpts of deposition - Direct          296

1          some matches in your e-mail at Exhibit 189?

2          "ANSWER:  I don't think in my -- at that point, I

3          probably didn't feel confident that -- I didn't have

4          enough confidence in those numbers that they would be

5          released to be, you know, saying what had happened

6          yet.  In my mind, it was still sort of a work in

7          progress.

8          "QUESTION:  Did you feel like you didn't have the

9          authority to advise Representative Harless that the

10         queries had been run by your supervisor?

11         "ANSWER:  I don't know that I didn't have the

12         authority.  I think it was more than I didn't feel

13         like it was a finished product to be discussed.

14         "QUESTION:  And why did you feel that way, given that

15         you, on February 1st, had written to your colleagues

16         saying you were going to run it by your supervisors,

17         and then it would be ready to be sent out?

18         "ANSWER:  Well, you know, executive management had

19         expressed some concerns with the queries, so I didn't

20         know if we would get additional direction to do it

21         differently or if they might bring in other people to

22         help us, or, you know, what was going to happen with

23         that.

24         "QUESTION:  Did they tell you specifically not to, or

25         was it understood that you were not to share the

McGeehan / By excerpts of deposition - Direct          297

1        existence of the queries with members of the

2        Legislature?

3        "ANSWER:  I think it was understood that it was a

4        work in progress and that it shouldn't be released

5        until they felt confident that it was finished.

6        "QUESTION:  What were you still analyzing on February

7        25th, 2011?

8        "ANSWER:  Well, I wasn't analyzing it, but it was in

9        the hands of the executive team.

10       "QUESTION:  Do you see that you indicate to

11       Representative Harless that your IT department was

12       still analyzing the data?

13       "ANSWER:  I did say that.

14       "QUESTION:  Was that accurate?

15       "ANSWER:  I don't know that -- I don't know that our

16       IT department at that point was doing anything else

17       with it, but in my mind, it was still an ongoing

18       project, and it was possible that we could get

19       direction to refine those queries or change up those

20       queries, which would have involved the IT staff to do

21       that.

22       "QUESTION:  But in other words, the IT department was

23       not, at the moment that you wrote this e-mail, in

24       fact, analyzing the data; is that correct?

25       "QUESTION:  I guess it would have been more accurate

1      to say that we were still, you know, analyzing the

2      data.  And the IT department may have been needed,

3      but at that precise time, they weren't doing anything

4      else.  But they may have been needed to finish it up.

5      "QUESTION:  Going back to Exhibit 188, is there any

6      reason that you would not have brought this analysis

7      to the attention of Coby Shorter and John Sepehri

8      fairly shortly after you wrote this e-mail on

9      February 1st?

10     "ANSWER:  No.

11     "QUESTION:  You would have held -- you would not have

12     held -- you would have held on to this data and not

13     -- you would not have held on to this data and not

14     released it to your supervisor pretty promptly?

15     "ANSWER:  No.  Most likely, as soon as -- yes, I

16     would have tried to give it to them quickly.

17     "QUESTION:  And so comparing again Exhibit 188 and

18     189, in the periods between when you wrote the e-

19     mails on February 1st and February 27th, why did your

20     position change between indicating to your colleagues

21     that you were prepared to give it to your supervisors

22     so they could distribute it to the legislative folk

23     and advising the House sponsor that it was still

24     under analysis with your IT departments?

25     "ANSWER:  Well, you know, I hadn't gotten a green

1          light on -- with the initial analysis, and there

2          were, you know, some reservations expressed regarding

3          the data, so I didn't -- you know, like I said, this

4          was -- this was the analysis that we performed in

5          house.  I didn't know if executive management might

6          bring additional resources to bear to maybe improve

7          upon that analysis.

8          "QUESTION:  Turning back to Exhibit 189, again, back

9          to the paragraphs concerning the analysis of the

10         data, you indicate you hoped to have the analysis by

11         Monday.  Do you see that?

12         "ANSWER:  Yes.

13         "QUESTION:  And what was that based on?

14         "ANSWER:  My -- you know, generally, I would try to

15         be very responsive to legislators, so I was probably

16         feeling like we should -- you know, that we would

17         have this available, but it wasn't my decision, so...

18         "QUESTION:  Turning your attention back to the

19         legislative history of Senate Bill 14, when was

20         Senate Bill 14 due to be considered on the House

21         floor?

22         "ANSWER:  It was heard on March 1st, I think.  It

23         looks like March 1st.

24         "QUESTION:  Did you provide any analysis to

25         Representative Harless' office as you indicated you

McGeehan / By excerpts of deposition - Direct          300

1        would in this e-mail?

2        "ANSWER:  I -- in the e-mail, it says that I'm

3        attaching a -- let me see what it says.  Oh, okay.

4        Well, I guess we didn't send her anything.  I was

5        thinking maybe we sent her, you know, our standard

6        analysis of the voter registration database, but it

7        looks like, at least in this e-mail exchange, I

8        didn't -- we didn't send her that.  And instead, I'm

9        referring to this other analysis, which I don't think

10       we have shared with her.

11       "QUESTION:  Ms. McGeehan, did you testify before the

12       House Select Committee on Voter Identification and

13       Voter Fraud?

14       "ANSWER:  Yes.

15       "QUESTION:  Did that occur on March 1st, 2011?

16       "ANSWER:  Yes.

17       "QUESTION:  Did you appear as a resource witness at

18       that hearing?

19       "ANSWER:  Yes.

20       "QUESTION:  You've been handed what's been marked as

21       Exhibit 191, which is PL 903.  Do you recognize this

22       document?

23       "ANSWER:  Yes.  I believe this is an excerpt from my

24       testimony before the Select Committee on Voter

25       Identification and Voter Fraud.

McGeehan / By excerpts of deposition - Direct          301

1     "QUESTION:  And turning your attention to Page 289

2     and 290 of Exhibit 191.

3     "ANSWER:  Okay.

4     "QUESTION:  Do you see that someone asked you a

5     question about the number of voters without a driver

6     license number on Page 289?

7     "ANSWER:  Yes.

8     "QUESTION:  Do you know who the unidentified

9     representative was, even though the person is not

10    identified in the transcript?

11    "ANSWER:  I believe it was Representative Anchia.

12    "QUESTION:  What was he asking you?

13    "ANSWER:  He's asking about the number of voters who

14    did not register without a driver's license.  Wait.

15    Let's see what it says here.  I may have to refer to

16    the --

17    "MS. WESTFALL:  Let the record reflect that the

18    witness is currently looking at Exhibit 190 --

19    "THE WITNESS:  190.

20    "MS. WESTFALL:  -- to refresh her recollection about

21    the analysis referred to on Page 289 of Exhibit 191.

22    "ANSWER:  So he's asking about the figure, the number

23    of 600,000.  A lot of people have been talking about

24    this voter figure of 600,000 as being people who

25    registered without their social security number or a

1    driver's license number, and that's consistent with

2    the number on Exhibit 190, which was 690,887.  And

3    his question, is the number bigger than that?  So I

4    need to read on to see what I was saying.

5    "QUESTION:  Do you see on Page 290 that in response

6    to what you believe a question that came from

7    Representative Anchia about the number of voters

8    without a driver license, you testified that your IT

9    department was still in the process of getting good

10    matching criteria, et cetera?

11    "ANSWER:  Yes."

12    **MS. WESTFALL:**  If you could go a little bit lower?

13    "QUESTION:  And that it could be difficult to do the

14    right match?

15    "ANSWER:  Yes.

16    "QUESTION:  Why did you not tell the Legislature that

17    your office had already conducted the matches?

18    "ANSWER:  Well, I -- you know, as I stated earlier

19    with the conversation with Representative Harless, I

20    didn't feel like that was -- that that was the final

21    product and that changes could still come.  So it was

22    my understanding that it was still being analyzed and

23    there could be future changes.

24    "QUESTION:  Did you seek authorization from

25    Mr. Shorter or Mr. Sepehri to provide that response

1              to the Legislature?

2              "ANSWER:  I think I probably did ask them before this

3              hearing if we could release it, and that probably the

4              response was no, you know, we're still analyzing

5              this.

6              "QUESTION:  Did they continue to have concerns about

7              having different sets of results based on the six

8              queries, or were there other -- well, first, a bad

9              question.

10             "Did they continue to have concerns about the

11             different results from the different queries?

12             "ANSWER:  We didn't really have a substantive

13             conversation about it, so all I knew was they were

14             still looking at it.

15             "QUESTION:  Did you see authorization, after you met

16             with Representative Harless, to release this

17             information to the Legislature?

18             "ANSWER:  Probably.  I mean, again, I don't have a

19             clear memory, but my e-mail references it, so most

20             likely, I would have probably asked John about that.

21             "QUESTION:  And what was your request to him?

22             "ANSWER:  Again, it's very fuzzy.  I'm just -- but

23             based on the e-mail that I sent to Representative

24             Harless' office, I'm referencing it, so I -- in my

25             mind, you know, I probably was thinking that maybe it

McGeehan / By excerpts of deposition - Direct          304

1          would be released or -- but -- and most likely, I

2          would have just spoken to John over the phone or in

3          person on it.

4          "QUESTION:  What did John say in response to your

5          request?

6          "ANSWER:  Again, I don't think it was any lengthy

7          discussion.  I think it was more like, you know, this

8          is still being reviewed, not ready.

9          "QUESTION:  Did he give you any substantive reason as

10         to why it couldn't be released?

11         "ANSWER:  No.

12         "QUESTION:  Did he understand that the House sponsor

13         wanted this information?

14         "ANSWER:  Yeah.  I mean, I think he was copied on

15         that e-mail, and he was probably at that meeting, so

16         I think he understood that.

17         "QUESTION:  Did he understand that Representative

18         Anchia was likely interested in this information

19         based on his previous --

20         "ANSWER:  I can't speculate, but...

21         "QUESTION:  Can you -- sitting here today, can you

22         identify any other instance where you completed

23         analysis at the request of the Legislature where you

24         didn't turn it over to the Legislature?

25         "ANSWER:  No.

McGeehan / By excerpts of deposition - Direct         305

1         "QUESTION:  Turning back to Exhibit 199, when you

2         were advised Representative Anchia that your IT

3         department was still looking at it and you were

4         trying to get good matching criteria, do you believe

5         that was accurate?

6         "ANSWER:  Yes.  You know, I think that was -- based

7         on the only real conversation I had about it, that

8         was the concern was, was this reliable data, were

9         these good queries, and so that was -- that was my

10         understanding, that the concern was regarding the

11         integrity of the data.

12         "QUESTION:  Do you think a more accurate response to

13         Representative Anchia's question would have been to

14         say the general counsel is reviewing data, it is

15         pending, we will get back to you?

16         "ANSWER:  You know, we were a team, so we don't like

17         to throw anybody under the bus, so it was just -- in

18         my mind, it was still a work in progress, so...

19         "QUESTION:  But, in fact, your IT department did not

20         have control of the data at the time of your

21         testimony; isn't that -- isn't that the case?

22         "ANSWER:  That's correct.

23         "QUESTION:  At any time after your testimony on March

24         1st, 2011, was the information from the queries at

25         Exhibit 188 released to the Legislature during the

McGeehan / By excerpts of deposition - Cross                306

1        session?

2        "ANSWER:  During session, no.

3        "QUESTION:  But do you believe, as a matter of public

4        policy, that the public and the Legislature should

5        have information about the impact of legislation

6        being considered by the Texas Legislature?

7        "ANSWER:  If the information is available, then it

8        seems like, yes, the public should have access to

9        it."

10       **THE COURT:**  Okay.

11       **MR. TATUM:**  Stephen Tatum for the Defendants, your

12  Honor.  And for this reading, playing the part of Ms. McGeehan

13  will be my colleague Jennifer Roscetti.  I have a copy of our

14  excerpts --

15       **THE COURT:**  Okay.

16       **MR. TATUM:**  -- for you, if I might approach.

17       **THE COURT:**  Yes.

18       **MR. TATUM:**  And, your Honor, I apologize in advance

19  for any overlap.

20            **EXAMINATION OF ANN MCGEEHAN**

21           **BY EXCERPTS OF DEPOSITION TESTIMONY**

22     **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY MS. ROSCETTI)**

23       "QUESTION:  Where are you currently employed?

24       "ANSWER:  I'm currently employed by the Texas County

25       and District Retirement Association -- System --

McGeehan / By excerpts of deposition - Cross                    307

1     Retirement System.

2     "QUESTION:  What is your title?

3     "ANSWER:  I'm Assistant General Counsel.

4     "QUESTION:  What are your responsibilities?

5     "ANSWER:  Provide general legal advice, review

6     administration of benefits, open meetings, open

7     records issues, occasional tax issues.

8     "QUESTION:  Have you held that position continuously

9     since you left the Secretary of State's office?

10    "ANSWER:  Yes.

11    "QUESTION:  Do you remain in contact with the

12    Election Division?

13    "ANSWER:  Not really.  You know, occasionally but not

14    regular contact.

15    "QUESTION:  Was there any legal requirement that the

16    Division prepare this report on a monthly basis?

17    "ANSWER:  No.

18    "QUESTION:  And what was the purpose of providing

19    that information to the public?

20    "ANSWER:  It was regularly requested information from

21    the media, so I think the intent was just to make it

22    readily available.

23    "QUESTION:  Did your office, beyond the website,

24    disseminate it in any other manner?

25    "ANSWER:  The only other way it was disseminated was

1              if a person made a request for that information."

2         **THE COURT:**  And, I'm sorry, what are we talking about

3    there?  Which report or --

4         **MR. TATUM:**  I believe here they are --

5         **MS. ROSCETTI:**  Is it the report to Shorter?

6         **MR. TATUM:**  The report to Coby Shorter?

7         **MS. ROSCETTI:**  I think so.

8         **MR. TATUM:**  Okay.

9         **MS. ROSCETTI:**  Or  the  ledge  that  went through

10   him.

11        **MR. TATUM:**  I believe that's what it is, your Honor,

12   but we can --

13        **THE COURT:**  The analysis?

14        **MS. WESTFALL:**  No.

15        **MS. ROSCETTI:**  I believe so.

16        **THE COURT:**  What report are we talking about?

17        **MS. WESTFALL:**  I believe this is about Spanish

18   turnout and --

19        **THE COURT:**  Okay.

20        **MS. WESTFALL:**  -- registered voter analysis.

21        **THE COURT:**  Okay.

22        **MS. WESTFALL:**  It's nothing to do with what the

23   previous reading pertained to.

24        **THE COURT:**  It didn't sound like it, but I couldn't

25   figure what --

1          **MR. TATUM:**  I apologize, your Honor.

2          **THE COURT:**  -- figure out what he was talking about.

3          **MR. TATUM:**  It probably got lost in the culling down.

4          **THE COURT:**  I got it.

5          **MR. TATUM:**  Okay.  I'm not sure where we were.  I'll

6      start over on that section.

7                "QUESTION:  Was there any legal requirement that the

8                Division prepare this report on a monthly basis?

9                "ANSWER:  No.

10               "QUESTION:  And what was the purpose of providing

11               that information to the public?

12               "ANSWER:  It was regularly requested information from

13               the media, so I think the intent was just to make it

14               readily available.

15               "QUESTION:  Did your office, beyond the website,

16               disseminate it in any other manner?

17               "ANSWER:  The only other way it was disseminated was

18               if a person made a request for that information.

19               "QUESTION:  And could the person request further,

20               more detailed information that was on the website

21               through your office about Hispanic surnamed voters?

22               "ANSWER:  I believe they could get information, you

23               know, maybe down to age level, county.  They probably

24               could even request a list of the, you know, specific

25               voters and their addresses.  Most of that is public.

McGeehan / By excerpts of deposition - Cross                    310

1        "QUESTION:  Campaigns and candidates --

2        "ANSWER:  Yes.

3        "QUESTION:  -- would make those types of requests?

4        "ANSWER:  Yes, uh-huh.

5        "QUESTION:  Did you regularly provide this report to

6        the legislature?

7        "ANSWER:  It was provided to the legislature for

8        purposes of the legislators mailing out their

9        newsletters and things like that.  I don't know that

10        it was provided in other context.

11        "QUESTION:  So individual legislators on a case-by-

12        case basis would seek this list from you; is that

13        correct?

14        "ANSWER:  Well, I don't know that they requested the

15        list with annotations for Hispanic surnames.  That

16        was basically -- we would have a standard form and

17        you could request this data and could simply checkbox

18        for what you wanted.  So that was an option.  If you

19        wanted Hispanic surnames flagged, that could be a

20        request.  And I don't remember if the legislators

21        requested that or not.

22        "QUESTION:  Did you regularly provide the list of

23        Hispanic surname voters to the Governor's office?

24        "ANSWER:  I don't recall doing that.

25        "QUESTION:  Did you provide it to the Lieutenant

1      Governor's office?

2      "ANSWER:  I don't think so.

3      "QUESTION:  Did the Division regularly conduct

4      matches of voter registration information on an

5      application with the driver license database as part

6      of the HAVA requirements?

7      "ANSWER:  Yes.

8      "QUESTION:  Wasn't the Division in a sense sort of

9      familiar with the matching process between TEAM and

10     the DPS driver's license database?

11     "ANSWER:  Yes.

12     "QUESTION:  But not withstanding these concerns,

13     there were some --

14     "ANSWER:  Well, but there's a big distinction,

15     because if you have a driver's license number, it's a

16     very simple match.  If you don't have a driver's

17     license number, then it's harder to match.

18     "QUESTION:  And why is there that difference?

19     "ANSWER:  If you don't have a unique number to match

20     on, there can be variations in a person's first name

21     or last name.  If there's a space between the, you

22     know, the M-C, you get McGeehan, De La Garza, things

23     like that.  There are issues on matching.

24     "QUESTION:  Prior to Senator Williams' request, had

25     anyone requested that the Division conduct this sort

1          of analysis of matching TEAM with the DPS driver's

2          license database?

3          "ANSWER:  I don't recall.  I don't think so.

4          "QUESTION:  When you met with Mr. Shorter and

5          Mr. Sepehri, did they express any concerns to you

6          about any political ramifications of revealing these

7          numbers to the legislator while it was considering

8          SB 14?

9          "ANSWER:  No.

10         "QUESTION:  They weren't concerned about the number

11         of voters who were indicated not to have a driver's

12         license?

13         "ANSWER:  They didn't express any of that to me.

14         "QUESTION:  Was it your view that the information was

15         not being released because of the number of voters

16         that had been found not to have an ID?

17         "ANSWER:  No.

18         "QUESTION:  Did you believe that the reason it was

19         being withheld and not released to the public was

20         legitimate?

21         "ANSWER:  Legitimate.  Executive management had

22         concerns about the reliability of the data.  That's a

23         legitimate reason not to release it.

24         "QUESTION:  Is that the only legitimate reason not to

25         release it?

1          "ANSWER:  There may be others.

2          "QUESTION:  But sitting here today, is the sole one

3          you can think of.

4          "ANSWER:  Yes.

5          "QUESTION:  Do you believe as a general matter that

6          the legislature and the public should have

7          information about the impact of legislation being

8          considered by the legislature?

9          "ANSWER:  Texas has very strong public information

10         laws, so most of that information is readily

11         available upon request.

12         "QUESTION:  Are you aware of from any quarter,

13         whether it's Mr. Shorter, Mr. Sepehri, elsewhere,

14         that there was concern about releasing the data

15         because it could threaten the passage of Senate Bill

16         14?

17         "ANSWER:  Was I aware of any concern?  No.

18         "QUESTION:  Was there any concern about the releasing

19         of this data threatening public support for Senate

20         Bill 14?

21         "ANSWER:  Not that I was aware of.

22         "QUESTION:  Was there any concern about providing

23         this information to bill opponents?

24         "ANSWER:  No.

25         "QUESTION:  Was there any concern that this list of

McGeehan / By excerpts of deposition - Cross                314

1          voters without driver licenses could be compared

2          against Spanish surname registered voter lists?

3          "ANSWER:  No.

4          "QUESTION:  Was there any concern about this list

5          sort of being the beginning of a process of figuring

6          out the impact on minority voters of Senate Bill 14?

7          "ANSWER:  Not that I'm aware of.

8          "QUESTION:  Did you ever hear the argument that

9          Senate Bill 14 was necessary to instill confidence in

10         Texas voters?

11         "ANSWER:  Yes.

12         "QUESTION:  Are you aware of any facts indicating

13         that between 2005 and 2011, Texas voters, in fact,

14         did lack confidence in the system?

15         "ANSWER:  Am I aware of any facts?

16         "QUESTION:  Yes.

17         "ANSWER:  I'm not aware of any studies, but our

18         office would, you know, regularly get phone calls,

19         emails, letters from folks that had questions about

20         the integrity of the process and would advocate for

21         more safeguards.

22         "QUESTION:  Do you recall correspondence from

23         constituents related to concerns about in-person

24         voter impersonation?

25         "ANSWER:  I don't recall anyone calling it that, in-

1  person voter impersonation, but we, you know, would

2  get complaints from voters who wanted to see, you

3  know, more safeguards in the process which would --

4  could include photo ID.

5  "QUESTION: Are you aware of any facts that would

6  support the need for voter ID as a means of

7  instilling confidence in Texas voters?

8  "ANSWER: I think, again, you know, based on

9  communications from the public with our office, yes,

10 I think that some voters would have a greater

11 confidence in the system with photo ID in place.

12 "QUESTION: At any time since the passage of Senate

13 Bill 14, have you come to conclude that Senate Bill

14 14 will have discriminatory impact on African

15 American or Hispanic voters in the State of Texas?

16 "ANSWER: No. I haven't seen any information to

17 indicate that.

18 "QUESTION: At any time since the passage of Senate

19 Bill 14, have you come to conclude that Senate Bill

20 14 was enacted at least in part with a racially

21 discriminatory purpose?

22 "ANSWER: No.

23 "QUESTION: Did you, when you were at the Division,

24 start preparing a plan for implementing election

25 identification certificates?

McGeehan / By excerpts of deposition - Cross                316

1        "ANSWER:  The -- we worked with DPS because DPS would

2        be actually issuing them.  So I don't -- we didn't

3        initiate that program.  DPS did.  But we worked with

4        them.

5        "QUESTION:  Could you describe generally what you did

6        in preparation for administration of election

7        identification certificates, which I'll call EICs?

8        "ANSWER:  Okay.  I left in November of 2011 so I

9        didn't have too much involvement.  I don't know what

10       the ultimate -- what the -- you know, the ultimate

11       rules turned out to be.  But we met with them to

12       review what it would look like, and I think we saw an

13       initial draft of the administrative rules that they

14       intended to adopt that would, you know, govern the

15       process of issuing them.

16       "QUESTION:  Anything else?

17       "ANSWER:  I think that was it.

18       "QUESTION:  Did you have any feedback from them on

19       the draft rules?

20       "ANSWER:  Yes.  I think we had a meeting and we

21       discussed the rules.

22       "QUESTION:  Okay.  During the time that the

23       legislator was in session, was there ever created to

24       your knowledge a system of queries that gave accurate

25       information with respect to a number of voters that

McGeehan / By excerpts of deposition - Cross                317

1        did not have a TDL or a personal ID in Texas?

2        "ANSWER:  I was not aware.

3        "QUESTION:  Are you aware of any queries being

4        performed by the Secretary of State's office during

5        the time that the legislator was in session that gave

6        accurate numbers with respect to the number of voters

7        in Texas that did not have a TDL or an ID number?

8        "ANSWER:  This is the only query that we did during

9        the session, and the limitations of the query are as

10       we discussed and state in the memo.

11       "QUESTION:  Okay.  During the session, did the

12       Secretary of State's office run any matching queries

13       that produced an accurate number of voters in the

14       State of Texas that did not have a TDL or an ID

15       number?

16       "ANSWER:  No.

17       "QUESTION:  Okay.  Thank you.  Would you look at

18       Exhibit 191, please, and turn to page 290?  And you

19       see on page 290 this is -- well, what -- this is your

20       testimony that you were -- that was given on April

21       11th, 2011, correct?

22       "ANSWER:  It was March 1st actually.

23       "QUESTION:  Okay.  This was transcribed by --

24       "ANSWER:  Yeah.

25       "QUESTION: Okay.  And tell us again who is the

1      unidentified representative questioning you at the

2      hearing?

3      "ANSWER:  I believe that was Rafael Anchia.

4      "QUESTION:  Okay.  Now, you'll see in the -- at the

5      bottom part your last paragraph of testimony on page

6      290, the last sentence of that testimony.  Tell me if

7      I read this correctly.  You testified:  'And our IT

8      department is looking at that, trying to get good,

9      matching criteria, because without that unique

10     identifying number of the TDL, it can be sometimes

11     difficult to make sure you have the right match.'

12     Why did you state to Representative Achia?

13     "ANSWER:  Because I was trying to explain to the

14     representative that we were still analyzing the data,

15     and that because we didn't have any identifying

16     number, we couldn't be positive that we had a match.

17     And that was making -- delaying the analysis.

18     "QUESTION:  Okay.  And when you say trying to get

19     good matching criteria, what was your concern with

20     the matching criteria that was utilized in the

21     queries that were produced in Exhibit 188?

22     "ANSWER:  Well, we had, you know, six different sets

23     of criteria, so we had six different numbers, so --

24     which made -- you know, which could cause some

25     concern -- well, what is the right number?  If you

Barber / By excerpts of video deposition - Direct        319

1                could come up with six different numbers, you know,

2                why can't you come up with a specific answer?"

3            **MR. TATUM:**  No further questions, your Honor.

4            **THE COURT:**  Okay.

5        **(Pause)**

6            **MR. BARON:**  We call Ruby Barber by video, your Honor.

7    There's a binder actually has two transcript excerpts in it:

8    one from Barber and one from Trotter, which we will

9    subsequently play --

10           **THE COURT:**  Okay.

11           **MR. BARON:**  -- but probably not back-to-back.

12   Ms. Barber is a 93-year-old woman from Bellmead (indiscernible)

13   Senate Bill 14.

14       **(Pause)**

15           **MR. BARON:**  You're waiting on us, right, Judge?

16           **THE COURT:**  Yes.

17       **RUBY BARBER, PLAINTIFFS' WITNESS, BY VIDEO DEPOSITION**

18       **(Excerpts of video deposition of Ruby Barber played from**

19   **4:16 p.m. to 4:38 p.m.)**

20           **MR. BARON:**  That concludes the offer, your Honor.  I

21   would like to publish just a couple of documents that were

22   exhibits actually from her son's deposition which in the -- and

23   they actually took her deposition as well.  In the interest of

24   time --

25           **THE COURT:**  Okay.

1          **MR. BARON:**  -- we're not going to play his

2    deposition.  That's Plaintiffs' 830, if we can bring that up

3    real quick.  And I think 830 should be -- this is the two-page

4    exhibit that is the census data that is referred to in her

5    deposition on page 40, lines 7 through 12.  And then just for I

6    guess informational sake, I think it's Defendants' Exhibits

7    270, 271, and 272, which are the newspaper articles that were

8    published by the *Waco Tribune* I think the day after she went to

9    DPS the first time and then the day of or the day after she

10   returned from her successful visit the second time.

11          **THE COURT:**  Okay.

12          **MR. BARON:**  That concludes the offer from us, your

13   Honor.

14          **THE COURT:**  Does the defense have excerpts from that

15   depo?

16          **MS. ROSCETTI:**  Yes, your Honor.  We have a short

17   excerpts from Ms. Barber's deposition.

18          **THE COURT:**  Okay.

19       **(Excerpts of video deposition of Ruby Barber played from**

20   **4:39 p.m. to 4:42 p.m.)**

21          **MS. ROSCETTI:**  That's it, your Honor.

22          **THE COURT:**  All right.

23          **MS. WESTFALL:**  Elizabeth Westfall for the United

24   States.  The Plaintiffs will now read from the deposition of

25   Todd Smith, which was taken in *Texas v. Holder* on June 1st,

321

1   2012.

2           **THE COURT:**  So we're not proceeding with Vera

3   Trotter?  I think --

4           **MS. WESTFALL:**  Not --

5           **THE COURT:**  And that's fine.

6           **MS. WESTFALL:**  -- at this time.

7           **MR. ROSENBERG:**  Not at this time.

8           **THE COURT:**  Okay.

9           **MR. ROSENBERG:**  We'll going to try to put in --

10          **MS. WESTFALL:**  Not at this time.

11          **MR. ROSENBERG:**  -- a couple readings first.

12          **MS. WESTFALL:**  Yes.

13          **MR. BARON:**  Yes.  I think the plan is to try to break

14  it up a little, your Honor.

15          **MS. WESTFALL:**  On the videos.

16          **THE COURT:**  All right.  And --

17          **MS. WESTFALL:**  May I approach?

18          **THE COURT:**  Yes.

19          **MS. WESTFALL:**  This is the deposition of

20  Representative Todd Smith.  And my colleague, the witness, can

21  introduce himself for the record.

22          MR. SAMUEL:  As Todd Smith?

23          **MS. WESTFALL:**  No, as your real persona.

24          **MR. OLIKER-FRIEDLAND:**  My name is Samuel Oliker-

25  Friedland (phonetic) with the DOJ.

1          **THE COURT:**  Playing the role of Todd Smith.

2          **MR. OLIKER-FRIEDLAND:**  Of Todd Smith, yes.

3                **EXAMINATION OF TODD SMITH**

4           **BY EXCERPTS OF DEPOSITION TESTIMONY**

5     **(QUESTIONS READ BY MS. WESTFALL; ANSWERS READ BY**

6                     **MR. OLIKER-FRIEDLAND)**

7          "QUESTION:  Good morning, Mr. Smith, how are you?

8          "ANSWER:   Good.

9          "QUESTION:  Could you please state and spell you name

10         for the record?

11         "ANSWER:  Todd Smith, T-o-d-d, S-m-i-t-h.

12         "QUESTION:  And if I refer to you, unless I specify

13         otherwise, I'm asking you a question about your

14         capacity as a former member of the Texas House of

15         Representatives.  Do you understand?

16         "ANSWER:  Yes, but I'm a current member of the House

17         of Representatives.

18         "QUESTION:  My apologies.  When were you first

19         elected to the Texas House of Representatives?

20         "ANSWER:  1996.

21         "QUESTION:  Are you aware of the photo ID bill that

22         was introduced in 2009?

23         "ANSWER:  Yes.

24         **MS. WESTFALL:**  Can you mark this as Exhibit 29?  It's

25         also PL853.

Smith - By excerpts of Deposition - Direct          323

1        "QUESTION:  You've been handed what's been previously

2        marked as US29.  Do you recognize this document?

3        **MS. WESTFALL:**  And could you blow that up a little

4        bit, the highlighted part?

5        "ANSWER:  I believe this is the Senate bill that --

6        or I don't know if this is the version that was

7        passed out of the Senate but I presume it is and the

8        number refreshes my memory, sounds right.

9        "QUESTION:  I believe you just testified that you

10       filed the shell bill when you became committee chair

11       for the House Elections Committee?

12       "ANSWER:  Yes.

13       "QUESTION:  When were you appointed chair of the

14       House Elections Committee?

15       "ANSWER:  Oh, February 2009, I believe, I guess.  I'm

16       pretty sure it had to be February.  It was late.  I

17       remember that because we had a new speaker.

18       "QUESTION:  Was that Speaker Straus?

19       "ANSWER:  Yes.

20       "QUESTION:  Tell me how it happened that you became

21       chair of the Elections Committee.

22       "ANSWER:  The speaker appointed me, I think, to

23       answer that question.

24       "QUESTION:  Was it your understanding when you were

25       appointed chair that the primary role that you were

Smith - By excerpts of Deposition - Direct                  324

1          going to have on the committee was to move forward

2          with the photo ID bill?

3          "ANSWER:  Yes.

4          "QUESTION:  That was the chief focus of the session;

5          is that right?

6          "ANSWER:  That was clearly the -- yes, I spent almost

7          all my time that session trying to pass that bill.

8          "QUESTION:  Turning your attention to Senate Bill 362

9          itself, could you take a look at the forms of ID that

10         are permitted -- which if I could have you refer to

11         Page 5 of that exhibit.  Have you had a chance to

12         take a look?

13         "ANSWER:  I've skimmed it, yes.

14         **MS. WESTFALL:**  And on to the next page, please.  And

15         down a little further.  And on to the next page,

16         please.

17         "QUESTION:  Have you had a chance to take a look?

18         "ANSWER:  Yes.

19         "QUESTION:  Could you describe the forms of allowable

20         ID under Senate Bill 362 in a general sense?

21         "ANSWER:  Well, there's a number of photo IDs that

22         are available as an option and then, again, a long

23         list of non-photo IDs that may be used in lieu of

24         photo ID.

25         "QUESTION:  Was Senate Bill 362 essentially quite

1       similar iterations of photo ID that had been

2       introduced in the House?

3       "ANSWER:  I believe so, yes.

4       "QUESTION:  And is it your understanding that Senate

5       Bill 362 was introduced in the Senate for the same

6       reasons that previous photo ID bills had been

7       introduced in the house?

8       "ANSWER:  I presume so, yes.  The policy arguments

9       were the same.

10      "QUESTION:  Were there any new purposes that it was

11      serving in 2009?

12      "ANSWER:  Yeah -- no, not other than just continued

13      demand from the grassroots that this bill be passed

14      building political pressure.

15      "QUESTION:  Tell me who -- are there particular

16      grassroots groups that you had in mind that you

17      identify with this issue?

18      "ANSWER:  Just -- you know, I think all Republican

19      Party groups, Texas Federation of Republican Women

20      and then just any other party affiliated group.  The

21      party activists in general had determined that this

22      was an important issue.

23      "QUESTION:  Why was it such a priority for those

24      groups?

25      "ANSWER:  Again, the fear that large numbers of votes

1        were being cast by people who were not legally

2        entitled to do so and predominantly to the benefit of

3        the other party.

4        "QUESTION:  So do you think it was -- it was

5        motivated by the same concerns about noncitizen

6        voting that animated the bills in 2005 and 2007?

7        "ANSWER:  Again, I think, you know, their --

8        certainly noncitizens voting was a significant

9        concern of theirs but I think they would be concerned

10       about anybody voting that's not legally entitled to

11       do so.

12       "QUESTION:  Are you aware of any facts -- any

13       instances of in-person voter impersonation that had

14       arisen between 2007 and 2009?

15       "ANSWER:  I'm sure there were some but some

16       individual alleged instances but I can't cite you as

17       to any.

18       "QUESTION:  Are you aware of any such instances that

19       are not already discussed on the public record in the

20       public debate of 362?

21       "ANSWER:  No.

22       "QUESTION:  Are you aware of the Election Division

23       having undertaken an effort in February or March of

24       2011 to match the voter registration list against the

25       driver's license database?

Smith - By excerpts of Deposition - Direct          327

1          "ANSWER:  I don't recall that.

2          "QUESTION:  Did you ever hear about that at all?

3          "ANSWER:  No, not until today.  Not that I recall.

4          "QUESTION:  I will represent to you that Ann McGeehan

5          in her deposition yesterday testified that such a

6          match had been conducted and that it indicated that

7          around 700,000 voters did not have access -- that

8          were on the voter registration rolls did not have a

9          driver's license.

10          "ANSWER:  Currently, yeah.

11          "QUESTION:  Does that testimony surprise you?

12          "ANSWER:  Not really.  I mean, I knew -- my own

13          calculation was that it was 700,000 people and I

14          really didn't know precisely how many.  It depended

15          on which estimate you used of what percentage of, you

16          know, registered voters do not have driver's licenses

17          but just my extrapolation from estimates that seemed

18          more reliable from other states.  I think it may have

19          been in the Indiana and Supreme Court opinion and

20          then kind of presuming something about the nature of

21          Texas' population.  So it might.  I think it may have

22          been a 2-percent figure like something that in the

23          Supreme Court opinion and so my presumption was that

24          it was something higher than that because of the

25          nature of our population.  And so, you know, I think

Smith - By excerpts of Deposition - Direct                328

1          you'll see if you get that slideshow projection, I

2          may have, you know, estimated in that slideshow

3          projection that it was 700,000 people that did not

4          have a photo ID.

5          "QUESTION:  When did you conduct that analysis?

6          "ANSWER:   2009.  Everything I did on this was in

7          2009.

8          "QUESTION:  And how did you conduct that analysis?

9          "ANSWER:  Again, I think just from something I read

10         there was a reliable estimate of another state of the

11         percentage of people that were legal voters that did

12         not have a photo ID and I took that percentage and I

13         doubled it or something.  And, you know, I mean, some

14         of the states that -- you know, there was -- again, I

15         think I've already testified there were estimates as

16         low as less than 1 percent and as high as 10 percent

17         and so in reading it all, if you come up with

18         something in between, you come up with something

19         close to what you're talking about.  That may be a

20         little higher than I anticipated but I may have been

21         thinking 4 or 500,000.

22         "QUESTION:  Who in your office conducted that

23         analysis?

24         "ANSWER:  Me.

25         "QUESTION:  And did you -- other than the --

Smith - By excerpts of Deposition - Direct                    329

1    "ANSWER:  Back of the envelope kind of analysis, I
2    can assure, but --
3    "QUESTION:  In the -- other than the Power Point you
4    just testified to that was listed in the privilege
5    log you testified about earlier, did you memorialize
6    this analysis in writing anywhere?
7    "ANSWER:  No.  But I probably would have mentioned it
8    in committee hearings.
9    "QUESTION:  And which committee hearings did you
10   mention it in; do you remember?
11   "ANSWER:  I don't know but just anyone where we were
12   discussing voter ID.
13   "QUESTION:  Did you share any of your Power Points
14   that you prepared for these communications with
15   constituent groups with any of your colleagues in the
16   legislature?
17   "ANSWER:  It seems like I just ran it by the
18   speaker's office before I went out and did it --
19   "QUESTION:  Did you share --
20   "ANSWER:   -- because I felt that was appropriate for
21   me to at least let them know what I was going out in
22   the public while he was a committee chairman and
23   present.
24   "QUESTION:  Did you remain chair of the committee on
25   elections for the interim session --

1          "ANSWER:  Yes.

2          "QUESTION:  -- in 2010?

3          "ANSWER:  Yes.

4          "QUESTION:  Did you hold hearings on voter ID in

5          2010?

6          "ANSWER:  I believe we did.

7          "QUESTION:  Do you recall that Ann McGeehan testified

8          in that hearing?

9          "ANSWER:  I presume she did.  She's testified in

10         front of the Hearing Committee so many times.  I

11         don't really recall that specific one but I'm sure

12         she did.

13         "QUESTION:  Do you recall that at the hearing she had

14         testified she was aware at that time of 24 election

15         fraud cases for possible prosecution for election

16         fraud in the past two years and that two of these

17         involved in-person voter impersonation?

18         "ANSWER:  Sounds right.

19         "QUESTION:  You've been handed what's been marked

20         US106" --

21         **MS. WESTFALL:**  -- which is an exhibit in this case as

22    PL1043.

23         "QUESTION:  Do you recognize this document?

24         "ANSWER:  I'm sorry.  I'm still looking at the

25         newspaper article.  106?

1          "QUESTION:  Yes.

2          "ANSWER:  Is this the one I filed in 2011?

3          "QUESTION:  Yes.

4          "ANSWER:  Yeah, it looks like it.

5          "QUESTION:  Are you familiar with ways in which this

6          bill, House Bill 401, differs from Senate Bill 14

7          that was filed that Senator Fraser?

8          "ANSWER:  In general, it simply does not allow you to

9          vote with two non-photo IDs.  Big difference.

10         "QUESTION:  And do you see at the first page on

11         Section -- well, Section 1 of this bill, the section

12         regarding voter ID cards?

13         "ANSWER:  Uh-huh.

14         "QUESTION:  Do you know why you included this

15         provision?

16         "ANSWER:  Probably because whatever state I asked

17         that this legislation be patterned after had some

18         similar provision but --

19         "QUESTION:  And do you see that this requires that

20         the registrar provide at least one place in the

21         county to accept applications for and issue Texas

22         voter identification cards?  Do you see that?

23         "ANSWER:  I'm not seeing where exactly it says that.

24         "QUESTION:  On Page 1 under Section 12.007.

25         "ANSWER:  Uh-huh.  "Each voter registrar shall issue"

1          -- "the voter registrar must provide one place in the

2          county to accept applications for and issue Texas

3          voter identification cards."  Yeah.

4          "QUESTION:  Do you remember that provision?

5          "ANSWER:  I didn't remember it until you pointed it

6          out to me.  You know, I think that's just about

7          ensuring that there's access -- reasonably easy

8          access to these cards.

9          "QUESTION:  Do you believe that's important to

10         include in any photo ID bill?

11         "ANSWER:  I do, yes, believe that it's important that

12         legal voters have access to the polls.

13         "QUESTION:  Did you believe it was an important

14         attempt to try to minimize the burden on voters who

15         didn't possess one of the forms of photo ID?

16         "ANSWER:  I think it's important to take all

17         reasonable efforts to make -- to ensure that legal

18         voters have a reasonable -- reasonable burden in

19         casting a legal vote.

20         "QUESTION:  And do you think it's important in that

21         regard to ensure that voters don't need to travel a

22         significant distance to obtain one of those cards?

23         Is that why you included that provision?

24         "ANSWER:  You know, yes.  I mean, I think the

25         presumption was that by requiring some such

Smith - By excerpts of Deposition - Direct                333

1    availability by county that the maximum distance that

2    anyone would have to travel to get one could only be

3    so much.

4    "QUESTION:  You've been handed what's been marked

5    107 --

6    **MS. WESTFALL:**  -- which is in this case PL127.

7    "QUESTION:  Do you recognize this document?

8    "ANSWER:  Only that it was a bill that we filed at

9    some point in the most recent legislative session.

10    "QUESTION:  Why did you file this bill?

11    "ANSWER:  I think because during the prior campaign I

12    had made promises to do so.

13    "QUESTION:  Was this a promise to your constituents?

14    "ANSWER:  Yes.  I believe that's correct.

15    "QUESTION:  Could you describe what the bill is

16    intended to do?

17    "ANSWER:  Require that a voter provide proof of

18    citizenship when registering to vote rather than

19    simply relying on their honesty in checking the box.

20    "QUESTION:  Which of your constituents urged you to

21    file this type of legislation?

22    "ANSWER:  I don't -- I don't know if I can cite

23    specific constituents that urged me to do it.  I

24    think in some of the political literature that we had

25    sent out responding to the attacks that I killed

Smith - By excerpts of Deposition - Direct          334

1           voter ID, we had decided to say we would file certain

2           legislation like this.  So it was a -- you know, just

3           keeping a campaign pledge.

4           "QUESTION:  Why did you think this bill was

5           necessary?

6           "ANSWER:  I don't know that it was necessary.  I

7           think it's just another way that you can ensure that

8           every legal voter is a citizen.

9           "QUESTION:  This was designed to require documentary

10          proof of citizenship when registering to vote; isn't

11          that right?

12          "ANSWER:  Right.  I think Arizona did it, if I recall

13          correctly.  Is that right?

14          "QUESTION:  As you sit here today, can you think of

15          any facts or information that would support the need

16          for requiring documentary proof of citizenship when

17          registering to vote?

18          "ANSWER:  Just because there's concern among the

19          people I represent that it's too easy to lie and

20          thereby vote and, therefore, they presume it's

21          probably happening.

22          "QUESTION:  Do you have any evidence or facts or

23          information about noncitizens who had done just that

24          and were on the voter rolls?

25          "ANSWER:  No.

Smith - By excerpts of Deposition - Direct          335

1        "QUESTION:  Did your constituents present you with

2        any such facts or analysis?

3        "ANSWER:  No.

4        "QUESTION:  Do you have any data from the Elections

5        Division on that point?

6        "ANSWER:  No.

7        "QUESTION:  Did you ever introduce a bill requiring

8        documentary proof of mental capacity for people who

9        are registering to vote?

10       "ANSWER:  I don't recall ever doing that.

11       "QUESTION:  Did you ever introduce a bill requiring

12       documentary proof of age for persons registering to

13       vote?

14       "ANSWER:  No.

15       "QUESTION:  Did you ever introduce a bill requiring

16       documentary proof of residence for persons applying

17       to register to vote?

18       "ANSWER:  I don't believe so.

19       "QUESTION:  Would it be fair to say then that with

20       respect to bills that you've introduced regarding

21       eligibility requirements for voter registration that

22       the only bills you've ever introduced had to do with

23       documentary proof of citizenship?

24       "ANSWER:  Probably.

25       "I'm going to hand you what's been previously marked

Smith - By excerpts of Deposition - Direct                336

1    as US81" --

2              **MS. WESTFALL:**  -- which is in this case PL845.

3              "QUESTION:  Do you recognize this document?

4              "ANSWER:  I presume this is the bill that we passed

5              this prior session on voter ID.

6              "QUESTION:  And I will represent to you that this is

7              the version that was filed in the Senate.  This was

8              not the engrossed version.

9              "ANSWER:  Okay.

10             "QUESTION:  Are you familiar with the forms of photo

11             ID allowable under Senate Bill 14?

12             "ANSWER:  I don't recall off the top of my head, no.

13             "QUESTION:  Turning your attention to Page 8 of this

14             document, Section 12, could you take a quick look at

15             the forms of ID allowable listed on Page 8?

16             "ANSWER:  Okay.

17             "QUESTION:  Do you see that it only allows for a

18             relatively limited number of IDs?  Is that right?

19             "ANSWER:  Yes.

20             "QUESTION:  Does this represent a significant

21             departure from Senate Bill 362 in terms of the forms

22             of allowable ID?

23             "ANSWER:  Yes.

24             "QUESTION:  Could you describe those differences?

25             "ANSWER:  Instead of having a long list of photo IDs

Smith - By excerpts of Deposition - Direct          337

1      and/or a long list of non-photo IDs that you could

2      use in conjunction with one another, you had to

3      provide one of the much small number of photo IDs and

4      you could not vote without a photo ID except I think

5      in the final version, there were some exceptions.

6      "QUESTION:  Do you recall when Senate Bill 362

7      allowed for expired IDs in any cases?

8      "ANSWER:  No, I don't remember.

9      "QUESTION:   And if you don't remember, you can refer

10     back Bill -- to Senate Bill 362 if you want to take a

11     look at the IDs because I want to ask you some

12     questions to compare.

13     "ANSWER:   You want me to look at the photo IDs or

14     the non-photo?

15     "QUESTION:  The photo.  For example, turning your

16     attention to the driver's license --

17     "ANSWER:   Uh-huh.

18     "QUESTION:  -- you see under Senate Bill 14 as

19     filed --

20     "Yes.

21     "QUESTION:  -- "it could not be expired and under

22     Senate Bill 362, it could have been expired within

23     two years of presenting that form of ID; is that

24     correct?

25     "ANSWER:  Yes.

1      "QUESTION:  Do you know why Senate Bill 14 limited

2      the ability to present expired ID that had been in

3      place in Senate Bill 362?

4      "ANSWER:  No.

5      "QUESTION:  Is there any difference in terms of

6      proving your identity when you go to the polls and

7      using a form of ID that was expired within two years

8      and one that is current in your view?

9      "ANSWER:  Not that I can think of.

10     "QUESTION:  Do you know why non-photo ID was

11     eliminated as an acceptable form of ID in Senate Bill

12     14?

13     "ANSWER:  Just a concern that, again, like a voter

14     registration card, someone can have one of those

15     documents in their possession and represent that

16     they're somebody who they're not and that wouldn't be

17     readily apparent at the polls.

18     "QUESTION:  But it was an acceptable form of ID that

19     the Senate had just passed in 2009, correct?

20     "ANSWER:  Yes.

21     "QUESTION:  And in the form of Senate Bill 362,

22     right, that provision was included?

23     "ANSWER:  Yes.

24     "QUESTION:  And the Senate supported it; is that

25     right?

Smith - By excerpts of Deposition - Direct                    339

1        "ANSWER:  Yes.

2        "QUESTION:  So why the complete change in approach in

3        2011?

4        "ANSWER:  I think it was just because in each

5        instance the legislature was trying to pass the

6        strictest photo ID bill it could under the political

7        makeup of the body.

8        "QUESTION:  Who would know why non-photo ID was taken

9        out of Senate Bill 14?

10       "ANSWER:  I think everybody understands why non-photo

11       ID was taken out of Senate Bill 362 because it was

12       just a demand by our constituents that we require a

13       photo ID in order for people to vote and they were

14       very cynical about the notion of allowing non-photo

15       IDs and you were -- like I said, my opponent used

16       that against me in the most recent election

17       politically without mentioning that he too had voted

18       for that same version of the bill.  So this notion of

19       letting people vote with their library cards feeds

20       the perception that you're in favor of liberal laws

21       allowing people to vote even under circumstances

22       where they were not legally entitled to do so.

23       "QUESTION:  Do you know whether there was one person

24       or a group of people who decided that Senate Bill 14

25       would not include non-photo ID?

1      "ANSWER:  Like I said, I think every Republican

2      member of the legislature would have been lynched if

3      the bill had not passed.  That was a fairly strict

4      photo ID bill given the political makeup of the body

5      in the 2011.

6      "QUESTION:  Do you have a feeling of who was driving

7      Senate Bill 14 in the Senate?

8      "ANSWER:  I think it was being driven by -- you know,

9      you could argue that the grassroots themselves were

10     being, you know, incited by outsiders but however

11     that happened, it clearly had happened and there was

12     just -- everybody that was a Republican was driving

13     that train in the Senate and in the House.

14     "QUESTION:  Can you describe the election

15     identification certificate under Senate Bill 14?

16     "ANSWER:  No.  I mean, it's my understanding that

17     this would just be a unique new card that would be

18     created to use for the sole purpose of voting.

19     "QUESTION:  And I believe you said -- go ahead.

20     "ANSWER:  A photo -- it would include a photo and

21     presumably additional identifying information but I

22     don't know precisely what.

23     "QUESTION:  Where would you obtain that document?

24     "ANSWER:  Wasn't it like a DPS location?

25     "QUESTION:  Was it a driver's license office?

Smith - By excerpts of Deposition - Direct        341

1        "ANSWER:  I don't remember.

2        "QUESTION:  But is it your understanding that there

3        would be -- to the extent there's travel required to

4        get the document --

5        "ANSWER:  Sure.

6        "QUESTION:   -- that's a burden.  Do you agree with

7        that?

8        "ANSWER:  The question is is it an unreasonable

9        burden but I don't think there's any question that

10       it's a burden.  Yes, it's a burden.

11       "QUESTION:  Do you also agree that to obtain the

12       underlying documents to get the election

13       identification certificate to the extent that costs -

14       - that costs some sort of out-of-pocket cost, that's

15       likewise a burden?

16       "ANSWER:  Sure.

17       "QUESTION:  Are there any other burdens you can think

18       of now associated with getting an election

19       identification certificate?

20       "ANSWER:  You know, I mean, the cost of obtaining the

21       documents to get the ID, to -- you know, I don't know

22       if travel is involved in getting -- in getting the

23       documents to get the photo ID but you may have travel

24       involved there.  I don't know.  If that is stuff

25       that's handled by the mail or must involve travel --

Smith - By excerpts of Deposition - Direct        342

1          but so other than travel to get the required photo ID

2          and/or the documents that are necessary to get the

3          photo ID and the cost of the documents to get the

4          photo ID, I'm not aware of anything else.

5          "QUESTION:  Are you aware of the fact that you may

6          have to take -- you may have to go to a driver's

7          license office during business hours only?

8          "ANSWER:  Yes.  I presume that would be the case.

9          "QUESTION:  And for persons who work during the day,

10         it might be a burden to take time off to travel

11         during business hours to a driver's license office;

12         isn't that right?

13         "ANSWER:  Yes.

14         "QUESTION:  And, also, have you been a driver's

15         license recently to renew your driver's license?

16         "ANSWER:  Depends on your definition of recently but

17         I've been to one whenever the deadline was here in

18         Austin.

19         "QUESTION:  Are you aware that sometimes or perhaps

20         often one faces very long lines at driver's license

21         offices?

22         "ANSWER:  I hear that.  I've been fortunate enough to

23         avoid it but, yeah, I know there were concerns about

24         that.

25         "QUESTION:  What have you heard about lengthy lines

Smith - By excerpts of Deposition - Direct                343

1      at the driver's license offices?

2      "ANSWER:  Oh, it seems to me didn't we do something

3      legislatively that resulted in even longer lines than

4      normal and that there were complaints about that last

5      session.

6      "QUESTION:  How long are the lines?  How long have

7      you heard that people -- that they can extend for

8      people?

9      "ANSWER:  I don't know but I presume there were

10     budget cuts that reduced the number of employees or

11     lengthened those lines but in terms -- I don't know

12     what the anecdotal horror stories are about the

13     longest period of time someone has stood in line to

14     get a driver's license renewed but I know there has

15     been some concern.  I believe there's been some

16     concern about it, whatever time it was before getting

17     even longer because of budget cuts.

18     "QUESTION:  Are you aware of credible evidence,

19     convictions, something where you know for sure this

20     was in-person voter impersonation you can testify

21     about today?

22     "ANSWER:  My presumption is that you are a fool or

23     you're uninformed if you're willing to commit a

24     felony in order to add a single vote to the candidate

25     of your choice.  And so the question is how many

Smith - By excerpts of Deposition - Direct          344

1    fools are out -- that are out there.  And, you know -

2    - you know, again, I think I've answered that

3    question.  More than the actual cases that we're

4    aware of but not an epidemic.

5    "QUESTION:  But in your view, your testimony is that

6    it would not be very rational for an individual to

7    engage in this behavior.  So to that extent --

8    "ANSWER:  It seems to me that the penalty in relation

9    to the benefit is pretty severe and I can't -- you

10   know, the fear -- you know, the question is do they

11   really understand the consequences.  It is hard for

12   me to imagine people doing it, if they did but, you

13   know, some people are really into politics.

14   "QUESTION:  You had talked earlier in your deposition

15   about the fact that there's probably some very small

16   number of people who lack photo ID and that you

17   basically presented that proposition and I was

18   curious --

19   "ANSWER:  Who lacked a driver's license.  I don't

20   know that we ever really were able to determine who

21   didn't have -- how many people of the 5 or 6 percent,

22   whatever, 2 percent, whatever it is that don't have a

23   driver's license, what proportion of those have some

24   other form of photo ID that would be acceptable on

25   the list.

Smith - By excerpts of Deposition - Direct          345

1      "QUESTION:  So with respect to these people, did you

2      ever in your mind come to an idea of who they might

3      be, what their personal circumstances might be?

4      "ANSWER:  People who don't drive.

5      "QUESTION:  And who are the people who don't drive?

6      "ANSWER:  Yeah.  I don't know but I presume very poor

7      would be prominent among the list of people who use

8      public transportation.  Perhaps the very elderly

9      although -- don't they have a social security or

10     Medicaid/Medicare photo ID?  You don't get a photo

11     ID?  I thought senior citizens had something but --

12     so those are the ones I can think of, the elderly

13     that don't drive and poor.

14     "QUESTION:  It's caused me to think of another

15     question which is do you know specifically the

16     studies that you read about the impact of photo ID on

17     minority voters?

18     "ANSWER:  No.

19     "QUESTION:  Do you know when you read those studies?

20     "ANSWER:  Yeah.  Everything I did would have been in

21     2009.

22     "QUESTION:  What was the conclusion of those

23     studies?

24     "ANSWER:  I don't know that there was only one

25     conclusion to the studies.  You know, there --

Smith - By excerpts of Deposition - Cross                346

1              there's a study for every conclusion you want to

2              reach.  I don't remember.  You know, to me, again, if

3              the question is are the people that do not have photo

4              IDs more likely to be minority than those that are

5              not, I think it's a matter of common sense that they

6              would be.  I don't need a study to tell me that."

7         **MS. WESTFALL:**  Thank you.  I have no further

8    questions.

9         **MS. ROSCETTI:**  May I approach?

10        **THE COURT:**  Yes.

11      **(Counsel approached)**

12        **MS. ROSCETTI:**  Thank you.  Your Honor, Jennifer

13   Roscetti reading for counsel and Stephen Tatum reading

14   Mr. Smith -- or Representative Smith.  There is a part on this

15   reading where a third party states on the record and so I was

16   going to identify that person but we'll also be putting it on

17   the screen.

18                  **EXAMINATION OF TODD SMITH**

19               **BY EXCERPTS OF DEPOSITION TESTIMONY**

20      **(QUESTIONS READ BY MS. ROSCETTI; ANSWERS READ BY MR. TATUM)**

21              "QUESTION:  Could you state and spell your name for

22              the record, please?

23              "ANSWER:  Todd Smith, T-o-d-d, S-m-i-t-h.

24              "QUESTION:  When were you first elected to the Texas

25              House of Representatives?

1    "ANSWER:  1996.

2    "QUESTION:  What area does that encompass?

3    "ANSWER:  Geographically?

4    "QUESTION:  Geographically.

5    "ANSWER:  Roughly the Hurst, Euless, Bedford area.

6    "QUESTION:  What is the number of the district?

7    "ANSWER:  92.

8    "QUESTION:  And then it went to the House and what

9    happened after that?

10   "ANSWER:  It never made it to the House floor.  That

11   was the infamous --

12   "MS. PERALES: Chub.

13   "ANSWER:  Yeah.  Where the -- the opponents of the

14   bill basically talked the session -- talked the

15   remainder of the session so that bill and every bill

16   after it on the calendar died.

17   "QUESTION:  So I believe you testified that Senate

18   Bill 362 was -- didn't reach the House floor because

19   it was chubbed; is that correct?

20   "ANSWER:  Yes.

21   "QUESTION:  Other than what you've testified about

22   today -- actually, strike that.  Could you tell me

23   every single purpose that you're aware of for Senate

24   Bill 14 legislative purpose?

25   "ANSWER:  Ensuring that every vote that is cast is a

1      legal vote and deterring -- making it more difficult

2      for someone to cast an illegal vote and providing the

3      required identification without any financial burdens

4      associated with it other than the costs associated

5      with travel, I suppose, and whatever documents are

6      required to get the document.  You know, I think

7      that's it.

8      **MS. ROSCETTI:**  Nothing further, your Honor.

9      **THE COURT:**  Okay.

10     **MS. RUDD:**  Your Honor, Amy Rudd for Texas NAACP and

11  MALC.  And now we're going to read into the record the

12  deposition testimony of Yannis Banks.  It's very short.  If I

13  may approach?

14     **(Counsel approached)**

15     **MS. RUDD:**  And for the record, my colleague in the

16  witness box is Daniel Covich.

17              **EXAMINATION OF YANNIS BANKS**

18           **BY EXCERPTS OF DEPOSITION TESTIMONY**

19    **(QUESTIONS READ BY MS. RUDD; ANSWERS READ BY MR. COVICH)**

20     "QUESTION:  Mr. Banks, would you please state your

21     full name for the record?

22     "ANSWER:  Sure.  Yannis Kereldanladee Banks.

23     "QUESTION:  Does the Texas NAACP contend that Senate

24     Bill 14 affects its ability to fulfill its mission as

25     an organization?

Banks / By excerpts of Deposition - Direct          349

1       "ANSWER:  It's harmful to us, yes.

2       "QUESTION:  You contend that SB 14 is harmful to the

3       ability of Texas NAACP to fulfill its mission?

4       "ANSWER:  Yes.  I'm saying that it is harmful to us

5       to fulfill the mission as stated on the website, yes.

6       "QUESTION:  So is it accurate to say that in your

7       opinion Senate Bill 14 has made it -- has made the

8       Texas NAACP unable to fulfill its mission to the

9       degree that it wants to?  Is that what your testimony

10      is?

11      "ANSWER:  I'm saying we are -- the Texas NAACP is not

12      able to do all that we would want to do and need to

13      do and strive to do and is our purpose to do due to

14      Senate Bill 14 and its enactment.

15      "QUESTION:  Does the Texas NAACP feel like their

16      voice is not adequately expressed or heard by the

17      legislature during the consideration of SB 14?

18      "ANSWER:  I feel like it was -- we expressed it

19      adequately.  I felt like it wasn't heard or listened

20      to.

21      "QUESTION:  Why does the Texas NAACP feel that their

22      concerns and expressed issues were ignored?

23      "ANSWER:  They weren't implemented, I guess, you

24      could say or even, you know, they just seemed to --

25      they went forward with the bill as written, no

Banks / By excerpts of Deposition - Direct                350

1    changes, no nothing, just -- you know, there wasn't

2    any lack of concern or worry about it.

3    "QUESTION:  Could you describe what kind of

4    adjustments to your programming activities, if any,

5    the Texas NAACP has had to make --

6    "ANSWER:  Sure.

7    "QUESTION:  -- "because of the enactment of SB 14?

8    "ANSWER:  Yeah.  Well, as we mentioned earlier, when

9    you -- when we -- we have had to do more workshops

10   from -- from it at our state convention which takes

11   away from training we wanted to do.  Resources that

12   we had available as far as financial-wise, we had to

13   change and divert from different areas or programs or

14   what have you in order to make sure we could fund the

15   work we have to do.  With having more training, it's

16   less focused on different issues and we can't focus

17   on even the way I've had to operate for our state

18   convention, a role I would normally play with help

19   planning or getting things mailed out and shipped

20   out.  From talking to Linda, the state secretary, she

21   said about 80 percent of the work I used to do for

22   that, which I noticed I had stopped doing a lot,

23   she's had to pick up and do herself or what have you.

24   So there was a workload that I used to be able to

25   focus on that had to be -- it was diverted from me.

1     So different, you know, at times when you can have or

2     be focused more on issues that could be pressing or

3     say, 'I need to have you-all understand this issue

4     and that issue,' whether it's education or financial

5     issues, other issues that are important and impact or

6     even working with different organizations where there

7     may be some discriminatory acts happening to a

8     company or different organization and they want

9     assistance.  It could be we're not able to sit down

10    and work with them because we have this going on.  Or

11    it could be a group we've worked with on a different

12    issue completely separate from this and they are

13    having a meeting about it, want to talk about it and

14    we say, 'I can't make it because I have to do this.

15    I need to do that.  This is going on.'  So there are

16    times when I'm working with some of the -- of our

17    allies.  I have to either cancel meetings, not attend

18    meetings or just miss it flat out and tell them,

19    'Yes, I can be there,' and something comes up and I'm

20    not going to be there.  So that aspect of resources.

21    "QUESTION:  And has the diversion of resources that

22    you've talked about -- has that been ongoing and

23    continuous from the enactment of SB 14 to present

24    day?

25    "ANSWER:  Yes.

Banks / By excerpts of Deposition - Direct          352

1    "QUESTION:  Okay.  What I'm asking is, has the amount

2    or the percentage of those resources in relation to

3    all the resources available to the Texas NAACP -- has

4    that percentage changed, either increased or

5    decreased between the enactment of SB 14 and now?

6    "ANSWER:  I'd say yes.  I couldn't give you

7    percentage-wise to the changes but I'd say yes.

8    "QUESTION:  Does the Texas NAACP contend that it

9    suffered harm as an organization as a result of

10   SB 14?

11   "ANSWER:  Yes.

12   "QUESTION:  And is that harm continuing today?

13   "ANSWER:  Yes.

14   **MS. RUDD:**  That concludes our reading, your Honor.

15   **THE COURT:**  Okay.

16   **MR. TATUM:**  Stephen Tatum for the Defendants again,

17   your Honor.

18   **THE COURT:**  Okay.

19   **MR. TATUM:**  Jennifer Roscetti again will be reading

20   the part of Mr. Banks.

21   **THE COURT:**  Do you have an extra copy?

22   **MR. TATUM:**  Oh.

23   **THE COURT:**  Thank you.

24   **MR. TATUM:**  Yes.

25   //

1              **EXAMINATION OF YANNIS BANKS**

2          **BY EXCERPTS OF DEPOSITION TESTIMONY**

3    **(QUESTIONS READ BY MS. TATUM; ANSWERS READ BY MS. ROSCETTI)**

4              "QUESTION:  So is it possible that in any given year

5              there are going to be issues considered pressing to

6              the Texas NAACP that aren't going to receive the

7              allocation of resources that may be necessary?

8              "ANSWER:  Yes, it would be and there would be -- and

9              there will be times where something that keeps

10             recurring or is there and the costs that may be

11             associated or other programs will get less than maybe

12             they normally have or normally would get because you

13             have to find the money that you would need to or the

14             time or the resources or the energy to focus on this

15             issue that these other issues could suffer.

16             "QUESTION:  Okay.  Because of Senate Bill 14, is it

17             your opinion that the Texas NAACP is no longer able

18             to fulfill its mission?

19             "ANSWER:  It hinders the Texas NAACP from being able

20             to fulfill its mission.

21             "QUESTION:  It hinders it?

22             "ANSWER:  It hinders it.  It hurts it.  It hurts us,

23             I guess I should say.  It hurts us from being able to

24             fulfill its mission.

25             "QUESTION:  But in your opinion today, the Texas

Banks / By excerpts of Deposition - Cross                    354

1      NAACP has been able to fulfill its mission despite

2      Senate Bill 14?

3      "ANSWER:  It hinders us from being able to fulfill

4      our mission as it should be done.  So I guess if it's

5      hindered or hurt, you're not able to do it but it's

6      hindering and hurting us from --

7      "QUESTION:  So is it accurate to say that in your

8      opinion, Senate Bill 14 has made it -- has made the

9      Texas NAACP unable to fulfill its mission to the

10     degree that it wants to?  Is that what your testimony

11     is?

12     "ANSWER:  I'm saying we are -- the Texas NAACP is not

13     able to do all that we would want to do and need to

14     do and strive to do and is our purpose to do due to

15     Senate Bill 14 and its enactment.

16     "QUESTION:  Do you know how many members of the Texas

17     NAACP do not possess an acceptable form of ID under

18     Senate Bill 14?

19     "ANSWER:  I would not be able to say, no.

20     "QUESTION:  You do not know how many?

21     "ANSWER:  No.

22     "QUESTION:  Are you able to identify one?  I don't

23     want the actual identity but are you able to identify

24     one member of the Texas NAACP who does not possess an

25     acceptable form of ID under Senate Bill 14?

Banks / By excerpts of Deposition - Cross          355

1      "ANSWER:  No.

2      "QUESTION:  Do you know how many constituents at the

3      Texas NAACP do not possess an acceptable form of ID

4      under Senate Bill 14?

5      "ANSWER:  No.

6      "QUESTION:  Okay.  Do you know how many election

7      cycles we've had in the state of Texas since the

8      enactment of SB 14?

9      "ANSWER:  I believe two.

10     "QUESTION:  Do you know -- are you aware if more or

11     less of your members voted in those elections

12     compared to previous ones?

13     "ANSWER:  I am not aware.

14     "QUESTION:  Are you aware if any of the members of

15     constituents of the Texas NAACP were not able to vote

16     in either one of those election cycles because of

17     SB 14?

18     "ANSWER:  Yes.

19     "QUESTION:  You are aware?

20     "ANSWER:  Yes.

21     "QUESTION:  And how were you made aware of that?

22     "ANSWER:  We received the information that somebody

23     was not able to -- to vote this past election cycle.

24     "QUESTION:  You received information?

25     "ANSWER:  Yes.

1          "QUESTION:   What kind of information?   How did you

2          receive that information?   Sorry, that was two

3          questions.   How did you receive that information?

4          "ANSWER:   It was attorney-client privilege.

5          "QUESTION:   Okay.   Did you receive any information

6          about instances in which a Texas NAACP member and

7          constituent was unable to vote directly from a member

8          or constituent?

9          "ANSWER:   Not that I'm aware of.

10          **MR. TATUM:**   No further questions, your Honor.

11          **THE COURT:**   Okay.

12          **MR. BARON:**   Judge, they're going to have to queue up

13  Vera Trotter --

14          **THE COURT:**   Okay.

15          **MR. BARON:**   -- who is a 71-year-old African American

16  female from Dallas and while we're waiting, I do have a copy of

17  the various minutes from the various appendix of the Korbel

18  report and --

19          **THE COURT:**   Okay.   Yes.

20          **MR. BARON:**   -- they're all individually labeled and I

21  know they've been served on the State and I will try to figure

22  out what happened to the ECF but --

23          **THE COURT:**   No, no, it doesn't matter.   I just didn't

24  -- I just wanted to be sure I had everything I needed.

25          **MR. BARON:**   There are all of them and they're all

1    listed in the index.

2              **VERA LEE MILLER TROTTER, PLAINTIFFS' WITNESS,**

3                        **BY VIDEO DEPOSITION**

4          **(Excerpt of Video Deposition of Vera Lee Miller Trotter**

5    **was played from 5:18 p.m. to 5:48 p.m.)**

6              MR. BARON:  That includes the offering, your Honor.

7    The only exhibit I would mention is Defendants' Exhibit 2725

8    which is a copy of the temporary election identification

9    certificate mentioned in the testimony -- Defendants' Exhibit

10   2725.

11             MS. ROSCETTI:  Your Honor, the Defendants have

12   proffers of your charter as well.  May I approach?

13             THE COURT:  Yes.

14         **(Counsel approached; excerpt of Video Deposition of Vera**

15   **Lee Miller Trotter was played from 5:49 p.m. to 5:56 p.m.)**

16             MS. ROSCETTI:  Thank you, your Honor.  No more.

17             THE COURT:  Okay.  Thank you.

18             MR. ROSENBERG:  I think we're done for the day.

19             THE COURT:  I think so.  Where are we on --

20             MR. ROSENBERG:  We're in very good shape, your Honor.

21             THE COURT:  Okay.

22             MR. ROSENBERG:  We have two more live witnesses

23   tomorrow morning and I count three relatively short readings.

24   There might be a few publications of documents but it looks as

25   if we will close by lunch tomorrow.

1          **THE COURT:**  Okay.

2          **MR. SCOTT:**  And then we'll kick off at 1:00 o'clock.

3          **THE COURT:**  Okay.  And I think we'll be here through

4     the rest --

5          **MR. SCOTT:**  It looks like we should be through with

6     our last witness -- depending on how long their crosses are --

7     sometime about lunchtime on Wednesday.

8          **THE COURT:**  Okay.

9          **MR. SCOTT:**  So we're doing some live folks tomorrow,

10    some readings of a number of legislators and then we have two

11    live witnesses on Wednesday that are currently scheduled and

12    we're done.

13         **THE COURT:**  Okay.

14         **MR. ROSENBERG:**  So I guess we're looking at Thursday

15    closings.

16         **THE COURT:**  Okay.

17         **MR. ROSENBERG:**  We're not sure yet.  We'll be talking

18    whether -- it's your Honor's discretion obviously in the

19    mornings or the afternoon.

20         **THE COURT:**  Probably morning if you-all are ready in

21    the morning.

22         **MR. SCOTT:**  We defer to you.

23         **THE COURT:**  Yeah.  We'll -- let's see where we end up

24    on Wednesday.

25         **MR. ROSENBERG:**  Thank you, your Honor.

**THE COURT:** All right. You can be excused.

(Proceeding adjourned at 5:57 p.m.)




### CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_____                    September 9, 2014

        Signed                                          Dated




*TONI HUDSON, TRANSCRIBER*