```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
                     CORPUS CHRISTI DIVISION




MARC VEASEY, ET AL.,           )      CASE NO: 2:13-CV-00193
                               )
            Plaintiffs,        )              CIVIL
                               )
     vs.                       )        Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )      Tuesday, September 9, 2014
                               )      (7:58 a.m. to 12:04 p.m.)
  _____Defendants._____ )      (1:08 p.m. to  6:25 p.m.)


                     BENCH TRIAL - DAY 6

           BEFORE THE HONORABLE NELVA GONZALES RAMOS,
                 UNITED STATES DISTRICT JUDGE




Appearances:              See Next Page

Court Recorder:           Genay Rogan

Clerk:                    Brandy Cortez

Court Security Officer:   Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

<u>APPEARANCES FOR:</u>


Plaintiffs:                     CHAD W. DUNN, ESQ.
                                KEMBEL SCOTT BRAZIL, ESQ.
                                Brazil and Dunn
                                4201 Cypress Creek Parkway, Suite 530
                                Houston, TX 77068

                                ARMAND DERFNER, ESQ.
                                P.O. Box 600
                                Charleston, SC 29402

                                J. GERALD HEBERT, ESQ.
                                Attorney at Law
                                191 Somervelle Street #405
                                Alexandria, VA 22304

                                NEIL G. BARON, ESQ.
                                914 FM 517 Rd. W, Suite 242
                                Dickinson, TX 77539

                                EMMA P. SIMSON, ESQ.
                                Campaign Legal Center
                                215 E. Street NE
                                Washington, DC 20002

Mexican American               EZRA D. ROSENBERG, ESQ.
Legislative Caucus,            Dechert, LLP
et al.:                        902 Carnegie Center, Suite 500
                                Princeton, NJ 08540-6531

                                MARK A. POSNER, ESQ.
                                AMY L. RUDD, ESQ.
                                GARY BLEDSOE, ESQ.
                                SONIA K. GILL, ESQ.
                                ERANDI ZAMORA, ESQ.
                                Lawyers' Committee for Civil Rights
                                1401 New York Ave. NW, Suite 400
                                Washington, DC 20005

                                DANIEL G. COVICH, ESQ.
                                802 N. Carancahua, Suite 2100
                                Corpus Christi, TX 78401

3

**APPEARANCES FOR:**          (CONTINUED)


Mexican American         MYRNA PEREZ, ESQ.
Legislative Caucus,      VISHAL AGRAHARKAR, ESQ.
et al.:                  JENNIFER CLARK, ESQ.
                         Brennan Center for Justice
                         161 Avenue of the Americas
                         12th Floor
                         New York, NY 10013


United States           RICHARD DELLHEIM, ESQ.
of America:             ELIZABETH S. WESTFALL, ESQ.
                         DANIEL FREEMAN, ESQ.
                         ANNA BALDWIN, ESQ.
                         AVNER SHAPIRO, ESQ.
                         MEREDITH BELL-PLATTS, ESQ.
                         JOHN SMITH, ESQ.
                         PAXTON WARNER, ESQ.
                         BRADLEY HEARD, ESQ.
                         ROBERT BERMAN, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530


                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006


Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209


                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751


                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

4

<u>APPEARANCES FOR:</u>          (CONTINUED)


Texas League of Young         RYAN HAYGOOD, ESQ.
Voters Education Fund:        NATASHA KORGAONKAR, ESQ.
                              DEUEL ROSS, ESQ.
                              LEAH ADEN, ESQ.
                              NAACP Legal Def. and Educational Fund
                              40 Rector St., 5th Floor
                              New York, NY 10006


                              DANIELLE CONLEY, ESQ.
                              KELLY DUNBAR, ESQ.
                              M. HASAN ALI, ESQ.
                              LYNN EISENBERG, ESQ.
                              JONATHAN E. PAIKIN, ESQ.
                              RICHARD F. SHORDT, ESQ.
                              SONYA LEBSACK, ESQ.
                              TANIA C. FARANSSO, ESQ.
                              Wilmer Cutler Pickering, et al.
                              1875 Pennsylvania Avenue, NW
                              Washington, DC 20006

Texas Association of          ROLANDO L. RIOS, ESQ.
Hispanic County Judges        115 E. Travis
and County                    Suite 1654
Commissioners:                San Antonio, TX 78205


                              PRESTON HENRICHSON, ESQ.
                              222 W. Cano
                              Edinburg, TX 78539


State of Texas:               JOHN BARRET SCOTT, ESQ.
                              Deputy Attorney General
                              for Civil Litigation
                              Office of the Attorney General
                              P.O. Box 12548
                              Austin, TX 78711


                              JOHN REED CLAY, JR., ESQ.
                              LINDSEY E. WOLF, ESQ.
                              JENNIFER ROSCETTI, ESQ.
                              G. DAVID WHITLEY, ESQ.
                              STEPHEN L. TATUM, JR., ESQ.
                              STEPHEN R. KEISTER, ESQ.
                              Office of the Attorney General
                              P.O. Box 12548
                              MC001
                              Austin, TX 78711

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


State of Texas:          BEN A. DONNELL, ESQ.
                         Donnell Abernethy Kieschnick
                         555 N. Carancahua, Suite 400
                         Corpus Christi, TX 78401

                         WHITNEY DEASON, ESQ.
                         JOHN CRAWFORD, ESQ.

Non-Party Senators       ARTHUR D'ANDREA, ESQ.
& Non-Party              Office of the Attorney General
Representatives:         209 W. 14th Street, 7th Floor
                         Austin, TX 78701

                         DAVID TALBOT, ESQ.

                         JAMES B. ECCLES, ESQ.
                         Office of the AG of Texas
                         300 W. 15th Street, 11th Floor
                         Austin, TX 78701

                         ALICE LONDON, ESQ.
                         Bishop London Brophy & Dodds
                         3701 Bee Cave Rd., Suite 200
                         Austin, TX 78746

6

1                           INDEX

2   PLAINTIFFS' WITNESSES    DIRECT    CROSS     REDIRECT  RECROSS

3   VERNON BURTON

4     BY MS. KORGAONKAR      16/19                  69

5     BY MR. SCOTT                     50                       71

6     BY MS. WESTFALL                            71

7     BY MR. DERFNER                             71/73

8   DR. COLEMAN BAZELON      76/96     121        135

9   JOE PETERS              137       159

10    (VIA DEPO)

11  ESTELA GARCIA ESPINOZA   165      175

12    (VIA DEPO)

13  IMANI CLARK             184       190

14    (VIA DEPO)

15

16  DEFENDANTS' WITNESSES

17  MANUEL ANTONIO RODRIGUEZ

18    BY MR. SCOTT          197                   311

19    BY MS. BALDWIN                  247

20    BY MR. DERFNER                  270

21    BY MS. VAN DALEN               301

22  VICTOR FARINELLI

23    BY MS. WOLF           312                   403

24    BY MR. FREEMAN                 363

25    BY MR. HEBERT                  399

EXCEPTIONAL REPORTING SERVICES, INC

1    **Corpus Christi, Texas; Tuesday, September 9, 2014; 7:58 a.m.**

2                          **Call to Order**

3           **MR. SCOTT:**  Good morning.  Your Honor, I -- John

4    Scott.  I have some information for the Court.  I have passed

5    off an Amended Answers to -- or an Amended Answer, but it's

6    part and parcel of the Amended Answers to a 30(b)(6) deposition

7    on written questions to the Department of Public Safety.

8           Yesterday about 7:00 o'clock Ben notified me that the

9    folks had a question about whether that was 30(b) -- on the

10   30(b)(6) answer related to Number 35, was as accurate as it

11   needed to be.

12          **THE COURT:**  Okay.

13          **MR. SCOTT:**  One of the issues that's out there in

14   this case is there's about 180,000 people just from a

15   historical perspective we had the Department of Public Safety

16   issue back in July.  We notified the Court and the parties

17   about that.

18          As a result of that Dr. Ansolahehere, I think, did a

19   modified report where he dropped his number down to

20   approximately 600,000.  That number went back up to about 180-

21   something -- about 180,000 folks subsequent to the Answers to

22   the deposition on written questions, and then started kind of

23   an interchange between our office and the Department of Justice

24   trying to figure out where that number was based on.

25          Brian, if you -- and so --

1          (Counsel confer)

2              **MR. SCOTT:**  The first thing on this list.

3              **MR. FREEMAN:**  Your Honor, before anything is

4    published to the Court, the United States would move to strike

5    any modification answers to these 30(b)(6) questions under Rule

6    37(c) which is self-executing.

7              The State of Texas has been asking questions

8    regarding license surrender fields of various experts during

9    this trial, and yet on the morning that the Plaintiffs are

10   going to rest their -- close their case they have provided us

11   with a paper copy of a modification of these Rule 30(b)(6)

12   answers.

13             **THE COURT:**  What does the modification do?

14             **MR. FREEMAN:**  It changes their answer with regard to

15   the effect of particular license surrender flags.  Now

16   Mr. Scott is referring to 180,000 individuals who were on the

17   no match list on account of the fact that their driver's

18   license or other Texas-issued ID card has been surrendered.

19             This changed actually the flags and not card status

20   and this only affects approximately 20,000 individuals.

21             But under the Fifth Circuit's Decision at *CQ Inc v*

22   *TXU Mining Code,* 565 F3d 268, there's little question that

23   under Rule 37(c) this should be struck.  This information

24   was --

25             **THE COURT:**  What's the bottom line here?  What does

9

1    this modification do?

2             **MR. SCOTT:**  So, your Honor --

3             **THE COURT:**  -- what are we trying to do?

4             **MR. SCOTT:**  Your Honor, in -- I guess, first and

5    foremost, here's the Depo written questions, the original

6    version and the Amended Answer.

7             **THE COURT:**  So where are we, Number 35?

8             **MR. SCOTT:**  35, yes, ma'am.  So I -- I actually

9    pulled it up --

10            **THE COURT:**  Okay.

11            **MR. SCOTT:**  -- the top of the page has the answer to

12   it.

13        **(Pause)**

14            **THE COURT:**  So where's the modification, the short

15   one or the longer one?

16            **MR. SCOTT:**  The shorter one, your Honor.

17            **THE COURT:**  And what are you adding or subtracting?

18            **MR. SCOTT:**  Well, the -- what it ends up being is a

19   clarification, so surrendered licenses in Texas, if you come

20   from a -- from another state and you have to hand in your other

21   license from, if I move from Washington DC to Texas, and I go

22   to get a license from the Department of Public Safety, you have

23   to hand in your old license to them, that's a -- that's a

24   surrender.  From that day forward you're on the surrender list.

25            There are also people on the surrender list, they

1   would include people that have convicted -- or certified sex

2   offenders, so each year they surrender their identification

3   over to the Department of Public Safety and they're issued a

4   new one.

5           It includes somebody that's 65 or older, or somebody

6   who just simply doesn't want to drive anymore and they

7   surrender their license.  It is a broad, broad universe of

8   stuff.

9           **MR. FREEMAN:**  And, your Honor, again, the change only

10  affects approximately 20,000 people, but the State, at this

11  late hour, is attempting to prejudice the United States by

12  claiming that there is also some confusion on

13  Dr. Ansolahehere's no match list.  And so the United States is

14  simply prejudiced by the fact that they have chosen to wait

15  over a month, all these months, pleural, to disclose this after

16  Dr. Ansolahehere has already testified.

17          At a minimum the United States would respectfully

18  request that we be allowed -- that the United States be allowed

19  to have Dr. Ansolahehere submit a Supplemental Declaration and

20  that the State of Texas be precluded from attempting to claim

21  any error or otherwise attempt to impeach Dr. Ansolahehere

22  based on this late-breaking change.

23          **MR. SCOTT:**  So, for the record, it's not -- I learned

24  yesterday about (indiscernible) and the first thing I do, I

25  can't control what information I get, when the Department of

1    Public Safety tells me that might not be correct then we need

2    to find out if it is correct.

3           We found out that it was not correct, we amended it

4    and we're here this morning to let everybody know in open Court

5    that it was not correct, and --

6           **MR. FREEMAN:**  And, your Honor --

7           **MR. SCOTT:**  -- and then I wanted to give, as

8    background though, the difference kind of the whole issue

9    because ultimately this is an issue that the parties on the

10   other side, as part of this process of last night, all through

11   the night.  There's a deposition that was taken in the old case

12   that goes right to the heart of this and gives the answer that

13   I think they ought -- that they worked their numbers up the

14   original time.

15          But here's -- here's the email to Anna Baldwin --

16          **MR. FREEMAN:**  That's also not correct, your Honor.

17          **MR. SCOTT:**  Okay, well, we'll show you, Dan.

18          **MR. FREEMAN:**  No, it's not correct.  It's our

19   original numbers --

20          **THE COURT:**  Sir -- excuse me.  Let him finish and

21   then you could argue.

22          **MR. FREEMAN:**  I'm sorry, your Honor.  I'm sorry.

23          **MR. SCOTT:**  So this is an email from David Whitley to

24   Anna Baldwin, and this is after -- after the increase in the

25   number to about 180,000 people.  And it was with respect to

1   Issue 2.

2        You stated that based on DPS's written answers the

3   DWQ-DOJ is changing some matches to no matches, I asked you if

4   you would provide science to specific questions that formed the

5   basis for that change, and you said you would not, but they

6   generally pertained to card status and how that changes,

7   whether someone does or doesn't have an acceptable form of ID

8   under SB 14.

9        I would like to reiterate my request that specific

10  questions and answers from the DPS-DWQ be cited as authority

11  for changing matches into no matches.

12       Further, to the extent registered voters have a card

13  status before the DPS-DWQ, the United States has been in

14  possession of that information since February.

15       Anyway, so our whole interest was trying to figure

16  out which question is this?  So what's the next one?

17       So, David, as we discussed on the phone yesterday,

18  the card status as it relates to changes to the United States

19  match list are voluntary surrender, voluntary surrender

20  insurance, voluntary surrender medical and vol --

21       **THE COURT:**  You know, you can -- you-all can slow

22  down.  You-all know this backward and forward --

23       **MR. SCOTT:**  I'm sorry.

24       **THE COURT:**  -- I don't, it's the first time I'm

25  seeing this.

1           **MR. SCOTT:**  I'm sorry.

2           **THE COURT:**  Okay?  I haven't even gotten to read the

3  question or the answer yet.

4           **MR. SCOTT:**  I'm sorry.

5           **THE COURT:**  Go ahead.

6           **MR. SCOTT:**  I'm sorry.

7           **MR. DERFNER:**  And then you are (indiscernible) and

8  I'm saying it's not (indiscernible).

9           **MR. SCOTT:**  Okay.

10          **MR. FREEMAN:**  Your Honor, to be clear, each of those

11  four status fields are unaffected by the change here.  The

12  change that is noted in these changes to the 30(b)(6) answers

13  has to do with the voluntary surrender flag which is a much

14  more minor change than --

15          **MS. BALDWIN:**  So what (indiscernible) clarify, it's

16  the license surrender fields, none of the card statuses, the

17  voluntary surrender, the voluntary surrender insurance, the

18  voluntary surrender medical and the voluntary surrender CSO are

19  the bulk of the things that were changed, and none of those are

20  affected by Defendants' change to Number 35; it's simply the

21  license surrender field, which is a far smaller number of

22  records.

23          **MR. DERFNER:**  Well, your Honor, could I be heard?  I

24  mean, I haven't said anything yet.  Could I be heard on this?

25          **THE COURT:**  You may.

1          **MR. DERFNER:**  All I would like to suggest is this has

2     clearly ran back and forth.  You've got the issue of prejudice,

3     you've got the issue of -- if you want to get to the bottom of

4     what the real facts are I'm going to suggest that you defer any

5     ruling and maybe even listening on this at least till this

6     afternoon so the parties can spend part of the morning or

7     lunchtime figuring out how to even present the question to you.

8          **THE COURT:**  That's fine.

9          **MR. DERFNER:**  Because there's no way we can deal with

10    it with these things floating back and forth out of thin air.

11         **THE COURT:**  I'm okay with that.  We can set aside

12    sometime this afternoon to address the issue.

13         **MR. DERFNER:**  Thank you.

14         **MR. SCOTT:**  And we define that it's only 20,000.  I

15    just wanted the Court and everybody to know as soon we got back

16    here.

17         **THE COURT:**  Okay.

18         **MR. SCOTT:**  This is the first time.

19         **THE COURT:**  Okay, we're on notice.

20         **MR. SCOTT:**  Okay, thank you.  Do you want me to hold

21    onto those until this afternoon or keep them there?

22         **THE COURT:**  No, let me hold onto them.

23         **MR. SCOTT:**  Okay.

24         **THE COURT:**  I do have to -- did you-all get to talk

25    further about the offer of proof that was discussed a couple of

15

1  days ago?  Mr. Dunn, you wanted to look at something the State

2  was going to produce before then?  And I -- we don't need to do

3  that right now, it's just that's still kind of hanging out

4  there.

5       **MR. DUNN:**  No, I haven't seen it, so I --

6       **THE COURT:**  Okay.  Do you know what I'm talking

7  about, though?

8       **MR. DUNN:**  Okay.  Yes, ma'am, I do.

9       **THE COURT:**  Okay.  And you-all don't have to do it

10  right now.

11       **MR. DUNN:**  Okay.

12       **THE COURT:**  I just don't want to -- that to fall

13  through the cracks.

14       All right, anything else before we get started?

15     **(No audible response)**

16       **MS. KORGAONKAR:**  Good morning, your Honor.

17       **THE COURT:**  Good morning.

18       **MS. KORGAONKAR:**  I'm Natasha Korgaonkar on behalf of

19  the Texas League of Young Voters Education Fund and Amani

20  Clark.  The Plaintiffs now call Dr. Vernon Burton to the stand.

21     **(Pause)**

22       **THE COURT:**  Good morning, sir.  Would you raise your

23  right hand?

24  //

25  //

1            **VERNON BURTON, PLAINTIFFS' WITNESS SWORN**

2            **THE WITNESS:**  I do.

3            **THE CLERK:**  Thank you, sir.

4                     **VOIR DIRE EXAMINATION**

5    **BY MS. KORGAONKAR:**

6    Q    Good morning, Dr. Burton.

7    A    Good morning.

8    Q    Would you please introduce yourself to the Court?

9    A    I'm Orville Vernon Burton.

10   Q    And where are you currently employed, Dr. Burton?

11   A    At Clemson University in South Carolina.

12   Q    You are a professor there?

13   A    I am.

14   Q    And how long have you been a professor at Clemson?

15   A    Since 2010.

16   Q    What is your title?

17   A    I am the Creativity Professor of Humanities, Director of

18   the Clemson Cyber Institute, Professor of History, Professor of

19   Sociology and Professor of Computer Science.

20   Q    And although you've taught in a number of different

21   departments, your report and testimony today are offered in

22   your capacity as a Professor in which discipline?

23   A    History and Sociology.

24   Q    What are your areas, Dr. Burton, of academic focus?

25   A    American History, specifically the American South and race

 1  relations.

 2  Q    And you attached a copy of your CV as Appendix A to the

 3  report that you submitted in this case, is that right?

 4  A    I did.

 5  Q    Does that CV accurately summarize your professional

 6  background?

 7  A    Yes.

 8  Q    And, Dr. Burton, your CV reflects that as recognition for

 9  your teaching you were selected nationwide as the 1999 US

10  Research and Doctoral University Professor of the Year by the

11  Carnegie Foundation for the Advancement of Teaching, is that

12  right?

13  A    That's correct.

14  Q    And the CV also reflects that as a recognized expert on

15  race relations and the American South, the Illinois State

16  Legislature honored you with a special resolution for your

17  contributions as a scholar and a teacher, is that right?

18  A    Yes.

19  Q    And it additionally reflects that you have authored or

20  edited 20 books, and it looks like more than about 200

21  articles?

22  A    That's correct.

23  Q    And, as well, that you served as the President of the

24  Southern Historical Association in 2012, is that right?

25  A    Yes.

1  Q    And what, Dr. Burton, is the Southern Historical

2  Association?

3  A    The Southern Historical Association is the second largest

4  group of association -- a professional association of

5  historians who study American History and their focus is the

6  American South.  It also includes a number of scholars who are

7  not primarily Southern historians, but who reside in what we

8  think of as the American South.  They may be teaching Latin

9  American history, for example.

10 Q    Okay.  And have you served before as an expert in a voting

11 rights case?

12 A    I have.

13 Q    Roughly how many times do you think you have done that?

14 A    I really don't know, have not kept count.

15 Q    Okay.  And did you provide testimony in connection with

16 those cases?

17 A    I have in some, but probably the majority not.

18 Q    Okay.  Have you served as an expert in a voting rights

19 case within the past 10 years?

20 A    Yes.

21 Q    Do you remember which cases?

22 A    Yes.

23 Q    Okay.

24 A    Texas and Georgia Re-districting in the last round, and

25 the South Carolina Voter ID case about the same time, 2012, I

1    think.

2              **MS. KORGAONKAR:**  Your Honor, based on Dr. Burton's

3    qualifications and those set forth in his report, the

4    Plaintiffs offer Dr. Burton as an expert in United States

5    History, and more specifically in the history of the American

6    South.

7              **THE COURT:**  Okay.  You can continue.

8                        **DIRECT EXAMINATION**

9    **BY MS. KORGAONKAR:**

10   Q    You've been retained as an expert in this case,

11   Dr. Burton, is that right?

12   A    Yes.

13   Q    And did you produce a written report in conjunction with

14   your work?

15   A    I did.

16   Q    Okay.  And --

17             **MS. KORGAONKAR:**  Your Honor, may I approach the

18   witness and the bench as well?

19             **THE COURT:**  Yes.

20   **BY MS. KORGAONKAR:**

21   Q    And, Dr. Burton, I have just handed you PL70060.  If you

22   could please just take a moment to review it and let me know

23   whether this is a complete copy of the report that you

24   submitted in this case?

25   A    It looks like it is.

Burton - Direct / By Ms. Korgaonkar                    20

1   Q    Okay.  What were you asked to examine, Dr. Burton, in this

2   case?

3   A    I was asked to assess the social and historical conditions

4   in Texas, including past and official -- past and present

5   official acts of racial discrimination to determine whether

6   Senate Bill 14 causes an inequality in opportunities for

7   African Americans or other minorities in Texas to vote in

8   person and to otherwise participate in the electoral process.

9   Q    And we'll go through your findings in detail momentarily,

10  but could you please summarize the conclusion that you reached?

11  A    Well, based on a study of the totality of the

12  circumstances, Senate Bill 14 results in the disproportionate

13  disfranchisement of African Americans and other minority voters

14  because of race.

15  Q    Which materials did you consult to reach that conclusion?

16  A    I have consulted the materials that I think any expert or

17  academic would normally use in this -- in answering a question

18  like this, particularly starting with the secondary literature

19  and all of the primary literature that I could consult at the

20  time, and it's all listed in Appendix C, everything that I have

21  relied upon to produce my report.

22  Q    Okay.  Are those the same types of materials that you

23  normally use to examine a question such as the one posed to you

24  for this case?

25  A    Yes.

Burton - Direct / By Ms. Korgaonkar                    21

1    Q     And what's the methodology, Dr. Burton, that you used?

2    A     Well, I start with a question.  As a historian I use

3    primarily a historical methodology and methodology that's

4    common for social scientists to examine questions of this sort.

5    Q     Is it right to say that you considered each of the Senate

6    factors to determine whether, as you said, under the totality

7    of circumstances SB 14 interacts with social and historical

8    conditions in Texas --

9    A     Yes.

10   Q     -- to cause an inequality in the political process --

11   A     Yes.

12   Q     -- for Black voters?

13   A     Yes, it is, and I focused on four in this report.

14   Q     Which are the four that you focused on in your report?

15   A     Senate Factor 1, Senate -- which is the history of

16   official discrimination Texas voting; Senate Factor 5 which

17   looked at racial disparities in socioeconomic factors; and

18   Senate 6 looking at racial -- Senate Factor 6, excuse me,

19   looking at racial appeals; and Senate Factor 9 where the

20   rationale given for SB 14 was tenuous or not.

21   Q     Were you asked to consider whether SB 14 was enacted with

22   discriminatory intent?

23   A     No, I was not.

24   Q     So you didn't, then, draw any conclusions as to whether SB

25   14 had a discriminatory intent in its enactment?

1   A    No, I did not draw a conclusion.

2   Q    Dr. Burton, let's first turn to your consideration of

3   Senate Factor 1.  You mentioned that just a moment ago, but if

4   you could state again, please, what is Senate Factor 1?

5   A    It's the history of official discrimination in Texas

6   voting.

7   Q    And could you provide a brief overview of the general

8   experiences of voters of Color in Texas?

9   A    Certainly.  Texas has a long history of discrimination in

10  official acts to either disfranchise or dilute or deny

11  minorities an equal opportunity to participate in the electoral

12  process.

13  Q    And your report went through a number of devices that you

14  have determined that Texas has historically used to

15  disfranchise Black voters and other voters of Color, is that

16  right?

17  A    That's correct.

18  Q    Without providing an exhausted list of all of those

19  different devices, could you identify just a few examples?

20  A    Yes.  And this is not -- not at all exclusive, but I

21  actually focused on the all White primary, the secret ballot

22  and the use there of illiteracy as a way to deny people the

23  process of voting.  I looked at the poll tax, re-registration

24  and purging as well as SB 14.

25  Q    What, in your opinion, was the stated rationale for the

1    enactment of all White primaries in Texas?

2    A     The stated rationale was voter fraud.

3    Q     What was the stated rationale, in your opinion, for the

4    use of secret ballot provisions in Texas?

5    A     The stated rationale was to prevent voter fraud.

6    Q     And what was the stated rationale, in your opinion, for

7    the use of the poll tax in Texas?

8    A     The stated rationale by the State was to prevent voter

9    fraud.

10   Q     And how about the stated rationale for the use in Texas of

11   re-registration requirements and voter purges?

12   A     The stated rationale was voter fraud.

13   Q     Dr. Burton, in your expert opinion, did these devices

14   actually respond to sincere concerns or incidents -- incidences

15   of voter fraud?

16   A     No.

17   Q     Okay.  I'd like to begin, Dr. Burton, with your discussion

18   of all White primary elections.

19            What are all White primaries?

20   A     All White primaries, often called "Democratic White

21   primaries" because by that time, in most of the Southern

22   states, including Texas, the Democratic party was the

23   predominant party and in some ways the only party that really

24   mattered.  And what it did was to exclude in statute form

25   anyone but White people from voting in the primary, which is

 1    when you have a one-party state pretty much is the only

 2    election that matters.

 3    Q    And when were all White primaries first used in Texas?

 4    A    Well, they were used in various counties and areas after

 5    the end of Reconstruction, but 1895 is the general date that

 6    historians put that the State encourages and tries to get

 7    started White primaries throughout the State.

 8    Q    And the stated purpose for them at the time?

 9    A    Is voter fraud.

10    Q    Now, Dr. Burton, I'd like to turn your attention to Page 7

11    of your report.  If you could please read the first highlighted

12    text?

13    A    Professor David Montehall (phonetic) writes that "One of

14    the stated purpose of the Taro law was to prevent opening," and

15    I quote, "the flood gates for illegal voting as one person

16    could buy up the Mexican and Negro votes therefore, to prevent

17    voter fraud."

18    Q    And you stated that all White primaries were initially

19    used in the 1890s.

20         Can you offer just a brief historical context of what

21    was happening in Texas at that time?

22    A    Well, the 1890s is really -- comes on the heels of

23    Reconstruction, a brief period when you had an interracial

24    democracy and African American men participated fully in the

25    electoral process, were quite successful as members of the

1    Republican party.

2            The time of the White primary you have, in fact, a

3    growing perception and a real threat of a coalition of poor

4    Whites and poor Blacks, particularly among farmers in Texas

5    coming out of the grange of the 1880s and the developing into

6    the Peoples Party properly known as the Populist Party.

7    Q    And if you could just, Dr. Burton, read the highlighted

8    text on --

9    A            "For example, the Dimmit County newspaper reported on

10               12 June 1914 that the White man's primary association

11               as the local White primary system was known,

12               absolutely eliminates the Mexican vote as a factor in

13               nominating County candidates though we graciously

14               grant the Mexican the privilege of voting for them

15               afterwards."

16   Q    So based on the historical context, is this potential what

17   you are actually stating that the all White primary responds

18   to?

19   A    Yes.  It is denying access to the vote in the only

20   election that really mattered in Texas at that time to African

21   Americans and minorities.

22   Q    Did the all White primaries effectively function as an

23   outright ban on Black voters' ability to cast ballots?

24   A    It did.

25   Q    Were there efforts in the era of all White primaries to

1    actually stop the practice?

2    A    Yes, and there was a successful court case.  In 1918, in

3    Waco, Texas, in which African Americans sued and won.

4    Q    And did that victory last from Waco?

5    A    No.  Immediately the Texas State's Legislature, in 1922,

6    enacted a law and you can see highlighted there from the law,

7    that "any qualified electorate under the laws of the

8    Constitution of Texas who is a Democrat shall be eligible to

9    participate in Democratic primaries, but in no event shall a

10   Negro participate in a Democratic primary in the State of Texas

11   and ballots cast by Negros are void."

12   Q    Until when were all White primaries used here in Texas?

13   A    Until 1944 in *Smith v Allwright*, the Texas case, that

14   becomes a precedent for ending White primaries throughout the

15   South.

16   Q    Were literacy tests used in States of the former

17   Confederacy to prevent Black citizens from voting?

18   A    Yes.

19   Q    Were they used here in Texas?

20   A    No, they were not.  Interestingly enough, it was used

21   through the secret ballot where people who were illiterate were

22   not able to vote, or at least know how they were voting with

23   the secret ballot.

24   Q    And the secret ballot provisions were used here in Texas?

25   A    That's right.  In fact, they were used in most places in

1   the South, and they were developed actually not in the South,

2   they were supposedly a reform developed during the progressive

3   era in Northern, large Northern urban centers with the explicit

4   purpose to keep minorities such as Italians and others who did

5   not speak English from being able to vote.

6          And then they were adopted with the explicit purpose

7   of the South as a way to keep African Americans who were -- of

8   course, came out of slavery where they could not read or write,

9   and with very little State support compared to State support

10  for Whites, were a lot more illiterate, in fact, than were

11  Whites.  Then, of course, Mexican Americans whose language was

12  Spanish also were affected by the secret ballot.

13  Q    Could you just -- if we could back up for a moment,

14  explain what the secret ballot provision actually is?

15  A    Yeah.  It says that a person gets to vote a secret ballot,

16  so you go into the voting booth, as you would today, by

17  yourself.  Initially in Texas you could have assistance, but

18  that assistance was only by Democrats, White Democrats, so if

19  you wanted to vote something else you had no idea how the

20  person assisting you would vote you, plus the intimidation

21  factor of having to go in and say to, perhaps a landowner who

22  you might be working for, that you wanted to vote differently.

23  Then later the actual assistance is done away with.

24  Q    And were the secret ballot and limited assistance

25  provisions race-neutral on their face?

1  A    They were race-neutral on their face.

2  Q    Were they, in fact, race-neutral?

3  A    No.

4  Q    If I could turn your attention, Dr. Burton, to the

5  highlighted text.  You mentioned a moment ago that there were

6  disparities in literacy.  Is this what you were referring to?

7  A    Yes.  This is from my report.  "In 1900 45.1 percent of

8  adult African American men were illiterate.  By comparison,

9  only 8.6 percent of White men in Texas were illiterate."

10  Q    And how long did these provisions remain in place

11  throughout Texas or in parts of Texas?

12  A    Well, of course, you still have the secret of ballot, but

13  you can now have assistance, and that came with the _Garza_ case

14  in the 1970s so they lasted through the 1970s.

15  Q    And what was the rationale for secret ballot provisions

16  and limited assistance provisions?

17  A    Voter fraud, prevention of voter fraud.

18  Q    In your opinion and based on your historical research,

19  what was the actual reason that these provisions were used?

20  A    To use in this supposedly race-neutral device to

21  disfranchise and deny the vote to African Americans and to

22  other minorities in Texas.

23  Q    Dr. Burton, your report also explains that poll taxes were

24  used in Texas to prevent Black citizens and other citizens of

25  Color from voting.  Is that correct?

1    A    That is correct.

2    Q    And there's been some discussion in this case already

3    about poll taxes, but could you please just explain what a poll

4    tax actually is?

5    A    Well, a poll tax is simply a head tax, and if you wanted

6    to vote and, of course, only men were voting then, you had to

7    pay a tax.  You also then had to hold onto this slip of paper

8    which isn't necessarily an easy thing for working people who

9    don't have the kind of desk and filing systems that we do, and

10   it was in Texas, in particular, at a particular time when you

11   may not have cash, that you -- because it was an economy cash

12   came when crops were sold and that's when you would have it;

13   otherwise, you would have to go and borrow money there.  And it

14   wasn't just a poll tax to allow you to vote; that was to vote

15   in the general Texas election, but someplace say if you want to

16   vote in an election in Houston, you had to pay an additional

17   tax on top of that.

18   Q    Were poll taxes enacted in about 1902?

19   A    That is right.

20   Q    And do you know the means by which they were enacted?

21   A    It was a State Constitutional Amendment.

22   Q    Were they facially race-neutral?

23   A    They were facially race-neutral.

24   Q    In your opinion, were poll taxes, in fact, race-neutral?

25   A    No.

Burton - Direct / By Ms. Korgaonkar                         30

1   Q    And is this highlighted text, an excerpt from some of the

2   evidence that you relied upon to support that conclusion?

3   A    It is.  This is an article in the Houston <u>Telegraph</u>:

4            "Must the low groveling equal before the law, lazy

5            purchasable Negro who pays no taxes have the

6            privilege of neutralizing the vote of a good citizen

7            and taxpayer?  All of the miserable apologies for men

8            with White skins who exercise the right to vote only

9            because it furnishes them with whiskey, be allowed to

10           vote if they don't pay the State a pittance for its

11           protection and the privileges afforded them."

12  Q    What was the actual reason, based on your research, that

13  poll taxes were used?

14  A    Well, poll taxes were a way, though racially-neutral on

15  the surface, to disfranchise, to deny the vote to those who

16  were disproportionately poor; that is, it was more difficult to

17  pay for a poll tax at the time.

18  Q    And if you could just turn your attention to the

19  highlighted text?

20  A    Yes.  This is an article by E.G. Center (phonetic) who was

21  a newspaperman and then later a State Senator, and he's going

22  through the reasons for the poll tax, and he says:

23           "Another and if possible more weighty reason why the

24           poll tax amendment should be adopted is that it means

25           the elimination of the race issue in politics.  With

EXCEPTIONAL REPORTING SERVICES, INC

1              two strong parties in Texas today the Negro would

2              hold the ballots of power."

3    Q    So does this quote suggest that part of the reason for the

4    use of a poll tax was that Black voters, at the time, may

5    actually have sway in a popular vote?

6    A    Yes, exactly.  This is the -- this is a reference, of

7    course, to the Peoples Party or the Populist Party and the

8    movement has been quite successful.  You have coalitions of

9    Black and White farmers, of poor Whites and African Americans

10   who are voting, and it continues on, in fact, into the 20th

11   Century where you have fusion coalitions with the -- what

12   remains of the Republican party in Texas and the Populist

13   party, and in certain areas of Texas they continue to vote and

14   be quite successful.  It's a reference to this emerging threat

15   of African Americans, again, being able to vote as they did in

16   Reconstruction.

17   Q    Ultimately poll taxes were deemed unconstitutional under

18   the Federal Constitution, is that right?

19   A    That is correct.  The 24th Amendment in 1964 outlawed the

20   poll tax, but it continued in Texas because Texas argued they

21   could use, if it weren't Federal elections, a poll tax in other

22   State elections.

23   Q    Did there ever come a time in Texas history before the

24   Federal ban on poll taxes, when ending the use of that practice

25   through re-amending the Texas State Constitution was

1   considered?

2   A     Yes.   In 1963 there was a referendum in the State of Texas

3   on the poll tax.   You have to put it in the context, this is

4   the time when the Nation is debating doing away with the use of

5   the 24th Amendment to do away with the poll tax so Texas votes

6   upon doing away with the poll tax in Texas.   There's a good bit

7   of debate on that, you can follow the newspapers at the time,

8   too.

9   Q     How did that referendum fare?

10  A     Texans voted to maintain the poll tax.

11  Q     And at that time period what were the main points in

12  popular discourse in favor of the poll tax?

13  A     Once again the argument and the rationale was to prevent

14  voter fraud.

15  Q     And I'd like to turn your attention here to the

16  highlighted text.   If you could just read that out loud?

17  A     Right.   This is a Texas Congressman who says:   "The poll

18  tax has been some small defense at least against mass fraud,

19  mass hysteria, mass ignorance and mass indifference in the

20  voters" and that is in 1963.

21  Q     So is it fair to say that poll taxes couldn't be rejected

22  through popular vote in Texas as recently as the 1960s on this

23  basis?

24  A     Yes.

25  Q     That they may have prevented -- prevent vote fraud?

1   A    That is correct.

2   Q    And did Texas continue to use poll taxes after the initial

3   Federal ban on that practice?

4   A    They did until 1966.  In fact, when the Federal Court

5   ruled the poll tax was unconstitutional and found that one of

6   its primary purposes had been to and I quote, "disenfranchise

7   the Negro."

8   Q    Your report also explains that re-registration

9   requirements and voter purges in Texas were used to prevent

10  Black citizens from voting, is that right?

11  A    That's correct.  Immediately after the poll tax was done

12  away with by Court Order, the State Legislature passed a re-

13  registration act, I mean, just immediately so in 1966.  As

14  politicians then, as today know, as do social scientists, that

15  every time you have a re-registration you lose voters and a

16  disproportionate number of those voters that you lose are the

17  poor voters and, particularly, minorities.

18  Q    You just mentioned the re-registration requirements were

19  initiated in 1966.

20  A    Correct.

21  Q    Until when did they last, approximately?

22  A    Well, they were immediately struck down by the Courts.

23  Q    And what was a re-registration requirement?

24  A    It meant that you had to go back to register to vote

25  again, to be able to, and it was an annual -- what Texas did

1   made it an annual re-registration so that every year you would

2   have to -- you would have to register to be able to vote.

3   Q    What was the stated rationale for this annual re-

4   registration requirement?

5   A    Voter fraud, and we have a quotation from Governor John

6   Connelly, this is from his address to the Senate.

7   Q    And that is on, I believe, Page 14.

8   A    Okay.  Here he is addressing -- here he is addressing the

9   Legislature about the re-registration:

10              "I agree with your position that annual re-

11              registration is the most logical means of preventing

12              fraud and guaranteeing the purity of the ballot box."

13              One newspaper actually said that the re-registration

14   was a poll tax without the tax.

15   Q    What was the true impetus for the initiation of this

16   annual re-registration requirement according to your research?

17   A    It was to, again, disfranchise or make it more difficult

18   for African Americans and other minorities to register and

19   participate in the electoral process.

20   Q    And you mentioned earlier that its timing came just on the

21   heels of the end of the poll tax, right?

22   A    That's right, and also with the Voting Rights Act of 1965,

23   and they realized increased participation of African Americans

24   and minorities in the voter process, there would be a lot more

25   people able to register to vote and to participate in the

1    elections.

2    Q    And about how long was this requirement used?

3    A    1970 -- '71 it's declared unconstitutional, again, because

4    of substantial disfranchising effect.

5    Q    Was it replaced by another device after it was struck?

6    A    It was.  Immediately the Texas Legislature put in a purge

7    law which is, basically, another re-registration, and the purge

8    law was another way to get rid of people, particularly

9    minorities, on the voting lists and registration lists so they

10   would not be able to vote.

11   Q    And how long did the voter purge law last?

12   A    Until Texas was covered by the Voting Rights Act in 1975,

13   and then the Justice Department -- the US Justice Department

14   objected to the purge and a Court enjoined it so that it was

15   stopped about '75 or '76.

16   Q    You have just testified, Dr. Burton, that all White

17   primaries, secret ballot requirements, poll taxes, re-

18   registration requirements and voter purging have all been used

19   in Texas to prevent Black citizens and other citizens of Color

20   from voting, is that right?

21   A    Yes.

22   Q    And in your report you assert that SB 14 represents a

23   modern day continuation of a longstanding practice in Texas of

24   passing election laws to make it more difficult for people of

25   Color to vote, is that right?

1   A    That is correct.

2   Q    In what specific ways are poll taxes, for example,

3   comparable to SB 14 in your opinion?

4   A    Well, immediately four come to mind that we've already

5   discussed, that first they proclaim to be race-neutral; 2, they

6   use the stated rationale that they are to prevent voter fraud;

7   3, that they disproportionately disfranchise or affect

8   minorities and African Americans; and, 4, that both come at

9   times when the party in power in politics in Texas perceives

10  the threat of African Americans, in particular, and minority

11  voter increased voter ability to participate in the electoral

12  process.

13  Q    What do you understand the stated rationale for SB 14 to

14  be?

15  A    The stated rationale is to prevent voter fraud.

16  Q    And, in your opinion, what does SB 14 actually respond to?

17  A    I think it responds to the particularly widespread

18  knowledge that Texas has become a majority minority State,

19  which you get a lot of discussion in the newspapers, even among

20  politicians, 2003, 2005, and then with the 2010 census.  And in

21  addition to that, I mean, the last census has this huge what, 4

22  million person increase of which a huge majority of is by

23  minorities.  Texas gets more Congressional seats.

24           And in addition to this you have the candidacy of

25  Barack Obama in 2007, 2008 and the larger turnout, particularly

1    of African Americans in elections that has normally been the

2    case, and all of this comes together very similar to how the

3    Populist movement threatened Democrats back in the early 20th

4    Century to be a threat, so that SB 14 is a reaction to those

5    particular events.

6    Q    And in your deposition, Dr. Burton, you discuss that at

7    the time periods when these various devices were enacted in

8    Texas, for the most part the highest elected and even unelected

9    positions in the State of Texas were almost exclusively held by

10   Democrats, is that right?

11   A    Yes, generally that is the case.

12   Q    And does that fact make any difference to your analysis or

13   the conclusions that you reached?

14   A    No, not at all.  If anything, it perhaps makes them

15   stronger because it does not matter who is in charge of State

16   politics or the political parties in power in Texas, whether

17   they're Republicans, Democrats or Martians, every time that

18   African Americans have, in fact, been perceived to be

19   increasing their ability to vote and participate in the process

20   there has been State legislation to either deny them the vote

21   or at least dilute the vote or make it much more difficult for

22   them to participate on an equal basis as Whites in the State of

23   Texas.

24   Q    And in your Senate Factor 1 analysis in your report you

25   discuss the history of student voting rights at Prairie View A

1    and M University, is that right?

2    A    That's correct.

3    Q    Do you know which County Prairie View is in?

4    A    Yes, it's in Waller County, Texas.

5    Q    And why did you include a section in your Senate Factor 1

6    analysis about Prairie View in Waller County?

7    A    Well, a couple of reasons.  First, the Plaintiff Amani

8    Clark, who had been able to vote with her student ID and is no

9    longer able to vote with just a student ID, is a Plaintiff.

10           And then, secondly, Waller County is, to me, a great

11   example of a place where you see the increased participation of

12   minorities and how, at the ground level, that is where the

13   rubber hits the road, how election officials have worked to

14   deny and make it more difficult, and you have a long 40-year

15   period of history of continuous restrictive legislation or

16   enactment of it, or perceived threats to keep African Americans

17   from voting in Waller County.

18   Q    And which -- what incidence initiated that history?

19   A    Well, in 1971, of course, the 26th Amendment is passed and

20   that allows 18-year-olds to vote.  So with that in 1971 then

21   Waller County becomes a Black majority county.

22   Q    And did the County respond to that demographic shift or

23   shift in the composition of the voting age population?

24   A    Yes.  Leroy Symm, who was the tax assessor and voter

25   registrar put out a questionnaire.  He said that only students

Burton - Direct / By Ms. Korgaonkar                    39

1    could vote whose parents owned property in the County or lived

2    in the County, and/or the student owned property in the County

3    and did a questionnaire to discourage people from voting.

4              Students actually took this to Court.  It finally

5    went to the Supreme Court and in 1979 it was ruled

6    unconstitutional to put added burdens on constitutional rights

7    to vote, sort of a famous Court case out of Texas.

8    Q    And did discrimination in voting in Waller County continue

9    after that Supreme Court case?

10   A    No.  In 1992 the County prosecutor actually indicted

11   Prairie View students for illegally voting.

12   Q    And how did those indictments fare?

13   A    Well, the Justice Department wrote a letter to Waller

14   County and then they dismissed it.

15   Q    Was that a 1992 incident?

16   A    It was 1992.

17   Q    The final chapter --

18   A    Oh, I'm sorry.

19   Q    Was that the final chapter in the history of racial

20   discrimination and voting in Waller County?

21   A    No.  I document in 2003 you have a student who is running

22   for the Council there, the Commission, and at that time, in

23   fact, Oliver Kitzman, the County District Attorney, writes a

24   letter to the County Election Board, and he says that he will

25   prosecute, in fact, students for voter fraud if they try to

1    vote.  Sort of the same old canard that we've heard throughout

2    Texas history, and he says that they do not meet his definition

3    of domicile and he makes it clear that they do not make his

4    definition of domicile.

5    Q    What happened with those threats?

6    A    Well, students were able to enjoin the District Attorney

7    from making further threats.

8    Q    And is that 2003, I think you said, incident the final

9    chapter?

10   A    No, immediately after that, in fact, the -- they changed

11   the early voting act, and this is particularly significant.

12   This would be 2003 for the 2004 election, because the election

13   is held over the student -- the school Spring break so students

14   wouldn't be there, and they had to, in fact, I think the

15   Justice Department stepped back in again and they changed it

16   back, and the student actually wins and only wins because of

17   the early voting.  They had reduced it to like six hours where

18   it had been like 18 hours over two days, on one day.

19   Q    So anything after that that happened in Waller County?

20   A    Yes.  Particularly going along with what I had said about

21   President Obama inspiring and bringing out a lot of African

22   American votes, right at the time that President Obama begins

23   to run for the Presidential nomination you begin to have a huge

24   number of uncleared; that is, they did not clear the changes to

25   the election process from there to 2008 in Prairie View.

1           For instance, they limited the number of people that

2   a registrant could register, which was directly related to the

3   students trying to get registered.  They rejected an

4   application that had the wrong zip code, or if they used the

5   old form, which is clearly stated that they had to accept them,

6   and this was finally stopped with a consent decree in October

7   of 2008, a number of those sorts of things.

8   Q    In addition to your discussion of Senate Factor 1, you

9   also considered Senate Factor 5 in your report, is that right?

10  A    I did.

11  Q    And what is Senate Factor 5?

12  A    Senate Factor 5 looks carefully at the racial disparities

13  in socioeconomic areas of life.  Senate Factor 1, of course, is

14  the history of official or State-sponsored acts of

15  discrimination.  Senate Factor 5 does not necessarily have to

16  be State-sponsored, it's just whether those disparities exist

17  or not.

18  Q    And in considering Senate Factor 5 which areas of

19  potential disparity did you focus on?

20  A    I focused on education, transportation, housing and

21  employment.

22  Q    Let's focus on education.  Were schools segregated in

23  Texas?

24  A    Yes.

25  Q    Could you please explain that history?

1   A    Well, of course, African Americans coming out of slavery

2   had no schools, and it was the custom and tradition, and it was

3   frowned upon to provide any education.  The first codification

4   is in the 1875 Texas Constitution which you have highlighted

5   from the report and reads:  "Separate schools shall be provided

6   for the White and Colored children and impartial provisions

7   shall be made for both."

8   Q    And to the extent that it existed for Black students, was

9   higher education also racially segregated?

10  A    No, it was -- excuse me, yes, it was racially segregated,

11  higher education was segregated.  There was basically no higher

12  education, and it's an important law -- an important Supreme

13  Court case comes out of Texas dealing with desegregation in

14  higher education.

15  Q    And which Court case is that?

16  A    That's _Sweatt v Painter_ that was decided in 1950.

17  Q    And can you tell me about -- about _Sweatt v Painter_?

18  A    Sure.  Heman Sweatt was a student, he had graduated from

19  Wiley College and a postal worker.  Then in 1946 he applies at

20  the University of Texas Law School.  There was no law school

21  for African Americans in Texas, none that he could apply to.

22  He is rejected because he's African American and then the famed

23  Civil Rights lawyer, Thurgood Marshall, represents him.  It

24  goes through the Texas State's Courts all the way to the

25  Supreme Court where Marshall prevails and Sweatt prevails, and

1    they order that he be admitted to the University of Texas.

2              I admitted that when Thurgood Marshall and Sweatt

3    sued that Texas actually creates a Black law school in Houston

4    so that you can have supposedly separate, but equal, but the

5    Supreme Court found it was no where equal on a number of

6    levels.

7    Q    So were efforts to end segregation in Texas in education

8    successful after Mr. Sweatt won his lawsuit?

9    A    No.  It becomes a precedent for *Brown v Board*, but there

10   was no desegregation of the schools in 1950 with *Sweatt v

11   Board,* but this is an important precedent for *Brown v Board* in

12   1954 which is the Court case that ends the sort of *Plessy v

13   Ferguson* law of the land of separate, but equal.

14   Q    What impact, if any, did the *Brown* decision have on racial

15   segregation in Texas schools?

16   A    Well, Texas, like other Southern states resisted

17   integration, and particularly, *Brown v Board.*  And Texas was

18   part, or at least part of Texas, politicians were part of what

19   became known as "massive resistance," that is, resistance to

20   desegregation.  This is sort of the first, I guess, written

21   statement for this, it's called the "Southern Manifesto."

22   Q    Let me get that slide up of that.  Tell me about that

23   resistance and about the Southern Manifesto.

24   A    Well, the Southern Manifesto was written by a Southern

25   politician, Sam Irvin, Strom Thurman and others had a real hand

1   in it, and it decried the Supreme Court's decision in *Brown v*

2   *Board*, and I will read this highlighted section:

3           The Manifesto decried the Supreme Court abuse of

4   judicial powers because Justices, and this is the quote,

5               "Substituted their personal political and social

6               ideas for the established law of the land and had,

7               thereby, planted hatred and suspicion where there had

8               been heretofore friendship and understanding."

9   Q    Dr. Burton, do you remember your deposition being taken in

10  this case in Austin last month?

11  A    I do.

12  Q    Do you remember where it took place?

13  A    It took place in the Attorney General's building named for

14  Price Daniel and Price Daniel was a US Senator at the time of

15  the Southern Manifesto and signed the Southern Manifesto, and

16  the next year he's elected Governor of Texas.

17  Q    After *Brown v Board* and after the Southern Manifesto, did

18  Texas then desegregate its school in compliance with the

19  Constitution?

20  A    No.   Texas continued resistance for a long time, and I

21  give a list, starting about Page 23, of specific examples and

22  cities and areas, and one such is the 1970s, for instance.

23  Harris County School Board resisted *Brown v Board* by giving --

24  insisting then that Latino students; that is, Hispanic students

25  or Whites, so they took the Hispanic students and the Black

Burton - Direct / By Ms. Korgaonkar                45

1   students and put them together and said that the schools were

2   no longer segregated.

3   Q    And how is all -- does all of this history of racial

4   segregation in education continue to affect educational

5   opportunities for students of Color in Texas today?

6   A    Well, it has continued from the time when particularly

7   African Americans were enslaved to present day we're going back

8   to even more re-segregation which is based upon employment

9   patterns, transportation where schools were built and, of

10  course, housing patterns, residency patterns where, in fact,

11  people had to live, covenants and other things kept them from

12  living in other places.  So it has a continuing relevance and,

13  in fact, Senate Factor 1, the history of official

14  discrimination ties in with these disparities very strongly in

15  how and why you have the disparities.  Education is, in fact,

16  the key component as to who votes and who does not, the

17  correlation, and also a correlation with wealth, of course, so

18  all of these things come together in a totality of

19  circumstances.

20  Q    And some of these statistics that are found on Page 25 of

21  your report demonstrate those same disparities that you

22  discussed, is that right?

23  A    That's right.  I wrote "Graduation rates between Whites

24  and historically disadvantaged minorities is substantial.

25  Fewer than 60 percent of African Americans and Latino students

Burton - Direct / By Ms. Korgaonkar                          46

1    in Texas earn regular diplomas alongside their classmates, and

2    in Texas almost a third of African Americans older than 25 have

3    not even graduated from high school."

4    Q    And in addition to Senate Factors 1 and 5, Dr. Burton, you

5    also considered Senate Factor 6, is that right?

6    A    I did.

7    Q    And what is Senate Factor 6?

8    A    Senate Factor 6 is the use of racial appeals.

9    Q    In a campaign?

10   A    Yes, right, in campaigns.

11   Q    Okay.  And what did you examine specifically in your

12   Senate Factor 6 consideration?

13   A    Well, I looked at a couple of things.  One, that race has

14   been a central feature of politics.  Of course, in the South,

15   and Texas is no exception from the beginning, from slavery and

16   the Civil War to the present date, the post-Civil Rights era

17   and particularly I looked at the modern Civil Rights movement,

18   the shift of political alignments between the Democrats and the

19   Republicans, and then looked specifically at how racial appeals

20   are used in elections and in politics, and this is really

21   important, of course, when you consider the high racial block

22   voting that's been documented in Texas in elections.

23   Q    And if, Dr. Burton, I could just ask you to take a look at

24   -- at this slide on your screen right now, which is Exhibit 1

25   to your report.

1   A     Yes, this --

2   Q     And if you could tell me what you see here?

3   A     Well, yes.  Here you have, of course, blackbirds which is

4   a symbolic reference to African Americans; in fact, if they are

5   crows, then that would refer to Jim Crow which was a system of

6   segregation and sort of a derogatory term that is used.  Here

7   your candidate, M. J. Khan, is surrounded by only Democrats who

8   are minorities.

9           If you look at the writing on there, it even sort of

10  is scary in terms of almost like blood dropping at the time,

11  and when "birds of feather flock together."

12          Now this is actually a copycat flyer that was used in

13  1988 in a Joel Redmond (phonetic), against Joel Redmond

14  campaign where he is a nonminority and then only minorities are

15  placed around him, but it shows how successful people thought

16  it was to use the same format again.

17  Q     So this is an example of a racial appeal in a political

18  campaign?

19  A     That's right.  That's right.

20  Q     And if you could look at the next slide that I'll put up,

21  is this another example of a racial appeal in a political

22  campaign?

23  A     It is.  In my -- in my report I go through the social

24  science literature of the shift from overt to covert and the

25  sort of symbols that are used in racial campaigns now

1    explaining what Lee Atwater, the strategist for -- early

2    strategist for using these kind of campaigns, why they are

3    successful and how they are done, and this is a good example of

4    one.

5            This is Chris Turner.  Now Chris Turner is White, but

6    they have used the computer to darken his complexion to make

7    him look much more like a minority.  He's the great pretender.

8    Of course, the background is the flag of China and on his shirt

9    is a pin, the Mexican -- Mexico's flag or representation of it,

10   and this -- it is a way to identify in terms that historians or

11   people of literature would talk about, Chris Turner, this

12   Anglo, with these other threatening groups; that is, China

13   where supposedly jobs are going, or Mexico with illegal

14   immigration, and it speaks to -- and the text speaks to those

15   issues.  What we're interested is sort of the way it is

16   presented in terms of the racial appeal.

17   Q    And, finally, Dr. Burton, you also consider Senate Factor

18   9 in your report, is that correct?

19   A    I do.

20   Q    What is Senate Factor 9?

21   A    Senate Factor 9 is the rationale given, in fact, for a law

22   and whether that rationale is tenuous or not.  And in this case

23   I am looking at the SB 14 and whether the rationale of voter

24   fraud given for SB 14 is tenuous or not.

25   Q    And what do you understand the stated rationale for SB 14

1    to be?

2    A    Voter fraud.

3    Q    And the prevention of in person voter fraud?

4    A    That's right, the prevention of voter fraud.

5    Q    And do you believe that the prevention of in person voter

6    fraud is an appropriate legislative goal?

7    A    If -- if it exists it certainly is, but certainly we have

8    seen in all of the other, from the all White primary, the

9    secret ballot, the poll tax, the re-registration, even students

10   trying to vote in Waller County, this has been the same canard

11   used again and again for voter fraud.

12   Q    So did you conclude that SB 14 only has a tenuous

13   relationship with its stated rationale of the prevention of in

14   person voter fraud?

15   A    I did.

16   Q    And, Dr. Burton, having considered Senate Factors 1, 5, 6

17   and 9, what did you ultimately conclude in your report?

18   A    Well, I concluded through the totality of the

19   circumstances, it seems clear to me that because of race, in

20   particular, Texas pattern of official historical and modern

21   discrimination in voting, education, employment and housing,

22   SB 14 causes an inequality of access to the electoral process

23   for African American and minority voters in Texas.

24           MS. KORGAONKAR:   Okay.   Thank you for your testimony,

25   Dr. Butron.   I pass the witness.

**CROSS EXAMINATION**

1

2    **BY MR. SCOTT:**

3    Q    Hello, Dr. Burton.  We met on the elevator today I think.

4    A    That's correct.

5    Q    You currently work at the -- out of the Strom Thurmond

6    Institute at Clemson University; is that correct?

7    A    That's where one of my offices is.

8    Q    You have done a declaration that's -- you understand

9    that's also been submitted to the Court for the Court's

10   consideration, correct?  Your report?

11   A    My report, yes, sir.

12   Q    And I think you said that everything that you considered

13   and relied on is contained either in that report or the

14   appendix to that report, correct?

15   A    That's right.  Of course --

16   Q    And your experience.

17   A    Yeah.  And my experience as a historian for 40 years, of

18   teaching, writing about these issues and researching them.

19   Q    Much of your historical analysis I guess in this case

20   relates back to something from -- I think you said 1895 is

21   where the start point was; is that correct, from your analysis

22   for the -- your opinions here today?

23   A    Well, I think it's the totality of circumstances, so they

24   go even further back.  But we focused upon probably state

25   official in the testimony I did here, state official acts began

Burton - Cross / By Mr. Scott                          51

1    about 1895.

2    Q    Well, I mean the first thing was -- the first two things

3    you considered were all White Primary and poll taxes, correct?

4    A    Correct.  Secret ballots.

5    Q    Secret ballots, I'm sorry.

6         **MR. SCOTT:**  So, Brian, let's go ahead and pull up the

7    declaration of Dr. Burton and we'll just kind of walk through

8    these.

9    Q    Dr. Burton, I'm going to be starting at Page 6 I believe

10   of your declaration.  If it's easier to look at the one in

11   front of you, great; and if it's easier on the screen, that's

12   super fine, also.

13        We'll start with the all White Primary 1895 to 1944,

14   correct?

15   A    Correct.

16   Q    There ain't an all White Primary in the state of Texas

17   currently, correct?

18   A    No, there is not.

19   Q    Nor has there been since 1944, some time before the end of

20   World War II, correct?

21   A    That's correct.  Ended by the amendment.

22   Q    On Page 10 is where --

23        **MR. SCOTT:**  If you'd flip over there, Brian.

24   Q    That's the poll taxes.  And you're aware of how much an

25   election ID certificate costs in the state of Texas, correct?

Burton - Cross / By Mr. Scott                          52

1   A     I did know.  I'm blanking on it.  The election

2   certificate -- I thought you were talking about the poll tax,

3   sorry.

4   Q     No, sir.  So the current election ID certificate under

5   SB 14 is a free certificate that the state of Texas will

6   provide to anybody at any time --

7   A     Well, actually, it's --

8   Q     -- well, Monday through Friday, 8:00 to 5:00.

9   A     Can I respond?

10  Q     Absolutely.

11  A     It's supposedly free.  The effort and time, in particular

12  for poor minorities to do that is going to cost like the poll

13  tax did.

14  Q     I understand your opinions on that.  And so but if a

15  person has the documentation with them and they go in there

16  to -- they're going to wait in line just like everybody else

17  that's gone into the facility to get an ID, correct?

18  A     That's correct if they already have it.  But the problems

19  associated with getting it are disparately, you know,  much

20  more for minorities and African Americans.

21  Q     Okay.  You have participated in litigation before,

22  correct?

23  A     What do you mean by "participated in litigation"?

24  Q     You've been a -- you've submitted amicus briefs to the

25  Supreme Court of the United States; is that correct?

1  A    I think I have signed amicus briefs that were submitted.

2  Q    And specifically, you made these same arguments relating

3  to poll taxes and the all White Primary in a brief you filed in

4  a case that was known as *Shelby County*.  Do you recall that?

5  A    I don't but I probably did.

6       **MR. SCOTT:**  Okay, Brian.

7  Q    I'm going to turn your attention if I could, Doctor, to --

8  this is an amicus brief that was filed with the United States

9  Supreme Court in a case called *Shelby County versus Eric*

10 *Holder, Jr., Attorney General, et al.*  Do you recall that?

11 A    I do.

12 Q    And you --

13      **MR. SCOTT:**  Brian, if you'll go to -- I think it's

14 5A.

15 Q    Which is just your signature on that -- your electronic

16 signature and a little bit of information on you.

17      **MR. SCOTT:**  That's okay.  Just stay there, Brian.

18      **THE WITNESS:**  I accept that I signed it.

19      **MR. SCOTT:**  Sure.

20      **THE WITNESS:**  I just didn't remember when you asked

21 but...

22 **BY MR. SCOTT:**

23 Q    Did *Shelby County* reject -- did the Supreme Court in

24 *Shelby County* reject the argument that the burdens of the

25 Voting Rights Act may be imposed on a state by looking to the

Burton - Cross / By Mr. Scott                                    54

1    far past?

2    A    I don't believe so.

3            **MR. SCOTT:**  Brian, if you'll bring up *Shelby County.*

4    Q    There's your signature on -- we're a little ahead of Brian

5    today.  Orville Vernon Burton, Professor of History, Computer

6    Science, Clemson University.  That's you, correct?

7    A    Right.

8    Q    And that references also your book, *The Age of Lincoln,*

9    which won an award at the Chicago Tribune Heartland Literate

10   Award for Non-Fiction.  Congratulations.

11   A    Thank you.

12   Q    So that's you who signed off on this petition and the

13   contents and the arguments that were contained in that amicus

14   brief that referenced specifically poll tax and the all White

15   Primary, correct?

16   A    Correct.

17           **MR. SCOTT:**  Brian, if you'll turn over to the *Shelby*

18   *County* decision.

19   Q    Have you reviewed, Doctor, the *Shelby County* decision by

20   the U.S. Supreme Court before you came to your opinions that

21   you've rendered in this case?

22   A    I had read it earlier.  I did not sit down and study it

23   for this case.  But when it came out, I did read it.

24           **MR. SCOTT:**  Brian, will you zoom in on that first

25   headnote two area?

1   Q        "At the same time voting discrimination still exists;

2            no one doubts that.  The question is whether the

3            Act's extraordinary measures" --

4   Talking about the Act is the Voting Rights Act, correct?

5   A    Correct.

6   Q        "The Acts, extraordinary measures including its

7            disparate treatment of the states, continue to

8            satisfy constitutional requirements."

9        Now, how did -- so you took that into consideration

10  when you were coming up with the opinions that you've rendered

11  in this case, correct?

12  A    I was not thinking about -- about this case at all.  I was

13  familiar with it.  But, you know, I will say this was about a

14  Section Five case.  This is a Section Two case.  And what it

15  says right here how you do the Senate factors is a history of

16  official racial discrimination.  And that's why I was doing the

17  Senate factors, which the Supreme Court also held that the

18  Senate factors coming out of the twenty-fifth year renewal of

19  the Voting Rights Act instead of the best standard to

20  understand an act.

21  Q    Okay.

22       **MR. SCOTT:**  Brian, if you'll turn to 2628.

23  Q        "In 1965, the states could be divided into two

24            groups:  those with a recent history of voting tests

25            and low voter registration and turnout and those

1          without those characteristics.  Congress based its

2          coverage formula on that distinction.  Today the

3          nation is no longer divided along those lines, yet

4          the Voting Rights Act continues to treat it as if it

5          were."

6          Did you consider this passage and the issue of low

7    voter registration and turnout in forming the opinions that

8    you've rendered here today?

9    A    Well, no.

10   Q    Did you have an opportunity to look at the voter turnout

11   in the state of Texas as in the 2013 elections?

12   A    Not 2013.  I cite I believe in my report to the turnout

13   for the 2012 election and the 2008 elections.

14   Q    How about the 2014 March and May primaries?  Did you

15   consider the turnout in those elections?

16   A    No.

17   Q    Had you considered the voter registration numbers in the

18   state of Texas, for instance, a comparison from 1990 voter

19   registration amongst minorities and Anglos as compared to 2012?

20   A    No.

21   Q    Would it surprise you or would you disagree as a political

22   scientist with the proposition that across all minority groups

23   their voter registration hasn't, in fact, increased in Texas

24   from 1990 to 2012?

25   A    No.

Burton - Cross / By Mr. Scott                                57

1   Q    Would you disagree with that?

2   A    No, I would not disagree with it.

3   Q    You also -- so let's go back over to your declaration.

4   You complain that there's insufficient voter fraud to justify a

5   voter ID law.  Do you recall that in your declaration?

6   A    You'll have to show me where I say that, please.

7   Q    Let's turn if we could to Page 41 of your declaration.

8        **MR. SCOTT:**  Brian, would you pull up that section?

9   Q    Have you found that, Doctor?

10  A    On Page 41?

11  Q    Yes, sir.  Forty-one and 42.

12  A    Okay.

13  Q    You complain of voter fraud that it's too tenuous to

14  justify Senate Bill 14, specifically.  And I think you cite

15  reference to Buck Wood, who was one of the witnesses that has

16  testified in this case.

17  A    That's right.

18  Q    You let me know when you've found it.

19  A    I found 41-42.

20  Q    Oh, okay.  And is that correct you believe that there is

21  too little evidence of voter fraud to justify SB 14?

22  A    Well, I did not study the voter fraud.  I studied the

23  media reports, the legislative reports and others on voter

24  fraud.  And it seemed to me that on in-person voter fraud there

25  was hardly any ever identified, particularly out of all the

Burton - Cross / By Mr. Scott                    58

1   votes that had been cast.  Now, there was voter fraud

2   identified in absentee voting, but this is one of the reasons

3   it seemed so tenuous.

4          If the concern is for the voter fraud that people

5   know that exists, you know, why aren't they looking at that

6   instead of in-person voting, which does not, as best I have

7   been able to discern from, again, not making this a primary

8   focus of study; then why haven't they focused there if that is

9   a concern and where evidence has arisen?  It adds to the

10  tenuousness of it since this does not seem, SB 14, to address

11  that issue at all.

12  Q    Do you recall filing a amicus brief with the U.S. Supreme

13  Court in a case styled *Crawford versus Marion County Election*

14  *Board*?

15  A    I do remember.

16  Q    And did Mr. Gerry Hebert was he your attorney of record in

17  that case?

18  A    I don't know.

19       **MR. SCOTT:**  Brian, if you'll pull up the amicus brief

20  in *Crawford versus Marion County* that was filed by Dr. Burton.

21  Q    This is the face sheet of the amicus brief, and there it's

22  got the counsel of record, J. Gerald Hebert from the Campaign

23  Legal Center in Washington, D.C.

24          Does that refresh your recollection as to whether he

25  represented you or not in that case?

EXCEPTIONAL REPORTING SERVICES, INC

Burton - Cross / By Mr. Scott                          59

1  A     It does.

2  Q     Okay.  In the Supreme Court --

3            **MR. SCOTT:**  On Page 30, Brian.

4  Q     -- you made the argument that Indiana didn't have enough

5  fraud.  Do you recall that?

6  A     (No response)

7  Q     Let me read to you out of your brief.

8            "Is the ostensible reason by a preponderance of the

9            Indiana law and less stringent photo ID laws in other

10           states credible?  Their claim is that they are

11           designed to prevent in-person fraud."

12 Did I read that correctly?

13 A     Yes.

14 Q     And that was one of the arguments that your amicus brief

15 was attempting to point out to the United States Supreme Court

16 in *Crawford,* correct?

17 A     That's correct.

18 Q     Do you believe that your counsel made adequate arguments

19 to make sure the Supreme Court understood all those issues

20 related to the in-person fraud that you were trying to raise

21 with them?

22 A     I really don't have any knowledge of what was argued

23 there.  I was not there at the trial.

24 Q     Well, I'll say on the record that Mr. Hebert is a very

25 fine attorney.  I am sure, I am positive he did.

Burton - Cross / By Mr. Scott                                60

1              So let's turn to Page 31 of the amicus brief.  One of

2    the contentions you make on Page 31 of your amicus brief is the

3    Indiana legislature should have studied the issue more.

4              Do you recall making that argument?

5    A    I remember that argument being made.

6    Q    Also, on Page 31 of your amicus brief filed with the U.S.

7    Supreme Court that Indiana hadn't prosecuted in-person voter

8    fraud.  Do you recall making that argument?

9    A    I remember that argument being made.

10   Q    Have you been in the courtroom the last few days and

11   listened to some of the other experts that the Plaintiffs have

12   offered in this case?

13   A    No, I have not been in the courtroom.

14   Q    Have you had an opportunity to visit with -- I think you

15   pronounce her name Minnite, Dr. Minnite?  Do you recall who she

16   is?

17   A    No, I do not.

18   Q    Well, would it surprise you to learn that she was one of

19   your co-proponents, signors, amicus, whatever you call some

20   lady that files an amicus brief, party?

21   A    It would not surprise me or surprise me either one.  I

22   haven't thought about it.  I signed it.

23   Q    Okay.

24   A    But I did not sign it because other people signed it.  I

25   signed it because I agreed with it.

Burton - Cross / By Mr. Scott                          61

1  Q    And the Supreme Court rejected these arguments in *Crawford*

2  by upholding the Indiana voter ID law despite the fact that

3  Indiana had no evidence of in-person fraud occurring in

4  Indiana's history, much less being prosecuted to conviction; is

5  that correct?

6  A    I don't want to say.  I'm not a -- a lot of these

7  questions you're asking me, I'm not an attorney and don't

8  pretend to be.  I'm a historian and sociologist and I use these

9  kind of records studying them for sources and for things.  So I

10 want to be careful in trying to make interpretations.  I don't

11 really feel comfortable drawing an interpretation, a legal

12 interpretation at all.

13        I don't know if they specifically rejected these

14 things.  I read, you know, the decision.  But I'm not sure.

15 I'd be uncomfortable saying that they said that this was

16 specifically being rejected.

17 Q    If I took a survey of this courtroom randomly and picked,

18 I don't know, three or four out of the crowd, do you think they

19 filed more or less amicus briefs than you in the United States

20 Supreme Court?

21 A    I have no idea.

22        **(Laughter)**

23        I know my wife's back there and I don't think she's

24 ever filed one.

25        **(Laughter)**

Burton - Cross / By Mr. Scott                    62

1   Q    I haven't either.

2   A    Okay.

3              **MR. SCOTT:**  So, Brian, if you'll bring up the

4   *Crawford* opinion and specifically on 553 U.S. 181, 194 and 195.

5   Q    Here is the U.S. Supreme Court responding, in part, to

6   your amicus brief and to the arguments that you've made.

7              "Voter fraud.  The only kind of voter fraud that

8              SEA 483 addresses is in-person voter impersonation at

9              polling places.  The record contains no evidence of

10             any such fraud actually occurring in Indiana at any

11             time in its history."

12             Well, they agreed with you.  There was no evidence in

13  the record to support the contention that there was in-person

14  voter fraud; is that correct?

15  A    Yes.

16  Q    So on Page 45 of your declaration through 47 you relate

17  the complaints, I guess, about the burdens of traveling to the

18  Department of Public Safety; is that correct?

19  A    I haven't looked at it but I'll take your word.  Could I

20  take a moment before I --

21  Q    Yes, sir.

22  A    -- agree that I've done something?

23  Q    Yes, sir.

24  A    So this is Pages 45?

25  Q    Yes, sir.  Through 47.

1   A    Okay.

2        **(Pause)**

3            Okay.

4   Q    Are you getting paid by the hour?  It's okay.

5   A    I'm a slower reader.  It's --

6   Q    It's okay.

7   A    It's like, you know, a lot of Texans came from South

8   Carolina.  You're probably familiar with slow readers.

9        **(Laughter)**

10  Q    Extremely slow readers.

11           **THE COURT:**  They're not talking slow through this

12  trial.

13       **(Laughter)**

14  **BY MR. SCOTT:**

15  Q    All right.  All I really wanted to make sure is that you

16  agree with my characterization I guess that this is the -- this

17  is the portion of your opinion where you're complaining that

18  voters -- many of them don't have the time or money to acquire

19  the necessary documents to get to the Department of Public --

20  or get the documents in and then get over to the Department of

21  Public Safety and effectuate getting a photo ID, correct?

22  A    That's right.  And sorry I took so long reading.

23  Q    No, no, I was just having fun.

24  A    It's just I'm always reluctant to testify to something

25  until I see what I have said.  And I'll try not to slow you

Burton - Cross / By Mr. Scott                    64

1   down.

2   Q    You're not slowing me down.

3        Did you have an opportunity to visit with any of your

4   counsel about the testimony of Commissioner Ortiz yesterday?

5   A    No, I've not at all.

6   Q    Well, specifically he had a recording -- at least the

7   Court's recording at 8:20.08 through 8:23 in the record

8   yesterday showed that he did not agree -- I'm sorry, I don't

9   disagree with what Congress is saying here in the committee

10  reports for the MVRA.

11       What's the MVRA?

12  A    The Motor Voter Registration Act.

13  Q    Yes, sir.  Which explains that having potential voters go

14  to the DMV to register was the most cost effective method of

15  registration.

16       Do you disagree that the most cost effective method

17  of registration, voter registration, for states is having the

18  places like the Department of Public Safety?

19  A    For the states, not for the people.

20  Q    Yes.

21  A    Yes, I think that makes sense.  I agree with the Motor

22  Voter Registration.

23  Q    I mean the best for the citizens would be we'd all have

24  our own little personal kiosk in our home and we'd just sit

25  there, push a magic button and it would spit out what we need,

Burton - Cross / By Mr. Scott                    65

1  right?

2  A     Well, we're almost there.

3  Q     Well, we're not though are we?

4  A     We're getting close.

5  Q     Well, okay.  So the Supreme Court in *Crawford* --

6        **MR. SCOTT:**  Brian, will you pull up *Crawford* 553 at

7  198 please, sir?

8  Q     For most voters -- this is the Supreme Court responding

9  again to your amicus brief:

10             "For most voters who need them the inconvenience of

11             making a trip to the Bureau of Motor Vehicles,

12             gathering the required documents and posing for a

13             photograph surely does not qualify as a substantial

14             burden on the right to vote or even represent a

15             significant increase over the usual burdens of

16             voting."

17             Now, you filed the amicus brief with the Supreme

18  Court of the United States.

19  A     Could you put that back up, please?

20  Q     Absolutely.

21        **MR. SCOTT:**  Brian, would you put that back up?

22  Q     So you filed a brief with the United States Supreme Court.

23  You made your arguments very similar to the arguments you've

24  made here.  And the response from the Supreme Court, the

25  Justices in the Supreme Court, was the provision I just read to

1  you.

2  A     That's right.  And I think it's significant, said for most

3  voters.  And I would agree for most voters.  I think what this

4  report showed, particularly Senate factor one, is historically

5  why that's not true for the others that are not most voters.

6  It is on those minorities, particularly African Americans, that

7  the largest burden is going to fall.

8  Q     Did you make that argument to the Supreme Court?

9  A     You know, I did not make this argument to the Supreme

10 Court.  I signed an amicus brief that I agreed with.  I was not

11 there.  I read the opinion some time ago.

12        But I'd also point out about this decision, this was

13 not a state covered by the Voting Rights Act which had strong

14 historical evidence for discrimination over the years and was

15 not covered.  So it seems to me that -- well, you go ahead.

16 I've made my point.

17 Q     What's the most segregated city in the United States?

18 A     Well, a lot try to claim it but I don't...

19 Q     Does Milwaukee sound right?

20 A     I've seen Milwaukee, I've seen Chicago, I've seen a lot of

21 them called at different times the most segregated city in

22 America.

23 Q     Okay.  Was Houston or Dallas or Fort Worth or San Antonio

24 or Austin or Corpus Christi or any Texas city that you can

25 recall ever listed as the most segregated city in the United

Burton - Cross / By Mr. Scott                          67

1    States?

2    A     Not that I recall.  But you understand that, of course,

3    segregation came about after the Civil War.  The south was -- I

4    mean, yeah, the south was the most integrated place in the

5    nation.  Because you could not have segregation and have people

6    enslaved.  You had to have people there with them to make them

7    enslaved.  So I'm not sure what the point of the integration,

8    segregation of the cities is.

9              **MR. SCOTT:**  So, Brian, if you'll go to 553 at 199.

10   Q         "Both the evidence -- both evidence in the record and

11             facts which we may take judicial notice of, however,

12             indicate that a somewhat heavier burden may be placed

13             on a limited number of persons.  They include elderly

14             persons born out of state who may have difficulty

15             obtaining a birth certificate, persons who because of

16             economic or other personal limitations may find it

17             difficult either to secure a copy of their birth

18             certificate or to assemble the other required

19             documentation to obtain a state issued

20             identification.  Homeless persons" --

21             **MR. SCOTT:**  If you'll keep moving up a little bit for

22   me, Brian.

23   Q    "And persons with a religious objection to being

24   photographed."

25             Now, when you were reviewing *Crawford* in preparation

Burton - Cross / By Mr. Scott                                68

1   for forming your opinions in this case --

2   A    I did not review *Crawford.*  Again, you know, I'm not an

3   attorney, I don't do a legal opinion.  What I did was put

4   together Senate factors as a historian and a socialist.  So I

5   did not review *Crawford* at all.

6   Q    Well, what you did add to the back of your appendix was

7   38 different law decisions, court decisions.  Do you recall

8   that?

9   A    I do.

10  Q    Do you also recall that not a single one of those

11  decisions was *Crawford,* you didn't include *Crawford* as any of

12  the decisions of the 38 other decisions involving cases --

13  A    This is from Appendix C.

14  Q    Yes, sir.

15  A    In fact, yeah, I did not do -- but what I did do is looked

16  at -- in Appendix B I did look at the voter ID rules and

17  things.  But, no, I did not have *Crawford* there.

18  Q    Well, is there a better template for the review of the

19  Voting Rights Act and voter ID than the opinion in which you

20  filed an amicus and the United States Supreme Court responded

21  to that amicus, amongst others, in its case *Crawford v Marion*

22  *County*?

23  A    I don't think it was relevant to what I was doing here.  I

24  would have been happy to have had it in there; and, obviously,

25  I had read it in the past.  And I talk about the voter ID and

Burton - Redirect / By Ms. Korgaonkar                69

1   how it was implemented in the Indiana in the appendix to show,

2   in fact, that Texas did not follow the more lenient ways that

3   Indiana allowed people to have IDs.  So I was familiar with it

4   and I was familiar particularly with the implementation.  But I

5   don't see how not having it as a source relates to anything to

6   the report that I was doing.

7   Q    Thank you, sir.

8        MR. SCOTT:  Pass the witness.

9                        REDIRECT EXAMINATION

10  BY MS. KORGAONKAR:

11  Q    Dr. Burton, I just have a couple of questions for you that

12  are about Texas.

13  A    Okay.

14  Q    Can SB 14 be understood without its historical context?

15  A    Absolutely not.  This is the purpose of my report.  There

16  is a straight line that goes from these state sponsored acts to

17  deny the right to vote or at least to make it more difficult

18  for Blacks and minorities to SB 14.

19        And I would also point out that, you know, when they

20  said these are older, well, they stop most of them because you

21  have the Voting Rights Act in 1975.  And even though I point

22  out other things like Waller County and even the use of

23  redistricting, that it seems very significant to me in telling

24  that the minute that this part of the Voting Rights Act that

25  triggers coverage of Texas is gone, then SB 14 comes right back

Burton - Redirect / By Ms. Korgaonkar                    70

1   in as a straight line from the earlier disfranchise and diluted

2   measures that I have outlined.

3   Q    And that in between period you're talking about where

4   Section Five is in effect, is the period between

5   re-registration requirements and voter purges in SB 14; is that

6   right?

7   A    That's right.  That's right.  And, in fact, Texas has more

8   objections.  There have been more objections by the Department

9   of Justice to Texas than any other state.  And that's a

10  critical difference.  I don't want to go on and start

11  lecturing, but I think that is a critical difference between

12  Indiana and Texas.  You cannot ignore your history.  History is

13  powerful.  History is important and history has consequences.

14  And those consequences that I laid out in the historical state

15  discrimination come back in the socioeconomic factors that we

16  looked at.  And those go together as to why SB 14

17  disproportionately makes it more difficult for African

18  Americans and minorities to participate in the electoral

19  process with SB 14.

20  Q    Okay.  I have no further questions for you right now,

21  Dr. Burton.  Thank you.

22          **THE COURT:**  Anything else from the State?

23          **MS. WESTFALL:**  Your Honor, if I may?  Elizabeth

24  Westfall for the United States.  I have one question for you.

25  //

1                          **REDIRECT EXAMINATION**

2     **BY MS. WESTFALL:**

3     Q    Was there any claim under the <u>Voting Rights Act</u> considered

4     in the *Crawford* case, to your knowledge?

5     A    I don't think so.  I -- again, I want to make clear that I

6     am not an attorney.  I am not here to make and don't pretend to

7     make legal claims.  I wish I could make the laws.

8     Q    Thank you, sir.

9     A    But I can't.

10    Q    Thank you, sir.

11          **MR. DERFNER:**  Let me just follow-up on that, if I

12    may, your Honor.

13                          **REDIRECT EXAMINATION**

14    **BY MR. DERFNER:**

15    Q    In fact, in the *Crawford* case, was there any claim, as far

16    as you know, of racial discrimination, of discrimination

17    against African Americans or Hispanics, or any kind of

18    discrimination?

19    A    Not that I know of.

20    Q    Thank you.

21                          **RECROSS EXAMINATION**

22    **BY MR. SCOTT:**

23    Q    So you made a comparison of Indiana's objections that they

24    received versus Texas objections to Section 5?

25    A    I don't remember doing that.  You want to --

1  Q    Well, you said a second ago that Texas had the highest

2  number of objections to Section 5 of any state.

3  A    Indiana is not covered under Section 5.

4  Q    Exactly.  Well, so how many objections does -- has the

5  State of Texas received since 1990?

6  A    I'd have to look.  I did look at that, but I didn't

7  include it in the report.  I broke it down by decade --

8  Q    Do you know how many submissions by Texas and sub-

9  jurisdictions in Texas that have been made since 1990 to the

10 DOJ?

11 A    Well, I know that in Waller County, they did not submit

12 their changes and they had to go to a -- no, you know, I looked

13 at those things, but I don't remember the numbers.

14 Q    Well, how about 112,261 submissions to the Department of

15 Justice, with 120 objections?  Does that sound right?

16 A    I will accept it if that is the number -- official number

17 you have.  I looked.  And there's a -- there was also a table I

18 looked at that was put together in a report for the renewal of

19 the Voting Rights Act at that time that had them there as well,

20 so I have a general idea and it sounds right.

21        MR. SCOTT:  Thank you.  No further questions.

22        MR. DERFNER:  Your Honor?

23        THE COURT:  Okay.

24        MR. DERFNER:  I'm sorry to keep this going.

25 //

**FURTHER REDIRECT EXAMINATION**

**BY MR. DERFNER:**

1  Q    If we're talking about Indiana and Texas -- Professor

2  Burton, talking about Indiana and Texas, are you generally

3  familiar with the fact that in *White versus Regester*, the

4  Supreme Court struck down multi-member districts in Texas back

5  in the earlier '70s?

6  A    I am, and that's the basis in fact for the renewal of the

7  Voting Rights Act, which you were involved with, where you get

8  a totality of the circumstances.  Evidence of the Senate

9  factors comes from the Texas case of *White v. Regester*, along

10 with *McKeithen* (phonetic) and the two others that were added

11 on.

12 Q    And are you familiar enough with *White versus Regester*,

13 Professor Burton, to know or remember that in that case, the

14 Supreme Court had recently, just two years before, upheld

15 multi-member districts in Indiana in *Whitcomb versus Chavis*,

16 and that in *White versus Regester*, the State of Texas argued

17 well, if multi-member districts are okay in Indiana, they must

18 be okay in Texas?  Do you remember that?

19 A    I do remember it now that you jogged my memory.

20 Q    And so do you remember that when the Supreme Court decided

21 *White versus Regester*, they said in a sense, clearly, just

22 because something is okay in Indiana does not mean it's okay in

23 Texas with Texas's record and history and facts?

Burton - Redirect / By Mr. Derfner                    74

1  A    I will take your interpretation as an attorney to say

2  that's what they mean.  But, again, I don't want to -- but it

3  makes logical sense to me.

4           MR. DERFNER:  Thank you very much.

5           MR. SCOTT:  Nothing further.

6           THE COURT:  Nothing further for this witness?  Then

7  thank you, sir.

8           THE WITNESS:  Thank you.

9           THE COURT:  You can step down.

10          THE WITNESS:  Sorry about taking that time to read

11 that.

12          THE COURT:  That's not a problem at all.

13          THE WITNESS:  I get nervous.

14          THE COURT:  No, you did fine.

15      **(Witness steps down)**

16          MR. DUNN:  Your Honor, Chad Dunn on behalf of the

17 Veasey/LULAC Plaintiffs.  You'll recall in the dismissal

18 briefing there was a -- some briefing about whether the

19 Governor's office was an appropriate party defendant in the

20 case.  So I want to bring to the Court's attention -- I'm just

21 going to give some exhibit numbers here --

22          THE COURT:  Okay.

23          MR. DUNN:  -- that indicate the Governor's office

24 participating in the administration of -- implementation of

25 Senate Bill 14.  So they're Plaintiffs -- these are all

75

1  Plaintiffs' exhibit numbers:  294, 922, 924, 1073, 1074, 1076,

2  1077, 1078, 1079, 1081, and 1082.  Thank you, Judge.

3       **(Pause)**

4            **MS. WESTFALL:**  One second, your Honor.

5            **THE COURT:**  Okay.  Are you leaving?

6            **MR. SCOTT:**  I just need to go get a witness ready for

7  this afternoon.  Is that okay?

8            **THE COURT:**  That's fine.  I just saw you packing up

9  to leave us.

10            **MR. SCOTT:**  I quit.

11       **(Laughter)**

12            **THE COURT:**  That's what I was thinking.

13       **(Mr. Scott/co-counsel confer)**

14            **MS. CONLEY:**  Good morning, your Honor.

15            **THE COURT:**  Morning.

16            **MS. CONLEY:**  Danielle Conley for the Texas League and

17  Imani Clark, and the Plaintiffs call Dr. Coleman Bazelon.

18       **(Pause)**

19            **THE COURT:**  Good morning.  Would you raise your right

20  hand?

21            **THE WITNESS:**  May I be affirmed?

22            **THE COURT:**  Yes.  He wants to be affirmed.

23  //

24  //

25  //

1          **DR. COLEMAN BAZELON, PLAINTIFFS' WITNESS, SWORN**

2          **MS. CONLEY:**  Your Honor, these are just a set of the

3    demonstratives we'll be using.

4                **THE COURT:**  Okay.

5          **MS. CONLEY:**  Good morning, Dr. Bazelon.

6          **THE WITNESS:**  Good morning.

7                          **DIRECT EXAMINATION**

8    BY MS. CONLEY:

9    Q    Could you please state your full name?

10   A    Coleman David Bazelon.

11   Q    And are you currently employed?

12   A    Yes, I am.

13   Q    What is your current place of employment?

14   A    The Brattle Group.

15   Q    And can you please describe briefly what the Brattle Group

16   does?

17   A    The Brattle Group is an economic consulting firm.

18   Q    And what type of work do you do at the Brattle Group?

19   A    I'm a principle and economic consultant for the Brattle

20   Group.

21   Q    Could you briefly describe your educational background for

22   the Court?

23   A    I have a B. A. from Wesleyan University in Middletown,

24   Connecticut; I have a diploma in Economics from the London

25   School of Economics in London, England; and I have a Master's

1   of Science and a Ph.D. in Economics issued from the Department

2   of Agricultural and Resource Economics at U. C. Berkeley.

3   Q    Okay.  And is a Ph.D. in Agricultural and Resource

4   Economics different from a Ph.D. in Economics?

5   A    Not really.  It's issued from a separate department, but

6   it's the same core economics training.  In fact, I took many of

7   my core economic classes out of the Econ Department at

8   Berkeley, and many of the Berkeley Econ students took their

9   core statistics in econometric classes out of my department.

10  Q    And you're not a lawyer, are you?

11  A    I am not a lawyer and don't pretend to be one.

12  Q    Okay.  So you're not here today at all for any legal

13  opinions, right?

14  A    Not at all.

15  Q    Okay.  Could you please briefly describe your work

16  experience prior to joining the Brattle Group?

17  A    My first significant professional engagement outside of

18  graduate school was at the Congressional Budget Office where I

19  was an analyst and then principal analyst.  And then after

20  that, I worked at the Analyst Group, which is another economic

21  consulting firm, before joining the Brattle Group in 2007.

22  Q    And do you consider yourself to be an expert in economic

23  and statistical analysis?

24  A    Yes, I do.  As an economic consultant, what I do is apply

25  the principles of economics and statistics to a wide variety of

1    questions.

2    Q    And what kinds of cases have you worked on over the course

3    of your career?

4    A    As an economic consultant, I work on really quite a wide

5    variety of cases, almost anything that would come up at a firm

6    like the Brattle Group.  But within that variety of cases, I

7    tended to focus on telecommunications media and technology

8    industries where I have some specific expertise.

9    Q    And is your experience applying economic principles

10   limited to cases involving telecommunications issues?

11   A    Not at all.  As I say, I've applied them on areas outside

12   of that -- those industries.  But more broadly the skills that

13   I bring to the questions I answer are very portable and

14   applicable widely.

15   Q    And have you ever worked on or testified in a case

16   relating to voting rights?

17   A    I have not.

18   Q    Have you ever worked on or testified in a case relating to

19   racial discrimination?

20   A    I have not.

21   Q    And does that lack of experience with respect to those

22   areas affect the reliability of your opinions here?

23   A    No, it doesn't.  I'm applying solid economic principles to

24   the analysis I present here.

25   Q    And those economic principles can apply, as you testified,

Bazelon - Direct / By Ms. Conley                    79

1    across a wide range of subject matters, correct?

2    A    That's correct.

3    Q    Outside of this particular case, have you had the

4    opportunity to perform quantitative analyses on large datasets?

5    A    Yes.  We often work with large datasets in our work.

6    Q    And could you please give the Court some examples of that

7    work?

8    A    It's not uncommon that we will have, for example,

9    customer-level records of the customers of a firm that could

10   include thousands or millions of customers.  I've worked on

11   cases with large datasets of patent data and in a variety of

12   other areas.

13          **MS. CONLEY:**  And, your Honor, may I approach the

14   witness?

15          **THE COURT:**  Yes.

16      **(Pause)**

17          **MS. CONLEY:**  And, your Honor, just for the record,

18   I've handed the witness Plaintiffs' Exhibit 757, 756, and 1054.

19      **(Pause)**

20   **BY MS. CONLEY:**

21   Q    So, Dr. Bazelon, you should have a document in front of

22   you that's been marked as Plaintiffs' Exhibit 757.  Is that

23   document the amended expert report that you filed in this

24   matter?

25   A    Yes, it looks like it.

Bazelon - Direct / By Ms. Conley                80

1    Q    And you should also have a document that's been marked as

2    Plaintiffs' Exhibit 756.  Is that the reply report that you

3    filed in this matter?

4    A    Yes, that's correct.

5    Q    And so if it would be helpful for you to refer to your

6    report, your amended expert report, or your reply report at any

7    time during your testimony, please feel free to do so.  Did you

8    attach your CV to your amended report in this case?

9    A    Yes, I did.

10   Q    And have you produced an updated version of that CV since

11   you filed your amended report?

12   A    Yes.  At my deposition I was requested to provide an

13   updated CV which we provided a couple days later.

14   Q    And is that updated CV the third document that I handed

15   you which is marked as Plaintiffs' Exhibit 1054?

16   A    That looks like the updated CV, and it has a date of

17   August 25th, which would have been a couple of days after my

18   deposition.

19   Q    And does that CV accurately summarize your professional

20   background?

21   A    Yes, it does.

22   Q    Can you tell the Court approximately how many papers

23   you've published in scholarly peer review journals?

24   A    They're listed in my CV, but I think there's about ten of

25   them in there.

EXCEPTIONAL REPORTING SERVICES, INC

Bazelon - Direct / By Ms. Conley                    81

1          **MS. CONLEY:**  Your Honor, based on these

2   qualifications, and as more set forth in Dr. Bazelon's report,

3   we offer Dr. Bazelon as an expert in economic and statistical

4   analysis.

5          **THE COURT:**  Okay, you can proceed.

6   BY MS. CONLEY:

7   Q    Okay, so let's move on to the opinions that you formed in

8   this case.  As an initial matter, what were you asked to do?

9   A    Evaluate the economic burden of SB 14 on voters in Texas

10  and whether or not that burden had a racial component to it.

11  Q    And have you formed any opinions regarding whether SB 14

12  imposes a burden on voters in Texas?

13  A    Yes, I have.

14  Q    Okay, let's take a look at slide 2.  And does this slide

15  accurately reflect the conclusions that you reached in this

16  case?

17  A    Yes.  That's a summary of my three main conclusions.

18  Q    Well, let's walk through them one-by-one.  What's the

19  first conclusion that you reached in this case?

20  A    That a disproportionate share of registered voters who

21  will need a new ID to continue to be able to vote under SB are

22  African American.

23  Q    Okay.  And with respect to that conclusion, what are the

24  actual numbers that you found?

25  A    That -- I want to --

Bazelon - Direct / By Ms. Conley                    82

1  Q    And I -- sure.

2  A    I want to read them from my report to make sure I get them

3  accurate.

4  Q    Maybe I can help you --

5  A    As I report in my Table 1, that although overall about 5.3

6  percent of registered voters in -- that I measure in Texas will

7  be affected by SB 14, meaning that they will need to acquire an

8  SB-compliant ID in order to retain their in-person -- their

9  right to vote in person, that proportion of affected registered

10 voters was only 4.5 percent White registered voters in Texas,

11 with 6.8 percent for African American registered voters in

12 Texas, and 6.5 percent Hispanic registered voters in Texas.

13 Q    Okay.  And what's the second conclusion that you reached?

14 A    Acquiring an ID for the purpose of voting, including a

15 nominally free ID, comes with real economic costs.

16 Q    What do you mean when you say, "real economic costs?"

17 A    That -- I measured a -- there are a number of costs that

18 would go along with having to acquire an ID to retain their

19 right to vote in person.  I focused my analysis on carefully

20 measuring one of those costs, one component of those costs,

21 which is a travel cost, and that what I found is that on

22 average, across all registered voters in Texas, the travel cost

23 component was $42.83.

24 Q    In the travel costs to acquire an EIC; is that right?

25 A    That's correct.  That's traveling to and from an EIC-

EXCEPTIONAL REPORTING SERVICES, INC

Bazelon - Direct / By Ms. Conley                    83

1    issuing facility.

2    Q    And what's the third conclusion that you reached?

3    A    That the burden of the cost imposed by SB 14 is

4    substantially higher for African American Texans who are

5    disproportionately poorer than for White Texans.

6    Q    And just -- can you go into a little bit of detail as to

7    what exactly you mean by that?

8    A    Certainly.  The common sense understanding that a poor

9    person is less able to bear any level of cost than a rich

10   person plays out in this case in that African Americans in

11   Texas tend to be much poorer than White Texans and, therefore,

12   their ability to bear the cost imposed by SB 14 is -- they're

13   less able, or the burden of the -- bearing the cost is higher

14   for African Americans.  And that -- it's the analysis that I

15   present at the end of my report by one measure relating it to

16   the amount of wealth the average family has, that that burden

17   is four times higher for African American Texans than for White

18   Texans.

19   Q    So if I'm understanding your conclusions correctly, there

20   seems to be two levels of disparity that you've identified and

21   then built into your analysis; is that right?

22   A    That's correct.

23   Q    Okay.  So you found that African Americans are more likely

24   to need to obtain an SB 14-compliant ID in order to retain the

25   right to vote, and that the burden of the cost of acquiring an

Bazelon - Direct / By Ms. Conley                    84

1   SB 14-compliant ID is substantially higher for African

2   Americans?

3   A    Yes.

4   Q    Okay.  And are those conclusions interdependent?

5   A    They're connected in that they reinforce each other and

6   that both analyses show that there is a disproportionate burden

7   on African Americans.  But the conclusions are independent of

8   each other, or survive, in the sense that even if you didn't

9   think that there was a disproportionate prevalence of needing

10  an ID, that the burden analysis stands on its own, that the

11  bearing of the cost would be higher for African Americans.  And

12  that similarly, even putting aside the burden analysis of the

13  ability to bear the cost, the prevalence analysis shows that if

14  all we know about you is that you're African American, you are

15  more likely to require an ID in order to retain your right to

16  vote as a result of SB 14.

17  Q    And, Dr. Bazelon, I believe you have your amended expert

18  report in front of you; is that right?

19  A    I do.

20  Q    And why did you file an amended expert report in this

21  case?

22  A    After I filed the initial report, I was provided with some

23  additional data and I updated my analysis based on that

24  additional data.

25  Q    So I'd like to go ahead and turn to your first conclusion

Bazelon - Direct / By Ms. Conley                    85

1   in a little bit more detail.  So you looked at the share of

2   registered voters who need to obtain an SB 14-compliant ID in

3   order to retain their right to vote in person; is that right?

4   A     That's correct.

5   Q     Okay.  And just because it's easier, I'll sometimes refer

6   to that population as affected registered voters; is that all

7   right?

8   A     Yes, that's how I refer to them in the report.

9   Q     Okay.  Now, stepping back, did the Department of Justice

10  give you any data pertaining to whether Texas registered voters

11  possess an SB 14-compliant ID?

12  A     Yes.  I was provided with the results of the sweeps of the

13  matching analysis that the Department of Justice performed on

14  the records in the TEAM database.

15  Q     And that data, the results of the sweeps of the matching

16  analysis, is that what you used to then conduct your analysis

17  regarding prevalence?

18  A     Yes.  That was the basis for my calculations of who needed

19  a -- to acquire an ID and who didn't.

20  Q     So if you could just briefly walk through the Court --

21  basically describe what you did with the data that was given to

22  you by DOJ to determine the overall number of affected

23  registered voters.

24  A     I took --

25            THE COURT:  Can you scoot the mic a little closer to

                    Bazelon - Direct / By Ms. Conley                86

1    you?  Or scoot up, either way.

2              **THE WITNESS:**  Absolutely.

3    A    I -- so the data provided by DOJ was the output of the

4    matching algorithms of each registered voter in Texas against

5    the SB-compliant ID databases, and there was multiple sweeps

6    for each database.  So cumulatively, each record in the TEAM

7    database had over 150 chances of matching something and being

8    shown to have an ID that would be compliant with SB 14.  I took

9    that data and collapsed it to estimate the number of the TEAM

10   database records that did not match to any database and also

11   did not match to the disability-eligible set of voters.

12   Q    Okay.  And we'll get to the point about the disability-

13   eligible voters in a second.  But just backing up, I believe

14   you testified earlier that once you did your analysis, you

15   ultimately found that 5.3 percent of Texas registered voters

16   would need to obtain an SB 14-compliant ID in order to retain

17   their right to vote in person; is that right?

18   A    That's right.  Of the set of voters that I -- of

19   registered voters from the TEAM database that I looked at, I

20   found a little over 700,000 of them would need to acquire an ID

21   to retain their right to vote, and that that came to about 5.3

22   percent of the total registered voters that I analyzed.

23   Q    And you said a little over 700,000?

24   A    Yes.

25   Q    Okay.  Have you reviewed Dr. Ansolabehere's analysis and

1   conclusion regarding the overall number of registered voters

2   who lack SB 14-compliant ID?

3   A    Yes, I have.

4   Q    And if I understand it correctly, the number he reaches is

5   not exactly the same as the number you reached, correct?

6   A    That's true.

7   Q    Your number is smaller?

8   A    Yes.

9   Q    And what accounts for that difference?

10  A    There's a couple of things that he and I chose to do

11  differently, but the majority of the difference between our

12  numbers is accounted for by the disability-exempt registered

13  voters in Texas.

14  Q    And why did you make the choice to exclude from your

15  calculation of affected registered voters those registered

16  voters who may be eligible for a disability exemption?

17  A    In essence, it was a conservative assumption for a number

18  of reasons, but I was focusing on the ability to require an ID

19  to retain your right to vote in person.  The -- and ended up

20  measuring travel cost related to that.  The remedy for a

21  disability-exempt person is a different set of actions they

22  have to take, which I didn't end up analyzing.  And so to try

23  to take the issue off the table, I just assumed that they would

24  be able to get an ID; although, it's worth noting that it does

25  not appear that many disability-eligible voters have taken

1    advantage of this option so far.

2    Q    So -- and in that regard, your method of doing this was

3    extremely conservative; is that right?

4    A    Yes, it is.  That population of voters tends to have more

5    minorities than the average registered voters.  So by assuming

6    that they all had IDs, I was in sort of -- in essence biasing

7    my analysis against finding any difference in prevalence rates.

8    Q    So let's take a step back for a minute.  Do your results

9    capture the entire universe of Texans who would need to obtain

10   an SB 14-compliant ID in order to retain their right to vote in

11   person?

12   A    No, it does not.  It focuses on registered voters as

13   provided in the TEAM database.  And I -- and that's a subset of

14   the voters would be affected by SB 14.  SB 14 would affect any

15   eligible voter who wanted to vote, whether or not they were

16   registered.  So there's inevitably quite a number of people in

17   Texas who are eligible to vote but have not yet registered; and

18   to the extent they do not currently possess an ID, they would

19   also be affected by SB 14.

20   Q    Now, in looking at your conclusion regarding the racial

21   breakdown, you concluded that African American registered

22   voters in Texas are disproportionately likely to need to obtain

23   new ID to retain the right to vote under SB 14; is that right?

24   A    That's correct.

25   Q    And can you briefly -- or at a high level describe the

Bazelon - Direct / By Ms. Conley                    89

1  methodology that you used in performing that analysis?

2  A    I used information on the geographic distribution of Texas

3  citizens by race to infer the racial makeup of the affected --

4  the set of affected registered voters that I measure in the

5  prevalence analysis.

6  Q    And so just so the Court's clear, maybe we can walk

7  through the few steps that you took in order to do that.  So

8  first, you estimated the portion of African American registered

9  voters in each census block group; is that right?

10 A    That's correct.  My analysis of prevalence had three steps

11 to it.  The first was recognizing that my analysis was done at

12 a census block group level, I estimated for each census block

13 group the percentage of registered voters who would be African

14 American, and likewise the percentage that would be White

15 Texans.

16 Q    And then what did you do next?

17 A    The second step was then to geocode the location of the

18 TEAM records of the affected registered voters, the 700 plus

19 thousand that I mentioned earlier, and then physically locate

20 them within census block groups in Texas.  So I would have the

21 number of actual affected registered voters in each census

22 block group.

23 Q    Okay.  And then after you assigned each affected

24 registered voter to a census block group, then what did you do?

25 A    The third step was then to multiply the first two together

1   so that I would get an estimate of the number of African

2   American or White or Hispanic affected registered voters.

3   Q    And so just to be clear, you didn't assign a race to each

4   individual voter in a census block group.

5   A    No, I did not.  My analysis was at the census block level,

6   so I have an estimate of the number of, for example, African

7   American affected registered voters in a census block, but I

8   can't tell you of the set of affected registered voters in the

9   census block group exactly which ones are specifically African

10  American.

11  Q    Okay.  And in your opinion, does that method reflect a

12  reliable prediction of the racial breakdown of affected

13  registered voters?

14  A    Oh, yes.

15  Q    And would you describe your method -- or your analysis, as

16  conservative?

17  A    Yes.  In many ways it's conservative.  I -- many of the

18  choices I mentioned, for example excluding the set of

19  disability-eligible voters from the set of affected registered

20  voters, would tend to bias away from finding a result.  But

21  more broadly, the approach of using only the geographic

22  distribution population to identify racial variation limits the

23  amount of racial variation I'm going to find.  And doing it at

24  the census block group level is somewhat aggregated.  It's not

25  a big geographic area, but it aggregates the data and would --

 1  as a structural matter of the analysis would tend to bias it

 2  downwards in finding a lower disparity than would actually

 3  exist.

 4  Q    Okay.  So your method -- using your method, you'd be more

 5  likely to underestimate racial disparities.

 6  A    Absolutely.

 7  Q    Okay.  And then conversely, would a more granular analysis

 8  than what you did be expected to find greater racial

 9  disparities?

10  A    Yes.  And I explained this in the appendix in my report,

11  but that if as you get to a finer and finer geographic area or

12  brought other information to bear about the individuals, you

13  would be able to identify the racial disparity more precisely

14  and would be expected to find a larger disparity between the

15  races.

16  Q    Dr. Bazelon, did you review the expert report of Dr. Milyo

17  offered on behalf of the Defendants?

18  A    Yes, I did.

19  Q    And are you aware of his criticism that the census data

20  used in your analysis over-reports registration rates?

21  A    I'm aware of that, yes.

22  Q    And what's your response to that criticism?

23  A    It doesn't really affect my analysis.  So as an initial

24  matter, the census statewide data on registration rates is only

25  used to find -- as part of the analysis to find the relative

1    shares of registered voters.  So if everybody over-reports to a

2    first approximation, that kind of cancels out.  But more

3    importantly, even if one group does over-report, it doesn't

4    change my ultimate conclusion about the prevalence of the

5    affected registered voters.  So I did a sensitivity analysis to

6    demonstrate this.  And if you reduce the propensity to register

7    for just African Americans, the way it flows through my

8    analysis is, you will estimate that fewer African Americans are

9    registered to vote and you will also estimate as a result of

10   that that fewer African Americans are in the subset of affected

11   registered voters in a census block, but you don't end up

12   affecting the share of African American voters who are affected

13   registered voters.  So the 6.8 percent that I measure flows

14   through and is robust to any sensitivities in that census data

15   that he pointed out.

16           **MS. CONLEY:**  Let's take a look at slide 3, please.

17   Oh, it's up.

18   Q    And I think this slide captures the results that you

19   reached regarding prevalence that you testified to a moment

20   ago.

21   A    That's correct.

22   Q    And so looking at this graph, can you just describe for

23   the Court what you found?

24   A    Yes.  It summarizes the data from my Table 1, that as I

25   noted earlier, whereas 5.3 percent of all registered voters in

Bazelon - Direct / By Ms. Conley                          93

1    Texas would need to acquire an ID to retain their right to

2    vote, only 4.5 percent of the set of White registered voters

3    would need an ID to retain their right to vote, in contrast to

4    African American registered voters that are affected at a 6.8

5    percent rate, and Hispanic registered voters who are affected

6    at a 6.5 percent rate.

7    Q    Now, Dr. Bazelon, would you expect to see results like

8    this if racial disparities didn't actually exist?  And I guess

9    let me try and be more clear about that.  How confident are you

10   that these racial disparities would not just appear randomly?

11   A    I'm very confident these are not random fluctuations in

12   the data.  First of all, the difference in the prevalence rates

13   are not trivial, as indicated on this graphic.  They're also

14   consistent with what the other experts have found.  But

15   probably most important, as I've mentioned, my analysis sort of

16   at every turn is the most conservative I could make it, in

17   essence biased against finding any difference in results.  And

18   the fact that I do find differences in results here gives me

19   great confidence.  Another way of putting it would be, to the

20   extent any of the uncertainty around the data is resolved, my

21   expectation is strongly that it would be resolved in the

22   direction of creating a greater difference than reported here.

23            **MS. CONLEY:**  Okay.  Let's take a look at slide 4.

24   Back.  There we go.

25   Q    Dr. Bazelon, what's an odds ratio?

1   A    An odds ratio expresses the chance of an individual in one

2   group being affected relative to another group, in this case

3   using the White registered voters as sort of the base

4   expectation.

5   Q    And so does this slide give us an indication of what those

6   numbers, the 4.5 percent, 6.8 percent, and 6.5 percent really

7   mean?

8   A    Yes.  It puts them in the context of showing that, again,

9   if all we knew was your racial -- the race of the affected

10  registered -- of the registered voter, that we know there's an

11  over a one and a half times the higher likelihood that if

12  you're African American, you're going to be an affected

13  registered voter compared to being White.  And similarly, for

14  Hispanics there's almost a one and a half -- just under a one

15  and a half times chance that you'll be an affected registered

16  voter if you're Hispanic compared to if you're a random White

17  registered voter.

18  Q    Thank you.  And I'd also like to look at your results in

19  terms of the registered voter population as a whole.

20       **MS. CONLEY:**  Can we turn to slide 5?

21  Q    And what does this slide reflect?

22  A    What we're seeing here is the share of the pool of all

23  registered voters by these three racial groups.  So it's

24  showing that even though we've heard testimony that White

25  Texans are less than half the population in Texas, that they

1   make up 58 percent of the registered voters in Texas.

2   Q    So just to be clear, do the blue bars represent what the

3   share of registered voters who would need to obtain an SB 14-

4   compliant ID would look like if there were no racial

5   disparities?

6   A    That's correct.  If race did not enter into your need to

7   acquire an ID to remain -- to retain your right to vote, then

8   the expectation would be that the set of -- the share of the

9   subset of registered voters who need an ID would follow the

10  same distribution as the overall share of registered voters.

11  Q    Okay.  And so what happens when we look at the actual

12  share of the registered voter population by race who must

13  obtain an SB 14-compliant ID in order to retain their right to

14  vote in person?

15  A    We find under, again, my conservative analysis that it

16  does not follow the same pattern as the share of registered

17  voters overall, that less than half of the pool of affected

18  registered voters are White Texans, you know, a full nine

19  percentage points lower than their share of the registered

20  voter pool.  And similarly, you see higher shares of the

21  affected registered voter pool coming from African American and

22  Hispanic Texans.

23  Q    Now, you said earlier that you did review the conclusions

24  and analysis of Dr. Ansolabehere, right?

25  A    Yes, I did.

1   Q    Okay.  And so you're aware that in terms of rates of ID

2   possession between Whites and African American registered

3   voters and Hispanic and White registered voters,

4   Dr. Ansolabehere found a greater disparity than you did.

5   A    Yes.  As expected, his disparity was larger.  As I

6   mentioned, my analysis was -- in essence had the thumb on the

7   scale against finding a result, whereas I don't believe he did.

8   He was looking for the best estimate of the numbers.  But

9   broadly speaking, they point in the same direction.  I think

10  they're highly consistent.

11  Q    So although you used different methodologies, do you

12  consider your findings to be consistent with those of

13  Dr. Ansolabehere?

14  A    Yes, I do.

15          THE COURT:  Shall we take our morning break?

16          MS. CONLEY:  Sure.

17          THE COURT:  We'll take about a 15-minute break.

18          THE WITNESS:  Sure.

19      (A recess was taken from 10:07 a.m. to 10:24 a.m.; parties

20  present)

21              DIRECT EXAMINATION (CONTINUED)

22  BY MS. CONLEY:

23  Q    Dr. Bazelon, did you make any findings regarding the share

24  of affected registered voters in the census block groups that

25  contained historically Black colleges and universities?

1  A    Yes.  I did also look at the census block groups around

2  the HCBUs in Texas and I think I mentioned that the overall

3  average of rate of affected register voters in -- across Texas

4  was about 5.3 percent, a little over 5 percent.  And that in

5  the census block groups around the historically Black colleges

6  and universities it was more like 17 percent was the average

7  share of affected registered voters, more than three times as

8  high.

9  Q    I'd like to go ahead and move on to your second conclusion

10 regarding the travel costs associated with obtaining an

11 election identification certificate or NEIC.  You mentioned

12 that you concluded that acquiring an EIC comes with real

13 economic costs and that you specifically quantify the average

14 travel cost to obtain an EIC; is that correct?

15 A    That's correct.

16 Q    And just stepping back, what do you mean by travel costs?

17 A    By travel costs, I mean the economic costs associated with

18 taking a trip.  In this case, a trip to an EIC issuing

19 location.  It includes out of pocket costs which might be cab

20 or bus fare but also opportunity costs such as the cost of the

21 value of your time to take the trip.  It's analogous to

22 something I do in my consulting abroadly which is if you're

23 estimating damages you'd ask how much does somebody need to be

24 compensated to be as well off as they would be without the

25 thing that was causing the need for the compensation.  So here,

1   it would be an estimate of economically how much would the

2   individual have to be paid to not have to take -- to be as well

3   off economically in a world where they didn't have to take that

4   trip.

5   Q    Okay.  So, is the estimation of travel costs and

6   compensating variation are these standard methodologically

7   practices for economist?

8   A    Yes, very much so.

9   Q    And are the travel cost of obtaining an EIC the ultimate

10  metric in your analysis for assessing the impact of SB 14?

11  A    No, they're not.  First of all, as I've mentioned the

12  travel costs are only one portion of the cost that an

13  individual would bear, potentially bear in having to get an ID.

14  But more importantly, we're not estimating these costs because

15  a third party's paying it.  We're estimating these costs

16  because the individual themselves are paying them.  And so it's

17  important to put the costs in the context of the ability of the

18  individual to bear those costs.  That's what my third bucket of

19  analysis is about.

20  Q    And when you refer to the third bucket of analysis that's

21  your burden analysis, is that right?

22  A    That's correct.

23  Q    Okay.  Well, let's talk just briefly about that third

24  step, the burden of obtaining an EIC.  What -- why is that

25  relevant to the second conclusion with respect to the

1   calculation of travel costs?

2   A     The costs are not the disembodied measure of the burden.

3   It's the individual's ability to pay the costs.  And as I noted

4   earlier and as is common sense, a low income person is less

5   able to pay any level of costs than a higher income individual

6   and the disparity in income levels between African Americans

7   and White in Texas flows through the analysis to create

8   different burdens in their ability to pay the costs imposed by

9   SB 14.

10  Q     So basically you're saying you can't look at the cost in a

11  vacuum, is that right?

12  A     That's correct.

13  Q     So back to your second conclusion regarding the travel

14  costs of obtaining an EIC, I guess first why did you choose to

15  estimate the travel costs of obtaining an EIC as opposed to one

16  of the other forms of ID permitted by SB 14?

17  A     The EIC which was created by SB 14 to remedy the specific

18  problem with individuals who didn't have IDs and needed them

19  for the purpose of voting is the, you know, it comes at a zero

20  cost.  The only other one that comes at a zero costs are

21  related to veteran or a disability status.  But it also is an

22  ID that doesn't come with extraneous requirements unrelated to

23  voting such as learning to drive a car or being trained to

24  carry a concealed handgun so it's the one that most closely

25  focuses on remedying the problem created by SB 14 which is that

Bazelon - Direct / By Ms. Conley                    100

1    you need it to inquire an ID to retain your right to vote in

2    person.

3    Q    And generally, just at a high level how did you determine

4    the travel costs of obtaining an EIC?

5    A    I measured -- I estimated the trips, the time and cost of

6    trips for individuals as measured from the census block that

7    they're in to various EIC issuing locations across certain

8    different modes of travel and assumed that the individual would

9    choose the economically rational trip which would be the one

10   that would be the least cost to them.

11   Q    Okay.  So for each voter in a census block group you

12   calculate the time and the out of pocket cost from each of

13   three EIC issuing locations that are nearest to them; is that

14   right?

15   A    Yes, I choose the three EIC issuing locations that are

16   closest to the census block as the crow flies as they say in

17   the linear sense recognizing that when you get into the details

18   of traveling around the closest EIC location may not be the

19   easiest one to get too.

20   Q    Okay.  And then you make judgments about whether those

21   particular voters would take a particular mode of

22   transportation there.  So whether it's walking, public transit

23   or a taxi, is that right?

24   A    That's correct.  I -- three locations, three modes of

25   traffic.  In essence I calculate the cost of the trip nine

Bazelon - Direct / By Ms. Conley                    101

1    times for the census block and then pick the one that -- for

2    that -- the voter -- type of voter I'm analyzing minimizes

3    their travel costs and that exercise is repeated across the --

4    all the census block groups in Texas that have affected

5    registered voters in them.

6    Q    And you do not calculate the distance to an EIC issuing

7    location from each individual voters address; is that right?

8    A    That's correct.  As I noted earlier my analysis is at the

9    census block group level and I don't have a view toward the

10   racial composition of the specific individual households so

11   that estimating the travel from the household doesn't add --

12   really add any information to my analysis because I then have

13   to average them across the census block group to get my racial

14   analysis anyway.

15   Q    And if you didn't use the individual voters address how

16   did you measure the distance to an EIC issuing location?

17   A    I used it from the centroid of the census block group.

18   Q    And how did you calculate the centroid?

19   A    It's provided by the census bureau with the data on the

20   block group boundaries.

21   Q    And as I recall from other testimony in this case a census

22   block could vary in size; is that right?

23   A    That's correct.  I think we've seen that is about 15,000

24   of them in Texas so imagine dividing the State of Texas to the

25   15,000 geographic areas.  Some of them are going to be larger

1   than others.

2   Q    So does an individual generally live close to the centroid

3   of his or her block group?

4   A    There's variation.  I'll note that the centroid is

5   actually defined as the point in the census block group that's

6   closest to all the individuals in that census block group.  But

7   it's certainly true that some individuals will live a little

8   below the centroid.  Some will live a little bit above, a

9   little closer, a little further away than the centroid in

10  relation to an EIC issuing location.  But the small variations

11  would be expected to cancel out over time and they're not

12  expected in general to be very large.  I think most, more than

13  half the census block groups in Texas are well under a mile so

14  the distance from the individual to the centroid wouldn't be

15  expected to be anywhere more than half a mile in most cases

16  which would be a small difference in cost.  You could walk it

17  in a few minutes.

18  Q    so then using the centroid, do you think that would affect

19  your analysis in any way?

20  A    No.  The analysis at its heart, the racial variation is at

21  the census block group level and there's no added information

22  from a finer grained analysis on the location of the travel and

23  points.

24  Q    Sorry.  And in other words I just want to make sure I'm --

25  I don't think my last question was clear but if one individual

Bazelon - Direct / By Ms. Conley                    103

1   voter lives a little closer to the centroid and another

2   individual voter lives a little further from the centroid does

3   that -- does the fact that you used the centroid impact, the

4   overall analysis of the travel costs?

5   A    It does not.  It would only have an impact if there were

6   some systematic racial component to the differences where

7   people lived inside of the census block group.  And that that

8   component not only had a racial dimension but was also relevant

9   or oriented toward the EIC issuing locations and that strikes

10  me as plausible.

11  Q    How did you determine which EIC issuing locations to use

12  as a part of this analysis?

13  A    I started with the DPS offices in Texas and added to that

14  the county offices in the counties that have offered to issue

15  EICs as well.  And then there's a few mobile stations that the

16  State has provided and I've chosen, again as just a

17  conservative assumption to try to take the issue off the table,

18  I've just treated each mobile station as if it was a permanent

19  EIC issuing office.

20  Q    So even if an EIC location was only up for let's say a day

21  or 48 hours, for purposes of a urinalysis, you treat that as a

22  permanent picture at which someone could go obtain an EIC?

23  A    Yes.

24  Q    Okay.  Now, you know both in your report and I think you

25  testified earlier that in calculating the costs of travel you

Bazelon - Direct / By Ms. Conley                    104

1    took into account the value of time.

2    A    That's correct.

3    Q    And what is the value of time?

4    A    It's in the compensating variation principal.  It's the

5    amount that an individual needs to be compensated for their

6    time spent in the activity and I used the wage rates of

7    individuals in Texas as the measure of the value of their time.

8    Q    So you used the wage rates to calculate the value of time?

9    A    Yes, or the wage rates represent -- yes, are the value of

10   time and in the travel costs calculation they are multiplied by

11   the amount of time spent to get the time opportunity cost

12   component of the travel costs estimate.

13   Q    And when you say you used the wage rates do those wage

14   rates vary by race?

15   A    They vary both by race and geography so the census

16   provides information on wages at the census tract level.  A

17   census tract is a slightly larger unit of geography than a

18   census block group, roughly three census block groups in a

19   census tract I believe on average.  And at the census tract

20   level, we have wage data by race.

21   Q    So standing alone, would a value of time analysis reflect

22   racial disparity and income?

23   A    Well, there is a significant racial disparity in the

24   average wage rates by race in Texas and so any travel cost

25   analysis that uses wage rates that are wage specific would be

1    reflective of those differentials.  In essence, an African

2    American's value of time or what you need to compensate them

3    for their time is quite a bit less under this modeling approach

4    then it is for White African -- for a White Texan.

5    Q    So just to be clear on that point if in your analysis

6    you're looking at a particular census tract where African

7    Americans on average make $10 an hour and Whites on average

8    make $20 an hour then the value of time metric would reflect

9    that racial disparity among the wages; is that right?

10   A    Absolutely.

11   Q    So let's take a look at slide six.  I think this is an

12   example of how you calculated out of pocket travel costs and

13   how you valued time; is that right?

14   A    That's correct.

15   Q    Okay.  Can you please walk us through the hypothetical

16   calculations there?

17   A    Sure.  I'll try to do this briefly.  First, I'll note that

18   this is for a hypothetical African American affected registered

19   voter.  The $13.03 that I'm using as the opportunity cost of

20   time is reflective of the (indiscernible) African American wage

21   across the State of Texas so this doesn't represent any

22   specific block group.  It's just a hypothetical example.  The

23   way the analysis works is by using the google maps API

24   function.  I estimate the travel time and ultimately the fares

25   associated with traveling to a DPS or an EIC issuing location

1  by taxi, walking or public transit and I do it for the three

2  closest locations for a total of nine estimates.  Each estimate

3  has a value of time component and a fare component.  I can

4  illustrate for example on the middle row of walking and the

5  third -- going to the third EIC issuing location we see that

6  the travel time is 180 minutes which is three hours so that the

7  value of time part of this calculation is three times the

8  hourly wage rate so three times $13.03 is $39.09.  And that's

9  where that component comes from.  For the other modes of

10 travel, there's also a fare component.  I add them up.  I have

11 nine -- the costs of nine different options that an individual

12 can take to acquire an EIC and I choose the one that is the

13 lowest cost out of those nine.  In the example on the screen,

14 it's taking public transit to location number one.

15 Q    So for this hypothetic voter you concluded that he or she

16 would take public transit.  It would 42 minutes and that the

17 total cost of obtaining - total travel cost of obtaining an EIC

18 would be $13.22.

19 A    That's correct.

20 Q    And so then in calculating average travel costs in general

21 you selected the lowest cost method for each voter?

22 A    That's correct.  And there would be a difference by race

23 in the wage rate that was used and that difference in wage rate

24 can lead to different choices in travel mode and even which is

25 the -- which location to travel too.  So if two neighbors had

Bazelon - Direct / By Ms. Conley                    107

1   the same wage rate they would have the exact same travel cost

2   but because if the two neighbors are of a different race

3   they're likely to have a different wage rate.  That can lead to

4   different choices even from the same census block group.

5   Q    So Dr. Bazelon, let's step back and just focus on travel

6   times for a minute, not the cost of travel but just the time

7   for traveling.  Did you find a disparity among travel times for

8   African American affected registered voters versus white

9   affected registered voters?

10  A    Yes.  Using this cost minimizing approach to choosing

11  which mode of travel and which location to go to it turns out

12  that African Americans will spend over 80 minutes on average in

13  the travel time whereas White Texans would spend under 40

14  minutes or less than half of the same amount of time traveling.

15  Q    And are those numbers reflected at table six in your

16  report?  Is that right?

17  A    Table six sounds right.

18  Q    On page 29.

19  A    Yes.

20  Q    So you concluded that African Americans would spend over

21  two times more time traveling than Whites would under your

22  analysis.

23  A    That's correct.

24  Q    And just so we're clear, your estimate of travel time does

25  not include any additional time spent acquiring an EIC such as

Bazelon - Direct / By Ms. Conley                    108

1   waiting at the DPS or gathering any documents you might need to

2   obtain the EIC; is that right?

3   A    That's correct.  It just focuses on the roundtrip to the

4   EIC issuing location.

5   Q    So if you had to spend 45 minutes gathering documentation

6   that you need and if you have to wait in line for an hour at

7   DPS would that increase the cost of obtaining an EIC?

8   A    Yes.  That would be additional time spent in an economic

9   model that would be additional time that needs to be

10  compensated for and would add to the cost the individual bears

11  in fulfilling out that task.

12  Q    So turning back to the travel costs alone for a minute, I

13  believe you testified earlier that based on the calculations

14  that you performed the average expected travel cost to obtain

15  an EIC across all registered voters in Texas would be about

16  $42; is that right?

17  A    That's correct.

18  Q    And that $42 figure, that's not broken down by race?

19  A    That's correct.

20  Q    Okay but you also calculated the travel cost to obtain an

21  EIC by race; is that right?

22  A    That's right.  Using the differential in wage rates in

23  each census tract, I'm able to perform separate calculations

24  for African American and White affected registered voters in

25  Texas.

Bazelon - Direct / By Ms. Conley                    109

1   Q    And when you look at travel cost by race what was the

2   average expected travel cost to obtain an EIC for African

3   American affected registered voters in Texas?

4   A    Twenty-seven dollars and forty-six cents.

5   Q    And what was the average expected travel cost for White

6   affected registered voters in Texas?

7   A    Forty-eight dollars and sixty-eight cents.

8   Q    So, Dr. Bazelon, what explains the differential between

9   the average cost of travel to obtain an EIC for African

10  American registered voters as compared to White affected

11  registered voters?

12  A    That's driven by the differential in the wage rate used in

13  calculating the costs of travel and therefore what's the cost

14  minimizing mode of travel.  The differential of wage rates

15  affects the calculations in two way.  One, the first order of

16  affect is simply that any time spent is going to create -- the

17  meter is running faster for the White travelers than the

18  African American travelers.  But because the difference in

19  opportunity cost of time there's a different choice of travel

20  mode taken in aggregate where the White affected registered

21  voters tend to drive a -- take a car more often and I model

22  that as -- the cost of that being the opportunity cost of a

23  ride which is modeled as taking a taxi.  They tend to take

24  taxi's more often whereas African Americas in Texas will spend

25  more time on public transportation or walking.

Bazelon - Direct / By Ms. Conley                    110

1   Q    And just stepping back is it accurate to say that the

2   difference in the value of time here is actually reflecting an

3   underlying racial disparity in wage rates?

4   A    Yes, it's the -- it's that difference in wage rates that's

5   driving the difference in the costs.  As I noted, if the wage

6   rates were the same there'd be no difference between the

7   African American and White travel costs numbers.

8   Q    Okay.  Because I'm hearing that you found that the bottom

9   line travel costs for White registered voters who need to

10  obtain SB 14 compliant IDs are higher than for African American

11  registered voters who need an SB 14 compliant ID and does that

12  mean that Whites face a greater burden than African Americans

13  in obtaining an ID?

14  A    No, it doesn't.  This is the amount of -- the estimate of

15  the compensation the individual would have to be given to be as

16  economically as well off but of course it's not you or I paying

17  the compensation it's the actual individual affected voter.  So

18  the burden analysis that I performed in the third section puts

19  those costs in the context of the ability to pay by racial

20  group.

21  Q    And so how do you respond to Dr. Milo's criticism that

22  your finding that the travel costs are higher for Whites than

23  for African American registered voters makes your conclusions

24  inconsistent with the findings of the other plaintiffs' experts

25  in this case?

1  A    He's just misunderstanding my analysis.  As noted a moment

2  ago, I do find higher travel times which is the metric used by

3  most of the other plaintiffs' experts.  So it's completely

4  consistent with that and to look at costs without placing them

5  in the context of the burden that they create on the

6  individuals paying those costs would be -- is inappropriate.

7  So I reject that criticism.

8  Q    Dr. Bazelon, given your expert analysis, is it correct to

9  say that obtaining an EIC is costless or free?

10  A    No. Even though there's no charge by the state for the

11  actual document the travel cost portion alone shows that

12  there's a meaningful cost associated with acquiring the ID.

13  Q    And just to be clear, you testified earlier that your

14  calculation of travel costs doesn't provide a full picture of

15  the costs that could be associated with obtaining an EIC?

16  A    That's correct.  There's -- you've noted time that you

17  might spend waiting.  There's time gathering documents you

18  might have.  In addition, there could be costs associated with

19  going to the EIC issuing location such as childcare for some

20  individuals.  Plus many individuals will also require extra

21  efforts to get the underlying documents such as a birth

22  certificate.  I think it's been talked about quite a bit.

23  Q    Well, Dr. Bazelon, if you were aware of these other

24  potential costs why did you choose not -- why did you choose to

25  monetize only the travel cost portion of obtaining an EIC?

1    A    For a couple of reasons.  Again, this is in line with my

2    conservative approach to this that I'm looking at the minimum

3    necessary to show the effect that I'm finding.  But

4    furthermore, those other costs tend to be individualized.

5    They're specific to the individual voter whereas the travel

6    cost portion is one that would be common to virtually all the

7    voters that need to acquire an ID.

8    Q    Let's take a look at slide seven.

9         What does this slide reflect?

10   A    This illustrates for a hypothetical African American

11   registered voters, some of the costs that they can incur trying

12   to acquire an EIC.

13   Q    And just looking at the second and third bullet points,

14   those costs like the travel costs would be based on an

15   individual's wage rates; is that right?

16   A    Yes.  Again here the illustration is an hour spent in

17   these two activities, again valued at the median -- in this

18   example at the median African American wage in Texas of $13.03

19   an hour.

20   Q    And based on this example what are the total costs that

21   this hypothetical voter would incur in attempting to obtain an

22   EIC?

23   A    So if you add up the costs illustrated here they come to

24   over $86 and I think the point of this slide that I was trying

25   to illustrate is that these other costs, they're not

1   necessarily borne by all individuals.  They can be borne by

2   some individuals and when they are they can easily swamp the

3   actual travel costs that I'm measuring here.  In this simple

4   example the total costs are more than three times the amount

5   that are measured of travel costs alone.

6   Q    And we're talking about this hypothetical African American

7   registered voter but is it your understanding that some of the

8   very people who have testified in this case at trial who have

9   dealt with some of these additional costs?

10  A    Yes.  I wasn't here to hear the testimony but I had access

11  to the transcripts and read some of the transcripts and I seem

12  to recall descriptions of the difficulty of getting birth

13  certificates and the -- not just the fees but the time spent in

14  trying to acquire them.

15  Q    Are you aware of Dr. Milo's criticism that in estimating

16  the travel costs of obtaining an EIC you failed to consider

17  that voters can minimize the costs in travel by combining their

18  trip to an EIC issuing location with other errands?

19  A    Yes, I'm aware of that criticism.

20  Q    And what's your response to that criticism?

21  A    I find it misplaced.  First of all, Dr. Milo doesn't

22  provide any analysis as to the actual ability to combine trips

23  in that way or what effect they would have on total costs

24  added.  Segments of a trip would add costs to the total pie.

25  But perhaps more importantly, I think it's commonsense that

1    your ability to chain trips in that way are going to be easier

2    if you're driving rather than walking or taking public

3    transportation and because driving is the mode chosen more

4    often by White Texans than by African Americans that if you did

5    make some adjustment to the costs I think it would end up

6    lowering the costs for the White affected registered voters

7    much more than it would for the African American registered

8    voters.

9    Q    And are you also aware that -- of Dr. Milo's criticism

10   that in estimating the travel costs of obtaining an EIC you

11   failed to consider the assistance that might be offered by

12   third parties such as friends and relatives?

13   A    I'm aware he made that criticism.

14   Q    And what is your response to that criticism?

15   A    It's inappropriate.  I did take that into account.  As I

16   note in my report the use of taxi fare is the measure of the

17   economic value of a ride.  It's not -- and I don't want to

18   suggest that necessarily everybody will in fact take a taxi;

19   some people will be able to get rides from friends or relatives

20   -- but the economic value of what's given by that friend or

21   relative is measured in what the individual's able to avoid

22   paying by getting that ride.  The opportunity costs and that's

23   the value of a taxi.

24   Q    And are you also aware that Dr. Milo argues that because

25   an EIC is valid for six years that any associated costs must be

1    spread out over multiple uses?

2    A    Yes, I am.

3    Q    And what is your response to that?

4    A    Again, I reject that criticism.  The first point to make

5    is that it's the next election that is causing you to go out

6    and get the EIC and spend it and the EIC is a fixed sunk

7    investment and it's -- many people don't vote in all elections

8    and it's not the case that you would get a refund on your EIC

9    costs if you don't end up using it over the full six years.  So

10   the cost is borne for that first election.  Having the EIC,

11   you're then available to vote in elections later on.

12   Q    And let's briefly discuss the last conclusion that you

13   reached in your report.  You explained to us that the costs of

14   obtaining an EIC have to be viewed in terms of the burden

15   imposed by those costs.

16          So how exactly did you measure the burden imposed by

17   the travel costs that you calculated?

18   A    I tried to put it in the context of the ability of

19   individuals to pay those costs and ultimately I provide an

20   illustration of what the burden is relating it to the wealth

21   and income of African Americans versus Whites in Texas and show

22   that it's about four times the burden for African Americans.

23   Q    Excuse me, speak up just a little bit, Dr. Bazelon.

24   A    Sorry.  It's about four times the burden for African

25   Americans.

1  Q    Okay.  And I think you testified earlier that the average

2  expected travel costs across all registered voters in Texas is

3  a little over $42; is that right?

4  A    That's correct.

5  Q    Okay.  And do you think $42 is a trivial number?

6  A    No, I don't.

7  Q    Let's take a look at slide eight and what does that slide

8  reflect?

9  A    Well, trying to put what a nontrivial cost for -- in a

10 voting context would be, I tried to compare the $42 in travel

11 costs alone that I estimate to the $1.75 in the poll tax that

12 the Supreme Court found unconstitutional in Texas in 1966 and

13 to scale them because 1966 was a long time ago.  I'm

14 illustrating it in terms of the average hourly wage in the U.S.

15 at the time.  So as the slide shows, the poll tax that was

16 found unconstitutional was well under an hour's worth of wages

17 in 1966.  It was only 69 percent, whereas just the travel cost

18 portion of what I'm estimating here is 173 percent of the

19 average hourly wage and I think this shows that the amounts of

20 money we're talking about here are plenty significant for the

21 purposes of talking about voting.

22 Q    And you explained earlier that you calculated the average

23 travel costs of obtaining an EIC separately for African

24 American and for White registered voters, right?

25 A    That's correct.

Bazelon - Direct / By Ms. Conley                 117

1  Q     And did you also assess the burden imposed by those costs

2  separately for African American and White affected registered

3  voters?

4  A     Yes, I did.

5  Q     And what were the results of your analysis?

6  A     Broadly speaking that because African Americans are much

7  poorer than Whites in Texas that the burden is greater for

8  them.

9  Q     So the basic idea here is that a dollar is worth more to

10 Ms. Sammi Bates, who testified in this trial that the costs of

11 obtaining a birth certificate were significant because she

12 needed money for food, than a dollar is to you; is that right?

13 A     That's correct.  I can afford to -- I can afford a small

14 cost much better than she can.

15 Q     And is that an established economic principle comparing

16 the value or the feel of a dollar to one individual versus

17 another?

18 A     What is an established economic principle is that for any

19 given individual as your income goes up the value of an extra

20 dollar goes down so that a rich me has a low value of an

21 additional dollar compared to a poor version of me.  What

22 economics is less precise about is comparing two individuals

23 that are equally situated.  So if, for example, Ms. Bates had

24 the income level and wealth and other socioeconomic indicators

25 that I have so that she was comparable on that level what

1    economics would have trouble saying is in that case whether I

2    value a dollar more than she does or not.  But it's clear that

3    for both of us being a lower income she would -- the lower

4    income version of either of us would value an incremental

5    dollar much more than the higher income version of either of

6    us.

7    Q    And did you actually quantify the comparative burden on

8    African American and White affected registered voters of the

9    travel costs to obtain an EIC?

10   A    I tried to put it in a context by scaling it to the

11   individual's income and comparing it to their wealth and that's

12   where my comparison of -- or my conclusion of the burden by

13   that measure as being four times higher for African Americans

14   than White Texans comes from.

15   Q    And what was the -- well, was the first step in that

16   analysis in quantifying that burden looking at the

17   socioeconomic status of African American Texans as compared to

18   White Texans?

19   A    Yes.  There's lots of ways to get at socioeconomic status

20   and although I end up illustrating it with respect to wealth I

21   did examine the socioeconomic status of African Americans

22   versus White Texans across a wide variety of variants.

23   Q    So let's take a look at slide nine.  Okay.

24        What does this slide reflect?

25   A    This reports the median household income of African

1    American versus White households and shows that the median

2    household income for African Americans is a little over $31,000

3    a year whereas for the median White household it's over $52,000

4    a year, a difference of over $21,000.

5    Q    And let's take a look at slide ten.

6    A    This is a similar illustration but now based on wealth;

7    that the median household wealth of an African American

8    household in Texas is just under $12,000 whereas the median

9    household wealth of a White family in Texas is almost $98,000,

10   a difference of almost $86,000.

11   Q    And am I reading the last line of that chart right,

12   households below White median 82.5 percent?  That would mean

13   that 82.5 percent of African American households have less

14   wealth than the White median?

15   A    That's correct.  The $97,800 median estimate for White

16   household wealth is as I said the median.  The median is

17   defined as the point where half the sample would be below it

18   and half above it.  So 50 percent of White households have

19   wealth below $97,800 whereas 82 1/2 percent of African American

20   households have wealth below that mark.

21   Q    And in addition to income and wealth you also looked at

22   poverty rates; is that right?

23   A    Yes.  In this slide from my table nine it looks at the

24   poverty status between African Americans and Whites and finds

25   that 23 percent of the African Americans in Texas are below the

1    poverty level whereas only 9 percent of Whites are, a full 15

2    percentage point difference in poverty rates.

3    Q    And did you consider any other factors in comparing the

4    socioeconomic status of African Americans and White Texans?

5    A    Yes, I looked at a couple of other factors that are known

6    to correlate highly with income and wealth including employment

7    status and educational attainment.

8    Q    And does this slide, slide twelve, reflect your findings

9    with respect to education and unemployment levels?

10   A    Yes, it does.  It's on the unemployment -- or employment

11   status it's showing that the unemployment rate of African

12   Americans in Texas of 12 percent versus the White unemployment

13   rate of 5 percent is more than twice as high.  Similarly, if

14   you look at the failure to achieve a high school diploma or an

15   undergraduate degree that there's big differences between White

16   and African American attainment of these educational

17   benchmarks.

18   Q    And so let's return to your conclusion regarding the

19   comparative burden of the travel costs of obtaining an EIC.

20        How did you ultimately conclude that African American

21   voters must expend a share of their wealth that is more than

22   four times greater than the share required for White voters?

23   A    I looked at the differential costs that I estimated went

24   into the travel costs portion of getting an EIC and scaled that

25   to the days wages of each group and then looked at that as a

1    share of stored wages in their wealth that they have and it's

2    that calculation that leads me to the conclusion that the

3    $27.46 travel cost is four times the share of the stored wealth

4    of an African American family than the $48.68 is of a White

5    Texan family.

6         **MS. CONLEY:**  Thank you, Dr. Bazelon.  Pass the

7    witness.

8         **MR. CLAY:**  Good morning.

9         **THE WITNESS:**  Good morning.

10        **MR. CLAY:**  It's good to see you again, sir.  I just

11   had a few questions for you.  It won't be long, I promise.

12        Brian, could -- when we talked -- one second

13   actually, Brian.

14                       **CROSS EXAMINATION**

15   **BY MR. CLAY:**

16   Q    When we talked in your deposition you mentioned that the

17   method for calculating travel times that you used was Google

18   API, correct?

19   A    That was what calculated the time and distances metrics

20   that I used.

21   Q    Right.  And you also, after some discussion, let me know

22   that Google API is really nothing more than what is behind

23   Google Maps if I go on the Internet, correct?

24   A    That's a fair characterization, yes.

25   Q    Okay.  Brian, could you put up the Google Map thing?

1          So this is -- this is Google Map, the same thing as

2    Google API, is what you used, right?

3    A    It should be.

4    Q    Okay.  And then -- so I've got a fictional place here.  I

5    was actually going to use Ben Donnell's address but I didn't

6    think he'd appreciate it so I just -- I just picked a random

7    address that was about one mile from the Corpus Christi DPS

8    office.

9          Can we zoom in a little bit to try and get these

10   numbers a little bit clearer?

11         You will see that it gives us three different routes

12   and it gives us the time for walking each route.  They're all

13   about 3.3 miles and the time is about -- I'm going to call it

14   1.1 hour.  I think that's -- roughly 1.1 hour, correct?

15   A    I'll give you that.

16   Q    What is Google using as the mile per hour?

17   A    I don't know.

18   Q    It was a simple calculation, right?

19   A    The average miles per hour you could calculate by dividing

20   the miles by the time.

21   Q    And what would you get?

22   A    Around a little over three miles an hour.

23   Q    Okay.  And then we also talked a little bit about your

24   decision to use noon as the starting time.

25   A    That's correct.

1    Q    And you recall that -- Brian, could you put his 79:7-19 to

2    his deposition up, please?

3              Do you recall this question and answer?  You said you

4    picked noon.  I said:

5              "How did you pick noon?"

6              "Answer:  It seemed a good compromise between, you

7              know, if you had picked three in the morning there

8              would never be any traffic, et cetera and that seemed

9              quite unrealistic.  Plus, the issuing places aren't

10             generally open much after working hours.  Some of

11             them have some later hours and some Saturday hours

12             but most of the time they're open is during the

13             workweek.  So I wanted to pick a workday time and I

14             thought it would more conservative to pick noon than

15             to say sometime during rush hour when it would have

16             taken longer."

17             Is that right?

18   A    That's correct.  For the purpose of the analysis I was

19   doing, I thought that was the more conservative assumption.

20   Q    Okay.  And your analysis relies on Dr. Ansolahehere's no

21   match list, correct?

22   A    It relies on the outputs of the no match algorithm or the

23   sweeps and I calculate my own lists.

24   Q    And you removed registered voters who were -- who lacked

25   an SB 14 ID but were disabled -- were able to get an exemption,

1    a disabled exemption, correct?

2    A    There were -- according to the sweeps of the disability

3    database they would be eligible for the exemption, that's

4    correct.

5    Q    But you did not remove voters who were -- registered

6    voters who lacked SB 14 ID that were over the age of 65,

7    correct?

8    A    Again, that's correct, and again, another what I thought

9    was conservative assumption given the analysis I was doing.

10   Q    Okay.  And then you -- the next thing you did was you

11   calculated -- well, I'm going to use the word "imputed" race to

12   the various block groups; is that correct?

13   A    The census provides at the census tract level the wages by

14   race and I used the wages for the census tracts that the block

15   groups were in.

16   Q    And do you recall which census data you used?

17   A    I don't.  We -- I think we looked this up during my

18   deposition.  We could look it up again if you'd like.  I don't

19   have it off the top of my head?

20   Q    Do you mind just for the Court's purposes?

21   A    Okay.  So for which calculation are you asking?

22   Q    For your racial imputation to the various block groups.

23   A    So that was done -- the racial imputation combined a

24   couple of different data sources that used the survey data of

25   the propensity to register to vote by racial group and then it

Bazelon - Cross / By Mr. Clay                    125

1    used the population by racial group at the census block level.

2    Q    And what year were those?

3    A    I believe the racial population data was based on 2010 and

4    I think we looked up during the deposition the 2012 census

5    survey data.

6    Q    Okay.  And then you went about determining the number of

7    registered voters within each census block group, correct?

8    A    I created an estimate based on the racial population of

9    the census block group and the propensity to vote for the

10   purposes of calculating what share of registered voters in a

11   census block group were by each race that I was analyzing so

12   that I could then apply that unbiased number to the actual

13   affected registered voters in the block group, understanding

14   that I took what I thought the distribution of race was of the

15   registered voters in a block group and applied it to the

16   affected registered voters without any adjustments for the

17   possibility that one racial group or another might be more

18   likely to be in the affected registered voter group.

19   Q    Understood.  Could you pull up paragraph 81 of his report?

20   It's on page 46.

21        It says here -- you write:

22        "I assume that the propensity to register to vote is

23        the same for all Texas residents within the same

24        race; that is, an African American's propensity to

25        register to vote is assumed to be constant across all

1              block groups in Texas."

2              And so your analysis doesn't take into account that

3     the propensity to vote might also be related to say education

4     level, correct?

5     A    So first of all, this is propensity to register to vote,

6     not to vote.

7     Q    Thank you.

8     A    But I did not separately try to adjust these numbers by

9     other predictors of registering to vote, which would have

10    potentially increased them a little bit one place and the

11    other, but those would have all canceled out.

12    Q    And, so, turning to your travel costs, you calculated --

13    let's see; what slide was that?

14         **(Pause)**

15    A    Are you looking for the example of the travel cost

16    calculations?

17    Q    I'm looking for the comparison between the travel costs

18    for African-American registered voters and for White registered

19    voters.

20    A    Table Six?

21    Q    Okay.

22    A    Page 29?

23    Q    Yes.  Thank you.

24         Page 29, Brian.

25         **(Pause)**

1          There you go.  And, so, you calculated that for

2    affected White voters, the total cost, the economic cost, was

3    $48.68, correct?

4    A    That's correct.

5    Q    And for affected African-American voters it was 27

6    point -- $27.46, correct?

7    A    Yes.

8    Q    And you also calculated that as a percentage of a day's

9    wage, correct?

10   A    That's correct.  In the burden section that was the first

11   step of the two-step process that led to the four-to-one

12   disparity.

13        **MR. CLAY:**  Brian, could you pull up page -- paragraph

14   71 on 36 through 37?

15   **BY MR. CLAY:**

16   Q    And, so, you calculated that the $27.46 represents

17   approximately 26 percent of a day's earnings for African

18   Americans, and then the 48.68 represents --

19        Next page, please.

20   A    Thirty percent.

21   Q    So, it's a slightly bigger percentage for White voters in

22   terms of -- in terms of their daily earnings, correct?

23   A    That's correct.  This scaling -- if I can anticipate where

24   you're headed, this scaling --

25   Q    That was actually my last question on this.

1    A    -- to the -- okay.  If you don't --

2    Q    Yeah.  Could we go to slide seven, please?  I just want to

3    talk about the breakdown of the hypothetical voter.

4         So, these costs here are what you've enumerated for a

5    hypothetical African-American registered voter, and I assume it

6    could be a hypothetical Anglo voter as well, correct?

7    A    It could be, although an Anglo voter with a --

8    Q    The -- the travel costs would be different.

9    A    -- a wage -- a travel cost of $27 or a wage rate of 13.03

10   would be at the very bottom end and wouldn't represent an

11   average, which is what this is representing.

12   Q    So, the difference would fall in this category here,

13   right?

14   A    That, plus the second and third where the wage rates are

15   driving the costs.

16   Q    Okay.  And, so, for a hypothetical Anglo registered voter

17   this number would be higher, correct?

18   A    If you included the same time categories in the second and

19   third category and the same other costs of the fee --

20   Q    Yeah.

21   A    -- the fees.

22   Q    Keeping everything else equal.

23   A    Yes.  Yes.

24   Q    Uh --

25   A    The difference --

Bazelon - Cross / By Mr. Clay                          129

1    Q    -- and, then --

2    A    -- in wage rates between African Americans and Whites

3    would drive that number higher for Whites.

4    Q    Okay.  And, so, travel costs; how much of this 27.46 is

5    out-of-pocket expenses?  I think you used the words "monetary

6    cost" in your report; is that right?

7    A    That sounds familiar.

8    Q    How much of this is monetary costs?

9    A    Twelve dollars and sixty-five cents.

10   Q    And, so, $15 roughly is economic cost, right?

11   A    That's --

12   Q    So, it doesn't actually reflect any money coming out of

13   the voter's pocket; is that right?

14   A    So, they're all economic costs.  The $15 represents the

15   value of time portion of the estimate.

16   Q    So it's a non-monetary cost.

17   A    Um, it's not an out-of-pocket expense.

18   Q    Okay.  And, then, again, the one hour spent at DPS --

19   A    Or --

20   Q    -- how much of this --

21   A    -- actually I should be just a little bit -- sorry -- just

22   a little bit more careful.  It's probably not an out-of-pocket

23   expense, so I don't model it that way.  It is possible that

24   somebody is taking time off from work and that's actual money

25   out of their pocket, but that's not what I'm modeling here

Bazelon - Cross / By Mr. Clay                    130

1    directly.

2    Q    Okay.  And, so, this is also likely not an actual expense,

3    right?  This is an economic cost.  This is a -- is a non-

4    monetary expense, correct?

5    A    Yes.  It's the value of time.

6    Q    And so is the one hour spent acquiring a birth

7    certificate, right?

8    A    That's correct.

9    Q    And these two other categories, the birth certificate fees

10   and the partial day of childcare services, those actually

11   represent if -- if they had to be incurred, they would -- those

12   would be actual expenses, correct?

13   A    They would be --

14   Q    Out-of-pocket expenses.

15   A    -- out-of-pocket expenses.  Sure.

16   Q    And this $22; are you aware that Texas has lowered the

17   price of a birth certificate for voters who would like an EIC

18   to two or three dollars?

19   A    My understanding is that that is an option for some

20   voters, but I believe they have to go in person -- is that

21   correct? -- to get it, which is why this is labeled as a mail-

22   in application.

23   Q    Well, aren't you -- aren't you assuming they go in person

24   when you are doing this calculation?

25   A    Not necessarily.  That's -- that could be just the time it

1  takes to fill out the application or research what it takes to

2  get your birth certificate.

3  Q    The other wealth statistics that you look at -- well, all

4  of them, actually -- none of them relate to -- they're all

5  total population statistics, right?  They're statistics of the

6  entire population, correct?

7  A    That's correct.  They're -- the way I view it is, if -- if

8  you -- if all you know about somebody is their race, here's the

9  prevalence number, here's the economic cost number, and here's

10  the context for that number.

11  Q    So, you didn't look at wealth statistics for the citizen

12  voting age population; is that right?

13  A    Well, the wealth statistics are household level, so they

14  wouldn't be broken out by individuals in that way.

15  Q    So, no, you did not.

16  A    That's correct.

17  Q    Okay.

18  A    But nor -- nor would it be possible to.

19  Q    And your analysis does not identify the travel costs of

20  any individual on Dr. Ansolabehere's no-match list; is that

21  right?

22  A    It is not geared toward individuals.  That's correct.

23  Q    And it doesn't identify whether or not anybody on his list

24  does or does not have a birth certificate, correct?

25  A    That's correct.  I did not do any analysis on that.

1  Q    And it does not identify -- although the data was

2  available from Catalist, it does not identify the relative

3  wealth of any individual on Dr. Ansolabehere's no-match list,

4  correct?

5  A    That's correct.  I did not use any Catalist data.

6  Q    What is the Bazelon Center?

7  A    That's a mental health advocacy group.  It used to be

8  called, I think, the Mental Health Center Law Group or

9  something like that, that when Judge Bazelon passed away that

10 was his legacy and it was renamed in his honor.

11 Q    Are you related to Judge Bazelon?

12 A    He was my great uncle.

13         **MR. CLAY:**  Could you go to the next one.

14 **BY MR. CLAY:**

15 Q    Are you a donor?

16 A    Yes.

17 Q    Is this you here, Coleman David Bazelon?

18 A    I don't see it yet, but that is -- yes.  That's me.

19 Q    And I'm right in my understanding that they do a lot of

20 advocacy work alongside the civil rights division of the

21 Department of Justice, correct?

22 A    You know, I don't actually do anything with them, but

23 that's probably right.

24 Q    In fact, in this newsletter there's five or six cases in

25 which the Bazelon Center is currently working alongside the

1    Civil Rights Division of the Department of Justice.  Did you

2    know that?

3    A    I didn't know that.

4              **MR. CLAY:**  Could you pull up the -- do you have the

5    highlighted portions?

6    **BY MR. CLAY:**

7    Q    So, here's one for the District of Columbia charter

8    schools; U.S. Department of Justice filed a complaint -- or the

9    Bazelon Center filed a complaint with the U.S. Department of

10   Justice.

11             Next one.

12             Here we go.  Disability rights section of the U.S.

13   Department of Justice Civil Rights Division.  And there are --

14   there are four or five more just like this one.

15             Could you go to the next --

16             Do you know -- do you know Mr. Derfner?

17   A    Derfner.

18   Q    Armand -- Armand Derfner?

19   A    I don't know that I know him.  The name sounds vaguely

20   familiar, but I really don't; can't place him.

21   Q    Well, it looks like you were defending the Affordable Care

22   Act also at the Bazelon Center.

23             **MS. CONLEY:**  Objection.  Did you say "you" were

24   defending?

25             **MR. CLAY:**  Well, the Bazelon Center was.

1              **MS. CONLEY:**  Yeah.  That's --

2              **MR. SPEAKER:**  Not (indiscernible).

3              **MS. CONLEY:**  I move to strike that.

4              **MR. CLAY:**  I'll rephrase it.  It looks like the

5     Bazelon Center was --

6              **THE COURT:**  I'm sorry; there is some laughing going

7     on over here, and I'm not sure what it's about.  Is there a

8     problem?  Is there a problem from the Government, the United

9     States?

10             **MS. SPEAKER:**  No, ma'am.

11             **THE COURT:**  Right here; these counsel sitting right

12    here, to the right of the table right here.  Is there a

13    problem?

14             **MR. FREEMAN:**  No, ma'am.

15             **MS. SPEAKER:**  No, ma'am.

16             **THE COURT:**  Okay.  It's not polite.

17             **MR. CLAY:**  Just go to the next, to the -- yes.

18    Correct.

19    **BY MR. CLAY:**

20    Q    Well, he's also a donor for the Bazelon Center.  Do you

21    see that?

22    A    I do.  I stop skimming the donor list after the B's.

23    Q    Could we pull up his signature on the report, please?

24             This is your signature, correct?

25    A    Yes.

1    Q    Do you know what the ACLU of Maryland is?

2    A    I'm quite familiar.

3    Q    And why is that?

4    A    I'm the president of the board of the ACLU, the Maryland

5    ACLU affiliate.

6    Q    Do you always leave that distinguished appointment off of

7    your C.V.?

8    A    I leave that and all other non-professional related

9    activities off my C.V.

10            **MR. CLAY:**  Nothing further.

11            **MS. CONLEY:**  I just have one follow-up.

12                      **REDIRECT EXAMINATION**

13   **BY MS. CONLEY:**

14   Q    Dr. Bazelon, for purposes of your analysis, did you look

15   at racial disparities in vehicle ownership?

16   A    I did not.

17   Q    Okay.  So, if it were the case that African Americans were

18   less likely to own vehicles, wouldn't you say that that would

19   equate to possibly more wages lost, more likelihood that you

20   might need childcare, and other things that could drive the

21   costs up for African Americans?

22            **MR. CLAY:**  Objection.  This is outside the scope of

23   both his report and my cross examination.

24            **THE COURT:**  Sustained.

25            **MS. CONLEY:**  Thank you.

1          **THE COURT:**  Nothing further for this witness?  Then

2    you can step down, sir.

3          **THE WITNESS:**  Thank you.  Do these stay here?

4          **THE COURT:**  I'm sorry?

5          **THE WITNESS:**  Do these stay here?

6          **THE COURT:**  He has some exhibits here, Ms. Conley,

7    or -- or matters --

8          **MS. CONLEY:**  Oh, it's just the reports.

9          **THE COURT:**  He can take them?

10         **MS. CONLEY:**  Yeah.

11      **(Witness stepped down)**

12         **MR. DUNN:**  Your Honor, Chad Dunn on behalf of the

13   Veasey LULAC plaintiffs.  I'm not doing any evidence at this

14   point, but we do think the Court might benefit from a very

15   short, two-page pleading that cites to the statute and what

16   regulations interpret the statute, as the Court might want to

17   understand that as it works on its opinion, so I'll hand that

18   out if that's acceptable.

19         **THE COURT:**  Okay.

20         **MR. DUNN:**  Should I also file it on ECF later, or is

21   this acceptable?

22         **THE COURT:**  It's acceptable --

23         **MR. DUNN:**  Okay.

24         **THE COURT:**  -- for the trial purposes.

25         **MR. FREEMAN:**  Your Honor, the United States would

1   next like to call as a witness through deposition Mr. Joe

2   Peters.

3            **(Pause; voices and whispers off the record)**

4                   **EXAMINATION OF JOE PETERS**

5              **BY EXCERPTS OF DEPOSITION TESTIMONY**

6        **(QUESTIONS READ BY MR. FREEMAN; ANSWERS READ BY COUNSEL)**

7              "QUESTION:  Mr. Peters, thank you for taking the time

8              for the deposition.  If you could please state your

9              name for the record?

10             "ANSWER:  Joe Peters."

11             **MR. FREEMAN:**  And Exhibit 38.  And, for the record,

12   this is Plaintiffs' Exhibit 344.

13             "QUESTION:  What is this document?

14             "ANSWER:  This appears to be a copy of the Texas

15             Administrative Code, Title 37, Part 1, Chapter 15.

16             "QUESTION:  Is this the complete set of regulations

17             that DPS has promulgated to implement its election

18             identification certificate program?

19             "ANSWER:  I believe it is.

20             "QUESTION:  Could you please take a look at Section

21             15.181(d)?

22             "ANSWER:  B, as in boy?

23             "QUESTION:  D, as in --

24             "ANSWER:  Oh, D, as in David?

25             "QUESTION:  Sure.  This provision bars an individual

Peters / Via excerpts of Deposition - Direct          138

1              who, quote, 'has been issued,' close quote, a set of

2              documents that are sufficient to cast an in-person

3              ballot under SB 14 from obtaining an EIC from DPS,

4              correct?

5              "ANSWER:  Yes.

6              "QUESTION:  What if that document has been lost or

7              stolen?

8              "ANSWER:  If the document has been lost or stolen,

9              assuming that it's a driver's license or I.D. card

10             that was issued by DPS, we can determine whether or

11             not they still have a valid card or still have a

12             valid license, and we would issue the -- we would not

13             issue the election identification certificate.

14             "QUESTION:  Is there a fee for an individual who has

15             DPS-issued I.D. that has lost that I.D. to obtain a

16             new copy?

17             "ANSWER:  Yes.

18             "QUESTION:  Okay.  How is this list of documents

19             created, the documents required for obtaining an EIC?

20             "ANSWER:  I don't know that.

21             "QUESTION:  Does it appear to be modeled on any other

22             provision set out by DPS?

23             "ANSWER:  It does.

24             "QUESTION:  And what provision is that?

25             "ANSWER:  That would be the requirements for driver's

Peters / Via excerpts of Deposition - Direct          139

1       license identification and I.D. card identification.

2       "QUESTION:  And what was the basis for using the

3       driver's license or personal identification card

4       requirements as the requirements for an election

5       identification certificate?

6       "ANSWER:  Continuity of the process.  The customer

7       service representatives, which, if I can, I would

8       refer to them as 'CSRs' going forward, if that's all

9       right.

10      "QUESTION:  But not necessarily to reduce the burden

11      on individuals who are applying for an EIC?

12      "ANSWER:  Correct.  My understanding was that the

13      thinking was -- if individuals were accustomed to

14      what they had to have for a driver's license or I.D.

15      issuance and knew that the same was applicable to the

16      EIC, there would be less confusion on the part of the

17      applicant for an EIC.

18      "QUESTION:  And if -- by 'individuals' you mean CSRs,

19      correct?

20      "ANSWER:  Yes.

21      "QUESTION:  Not applicants?

22      "ANSWER:  Well, no, I'm not talking about

23      applicants."

24      **MR. FREEMAN:**  Uh --

25      "ANSWER:  I'm talking about applicants."

Peters / Via excerpts of Deposition - Direct          140

1        **MR. SPEAKER:**  Pardon me.

2        "QUESTION:  But applicants for EICs are individuals

3        who are not accustomed to holding --

4        "ANSWER:  That's correct.  That's correct.

5        "QUESTION:  Is that computerized check conducted for

6        every individual who applies for an EIC?

7        "ANSWER:  Yes.  I believe that's -- that's actually

8        done in the -- well, I better not answer that one

9        that way, because I'm not real sure.  I'm thinking of

10       the quality assurance process that we go through once

11       an EIC is issued.  Our -- we have a -- license and

12       records service is doing quality assurance on every

13       EIC that's issued.  Once -- once the card -- or once

14       the application hits the database, then the EIC

15       staff -- I mean the license of records, or LRS staff,

16       looks at every application in the database to be sure

17       that all the documentation that's required to prove

18       citizenship and birth and so forth is in the

19       database.

20       "QUESTION:  Is -- is that same level of scrutiny

21       provided to driver's licenses and identification

22       cards?

23       "ANSWER:  Yes, but on -- usually on a local level in

24       a spot check.

25       "QUESTION:  So, it's an audit for driver's licenses

Peters / Via excerpts of Deposition - Direct          141

1       and identification cards, but it's a check for every

2       EIC.  Is that correct?

3       "ANSWER:  Yeah.

4       "QUESTION:  Okay.  But, of course, an individual can

5       obtain an EIC without proof of citizenship if they

6       provide a Texas driver's license that's been expired

7       for less than two years, correct?

8       "ANSWER:  Yes, sir.  Yes, sir.

9       "QUESTION:  Is it necessary to provide documentary

10      proof of citizenship in Texas in order to register to

11      vote?

12      "ANSWER:  Provide proof of citizenship in order to

13      register to vote?

14      "QUESTION:  Documentary proof of citizenship.

15      "ANSWER:  I'm not aware that it is.

16      "QUESTION:  It is -- it is necessary to obtain -- or

17      to provide documentary proof of citizenship in order

18      to obtain a driver's license or identification card

19      in Texas?

20      "ANSWER:  Yes.

21      "QUESTION:  Proof of citizenship?

22      "ANSWER:  Yes.

23      "QUESTION:  Or lawful presence?

24      "ANSWER:  Uh, well, lawful presence.

25      "QUESTION:  So, a non-citizen --

Peters / Via excerpts of Deposition - Direct          142

1      "ANSWER:  So, a non-citizen could obtain -- could

2      obtain a driver's license or I.D. card.

3      "QUESTION:  So, this proof of citizenship requirement

4      for an EIC is an additional burden for individuals

5      for attempting to vote using an EIC that doesn't

6      exist for individuals who attempt to vote using a

7      driver's license or identification card, correct?

8      "ANSWER:  That's my understanding.

9      "QUESTION:  Please look at Section 15.182(4), which

10      is supporting identification.  What is the purpose of

11      this set of documents?

12      "ANSWER:  Supporting identification will aid the

13      customer service representatives or the person doing

14      the issuance in establishing the identity of the

15      applicant.

16      "QUESTION:  There are several other documents on this

17      list that never expire, such as school records or

18      military records, correct?

19      "ANSWER:  Correct.

20      "QUESTION:  Why are those acceptable when other

21      documents must have been expired within a certain

22      amount of time?

23      "ANSWER:  I don't have a good answer for that.

24      "QUESTION:  If there is a disagreement between an

25      individual's voter registration record and that

Peters / Via excerpts of Deposition - Direct                143

1        individual's expired driver's license with regard to

2        a first name, will those documents be sufficient to

3        obtain an election identification certificate?

4        "ANSWER:  If the applicant is otherwise eligible for

5        the election identification certificate and if the

6        name -- the entire name is substantially the same,

7        they would more than likely be issued the EIC.

8        "QUESTION:  Is the substantially -- sorry.  Is the

9        substantially similar rule that you described

10       earlier, is that only with regard to first names?

11       "ANSWER:  No.

12       "QUESTION:  So, last name as well?

13       "ANSWER:  Yes, sir.

14       "QUESTION:  If there is a disagreement because of an

15       individual's name having been changed, such as a

16       woman getting married, so that her first name remains

17       the same but the last name is entirely different --

18       "ANSWER:  Uh-huh.

19       "QUESTION:  -- will that application for an EIC be

20       granted?

21       "ANSWER:  It -- it may not.  It just depends on what

22       supporting documentation the applicant can provide

23       that will convince the -- the issuing CSR that she's

24       who she said she is.

25       "QUESTION:  Okay.  Could you take a look at Section

Peters / Via excerpts of Deposition - Direct          144

1              15.183(a)(3)?

2              "ANSWER:  Okay.

3              "QUESTION:  Who at DPS -- sorry.  First off, does

4              this require an individual requesting an election

5              identification certificate submit to fingerprinting?

6              "ANSWER:  The current rule does require."

7              **MR. FREEMAN:**  Exhibit 39, please.  And that, for the

8      record, is Plaintiffs' 345.

9              "QUESTION:  Have you seen this article before?

10             "ANSWER:  Yes, I have.

11             "QUESTION:  And does this article state that more

12             than one DPS employee said during the week of

13             September 19th, 2013, that, 'If you can't pass a

14             warrant check, you can't walk in and get a voter I.D.

15             and, if you try, you won't walk back out'?

16             "ANSWER:  That's what the article says.

17             "QUESTION:  Has DPS promulgated any rules or notices

18             in order to combat this perception that a warrant

19             check will be run?

20             "ANSWER:  Well, as far as promulgating rules,

21             published rules in the administrative code, I don't

22             recall that there were.

23             "QUESTION:  Okay.  Do you have discretion, 'you'

24             being DPS, to begin taking fingerprints at any time

25             under the existing regulation?

Peters / Via excerpts of Deposition - Direct          145

1      "ANSWER:  Yes, we do under existing regulation.

2      "QUESTION:  And are there any plans to amend the

3      regulation?

4      "ANSWER:  Absolutely not.

5      "QUESTION:  Okay.  Is it your understanding that

6      there is a public perception that interactions with

7      DPS will trigger a check for warrants?

8      "ANSWER:  There is that public perception in some

9      circles.

10     "QUESTION:  Is law enforcement present at DPS offices

11     that issue driver's licenses and EICs?

12     "ANSWER:  Some of those there are.

13     "QUESTION:  So, it's more likely that offices in

14     urban areas will have law enforcement present?

15     "ANSWER:  Yes, sir.  I think that's a safe statement.

16     "QUESTION:  But my question was, are there any formal

17     rules or regulations that authorize the issuance of

18     EICs from mobile stations or county offices?

19     "ANSWER:  Authorizing EICs specifically?  No.

20     "QUESTION:  Does SB 14 require or authorize issuance

21     of EICs from mobile stations or county offices?

22     "ANSWER:  No.

23     "QUESTION:  Is it subject to DPS's discretion to

24     terminate the issuance of EICs from mobile stations?

25     "ANSWER:  Yes.

Peters / Via excerpts of Deposition - Direct          146

1      "QUESTION:  Is it subject to DPS's discretion to

2      terminate the issuance of EICs from county offices?

3      "ANSWER:  Yes.

4      "QUESTION:  Sure.  Am I correct that you've

5      established EIC operations in more than eight

6      counties in which you do not have functional DPS

7      offices?

8      "ANSWER:  Yes.

9      "QUESTION:  And what is the statute, rule, or

10     regulation that authorizes that?

11     "ANSWER:  I'm not aware of one.

12     "QUESTION:  Has any formal notice been given that

13     EICs are available from mobile stations as a general

14     matter?

15     "ANSWER:  Yes.

16     "QUESTION:  What formal notice is that?

17     "ANSWER:  Press releases from the Department of

18     Public Safety Media and Communications Office, social

19     media from the media and communications office, our

20     website.  The Secretary of State, I believe, has done

21     notification.

22     "QUESTION:  Any direct mailers to registered voters?

23     "ANSWER:  Not that I'm aware of.

24     "QUESTION:  Any targeted outreach to minority

25     communities?

Peters / Via excerpts of Deposition - Direct          147

1              "ANSWER:  From DPS perspective?  No."

2              **MR. FREEMAN:**  Exhibit 41, please.  And, for the

3    record, this is Plaintiffs' Exhibit 347.

4              "QUESTION:  What is this document?

5              "ANSWER:  This is an e-mail from Tony Rodriguez at

6              DPS to Wroe Jackson at the Secretary of State's

7              office dated October 2nd, 2013.

8              "QUESTION:  Am I correct that this e-mail relays

9              complaints from a county commissioner in Bexar County

10             concerning the sufficiency of notice before mobile

11             stations were present in Bexar County?

12             "ANSWER:  That's correct.

13             "QUESTION:  So, you're not aware -- you're not aware

14             of any specific efforts that were made to provide

15             more notice than the amount of notice that this

16             county commissioner deemed insufficient?

17             "ANSWER:  I'm not.

18             "QUESTION:  At any point did DPS consider a rule that

19             would have allowed individuals to obtain an EIC

20             without bringing a certified birth certificate by

21             connecting DPS stations directly to the Department of

22             State Health Services in order to verify birth

23             records?

24             "ANSWER:  There was discussion about that, about the

25             ability and the costs for DPS to have direct access

1       to verify birth certificates.

2       "QUESTION:  And why was the decision made not to

3       create that direct connection?

4       "ANSWER:  I'm not sure what the -- the issues were

5       with HHSC, but the primary problem was the

6       connectivity and DPS having direct access and the

7       cost of programming that would -- that would allow us

8       to have direct access.

9       "QUESTION:  And am I correct that this would have

10      allowed individuals who don't presently have a birth

11      certificate to obtain an EIC without traveling to

12      another location to obtain their birth certificate?

13      "ANSWER  I would say yes.

14      "QUESTION:  Have there been any studies -- you talked

15      about the monetary studies by DPS on the -- for

16      example, the wait times at some of the offices.

17      Have -- has there been any study to determine if the

18      lines are longer or if there's more wait because of

19      the issuance of EICs?

20      "ANSWER:  No, sir.  We track wait times in some of

21      the larger offices with queuing systems in place, but

22      EIC transactions are not distinguished in those

23      queuing systems.

24      "QUESTION:  And so I understand your testimony, there

25      are 78 -- currently 78 counties without a DPS office;

Peters / Via excerpts of Deposition - Direct          149

1       is that -- is that right?

2       "ANSWER:  Correct.

3       "QUESTION:  And are these counties concentrated in

4       specific geographic regions in the state?

5       "ANSWER:  No, sir.  They're not concentrated in any

6       specific geographic region of the state.  For the

7       most part they're rural area counties and probably

8       more in the West Texas region than East Texas.

9       "ANSWER:  Okay.

10      "QUESTION:  So, if you had to generalize about

11      counties that don't have a DPS office, it would be

12      some combination of rural West Texas, understanding

13      that those -- there are probably lots of exceptions

14      to that?

15      "ANSWER:  Yes, in the Panhandle.

16      "QUESTION:  And does DPS know anything about the

17      racial demographics of the counties without DPS

18      offices?

19      "ANSWER:  No, sir.

20      "QUESTION:  Has anyone at DPS ever studied or

21      analyzed that issue?

22      "ANSWER:  Not that I'm aware of.

23      **MR. FREEMAN:**  Plaintiffs' Exhibit 352, please.

24      "QUESTION:  Okay. So, Mr. Peters, turning to just the

25      attachment, then, can you describe for me what this

Peters / Via excerpts of Deposition - Direct                150

1       attachment is?

2       "ANSWER:  The attachment appears to be a list of

3       driver's license offices, the cities they're in, the

4       counties they're in, the numbers of employees that

5       are assigned to that office, what DPS region the

6       office is in, the office hours and the days that

7       office is open --

8       "QUESTION:  Yeah.

9       "ANSWER:  -- and estimated county population in

10      2012 --

11      "QUESTION:  Right.

12      "ANSWER:  -- and whether or not public transportation

13      was available and whether or not it has electronic

14      queuing system available.

15      "QUESTION:  In connection with this chart did DPS

16      analyze the costs in time or dollars for those that

17      could make use of public transportation to arrive at

18      a DPS office?

19      "ANSWER:  No, sir, not that I'm aware of.

20      "QUESTION:  And what forms of public transportation

21      were considered in creating this chart?

22      "ANSWER:  Bus lines, taxi service, rail if it was

23      available.

24      "QUESTION:  So, taxi service was included as a

25      potential means of available public transportation?

Peters / Via excerpts of Deposition - Direct            151

1          "ANSWER:  That's my understanding, yes, sir.

2          "QUESTION:  So, if someone could -- that lived on the

3          outskirts of, say, Dallas County could call a taxi

4          and pay $80 and have the taxi take the person to the

5          Dallas-Garland Mega Center, that would be considered

6          a form of public transportation that would lead to

7          the checking of the X in this column?

8          "ANSWER:  Yes, sir.

9          "QUESTION:  Okay.  And for those folks that don't

10         have access to available public transportation, as

11         DPS is defining it for purposes of this chart, are

12         there any forms of transportation assistance

13         available to -- for an individual to get to the DPS

14         office to secure -- to apply for an EIC or any

15         information doc?

16         "ANSWER:  Are you asking if DPS provides

17         transportation for those to get to a -- people to get

18         to a driver's license office?

19         "QUESTION:  Yes.  Or any form of assistance designed

20         to enable them.

21         "ANSWER:  There is a method we can enable them in

22         certain circumstances.

23         "QUESTION:  And what are those circumstances?

24         "ANSWER:  We call it homebound.

25         "QUESTION:  The circumstance in my question was, I

Peters / Via excerpts of Deposition - Direct                152

1             don't own a car and I live in a county without public

2             transportation; could I successfully apply for a

3             homebound service?

4             "ANSWER:  Are there any other circumstances other

5             than that you don't own a car?

6             "QUESTION:  No.  I don't own a car.

7             "ANSWER:  No, sir.

8             **MR. FREEMAN:**  Exhibit 50, please.  And, for the

9    record, this is Plaintiffs' Exhibit 409.

10            "QUESTION:  Mr. Peters, have you seen this e-mail

11            exchange before?

12            "ANSWER:  Yes, sir.

13            "QUESTION:  And that's an e-mail from a Mr. Herd to a

14            Tracy Henson and Shaya Birch; is that correct?

15            "ANSWER:  Yes, sir.

16            "QUESTION:  Do you know who Mr. Herd is?

17            "ANSWER:  I believe he is the Dallas County voter

18            registrar.

19            "QUESTION:  And looking at the e-mail, it appears to

20            be a request for assistance from DPS to deploy mobile

21            EIC units at various events.  Is that accurate --

22            "ANSWER:  Yes, sir.

23            "QUESTION:  -- summary of the e-mail?

24            "ANSWER:  Yes, sir.

25            "QUESTION:  And then there's a series of forwards of

Peters / Via excerpts of Deposition - Direct          153

1              the e-mail from -- the one I want to turn to, I

2              guess, is on September 10th, 2013, at 19:21, a JoAnn

3              Mastrachio says, 'Tony, I'm handing this one off to

4              the EIC guru.'

5                          Do you see that?

6              "ANSWER:  Yes, I see that.

7              "QUESTION:  Okay.  And then Mr. Rodriguez turns

8              around and sends the e-mail chain on Tuesday,

9              September 10th, at 2:13 to Mr. Watkins, who I believe

10             you testified is one of your deputies?

11             "ANSWER:  Yes.

12             "QUESTION:  And yourself.

13             "ANSWER:  Yes.

14             "QUESTION:  Is that correct?

15                          And what are the first two words of his e-

16             mail?

17             "ANSWER:  'Mission creep.'

18             "QUESTION:  And what did you understand Mr. Rodriguez

19             to mean by 'mission creep' when you saw this e-mail?

20             "ANSWER:  That the mission was expanding.

21             "QUESTION:  And in what way was the mission

22             expanding?

23             "ANSWER:  By deploying the mobilizations.

24             "QUESTION:  And would you agree with me that 'mission

25             creep' carries a negative connotation?

Peters / Via excerpts of Deposition - Direct          154

1        "ANSWER:  It could.

2        "QUESTION:  Okay.  So with regards to the customer

3        service representatives does DPS require them to

4        obtain a certain level of education in order to be

5        employed?

6        "ANSWER:  No.

7        "QUESTION:  How many of the customer service

8        representatives are fluent in Spanish?

9        "ANSWER:  I don't know that.

10       "QUESTION:  Is there any requirement -- sorry -- is

11       there a requirement that offices have a minimum

12       number of Spanish speakers?

13       "ANSWER:  No.

14       "QUESTION:  What if someone -- what are DPS employees

15       trained to do if someone has sufficient money to pay

16       for a replacement card but not enough money to pay

17       for the supporting documentation required to get an

18       ID?

19       "ANSWER:  If they don't come in with the supporting

20       documentation, then they won't be issued.

21       "QUESTION:  Okay.  If you could turn to the -- or go

22       to the bottom of this page, Question Number 13.

23       Would renewal notices for an election certificate be

24       sent to cardholders, and is it DPS' policy that

25       renewal notices for an election certificate are not

1              sent to EIC holders?

2              "ANSWER:  I don't know the answer to that question.

3              We haven't -- we're not that far along in the

4              process.  I know -- I know what the training document

5              says.

6              "QUESTION:  Is there anything that says something

7              different from this training document?

8              "ANSWER:  Not that I'm aware of.

9              "QUESTION:  Are renewal notices sent to individuals

10             who have driver's licenses?

11             "ANSWER:  Yes.

12             "QUESTION:  Are renewal notices sent to individuals

13             who have photo identification?

14             "ANSWER:  I believe they are.

15             "QUESTION:  What is the reason for the difference in

16             policy?

17             "ANSWER:  I don't know.

18             **MR. FREEMAN:**  Exhibit 57, please.  And for the record

19     this is Plaintiffs' 361.

20             "QUESTION:  The second document I just handed you is

21             a printout from Texas' DPS website from a page

22             entitled Election Identification Certificates EIC

23             documentation requirements; is that correct?

24             "ANSWER:  Yes.

25             "QUESTION:  And if you could compare the documents

1    listed there as acceptable secondary identification

2    to the ones listed on -- in Appendix G.

3    "ANSWER:  Okay.

4    "QUESTION:  Are they the same?

5    "ANSWER:  There's an omission in the website with

6    respect to the DHS or Department of State Health

7    Services record of birth issued only for the purposes

8    of obtaining an EIC.

9    "QUESTION:  So is it correct that the Texas

10   Department of State Health Services record of birth

11   issued only for the purpose of obtaining an EIC is an

12   acceptable form of secondary identification for an

13   EIC?

14   "ANSWER:  It is.  It is.

15   "QUESTION:  Why is the website not updated to reflect

16   that?

17   "ANSWER:  Someone just didn't update it.

18   "QUESTION:  Does DPS have a campaign to advertise the

19   EIC issuance program?

20   "ANSWER:  I don't know that I could classify it as a

21   campaign.  There is an effort -- an ongoing effort to

22   keep the public apprised of the availability of EICs

23   and where they can obtain them and when they can

24   obtain them and what they need to obtain one.

25   "QUESTION:  So what are the primary venues in which

1           that information is publicized?

2           "ANSWER:  Press releases.

3           "QUESTION:  Are there any other forms that your --

4           that your EIC public education program takes outside

5           of press releases?

6           "ANSWER:  Social media.

7           "QUESTION:  Okay.  So how much money was budgeted in

8           2013 to publicize the EIC program?

9           "ANSWER:  None that I'm aware of.

10          "QUESTION:  Are your press releases also written in

11          Spanish?

12          "ANSWER:  I've not seen one in Spanish, and I can't

13          tell you whether they were.

14          "QUESTION:  So it was more convenient for DPS staff

15          for them -- for the units to be open during business

16          hours?

17          "ANSWER:  Well, that's part of the reason.

18          "QUESTION:  So what leads you to say now that

19          business hours is more convenient for the applicants?

20          "ANSWER:  I don't know.  I just -- that was my

21          assumption that, you know, they are accustomed to

22          doing business during business hours and not

23          necessarily accustomed to trying to get business done

24          after business hours.

25          "QUESTION:  Even if they also have their own business

Peters / Via excerpts of Deposition - Direct          158

1              such as work during business hours?

2              "ANSWER:  Yes.

3              "QUESTION:  Let me ask it this way.  In your view, is

4              the result of low applications for EICs a result of

5              DPS' failure to engage in appropriate outreach?

6              "ANSWER:  No.

7              "QUESTION:  In your view, is the low demand for EICs

8              to date, again, low demand in your view, the result

9              of DPS' failure to ameliorate the burdens of

10             obtaining an EIC?

11             "ANSWER:  No.

12             "QUESTION:  Okay.  So in DPS' view, DPS has done

13             everything right, yet demand for DPS applications has

14             been low.  Is that an accurate summary of DPS' view?

15             "ANSWER:  Yes."

16        **MR. FREEMAN:**  That concludes the excerpts of

17   Mr. Peters' deposition.

18        **MS. ROSCETTI:**  Your Honor, may I approach?

19        **THE COURT:**  Yes.

20        **MS. ROSCETTI:**  Jennifer Roscetti for the Defendant.

21   And Stephen Tatum will be playing the role of Joe Peters.

22   //

23   //

24   //

25   //

**EXAMINATION OF JOE PETERS**

**BY EXCERPTS OF DEPOSITION TESTIMONY**

**(QUESTIONS READ BY MS. ROSCETTI; ANSWERS READ BY MR. TATUM)**

"QUESTION:  Mr. Peters, what is your position?

"ANSWER:  I'm the assistant director at the

Department of Public Safety for the driver's license

division.

"QUESTION:  And what are your responsibilities in

that position?

"ANSWER:  I oversee driver licensing, ID card

issuance and election identification card issuance,

enforcement and compliance, policy and business

improvement and business intelligence in the driver's

license division.

"QUESTION:  Okay.  I would like to move on to the

mobile stations and county offices that provide EIC

services.

"Are there any formal rules or regulations that

authorize the issuance of EICs for mobile stations?

"ANSWER:  There is legislation that was passed in the

83rd session that authorizes DPS to enter into a

memoranda of agreement with county offices to issue

driver licenses -- I'm sorry -- to provide renewal

services and address changes and so forth for driver

licenses and identification cards.  And that was the

Peters / Via excerpts of Deposition - Cross                160

1       basis for which we believed we were also authorized

2       to do issuance of EICs by the county.  And the

3       process is governed by a memorandum of agreement that

4       the county signed with DPS to conduct EIC issuance.

5       "QUESTION:  We're go to that eventually.  Sure.

6       "I am correct that you've established EIC operations

7       in more than eight counties in which you do not have

8       functional DPS offices?

9       "ANSWER:  Yes.

10      "QUESTION:  Have you provided any other notice other

11      than your website of the list of fixed county offices

12      where EICs are available?

13      "ANSWER:  Yes.

14      "QUESTION:  What notice?

15      "ANSWER:  Press releases.  We have spreadsheets that

16      indicate those offices where we're going to provide

17      EIC services.

18      "QUESTION:  Are you aware of any outreach that's been

19      known to TV stations?

20      "ANSWER:  I'm -- I know it's been done because I've

21      seen some of the releases.  But as -- when you're

22      talking specifics, I don't have it.

23      "QUESTION:  Are you aware of any outreach to Spanish

24      language TV stations?

25      "ANSWER:  I know the Spanish language TV stations

1       have been granted interviews and have done stories on

2       the EIC process.

3       "QUESTION:  So when a county enters into this

4       agreement with DPS to handle the processing of EICs

5       they are given the training by DPS?

6       "ANSWER:  Yes, sir.

7       "QUESTION:  And they're given the equipment by DPS?

8       "ANSWER:  Yes, sir.

9       "QUESTION:  And how long do they get to keep the

10      equipment?  Is it up to them?  Is it pursuant to some

11      agreement?

12      "ANSWER:  It's pursuant to the agreement, but it's up

13      to them.  They keep it as long as they're willing to

14      provide the service.

15      "QUESTION:  And for those counties that will not

16      provide the service, that's when a mobile unit is

17      utilized?

18      "ANSWER:  With DPS employees, yes, sir.

19      "QUESTION:  So if a county says, 'We're not going to

20      be part of that agreement,' DPS would set up their

21      mobile station?

22      "ANSWER:  Yes, sir.

23      "QUESTION:  And be manned only by DPS employees?

24      "ANSWER:  Correct.

25      "QUESTION:  How would they determine the location and

Peters / Via excerpts of Deposition - Cross                    162

1          the timing of those mobile units?

2          "ANSWER:  The location is determined by the local

3          supervisors.  They'll travel to one of those counties

4          and scout potential locations and then determine

5          whether or not the owner or the proprietor of the

6          location agrees to let us have the space for so many

7          hours a day for so many days.

8          "QUESTION:  Who could request a DPS mobile unit?

9          "ANSWER:  Local officials can request it.  In the

10         case where we -- where we don't get a request from a

11         local county, our goal was to be able to provide EIC

12         availability in all 254 counties before every

13         election.

14         "QUESTION:  Have you seen any increase in the wait

15         time since the -- since SB 14 went into effect?

16         "ANSWER:  No, sir.  As a matter of fact, we're seeing

17         decreases in wait times.

18         "QUESTION:  Okay.  And for those folks that don't

19         have access to available public transportation, as

20         DPS is defining it for purposes of this chart, are

21         there any forms of transportation assistance

22         available to -- for an individual to get to the DPS

23         office to secure -- to apply for an EIC for any

24         information doc?

25         "ANSWER:  Are you asking if DPS provides

Peters / Via excerpts of Deposition - Cross                    163

1          transportation for those people to get to a DL

2          office?

3          "QUESTION:  Yes.  Or any form of assistance designed

4          to enable them.

5          "ANSWER:  There is a method that we can enable them

6          in certain circumstances.

7          "QUESTION:  And what are those circumstances?

8          "ANSWER:  We call it homebound.

9          "QUESTION:  Homebound?

10         "ANSWER:  Or if --

11         "QUESTION:  Can you describe that for me?

12         "ANSWER:  If an individual for whatever reason is

13         physically challenged and can't get to a driver's

14         license office and needs to do a driver license

15         renewal or an ID card renewal, then depending on

16         those circumstances we may dispatch a CSR to their

17         home or their place of residence and process their

18         renewal or the address change, whatever they're

19         after.

20         "QUESTION:  And that service is also available for

21         EICs?

22         "ANSWER:  Yes, it would be.

23         "QUESTION:  Okay.  Is there a specific name for those

24         employees who staff the desks and would be

25         responsible for issuing EICs?

1          "ANSWER:  Customer service representatives.

2          "QUESTION:  Okay.  So do customer service

3          representatives and other DPS employees receive

4          training on a regular basis?

5          "ANSWER:  They do ongoing training.

6          "QUESTION:  Ongoing training?  What does 'ongoing'

7          mean?

8          "ANSWER:  That means that periodically they -- they

9          have refresher training.  If technology changes, they

10         get refresher training.

11         "QUESTION:  Uh-huh.

12         "ANSWER:  If significant rules or legislation are

13         enacted or adopted that would affect their duties,

14         then they're trained.

15         "QUESTION:  Okay.  So they are trained -- in addition

16         to this specialized training that you're talking

17         about, are they just trained on an annual basis or

18         regularly with regards to general procedures?"

19         **MS. ROSCETTI:**  I guess that got cut off.

20         "QUESTION:  Does DPS have a campaign to advertise the

21         EIC issuance program?

22         "ANSWER:  I don't know that I could classify it as a

23         campaign.  There is an effort -- an ongoing effort to

24         keep the public apprised of the availability of EICs

25         and where they can obtain them and when they can

Espinoza / Via excerpts of Deposition - Direct                165

1                obtain them and what they need to obtain one.

2                "QUESTION:  So what are the primary venues in which

3                that information is publicized?

4                "ANSWER:  Press releases."

5          MS. ROSCETTI:  Thank you.  No further, your Honor.

6          THE COURT:  Okay.

7          MS. VAN DALEN:  Your Honor, The Plaintiffs' next

8    witness is Estela Espinoza.  Marinda Van Dalen will be reading

9    the questions and Amy Rudd will be reading the answers.

10         THE COURT:  She's a Plaintiff, right?

11         MS. VAN DALEN:  She's a Plaintiff, your Honor.  May I

12   approach the bench?

13         THE COURT:  Yes.

14             EXAMINATION OF ESTELA GARCIA ESPINOZA

15              BY EXCERPTS OF DEPOSITION TESTIMONY

16    (QUESTIONS READ BY MS. VAN DALEN; ANSWERS READ BY MS. RUDD)

17                "QUESTION:  Can you state and spell your name for the

18                record?

19                "ANSWER:  Estela G. Espinoza.

20                "QUESTION:  Okay.

21                "ANSWER:  E-s-t-e-l-a Garcia, G-a-r-c-i-a, Espinoza,

22                E-s-p-i-n-o-z-a.

23                "QUESTION:  Thank you.  And Ms. Espinoza, where were

24                you born?

25                "ANSWER:  In Sullivan City.

1          "QUESTION:  And when were you born?

2          "ANSWER:  1944.

3          "QUESTION:  And do you know what date on which you

4          were born, the specific date?

5          "ANSWER:  January the 16th.

6          "QUESTION:  I'm going to mark as the first exhibit a

7          document which has been Bates stamped ORT 0000003.

8          **MS. VAN DALEN:**  And for your Honor that is now

9     Plaintiffs' Exhibit Number 996, which I offer into evidence.

10         "QUESTION:  Do you recognize this document?

11         "ANSWER:  Yes, ma'am.

12         "QUESTION:  What is it?

13         "ANSWER:  It's my birth certificate.

14         "QUESTION:  And you'll note in Item 7 it says, 'Date

15         of birth, February 13th, 1944'?

16         "ANSWER:  Yeah, that's wrong.

17         "QUESTION:  Do you know why that date is on here?

18         "ANSWER:  No, ma'am.

19         "QUESTION:  If you take a look at the bottom of this

20         document, there's a date January 8th, 2014.  Did you

21         obtain this document on or about January 8th, 2014?

22         "ANSWER:  Yes.

23         "QUESTION:  And why did you obtain this document?

24         "ANSWER:  Because I didn't have it.  I didn't have a

25         birth certificate.

Espinoza / Via excerpts of Deposition - Direct          167

1          "QUESTION:  Prior to January 8th, 2014, had you ever

2          had a copy of your birth certificate in your

3          possession?

4          "ANSWER:  No, ma'am.  No, ma'am.

5          "QUESTION:  And did you pay money to obtain this

6          birth certificate?

7          "ANSWER:  No, ma'am.

8          "QUESTION:  Did somebody else pay -- did somebody

9          else obtain this birth certificate for you?

10         "ANSWER:  Yes.

11         "QUESTION:  And do you know who that was?

12         "ANSWER:  Legal Aid.

13         "QUESTION:  And that's Texas Rio Grande Legal Aid?

14         "ANSWER:  Yes, ma'am.

15         "QUESTION:  Ms. Espinoza, do you currently live in

16         Raymondville?

17         "ANSWER:  Yes, ma'am.

18         "QUESTION:  And is that in Willacy County?

19         "ANSWER:  Yes, ma'am.

20         "QUESTION:  And what is your current address?

21         "ANSWER:  It's 575 West Tampico.

22         "QUESTION:  And for how long have you lived at that

23         address?

24         "ANSWER:  Since 1970.

25         "QUESTION:  And where did you live before that?

Espinoza / Via excerpts of Deposition - Direct          168

1     "ANSWER:  Before that?  I lived -- I lived in so many

2     places because my husband was a farm worker.

3     "QUESTION:  And are you currently registered to vote

4     in Texas?

5     "ANSWER:  I think so, yes.

6     "QUESTION:  Do you have a voter registration card?

7     "ANSWER:  Yes, ma'am.

8     "QUESTION:  And where did you attend school?

9     "ANSWER:  In Sullivan City.

10    "QUESTION:  And what level of education did you

11    complete?

12    "ANSWER:  Sixth grade.

13    "QUESTION:  And are you currently employed?

14    "ANSWER:  No, ma'am.

15    "QUESTION:  Have you ever been?

16    "ANSWER:  I'm disabled.

17    "QUESTION:  Sorry, okay.  Have you ever been

18    employed?

19    "ANSWER:  Yes.  I worked as a provider since 2000 --

20    I started in 2000 until 2005.

21    "QUESTION:  And when you say 'provider,' do you mean

22    childcare provider?

23    "ANSWER:  Adult.

24    "QUESTION:  Adult provider?

25    "ANSWER:  Yes.

Espinoza / Via excerpts of Deposition - Direct          169

1    "QUESTION:  Do you currently have a Texas driver's

2    license?

3    "ANSWER:  It expired.

4    "QUESTION:  Do you know when it expired?

5    "ANSWER:  It expired in 2009 because I -- I got sick.

6    I got -- I began getting sick in 2008 and I -- I had

7    several surgeries on my kidneys.  And then I was

8    recovering from that and I -- I had to have my knees

9    replaced, and it's been on and off with doctors.  So

10   I couldn't -- I couldn't renew my license because of

11   all my illnesses I've had.

12   "QUESTION:  Do you currently own a car?

13   "ANSWER:  I have a car, yes.

14   "QUESTION:  Is the title in your name?

15   "ANSWER:  Yeah, me and my daughter's.

16   "QUESTION:  Do you have a personal identification

17   card that was issued by the Department of Public

18   Safety?

19   "ANSWER:  Just my expired license.

20   "QUESTION:  Do you have a Texas license issued by the

21   Department of Public Safety which is for the purpose

22   of owning a concealed handgun?

23   "ANSWER:  No, no, no.

24   "QUESTION:  Do you have a passport?

25   "ANSWER:  No, ma'am.

Espinoza / Via excerpts of Deposition - Direct          170

1        "QUESTION:  Have you ever had a passport?

2        "ANSWER:  No, ma'am.

3        "QUESTION:  Did you vote in the March 4th, 2014

4        Democratic Primary?

5        "ANSWER:  Yes, I did.

6        "QUESTION:  Did you vote in person?

7        "ANSWER:  Yes, ma'am.

8        "QUESTION:  And how did you -- did you present a

9        photographic identification when you voted in person?

10       "ANSWER:  No.

11       "QUESTION:  Where did you vote in person?

12       "ANSWER:  At the library.

13       "QUESTION:  Did they ask you to present a

14       photographic identification?

15       "ANSWER:  They didn't ask me nothing.

16       "QUESTION:  Do you recall voting in the November 6th,

17       2012 general election?

18       "ANSWER:  Yes, ma'am.

19       "QUESTION:  And did you vote in person?

20       "ANSWER:  In person always.

21       "QUESTION:  Have you ever voted by mail?

22       "ANSWER:  No, ma'am.

23       "QUESTION:  When did you first register to vote?

24       "ANSWER:  I don't remember.

25       "QUESTION:  And do you know since you've been

Espinoza / Via excerpts of Deposition - Direct          171

1    registered to vote how many times have you voted?

2    "ANSWER:  No, ma'am, I don't remember.

3    "QUESTION:  Did you vote every year?

4    "ANSWER:  Yes.

5    "QUESTION:  And why is it important for you to be

6    able to vote in Texas?

7    "ANSWER:  Because I always voted, and I don't know

8    how come if I'm -- it doesn't mean that because I'm

9    poor or I don't have enough money or I'm a Mexican

10   that I can't be able to vote like everyone else.

11   "QUESTION:  Do you recall how you found out that it

12   was possible to register to vote?

13   "ANSWER:  Well, my parents would talk to us about

14   that, and they would tell us it was very important

15   for us to -- to vote.

16   "QUESTION:  Do you agree that your Texas driver's

17   license expired January 16th, 2009?

18   "ANSWER:  Yes, ma'am.

19   "QUESTION:  And do you agree that you no longer drive

20   and have no need to renew your driver's license or

21   obtain any other identification?

22   "ANSWER:  Yes.

23   "QUESTION:  And if you take a look down at Number 76,

24   do you agree it says" --

25   **MS. VAN DALEN:**  And your Honor, that's referring to

Espinoza / Via excerpts of Deposition - Direct          172

1    the Complaint in this lawsuit.

2             "QUESTION:  It says, 'Ms. Espinoza does not have the

3             documents required to obtain an election

4             identification certificate'?  Do you agree with that

5             statement?

6             "ANSWER:  Yes, ma'am.

7             "QUESTION:  Do you have a copy of your marriage

8             license?

9             "ANSWER:  I've lost it.

10            "QUESTION:  And are you aware of what an election

11            identification certificate is?

12            "ANSWER:  (No audible response)

13            "QUESTION:  Are you?

14            "ANSWER:  No, ma'am.

15            "QUESTION:  And can you tell me a little bit about

16            what you understand the lawsuit to be about?  And I'm

17            going to precursor your counsel's objection.  I don't

18            want you to tell me anything that your counsel has

19            told you.  That is just your -- this is just your own

20            understanding.

21            "ANSWER:  About what?

22            "QUESTION:  Why you're here today.

23            "ANSWER:  Well, because it's concerning -- I

24            understand that it's because I -- I want to vote, and

25            I don't know if I'm going to be able to.

Espinoza / Via excerpts of Deposition - Direct          173

1          "QUESTION:  Are you aware that in Willacy County you

2          can obtain a free photo identification for purposes

3          of voting at the county office?

4          "ANSWER:  No, I don't know.

5          "QUESTION:  And do you know approximately how far the

6          DPS office in Harlingen is from your home?

7          "ANSWER:  From here?  Twenty miles.

8          "QUESTION:  If you take a look at allegation 77" --

9          **MS. VAN DALEN:**  Again referring to the Plaintiffs'

10 Complaint.

11          "QUESTION:  Would you agree that there's no need for

12          you to obtain a delayed birth certificate because you

13          now possess a copy of your birth certificate?

14          "ANSWER:  To get another one you mean?  Yes, because

15          some -- some of the answers are incorrect.

16          "QUESTION:  Let's take a look at allegation 76.  I

17          think you had said that -- well, the allegation reads

18          you were born on a ranch in Starr County, Texas in

19          1944 in a birth that was not attended by a physician?

20          "ANSWER:  Right.  Yes, ma'am.

21          "QUESTION:  Is it your contention in this lawsuit

22          that your ability to vote has been infringed on by

23          the state of Texas?

24          "ANSWER:  Yes, ma'am.

25          "QUESTION:  And do you know the forms of

Espinoza / Via excerpts of Deposition - Direct          174

1          identification that you need to show in order to be

2          able to vote in Texas?

3          "ANSWER:  No, ma'am.

4          "QUESTION:  And I think you testified that you -- you

5          don't know that there's a free identification that's

6          available to people who don't have a current driver's

7          license?

8          "ANSWER:  No.

9          "QUESTION:  I think you had testified earlier that

10          your birth date is January 6th, 1944, which is

11          different from the date on your birth certificate.

12          How do you know that the January 16th date is the

13          correct date?

14          "ANSWER:  Because that's the date of birth that's in

15          my baptism papers.

16          "QUESTION:  Do you still have your baptism papers?

17          "ANSWER:  Yes, ma'am."

18          **MS. VAN DALEN:**  Your Honor, that completes the

19  reading.

20          **THE COURT:**  Okay.

21          **MR. TATUM:**  Stephen Tatum for the Defendants, your

22  Honor.  Jennifer Roscetti reading the part of Ms. Espinoza.

23  //

24  //

25  //

1                   **EXAMINATION OF ESTELA GARCIA ESPINOZA**

2                   **BY EXCERPTS OF DEPOSITION TESTIMONY**

3        **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY MS. ROSCETTI)**

4                   "QUESTION:  And are you 69 years old?

5                   "ANSWER:  I'm 70.

6                   "QUESTION:  And is the car registered in Texas?

7                   "ANSWER:  Yes, ma'am.

8                   "QUESTION:  Do you currently have in your

9              possession -- and I don't mean with you today.  I

10             mean in your home -- the title for the car and the

11             registration for the car?

12                  "ANSWER:  Yes, ma'am.  Yes, ma'am.

13                  "QUESTION:  Do you have in your possession

14             documentation which relates to the financing of the

15             car?

16                  "ANSWER:  Yes, ma'am.

17                  "QUESTION:  And it says the 2014 March Democratic

18             Primary.  Did you vote in the March 4th, 2014

19             Democratic Primary?

20                  "ANSWER:  Yes, I did.

21                  "QUESTION:  Did you vote in person?

22                  "ANSWER:  Yes, ma'am.

23                  "QUESTION:  And how did you -- did you present a

24             photographic identification when you voted in person?

25                  "ANSWER:  No.

1       "QUESTION:  Where did you vote in person?

2       "ANSWER:  At the library.

3       "QUESTION:  Did they ask you to present a

4       photographic identification?

5       "ANSWER:  They didn't ask me nothing.

6       "QUESTION:  And if you -- if you take a look under

7       activity type, which I guess is three columns over to

8       the right, and it says EV.  Do you know whether you

9       voted early in that election or did you vote on

10      election day?

11      "ANSWER:  It was early.

12      "QUESTION:  And how did you get to Reber Memorial

13      Library to vote?

14      "ANSWER:  My daughter drive me.

15      "QUESTION:  And do you know if the name on your voter

16      registration card is spelled correctly, if your name

17      is spelled correctly on your voter registration card?

18      "ANSWER:  Yes, ma'am.

19      "QUESTION:  Do you have homeowner's insurance?

20      "ANSWER:  Yes, ma'am.

21      "QUESTION:  And do you have a policy -- a copy of the

22      policy for that insurance?

23      "ANSWER:  Yes, ma'am.

24      "QUESTION:  And is the homeowner's insurance that you

25      have, is that current?

1        "ANSWER:  Yes, ma'am.

2        "QUESTION:  It's the number, but is it also a social

3        security card?

4        "ANSWER:  Yes, ma'am.

5        "QUESTION:  And this is a copy, obviously, because

6        this is what was given to us by your counsel; but do

7        you have the original of this document?

8        "ANSWER:  Yes, ma'am.

9        "QUESTION:  And I know you said that your driver's

10       license expired in 2009.  Do you still have a

11       physical copy of the actual driver's license that

12       expired?

13       "ANSWER:  Yes, ma'am.

14       "QUESTION:  And do you have a Medicare or Medicaid

15       card?

16       "ANSWER:  Yes, ma'am.

17       "QUESTION:  And which one?

18       "ANSWER:  I have both.

19       "QUESTION:  Do you know that Texas has a requirement

20       requiring certain forms of identification to be

21       presented to vote in person?

22       "ANSWER:  No.

23       "QUESTION:  So you don't know what an election

24       identification certificate is?

25       "ANSWER:  No, ma'am.

Espinoza / Via excerpts of Deposition - Cross          178

1          "QUESTION:  If there was a way for you to obtain a

2          free form of identification in order to vote, is that

3          something that you would want to obtain?

4          "ANSWER:  Sure.

5          "QUESTION:  Is that something that you have tried to

6          obtain?

7          "ANSWER:  No, ma'am.

8          "QUESTION:  Do you know generally where is North

9          Third in Raymondville?

10         "ANSWER:  Yes, I do.

11         "QUESTION:  Assuming that you could obtain a free

12         photo identification from the state of Texas, would

13         you be willing to travel to a county office in order

14         to obtain that?

15         "ANSWER:  Sure.  Yes, ma'am.

16         "QUESTION:  And how would you get there?

17         "ANSWER:  My daughter would take me.

18         "QUESTION:  And when you renewed it, did you go to a

19         DPS office to do that?

20         "ANSWER:  Yes, ma'am.  Yes, ma'am.

21         "QUESTION:  And just for the record when I say 'DPS,'

22         I mean Department of Public Safety.

23         "ANSWER:  Yes, ma'am.

24         "QUESTION:  And which DPS office did you go to?

25         "ANSWER:  In Harlingen.

1      "QUESTION:  And do you know approximately how far the

2      DPS office in Harlingen is from your home?

3      "ANSWER:  From here?  Twenty miles.

4      "QUESTION:  And how would you get to that DPS office?

5      "ANSWER:  I would drive.

6      "QUESTION:  When you go out did you say -- I think

7      you testified your daughter will drive you places?

8      "ANSWER:  Yes, ma'am.

9      "QUESTION:  And if you look at 77, it states that you

10     don't have a car.  But this is actually changed now.

11     You do have a car, correct?

12     "ANSWER:  Yes, ma'am.

13     "QUESTION:  Assuming you had the documentation to

14     obtain the free form of identification which would

15     allow you to vote, would you still believe that your

16     rights are being infringed -- are being affected by

17     the state of Texas?

18     "ANSWER:  No.

19     "QUESTION:  Do you support the idea that only

20     registered voters should be allowed to vote?

21     "ANSWER:  Yes.

22     "QUESTION:  When a person shows up to the polling

23     place, when they go to the library to vote and they

24     say, 'I am John Doe, I am so-and-so,' do you think

25     it's important that they actually are John Doe and

Espinoza / Via excerpts of Deposition - Cross          180

1          not using someone else's name to vote?

2          "ANSWER:  Yes.

3          "QUESTION:  And why do you think that's important?

4          "ANSWER:  Because you're not supposed to lie.  You're

5          supposed to say who you are.

6          "QUESTION:  Do you think that lying and saying you're

7          somebody else when you go to vote, do you think that

8          should -- do you think that that should be illegal?

9          "ANSWER:  No, ma'am.  Could be -- what?  Illegal?

10         Yes.

11         "QUESTION:  Do you think that asking somebody to show

12         photographic identification would be one way to stop

13         that kind of behavior?

14         "ANSWER:  Right.  Yes, ma'am.

15         "QUESTION:  And if you knew that everyone who went to

16         the polls had to show photo ID, would that give you

17         more confidence in the voting system?

18         "ANSWER:  Yes, ma'am.  Yes, ma'am.

19         "QUESTION:  Have you ever spoken to anyone who is

20         affiliated with LUPE?

21         "ANSWER:  No.

22         "QUESTION:  Have you ever volunteered for them?

23         "ANSWER:  No, ma'am.

24         "QUESTION:  And are you a member of LUPE?

25         "ANSWER:  No, ma'am.

Espinoza / Via excerpts of Deposition - Cross          181

1          "QUESTION:  Have you ever made a donation to LUPE?

2          "ANSWER:  No, ma'am.

3          "QUESTION:  Have you ever visited their website?

4          "ANSWER:  No, ma'am.

5          "QUESTION:  And has anyone from LUPE ever offered you

6          help in registering to vote?

7          "ANSWER:  No, ma'am.

8          "QUESTION:  Have they ever offered you help to obtain

9          a driver's license or photo identification in order

10         to vote?

11         "ANSWER:  No, ma'am.

12         "QUESTION:  And do you recognize Exhibit 6, 7 and 8?

13         "ANSWER:  Yes.

14         "QUESTION:  Are these documents from your files or

15         are these copies of documents that you have in your

16         possession?

17         "ANSWER:  Yes, ma'am.

18         "QUESTION:  So that's the Estela Espinoza that's

19         referenced -- that's referred to in each of these

20         documents?

21         "ANSWER:  Yes, ma'am.

22         "QUESTION:  Is you?

23         "ANSWER:  Yes, ma'am.

24         "QUESTION:  So you do not agree that this is an IRS

25         Form 1099.

Espinoza / Via excerpts of Deposition - Cross          182

1          "ANSWER:  From 1999?

2          "QUESTION:  Sorry.  No, 1099.  It's just a type of

3          IRS form that they use.

4          "ANSWER:  Oh, okay.

5          "QUESTION:  I didn't mean to testify.

6          "ANSWER:  Oh, yeah.  Yes, ma'am.

7          "QUESTION:  Are you paying your attorneys any fees?

8          "ANSWER:  No, ma'am.

9          "QUESTION:  Sure.  We talked a little bit about the

10         law that requires you to show certain forms of

11         photographic identification in order to vote today.

12         And do you personally think that the law that

13         requires that photographic identification was enacted

14         with a purpose to discriminate against certain groups

15         of people?

16         "ANSWER:  No.

17         "QUESTION:  How many children do you have?

18         "ANSWER:  I have five.

19         "QUESTION:  Do they all drive cars?

20         "ANSWER:  No.

21         "QUESTION:  How many of them drive cars?

22         "ANSWER:  Four.

23         "QUESTION:  And do the four that drive cars do they

24         live close nearby to you in Raymondville?

25         "ANSWER:  Just three.

1              "QUESTION:  And do those three, do they give you

2              rides places?

3              "ANSWER:  Yes."

4         **MR. FREEMAN:**  No more questions, your Honor.

5         **THE COURT:**  All right.  Let's go ahead and break for

6    lunch.  If you all want to return at 1:10.  You can be excused.

7         **(A recess was taken from 12:04 p.m. to 1:08 p.m.; parties**

8    **present)**

9         **THE MARSHAL:**  All rise.

10        **MR. ROSENBERG:**  Good afternoon, your Honor.  Ezra

11   Rosenberg.  Just briefly to give you an update on, first, the

12   issue that was raised this morning.  The parties met I guess

13   for about 40 minutes.  We are still in discussions.  We're

14   going to continue discussions after the close of trial today.

15        **THE COURT:**  Okay.

16        **MR. ROSENBERG:**  And we hope to come up with a

17   workable solution.

18        **THE COURT:**  Okay.  Next witness?

19        **MS. FARANSSO:**  Good afternoon, your Honor.  Tania

20   Faransso on behalf of the Texas League and Imani Clark.  The

21   next witness is Imani Clark and my colleague, Leah Aden, will

22   be reading the part of Ms. Clark.

23        May I approach?

24        **THE COURT:**  Yes.

25   //

1              **EXAMINATION OF IMANI CLARK**

2           **BY EXCERPTS OF DEPOSITION TESTIMONY**

3    **(QUESTIONS READ BY MS. FARANSSO; ANSWERS READ BY MS. CLARK)**

4              "QUESTION:  Are you currently registered to vote in

5              Texas?

6              "ANSWER:  Yes, I am.

7              "QUESTION:  Okay.  And when did you register to vote

8              in Texas?

9              "ANSWER:  In 2010.

10             "QUESTION:  Okay.  And what's your current Texas

11             address?

12             "ANSWER:  I live in University Village on the campus

13             of Prairie View A&M University.

14             "QUESTION:  And you're a student here at Prairie View

15             A&M University.  Is that correct?

16             "ANSWER:  Correct.

17             "QUESTION:  Okay.  And when are you set to graduate?

18             "ANSWER:  My expected graduation date is May 2016.

19             "QUESTION:  And when did you start here at Prairie

20             View A&M?

21             "ANSWER:  I started in August of 2010.

22             "QUESTION:  Why did you decide to intervene in this

23             suit?

24             "ANSWER:  Because I feel strongly about the way that

25             SB 14 will affect me, as well as others.

1              "QUESTION:  And how will SB 14 affect you?

2              "ANSWER:  SB 14 will prevent me from being able to

3              vote with my California state ID or any other

4              identification that I may have.

5              "QUESTION:  And how did you feel -- did you feel that

6              when SB 14 went into effect this summer and when you

7              learned of that fact, did you feel the same way?  Did

8              you feel that it would affect you then?

9              "ANSWER:  Yes.

10             "QUESTION:  Can you tell me what forms of

11             identification you do currently possess?

12             "ANSWER:  Yes.  I have a California state issued ID,

13             a California driver's license, a birth certificate,

14             as well as a Social Security card.

15             "QUESTION:  Do you also have a Prairie View A&M

16             student ID card?

17             "ANSWER:  Yes, I do.

18             **MS. FARANSSO:**  And for the record, your Honor, the

19     next excerpt refers to Paragraphs Number 9 and 10, that refers

20     to Paragraphs 9 and 10 of the Amended Complaint filed by the

21     Texas League and Imani Clark and that is Plaintiffs'

22     Exhibit 971.

23             "QUESTION:  And scrolling down to Number 9, would you

24             please read that sentence for me?

25             "ANSWER:  Yes.  Ms. Clark is a lawfully registered

1      Black voter in Waller County, where she resides and

2      is a student at Prairie View A&M University, a

3      historically Black public university and the second

4      oldest public institution of higher education in

5      Texas.

6      "QUESTION:  Is that a true statement?

7      "ANSWER:  Yes, it is.

8      "QUESTION:  Okay.  And if you wouldn't mind looking

9      at Number 10 and reading that sentence for me or

10     those two sentences for me, as well.

11     "ANSWER:  Ms. Clark has previously voted in person in

12     Texas using her Prairie View A&M University student

13     identification, but does not possess any of the photo

14     IDs required under SB 14 for in-person voting.

15     Acquiring such forms of photo identification would be

16     unduly burdensome for Ms. Clark.

17     "QUESTION:  Is that a true statement?

18     "ANSWER:  Yes, it is.

19     "QUESTION:  Okay.  When did you use your Prairie View

20     A&M student ID to vote, do you remember?

21     "ANSWER:  I believe it was in 2010.

22     "QUESTION:  Do you remember what election it was for?

23     "ANSWER:  I believe it was the city election.

24     "QUESTION:  City of Prairie View?

25     "ANSWER:  Yes.

Clark / Via excerpts of Deposition - Direct          187

1        "QUESTION:  And can you please tell me why acquiring

2        such forms of photo ID would be unduly burdensome?

3        "ANSWER:  Because I do not have any, I believe you

4        can say, forms of transportation or time throughout

5        my schedule to retrieve these forms.

6        "QUESTION:  Okay.  Do you have a Texas driver's

7        license?

8        "ANSWER:  No, I do not.

9        "QUESTION:  Okay.  Have you ever?

10       "ANSWER:  No, I have not.

11       "QUESTION:  Have you ever had a Texas personal

12       identification card?

13       "ANSWER:  No, I have not.

14       "QUESTION:  Okay.  And do you currently have one?

15       "ANSWER:  No, I do not.

16       "QUESTION:  Do you have a Texas concealed handgun

17       license?

18       "ANSWER:  No, I do not.

19       "QUESTION:  Do you have a United States military

20       identification card?

21       "ANSWER:  No, I do not.

22       "QUESTION:  Do you have a United States citizenship

23       certificate or certificate of naturalization?

24       "ANSWER:  No, I do not.

25       "QUESTION:  You mentioned earlier that you are

Clark / Via excerpts of Deposition - Direct            188

1      registered to vote in Texas.  Have  you ever

2      registered to vote anywhere else?

3      "ANSWER:  No, I have not.

4      "QUESTION:  Okay.  And do you know how many elections

5      you voted in?

6      "ANSWER:  Two.

7      "QUESTION:  And what were those?

8      "ANSWER:  The first was the city elections in 2010.

9      The second was the latest presidential election.

10     "QUESTION:  And you voted here in Texas for both of

11     those elections?

12     "ANSWER:  Correct.

13     "QUESTION:  Do you know where you want to live after

14     graduation?

15     "ANSWER:  No, I do not.

16     "QUESTION:  Do you plan to stay in Texas?

17     "ANSWER:  I do not know.

18     "QUESTION:  Would you like to return to California?

19     "ANSWER:  I do not know.

20     "QUESTION:  Okay.  Can you explain to me specifically

21     what bothers you about the SB 14 voter ID law?

22     "ANSWER:  What bothers me the most is that when I

23     first attended Prairie View there was no problem with

24     me voting with my student ID, and now there's an

25     issue with me using that, as well as my California

1        state ID.  And I feel as though it should never have

2        been an issue to begin with and I feel like it's just

3        a way to prevent minorities, African-Americans and

4        Latinos, from voting in any elections.

5        "QUESTION:  Okay.  Why do you feel that way?

6        "ANSWER:  I feel that way because I believe it's

7        taking people's freedom from being able to vote.  I

8        feel like it's a privilege to be able to vote.

9        "QUESTION:  And can you specify the obstacles that

10        the voter ID law places between you and voting?

11        "ANSWER:  I feel as though it's -- it's a lot of work

12        for me to be able to go to the DPS and retrieve these

13        forms simply because of the fact that I am a full-

14        time student, you know, with a job and

15        extracurricular activities and I just really don't

16        have time in my schedule to retrieve these forms.

17        And I feel as though if things go back to the way

18        they were with students and any citizens being able

19        to vote with, whether it's a student ID or a state

20        issued ID, that that should be fine, it shouldn't be

21        a problem."

22        **MS. FARANSSO:**  Your Honor, that concludes the

23 reading.

24        **MR. TATUM:**  Steven Tatum for the Defendants,

25 your Honor, and reading the part of Ms. Clark, as always, is

Clark / Via excerpts of Deposition - Cross                 190

1   Ms. Roscetti.  And I just want to bring your attention to the

2   second page, there's a portion there that for whatever reason

3   got left out, so when we get there we'll just read it from the

4   screen.  It's on Page 3.

5                    **EXAMINATION OF IMANI CLARK**

6                **BY EXCERPTS OF DEPOSITION TESTIMONY**

7     **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY MS. ROSCETTI)**

8             "QUESTION:  Okay.  And you're a student here at

9             Prairie View A&M University.  Is that correct?

10            "ANSWER:  Correct.

11            "QUESTION:  Why did you want to get a California

12            driver's license?

13            "ANSWER:  I wanted to get one so that I would be able

14            to drive while I was home in California for the

15            break.

16            "QUESTION:  Do you remember what day you got this

17            California license, what day it was issued?

18            "ANSWER:  No.

19            "QUESTION:  Can you look at the very bottom of the

20            card, please, on the bottom right corner?

21            "ANSWER:  Okay.

22            "QUESTION:  Can you read the issuance date?

23            "ANSWER:  January 10th, 2014.

24            "QUESTION:  Is there a reason that you chose to get a

25            California driver's license instead of a Texas

1      driver's license?

2      "ANSWER:  Yes.

3      "QUESTION:  And what was that reason?

4      "ANSWER:  Because I'm not sure where I will be after

5      school.  Most likely I will be in the state of

6      California.

7      "QUESTION:  So you think you want to move back to

8      California after you graduate.  Is that correct?

9      "ANSWER:  Yes.

10     "QUESTION:  Were you aware at the time that you got

11     your California driver's license that the Texas

12     driver's license qualifies as one of the types of

13     identification under the Texas voter ID law that you

14     can use to vote in Texas?

15     "ANSWER:  Yes.

16     "QUESTION:  Can you tell me what forms of

17     identification you do currently possess?

18     "ANSWER:  Yes.  I have a California state issued ID,

19     a California driver's license, a birth certificate,

20     as well as a Social Security card.

21     "QUESTION:  And is this an accurate copy of your

22     Prairie View A&M University student ID card?

23     "ANSWER:  Yes, it is.

24     "QUESTION:  So you've agreed that you have the docs,

25     the documents, to obtain an election identification

1          certificate.  Correct?

2          "ANSWER:  Yes.

3          "QUESTION:  Do you want an ID under the voter -- that

4          would allow you to vote in Texas under the voter ID

5          law?

6          "ANSWER:  I don't know.

7          "QUESTION:  Okay.  Do you have a Texas driver's

8          license?

9          "ANSWER:  No, I do not.

10         "QUESTION:  Okay.  Have you ever?

11         "ANSWER:  No, I have not.

12         "QUESTION:  Okay.  Do you want one?

13         "ANSWER:  I don't know.

14         "QUESTION:  What do you mean by you don't know?

15         "ANSWER:  I'm not sure if I will need one while I'm

16         here.  No, I do not.

17         "QUESTION:  Okay.  And do you want one?

18         "ANSWER:  I don't know.

19         "QUESTION:  And what does that mean?

20         "ANSWER:  I'm not sure if I will need one.

21         "QUESTION:  For what purpose?

22         "ANSWER:  Purposes of just living in the state of

23         Texas.

24         "QUESTION:  Do you want to obtain an election

25         identification certificate?

Clark / Via excerpts of Deposition - Cross                193

1        "ANSWER:  I don't know.

2        "QUESTION:  Okay.  Are you aware that the closest DPS

3        office is in Hempstead, about 5 or 6 miles away?

4        "ANSWER:  No, I do not.

5        "QUESTION:  What if you're going off campus, what

6        form of transportation do you use?

7        "ANSWER:  I would use a friend's vehicle.

8        "QUESTION:  When you say you will use a friend's

9        vehicle, what does that mean?

10       "ANSWER:  Meaning they will drive me.

11       "QUESTION:  Were you aware that Texas held a primary

12       election in 2014?

13       "ANSWER:  Yes.

14       "QUESTION:  Did you want to vote in that election?

15       "ANSWER:  No, I did not.

16       "QUESTION:  Why not?

17       "ANSWER:  Because I was not interested in voting

18       during that election.

19       "QUESTION:  So if you're not a resident of Texas,

20       what state are you a resident of?

21       "ANSWER:  California.

22       "QUESTION:  Okay.  Do you support the idea that the

23       State of Texas should make sure that the individuals

24       who show up at the polls to vote are who they say

25       they are?

1      "ANSWER:  Yes.

2      "QUESTION:  Okay.  And what is your understanding --

3      what is your understanding of what voter fraud is?

4      "ANSWER:  I believe that it is pretty much somebody

5      that is pretending to be someone that they're not in

6      order to vote.

7      "QUESTION:  Okay.  Do you think that requiring voters

8      to show a photo ID at the polls will help detour

9      voter fraud?

10      "ANSWER:  Yes.

11      **MR. TATUM:**  And the section we will read from the

12  screen.

13      "QUESTION:  Okay.  Would it give you more confidence

14      in the voting system to know that everyone was

15      showing a photo ID of themselves when they show up to

16      vote?

17      "ANSWER:  Yes.

18      "QUESTION:  Okay.  And you previously stated that you

19      will be here over the summer.  Is that correct?

20      "ANSWER:  Yes, it is.

21      "QUESTION:  And you previously stated that you,

22      particularly for the second session, only have one

23      class.  Is that correct?

24      "ANSWER:  Yes.

25      "QUESTION:  And you do not have a job set up yet.  Is

Clark / Via excerpts of Deposition - Cross                    195

1              that correct?

2              "ANSWER:  Not yet, correct.

3              "QUESTION:  And you were here over spring break.  Is

4              that correct?

5              "ANSWER:  Yes."

6              **MR. TATUM:**  Nothing further, your Honor.

7              **THE COURT:**  Okay.

8              **MR. ROSENBERG:**  May we have the judicial notice Order

9    that was ECF 396 pulled up on the screen, please?

10             And your Honor, Ezra Rosenberg, I'd just like to read

11   a few paragraphs of this Order that granted judicial notice to

12   certain facts.

13             And flip to the second page, please.

14             And again, this is ECF 396, Paragraph 4.

15             "Among non-Hispanic White persons of voting age,

16             19.4 percent are age 65 or older; 1,760,065 divided

17             by 9,074,684.

18             "Among Hispanic persons of voting age, 8.7 percent

19             are age 65 or older; 532,921 divided by 6,143,144.

20             "Among non-Hispanic Black persons of voting age,

21             10.6 percent are age 65 or older; 220,837 divided by

22             2,076,282."

23             And I think at this point -- let me just check with

24   cocounsel.  At this point, subject to a few open items,

25   your Honor, including the date issue, we talked about cleaning

1  up the exhibits, so the record is open but in terms of

2  additional live testimony or affirmative readings, the

3  Plaintiffs are collectively resting.

4      **(Plaintiffs rest)**

5          **THE COURT:**  Okay.

6          **MR. DONNELL:**  Your Honor, if we could have a couple

7  of minutes.  I don't think Mr. Scott anticipated that the

8  resting would come as soon as it did, because he's right

9  outside.

10     **(Pause)**

11         I think we anticipated, your Honor, that the

12 opposition was going to read more than they have read, so….

13         **THE COURT:**  Okay.

14     **(Pause)**

15         **MR. SCOTT:**  Your Honor, my witness ran to the

16 restroom.  He asked me was he going to be on the stand long and

17 I said I hope not.  I apologize.

18     **(Pause)**

19         **MR. SCOTT:**  The Defendants are going to call Tony

20 Rodriguez --

21         **THE COURT:**  All right.

22         **MR. SCOTT:**  -- of the department of Public Safety.

23         **THE COURT:**  Good afternoon, sir.  If you'll raise

24 your right hand.

25 //

1      **DEFENDANTS' WITNESS, MANUEL ANTONIO RODRIGUEZ, SWORN**

2          **THE COURT:**  You can have a seat.

3                          **DIRECT EXAMINATION**

4   **BY MR. SCOTT:**

5   Q    Good afternoon, Mr. Rodriguez.  Would you introduce

6   yourself to the Court?

7   A    My name is Manuel Antonio Rodriguez.

8   Q    How old a man are you?

9   A    Sir, I'm 53 years old.

10  Q    Tell the Court a little bit about yourself, background.

11  A    Yes, sir.  I was born in Seattle, Washington.  I come from

12  an academic family.  My parents had an academic background.  As

13  a result, I've traveled around the United States extensively.

14  Joined the Army in 1983.  I have a 30 year Army career.  And I

15  joined the Department of Public Safety in January of 2012.

16  Q    So let's break that up a little bit.  Tell me a little bit

17  about your mom.

18  A    My mom's from Washington state, or was from Washington

19  state.  Her parents owned a grocery store on the Olympic

20  Peninsula and they ran that for a number of years.

21  Q    How about your dad?

22  A    My dad's from South America, from Peru.  He left

23  South America, he came up to the United States on a tramp

24  steamer.  He only had enough money to go to California.  Some

25  folks on the boat gave him some money so he could go to

1    Washington state so he could attend the University of

2    Washington, where he started studying entomology.  He got a

3    Master's degree in entomology.  And he put himself through

4    college ironing shirts and picking chicken eggs.  He

5    subsequently changed degrees and he traveled to Harvard.  He

6    got a Master's degree from Harvard.  He has a Ph.D. from the

7    University of Michigan.  He's known -- or was known before he

8    retired as an expert in the printing press and in the book *In*

9    *the New World*.

10   Q     You started your military career when?

11   A     Well, I signed my contract with the Army in 1980.  I

12   attended Airborne School prior to that.  I joined the Army.  I

13   received my commission in 1983.  I had an ROTC commission.  I

14   was assigned as a --as an armor officer.  My first duty

15   assignment was F School, was Fort Hood, Texas, where I served

16   in the 1st Cavalry Division.  Subsequently I was assigned as a

17   brigade logistics officer or assistant logistics officer.  I

18   had a tour, short tour of duty in Honduras as a base defense

19   officer.  I was re-branched to Military Intelligence.  I was

20   sent to Military Intelligence School.  I went through the

21   transition course, the officer advance course, the

22   interpretation course.  I was assigned after my advance course

23   to a cavalry squadron in Germany.  I was the squadron

24   intelligence officer on the inter-zonal German border and I did

25   that for three years.  Well, I was an intelligence officer for

Rodriguez - Direct / By Mr. Scott                    199

1    a year and a half and I commanded a troop for a year and a

2    half.  I asked to and I was allowed to stay overseas.  I was a

3    brigade intelligence officer from roughly June of 1992 until

4    the brigade was deactivated in January of 1994.  I served as a

5    intelligence operations officer in the 3rd Infantry Division

6    headquarters.

7              And then after that I went to Fort Leavenworth,

8    Kansas.  I attended the Command and General Staff College at

9    Fort Leavenworth and the School of Advanced Military Studies,

10   also at Fort Leavenworth, Kansas.  I was assigned after that to

11   the 1st Cavalry Division, Fort Hood and I was a division plans

12   officer, intelligence plans officer, for probably about a year.

13   I deployed to Bosnia with an intelligence battalion.  That was

14   in '98/'99.  When I returned from Bosnia I was assigned as the

15   executive officer for the 504th Military Intelligence Brigade,

16   also at Fort Hood.  I did that for a year, promoted to

17   Lieutenant Colonel.  I applied for a position as a professor of

18   military science.  The Army sent me to South Dakota.  I was a

19   PMS for the University of South Dakota for probably about two

20   years and then I returned back to the active Army or a unit in

21   the Army as the GTU or the intelligence war plans officer for

22   the 3rd Corps, Fort Hood.

23   Q    And so you at some point retired from the United States

24   Army, honorable discharge?

25   A    Yes, sir.

Rodriguez - Direct / By Mr. Scott                          200

1   Q    And what year, again, was that?

2   A    That was June of 2005.

3   Q    And your rank?

4   A    When I retired from active duty I was a Lieutenant

5   Colonel.

6   Q    And did you remain in the Reserves?

7   A    Well, when you retire from active duty you are placed into

8   a reserve status.  In March of 2006 I joined the Texas State

9   Guard and I was promoted to the rank of Colonel and I assumed

10  command of a civil affairs regiment in Gatesville, which is

11  near my home.  I did that for about four years, short of four

12  years.  And I was moved to headquarters, where I was a

13  personnel officer.  I was promoted to Brigadier General and I

14  believe I was probably a Brigadier for about 15 months and then

15  I was promoted to Major General, which is the capacity that I

16  serve in now.

17  Q    You're currently a Major General in Texas?

18  A    In the Texas State Guard, yes, sir.

19  Q    So you, as part and parcel, I guess, of that job are

20  allowed to have a full-time job with the Department of Public

21  Safety, is that correct?

22  A    Yes, sir.  The Texas State Guard is a non-paying

23  assignment, unless I'm activated for some reason.

24  Q    And what is your job title with the Department of Public

25  Safety?

1    A    In the Department of Public Safety I'm a senior manager in

2    the driver license division.  I'm responsible for -- if you

3    were to take a line and draw it from Fort Worth to Houston, I'm

4    responsible for all the offices that are west of that line.

5    Q    Who's in charge at the Department of Public Safety for

6    those offices east of that line?

7    A    That's Steve Bell, Steven Bell.

8    Q    He's got identical job responsibilities to you for that

9    portion of the state, correct?

10   A    Yes, sir.  The only difference is geography.

11   Q    How many people and -- first, how many offices are in your

12   region?

13   A    I've got about 130, about --

14   Q    And with regard to number of people that you manage in

15   those offices?

16   A    About 600.

17   Q    Now, let's break something down.  Let's start before the

18   implementation of SB 14.

19        Did you have the job that you just described with the

20   Department of Public Safety?

21   A    No, sir.

22   Q    Well, prior to June of 2013 you were in charge of those

23   offices, same offices, correct?

24   A    Yes, sir.  I'm still in charge of those offices.

25   Q    After June of 2013 you got some added responsibilities and

1    we'll talk about that in a minute.  But let's talk about the

2    responsibilities as you held with those offices before that

3    date in June of 2013.

4            What were you doing in those field offices or what

5    was the Department of Public Safety doing in those field

6    offices you managed?

7    A    Well, I was responsible for to oversee the day-to-day

8    operations of those offices.  So customer complaints that were

9    escalated, I'd help resolve, technology issues or connotating

10   issues with the systems that we had in the offices, fielding of

11   new equipment, the day-to-day administration, promotions,

12   raises, those kinds of things.

13   Q    Were the Department of Public Safety offices you were in

14   charge of issuing driver's licenses before June of 2013?

15   A    Yes, sir.

16   Q    Same thing with personal identification certificates?

17   A    Yes, sir.

18   Q    Help me understand something.  There's something called a

19   personal identification certificate, there is an election

20   identification certificate, and there's a driver's license.

21   Are they all simply a -- and I'll pull mine out here and hold

22   it up for the Court.  They all simply look just like a driver's

23   license card, correct?

24   A    Yes, sir.  They're all plastic cards.

25   Q    And whether it's referred to as a certificate or not, it

1   really is a card?

2   A    Yes, sir.

3   Q    Okay.  How was it you became familiar with SB 14?

4   A    Well, I was asked by my chain of command to be the project

5   manager for the election certificate.

6   Q    What day were you asked to do that job?

7   A    That was June 26th, 2013.

8   Q    And what day was it implemented?

9   A    I believe it was the day before.  I believe it was

10  June 25th.

11  Q    And from your standpoint, you came into it and were

12  attempting to deal with the issue of implementing the election

13  ID certificate on a statewide basis and on an almost

14  instantaneous basis, correct?

15  A    I was asked to take it and implement it immediately, yes.

16  Q    Now, you didn't come into it without some infrastructure

17  already set up in place, is that correct?

18  A    The technical infrastructure, the design of the card,

19  supporting forms, by and large, already had been created and

20  were in place when I assumed control.

21  Q    And who had done that?

22  A    Well, I don't know the specifics.  I know that assistant

23  director Rebecca Gaveo (phonetic) was in charge prior to that

24  and she had overseen the majority of those preparations.

25  Q    Were there already some administrative rules in place for

Rodriguez - Direct / By Mr. Scott                    204

1   the issuance of election ID cards?

2   A    Yes, sir.

3   Q    And those were something that you took on starting in

4   June, when you were put in charge of this program, correct?

5   A    Yes, sir.

6   Q    So take us through a little bit about what your first

7   steps were when you were given the task.

8   A    Well, I can't remember exactly, but I know that I

9   communicated with the regional managers in the field and we

10  told them that we were going to be doing -- we were going to be

11  issuing election certificates.  I know that I needed to get a

12  hold of the IT people to enable the system to allow it to issue

13  EICs, and so our driver license system, I call it DLS.

14  Q    Prior to June of 2013, if a citizen in the state of Texas

15  wanted to get a driver's license was there a requirement that I

16  present a birth certificate?

17  A    That's part of the requirements, yes, sir.

18  Q    Same question with regard to a personal identification

19  certificate, was it required, again before the implementation

20  of SB 14?

21  A    Those are part of the requirements for the ID as well,

22  yes, sir.

23  Q    How was it, to your knowledge -- well, since the

24  implementation -- strike that.

25          Since the implementation of SB 14 by the State of

Rodriguez - Direct / By Mr. Scott                          205

 1    Texas, is there a part of the requirement that a person present

 2    a birth certificate?

 3    A     For an EIC?

 4    Q     Yes.

 5    A     Yes, sir.

 6    Q     Is that in the rules?

 7    A     It's the Transportation Code.

 8    Q     And what is in the Transportation Code that you rely on on

 9    that?

10    A     Could you put a sharper point on the question?

11    Q     Sure.  From your standpoint, is it mandatory that every

12    person have a birth certificate?  I mean let's say -- and we've

13    heard some testimony from one of the witnesses that has been

14    presented that she never presented a birth certificate.

15    A     Yes, sir.

16    Q     And so how is it possible that the vast majority of people

17    believe they need a birth certificate, but this lady was able

18    to get one without having a birth certificate?

19    A     Some of the customers that come to the offices seeking

20    driver licenses or election certificate or personal ID cards

21    simply don't have birth certificates.  Either they were born at

22    home or the midwife didn't file the proper paperwork with the

23    county or there may be another reason.  But there's a small

24    number of our customers that don't have birth certificates.

25    Q     Was that true back when you all were just issuing driver's

1    licenses and personal ID certificates?

2    A    Yes, sir.  It's always been that case.

3    Q    And so what is -- have there been workarounds the

4    Department of Public Safety has executed on behalf of people

5    with driver's licenses and personal identification certificates

6    to get around this rare group of people that don't have a birth

7    certificate?

8    A    Yes, sir, that's a good way to categorize it.

9    Q    What is -- what have been the workarounds you've seen?

10   A    Well, the workarounds are that we'll accept other

11   governmental documents that the customer may present or may

12   have in their possession.  But the general rule of thumb is, is

13   that the farther you get from the primary documents, then we

14   have to make up for that with a greater number of other

15   documents.  So it could be children's birth certificates, as an

16   example, or a DD-214.

17   Q    What is that?

18   A    That's a military document, it's a document in the

19   military service.  We can accept that.  Just to show that that

20   person had that name -- the idea is, is that we have to

21   establish an individual's identity and so if they don't have a

22   birth certificate, we would rely on a greater number of other

23   government documents to help establish their identity.

24   Q    Well, is that -- is that advertised on your website?

25   A    Customers can go to the website and there's a list of

1  documents that are -- that we'll accept.

2  Q    Well, why is it that -- well, from the standpoint of being

3  able to verify a person's identity, why is that important to

4  the Department of Public Safety before it issues an ID?

5  A    Well, we're providing a document or an ID card or an

6  election ID certificate or a driver license and the State of

7  Texas is doing that, the State of Texas is doing that and we're

8  validating that that person is who they say they are.

9  Q    So why is a birth certificate better than any of these

10 other forms?

11 A    It's just one of the documents that we ask for in the

12 Transportation Code.

13 Q    And by "we," the state?

14 A    "We," the state, yes, sir.

15 Q    That was that way when you took over your job

16 responsibilities?

17 A    Yes, sir.

18 Q    Do you know who Ruby Barber is?

19 A    I'm familiar with the -- with the name.

20 Q    How is it the Department of Public Safety is able to issue

21 Ms. Barber an election ID. card without her having a birth

22 certificate?

23 A    Well, one of our -- one of our customer service

24 representatives, CSRs, in Waco was able to locate her, her

25 information on the census data -- using the census.  I believe

Rodriguez - Direct / By Mr. Scott                     208

1    it was the 1940 census.

2    Q    So if you could find my name on a census track, and I was

3    unable to produce and represent to you, after all good due

4    diligence, I can't find the birth certificate.  I don't have a

5    birth certificate.  The, the Department of Public Safety is

6    willing to take extraordinary -- or look at different types of

7    documents in order to effectuate getting somebody a driver's

8    license or a personal identification card or, and even an

9    election ID. card, correct?

10   A    It could be the case.  Again, I'd need to see what

11   documents that the customer presented in order to make a -- in

12   order to make a final determination.

13   Q    Who makes that final call on whether a person's ultimate

14   form of identification or verifying their identification is

15   made within the Department of Public Safety?

16   A    Well, I've been involved in making some of those calls and

17   I do consult with, with our Office of General Counsel and with

18   my chain of command on, on some of them.  It would all depend

19   very much on a case by case basis.

20   Q    Is Ms. Barber the only one that's had a case like that, to

21   your knowledge?

22   A    Not, not to my knowledge.  I know we've worked with other,

23   other customers for, for other forms of identification.  No

24   election certificates that come to mind.

25   Q    Okay.  Why is it that a person is unable to use a driver's

EXCEPTIONAL REPORTING SERVICES, INC

1  license that's expired more than two years in order to get an

2  election ID. card?

3  A    It's part of the -- it's part of the administrative rules

4  of the Transportation Code.

5  Q    Well, there's got to be a better explanation than it's

6  just in, because it's written in a book.  What is the reason?

7  A    Those are the guidelines and that's the industry standard,

8  as I understand it, in the driver license industry.  Because in

9  Texas when you get a driver license, the term for the driver

10  license is six years.  So it's been issued six years, and then

11  if you say that it's been expired for two years, it's really

12  eight years old.  But it becomes a supporting identification

13  document.

14  Q    Well, so if somebody presents at the driver's license

15  bureau with less than -- at a DPS Office, and they -- their

16  license has been expired less than two years, there is no issue

17  whatsoever with that serving as proper identification in order

18  to effectuate getting a new -- an election ID. card, for

19  instance, correct?

20  A    I don't believe so, no, sir.

21  Q    Have you run into a problem with people complaining that

22  they presented with ID. cards that are less than two years old,

23  but expired, less than two years' expired, and not being able

24  to obtain an election ID. card?

25  A    No, sir, not to my knowledge.

1  Q    How often does the Texas citizen who has a driver's

2  license have to come in to renew their license?

3  A    Come into an office, sir?

4  Q    Yes, sir.

5  A    Every 12 years, unless there's an issue.  They can renew

6  on-line at the six-year mark.

7  Q    And why is it that somebody has to come and get a new

8  license issued, and actually get a new photograph at least

9  every 12 years?

10  A    A person's appearance may change substantially.

11  Q    What is the purpose, again, of these ID. cards?  It's to

12  verify your identification, correct?

13  A    Well, yes, sir.

14  Q    And that's why the document someone uses to give the

15  document, the card, is so important, correct, from DPS's

16  standpoint?

17  A    Yes, sir.

18  Q    The Department of Public Safety is standing up and

19  verifying that this person is who they say they are when they

20  issue an identification card; is that correct?

21  A    That's correct.

22  Q    Now, with regard to CSRs -- and that's customer service

23  representatives, correct?

24  A    Yes, sir.

25  Q    What kind of training do you ensure that they have to be

Rodriguez - Direct / By Mr. Scott                    211

1   able to address the issues that somebody that presents wanting

2   an election ID. card -- do they receive any special training?

3   A    Well, all of our new employees, they -- there's a --

4   there's a block of instruction that they're -- that they're

5   provided.  And it's standardized, standardized training that

6   they're given.  And then there's refresher training.  And we've

7   provided refresher training for all of our current employees, I

8   believe it's three times now, with regard to election

9   certificates.  And all of our new employees that have come in

10  since, since we've been issuing election certificates, they've

11  been -- they've received that training as well.

12  Q    So where do you go to get CSRs?

13  A    Well, we, we post it on-line.  It's -- if you go to the

14  DPS web site, then there's an employment tab on there that

15  people can --

16  Q    Do you try and obtain -- do you try and get people from

17  the local communities?

18  A    Well --

19  Q    That are familiar with the languages?

20  A    The, the people that go to our offices that apply for jobs

21  and subsequently get them, by and large are from the local

22  community.

23  Q    So tell me what-all different languages you-all have --

24  you offer at some of the different offices that the, the Public

25  Safety staffs.

1  A    Well, the, the documents we provide are in English and

2  Spanish, but I know, from personal observation, that some of

3  our employees in Houston, for instance, they do speak

4  Vietnamese.

5  Q    Any other languages?

6  A    There may be some others ones I'm not familiar with.

7  Q    How are the -- CSRs informed there -- what is their job?

8  I mean, what is their obligations?

9  A    The CSR greets the customer when they come to the office.

10  Depending on what, what their assignment is for the day, would

11  greet the customer when they come into the office.  They review

12  the documents the customer has, find out what, what the

13  customer's seeking, in terms of an ID. card or driver license,

14  and then, and then they pass it to another CSR who would, would

15  process the individual into our DPS -- or driver license

16  system, and give the vision test, collect the fee, and issue a

17  transaction slip.  And there could be a drive test, a written

18  test, if it's an original application.

19  Q    Now, what's a mega center?

20  A    A mega center is our term for -- there's -- originally it

21  was six, there's now seven large, very large buildings around

22  the state and they're -- they have more than about -- more than

23  20 employees at each of those centers, and they're able to,

24  because we have such a concentration of, of employees there,

25  CSRs there, we're able to process a large number of -- a large

Rodriguez - Direct / By Mr. Scott                    213

1  number of customers very quickly.

2  Q    Do you know how those sites were selected for the mega

3  centers?

4  A    Well, that was done before I came to the department.  I

5  was given a study from Texas State when I arrived, as part of

6  my reading, and those locations had been selected because they

7  represented the areas around the state where it made the most

8  sense for us to put them, from a business standpoint.

9  Q    Now, there are some counties that have the Department of

10 Public Safety Offices that issue driver's licenses and other

11 identification cards, including the EIC, there's other counties

12 that don't.  Why does a county not have a -- why is it that

13 some counties don't have an operational Department of Public

14 Safety Office that issues ID. cards?

15 A    There could be a variety of reasons.

16 Q    What are those?

17 A    Some of the counties don't have the space in their county

18 offices.  They, they don't have the location that they can

19 offer us to -- for us to conduct business.  And some counties

20 that are rural, it doesn't make business sense in order for us

21 to have somebody to, to go there, to issue these documents.

22 Q    So it, it sounds like it's a little bit about price or

23 cost?

24 A    Well, we have a budget we have to operate within.

25 Q    Well, do some of the counties have less demand than other

1   counties?

2   A    Well, I would imagine so.  It's the demand within the

3   counties determined by the population in the county.

4            MR. SCOTT:  Brian, would you put Defendants' 1170 on?

5   Q    So this is Defendants' 1170.  And what is it?

6            MR. DUNN:  Excuse me, Mr. Scott.  Could we ask the

7   witness to speak up just a little bit.

8            MR. SCOTT:  Oh, yeah.

9            THE WITNESS:  I apologize for that.  Sorry.

10  BY MR. SCOTT:

11  Q    So what, what is this?

12  A    Well, that's a map of Texas.  The red dots represent

13  driver license offices, the shaded circles around the red dots

14  represent 25-mile -- 25-mile circles around each of those

15  offices.  And I understand from the other data in the data

16  block below on the bottom left, is it's based on the 2010

17  census.

18  Q    And the analysis shows that there's approximately 98.7

19  percent of the total population of our great state is within 25

20  miles of a driver's license office; is that correct?

21  A    Yes, sir.

22  Q    And this is before there were election ID. centers set up

23  in various counties; is that correct?

24  A    That --

25  Q    This does not reference that?

1    A    That's correct.

2    Q    Okay.

3         **MR. SCOTT:**  Brian, if you would go to the next page

4    of this document?

5    Q    So we see a change and it shows this, this looks like it

6    shows 99.95 percent of the total population of the great State

7    of Texas is within 50 miles of a driver's license office; is

8    that correct?

9    A    Yes, sir.  It's the same information, except that the, the

10   circle had been expanding.

11   Q    There's -- why are the hours at the DPS Offices from -- a

12   lot of them from 8:00 a.m. to 5:00 p.m.?  How did you-all

13   select that, Monday through Friday?

14   A    Sir, those are standard office hours.  They were selected

15   before I came to the department.

16   Q    So is there a reason that you-all have added Saturday

17   hours for the purpose of issuing EICs at some of your

18   facilities?

19   A    Well, my chain of command asked me to -- directed me to go

20   ahead and do that.  And so I made the coordination to make

21   those offices open up.

22   Q    And what hours do you-all operate on Saturdays?

23   A    To issue election certificates?

24   Q    Yes, sir.

25   A    That would go from 10:00 o'clock to 2:00 o'clock in the

Rodriguez - Direct / By Mr. Scott                216

1    afternoon.

2            **MR. SCOTT:**  Brian, let's pull up Defendants' 803,

3    please.

4    Q    So, what is this?

5    A    That's the most current version of the DL-14C.  It's an

6    application for a Texas Election Identification Certificate.

7    Q    And it is a how many page form?

8    A    It's a single-page form.

9    Q    And the -- this is what someone would fill out if they

10   came into your -- the Department of Public Safety Office and

11   wanted to get an election ID. card, correct?

12   A    Yes, sir.

13   Q    Let's walk through some of the parts.  Is it possible --

14           **MR. SCOTT:**  Brian, if you'll raise this up.

15   Q    Is it possible to use the process of coming and getting an

16   election ID. form to register to vote, for instance, can you do

17   it all at one site, at one time, at the Department of Public

18   Safety on this form?

19   A    If the customer chooses to, they may.

20   Q    And is that true with the -- equally true with the

21   personal ID. cards, as with the driver's license, correct?

22   A    Yes.  They'd fill out a DL-14.  It's, it's a slightly

23   different form.

24   Q    Does, does the Department of Public Safety do a background

25   check on somebody if they come in to fill this document out?

1   A    An applicant?

2   Q    Yes.

3   A    No, sir.

4   Q    Does the Department of Public Safety check for warrants on

5   anybody that comes out and wants to apply for an election ID.

6   certificate?

7   A    No, sir.

8   Q    If you'll speak up.

9   A    No, sir.

10  Q    There was a period where somebody decided they wanted to

11  capture fingerprints, correct, right, the early days?

12  A    Well, that was -- that was part of the original business

13  process because that's how we do driver licenses and personal

14  identification cards.

15  Q    So as we sit here today, if somebody comes in and applies

16  for a Texas election ID. certificate, are they fingerprinted in

17  any way?

18  A    No, sir.

19  Q    That's been completely stopped; is that correct?

20  A    The system that we're fielding into our offices does not

21  allow the CSR to, to take fingerprints.  That, that option's

22  bypassed.  They go to image capture, which is the picture, but

23  it bypasses fingerprint capture.

24  Q    Well, you mentioned a second ago that there's a business

25  process.

Rodriguez - Direct / By Mr. Scott                    218

1    A    Yes, sir.

2    Q    So when you took over operation of running the election

3    ID. certificate issuance for the Department of Public Safety,

4    there were already two processes in place for issuance of

5    driver's licenses and personal identification cards, correct?

6    A    There were two very similar processes, yes.

7    Q    And was it your -- was it the decision of the department

8    to include this third universe of cards they were going to

9    issue to be almost identical to the other two?

10         **MR. DERFNER:**  Your Honor, I'd like to object to the

11   leading question posed.

12         **THE COURT:**  Sustained.

13   **BY MR. SCOTT:**

14   Q    So how is it that you selected, or the department selected

15   to issue election ID. cards in a way similar to the way that it

16   issued driver's licenses and personal identification cards?

17   A    Well, we wanted to make the process by which we issued

18   election ID. certificates as similar to the other two processes

19   as possible because it facilitated the training that we had to

20   do for the employees.  We, we have 1,800, about, field

21   employees.  So if we kept the processes for those documents the

22   same, or substantially the same, it, it made it much easier for

23   us to train and to issue the documents.

24   Q    Have, have you encountered any citizens who presented for

25   EIC, but switched to a different one, wanting some other type

1    of card?

2    A    We've had some customers who come in, and when they

3    understand what an election certificate is intended for, they

4    decide that they want to get an ID. card instead.

5            **MR. SCOTT:**   Brian, if you'll pull up Defendants' 732,

6    please?

7    Q    What's this?

8    A    Sir, that looks like a -- it looks like a screen capture

9    from our Department of Public Safety web site.  And it --

10   it's -- it's the -- our election, election identification

11   certificate page.

12   Q    So if somebody goes to the Public -- if somebody -- can

13   somebody go to the Department of Public Safety's web site and

14   find information out about election ID. certificates?

15   A    Yes, sir.  And this is -- this is one of the sources they

16   could use for it.

17   Q    What other sources are there to find out about -- if

18   someone has more specific questions about election ID.s, that

19   they can turn to?

20   A    Well, I know that the Secretary of State has information

21   on their web site, but I'm not conversant on it.

22   Q    Let's turn our attention, if we could, to the mobile EIC

23   units.  What's a mobile EIC unit?

24   A    That's a term that we use for, for the equipment.  And the

25   equipment consists of two large Tupperware tubs, and in those

1    tubs there's a laptop computer, there's a printer/scanner,

2    there's the, the camera with the tripod, there's, there's a

3    blue screen that we use as the background for all of our

4    documents, there's paper, forms, and those kinds of things.

5    It's, it's everything that the customer service representative

6    would need to, to go to a site to set up to take applications

7    for EIC.

8    Q    Have you -- has the Department of Public Safety worked

9    with the Secretary of State on determining locations where to

10   set up the EICs?

11   A    We, we have had discussions, yes.

12   Q    Do you know why it is that those locations have been

13   selected and the way they work?

14   A    Well, I know that some counties have, have requested EIC

15   operations in their counties, and they do that through the

16   Secretary of State.

17   Q    So it's not just the Department of Public Safety that's

18   issuing EICs today; is that correct?

19   A    That's an accurate statement, yes.

20   Q    Who else is issuing?

21   A    Well, counties.  We have, I believe it's 55 counties

22   across the state that we've entered into a memorandum of

23   understanding with, and we've provided training for and

24   equipment to, and they're able to issue election certificates

25   across the state.  The Health and Human Services will be

Rodriguez - Direct / By Mr. Scott                    221

1    issuing EICs in, I believe, it's seven counties in this

2    upcoming election, and then they helped us out in the last

3    election.  And the Secretary of State, we've trained about 20

4    or so of their personnel to, to issue EICs from the mobile

5    systems as well.

6              **MR. SCOTT:**  Brian, if you'll pull up Defendants'

7    1209, please.

8    Q     What is -- what is this?

9    A     Sir, this is -- it's -- this is the MOU that I was

10   referring to that we enter into with the counties.

11   Q     So, for instance, this one's entered into between Duval

12   County and the Department of Public Safety; is that correct?

13   A     Yes, sir.

14   Q     Is there a difference between this MOU and the MOUs that

15   the Department of Public Safety enters into with the other

16   counties, that it has done so?  They're all the same, right?

17   A     No, sir.  We, we have one, one template for MOUs, and the

18   only thing that's different are the -- is the counties.

19   Q     How many counties had MOUs, as we sit here today?

20   A     To the best of my knowledge, it's 55.

21   Q     And then how many counties have -- or, or do you have

22   other alternate forms of coverage for those counties, whether

23   it's the Department of Public Safety (indiscernible), or Health

24   and Human Services, or Secretary of State people?

25   A     The Health and Human Services covers is -- we're planning

1   to cover seven; and they covered seven during the last

2   election.  We're planning to cover 16 -- we, DPS, is planning

3   to cover 16 during this -- during the upcoming election.

4   Q    Before this next election, how many counties out of the

5   254 counties in the State of Texas, will have, at the very

6   least, election ID. card centers available for the issuance?

7   A    I understand your question to be, if the Department of

8   Public Safety is going to provide coverage for all the

9   counties?

10  Q    Yes.

11  A    Yes.  The Department of Public Safety will provide, and

12  has provided, coverage for all 254 counties in the state.

13  Q    So, in addition to those maps we saw, when we saw that 99

14  1/2 percent of the population of the State of Texas is within

15  50 miles of a Department of Public Safety Office as a result of

16  the additional coverage and resources through MOUs the State of

17  Texas and the Department of Public Safety is now providing for

18  EICs in all -- in all 254 counties; is that correct?

19  A    That's an accurate statement, yes, sir.

20  Q    There's been some talk in this, this case about some, oh,

21  e-mails you sent out.  And I'd like to go through some of them

22  with you and find out --

23        **MR. SCOTT:**  Brian, do you have the e-mails?  I can

24  use the ELMO.  If you'll turn the ELMO on.  Oh, you got them?

25  Yeah, that's great.  Well, let's go to Defendants' 819, Brian.

1        (Pause)

2   Q    This is Defendants' 819, Mr. Rodriguez.  This is an e-mail

3   from you to a number of people.  Read that first paragraph, I

4   guess.

5   A    I say, "Folks, election certificates are" -- "will be a

6   big deal for the next week to ten days.  Expect to be peppered

7   with requests regarding the number of certificates we have

8   issued, and if there are any problems with issuance.  We should

9   expect this as part of the normal course of events.  I would

10  ask that you institute the following in your regions:  Have

11  your offices report anyone asking you for an EIC to you and, in

12  turn, pass this to me. Daily at 11:00 o'clock and again at 4:00

13  o'clock, please send me a note about any IC requests/issuances.

14  I know this sounds redundant, and you're right, but trust me on

15  this one, I will need negative activity reports to feed the

16  machine up here.  Thank you for your patience.  V.R. Tony

17  Rodriguez."

18  Q    So, let's go through some of that third, I'll call it the

19  third paragraph.  It says, "I will need negative activity

20  reports."  I'm going to stop there.  What's a negative activity

21  report?

22  A    Well, my experience with the negative activity report is

23  that, that's a report that's generated by a unit that says that

24  nothing has happened here.  And we want those reports, and this

25  is where people who don't understand military get confused, we

1   want those reports to know that nothing has happened there,

2   because it, it does sound simplistic, but sometimes things get

3   moving very quickly and people forget to send the reports, but

4   I know, there's no ambiguity in my mind when somebody sends me

5   an e-mail message and they say, "Nothing has happened; that

6   they -- that they're aware of the timeline, they provide --

7   they generated the report and there truly is -- nothing has

8   happened.  I don't have to question that.

9   Q    Do you want to know whether they've issued a hundred or if

10  they've issued zero, correct, and anywhere in between?

11  A    I want to know what's going -- I want to know what

12  activity has happened within that area.

13  Q    So the next part of it, "to feed the machine up here."

14  What's the "machine up here"?

15  A    Sir, the machine is headquarters, it's Austin.  I'm part

16  of the machine.  The machine runs on, on information.  It's a

17  system.  I need to get reports in order to, to take that

18  information and to process it and to provide it to my chain of

19  command, so they can make decisions.

20       **MR. SCOTT:**  Defendants' 820, Brian.  I'll tell you

21  what, go back to that last one.  I want -- we can find it out

22  on this one.  Leave it here.

23  Q    So, when -- what day did you find out you were in charge

24  of the program?

25  A    The 26th.

Rodriguez - Direct / By Mr. Scott                     225

1   Q    June 26th, 2013, the same day that you sent this e-mail

2   about the zero -- the negative activity reports, correct?

3   A    Yes.

4   Q    Okay.  So that's at 1:45.  And --

5              MR. SCOTT:  Slow down.

6   Q    And this is Defendants' Exhibit 820.  And you get a

7   response back from, who's that?

8   A    That's Salestus Winkley.  He's the, the regional manager

9   for DPS Region 1A; and that's, that's Dallas.

10  Q    And he tells you how -- what, zero?

11  A    His answer back is zero.

12  Q    And then what's your response back to him?

13  A    I said, "Zero's a good number.  Let me know at 11:00

14  o'clock.  Thank you."

15  Q    So he's letting you know what time -- I don't see what

16  time he sent you that.

17  A    He sent it at 11:39 the next morning.

18  Q    Okay.  And was he letting you know that on the 26th he had

19  issued no EICs?

20  A    As of the previous day, right, the 26th he hadn't issued

21  any EICs.

22  Q    And why is zero a good number?

23  A    Because now I know that this is a negative activity

24  report.

25  Q    Okay.

Rodriguez - Direct / By Mr. Scott                226

1  A    I know that Salestus had, had done his due diligence.  He

2  had contacted his offices and before he went it to me, because

3  I know Salestus, he made sure that information was correct and

4  he had zero issuances, zero inquiries.

5  Q    Why did you want to hear back again at 11:00 o'clock?

6  A    Because that was the time that I established in the

7  previous e-mail I, I set up twice a day to put in for the

8  units -- for the regions to provide me with, with reports.

9        **MR. SCOTT:**  Brian, if you'll pull up Defendants' 823,

10  823.

11  Q    So this is June 27th; is that correct?

12  A    Yes, sir.

13  Q    And that's Day 2 of your -- the program you're in charge

14  of at this point in time, correct?

15  A    Yes, sir, that's true.

16  Q    And you write what at 4:15 p.m.?

17  A    At the bottom I say -- I send a message to Joe Peters, the

18  assistant director, and, and I sent it over to -- it's the

19  regional managers, my immediate supervisor, Paul Watkins, and

20  then some other leadership in DL.  And I say, "Sir, we've

21  continued our clean sweep.  No EICs issued.  We had a close

22  call at Vantage Park, but the customer opted out and left the

23  office."

24  Q    So, "We continued our clean sweep.  No EICs issued."

25  What's that mean?

1    A    Well, that nobody had come in, no customers had come in

2    and, and requested an EIC.

3    Q    In the last sentence, "We had a close call at Vantage

4    Park, but the customer opted out and left the office"?

5    A    I was -- I was being informal with, with Assistant

6    Director Peters.  I'd known him for a couple weeks at that

7    point.  I felt comfortable enough, it's -- it was just say, "We

8    had a close call.  We could have issued one, but we didn't."

9    Q    And up top you got a response back from him and John

10   Crawford; is that correct?

11   A    Yes.

12   Q    And what is it that -- first of all, who is John Crawford?

13   A    He works at the DPS.  He's one of our IT people.

14   Q    And what was the purpose of his e-mail to you?

15   A    Well, the note that I got from John just says that,

16   because John can see what's going on in the database -- I don't

17   know how that works, but what that was is, that was just a

18   confirmation that we had not issued any EICs.  Now, the other

19   thing I'd like to point out is that -- is that, it says, "Only

20   four show up since Tuesday, and those are the four that Lynn

21   and Carol generated."  Those are part of our tests to make sure

22   that our EIC system is actually functioning and we could issue

23   cards, if customers wanted them.

24   Q    So by "tests," those really weren't even issued?

25   A    No, they weren't issued, no.

1   Q    So we were still at zero on that day when you got that

2   report?

3   A    That's correct.

4   Q    So the four that were in John Crawford's e-mail, because

5   he was registering what was in the system, those were just

6   exemplars of what could happen?

7   A    Well, that was a test that they had that Lynn and Carol

8   had run in order to make sure that the system would work when

9   we needed it to.

10  Q    Did you have any idea what the demand was going to be when

11  you started this program on, what, implemented on June 26th?

12  A    No, I didn't.

13  Q    What were the other steps that you were undertaking at the

14  same time that you were trying to get numbers from the field,

15  as far as implementing the new EIC program?  Take us through

16  what was going on during that time frame.

17  A    Well, we -- the majority of it was, was to make sure that

18  the system was able to produce the ID. cards, or the cards that

19  you've seen here.  It was to nail down the reporting

20  requirements, to make sure that we had the information coming

21  up that we needed to have come up.  And it was -- it was just a

22  very busy time.

23  Q    So if we look at Defendants' 821 --

24           MR. SCOTT:  And I think that's up.  Is that right,

25  Brian?

Rodriguez - Direct / By Mr. Scott                                    229

1   Q     This is an e-mail with you and a man named Thomas Carter.

2   Who is Thomas Carter?

3   A     Thomas Carter is the -- is the regional manager for DPS

4   Region 2A.  It's, it's Houston.

5   Q     We'll go to the bottom there.  The first thing you write

6   is, "Team, just to follow up on the note I sent Friday, I only

7   need your EIC reports once a day at 4:00 o'clock."  Why is

8   that?

9   A     Well, that's a change that I had sent out.  If you recall

10  the previous e-mail, I had asked for information from the field

11  at 11:00 o'clock and 4:00 o'clock, so twice a day.  In this

12  e-mail I'm asking for it once a day.  There wasn't the -- there

13  wasn't the customer demand that we had anticipated.  We didn't

14  know how many we were going to issue.  It turned out that we

15  didn't have as much customer demand as we wanted to, so I

16  reduced the reporting requirement to once a day and I made it

17  at 4:00 o'clock.

18  Q     And so Mr. Carter advises you at 3:45 on July 5th that

19  he's negative today.  What's that mean?

20  A     That means that -- I understood that to mean that he had

21  no issuances and no inquiries.

22  Q     And so the next one up you write what, you read what?

23  A     It says, "No inquiries either," and so I'm asking him the

24  specific, "This is getting better by the day."  And then Tom

25  responds back and says, "Not."  So this is another example of a

1  negative activity report.

2  Q    What's getting better by the day?

3  A    Well, that that was -- we had -- we had prepared, we had

4  the system in place, we had trained the CSRs, we had worked to

5  get the reporting requirements out and to make sure that

6  everybody in the field was ready to issue election

7  certificates.  So we were disappointed that we weren't issuing

8  the cards that we thought that we were going to issue.

9  Q    How much extra time were people working?

10  A    I suppose the amount of time that was being worked would

11  depend on how close the person was to Austin.  A CSR in the

12  field, for instance, working you know -- working in Ozona,

13  let's say, probably it didn't have much effect on them.  But I

14  know that the assistant managers were busy collecting reports

15  and the regional managers were collecting and compiling reports

16  and I was collecting and compiling reports.  So, the management

17  teams were pretty busy.

18        MR. SCOTT:  Brian, bring up Defendants' 822, please,

19  sir.

20  BY MR. SCOTT:

21  Q    This is an email between you and a number of people, dated

22  July 15th.  And what was the purpose of this email?

23  A    The bottom email is a shift in the reporting from daily to

24  weekly, so it's for the same reason that we previously had

25  shifted it from twice a day to once a day.  The amount of

Rodriguez - Direct / By Mr. Scott                    231

1   activity wasn't high enough to warrant a daily report so I

2   shifted it and I decided to make it a weekly report, and I

3   recommended that to the chain of command and they approved.

4   Q    So what you were encountering was there was not -- there

5   were not very many issuances of EIC's at this point in time,

6   correct?

7   A    I don't recall many.

8   Q    Well, let's go to that top part there.  That's an email

9   from John Crawford to you and he let you know how many

10  certificates were issued on that week, correct?

11  A    Yes, the numbers.

12  Q    And he said there were two, correct?

13  A    Two.  Yes, sir.

14  Q    So, as a result of that, you were taking at least one

15  thing off of the people that report to you's plate by reducing

16  their daily reports that they needed to make to you, correct?

17  A    Yeah.  It would reduce their administrative overhead.

18       **MR. SCOTT:**  Brian, if you'll bring up Defendants'

19  834, please.

20       **(Pause)**

21  BY MR. SCOTT:

22  Q    This email from you is dated August 28th, 2013.  If you'll

23  go ahead and read that to us.

24  A    Yes.

25            "Folks:  EIC's are becoming a big deal now and the

Rodriguez - Direct / By Mr. Scott                    232

1              information requirements are tightening up.  Starting

2              this Friday, I will need the following information

3              (which some of you have been providing) formatted as

4              shown:  date, office name and station number, and

5              then narrative."

6              And then I provide an example below.  Would you like

7    me to read that to you, sir?

8    Q    Skip the example, but that last sentence there.

9    A    It says:  "The clearer you make this up front, the fewer

10   follow-up phone calls we will have to have."

11   Q    What was the reason you wrote that last line?

12   A    Well, the reports I was getting were not in the format

13   that I needed, so I needed to get everybody on one format for

14   continuity.  And then I was spending a lot of time calling down

15   to regents to find out the information or to clarify the

16   information on the reports that they were sending that weren't

17   formatted the way I needed them.  What it did is, by putting it

18   into a single format, it made it easier for me to get the

19   information and it reduced the amount of errors that could be

20   entered into the reports that I was producing.

21   Q    So it says -- that first line, the first sentence, you

22   say:  "EIC's are becoming a big deal now."

23   A    Yes, sir.

24   Q    Let's stop there.

25   A    Okay.

Rodriguez - Direct / By Mr. Scott                    233

1   Q    Were they not a big deal before then?

2   A    Well, they were.  I just wanted to focus them on the

3   information requirements that I was tightening up.

4   Q    Were you getting closer to elections; did that play any

5   role in this?

6   A    We focused on them all the way through and then through

7   the cure period.

8   Q    It says:  "The information requirements are tightening

9   up."  What information requirements were tightening up?

10  A    Well, what we were asking for is we were asking for more

11  granularity, and so if you look at the example that I provide

12  I've got the date, I've got the city, the station number, and

13  then I have a narrative that says -- in this example, it says

14  that a customer came in but decided to get an ID card and then

15  no other inquiry.  So all it did is it gave the regional

16  managers an idea on the information that I was looking for in

17  order for me to get my reports and compile them and provide

18  them.

19  Q    So you were trying, by this email, to get people to give

20  you specific information in the way that you set out in your

21  example; is that correct?

22          **MR. DERFNER:**  Objection.  I don't expect --

23          **MR. SCOTT:**  I'll rephrase.  Strike that.

24          **MR. DERFNER:**  -- standing up every time, but

25  Mr. Scott is doing a lot of reading, your Honor.

1          **THE COURT:**  Sustained.

2    **BY MR. SCOTT:**

3    Q    What was the purpose of putting the example into this

4    email in the way that you did?

5    A    I wanted the regional managers to give me the information

6    that I needed.  I needed it in this format and I needed it at

7    certain times.

8    Q    And did you start getting this?  Well, did the people that

9    worked for you, did they start complying with your request?

10   A    By and large.  There's always five percent of the people

11   who never get the message.

12          **MR. SCOTT:**  So let's pull up, Brian, Defendants' 837

13   please.  Brian, let's start, if we could, down at the bottom on

14   Page 2 of that email.

15   Q    So is this an email from you?

16   A    Yes, it is.

17   Q    What date?

18   A    That's the 9th of September, 2013.

19   Q    If you'll read the body of that email.

20   A          "Folks:  The word has come down that we need to open

21          offices in the top 13 counties where the Sec. State

22          thinks there are potential voters who do not possess

23          ID.  In our area, that means the 22 offices listed

24          below.  These offices will be open this Saturday.

25          You can use hourly employees.  If the employee has 40

1          hours already, they get time-and-a-half.  If not,

2          they get straight pay.  As soon as I get additional

3          information I will set up a conference call tomorrow.

4          In the meantime, I need you to start working on

5          getting your folks energized."

6    Q    So first of all, were people not energized?

7    A    Well, we're asking them to open -- to work in offices on

8    Saturdays.  We have a finite number of employees and we ask

9    them to work pretty hard already.  Asking them to work an

10   additional day is -- we didn't know what effect that would have

11   on the employees.

12   Q    How did you-all go about doing that, getting people to

13   work on Saturdays?

14   A    We asked for volunteers and, actually, it worked out very

15   well.  We were concerned -- the discussions that I had with

16   Steve -- that some of the tenured employees might just quit.

17   But we didn't have any of that.

18   Q    Did anybody quit?

19   A    Not to my knowledge.

20   Q    Did you ever run into a problem staffing the offices on --

21   or, getting volunteers to staff the offices on Saturday?

22   A    No, sir.

23        **MR. SCOTT:**  So let's roll that up, Brian, to the top

24   on Page 1.  I believe it's the 9/9/2013 email.

25   //

1   **BY MR. SCOTT:**

2   Q    Do you recognize this email?

3   A    Yes, sir.

4   Q    What day did you send this email out?

5   A    That was on the 9th of September.

6   Q    And who did you send it to?

7   A    The addressees are our regional commanders.  Commander

8   Rodriguez is our regional commander for DPS Region 3.

9   Commander Matthews is DPS Region 4.  And Commander Albus is DPS

10  Region 6.

11  Q    And so what was the information you were sending to those

12  folks?

13  A    I was providing them the information about the Saturday

14  openings for their situational awareness.

15  Q    And why was it that you wanted them to be aware of what

16  you were doing with the offices?

17  A    A DPS regional commander is -- he's a commissioned law

18  enforcement officer.  He's the highest ranking DPS person in

19  that geographic area.  He knows -- he is supposed to know

20  everything that is going on in his DPS region and so my note

21  was for their situational awareness that they would know that

22  there would be offices that would be open on Saturdays, which

23  is outside the normal duty hours.

24       MR. SCOTT:  Brian, let's bring up Defendants' 850,

25  please.  Let's go to Page 2 if we could.  Let's go specifically

1   to that September 10th email from Mr. Rodriguez.  There we go.

2   Q    Mr. Rodriguez, there's an email that's in the middle of

3   the row there from you to, it looks like, Joe Peters and Paul

4   Watkins and it's dated September 10th, 2013.  Do you recognize

5   that document?

6   A    Yes, sir.

7   Q    Would you read that?

8   A    Yes, sir.  It says:

9            "Mission Creep:  These folks" -- and there's an email

10           below that -- "would like our DSU's" -- that's a

11           Disaster Support Unit -- "at locations other than our

12           offices, 'appropriate public and private events' like

13           state fairs, to issue EIC's.  I'm not sure who we

14           would like to reach out to them."

15  Q    So what is "mission creep"?

16  A    Well, mission creep, in my lexicon, is -- that's a

17  changing mission, an evolving mission, in a dynamic

18  environment.

19  Q    Was this a program that has evolved through time?

20  A    The EIC program?

21  Q    Yes.

22  A    Yes, sir.

23  Q    And is mission creep a term involved in the military?

24  A    It is.

25  Q    Are there a lot of former military in the Department of

Rodriguez - Direct / By Mr. Scott                    238

1   Public Safety?

2   A    There are a number of former military, retired and former.

3           **MR. SCOTT:**  Brian, bring up Defendants' Exhibit 1253

4   please.  Why don't you bring it up to the top?

5   Q    Did you get a copy of this email?

6   A    Yes, sir.

7   Q    Who did you get it from?

8   A    That was sent by Ms. Bell.  She is from Fayette County.

9   Q    And does the Texas Department of Public Safety have a

10  current MOU, or it did at the time, with Fayette County?

11  A    It did.  And to the best of my knowledge, we will do.

12  Q    Okay.  If you would read what Ms. Bell wrote to you back

13  on November 20th, 2013?

14  A    Yes.  It says:

15           "Mr. Rodriguez: My County is one of the 'EIC mobile

16           light units.'  I am writing to ask if it would be

17           permissible to take the equipment to a nursing home.

18           Regards, Deena Bell"

19  Q    What equipment was she talking about?

20  A    She was talking about the mobile equipment that DPS had

21  purchased, configured, and provided to Fayette County.

22  Q    So for somebody like Ms. Bell, and we'll use her as an

23  exemplar of, perhaps, those other folks that have MOU's that

24  were done with the Department of Public Safety to operate the

25  EIC mobile units.  Did she receive any kind of training from

1   the Department of Public Safety?

2   A    Yes, sir.

3   Q    What was that training?

4   A    We had centralized training at locations around the state.

5   The counties that wanted to participate in issuing EIC's were

6   sent a letter and they were told where to be and when to be

7   there.  They came in.  Our training team provided the training

8   for them.  They inventoried and issued the equipment.  They

9   provided them with a blank copy of the MOU that we've

10  previously seen, and then the county employees went back to

11  their counties.  They gave the blank MOU to their county

12  commissioners and if the county judge signed it then we

13  accepted EIC's from them.

14  Q    So let's slow down and we'll take it a piece at a time.

15  How about that?  On November 20th, 2013, at 10:22 a.m., you

16  received a request from Deena Bell at the Fayette County

17  Elections Administrator; is that correct?

18  A    Yes, sir.

19  Q    And what did you do in response to receiving this request

20  to use the EIC mobile light unit in nursing homes?

21  A    Well, I just responded to her.  I told her I thought that

22  was a great idea.  That's what it says:  "I think this is a

23  great idea."

24  Q    And did you respond that same day?

25  A    Yes, sir.  It was a couple hours later, but yes, sir.

Rodriguez - Direct / By Mr. Scott                                240

1   Q    So let's talk about, though -- now, let's talk a little

2   bit more about somebody like Ms. Bell who -- or, her or folks

3   that work for her would be actually going to that nursing home

4   and helping folks getting EIC's.

5   A    Yes.

6   Q    What is the process after they -- well, when they issue

7   the EIC's.  What do they do?  Tell the Court a little bit about

8   that process.

9   A    So, the county employees would review whatever

10  documentation that the customer has.  They would scan those

11  documents.  And they would receive some training in what

12  documents to accept that constitute residency and constitute

13  citizenship and those kinds of things; identification.  They

14  scan it into the computer that we provide.  That information is

15  then loaded onto a thumb drive.  At the end of the day, the

16  county employees call a point of contact in DPS and then we

17  drive out there.  One of our driver license employees drives

18  out there, gets the thumb drive, and then enters it into the

19  driver license system.  I did skip one part.  We also provide

20  the phone numbers for the regional communication sections so

21  that the county personnel who are issuing EIC's can call to see

22  if the customer already has an EIC -- I'm sorry -- a personal

23  ID or a driver's license.

24  Q    Okay.  And does the customer -- so would one of these

25  folks at the nursing home in Fayette County, would they receive

Rodriguez - Direct / By Mr. Scott                                    241

1    an actual paper copy, just like if they had gone to a DPS

2    station, with their photo on it?

3    A    They would receive what we call a transaction receipt, and

4    the transaction receipt is the card until they get the plastic

5    card in the mail.

6    Q    Almost identical to the process of when I go get a

7    driver's license and there's a piece of paper I get with my

8    name on it?

9    A    It was intended to be that way, yes, sir.

10   Q    Okay.  So, again, it's the same process that was set up

11   for the other two forums; is that correct?

12   A    The business process is the same.

13   Q    Okay.

14        **(Pause)**

15        Do you know if Ms. Bell is still issuing EIC's in nursing

16   homes in Fayette County?

17   A    I don't know.  I know that Fayette County -- I believe

18   they are still a signatory to the MOU.

19   Q    Okay.  So let's --

20        **MR. SCOTT:**  Brian, bring up Defendants' 817 please.

21   **BY MR. SCOTT:**

22   Q    So this is a September 25th email between you and Gary

23   Albus.  And I think you've already identified Mr. Albus as a

24   Regional Commander; is that correct?

25   A    Commander Albus, yes.  He is the Regional Commander for

1    Region 6.

2    Q    Where is Region 6?

3    A    Region 6, roughly, is Waco, Central Texas, Austin, down to

4    San Marcos.

5    Q    So let me get you to read the first -- well, just go ahead

6    and read the first part of that email, the first paragraph.

7    A    It says:

8              "Commander Albus:  I apologize for the short notice,

9              but I wanted you to know that DPS-DL has been

10             directed by the Secretary of State (SOS) to conduct

11             EIC operations outside of brick and mortar offices in

12             Regions 1, 2, and 4 beginning next week.  While this

13             does not immediately affect your region, we expect to

14             be directed to issue EIC's using mobile systems we

15             have built in Region 6 as early as the 7th of

16             October.  As soon as I receive a list from the

17             Secretary of State I will forward it to you.  SOS has

18             purchased enough equipment (computer scanners,

19             cameras) to build 25 mobile light systems for use in

20             issuing EIC's only.  Region 6 will receive four of

21             the 25 (see attachment).  IT has configured these

22             computers to protect the PII (Personally Identifiable

23             Information) of customer's driver license and we

24             developed a business model for our employees to use.

25             Because of security reasons, these units do not have

Rodriguez - Direct / By Mr. Scott                    243

1          internet access and our employees will not be able to

2          verify customer eligibility on site.  In order to

3          overcome this, Assistant Director Skylor Hearn has

4          determined that our personnel can use the regional

5          communication centers to run a 1027 on the applicants

6          to verify their eligibility to receive an EIC.  (We

7          will not run a warrant check)  We have loaded all six

8          regional numbers into the cell phones that are

9          included in the kits.  While some technical issues

10         remain, we are planning to issue the equipment

11         tomorrow and train our personnel to use them."

12         And then it has a breakdown of the systems.

13   Q    Okay.  So does the Secretary of State direct you how to

14   use these machines?

15   A    No, that's probably my Army coming out.  We're in a

16   cooperative.  We're a corroboration with Secretary of State.

17   You could say it's a unity of effort, as I understand it.  We

18   work together with them.

19   Q    Now, Secretary of State bought how many machines?

20   A    I believe the number was 25.

21   Q    And has the Department of Public Safety actually purchased

22   some separate machines?

23   A    I don't know.  I know that other machines exist, but I

24   don't know how they were paid for.

25   Q    Okay.  Well, how many -- the EIC's -- the mobile units

1    that are part and parcel of the memorandum of understanding of

2    these different counties throughout the state, who paid for

3    those units?

4    A    I don't know.

5    Q    Oh, well not, who paid for them.  Were those supplied to

6    the counties?

7    A    Yes.  Okay.  So, I understand.  And I refer to them in

8    some emails as "Phase III EIC's," and those units, there were

9    about 80 systems were purchased, configured, and training was

10   provided to the counties.  And they, in turn, the counties, I

11   believe 55 of them, have those systems and are using them now.

12            **MR. SCOTT:**  Brian, if you could bring up Defendants'

13   818 please.  And if you'll start down there at the bottom of

14   that, October 24th, 1:57 p.m.

15   **BY MR. SCOTT:**

16   Q    First of all, did you send this email out?

17   A    I did send this email.

18   Q    And then, would you go ahead and read starting with

19   "team"?

20   A    Well, I just want to point out that this went to every

21   employee, every field employee, in the Driver License Division,

22   all 1,800 of them.

23   Q    Okay.

24   A            "Team:  This is to clarify an issue regarding EIC

25            applications from college students who reside in

1                Texas and hold out-of-state DL/ID.  Apparently, one

2                of our offices advised an out-of-state college

3                student they would have to surrender their out-of-

4                state DL to obtain an EIC.  Students who live in

5                Texas but hold an out-of-state DL/ID are not required

6                to surrender their out-of-state license when they

7                apply for an EIC.  One of the seven forms of

8                acceptable ID for voting is a Texas DL and an out-of-

9                state DL is not one of them.  The out-of-state

10               student may keep their DL and get an EIC."

11   Q    And why was it you were making this clarification?

12   A    Well, we had -- and if you look at the email directly

13   above it from Amelia Flores, who is in Region 2.  Because we

14   had a problem in one of our offices.  It was the Bryan office

15   and I didn't want to embarrass her by saying Bryan had done

16   this.  I just -- I put it out as a blast to everybody.  And we

17   had a problem and one of our employees had told an out-of-state

18   student that they would have to surrender their out-of-state

19   driver license.

20   Q    And, evidently, it was a student at somewhere in the Bryan

21   area, correct?

22   A    Yes, sir.

23   Q    Okay.  And then you write -- she writes to you:  "Bryan?"

24   And you write back "Ja."  What is "Ja"?

25   A    I'm sorry, that's German.  It means yes, yeah.

Rodriguez - Direct / By Mr. Scott                    246

1   Q    Oh, okay.  And then we go up a little bit further.  You

2   got another one from Ms. Flores.  It says what?

3   A    "Sigh.  I already contacted Texas A&M this morning."

4   Q    Why would she be contacting Texas A&M?

5   A    Well, the best of my recollection is that the problem had

6   happened around our Bryan office and that's where A&M is

7   located.

8   Q    Okay.

9        **(Pause)**

10       I'm going to put on the --

11       **MR. SCOTT:**  Oh, Brian, will you bring up Defendants'

12   Exhibit 2155?

13       **(Pause)**

14   **BY MR. SCOTT:**

15   Q    What is this, sir?

16   A    This is a press release that the Department of Public

17   Safety puts out, and in this case the title is "DPS reminds

18   Texans Election Identification Certificates available at driver

19   license offices."

20   Q    So, how is it that the Department of Public Safety

21   typically gets word on the street about a program such as

22   EIC's?

23   A    I'm not familiar with the details of it.  I mean, what I

24   know based on my personal observation is we have a Media and

25   Communications Section and that's headed by Katherine Cesinger.

1    I believe she's an AD or perhaps a DAD [sic].  I'm not sure

2    which.  But they have a network of PIO and safety and education

3    or public information troopers around the state and she puts

4    out information through them.  And then she also puts out

5    information on our website and through other media venues.

6    That's what I know.

7              **MR. SCOTT:**  Thank you.  Pass the witness.

8                         **CROSS EXAMINATION**

9    **BY MS. BALDWIN:**

10   Q    Good afternoon.

11             **MS. BALDWIN:**  Your Honor, may I approach to give

12   Mr. Rodriguez a copy of his deposition?

13             **THE COURT:**  Yes.

14             **THE WITNESS:**  Thank you very much.

15        **(Pause)**

16   **BY MS. BALDWIN:**

17   Q    Good afternoon, Mr. Rodriguez.  My name is Anna Baldwin

18   and I represent the United States.

19   A    Pleased to meet you.

20   Q    We haven't met before but it's nice to see you today.

21        I'd like to begin by talking with you about the process

22   for applying for an Election Identification Certificate.

23             **MS. BALDWIN:**  Let's pull up Plaintiffs' 344 if we

24   could, and if we could zoom in at the title.

25   //

Rodriguez - Cross / By Ms. Baldwin                    248

1   Q    And this is a section of the Texas Administrative Code

2   that deals with the requirements for eligibility and applying

3   for the EIC, correct?

4   A    Yes.

5   Q    And you're familiar with this section of the code,

6   correct?

7   A    I'm familiar, yes.

8   Q    Okay.

9        **MS. BALDWIN:** Let's take a look at 15.182.  We could

10  just zoon in on that column there.  Great.

11  Q    And this provides the general categories of documents that

12  somebody applying for an EIC must provide, correct?

13  A    Scroll down please.

14  Q    Sure.  The general types of -- there are three kind of

15  classifications of documents for applying for an EIC.  There's

16  a primary identification, secondary identification, or

17  supporting identification; is that correct?

18  A    Yes, that's correct.

19  Q    Okay.  And so, if you have one form of primary

20  identification, that's all you need to provide in order to get

21  an EIC; is that correct?

22  A    Yes.

23  Q    Okay.

24  A    But I'd like to point out that forms of primary

25  identification are useful for voting in and of themselves.

Rodriguez - Cross / By Ms. Baldwin                    249

1   Q    Sure.  The only documents --

2        MS. BALDWIN:  If we could look on the next page of

3   this document -- if we can start kind of on -- I'm sorry.  If

4   we could start on -- go back up.  Sorry, the prior page.  And

5   zoom in on "primary identification," number two.  So if we

6   could pull up that and then the rest of Paragraph 2 that goes

7   onto the next page.  Okay.

8   Q    So the only forms of primary identification that are

9   permissible are driver licenses or Texas personal ID's that

10  have been expired between 60 days and two years, correct?

11  A    Um.

12  Q    Can you see that?

13  A    Yes.

14  Q    Okay.  So, for example, a Texas registered voter who has

15  never had a Texas driver's license or a personal identification

16  card, they would not have a form of primary identification by

17  definition, correct?

18  A    I believe that's correct.

19  Q    Okay.  And so the primary identification, that's the only

20  category where you just have to provide one underlying

21  document, correct?

22  A    That's how I understand it.

23  Q    Okay.  So, instead, for a Texas registered voter who has

24  never had a driver's license or never had a personal

25  identification card, they would have --

Rodriguez - Cross / By Ms. Baldwin                    250

1          **MS. BALDWIN:**  If we could go back to the first page

2    of the document and zoom in on 1582, that kind of big section.

3    Q    They would have a choice between presenting either two

4    pieces of secondary identification or one piece of secondary

5    identification and two pieces of supporting identification; is

6    that right?

7    A    That's how I understand it, yes.

8    Q    Okay.  And the forms of allowable secondary

9    identification, --

10         **MS. BALDWIN:**  if we could look on Page 2 under -- in

11   that first column where it says "secondary identification."  If

12   we could see all of Number 3.  So if we could get 3(a)

13   through (d).

14   Q    The secondary identification, they include birth

15   certificates, correct?

16   A    Yes, that's Paragraph 3(a).

17   Q    Okay.  And the birth certificates have to be originals or

18   certified copies, correct?

19   A    That is correct.

20   Q    Okay.  And if you haven't had a name or a gender change,

21   which are the other -- in (c) -- and you don't have a

22   citizenship certificate, you would have to have a birth

23   certificate in order to use the secondary document option; is

24   that correct?

25   A    Um.

Rodriguez - Cross / By Ms. Baldwin                    251

1    Q    So, for a voter who has never had a driver's license

2    before and if they're not a naturalized citizen and haven't had

3    a name change, they're going to have to get, under this

4    regulation, an original or certified copy of their birth

5    certificate; isn't that correct?

6    A    We would ask them to bring that and provide it.

7    Q    Okay.  And that's what the regulation says on the face of

8    the regulation; there is no exception to that?

9    A    On this, I -- well, refer back.  Is this the

10   Transportation Code?

11   Q    Yes.

12   A    Okay.  I believe further down in the Transportation Code

13   it says "other documents."  There's a limited amount of

14   discretion that the department has.

15   Q    Okay.  But it doesn't provide in this section in some

16   instances -- it nowhere says that other documents, meaning

17   birth certificates, aren't always required, right?  That's just

18   a case-by-case determination that DPS makes sometimes.

19   A    Well, the majority of our customers have birth

20   certificates.  There are a few that may not.

21   Q    Right.

22   A    And we work with those customers to issue them the ID that

23   they're looking for.

24   Q    But there's nothing in this regulation that says it's fine

25   to not provide birth certificates.  That's something that DPS

1    just exercises that discretion, but that's not codified

2    anywhere in this regulation.

3    A     Yes.

4    Q     Okay.  So if you don't have citizenship papers or a name

5    change, under this regulation you're going to have to present a

6    birth certificate and two forms of supporting identification;

7    is that right?

8    A     That's how I understand it.

9    Q     Okay.  And if we could look at some of the forms of

10   supporting identification there in number four, they include

11   things like a voter registration card in A, correct?

12   A     The -- the area that you have selected there's --

13   there's -- it goes up.  You see it goes to Q, so --

14   Q     Sure.

15   A     -- it goes up to the top of that page.

16   Q     Let's look at actually the -- some of the forms on the

17   other side of the page.  It also includes supporting

18   identification, things like -- if we could scroll up on the

19   page some more -- a pilot's license.  Now, a pilot's license

20   isn't a form of identification that was designed specifically

21   for the election identification certificate process, was it?

22   A     I don't know.

23   Q     You wouldn't expect it to be normal that somebody who

24   doesn't have a driver's license to come in with a birth

25   certificate and a pilot's license.

1   A     I don't know what a customer might have.

2   Q     You -- you have not encountered that.

3   A     I have not encountered that.

4   Q     And the population of folks who are applying; they're not

5   going to be presenting a pilot's license, generally.

6   A     I don't know.  I haven't encountered it to date.

7   Q     Okay.  One of the other forms, I believe, is a boat title.

8   Again, that's not something that DPS decided would be

9   specifically appropriate for election identification

10  certificates, is it?

11  A     Specific to election identification certificates?

12  Q     Right.

13  A     No.

14  Q     No.

15  A     That's just part of what we ask for as we're issuing

16  driver licenses and personal identification cards and -- and

17  election certificates.

18  Q     Sure.  Because all of these forms of supporting

19  documentation, these weren't actually designed with election

20  identification certificates in mind; is that correct?

21  A     I don't know -- I don't know how they were designed.  I

22  didn't -- I didn't have a hand in developing them.

23  Q     Okay.  But they mirrored the driver's license process,

24  correct?

25  A     The -- the driver's license and the personal I.D. cards

Rodriguez - Cross / By Ms. Baldwin                      254

1    and election certificates all require roughly the same

2    identification.

3    Q    And, so, when DPS decided to mirror the driver's license

4    process in the process of issuing election identification

5    certificates for these secondary documents, DPS didn't, as far

6    as you know, consider the relative ease with which a person

7    might obtain any of these forms of supporting identification.

8    A    I -- those decisions were made before I became a DPS

9    employee.  I'm not familiar with the discussions.

10   Q    Right.  And you've previously testified that you're not

11   aware of anybody at DPS considering the relative ease; isn't

12   that correct?

13   A    Not to my knowledge.

14   Q    And did you testify that DPS -- you're not aware of

15   anybody knowing what -- for all of these forms -- what an

16   individual would have to do in order to get the identification

17   documents that DPS collects; isn't that right?

18   A    Well, we don't know what the customer would have to do in

19   order to get them.  That's correct.

20   Q    And, in fact, at the time of your deposition in this case

21   you didn't know how much it would cost to obtain a certified

22   birth certificate; isn't that correct?

23   A    No.

24   Q    But you're in charge of this program and administering it;

25   that's right?

Rodriguez - Cross / By Ms. Baldwin                    255

1  A    Yes, but different -- different localities charge

2  different amounts of money for birth certificates.

3  Q    Okay.  But you didn't know how much a Texas one would

4  cost, for example.

5  A    No.

6  Q    I'd like to pull up a web page from the South Carolina

7  state election commission, if we could.

8          So, South Carolina also has a voter I.D. law, and I

9  just want to -- if we could zoom in on where it starts that "if

10 you do not have one of these photo I.D.'s."  So, one of the

11 options that a voter would have in South Carolina is to go to

12 their county voter registration office and provide their date

13 of birth and the last four digits of their social security

14 number and get a free photo voter registration card.

15         That's not something that you could do in Texas in

16 order to get an EIC, is it?

17 A    No.

18 Q    Would you agree that South Carolina's method is less

19 burdensome for voters, to just be able to state some numbers

20 that you already have without having to get underlying

21 documentation?

22 A    I don't know what would be burdensome to a voter.

23 Q    You don't know that it would be burdensome to have to go

24 out and purchase a birth certificate compared to just giving

25 the last four digits of your social security number?

Rodriguez - Cross / By Ms. Baldwin                    256

1  A    I -- I don't know whether that's a burden or not.  It's a

2  requirement the State of Texas has.

3  Q    Okay.  Is it more burdensome to pay an amount of money

4  than to just provide information that's already at hand?

5  A    I -- I don't know.

6  Q    We talked -- you talked earlier with Mr. Scott about the

7  fact that initially when DPS was issuing election

8  identification certificates that DPS was fingerprinting EIC

9  applicants, correct?

10  A    The -- early in the process, yes.

11  Q    And if we could take a look back at the PL-344.  In the

12  rule, the -- if we could scroll to the next page; and the next.

13        On number three, the -- that's highlighted,

14  "fingerprints of the applicant," that's still in the current

15  version of the regulation as a requirement, correct?  DPS

16  hasn't removed that.

17  A    To my knowledge, DPS has not removed that, but we -- we

18  don't capture fingerprints, and the current FBI system we use

19  and our fielding doesn't allow the CSR's to capture

20  fingerprints.

21  Q    But it's still a requirement on the books.

22  A    It's -- it's still part of this -- it's still part of

23  the -- still part of the -- the administrative code, but we

24  don't do it.

25  Q    Okay.

Rodriguez - Cross / By Ms. Baldwin                257

1    A    And we haven't -- we haven't done it for several cycles.

2    Q    And the reason why is because the Secretary of State

3    directed DPS to stop, notwithstanding what's in your

4    regulation.

5    A    I don't know.  I know that my chain of command told me,

6    and I -- I put out a message to the field that -- that

7    indicated that we would not collect fingerprints.

8    Q    And it's not your understanding -- you didn't previously

9    testify that that was based on what the Secretary of State told

10   DPS to do?

11   A    I can't remember.

12   Q    I believe you also talked with Mr. Scott about the fact

13   that it's not uncommon for law enforcement to be present at DPS

14   offices; is that correct?

15   A    DPS is a law enforcement agency.

16   Q    So, for example, at some offices the highway patrol and

17   Texas Rangers are going to be co-located with some DPS offices.

18   A    That's correct; there could be.

19   Q    If we could pull up Plaintiffs' 396, and if we could

20   highlight in on the gentleman -- the kind of top half of the e-

21   mail.

22          This is an e-mail that you talked about earlier that

23   you sent, and it was about DPS being asked by the Secretary of

24   State to open offices on Saturdays specifically only for the

25   purpose of issuing election identification certificates, right?

Rodriguez - Cross / By Ms. Baldwin                    258

1   A    That's correct.

2   Q    Okay.  And the offices were being opened in the 13

3   counties where the Secretary of State believed that there were

4   the highest number of Texans that needed EICs, correct?

5   A    That is correct.

6   Q    And these Saturday hours would be solely for EIC

7   transactions, so nobody would be coming in for driver's

8   licenses or anything else.

9   A    Well, the customer may come in for the driver's license,

10  but that's not a service that we offer.

11  Q    Okay.  And, so, as part of having specific EIC-only office

12  hours, in that first line:

13           "I realize this creates a real issue for you, but it

14           would be very helpful if you could provide some

15           troopers for presence."

16           So, you personally requested that law enforcement be

17  present specifically while voters were applying for EICs?

18  A    I wanted the -- I wanted the regional commanders to know

19  that we would have offices that would be open outside of the

20  normal duty hours, business hours, on Saturdays within their

21  regions and that if their troopers came by and they saw cars

22  outside there, that the -- that's what we were doing.

23  Q    Well, it doesn't read as a heads up.  "It would be helpful

24  if you could provide some troopers for presence."  That's what

25  you wrote, isn't it?

Rodriguez - Cross / By Ms. Baldwin                    259

1    A    That's what I wrote.

2    Q    And that seems to be requesting a law enforcement presence

3    specifically when people are applying for EICs.  Wouldn't you

4    agree?

5    A    That's -- no, not necessarily, no.  I wanted them to know

6    that that's what we were doing on Saturdays.

7    Q    And you wanted them to know and to provide some presence,

8    right?

9    A    If they had some presence, if the highway patrol had a car

10   going by.

11   Q    Okay.  And based on a number of the e-mails that you've

12   already talked about with Mr. Scott, you would agree that

13   you've been in frequent communication with DPS regional

14   managers about the number of EICs that they're issuing and the

15   process?

16   A    Yes.

17   Q    Okay.  Let's pull up Plaintiffs' 378, if we could.  Great.

18        And this is an e-mail that we've already talked about

19   that you sent to a number of folks who are all DPS regional

20   managers?

21   A    The DPS regional managers are on the two line, and then

22   there are assistant managers and Paul Watkins, my direct

23   report, and Stephen Bell, who is my counterpart, and they're on

24   the C.C. line.

25   //

Rodriguez - Cross / By Ms. Baldwin                    260

1    Q    Okay.  And previously you testified that, you know, when

2    you were sending this, focusing in on the line that says:

3              "I know this sounds redundant, and you are right, but

4              trust me on this one; I will need negative activity

5              reports to feed the machine up here."

6              Now, I understood your testimony in talking with

7    Mr. Scott as saying that you just were writing this to say that

8    you needed activity reports; you wanted to know what was going

9    on in the field.

10   A    I want --

11   Q    Is that --

12   A    I needed to know what was going on in the field.

13   Q    Well, if you needed to know what was going on in the

14   field, why did you assume that it would be nothing by saying,

15   "I needed negative activity reports"?

16   A    I didn't assume that it would be nothing.  I wanted to

17   know if -- I wanted to know what was going on, whether there

18   were issuances or not.

19   Q    Well, why didn't you say, "Whether there are issuances or

20   not, I would need negative or positive activity reports"?

21   A    That's how I talk.  If you look at the paragraph above it,

22   it says:

23              "I would ask you to institute the following in your

24              regions, to have their offices report anyone asking

25              for an EIC to you, and, in turn, pass that to me" --

Rodriguez - Cross / By Ms. Baldwin                    261

1           That's a positive report --

2           -- "and daily at 11:00 o'clock and again at 4:00

3           please send me a note about any EIC requests and

4           issuances."

5           So, that gets into the information that I need from

6    them, and then I also wanted to make sure that if there was no

7    activity that they also send me a report, and that would reduce

8    the ambiguity in my own mind.

9    Q    You would agree that this reads that you expected for

10   there to be negative activity reports, though, wouldn't you?

11   A    No, I wouldn't.

12   Q    Could we pull up Plaintiffs' 380?  And, again, this is

13   another e-mail that we've discussed, if we could focus in on --

14   let's start with the message from Mr. Carter about midway down

15   the page.

16           So, Mr. Carter, where he writes "negative today,"

17   he's writing that there were no EIC issuances in his region?

18   A    No EIC issuances.

19   Q    Okay.  And you responded to him, if we could see the

20   response above that:  "No inquiries either.  This is getting

21   better by the day."

22           If I understood your testimony on direct, you

23   testified that "This is getting better by the day" was an

24   indication of you being disappointed?

25   A    Yes.  We had been asked to do something; I had been given

Rodriguez - Cross / By Ms. Baldwin                       262

1   a mission, a job, a project, however you want to refer to it

2   as.  We had -- we had gone through an awful lot of effort.  We

3   had our employees trained and were ready to issue the EICs,

4   and -- and we weren't issuing any up to this point.

5   Q    You would agree that "This is getting better by the day"

6   is a pretty unusual way to express disappointment.

7   A    Sometimes I express sarcasm.

8   Q    But not concern.  So, no issuances, and the response is

9   sarcasm, not, "I wonder what we could be doing better or

10  differently."

11  A    Well, we've -- we had an extensive media campaign that we

12  had opened offices on extended hours, or were preparing to.

13        **MS. BALDWIN:**  If I could ask -- I don't believe that

14  we've had it loaded, because it was just served last night into

15  our system yet; if we could pull up Defendants' 2739?

16        **MR. SCOTT:**  (indiscernible)

17       **(Laughter)**

18        **MS. BALDWIN:**  No, I -- I think this is the total

19  number of EICs issued.  This one was leaked by Ms. Reed.

20  **BY MS. BALDWIN:**

21  Q    So, from this chart, as of the end of last week, there

22  were 279 EICs that had been issued in total; is that right?

23  A    You're reading it correctly.

24  Q    Okay.  And DPS has been issuing EICs for more than a year

25  now; is that right?

Rodriguez - Cross / By Ms. Baldwin                    263

1   A    Since the 26th of June, 2013, yes.

2   Q    Okay.  And, so, that combined total of 279, that includes

3   all of the permanent DPS offices, right?

4   A    That's -- that's every office, every county, the HHSC

5   offices, and the mobiles.

6   Q    Okay.  And, so, if I'm doing the math, how many permanent

7   DPS offices are there?

8   A    To the best of my knowledge, 230; we've -- approximately.

9   Q    Okay.  And there are another 55, I believe you said,

10  counties that are now authorized to issue EICs?

11  A    That's correct.

12  Q    And, then, there are at least another 25 mobile EIC

13  stations that can be --

14  A    Well, there are 16 that are operated by DPS employees --

15  Q    Okay.

16  A    -- and, then, there are seven that HHSC operates.

17  Q    Okay.  So, 67.  So, were -- there are well over 300

18  locations that are issuing EICs; is that -- between the

19  permanent offices, the county offices, and these mobile EIC

20  stations, right?

21  A    I'll trust your math.  I don't know.

22  Q    Okay.  But, so, that means that if every location had even

23  issued two EICs, the number would be more than doubled, right?

24  But there's not a lot of activity going on at any of these

25  locations, correct?

Rodriguez - Cross / By Ms. Baldwin                     264

1    A    We've issued 279 EICs.

2    Q    Right.  And if every location that issued EICs had even

3    issued two, that number would be doubled.

4    A    It would be higher.  Again, I'm not going to do the math

5    on the stand.

6    Q    And in talking about the coverage and statewide, the

7    county locations that you referred to that are the result of

8    the memorandum of agreement, those aren't permanent locations,

9    right?  Those could be -- that memorandum of understanding

10   could be withdrawn at any time.

11   A    That's not an accurate statement.  The memorandum of

12   understanding has a provision in there that -- that, to the

13   best of my knowledge, either party can terminate, but it's

14   required in writing, and there is a -- I believe there is a

15   notification -- I'd have to see the -- the document to point

16   that out to you.

17   Q    Okay.  Sure.  Why don't we pull that up, then.  It's

18   Plaintiffs' 281; and if we could go to page four of that

19   document.

20   A    I think you'll have to scroll up.

21   Q    "This memorandum is effective on the day it is fully

22   executed and will terminate on the written agreement of the

23   parties to terminate it."

24   A    Please -- please scroll up.

25   Q    Okay.

Rodriguez - Cross / By Ms. Baldwin                         265

1    A     Keep going.

2    Q     Keep going.

3    A     All right.  It's the previous page.

4    Q     Previous page?

5    A     Uh --

6    Q     Duration of partnership?

7    A     Oh, go back.  That's -- that's not an -- that's a -- may I

8    see the top of this, please?

9    Q     Sure.  Do you want to see the first page?

10   A     This is between the -- memorandum of understanding;

11   (indiscernible).  This is between the Secretary of State and

12   the -- and the DPS.  It's not between the counties.

13   Q     Okay.  My -- my -- thank you for clarifying.  So, as to

14   this document, the -- this partnership here between the

15   Secretary of State and DPS is discretionary and subject to

16   written termination.

17   A     I'd have to see the whole thing again, but -- I mean, if

18   you want me to be certain --

19   Q     Sure.

20   A     -- I'd have to see it.

21   Q     On page four; there is nothing in that language that makes

22   this permanent, is there?

23   A     I -- no, I suppose not.

24   Q     Okay.  For the mobile EIC units that DPS staffs, it's

25   DPS's position that DPS prefers to issue EICs during business

Rodriguez - Cross / By Ms. Baldwin                    266

1   hours; is that correct?

2   A    EIC prefers to -- to do its business during the hours that

3   we have posted on line.  Those are generally understood to be

4   business hours.

5   Q    And you testified at your deposition that that's because

6   business hours are better for DPS employees, correct?

7   A    Well, it's -- our employees have worked very hard, and one

8   of the benefits is, is that they have routine hours, and as

9   much as we can try and keep that within there, we try and keep

10  their hours routine for them.

11  Q    And that's why DPS prefers that the mobile EIC units that

12  it staffs follow business hours.

13  A    Well, the mobile EICs are -- are slightly different

14  because there's --

15  Q    That DPS staffs.  I'm sorry.

16  A    -- there's travel involved in -- in those, so the CSR

17  would have to -- to get the equipment, would have to inventory

18  the equipment and make sure it works, and then transport it to

19  wherever they're working and then set it up.  So, that travel

20  time is -- is taken into consideration when -- when we

21  determine the hours for the mobile units.  And, then, at the

22  end of the day, they have to -- when they close down, they have

23  to pack everything back up and they have to drive back to their

24  home office and -- and enter the information collected, the

25  issuance information collected, into DLS.  So, depending on

Rodriguez - Cross / By Ms. Baldwin                           267

1    where they go, there could be a significant amount of travel

2    time involved.

3    Q    Sure.  If you could turn in your deposition to page 295;

4    and if you could take a look, when you're there, at line 14.

5    A    Two ninety-five, line 14?

6    Q    Uh-huh.  And the question is:

7              "QUESTION:  Is it DPS's position that business hours

8              is a better time for mobile EIC units as well?

9              "ANSWER:  Well, we -- or because of our employees, we

10             prefer to issue the EICs during business hours.

11             That's what we do everywhere else in the state."

12             You don't disagree with that testimony today, do you?

13   A    No, I don't disagree with it.

14   Q    Okay.  And, to your knowledge, DPS has never considered

15   whether business hours or non-business hours are best for the

16   people, the customers who need to access those mobile EICs.

17   A    Well, there have been -- we have also engaged in

18   discussions with our regional managers, and we've asked them

19   when they work with the counties for their mobile units to try

20   and schedule one extended-hour day per -- per EIC cycle and try

21   and schedule them on Saturdays.

22   Q    But at the time of your deposition -- and let me know if

23   you're changing your testimony today -- you were asked:

24             "QUESTION:  Has DPS ever" --

25             And this is on page 296.

Rodriguez - Cross / By Ms. Baldwin                                268

1              "QUESTION:  Has DPS ever considered whether business

2              hours also work better for people who would be going

3              to use mobile EIC units?

4              "ANSWER:  Not to my knowledge."

5   A    Okay.

6   Q    Is that still your testimony today?

7   A    Yes.

8   Q    So, again, turning back to the idea that DPS has issued

9   all of 279 EICs as of last week, you don't know how many people

10  in Texas lack one of the required forms of I.D. under SB 14, do

11  you?

12  A    I don't know.

13  Q    And, so, despite not knowing how many people need an EIC

14  and despite having only issued 279 EICs statewide, you've

15  testified that you believe that the EIC program is a success,

16  correct?

17  A    That's correct.  It is a success.

18  Q    And you explicitly believe that the number of EICs issued

19  is not a factor in determining whether the program is a

20  success, correct?

21  A    It's not a criteria we use to measure success.

22  Q    In fact, you suppose that the program might still be

23  regarded as a success even if it had issued zero EICs, correct?

24  A    We had provided a service to the people of the state of

25  Texas, and that was our measure of success.  The number of EICs

Rodriguez - Cross / By Ms. Baldwin                    269

1   that we issued is secondary.

2   Q    So, the answer to my question is yes.  Even if you had

3   issued zero EICs, because you provided the services making them

4   available, you could still consider the program a success.

5   A    Because we had provided the service, yes.

6   Q    I'd like to pull up Plaintiffs' 691, which is a PowerPoint

7   from the Georgia Secretary of State's office regarding

8   implementation of their photo I.D. law.

9           So, you would agree Georgia is a much smaller state,

10  population wise, than Texas, right?

11  A    I don't know the population of Georgia.

12  Q    Okay.  Not even a ballpark?  I'll -- I'm happy to

13  represent to you it is a smaller state, if that's not something

14  you're --

15  A    I will believe you.

16  Q    Okay.  If we could take a look at page three.

17          So, in Georgia the forms of acceptable I.D. include a

18  Georgia driver's license, even if expired.  Do you happen to

19  know, is that different from what Texas does under SB 14?

20  A    I'm unfamiliar with any of Georgia's laws.

21  Q    But I mean, as compared to Texas, Texas doesn't accept

22  indefinitely expired Texas I.D.'s.

23  A    No.  No, we don't.

24  Q    Okay.  And any valid state or federal government issued

25  photo I.D.?  That's not something that Texas does under SB 14,

Rodriguez - Cross / By Mr. Derfner                    270

1   is it?

2   A    I -- I'd have to refer back to it.

3   Q    And tribal I.D.'s, employee photos?  I'll represent to you

4   that that's not included in -- under SB 14, if you're not aware

5   of that fact.

6   A    Okay.  I -- right.

7   Q    So, this is a much broader list of acceptable I.D.'s than

8   Texas accepts, but notwithstanding that fact, if we could look

9   at page nine of this document.

10        So, Georgia's photo I.D. law started being enforced

11  in 2006, and in that year, in the first half of the year, I

12  believe from May forward, its county voter registrars issued

13  2,182 photo voter I.D. cards.  That's a lot bigger number than

14  have been issued in Texas, isn't it?

15  A    It is.

16  Q    But that number still doesn't change your evaluation of

17  whether or not Texas's EIC program is a success?

18  A    No, it doesn't.

19        **MS. BALDWIN:**  Thank you.

20     **(Pause)**

21                    **CROSS EXAMINATION**

22  **BY MR. DERFNER:**

23  Q    Hello, Mr. Rodriguez.  My name's Armand Derfner.  I'm one

24  of the lawyers for the Veasey/LULAC plaintiffs in this case.

25  A    I'm pleased to meet you.

Rodriguez - Cross / By Mr. Derfner                    271

1   Q    And me, too.  I just -- let me start by clearing up for

2   myself some of the things that we've heard testified about

3   today.  We've heard -- and I guess you've heard ad nauseam

4   about the -- these e-mails with words like, "Zero is a good

5   number," and, "It's getting better by the day," et cetera.

6   Obviously, you've explained what you say you meant.  The

7   question is:  What did people hear?

8            Did you tell -- did you give the same kind of

9   explanation to your supervisors about what you meant?

10  A    I don't -- I don't understand the question.  Do --

11  Q    Well, did your --

12  A    Do you --

13  Q    At least one of those went to Joe Peters.  He's your

14  supervisor, correct?

15  A    Yes, sir, he is.

16  Q    And were you -- did others of those e-mails go to either

17  him or any other supervisors?

18  A    Yes.

19  Q    So, your supervisors were aware of what you said in those

20  e-mails, correct?

21  A    Yes.

22  Q    Okay.  Did they ever ask you what you meant?

23  A    No, sir.

24  Q    So, whatever they interpreted you to mean, that would mean

25  that they had no problem with it or they were in sync with what

1   you said.  Is that a fair assumption?

2           **MR. SCOTT:**  Objection to form.  Calls for

3   speculation.

4           **MR. DERFNER:**  Well, of course it does.  Lots of

5   things call for speculation.

6           **THE COURT:**  Sustained.

7           **MR. SCOTT:**  He's not a mind reader.

8           **THE COURT:**  Sustained.

9   **BY MR. DERFNER:**

10  Q    Okay.  You never had any negative feedback about any of

11  those comments from your supervisors, correct?

12  A    No, sir.

13  Q    Okay.  Let me ask a little bit about Ruby Barber.  She's

14  the woman that got an EIC without having the documents required

15  by your regulations.  Is that correct?

16  A    She didn't have some of the documents.  That's correct.

17  Q    Okay.  And I think you told us that that's because DPS

18  claims or exercises discretion in certain cases; is that

19  correct?

20  A    Limited discretion.  Limited -- limited discretion.

21  Q    Limited discretion.  Well, she didn't have a birth

22  certificate, right?

23  A    Not to my knowledge, no.

24  Q    Okay.  And, in fact, you moved heaven and earth to go find

25  the census from her birth in Tennessee, correct?

Rodriguez - Cross / By Mr. Derfner                    273

1    A    I didn't; one of our customer service representatives did.

2    Q    Okay.  And she's White; is that correct?

3    A    I don't know.

4    Q    But you have records that show her race, don't you?  Don't

5    DPS records show race?

6    A    I've -- I've never looked up Ms. Barber's race.

7    Q    Okay.  The discretion that you say you have; is that

8    stated anywhere in your regulations?

9    A    I believe in the transportation code it says other

10   documents the department may require.  I'd have to see the

11   transportation code in order to -- to show you the paragraph.

12   Q    Okay.  Okay.  Let's take a look at that.  Can we have --

13   when you say "transportation code," are you talking about the

14   transportation code sections dealing with the EIC?

15   A    There would be -- it would be the driver license, the

16   driver licenses; the driver license and the I.D. cards.

17   Q    But she got an EIC, didn't she?

18   A    Yes, she did.

19   Q    So, why would she be covered by the driver's license

20   rules?

21   A    Because the -- the documentation that we require for all

22   three of those documents is roughly the same.

23   Q    By whose -- who makes that determination?

24   A    That determination was made as part of our business

25   process before I became a DPS employee.

1  Q    So, my question is, again, is it the transportation code,

2  which is the law, that says you have discretion, or is there

3  someplace else that says you have discretion?

4  A    I believe it's the transportation code.

5  Q    Okay.  And the discretion -- okay.  Let's assume that you

6  have the discretion according to the transportation code; we'll

7  come back to that.  Do your regulations say you have that

8  discretion?

9  A    Um --

10 Q    I'll show them to you if you'd like.

11 A    That would be helpful.

12 Q    Okay.

13     **(Pause; voices and whispers off the record)**

14     Let me ask another question while we're getting this

15 straightened out.  Is there anything on your website that tells

16 people that you have discretion?

17 A    Not to my knowledge, no.

18 Q    Okay.  Let me ask another couple of questions about your

19 website.  Is your website in English?  I mean, do you have a

20 website in English?

21 A    Yes, sir.

22 Q    And do you have a website in Spanish, or is there stuff on

23 your website that is in Spanish?

24 A    I don't recall.

25 Q    Oh.  Okay.  Do you speak Spanish?

Rodriguez - Cross / By Mr. Derfner                    275

1   A    I speak some.

2   Q    Okay.  Have you ever tried to look to your website to see

3   if there is anything in Spanish?

4   A    I have not.

5   Q    Okay.  If somebody -- strike that.

6        MR. SCOTT:  So, this is the administrative code.  Are

7   you looking for the transportation with the 521(a) 001F?

8        MR. DERFNER:  I can show him that, too, but

9   (indiscernible) show him this one.

10       MR. SCOTT:  Sure.

11       MR. DERFNER:  May I approach the witness, your Honor?

12       THE COURT:  Yes.  Yes.

13       THE WITNESS:  Thank you very much.

14  BY MR. DERFNER:

15  Q    This is -- what I'm showing the witness, and have

16  previously just checked with Mr. Scott, is -- I think it's 37

17  TAC, Texas Administrative Code, Section 15.181 through 185,

18  which is five sections dealing with the requirements for an

19  EIC.  That's the administrative regulations; it's not the

20  statute.

21       (Pause)

22  A    All right, sir.

23  Q    Okay.  Is there anything in there -- I'm sorry; are you

24  still reading?

25  A    No.  I didn't know if you wanted it back.

1  Q    No, you can --

2  A    Okay.

3  Q    You can have it.  Is there anything in there that says you

4  have discretion to waive some of the documentary requirements?

5  A    I -- I can't find it.  No, sir.

6  Q    Oh, okay.  I'm sorry.  I'm told it's on the screen, too.

7            **MR. DUNN:**  Do you mind if I stand with Mr. Derfner?

8            **THE COURT:**  That's fine.

9            **MR. DERFNER:**  I need all the help I can get.

10 **BY MR. DERFNER:**

11 Q    I'm sorry.  I interrupted your answer.  Is there anything

12 on there that tells anybody that DPS has discretion to waive

13 some of the requirements?

14 A    No, I can't find it, no.

15 Q    Okay.  So, how would a person, let's say a customer for an

16 EIC, know whether there's discretion or not?

17 A    Well, they would have the intern to come to our office

18 with the documents that they have and enter into dialogue with

19 one of our customer service representatives and depending on

20 what the customer provided, then we would see what they had --

21 we'd have to see what they have to have.

22 Q    Okay.  And what do you tell your customer service

23 representatives about how to exercise their discretion?

24 A    Well, they're trained that if they have a question that

25 they refer it up to the successive levels in the chain of

Rodriguez - Cross / By Mr. Derfner                    277

1   command.

2   Q    How do they know when to do that and when to just say,

3   "No"?

4   A    If they have a customer that doesn't have all the

5   documents, then there would be a discussion they would have

6   with their supervisor.

7   Q    So, would you expect that any customer that comes in and

8   doesn't have their documents is going to prompt a discussion

9   between the CSR and the supervisor?

10  A    I think the discussion would be if the customer didn't

11  have any documents or if they just left them at home.

12  Q    Then there wouldn't be a discussion.

13  A    There may not be, no.

14  Q    Okay.  But if a customer comes in with any kind of

15  documents that could conceivably come close, the customer

16  service representative is instructed to talk to their

17  supervisor?

18  A    No, they're not instructed to do that.  It's not as

19  absolute as you describe it.

20  Q    Well, how do they know what they're supposed to do, then?

21  A    Well, they receive training on the documentation that

22  they're supposed to receive and if they're presented with

23  something that's outside that, they can refer to their

24  supervisor.  The supervisors generally are very close.

25  Q    I see.  But you don't tell them when to ask the supervisor

1    and when not to.

2    A    Well, if it exceeds their experience, then they ask.

3    Q    And so, if the same customer with the same documents --

4    two customers with similar documents came in, one in Waco, one

5    in El Paso, they might get two different responses.  Is that

6    correct?

7    A    It's possible that they could and we've been working to

8    address that issue with training.  But, yes.

9    Q    Do you have any training manuals that say that?

10   A    We have training packages that our DPS training section

11   has produced.

12   Q    Do they talk about discretion and how to exercise it?

13   A    I'd have to refer to them, but I know that it's not

14   unusual for me to get a phone call from a regional manager

15   asking me to take a look at the documents that a customer had

16   provided.

17   Q    If it's not unusual, how come you don't put something down

18   in writing to give them some guidance?

19             By the way, I want to apologize to the court reporter

20   for wandering over out of the range of the microphone.

21             THE COURT:  We can hear you.

22   BY MR. DERFNER:

23   Q    So, should I repeat the question?

24   A    Would you mind?

25   Q    Okay.  Could the court reporter repeat it?  Now that I've

1    apologized to you.

2              **THE COURT:**  She can play it back.  It's an electronic

3    recording, so she can't read it back.

4              **MR. DERFNER:**  Oh, I'm sorry.

5              **THE COURT:**  She can play it back if you need her to.

6              **MR. DERFNER:**  Okay.  Thank you.  Okay.  I'll just ask

7    the question again.

8    **BY MR. DERFNER:**

9    Q    If it's not unusual for you to get these kinds of

10   questions, then why doesn't DPS put something down on paper to

11   get uniformity and get guidance for all of its employees?

12   A    Because we have a set of operating instructions, the

13   training that we provide them.  That provides the uniformity

14   the employees need in order to provide customer service to the

15   people that come into the office.

16   Q    And I infer from what you said that that set of

17   instructions has nothing about the exercise of discretion.  Is

18   that correct?

19   A    I don't believe so.

20   Q    Okay.  Now, how do you spend your time?  Well, before I

21   ask that -- strike that question.

22              What is your job?  What are your duties at DPS?  You

23   Mr. Rodriguez?

24   A    I'm a senior manager.  I'm responsible for DPS Regions 3,

25   4, 5 and 6.  That's the Panhandle down the Rio Grande Valley,

1   Central Texas and out to El Paso.

2   Q    Okay.  And what work does that involve?

3   A    Well, we attend -- I attend conference calls, policy

4   meetings, weekly updates.  I have routine phone calls with my

5   managers to see if they have any systemic problems that I need

6   to resolve, hiring boards, those kinds of things.  It's very

7   routine.

8   Q    Okay.  How many -- what kinds of product or what kinds of

9   results come out of that?  Driver's licenses, personal IDs,

10  handgun permits?  Is that part of your responsibility or not?

11  A    The concealed handgun program is run by the RSD.  It's the

12  -- the acronym escapes me, but it's not driver license.

13  Q    Okay.  So, you're in the driver's license section one

14  might say?

15  A    Division is what it's called.

16  Q    Division?  Okay.  How many driver's -- does that include

17  personal IDs, as well?

18  A    It does.

19  Q    Okay.  How many driver's licenses and personal IDs would

20  you say come out of your regions -- those, I think, four or

21  five regions that you named?  In other words, the ones that are

22  responsible to you in a year?

23  A    I don't know how many come out of my regions.  I know that

24  we produce about six million driver licenses and personal ID

25  cards per year for the State of Texas.

1  Q    For the state.  And how many region -- how many people are

2  there at your level to divide up the state?

3  A    There's myself and then there's Steve Bell -- Steven Bell

4  -- and he's responsible for DPS Regions 1 and 2.  And that's

5  Dallas/Fort Worth is 1 and the eastern part of Texas and

6  Houston is Region 2.

7  Q    So, you're responsibility is roughly more or less half of

8  the state?

9  A    I have the geographical area and he has the population

10  centers.

11  Q    Okay.  It keeps you pretty busy?

12  A    Yes, sir.

13  Q    Okay.  And how much time would you say you spend on the

14  EIC part of your duties?

15  A    I think it would depend on if we're in an election cycle

16  or preparing for an election cycle.

17  Q    Okay.  And suppose you're not.  What about, say, the

18  summer?

19  A    Sure.  Maybe two, three hours a week.  Usually I speak

20  with -- we have two analysts that work on EICs and usually I

21  talk to them to find out what the status is if we've issued any

22  other EICs; if there's any new counties I have decided to enter

23  into the MOU with us; and then there's preparation that has to

24  be done before we start an election cycle.  The equipment has

25  to be inventoried and that kind of thing.

Rodriguez - Cross / By Mr. Derfner                282

1  Q    And is there anybody in the DPS whose job is just EIC and

2  nothing else?

3  A    Not to my knowledge, no.

4  Q    Is there anybody other than you that has any significant

5  responsibility for the EIC program?

6  A    Yes.

7  Q    And who is that?

8  A    Well, that would be Steven Bell and the way we've divided

9  the responsibilities is I'm responsible for the operations and

10 Steven does the logistics portion.  He tracks where the mobile

11 units are, physically.  He makes sure that the regional

12 managers are (indiscernible) and that if parts need to be

13 ordered that they're ordered and sent out to the right

14 location.

15 Q    Okay.  Let me ask you another question.  You told us

16 earlier about these seven mega centers --

17 A    Yes, sir.

18 Q    -- that had recently -- I guess recently been created or

19 whatever.  Are they mostly in different metropolitan areas of

20 the state?

21 A    That would be a fair categorization, yes.

22 Q    Okay.  And I think you said when you were asked on direct

23 examination about where they were located or how the locations

24 were picked -- correct me if I'm wrong -- but I think you said

25 something like, "You pick the locations that made more sense."

Rodriguez - Cross / By Mr. Derfner                    283

1    If I've got you wrong, you can change it and correct me.

2    A    We had a study from Texas State and Texas State had done

3    an analysis based on the population growth in certain areas

4    around the state and they did a zip code analysis.  And so,

5    based on those locations and the availability of land within

6    those areas, we went ahead and we put mega centers in those

7    areas.  We're putting one -- we're putting a mega center here

8    in Corpus Christi, as a matter of fact.

9    Q    Will that be number 8?

10   A    Yes.

11   Q    Okay.  So, the Texas State study, did that focus mostly on

12   what part of the state they should be in, or did it also talk

13   about where it should be located if you decided to put one in a

14   certain area?

15   A    It focused on where they should be located within certain

16   areas in the state.

17   Q    And what kind of factors did they take into account?

18   A    Well, I'm not an expert on it.  To the best of my

19   recollection, it was the population -- it was anticipate a

20   population growth within those areas, and it was also -- then

21   based on those factors, and there may have been some other ones

22   that I don't know about, they had a circle.  And they said,

23   "Within this" -- I believe it was a five-mile circle or a ten-

24   mile circle -- where it was recommended that we put the offices

25   in those locations and then we tried to.  We tried to purchase

Rodriguez - Cross / By Mr. Derfner                284

1    land within those areas, real estate, and in some cases -- and

2    I believe the Leon Valley mega center in San Antonio was

3    located just outside of the area that they -- that Texas State

4    had recommended because that was the only place that we could

5    get real estate.

6    Q    And what kind of land or what kind of area are you looking

7    for, generally, when you locate one of these mega centers?

8    A    Well, it's about a 20,000 square foot facility.  So, we

9    want to make sure that it has access by road, they've got good

10   access for trucks, that it's on a public bus line, and that

11   it's easily accessible by customers.

12   Q    Okay.  And when you open the mega centers, does that

13   sometimes lead you to close down some other DPS offices?

14   A    I don't think we've closed down any other driver license

15   offices as a result of opening the mega centers.  One of the

16   reasons that we wanted to open the mega centers was because

17   they would have what Texas State calls and what we refer to as

18   gravitational pull, so that we have those large concentrations

19   of customer service representatives and that would draw the

20   customers away from the smaller offices into the large offices.

21   And San Antonio is an example of that because the Boerne office

22   was extremely busy.  Boerne is a growing community.  We opened

23   a San Antonio mega center in Leon Valley and that drew a lot of

24   customers away from the Boerne office and it allowed us to

25   conduct some improvements in the Boerne office.  And the

Rodriguez - Cross / By Mr. Derfner                    285

1   customers are still served --

2   Q     And have there been some situations where you were able to

3   or chose to close an office as a result of the mega center

4   gravitational pull pulling customers away?

5   A     Sir, I don't recall any of those.  I don't recall that we

6   had closed an office as a result of the mega center openings.

7   Q     Do you remember closing an office in downtown Dallas in

8   the last couple of years?

9   A     That's in Steve's area.  I wasn't -- I don't have direct

10  knowledge of that.

11  Q     Okay.  If you had a choice of locations, whether it's San

12  Antonio or Harris County area, and one area is convenient for

13  drivers and you're issuing within the state six million

14  driver's licenses and personal IDs a year, and the Secretary of

15  State were to tell you, "You know something?  That's really

16  sort of inconvenient for people who don't have driver's

17  licenses, people who need EICs.  They're more located

18  downtown."  And you've issued 279 of those.  If you have a

19  conflict like that, where do you put the mega center?

20  A     Well, I'm unaware of any conflict that we had like that.

21  We've never had a discussion with the Secretary of State about

22  the location of a mega center.

23  Q     Okay.  So, if the Secretary of State had some views like

24  that, you wouldn't know about it.

25  A     No, sir.

Rodriguez - Cross / By Mr. Derfner                286

1   Q    Did you ever ask them?

2   A    No, sir.

3   Q    Okay.  And did they ever volunteer?

4   A    Not to my knowledge and not to me.

5   Q    Okay.  Let's talk about the Secretary of State a little

6   bit.  If I understood you correctly -- I may have missed it --

7   when you said that the fingerprinting that you do -- that you

8   did, I'm sorry, that you did -- was ended because the Secretary

9   of State told you to end it.  Is that correct?

10  A    I got it through my chain of command.  I can't remember

11  exactly how it came to them to me, but I know that it was --

12  that we stopped taking fingerprints, I believe it was September

13  of 2013.

14  Q    Well, I understand.  You said it was your chain of

15  command, but didn't it come from the Secretary of State?

16  A    It may have.  Yeah.

17  Q    Let's look at your deposition.  Do you have your

18  deposition transcript there?  Did you have it up there?

19  A    I do.  You provided me one.

20  Q    Would you look at page 83, line 21, I believe?  Could you

21  read those couple of lines?  I think line 21 through 23.

22  A    "And why did DPS decide to suspend the requirement -- it

23  was directed not to by the Secretary of State," okay.  That

24  answers the question.

25  Q    Okay.  If the Secretary of State said, "Don't take

Rodriguez - Cross / By Mr. Derfner                287

1  fingerprints," why did you even start?

2  A    Well, it goes back to what I said about our business

3  processes as they were originally set up is we wanted to have

4  the process for all three of the documents that we issue be the

5  same.  And that's what we do for driver licenses and personal

6  ID cards.

7  Q    Well, did the Secretary of State tell you not to do the

8  fingerprints only after you had started or back at the

9  beginning?

10 A    I believe it was after we had started.

11 Q    Why didn't the Secretary of State -- if you know -- why

12 didn't they tell you not to at the very beginning?

13 A    I don't know.  I don't know.  I don't know.

14 Q    Well, in fact, what -- did DPS check with the Secretary of

15 State before issuing its regulations?

16 A    I don't know because the regulations were in place before

17 I became a DPS employee.

18 Q    Do you think the Secretary of State would have said,

19 "Okay," if DPS had shown them regulations with fingerprints in

20 them?

21 A    I don't know what they would have said, sir.

22 Q    Okay.  Do you have anything to suggest that DPS ever did

23 talk to the Secretary of State about the regulations it was

24 drafting?

25 A    I don't believe so, sir.  I don't know.  I wasn't -- I

Rodriguez - Cross / By Mr. Derfner                    288

1   wasn't a DPS employee.

2   Q    Okay.  Let's take a look at this -- the EIC law, okay?

3         MR. DERFNER:  Could we have Exhibit PL44?  And we're

4   going to go down to almost the last page, Section 20.

5   Somebody's going to have to tell me when it's up there.

6         MR. DUNN:  It's there.

7         MR. DERFNER:  Twenty?

8         MR. DUNN:  Well, we're getting to Section 20 now.

9         MR. DERFNER:  Okay.

10         MR. DUNN:  We're there now.

11         MR. DERFNER:  Okay.

12  BY MR. DERFNER:

13  Q    So, Section 20 is the EIC law.  It creates this new part

14  of the Transportation Code.  Why would the -- why would the

15  legislature have put an election law in the Transportation

16  Code; do you have any idea?

17  A    I don't know.

18  Q    Okay.  Well -- and it says DPS is supposed to create an

19  issue -- this EIC form, correct?

20  A    Yes.

21  Q    Okay.  And there's a number of sections here including one

22  that says it's supposed to be free; is that correct?

23  A    Uh, you have to scroll down.  I'd like to see it.

24  Q    Can you see -- let's see.  That would be -- Section 20 --

25  it is -- oh, it's B I think.  "The Department may not collect a

1   fee;" is that B?

2   A    I see that; yes.

3   Q    Okay.

4   A    That's what it says.

5   Q    And it's highlighted.  Okay.  So, that's the section --

6   you're familiar with that section, I guess, or with the rule

7   that the EIC is free, correct?

8   A    That's correct.  It's free.

9   Q    We'll come back to that.  Let's look now at Section --

10  let's see -- that's 10 -- F.  Would you read Section F?

11  A    It says,

12           "The Department may require each applicant for an

13           original or renewal election identification

14           certificate to furnish to the Department the

15           information required by Section 121.142."

16  Q    Okay.  So, they give you all this discretion.  Did they

17  give you any guidance in the statute?

18  A    Well, that's the guidance that we need in order to

19  formulate our rules.

20  Q    Okay.  So, let's turn to Section -- so you -- you can --

21  you can -- "may," right?  "May," not "must" require the

22  information that you collect under Section 521.142?

23  A    Yes.

24  Q    Okay.  And let's turn to that one.  That would be Exhibit

25  Plaintiffs' 340.  And that's the Transportation Code section

Rodriguez - Cross / By Mr. Derfner                    290

1   dealing with driver's license, correct?

2   A     Yes.

3   Q     Okay.  And why don't we turn to Section E of that -- well,

4   first, that has a number of things that you can ask the -- or

5   should ask the applicant for a driver's license for, right?

6   A     Yes.

7   Q     And it, in fact, includes thumbprints?

8   A     Uh, if you scroll up.  I'd like to see that.

9   Q     Okay.

10            **MR. DUNN:**  Is it on the first page?

11            **MR. DERFNER:**  What?

12            **MR. DUNN:**  Is it on the first page?

13            **MR. DERFNER:**  I didn't look.  Let's see.  I give up.

14  We'll forget about that part.

15  Q     Okay.  Turn to Section E --

16  A     Okay.

17  Q     -- of 521.142.

18            **MR. DUNN:**  We're there.

19  A     It's there.

20  Q     Okay.  And what does that say?

21  A     It says,

22            "The application must include any other information

23            the Department requires to determine the applicant's

24            identity, residency, competency, and eligibility as

25            required by the Department or State law."

Rodriguez - Cross / By Mr. Derfner                    291

1   Q    Pretty much gives you a blank check, right?

2   A    Uh, I wouldn't say it's a blank check.

3   Q    Does it impose any limitations on you?

4   A    Uh, well, I mean, it's -- it's a subsection.  It says

5   here's all the things that you are going to do above it and

6   then there is limited discretion built into that paragraph.

7   Q    Okay.  And then pursuant to that, you drafted your

8   regulations that we've already talked about, right?

9   A    The -- the regulations?

10  Q    Correct.

11  A    The procedures for -- to issue EIC's?

12  Q    Right.

13  A    Yes.

14  Q    And that's when you put in these -- this sort of regime of

15  primary documents, secondary documents, supporting documents,

16  right?

17  A    Those are the documents we need; yes.

18  Q    Okay.  Are you -- and one of the documents you ask for is

19  a birth certificate, right?

20  A    That's correct.

21  Q    Okay.  Uh, and that's issued by the Department of HHS --

22  Health and Human Services?

23  A    In Texas, yes.

24  Q    In the State Department of HHS.  Uh, are you familiar with

25  what the State Department of HHS requires for issuing a birth

certificate?
A I am not.
Q Okay. Have you ever talked to HHS about it?
A No, I have not.
Q Okay. Would you be surprised to learn that the Department of HHS, while it wants proof of identity and has a lot of security measures in it including the paper, will take any State or Federal I.D. as a primary document?
A Would it surprise me?
Q Yeah.
A I'm not surprised by it; no.
Q Well, wouldn't it make sense for DPS to have checked with, for example, HHS what their requirements are?
A It's -- in terms of the formulation of the Transportation Code?
Q Yeah.
A That's outside of my -- I don't know about the formulation of the Transportation Code.
Q Okay.
A I don't know how those are (indiscernible)
Q You -- because the regulations were drafted before you got there?
A Yes.
Q Okay. But you don't have any sense -- you've never had any consultations with HHS about the regulations or about the

Rodriguez - Cross / By Mr. Derfner                    293

1   requirements for proving identity, have you?

2   A    I have not.

3   Q    Okay.  And did I understand -- well, have you ever been

4   involved in conversations or discussions about whether DPS

5   should require or should allow for online presentation of birth

6   certificates rather than it requiring a paper copy that is

7   original or certified?

8   A    I've never been a party to those conversations; no.

9   Q    Have you ever heard of such conversations?

10  A    No, sir.

11  Q    Okay.  Let's -- I just want to talk a little bit about --

12  I think I've asked about enough questions about the EIC.  I

13  want to ask a few questions about the driver's license.  Can

14  you tell me briefly what the ALR system is?

15  A    I know it's -- I believe it stands for Administrative Law

16  Review.  It's not -- it's not within my --

17  Q    Maybe I've got the wrong one.  I'm talking about the

18  Administrative License Revocation.

19  A    I don't know anything about that.

20  Q    Okay.  Are you familiar with any situations in which a

21  driver's license is confiscated, removed or in any event -- in

22  any way taken from a driver for some kind of highway matter or

23  highway offense?

24  A    I don't know if we -- I can't recall if we take them away.

25  I know that the -- a license can be suspended if the customer

1  has -- exceeds a certain number of points.  But I don't believe

2  that we take the card away from the -- from the customer.

3  Q    Okay.  I'm going to show you Exhibit --

4          **MR. DERFNER:**  For this one.

5          **MR. DUNN:** Plaintiffs' 804.

6          **MR. DERFNER:**  804.  Is it -- have you got 804?

7          **MR. DUNN:**  Top.

8          **MR. DERFNER:**  Okay.

9          **MR. DUNN:**  Top half.

10 **BY MR. DERFNER:**

11 Q    What is that form, Mr. Rodriguez?

12 A    It's a notice of suspension, temporary driving permit.

13 Q    Okay.  And does it indicate on there anywhere that the

14 license can sometimes be revoked on the spot?

15 A    Let me see.

16 Q    If you'll go to this box.

17 A    There's a block in the bottom.  It says, "If your Texas

18 driver license was confiscated, this document will serve as

19 your temporary driving permit."

20 Q    Okay.  Are you familiar with that form?

21 A    Uh, no; I haven't seen it.

22 Q    It's what?  The DIS 25?  Okay.  I'm going to show you --

23 let's see.

24          **MR. DERFNER:**  Let's put --

25 A    That's a DI -- sir, it's a DIC 25.

Rodriguez - Cross / By Mr. Derfner                    295

1   Q     I'm sorry.  What?

2   A     A DIC.

3   Q     A DIC.  Thank you.

4         **MR. DERFNER:**  Can we have the Elmo?

5         **MR. DUNN:**  I believe this is Plaintiffs' 808.

6         **MR. DERFNER:**  Okay.

7         **MR. DUNN:**  It's up for (indiscernible).

8         **MR. DERFNER:**  Yeah.

9   Q     Do you see that -- do you see reference to confiscation of

10  licenses there?

11  A     Give me a second to find that on the e-mail.

12  Q     Down near the bottom of the e-mail.

13  A     Okay.

14        **MR. DUNN:**  This references if they got a DI 25.

15        **MR. DERFNER:**  _____? 3:37:14

16        **MR. DUNN:**  No.

17        **MR. DERFNER:**  Okay.  What about this one?

18        **MR. DUNN:**  Yeah; this is (indiscernible).

19        **MR. DERFNER:**  Okay.  Let's put another one up.  I

20  think Kim can do this.  It's what -- 80 --

21        **MR. DUNN:**  809.

22        **MR. DERFNER:**  809.

23        **MR. DUNN:**  Beginning in the bottom bold paragraph.

24  Q     Is there a reference there to revoking a license?

25  A     "What is the protocol for confiscated licenses?"  It's, uh

EXCEPTIONAL REPORTING SERVICES, INC

Rodriguez - Cross / By Mr. Derfner                    296

1    -- it says,

2              "Texas Transportation Code 524.11(b)(2) and (3) and

3              724.032(2) and (3) provide the requirements for a

4              peace officer to confiscate a driver license where

5              the driver is arrested for alcohol related offense

6              under ALR."

7    Q    Okay.  Let's see --

8              **MR. DERFNER:**  I don't see anything about confiscating

9    (indiscernible).

10             **MR. DUNN:**  No.  (indiscernible).

11             **MR. DERFNER:**  Okay.

12   Q    Uh, I'm going to show you another document -- actually,

13   I'll give you this one.

14             **MR. DERFNER:**  May I approach the witness, your Honor?

15             **THE COURT:**  Yes.

16   A    Thank you.

17   Q    It's DL174.  Can you tell me what that is?

18   A    It's a form that we use if a customer wants to surrender a

19   driver license or I.D. card.

20   Q    So, a customer signs that and surrenders a driver's

21   license or I.D. card for several -- one of several reasons,

22   right?

23   A    It's indicated on the blocks below; yes.

24   Q    Would you tell us what those reasons are?

25   A              "I no longer wish to be licensed to drive a motor

Rodriguez - Cross / By Mr. Derfner                              297

1              vehicle upon the streets and highways.  I am no

2              longer physically qualified and/or mentally alert to

3              safely operate a motor vehicle upon the streets and

4              highways.  I no longer wish to be a licensed driver

5              to drive a motor vehicle because of motor vehicle

6              liability insurance reasons.  I am required to obtain

7              a driver license and/or identification card under the

8              provisions of 521.7 -- I'm sorry -- 272 TRC, sex

9              offender registration, and I no longer wish to have

10             an identification card."

11   Q    Okay.  Uh, where on that form does it tell the customer or

12   the driver that if they give up their license, they may be

13   preventing themselves from being able to vote?

14   A    It's not depicted on the form; no.

15   Q    Well, do you have any regulation or instruction to tell

16   them that?  Anything in writing?

17   A    Not to my knowledge; no.

18   Q    We've had some numbers -- and, in fact, this is an issue

19   going on back and forth that we'll be dealing with some more

20   about how many of these there are.  How many of these license

21   surrenders are there in a given year?

22   A    I don't know.

23   Q    Okay.  A license surrender is a good idea for regulating

24   drivers and keeping the roads safe, isn't it?

25   A    It could be.  I mean, some customers, they ought to

Rodriguez - Cross / By Mr. Derfner                298

1   surrender their documents for a variety of reasons.

2   Q    Right.  I gave up my license a few years ago, thank

3   goodness, so I understand that.  So, we're not quarreling with

4   the notion that these are good ideas for a law enforcement and

5   traffic enforcement agency to do.  But you're not just that,

6   are you?  Aren't you supposed to be an election agency, too?

7   A    Well, we're a public safety organization.

8   Q    Okay.

9   A    And election certificates are one of the services that we

10  offer.

11  Q    Well, but let -- we're talking now -- we're not talking

12  about EIC's.  We're talking about driver's licenses.  You have

13  a driver's license in your pocket, I assume?

14  A    I do.

15  Q    And let's assume -- if you don't have a passport, that

16  driver's license is what lets you vote; is that right?

17  A    It's one of the documents that I could use to vote.

18  Q    Right.  But let's talk about Mr. Rodriguez.  Let's assume

19  you don't have a passport.

20  A    Okay.

21  Q    If you don't have a passport, is there any -- are there

22  any of the other cards that you have that would let you vote

23  besides the driver's license?

24  A    Yes.

25  Q    What's that?

Rodriguez - Cross / By Mr. Derfner                                    299

1   A    I have a concealed handgun license.

2   Q    Oh, I'm sorry.  Okay, okay, okay.

3   A    I have a military I.D. card, retired.

4   Q    And -- oh, active duty military?

5   A    I'm retired.

6   Q    Okay.  Let's take a person who doesn't have those things,

7   though.  We're not talking about Mr. Rodriguez now.  But let's

8   take a voter -- a registered voter and a licensed driver who

9   has -- who votes -- who satisfies the voter I.D. requirement of

10  SB14 with their driver's license, okay?  Now, if that driver's

11  license, if they surrender it unknowingly or if it gets revoked

12  as a part of the suspension, they can't vote, can they?

13  A    It would depend if the driver license were confiscated.

14  They could still use it as an I.D. card whether it was --

15  whether they were eligible to drive on it or not is my

16  understanding.

17  Q    Okay.  Even if it's confiscated?

18  A    Well, if they confiscate it, they no longer have it but

19  then they're issued the temporary.

20  Q    Okay.  So, what does the Department do -- what rules do

21  you have to make sure that when somebody falls afoul -- maybe

22  it's drunk driving -- maybe that's why they confiscate it on

23  the spot.  Not a bad idea, but what does the Department do to

24  make sure that the traffic offense doesn't disfranchise the

25  voter?

1  A    I'm unaware of anything that we do to ensure that people

2  who have their license confiscated are also able to vote.

3  Q    But in a sense, that driver's license is now not just one

4  card.  It's really two cards in one, right?

5  A    Well, the driver license is used for a variety of

6  purposes.

7  Q    But we're talking about this purpose, voting, right?

8  A    It could be.  It's one of the forms of I.D. that we use.

9  Q    Okay.  And if it's taken away for a traffic offense or

10 traffic incident, there's nothing to secure or safeguard the

11 voter's interest and the voter's right, is there?

12 A    I don't know.  It would depend on what other documentation

13 the voter has.

14 Q    Thank you.  Thank you very much, Mr. Rodriguez.

15 A    Thank you, sir.

16      **THE COURT:**  Let's take a 15 minute break.  Is there

17 going to be more --

18      **MR. DUNN:**  No redirect, your Honor.

19      **THE COURT:**  Was there going to be more questions on

20 this side?

21      **MS. VAN DALEN:**  I have additional questions, your

22 Honor, but I'm happy to do that --

23      **THE COURT:**  Okay.  Well, let's take a break.

24      **THE MARSHAL:**  All rise.

25      **(A recess was taken from 3:43 p.m. to 4:03  p.m.; parties**

 1   **present)**

 2          **MS. VAN DALEN:**  Your Honor, Marinda Van Dalen.

 3                    **CROSS EXAMINATION**

 4   **BY MS. VAN DALEN:**

 5   Q    Mr. Rodriguez, is it possible for a monolingual Spanish

 6   speaker to determine where he or she would need to go to get an

 7   EIC using the Internet?

 8   A    I -- if I understand your question, somebody who only

 9   speaks Spanish, is it possible for them to determine where to

10   get a Texas identification certificate -- election

11   identification certificate?

12   Q    Yes, that's my question.

13   A    Okay.  I don't know what they would have to do in order to

14   satisfy those requirements.

15   Q    You don't know whether that information is available on

16   the DPS Web site?

17   A    No, as I've said before, I don't -- I don't know.

18   Q    Okay.  Well, let's see.  I'm going to do a Google search,

19   "EIC Texas," and the first thing that comes up is a DPS hit.

20   I'm going to go to that.  It's in English, and it has a Spanish

21   link, which I'm going to hit.

22          Do you see that?

23   A    I do.  Hyperlink.

24   Q    And if you look at this page that comes up, I'm going to

25   represent that on the left it says here, "Ubicación de las

1    oficinas."  Am I correct that that would be "locations for

2    offices"?

3    A    Well, as I've said before, I'm not conversant in Spanish,

4    but that's --

5    Q    Okay.  I'm going to put the --

6    A    That what it -- that what it seems to say.

7    Q    I'm going to put the cursor on that, and it shows a Google

8    Translate that says --

9    A    "Office locations."

10   Q    -- "office locations."  So I'm going to hit that.  The

11   next page that I get shows a number of buttons where I can put

12   in my ZIP code, my city, or my county.  That's in English, but

13   the remainder of the page is in Spanish right now.

14            I'm going to imagine I'm a monolingual Spanish

15   speaker who lives in Raymondville, Texas.  Do you know what

16   county that's in?

17   A    No.

18   Q    It's in Willacy County.  If I want to put in my city and I

19   hit the "city" button, and then go on this list of cities, do

20   you agree with me that there's -- that Willacy County -- it's

21   in alphabetical order -- doesn't appear on that list?

22   A    I thought you said you entered cities?

23   Q    I did, and there's a selection of cities.

24   A    But you're saying --

25   Q    These are --

Rodriguez - Cross / By Ms. Van Dalen                    303

1  A    -- you're looking for Willacy County?

2  Q    Oh, no.  Sorry.  I'm looking for Raymondville.  I'm sorry.

3  Thank you for correcting me.

4  A    Scroll up, please.  Stop.  No, Raymondville is not on

5  there on the city listing.

6  Q    Okay.  Okay.  Thank you.  I'm going to look now at county.

7  And would you agree with me that Willacy County isn't on that

8  list?

9  A    I don't see it on the list, no.

10  Q    Okay.  Now, looking at this list of counties, are you

11  generally familiar -- couldn't maybe name all of them, surely

12  -- but with the counties in Texas?

13  A    Generally speaking.

14  Q    Okay.  And if I go to the top of this list, do you see

15  here that we've got what's marked --

16  A    Campana.

17  Q    -- "Campana County"?  Is there a county in Texas you're

18  aware of that's called "Campana County"?

19  A    No, that means "Bell."

20  Q    Okay.  If I continue down this list and I show here, what

21  is that one that I've highlighted?

22  A    It appears to say "Marrón."

23  Q    Okay.  And do you see also that that breaks --

24  A    Marrón, Brown County.

25  Q    -- the alphabetical order?  I'm sorry.  I didn't mean to

Rodriguez - Cross / By Ms. Van Dalen                    304

1   speak over you.

2   A    I believe this is "Brown."

3   Q    Okay.  Thank you.  Now, since it -- my county -- if I live

4   in Raymondville in Willacy County, I can't search by my city or

5   my county.  I'm going to put the ZIP code, which I happen to

6   know is 78580, and I'm going to hit the search button on the

7   Spanish page.

8            And I think you'll agree with me that the Web page it

9   takes me to is in English?

10  A    Yes.

11  Q    Okay.  And that it suggests that even though I was -- I

12  came here from the EIC Web page, that it's discussing payment

13  methods, suggesting I might need to make a payment?

14  A    Well, what it says -- it says, "No driver license offices

15  found," and I believe you were looking for a facility at which

16  you could get an EIC.

17  Q    That's right.

18  A    Okay.  And you can get an EIC at a driver license office,

19  ma'am.

20  Q    Right, but it -- on this -- I came to this Web site by

21  looking for an -- a location to get an EIC following the links.

22           But what I was asking you about is that there's

23  information here, it says "payment method," suggesting that a

24  payment would be necessary; is that correct?

25  A    It just says that driver license offices now accept credit

EXCEPTIONAL REPORTING SERVICES, INC

1   cards, cash, checks, and money orders.  So for some services,

2   we do have a payment.

3   Q    Okay.  Now, this information isn't in Spanish, although I

4   came to it from a Spanish page.  If I go down the page, will

5   you agree with me that there's -- appears in very small type

6   down here, it says "español"?

7   A    Could you put the cursor over it, please?

8   Q    Sure.  Here.

9   A    Yes.

10  Q    Okay.  So if I'm a monolingual Spanish speaker and I get

11  this page, perhaps I read down and find this, and I hit this

12  tab.  I get information here, which I'll represent to you has

13  information about Google Translate and opportunity -- the

14  opportunity to continue, which I'm going to do.

15          I'm going to disable the safe mode, see if it goes.

16  And it brings me back to this page, the election identification

17  certificate page; is that correct?

18  A    That's what that page is.

19  Q    Now, I am going to do a new Google search.  I'm going to

20  do "EIC Texas," go again to the first hit, and this time I'm

21  going to check in English the information that's available to

22  me.

23          I'm going to go to "Office Locations," just like we

24  did, and I'm going to go straight to "Search By ZIP Code,"

25  since that was how we found the information in Spanish, and I'm

1    going to hit the same ZIP code in, 78580, and do my search.

2              Will you agree with me, sir, that going from the EIC

3    page in English as opposed to the EIC page in Spanish, that

4    rather than getting no locations, I actually get an option for

5    six locations for DPS offices?

6    A    That's what the Web site says.

7    Q    Okay.  I'm going to go now to the second -- to the second

8    hit, assuming that I was the monolingual Spanish speaker still

9    looking information, since the first hit had -- didn't actually

10   provide me with a location to go to, you'll agree.

11             If I do that, I get a different Web site from the DPS

12   -- a different page from the DPS Web site with information

13   about EICs in English.  Do you agree?

14   A    I do.  It's a different page.

15   Q    Okay.

16   A    It does deal with EICs.

17   Q    Okay.  And if I go down, looking for information in

18   Spanish, again, I -- at the very bottom in small type, there's

19   a place that says "español," correct?

20   A    Same hyperlink, yes.

21   Q    I'm going to hit that.  I'm going to check out the

22   information on Google Translate and opt to continue.  And then

23   I get this Web site, which is in -- or this page from the Web

24   site, which is in Spanish.

25             I'm going to -- using the Google Translate bar up

Rodriguez - Cross / By Ms. Van Dalen                    307

1    here, I'm going to go to the English page so that we can look

2    at the same page, but in English, that the person would be

3    looking at in Spanish, since there's no translator here.

4              Can you show me on this page where, if any -- if

5    anywhere, is any information about EICs?

6    A    You have to go to the driver license section.

7    Q    Okay.  So if I want to know information about the EIC, I

8    have to go to the driver license section?

9    A    Because the Driver License Division is the entity within

10   DPS that provides EICs.

11   Q    Okay.  Have you guys informed the public about that, sir?

12   A    I don't understand the question.  We have press

13   releases --

14   Q    Okay.  How would the --

15   A    -- and --

16   Q    -- person using the Internet know to go to the driver's

17   license section to get an -- information about EICs?

18   A    They could go to the -- they could go to the same page

19   that you're on and they could type "search" into the "Search

20   DPS" box, and they could enter "EICs."

21   Q    Okay.  If I go here to driver's license, then what do I

22   do?

23   A    If you click on that, please.  And scroll down to here.

24   And click that.

25   Q    Pardon?

1    A    Would you mind clicking where it says "choose" in the

2    green box?  And apply for an election certificate.

3    Q    Okay.  And that brings us back where we actually started,

4    where we weren't able to get a location using the Spanish page

5    to know where to go to, correct?

6    A    This is our EIC information page, yes.

7    Q    Okay, that we started with when we -- when we went in the

8    first Google hit, correct?

9    A    Yes.

10   Q    Okay.  Okay.  I'm going to do a new Google search.  Once

11   again, as a monolingual Spanish speaker from Raymondville, I

12   think, okay, that -- I still don't know where to go.  I'm going

13   to go to the third hit on Google, and this is what comes up.

14   This is the application for an EIC.  Am I correct?

15   A    This is DL-14C.  It's an application for a Texas election

16   identification --

17   Q    All right.

18   A    -- certificate.  Yes, ma'am.

19   Q    And it's in English only?

20   A    This version is English only, yes.

21   Q    Okay.  And does this version that comes up refer in any

22   way to a Spanish version that you know of?

23   A    I know that there is a Spanish version.  I don't see a

24   reference on this one.

25   Q    If -- would you agree that a monolingual Spanish speaker

Rodriguez - Cross / By Ms. Van Dalen                309

1   using the DPS Web site and the Google search engine would not

2   be assisted in finding a location to go to to get an EIC?

3   A    I don't know -- I don't know what a monolingual Spanish

4   speaker would have to go through in order to find the

5   information they want to seek an EIC.

6   Q    Okay.  And what we did -- what I just walked us through

7   today did not result in information that would allow me to know

8   where to go to get an EIC; is that correct?

9   A    If you lived in that particular county.

10          **MS. VAN DALEN:**  Can you please pull up PL 794.  I'm

11  sorry.  Can we switch back to the -- toggle back, please.

12  Q    Would you agree with me that a person who presents a birth

13  certificate at DPS in order to get an EIC which has a different

14  name than the other identification that they were being -- that

15  they were presenting would be required to show legal

16  documentation of name change?

17  A    If the names are substantially different, yes.

18  Q    Okay.  For example, if a person was born with the name

19  "Garcia," and got married and became "Espinoza"?

20  A    We would want to see the marriage certificate.

21  Q    Okay.  And the -- and that would have to be the original

22  or a certified copy?

23  A    To the best of my knowledge.  Yes.

24  Q    And photocopies would not be accepted?

25  A    No, I don't believe we accept photocopies.

Rodriguez - Cross / By Ms. Van Dalen                310

1    Q    Okay.

2         MS. VAN DALEN:  And now I'd like to go to the -- to

3    the (indiscernible).  Okay.

4    Q    This is a document that shows the cost for a marriage

5    certificate in Carson County.  Could we go to the second page,

6    and I believe it shows that the cost is $33; is that correct?

7    A    It says, "Issuing certified copy of marriage license,

8    $33."

9    Q    And, sir, I believe you testified that you're not familiar

10   with the Secretary of State's Web site information about

11   getting -- obtaining EICs; is that correct?

12   A    No, not entirely.

13   Q    Why have you not looked at that?

14   A    Because I've concerned myself with the DPS portion.

15   Q    Thank you, sir.  I have no further questions.

16   A    Thank you.

17        MR. SCOTT:  Well, now I have to --

18        THE COURT:  Okay.

19        MS. VAN DALEN:  Do you want my computer?

20        MR. SCOTT:  No, we'll use ours.  Yours didn't seem to

21   work for that -- my (indiscernible).

22        Brian, may we get it lit up here?

23        MS. VAN DALEN:  I thought it worked just fine.

24        THE COURT:  She put a bug in it.

25        MR. SPEAKER:  Do you want (indiscernible).

Rodriguez - Redirect / By Mr. Scott                    311

1          **MR. SCOTT:**  What are you putting up there, Brian?

2     We're back, so roll it up, Brian.

3                         **REDIRECT EXAMINATION**

4     **BY MR. SCOTT:**

5     Q    Mr. Rodriguez, do you recognize this page?

6     A    Yes.  Yes.

7     Q    Stop.

8          **MR. SCOTT:**  So I'm going to not offend others that

9     may be Spanish speaking, but would you click right here?  And

10    scoot down -- okay, slow down.  Oh, that's right.  Go up a

11    little further.  We're going to go up to -- no, down.  We're

12    going to get to Willacy County.  Keep going.  Keep going.  Oh,

13    no.  Keep going.  Stop.

14    Q    "Condado de Willacy," qué es eso?  What is that?

15    A    It's "Willacy County."

16    Q    Okay.

17         **MR. SCOTT:**  So hit the back button one more time,

18    Brian.  Just back.  Okay.  So it goes from -- and then go down

19    a little.  Well, I mean up.

20    Q    And that is the central page that -- I skipped the step to

21    get to that page, but that's the same page you were discussing

22    a moment ago?

23    A    This is the main EIC page on the DPS Web site.

24    Q    I thank you for your time.

25         **MR. SCOTT:**  Pass the witness.

Farinelli - Direct / By Ms. Wolf                    312

1              THE COURT:  Any further questions from the

2   Plaintiffs?

3              MS. VAN DALEN:  No, your Honor.

4              THE COURT:  Okay.

5              MS. VAN DALEN:  Thank you.

6              THE COURT:  Thank you, sir.  You can step down.

7              THE WITNESS:  Thank you, your Honor.

8          (Witness Excused)

9              MS. WOLF:  Your Honor, Defendants call Victor

10  Farinelli to the stand.

11             THE COURT:  There's a little incline there that

12  everybody stumbles on.  Would you raise your right hand.

13             VICTOR FARINELLI, DEFENDANTS' WITNESS, SWORN

14             THE CLERK:  You may be seated.

15                      DIRECT EXAMINATION

16  BY MS. WOLF:

17  Q    Good afternoon, Mr. Farinelli.

18  A    Hello.

19  Q    Could you please introduce yourself to the Court?

20  A    My name is Victor Anthony Farinelli.  I'm with the

21  Department of State Health Services Vital Statistics Unit.

22  I've been working with the Vital Statistics Unit for a little

23  over 12 years now.

24             Started off as a clerk three, which is affectionately

25  known as a stack rat, which is putting books away, most of the

Farinelli - Direct / By Ms. Wolf                    313

1    birth certificate books and stuff, and I worked my way up into

2    processing amendments and certified copies of birth

3    certificates, and worked up to field services, where I worked

4    with our service and source providers, providing them

5    instructions on how to deal with vital statistics issues in

6    their office -- laws, rules, policies, and procedures.

7              And about a -- a little over a year ago, I became the

8    electronic registration manager.  Since -- within the past

9    three or four months, we kind of had a little reorg, so now I'm

10   called the communications manager, where I manage the Field

11   Services Unit and also our communications, our call center,

12   which is our front line call center, and then our electronic

13   registration help desk.

14   Q    And you mentioned Field Services.  Could you tell us a

15   little more about what Field Services does?

16   A    Field Services is our unit that works with our service and

17   source providers.  So the Field Services Unit has area

18   representatives, which those representatives are basically the

19   representative for the state registrar in that area.

20             We provide them with instructions on situations that

21   come up in their office.  We provide them with instructions on

22   the laws, interpretation on laws, rules, policies, and

23   procedures.

24   Q    And on a day-to-day basis, what do you typically do in

25   your job?

1    A    It could vary.  I manage workload, since I am a manager.

2    I manage -- directly manage 31 people, so a lot of it has to do

3    with that.  But I deal with a lot of inquiries from local

4    offices, and hospitals, funeral directors, doctors, with basic

5    questions about what they should do in certain situations.

6    Q    And are you familiar with the term "local registrar"?

7    A    Yes.

8    Q    And what is a local registrar?

9    A    So in the State of Texas, we have a dual registration

10   system when it comes to vital records or vital -- births,

11   deaths -- birth and death certificates -- a copy of the records

12   held at the state level, and then there's a local government

13   office that holds a copy of the record.

14          And that could be a justice of the peace.  So, in

15   accordance to state law, every justice of the peace is

16   considered a local registrar, and then a municipality over a

17   certain population can be a local registrar, and then if the

18   justice of the peace and/or a municipality consolidates their

19   vital statistics processes with a county clerk, then that

20   county clerk can become a local registrar.

21   Q    And the dual record system, how long has that been in

22   place in Texas?

23   A    Since the vital statistics -- since birth certificates

24   have been being filed, and that's in 1903.

25   Q    Can you walk a little bit -- walk us through how a birth

Farinelli - Direct / By Ms. Wolf                    315

1   record is created in Texas?

2   A    So if a child is born in a hospital, which most children

3   are born in a hospital in the State of Texas, that record is

4   entered into our -- what is called the "Texas Electronic

5   Registration System."  The person designated by the hospital

6   administrator -- the way the law is written, it says the

7   hospital administrator or designee shall enter -- file the

8   birth certificate.

9             So that designee, we refer to as a "birth registrar."

10   They enter this information into the Texas Electronic

11   Registration System regarding any -- regarding the demographic

12   information of the child and the parents -- name, date of

13   birth, birth date of the parents, parent's name, where they

14   were born, address of the parent -- and then we also collect

15   statistical data that's not on the legal portion of the birth

16   certificate, but has to do with the birth itself, so

17   characteristics of labor and delivery, stuff like that.

18             It's completed in the Texas Electronic Registration

19   System.  They sign off on it electronically and then release it

20   to the state.  And once it comes to the state, we number it and

21   date it.  And we actually print out a physical copy of the

22   record to put on file in our office.

23             And then it's sent electronically over to the local

24   registrar's office for filing.  They also do -- and they also

25   number, and date it, and print out a physical copy for their

1  records.

2  Q    If a child is born at home, is it required that a birth

3  record be created?

4  A    The way the law is written, it says that all children born

5  here in the State of Texas shall be registered.  So regardless

6  of where you're born in the State of Texas, the birth

7  certificate should be registered.

8           So if the birth was attended by a midwife, the

9  midwife is responsible for filing that.

10          If it's not attended by -- there was no midwife or

11  doctor that attended the birth, the child wasn't born in a

12  birthing center or a hospital, it's -- the law says it's the

13  responsibility of the parent to go to the local registrar and

14  file that record.

15 Q    And how about if a child is a foundling, for example, a

16 child was dropped off at a hospital, or a fire station, or the

17 church?

18 A    Okay.  In those cases, the hospital that -- we instruct

19 the hospital that first saw that child that if the child

20 appears to be 60 days or younger, in order to assist with that

21 child having a productive life, we instruct those hospitals to

22 file a birth -- what is called a "founding birth certificate"

23 for those children.

24          And this way, it's easier for the child to be adopted

25 in the future, or get any kind of assistance for that child, if

Farinelli - Direct / By Ms. Wolf                    317

1   the state takes custody of the child, to be able to get

2   assistance for that child, and so on and so forth.

3          So there's no specific law in place that says that

4   the hospital is supposed to, but the Department of State Health

5   Services, in order to better assist this -- these children, we

6   instruct the hospitals to do so.

7   Q    And are there circumstances in which a child's birth

8   record would not be filed?

9   A    There are.  If the -- generally if the -- it happens when

10  a child is born at home and the parents fail to go to the local

11  registrar's office.  So the time limit to file a record is from

12  five -- one to five days that the child -- their record has to

13  be filed no later than the fifth day after the date of birth.

14         From five days to one year, it's considered a delayed

15  record; however, the way the law is written, it says that it

16  can be -- that delayed record can be filed on a regular birth

17  certificate up to one year.

18         If, say, the child was born at home, for example, and

19  the parents failed to go to the local registrar's office to

20  file the record, then -- and it -- and a year passes, then they

21  have to go through a delayed registration process at that

22  point.

23  Q    So you talked a bit about the dual registration system and

24  a record going to the state, and then also to the local

25  registrar.  Do the parents automatically receive a certified

EXCEPTIONAL REPORTING SERVICES, INC

1   copy of the child's birth certificate at birth --

2   A    No.

3   Q    -- or whenever it's issued?

4   A    No.

5   Q    Okay.  And do most parents request a certified copy of the

6   child's birth certificate?

7   A    Yes, generally they do.

8   Q    And --

9   A    Right at the time of birth or shortly after, and it's

10  generally for insurance purposes, or if they're on public

11  assistance, generally getting things -- getting business taken

12  care of and for -- because we find that they need birth

13  certificates a lot of times right at the time of birth.

14  Sometimes, they may not.  But it -- we generally find that they

15  get it at least by the time the child is 5, when they're

16  starting school, or something.

17  Q    And going back to the local registrars, does every county

18  in Texas have a local registrar?

19  A    Every county in the State of Texas has at least one local

20  registrar.

21  Q    So some counties have more than one?

22  A    Yes.

23          **MS. WOLF:**  Brian, if you can pull up Defendants'

24  2741?

25  Q    And is this the -- I guess the first page of the local

1    registrars in Texas?

2    A    Yes.

3    Q    Okay.  And I won't flip through every page, but is this

4    document on the Web site?

5    A    Yes.

6    Q    Okay.  And approximately how many local registrars are

7    there in Texas?

8    A    There's over 400.

9    Q    And which counties would you say have the most local

10   registrars?

11   A    I -- Hidalgo County.  I'm not sure exactly how many they

12   have, but they have quite a few.  It's over ten, I believe.

13   Nueces County has quite a few, too.

14   Q    How does one become a local registrar?

15   A    Like I was saying earlier, that every JP is a local

16   registrar, and then every municipality over a certain

17   population is a local registrar, so they would automatically be

18   a local registrar at that point.

19        And county clerks aren't automatically local

20   registrars, but they can be if those -- if the vital

21   registration processes for those local registrars consolidate

22   with the county clerk's office.

23   Q    And what is the Remote Birth Access System?

24   A    Remote Birth Access System is a Internet portal for our --

25   for local registrars that sign a contract with our office to

Farinelli - Direct / By Ms. Wolf                    320

1   access our database for all birth records in the State of

2   Texas.

3          So if the child was born in Dallas, but the parents

4   live in Harris County, they can go down to the City of Houston

5   Vital Statistics Office, for example, and get a copy of that

6   record there.

7          **MS. WOLF:**  Brian, can you pull up Defendants' 362?

8   Q    Is this a list of the Remote Birth Access sites in the

9   State of Texas?

10  A    Yes.

11         **MS. WOLF:**  And, Brian, can you pull up Defendants'

12  364?

13  Q    Is this the first page of a list which provides the

14  addresses of the Remote Birth Access sites -- Remote Access

15  Birth sites in Texas?

16  A    Yes.

17  Q    Okay.  And to your knowledge, is this list and the list of

18  the local registrars available on the Department of Health

19  Services Web site?

20  A    Yes.

21  Q    And let's walk through this exhibit and walk through the

22  location of some of the Remote Birth Access sites.

23         **MS. WOLF:**  Brian, if you can scroll through until you

24  get to Jackson County.  Okay.

25  Q    And you'll see there -- what's the address that's listed

Farinelli - Direct / By Ms. Wolf                    321

1   there for the Jackson County Remote Birth Access site?

2   A    It's the Jackson County Clerk's Office at 115 West Main,

3   Room 101, Edna, Texas, 77957.

4         MS. WOLF:  Brian, can you pull up Plaintiffs' 495,

5   please.  Okay.  And scroll to Paragraph 6, I believe.  Okay.

6   And just highlight -- if you can actually highlight Paragraph 6

7   and 7, that would be great.  Okay.

8   Q    So is the address that's listed on Plaintiffs' Exhibit

9   495, is that the same address that you just saw on the list of

10  the Remote Birth Access sites for Jackson County, for example?

11  A    Yes.

12  Q    Okay.

13        MS. WOLF:  And, Brian, if you can go back to the list

14  of the Remote Birth Access sites, Defendants' 364.  Okay.  And

15  if you can go to the entry for Karnes County, K-A-R-N-E-S.

16  Q    And what's the address?

17  A    201 West Calvert, Suite 100, Karnes City, 78118.

18        MS. WOLF:  And, Brian, if you can pull up Plaintiffs'

19  497?

20  Q    And the address there -- what's the address there?

21  A    210 West Calvert Street, Suite 140, Karnes City, 78118.

22        MS. WOLF:  Brian, if you can pull up Defendants'

23  2744.  And if you can zoom in.

24  Q    You'll see -- do you recognize these as walking

25  directions?

EXCEPTIONAL REPORTING SERVICES, INC

1    A    Yes.

2    Q    Okay.  And what -- what's the distance between the two

3    addresses that you just read, walking?

4    A    Two hundred and ninety-two feet.

5    Q    Okay.

6         MS. WOLF:  Brian, if you can -- sorry to make you

7    keep flipping back and forth -- if you could pull up

8    Defendants' 364.  And if you can go to the entry for Willacy

9    County.

10   Q    And what's the address that's listed for Willacy County?

11   A    Willacy County Clerk's Office, 576 West Main,

12   Raymondville, 78580.

13   Q    Okay.  So that's where in Willacy County there's a Remote

14   Birth Access site, correct?

15   A    Correct.

16   Q    Okay.

17        MS. WOLF:  Brian, can you pull up Plaintiffs' 518.

18   Q    And what's the address that you see in Paragraph 6 there?

19   A    190 North Third Street, Raymondville, 78580.

20        MS. WOLF:  And, Brian, if you can pull up Defendants'

21   2745, please.  And zoom in exactly where you're -- thank you.

22   Q    Those are the two addresses we just looked at, correct?

23   A    Uh-huh.

24   Q    So what's the distance walking between those two

25   addresses?

1   A    Hundred and forty-one feet.

2   Q    Okay.  So talking about the Remote Birth Access System, do

3   the local registrars -- do they pay for records obtained from

4   the Remote Birth Access System?

5   A    Yeah, so per contract, every record that they issue, they

6   pay the Vital Statistics Unit $1.83 per record issued.

7   Q    And does that fee apply to all records that are issued?

8   A    No, it doesn't apply to birth certificates for -- that are

9   going to be used for the election identification purposes.

10  Q    And you mentioned election identification purposes.  Are

11  you familiar with what an election identification card or

12  certificate is?

13  A    Yes.

14  Q    And what's your understanding of what that is?

15  A    That is a card that can be used for -- that's issued by

16  the Department of Public Safety for -- used for election

17  purposes.

18  Q    And how did you -- how did you come to know what an

19  election card or certificate is?

20  A    When Senate Bill 10 -- is it Senate Bill 10?  I think

21  that's the Senate bill where -- that put that in -- put that in

22  place was first proposed to the Texas legislation, I did the

23  bill analysis on that.

24  Q    So was that in 2011?

25  A    Yes.

1   Q    So the 2011 voter ID bill?

2   A    Right.

3   Q    Okay.  And let's talk a little bit more about the local

4   registrars.  I know we looked at Jackson County, Karnes, and

5   Willacy -- and I'm not going to walk through a bunch of

6   counties -- but are -- to your knowledge, are there other

7   counties where there's -- local registrars are also the county

8   clerk?

9   A    Yes.

10  Q    Okay.  What's the Department of State Health Services rule

11  as respects the local registrars?

12  A    According to the Health and Safety Code 195, the law says

13  in order to have uniform compliance with the vital statistics

14  system in the State of Texas, we have supervisory power over

15  the local registrars and deputy registrars.  So we provide them

16  instructions on what they should be doing to be issuing birth

17  certificates and securing birth certificates in their office to

18  make sure that those documents are secure, instructions on

19  filing those documents, and retaining them -- record storage.

20  Q    And how do you communicate with the local registrars?

21  A    We provide online training.  There's two online trainings

22  that we provide to them on instructions on how to file birth

23  and death certificates.  We provide in-person trainings at our

24  regional summer conferences that we hold throughout the state,

25  and we also have an annual conference that we hold in Austin in

1   December.  It's a three-day conference, educational conference.

2               And we also conduct local registrar site inspections,

3   or site audits.  Those are also used for not only looking at

4   the office and making sure that they're compliant with vital

5   statistics law, rules, policies, and procedures, but also we

6   use it as a training method in our office.

7   Q    And during those trainings and conferences, has the topic

8   of the election identification certificate birth certificate

9   come up before?

10  A    Yes, it was briefly mentioned at the 2013 regional

11  conferences.  We didn't have a specific conference involved,

12  but -- conference session for it, but it was talked about by

13  the State Registrar and us field service representatives to

14  informally let them know that there was some talk about it.

15              And then at our annual conference in 2013, we had a

16  session on voting in the State of Texas in general.  We talked

17  about the EIC, we talked about the EIC birth certificate, and

18  we also talked about other voting things that -- in regards to

19  vital statistics, like sending death abstract information to

20  the Secretary of State's Office to remove deceased voters off

21  the voter rolls.

22  Q    And are any reports provided by the local registrars to

23  the Department of State Health Services?

24  A    They -- we ask them to provide a self-assessment survey

25  every year.  There's nothing in state law that requires them to

1    do that; however, we have a little incentive, but it -- we make

2    it part of a -- what is called a "five-star award."  So if they

3    send that in, and there's some other criteria that are in the

4    other -- there's four other criteria besides that for that

5    five-star award, if they meet all five of those, then they get

6    an award from the State Registrar, saying they're a five-star

7    local office.

8             So it's a little bit of an incentive to get those

9    reports in.  But, again, they're not required to do that.

10   Q    And let's talk a little bit about the remote access

11   system.  Is there a handbook which is provided to those local

12   registrars which have the remote access system?

13   A    There's a remote access handbook itself.  And it explains

14   what they should be doing on how to issue records out of the

15   system, actually technically how do you do it, and also what

16   they should do if they accidentally print a record out that

17   they didn't mean to, and how to void that out.

18            So basic instructions on how to do it and policies on

19   what to do in certain situations, like if I accidentally print

20   a record out, what should I do.

21   Q    And to your knowledge, is the -- is there a reference or

22   instructions as respects the EIC birth certificates in those

23   handbooks?

24   A    Yes, there is.

25   Q    And you talked a little bit about the training seminars

1    and site visits.  Could you describe generally, as respects the

2    EIC birth certificates, what efforts you've made to educate

3    local registrars about the EIC birth certificates?

4    A    When we do our site visits, that's one of the things we

5    ask them, do you -- along with other questions -- is do you

6    have procedures in place for issuing EIC?

7         When we do our trainings, we discuss how it should be

8    issued, when it should be issued, the different ways to issue

9    it, if they're on the remote or if they're not on the remote.

10        And so -- and in this next conference coming up, I'm

11   actually -- I'm the one who's going to be responsible for doing

12   the local training, so I'm also going to be including something

13   in -- at this one, so.

14   Q    And for how long has the Department of Health Services,

15   through the local registrars or through its own office, been

16   making the EIC birth certificates available?

17   A    It was at the end of October is when we first started

18   doing it.

19   Q    And since that time, have any local registrars refused to

20   issue EIC birth certificates?

21   A    Not that I'm aware of.

22   Q    Are there any remedies under the contracts that you have

23   with the local registrars who have the remote access system in

24   the event that they fail to comply with those contracts?

25   A    Yes, we can terminate their contract if they fail to

1    comply with that contract.  And, also, if they're conducting

2    activity that's fraudulent, too, we discover that there is

3    fraud, we can also report them to the Office of Inspector

4    General.

5    Q    So if a local registrar were to fail to issue an EIC birth

6    certificate, what remedies would the Department of State Health

7    Services have?

8    A    Well, first, we would -- we would contact them and find

9    out why.  It could have been a miscommunication, so we're not

10   going to terminate them right then and there.  But if it comes

11   to find out that they're just refusing to perform those

12   functions as a local registrar, then we're going to terminate

13   their contract.

14          And if they're not on the remote and we find out that

15   they're not issuing off of their own records for EIC purposes,

16   we'll find out, and it -- and this goes with any vital

17   statistics process -- if they're refusing to perform that

18   function as a local registrar, we have no enforcement power

19   over them, but we can go to the -- say, if it's a county clerk,

20   we can go to the county -- a county judge and ask them to

21   appoint someone else to perform that function.

22   Q    And --

23   A    And then at that point, it's up to that county clerk to --

24   or county judge if they're going to take care of that.

25   Q    And I think you kind of implied this, but just for the

1  record, can any local registrar issue an EIC birth certificate

2  regardless of whether they have access to the remote access

3  system?

4  A    Yes.

5  Q    Okay.  Let's talk a little bit about the certified copies

6  that are offered by the Department of Health Services.  Do you

7  know the difference between an open record and a closed record?

8  A    Yes.  In accordance to Government Code 552.115, birth

9  certificates that are 75 years of age or -- or under 75 years

10  of age are exempt from open records; so, therefore, they're

11  closed to the public.

12        Anything, if it's 75 years of age or older, then it's

13  open record, and anyone in the public can get a copy of that.

14  Q    And which of those types of records could an individual's

15  attorney obtain?

16  A    They could -- an attorney could possibly get either one.

17  If it's an open record, anybody in the public can get it,

18  regardless of who they are.  If it's closed record, and an

19  attorney is acting on behalf of a registrant or their immediate

20  family member, like, they're acting as their legal agent, the

21  Texas Administration Code states that they can request it on

22  behalf of the registrant or an immediate family member if

23  there's some kind of designation document showing they are

24  their legal agent.

25  Q    And what are the forms of certified copies of birth

1  certificates the Department of State Health Services could

2  issue?

3  A    Well, we have what is called an "abstract record," which

4  is basically the information is abstracted from the original

5  birth certificate with limited information, so it's got the

6  name, date of birth, parents' information, county of birth,

7  file information, so file date, file number.

8          That is what is issued from the remote site.  That

9  abstract is also -- we have an heirloom record that's a little

10 bigger that's more for, like, keepsake.  That's also an

11 abstract record, so it contains the same information.

12         And then we have the long-form version, which is an

13 actual certified copy of the original birth certificate itself.

14 So it has the hospital information on it, birth state of the

15 parents -- birth state or country, birth date of the parents,

16 and then the address of the mother at the time of birth.

17 Q    To your knowledge, which of those forms is acceptable to

18 obtain an EIC?

19 A    Both versions can be accepted.

20 Q    And do any of the certified copies that are issued by DSHS

21 or the local registrars, do those ever expire?

22 A    No.

23         **MS. WOLF:**  Brian, if you can pull up Defendants' 358

24 and Defendants' 1274.  That's okay.  We'll just -- 358 is fine.

25         **MR. SPEAKER:**  (Indiscernible).

1          **MS. WOLF:**  That's okay.

2    **BY MS. WOLF:**

3    Q     Do you recognize this document?

4    A     Yes, it's an example of our abstract version of the birth

5    certificate for the election identification card.

6    Q     And how much does it cost to obtain one of these

7    certificates?

8    A     Through the state, we waive all the fees.  Through a local

9    registrar, at least $2.

10   Q     And when you say "at least $2," what's the most it could

11   cost from a local registrar to obtain?

12   A     They could charge an additional -- they have a

13   preservation fee that they can -- some local registrars have

14   that they can charge a dollar more, so $3 at the most.

15   Q     And is that different from the price of a regular abstract

16   birth record?

17   A     A regular abstract is 22 at the state office, and then

18   some locals charge 23.

19   Q     And the $2 fee that's charged by the local registrars,

20   where does that go?

21   A     A dollar eighty of it goes to the State Comptroller's

22   Office, and then 20 cents is retained by the local registrar.

23   Q     Are there any restrictions on obtaining this particular

24   type of a birth certificate?

25   A     For the election identification card certificate, only the

1    registrant themselves, and they have to show up in person.

2    Q     Are there any age restrictions?

3    A     Sixteen years of age or over.  We found that some people

4    that were -- when we first implemented this, we had some

5    parents come in to get this document for infants, and an infant

6    is not going to be voting any time soon, so we figured it would

7    be 16 years of age or older.

8    Q     And you'll see there that there's a notation, "For

9    election purposes only.  Cannot be used as identification."

10   Why is that notation on this particular document?

11   A     So when we proposed the -- when the Texas Administration

12   Code change was proposed to allow for a fee waiver on

13   certificates for identification -- to be used for the election

14   identification card, to waive that fee, we received a lot of

15   public comment from our local registrars, stating that if the

16   -- if the general public found out that they could get a birth

17   certificate for free, regardless of what they were going to use

18   it for, if they put on the application "for election purposes,"

19   and we gave it to them for free, that it would -- we would get

20   a lot of people coming in, wanting -- just putting "election"

21   on there and getting a free record, and it would be detrimental

22   to their revenue.

23          And we -- the local offices and the state office, we

24   don't have our -- we're not appropriated funds from the

25   legislator for budget-wise.  We make our own budget out of our

1    fees that we sell.  So in order to keep our offices open, not

2    only at the state but the local, it was decided to have this

3    limitation on that certificate.

4    Q    How many EIC birth certificates can an individual obtain

5    in a lifetime?

6    A    One.

7    Q    How many times could an individual use an EIC birth

8    certificate in order to obtain or renew an EIC?

9    A    It doesn't have an expiration date, so every time that

10   they want to renew their EIC card, they can bring that to

11   the --

12   Q    And how can one find out about where they could obtain an

13   EIC birth certificate?

14   A    We have some information on our Web site that shows where

15   the -- explains a little bit about it, and then -- and tells

16   them where they can go, and we have some links to the list of

17   local registrars and the remote sites, and tell them they can

18   get it in our office, too.

19           **MS. WOLF:**  Brian, can you pull up the Department of

20   State Health Services Web site?

21   Q    So if I'm looking at this Web site, where do I click in

22   order to find this information?

23   A    You go to "Birth, Death, Marriage, and Divorce Records."

24   Q    Okay.

25   A    On the side menu there.  Left-hand side.  And click on

1    "Vital Statistics Main Page."

2              And if you scroll down, there's a section for general

3    public.  And there's a link right there in the middle of the

4    page.  It says, "Birth Certificates for Election

5    Identification."  It has some information there about what that

6    is.

7              And then if you scroll down, there's some links for

8    visiting the local office, plus there's some information links

9    to what the Secretary of State's Office has, what DPS has,

10   VoteInTexas.gov has.

11             **MS. WOLF:**  Brian, if you can click on -- those links

12   that are -- this is my first time with the pointer.  There we

13   go.

14             If you can click on the links -- there's some links

15   by "please visit," right there.  Do you see "please visit"?

16   Okay.  So, Brian, if you can click on local registrar's office?

17   And zoom out a little bit.  Okay.

18   Q    So this page -- where would this page take you?

19   A    This right here, it has three -- it's three options.

20   There's three drop-down menus.  One is for a list of all the

21   local registrars, one is for a list of our remote sites, and

22   then they select it by county range.  So all the A counties are

23   in one range, all the, you know, B counties -- so on and so

24   forth.

25             So if they select the middle box, that's going to be

1    all the local registrars regardless of whether they're on the

2    remote site or not.

3            The box to the right of the screen there, that's for

4    our remote sites.

5            So it has a list of all the counties, and when you

6    select that, it will have the list of the county and whether

7    there's a remote site in that county.

8    Q    Okay.

9            **MS. WOLF:**  And, Brian, if you can scroll back to the

10   last page we were on.  Okay.

11   Q    So these links -- and how about if they click on this

12   remote access site, will that --

13   A    It's going to take them to the same page that we just went

14   to.

15   Q    Okay.  And then --

16   A    And then they would just select "List of Remote Birth

17   Sites."

18           **MS. WOLF:**  Brian, if you can scroll back.

19   Q    And how about if they click on the Department --

20   A    That's going to --

21   Q    -- of State Health Services?

22   A    -- give them information about where our office is.

23   Q    Okay.  And if you scroll back, how about let's click on

24   one of the links at the bottom of the page.  Where is that

25   going to take them?

1   A    That's going to take them to the information page that we

2   -- that was discussed earlier with the previous witness.

3   Q    Okay.  And how about if you click on the one -- the one

4   that says "Secretary of State Information on EIC"?

5   A    That's going to take them to the Secretary of State's Web

6   site for voting and what is required.

7   Q    Okay.

8        **MS. WOLF:**  And, Brian, if you could scroll back one

9   more time.

10  Q    How about if we click on VoteTexas.gov?

11  A    It's going to take them to requirements for voting in the

12  State of Texas.

13  Q    Okay.  And you'll see -- that will show them -- well, what

14  does that show them?

15  A    It shows them -- it asks them do you know -- do have photo

16  ID?  You don't have photo ID, and then it tells them what they

17  can do to get photo identification --

18  Q    Okay.

19  A    -- for voting.

20  Q    Okay.

21       **MS. WOLF:**  And, Brian, can you click back to the very

22  first page, the original DSHS homepage?  So -- and scroll out a

23  little bit.  And zoom out a little bit.  Awesome.  Thank you.

24  And over to the other side.  Thank you.

25  Q    Okay.  So what happens if they click on this "Get a Birth

1    or Death Certificate"?

2    A    That's going to take them to this section here of the --

3    Q    Okay.

4    A    -- Web site.

5    Q    And then where would they click next to get to the --

6    A    "Certified copy of birth certificate."

7    Q    Okay.  And so if you can --

8    A    And --

9    Q    -- scroll out a little bit, Brian, that would be --

10   A    And then in the middle of the -- like, the last paragraph

11   there, there's -- on there -- on that page --

12   Q    Right here?

13   A    Yeah.

14   Q    Okay.  And so if we click on that, that will take us to

15   where we just were?

16   A    Take you to that information page that we were just at.

17        **MS. WOLF:**  Thanks, Brian.

18   Q    So let's talk a little bit about what happens when

19   somebody goes to obtain a birth certificate.  How long can an

20   individual, when they walk into a local registrar's office, be

21   expected to wait in order to get their birth certificate?

22   A    It depends on the local office.  Generally, a couple

23   minutes.  It could take longer depending on the office.

24   Q    And how about when somebody travels to the Austin office?

25   A    We -- it could be a couple minutes.  It could take a

1    little longer, depending on how busy we are, and also if we

2    have to do a manual search for that record.

3    Q    What's a manual search?

4    A    If the record is not in our database -- say, they have a

5    delayed record on file -- then we have to actually do a manual

6    search for that record, because they're not in our database.

7    So we have card indexes and some index books that we have to go

8    through and look through.

9    Q    So what's the first thing that happens when somebody walks

10   into an office?

11   A    In our office, we have a window that we direct all the

12   public to.  That person comes up to a processor at -- that

13   processor asks them, "What's your purpose of being here today?"

14   And -- because we have a variety of reasons why people come

15   into our office, if they're wanting to amend a record, or file

16   a new birth certificate based on parentage or adoption, we --

17   or if they're just wanting it for a certified copy of a record.

18          So, for example, if they're just wanting a certified

19   copy of the record, we ask them what the purpose of -- is that

20   -- for that record, because we want to make sure that we get

21   them the correct record, because, like, the abstract can't be

22   used for -- it's been our experience that passport won't accept

23   it for the -- they will accept it on some cases, but it's

24   better to give them the long-form record for a passport, or for

25   a Bureau of Indian Affairs card, they want a long form.

1          So we want to make sure that we get them the right

2    version of the certified copy.  So -- and we also do it for

3    security purposes, so if somebody comes in and they say, "I

4    need it for identification," we pull that record up and that

5    record says that that person is deceased, obviously they don't

6    need it for identification purposes, so we have to kind of look

7    into that a little bit further.

8    Q    Okay.  And that's at the Austin office, correct?

9    A    Yes.

10   Q    So what happens when somebody goes into their local

11   registrar's office?

12   A    We instruct the local registrars to do the same thing, ask

13   what the purpose is for getting that record.  And that's,

14   again, to make sure that they get the right record, because the

15   local -- if, say, they do need it for Bureau of the Indian

16   Affairs card, and that local doesn't have the original record

17   on file in their office, it's not going to do that person any

18   good to remote -- issue it off the remote.

19         So they're going to make sure that that customer gets

20   the right record that they need.

21   Q    And do you ask them to fill out any paperwork?

22   A    Each person that comes in for a birth certificate,

23   applicant, they're required to fill out an application.

24   Q    And that's in both the local registrars and the office in

25   Austin?

1    A    Yes.  Yeah, it --

2    Q    And --

3    A    -- has to be retained for three years, so we have to keep

4    that on file.

5    Q    And what types of information does that form --

6    A    Basic demographic information about the child, so name of

7    the child, date of birth, county of birth, and parents'

8    information, including the mother's maiden name.

9          We also ask the name of the person applying for that

10   record and the purpose that they're asking for it.  So on the

11   record, it -- on the application itself, it also has a -- for

12   the purpose of that -- for obtaining that record.

13   Q    And is there a separate application for an EIC birth

14   certificate?

15   A    Yes.

16   Q    Okay.

17        **MS. WOLF:**  Brian, can you pull up Defendants' 2743?

18   Q    Is -- what's Defendants' 2743?

19   A    This is the application that is used to apply for a

20   certificate of birth for an election identification card.

21   Q    Okay.  Now, is there a line on here for purpose?

22   A    No, because this -- this application here is specifically

23   for that purpose.

24   Q    So what would happen if somebody came in and let's say

25   somebody forgot to ask them what the purpose was, and gave them

1    a regular form, and they put "election" on the purpose?  What

2    would happen then?

3    A    Then we're going to ask them are -- "Do you just need it

4    for election purposes?"  And if they're going to use it for

5    something else, then -- besides election, then we'll process it

6    as is.

7         If they're just using it for election, then we'll let

8    them know that, you know, they can obtain it for free if they

9    fill out this application and if it is the registrant

10   themselves that's applying for that.

11   Q    So taking a look at this exhibit, if you see up here,

12   there's a line that says, "Please print and include valid ID."

13   A    Uh-huh.

14   Q    What generally are the forms of identification an

15   individual can present in order to obtain an EIC birth

16   certificate?

17   A    So the -- in the Texas Administration Code, there's a --

18   there's three forms of identification.  There's a primary, a

19   secondary, and supporting document.

20        A primary is -- and reviewing before I came in --

21   came to the trial, a primary is a photo identification issued

22   from a governmental entity, and that's a current form.  And in

23   accordance to our policy and in the local registrar handbook,

24   what we mean by "current" is a, like, a driver's license that's

25   not expired more than 90 days.

1    Q    And how about for the secondary forms?

2    A    Secondary would be anything with the registrant's name

3    and/or signature on it that -- or a photo -- a primary ID

4    that's expired.  If it's expired more than 90 days, we'll use

5    it as a secondary document.  Social security card.  Anything

6    with a name on it that's issued from a government entity.

7    Foreign passport.

8             MS. WOLF:  Brian, if you can pull up Defendants' 359.

9    Q    Is this the regulation you were referring to when you said

10   that the reg lists the forms of ID?

11   A    Yes.

12   Q    Okay.

13            MS. WOLF:  Brian, if you can turn to -- I think it's

14   on the second page.  No, actually, the third page.  Let's try

15   for the fourth.

16            THE WITNESS:  I think it's after this section.

17            MS. WOLF:  Okay.  There we go.

18            THE WITNESS:  There we go.

19            MS. WOLF:  So if you see -- let's scroll down a

20   little bit.  Okay.  And if you can scroll down a little bit

21   more.  Okay.

22   BY MS. WOLF:

23   Q    So you'll see Item 9 over here, it says, "All applicants

24   must present identification consistent with the following

25   identification requirements."  Is that the section you were

1  talking about with respect to the primary, secondary, and

2  supporting?

3  A    Uh-huh.

4  Q    Okay.

5         **MS. WOLF:**  So, Brian, if you can scroll out.

6         **MR. SPEAKER:**  Or -- yes.

7         **MS. WOLF:**  Okay.  And scroll up a little bit.

8  **BY MS. WOLF:**

9  Q    Okay.  So then if you see Item 10, it's primary

10 identification.

11        **MS. WOLF:**  And if you scroll down to Section D.

12 Q    At least on this page, are those the forms of primary

13 identification?

14 A    Yes.

15 Q    Okay.

16        **MS. WOLF:**  And if -- Brian, if you can flip to the

17 next page.

18 Q    Up until, I guess, the rest of that whole left column, are

19 those additional forms of primary identification?

20 A    Yes.

21 Q    So if an individual has one of those forms of primary

22 identification, do they need to present anything else in order

23 to get a birth certificate?

24 A    No.

25 Q    And if you go back to the page before and you'll see

1   there's a section there that --

2        **MS. WOLF:**  If you scroll down a little bit --

3   Q    That Section B up there that says, "All acceptable primary

4   identification documents must be current and valid" --

5   A    Right.

6   Q    -- was that what you were referring to in 90 days?

7   A    Right.  Yeah, so what we consider current and valid,

8   that's in our policy and in the local registrar handbook is 90

9   day -- it expired no more than 90 days.

10  Q    Okay.

11       **MS. WOLF:**  And, Brian, if you can go to the next

12  page.

13  Q    So the documents that start on Item D in the lower left-

14  hand, are those four that are listed there -- are those what

15  you referred to as "secondary identification"?

16  A    Yes.

17  Q    And how many forms -- if an individual doesn't have a

18  primary identification, how many forms of secondary

19  identification does an individual need to present in order to

20  get a birth certificate?

21  A    They have to have two -- two documents.

22  Q    So two of those --

23  A    Two of those.

24  Q    -- or --

25       **MS. WOLF:**  Brian, if you can flip to the next page.

1  Q    Are those additional in that column on the left --

2  starting up here and going down here, are those additional --

3  A    Yes.

4  Q    -- forms of secondary identification?

5  A    Yes.

6  Q    So if an individual has two of those forms, they can get

7  the birth certificate without anything else?

8  A    Correct.

9  Q    Okay.  Can you take a look at Item 12?

10  A    Uh-huh.

11  Q    Is that what you're referring to as "supporting

12  identification"?

13  A    Correct.

14  Q    What are -- and looking at the document, there are no

15  forms of supporting identification listed in the regulation; is

16  that correct?

17  A    Correct.

18  Q    So what are some examples of supporting documents that the

19  Department of Health Services would accept?

20  A    Well, off -- for example, a utility bill that has their

21  name on it, a current pay -- paycheck stub, a lease agreement.

22  There's a -- we're going to work with the customer in order to

23  see what documents they do have.  That's why there's not a

24  specific list that's -- so that we can work with that person to

25  try to find the best documents to use in order to issue them

1    their certified copy because if they're in there -- if they're

2    trying to -- legitimately trying to get a birth certificate,

3    we're going to work with them to try to get them that document.

4    Q    So would an individual need to present other documents in

5    addition to the supporting documents?

6    A    They have to have at least one secondary.

7    Q    So the other day, you weren't in the courtroom but a

8    gentleman testified that all he had is a social security card,

9    what he represented to be a copy of a temporary Texas driver's

10   license and some workers' compensation correspondence that he

11   had from 2004.  Would that be sufficient documentation for him

12   to obtain a birth certificate?

13   A    We'd have to review it when it came in but taking it on

14   face value of what you've presented, we would use the social

15   security card as a secondary and the other two documents as

16   supporting.  Now, if was the actual temporary card that was

17   issued from DPS, then we would use that as a secondary.  So all

18   they would have to have is those two.  So it depends on what

19   we're looking at when we get it.

20   Q    And another gentleman had stipulated that he has an

21   expired Texas driver's license and a Medicare card.  Would

22   those be sufficient to obtain a birth certificate?

23   A    Yes.

24   Q    What happens if an individual was born in another state

25   and comes into either the main office in Austin or the local

1   registrar's office and seeks to obtain a birth certificate?

2   A    We're going to provide them with information on where to

3   go to get their record.  We will -- if they come into our -- to

4   a State office, we're going to provide them with contact

5   information.  We may even print out from their website an

6   application that they can send.  Say, if they were born in

7   Louisiana, we're going to let them know, this is the contact

8   information for Louisiana Vital Statistics.  This is what you

9   need to do.

10           And if we have access to the Internet at that time,

11  we may print out an application for them and tell them what

12  they need to do.  Local registrars generally follow the same

13  procedure, especially if they're on one of the bordering cities

14  in Texas, like Texarkana and stuff because there's -- a lot of

15  times, they're not sure which side of the state they were born

16  on.  So that happens a lot.

17  Q    And what happens if an individual was born outside of the

18  country and comes into the local registrar's office or the main

19  office in Austin seeking some form of a birth record?

20  A    So if they were born -- a U.S. citizen is born abroad --

21  so if it's a child born of U.S. citizens and they were born

22  abroad, say, Germany or something like that, then they would

23  have to contact the Department of State to get a certificate of

24  birth of a person born abroad -- of a U.S. citizen born abroad

25  through the Department of State.

1  Q    Let's talk about if somebody comes in and requests a birth

2  certificate and their name on the birth certificate -- they've

3  been married and they've taken their husband's name.  So the

4  name on the birth certificate is the maiden name and the name

5  on the documents that they may present to get the birth

6  certificate is their married name.

7  A    Uh-huh.

8  Q    What happens in that situation?

9  A    Well, we're going to take the application on face value.

10  So if they've correctly identified the record, there's no

11  indication that they're trying to be -- trying to deceive

12  anything, we're going to take it on face value and -- because

13  we know that a lot of people who get married, they assume their

14  spouse's name as their last name.  We generally see it with the

15  bride taking on the groom's name but we've also come across

16  that rare occasion when the groom took the bride's name.

17         So we know that that does happen.  We're going to

18  take it on face value.  If there's any question after looking

19  over the application that their -- that this person may not be

20  the wife or that registrant's name -- person, we may ask for a

21  marriage license to confirm that yes, this was.  If they were

22  married in the state of Texas, we're going to look up in our

23  records to see if there was a marriage license on file and what

24  the maiden name of that individual is.

25  Q    So in that situation, you wouldn't require them to present

1   a marriage certificate.

2   A     Right.

3   Q     You would look it up for them?

4   A     Yeah, we would ask them, "Are you -- were you married in

5   Texas" and so we can look in our database for that.

6   Q     What happens if somebody comes in and writes their name on

7   the form and it's spelled differently than the name that's in

8   the system?

9   A     So what we're going to do is we'll ask them a few

10  questions, like if they're ever gone by a different name.  If

11  it's extremely different, we're going to ask a little bit -- a

12  few probing questions to find out what's going on.  Generally

13  what we see, it's just small spelling errors.  So we'll let

14  them know that their birth certificate and -- what they have on

15  the application and what the birth certificate says are --

16  don't match and the we'll let them know, you can -- you have to

17  amend the record to correct it.

18          If they absolutely insist that they want the

19  certified copy even though it's incorrect, we'd let them know,

20  okay, we can issue that but it may not do you any good to get

21  -- use that record if it doesn't match your other

22  identification.

23  Q     So if an individual comes into a local registrar seeking

24  an EIC birth certificate and the local registrar looks up in

25  the system and the name is spelled differently, what happens?

1  A    So if it's in the remote, the local will call us to find

2  out.  So sometimes there is data entry errors in the remote

3  because it was -- somebody was data entering what was on the

4  birth certificate.  So they'll call us and find out whether

5  that information is correct or not.  If it is -- what we have

6  in the remote is correct, then that will -- that local

7  registrar will let them know the information doesn't match.

8  You're going to have to get it amended.  Again, if they

9  absolutely want the incorrect record, they'll issue that copy

10 but they discourage it just because we'd be doing a disservice

11 to that registrant for issuing a document they can't use.

12 Q    How about if an individual comes in and you look up their

13 record and the date of birth on the record that's in your

14 system is later than the date of birth that the applicant has

15 told you is their birthday?

16 A    So to clarify, on the birth certificate, it has one day,

17 say July 13th but they're saying July 1st is their birthday?

18 Q    Sure.

19 A    They could amend the record at that point.  If it's a day

20 -- a few days like that, we're not going to ask for a

21 supporting document.  They would fill out the amendment

22 application and there's an affidavit portion of that that needs

23 to be signed by either -- if the child -- if the registrant is

24 a child under 18 years of age, we're going to want the parent

25 or parents, if both parents are listed on the record, to sign

Farinelli - Direct / By Ms. Wolf                    351

1   that affidavit portion in front of a notary.  If the child --

2   if the person is 18 years of age or older, we're going to ask

3   for a parent or an older relative to sign the affidavit portion

4   and we wouldn't need a supporting document at that point.

5   Q    So can an individual obtain the amendment at the local

6   registrar's office?

7   A    No, it has to be -- they can -- local can assist them in

8   filling the document out but it has to be sent to the State in

9   order to complete it.

10  Q    And --

11           MS. WOLF:  Can you -- Brian, can you please pull up

12  Defendants' 2740?

13  Q    What's this document?

14  A    This is the Application to Amend Certificate of Birth,

15  VS170.

16  Q    And is this what an individual would be provided that

17  they'd need to submit to the State to amend?

18  A    Correct.

19  Q    Okay.  So if you take a look at the second page of this

20  document and you'll see if you scroll down a little bit,

21  there's some documents listed there, correct?

22  A    Uh-huh.  Yes.

23  Q    Is this an exclusive list of the documents that could be

24  used to amend a birth certificate?

25  A    No, it's not -- it's not all inclusive.

Farinelli - Direct / By Ms. Wolf                    352

1  Q    So what else could an individual present in order to

2  effect an amendment of their birth certificate?

3  A    We could possibly use a school census record which are --

4  the county -- some of the county clerks have those records on

5  file in their office -- a doctor's office record, not

6  necessarily a hospital record but like a -- if they went to the

7  doctor, immunization record -- if -- something issued from an

8  entity that is not -- maybe a church record too that's not

9  necessarily a baptismal record.

10 Q    And --

11         MS. WOLF:   Brian, if you can scroll back to the first

12 page.

13 Q    -- what happens if an individual doesn't have -- you'll

14 see there's a reference to Affidavit of Older Relative,

15 correct?

16 A    Correct.

17 Q    Okay.  So happens if an individual doesn't have an older

18 relative?

19 A    Well, at that point, they would have to sign the affidavit

20 portion themselves and then we would actually need a supporting

21 document at that point regardless of what the change is.

22 Q    And how does the individual know that they could sign the

23 affidavit themselves?

24 A    At that point, we generally -- if they don't have an older

25 relative, they contact our office.  So they'll call our toll-

Farinelli - Direct / By Ms. Wolf                           353

1   free number and we'll explain to them what they can do and what

2   they can't do and we'll assist them in that way.  We'll ask

3   them what kind of supporting documents that they have, you

4   know, can they get this, can they get that, can they get a

5   school record.

6   Q     And does this form need to be -- as you see, there's a

7   notary designation there.

8   A     Yes, it has to be notarized.  We will also accept the seal

9   from the county clerk.  So if they sign it in front of the

10  county clerk, we'll accept that too.

11  Q     So what would the cost be -- let's say an individual comes

12  in to get an EIC birth certificate and it turns out they need

13  to effect an amendment, what would the cost be to that

14  individual for obtaining an amended birth certificate?

15  A     If they come to our office and they're getting it -- if

16  they come and apply and -- it's going to be at least $15.  If

17  it's going to be at the local, it's going to be 17 or 18 at the

18  most.  We find in some of the smaller local registrar's offices

19  -- communities that they will actually just waive that search

20  fee because they know just about everybody in the community.

21  So they'll usually just say, "Don't worry about it."

22  Q     And how would an individual know that their birth

23  certificate has been amended?

24  A     So when we -- when they send in an application to amend

25  the certificate, we have within 30 business days to respond

1    once we receive the application.  If it's been -- if we were

2    able to process the amendment, we send them a letter saying,

3    "The record has been amended."

4           If they pay for a certified copy at that point, we'll

5    send them a certified copy of the amended record.  If it can't

6    be amended, we send them a letter saying, "This can't be

7    amended.  This is why."  Usually it has to do with some kind of

8    supporting document or they completed the application

9    incorrectly.

10   Q    So if the amendment -- so I think you testified that the

11   EIC birth certificate has to be obtained in person, right?

12   A    Right.

13   Q    Okay.  If the amendment was done at the state level, is it

14   still possible for the person to obtain their amended EIC birth

15   record in person?

16   A    Yes because we -- once we're done with the amendment,

17   we're going to send -- we're going to update our database

18   through the remote.  So, say, there was a spelling error on the

19   child's name, for example, we're going to correct it and once

20   we've amended the actual birth certificate, we're going to

21   correct the database to where it matches the new amended record

22   and also we're going to send a copy of the amendment

23   electronically through our system to the local registrar for

24   them to put with their birth certificate.

25   Q    So we talked a little bit about what happens if the

1    information doesn't match.  Let's talk about what happens if

2    somebody goes into a local registrar's office and the local

3    registrar can't find their record.  What happens then?

4    A    In -- generally in most cases, the local registrar is

5    going to contact -- they usually contact our field services

6    representatives and those are -- a lot of times what I deal

7    with on a daily basis is that a customer has come on into the

8    office and that local registrar can't find a copy of the

9    record.  And especially some of the older ones, sometimes since

10   it was a dual registration system and before electronic

11   registration, there was actually a paper record that went to

12   the local.  The local recorded that and they were supposed to

13   make a copy of that record.

14         Well, before copiers, they would have to actually

15   type out a different record.  Sometimes they'd fail to do that

16   and just send the original up to us.  Okay.  So if they did a

17   search of their records and didn't find it, they'll contact us

18   and see if we have it on file.  If we do, we'll send them a

19   copy of it either by fax or by secure email so that they can

20   have it for their records and then issue the certified copy.

21   Q    And what happens if the State can't find it either?

22   A    Then at that point, we're going to instruct the local to

23   tell -- let them know we didn't have the copy of the record and

24   to instruct the customer that they're going to have to go

25   through a delayed registration process.  Part of that process

Farinelli - Direct / By Ms. Wolf                              356

1    is they have to actually apply for a certified copy at the

2    State, reason being we're going to do another search.  So

3    another processor is going to do another search for that record

4    and if they do happen to find one, we're going to issue a

5    certified copy of that record.  If they don't, then we're going

6    to send them Delayed Birth Certificate information.

7              **MS. WOLF:**  And so, Brian, if you can pull up

8    Plaintiffs' 989.

9    Q    So I'll represent this is an exemplar that was provided by

10   the Plaintiffs which relates to one of the Plaintiffs in this

11   case.  And is this the correspondence -- is this what you were

12   referring to when you referred to the Delayed Birth Certificate

13   packet?

14   A    Yes.  So this is one where we -- they sent in the fee for

15   a certified copy.  We did a search for a record.  We didn't

16   find one.  So at this point, we'd send them a letter saying,

17   "We didn't find a record.  Enclosed are all the documents

18              you're going to need to fill out to complete the

19              delayed registration process and some information

20              that you're going to need to gather in order to file

21              that process."

22             **MS. WOLF:**  Brian, if you can flip to what's been

23   Bates numbered as ORT19748, I believe it's the ninth page of

24   this document.

25   Q    So is this one of the forms that would be included in the

EXCEPTIONAL REPORTING SERVICES, INC

1   Delayed Birth Certificate packet?

2   A    Yes.

3   Q    Okay.  And what's on this particular form?

4   A    It talks about supporting document requirements, what is

5   required for certain age periods and then a list of supporting

6   documents that could be used.  It's not all inclusive but these

7   are some of the documents that we generally see come through

8   for -- that would be good for a -- to use in support of that

9   delayed registration.

10  Q    And what are some other documents in addition to those on

11  this page which could be used in order to obtain a Delayed

12  Birth Certificate?

13  A    The -- a school census record, a -- possibly a church

14  record that's not necessarily a baptismal record, public

15  assistance information if it does have their name and date of

16  birth and place of birth on there, a doctor's office records

17  like an immunization record.

18  Q    And you'll see there's a reference there to "hospital

19  record."

20  A    Uh-huh.

21  Q    What kinds of hospital records would be accepted?

22  A    Hospital admittance records, generally like if they went

23  to the doctor -- like if their child was born at home and then

24  they went to the doctor afterwards, something -- hospital

25  admittance record when the child was admitted at the hospital.

1   It could be if they went and had surgery later on in life,

2   anything that shows that their name, date of birth and place of

3   birth and it was issued from that -- a hospital or a medical

4   center.

5   Q    And if an individual didn't have the requisite number of

6   these documents, how would they find out that there are other

7   forms of documents that they could submit?

8   A    Generally when we get in an application and we can't

9   fulfill that application, we call the registrant and let them

10  know that the documents that they had couldn't be used.  And

11  then we talk with them to find out if there's anything else

12  that they have that we could possibly use.

13  Q    And what's the turnaround time on obtaining a Delayed

14  Certificate of Birth?

15  A    It could be anywhere between a few weeks -- a couple, few

16  weeks to a year.  It depends on the application.

17  Q    And what would you say is the average?

18  A    Average is probably the same as an amendment, 30 business

19  days.

20  Q    If you take a look back at the first page of this exhibit

21  and you'll see the date of this letter is October 4th, 2013,

22  correct?

23  A    Uh-huh -- yes.

24  Q    So that's about a year ago?

25  A    Yes.

1   Q    Okay.  So this individual submitted these documents the

2   date of this letter.  Under your assessment, they could have

3   had the Delayed Birth Certificate by now?

4   A    If the documents were accepted, yeah, they could have it.

5   Q    And why do you require the supporting documentation that

6   you do in order to obtain a Delayed Birth Certificate?

7   A    Texas Health and Safety Code requires it.  It's in the

8   Texas Health and Safety Code that for certain delayed records,

9   there's certain criteria for each one and depending on the age,

10  we have to have those supporting documents.  And they also have

11  to be abstracted on the birth certificate itself at that point.

12  Q    And once a Delayed Birth Certificate is issued by the

13  State -- strike that.  Can you obtain a Delayed Birth

14  Certificate from the local registrar?

15  A    You can obtain it from the county clerk, okay.  The way

16  the laws and rules are written is that the delayed record is

17  going to be sent to the county clerk where the child was born.

18  If that county clerk is also the local registrar, then it will

19  go to the local registrar.  But for example, if they were born

20  in the city of Arlington in Tarrant County, the city of

21  Arlington is the local registrar for the city of Arlington

22  proper and then Tarrant County does for other cities throughout

23  there.

24          So it wouldn't -- if they were born in Arlington, it

25  wouldn't go to the city of Arlington.  It would go to the

Farinelli - Direct / By Ms. Wolf                    360

1    Tarrant County Clerk's office.  So they would have to go down

2    to the Tarrant County Clerk's office to get that record.

3    Q    And who could create a delayed record of birth?

4    A    The delayed record can only be filed at the state level.

5    Q    Okay.  And so I'm a little -- I was a little admittedly

6    confused on this myself and I want to make sure that the

7    Court's abundantly clear on the cost --

8    A    Okay.

9    Q    -- for obtaining a Delayed Birth Certificate even if it's

10   for an EIC.  So can you just walk us through what the cost

11   would be for an individual who goes in to seek an EIC birth

12   certificate and needs to get a delayed record because I want to

13   make sure the record is clear?

14   A    So if they come in for -- if they come into the State and

15   they come into the State office and we do a search and we don't

16   find that record, we're going to waive the fee for the EIC.  So

17   it's going to at least cost them $25 to process that birth

18   certificate and then at that point once it's been processed

19   that they come back, we'll give them the free record for the

20   EIC.

21        If they go to the local, it's going to at least be $2

22   for -- 2 to $3 for the search and then they have to send a

23   request to our office for -- if -- so if they're at -- went to

24   the local office for the EIC since they have to be in person to

25   get the EIC and we have to do a search in our office, it's

1    going to be $22 for the search and then if we don't find a

2    record, we return that search fee of $22 and then $25 for the

3    processing.

4              So at a minimum if they do it by mail, it's going to

5    be at a minimum of $47 and then if they want -- once we're done

6    filing it if they want a certified copy of that record, if they

7    go to the local office and they need it for identification --

8    election identification purposes or go to the county clerk's

9    office, they can get it for the 2 to $3.  If they come to our

10   office, we're going to give it to them for free but if they do

11   it by mail, it's going to be another $22 for that.

12   Q    And if they go to a local registrar who's not the county

13   clerk?

14   A    They're not going to have that record and it's not going

15   to be available on the remote side.

16   Q    Okay.  Thanks for clearing that up.  Generally, what's the

17   goal of the Department of State Health Services and the local

18   registrars when an individual comes in to get a birth

19   certificate?

20   A    We're going to do our best to try to get them their birth

21   certificate.  I mean, we're public servants.  So we're there

22   for the public.  So we're going to do what we can to get them

23   their birth certificate because most of the time, people are

24   honestly trying to get their birth certificate.

25             So we have to weigh the helping the public as much as

1   we can but also keeping the record secure because identity

2   theft is not an uncommon phenomena.  So it does happen and so

3   we have to weigh keeping the record secure and all the -- and

4   keeping the integrity of all vital records in the state of

5   Texas intact and also helping the public to try to get those

6   records out to them --

7   Q     And are there --

8   A     -- who legitimately need them.

9   Q     And are there situations in which HSSC has offered

10  assistance in obtaining birth certificates?

11  A     We've had a few instances, like for example, when --

12  Hurricane Katrina.  So when we had a lot of people moving in

13  from Louisiana, we put a process in place where we worked with

14  the Louisiana Vital Statistics office.  Our state registrar and

15  their state registrar put a procedure in place to -- they would

16  come to our office or send an application into our office.  We

17  would gather all the documents and send it over to Louisiana to

18  get them their birth certificate at that point.

19            I know of a couple instances where -- like for the

20  Bastrop fire which was a big fire -- forest fire up in Bastrop

21  -- the Bastrop County Clerk waived fees for birth certificates

22  to help the public and then there was one recently south of

23  Austin where the creek -- Onion Creek flooded and the City of

24  Austin put a mobile unit out there to help with that.

25            **MS. WOLF:**  I pass the witness.

1          **THE COURT:**  Okay.

2      **(Counsel conferred)**

3                      **CROSS EXAMINATION**

4  **BY MR. FREEMAN:**

5  Q    Dan Freeman on behalf of the United States.  Good to see

6  you again, Mr. Farinelli.

7  A    You too, sir.

8  Q    I'd like to ask just a few additional questions and I'd

9  like to sort of clear up the process a little bit.  We may

10  travel a little bit of ground that's been covered already but

11  we'll go quick.

12  A    Okay.

13  Q    So let's start from the creation of a birth record.  A

14  child is born in Texas and a designated individual is supposed

15  to submit information for the creation of a birth record,

16  right?

17  A    Correct.

18  Q    But is every child born in Texas actually registered

19  within the first year?

20  A    No.

21  Q    And that birth record is going to be housed at your office

22  in Austin and at one local birth registrar's office?

23  A    Correct.

24  Q    Okay.  The child's parents don't get a first copy of the

25  birth certificate for free, right?

```
                    Farinelli - Cross / By Mr. Freeman              364
```

1    A    Correct.

2    Q    And there's no public assistance available with regard to

3    obtaining a birth certificate that you're aware of, right?

4    A    No, huh-uh.

5    Q    And if a birth record is not created in the first year

6    after a child's birth, that individual or their parent has to

7    go through the Delayed Birth Certificate process, correct?

8    A    Correct.

9    Q    And that first requires a 22-dollar search fee?

10   A    Yes.

11   Q    And then a 25-dollar charge to file the Delayed Birth

12   Certificate; am I right?

13   A    Correct.

14   Q    So that's a total of $47 just to file the Delayed Birth

15   Certificate, correct?

16   A    Correct.

17   Q    And the individual also has to submit documents, correct?

18   A    Correct.

19   Q    And there's no rule or regulation reducing fees related to

20   Delayed Birth Certificates if your office needs to create a

21   Delayed Birth Certificate because the individual needs to get a

22   birth certificate to obtain an EIC, right?

23   A    No, there isn't.

24   Q    And after the delayed birth record is filed, the

25   individual will still have to pay to obtain a certified copy of

Farinelli - Cross / By Mr. Freeman                    365

1   the birth record unless they're getting an Election

2   Identification Birth Certificate from your office in Austin,

3   correct?

4   A     Correct or if they go to the county clerk where we send

5   the record --

6   Q     Okay.

7   A     -- the copy of the record, right.  So --

8   Q     You also discussed amending a birth certificate during

9   your direct examination, correct?

10  A     Correct.

11              **MR. FREEMAN:**  And if we could pull back up

12  Defendants' Exhibit 2740 and if we could -- well, that's not

13  what I was looking for.

14  Q     Well, let's do it without the exhibit.  Am I correct that

15  amending a birth certificate costs $15?

16  A     Correct.

17  Q     And that cost doesn't include an actual copy of the birth

18  certificate; am I right?

19  A     No, it does not.

20  Q     And there's no regulation that waives any part of the

21  amendment fee for individuals who need a birth certificate to

22  obtain an Election Identification Certificate, correct?

23  A     No, there isn't.

24  Q     And to be clear, amending a birth certificate requires

25  submission of supporting documentation, correct?

Farinelli - Cross / By Mr. Freeman                    366

1   A    Depending on the change.  I mean, it -- the -- if it's the

2   affidavit portion signed -- on most changes, if the affidavit

3   itself is signed by an older relative or the parents if it's a

4   minor child, then with most changes, just the affidavit is

5   sufficient.

6   Q    Okay.  With regard to the older relative, if it's just a

7   sibling who's a year or two older so they can't really swear to

8   the facts of the birth, would that be sufficient?

9   A    Yes.

10  Q    So as long as they're older at all?

11  A    Yes.

12  Q    Okay.  So then let's talk about fees for actually getting

13  an ordinary certified copy of a birth certificate.  Am I

14  correct, a certified copy of a birth record if it's obtained

15  from your office in person or by mail, that's $22, correct?

16  A    Correct.

17  Q    And it'll cost an extra $5 to expedite a birth record

18  ordered by mail, right?

19  A    Correct.

20  Q    And it'll cost $22 plus a credit card fee if it's ordered

21  from your office online, correct?

22  A    Right and there is an expedite fee on there too.

23  Q    So it's 22 plus --

24  A    So --

25  Q    -- 5 plus the credit card?

Farinelli - Cross / By Mr. Freeman                    367

1   A     Yeah, yeah.

2   Q     Okay.

3   A     Because that's an -- it's automatically expedited.  So we

4   charge an expedite fee.

5   Q     Got it.

6   A     Yeah.

7   Q     And it may cost 22 or $23 if it's obtained from a local

8   registrar, either the registrar who has jurisdiction over the

9   place of birth or a registrar under remote, correct?

10  A     Correct.

11  Q     Okay.

12  A     And it depends -- the 22 and 23 depend on that individual

13  local registrar.

14  Q     Got it.  Let's walk through each of the methods to obtain

15  a birth record.  First, a birth certificate online -- in order

16  to request an ordinary certified copy of a birth record online,

17  an individual has to provide either a current valid driver's

18  license or an identification card from Texas or another state,

19  right?

20  A     Correct.

21  Q     So if an individual doesn't have a valid driver's license

22  or identification card from Texas or another state, they can't

23  order a birth certificate online at any price, correct?

24  A     You are correct.

25  Q     In order to request an ordinary certified copy of a birth

Farinelli - Cross / By Mr. Freeman                    368

1    record by mail or in person, an individual has to provide

2    either one form of primary ID, two forms of secondary ID or one

3    secondary and two forms of supporting, correct?

4    A    Correct.

5    Q    And you already discussed with counsel for the State what

6    a primary ID is but would you agree that each of the following

7    documents is sufficient to establish identity in order to

8    obtain a certified copy of a birth record?  A driver's license

9    for any -- from any state?

10   A    Yes.

11   Q    Federal or state identification card from any state?

12   A    Yes.

13   Q    And that includes a public employee identification card?

14   A    Yes.

15   Q    A federal, state or city law enforcement employment

16   identification card?

17   A    Yes.

18   Q    An offender identification card?

19   A    Yes.

20   Q    Military identification card?

21   A    Yes.

22   Q    Concealed handgun license?

23   A    Yes.

24   Q    Pilot's license?

25   A    Yes.

1    Q    U.S. passport?

2    A    Yes.

3    Q    Would you agree that there are many documents that

4    standing alone establish identity for purposes of obtaining a

5    Texas birth certificate but not for purposes of voting?

6    A    I'm -- to the best of my knowledge, I'm not sure what's

7    needed for voting.  Even though I just saw it, I should know

8    but to the best of my knowledge, yeah.  I mean, there's some

9    documents on there that they could get a birth certificate but

10   not vote with.

11   Q    Okay.  And two secondary documents establish identity as

12   well, correct?

13   A    Correct.

14   Q    And that includes student IDs, right?

15   A    Yes.

16   Q    Expired primary ID?

17   A    Expired primary ID, yes.

18   Q    A social security card?

19   A    Yes.

20   Q    A Medicaid card?

21   A    Yes.

22   Q    A Medicare card?

23   A    Yes.

24   Q    A medical insurance card?

25   A    Yes.

1   Q    A private employer ID card?

2   A    Yes.

3   Q    And there are others, correct?

4   A    Yes.

5   Q    A Texas resident can't vote with a social security card

6   and a student ID, can they?

7   A    To the best of my knowledge, no.

8   Q    And a Texas resident can't vote with a primary employer ID

9   card and that health insurance card -- or excuse me -- a

10  private employee ID card and a health insurance card, right?

11  A    Correct.

12  Q    And a Texas resident can't vote with a driver's license

13  that's been expired for six months and a Medicare card,

14  correct?

15  A    Can't -- what --

16  Q    Cannot.

17  A    Cannot.  To the best of my knowledge, no.

18  Q    But they could establish identity for purposes of

19  obtaining a birth certificate with those documents, right?

20  A    Correct.

21  Q    Do you know why there's this distinction?

22  A    We're -- so generally the -- what is called the "breeder

23  document" is a birth certificate and with that document,

24  generally somebody can establish their identity with that.  So

25  generally they're going to want to come to us the first part

1  and get that birth certificate.  So we're going to make it a

2  little easier for them to -- and most of those documents there,

3  we can assure that they're valid documents for the most part

4  and so having a little wider variety of documents that can be

5  used to establish identity makes it easier for that registrant

6  or their immediate family member to get a copy of that birth

7  certificate because we know, like, the Social Security

8  Administration does have a little bit stricter policies in

9  order to get a social security card, same with the DPS.

10          So since that birth certificate is a breeder

11 document, meaning it starts all from there, we're going to try

12 to provide as much information as we can in order for them to

13 get that birth certificate.

14 Q    Do you know how many instances there were of forged or

15 stolen birth certificate records in the state of Texas in the

16 last ten years?

17 A    No, I don't.

18 Q    Is identity theft using birth certificates a common

19 problem?

20 A    It's not a common problem but it is -- there is a problem,

21 yes.

22 Q    More than four instances certainly in the last ten years

23 of identity theft using birth certificates?

24 A    In the past ten years, yeah, probably.

25 Q    Okay.  Do you know how common in-person voter

1    impersonation is?

2    A    No, I'm not aware of that.

3    Q    Okay.  Mr. Farinelli, you testified during your direct

4    concerning the Election Identification Birth Certificate.  To

5    be clear, that's marked for election purposes only.  It cannot

6    be used as identification, correct?

7    A    Correct.

8    Q    Now, the Texas legislature didn't take any action to

9    eliminate birth certificate fees for individuals who require a

10   birth certificate to obtain an EIC, correct?

11   A    Correct.

12         MS. WOLF:  Objection, your Honor.  It's outside the

13   scope of the direct.

14         THE COURT:  What was the question?

15         MR. FREEMAN:  Whether the Texas legislature took any

16   action to eliminate birth certificate fees for individuals who

17   require a birth certificate to obtain an EIC.

18         THE COURT:  Overruled.  You can answer.

19         THE WITNESS:  When I was doing bill analysis for

20   that, no, they didn't waive the fees for that.

21   BY MR. FREEMAN:

22   Q    And there are other circumstances in which there's a full

23   statutory waiver of all fees for obtaining a certified copy of

24   a birth record.  Am I right?

25   A    Yes, there is other provisions in the state law for that.

Farinelli - Cross / By Mr. Freeman                    373

1   Q    And in those cases, the birth certificate is not stamped

2   with a limitation on use, is it?

3   A    No.

4   Q    And so as a result, the Department of State Health

5   Services, they promulgated a regulation that created the

6   Election Identification Birth Certificate --

7   A    Right.

8   Q    -- and they waived all non-statutory fees, correct?

9   A    Correct.

10  Q    And your office has a policy of waiving the statutory fees

11  as well; am I correct?

12  A    Correct.

13  Q    But when I deposed you back in May, your office had not

14  actually ever done that because it --

15  A    We --

16  Q    -- hadn't issue any?

17  A    Right.  And we still haven't issued any.

18  Q    Got my next question.  So at this point, no birth

19  certificate has been issued for free in the state of Texas; is

20  that correct -- under this rule?

21  A    That is correct.

22  Q    Now, it's not possible to apply for an Election

23  Identification Birth Certificate online, correct?

24  A    Correct.

25  Q    And it's not possible to apply for an Election

1    Identification Birth Certificate by mail; am I right?

2    A     You are correct.

3    Q     An individual who wishes to obtain an Election

4    Identification Birth Certificate has to travel to an office and

5    apply in person, correct?

6    A     Correct.

7              MR. FREEMAN:  If we can pull up PL216 and Page 3,

8    please.  And if we can blow up the two paragraphs under

9    "General Comments."  Yeah.

10   Q     And if you could take a moment to review that, sir.

11   A     Okay.

12   Q     Is it clear from this comment that the original rule

13   proposal did not state where Election Identification Birth

14   Certificates could be obtained?

15   A     It just says that -- well, it says that they can only be

16   obtained in person at the Bureau of Vital Statistics or a local

17   registrar or a county clerk.

18   Q     And commenters were asking because the original proposal

19   probably didn't make that clear.

20             MS. WOLF:  Objection, your Honor.

21             THE COURT:  Sustained.

22             MR. FREEMAN:  Okay.

23   BY MR. FREEMAN:

24   Q     And does the response provide any explanation for why

25   election identification birth certificates would be made

1    available only in person?

2    A    Can you repeat the question?

3    Q    Does the response in the final regulation explain why

4    election identification birth certificates would only be made

5    available in person?

6    A    On this exhibit, no.

7    Q    Okay.  Let's turn to locations where election

8    identification birth certificates are available.

9           First, an individual born in Texas can apply for an

10   election identification birth certificate at your office in

11   Austin, right?

12   A    Correct.

13   Q    And that's open 8:00 to 5:00 Monday through Thursday?

14   A    Monday through Friday.

15   Q    Oh, I'm sorry.  Monday through Friday.  But no evenings,

16   no weekends?

17   A    No.

18   Q    Okay.  The second option is to apply to a local registrar

19   connected to Austin via your remote?

20   A    Correct.

21   Q    And they'll have access to all the Austin records, right?

22   A    Correct.

23   Q    Am I correct that in approximately 85 counties there's no

24   local registrar who is connected to the remote?

25   A    Without me looking, I'm going to say that that sounds

Farinelli - Cross / By Mr. Freeman                    376

1    about right.

2    Q    Okay.

3    A    Yeah.

4    Q    Roughly 85.

5    A    Yeah.

6    Q    Okay.

7    A    That sounds about right.

8    Q    And there are no more than five local registrars in any

9    county that are connected to the remote system, right?

10   A    That sounds about right, correct.

11   Q    Certainly far fewer than there are, for example, polling

12   places in a given county, if it's an urban county, right?

13   A    I'm not sure what -- from my experience when it comes to

14   vote poll -- voting polls, yes.  Yeah.

15   Q    Okay.  And the third and last option is to apply to the

16   single local registrar with jurisdiction over the location

17   where an individual was born, correct?

18   A    I'm sorry, can you repeat that again?

19   Q    I'm sorry, no, absolutely I talk too fast.

20   A    No, that's okay.

21   Q    The third and last option is to apply to the single local

22   registrar with jurisdiction over the location where the

23   individual was born, is that correct?

24   A    Correct.

25   Q    And if there are several local registrars in a given

Farinelli - Cross / By Mr. Freeman                    377

1  county, the applicant will have to know which specific

2  registrar to go to, is that right?

3  A    Correct.

4  Q    And the State has no control over the hours of local

5  registrars, is that right?

6  A    Correct.

7  Q    And they have no control over staffing?

8  A    Correct.

9  Q    And no control over the locations of the local registrars,

10  is that right?

11  A    Correct.

12  Q    And you don't know whether any local registrars are

13  located near public transit, do you?

14  A    The only one I'm aware of is the city of Austin, just

15  because I live there, and they are, but other ones, no.

16  Q    Okay.  And you have no control over whether local

17  registrars are placed near predominately minority communities,

18  do you?

19  A    No, I don't.  I'm not aware.

20  Q    And there's no State requirement that any of those offices

21  have Spanish speaking staff available to assist individuals who

22  have trouble communicating in English, am I right?

23  A    You are correct.

24  Q    Now, you testified during your direct examination that

25  your office has supervisory power over the locals, is that

1    correct?

2    A    Yes.

3    Q    In fact, the Department of State Health Services doesn't

4    have any enforcement power to force a local to issue election

5    identification certificates if they're not actually issuing

6    them, right?

7    A    Correct.  So the way the law is written, it says we have

8    supervisory power but there's no other provision in state law

9    to allow us to enforce that.  So we can -- there's no stick

10   involved, to put it bluntly on that.

11   Q    And you talked about on your direct that you could

12   terminate the contract between Austin and a local for failure

13   to issue EIC birth certificates, correct?

14   A    Off the remote, yes.

15   Q    Off the remote.

16   A    Right.

17   Q    Do you remember testifying about the reasons why that

18   contract could be terminated during your deposition?

19   A    I -- a little bit, yes.  So do you want me --

20   Q    I'll bring it up.  I'll bring it up.

21   A    Okay.

22        MR. FREEMAN:  If we could bring up 108-15 through

23   109-7.

24   Q    And did I ask you, so if we can go back real quick to the

25   contract --

Farinelli - Cross / By Mr. Freeman                    379

1    A    Okay.

2    Q    -- and violating the contract:

3              "QUESTION:  Are there any particular bases that you

4              are aware of in which a remote birth certificate

5              issuance site would have their contract terminated?

6         Did you answer:

7              "ANSWER:  If they were not paying us the $1.83 per

8              record issued we would probably terminate their

9              contract.  If they have just been searching on the

10             database without document production, we would more

11             than likely investigate it and if it continues

12             terminate their contract.

13             **MR. FREEMAN:**  And then going on to the next page, did

14   I ask:

15             "QUESTION:  Okay.  Anything else you can think of?

16        And did you answer:

17             "ANSWER:  Not offhand.

18        And then I asked:

19             "QUESTION:  So you're not aware of any additional

20             basis why -- bases why you'd terminate a contract?

21        And then you said:

22             "ANSWER:  No."

23        Is that correct?

24   A    Yes.

25   Q    Okay.  And you described that there had been a session at

1   a conference for birth registrars about voting issues, is that

2   correct?

3   A    Correct.

4   Q    That was one of three simultaneous sessions, is that

5   correct?

6   A    Correct.

7   Q    And those conferences were voluntary?

8   A    Yes.

9   Q    Okay.  Now, with regard to ordinary birth records, an

10  individual can request a copy of their own birth record or that

11  of an immediate family member, is that correct?

12  A    Correct.

13  Q    But that's not -- it's not possible for an immediate

14  family member to apply for an election identification birth

15  certificate on behalf of an immediate family member, is that

16  correct?

17  A    Correct.

18  Q    And, in fact, you don't know what the purpose of that

19  limitation is, am I right?

20  A    Correct.

21  Q    An applicant for an election identification birth

22  certificate has to meet the same documentation requirements as

23  an applicant for an ordinary certified copy of a birth

24  certificate, right?

25  A    Correct.

Farinelli - Cross / By Mr. Freeman                    381

1   Q    And so it's not possible for an immediate family member

2   who does have identification to help their family member who

3   needs identification by showing identification needed to meet

4   the birth certificate application requirements, is that right?

5   A    So -- yeah, you're correct on that.

6   Q    So if I have an ID and my sister doesn't and she needs a

7   birth certificate, I can't show my ID and say this is my

8   sister, can I have an election identification birth certificate

9   for her, but I could pay $22 and get her an ordinary birth

10  certificate, right?

11  A    Correct.

12  Q    Mr. Farinelli, you discussed with counsel for Defendants

13  an application form for an election identification birth

14  certificate, is that correct?

15  A    Correct.

16          **MR. FREEMAN:**  If we could bring up Defendants'

17  Exhibit 2743.

18          Nope, not the website.

19          Great.  If we could zoom in on the bottom left, right

20  there.

21  Q    This is a form that was revised in September of 2014,

22  correct?

23  A    Correct.

24  Q    When did you become aware that this provision had been

25  made?

Farinelli - Cross / By Mr. Freeman                    382

1   A    Just a few days ago.

2   Q    When did you become aware that this provision was being

3   considered?

4   A    Just a few days ago.

5   Q    Have you ever seen a physical copy of the September

6   version of this form?

7   A    The September version, a physical copy of it?

8   Q    A printed copy in the Austin office.

9   A    No.

10  Q    Have you ever seen a physical copy, a printed copy of the

11  September version of the form in a local registrar's office?

12  A    No.

13  Q    Do you have personal knowledge that this form has been

14  distributed for use in any local registrar's office in Texas?

15  A    No.

16  Q    Do you have any personal knowledge that any copy of this

17  form has been physically printed for use outside of this

18  courtroom?

19  A    No, I don't.

20  Q    And has this form been translated into Spanish?

21  A    No.

22          **MR. FREEMAN:**  Okay.

23          If we could bring up Plaintiffs' 221.

24  Q    This is the application for an election identification

25  certificate as it existed on the first day of this trial,

Farinelli - Cross / By Mr. Freeman                    383

1    September 2nd, 2014.  Is that correct?

2    A     September 2nd, 2014?  Yes.

3    Q     And let's scroll down to the bottom where the difference

4    is.  Am I correct that this form says applications without

5    photo identification will not be processed?

6    A     That is correct.

7    Q     So, in fact, to your knowledge, the only form that

8    actually exists in offices around the state continues to tell

9    applicants for an election identification birth certificate

10   that applications without photo identification will not be

11   processed, correct?

12            MS. WOLF:  Objection, your Honor.

13            MR. FREEMAN:  On what grounds?

14            MS. WOLF:  Assumes facts not in evidence.

15            THE COURT:  Overruled.

16            THE WITNESS:  To the best of my knowledge you are

17   correct.

18   BY MR. FREEMAN:

19   Q     In fact, you would agree that most people who need an

20   election identification birth certificate will not have a photo

21   ID, right?

22   A     You are correct.

23   Q     And so if an individual comes into a local registrar's

24   office and asks for an application for an election

25   identification birth certificate, this is the form that they

1    are going to be handed, is that correct?

2    A    To the best of my knowledge, yes.

3    Q    And just out of curiosity, was this form ever translated

4    into Spanish?

5    A    No.

6    Q    Now, in the Austin office you don't have any signage

7    indicating that election identification birth certificates are

8    available, correct?

9    A    You are correct.

10   Q    And there are no posted notices required in local

11   registrars' offices indicating that election identification

12   birth certificates are available, correct?

13   A    Specifically election identification --

14   Q    Yes.

15   A    -- certificates?

16   Q    Yes.

17   A    To the best of my knowledge, no.

18   Q    Now, you testified on your direct there are specific

19   procedures in local registrars' offices when individuals ask

20   why they need the birth certificate, correct?

21   A    Yes.

22            MR. FREEMAN:  If we could pull up Page 112 of the

23   deposition and zoom in starting at Line 22.

24   //

25   //

Farinelli - Cross / By Mr. Freeman                385

1   **BY MR. FREEMAN:**

2   Q    Did I ask:

3             "QUESTION:  Okay.  But there's no specific procedure

4             in that office like there is in the Austin office

5             when an individual is asked for what purpose they

6             need their birth certificate?"

7             Correct?

8   A    Correct.

9   Q    And going to the next page, you answered:

10            "ANSWER:  That is correct."

11  A    Okay.  Yes.

12  Q    That was your testimony?

13  A    Yes.

14  Q    Okay.  Now, issuing an election identification birth

15  certificate costs money due to security paper, staff time, and

16  the like, correct?

17  A    Correct.

18  Q    And if a person comes into a local registrar's office and

19  purchases a regular certified copy of a birth certificate for

20  $22 or $23, that office nets a profit, correct?

21  A    One more time.

22  Q    Sorry.  If an individual comes into a local registrar's

23  office and buys a certified copy of a birth certificate, the

24  office will net a profit, correct?

25  A    Correct.

1  Q    And, in fact, you said that's how those offices are

2  funded, correct?

3  A    Correct.

4  Q    But if a person comes into a local registrar's office and

5  specifically requests an election identification birth

6  certificate for two or three dollars, that office will lose

7  money, correct?

8  A    Correct.

9  Q    So the local registrar's office has an incentive not to

10 suggest just out of the blue unprompted that an individual get

11 an election identification birth certificate rather than a

12 certified copy of a birth certificate, correct?

13 A    Well, I can't assume that.  I --

14 Q    They either make money or they lose money, so --

15 A    Right.

16 Q    Okay.

17 A    But I can't really tell what their incentive's going to

18 be, could be -- you know, I can't.

19         **MR. FREEMAN:**  Okay.

20         If we could bring up Plaintiffs' 452.

21 Q    If you could take a moment to look at that and

22 specifically the third paragraph.

23 A    Okay.

24         **MS. WOLF:**  Your Honor, I'm going to object to the

25 line of this questioning.  Mr. Farinelli was offered as a

Farinelli - Cross / By Mr. Freeman                     387

1    30(b)(6) designee or agent/trustee and my understanding is that

2    as a part of that 30(b)(6) definition these particular comments

3    relating to the rule would not be discussed, so not for why

4    being asked different at trial.

5            **MR. FREEMAN:**  And your Honor, this is the only

6    witness that the State has called with regard to the Department

7    of Vital Statistics.  Moreover, on cross examination the

8    Defendants have been permitted to ask about a variety of

9    documents that are germane to the direct testimony, even if the

10   witness --

11           **THE COURT:**  What is this?

12           **MR. FREEMAN:**  -- does not have specific knowledge.

13           **THE COURT:**  What is this?

14           **MR. FREEMAN:**  This is a letter with regard to the

15   change made to regulations related to creation of the election

16   identification birth certificate and specifically discusses the

17   resistance of local registrars to creation of that document.

18           What happened with regard to the 30(b)(6) deposition

19   was that the State did not produce a witness, notwithstanding

20   the notice, on this specific topic; however, they provided

21   substantial documents.

22           **THE COURT:**  Overruled.  I'll let you go there.  I'm

23   going to just see.

24           **MR. FREEMAN:**  We'll be quick.

25           **THE COURT:**  Okay.

1    **BY MR. FREEMAN:**

2    Q    Mr. Farinelli, am I correct that this is a letter from the

3    Collin County Clerk in which the Collin County Clerk expressed

4    concerns both about lost revenue and the enormous liability

5    that the change would put on clerks' offices due to potential

6    for individuals to request unlimited certified copies of birth

7    certificates?

8    A    That's what that statement says, yes.

9            **MR. FREEMAN:**  And if we could pull up

10   Plaintiffs' 216.

11           If we can go to the second page, left column, and

12   blow up the two paragraphs following "concerns about costs."

13   Q    Would you agree that this states that several commenters

14   expressed concerns about the fiscal impact of the rule and

15   described it as an unfunded mandate?

16           **MS. WOLF:**  Objection, your Honor.  The document

17   speaks for itself.

18           **THE COURT:**  Overruled.

19           **THE WITNESS:**  Well, that's what the document says.

20   Q    Now, you're not aware of any specific procedures that the

21   local registrars have adopted to make sure that voters know

22   that election identification birth certificates are available,

23   right?

24   A    I'm sorry, I was reading that.

25   Q    That's fine.

Farinelli - Cross / By Mr. Freeman                389

1   A    I apologize.

2   Q    You're not aware of any specific procedures that local

3   registrars have adopted to make sure that voters know that if

4   they need a birth certificate they can get one for two or three

5   dollars, correct?

6   A    Correct.

7   Q    And other than preannounced site visits, you have no

8   procedure in place to ensure that when an individual goes into

9   a local registrar and asks for a birth certificate that they

10  need for an EIC that they're offered an election identification

11  birth certificate, correct?

12           **MS. WOLF:**  Objection, misstates the testimony.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  Can you repeat the question?

15  **BY MR. FREEMAN:**

16  Q    Sure.  Absolutely.  And other than preannounced site

17  visits --

18  A    Okay.

19  Q    -- you have no procedures in place to ensure that when an

20  individual goes into a local registrar and asks for a birth

21  certificate that they need for an EIC that they're offered the

22  election identification birth certificate, is that right?

23  A    That's correct.

24  Q    Next I'd like to talk about what, if any, efforts have

25  been made to educate the public concerning the availability of

1    election identification birth certificates.

2              First, were there any press releases concerning the

3    availability of election identification birth certificates?

4    A    Press releases to the public?

5    Q    Yes.

6    A    Not that I am aware of.

7    Q    Was there a media campaign?

8    A    Not that I am aware of.

9    Q    Were there any direct notices to voters?

10   A    Not that I am aware of.

11   Q    And has the Department of State Health Services given any

12   kind of materials to DPS for DPS to hand out if an individual

13   tries to get an EIC but doesn't have a birth certificate?

14   A    To the best of my knowledge, no.

15   Q    And when I asked you during your deposition if there had

16   been any effort to educate individuals who need an EIC in order

17   to vote and need a birth certificate in order to get an EIC

18   that the election identification birth certificate exists at a

19   reduced price, you answered no, correct?

20   A    Recalling my -- I think so, yeah.

21   Q    And you discussed what's no currently up on the Department

22   of State Health Services website with your counsel, correct?

23   A    Correct.

24   Q    When we met for your deposition you agreed with me that

25   there was nothing on the general public section of the

Farinelli - Cross / By Mr. Freeman                    391

1    Department of State Health Services website that let voters

2    know that election identification birth certificates were

3    available at a reduced price --

4    A     Correct.

5    Q     -- correct?

6          And if I represented to you that I looked at the

7    website on Sunday and that there was still no reference on the

8    general public section of the Department of State Health

9    Services website to an election identification birth

10   certificate, would you have any reason to disagree with me?

11   A     No.

12   Q     And if I represented to you that when I went to the

13   website on Sunday there was no separate page describing the

14   availability of election identification birth certificates,

15   would you have any reason to disagree with me?

16   A     No.

17   Q     And you told me at your deposition that there was no plan

18   to assess the election identification birth certificate program

19   or to change it in the future, is that correct?

20   A     Yes, and that's currently.

21         **MR. FREEMAN:**  If we could pull up the State's

22   demonstrative and go to the second page.  Third page.

23   Q     You can see that right there, that says last updated

24   September 8th, 2018 (sic), is that correct?

25   A     Correct.

1              **MR. FREEMAN:**  And if we go to the next page.

2              Oh, do we have the new one?

3              Next page.

4              Next page.

5    **BY MR. FREEMAN:**

6    Q    Well, do you recall when the web page specifically

7    relating to election identification birth certificates went

8    live?

9    A    The public page?

10   Q    The public page.

11   A    I believe it was yesterday.

12   Q    And was that released -- was that revised again today,

13   that page?

14   A    Yes.

15   Q    And so it was so hastily released that it had to be

16   altered the next day, would you agree with that?

17   A    It had to be updated.  I'm not sure hastily released.

18   Q    Okay.  That's fair.  That's fair.

19              When did you become aware that revisions were being

20   made?

21   A    Yesterday.

22   Q    And when did you become aware that the revision was being

23   considered?

24   A    Yesterday.

25   Q    As we sit here today, do you know how many hits the

Farinelli - Cross / By Mr. Freeman                          393

 1   general public section on the Department of State Health

 2   Services website has gotten since this update?

 3   A     No, I wouldn't -- I don't know that information.

 4   Q     So do you know if anyone outside of this courtroom or the

 5   people in this courtroom has actually ever seen that website?

 6   A     I couldn't say.

 7   Q     Okay.  As of May, only 60 election identification birth

 8   certificates have been issued via the remote access system

 9   across the entire state of Texas, is that right?

10   A     At the time of the deposition, yes,.

11   Q     And I'm going to go out on a limb, I'm curious, how many

12   have been issued now?

13   A     I haven't checked.

14   Q     Oh, okay.  Are you aware --

15   A     That was --

16   Q     Sorry?

17   A     The deposition was the last time we checked.

18   Q     Okay.  Are you aware of how many EIC applications have

19   been rejected for lack of a birth certificate?

20   A     Through the Department of Public Safety, is that what --

21   Q     Yes.  How many election --

22   A     Oh, no.  I don't know.

23   Q     The Texas Department of State Health Services provides

24   data regarding -- oh, we did that.

25              The Texas Department of State Healthy Services

1    provides data regarding births through its remote system to the

2    Social Security Agency, correct?

3    A    Correct.

4    Q    And this allows the Social Security Administration to

5    verify births without use of paper documentation, am I correct?

6    A    Correct.

7    Q    So there's no technical impediment to connecting the birth

8    certificate database directly to another government entity, is

9    that right?

10   A    Correct.

11   Q    And if there were an agreement between your office and the

12   Department of State Health Services, there would be no legal

13   impediment to providing DPS with direct access to the birth

14   certificate database, is that correct?

15   A    You said between our office and the Department of State

16   Health Services.  I'm part of --

17   Q    I'm sorry.  I meant to say DPS.

18   A    Oh, okay.

19   Q    Between your office and DPS --

20   A    Okay.

21   Q    -- there would be no legal impediment --

22   A    No.

23   Q    -- if there were an agreement?

24   A    No.

25   Q    In fact, the remote access that you provide to local

Farinelli - Cross / By Mr. Freeman                395

1   registrars is just a web page with a login and a password, is

2   that right?

3   A    It's a web portal, yeah.

4   Q    Web portal.  And your office doesn't charge for queries,

5   so long as a certified copy of a birth record is not created,

6   is that right?

7   A    We don't charge for queries, no.

8   Q    Do you know if other states that require a photo ID to

9   vote have set up a link between their vital statistics offices

10  and the office that issues election IDs?

11  A    I'm not sure, no.

12  Q    If that type of link were set up in Texas, it would allow

13  a voter who doesn't have a birth certificate to go to DPS and

14  get an EIC in a single trip without traveling to a local

15  registrar and without paying anything for a birth certificate,

16  isn't that right?

17  A    Feasibly, yes.

18  Q    But this link hasn't been set up?

19  A    No.

20  Q    We're almost done.  I'd like to ask a few quick questions

21  about Texans who were born in other U.S. states.  I'm going to

22  put up the same document that we already used at your

23  deposition, Plaintiffs' 228.

24       Mr. Farinelli, would you agree that this document

25  consensus estimates that about --

1            **MR. FREEMAN:**  Can you zoom in on the table.

2    Q    Would you agree this documents estimates that about

3    21 million individuals are natives of the United States and

4    live in Texas?

5    A    Yes.

6    Q    And about 5.5 million individuals are natives of the

7    United States and are not born in Texas, so 21 minus 15 and

8    change, so somewhere between --

9    A    Yes.

10   Q    -- 5.5 million individuals -- oh, even better.

11   A    Yes.

12   Q    Okay.  Thank you.

13           So just shy of 25 percent of Texans who were born in

14   the United States were born in another state, correct?

15   A    Correct.

16   Q    Those Texans aren't eligible for a reduced price election

17   identification birth certificate from your office, right?

18   A    Correct.

19   Q    If they need a birth certificate in order to vote, they

20   will have to purchase a full price birth certificate from the

21   state in which they were born, right?

22   A    To the best of my knowledge, yes, unless that state has

23   some kind of program.

24   Q    And those prices vary, correct?

25   A    Correct.

Farinelli - Cross / By Mr. Freeman                         397

1   Q    Do you know if every state even allows an individual who

2   doesn't have a photo ID to order a birth certificate by mail?

3   A    Repeat that question again.

4   Q    Sure.  Do you know if every state allows an individual who

5   doesn't have a photo ID to order a birth certificate by mail?

6   A    I don't know if every state.  I know like my personal

7   knowledge of California, you don't need a photo ID, but you

8   need a notarized statement from them.

9   Q    Okay.  But you don't know about every state?

10  A    No.

11  Q    Okay.  So it's possible that some individuals may not be

12  able to obtain their birth certificate that they need to get an

13  EIC without traveling to their state of birth, is that correct,

14  or hiring someone to take care of it for them?

15  A    I could assume that, yeah.

16  Q    Okay.  Mr. Farinelli, can we agree that an individual who

17  seeks an election identification birth certificate must take

18  time to travel to a location where he can apply for a birth

19  certificate?

20  A    Yeah, travel time is going to be a factor.

21  Q    Can we agree that because of the hours that these

22  locations are open, some individuals will have to take time off

23  of work to obtain an election identification birth certificate?

24  A    It could be assumed that, yeah.

25  Q    Can we agree that individuals will have to spend money on

1    transportation to get to these locations because individuals

2    who need an election identification birth certificate are not

3    individuals who have driver's licenses?

4    A    Yeah, I could probably agree with that.

5    Q    Can we agree that an individual may use a birth

6    certificate for numerous reasons other than obtaining

7    identification for voting, such as insurance, school, and

8    obtaining other forms of identification?

9    A    Yes.

10   Q    Can we agree that the time and cost that an individuals

11   will have to take to obtain an election identification birth

12   certificate, that by limiting the use of that birth certificate

13   to obtaining an EIC means that all the time and costs are only

14   going to be related to that individual's desire to vote?

15   A    I could agree with that.

16            **MR. FREEMAN:**  Pass the witness.

17            Thank you, Mr. Farinelli.

18            **MS. WOLF:**  Your Honor, I just have -- oh, I'm sorry.

19            **MR. HEBERT:**  Your Honor --

20            **THE COURT:**  Go ahead.

21            **MR. HEBERT:**  -- I just have a few questions.

22            **THE COURT:**  Yes.

23            **MR. HEBERT:**  Could we bring up Defendants'

24   Exhibit 355 at Page 2.

25            I know it's the end of the day, your Honor.  I'll try

Farinelli - Cross / By Mr. Hebert                    399

1   to --

2            THE COURT:  That's fine.

3            MR. HEBERT:  -- go five minutes or more, maybe ten.

4            Page 2.  Is that Page 2?

5        (Counsel confers with IT technician)

6            MR. HEBERT:  If you could highlight the area

7   underlined on the right-hand side.

8                         CROSS EXAMINATION

9   BY MR. HEBERT:

10  Q    So this was the -- if you look at the bottom you'll see

11  this was the proposed rules that your office issued in August

12  of 2013 and the part that has been highlighted here, can you

13  explain what that is, sir?

14  A    That is the new -- that was part of the new section of the

15  Texas Administration Code waiving the fee for a certified copy

16  when they're trying to obtain an election identification

17  certificate issued by the Department of -- Department.

18  Q    Okay.  And the original proposal here didn't contain

19  anything about having to show up in person to get the so-called

20  free EIC birth certificate?

21  A    This just refers to the fees.

22           MR. HEBERT:  Okay.

23           Now could we pull up Exhibit 356 at Page 4.

24           Yeah, we're done with this.

25           356, Page 4, which is the final regulation in

Farinelli - Cross / By Mr. Hebert                    400

1   October.  And I want to focus is on T, which was the section we

2   were looking at before.

3   **BY MR. HEBERT:**

4   Q    So we see here that there's been a change, correct, that

5   it now says an applicant who appears in person to obtain a

6   certified copy from the Department.  You must appear in person.

7   So there was a change made, correct?

8   A    Correct.

9   Q    All right.  And do you have knowledge as to why that

10  change was made?

11  A    No, I'm not sure.

12       **MR. HEBERT:**  Okay.  If we could bring up 358, please.

13  And if we could -- yeah, thank you.  We've heard a lot of talk,

14  your Honor, about the EIC birth certificate, and I thought it

15  would just be worth showing.  So this is Defendants' Exhibits

16  358.

17  Q    And I'm calling your attention, sir, to this section down

18  here that is stamped on it, "For election purposes only.

19  Cannot be used as identification."  Correct?

20  A    Uh-huh.

21  Q    Now, that was added -- in the original August proposals,

22  that was not included, was it?  It was added in the final rules

23  in October.  Do you remember that?

24  A    It's not in the rules.

25  Q    Oh, it's in the code?

Farinelli - Cross / By Mr. Hebert                     401

1   A    It's not.  It's policy.

2   Q    It's just policy.  So you've decided that as a policy

3   matter, you'll now make sure that these birth certificates for

4   EICs have this stamp, correct?

5   A    Correct.

6   Q    All right.  Does that diminish its value in any way for

7   anyone who wants to use it, other than for purposes of getting

8   an EIC?

9   A    They can only use it for EIC.

10  Q    Now, in your deposition, you were asked a question that I

11  want to pose to you again.  Do you agree, sir, that the time

12  and cost it takes for somebody to obtain an EIC birth

13  certificate, plus the limited use of the stamp that's on it,

14  that that burdens the right to vote?  Do you agree with that?

15  A    It burdens their right to vote?

16  Q    Yes.  Places a burden on voters.  Does that make it

17  easier?

18  A    That --

19        MS. WOLF:  Objection, your Honor.  I think he's

20  asking for a legal conclusion.

21        THE COURT:  Sustained.

22  BY MR. HEBERT:

23  Q    Okay, all right.  Finally -- final question is, do you

24  know Calvin or Floyd Carrier?  Have you ever heard of them?

25  A    No.

Farinelli - Cross / By Mr. Hebert                                402

1   Q    They testified earlier in this case and they were also

2   deposed in this case.  Their deposition was in -- on July 25th.

3   And then they testified that they received a call from somebody

4   in your office named Geraldine Harris.  Do you know who that

5   is?

6   A    She's the State Registrar.

7   Q    She's the State Registrar.  And she called them up on the

8   phone, according to the testimony.  Do you know anything about

9   why she called them on the phone?

10  A    Huh-uh.

11  Q    Do you know anything about how their paperwork ended up on

12  the State Registrar's desk?

13  A    Huh-uh.

14  Q    No?

15  A    No.

16  Q    You think -- the testimony that they gave was that they've

17  been trying to get a birth certificate for the elder

18  Mr. Carrier for about 18 months.  Do you have any reason to

19  know why it's taking them 18 months, or anybody else?

20  A    No.

21  Q    No.  And you're aware they filed a lawsuit in this case,

22  that one of the Plaintiffs, Mr. Floyd Carrier, is, that he's

23  saying that he's saying that he's being denied the right to

24  vote in an unconstitutional manner because he can't get the

25  birth certificate to get an identification?

1   A    I didn't know until you just said that.

2          **MR. HEBERT:**  Thank you.  No further questions.

3          **MS. WOLF:**  Your Honor, I'll be quick.

4                      **REDIRECT EXAMINATION**

5   **BY MS. WOLF:**

6   Q    Mr. Farinelli, Mr. Freeman had talked to you about some

7   other instances where DSHS will waive the fees for birth

8   certificates.  Do you know in those instances whether DSHS

9   requires proof of those particular circumstances in order to

10  have those fees waived?

11  A    With -- so one of -- like for example, one of the

12  provisions is they can get a free birth or death certificate,

13  marriage document, if it's for a claim against the government

14  and a -- if it's a veteran or spouse or widow of a veteran.  So

15  in that -- that can only be requested by the -- there's a

16  document called the TDC 14 Form that the Texas Veteran's

17  Commission has.  They have to fill that out.  So it's either a

18  state veteran's officer or a county veteran's officer has to

19  fill that out and send that in.  So -- there's another one for

20  military purposes for as they're being deployed, they can get a

21  copy of their birth certificate or I think their children's

22  birth certificates.  But that's a special application, too.

23  Q    Is there any proof that an EIC birth certificate applicant

24  has to present that they are applying for election purposes

25  only?

1    A    They just fill out that application.

2    Q    And you talked a little bit about the local registrars

3    which don't have remote access.  In your experience, are the

4    local registrars which don't have remote access, which types of

5    communities are those located in?

6    A    They're generally rural areas.

7    Q    And in those rural areas, is there typically more than one

8    local -- how many local registrars are their typically in those

9    rural areas?

10   A    Generally one.

11   Q    And talked a little bit about -- who typically staffs the

12   offices of the local registrars?

13   A    It's the government office that -- whatever government

14   that is.  So if it's the county clerk, it's going to be the

15   county government that staffs them.

16   Q    Would they typically staff from people who live in the

17   member -- in the local community?

18   A    Yes, yeah.

19   Q    And Mr. Freeman showed you Defendants' Exhibit 361.

20        MS. WOLF:  Brian, can you pull that up, 361, please?

21   Thank you.  Yes.

22   Q    And this was the EIC application form that was in effect

23   at the time of your deposition, correct?

24   A    Correct.

25   Q    And have the -- and there's a line that Mr. Freeman

Farinelli - Redirect / By Ms. Wolf                405

1    pointed to you -- and I forgot my handy dandy pointer.  But

2    there's a line down there which talks about photo

3    identification.  Do you see that?

4    A    Correct.

5    Q    Between the time that this form was issued and the time

6    that the form that was recently issued that we talked about,

7    have the actual requirements for identification to present a

8    birth certificate, have those changed at all?

9    A    No.  That's why we changed the form.

10   Q    So the regulations have been the same?

11   A    Right.  Because we were following the same process, and so

12   I'm not sure why it said they needed photo identification in

13   the first place.

14        MS. WOLF:  And, Brian, can you pull up that link that

15   we looked at before for the DSHS website, please?

16   Q    And we'll -- I won't make you walk through the steps to

17   click since I think we all know how you get there.

18        MS. WOLF:  But, Brian, if you would click on "get a

19   birth or death certificate."  You go ahead and you click on

20   certified copy of birth certificates and then you go ahead and

21   click on birth certificate for election identification page.

22   Q    And let's go down to -- is there a link there for the EIC

23   application for election identification?

24   A    Yes.

25        MS. WOLF:  Okay.  Brian, can you go ahead and click

1    on that link for us?

2    Q    So which form is available publically on the website?

3    A    Currently the new version, the one updated September --

4    Q    And this was recently updated; is that correct?

5    A    Correct.

6    Q    Typically how long when a form is updated does it take to

7    actually circulate it to the local registrar's office?

8    A    Generally it doesn't take very long.

9    Q    Are there plans, to your knowledge, to circulate this

10   form?

11   A    To my knowledge, yes.

12   Q    And are there any plans to take this form down off the

13   website after today?

14   A    Take it off the website?  No.

15   Q    And are there any plans to take the website the way that

16   it's been set up that we walked through today, are there any

17   plans to take that down?

18   A    Oh, no.

19   Q    Okay.  And Mr. Freeman also showed you some census data.

20   Do you remember that?

21   A    Yes.

22   Q    Okay.  Are you aware of how many of those approximately

23   five million people that the ACS says are born out of state

24   actually lack either a certified copy or an original copy?

25   A    No.

1   Q    Or, I'm sorry, or an original of their birth certificate?

2   A    No, I don't.

3             MS. WOLF:  I'm -- no further questions, your Honor.

4             THE COURT:  All right.  Anything else for this

5   witness?

6             MR. DERFNER:  No, your Honor.

7             MR. FREEMAN:  Nothing from the United States.

8             THE COURT:  You can step down, sir.

9             THE WITNESS:  Thank you.

10            THE COURT:  Thank you.

11         **(Witness steps down)**

12            THE COURT:  Okay, where are we for tomorrow?

13            MR. SCOTT:  Well, we're at 6:30.  Tomorrow we still

14  have Keith Ingram, which is the Director of Elections for the

15  Secretary of State, followed by Trey Hood, expert witness, and

16  the last witness for tomorrow for the State of Texas will be

17  John Crawford with the Department of Public Safety.

18            THE COURT:  Okay.  And then continue to read

19  excerpts.

20            MR. SCOTT:  And then we've got some readings.  So

21  it's probably going to end up eating up the whole day if it

22  goes kind of like this process.

23            THE COURT:  Okay.  Anything else on the DPS?  I know

24  I --

25            MR. ROSENBERG:  No.  I mean, we are going to have to

1    talk.  It is an issue that does affect one to four experts,

2    which is the problem.  And that might have other ramifications

3    that we are going to have to discuss it now and hopefully be

4    able to report back tomorrow morning.

5            **THE COURT:**  Okay.  So you all are going to discuss it

6    further?

7            **MR. SCOTT:**  Yes, ma'am.

8            **THE COURT:**  All right, thank you.  You're excused.

9        **(This proceeding was adjourned at 6:25 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _September 10, 2014_

                    TONI HUDSON, TRANSCRIBER