UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,           )        CASE NO: 2:13-CV-00193
                               )
              Plaintiffs,      )              CIVIL
                               )
       vs.                     )        Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )  Wednesday, September 10, 2014
                               )     (7:59 a.m. to 12:00 p.m.)
              Defendants.      )     (1:04 p.m. to  5:50 p.m.)


BENCH TRIAL - DAY 7

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:              See Next Page

Court Recorder:           Genay Rogan / Lori Cayce

Clerk:                    Brandy Cortez

Court Security Officer:   Adrian Perez

Transcriber:              Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiffs:                         CHAD W. DUNN, ESQ.
                                    KEMBEL SCOTT BRAZIL, ESQ.
                                    Brazil and Dunn
                                    4201 Cypress Creek Parkway, Suite 530
                                    Houston, TX 77068

                                    ARMAND DERFNER, ESQ.
                                    P.O. Box 600
                                    Charleston, SC 29402

                                    J. GERALD HEBERT, ESQ.
                                    Attorney at Law
                                    191 Somervelle Street #405
                                    Alexandria, VA 22304

                                    NEIL G. BARON, ESQ.
                                    914 FM 517 Rd. W, Suite 242
                                    Dickinson, TX 77539

                                    EMMA P. SIMSON, ESQ.
                                    Campaign Legal Center
                                    215 E. Street NE
                                    Washington, DC 20002

Mexican American                    EZRA D. ROSENBERG, ESQ.
Legislative Caucus,                 Dechert, LLP
et al.:                             902 Carnegie Center, Suite 500
                                    Princeton, NJ 08540-6531

                                    MARK A. POSNER, ESQ.
                                    AMY L. RUDD, ESQ.
                                    GARY BLEDSOE, ESQ.
                                    SONIA K. GILL, ESQ.
                                    ERANDI ZAMORA, ESQ.
                                    Lawyers' Committee for Civil Rights
                                    1401 New York Ave. NW, Suite 400
                                    Washington, DC 20005

                                    DANIEL G. COVICH, ESQ.
                                    802 N. Carancahua, Suite 2100
                                    Corpus Christi, TX 78401

**APPEARANCES FOR:**          (CONTINUED)


Mexican American          MYRNA PEREZ, ESQ.
Legislative Caucus,       VISHAL AGRAHARKAR, ESQ.
et al.:                   JENNIFER CLARK, ESQ.
                          Brennan Center for Justice
                          161 Avenue of the Americas
                          12th Floor
                          New York, NY 10013


United States            RICHARD DELLHEIM, ESQ.
of America:              ELIZABETH S. WESTFALL, ESQ.
                         DANIEL FREEMAN, ESQ.
                         ANNA BALDWIN, ESQ.
                         AVNER SHAPIRO, ESQ.
                         MEREDITH BELL-PLATTS, ESQ.
                         JOHN SMITH, ESQ.
                         PAXTON WARNER, ESQ.
                         BRADLEY HEARD, ESQ.
                         ROBERT BERMAN, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530


                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006


Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209


                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751


                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

4

**APPEARANCES FOR:**          (CONTINUED)


Texas League of Young     RYAN HAYGOOD, ESQ.
Voters Education Fund:     NATASHA KORGAONKAR, ESQ.
                          DEUEL ROSS, ESQ.
                          LEAH ADEN, ESQ.
                          NAACP Legal Def. and Educational Fund
                          40 Rector St., 5th Floor
                          New York, NY 10006


                          DANIELLE CONLEY, ESQ.
                          KELLY DUNBAR, ESQ.
                          M. HASAN ALI, ESQ.
                          LYNN EISENBERG, ESQ.
                          JONATHAN E. PAIKIN, ESQ.
                          RICHARD F. SHORDT, ESQ.
                          SONYA LEBSACK, ESQ.
                          TANIA C. FARANSSO, ESQ.
                          Wilmer Cutler Pickering, et al.
                          1875 Pennsylvania Avenue, NW
                          Washington, DC 20006

Texas Association of      ROLANDO L. RIOS, ESQ.
Hispanic County Judges    115 E. Travis
and County                Suite 1654
Commissioners:            San Antonio, TX 78205


                          PRESTON HENRICHSON, ESQ.
                          222 W. Cano
                          Edinburg, TX 78539


State of Texas:           JOHN BARRET SCOTT, ESQ.
                          Deputy Attorney General
                          for Civil Litigation
                          Office of the Attorney General
                          P.O. Box 12548
                          Austin, TX 78711


                          JOHN REED CLAY, JR., ESQ.
                          LINDSEY E. WOLF, ESQ.
                          JENNIFER ROSCETTI, ESQ.
                          G. DAVID WHITLEY, ESQ.
                          STEPHEN L. TATUM, JR., ESQ.
                          STEPHEN R. KEISTER, ESQ.
                          Office of the Attorney General
                          P.O. Box 12548
                          MC001
                          Austin, TX 78711

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


State of Texas:          BEN A. DONNELL, ESQ.
                         Donnell Abernethy Kieschnick
                         555 N. Carancahua, Suite 400
                         Corpus Christi, TX 78401

                         WHITNEY DEASON, ESQ.
                         JOHN CRAWFORD, ESQ.

Non-Party Senators       ARTHUR D'ANDREA, ESQ.
& Non-Party              Office of the Attorney General
Representatives:         209 W. 14th Street, 7th Floor
                         Austin, TX 78701

                         DAVID TALBOT, ESQ.

                         JAMES B. ECCLES, ESQ.
                         Office of the AG of Texas
                         300 W. 15th Street, 11th Floor
                         Austin, TX 78701

                         ALICE LONDON, ESQ.
                         Bishop London Brophy & Dodds
                         3701 Bee Cave Rd., Suite 200
                         Austin, TX 78746

6

1                              INDEX

2  DEFENDANTS' WITNESSES     DIRECT     CROSS      REDIRECT   RECROSS

3  DAVID DEWHURST              12         48

4    (VIA DEPO)

5  M.V. HOOD, III

6    BY MR. SCOTT             79

7    BY MR. DELLHEIM                    121/191

8    BY MR. ROSENBERG                    211

9    BY MR. DUNN                         238

10 DAN PATRICK                245        288

11   (VIA DEPO)

12 BRIAN KEITH INGRAM

13   BY MR. SCOTT            307

14   BY MS. WESTFALL                     336

15   BY MR. DUNBAR                       371

16   BY MR. BRAZIL                       383

17 TROY FRASER               397        403

18   (VIA DEPO)

19

20

21

7

 1   **Corpus Christi, Texas; Wednesday, September 10, 2014; 7:59 a.m.**

 2                        **(Call to Order)**

 3        **THE COURT:**  Good morning.

 4        **MR. ROSENBERG:**  Good morning, your Honor.  Ezra

 5   Rosenberg.  I wanted to report on not just the progress, but I

 6   think the success that we had in our discussions, subject to

 7   your approval, of course, and particularly as to a crucial

 8   aspect of what we have agreed to.

 9             Number one, the plaintiffs will not -- will withdraw

10   their objection to defendants' amended responses to the

11   deposition (indiscernible) questions that were filed yesterday.

12             Number two -- and, as a result of -- a little

13   preface.  As a result of those -- that amendment, as I said

14   yesterday, there was a kind of a domino effect on some, and as

15   Mr. Derfner will add, not all of the experts.  As a result,

16   there has to be some new reports submitted, but the reports are

17   going to be limited to the effect of the change.  So, by next

18   Tuesday, close of business, Dr. Ansolabehere and Dr. Webster

19   will file their amended reports limited strictly to the

20   recalculation of the data as a result of the recategorization

21   of the surrender data and as a result of the DWQ.  By close of

22   business on Wednesday, Dr. Bazelon will do the same; and that's

23   Wednesday next.  By close of business Thursday, Dr. Hood will

24   do the same; and that's Thursday next.

25             The parties have also agreed, subject to your Honor's

1    approval, that the supplementation to the findings of fact and

2    conclusions of law will be filed no later than midnight of

3    Thursday next.  And, finally -- and this is the one that's

4    certainly subject to your Honor's schedule -- because of the

5    prospect of the changes in some of the reports, the parties

6    have agreed that they really can't close just yet and would

7    ask, if your Honor is available to give us those three hours on

8    Monday, the 22nd, a week from Monday, we would all come back to

9    Corpus Christi and present our closing arguments.

10           Another part of this, of course, is that neither

11   party will be impeaching or -- the credibility or criticizing

12   the other party for relying on the prior calculations.

13           **THE COURT:**  So, the response, that DPS response, is

14   that what went to that 183,000 --

15           **MR. ROSENBERG:**  That's correct, your Honor.  Right.

16           **THE COURT:**  And --

17           **MR. DERFNER:**  Let me just say this, your Honor.

18           **THE COURT:**  Okay.

19           **MR. DERFNER:**  For that reason, the -- the changes

20   that have to be made, while necessary, are not earth shaking,

21   and they don't fundamentally change the case.  Your Honor's

22   heard a number of numbers about no matches ranging from the

23   500,000 to the 700,000 number.  The new number, for example,

24   from Dr. Ansolabehere is still going to be in that range, and

25   it's going to be north of the 619,000 number that's been

9

1    bandied about that Mr. Scott has referred to.  So, it's a

2    change -- these are changes that need to be taken account of,

3    but they don't fundamentally change the basic numbers.  They

4    move them some, but they won't be a big change.

5                **THE COURT:**  Okay.  I'm okay with that.

6                What's the timeframe here?  I know we have the

7    November elections; we have, I guess, early voting starting

8    mid-October.

9                **MR. ROSENBERG:**  I believe it was October 20th.

10               **MS. SPEAKER:**  Twentieth or 21st, yeah.

11               **MR. SCOTT:**  We've already received applications

12   for --

13               **MS. SPEAKER:**  Twentieth.

14               **MR. SCOTT:**  -- the early -- I mean the absentee

15   ballots, and then the ones that will be -- the rest of them

16   will be -- I think start being sent out, I think, next week.

17   And I will confirm that.  We've got the director of elections

18   here.

19               **THE COURT:**  But for the mail-in ballots that's kind

20   of --

21               **MR. SCOTT:**  Yes.

22               **THE COURT:**  -- separate (indiscernible).

23               **MR. SCOTT:**  Yes.  Yes.

24               **MR. DONNELL:**  It's already in progress.

25               **THE COURT:**  Okay.  And the --

1          **MR. SCOTT:**  I'll get you the early voting dates.

2          **THE COURT:**  The findings of fact -- the amended or

3    the supplemental, I'm not sure what you all are going to be

4    providing, due a week from tomorrow, I guess --

5          **MR. ROSENBERG:**  That's correct, your Honor.

6          **MR. SCOTT:**  October 20th.

7          **THE COURT:**  -- with references to the trial

8    transcript, or no?

9          **MR. ROSENBERG:**  Yeah.  It references to the trial

10   transcript where -- where appropriate and to the -- there has

11   been a supplementation of too many new exhibits lists, so there

12   will be, obviously, reference perhaps to some of the new

13   exhibits.

14         **MR. SCOTT:**  And we -- I think all parties have the

15   copies of the daily, so we've all got our transcripts --

16         **THE COURT:**  Okay.

17         **MR. SCOTT:**  -- and we've been working through it

18   already.

19         **THE COURT:**  All right.

20         **MR. SCOTT:**  And, so, October 20th is the day -- is

21   the first day of early voting, your Honor.

22         **THE COURT:**  Okay.

23         **MR. SCOTT:**  And that would be the first day that

24   someone would need to use their I.D.

25         **MR. ROSENBERG:**  And I guess the last question I have

1    is, on the 22nd would you prefer the morning or the afternoon?

2              THE COURT:  How long -- plaintiffs asked for three

3    hours?

4              MR. ROSENBERG:  No.  Plaintiffs would --

5              THE COURT:  No.

6              MR. ROSENBERG:  -- be able to do theirs in two hours,

7    your Honor.

8              THE COURT:  Two hours.

9              MR. ROSENBERG:  Yeah.

10             THE COURT:  And defense?

11             MR. CLAY:  Less than an hour; 30 minutes.

12             MR. SCOTT:  We'll take the hour.

13        **(Laughter)**

14             MR. DONNELL:  (indiscernible)

15             MR. SCOTT:  We'll take the hour.

16             THE COURT:  Okay.  Let me just check on -- on one

17   thing, and then I'll let you know --

18             MR. ROSENBERG:  Okay.

19             THE COURT:  -- if I'd prefer the morning or the

20   afternoon.  Okay?

21             MR. ROSENBERG:  Great.  Thank you very much, your

22   Honor.

23             MR. SPEAKER:  (indiscernible) Monday?

24             THE COURT:  All right.

25             MR. SPEAKER:  Monday.  Monday.

Dewhurst / by excerpts of Deposition - Direct          12

1         **THE COURT:**  Monday, 22nd.

2         Okay.

3         **MR. SCOTT:**  And, your Honor, we're going to start off

4    the day with readings.

5         **MS. DEASON:**  Your Honor, may I approach?

6         **THE COURT:**  Yes.

7         **MS. DEASON:**  Whitney Deason and Stephen Tatum for the

8    defendants.  We'll be reading from David Dewhurst's deposition.

9                   **EXAMINATION OF DAVID DEWHURST**

10                  **BY EXCERPTS OF DEPOSITION TESTIMONY**

11      **(QUESTIONS READ BY MS. DEASON; ANSWERS READ BY MR. TATUM)**

12         "QUESTION:  Good morning, Mr. Dewhurst.

13         "ANSWER:  Good morning.

14         "QUESTION:  What is the Committee of the Whole?

15         "ANSWER:  A Committee of the Whole is a legislative

16         process in which I've used a number of times on a

17         number of different subjects in order to provide all

18         the senators voluminous information, pro and con, on

19         an issue at one time.

20         **MS. DEASON:**  Oh, sorry.  Thank you.

21         "QUESTION:  How is it convened?

22         "ANSWER:  It is convened by my asking a member of the

23         Senate to call for a Committee of the Whole.  And --

24         and the Committee of the Whole is activated, and I

25         am -- I step down temporarily as the presiding

1          officer and I appoint a chair of the Committee of the

2          Whole.  And traditionally, the Lieutenant Governor

3          takes the chair of the senator that has been

4          appointed to be the Chair of the Committee of the

5          Whole.

6          "QUESTION:  Is it accurate that the Lieutenant

7          Governor does not convene, does not have the power to

8          convene the Committee of the Whole, another senator

9          does?

10         "ANSWER:  That is true.

11         "QUESTION:  What types of legislation does the

12         Committee of the Whole typically consider?

13         "ANSWER:  There's no typical legislation the

14         Committee of the Whole considers.  It can be whatever

15         subject the Lieutenant Governor chooses.  We have had

16         Committee of the Whole on redistricting issues.

17         We've had Committee of the Whole on school finance.

18         And we've had Committee of the Whole on voter I.D.

19         It is a relatively common tool where you have a lot

20         of information that would not be disseminated to two-

21         thirds of your Senate if it just went through a

22         committee hearing.

23         "QUESTION:  Does the Lieutenant Governor have the

24         right to debate and vote on all questions in the

25         Committee of the Whole?

Dewhurst / by excerpts of Deposition - Direct          14

1         "ANSWER:  Yes.

2         "QUESTION:  When voter I.D. was referred to the

3         Committee of the Whole in 2009 and 2011, did you vote

4         in the Committee of the Whole in favor of those

5         bills?

6         "ANSWER:  Yes.

7         "QUESTION:  After a bill is assigned to the Committee

8         of the Whole, does the Committee of the Whole

9         function in the same way that other committees do?

10        "ANSWER:  Yes.

11        "QUESTION:  Do you recall, sitting here today, why

12        you referred these -- those legislations to the

13        Committee of the Whole?

14        "ANSWER:  Because the Committee of the Whole

15        generally is the best place to provide lengthy public

16        testimony either for or against a bill so that all

17        members, all 31, hear the public testimony rather --

18        rather than just the seven or eight of the 31 who are

19        assigned to the committee that is hearing the bill.

20        "QUESTION:  That you just testified -- you just

21        testified that it was fairly common that bill

22        supporters would wait for their supporters to be

23        present on the floor such that they would -- such

24        that they had two-thirds and then they would seek to

25        move to suspend.  Do you recall when that happened

Dewhurst / by excerpts of Deposition - Direct        15

1     before, a specific instance?

2     "ANSWER:  The only thing I -- the only thing I can

3     remember on a number of different bills that that

4     occurred, it's a fairly common legislative practice.

5     You try and move your bill when you have the votes on

6     the floor.

7     "QUESTION:  How often does that happen in the

8     session?

9     "ANSWER:  Monthly.

10    "QUESTION:  But it happens every session, to your

11    knowledge?

12    "ANSWER:  Yes.

13    "QUESTION:  Was there any other set of circumstances

14    or facts that caused you to conclude in 2008 that it

15    was a good idea to press forward with voter I.D. in

16    2009?

17    "ANSWER:  Well, beginning in 2005, when we first

18    looked at passing voter I.D., the reason I did that

19    was because I had been concerned for many, many years

20    about low voter turnout in Texas.  And I have heard

21    consistently over the last 10 to 12 years that --

22    that many Texans either hesitate to vote or don't

23    vote because they don't think their vote will count

24    because they're concerned about voter fraud.

25    "QUESTION:  Was there a particular aspect of Senate

Dewhurst / by excerpts of Deposition - Direct                    16

1        Bill 362 that you were involved in?

2        "ANSWER:  It was my desire to model a Voter I.D. bill

3        as close as we could after what had passed in Indiana

4        and been approved by the U.S. Supreme Court, and I

5        don't remember when Georgia received their

6        preclearance, but -- but at a later date, the Georgia

7        bill.

8        "QUESTION:  So you were following the Indiana photo

9        I.D. bill, the Georgia photo I.D. bill.  Were there

10       any other models that you were following in

11       developing Senate Bill 362?

12       "ANSWER:  In all my conversations with Senator

13       Fraser, in all my conversations with Democrat

14       Senators and Republican Senators, I stressed that I

15       wanted the bill to be constitutional, meet all of the

16       guidelines and that those two bills -- and now I may

17       be getting ahead of myself several months because I

18       don't remember when the Georgia bill was precleared,

19       but I think that the Indiana bill was approved by the

20       Supreme Court in 2008, which would have preceded this

21       by at least six months -- that these were good

22       examples of bills that we could model our legislation

23       after to make sure that we met all of the

24       constitutional requirements and protected all of our

25       citizens, because, again, my goal was increasing

Dewhurst / by excerpts of Deposition - Direct          17

1      turnout by everyone.

2      "QUESTION:  Did you have concerns about non-photo

3      I.D.?

4      "ANSWER:  Yes.

5      "QUESTION:  What were those concerns?

6      "ANSWER:  That they would not -- that they were a

7      start.  They were a start in the process to reduce

8      fraud.  But I could not evaluate whether or not they

9      alone would permit the integrity of the election

10     process to be protected, how much fraud they would

11     reduce of in-person and/or other frauds, mail-in and

12     registration, and I expressed that to -- to Senator

13     Fraser.

14     "QUESTION:  Were you aware of any particular

15     instances in which non-photo I.D. had been used in

16     the past fraudulently by voters in Texas?

17     "ANSWER:  Are you asking me about a specific timeline

18     or any time prior to and including the regular

19     session, 2009?

20     "QUESTION:  The latter; any time prior to 2009, were

21     you aware --

22     "ANSWER:  Prior to 2009 or including 2009?

23     "QUESTION:  Including 2009.  Were you aware?

24     "ANSWER:  Yes.

25     "QUESTION:  And what -- when did that occur?

Dewhurst / by excerpts of Deposition - Direct          18

1        "ANSWER:  During -- during my conversations to voters

2        around the state for the -- for the four years prior

3        to 2009, I was frequently told of -- by people,

4        including election officials, of in-person fraud that

5        had been committed.  During the 2009 session, during

6        the 24 -- was it 24 hours?  Was it the 2009?  Twenty-

7        four was in 2011?  No.  It was in 2009.  During the

8        2009 session, in which we had a 26 or 27-hour nonstop

9        session, it was replete with examples of in-person

10       voter fraud.

11       "QUESTION:  Outside of what you heard from voters and

12       Texans through traveling the state and the hearing in

13       2009, are you aware of any other instances of persons

14       using non-photo I.D. to commitment -- to commit in-

15       person voter impersonations?

16       "ANSWER:  Yes.

17       "QUESTION:  Could you tell me about those instances.

18       "ANSWER:  Well, I'll just share one with you, and

19       that is that Senator Tommy Williams told me that

20       his -- and I may be getting this wrong.  It was

21       either his father or his brother had died in the mid-

22       1990's and it wasn't until -- until the late 2000's

23       that he discovered that his deceased father or

24       brother had voted almost every election, and, not

25       surprising, in the Democrat primary.

1      "QUESTION:  Did the Crawford decision have any impact

2      on the development of voter I.D. legislation in

3      Texas?

4      "ANSWER:  Yes.

5      "QUESTION:  How did it impact the development of

6      legislation in Texas?

7      "ANSWER:  Over time, certainly by 2011 and Senate

8      Bill 14, I felt that it was important, and Senator

9      Fraser agreed, that we focus on a model that had been

10     approved by the U.S. Supreme Court and in the case of

11     Georgia had reached preclearance.

12     "QUESTION:  Did you want to -- when you -- when

13     Senate Bill 362 had been filed, did you want to

14     ensure that Texas could enforce Senate Bill 362 had

15     it been enacted?

16     "ANSWER:  My intent from day one, in 2005 through

17     today, is make sure that any election legislation is

18     constitutional, protects all parties, and increases

19     the amount of turnout.

20     "QUESTION:  And you wanted to be able to enforce

21     Senate Bill 362 by getting it precleared under

22     Section 5 of the Voting Rights Act; is that right?

23     "ANSWER:  Yes.

24     "QUESTION:  Did you consider whether it was advisable

25     to determine the impact of Senate Bill 362 on

1      minority voters and make any adjustments in the bill,

2      if necessary, to increase the likelihood of

3      preclearance?

4      "ANSWER:  During the time of 2008 and 2009, we looked

5      at and were able to find evidence, both in -- in

6      Indiana's case, as well as several studies that were

7      done by universities and think tanks, that showed

8      that there were no reduction in minority voter

9      turnout in states with a photo voter I.D. or voter

10     I.D.

11     "QUESTION:  And those states would include Indiana --

12     or only included Indiana and Georgia; is that

13     correct?

14     "ANSWER:  Those were the two states that we had

15     empirical data from their Secretary of State's

16     office.  We -- but we also searched and found

17     studies -- empirical studies that were done by a

18     couple of universities and by one think tank.

19     "QUESTION:  What was the purpose of Senate Bill 362?

20     "ANSWER:  Purpose of 362 -- Senate Bill 362 was, like

21     I testified on House Bill 218, to reduce voter fraud.

22     "QUESTION:  Are there any other purposes of Senate

23     Bill 362 that are not set forth in this press

24     release?

25     "ANSWER:  No.  The purpose of Senate Bill 362 is to

Dewhurst / by excerpts of Deposition - Direct          21

1       reduce in-person voter fraud, which will, in my

2       judgment, after talking to thousands of people,

3       increase the confidence of the voters in Texas of the

4       integrity of our voting system and result in a higher

5       voter turnout, as we've seen in the case of Indiana

6       and Georgia.

7       "QUESTION:  Did Senator Williams look into any

8       possible changes to the rules in order to ensure that

9       the Senate would pass a voter I.D. bill as opposed to

10      what happened with House Bill 218?

11      "ANSWER:  I'm not advised.

12      "QUESTION:  What do you mean by 'I'm not advised'?

13      Does that mean you don't know?

14      "ANSWER:  I don't know what Senator Williams did or

15      didn't do.

16      "QUESTION:  Thank you.  Did Senator Shapleigh raise a

17      point of order against further consideration of

18      Senate Resolution 14 insofar as it should be referred

19      to a committee?

20      "ANSWER:  I don't know.  I'll have to read and -- to

21      see.

22      "QUESTION:  Certainly.  And I would --

23      "ANSWER:  Page 25?

24      "QUESTION:  Exactly.  Thank you.  So, yes, a point of

25      order was made by Senator Shapleigh in that regard?

Dewhurst / by excerpts of Deposition - Direct          22

1          "ANSWER:  Yes.

2          "QUESTION:  Did you rule on that point of order?

3          "ANSWER:  I did.

4          "QUESTION:  How did you rule?

5          "ANSWER:  I overruled it.

6          "QUESTION:  Why did you overrule it?

7          "ANSWER:  Because the rules of the Senate permitted a

8          majority of the senators to change Senate rules.  So,

9          therefore, this resolution was entirely within the

10         tradition and rules of the Senate.

11         "QUESTION:  Had you ever in any previous rule of a

12         regular session seen a particular issue area carved

13         out or set for approval by a majority in Rule 16?

14         "ANSWER:  Yes.

15         "QUESTION:  What rule is that?

16         "ANSWER:  All the rules were subject to a simple

17         majority vote.

18         "QUESTION:  I see.

19         "ANSWER:  All of them.

20         "QUESTION:  Did it have to be -- did the referral of

21         the bill to the Committee of the Whole have the

22         effect of expediting its consideration?

23         "ANSWER:  No.

24         "QUESTION:  Are members prohibited from offering

25         amendments to bills while they're being considered by

Dewhurst / by excerpts of Deposition - Direct          23

1          the Committee of the Whole?

2          "ANSWER:  No.

3          "QUESTION:  If an opponent of a bill wants to slow

4          down consideration of a bill in a committee, other

5          than the Committee of the Whole, what procedures

6          would the bill opponent employ?

7          "ANSWER:  Well, I'm going to have to think for a

8          moment, because there's a limited number of ways that

9          an opponent of the bill could slow down consideration

10          in a committee.  One that quickly comes to mind is to

11          try and talk the chair of the committee into waiting

12          on consideration of the bill.  Perhaps another

13          option, as was done in this case by the Democrats,

14          and that is to extend by X amount of time the

15          consideration of the bill by having a lot of public

16          testimony.

17          "QUESTION:  Okay.  Getting back -- let's see.  I

18          guess I wanted to ask you as to, one, whether you

19          believed that Senate Bill 362 was less likely to

20          disenfranchise elderly, poor, or minority voters

21          because it permitted the use of non-photo I.D.

22          "ANSWER:  Well, first of all, I don't believe that

23          Senate Bill 362 disenfranchises elderly, poor, or

24          minority voters, and all of the empirical data that

25          I've seen shows just the opposite.

Dewhurst / by excerpts of Deposition - Direct          24

1        "QUESTION:  Certainly.  Would you agree that photo

2        I.D. legislation that did not include the use of non-

3        photo I.D. would have a greater chance of

4        disenfranchising elderly, poor, or minority voters?

5        "ANSWER:  I categorically oppose that statement.  It

6        is not true.  All of the empirical data I've seen has

7        shown that there is no -- no example that I'm aware

8        of where in any jurisdiction with a photo voter I.D.

9        requirement, that individuals have not been able to

10       obtain access to acceptable documents.

11       "QUESTION:  Is it fair to say that you were aware of

12       the cost of obtaining a Texas birth certificate in

13       2009?

14       "ANSWER:  I was aware that there may be some cost.

15       I'm not -- I don't remember whether I knew, as

16       Exhibit 14 points out, that -- that it was a cost of

17       $22.  That surprises me.  But I knew there was a cost

18       for obtaining some of the documents, and I wanted to

19       get that down to zero.

20       "QUESTION:  What steps --

21       "ANSWER:  Because my goals were to increase voter

22       turnout.

23       "QUESTION:  What steps did you take to get that, get

24       that cost to zero, besides telling the birth

25       certificate issuance people that they needed to fix

1          that?

2          "ANSWER:  But, Counsel, the -- I've answered your

3          question before by saying that my first priority was

4          to get the bill passed.  Then the implementation of

5          the rules -- the implementation of the bill through

6          rules to be issued by the agencies is -- is always

7          done.  And -- and, then, during that process I told

8          them it was my intent to have the cost reduced, as I

9          have done subsequent in Senate Bill 14.

10         "QUESTION:  Did you believe in 2009 that any of the

11         costs associated with the documents, of the

12         underlying documents necessary to obtain photo I.D.,

13         would be costly for some voters?

14         "ANSWER:  No.  Because it was my intent during the

15         implementation, once the bill had passed -- during

16         the implementation of the bill by the agencies to

17         reduce that cost.

18         "QUESTION:  Senate Bill 362 was not passed by the

19         House; is that correct?

20         "ANSWER:  That is correct.  We passed it in the

21         Senate.

22         "QUESTION:  Did it pass with a majority of the

23         Senators in the Senate?

24         "ANSWER:  Yes.

25         "QUESTION:  And not two-thirds; is that correct?

Dewhurst / by excerpts of Deposition - Direct          26

1        "ANSWER:  That is correct because of the rule change.

2        "QUESTION:  Do you know why Senate Bill 362 failed to

3        pass in the House?

4        "ANSWER:  With no criticism intended, the House let

5        the bill sit from the day it was received from the

6        Senate on March 19th for almost two weeks until

7        March 31st, and then after a -- taking testimony in

8        the House on April 7th, it sat for almost five weeks.

9        "QUESTION:  And, so, there was not sufficient time in

10       the session to get it passed in the House?

11       "ANSWER:  It was -- it was placed on major state

12       calendar, and if I recall correctly, the Democrats

13       chubbed it to death, meaning they talked and talked

14       and talked on routine matters, killing routine bills

15       in order to kill the bill.

16       "QUESTION:  Did you want the Senate to pass the voter

17       I.D. bill in 2011?

18       "ANSWER:  Yes.

19       "QUESTION: What did you believe could be done

20       differently to ensure the passage of voter I.D.

21       legislation in the 2011 session than had been done in

22       2009?

23       "ANSWER:  Well, one, take the bill up earlier and

24       pass it earlier to make it more difficult for the

25       opponents of the bill to chub it in the House.

Dewhurst / by excerpts of Deposition - Direct          27

1          "QUESTION:  Did you prior to the 2011 session discuss

2          with Senator Fraser filing another voter I.D. bill?

3          "ANSWER:  Yes.

4          "QUESTION:  Did you discuss any other provisions of

5          the bill?

6          "ANSWER:  Yes.

7          "QUESTION:  What were the provisions you discussed?

8          "ANSWER:  I reminded Senator Fraser that for then --

9          for then six long years, I had been meeting regularly

10         with the Democrat Senators to agree on a bipartisan

11         bill, because the Democrat Senators recognized that

12         they were on the wrong side of the majority of the

13         voters of Texas.  They recognized that a super

14         majority of, not only Anglo, but Hispanic and

15         African-American voters, during that time period from

16         2008 through 2011, were in favor of a voter I.D., and

17         that we really ought to work together and come up

18         with a bill.

19         "All of the flexibility afforded in 218 and 362 was

20         voted against time after time by -- by the Democrat

21         voters.  While in the House, a number of minority

22         voters voted for those bills.  And I discussed with

23         Senator Fraser that maybe it's time to focus

24         inclusively on a bill that is -- that is clearly

25         constitutional by modeling this after the Indiana and

1        Georgia bills.

2        "QUESTION:  Are you aware of the criteria used for

3        determining which photo I.D.'s to include in Senate

4        Bill 14?

5        "ANSWER:  Only generally repeating my testimony of a

6        moment ago, that there had been a discussion in the

7        fall of 2010 about modeling our -- the next bill that

8        was introduced in 2011 on the Indiana bill and the

9        Georgia bill, principally because I wanted to make

10       sure that after years of trying to pass a fair bill,

11       that we got one passed that was imminently

12       constitutional and met all of the tests.

13       "QUESTION:  Why did Senate Bill 14 not allow the use

14       of non-photo I.D.'s?

15       "ANSWER:  Well, I think our intent was to model the

16       bill after the Indiana bill that had -- that had been

17       cleared by the U.S. Supreme Court and the Georgia

18       bill.

19       "QUESTION:  Thank you.  So, I believe you just

20       testified that Senate Bill 14 did not allow the use

21       of non-photo I.D. because it was modeled on the

22       Georgia and Indiana photo I.D. laws, which also did

23       not include photo I.D. -- did -- I'm sorry; did not

24       include non-photo I.D.

25       "ANSWER:  My conversations with Senator Fraser were

Dewhurst / by excerpts of Deposition - Direct                29

1          that since -- since we had started the process with

2          218 and 362 in the 2005, 2007, and 2009 sessions, and

3          the Democrats were, in the Texas Senate, were

4          chubbing us, I was having critical conversations with

5          them in which they would say one thing and then on

6          the floor they were saying something else; in other

7          words, saying that we could work this out, we could

8          reach an agreement.  They were voting against all our

9          efforts and -- that I thought that after all of this

10         effort, culminating six years of work, that the only

11         absolute that we had and the most logical safe harbor

12         for us was to model our legislation after the Indiana

13         bill, which had already been approved by the U.S.

14         Supreme Court, and/or the Georgia bill.  As we sit

15         here at this moment, you have made a representation

16         that the Indiana bill had no non-photo I.D., and I

17         don't remember, as I sit here, whether or not the

18         Georgia bill included some or not.  But that general

19         overview was what I communicated, not only to Senator

20         Fraser as a -- and I'm not using the word correctly,

21         but a safe place to be, in order to meet the

22         constitution of the United States and make sure we

23         increased voter turnout.

24         "QUESTION:  How did the exception for voters over the

25         age of 70 come to be included in the Senate Bill as

Dewhurst / by excerpts of Deposition - Direct          30

1          it was introduced?

2          "ANSWER:  Because we were about to go into it.  And

3          that is for -- at this point in time, for the

4          previous four years, I have been -- and the word

5          negotiating may be too formal of a word, but

6          certainly talking -- twisting arms among Republicans

7          and principally Democrats to find common ground to

8          pass a voter I.D. bill.  And as I've testified

9          several times already, the Democrats were telling me

10         one thing in person and something else when they were

11         pontificating on the floor of the Senate.  I was led

12         to believe and was telling Republicans, as late as

13         going into the 2009 session, that I thought we could

14         work out a mutually -- a mutually agreeable bill, but

15         that turned out not to be the case.  I don't mean

16         this in any way a criticism, other than it became,

17         obviously, to them, a wedge issue.  And regardless of

18         what they may share with me as a friend, they could

19         not publicly vote for a voter I.D. bill.  And, so,

20         that -- that frustration, again, led me to recommend

21         that we go to the only known constitutional safe

22         harbor we had, which was to model Senate Bill 14

23         after the Indiana and Georgia bills.

24                  "It is substantially the same answer that I

25         just gave.  Over a four-plus-year time period, and in

Dewhurst / by excerpts of Deposition - Direct          31

1          talking -- if not negotiating with the Democrat

2          Senators, one of the requests that they repeatedly

3          made was, 'How about Grandma'?  In fact, Senator

4          Mario Gallegos frequently talked in private with me

5          and on the floor about, 'Grandmother doesn't have a

6          driver's license.'  And, so, trying to be responsive

7          to that concern, I pushed for the exception of

8          people -- I can't remember now whether it was over 75

9          or over 70.

10         "QUESTION:  My question stands.  Weren't you

11         requested by bill opponents relief and accommodations

12         to make sure that -- that racial minorities would be

13         able to have access to I.D.'s and participate in

14         elections?

15         "ANSWER:  I don't know that it was worded quite like

16         that to me, but to be responsive to the public

17         testimony that I heard, not only in 2005 and 2007 and

18         2009, we made an effort to -- to eliminate the cost

19         on the underlying documents that were required in

20         order to be able to vote.

21         "QUESTION:  Why did you place -- other than what you

22         just testified to, you wanted to get this bill

23         quickly to the House, was there any reason why you

24         placed a priority on passing voter I.D. before some

25         of these other items you mentioned in the talking

Dewhurst / by excerpts of Deposition - Direct                32

1        points, the budget, eminent domain, border security,

2        et cetera?

3        "ANSWER:  Counsel, in my conversations with both

4        Republicans and Democrats, they wanted to get this

5        issue behind them, and they thought it would be

6        better that we address it early in the session and

7        got on with all of our other work.  And that came

8        from conversations with Republicans and Democrats.

9        "QUESTION:  Is it true that Democrats did have

10       concerns about the expedited consideration of Senate

11       Bill 14, notwithstanding what you just testified to?

12       "ANSWER:  I know that certain Democrat Senators

13       raised concerns, but keep in mind that -- that they

14       raised concerns about anything involving this bill.

15       And I viewed it as simply a delaying or -- or

16       measure, because from my conversation with the

17       Democrat Senators who had talked to me over the

18       period, at this point four years, five years, about

19       trying to work together, this was a wedge issue that

20       the Democrats were not going to agree to regardless

21       of the fact, again, that the -- a super majority of

22       Texas voters, Anglo, African American, and Hispanic,

23       according to polls, were in favor of a voter I.D.

24       "QUESTION:  Why did you think that it was in the

25       Senate's best interest to complete work on voter I.D.

Dewhurst / by excerpts of Deposition - Direct          33

1         before focusing on these other issues?

2         "ANSWER:  Because I wanted to put this issue behind

3         us so we wouldn't have a spillover on other issues

4         that -- that I believe we had an -- we had a

5         excellent chance of working together on a bipartisan

6         basis.

7         "QUESTION:  Do you believe that Senate Bill 14

8         endeavored to ensure that obtaining I.D. was no more

9         inconvenient or burdensome than voting?

10        "ANSWER:  Yes.

11        "QUESTION:  And how did you do that?

12        "ANSWER:  How did it not --

13        "QUESTION:  How did it -- how did it make obtaining

14        I.D. no more inconvenient or burdensome than the act

15        of voting?

16        "ANSWER:  In an effort to combat fraud and reduce the

17        number of fraudulent voters, whether it's in-person

18        voting, mail-in, or registration, a process was

19        started to pass legislation which would have reduced

20        in-person fraud.  And I tried to include a

21        registration fraud, but that was taken off because of

22        the one -- the one-subject rule, the -- the two-

23        subject rule.  And -- and that requirement to prove

24        who you are has not changed, and efforts were made

25        through the regulatory process in order to make the

Dewhurst / by excerpts of Deposition - Direct                  34

1          I.D. that was required in order to vote free, or as

2          nearly free as possible, and to ease the time that it

3          took a person to obtain that documentation.  As I

4          recall, it was reduced down to two days by regulation

5          or statute so that it was no more inconvenient or

6          burdensome than the normal act of voting,

7          understanding that a voting I.D. was introduced.

8          "QUESTION:  And is it your testimony that you thought

9          Senate Bill 14 would withstand or would be precleared

10         because the Georgia photo I.D. law had been

11         precleared by the Department of Justice?

12         "ANSWER:  Yes.  And because in my entire experience,

13         Counsel, my entire life with this bill, which seems

14         like longer than six years, I have never heard one

15         person use race discrimination as a reason for

16         passing this bill.  And I have -- I have always

17         wanted to increase the number of voters, whether

18         they're Hispanic, African American, or Anglo.

19         "QUESTION:  Did you learn at any time during the

20         consideration of Senate Bill 14 the number of

21         registered voters without a driver's license or a

22         personal I.D. card?

23         "ANSWER:  I was told that it was a small number, but

24         I don't recall the exact number.

25         "QUESTION:  Do you recall who told you that?

Dewhurst / by excerpts of Deposition - Direct          35

1          "ANSWER:  Staff.

2          "QUESTION:  Your staff?

3          "ANSWER:  Yes.

4          "QUESTION:  Was that during consideration of Senate

5          Bill 14?

6          "ANSWER:  I don't remember.

7          "QUESTION:  Was that Mr. Hebert or someone else in

8          your office?

9          "ANSWER:  I don't remember.

10         "QUESTION:  Did you learn that before Senate Bill 14

11         was passed by the Senate?

12         "ANSWER:  I believe I did.

13         "QUESTION:  By small, did you learn -- what do you

14         mean by small?

15         "ANSWER:  Three to seven percent.

16         "QUESTION:  I'm just trying to understand why you

17         felt that the information, since you had been

18         provided by Mr. Hebert --

19         "ANSWER:  Right.

20         "QUESTION:  -- a universe of persons, Texas -- actual

21         Texas voters without the I.D. --

22         "ANSWER:  Right.

23         "QUESTION:  -- why you wouldn't want to investigate

24         the racial breakdown of those voters and why you

25         relied upon data in other states.  That's what I'm --

Dewhurst / by excerpts of Deposition - Direct        36

1              simply what I'm trying to ask you.

2              "ANSWER:  If the universe of voters is three to seven

3              percent, let's say, on average, five percent, then

4              some -- some -- some percentage of that universe

5              would be minority voters.  And I felt that, in light

6              of the -- the efforts which we were -- I had already

7              communicated with Senator Fraser on, on making this a

8              no cost to people that want to obtain photo voter

9              I.D., that the agencies, DPS and Health and Human

10             Services, would implement what we wanted, and they

11             did.  And, therefore, the -- that was not going to be

12             a problem.  A driver's license was not the only form

13             of identification that was required under Senate

14             Bill 14.  Senate Bill 14 did provide for free

15             identification.  It didn't make any difference.  All

16             you had to do was apply and get an election

17             identification card.  And, so, I didn't feel like at

18             that point, knowing that they -- having problems

19             marrying the databases and knowing that there was a

20             continuing problem with -- with accessing the data,

21             that it would -- that it would be worth the time

22             spent, since I didn't believe it was going to be at

23             that point in time, in 2011, productive.

24             "QUESTION:  Did you believe that the racial

25             composition of the voters in Texas was similar to the

1       racial composition of the voters in Indiana and in

2       Georgia?

3       "ANSWER:  Not in Indiana, although Indiana has a

4       higher percentage of minority voters than I had

5       anticipated, based on the testimony from the

6       Secretary of State's office, a large African-American

7       and increasing Hispanic population in the carried

8       area and others.  I thought our population, not so

9       much from a Hispanic point of view, but from African

10      American, was not totally dissimilar in Georgia.  And

11      based upon that, I felt that the information in front

12      of us clearly indicated that there was not a risk of

13      any discrimination against any groups.  As a matter

14      of fact, my goal from day one has been to increase

15      turnout.  I happen to be one of the biggest critics

16      of Republicans and Democrats for not doing everything

17      possible to increase voter turnout.  I think it's

18      healthy for democracy.  End of speech.  But I really

19      believe that.

20      "QUESTION:  Do you think it would have been helpful

21      to target efforts towards, for example, locating

22      driver license offices or implementing the EICs in

23      the manner in which you've testified to know more

24      information about where these voters resided?

25      "ANSWER:  Yes.  And we generally knew where they

Dewhurst / by excerpts of Deposition - Direct          38

1          resided.

2          "QUESTION:  How?

3          "ANSWER:  We knew -- because we have voter records,

4          and I talked to the DPS on several occasions about

5          expanding our hours, growing the -- increasing the

6          size of our driver's license departments, so we

7          could -- so we could handle more driver's license,

8          both -- more drivers' applications and the new

9          increase in election identification cards.  And the

10         DPS has been responsive.  They have enlarged, based

11         upon the appropriation that I made for them last

12         year, a number of their locations.  They have changed

13         their hours to include Saturdays in a number of their

14         locations.  They have added, the last time I looked,

15         25 mobile registration vans to move into areas to

16         increase registration.  I happen to believe it's

17         healthy, whether you're a Democrat or Republican, to

18         increase overall voter turnout.

19         "QUESTION:  And, sir, I appreciate your testimony.  I

20         want to draw your attention back to the legislative

21         process and whether steps were taken during the

22         pendency and consideration of Senate Bill 14 to

23         identify where those voters were located.

24         "ANSWER:  As I said, in my previous -- in my

25         conversations with the DPS, they had a general idea

Dewhurst / by excerpts of Deposition - Direct            39

1          of where most of your population was from that was

2          minority that could be serviced from their different

3          driver's license stations.  And they felt that by

4          expanding those stations and by expanding the hours

5          of service that they would access people that needed

6          free I.D.

7          "QUESTION:  When did you have those conversations

8          with DPS?

9          "ANSWER:  During the pendency of Senate Bill 14 and

10         afterwards.

11         "QUESTION:  Did you --

12         "ANSWER:  That's why you saw 25 new vans

13         appropriated.  That's why you saw appropriations

14         being made to expand the Texas driver's license

15         departments around the state.

16         "QUESTION:  And did those appropriations occur in the

17         2013 legislature?

18         "ANSWER:  That's right.

19         "QUESTION:  Do you believe that it was the intent of

20         the Texas legislature to enact the strictest photo

21         I.D. law in the country?

22         "ANSWER:  It was the intent of the legislature -- it

23         was the intent of the Lieutenant Governor to pass a

24         photo -- a photo voter I.D. bill which reduced fraud;

25         and not to repeat myself, I apologize, but to improve

Dewhurst / by excerpts of Deposition - Direct          40

1          the confidence by the voters in Texas in our election

2          process, because I warrant to you, most voters didn't

3          have a lot of confidence in the validity of their

4          vote counting -- one person, one vote -- and, as a

5          result, increase the turnout of voters, because in

6          Texas we have a real problem with low voter turnout.

7          "QUESTION:  Do you believe that Senate Bill 14

8          burdens anybody's right to vote?

9          "ANSWER:  You're asking me to speculate.  It's almost

10         a hypothetical question.  I'm -- I'm sure somebody

11         somewhere has been burdened.  Now we have to get into

12         the relative analysis of how much they've been

13         burdened.  But, again, I haven't heard of complaints.

14         I haven't heard of concerns in Texas from the four

15         elections that we've run under Senate Bill 14 of

16         people not being able to gain access.  And I haven't

17         heard anything from Ms. Westfall, I haven't heard

18         anything from you, about people that -- that are

19         having a problem getting acceptable photo voter I.D.

20         If there are cases, then I'd love to know about it

21         because I want to address it.  I want to make sure

22         everybody has the chance to vote who wants to vote.

23         I want to see more people vote.

24         "QUESTION:  Governor, if I could have a few

25         questions, a little bit of your time, earlier in the

Dewhurst / by excerpts of Deposition - Direct            41

1            deposition you said something about you don't recall

2            any specific debate amongst the Democrats or the

3            Senators about some issues, but let's take away the

4            floor debates and let's ask you a more simple

5            question.  During the course of consideration and

6            prior to the passage of SB 14, were -- did you have

7            any communication with any Democrats or folks that

8            ultimately were opposed to SB 14?

9            "ANSWER:  Well, since the first day that we

10           considered voter -- voter I.D. in the bill that came

11           over from the House in two thousand --

12           "QUESTION:  '09?  Three sixty-two?

13           "ANSWER:  No, no, no.  Bear with me for just a

14           moment.  In 2005 --

15           "QUESTION:  Okay.

16           "ANSWER:  -- House Bill 218?  Is that right?  Two

17           eighteen came over.  Two thousand seven.  All right.

18           Ever since the first -- all right.  Excuse me.

19           Excuse me.  Ever since before the 2007 session in

20           which I knew there was going to be a push in the

21           House and one in the Senate to consider a voter I.D.

22           bill, I started multiple conversations with the then

23           11 Democrat Senators in the Senate and -- and worked

24           with them on trying to come up with a compromise

25           bill.  And that was the genesis for a number of the

Dewhurst / by excerpts of Deposition - Direct          42

1          non-photo I.D.'s that were included, the exception

2          that we included even in Senate Bill 17, which we --

3          excuse me, Senate Bill 14, which we passed out of the

4          Senate in 2011, with an exception for seniors over 70

5          years old.

6          "QUESTION:  What Senators -- what Democratic Senators

7          do you recall visiting with prior to that SB --

8          "ANSWER:  I visited -- I visited with virtually every

9          one of them.  Every one of them, from Senator Van de

10         Putte, Senator then Shapleigh, Senator Hinojosa,

11         Senator Uresti, Senator Whitmire, Senator Gallegos,

12         Senator Lucio, et cetera, and -- and I continued

13         negotiating with them on a compromise bill, in good

14         faith, in 2006, before the 2007 session, during --

15         during the regular session in 2007, when the House

16         took up and passed their voter I.D. bill, House Bill

17         218, and sent it to us.  And I worked with them in

18         the latter part of the session as our Committee on

19         State Affairs considered the bill, passed it out of

20         State Affairs, and it went to the floor.  I was

21         optimistic that we would be able to -- to work

22         something out.  The Democrats that I spoke to, in

23         essence, realized that they were on the wrong side of

24         their voters.  In fact, several of them used that

25         word we're -- I know we're -- we're upside down in

Dewhurst / by excerpts of Deposition - Direct          43

1    our voters, but this is an issue that will get us a

2    primary opponent if we go along with it.  They knew

3    me.  They know me.  And they knew that my goal was to

4    increase overall voter turnout, because this has been

5    a -- a concern of mine since I first came into the

6    legislature.

7    "QUESTION:  Did -- did any of your communications

8    with any of the Senators prior to the passage of

9    SB 14 allay any fears you had with regard to perhaps

10   any kind of adverse impact of the passage of SB 14 on

11   any specific minority group?

12   "ANSWER:  The Democrat Senators that I spoke with,

13   and -- and if you go all the way to 2011, that --

14   that number that -- we added one more Democrat

15   Senator in the Senate.  That was Senator Wendy Davis.

16   And I don't recall I spoke to her about voter I.D.,

17   but I did speak to the other Senators.  Their --

18   their comments to me were much more measured, much --

19   much more open than what they said on the floor.

20   "QUESTION:  So, let's -- let's deal with a couple of

21   different parts.  So, specifically, let's take

22   individual Senators that you recall speaking to prior

23   to the passage of SB 14.  So, specifically, do you

24   recall the names of any of the specific Senators that

25   you spoke with prior to the passage of SB 14 about

1      these discussions that you heretofore described in

2      your testimony?

3      "ANSWER:  Well, some of the conversations took place

4      during the 2009 session in the discussion of Senate

5      Bill 362, but they -- and some took place during the

6      interim leading up to the 2011 session, where we took

7      up Senate Bill 14.  But I had numerous conversations

8      with Senator Eddie Lucio, and I had numerous

9      conversations with Senator John Whitmire.  I had

10     numerous conversations with Senator Eliot Shapleigh

11     before he stepped down from the Senate.  I had

12     numerous conversations with Senator West that I can

13     remember about the fact that they were upside down as

14     far as their voters were concerned and why don't we

15     work together.  And a number of them I can remember,

16     even with Eliot Shapleigh, trying to negotiate with

17     him what -- what exceptions we needed.  He focused on

18     elderly voters needing an exception.  In the case of

19     Senator Mario Gallegos, who I talked to repeatedly,

20     he focused on his grandmother and wanting to have an

21     exception for elderly people also.  On the case of

22     John Whitmire, Senator Whitmire, he was not as

23     optimistic that anything could be worked out on a

24     consensus basis because it would probably, in his

25     words, generate a primary opponent for him.  So, I

Dewhurst / by excerpts of Deposition - Direct          45

1          understood that.  I understood that.  But -- but --

2          and I don't know if -- if the three opposing counsel

3          will understand this, but at least in Texas, it's

4          such a different state from Washington, that I

5          consider all these Democrat Senators friends of mine.

6          And that's why I'm glad you asserted privilege, and

7          I'm glad this is confidential, because I really don't

8          want to hurt anyone.  And -- but none of them voted

9          for any of our bills.  But I -- I went out on a limb

10         and told the Republican caucus in, I believe it was

11         the 2009 session, that I was optimistic we could work

12         out a consensus, and I was wrong.  I could not work

13         it out.

14         "QUESTION:  But, nevertheless, the SB 14, it sounds

15         like, incorporated some of those discussions and

16         negotiations you had with some of these Democrats who

17         ended up voting against the bill; is that correct?

18         "ANSWER:  Some of the -- some of the provisions in

19         Senate Bill 14 were parts of the concessions, the

20         compromises that -- that we had discussed with

21         Senator Fraser in order to bring on -- in order to

22         bring on Democrats on board in Senate Bill 362, and

23         some of those were retained in Senate Bill 14.

24         "QUESTION:  Now, there is a procedure in the Texas

25         Senate today, and there was one back during the

Dewhurst / by excerpts of Deposition - Direct          46

1      consideration of SB 14 and SB 362, where a Senator

2      had the right to add written comments to the record,

3      the official record, after the debate and after the

4      passage of the bill; is that correct?

5      "ANSWER:  Well, that's true, but it's true for all

6      Senators.  In other words, Senators have the right

7      to -- to notify the Secretary of the Senate within a

8      short period of time after adjournment to change

9      their vote, as long as it doesn't change the outcome

10     of a particular bill, and they have the right to

11     submit written comments.

12     "QUESTION:  How does one look at the record and know

13     whether someone has submitted those before or after a

14     vote is taken, either way?

15     "ANSWER:  Well, let me -- let me see if I can answer

16     you this way.  What was the -- what was the exhibit

17     number on the -- on the Senate journal?  I

18     remember -- I remember in 2009 being shocked, and I

19     believe the same thing happened in 2011, but I

20     remember that -- that upon passing Senate Bill 362

21     out of the Senate in the 2009 session, staff brought

22     me a copy of the journal as amended by comments from

23     a number of Democrat Senators a day or two later.

24     And, quite frankly, I was disappointed.  Hurt my

25     feelings was too strong, but I was disappointed in

Dewhurst / by excerpts of Deposition - Direct          47

1          the -- in the tone and the words that were used by

2          some of the Senators.

3          "QUESTION:  Did you -- were you ever able to

4          determine why they would have submitted it after the

5          debate and after the vote on SB 362?

6          "ANSWER:  Sure.  This is all for the Department of

7          Justice, of course.  That's why they were submitting

8          them.  They didn't have the -- they didn't have

9          the -- the -- let me stop there.  They -- they chose

10         not to say it on the floor of the Senate, where we

11         would have responded to them, but they put it in

12         letters and submitted it into the journal.  I mean,

13         it's not different from in -- in -- in a letter that

14         Senator Leticia Van de Putte wrote in either 2009 or

15         2011 to Senator Robert Duncan on the Committee of the

16         Whole objecting to what she felt was a short time

17         line between Thursday and a Monday afternoon hearing.

18         She copied the Department of Justice in Washington.

19         So, this was all orchestrated.  It's well known among

20         all of the Republicans and the Democrats, because I

21         talked to them about it, that during these -- that

22         during these proceedings they all had third -- third-

23         party prepared notes.  It was all scripted;

24         everything scripted by their lawyers on what they

25         said."

Dewhurst / by excerpts of Deposition - Cross          48

1      **MS. DEASON:**  Your Honor, that concludes Defendants'

2  reading from Lieutenant Governor Dewhurst's deposition.

3      **(Pause)**

4      **MS. WESTFALL:**  Your Honor, Elizabeth Westfall for the

5  United States.  May I approach?

6      **THE COURT:**  Yes.

7      **(Pause)**

8      **MS. WESTFALL:**  Dan Freeman will be reading the part

9  of Lieutenant Governor Dewhurst.  Mr. Freeman, you ready?

10      **MR. FREEMAN:**  Yes.

11      **EXAMINATION OF LIEUTENANT GOVERNOR DAVID DEWHURST**

12          **BY EXCERPTS OF DEPOSITION TESTIMONY**

13  **(QUESTIONS READ BY MS. WESTFALL; ANSWERS READ BY MR. FREEMAN)**

14      "QUESTION:  Since 2005, who in your office has been

15      responsible for handling voter ID issues?

16      "ANSWER:  Since I became Lieutenant Governor

17      initially in 2003, when I came in, Spencer Reid, who

18      was our general counsel.  But subsequent to that,

19      Bryan Hebert when he joined us as a staff attorney in

20      the mid-2000s.

21      "QUESTION:  Was it -- is it fair to say that Bryan

22      Hebert primarily handled all of your voter ID issues?

23      "ANSWER:  That is my current recollection.

24      "QUESTION:  Who was the staff person who handled

25      voter ID issues for you in 2007?

Dewhurst / by excerpts of Deposition - Cross                49

1          "ANSWER:  I don't remember when -- when Bryan Hebert

2          joined us, but if he was on our staff in 2007, my

3          memory is that it would have been Bryan Hebert.

4          "QUESTION:  Could you describe Mr. Hebert's role for

5          you in handling voter ID when he did arrive?

6          "ANSWER:  The way I organized my office since I first

7          came in as Lieutenant Governor, I had non-lawyers as

8          policy analysts with responsibilities for different

9          committees, and I assigned the different members of

10         my legal staff to different committees.  And so if --

11         if my memory is correct on this, Brian Hebert was

12         assigned to State Affairs to follow the legislation

13         in that committee.  And that would include over a

14         period of January to early June, 2007, 400 to 600

15         bills.

16         "QUESTION:  Could you mark this?  You've been handed

17         what's been marked as Exhibit 4."

18         **MS. WESTFALL:**  Which is PL-201.

19         "QUESTION:  Do you recognize this document?

20         "ANSWER:  No."

21         **MS. WESTFALL:**  Could you go up a little bit further,

22    please?

23         "QUESTION:  I will represent to you that this is a

24         printout of bills referred to the Committee of the

25         Whole from the Texas Legislature Online for the

Dewhurst / by excerpts of Deposition - Cross                50

1          regular sessions in 2003, 2005, 2007, 2009, 2011, and

2          2013.  Turning your attention now --

3          "ANSWER:  Well, hold on just a moment.

4          "QUESTION:  Oh, certainly, certainly, take your time.

5          Let me know when you've had a chance to review it.

6          "ANSWER:  Are you saying that according to this

7          Exhibit 4, which is to refresh my memory, in 2003

8          there were three bills referred to the Committee of

9          the Whole and one in 2009 and one in 2011?  Is that

10         what you're saying?

11         "QUESTION:  Thank you.

12         "ANSWER:  So you've refreshed my memory and we didn't

13         take up redistricting but we did take up school

14         financing.  And on three bills and twice, we had a

15         Committee of the Whole on Voter ID.

16         "QUESTION:  Did the House pass --

17         **MS. WESTFALL:**  And you can bring that down.

18         "QUESTION:  Did the House pass House Bill 218?

19         "ANSWER:  I believe so, yes.

20         "QUESTION:  When did it pass House Bill 218?

21         "ANSWER:  On April 24th, 2007.

22         "QUESTION:  Was that relatively late in the session?

23         "ANSWER:  Yes.

24         "QUESTION:  Could you describe generally what types

25         of ID are permitted under House Bill 218?

Dewhurst / by excerpts of Deposition - Cross          51

1        "ANSWER:  Well, other than reading what it says, it's

2        photo identification under A, and under B it is

3        additional ID.

4        "QUESTION:  Does that include non-photo ID?

5        "ANSWER:  Yes.

6        "QUESTION:  So Senate Bill 362 addressed in-person

7        voter impersonation solely; is that correct?

8        "ANSWER:  That is my understanding of the bill.

9        "QUESTION:  Did Senator Fraser file a voter ID bill

10       in 2008?

11       "ANSWER:  Let me look at Exhibit 10.  Yes.

12       "QUESTION:  Was it Senate Bill 362?

13       "ANSWER:  Yes.

14       "QUESTION:  Who was involved in developing the

15       substance of Senate Bill 362?

16       "ANSWER:  Principally, Senator Fraser's office with

17       general coordination with the appropriate parties in

18       my office.

19       "QUESTION:  Would that be Mr. Hebert?

20       "ANSWER:  I believe so.

21       "QUESTION:  How would you characterize the extent of

22       your office's involvement in developing Senate Bill

23       362?

24       "ANSWER:  Going back to my earlier testimony,

25       conversations with the bill sponsor and his staff as

Dewhurst / by excerpts of Deposition - Cross                52

1           to what they intended with the bill and -- and their

2           proposed timing, and where I disagreed, I would share

3           my thoughts with them.

4           "QUESTION:  Were you involved in the substance of the

5           bill at all, or just the procedure and timing of how

6           to move it?

7           "ANSWER:  Both.

8           "QUESTION:  Before Senator Fraser filed Senate Bill

9           362, did you discuss with him or any other Senator

10          what types of IDs to include in the bill?

11          "ANSWER:  Yes.

12          "QUESTION:  Who did you have this discussion with?

13          "ANSWER:  Senator Fraser.

14          "QUESTION:  Sir, now that you've had a chance to look

15          at Exhibit 9, at the list of ID, does this refresh

16          your recollection as to whether Senate Bill 362

17          allowed for the use of non-photo ID?

18          "ANSWER:  Yes.

19          "QUESTION:  And does it?

20          "ANSWER:  Yes.

21          "QUESTION:  Did you support Senate Bill 362?

22          "ANSWER:  I did.

23          "QUESTION:  And you voted for it in the Committee of

24          the Whole; is that correct?

25          "ANSWER:  Yes.

Dewhurst / by excerpts of Deposition - Cross                53

1       "QUESTION:  And you supported Senate Bill 362

2       notwithstanding that it included non-photo ID as a

3       permissible form of ID; is that correct?

4       "ANSWER:  Yes.  Because I felt like it was a start, a

5       start on the goal of reducing fraud.

6       "QUESTION:  Turning your attention back to Exhibit 10

7       -- 9, pardon me, and the forms of ID listed at Page

8       5, do you know how this list of acceptable IDs in

9       Senate Bill 362 was developed?

10      "ANSWER:  Yes.

11      "QUESTION:  How was it developed?

12      "ANSWER:  By Senator Fraser and a collaborative

13      effort with other offices, and I believe Bryan

14      Hebert.

15      "QUESTION:  Which other offices, if you know?

16      "ANSWER:  I don't specifically recall, but I remember

17      that Senator Fraser consulted other Senators.

18      "QUESTION:  Did he consult with Senator Duncan's

19      staff?

20      "ANSWER:  I believe he did.

21      "QUESTION:  Did he consult with Senator Williams'

22      staff?

23      "ANSWER:  I believe he did.

24      "QUESTION:  Do you know whether Senate Bill 362 was

25      modeled after House Bill 218?

1        "ANSWER:  My memory is that it was.

2        "QUESTION:  Turning back to my question, are you

3        aware of any consideration that Senator Fraser gave

4        to making changes to House Bill 218 before he filed

5        Senate Bill 362?  Are you aware?

6        "ANSWER:  It is my memory that Senator Fraser wanted

7        to base Senate Bill 362 on the previous session's

8        House Bill 218, which had -- because it had passed

9        the House and, therefore, was a good starting point.

10       "QUESTION:  What was the purpose of Senate Bill 362?

11       "ANSWER:  Purpose of 362 -- Senate Bill 362 was, like

12       I testified on House Bill 218, to reduce voter fraud.

13       "QUESTION:  Was it only aimed at ensuring that voters

14       who appeared at the polls were who they said they

15       were?

16       "ANSWER:  Yes.  And you will remember that I had

17       testified earlier it was my desire to address

18       ultimately at some point, not only in-person voting,

19       mail-in ballots and also registration.  But Exhibit 9

20       addressed only in-person voting.

21       "QUESTION:  Did you believe that in-person voter

22       fraud was the most important priority for the State

23       of Texas at that time, of all the voter frauds you

24       just testified to?

25       "ANSWER:  No.

Dewhurst / by excerpts of Deposition - Cross                55

1        "QUESTION:  How does the Senate adopt rules for the

2        regular session?

3        "ANSWER:  The Senate adopts rules by meeting among

4        the members exclusively, closed door, I believe, and

5        agree on rules.

6        "QUESTION:  And is this accomplished in the first one

7        or two days of session?

8        "ANSWER:  Yes.

9        "QUESTION:  Is it -- are they voted on by a majority

10       vote?

11       "ANSWER:  Yes.

12       "QUESTION:  Do you recall that Senate Resolution 14

13       was introduced by Senator Williams at the beginning

14       of the 2009 session?

15       "ANSWER:  Senate Resolution 14 --

16       "QUESTION:  Yes.

17       "ANSWER:  -- you said?

18       "QUESTION:  Yes.

19       "ANSWER:  What does Senate Resolution --

20       "QUESTION:  Pertaining to the rules.

21       "ANSWER:  Yes.

22       "QUESTION:  And I think it might be helpful if we

23       mark a document.  Could you please mark this as

24       Exhibit 12?"

25       **MS. WESTFALL:**  Which is PL-154.

Dewhurst / by excerpts of Deposition - Cross          56

1    "QUESTION:  You've been handed what's been marked as

2    Exhibit 12.  Do you recognize this document?

3    "ANSWER:  I'm not aware that I've seen it before, but

4    it represents the Senate Journal for January 14th,

5    2009.

6    "QUESTION:  If you could, turn your attention to Page

7    23 of the Senate Journal.

8    "ANSWER:  Yes.

9    "QUESTION:  It will -- it sets forth Senate

10   Resolution 14, which I just asked you about.  Could

11   you take a moment just to take a look at that

12   resolution and let me know when you've had a chance

13   to review it?

14   "ANSWER:  Yes.

15   "QUESTION:  Do you recall this Senate resolution?

16   "ANSWER:  Yes.

17   "QUESTION:  What was it designed to accomplish?

18   "ANSWER:  Several things, one of which, under D, that

19   bill of -- and now I'm reading from Exhibit 12, in

20   Rule 5.11D --"

21   **MS. WESTFALL:**  Could you blow that up a little?

22   "ANSWER:  -- notwithstanding Subsection A, a bill or

23   resolution relating to voter identification

24   requirements reported favorably from the Committee of

25   the Whole Senate may be set as a special order for a

Dewhurst / by excerpts of Deposition - Cross        57

1        time at least 24 hours after the motion is adopted by

2        a majority of the members of the Senate.

3        "QUESTION:  What practical effect does that provision

4        have, in your own words?

5        "ANSWER:  It permits, as a practical matter, photo

6        voter ID -- either photo voter ID or voter ID to be

7        passed with a majority vote instead of a two-thirds

8        vote.

9        "QUESTION:  Are you aware of any other Senate rule

10       where a particular type of legislation was subject to

11       this type of procedure?

12       "ANSWER:  I'm not aware of a similar rule change.

13       "QUESTION:  Had you ever seen a special item added to

14       the rules by subject matter as Senate Resolution 14,

15       Rule 5.11D does?

16       "ANSWER:  I don't remember ever seeing a special item

17       added in the Senate, the Senator's own rules, while

18       I've been Lieutenant Governor.

19       "QUESTION:  On February 17 -- turning your attention

20       back to Exhibit 10, on February 17th, 2009, was

21       Senate Bill 362 referred to the Committee of the

22       Whole?

23       "ANSWER:  Yes.

24       "QUESTION:  Were you the person to make this

25       referral?

Dewhurst / by excerpts of Deposition - Cross                      58

1        "ANSWER:  Yes.

2        "QUESTION:  Why did you refer Senate Bill 362 to the

3        Committee of the Whole?

4        "ANSWER:  Because pursuant to Exhibit 12, the

5        Senators had changed the Senate rules to require that

6        a bill on Voter ID be referred to the Committee of

7        the Whole.

8        "QUESTION:  Was that how you interpreted Senate

9        Resolution 14?

10       "ANSWER:  Yes.

11       "QUESTION:  That it obligated you to make that

12       referral?

13       "ANSWER:  Yes.

14       "QUESTION:  It was not within your discretion; is

15       that correct?

16       "ANSWER:  Yes.  If you look at 5.11D, it's clear.

17       "QUESTION:  You've been handed what's been marked as

18       Exhibit 13."

19       **MS. WESTFALL:**  Which is PL-204.

20       "QUESTION:  Do you recognize this document?

21       "ANSWER:  No.

22       "QUESTION:  Do you see that there's a quote that is

23       attributed to you in the second paragraph?

24       "ANSWER:  I see a paragraph that is attributed to me

25       in the second paragraph.

Dewhurst / by excerpts of Deposition - Cross          59

1        "QUESTION:  Do you believe that this is an accurate

2        quotation?

3        "ANSWER:  I don't -- I don't believe so in light of

4        your question.

5        "QUESTION:  Do you believe that -- you did at this

6        time -- actually, what's the date of this article,

7        Exhibit 13?

8        "ANSWER:  If you look above the caption in bold, it

9        says, 'March 4th, 2009.'

10       "QUESTION:  Does this refresh your recollection as to

11       whether you were advocating for a grace period of two

12       to four years in 2009?

13       "ANSWER:  You're going to have to define 'grace

14       period.'  For what?

15       "QUESTION:  What did -- what did you mean when you

16       were advocating for a grace period of two to four

17       years?

18       "ANSWER:  I was not advocating for a postponement of

19       the -- the validity of the bill for two to four

20       years.

21       "QUESTION:  What were you advocating for?

22       "ANSWER:  A phase-in on elderly voters without ID,

23       principally voters in their seventies.  Although

24       increasingly, voters in their seventies don't strike

25       me as elderly anymore.

Dewhurst / by excerpts of Deposition - Cross          60

1          "QUESTION:  Were you advocating for a phase-in for

2          any other classes of voters in 2009?

3          "ANSWER:  No.

4          "QUESTION:  Did you have any discussion with any

5          senator about the cost of obtaining a Texas birth

6          certificate or DPS ID card in 2009?

7          "ANSWER:  Yes.

8          "QUESTION:  Who did you discuss this with?

9          "ANSWER:  I discussed with Senator Fraser and several

10         other senators that, as the rules were promulgated by

11         the DPS and/or other agencies, that what we wanted to

12         -- to reduce any cost for obtaining documents

13         required to vote.

14         "QUESTION:  Was this in 2009?

15         "ANSWER:  Yes.

16         "QUESTION:  To your recollection, did you take any

17         steps to make that happen in the bill?

18         "ANSWER:  Counsel, I'm -- pardon me, but a lot of

19         times the implementation of bills are handled by

20         agencies that have the responsibility, and so that

21         was -- that was my conversation with several

22         senators, including Senator Fraser, and I believe I

23         communicated it to the agencies.

24         "QUESTION:  Was this left to the agencies to

25         implement?

Dewhurst / by excerpts of Deposition - Cross          61

1          "ANSWER:  Yes.

2          "QUESTION:  The reduction of cost, was it left to the

3      agencies?

4          "ANSWER:  Yes.

5          "QUESTION:  It was not in the text of Senate Bill

6      362, correct?

7          "ANSWER:  No.

8          "QUESTION:  Is it fair to say that you were aware of

9      the cost of obtaining a Texas birth certificate in

10     2009?

11         "ANSWER:  I was aware that there may be some cost.

12     I'm not -- I don't remember whether I knew, as

13     Exhibit 14 points out, that -- that it was a cost of

14     $22.  That surprises me.  But I knew there was a cost

15     for obtaining some of the documents, and I wanted to

16     get that down to zero.

17         "QUESTION:  Senate Bill 362 was not passed by the

18     House; is that correct?

19         "ANSWER:  That is correct.  We passed it in the

20     Senate.

21         "QUESTION:  Did it pass with a majority of the

22     senators in the Senate?

23         "ANSWER:  Yes.

24         "QUESTION:  And not two-thirds; is that correct?

25         "ANSWER:  That is correct, because of the rule

Dewhurst / by excerpts of Deposition - Cross          62

1       change.

2       "QUESTION:  Why did it fail to pass the House?

3       "ANSWER:  With no criticism intended, the House let

4       the bill sit from the day it was received from the

5       Senate on March 19th for almost two weeks, until

6       March 31st.  And then after a -- taking testimony in

7       the House on April 7th, it sat for almost five weeks.

8       "QUESTION:  So there was not sufficient time in the

9       session to get it passed in the House?

10      "ANSWER:  It was placed on major state calendar.  And

11      if I recall correctly, the Democrats chubbed it to

12      death, meaning they talked and talked and talked on

13      routine matters, killing routine bills in order to

14      kill the bill.

15      "QUESTION:  Did you want the Senate to pass the voter

16      ID bill in 2011?

17      "ANSWER:  Yes.

18      "QUESTION:  What did you believe could be done

19      differently to ensure the passage of voter ID

20      legislation in the 2011 session that had not been

21      done in 2009?

22      "ANSWER:  Well, one, take the bill up earlier and

23      pass it earlier to make it more difficult for the

24      opponents of the bill to chub it in the House.

25      "QUESTION:  Did you play a role in developing the

1       strategy to ensure that the legislature would pass

2       voter ID in 2011?

3       "ANSWER:  As I do on any of our important bills,

4       several hundred per session, I discussed with staff

5       the optimum times to pass voter ID, as well as other

6       bills.

7       "QUESTION:  What was your conclusion about the

8       optimum time to pass voter ID in 2011?

9       A    That it was better for the final passage of

10      voter ID if we could pass it within the 60-day

11      prohibition of where no legislation can be passed.

12      Under the Texas Constitution, the first 60 days, one

13      is prohibited from passing any legislation unless

14      it's placed on emergency call by Governor Perry.

15      "QUESTION:  Did you prior to the 2011 session discuss

16      with Senator Fraser filing another voter ID bill?

17      "ANSWER:  Yes.

18      "QUESTION:  When did you talk to him about that?

19      "ANSWER:  Sometime during the fall of 2012 -- I'm

20      sorry, sometime during the fall of 2010, excuse me.

21      "QUESTION:  Did part of that discussion -- what did

22      that discussion involve subject wise?

23      "ANSWER:  What I remember is a discussion with

24      Senator Fraser to inquire whether he was willing to

25      carry a voter ID bill again.

Dewhurst / by excerpts of Deposition - Cross          64

1          "QUESTION:  Did you ever consider hiring any entity

2          to research how Senate Bill 14 and the requirements

3          therein would impact voters in the State of Texas?

4          "ANSWER:  I directed staff to make inquiries as to

5          how to determine -- let me reword this.  I instructed

6          staff to try and determine what effects the bill

7          would have.

8          "QUESTION:  On voters in Texas?

9          "ANSWER:  Yes.

10         "QUESTION:  And was that inquiry or request on your

11         part directed to Mr. Hebert?

12         "ANSWER:  Yes.

13         "QUESTION:  But just to clarify in the terms of the

14         timing, do you believe that you made this inquiry of

15         Mr. Hebert during --

16         "ANSWER:  During 2009.

17         "QUESTION:  -- during 2009 or '11?

18         "ANSWER:  Oh, I'm sorry, during 2011.

19         "QUESTION:  Okay.  Were you aware when you made that

20         inquiry that the Secretary of State has a list of

21         Spanish surname registered voters that it maintains

22         based on the last name of the voter?

23         "ANSWER:  I don't remember.

24         "QUESTION:  Put differently, did you have any

25         recollection that the secretary -- any awareness that

Dewhurst / by excerpts of Deposition - Cross                    65

1          the Secretary of State had a list of Hispanic voters?

2          "ANSWER:  I don't remember whether I knew that or

3          not; although, logically, if you have a list of

4          registered voters, you can run a sort and see who --

5          who are -- who have Spanish surnames.

6          "QUESTION:  And just putting aside the process of

7          matching, though, I just want to ask you a question.

8          When did you first know that you could sort the voter

9          registration list by last name of the voter to

10         identify Spanish surname voters?

11         "ANSWER:  It's logical.

12         "QUESTION:  Have you known that since you've been in

13         your office as Lieutenant Governor?

14         "ANSWER:  Yes.

15         "QUESTION:  Turning back to the filing of Senate Bill

16         14, was it initially filed and received as Bill

17         Number 178?

18         "ANSWER:  I believe that's right.

19         "QUESTION:  Did you request that Senator Fraser

20         refile the bill in order to be assigned a lower bill

21         number?

22         "ANSWER:  Yes.

23         "QUESTION:  What is the significance of a bill

24         receiving a low bill number?

25         "ANSWER:  The significance is that the rest of the

Dewhurst / by excerpts of Deposition - Cross                66

1        legislature knows that it's a priority bill for the

2        Lieutenant Governor.

3        "QUESTION:  Did the Senate adopt a similar rule in

4        2011 that it had adopted in 2009 related to the

5        consideration of voter ID legislation?

6        "ANSWER:  You mean the special item we talked about?

7        "QUESTION:  Yes.

8        "ANSWER:  Yes.

9        "QUESTION:  Were you present in the Committee of the

10       Whole's consideration of Senate Bill 14?

11       "ANSWER:  Yes.

12       "QUESTION:  And I believe you testified earlier that

13       you voted in favor of Senate Bill 14 in the Committee

14       of the Whole.

15       "ANSWER:  Yes.

16       "QUESTION:  Could you mark this Exhibit 26 for

17       identification?"

18       **MS. WESTFALL:**  PL-887 or -- 897.

19       "QUESTION:  You've been handed what's been marked

20       Exhibit 26.

21       "ANSWER:  Yes.

22       "QUESTION:  Do you recognize this document?

23       "ANSWER:  Looks to be a transcript of proceedings

24       before the Senate on January 25th when we were in the

25       Committee of the Whole.

Dewhurst / by excerpts of Deposition - Cross          67

1       "QUESTION:  Turning your attention to Page 162 of the

2       transcript, and 163, starting at 162, line 17.

3       "ANSWER:  Yes.

4       "QUESTION:  Do you see that Senator West asked about

5       research conducted on the burdens of photo ID

6       requirements and whether they fall disproportionately

7       on racial minorities?

8       "ANSWER:  Yes.

9       "QUESTION:  Do you see that?  And do you see that

10      Senator Fraser responded with information about

11      polls, concerning support for -- polls in support of

12      identification requirements?

13      "ANSWER:  Yes.

14      "QUESTION:  Turning back to -- I think we got a

15      little bit sidetracked.  Turning back to the

16      exchange, do you believe that based on what -- that

17      Senator Fraser's response was responsive to Senator

18      West?

19      "ANSWER:  Well, Senator West asked, quote/unquote,

20      'Was there any research conducted on the burdens of

21      photo ID requirements that may fall

22      disproportionately on racial minorities?'  I think

23      the answer is no, based upon research.  But I'm not

24      sure that Senator Fraser addressed that question.

25      "QUESTION:  During consideration of Senate Bill 14,

Dewhurst / by excerpts of Deposition - Cross                68

1          was there a request from -- of the Secretary of State

2          for registered voters without a driver license?

3          "ANSWER:  I believe there was.  Are you representing

4          that there was?

5          "QUESTION:  I was just trying to understand your

6          memory sitting here today.  Do you recall that

7          Senator Williams made such a request on the Senate

8          floor?

9          "ANSWER:  You refreshed my memory.  Yes, I do.  Yes,

10         I do.

11         "QUESTION:  Do you recall that Ann McGeehan testified

12         as a resource witness at the hearing on Senate Bill

13         14?

14         "ANSWER:  Yes, I do.

15         "QUESTION:  Do you recall that Senator Williams twice

16         during her testimony said when are you going to get

17         me the data comparing the registered voters and who

18         have driver licenses?  Do you recall that?

19         "ANSWER:  Yes.

20         "QUESTION:  Do you think it was appropriate for

21         Senator Williams to seek this information from the

22         Secretary of State's Office?

23         "ANSWER:  Sure.

24         "QUESTION:  Do you think it was advisable for Senator

25         Williams to seek this information?

1          "ANSWER:  I have no problem with him asking.

2          "QUESTION:  Are you aware of whether the Secretary of

3          State's Office responded to Senator Williams' request

4          for the number of voters without a driver's license

5          or a person ID card?

6          "ANSWER:  I assume they did, but I don't know for a

7          fact.

8          "QUESTION:  Do you know if your -- and why do you

9          assume that they did?

10         "ANSWER:  Because the agencies are -- are well-

11         advised to be responsive to all the members of the

12         legislature including, but not limited to, the senior

13         -- a senior Senator who was -- in 2011, then the

14         secretary -- or the Chair of our Transportation and

15         Homeland Security Committee.

16         "QUESTION:  Do you think it would be unusual for the

17         Secretary of State not to provide that information

18         upon request?

19         "ANSWER:  If they had it, I would expect them to

20         provide.

21         "QUESTION:  Did you learn at any time during the

22         consideration of Senate Bill 14 the number of

23         registered voters without a driver license or

24         personal ID card?

25         "ANSWER:  I was told that it was a small number, but

Dewhurst / by excerpts of Deposition - Cross          70

1        I don't recall the exact number.

2        "QUESTION:  Do you recall who told you that?

3        "ANSWER:  Staff.

4        "QUESTION:  Your staff?

5        "ANSWER:  Yes.

6        "QUESTION:  Did you learn that before Senate Bill 14

7        was passed by the Senate?

8        "ANSWER:  I believe I did.

9        "QUESTION:  By small, did you learn -- what do you

10       mean by small?

11       "ANSWER:  Three to seven percent.

12       "QUESTION:  Do you know how that estimate was

13       derived?

14       "ANSWER:  I was told that there was approximately one

15       million registered voters who didn't have driver's

16       license, and the math flows from there.

17       "QUESTION:  Could you please mark this, Exhibit 27."

18       **MS. WESTFALL:**  PL-432.

19       "QUESTION:  You've been handed what's been marked as

20       Exhibit 27.  It is TX00107733 through 35.  Could you

21       just take a look at this document and let me know

22       when you've had a chance to review it?

23       "ANSWER:  Well, for a guy that's been busy doing a

24       lot of other things the last three years, the number

25       I gave you was pretty close.  And you're looking

1        anywhere from four to seven percent.

2        "QUESTION:  Do you recognize this document or any of

3        the numbers contained herein?

4        "ANSWER:  No.  I've never seen it before.

5        "QUESTION:  Did this -- did you receive any of this

6        information in an oral form from anyone?

7        "ANSWER:  I must have been because the information I

8        just shared with you that I was briefed that -- that

9        up to but not quite a million people.  And this is

10       showing a number between 650 and 700 -- 650,000 and

11       730,000.  Well, anywhere between 519 and 844,000.

12       But do not have -- do not have -- well, let me just

13       go with the conclusion.  Between 678,000 and 844,000

14       of the 12.6 million voters in -- on January 27th,

15       2011, don't have a Texas driver's license or an ID.

16       That number is roughly five percent.

17       "QUESTION:  So you believe based on looking at

18       Exhibit 27 that you received information in a

19       different form of these findings?

20       "ANSWER:  I believe I received -- it would be my

21       assumption that what I was briefed by staff prior to

22       -- prior to or simultaneous with the passing of

23       Senate Bill 14, that there was some three to seven

24       percent of the voters in Texas who didn't have Texas

25       driver's license is in fact what this statement says.

Dewhurst / by excerpts of Deposition - Cross                72

1    So now it has -- it is my belief that that number has

2    been dramatically reduced through the efforts that

3    we've implemented through the regulatory agencies,

4    DPS and Health and Human Services.

5    "QUESTION:  Okay.  And just because I just want you

6    to focus on the legislative process and what occurred

7    during that process, what was your understanding of

8    how these estimates were arrived at?

9    "ANSWER:  I was not briefed on that.  This is the

10   first time I'm looking at the document that goes into

11   more detail, other than the -- than the raw numbers,

12   less than a million out of almost 13 million voters.

13   "QUESTION:  And when you learned prior to -- I

14   believe you just testified prior to or during the

15   Senate's consideration of Senate Bill 14, did you

16   understand that that information had been derived

17   from a match or a comparison of registered voters

18   with people with driver license, so two different

19   databases?

20   "ANSWER:  I know that earlier on that -- that

21   Mr. Hebert was told that they were having difficulty

22   in taking the list of driver's licenses in the DPS

23   silo and the number of registered voters and names in

24   the Secretary of State's Office and matching them.  I

25   don't understand why, but I was told that.  And

Dewhurst / by excerpts of Deposition - Cross          73

1      Mr. Hebert was told that by -- by -- I believe the

2      person that sent this e-mail.  And then I remember

3      that sometime shortly thereafter, I was told that

4      there was less than a million people that didn't have

5      a driver's license out of the universe of 12.6, by

6      that time, slightly more.  And it looks -- let's call

7      it 13 million.  And that's a little -- that's roughly

8      five percent of the voters.  And I know efforts have

9      been made to -- to facilitate Election Identification

10     Cards and that those that want to provide -- that

11     they're going after birth certificates to make that

12     at no cost.

13     "QUESTION:  And just turning your attention back to

14     the legislature's consideration of Senate Bill 14,

15     when you got that information from Mr. Hebert that

16     three to seven percent of voters did not have a

17     driver license, did you ask him at that time whether

18     there could be an analysis of those voters with

19     Spanish surnames to respond to the concerns of bill

20     opponents that Senate Bill 14 would have an adverse

21     impact on minority voters?

22     "ANSWER:  No, I did not, because based on the

23     examples in Indiana, which is a different state than

24     Texas, but based upon the preclearance of the Georgia

25     photo voter ID and the national studies, I did not

1          believe that there was a -- that a photo voter ID --

2          ID bill could reduce the minority voters, but it in

3          fact would -- would generate just the opposite

4          effect, increase voting.

5          "QUESTION:  Do you think it would have been --

6          putting aside the Hispanic surname analysis, with

7          regard to the three to seven percent of voters

8          without a driver license, did you conduct any

9          investigation of where those voters resided or any

10          information about them whatsoever?

11          "ANSWER:  I don't believe so.

12          "QUESTION:  Did you have -- are you familiar with the

13          opinion issued by the three-judge court in *Texas*

14          *versus Holder* in August, 2012?

15          "ANSWER:  Generally.

16          "QUESTION:  Did you take any actions in response to

17          that decision by the court?

18          "ANSWER:  No.

19          "QUESTION:  Did you propose any changes to Senate

20          Bill 14?

21          "ANSWER:  No.

22          "QUESTION:  Okay.  Just to be clear in terms of the

23          time, I want to focus your attention on the time

24          between when the three-judge court issued the ruling

25          in August, 2012, to the time when Senate Bill 14 went

1          into effect in June, 2013.  At that time, is it

2          correct that voter ID was not enforced in the State

3          of Texas?

4          "ANSWER:  During the time period up until June of

5          2013?

6          "QUESTION:  Yes.

7          "ANSWER:  That is correct.

8          "QUESTION:  Are you aware of any in-person voter

9          impersonation that occurred during the 2012

10          presidential election in the State of Texas?

11          "ANSWER:  I testified earlier that we were apprised

12          of multiple cases of in-person fraud in the period

13          leading up to the 2009 and 2011 sessions.  But I'm

14          not aware of any in-person fraud in the 2012

15          presidential election.

16          "QUESTION:  During any election in the State of Texas

17          between August, 2012, and June, 2013, are you aware

18          of any in-person voter impersonation that occurred in

19          Texas?

20          "ANSWER:  No.

21          "QUESTION:  Okay.  Are there other factors that can

22          cause voter turnout to increase or decrease from

23          election to election?

24          "ANSWER:  Yes.

25          "QUESTION:  What are some of those factors?

Dewhurst / by excerpts of Deposition - Cross                76

1              "ANSWER:  Popularity of the candidates, the-then

2              current economic conditions, are two that quickly

3              come to mind.

4              "QUESTION:  I'm going to mark Exhibit 35 for

5              identification."

6              **MS. WESTFALL:**  Which is PL-251.

7              "QUESTION:  Does this poll look familiar to you?

8              "ANSWER:  No.

9              "QUESTION:  I can represent to you that this is taken

10             from the University of Texas, *Texas Tribune* poll.  Is

11             that you were referring to earlier?

12             "ANSWER:  It is, but I was looking at -- at earlier

13             polls that occurred in the 2008, 2009, 2010 time

14             period.

15             "QUESTION:  Okay.  And just for the record, this

16             particular poll is dated February, 2011.  Take a look

17             at the 2008 poll as well.

18             **MS. WESTFALL:**  Could you please pull up Exhibit PL-

19             433, which was Exhibit 36 in the deposition?

20             "QUESTION:  And does that 2008 poll look familiar to

21             you?

22             "ANSWER:  Yes, it does.

23             "QUESTION:  Okay.  And for the record, this also is

24             taken from the University of Texas, *Texas Tribune*

25             website, that includes the polling data.

Dewhurst / by excerpts of Deposition - Cross          77

1        "ANSWER:  And I looked at a Rasmussen poll, which is

2        a running average of other polls --

3        "QUESTION:  Okay.  Does it -- is it fair to say that

4        this poll then asked whether respondents would

5        support a law requiring individuals to present a

6        government-issued photo ID in order to be permitted

7        to vote?

8        "ANSWER:  I can only assume that it does because the

9        similar poll done three years later uses those words.

10       "QUESTION:  Right.  And we'll take a look at that in

11       just a moment.  Does this -- looking at the 2008 poll

12       that is Exhibit 36, does this question appear to

13       define what a government-issued photo ID is?

14       "ANSWER:  The statement says what it says by stating

15       that a government-issued ID is required.

16       "QUESTION:  And looking at the 2011 poll that you

17       have in front of you, which is Exhibit 35 --

18       "ANSWER:  It's the same wording.

19       "QUESTION:  -- it's the same wording, correct?

20       "ANSWER:  To present a government-issued photo ID.

21       "QUESTION:  Thank you.  So this, again, does not

22       define what a government-issued photo ID is, does it?

23       "ANSWER:  That's right.

24       "QUESTION:  Okay.  And Senate Bill 14 does not

25       include all forms of government-issued photo ID, does

Dewhurst / by excerpts of Deposition - Cross                78

1      it?

2      "ANSWER:  No, it does not.

3      "QUESTION:  Can you please mark this as Exhibit 38?"

4      **MS. WESTFALL:**  Or PL-214.

5      "QUESTION:  You've been handed what's been marked as

6      Exhibit 38.  Does this pool look familiar to you?

7      "ANSWER:  The -- I believe I've seen this poll

8      before.  I've seen a poll from Lighthouse.

9      "QUESTION:  Do you remember that this poll was

10     referenced during the testimony on the debate of

11     Senate Bill 14?

12     "ANSWER:  I believe I remember that.

13     "QUESTION:  If you look at the third page of this

14     document, the Bates number ending in 9047, the third

15     page, so the front of the second page.

16     "ANSWER:  Uh-huh.

17     "QUESTION:  On the very bottom it says, 'Photo Voter

18     ID Requirement.'

19     "ANSWER:  Yes.

20     "QUESTION:  Do you see that the question says, 'Do

21     you favor or oppose requiring a valid photo ID before

22     a person is allowed to vote?'

23     "ANSWER:  Yes.

24     "QUESTION:  This particular poll question does not

25     define or limit the term 'valid photo ID,' correct?

 1              "ANSWER:  Correct.

 2              "QUESTION:  Aside from the cost of underlying

 3         documentation to obtain an EIC, were you concerned

 4         that low-income individuals would have to pay costs

 5         to travel to obtain an EIC?

 6              "ANSWER:  No.  Because that's an individual's

 7         responsibility.  Our bus system works in most large

 8         cities.  Most people have relatives who have a

 9         driver's license, if they don't have a driver's

10         license, and can drive.  But that's an individual

11         responsibility to get to a centrally located location

12         and get your free voter ID so you can vote."

13              **MS. WESTFALL:**  I have no further questions.

14              **THE COURT:**  Okay.

15              **MR. SCOTT:**  Your Honor, at this time, the defense

16    would call Professor Trey Hood.

17         **(Pause)**

18              **THE COURT:**  Good morning.  Right up here.  And you

19    can raise your right hand.

20              **M.V. HOOD, III, DEFENDANTS' WITNESS, SWORN**

21                        **DIRECT EXAMINATION**

22    BY MR. SCOTT:

23    Q    Professor Hood, take a moment and tell the Court a little

24    bit about yourself.

25    A    Sure.  My name is M. V. Hood, the Third.  I'm also known

1    as "Trey," because I'm the third.  I'm currently a Professor of

2    Political Science at the University of Georgia.  I've been at

3    the university for 15 years now, since August of 1999.

4    Q    Do you have tenure at the University of Georgia?

5    A    Yes.

6    Q    And where'd you grow up?  Texas?

7    A    I grew up in Texas, in Waco.

8    Q    Where did you go to undergrad?

9    A    A And M.

10   Q    Where'd you get your Master's?

11   A    Baylor.

12   Q    And how about your Ph.D.?

13   A    Texas Tech.

14   Q    And what is your undergraduate degree in?

15   A    Political Science.

16   Q    How about your Master's and Ph.D.?

17   A    Political Science.

18   Q    And through your entire career, have you operated as a

19   Professor in the field of political science, or an Assistant

20   Professor?

21   A    Yes, at various stages of rank within that, yes.

22   Q    What type of classes do you teach currently over there at

23   the University of Georgia?

24   A    Currently I'm teaching -- well, right now I'm teaching a

25   large American Government section class.  I teach honors

Hood - Direct / By Mr. Scott                                    81

1   classes in American Government.  I teach courses in Southern

2   Politics.  I've taught graduate courses in Southern Politics,

3   and also a graduate course in Election Administration.

4   Q    Have you written any articles that have been published --

5   A    Yes.

6   Q    -- in peer reviewed journals?

7   A    Yes.

8   Q    Have you written any books?

9   A    Yes, I've written one book.

10  Q    Have you -- as part of the academic analysis or the work

11  product you've done in the academia, have you undertaken to

12  examine elections and the impact of voter IDs on those

13  elections?

14  A    Yes.  I mean, my general area of study is American

15  politics and policy.  And within that, I've tended to focus

16  throughout my career on southern politics, racial politics,

17  electoral politics, and election administration, yes.  And I've

18  written at least two articles specifically on the Georgia voter

19  ID law.

20  Q    What are the peer reviewed publications you've authored?

21  A    Well, they're detailed in my vitae.

22  Q    Okay.  Well, you've attached a copy of your vitae to a

23  report that was filed with this Court, a declaration.  You've

24  also filed -- or we filed on your behalf a supplemental

25  declaration that you worked -- on the work product and the

1    things you've derived in this case, correct?

2    A    That's correct.

3    Q    We're not going to talk about all those things.  We're

4    going to target a little bit of it for the benefit of the

5    Court.  But by no means are the subjects we're addressing today

6    the limitation on the opinions that you've developed in this

7    case; is that correct?

8    A    That's correct.

9    Q    Those opinions are more fully set out in your report that

10   have been filed with the Court.

11   A    I would agree with that, yes.

12   Q    In addition, next week you're going to be filing a

13   supplemental report as a result of some additional information

14   that's going to come to light, correct?  You understand that.

15   A    That's my understanding, yes.

16   Q    As part of doing your analysis in this case -- well,

17   strike that.  Have you testified as an expert before in other

18   cases?

19   A    Yes, sir.

20   Q    What type of cases have you testified in?

21   A    A number of them involved voter ID specifically.  Other

22   types of cases involved other times of election administration

23   matters like redistricting or early voting.

24   Q    And the process by which someone analyzes a -- the voter -

25   - the effects -- the potential effects of a voter ID law, such

Hood - Direct / By Mr. Scott                          83

1    as SB 14, have you followed the methodologies that you've used

2    in other cases, at least in part?

3    A    Yes, at least in part.

4    Q    Are the way that you performed your analysis in this case,

5    were those widely accepted and proper in the field of political

6    science?

7    A    Yes, I believe so.

8              **MR. SCOTT:**  At this time, your Honor, we would offer

9    Professor Hood as an expert in the fields of American Politics,

10   specifically Election Administration, Election Politics, Racial

11   Politics, and Southern Politics.

12             **THE COURT:**  Okay.

13   **BY MR. SCOTT:**

14   Q    Doctor, what were the analysis you performed and were

15   asked to do in this case?

16   A    I was specifically asked to do two things.  I was asked to

17   examine the potential overall impact of SB 14 on the Texas

18   electorate, and to respond specifically to a couple of expert

19   witness reports in this case, specifically Professor

20   Ansolabehere and the expert report from Professors Barreto and

21   Sanchez.

22   Q    Did you actually create a no match list of your own?

23   A    No.

24   Q    So your analysis that you performed in this case was of

25   Dr. Ansolabehere and the United States' Department of Justice

Hood - Direct / By Mr. Scott                              84

1   no match list that they created; is that correct?

2   A    Yes.  There are various permutations of that, but I was

3   always using the most recent list that had been provided by

4   Professor Ansolabehere.

5   Q    So now let's turn over to the same questions about the

6   Barreto Sanchez -- Professors Barreto and Sanchez survey.  Did

7   you actually go out and perform a survey of your own?

8   A    No, I did not.

9   Q    Were you able to, by using the data of the survey results

10  from Barreto -- Professors Barreto and Sanchez, able to analyze

11  what they had done?

12  A    Yes.  The dataset from the survey was forwarded to me for

13  analysis.

14  Q    And you derived some opinions based upon that dataset; is

15  that correct?

16  A    That dataset and then the no match list that had been

17  created.

18  Q    So what do you think the future effects of SB 14 are?

19  A    Well, the future effect if the law was left in place would

20  be to make it pretty difficult to perpetrate in-person voter

21  fraud at the polls.

22  Q    Anything else?

23  A    I guess secondary to that, you know, it could increase

24  voter confidence in the election system.

25  Q    Did you do an analysis of the Texas legislature to

1   determine the purpose that they had in passing SB 14?

2   A    No, I did not do such an analysis.

3   Q    And you were not asked to, correct?

4   A    That's correct.

5   Q    What is the process by which in political science one

6   would undertake to determine what the purpose of a legislative

7   body, such as Texas, in passing SB 14 is?  How would you

8   conduct such a study?

9   A    Well, I think there's a number of ways you could look at

10  that particular question.  You could do empirical analyses of

11  roll call votes or votes on amendments that had been related to

12  SB 14, whether they passed or not.  You could also look at the

13  -- you know, do a qualitative study analyzing the actual

14  structure and content of the amendments and what they were

15  offering, as well as, you know, looking at the debate

16  transcripts related to that particular piece of legislation

17  when it was up in committee or for a floor vote.  So there's a

18  number of ways you could sort of try to hone in on that

19  question.

20  Q    In analyzing the Professors Ansolabehere, Barreto, and

21  Sanchez, did you observe that they had made such an analysis of

22  any of the content -- I'm sorry, of any of the legislative

23  activities?

24  A    No.

25  Q    And you did not actually look at any of the rest of the

Hood - Direct / By Mr. Scott                    86

1  professors who have testified on behalf of the party Plaintiffs

2  in this case, correct?

3  A    That's correct.  I concentrated on those two reports

4  specifically.

5  Q    Do you know approximately when SB 14 was implemented in

6  Texas?

7  A    Approximately in June of 2013.

8  Q    And do you know how many statewide elections have taken

9  place under the terms of Senate Bill 14?

10 A    There have been three statewide elections that have

11 occurred:  2013 constitutional amendment election, the 2014

12 party primary, and the 2014 party primary runoff.  And there

13 have been various, you know, local and special elections also

14 held post-implementation.

15 Q    Did you make an analysis of the people -- well, the

16 turnout of the people on Dr. Ansolabehere's no match list?

17 A    Yes.  I took the no match list at various points -- and I

18 guess we'll just talk about the most recent no match list so

19 we're all on the same page --

20 Q    Yes.

21 A    -- the 786,000.  So, yes, I took that no match list and

22 ran it against voter history files from the Secretary of

23 State's Office to determine if anyone on the no match list had

24 turned out to vote in one of these post-implementation

25 elections.

Hood - Direct / By Mr. Scott                              87

1        **MR. SCOTT:**  So, Brian, will you bring up

2   demonstrative aid number 1?

3   Q    Doctor -- I mean, Professor Hood, what are we looking at

4   on the screen?

5   A    This is just a graphic that I created to give some overall

6   aggregate numbers.  And the 786,727 is the size of the latest

7   no match list.  So it's believed from Professor Ansolabehere's

8   numbers that that number of Texas registrants lack a valid form

9   of SB 14 identification.

10  Q    So let's run through them overall quick, and we'll

11  probably turn back to this.  But the next I guess bar there is

12  identified as disabled.  What does that relate to?

13  A    So this would be the set of registrants who were

14  identified again through the data matching procedure as having

15  a qualifying disability under SB 14.  So these would be people

16  that matched records in Social Security database or the

17  Veteran's Benefits database, and they have a 50 percent or

18  greater disability rating.  So that amounted to 85,031

19  registrants.

20  Q    The next bar you have on the "X" axis is the 65 and older;

21  is that correct?

22  A    That's correct.

23  Q     And --

24  A    So the --

25  Q    -- what's that?

1    A    Just pretty much exactly what it looks like.   There are

2    177,360 registrants on the no match list that are 65 or older.

3    Q    Okay.  And so let's skip the next one.  Let's -- although,

4    I guess, not skip it completely.  The next one says "voted once

5    since implementation."  That's 37,592.  And then let's switch

6    over to the final, which is the affected population.   And

7    you've got 512,920.  What's that number derived from?

8    A    Okay.  So I calculate a different subset of the no match

9    list that I call the affected population.  And so this would be

10   any registrant on the no match list who was under 65, who had

11   not been able to vote in a post-implementation election, or who

12   did not have a qualifying disability.

13   Q    Okay.  So now one of the things that you've pointed out on

14   this list is --

15            **MR. SCOTT:**  And let's go to that.  Brian, could you

16   enlarge the voting since implementation?

17   Q    You've identified 37,592 people who have -- were on

18   Dr. Ansolabehere's no match list who have in fact cast ballots

19   since the implementation of SB 14; is that correct?

20   A    That's correct.  And I'd just like to point out, these are

21   unique voters because some of these individuals actually voted

22   in more than one of these elections.  So these are all unique

23   voters.

24   Q    So there's no duplicates in there?

25   A    No.

1   Q    Okay.  Yes, there's no duplicates in there?

2   A    Yes, there's no duplicates.

3   Q    Okay.  Brian -- well, wait.  Have you analyzed how these

4   people voted?

5   A    I was able to parse those numbers out a little bit further

6   using again data from the Texas Secretary of State's Office.

7         **MR. SCOTT:**  Brian, would you bring up demonstrative

8   aid number 2?

9   Q    So what are we looking at here, doctor?

10  A    So this is a further division of those 37,500 --

11        **MR. DELLHEIM:**  Excuse me, your Honor.  I'm sorry to

12  interrupt.  We have not seen this demonstrative.

13        **MS. ROSCETTI:**  These were sent out last night from

14  Dave Whitley.

15        **MR. DELLHEIM:**  Forgive me.  I'm incorrect.  I'm

16  sorry.

17        **THE COURT:**  It's okay.

18        **MR. DELLHEIM:**  Thank you.  I'm sorry to interrupt,

19  John.

20        **MR. SCOTT:**  Here, I tell you what.  Richard, let me

21  let you -- I'll do the ones on the screen.  Here's the --

22        **MR. DELLHEIM:**  I appreciate it.  Thank you so much.

23  I apologize.

24  //

25  //

1    BY MR. SCOTT:

2    Q    So what are we looking at here?

3    A    This is the method of voting used by those 37,500, I

4    think, 92, voters that I identified as having voted post-

5    implementation.  So in Texas, you can cast a ballot absentee by

6    mail, you can vote early in person, or you can vote on election

7    day at the precinct in person.

8    Q    And what percentage were you able to derive out of those

9    37,000 who had voted in person in the election since the

10   implementation of SB 14?

11   A    So 81 percent of the 37,000 voted exclusively in person.

12   So, again, they may have voted in person more than once even,

13   but they only used the in-person voting.  So that would be

14   early in-person or election day at the precinct in person.

15   Q    Well, and if we go up one section, it says in-

16   person/absentee.  So 1.4 percent of that 37,000 voted in person

17   in one of the elections, but they also voted absentee.

18   A    Right.

19   Q    Okay.

20   A    But they at least voted in person at least once.

21   Q    And then the charts up there above, you've got absentee

22   who you've identified as -- well, explain that how -- they look

23   like the --

24   A    Well, these -- this is a division of those that voted

25   absentee by mail.  Of those total votes, 16.2 percent were

Hood - Direct / By Mr. Scott                               91

1    absentee ballots cast by those 65 and older, and 1.5 percent

2    were absentee ballots cast by those under 65.

3    Q    And, again, this is not using your derived numbers.  This

4    is using the Department of Justice's numbers and analyzing

5    those numbers, correct?

6    A    Yes, using the Secretary of State data.

7    Q    Okay.  So how do you explain -- how is it possible that

8    this number of people on the no match list voted?  Were you

9    able to come up with an explanation, I guess?

10   A    Well, can I make one other point about this --

11   Q    Sure.

12   A    -- graphic before I forget.  So what we see here is that

13   you can take the 81 percent, plus the 1.4 percent, those are

14   individuals that voted in person at least once.  So they had to

15   have had an SB 14 identification to comply with the law.

16   Sixteen .2 percent of the total number voted absentee by mail,

17   but they were 65 or older, so they qualified to vote absentee

18   by mail.  So really almost everyone in this graphic, save the

19   1.5 percent up at the top there, either were qualified to vote

20   absentee by mail and bypass the identification qualifications,

21   or they have -- they've turned out to vote in person and must

22   have a valid ID.  So almost everyone in this graphic is either

23   essentially not affected because they voted absentee by mail or

24   they made adjustments post-implementation to get an ID.

25            MR. SCOTT:  Okay.  And so Brian, bring up -- back up

1    number 1.

2    Q    To put I guess the fine tooth on that, that is why you

3    have gone, at least in evaluating Dr. Ansolabehere's list, from

4    786,000 down to the 512,000 number on the far right-hand,

5    correct?

6    A    Yes.

7    Q    Okay, all right.

8         MR. SCOTT:  So, Brian, will you bring up

9    demonstrative number 3?

10        THE COURT:  Now, and those demonstratives are in the

11   report as charts, or no, you all just took the numbers in the

12   report and made demonstratives?  Which is fine.

13        MR. SCOTT:  Yes, ma'am.  We will leave one with the

14   Court as well.

15        THE COURT:  (Indiscernible)

16   BY MR. SCOTT:

17   Q    So what are we looking at right now?

18   A    These are just some summary numbers that I created based

19   off of these various categories that we've been talking about.

20   So from Professor Ansolabehere's latest iteration of the no

21   match list, 5.8 percent of Texas registrants are thought not to

22   possess valid SB 14 identification.

23   Q    So let me -- let's make sure --

24        MR. SCOTT:  Brian, will you enlarge that?

25   Q    When you talk about 5.8 percent, that is off of

Hood - Direct / By Mr. Scott                      93

1  Dr. Ansolabehere's no match list.  It represents 5.8 percent,

2  correct?

3  A     Yes.

4  Q     That's the 786,000 and some odd number, correct?

5  A     That's correct.

6  Q     All right.  What's this?

7  A     Well, that's the potential number of registrants who may

8  be affected by the law.  So, again, this is anyone who doesn't

9  have a valid SB 14 identification or who is under 65 or who

10 does not have a qualifying disability or who has not voted

11 post-implementation.  So that's 3.8 percent of the total

12 registrant population.

13 Q     And, again, you derived this using Dr. Ansolabehere's

14 information, correct?  And this number is the net number after

15 -- of your -- what the 500 and some odd thousand souls that

16 you've identified being on the affected population, correct?

17 A     That's correct.

18 Q     Okay.  And this is out of the overall 13 million --

19 A     Approximately 13 and a half million --

20 Q     Of?

21 A     -- Texas registrants.

22 Q     Registered voters, okay.  So what is this chart?

23 A     So that is just simply the percentage of registrants

24 thought to have valid SB 14 identification, 94.2 percent.

25 Q     Now, that is Dr. Ansolabehere's current -- that's his

1   estimate.  That's not yours, correct?

2   A    Correct.

3   Q    I mean, that's his match list as a percentage of that 13

4   and a half million people, correct?

5   A    Correct.

6   Q    All right.  And that number plus this number of the first

7   chart, the 5.8, gives us the hundred percent of that universe.

8   A    Yes.

9   Q    Okay.  So what is this?

10  A    This is I guess you could say the segment of the

11  registered population that should be unaffected.  So, again,

12  these individuals, or these registrants, have a valid SB 14

13  identification, they're 65 and older and can vote an absentee

14  ballot without -- with that excuse.  They have a qualifying

15  disability under the law or they voted post-implementation.

16  Q    So 96.2 -- it's your opinion that 96.2 percent of the

17  population of Texas that's registered to vote is unaffected by

18  the terms -- by looking at Dr. Ansolabehere's list is

19  unaffected by SB 14, correct?

20  A    Yes.

21  Q    Did you do an analysis of the racial makeup of either this

22  5.8 percent or this 3.2 percent?

23  A    No, I did not.

24  Q    And why did you not do that?

25  A    I wasn't asked to look into that question.

1  Q    And what would you need to have before you were able to do

2  such a racial analysis?

3  A    Well, in Texas, we don't know a registrant's race.  That's

4  not part of the registration process in Texas.  It is in some

5  states, but not Texas.  So before -- so we have to estimate

6  race or ethnicity of registrants.  But before we could

7  undertake that, we would need to have as accurate a rendering

8  as possible of those that we believe not to possess valid

9  identification, because we are going to have to build an

10 estimate on top of an estimate.

11 Q    And each time you build an estimate on top of an estimate,

12 does that magnify the potential errors?

13 A    It could if there are errors, yes.

14 Q    Well, does the TEAM database in Texas, which is the

15 Secretary of State's registered voter database, does it

16 identify anywhere in there the race of the registrants?

17 A    There's no self-reported racial data in the TEAM database.

18 Q    And that's what you were referring some states actually do

19 capture that information, correct?

20 A    That's correct.

21 Q    For instance, South Carolina and Georgia.

22 A    That's correct.

23       **MR. ROSENBERG:**  Objection, leading, your Honor.

24       **THE COURT:**  Sustained.

25       **(Pause)**

1  **BY MR. SCOTT:**

2  Q    So when you were doing your analysis of Dr. Ansolabehere's

3  no match list, did you find any errors on the database

4  provided?

5  A    Some of the data was erroneous, yes.

6  Q    Let's walk through what you found.

7  A    Okay.

8  Q    Or maybe give a couple of examples for the Court.  And by

9  erroneous, how were you able to determine it was erroneous?

10 A    Just dates of birth, for instance, that were completely

11 nonsensical, you know.

12 Q    What's a nonsensical date of birth?

13 A    You know, like 1/1/1900, for instance.

14 Q    Well, so you take those two or three people, four people

15 out of the system, and then you do your evaluation?

16 A    Well, any time I was doing age calculations, yes, I

17 truncated the age range to some kind of valid range, between I

18 think 18 and 105 is where I truncated it.  So if someone had --

19 for my analysis that we just looked at, for age, if someone had

20 a completely nonsensical date of birth, you know, they were

21 just coded as missing.  I couldn't make use of them.

22 Q    So -- well, how many people in Dr. Ansolabehere's list had

23 a date of birth that would make them 114 years old?

24 A    Well, I don't know specifically on his no match list, but

25 the TEAM database, I have some information in my reports on

Hood - Direct / By Mr. Scott                    97

1   that.

2   Q    Oh, great.  What was that?

3   A    Let me flip over here real quick.  It looks like there

4   were 18,432 registrants on the TEAM database that had a date of

5   birth of 1/1/1900.

6   Q    So there were over 18,000 people on the TEAM database that

7   have a date of birth of 114 or more?  I mean, it makes them 114

8   years old, correct?

9   A    Yes.

10  Q    And as a result of your analysis, you pulled those

11  individuals completely off the TEAM database matching ship that

12  you received from the Department of Justice for your analysis,

13  correct?

14  A    Well, from -- I think to be very specific, from the no

15  match list that was eventually sent back to me, if someone had

16  a date of birth that looked like that, I coded it as missing so

17  they wouldn't be a part of the analysis --

18  Q    Okay.

19  A    -- because we really don't know how old that individual

20  is.

21  Q    How about deaths?  I know Dr. Ansolabehere testified that

22  he took out the deaths that came from the Department of Public

23  Safety.  Do you have any criticisms of that?

24  A    I mean, he did use the DPS database and reported deaths in

25  the DPS database to remove decedents from the registration

Hood - Direct / By Mr. Scott                    98

1   database, that's true.  But if you're using the DPS database to

2   do that, you can only do that where there's a match between the

3   DPS database and the TEAM database.  So anyone that doesn't

4   match, you know, we can't remove them as being deceased

5   necessarily.

6   Q    That's clever.  You can take -- if you take -- if you

7   limit it to the Department of Public Safety information about

8   deaths, you automatically are only going to pull people off of

9   potential match lists, correct?

10  A    Well, they have to match.

11  Q    Because otherwise -- that makes sense, okay.  So how would

12  -- how did he adjudicate the deaths on the no match portion in

13  doing his analysis?

14  A    Well, he does turn to some other data sources.  Again, he

15  can't use an official state data source at that point.  But I

16  think he uses some data from Catalyst.

17  Q    And do you recall how many people approximately that were

18  removed by Dr. Ansolabehere from the -- using DPS numbers from

19  otherwise that would have been on the match list?

20  A    I think I have that in my supplemental report.  Footnote

21  10 of my supplemental report -- and I'm -- I think this should

22  be the latest no match list iteration -- I have a figure of

23  76,882 records have been removed from the TEAM database because

24  they were believed to be deceased.

25  Q    Did you find any other errors in -- well, how -- what --

1    were you able to determine how -- what percentage of the TEAM

2    database had full Social Security numbers, nine digits?

3    A    Yes, I was.

4    Q    What number was that percent-wise?

5    A    Fifty-one .09 percent had a full S. S. nine.

6    Q    So the other 49 percent just had a partial or no Social

7    Security number attached to it, correct?

8    A    Partial or none, yes.

9    Q    Okay.  So did you make an evaluation of provisional

10   ballots that were cast in the State?

11   A    Yes, I did.

12        **MR. SCOTT:**  Brian, would you show Table 12?

13   Q    Now, this was a report -- this is in your report.  It's

14   Table 12 in your report, correct?

15   A    Correct.

16   Q    Walk us through a little bit about what this chart is.

17   A    This is an analysis of provisional votes that have been

18   cast in Harris County during the 2013 constitutional amendment

19   election and the 2014 primary.

20   Q    And were you able to develop a knowledge of what the

21   number of provisional votes were cast and how they -- were the

22   problems with the individual provisional ballots?

23   A    Yes.  So you get pretty specific in terms of why

24   provisional votes were being cast; and, in this case, we wanted

25   to look at provisional votes that were being cast for ID

1    reasons.

2         **MR. SCOTT:**  Brian, would you bring up demonstrative

3    aid number 4, please?

4    Q    What are we looking at, doctor?

5    A    Well, this corresponds directly to the table we were just

6    looking at.

7    Q    Okay.

8    A    And it's just a graphical presentation.

9    Q    One color's red, one color is blue.  What do those

10   reference?

11   A    Okay.  The red represent the 2014 primary and the blue the

12   2013 constitutional amendment election.

13   Q    Okay.  And so -- and what were the findings of your

14   analysis?

15   A    Well, we can start at the bottom and see that of the total

16   votes cast in those elections in Harris County, .27 were

17   provisional and .17 in the primary -- .27 in the constitutional

18   amendment election and .17 in the primary election.

19        **MR. SCOTT:**  So, Brian, go back out to the greater

20   demonstrative.

21   Q    That's .27 percent of one percent, two-tenths of one

22   percent, correct?

23   A    Yes.  Yeah, the axis ends at one percent, not a hundred

24   percent; one percent.

25   Q    So this is not 100.  This is -- the one percent on your

Hood - Direct / By Mr. Scott                              101

1   chart does not represent 100 percent.  This is one percent of

2   the way to a hundred way over here, correct?

3   A     Way over there, yes.

4   Q     Way over there, okay.  So two-tenths of one percent of the

5   population in the 2013 constitutional election -- I'm sorry, of

6   the registered voters in Harris County cast a provisional

7   ballot; is that correct?

8   A     Correct.

9   Q     And in the primary, .17 percent of one -- well about two-

10  tenths again, two-tenths of one percent cast a provisional

11  ballot in Harris County, correct?

12        **MR. DELLHEIM:**  Your Honor, we're going to object to

13  the continuing leading.

14        **THE COURT:**  Sustained.

15  **BY MR. SCOTT:**

16  Q     So what else did you find?  What did you find -- what's

17  this next bar relate to?

18  A     Well, of course provisional ballots can be cured, as they

19  call it in Texas.  So sometimes someone can correct the problem

20  and have the provisional ballot converted to a regular ballot.

21  So that's what the next set of bars looks at.

22        So the next set of bars looks at the number of

23  provisional ballots as a total that were not cured and,

24  therefore, not counted in the end, and that equates to .16

25  percent in the Constitutional Amendment election or .08 percent

1    in the 2014 Primary.

2    Q     And in the next chart up there it says "PB-ID issue."

3    A     Okay.

4    Q     What's that relate to?

5    A     So now I've subset the provisional votes, the provisional

6    ballots specifically for those that were cast because of an ID

7    problem.  Again, only typically about 10 to 15 percent of

8    provisional ballots being cast were for ID reasons.  Other

9    reasons someone might cast a provisional ballot include, you

10   know, registration issues or showing up to vote at the wrong

11   Precinct, so only about 10 to 15 percent of the total

12   provisional ballots were for ID reasons.

13          And then if you look at that out of the total vote

14   it's .04 percent for the 2013 Constitutional Amendment election

15   or .02 percent for the 2014 Primary.

16          And then, again, if someone casts a provisional

17   ballot for ID reasons they have recourse to bring an ID in

18   before the vote is canvased and have that provisional ballot

19   converted to a regular ballot.

20          So in the end, the last set of bars up at the top of

21   this figure are the percentage of provisional votes cast for ID

22   reasons that were not eventually counted, and that equates to

23   approximately the same percentage.  The numbers go down a

24   little bit, the aggregate numbers, but percentage-wise it's .04

25   percent of the 2013 Constitutional Amendment election or .02

1   percent of the 2014 Primary.  So of those voters that showed up

2   to vote in Harris County on Election Day, these -- the very top

3   bar graphic there, this is the percentage of the voters that

4   were impacted that showed up by SB 14.

5   Q    Now did you do an analysis of any other counties other

6   than Harris County?

7   A    Well, I'd also like to point out one other thing on this

8   graphic if I could?

9   Q    Sure.

10  A    You can see that the number of provisional ballots and the

11  number of provisional ballots cast for ID reasons falls across

12  those two elections, so there are more in the 2013

13  Constitutional Amendment election as compared to the 2014

14  Primary.

15  Q    Okay.  Is that because there was a larger turnout?

16  A    No.  I guess you could -- one argument might be that

17  voters are adjusting to the effects of the new law.

18  Q    So let's get back to that other question.

19  A    Okay.

20  Q    Did you expand your view of provisional ballots?

21  A    I did.  I did an analysis encompassing nine of the 10

22  largest counties by population in Texas.

23       **MR. SCOTT:**  Brian, would you bring up Table 13 out of

24  Professor Hood's report?

25  Q    Now what are we looking at?

1    A    These are -- this is very similar to the table we just

2    looked at although this encompasses nine out of 10 of the

3    largest counties, again in Texas, and this is only for the 2013

4    Constitutional Amendment election that was held post-

5    implementation.

6              So the one -- the one missing county is Dallas

7    County.  I wasn't able to obtain any data from Dallas County.

8    Q    Why is that?

9    A    To my understanding they never reported any data on

10   provisional ballots.

11   Q    Okay, if they did you did not receive it, correct?

12   A    I didn't receive it.  If they had and I had it I certainly

13   would have included it in this table.

14   Q    Okay.  So --

15   A    And let me just say, too, that these nine -- even though

16   these are nine out of 10 counties, 10 largest counties and, of

17   course, Texas has 254 counties, nevertheless this is 53 percent

18   of the total vote cast in this election just out of these nine

19   counties.

20   Q    So what we're looking at on Table 13 is an analysis of 53

21   percent -- a sub-analysis of 53 percent of the overall votes

22   cast in that election, correct?

23   A    Yes.

24   Q    Okay.

25             **MR. SCOTT:**  So, Brian, will you pull up Demonstrative

1    A again?  There you go.

2    Q    What are we looking at?

3    A    This is very similar, again, to the other graphic, and

4    this is based off the table we were just looking at, so this is

5    the percentage of provisional ballots cast from the nine

6    counties in the 2013 Constitutional Amendment election, amounts

7    to .21 percent, again, about two-tenths of a percentage point.

8              Provisional ballots not counted from these counties

9    amounts to .14 percent.

10             Provisional ballots cast specifically for ID reasons

11   amounts to .03 percent.

12             And the same for Provisional ballots cast for ID

13   reasons that were not eventually counted amounts to .03 percent

14   of the total votes cast in these nine counties.

15   Q    And were you able to make any conclusions or come to an

16   opinion on how these relate to the results that you've already

17   described over for Harris County?

18   A    Well, they're in line with those results.  Again, of those

19   that showed up to vote at the polls in this particular election

20   in these nine counties I guess we could say that .03 percent

21   were affected directly by SB 14.

22   Q    So did you have an opportunity to review the results?

23   Let's turn our attention to the surveys.

24   A    Okay.

25   Q    You had an opportunity to review the materials provided by

Hood - Direct / By Mr. Scott                    106

1    Professors Barreto and Sanchez, is that correct?

2    A    That's correct.  I had their expert report.  I had some

3    ancillary documents and appendix that they included with the

4    report, and the actual data set, the survey data set.

5         **MR. SCOTT:**  So, Brian, will you show Plaintiffs

6    Exhibit 754, and specifically Page 26?  And Paragraph -- I'm

7    sorry, Page 9, Paragraph 26?

8    Q    So I'm going to turn your attention to that last sentence

9    there.  "It is very problematic to assume future behavior on

10   the part of the survey respondents."  Do you see that?

11   A    Yes.  Yes, sir.

12   Q    Isn't that what Drs. -- or Professors Barreto and Sanchez

13   were doing in their report?

14   A    Certainly, yes.

15   Q    I mean, why do you find that problematic, or any criticism

16   you might have of that?

17   A    Well, Professors Barreto and Sanchez obviously did a

18   survey trying to determine levels of ID possession in Texas and

19   this is in response.  This is in a rebuttal report they issued

20   to both myself and Professor Milyo, and this is in response to

21   one of his questions but, again, just because certain factors

22   were found to be in place in the survey doesn't mean that

23   things can't change, or that the survey respondents may not

24   change their behavior.  For instance, if someone didn't have an

25   ID they might change their behavior to come into compliance

Hood - Direct / By Mr. Scott                          107

1   with the law.

2   Q    Well -- and in fairness to Professors Barreto and Sanchez,

3   in their depositions -- or Professor Barreto's deposition, he

4   said he envisioned that there would be a group of people, and

5   I'm paraphrasing, that would cycle in and cycle out of these

6   groups, but that the numbers would stay constant throughout

7   time and equilibrium.

8            MR. DUNN:  Your Honor, we're going to have to object

9   again on leading which is getting out-of-hand at this point.

10           MR. SCOTT:  I was going to -- setting up the next

11  question.

12           MR. ROSENBERG:  And, in addition, this goes beyond

13  opinions that he's given in his report.

14           THE COURT:  Sustained as to leading.

15  BY MR. SCOTT:

16  Q    And so -- well, let's turn our attention, let's focus in a

17  little more detail on the Barreto-Sanchez survey.

18  A    Okay.

19  Q    Were you able to replicate the Barreto-Sanchez survey?

20  A    So I received the data set of the survey responses and

21  with various additional variables appended to it that

22  Professors Barreto and Sanchez had created, and the first thing

23  I tried to do was just simply replicate the results that they

24  got that they reported in their expert report.  And the answer

25  is no.  I was able to get close, but I was never able to get

1   right on their numbers.

2   Q    Well, had you ever attempted before to try and analyze

3   somebody else's survey using their data?

4   A    Certainly.

5   Q    How many times?

6   A    I mean, certainly, you know, in an academic setting many

7   times.  I mean, I -- I've made use of other data sets created

8   by other researchers many, many, many times over the course of

9   my academic career.

10  Q    Are we talking more than two, 200?  Are we talking

11  hundreds or --

12  A    I'd say more than 100, certainly.  I mean, I've made use

13  of all kinds of data sets.

14  Q    And were you able, on most of those occasions, to be able

15  to match the data with the survey?

16  A    I was able to typically -- to typically replicate what

17  someone else has done, yes.

18          **MR. SCOTT:**  Brian, if you'll pull up Page 30 of

19  Professor Hood's report, Table 10B?

20  Q    What are we looking at?

21  A    Well, this was my effort to, or this is my report and my

22  effort to replicate their findings from their survey.

23  Q    And so walk the Court through a little bit about what

24  we're looking at.

25  A    So we could compare this back to 10A which is just the

1   report of their survey findings from their expert report that I

2   included.  But this is my attempt to replicate their survey

3   findings.  So, for instance, if you look at the column over to

4   the right, Percent of Registered Voters Lacking SB 14 ID, and

5   you look down the column, it says "Survey Weight."  That's the

6   survey weight created by Professors Barreto and Sanchez and

7   that was appended to their data set, so I'm using that weight

8   variable.

9            And in this case the numbers I derived from their

10  survey are that 3.3 percent of total respondents -- total

11  registrants, I guess you could say, lack SB 14 identification,

12  and that would include 2 percent of Anglos, 4.5 percent of

13  Blacks and 5.7 percent of Hispanics.

14  Q    So did you then undertake to do an analysis using their

15  survey data to develop some opinions in this case?

16  A    Yes.  Yes, I went beyond just this, yes.

17  Q    And -- okay.  And so did you limit, though, did you use

18  their survey weight, or did you come up with a different survey

19  weight?

20  A    Well, I came up with my own survey weight, but I always

21  report every finding I have on all of these tables using both

22  sets of weights.

23  Q    Okay, so --

24  A    So the Reconstructed Weight column is the weight variable

25  I created, the Survey Weight is the variable that Professors

Hood - Direct / By Mr. Scott                          110

1   Sanchez and Barreto created.

2   Q    So where there's differences you've identified

3   specifically the differences between the two efforts, correct?

4   A    Yes.  Yes, it's all laid out there.

5        **MR. SCOTT:**  So, Brian, if you'll turn to Page 33, and

6   Table 10D?

7   Q    Professor, what are we looking at?

8   A    Well, this is -- this is where I undertook an analysis

9   specifically of the variable or the indicator they created in

10  the survey that tells us whether or not the respondent has a

11  SB 14 identification or not, and I did some recalculations on

12  that particular indicator.

13  Q    Okay.  And walk us through the chart.

14  A    Okay.  Again, it's very similar to the previous chart.

15  The two columns to the left are the Voting Eligible Population,

16  the two columns to the right are the Registrant Population, and

17  then under that there's the results for both their survey

18  weight and my survey weight.

19        So, again, using this recalculated ID Possession Rate

20  variable, if you look down the column where it says "Registrant

21  Survey Weight," we see that 1.8 percent of -- of respondents to

22  the survey are thought not to have valid SB 14 identification,

23  and that would include .9 percent of Anglos, 3.3 percent of

24  Blacks and 3.1 percent of Hispanics.

25  Q    So if we use -- let me make sure I understand that.  If

1  we're talking about percent of registered voters affected by

2  SB 14 using Barreto and Sanchez's data, that would be this

3  column on Table 10B under "Survey Weight," is that correct?

4  A    Well, this -- everything we're talking about uses their

5  data.

6  Q    Okay.

7  A    That's using their weight variable I think specifically,

8  technically.

9  Q    Okay.  And so using that you were able to develop that

10 what percentage of Whites are without -- based on their survey,

11 are without a proper photo ID for purposes of complying with

12 SB 14?

13 A    .9 percent.

14 Q    The same question for persons identified as Black in the

15 survey?

16 A    3.3 percent.

17 Q    And the same question with regard to folks who have

18 identified themselves as Hispanic in the survey?

19 A    3.1 percent.

20 Q    And the same question for -- well, why is there no

21 information for Asians and Native Americans?

22 A    Well, there is information, they are just all zeros.  I

23 mean, any of these tables are going to be zeros for those

24 particular racial groups, Asians and Native Americans and

25 anyone that was put into this category of "Other Race."  And

1  so, in other words, they have 100 percent possession rates for

2  those lower categories.

3  Q    Is that what the survey results were?

4  A    Yes.  Yes.

5  Q    So it's not zero percent?  I was looking at this wrong.

6  So it's 100 percent of Asians, based upon the survey results

7  from Drs. Barreto and Sanchez, possessed proper photo ID to

8  comply with SB 14, is that correct?

9  A    Yes.  I don't think you were looking at it wrong.  Again,

10  this is -- this is nonpossession rates, so the nonpossession

11  rates zero so you can, of course, infer from that that the

12  possession rate is 100.

13  Q    So if my wife, who is a Native American, showed up and was

14  able to say she had -- she falls into this category of surveys,

15  right, we'd expect her to have a photo ID?

16  A    Based on the survey data, yes.

17        **MR. SCOTT:**  So let's turn to Chart 11A, if we could,

18  on Page 34.

19  Q    What are we looking at?

20  A    This is -- this is where I'm, you know, again, this is all

21  using the survey data from Professors Barreto and Sanchez.

22        This would be respondents to the survey who lack

23  proof of citizenship.  So, for instance, lack a birth

24  certificate.  So what I'm doing is I'm counting anyone that

25  already has SB 14 identification, and I'm adding to them anyone

Hood - Direct / By Mr. Scott                    113

1    that is reported in the survey that they have a birth

2    certificate or, for instance, a US certificate of citizenship,

3    some document that would -- that would prove citizenship.

4           And then I'm looking at who is left.  So that the

5    people left are those that either, A, don't have an ID; or, B,

6    on top of that don't have underlying documentation for proof of

7    citizenship.

8    Q    So let's walk through some of the results that you were

9    able to derive using Professors Barreto and Sanchez's data from

10   their survey.

11   A    Okay.  So, again, using registered voters, again under the

12   Survey Weight column, which is -- which is their survey weight,

13   .9 percent of respondents to the survey had neither qualifying

14   SB 14 documentation or some underlying documentation for proof

15   of citizenship.  And if you break that down by racial or ethnic

16   category, that would be 1.2 percent of Anglos, .8 percent of

17   Blacks and .6 percent of Hispanics although, again, I could

18   point out in this particular column that none of the

19   differences between Anglos and Blacks and Anglos and Hispanics

20   are significant, statistically significant.  So we could almost

21   say there's really no difference between Whites, Blacks and

22   Hispanics on this particular metric from the survey.

23   Q    And that's using the Survey Weight that Dr. -- that

24   Professors Barreto and Sanchez used, correct?

25   A    Yes.  Yes.

1  Q     Now you did a reconstructed weight and you came up with a

2  little different numbers, is that correct, for those same

3  fields?

4  A     Yes.  Those would be the correct numbers, yes.

5  Q     And so walk the Court through those.

6  A     Well, if you use the weight that I constructed, 1 percent

7  of the total registrant population would have neither SB 14

8  identification or proof of citizenship, and that would include,

9  if you break it down by race or ethnicity, 1 percent of Anglos,

10 1.7 percent of Blacks and .9 percent of Hispanics.

11 Q     And if we look at Asians and Native Americans, as well as

12 any other races, based upon the data in the survey that was

13 conducted, those folks would have -- or expected, at least

14 based upon those results, to have 100 percent of their

15 population to have birth certificates, correct?

16        MR. DELLHEIM:  Objection, leading -- ongoing leading.

17 BY MR. SCOTT:

18 Q     Okay.  Did you render -- did you render an opinion as to

19 what percentage, based upon the data that you evaluated from

20 Barreto and Sanchez of Asians and Native Americans who were in

21 possession of documents that would give proof of citizenship by

22 race?

23 A     I did.  Using --

24 Q     What was that?

25 A     Using the survey data, again, 100 percent of Asians or 100

1    percent of Native Americans, or 100 percent of those that were

2    -- that were other respondents placed in this Other racial

3    category, had SB 14 identification.

4    Q    And that, again, is based only on the survey results,

5    correct?

6    A    Yes.  This is all just the survey.

7             **MR. SCOTT:**  Could we -- Brian, turn to Table 11B on

8    Page 35, please?

9    Q    What are we looking at?

10   A    This is similar to the table we were just looking at, but

11   I've added some other categories to what we were just looking

12   at.

13            So this is a -- in the end this is who may be

14   affected by SB 14, and that would include someone that doesn't

15   have SB 14 identification; they don't have underlying

16   documentation for citizenship; they are under 65 and,

17   therefore, can't vote absentee with that excuse; they don't

18   have a qualifying disability and they haven't voted in a post-

19   implementation election.

20   Q    And would you go through with the Court --

21   A    So who's -- so basically who's left after we take those

22   categories out.

23   Q    And what were the findings based upon using Professors

24   Barreto's and Sanchez's survey weight along with their survey

25   data?  What were you able to derive?

1  A    Well, again, let's just look at percent of registered

2  voters in the Survey Weight category and look down that column,

3  so .6 percent of the registrant population fall into, again,

4  what I have defined in this particular slide as being affected

5  by SB 14.  And that would include .6 percent of Anglos, .8

6  percent of Blacks and .5 percent of Hispanics, and zero percent

7  of Asians, zero percent of Native Americans and zero percent in

8  the Other racial category.

9  Q    Were -- so were you able to find any inaccuracies in --

10 well, I'll tell you what, let's take a peek at Question Number

11 10.

12         **MR. SCOTT:**  Brian, can you bring up Question Number

13 10 in the Barreto-Sanchez survey?  I think it's on Page 10.

14 And if you'd enlarge that, please, sir?

15 Q    So what are we looking at?

16 A    This is a question from the survey.  This is the survey

17 instrument that was -- that was developed by Professors Barreto

18 and Sanchez, and I did receive a copy of the survey instrument

19 as well.

20 Q    And --

21 A    And this is a question that ask about two specific forms

22 of SB 14 identification.  It asks survey respondents if they

23 have either a State of Texas concealed handgun license or a

24 United States Citizenship Certificate with their photograph.

25 Q    So in -- first of all, I guess, is the US Certificate of

1   Citizenship with photograph, is that a proper form of ID under

2   the terms of SB 14?

3   A    Yes, that would be compliant with SB 14.

4   Q    In the survey data, how many respondents answered yes to

5   possessing a US Certificate with a photograph?

6   A    From my calculations it was 22 survey respondents.

7   Q    And how many of those 22 respondents were coded in the

8   survey data as possessing the Senate Bill 14 IDs?

9   A    I only saw 10 that were coded as possessing this

10  particular form of identification.

11  Q    How were the other 12 coded -- or who should have been

12  coded as possessing SB 14 ID, how were they, in fact, coded in

13  the data?

14  A    They appeared to be coded as not possessing SB 14

15  identification.

16  Q    Were you able to determine the racial breakdown of those

17  persons that were coded incorrectly?

18  A    Of the 12?

19  Q    Yes, sir.

20  A    Yes.  Yes, from -- again, all of this is from the survey

21  data.  It appeared that 11 of 12 of those respondents had self-

22  identified as Hispanic.

23  Q    What effect would that have had on the Hispanic

24  nonpossession rates in the survey?

25  A    Well, it would, in my opinion, artificially drive up the

Hood - Direct / By Mr. Scott                         118

1   nonpossession rate for Hispanics.

2   Q    By how much?

3   A    Well, we can -- we can look back at my tables, that may be

4   the easiest way --

5          **MR. SCOTT:**  How about we pull up 10B, Brian?

6   Q    Is 10B the right one?

7   A    Yes.  Yes, sir.

8   Q    And what are we looking at?

9   A    Well, again, this is -- this is my effort to replicate

10  Professors Barreto and Sanchez's report.  So let's look at the

11  Registered Voter column, Survey Weight column, for Hispanics

12  5.7 percent of Hispanics are thought to not be in possession of

13  SB 14 identification.

14  Q    Okay.

15  A    And then, again, I re-calculated the ID possession rate

16  variable to include those 12 individuals who had a US

17  Certificate of Citizenship with photograph who had not been

18  categorized as having ID as having ID, so I re-coded them.

19          I also re-coded an individual who supposedly had a

20  State ID card, but I could find no evidence in the survey that

21  they had a State ID card, so I actually coded them from having

22  ID to not having ID.

23  Q    Okay.

24  A    So I went the other way with that particular case.

25  Q    And what is the new number that you would get if -- on

1   this survey?

2   A    Well, that's in 10C so --

3          MR. SCOTT:   Brian, would you pull up 10C?

4   A    10C uses my recalculated ID possession variable.  So,

5   again, it would be 3.9 percent, so including those 12 cases

6   would lower the Hispanic nonpossession rate to 3.9 percent.

7   Q    So by excluding them the number went from 3.9 percent to

8   5.7 percent?

9   A    Yes.

10  Q    Were you able, in the survey -- as a result of the survey

11  results, to derive how many people in the survey identified

12  themselves as having EICs?

13  A    Yes.  That was one of the forms of identification that was

14  asked about in the survey.

15  Q    And what were you able to derive?

16  A    I believe it was 2.1 percent reported they had an Election

17  Identification Certificate from the survey.

18  Q    So approximately what is 2.1 -- what's approximately 2

19  percent of 13 million -- 13 and a half million people?

20  A    Well, let me -- I think it's in my report.

21  Q    Okay.

22  A    Let me -- so 2.1 percent of the total registrant

23  population would be 284,852.

24  Q    So if we were to extrapolate out what Professors Barreto

25  and Sanchez had done, we would expect that there would be

1   284,000 plus or minus persons with election ID certificates as

2   we sit here today, correct?

3   A    Yes.

4   Q    Were -- were you here to hear the Department of Public

5   Safety testimony that there's been 279 EICs issued to the

6   State?

7   A    I wasn't here for that testimony, no.  At the time the

8   survey was conducted I did know that there were less 200 EICs

9   that had been issued at that time.

10  Q    So as a result of using that survey material, you were

11  able to derive that Professors Sanchez and Barreto's survey

12  results are over -- at least with regard to EICs, overstate the

13  actual reality by about a thousand times, 1,020, is that

14  correct?

15  A    I didn't convert that into a percentage but, yes, it's

16  over-estimates -- it's greatly over-estimated in the number of

17  EICs, yes.

18          **MR. SCOTT:**  Pass the witness.

19          **THE COURT:**  Let's go ahead and take a 15-minute

20  break.

21          **MR. SCOTT:**  Your Honor, we've marked the sections

22  that we did on that chart.  I don't know if you want them for

23  your (indiscernible), but you may have already got them.

24          **THE COURT:**  Which ones?

25          **MR. SCOTT:**  The ones that we were going through on

1    the technical demonstratives?

2           THE COURT:  Oh, yeah, that's fine.  I don't know if

3    Plaintiffs want to see that, but --

4           THE CLERK:  All rise.

5        **(A recess was taken from 10:12 a.m. to 10:27 a.m.; parties**

6    **present)**

7           MR. DELLHEIM:  Good morning, your Honor.

8           THE COURT:  Good morning.

9           MR. DELLHEIM:  Richard Dellheim for the United

10   States.

11                    CROSS EXAMINATION

12   BY MR. DELLHEIM:

13   Q    Good morning, Dr. Hood.

14   A    Good morning, Mr. Dellheim.

15   Q    Long time no see.

16          I want to talk to you a little bit about some of your

17   testimony regarding turnout and voter ID laws.  You and

18   Professor Bullock published a study in 2012, correct,

19   purporting to show the differences in turnout by race after

20   Georgia implemented its voter ID law, correct?

21   A    That's correct.

22   Q    And one of the findings of that study was your conclusion

23   that the implementation of Georgia's photo voter ID law

24   directly resulted in an across-the-board depression in voter

25   turnout, correct?

1   A    That's correct.

2   Q    Okay.  And the depression in voter turnout was for all

3   racial and ethnic categories, correct -- the White voters?

4   A    Excuse me.  Yes, sir.

5   Q    Okay.  So turnout for White voters dropped.  Turnout for

6   African American voters dropped, correct?

7   A    Correct.

8   Q    Turnout for Hispanic voters dropped, correct?

9   A    Correct.

10  Q    And you pinned that dip in turnout directly to the

11  implementation of the Georgia voter ID law, correct?

12  A    That was the sole purpose of that academic endeavor, was

13  to try to study the effects, if any, of the implementation of

14  Georgia's voter ID law.

15  Q    Okay.

16  A    So yes.

17  Q    Okay.  And -- but on Pages 10 and 11 of the report you

18  submitted to this court in this case, you state, do you not,

19  that there's been a growing body of scholarly research that

20  indicates -- excuse me.  Strike that.  On -- in your report in

21  this case, you cite a series of studies and you conclude that

22  voter ID laws, in fact, do not impact turnout, correct?

23  A    Many of the other studies I cite couldn't find a specific

24  effect, no.

25  Q    Okay.

Hood - Cross / By Mr. Dellheim                    123

1   A    That's true.

2   Q    Okay.  And those are studies from 2006 and 2007 and I

3   believe one from 2008, correct?

4   A    I think -- yes, I think one of them is fairly -- perhaps

5   even more recent than that.

6   Q    Well, let me ask --

7   A    I don't want to hold things up but -- but anyway, as many

8   -- I did a search and even the most recent studies I included

9   in this.  So --

10  Q    Okay.  But you would agree with me, would you not, that at

11  least as of 2012 that there's been a growing body of scholarly

12  research that indicates that those more likely to be affected

13  by voter ID laws are minority voters?

14  A    Well, from -- not from my sweeps of the academic

15  literature.

16  Q    Okay.  Well, do you recall testifying to that effect in

17  court in front of three federal judges in the South Carolina

18  case?

19  A    Not specifically.

20  Q    Okay.  Let me pull up -- to remind you, let me pull up

21  your deposition testimony in that case.

22          MR. DELLHEIM:  Would you please pull up Page 233 of

23  that deposition?

24  Q    Can you see Line 4?

25  A    Yes, sir.

1  Q    The question is, "There's a growing body of scholarly

2  research that indicates that those were more likely to be

3  affected by the adoption of photo ID or minorities?"

4       Do you recall your answer, sir?

5  A    The answer is, "That is one of the findings from a number

6  of academic studies."

7  Q    Okay.

8  A    I should say that there's some academic studies that I

9  talked about in this most recent report that have been produced

10 since that case occurred.

11 Q    Okay.  And that case was in 2012, correct?

12 A    Yes.

13 Q    Okay.  And that was the question asked and that was your

14 answer?

15 A    Yes, sir.

16 Q    Okay.  You've also written that it's a known fact that

17 those without ID are less prone to participate in elections

18 compared with those who possess photo ID, correct?

19 A    Yes.  That was a finding from a -- we did a series of

20 articles really on the Georgia voter ID statute and one of them

21 was before the law was implemented and so we looked at those

22 registrants in Georgia who we thought lacked ID and looked at

23 their previous voting behavior patterns.

24 Q    Okay.

25 A    And, yes, they typically had lower turnout rates than

Hood - Cross / By Mr. Dellheim                          125

1    those that were thought to possess ID.

2    Q     Okay.  And you have also testified and written in the past

3    about the concept of the costs of voting.  Do you understand

4    what I mean when I say "costs of voting," sir?

5    A     Yes, sir.

6    Q     Okay.  Explain to the Court briefly what that concept

7    means in political science?

8    A     Well, it's not necessarily a monetary cost but it can be

9    the effort required to participate in the electoral process --

10   Q     Okay.

11   A     -- whether that's registering to vote, casting a ballot,

12   et cetera.

13   Q     Okay.  And the theory is that the more costs the system

14   imposes, the less likely a voter may be to turn out to vote,

15   correct?

16   A     Yes, in general.  I mean, there are other factors that

17   could potentially overcome that for some voters.

18   Q     Okay.  And you will -- and you told me in your deposition

19   that you can't think of a political science concept that is

20   more firmly established with respect to voter turnout than that

21   one.  Is that an accurate summary of your testimony?

22   A     I believe so, yes.

23   Q     Okay.

24   A     Certainly related to the literature -- academic literature

25   on voter turnout.

1   Q    Okay.  And you just mentioned examples of some of the

2   costs.  Requiring an ID to vote imposes costs on voters, right?

3   A    If they don't already possess an ID, yes.

4   Q    Okay.  And requiring photo IDs imposes a cost on voters,

5   correct?

6   A    Again, yes, if they don't already possess the proper photo

7   identification.

8   Q    And that's even when the photo IDs are free, correct?

9   A    Yes.  Well, that -- yeah, I was about to say that's --

10  we're not necessarily talking about a monetary cost at this

11  point.

12  Q    Okay.  And requiring a citizen to travel to a government

13  office some place and pay money as a prerequisite to obtaining

14  a photo ID, that also imposes costs, correct?

15  A    That would require effort on the part of the registrant or

16  the citizen to obtain a free -- in this case an EIC in this

17  state.

18  Q    And money, too, right?

19  A    You mean in terms of travel?

20  Q    Well, I just -- part of my question was, if a voter had to

21  go to a government office and pay money to obtain an underlying

22  documentation as a prerequisite to obtaining an ID -- as a

23  prerequisite to casting a vote, that imposes costs, correct?

24  A    If, for instance, they didn't have a proof-of-citizenship

25  document like a birth certificate, I believe it would cost 2 to

Hood - Cross / By Mr. Dellheim                              127

1    $3 in the state of Texas to obtain that, yes.

2    Q    Okay.  Does that cause you any concerns?

3    A    Well, I believe I testified at my deposition that I

4    believe that Texas should waive the fee completely for birth

5    certificates, not for anyone that walks into an office and

6    wants a birth certificate but for those who want a birth

7    certificate to receive an EIC.

8    Q    Okay.  And are you aware that there's been testimony in

9    this court that there are instances where citizens born in

10   Texas who want to obtain an EIC do not have the fees for a

11   birth certificate waived, for instance, in the case of a

12   delayed birth certificate?  Were you aware of that?

13   A    I did not hear that testimony, sir.

14   Q    Okay.  Would it cause you any concern if the evidence in

15   this case showed that some voters may have to pay $47 to obtain

16   a birth certificate in order to obtain an EIC in order to be

17   able to cast a ballot that counts?

18   A    Well, again, having said what I just said in terms of

19   reducing the cost of a birth certificate to zero for those that

20   need an EIC, then yes.

21   Q    Yeah.  And we had talked that this is akin to a poll tax.

22   Remember that conversation we had?

23   A    We had a conversation.  I don't believe that I

24   characterized SB 14 as a poll tax.

25   Q    Well, do you remember me asking you what the difference

1   was between a poll tax and charging voters fees to get

2   underlying documentation?  Do you recall your testimony about

3   the differences that you found between what Texas does now and

4   the traditional poll tax?

5   A    I remember -- I can recall some of that.

6   Q    Okay.  Do you recall testifying that the poll -- that the

7   -- that one difference was that the poll tax money went to the

8   schools while here it goes to whatever entity issues birth

9   certificates?  Do you recall that?

10  A    Well, it's traditionally a poll tax, you know, going back

11  into the mid-1960s and before.  That's what I'm talking about.

12  Typically the poll tax went to the local school system.  That's

13  what I was talking about.

14  Q    Okay.  And the other difference you found between what

15  Texas does now and the traditional poll tax was that under the

16  old system, everyone had to pay the poll tax and here just

17  people without SB 14 ID, right?

18  A    Well, again, I wouldn't characterize paying for underlying

19  documentation as a poll tax, per se, but, yes, someone may have

20  to pay several dollars to get a birth certificate.  That's

21  true.

22  Q    You've testified the reasons that -- why political

23  scientists look at voting costs and why we're talking about it

24  now.  It's because they directly impact turnout, right?

25  A    Yes, sir.

1   Q    Okay.  And the more the institutional costs go up, the

2   less likely a voter is to turn out to vote, right?  Okay.

3   A    Typically, yes.  I mean, again, there are other factors

4   that can counterbalance the cost for voters.

5   Q    Okay.  And your -- and you testified in the *Billips* case

6   with respect to your study in Georgia that the reason that you

7   attributed the dip in turnout in Georgia was because of the

8   cost that the voter ID law imposed on voters.  Do you recall

9   that, sir?

10  A    Well, let me say that the *Billips* case occurred when

11  Georgia's voter ID law was enjoined and I was referring to a

12  study that we conducted prior to implementation.  So I'm not

13  trying to dodge your question.  I think there's a little bit of

14  a disconnect there.

15  Q    Okay.  But it is well-established that -- well, strike

16  that.  I want to go just a little bit farther in this --

17  A    Oh, okay.

18  Q    -- category and we'll move on.  But it's well-established,

19  correct, that socioeconomic status is highly correlated to

20  turnout?

21  A    It's related to turnout, yes.

22  Q    Okay.  Those with higher income, education and

23  occupational prestige have typically turnout for elections at

24  higher rates than those without those things, correct?

25  A    That's correct.

1  Q    Okay.  And it's also -- you've also demonstrated that

2  historically minority voters tend to turn out at lower rates

3  than Anglo or White voters, correct?

4  A    Well, I've -- in fairness, I've studied minority voting

5  patterns for decades.  I mean, I haven't done it for decades

6  but I've studied it over decades and those patterns, in

7  fairness, have been changing as of late.  So I don't know that

8  I would make that statement currently.

9  Q    Okay.  But historically, that has been true, correct?

10 A    Historically, yes.

11 Q    Okay.  And that's in part because of the lower

12 socioeconomic status that minority voters have in comparison to

13 Anglo and White voters, correct?

14 A    Well, that might be one factor, yes.  I'm not going to say

15 that's the only factor related to minority turnout rates.

16 Q    Okay.  And you have found -- strike that.  Let me ask you

17 this.  When you were working this case, did you do any

18 independent analysis to determine the rates at which African

19 American and Hispanic voters turn out to vote in Texas in

20 comparison to White or Anglo voters?

21 A    For this specific case?

22 Q    Yes.

23 A    No, sir.

24 Q    Okay.  Did you do any empirical statewide study of the

25 cost that SB 14 imposes on Texas voters without ID?

1    A    No, sir.

2    Q    Did you look at any geography data or any demography data

3    or any socioeconomic status data of any kind?

4    A    I looked at some geographic data.

5    Q    What did you look at?

6    A    I was looking at the distribution of centers that could

7    deliver EICs around the state.

8    Q    Okay.  You offered no opinion in your report regarding

9    EICs, correct?

10   A    Well, there are some opinions.

11   Q    Forgive me.  You didn't offer any opinion regarding the

12   effectiveness of the EIC program in Texas, correct?

13   A    Not beyond a description of what it is --

14   Q    Okay.

15   A    -- no.

16   Q    So let me ask again.  Did you -- you've done no study

17   whatsoever of socioeconomic status of Texas voters, correct,

18   for your opinions in this case?

19   A    That's correct.  That's correct.

20   Q    Okay.  Did you do any empirical study of turnout rates by

21   race or ethnicity in Texas for your work in this case?

22   A    No, sir.

23   Q    Did you do any study of statewide turnout patterns over

24   time in Texas for your work in this case?

25   A    No, sir.

1    Q    Have you done any empirical study of the rates at which

2    Texas registered voters have ID permissible under SB 14?

3    A    Could you say that one more time, please?

4    Q    Sure.  Have you done any empirical study of the rates at

5    which Texas registered voters have or don't have ID that is

6    permissible under SB 14?

7    A    Well, that was the sole purpose of the no-match list

8    exercise.

9    Q    Did you conduct any data matching in this case?

10   A    Well, no, I didn't -- again, just to clarify, I didn't do

11   the actual data matching but I had the results of the data

12   matching.

13   Q    Okay.

14   A    So I guess it depends on where you want to say the word

15   "analysis" comes in.

16   Q    Okay.  In prior work that you've done in the South

17   Carolina case where you wanted to determine the relative rates

18   at which voters possessed ID, you did your own data matching,

19   correct?

20   A    Yes, I did in that case.

21   Q    And in the Wisconsin case, you did your own data matching,

22   correct?

23   A    That's correct.

24   Q    And in the Georgia case, you relied upon data matching for

25   your analysis in that case, correct?

Hood - Cross / By Mr. Dellheim                    133

1    A    Yes.

2    Q    And you performed some data matching in that case,

3    correct?

4    A    Yes, that's correct.

5    Q    Okay.  You've done no data matching in this case, correct?

6    A    That's correct.

7    Q    And you've done no regression analyses in this case,

8    correct?

9    A    That's correct.

10   Q    And you've done no homogeneous precinct analyses in this

11   case, correct?

12   A    That's correct.

13   Q    And you've done no Spanish surname analysis in this case,

14   correct?

15   A    That's correct.

16   Q    Okay.  Your report asked this Court to consider SB 14 in

17   light of ID laws in other states like Georgia and South

18   Carolina; is that right?

19   A    I do a comparison, yes.

20   Q    Okay.  And you've tested -- and your report states that

21   the Texas ID law is very similar -- I think that's the words

22   you used -- very similar to Georgia's and South Carolina's,

23   correct?

24   A    I can't remember if that's the exact terminology but

25   that's probably -- probably pretty close.

1   Q     I'll represent it to you --

2   A     Okay.

3   Q     -- but we can check.

4   A     Okay.

5   Q     And I think that on Page 8 of your report -- or I'm sorry

6   -- Page 6 of your report, you say that they're very similar

7   because, number one, they all require government photo ID and,

8   number two, they have similar procedures for voters who lack

9   ID.  Does that --

10  A     Those were the similarities between the three states, yes.

11  Q     Okay.  And would you agree with me that the statutes --

12  that if the Texas statute is not, in fact, very similar to

13  those of the other states, then the comparisons that you make

14  are not particularly meaningful?

15  A     Well, I -- you know, in fairness, I point out similarities

16  and differences for these.

17  Q     Okay.  Well, let's talk about the Georgia statute for a

18  second.  You say that on Page 8 of your report that all three

19  states require the presentation of a limited set of government

20  photo IDs; is that right?

21  A     On Page 8?  I'm sorry.

22  Q     I believe it's Page 8.  But it's not -- let me ask you

23  this.

24  A     Okay.

25  Q     You're welcome to look for it but let me ask you this.

1   It's your view that Texas and Georgia and South Carolina ask

2   voters to present a limited set of IDs, correct?

3   A    Well, there is a certain subset of IDs, yes.

4   Q    Okay.  And the type of IDs that a state will accept at the

5   polling place is important, is it not, because it's kind of the

6   gateway to the polling place?  If a voter isn't permitted --

7   strike that.  If the state limits the types and variety of IDs

8   that are accepted, it directly impacts who is allowed to come

9   into the polling place and cast a ballot on the machine that

10  counts, right?

11  A    It could, yes.

12  Q    Okay.  So Texas -- there's seven forms of ID accepted in

13  Texas, right?

14  A    Yes.

15  Q    Okay.

16  A    I guess it somewhat depends on whether you count a

17  Veterans' Affairs card under the military ID category or not

18  but yes.

19  Q    Okay.  A current driver's license, correct?

20  A    That's correct, yes, sir.

21  Q    Okay.  And a free state voter identity card?

22  A    Yes, sir.

23  Q    A -- like an EIC, right, like --

24  A    A free form of -- yes, a free form of voter

25  identification.

1  Q    Okay.  And a state identity card?

2  A    Yes, sir.

3  Q    A valid U.S. passport?

4  A    Yes, sir.

5  Q    A valid U.S. military ID?

6  A    Yes, sir.

7  Q    Okay.  And South Carolina accepts those same things,

8  correct?

9  A    Yes.  All three of those states accept those forms of

10  identification.

11  Q    Okay.  And Georgia opens the gate a little wider, doesn't

12  it?  It allows a photo ID issued by any branch, department,

13  agency or entity of the state, correct?

14  A    That's correct.

15  Q    Up and down the state, any state agency or entity that has

16  a photo ID, anyone can use that to vote, correct?

17  A    That's correct.

18  Q    And that's not true in Texas, correct?

19  A    No, that's not true in Texas.

20  Q    Okay.  And in Georgia, Georgia will accept a valid ID with

21  photo issued by any branch, department, agency or entity of any

22  other state, right?

23  A    That is correct, yes.

24  Q    Okay.  Texas doesn't do that, right?

25  A    No, sir.

Hood - Cross / By Mr. Dellheim                     137

1    Q    Okay.  And Georgia will accept as permissible ID to vote

2    any photo -- any ID with photo issued by any branch,

3    department, agency or entity of the U.S. Government, correct?

4    A    That is correct.

5    Q    Okay.  And Texas doesn't do that?

6    A    That's correct.

7    Q    And Georgia will accept a valid employee ID card with

8    photo issued by any agency, branch or entity of any county,

9    correct?

10   A    Correct.

11   Q    Okay.  And any municipality, correct?

12   A    Correct.

13   Q    And any employee ID from any of the 50 states, correct?

14   A    An -- I guess an employee ID issued by a state

15   government --

16   Q    Yes.

17   A    -- is that fair?

18   Q    Yes.

19   A    Okay, all right.

20   Q    And Texas doesn't do any of that, correct?

21   A    No.

22   Q    Okay.  And we can go on and on about what Georgia accepts.

23   They accept college and university IDs, correct?

24   A    Well, there's a subset, yes -- not any college ID outside

25   of the state per se but there is a subset of state universities

Hood - Cross / By Mr. Dellheim                          138

1    and colleges where student IDs can be used.  That's true.

2    Q    Okay.  And Georgia will also accept expired driver's

3    licenses, right?

4    A    That is true, yes.

5    Q    And they will accept tribal ID, correct?

6    A    That's true.

7    Q    Okay.  And Texas doesn't accept any of that, right?

8    A    That's correct.

9    Q    Okay.  Let's switch to South Carolina for a second.

10   A    Okay.

11   Q    South Carolina does something a little bit different from

12   Georgia, doesn't it?  South Carolina has a provision that I

13   think has been dubbed an ameliorative provision called the

14   "Reasonable Impediment Provision," right?

15   A    That's correct.

16   Q    And you're very familiar with that, are you not?

17   A    Probably more familiar than most people, yes.

18   Q    Okay.  And most people, they didn't want to be, I guess.

19        Would you agree with me that under South Carolina

20   law, anybody who lacks a photo ID can cast a provisional ballot

21   that will count so long as the voter states the reason for not

22   having ID?

23   A    Well, if they go in and execute the Reasonable Impediment

24   Affidavit, yes, they'll -- they can cast a provisional ballot

25   which will be counted unless the provisional ballot -- or

1    unless the affidavit is proven to be false.

2    Q    Correct.

3    A    Forgetting your ID though is not a reason to cast a

4    Reasonable Impediment Affidavit in South Carolina.

5    Q    Um, but --

6    A    Not having an ID would be.

7    Q    Okay.  So --

8    A    If you forget your ID, then you have to cast just a

9    regular provisional ballot and try to get it cured or counted

10   by bringing ID back up to the County Canvass Board.

11   Q    Well, just like in most states, if you don't -- if they

12   require ID --

13   A    Right.

14   Q    -- if you don't have your card, you may have to --

15   A    Georgia or --

16   Q    Correct.

17   A    -- Texas even, yes.

18   Q    Okay.  But if you go -- in South Carolina, if you have

19   your voter -- your non-photo voter registration card and you

20   tell the poll worker that you don't have an ID because you have

21   -- you work or you're too busy or you have kids or any number

22   of reasons, those reasons will not require the state to reject

23   that ballot, right?

24   A    Correct unless for some reason, that elector is executing

25   a false affidavit.

1  Q    Are you aware of any ameliorative provision in any photo

2  ID law in any state in the country that is as broad and

3  forgiving of those who do not have acceptable photo ID so that

4  those voters can cast ballots that count?

5  A    As the one in South Carolina?

6  Q    Yes, sir.

7  A    No, I'm not.

8  Q    Okay.  Now, are you aware of any state in the country that

9  accepts a broader array of acceptable photo IDs than Georgia?

10 A    I think Mississippi comes close.  They have a pretty broad

11 array of IDs that they allow.

12 Q    Okay.  But my question was, do you know of any state that

13 accepts a broader array than Georgia?

14 A    Well, not broader, no.

15 Q    Okay.

16 A    Okay, thank you.

17 Q    I want to talk a little bit about -- more about your

18 Georgia study because as I read your report, I think -- and you

19 can correct me if I'm wrong but I think the purpose of you

20 talking about the Georgia study in your report is that you

21 would like this Court to graft the results of that study onto

22 Texas in terms of its consideration of SB 14.  Is that a fair

23 statement?

24 A    I think that's fair.  You know, I could be proven wrong

25 but sitting here today, I don't know of any other academic

1    studies that have really done a before-and-after test to the

2    implementation of a voter ID law.  So --

3    Q    Okay.  And for that study, you looked at turnout data from

4    Georgia in 2004 before Georgia implemented its voter ID law and

5    then you looked at turnout data from 2008 after Georgia

6    implemented its voter ID law, correct?

7    A    That's correct.

8    Q    And you studied general elections for this study; is that

9    right?

10   A    That's correct.

11   Q    And why did you study general elections?

12   A    I thought they would be a good gauge.  Well, there was --

13   the law was cleared for implementation in '07.  So the next

14   election was a presidential election --

15   Q    Okay.

16   A    -- in '08 and so to have a counterpart to that, I went

17   back to the 2004 election.

18   Q    Okay.  And that was -- and general elections tend to

19   provide the richest data, correct?  It's the most -- the

20   highest turnout election, right?

21   A    Well, I would say they have the highest turnout.  That's

22   easily proven.

23   Q    Okay.  And the methodology that you used to compare the

24   2004 and 2008 turnout data, let's talk about that for a second.

25   For your study, you didn't have a no-match list from 2004 based

1   on 2004 data, right?

2   A    No.  If I can explain, we received a no-match list -- and,

3   again, this wasn't done for a court case.  So all these data

4   were publicly accessible data that we had to work with.  We

5   received a no-match list from the Georgia Election Board -- or

6   State Election Board in Georgia that they had run for the

7   purposes of an educational campaign and so that was the no-

8   match list in 2007 we were using.

9   Q    Okay.  So you began with a no-match list that Georgia

10  created in 2007?

11  A    That's correct.

12  Q    Okay.  And you matched the data -- and that list was

13  created by matching voter registration information from 2007

14  against a Department of Motor Vehicles database from 2007,

15  correct?

16  A    That's correct, yes.

17  Q    Okay.

18  A    The state did the match.  I didn't do that particular

19  match.

20  Q    Okay.  So you have a match and a no-match list from 2007

21  data, correct?

22  A    Correct.

23  Q    And then you -- and then from there, you looked at the

24  voter histories for people on the no-match list to see whether

25  they had turned out to vote in 2004 and to see if they turned

Hood - Cross / By Mr. Dellheim                        143

1   out to vote in 2008.  Is that a fair statement?

2   A    Well, there's an intervening step and --

3   Q    Okay.  Tell us that.

4   A    -- we had copies of the voter registration databases in

5   Georgia from 2004.  So we had a snapshot of the Georgia

6   electorate in 2004 and we had -- after the election, of course,

7   we got a copy of the voter registration database from 2008 in

8   Georgia and then we added to that voter history files that tell

9   us whether or not those registrants turned out to vote or not.

10  Q    Okay.  So you -- for your 2004 list, you, in fact, didn't

11  really know who lacked an ID in 2004, did you?

12  A    No, we were using the 2007 data.

13  Q    Okay.  Because between 2004 and 2007, lots of people could

14  have gotten lots of IDs, correct?

15  A    It's possible, yes.

16  Q    Okay.  And the IDs we're talking about are just Department

17  of Motor Vehicle IDs, right?

18  A    From what -- from my memory of the match -- it's been a

19  while since I've looked at it -- now, these were registrants

20  who had a driver's license or state ID card --

21  Q    Okay.

22  A    -- in Georgia.

23  Q    But not any of the array of IDs that we just discussed,

24  correct?

25  A    That's correct.

Hood - Cross / By Mr. Dellheim                    144

1   Q    Just two?  I'm sorry --

2   A    Those two, yes.

3   Q    Okay.  And for your 2008 data, you didn't know who, in

4   fact, had or didn't have an ID in 2008, correct?

5   A    No, not at that particular point in time.

6   Q    Okay.  And the no-match list that you worked from, that

7   had not been scrubbed for deceased voters, correct?

8   A    The no-match list?

9   Q    Yes.

10  A    Are you asking if the State had scrubbed that?

11  Q    Well, I'm asking if the State had scrubbed it or you,

12  having gotten a list, determined whether it had been scrubbed

13  for deceased persons.

14  A    Well, I didn't scrub it for decedents.

15  Q    Okay.

16  A    I can say that.

17  Q    And as you sit here today, you don't know whether the

18  State did?

19  A    I'm unsure.

20  Q    Okay.  I want to look at Table 2 of your report and I want

21  to ask you this.  However derived, the results of your study

22  make one thing clear and that's that Georgia's voter ID law

23  suppressed turnout across the board for all racial and ethnic

24  categories, right?

25  A    That's correct, yes.

1   Q    Okay.

2            **MR. DELLHEIM:**  Will you bring up Table 2, please?

3   It's Page 13.

4   Q    Table 2 is the probability of turnout of Georgia

5   registrants by identification, status and race, right?

6   A    That's correct.

7   Q    Your models -- your turnout models were based on estimates

8   of turnout, right?

9   A    I think -- they were based on actual turnout.  I mean --

10  and what I -- we did model turnout but what I'm saying is that

11  the underlying data we had were essentially -- was essentially

12  population data.  We had the entire voter registration

13  database, not part of it.

14  Q    Okay.  And you took the --

15  A    But these are statistical models, to be fair.

16  Q    These are statistical models --

17  A    Yes.

18  Q    -- and the turnout rates that you report in Table 2 are

19  systematic overestimates of the actual turnout, are they not?

20  A    What we do know with the turnout rates are, yes, they tend

21  to overestimate turnout.

22  Q    Okay.  And that's what you testified in court in the South

23  Carolina, correct --

24  A    Yes.

25  Q    -- in the South Carolina case?  And the systematic

1    overestimates, do you recall testifying that they are

2    especially large for those without ID?

3    A    I don't specifically remember that.

4    Q    Um --

5    A    But if I said that, then I said that.

6    Q    Well, I don't -- you don't need to take my word for it.

7    I'm just -- if you don't remember, I can show you your

8    testimony.

9    A    I don't specifically remember that.

10   Q    Okay.

11            MR. DELLHEIM:   Do you want to bring up Page 236 of

12   the South Carolina trial testimony, please?   Lines 5 and 6.

13   Q    "QUESTION:   The overestimates are especially large for

14   voters who lack voter ID; isn't that right?"   Do you recall

15   your answer, sir?

16   A    "Yes, they're larger."

17   Q    Okay.   And that was the question asked and that was the

18   answer you gave?

19   A    That's correct, yes.

20   Q    Okay.   And does your report in this case note that the

21   turnout data in Table 2 are, in fact, systematic overestimates?

22   A    I don't think it indicates that, no.

23   Q    And you don't want this Court to rely on systematic

24   overestimates to reach a conclusion in this case, do you?

25   A    Well, I'd like the Court to take the study into account.

1   Q    Okay.

2         **MR. DELLHEIM:**  Let's look at Table 3, if we could.

3   That's the next page.   Okay.

4   Q    Table 3 of your report shows what you say are the actual

5   turnout figures by raising ID possession in 2004 and 2008,

6   correct?

7   A    That's correct.  So these are just percentages.  They're

8   not derived from statistical models.

9   Q    Okay.  And the turnout data -- let me ask you this.  You

10  didn't include these data in your 1012 published study, did

11  you?

12  A    No.

13  Q    Why didn't you include the actual turnout as opposed to

14  the systematic over-estimation of turnout?

15  A    Well, again, typically in the social sciences when we're

16  studying phenomena, we model it using statistical models.  So

17  the study probably would have been susceptible to the criticism

18  that I didn't have a statistical model to study turnout if I

19  had not done it.

20  Q    Okay.  And --

21  A    And you make choice about -- you know, academic articles

22  are short.  You have to make choices about what to include and

23  what not to include.

24  Q    Okay.

25  A    So we included the previous table in that academic

1   article.

2   Q    And when you calculated the results of the turnout, it was

3   your conclusion that, in fact, the voters who were most

4   impacted by the implementation of Georgia's voter ID law were

5   not minority voters but, in fact, White voters, correct?

6   A    Correct.  White voters were slightly more effective.

7   Q    Okay.

8   A    Again, this is using a -- what's called a "Policy Impact

9   Analysis" which in the end calculates a difference-of-the-

10  difference measure.  So what we're doing is comparing those

11  pre-implementation in 2004 who have an ID and who don't have an

12  ID calculating a difference measure there, going across the

13  implementation cycle to the next election and comparing those

14  with and without ID and looking to see if there's a gap there

15  and then taking those two difference measures and creating a

16  difference-of-the-difference measure which is what I call the

17  "inner election difference" which is over on the far right.

18         So what we're trying to do is to see -- we know

19  there's a gap between those that turn out with ID compared to

20  those that have turned out without ID.  So across the

21  implementation cycle where the voter ID law was implemented, we

22  want to see if that gap gets bigger or smaller and the negative

23  sign there indicates that it's gotten bigger between the two

24  groups.

25  Q    Okay.

1    A    So --

2         **MR. DELLHEIM:**  May I approach the witness to give him

3    my calculator?

4         **THE COURT:**  Yes.

5         **(Counsel approached)**

6    **BY MR. DELLHEIM:**

7    Q    There is probably no one in this courtroom worse at math

8    than I.  So I want a little help in breaking down what these

9    charts really say.  Would you tell the Court what the

10   difference in turnout was between 2004 and 2008 for all voters

11   with ID?  And if I read it right --

12   A    It's about 2.9 percent.

13   Q    Okay.  Two percentage points, correct?

14   A    Well, almost 3 percentage points.

15   Q    Points?

16   A    Yes.  Yes.

17   Q    Okay.  And what was the difference in turnout between 2004

18   and 2008 for all voters without ID?

19   A    About 8 points.

20   Q    Okay.  And let's do it for White voters without ID.  What

21   was the difference between 2004 and 2008 turnout?

22   A    13.1.

23   Q    Okay.  And what was it for White voters with ID?

24   A    4.6.

25   Q    Okay.  And let's do it for African American voters with

Hood - Cross / By Mr. Dellheim                    150

1   ID.  What was the turnout difference between 2004 and 2008

2   according to your study?

3   A    Plus 3.4.  So it increased 3.4 percentage points.

4   Q    And you did that by subtracting 71.2 from 67.8?

5   A    Right.

6   Q    Okay.  And for African American voters without ID, what

7   was the turnout differential between 2004 and 2008?

8   A    Okay, 3 points.

9   Q    Okay.  And last, what about Hispanic voters with ID --

10  A    Okay.

11  Q    -- and without?

12  A    4.5 for those with ID --

13  Q    Uh-huh.

14  A    -- and 11.4 for those without ID.

15  Q    Okay.

16       **MR. DELLHEIM:**  Tim, let's pull up --

17  Q    We've taken those numbers that you testified to in your

18  deposition and you just affirmed them here and put them in this

19  chart.  Take a look --

20       **MR. DELLHEIM:**  And, Tim, let's add in the results

21  that Dr. Hood just testified to.

22  Q    Is that correct, sir?

23  A    It looks correct, yes, sir.

24  Q    Okay.  Now -- and these are the figures that you based

25  your conclusion at the bottom of Page 14 of your report that

1   the law impacted White voters more than any other racial or

2   ethnic group, correct?

3   A    Well, not exactly.  I mean, I used these turnout figures

4   but, again, we're comparing different groups here.

5   Q    Okay.  But in terms of the absolute numbers here, is it

6   fair to say that you looked at those numbers and you saw that

7   the drop in turnout between 2004 and 2008 for White voters was

8   13.1 points and that was the highest turnout differential for

9   any of the racial or ethnic groups?

10  A    Yes.

11  Q    Okay.  And you agree that the accepted practice in social

12  sciences is to look at the weight of impact on different groups

13  and not just absolute numbers.  Would you agree with that?

14  A    Well, again, in this -- well, to qualify, in this

15  particular study, we were using a particular type of research

16  design which called for the comparisons that we made that are

17  written about in the study.

18  Q    Okay.

19  A    I mean, you're talking about another way that we could

20  make comparisons but that was not the thrust of this particular

21  study.

22  Q    Well, let me ask my question again.  Would you agree that

23  the accepted practice in social sciences is to look at the

24  weight of impact and not just on the absolute numbers?

25  A    It depends really.

Hood - Cross / By Mr. Dellheim                    152

1   Q    Okay.

2   A    I mean, I have to qualify.

3   Q    Okay.

4   A    Again, in this particular research design, no.  In other

5   types of research, yes.

6   Q    Okay.  Well, we can easily calculate the percentages --

7   A    Sure.

8   Q    -- reflected here, correct?

9   A    Sure.

10  Q    Okay.  Let's look at your calculator, please.

11  A    Okay.

12  Q    Would you please calculate for all voters without ID what

13  the percentage is?  And I think by doing that, I think we

14  divide -- I think you testified at your deposition that you

15  divide 8 by 47.6, correct?

16  A    Yes, that's correct.  So it'd be 16.8.

17  Q    Okay.  And do that for me, if you would, for White voters

18  without ID.

19  A    Okay.  Okay.

20  Q    Did you do that, sir?

21  A    I'm working on it.

22  Q    Oh, sorry.

23  A    So the differential is 13.1 divided by --

24  Q    -- 52.1.

25  A    Yes, 25.1.

 1   Q    Okay, 25. 1?

 2   A    Did I do that wrong?  13.1 divided by -- maybe I'm looking

 3   at the wrong table.

 4   Q    No, I think -- well, it's 13.1.  I think you testified at

 5   your deposition you divide 13.1 by 52.1.

 6   A    That's 25.1.

 7   Q    Okay.  I believe you testified in your deposition it was

 8   25.2.  I think it was rounded up.

 9   A    Oh, okay, sorry.

10   Q    Is that fair?

11   A    Yes, that's fair.

12   Q    Okay.  And let's do it for African Americans without ID.

13   A    Okay.

14   Q    I believe you testified you divide 3 by 44.8.

15   A    6.7.

16   Q    And for Hispanic voters without ID.  Would you please

17   divide 11.4 by 34.4?

18   A    33.1.

19   Q    Okay.  And that could be rounded up to 33.2; is that fair?

20   A    I'm getting 33.13, so.

21   Q    Okay.  Well, we'll call it 33.1 and that 33.2 on this

22   exhibit is incorrect then, correct?  Is that right?

23   A    Well, from what I'm getting here.

24   Q    Okay, all right.  So when we calculate the rate of change

25   by percent as opposed to absolute numbers using your numbers we

1   find that in fact it's not White voters who are more affected

2   by the implementation of the Georgia voter ID law but in fact

3   it is Hispanic voters, correct?

4   A    Calculated this way, yes.  Again, turnout rates vary for

5   many different reasons and that's why it's important I'd argue

6   to compare turnout between those that have ID and those that

7   don't have ID as I did in the study.

8   Q    Okay.  I understand, but one of the purposes of your study

9   was to look at the impact on racial groups, correct?

10  A    That's correct, yes, we did.

11  Q    And your study said and you've repeated it in your report

12  in this case to this Court that the racial group most affected

13  by the implementation of Georgia's voter ID law was in fact

14  White voters and according to your calculations in fact it is

15  Hispanic voters, right?

16  A    Well, using those calculations, yes, that's correct.

17  Q    Okay.  Now something -- you can take that down, thank you.

18  Something occurred in 2008 that impacted turnout in a rather

19  dramatic way; is that right?

20  A    Yes, I'd say so.

21  Q    Okay.  And you've written and you've testified in court

22  that the 2008 election was and I will -- I think I will capture

23  your words accurately --

24  A    Okay.

25  Q    -- but you can tell me if I don't.  "The 2008 election was

1    momentous, historic, no equivalent in history, a huge event."

2    Obviously -- I'm quoting from your *Achieving Validation*

3    article --

4    A    Okay.

5    Q    -- "Obviously this contest for African Americans in

6    particular has no equivalent in the history of presidential

7    politics."

8              Do you know what I'm talking about, sir?

9    A    Yes, that's -- those are descriptions in that article of

10   that particle election.

11   Q    Okay.  And you also wrote in your piece with Dr. Bullock

12   that voters in 2008 "acted in an environment that provided a

13   unique stimulus, the candidacy of the charismatic Barack Obama.

14   Obama's candidacy had an especially great impact on African

15   Americans, a group usually classified among those less inclined

16   to participate."

17             Does that sound familiar to you, sir?

18   A    Which -- which article with Dr. Bullock?

19   Q    This is your 2012 article with Professor Bullock.

20             Can you bring that up, please, Tim, page six?

21   A    Okay.  I've got you.

22             **MR. DELLHEIM:**  It's at the bottom.

23   Q    "Georgia is like other American's acting in an environment

24   that provided a unique stimulus" --

25   A    Right, gotcha.

Hood - Cross / By Mr. Dellheim                    156

1    Q    Does that sound familiar to you?

2    A    Yes.

3    Q    Your memory is refreshed?

4    A    Yes.

5    Q    Okay.  You and other political scientist have referred to

6    this as the Obama effect, correct?

7    A    That's correct.

8    Q    And it was in your opinion unique, right?

9    A    Well, I think I stated this in my deposition.  I guess

10   it's up to time to see how unique it was.

11   Q    Okay.  But at least in 2008 you would agree with me would

12   you not that the Obama effect sparked unprecedented African

13   American turnout for that election, right?

14   A    I think that's pretty easy to document, yes.

15   Q    Okay.  Now for your 2008 study of turnout in Georgia, I

16   want to ask you a couple of questions.

17        Number one, you've testified that the voter ID law

18   suppressed turnout for all racial and ethnic groups including

19   African Americans, correct?

20   A    That's correct.

21   Q    But at the same time it galvanized turnout for African

22   Americans on the other, correct?

23   A    That's correct.

24   Q    Okay.  Did you attempt in any way to isolate or control

25   for the Obama effect?

1    A    Well, I think we've talked about this a number of times

2    and I argued that the research design we use where we have a

3    before and after time point helps to control for what we call

4    history effects and this would be an effect of history, this

5    particular candidacy and this particular election cycle.  I'm

6    talking about President Obama of course.

7              So my argument is that to the extent possible the

8    research design that we employ helps to control for that.

9    Q    Okay.  You don't know to what degree minority voters

10   overcame the burdens imposed by the Georgia photo ID law to in

11   fact -- strike that.  Let me ask it I hope in a clear way.

12             You don't know to what degree minority voters

13   overcame the burdens associated with the voter ID law versus

14   those who did not overcome those burdens, correct?

15   A    Well, if we're correct in assuming that we know who --

16   which one of those minority voters did not have an ID -- we can

17   look at their turnout rates.

18   Q    That wasn't really my question.

19   A    Okay.

20   Q    So let me ask it different way.

21             Your study did not attempt in any way to isolate

22   those voters who came out to vote and were galvanized to come

23   out to vote because of the Obama effect, right?

24   A    That's correct.

25   Q    So you --

1   A    You're talking about specifically the article on the

2   implementation of the Georgia voter ID law, is that --

3   Q    Any article, any study.  Your 2012 study with Dr. Bullock,

4   your *Achieving Validation* article --

5   A    Well, there's the --

6   Q    You have done no -- and let's focus for a second, sir, on

7   your study with Dr. Bullock and in your report in this case.

8            You did not in any way isolate or identify those

9   voters who turned out to vote because of the unique, momentous,

10  historic conditions in that particular election, correct?

11  A    If you're asking if I can categorize voters in that

12  fashion the answer is no.

13  Q    You performed a multi-variable regression analysis for

14  that case or for that study?

15  A    Well, yes, just about every study we do does.

16  Q    Okay.  And you didn't isolate for the Obama effect,

17  correct?

18  A    Well, again, everyone in the 2008 election cycle was

19  exposed to "the Obama effect."

20  Q    But you didn't disentangle those -- the conundrum that

21  your report presents and that your study presents of those

22  depressed by the Georgia photo ID law and those galvanized to

23  turn out, you don't separate those issues at all, correct?

24  A    Well, we don't know at the individual level if that's --

25  if that's what you're driving at.

1   Q    Okay.  Would you agree --

2   A    I mean I don't -- I don't know someone's motivations for

3   instance at the individual level in that study.

4   Q    Okay.  Would you agree that minority turnout in Georgia in

5   2008 would have been substantially lower had it not been for

6   what you have called the Obama effect?

7   A    I would assume it would be lower.  We know what it was.

8   Q    Now turnout -- 2008 turnout data was critical to your

9   analysis in that case, correct?

10  A    Yes, sir.

11  Q    And in this case which involves 2000 [sic] turnout data

12  you were -- your report does not mention the Obama effect as a

13  stimulus for turnout, correct?

14  A    I don't think so, no.

15  Q    But in another case where you were asked to analyze

16  minority turnout data from 2008 you cited the Obama effect did

17  you not?  You called the 2008 election an outlier.  Do you

18  recall that, in the Florida case?

19  A    Yes.

20  Q    Okay.  And you even made a chart showing the historical

21  trends by race in Florida, correct?  Do you remember that, sir?

22  A    Yes, sir.

23  Q    Can we bring up page eight of the report from Florida?

24       Do you recognize this, sir?

25  A    It's been awhile but yes.

1  Q    Okay.  And in this case where on behalf of your client --

2  your client had an interest in showing that minority voters

3  were not sparked to turn out in high numbers generally.  You

4  created this charge and you said indeed when the 2008 general

5  election is removed from the analysis the numbers more

6  accurately historical -- historic trends.  Then you create the

7  chart and it says does not include the 2008 election, right?

8  A    That's correct.

9  Q    And you -- in your report in that case to the Court and

10 your testimony in that case to the Court was that 2008 was an

11 outlier.  Do you remember that?

12 A    Well, that's correct although that was -- it's been

13 several years ago, you know.

14 Q    Okay.

15 A    Again, as I pointed out when we talked a few weeks ago, I

16 don't know that that's necessarily the case now.  I mean as we

17 get more elections out from 2008.

18 Q    I guess what I am wondering about is why make such a big

19 deal out of the anomalous nature of African American and

20 minority turnout in 2008 in one case and dismiss that turnout

21 as an outlier, an anomalous, and ask the Court to ignore it,

22 but in this case you're silent about it.

23 A    Well, at one point in time I thought that could have been

24 an outlier.  Again we talk about things, trend lines.  At least

25 in Georgia, I can say that in 2008 of course Black turnout goes

Hood - Cross / By Mr. Dellheim                161

1   up and if you look at the 2010 midterm compared to the 2006

2   midterm, Black turnout is elevated over that level and then in

3   the 2012 turnout numbers in Georgia at least, Black turnout is

4   pretty analogous to the 2008 turnout.  So I don't know at this

5   point if we're seeing a new pattern or not.

6   Q    Okay.  The Florida court, three federal judges, did not

7   accept your opinion about that, correct?

8   A    That's correct.

9   Q    Can you pull up the Florida opinion please?

10          This is page 28 of *Florida versus U.S.*, 885 F.Supp 2d

11   at 326.  The Court seemed to have concerns about many of your

12   opinions in that case but I just want to show you this one.

13          "Finally, we reject Professor Hood's intention that

14          the 2008 general election was an outlier that should

15          be ignored.  More specifically, Professor Hood

16          asserts that the anomalous circumstances surrounding

17          the 2008 election, mainly the historic candidacy of

18          Barack Obama the first African American presidential

19          candidate representing one of the two major political

20          parties in the United States, coupled with the

21          intensity of interest in President Obama's candidacy

22          among African American voters, account for the spike

23          in early person voting turnout among African

24          Americans in 2008."

25          Again, sir, why would you one case where the effect

1  of the law on minority turnout was an issue tell a Court that

2  2008 was an outlier that should be ignored and in another case,

3  this one, tell the Court that 2008 turnout data is critical to

4  the analysis and the impact of a voter ID law?

5  A    Well again, I mean in fairness my opinion has been

6  changing on this particular matter as we've been able to amass

7  more election data since 2008.

8  Q    You can take that down, thank you.

9         You testified earlier that the point of relying on

10 your Georgia study in this case is that you hope that the Court

11 will graph the results of what you found in Georgia and apply

12 them to Texas.

13         Texas and Georgia are obviously very different

14 states, correct?

15 A    They're different in some respects, certainly.

16 Q    Different demographics, right?

17 A    They don't have the exact same demographics, no.

18 Q    Okay.  Would you agree with me that for the Court to

19 evaluate the turnout figures you present in your Georgia study

20 and apply them to Texas the Court would need to know Georgia's

21 historic turnout patterns and match them against Texas's?

22 A    That would be one way to look at it, yes.

23 Q    You didn't do that here though did you, sir?

24 A    No, I didn't do that analysis.

25 Q    Have you conducted any empirical study of turnout in Texas

 1   that compared 2008 turnout data with 2004 turnout data?

 2   A    Not in Texas, no.

 3   Q    Any empirical study of Texas's turnout trends

 4   historically?

 5   A    Well, I've looked at historical voting patterns in Texas.

 6   Q    Okay.

 7   A    I mean as part of my -- my work on southern politics.

 8   Q    Okay.

 9   A    Texas is included under that umbrella.

10   Q    Fair enough, fair enough.  Let me ask it a different way.

11        Did you -- did you prepare any empirical study of

12   Texas turnout trends historically for your work in this case?

13   A    No, I did not.

14   Q    Okay.  Did you -- did you endeavor to launch any empirical

15   study of -- well, any comparison of Texas ID possession rates

16   by race or ethnicity with Georgia ID possession rates by race

17   and ethnicity?

18   A    Not by race -- race and ethnicity.

19   Q    Would you agree with me that for the Court to evaluate the

20   turnout figures you present in your Georgia study and apply

21   them to Texas the Court would need to know how Georgia's racial

22   and ethnic populations compare to Texas's?

23   A    Well, to a certain degree, yes.  Both states have fairly

24   large minority populations.

25   Q    And you've not compared Georgia demographic data with

Hood - Cross / By Mr. Dellheim                    164

1    Texas, correct?

2    A     In this case?

3    Q     Yes.

4    A     That's correct.

5    Q     And no analysis of Texas geography in comparison to

6    Georgia geography, correct?

7    A     That's correct.

8    Q     And you've testified there's -- you've done no data

9    matching, regression analyses, homogeneous precinct analyses,

10   or Spanish surname analyses for your work in this case,

11   correct?

12   A     That's correct.

13   Q     And no study of socioeconomic statistics by race or

14   ethnicity in Texas?  I think you mentioned that before,

15   correct?

16   A     That's correct.

17   Q     No study of the Obama effect in Texas for your work in

18   this case, correct?

19   A     Well, no, I didn't study turnout patterns in Texas, so,

20   no.

21   Q     Okay.  And no study of the distances Texas voters need to

22   travel to get to a DPS office or an EIC office, correct?

23   A     I looked at data regarding that question.  I didn't

24   conduct an independent study on that.

25   Q     Okay.  Right, and based on all of that, is it true that

1   you cannot state to a reasonable degree of scientific certainty

2   that the data you report from Georgia regarding what you say is

3   the impact of Georgia's voter ID law has any applicability to

4   Texas?

5   A    Well, I think it has some applicability because again it's

6   one of few states we can look at in terms of what happens when

7   a government issued photo ID law is implemented.

8   Q    I remember you --

9   A    They're not the same state.  I agree with that.

10  Q    I remember you saying this at your deposition.  You said

11  that, I think it was "There's probably some applicability to

12  Texas."

13          Do you recall that, sir, saying some --

14  A    I think there's -- yes, I probably said something like

15  that.

16  Q    And you repeated something very similar just now, right?

17  A    Yes.

18  Q    The "probably has some applicability" standard is not one

19  recognized by social science, is it?

20  A    I probably wouldn't use that terminology in a research

21  article, no.

22  Q    Okay.  And you've conducted no empirical studies to

23  provide an empirical basis to believe that the data that you

24  report from your Georgia study in any way applies to Texas, do

25  you?

1  A    No, I wouldn't say so, no.

2  Q    Okay.  And you recall testifying in other cases, in other

3  times, under oath about what's become known as the Hood

4  principle?

5  A    Yes.

6  Q    Okay.  And under the Hood principle you would never ask

7  the Court to believe something that you have not proven by

8  empirical study, right?

9  A    I think that the principle states something as I like to

10 see empirical verification, something like that.

11 Q    Let's bring up page 151 of Dr. Hood's deposition please,

12 line 9.

13       And the Hood principle as we refer to it in open

14 court in South Carolina and it was referred to elsewhere is

15 that you would not -- you would not ask the Court to accept any

16 opinion that you have not proven by empirical study.

17       Do you recall that testimony, sir?  And what was your

18 answer?

19 A    I did state that, yes.

20 Q    Okay.  And was that question asked and was that your

21 question that day?

22 A    This is from our deposition in Austin?

23 Q    And that was your answer that day?

24 A    Yes, yes.

25 Q    Okay.  And you're not changing your professional

Hood - Cross / By Mr. Dellheim                    167

```
 1   standards --

 2   A    No.

 3   Q    -- during your testimony in this court, correct?

 4   A    Of course not, no.

 5   Q    Okay.  And you've not proven empirically that your Georgia

 6   study applies to Texas; is that right?

 7   A    I'm not proving that empirically, no.

 8   Q    So you're not asking this Court to believe something

 9   you've not proven empirically, are you?

10   A    Well, I didn't prove it empirically again.

11   Q    I want to talk if I may about something on page nine of

12   your report under the heading Roman Numeral V, Academic

13   Research --

14   A    Okay.

15   Q    -- on Voter ID.

16            I want to look at the highlighted sentence in the

17   middle of that paragraph.

18            "ID disparity only matters, however, if it ultimately

19            causes a disparity in voter turnout.  As well, to

20            matter in a legal sense this turnout gap must fall

21            disproportionately on minority registrants."

22            This portion of your report I think, and you can

23   correct me if I'm wrong, accepts the fact that there is

24   disparity and a racial disparity in ID possession rates in

25   Texas, correct?
```

1   A    Well, I'm talking about what Professors Barreto and

2   Sanchez and Professor Ansolahehere found.

3   Q    Okay.

4   A    I mean that's what it's referencing.

5   Q    I understand that.  You don't question the fact that there

6   are -- that there are racial disparities in ID possession rates

7   in Texas do you?

8   A    Well, from their numbers there are.

9   Q    Okay.  And you haven't done your own independent study,

10  correct?

11  A    Yes, I didn't do my own analysis.

12  Q    Okay.  So we will assume then that for purposes of your

13  testimony at least that you don't -- you don't dispute the fact

14  that there is a disparity in ID possession rates and I want to

15  -- I want to focus in on your view of the impact of the

16  disparate possession.

17          You say again "ID disparity only matters if it

18          ultimately causes a disparity in voter turnout, as

19          well as the matter in the legal sense this turnout

20          gap must fall disproportionately on minority

21          registrants."

22          Let me -- let me focus you on the second sentence if

23  I may.

24          What's the basis for your legal conclusion in the

25  second sentence?

1    A     I don't know that I'm drawing a legal conclusion but I

2    mean given the scope of this case that would seem to be one of

3    the things that matter.

4    Q     You say "To matter in a legal sense."  You give a legal

5    conclusion.

6           Is that based on any court case?

7    A     Well, I can point to other court cases where there have

8    been gaps in ID possession found.

9    Q     That's not my question.

10   A     Okay.

11   Q     My question is do you have any basis for your -- for the

12   legal conclusion in the second sentence?

13   A     Am I citing an opinion for instance?  Is that fair?

14   Q     Are you citing an opinion?

15   A     No, I'm not citing an opinion.

16   Q     Can you name an opinion that says that?

17   A     Not off the top of my head, no.

18   Q     Can you name any legal authority that says that?

19   A     Not that I can think of.

20   Q     Okay.  Let's go to the first sentence.

21          "ID disparity only matters if it ultimately causes a

22   disparity in voter turnout."

23          Let me ask you, would you agree with me that just

24   because a minority voter works to overcome a disproportionate

25   burden that a voting system imposes that that means that there

1    was in fact no disproportionate burden imposed?

2    A    Well, for instance, if someone doesn't have ID and they go

3    out to seek an EIC to be compliant with the law then, yes, that

4    would require some effort on that voter's part.

5    Q    Okay.  But if the voter turns out to vote -- we're talking

6    about turnout here.

7    A    Okay.  Well, in that case I --

8    Q    We're not talking about getting an ID.  We're talking

9    about turnout.

10   A    Okay.  I would say that they've overcome whatever burden

11   that may have been there and successfully cast a ballot at that

12   point.

13   Q    So your view is that no matter what the burden a system

14   imposes on voters and no matter how disproportionately they may

15   be borne by minority voters, if those minority voters turn out

16   to vote there is -- the burden is inconsequential, correct?

17   A    I'm not saying someone didn't have to overcome a burden.

18   Q    Uh-huh.

19   A    Now this is under the section labeled Academic Research.

20   So I am talking about what myself and other academic

21   researchers are looking at in terms of the impact of these

22   laws.  So as more and more of these laws have been implemented

23   we've -- as researchers, we've turned to looking at this from

24   ID possession rates to turnout rates --

25   Q    Okay.

```
 1   A    -- because we can study that now in states where the laws

 2   have been implemented.  So in fairness this is -- this is a

 3   metric that's being used by academics to study these laws.

 4   Q    I'm sorry, it's a metric being used --

 5   A    This is a metric being used by academics to study these

 6   laws.

 7   Q    Okay.  Well, let me ask you this.

 8        Do you recall testifying -- do you recall testifying

 9   at your deposition that there's in fact no support in the

10   literature for your view that only turnout matters when

11   analyzing the impact of a voter ID law?

12   A    (No audible response)

13   Q    Let's pull up page 91 of his deposition please, line 19.

14   Let's open it up.  Is that page 191?

15        MR. SPEAKER:  Oh, I thought you said 91.

16        MR. DELLHEIM:  No, sorry, 191 please.

17   Q    "QUESTION:  Okay.  So, but you're not aware of any

18        article that supports your view that only turnout

19        matters in analyzing the objective of voter ID law,

20        correct?"

21        Mr. Keister objected to form.

22        "ANSWER:  That's correct."

23        Do you recall that question, sir, and do you recall

24   your answer?

25   A    Yes.
```

Hood - Cross / By Mr. Dellheim                    172

1    Q    Okay.

2    A    Yes.

3    Q    So in fact your testimony just now that this is where the

4    literature is going is not in fact accurate, right?

5    A    Well, from what I -- okay, hang on.

6         **(Pause)**

7    A    Well, I don't think I -- I said -- well, I qualified it

8    certainly to say that I think turnout is the best metric to use

9    in the end.

10   Q    Right, and that's your personal opinion, correct, but it's

11   not supported by the literature is it?

12   A    Well, I've published in this area so I guess it is to some

13   extent.

14   Q    Okay.

15   A    I mean I've utilized that method as a way to look at these

16   laws.

17   Q    Okay.  Let me ask you a question.

18        If to save money a jurisdiction decided to charge

19   African American voters $5 to vote, to cast a ballot, but it

20   charged Anglos nothing at all, and because of outrage,

21   mobilization, whatever reason, African American voters in fact

22   paid the $5 and turned out to vote in numbers that were similar

23   to those of the past would you say they have not been burdened

24   in a legal or any other sense?

25   A    Well, in that hypothetical yes.  Certainly they've had to

Hood - Cross / By Mr. Dellheim                    173

1    pay literary a monetary cost in that case, in your example.

2    Q    But in your paradigm you say only turnout matters.  It

3    doesn't matter about the burden.  All you focus on is the

4    turnout, fair?

5    A    That's the end result that we look at usually, yes.

6    Q    So in my hypothetical, if African American voters in fact

7    paid $5 to vote and turned out to vote under your paradigm they

8    would not have been burdened, correct?

9    A    Well, we wouldn't be able to pick up on the burden in the

10   study because the turnout rate would be about the same.

11   Q    Well, I'm not talking about what you can study.  I'm

12   talking about the way in which you were urging this court to

13   view the evidence in this case and it is your opinion that only

14   turnout matters in analyzing the effect of the voter ID law,

15   correct?

16   A    That's what I say [sic].

17   Q    So if a law -- if a new law, again to save money, a

18   jurisdiction implements a law that says polling places in

19   Hispanic neighborhoods will only be open from 10:00 in the

20   morning until noon and polling places in predominately Anglo

21   neighborhoods are open from 6:00 in the morning to 8:00 at

22   night and because of outrage, or mobilization, or whatever

23   reason Hispanic voters clog those polling places and turn out

24   to vote under your paradigm there would be no burden, correct?

25   A    Well, we wouldn't pick that up if we were studying at

Hood - Cross / By Mr. Dellheim                    174

1    using turnout rates.

2    Q    I'm not asking about what you can study.  I'm asking about

3    the paradigm that you used to analyze this case.  Under your

4    paradigm you would say those voters have not been burdened

5    because they turned out.

6    A    Because they overcame the burden.

7    Q    Do you know there's testimony in this case from a voter, I

8    believe her name was Ms. Maximina Lara who paid a poll tax to

9    vote in her earlier life and I think it's fair to say that

10   currently Ms. Lara's income is modest.

11           Is it your expert opinion that a state law that makes

12   people like Ms. Lara pay a poll tax is not a burden on Ms. Lara

13   merely because she in fact paid it and voted?

14   A    Now are we talking about --

15   Q    I'm talking in the past.

16   A    -- decades ago?

17   Q    I'm talking in the past.

18   A    Well, I think most people would view poll taxes as a

19   burden on the general electric [sic].

20       **(Pause)**

21   Q    And again in your paradigm the burden doesn't matter it's

22   only turnout that you look at, right?

23   A    Well, that's where things have been moving, yes.

24   Q    Okay.  Not in the literature though?

25   A    No, in the literature, yes, in the academic literature.

1   Q    Forgive me, I thought you had testified at your deposition

2   that you can't think of any published piece in a literature

3   that supports the view that you are articulating in this court.

4   A    Well, I'm saying turnouts being used as a metric, not the

5   only metric per say.

6   Q    Let's move on.

7         MR. DELLHEIM:  Don't that down.

8   BY MR. DELLHEIM:

9   Q    You expressed some concerns in your direct testimony and

10  in your report about the work of Dr. Ansolabehere, correct?

11  A    It would be more --

12  Q    Sure.

13  A    -- get more specific?

14  Q    Sure.

15  A    Okay.

16  Q    Sure.  You cite in your report, I think there are

17  something like six criticisms that you spell out.

18  A    I think there's seven.

19  Q    Maybe seven.

20  A    But now in fairness I'm not always talking about a

21  criticism of Professor Ansolabehere per se, but the difference

22  is the data that were available for him to use in this case.

23  Q    Okay.  All right.  And I know I've asked you this before.

24  Before we talk about Professor Ansolabehere and the data

25  matching, you've done data matching yourself in this case,

1   correct?  I think you testified that before.

2   A     That's correct.

3   Q     But it's a methodology you've employed many times as a

4   scholar, correct?

5   A     I've employed it before, yes.

6   Q     Okay.  And it's a recognized and accepted methodology by

7   the Political Science Academy?

8   A     Certainly and other disciplines as well.

9   Q     Okay.  And I think you also previously testified that

10  you've not done any regression analysis, correct?  Excuse me,

11  for your work in this case.

12  A     Okay.  Yes.  All right.

13  Q     And we know that Dr. Ansolabehere did data matching and

14  regression analysis but you did neither for your work in this

15  case, right?

16  A     That's correct.

17  Q     Okay.  And Dr. Ansolabehere performed homogenous precinct

18  analysis.  Did you do anything similar for your work in this

19  case?

20  A     No.

21  Q     And in fact your report doesn't contain any criticism of

22  Dr. Ansolabehere's regression analysis, right?

23  A     I don't believe so, no.

24  Q     Okay.  And your reports do not contain any criticisms of

25  Dr. Ansolabehere's homogenous precinct analysis, correct?

1   A    That's correct.

2   Q    And Dr. Ansolabehere also used Spanish surname analysis,

3   correct?

4   A    I believe that's correct from the --

5   Q    And your report doesn't criticize his Spanish surname

6   analysis, correct?

7   A    From the team data base, I believe.

8   Q    Yes.

9   A    Yes.

10  Q    Okay.

11  A    No, it doesn't.

12  Q    Okay.  Thank you.

13  A    Yes.

14  Q    Did you perform any Spanish surname analysis for your work

15  in this case?

16  A    No, sir.

17  Q    The first criticism that you addressed to Dr. Ansolabehere

18  is that you say there was a lack of a unique identifier between

19  databases.  Explain what you mean by that if you would.

20  A    Well, unique and not only that but permanent identifiers

21  so an identifier that won't change over the course of someone's

22  life for instance.

23  Q    Okay.

24  A    Like a social security number.

25  Q    Like of a -- they call it ssn -- ssn 9.

 1  A    SS - a full social security number, yes.

 2  Q    Okay.  And you tied that concern to the no match rate that

 3  Dr. Ansolabehere found in his first report, correct?

 4  A    Yes.  Yes.

 5  Q    Okay.  And the numbers in that first report were of

 6  course overtaken by events, right?

 7  A    We've had -- yes.  We've had several -- yes.

 8  Q    Okay.

 9  A    I mean this report was written based on the larger no

10  match list.

11  Q    Okay.

12  A    How's that?

13  Q    That's fine.

14  A    Okay.

15  Q    I just want to clarify that -- the criticism that you had

16  that was tied to the number that Dr. Ansolabehere found.  That

17  number was overtaken by events and it was clearly not

18  Dr. Ansolabehere's fault, correct?

19  A    No.  I never said that.

20  Q    Okay.  So after Dr. Ansolabehere received additional DPS

21  data and matched them, his no match rate was 5.8 percent,

22  correct?  Does that sound right?

23  A    I'm just going to look real-- very quickly here.  In the

24  last iteration of the no match list which includes Seven

25  Hundred Eighty Six Thousand, Seven Hundred and Twenty-Seven,

1   the no match rate was 5.83 percent.

2   Q    Okay.

3   A    Okay.

4   Q    And that figure is lower than the match rate you relied on

5   for your Georgia study, correct?  The no match rate from your

6   Georgia study was about 6.04 percent, correct?

7   A    I think that's -- yes, I think that's right.

8   Q    And you told me at your deposition you considered

9   Dr. Ansolabehere's no match figure to be accurate.  Do you

10  remember that?

11  A    Well to the extent to which the algorithms he ran can be

12  accurate using those data sources, yes.

13  Q    Okay.  And the no match rate Dr. Ansolabehere found in

14  this case is close to the no match you found in the South

15  Carolina case when you did data matching, correct?  That was

16  about five percent, right?

17  A    I think -- was it a little under five?  I can't --

18  Q    If you're going to test my memory, I think it was about

19  4.8 percent, if that sounds right to you.

20  A    I think that's about right, yes.

21  Q    Okay.

22  A    So it's a point off of that, yes.

23  Q    Okay.  For your Georgia work you -- I heard you during

24  your direct express some concerns about Dr. Ansolabehere not

25  having access to full SS-9 for every record, right?

1   A     Yes, yes.

2   Q     Okay.  But for your Georgia work you didn't use full ss-9

3   to match any data for your thousand words study, correct?

4   A     Well the State performed the no match list analysis.  They

5   produced the list.

6   Q     That's right.  And you relied on that list, right?

7   A     Right.

8   Q     And you didn't express to your editors or to any court

9   that the data matching that you relied on for your study was

10  potentially inaccurate because it lacked full ss-9, did you?

11  A     Well, the Georgia voter registration database does contain

12  full ss-9s and they, the State that is, conducted that no match

13  analysis.  I just received the results of that.

14  Q     And for your work in Wisconsin you didn't have access to

15  full ss-9s, did you?

16  A     No, I didn't there.

17  Q     Did you tell the Court in that case that your work was

18  potentially inaccurate because you didn't have full ss-9

19  access?

20  A     I don't know that I used the word inaccurate.  I think I

21  stated, I could be proven wrong but I think I stated in at

22  least one of the expert reports that that was a problem.

23  Q     A problem with your own data?

24  A     Well, not my data.  A problem with the data from the

25  Wisconsin -- what's called the Wisconsin Governmental

Hood - Cross / By Mr. Dellheim                    181

1    Accountability Board which is --

2    Q    Understood and you didn't tell the Court that you doubted

3    the accuracy of the data you produced in that case, did you?

4    A    Well, I said this was the best possible effort.

5    Q    Okay.

6    A    I do think that I said something about the lack of social

7    security numbers though.

8    Q    Okay.  There's no scholarly literature that says database

9    matching should match on ss-9s as close to other verification

10   methods, correct?

11   A    Ss-9s alone?

12   Q    Yes.

13   A    No.

14   Q    And the lack of full ss-9 does not make the data matching

15   unreliable, does it?

16   A    Well, again I guess I would argue that it would probably

17   be slightly more reliable if every database we were using had

18   fully populated social security numbers across all the

19   databases.  It would make it easier to perform matches.

20   Q    Okay.  Well, the Wisconsin Court in the State case made

21   clear that the lack of ss-9s across the Wisconsin voter

22   registration databases -- the Wisconsin voter registration

23   database and the Wisconsin Department of Motor Vehicle's

24   database was not a "significant factor" in the match's

25   reliability; you remember that?

1   A    Not specifically but it's been a while since I've looked

2   at that.

3            **MR. DELLHEIM:**  Want to bring up the Wisconsin

4   opinion, please, Tim.  Case 10, paragraph six.

5   **BY MR. DELLHEIM:**

6   Q         "The Georgia databanks, the driver's licenses and

7             voter, and the voter, both contain social security

8             identification.  On the Wisconsin, the SBRS includes

9             social security identification but the Wisconsin

10            Department of Transportation data does not.  This

11            difference is not a significant factor in the

12            relative reliability of the exact match analysis when

13            used to analyze voter ID that's used in Georgia and

14            Wisconsin."

15            Does that refresh your recollection, sir?

16  A    Yes, sir.

17  Q    So you don't know of any court that's rejected any data

18  matching of voter ID case merely because the data lacked full

19  ss-9, do you?

20  A    No, I don't.

21  Q    And in fact you have no evidence whatsoever and you do not

22  believe that the lack of a unique identifier like ss-9 among

23  the databases in this case caused any inaccuracy, do you?

24  A    Well, I don't know the answer to that to be quite honest.

25  Q    You have no evidence, do you?

Hood - Cross / By Mr. Dellheim                    183

 1   A    I don't have any evidence, no.

 2   Q    And it's not your opinion; is it?

 3   A    I simply stated and I'll say it again that it would

 4   probably been a more accurate match had every database been

 5   populated with full social security numbers.

 6   Q    I understand that.

 7   A    Okay.

 8   Q    But it is not your opinion that the lack of a unique

 9   identifier like ss-9 among the databases in this case caused

10   any inaccuracy, correct?

11   A    No necessarily, no.

12        MR. DELLHEIM:   Let's look at page 206 of his

13   deposition, please.   Line 22.

14   BY MR. DELLHEIM:

15   Q         "QUESTION:  And it's not your opinion that the lack

16              of a unique identifier caused the racial disparities

17              observed in the results, correct?"

18              And the answer was?

19   A    Well, now we're talking about two different things though.

20   Q    Are we?

21   A    Well, yes, to some extent.  We were just talking about

22   general database matching and now we're -- here we're talking

23   about racial disparities observed.

24   Q    Let me ask you this.

25        MR. DELLHEIM:   You can take that down, please.

Hood - Cross / By Mr. Dellheim                    184

1  **BY MR. DELLHEIM:**

2  Q    You have no -- did I get your testimony right?  You have

3  no evidence that the lack of ss-9 caused any inaccuracies?

4  A    I don't have any evidence of that fact.

5  Q    Okay.

6  A    No, sir.

7  Q    In your testimony that the match rate may have been lower

8  if there was a full ss-9 is speculation, is it not?

9  A    Informed intuition is that.

10 Q    It's unfastened to any empirical analysis, correct?

11 A    Well, that's true.  That's true.

12 Q    Okay.  And you're not going to ask the Court to believe

13 anything you've not proven empirically, right?

14 A    Correct.

15 Q    Okay.  Did you conduct any kind of validation analysis of

16 Dr. Ansolabehere's data match result to assess the accuracy of

17 the reported match results?

18 A    No, I did not.

19 Q    Okay.  But you know that Dr. Ansolabehere's validation

20 analysis found that the ss-9 matched 97.6 percent of the team

21 database records with full ss-9?

22 A    Well, for this -- Okay.  For the subset of the team

23 database that had full ss-9, yes, that's true.

24 Q    And versus the address, name, gender and date of birth

25 combinations that he used that matched 97.4 percent of those

1   same records?

2   A    Right.

3   Q    And given that fact would you agree with me that

4   Dr. Ansolabehere's multiple primary identifiers of using

5   address, name, gender and date of birth are the functional

6   equivalent of ss-9?

7   A    Well, given that subset of the data it appears to be

8   close, yes.  I mean, there's a whole other half of the cases,

9   49 percent of the cases that don't have ss-9.

10  Q    Okay.  But you told me at your deposition that you

11  considered them to be the functional equivalent of ss-9,

12  correct?

13  A    Well, the matching algorithms he developed appear to be

14  about the functional equivalent of that, yes.

15  Q    Okay.  And if you had had serious concerns you could have

16  performed a validation analysis, correct?

17  A    I assume so, yes.

18  Q    But you didn't, did you?

19  A    I didn't do that type of analysis, no.

20  Q    Okay.  And you didn't perform that kind of validation

21  analysis for the data matching work you did in Wisconsin,

22  correct?

23  A    Not that particular types of validation, no.

24  Q    And you didn't do it in South Carolina, correct?

25  A    No.

1  Q    And you didn't do it in Georgia, correct?

2  A    Again, I didn't do the actual data matching in Georgia.

3  Q    Okay.  You didn't insist that a validation study be run on

4  those numbers, correct?

5  A    That's correct.

6  Q    Okay.  Let's go to the second issue.  You expressed a

7  concern that the State ID Number in the Texas database is not

8  fully populated.  Does that ring a bell?

9  A    Yes.  Yes, sir.

10  Q    Okay.

11  A    I mean, again that would be another type of unique

12  identifier that would help us link these databases together, at

13  least to the DPS database in that case.

14  Q    Okay.  Well, let me ask you this, for people who have

15  never had a driver's license, the fact that the State ID field

16  is not fully populated is not really going to matter, is it?

17  A    If they've never done any business at the Department of

18  Public Safety then no they probably wouldn't have a State ID

19  Number in that field.  That's true.

20  Q    Okay.  And it's not your opinion that the lack of a State

21  ID Number caused the racial disparities observed in

22  Dr. Ansolabehere's analysis, correct?

23  A    That's correct.

24  Q    And you'd agree with me that you'd have no basis to reach

25  that conclusion because you didn't undertake any analysis of

1  the racial ethnic characteristics in the no match list, right?

2  A    That's correct.

3  Q    Okay.  The third issue you raised is inconsistent data

4  between fields.  Do you remember that, sir?

5  A    Yes, sir.

6  Q    Okay.  And you give an example of one database record

7  having the name of Jim for instance as a first name and another

8  having the name James.

9  A    That's correct, yes.

10 Q    And that's only an issue when you're matching on first

11 names, correct?

12 A    If that was part of the match string then yes.

13 Q    Okay.  And Dr. Ansolabehere used multiple matching

14 combinations, correct?

15 A    That is correct.  I think 13 if I remember correctly.

16 Q    Well, I think we counted them up at your deposition and I

17 believe that you came up with five.

18 A    Well, I meant 13 in all.

19 Q    Okay.

20 A    There may have been five that used name, first name.

21 Q    Okay.  And the fact that Dr. Ansolabehere used five

22 different matching combinations that did not involve first

23 names, that addresses your concern about inconsistent first

24 names, doesn't it?

25 A    Well, at least on the first name issue, yes.

1  Q    And when you made that criticism in your declaration had

2  you overlooked the portion of the report where Dr. Ansolabehere

3  explained that he used multiple name -- multiple matching

4  combinations not involving first names?

5  A    That was simply an example of mismatched data.

6  Q    Okay.  And it's not your opinion is it that the difference

7  in first names caused any of the racial disparities observed in

8  Dr. Ansolabehere's report, is it?

9  A    I don't have any evidence of that, no.

10  Q    And you've not identified anyone specifically on the no

11  match list that you believe should not be there as a result --

12  excuse me, as the result of inconsistent data between the

13  fields, correct?

14  A    Yes, that's correct.

15  Q    Okay.  The next concern that you articulate relates to

16  errors in the team database, right?  You say that --

17  A    Yeah.  Well, there is some data that are just obviously

18  erroneous.

19  Q    Okay.  And you testified in this Court that you gave an

20  example of bad birthdates, correct?

21  A    Yes, there is some in there.

22  Q    Okay.  Dr. Ansolabehere used at least three different

23  matching combinations that never involved birthdates, correct?

24  A    I believe I recall that, yes.

25  Q    Okay.  And the fact that he used those multiple matching

1    combinations that didn't involve birthdates in fact resolves

2    your concern about some records having bad birthdates, correct?

3    A    Well, at least on the birth date issue, yes.

4    Q    Okay.  You also testified on direct about incomplete death

5    data, right?

6    A    Yes, that's correct.

7    Q    Okay.  Do you know that the Texas Secretary's date matches

8    the team database to the Social Security Administration's

9    master death file to be sure anyone who has died is removed

10   from the database?

11   A    I believe a match is performed and I believe there are a

12   series of steps though beyond that match.

13   Q    Okay.

14   A    If I'm recalling what I read correctly.  If there's not a

15   full social security number match and a match on some other

16   fields then I believe they have to send that case back to the

17   County where that registrant resided and let the County

18   investigate it.  I believe that was the process.

19   Q    Okay.  And do you recall how often this is done?

20   A    How often they do sweeps?

21   Q    Yes.

22   A    No, I don't.

23   Q    Okay.  You didn't look at that before making the

24   criticisms in your report, did you?

25   A    I didn't look at that particular piece of information, no.

1  Q    Do you have any reason to believe that Texas is in fact

2  doing a bad job of scrubbing the team database of persons who

3  have died?

4  A    No, I don't think I ever said that.

5  Q    Okay.  And Dr. Ansolabehere ran two additional sweeps to

6  make sure that the list didn't contain dead people, didn't he?

7  A    Could you tell me what those -- go ahead.

8  Q    DPS.

9  A    That's true.

10 Q    And Catalyst -- the Catalyst Debt file, correct?

11 A    Yes, I think I mentioned that earlier.

12 Q    Yes and have you identified even one person from the

13 Thirteen Million plus team database who is in fact deceased?

14 A    You mean after these sweeps?

15 Q    Yes.

16 A    No.

17          THE COURT:  Let's go ahead and break right there.  If

18 you all want to return at 1:05.  You can step down.

19          **(A recess was taken from 12:00 p.m. to 1:04 p.m.; parties**

20 **present)**

21          THE CLERK:  All rise.

22          THE COURT:  You can have a seat.

23          MR. DELLHEIM:  May I proceed, your Honor?

24          THE COURT:  Yes.

25          MR. DELLHEIM:  Thank you.

1          **CROSS EXAMINATION (CONTINUED)**

2     BY MR. DELLHEIM:

3     Q     Good afternoon, Dr. Hood.

4     A     Good afternoon.

5     Q     I think where we broke we were about to talk about the

6     next concern in your report regarding Dr. Ansolahehere.  You

7     expressed some concerns that Texas does not record a

8     registrant's race or ethnicity, right?

9     A     That's correct.

10    Q     Okay.  Would you agree with me that well-accepted Social

11    Science provides several methodologies for estimating racial

12    characteristics?

13    A     It can be estimated, yes.

14    Q     Okay.  And Social Science -- and there are many well-

15    accepted methods according to Social Science for doing that,

16    correct?

17    A     I would say there are a number.

18    Q     Okay.

19    A     I don't know that I'd use the adjective "many."

20    Q     Okay.  Regression analysis is one, correct?

21    A     Ecological regression, yes.

22    Q     Yes, and homogeneous precinct analysis is another,

23    correct?

24    A     Yes.

25    Q     Data matching is another, correct?

1   A    Well, it depends on what you are matching to.

2   Q    Okay.

3   A    If it doesn't have it in the data base you are matching to

4   then no.

5   Q    And in that case you might need to refer to something like

6   ecological regression analysis, correct?

7   A    One of those techniques, ecological inference, ecological

8   regression, homogeneous precinct analysis.

9   Q    Okay.  And you testified at your deposition, did you not,

10  that retrogression analysis is probably the most prevalent type

11  of analysis used in the Social Sciences period, correct?  Do

12  you remember --

13  A    Well, I said "OLS regression" regression analysis.

14  Q    Okay.

15  A    Yes, I did say that.

16  Q    Okay.  And you do use regression analysis many times in

17  your scholarly work, correct?

18  A    That's correct.

19  Q    And Dr. Ansolahehere used regression analysis in this case

20  to estimate the race of voters on the team data base, correct?

21  A    That is correct.

22  Q    And your report has no criticism of Dr. Ansolahehere's

23  retrogression analysis, correct?

24          **MR. SCOTT:**  Objection, asked and answered.

25          **THE COURT:**  Sustained.

1   **BY MR. DELLHEIM:**

2   Q    And your report does not identify a single person on

3   Dr. Ansolahehere's no match list who should, in fact, not be

4   there, correct?

5   A    That's correct.

6   Q    And Dr. Ansolahehere constructed an algorithm to do the

7   searches for this case, right?

8   A    That is correct.

9   Q    And the Defendants also constructed an algorithm to do

10  searches in this case, correct?

11  A    That's correct.

12  Q    And you wrote that algorithm?

13  A    Yes.

14  Q    Okay.

15       **MR. DELLHEIM:**  Could we -- Ken, we could we put up

16  the algorithm, please?

17  Q    Do you recognize that, sir?

18  A    Yes, sir.

19  Q    Is that the algorithm that you wrote in this case?

20  A    Well, I guess it goes on down a few pages.

21  Q    Yes, but do you recognize that?

22  A    Yes.  Yes.

23  Q    Okay.  And you requested that these match combinations be

24  run against the team data base, correct?

25  A    That's correct.

1  Q    Okay.  And the purpose of that was to determine as

2  accurately as possible those Texas voters who may have lacked

3  SB 14 ID, correct?

4  A    That was the purpose of these algorithms, yes.

5  Q    Okay.  And Dr. Ansolahehere performed a data matching

6  according to this algorithm, correct?

7  A    Yes, he did, yes.

8  Q    And you reviewed the results, correct?

9  A    Yes.

10  Q    And you compared those results of Dr. Ansolahehere's

11  running of your algorithm against the results of running his

12  algorithm, correct?

13  A    At some point, yes.  Early -- earlier in the process.

14  Q    And there was substantial overlap, was there not, between

15  the results derived by Dr. Ansolahehere's analysis -- matching

16  of -- or running of his algorithm and his running of your

17  algorithm, correct?

18  A    There was a pretty heavy overlap between the two, yes.

19  Q    Yeah.  Do you recall testifying it was very high, about

20  95-plus percent?

21  A    I couldn't put an exact number on it, but, yes, I agree

22  with what I said previously.

23  Q    Okay, and you said it was about 95-plus percent, is that

24  correct?

25  A    Yes.  I'm just saying I can't tell you exactly what it is.

1    Q    Fair enough.  And you have no basis to believe that the

2    team data base systematically biased the match results, is that

3    right?

4    A    I don't think it systematically biased it, no.

5    Q    Okay.  And your report doesn't say that, correct?

6    A    No, it doesn't.

7    Q    Okay.  You spoke with Mr. Scott about -- about voters

8    affected by SB 14 and there was a Demonstrative that you-all

9    put up.  Do you remember that earlier this morning?

10   A    Yes, sir.  Yes, sir.

11   Q    And --

12          MR. DELLHEIM:  Could we put that back up?  Do you

13   mind if we put that Demonstrative -- the first page of the

14   Demonstrative that you used this morning?

15          MR. SCOTT:  Sure.  Brian, would you put the first

16   Demonstrative up, please?

17          MR. DELLHEIM:  I appreciate it, thank you.

18          MR. SCOTT:  That one?

19          MR. DELLHEIM:  That one.

20   BY MR. DELLHEIM:

21   Q    Dr. Ansolahehere's no match list had about 786,000 voters

22   on it, correct?

23   A    Correct.

24   Q    And there were people in this case that you observed is

25   that anyone over 65 is unaffected by SB 14 because they can

1   cast an absentee ballot, right?

2   A    Yes, they are unaffected unless they went to vote in

3   person.

4   Q    Okay.  You would -- would you agree with me that -- that

5   voters 65 or older may, in fact, want to come to the polling

6   place and cast their vote in person because they can get, for

7   instance, necessary assistance in casting a ballot?

8   A    I would agree there is -- there is a certain subset of

9   voters who want to show up at the polls on Election Day in

10  person.

11  Q    And do you know that to cast a ballot in Texas -- an

12  absentee ballot in Texas, that ballot has to be put in the mail

13  a certain amount of time before the election?

14  A    Yes, unless someone were to say, "Have it delivered to the

15  Clerk's office in person."

16  Q    Okay.  And for those voters over 65 who lack SB 14 ID and

17  who insist on voting at the polls because they maybe want more

18  time to make an informed decision, or they may need necessary

19  assistance in using a machine or reading a ballot, or for any

20  other medical reason, or for any reason at all, is it really

21  your testimony that 177,000 people are absolutely unaffected by

22  SB 14?

23  A    Well, if they choose to vote absentee by mail they are

24  unaffected.  Anyone in that category who may choose to vote in

25  person, who doesn't have an ID, would have to get an SB 14-

1   compliant ID, that's true.

2   Q    And if they don't they are, in fact, affected by SB 14,

3   correct?

4   A    Yes, in an in person voting situation, yes.

5   Q    Okay.  And voters with disabilities, about 85,000 --

6   A    Correct.

7   Q    -- on this Demonstrative and on Dr. Ansolahehere's list, I

8   have really the same question.

9        Wouldn't you agree there are disabled voters who,

10  because of their disability, or for really any other reason,

11  that insist on voting in a polling place because, Number 1,

12  they can get assistance; Number 2, the polling place is

13  accessible?

14  A    It's possible.  Let me -- let me just say as far as voters

15  with a disability goes that in Texas that is a qualified reason

16  to vote an absentee ballot, or any voter that has a SB 14

17  qualified disability can petition to have a flag put in the

18  team data base whereby they would not have to have ID if they

19  voted in person, so those are two possibilities.

20  Q    Right.  And how many, to your knowledge, disabled voters

21  have applied for and received exemption from SB 14?

22  A    I think it was 18.

23  Q    Eighteen?

24  A    Yes.

25  Q    Out of 177,360?  Whoops, excuse me --

1    A    85,000.

2    Q    -- 85,031, correct?

3    A    Yes.

4    Q    And for the remaining 85,017 remaining disabled voters in

5    Texas without SB 14 ID, if they tried to vote in person at the

6    next election they would not be able to count -- to cast votes

7    that counted, right?

8    A    If they didn't take the step of having the record flagged

9    ahead of time then, yes.

10   Q    Okay.  So it's not really true that they are unaffected by

11   SB 14, correct?

12   A    Well, they can -- they can choose to be unaffected

13   essentially I guess I would argue.

14        **MR. DELLHEIM:**  You can -- thank you very much, you

15   can take that down.  I appreciate it.

16   Q    You spoke with Mr. Scott about voters that you identified

17   on the no match list who cast in person ballots at some recent

18   Texas elections, correct?

19   A    That's correct.

20   Q    And the ID data in this case dates to January -- the team

21   data base dates to January 15th of 2014, correct?

22   A    That's correct.

23   Q    How many of the voters that you identified to Mr. Scott

24   this morning obtained ID after January 15th, 2014?

25   A    I'm not sure of that.

Hood - Cross / By Mr. Dellheim                    199

1   Q    Did you make any effort to find out?

2   A    Well, these would be voters in the most recent incarnation

3   of the no match list so fairly recently run.

4   Q    But the most recent incarnation of the no match list was

5   based on team data produced in January of 2014, correct?

6   A    That's true.

7   Q    So my question is did you make any attempt to find out how

8   many of the voters you discussed with Mr. Scott this morning,

9   in fact, had obtained ID after January 15th?

10  A    No, I don't know that number.

11  Q    At your deposition we discussed the fact that the

12  literature establishes that poll workers can often apply voting

13  rules inconsistently at the polling place, do you recall that?

14  A    Yes, sir.

15  Q    And are you aware how poll workers were trained in Texas

16  prior to implementing SB 14?

17  A    I read some materials relating to that, yes.

18  Q    Do you know how many training sessions were administered

19  to poll workers throughout Texas about how to carry out the

20  provisions of SB 14 in the polling place?

21  A    I'm not sure about the number, no.

22  Q    Do you know how many poll workers there are in Texas for a

23  typical election?

24  A    Thousands.

25  Q    Okay.  And would you agree with me that especially when

1   new rules apply at a polling place, poll workers often apply

2   those rules inconsistently?

3   A    Well, I can only say in this case that SB 14, in

4   particular, doesn't give poll workers discretion.  In some

5   States poll workers actually have discretion to ask for ID or

6   not.  That's not the way the law reads in Texas, they're

7   supposed to ask everyone who steps into a polling place to vote

8   in person for a form of SB 14 ID.

9   Q    I agree with you, but my question was especially when new

10  rules apply at a polling place, poll workers often make

11  mistakes, don't they?

12  A    Well, poll workers make mistakes, they're human.

13  Q    Okay.  And in a state as large as Texas -- strike that.

14          You don't know the extent to which poll worker error

15  may have contributed to the statistics you discussed with

16  Mr. Scott this morning, correct?

17  A    That is correct.

18  Q    Your report discusses some -- some elections in Texas with

19  respect to provisional ballots cast, and you talked with

20  Mr. Scott about that.  You looked at the number of provisional

21  ballots cast in Harris County for the 2013 Constitutional

22  Amendment election, right?

23  A    That's correct.

24  Q    And you also looked at Harris County for the 2014 Primary

25  election, right?

1  A    That's correct.

2  Q    And your conclusion was that almost all of the voters who

3  cast provisional ballots were unaffected by SB 14, is that a

4  fair characterization?

5  A    I think that maybe the fairer characterization is that of

6  the voters that showed up for those elections in Harris County,

7  hardly any were affected by SB 14.

8  Q    Okay.  And we'll leave aside the discussion we had earlier

9  this morning about whether voters who show up, whether that is

10  the proper gauge -- whether showing up is the proper gauge for

11  determining the amount of burden they endured to get there,

12  we'll leave that aside for a moment.

13        You would agree with me that analyzing Provisional

14  ballots does not, in fact, account for the actual impact of a

15  photo ID law, would you?

16  A    I would say that it's one metric.  It doesn't account for

17  someone who may never have shown up at the polls obviously.

18  Q    Okay.

19        **MR. DELLHEIM:**  Would you please bring up Dr. Hood's

20  2012 article with Professor Bullock?  Page 41 near the top.

21  41.  That's all right.  I'm sorry, 411.  I'm sorry, forgive me.

22        **(Counsel confer)**

23        **MR. DELLHEIM:**  4-1-1.

24  Q    This is your 2012 article with Professor Bullock, correct?

25  A    That is correct.

Hood - Cross / By Mr. Dellheim                    202

1  Q    Okay, and you -- and the two of you wrote:

2           "Although studying provisional ballots is one method

3           for trying to gauge the effect of photo ID laws, this

4           metric does not factor voter suppression that may be

5           associated with implementation of such a statute.  In

6           other words, provisional ballots are only a measure

7           of those registrants who have shown up at the polls

8           lacking proper photo ID.  Those lacking photo ID who

9           may have been deterred in attempting to cast an in

10          person ballot are not captured by this measure."

11          Is that what you wrote with Professor Bullock, sir?

12 A    That's accurate and that goes along with what I just said

13 a few seconds ago.

14 Q    Okay.  And --

15          **MR. DELLHEIM:**  Thank you, Ken.

16 Q    What did you do for your analysis of the ballots in Harris

17 County or your analysis of the 10 counties with respect to the

18 Primary election to determine the degree of voter suppression

19 caused by SB 14?

20 A    That metric wouldn't capture someone who was deterred from

21 ever showing up to the polls.

22 Q    Okay.

23 A    So the answer is nothing.

24 Q    And I guess I have the same question as to the Mississippi

25 and South Carolina elections you looked at.  First of all, let

1   me back up for a second.

2          General elections tend to be lower turnout than --

3   than Primary -- excuse me, Primary elections tend to be -- have

4   a smaller turnout than general elections?

5   A    That's correct.

6   Q    Okay.  And you looked at some elections in Mississippi and

7   South Carolina, and these were some special elections and

8   Primary elections, correct?

9   A    I looked at a special Congressional District election in

10  South Carolina which was, really, I guess the first election of

11  any size that was held under South Carolina's voter ID statute,

12  and then I looked later at the Primary elections held in South

13  Carolina this past summer -- I guess it is September now, so

14  this past summer, and then also in Mississippi Primary

15  elections that were held -- Primary and Primary runoff

16  elections that were held in Mississippi also this past summer.

17  Q     Okay.  And with respect to the Mississippi and South

18  Carolina elections, fair to say you did no empirical study to

19  determine the degree to which those voter ID laws may have

20  suppressed voter turnout?

21  A    I think the only thing that might get at that is the count

22  of the reasonable impediment affidavits that we collected in

23  South Carolina, because in that case someone can show up, as

24  you indicated earlier, as we talked about and vote without an

25  ID.

1  Q    And that's certainly if they know -- if they know what the

2  rules are, correct?

3  A    Well, that's -- that's true.

4  Q    Okay.

5  A    So -- I think that that gets to that question to some

6  degree in South Carolina.

7  Q    Okay.  And you didn't get to that question at all in

8  Texas, right?

9  A    No.  No.

10 Q    Okay.  So is it fair to say you have done no empirical

11 study that even begins to suggest that whatever happened in Tex

12 -- excuse me, in Mississippi and South Carolina has any

13 applicability to Texas, correct, with respect to provisional

14 ballots?

15 A    That's correct.

16 Q    And you've done no empirical analysis to extrapolate the

17 results of your studies in Harris County and the 10 other Texas

18 counties to Texas statewide, correct?

19 A    Those are only a subset of counties in Texas, that's

20 certainly true.

21 Q    Okay.  And so to apply the results of your Provisional

22 ballot analysis in Texas and to -- and to extrapolate them

23 statewide that would involve speculation, correct?

24 A    Well, I -- to some degree I guess the inference you can

25 draw is that perhaps the provisional ballot rate would be about

Hood - Cross / By Mr. Dellheim                    205

```
 1   the same in the rest of Texas as these 10 counties.

 2   Q    Okay.  But you have not endeavored to do that empirically,

 3   to do that test empirically?

 4   A    I wasn't able to count provisional ballots in all 254

 5   counties, no.

 6   Q    Okay.  And -- and under your working rules you would not

 7   ask this Court to do that, correct?

 8   A    To?

 9   Q    To speculate as to the effect of SB 14 in any county other

10   than the ones you've looked at, correct?

11   A    Well, I -- that's correct.  I think the Tables speak for

12   themselves.

13   Q    Okay.  During your deposition we talked about SB 14,

14   obviously in some degree, and I want to ask if you recall

15   testifying that among the voter ID laws in force and effect as

16   we sit here today, do you recall or do you know of any that are

17   more strict than Texas's?

18   A    Well, again, I think I mentioned one that is not in effect

19   currently.  I don't know if we're counting Wisconsin or not.

20   Q    Well, that was struck down by a Federal Court, correct?

21   A    It's enjoined, yes.  Yes.

22   Q    Yes.  So let me repeat my question.

23        Among -- among any voter ID law currently in force

24   and effect as we sit here today, do you know of any that are

25   more strict than Texas's?
```

1   A    Well, do we need to get into what -- into talking about

2   strictness or trying to define strictness?  I mean, because in

3   some ways there are accommodations in the law that are broader

4   than some other states.  We talked about the ID mix which is

5   less so than say Georgia, for instance.

6   Q    Okay.

7        **MR. DELLHEIM:**  Could we bring up Page 83 of his

8   deposition?  Line 10.

9   Q    "QUESTION:  Okay.  So as you sit here today, based on

10       the scientific study you have done of the voter ID

11       laws with which you are intimately familiar and could

12       render an expert opinion in, do you know of any State

13       voter ID laws stricter than Texas's?

14       "Mr. Keister lodges an objection.

15       "QUESTION:  And I will add the qualification that we

16       are talking about laws that are currently in force.

17       "Mr. Keister lodges an objection.

18       "ANSWER:  Okay.  If we can't count Wisconsin, then

19       no."

20       Was that the question asked to you, and was that your

21   testimony, sir?

22   A    I think that's accurate.  Again, I note the caveat that

23   I'm not intimately familiar with all 50 identification laws

24   across the US, so.

25   Q    We spoke earlier about the opinion you -- some of the

Hood - Cross / By Mr. Dellheim                    207

1    opinions you offered to the Florida Court and the Florida

2    Court's rejection of those opinions.  You have testified in

3    several voter ID cases.  Let me ask you this:

4              In the *Billups* case you submitted a report which was

5    essentially your Georgia study in an earlier incarnation, the

6    Thousand Words study, correct?  Do you remember that, sir?

7    A    Yes, although it was -- that's a separate study from the

8    second one.

9    Q    Okay.

10   A    But, yes, it's the earlier study.

11   Q    Okay.

12   A    That's correct.

13   Q    And, in fact, you cite that study, the Thousand Words

14   study in your report in this case, don't you?

15   A    Yes.

16   Q    Okay.  And you gave expert testimony in the *Billups* case?

17   A    I was deposed, yes.

18   Q    And that was with respect to the impact of the voter ID

19   law in Georgia, right?

20   A    Yes.  Yes.

21   Q    And the Court in *Billups* threw out your report and your

22   testimony on Daubert grounds, correct?

23   A    That's correct.

24   Q    And you cite that you -- you cite the report that the

25   Georgia Court threw out, and you cite that report in this

1   report.

2           Did you alert this Court that another Court had found

3   your _Thousand Words_ study to be unreliable?

4   A    Well, I cite the academic article in this particular

5   expert report --

6   Q    Yes.

7   A    -- to be accurate.

8   Q    Right, so my question is, having cited that study, did you

9   alert this Court that another Federal Court had found it to be

10  wholly unreliable?

11  A    No.

12  Q    You testified recently in the Wisconsin voter ID case, the

13  Federal case, is that correct?

14  A    Yes, that's correct.  There were two cases that were

15  consolidated.

16  Q    Okay.  There was the State -- and you testified earlier in

17  the State case, correct?

18  A    That's correct as well.

19  Q    Okay.  And that Court rejected your -- the State Court,

20  the Wisconsin State Court, the _NAACP_ case rejected your

21  testimony as substantially less credible than your opposing

22  expert, do you recall that?

23  A    Well, my testimony wasn't thrown out in that case.

24  Q    Yes, it was just found to be substantially less credible,

25  correct?

Hood - Cross / By Mr. Dellheim                    209

1   A    As far as I can remember, yes.

2   Q    And you testified recently in the Federal voter ID case,

3   and that Court, in the _Frank v Walker_ case, rejected your

4   analysis as suspect, do you recall that, sir?

5   A    Not particularly.

6        **MR. DELLHEIM:**  Ken, let's put up, if we can, Page 76

7   of the _Frank v Walker_ opinion.  To the top, please.

8   Q    This is the Court, Page 76:

9            "For these reasons I have concluded that Hood's

10           decision to automatically count a pair of entries as

11           a match if they had matching identification numbers

12           renders his conclusions in the number of registered

13           voters without an ID suspect."

14           Did I read that accurately, sir?

15  A    Yes.  It doesn't mean my whole analysis was suspect, just

16  on that point.

17  Q    Okay.  In the Florida case we mentioned earlier, we had

18  talked earlier that the Court rejected your -- your view that

19  the 2008 election was an anomaly, but it also went on to reject

20  your testimony nearly completely, correct?

21  A    Well, my testimony wasn't rejected.

22  Q    Okay.

23       **MR. DELLHEIM:**  Let's pull up Page 26 in the Florida

24  Opinion.

25  Q    This is _Florida versus the United States._

1              "We reject the contrary opinions of Florida's expert

2         which is Professor Hood.  We do so because the

3         analysis undermined his conclusions, suffers from

4         the number methodological"

5         And it goes on for pages to outline them.  Does that

6  refresh your recollection, sir?

7  A    Yes.

8  Q    Given all that we have discussed in applying what we have

9  called and what you refer to as the "Hood Principle," would you

10 agree with me that you have not proven to a reasonable degree

11 of scientific certainty what the impact of SB 14 will be in

12 Texas?

13 A    I am aware of -- I have looked -- analyzed the impact

14 since the implementation of SB 14.

15 Q    Let me ask it again.  Given everything we have discussed

16 in applying the principle that you are not going to ask the

17 Court to believe -- to believe anything that you have not

18 proven by empirical study, you have not proven to a reasonable

19 degree of scientific certainty what the impact of SB 14 will be

20 in Texas statewide, correct?

21 A    What it will be?  Like as in the future?

22 Q    How about is or will be?

23 A    I think I've touched on the "is" part of that.

24 Q    Statewide?

25 A    Well, if you are referring to my provisional vote

1    analysis, it doesn't extend statewide, no.

2            **MR. DELLHEIM:**  Okay.  I have no further questions,

3    thank you.

4            **THE WITNESS:**  Thank you.

5                         **CROSS EXAMINATION**

6    **BY MR. ROSENBERG:**

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Ezra Rosenberg.  Nice to see you again, Dr. Hood.

10   A    Good to see you as well.

11   Q    A few questions.  And I'm going to focus on the Barreto

12   and Sanchez survey, but because we're being clocked, I'll just

13   go with the Barreto survey.  Okay?

14   A    Can I do the same?

15   Q    You've designed a total of five surveys in your career;

16   isn't that correct?

17   A    I think we counted them up at the deposition.

18   Q    None of them were surveys of voter identification, right?

19   A    That's true.

20   Q    And you're aware that Dr. Barreto has designed a number of

21   surveys on voter identification?

22   A    At least two others that I know of, yes.

23   Q    And you're aware that he has designed hundreds of surveys

24   in total?

25   A    I don't know what the number s.  It's quite a few, I'd

1    say.

2    Q    Now, nothing stopped the State of Texas from asking you to

3    do a survey in this case, right?

4    A    I assume not.

5    Q    You weren't asked; isn't that correct?

6    A    That's correct, I wasn't asked.

7    Q    And you did not, yourself, consider it; isn't that

8    correct?

9    A    That's correct.

10   Q    But you did review Dr. Barreto's survey here, right?

11   A    I did.

12   Q    And you're familiar with his reputation in the field?

13   A    Yes.  I know who he is.

14   Q    Not only do you know who he is, but you've read a number

15   of his scholarly articles, right?

16   A    That's certainly true.

17   Q    And you --

18   A    And part of a book.

19   Q    Excuse me?

20   A    Part of a book.

21   Q    And part of a book.  And you consider him to be highly

22   competent in his field?

23   A    Yes.

24   Q    And your opinion -- you reviewed his survey in *Frank*

25   *versus Walker* in the Wisconsin case, right?

1  A    That is correct.

2  Q    And in that case your opinion there was that, "Dr. Barreto

3  conducted his survey in a professional manner using commonly

4  accepted survey practices"; isn't that correct?

5  A    That's correct.

6  Q    As a matter of fact, you credited him with what you called

7  a, "Notable improvement in survey questionnaires of this

8  sort" -- this sort being voter identification -- "because he

9  had figured out a way of developing questions to capture

10 responses dealing with possession of ID.s, other than driver's

11 licenses"; isn't that correct?

12 A    I think I made note of that, yes --

13 Q    Now --

14 A    -- in the expert report.

15 Q    And in testimony?

16 A    I'm not denying that.  I mean, it is an important fact if,

17 if we're trying to discern the impact of a voter ID. law that

18 we look at any form of voter -- any form of identification that

19 could be used (indiscernible) that law, certainly.

20 Q    And you call what he had done in that regard to be a

21 "notable improvement over other surveys of the kind"?

22 A    Previous surveys, from my memory, just looked at certain

23 types of identification, like a driver's license or state ID.

24 card.

25 Q    Now, in this case, you have no criticism about the way

1    Dr. Barreto went about selecting the sample respondents; isn't

2    that correct?

3    A    I don't believe so, no.

4    Q    And you have no criticism about the random digit dialing

5    system that he uses selecting those respondents, right?

6    A    That's correct.

7    Q    And you have no criticism of the household random sampling

8    technique that was used to help gather other of the

9    respondents, right?

10   A    That's correct.

11   Q    And you don't criticize the size of the sample that they

12   selected as being suitable for the purpose of the -- of the

13   survey, right?

14   A    I characterize it as suitable.

15   Q    And, matter of fact, you have no criticism about anything

16   about the sample techniques that Dr. Barreto utilized in this

17   case?

18   A    I don't think I raised any, no.

19   Q    And, by the way, you agree that respondent confidentiality

20   and anonymity are standard in the field of surveys, right?

21   A    It's important, yes.

22   Q    As a matter of fact, you agree that respondents are more

23   likely to give honest answers if they believe that the survey

24   is confidential and anonymous?

25   A    Yes.  Under certain circumstances, yes.

Hood - Cross / By Mr. Rosenberg                    215

1   Q    And in this case, you're aware that Dr. Barreto used

2   oversampling, right?

3   A    Yes.  Yes.

4   Q    And did that because it was important to get a suitable

5   number of Black respondents and a suitable number of Hispanic

6   respondents, right?

7   A    Correct.

8   Q    And you don't criticize the way Dr. Barreto undertook the

9   oversampling, correct?

10  A    Many surveys use oversamples in that regard.

11  Q    And you don't criticize the way Dr. Barreto did it in this

12  regard, right?

13  A    Correct.

14  Q    And you reviewed the survey instrument in this case,

15  right?

16  A    Yes, sir.

17  Q    And with the exception of a question dealing with the

18  Veterans Administration ID., you don't have any other criticism

19  of that survey instrument?

20  A    I think that was the one issue I raised with the survey

21  instrument.

22  Q    You don't criticize the survey instrument in, in --

23  because of bias that's implicit in any question, right?

24  A    No, sir.

25  Q    You don't criticize the questionnaire in terms of there

1    being bias in the order of the questions, right?

2    A    No, sir.

3    Q    And you don't criticize the survey in terms of there being

4    bias, in terms of context of the questions; isn't that correct?

5    A    That's correct.

6    Q    And you don't criticize the response rate that Dr. Barreto

7    got as being suitable ground for him to draw the conclusions

8    that were, were drawn; isn't that correct?

9    A    Well, I think I -- the survey response rate was within

10   acceptable norms.  Maybe it's the way to put it.

11   Q    Now, you did testify on direct that you had problems

12   replicating what Dr. Barreto did, right?

13   A    I did, yes.

14   Q    You came close, though, you said?

15   A    No, I -- well, clearly, it's in the -- it's in the report.

16   It did come close, I just couldn't quite hit it on the -- on

17   the head.

18   Q    Yeah.  Are you aware there's, there's another expert,

19   Dr. Milyo in this case, are you aware he was able to replicate

20   the results, aren't you?

21   A    No, I haven't -- I haven't talked to Dr. Milyo.

22   Q    You haven't read his report?

23   A    No.  No.

24   Q    You didn't compare notes or anything like that?

25   A    No, I didn't.

1   Q    Okay.  I've been trying to figure out why you weren't able

2   to replicate the results, frankly, and I --

3   A    Well, I have, too.

4   Q    Well, let's -- let's -- maybe we can work together and see

5   if we can figure it out.

6   A    Okay.

7          **MR. ROSENBERG:**  Can we have the ELMO on, please?  See

8   if this is the one I want.

9   Q    Does that look like a page from your data set?

10  A    Well, it, it looks like a printout, a --

11  Q    Of your data sets?

12  A    Well, not my data set, but --

13  Q    Well --

14  A    -- I mean, the survey data set, is that fair?

15  Q    Well, you see where it says, "Hood -- TX, underscore,

16  survey, underscore, Barreto, underscore, Sanchez.SAV"?

17  A    Okay.

18  Q    Isn't that the data set that was sent to us from you, your

19  reconstruction?

20  A    Well, it wasn't a reconstruction; it was just the data set

21  that had been sent to me that I sent back.

22  Q    Well, didn't you do a binary reconstruction of the ID.s

23  here?

24  A    Yes, but all I'm saying is the rest of the data set was

25  the same.

Hood - Cross / By Mr. Rosenberg                    218

1   Q    Right.  But that -- the language "binary reconstruction of

2   ID. possession," isn't that -- aren't those your -- isn't that

3   your tabulation?

4   A    That sounds familiar.  I think I named the variable after,

5   or gave it that label.

6   Q    Okay.  Then let's look down -- see if I don't blind anyone

7   with this.  You see where it says "30" under "binary

8   reconstruction of ID. possession"?

9   A    Yes.

10  Q    And that's 30 know it expired before January of 2014; do

11  you see that?

12  A    Yes.

13  Q    That means those people did not have current ID.s, right,

14  those respondents?

15  A    Well, I, I guess it -- you know, up to 60 days before that

16  it would have been usable.

17  Q    Right.  But the point of this question was to see whether

18  or not those were current ID.s, right, 60 days or more?

19  A    I'd have to look at the question again.  I mean, I can see

20  what the printout says.

21  Q    Do you know why you're listing those 30 as having ID.s --

22  A    No.

23  Q    -- even though they're not current?

24  A    No, I don't know why.

25  Q    And we'll show you another page from your data set.  And,

1    again, do you see under "ID.s," "No expired before

2    January 2014"?  You have them as yeses, right?

3    A    Yes.

4    Q    And you can't explain that here, can you?

5    A    Not sitting right here, no.

6    Q    All right.  Let me see if I can help you a little.

7    A    Okay.

8    Q    When you were trying to calculate who were yeses and who

9    were no's, in terms of ID.s, how did you figure out who was a

10   yes and who was a no?

11   A    How?  By looking at the survey questionnaire.

12   Q    Well, in -- specifically --

13        **MR. ROSENBERG:**  Let's -- you know, let's bring up

14   Page 30 of Dr. Hood's report.

15   Q    And go to the top, the first sentence on top, first line,

16   if you can highlight that using the indicator?  Using the

17   indicator in the data set denoting ID. possession, do you see

18   that?

19   A    Yes.

20   Q    And that's how you selected who had possession, who did

21   not, using the indicator?

22   A    Well, that was a variable that was in the data set that --

23   Q    Let's see what that variable was.

24        **MR. ROSENBERG:**  Let's go down to the bottom footnote

25   of 63, all the way down.  There we are.

Hood - Cross / By Mr. Rosenberg                    220

1   Q    The indicator was labeled in the data set, "ID.,

2   underscore, type," right?

3   A    Yes.

4   Q    So that's what you did.  You basically looked to see where

5   respondents had a column, so to speak, with -- under "ID.

6   type," and there was some ID. placed there, and you put that

7   person as a yes; isn't that right?

8   A    That variable was already created in the data set I got,

9   so I -- no, not in that case.  I don't think that's accurate to

10  say, I was moving people around at that point.

11  Q    Oh, I'm not suggesting you're moving things -- people

12  around, Doctor.

13  A    Okay.

14  Q    I'm suggesting that if you saw a respondent who had a, an

15  ID. labeled under "ID. type," you'd consider that person a yes

16  because you thought that was the indicator for ID.; is that

17  correct?

18  A    Yes.

19  Q    Is there anything, any place in Dr. Barreto's report -- if

20  you want to, you can look through it -- where Dr. Barreto says

21  that ID., underscore, type, is the summary variable for ID.

22  possession?

23  A    I can't recall that, no.

24  Q    Is there anything in Dr. Barreto's data set that it tells

25  you, that instructs you that ID., underscore, type is a summary

1    variable for ID. possession?

2    A    I don't know what the label was that it was appended to

3    that variable.

4    Q    But you assume that that was the summary for ID.

5    possession?

6    A    Yes.

7    Q    Have you ever heard of anything called programmable

8    variable?

9    A    Sure.

10   Q    What's a programmable variable?

11   A    It's a variable that's created from a set of code.

12   Q    And sometimes surveyors use a programmable variable,

13   perhaps, as a cumulative rolling variable, that basically

14   allows them to go from question to question?  Is that how it

15   works?  I'll give you some examples, perhaps?

16   A    Okay.  Go ahead.

17   Q    This -- in this survey, this was done by people sitting at

18   a computer talking on the phone, right?

19   A    That's correct.

20   Q    So you get an answer, Question Number 1:  Do you have a

21   driver's license?  Yes, let's assume.  Okay.  The next question

22   is something like:  Is it current or expired?  Can you

23   understand circumstances where the surveyor would use ID.,

24   underscore, type as a programmable variable to bridge from the

25   first question to the second question, from the question of

1    possession to the question of current or expired?  Does that

2    make sense?

3    A    Are we talking about survey branching?  I mean, is that

4    fair?

5    Q    Exactly.

6    A    Okay.

7    Q    And there is survey branching here, right?

8    A    I -- yeah, it was pretty obvious they used branching in

9    the survey.

10   Q    So you could understand, perhaps, the need to use a

11   programmable variable, like ID. type, to branch from question

12   to question, correct?

13   A    Yes.

14   Q    And in that sense, ID. type could simply be the

15   programmable variable, but does not -- is not a summary

16   variable that says at the end that that's the yes or the no.

17   For that you have to go through all of the questions, correct?

18   A    Well, that's one possibility, yes.

19   Q    So perhaps that might explain why you weren't able to

20   completely replicate what Dr. Barreto did; isn't that correct?

21   A    It's one possibility, I agree.

22   Q    Now there's some other differences between the way you

23   approached things and the way Dr. Barreto approached things.

24   And let me zoom ahead to the issue of weighting.  Now, you

25   agree that weighting -- W-E-I-G-H-T-I-N-G -- is a standard and

1   widely accepted procedure in the field of survey analysis, to

2   make sure that the survey results are reflective of the

3   population being sampled, correct?

4   A     That's correct.

5   Q     That's a, just basically, it's one of the basic principles

6   of analysis; isn't that correct?

7   A     Most surveys have to be weighed, yes.

8   Q     So when you want to see what percentage of Black voters

9   have ID., and what percentage of Hispanic voters have ID., and

10  what percentage of White voters have ID., you would want to

11  make sure that those population groups whom you are sampling

12  are reflective of the population of those groups as a whole,

13  correct?

14  A     Okay.  Well, you want to make sure that the sample

15  proportions for those groups match the population numbers, is

16  that fair?

17  Q     Well, you want to make sure that those groups, themselves,

18  represent those groups.  Meaning, I'll give you some examples.

19  For example, if you want to figure out the percentage of Black

20  voters who don't have ID.s, of Hispanic voters who don't have

21  ID.s, of White voters who don't have ID.s, you want to make

22  sure that, for example, the Black respondents were reflective

23  of Black individuals in the population of Texas as a whole, in

24  terms of income; isn't that correct?

25  A     Yes.

1    Q    And in terms of gender; isn't that correct?

2    A    Yes.

3    Q    And in terms of education; isn't that correct?

4    A    Yes.

5    Q    And the same as to Hispanics, you want to make sure that

6    those respondents were reflective of the actual population, in

7    terms of those very important demographic groups, right?

8    A    Okay.

9    Q    The same thing as to Whites, right?

10   A    Yes.

11   Q    So, for example, if the survey respondents were

12   disproportionately wealthy Blacks or disproportionately young

13   Whites, you'd want to apply established weighting methods to

14   adjust the weight given to those responses to accurately

15   reflect the actual population, correct?

16   A    Yes.

17   Q    And Dr. Barreto did that, right?

18   A    Well, again, I quibbled with, with the end result of it,

19   but …

20   Q    Well, Dr. Barreto did internal weighting of each

21   population group, weighting Blacks according to income,

22   according to education, according to gender?

23   A    That's correct.

24   Q    And according to age -- I forgot age, correct?

25   A    You're correct.

1    Q    You did not?

2    A    No, I didn't.  And I stated I didn't.

3    Q    And he did the same thing as to Hispanics, and you did

4    not, right?

5    A    No.  I just --

6    Q    And he did the same thing as to Whites, and you did not?

7    A    I just adjusted my weight variable to make sure that the

8    sample proportions matched the population proportions on race

9    and ethnicity.

10   Q    As a whole?

11   A    Yes.

12   Q    But that only goes to, ultimately, the overall number,

13   when you combine the races and ethnicities together; isn't that

14   correct?

15   A    That's when you need the correction, yes.

16   Q    Because that's the only time you're worried about whether

17   the percentage of Blacks whom you sampled are reflective of the

18   percentage of Blacks in the population, the percentage of

19   Hispanics whom you sampled are reflective of the percentage of

20   Hispanics as a whole in the population, and the same thing as

21   to Whites, and then you get this big number.  But that's only

22   for the overall number, right?

23   A    Yes.

24   Q    Not for the percentage of Blacks who have ID.s or don't

25   have ID.s, or Hispanics who have ID.s or don't have ID.s, or

1   Whites who don't have ID.s, right?

2   A    Right.

3   Q    In fact, you agree that younger persons are less likely to

4   have ID.s than older persons?

5   A    I think we talked about this a little bit.

6   Q    Yes.

7   A    In, in Georgia it appears that older individuals may be

8   less likely.

9   Q    Well, that's why you would want to make sure that when you

10  do your analysis, you're weighting properly for age, because

11  there could be age-related differences, right?

12  A    There can be various socio-demographic differences, yes.

13  Q    In fact, at the time of your deposition here, you hadn't

14  even bothered to look at those factors?

15  A    Age?

16  Q    In connection with this case.

17  A    That's correct.

18  Q    And, in fact, you, therefore, assigned the same weight to

19  every Black respondent, the same weight to every Hispanic

20  respondent, the same weight to every White respondent, no

21  matter what their age was, no matter how, how poor or wealthy

22  he or she was, no matter how educated he or she was and, in

23  fact, no matter whether he was a she or she was a he, right?

24  A    That's correct.

25  Q    But Dr. Barreto did that analysis, right?  He did the

1   weighting?

2   A    He, he weighed --

3   Q    And, in fact -- I'm sorry to interrupt you.

4   A    He, he used that on the weight variable, yes.

5   Q    And, in fact, on --

6             **MR. ROSENBERG:**  Let's go to Table 2 of Dr. Barreto's

7   reply report.

8   Q    By the way, while that's coming up, I think you were here

9   last week, right?

10  A    No, sir.

11  Q    Our first day in Corpus Christi.

12  A    This --

13  Q    Okay.  So you weren't --

14  A    This week, yes, not last week, no.

15  Q    Okay.  It all blurs.  So you were not here for

16  Dr. Barreto's testimony?

17  A    No, I didn't see it.

18  Q    Okay.  And have not read his testimony?

19  A    Yes, I did.

20  Q    Oh, you did read his testimony?

21  A    Yes.

22  Q    Oh, great.

23            **MR. ROSENBERG:**  Can we get to Table 2, please?

24            **UNIDENTIFIED SPEAKER:**  I'm not sure what pages it's

25  on.

1        **(Pause)**

2             **MR. ROSENBERG:**  It's on Page 5.

3             **UNIDENTIFIED SPEAKER:**  Page 5, that's Table 1.

4    **BY MR. ROSENBERG:**

5    Q    And Dr. Hood, turning your attention to the screen and you

6    see Table 2.  You've seen this table before, right?

7    A    Yes, sir.

8    Q    And that's a comparison of the census columns to -- of

9    weights as to each of these demographics for Anglos, African

10   Americans, and Hispanics, compared to the Hood column, correct?

11   A    Yes.  Yes, sir.

12   Q    And Dr. Barreto -- you weren't here, but you did read his

13   testimony -- testified that the census column is the same

14   column that he used in his report.  Did you read that in his

15   testimony?

16   A    I believe I remember reading that, yes.

17   Q    So, while Dr. Barreto mirrored the census on every age

18   cohort, every education cohort, every income cohort, and

19   every -- each of the two gender cohorts, you did not, correct?

20   A    That's correct, I didn't use those factors to weight on.

21   Q    And, matter of fact, there were fairly substantial

22   differences, if you look at Anglos, you were underrepresented,

23   in terms of age, 13.7, correct, percent difference?

24   A    Yes.

25   Q    Overrepresented on elder -- I don't want to call us

1    elderly Whites, because I'm almost there -- 65 and over, at

2    25.7 percent difference, you see that?

3    A    Yes.  Yes.

4    Q    With African Americans 65 and over, you are

5    overrepresented at 35.3 percent and underrepresented at 21.1

6    percent; do you see that?

7    A    Yes, sir.

8    Q    Education, Anglos you were overrepresented 11.5 percent,

9    right?

10   A    Yes.

11   Q    And so on.  And you can't dispute these figures; isn't

12   that correct?

13   A    No, I'm not.

14   Q    Now, I'm going to just very briefly turn to your tables

15   that Doctor -- that Doctor -- yeah, that Dr. Scott went through

16   with you.

17          **MR. SCOTT:**  You're going to use my demos through him?

18          **MR. ROSENBERG:**  No, no, no, I'm going to use his

19   tables.  And let's go to Table 10B.  I'm sorry, 10 is in -- it

20   includes the report in Table 10B, and it's Page --

21          **THE COURT:**  Thirty?

22          **MR. ROSENBERG:**  -- 30.

23   **BY MR. ROSENBERG:**

24   Q    Well, this was the first table, I think, you talked to

25   Mr. Scott about, and this was a straight comparison of how you

1   have computed Barreto's survey results -- it's the left-hand

2   column for voting eligible population, right?

3   A    Yes, sir.  I'm trying to replicate the results here.

4   Q    Right.  And that's where I think we are that -- that who

5   would have them based on some errors, in terms of who was a yes

6   and who was a no as we've seen, right?  That might be the

7   reason why it's --

8   A    It's, it's possible.  It's possible.

9   Q    And the next is your reconstructed weight, right?

10  A    Yes.  Yes.

11  Q    And you used his weights for that left-hand column --

12  A    Where it says "survey weight," that's Dr. Barreto's.

13  Q    Right.  And those are the weights that were based upon the

14  cohorts of age, education, income, and gender, right?

15  A    That was the weight that was -- came with the survey data

16  set that I was given.

17  Q    And then you have your reconstructed weight, which is not

18  based on those cohort -- by cohort weight, right?

19  A    Right.

20  Q    And even with the possible errors in who was a yes and who

21  is no, you still have the statistical significance of 10.4

22  percent Hispanics to Whites on, on voting eligible population

23  for, for the Barreto survey weight, right?

24  A    Yes, that's correct.

25  Q    That's statistically significant at the .95 level of

Hood - Cross / By Mr. Rosenberg                    231

1   significance, right?

2   A    Right.  The .05 level, yes.

3   Q    Right.  And, in fact, the 7.3 percent Blacks to Whites

4   approaches statistical significance, does it not, at the --

5   A    Well, we talked about this previously, again.  It

6   either -- it either met the mark or it didn't.  I can't tell

7   you sitting here exactly what the P level was for that set.

8   Q    So since we talked about it, you didn't go back and

9   compute the P value, did you?

10  A    I didn't, no.

11  Q    If I told you the P value is statistically significant at

12  the .10 level of significance, would you be surprised?

13  A    Not, not necessarily.  I mean, you've lowered the

14  significance level in that case, so it's possible.

15  Q    And you found even doing your reconstructed weight without

16  the proper weighting, you found 6 -- 6.9 percent Hispanics to

17  Whites, and that's statistically significant?

18  A    That's -- that would be correct, yes.

19  Q    And looking at the registered voters, again, assuming

20  whatever you did, in terms of yeses and no's when you looked at

21  Barreto's survey, both Hispanics and Blacks were statistically

22  significant compared to Whites, right?

23  A    That's correct.

24  Q    And, again, even under your reconstructed weight,

25  statistical significance, Hispanics to Whites, right?

1  A    That's correct.

2        **MR. ROSENBERG:**  Let's go to the 10 -- 10C.

3  Q    Now 10C, the only difference between 10C and 10B is that

4  you took out those -- your -- it was very nice of you, and

5  honest -- you put back one person as a no whom you found and

6  took out 12 who had been yeses and you categorized them as no's

7  because -- I'm sorry, who had been no's and you categorized

8  them as yeses because of an issue as to whether -- citizenship,

9  right?

10  A    Yes.  Whether they had a U.S. --

11  Q    Right.

12  A    -- certificate of citizenship with photograph.

13  Q    And again, it's possible that that could have been based

14  on your reading of ID. type; isn't that correct?

15  A    No.  At that time I had completely -- when it says

16  "recalculated ID. possession variable," I had gone through the

17  survey instrument and tried to completely reconstruct the ID.

18  variable myself.  So, so, question by question by question.

19  Q    Even doing it that way, now you find statistical

20  significance when you looked at the survey with the -- with the

21  proper weighting of 7.3 percent Hispanics to Whites, that's

22  statistically significant, right?

23  A    Yes, sir.

24  Q    And 7.7 percent Hispanics -- Blacks to Whites, that's

25  statistically significant, right?

1   A    Yes, in the voting eligible population.

2   Q    In the voting eligible, and in the registered voting

3   population you have statistical significance, 3.9 percent for

4   Hispanics to the 2 percent White, and statistical significance

5   4.5 percent for Blacks to the 2 percent for Whites, right?

6   A    That's correct, sir.

7   Q    And, again, even in your reconstruction, without doing the

8   internal weighting, we still have statistical significance, 4.2

9   percent for Hispanics, 2.5 percent for Whites, right?

10  A    That is correct, yes.

11           **MR. ROSENBERG:**  Let's go to the next table, 10D,

12  please.

13  Q    Now, 10D is kind of interesting.  Is this the one where

14  you take out everyone 65 and over and everyone who's disabled?

15  A    I don't take them out of the -- of the data set for the

16  analysis, but I'm not -- so when I say "affected population,"

17  again, this would be someone that doesn't have an ID., someone

18  that's under 65, someone that doesn't have a qualifying

19  disability, or someone that hasn't voted post implementation.

20  Q    One -- but they're not included then as not having an ID.

21  on this -- on these, right?

22  A    That's right.  That's who's, who's left.

23  Q    Right.

24  A    Yes.

25  Q    So they're out of this table?

1  A    Well, they were using the analysis, but, yeah, they're --

2  that's who's left after you take out those groups.  Does that

3  make sense?

4  Q    Yeah, in a way.  I'll tell you what my problem is.

5  A    All right.

6  Q    Well, first I'll tell you the good news.  The good news is

7  we still have statistical significance, 6.3 percent Hispanics

8  to Whites, and 5.8 percent Blacks to Whites, right, under

9  "voting eligible population"?

10 A    That's correct.

11 Q    Even under your other reconstruction, we have 3.2 percent

12 statistical significance to 1.7 percent, correct, for

13 Hispanics?

14 A    That's correct.

15 Q    For registered voters we have statistical significance,

16 3.1 percent to .9 percent and -- for Hispanics and 3.3 percent

17 to .9 percent for Blacks, right?

18 A    That's correct.

19 Q    And under, again, your reconstruction, again, 2.1 percent

20 for Hispanics to .5 percent for Blacks, right?

21 A    Yes, sir.

22 Q    And that's why I said "the good news."  The bad news, you

23 have fewer people who you're looking at in this analysis; isn't

24 that correct, because you've taken out a lot of people from

25 both the yes and no's?

1   A    Well, again, I haven't removed them, they're just not part

2   of the -- what would be the affected population group.  They're

3   in the unaffected group.

4   Q    Okay.  But, again, no weighting as to age, et cetera?

5   A    Well, unless you use the survey weight, which is analogous

6   to the Barreto weight.  I mean, that is the Barreto weight,

7   right?

8   Q    And that's where we get the statistical significance, both

9   Hispanics and Blacks?

10  A    Yes.  In that table, yes.

11  Q    Let's go to the next one, which I think was 11A.  And this

12  is the one that you said was based just on those persons who

13  were citizens; is that correct?

14  A    No, sir.

15  Q    Okay.  Tell me -- tell me what this one is.

16  A    Okay.  So this is anyone who -- this is basically looking

17  to see who doesn't have certain types of underlying

18  documentation, specifically proof of citizenship.

19  Q    That's right.  Okay.  So this was her --

20  A    Well, he said they were a citizen.

21  Q    I'm sorry.

22  A    Okay.

23  Q    I'm sorry.  I -- my, my misstep.  But this was solely

24  respondents who lacked proof of citizenship?

25  A    Well, and that didn't have an ID.  If they had an ID.,I

Hood - Cross / By Mr. Rosenberg                   236

1    didn't really count it against them, if they didn't have the

2    underlying documentation because they had the ID.

3    Q    How large a subsample is this?  Thirty people, maybe?

4    A    It's not many.  I mean, I guess you could -- you could

5    multiply some of those percentages by -- what was it, about

6    2,300 --

7    Q    Right.

8    A    -- I mean, approximate respondents?

9    Q    So the universe you're looking here is about a third of

10   your respondents, right?

11   A    It's not many, yes.

12   Q    It's not many.  Did you do any reweighting even of the

13   Barreto-Sanchez weighting, in light of the fact that you

14   reduced the, the population sample down to around 30?

15   A    No.  I didn't do anything to their weight variable amount.

16   Q    And, nevertheless, even here with a very, very small

17   sample, maybe 30 people, we have statistical significance for

18   Hispanics of voting eligible population 2.4 percent to 1

19   percent, right?

20   A    That's correct.

21   Q    And then, finally, we might as well look at 11B.  And this

22   is one where you -- this is the one which is even smaller,

23   right, because here we're dealing with that group of 30 that

24   you've now reduced -- you, you've taken out the people who are

25   65 or over, people who are disabled, right?  So what are we

Hood - Cross / By Mr. Rosenberg                237

1    dealing with here, five?

2    A    Okay.  Well, may -- let me -- let me start over, so we're

3    not -- no one's confused about this.  So this, this would be,

4    basically, who lacks proof of citizenship, who doesn't already

5    have an SB 14 ID., who is under 65, who is not disabled, and

6    who has not cast a ballot post implementation.

7    Q    Very, very small universe left here; isn't that correct?

8    A    It's a small number of people, yes.

9    Q    And, in fact, even according to all your numbers --

10            **MR. ROSENBERG:**  Well, withdrawn.

11   Q    By the way, you consider yourself an expert on American

12   elections, right?

13   A    Yes, sir.

14   Q    And when you testified in Wisconsin late last year, you

15   said you were unaware of a single case of in-person voter

16   impersonation fraud; isn't that correct?

17   A    Did I say anywhere or in Wisconsin?

18   Q    Well, actually, that was the same question that you raised

19   at the deposition.  And the answer is anywhere, if you're

20   asking me.

21   A    Okay.  Well, at least I consistently remembered that.

22   So …

23   Q    Right.  And since then, you're, you're not aware of a

24   single instance of in-person voter identification fraud

25   anywhere in the country; isn't that correct?

Hood - Cross / By Mr. Rosenberg                238

1   A     I haven't read of any, no.

2   Q     Thank you.

3              **MR. ROSENBERG:**  No further questions.

4                         **CROSS EXAMINATION**

5   **BY MR. DUNN:**

6   Q     Hello, Dr. Hood.  My name is Chad Dunn.  Nice to meet you.

7   A     Nice to meet you.

8   Q     You and I have not had an opportunity to meet.  I think I

9   was in Dr. Sanchez's deposition when you gave testimony in this

10  case.  I represent the Veasey LULAC Plaintiffs here.  Do you

11  understand that now?

12  A     Yes, sir.  Yes.

13  Q     All right.  Most of what I wanted to ask you was ably

14  handled by Mr. Rosenberg and Mr. Dellheim.  There's just a few

15  topics I want to deal with.

16              As I understand your testimony here today and from

17  looking at your report and deposition, the expert analysis that

18  you've analyzed is that of Dr. Ansolabehere, that of

19  Dr. Barreto and then that of Dr. Sanchez; is that true?

20  A     Yes, yes.

21  Q     And with the other 14 or so experts that have come before

22  this Court and testified you haven't offered any opinions on

23  their methodology or their conclusions; is that true?

24  A     No, I just concentrated on those reports that I indicated

25  earlier.

1  Q    So it's a true statement those are the only three experts

2  you've offered criticism of, correct?

3  A    Yes.

4  Q    All right.

5  A    Yes.

6  Q    There's another expert though in this case, Dr. Herron,

7  who took the data from the database algorithm and produced a

8  report and testimony as it pertains to racial disparity and ID

9  possession.  Are you aware of that?

10  A    I'm aware a report was produced by Dr. Herron, yes.

11  Q    Okay.  But that's not a report you've had occasion to give

12  testimony on today; is that right?

13  A    That's correct.

14  Q    Dr. Herron's numbers are, in fact, consistent with

15  Dr. Ansolabehere's numbers and also the numbers that were

16  produced by the survey.  And I assume you're not aware of that

17  fact either?

18  A    I didn't really have time to -- I can't say that I didn't

19  take a cursory look at that report, but I certainly didn't have

20  time to look at it in detail.

21  Q    Now, I understand -- if I understand your testimony at

22  deposition and today, you were involved at the very beginning

23  in this case in developing the algorithm system that was going

24  to be run on behalf of the State as it pertains to the database

25  match.  Do you remember Mr. Dellheim asking you about this?

1    A    Yes.

2    Q    Okay.  And ultimately you came up with that five formula

3    system or algorithm; am I right?

4    A    I think it was five.

5    Q    Right.  Mr. Dellheim showed it to you earlier.

6    A    I mean the one that was up on the screen earlier.  That

7    was accurate.

8    Q    And that was run at the State's request; is that true?

9    A    That's correct.

10   Q    It was run against all the federal databases and compared

11   to the team database; is that right?

12   A    Yes.

13   Q    And it came back with a data set.

14   A    Yes.

15   Q    Is that right?

16   A    Yes.

17   Q    A data set that you wanted and you were expecting to see

18   in this case; is that true?

19   A    Yes, yes.

20   Q    And if I understand your testimony at deposition, you

21   analyzed that data set; is that right?

22   A    I looked at it, certainly.

23   Q    But then ultimately when you produced your report in this

24   case there's no analysis or conclusions based upon the

25   algorithm the State wanted to have run; is that true?

1  A    Right.  It's Professor Dr. Ansolabehere's numbers.

2  Q    Well, let me back up to another database match and see if

3  you've heard anything about that.

4           There's testimony here in this case that the

5  Secretary of State's Office when Senate Bill 14 was being

6  considered by the legislature performed a database match to try

7  to determine the number of affected individuals under Senate

8  Bill 14.  Are you aware of that match?

9  A    No.

10  Q    And, in fact, the testimony in the case is that the

11  Secretary of State's Office came up with a number in the

12  neighborhood of 800,000 affected people.  But then according to

13  the Secretary of State it's been alleged that number wasn't

14  shared with any members of the legislature.  Are you aware of

15  that fact?

16  A    I'm not aware of much of this at all to be honest with

17  you.

18  Q    So when you were retained by the State, I take it from

19  your testimony you weren't provided any previous analysis the

20  State had performed to try to determine the effect of their law

21  Senate Bill 14; is that true?

22  A    That's correct.

23  Q    And I guess what I find curious about your testimony,

24  Dr. Herron [sic], which isn't really an indictment of you but

25  perhaps more of the State, is the testimony in this case is

Hood - Cross / By Mr. Rosenberg                    242

1   that the State has done a database match when this law was

2   being analyzed and then it had you design a database match, and

3   yet we hear no conclusions from it in this case.  You've

4   offered none; is that right?

5   A    Not from that database match, no.

6   Q    Now, certainly if the State had wanted to advance some of

7   its resources to the question, somebody with your expertise and

8   experience could have taken that five-formula algorithm and

9   come up with some answers today for this Court in terms of what

10  the disparity might be and the number of folks affected by

11  Senate Bill 14; could they have not?

12  A    They could have asked me to do that, yes.

13  Q    Now, I'd like to shift gears with you a little bit if I

14  could.

15        Do you believe that ID possession is correlated with

16  income?

17  A    Yes, most likely.

18  Q    So, in other words, the poorer you are the more likely you

19  are to not have ID; is that true?

20  A    Well, certainly certain types of ID, I'd say, like a

21  driver's license.

22  Q    And, in fact, that's one of the points that Mr. Rosenberg

23  I believe ably made, that that's why it's so important that

24  when you weight survey data you don't just do it by race but

25  you do it by income.  Wouldn't you agree?

1   A    Well, again, I explained in the expert report why I did

2   what I did.  And I was just trying to bring the racial

3   proportions back into line.

4   Q    In your study of Texas in this case I assume that you

5   stumbled across data that indicates that African Americans and

6   Latinos in Texas are much more likely to be poor and lower

7   income than Anglos.

8   A    Well, I didn't look up any of that data, no.

9   Q    So you're telling us as you sit here today you're unable

10  to confirm for the Court whether the minority population in

11  Texas is, on average, poorer than the Anglo population?

12  A    Well, I'm saying I didn't look up those facts from the

13  census, no.

14  Q    Okay.  So does that mean you don't know?

15  A    Well, I always like to confirm.

16  Q    What is your hunch?

17  A    It's probably yes.

18  Q    Okay.

19  A    But I'm just making it clear that I didn't look that up.

20  Q    So when you were working with the data of Dr. Ansolabehere

21  and Dr. Barreto and Dr. Herron and you were making adjustments

22  to it --

23  A    Well, I was just working with Dr. Ansolabehere's data, to

24  be honest with you.

25  Q    Oh, that's correct, you've told me that.  So when you were

1   working with Dr. Ansolabehere's data and the survey --

2   A    Yes, the survey, too.

3   Q    -- from Dr. Barreto and you were making adjustments to the

4   methodology that had the result of reducing the racial

5   disparity, did that not alarm you in light of the conclusions

6   that you should have already reached in your mind that given

7   the minority population was lower income there would be

8   disparity in ID possession?

9   A    Well, there still was disparity.

10  Q    It was just minimized by you; is that right?

11  A    The numbers shifted, yes.

12  Q    Thank you, sir.  I appreciate your time.

13  A    Thank you.

14          **MR. SCOTT:**  Is the common interest through?

15          **THE COURT:**  Is everyone on this side finished?

16          **MR. ROSENBERG:**  Yes.

17          **THE COURT:**  Okay.

18          **MR. SCOTT:**  No further questions, your Honor.  May

19  the witness be dismissed?

20          **THE COURT:**  Yes.  Thank you.  You can step down, sir.

21          **THE WITNESS:**  Thank you,  your Honor.

22      **(Witness steps down)**

23          **MR. SCOTT:**  Your Honor, I think the next will be a

24  reading from Senator Patrick's deposition.

25      **(Pause)**

1          **MS. WOLF:**  Your Honor, Lindsey Wolf for the

2     Defendants will be reading from Dan Patrick's deposition.

3     **EXAMINATION OF DAN PATRICK BY EXCERPTS OF DEPOSITION TESTIMONY**

4          **(QUESTIONS READ BY MS. WOLF; ANSWERS READ BY MR. SCOTT)**

5               "QUESTION:  Senator Patrick, could you state and

6               spell your name for the record?

7               "ANSWER:  Dan Patrick, D-a-n P-a-t-r-i-c-k.

8               "QUESTION:  Yeah.  Was voter ID an important issue to

9               you as a Texas senator?

10              "ANSWER:  It was an important issue to listeners.  It

11              was an important issue to voters and citizens in

12              Texas.  If you look at the polling, I believe at one

13              point 90 percent of Texas voters -- which would be

14              Republicans, Democrats, Independents -- were in

15              support of it.  I believe I saw a poll with that.

16              But it was a very high percentage.  But it was no

17              more or -- I wouldn't say no less, but there were

18              many important issues.  It was one of many issues

19              that people would talk about.  And some of that was

20              not so much seasonal; but, you know, talk radio is

21              often driven by the headlines in the news.  So it

22              might be a hot topic if there was a story and then it

23              might not be discussed for months.

24              "QUESTION:  But you would say that the issue of voter

25              ID was important to your listeners on the radio?

Patrick / By excerpts of Deposition - Direct          246

1         "ANSWER:  I believe the issue of photo voter ID -- I

2         know we talked about that early -- to be clear, was

3         important to, apparently -- based on some polls that

4         I read in the papers and saw somewhere -- 80, 90

5         percent of the people in Texas.

6         "QUESTION:  You mentioned some polling that you were

7         aware of.  Did you ever see the specific poll

8         questions that you're referring to that reflected a

9         particular level of support for photo voter ID?

10        "ANSWER:  I would imagine that I read the questions

11        in a newspaper article.  Did I see the actual poll?

12        Only as it would have been reported, to my knowledge.

13        I've seen results of polling.  But there were

14        frequent articles, as I recall, in the newspapers at

15        the time, or online somewhere, because this issue

16        went on a number of -- this issue went on a number of

17        years, as you know, that would -- it was usually

18        always the same, that the vast majority of

19        Republicans, Democrats, and Independents, supported

20        the legislation.

21        "QUESTION:  You voted in favor of Senate Bill 362; is

22        that correct?

23        "ANSWER:  If that's what the record reflects, yes.

24        "QUESTION:  And is that why you supported it, because

25        you believe it reflected what you thought the

Patrick / By excerpts of Deposition - Direct        247

1     majority of Texas wanted, or were there other reasons

2     why you supported this bill?

3     "ANSWER:  I believe it's important to protect the

4     integrity of the ballot box and I believe that it was

5     the will of the people.  As a legislator -- not

6     always, but much of the time -- you vote for

7     legislation that is supported by a majority of the

8     people.  And in this case it was a -- what I believe

9     was a large majority of Texans from all political

10    perspectives.

11    "QUESTION:  And how did you ascertain in your

12    judgment that this bill in particular was supported

13    by a majority of Texans?

14    "ANSWER:  We have talked a little about this in the

15    deposition already.  Newspaper articles, polling that

16    I read about, talking to folks, whether it was on the

17    radio or in person, probably calls to our office.

18    There was a general sense that not 100 percent of the

19    people, but 80 or 90 percent of the people believe

20    that showing a photo when you came to vote was

21    appropriate to protect the integrity of the ballot

22    box.

23    "QUESTION:  Were you aware that there are some Texas

24    voters who didn't support this legislation?

25    "ANSWER:  The one thing you learn as a legislator is

Patrick / By excerpts of Deposition - Direct          248

1          you're never going to get 100 percent of the vote and

2          you're never going to get 100 percent of the people

3          to agree on any legislation.

4          "QUESTION:  Within the legislature itself, was it

5          even close to 100 percent of the Senate supporting

6          this bill?

7          "Ms. Donnelly objects on form.

8          "You can answer.

9          "ANSWER:  I believe it was 100 percent.  I could be

10         wrong, but I believe it was 100 percent.  There may

11         have been one or two Republicans who didn't vote, but

12         I believe it was unanimous.  The Democrats did not

13         support it.  But their constituents -- based on

14         polling and news stories, and interviews that I

15         received, and general knowledge -- supported it.

16         "QUESTION:  So it's your judgment that even though --

17         let me just be clear then.  So you understood that no

18         Democratic members of the Senate supported SB 362; is

19         that correct?

20         "ANSWER:  Supported it or voted for it?

21         "QUESTION:  Voted for it.

22         "ANSWER:  To my recollection -- the record can

23         correct it -- I do not believe any Democrats voted

24         for it.

25         "QUESTION:  But you think, notwithstanding the fact

Patrick / By excerpts of Deposition - Direct          249

1       that no Democrats voted for it, you think their

2       constituents supported this bill in particular?

3       "ANSWER:  I can't speak to this bill in particular.

4       I believe that the majority of their constituents

5       support the concept.

6       "QUESTION:  So my question was:  What was the

7       legislative purpose of this bill?

8       "ANSWER:  To protect the integrity of the ballot box

9       by doing our best to assure that the only people

10      voting were people who were eligible to vote and

11      registered to vote.

12      "QUESTION:  Was it your view that voters had a lack

13      of confidence in the election process in Texas prior

14      to this point?

15      "ANSWER:  Yes.  You asked me earlier did I -- was

16      I -- I took the question as, was I personally aware

17      of any particular voter fraud; and my answer was, was

18      I personally aware, was no.  But there had been some

19      news accounts, there had been testimony, there was a

20      belief in -- by the general public that potentially

21      there was fraud taking place in the voting booth.

22      "QUESTION:  And specifically, in-person voter

23      impersonation fraud?

24      "ANSWER:  Yes, that -- that people believed in

25      general I -- I would say on two tracts.  They

1       believed that the system was ripe for fraud because

2       anyone could show up with a voter registration card

3       and you didn't know if they were the person.  And

4       secondly -- and this is why I believe the bill had

5       universal support and -- again, from people from all

6       walks of life and minority and majority

7       populations -- they did not view it being

8       unreasonable to require someone to have a photo ID to

9       vote.

10      "Because what people would say to me all of the

11      time -- all of the time; whether it was on the radio,

12      in a meeting, seeing them down -- you know, walking

13      down the street talking about it, if -- if this issue

14      came up, is, we live in a society where we're

15      required to present a photo to do almost everything

16      we do; pick up your grandchild at school, your child

17      at school, get on an airplane, cash a check, use your

18      credit card.  The general public -- and this is why

19      90 percent of the people support it; 90 percent of

20      the people -- or at least, you know, the vast

21      majority, whatever the specific poll says -- people

22      don't see it as unreasonable because they are

23      asked -- the majority of people understand that this

24      is -- is something that is -- has become a part of

25      the -- of society.

Patrick / By excerpts of Deposition - Direct          251

1          "QUESTION:  But you're not aware of any specific

2          polls that were taken of the specific constituents of

3          your colleagues who are Democrats showing that they

4          supported SB 362, are you?

5          "ANSWER:  I don't know of a specific poll on 362.

6          "QUESTION:  So, in fact, you don't know, based on any

7          polling data, that SB 362 enjoyed anything like

8          universal support among Texas voters?

9          "There's an objection, argumentative.  Objection,

10          form.

11          "ANSWER:  I think the first question you asked me a

12          few minutes ago was a general polling question, which

13          I answered.  If you're asking me now, specifically,

14          have I seen a poll that specifically said people

15          supported this bill word-for-word, no, I have not

16          seen a poll.

17          "QUESTION:  So you don't --

18          "ANSWER:  Not that I recall.

19          "QUESTION:  But other than polling data, do you have

20          any other reason to believe that there was widespread

21          support, including among minority Texans, for this

22          specific legislation -- in other words, SB 362 --

23          notwithstanding the unified opposition of every

24          member of the Texas Senate who represents a majority

25          minority district?

Patrick / By excerpts of Deposition - Direct          252

1          "Objection, argumentative.

2          "Go ahead.

3          "ANSWER:  And as I think I've answered -- as candidly

4          and as directly as I can -- it was more than polls.

5          This issue had been -- had been in the public for a

6          number of years.  You know, just general

7          conversations about it with people; whether they were

8          in my district or out of my district, whether they

9          stopped me on the street or whether it was at a

10         meeting or whether it was a phone call.  It's -- it

11         was almost to the point, it was so universal, that --

12         support for the bill, for the concept of photo voter

13         ID -- it was so universal that you really had to

14         shake your head and wonder why anyone would be voting

15         against it.  I can't explain why the Democrats voted

16         against it.

17         "QUESTION:  So let's say that there are 10 percent,

18         approximately, of registered voters who lack a

19         required photo ID.  Also, assume that that 10 percent

20         is disproportionately poor, disproportionately a

21         racial minority, and that it's difficult to get one

22         of the required forms of photo ID.  Would that

23         combination of factors be something that you think

24         should weigh into the consideration of a bill like

25         this?

1       "I'm going to object to the form of the question.

2       But you can answer if you understand it.

3       "ANSWER:  I could only answer with a hypothetical

4       back of -- how I would potentially look at that.

5       First, would those people -- how many of those

6       people, for example, would be over 65 and who could

7       vote by mail and who do vote by mail.  Now, they --

8       some people over 65 prefer to vote in person.  I

9       understand that.  So that would have to be taken.

10      How many of those people live in urban areas where

11      it's very convenient to get to a DPS and get a free

12      ID, for example.  So what's the real percentage?

13      Again, the premise that you're making is not a

14      premise I agree with, that -- and I don't know what

15      the numbers are, obviously.  And you asked me a

16      hypothetical. I do not agree with the premise that a

17      significant number of people do not have or cannot

18      get a photo ID.

19      "And remember, even -- and if you look since -- not

20      through 62, but since SB 14 passed, we've had, I

21      believe, five total elections, maybe more, from city

22      to state, county.  You know, I don't think there have

23      been any complaints.  I'm not -- I'm personally not

24      aware.  It doesn't mean there haven't been a few, but

25      we've had millions of people vote.  And I think, in

Patrick / By excerpts of Deposition - Direct                254

1     some cases, voter turnout is actually higher.

2     Sometimes the primaries are not, depending if it's

3     the presidential or a gubernatorial year.  But here

4     we are in 2014.  I'm not -- when you ask me am I

5     aware of what people think, I'm not aware of one

6     complaint.  Maybe there has been to my office.  I'm

7     not aware of one person that's complained, and I do

8     have a district where -- where, as I said earlier, I

9     don't know the exact number, but I think somewhere

10    around 30 percent plus, 35, 38 percent, are minority.

11    I'm not aware of any complaints to the Secretary of

12    State.  Maybe there have been -- the only thing that

13    I -- I think I read a story about someone complaining

14    because they showed up and left it at home.

15    "So I think that what -- the bill that we passed, I

16    think we were thoughtful.  We tried to take into

17    account the hypotheticals that you present to us, and

18    I think the proof would show five years -- or not

19    five years -- three years, after the fact, that

20    students aren't complaining, seniors aren't

21    complaining, minorities aren't complaining, and

22    voting turnout is healthy.

23    "QUESTION:  You're aware that the law is currently

24    being subjected to challenge under the Voting Rights

25    Act for having a racially discriminatory impact,

1     including by plaintiffs in the state of Texas.  Does

2     that count as complaining to you?

3     "There's an objection to the form of the question.

4     "ANSWER:  Anyone can sue anyone for anything, but I'm

5     not aware of constituents and voters in any large

6     numbers complaining that they in some way were

7     disenfranchised.  And remember, for the record --

8     "QUESTION:  So you're not -- if you haven't looked

9     into that, how do you know that voters aren't being

10    affected in the past five elections?

11    "ANSWER:  When voters aren't happy, you hear from

12    them.  They call your office, they find a reporter,

13    they show up on a news station.  And, again, there

14    may have been a report somewhere or a news story

15    or -- you know, somewhere, but I'm just not aware of

16    any.  And, again, we're talking about millions of

17    people.  Could there have been a handful?  I mean, I

18    don't know.  But I'm sure not aware of anyone.  You

19    would have to show me that a significant number of

20    people felt they couldn't vote.  I just haven't seen

21    it.

22    "So I think the bill has been a success; and I think

23    people, minority and majority, have embraced it and

24    feel that we have integrity at the ballot box.

25    "QUESTION:  What was the purpose of SB 14?

1      "ANSWER:  As I answered earlier, to protect the

2      integrity of the ballot box and -- and pass a bill

3      that the vast majority of people had indicated they

4      wanted passed and believed should pass.

5      "QUESTION:  So is it fair to say that the purpose of

6      SB 14 was the same purpose as SB 362?

7      "ANSWER:  I'm always careful when you characterize

8      something, but I think that's probably a fair

9      characterization.

10     "QUESTION:  So you think if a voter has to travel

11     150 miles round-trip, that's not going to impact

12     whether or not they get an EIC?

13     "ANSWER:  Once again, you would have to give me the

14     specifics of that voter.  Is that voter over 65?  If

15     they're over 65, they can vote from mail, so it

16     obviously wouldn't impact them.  You would have to

17     give me the specifics of a voter who you might be

18     trying to make that case for.  Has that voter ever

19     gone anywhere from their home, anywhere near a DPS

20     office, in between elections or before an election?

21     Because you only have to do it once.  So you'd have

22     to give me the specifics of a given person.

23     "As I've said earlier, to my knowledge we haven't had

24     any complaints from people who live in these counties

25     that don't have DPS -- to my knowledge we haven't had

1       any complaints of people saying, 'Yeah, gosh, I just

2       never ever got by DPS to get a photo ID.'  It's

3       just -- and I've never heard any -- I've never heard

4       one Democrat senator or a Republican senator who

5       represents a rural area, since this bill passed, say

6       to me that it was a burden.

7       "QUESTION:  But you expect that if there are problems

8       people will bring it up affirmatively without you

9       taking any further investigation?

10      "ANSWER:  That's pretty much how the system works.

11      You know, sometimes you pass legislation that just

12      may have a techni- -- you know, some kind of -- as we

13      call them, unintended consequences at times.  And,

14      believe me, either -- you know, someone brings it to

15      your attention.  And sometimes it's valid to try and

16      fix it in the next session, sometimes it's not.

17      "But, I mean, I can sit here honestly today and say I

18      don't think I've had one senator, including a

19      Democrat, come back and say, you know, this -- 'Dan,

20      this really didn't work out; you know, we need to --

21      or we need to fix something, you know, we need to

22      make a change in the bill.'  And we -- and, look,

23      we've already had a session in 2013 and I don't -- I

24      stand to be corrected, you can check the records.  I

25      don't think one Democrat -- and every Democrat voted

1    against it.  I don't think one Democrat tried to

2    amend this bill in any way or update it in the last

3    session.  They may have, but I don't remember it.

4    "QUESTION:  Would there have been any likelihood that

5    a repeal of this bill could pass?

6    "ANSWER:  Not a repeal.  I said to fix it.  In other

7    words, if there's a problem, if you came to me and

8    said, 'Dan, you know, this is a problem in my

9    district and I know the bill's not going to be

10   repealed and -- you know, but can we fix this?  Can

11   we try to?'  I do not know of one Democratic senator

12   who came to me or made it an issue.  I don't remember

13   one article.  I don't -- I just -- but I think that's

14   because I don't think the Democrats are getting much

15   pushback in their district or questions.

16   "QUESTION:  But that's just your assumption, you

17   haven't actively sought out that information?

18   "And there's an objection that it's argumentative.

19   "ANSWER:  Well, what I'm saying to you is not an

20   assumption.  Well, it's -- yeah, I don't know if

21   anyone has complained to the -- what I do -- I do not

22   recall.  Maybe someone said something to me in

23   passing or something or at lunch, but I do not recall

24   any Democrat senator or Republican senator saying

25   that we need to go back and tweak this, in any way,

Patrick / By excerpts of Deposition - Direct          259

1     shape or form.

2     "And, again, being chair of education where I really

3     do have my arms around what happens, the best example

4     I can give you is several years ago we voted for a

5     number of standard state tests to graduate from high

6     school.  We had enough negative feedback from enough

7     parents and enough teachers and enough

8     superintendents, that collectively we went back and

9     changed the number of state tests.  We reduced them

10    from 15 to 5 last session.

11    "So what I'm suggesting to you is, when we pass major

12    legislation -- and, again, every bill's important --

13    the legislation impacts a large number of people,

14    that it is not uncommon for senators to go back in

15    another session or two sessions and say, 'You know

16    what, we can improve it; we can make it better.'

17    "And so all I'm saying to you is, that in 2013 I'm

18    not aware of anyone coming to us or -- or the

19    Democrat caucus, or a group of senators coming and

20    saying, 'Look, this is the law, and we have to live

21    with the law.'  That's out of the lawsuit. But

22    would -- 'would you-all work with us and change

23    this?'  I'm just not aware of it.

24    "QUESTION:  I'd like to ask about another amendment

25    that you sponsored.  If you could turn to page 123 of

1         the Senate Journal from January 26th.

2         "ANSWER:  Okay.

3         "QUESTION:  And Floor Amendment 18, is this an

4         amendment that you sponsored?

5         "ANSWER:  I was the co-author of it with Senator

6         Hinojosa.

7         "QUESTION:  Okay.  And what was the purpose of this

8         amendment?

9         "ANSWER:  It just included -- it gave one more item,

10        because we had -- we had somewhere in the

11        neighborhood, back then, 3 or 400,000 -- I shouldn't

12        speculate -- but hundreds of thousands of people with

13        CHLs; and Senator Hinojosa, who is a person who

14        supports CHLs, in my view, and he thought that -- I

15        know that he and I talked about it.  I just don't

16        remember the conversation.  But he was supportive of

17        it, and so he carried it just to give one more,

18        because we knew that those people that had a CHL had

19        been -- not that you need a background check for one;

20        but we knew that was an authentic, you know,

21        government document.

22        "QUESTION:  It's your testimony that you understood

23        the preferences of the constituents of every

24        Democratic senator better than they did themselves?

25        "And there's an objection, argumentative.

Patrick / By excerpts of Deposition - Direct          261

1              "You can answer.

2              "ANSWER:  Yeah, I wouldn't pretend that I know

3         another senator's district better than I know mine.

4         But, again, looking at the polling data and the

5         general sense of news reports and opinions on this

6         issue, it was clear that -- based on polling data and

7         other data -- that a majority, or a significant

8         number at least, in some of their districts,

9         supported photo voter ID.

10             "QUESTION:  So is it fair to say that even before the

11        bill was called for a vote, you expected it to be a

12        party line vote?

13             "ANSWER:  Yes.

14             "QUESTION:  And why was that your expectation?

15             "ANSWER:  Based on past votes on other bills of

16        similar subjects.

17             "QUESTION:  And what's the blocker bill?

18             "ANSWER:  The blocker bill, if I can explain it to

19        you very simply, because it's not complicated.  Texas

20        for a long time, was a -- and the reason I know

21        pretty well is because I've been opposing it for a

22        long time and I've given debates on the floor.  For

23        most of the last century, Texas was an all Democrat

24        state, in terms of its legislators or strong

25        majority.  So in the '30s, '40s, '50s and '60s, when

1    there were 31 senators, there may have been, at any

2    given time, two, three or four Republicans with all

3    Democrats.  For all the Democrats -- and if it were

4    all Republicans, it would be the same thing.  But

5    when everyone in the room is in the same party, you

6    have to -- and you want your bill and you want your

7    bill and he wants his bill and everybody wants their

8    own bill; well, not everybody can bring their bill to

9    the floor.  There's only so much time.  And so, how

10   do you decide who gets their bill to the floor?  So a

11   little bit of the history of that, I think this --

12   because it's a Senate rule, it's not in the

13   Constitution; it's voted on by senators.

14   "So the Democrats, to -- the best history I can

15   recall, the Democrats actually created the bill, in

16   essence, so that there was a way to organize what

17   bill comes on the floor.  So if you can get 20 other

18   Democrats -- since there's 26 or eight of you,

19   however many -- if you can get 20, okay, I'll take

20   your bill.  But otherwise, I just can't -- if you're

21   the lieutenant governor, you can't take everyone's

22   bill.

23   "In the 1950s, it really came into play where it

24   started being used a little bit.  In essence, what

25   the blocker bill says -- think of one street of

Patrick / By excerpts of Deposition - Direct          263

1       traffic.  If there's a car and it's broken down,

2       every car behind it can't go through, it's blocking

3       traffic, so you have to go around to move forward.

4       "What the blocker bill does is -- and again, the

5       Democrats, from the best of my study, started it,

6       created it.  What the blocker bill -- and it was

7       also -- it's known as the rosebush bill.  The

8       Democrats would have someone file a bill dealing with

9       the landscaping of the Capitol and they would never

10      pass the bill.  It would block every other bill.  So

11      for you to pass your bill, you would have to get

12      20 other senators to agree with you, because you'd be

13      the 21st vote, to suspend the rules to go around that

14      bill.

15      "So what has been the tradition over the years --

16      and, again, the Senate -- the lieutenant governor

17      doesn't decide, the senators vote on that -- every

18      year we vote on the rules.  The senators, Democrats

19      and Republican, we get in a room and we all vote --

20      and we vote all the rules.  We can vote any rule we

21      want.  And so that rule is still in place today.

22      "And so every session there is a bill -- it may not

23      be -- I don't even know what they have been the last

24      couple of sessions.  I don't know if it's landscaping

25      anymore.  But a bill is filed, it's put in the chute

1    ready to go, but it never gets voted on.  So if we

2    were all senators, I would -- I go around with my

3    little card and I count up my 20 senators.  And once

4    I have 20, plus me, 21, I turn it in to the

5    lieutenant governor and say I have the -- I can

6    suspend the blocker bill rule, and move around it to

7    pass my bill.  The lieutenant governor still has the

8    decision to allow me to do that, or not.

9    "But that's what the blocker bill is.  That's a long

10   explanation; but so you really understand and get

11   your arms around it, that's what it has meant.  In

12   the House, they don't have it.  They actually have a

13   committee that decides which bills come to the floor.

14   So all the committees pass bills.  So the Senate just

15   deals with it that way, with 31 members.

16   "QUESTION:  Okay.  In the modern era, has having a

17   blocker bill required that there be bipartisan

18   cooperation in order to bring a bill to the floor,

19   essentially?

20   "ANSWER:  You know, that's what -- I personally

21   believe that's a little bit of a misnomer.  That's

22   what people will say.  I don't -- I believe the --

23   the blocker bill is outdated because it was really

24   created -- in my view and in my study, and I could be

25   wrong, but in my view, for a one-party system of how

Patrick / By excerpts of Deposition - Direct                265

1    to decide who gets the bill so there's not a

2    catfight.  It had nothing to do with -- in fact, I

3    think I could say clearly:  The blocker bill has

4    nothing to do with bipartisanship because it was

5    implemented and used primarily in a one-party state.

6    "QUESTION:  Originally.  But now, without the blocker

7    bill, does it mean that only Republicans -- any bill

8    that the Republicans decide -- because they're the

9    majority -- to bring to the floor, that they have the

10   ability to do that regardless of whether they have

11   any Democratic votes?

12   "ANSWER:  No.  Because in 2007, my first session,

13   there were only 20 Republicans, so on every bill we

14   needed at least one Democrat.  Then in 2009 and 2011

15   we lost a seat, so we had 19.  So on every bill we

16   had to have at least two Democrats, and that's if you

17   had every Republican.

18   "And lots of times a Republican will have a bill that

19   doesn't -- you know, what I tell people all the time

20   is everyone thinks it's a Republican/Democrat divide.

21   It's not in Texas, for the most part.  On some

22   issues.  You know, this obviously was a party line

23   vote.

24   "Most of our bills in Texas are along geographical

25   issues, it's urban and rural.  So very often you will

Patrick / By excerpts of Deposition - Direct                266

1    have -- in Harris County, for example, our two

2    Democratic -- our two Democrat senators in Harris

3    County -- three rather, we will, the Republican two

4    senators, or three of us, different parts, we will --

5    we will be together because we're representing

6    Houston and Harris County and what's in the best

7    interest.

8    "And when you come to education or transportation or

9    water, or whatever it might be, we have different

10   issues than they do in West Texas, so you'll often

11   see the Democrat Valley senators team up with West

12   and East Texas rural Republicans.  So it's not always

13   a party issue.

14   "So the -- so the -- you know, the answer to the

15   question:  We can't pass whatever we want because

16   we're always a vote or two short, and sometimes we --

17   and sometimes we can be five or six short.

18   "QUESTION:  But in this instance, does your email

19   reflect that, absent this rule, it would only have

20   taken 19 votes and you had exactly 19 Republicans?

21   "ANSWER:  Yes.  Well, let me see.  Let me -- I say

22   yes.

23   "Yes, because during special sessions -- and we've

24   had 15 special sessions, I think is the number, I

25   could be one or two off, in the last decade or so, we

Patrick / By excerpts of Deposition - Direct        267

1          don't use the 21-vote rule.  So on the special

2          sessions we don't use the 21-vote rule.  And on

3          occasion in regular sessions -- in regular session

4          it's been set aside or -- there are various ways to

5          work around it, so it's -- it's not unprecedented.

6          "QUESTION:  But it's not unusual in regular sessions?

7          "ANSWER:  It's not unusual, but it's not

8          unprecedented either.  Not in my view.

9          "QUESTION:  Was that a concern that you had in

10         passing SB 14, that illegal immigrants were voting in

11         Texas?

12         "ANSWER:  Well, our concern was that we wanted

13         integrity of the ballot box so that no one who was

14         ineligible or not registered to vote, voted.

15         "QUESTION:  So one question is does SB 14 directly or

16         indirectly impact the illegal immigrants, as you use

17         this language in this email?

18         "MS. DONNELLY:  Objection.  Argumentative.

19         "Go ahead.

20         "ANSWER:  I don't know better to answer the question.

21         The purpose of Senate Bill 14 was to make sure we had

22         integrity of the ballot box so that people who were

23         ineligible to vote or not registered, that they

24         didn't vote.  And that's a -- a spectrum of people.

25         And illegal immigrants are a subset of that group

Patrick / By excerpts of Deposition - Direct            268

1       because they're not eligible to vote.

2       "It wasn't -- in my view, it wasn't -- that was not

3       the sole purpose of the bill.  It wasn't the sole

4       purpose of the bill, beyond what I've said, clearly.

5       "QUESTION:  And it's not based on any sort of

6       analysis that you or anyone in the Senate conducted

7       in considering SB 14, is that right?

8       "ANSWER:  I can't speak for other people.  But for

9       me, I just kind of logically walked through the steps

10      of wherever someone might live in Texas, if they were

11      able-bodies, whether they were poor, middle class,

12      or -- or otherwise, and I came to that conclusion.

13      "And as I also testified earlier, three years after

14      the bill has been passed, and multiple election --

15      multiple elections, there's just no evidence -- and I

16      know this is all about evidence -- I don't think

17      there's any evidence, any significant evidence, of

18      any large number of people -- or anyone at all -- who

19      has said this is an issue.  We just haven't heard it.

20      "And so I think the process that at least I went

21      through, and the decision that I made, turned out to

22      be proven to be correct.

23      "And again, as I said earlier, I haven't had a -- and

24      we have Democrats from the inner city and rural areas

25      all over the state.  I work very well with them.

1     They work very well with me.  And I've not had one

2     come to me and say, 'Dan, we need to fix this.'

3     "And I'm not aware of any legislation to address any

4     of these issues that you bring up, which, I respect

5     you bring them up, but I just don't think there's any

6     -- there's just nothing here that you can point to.

7     So I believe we were good.  I think we were right.

8     "QUESTION:  In your last paragraph of the email on

9     Page 2, the last sentence is 'Let's not sacrifice a

10    very good bill for perfect, especially if perfect for

11    some gets us thrown out by the courts.'

12    "And what did you -- what did you mean by this?

13    "ANSWER:  This is commonplace for a Republican or a

14    Democrat officeholder that very often Democrats will

15    have constituents who don't think their bill is

16    perfect in their view.  So, heaven forbid, don't --

17    don't let the Republicans pull this one over on you.

18    "And -- and Republicans, we have constituents who

19    will often call up and say, 'Don't let the Democrats

20    pull this over on you, you need to do this, this,

21    this, and this.'  It happens on a lot of legislation

22    for all of us, in both parties.

23    "And so my point was, that there were people,

24    apparently, who were contacting my office and all

25    upset about we should have this amendment or

Patrick / By excerpts of Deposition - Direct          270

1          placards, or whatever.

2          "And that was my point:  Look, this is a good

3          amendment, it was part of the Indiana bill, the

4          courts upheld the Indiana bill, let's not -- let's

5          not sacrifice this important legislation because a --

6          you know, a handful of people don't think it's

7          perfect.

8          "QUESTION:  Okay.  But not because you didn't think

9          it was perfect?

10         "Object to the form of the question.

11         "ANSWER:  Give me a question.

12         "QUESTION:  Let me rephrase that.  What I guess I

13         want to know:  For you, were you saying here that the

14         bill would have been perfect if it didn't include the

15         disability amendment?

16         "ANSWER:  No.  No, I don't -- no.  What I -- what I

17         was -- what I was attempting to say -- maybe I didn't

18         say it artfully.  I thought it was a very good bill.

19         "But if we try to please every person in our

20         constituency on every piece of legislation so that

21         the -- in the eye of the beholder, that person gets

22         the perfect bill, then we will never pass anything.

23         "And the Democrats have the same problems on their

24         side.  That's why Washington is in gridlock and why

25         sometimes Austin's in gridlock.

Patrick / By excerpts of Deposition - Direct            271

1        "QUESTION:  And you referred to -- again, in your

2        last answer, the Indiana law?

3        "ANSWER:  Yeah.

4        "QUESTION:  And I think on the first page of this

5        email you say:  'Our bill is similar to the Indiana

6        law that was approved by the courts.'

7        "But what makes it one of the -- you noted that it

8        was one of the best in the country.  What do you

9        think made it one of the best photo ID bills in the

10       country?

11       "ANSWER:  Well, I've worked on a lot of legislation

12       where it's taken me two or three -- I've only been

13       there four session, but it's taken -- four sessions,

14       but it's taken me two or three sessions to pass a

15       bill.  And usually, over time, the bills get better

16       because over time you just get more -- very often,

17       more knowledge, more input, more buy-in from people.

18       "And -- and so, you know, I think by the time we got

19       to 2011, based on, again, this -- I don't remember

20       all the details of Indiana, but maybe there had been

21       some court cases that had been resolved or addressed

22       from '07 to '11.  I don't remember.  But I just -- I

23       think by then we probably had a better bill than we

24       had before, and that happens -- happens often.

25       "And, you know, just because all the Democrats -- we

1          talked about voting along party lines earlier.  Just

2          because all the Democrats voted against it doesn't

3          mean that -- you know, they may have -- they may have

4          thought that this bill's a little bit better bill

5          than before, because they've worked, obviously, to

6          try to improve it or amend it or work -- or work with

7          me.  So I just think it was probably a -- obviously

8          they voted against it, but -- but --

9          "QUESTION:  And did you think it was better than

10         other photo ID bills in the country because it was

11         more restrictive?

12         "ANSWER:  No.  I just -- no.  I thought it was a -- I

13         thought it was a -- it was a well thought out bill at

14         the end of the day and I didn't think it was -- I

15         didn't think it was undue burden, as I've said many

16         times.

17         "And I think we were thoughtful in the deliberation

18         of it and I actually thought, and I -- and I seem to

19         recall Democrats saying at the time that we had a

20         very respectful 24- or 26-hour debate on the floor.

21         There was no acrimony.  There was no -- it was -- it

22         was a very healthy, good discussion of the issue and

23         so that's, you know, what -- how I felt about it.

24         "QUESTION:  How did you vote on this amendment?

25         "ANSWER:  Against it.

Patrick / By excerpts of Deposition - Direct          273

1      "QUESTION:  Okay.  Any why?

2      "ANSWER:  I think that the belief was that this does

3      not meet the criteria of a document issued by the

4      state that would be something that would be as

5      foolproof as a driver's license or CHL or a military

6      document or passport.

7      "We have -- I think we have 36 public universities in

8      the state, countless private universities, countless

9      community colleges.  And when you go to vote, it

10     would have been -- it could have been very confusing

11     for the election judge or the person working -- the

12     poll workers, to have a plethora of all these IDs.

13     It's pretty clear now, it's -- people can identify

14     all these other ones.

15     "QUESTION:  Okay.  But if you were told you're not

16     allowed to vote in person, but you can only vote by

17     mail, would you be losing something?

18     "Objection.  Form.

19     "ANSWER:  I'm not sure I understand.

20     "QUESTION:  Would you feel that was some kind of a

21     disadvantage to you?

22     "ANSWER:  I'll be happy when I'm 65 and can vote by

23     mail.

24     "QUESTION:  Okay.  But -- but we've had -- heard some

25     testimony today about the Federal Courts and -- and

1          perhaps the Supreme Court upholding Indiana's voter

2          ID law.

3          "Are you aware that the Supreme Court has upheld

4          Indiana's voter ID law?

5          "ANSWER:  It's as I -- I believe I testified earlier

6          today it seemed to me somewhere in the past that was

7          information that -- that I was aware of.

8          "QUESTION:  Were you aware of it in 2011, when the

9          Legislature passed the voter ID law?

10         "ANSWER:  I can't speak for certain, but I believe

11         so.

12         "QUESTION:  Are you aware that Georgia has a voter ID

13         law?

14         "ANSWER:  I think I've heard that.

15         "QUESTION:  Are you aware that the Department of

16         Justice precleared Georgia's voter ID law under the

17         Voting Rights Act?

18         "ANSWER:  Actually, I do recall that story.

19         "QUESTION:  We also -- you also talked a little bit

20         about polls that you -- I think I'm not

21         mischaracterizing your testimony when I say the word

22         plural, polls.

23         "ANSWER:  Correct.

24         "QUESTION:  We only heard one by name mentioned

25         specifically, which I think was the Baselice, which

Patrick / By excerpts of Deposition - Direct          275

1        I -- which I spell -- which I think we decided it was

2        B-a-s-e-l-i-c-e, poll.

3        "That was one of the polls that you referenced

4        earlier?

5        "ANSWER:  Correct.

6        "QUESTION:  Is that the poll -- you also mentioned a

7        poll that showed that 90 percent of Texans favored

8        voter ID.  Is that the Baselice poll?

9        "ANSWER:  Yes, I believe it is.

10       "QUESTION:  But you did -- you did look at other

11       polls when considering voter ID in 2011, or before?

12       "ANSWER:  I don't know that the word would be looked

13       at a poll.  I don't even know that I looked at the

14       Baselice poll.  But I've read -- I've read about

15       polls.

16       "You know, sometimes a newspaper could conduct a poll

17       or a TV station or other entities and it's reported

18       by the media.  So I don't know that I actually looked

19       at a poll.  But I looked at the reports of polls, and

20       they were all consistent.

21       "QUESTION:  Earlier you mentioned that the polls that

22       you were aware of showed broad support across -- and

23       I don't -- if I'm mischaracterizing your testimony,

24       let me know -- across political ideologies.

25       "In other words -- and I think you used words broad

Patrick / By excerpts of Deposition - Direct          276

1          support among Republicans, Independents, and

2          Democrats.  And I went backwards.  I went from left

3          to right.  I should have gone from right to left.

4          "ANSWER:  Yes, the polls that I saw, it seems to me I

5          remember a number where 96 percent of the Republicans

6          and 74 percent of Democrats supported photo voter --

7          photo voter ID.  There seemed to be a poll somewhere

8          in the past I read.

9          "QUESTION:  Were you aware that photo voter ID

10         garnered support from the majority of minorities in

11         Texas in 2011 when the Texas Legislature was

12         considering voter ID?

13         "ANSWER:  I think my testimony earlier today was that

14         I believed that was the case, that the constituents

15         of the legislators who voted against the bill, the

16         majority of them favored it.

17         "QUESTION:  So at the time that you voted for SB 14,

18         in your opinion photo voter ID was supported by a

19         majority of minorities in Texas?

20         "ANSWER:  Yes.

21         "QUESTION:  So we've talked about polls as one thing

22         you've considered, you know, throughout your

23         consideration of voter ID and the various times it

24         was brought up in the Texas Legislature.  Did you --

25         what else did you consider, other than that?

1      "ANSWER:  Well, first of all, did I think it was

2      important?  And I did, to protect the integrity of

3      the ballot box.  Did I think it was a reasonable

4      request of people to have a photo to vote?  Based on

5      many things I've said today, you need a photo for so

6      many other things.

7      "Based on all the people I had talked to over a

8      period of time, looking at all the polls and -- and

9      you said something that just actually made me think

10     of something about the majority of minority voters.

11     "Very often, if we have a contentious issue where --

12     not the legislatures -- legislators, because

13     sometimes legislators will divided -- but the

14     citizens, where citizens are divided on an issue,

15     they show up at the Capitol and rally for and again.

16     "I don't recall anyone -- I could stand to be

17     corrected -- but I don't recall at any time there

18     being a large group -- I mean, you know, where we

19     hear them yelling outside, which we often do on bills

20     opposing voter ID.

21     "And then when you have one group -- or for it, to be

22     honest.  I mean -- and then when you have one group -

23     - or for it, to be honest.  I mean, there may have

24     been small groups that came up, or individuals.

25     "And what that means is that -- that it was

Patrick / By excerpts of Deposition - Direct                    278

1       overwhelming support for it and it was -- it was a

2       no-brainer to a lot of people that this is a -- that

3       this is reasonable to require and we want to protect

4       our ballot box.

5       "So it was -- it was very natural, and very expected,

6       I think, by the people, that we were going to pass it

7       for that reason.

8       "QUESTION:  Were you aware during your consideration

9       of the Texas voter ID laws, you know, either in '07,

10      '09, or '11, that counties were having to cancel or

11      remove noncitizens from their voter rolls?

12      "ANSWER:  I believe that -- and I'd have to go back

13      and really thing through this.  But I believe, and

14      was aware through conversations, that a number of

15      counties were trying to clean up their voter rolls

16      from people who were deceased and people who may not

17      have been eligible to register, yes.

18      "QUESTION:  You said earlier that -- I believe that

19      you said this, and correct me if I'm wrong, you said

20      it was fairly easy to register to vote in Texas; is

21      that right?

22      "ANSWER:  Yes.

23      "QUESTION:  Do you believe that there were -- are you

24      aware of any voter registration fraud in Texas?

25      "ANSWER:  I think there was testimony of voter

Patrick / By excerpts of Deposition - Direct       279

1       registration fraud.

2       "QUESTION:  Prior to the enactment of SB 14, if

3       someone fraudulently registered to vote and was not

4       apprehended or caught, how difficult would it have

5       been for them to -- to vote?

6       "ANSWER:  It would have been easy.

7       "And to answer your last question, it took me a

8       second to cycle through, if people know they have to

9       have a photo to vote, then it could impact voter

10      registration fraud because people would know I can

11      register to vote, but I actually can't vote if I

12      don't have a photo ID matching up with the name I've

13      registered under.  So it could obviously impact --

14      could impact it.

15      "QUESTION:  So you think that Texas voter ID law

16      could deter voter registration fraud?

17      "ANSWER:  In that context, it could.

18      "QUESTION:  Do you recall the first time that Texas

19      Legislature considered voter ID?

20      "ANSWER:  Well, the first time that I'm aware of,

21      that -- that I was a senator, was 2007.  I don't know

22      if it was considered before that.

23      "QUESTION:  What happened in 2007?  I mean,

24      obviously, it wasn't passed, right?

25      "ANSWER:  Yeah, we passed it in the Senate.  There

1      were a couple of senators missing from the floor.

2      And the 21-vote rule is based on the number of

3      senators present, not 31 senators, so the fewer

4      senators, then your threshold decreases.  And there

5      were fewer senators that day.

6      "We passed the bill.  Senator Whitmire objected and -

7      - and said that he was in the restroom and was not

8      aware of the vote and -- and protested.  And there

9      was another Democrat who was not there that day.  And

10     the protest went -- and the protest went on quite a

11     while from Senator Whitmire, that it wasn't right, it

12     wasn't fair, it was an important bill, he should have

13     been able to vote.

14     "And so the lieutenant governor, David Dewhurst at

15     the time, said, 'Okay, we'll -- we'll have another

16     vote.'  Not everyone agreed with that, but we

17     respected his decision.

18     "I've never seen in my entire time of over 16,000

19     votes a vote be -- the gavel -- the gavel come down -

20     - bless you -- the gavel come down and a senator

21     complain and a -- and the lieutenant governor give

22     them a mulligan.  I've never seen that.  But the

23     lieutenant governor did.

24     "And while we went through this 20-minute, or

25     whatever it was, debate on should we have a revote,

Patrick / By excerpts of Deposition - Direct        281

1        the Democrats went and got the senator at his home.

2        "I'm not -- you know, I don't know if he was ill or

3        just late.  They went and got that senator, it was

4        Senator Uresti, and as we were going through the roll

5        call, we do it alphabetically, just as we got pretty

6        much down at the end of the alphabet, Senator Uresti

7        suddenly appeared on the Senate floor and we lost by

8        a vote --

9        "QUESTION:  And so it was passed --

10       "ANSWER:  -- as I recall.

11       "QUESTION:  -- it was passed out, but then the vote

12       was redone.  And therefore it never made it out of

13       the Senate in 2007?

14       "ANSWER:  Yes, because we, as I recall -- I'd have to

15       go back and check the archives, the -- for a vote.

16       We didn't have the 21-vote, or we lost by a vote,

17       however the vote -- however the count came out.

18       "QUESTION:  So the blocker bill is ultimately what

19       did in voter ID in 2007?

20       "ANSWER:  Correct.

21       "QUESTION:  And then am I right saying that voter ID

22       was again considered by the Legislature in 2009?

23       "ANSWER:  Correct.

24       "QUESTION:  What happened in 2009?

25       "ANSWER:  I'd have to go back and look at the

Patrick / By excerpts of Deposition - Direct          282

1       history.  I believe it passed out of the Senate, and

2       I don't know what happened.  I can't remember.  If I

3       were shown the documents, I would remember right

4       away, but I don't remember what happened next.

5       "QUESTION:  But it wasn't passed by the Legislature,

6       correct?

7       "ANSWER:  Correct.

8       "QUESTION:  Do you know what chubbing is?

9       "ANSWER:  Yes.

10      "QUESTION:  What is chubbing?

11      "ANSWER:  In the House they have different rules than

12      the Senate.  In the House you are allowed to stand up

13      and speak -- I don't know all the House rules

14      verbatim -- but I believe you can speak for ten

15      minutes against a bill, and so -- any bill.

16      "So what happens is -- and the Democrats have used

17      this on a number of occasions, in my recollection.

18      And there are -- at any time there may have been 50

19      or 55 Democrats in the House.  I don't know if each

20      one -- but they would chub every -- the House, as I

21      explained earlier, has a different way they -- has a

22      different way they bring bills to the floor.

23      "And so my memory is that voter ID was so many bills

24      down, and they chubbed every bill.  So they'd talk

25      for ten minutes, and just before their time ran out

Patrick / By excerpts of Deposition - Direct          283

1        they basically ended their -- 'That's all I have to
2        say.'  And then the next person did it.
3        "So they brought the process -- the legislative
4        process to a grinding halt on everything in order to
5        slow that bill down.
6        "And I don't know if that's what eventually killed it
7        or the clock just ran out.  I just don't recall.
8        Because the votes were in the House.
9        "Clearly, the Republicans had, in 2009, I don't know,
10       a -- I'm not sure what the majority, but they had the
11       votes to pass it.
12       "QUESTION:  Let's just hypothetically say there's
13       bill X that's buried down on the order of when it
14       would come up on the floor --
15       "ANSWER:  Right.
16       "QUESTION:  -- that a group of legislators want to
17       kill it.
18       "ANSWER:  Yes.
19       "QUESTION:  And they'll talk for ten minutes on every
20       bill in front of that, right?
21       "ANSWER:  Yes.
22       "QUESTION:  In the hopes of basically preventing that
23       bill from ever coming up to the floor?
24       "ANSWER:  Correct.
25       "QUESTION:  If there are bills after bill X, what

Patrick / By excerpts of Deposition - Direct          284

1          happens to them?

2          "ANSWER:  They all die, too.

3          "QUESTION:  Okay.

4          "ANSWER:  Everything dies.

5          "QUESTION:  And then in 2011, what happened in 2011?

6          "ANSWER:  In 2011 we passed the bill and -- out of

7          the Senate.

8          "QUESTION:  The Senate?

9          "ANSWER:  And then it passed out of the House at some

10         point.  I don't know if it came back to the Senate or

11         not.  I don't remember if it was amended.  It went to

12         the governor and was signed.

13         "QUESTION:  Did you have two-thirds in the Senate?

14         "ANSWER:  We made an exception for the two-thirds

15         rule and we passed it as -- and I forget the

16         procedural matter in which we did, but we passed it

17         without the two-thirds rule.

18         "QUESTION:  Do you think that what happened in 2007

19         and 2009 is -- is that the reason that the Senate

20         made an exception for voter ID in 2011?

21         "ANSWER:  I think it's part of the reason.  The main

22         reason we wanted to pass it was the integrity of the

23         ballot box. and 90 percent of the people, in our

24         view, supported it.

25         "But rules are designed -- rules are designed for

1    both parties to be able to work through the system

2    and pass or stop legislation.  Rules can be abused.

3    "For example, the blocker bill, as we've talked about

4    before, was designed to be a one-party, really, how

5    to get bills to the floor.  And it was designed, some

6    might say, to try to bring people together, because

7    you have to work across the aisle to get it done.

8    Democrats need us, we need them.

9    "But the Democrats in the Senate had fallen into a --

10   had begun a habit of just saying to us, 11 of us --

11   and there were 11 and 12 at various times in the

12   Senate -- that 'We're just going to' -- on a lot of

13   bills, on a lot of bills -- 'We're not voting for

14   your bill.'

15   "And then we would sit down and say, 'Well, we'd like

16   to -- let's negotiate, and how can we make this

17   work?'  'No, we're not negotiating, we're not

18   interested.'  So they used the blocker bill just to

19   say, 'No, wasting time, not interested.'

20   "And -- and so what happens is -- and I never quite

21   understood that tactic, because you go to special

22   session.  We don't use the 21-bill rule.  Everyone

23   knows we don't use the 21-bill rule.  And we can pass

24   bills.

25   "And then over in the House again, I think the House

Patrick / By excerpts of Deposition - Direct                286

1      Republicans were not only upset that the voter --

2      that the voter ID was chubbed, but everybody else's

3      bills died behind -- I don't know how many there

4      were.  So there might have been a bill needed for a

5      community, it may have been a Democrat one or

6      Republican, but all bills died.

7      "So, you know, I think in 2011 we said the Democrats

8      have used the rules; whether we like the way the used

9      the rules or not, they used the rules to stop the

10     bill and we used the rules to pass the bill.

11     "And -- you know, I said to a Democrat senator one

12     time, I'll never quite understand -- and I have a

13     very good relationship and work well and we pass --

14     work well on a lot of bills together.

15     "But I said to a senator once, I said, 'I've never

16     understood -- I've never understood you all locking

17     arms and saying no on these bills that you don't

18     want; because if you would negotiate with us, we'd

19     pass a bill that you might find more palatable

20     because you would have influence on.  But if you're

21     not interested in negotiating, then we're not going

22     to have a special session and you're not going to

23     have any influence, because we only need 16 votes.

24     Simple majority.'  I've never quite understood that

25     thinking.

Patrick / By excerpts of Deposition - Direct       287

1       "If I were in the minority party, I would want to try

2       and -- and make every bill, if I know it's eventually

3       going to pass, I would like to have as much influence

4       on it as I can.

5       "Sorry to interrupt.  How are we doing on time?

6       There was a discussion off the record.

7       "QUESTION:  If you'll permit me to run through.

8       Earlier we were talking a little bit about student

9       IDs.  Do you know whether noncitizens can attend

10      state universities?

11      "ANSWER:  They can.

12      "QUESTION:  What about persons who are below the age

13      of 18 years old?  Can -- what about persons who below

14      the age of 18 years old?

15      "ANSWER:  Can they?

16      "QUESTION:  Can they attend state universities?

17      "ANSWER:  Yes.

18      "QUESTION:  Does a student ID prove citizenship?

19      "ANSWER:  No.

20      "QUESTION:  It doesn't even prove state residency,

21      does it?

22      "ANSWER:  No.

23      "QUESTION:  Does a student ID, to your knowledge --

24      are you aware of any student ID issued by a Texas

25      university that shows date of birth?

Patrick / By excerpts of Deposition - Cross                288

1              "ANSWER:  No."

2              **MS. WOLF:**  That concludes Defendants readings from

3    Senator Patrick's deposition.

4              **THE COURT:**  Okay.

5              **MR. GEAR:**  Bruce Gear on behalf of the United States.

6    Samuel Oliker (phonetic) will be reading the part of Dan

7    Patrick.

8              I have a copy for the Court.  May I approach?

9              **THE COURT:**  Yes.

10             **MR. GEAR:**  I also have a copy for the court reporter.

11             **THE COURT:**  Thank you.

12   **EXAMINATION OF DAN PATRICK BY EXCERPTS OF DEPOSITION TESTIMONY**

13     **(QUESTIONS READ BY MR. GEAR; ANSWERS READ BY MR. OLIKER)**

14             "QUESTION:  And is the only kind of fraud that could

15             have been prevented by SB 14 in-person voter

16             impersonation fraud?

17             "ANSWER:  I believe that would be an accurate

18             statement.

19             "QUESTION:  If we could take a look at -- if we could

20             take a look on Page 118 of the journal, from

21             January 26th, at Floor Amendment No. 12.

22             **MR. GEAR:**  Also marked as PL13.

23             "ANSWER:  Okay.

24             "QUESTION:  If you could take a moment to look at

25             this, and tell me when you're ready.

Patrick / By excerpts of Deposition - Cross                289

1        "ANSWER:  Number 12.

2        "Yes.  Okay.

3        "QUESTION:  This amendment would have provided that

4        the underlying documentation that you need to obtain

5        a state form of SB 14 photo ID would be provided

6        free; is that correct?

7        "ANSWER:  Yes.

8        "QUESTION:  And would this amendment have interfered

9        with the effectiveness of the purpose of SB 14?

10        "ANSWER:  I can't speak to that.

11        "QUESTION:  Sitting here today, do you have any

12        opinion on that?

13        "ANSWER:  I'd have to think it through.  I'm not

14        prepared to give you an answer quickly.

15        "QUESTION:  Receiving a free birth certificate

16        wouldn't harm the ability of the State of Texas to

17        verify a voter's identity in any way that you can

18        think of, would it?

19        "ANSWER:  I don't know that that's the -- I don't

20        know that that may have been the issue.  The issue

21        may have been that there's a cost to produce a

22        document, and, you know, if there was a reasonable

23        low cost for someone to -- you know, do that.  And I

24        don't know if that's changed since then or not.  But

25        at the time, I think that was the view.

Patrick / By excerpts of Deposition - Cross          290

1      "QUESTION:  So this amendment was tabled, is that

2      correct?

3      "ANSWER:  Correct.

4      "QUESTION:  And just to make sure that I understand,

5      tabling means it doesn't go forward, it kills the

6      amendment?

7      "ANSWER:  Correct.

8      "QUESTION:  And was this amendment tabled on a party

9      line vote?

10     "ANSWER:  Yes.

11     "QUESTION:  And you voted against this -- you voted

12     to table, correct?

13     "ANSWER:  Yes.

14     "QUESTION:  This amendment would have placed the cost

15     of obtaining documents on the State rather than the

16     voters, is that right?

17     "ANSWER:  Yes.

18     "QUESTION:  And did you oppose that concept?

19     "ANSWER:  Well, I think by -- I think my record

20     speaks for itself.

21     "QUESTION:  So you wanted the cost imposed on voters?

22     "ANSWER:  Yes, if it was a reasonable cost.

23     "QUESTION:  Take a look at Floor Amendment Number 13,

24     from January 26, on Page 110.

25     "ANSWER:  Yes, sir.

Patrick / By excerpts of Deposition - Cross                  291

1        "QUESTION:  So does it appear to you that this

2        amendment, by switching the language 'that has not'

3        or 'regardless of whether it has,' the purpose of

4        this was to allow for the use of IDs even when they

5        have expired?

6        "ANSWER:  Yes.

7        "QUESTION:  And this amendment was tabled, is that

8        correct?

9        "ANSWER:  Correct.

10       "QUESTION:  And again, that was a party line vote,

11       correct?

12       "ANSWER:  Correct.

13       "QUESTION:  And you voted in favor of tabling?

14       "ANSWER:  Correct.

15       "QUESTION:  Would this amendment have allowed for the

16       use of indefinitely expired IDs?

17       "ANSWER:  That's probably how I would have read that.

18       "QUESTION:  And would that have interfered with the

19       effectiveness of SB 14?

20       "ANSWER:  As I spoke earlier, I believe we should

21       have a valid -- you should have a valid current.  So

22       it's just my belief.

23       "QUESTION:  But you can't say, one way or another,

24       whether that would interfere with the effectiveness

25       of the bill?

Patrick / By excerpts of Deposition - Cross                292

1       "ANSWER:  No.

2       "QUESTION:  Take a look with me at Floor Amendment

3       Number 24.

4       "This amendment would have allowed individual

5       counties to decide whether to issue voter

6       registration certificates with a voter's photo, isn't

7       that correct?

8       "ANSWER:  Yes.

9       "QUESTION:  This amendment was also tables on a party

10      line vote, correct?

11      "ANSWER:  Yes.

12      "QUESTION:  Why wouldn't it have been a good idea to

13      let individual counties decide whether or not to

14      issue photo voter registration cards?

15      "ANSWER:  I don't recall.

16      "QUESTION:  Would this amendment have interfered with

17      the effectiveness of SB 14?

18      "ANSWER:  I don't know, because I don't recall the

19      specifics of the debate.

20      "QUESTION:  Would this amendment have been helpful,

21      given that, in alleviating the travel burdens that

22      you identified -- at least with respect to disabled

23      voters, and that there aren't DPS offices in every

24      county -- so through this amendment would you have

25      had a place in every county in Texas, if the county

Patrick / By excerpts of Deposition - Cross          293

1     wanted, they would have the option to provide photo

2     ID?

3     "ANSWER:  I don't know.

4     "QUESTION:  Well, a county can't unilaterally decide

5     to open DPS offices, can it?

6     "ANSWER:  No.

7     "QUESTION:  But under this amendment a county would

8     have been able to decide to offer its voters a photo

9     ID?

10    "ANSWER:  Under this amendment, I think so.

11    "QUESTION:  And sitting here today, you don't recall

12    why you opposed this?

13    "ANSWER:  I do not.

14    "QUESTION:  If you could take a look at Amendment

15    Number 29 on Page 129.

16    "ANSWER:  All right.

17    "QUESTION:  This is an amendment that would have

18    expanded DPS's operating hours to at least some

19    evening and weekend hours, is that correct?

20    "ANSWER:  Yes.

21    "QUESTION:  And this amendment was also tables on a

22    party line vote, is that correct?

23    "ANSWER:  Yes.

24    "QUESTION:  So you voted against this amendment,

25    correct?

Patrick / By excerpts of Deposition - Cross                 294

1        "ANSWER:  Yes.

2        "QUESTION:  And would this amendment have interfered

3        with the effectiveness of SB 14's stated purpose?

4        "ANSWER:  I can't respond because I -- I don't know

5        based on sitting here looking at this today.  There

6        was obviously some discussion by Senator Ellis and

7        may have been some discussion by someone who opposed

8        it.  Don't know.

9        "QUESTION:  Would this amendment have made it less

10       burdensome for voters without a photo ID who work

11       hourly jobs to get to a DPS office?

12       "ANSWER:  I can't speculate on that.

13       "QUESTION:  You don't think it would be helpful for a

14       voter who has a 9:00 to 5:00 job, without leave, to

15       have the opportunity to go to DPS on the weekend to

16       get an EIC if they needed one?

17       "ANSWER:  I can't speculate on it.

18       "QUESTION:  The last amendment I'd like to talk about

19       is Floor Amendment 30.  If you could take a moment to

20       look at that.

21       "ANSWER:  Okay.  Okay.

22       "QUESTION:  This amendment would have asked the

23       Secretary of State to report on a number of issues

24       related to the implementation of SB 14, is that

25       correct?

Patrick / By excerpts of Deposition - Cross                    295

1       "ANSWER:  Yes.

2       "QUESTION:  Did you oppose finding out the number of

3       voters, yearly, who voted a provisional ballot

4       because they came to the polls without acceptable ID?

5       "ANSWER:  The amendment speaks for itself and I voted

6       to table the amendment.

7       "QUESTION:  And did you oppose specifically asking

8       the Secretary of State to find out whether the ID

9       requirement was having a disparate impact on women,

10      elderly voters, minority voters, students, or persons

11      with disabilities?

12      "ANSWER:  The amendment speaks for itself and I voted

13      to table the amendment.

14      "QUESTION:  And the amendment was tables on a party

15      line vote, is that correct?

16      "ANSWER:  Yes.

17      "QUESTION:  So to that point, were there any studies

18      conducted on the number of students that had driver's

19      licenses?

20      "ANSWER:  There may have been or not.  I don't know.

21      "QUESTION:  So was -- was the -- was the number of

22      Texas students that had driver's licenses actually

23      something you considered while considering this

24      amendment?

25      "ANSWER:  It was something that -- you know, that

1    occurred to me, that not all students would have

2    driver's -- not all students would have a car.  But

3    the vast majority -- not all -- but the vast majority

4    of college students over the age of 18 likely had a

5    driver's license.

6    "QUESTION:  I guess my question for you is:  Where

7    are you getting this information?  Is that just based

8    on a general intuition?

9    "ANSWER:  Yeah.  I don't -- I don't -- there may have

10   been or may not have been.  I don't know if there was

11   any research on that.  But if you were to ask me

12   today -- if you were to go out on the street and ask

13   a thousand people, 'Do you think the average student

14   in college over the age of 18 has a driver's

15   license?', I think most people would say, 'Yeah,

16   probably so.'  It doesn't mean all of them did.  But

17   if they didn't, they are able-bodied people and they

18   can go to DPS and get a free -- a free ID.

19   "QUESTION:  But you don't know, and you didn't know

20   then, the exact percentage of Texas students that

21   lacked a driver's license; is that right?

22   "ANSWER:  That is correct.

23   "QUESTION:  And do you recall whether there was any

24   facts or evidence presented that suggested that

25   student IDs had been used for voting fraud anywhere?

Patrick / By excerpts of Deposition - Cross            297

1        "ANSWER:  I don't recall.

2        "QUESTION:  Sitting here today, are you aware of

3        voter fraud committed anywhere with student IDs?

4        "ANSWER:  I'm not aware today.

5        "QUESTION:  Prior to the enactment of SB 14, did you

6        or any of your staff conduct any analysis on how many

7        registered voters have used student IDs to vote in

8        previous elections?

9        "ANSWER:  No, not that I'm aware of.  Not that I

10       recall.

11       "QUESTION:  Did you or any of your staff perform any

12       analysis on the effect of excluding student IDs on

13       student voter turnout?

14       "ANSWER:  No.

15       "QUESTION:  And did you or any of your staff conduct

16       any analysis on the effect of excluding student IDs

17       on registered student voters at historically black

18       colleges and universities in Texas?

19       "ANSWER:  No.

20       "QUESTION:  Okay.  I'm going to hand you an e-mail

21       that was produced in this litigation."

22       **MR. SCOTT:**  Also marked as PL-331.

23       "ANSWER:  Okay.

24       "QUESTION:  And this appears to be an e-mail from you

25       dated February 24, 2011, to

1         catherine@kingstreetpatriots.org; is that correct?

2         "ANSWER:  Yes.

3         "QUESTION:  And who is Catherine?

4         "ANSWER:  Catherine Englebredth.  I believe she is

5         the founder of King Street Patriots or True the Vote.

6         Maybe not King Street Patriots.  She's involved with

7         King Street Patriots.  Let's leave it at that.

8         "QUESTION:  And what is King Street Patriots?

9         "ANSWER:  It's a -- I think it's a Tea Party group.

10        "QUESTION:  Okay.  And so you note here, in the

11        second paragraph, just as you did in the previous e-

12        mail that we looked at, that '77 counties in Texas do

13        not have a DPS office,' right?

14        "ANSWER:  Yes.  77 counties, or more, in Texas, don't

15        have a lot of things.

16        "QUESTION:  Okay.  But this -- but this is

17        specifically about --

18        "ANSWER:  Yes.

19        "QUESTION:  -- the lack of DPS offices --

20        "ANSWER:  Yes.

21        "QUESTION:  -- in particular counties?

22        "ANSWER:  Yes.

23        "QUESTION:  Okay.  Great.  And then you further note

24        that a disabled person may not be able to get 'a ride

25        over 75 miles if they live in one of these counties

Patrick / By excerpts of Deposition - Cross                    299

1       to get the photo ID' --

2       "ANSWER:  Right.

3       "QUESTION:  -- right?

4       "ANSWER:  Yeah.  This was a little 'belt and

5       suspenders.'  I wanted to be sure that people who had

6       disabilities had -- to make sure they had the

7       opportunity to vote in person if they wanted to vote.

8       "QUESTION:  Right.  And one of your -- your points

9       here, is that 'Therefore, a disabled person may' not

10      'be disabled to get a ride to their local precinct' -

11      - or, sorry, 'Therefore, a disabled person may be

12      able to get a ride to their local precinct, but not a

13      ride over 75 miles if they live in one of these

14      counties to get the photo ID.'

15      "ANSWER:  Yes.

16      "QUESTION:  Okay.  And I believe that you testified

17      earlier that -- your testimony was that people get

18      rides all the time and that you didn't think it was

19      harder for people without cars to get an ID.

20      "ANSWER:  If they were not disabled.

21      "QUESTION:  So if the person is -- so you think it's

22      a burden, if someone is disabled, to get a ride from

23      someone to a DPS, but it's --

24      -- but it's not a burden if someone needs to get a

25      ride for any other reason from someone to get to DPS?

1       "ANSWER:  You know, some of these things you apply

2       your common sense and your knowledge.  And we -- and

3       we reasonable people -- that's how we write

4       legislation, very often.

5       And you come to the conclusion, as I've said earlier

6       in my testimony, that if a person chooses to live in

7       a rural -- in a rural area, they usually have some

8       means of getting somewhere; otherwise...

9       Well, and again, take the disabled community to the

10      side.  I'm talking about an able-bodied community --

11      whether they're black, white, or brown, poor, middle

12      class, or wealthy -- they have -- if they live in a

13      rural area, they have some means of getting

14      somewhere.  They either have their own car or a

15      family member has a car or a friend has a car.

16      It is not logical, to me, that someone lives in a

17      remote area without any access to transportation to

18      get anywhere; otherwise, they would be very isolated.

19      "QUESTION:  Do you think that some -- you mentioned

20      living in a rural area being a choice, right?

21      "ANSWER:  It can be.

22      "QUESTION:  It can be.

23      "ANSWER:  Not always, but it can be a choice.

24      "QUESTION:  But you would admit that it's not always

25      a choice?

Patrick / By excerpts of Deposition - Cross          301

1     "ANSWER:  Yeah, I don't know why people choose to

2     live places.  But all of us choose to live in a

3     state, choose to live in a city, choose to live in a

4     county, choose to live wherever we live.  Sometimes

5     it's by where we work.  You know.  So I can't speak

6     for everyone.  But very often, people choose to live

7     where they choose to live.

8     "QUESTION:  Would you agree that if you are poor or

9     live below the poverty line in a rural area, that it

10    may not necessarily be a choice just to pack up and

11    move?

12    "ANSWER:  Yeah, I understand that sometimes it might

13    not be a choice.

14    "QUESTION:  Okay.  So you also state -- and let me

15    find it -- in your Number 2 here, in that same

16    Paragraph, it's the last sentence:  'It could even be

17    a burden in a suburban or urban area, e.g. there is

18    not a single DPS office inside the Loop.'  Isn't

19    that --

20    "ANSWER:  Yes.

21    "QUESTION:  Okay.  And by 'inside the Loop,' do you

22    mean inside of the -- Interstate 610, correct?  The

23    area of Houston that's inside of Interstate 610; is

24    that right?

25    "ANSWER:  Yes.  And I believe that's correct.  I may

1       be incorrect, and we may have opened one since then,

2       but I -- at the time, I believe that was correct.

3       "QUESTION:  But at this time there were no DPS

4       locations in the Loop?

5       "ANSWER:  I believe it.

6       "QUESTION:  Okay.  So is it fair to say that at this

7       time in your view, the lack of DPS offices in some

8       counties and the lack of DPS offices inside the Loop

9       would impose an undue burden on disabled individuals

10      who needed to travel longer distances to obtain a

11      photo ID?

12      "ANSWER:  I think the document speaks for itself.

13      The document's pretty clear.

14      "QUESTION:  At the time you wrote this e-mail, it was

15      your view that the lack of DPS offices inside the

16      Loop could pose a burden -- an undue burden on

17      disabled individuals --

18      "ANSWER:  It could impose a burden on people who have

19      a significant disability who otherwise, in my view,

20      are people who kind of try to live independently.

21      There are a lot of disabled people who try to live on

22      their own.

23      "QUESTION:  So it seems -- it seems to me, based on

24      everything that we've discussed today then, looking

25      at these e-mails, that you greatly consider the

Patrick / By excerpts of Deposition - Cross                    303

1      burden that disabled individuals may face in trying

2      to obtain a photo ID; is that accurate?

3      "ANSWER:  Well, no, if the -- if the word 'greatly

4      considered.'  But obviously, I considered it.

5      "QUESTION:  And you were persuaded that certain

6      individuals, specifically disabled individuals, could

7      face burdens in obtaining a photo ID, and that was a

8      problem that you wanted to remedy; is that -- is that

9      right?

10     "ANSWER:  I think that my testimony and my documents

11     and the amendment speak for themselves.

12     "QUESTION:  And so did you consider the burden of

13     operating [sic] a photo ID that would fall on any

14     groups other than disabled?

15     "ANSWER:  No, because I didn't see it as a great

16     burden for a great number of people or a burden for a

17     significant number of people.  As I've testified

18     before, and don't mind repeating:  We live in a

19     society where many people are required to have a

20     photo ID for a variety of things.

21     I mean, you know, the federal government, for

22     example, has decided you have to have a legal photo

23     ID to get on an airplane; even people who live in

24     remote rural areas, even people who are poor, even --

25     you know, people who fall into all categories,

1            actually including people with disabilities.

2            So I did not see it as an undue burden for able-

3            bodied people, regardless of their economic status.

4            "QUESTION:  Has any voter ever told you that they're

5            not going to vote in a particular election because

6            they're afraid that their vote will be diluted by

7            fraudulent votes?

8            "ANSWER:  Not that I recall.  Someone may have said

9            it, but I don't -- nothing specific that I can

10           recall.

11           "QUESTION:  Do you believe that prior to the passage

12           of SB 14 there were Texas voters who did not vote

13           because they believed that in-person voter

14           impersonation would cancel out their vote?

15           "ANSWER:  I wouldn't know that, but I've never heard

16           anyone say it to me.

17           "QUESTION:  Would it surprise you to learn that DPS,

18           at least for a while, was making applicants who

19           wanted to vote with an EIC give them their

20           fingerprints?

21           "ANSWER:  No.

22           "QUESTION:  Do you think that's something they out to

23           be able to do?

24           "ANSWER:  I stand to be corrected, but I believe when

25           you get your driver's license, we give a fingerprint.

| | |
|---|---|
| 1 | When you get a CHL, you get a fingerprint.  And when |
| 2 | you're in the military, you get a fingerprint. |
| 3 | So -- so for some other documents that we already |
| 4 | require -- and, again, I have to stand corrected on |
| 5 | the driver's license, but I know that to get a CHL |
| 6 | you have to submit fingerprints. |
| 7 | "QUESTION:  Do you think it's appropriate to make |
| 8 | somebody get fingerprinted in order to be able to |
| 9 | vote? |
| 10 | "ANSWER:  You could back that down and say, 'Is it |
| 11 | appropriate to make someone give a fingerprint to get |
| 12 | a driver's license?'  We're trying to establish to be |
| 13 | sure that we have integrity at the ballot box. |
| 14 | "QUESTION:  Senator Patrick, in your campaign for |
| 15 | lieutenant governor, would you agree that illegal |
| 16 | immigration has been a significant issue? |
| 17 | "ANSWER:  Yes. |
| 18 | "QUESTION:  Do you believe that your positions on |
| 19 | illegal immigration were one thing that specifically |
| 20 | appealed to voters? |
| 21 | "ANSWER:  Yes. |
| 22 | "QUESTION:  Exhibit 9, is this an image that your |
| 23 | campaign has used on the Internet?" |
| 24 | **MR. SCOTT:**  And that's also marked as Plaintiffs' |
| 25 | Exhibit 330. |

Patrick / By excerpts of Deposition - Cross                306

1        "ANSWER:  You know, I assume so.  We -- it was a long

2        campaign, obviously.  The record speaks for itself.

3        "QUESTION:  Could you describe what's pictured in

4        this image?

5        "ANSWER:  Well, it speaks for itself.  It's people

6        getting on a train, is what it appears to me, or

7        maybe it's climbing a fence.  Hard to say.  It could

8        be a railcar.  It could be a fence.

9        "QUESTION:  Are the three men pictured supposed to

10       represent illegal immigrants?

11       "ANSWER:  Don't know.  I didn't do the ad, but -- but

12       that would be my -- I think that's what it would

13       suggest.

14       "QUESTION:  And as you look at this ad, what's the

15       race of the persons pictured?

16       "ANSWER:  You can't tell by -- you can't tell by the

17       photo I've been given.

18       "QUESTION:  Do they look Anglo to you?

19       "ANSWER:  The one in the middle -- it's impossible to

20       tell, in my view.  And the one closest, impossible,

21       because the face is -- the whole person is -- is

22       dark.

23       "QUESTION:  They are dark images, correct?

24       "ANSWER:  They're dark images.

25       "QUESTION:  Why does this ad use the word 'invasion'?

1          "ANSWER:  Because the word 'invasion' applied to the

2          numbers of illegal immigrants that had been pouring

3          over the border in recent times.  Other people might

4          use different words, but it's been a significant

5          number of people.

6          **MR. FRIEDLAND:**  And that's it for the reading, your

7   Honor.

8          **THE COURT:**  All right.

9          **MR. SCOTT:**  Your Honor, the State would call Keith

10  Ingram.

11      **(Pause)**

12          **THE COURT:**  Hi.  Good afternoon.

13          **MR. INGRAM:**  Howdy.

14          **THE COURT:**  You can approach over here and raise your

15  right hand.

16          **BRIAN KEITH INGRAM, DEFENDANTS' WITNESS, SWORN**

17                      **DIRECT EXAMINATION**

18  **BY MR. SCOTT:**

19  Q    Would you state your name for the record please, sir?

20  A    Certainly.  My name is Brian Keith Ingram.

21  Q    Mr. Ingram, would you introduce yourself to the Court and

22  let her know a little bit about who you are and what you do for

23  a living?

24  A    Sure.  My name is Keith Ingram.  I go by Keith.  And I am

25  the Director of the Elections Division at the Secretary of

1   State's office.

2   Q    How long have you served in that position?

3   A    Two years, nine months, five days.

4        **(Laughter)**

5   Q    Who's counting?

6   A    But who's counting.

7   Q    What does the Director of Elections for the Secretary of

8   State do?

9   A    Well, the Secretary of State is the chief election officer

10  for the State of Texas and the Legislature has instructed her

11  to create a division to fulfill that responsibility of hers.

12  And I'm the director of that division.

13  Q    And how many people do you got working for you?

14  A    Currently just under 30.  We either have 28 or 29.

15  Q    Well, how is it possible to conduct all the elections in

16  the State of Texas with 30 people and yourself?

17  A    Well, we don't do the elections.  We're sort of technical

18  assistance for the folks who actually put on the elections, so

19  the county officials, the city school, and other political

20  subdivisions that actually put on the election.  We answer

21  their questions.  We give them materials.  We prepare them

22  beforehand.  We do that sort of thing, but we don't do the

23  election itself.

24  Q    Well, for instance, yesterday there was an election up in

25  the panhandle, correct?

Ingram - Direct / By Mr. Scott                    309

1   A    That's right, SD 28 special election was yesterday.

2   Q    Would that have been -- what would be your involvement

3   from the Secretary of State in implementing that election?

4   A    Well, we worked with the Governor's Office on the

5   proclamation, setting the date, and telling the Governor what

6   the calendar was going to be for the election.  We had to

7   answer a lot of questions from the 51 counties involved because

8   they're not used to special elections, and so we had to give

9   them a lot of handholding and guidance.  And then last night we

10  took in the returns to post on our website for the public.

11  Q    Did you-all run into any problems?

12  A    We did have a problem yesterday, yes, sir.

13  Q    What kind?

14  A    Lamb County ran out of ballots in the middle of the

15  afternoon and needed help from us on how to create emergency

16  ballots.

17  Q    Any issues at all with voter ID?

18  A    No.

19  Q    How do you-all track problems like -- so, Lamb County

20  calls, they have a special election, they tell you we ran out

21  of ballots.  Do you-all track those problems as they develop

22  over the course of an election?

23  A    Well, in that case, Lamb County called me directly and I

24  had to take the call and then direct one of my lawyers to help

25  them with the process for emergency ballots.  And so, yes, we

1    handle some things by phone.  We handle some things by email.

2    Things like that, that are emergencies, we handle by phone.

3    Q    So, what is the process in Texas for registering to vote?

4    A    There are two main ways that we register to vote in Texas.

5    The primary way is the regular National Voter Registration Act

6    postcard application, the piece of paper that is returned to

7    the county voter registrar.  The second way is the Department

8    of Public Safety.  Whenever someone changes their driver's

9    license or applies for a Texas driver's license or ID or any

10   other transaction that DPS has with an individual.  They will

11   ask that person if they are interested in registering to vote

12   or updating their voter registration.  And, if so, they'll

13   check a box on the form on the computer and the information

14   related to voter registration will be transmitted

15   electronically to our office.  And those are the two primary

16   ways that we register voters in Texas.

17   Q    You mentioned NVRA.  That's the National Voter

18   Registration Act?

19   A    Yes.  The National Voter Registration Act of 1993 required

20   entities like DPS, who issue driver's licenses, to be

21   participants in the voter registration process.

22   Q    Are there rules -- are there laws within the NVRA or

23   sections within the NVRA that apply to the maintenance of

24   voters' records from your standpoint as the Director of

25   Elections for the State of Texas?

Ingram - Direct / By Mr. Scott                    311

1   A    Yes.   The NVRA requires that states have in place a

2   general program making reasonable efforts to remove certain

3   categories of persons from the voter rolls.   Those categories

4   are felons, mentally incapacitated folks, people who have

5   moved, and people who have died.

6   Q    So let's go -- start with the folks that have moved.   How

7   do you get rid of somebody that has moved off the voter rolls?

8   A    The NVRA process in Texas involves the Texas voter

9   registration certificate.   At the end of every odd-numbered

10  year, every single registered voter in Texas will get a voter

11  registration certificate that's a different color than the

12  cycle before.   And that is a non-forwardable piece of mail.   So

13  if someone has moved from their address that they have on file

14  with the voter registrar that piece of mail will bounce back to

15  the voter registrar.   The voter registrar will put the voter in

16  suspense and then we'll send a confirmation notice to the

17  voter.   A confirmation notice just says to the voter, it looks

18  like you've moved, you need to update your address or register

19  in the county where you've moved to.   And that is a forwardable

20  piece of mail.   Most people respond to the confirmation notice.

21  About 75 percent respond within the first 30 days, update their

22  address, and they go on being active voters.   The remaining

23  25 percent go into long-term suspense and if they don't vote in

24  the next two federal elections then they'll be purged after the

25  second one.

1  Q    Okay.  So that's a lot of information.  Let's break it

2  down a little bit.  So, once you've identified someone that has

3  -- you have received their voter registration card back in the

4  mail?

5  A    Right.

6  Q    The next step is you-all send a correspondence out to that

7  person?

8  A    The county will send a confirmation notice asking the

9  voter to update their address.

10  Q    So, again, who mails the voter registration card out?

11  A    The counties mail the voter registration cards.

12  Q    And the counties receive the voter registration cards

13  back, correct?

14  A    That's right.

15  Q    And the counties are then obligated under law to try and

16  attempt to resolve the status of that voter, correct?

17  A    That's right.

18  Q    Now, there's two types of counties in our state; there's

19  online and offline.  What's an online county?

20  A    Online counties are usually smaller in population.

21  There's 215 of them.  And they deal with the Texas voter

22  registration database, known as TEAM, in real time.  And so

23  whenever they add a voter or cancel a voter or change a voter's

24  information, that goes into the database immediately.  They're

25  online with the system.  The remaining 39 counties in Texas are

1   offline.

2   Q     What's that?

3   A     They've got their own voter registration system,

4   proprietary, sold to them by a vendor.  And what they do is

5   they input their information into their system and their system

6   batch processes with the statewide system overnight.

7   Q     So now let's turn our attention to deaths, because I think

8   that was one of those other items.

9   A     That's right.

10  Q     So when -- how do you find out that a voter has died?

11  A     There are several ways.  And the law says that if a voter

12  registrar has personal knowledge that a voter is deceased, they

13  can remove that voter from the roll.  If the local registrar of

14  death reports to the county that a voter has passed away, they

15  can remove that voter.  The local registrars of death across

16  the state send their information to the Bureau of Vital

17  Statistics and we get an update from BVS once a week, once

18  every 10 days, and then we will take that information from the

19  Bureau of Vital Statistics.  And we do two things with it --

20  three things I guess.  Number one, if it's a strong match, we

21  will cancel that person for the online counties.  So if someone

22  that we get from the Bureau of Vital Statistics has a first

23  name, last name, date of birth, full nine of the social match,

24  they're cancelled by the state.  That's the only category of

25  voter that the state actually cancels right away.  And then, if

1    it's anything less than that, if they match on any number of

2    items less than first name, last name, date of birth, and full

3    nine of the social, they're sent to the counties for further

4    investigation and then cancellation.

5    Q    So what does the county do when they get notice for

6    further investigation?

7    A    Well, in the past what they would do is just immediately

8    send a notice to the voter that says we've received

9    information, you know, in the course of matching, that makes it

10   appear that you're deceased.  If we don't hear from you in the

11   next 30 days we're going to cancel your voting record.  And so

12   that's the way they used to investigate.  House Bill 3593 in

13   the last legislative session requires that counties do

14   something else between receiving the weak match from us and

15   proceeding to the confirmation notice.

16   Q    What's that?

17   A    The legislation just says they've got a duty to

18   investigate.  Quite a few counties use public data to look

19   someone up on to see if they can get more bits of information

20   associated with the voter to make a determination as to whether

21   or not the two persons are the same.

22   Q    So the next group of people I think you've identified were

23   folks who were felons and --

24   A    Well, if I could.  For offline counties, the process is a

25   little different.

Ingram - Direct / By Mr. Scott                    315

1  Q    Oh, okay.

2  A    And it's important to know that the offline counties,

3  there are only 39 of them out of the 254.  But out of our

4  13.5 million registered voters in Texas, about 10 million live

5  in offline counties.  So most of the voters in Texas are in

6  offline counties, but most of the counties are online with the

7  system.

8       For offline counties, the process is a little different.

9  For strong match deceased, since we don't have the ability to

10  interact directly with their proprietary voter registration

11  system, we will send them a task for them to work.  And the

12  task is a Code 99, which is for them to cancel the voter's

13  record.  It's a nondiscretionary thing, but they still have to

14  actually do it or have a mechanism in place with their voter

15  registration system to do it automatically.  And then we will

16  also send them the weak matches, same as we do the online

17  counties.

18  Q    So the administration of the database information, at

19  least with strong deaths, is done by offline counties, correct?

20  A    Right.

21  Q    And for online counties, that is administered through the

22  state; your office, correct?

23  A    That's right.

24  Q    Okay.  So now let's turn our attention over to folks that

25  are felons.  How does the Secretary of State's office get

1  notified that someone is now a felon?

2  A    We get a file from DPS, I believe daily or close to that,

3  regarding felony convictions in the state.  And we will

4  separate those by county and send them to the counties to work.

5  All felons are treated as weak matches.  There is no strong

6  match for a felony.

7  Q    And so a weak match, as you just talked about, is dealt

8  with the same way as a weak match for a death, correct?

9  A    That's right.  They have to --

10  Q    The job, the task, of figuring out whether that person

11  should be removed or not is given to the individual county to

12  go through and process, correct?

13  A    The individual county has to investigate and cancel the

14  voter if they are, in fact, a convicted felon.

15  Q    And what was the last group of folks within NVRA that you-

16  all have to identify?

17  A    We've got folks that move, deceased, mentally

18  incapacitated.

19  Q    I think it was mentally incapacitated.  How do you learn

20  that someone has developed a mental incapacitation that would

21  prevent them from writing -- to vote?

22  A    The probate courts, when there is a determination of

23  mental incapacity, will give that information to their local

24  voter registrar in the same county.

25  Q    Okay.  So the information for the offline counties, is it

1    dealt with the same for all these categories of people; that

2    is, you provide to the offline counties notice of this

3    information, for instance, a felony?

4    A    Right.

5    Q    We've talked about Ms. Cargill, who is on death row, and

6    she has been on it since 2010, and she is still on the voter

7    rolls.  Did you know that?

8    A    I didn't.  What county is that?

9    Q    Smith County.

10   A    Interesting.

11        **(Laughter)**

12   Q    If you -- let's use her as an example.  If you were to

13   send an email out after we leave here today letting them know

14   that her name has come up and it appears she is still on the

15   voter rolls, what is the process Smith County over in Tyler --

16   somebody in Tyler supposed to do with her?

17   A    What Smith County would do is send a confirmation notice

18   to the last mailing address in the voter registration system

19   for that voter saying it appears that you have been convicted

20   of a felony and your record is going to be cancelled in 30 days

21   if we don't hear from you.

22   Q    What is the stick by which your office has to make sure

23   that Smith County does that?

24   A    We don't have one.

25   Q    So they may be mandated to do it, but have you ever seen

Ingram - Direct / By Mr. Scott                        318

1    instances where counties simply don't get it done, --

2    A     Yes.

3    Q     -- for whatever reason.  They may not have the resources;

4    whatever.

5    A     Certainly.

6    Q     Tell us a little bit about those.

7    A     Well, we found out in 2012 that -- in 2012, the mass mail-

8    out of voter registration certificates that was supposed to go

9    out at the end of 2011 was delayed because of the redistricting

10   litigation.  So the court Order in that redistricting

11   litigation from the San Antonio court required that the mass

12   mail-out go April 24th of 2012.  Well, it was very soon

13   thereafter that we started getting calls from a lot of persons

14   in Travis County who were very concerned because deceased

15   relatives of theirs had received a voter registration

16   certificate.  And it turned out, on an investigation with

17   Travis County, that they had not cancelled any of the strong

18   matched deceased that we had sent to them since TEAM has been

19   in place in 2007.  So they had a five year period there where

20   they hadn't actually cancelled any strong matched deceased in

21   Travis County.  And the explanation for that was that they

22   didn't know what a Code 99 was, so they didn't understand the

23   tasks that had been sent to them.

24   Q     Well, do you know of any kind of information about how

25   many dead people may or may not be on the system?

1  A    I don't.  The last investigation in that regard that I did

2  was in connection with the 2012 preclearance litigation.  And

3  the Department of Public Safety looked at our voter rolls and

4  they were of the opinion that we had 50,000 deceased persons on

5  the voter rolls.

6  Q    What is HAVA?

7  A    HAVA is the Help America Vote Act of 2002.

8  Q    What does it -- what impact, if any, does it have on your

9  job as Director of Elections for the State of Texas?

10 A    Well, HAVA had a couple of main components.  The first

11 thing that HAVA did was address the voting equipment that

12 states use for elections.  It was a result of the hanging chad

13 election in Florida in 2000, so it explicitly prohibited punch

14 card ballots going forward.  And it required that every single

15 polling place in a federal election have a disabled accessible

16 voting unit available for voting.  The other thing that it did

17 besides affect voting equipment in the polling place was

18 require that states have a statewide electronic voter

19 registration database for counties or other voter registrars to

20 use to keep track of voters.

21 Q    Well, from the standpoint of TEAM, how old is the TEAM

22 database that you-all are using?

23 A    TEAM was brought online in 2007.

24 Q    What's its end of life estimated by you to be?

25 A    Its end of life was the end of 2013.

1    Q    And when something like TEAM reaches its end of life what

2    happens; --

3    A    You replace it.

4    Q    -- why isn't it dead?

5    A    You replace it as soon as you can, --

6    Q    And are you-all --

7    A    -- resources permitting.

8    Q    -- in the process of doing that?

9    A    We are.  We let out a request for offer at the end of --

10   in October of 2013.  We entered into a contract with a group

11   called PCC Technology Group in July of this year to redevelop

12   TEAM.

13   Q    And so what's the -- how long of a process is it going to

14   be before that's developed and implemented?

15   A    We have a fairly aggressive timeline.  We want the

16   redeveloped TEAM to be in place before the constitutional

17   amendment election in 2015.  So, by November of 2015, we want

18   the new system to be on board.  We don't want to beta test a

19   new system in a presidential primary.

20       **(Pause)**

21   Q    I'd like to visit with you a little bit about SB 14.  Do

22   you know what SB 14 is?

23   A    Yes.  It's the bill passed in the 82nd Legislature

24   regarding photo ID.

25   Q    What role, with regard to the implementation of SB 14, has

1   the Secretary of State's office, and specifically yourself,

2   had?

3   A    Well, our role is to implement laws passed by the

4   legislature, and with regard to something as -- I don't want to

5   say as -- as multi-faceted a change as SB 14 was, it requires a

6   multi-faceted, multi-layered response on our part to implement

7   it.  And, so, we -- we've -- we have to first determine what

8   the law requires; then we have to come up with forms to

9   implement what the law requires, that the -- the poll workers

10  would use in the polling place and the voter registrar would

11  use in the office during the cure period, and then we have to

12  determine what exactly they meant when they came up with the

13  63.0101 list of six I.D.'s plus an EIC, and then we have to

14  communicate all of this information to the county election

15  officials so that they can train their poll workers.  So, we

16  came up with training materials and -- and all that -- forms,

17  all of that stuff.  And, then, there is another layer.  We have

18  to actually reach out to the public to make sure that they know

19  what's expected of them and that it is different than it was

20  before and -- and make sure that they're prepared when they go

21  to the polls.

22  Q    Well, let's break that down a little bit if we could.

23  With regard to communicating to the counties and all of the

24  poll workers -- first of all, how many poll workers are there

25  in the state?

1    A    Um --

2    Q    Let's say the upcoming election in November of 2014.  How

3    many poll workers would we talking about in the state of Texas?

4    A    We would expect for the November election for there to be

5    more than 8,000 polling places, and we would expect there to be

6    more than 25,000 poll workers working that day.

7    Q    And whose -- is there -- do you have a responsibility to

8    educate the people who are going to be implementing the

9    elections in this state?

10   A    We have an obligation to educate the counties and to make

11   education materials available to the counties for them to

12   educate the poll workers.

13   Q    When does that start?

14   A    It started in June of 2013.

15   Q    So, you've been doing training of the different counties

16   to help facilitate the training of those 25,000 employees since

17   when?

18   A    Since June of 2013.  This -- this crop of election

19   workers, this crop of poll workers, is going to begin training

20   this week and next week.  The training for this election is --

21   is starting now.

22   Q    And will you be training -- well, have you prepared

23   training materials for those folks?

24   A    Yes.

25   Q    And have you, I guess, identified the teachers for those

1  courses?

2  A    We don't.  The counties do that, and they set the schedule

3  for when the classes are going to be and -- SB 14 did something

4  unique with regard to poll worker training that hadn't been

5  done before.  Before SB 14, only the election judge in a

6  polling place was required to undergo training by the counties

7  for the election.  The judge was then expected to communicate

8  the information to the other poll workers in -- in the polling

9  unit.  SB 14 requires that all poll workers go -- undergo

10 training with regard to photo I.D. requirements.  And, so, we

11 have developed sort of two modules for poll worker training.

12 We've got photo I.D. only, which includes the list of

13 acceptable I.D.'s, their pictures, different variations that

14 occur, and then we also have integrated into that

15 substantially-similar-name training.  So, when poll workers,

16 all election workers, get trained with regard to photo I.D.,

17 they get acceptable I.D. education as well as similar-name

18 education.

19         The judges, who get the full course of poll worker

20 training, get that module as well, but they also get stuff

21 about setting up the polling place, what happens with voting

22 equipment when it malfunctions, who to call, how to close down

23 a polling place at the end of the day, and the -- the

24 procedures for that.  So -- so, they don't just get the photo

25 I.D. training.

1   Q    So, part and parcel of SB 14 was an identification --

2   well, photo I.D. requirement.  You were given by statute

3   certain photographic I.D. that were supposed to be acceptable.

4   How did you go about implementing or conveying the message to

5   the poll workers, or the judges who would convey it then to the

6   poll workers, which types of photo I.D. were acceptable?

7   A    Right.  Our -- our obligation in connection with being the

8   chief election officer for the state, is to interpret and

9   implement what the legislature says.  And, so, they changed

10  63.0101 of the code, which had a previous list of acceptable

11  forms of I.D. at the polling place, and they changed that list.

12  And the list now is -- has got six categories plus an election

13  identification certificate.  And, so, we took that list and

14  applied common sense, you know.  A driver's license is a

15  driver's license; a personal I.D. card is a personal I.D. card;

16  an EIC is what it is; a passport is what it is.  But there is

17  something called a "passport card" that people can use for land

18  entry into Canada and Mexico or to go to the Caribbean.  And,

19  so, we determined that a passport card was an acceptable form

20  of passport for voting.

21        And, then, there is a certificate of citizenship is

22  on the list, the new 63.0101 list, and it turns out that

23  certificate of citizenship is something that the Department of

24  Immigration Naturalization, whatever it is, that the federal

25  government has as a specific thing.  So, when you say

1   "certificate of citizenship," that is a thing.  But it's not

2   the thing that the drafters of SB 14 meant.  We talked to the

3   drafters, and what they meant was, they meant the piece of

4   paper that you get when you become a citizen.  So, they should

5   have said "naturalization certificate."  A naturalization

6   certificate is a lot more common than a citizenship

7   certificate.  So, we include both of those things in acceptable

8   forms of I.D. because we're trying to implement the will of the

9   legislature.

10          And, then, the other big category is military I.D.

11  When you talk to the Department of Defense about military I.D.,

12  they have a wide variety of items that -- that they issue or

13  that related agencies issue to military persons.  And, so, our

14  goal with regard to implementing this law was to make the list

15  as expansive as possible so that no one is disenfranchised.

16  And, so, we took every single form of military I.D. that there

17  is:  the CAC card; the DOD contractor CAC card; the DOD

18  civilian retiree card; uniformed military services I.D., which

19  they've got four different versions of that, that are different

20  colors for -- for different purposes; as well as the V.A.,

21  Veterans Affairs, card.  We wanted to make sure that as many

22  voters as possible would be encompassed in the list of

23  acceptable forms of I.D.

24  Q    Let's talk briefly about the certificate of citizenship.

25  I mean, that's the one that you could -- if I'm born -- let's

1    say I'm born in Canada or I'm born in Mexico or any other

2    foreign land, but my parents are both United States citizens.

3    In order to effectuate proving that I am, in fact, a U.S.

4    citizen, I can obtain from the Department of State, or whoever

5    issues it, Immigration, a certificate of citizenship, and it

6    will have my picture, correct?

7    A    That's right.

8    Q    And it may be my picture as a baby if somebody gets a hold

9    of one of those as a baby, correct?

10   A    That's right.  And --

11   Q    Well -- well --

12   A    And I -- it's my understanding that children who are

13   adopted from overseas also get citizenship certificate.  So,

14   yeah, it's our understanding from certificate of citizenship

15   that the photos on there would not be very useful for

16   determining the identity of a voter.

17   Q    Are you aware of a New York Inspector General's report?

18   A    Um --

19   Q    On voter fraud?

20   A    I am.  I remember when that came out.  That was at the end

21   of last year, I believe.

22   Q    Well, why would you have reviewed such a thing?

23   A    That kind of thing is of -- of strong interest to election

24   directors across the country.  I happen to know one of the

25   election directors in New York, and so I called him

Ingram - Direct / By Mr. Scott                    327

1    immediately.

2    Q    And what was it about that interchange that goes into

3    play, I guess, from the standpoint of implementing elections in

4    Texas?

5    A    Well, what stuck out to me in that report --

6              MS. WESTFALL:  Objection.  Hearsay.

7              MR. SCOTT:  Well, I'm not offering it for the truth

8    of the matter asserted, simply asking what -- from his

9    standpoint of implementing SB 14.

10             THE COURT:  Overruled.

11             THE WITNESS:  What stuck out to me from that report

12   is that the -- the attempt to impersonate ineligible voters was

13   successful 61 out of 63 times.  And that -- that made an

14   impression.

15   BY MR. SCOTT:

16   Q    So, why is it -- what relevance does that have, though, to

17   the implementation of SB 14?

18   A    Well, it --

19             MS. WESTFALL:  Objection.  Relevance.  Hearsay.

20             THE COURT:  Overruled.

21             THE WITNESS:  It has always been my contention that,

22   in the absence of a photo I.D. requirement, that someone can

23   come to vote with a certificate, a voter registration

24   certificate, and say that they're the person on that

25   certificate and vote with it, and that the only way that it

1    would get caught is if the person who's behind the table knows

2    either the name on the voter certificate or knows the person

3    standing in front of the table and knows they're not the same

4    person.  So, absent serendipity, voter impersonation fraud

5    would not be caught.  And when I saw the inspector general's

6    report that said 61 out of 63 attempts were successful, that

7    confirmed my belief that voter impersonation fraud is very

8    difficult to catch absent a photo I.D. requirement.

9    **BY MR. SCOTT:**

10   Q    So, you found out that SB 14 was being implemented, I

11   guess, back in June of 2013 with the *Shelby County* case; is

12   that correct?

13   A    That's right.

14   Q    Tell me what happened.  How did you -- how did you go

15   about getting -- well, that's too broad.  Let me ask you a

16   little closer question.

17        So, what were the steps you undertook at that time to

18   implement SB 14?

19   A    Well, you know, we had -- we had some idea that the *Shelby*

20   *County* decision was going to -- was in the hopper and was

21   coming and that it could lead to the implementation of photo

22   I.D., so we had taken the forms and the rules that we had

23   worked on during 2011 and sort of gave those a fresh look, had

24   them ready to go, had material for our website ready, so that

25   we could begin the process right away of -- of implementing

1    photo I.D.  Interestingly, on June 25th, 2013, several local

2    entities were in the middle of early voting for runoffs, and so

3    we got a lot of panicked calls from cities and water districts

4    across the state because they just received word from the

5    Attorney General that photo I.D. was effective immediately.

6    And my response to them was:  I think he meant effective

7    immediately as soon as you finish the election you're in right

8    now; you know, that -- that kind of immediate.  And since June

9    25th of 2013, we have been in the process, basically, of trying

10   to build the plane and fly it at the same time.

11   Q    Well, I guess part of that process has been the rollout of

12   election I.D. mobile units.

13   A    Right.

14   Q    There has been some testimony developed yesterday -- you

15   were in the courtroom it looked like when Mr. Rodriguez was

16   testifying from the Department of Public Safety.  Were you?

17   A    Sure.

18   Q    With regard to the implementation of the mobile EIC units,

19   what role, if any, did the Secretary of State's office play?

20   A    Well, in the lead-up to the *Shelby County* decision, I

21   talked to other election directors across the country who

22   had -- who were either in the middle of undergoing the process

23   of implementing photo I.D. or who had done it, so I talked to

24   the election directors in Indiana, I talked to Alabama and

25   Georgia, and I talked to both the election director and the

Ingram - Direct / By Mr. Scott                    330

1    Secretary of State in Tennessee, Tre Hargett, about what they

2    had done.  And a recurring theme that a lot of these other

3    states have done was making the opportunity for free voting

4    I.D. to be available mobilely, remotely across the state.  And,

5    so, we investigated with the Department of Public Safety as to

6    whether or not that was a possible thing to do in Texas, and

7    that we would help in any way possible to make that happen.

8    Q    And part of that process was extending funds out of the

9    Secretary of State's budget to purchase 25 of those machines,

10   correct?

11   A    That's right.

12        **MS. WESTFALL:**  Objection.  Leading.

13        **THE COURT:**  Sustained.

14   **BY MR. SCOTT:**

15   Q    And, so, after -- so, what role, if any, did the Secretary

16   of State do to implement this idea of executing these EIC

17   mobile units?

18   A    Well, since it was sort of our idea, we wanted to be

19   helpful, so we bought -- we wanted to know what equipment we

20   needed to buy to make this possible, and we got the list from

21   the Department of Public Safety, and we actually purchased the

22   equipment.  We also interfaced with the counties, since we have

23   contacts with the counties and their elections officials, to

24   see about where to put the election identification certificate

25   mobile units in those counties.

1   Q    Well, what kind of information did you receive from the

2   standpoint -- from the counties as far as why certain locations

3   might be better than others?

4   A    Well, there were -- there were two things that we used to

5   make that determination.  Number one, we did a list -- a

6   match -- a no-match list against I.D.'s, so we have a driver's

7   license database that we use to constitute the jury will.  We

8   matched our voter registration list against that in July of

9   2013 so that we could get a list by zip code of the non-

10  matches.  And one aspect of the mobile EIC campaign was to send

11  the mobile EICs in the vicinity of zip codes that had a higher

12  number of non-matches than other zip codes.  The other

13  component of the mobile EIC campaign was to take care of those

14  big swathes of country out in Southwest Texas that -- that are

15  just huge to make sure that the rural areas had a closer access

16  to an EIC if they needed one rather than driving to their

17  closest DPS office.

18  Q    So, you used whatever resources you could to try and

19  locate the places?

20  A    That's right.

21  Q    And when you found the places, did you help the staff --

22  or what did you all do next after you identified those

23  locations?

24  A    For the fall campaign, the staffing and the logistics of

25  actually getting the units to the place fell completely to the

1    Department of Public Safety.  So, the way it worked is we would

2    talk to the county, the county would get back to us with some

3    locations, we would give those locations to the Department of

4    Public Safety, the Department of Public Safety would make a

5    determination as to whether or not those locations were

6    adequate, and if they were, then the Department of Public

7    Safety would take the mobile EIC unit to the location on the

8    day specified.  In the -- in the spring leading up to the March

9    primary, we did it a little differently.  We -- we went more to

10   an invitation model, so we didn't have as many units out, but

11   we went where we were asked to come, and we had Secretary of

12   State staff that were trained to assist with the issuance of

13   EIC so that a DPS person would bring the unit to the locations

14   and a Secretary of State person would meet them there, and the

15   two would man the unit during the period.  That process is what

16   we're doing this fall as well.

17   Q    So, when does the -- does the program have a ebb and flow

18   to it as far as the activity?

19   A    Sure.

20   Q    What is that?

21   A    Well, we ratchet up prior to elections.

22   Q    Why is that?

23   A    Because people have voter registration and election

24   identification certificates on their mind at that point.

25   Q    Will they -- so, what are the operating hours that you

1  will be running those 25 units from the Secretary of State's

2  office?

3  A    Right now we've got, I think, 18 locations that are in the

4  process.  I think we've got a couple of those October 10th and

5  11th that have actually gone green; the DPS has approved them.

6  And, so, there are some very -- various stages.  We -- those

7  locations are from something like September 23rd through

8  October 15th right now.  We're going to -- we've sent an e-mail

9  to 101 counties last week asking them to invite us, basically,

10 and so we expect for those -- that number of locations to grow.

11 Q    So, when does early voting start?

12 A    Early voting starts October 20th.

13 Q    And when does it end?

14 A    It will end the Friday before election day.

15 Q    How much money did the DP -- I mean did SOS expend in

16 advertising election I.D. certificates and the change in the

17 SB 14 law before the November, 2013, election?

18 A    Well, it -- having photo I.D. go into effect in an odd-

19 numbered year was a blessing and a curse.  It was a blessing

20 because it's a low-turnout election; you have the opportunity

21 to -- to try in real time poll worker training, see how it

22 goes.  The curse was that Help America Vote Act money cannot be

23 used to educate voters for a non-federal election.  So, we

24 couldn't use HAVA money for that.  So, we took $400,000 out of

25 our agency's budget and we funded an education campaign for

1   part of September, October, into the November, 2013, election.

2   Q    How does the Secretary of State's office go about

3   attempting to get the word out to the different counties about

4   changes like SB 14?

5   A    We have a county election official seminar that is our

6   primary vehicle for interacting with the counties.  It's a

7   three-day seminar that we do every July, and we've had two of

8   those since SB 14.  So, the July, 2013, conference was geared

9   almost completely around SB 14 and the changes that would be

10  required.  This conference that we just had in 2014 had a

11  little bit of SB 14 in it, but it was mainly in the nature of

12  these are some of the recurring issues that have come up; this

13  is what you need to address with your poll workers.  So, it was

14  much less of a all-encompassing thing this July.

15  Q    Do you know how much money Secretary of State's office has

16  spent on the implementation of SB 14?

17  A    Um --

18  Q    To date?

19  A    I'm not sure exactly.  We've spent $2 million this year,

20  or we will spend $2 million by the -- by the November election.

21  We spent 400,000 of our money last year, and we spent probably

22  $100,000 on equipment and personnel for EIC units.

23  Q    What's HAVA money?  I mean, what's that reference?

24  A    When the Help America Vote Act of 2002 was passed, the

25  federal government gave states money to buy voting equipment

1    and to purchase a voter registration database or build one, and

2    that -- that's what I'm talking about.  Whenever we -- whenever

3    we -- we had to tell the Election Assistance Commission how we

4    were going to spend the money, so we had to divide it up into

5    strategies, and then we've got some percentage wiggle room

6    within those strategies, but basically we had to commit to the

7    EAC that this is -- these are the areas we're going to spend

8    this money on, in order to get the money from the federal

9    government.

10   Q    So, in the November election, as it compared -- November,

11   2013 -- how did that compare to the November -- the last

12   similar type of election, I guess another constitutional

13   election?

14   A    Well, the --

15   Q    On voter turnout.

16   A    Yeah; the voter turnout was up quite a bit, not quite

17   double, and the process was very smooth.  On election day we

18   have -- we have a war room, so the attorneys in my office and

19   some other folks will get together in a conference room with

20   computers and phones, and we answer phones on election day;

21   calls from the public, calls from county election officials.

22   And the November, 2013, war room was very quiet.  We probably

23   had as many calls about candidate filing as we had about the

24   election that day, so as far as we could tell from our vantage

25   point, the election was very smooth, even though the turnout

Ingram - Cross / By Ms. Westfall                                336

1    was up substantially over the 2011 turnout.

2              MR. SCOTT:  I thank you for your time.  Pass the

3    witness.

4              THE COURT:  Shall we take a break?

5              MS. WESTFALL:  Thank you.

6              THE COURT:  Fifteen-minute break.

7              COURTROOM ATTENDANT:  All rise.

8         (A recess was taken from 3:55 p.m. to 4:13 p.m.; parties

9    present)

10             THE COURT:  Have a seat.

11             MS. WESTFALL:  Elizabeth Westfall for the United

12   States.  May I approach the witness?

13             THE COURT:  Yes.

14                       CROSS EXAMINATION

15   BY MS. WESTFALL:

16   Q    Good afternoon, Mr. Ingram.

17   A    Good afternoon.

18   Q    I'm Elizabeth Westfall.  It's good to see you again.

19   A    Good to see you.

20   Q    I've handed you your deposition transcript from 2014 and

21   your trial testimony from 2012 from the *Texas v. Holder* case.

22             So let's talk a little about early voting by mail in

23   Texas.  The photo ID requirements of Senate Bill 14 don't apply

24   to early voting by mail, correct?

25   A    For the most part.  There is an exception.

1    Q    But early voting by mail -- and early voting by mail is

2    not the same as voting in person, right?

3    A    That's true.

4    Q    And, in Texas, every voter has a right to vote in person,

5    correct?

6    A    Certainly.

7    Q    And the exception you're talking about to photo ID

8    requirements concerning early voting by mail, is that for HAVA

9    voters who sometimes need to send in their photo ID; is that

10   correct?

11   A    That is correct.  And if they're -- what we call the

12   "first-time voter rule," if they register to vote and they

13   don't provide a form of identification, either a driver's

14   license number or a social security number, they flunk live

15   check, and they are what we call an "ID voter," and they have

16   to provide ID, even if they vote by mail.

17   Q    Only certain classes of voters are eligible to cast a

18   ballot by mail; isn't that right?

19   A    That's true.  You have to have a reason to vote by mail.

20   Q    Voters who are 65 age -- 65 years of age or older on

21   election day are eligible to vote by mail; is that right?

22   A    They are.  That's one of the categories.

23   Q    And voters with certain physical conditions or illnesses

24   are eligible to vote by mail, right?

25   A    I wouldn't agree with that.  The term is "disabled," and

1    the voter gets to determine whether they're disabled or not.

2    So the voter can just check the box that they're disabled and

3    the voter -- election clerk takes their word for it.

4    Q    And voters who expect to be absent from the county on

5    election day or during early voting; is that right?

6    A    That's one of the categories.  Yes, ma'am.

7    Q    And certain voters who are detained in jail are eligible

8    to vote by mail; is that right?

9    A    They can.

10   Q    And no other voters are eligible to cast a ballot early by

11   mail; is that right?

12   A    That's right.  There are some other special categories of

13   absentee ballots for a late-arising disability or a death in

14   the family.  So there's some other things that are like voting

15   by mail that aren't quite, but are remote voting.

16   Q    To vote early by mail, a voter must take several steps,

17   right?

18   A    Well, I guess you could put it that way.  They have to ask

19   -- they have to make an application for a ballot, and then

20   they've got to fill the ballot out, and return it.

21   Q    And the voter cannot submit the request for an absentee --

22   for a mail -- early voting by mail application in person --

23   A    No, no.  You can --

24   Q    -- is that right?

25   A    You can request them in person.  You --

1   Q    Can you -- you can't request them online, can you?

2   A    Online, you can fill out the form, and print it, and mail

3   it in.  But you can take the form to the early voting clerk as

4   well.

5   Q    Unlike other states, voters in Texas cannot request an

6   early mail ballot by phone; is that right?

7   A    That's true.

8   Q    And a voter cannot apply for --

9   A    I mean, I say it's true.  I don't know about other states.

10  I know in Texas you can't request a ballot by mail by phone.

11  Q    Thank you.  A voter can't apply prior to 60 days before an

12  election, right?

13  A    No, that's not true.  If all they're asking for is the

14  ballot by mail for that election, then you're correct.  They

15  have to wait until within 60 days before the election.

16          However, persons who are over the age of 65 or

17  disabled, can -- they can send one application in in January

18  and get all the ballots to which they're entitled for the whole

19  year.

20          And so there have been quite a few folks who have

21  applied for an annual application for ballot by mail this

22  summer that didn't have to wait until the 60-day cutoff.

23  Q    And the voter must submit the application by the ninth day

24  before the election, right -- unless hand-delivering it to the

25  clerk after that time; is that correct?

1   A     Well, no.   They have to do it by the ninth day, whether

2   it's in person or by mail.   And if that ninth day falls on a

3   weekend, it rotates back to the Friday before.   So when the

4   election is on Tuesday, the actual cutoff for the application

5   for ballot by mail is 11 days, and that is both in person and

6   received by the mail.

7   Q     And that deadline is much --

8   A     Unless it's one of these special categories we talked

9   about before, where you have a late-arising disability or a

10  death in the family.

11  Q     Thank you.   That deadline of nine days is much earlier

12  than what is required in many other states; is that right?

13  A     Again, I don't know what other states require.   The law in

14  Texas before this last legislative session was that you could

15  apply for a ballot by mail as late as seven days before the

16  election.   That was changed in the legislative session as a

17  result of our omnibus bill, and the reason for that change was

18  because the post office -- we have obviously a working

19  relationship with the post office -- is making changes with

20  regard to the consolidation of their central processing units

21  and cutting the number, and they had told us that what their

22  changes were going to do to the process of first-class mail was

23  that add at least one day and possibly two days to each leg of

24  a trip.

25             And so we did not want voters in Texas to have the

1   impression that they could apply for a ballot by mail on the

2   seventh day before an election and have a realistic shot of

3   getting that in by election day.  So we wanted to rotate that

4   back so that -- so that our deadline was realistic and would

5   accommodate the voter's actual intent to vote.

6   Q    And once the clerk receives the request, the clerk has a

7   week to process a request and mail the absentee ballot; is that

8   right?

9   A    I think so.  Yes, ma'am.

10  Q    Once the voter receives the ballot, the voter must mail it

11  so it will be received by the clerk on election day; is that

12  correct?

13  A    They can return it either by mail or common or contract

14  carriers.  So if they're close to the deadline, they can return

15  it by FedEx.

16  Q    Which means the voter must mail the ballot in advance of

17  election day; is that right?

18  A    That's right.

19  Q    Isn't it true that voters who are eligible for mail-in

20  ballots have applied for EICs?

21  A    I don't know.

22  Q    Are you aware that, as of May 2014, the number of EICs

23  issued was 266?

24  A    I don't know the numbers of EIC applicants.

25  Q    Are you --

1  A    That's a DPS question.

2  Q    Are you aware that 62 issuances of EICs were to voters

3  over the age of 65?

4  A    I'm not aware of the EIC issuance.  You would have to talk

5  to DPS about that.

6  Q    And doesn't that show, if it's true, that there are people

7  over the age of 65 who want to vote in person, but don't

8  otherwise have Senate Bill 14 ID and go to the effort of trying

9  to get an EIC?

10  A    I don't know if it shows that or if they just want to have

11  the card.  I don't know what it shows.  You'd have to ask the

12  voters what their intention was.

13  Q    An EIC card can't be used for anything other than voting,

14  correct?

15  A    That's right.

16  Q    Before Senate Bill 14, Texas had a system of verifying

17  voters' identity at the polls, correct?

18  A    Yes.

19  Q    Election officials provided to each and every voter free

20  of charge a voter registration certificate, which was mailed to

21  each voter's residence if they successfully applied to register

22  to vote; is that right?

23  A    That's right.

24  Q    And to receive a voter registration certificate, an

25  applicant only had to complete a voter registration

1  application.  No additional documentation was required; is that

2  right?

3  A   Yes, they had to fill out completely a voter registration

4  application.  If it was incomplete in any way, then they would

5  receive a notice of incomplete and would have to submit

6  additional information.

7  Q   And under the law prior to Senate Bill 14, voters could

8  present their voter registration certificate at the polls; is

9  that correct?

10 A   That's right.

11 Q   And voters using that method of identity could cast a

12 regular ballot even if at -- strike that.

13         Voters could still cast a regular ballot even if they

14 didn't have their registration certificate as long as they

15 executed an affidavit and presented one of numerous forms of

16 photo and nonphoto ID; is that right?

17 A   I don't know about "numerous."  I don't know.  That's a

18 value judgment.  There were -- there was a list of acceptable

19 IDs that they could -- they would have to sign an affidavit on

20 the combo form that they've lost their certificate, and then

21 they would have to present an alternate form of ID in the

22 previous version of 63.0101.

23 Q   And that included numerous forms of nonphoto ID; is that

24 correct?

25 A   I don't know about "numerous."  That's a value judgment

1   that I'm not prepared to give.

2   Q    But it was a number, wasn't it?

3   A    There was --

4   Q    Several --

5   A    -- a number.  There was a number.  I think there might

6   have been -- I don't have the old list with me, but there might

7   have been nine categories on it instead of the current six.

8   Q    Did it include a copy of a current utility bill, a bank

9   statement, a government check, a paycheck, or other form of

10  government document showing the name and the address of the

11  voter?

12  A    Yes.  I'm trying to think about paycheck.  I think the

13  actual word was "pay stub," but yes.

14  Q    And Texas's prior voter identification law was in effect

15  in similar form for over a decade before Senate Bill 14 was

16  enacted; is that right?

17  A    I don't know how long it was in place.  It was in place

18  for a while.

19  Q    Was it in place since around 1997; is that right?

20  A    I don't know.  I could check.

21  Q    Now, I want to turn to the disability exemption under

22  Senate Bill 14.  SB 14 allows some voters with a disability to

23  be exempted from the photo requirements; is that right?

24  A    Correct.

25  Q    But this is really a meaningless exemption, isn't it?

1  A    Again, I'm not going to agree with your value judgments.

2  No, ma'am.

3  Q    So let's talk about it.  The disability exemption of

4  Senate Bill 14 does not apply to all voters with disabilities,

5  correct?

6  A    That's true.  I don't know exactly what you're getting at.

7  I know that to achieve a disability exemption on your voter

8  registration certificate, you have to demonstrate to the voter

9  registrar that you are disabled.

10        For the Social Security Administration disability,

11  any level of disability percentage is sufficient to get the

12  exemption.  If you're getting it from the Veterans

13  Administration, you have to be 50 percent disabled.

14        So in addition to showing disability from Social

15  Security Administration and the Veterans -- or the Veterans

16  Administration, you also have to swear that you don't have

17  another acceptable form of ID.

18        So that's how you get the disability exemption.

19        **THE COURT:**  And on the mail-in ballots, it's just

20  they themselves can just say they're disabled and that's it?

21        **THE WITNESS:**  That's right.

22  **BY MS. WESTFALL:**

23  Q    The disability exemption in Senate Bill 14 as enacted,

24  what you just described, is significantly narrower than the

25  version of the bill in the Senate as passed; is that right?

1    A    I haven't done a comparison.  I don't know if it's

2    narrower or not.

3    Q    Do you recall that the version of the disability exemption

4    in the Senate-passed version allowed voters with a

5    certification from a doctor to be exempted from Senate Bill

6    14's photo ID requirements?

7    A    I'm not familiar with that draft that came out of the

8    Senate.

9    Q    Turning back to Senate Bill 14 as enacted, to be clear, if

10   a disabled voter goes to the polls on election days, the voter

11   can't be exempted from Senate Bill 14's ID requirements then

12   and there, correct?

13   A    Repeat that question.  I'm sorry.

14   Q    Sure.  If a disabled voter goes to the polls on election

15   day, the voter can't become exempted from Senate Bill 14 there

16   at the polls, correct?

17   A    I'm not sure what you're asking.  If a disabled person

18   goes to the polls without an acceptable form of identification

19   and wants to claim a disability exemption in the polling place,

20   then you're correct.  They cannot do that.

21   Q    And, in fact --

22   A    They can do it --

23   Q    Go ahead.

24   A    They can do it in the cure period, the six days following

25   the --

1   Q    Right.

2   A    -- election.

3   Q    In fact, even if the voter brought documents from the

4   Social Security Administration or the Department of Veterans

5   Affairs to the polls on election day, the voter could not get a

6   disability exemption, right?

7   A    That's right.

8   Q    That wouldn't be enough, right?

9   A    Well, it would be enough.  It would just be the wrong time

10  and place.

11  Q    A disabled voter must obtain the exemption before election

12  day, correct?

13  A    Or subsequent thereto in the cure period.

14  Q    And you can't obtain the exemption at the polls on

15  election day, right?

16  A    We've covered that.  Yes, ma'am.

17  Q    Instead, a voter must submit a copy of the documents from

18  the Social Security Administration or the Department of

19  Veterans Affairs to his or her county clerk; is that correct?

20  A    I believe it's the voter registrar --

21  Q    And --

22  A    -- which may be the county clerk, but often is the tax

23  assessor/collector.  So I don't know want to quibble about, but

24  they are people.

25  Q    Thank you.  And if the voter is already registered, he or

1   she must complete another form to obtain this exemption, right?

2   A     That's right.  We've created an application for disability

3   exemption.  It's a one-page application where the voter has to

4   fill out the bottom portion.  The top portion is instructional.

5   Q     And even if you go through the process of getting the

6   documentation from a federal agency, the Social Security

7   Administration or the Department of Veteran Affairs, submitting

8   the -- submit the form to your county registrar and obtain the

9   exemption, the exemption is not permanent, right?

10  A     I want to talk to you about the first part of your

11  question.  The "go through the process" piece happens

12  independent of requesting a disability exemption.  People go

13  through the process to become disabled according to the Social

14  Security Administration for a variety of reasons.  They get

15  injured at work.  They go through -- so they have the

16  paperwork.  That's not -- they don't have to go through the

17  process to get paperwork for voting.  They've gone through that

18  process because they've become disabled -- you know, injured in

19  combat for Veterans Affairs.

20        But, anyway, once they've got the paperwork, the

21  exemption is certainly permanent, yes -- as long as the voter

22  doesn't move to a different county.

23  Q     But if a voter does move from one county to another in

24  Texas, the voter must reapply for the disability exemption; is

25  that correct?

Ingram - Cross / By Ms. Westfall                    349

1   A    Yes.  They've moved to a different county -- we have a

2   county-based voter registration system in Texas, and the law

3   requires -- 13, I believe, 101 of the Election Code requires

4   that the voter registrar maintain with regard to their voters

5   the information on that voter during the pendency of the

6   voter's active registration and up to two years after they're

7   canceled.

8         And so if a voter becomes -- gets the disability

9   exemption in one county and moves to another county, then that

10  county that they move to doesn't have the paperwork, and

11  they've got a statutory obligation to maintain that paperwork.

12  So the voter would have to reapply for the disability

13  exemption, if they move.  Yes, ma'am.

14        But they also have to re-register to vote.  We don't

15  have voter registrations that transfer across counties either.

16  Q    As of January of this year, the disability exemption had

17  not benefitted many Texans; isn't that right?

18  A    I don't know about "many."

19  Q    Data from the TEAM database produced in this case shows

20  that only 18 voters had obtained the exemption; is that right?

21  A    I think it was 19.

22  Q    But 18 or 19 is a small number, correct?

23  A    Again, I don't know -- you insist on value judgments.  I

24  don't know if that's a small number or not.  There might have

25  been 19 people who needed it.  So I'm not going to agree with

1   value judgments.

2   Q    Let's turn to provisional ballots.  Voting a provisional

3   ballot that isn't counted is not the same as voting a regular

4   ballot, right?

5   A    No.

6   Q    Because regular ballots are counted, right?

7   A    Provisional ballots often are counted as well, but the

8   process of casting a provisional ballot is different than

9   casting a regular ballot.  Yes, ma'am.

10  Q    And it's true that many provisional ballots are, in fact,

11  not counted, correct?

12  A    Many are not counted, and many are counted.

13  Q    Senate Bill 14 requires that voters who appear without

14  necessary photo ID must cast a provisional ballot, correct?

15  A    That's right.

16  Q    And under Senate Bill 14, voters who cast a provisional

17  ballot have six days to cure their ballot, right?

18  A    No, ma'am.  That is not correct.  They have until six days

19  after the election.  If they vote on the first day of early

20  voting, then they've got substantially more than six days.

21  Q    And to cure the ballot and ensure it will be counted, a

22  voter either has to bring a copy of Senate Bill 14 ID to the

23  registrar or meet one of the exemptions under Senate Bill 14;

24  is that correct?

25  A    Right.  We've also added to the Rule 81.71 to allow voters

Ingram - Cross / By Ms. Westfall                351

1    to execute an affidavit that they're the same person if the

2    identity couldn't be verified from the document they provide.

3    Q    And that relates to the similar name issue; is that

4    correct?

5    A    Well, it's more -- it's broader than the similar name

6    issue.  63.001(d) requires that the election clerk verify the

7    voter's identity from the identification provided.  So one of

8    the reasons that someone would be unable to vote a regular

9    ballot and would have to vote provisionally is if their picture

10   was a lot different than their appearance when they vote.

11              And, specifically, the reason that we added that to

12   Rule 81.71 was for the transgender population, to make sure

13   that they had an opportunity to cast a ballot just by signing

14   an affidavit.  They have to sign an affidavit at the voter

15   registrar during the cure period, but they can do that.

16   Q    So getting back to the exceptions to the general rule that

17   provisional ballots won't count unless you show a Senate Bill

18   -- an SB 14 compliant ID during the cure period, there are two

19   exceptions, correct, to that rule?

20   A    I think I just mentioned a third.

21   Q    And putting aside that exception, there are two

22   exceptions, right?

23   A    Well, there's two statutory exceptions, and then there's

24   one administrative exception.  The two statutory exceptions are

25   religious exemption and disaster.

Ingram - Cross / By Ms. Westfall                    352

1  Q    And the religious exemption is if a voter executes an

2  affidavit indicating that she has a consistently held religious

3  objection to being photographed, correct?

4  A    Right, or he.

5  Q    And the second exception is if a voter executes an

6  affidavit indicating that the voter doesn't have any ID as a

7  result of a natural disaster; is that right?

8  A    A natural disaster declared by the governor or the

9  president.  Yes, ma'am.

10  Q    So beside those two exceptions and the one you described

11  about the picture and similar name, all other voters who cast a

12  provisional ballot because they didn't have a form of Senate

13  Bill 14 ID must go to the registrar and present compliant ID

14  within the cure period; is that right?

15  A    Compliant ID from which the voter's identity can be

16  verified.  Yes, ma'am.

17  Q    In other words, if an election were on a Tuesday, the

18  voter who cast a provisional ballot would have until the

19  following Monday to go to the registrar and show compliant

20  Senate Bill 14 ID; is that right?

21  A    Right, unless Monday was Veterans Day or Veterans Day

22  observed, and then it would be the next Tuesday.

23  Q    The Secretary of State's regulations provide that a voter

24  registrar's office only need be open for provisional voters

25  during regular business hours on regular business days; is that

1    right?

2    A    What required that?

3    Q    The Secretary of State's regulations, Texas Administrative

4    Code 81.175(b)(3); is that correct?

5    A    I'm not familiar with that off the top of my head, but it

6    is true that we cannot mandate for counties to be open

7    additional hours.  We can't impose unfunded mandates on the

8    counties.

9    Q    There's only one voter registrar per county, right?

10   A    That's true.

11   Q    And in most cases, it's a farther distance for a voter to

12   travel to the registrar's office than to a polling location; is

13   that correct?

14   A    There's one voter registrar, but that doesn't meant

15   there's only one voter registrar's office.  There are often

16   satellite locations in larger population counties, so I

17   wouldn't agree that there's just one central location for every

18   county.

19   Q    And you have no idea how many voters have cast a

20   provisional ballot due to Senate Bill 14 ID problems, correct?

21   A    No, ma'am.  We've not made any survey or determination of

22   that.  I've read news reports and I've talked to county

23   election officials about that question.

24   Q    Counties are not required to track provisional ballots in

25   TEAM; is that right?

1   A    That's right.

2   Q    And many counties elect not to voluntarily supply that

3   information into TEAM; is that correct?

4   A    I wouldn't say "many."  It's a few.   And usually the case

5   is in smaller population counties with very low number of

6   provisional ballots.  They are concerned about maintaining

7   ballot secrecy, and so they will lump their provisional ballots

8   that were counted in with early voting or election day voting

9   rather than call attention to it separately, so that people

10  don't know how someone voted.

11  Q    And even if a county inputs data about provisional ballots

12  into TEAM, TEAM doesn't indicate the reason the ballot was

13  rejected; is that correct?

14  A    That's right.  The way that we capture the information on

15  the number of provisional ballots and the number of provisional

16  ballots that are accepted and rejected is the EAC survey that's

17  done at the end of even-numbered years.

18  Q    Okay.  I want to turn to the topic of applying for an EIC.

19  It's more burdensome to apply for an EIC than it is to register

20  to vote in Texas; is that right?

21  A    I don't know.

22  Q    Okay.  Let's talk about it.  DPS requires voters applying

23  for an EIC to submit documentary proof of U.S. citizenship; is

24  that correct?

25  A    It's my understanding that you have to present proof of

1   citizenship and identity.

2   Q    Whereas voter registration applicants don't need to

3   provide documentary proof of U.S. citizenship to register to

4   vote in Texas; is that right?

5   A    They have to swear they're a citizen.  They check the box.

6   Q    But they don't have to provide documentary proof of

7   citizenship; is that right?

8   A    Not yet.  No, ma'am.

9   Q    Other than the affidavit, correct?

10  A    That's right.

11  Q    For a few months in 2013, when DPS was issuing EICs, it

12  collected fingerprints for all EIC applicants; is that right?

13  A    I don't know.  I know they did it for some period.  I

14  don't know if it was months, or weeks, or days.  I don't know.

15  Q    It was in 2013; is that correct?

16  A    It was in 2013.  Yes, ma'am.

17  Q    And it was the Secretary of State's Office that told DPS

18  to stop collecting fingerprints, correct?

19  A    The very day that we can tell DPS to do anything and they

20  do it will be a very good day.  No, we did not tell DPS to do

21  anything.  We ask if they might refrain from doing that.  Yes.

22  Q    And you told them this because you thought that

23  fingerprinting was unnecessary and might create an additional

24  hurdle for voters, right?

25  A    I felt like that there was not a good justification for

1    requiring the fingerprints.  I understood the reason they were

2    doing it.  They had an existing process in place, and, you

3    know, they didn't want to add a layer of complexity with their

4    customer service representatives by having a different process

5    for this particular form of ID, so I understand why they did

6    it.  But I wanted to make clear to them that, as far as we were

7    concerned, that was an unnecessary thing and -- with regard to

8    verifying the voter's identity -- and that it might be

9    something that some voters would object to.  And since there

10   was no reason for it, it probably would be a good idea for it

11   not to happen.

12   Q    And is it fair to say, based on your previous comment,

13   that DPS was somewhat resistant to making this change?

14   A    I don't know if I would characterize it as "resistant."

15   They just had reasons why they did it.  The bill, SB 14,

16   allowed it.  They had passed a rule for it.  And so they, you

17   know, didn't want to change horses in midstream.

18   Q    And DPS wanted to collect fingerprints because it's a law

19   enforcement agency; and when they interact with someone, they

20   want to collect data; is that right?

21   A    I don't know about that.  What the -- what they expressed

22   to us is that the -- adding a layer of complexity with regard

23   to customer service representatives in a different process

24   would be a training issue for them and it would take time.

25   Q    And DPS, to your knowledge, hasn't changed its regulation

1   that requires them to collect fingerprints from EIC applicants,

2   correct?

3   A    I don't know.  I haven't read the rule.

4   Q    Voter registration applicants don't need to provide

5   fingerprints to register to vote, right?

6   A    No, ma'am.

7   Q    And you don't know whether an applicant for a passport has

8   to provide fingerprints, do you?

9   A    I don't think so.  My wife and daughter have passports

10  that they've applied for recently, and I don't think they had

11  to submit fingerprints.

12  Q    State troopers or law enforcement are usually present at

13  DPS offices, correct?

14  A    That's right.

15  Q    And usually law enforcement is not present at the polling

16  place on election day; is that correct?

17  A    I don't know about "usually."  I guess usually they're

18  not.  They can be if, for some reason, the election judge feels

19  like there's a risk to a breach of the peace, and so they can

20  call a constable or something to come to the polling location,

21  and that happens periodically.

22  Q    So let's talk about mobile units.  What are mobile units?

23  A    Well, a mobile unit is a collection of equipment that can

24  be transported from place to place.  So it's a computer.  It's

25  a printer-scanner.  It's a backdrop for a photo.  It's a

Ingram - Cross / By Ms. Westfall                           358

1   camera.  It's a tripod.  And it can go in these -- in bins and

2   be transported to a location, set up, and then taken down, and

3   moved to another place.

4   Q    I believe you testified in your direct that the Secretary

5   of State's Office was involved in directing the location of

6   mobile units to issue EICs; is that correct?

7   A    With regard to the 25 sets of equipment that we purchased

8   for the program.  Yes, ma'am.

9   Q    And the Secretary of State and DPS have a memorandum of

10  understanding about mobile units, correct?

11  A    We do.  Again, with regard to the 25 that we purchased.

12            **MS. WESTFALL:**  Could you please pull up PL 281?

13  Q    This is the memorandum of understanding you were just

14  testifying about, correct?

15  A    That's right.  It looks like it.  It's the first page of

16  it.

17  Q    You entered into this document -- and I guess scrolling

18  down to the second page at the bottom, or maybe the third, or

19  the fourth, at the bottom -- you entered into this in October

20  2013, correct?

21  A    Right.  That's the time when it was formalized.  We had

22  already been operating under those provisions for probably a

23  month by then.

24  Q    And the MOU set forth what the Secretary of State's Office

25  and DPS had agreed to do jointly with regard to EIC mobile

Ingram - Cross / By Ms. Westfall                    359

1    units; is that right?

2    A    Right, the 25 that we had purchased.

3    Q    And as of the date of your deposition in April 2014, the

4    MOU was in effect, right?

5    A    That's right.

6    Q    And there's no law or regulation requiring the Secretary

7    of State and DPS to enter into this agreement; is that right?

8    A    That's correct.  There's not any -- it's not part of the

9    statute.

10   Q    There's no law or regulation requiring the Secretary of

11   State and DPS to offer mobile EIC centers to voters without

12   qualifying SB 14 ID; is that correct?

13   A    There's not a legal requirement that we make mobile

14   opportunities available for folks to collect EICs.  No, ma'am.

15   Q    And turning your attention to Page 3, items -- Section 7,

16   at the top -- I guess it's Page 4, at the top, where it's

17   highlighted -- if you could blow that up -- by the very terms

18   of this agreement, the Secretary of State and DPS could agree

19   to terminate this memorandum at any time; is that right?

20   A    Right.

21   Q    In fact, the issue --

22   A    And --

23   Q    -- of whether to continue the EIC mobile program is left

24   to the discretion of the Secretary of State and DPS; is that

25   correct?

1   A    That's correct.  I would imagine the governor's office

2   would have something to say about it as well, but yes.

3   Q    And I believe you testified about that in your deposition.

4   The memorandum of understanding, turning back to Page 1 of PL

5   281, in Section 3, the MOU provided for 25 mobile units

6   purchased by the Secretary of State, correct?

7   A    It did -- does.

8   Q    And these 25 units were intended to cover the entire State

9   of Texas, to the extent counties did not have a driver license

10  office; is that correct?

11  A    No, ma'am.  That is not correct.

12  Q    The MOU provided -- the sum total of the units provided by

13  this MOU was 25; is that correct?

14  A    That's correct.

15  Q    You don't have a separate MOU to provide for other mobile

16  units beyond the 25 in the MOU, which is PL 281; is that right?

17  A    That's right.  Because the other mobile units are DPS

18  only.  They're not -- it's not a joint process with us and the

19  DPS.  It's their program completely, exclusively.

20  Q    And we'll talk a little bit about that later.

21  A    Well, I just want to make clear that this program is not

22  designed to cover counties that don't have driver's license

23  offices.  This is a separate program from that one.

24  Q    Thank you.  The Secretary of State didn't analyze the

25  number of mobile units needed to reach registered and eligible

 1  voters without qualifying photo ID; is that correct?

 2  A    I don't even know how to answer that question.  I can't

 3  begin to answer that question.   There are -- you can't analyze

 4  what you don't know.  We don't know how many people don't have

 5  ID, so we don't have any ability -- you know, for the numerator

 6  piece -- to even -- or the denominator piece, to even begin the

 7  process of such an analysis.

 8  Q    So put differently, you did not conduct such analysis; is

 9  that right?

10  A    We can't.

11  Q    And you didn't, correct?

12  A    We can't, so we didn't.  You can't do what you can't do.

13  Q    The Secretary of State could have purchased more mobile

14  units, correct?

15  A    Could have, sure.

16  Q    Mobile units tend to be in a location within a county for

17  two days; is that correct?

18  A    I -- it varies.  It can -- it primarily was either a day

19  or two at a spot; however, we did have mobile units, especially

20  in Houston, at the Lone Star College and the Holman Street

21  Baptist Church, for six weeks leading up to the 2013 election.

22  Q    Mobile units were generally moved to another location in

23  the county after that two-day period; is that correct?

24  A    Again, it varied.  Sometimes it would move within the

25  county, sometimes it would go to an adjacent county.  The plan

```
 1   that we followed was sort of trying to make a trek, a path; so,

 2   yes, it moved.  But whether it moved in county or out of

 3   county, I don't know.  It depended.

 4        MS. WESTFALL:   Could you pull up PL 281 again?

 5   Q    Under the MOU -- under the MOU, the Secretary of State is

 6   only required to provide two days' notice to DPS of the

 7   location for each mobile EIC center before the start date of

 8   operations, correct?

 9   A    The minimum date in the MOU, the minimum required lead

10   time was two days.  That was lengthened to five days later.

11   Q    But that's not memorialized in the memorandum, is it?

12   A    I -- that's memorialized -- we have to memorialized

13   amendments to this in writing, and we've done it in e-mails

14   subsequent to this.

15   Q    Some counties had complaints about lack of notice to the

16   counties on the location of the mobile units, correct?

17   A    Sure.

18   Q    In fact, some counties informed you they felt they didn't

19   have enough notice of the mobile units to sufficiently

20   advertise to voters, correct?

21   A    I don't know exactly what you're talking about; but, yes,

22   that was a complaint we heard.  And like I told Mr. Scott, you

23   know, this process especially was a process of building the

24   airplane while we were flying it.  This was intense, time-

25   sensitive.
```

1  Q    Is it fair to say that some counties thought that

2  providing mobile units that were only open during business

3  hours was not particularly helpful, correct?

4  A    Yes, we heard that from Javier Chacon in El Paso and we

5  heard it from Oscar Villarreal in Webb County.

6        **MS. WESTFALL:**  Could you pull up PL 292?  Could you

7  go to the second page, please.

8  Q    Did you receive a letter from Bruce Elfant on October

9  13th, 2013?

10 A    Yes.  I mean, I don't know if I got it that day or the

11 next day, but yes.

12       **MS. WESTFALL:**  And if you could highlight the first

13 paragraph?

14 Q    Do you see that Mr. Elfant is -- indicates that he had a

15 week and a half to prepare for the outreach locations?

16 A    I see that that's what he says.  I disagree that he had a

17 week and a half.  The reason that he had a week and a half, if

18 that's all he had, was because the elections office -- Bruce

19 Elfant is the tax assessor/collector for Travis County.  The

20 elections office is in Dana DeBeauvoir, the county clerk's,

21 office.  And the elections office had issues coming up with

22 locations.

23 Q    And turning down to the bottom of Page 1, do you see that

24 Mr. Elfant reports on the contacts that resulted from the

25 mobile units?

1    A    I do.

2    Q    There were 224 contacts, correct?

3    A    That's what he says.

4    Q    And you see at the bottom it indicates there were zero

5    election identification certificates issued, correct?

6    A    I agree that's what he says.

7    Q    And on the next page of this letter, at the top, on the

8    very first sentence -- if you could highlight that -- do you

9    see that Mr. Elfant indicated, "We learned from this effort

10   that it's more difficult to reach this population than we

11   expected"?

12   A    I definitely see that's what he says.  Yes, ma'am.

13   Q    So DPS -- and you could put that down.

14   A    I don't know what population he's talking about, and so I

15   don't know what he means by that.

16   Q    So DPS believed that it -- the mobile units it ran should

17   operate during business hours, correct?

18   A    DPS definitely preferred that we tell the counties it

19   would be open during business hours.

20   Q    And in advance of the November 2013 elections, the mobile

21   units were only open during business hours, correct?

22   A    That is not correct.  No, ma'am.

23   Q    Apart from some extended hours in Webb County, you're not

24   aware of mobile units that operated in 2013 with extended

25   hours; is that correct?

Ingram - Cross / By Ms. Westfall                    365

1   A    I know that in Webb County on a Friday night, we went

2   late.  I don't know if, in the early stages, that might have

3   provoked DPS's desire to have business hours only.  There might

4   have been one or two that were open until 6:00 or 7:00.

5   Q    But that's it, correct?

6   A    Yes, ma'am.

7   Q    Sir, you testified about the county offices that were

8   processing applications for EICs at a county site using mobile

9   EIC materials, correct?

10  A    I don't know if I testified that -- about that

11  specifically.  The plan for reaching the 79 counties in Texas

12  that didn't have driver's license offices was handled by DPS.

13  We did have some input with regard to that, and we definitely

14  interfaced with those county election officials on the front

15  end of that program.

16        And so the plan, as I understood it, DPS's plan, was

17  to try to get the counties to agree to issue election

18  identification certificates on a regular basis in their county

19  using their existing personnel.  And the counties that would

20  not agree to accept the training and the equipment in order to

21  do that for themselves, the DPS made a commitment to be in

22  those counties at least five days in a row prior to the

23  November '13 election.

24        And I think they're doing the same thing this fall

25  for the counties that continue not to issue EICs on their own.

Ingram - Cross / By Ms. Westfall                366

1  Q    So some counties and DPS have entered into an agreement

2  for this purpose, correct?

3  A    That's right.

4  Q    And you testified in your deposition about the contract

5  between DPS and the counties, correct?

6  A    I don't know if I testified about it.  I've seen the

7  interlocal agreement.  Some of the counties who signed it sent

8  it to me, and I forwarded it to DPS for them.

9         **MS. WESTFALL:**  Could you pull up PL 282, please.

10        **MR. SPEAKER:**  Two --

11        **MS. WESTFALL:**  Two eighty-two.  That's 828.  Thank

12 you.

13 **BY MS. WESTFALL:**

14 Q    This is a standard contract used with all counties,

15 correct?

16 A    I don't --

17 Q    It --

18 A    -- know what that means.

19 Q    This is the --

20 A    The only counties --

21 Q    -- contract --

22 A    -- that this could be used with are the 79 that don't have

23 a driver's license office.  And so it's certainly not to be

24 used with all 254 counties.

25 Q    But --

Ingram - Cross / By Ms. Westfall                367

1   A    So the 79 that don't have a driver's license office, this

2   is the standard agreement if they accept it.

3   Q    Thank you.  Counties can voluntarily enter into this

4   agreement, correct?

5   A    Sure.

6   Q    Counties are not paid for their services under this

7   agreement, correct?

8   A    That's right.

9   Q    So counties can determine if they want to participate in

10  this program, correct?

11  A    That's right.

12  Q    In fact, under this interlocal cooperation contract,

13  counties can unilaterally terminate this agreement with 30

14  days' notice; is that right?

15  A    I believe so.  I haven't seen the termination provision

16  lately, but I think that's what it says.

17  Q    And why don't we just turn to that.  On the first page, at

18  the bottom, under "Terms and Conditions," it indicates

19  termination.  Do you see that?

20  A    I do.  So it says either party can do it.  The county can

21  do it or DPS could do it.

22  Q    And you're not aware of any legal obligation for any

23  county to participate in this program, correct?

24  A    No, that's right.

25  Q    Some -- in your experience, some counties refuse to

1  participate in this county-run EIC program, correct?

2  A     Yes, they did.

3  Q     Some counties refused to be trained to operate these

4  offices, correct?

5  A     They did refuse to participate.  Yes, ma'am.

6  Q     Nothing from a legal standpoint that the Secretary could

7  do in response to this reaction, was there?

8  A     That's right.  As is often the case when they disagree

9  with us.

10  Q     And the Secretary of State has no recourse if a county

11  refuses to participate except to try to persuade the county to

12  participate in this program; is that right?

13  A     We did use our most persuasive tone of voice.

14  Q     And the Secretary of State has no recourse if a county

15  refuses to participate; is that right?

16  A     That's right.  I've said that before.  I agree with you on

17  that.

18  Q     And counties can set the hours of operation of this

19  program, correct?

20  A     Yes, the Election Code requires that voter registrars have

21  regular business hours.  It doesn't mean that they are normal

22  business hours, but they need to be regular.

23         And during those regular business hours, they need to

24  offer voter registration to the members -- to the population of

25  their county.  And so it's a similar thing for this, that they

1   have to offer it during regular business hours -- whatever that

2   is for that county.

3   Q    And turning back to the PL 282, under "County," in the

4   first paragraph on Page 1 -- on Page 1 -- it indicates, does it

5   not, that the county selects the hours of operations; is that

6   right?

7   A    That's right.

8   Q    And, in fact, a number of counties have set irregular or

9   temporary hours; is that right?

10  A    I don't know what they've done.

11  Q    Are you aware that, in Hansford County, the office

12  offering EICs is only open between 8:00 a.m. and 4:45 p.m. on

13  weekdays?

14  A    I don't know even know where Hansford is.

15  Q    Okay.

16  A    I assume that's one of the little places up in the

17  panhandle, but I don't know for sure.  I'd have to check.

18  Q    And you're -- are you aware that in La Salle County, it

19  doesn't accept EIC applications in the normal course of

20  business and only accepts EIC applications on a total of four

21  days before the election?

22  A    I'm not aware of what La Salle County does.

23  Q    And about 61 counties, or maybe 55 as we heard from

24  Mr. Rodriguez yesterday, issue EICs; is that right?

25  A    I heard that testimony.  I was glad to hear it.  The last

1    number I had heard was 40 counties had agreed and had been

2    trained.

3    Q    And are you aware of the number of county offices that

4    have actually issued EICs of that 40, or 55, or 61?

5    A    I don't know how many have.  I know that Becky Duff in

6    Grimes County has issued three of them, the last I heard,

7    because she's very proud of that achievement.

8    Q    Are you aware that, of all of the counties offering EICs,

9    51 of those counties have not issued a single EIC?

10   A    That wouldn't surprise me.  No, ma'am.

11   Q    So the state has been implementing the EIC program for

12   more than one year at this point, correct?

13   A    Election identification certificates have been available

14   to the public since June 25th or June 26th, 2013.  Yes, ma'am.

15   Q    And when you had your deposition taken in this case in

16   April of this year, you couldn't assess whether the EIC program

17   had been successfully made available to the public, correct?

18   A    I don't think that's what I said.  I think that I said

19   that we were going to evaluate the success of the mobile unit

20   program after this November's election.

21          But as regards the whole EIC obligation of the State

22   of Texas, we are certainly not going to undertake an evaluation

23   of that.  That's for the Legislature to do.

24   Q    And as of September 5th, 2014, are you aware that the

25   number of EICs issued was 279 for the entire State of Texas?

Ingram - Cross / By Mr. Dunbar                            371

1   A    I have heard that number this week.  That's the first I've

2   heard of it.

3           MS. WESTFALL:  Thank you.  I have no further

4   questions.

5           THE COURT:  Anyone else over here?

6           MR. DUNBAR:  Yes.

7           MR. DUNBAR:  Good afternoon, Mr. Ingram.  My name is

8   Kelly Dunbar, and I represent the Texas League of Young Voters

9   Education Fund and Imani Clark.  And we've never met before,

10  but it's good to meet you.

11          THE WITNESS:  Good to meet you.

12          MR. DUNBAR:  And I just have a few questions for you.

13                      CROSS EXAMINATION

14  BY MR. DUNBAR:

15  Q    Now, you testified in your direct testimony about a report

16  from New York City involving an investigation into in-person

17  voter impersonation; is that correct?

18  A    That's right.  That was the piece of the report that stuck

19  out to me.

20  Q    Right.  And that report was released in December of 2013;

21  is that correct?

22  A    I know it was at the end of 2013, right before our

23  National State Election Directors meeting in Washington, D. C.

24  in January or February of this year.

25  Q    Okay.  And SB 14 itself was enacted in 2011; is that

1    correct?

2    A    It was.

3    Q    And the decision made by the Attorney General's office to

4    enforce SB 14 immediately after the Supreme Court Shelby County

5    decision, that was made in the summer of 2013; is that correct?

6    A    June 25th, 2013, yes, sir.

7    Q    So the information contained in this New York report

8    couldn't possibly have influenced either the legislative

9    decision to enact SB 14 or the Attorney General's decision to

10   enforce; is that correct?

11   A    I wasn't part of the legislative process on SB 14 in 2011.

12   At that time, I was in the Governor's office.  So I don't know

13   what influenced them or not.  Obviously something that occurs

14   after in time can't influence them.  However, the prospect of

15   in-person voter impersonation fraud I think was very much on

16   their minds.

17   Q    Okay.  And so I -- as I understand the report correctly --

18   and I've been reviewing it here since you mentioned it -- this

19   was an undercover sting operation by the Department of

20   Investigations within New York City; is that correct?

21   A    I believe so, yes.

22   Q    So not a single one -- and just so the record is clear,

23   not a single one of the 61 instances you've mentioned is

24   actually a case of in-person voter fraud; is that correct?

25   A    Well, I don't know what you're using for a definition.

Ingram - Cross / By Mr. Dunbar                     373

1   What happened in that situation is that 61 times out of 63,

2   using someone else's identity they were able to obtain a ballot

3   and go back to the voting booth.  Now, obviously being the

4   Inspector General for the State of New York, they did not want

5   to commit a crime by illegally voting that ballot, so they did

6   not vote it.  So if you're saying that stopping short of voting

7   a ballot is not committing in-person voter impersonation fraud,

8   I agree with you on that.  It was not actually an attempt to

9   swing an election or commit fraud.  It was an attempt to show

10  that the system was not foolproof.

11  Q    Right.  So there was not a single one of these individuals

12  had the *mens rea*, or the intent, to commit voter fraud.  They

13  were all investigators; is that correct?

14  A    I'm not a criminal lawyer.  I'm not going to get into *mens*

15  *rea*.  They had an intent to show that the system was penetrable

16  and they did so show.

17  Q    Right.  Well, let me --

18          **MR. DUNBAR:**  Your Honor, if I may approach the

19  witness?

20          **THE COURT:**  Yes.

21          **MR. DUNBAR:**  We printed off a copy of the report

22  here.  I have a copy up on my iPad.

23  **BY MR. DUNBAR:**

24  Q    Have you seen that report before?

25  A    Sure.

1   Q    And is that the report you're referring to?

2   A    It is.

3   Q    Okay.

4        **MR. DUNBAR:**  And can we bring it up on the -- could

5   we turn to page --

6   Q    Could you turn to page 13 of the report?

7   A    Absolutely.

8        **MR. DUNBAR:**  I'm sorry, PDF page 13, or page 13 at

9   the bottom.

10  Q    And the very last paragraph on the page, the very last

11  sentence.  Could you read that sentence aloud into the record,

12  Mr. Ingram?

13  A    Sure.  That sentence says, "This information is not a

14  finding of actual voter fraud," because, of course, they're not

15  committing voter fraud, "but rather consists of snapshots of

16  deficiencies in the voter rolls.

17       **MR. DUNBAR:**  And then can we drop down to footnote

18  25, please?

19  Q    Could you read the first sentence of footnote 25?

20  A    Sure.  It says, "Several studies have concluded that voter

21  fraud is rare."

22  Q    And you'll see the first cite there as to Dr. Lorraine

23  Minnite.

24  A    Uh-huh.

25  Q    Are you aware that she's an expert that testified in this

1    case?

2    A    I am not.

3    Q    That footnote sentence, the authors of the report seem to

4    be suggesting that -- accepting the conclusion that voter fraud

5    is actually rare, correct?

6    A    I don't read that from this, no, sir.

7    Q    Well, they're making the point that the investigators --

8    that the finding only relates to the potential that there's

9    some bloat in the registration polls, that this is "not a

10   finding of actual voter fraud," correct?

11   A    Well, the point of the bloat in the voter registration

12   rolls makes voter impersonation fraud possible if you don't

13   have a photo ID requirement.  Because it hasn't been shown that

14   voter fraud has occurred, that actual voter fraud prosecutions

15   are rare, is not proof that in-person voter impersonation

16   doesn't happen.  And the fact that 61 out of 63 times they were

17   able to obtain a ballot under false identity is an indicator

18   that voter fraud could be more prevalent than is actually known

19   of by prosecutions.

20   Q    Right.  But the study at best suggests that it speaks to

21   the rate at which in-person voter fraud might be detected.  It

22   doesn't say a thing about the prevalence of whether in-person

23   voter fraud is actually occurring; would you agree with that?

24   A    I would agree with that.  And I would say that the

25   improbability of detection makes it impossible to know how

1    often it actually occurs because it is impossible to detect if

2    you don't check.  And without a photo ID, we don't check.

3    Q    Understood.  And are you aware that New York law has no ID

4    requirement at the actual ballot place?

5    A    I am.

6    Q    Okay.  And so if you look at -- if you scroll up to the

7    middle paragraph, the first few sentences speak to the fact

8    that these 61 of 63 instances, the investigators simply signed

9    their name at a registration -- in a registration book,

10   correct?

11   A    That's right.  And --

12   Q    And the paragraph also goes on to suggest that the real

13   problem here is that the poll workers weren't doing their job

14   checking the signatures that they signed on paper versus the

15   signatures in the registration rolls, correct?

16   A    Right, and the date of birth.  If you've got somebody in

17   their twenties and thirties signing for an 82-year-old or a 92-

18   year-old, then --

19   Q    Right.  So the problem with detection wasn't necessarily

20   New York's non-photo ID law.  It was that poll workers weren't

21   enforcing the law that they were supposed to enforce, correct?

22   A    I don't know about that at all.

23   Q    Okay.  And prior to SB 14, I believe you testified to

24   Ms. Westfall that Texas in fact did have a form of

25   identification requirement in effect at the polls, correct?

Ingram - Cross / By Mr. Dunbar                    377

1   A    That's right.  You could bring your voter registration

2   certificate or you could bring somebody else's voter

3   registration certificate and vote it.

4   Q    And with that ID requirement, are you aware that the

5   record in this case establishes that since 2002, in the State

6   of Texas, there has been a grand total of one conviction for

7   in-person voter impersonation and one guilty plea?

8   A    I'm not aware of those numbers, no, sir.  I mean --

9   Q    Okay.  Those numbers --

10  A    -- I don't --

11  Q    -- don't factor into your opinion about the prevalence of

12  in-person voter fraud in Texas?

13  A    No.  The fact that those cases exist indicates to me that

14  it happens.  The fact that it happens is the thing that we're

15  trying to prevent here.  And the fact that it happens indicates

16  that it can happen again, unless you have something in place to

17  prevent it.  And that is the whole point of those cases.  So

18  whether it's two cases or 61 out of 63, or whatever it is, the

19  fact that it's possible and that it does in fact happen

20  sometimes -- we have some elections in this state, a remarkable

21  number of elections that are one or two votes or tied.  And

22  this kind of thing, if it happens at all, is a problem.

23  Q    Okay.  Mr. Ingram, let's do the math then on that

24  assumption.  You've said you have no reason to doubt the two

25  instances occurring since 2002.  Let's accept that this

1  investigative study in the State of New York that's really

2  about voter registration actually has something to do with in-

3  person voter impersonation, and let's do the math.

4  A    Well, you understand --

5  Q    So the --

6  A    -- in Texas, we've got bloated voter rolls as well --

7  Q    Sir --

8  A    -- despite our best efforts.  You -- I mean, this is a

9  common problem across states.  You might have seen a pew study

10 that said something like, I don't know eight million voters

11 across the country shouldn't be on the rolls.  I mean, this is

12 a common problem that, despite our best efforts, occurs.

13 Q    I know.  I'm asking a different question, though.  I just

14 want to do the math accepting any applicability of this study.

15 Sixty-three -- there were 63 attempts to vote as an ineligible

16 voter by these investigators and they were caught twice, right?

17 So that's -- doing my rough math, that's a 97 percent capture

18 rate, correct?  Or, sorry, excuse me, success rate; three

19 percent of the time they were caught, correct?

20 A    I haven't done the numbers.  I'll take your word on that.

21 Q    Okay.  And so if we extrapolate that out, we have two

22 incidents in Texas that have been proven either by a guilty

23 plea or a conviction in the past ten years.  So the math is

24 pretty simple, I think, given that we have two, we were caught

25 twice there, we have two instances here.  If we extrapolated

1   that number out and accepted the relevance of this detection

2   rate, that would mean that over the course of that ten years in

3   Texas, there have been 63 cases of in-person voter

4   impersonation, correct?  Or 6.3 a year.

5   A    Yeah, I --

6   Q    Would you agree with that math?

7   A    Definitely not.

8   Q    What's wrong with the math, sir?

9   A    There's nothing wrong with the math.  There's something

10  wrong with the assumption behind it, that the rate of capture

11  is the same as it was in New York.  The fact that there have

12  been two convictions, either a conviction and a guilty plea,

13  doesn't mean that people weren't caught more often than that.

14  I heard about one in Maverick County where a brother showed up

15  to vote for his brother.  And so, you know, just because

16  there's only two convictions that you're aware of as we sit

17  here today doesn't mean that's the only number that was caught.

18  It just means that that's the number that was convicted.

19  And --

20  Q    But, sir, this was --

21  A    And --

22  Q    Sorry, go ahead.

23  Q    -- I further don't agree that the rate here is necessarily

24  indicative of the rate in Texas.  It could be higher, it could

25  be lower, so it could be less than six a year, it could be a

1   lot more than six a year.  We don't know, you and I, as we sit

2   here today.  What we do know is that without a photo ID

3   requirement, we can't know because we don't check.

4   Q    So, sir, you are unwilling to accept the fact that a 97

5   percent -- or a three percent capture rate from New York is

6   applicable to Texas, but you are willing to accept the idea

7   that a controlled study by investigators somehow sheds light on

8   the potential for voter fraud in Texas, despite the fact they

9   operate under fundamentally different identification laws?

10  A    I think you're misunderstanding what I'm saying.  I'm

11  saying that this study shows that it's possible and that it's

12  relatively successful.  That's all this study shows for me.

13  The fact that it does happen and we do catch people doing it in

14  Texas without photo ID indicates that not only is it possible,

15  but that it happens.  The combination of those two things means

16  that we should have in place a reasonable control to make sure

17  that it doesn't happen anymore.

18  Q    Okay.

19  A    That's all I'm saying.

20  Q    And I -- you've read the report you said, correct?

21  A    Sure.

22  Q    So I take it you're aware the authors of the report

23  explain that the findings they made here were not statistically

24  significant?

25  A    Yeah, I guess.  I don't know.

Ingram - Cross / By Mr. Dunbar                        381

1    Q    Okay.  Could we turn to page 49, please?

2    A    Sure.

3         **(Pause)**

4    Q    And can you read footnote 65?

5              **MR. SCOTT:**  May the witness be allowed to read the

6    reference point --

7              **MR. DUNBAR:**  I'm sorry, sure.  You can scroll up.

8    A    Okay.  So what they're saying is that they found 63

9    ineligible persons on the rolls and that those 63 persons are

10   not statistically significant compared to the total voter roll.

11   Yeah, I agree with that --

12   Q    So that means the results could have been random, correct?

13   A    I don't know what that means.

14   Q    Okay.

15   A    It means --

16   Q    No, we'll move on.

17   A    -- that 63 people out of however many the total number of

18   registered voters is a statistically insignificant number.

19   That's a --

20   Q    Okay.

21   A    -- small number for this voter roll.

22   Q    Okay, thank you.  And could you turn to the recommendation

23   section of the report, please, which is page 45?  It's actually

24   entitled "Conclusions and Recommendations" and goes on for the

25   next few pages.  If you've read the report, you may not need to

 1  review it.  But I guess my question is, as a result of this

 2  undercover sting operation, was there any recommendation made

 3  that the City or the State adopt photo identification

 4  requirements?

 5  A    I don't believe so, no, sir.

 6  Q    Okay.

 7  A    Their emphasis was on cleaning up the voter rolls and

 8  making sure that poll workers were trained.

 9  Q    Right.  And those things had nothing to do with photo

10  identification requirements, correct?

11  A    That's right.

12  Q    Okay.  And just so I'm clear, you've offered a lot of

13  opinions on the prevalence of -- potential prevalence of in-

14  person voter impersonation in Texas, but has the Secretary of

15  State's Office studied or is there anything you can point us to

16  that would document the prevalence of in-person voter

17  impersonation, other than the information we've already been

18  supplied by the Office of the Attorney General?

19  A    Right.  And, again, I think you're misunderstanding what

20  I'm saying.  I'm making no comment on the prevalence of voter

21  impersonation fraud.  I'm making no comment on that whatsoever.

22  I --

23  Q    Okay.  So sitting here today, you have no idea what the

24  prevalence of in-person voter fraud is in Texas?

25  A    I know that it happens and I know that it's possible

 1  without a photo ID to check.

 2  Q    Okay.  Thank you, sir.

 3        MR. BRAZIL:  Briefly, your Honor.  Scott Brazil for

 4  the Veasey/LULAC Plaintiffs.  Good afternoon.

 5        THE WITNESS:  Good afternoon, Scott.  Good to see

 6  you.

 7        MR. BRAZIL:  You and I met at your deposition a few

 8  months ago, did we not?

 9        THE WITNESS:  We did.

10        MR. BRAZIL:  I'm batting cleanup, so if I lose you,

11  just stop me and ask me to back up and start over.  Okay?

12        THE WITNESS:  Sure will.

13        MR. BRAZIL:  I want to cover five or six areas with

14  you very briefly, and a couple of the other lawyers touched on

15  these areas.

16                        **CROSS EXAMINATION**

17  **BY MR. BRAZIL:**

18  Q    I think you told Mr. Scott -- and I wrote this down --

19  that the Secretary of State's Office, or role, was to implement

20  Senate Bill 14 by implementing the forms, educating the poll

21  workers, educating the public, determining the types of IDs

22  that the legislator wanted to use.  Is that a good summary?

23  A    More or less.  Our role with regard to the laws passed by

24  the legislator is to:

25              "-- Obtain and maintain uniformity in the

1              application, operation, and interpretation of the

2              Election Code and election laws outside the Code.   In

3              performing this duty, the Secretary shall prepare

4              detailed and comprehensive written directives and

5              instructions related to and based on this Code and

6              the election laws outside this Code.   The Secretary

7              shall deliver -- distribute these materials to the

8              appropriate state and local authorities having duties

9              in the administration of these laws."

10   And that is exactly what we did with regard to SB 14.

11   Q    And you're reading from what, for the record?

12   A    I'm reading from the Election Code, Section 31.003.

13   Q    Okay.

14   A    The next thing that we are responsible for is providing

15   assistance and advice to election workers as they implement

16   these laws.  And that's 31.004.

17   Q    Okay.  So in doing that, you also had to interact with the

18   DPS; is that correct?

19   A    Sure.

20   Q    Okay.  And you've already told us that you cannot force

21   the Department of Public Safety to do anything; you can just

22   strongly suggest.

23   A    We can suggest, we can cajole, we can persuade, we can do

24   all of those things, yes, sir.

25   Q    And one example that was brought up was the fact that the

1    Secretary of State's Office strongly suggested to the DPS that

2    they not fingerprint applicants for EICs, correct?

3    A    That's correct.

4    Q    Okay.

5    A    We definitely made that suggestion.  I don't know about

6    the strength of the suggestion.  We thought it was a bad idea.

7    Q    It was strong enough that they stopped doing it.

8    A    Well, they stopped doing it.  I don't know if it's because

9    of our suggestion.  I'd flatter myself to think so.

10   Q    Do you know why they stopped doing it?

11   A    I don't.

12   Q    Were you here when Mr. Rodriguez testified from the DPS?

13   A    I was, but I wasn't here for his whole deposition, if he

14   talked about that.

15   Q    To your knowledge, has the Department of Public Safety and

16   the State of Texas ever been involved in any election process

17   until Senate Bill 14?

18   A    Sure.

19   Q    Okay.  Give us an example.

20   A    We've got an -- obviously a relationship with the

21   Department of Public Safety as a result of their obligations

22   under the NVRA.  So DPS has been responsible for gathering

23   voter registration applications at their offices since NVRA was

24   passed in '93.  And in connection with that responsibility, we

25   worked closely with the DPS to have in place a mechanism for

1    transmitting those applications electronically rather than them

2    collecting paper and delivering the paper to the voter

3    registrars in their county.  So we now have electronic

4    interface with the Department of Public Safety for the

5    transmission of voter registration applications.  We also have

6    a number of portals with DPS for live check of voter

7    registration applications.  We have one for the transmission to

8    us of the felony convictions.  And then we've got the jury

9    wheel database that we have.  And we also instituted a new

10   thing.  In 2012, there were a number of reports where a voter

11   would show up at the polls, they wouldn't be on the list of

12   registered voters, they would say, "I registered to vote at DPS

13   when I got my driver's license," and so there was a lot of

14   calls back and forth between the voter registrars and the

15   counties, our office, and DPS about those individuals.  And so

16   we developed after that election a web portal so that the

17   county could upload the information from such voters, and the

18   DPS would check into it.  They have a person dedicated to that.

19   And then they would transmit the information back so there

20   wouldn't be a lot of phone calls and, you know, trying to

21   figure out who to talk to.  So we work with DPS on an ongoing

22   basis on a number of fronts.

23   Q    And after Senate Bill 14 went into effect, the Department

24   of Public Safety was in charge of issuing EICs.

25   A    The statutory responsibility for issuing election

Ingram - Cross / By Mr. Brazil                          387

1   identification certificates was given to the DPS, yes, sir.

2   Q    And they were not provided any additional funding,

3   correct?

4   A    I'm not aware.  I don't think so.

5   Q    And since the implementation of Senate Bill 14, are you

6   aware of how many EIC applicants were fingerprinted?

7   A    I don't know.

8   Q    If I go to the Secretary of State's website and I go to

9   the Election Division, will it tell me -- as an EIC applicant,

10  when I go to the DPS office, will it tell me that I will not be

11  fingerprinted?

12  A    No.

13  Q    Will it tell me that a warrant check will not be

14  performed?

15  A    No.

16  Q    If I go to the DPS website, will it tell me that when I go

17  to a DPS office to apply for an EIC, that a warrant check will

18  not be performed?

19  A    No.  I don't believe so.  I don't -- haven't familiarized

20  myself totally with their website.  That's not a bad idea,

21  though.  I think that we could add that, sure.

22  Q    Okay.  And you could add that with a phone call, could you

23  not?

24  A    We could have that up by the end of the week.

25  Q    Could you strongly suggest to the DPS that they put that

Ingram - Cross / By Mr. Brazil                    388

1   on their website as well?

2   A    I don't know if I could strongly suggest it.  I could say,

3   you know, we're doing it, might be a good idea for you all to

4   do it.

5   Q    If I went to the DPS office here in Corpus Christi and

6   walked into the DPS office, would there be a separate line for

7   applicants who wanted an EIC?

8   A    I don't know anything about DPS's process.

9   Q    Would there be any signage about the EIC?

10  A    I have no idea.

11  Q    Would there be a sign that says, "If you apply for an EIC,

12  we will not fingerprint you?"

13  A    I don't know.

14  Q    Will there be a sign that says, "If you apply for an EIC,

15  we will not do a warrant check?"

16  A    I don't know what signs they have at DPS.

17  Q    Was anybody in the Secretary of State's Office contacted

18  or requested during the debate in the House and Senate on SB 14

19  with regard to the types of photo identification that were

20  going to be included in the bill?

21  A    I wasn't in the Secretary's office at the time.  I have no

22  idea what requests were made or what the back and forth was on

23  the list of IDs.

24  Q    Have you been told by anybody that they were or were not

25  contacted and asked for their input into the types of photo

1    identification that would be part of the law?

2    A    I haven't heard that from anybody.  You know, I've read

3    Ann McGeehan's committee, the whole testimony.

4    Q    Okay.  Was she asked?

5    A    I don't know.  I don't remember that off the top of my

6    head.

7    Q    What about the previous sessions when photo ID bills were

8    proposed?  Do you know whether or not the Secretary of State's

9    Office was consulted at that time about the types of photo IDs

10   that would be --

11   A    I have no idea.

12   Q    Okay.

13   A    Up until 2008, I was just practicing law, minding my own

14   business.

15   Q    And then you went to the Governor's office.

16         **THE COURT:**  Don't you wish you still were.

17         **(Laughter)**

18         **THE WITNESS:**  Sometimes.

19   **BY MR. BRAZIL:**

20   Q    Then you went to the Governor's office?

21   A    I did.

22   Q    Okay.  And you've been with the Secretary of State's

23   Office how long?

24   A    Two years, nine months, five days.

25   Q    Has the Secretary of State's Office ever conducted any

Ingram - Cross / By Mr. Brazil                    390

1    type of studies, analysis, of the effect of Senate Bill 14 on

2    minorities or on the elderly?

3    A    No, sir.

4    Q    Is it still true today that the Secretary of State's

5    Office does not maintain a database on provisional ballots?

6    A    That's right.  We have the information that the counties

7    report to us about their provisional ballot totals, and we also

8    have the responsibility of collecting the EAC information at

9    the end of even-numbered years.  So we do have information

10   regarding provisional ballots from even-numbered year elections

11   that we've transmitted to the Election Assistance Commission.

12   Q    But when I took your deposition, you could not tell me how

13   many provisional ballots were cast in November of 2013,

14   correct?

15   A    I know what the counties reported to us.  I don't know if

16   that's an accurate number.

17   Q    Okay.  Is there any reason why the Secretary of State's

18   Office cannot request from the 254 counties after an election

19   how many provisional ballots were cast, how many were cured,

20   and why they were cast?

21   A    I guess we could ask that.  I don't know really why we

22   would.  The role that we play with regard to the counties --

23   the counties actually put on the elections, and our role is

24   advisory in nature.  And so we have to maintain a relationship

25   with the county election officials.  They need to trust that

Ingram - Cross / By Mr. Brazil                    391

1   they're going to get good information from us.  And they need

2   to trust that we're not going to ask them to do anything

3   without a very good reason for them to do it.  And so if we use

4   up our ability to ask them to do things on stuff that, you

5   know, maybe we don't need to ask, then we would lose some

6   credibility with the counties that we really need when it comes

7   to crunch time.  So, you know, we could ask them to do a lot of

8   things, but you have to do the cost benefit analysis as to

9   whether or not the information that you receive would be

10  useful.  And given the experience that we've had with photo ID

11  implementation in the November, 2013, election, the March

12  primary, the May uniform date, the May runoff, the special

13  election for SB 4, the special election that we just had with

14  SB 28, as well as who knows how many tax rollback elections,

15  there isn't any indication that there's a need to collect that

16  information in a systematic way.  And since there's not a need,

17  we don't want to use up our opportunity to request things of

18  the counties for something that we don't need.  We're curious

19  about, of course.  We have natural human curiosity about what's

20  happening specifically, but we don't have any real need to have

21  that information, that we can ascertain.

22  Q    Would it not be important to the Secretary of State's

23  Office to know how many provisional ballots are cast,

24  especially in a general election by individuals who do not have

25  the required photo identification, and then to see how many of

Ingram - Cross / By Mr. Brazil                        392

1   those individuals were able to cure?

2   A    Again, if it was a problem, then yes, we might want to

3   collect that information.  But there hasn't been any indication

4   that there's a problem at all.  Yesterday's special election in

5   SB 28, there were 127 total provisional ballots reported to us.

6   Now, I have no idea how many of those were ID-related.  I do

7   know from news reports from previous elections that the

8   likelihood is that it's the little end of the stick.  And so

9   127 provisional ballots when there were almost 43,000 cast is

10  less than a percent.  It's about .2 percent of the ballots cast

11  were provisional in total.  So it doesn't appear like -- it

12  doesn't appear to us as if there is a real crying need to find

13  out these numbers when they're small.  If there was a

14  significant issue that presented itself, then we might think

15  differently about that.

16  Q    Is there any rule or regulation that prevents the

17  Secretary of State's Office from requesting that information

18  from the counties?

19  A    Like I said, we could request it.  We can request lots of

20  things.  But we limit ourselves in our requests.

21  Q    Has the Secretary of State's Office made any suggestions

22  to the legislature regarding adding additional photo IDs?

23  A    I have not made any suggestions to the legislature in that

24  regard.  I have received inquiries from legislators about

25  specific issues that have arisen, and so I anticipate that some

1   of those kind of bills will be on the table next session, yes,

2   sir.

3   Q    Were you here when Congressman Marc Veasey testified?

4   A    I was not.

5   Q    He testified that he has a photo ID that he uses as a

6   member of Congress that allows him access to restricted areas

7   in Washington, D. C., including the White House, but he cannot

8   vote with that photo ID.  Does that strike you as odd or

9   irrational?

10  A    I'm not going to make value judgments about the

11  legislature's decision on what to include in the 630101 list.

12  It's their decision.

13  Q    Harris County you will agree is geographically large.

14  A    Harris County is a big county population wise and

15  geography, yes, sir.

16  Q    If I go to my precinct on the north side of Harris County

17  and I go in to vote and I don't have photo identification, I'll

18  have to cast a provisional ballot.

19  A    That's right.

20  Q    Okay.  And I'll have six days to cure that.

21  A    That's not correct.

22  Q    Okay.

23  A    You'll have until six days --

24  Q    If I go in on election day, I'll have six days to cure it.

25  A    You'll have six days from election day, yes, sir.

1    Q    Okay.  And where can I go to cure that?

2    A    You can go to any of the satellite offices for the Voter

3    Registrar.  I believe his name is Mike Sullivan so you can go

4    to any of Mike Sullivan's offices.

5    Q    And do you know where his offices are or do you know which

6    offices will allow you to cure?

7    A    Any satellite office of the VR you can cure at.  I've

8    talked to Mike about that.

9    Q    What if I'm an hourly worker and I'm going to have to take

10   off a half a day of work to go and cure because I didn't have

11   the correct photo ID.  Are there any studies that you're aware

12   of that talk about the effect on that person?

13   A    I'm not sure but I believe that Harris County has Saturday

14   hours for their voter registrar so that you can cure on a

15   Saturday.  There's not any reason to take time off of work.  I

16   also think that they have Sunday hours.  And I believe that

17   when Veterans Day observed they actually had the offices open

18   on that day for cures.

19   Q    Last question.  I go in to vote in my precinct and I'm

20   going to have a valid Texas drivers license and I have my Voter

21   Registration card.  Am I going to be allowed to vote?

22   A    I would imagine, yes, sir.  If you've got a valid driver's

23   license you can vote.

24   Q    What if my driver's license is 65 days expired.  Am I

25   going to be allowed to vote?

1    A    You're going to be allowed to vote a provisional ballot,

2    yes, sir.

3    Q    Okay.  Now, the only thing that changed between the first

4    example and the second example is the five days; is that

5    correct?

6    A    Well, I would say 65 days but yes.

7    Q    Okay, 65 days.  Isn't the reason that you've been giving

8    us and all the witnesses from the State for the Senate Bill 14

9    is to prove who you say you are.  Is that right?  Photo ID is

10   to prove who you say you are.

11   A    My belief about the purpose of photo ID is to make sure

12   that the person in front of the table is the person on the list

13   of registered voters; yes, sir.

14   Q    Okay.  Isn't it going to be clear to the poll worker that

15   just because I'm 65 days expired I am that person?

16   A    I don't know what will be clear to the poll worker.  I

17   know that the legislature has determined that it can be 60 days

18   expired and used and if it's more than 60 days it can't be

19   used.

20   Q    What about -- what if I work for American Airlines and I

21   have a photo ID that I use to get into all restricted areas of

22   Intercontinental Airport or Dallas Fort Worth.  Can I use that

23   to vote?

24   A    If you're talking about a company ID, no sir.  That's not

25   on the list of acceptable forms of ID.

```
 1              MR. BRAZIL:  Thank you.  Pass the witness, your

 2     Honor.

 3              THE COURT:  Okay.  Anyone else on the plaintiffs'

 4     side?

 5              MR. SCOTT:  No.  Your Honor, may the witness be

 6     excused?

 7              THE COURT:  Yes.  Thank you.  You can step down.

 8              THE WITNESS:  Thank you, Judge.

 9          (Witness excused)

10              THE COURT:  Ms. Westfall, there's documents up here

11     but they're --

12              MS. WESTFALL:  Oh.  Sorry, your Honor.

13              THE COURT:  That's okay.

14              MS. WESTFALL:  Thank you.  Have a good day.

15          (Pause)

16              MS. DEASON:  Your Honor, Whitney Deason for the

17     Defendant --

18              THE COURT:  Hold on one second.

19              MS. DEASON:  Oh, I apologize.

20          (Voices heard off the record)

21              THE COURT:  Okay.

22              MS. DEASON:  Your Honor, Whitney Deason for the

23     Defendants.  We're going to be reading from Senator Troy

24     Fraser's deposition today.  And Stephen Tatum will be reading

25     for Senator Troy Fraser.
```

Fraser / by excerpts of Deposition - Direct          397

1    **EXAMINATION OF TROY FRASER BY EXCERPTS OF DEPOSITION TESTIMONY**

2      **(QUESTIONS READ BY MS. DEASON; ANSWERS READ BY MR. TATUM)**

3               "QUESTION:  Senator, are you aware that the Texas

4          Constitution prohibits the passage of a bill within

5          the first 60 days of a legislative session unless it

6          has been designated as an emergency item?

7               "ANSWER:  That is my understanding of the Texas

8          Constitution.

9               "QUESTION:  Thank you.  Was there an urgency in your

10         mind requiring the expeditious passage of Senate

11         Bill 14?

12              "ANSWER:  It's interesting that the Democratic caucus

13         took a position that it would like to go ahead and

14         get this out of the way.  So the answer is yes, that

15         it was a general consensus of the Senate as a whole.

16         We didn't make an official decision of that because

17         you can't do that.  But the -- both caucuses agreed

18         that it would be nice to go ahead and deal with this

19         issue early.

20              "QUESTION:  Thank you for that testimony.  Other than

21         the polls, putting aside the polls, were there any

22         other facts showing that allowing non-photo ID in a

23         voter ID bill would result in incidents of voter

24         fraud?

25              "ANSWER:  Well, there are multiple studies that have

Fraser / by excerpts of Deposition - Direct          398

1      been done all the way back to 2000.  There were -- a

2      study by the University of Missouri, there was a

3      study by the University of Delaware, there's a study

4      by the Heritage Foundation, studies by the Baker

5      Carter group, all showing that a photo ID would

6      improve the integrity of the ballot box; and in fact,

7      the implementation of a photo ID bill would not lower

8      turnout in an election.

9      "QUESTION:  You mentioned the difficulty of

10     standardizing IDs from public -- from private

11     institutions of higher education.  Did you give any

12     consideration to standardizing ID from public

13     institutions of higher education in Texas?

14     "ANSWER:  Actually, we did, but we get into the same

15     Kinko's problem, is that you could go there this

16     afternoon and make your own ID very, you know, easily

17     at Kinko's.  We realized that the -- in Texas, we

18     came up with a very sophisticated process with the

19     driver's licenses with multiple things that cannot be

20     replicated and will keep people from either changing

21     or duplicating a Texas driver's license on an ID that

22     is issued by the Department of Public Safety.

23     "So to ensure the integrity of the ballot box and

24     make sure that an ID has been not been issued by an

25     unauthorized source, we chose to use the four sources

Fraser / by excerpts of Deposition - Direct          399

1          that we -- either the federal government of the

2          passport, federal government military ID, a -- the

3          handgun picture ID or an ID issued by the Texas

4          driver's license, the Department of Public Safety or

5          an ID that had been issued for voting were the

6          acceptable forms.

7          "QUESTION:  What about the concealed handgun license?

8          Did you receive any testimony about the difficulty of

9          replicating that ID?

10          "ANSWER:  Juan Hinojosa is a Democratic member, that

11          I worked very closely with, presented an amendment.

12          He is a -- both a carrier of the permit and a -- and

13          he carries a handgun all the time on the Floor.  And

14          he asked that that amendment be put into the bill,

15          and I accepted his amendment.

16          "QUESTION:  Senator, if you would turn to, I believe

17          the first document is Exhibit 40.  Have you seen that

18          document before?

19          "ANSWER:  Yes, I have.

20          "QUESTION:  What is that?

21          "ANSWER:  That's a poll taken by the University of

22          Texas, July 2008.  The questions that were asked, per

23          voter ID, they were asked, 'Do you support a law

24          requiring an individual to present a government

25          issued photo ID and in order to be permitted to

1          vote?'  A full photo ID.

2          "QUESTION:  And that is information you had and

3          looked at before the passage of SB 14, correct?

4          "ANSWER:  And this was July '08, so this was actually

5          delivered to me prior to the 2009 session.  And the

6          results showed that at that time, 73 percent of

7          Anglos favored a full photo ID, 68 percent of

8          Black -- or African-American and 65 percent of

9          Hispanics.

10          "QUESTION:  Okay. So let's turn over to Exhibit 41.

11          "ANSWER:  Okay.

12          "QUESTION:  What is that document?

13          "ANSWER:  That is the Lighthouse opinion poll that

14          was done prior to January 10, 2011, two weeks prior

15          to the passage of Senate Bill 14.

16          "QUESTION:  And did it ask -- was there information

17          in Exhibit 41 relating to voter ID?

18          "ANSWER:  It was a question asked, 'Do you favor or

19          oppose requiring a valid photo ID before a person is

20          allowed to vote?'

21          "QUESTION:  And what were the breakdown of the

22          percentages in support?

23          "ANSWER:  White, 86 percent; African-American, 82

24          percent; Hispanic, 83 percent.

25          "QUESTION:  And to your knowledge, who was provided

Fraser / by excerpts of Deposition - Direct                401

1          that information in the poll that is contained in

2          Exhibit 41 in the Texas Legislature?

3          "ANSWER:  This was a public poll, a statewide

4          landscape benchmark survey and it was provided to the

5          public.  Do you have -- I had access -- I had this

6          information when I laid out Senate Bill 14.

7          "QUESTION:  Do you know if any other state Senators

8          had that information contained in Exhibit 41?

9          "ANSWER:  It's likely that probably all 31 had this.

10         "QUESTION:  Did you attempt to share these studies

11         with your colleagues in the Senate?

12         "ANSWER:  Yes, I did.

13         "QUESTION:  Prior to the passage of SB 14?

14         "ANSWER:  Yes, I did.

15         "QUESTION:  And were they made freely available to

16         both proponents and opponents?

17         "ANSWER:  Yes.  And I would like to make an

18         additional reference on this, actually.  During the

19         laying out of the bill in 2007, Senator Zaffirini had

20         noticed that I had a huge book with all of this in

21         there, and she asked to see it.  I not only gave it

22         to her, but I made sure that she was aware of all the

23         things I had in the book pertaining to these, that

24         they had received.

25         "QUESTION:  Let me hand you what's been marked as

Fraser / by excerpts of Deposition - Direct          402

1          Exhibit 45 to your deposition.

2          "ANSWER:  Yeah.

3          "QUESTION:  Have you ever seen that document?

4          "ANSWER:  Yes, I have.

5          "QUESTION:  What is it?

6          "ANSWER:  It was a poll done by the University of

7          Texas in which we received in February of 2011, the

8          poll actually was taken in December of 2010.  It was

9          a follow-up to the 2008 poll of basically asking the

10         same questions saying, 'Do you agree or disagree that

11         registered voters should be required to present a

12         government issued photo ID before they can be allowed

13         to vote?'  Of the people that they polled, 75 percent

14         agreed.  The racial makeup of the poll showed that it

15         was broadly agreed to even among Democrats and

16         Republicans and that if you looked at the racial

17         makeup of who agreed with this, 80 percent of Anglos

18         agreed, 63 percent of African-Americans agreed and

19         68 percent of Latinos.  The Latino number actually

20         increased in that two-year period.

21         "QUESTION:  And did you -- and you had that in your

22         possession prior to the passage of SB 14?

23         "ANSWER:  Yes, I did.  And I made this available to

24         all 31 members."

25         //

Fraser / by excerpts of Deposition - Cross          403

1      **MS. DEASON:**  That concludes Defendants' readings from

2   Senator Fraser's depo.

3      **THE COURT:**  Okay.

4      **MS. FARANSSO:**  Your Honor, Tanya Faransso for the

5   Texas League.  And Lynn Eisenberg will be reading for Senator

6   Fraser.  May I approach?

7      **THE COURT:**  Yes.

8      **MS. FARANSSO:**  And we'll be reading first from

9   Senator Fraser's deposition in the Section Five litigation

10  dated May 17th, 2012.

11  **EXAMINATION OF TROY FRASER BY EXCERPTS OF DEPOSITION TESTIMONY**

12  **(QUESTIONS READ BY MS. FARANSSO; ANSWERS READ BY MS. EISENBERG)**

13          "QUESTION:  Good morning, Senator Fraser.  Could you

14          state and spell your name for the record, please?

15          "ANSWER:  Troy Fraser, F-r-a-s-e-r.

16          "QUESTION:  Do you believe that compliance with the

17          Voting Rights Act is important?

18          "ANSWER:  I believe when the Act was passed in '65 it

19          was important.  I believe today the Voting Rights Act

20          has outlived its useful life.

21          "QUESTION:  When do you believe -- first of all, what

22          do you mean by that, 'outlived its useful life'?

23          "ANSWER:  I believe it's outlived its useful life.

24          "QUESTION:  What is Texas' current system for

25          determining how to verify the identity of a voter

Fraser / by excerpts of Deposition - Cross                     404

1        before section -- before SB 14 was enacted?

2        "ANSWER:  The only requirement Texas has that if you

3        show your -- your voter registration card that is

4        sent by -- in the mail to people, and whoever has

5        that card in their possession can walk up and vote.

6        "QUESTION:  Has this system failed to prevent voter

7        fraud, in your view?

8        "ANSWER:  No.

9        "QUESTION:  Okay.  Senator, do you know what a

10       citizenship certificate is?

11       "ANSWER:  No.

12       "QUESTION:  Is it a form of ID in Senate Bill 14?

13       "ANSWER:  Yes.

14       "QUESTION:  Do you have any idea how much it cost to

15       obtain a citizenship certificate?

16       "ANSWER:  No.

17       "QUESTION:  Do you know how much it cost to obtain a

18       U.S. passport?

19       "ANSWER:  No.

20       "QUESTION:  Do you know what documents you would have

21       to provide to get a U.S. passport?

22       "ANSWER:  I believe a birth certificate.

23       "QUESTION:  And anything else besides a birth

24       certificate?

25       "ANSWER:  Not to my knowledge.

1                "QUESTION:  Do you know how long it takes to obtain a

2                passport?

3                "ANSWER:  No.

4                "QUESTION:  Do you know how much it costs to obtain

5                the documents necessary to get an election

6                identification certificate under Senate Bill 14 and

7                associated regulations?

8                "ANSWER:  No.

9                "QUESTION:  And if the documents needed to get the

10               election identification certificate are not

11               themselves free, is there a cost associated with

12               obtaining an election identification certificate?

13               "ANSWER:  I don't know.

14               "QUESTION:  Where does one obtain an election

15               identification certificate?

16               "ANSWER:  I don't know.

17               "QUESTION:  And when are those offices open?

18               "ANSWER:  I don't know."

19               **MS. FARANSSO:**  Your Honor, we'll now move on to

20       Senator Fraser's deposition on July 23rd, 2014 in this

21       litigation.

22               "QUESTION:  Senator, you've just been handed what has

23               been marked as Exhibit 6."

24               **MS. FARANSSO:**  For the record that's Plaintiffs'

25       Exhibit 231.

Fraser / by excerpts of Deposition - Cross                406

1          "QUESTION:  Do you recognize this document?

2          "ANSWER:  It appears to be a press release from my

3          office.

4          "QUESTION:  Do you know who would have drafted this

5          document for you?

6          "ANSWER: :  Most of my press at this time was drafted

7          by my chief of staff, Janice McCoy.

8          "QUESTION:  Would you have reviewed what she drafted

9          and put your name on as the author?

10         "ANSWER:  Yes.

11         "QUESTION:  If you don't mind, could you just look

12         back at Exhibit 6, please?"

13         **MS. FARANSSO:**  And again, that's Plaintiffs'

14    Exhibit 231.

15         "QUESTION:  And turn to the second page, that back

16         page, the back of the first page there.  If you look

17         at the third paragraph of that page, which is the

18         second full paragraph, it reads:

19         'So I'm offering Texas voters new protections that

20         will prevent fraud at the ballot box.  But

21         importantly, the legislation I filed will not send

22         anyone away from the polling place without being able

23         to cast their ballot.  Senate Bill 362 will require

24         voters to show either one form of photo

25         identification or two other forms of non-photo

Fraser / by excerpts of Deposition - Cross                407

1       identification.  The non-photo identification can be

2       a utility bill, mail from a government entity or even

3       a library card.  And voters who cannot produce

4       acceptable forms of identification will still be

5       allowed to cast a provisional ballot.  So despite all

6       the rhetoric some might hear from the opposition, let

7       me be clear: No eligible voter will walk away from a

8       polling location without being able to cast their

9       ballot.'

10      "Do you recall this text?

11      "ANSWER:  Yes.

12      "QUESTION:  And did you agree with these statements

13      at the time?

14      "ANSWER:  Yes.

15      "QUESTION:  Do you recall that you filed a voter ID

16      bill in the Senate on November 8th, 2010, and that it

17      received the bill number of Senate Bill 178?

18      "ANSWER:  Yes.

19      "QUESTION:  And when that bill was re-filed did it

20      receive the bill number Senate Bill 14?

21      "ANSWER:  Yes.

22      "QUESTION:  And did you re-file that bill at the

23      request of the Lieutenant Governor?

24      "ANSWER:  Yes.

25      "QUESTION:  Okay.  Thank you.  Does the Lieutenant

Fraser / by excerpts of Deposition - Cross                408

1      Governor reserve lower bill numbers for legislative

2      priorities?

3      "ANSWER:  Yes.

4      "QUESTION:  Thank you.  You were the author of Senate

5      Bill 14; is that right?

6      "ANSWER:  Yes.

7      "QUESTION:  The photo ID requirement in Senate

8      Bill 14 was intended to combat only in-person voter

9      fraud, correct?

10     "ANSWER:  Yes.

11     "QUESTION:  Did any of the testimony or research that

12     you've been referring to show or demonstrate that

13     allowing non-photo identification would result in

14     incidents of in-person voter fraud?

15     "ANSWER:  The answer is that the information we found

16     that the -- the best way to ensure the integrity of

17     the ballot box, to make sure the person was who

18     they -- you know, who they said they were, was to

19     have a photo ID.

20     "QUESTION:  And what was that information?

21     "ANSWER:  Testimony from the public and polling of

22     asking the public if they thought that it was, you

23     know, the best way.

24     "QUESTION:  So your basis for thinking about the

25     inclusion of non-photo ID would result in in-person

Fraser / by excerpts of Deposition - Cross          409

1      voter fraud were polls asking the public what they

2      thought about voter ID?

3      "ANSWER:  You're answering your own question.

4      "QUESTION:  So that's a yes?

5      "ANSWER:  You want to ask that -- no, that's not a

6      yes at all.  If you want to ask me a question instead

7      of a compound question, you know, -- the public, when

8      asked, do you think that the ballot box, integrity of

9      the ballot box would be improved by having a strict

10     photo ID, the answer was an overwhelming yes.  In

11     some cases, as high as 88 percent.

12     "QUESTION:  You mentioned that Senate Bill 14

13     clarified that set of identification because you

14     thought that that would be for the ease of the

15     voters, correct?

16     "ANSWER:  And poll workers.

17     "QUESTION:  And poll workers.  Specific to voters,

18     why would it be easier on voters to have a narrower

19     set of identification?

20     "ANSWER:  It's clear whenever they go in to vote of

21     what an acceptable form of ID would be.

22     "QUESTION:  Would it be easier for a voter who did

23     not possess one of the forms of identification

24     stipulated in Senate Bill 14?

25     "ANSWER:  It would be clear to that voter.

Fraser / by excerpts of Deposition - Cross                410

1      "QUESTION:  It would be clear to that voter that they

2      did not possess that form of identification?

3      "ANSWER:  It would be clear to them what forms of

4      identification are acceptable.

5      "QUESTION:  Would it be easier for that voter to then

6      cast a vote?

7      "ANSWER:  You're trying to make me determine what

8      someone's mind that I haven't met what is and is not.

9      That's subjective.

10     "QUESTION:  You mentioned the difficulty of

11     standardizing IDs from public -- from private

12     institutions of higher education.  Did you give any

13     consideration to standardizing ID from public

14     institutions of higher education in Texas?

15     "ANSWER:  Actually, we did.  But we get into the same

16     Kinko's problem is that you could go there this

17     afternoon and make your own ID very, you know, easily

18     at Kinko's.  We realize that the -- in Texas we came

19     up with a very sophisticated process with the

20     driver's licenses with multiple things that cannot be

21     replicated and will keep people from either changing

22     or duplicating a Texas driver's license on an ID that

23     is issued by the Department of Public Safety.

24     "QUESTION:  Senator, at the time you were drafting

25     and considering Senate Bill 14, were you aware of any

Fraser / by excerpts of Deposition - Cross                411

1   instances in Texas when a -- where a forged student

2   ID had been used for in-person voter fraud?

3   "ANSWER:  I'm not sure how to answer that because

4   that was not information we ever asked for.

5   "QUESTION:  But just to confirm, you had no factual

6   information as to whether a student ID had been used

7   to commit in-person voter fraud in Texas?

8   "ANSWER:  That testimony, to my knowledge, I don't

9   know that it was ever asked.

10   "QUESTION:  Okay.  Are you aware of any such

11   instances of student ID being used to commit voter

12   fraud anywhere in the country?

13   "ANSWER:  I don't know that that information has ever

14   been delivered to me.

15   "QUESTION:  Okay.  And you did not ask for any such

16   information with respect to Texas or other states,

17   correct?

18   "ANSWER:  No.  We were moving toward making sure that

19   we do IDs that could not be forged.

20   "QUESTION:  Did you conduct any analysis as to

21   whether college students were more or less likely to

22   possess the forms of identification that were listed

23   in Senate Bill 14?

24   "ANSWER:  Actually, there was a lot of discussion

25   about who possessed driver's licenses, who had ID,

Fraser / by excerpts of Deposition - Cross                412

1          who had passports, who had concealed handgun permits.

2          And yes, it was discussion about the age of the

3          people and who had what.  And we determined that

4          actually the younger people were more likely to have

5          the -- all the forms of ID that could be used.

6          "QUESTION:  Did that --

7          "ANSWER:  And a student ID was not needed.

8          "QUESTION:  Did that research that pertained to the

9          younger population break down the percentages of the

10         younger population that possessed ID by race?

11         "ANSWER:  To my knowledge not -- no.

12         "QUESTION:  Did you -- did the Senate Committee

13         receive any testimony that Texas driver's license or

14         personal identification cards cannot be replicated?

15         "ANSWER:  The answer would be no on that, because I

16         think anything in today's technology can be

17         replicated.  We believe that we have one of the most

18         safeguards in our Texas driver's license of virtually

19         any state.  But in today's technology I suspect

20         anything could be replicated.

21         "QUESTION:  Are you aware that some voters prefer to

22         vote in person rather than by mail?

23         "ANSWER:  Yes.

24         "QUESTION:  Do you believe that if a voter had to

25         travel a hundred miles round trip to obtain an EIC,

1      that that would impact their decision as to whether

2      to obtain an EIC?

3      "ANSWER:  Once again, people in Texas that have

4      chosen to live in remote areas, by choosing to live

5      there, they understand that they would have to travel

6      to receive groceries, food, water, driver's license

7      and the election identification.

8      "QUESTION:  Do you believe that all people who live

9      in remote areas have decided to live in those remote

10     areas by choice?

11     "ANSWER:  I think -- I don't think you could say all

12     on anything, because there's probably exceptions to

13     every rule.

14     "QUESTION:  And do you believe that the choice of

15     living in a remote area should impact one's right to

16     vote?

17     "ANSWER:  Everyone in remote areas have the right and

18     opportunities to vote if they either choose to get an

19     identification card.  If they choose not to get one,

20     they can vote by mail.

21     "QUESTION:  Would you agree that a form of

22     identification is not free if it costs money to

23     obtain the underlying documents required to obtain

24     that form of identification?

25     "ANSWER:  It's very clearly not free if it cost

Fraser / by excerpts of Deposition - Cross                414

1       money.  But the state of Texas has done everything

2       they can to make it either free or as least expensive

3       as possible.

4       "QUESTION:  Would you agree that a form of

5       identification is not free if it costs money to

6       travel to obtain that form of identification for the

7       sole purpose of voting?

8       "ANSWER:  Obviously, if you travel there, there is a

9       cost to travel.

10      "QUESTION:  Senator, do you recall during the debate

11      in the Committee of the Whole on SB 14 responding, 'I

12      am not advised to numerous questions'?

13      "ANSWER:  Yes.

14      "QUESTION:  What does the answer 'I am not advised'

15      mean?

16      "ANSWER:  It means that I don't have -- I do not have

17      sufficient information to answer your question.

18      "QUESTION:  Do recall that Senator West asked you

19      specifically, 'Will the elimination of the government

20      documents as a form of ID disproportionately affect

21      African Americans and Hispanics'?

22      "ANSWER:  If this is an accurate indication of what

23      was said, the paper says yes, that --

24      "QUESTION:  Do you have any reason to doubt the

25      accuracy of this transcription of the record?

Fraser / by excerpts of Deposition - Cross                415

1        "ANSWER:  No.

2        "QUESTION:  Do you see that you responded, 'I am not

3        advised' to Senator West's question?

4        "ANSWER:  Yes.

5        "QUESTION:  Why did you respond, 'I am not advised'?

6        "ANSWER:  He asked me if the -- if the elimination of

7        government documents would disproportionately affect

8        African Americans and Hispanic.  There had been a

9        poll taken less than a week before that -- asking

10       Hispanics and African Americans if they were in favor

11       of the passage of a strict photo ID bill, and the

12       percentages were in the upper 80s; that they

13       responded that they were in favor of the passage of a

14       strict photo ID bill.  So the answer is no.

15       "QUESTION:  Senator, you've been handed what has been

16       marked as Exhibit 20."

17       **MS. FARANSSO:**  And for the record this is Plaintiffs'

18   Exhibit 847.

19       "QUESTION:  So does this appear to be the Senate

20       Journal from January 26, 2011?

21       "ANSWER:  It does.

22       "QUESTION:  And is the Senate Journal essentially a

23       record of events that occur on the Senate Floor?

24       "ANSWER:  Yes.

25       "QUESTION:  Senate Bill 14 did not include a

EXCEPTIONAL REPORTING SERVICES, INC

Fraser / by excerpts of Deposition - Cross                    416

1          provision requiring a free birth certificate did it?

2          "ANSWER:  No.

3          "QUESTION:  HB 218, SB 362 and SB 14 all served the

4          same purpose, correct?

5          "ANSWER:  The purpose was to protect the integrity of

6          the voting box.

7          "QUESTION:  And these were forms of ID that were

8          included in the previous versions of the voter ID

9          legislation, correct?

10         "ANSWER:  They were unacceptable to me?

11         "QUESTION:  At the time they were acceptable?

12         "ANSWER:  Yes.

13         "QUESTION:  And you sponsored a bill that you found

14         unacceptable?

15         "ANSWER:  I said that they were a starting point, a

16         good starting point and that in the process I wanted

17         to correct that.  My goal was to change the forms of

18         identification, yes.

19         "QUESTION:  Do you typically sponsor bills that you

20         find to be unacceptable?

21         "ANSWER:  Yes.

22         "QUESTION:  If you could continue to look at the same

23         page, Amendment 19."

24         **MS. FARANSSO:**  And again, this is Plaintiffs'

25    Exhibit 847.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fraser / by excerpts of Deposition - Cross                417

1       "QUESTION:  Looking at Amendment 19 offered by

2       Senator Ellis, do you see that amendment?

3       "ANSWER:  Got it.  Got it.  Okay, yes.  Okay.

4       "QUESTION:  Okay.  And this amendment would have

5       allowed as an acceptable form of identification a

6       student ID card from a public university in Texas

7       that contained the person's photograph and has not

8       expired, correct?

9       "ANSWER:  Yes.

10      "QUESTION:  Just to be clear, this amendment would

11      not have permitted student IDs from other states,

12      would it?

13      "ANSWER:  No.

14      "QUESTION:  And this amendment would not have

15      permitted students IDs from private institutions of

16      higher education in Texas, would it?

17      "ANSWER:  No.

18      "QUESTION:  So this amendment would have allowed a

19      limited set of student ID cards from public

20      universities in Texas, correct?

21      "ANSWER:  Yes.

22      "QUESTION:  And you moved to table this amendment; is

23      that right?

24      "ANSWER:  Yes.

25      "QUESTION:  Was it your belief that it would go --

Fraser / by excerpts of Deposition - Cross            418

1        that the public legislative record would either go to

2        the Department of Justice or a three-judge panel as

3        part of the Section 5 review process?

4        "ANSWER:  I did believe that it would go one of the

5        two places.

6        "QUESTION:  Did that make you consider how -- what

7        sort of statements you made on the Senate Floor?

8        "ANSWER:  I was aware that everything that I was

9        saying was part of a public record.

10       "QUESTION:  I'd ask you again, do you believe that

11       adding IDs issued by the federal government, state

12       government or local government would have interfered

13       with the effectiveness of Senate Bill 14?

14       "ANSWER:  I do not believe the bill would have been

15       as effective because we believed we needed to

16       implement a clear photo ID bill.

17       "QUESTION:  Do you believe that federal employee IDs

18       are secure?

19       "ANSWER:  I'm sorry, I don't know.

20       "QUESTION:  Do you know whether some federal employee

21       IDs encrypt the fingerprint of the cardholder into

22       the card?

23       "ANSWER:  I do not know that.

24       "QUESTION:  Do you believe or know whether some

25       federal ID employee IDs are more secure than state-

Fraser / by excerpts of Deposition - Cross                     419

1        issued forms of photo ID?

2        "ANSWER:  I do not know that.

3        "QUESTION:  Are you aware of any voter who did not

4        vote in an election due to concerns about ineligible

5        voters participating in elections?

6        "ANSWER:  No.

7        "QUESTION:  Were you aware that the Department of

8        Public Safety had issued regulations requiring

9        applicants for an EIC to give their fingerprints to

10       the DPS in order to get an EIC?

11       "ANSWER:  No.

12       "QUESTION:  Is that -- was SB 14 intended to give

13       that kind or that degree of discretion to DPS?

14       "ANSWER:  We gave broad authority under rule to DPS

15       to develop the EIC.

16       "QUESTION:  So if DPS says they want an applicant for

17       an EIC to issue -- to give them their fingerprints,

18       is that in keeping with SB 14?

19       "ANSWER:  We gave broad authority to DPS to develop

20       guidelines.

21       "QUESTION:  Senator, I'd like to talk to you about a

22       few exhibits that Mr. Scott examined you on.  First

23       is Exhibit Number 40 -- I'm sorry, Exhibit 45,

24       apologies.  It's the Texas Politics Poll.

25       **MS. FARANSSO:**  And for the record this is Plaintiffs'

1    Exhibit 251.

2              "QUESTION:  Now, can you read what that first

3              question is?  It says, 'Do you agree or disagree?'

4              Can you read that question, please?

5              "ANSWER:  'Do you agree or disagree that registered

6              voters should be required to present a government

7              issued photo ID before they can be allowed to vote?'

8              "QUESTION:  And you said that this poll is one of the

9              polls that you used as a basis to suggest that a

10             photo ID requirement --

11             "ANSWER:  It was one of the polls that we did

12             reference of a poll that was taken.

13             "QUESTION:  Does this poll define what a 'government

14             issued ID' is?

15             "ANSWER:  In a poll the question that is asked is the

16             question that is asked.  They asked the question that

17             I read to you.  The question I think speaks for

18             itself.

19             "QUESTION:  And you don't know how any single

20             respondent to this poll interpreted the phrase 'a

21             government issued photo ID'; is that correct?

22             "ANSWER:  It would be subjective for me to project

23             what someone that was asked a poll the way they

24             interpreted this.

25             "QUESTION:  So the answer is yes?

Fraser / by excerpts of Deposition - Cross                421

1          "ANSWER:  The answer is yes.

2          "QUESTION:  Can you please turn to Exhibit Number 41

3          that Mr. Scott asked about?

4          **MS. FARANSSO:**  And for the record this is Plaintiffs'

5   Exhibit 247 at Page 3.

6          "QUESTION:  Do you see at the bottom where it says

7          photo -- Photo Voter ID Requirement?

8          "ANSWER:  Uh-huh.

9          "QUESTION:  And can you read that question, please?

10         "ANSWER:  'Do you favor or oppose requiring a valid

11         photo ID before a person is allowed to vote?'

12         "QUESTION:  Is 'valid photo ID' defined anywhere in

13         this Lighthouse opinion poll?

14         "ANSWER:  No.

15         "QUESTION:  And is it fair to say that you have

16         absolutely no idea how any respondent to this poll

17         interpreted the phrase 'valid photo ID'?

18         "ANSWER:  It would be subjective for me to in any way

19         guess what they -- I think the person had to rely on

20         the question on its face of what it said.  This is a

21         question that was asked.

22         "QUESTION:  So your answer is you do not know how any

23         person interpreted the phrase 'valid photo ID'?

24         "ANSWER:  It would be impossible for me to do it

25         other than the question speaks for itself.

Fraser / by excerpts of Deposition - Cross                422

1            "QUESTION:  So your answer is a yes, you don't know

2            how any person interpreted the word -- phrase 'valid

3            photo ID'?

4            "ANSWER:  My answer is that the question speaks for

5            itself and there's going to be no way for me to

6            interpret the way they interpreted it."

7            **MS. FARANSSO:**  Your Honor, that concludes the

8     reading.

9            **THE COURT:**  All right.  Shall we wrap up there?  What

10    do we have for tomorrow?

11           **MR. SCOTT:**  We have how many readings left?

12        **(Voices heard off the record)**

13           **MR. SCOTT:**  Almost 12.

14           **THE COURT:**  Okay.

15           **MR. SCOTT:**  And then we have one more live witness,

16    your Honor.  And it should be a very short one on the direct

17    and we'll attempt to even object if they get outside.

18           **THE COURT:**  All right.  So we're good.  Then we'll

19    see you in the morning.  You're excused.

20        **(Counsel thank the Court)**

21        **(This proceeding was adjourned at 5:50 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    September 11, 2014_

                    TONI HUDSON, TRANSCRIBER