UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


| | | |
|---|---|---|
| MARC VEASEY, ET AL., | ) | CASE NO: 2:13-CV-00193 |
| | ) | |
| Plaintiffs, | ) | CIVIL |
| | ) | |
| vs. | ) | Corpus Christi, Texas |
| | ) | |
| RICK PERRY, ET AL., | ) | Thursday, September 11, 2014 |
| | ) | (8:00 a.m. to 11:59 a.m.) |
| Defendants. | ) | (1:30 p.m. to  1:47 p.m.) |


BENCH TRIAL - DAY 8

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:            See Next Page

Court Recorder:         Genay Rogan

Clerk:                  Brandy Cortez

Court Security Officer: Adrian Perez

Transcriber:            Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

<u>APPEARANCES FOR:</u>


Plaintiffs:                      CHAD W. DUNN, ESQ.
                                 KEMBEL SCOTT BRAZIL, ESQ.
                                 Brazil and Dunn
                                 4201 Cypress Creek Parkway, Suite 530
                                 Houston, TX 77068

                                 ARMAND DERFNER, ESQ.
                                 P.O. Box 600
                                 Charleston, SC 29402

                                 J. GERALD HEBERT, ESQ.
                                 Attorney at Law
                                 191 Somervelle Street #405
                                 Alexandria, VA 22304

                                 NEIL G. BARON, ESQ.
                                 914 FM 517 Rd. W, Suite 242
                                 Dickinson, TX 77539

                                 EMMA P. SIMSON, ESQ.
                                 Campaign Legal Center
                                 215 E. Street NE
                                 Washington, DC 20002

Mexican American                 EZRA D. ROSENBERG, ESQ.
Legislative Caucus,              Dechert, LLP
et al.:                          902 Carnegie Center, Suite 500
                                 Princeton, NJ 08540-6531

                                 MARK A. POSNER, ESQ.
                                 AMY L. RUDD, ESQ.
                                 GARY BLEDSOE, ESQ.
                                 SONIA K. GILL, ESQ.
                                 ERANDI ZAMORA, ESQ.
                                 Lawyers' Committee for Civil Rights
                                 1401 New York Ave. NW, Suite 400
                                 Washington, DC 20005

                                 DANIEL G. COVICH, ESQ.
                                 802 N. Carancahua, Suite 2100
                                 Corpus Christi, TX 78401

3

**APPEARANCES FOR:**          (CONTINUED)


Mexican American          MYRNA PEREZ, ESQ.
Legislative Caucus,      VISHAL AGRAHARKAR, ESQ.
et al.:                  JENNIFER CLARK, ESQ.
                         Brennan Center for Justice
                         161 Avenue of the Americas
                         12th Floor
                         New York, NY 10013


United States            RICHARD DELLHEIM, ESQ.
of America:              ELIZABETH S. WESTFALL, ESQ.
                         DANIEL FREEMAN, ESQ.
                         ANNA BALDWIN, ESQ.
                         AVNER SHAPIRO, ESQ.
                         MEREDITH BELL-PLATTS, ESQ.
                         JOHN SMITH, ESQ.
                         PAXTON WARNER, ESQ.
                         BRADLEY HEARD, ESQ.
                         ROBERT BERMAN, ESQ.
                         U.S. Department of Justice
                         950 Pennsylvania Ave. NW
                         Washington, DC 20530

                         BRUCE I. GEAR, ESQ.
                         Department of Justice
                         1800 G Street NW
                         Washington, DC 20006

Ortiz Plaintiffs,        JOSE GARZA, ESQ.
et al.:                  7414 Robin Rest Dr.
                         San Antonio, TX 78209

                         ROBERT W. DOGGETT, ESQ.
                         Texas Rio Grande Legal Aid, Inc.
                         4920 North IH 35
                         Austin, TX 78751

                         MARINDA VAN DALEN, ESQ.
                         Texas RioGrande Legal Aid, Inc.
                         531 E. St. Francis
                         Brownsville, TX 78520

4

**APPEARANCES FOR:**            (CONTINUED)


Texas League of Young          RYAN HAYGOOD, ESQ.
Voters Education Fund:         NATASHA KORGAONKAR, ESQ.
                               DEUEL ROSS, ESQ.
                               LEAH ADEN, ESQ.
                               NAACP Legal Def. and Educational Fund
                               40 Rector St., 5th Floor
                               New York, NY 10006


                               DANIELLE CONLEY, ESQ.
                               KELLY DUNBAR, ESQ.
                               M. HASAN ALI, ESQ.
                               LYNN EISENBERG, ESQ.
                               JONATHAN E. PAIKIN, ESQ.
                               RICHARD F. SHORDT, ESQ.
                               SONYA LEBSACK, ESQ.
                               TANIA C. FARANSSO, ESQ.
                               Wilmer Cutler Pickering, et al.
                               1875 Pennsylvania Avenue, NW
                               Washington, DC 20006

Texas Association of           ROLANDO L. RIOS, ESQ.
Hispanic County Judges         115 E. Travis
and County                     Suite 1654
Commissioners:                 San Antonio, TX 78205


                               PRESTON HENRICHSON, ESQ.
                               222 W. Cano
                               Edinburg, TX 78539


State of Texas:                JOHN BARRET SCOTT, ESQ.
                               Deputy Attorney General
                               for Civil Litigation
                               Office of the Attorney General
                               P.O. Box 12548
                               Austin, TX 78711


                               JOHN REED CLAY, JR., ESQ.
                               LINDSEY E. WOLF, ESQ.
                               JENNIFER ROSCETTI, ESQ.
                               G. DAVID WHITLEY, ESQ.
                               STEPHEN L. TATUM, JR., ESQ.
                               STEPHEN R. KEISTER, ESQ.
                               Office of the Attorney General
                               P.O. Box 12548
                               MC001
                               Austin, TX 78711

<u>**APPEARANCES FOR:**</u>          (CONTINUED)


State of Texas:          BEN A. DONNELL, ESQ.
                         Donnell Abernethy Kieschnick
                         555 N. Carancahua, Suite 400
                         Corpus Christi, TX 78401

                         WHITNEY DEASON, ESQ.
                         JOHN CRAWFORD, ESQ.

Non-Party Senators       ARTHUR D'ANDREA, ESQ.
& Non-Party              Office of the Attorney General
Representatives:         209 W. 14th Street, 7th Floor
                         Austin, TX 78701

                         DAVID TALBOT, ESQ.

                         JAMES B. ECCLES, ESQ.
                         Office of the AG of Texas
                         300 W. 15th Street, 11th Floor
                         Austin, TX 78701

                         ALICE LONDON, ESQ.
                         Bishop London Brophy & Dodds
                         3701 Bee Cave Rd., Suite 200
                         Austin, TX 78746

6

1                              **INDEX**

| 2  DEFENDANTS' WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| 3  JOHN CRAWFORD | 7/16 | 25 | | |
| 4     VOIR DIRE | 10 | | | |
| 5  FORREST MITCHELL | 63 | | | |
| 6     (VIA DEPO) | | | | |
| 7  TOMMY WILLIAMS | 85 | 104 | | |
| 8     (VIA DEPO) | | | | |
| 9  CAROLYN GUIDRY | 138 | 163 | | |
| 10    (VIA DEPO) | | | | |
| 11 BRYAN HEBERT | 178 | 188 | | |
| 12    (VIA DEPO) | | | | |
| 13 KENNETH SMITH | 226 | | | |
| 14    (VIA DEPO) | | | | |
| 15 MICHELLE RUDOLPH | 231 | | | |
| 16    (VIA DEPO) | | | | |

17

| 18 DEFENDANTS' EXHIBITS | RECEIVED |
|---|---|
| 19 2746 | 25 |
| 20 2747, 2748 under seal | 137 |

21

22

23

24

25

EXCEPTIONAL REPORTING SERVICES, INC

1    **Corpus Christi, Texas; Thursday, September 11, 2014; 8:00 a.m.**

2                        **(Call to Order)**

3              **THE COURT:**  Good morning.

4        **(Counsel respond, "Good morning.")**

5              **THE COURT:**  You can have a seat.

6              **MR. SCOTT:**  Good morning.

7              **THE COURT:**  Good morning.

8              **MR. SCOTT:**  Your Honor, Plaintiffs would call

9    Mr. John Crawford from the Department of Public Safety.

10             **THE COURT:**  Good morning.  Would you raise your right

11   hand?

12         **JOHN WILLIAM CRAWFORD, PLAINTIFFS' WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14   **BY MR. SCOTT:**

15   Q    Mr. Crawford, would you introduce yourself to the Court,

16   please.

17   A    Yes.  I'm John William Crawford.

18   Q    Mr. Crawford, what do you -- who do you currently work

19   for?

20   A    I work for the Information Technology Division of the

21   Texas Department of Public Safety.

22   Q    And what do you do in your capacity -- what do you do --

23   what's your capacity over there at the DPS?

24   A    I am the manager of licensing services applications, so I

25   have a team of software developers/programmers that support the

Crawford - Direct / By Mr. Scott                    8

1    applications used by the Driver License and Regulatory Services

2    Divisions at DPS.

3    Q    And how many folks work for you?

4    A    Nineteen.

5    Q    And with regard to your operations over there, are you the

6    manager over the records that -- the driver's license records,

7    personal ID., and EIC records that are stored with the

8    Department of Public Safety?

9    A    Yes.

10   Q    And how long have you been over there?

11   A    I've been with the department for six years.

12   Q    And how long have you been in your current capacity?

13   A    Since December of 2012.

14          MR. SCOTT:  May I approach, your Honor?

15          THE COURT:  Yes.

16   Q    I'm going to hand you --

17          MR. SCOTT:  Brian, will you put up 2746?

18   Q    I'm going to hand you what's been marked for --

19          MR. DUNN:  Your Honor, I'd like to be heard on this

20   matter, if I could?

21          THE COURT:  Okay.

22          MR. DUNN:  I would like to take this witness on voir

23   dire and demonstrate that what he is about to provide is

24   undisclosed and, in fact, concealed, purposely concealed,

25   expert testimony, without a proper designation, without a

1   proper foundation.

2           **MR. SCOTT:**  Okay.  We're having a cross -- I mean,

3   we've got cross.  It's a bench trial.

4           **THE COURT:**  Is he offered as an expert?

5           **MR. SCOTT:**  He's not offered as an expert.  He's --

6   he's proving up a summary information of just a DPS comparison

7   with DOJ comparison.  They do a database match of the two

8   materials that have been provided to both sides, and this is

9   the results.  He's just doing it in summary form.  He's just

10  proving the document up.

11          **MR. DUNN:**  In other words, the witness has done an

12  undisclosed database match.  And had we known that this wasn't

13  expert testimony, the Department of Justice or the private

14  clients could have saved ourselves thousands of dollars and

15  months of effort producing reports --

16          **THE COURT:**  So did he do a matching?

17          **MR. SCOTT:**  There was a computer comparison of --

18          **THE COURT:**  That --

19          **MR. SCOTT:**  -- their chart.

20          **THE COURT:**  And it was provided to the Defendants?

21          **MR. DUNN:**  Yesterday.

22          **MR. SCOTT:**  Well, this chart was because they just

23  did this yesterday.  This is in response to Dr. Ansolahehere's

24  deposition -- I mean, testimony that he said in this case.

25          **THE COURT:**  You-all have had that a long time.

```
                    Crawford - Voir Dire / By Mr. Dunn          10
```

 1          **MR. SCOTT:**  Well, his information concerning the, the

 2   issue of not using race, and then identifying and making

 3   results saying that it's all based upon the race, I think I

 4   asked Dr. Ansolahehere specifically, "Would you agree that I

 5   have not" -- "that you have not" -- or, "You'd agree that you

 6   have over 2 million errors in race classification?"  And he

 7   said, "I can't" -- "I don't know.  I don't know."  So it's a

 8   clarification of, which is the purpose of rebuttal evidence.

 9          **MR DUNN:**  This witness was presented for deposition

10   as a 30(b)(6) witness only on the database snafu, and, in fact,

11   was asked by Mr. Baldwin in the deposition, "Have you compared

12   the databases?"  Mr. Scott objected and he was instructed not

13   to answer any questions about that.

14          **THE COURT:**  Okay.  I'm going to allow the cross at

15   this point -- the voir dire.

16                    **VOIR DIRE EXAMINATION**

17   **BY MR. DUNN:**

18   Q    Hello, Mr. Crawford, my name is Chad Dunn.  We've never

19   met before, have we?

20   A    No, sir.

21   Q    All right.  Well, I'm sorry you're here in the middle of

22   this, but there are a few things I'd like to establish for our

23   record.  As I understand it, you manage a team in the

24   Department of Licensing over at DPS; is that true?

25   A    It's the Department of Information Technology.

1  Q    I beg your pardon, no disrespect meant.  It's also my

2  understanding that you personally are not a programmer; is that

3  correct?

4  A    That is correct.

5  Q    And, in fact, you manager a team of programmers; is that

6  true?

7  A    That is correct.

8  Q    And you told us at your deposition that reading code and

9  reading programming is not something that you understand; is

10  that right?

11  A    It's not something that I do as a rule, no.

12  Q    And, in fact, you have to rely upon others; is that true?

13  A    That's correct.

14  Q    Now, ultimately, if, if the Court permits it today, you

15  intend to testify about a match of the DPS records to the no

16  match list that was provided by the Department of Justice; is

17  that right?

18  A    I don't believe that it was the no match list; I believe

19  that it was the list of -- my understanding is it was a list of

20  voters.

21  Q    I see.  So, but, nevertheless, what you -- what your

22  department has done is taken the DPS race ID. and compared it

23  with the race ID.s that have been used in an expert report in

24  this case; is that right?

25  A    I'm not aware that that's an expert report, but, yes, it

1    was a comparison of a file provided from the Department of

2    Justice and files that we provided from DPS.

3    Q    Now I understand based upon what your testimony in your

4    deposition is, but that's not something that you did, that's

5    something people who work for you did; is that true?

6    A    That is correct.

7    Q    It's also my understanding, based solely on the fact that

8    we just received this a little more than 24 hours ago, but it's

9    my understanding that this analysis has been performed in,

10   would you say, the last week and a half?

11   A    No, sir.  I believe it was performed on the 4th or 5th of

12   September.  So it would have been last -- like a week ago

13   today, I believe.

14   Q    Last week.  So were you present for any discussions when

15   it was decided when or how this would be produced to the

16   Plaintiffs in this case?

17   A    When?  No, sir.  I've been in discussions with the

18   attorneys from, from the Attorney General's Office, but not

19   specifically about when it was going to be provided.

20   Q    So I suppose you couldn't enlighten us at all in why it

21   was 24 hours or so ago that we first learned about your

22   analysis?

23   A    I don't know that.

24   Q    I do want to show you a few things.  Did you help the

25   department -- the Office of the Attorney General prepare some

1   of the filings or descriptions of you as a witness in this

2   case?

3   A    I'm sorry, could you --

4   Q    Sure.

5   A    -- restate?

6   Q    And maybe I ought to explain.  When we have a lawsuit, the

7   parties have to disclose their witnesses.  And I just want to

8   know if you helped review those and edit those.

9          **MR. SCOTT:**  Your Honor, is this voir dire on the

10  underlying issue?  This seems like cross examination.

11         **THE COURT:**  Argument, probably, for the Court.

12         **MR. DUNN:**  All right.  That's fine, Judge.

13  **BY MR. DUNN:**

14  Q    So, lastly, I guess I want to, just to understand,

15  Mr. Crawford, whatever it is that you can tell us about these

16  race ID. matters pertains to activities that somebody else in

17  your department took; is that right?

18  A    That is correct.

19  Q    And the code was constructed in order to do this

20  comparison; is that true?

21  A    That is correct.

22  Q    And I assume you provided that to the Attorney General's

23  Office, the actual code?

24  A    I did not personally, no.

25  Q    Well, I can tell you it hasn't been provided to the

1   Plaintiffs in this case.  Was that your decision?

2   A    No, sir.

3   Q    And then, in terms of the data set or the, the output, so

4   to speak, from this code that you -- that your office

5   performed, have you provided that to the Attorney General's

6   Office?

7   A    One more time, please.

8   Q    Sure.  After the code is run, this code that your

9   department developed, after it's run it comes up with an

10  output; is that right?

11  A    Yes.

12  Q    Has that output actually been provided to the Attorney

13  General's Office?

14  A    Yes.  It's, it's this exhibit.

15  Q    Well, and let me -- let me be more precise.  The exhibit,

16  as I understand it, is a summary --

17  A    That's correct.

18  Q    -- of the output; is that true?

19  A    That is correct.

20  Q    So what I'm asking you is has the actual output been

21  provided to the Attorney General's Office?

22  A    Well, this is the output.  The summary is what the code

23  was constructed to do.

24  Q    Well, the code ultimately went and flagged individual

25  entries, would you agree, in its comparison?

1   A    No, I would not.  Flag individual entries?  No, sir.

2   Q    But your testimony to this Court, that when that formula

3   was run, when that algorithm was run, you received nothing else

4   from the computer system, other than what's on this table?

5   A    I, personally, did not.

6   Q    And that's because this was actually performed by somebody

7   else in your office; is that right?

8   A    That's correct.

9        **MR. DUNN:**  Your Honor, at this point, I'm not going

10  to move to exclude this testimony, but I hope I've demonstrated

11  that its late disclosure, and the fact that this witness didn't

12  actually perform it undermines its reliability.

13       **THE COURT:**  All right.

14       **MR. SCOTT:**  And, your Honor, a couple of points:

15  one, the data that he's talking about that he -- that Mr. Dunn

16  has said they didn't have is the Department of Justice

17  Ansolahehere -- I'm sorry, the common interest Ansolahehere

18  data output that was pursuant to an order of this Court and

19  provided to the State of Texas, that is the data that he took

20  on one of the comparisons, from Dr. Ansolahehere.

21       The second is the data that was provided by the

22  Department of Public Safety to the common interest Plaintiffs

23  that designated the race on every one of these individuals, the

24  race field.  So all the underlying data has, in fact, been

25  provided and is there.

1          **THE COURT:**  But, but you don't just get to take that

2    data and have someone do an analysis on it and then spring it

3    on the other side.  Right?

4          **MR. SCOTT:**  Well, I think that if it was sprung, I

5    would agree.  We're simply trying to rebut what the testimony

6    that was -- Dr. Ansolahehere rendered at trial, from the

7    standpoint of race comparison.

8          **THE COURT:**  But that's something that could have

9    been -- with what you had and the information that the state

10   had, that could have been done already.  It was not necessary

11   to wait until now.

12         **MR. SCOTT:**  I think that's right.  You're right.

13         **THE COURT:**  All right.  So let's move on.

14         **MR. SCOTT:**  So, Brian, will you bring that up?

15                    **DIRECT EXAMINATION (RESUMED)**

16   **BY MR. SCOTT:**

17   Q    Mr. Crawford, in your capacity as manager of the

18   information -- what's the name of the section, the division?

19   A    Let me think for a minute, Licensing Services

20   Applications.  Sorry.

21   Q    It's okay.  First time you ever testified?

22   A    Yes, sir.

23   Q    How many times have you been in Federal Court?

24   A    Only in this room, yesterday and then a couple of weeks

25   ago, and today.

Crawford - Direct / By Mr. Scott                    17

1   Q    So, but the underlying foundation of the information

2   that's here, where did the DOJ race column information come

3   from on, for purposes of identification, Defendants' 2746?

4   A    The, the race information was provided in a file of

5   approximately 13 1/2 million records that the Attorney

6   General's Office sent us.  And my understanding is that it came

7   from the Department of Justice.

8   Q    Over here, the next column it says, "DPS race"; is that

9   correct?

10  A    Yes, sir.

11  Q    Where did that come from?

12  A    That is a listing of the -- of the races that can be

13  entered into the driver license database.

14  Q    And who -- and so it's entered by someone, either the

15  customer service representative whom they receive it from a

16  customer or just a citizen trying to get an ID. card, a

17  driver's license, or an EIC; is that correct?

18  A    Yes, that's correct.

19  Q    That's self-identified information; is that correct?

20  A    Yes, sir.  The customer provides that information when he

21  or she fills out the -- an application form.

22  Q    The VUID count over here, what is that?

23  A    That is -- so we -- when we match the Department of

24  Justice data against the DPS driver license data, we matched

25  approximately 12.6 million records.  Of those, 309,487 were

1   designated Asian in the Department of Justice data set.  We

2   compared that race information to the race information for the

3   matching record, and the DPS data set.  So, for example, of the

4   309,000 records that had Asian as a designation, we found

5   216,782 that had that designation in the DPS data.

6   Q    So a comparison was made from the material that was

7   provided by DOJ as, as to the race.  The data that was in the

8   data field was provided by DOJ, which is the self-identified in

9   this column as Asian, and over here is how many out of that

10  data field matched up between those two documents; is that

11  correct?

12  A    That's correct.  Out of that 309,487, 216,782 were

13  designated Asian.

14  Q    So, for instance, here is a person who has been identified

15  as Asian.  They have self-identified with the DPS public

16  records as being Hispanic, and there were 1,750 of those out of

17  this 309,487; is that correct?

18  A    That is correct.

19  Q    Okay.

20       **MR. SCOTT:**  So Brian, if you'll switch up -- if

21  you'll move the chart up, please?  Stop for a second.

22  Q    So, again, DOJ race Black, self-identified White, how many

23  VUID would have been incorrectly -- well, not incorrectly, but

24  not matched?

25  A    Well, that -- of the -- for those designated Black in the

Crawford - Direct / By Mr. Scott                    19

1    Department of Justice file, there were 1.5 million, 1.57

2    million, 1,189,000 matched.  Those were also designated Black,

3    345,564 were designated White.

4    Q    Okay.  So, and then let's go to the Caucasian.  DOJ race

5    designation, White, correct?

6    A    Yes.

7    Q    DPS self-identified records, public records, Black, and

8    how many of those were like that?

9    A    433,787.

10   Q    So that means that there were misclassified as Anglos in

11   the DOJ material, 433,000 people who, in fact, are African

12   American, correct -- or self-identified themselves as Black?

13   A    They identified themselves as, as African American, yes,

14   as Black.

15   Q    Okay.

16        **MR. SCOTT:**  Brian, if you'll move this -- reduce

17   that, please?

18   Q    So, over here to the right-hand side we have an additional

19   breakout.

20        **MR. SCOTT:**  I guess, one more thing.  Brian, go to

21   Page 2.  Bring up the Hispanic, or just enlarge that whole

22   area.

23   Q    So, DOJ race designation, Hispanic, correct?

24   A    Yes.

25   Q    What's the DPS race for Hispanic over here in this column?

Crawford - Direct / By Mr. Scott                          20

1    A    That's the H.

2    Q    Okay.  And how many of the ones out of the 2.7 million who

3    were identified by DOJ as Hispanic, and DPS self-identified

4    public records had as Hispanic, how many was the total count?

5    A    717,857.

6    Q    So, go down, drop down to the bottom one.  Hispanic in

7    DOJ's document, DPS self-identified race, White, how many were

8    those?

9    A    1,784,838.

10   Q    American Indian, what is the designation -- so, walk

11   through -- walk the Court through, if you would, the DPS self-

12   identified race identifier that's in our -- the public record.

13   A    The A designation is Asian and Pacific Islander; B is

14   Black; H is Hispanic; I is American Indian and Alaskan Native;

15   O is other; and W is White.

16   Q    And those are all self-identified by the customer,

17   correct?

18   A    That is correct.

19   Q    Is there any kind of -- I mean, you-all don't attempt to

20   try and classify people, do you?

21   A    We do not.  We take whatever -- the customer service

22   representative takes whatever is entered on the form,

23   whatever's disclosed by the, the applicant and enters that into

24   the driver license database.

25   Q    And that is the material that's contained in your records,

1    the Department of Public Safety records that you're in charge

2    of?

3    A    That's correct.

4    Q    Okay.

5         **MR. SCOTT:**  Okay.  If you'll reduce that, Brian, and

6    go back up to Page 1, please, sir.  If you'd enlarge this

7    section over here.

8    Q    Tell us what we're looking at.

9    A    That is the summary of the, the number of records that

10   matched in the first column.  For example, 216,782 matched on

11   Asian; 92,656 were different, between DOJ and DPS data.

12   Q    With regard to the DOJ -- so, next, next door to that

13   you've got DPS and DOJ same, correct?

14   A    That's correct.  That was a match.

15   Q    So, and by "match," it means simply that they are the

16   same?  I mean, the designation by DOJ and the report that they

17   produced on race classification, and the self-identified

18   Department of Public Safety records are the same, correct?

19   A    That's correct.

20   Q    Now, the next column is DPS and DOJ different.  What's,

21   what's contained within that column?

22   A    That's a summary of the number of records that had a

23   different race designation between DPS and DOJ data.

24   Q    And so, when we look down at -- is -- what the total down

25   here, what is that 3.1 -- 3,151,228 related to?

1    A    Of the records that we match, the 12.6 million, I believe,

2    is the number at the bottom of the page, those are the

3    number -- that's the number that were different, which the race

4    designation was different between the Department of Justice and

5    DPS data.

6    Q    The last column, it is another set of numbers that's to

7    the right, it's in yellow highlighted, but why are those

8    numbers -- what -- explain that column.

9    A    In -- until 2010, Hispanic was not a choice that could be

10   made in the DPS database.  In other words, you couldn't self-

11   identify as Hispanic.  That capability became possible in 2010.

12   So that is the number of people who either applied for an

13   original driver license or ID. card, or who renewed their

14   license in a driver license office since 210 -- I'm sorry,

15   since 2010.

16   Q    So --

17   A    And --

18   Q    So let me stop you there.  Prior to 2010 -- and I think

19   it's November 2009 was the first time we started collecting

20   that data as a state?

21   A    The very end of 2009 was in three offices, that's when it

22   began.

23   Q    And that was the first time that the designation

24   "Hispanic" was set out by itself; is that correct?

25   A    That is correct.

1   Q    Okay.  With regard to that, are the numbers in the right-

2   hand side, those have all been developed as a result of self-

3   identification subsequent to this 2010 date; is that correct?

4   A    That's correct.

5   Q    Okay.  And what is the total of misclassifications since

6   2010 and the Hispanic information has been being captured?

7   A    The total of all of them is 1,813,217.

8   Q    So does that mean then that the Hispanic -- I guess I want

9   to make sure we can clarify something.  How is it possible then

10  that we have Hispanic over here in the middle column that is

11  different than this number over on the far hand -- right-hand

12  side?

13  A    Because since 2010 -- and let me make sure I got this

14  clear -- since 2010 the option of, of entering Hispanic as a

15  race in the driver license database became possible, so that

16  1,047,000 people who were designated Hispanic in the Department

17  of Justice data had the opportunity to enter Hispanic as a race

18  in the driver license database.

19  Q    So how often does the field turn over?  So we've got how

20  many records, approximately, in the system?

21  A    In the -- in the total driver license database --

22  Q    Yes.

23  A    -- I believe it's about 28 million.

24  Q    But you compared this only to the data extracted from

25  January and -- that were provided to the common interest

Crawford - Direct / By Mr. Scott                           24

1    Plaintiffs, and in July after the DPS snafu, those documents

2    were providing -- another 3.1 million approximate records were

3    provided, correct?

4    A     That's, that's correct.

5    Q     And out of that grand universe, and only out of that grand

6    universe, was this match done as evidenced in Defendants'

7    Exhibit 2746 for identification purposes, correct?

8    A     That is correct.

9    Q     Okay.

10          **MR. SCOTT:**  Your Honor, at this time we would offer

11   Defendants' Exhibit 2746.

12          **MR. DUNN:**  Your Honor, we have the reliability

13   objections that we made earlier and others that we're going to

14   tease out in cross examination, so -- but we don't object to

15   the admission of the exhibit, just that, that it's hearsay and

16   that it shouldn't be relied upon for any matter.

17          **MR. SCOTT:**  The underlying records are from public

18   records to the --

19          **THE COURT:**  Okay.  Anyone --

20          **MR. SCOTT:**  -- Department of Justice.

21          **THE COURT:**  Anyone else?  So then --

22          **MR. SCOTT:**  I'm sorry.

23          **THE COURT:**  Go ahead.

24          **MS. BALDWIN:**  Again, we're not going to try and

25   preclude the testimony, but it's likely that at the end we're

1  going to ask your Honor to not give the testimony any weight as

2  improper expert testimony.

3          **THE COURT:**  It's going to the weight, but no

4  objection to its admissibility, is what I'm hearing.

5          **MR. DUNN:**  Yes.

6          **THE COURT:**  Okay.  So, it will be admitted.

7      **(Defendants' Exhibit Number 2746 was received in evidence)**

8          **MR. SCOTT:**  Pass the witness.

9          **MS. BALDWIN:**  Good morning, Mr. Crawford.

10         **THE WITNESS:**  Good morning.

11         **MS. BALDWIN:**  Just let me get situated.  One moment.

12     **(Pause)**

13         **MS. BALDWIN:**  And if I could approach the witness,

14  your Honor, just to him a copy --

15         **THE COURT:**  Yes.

16         **THE WITNESS:**  Thanks.

17                        **CROSS EXAMINATION**

18  **BY MS. BALDWIN:**

19  Q    Good morning.  And I'm Anna Baldwin representing the

20  United States.  We've met before at your deposition.

21  A    Yes.  Good morning.

22  Q    Good morning.  So, I just wanted to -- I don't want to

23  belabor some of the points that you've discussed with Mr. Scott

24  and also with Mr. Dunn, but in practical terms at the

25  Department of Public Safety, you supervise a team of people who

                     Crawford - Cross / By Ms. Baldwin                    26

1   actually do programming and coding, correct?

2   A      That is correct.

3   Q      And you don't do that work yourself?

4   A      That is correct, I do not.

5   Q      And you didn't do any of the underlying work that went

6   into this chart that we've seen this morning yourself?

7   A      I did not.

8   Q      So, just in order to understand the steps that had to be

9   taken to make up this chart, the DPS database is a relational

10  database made up of a lot of interlocking tables; is that

11  right?

12  A      The database is, yes, that's correct.

13  Q      And so, just to get the information out of that database,

14  you have to write programming code to extract relevant

15  information, right?

16  A      That is correct.

17  Q      And you didn't do that?

18  A      I did not.

19  Q      And, in fact, because you don't code, you don't know -- if

20  you saw the code, could you even be sure that it was accurate

21  and correctly done?

22  A      I could not, no.

23  Q      Okay.  So that's the first task that has to be done, is

24  the actual extract of the relevant records from DPS to be

25  compared.  The second task, you said there was a match done and

Crawford - Cross / By Ms. Baldwin                    27

1    this is sort of in the conversation you were having with

2    Mr. Scott almost just assumed, it -- you can't just

3    automatically take these records from the voter registration

4    database and say, "Oh, it matches to this record from the

5    driver's license database," right?  You have to develop

6    matching criteria, right?

7    A    That's correct.  That is correct.

8    Q    And you're not at all expert in developing matching

9    criteria, are you?

10   A    I am not.

11   Q    Do you even know what the matching criteria were that were

12   used in that?

13   A    Yes, I -- I believe that I do.

14   Q    And what were those?

15   A    The first match was on driver license number and last

16   name.  And, so, if you get a match there, on those two

17   elements, then that's considered a good match.  For records

18   that didn't match there, another criteria was, I believe,

19   social security number and last name.  I don't have the -- all

20   of the criteria here, but --

21   Q    So -- so, sitting here today, you're not actually sure

22   what matching criteria were used.

23   A    I can't repeat that to you.

24        **MR. SCOTT:**  Objection.  Mischaracterizes the

25   evidence.  He's identified two (indiscernible).

Crawford - Cross / By Ms. Baldwin                    28

1           MS. BALDWIN:   Two.  But there were more than two,

2    right?

3           THE WITNESS:   I --

4           THE COURT:   Overruled.

5           THE WITNESS:   There were -- I believe there were

6    four.

7    BY MS. BALDWIN:

8    Q     And do you know what the other two were?

9    A     I can't recall off the top of my head, no.

10   Q     And would you understand that what the specific matching

11   criteria are could be important to how records are connected?

12   A     Yes.

13   Q     And using better or worse criteria could result in a

14   correct identifying two people who are actually the same or

15   using poor criteria could result in connecting people who

16   aren't actually the same?

17   A     Yes.

18   Q     But, again, sitting here today, you don't actually know

19   what was done?

20   A     I know what was done; I can't recall the specific details

21   without referring to some notes or some information from the

22   developer.

23   Q     Okay.  Because you weren't the developer.

24   A     I was not the developer.  That's correct.

25   Q     And you don't have any expertise to evaluate the

Crawford - Cross / By Ms. Baldwin                    29

1    appropriateness of those steps that were taken, in any event,

2    do you?

3    A    Expertise?  Well, I'd say that in years of I.T.

4    experience, I have experience in understanding what it takes to

5    match two records together.

6    Q    Okay.  Have you done any peer-reviewed studies of database

7    matching?

8    A    I have not.

9    Q    Do you keep up with the scholarship on the best techniques

10   in database matching?

11   A    I personally do not.

12   Q    So -- and, then, so we've talked about there is the

13   extraction stage, there's the matching stage, and then there's

14   the comparing the actual -- once the records have been matched,

15   comparing what the race is in one dataset with what the race is

16   in another dataset, correct?

17   A    Yes.

18   Q    And that also takes a separate set of code to make that

19   comparison, correct?

20   A    Yes.

21   Q    And you didn't write that code.

22   A    I did not.

23   Q    And if you reviewed that code, you would have no basis to

24   know whether there were errors in it or not.

25   A    I personally would not.

Crawford - Cross / By Ms. Baldwin                              30

1    Q    So, essentially, if I understand your testimony, you

2    didn't do the extraction; you didn't do the match; and you

3    didn't do the comparison of the race; and, in fact, on some of

4    those steps you don't know what was done, you don't know how it

5    would do it, but you're just asking the Court to trust you and

6    vouch that the information that you've put up is accurate.  Is

7    that correct?

8    A    I -- I trust the people who work for me to know how to do

9    those jobs.  So, yes, when they tell me that -- that they've

10   done the work correctly, then -- then, yes, I believe them,

11   based on my experience in working with them.

12   Q    So, your testimony today is based solely on what you were

13   told by someone else.

14   A    That is correct.

15   Q    Somebody who's not here in the courtroom and who, in fact,

16   hasn't even been identified to the plaintiffs.

17   A    For this particular extract, yes.

18   Q    Now, I saw that you were in court some yesterday.  Were

19   you here during the testimony of Dr. Hood?

20   A    I'm sorry; which -- who was Dr. Hood?

21   Q    Sure.  Dr. Hood is an expert who was retained by the

22   State.  He was talking about some of the matching --

23   A    Yes, I was here for part of his testimony.

24   Q    Okay.  And, so, did you know that -- again, Dr. Hood was

25   retained by the State of Texas?

EXCEPTIONAL REPORTING SERVICES, INC

Crawford - Cross / By Ms. Baldwin                    31

1    A    I did not know that before, no, before being in the

2    courtroom.

3    Q    Do you know that Dr. Hood has done his own database

4    matching in prior cases?

5    A    I was not aware of that, no.

6    Q    Do you know why the State asked the Department of Public

7    Safety to do this matching rather than its own expert who it

8    hired for this litigation and has done matching in previous

9    cases?

10   A    I do not.

11   Q    You understand that -- this work that you did here, I just

12   want to get clear on the timeline of it as well.  When was the

13   first time that DPS conducted any comparison of the race

14   information from information produced by the plaintiffs to DPS

15   self-identified race?

16   A    I believe that we received the file on -- last week, on

17   September 3rd, and the matching exercise began on the 4th of

18   September.

19   Q    Okay.  So, DPS, your testimony is, had done nothing prior

20   to look at any mismatches between race I.D.'s prior to

21   September 3rd.

22   A    Not to my recollection, no.

23   Q    But that involvement, of course, wasn't DPS's first

24   involvement in data used in this case, right?

25   A    That's correct.

1    Q     Okay.  And you understand that DPS was required to produce

2    to the United States an extract of the DPS database showing

3    people who have driver's licenses or personal I.D.'s, right?

4    A     Yes.

5    Q     And for that case, that production occurred way back in

6    February, right?

7    A     Yes.

8    Q     And the February production was supposed to be a snapshot

9    of certain information from the driver's license database as it

10   existed on January 15th, 2014, right?

11   A     That is correct.

12   Q     And there were serious errors in the production of that

13   January 15th extract; isn't that true?

14   A     There were errors.  There were -- there was missing data,

15   yes.

16   Q     In fact, there were millions of driver's license and

17   personal I.D. records that should have been extracted and

18   produced back in February that weren't, right?

19   A     That is correct.

20   Q     And that happened because of a programming error by DPS

21   staff.

22   A     That is correct.

23   Q     Somebody at DPS wrote incorrect computer code, and it

24   resulted in millions of records being omitted from a very

25   straightforward process of extracting data from the database,

1    right?

2    A    I'm not sure I would agree that it was straightforward.

3    Q    Okay.

4    A    It's a very complex database.

5    Q    Okay.  So, it's a complex database, and the extraction was

6    done incorrectly, and millions of records were omitted.

7    A    That's correct.

8    Q    And the process you've just put up here, extraction is

9    only the first step.  You have to do several other programming

10   steps after that, right?

11   A    Well, the data that was used here had already been

12   extracted, so extraction was not part of this exercise.

13   Q    Okay.  Going back to January, though, so there was an

14   error that resulted in millions of records being omitted,

15   correct?

16   A    That's correct.

17   Q    And at your deposition we talked about how in the normal

18   course of business at DPS code that was used for the January

19   extract would have been subject to review by a quality

20   assurance team, correct?

21   A    I'm sorry; would you repeat that, please.

22   Q    At your deposition in January -- at your deposition we

23   talked about how in the normal course of business at DPS code

24   like the code that was used for the January extract would have

25   been subject to a quality assurance team review.

1    A    In the normal course of business, yes, that's true.

2    Q    But for that data production in this case, there was no

3    quality assurance team, right?

4    A    That's correct.

5    Q    And that happened because you weren't given adequate time,

6    your staff wasn't given adequate time to do the extract, right?

7    A    We were not given adequate time to include a formal

8    quality assurance activity.

9    Q    And in your deposition you testified that you were

10   concerned about having to run that extract quickly, right?

11   A    Yes.

12   Q    And you were concerned about the accuracy, potentially,

13   given the quickness, that that could have an impact.

14   A    I was concerned about how quickly we needed to provide the

15   data, yes.

16   Q    And you also testified that it would have been your usual

17   practice, when you have a concern about the accuracy of your

18   work that you were being asked to do, that you would express

19   that concern to others.

20   A    Yes.

21   Q    And you also testified that -- excuse me.  Strike that.

22        Notwithstanding the concern that you couldn't follow

23   the normal quality assurance process and you didn't -- you

24   know, you were concerned about the amount of time, you didn't

25   realize that this mistake had been made until July.  Is that

Crawford - Cross / By Ms. Baldwin                    35

1    correct?

2    A    That's correct.

3    Q    So, months passed before anybody had any idea that the

4    data that all the parties in this case were relying on was

5    incomplete.

6    A    That's correct.

7    Q    So, if we could pull up the Crawford declaration; and next

8    page; and -- so, zoom into paragraph three.

9              So, this paragraph reviews what we have just been

10   talking about, that for data that was produced in February, it

11   took until July 22nd to realize, you know, more than six months

12   later, that there had been a problem with the programming,

13   right?

14   A    Yes.

15   Q    And, so, again, just as a comparison, this process

16   happened last week, and nobody, outside of DPS, has had a

17   chance to review the code that was used for the information you

18   presented to the Court today.

19   A    That's correct.

20   Q    So, in your declaration you told the Court that --

21             If we could zoom out of that paragraph; can we go to

22   the next page?  Can we zoom in on paragraph five?

23             -- said that the misapplication of the data qualifier

24   resulted in the inadvertent exclusion of approximately 2.8

25   million records.  And that 2.8 number that you provided there

Crawford - Cross / By Ms. Baldwin                    36

1   turned out to be inaccurate, correct?

2   A    It was -- it was low, yes.

3   Q    What DPS ultimately produced to the Department of Justice

4   was not 2.8 million records, but 3.1 million records, right?

5   A    That's correct.

6   Q    So, the number of records that you told the Court in a

7   sworn declaration would be affected was off by about 300,000,

8   correct?

9   A    That is correct.

10  Q    And didn't you testify in your deposition that the

11  2.8 million figure that you had put in that sworn statement had

12  just been based on a guess?

13  A    It was based on an estimate by the programmer that was --

14  that was addressing this issue.

15  Q    If you could turn in your deposition to page 67.

16            Shirley, let's pull this up on the screen if we

17  could; 67 line four -- 24.

18            **MR. SPEAKER:**  I'm sorry; which line?

19            **MS. BALDWIN:**  So, we'll start at line 24.  How did --

20  and then we'll go to the next page.

21  **BY MS. BALDWIN:**

22  Q            "QUESTION:  How did someone arrive at the estimate of

23            2.8 million?

24            And your answer:

25            "ANSWER:  I believe that Bob Brandel examined some of

Crawford - Cross / By Ms. Baldwin                           37

1              the database parameters" --

2              We're on the next page.

3              -- "to get a rough idea of what would be -- what the

4              number would -- would likely be.

5              "QUESTION:  In more concrete terms, can you explain

6              what you mean by 'examine database parameters'?  If

7              you look at a count of the number of status records

8              that appeared on the database, which I believe was

9              over four million, with the assumption that some of

10             those records would have appeared in the January

11             extract, it's just a rough estimate based on that

12             number.  In other words, taking the number of four

13             million, it's just a guess based on a proportion."

14             And your answer was:  "Yes."

15   A    A guess based on a proportion, yes.

16   Q    Okay.  And did you tell the Court in your sworn statement

17   that 2.8 was -- million records being affected was just a

18   guess?

19   A    A guess based on a proportion.

20   Q    You put that in your sworn statement to the Court, that

21   the 2.8 million number of records affected was a guess based on

22   a proportion?  We can pull up your declaration, but I don't --

23   A    Yes.

24   Q    -- believe that language appears in it.

25             Could we go back to the declaration?  If we could go

1    to the next page.

2              So, I see in paragraph five:

3              "The misapplication of the data qualifier resulted in

4              the inadvertent exclusion of approximately

5              2.8 million records."

6              There is no qualification that that's a guess based

7    on a proportion, is there?

8    A    No.  It says approximately.

9    Q    Okay.  So, I want to move on and talk about what you've

10   been asked to do today.  So, you talked with Mr. Scott about

11   the fact that there was a long period of time during which DPS

12   did not give anyone the option to self-identify as Hispanic,

13   correct?

14   A    That is correct.  Prior to 2010 that was not an option.

15   Q    So, if we could bring up Plaintiffs' 942; and the second

16   page.  If we could go to the prior -- in the first paragraph,

17   prior to May, 2010, and zoom in on that first paragraph.

18             "Prior to May, 2010" --

19             And this is a letter that we've seen a number of

20   times before from the director of elections to the Department

21   of Justice sent in 2012.

22             "Prior to May, 2010, the DPS followed Federal Office

23             of Management and Budget guidelines, which does not

24             categorize Hispanic as a race.  Thus, in following

25             DOJ's directive to match voter registration lists

Crawford - Cross / By Ms. Baldwin                    39

1              with the list of driver's license and I.D. holders

2              produces anomalous and highly misleading results.

3              Due to the recent addition of Hispanic to the

4              driver's license and personal I.D. application, the

5              number of Hispanic I.D. holders in Texas is

6              exponentially higher than DPS's raw data indicates."

7              You don't have any basis to disagree with that

8    statement, do you?

9    A    I've never seen it before --

10             **MR. SCOTT:**  Your Honor, under the rule of optional

11   completeness, may the witness be able to read the rest of the

12   document?

13             **THE COURT:**  Yes.

14             **MR. SCOTT:**  Do you have a copy for the witness?

15             **MS. BALDWIN:**  Sure.  I'm happy to hand up a copy.

16             **MR. SCOTT:**  Specifically, that portion that applies

17   to November -- that they started capturing that information,

18   November 29, 2009.

19             **MS. BALDWIN:**  And, Mr. Scott, I don't have the --

20             **MR. SCOTT:**  What is this?

21             **MS. BALDWIN:**  This is Plaintiffs' 942.  I don't have

22   the Excel spreadsheets that were attached, but I do have the

23   complete letter.

24             And the portion I was reading from is on this

25   paragraph.

1          **THE WITNESS:**  And you want me to read --

2          **MS. BALDWIN:**  I think Mr. Scott wanted --

3          **MR. SCOTT:**  You were about to review the document.

4          **THE WITNESS:**  Okay.

5          **MR. SCOTT:**  Your Honor, may I approach the witness?

6          **THE COURT:**  Yes.

7          **MR. SCOTT:**  Just to look at it; I don't have a copy

8    either.

9          **(Pause)**

10   **BY MS. BALDWIN:**

11   Q    Okay.  So, my question is, you don't contest that there

12   are errors that still today remain in DPS's race data because

13   until fairly recently a major demographic group in the state of

14   Texas, Hispanics, had no option of correctly self-reporting

15   their race.

16   A    I don't think I am in a position to say whether those are

17   errors or not.

18   Q    So, if I got a -- if I identified as Hispanic and I got a

19   driver's license in January, 2009, and I had no option to

20   choose Hispanic, you don't think that anything that the person

21   selected would be an error because they don't actually identify

22   as any of those races?

23   A    I don't personally have the kind of background to

24   understand what that means.

25   Q    Okay.

1   A    At the time that someone applies for a license and is

2   required to provide information, it's whatever information is

3   available to provide.

4   Q    Right.  And, so, but there certainly could be a scenario

5   where, until very recently, the option that a person wanted to

6   select, who is Hispanic, wouldn't have been available to them,

7   correct?

8   A    Hispanic was not an available choice --

9   Q    Okay.

10  A    -- in the January, 2010, that you -- example that you

11  cited.

12  Q    So, as a result of not having Hispanic as an option, there

13  are a number of entries -- I mean, well -- strike that.  Let me

14  step back.

15        So, your testimony is you don't know whether there

16  are any errors or not as relates to Hispanic self-I.D.'s in the

17  DPS driver license database?

18  A    Uh, what would you -- I don't know what your definition of

19  "error" is.

20  Q    Someone who, in fact, identifies themselves as Hispanic

21  that's not identified as Hispanic in the driver's license

22  database.

23  A    If the option wasn't there, I don't see how that could be

24  classified as an error.

25  Q    But it wouldn't correctly represent their self-

1    identification, right?

2    A    If someone wanted to identify as Hispanic and couldn't,

3    then they couldn't.

4              MS. BALDWIN:  Right.  Okay.

5              Well, I'd just like to -- I'm going to hand up an

6    exhibit just because it's an excerpt from the driver license

7    database and which has been, you know, marked as highly

8    confidential, so I, you know, wouldn't want to publish that to

9    the Court without consent.  I can hand around a copy.

10             MR. SCOTT:  Yeah, I -- I mean, I think that's the

11   goal; we're trying to keep confidential information of the

12   citizens out of the record, so --

13             MS. BALDWIN:  And it's been redacted to have social

14   security and address information taken out.

15        (Pause)

16             MS. BALDWIN:  And I apologize for the small type on

17   this.

18   BY MS. BALDWIN:

19   Q    Mr. Crawford, do you know who Rafael Edward Cruz is?

20   A    I do not.

21   Q    Can we pull up the Texas Tribune website that I sent

22   earlier?  And could we click on the link that says "Ted Cruz,"

23   and I'll represent to you that he's much more commonly known

24   under the U.S. Congress Senators?  All the way on the other

25   side.  Get my pointer.

Crawford - Cross / By Ms. Baldwin                     43

1          MR. SPEAKER:  Here?

2   BY MS. BALDWIN:

3   Q    Now, can -- now, in this -- this is an excerpt from the

4   driver license database.  Do you see under "race" where it

5   identifies Rafael Edward Cruz as white?

6   A    Yes.

7   Q    Do you have any knowledge of whether Senator Ted Cruz is,

8   in fact, Hispanic?

9   A    I personally do not, unless -- well, just based on the

10  information that's on the screen there.

11  Q    Okay.  Let's look at the next entry on this sheet, which

12  is for Filemon Bartolome Vela.  If we could hit the "back" and

13  look under the Congressional delegation; scrolling down, under

14  the B's.  All the way at the bottom; can we keep -- can we --

15  whoo.  Can we click right there?

16          MR. SPEAKER:  No.

17          MS. BALDWIN:  Vela, not Veasey.  Vela.

18          MR. SPEAKER:  Okay.

19  BY MS. BALDWIN:

20  Q    And, Mr. Crawford, what race does the DPS driver license

21  database identify Mr. Vela as?

22  A    White.

23  Q    And in this public profile what race is he identified as?

24  A    Hispanic.

25  Q    Okay.  Let's hit "back" again.  And if we could take a

1   look at Ruben Eloy Hinojosa.  And in the driver license

2   database what race is U.S. Congressman Hinojosa identified as?

3   A    White.

4   Q    And what race is he identified as here in this public

5   profile?

6   A    Hispanic.

7   Q    Okay.  If we could go back, and if we could take a look at

8   U.S. Representative Cuellar, Henry Cuellar; what race is

9   Enrique Roberto Cuellar identified as by DPS?

10  A    Hispanic.

11  Q    Hispanic.  And here is a case -- the entire Congressional

12  delegation doesn't appear to be misidentified.  If we could hit

13  "back."

14       Now, the next two entries on your sheet are Joaquin

15  and Julian Castro.  Do you know who those men are?

16  A    Yes, I believe that they're brothers, and one -- I believe

17  one is a Congressman and the other is a former mayor of San

18  Antonio.

19  Q    Right, who is currently a cabinet member?

20  A    Yes.

21  Q    And they're twins, right?

22  A    Yes.  That's my understanding.

23  Q    And do you see that DPS has identified one of them as

24  white and the other as Hispanic?

25       MR. SCOTT:  Objection --

Crawford - Cross / By Ms. Baldwin                          45

1          THE WITNESS:  DPS did not --

2          MR. SCOTT:  -- to form, your Honor.  I think the

3    representation by this witness -- it mischaracterizes his

4    testimony.  The information in the public database that is the

5    Department of Public Safety records is self-identified

6    information from the customer who is registered.  And I think

7    that's the only testimony that this witness has said, so I

8    object to the mischaracterization of the evidence.

9          MS. BALDWIN:  The DPS database identifies one of --

10         THE COURT:  I don't remember --

11         MS. BALDWIN:  Oh, I'm sorry.

12         THE COURT:  -- the question now, as it was phrased,

13   so start over.

14         MS. BALDWIN:  Okay.  I'll withdraw whatever that

15   question was, your Honor, and ask it better.

16   BY MS. BALDWIN:

17   Q    You would agree that in the DPS database one of these men,

18   who are brothers, is identified as White and the other as

19   Hispanic.

20   A    That's what's contained in the DPS database according to

21   this sheet, yes.

22   Q    Okay.  Let's take a look at Pete Gallego, Representative

23   Pete Gallego.  And in the DPS database what race is

24   Representative Gallego listed as?

25   A    White.

Crawford - Cross / By Ms. Baldwin                        46

1    Q    And here we see in this public profile that he's

2    identified as Hispanic, correct?

3    A    Hispanic.  Yes.

4    Q    And there are a few more, but just last, do you know who

5    Alberto Gonzalez is?  The --

6    A    It --

7    Q    -- the former Attorney General of the United States?

8    A    The former attorney -- yes.  I -- I recognize that name.

9    Q    Yes, sir.

10   A    There is no identification here that says that's who that

11   is, but --

12   Q    I'll represent to you based on the data brick that that

13   is, in fact, the former attorney general; and what race is he

14   listed as in the DPS database?

15   A    White.

16   Q    Okay.  So, do these -- these are anecdotal examples, but I

17   want to look at the demonstrative that you've actually created

18   for this case.

19         If we could bring up what I called the "new proffer";

20   and go to the next page.  Zoom in big on that, please.

21         So, if I understand, every individual represented in

22   the charts that appear on the left-hand side, that's you know,

23   representing a voter who you're saying has matched to the DPS

24   database.  So, it -- each of those numbers represents a

25   registered voter who, based on the match, would have a DPS form

1   of I.D.  Is that correct?

2   A     That is correct.

3   Q     Okay.  And, so, this chart doesn't, by itself, list the

4   number of registered voters who are Hispanic, in total,

5   according to DPS race classifications, right?  It just breaks

6   out -- in other words, it goes -- the Catalist, or what's

7   referred to here as Anso race, and then the concordance with

8   the DPS race, but it -- this -- the demonstrative never gives a

9   total for in total of all the people who matched, how many

10  people DPS says are Hispanic, right?

11  A     I'm sorry; could you do that one more time, please?

12  Q     Sure.  If I wanted to figure out, based on the match, the

13  total number of registered voters who DPS has identified to be

14  Hispanic and have a driver's license database, that number

15  isn't already given in this chart.

16  A     Well, DPS doesn't identify anyone as Hispanic.  The -- the

17  individuals do.

18  Q     Sure.  And I don't mean to be tripping up over that.  But

19  the self-identification, if I wanted to know the number of

20  people who've self-identified as Hispanic who are registered

21  voters, there's -- who you matched -- there's not one number

22  that represents that in this chart.

23        **(Pause)**

24  A     Would you ask it one more time, please?

25  Q     Sure.

Crawford - Cross / By Ms. Baldwin                    48

1   A    It's --

2   Q    If I wanted to know how many people DPS has in its

3   database listed as Hispanic, there's not one number who are

4   registered voters; you never give a summary note total,

5   Hispanic registered -- Hispanic, according to DPS self-I.D.'s,

6   Hispanic registered voters, right?  That's not a number that's

7   already added up.

8   A    It's not, because we don't know who registered voters are.

9   Q    But based on your match, you don't provide a summary of

10  the match total.  Everybody on this chart is registered voters,

11  as you just testified.

12  A    Okay.

13  Q    Okay.  So, if we wanted to figure out the total number of

14  people who matched and who are identified in the DPS database

15  as Hispanic, would you agree with me that we would take from

16  each of those boxes the number of "H" for Hispanic here, the

17  number for "H" for Hispanic here, the number for "H" for

18  Hispanic here, and so on, and just add those up, and that would

19  be all the people who are matched who have a I.D. in the DPS

20  database as Hispanic?

21  A    Yes, I believe that's correct.

22  Q    Okay.  Well, let's do that math.  If I could approach with

23  a calculator?

24       **(Pause)**

25            So, starting in this chart, let's enter 1,750 and add

                        Crawford - Cross / By Ms. Baldwin                49

1    11,814, and then add 68,737.  If we could go to the next page,

2    so, the number Hispanics listed here is 717,857, and add to

3    that 869, and add to that 2,639.  And what total do you get?

4    A    I get 803,666.

5    Q    Me, too.  So, that number seems awfully low to me.

6    Doesn't it to you?  That out of 12 million voters who matched

7    to an I.D., only a little over 800,000 Hispanic registered

8    vote -- people who are Hispanic have a DPS I.D., if this is the

9    metric you're using?

10   A    And what's your question?

11   Q    Doesn't it seem awfully low to think that there are only

12   800,000 Hispanic registered voters with an I.D. in the state of

13   Texas out of 12 million?

14   A    I -- I don't have the -- the knowledge to -- to speculate

15   on -- on how many there should be.

16   Q    So, there is a figure called "Spanish Surname Voter

17   Registration."  Have you ever heard of that?

18   A    I have not.

19   Q    Okay.  Just so we can define it, let's pull up PL-694 and

20   go to page 16 of this document.  This is a document from the

21   Texas Legislative Council.  And just as a basis for my

22   question -- I'm sorry; it's page 10.  It was 16 of the PDF.

23              "Spanish Surname Voter Registration, also reported in

24              the Secretary of State's statewide voter registration

25              database, is generated using a comparison to the 2000

1          Census Bureau list of Spanish surnames.  While most

2          sources agree that the match between people who have

3          Spanish surnames and those who consider themselves

4          Hispanic is relatively good in Texas, the Census

5          Bureau estimates a 90-percent correlation for this

6          state.  The number of reported registered voters with

7          Spanish surname is not a precise measure of Hispanic

8          voter registration."

9          And it continues.

10          So, basically, the idea of this is the Secretary of

11  State keeps a list of voters who have Spanish surnames.  So

12  that we can compare how that 800,000 number of people listed as

13  Hispanic in the DPS database compares to the Spanish surname

14  voter registration population, I'd like to just briefly show

15  you --

16          Could you bring up the C-235 redistricting report?

17          And I'm just going to show you this so you can see

18  that it's the basis for the next demonstrative and where the

19  figures are taken from.  This is a document that was created --

20          Can you zoom in, in the top corner over there?

21          By the Texas Legislative Council.

22          You can hide that now.

23          And this list -- this is for all the congressional

24  districts in the state, and it lists the total voter

25  registration and the percentage of Spanish surname voter

Crawford - Cross / By Ms. Baldwin                    51

1   registration.  And, so, I'm just showing you this chart just as

2   the basis for everything in the next demonstrative is coming

3   from.

4         If you could pull up the C-235 redistricting

5   demonstrative.

6         So, this lists for each of the congressional

7   districts the total voter registration, the same percent of

8   Spanish surname voter registration, and then the raw total of

9   registered voters who have Spanish surnames.  And when you sum

10  all of those numbers, you get -- if you can hide that pull-

11  out -- you get this total number of 2.9 million.

12        Two point nine million is an awfully lot larger than

13  the 803,666 figure on your demonstrative, isn't it?

14  A    They're two different numbers, yes.

15  Q    Okay.  So, you're not taking the self-reported race

16  information in DPS's database as the actual truth, are you?

17  That's just what, based on the available options at any one

18  time, what was entered, as far as you understand?

19  A    That is the information that was entered into the

20  database, yes.

21  Q    And if -- it's likely that if one were to try and take

22  that as the truth and to try and say, oh, this represents the

23  number of Hispanics, it would likely significantly undercount

24  Hispanics based on the simple fact that there was no option to

25  self-identify until very recently, right?

1    A    I -- I don't think that I am in a position to express an

2    opinion on that.

3    Q    Okay.  Well, the 2.9 and 800,000 kind of speak for

4    themselves.

5          We talked a little bit about this, but I just want to

6    make sure we're clear that every time, prior to the option

7    being available, that a Hispanic person was forced to self-

8    identify and not given the option of Hispanic and they chose

9    another race, that could be something that makes those other

10   categories, like White or Black, not represent the actual truth

11   of how that person self-identifies as well.  Wouldn't you

12   agree?

13   A    If the option wasn't there that a person wanted to choose,

14   that person would have to choose one of the available options.

15   Q    Right.  And you wouldn't have any way to know, sitting

16   here today, which option somebody would have chosen if they

17   weren't presented with Hispanic.  There is no way to know what

18   calculus every individual had to go through to make those

19   choices.

20   A    That's correct.

21   Q    And, so, there is no way to know how many people actually

22   identified as Hispanic and chose White.

23   A    That's correct.

24   Q    And there is no way to know how many people actually

25   identified as Hispanic and chose Black.

Crawford - Cross / By Ms. Baldwin                      53

1  A    That's correct.

2  Q    So, you don't have any basis to disagree with something

3  that Mr. Ingram wrote in the letter, which you have up there,

4  that:

5              "It's impossible to identify which racial

6              classifications Texans of Hispanic descent selected

7              on I.D. applications completed prior to May, 2010.

8              For this reason, DPS's race data for racial

9              classifications other than Hispanic are no doubt

10             significantly distorted."

11             It's on the second page of that letter.  If you'd

12 pull up PL-942.

13 A    Yeah, I can't -- oh, I see what you're --

14 Q    You don't have any basis to disagree with -- with that

15 statement?

16 A    I don't have any basis to -- to disagree or make any kind

17 of judgment on it.

18 Q    Okay.  If we could go back to the Crawford demonstrative,

19 please; and the first page of the chart.  Could we zoom in on

20 this part of the page?

21             Do you know that prior to circulating this version of

22 the chart your counsel circulated another version that had

23 different labels of these?  For the DPS and Anso same and DPS

24 and Anso different?

25 A    Yes.

                     Crawford - Cross / By Ms. Baldwin                54

1   Q    And do you recall what the -- this column originally was

2   called?

3   A    I'm sorry; could you point it out?  That one -- I believe

4   that was initially labeled "correct."

5   Q    And this one was originally labeled --

6   A    That was originally labeled "incorrect."

7   Q    And why were those changed?

8   A    Because --

9           **MR. SCOTT:**  Your Honor --

10          **THE WITNESS:**  -- I believe --

11          **MR. SCOTT:**  -- to the extent it involves

12  conversations with counsel, I would assert the attorney-client

13  privilege.  Department of Public Safety is one of our clients.

14  They have been sued in this lawsuit --

15          **THE COURT:**  Sustained.

16          **MR. SCOTT:**  -- representing them.

17  **BY MS. BALDWIN:**

18  Q    You would agree that it would be misleading to have called

19  this "correct" and "incorrect" based on the fact that Hispanics

20  didn't have an option to self-report race.

21          **MR. SCOTT:**  Objection to form.  Argumentative.

22          **THE COURT:**  Overruled.

23          **THE WITNESS:**  Would you -- one more time, please?

24  Q    This chart would have been significantly misleading had

25  this label been "correct" and this label been "incorrect" given

1    that Hispanics didn't have the option to self-report race until

2    very recently.

3    A    I'm not sure that I would agree with the word

4    "misleading."

5    Q    It wouldn't necessarily -- that data wouldn't necessarily

6    represent those people's own correct self-identifications,

7    because they didn't have the option to do so.

8    A    Yes.  I agree.

9    Q    And, so, it would have been misleading to have called this

10   "correct" and this second column "incorrect."

11   A    I -- I can't say that I would agree with the statement of

12   "misleading."

13   Q    So, this column here, DPS and Anso different, who applied

14   for original card or renewed their card in a field office since

15   2010, what's the purpose of separating out the 2010 data here?

16   A    Because Hispanic was an available choice in the driver

17   license database starting in 2010; so that those people who

18   either got an original driver license or I.D. card or who

19   renewed their license in a -- in a DPS office, in a driver

20   license office, had the option of selecting Hispanic as race in

21   the race category.

22   Q    But it's not something that's automatically updated, is

23   it?

24   A    No.

25   Q    Okay.  Could you pull up, please, the Germane (phonetic)

1    Martinez deposition at page 35? 9:05:24

2              Do you know Germane Martinez?

3    A    I do.

4    Q    Okay.  This is from a deposition that she gave as a Rule

5    30(b)(6) witness in 2012.  And let's see; let's look at -- if

6    we could zoom in on line three.

7              And she was asked:

8              "QUESTION:  Once information as to certain licensee's

9              ethnicity in terms of whether they're Hispanic or not

10             is in the system, how is that information treated in

11             the system?  By that I'll be much more specific.  Do

12             you go back and revise the prior information?

13             "ANSWER:  No, sir.  It's only" --

14             And I believe that's supposed to be "updated" --

15             "-- when the applicant reapplies for some reason and

16             if they choose to change it on their application at

17             that time."

18             This testimony from a 30(b)(6) witness represents

19   that it would only be updated at the time of making a totally

20   new application.  Are you saying that this testimony is -- do

21   you have a basis to believe that this is incorrect?

22   A    My understanding, and -- and remember I'm an I.T. person

23   not a driver license division employee.  My understanding is

24   that when -- if you go into a driver license office to renew

25   your license, you do have the option of updating information

                    Crawford - Cross / By Ms. Baldwin          57

1    about your -- that's associated with your particular license.

2    Q    But, as you just said, you're an I.T. person, not a

3    business person, right?

4    A    That's correct.

5    Q    And you don't work in the field offices.

6    A    I do not.

7    0Q    And you're not familiar with all of the procedures that

8    occur in the field offices.

9    A    I am not.

10   Q    And this is someone who is a 30(b)(6) designee for the

11   Department of Public Safety, and she testified that it's only

12   at reapplication that there would be a option to change it.

13   So, do you have any personal knowledge that allows you to say

14   that this statement is incorrect?

15   A    I don't think it --

16         **MR. SCOTT:**  Your Honor, that's why we've done the

17   chart the way we did, and so I don't know that this is

18   proper -- well, sorry.

19         **THE COURT:**  Go ahead.

20         **THE WITNESS:**  I'm sorry?

21         **THE COURT:**  Go ahead.  You can answer.

22         **THE WITNESS:**  Okay.

23         **THE COURT:**  You can respond.

24      **(Voices and whispers off the record)**

25   //

1   **BY MS. BALDWIN:**

2   Q    Does this language here -- just to be clear, does this say

3   "renewal" or "reapply"?

4   A    Renewal.  I don't know what "reapplies for some reason"

5   means in that context.

6   Q    But it doesn't say that it happens at renewal, does it?

7   A    That does not say that.  That's correct.

8   Q    If we could go back to the Crawford demonstrative.  And

9   go -- keep going.  Can you zoom in on that chart, I think?

10          So, this chart shows for each racial group in here

11  that Anso race, I understand, is information that was taken

12  from the file from the Department of Justice?  This is

13  information from the Department of Justice file here in this

14  Anso race column?

15  A    I believe that's correct, yes.

16  Q    And the same with this race confidence, highly likely,

17  likely, possibly?  Is that --

18  A    That's my understanding, yes.

19  Q    Okay.  And, then, the DPS and Anso same; what does this

20  column represent?

21  A    That represents records in which the race field matched

22  between the DPS and the Department of Justice data.

23  Q    And the DPS and Anso different is where they didn't match?

24  A    That's correct.

25  Q    And, then, the sum is just the total of both of these?

Crawford - Cross / By Ms. Baldwin                               59

1   A    That's correct, yes.

2   Q    Okay.  So, if I wanted to find out the percentage that was

3   correct -- let me not say correct -- the percentage that was

4   the same between the DPS database and the DOJ file for, for

5   example, Blacks, who had this highly likely race confidence,

6   would you agree that I would divide four thousand four hundred

7   fourteen six fifty-four over the sum?

8   A    Yes.  To -- that would produce the percentage, yes.

9   Q    Could you do that for me?

10  A    And which -- which number?  Four fourteen --

11  Q    The four fourteen six --

12  A    -- six fifty-four?

13  Q    Yes, sir; over the sum.

14  A    That says 95.6 percent.

15  Q    Okay.  And let's do the likely.  What percentage are the

16  same for African Americans who are likely?

17  A    That's 79.2 percent.

18  Q    Okay.  And Black possibly?

19  A    I got 65.5 percent.

20  Q    Okay.  So, those are the percentages overlap between the

21  DOJ Catalist race estimates and the DPS reports.  Do you know

22  that your -- a version of this chart was initially circulated

23  to all parties in this case that had those percentages on the

24  chart?

25  A    I don't recall seeing that.  I might have, but I don't

Crawford - Cross / By Ms. Baldwin                                    60

1  recall seeing it.

2  Q    Okay.  Well, they're not here now, at any rate.

3              THE COURT:  Do you have an objection?

4              MR. SCOTT:  Well, your Honor, to the extent that

5  she's referring to demonstratives which by agreement of the

6  parties we were going to provide and we did, in fact, provide

7  to the other side all potential demonstratives we'd be using,

8  we've decided to just use this one so far, so that's the only

9  one.

10             THE COURT:  Okay.

11             MS. BALDWIN:  And my question is just whether he knew

12 that there was another demonstrative that had this math already

13 stated on it.

14             THE COURT:  Okay.

15             THE WITNESS:  I -- I don't recall seeing it.  I may

16 have, but I don't specifically remember seeing it.

17 BY MS. BALDWIN:

18 Q    Okay.  Let's do the same for the Caucasian highly likely,

19 if we could.  So, the percentage overlap, when you divide the

20 same over the sum.

21 A    That's 96.35 percent.

22 Q    Okay.  And the likely?

23        (Pause)

24 A    I'm sorry; I typed it in wrong.

25 Q    No problem.

Crawford - Cross / By Ms. Baldwin                61

1  A    I've got to start over.  Just a second.  Four four five
2  three seven nine two divided by four six -- oh, no, I'm sorry.
3  I did it wrong again.  We're talking about Caucasian likely.
4  Q    Caucasian likely; so that --
5  A    Eighteen -- eighteen ninety-three --
6  Q    Seven twenty-two.
7  A    -- seven two two --
8  Q    Over two --
9  A    -- divided by two zero --
10 Q    Five two.
11 A    -- five two --
12 Q    Six one seven.
13 A    -- six one seven.  I did something wrong again.  I'm
14 sorry.
15 Q    That's okay.
16 A    I --
17 Q    The percentages are what the percentages are.  We can all
18 clearly understand that you can calculate the percentage
19 overlap from this.
20        The outlier in terms of the percentage overlap is
21 with the Hispanic numbers; wouldn't you agree?  These have a
22 significantly lower percentage being the same than the
23 Caucasian and the Black.
24 A    It -- it would appear to be the case, yes.
25 Q    And that could certainly be because of the lack of the

1    ability to self-identify as Hispanic.

2    A    That would be a logical assumption, yes.

3    Q    Okay.  The last thing I just wanted to ask, you had

4    previously testified that throughout this process you relied on

5    your staff to make accurate data comparisons, correct?

6    A    Yes.

7    Q    Just the same as you relied on them to do the January data

8    extract correctly.

9    A    Yes.

10             MS. BALDWIN:  That's all.

11             MR. DUNN:  Your Honor, we have no further questions.

12             THE COURT:  All right.  Mr. Scott, then?

13             MR. SCOTT:  No redirect, your Honor.  We ask that

14   this witness be excused.

15             THE COURT:  All right.  Thank you, sir.  You can step

16   down.

17             THE WITNESS:  Thank you, your Honor.  Do I leave

18   everything here?

19             THE COURT:  Yes.  We'll get it.

20             THE WITNESS:  Okay.

21             MR. SCOTT:  (indiscernible) hand this to the Court.

22             THE WITNESS:  Thank you.

23        **(Witness stepped down; pause)**

24             MR. SCOTT:  Your Honor, we're -- going to be some

25   readings, I think, of some excerpts of depositions at this

Mitchell / by excerpt of Deposition                    63

1   point in time, your Honor.

2           THE COURT:  Okay.

3       **(Pause; voices and whispers off the record)**

4           MS. WOLF:  Your Honor, Lindsey Wolf for the

5   defendants.  We're going to present the trial testimony of

6   Major Forrest Mitchell both from the bench trial in the

7   Section 5 case as well as Major Mitchell's deposition in this

8   case, and I would just note for the record the bench trial

9   transcript that we handed your Honor is a little bit broader

10  than what we'll be reading into the record today.  And I'll be

11  starting from the trial testimony from the Section 5 case.

12          THE COURT:  Okay.

13              **EXAMINATION OF FORREST MITCHELL**

14            **BY EXCERPTS OF DEPOSITION TESTIMONY**

15      **(QUESTIONS READ BY MS. WOLF; ANSWERS READ BY COUNSEL)**

16          "QUESTION:  What is it that you do for the Texas

17          Attorney General's Office?

18          "ANSWER:  I'm a state criminal investigator with

19          supervisory responsibility.

20          "QUESTION:  And where do you currently live?

21          "ANSWER:  I live in Austin, Texas, with my wife and

22          children.

23          "QUESTION:  How long have you worked for the Office

24          of Attorney General in Austin?

25          "ANSWER:  Since -- in September it will be 15 years.

Mitchell / by excerpt of Deposition                    64

1        "QUESTION:  And what did you do when you first joined

2        the office?

3        "ANSWER:  When I first joined the office, I was

4        assigned to the prosecution assistance division, and

5        our job was to travel around the state and help

6        smaller, rural jurisdictions in the capital murder

7        prosecutions.

8        "QUESTION:  And what was your next position with the

9        Office of Attorney General after that?

10       "ANSWER:  In June of 2005 I was promoted to the rank

11       of lieutenant with special -- with the Special

12       Investigations Unit.

13       "QUESTION:  Can you tell the Court what it is that

14       the Special Investigations Unit does?

15       "ANSWER:  Yes.  The Special Investigations Unit is a

16       team of -- or has a team of investigators that

17       conduct criminal investigations in a wide variety of

18       areas.  Some of these areas include money laundering,

19       human trafficking, public integrity, white-collar

20       crime, and election violations.  I also have a team

21       of investigators who assist local D.A.'s with

22       criminal cases as well.

23       "QUESTION:  When was this unit formed, sir?

24       "ANSWER:  It was formed in the summer of 2005.

25       "QUESTION:  And how many law enforcement officers do

Mitchell / by excerpt of Deposition                65

1        you supervise total within the SIU?

2        "ANSWER:  There are 40 investigators in the Special

3        Investigations Unit.

4        "QUESTION:  How -- do all of those work on elections

5        investigations?

6        "ANSWER:  No, sir, only a portion.

7        "QUESTION:  And, in fact, of the 64 officers under

8        your charge, how many work on election violations?

9        "ANSWER:  We currently have three investigators

10       assigned to work election cases in the State of

11       Texas.

12       "QUESTION:  And how do you refer to that subgroup of

13       the SIU?

14       "ANSWER:  We refer to them as the elections team.

15       "QUESTION:  Now, what are the types of election code

16       violations that the election team investigates?

17       "ANSWER:  It would be illegal voting and other

18       violations of the Texas Election Code or Penal Code

19       offenses surrounding elections.

20       "QUESTION:  And let's focus on the illegal voting

21       cases for a moment.  Are there different types of

22       illegal voting cases that you investigate?

23       "ANSWER:  Yes, sir.  Under Chapter 64 of the Texas

24       Election Code, the offense of illegal voting is kind

25       of broken into four categories:  The first category

Mitchell / by excerpt of Deposition                    66

1    would be an ineligible voter casting a ballot in an

2    election; another would be voter impersonation;

3    another example is a voter who votes more than once

4    in an election; and then the final type of illegal

5    voting is a person who marks a ballot contrary to the

6    instructions of a voter.

7    "QUESTION:  Okay.  Now, one of the things you said is

8    'voter impersonation.'  What is that?

9    "ANSWER:  Voter impersonation is when someone uses

10   another's identity to cast a ballot in an election,

11   either to vote again or to vote in an election

12   they're not eligible to vote in.

13   "QUESTION:  Now, I want to talk first before we go

14   into that in more detail about the referral

15   investigation process.  How does the SIU learn of

16   potential cases of election violations?

17   "ANSWER:  The Office of the Attorney General receives

18   investigative referral requests from a wide variety

19   of sources.  The first would be the Texas Secretary

20   of State's Office; another source would be the local

21   district and county attorneys, and then also from

22   elections administrators and then from local law

23   enforcement.  And then when the Attorney General's

24   Office receives these referrals, they're routed to

25   the Special Investigations Unit.

Mitchell / by excerpt of Deposition                    67

1      "QUESTION:  So we're clear, does the Office of

2      Attorney General ever initiate investigations on its

3      own without a referral?

4      "ANSWER:  By our policy, we're referral driven.

5      "QUESTION:  Are all election violation referrals to

6      the Office of Attorney General typically routed to

7      the SIU office?

8      "ANSWER:  Yes, sir.

9      "QUESTION:  Does the SIU or the Office of Attorney

10     General's office have sole jurisdiction over election

11     violation cases within the State of Texas?

12     "ANSWER:  No, sir.  Local district and county

13     attorneys have concurrent jurisdiction on elections,

14     and also the federal government has jurisdiction in,

15     I would presume, national elections.

16     "QUESTION:  Now, are those county D.A.'s or county

17     attorneys, are they required to refer to the Office

18     of Attorney General cases to you, or can they

19     prosecute those on their own?

20     "ANSWER:  There's no legal requirement for the local

21     county and district attorneys to refer a case to us.

22     They have concurrent jurisdiction and they're capable

23     of investigating and prosecuting those on their own.

24     "QUESTION:  In addition to your supervisory

25     responsibilities, have you personally been assigned

Mitchell / by excerpt of Deposition                      68

1              to investigate election violations?

2              "ANSWER:  Yes, sir.  I have been assigned cases and I

3              have assisted in investigation of election code

4              offenses.

5              "QUESTION:  And do you keep track of all election

6              violation cases that are referred to your office?

7              "ANSWER:  Yes, sir, I do."

8         **MS. WOLF:**  And we're going to skip to page 42,

9    line 22.

10             "QUESTION:  Now, after you receive the referral and

11             enter it on your spreadsheet, what do you do after

12             that?

13             "ANSWER:  Well, we evaluate the case and make sure

14             that the criminal investigation is warranted, and

15             then it would be approved -- or it would be assigned

16             to a member of the elections team to investigate."

17        **MS. WOLF:**  And we're going to skip to page 44, line

18   three.

19             "QUESTION:  Does your election spreadsheet contain

20             federal investigations of election violations?

21             "ANSWER:  No, sir.  We don't have information on

22             federal prosecutions or investigations.

23             "QUESTION:  All right.  Now, in terms of referrals of

24             election violations to SIU for investigation, how

25             many have been referred?

Mitchell / by excerpt of Deposition                    69

1        "ANSWER:  Since approximately 2002, there have been

2        320 referrals made to the Office of the Attorney

3        General.

4        "QUESTION:  And of those 320 referrals, how many

5        different Texas counties does that represent?

6        "ANSWER:  I believe it represents 97 of the 254

7        counties.

8        "QUESTION:  Now, you talked about the referral

9        process and sometimes you don't proceed with it.  So

10       let me ask you, of the 320 referrals, how many has

11       the SIU actually investigated?

12       "ANSWER:  Since 2004, we've investigated a total of

13       186 cases.

14       "QUESTION:  So, of the 186 investigated cases that

15       SIU has investigated, in general terms, the types of

16       election code violations, what types of election code

17       violations did those involve?

18       "ANSWER:  These could be illegal voting or other

19       violations of the Texas Election Code or Penal Code

20       offenses.

21       "QUESTION:  Of the 186 cases, how many of those have

22       been referred for prosecution?

23       "ANSWER:  Sixty-two.

24       "QUESTION:  Of the 62 cases that have been referred

25       to prosecution, how many have resulted in positive

Mitchell / by excerpt of Deposition                    70

1        outcomes or convictions?

2        "ANSWER:  I believe that number is 50.

3        "QUESTION:  One of the areas you described earlier is

4        illegal voting, and I think one of those types is in-

5        person voter fraud.  So I want to ask you, of the 62

6        cases referred for prosecution, how many of those

7        involved voter impersonation?

8        "ANSWER:  There are a total of six cases that

9        involved voter impersonation that were prosecuted.

10       "QUESTION:  And of those 62 cases referred for

11       prosecution, how many involve in-person voter

12       impersonation?

13       "ANSWER:  There have been five cases that have been

14       sent for prosecution involving in-person voter

15       impersonation.

16       "QUESTION:  Does this tally include any referrals

17       from the May primaries?

18       "ANSWER:  No, sir.

19       "QUESTION:  Is there any case that you've

20       investigated that comes to mind that involves in-

21       person voter impersonation?

22       "ANSWER:  Yes, sir, there is a case.

23       "QUESTION:  Can you tell the Court the general facts

24       of that case?

25       "ANSWER:  This case involved the 2009 Progreso

Mitchell / by excerpt of Deposition                71

1      Independent School District election down in Hidalgo

2      County, and this case involved two brothers and their

3      mother who went to the polling place.  One brother --

4      I'm sorry, if I may clarify.  One brother was

5      actually incarcerated in the state penitentiary in

6      San Antonio.  The other brother went to the polling

7      place with the incarcerated brother's voter

8      registration certificate and he presented himself as

9      if he were his brother.

10              "This was discovered by a poll worker

11     inside the location, and she alerted the election

12     judge.  However, since the voter had a lawful voter

13     registration certificate, the elections department

14     let him proceed to vote.

15     "QUESTION:  Now, were there -- other than the two --

16     other than the brother who attempted to vote on

17     behalf of the other brother, was there another

18     defendant involved in that case?

19     "ANSWER:  Yes, there was.  The other defendant, Reyna

20     Almanza, is the mother of two sons, and she was

21     actually present with Lorenzo Antonio Almanza, and

22     she interjected with the election judge and vouched

23     for the identity of her son who was using the

24     impersonation -- the impersonated voter registration

25     certificate.

1      "QUESTION:  How is it that the case -- how was it

2      that case was discovered and brought to the attention

3      of the authorities?

4      "ANSWER:  The case was brought to light through the

5      poll worker who was present at the polling place.

6      "QUESTION:  And the poll worker, did she know both

7      brothers?

8      "ANSWER:  Yes, she did.  The poll worker actually

9      went to high school with the incarcerated brother.

10     "QUESTION:  As a supervisor or an investigator with

11     SIU, you've worked on cases involving voter

12     impersonation at the polling place?

13     "ANSWER:  That's correct.

14     "QUESTION:  From your experience, can you tell us how

15     difficult it is to detect in-person voter

16     impersonation at the polling place?

17     "ANSWER:  I would say it's very difficult to detect.

18     "QUESTION:  Why is that?

19     "ANSWER:  Because it would require somebody at the

20     polling place actually having personal knowledge of

21     the voter who is presenting themselves as the

22     impersonated voter, and then they would also

23     additionally have to be able to observe how that

24     person is checked in during the accepting a voter

25     process.

Mitchell / by excerpt of Deposition                    73

1       "QUESTION:  As compared to mail-in voting fraud, how

2       difficult is in-person voter impersonation to detect

3       or investigate?

4       "ANSWER:  I believe in-person voter impersonation is

5       more difficult to detect than mail-in ballot, for

6       instance, voter impersonation.  And it really deals

7       with the amount of time that the suspect spends with

8       the voters.  In mail-in ballot cases, they spend a

9       great deal of time with the voters and use their

10      mail-in ballots to cast the election.  In voter

11      impersonation cases, there's very little interaction

12      with the witnesses, so frequently they're unable to

13      identify the suspects through a conventional photo

14      array.

15      "QUESTION:  In addition to this case, have you -- are

16      you aware of any other additional pending voter

17      impersonation cases within the State of Texas?

18      "ANSWER:  Pending criminal cases?

19      "QUESTION:  Yeah, currently.

20      "ANSWER:  We currently have two pending criminal

21      cases in the state of Texas right now with the

22      Attorney General's office that involve voter

23      impersonation.  One is the Mara Comparion case out of

24      Bexar County and then the second case is Lorenzo

25      Antonio Almanza, the one in Hidalgo County.

1        "QUESTION:  Are you aware of any others that your

2        office is not pursuing or investigating?

3        "ANSWER:  No, I'm not aware.

4        "QUESTION:  Are you familiar --

5        "ANSWER:  I apologize.

6        "QUESTION:  Okay.

7        "ANSWER:  I am aware -- sorry.  I am aware of another

8        case that is being investigated by a local District

9        Attorney up in Tarrant County where a mother had her

10       son vote in an election.

11       "QUESTION:  Are you familiar with the voter ID bill

12       at issue in this case, Senate Bill 14, just generally

13       the terms?

14       "ANSWER:  Yes, I am.

15       "QUESTION:  Does Senate Bill 14 increase the

16       penalties for voter impersonation?

17       "ANSWER:  Yes, sir, it does.  It affects all types of

18       illegal voting, not just voter impersonation.  It

19       enhances the penalty for a criminal attempt from a

20       Class A misdemeanor to a state jail felony and then

21       it also enhances the actual offense of illegal voting

22       from a third-degree felony to a second-degree felony

23       and that would apply to all four types of illegal

24       voting.

25       "QUESTION:  And then you identified a second -- or a

Mitchell / by excerpt of Deposition                    75

1    sixth case and I believe you identified that as

2    Tarrant County?

3    "ANSWER:  Well, sir, I identified a case that we were

4    also involved in which was the Melvin K. Ponce

5    investigation which was a mail-in ballot voter

6    impersonation.

7    "QUESTION:  In the Melvin K. Ponce case, that would

8    not have been covered by SB 14 had it been in place;

9    isn't that correct?

10   "ANSWER:  Into what regard?

11   "QUESTION:  In regards SB 14 would not have stopped

12   the Melvin K. Ponce case; isn't that correct?

13   "ANSWER:  It could have had a deterrent effect.

14   "QUESTION:  And just so I'm clear, SB 14 as it's

15   drafted deals specifically with voter impersonation

16   at the polling place.  Isn't that your understanding?

17   "ANSWER:  No, sir.  It is drafted in that one of the

18   portions of SB 14 deals with the offense of illegal

19   voting and there are four categories of that and it

20   enhances the penalty range for all four types of the

21   offense.

22   "QUESTION:  SB 14 would not have presented the case

23   of Dolores McMillan -- SB 14 would not have prevented

24   the case of Dolores McMillan because it occurred

25   before the polls open; isn't that correct?

Mitchell / by excerpt of Deposition                    76

1       "ANSWER:  Again, I believe there could have been a

2       deterrent effect based upon the statute but it

3       wouldn't -- but it would not have prevented her from

4       doing so.

5       "QUESTION:  And then finally the last case that you

6       mentioned was -- and actually didn't mention it by

7       name but Jack Crowder, III.  Would that be one of the

8       voter impersonation cases that you're identifying

9       here today for the judges?

10      "ANSWER:  Yes, sir.  That is Jack Carol Crowder and

11      that was the 2008 general elections in Harris County,

12      Houston, Texas.

13      "QUESTION:  Now, the allegation for the Jack Carol

14      Crowder case is that he voted on behalf of his

15      deceased father; is that accurate?

16      "ANSWER:  Yes, sir.  He presented his deceased

17      father's voter registration certificate and cast a

18      ballot in that election.

19      "QUESTION:  And how do you know he presented his

20      father's voter registration card?

21      "ANSWER:  I believe he told me that and he provided

22      the voter registration certificate to us during an

23      interview.

24      "QUESTION:  Of all the types of voter fraud that you

25      investigate as an investigator, which is the most

Mitchell / by excerpt of Deposition                77

1       difficult to detect?

2          "ANSWER:  I would think in-person voter

3          impersonation.

4          "QUESTION:  With respect to the Almanza case, can you

5          tell us who has been charged in that fact pattern

6          that you described early in your testimony?

7          "ANSWER:  Both Lorenzo Almanza and Reyna Almanza were

8          charged with illegal voter impersonation and then

9          Reyna Almanza has been convicted by Brooks County

10         Court for illegal voting -- voter -- voting

11         impersonation.

12         "QUESTION:  And the other case is pending; is that

13         correct?

14         "ANSWER:  Yes, sir.

15         **MS. WOLF:**  And now we'll switch to Major Mitchell's

16     deposition from August 12th, 2014.

17         "QUESTION:  All right, Major Mitchell.  We're still

18         talking about the Prosecutions Resolved portion of

19         your spreadsheet and we've identified the different

20         cases since the -- since your last deposition --

21         sorry.  And we've identified the 17 different cases

22         since the -- since your last deposition.  Of those

23         17, how many involved charges of in-person voter

24         impersonation?

25         "ANSWER:  There's only one case that's specifically

Mitchell / by excerpt of Deposition                78

1          illegal voting -- voter impersonation was charged and

2          convicted.

3          "QUESTION:  And that's Mr. Almanza; is that correct?

4          "ANSWER:  Yes, sir, Lorenzo Antonio Almanza, Jr.

5          "QUESTION:  And what can you tell me about that case?

6          "ANSWER:  I believe I testified in my trial and in

7          the deposition that the facts and the circumstances

8          of that case were Lorenzo Antonio Almanza presented

9          himself at the Progreso School District election and

10          utilized his brother's voter registration

11          certificate.  His brother at the time -- I believe

12          his name was Orlando Almanza -- was in custody in

13          San Antonio in the state penitentiary when that

14          election occurred and that Lorenzo used his voter

15          registration certificate to vote a second time in

16          that election.

17          During the course of the -- when he presented himself

18          to the elections officials there, a poll watcher

19          observed the name that was being put down on the

20          combination form and recognized that this was not

21          Orlando Almanza.  This was his brother, Lorenzo

22          Antonio, Jr., and brought that attention of

23          -- brought that to the attention of the election

24          judge.  It was at that point in time, I believe, that

25          the mother, who had previously been convicted in our

Mitchell / by excerpt of Deposition                     79

1           -- at the time of my deposition and at the time of

2           the trial, that she interjected herself and began to

3           argue with the elections judge and election workers,

4           vouching that that was, indeed, her son Orlando and

5           not Lorenzo.  And the elections administrator for

6           that school district election allowed him to vote,

7           which became a second vote in that election,

8           utilizing his brother's voter registration

9           certificate.

10          "QUESTION:  Put differently, you were able to

11          investigate and prosecute Mr. Almanza for what he did

12          without an SB 14 photo identification requirement in

13          effect, correct?

14          "ANSWER:  Yes, sir, because we had a witness who was

15          able to positively identify that suspect.

16          "QUESTION:  Right.  Was Mr. Almanza a part -- were

17          there allegations in Mr. Almanza's case that this was

18          part of a kind of coordinated effort to affect the

19          outcome of the election at issue?

20          **MS. WOLF:**  There's an objection.

21          "ANSWER:  This case involved many allegations

22          involving many people.

23          "QUESTION:  And, Mr. Almanza, I believe we said, pled

24          guilty to illegal voting/voter impersonation and he

25          was sentenced to two years in TDCJ; is that right?

Mitchell / by excerpt of Deposition                    80

1      "ANSWER:  Yes, sir.  That refers to Texas Department

2      of Criminal Justice and that would be our state

3      penitentiary.

4      "QUESTION:  Sure.  This is Page 5 of your own

5      spreadsheet which may be easier for you to use.  And

6      you're -- so you're referring to 000237?  Oh, I'm

7      sorry.

8      "ANSWER:  So you're referring to 000237?

9      "QUESTION:  Yes, sir.

10     "ANSWER:  In Gillespie County?

11     "QUESTION:  Yes, sir.  I think it's eight up from the

12     bottom.

13     "ANSWER:  Yes, sir, okay.

14     "QUESTION:  Starting with that and then going four

15     pages of the spreadsheet to Page -- well, it actually

16     carries over to Page 13, Texas I.R. 000245, the very

17     top entry.  You have what appears to be hundreds of

18     referrals that were made on the same day that all

19     have the same allegation listed, which is illegal

20     voting, voter impersonation, deceased voter that were

21     referred from the Secretary of State's office.  Am I

22     -- am I understanding that spreadsheet correctly?

23     "ANSWER:  Yes, sir.

24     **MS. WOLF:**  And there's an objection.

25     "QUESTION:  And those are from counties across Texas,

Mitchell / by excerpt of Deposition                    81

1          it appears; is that correct?

2          "ANSWER:  Yes, sir.  There are multiple counties that

3          are listed in this -- in that -- in these referrals.

4          "QUESTION:  Can you provide me any background on how

5          these referrals came from the Secretary of State's

6          office?

7          **MS. WOLF:**  And there's an objection.

8          "ANSWER:  These come to the Secretary -- these come

9          from the Secretary of State's office like all of our

10         referrals come from the Secretary of State's office.

11         A packet was prepared that was referred to the

12         director of law enforcement and then given to our

13         criminal justice intake division --

14         "QUESTION:  Uh-huh.

15         "ANSWER:  And containing allegations of deceased

16         voters --

17         "QUESTION:  Uh-huh.

18         "ANSWER:  -- who were voting in elections throughout

19         all the different counties mentioned in the

20         spreadsheet and the various elections mentioned in

21         the spreadsheet.

22         "QUESTION:  But you don't recall anything

23         specifically about this bucket of a couple hundred

24         referrals?

25         "ANSWER:  I think it's 254 referrals.

Mitchell / by excerpt of Deposition                82

1      "QUESTION:  Two hundred and fifty-four.

2      "ANSWER:  And I don't know specifically exactly how

3      they were identified in each one.

4      "QUESTION:  But it is unusual -- and I'm just looking

5      at your spreadsheet.  At least there's no other

6      occasion that I can tell where the Secretary of

7      State's office has sent over this volume of referrals

8      at once, is there?

9      **MS. WOLF:**  And there's an objection.

10     "ANSWER:  There's one case that we received

11     allegations of illegal voting/voter impersonation

12     with deceased voters out of Harris County --

13     "QUESTION:  Uh-huh.

14     "ANSWER:  -- which also -- which is also contained in

15     the spreadsheet.

16     "QUESTION:  Uh-huh.

17     "ANSWER:  When we received that referral, it said

18     that there were 10,000 individuals.

19     "QUESTION:  Uh-huh.

20     "ANSWER:  So we do receive allegations of deceased

21     voters in elections.  It is atypical to get that many

22     from different jurisdictions.

23     "QUESTION:  Right.  And there's a lot of -- there's a

24     lot of ways that someone might attempt to

25     impersonatea deceased voter and vote, correct?

Mitchell / by excerpt of Deposition                    83

1      **MS. WOLF:**  And there's an objection.

2      "ANSWER:  Yes.  We have cases where voters have

3      impersonated someone else and that's been done in

4      different ways.

5      "QUESTION:  Within SIU, which of your investigative

6      teams is currently the most resource intensive?

7      "ANSWER:  I would say it's the money laundering team.

8      "QUESTION:  Money laundering.  And where would the

9      election team rank?

10     **MS. WOLF:**  Objection.

11     "ANSWER:  As I previously testified, it's on par with

12     the public integrity team.  Each of those teams have

13     about three or four investigators.  And if I could

14     even further clarify.

15     "QUESTION:  Please.

16     "ANSWER:  The resources depend on the actual year.

17     We receive more referrals in a year which contain a

18     primary and a general election than we do in the off

19     years where we only have, perhaps, school district

20     and municipal elections.  So on even numbers of

21     years, we tend to see more cases than we do on the

22     odd number of years.

23     "QUESTION:  Thank you.  Mr. Mitchell, do you believe

24     that there is undetected in-person voter

25     impersonation fraud occurring in Texas?

Mitchell / by excerpt of Deposition                    84

1            "ANSWER:  It is my opinion, yes.

2            "QUESTION:  And what is your source for that opinion?

3            "ANSWER:  Having conducted criminal investigations

4            and in reviewing criminal investigations of my staff

5            over my tenure here at this office.

6            "QUESTION:  So could you be more specific or it's

7            just your general instinct?

8            "ANSWER:  We -- we have conducted investigations that

9            did not result in criminal charges where we suspected

10           voter impersonation occurred and that is both through

11           my experience as an investigator investigating cases

12           and also as a supervisor reviewing investigative

13           reports.

14       **MS. WOLF:**  And that concludes Defendants' readings

15   from Mr. Mitchell.

16       **THE COURT:**  Okay.

17       **MR. DUNN:**  Your Honor, we did our initial readings

18   earlier.

19       **THE COURT:**  Okay.  So nothing from the Plaintiffs on

20   that?

21       **MR. ROSENBERG:**  Nothing further.  We're relying what

22   has already been read into the record.

23       **THE COURT:**  Okay.

24       **(Counsel conferred)**

25   //

1          **MR. KEISTER:**  Good morning, your Honor, Ronnie

2    Keister and Ben Donnell for the Defense.  And we'll be reading

3    selected portions of the Senator Williams deposition.

4                    **EXAMINATION OF TOMMY WILLIAMS**

5                  **BY EXCERPTS OF DEPOSITION TESTIMONY**

6    **(QUESTIONS READ BY MR. KEISTER; ANSWERS READ BY MR. DONNELL)**

7                "QUESTION:  Good morning, Senator Williams.  How are

8                you this morning?

9                "ANSWER:  I'm well.

10               "QUESTION:  Okay.  Let's talk about your tenure in

11               the Texas legislature.  You were initially elected to

12               the Texas House in 1996; is that right?

13               "ANSWER:  That's correct.

14               "QUESTION:  And you served there until you were

15               elected to the Senate in 2002?

16               "ANSWER:  That's correct.

17               "QUESTION:  House Bill 218 in the 2000 session was a

18               bill designed to combat in-person voter fraud; is

19               that correct?

20               "ANSWER:  Yes.

21               "QUESTION:  Do you recall House Bill 218 generally?

22               "ANSWER:  Only that it was a voter ID bill.

23               "QUESTION:  Do you recall who sponsored it on the

24               Senate side?

25               "ANSWER:  I don't know.

Williams / by excerpt of Deposition                    86

1          "QUESTION:  If I told you that Troy Fraser sponsored

2          that bill, would that sound right to you?

3          "ANSWER:  He was very involved in the issue, yes.

4          "QUESTION:  When did you become very involved in the

5          issue?

6          "ANSWER:  You know, I don't have a specific

7          recollection about when 1 became involved in it.

8          It's a -- it was an issue that was important to a lot

9          of people and a lot of my constituents during my

10         legislative career.

11         "QUESTION:  Okay.  But to be fair, voter ID

12         legislation was fairly controversial legislation for

13         several sessions, correct?

14         "ANSWER:  I don't think it was controversial.  There

15         was a lot of opposition to it on one side but I

16         wouldn't say it was controversial.  It was widely

17         perceived by the public as something that was a good

18         thing.

19         "QUESTION:  Okay.  Do you recognize Exhibit 1?

20         "ANSWER:  This looks like it is the filed version of

21         House Bill 218 as it was filed in the House.

22         "QUESTION:  Okay.  And that was the voter ID

23         legislation filed during the 2007 legislative

24         session, correct?

25         "ANSWER:  Yes.  It looks like it was pre-filed in

Williams / by excerpt of Deposition                87

1      November of 2006.  So it would have been for the 80th

2      regular session, it says.

3      "QUESTION:  And the purpose of this legislation was

4      to combat in-person ID -- in-person voter ID fraud,

5      correct?

6      "ANSWER:  I think that was the intent of the author,

7      yes.

8      "QUESTION:  Sure.  At the time that House Bill 218

9      was being considered by you in committee, did you

10     consider a student identification card to be an

11     acceptable form of photo ID?

12     "ANSWER:  I don't recall that I cared for this

13     provision.  It was a part of the bill but I'm not

14     sure that I -- I don't necessarily agree with every

15     provision of every bill.  So --

16     "QUESTION:  Fair enough.  Can you tell me why you

17     might not have agreed with this particular provision?

18     "ANSWER:  I think, you know, it makes it a lot more

19     difficult for the people who are working at the polls

20     to identify -- to know whether it's a valid ID or not

21     because we have 38 general academic institutions in

22     this state and we have a bunch of health science

23     centers and a lot of people that are issuing student

24     ID cards, including all of our community colleges and

25     so I think it becomes very difficult for someone at

Williams / by excerpt of Deposition                    88

1    the poll to know whether that's actually a valid ID

2    or not.

3    "QUESTION:  And is it your opinion that the only form

4    of identification that can truly identify or verify

5    who a person is is a photo identification?

6    "ANSWER:  I think that -- that the way it -- that's

7    the way it was listed in Senate Bill -- I was --

8    excuse me -- Senate Bill 14 was.  There were primary

9    forms of identification and secondary forms of

10   identification and I think that a match -- a much

11   more reasonable way to determine whether the person

12   before you is really the person they said they were.

13   So --

14   "QUESTION:  Was one of the purposes of Senate Bill --

15   excuse me.  Was one of the purposes of Senate Bill 14

16   to ensure that people who show up to the polls to

17   vote are United States citizens?

18   "ANSWER:  I think that would have been -- I don't

19   remember that as a primary objective but I think the

20   objective was that they were registered and legal to

21   vote and that that would be one of the things.  I

22   don't remember that being -- I think the purpose of

23   the bill was to prevent in-person voter fraud.  That

24   would include people who weren't citizens of the

25   United States who tried to vote but I don't think

Williams / by excerpt of Deposition                    89

1       that was the only thing.

2       "QUESTION:  Are you aware that the DPS in 2011 had

3       antiquated technology in its driver's license

4       division?

5       "ANSWER:  I know that I spent a lot of time and

6       effort during the 2011 session working with the

7       department to figure out how we could modernize and

8       streamline the issuance of driver's licenses and

9       election identification certificates.  My interest in

10      that was primarily because I think I got -- I believe

11      it's correct to say that we received more complaints

12      in our office about the waiting lines at driver's

13      license offices than any other single function of

14      state government.  So there was a problem there.

15      "QUESTION:  Okay.  So were your efforts to try and

16      modernize and streamline the process for issuing

17      driver's license -- driver's licenses more a function

18      of general public complaints about that process or

19      was it more something done in conjunction with SB 14

20      and this whole new notion of obtaining an election

21      identification certificate?

22      "ANSWER:  I think it's a matter of public record that

23      I wanted the -- for -- just as a general policy of

24      making state government work for the citizens, that

25      this was something that needed to be done but that it

Williams / by excerpt of Deposition                    90

1       was also important that we address the issue if we

2       were going to require people to have to go to the DPS

3       office and obtain these Election Identification

4       Certificates.  And I felt like it was important that

5       they be able to get that in a timely and reasonable

6       way.

7       "QUESTION:  And were you satisfied prior to the

8       passage of SB 14 that people were going to be able to

9       obtain Election Identification Certificates in a

10      timely and reasonable way?

11      "ANSWER:  Yes.

12      "QUESTION:  And why is that?

13      "ANSWER:  It would have been based on what my efforts

14      were with the DPS, the discussions that I'd had, what

15      we were doing, planning to do in the budget and all

16      those sorts of things.

17      "QUESTION:  Okay.  Let's talk about that.  What was

18      your plan, prior to the passage of SB 14, for

19      budgeting for the kinds of things that would be

20      required to streamline and modernize the issuance of

21      driver's licenses Electronic Identification

22      Certificates?

23      "ANSWER:  I think it would be a mischaracterization

24      to say it was my plan.  I think that it might be more

25      accurate to say that I had asked the DPS to tell me,

1        what is it going to take to solve this problem and

2        then work with them to mold that into something that

3        we could put into the budget to address this issue.

4        "QUESTION:  Okay.  And when you got to that end point

5        in the 2011 legislative session, were you satisfied

6        that the DPS was going to get enough budgetary

7        dollars to do what it needed to do to, as you said,

8        modernize and streamline the issuance of driver's

9        licenses and electronic" --

10       **MR. KEISTER:**  Which is spelling incorrect.  It should

11       be "election."

12       "QUESTION:  -- identification certificates?

13       "ANSWER:  I think, based on what they knew at that

14       time and what I knew at that time, I believe that was

15       true.

16       "QUESTION:  Do you know whether there were specific

17       dollars set aside that year for the processing of --

18       **MR. KEISTER:**  Once again, it says "electronic."  It

19       should be "election."

20       "QUESTION:  -- identification certificates?

21       "ANSWER:  That would be a question that you'd be

22       better to ask the Department of Public Safety.  In

23       general, what I recall is that their message to me

24       was that they should be able to -- they would be able

25       to deal with the cost and I don't think there was a

Williams / by excerpt of Deposition                    92

1    -- I recall there wasn't a fiscal note related to the

2    cost of this, that they felt like they could handle

3    it in the ordinary course of business and so -- that

4    it wouldn't be an overwhelming problem for them.  And

5    I think, in particular, since we were giving them the

6    money for these mega centers and mobile driver's

7    license centers and the things that we had talked to

8    them about, you know, I think they felt like they

9    could take care of it.

10    "QUESTION:  And is it fair to say that those mega

11    centers were in heavily populated areas where the

12    demand was higher?

13    "ANSWER:  I think that they were put in place to

14    relieve the inadequate facilities that we had in

15    heavily populated areas.  So we're probably saying

16    close to the same thing.  So --

17    "QUESTION:  Okay.  And then the other thing that you

18    mentioned was mobile units.  Explain to me what

19    mobile units were -- are.

20    "ANSWER:  Well, there were driver's license offices

21    that  weren't open every day in some rural areas of

22    the state.  And as I recall, we were encouraging them

23    to develop mobile units that they could have a

24    regular circuit that they went around to address this

25    renewal and issuance of driver's licenses and I guess

Williams / by excerpt of Deposition                    93

1      as an ancillary to the voter ID thing.  So --

2      "QUESTION:  Did you know on January 25th, 2011 when

3      SB 14 was passed out of the Senate whether there

4      would be enough budgetary dollars to go to the things

5      that would be required by SB 14?

6      "ANSWER:  Yes.

7      "QUESTION:  How did you know that?

8      "ANSWER:  I am a member of the Senate Finance

9      Committee and I discussed it with the chairman of the

10     Senate Finance Committee and the Lieutenant Governor,

11     the other members of the Senate Finance Committee and

12     we were committed to making sure there was enough

13     money in the budget to address whatever issues that

14     were related to this.

15     "QUESTION:  Did you ever perform an analysis or ask

16     the DPS to perform an analysis of how many people in

17     Texas who are registered -- who are able to vote

18     lacked one of the other forms of photo identification

19     listed in SB 14?

20     "ANSWER:  You know, I don't think it would have been

21     just the Department of Public Safety.  I know that

22     there were discussions with the Secretary of State

23     and the Department of Public Safety and there were

24     some estimates.  I have no recollection of what that

25     is.  My recollection is that the department was

Williams / by excerpt of Deposition                    94

1      comfortable that they would not require an additional

2      appropriation to be able to issue the Election

3      Identification Certificates.

4      "QUESTION:  But what did the --

5      "ANSWER:  They felt like that it would have had an

6      insignificant impact on their workload if we were

7      able to address these other issues they had, which I

8      was committed to doing.

9      "QUESTION:  Do you have any knowledge of whether the

10     Secretary of State's office, now in hindsight, has

11     had sufficient money to educate Texas voters about

12     the new ID requirements?

13     "ANSWER:  To my knowledge, it hasn't been a problem.

14     So I would say, yes, they had sufficient resources to

15     do it.  And I don't recall ever having the Secretary

16     of State come to me when I was chair of finance or

17     chair of transportation and Homeland Security saying

18     we needed more money for voter education.

19     "QUESTION:  Do you know why in 2011 the legislation

20     that was put forward eliminated a voter's ability to

21     present secondary forms of identification?

22     "ANSWER:  I think that you're mischaracterizing what

23     the legislation did.  I think what it did was, it

24     provided for a form of photo identification that was

25     free of charge and many of these things that were

Williams / by excerpt of Deposition                    95

1       secondary items of identification in the previous

2       bills could be used to obtain an Election

3       Identification Certificate.  So I think you phrased

4       and mischaracterized what the bill did.  What the

5       bill did was, it said, you know, we're going to have

6       really basically one of these two forms of photo

7       identification and a lot of the alternative forms

8       were incorporated into what it took to get the

9       Election Identification Certificate, not completely

10      but in general.

11      "QUESTION:  Was it your opinion when you were

12      considering SB 14 that a more restrictive bill that

13      only allowed voters to present photo identification

14      at the polls was a better form of voter ID

15      legislation?

16      "ANSWER:  I wouldn't characterize it that way.

17      "QUESTION:  How would you characterize it?

18      "ANSWER:  I think SB 14 was a better bill than the

19      bills that had been considered in the previous two

20      sessions because it required a more secure form of

21      identification and it would be easier for the people

22      who were working at the polls to determine if they

23      were being presented with a valid form of ID or not.

24      "QUESTION:  Okay.  What did you do prior to the

25      passage of SB 14 to research in-person voter fraud in

Williams / by excerpt of Deposition                    96

1    Texas?

2    "ANSWER:  I think the primary information that we

3    received about this was from the testimony that we

4    received either in the State Affairs Committee or in

5    the Committee as a Whole.

6    "QUESTION:  What did you do prior to voting for SB 14

7    to satisfy yourself that there would not be a

8    disproportionate impact on the minority voting

9    community in Texas?

10   "ANSWER:  Well, we took extensive testimony in the

11   State Affairs Committee over a couple of different

12   sessions.  And while I don't have a specific

13   recollection, I'm sure that this issue was brought up

14   because Senator Ellis and Senator Van de Putte had

15   both voted against the bills and were members of the

16   committee and they would have raised those issues.

17   So I know it was discussed and I'm certain it was

18   discussed in -- in committee.  And that's the purpose

19   of having a bill heard before it comes to the floor,

20   is to get these kind of things vetted.

21   "QUESTION:  You do recall testimony from various

22   interest groups that African-Americans and Hispanics

23   would have disproportionate burdens as a result of

24   SB 14, didn't you?

25   "ANSWER:  And that was asserted in some groups.

1      "QUESTION:  Did you do anything to look into those

2      assertions or satisfy yourself about whether those

3      assertions were accurate?

4      "ANSWER:  Yes.  That was a part of the debate.  That

5      would have been when I considered it.

6      "QUESTION:  Prior to voting on Senate Bill 14, did

7      you look into this issue of whether African-Americans

8      and Latino citizens in Texas disproportionately

9      lacked access to motor vehicles?

10     "ANSWER:  First of all, I would say that with respect

11     to this entire document that I have before me, I have

12     no idea whether these assertions are true.  This is a

13     viewpoint of an advocacy group.  The second thing I

14     would say is that with respect to your specific

15     question, is that that would have been something that

16     we considered both in committee, in the State Affairs

17     Committee, in the Committee as a Whole and it would

18     have been the subject of floor debate.  So if you're

19     asking me if I considered these things, I listened

20     carefully to everybody's viewpoint.  I may not always

21     agree with it but, yes, this would have been

22     something that we would have considered during the

23     process.

24     "QUESTION:  Did it concern you in voting on SB 14

25     that African-Americans and Latinos might

Williams / by excerpt of Deposition                98

1          disproportionately lack access to a motor vehicle?

2          "ANSWER:  I voted for the bill and I don't believe

3          that there was anything in the bill that has

4          prevented any African-American from being able to

5          obtain an Election Identification Certificate if they

6          needed one to vote, if they didn't already have a

7          driver's license.

8          "QUESTION:  Did you do anything -- was there anything

9          in SB 14 that ameliorates the cost to obtaining an

10         EIC for indigents, people who are indigent in Texas?

11         "ANSWER:  It was free.  If you -- if you didn't have

12         one of the other forms of ID, the document -- the

13         Election Identification Certificate was free.

14         "QUESTION:  In any event, there is no exception in

15         SB 14 for people who are indigent in Texas, correct?

16         "ANSWER:  I think the Election Identification

17         Certificate is free of charge.  That is the

18         exception.

19         "QUESTION:  Sorry, I misspoke.  There is no exception

20         to the photo ID requirement for people who are

21         indigent; is that right?

22         "ANSWER:  No, the certificate is free.

23         "QUESTION:  One of the things that the minor -- or

24         the Democratic opposition, I should say, was pretty

25         vocal about in the debates about Senate Bill 14 is

Williams / by excerpt of Deposition                    99

1        that there was really no significant in-person voter

2        fraud in Texas, right?

3        "ANSWER:  I'm not sure.  They may have asserted that

4        but I'm not sure that I agree that that's true.

5        "QUESTION:  I understand that.  I just -- my only

6        point is that that was part of what opposition was

7        lodged against this legislation is that it didn't --

8        there was no real in-person voter fraud to combat.

9        Do you recall that?

10       "ANSWER:  Well, you know, once again, what I would

11       say is that voter fraud is very difficult to detect

12       if you don't require an ID when someone votes.  How

13       are you going to know if they're committing fraud if

14       you don't ask them for an ID?  So it's very difficult

15       to detect unless you require some form of

16       identification.  Now, it's -- I have a lot of

17       anecdotal evidence that it happens.  My grandfather

18       voted for 62 years in the Democratic primary after he

19       died.

20       "QUESTION:  Okay.  Was there any budgetary request or

21       any budgetary issues with regard to SB 14 with regard

22       to DPS?

23       "ANSWER:  I think what I asked -- what I testified to

24       was the Department of Public Safety -- that I

25       specifically asked them what did they need to be able

Williams / by excerpt of Deposition                    100

1       to streamline the whole process of issuing driver's

2       license and thereby also the EINs but to get their

3       whole operation where we didn't have this backlog of

4       people who were standing in line for hours to get

5       their license or Election Identification Certificate

6       after the law passed.  So we gave them the money that

7       they needed.

8       "QUESTION:  Has there been any report of people

9       faking their photo identification in order to vote?

10      "ANSWER:  You know, I'll answer it this way.  I

11      haven't had a single complaint about Senate Bill 14

12      since the bill was passed.  I don't know whether

13      there have been any reports of people who were trying

14      to vote or if they were just kept away by the

15      knowledge that they would have to produce an ID but I

16      am unaware of a single person in the entire state of

17      Texas that was denied the right to vote because of

18      Senate Bill 14.  I'm not saying it doesn't exist but

19      if it does, I am completely unaware of it.

20      "QUESTION:  Did you believe there was a lot of

21      support for SB 14, a lot of public support?

22      "ANSWER:  There was a lot of bipartisan support for

23      it in the public, not in the legislature.

24      "QUESTION:  And can you look at JA000844?  And do you

25      see there's a statement by you and at the very bottom

1        going up to the next page, it says, 'And then finally

2        I wanted to ask you.  We had talked earlier about the

3        project that I asked you to do, to cross-reference

4        the driver's licenses and the voter registration.

5        How is that coming along?  I know I only asked today'

6        and Ms. McGeehan says, 'Yes.'  Do you see that?

7        "ANSWER:  I see it.

8        "QUESTION:  Does this refresh your recollection that

9        you asked for an analysis from DPS and SOS about

10       registered voters who didn't have a driver's license

11       or a Texas ID?

12       "ANSWER:  Yes, what I did -- what I don't know by

13       looking at this is whether it would appear -- but I'm

14       not sure and I'd like to clarify for the record that

15       this was the -- it was -- if this was the Committee

16       of the Whole.  It looks like it was.

17       "QUESTION:  This was -- this was the Committee of the

18       Whole, yes.

19       "ANSWER:  Okay, so this was a Committee hearing and

20       this would have been the appropriate place for me to

21       ask such a thing.

22       "QUESTION:  And do you recall asking Ms. McGeehan?

23       "ANSWER:  Now that you showed me this I do.

24       "QUESTION:  Why did you want this analysis?

25       "ANSWER:  Let me see what the -- I don't know.  It

1      would appear from the transcript that I wanted to

2      know if we could focus our education efforts on the

3      people that were registered voters who didn't have a

4      driver's license or a state-issued ID already.

5      "QUESTION:  Didn't you say that you wanted to -- you

6      wanted this analysis for voter education, is that

7      right?

8      "ANSWER:  It would appear from the transcript.  I'd

9      like to take another look at it and see.  So it looks

10     like what we were trying to do is -- Ms. McGeehan

11     says I approached her earlier today to do some

12     comparisons to try to further focus in on those who

13     are registered voters that don't have or have not

14     been issued a driver's license or personal ID, so

15     we're trying to run some of these numbers.

16     So I think that was I trying to do was just see who

17     these people were, how many there were, and if we

18     could focus the education efforts on making sure that

19     they knew what they needed to do to be able to vote

20     the next time.

21     "QUESTION:  Okay.  What -- when you say that you

22     could "focus voter education on these voters," can

23     you tell me what you mean by that?

24     "ANSWER:  I wanted to be sure that we understood how

25     big the problem was.  I think, you know, we needed,

Williams / by excerpt of Deposition - Direct          103

1          if there was a problem and I think it was up to the

2          Secretary of State's office, but I wanted to know --

3          I wanted them, if that analysis had been done, that

4          we would have known whether or not they could address

5          the problem, and so I felt like it was important that

6          we ask that question.

7          "QUESTION:  And when you say you wanted to make sure

8          "we" understood how big the problem was, "we" means

9          the legislature?

10         "ANSWER:  Yes.

11         "QUESTION:  And you wanted to know -- to make sure

12         that you could address that issue?

13         "ANSWER:  Make sure that it was being addressed.

14         "QUESTION:  I see.  So you didn't necessarily intend

15         the legislature to take an action to address the

16         problem?

17         "ANSWER:  I don't think it would be -- I think it

18         would not have been necessary for anything to happen

19         in this bill.  But it would have given us, in the

20         Senate Finance Committee, an idea whether they had

21         adequate resources or not.  So it was a question to

22         make sure the agency was considering what they needed

23         to do."

24     **(End of reading of excerpts)**

25  //

1          **MR. KEISTER:**  Okay, thank you.  That completes our

2    reading, your Honor.

3          **THE COURT:**  Okay.

4       **(Pause)**

5          **MS. RUDD:**  Amy Rudd for Texas NAACP and MALC, and for

6    the record my colleague, Vishal Agraharkar, is sitting in the

7    witness box.  And, your Honor, we'll be reading from three

8    different transcripts, the June 1st, 2012 deposition transcript

9    for Senator Williams; his transcript from the Section 5 trial;

10   and also the transcript from his June 29th, 2014 deposition.

11          If I could approach I have a copy for you-all.

12          **THE COURT:**  Yes.

13                    **EXAMINATION OF TOMMY WILLIAMS**

14         **BY EXCERPTS OF DEPOSITION AND TRIAL TESTIMONY**

15     **(QUESTIONS READ BY MS. RUDD; ANSWERS READ BY MR. AGRAHARKAR)**

16          "QUESTION:  Do you recognize Exhibit 1?

17          **MS. RUDD:**  And for the record, excuse me, for the

18   record that's PL-859.

19              "ANSWER:  This looks like it is the filed version of

20              House Vote 218, as it was filed in the House.

21              "QUESTION:  And that was the voter ID legislation

22              filed during the 2007 legislative session, correct?

23              "ANSWER:  Yeah.  It looks like it was pre-filed in

24              November of 2006, so it would have been for the 80th

25              regular session it says.

1        "QUESTION:  Do you recall that HB 218 passed out of

2        the State Affairs Committee?

3        "ANSWER:  Yes, it did.

4        "QUESTION:  And you voted to pass that out of

5        Committee, correct?

6        "ANSWER:  I did.

7        "QUESTION:  Do you recall that that vote was strictly

8        along party lines?

9        "ANSWER:  It wouldn't surprise me if it was.  I don't

10       recall the vote.

11       "QUESTION:  At the time that you voted to pass HB 218

12       out of Committee, did you think it was a good bill?

13       "ANSWER:  I did.

14       "QUESTION:  There are seven different forms of

15       photographic identification that were acceptable

16       under HB 218 in this version, correct?

17       "ANSWER:  Correct.

18       "QUESTION:  And then if you look at Subsection (b),

19       there are 11 different forms of nonphoto ID that were

20       acceptable under this version of the legislation,

21       correct?

22       "ANSWER:  I have to read it.

23       "QUESTION:  Sure.

24       "ANSWER:  Actually I -- let's see, yeah, there are

25       11, that's correct.

Williams / by excerpt of Deposition - Cross                106

1        "QUESTION:  Senator Fraser made a motion to consider

2        HB 218 outside the regular course of business,

3        correct?

4        "ANSWER:  I believe he made a motion to suspend the

5        regular order of business to take up and consider

6        House Bill 218.

7        "QUESTION:  And when you say the "regular order of

8        business," that's the sort of default calendar in the

9        Senate, correct?

10       "ANSWER:  The regular order of business is the order

11       of the bill -- the order that bills come out of

12       Committee numerically and by time, when they were

13       voted out of Committee.  That's the regular order of

14       business out of the Substantive Committee.

15       "QUESTION:  And in the regular order of business,

16       bills are considered in the order that they come out

17       of Committee, correct?

18       "ANSWER:  Under the regular order of business.

19       "QUESTION:  And if you want a bill to be considered

20       outside the regular order you have to suspend the

21       regular order of business, is that right?

22       "ANSWER:  That's correct.

23       "QUESTION:  And, typically, to suspend the regular

24       order of business you need a two-thirds vote of

25       Senate members present at the time?

1          "ANSWER:  That's true of the Senate and the House.

2          "QUESTION:  Exhibit 4," which is PL-860, "is a copy

3          of the Senate Journal from May 15th, 2007, is that

4          right?

5          "ANSWER:  It would appear to be.

6          "QUESTION:  And if you look at the second page of

7          that document, at the bottom of the page, there's a

8          portion titled 'COMMITTEE SUBSTITUTE HOUSE BILL 218

9          ON SECOND READING,' do you see that?

10         "ANSWER:  I do.

11         "QUESTION:  And there it says that 'Senator Fraser

12         moved to suspend the regular order of business to

13         consider CSHB 218,' correct?

14         "ANSWER:  Would you repeat the question?

15         "QUESTION:  Sure.  I'm just verifying that that says

16         that Senator Fraser moved to suspend the regular

17         order of business to take up consideration of CSHB

18         218.

19         "ANSWER:  Correct.

20         "QUESTION:  And then at the very bottom it says that

21         Senator Shapleigh called for a verification of the

22         vote?

23         "ANSWER:  I see that.

24         "QUESTION:  So -- and you have no reason to question

25         whether that recording in the Senate Journal is

Williams / by excerpt of Deposition - Cross          108

1          accurate, correct?

2          "ANSWER:  I believe that it's accurate.

3          "QUESTION:  And then there was a roll call performed,

4          correct?

5          "ANSWER:  Yes.

6          "QUESTION:  And this time Senators Whitmire and

7          Uresti voted against considering CSHB 218 outside the

8          regular course of business, correct?

9          "ANSWER:  Correct.  The motion failed 20 to 11.

10         "QUESTION:  And so no voter ID after that -- no voter

11         ID legislation passed out of the Senate in the 2007

12         session, is that right?

13         "ANSWER:  I don't believe so.

14         "QUESTION:  And you mentioned that there were

15         actually two votes taken in the Senate on whether to

16         bring HB 218 to the Floor, is that right?

17         "ANSWER:  That's correct.

18         "QUESTION:  And the result of the first vote was that

19         more than two-thirds of the senators present voted to

20         suspend the regular order of business and take up HB

21         218, is that right?

22         "ANSWER:  The first vote, yes.

23         "QUESTION:  And Senator Carlos Uresti was not present

24         on the Senate Floor for that first vote because he

25         was ill, is that right?

Williams / by excerpt of Deposition - Cross                  109

1      "ANSWER:  I believe he was excused as being ill.

2      "QUESTION:  And Senator Uresti is Hispanic, correct?

3      "ANSWER:  Yes, he is.

4      "QUESTION:  He represents a large Hispanic population

5      in Texas, is that correct?

6      "ANSWER:  Yes.

7      "QUESTION:  Senator Uresti had publicly opposed HB

8      218, is that right?

9      "ANSWER:  I believe he had.  I don't know that he

10     expressed that to me, but I would have presumed that

11     he was against it.

12     "QUESTION:  The result of the second vote on HB 218

13     was that the Senate was not able to suspend the

14     regular order of business and take up the bill, is

15     that correct?

16     "ANSWER:  That's correct.

17     "QUESTION:  And Senator Uresti, you mentioned in your

18     Direct testimony, voted in that second vote, is that

19     correct?

20     "ANSWER:  That's right.  He came to the Floor.

21     "QUESTION:  And is it the case that you were

22     disappointed in how the Senate handled the two votes

23     on HB 218 in 2007?

24     "ANSWER:  Yes, that was my public statement in the

25     following session, in '09.

Williams / by excerpt of Deposition - Cross                110

1        "QUESTION:  And in that same public statement did you

2        characterize the vote on the Senate Floor as 'a very

3        ugly scene?'

4        "ANSWER:  I did.

5        "QUESTION:  One of the things that happened in the

6        2009 session is that you proposed a rule change, a

7        change to Senate rules.  Do you recall that?

8        "ANSWER:  I recall that I proposed a rule change.  It

9        could have been in 2009, I don't recall the exact

10       session.

11       "QUESTION:  The rule change that I'm referencing is a

12       change that would allow any bill relating to voter

13       identification requirements to be set as a special

14       order and considered by the Senate on a majority

15       vote.  Do you recall that rule change?

16       "ANSWER:  Yes, I proposed a rule change.  I don't

17       recall which session it was off the top of my head.

18       If you have something that could refresh my memory,

19       I'll be glad to take a look at it.

20       "QUESTION:  Exhibit 6," which is PL-423, "is a copy

21       of the Senate Journal dated January 14th, 2009,

22       correct?

23       "ANSWER:  It would appear to be.

24       "QUESTION:  And if you look at the third -- the

25       second line down, the Secretary is recorded as

Williams / by excerpt of Deposition - Cross                111

1         saying, 'Senate Resolution 14 adopting the rules of

2         the Senate of the 80th Legislature as the permanent

3         rules of the Senate of the 81st Legislature with the

4         following modifications by Williams.'  Do you see

5         that?

6         "ANSWER:  I see that.

7         "QUESTION:  Does that refresh your recollection that

8         you proposed a rule change to the rules of the Senate

9         in the 2009 legislative session?

10        "ANSWER:  Yes.

11        "QUESTION:  And this was the very session after HB

12        218 had failed to gain a two-thirds vote to come to

13        the Floor of the Senate, correct?

14        "ANSWER:  That's correct.

15        "QUESTION:  In 2009 the Senate considered and passed

16        voter ID legislation titled SB 362, correct?

17        "ANSWER:  That's correct.

18        "QUESTION:  And we've talked about it, and you

19        mentioned in your Direct testimony, you were the

20        sponsor of that rules resolution that allowed SB 362

21        to be considered on the Floor of the Senate, correct?

22        "ANSWER:  That's correct.

23        "QUESTION:  The Senate adopts a rules resolution

24        prior to each legislative session, is that right?

25        "ANSWER:  That's correct.

1        "QUESTION:  And the rules set forth how the Senate

2        will operate during the session, is that right?

3        "ANSWER:  That's correct.

4        "QUESTION:  So one of the things that the rule change

5        at the beginning of the 2009 session allowed you to

6        do as -- as the Senate, is to consider voter

7        identification bills as a special order of business,

8        is that correct?

9        "ANSWER:  This -- the rule amendment that I offered

10       in the 2009 session allowed voter identification

11       legislation to be considered under a special order.

12       My recollection is that it had to be passed out of

13       the Committee of the Whole by a majority vote to be

14       able -- to be eligible to be considered under the

15       special order provision.

16       "QUESTION:  Okay.

17       "ANSWER:  That's my recollection.

18       "QUESTION:  So adopting your proposed rule change

19       took a majority vote of senators, correct?

20       "ANSWER:  That's true every session.

21       "QUESTION:  Fair.  And in considering voter ID

22       legislation as a special order also took a majority

23       vote of senators out of the Committee of the Whole,

24       correct?

25       "ANSWER:  I think that the voter ID legislation was

1        required to be considered by the Committee of the

2        Whole.  It had to pass out of Committee under the

3        regular Committee rules, which would have been a

4        majority vote, and then it could be brought to the

5        Floor under a special order that would only require a

6        majority vote.

7        "QUESTION:  Right.  Without your rule change,

8        considering voter ID legislation as a special order

9        after it passed out of Committee, would have required

10       a two-thirds vote of senators present, correct?

11       "ANSWER:  If you were going to consider it out of the

12       regular order of business it would be true.

13       "QUESTION:  Right.  So what I'm -- without your rule

14       change it would have required to consider it outside

15       the regular order of business after it passed out of

16       Committee, a two-thirds vote of senators present,

17       correct?

18       "ANSWER:  If it were being considered out of the

19       regular order of business.

20       "QUESTION:  Right, which is exactly what I just said,

21       so I'm correct?

22       "ANSWER:  Is that a question?

23       "QUESTION:  Yes.

24       "ANSWER:  I think you are.

25       "QUESTION:  One of the things we were discussing

Williams / by excerpt of Deposition - Cross                114

1        before was that at least in Senator Whitmire's tenure

2        as Dean of the Senate, prior to 2009 he typically

3        laid out the rules of the Senate.  Is that consistent

4        with your recollection?

5        "ANSWER:  I can't speak to that, how it was done

6        prior to 2009.  From the '03, the '05 and the '07

7        session he laid out the rules, but I can't speak to

8        prior to that.  I don't know before '03.

9        "QUESTION:  But in your tenure as a senator, while up

10       until 2009 Senator Whitmire laid out the rules of the

11       Senate?

12       "ANSWER:  He did in the '03 session, the '05 session

13       and the '07 session.

14       "QUESTION:  And the reason that he didn't do so in

15       the 2009 session is because he was opposed to this

16       proposed rule change, is that correct?

17       "ANSWER:  He was opposed to this, that's correct.

18       "QUESTION:  And it's a matter of public record, isn't

19       it, that you carried SR 14, the Senate Resolution in

20       2009, to the Floor because Senator Whitmire did not

21       want to do it, correct?

22       "ANSWER:  That's correct.

23       "QUESTION:  Do you recall that the proposed rule

24       change in 2009 was relatively controversial in the

25       Senate?

1          "ANSWER:  There was a lot of opposition and there was

2          a lot of debate about the rule change.

3          "QUESTION:  I think you previously testified that

4          there were about six hours of debate on the proposed

5          rule change?

6          "ANSWER:  About six, six and a half hours, yeah.

7          "QUESTION:  And all of the Democratic Senators were

8          opposed to the rule change, is that correct?

9          "ANSWER:  That's correct.

10          "QUESTION:  And we talked about this earlier, but

11          within Senate Resolution 14 there was a majority vote

12          requirement rather than a two-thirds vote requirement

13          to set bills addressing the issue of voter

14          identification as special orders, correct?

15          "ANSWER:  That's correct.

16          "QUESTION:  And you mentioned Rule 5.11(d) as being a

17          rule applicable to that, correct?

18          "ANSWER:  Correct.

19          "QUESTION:  And during the hearing on SR 14 you said

20          that you modeled Rule 5.11(d) off of the rules of the

21          67th legislative session in 1981 addressing the issue

22          of redistricting, correct?

23          "ANSWER:  I believe that's correct.

24          "QUESTION:  And this is from the research that you

25          talked about in the hearings on SR 14, is that

Williams / by excerpt of Deposition - Cross                116

1          correct?

2          "ANSWER:  Yes.

3          "QUESTION:  And during that hearing other senators

4          voiced disagreement with your research, is that

5          right?

6          "ANSWER:  No, I think they were -- they didn't

7          necessarily agree with what I was saying, but I'm not

8          sure.  Yeah, there were people who disagreed with me,

9          yeah.

10          "QUESTION:  We have Senate Resolution 67 from the

11          81st legislative session, and you can see the date at

12          the bottom here, Senator, and this is Senate

13          Resolution 98, and it's adopted on February 5th,

14          1981.  So would that be the 67th legislative session,

15          is that correct?

16          "ANSWER:  You know, I don't know, it could be.

17          "QUESTION:  Well, Senator, a legislative session

18          would adopt rules in January or February, is that

19          correct?

20          "ANSWER:  Correct.

21          "QUESTION:  And we're talking about the legislative

22          session, they occur on odd-numbers -- odd-numbered

23          years, is that right?

24          "ANSWER:  That's correct.

25          "QUESTION:  So here we have February 5th, 1981, is

Williams / by excerpt of Deposition - Cross          117

1          that correct?

2          "ANSWER:  Yeah.

3          "QUESTION:  And if we move onto Pages 12, 13 and 14

4          of this exhibit and we'll see special orders on the

5          bottom of Page 12, correct, Senator?

6          "ANSWER:  Yes.

7          "QUESTION:  And I'll let you take a look at the text

8          after Number 14, and under the category of 'Special

9          Orders,' and ask if you can point me to the area

10         where redistricting bills are allowed to be set as

11         special orders pursuant to a majority vote?

12         "ANSWER:  It wasn't in -- I don't believe it was in

13         this rules resolution.  I believe it was a separate

14         resolution.

15         "QUESTION:  So a separate resolution.  Your testimony

16         is that a separate resolution set redistricting as a

17         special order, is that correct?

18         "ANSWER:  To the best of my recollection, yes.

19         "QUESTION:  And voter identification, however, under

20         Rule 5.11(d) and Rule 16.077 were contained in the

21         Senate Resolution 14 in 2009, is that correct?

22         "ANSWER:  Yes.

23         "QUESTION:  And they were contained in the Senate

24         Resolution the next year, in 2011, is that right?

25         "ANSWER:  That's correct.

Williams / by excerpt of Deposition - Cross          118

1       "QUESTION:  And during the hearing on SR 14, and you

2       mention this in your Direct testimony, you defined

3       voter ID as an intractable issue in the Texas Senate?

4       "ANSWER:  That was a part of my public testimony,

5       yes.

6       "QUESTION:  And that's why you proposed a majority

7       vote to address it, is that right?

8       "ANSWER:  That's correct.

9       "QUESTION:  Every single vote during the debate on

10      your proposed rule change in 2009 split along party

11      lines, is that right?

12      "ANSWER:  I don't -- I don't recall, it was either

13      party line or very close to party line vote.

14      "QUESTION:  You would stand by whatever appears in

15      the Senate Journal on that debate?

16      "ANSWER:   I think that the Senate Journal accurately

17      reflects what happened.  Senator Carona had an

18      objection to it, and I'm not sure how he voted on

19      every single one of those amendments.

20      "QUESTION:  Ultimately, your proposed rule change in

21      2009 passed, is that correct?

22      "ANSWER:  It did.

23      "QUESTION:   In 2009 the Senate considered and passed

24      voter ID legislation titled SB 362, correct?

25      "ANSWER:  That's correct.

Williams / by excerpt of Deposition - Cross                119

1    "QUESTION:  Senator Williams, you supported S --

2    Senate Bill 362, is that correct?

3    "ANSWER:  I did.

4    "QUESTION:  And Senate Bill 362 provided for the

5    alternative of bringing two nonphoto IDs to the

6    polls, is that correct?

7    "ANSWER:  I think what it did is that it provided

8    that if you had your voter registration card and one

9    other form of ID, that that would be sufficient.

10   "QUESTION:  Senate Bill 362 was ultimately considered

11   by the Committee of the Whole, correct?

12   "ANSWER:  I believe that's true.

13   "QUESTION:  And the Committee of the Whole is just

14   the entire body of senators making up the Senate, is

15   that right?

16   "ANSWER:  That's correct.

17   "QUESTION:  And eventually the Senate, the Committee

18   of the Whole, voted to pass Senate Bill 362 out of

19   Committee, correct?

20   "ANSWER:  I believe that's correct.

21   "QUESTION:  And you voted to pass Senate Bill 362 out

22   of Committee, correct?

23   "ANSWER:  I did.

24   "QUESTION:  After Senate Bill 362 was voted out of

25   the Committee of the Whole, it was set as a special

Williams / by excerpt of Deposition - Cross                120

1    order, is that right?

2    "ANSWER:  You know, I believe it was.  I don't -- I

3    don't have a specific recollection of that.  I'm sure

4    it's in the Senate Journal.  Whatever is reflected in

5    the Senate Journal is accurate.

6    "QUESTION:  Okay.  Well, let's take a look at Page

7    592 of the Senate Journal, Item 4.

8    "ANSWER:  Uh-huh (yes.)  I see it.

9    "QUESTION:  Does that refresh your recollection that

10   Senate Bill 362 was set as a special order?

11   "ANSWER:  The Journal says that, 'On March 11th, 2009

12   the Senate voted to set Senate Bill 362 and no other

13   bill for special order.  The vote on the special

14   order was 19 to 12.'

15   "QUESTION:  And that's consistent with your

16   recollection, yes?

17   "ANSWER:  I have no reason to believe that's not

18   true.

19   "QUESTION:  And, again, all eight ethnic minorities

20   listed here in the Senate Journal voted against

21   sending Senate Bill 360 -- setting Senate Bill 362 as

22   a special order, is that right?

23   "ANSWER:  That's my recollection, and that's what it

24   says here in the Senate Journal.

25   "QUESTION:  And then, ultimately, Senate Bill 362

Williams / by excerpt of Deposition - Cross                    121

1          passed on the third reading.  Is that right, it

2          passed out of the Senate?

3          "ANSWER:  It was passed out of the Senate and it was

4          sent to the House.

5          "QUESTION:  And, again, the vote to pass Senate Bill

6          362 out of the Senate was split along party lines,

7          right?

8          "ANSWER:  Yes.

9          "QUESTION:  With everybody who is self-identified as

10         an ethnic minority voting against passing it out of

11         the Senate, correct?

12         "ANSWER:  To the best of my knowledge, yes.

13         "QUESTION:  And then, ultimately, what happened is

14         that Senate Bill 362 didn't pass the House in that

15         particular legislative session, is that right?

16         "ANSWER:  That's my recollection.

17         "QUESTION:  And so voter ID legislation didn't become

18         the law in the 2009 session, right?

19         "ANSWER:  That's correct.

20         "QUESTION:  So in 2007 and 2009, that legislation

21         that was proposed allowed voters to go to the polls

22         with two forms of secondary identification to

23         identify themselves, right?

24         "ANSWER:  Had it been enacted, that would have been

25         true.

Williams / by excerpt of Deposition - Cross                122

1           "QUESTION:  And in 2011 the legislation, SB 14,

2           didn't allow voters to present those forms of

3           secondary identification at the polls to identify

4           themselves, right?

5           "ANSWER:  That's correct.

6           "QUESTION:  Instead, what SB 14 does is it requires

7           anybody who can't get one of the forms of primary

8           photographic identification to take their secondary

9           forms of ID to the DPS to get an electronic (sic)

10          identification certificate, is that right?

11          "ANSWER:  Election.

12          "QUESTION:  I'm sorry, election identification

13          certificate?

14          "ANSWER:  That's correct.

15          "QUESTION:  Do you know if a noncitizen can obtain a

16          driver's license in Texas?

17          "ANSWER:  Yes, they can.

18          "QUESTION:  Do you know whether or not everyone who

19          holds -- currently holds a Texas driver's license has

20          shown proof of US citizenship?

21          "ANSWER:  What I know is that they have either shown

22          it previously, or they will be required to show it

23          when their license is renewed, and so that's a

24          process that would take a few years because I think

25          your license is good for about six years, so --

Williams / by excerpt of Deposition - Cross          123

1      "QUESTION:  Do you know how many people currently

2      hold a Texas driver's license who has not shown proof

3      of US citizenship?

4      "ANSWER:  You could get that from DPS, but I don't

5      know that number.

6      "QUESTION:  Does your driver's license state that you

7      are a citizen?

8      "ANSWER:  No.

9      "QUESTION:  And do you know if the driver's license

10     held by someone who is a legal permanent resident

11     would state that they are an LPR?

12     "ANSWER:  I don't know the answer to that.

13     "QUESTION:  Can a noncitizen be issued a military ID?

14     "ANSWER:  I believe they can if they are a member of

15     the military.

16     "QUESTION:  Would it surprise you to hear that there

17     are at least 10 different types of US military IDs?

18     "ANSWER:  No.

19     "QUESTION:  Do you know if poll workers in Texas are

20     trained to distinguish between different types of

21     military IDs?

22     "ANSWER:  I don't know.

23     "QUESTION:  What is a citizenship certificate?

24     "ANSWER:  I don't know.

25     "QUESTION:  Is one of the --

1       "ANSWER:  Yeah.

2       "QUESTION:  -- acceptable types of ID in Senate Bill

3       14.  Have you seen one?

4       "ANSWER:  No.

5       "QUESTION:  And would you know how much it costs to

6       obtain one?

7       "ANSWER:  No.

8       "QUESTION:  Do you know how you would obtain a

9       replacement?

10      "ANSWER:  No.

11      "QUESTION:  Oh, you've never seen one?

12      So a person who brings to the polling booth a

13      citizenship certificate that has a picture of him

14      when he was five years old, would that verify a

15      person's identity?

16      "ANSWER:  I have no idea.

17      "QUESTION:  How much does it cost to obtain a US

18      passport?

19      "ANSWER:  I don't know.

20      "QUESTION:  Do you know how many Texan voters hold

21      valid US passports?

22      "ANSWER:  No.

23      "QUESTION:  Does SB 14 require employers to provide

24      paid leave so that employees may obtain an election

25      identification certificate?

Williams / by excerpt of Deposition - Cross                    125

1       "ANSWER:  Not to my recollection.  I can look at it

2       and see, but I don't recall that it did that.

3       "QUESTION:  My question is do you know whether some

4       people in Texas live at least 50 miles from the

5       nearest driver's license office?

6       "ANSWER:  I'm sure some do, maybe more than that.

7       "QUESTION:  And how much would gas cost, at a

8       minimum, to drive a 100-mile round trip to get the

9       election identification certificate?

10      "ANSWER:  I have no idea.  It would depend on what

11      kind of car you were driving, or whether you were on

12      a motorcycle or riding a bicycle, or what it might

13      be.

14      "QUESTION:  Senator Davis proposed Amendment 12,

15      which provided that the underlying document needed to

16      obtain an election identification certificate; that

17      is, the birth certificate, would be free for indigent

18      voters.  Did you oppose this amendment?

19      "ANSWER:  You'd have to look at the record.  My

20      recollection is that I opposed the amendment.

21      "QUESTION:  Senator Ellis proposed Amendment 19 to

22      add student IDs to the list of acceptable photo IDs,

23      and this would be limited to student IDs issued by

24      Texas public universities.  Did you oppose this

25      amendment?

Williams / by excerpt of Deposition - Cross          126

1      "ANSWER:  My recollection is that that I voted

2      against that amendment.

3      "QUESTION:  So, Senator Williams, did you have a role

4      in the introduction of Senate Bill 14 in 2011?

5      "ANSWER:  I was a joint or co-sponsor of the bill.

6      "QUESTION:  Was SB 14 given a designation by the

7      Governor to be emergency legislation?

8      "ANSWER:  My recollection is that he did make voter

9      ID an emergency item.

10     "QUESTION:  And what are the consequences of a bill

11     to have such designation?

12     "ANSWER:  It can be considered earlier in the

13     sessions.

14     "QUESTION:  One of the major concerns raised in

15     connection with Senate Bill 14 was that there wasn't

16     sufficient evidence of in person voter fraud in Texas

17     to justify strict photo ID law.  Do you recall that?

18     "ANSWER:  That was asserted by the opponents of the

19     bill.

20     "QUESTION:  What did you do prior to the passage of

21     SB 14 to research in person voter fraud in Texas?

22     "ANSWER:  I think the primary information that we

23     received about this was from the testimony that we

24     received either in the State Affairs Committee or in

25     the Committee as a Whole.

Williams / by excerpt of Deposition - Cross                127

1        "QUESTION:  Other than the testimony about in person

2        voter fraud that was received in those two

3        Committees, is there any other evidence of in person

4        voter fraud that you collected in connection with

5        your consideration of SB 14?

6        "ANSWER:  I don't know what you mean by that,

7        'evidence that I collected.'  How would you know if

8        someone was committing in person voter fraud if you

9        didn't require them to have an ID, can you tell me?

10       "QUESTION:  Well, in person voter fraud is a

11       prosecutable offense in Texas, correct?

12       "ANSWER:  It is.

13       "QUESTION:  It's subject to criminal penalties,

14       correct?

15       "ANSWER:  It is.

16       "QUESTION:  It was subject to criminal penalties

17       prior to the passage of SB 14, correct?

18       "ANSWER:  Yes.

19       "QUESTION:  And prior to the passage of SB 14 there

20       were convictions for voter fraud in Texas, are you

21       aware of that?

22       "ANSWER:  Yes.

23       "QUESTION:  So were those -- how were those instances

24       of voter fraud detected when there was no photo ID

25       law?

1       "ANSWER:  I have no specific recollection of how they

2       were prosecuted.  I know that they were fairly rare.

3       "QUESTION:  Is it true that there are relatively few

4       instances of prosecuted in person voter fraud in

5       Texas that have been reported?

6       "ANSWER:  In relation to the number of people voting

7       it's not very high.

8       "QUESTION:  And you also mentioned, during the 2011

9       session SB 14 was, in fact, made a special order by a

10      majority vote, is that correct?

11      "ANSWER:  Yes.

12      "QUESTION:  And it was also sent, prior to that, to a

13      Committee of the Whole hearing, is that right?

14      "ANSWER:  Right.

15      "QUESTION:  Prior to the Committee of the Whole

16      hearing in January 2011, on January 25th, 2011 you

17      requested that the Secretary of State's office

18      perform an analysis, correct?

19      "ANSWER:  Yes.

20      "QUESTION:  And you specifically requested that Ann

21      McGeehan, the Elections Director at the time, perform

22      an analysis cross-referencing registered voters and

23      driver's license data bases, is that right?

24      "ANSWER:  Yes.

25      "QUESTION:  And you asked Ms. McGeehan on the public

Williams / by excerpt of Deposition - Cross          129

1      record if she needed any additional direction from

2      the legislature to accomplish this cross-referencing,

3      right?

4      "ANSWER:  I believe that's correct.

5      "QUESTION:  And you brought this request up again

6      during the Committee on the Whole hearing, and you

7      confirmed this request with a representative of DPS

8      who was testifying, Rebecca Davio, correct?

9      "ANSWER:  I believe that's correct.

10      "QUESTION:  And you're not sure if your office ever

11      got a response to this request, is that right?

12      "ANSWER:  I wasn't sure when I was deposed.

13      Subsequent to my deposition I went back and checked

14      with my office staff and we did not receive that

15      report.

16      "QUESTION:  But you considered this information

17      important enough to ask about it twice on the public

18      record, is that right?

19      "ANSWER:  Yes.

20      "QUESTION:  And your request was made before the

21      House considered the bill, is that right?

22      "ANSWER:  Yes.

23      "QUESTION:  And your request was made before SB 14

24      was signed into law, is that correct?

25      "ANSWER:  Yes.

Williams / by excerpt of Deposition - Cross          130

1       "QUESTION:  And you were aware there was testimony

2       during the Committee on the Whole hearing concerning

3       the disproportional impact of SB 14 on minority

4       voters, correct?

5       "ANSWER:  There was testimony to that effect.

6       "QUESTION:  Ultimately SB 14 was passed out of the

7       Committee of the Whole, correct?

8       "ANSWER:  Yes.

9       "QUESTION:  And you voted to pass that bill out of

10      Committee?

11      "ANSWER:  I did.

12      "QUESTION:  And that bill was, again, along strict

13      party lines, correct?

14      "ANSWER:  I believe that it was.

15      "QUESTION:  How many other bills in this 82nd session

16      were considered by the Committee of the Whole without

17      being considered by another committee previously?

18      "ANSWER:  I don't recall that there were any other

19      bills that were considered by the Committee of the

20      Whole that session, but my memory isn't perfect.

21      That's some time ago.

22      "QUESTION:  During the debates on Senate Bill 14, did

23      you do anything to look into the claim that African

24      Americans disproportionately lacked access to motor

25      vehicles in Texas?

1        "ANSWER:  It may have been debated, but I don't -- I

2        don't recall any specific details or anything I might

3        have done related to that.

4        "QUESTION:  And was it concerning to you, when you

5        were voting on SB 14, that the Latino population in

6        Texas might live disproportionately further from DPS

7        offices?

8        "ANSWER:  I'm not sure that it was something that I

9        was worried about when I voted for it.  I think my

10       concerns had been satisfied.

11       "QUESTION:  Do you recall testimony from various

12       interest groups that African Americans and Hispanics

13       would have disproportionate burdens as a result of SB

14       14?

15       "ANSWER:  That was asserted by some groups.

16       "QUESTION:  Did you do anything to look into these

17       assertions or satisfy yourself about whether these

18       assertions were accurate?

19       "ANSWER:  Yes, that was a part of the debate, and

20       that would have been when I considered it.

21       "QUESTION:  And I understand it was part of the

22       debate.  What I'm asking is slightly different, and

23       that's whether you did anything to determine whether

24       the assertions by those groups about the

25       disproportionate burdens on the minority community

1          were true?

2          "ANSWER:  Yes, that would have been part of what I

3          considered during the debate, both in Committee and

4          on the Floor.

5          "QUESTION:  And I understand -- I understand that as

6          a result of considering legislation you hear

7          testimony and you have to think about the testimony.

8          Did you do any research to determine whether the

9          claims of the minority community that this

10         legislation would have as disproportionate impact on

11         their constituents was accurate?

12         "ANSWER:  I -- I don't have a specific recollection.

13         My staff might have done some work on that but, you

14         know, I can't -- I can't sit here and tell you that I

15         did or I didn't.

16         "QUESTION:  Did you do any research when you were

17         debating SB 14 about what percentage of African

18         Americans owned concealed handgun licenses in Texas?

19         "ANSWER:  I don't have a recollection that I did or I

20         didn't.

21         "QUESTION:  Was any statistical information about

22         that available to you when you voted on Senate Bill

23         14, to your knowledge?

24         "ANSWER:  There may have been, I don't recall.

25         "QUESTION:  Would that information have been

Williams / by excerpt of Deposition - Cross          133

1          important to you in determining whether to vote for

2          the bill?

3          "ANSWER:  Probably not.

4          "QUESTION:  Did you look into the ethnic makeup of

5          people living below the poverty line in connection

6          with your debate about voter ID legislation in 2011?

7          "ANSWER:  I do not recall at this time.

8          "QUESTION:  Would knowing that African Americans and

9          Hispanics disproportionately make up those living

10         below the poverty line in Texas have made a

11         difference to you in your consideration of SB 14?

12         "ANSWER:  You know, the provisions of Senate Bill 14

13         were that you could get this election identification

14         certificate at no cost, and so I don't think that

15         that was really an issue that I would have given a

16         lot of consideration to."

17     **(End of reading excerpts)**

18         **MS. RUDD:**  That concludes our reading.  And, your

19 Honor, I just want to draw your attention to two other

20 exhibits, PL-157, which is Senate Resolution 98 from the 67th

21 legislative session that was mentioned in that reading; and PL-

22 172, which is Senate Resolution 14 from the 81st legislative

23 session.  Thank you.

24         **THE COURT:**  Okay.  We can go ahead and take a morning

25 break.  During the lunch hour we are going to be in recess from

1    12:00 to 1:30 today.  Okay.

2              **MR. SPEAKER:**  Thank you, your Honor.

3              **THE CLERK:**  All rise.

4         **(A recess was taken from 10:24 a.m. to 10:41 a.m.; parties**

5    **present)**

6              **THE COURT:**  All right.

7              **MR. SCOTT:**  Your Honor, there are -- not the next one

8    but the next two out of the next three are Department of

9    Justice witnesses and I think the Department of Justice has

10   approached the State about how to perhaps handle the reading of

11   that information.  Some of it evidently contains some

12   information that does in fact relate to law enforcement

13   operations that just from a practical standpoint would be

14   better not having it on the public record.

15             It's something we can hand to you but it's pretty

16   clear from our understanding that you've already got more than

17   your fair share of reading to do --

18             **THE COURT:**  Okay.

19             **MR. SCOTT:**  -- and you wanted it read and so we're

20   happy to do that but --

21             **THE COURT:**  Well, how much is it?  What are we

22   talking?

23             **MS. WOLF:**  Um.

24             **MR. SCOTT:**  I think one is a 17 page exert and the

25   other's a 19 page exert out of depos.

1      **THE COURT:**  So is the proposal from both sides that

2  you all just give that to me and then what do we do with the

3  records, seal that portion?  I'm not sure exactly what the

4  request is.

5      **MR. SHAPIRO:**  The United States' request would be for

6  the Court to be given the documents so they could review them

7  under seal and you know, I don't think it would take that long

8  for the Court to review --

9      **THE COURT:**  Okay.

10      **MR. SHAPIRO:**  -- those documents.

11      **THE COURT:**  And then for purposes of the record what

12  are we doing for it to be in the record?  We're just going to

13  admit them sealed, what you give me and it's not going to be

14  part of the official transcript as -- for Court reporting

15  purposes?

16      **MS. WOLF:**  Sure, your Honor.  And -- I mean, the

17  other thing we can do is we're submitting some exhibits under

18  seal, we could mark them as exhibits if you want to just have

19  them that way and we're put them on the drive of the sealed

20  exhibits.

21      **THE COURT:**  That's fine.

22      **MS. WOLF:**  Okay.

23      **MR. SHAPIRO:**  Thank you, your Honor.

24      **MS. WOLF:**  Thank you, your Honor.

25      **THE COURT:**  Okay.

1          **MR. SCOTT:**  That takes two of the readings off the

2     list.

3          **THE COURT:**  Okay.  And that's who?

4          **MS. WOLF:**  Sorry.

5          **MR. SHAPIRO:**  It's Frary and Flusher.

6          **THE COURT:**  Who?

7          **MR. SHAPIRO:**  Michelle Flusher.

8          **MS. WOLF:**  Flusher and Debra Frary.

9          **THE COURT:**  Okay.  How do you spell Michelle's name?

10    Last name?

11         **MS. WOLF:**  F-L-U-S-H-E-R.

12         **MR. SHAPIRO:**  That's correct, your Honor.

13         **THE COURT:**  Okay.

14         **MR. SHAPIRO:**  Can we approach with the excerpt --

15         **THE COURT:**  Yes.

16         **MR. SHAPIRO:**  Thank you.

17         **MR. SCOTT:**  We're going to mark those as Exhibits

18    what for the record?

19         **MS. WOLF:**  John, it will be 2747 and 2748.

20         **MR. SCOTT:**  2747 was the summary.

21         **MR. SPEAKER:**  (indiscernible)

22         **MR. SCOTT:**  Oh, okay.

23         **THE CLERK:**  (indiscernible)

24         **MR. SCOTT:**  Yes.  Your Honor (indiscernible) that's

25    being placed under seal is the excerpts from Debra Frary,

137

1   F-R-A-R-Y.  We've marked as Defense Exhibit 2747 and we would

2   like this to be placed into evidence and put under seal.

3            **THE COURT:**  All right.  The second?

4        **MR. SCOTT:**  And the second is the deposition exerts

5   of Michele Slusher and it's being marked as 2748 and

6   (indiscernible) move for its admission.

7            **THE COURT:**  All right.  So those will be admitted

8   under seal by agreement, correct?  Okay.

9        **(The Court received Defense Exhibit 2747 and Exhibit 2748**

10  **into evidence and placed under seal)**

11           **MR. SHAPIRO:**  Your Honor, (indiscernible)

12           **THE COURT:**  Okay.

13           **MS. WOLF:**  And your Honor, our next reading will be

14  from the deposition of Carolyn Guidry and there's one

15  housekeeping matter that's also related to that.  There's an

16  exhibit, Defendants' 456, which was one of the exhibits we

17  identified for you on September 2nd which we're still trying to

18  work out amongst ourselves because it's a 600 page exhibit.  I

19  sent the pages to counsel this morning but they needed some

20  time to review so prior to the closing we're get your honor

21  whatever final version of that exhibit is it.

22           **THE COURT:**  Okay.

23           **MS. WOLF:**  But it's 456 and it's related to this

24  witness.

25           **THE COURT:**  Okay.

1          **MR. HEBERT:**  That's correct.

2          **THE COURT:**  So now we're reading who?

3          **MS. WOLF:**  (indiscernible)

4          **THE COURT:**  All right.

5                    **EXAMINATION OF CAROLYN GUIDRY**

6               **BY EXCERPTS OF DISPOSITION TESTIMONY**

7     **(QUESTIONS READ BY MR. WHITLEY; ANSWERS READ BY MS. WOLF)**

8          "QUESTION:  State your name for the record, please.

9          "ANSWER:  Carolyn Guidry.

10         "QUESTION:  Do you understand you're not a party to

11         this lawsuit.

12         "ANSWER:  I am.

13         "QUESTION:  Okay.  And you're the County Clerk for

14         Jefferson County, is that correct?

15         "ANSWER:  That's correct.

16         "QUESTION:  Excellent.  So, to start us off, can you

17         give us a bit of background about yourself, where

18         you're from, where you went to school, past jobs?

19         "ANSWER:  I ran for office in 2004 for County Clerk

20         and I was elected at that time for an unexpired term.

21         So I've been County Clerk since October of 2004.  And

22         I'm serving in my ninth year as County Clerk.  And as

23         County Clerk I oversee the elections for Jefferson

24         County.

25         "QUESTION:  And did you run with a political party

Guidry / by excerpts of Deposition - Direct                    139

1        when you ran for County Clerk?

2        "ANSWER:  Yes, I did.

3        "QUESTION:  And which party was that?

4        "ANSWER:  Democrat party.

5        "QUESTION:  Excellent.  Have you had any other

6        experience working in a campaign?

7        "ANSWER:  I've worked campaigns since I was about 12

8        years old.  I've always done I get out to vote

9        campaigns.  I have -- my uncle was very politically

10       active so I've been involved in campaigns since he --

11       at a very, very young age.  So I've always been

12       involved especially being a union official I was

13       always very, very involved so yes.

14       "QUESTION:  Okay.  So you've been doing this now for

15       about nine years and how many staff do you have in

16       your office?

17       "ANSWER:  As a County Clerk I have 35 people in my

18       office.  For the election department I have five

19       people in the election department.

20       "QUESTION:  And who are the five that are in the

21       election department?

22       "ANSWER:  Right now the election manager is Naomi

23       Doyle.  The election programmer is Frederick Cribs

24       (Phonetic).  The warehouse manager is Toy Linton.  I

25       have Denise Plumber as a voting technician and then

1      Adrian Taylor is also a voting technician.

2      "QUESTION:  And what do each of those employees do?

3      What are their responsibilities?

4      "ANSWER:  Naomi Doyle is the election manager.  She

5      oversees the entire department.  So she's responsible

6      for everything that goes on starting with the

7      processing of all the mail ballots, all the way down

8      to everything that they do to make sure that they get

9      all the information they need to make sure the

10     program is done, to make sure the equipment is

11     processed -- the equipment is programmed, everything

12     that they need is done.  Just make sure that they are

13     made ready for all the elections.

14     "QUESTION:  Okay.

15     "ANSWER:  Frederick Cribs, the programmer which he is

16     in training.  He's new.  And he does not do all that

17     programming right now.  We're outsourcing that.  But

18     once he gets fully training he will do all the

19     programming of our ballots and stuff.  Right now he

20     does other website updating, the EA tablets that we

21     use to process the voters and stuff.  So he has a lot

22     of other responsibilities as well.

23     Toy Taylor, she's the warehouse supervisor.  She

24     maintains all the equipment.  She actually works with

25     programming the equipment once we get the program to

1        program each (indiscernible) once it's sent out to

2        the field.  They also help -- all of them help with

3        all the testing and everything before it is deployed.

4        Of course the voting technicians work under the

5        direction of the warehouse supervisor with all the

6        testing and making sure everything is operable.

7        "QUESTION:  Excellent.  To go back for a second, did

8        you receive a deposition notice today that requested

9        documents?

10       "ANSWER:  Yes, I did.

11       "QUESTION:  And did you bring documents with you

12       today?

13       "ANSWER:  Yes, I did.

14       "QUESTION:  And could you describe generally what's

15       included in those documents?

16       "ANSWER:  Well, what's in those documents, first I

17       pulled the Senate Bill which is what we're talking

18       about.  I also pulled things like the press releases

19       that we did pertinent to the photo ID, signs that we

20       post at the polling locations, training material that

21       we use to train our poll workers.  Public request we

22       got pertaining to the photo ID or anything to do with

23       the photo ID or the Senate Bill.

24       Any complaints we got about the photo ID, budget

25       allocations that we did to finance for photo ID,

Guidry / by excerpts of Deposition - Direct          142

1          money we spent for advertising for photo ID for what

2          was required when they come to the polling locations.

3          The mailing that went out for the 2014 Tax Statements

4          that went out, communications that I had between

5          Judge Branick as well as the Secretary of State that

6          was regarding photo ID.

7          Communications and emails that we had when we were

8          trying to setup, setup for EIC in order for the

9          people in Jefferson County that did not have the

10         proper photo ID to be able to obtain their EIC

11         Certificates to be able to vote, provisional ballots

12         that we had during the March primary and the runoff

13         election that had to do with photo ID, people that

14         had to vote originally as well as the list of our

15         election workers.  And then we only had one alleged

16         incident that might have been voter fraud.  Those are

17         the documentation that I pulled.

18         "QUESTION:  Excellent and was there someone in your

19         office who was put in charge of collecting all the

20         documents that were responsive or did you do that

21         yourself?

22         "ANSWER:  I collected those documents.

23         "QUESTION:  You did that, okay.  And was there any

24         search for documents outside of the County Clerk's

25         Office but that might be in possession of the County?

1    "ANSWER:  No.

2    "QUESTION:  Closer to the election?

3    "ANSWER:  What we normally do is we start training

4    before the early voting period starts.  So normally

5    we have training like a month before early training

6    starts.  We were in training for at least two weeks

7    because we have 200 people for training.  So you have

8    training classes four days a week.  They're like two

9    or three hour sessions and people come out to the

10   County session to train.

11   "QUESTION:  So you offer them four days a week.  Are

12   people expected to come all four days or do they pick

13   one?

14   "ANSWER:  No, they only come for two to three -- two

15   to three hours one day.  And we assign them classes.

16   "QUESTION:  So this is an in person training?

17   "ANSWER:  Right.

18   "QUESTION:  Okay.  So the training that the poll

19   workers in Jefferson County received, is it just the

20   in person or do they also do an online training?

21   "ANSWER:  They have some online training as well.

22   "QUESTION:  And do you know if it's voluntary or is

23   it mandatory?

24   "ANSWER:  Oh, it's mandatory for us because we have a

25   tracking system and we can tell whether or not they

1       have taken all the classes.

2       "QUESTION:  Okay.  And how many classes do they have

3       to take online?

4       "ANSWER:  It's a whole program of classes.  I mean,

5       it's like -- I'd have to look at that program.  It's

6       our clarity program and it's just a different course

7       that tells you how to set up the polling location.

8       It's tells you how to qualify a voter.  It's just a

9       regular normal setup of poll worker training and it

10      is different -- I mean, it just has different classes

11      of training of how a to b of what you do the entire

12      day.

13      "QUESTION:  Was there any special training on the

14      photo ID and how to accept a voter's identification?

15      "ANSWER:  No, the training on photo ID was the

16      training that we gave in person.

17      "QUESTION:  And did you receive materials from the

18      Secretary of State like power points or other

19      training materials to use when you educated your

20      employees or your coworkers?

21      "ANSWER:  We did get some materials from the

22      Secretary of State that we implemented into our

23      entire training.

24      "QUESTION:  So did you use those or did you just

25      incorporate those into the County training?

1          "ANSWER:  We incorporated some of it into the

2          County's training.

3          "QUESTION:  Okay.  So you also mentioned that you did

4          some stuff to educate voters.  What types of things

5          did you do to educate voters?

6          "ANSWER:  We had radio time that we to educate the

7          voters.  We did workshops to educate the voters.  We

8          would reach out to different organizations and go out

9          and talk to them.  Like I said we did the tax inserts

10         for every tax statement that went out.  I have that

11         material here for you.  We did it English and

12         Spanish.  They were little, you know, little slips

13         that went out in every tax statement to let them know

14         when you go to vote now you have to have photo ID --

15         voter ID.  Those are the things we did to make sure

16         that voters knew when they went to vote, effective

17         immediately, that you now had to have these types of

18         photo ID.

19         "QUESTION:  Did the County do any billboards?

20         "ANSWER:  No, we did not do any billboards.

21         "QUESTION:  Okay.  Who's generally responsible for

22         voter education activities in the State?  Is it

23         usually the Secretary of State's Office, the Counties

24         or some combination of both?

25         "ANSWER:  For voter education I think it's probably a

1    combination.

2         "QUESTION:  And did you feel that it was particularly

3         important to educate voters about the photo ID law

4         with radio ads, tax inserts, etc.?

5         "ANSWER:  Oh, definitely.

6         "QUESTION:  And why did you think that was important?

7         "ANSWER:  Well, I think it was a way to reach our

8         local voters.  I think it was the best way for us to

9         reach our local voters anyway.

10        "QUESTION:  And did your office do anything to

11        analyze the impact of SB 14 on voters?

12        "ANSWER:  Not other than we lifted the number of --

13        we didn't have a horrific amount of provisional

14        ballots when we looked at it.  I think we had a total

15        of seven over the March primary (indiscernible)

16        election which I guess is an enormous amount.  But I

17        don't -- isn't an enormous amount but I don't think

18        that we've had a great amount of people not having ID

19        in the past.  But of course most people come just

20        with their voter registration cards in the past.  So

21        I don't know.

22        "QUESTION:  And were there any provisional ballots in

23        the May Special Election?

24        "ANSWER:  None to do with photo ID.

25        "QUESTION:  Okay.  Now you mentioned -- so you

Guidry / by excerpts of Deposition - Direct          147

1      brought up before that there may be one allegation of

2      voter fraud.  Is there -- if you think that there's

3      voter fraud going on in the County, what happens?  Do

4      you refer that to someone?

5      "ANSWER:  Yes, I refer it to the District Attorney's

6      Office.

7      "QUESTION:  Anyone else?

8      "ANSWER:  No I leave it up to them where it goes from

9      there.

10     "QUESTION:  Okay.  Now, to turn to the substantially

11     similar names provision that we've talked about.  Who

12     makes the decision -- when a voters who do they hand

13     their ID too?

14     "ANSWER:  The clerk at the desk, whoever is

15     processing the voter at that time.

16     "QUESTION:  And so the election clerk processes the

17     voter and what happens, the voter hands their ID

18     over?

19     "ANSWER:  Right.

20     "QUESTION:  And then the election clerk -- what does

21     the election clerk do with the ID?

22     "ANSWER:  WE have voter administration tablets and we

23     have all the voters listed.  So there names should

24     match what their voter registration says and in the

25     voter registration database they also have their

Guidry / by excerpts of Deposition - Direct                148

1          formal names -- former names as well.  For instance,

2          for a female you may have a former name which will

3          help with your identification.

4          "QUESTION:  So the election clerk takes the ID, looks

5          it up in this tablet, do they swipe the ID in a

6          machine?

7          "ANSWER:  No.

8          "QUESTION:  Okay.  So they just type in the last name

9          or their first name?

10         "ANSWER:  Right.

11         "QUESTION:  And look the person up?

12         "ANSWER:  Uh-huh.

13         "QUESTION:  And so the election clerk has the ID.

14         Are they the ones who decide whether the ID is

15         substantially similar to the voter list?

16         "ANSWER:  Right.

17         "QUESTION:  And did the County give any guidance

18         beyond what the Secretary of State's Office gave out

19         about what substantially similar means?

20         "ANSWER:  Yes, that's part of our training.

21         "QUESTION:  And what kind of additional guidance did

22         you give?

23         "ANSWER:  Well, it was part of the training that came

24         from the Secretary of State's Office about similar

25         names and it's part of the training that we have.

Guidry / by excerpts of Deposition - Direct            149

1       You know, just basically you have to look at names

2       and some things are just kind of like common sense

3       stuff.

4       "QUESTION:  And this -- is this the training that the

5       Secretary of State's Office gave --

6       "ANSWER:  Right.

7       "QUESTION:  -- or is this stuff that the County

8       developed?

9       "ANSWER:  The training the Secretary of State gave

10      that we implemented.

11      "QUESTION:  Okay.  So did you use the same examples

12      from the Secretary of State's Office?

13      "ANSWER:  Right.

14      "QUESTION:  And did you provide any additional

15      examples that the County developed?

16      "ANSWER:  I did which is kind of funny.  I provided

17      like even -- what I provided also was on there.  Like

18      when you're talking about transposing numbers like

19      for their birthdates sometimes, you know.  Even on

20      their driver's license they will transpose numbers.

21      They need to get it corrected.  Look at the

22      birthdates, like it may be 01-27-52.  They may have

23      01-17-52 or they may misspell the name and stuff.

24      Even looking at a picture, sometimes on their

25      driver's license it may not look exactly like them.

Guidry / by excerpts of Deposition - Direct          150

1      They may have changed their hairstyle, something but

2      you've got to really look and use some common sense

3      sometimes, is that really that person?  And that's

4      what I expect them to do and then when all else

5      fails, I tell them that that's why they have the

6      judges and there are alternate judges there to help

7      them make those decisions.  And if all else fails

8      before you turn down a voter that's what we're here

9      for.  Many days I jump in a car, drive to a polling

10     location to make a decision.

11     "QUESTION:  So did that happen at all in any of the

12     elections where you got a call and they said we have

13     an issue and you had to go to a polling place?

14     "ANSWER:  Not for similar names.  I've not had to do

15     that you know.

16     "QUESTION:  Okay.  And so if the election clerk

17     thinks that someone's name is substantially similar

18     but not an exact match, what happens?

19     "ANSWER:  If they think it's substantially similar --

20     "QUESTION:  Uh-huh.

21     "ANSWER:  -- and not a match, then they should let

22     them vote.

23     "QUESTION:  And does the voter have to do anything in

24     order to vote?

25     "ANSWER:  They need to fill out a form.

Guidry / by excerpts of Deposition - Direct                   151

1        "QUESTION:  Okay.  And what form is that?

2        "ANSWER:  It's just a form saying yes, that's me.

3        And we have forms for that and it's in their kit and

4        they fill it out.

5        "QUESTION:  Okay.  Did you give me any guidance

6        perhaps on nick names, like did you give a list of

7        nick names that people go back for various names?

8        "ANSWER:  Yeah, I think in here they even have

9        samples of stuff like that.

10       "QUESTION:  When you say they have examples, is that

11       the Secretary of State's training?

12       "ANSWER:  Well, the Secretary of State's training.

13       "QUESTION:  So the complaint was that one of the

14       election workers was not implementing the law as it

15       was intended?

16       "ANSWER:  Right.

17       "QUESTION:  Are there any other complaints from

18       voters in Jefferson County about the photo ID law?

19       "ANSWER:  Not other than that -- than the one that I

20       got from her and she had another one on there as

21       well, basically the same thing.

22       "QUESTION:  That somebody was not asking for ID when

23       they should have been?

24       "ANSWER:  Right, right, right.

25       "QUESTION:  And so you've not received any other

Guidry / by excerpts of Deposition - Direct                152

1          complaints from constituents about this photo ID law?

2          "ANSWER:  Have I received any complaints?

3          "QUESTION:  Yes.

4          "ANSWER:  No.  You mean as far as going to the

5          polling locations?

6          "QUESTION:  The voters, yeah.

7          "ANSWER:  No.

8          "QUESTION:  Okay.  Are you aware that SB 14 provides

9          a disability exemption for voters with certain types

10         of disabilities?

11         "ANSWER:  I'm aware of that.

12         "QUESTION:  And there's a regulation from the

13         Secretary of State's Office that offers some guidance

14         on substantially similar names, is that correct?

15         "ANSWER:  That's correct.

16         "QUESTION:  Okay.  Let me ask you, are you aware of

17         any examples in Jefferson County of a register voter

18         who has had difficulty obtaining an EIC?

19         "ANSWER:  I'm not aware.

20         "QUESTION:  And when they were actually set up in

21         February, did they provide you with any assistance in

22         reaching out to the residents of Jefferson County

23         regarding the availability of the mobile EIC

24         stations?

25         "ANSWER:  When they set up in February, yes they did.

Guidry / by excerpts of Deposition - Direct                153

1          They did some radio announcements.

2          "QUESTION:  But the Secretary of State's Office did

3          the radio announcement?

4          "ANSWER:  Yes, they did.

5          "QUESTION:  Now, with respect to what you would look

6          for or what you would train the poll workers to look

7          for with respect to a proper military ID, have you

8          been provided examples by the Secretary of State as

9          to what the various military IDs look like?

10         "ANSWER:  Yes.

11         "QUESTION:  Okay.  During those hearings you heard

12         any -- have you heard any of the citizens of

13         Jefferson County making complaints to the

14         Commissioner's Court that they have been unable to

15         obtain photo IDs that would allow them to vote?

16         "ANSWER:  No, sir.

17         "QUESTION:  Okay.  Has that issue even come up to

18         your knowledge at any of the Commission Court

19         Hearings that you've attended?

20         "ANSWER:  No, it has not.

21         "QUESTION:  Okay.  Have they, putting SB 14 aside for

22         the moment, has the Commissioner's Court generally

23         been supportive of your offices' attempt to educate

24         the voters about any election issues?

25         "ANSWER:  Yes, sir.

1      "QUESTION:  Okay.  In other words, your efforts to

2      educate voters did not begin when SB 14 went into

3      effect, correct?

4      "ANSWER:  No, sir.

5      "QUESTION:  There was lots of issues that you worked

6      to educate voters on that have nothing to do with

7      SB 14, correct?

8      "ANSWER:  Yes, sir.

9      "QUESTION:  Okay.  Now how would you characterize

10     your offices' working relationship with the Texas

11     Secretary of State's Elections Division?

12     "ANSWER:  We have a good working relationship with

13     them.

14     "QUESTION:  Okay.  And if you have a question about

15     SB 14 or anything else, are you able to contact the

16     Secretary of State's Office and ask those questions?

17     "ANSWER:  Yeah.

18     "QUESTION:  And are they responsive to you?

19     "ANSWER:  Yes.

20     "QUESTION:  Okay.  So if you have a question on

21     elections, at least from the State's side or the

22     Secretary of State's side, they are willing to talk

23     to you and willing to give you the answers, correct?

24     "ANSWER:  Right.

25     "QUESTION:  Okay.  And also do you receive emails

Guidry / by excerpts of Deposition - Direct          155

1          frequently from the Secretary of State's Office?

2          "ANSWER:  We get advisories all the time.

3          "QUESTION:  Has any groups or private organizations

4          contacted you and offered to give you assistance in

5          educating voters of Jefferson County about the

6          requirements of SB 14?

7          "ANSWER:  No, they've no.

8          "QUESTION:  Okay.  And I believe you testified that

9          there were not provisional ballots cast during the

10         2013 Constitutional Amendment Election?

11         "ANSWER:  That's correct.

12         "QUESTION:  Okay.  Do you know of anyone being turned

13         away from the polls during the Constitutional

14         Election -- Constitutional Amendment Election of 2013

15         because they did not have a photo ID?

16         "ANSWER:  No, I do not.

17         "QUESTION:  Okay.  Well, let me ask it this way then.

18         During the Constitutional Amendment Election of 2013

19         to your knowledge was there any issues raised to you

20         with respect to problems caused by the substantially

21         similar name aspect of SB 14?

22         "ANSWER:  Were there any problems raised?

23         "QUESTION:  Right.

24         "ANSWER:  Not that I'm aware of.

25         "QUESTION:  Okay.  So provisional ballots are cast

Guidry / by excerpts of Deposition - Direct          156

1       for a lot of reasons, other than the requirements of

2       SB 14, correct?

3       "ANSWER:  That's correct.

4       "QUESTION:  Okay.  So you think with respect to the

5       March Primary of 2014, you think there were three

6       provisional ballots cast because of SB 14?

7       "ANSWER:  Uh-huh.

8       "QUESTION:  And do you know what the basis of each of

9       those were?  Was it because the person didn't have

10      any ID or didn't have a correct ID or do you know?

11      "ANSWER:  No ID.

12      "QUESTION:  No ID at all?

13      "ANSWER:  Well, I can tell you in a minute.  Well,

14      this one says failed to present acceptable ID on the

15      first one.  The second one says failed to present

16      acceptable ID.  On the third one it says expired ID

17      and on the fourth one it was expired ID.

18      "QUESTION:  All right.  Now did you hear any

19      complaints from anyone that they were not allowed to

20      vote in the March 2012 Primary because of a similar

21      name issue?

22      "ANSWER:  No, sir.

23      "QUESTION:  And I guess it would have been more a

24      dissimilar name?

25      "ANSWER:  Right.

Guidry / by excerpts of Deposition - Direct          157

1      "QUESTION:  Did anyone complain to you, hey, I was

2      not allowed to vote because my name did not match my

3      ID?

4      "ANSWER:  No.

5      "QUESTION:  Okay.  Did anyone complain to you, to

6      anyone in your office, that they were not allowed to

7      vote in the March 2014 Primary because the name on

8      the voter roll did not match exactly the name on

9      their -- the ID that they presented?

10     "ANSWER:  No.

11     "QUESTION:  Okay.  Did anyone complain to you after

12     the 2014 March Primary that for any reason SB 14

13     prevented them from being able to vote?

14     "ANSWER:  No, sir.

15     "QUESTION:  Okay.  Now, was the 2014 March primary

16     the issue where the gentleman complained that he was

17     not asked for an ID?  Remember, we spoke that

18     earlier?

19     "ANSWER:  Let me see if I have that email.

20     "QUESTION:  Do you recall the letter I'm talking

21     about?

22     "ANSWER:  Yes, I do.

23     "QUESTION:  Okay.  But I believe it was a poll worker

24     who wrote the letter the complaint that had been made

25     to her, correct?

EXCEPTIONAL REPORTING SERVICES, INC

Guidry / by excerpts of Deposition - Direct          158

1       "ANSWER:  Yeah.  It was for the March 4th primary,

2       because she sent it March 5th.

3       "QUESTION:  So that particular letter, who sent it

4       before you put it back in the stack?

5       "ANSWER:  It was Sherry Boudreaux.

6       "QUESTION:  That's the letter that she wrote to you?

7       "ANSWER:  Yes.  She's one of the election judges.

8       "QUESTION:  Did she relate the individual's name who

9       made the complaint?

10      "ANSWER:  No, she did not.

11      "QUESTION:  Okay.  So that letter is the only

12      complaint you're aware of in March for the 2014

13      primary related to SB 14, correct?

14      "ANSWER:  Yes.

15      "QUESTION:  And the gentleman who made that complaint

16      was not complaining that he was not allowed to vote

17      because of the photographic requirement, correct?

18      "ANSWER:  No, he was allowed to vote.  He was

19      complaining why was he not asked for his photo ID.

20      "QUESTION:  Okay.  So he felt like he should have

21      been asked for a photo ID, correct?

22      "ANSWER:  Right.

23      "QUESTION:  And he was not?

24      "ANSWER:  Yeah.

25      "QUESTION:  Okay.  Did he indicate that he would have

Guidry / by excerpts of Deposition - Direct          159

1        been more comfortable if he had asked -- if he had

2        been asked to show his photo ID?

3        "ANSWER:  I guess he was trying to figure out why the

4        same rules didn't apply to him if everybody else was

5        being asked.

6        "QUESTION:  And to him, it was important anyone show

7        the photo ID, correct?

8        "ANSWER:  I can assume that was his reason.

9        "QUESTION:  Okay.  And that's the only complaint that

10       you recall from the 2014 primary?

11       "ANSWER:  Yes, that's correct.

12       "QUESTION:  And there was none with respect to the

13       2013 election, correct?

14       "ANSWER:  No, sir.

15       "QUESTION:  All right.  Then the next election was

16       the runoff election?

17       "ANSWER:  Yes.

18       "QUESTION:  Was that in May?

19       "ANSWER:  Well, it actually wasn't the next one.

20       "QUESTION:  What was the next election after the

21       March, 2014 primary?

22       "ANSWER:  We had the Senate District, May 5th.

23       "QUESTION:  Okay.

24       "ANSWER:  That was Senate District 4, we had the May

25       5th election.  And then we had the runoff on May

Guidry / by excerpts of Deposition - Direct          160

1        27th.

2        "QUESTION:  That was a special election?

3        "ANSWER:  Yeah.

4        "QUESTION:  Who had been the previous senator, or who

5        vacated their position?

6        "ANSWER:  Tommy Williams.

7        "QUESTION:  All right.  Were there any provisional

8        ballots cast during that particular election?

9        "ANSWER:  No, there were none.

10       "QUESTION:  Okay.  Were there any similar names

11       afterwards filled out during that election?

12       "ANSWER:  There were none.

13       "QUESTION:  Did you receive any complaints that

14       anyone complained that they were not allowed to vote

15       during that election because of any of the -- any of

16       the photo ID requirements?

17       "ANSWER:  Not that I'm aware of.

18       "QUESTION:  Okay.  Did anyone from your office report

19       to you they had hear complaints that someone had not

20       been allowed to vote because of the requirements of

21       SB 14 or photo ID?

22       "ANSWER:  No, sir.

23       "QUESTION:  Okay.  So with respect to -- well, let's

24       just go on.  The next election then would have been

25       the runoff, correct?

Guidry / by excerpts of Deposition - Direct                161

1        "ANSWER:  The runoff, May 27th.

2        "QUESTION:  All right.  And with respect to the May

3        27th runoff, were provisional ballots cast?

4        "ANSWER:  Yes.

5        "QUESTION:  Okay.  How many were cast?

6        "ANSWER:  I think there were seven, but three

7        pertaining to photo ID.

8        "QUESTION:  How many total provisional ballots, if

9        you have it?

10       "ANSWER:  Total?  Eleven total.

11       "QUESTION:  Okay.  And do you know what -- why --

12       what the provisional ballots were, other than the

13       ones that were cast because of SB 14?  What types of

14       issues?

15       "ANSWER:  Yeah, they were like -- they would show up

16       and they already had a ballot by mail, and they would

17       show up at the polling location to vote when they

18       already had a mail ballot that we had or --

19       "QUESTION:  Okay.  Based upon the five elections in

20       Jefferson -- or four -- based on the five elections

21       that's occurred in Jefferson County after SB 14 has

22       become implemented or became implemented, do you,

23       based upon that experience, have any reason to think

24       SB 14 has prevented people from voting in Jefferson

25       County?

Guidry / by excerpts of Deposition - Direct          162

1          "ANSWER:  I don't think it's prevented people from

2          voting.

3          "QUESTION:  Do you see anything in the numbers of

4          those elections that would indicate to you that there

5          has been a decrease in voting in Jefferson County

6          after the implementation of SB 14?

7          "ANSWER:  No, sir.

8          "QUESTION:  Okay.  Whose idea was it to send out with

9          the tax -- property tax statement, I assume?

10         "ANSWER:  Right.

11         "QUESTION:    Whose idea was it to send out, with

12         property tax statements, the SB 14 information?

13         "ANSWER:  It was mine.

14         "QUESTION:  Why did you do that?

15         "ANSWER:  Because it was the cheapest way I could

16         think to reach all the people in Jefferson County.

17         "QUESTION:  Okay.  And do you think that was

18         effective?

19         "ANSWER:  I hope so.

20         "QUESTION:  When will your office have to start

21         preparing to get ready for the election, for the 2014

22         election?

23         "ANSWER:  I've already begun.

24         "QUESTION:  You've already begun?

25         "ANSWER:  We've already begun.  We already contacted

Guidry / by excerpts of Deposition - Cross                163

1           the early voting and polling locations to put them on

2           notice to make the facilities ready for November.  We

3           have already done that, so we've already begun.

4           "QUESTION:  Okay.  So elections don't occur just

5           within a matter of days.  There's months and months

6           of planning, correct?

7           "ANSWER:  Months and months of planning.

8           "QUESTION:  Okay.

9           "ANSWER:  Absolutely."

10      **(Pause)**

11          **MS. SIMSON:**  Good morning, your Honor.  Emma Simson

12   for the Veasey/LULAC Plaintiffs.  I'll be reading and Tania

13   Faransso will be reading the answers.

14                  **EXAMINATION OF CAROLYN GUIDRY**

15              **BY EXCERPTS OF DEPOSITION TESTIMONY**

16    **(QUESTIONS READ BY MS. SIMSON; ANSWERS READ BY MS. FARANSSO)**

17          "QUESTION:  Could you go ahead and state your name

18          for the record, please?

19          "ANSWER:  Carolyn Guidry.

20          "QUESTION:  Okay.  And you are the County Clerk for

21          Jefferson County; is that correct?

22          "ANSWER:  That's correct.  I ran for office in 2004

23          for county clerk, and I was elected at that time for

24          an unexpired term.  So I've been county clerk since

25          October of 2004.  And I'm serving in my ninth year as

EXCEPTIONAL REPORTING SERVICES, INC

Guidry / by excerpts of Deposition - Cross          164

1       county clerk.  And as county clerk, I oversee the

2       elections for Jefferson County.

3       "QUESTION:  Did the Secretary of State's Office

4       request any information about how many provisional

5       ballots had been cast in the elections because of an

6       ID problem?

7       "ANSWER:  The Secretary of State's Office did not.

8       "QUESTION:  Are you aware that other counties have

9       received authorization to issue EICs through their

10      county clerk's office?

11      "ANSWER:  No, I'm not.

12      "QUESTION:  Is that something that you would think

13      the county would be interested in doing if it were

14      possible for the county clerk's office to get

15      authorization to issue EICs?

16      "ANSWER:  Yes.

17      "QUESTION:  And you mentioned two mobile units on two

18      different days, so I took that to mean there was one

19      mobile unit on each day; is that correct?

20      "ANSWER:  That's correct.

21      "QUESTION:  And were those two days before the

22      November election?  When were those --

23      "ANSWER:  They were before the March primary.

24      "QUESTION:  So there were no mobile EIC units before

25      the November election?

Guidry / by excerpts of Deposition - Cross                165

1      "ANSWER:  There were not.  They did contact me prior

2      to the November election, but they contacted me like

3      days before they wanted me to bring the unit, and I

4      didn't think that was very beneficial because it did

5      give us adequate time to notify the people in order

6      to give them adequate time to be anywhere.  You know,

7      if it's going to be a benefit, I think you need to

8      have time to at least be able to circulate maybe to

9      the church or to the organizations, 'Hey, they're

10     going to be here,' so you would have a good

11     attendance.

12     "QUESTION:  So the Secretary of State's office

13     contacted you about having a mobile EIC unit for the

14     November election, but you declined because you

15     didn't feel you had enough time to organize it?

16     "ANSWER:  That's correct.

17     "QUESTION:  So for the March election you said you

18     had two mobile units before those.  And how far in

19     advance was that arranged, can you recall?  Was it a

20     few days or a few weeks before the election that you

21     had those units?

22     "ANSWER:  Well, I think they actually came in

23     February.  They actually came in February because

24     what they had told me in November when I declined,

25     they said, 'Well, if you don't want us to come now,

Guidry / by excerpts of Deposition - Cross          166

1        when do you want us to come?'  I said, 'Maybe in

2        January some time.'  They said, 'Okay.  Contact us in

3        January.'  So I started contacting them in January.

4        So then when I tried to set them up in January -- and

5        I had set up some dates.  And then when I contacted

6        them, they said, 'No, we can't do it then,' after I

7        had set everything up.  And then they turned around

8        and gave me some more dates.  And then we set up

9        those dates which ended up being in February.

10       "QUESTION:  And did they say why they couldn't do the

11       dates in January?

12       "ANSWER:  Well, they said that I did not give them

13       enough time.  So we went -- just went back and forth

14       for a while.  So they ended up coming before the

15       early voting period started in February.

16       "QUESTION:  And how much time approximately did you

17       have to advertise that those units were going to be

18       here?

19       "ANSWER:  I have to look at these dates.  I think

20       about a week maybe.

21       "QUESTION:  So only about a week?

22       "ANSWER:  Yeah, I think so.

23       "QUESTION:  Okay.  So when you did this campaign in

24       February to advertise the mobile EIC units, you think

25       you had about a week.  Did you feel that was enough

Guidry / by excerpts of Deposition - Cross                167

1        time to advertise the mobile units?

2        "ANSWER:  Well, it was better than a couple days.  It

3        was better than a couple days.

4        "QUESTION:  And you mentioned two locations were

5        used.  What were those two locations?

6        "ANSWER:  One location was the Alice Keith Community

7        Center on Highland.  That's here in Beaumont.  And

8        the other one was the Port Arthur Public Library.  Of

9        course, that's in Port Arthur.  And the dates were

10       February 26th and February 27th.

11       **MS. SIMSON:**  Okay.  And, your Honor, we're now going

12  to turn to page 53, line 13.

13       "QUESTION:  So were the mobile units ever sent to

14       special events, like fairs?

15       "ANSWER:  No.  That was the only time that they were

16       down here.

17       "QUESTION:  Was there ever any discussion about

18       sending mobile units to senior citizen centers?

19       "ANSWER:  No.  This was the only time that they were

20       going to come down here.  This is the only time

21       offered to us, period.

22       "QUESTION:  So the only instance of voter fraud that

23       you can recall is this one potential fraud related to

24       a request for a mail-in ballot?

25       "ANSWER:  Right.

Guidry / by excerpts of Deposition - Cross          168

1          "QUESTION:  And have you referred this case to the

2          district attorney's office?

3          "ANSWER:  I have.

4          "QUESTION:  Are you aware of any instances of voter

5          fraud in Jefferson County that SB 14 could have

6          prevented?

7          "ANSWER:  No.

8          "QUESTION:  So the only instance of voter fraud that

9          you're aware of is a mail-in ballot?

10          "ANSWER:  That's correct.

11          "QUESTION:  Did the Secretary of State's office

12          contact you at all about how the implementation of

13          SB 14 went in any of the elections?

14          "ANSWER:  No, they have not.

15          "QUESTION:  Did the Secretary of State's office

16          collect any information from you about how the

17          implementation of SB 14 went?

18          "ANSWER:  No, they have not.

19          **MS. SIMSON:**  And we're going to turn to page 76, line

20   22.  Sorry, line 9.

21          "QUESTION:  The county also has the ability to issue

22          certified copies of birth certificates; is that

23          correct?

24          "ANSWER:  That's correct.

25          "QUESTION:  And what is the cost of getting a

1        certified copy of a birth certificate?

2        "ANSWER:  I think it's $23.

3        "QUESTION:  If a person comes into the office and

4        says, 'I need a certified copy of my birth

5        certificate,' does the clerk know to ask whether they

6        are looking for one of these to get an EIC?

7        "ANSWER:  No, they're not going to ask.

8        "QUESTION:  So typically, if I walked into the office

9        and said, 'I need a certified copy of my birth

10       certificate,' the person sitting at the desk would

11       say, 'That's going to be $22?'  Is that correct?

12       "ANSWER:  Twenty-three dollars, that's correct.

13       "QUESTION:  Twenty-three dollars.  If a person shows

14       up at the polls and the information on their ID

15       doesn't exactly match the information on the poll

16       book, can they show other documents to show the

17       election clerk that they are who they say they are?

18       "ANSWER:  They have to have a -- one of their

19       approved forms of photo ID.

20       "QUESTION:  Could they, for instance, show a credit

21       card to show that their name has changed?

22       "ANSWER:  No.

23       "QUESTION:  Okay.  So it's just based on the

24       information on their ID?

25       "ANSWER:  Right.

Guidry / by excerpts of Deposition - Cross                    170

1          "QUESTION:  What about if a person comes back to cure

2          their ballot?  Could they show additional

3          documentation then?

4          "ANSWER:  There are forms of additional documentation

5          they can show to the voter registrar.

6          "QUESTION:  Based on your experience as county clerk

7          and administering elections, do you think that the

8          substantially similar name provision is one that all

9          poll workers will interpret the same way?

10         "ANSWER:  No.

11         "QUESTION:  And why is that?

12         "ANSWER:  Well, because, I mean, you have 400 people

13         thinking 400 different ways.  There is no way they

14         are all going to think the same way.

15         "QUESTION:  Where are the DPS offices located in

16         Jefferson County?

17         "ANSWER:  Oh, the DPS office, you cannot get there.

18         They're not accessible, I can tell you that right

19         now.  And that's part of the problem.  That has been

20         part of the problem.  And that's been part of the

21         complaint is because I know the one in Beaumont is

22         far out of the way, and there are no buses that run

23         out there.  Now, the one --

24         "QUESTION:  You say that's been part of the

25         complaint?

Guidry / by excerpts of Deposition - Cross                 171

1      "ANSWER:  That's been part of the complaint that I've

2      heard from people about the DPS office being one of

3      the only places that you can go and pick up your EIC

4      card, or even going to get any type of

5      identification, for anyone, whether it's EIC or just

6      an identification period, because it's not that

7      accessible.  And I don't know where the one in Port

8      Arthur is at all.  I know there's one out there, but

9      I don't know where it is.  But, no, it's not

10     accessible.

11     "QUESTION:  Have you heard any complaints from county

12     residents regarding the DPS offices?

13     "ANSWER:  Well, yeah.  They complaint it's not

14     accessible, it's far, and it's always too crowded.

15     "QUESTION:  Do you have an opinion as to whether or

16     not the underlying documents that are necessary to

17     present in order to receive an EIC are free?

18     "ANSWER:  They are not free.

19     "QUESTION:  And when you say they are not free, what

20     is the basis of your opinion?

21     "ANSWER:  Well, you have to have some type of a birth

22     certificate, or a marriage license, or some type of

23     form to prove who you are.

24     "QUESTION:  And I believe you also testified that if

25     an individual enters into the office of vital

Guidry / by excerpts of Deposition - Cross                172

1          statistics to get a birth certificate, that they

2          would not be immediately informed of the reduced fee.

3          "ANSWER:  Not unless they would tell the clerk what

4          the purpose was -- what they are there for, what they

5          need it for.  I mean, it's not information that's

6          just volunteered.  I mean, the clerk is not going to

7          say, 'Do you need a birth certificate for an EIC

8          card?'

9          "QUESTION:  How has the county advertised regarding

10         the religious exemptions for photo IDs?

11         "ANSWER:  We have not advertised anything about

12         exemptions, religious exemptions.

13         "QUESTION:  Has the county advertised regarding

14         disability exemptions?

15         "ANSWER:  No, we have not.

16         "QUESTION:  Are you aware of whether the state has

17         provided any assistance in advertising that

18         information -- that type of information regarding

19         exemptions in Jefferson County?

20         "ANSWER:  I'm not aware of any.

21         "QUESTION:  And as the election administrator, is it

22         fair to say that if they had, you would be aware of

23         that?

24         "ANSWER:  That's correct.

25         "QUESTION:  Are you aware of any county resident

Guidry / by excerpts of Deposition - Cross          173

1          complaining to you or your staff regarding DPS

2          because of fear of being targeted in any fashion by

3          the DPS offices?

4          "ANSWER:  Well, I don't know about fear.  I guess

5          there was an initial dialogue whether or not if they

6          apply for EIC, could they be arrested if they had

7          warrants.

8          "QUESTION:  When you say 'initial dialogue,' who was

9          this dialogue with?

10         "ANSWER:  Just citizens of Jefferson County.  I mean,

11         that was the initial dialogue any time they go to

12         DPS, though.

13         "QUESTION:  And what is your understanding of --

14         could you please explain the substance of that

15         dialogue?

16         "ANSWER:  I mean, most people think that when they go

17         to DPS, that DPS is going to run their name to see if

18         they have any warrants.  I mean, I've known a lot of

19         people that if they have warrants, they go straight

20         from DPS to jail.  I guess if you do the crime, you

21         do the time.

22         "QUESTION:  What about underlying traffic tickets?

23         "ANSWER:  Those, too.

24         "QUESTION:  And what, if any, understanding do you

25         have about the process at DPS regarding running for

1          warrants for underlying tickets or traffic tickets?

2          "ANSWER:  Well, I don't know what their process is.

3          "QUESTION:  So as you sit here today, your testimony

4          is that you heard from county residents regarding

5          concerns related to being arrested at DPS and having

6          their names checked for tickets or traffic tickets,

7          but you don't know what that process is at DPS

8          currently?

9          "ANSWER:  That's true.

10         "QUESTION:  Regarding the mobile EIC stations, did

11         the Secretary of State's office assist in any way to

12         determine the appropriate locations for the mobile

13         EIC stations?

14         "ANSWER:  No, they did not.

15         "QUESTION:  Did they provide you with any data that

16         may suggest where the highest no matches may be in

17         Jefferson County?

18         "ANSWER:  No, they did not.

19         "QUESTION:  Okay.  So you think with respect to the

20         March primary of 2014, you think there were three

21         provisional ballots cast because of SB 14?

22         "ANSWER:  Uh-huh.

23         "QUESTION:  And do you know what the basis of each of

24         those were?  Was it because the person didn't have

25         any ID or didn't have a correct ID, or do you know?

Guidry / by excerpts of Deposition - Cross                175

1      "ANSWER:  No ID.

2      "QUESTION:  No ID at all?

3      "ANSWER:  Well, I can tell you in a minute.  Well,

4      this one says, 'Failed to present acceptable ID,' on

5      the first one.  The second one says, 'Failed to

6      present acceptable ID.'  On the third one, it says,

7      'Expired ID.'  And on the fourth one, it was,

8      'Expired ID.'

9      "QUESTION:  Okay.  So --

10     "ANSWER:  So I had two expired and two failed to

11     present.

12     "QUESTION:  Okay.

13     "ANSWER:  So it was four for the March 4th primary.

14     "QUESTION:  Okay.  And were any of those provisional

15     ballots cured?

16     "ANSWER:  No, sir.

17     "QUESTION:  Okay.  So with respect to -- well, let's

18     just go on.  The next election then would have been

19     the runoff, correct?

20     "ANSWER:  The runoff, May 27th.

21     "QUESTION:  All right.  And with respect to the May

22     27th runoff, were provisional ballots cast?

23     "ANSWER:  Yes.

24     "QUESTION:  Okay.  How many were cast?

25     "ANSWER:  I think there were seven, but three

Guidry / by excerpts of Deposition - Cross          176

1          pertaining to photo ID.  And these two are 'no

2          presented,' 'failed to present ID,' one, twice.  Two

3          of them are fail to present ID and one of them is

4          just does not have acceptable ID, whatever that

5          means.

6          "QUESTION:  Okay.  Were any of those cured?

7          "ANSWER:  No, sir.

8          "QUESTION:  With respect to the DPS offices, you say

9          there's one in Beaumont and one in Port Arthur?

10         "ANSWER:  Yes, sir, I think.

11         "QUESTION:  That you know of?

12         "ANSWER:  Yes, sir.

13         "QUESTION:  Do you know the address of the one here

14         in Beaumont?

15         "ANSWER:  No, sir.  I know it's way out on Tram Road

16         somewhere.

17         "QUESTION:  Do you know the location?  Does 7200

18         Eastex Freeway sound familiar?

19         "ANSWER:  That sounds right.

20         "QUESTION:  Okay.  Where would that be -- we're at

21         the courthouse today, correct?  The district

22         attorney's office.  In relation to where we are

23         today, where would the Beaumont DPS office be that's

24         at 7200 Eastex Freeway, just generally speaking?

25         "ANSWER:  Catch the freeway, go 10, go 69, Eastex

Guidry / by excerpts of Deposition - Cross          177

1     Freeway, 69 going north, and it's all the way until

2     you get past 105, all the way out that way, exit 105.

3     "QUESTION:  I'm not that familiar.

4     "ANSWER:  Okay.

5     "QUESTION:  How far do you think it is from here?

6     "ANSWER:  It's a good little ways out.  It's nothing

7     I don't want to walk to.  It's about -- way out.

8     "QUESTION:  How long do you think it would take you

9     to drive it?

10    "ANSWER:  It would take 20, 25 minutes to get out

11    that way, 25.

12    "QUESTION:  With respect to Jefferson County, or at

13    least the people that particular office would serve -

14    - I suppose Port Arthur has its own -- geographically

15    speaking, do you think that that's centrally located

16    for the people it's trying to serve?

17    "ANSWER:  No, not at all.

18    "QUESTION:  Okay.  And are there people over the age

19    of 65 that you know prefer to vote in person instead

20    of by mail?

21    "ANSWER:  Absolutely.  We have some people that will

22    not vote early and they insist on going on election

23    day to cast their ballot.

24    "QUESTION:  Before SB 14, what were generally the ID

25    requirements to vote?

1    "ANSWER:  Your voter registration, any form of an ID

2    issued from DPS, your student ID.  You could have

3    used a utility bill, you know.  We had about nine or

4    ten different forms of ID that you could have used.

5    "QUESTION:  And based on your experience as a county

6    clerk administering elections, did you think those

7    requirements were sufficient to secure the voting

8    requirements?

9    "ANSWER:  They were sufficient."

10   **MS. SIMSON:**  Thank you, and that's all.

11   **(Pause)**

12   **MR. WHITLEY:**  Your Honor, this is an excerpt from the

13   deposition of Bryan Hebert.  I have a copy for you.  May I

14   approach?

15   **THE COURT:**  Yes.

16   **EXAMINATION OF BRYAN HEBERT**

17   **BY EXCERPTS OF DEPOSITION TESTIMONY**

18   **(QUESTIONS READ BY MR. WHITLEY; ANSWERS READ BY MR. KEISTER)**

19   "QUESTION:  Do you know what happened to Senate Bill

20   362 in the House?

21   "ANSWER:  It looks like on May 23rd, 2009, it would

22   have -- it was placed on the major State calendar.

23   And my memory is that there's a fair amount of

24   opposition from Democrats in the House, some would

25   say stall tactics.  They talked at length on bills

1    that normally would have been passed as a matter of

2    routine.  To delay consideration of the bill on the

3    major State calendar, it was certainly, again, met

4    with sort of stiff partisan opposition in the House.

5    But I can't recall the specific details of its

6    demise.

7    "QUESTION:  Is there a term that is used to refer to

8    when there's a lot of talking about a bill to stop

9    consideration of other bills?

10   "ANSWER:  'Chubbing' is the word or term around the

11   Capitol that's used, yes.  Again, it's -- there's no

12   filibuster allowed in the House.  They have strict

13   rules on the amount of time a person may speak, but

14   if every single person uses every second of time on

15   every single bill to delay consideration of other

16   bills or other actions, 'chubbing' is the term that's

17   often used.

18   "QUESTION:  And how did opponents of Senate Bill 362

19   -- how did they manage to chub it to death, so to

20   speak?

21   "ANSWER:  Me memory from watching it on TV, because I

22   was not in the House, is that on other calendars, the

23   major State calendars, just one calendar bill the

24   House considers is that there were other calendars

25   for that, or days before that even, wherein the

1    Democrats -- my memory is that it was all Democrats -

2    - spoke at length on those procedural or

3    uncontroversial bills to delay the consideration of

4    the major State calendar.

5    "QUESTION:  Other than what you just testified to,

6    there are no other facts that warranted such prompt

7    consideration of Senate Bill 14; is that right?

8    "ANSWER:  Again, the same that I mentioned earlier,

9    the desire to actually have it passed this time.

10   This was now the third or fourth or fifth session

11   that it had been attempted to be passed.  And on

12   multiple occasions had run out of time or procedural

13   obstacles had been placed in its way that stopped it.

14   So if nothing else, to get it done.

15   "QUESTION:  What facts do you know or did you know at

16   the time when you wrote this set of talking points

17   that would enable you to predict that SB 14 would

18   have that effect?

19   "ANSWER:  Again, I think the whole intent of the bill

20   is to make sure eligible, properly identified voters

21   are casting votes.  We had had testimony over the

22   years that, in fact, the registration rules were not

23   a hundred percent accurate and, in fact, there may be

24   registration cards sent to people who are dead or

25   felons or otherwise ineligible.  And so accurate, up-

1      to-date identification required at the polling place

2      seems on its face to protect against fraud and be

3      designed to count only eligible voters and votes.

4      "QUESTION:  Isn't it true that some of the forms of

5      ID allowable under SB 14 could be obtained by persons

6      who are not U. S. citizens?

7      "ANSWER:  Sure.  No system is perfect, but I think

8      this was a step in the right direction towards

9      increasing the security.  It didn't say make a

10     hundred percent secure because there's no such thing.

11     But yes, any system designed by humans can be abused

12     by humans.

13     "QUESTION:  So what types of ineligible voters would

14     SB 14 prevent from voting?

15     "ANSWER:  It's a broad category, I think.  My

16     understanding of ineligible voters would be someone

17     who doesn't live in the state, someone who is dead,

18     someone who fraudulently obtained someone else's

19     identifying registration card, someone who produces

20     false documentation.  I could go on, I guess, but

21     it's a broad category.

22     "QUESTION:  Well, turning back to that first

23     category, people that don't reside in the state,

24     those people are clearly ineligible to vote in the

25     State of Texas, correct?

1           "ANSWER:  Right.  Well, I should say if they're a

2           resident, but currently out of the state, they may

3           vote.  But yes, generally, that's right.

4           "QUESTION:  Assuming someone moved to another state

5           with intent to remain in that other state and they

6           were not a Texas resident, then suppose that

7           individual came back into the state with a driver's

8           license with their former Texas address and a

9           picture, that would be a qualifying ID under SB 14,

10          correct?

11          "ANSWER:  Uh-huh.

12          "QUESTION:  So under that circumstance, it would not

13          prevent an ineligible voter who should not be on the

14          voter rolls from participating in an election; isn't

15          that right?

16          "ANSWER:  Right.  Like I said, there's no perfect

17          system.  The universe of potential crimes or

18          ineligible votes that would be case is larger without

19          this bill, and it is smaller with this bill, but it's

20          not a perfect system.  Of course, fraud still exists,

21          and that's why lots of other bills have been able to

22          be introduced regarding voter fraud.  There are lots

23          of types of fraud and efforts to stop that.

24          "QUESTION:  And then finally, what facts were you

25          aware of at the time that you wrote this, that SB 14

Hebert / by excerpts of Deposition - Direct          183

1          would protect public confidence in elections?

2          "ANSWER:  As you asked a similar question about 362,

3          I think the polling continued to show that the voters

4          of Texas supported photo ID, and that includes

5          minority voters, Blacks and Hispanics, and then

6          voters as a whole overwhelmingly.  I think you could

7          draw just from that, that public confidence would

8          increase by adopting measures supported by the

9          public.

10          "QUESTION:  Turning to measures required to offset

11          burdens, how did SB 14 accomplish and fulfill these

12          required measures?  And we'll start off with the

13          first one.  How does SB 14 provide access to free

14          photo ID cards?

15          "ANSWER:  As I see it, the bill currently as

16          implemented allows -- required DPS to create election

17          identification cards, which are similar to driver's

18          licenses, but for the purpose of having a photo ID

19          for elections, and those were to be issued at no

20          cost.

21          "QUESTION:  At the time that you wrote these bullet

22          points, you knew, did you not, that it cost -- there

23          was a cost associated with obtaining a birth

24          certificate in the State of Texas, correct?

25          "ANSWER:  At the time of this, yes.

Hebert / by excerpts of Deposition - Direct          184

1        "QUESTION:  And that cost was $22 at a minimum,

2        correct?

3        "ANSWER:  Yes.  But it's not today, as I understand

4        it.

5        "QUESTION:  But at the time the bill was being

6        considered when you wrote these bullet points, the

7        cost was $22, right?

8        "ANSWER:  Again, yes, and this bullet point says,

9        'Access to free photo ID cards.'  The cards are free.

10       "QUESTION:  But the underlying documentation to get

11       the free card is not free, correct?

12       "ANSWER:  If you already have a birth certificate,

13       it's free.

14       "QUESTION:  If you don't have a birth certificate,

15       it's not free, though, right?

16       "ANSWER:  It would have been $22, and now I believe

17       it's either zero -- zero to $3.

18       "QUESTION:  Doesn't that card show the person's

19       identity?  You can see the picture and you can see

20       the person.

21       "ANSWER:  A forged student ID with a photograph would

22       be less secure, yes.  In my opinion, it's more easily

23       forged than the types of documents or IDs permissible

24       under SB 14.

25       "QUESTION:  But the purpose of the photo ID

Hebert / by excerpts of Deposition - Direct          185

1        requirement is so that the voter can prove I am who I

2        say I am, this is my picture, I am me.

3        "QUESTION:  Right.  On a secure, widely recognizable

4        form of ID.  And there are I don't know how many

5        colleges in Texas, or in the instance of eligible

6        voters from Texas who reside in Texas and intend to

7        reside in Texas, continue school out of state or

8        private universities, the pool of potential IDs and

9        the ability to forge those gets much easier, I think.

10       "QUESTION:  Can you identify any attempts to make the

11       bill less retrogressive or as least burdensome as

12       possible to voters and still accomplish the goals of

13       the legislature?

14       "ANSWER:  Sure.  There were additional forms of ID

15       added by amendment on the floor.  There were broad

16       exemptions for certain class of people.  There were

17       free election identification cards issued.  I think

18       all of those things were designed to be less

19       burdensome for voters.

20       "QUESTION:  What studies did the Lieutenant Governor

21       use to satisfy himself that SB 14 would not reduce

22       turnout among minority voters?

23       "ANSWER:  Well, Senator -- I mean, the Lieutenant

24       Governor Dewhurst would have been a sitting member of

25       the Committee of the Whole, so he would have reviewed

1      all of those documents presented during that debate.

2      "QUESTION:  Can you identify any studies that he

3      reviewed to satisfy himself that it would not reduce

4      turnout among minority voters?"

5      **MR. WHITLEY:**  And there's an objection.

6      "QUESTION:  You may answer.

7      "ANSWER:  I don't remember specific names of reports

8      or studies.  I do remember generally that Senator

9      Wentworth's presentation included voter turnout in

10     states that implemented voter ID.

11     "QUESTION:  Are you aware of any facts or basis for

12     including concealed handguns as an acceptable form of

13     ID, but not Medicare cards or student ID cards?

14     "ANSWER:  Well, from my own knowledge, I would -- I

15     know that the concealed handgun licenses are issued

16     by DPS, which also issues driver's licenses and

17     election ID cards and personal identification cards.

18     I know they have personal -- identifying information

19     and expiration dates on their face.  Medicare cards,

20     I'm honestly not sure what those look like.  I'm not

21     sure if they include expiration dates or other

22     identifying information.  Student Ids, I've talked

23     about before.  I think even if as in the proposed

24     amendment in the Senate, you say accredited public

25     university in Texas, that's still a very, very large

Hebert / by excerpts of Deposition - Direct          187

1        pool of potential identifications, which may or may

2        not have security elements or expiration dates or any

3        other number of identifying characteristics.

4        "QUESTION:  Were there any forms of ID used by DPS

5        that were -- are not acceptable photo IDs under

6        Senate Bill 14?

7        "ANSWER:  I'm not aware of any.

8        "QUESTION:  At any time since the passage of Senate

9        Bill 14 have you come to believe that it was passed

10       with any discriminatory purpose, in the whole or in

11       part?

12       "ANSWER:  I do not believe that it was passed with

13       any discriminatory purpose, in whole or in part.

14       "QUESTION:  Was Senate Bill 14 enacted in part to

15       reduce the participation of Hispanic voters?

16       "ANSWER:  I do not believe so.

17       "QUESTION:  Was SB 14 enacted in part to reduce the

18       participation of African American voters?

19       "ANSWER:  I do not believe so.  And, in fact, at

20       least on the House side, there were minority members,

21       Black and Hispanics, who voted for the bill.

22       "QUESTION:  At any time since the passage of Senate

23       Bill 14, have you come to believe that Senate Bill 14

24       will have a disproportionate effect on minority

25       voters as compared to Anglo voters?

1          "ANSWER:  I have not seen any evidence to convince me

2          of that."

3          **MS. WESTFALL:**  Elizabeth Westfall for the United

4    States, and Sam Oliker-Friedland will play Bryan Hebert.  May I

5    approach?

6          **THE COURT:**  Yes.

7          **MR. SCOTT:**  By far the best reader.

8          **THE COURT:**  Yeah, I agree.  He takes his role

9    seriously.

10     **(Laughter)**

11          **MS. WESTFALL:**  That's why he was selected.  Thank you

12   for the kind words.

13                    **EXAMINATION OF BRYAN HEBERT**

14                **BY EXCERPTS OF DEPOSITION TESTIMONY**

15          **(QUESTIONS READ BY MS. WESTFALL; ANSWERS READ BY**

16                    **MR. OLIKER-FRIEDLAND)**

17          "QUESTION:  During the five-year period that you

18          served as Mr. Dewhurst's deputy general counsel, you

19          were the point person for the Secretary of State's

20          office; is that right?

21          "ANSWER:  Correct.

22          "QUESTION:  Fair to say you're quite familiar with

23          the Texas election code?

24          "ANSWER:  Correct.

25          "QUESTION:  So was there a time when Mr. Dewhurst

Hebert / by excerpts of Deposition - Cross                189

1          rehired you?

2          "ANSWER:  Yes.

3          "QUESTION:  When was that?

4          "ANSWER:  That was in October of 2012.

5          "QUESTION:  What position did he hire you for?

6          "ANSWER:  General counsel.

7          "QUESTION:  Turning your attention back to Exhibit

8          155 --

9          **MS. WESTFALL:**  Which is PL-205.

10         "QUESTION:  -- Mr. Hebert, do you recognize this

11         document?

12         "ANSWER:  It looks like an email I sent to Janice

13         McCoy for use -- or it says, 'For your use as

14         needed,' and it is a series of attachments relating

15         to talking points and arguments in support of Senate

16         Bill 362 as well as some overview of various election

17         laws and processes used.

18         "QUESTION:  And you just described a bunch -- several

19         attachments to the email to Exhibit 155.  Did you

20         draft all those attachments yourself?

21         "ANSWER:  This looks like -- my memory is that, yes,

22         I drafted or at least substantially drafted these

23         documents.

24         "QUESTION:  Turning your attention to the date of the

25         email, what is the date of the email?

Hebert / by excerpts of Deposition - Cross          190

1      "ANSWER:  March 4th, 2009.

2      "QUESTION:  Was this email sent to Ms. McCoy shortly

3      before the Committee of the Whole's consideration of

4      Senate Bill 362?

5      "ANSWER:  I'd have to refer to the history again.

6      The email is from March 4th and the committee took

7      testimony on March 10th.  It was passed after that.

8      So yes, I mean, it was before consideration by the

9      Senate.

10     "QUESTION:  And several days before; is that correct?

11     "ANSWER:  Correct.

12     "QUESTION:  When did you draft the attachments to

13     Exhibit 155?

14     "ANSWER:  I do not recall.

15     "QUESTION:  Roughly around the same time as the

16     email?

17     "ANSWER:  I can't recall.  It may have been the fall

18     before session.  It may have been right before.  I

19     can't recall.

20     "QUESTION:  Do you know why you drafted the

21     attachments?

22     "ANSWER:  For her use as needed.  Again, I think to

23     help with passage of the bill by providing outlines

24     of relevant law and arguments to extend to opponents

25     of the bill.

Hebert / by excerpts of Deposition - Cross                    191

1        "QUESTION:  Do you see that in Bullet 1 --

2        **MS. WESTFALL:**  On the next page, Bullet 1.

3        "QUESTION:  -- that you write, 'There is less chance

4        of disenfranchising elderly, poor, or minority

5        voters?'

6        "ANSWER:  Yes, it says that.

7        "QUESTION:  And how did you determine that Senate

8        Bill 362 would have that effect?

9        "ANSWER:  I don't recall specific reason for that.

10       Again, other than this document taken as a whole with

11       the others are intended to be arguments in favor of

12       the bill.  And, you know, any election reform has a

13       chance of disenfranchising voters, and this is

14       evidently less chance of disenfranchising voters.

15       "QUESTION:  And what particular provisions in Senate

16       Bill 362 made it less likely to disenfranchise these

17       classes of voters?

18       "ANSWER:  Again, I assume it's related to the forms

19       of identification that are acceptable.

20       "QUESTION:  So is it fair to say that given that it

21       allowed for the use of non-photo ID, that would make

22       it less likely to disenfranchise these classes of

23       voters?

24       "ANSWER:  It's possible.  Again, looking at *Crawford*,

25       you know, the court allowed that forms of voter

Hebert / by excerpts of Deposition - Cross          192

1   reform will often disenfranchise some voters and, you

2   know, if it's some minimal number or negligible

3   number, then that might be okay if there are other

4   benefits to the law.

5   "QUESTION:  Turning your attention back to what you

6   wrote about Senate Bill 362, is it fair to say that

7   you were referring to the use of non-photo ID made it

8   -- the bill less likely that it would disenfranchise

9   these forms of -- these classes of voters?

10   "ANSWER:  I can't be sure.  I know there are more

11   forms of ID certainly as compared to the current law,

12   but I don't know if I was specifically referring to

13   photo or non-photo.

14   **MS. WESTFALL:**  And again, it says -- "less than a

15   chance."

16   "ANSWER:  Less than a chance.

17   **MS. WESTFALL:**  Sorry, go ahead.

18   "ANSWER:  It doesn't -- I don't think it acknowledges

19   that people will be disenfranchised.  It acknowledges

20   the chance of disenfranchisement is some percentage

21   less under this bill.

22   "QUESTION:  Is it -- were you intending to suggest

23   there was less of a chance of disenfranchising

24   elderly, poor, or minority voters relative to hard-

25   photo ID bills than would only permit the use of

Hebert / by excerpts of Deposition - Cross                193

1    photo ID?

2    "ANSWER:  I don't recall what I was drawing

3    comparison to.  Different forms of bills is all I can

4    say.

5    "QUESTION:  Is it fair to say that without the

6    provision allowing use of non-photo ID in Senate Bill

7    362, that it would increase the likelihood of

8    disenfranchisement for these groups?

9    "ANSWER:  It's possible.

10   "QUESTION:  Did you write this bullet about

11   preclearance --

12   **MS. WESTFALL:**  And turning down to number 5,

13   preclearance.

14   "QUESTION:  -- because you believed that allowing

15   more forms of ID would decrease the bill's

16   discriminatory impact on voters?

17   "ANSWER:  I believe that this bill, what it says,

18   increases the chances of preclearance because it had

19   -- because of the list of acceptable ID in the bill.

20   "QUESTION:  Turning your attention to 00087014, the

21   last page of Exhibit 155, Process for Obtaining a

22   Texas Birth Certificate.  When Senate Bill 362 was

23   under consideration, did you consider the cost of

24   obtaining photo IDs required under that law -- bill?

25   "ANSWER:  Looking at this page, it's clear that I

Hebert / by excerpts of Deposition - Cross          194

1        considered it.  Again, I was not a bill sponsor.

2        "QUESTION:  Does looking at Texas 00087014 refresh

3        your recollection as to whether you undertook or

4        someone in your office undertook research on the cost

5        of birth certificates in Texas?

6        "ANSWER:  It's clear from this document that birth

7        certificates were considered.  Each of the 1, 2, 3,

8        and 4 on that page mention birth certificates.  I

9        can't recall if I would have been the one that did

10       it, likely, and I can't remember if I looked

11       specifically at cost or if I looked at birth

12       certificates generally.

13       "QUESTION:  Do you know why you focused on the cost

14       of birth certificates?

15       "ANSWER:  I don't know that I focused on the cost of

16       birth certificates.  I think I looked at the

17       availability of birth certificates, looking at this

18       document.

19       "QUESTION:  Do you know why you looked at the

20       availability of birth certificates as opposed to

21       other forms of identification?

22       "ANSWER:  I think likely that birth -- I mean, I

23       think birth certificates are one of the more common

24       methods of obtaining other types of identification,

25       and so I looked into how one goes about getting

1          copies of birth certificates.

2          "QUESTION:  You've been handed Exhibit 161.

3          **MS. WESTFALL:**  Which is PL-845.

4          "QUESTION:  Do you recognize this document?

5          "ANSWER:  Appears to be a copy of some version of

6          SB 14.

7          "QUESTION:  Do you see the date at the bottom?

8          "ANSWER:  Looks like the date January 12, 2011.

9          "QUESTION:  And you were involved in developing

10         Senate Bill 14; is that right?

11         "ANSWER:  I had conversations with Janice McCoy

12         regarding the bill, and I had been working on it

13         previous sessions.  Yes, I think it's fair to say I

14         was aware, and I was certainly -- and for my office's

15         purposes in charge of analyzing and tracking the

16         bill.

17         "QUESTION:  Were you involved in drafting Senate Bill

18         14?

19         "ANSWER:  I don't recall.  I may have.  I have a

20         background of drafting bills.  It's possible that I

21         may have helped with the language, sure.

22         "QUESTION:  Do you recall what sources you consulted,

23         if any, to draft Senate Bill 14?

24         "ANSWER:  To the extent I did draft or help with

25         drafting language, I assume I would have looked at

1      previous versions of this bill.  I would have looked

2      to other states where voter ID was implemented--

3      Indiana and Georgia and Louisiana.  I would have

4      looked through testimony provided during the course

5      over the last previous few sessions on this concept.

6      I don't know what else.  I imagine I would have drawn

7      from a lot of sources.  But most importantly, if I

8      was asked to draft something, I would have just done

9      what I was asked to draft as a sort of administrative

10     matter.

11     "QUESTION:  You've been handed what's been marked as

12     Exhibit 174.

13     **MS. WESTFALL:**  Which is PL-847.

14     "QUESTION:  Do you recognize this document?

15     "ANSWER:  It appears to be the Senate Journal entry

16     from -- or at least part of Wednesday, January 26th,

17     2011.

18     "QUESTION:  Do you see that it lists a floor

19     amendment offered by Senator Duncan --

20     "ANSWER:  Yes.

21     "QUESTION:  -- related to indigent voters?

22     "ANSWER:  Yes.

23     "QUESTION:  Would this amendment have required the

24     counting of provisional ballots of individuals,

25     voters who attest they are indigent and do not have

Hebert / by excerpts of Deposition - Cross                197

1       ID?

2       "ANSWER:  If the person executed an affidavit stating

3       that they were indigent or had a religious objection

4       or were not otherwise challenged, then it looks like,

5       yes, that the provisional ballot would have been

6       counted.

7       "QUESTION:  This amendment was adopted by the Senate,

8       was it not?

9       "ANSWER:  I don't have the vote on that.

10      "QUESTION:  Sir, does it indicate on page 138 the

11      vote?

12      "ANSWER:  I'm sorry, yes.

13      "QUESTION:  Was it adopted by the Senate?

14      "ANSWER:  Yes.

15      "QUESTION:  Was this provision included in the final

16      version of Senate Bill 14 that's signed into law?

17      "ANSWER:  I do not believe it was.

18      "QUESTION:  Had this been adopted into the final

19      version of the bill signed into law, would it have

20      reduced the burden on poor voters?

21      "ANSWER:  I think it would -- would it have reduced

22      the burden on poor voters if this had been adopted?

23      It's possible.

24      "QUESTION:  Are poor voters disproportionately

25      minority?

1     "ANSWER:  I don't know that to be true, but I suspect

2     that to be true.

3     "QUESTION:  Do you see that there's a floor amendment

4     Number 12 offered by Senator Davis to prohibit state

5     agencies from charging fees for the issuance of

6     acceptable forms of photo ID under Senate Bill 14 or

7     for underlying documentation --

8     "ANSWER:  Yes.

9     "QUESTION: -- to get those forms of ID?

10    "ANSWER:  Yes.

11    "QUESTION:  Was this amendment adopted by the Senate?

12    "ANSWER:  No.

13    "QUESTION:  Had this been adopted, would this have

14    reduced the burden on poor voters?

15    "ANSWER:  It's possible, although, again, today, I

16    think the charge for a birth certificate is $3 or

17    zero dollars, depending on the county.

18    "QUESTION:  But at the time Senate Bill 14 was

19    adopted by the legislature, that was not the case,

20    correct?

21    "ANSWER:  Correct.

22    "QUESTION:  You've been handed what's been marked as

23    Exhibit 163.

24    **MS. WESTFALL:**  Which is PL-271.

25    "QUESTION:  Do you recognize this document?

Hebert / by excerpts of Deposition - Cross                    199

1       "ANSWER:  It looks like an email from myself to some

2       Senate staff and some people in my office with

3       attached documents related to compliance with the

4       Supreme Court, talking points on the bill, and

5       comparisons of various state election laws.

6       "QUESTION:  Turning to measures required to offset

7       burdens --

8       **MS. WESTFALL:**  On the following page.

9       "QUESTION:  -- how did Senate Bill 14 accomplish and

10      fulfill these required measures?  And we'll start off

11      with the first one.  How does Senate Bill 14 provide

12      access to free photo ID cards?

13      "ANSWER:  As I see it, the bill currently as

14      implemented allows -- required DPS to create election

15      identification cards, which are similar to a driver's

16      license, but for the purpose of having a photo ID for

17      elections.  And they were to be issued at no cost.

18      "QUESTION:  At the time that you wrote these bullet

19      points, you knew, did you not, that it cost -- there

20      was a cost associated with obtaining a birth

21      certificate in the State of Texas, correct?

22      "ANSWER:  At the time of this, yes.

23      "QUESTION:  And that cost was $22 at a minimum,

24      correct?

25      "ANSWER:  Yes.  But it's not today, as I understand

Hebert / by excerpts of Deposition - Cross                200

1       it.

2       "QUESTION:  But at the time the bill was being

3       considered, when you wrote these bullet points, the

4       cost was $22, right?

5       "ANSWER:  Again, yes, and this bullet point says,

6       'access to free photo ID cards.'  The cards are free.

7       "QUESTION:  But the underlying documentation to get

8       the free card is not free, correct?

9       "ANSWER:  If you already have a birth certificate,

10      it's free.

11      "QUESTION:  And if you don't have a birth

12      certificate, it's not free, though, right?

13      "ANSWER:  It would have been $22, though now I

14      believe it's zero to $3.

15      "QUESTION:  That occurred -- the change in what it

16      cost to get a birth certificate occurred after Senate

17      Bill 14 was enacted, did it not?

18      "ANSWER:  I think that's right.

19      "QUESTION:  Provisional ballots aren't very

20      meaningful if you cast them and they're not counted,

21      right?  That's not really voting, right?

22      "ANSWER:  It's voting.  But I think, again, the idea

23      that a constituent can go back and confirm that their

24      ballot is being counted was the point.  And then

25      SB 14 voters are allowed the opportunity to get the

1          ID and make sure that their ballot is counted.

2          "QUESTION:  Do you think that having to go back to an

3          election official a second time is more burdensome or

4          less burdensome than voting a provisional ballot once

5          and having election officials determine whether

6          that's valid from the standpoint of the voters?

7          "ANSWER:  It's all part of casting a vote.  Two trips

8          is more than one trip.  But again, in terms of

9          process of voting, there's lots of steps.  In Texas,

10         for example, in primaries and caucuses and things,

11         there are multiple meetings and steps you have to

12         have to have your voice counted.  So yes, if you're

13         asking me is two trips more than one, yes, it is.  Is

14         it more burdensome?  You know, it's part of casting a

15         vote, but I don't think it's too burdensome.

16         "QUESTION:  In terms of the inconvenience of voting,

17         are you aware that to obtain an EIC, you must present

18         a document that indicates your U. S. citizenship?

19         "ANSWER:  I'm not aware.  I'm aware that -- my

20         understanding is that the EIC runs parallel to

21         driver's licenses.  And obviously, the distinction

22         being that one is for voting only and one is for a

23         broader set of functions.  So I can't say that I know

24         that to be a fact.

25         "QUESTION:  Are you aware that Senate Bill 14

Hebert / by excerpts of Deposition - Cross                202

1    permitted DPS in creating the EIC to require

2    fingerprinting of applicants?

3    "ANSWER:  I'm not aware of that.  And I don't have

4    the EIC language in front of me, so I can't be a

5    hundred percent certain what the statute says.

6    "QUESTION:  And voters in registering to vote need

7    not supply fingerprints; is that correct?

8    "ANSWER:  To register to vote, right.  I don't think

9    you need to supply fingerprints.

10    "QUESTION:  To register to vote, you need not, in the

11    State of Texas, provide proof that you're a U. S.

12    citizen, other than signing under penalty of perjury

13    on your voter registration application; is that

14    correct?

15    "ANSWER:  Right.  I think signing that -- effectively

16    signing an affidavit is a step of assurance for the

17    State of Texas.

18    "QUESTION:  And that's a different way to prove

19    citizenship in the voter registration context than to

20    obtain an EIC assuming you have to show --

21    "ANSWER:  Fingerprints and signatures are different,

22    yes.

23    "QUESTION:  Assuming that you must show documentary

24    proof of citizenship to obtain an EIC, that is not

25    how you prove citizenship when you register to vote;

Hebert / by excerpts of Deposition - Cross                203

1    is that correct?

2    "ANSWER:  I think that's correct.

3    "QUESTION:  You've been handed what's been marked as

4    Exhibit 164.

5    **MS. WESTFALL:**  Which is PL-272.

6    "QUESTION:  Do you recognize this document?

7    "ANSWER:  Yes.

8    "QUESTION:  What is it?

9    "ANSWER:  It is an email from myself to various

10   Senate staff, cc'ing my chief of staff and policy

11   director, expressing concerns about preclearance.

12   And then there's an attachment explaining generally

13   the standard of review by the Department of Justice.

14   **MS. WESTFALL:**  And turning down to the text of that -

15   - the previous page -- the text of the email.  Thank

16   you.

17   "QUESTION:  Do you see that at the top -- and this is

18   -- for the record, this is TX00262650 through

19   TX00262652.  After you sent this email, were there

20   any changes made to the bill to address any of these

21   concerns?

22   "ANSWER:  Again, I don't know for sure without seeing

23   subsequent copies of the bill.  I know the bill

24   changed from January 22nd through final passage.

25   "QUESTION:  The Texas legislature wanted Senate Bill

Hebert / by excerpts of Deposition - Cross            204

1       14 to be precleared; did it not?

2       "ANSWER:  Yes.

3       "QUESTION:  It wanted to enforce Senate Bill 14; did

4       it not?

5       "ANSWER:  Yes.

6       "QUESTION:  Do you see that in this email you made

7       the suggestion that the legislature might consider

8       adding a longer list of acceptable photo IDs?

9       "ANSWER:  Yes.  It says to increase the chances, you

10      might consider adding a list of additional IDs.

11      "QUESTION:  And you proposed using language in

12      Georgia's law which includes ID issued by the federal

13      government, state government, or local government

14      within the state?

15      "ANSWER:  That's correct.

16      "QUESTION:  And you also suggested at a minimum, you

17      might include language from Senate Bill 362

18      concerning valid ID issued by an agency or

19      institution of the federal government or agency or

20      institution of political subdivision of the state.

21      Do you see that suggestion?

22      "ANSWER:  Yes.

23      "QUESTION:  Why did you suggest adding these forms of

24      ID to the bill?

25      "ANSWER:  Again, I think we know that Georgia's law

Hebert / by excerpts of Deposition - Cross                    205

1        was precleared, and so closer to other precleared

2        laws, the better in terms of again increasing

3        chances.  It doesn't mean it was the only way to do

4        it, but I think that it's easy to argue it would

5        increase the chances of that happening.

6        "QUESTION:  Do you see that you flagged the issue of

7        whether the law includes mitigating effects?

8        "ANSWER:  Yes.

9        **MS. WESTFALL:**  And turning to the next page, please.

10       "QUESTION:  And one of the things you list is

11       education efforts targeted at minority communities.

12       "ANSWER:  Yes.

13       "QUESTION:  Do you recall whether Senate Bill 14

14       included any targeted education efforts at minority

15       communities as signed into law?

16       "ANSWER:  Without having the final version in front

17       of me, my memory is that Secretary of State was given

18       authority to implement an education program.  And the

19       need to do that and minority training I think was

20       discussed during debate over the bill.

21       "QUESTION:  You've been handed what's been marked as

22       165.

23       **MS. WESTFALL:**  Which is PL-899.

24       "QUESTION:  Do you recognize this?

25       "ANSWER:  One sixty-five is a copy of SB 14.

Hebert / by excerpts of Deposition - Cross                206

1      "QUESTION:  This is the version that was signed into

2      law; is that correct?

3      "ANSWER:  Appears so.

4      "QUESTION:  So turning your attention now to Exhibit

5      165, are there education efforts targeted at minority

6      communities in this bill?

7      "ANSWER:  Well, it requires the voter registrar of

8      every county that maintains a website to include

9      information, so that would presumably include

10     minority majority counties.

11     "QUESTION:  But to your knowledge, it's not a

12     targeted voter education program; is that correct?

13     "ANSWER:  Statute -- statutory language does not have

14     specific reference to minorities.

15     "QUESTION:  In SB 14, does it include a provision

16     about providing photo IDs in isolated and

17     impoverished areas?

18     "ANSWER:  I don't see specific references, again,

19     other than the fact that those individuals would fall

20     under general directives to county officials and the

21     Secretary of State.

22     "QUESTION:  But to your knowledge, SB 14 did not have

23     targeted -- a targeted program for isolated and

24     impoverished areas; is that right?

25     "ANSWER:  The statutory language did not, and I'm not

1   certain if the Secretary of State or DPS or other

2   state agencies have separate authority.

3   "QUESTION:  You've been handed what's been marked as

4   170 --

5   **MS. WESTFALL:**  Which is PL-277 and --

6   "QUESTION:  -- Texas 00081575.  Do you recognize this

7   document?

8   "ANSWER:  Looks like an email from myself to various

9   Senate staffers and my chief of staff and policy

10  director laying out, 'the plan for Tuesday,' which I

11  assume would have been floor debate and the Committee

12  of the Whole.  And it lays out invited witnesses,

13  certain roles different senators would play, some

14  other items.

15  "QUESTION:  Who was Katie Ogden?

16  "ANSWER:  Katie Ogden worked for Senator Wentworth, I

17  believe, as chief of staff.

18  "QUESTION:  Is it fair to say this email is sort of

19  saying that plan for testimony and how consideration

20  of the bill would occur?

21  "ANSWER:  To the extent you can have a plan and

22  execute it on the floor of the Senate, I suppose it

23  is an attempt to -- at best, it's an outline of how

24  things might go.

25  "QUESTION:  Were you responsible for that outline?

Hebert / by excerpts of Deposition - Cross                208

1        "ANSWER:  I honestly can't remember if these are my

2        ideas or if this is me passing a message, but this is

3        an email from me.

4        "QUESTION:  Who else would have developed this plan

5        besides you?

6        "ANSWER:  Senator Fraser and his staff, any of the

7        senators listed here, perhaps Blaine Brunson or Julia

8        Rathgeber.

9        "QUESTION:  But is it more likely that it came from

10       your office give that you were the point person for

11       the elections and voting issues?

12       "ANSWER:  It's unlikely I would have done all this

13       without significant input from the bill sponsor and

14       the senators listed.  It's not my place to tell

15       senators what they're going to be doing during debate

16       of a bill.

17       "QUESTION:  But was it your role to kind of organize,

18       coordinate, and communicate the plan to others?

19       "ANSWER:  At least to these people, that seems fair.

20       "QUESTION:  Do you see that under 'floor tasks' in

21       the parentheses, you urge senators to emphasize the

22       detection and deterrence of fraud and protect public

23       confidence in elections?

24       "ANSWER:  Yes.

25       "QUESTION:  Why did you stress the need for senators

Hebert / by excerpts of Deposition - Cross                209

1        to emphasize those points?

2        "ANSWER:  Because that was the goal of the bill as I

3        understood it.

4        "QUESTION:  Were you concerned that they may -- they

5        might say other things on the floor of the senate

6        about other reasons for SB 14 being considered?

7        "ANSWER:  I -- even if I had concerns about a senator

8        -- what a senator might say, there's no stopping a

9        senator who wants to say something.  But, yeah, to

10       the extent that senators were looking for direction,

11       I think this was an attempt to remind people what the

12       point of the bill was.

13       "QUESTION:  You've been handed what's been marked as

14       Exhibit 175.

15       **MS. WESTFALL:**  Which is PL-279.

16       "QUESTION:  Do you recognize this document?

17       "ANSWER:  It looks like a press release by the

18       Lieutenant Governor.

19       "QUESTION:  Do you see that in the second paragraph,

20       it states, 'A voter ID will ensure that only U. S.

21       citizens who are legally eligible to vote in Texas

22       elections?'

23       "ANSWER:  Yes.

24       "QUESTION:  Do you recognize this document?

25       "ANSWER:  Yes.

1      "QUESTION:  What is it?

2      "ANSWER:  It looks like an email from myself to

3      Senate staffers, some Senate staffers, with an

4      attachment summary of SB 14 as it passed the Senate.

5      "QUESTION:  For the record, Exhibit 176 is Texas

6      00034469 through Texas 00034471.

7      **MS. WESTFALL:**  PL-234.

8      "QUESTION:  Did you draft the attachment to Exhibit

9      176?

10     "ANSWER:  I think I probably did.

11     "QUESTION:  And the attachment is titled Voter ID

12     Bill Summary, correct?

13     "ANSWER:  Correct.

14     **MS. WESTFALL:**  And if you could blow up the first

15     paragraph.

16     "QUESTION:  Who was the intended audience of this

17     bill summary?

18     "ANSWER:  I assume the people on the email that I

19     sent it to.

20     "QUESTION:  Was it solely for purposes of advising

21     these staff people, or was it intended for a broader

22     audience?

23     "ANSWER:  It's possible it was intended for people on

24     the Lieutenant Governor's staff, as well as the

25     recipients of this email.

Hebert / by excerpts of Deposition - Cross                    211

1      "QUESTION:  Did you circulate this summary to anybody

2      else besides the recipients of the first page of

3      Exhibit 176?

4      "ANSWER:  I don't recall whether I did or not.

5      "QUESTION:  Was this summary reviewed and approved by

6      anyone in your office before it went out?

7      "ANSWER:  Probably not, but I can't be sure.

8      "QUESTION:  Did Lieutenant Governor Dewhurst see this

9      summary?

10     "ANSWER:  I can't recall.  It's possible.

11     "QUESTION:  Do you see it was dated January 27th,

12     2011?

13     "ANSWER:  The email is dated January 27th, 2011, yes.

14     "QUESTION:  Was this email drafted after the Senate

15     had adopted Senate Bill 14?

16     "ANSWER:  It appears that yes, it was.

17     "QUESTION:  Do you see --

18     **MS. WESTFALL:**  Turning back to the bill summary.

19     "QUESTION:  -- the first sentence characterizes SB 14

20     as the strictest photo ID bill in the country?

21     "ANSWER:  Yes, arguably the strictest photo ID bill.

22     "QUESTION:  What was your assessment based on?

23     "ANSWER:  The comparison of Texas requirements to

24     states that had other photo ID requirements.

25     "QUESTION:  What made it -- what particular facets of

Hebert / by excerpts of Deposition - Cross                212

1       the bill made it the strictest in the country?

2       "ANSWER:  I assume it was related to the forms of

3       acceptable ID.  It could also have been related to

4       criminal penalties associated with fraudulent

5       election activity.

6       "QUESTION:  And at the time that Senate Bill 14 was

7       being considered, were you aware of any facts or

8       evidence that suggested student ID had been used for

9       voting fraud in the State of Texas?

10      "ANSWER:  Not that I recall.

11      "QUESTION:  Were you aware of any evidence that

12      student IDs had been used for voting fraud anywhere

13      in the country?

14      "ANSWER:  Not that I recall.

15      "QUESTION:  Was there any discussion about the effect

16      of excluding student IDs on voting at historically

17      Black colleges or universities in the state?

18      "ANSWER:  Was there any analysis?

19      "QUESTION:  Correct.

20      "ANSWER:  I'm not aware.

21      "QUESTION:  So there was no assessment on the impact

22      of excluding student IDs on minority voters?

23      "ANSWER:  I'm not aware of any analysis.

24      "QUESTION:  Are you familiar with the opinion of

25      *Texas versus Holder* denying judicial preclearance of

```
 1          Senate Bill 14?
 2          "ANSWER:  I am generally familiar.
 3          "QUESTION:  Did the Lieutenant Governor take any
 4          actions to respond to that decision?
 5          "ANSWER:  I can't remember any specific action.
 6          "QUESTION:  Did he propose any changes to Senate Bill
 7          14?
 8          "ANSWER:  I can't recall.
 9          "QUESTION:  Did he or any senator urge that
10          amendments to Senate Bill 14 be made to address any
11          of the concerns raised by the court?
12          "ANSWER:  I can't recall specific suggestions.
13          "QUESTION:  Are you aware of any in-person voter
14          impersonation that occurred in the State of Texas
15          during the 2012 presidential election?
16          "ANSWER:  I am not personally aware of any.
17          "QUESTION:  Are you aware of any in-person voter
18          impersonation that occurred in Texas during any
19          election between August, 2012, and June, 2013?
20          "ANSWER:  I cannot recall being aware of any.
21          "QUESTION:  Were you involved in drafting the EIC
22          provision that was adopted during the conference?
23          "ANSWER:  I believe I was.
24          "QUESTION:  How did you develop that language?
25          "ANSWER:  I believe my intent was to have it parallel
```

Hebert / by excerpts of Deposition - Cross                214

1        existing statutory or rule language for drivers'

2        licenses, after removing parts that were not

3        relevant.  The goal was to have the cards and the

4        information be similar to drivers' licenses and

5        issued by the same agency.

6        "QUESTION:  Did you consider the hours of operation

7        for driver license offices when you were developing

8        the EIC provision?

9        "ANSWER:  I mean, generally the hours of operation of

10       DPS offices were debated on the floor of the Senate,

11       so I think, yes, I would have considered it.

12       "QUESTION:  Was there any response legislatively to

13       those concerns raised?

14       "ANSWER:  Not within the face of this statute.  But

15       I'm not sure what other legislative actions were

16       taken.  And, again, I know as a fact that actions

17       were taken by the Department of Public Safety.

18       "QUESTION:  Was it left to DPS, when the bill was

19       being crafted, as to what the hours of the driver

20       license offices would be?

21       "ANSWER:  Yes.  DPS sets the hours of their office

22       based on the whole range of factors, including

23       population and usage and so forth.

24       "QUESTION:  And Senate Bill 14 did not direct or

25       influence in any way where driver licenses offices

Hebert / by excerpts of Deposition - Cross                215

1    were located; is that correct?

2    "ANSWER:  I'd have to check to be sure.  I don't see

3    any language doing that.

4    "QUESTION:  Did the legislature, in crafting SB 14,

5    give any consideration to the availability of driver

6    license offices via public transit?

7    "ANSWER:  Again, my recollection is that it was --

8    that it may have been part of the debate on the

9    floor, but I can't remember any specific language in

10   the face of the statute addressing that.

11   "QUESTION:  During consideration of SB 14, was there

12   any analysis of cost or steps a voter would need to

13   take to obtain an EIC?

14   "ANSWER:  I can't recall.

15   "QUESTION:  Do you think it would be problematic if

16   SB 14 made it more difficult for Hispanic and African

17   American voters to participate in elections, even if

18   it didn't wholly disenfranchise them?

19   "ANSWER:  Would it be problematic if SB 14 adversely

20   impacted minority populations?

21   "QUESTION:  Made it more burdensome?

22   "ANSWER:  Made it more burdensome.  It would depend

23   on the extent of that burden.  It would be dependent

24   on whether it was only minorities that were burdened.

25   It would depend on whether there was an intent to

1                  burden only those minorities.  So possibly, just to

2                  answer, I guess.

3                  "QUESTION:  Are minority voters in Texas more likely

4                  to be poor than Anglos, to your knowledge?

5                  "ANSWER:  I would assume, I mean, I think

6                  historically poor populations have generally had

7                  higher representation among minorities, that's fair.

8                  And that's probably true in Texas and every other

9                  state."

10                 **MS. WESTFALL:**  Thank you.  No other questions.

11                 **THE COURT:**  All right.  Let's recess for lunch, and

12        if you'll return at 1:30.

13                 **MR. SPEAKER:**  You said 1:30?

14                 **THE COURT:**  One-thirty.

15                 **MR. SPEAKER:**  Thank you.

16            **(A recess was taken from 11:59 a.m. to 1:30 p.m.; parties**

17        **present)**

18                 **THE COURT:**  You can have a seat.

19                 **MR. SCOTT:**  Your Honor, a couple of housekeeping

20        things Ms. Wolf for the State will address from our

21        perspective.

22                 **MS. WOLF:**  Your Honor, in terms of the exhibits, I

23        think when we started we only moved in -- or sought to move in

24        the first batch, and since both parties have been filing

25        supplemental lists.

1          **THE COURT:**  Okay.

2          **MS. WOLF:**  So the plan is to keep, I guess, the final

3    submission of the list open until Thursday, because we need to

4    coordinate with the other side and make sure that everybody has

5    got the right list and all the agreements that have been worked

6    out are reflected in what goes for the final version of the

7    Court.

8          But at this time, subject to that, Defendants would

9    seek to move in, I believe it's exhibits -- whatever is

10   remaining until 2750, which is the last one we're going to

11   mark, subject to the agreement that we've made with the

12   Plaintiffs in terms of reserving objections.

13         **MR. ROSENBERG:**  And that's right, your Honor.  And

14   we, on the Plaintiffs' side, will also be moving in at this

15   time all of our supplemental exhibit lists.  I don't have the

16   numbers with us --

17         **THE COURT:**  Okay.

18         **MR. ROSENBERG:**  -- again, subject to the same

19   agreement.

20         **THE COURT:**  But those are by agreement, right?

21         **MR. ROSENBERG:**  Right.

22         **MS. WOLF:**  Yes.

23         **THE COURT:**  So those are admitted.  But there was a

24   couple when we started on the 2nd, before we began the trial,

25   we discussed some exhibits, right, that needed --

1          **MS. WOLF:**  Yes.

2          **THE COURT:**  -- to be addressed by the Court still,

3    and you mentioned one earlier.

4          **MS. WOLF:**  Yes.

5          **THE COURT:**  But I thought there were a couple other

6    ones --

7          **MS. WOLF:**  There --

8          **THE COURT:**  -- too.

9          **MS. WOLF:**  There are two others -- and I don't know

10   if Mr. Hebert wants to address them -- there were two others

11   that they were -- oh, Emma, if you want to address them.

12         **MS. SIMSON:**  I think we can withdraw them.

13         **MS. WOLF:**  Withdraw them?

14         **THE COURT:**  Well, and we don't --

15         **MS. WOLF:**  Okay.

16         **THE COURT:**  -- have to do that right now.  I just

17   know there's still something left --

18         **MS. WOLF:**  No, and I --

19         **THE COURT:**  -- hanging --

20         **MS. WOLF:**  -- appreciate it.  You guys --

21         **MS. SIMSON:**  Yeah.

22         **MS. WOLF:**  So they're going to withdraw those two

23   exhibits.

24         **THE COURT:**  Okay.

25         **MS. WOLF:**  So we'll reflect that in what we submit --

1           THE COURT:  So the only thing --

2           MS. WOLF:  -- on Thursday.

3           THE COURT:  -- that's left is the one with Guidry?

4           MS. WOLF:  Yes, ma'am.

5           THE COURT:  That's all that's still --

6           MS. WOLF:  For exhibits, yes.

7           THE COURT:  For that.  Okay.

8           MS. WOLF:  And, and --

9           MR. SCOTT:  Your Honor, I think just from

10  clarification, I know that there's some exhibits I think in the

11  common interest group that have some personal identification

12  information on it.  I think there's a social security card and

13  some other things, and my understanding is they're going to

14  replace those with redacted versions.  I just want to make sure

15  the record is clear.

16          That's one of the --

17          THE COURT:  Okay.

18          MR. SCOTT:  -- housekeeping things that will take

19  place.

20          THE COURT:  And then the other matter, also,

21  Mr. Dunn, I believe, you and Mr. Scott were going to discuss

22  the -- what's going to be presented -- the offer of proof, I

23  guess --

24          MR. DUNN:  Yes, Judge, and --

25          THE COURT:  -- right?

1          **MR. DUNN:**  -- they've provided that to me, and I've

2    looked at it.  Obviously, we preserve our objections, but it's

3    a legitimate offer of proof.

4          **THE COURT:**  Okay.  So --

5          **MR. SCOTT:**  It is made to the Court -- or accepted to

6    be placed in under seal as part of the agreement with

7    Ms. London on behalf of the Democratic senators.

8          **THE COURT:**  And you're giving that to Brandy, or she

9    already has it?

10         **MR. SCOTT:**  I believe she --

11         **THE COURT:**  Okay.

12         **MR. SCOTT:**  -- already has that.

13         **THE COURT:**  Okay.  Okay.

14         **MR. SCOTT:**  Yes, your Honor.

15         **THE COURT:**  So we're good on that.

16         **MS. WOLF:**  And then one additional matter, your

17   Honor, the deposition designations that haven't been read into

18   the record.

19         My understanding is we're going to -- there's been

20   some discussion on things that need to be eliminated from those

21   with the Plaintiffs, so that's also going to come in.  We'll

22   get the final package on Thursday of everything that's -- which

23   eliminates what we've agreed to take out.

24         And I believe there are two depositions that were

25   very recently that we may be doing some counter-designations

1    for.

2            **THE COURT:**  Okay.  Wait.

3            **MS. WOLF:**  Sure.

4            **THE COURT:**  What are you talking about?

5            **MS. WOLF:**  Okay.

6            **THE COURT:**  Because what I've been considering is

7    what you all have been reading.  You all gave me two under

8    seal.  So what else?  You all are going to give me some more to

9    just read?

10           **MS. WOLF:**  Well, I think --

11           **MR. ROSENBERG:**  Well, I can talk on the Plaintiffs'

12   side.

13           **THE COURT:**  Okay.

14           **MR. ROSENBERG:**  To the extent that deposition

15   designations were not read and we still --

16           **THE COURT:**  Okay.

17           **MR. ROSENBERG:**  -- feel it's important, either they

18   will be specifically referenced in the findings of fact or

19   perhaps addressed in closing.

20           We -- on Saturday by agreement, we have -- we have

21   until Saturday to put in our counters and objections to the

22   Section 5 designations that were made last week -- that sort of

23   thing.

24           But, again, we --

25           **THE COURT:**  Okay.

1          **MR. ROSENBERG:**  -- will not just say, "Your Honor,

2     read this."  It will --

3          **THE COURT:**  No, you will not --

4          **MR. ROSENBERG:**  You will be specifically --

5          **THE COURT:**  -- say that.  You will not say that.

6          **MR. ROSENBERG:**  And our goal, quite frankly, your

7     Honor, is by Thursday to make sure there's no loose ends

8     between --

9          **THE COURT:**  Uh-huh.

10         **MR. ROSENBERG:**  -- the Defendants and the Plaintiffs

11    for your Honor.  That --

12         **THE COURT:**  Okay.

13         **MR. ROSENBERG:**  We have -- the exhibits are the

14    exhibits.  The designations are the designations.

15         **THE COURT:**  Okay.

16         **MR. SHAPIRO:**  And, your Honor, I'm --

17         **MS. WOLF:**  Great.

18         **MR. SHAPIRO:**  -- just looking for loose ends -- just

19    as promised before lunch, these are the excerpts from the

20    depositions of Debra Frary and Michelle Flusher --

21         **THE COURT:**  Okay.

22         **MR. SHAPIRO:**  -- which we now have marked as

23    Plaintiffs' Exhibit 1160.  We would like to --

24         **THE COURT:**  Okay.  You can give it to Brandy.

25         **MR. SHAPIRO:**  -- move --

1          **MR. ROSENBERG:**  And just one more thing before --

2          **MS. WOLF:**  Go ahead.

3          **MR. ROSENBERG:**  In that regard, I think both the --

4    both Plaintiffs and the Defendants will be -- I guess now are

5    -- we will be moving into evidence the -- all the deposition

6    designations, again, subject to the prior agreement.

7          **THE COURT:**  Okay.

8          **MS. WOLF:**  And Defendants as well, your Honor, will

9    be seeking to move the deposition designations in, subject to

10   the prior agreement.

11         **MS. SIMSON:**  Your Honor, one quick note.  Yesterday,

12   we talked about some of the expert reports getting amended in

13   light of information about the 183,000 people --

14         **THE COURT:**  Uh-huh.

15         **MS. SIMSON:**  -- that had been added.  We just wanted

16   to note from the Veasey-LULAC point of -- perspective,

17   Dr. Herron's report will not be updated, because he presented

18   data both with those numbers and without.

19         **THE COURT:**  Okay.

20         **MS. SIMSON:**  So the sections of his report that are

21   no longer going to be relied upon are Pages 50 to Pages 55,

22   Line 3.  That's where he had included the additional 183,000,

23   but the remainder of his report relies on the data that is now

24   going to be correct.

25         And then the other thing is in the main summary of

1    findings, he has summary of findings related to the 183,000,

2    and those are Page 8, Line 16 --

3            THE COURT:  But when you all amend your findings, are

4    you just going to supplement what you've already given the

5    Court, or are you providing something entirely -- a new

6    document that stands by itself?

7            MR. ROSENBERG:  We're going to be doing a new

8    document that stands by itself.

9            MR. SCOTT:  But we will --

10           THE COURT:  With designations --

11           MR. SCOTT:  -- also be providing a redline version,

12   as we understood the Court's rule.  So to the extent we had

13   proposed findings of facts and conclusions of law --

14           THE COURT:  Uh-huh.

15           MR. SCOTT:  -- the changes from that document -- it's

16   our understanding the Court wants us to provide a redline

17   document on those, or you don't?

18           THE COURT:  I --

19           MR. ROSENBERG:  He has different --

20           THE COURT:  -- don't need that, because are you all

21   -- I'm assuming you all are going to be citing -- we talked

22   about this yesterday -- to the trial testimony at this point

23   and the --

24           MR. ROSENBERG:  Yes.

25           THE COURT:  -- evidence in the trial, right?  So --

1          **MR. SCOTT:**  So don't?

2          **THE COURT:**  I don't think so.

3          **MR. SCOTT:**  Okay.

4          **MR. ROSENBERG:**  Okay.

5          **THE COURT:**  Let me think about that one; but, no, I

6     don't think so.

7          **MR. SPEAKER:**  Did you tell her what exhibit number

8     that was?

9          **MS. SIMSON:**  And that's exhibit --

10          **THE COURT:**  And --

11          **MS. SIMSON:**  Plaintiffs' Exhibit --

12          **THE COURT:**  And did Brandy tell you all maybe we

13     should start at 8:30 on the 22nd?

14          **MR. ROSENBERG:**  8:30.  Okay.  Thank you, your Honor.

15          **MS. WOLF:**  Your Honor, one additional housekeeping

16     matter.  Mr. Scott tells me we can unseal Dr. Milyo and

17     Dr. Hood's reports.

18          **MR. SCOTT:**  With the permission of the Court.

19          **MS. WOLF:**  With the permission of the Court.

20          **THE COURT:**  Okay.  So we'll unseal those.

21          Now -- and I guess we'll address this when the

22     Defendants finish.  A lot of experts were offered, and I

23     believe the agreement had been, you know, qualification-wise,

24     we were kind of waiting, and then I've never actually ruled on

25     those.

1          So we just need to address that at some point, but we

2     can proceed -- get the evidence in and finish probably.

3          **MR. SCOTT:**  And we've actually reduced it down to --

4     I believe down to two left, your Honor.

5          **THE COURT:**  Okay.

6          **MR. SCOTT:**  So if you want to go ahead.  Okay.

7          **MR. TATUM:**  All right.  Your Honor, Stephen Tatum for

8     the Defendants.  We will be reading in the deposition of

9     Kenneth Smith.

10              **EXAMINATION OF KENNETH SMITH**

11            **BY EXCERPTS OF DEPOSITION TESTIMONY**

12       **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY COUNSEL)**

13              "QUESTION:  Mr. Smith, would you state and spell your

14              full name for the record, please?

15              "ANSWER:  Kenneth Smith, K-E-N-N-E-T-H, Smith,

16              S-M-I-T-H.

17              "QUESTION:  Mr. Smith, are you currently employed?

18              "ANSWER:  Yes.

19              "QUESTION:  And who is your employer?

20              "ANSWER:  U.S. Department of Veterans Affairs.

21              "QUESTION:  And how long have you been an employee

22              with the U.S. Department of Veterans Affairs?

23              "ANSWER:  Seventeen years.  It'll be 17 years in

24              September.

25              "QUESTION:  Can you tell me what your official duties

Smith / by excerpts of Deposition                    227

1           and responsibilities are as the Assistant Director

2           for Data and Information -- for the Data and

3           Information Service at DVA?

4           "ANSWER:  Sure.  I'm responsible for operating and

5           maintaining DVA's enterprise data warehouse, which is

6           the source for all benefits information and reporting

7           for the Administration.

8           "QUESTION:  Okay.  So in your role as Assistant

9           Director for the Data and Information Service at the

10          VBA, does your work regularly require you to work

11          with information databases?

12          "ANSWER:  Yes.

13          "QUESTION:  Mr. Smith, were you asked to conduct a

14          match between databases of the Department of Veterans

15          Affairs and a database from the State of Texas in

16          this case?

17          "ANSWER:  Yes.

18          "QUESTION:  And can you briefly summarize the match

19          that you conducted?

20          "ANSWER:  Certainly.  We received an input file from

21          the Department of Justice that was represented as a

22          complete set of data from the TEAM database that you

23          described earlier.  We loaded that data into a secure

24          schema in the data warehouse.  We matched it against

25          data compiled from our database consisting of

1    veterans, living veterans who are 50 percent or

2    greater disabled, and then we conducted a number of

3    matching algorithms once we -- through this process.

4    There were a series of matches that we ran.

5    "QUESTION:  It says here in Paragraph 3, 'VBA was

6    able to load what looks to be less than the original

7    -- was able to load a number that is less than the

8    original number of records that it received; is that

9    correct?

10   "ANSWER:  Yes.

11   "QUESTION:  It then states that, 'The 8,763 voter

12   records that the VBA was not able to load and analyze

13   as part of the database comparison process contained

14   embedded commas in an address or in details."  Is

15   that correct?

16   "ANSWER:  Yes.

17   "QUESTION:  So from that statement, can you describe

18   for me why the VBA was not able to load and analyze

19   those 8,763 voter records?

20   "ANSWER:  Certainly.  So the database input file

21   contained a number of fields.  We told our database

22   that say there -- I can't remember the exact number.

23   Say there were 50.  We had to tell the database that

24   there would be 50 fields, and that these fields would

25   be separated by commas, meaning the database would

Smith / by excerpts of Deposition                    229

1         look -- would be looking for 59 commas separating

2         those 60 fields.  Every time the database reads a

3         comma it moves to a different field.  If there are

4         commas in the middle of the field, the database does

5         not know not to use them.  In other words, it loaded

6         the first 59 segments of data separated by commas,

7         and there was still data left over at the end.  The

8         database does not know what to do with it, so it

9         rejected them.

10        "QUESTION:  And that's the 8,763 voter records

11        referred to there?

12        "ANSWER:  Correct.

13        "QUESTION:  Those were rejected by the database?

14        "ANSWER:  Correct.

15        "QUESTION:  Were those records, the rejected records,

16        were they ever properly inputted or analyzed?

17        "ANSWER:  We did nothing further with those records.

18        I think we provided them back to DOJ.

19        "QUESTION:  And did DOJ ever resubmit the file

20        formatted correctly or differently so that those

21        8,763 voter records would not be rejected by your

22        database?

23        "ANSWER:  No.

24        "QUESTION:  Okay.  So those 8,763 voter records that

25        were on file originally -- that were on the file

1          originally given to you were ultimately never

2          analyzed in this matching process; is that correct?

3          "ANSWER:  Correct.

4          "QUESTION:  Do you have any idea what was contained

5          in those 8,763 voter records?

6          "ANSWER:  No.

7          "QUESTION:  I'm sorry.  You may have already

8          mentioned this.  I believe you said you brought it to

9          DOJ's attention that those records were rejected,

10         correct?

11         "ANSWER:  Yes.

12         "QUESTION:  And how did you let them know that?

13         "ANSWER:  I think we sent them an e-mail.

14         "QUESTION:  Do you remember who you sent it to?

15         "ANSWER:  Not offhand, not based on my recollection.

16         "QUESTION:  Did you send that e-mail?

17         "ANSWER:  I can't remember if it was me or one of my

18         technical staff.

19         "QUESTION:  And did the DOJ ever respond to that

20         e-mail?

21         "ANSWER:  I can't recall, actually."

22         **MR. TATUM:**  (Indiscernible).

23         **THE COURT:**  Okay.  Anything from the Plaintiff on

24    this witness?  Plaintiffs?

25         **MS. BALDWIN:**  We have a binder just of our federal

1    agency designations, but we're not going to be reading from

2    them.

3          **THE COURT:**  Okay.

4          **MR. TATUM:**  And I'll be reading from the deposition

5    of Michelle Rudolph.

6                **EXAMINATION OF MICHELLE RUDOLPH**

7              **BY EXCERPTS OF DEPOSITION TESTIMONY**

8        **(QUESTIONS READ BY MR. TATUM; ANSWERS READ BY COUNSEL)**

9              "QUESTION:  Michelle, would you please state and

10             spell your full name, please?

11             "ANSWER:  Michelle Saunders Rudolph, M-I-C-H-E-L-L-E,

12             S-A-U-N-D-E-R-S, R-U-D-O-L-P-H.

13             "QUESTION:  Michelle, are you currently employed?

14             "ANSWER:  Yes.

15             "QUESTION:  Where are you employed?

16             "ANSWER:  In Seaside, California.

17             "QUESTION:  And who is your employer?

18             "ANSWER:  The Department of Defense.

19             "QUESTION:  What is your official title at the

20             Department of Defense?

21             "ANSWER:  I'm the acting Director for Data Analysis

22             and Programs Division at the DMDC.

23             "QUESTION:  Could you tell me what your -- as

24             director of the Data Analysis Programs Division, can

25             you tell me what your official duties and

1      responsibilities are?

2      "ANSWER:  I have approximately 147 employees that I

3      ensure are trained to accurately receive, process,

4      and deliver data and information to agencies within

5      the federal government and Department of Defense.

6      "QUESTION:  Thank you.  Michelle, do you know what

7      this case is about?

8      "ANSWER:  What I know is -- I don't know what this

9      case is about.  I know what I needed to do.

10     "QUESTION:  And when you say 'what you needed to do,'

11     what do you mean by that?

12     "ANSWER:  The work that I needed to perform as

13     requested by the Department of Justice.

14     "QUESTION:  And what was that work that they

15     requested you to perform?

16     "ANSWER:  As described in my deposition, it was a

17     match of a TEAM database to a database at DMDC that

18     had valid ID cards with photographs.

19     "QUESTION:  Michelle, what was your involvement in

20     the matching process conducted in this case?

21     "ANSWER:  I read the directions from DOJ for

22     matching, as described in my declaration, and worked

23     with an analyst and computer programmer to ensure we

24     all understood the rules that were requested for

25     running it, and then oversaw the job happening.

Rudolph / by excerpts of Deposition                    233

1          "QUESTION:  Okay.  But you didn't -- you didn't

2          actually conduct the match yourself?

3          "ANSWER:  No.

4          "QUESTION:  That was done by Mr. Zach Simpson,

5          correct?

6          "ANSWER:  Yes.

7          "QUESTION:  So you all went -- so you all went over

8          the matching protocol provided by the Department of

9          Justice, which was included in your declaration,

10         correct?

11         "ANSWER:  Yes.

12         "QUESTION:  And then Mr. Zach Simpson ran the match.

13         Did you supervise or oversee his execution of the

14         match in this case?

15         "ANSWER:  Yes."

16              MR. TATUM:  Okay.  And we can end it right there.

17    Thank you very much, Your Honor.

18              THE COURT:  All right.  Anything from the Plaintiffs

19    on that?

20              MS. BALDWIN:  No, your Honor.

21              THE COURT:  Okay.

22              MR. TATUM:  And, your Honor, one final submission.

23    This is depo cuts for some of the Veasey-LULAC Plaintiffs.

24    Counsel for those Plaintiffs submitted to you a packet of

25    certain cuts related to standing --

234

1          **THE COURT:**  Uh-huh.

2          **MR. TATUM:**  -- and we'd just like to respond in kind

3     with other depo cuts.

4          **THE COURT:**  Okay.

5          **MR. TATUM:**  We're prepared to read them if you like,

6     but I have them here --

7          **THE COURT:**  No.

8          **MR. TATUM:**  -- also that --

9          **THE COURT:**  I'm going to miss you all when you all

10    are gone.  All right.

11         **MR. SCOTT:**  I have some bad news.  Subject to the

12    agreements we've already gone into, your Honor, the Defense

13    rests.

14         **THE COURT:**  All right.  Anything further from the

15    Plaintiffs?

16         **MR. ROSENBERG:**  Nothing further.  I think there's one

17    issue, your Honor --

18         **MR. CLAY:**  The -- over lunch, we filed a motion to

19    take judicial notice of the Solis and Saldivar indictments that

20    were testified about in the case.  And I think Mr. Rosenberg

21    had some objections he wanted to put on the record.

22         **THE COURT:**  Okay.  And I haven't -- it was just

23    handed to me when I took the bench, so I --

24         **MR. ROSENBERG:**  Yeah, and I --

25         **MR. CLAY:**  That's --

1        **MR. ROSENBERG:**  I haven't opened it, but I'm assuming

2   it's the politiqueras --

3        **MR. CLAY:**  Yes --

4        **MR. ROSENBERG:**  -- indictments.  And our position is,

5   your Honor, your Honor can take notice of the fact that those

6   indictments were issued.

7        However, we object on the basis of included hearsay

8   -- that that -- so long as it's not there for the truth of the

9   matter asserted.

10        We also have an objection on relevance, because it's

11   post-enactment activity, not pre-enactment of SB 14.

12        But, again, we'll -- we think those should be treated

13   the same way the rest of the evidence that objections have been

14   made, but your Honor can look at it for whatever weight it's

15   worth.

16        **THE COURT:**  Okay.  I'll review it.

17        **MR. CLAY:**  Thank you.

18        **MR. ROSENBERG:**  Thank you.

19        **THE COURT:**  Thank you.  Do we need to address the

20   experts', then, qualifications?  And I can --

21        **MR. SCOTT:**  I think it was the understanding, though,

22   that they were going to be done at the conclusion of the

23   direct --

24        **MR. SPEAKER:**  Of the testimony.

25        **MR. SCOTT:**  -- of the testimony of the experts.  So I

1    think to the extent anyone had an opportunity to assert it, if

2    they weren't asserted, they're in.

3             **MR. ROSENBERG:**  I think that's true.

4             **THE COURT:**  So no expert I need to address, then,

5    correct?

6             **MR. SPEAKER:**  That's correct.

7             **MR. SPEAKER:**  No, your Honor.

8             **MS. SPEAKER:**  No, your Honor.

9             **THE COURT:**  So the Court --

10            **MR. SPEAKER:**  Correct.

11            **MR. SPEAKER:**  Correct.

12            **MR. SPEAKER:**  Correct.

13            **MR. SPEAKER:**  Yes, your Honor.

14            **THE COURT:**  I'm sorry?

15            **MR. SPEAKER:**  Correct.

16            **THE COURT:**  Correct.  So then the Court accepts the

17   experts -- finds they're qualified to testify about the matters

18   they testified to.

19            You all are going to continue working on the

20   exhibits.

21            We will reconvene, then, on September 22nd at 8:30

22   for closing arguments.

23            And you all have already given me the schedule on the

24   supplementation regarding the experts, except for Herron -- I

25   guess will no longer be a part of that.

1              Findings of fact, conclusions of law to be done by

2    Thursday at midnight --

3              **MR. ROSENBERG:**  Yep.

4              **THE COURT:**  -- a week from today?

5              **MR. ROSENBERG:**  Yes, your Honor.

6              **THE COURT:**  And was there anything else we need to

7    address?

8              **MR. ROSENBERG:**  I think that's it.  And we actually

9    have an hour left of our time, which we won't use.

10             **THE COURT:**  Wow.  You all cut it close.  I would like

11   to keep your tech guys.  They were all really amazing, both of

12   them.  So I could just sit here, "Can you pull up, you know,

13   whatever exhibit for me while I sit here and work through the

14   case?"

15             But I thank you all very much.  You all behaved very

16   well and I appreciate --

17             **MS. SPEAKER:**  Thank you.

18             **THE COURT:**  -- the way you've handled the case, the

19   way you've tried the case, your courtesy and respect to each

20   other and to the Court.  And I know you all have done -- you

21   all have worked really hard on this case, both sides.

22             **MR. DERFNER:**  And I know I speak for everybody, your

23   Honor.  We say it's been a pleasure to try this case before

24   you --

25             **THE COURT:**  Thank you.

238

1          **MR. DERFNER:**  -- and your staff here.

2          **THE COURT:**  Thank you.

3          **MR. DERFNER:**  And I think I speak for everybody

4    there.

5          **MR. SPEAKER:**  Thank you.

6          **MS. SPEAKER:**  Thank you.

7          **MR. SPEAKER:**  Thank you, your Honor.

8          **THE COURT:**  All right.

9          **MS. SPEAKER:**  Thank you.

10          **MR. SPEAKER:**  Thank you very much.

11          **THE COURT:**  So you're excused.

12          **MS. SPEAKER:**  Thank you, your Honor.

13          **MR. SPEAKER:**  Thank you, Judge.

14      **(This proceeding was adjourned at 1:47 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>September 12, 2014</u>

          Signed                                                      Dated

*TONI HUDSON, TRANSCRIBER*