IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| MARC VEASEY, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>RICK PERRY, *et al.*,<br><br>        Defendants. | Civil Action No. 2:13-cv-193 (NGR)<br>(Consolidated Action) |

**PLAINTIFFS AND PLAINTIFF-INTERVENORS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

PROPOSED FINDINGS OF FACT ------------------------------------------------------------- 1

I.   DEMOGRAPHIC DATA FOR THE STATE OF TEXAS ................................. 3

II.  SB 14 IMPOSES A STRICT PHOTO ID REQUIREMENT FOR IN-PERSON
     VOTING ------------------------------------------------------------------------- 5

III. TEXAS' PREVIOUS VOTER ID LAW IMPOSED MINIMAL BURDENS ON
     VOTERS ------------------------------------------------------------------------- 9

IV.  SB 14 IMPOSES STRICTER REQUIREMENTS THAN OTHER PHOTO VOTER
     ID STATES --------------------------------------------------------------------- 11

V.   HISPANIC AND AFRICAN-AMERICAN VOTERS ARE SIGNIFICANTLY LESS
     LIKELY TO POSSESS SB 14 ID ------------------------------------------------ 13

     A.  Overview ............................................................................. 13

     B.  Dr. Ansolabehere's Database Matching and Multiple Methods of Demographic
         Analysis Demonstrate That There Are Statistically Significant Racial Disparities
         in ID Possession. ................................................................. 17

     C.  The Barreto/Sanchez Survey Demonstrates Racially Disparate ID Possession. ...... 34

     D.  Expert Agreement With Dr. Ansolabehere's Matching Results. .............................. 39

VI.  THE RACIAL DISPARITY IN ID POSSESSION IS NOT ALLEVIATED BY SB 14'S
     EXEMPTIONS OR BY THE FACT THAT IT DOES NOT APPLY TO PERSONS
     VOTING ABSENTEE BY MAIL ------------------------------------------------ 44

     A.  The Disability Exemption Has No Effect on the Racial Disparity. ......................... 44

     B.  The "Religious Objection" and the "Natural Disaster" Exceptions Do Not
         Alleviate the Racial Disparities. ............................................... 47

     C.  Voting By Mail Exacerbates the Disparity in ID Possession. .................................. 48

VII. SB 14 DISENFRANCHISED HUNDREDS OF VOTERS IN THE LOW TURNOUT
     NOVEMBER 2013 ELECTION ------------------------------------------------ 51

VIII. SB 14 IDS ISSUED BY TEXAS ARE DIFFICULT TO OBTAIN FOR REASONS OF
     COST, ACCESSIBILITY, AND AVAILABILITY ------------------------------- 54

     A.  State-Issued Forms of Qualifying Photo ID Can Be Burdensome to Obtain and
         Maintain. ............................................................................. 60

i

B.   The EIC Program Does Not Provide a Meaningful Opportunity to Obtain SB 14 ID. ................................................................................................................ 66

IX.   SB 14 IDS ISSUED BY FEDERAL GOVERNMENT ARE OF LIMITED AVAILABILITY AND ARE COSTLY ------------------------------------------------- 100

A.   Military Photo ID Cards are Available to Very Few Texans................................. 101

B.   Citizenship Certificates with a Photograph are Available to Very Few Texans and are Expensive to Replace if Lost............................................................................. 102

C.   U.S. Passports and Passport Cards Are Costly to Obtain. ..................................... 103

X.   HISPANIC AND AFRICAN-AMERICAN VOTERS ARE LESS LIKELY THAN ANGLO VOTERS TO HAVE THE UNDERLYING DOCUMENTS, TIME, TRANSPORTATION, AND MEANS TO OBTAIN SB 14 ID --------------------------- 103

A.   Dr. Henrici's Analysis Establishes that Obtaining Identification as Required  Under SB 14 Disproportionately Burdens Low-Income Minority Voters........................ 105

B.   Dr. Webster Found that Individuals in Areas with Low Access to Vehicles, Which Are Predominantly Minority, Face Substantial Travel Burdens to  Obtain an EIC. ................................................................................................................................ 109

C.   Dr. Chatman Found that African Americans and Hispanics Are Significantly More Likely Than Anglos to Experience a Burdensome Roundtrip Travel Time to an EIC Location. ............................................................................................................... 113

D.   Dr. Bazelon Found That Travel Burdens to an EIC Location, Analyzed in Monetary Terms, Are Significantly Greater for African Americans Than  Anglos................ 117

E.   The Barreto-Sanchez Survey Also Identified Burdens Regarding Obtaining an EIC. ................................................................................................................................ 121

F.   The Costs to Obtain an EIC Significantly Limit the Ability of the Individual Ortiz Plaintiffs to Vote. ................................................................................................. 122

XI.   SOCIAL, ELECTORAL, AND HISTORICAL CONDITIONS IN TEXAS INTERACT WITH SB 14 TO LIMIT THE ABILITY OF MINORITY VOTERS TO PARTICIPATE IN THE POLITICAL PROCESS ----------------------------------------------------------- 126

A.   Hispanic and African-American Voter Participation Rates Lag Behind the Anglo Rate. ...................................................................................................................... 129

B.   Texas has a Long History of Voting-Related Discrimination, Stretching Back Over a Hundred Years and Persisting Today.................................................................. 131

ii

C. Hispanics and African Americans Bear the Effects of Discrimination in Education, Employment, Housing, and Health, Hindering the Ability of These Groups to Participate Effectively in the Political Process. ...................................................... 136

D. Racially Polarized Voting Continues in Texas. ...................................................... 140

E. Contemporary Political Campaigns in Texas Continue to be Marked by Racial and Anti-Immigrant Appeals. ...................................................... 142

F. Hispanics and African Americans Have Been Underrepresented at All Levels of Government in Texas. ...................................................... 144

G. SB 14 Addresses a Type of Voter Fraud That is Essentially Nonexistent in Texas and Does Not Address Any Other Form of Voter Fraud. ...................................................... 145

H. SB 14 Does Not Address Non-Citizen Voting. ...................................................... 153

I. SB 14 Also Does Not Address the State's Interest in Promoting Voter Confidence. ...................................................... 153

XII. THE LEGISLATIVE PROCESS LEADING TO THE ADOPTION OF SB 14 -------- 154

A. 79th Texas Legislature (2005): House Bill 1706. ...................................................... 156

B. 80th Texas Legislature (2007): House Bill 218. ...................................................... 158

C. 81st Texas Legislature (2009): SB 362 ...................................................... 164

D. 82nd Texas Legislature (2011): SB 14. ...................................................... 178

E. The Choices that the Legislature Made ...................................................... 210

F. Implementation of SB 14 ...................................................... 213

G. Dr. Allan Lichtman's Conclusions Regarding the Legislature's Purpose .............. 214

H. Dr. Chandler Davidson's Conclusions Regarding the Legislature's Purpose. ....... 216

XIII. PLAINTIFFS' EXPERT WITNESSES ARE QUALIFIED TO OFFER OPINION TESTIMONY -------------------------------------------------------------------------------- 219

XIV. DEFENDANTS' EXPERTS OFFERED NO CREDIBLE ANALYSIS OF SB 14 ----- 228

A. Dr. Hood ...................................................... 228

B. Dr. Milyo ...................................................... 238

XV. THE PRIVATE PLAINTIFFS AND PLAINTIFF-INTERVENORS HAVE BEEN INJURED BY SB 14 ------------------------------------------------------------------------- 247

A.    Veasey Plaintiffs ...................................................................................... 247

B.    Young Voters Education Fund Intervenors ............................................. 259

C.    Texas Association of Hispanic County Judges and County Commissioners
      Intervenor .................................................................................................. 263

D.    Texas NAACP Plaintiffs .......................................................................... 264

E.    Ortiz Plaintiffs .......................................................................................... 268

PROPOSED CONCLUSIONS OF LAW-------------**ERROR! BOOKMARK NOT DEFINED.**

## PROPOSED FINDINGS OF FACT

*Introduction*

The Proposed Findings of Fact are organized into 15 sections.  The subject matter and ultimate findings of each section may be briefly identified and summarized as follows:

Section I describes the demographics for the State of Texas.

Section II describes the strict photo identification requirements of SB 14.

Section III describes the voter identification requirements that were in effect prior to the implementation of SB 14, which were more flexible and minimally burdensome.

Section IV compares SB 14 to the voter identification requirements adopted by other States, and finds that Texas has enacted a distinctively strict photo ID law.

Section V describes the statistical analyses conducted by plaintiffs' experts of the extent to which Texas citizens do not possess any of the forms of photo ID mandated by SB 14.  These analyses show that over one million voting age citizens and over 600,000 registered voters lack that ID.  The analyses further show that the percentage of Hispanics and the percentage of African Americans without SB 14 ID are both substantially higher than the percentage of Anglos without that ID and that these disparities are statistically significant.  In addition, various alternative ways of conducting these analyses all show that Hispanics and African Americans disproportionately lack SB 14 ID.

Section VI continues the discussion of the statistical analyses of ID possession, finding that SB 14's exemption for certain voters with disabilities, and the fact that SB 14 does not apply to persons voting absentee by mail, do not alleviate the significant racial disparities in SB 14 ID possession.

Section VII describes, notwithstanding limited elections results data maintained by the Elections Division of the Texas Secretary of State's office, evidence of the number of registered voters who lack SB 14 ID who unsuccessfully attempted to vote in-person in the very low-turnout, November 2013 state election.

Section VIII describes the burdens that voters without SB 14 ID will encounter in attempting to obtain any of the four forms of SB 14 ID issued by Texas. All four are issued by the Texas Department of Public Safety. The obstacles to obtaining these ID's include documentation requirements, eligibility limitations, fees, limited locations and business hours, travel burdens, potential loss of income due to in-person application requirements, and a lack of publicity and voter education.

Section IX describes the burdens that voters without SB 14 ID will encounter in attempting to obtain any of the forms of SB 14 ID issued by the federal government, including difficulties connected with eligibility limitations and fees.

Section X describes several expert analyses that demonstrate that Hispanic and African-American voters without SB14 ID will experience significantly greater burdens than Anglo voters in attempting to obtain SB 14 ID.

Section XI sets forth the social, electoral, and historical conditions in Texas that interact with SB 14 to further burden the ability of minority citizens without SB 14 ID to obtain that ID. These conditions include the fact that: a) voter participation rates among Hispanics and African Americans remain behind Anglo rates; b) Texas has a long history of racial discrimination in voting, that has continued to the present day; c) minorities in Texas suffer from the ongoing effects of discrimination in other areas, which has led to stark socioeconomic differences between the minority and Anglo populations; d) elections throughout the State continue to be

2

characterized by racially polarized voting; e) racial and anti-immigrant appeals are used in present-day elections; f) minorities are underrepresented in elected offices; g) SB 14 addresses a type of voter fraud – voter impersonation at the polls – that is essentially nonexistent; h) SB 14 does not address the issue of non-citizen voting; and i) SB 14 is not calculated to increase voter confidence in the electoral process.

Section XII provides a detailed recounting of the legislative process that led to the enactment of SB 14, beginning in 2005 and culminating in SB 14's passage in 2011.

Section XIII identifies the credentials of the expert witnesses to be presented by plaintiffs and plaintiff-intervenors, and finds that they are qualified to render the opinions they intend to offer.

Section XIV describes the Defendants' lack of credible expert analysis of SB 14.

Section XV describes the injuries that each plaintiff and plaintiff-intervenor has suffered as a result of SB 14.

## I.   DEMOGRAPHIC DATA FOR THE STATE OF TEXAS

1.   According to the 2010 Census, the State of Texas has a total population of 25,145,561, of whom 45.3 percent are non-Hispanic white, 37.6 percent are Hispanic, and 11.8 percent are non-Hispanic African American.[1]  Thus, over one-third of Texas's total population is Hispanic and about a tenth is African American.

---

[1] United States' Request for Judicial Notice, ECF no. 252, granted by Minute Order, May 28, 2014.  The U.S. Census Bureau does not treat "Hispanic" as a racial category and, instead, asks individuals to self-identify their race and then to separately self-identify whether they are Hispanic or not.  Accordingly, in order to be precise, the Court generally reports Census data by referring to the "non-Hispanic white" population and the "non-Hispanic African-American" population.  Otherwise, the Court uses the term "Anglo" to refer to non-Hispanic whites and the term "African American" to refer to non-Hispanic African Americans.

2.      According to the 2006-2010 American Community Survey ("ACS") conducted by the

U.S. Bureau of the Census, Texas has a citizen voting-age population of 15,276,966 persons, of

whom 57.6 percent are non-Hispanic white, 25.5 percent are Hispanic, and 12.7 percent are non-

Hispanic African American.[2]   Thus, about a quarter of the State's citizen voting-age population

is Hispanic and over a tenth is African American.

3.      According to the data from the 2000 Census and the 2006-2010 ACS, the citizen voting-

age population for the State of Texas has grown by 1,977,121 persons, of whom 25.0 percent are

non-Hispanic white, 46.4 percent are Hispanic, and 17.6 percent are non-Hispanic African

American.[3]   Thus, Hispanics have accounted for nearly half of the recent growth in Texas's

citizen voting-age population and African Americans have accounted for nearly a fifth.

4.      As discussed *infra*, certain sub-populations of the State of Texas are relevant to this

litigation, including persons age 65 or older and persons who possess military photo

identification.   Available census data relevant to these groups are as follows:

  a.   According to the 2010 Census, non-Hispanic whites in Texas make up a

       disproportionate share of the voting age population age 65 or older – 19.4 percent of

       the non-Hispanic white voting-age population is age 65 or older, 8.7 percent of the

       Hispanic voting-age population is age 65 or older, and 10.6 percent of the non-

       Hispanic African-American voting-age population is age 65 or older.[4]

  b.   According to the 2010-2012 ACS, non-Hispanic whites also make up a

       disproportionate share of military veterans – 12.0 percent of the non-Hispanic white

       voting-age population are military veterans, 4.1 percent of the Hispanic voting-age

---

[2] *Id.*
[3] *Id.*
[4] Order, ECF no. 396.

population are military veterans, and 9.7 percent of the non-Hispanic African-American population are military veterans.[5]

5.   According to the 2010-2012 ACS, Hispanics and non-Hispanic African Americans have a substantially lower socioeconomic status than non-Hispanic whites in Texas:[6]

|  | Non-Hispanic Whites | Hispanics | Non-Hispanic African Americans |
|---|---|---|---|
| Lack High School Diploma (age 25 and older) | 7.6% | 39.5% | 13.4% |
| Poverty Rate | 9.4% | 26.9% | 24.7% |
| Median Household Income | $62,426 | $38,600 | $37,041 |
| Median Per Capita Income | $35,598 | $14,768 | $19,133 |
| Unemployment Rate | 6.7% | 9.2% | 14.1% |
| Occupied Housing Units With No Available Vehicle | 3.9% | 7.0% | 12.9% |

## II.   SB 14 IMPOSES A STRICT PHOTO ID REQUIREMENT FOR IN-PERSON VOTING

6.   SB 14 requires nearly all in-person voters to present specified valid or recently expired photographic identification in order to cast a valid ballot (these forms of ID are referred to collectively as "SB 14 ID").[7]  Statutory exemptions are either narrow in scope or burdensome for voters to establish eligibility.[8]  In-person voters include those who seek to cast a ballot at the polls on Election Day and those who seek to cast a ballot through in-person early voting before

---

[5] United States' Request for Judicial Notice, ECF no. 252, granted by Minute Order, May 28, 2014.
[6] *Id.*
[7] *Infra* ¶¶ 7-15.
[8] *Infra* ¶¶ 11, 12.

Election Day at a designated early voting site.  In Texas, every voter has a right to vote in person.[9]

7.      Pursuant to SB 14, voters must present one of the following forms of identification when voting in person: (1) a Texas driver license, personal ID card, or election identification certificate (EIC), each issued by the Texas Department of Public Safety (DPS); (2) a Texas license to carry a concealed handgun issued by DPS; (3) a U.S. military ID card that contains the person's photograph; (4) a U.S. citizenship certificate that contains the person's photograph; or (5) a U.S. passport.[10]

8.      SB 14 prohibits the use of identification that has expired more than 60 days before the date of presentation, with the exception of U.S. citizenship certificates which have no expiration date.[11]

9.      SB 14 creates a new form of identification called an election identification certificate, which may be used only to establish identity for the purpose of voting.  SB 14 mandates that DPS must issue EICs without collecting a fee, but SB 14 permits DPS to require each applicant for an EIC to furnish the same information required to establish eligibility for a driver license, which includes thumbprints and any other information that DPS deems necessary to establish identity, residency, competency, and eligibility.[12]

---

[9] Trial Tr. 337:4-6 (Ingram) (Day 7).
[10] Tex. Elec. Code § 63.0101.
[11] Tex. Elec. Code § 63.0101; PL466 at 19 (TEX00310569).
[12] Tex. Transp. Code §§ 521A.001; *see also* Tex. Transp. Code § 521.142.

10.     A voter who does not present the required identification may cast a provisional ballot if he or she executes an affidavit stating that he or she is "(1) a registered voter in the precinct in which the person seeks to vote; and (2) is eligible to vote in the election."[13]

11.     A provisional ballot cast because a voter did not present allowable photo ID will not be counted unless the voter appears in person at the voter registrar's office during business hours within six days of the election and presents SB 14 ID or affirms either a religious objection to being photographed or loss of ID because of a declared natural disaster within the prior 45 days.[14]

12.     Voters with disabilities may apply for an exemption from the SB 14 photo ID requirements.  However, in order to do so, a voter must possess documentation from the Social Security Administration evidencing a disability determination or from the U.S. Department of Veterans Affairs evincing a disability rating of at least 50 percent.[15]  The voter must then complete and submit a supplemental form stating that he or she does not possess any other form of acceptable photo ID and a copy of his or her disability determination.[16]  Even if a voter possesses the necessary documentation and brought it with her to the polls on Election Day, the voter would not be exempted from SB 14's photo ID requirement; the voter must obtain the exemption before Election Day or in the cure period after Election Day.[17]  Disabled voters who

[13] Tex. Elec. Code § 63.011(a).
[14] Tex. Elec. Code §§ 65.054(b)(2), 65.0541(1).
[15] Tex. Elec. Code § 13.002(i)(1).
[16] Tex. Elec. Code § 13.002(i);  Ingram Dep. 138:23-144:24, Apr. 23, 2014; PL296 (Request for Disability Exemption).
[17] Trial Tr. 346:9-347:16 (Ingram) (Day 7).

have obtained an exemption and subsequently move to a different county must reapply for the disability exemption.[18]

13.     SB 14 applies only to voters who cast their ballot in person; it does not apply to ballots cast through absentee voting by mail.[19]  Texas limits absentee voting by mail to voters who: are 65 or older; expect to be absent from their county of residence during early voting and on Election Day; cannot appear at the polling place without physical assistance due to sickness or disability; or are confined to jail.[20]  Voters satisfy one of these criteria for absentee voting by affirming their reason for voting absentee on a mail ballot application.[21]

14.     In Texas, a voter must take several steps to vote early by mail.[22]  First, the voter must obtain, complete, and submit an application for an early by mail ballot.  The application cannot be made by phone or online.[23] Once the clerk receives the application, the clerk has seven days to process the application.[24]  Second, the voter must vote the ballot.[25]  Finally, the voter must mail it to the election clerk in advance of Election Day, so that the ballot will be received by the clerk no later than Election Day.[26]

15.     SB 14 also provides that in-person voters who present allowable photo ID may cast a regular ballot and have that ballot counted only if the voter's name on the ID presented is exactly the same as the voter's name as it appears on the registration rolls or, if not exactly the same, the

---

[18] Trial Tr. 348:23-349:15 (Ingram) (Day 7).
[19] Tex. Elec. Code § 63.0101.
[20] Tex. Elec. Code §§ 82.001-.004; Trial Tr. 337:17-338:15 (Ingram) (Day 7).
[21] Application for Ballot by Mail, http://www.sos.state.tx.us/elections/forms/pol-sub/5-15f.pdf; Trial Tr. 337:23-338:3 (Ingram) (Day 7) (affirmation sufficient to vote absentee due to disability).
[22] Trial Tr. 338:16-20 (Ingram) (Day 7).
[23] Trial Tr. 339:1-7 (Ingram) (Day 7).
[24] Trial Tr. 341:6-9 (Ingram) (Day 7).
[25] Trial Tr. 338:16-20 (Ingram) (Day 7).
[26] Trial Tr. 341:10-18 (Ingram) (Day 7).

two forms of the voter's name are "substantially similar."   This determination is made by each election officer at each polling place, subject to guidelines issued by the Texas Secretary of State.  If the election officer determines that the ID and registration names do not match exactly but are "substantially similar," the voter must complete an affidavit stating that she or he is the person on the registration rolls in order to complete a regular ballot.  If the election officer determines that the ID and registration names are neither an exact match nor "substantially similar," the voter may cast a provisional ballot; that ballot will be counted only if, as described in ¶ 11, the voter appears at the registrar's office after the election and is able to demonstrate that the two forms of her or his name are "substantially similar."[27]

## III.   TEXAS' PREVIOUS VOTER ID LAW IMPOSED MINIMAL BURDENS ON VOTERS

16.    Prior to the enactment of SB 14, the State of Texas maintained a different voter identification requirement for in-person voting. [28]  The legislature enacted that requirement in 1997 (HB 331) and amended it in 2003 (HB 1549) to bring it into compliance with the federal Help American Vote Act.[29]

17.    Under Texas's prior voter identification law, election officials provided to each and every voter, free of charge, a voter registration certificate – which was delivered directly to each voter's residence.[30]   To receive a voter registration certificate, a voter registration applicant need only complete a voter registration application and need not submit any additional

---

[27] 1 TAC § 81.71.
[28] Trial Tr. 342:16-344:13 (Ingram) (Day 7).
[29] PL471 (HB 331); PL472 (HB 1549); PL758 ¶¶ 60-62 (Burden Corr. Rep.); Trial Tr. 323:24-324:14 (Burden) (Day 3).
[30] Tex. Elec. Code § 13.144(a); Trial Tr. 342:16-23 (Ingram) (Day 7).

documentation.[31]  That certificate constituted sufficient identification to cast a valid, in-person ballot.  A voter who lost or misplaced the certificate could obtain a replacement certificate simply by placing a phone call or sending an email.[32]

18.     The voter registration certificate includes significant information identifying the voter, including the voter's name, gender, and birthdate.[33]

19.      Voters could still cast a regular ballot even if they did not have their registration certificate so long as they executed an affidavit to that effect, and presented one of numerous forms of photographic or non-photographic ID.   The permissible ID included:  (a) a Texas driver's license or personal identification card, current or expired, or a similar document from another State; (b) a form of identification containing a photograph establishing identity (such as an employee identification card); (c) a birth certificate or other document confirming birth that is admissible in a court of law and established identity; (d) United States citizenship papers; (e) a United States passport; (f) official mail addressed to the person by name from a governmental agency; (g) a copy of a current utility bill, bank statement, government check, paycheck, or other government document showing the name and address of the voter; or (h) any other form of identification approved by the Secretary of State's office.[34]

20.     Furthermore, voters who neither had their registration certificate nor had any of the alternative forms of identification could cast a regular ballot if a poll worker attested to the voter's identity.[35]

---

[31] Trial Tr. 342:24-343:6 (Ingram) (Day 7).
[32] Tex. Elec. Code § 15.004(a), (c).
[33] PL883 (Election Advisory No. 2013-08 (July 29, 2013)).
[34] PL471 § 30 (HB 331); PL044 § 14 (SB 14) (striking relevant text).
[35] PL471 § 27 (HB 331); PL044 § 21 (SB 14) (repealing relevant provision).

21.     County clerks with extensive experience in administering elections believe that the previous identification requirements were sufficient to serve all legitimate state interests in ensuring fair and accurate elections.[36]

## IV.   SB 14 IMPOSES STRICTER REQUIREMENTS THAN OTHER PHOTO VOTER ID STATES

22.     About two-thirds of the States enforce some form of a voter identification requirement for in-person voting, but only a minority of these States, including Texas, enforces a strict photo ID requirement.[37]

23.     In considering the enactment of SB 14, the Texas Legislature focused on the only two States that, at the time, maintained strict photographic voter identification laws, Georgia and Indiana.[38]  Even with respect to those states, neither law contains the same barriers to voting created by SB 14.[39]  Other photographic voter identification laws enacted since 2011 also contain a variety of ameliorative provisions not found in SB 14.[40]

24.     Unlike Texas, Georgia permits voters to establish identity using any photo identification card issued by any state in the United States or federal entity authorized to issue ID; any employee ID with a photo issued by the United States, Georgia, a Georgia sub-jurisdiction, or any other public entity in Georgia (including state colleges and universities); or a tribal ID.[41]

---

[36] Trial Tr. 177:24-178:9 (Guidry) (Day 8); Newman Dep. 72:20-73:2.
[37] Nat'l Conf. of State Legislators, *Voter Identification Requirements/Voter ID Laws*, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.
[38] PL464 (Ind. SEA 483 (2005)); PL470 (Ga. SB 84 (2006)).
[39] PL758 ¶ 65 (Burden Corr. Rep.); Trial Tr. 102:22-103:2 (Martinez Fischer) (Day 1); Trial Tr. 326:12-327:4 (Burden) (Day 3).
[40] PL758 ¶¶ 65-78 & fig.1 (Burden Corr. Rep.); Trial Tr. 324:20-326:11 (Burden) (Day 3); *infra* ¶¶ 24-30.
[41] Ga. Code Ann. § 21-2-417(a)(2), (4), (6); PL758 ¶ 68 (Burden Corr. Rep.).

Georgia also permits voters to establish identity using a Georgia driver's license without regard to its expiration date.[42]

25.     By statute, Georgia requires each county board of registrars to provide at least one place in the county at which it shall accept applications for and issue Georgia voter identification cards without a fee.[43]  Also by statute, Georgia requires issuance of a voter identification card to individuals who present a basic set of documents that may be obtained without cost.[44]  SB 14 does not contain similar provisions.[45]

26.     Any registered voter in Georgia may cast an absentee ballot without a specified reason and without meeting an age or disability criterion.[46]  Therefore, any voter who lacks photo ID necessary to meet Georgia's in-person voting requirements retains the ability to vote by mail even if he or she cannot qualify to cast a valid ballot in person.

27.     Unlike Texas, Indiana permits voters to establish identity using any document issued by the United States or the State of Indiana that includes the voter's name and photograph and is valid or has expired after the most recent general election.[47]  In the case of military or veterans identification, identification without an expiration date is acceptable.[48]

28.     By statute, Indiana will count a provisional ballot if the voter who cast the ballot executes an affidavit stating that he or she is indigent and unable to obtain proof of identification without payment of a fee.[49]  SB 14 does not contain a similar provision.[50]

---

[42] Ga. Code Ann. § 21-2-417(a)(1); PL758 ¶ 69 (Burden Corr. Rep.); PL759 ¶ 17 (Burden Reply Rep.).
[43] Ga. Code Ann. § 21-2-417.1(a); PL758 ¶ 75 (Burden Corr. Rep.).
[44] Ga. Code Ann. § 21-2-417.1(e).
[45] PL001 (SB 14).
[46] Ga. Code Ann. § 21-2-381(b).
[47] Ind. Code § 3-5-2-40.5(a); PL758 ¶ 67 (Burden Corr. Rep.).
[48] Ind. Code § 3-5-2-40.5(b).
[49] Ind. Code § 3-11.7-5-2.5(c).

29.     SB 14 allows voters to use fewer forms of photo ID to establish identity than many other strict photo voter ID states and notably omits student IDs and employee IDs.[51]  The Texas Legislature specifically rejected amendments that would have permitted voters to establish identity using photo IDs issued by high schools, colleges, universities, and employers.[52]

30.     SB 14 also contains fewer ameliorative provisions than many other photo ID states.  Most notably, it does not require that there be a location for obtaining acceptable ID without a fee in every county.  Nor does it contain a provision enabling voters who face a reasonable impediment to obtaining ID to cast a valid ballot.[53]  Indeed, the Texas Legislature specifically rejected an exception for voters who are indigent and cannot obtain an acceptable ID without paying a fee.[54]

## V.     HISPANIC AND AFRICAN-AMERICAN VOTERS ARE SIGNIFICANTLY LESS LIKELY TO POSSESS SB 14 ID

### A.     Overview

31.     Hispanic and African-American registered voters in Texas are disproportionately less likely than Anglo voters to possess any of the forms of photo ID required under SB 14.[55]

32.     In addition to statistical evidence establishing this disproportionality,[56] a number of low-income, minority witnesses testified as to how, for years, they have functioned without SB 14 IDs and, sometimes, even the documents needed to apply for such identification.[57]

---

[50] PL001 (SB 14).
[51] PL758 ¶¶ 67-68, 71-72 (Burden Corr. Rep.); Trial Tr. 324:11-325:13, 326:24-327:4 (Burden) (Day 3).
[52] PL011 (Tex. Sen. J., 82d Leg., Regular Sess., at 118 (5th Day Continued)); PL034 (Tex. H.J., 82d Leg., Regular Sess., at 982 (40th Day)).
[53] PL758 ¶¶ 73-78 & fig.1 (Burden Corr. Rep.); Trial Tr. 325:1-326:11 (Burden) (Day 3).
[54] PL011 at 34-35 (Tex. Sen. J., 82d Leg., Regular Sess., at 118 (5th Day Continued)).
[55] *Infra* ¶¶ 56-86, 97-121; Trial Tr. 254:20-255:7 (Veasey) (Day 1).
[56] *Id.*
[57] E. Martinez Dep. 56:20-62:22; Sanchez Dep. 8:13-11:8; Eagleton Dep. 18:6-21:5, 27:10-28:13, 45:16-47:10, 88:22-89:6, 106:5-19, 121:22-123:14, July 11, 2014; PL1095 (Eagleton Video Excerpts); Holmes Dep. 9:5-12:4, 18:13-24, 34:10-35:15, July 10, 2014; PL1094 (Holmes Video Excerpts); Bingham Dep.
(Cont'd…)

33.     The individual witnesses also highlight the relationship between socioeconomic

conditions and not having a qualifying SB 14 ID.[58]  For example, Ramona Bingham went

without a Texas driver license for roughly four years because of outstanding traffic-related

tickets and car insurance surcharge fees that she could not afford to pay.[59]  Similarly, Lionel

Estrada has been unable to renew his driver license that expired in January 2013 because he has

been unable to pay outstanding surcharges.[60]

34.     Witnesses employed by non-profit organizations that provide assistance to low-income

Texas residents and a local elected official representing predominantly low-income, minority

community testified that a significant number of low-income registered voters reside in Texas

without possessing SB 14 IDs or the documentation needed to obtain SB 14 IDs.[61]  They also

testified that the low-income voters without IDs whom they serve and work with are

disproportionately African American or Hispanic.[62]

35.     For example, Kristina Mora, a former Senior Caseworker at the Stewpot, a non-profit

servicing chronically and episodically homeless clients in the Dallas-Fort Worth area, testified

---

8:8-11:17, 12:1-6, 14:16-16:16, July 29, 2014; PL1091 (Bingham Video Excerpts); Taylor Dep. 18:8-12; Estrada Dep. 11:16-19; Margarito Lara Dep. 32:11-13; Davis Dep. 63:4-64:2; Trial Tr. 105:25-107:4, 108:21-23 (Mendez) (Day 2); Trial Tr. 21:12-22:5 (Davis) (Day 4); Trial Tr. 166:3-18, 169:1-3, 169:16-170:10, 171:16-22, 174:9-17 (Espinoza) (Day 6).
[58] Eagleton Dep. 18:6-21:5, 27:1-25; PL1095 (Eagleton Video Excerpts); Bingham Dep. 16:10-16; PL1091 (Bingham Video Excerpts); Sanchez Dep. 8:13-10:20, Aug. 6, 2014; Mendez Dep. 16:3-16.
[59] Bingham Dep. 14:6-16:16; PL1091 (Bingham Video Excerpts).
[60] Estrada Dep. 69:2-6; Trial Tr. 134:24-135:20 (Estrada) (Day 3).
[61] Davis Dep. 52:3-21, 58:18-60:13, 62:3-65:12, 73:3-16, July 16, 2014; Buchanan Dep. 39:2-40:2, 49:21-52:3, 57:18-59:25, 118:12-21, July 15, 2014; Guzman Dep. 60:24-66:2; Trial Tr. 361:4-24, 363:8-364:1, 376:4-15 (Guzman) (Day 3).
[62] Buchanan Dep. 92:9-93:4, 121:6-21; Trial Tr. 358:11-21 (Guzman) (Day 3); Trial Tr. 270:8-13; 284:9-285:11 (White) (Day 2) (explaining that approximately eighty percent of Christian Assistance Ministry's clients are minorities, and that, of its two locations, the one located in a predominantly minority area spends probably half or more of its resources on ID recovery, whereas the other, located in a mostly-Caucasian area, spends almost no resources on ID recovery).

that Stewpot's clients are "predominantly African-American," and that "on a daily basis" she and her colleagues encounter clients who have not had any forms of ID in their possession for more than four months.[63]  She also explained that on a daily basis, the Stewpot has to turn away large numbers of low-income, minority individuals who need financial or other assistance in obtaining SB 14 IDs and/or supporting documents.[64]

36.     Low income, minority voters who were required to cast a provisional ballot because they lack SB 14 ID testified that they were unable cure their ballot.  Some of these voters testified that they were unaware or confused about the steps necessary to cure their provisional ballot.[65] Others said that while they understood that they had to cure their provisional ballot for it to be counted, they were unable to cure within six days of the election.[66]  All of these voters were bitterly disappointed when their provisional ballot was not counted because of SB 14's ID requirement.[67]

37.     Indeed, while SB 14 provides voters just a few days to cure their provisional ballots, professionals providing assistance to those seeking to obtain an official state photo ID testified that it can routinely take many months for low-income individuals to acquire such an ID even with their assistance.[68]  For instance, one of these professionals testified, "[T]here are a large

---

[63] Trial Tr. 125:19-126:3 (Mora) (Day 2).
[64] Trial Tr. 128:19-131:13 (Mora) (Day 2).
[65] Eagleton Dep. 32:5-33:11, 42:9-43:8; PL1095 (Eagleton Video Excerpts); Holmes Dep. 17:10-20:11, 20:21-23:1, 23:15-24:2; PL1094 (Holmes Video Excerpts); Washington Dep. 22:21-25:25; PL1093 (Washington Video Excerpts); Trial Tr. 364:25-365:11 (Guzman) (Day 3).
[66] Bingham Dep. 33:22-39:22; Trial Tr. 358:13-19 (Farinelli) (Day 6).
[67] Washington Dep. 22:1-19; PL1093 (Washington Video Excerpts); Bingham Dep. 39:12-39:22, 138:20-139:11; PL1091 (Bingham Video Excerpts); Eagleton Dep. 32:15-33:11; PL1095 (Eagleton Video Excerpts); Holmes Dep. 115:21-116:11; PL1094 (Holmes Video Excerpts).
[68] Trial Tr. 278:5-16 (White) (Day 2); Trial Tr. 126:16-24 (Mora) (Day 2); Davis Dep. 62:3-13.

number of clients, probably between 15, maybe 20 percent of the clients that we see that it's going to take more than four months to obtain the Texas ID, due to the different barriers . . ."[69]

38.     In addition to burdening individual voters, SB 14 also has a broader impact on election outcomes in ways that disproportionately affect minority communities.  For example, Edcouch City Councilmember Daniel Guzman testified that SB 14 had a "tremendous[]" impact on election outcomes in his predominantly Latino, socio-economically depressed community.[70] Councilmember Guzman testified that in a recent election, where roughly 1,200 votes were cast, SB 14 likely affected a number of election outcomes because the ID requirement prevented a significant number of voters from voting.[71]

39.     Dr. Stephen Ansolabehere, and Drs. Matt Barreto and Gabriel Sanchez, conducted statewide analyses of voters or potential voters in Texas in order to assess the likelihood that Hispanic, African-American, and white voters possess SB 14 ID.  Using differing but complementary methodologies, Dr. Ansolabehere and Drs. Barreto and Sanchez arrived at the same conclusion: Hispanic and African-American voters are significantly less likely than Anglo voters (*i.e.*, non-Hispanic whites) to possess SB 14 ID.[72]  Dr. Ansolabehere examined the population of Texas registered voters, and used database matching to determine which voters have at least one of the forms of SB 14 ID according to the state and federal databases that record the holders of these ID.  Drs. Barreto and Sanchez conducted a telephone survey of a sample of voting age citizens in Texas.

---

[69] Trial Tr. 126:16-24 (Mora) (Day 2)
[70] Trial Tr. 358:16-21, 368:4-370:5, 375:9-376:3 (Guzman) (Day 3).
[71] *Id.*
[72] *Infra* ¶¶ 44-86, 89-103.

40.    The estimates by race of registered voters lacking SB 14 ID performed by Dr.

Ansolabehere are confirmed by analyses performed by Dr. Herron, Dr. Bazelon, and Dr.

Webster.[73]

41.    The racial disparities found also comport with nationwide studies of driver license

possession performed by the AAA Foundation for Traffic Safety of Americans aged 18 to 20 and

the Black Youth Project of American youth aged 18 to 29, which both found lower rates of

driver license possession among Hispanics and African-American youths than among Anglo

youths.[74]

> **B.    Dr. Ansolabehere's Database Matching and Multiple Methods of Demographic Analysis Demonstrate That There Are Statistically Significant Racial Disparities in ID Possession**

42.    Dr. Stephen Ansolabehere, a Professor of Government at Harvard University, performed

a database matching analysis in order to assess whether each of the approximately 13.5 million

individual registered voters in Texas possess SB 14 ID and whether these individual voters

qualify to apply for a disability exemption.[75]

43.    Dr. Ansolabehere then used multiple methods to estimate the racial composition of the set

of registered voters in Texas who lack SB 14 ID, along with those who do not qualify for a

disability exemption and those who do not qualify to vote by mail on account of age.[76]

> **1.    Dr. Ansolabehere's database matching methodology**

44.    In this case, Dr. Ansolabehere performed a database matching analysis, meaning that he

electronically compared records from multiple sources to see if records of individuals in one

---

[73] *Infra* ¶¶ 50-56, 104-121.
[74] PL758 ¶¶ 47-48 (Burden Corr. Rep.).
[75] *Infra* ¶¶ 44-55; Trial Tr. 129:11-130:3, 144:5-8 (Ansolabehere) (Day 1) (noting that the 13.5 million records were captured on January 15, 2014).
[76] *Infra* ¶¶ 131-134, 144-150.

database were "matched" to a record in another database.  For this analysis, he performed a database matching analysis that compared registered voters from Texas's voter registration database, the Texas Election Administration Management System (TEAM), to the Texas and federal identification databases for all types of acceptable photo ID, and to the federal disability databases that address the types of disability that may qualify an individual voter to apply for a disability exemption.[77]

45.     Database matching is a methodology routinely used in academic analysis.[78]

46.     The State of Texas itself regularly matches TEAM to other state and federal databases to identify and remove deceased voters, voters who have moved, and voters who have felony convictions.[79]

47.     Texas itself had matched TEAM against DPS records in July 2013 to determine "where non matches might be concentrated so that the Secretary of State could target mobile EIC units to those areas."[80]

48.     Dr. Ansolabehere's matching analysis connected voter records in TEAM to records from DPS databases for holders of Texas driver licenses, personal identification cards, concealed handgun licenses, and election identification certificates.  Dr. Ansolabehere received extracts of each of these Texas databases and matched the records himself between TEAM and DPS.  For the federal forms of identification, Dr. Ansolabehere provided each relevant federal agency with detailed written instructions, as well as sample programming code.  Dr. Ansolabehere did the

---

[77] *Infra* ¶¶ 48-55; Trial Tr. 129:11-20 (Ansolabehere) (Day 1).
[78] PL752R ¶¶ 12, 50-51 & nn. 11-20 (Ansolabehere Corr. Supp. Rep.); PL768 at 3-4 (Herron Rep.); Trial Tr. 131:20-132:3 (Ansolabehere) (Day 1).
[79] PL901 at 60-68 (Defs.' Responses to Pls. 1st Interrogs.) (Responses 18-19).
[80] PL901 at 63 (Defs.' Responses to Pls. 1st Interrogs.) (Response 18).

same with regard to federal disability determinations that establish eligibility for disability exemptions under SB 14.[81]

49.     Persons who conducted or supervised the matching at each federal agency completed sworn declarations attesting that they followed the instructions that they received, and representatives of each agency testified during deposition that they had significant experience with database matching, that they followed all instructions provided to them, and that no issues occurred that would have affected the integrity of the matching results produced.[82]

50.     Dr. Ansolabehere's database matching methodology produced robust and reliable results.[83]

51.     First, Dr. Ansolabehere's methodology, or overall matching "algorithm," involved detailed field standardization steps that were applied to all of the databases being matched.[84] Academic research shows that the types of standardizations performed by Dr. Ansolabehere improve the quality of the matching results.[85]

52.     Second, the matching algorithm that Dr. Ansolabehere developed relied on the construction and use of multiple identifiers for each record being matched.  Thus, for each single voter record in TEAM, up to 13 separate identifiers were constructed using different combinations of data related to the voter's address; date of birth; gender; first, middle, and last

---

[81] PL752R ¶¶ 15-18, 31-32 (Ansolabehere Corr. Supp. Rep.).
[82] PL913 (Smith Decl.); PL914 (Baydush Decl.); PL910 (Mims Decl.); PL912 (Rudolph Decl.); PL911 (Oshinnaiye Decl.); PL918 (Strausler Decl.); Smith Dep. 13:17-21, 14:12-19, 15:12-23, 24:9-25:16, 25:23-26:18, 41:21-23, 43:9-44:1, July 17, 2014 (VA); Mims Dep. 17:25-18:21, 31:11-32:16, 38:6-11, 42:12-21, 43:17-45:3, 53:7-15, 65:5-20, July 17, 2014 (VA); Baydush Dep. 16:12-17:24,  62:3-21, 66:2-7, July 22, 2014 (SOS); Rudolph Dep. 18:7- 19:2, 28:25-30:6, 35:11-36:15, 47:14-17, July 16, 2014 (DOD); Strausler Dep. 16:1-3, 16:12-17:2, 35:11-37:3, 42:15-24, 74:11-19 (SSA); Oshinnaiye Dep. 15:6-25, 26:7-27:18, 30:12-19, 31:7-25, 47:2-6, 51:24-52:15, July 22, 2014 (USCIS).
[83] *Infra* ¶¶ 51-55.
[84] Trial Tr. 137:19-20 (Ansolabehere) (Day 1); PL752R ¶ 50 (Ansolabehere Corr. Supp. Rep.).
[85] PL752 ¶ 50-51 (Ansolabehere Supp. Rep.); Trial Tr. 138:9-12 (Ansolabehere) (Day 1).

names; social security number; and Texas Driver License Number.[86]  A voter record in TEAM that was matched, using any one of these identifiers, to a record in any one of the Texas and federal ID databases was treated as a match; once this match was established, it then did not matter whether use of the other identifiers did or did not produce a match for that same ID database, or whether a match was found for any other of the ID databases.[87]

53.     Multiple identifiers are widely used in academic fields that employ database matching, including public health research.  This methodology has been shown to yield high rates of accurate matches.  Matching on multiple identifiers constructed from a three or four different field types (various combinations of name, age, address, and date of birth, as well as Social Security number and Texas Driver License number) means that the algorithm makes exhaustive use of all available information to generate accurate linkages between records.  By using multiple identifiers, the algorithm ensures that matches can still be made notwithstanding typographical errors, incomplete information, and variations between databases as to the form of a person's name.[88]

54.     Third, Dr. Ansolabehere's algorithm employed a technique called "one-to-many" matching.  This methodology, in combination with the use of multiple identifiers, guards against false negatives—*i.e.*, failure to match records that should be matched.[89]  Thus, for example, if

---

[86] Trial Tr. 138:15-139:12 (Ansolabehere) (Day 1).
[87] PL752R ¶ 52, Table V.1 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 141:2-7 (Ansolabehere) (Day 1).
[88] PL752R ¶ 53 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 138:22-140:16 (Ansolabehere) (Day 1).
[89] Trial Tr. 140:19-22, 141:11-18, 142:2-15 (Ansolabehere) (Day 1).  Dr. Ansolabehere validated the accuracy of matching on his age, name, date of birth and gender primary combinations against matching on full social security number and found that the two approaches were functional equivalents.  His approach of using both constructed combinations and social security number, in addition to DPS ID number where available, results in a very low rate of false negatives (*i.e.*, failure to connect records that should have been matched).  PL752R ¶¶ 176-80 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 172:22-173:11 (Ansolabehere) (Day 1).

there were one Texas voter named John Smith, with a birthday of Jan. 1, 1960, but two Texas

Driver License holders with this name and birth date, a match would still be made.  Voter John

Smith is deemed to have a driver license, and there is no need to determine which driver license

record is his.[90]

55.    Fourth, Dr. Ansolabehere's matching algorithm ensured that persons that DPS considers

to be dead are not included on the No Match List.  Instead, deceased voters were removed from

further analysis after matching occurred.  Thus, where a TEAM record matches to a DPS record

that the State of Texas has marked as deceased, Dr. Ansolabehere noted this information to allow

for the exclusion of the deceased from further analysis of the population of voters actually

affected by SB 14's requirements.[91]

### 2.    Over 600,000 registered voters in Texas lack SB 14 ID

56.    Dr. Ansolabehere concluded that there are approximately 608,470 registered voters in

Texas who do not possess acceptable SB 14 ID.[92]  This figure represents 4.5% of all registered

voters.  These 608,470 voters make up Dr. Ansolabehere's "No Match List."[93]

---

[90] PL752R ¶ 53 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 141:6-7 (Ansolabehere) (Day 1).

[91] PL752R ¶ 55 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 143:9-144:2 (Ansolabehere) (Day 1).

[92] The No Match number that Dr. Ansolabehere testified to at trial was 786,727, based on the analysis set out in his August 15, 2014 Supplemental Report.  *See* PL752 (Ansolabehere Supp. Rep.).  On September 9, 2014—a week after Dr. Ansolabehere had testified at trial—Defendant Texas Department of Public Safety served amended answers to written deposition questions, in which it changed its answer as to the meaning of one field in the DPS database in a manner that impacted whether certain records were valid for matching.  Trial Tr. 7:3-24, 10:23-11:5 (Day 6).  Dr. Ansolabehere's August 15, 2014 Supplemental Report had had treated Texas driver license and identification card records with numerical values in the "license_surrendered" field as not valid for matching, based on the understanding that those cards were no longer in the physical possession of the person to whom they were originally issued.  The amended deposition answers indicated that the "license_surrendered" field does not relate to whether or not a Texas driver license or identification card had been surrendered to DPS, but whether an out-of-state card had been surrendered.  PL752R ¶ 4 (Ansolabehere Corr. Supp. Rep.).  As a result, Dr. Ansolabehere conducted the matching process again and submitted a revised report on September 16, 2014, taking account of DPS's changed answer and not excluding records with indicators in the "license_surrendered" field.  Trial Tr. 7:4-8:12 (Day 7) (setting out joint stipulations of the parties regarding DPS's changed

(Cont'd…)

### 3. The more than 608,000 registered voters without SB 14 ID are disproportionately Hispanic and African American

57.     After identifying the total number of voters who likely do not possess required SB 14 photo ID, Dr. Ansolabehere conducted four different types of analysis to identify any racial disparities in rates of possession of SB 14 ID.  These analyses were necessary because TEAM does not contain race information self-reported by registrants.[94]

### a. Ecological regression found statistically significant racial disparities in SB 14 ID possession

58.     The first demographic analysis correlated the No Match List to racial data from the U.S. Census Bureau.  The first step in this process was to use "geocoding" to identify the census area (block group) in which each Texas registered voter lives (using voter addresses listed in TEAM).[95]  Dr. Ansolabehere then used a statistical method, called ecological regression, to estimate the percentage of non-Hispanic white (Anglo) registered voters, Hispanic registered voters, and African-American registered voters who lack SB 14 photo ID.  This method relies on the precise manner in which the geocoded no-match voters are distributed across Texas, together with Census data on the precise manner in which citizens of voting age, by race and ethnicity,

---

answers and correction of expert reports).  Dr. Ansolabehere's September 16, 2014 Corrected Supplemental Report affirmed that while certain figures had changed from those he testified to at trial, none of his ultimate conclusions were impacted.  PL752R ¶ 4 (Ansolabehere Corr. Supp. Rep.).
[93] PL752R ¶¶ 7, 63, Table VI.2 (Ansolabehere Corr. Supp. Rep.).  In calculating the percentage of registered voters who do not have an acceptable SB 14 ID, Dr. Ansolabehere excluded from his analysis voters  who matched to DPS records of persons marked as deceased.  Removing these deceased voters reduces the total number of registered Texas voters from 13,564,416 to 13,487, 594.  *Id.*
[94] PL752R ¶ 5 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 133:8-12 (Ansolabehere) (Day 1).
[95] PL766 ¶ 21 (Ghitza Rep.); Trial Tr. 149:8-23 (Ghitza) (Day 2).  Catalist, LLC, a data utility company that provides election-related data, conducted the geocoding of Texas's voter registration list using standard, pre-existing software.  The process of geocoding was entirely mechanical and involved no exercise of discretion.  Catalist's geocoding software is entirely separate from its race estimation software.  *Id.* at 150:3-151:12 (Ghitza) (Day 2).

22

are distributed across Texas.[96] Ecological regression is widely used in Voting Rights Act cases and has been relied upon by the Supreme Court and the Fifth Circuit to measure racial differences in voting patterns.[97]

59.     Ecological regression is a valid and accurate method by which to estimate the share of Anglo, Hispanic, and African-American voters who lack SB 14 ID.[98]

60.     Ecological regression estimates that, among the 608,470 registered voters who make up the No Match List, 2.0% of Anglo registered voters do not match to any record in the state and federal ID databases (hereinafter, referred to as lacking SB 14 ID).  In contrast, an estimated 5.9% of Hispanic registered voters and 8.1% of African-American registered voters lack SB 14 ID.[99]

61.     Stated differently, Hispanic registered voters are 195% more likely than Anglo registered voters to lack SB 14 ID, and African-American registered voters are 305% more likely than Anglo registered voters to lack SB 14 ID.[100]

62.     The disparities between Anglo registered voters and Hispanic registered voters, and between Anglo registered voters and African-American registered voters, are statistically significant and highly unlikely to have arisen by chance.[101]

---

[96] PL752R ¶¶ 66-67 (Ansolabehere Corr. Supp. Rep.).
[97] PL752R ¶ 21(Ansolabehere Corr. Supp. Rep.); *Thornburg v. Gingles*, 478 U.S. 30, 53-61 (1986); *Teague v. Attala Cnty.*, 92 F.3d 283, 285 (5th Cir. 1996); *Houston v. Lafayette Cnty.*, 56 F.3d 606, 612 (5th Cir. 1995);  Trial Tr. 132:12-16, 133:23-134:1 (Ansolabehere) (Day 1).
[98] Trial Tr. 132:12-17, 133:14-134:1, 150:16-18 (Ansolabehere) (Day 1).
[99] PL752R ¶ 68, Table VI.1 (Ansolabehere Corr. Supp. Rep.).
[100] PL752R, Table VI.1 (Ansolabehere Corr. Supp. Rep.).
[101] PL752R ¶ 70 (Ansolabehere Corr. Supp. Rep.).

        **b.**    **The statistically significant racial disparities identified using ecological regression are confirmed using homogeneous block group analysis**

63.    The second type of demographic analysis performed by Dr. Ansolabehere was to look at the race of persons who lack an SB 14 ID and who live in homogeneous block groups.  Such block groups are census block groups that are highly homogeneous for one racial group, specifically more than 80% white, black, or Hispanic.[102]

64.    Homogeneous block group analysis is a standard methodology in political science and other social sciences.[103]

65.    Homogeneous block group analysis estimates that approximately 11.5% of African-Americans and 8.6% of Hispanics do no possess an acceptable ID under SB 14, compared to 3.1% of white registered voters.[104]  These results are also statistically significant and highly unlikely to have arisen from chance.

        **c.**    **The racial disparities identified using ecological regression and homogenous block group analysis are also confirmed by a third analysis, using Catalist estimates of the race and ethnicity of individual registered voters in Texas**

66.    The third type of demographic analysis conducted by Dr. Ansolabehere used estimates of the race/ethnicity of each registered voter in Texas compiled by Catalist LLC, an election data utility company.  Catalist maintains a national database of voting-age persons, the data for which are obtained from official voting rolls in all 50 states, as well as national commercial and consumer databases.  Catalist combines publicly-available data, such census data, with private

---

[102] Trial Tr. 150:3-7 (Ansolabehere) (Day 1).
[103] Trial Tr. 134:5-12, 150:3-24 (Ansolabehere) (Day 1).
[104] PL1100R (Racial Disparity Comparative Chart); PL752R ¶ 69, Table VI.1 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 150:2-10 (Ansolabehere) (Day 1).

data and data modeling to track individual-level information on a variety of voter participation and demographic attributes.[105]

67.     For states such as Texas that do not have self-reported race on their voter rolls, Catalist relies on a statistical model that uses information about a person's name in combination with census information about where that person lives to determine the person's likely race and ethnicity.  In addition to assigning an estimated race, Catalist provides confidence scores for each racial estimate.[106]

68.     Catalist has conducted extensive validation of the accuracy of the model it uses, which Catalist obtains from a third-party vendor.  Specifically, Catalist has compared self-reported race information that nine states have collected for their registered voters with the results of their statistical model to confirm the model's accuracy and reliability.[107]  Based on validations conducted in 2014 with the voter rolls of these nine states, Catalist has found that for records that the model assigns the highest race confidence scores, the model's racial estimates match the voters' self-reported race with 90% or greater accuracy.[108]

69.     Approximately 60% of all African-American voters in the nine-state validation dataset had the highest or second-highest confidence score assigned to their race estimate.  For these African-American voters, the model was accurate 93% of the time for those with the highest rating, and correct 81% of the time for those with the second highest rating.  68% of all Hispanic voters had the highest or second-highest confidence score assigned to their race estimate.  The model was 90% accurate as to Hispanic voters with the highest rating, and correct 77% of the

---

[105] PL766 ¶ 6 (Ghitza Rep.); Trial Tr. 147:1-9 (Ghitza) (Day 2).
[106] PL766 ¶¶ 7-13 (Ghitza Rep.); Trial Tr. 154:19-155:12 (Ghitza) (Day 2).
[107] *See* PL766 ¶¶ 7, 9, 15 (Ghitza Rep.); Trial Tr. 155:13-156:7 (Ghitza) (Day 2).
[108] *See* PL766 ¶¶ 14-15 (Ghitza Rep.); Trial Tr. 157:5-161:17 (Ghitza) (Day 2).

time for those with the second highest rating. 91% of Anglo voters were assigned one of the two highest confidence ratings, the highest of which was correct 97% of the time, and the second highest of which was correct 91% of the time. [109] The results of the 2014 validations establish the validity and reliability of this method of predicting the race of individual Texas voters.[110]

70.     The accuracy and validity of Catalist's demographic data is further supported by the fact that Catalist data are widely used in academic research on registration and voting and have been vetted for publication in peer-reviewed journals.[111]

71.     Reliance on estimates provided by Catalist is a valid and accurate method by which to estimate the race of individual voters whose TEAM records could not be matched to state and federal identification databases.[112]

72.     Using Catalist, Dr. Ansolabehere estimated that approximately 3.6% of registered Anglo voters lack SB 14 ID. In contrast, 5.7% of Hispanic registered voters and 7.5% of African-American registered voters do not have SB 14 ID. These differences are statistically significant and highly unlikely to have arisen by change.[113]

73.     Put another way, Hispanic registered voters are 58% more likely than Anglo registered voters to lack SB 14 ID, and African-American registered voters are 108% more likely than Anglo voters to lack SB 14 ID.[114]

74.     That some individual voters' race will be misclassified by virtue of the fact that the Catalist race assignments are estimates does not undermine the aggregate reliability of this data

---

[109] *See* PL766 ¶¶ 14-15 (Ghitza Rep.); Trial Tr. 157:5-162:13 (Ghitza) (Day 2).
[110] *See* PL766 ¶ 15 (Ghitza Rep.); Trial Tr. 161:21-162:13 (Ghitza) (Day 2).
[111] *See* PL752R ¶ 45 (Ansolabehere Corr. Supp. Rep.); PL766 ¶ 16 (Ghitza Rep.); Trial Tr. 163:3-8 (Ghitza) (Day 2).
[112] *Supra* ¶¶ 54-58.
[113] PL752R ¶¶ 72-73, Table VI.2 (Ansolabehere Corr. Supp. Rep.).
[114] PL752R ¶¶ 72-73, Table VI.2 (Ansolabehere Corr. Supp. Rep.).

and methodology.[115]  Measurement error in the classification of race—for example, that some white voters are estimated to be black, while some black voters are estimated to be white—will bias the results toward finding no racial disparity.   Misclassification under such circumstances will make the two groups appear more similar in terms of the variable being studied (here, ID possession), than they actually are.[116]

75.     Dr. Ansolabehere also examined the subset of the No Match List for which Catalist reports its highest level of confidence as to race/ethnicity identification.  The gap in rates for ID possession between Hispanic and Anglo voters, and African-American and Anglo voters, widened when looking only at this subset of voters.  For this group, Hispanic registered voters are 84% more likely to lack ID than Anglo registered voters, and African-American registered voters are 200% more likely to lack ID than Anglo registered voters.[117]  That the racial disparity increased when looking only to the highest confidence level estimates confirms that any misclassification by race in the Catalist estimates narrows, rather than heightens, the observed racial disparities in ID possession.[118]

76.     Defendants attempted to call into question the reliability of the Catalist race estimates through the testimony of John Crawford, the Manager of Licensing Services Applications at the Texas Department of Public Safety.  Crawford testified regarding a previously undisclosed database match that other, unidentified personnel at DPS conducted between TEAM and the DPS database.  After matching registered voter and DPS records, unnamed DPS personnel compared

---

[115] Trial Tr. 152:11-18, 153:8-154:23 (Ansolabehere) (Day 1).
[116] Trial Tr. 153:13-154:23 (Ansolabehere) (Day 1); Trial Tr. 164:9-165:9 (Ghitza) (Day 2). PL752R ¶ 105 (Ansolabehere Corr. Supp. Rep.).
[117] PL752R ¶ 107, Table VII.2 (Ansolabehere Corr. Supp. Rep.).
[118] Trial Tr. 153:8-154:23, 227:21-229:12 (Ansolabehere) (Day 1).

the race listed in the DPS database for each voter matched to a form of DPS-issued ID, and the

race that Catalist had estimated for that voter.[119]

77.     The results of the Crawford/DPS matching exercise are unreliable and in no way serve to

undermine the validity of the Catalist race estimates.[120]   The race data collected by DPS

regarding licensed drivers and ID holders are critically flawed in that no one was able to self-

report their race/ethnicity as Hispanic until May 2010.  Prior to that point, Hispanics were forced

to choose from one of the following options: American Indian/Alaskan Native, Asian/Pacific

Islander, Black, Other, and White.  The effect of disallowing Hispanics to self-identify as such

until 2010 means that DPS's data significantly understate the number of Texas license and ID-

holders who are in fact Hispanic.[121]   The DPS/Crawford analysis would identify just over

800,000 registered voters holding DPS licenses/IDs as Hispanic, notwithstanding the fact that, as

---

[119] Trial Tr. 10:18-12:23, 13:14-15:8, 25:22-26:22 (Crawford) (Day 8).

[120] The existence of this match as conducted by DPS was disclosed to plaintiffs approximately 24 hours
prior to Mr. Crawford's testimony, in violation of the scheduling order and the Federal Rules regarding
expert disclosures.  *See* Fed. R. Civ. P. 26(a)(2).  Moreover, Mr. Crawford's testimony is not proper lay
testimony because he had no personal knowledge of the match that was conducted.  *See* F.R.E. 701(a),
(c).  He was neither aware of all matching criteria used, nor did he have the ability to personally review
the programming code that others wrote for conducting the match.  Trial Tr. 10:18-12:23, 13:14-15:8,
25:22-28:23, 29:12-30:17 (Crawford) (Day 8).  In addition, the fact that no witness with personal
knowledge was ever disclosed and available to testify as to the matching process actually undertaken is
particularly concerning given the serious programming errors that DPS has made in this litigation with
respect to its initial data production wherein DPS failed to produce over 3.1 million records for DPS ID
holders to plaintiffs.  Id. at 31:23-33:7, 33:22-35:6.  Indeed, in reliance on others at DPS, Mr. Crawford
had previously provided the Court with an inaccurate sworn summary regarding the magnitude of DPS's
initial programming error.  See ECF No. 431-1 at ¶ 5 (Crawford Declaration); Trial Tr. 35:20-38: 8
(Crawford) (Day 8).

[121] In correspondence to the Department of Justice, Texas's Director of Elections, Keith Ingram,
previously explained that "identify[ing] Hispanic voters by matching voter registration lists with lists of
licensed drivers and personal ID holders produces inaccurate and unreliable data" because of the
unavailability of a Hispanic option until 2010.   He continued to explain that in light of that recent change,
"the number of Hispanic ID-holders in Texas is exponentially higher than the DPS's raw data indicates"
and that it "is impossible to identify which racial classification Texans of Hispanic descent selected on ID
applications completed prior to May 2010" and accordingly, "DPS's data for racial classification other
than Hispanic are no doubt significantly distorted."   PL942 at 2 (Ingram Letter to DOJ of Jan. 12, 2012).
Trial Tr. 41:15-42:3 (Crawford) (Day 8).

of 2012, there were more than 2.9 million registered voters with Spanish Surnames in the State of Texas.[122]  Thus, any effort to call into question the accuracy of Catalist's Hispanic estimates based on DPS data must be rejected.  In addition, while the lack of a Hispanic self-reporting option no doubt affects the accuracy of the other DPS racial categories (because self-identified Hispanics may have chosen White or Black, for instance), the concordance between the Catalist estimates and the DPS self-reported data for Whites and Blacks is actually quite high, according to the DPS/Crawford analysis.[123]

      **4.**      **A fourth analysis, using the TEAM identifications of which voters have Spanish-surnames, also confirms the disparity in SB 14 ID possession between Hispanic and Anglo voters**

78.      Dr. Ansolabehere further validated his racial/ethnic results by analyzing the No Match List in combination with Texas's own "Spanish Surname" identifications of registered voters.  In TEAM, the Texas Secretary of State records whether or not each registered voter has a "Spanish Surname," based on a list of Spanish surnames produced in 2000 by the U.S. Census Bureau. The Texas Legislative Council has noted that "most sources agree that the match between people who have Spanish surnames and those who consider themselves Hispanic is relatively good in Texas."[124]

79.      Voters who have been designated in TEAM as having a Spanish surname are 41% more

---

[122] *Compare* DEF2746 (Crawford/DPS Demonstrative) with PL1161 (Texas Legislative Council C235 Redistricting Plan) & PL1162 (SSVR Demonstrative Using Texas Legislative Council Data). Trial Tr. 35:20-38: 8, 46:21-49:3, 49:16-52:4 (Crawford) (Day 8).

[123] DEF2746 (Crawford/DPS Demonstrative); Trial Tr. 58:10-59:19 (Crawford) (Day 8) (explaining that the Crawford/DPS demonstrative showed that Catalist and DPS race IDs was the same 95.6% of the time for those classified as Catalist as Black with the Highly Likely confidence level, and were the same 79.2% and 65.5% of the time from those classified as Black by Catalist at the Likely and Possibly confidence levels).   The equivalent figures taken from the DPS/Crawford demonstrative for Whites show a 96.4 % overlap at the Highly Likely level, and a 92.2% overlap at the Likely confidence level. These numbers are substantially similar to the validation estimates that Dr. Ghitza provided on behalf of Catalist. *See* PL766 at ¶ 15 (Ghitza Rep.).

[124] *See* PL694 at 10 (TLC Data for 2011 Redistricting In Texas).

likely to lack SB 14 ID than voters who did not have a Spanish surname (*i.e.*, Anglos, African Americans, and others).  This analysis understates the difference between Anglos and Hispanics because the group of registered voters without Spanish surnames includes African Americans and, as shown, African Americans are substantially less likely than Anglos to possess SB 14 ID. Even so, this gap is statistically significant and highly unlikely to have arisen by chance.[125]

> **5. That the regression, homogeneous block group analysis, Catalist, and Spanish Surname analyses all show large racial/ethnic disparities in SB 14 ID possession provides irrefutable support for the conclusion that such disparities exist**

80.    The Catalist, ecological regression, homogeneous block group analysis, and Spanish surname estimates each show the same pattern: that racial and ethnic minority registered voters in Texas disproportionately lack SB 14 ID as compared to Anglo registered voters.[126]  The similarity of the results using these four methods, especially as to the overall pattern, serves to validate the accuracy and reliability of each of these estimation methods.[127]  Viewed individually and taken together, there can be no doubt that there are in fact statistically significant racial disparities in rates of SB 14 ID possession.[128]  A summary of the no-match percentages of registered voters from each racial group, according to ecological regression, homogeneous block group analysis, Catalist, and Catalist High Confidence estimates are as follows:

|  | Ecological Regression | Homogenous Block Group | Catalist | Catalist High Confidence |
|---|---|---|---|---|
| Anglo | 2.0% | 3.1% | 3.6% | 3.1% |

---

[125] PL752R ¶¶ 109-10, Table VII.3 (Ansolabehere Supp. Rep.); Trial Tr. 157:2-15 (Ansolabehere) (Day 1).

[126] Trial Tr. 135:16-21 (Ansolabehere) (Day 1); PL1100R (Racial Disparity Comparative Chart).

[127] PL752R ¶ 80 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 151:1-15 (Ansolabehere) (Day 1).

[128] Trial Tr. 157:23-158:6 (Ansolabehere) (Day 1).

|  | Ecological Regression | Homogenous Block Group | Catalist | Catalist High Confidence |
|---|---|---|---|---|
| Hispanic | 5.9% | 8.6% | 5.7% | 5.7% |
| African American | 8.1% | 11.5% | 7.5% | 9.3% |

### 6.     The racial disparities in ID possession are not the result of "deadwood" on Texas's voter rolls

81.     Dr. Ansolabehere also performed numerous sensitivity tests to ensure that the presence of "deadwood" on Texas's voter registration rolls—out-of-date voter registration records for persons who have moved or died—did not correlate with or bias the racially disparate rates of SB 14 ID possession that he observed.[129]

82.     First, Dr. Ansolabehere analyzed the no-match rate by race after excluding voter registration records that had been flagged by Catalist as individuals who are deceased, who are deadwood, or who have a National Change of Address (NCOA) application on file with the U.S. Postal Service.[130]   Statistically significant racial disparities remained, both using Catalist race estimates and ecological regression, as shown below.[131]

|  | Ecological Regression | Catalist |
|---|---|---|
| Anglo | 1.9% | 3.5% |
| Hispanic | 5.9% | 5.7% |
| African American | 8.1% | 7.5% |

---

[129] PL752R ¶¶ 85-87 (Ansolabehere Corr. Supp. Rep.).
[130] Trial Tr. 163:4-21, 164:8-166:9 (Ansolabehere) (Day 1).
[131] PL752R ¶¶ 88-91, Tables VII.1.A & B (Ansolabehere Corr. Supp. Rep.); Trial Tr. 166:4-9 (Ansolabehere) (Day 1).

83.     Second, Dr. Ansolabehere examined the effect of excluding voters identified in TEAM as "Suspense" voters.  Validly-registered voters in TEAM are classified as either "Active" or "Suspense."  A suspense voter is eligible to vote, but has been identified as someone who may be removed ("purged") in the future, typically because information has been obtained by election officials indicating that the voter may have moved to a new address (in-state or out-of-state) without informing election officials of the new address and re-registering where necessary.[132] When Dr. Ansolabehere examined only Active voters using both Catalist race estimates and ecological regression, Hispanic and African-American registered voters were still less likely, at statistically significant rates, to possess SB 14 ID.[133]

|  | Ecological Regression | Catalist |
|---|---|---|
| Anglo | 1.4% | 2.9% |
| Hispanic | 5.9% | 5.2% |
| African American | 7.7% | 6.7% |

84.     Third, Dr. Ansolabehere removed all TEAM records that had matched to a DPS record expired for more than 60 days.  While an expired driver license may indicate that a person no longer drives, it may also signal that the person is no longer living at the residence listed for the expired license.  Here again, using both Catalist estimates and ecological regression, Hispanic and African-American registered voters lacked SB 14 ID at statistically significant, higher rates than Anglo voters.[134]

---

[132] Tex. Elec. Code § 15.081; Trial Tr. 163:8-11 (Ansolabehere) (Day 1).
[133] PL752R ¶¶ 92-95, Tables VII.1.A & B (Ansolabehere Corr. Supp. Rep.).
[134] PL752R ¶¶ 96-99, Tables VII.1.A & B (Ansolabehere Corr. Supp. Rep.); Trial Tr. 163:11-13 (Ansolabehere) (Day 1).

|  | Ecological Regression | Catalist |
|---|---|---|
| Anglo | 0.5% | 1.6% |
| Hispanic | 4.3% | 3.4% |
| African American | 5.4% | 4.2% |

85.     Finally, Dr. Ansolabehere combined each of these sensitivity tests, and removed from the analysis records flagged by Catalist as deceased, deadwood, or with NCOA flags, suspense voters, and records of voters that matched to expired DPS records.  The statistically significant racial disparities in ID possession persisted when measured both using Catalist and through ecological regression.  Using all of these filters for potentially invalid voter records, Hispanic registered voters were still 131% more likely than Anglos not to possess SB 14 ID using Catalist race estimates, and African-American registered voters 185% more likely to lack SB 14 ID. Using ecological regression, the percentage difference in rates of No Match is 760% for Hispanics as compared to Anglos, and 960% for African Americans. [135]

|  | Ecological Regression | Catalist |
|---|---|---|
| Anglo | 0.5% | 1.3% |
| Hispanic | 4.3% | 3.0% |
| African American | 5.3% | 3.7% |

86.     Dr. Ansolabehere's thorough analysis definitively demonstrates that Hispanic and African-American registered voters are significantly less likely to possess an acceptable SB 14 ID than Anglo registered voters. [136]

---

[135] PL752R ¶¶ 100-04, Tables VII.1.A & B (Ansolabehere Corr. Supp. Rep.).
[136] PL752R ¶¶ 64-110 (Ansolabehere Corr. Supp. Rep.); Trial Tr. 157:23-158:6 (Ansolabehere) (Day 1).

7. **Voters without photo ID include a substantial number of racial minority voters who participated in Texas elections prior to the enforcement of SB 14**

87.     The voters who are in Dr. Ansolabehere's No Match List voted in substantial numbers in elections prior to the implementation of SB 14.

88.     Viewed in terms of recent past participation, SB 14 impacts Hispanic and African-American voters at statistically significant higher rates than Anglos.  Ecological regression estimates that only 0.6% of Anglos who voted in the 2012 general federal election failed to match to an allowable SB 14 ID record.  In contrast, 2.0% of Hispanic voters and 4.2% of African-American voters who voted in 2012 did not match to an allowable SB 14 ID record.  In other words, Hispanics who voted in the last Federal general election are 233% more likely than Anglos not to be able to cast an in-person regular ballot on Election Day because of SB 14.  Recent African-American voters are also impacted at a rate 600% higher than for Anglos.[137]  Catalist estimates also show that a higher percentage of African-American and Hispanic voters who participated in the 2010 and 2012 elections than Anglos failed to match to an allowable ID.[138]

C.     **The Barreto/Sanchez Survey Demonstrates Racially Disparate ID Possession**

89.     Dr. Matthew Barreto, a Professor of Political Science at the University of Washington, and Dr. Gabriel Sanchez, an Associate Professor of Political Science at the University of New Mexico, conducted a survey concerning the current rates of possession of SB 14 ID and any burdens related to obtaining SB 14 ID.  The survey was designed to assess if there were any

---

[137] PL752R ¶¶ 81-83, Tables VI.4.A (Ansolabehere Corr. Supp. Rep.).
[138] PL752R ¶¶ 81-83, Tables VI.4.B (Ansolabehere Corr Supp. Rep.); Trial Tr. 167:14-168:15 (Ansolabehere) (Day 1).

statistically significant differences in rates of possession of SB 14 ID based on race or ethnicity among citizens of voting age in Texas.[139]

90.     In sum, the Barreto/Sanchez Survey establishes to a statistically significant degree that Hispanic and African-American eligible voters and registered voters are less likely than Anglo eligible voters and registered voters to possess SB 14 ID.

### 1.     Survey methodology

91.     When surveys are implemented accurately, the results generated from a sample of the population can be inferred to the larger population from which the sample is drawn, taking into account appropriate sampling error.[140]  If the sample if reflective of the larger population, and the survey is administered randomly, without bias, and with an adequate sample size and response rate, the results of the survey can be considered a statistically reliable estimate for those questions directed at all persons sampled.[141]  The Court notes that neither of Defendants' two experts, Dr. M.V. ("Trey") Hood III and Dr. Jeffrey Milyo, had any criticisms of the qualifications of Drs. Barreto and Sanchez , the way that they selected their survey sample or conducted the survey, bias in the form, order or context of the survey questions, the size of the universe of respondents selected, the sampling techniques used, or the size of the response rate as being sufficient from which to draw the conclusions reached in the survey.[142]  The Court finds that the Barreto/Sanchez Survey was conducted and implemented in accordance with a methodology accepted in the field of survey research, and the results of the survey are reliable.[143]

---

[139] PL753 at 1 (Barreto/Sanchez Rep.); Trial Tr. 29:17-20 (Barreto) (Day 3).
[140] PL753 at 6 (Barreto/Sanchez Rep.).
[141] PL753 at 6-7 (Barreto/Sanchez Rep.).
[142] Trial Tr. 213:25-216:10 (Hood) (Day 7); Milyo Dep. 106:17-20, 107:5-111:22.
[143] *Infra* ¶¶ 92-95; Trial Tr. 30:15-31:1 (Barreto) (Day 3).

92.     The Barreto/Sanchez Survey contacted survey respondents using two accepted methods: (a) random digit dial, which called phone numbers from a randomly generated list of phone numbers with Texas area codes, and (b) listed household samples, which randomly called actually known landline and cell phone numbers in Texas in order to reach a reliable sample of Hispanic and African-American eligible voters.  Calls were made at various times during the week and weekend, and phone numbers selected for the survey were dialed and re-dialed up to five times to attempt to reach a respondent, in order to avoid non-response bias. [144]

93.     Respondents were asked a series of questions as to whether they were in possession of any of the forms of photo ID required by SB 14 in order to vote, to state their race/ethnicity, and other questions directed to the potential burdens associated with obtaining the required photo ID if they did not possess it.[145]  Respondents were given the choice of answering the survey questions in English or Spanish.[146]

94.     The Barreto/Sanchez Survey obtained responses from 2,344 persons eligible to vote in Texas, [147] representing a Response Rate of 26.3% and a Cooperation Rate of 39.2%.  The Response Rate indicates the percent of people who agreed to take the survey out of the total number of cases in the sample, and the Cooperation Rate indicates the percent of people who agreed to take the survey out of the total number of people actually reached by the survey firm hired to implement the survey by the researchers.  In the field of survey research, response rates between 20 and 30 percent are considered to be accurate and in an accepted range.[148]

---

[144] Trial Tr. 33:18-35:16 (Barreto) (Day 3).
[145] PL753 at 7-8 (Barreto/Sanchez Rep.); PL753.1 (Barreto/Sanchez Survey Instrument); Trial Tr. 41:20-42:4, 45:13-47:14 (Barreto) (Day 3).
[146] PL753 at 11-12, 14-15 (Barreto/Sanchez Rep.); Trial Tr. 33:12-16 (Barreto) (Day 3).
[147] Trial Tr. 36:5 (Barreto) (Day 3).
[148] PL753 at 9 n.7, 16 n.12 (Barreto/Sanchez Rep.).

95.     After collecting the data, the Barreto/Sanchez Survey researchers compared the underlying demographic characteristics of the samples of Anglos, Hispanics, and African Americans surveyed to the Texas estimates for Texas from the U.S. Census American Community Survey (ACS) and used an accepted weighting algorithm to balance the sample according to certain demographic characteristics within each racial or ethnic group.  This helped to ensure that the sample generated was reflective of each of these populations in Texas.[149]

96.     For example, with regard to demographic balancing of the sample, according to the Barreto/Sanchez Survey, younger Texas eligible voters (ages 18-24) are over three times more likely to lack SB 14 ID than are middle-aged Texas eligible voters (ages 35-54).[150]

### 2.      The survey shows racially disparate ID possession

97.     According to the Barreto/Sanchez Survey, 7.2% of Texas eligible voters, approximating 1.2 million eligible voters, do not possess SB 14 ID.[151]

98.     According to the Barreto/Sanchez Survey, there is a statistically significant difference in the impact of SB 14 on different racial and ethnic groups, with the impact falling most heavily on Hispanics and African Americans.[152]

99.     According to the Barreto/Sanchez Survey, Hispanic eligible voters are 2.42 times more likely to lack SB 14 ID compared to Anglo eligible voters (11.4% of Hispanics versus 4.7% of Anglos).[153]

---

[149] PL753 at 16 (Barreto/Sanchez Rep.); Trial Tr. 49:10-50:15, 50:22-51:13, 51:18-52:8 (Barreto) (Day 3).
[150] PL753 at 23 (Barreto/Sanchez Rep.); Trial Tr. 64:13-18 (Barreto) (Day 3).
[151] PL753 at 17 (Barreto/Sanchez Rep.).
[152] PL753 at 18 (Barreto/Sanchez Rep.); Trial Tr. 57:1-24 (Barreto) (Day 3).
[153] PL753 at 18 (Barreto/Sanchez Rep.); Trial Tr. 56:22-25 (Barreto) (Day 3).

100.    According to the Barreto/Sanchez Survey, African-American eligible voters are 1.78 times more likely to lack SB 14 ID compared to Anglo eligible voters (8.4% of African Americans versus 4.7% of Anglos).[154]

101.    The results of the Barreto/Sanchez Survey as to the impact of SB 14 on Hispanic and African-American eligible voters in Texas is summarized in Figure 1 from the Barreto/Sanchez Report:[155]



** statistically significant difference from Whites at 95% confidence level
*** statistically significant difference from Whites at 99% confidence level

102.    Extrapolating from the results of the Barreto/Sanchez Survey, approximately 555,000 Hispanic and 180,000 African-American eligible voters in Texas lack SB 14 ID.[156]

103.    According to the Barreto/Sanchez Survey, SB 14 also has a greater impact on Hispanic and African-American registered voters than on Anglo registered voters.  Hispanic registered voters are 3.24 times more likely to lack SB 14 ID than are Anglo registered voters (6.8% of Hispanic registered voters versus 2.1% of Anglo registered voters), and African-American

[154] PL753 at 18 (Barreto/Sanchez Rep.); Trial Tr. 56:22-25 (Barreto) (Day 3).
[155] PL753 at 19 (Barreto/Sanchez Rep.); Trial Tr. 56:11-25 (Barreto) (Day 3).
[156] PL753 at 18 (Barreto/Sanchez Rep.); Trial Tr. 60:17-21 (Barreto) (Day 3).

registered voters are 2.33 times more likely to lack SB 14 ID than are Anglo registered voters (4.9% of African-American registered voters versus 2.1% of Anglo registered voters).[157]

### D. Expert Agreement With Dr. Ansolabehere's Matching Results

#### 1. Dr. Herron's matching analysis

104.    Dr. Michael Herron, an expert in analyzing large datasets and in statistical methods, analyzed the output of the plaintiffs' and the defendants' matching process to determine ID possession rates overall and by race.[158]

105.    Dr. Herron analyzed the TEAM database of 13,564,410 registered voters (current as of January 15, 2014).  Using the 13 primary and secondary sweeps from the plaintiffs' algorithm on both state and federal databases, Dr. Herron's analysis found that 619,354 registered voters could not be matched to records of individuals who have been issued SB 14 ID.  This means that approximately 4.6% of the registered voter pool appears to lack SB 14 ID.[159]

106.    Dr. Herron next analyzed the matching output to determine the racial impact of SB 14.[160] Because Texas's voter registration database does not include voters' race and ethnicity,[161] Dr. Herron used three methods to determine the likely racial composition of the "no-match" list: homogeneous block group analysis, "nearly homogeneous block group analysis," and ecological regression.[162]

---

[157] PL753 at 19 (Barreto/Sanchez Rep.); Trial Tr. 58:6-13 (Barreto) (Day 3).
[158] PL769 at 6-7 (Herron Rep.) (App'x A & B).
[159] PL769 at 27-28 (Herron Rep.).
[160] For the racial analysis, Dr. Herron did not count individuals who have qualifying disabilities as having ID.  Dr. Herron explained at his deposition that he did not include them because those voters would need to apply for and receive the exemption and that counsel had informed him that very few voters have obtained such exemptions.
[161] Dr. Herron noted that the voter registration database does contain a field to indicate Spanish surnames, but that field cannot classify Texas registered voters as white, Hispanic, or black. PL769 at 25 (Herron Rep.).
[162] PL769 at 28 (Herron Rep.).

107.    In using each of these methods, Dr. Herron relied on publicly available census data showing "CVAP" (citizen voting age population).  For each method, Dr. Herron began by placing voters into census block groups, using their residential addresses.  Dr. Herron did this by geocoding, which he did with the assistance of a specialist working under his supervision.[163]

108.    Homogeneous block group analysis.  The first method he used analyzed racially and ethnically homogeneous census block groups.  This analysis found that 96% of the registered voters living in homogeneous white census block groups appear to possess SB 14 ID, while only 91% and 87% of the registered voters living in homogeneous Hispanic and homogeneous African-American block groups, respectively, appear to possess SB 14 ID.[164]

109.    Nearly homogeneous block group analysis.  In a related analysis, Dr. Herron relaxed the homogeneity cutoffs in the census block groups.  Restricting attention to 796 census block groups in Texas whose CVAP is at least 96% Hispanic, white, or African-American, Dr. Herron reported this analysis in a format called "logical bounds."  This analysis found similar racial and ethnic disparities in ID possession rates, with white registered voters holding SB 14 ID at higher rates than African-American and Hispanic registered voters.[165]

110.    Ecological regression. The other method Dr. Herron used was an ecological regression, a method that complements the homogeneous and nearly homogeneous block group analyses.[166] Drawing on CVAP data from 11,949 census block groups, the regression analysis found that the estimated ID possession rate is 97.9% for non-Hispanic white registered voters, 92.3% for

---

[163] PL769 at 28-29 (Herron Rep.) (App'x C).
[164] PL769 at 31-32 (Herron Rep.).  The block groups on which this analysis was based were 213 completely homogeneous block groups: 137 all-Hispanic (containing 64,305 registered voters), 62 all-non-Hispanic-white (containing 31,777 registered voters), and 14 all-African-American (containing 7,503 registered voters).
[165] PL769 at 34-37 (Herron Rep.).
[166] PL769 at 37.

Hispanic registered voters, and 90.3% for African-American registered voters. These translate to non-possession rates of 2.1% for white voters, 7.7% for Hispanic voters and 9.7% for African-American voters.[167]

111.    Finally, Dr. Herron analyzed the defendants' separate matching algorithm (which included five sweeps) and found that this algorithm reported an even higher rate of ID non-possession (no-match rate) than that reported by the plaintiffs' algorithm.  Using the defendants' algorithm, the number of registered voters lacking ID was more than 675,000 – 5.0% of all registered voters.[168]  He also found that the disparity between the rate of ID possession by non-Hispanic white voters and the rates among both Hispanic and African-American voters was greater than the disparity reported using the plaintiffs' algorithm.[169]

112.    Dr. Herron's analyses were credible and reliable, both as to the overall number of no-matches and as to the racial and ethnic disparities in ID possession.  He used publicly available census data, and his methods were standard for this type of analysis.  The specific methods he used to analyze the racial and ethnic possession rates have been recognized or required by the Supreme Court and other courts.  Finally, Dr. Herron's report and analyses were essentially uncontradicted by any witness for defendants.  Dr. Hood, who testified as an expert for defendants, did not address Dr. Herron's findings or testimony at all.  Dr. Milyo's report (another of the defendants' experts, who did not testify at trial) contained brief comments about a preliminary report of Dr. Herron's (based on incorrect data provided by the State), but when Dr. Herron amended his report in light of the corrected data, Dr. Milyo did not respond.

---

[167] PL769 at 38-39 (Herron Rep.).
[168] PL769 at 41-44 (Herron Rep.).
[169] PL769 at 44-50 (Herron Rep.).

## 2.    Dr. Bazelon's matching analysis

113.    Dr. Coleman Bazelon, an economist and a principal at an economic consulting firm, performed a separate analysis to estimate the share of African-American and Hispanic registered voters who neither match to an ID record nor to records of persons qualified to apply for a disability exemption.

114.    Like Drs. Ansolabehere and Herron, Dr. Bazelon used geocoding to assign no-match registered voters (who, in his analysis, also are not eligible for a disability exemption) to census block groups, and then predicted the likely race of these registered voters based on the racial composition of their census block groups and statewide registration rates by race.[170]

115.    Dr. Bazelon used a conservative method to estimate racial composition that understates the extent of disparities in ID possession between minority and Anglo voters.  As Dr. Bazelon's report demonstrates, and as he explained at trial, a more granular demographic analysis—such an analysis that uses the methodologies employed by Dr. Ansolabehere—would be expected to find greater racial disparity.[171]

116.    Dr. Bazelon nevertheless found that—consistent with the findings of Drs. Ansolabehere and Herron—African-American registered voters are significantly less likely than Anglo registered voters to have SB 14 ID or to be eligible for the disability exemption, by a factor of

---

[170] PL757R ¶¶ 15, 24-31 (Bazelon Second Am. Rep.); Trial Tr. 89:10-90:10 (Bazelon) (Day 6).
[171] PL757R ¶¶ 15, 32 (Bazelon Second Am. Rep.); Trial Tr. 90:15-91:15 (Bazelon) (Day 6).

1.81.[172]  The results of Dr. Bazelon's analysis show a similar disparity between Hispanic and Anglo registered voters, by a factor of 1.82.[173]

117.    Dr. Bazelon further demonstrated that, if no such disparities existed, one would expect that the racial distribution of the population of registered voters who must acquire an SB 14-compliant ID in order to vote in person would track the racial distribution of the registered voter population as a whole—58% Anglo, 13% African-American, and 25% Hispanic.  In reality, however, Anglos make up only 44% of the population of registered voters who must obtain an SB 14-compliant ID in order to voter in person, whereas African Americans and Hispanics make up 18% and 35% of that population, respectively.[174]

118.    Dr. Bazelon specifically noted that, as compared to the rest of the State of Texas, the census blocks in which Texas's nine historically Black colleges and universities (HBCUs) are located have higher average voter registration rates (86% versus 54% statewide) and a higher average percentage of non-disability exemption eligible non-matches  (14% versus 4% statewide).  These data suggests that, as compared to the registered voter population statewide, SB 14 disproportionately affects the student population at HBCUs in Texas.[175]

### 3.    Dr. Webster's geographic analysis

119.    Dr. Gerald C. Webster, a Professor of Geography at the University of Wyoming, analyzed Dr. Ansolabehere's No Match List in order to determine whether higher concentrations

---

[172] PL756R ¶ 34 (Bazelon Am. Reply Rep.); PL757R Table 1 (Bazelon Second Am. Rep.); Trial Tr. 93:25-94:17 (Bazelon) (Day 6); PL1159R (Bazelon Am.Trial Demonstratives) at 4.
[173] PL757R Table 1 (Bazelon Second Am. Rep.); PL1159R (Bazelon Am. Trial Demonstratives) at 4.
[174] PL1159R (Bazelon Am. Trial Demonstratives) at 5; Trial Tr. 94:20-95:22 (Bazelon) (Day 6); PL756R ¶9 & n.26 (Bazelon Am. Reply Report).
[175] PL757R ¶ 73 (Bazelon Second Am. Rep.); Trial Tr. 96:23-97:8 (Bazelon) (Day 6).

of voters without SB 14 ID within a particular geographic area were more likely to occur when the population living in that area exhibited particular racial or socioeconomic characteristics.[176]

120.    Dr. Webster determined that substantial and statistically significant positive relationships existed between the share of registered voters in an area who are on Dr. Ansolabehere's No Match List and the share of the citizen voting-age population (CVAP) that is African American. He found a similar relationship between the share of registered voters on the No Match List and the share of the CVAP that is Hispanic.  On the other hand, Dr. Webster found a statistically significant negative relationship between the share of registered voters in the No Match List and the share of the CVAP that is Anglo.  In other words, a higher percentage of voters are likely to lack SB 14 ID in areas with a higher percentage of African-American and Hispanic CVAP, and a lower percentage of voters are likely to lack SB 14 ID in areas with higher Anglo CVAP concentrations.[177]

121.    Dr. Webster also found statistically significant positive relationships between the percentage of voters in an area who do not have SB 14 ID and both the citizen poverty rate of that area and the percentage of households in that area without access to a motor vehicle.[178]

## VI.    THE RACIAL DISPARITY IN ID POSSESSION IS NOT ALLEVIATED BY SB 14'S EXEMPTIONS OR BY THE FACT THAT IT DOES NOT APPLY TO PERSONS VOTING ABSENTEE BY MAIL

### A.    The Disability Exemption Has No Effect on the Racial Disparity

122.    The requirements to apply for a disability exemption pose a substantial barrier against disabled voters obtaining an exemption.[179]

---

[176] PL775R ¶¶ 66, 71 (Webster Supp. Rep.); Trial Tr. 256:5-18, 257:10-25 (Webster) (Day 4).
[177] PL775R ¶¶ 71-72 & tbl.10 (Webster Supp. Rep.); Trial Tr. 259:6-260:4, 260:6-13 (Webster) (Day 4).
[178] PL775R ¶¶ 71-72 & tbl.10 (Webster Supp. Rep.); Trial Tr. 281:12-19 (Webster) (Day 4).
[179] *Supra* ¶ 7.

123.    As of January 15, 2014, only 18 voters had successfully applied for a disability exemption, out of more than 13 million voters in Texas.[180]  Therefore, the disability exemption has had virtually no effect in lessening the burdens to voting imposed by SB 14.

124.    Several voters who testified in this case have disabilities but would not meet the statutory requirements of the SB 14 disability exemption.  For example, Phyllis Washington is an amputee who suffers from high blood pressure and diabetes, but she does not have documentation of disability status from either the Social Security Administration or the Veterans Administration.[181]  Ramona Bingham has suffered from crippling arthritis and serious depression since she was violently assaulted in 1998, but she too cannot meet the SB 14 documentation requirements.[182]

125.    Other voters testified that they were entirely unaware of the SB 14 disability exemption and what they would need to show in order to qualify for the exemption.[183]

126.    Individual voters who possess the documentary proof of a disability required to apply for a disability exemption testified that until they learned about the exemption from counsel, they were unaware that they could apply for an exemption, let alone know how they would go about doing so.[184]

127.    The State does not maintain data on the number of voters who have applied unsuccessfully for a disability exemption or the reason why any application for an exemption was rejected.  Texas has performed no assessment of the program.[185]

---

[180] PL752 ¶ 15 n.4 (Ansolabehere Supp. Rep.); Trial Tr. 349:19-350:1 (Ingram) (Day 7) (19 voters).
[181] Washington Dep. 7:4-10:4, 83:8-84:12, 117:21-118:1, 119:16-18; PL1093 (Washington Video Excerpts).
[182] Bingham Dep. 8:18-9:18, 15:15-16:3, 74:8-75:2; PL1091 (Bingham Video Excerpts); *see also* Eagleton Dep. 8:6-10, 18:21-23, 85:4-19; PL1095 (Eagleton Video Excerpts).
[183] Trial Tr. 151:10-23 (Taylor) (Day 3).
[184] *E.g.*, Holmes Dep. 9:5-21, 64:22-65:8; PL1094 (Holmes Video Excerpts).
[185] Ingram Dep. 156:18-157:6; PL901 at 69-70 (Defs.' Responses to Pls.' 1st Set of Interrogs.) (Response

(Cont'd…)

128.     County election offices that receive a request for a disability exemption are not required to respond within any specific timeframe, and there is no guarantee that an application submitted within thirty days of an election will be acted upon before the election.[186]

129.     Voters who have already received a disability exemption must reapply for the exemption when they move to another county, even if the disability exemption is recorded in TEAM.[187]

130.     Even making the unsupportable assumption that every voter who is eligible for a disability exemption possesses the required documentation and faces no impediment to applying successfully for the exemption, racial disparities in the effect of SB 14 persist.[188]

131.     Relying on the same database matching methodology described above, Dr. Ansolabehere concluded that approximately 534,512 voters in Texas neither possess an acceptable SB 14 ID nor qualify under SB 14 to apply for a disability-based exemption.  These 534,512 voters make up Dr. Ansolabehere's "No Match, Not Exemption-Eligible List," which represents 4.0% of registered voters in Texas.[189]

132.     The statistically significant racial disparity between Anglo voters and Hispanic and African-American voters persists when considering this group.[190]

133.     Dr. Ansolabehere's ecological regressions estimate that 5.3% of registered Hispanic voters, and 6.4% percent of registered African-American voters neither have SB 14 ID nor qualify for the disability exemption, in contrast to only 1.8% of registered Anglo voters.[191]

---

22).
[186] Ingram Dep. 151:7-153:19.
[187] Ingram Dep. 153:20-155:15.
[188] *Infra* ¶¶ 131-134.
[189] PL752R ¶ 63, Tables V.4.B & VI.3.B (Ansolabehere Corr. Supp. Rep.).
[190] PL752R ¶ 80 (Ansolabehere Corr. Supp. Rep.).
[191] PL752R ¶ Table VI.3.A (Ansolabehere Corr. Supp. Rep.).

134.    Stated differently, Hispanic voters are 194% more likely than Anglo voters to lack SB 14 ID and not be eligible for a disability exemption.  Likewise, African-American voters are 256% more likely than Anglos to neither have a valid SB 14 ID nor be eligible to apply for a disability exemption.[192]

135.    Using Catalist race estimations, Hispanic and African-American voters are also more likely than Anglo voters to be included in the "No Match, Not Exemption-Eligible List": 6.3% of registered African-American voters, and 5.2% of registered Hispanic voters, in contrast to only 3.2% percent of registered Anglo voters.[193]

136.    Thus, Catalist estimates show that Hispanic voters are approximately 63% more likely than Anglo voters to lack valid SB 14 ID and not be disability-exemption eligible; African-American voters are 97% more likely than Anglos to be in this group.[194]

137.    Dr. Ansolabehere's findings conform to data gathered by the U.S. Census, namely that the disability exemption will not lessen the racial disparity from SB 14.  According to the 2010-2012 ACS, 11.5% of civilian non-institutionalized persons in Texas have a disability, including 13.3% of Anglos, 9.5% of Hispanics, and 13.7% of African Americans.[195]

### B.    The "Religious Objection" and the "Natural Disaster" Exceptions Do Not Alleviate the Racial Disparities

138.    The Office of the Secretary of State does not track the number of individuals who have validated a provisional ballot by affirming that they have a religious objection to being photographed or that they could not present identification due to a natural disaster.  There is no

---

[192] PL752R ¶ Table VI.3.A (Ansolabehere Corr. Supp. Rep.).
[193] PL752R ¶ Table VI.3.B (Ansolabehere Corr. Supp. Rep.).
[194] PL752R ¶ Table VI.3.B (Ansolabehere Corr. Supp. Rep.).
[195] PL454 ¶ 20 (U.S. Request for Judicial Notice).

basis to believe that a substantial number of voters have availed themselves of these exemptions.[196]

### C.    <u>Voting By Mail Exacerbates the Disparity in ID Possession</u>

139.    The limitation of SB 14's requirements to in-person voting exacerbates racial disparities in ID possession because Anglo voters are more likely than Hispanic voters and African-American voters to vote absentee, and are more likely be over the age of 65 and qualify to vote absentee, thereby having a greater opportunity to avoid the SB 14 voter ID requirements.

140.    Many voters in Texas who lack SB 14 ID and may qualify to vote by mail are unaware that they are eligible to vote by mail and/or that the ID requirements of SB 14 ID do not apply to absentee voting.[197]

141.    The ability of some voters to cast a ballot by mail is not a substitute for the loss of a voter's right to cast an in-person ballot.  Some voters who are eligible to vote by mail strongly prefer to vote in person for a range of reasons, including the value of poll worker assistance, the desire to see their vote being cast, the habit of voting at the polls, and the enjoyment of carrying out a civic duty in the company of family and community.[198] For example, Sammie Bates testified that she always wants "to see my ballot go into the box where I'm voting…at least I want to see it go as far towards where it's supposed to go as I possibly can."[199] Indeed, Senator Ellis, an African-American who has represented a minority district for approximately 25 years,

---

[196] Ingram Dep. 243:13-244:6.
[197] Holmes Dep. 14:10- 15:19; PL1094 (Holmes Video Excerpts); Sanchez Dep. 32:21-24; Taylor Dep. 33:22-34:14.
[198] Eagleton Dep. 10:8-12:21; Benjamin Dep. 54:8-17; Washington Dep. 12:9-25, 16:4-17:15, 75:8-76:21; PL1093 (Washington Video Excerpts); Gholar Dep. 29:13-30:9; PL1092 (Gholar Video Excerpts); Trial Tr. 251:25-252:20 (Veasey) (Day 1); Trial Tr. 99:24-100:3 (Mendez) (Day 2); Trial Tr. 19:1-22 (Johnson) (Day 3); *infra* ¶ 890 (Benjamin), ¶ 900 (Gandy), ¶ 920 (DeLeon), ¶ 924 (Brickner), ¶ 983 (Taylor), ¶ 987 (Lara).
[199] PL1090 (Bates Video 14:10-14:44).

testified that "[i]n the African-American community, there is a strong tradition of showing up on election day."[200]   And Rev. Peter Johnson, who had been sent by Dr. Martin Luther King, Jr., to help Blacks in Texas deal with racial discrimination in voting, explained, "[I]f there's voting fraud . . . , it's from people gathering old people's votes and manipulating them absentee ballots. But if you understand Black America in the time of Blacks in the south . . . , going to vote and standing in line to vote is a big deal.  It's much more important for an 80-year old Black woman to go to the voting poll, stand in line, because she remembers when she couldn't do this."[201]

142.    According to U.S. Census data, Anglos in Texas are substantially more likely than Hispanics or African Americans to be 65 or older.[202]   Therefore, Anglos voters are far more likely to qualify automatically to be able to vote by mail—and thereby avoid the SB 14 ID requirements—than minority voters.

143.    According to the Current Population Survey, Anglos comprise a larger share of absentee voters in Texas.  This difference was not statistically significant until 2008, but in the last three federal general elections (2008, 2010, and 2012), mail voting rates for Anglos have consistently exceeded Hispanic and African-American mail voting rates to a statistically significant extent.[203]

144.    Racial disparities in the effect of SB 14 persist even if all persons age 65 or older are removed from the No-Match List (positing, incorrectly, that they suffer no harm by losing the ability to vote in person and being relegated to voting absentee). [204]  Indeed, the statistically significant racial disparity between Anglo voters and Hispanic and African-American voters increases in magnitude when considering only the subset of voters under 65 on the No Match

---

[200] Trial Tr. 156:23-157:22 (Ellis) (Day 4).
[201] Trial Tr. 19:6-13 (Johnson) (Day 3).
[202] PL759 ¶ 15 & n. 17 (Burden Reply Rep.); ECF No. 96.
[203] PL758 ¶¶ 81-82 & tbl.3 (Burden Corr. Rep.).
[204] Trial Tr. 158:22-159:6 (Ansolabehere) (Day 1).

List.  Using the same database matching methodology described above, Dr. Ansolabehere found

that there are 429,769 voters on the No Match list under age 65, representing 3.2% of all

registered voters.  According to Catalist estimates, only 2.3% of such Anglo voters lack SB 14

ID, in contrast to 4.4% of Hispanic voters, and 5.8% of African-American voters.  Using

ecological regression, the same figures are a mere 1.2% for Anglo voters, as compared to 4.8%

for Hispanic voters and 6.4% for African-American voters.[205]

145.    Statistically significant racial disparities also persist if, in addition to removing voters

over 65, all voters in the No-Match List who are disability-eligible also are removed (positing,

incorrectly, that every voter who is eligible for a disability exemption physically possesses the

required documentation and faces no impediment to successfully applying for the exemption).[206]

146.    Relying on the same database matching methodology described above, Dr. Ansolabehere

determined the number of registered voters who are on the No Match List who are under age 65

and are not disability-exemption eligible.  These 376,985 voters represent 2.8% of registered

voters in Texas.[207]

147.    Ecological regressions estimate that 4.3% of registered Hispanic voters lack valid SB 14

ID, are under the age of 65 and are not disability-exemption eligible, as well as 5.1% of

registered African-American voters.  In contrast, only 1.1% of registered Anglo voters meet

these criteria.[208]

[205] PL752R ¶ Table VI.3.A&B (Ansolabehere Corr. Supp. Rep.); Trial Tr. 159:20-160:1 (Ansolabehere) (Day 1).
[206] *Infra* ¶¶ 146-150.
[207] PL752R ¶ Table VI.3.B (Ansolabehere Corr. Supp. Rep.).
[208] PL752R ¶ 76 Table VI.3.A (Ansolabehere Corr. Supp. Rep.); Trial Tr. 162:3-5 (Ansolabehere) (Day 1).

148.    Stated differently, ecological regression estimates that Hispanic voters are 291% more likely than Anglo voters to meet these criteria, and African-American voters are 364% more likely than Anglos to meet these criteria.[209]

149.    Catalist data also revealed significant racial disparities with respect to this subset of the No Match List. 4.0% of Hispanic voters and 4.8% of African-American voters lack valid SB 14 ID, are under the age of 65 and are not disability-exemption eligible, in contrast to only 2.0% percent of Anglo voters.[210]

150.    In other words, Catalist estimates show that Hispanic voters are 100% more likely than Anglo voters to lack valid SB 14 ID, not qualify for a disability exemption, and not qualify to vote by mail on account of age.  African-American voters are 94% more likely than Anglo voters in this regard.[211]

## VII.    SB 14 DISENFRANCHISED HUNDREDS OF VOTERS IN THE LOW TURNOUT NOVEMBER 2013 ELECTION

151.    Texas does not collect statewide data on provisional ballots cast in statewide elections, such as provisional ballots cast by voters who lacked SB 14 ID.[212]  Keith Ingram, the Director of

---

[209] PL752R ¶ Table VI.3.A (Ansolabehere Corr. Supp. Rep.).
[210] PL752R ¶ Table VI.3.B (Ansolabehere Corr. Supp. Rep.).
[211] PL752R ¶ Table VI.3.B (Ansolabehere Corr. Supp. Rep.).
[212] PL763 at 6 (Cornish Rep.); PL901 at 54 (Defs. Resps. to Plts First Rogs.) ("Counties are not . . . required to track provisional ballots within the TEAM database and many elect not to do so. Neither are counties required to report to the state whether or not a voter's ballot was cast provisionally.").  Trial Tr. 252:23-253:1-3, 253:13-19, 254:2-5, 254:8-15 (Cornish attempting to survey 17 counties, the largest counties in the State, to analyze the provisional ballots cast in Texas elections following its implementation of SB 14 and having inconclusive findings "[b]ecause in Texas . . . there is no systematic method to tabulate or analyze the provisional ballots which were case in the elections and the specific reasons that those ballots were cast . . . whether it was because of a lack of photo ID"); 255:9-12 (Cornish testifying that SB 14 does not require "the counties to report to the SOS or to any other agency the number of provisional ballots"); 255:20-22 (Cornish testifying that Texas lacks a "central database or central recording of provisional ballots); 257:1-13 (Cornish testifying that while it may be possible to "determine the number of provisional ballots [cast in a general, statewide Texas election] . . . it's very difficult to actually look at them and see why the provisional ballot was cast, and that's because each

(Cont'd…)

the Election Division of the Secretary of State's office, testified that he is unaware of the number of provisional ballots cast due to lack of SB 14 photo ID.[213]

152.    Provisional ballot records from 30 Texas counties, representing 66.1% of the Texas citizen voting-age population, indicate that 281 provisional ballots were cast due to the voters' failure to present qualifying SB 14 ID in the 2013 November Constitutional Amendment election.[214] The county early voting ballot boards rejected 250 of the 281 provisional ballots cast because the voter failed to provide SB 14 ID.[215]

153.    The 2013 November General Election was a Constitutional Amendment election with no statewide elected offices on the ballot.[216]  Voter turnout was 8.6% of registered Texas voters, as compared to the turnout of 58.6% of registered Texas voters in the November 2012 Presidential election, and 38% of registered Texas voters in the November 2010 midterm election.[217]

154.    Voters in low-turnout elections such as the November 2013 Constitutional election are not representative of the general electorate. As compared with voters in Presidential elections, they tend to be disproportionately Anglo, be more educated, have greater income and resources,

_____

county has their own rules or they have their own method of storing provisional ballots"); 257:14-25 ("there [is] no systematic manner in which someone can determine that statewide what the provisional ballot cast due to photo ID is"); 278:10-14 (Cornish) (Day 3); Trial Tr. 390:4-16 (Ingram) (Day 7).
[213] Trial Tr. 307:21-308:1, 353:19-23 (Ingram) (Day 7).
[214] PL789 (public records responses from 30 counties for Nov 2013 election); U.S. Census Bureau, *Citizen Voting Age Population (CVAP) Special Tabulation From the 2008-2012 5-Year American Community Survey*, Voting Age Population by Citizenship and Race (CVAP), https://www.census.gov/rdo/data/voting_age_population_by_citizenship_and_race_cvap.html. *See also* Trial Tr. 252:23-253:1-3; 253:13-19; 254:2-5; 256:5-16 (Cornish attempting to survey 17 counties to analyze the provisional ballots cast in Texas elections following its implementation of SB 14 and finding that about twenty-five percent (25%) of those ballots in Harris County were photo ID related); Trial Tr. 290:7-291:4 (Cornish) (same) (Day 3).
[215] *Id.*
[216] Secretary of State, Election Results, http://w.sos.state.tx.us/elections/historical/.
[217] *Turnout and Voter Registration Figures (1970-current)*, http://www.sos.state.tx.us/elections/historical/70-92.shtml.

and have more consistent histories of voter participation. Consequently, they tend to possess traits that make them least likely to be affected by SB 14.[218]

155.    The record establishes that notwithstanding the low turnout in the November 2013 election, SB 14 impacted minority political participation in places like Edcouch, a socioeconomically depressed city in Hidalgo County.[219] The residents of Edcouch are largely Hispanic and poor—nearly half do not possess a car.[220]  During the November 2013 election, dozens of primarily Hispanic voters without SB14 compliant photo ID were prevented from casting ballots during early voting and on Election Day.[221]  There is one polling location in town, but because the city has no public transportation, voters without the requisite photo ID or underlying documents to obtain the photo ID (such as a birth certificate) found it burdensome— and nearly impossible—to make the 16 or 30 mile round trips, respectively, to the local DPS or County Courthouse in order to vote in that election.[222]  Given the low turnout in that election, the number of individuals denied the opportunity to vote easily could have resulted in a different outcome in the four city council races that were decided by 50 or few votes.[223]

156.    Several minority voters testified to voting provisionally during the November 2013 election, and having their provisional ballot rejected, because they lacked SB 14 ID.[224]

---

[218] PL759 at ¶¶ 22-25 (Burden Supp. Report); Trial Tr. 328:23-329:17 (Burden) (Day 3).
[219] Trial Tr. 357:10-11, 358:11-13 (Guzman) (Day 3).
[220] Trial Tr. 358:18-25 (Guzman) (Day 3).
[221] Trial Tr. 361:1-24, 363:8-364:1 (Guzman) (Day 3).
[222] Trial Tr. 359:16-21, 376:4-14 (Guzman) (Day 3).
[223] Trial Tr. 358:11-21, 375:20-376:3 (Guzman) (Day 3).
[224] See Bates Dep. 12:19-13:6, 14:2-8; PL1090 (Bates Video Excerpts); Benjamin Dep. 28:1-30:3; Eagleton Dep. 32:5-33:11, 42:9-43:8; PL1095 (Eagleton Video Excerpts); Holmes Dep. 17:10-20:11, 20:21-23:1, 23:15-24:2; PL1094 (Holmes Video Excerpts); Washington Dep. 22:1-25:25; PL1093 (Washington Video Excerpts).

157.    While hundreds of voters lost their vote in the November 2013 election when they had to vote by provisional ballot because of SB 14, these voters likely represent only a small fraction of the total number of voters SB 14 disenfranchised during that election.  It is reasonable to infer that some voters without SB 14 IDs who had heard of the law prior to the election may never attempted to go to the polls because they believed they would not be allowed to vote or that their vote would not be counted.[225]  The record further indicates that voters without SB 14 IDs were sometimes turned away from the polls without being given an opportunity to vote a provisional ballot.[226]

## VIII.   SB 14 IDS ISSUED BY TEXAS ARE DIFFICULT TO OBTAIN FOR REASONS OF COST, ACCESSIBILITY, AND AVAILABILITY

158.    Obtaining SB 14 ID issued by Texas is burdensome due to a variety of factors including documentation requirements, eligibility limitations, fees, travel burdens, potential loss of income due to in-person application requirements, limited business hours, and a lack of voter education.[227]

159.    The experiences of individual voters and individuals working to assist low-income Texans establish that low-income minority voters face substantial difficulties and burdens when seeking to obtain IDs, including challenges paying for identification or even supporting documents,[228] burdensome wait times at local DPS offices,[229] losing income from having to take

---

[225] Washington Dep. 14:11- 17:6; PL1093 (Washington Video Excerpts); Stanart Dep. 127:11-131:10; 131:24-132:6 (Harris County's chief elections officer testified as to ways in which the County informed voters prior to the November 2013 election that they would need a photo ID in order to vote, including putting up roughly 40 billboards that read: "Bring Your Photo ID to the Polls").
[226] Trial Tr. 368:1-3 (Guzman) (Day 3); Bingham Dep. 33:4-33:7, 33:22-34:11; PL1091 (Bingham Video Excerpts) (Day 2); Carrier, F. Dep. 95:3- 97:25.
[227] Trial Tr. 267:22-268:7 (Rodriguez) (Day 6) (DPS senior manager explaining that DPS never considered whether certain EIC-issuing offices should expand beyond traditional business hours).
[228] Bingham Dep. 6:17-19, 37:11-38:1; PL1091 (Bingham Video Excerpts); Holmes Dep. 35:16-36:7;
(Cont'd…)

time off from work,[230] and specific costs associated with maintaining a driver license, including insurance, tickets, fines, and fees.[231]

160.     For example, Dawn White, the Executive Director of Christian Assistance Ministry, a faith-based organization in San Antonio that devotes a large portion of its resources to helping low-income Texans obtain ID.[232]  She testified at trial that the process of obtaining photo ID and the required underlying documents, such as a birth certificate, is so complicated, expensive, and labor-intensive that many of her clients are unable to obtain such ID without assistance.[233]  The cost, per a client, to get a photo ID is $100, which includes providing people with extra financial assistance, like bus tickets, gas vouchers, and fees like the $11 license renewal.[234] Many of the clients in need of photo ID regularly operate without one.[235]  In San Antonio, the demand for assistance in obtaining ID exceeds Christian Assistance Ministry's capacity.  Consequently, although Christian Assistance Ministry sees about 10,000 individuals annually for whom they think can provide some assistance obtaining ID, they turn about half of them away, and are able to successfully assist only 2,500 in obtaining an ID or an underlying document.[236]

161.     Kristina Marie Mora, who recently served as the Manager of Casework Services at The Stewpot, a Dallas-based non-profit resource center established to help alleviate hunger and homelessness, testified that the burdens on homeless Texans in obtaining photo ID and the

---

PL1094 (Holmes Video Excerpts); Buchanan Dep. 58:5-17; Trial Tr. 129:13-24 (Mora) (Day 2).
[229] Trial Tr. 101:11-102:15 (Mendez) (Day 2).
[230] Buchanan Dep.123:1-2.
[231] Bingham Dep. 14:6-16:16; PL1091 (Bingham Video Excerpts).
[232] Trial Tr. 268:19-269:16 (White) (Day 2).
[233] Trial Tr. 278:21-279:16, 281:3-282:23 (White) (Day 2).
[234] Trial Tr. 277:17-278:20, 279:25-280:11 (White) (Day 2).
[235] Trial Tr. 286:12-287:17 (White) (Day 2).
[236] Trial Tr. 276:17-279:16, 280:25-281:2 (Day 2).

necessary underlying documentation (e.g. birth certificates, marriage records, certified school transcripts, social security cards) are particularly onerous for a population that already struggles to meet their daily basic needs for food, shelter, and medical attention.[237]  Most of the 4,000 to 5,000 predominantly African-American homeless individuals served annually by her organization simply do not have the basic necessities to navigate the application process on their own, including: access to the internet, consistent and reliable telephone service, and permanent mailing addresses.[238]  This necessarily results in time-consuming in-person trips to the relevant Agencies which, in turn, can put the individual at risk for missing a homeless shelter's typical afternoon curfew.  Missing the curfew means losing their bed for the evening.[239] Moreover, in-person visits to State agencies—particularly DPS, itself a law enforcement agency—may cause considerable anxiety among homeless individuals who have had negative experiences with law enforcement or fear arrest because of unpaid traffic tickets.[240]  Mora described the typical financial costs associated with obtaining an SB 14 ID as equivalent to the cost of two weeks at a homeless shelter.[241]  Like the Christian Assistance Ministry, The Stewpot routinely turns away individuals seeking assistance in obtaining identifying documents—many of whom line up for assistance as early as 5:00 AM each day.[242]

162.    Elizabeth Gholar, who is African American,[243] has been unable to obtain SB 14 ID from DPS because the document reflecting her home birth in Louisiana incorrectly lists her last name as her mother's maiden name.  As a result, she has been unable to prove to DPS's satisfaction

---

[237] Trial Tr. 112:7-25, 113:11-14, 115:13-22, 122:1-24 (Bingham, Mora) (Day 2).
[238] Trial Tr. 114:9-11, 116:21-117:10, 138:8 (Mora) (Day 2).
[239] Trial Tr. 118:4-119:4 (Mora) (Day 2).
[240] Trial Tr. 119:5-24 (Mora) (Day 2).
[241] Trial Tr. 118:11-119:3 (Mora) (Day 2)
[242] Trial Tr. 131:3-13 (Mora) (Day 2).
[243] Gholar Dep. 11:5-14; PL1092 (Gholar Video Excerpts).

(on two separate trips) that the birth certificate is her own.  She has retained an attorney in Louisiana to attempt to amend her 1938 birth certificate, something she has never before needed to do in order to vote, marry, or exercise any other constitutional right.[244]  Ms. Gholar does not consider voting by mail equivalent to voting in person, which she has described as a right that she has "earned" and "a celebration."[245]

163.   Lenard Taylor, also African American, was denied an SB 14 ID by DPS and told he needed to produce his social security card, his birth certificate, and his voter registration card.[246] He then went to the social security office, where he was told that he needed to have a Texas state ID in order to obtain a social security card.[247]  Mr. Taylor, who has been homeless in the past, has since obtained a birth certificate at a cost of $23—a sum that meant something to him.[248]

164.   Similarly, lay testimony details the significant transportation difficulties low-income minority voters experience when attempting to get to offices that issue SB 14 ID or documents required to apply for SB 14 ID.[249]

165.   For example, Marvin Holmes, who is African American, spent hours on two separate days traveling by public bus between his home in Houston and his local Office of Vital Statistics and again between his home and the nearest DPS office to obtain a certified copy of his birth certificate and SB 14 ID.[250]

---

[244] Gholar Dep. 63:1-25, 64:6-18, 65:15-17, 66:3-8, 66:15-19, 72:14-18, 74:3-21, 75:22-76:14, 78:5-79:10, 82:3-10; PL1092 (Gholar Video Excerpts).
[245] Gholar Dep. 61:2-9, 83:9-10; PL1092 (Gholar Video Excerpts).
[246] Trial Tr. 147:22-148:15, 149:15-150:7 (Taylor) (Day 3).
[247] Trial Tr. 148:16-21 (Taylor) (Day 3).
[248] Trial Tr. 150:5-19 (Taylor) (Day 3); PL1000 (Taylor Decl.).
[249] Davis Dep. 67:24-68:21; Buchanan Dep. 122:13-25; PL988 (Estrada Decl.); Trial Tr. 133:25-134:2, 134:16-23 (Estrada) (Day 3).
[250] Holmes Dep. 8:7-10, 28:14-33:13.

166.     For further example, Vera Trotter, who is an African American female, who is 73 years

of age testified that her driver's license expired in 2012.  She attempted to vote in the March

2014 primary election by presenting her voter registration card and expired driver's license

which was rejected.  She was not allowed to vote provisionally but was required to go to DPS

and present the same expired driver's license in order to obtain an Election Identification Card.

She then returned to the polls and cast her ballot following which she was told that she had to

take her EIC to the elections office to ensure that her ballot would be counted.  In total Ms.

Trotter made two trips to the polls, one trip to the DMV and one trip to the elections office to

cast a single ballot and did not find out that the ballot counted until she received written

notification approximately two to three weeks after voting.[251]

167.     Obtaining SB 14 ID also poses bureaucratic and procedural obstacles for voters.[252]

Individual voters who do not possess SB 14 ID have experienced difficulty in understanding the

requirements of SB 14 and complying with those requirements.[253]  For example, Naomi

Eagleton, who is African American, and does not have a qualifying SB 14 ID or birth certificate,

recently traveled to her local metro card office to obtain a new metro card with a photograph

because she believes, incorrectly, that the card will enable her to vote in person in the coming

election.[254]  In addition, Ms. Mora and Ms. White testified about the information costs that their

clients were forced to incur in seeking to obtain SB 14 ID.[255]

---

[251] Trotter Dep. 37:13-20, 59:18-60:3, 66:12-67:1, 98:3- 99:8.
[252] Buchanan Dep. 88:24-90:2, 108:3-9; Davis Dep. 47:1-10; E. Martinez Dep. 100:3-104:8; Washington Dep. 23:14-24:10; PL1093 (Washington Video Excerpts).
[253] Buchanan Dep. 88:24-90:2, 108:3-9; Washington Dep. 23:14-24:10; PL1093 (Washington Video Excerpts); E. Martinez Dep. 100:3-104:8.
[254] Eagleton Dep. 18:6-21:5, 27:8-28:13, 30:7-32:4, 44:1-12, 52:9-53:25, 88:22-89:6, 106:5-19, 121:22-123:14; PL1095 (Eagleton Video Excerpts).
[255] Trial Tr. 116:11-117:25 (Mora) (Day 2); Trial Tr. 276:11-277:11, 281:3-282:2 (White) (Day 2).

168.     For further example, Ruby Barber, age 93, knew she needed a photo ID but did not know what type of photo ID would allow her to vote.  She possessed an expired driver's license but never had a birth certificate because she was born in a rural town in Tennessee and her birth was never recorded except in the family Bible.  Ms. Barber went to the local DPS office with her expired driver's license, social security card, Medicare card and Scott and White Insurance card but was unable to obtain an EIC because she did not have a birth certificate.  Ultimately, after a Waco report ran an article in the Waco Tribune, Ms. Barber was contacted by the DPS office and required to make a second trip where she was provided with an EIC.  Apparently DPS was able to find a census record of Ms. Barber's birth on a family search website and issued her EIC on that basis.[256]

169.     Finally, low-income voters are often burdened by having to obtain qualifying state IDs from DPS, a state agency associated with the enforcement of traffic and other public safety laws. For example, Hector Sanchez, who is Hispanic, explained that for years, he has avoided interacting with DPS and its employees for fear of being arrested for an outstanding traffic-related warrant.[257]  Daniel Guzman, a local elected official representing a heavily Hispanic, low-income community in Hidalgo County, similarly testified concerning the fears local residents have concerning interactions with DPS.[258]

170.     Under the widely accepted "calculus of voting" applied in political science, increasing the costs associated with voting can reduce a voter's likelihood of participating in an election,

---

[256] Barber Dep. 6:9-22, 24:18-25, 29:15-22, 30:15-20, 34:12-24, 36:10-21, 40:7-12; PL 830 (Ruby Barber FamilySearch.org Page).
[257] Sanchez Dep. 29:3-32:9.
[258] Trial Tr. 357:8-12, 358:2, 358:14-21, 368:7-22, 372:2-9 (Guzman) (Day 3).

particularly among voters who lack the resources to overcome those costs.[259]  Because of socioeconomic disparities, minority voters are particularly unlikely to overcome the impediment posed by SB 14.[260]

### A.   State-Issued Forms of Qualifying Photo ID Can Be Burdensome to Obtain and Maintain

171.    Texas driver licenses, personal identification cards, and concealed handgun licenses can be difficult to obtain and to renew.  In each case, first-time applicants must apply in person at a DPS office, pay a fee, provide underlying documents that are not free to obtain, and overcome a variety of other procedural and substantive barriers.

#### 1.   Driver licenses and state IDs involve costly fees, and applicants must obtain and pay for underlying documentation, and overcome other procedural and substantive barriers

172.    First time applicants for a Texas driver license or Texas personal ID card must apply in person at a DPS office, and individuals must renew in person every other renewal.[261]  For many Texans who lack a driver license or access to a vehicle, travel to a DPS office is extremely burdensome.[262]

173.    DPS charges a $25 fee to first time applicants for a non-commercial Texas driver license, $16 to first time applicants for a Texas personal ID card under age 60, and $6 to first time applicants for a Texas personal ID card who are 60 or older.[263]

174.    DPS does not waive driver license or personal identification card fees due to indigence.[264]

---

[259] PL758 ¶¶ 7-12 (Burden Corr. Rep.); PL759 ¶¶ 5-12 (Burden Reply Rep.); PL760 at 48-49 (Burton Rep.); Trial Tr. 295:25-299:14, 331:8-332:9 (Burden) (Day 3).
[260] PL760 at 49 (Burton Rep.); Trial Tr. 295:10-17, 299:15-22 (Burden) (Day 3).
[261] Gipson Dep. 44:19-45:7, 60:20-25, June 9, 2014.
[262] *Infra* ¶¶ 189-190, 380-382, *supra* ¶ 165.
[263] Gipson Dep. 11:15-12:13, 55:13-56:5; PL443 (Application for DL/ID); PL444 (DL Division Fees Webpage).

175.    Applicants for a Texas driver license or personal identification must present proof of residency, proof of identity, and fingerprints.  Individuals applying for a driver license must also provide social security number verification and proof of vehicle registration and liability insurance for any vehicle owned by the applicant.[265]

176.    In addition, because of a law passed shortly after SB 14, applicants for original and renewal driver licenses and personal ID cards must present documentary proof of citizenship or lawful presence.[266]  As of May 18, 2014, only 4,143,370 holders of unexpired Texas licenses and personal ID cards who are U.S. citizens had satisfied the new proof of citizenship requirement. Over 14 million Texans who hold unexpired driver licenses and personal ID cards and who have previously indicated they are U.S. citizens will have to provide documentary proof of citizenship at the time of their next renewal in order to maintain their license or ID.[267]  Some of these individuals may face significant obstacles to doing so.[268]

177.    A Texas driver license can also be difficult to maintain because licenses may be suspended for several reasons, including failure to pay fines or to make other payments. Individuals whose driver licenses have been suspended or revoked may be ineligible to renew their driver license.[269]

178.    Texas law enforcement officer are authorized to confiscate driver licenses for certain driving-related offenses under a program known as the Administrative License Revocation

---

[264] Gipson Dep. 11:22-25.
[265] Tex. Transp. Code §§ 521.142-143; 37 Tex. Admin. Code §§ 15.42, .44-.45; Gipson Dep. 54:11-21; PL442 (DL Division Application Booklet); Trial Tr. 114:22-115:7 (Mora) (Day 2).
[266] Tex. Transp. Code 521.1425(c); Tex. Transp. Code 521.101(d-1); Tex. Transp. Code 522.052(i); PL1033 (Defs.' Responses to Pls. 2d Interrogs.) (Responses 1-2).
[267] PL1033 (Defs.' Responses to Pls. 2d Interrogs.) (Response 2).
[268] Trial Tr. 239:12-243:4 (Lara, Maximina) (Day 4).
[269] Gipson Dep. 20:5-21:11, 51:19-53:15.

(ALR) program.[270]  Exact figures for the number of confiscations under ALR are unavailable, but during legislative debate on SB 14, there was testimony that there are approximately 100,000 arrests per year for offenses that fall under ALR and allow for confiscations.[271]

179.     The legislature rejected a proposed amendment to SB 14 to allow voters to use the temporary, non-photo driving permit that is issued when a driver license is confiscated.[272]   A voter whose license is confiscated and who does not possess other SB 14 ID must obtain another form of qualifying photo ID to vote during the period of confiscation.

180.     When people voluntarily surrender their driver licenses—perhaps because they no longer believe they can safely drive—DPS makes no effort to provide them with an alternative form of voter identification or even inform them that they may face difficulties complying with SB 14.[273]

> **2.**     **Nearly one-third of counties lack a permanent DPS office, and in many counties that do have a permanent DPS office, the office keeps limited schedules, has long wait times, or requires some individuals to travel for hours to reach the office**

181.     Approximately 78 of the 254 counties in Texas do not have a permanent DPS office.[274]

182.     Approximately 46 counties of the 176 counties that do have a permanent DPS office have what are known as "scheduled offices."   These offices are not open five days a week.   In 32 of those counties, the DPS office is open only one day per week or a few times a month.[275]

183.     DPS offices do not ordinarily offer weekend hours.[276]

---

[270] Tex. Transp. Code § 524.011; PL1034 (Defs.' Responses to Pls. 3d Interrogs.) (Response 1).
[271] PL035 (Tr. House Floor Debate, Mar. 23, 2011); PL547 (1/25/11 E-mail from Essell to Gonzales); PL1083 (DPS webpage re Administrative License Revocation Program); Trial Tr. 65:5-14, 92:25-94:1 (Lichtman) (Day 4) ("In 2008, 112,250 licenses were suspended under the ALR process and this was explicitly brought up in the debates over SB 14.")..
[272] PL034 (House Journal Mar. 23, 2011); PL035 (Tr. House Floor Debate, Mar. 23, 2011).
[273] Trial Tr. 296:17-300:13 (Rodriguez) (Day 6).
[274] Peters Dep. 190:16-191:15, Apr. 30, 2014; Trial Tr. 106:8-11, 106:16-18 (Martinez Fischer) (Day 1).
[275] PL352 (DL Office Spreadsheet).

184.    There are a total of 225 driver license offices in the entire state.[277]

185.    In approximately 141 counties that have permanent DPS offices, DPS is never open past 5 p.m.  In 22 counties, one or more DPS offices are open until 6 p.m. or 7 p.m. one day per week. Six "Mega Centers" are open until 6 p.m. on multiple days per week.[278]

186.    As of October 2011, wait times in DL offices in metropolitan areas could be as long as three hours during busy months of the year.[279]

187.    Although DPS constructed "Mega Centers" in an effort to reduce wait times, none of the new DPS "Mega Centers" is inside of the inner freeway loops surrounding Houston, Dallas, San Antonio, or Fort Worth or in the urban core of Austin.[280]  Even after the opening of a Mega Center in the Houston area, wait times in two Houston driver license offices continued to be over an hour, not including time spent before entering the queuing system.[281]

188.    DPS acknowledges that "the typical driver license customer complaint is about uncomfortable, long wait times before they get to the counter to be helped."[282] DPS also admits a "service gap" caused by additional mandates placed on the driver license division combined with an increasing population.[283]  DPS has specifically conceded that SB 14 could lengthen wait times

---

[276] PL352 (DL Office Spreadsheet).
[277] PL775R ¶ 16 (Webster Final Rep.).
[278] PL352 (DL Office Spreadsheet).
[279] PL549 (10/7/11 Let. from DPS to Sen. Ellis).
[280] PL692 (New DL Mega Centers Website).
[281] PL685 (5/12 Average DPS Customer Wait Times); Davio Dep. 162:25-163:11; 165:9-167:11; 171:5-23, June 15, 2012.
[282] PL684 at 3 (3/15/12 DPS Driver License Study).
[283] PL684 at 9-11 (3/15/12 DPS Driver License Study); PL1035 at 6-8 (2/28/11 Driver License Study).

at driver license offices, particularly surrounding major voting times like a Presidential election.[284]

189.    Many neighborhoods with concentrated minority communities have no DPS office, such as Dallas's southeast quadrant.  Often these minority population concentrations are the legacy of housing segregation.  Public transit from Dallas's southeast quadrant to the DPS office in downtown Dallas takes two to four hours, round trip.[285]

190.    Although DPS tracks whether public transportation is available at its driver license offices, it defines public transportation to include paid ride services such as taxis.[286]

191.    In some heavily Hispanic regions along the border with Mexico, the nearest permanent DPS facility is 100 to 125 miles away.[287]

192.    DPS does not maintain any rules requiring that services to be available on weekends or during evening hours.[288]

193.    DPS has indicated that it makes no effort to coordinate with the Secretary of State's office to ensure that DPS offices are conveniently located for EIC applicants, who may be particularly dependent on public transportation.[289]   The Secretary of State has no authority over the implementation of the EIC program by DPS.[290]

---

[284] PL690 at 1 (DPS Legislative Analysis).
[285] PL760 at 45-46 (Burton Rep.); PL779 at 12-13; Trial Tr. 45:3-19 (Burton) (Day 6).
[286] Trial Tr. 149:24-151:8 (Peters) (Day 6).
[287] PL760 at 46-47 (Burton Rep.); PL779 at 9.
[288] Peters Dep. 95:23-96:3.
[289] Trial Tr. 148:24-152:7 (Peters) (Day 6); Trial Tr. 282:15-286:4 (Rodriguez) (Day 6).
[290] PL907 § 20; Trial Tr. 355:17-21, 386:23-387:1 (Ingram) (Day 7).

### 3.    Texas concealed handgun licenses are expensive, labor-intensive to obtain, and unavailable to some eligible voters

194.    A Texas resident who applies for a Texas concealed handgun license must submit evidence of having completed a handgun proficiency course, a valid Texas or other state's driver license or identification certificate number, a photograph, fingerprints, proof of age, a social security number, and a signature.  The applicant must also undergo a background check.[291]

195.    The standard application fee for an original Texas concealed handgun license is $140, although individuals who fall below federal poverty thresholds may pay a reduced fee of $70. Current and former military personnel and law enforcement officials, as well as senior citizens, may also apply at a reduced price.[292]

196.    A Texas concealed handgun license is initially valid for four years and then must be renewed every five years.  Renewal requires payment of an additional fee.[293]

197.    Registered voters who are under 21 years of age and who do not qualify for the military exception may not apply for a concealed handgun license.[294]

198.    DPS may suspend or revoke a concealed handgun for several reasons, such as delinquent child support and DWIs.[295]  Once final action is taken and the suspension or revocation goes into effect, DPS sends a letter instructing the individual to surrender the license to the department.[296]

199.    By statute, concealed handgun license applicants who do not reside within 25 miles of a facility with the capacity to process digital fingerprints and reside in a county with a population

---

[291] 37 Tex. Admin. § 6.12; Zgabay Dep. 10:4-11:19; 17:4-25, June 9, 2014.
[292] PL436 (CHL Fee Table).
[293] Zgabay Dep. 19:9-20:3; PL436 (CHL Fee Table).
[294] Zgabay Dep. 16:15-20.
[295] Zgabay Dep. 23:17-25:25.
[296] Zgabay Dep. 27:1-10.

of 46,000 or fewer may submit fingerprints by alternative means, based on concerns that this distance rendered such facilities inaccessible to potential applicants.[297]

### B. The EIC Program Does Not Provide a Meaningful Opportunity to Obtain SB 14 ID

#### 1. Overview

200.    The Texas EIC program is a failure.  The need to apply in person at locations that may be remote, open for limited hours, temporary, or unwelcoming; documentation requirements; the inability to use EICs for anything other than voting; and the failure of DPS to publicize information regarding EICs are among the many impediments to obtaining an EIC.  The inevitable result of these barriers is that Texas has issued a minute number of EICs to the population that needs them.[298]

201.    The EIC program is managed by DPS, and EICs generally must be applied for at a DPS location.[299]

202.    SB 14 provides no specific appropriation for DPS to implement the EIC program, so all funds for EIC issuance must come out of DPS general funds.[300] This lack of funding provides a disincentive for DPS to invest heavily in the EIC program. Indeed, Tony Rodriguez has referred to efforts to expand the EIC program as "mission creep."[301]

---

[297] Tex. Gov't Code § 411.175; Zgabay Dep. 40:18-42:6, 51:7-54:8.
[298] *Infra* ¶ 206.
[299] PL194, Peters Dep. 26:10-18.
[300] Trial Tr. 259:1-11 (Cornish) (Day 3) ("DPS received no additional funding relating to the issuance of the EICs").
[301] Trial Tr. 273:8-18 (Rodriguez) (Day 6).

203.    Tony Rodriguez testified that even though he administers the program, he normally

spends only two or three hours per week on the program.[302] No DPS staff works on the EIC

program fulltime.[303]

204.    DPS admits that its employees have undefined discretion in administering the EIC

program, despite the fact that such discretion is not provided for in statute or regulation.[304] This

discretion has resulted in unfair, inconsistent results. While some people receive EICs even

though they have failed to produce required documents,[305] others have faced seemingly

insurmountable barriers to acquiring EICs.[306]

205.    After the commencement of this litigation, DPS and the Office of the Secretary of State

began developing programs to make EICs available at locations other than permanent DPS

offices.  The half-hearted roll-out of these programs has prevented their success, and DPS has

already begun to roll back its use of mobile units in the weeks leading up to elections.

206.    Between June 2013 and early September 2014 (over 15 months), DPS had issued only

279 EICs.[307]  By contrast, Georgia—a state less than half the size of Texas—issued 2,182 voter

identification cards in the latter part of 2006, after the state began implementation in June 2006

following Voting Rights Act preclearance of its implementing regulations.[308]  As of May 2014,

62 EICs had been issued to voters over the age of 65, who are eligible to early vote by mail.[309]

---

[302] Trial Tr. 281:13-25 (Rodriguez) (Day 6).
[303] Trial Tr. 282:1-3 (Rodriguez) (Day 6).
[304] Trial Tr. 251:7-252:3, 273:7-274:17, 275:15-277:6 (Rodriguez) (Day 6).
[305] Barber Dep. 6:9-22, 24:18-25, 29:15-22, 30:15-20, 34:12-24, 36:10-21, 40:7-12; PL830 (Ruby Barber FamilySearch.org Page); Trial Tr. 272:13-273:6 (Rodriguez) (Day 6).
[306] Trial Tr. 290:13-15, 290:19-23, 290:24-291:18 (Benjamin) (Day 2).
[307] DEF2739 (Election Identification Certificates State and County Participation, September 5, 2014); Trial Tr. 262:13-263:3 (Rodriguez) (Day 6).
[308] PL691 at 9 (Georgia PowerPoint).
[309] PL1052 (EIC Applicants Data at Column R ("Age")).

207.    Many voters who lack SB 14 ID have never heard of an EIC.[310]  Even individuals who work for non-profit organizations that assist Texans in obtaining official photo IDs and other documentation had never heard of an EIC before speaking to plaintiff's counsel involved in this suit.[311]

208.    For voters who have heard that EICs are available, they face a combination of burdens in seeking to obtain one, including significant travel distances, technical and confusing processes, and the requirement to present an original or certified copy of a birth certificate.[312]

209.    The application for an EIC states that it is "for election purposes only; cannot be used as an identification card," and EICs bear the notation "FOR ELECTION PURPOSES ONLY CANNOT BE USED AS IDENTIFICATION."[313]  Thus, in contrast to a voter who obtains a driver license, a concealed carry permit, a passport, or any of the other forms of SB 14 identification, a voter who obtains an EIC receives no additional benefits from possessing an EIC.

210.    Tony Rodriguez, a senior manager in the DPS driver license division who has been put in charge of the EIC program, has written to subordinates that "zero is a good number" for requests for EICs at DPS offices, and when a lack of applications persisted wrote, "This is getting better

---

[310] Trial Tr. 172:10-14 (Espinoza) (Day 6); Washington Dep. 107:16-109:1; PL1093 (Washington Video Excerpts); Eagleton Dep. 28:6-29:3; PL1095 (Eagleton Video Excerpts); Holmes Dep. 19:3-5; PL1094 (Holmes Video Excerpts); Espinoza Dep. 35:4-6; Margarito Lara Dep.46:17-22, 101:19-21; PL1090 (Bates Video 13:10-13:44); Bates Dep. 19:17-20:12.
[311] Buchanan Dep. 66:1-67:19, 69:9-70:25; Trial Tr. 283:18-25 (White) (Day 2); Trial Tr. 131:14-21 (Mora) (Day 2).
[312] Sanchez Dep. 8:13-9:16, 29:3-32:9; E. Martinez Dep. 59:24-76:1, 79:5-10; PL1000 (Taylor Decl.); Estrada Dep. 9:11-13; Trial Tr. 130:9-1, 133:23-24, 136:7-20 (Estrada) (Day 3); Trial Tr. 102:3-8, 103:17-104:7 (Mendez) (Day 2); Trial Tr. 221:16-222:21 (Lara, Margarito) (Day 4); Bates Dep. 14:17-18:25.
[313] PL556 (Application for Texas Election Certificate); PL192 (Image of Election Identification Certificate).

by the day."[314]  Rather than expressing concern regarding the lack of EIC applicants soon after SB 14 went into effect, Mr. Rodriguez told the director of the driver license division and several regional managers that despite "a close call" involving an inquiry that did not lead to an issuance, DPS had continued a "clean sweep" of issuing no EICs.[315]  Despite that fact that Mr. Rodriguez' supervisors were aware of these emails, none gave him negative feedback on his comments.[316]

211.    In response to the low number of EICs issued immediately after SB 14 went into effect, DPS did not consider making any changes to its EIC publicity or educational outreach.[317]  DPS has also not used information gathered on EIC issuance to conduct any evaluations of the EIC program.[318]  Rather, according to Mr. Rodriguez, if no EICs had been issued, the program would still have been a success because "[t]he number of EICs that we issued is secondary."[319]

212.    Mr. Rodriguez has also resisted expending DPS resources on programs that seek to expand access to EICs.[320]

213.    DPS restricts access to EICs by conducting more thorough quality control checks on EIC applications than it does on applications for driver licenses.[321]

214.    DPS has failed to establish any systems to inform EIC-holders that their EICs are about to expire, but driver license-holders automatically receive such notice.[322]

---

[314] Trial Tr. 200:24-201:4, 225:6-14; 261:12-262:12 (Rodriguez) (Day 6); PL379 (6/27/13 Email from Rodriguez to Salestus); PL380 (7/5/13 Email from Rodriguez to Carter); Rodriguez Dep. 10:20-11:3, 12:22-13:8, 125:5-129:8, 129:17-132:15.

[315] PL382 (6/27/13 Email from Rodriguez to Peters); Rodriguez Dep. 136:19-138:12; Trial Tr. 226:9-227:8 (Rodriguez) (Day 6).

[316] Trial tr. 271:1-272:12 (Rodriguez) (Day 6).

[317] Rodriguez Dep. 154:4-18, 155:4-11.

[318] Rodriguez Dep. 166:12-23, 167:21-169:3, 171:13-16, 172:5-15, 1176:16-21.

[319] Rodriguez Dep. 286:8-287:8; Trial Tr. 268:8-269:5 (Rodriguez) (Day 6).

[320] PL396 (9/9/13 Email from Tony Rodriguez to Jose Rodriguez); Rodriguez Dep. 241:11-243:8.

[321] Rodriguez Dep. 101:13-16; 105:14-105:22; Trial Tr. 140:5-141:3 (Peters) (Day 6).

215.    Similarly, Keith Ingram, the Texas Director of Elections, has stated that the number of EICs issued is not a proper metric for evaluating the success or failure of the EIC program and that the Office of the Secretary of State has no obligation to increase the number of EIC applications.[323]

216.    Coby Shorter, the Deputy Secretary of State, stated that it would be premature to make changes to the EIC program before the November 2014 federal elections.[324]

> **2.    The locations and times to submit EICs applications are limited, and are difficult to access for many Texans**

> **a.    DPS offices**

217.    As set forth above DPS locations and hours are limited, and DPS customers can experience significant wait times.

218.    Prior to the November 2013 constitutional election, DPS opened 49 driver license offices in just 13 counties from 10 a.m. to 2 p.m. on eight Saturdays only for the purpose of accepting EIC applications.[325]

219.    These DPS offices were selected based on the July 2013 analysis by the Office of the Secretary of State of voters believed not to possess state-issued ID.[326]

220.    On the first Saturday when DPS opened offices for the purpose of issuing EICs, DPS received fewer than ten applications, and on a subsequent Saturday with nine offices open, DPS

---

[322] Trial Tr. 154:21-155:17 (Peters) (Day 6).
[323] Ingram Dep. 142:13-143:23, 343:7-344:5.
[324] Shorter Dep. 158:4-162:24
[325] PL1016 ¶ 38 (Defs. Objs. & Responses to U.S. 1st RFAs); PL396; Trial Tr. 257:19-258:5 (Rodriguez) (Day 6).
[326] Rodriguez Dep. 249:14-250:5, 250:20-251:13; Ingram Dep. 134:20-135:6; PL396 (9/9/13 Email from Tony Rodriguez to Jose Rodriguez).

received only two applications.  These low numbers have been consistent throughout the time that DPS has offered Saturday service.[327]

221.    DPS opened driver licenses offices on only three Saturdays before the May 2014 statewide primary election and has stated that it could choose to terminate this program at any time.[328]

222.    DPS makes no accommodation for individuals who do not reside within 25 miles of a location that accepts EIC applications to submit their application by alternative means.  By contrast, by statute Texas does make such an accommodation with respect to the digital fingerprints otherwise required to apply for a concealed handgun license.[329]

### b.      Mobile EIC units have not been effective.

223.    In approximately September 2013, after this litigation had commenced, DPS began implementing a program in which "mobile units"—packages of equipment used to process EIC applications—would be transported to different locations throughout the State.[330]

224.    On October 8, 2013, DPS and the Office of the Secretary of State (SOS) entered into a Memorandum of Understanding (MOU) under which SOS would purchase equipment needed to accept EIC applications and interface with counties to establish proper locations for temporary offices and DPS would provide staff to accept EIC applications and verify location and equipment feasibility.[331]  The MOU provided that the SOS would purchase twenty-five mobile

---

[327] PL451 (EIC Report Oct. 19); Rodriguez Dep. 243:12-244:19; Trial Tr. 258:2-5 (Rodriguez) (Day 6).
[328] PL396 (May 2014 Saturday DL Office List); Rodriguez Dep. 262:5-13; Peters Dep. 95:7-15.
[329] Tex. Gov't Code § 411.175; Zgabay Dep. 40:18-42:6, 51:7-54:8.
[330] Trial Tr. 357:22-358:8 (Ingram) (Day 7); Ingram Dep. 48:23-49:18.
[331] PL281 (Memorandum of Understanding); Trial Tr. 330:15-25, 331:21-332:16, 358:9-359:5 (Ingram) (Day 7).

units, although the SOS could have purchased additional units.[332]  The SOS did not analyze the number of mobile EIC units needed to reach registered and eligible voters without qualifying SB 14 ID.[333]

225.   DPS has discretion to operate mobile units, and can terminate their operation at any time.[334]  The MOU can also be terminated upon written agreement of the SOS and DPS.[335]

226.   As of approximately late May 2014, DPS had issued only 82 EICs from mobile units.[336]

227.   SOS and DPS sent 25 mobile units to various locations from September to November 2013, from January to March 2014, and in the spring of 2014.[337]

228.   In July 2013, SOS conducted a database match between the TEAM database and an extract of the driver license/personal identification card database in order to estimate the locations of concentrations of voters without state-issued SB 14 ID.[338]  SOS made no additional effort to assess the characteristics of the non-matched population, such as the share of Spanish-surnamed voters.[339]

229.   SOS positioned mobile units in rural counties and counties estimated by the July 2013 database match to have a high number of voters without state-issued SB 14 ID, with specific locations jointly determined by SOS, DPS, and county officials.[340]  SOS made no particular effort to target minority communities or concentrations of low income voters.[341]

---

[332] PL281 (Memorandum of Understanding); Trial Tr. 360:12-361:15 (Ingram) (Day 7).
[333] Trial Tr. 360:24-361:12 (Ingram) (Day 7).
[334] Trial Tr. 145:16-146:3 (Peters) (Day 6); Trial Tr. 359:21-360:2 (Day 7).
[335] PL281 (Memorandum of Understanding); Trial Tr. 358:12-359:20 (Ingram) (Day 7).
[336] PL1052 (May 2014 Issuance Statistics).
[337] Ingram Dep. 63:10-19; Rodriguez Dep. 190:19-191:5.
[338] Ingram Dep. 18:6-20:17; Trial Tr. 331:1-17 (Ingram) (Day 7).
[339] Ingram Dep. 342:9-25.
[340] Ingram Dep. 18:6-20:17, 67:11-71:13, 73:20-74:17; PL306 (9/24/13 Email from Ingram to Pierce).
[341] Ingram Dep. 73:20-74:25.

230.     SOS did not advertise the mobile EIC program, and DPS conducted no targeted outreach

or direct mailing concerning the time-sensitive mobile EIC program.[342]  Senator Uresti, for

example, testified that he and his staff only discovered that mobile EIC units would be available

in certain counties within his district by looking up the Secretary of State's website and that he

had heard nothing from the counties themselves and did not believe there was any advanced

advertisement of the mobile EICs.[343]  Senator Robert Duncan also was unaware of the mobile

EIC program.[344]  Commissioner Ortiz from Nueces County said the mobile units were "a

complete mystery" to him and that their location in Nueces County was not coordinated with

local officials.[345]

231.     In most cases, DPS has sent mobile units to particular locations for only one or two

days.[346]

232.     DPS has already rolled back the scope of the mobile unit program from 2013 to 2014.

Prior to and immediately after the November 2013 election, mobile units visited 36 counties on

31 total days, appearing in up to four locations in each county.[347]  Prior to the March 2014

primary election and May 2014 primary run-off, mobile stations visited only 18 counties on only

11 total days, and visited no more than two locations per county.[348]  In total, mobile EIC units

made nearly 10 times as many appearances in 2013 as they did in 2014 (414 versus 42).[349]

---

[342] Ingram Dep. 338:4-8; Trial Tr. 146:12-147:1 (Peters) (Day 6).
[343] Trial Tr. 213:6-214:-24 (Uresti) (Day 3).
[344] Duncan Dep. 263:8-13, Aug. 28, 2014.
[345] Trial Tr. 19:24-20:10 (Ortiz, O.) (Day 5).
[346] Trial Tr. 361:16-21 (Ingram) (Day 7).
[347] PL453 (2013 EIC Mobile Stations).
[348] PL1036 (2014 EIC Mobile Stations).
[349] PL453 (2013 EIC Mobile Stations); PL1036 (2014 EIC Mobile Stations).

233.   The MOU requires that SOS give DPS only two business days' notice before placing a mobile unit, and in some cases SOS provided only the minimum required notice.[350]

234.   Several county officials complained to DPS that they and their constituents had not been informed in advance that mobile EIC units would be in place, including a county commissioner in predominantly Hispanic Bexar County.  In one county, six of seven sites had no advance notice of EIC mobile units.  Another county rejected placement of EIC mobile units due to lack of time to notify county residents and organizations.[351]

235.   Multiple counties requested that mobile EIC units operate outside of business hours, but DPS determined that mobile units should only be open during business hours and established standard hours of 9 a.m. to 4 p.m.[352]  DPS made this decision to benefit its employees and did not consider whether EIC applicants would be able to travel to mobile EIC units during business hours.[353]

236.   In 2013, nearly all mobile units were open from 9 a.m. to 4 p.m.[354]  In 2014, the website setting out the mobile unit schedule stopped consistently listing times of operation.[355]

237.   Travis County voter registrar Bruce Elfant suggested to SOS in an October 2013 letter that the lack of success of EIC mobile units might be due to their limited operating hours and the

---

[350] PL281 (Memorandum of Understanding); Trial Tr. 362:5-14 (Ingram) (Day 7).
[351] Ingram Dep. 102:22-104:6; Peters Dep. 88:15-89:7; PL286 (10/1/13 Email from Rodriguez to Jackson); PL347 (10/2/13 Email from Rodriguez to Jackson); Trial Tr. 362:15-25 (Ingram) (Day 7); Trial Tr. 164:24-165:16 (Guidry) (Day 8).
[352] Rodriguez Dep. 291:14-292:9; Ingram Dep. 105:23-110:22, 326:9-327:6, 322:15-328:3; Rodriguez Dep. 292:12-294:4; PL289 (10/17/13 Email from Heard to Jackson); PL290 (10/4/13 Email from Chacon to Jackson); PL405 (10/3/13 Email from Watkins to Jackson); PL306 (9/24/13 Email from Ingram to Pierce); Trial Tr. 363:1-5, 364:16-19 (Ingram) (Day 7).
[353] Rodriguez Dep. 295:14-296:12; Trial Tr. 265:24-266:10, 267:6-13 (Rodriguez) (Day 6) (explaining that DPS prefers to keep routine hours for employees notwithstanding the remoteness of the location); Ingram Dep. 305:15-306:2.
[354] PL453 (2013 EIC Mobile Stations).
[355] PL1036 (2014 EIC Mobile Stations).

absence of direct notice to voters.[356]  SOS made no changes to the mobile EIC unit program in response to this letter.[357]

238.    For the cost of the EIC mobile units the state could have placed cameras in all 254 counties.[358]

239.    The Office of the Secretary of State has taken the position that issuance of EICs is not the responsibility of SOS and has not made any independent assessment of the success or failure of the EIC mobile unit program.[359]

### c.    Issuance of EICs at county offices has not been effective

240.    In approximately October 2013, after this litigation had commenced, DPS began entering into contracts with counties in which DPS did not maintain an office so that county officials could accept applications for EICs.[360]

241.    Notwithstanding the language of the contract, this arrangement is not authorized by SB 14 or any other Texas law.[361]

242.    Counties can voluntarily determine whether to accept applications for EICs and are under no legal obligation to offer EIC services.  Counties may unilaterally terminate their participation at any time.[362]

---

[356] PL292 (10/13/13 Letter from Elfant to Ingram); Ingram Dep. 105:23-107:7.
[357] Ingram Dep. 116:11-22.
[358] Trial Tr. 265:12-25 (Cornish) (Day 3).
[359] Ingram Dep. 122:15-124:8.
[360] PL282 (Interlocal Cooperation Contract); Ingram Dep. 84:3-84:2, 87:9-19.
[361] Peters Dep. 81:20-83:23; PL282 (Interlocal Cooperation Contract); Tex. Gov't Code §§ 791.001-.006 (authorizing local governments to contract for services); Tex. Transp. Code § 521.008 (authorizing a pilot program under which county employees may offer driver license, EIC and personal identification certificate services but limiting the program to counties in which DPS already maintains a presence and up to eight other counties of specified sizes).
[362] PL282 (Interlocal Cooperation Contract); Peters Dep. 91:12-23; Trial Tr. 366:9-24, 367:3-24 (Ingram) (Day 7).

243.     The SOS has no recourse if a county refuses to participate in the EIC program except to try to persuade the county to participate in the program.[363]

244.     Counties do not receive state funding or reimbursement for services related to acceptance of EIC applications.[364]  Having spent only $400,000 of its own money implementing SB 14, Texas has spent less than 5 cents per registered voter as compared to another state which has spent $1.25 per registered voter.[365] There is little, if any, documentation of Texas's spending on SB 14 implementation, including the State's development of EIC units.[366]

245.     Approximately 18 of 79 counties without driver license offices have declined to participate in the county EIC program.[367]  Several counties have pointed to a lack of facilities, funds, or staffing.[368]

246.     Counties select the locations and hours when they will accept EIC applications.[369]  There is no rule or regulation that requires county offices issuing EICs to offer Saturday hours.[370]

247.     The existence of a contract between DPS and a county does not establish that the county actually accepts EIC applications.  For example, Frio County, which DPS lists as accepting EIC applications, has never established any date or time when EIC applications would be made available or notified county residents that EIC applications are available.[371]

---

[363] Trial Tr. 366:9-368:17 (Ingram) (Day 7).
[364] PL282 (Interlocal Cooperation Contract); Peters Dep. 91:24-25; Trial Tr. 366:9-367:8 (Ingram) (Day 7).
[365] Trial Tr. 263:21-264:11 (Cornish) (Day 3).
[366] Trial Tr. 265:23-266:3 (Cornish) (Day 3).
[367] Peters Dep. 92:13-18; PL189 (County Locations Issuing EICs).
[368] Ingram Dep. 99:4-18, 101:18-102:9, 104:10-105:22; Peters Dep. 92:19-93:2; PL285 (9/26/13 Email from Jackson to Stephenson); PL287 (10/4/13 Email from Grim to Rodriguez); Newman Dep. 57:18-59:2.
[369] PL282 (Interlocal Cooperation Contract); Rodriguez Dep. 273:14-274; Trial Tr. 366:9-369:7 (Ingram) (Day 7).
[370] Peters Dep. 188:21-189:1.
[371] PL189 (County Locations Issuing EICs).

248.    Counties that accept EICs may arbitrarily limit the service to particular dates and times. For example, La Salle County accepts EIC applications only for two weeks preceding an election and then only on two Tuesdays from 9:00 a.m. to 3:00 p.m. and two Thursdays from 10:00 a.m. to 2:00 p.m.[372]  Similarly, although the Hansford County Tax Assessor-Collector's office is open between 8:00 a.m. and 4:45 p.m. on weekdays, it accepts EIC applications only between 8:00 a.m. and noon.[373]

249.    Counties may appoint an official to accept EIC applications whose job may be far removed from promoting participation in elections.  For example, in Edwards County, the only employee who accepts and processes EIC applications is the "dispatcher and temporary jailer."[374]

250.    In numerous counties designated by DPS as accepting EIC applications, the websites for the designated local officials do not mention that the official or their office will accept EIC applications.[375]

251.    According to officials in 44 of the 61 counties that DPS claims accept EICs, offices in those counties accepted only 31 complete EIC applications and 10 incomplete EIC applications from June 26, 2013, to June 27, 2014.[376]  DPS data indicate that county offices accepted 32

---

[372] PL500 ¶ 6 (Esqueda Decl. May 7, 2014).

[373] PL493 ¶ 6 (Cummings Decl., April 29, 2014).

[374] PL487 ¶¶ 3-4 (Ortiz Decl., May 5, 2014).

[375] PL189 (County Locations Issuing EICs); PL479 ¶¶ 3-4 (Cortelyou Decl., May 5, 2014); PL455 (Camp County Constable Website); PL509 ¶¶ 3-4 (Bennett Decl., May 19, 2014); PL460 (Oldham County JP Website); PL489 ¶¶ 3-4 (Jones Decl., May 19, 2014); PL458 (Franklin County Sheriff Website); PL516 ¶¶ 3-4 (Thomas Decl., May 6, 2014); PL461 (Somervell County Elections Website); PL484 ¶¶ 3-4 (Brookshire Decl., Apr. 21, 2014); PL456 (Delta County Judge Website); PL496 ¶¶ 3-4 (Hinojosa Decl., Apr. 25, 2014); PL459 (Hogg County Tax Assessor Website); PL485 ¶¶ 3-4 (Garcia Decl., Apr. 30, 2014); PL457 (Dimmit County Clerk Website).

[376] PL477 ¶ 7-8 (Pena Decl., May 19, 2014); PL478 ¶ 7-8 (Ohlendorf Decl., Apr. 21, 2014); PL479 ¶ 7-8 (Cortelyou Decl., May 5, 2014); PL480 ¶ 7-8 (Butler Decl., Apr. 30, 2014); PL481 ¶ 7-8 (Grim Decl., Apr. 22, 2014); PL482 ¶ 7-8 (Smith Decl., Apr. 28, 2014); PL483 ¶ 7-8 (Medley Decl., Apr. 28, 2014);

(Cont'd...)

complete EIC applications over a similar period but do not track applications rejected by county officials.[377]

252.    During this same period, only 10 counties received complete EIC applications, and at least one additional county received only an incomplete application.[378]

253.    Two counties, Duval and Jim Hogg, have accepted over 40% of the complete EIC applications accepted by county offices.[379]   At least 44 of the 61 counties listed by DPS as accepting EIC applications have received zero applications.[380]

        **3.**      **Obtaining an EIC is not cost free**

                **a.**      **EIC applications require submission of documents that cost money to obtain**

254.    An original applicant for an EIC must present one piece of "primary identification," two pieces of "secondary identification," or one piece of "secondary identification" and two pieces of

---

PL484 ¶ 7-8 (Brookshire Decl., April 21, 2014); PL485 ¶ 7-8 (Garcia Decl. June 9, 2014); PL486 ¶ 7-8 (Bazan Decl., May 19, 2014); PL487 ¶ 7-8 (Ortiz Decl., May 5, 2014); PL488 ¶ 8-9 (Bell Decl., May 13, 2014); PL489 ¶ 7-8 (Jones Decl., May 19, 2014); PL491 ¶ 7-8 (Duff Decl., Apr. 28, 2014); PL492 ¶ 11-12 (Altman Decl., May 15, 2014); PL493 ¶ 7-8 (Cummings Decl., April 29, 2014); PL494 ¶ 7-8 (Gray Decl., May 5, 2014); PL495 ¶ 7-8 (Williams Decl., Apr. 22, 2014); PL496 ¶ 7-8 (Hinojosa Decl., April 25, 2014); PL497 ¶ 7-8 (Opiela Decl., Apr. 22, 2014); PL498 ¶ 7-8 (Scogin Decl., Apr. 21, 2014); PL499 ¶ 7-8 (Timmons Decl., Apr. 17, 2014); PL500 ¶ 7-8 (Esqueda Decl., May 7, 2014); PL501 ¶ 7-8 (Fry Decl., Apr. 15, 2014); PL502 ¶ 7-8 (Powers Decl., Apr. 22, 2014); PL503 ¶ 7-8 (Willis Decl., Apr. 30, 2014); PL504 ¶ 7-8 (Parker Decl., Apr. 21, 2014); PL505 ¶ 7-8 (Jones Decl., Apr. 17, 2014); PL506 ¶ 7-8 (Sadovsky Decl., Apr. 29, 2014); PL507 ¶ 7-8 (Powell Decl., Apr. 21, 2014); PL508 ¶ 7-8 (Burks Decl., Apr. 28, 2014); PL509 ¶ 7-8 (Bennett Decl.); PL510 ¶ 7-8 (Hancock Decl., May 5, 2014); PL511 ¶ 7-8 (Woods Decl., May 9, 2014); PL512 ¶ 8-9 (Evans Decl., May 14, 2014); PL513 ¶ 7-8 (Mayfield Decl., Apr. 23, 2014); PL514 ¶ 7-8 (Askew Decl., Apr. 21, 2014); PL515 ¶ 7-8 (McAlister Decl., Apr. 28, 2014); PL516 ¶ 7-8 (Thomas Decl., May 10, 2014); PL1050 ¶ 7-8 (McDonald Decl., May 30, 2014); PL517 ¶ 9-10 (Moore Decl., May 9, 2014); PL518 ¶ 7-8 (Leyva Decl., May 12, 2014).
[377] PL462 (May 2014 Issuance Statistics).
[378] Citations collected in footnote 376, *supra*.
[379] Citations collected in footnote 376, *supra*.
[380] Citations collected in footnote 376, *supra*.

"supporting identification."[381]  Therefore, in order to obtain an EIC, a voter must present at least

one piece of either primary or secondary identification.

255.     During the development of these requirements, no consideration was given to whether it

would be difficult for an individual lacking SB 14 ID to obtain and present the documents

required to obtain an EIC.[382]

256.     Senior staff working for non-profits assisting low-income Texans with obtaining official

identifying documents testified that while the EIC can only be used for voting, the documentary

proof requirements made it just as complicated for low-income voters to obtain as the Texas

ID.[383]  For instance, Kristina Mora, a Senior Caseworker at one such non-profit, testified:  "Once

reviewing the documents that are required for the EIC, it was more clear to us . . . that . . . the

requirements for the Texas ID and for the EIC are very similar, if not the same as far as the

amount of barriers to obtaining those secondary documents.  And so, therefore, the value of

obtaining the EIC did not seem higher than using those efforts to obtain the Texas ID itself."[384]

257.     None of the forms of primary or secondary identification may be obtained for free.[385]

Thus, if a voter does not already possess the requisite forms of primary or secondary

identification, he or she must pay to obtain them.

258.     Primary identification consists only of a Texas driver license or personal identification

card that has been expired for 60 days but is within two years of the expiration date.[386]

---

[381] 37 Tex. Admin. Code § 15.182(1).
[382] Trial Tr. 254:3-13 (Rodriguez) (Day 6); Rodriguez Dep. 66:15-19, May 8, 2014.
[383] Trial Tr. 131:22-133:12 (Mora) (Day 2).
[384] Trial Tr. 132:19-25 (Mora) (Day 2).
[385] *Infra* ¶¶ 258-267.
[386] 37 Tex. Admin. Code § 15.182(2).

Obviously, a voter who does not already possess an expired Texas driver license or personal identification card cannot obtain one for the purpose of obtaining an EIC.

259.    Secondary identification consists of an original or certified copy of a birth certificate issued by the appropriate State Bureau of Vital Statistics or equivalent agency of one of the 50 states, a United States territory, or District of Columbia; an original or certified copy of a United States Department of State certification of birth; an original or certified copy of a court order of a U.S. court with name and date of birth (DOB) indicating an official change of name or gender; or U.S. citizenship or naturalization papers without an identifiable photo.[387]

260.    Approximately 68% of U.S. citizens in Texas were born in the State and—absent a name change or possession of an expired Texas ID— by operation of law any such individuals who apply for an EIC must, as part of that application, present a certified copy of a Texas birth certificate.[388]  In Texas, parents do not automatically receive a certified copy of a child's birth certificate when the child is born and there is no public assistance available with regard to obtaining a birth certificate.[389]  Moreover, although Texas requires that births be registered with the State, not every child born in Texas is actually registered within one year of birth.  After one year, parents are required to go through the Delayed Birth Certificate process, which costs a total of $47 and requires the submission of documents.[390]  Even after going through this process, an individual would still need to purchase a certified copy of the birth record.[391]

---

[387] *Id.* § 15.182(3).
[388] PL228 (ACS 08-12 tbl. B05002); Trial Tr. 395:20-396:15 (Farinelli) (Day 6).
[389] Trial Tr. 317:23-318:4, 363:24-364:4 (Farinelli) (Day 6).
[390] Trial Tr. 364:5-18 (Farinelli) (Day 6).
[391] Trial Tr. 364:24-365:7 (Farinelli) (Day 6).

261.    The basic fee to obtain a certified copy of a Texas birth record is $22, including a $20 in search and copy fees and a $2 statutory surcharge.[392]  An additional fee of $5 is charged for expedited service, an $8 fee is charged to have a birth record sent by overnight mail to the requestor, and a small credit processing fee is charged for online requests.[393]

262.    If an individual requests a certified birth record from a local registrar or county clerk, that office may charge an additional $1 fee.[394]

263.    If an individual does not possess the underlying forms of identification required to obtain a birth certificate, and if that individual cannot rely on a family member to request a birth certificate on his or her behalf, then the DHS recommends that the individual either purchase a birth certificate through a third-party vendor or retain a lawyer to file for a certificate—both options require additional costs and fees.[395]

264.    Approximately 25% of U.S. citizens residing in Texas were born in the United States or U.S. territories but outside of Texas and—absent a name change or possession of an expired Texas ID—any such individuals who apply for an EIC must present a birth certificate from outside Texas from their state or territory of birth.[396]  The cost of a certified copy of a birth certificate from other U.S. states or territories ranges in price from $5 (American Samoa) to $34 (Michigan).[397]  States neighboring Texas charge between $10 and $15.[398]  Eighteen states also require that applicants include a valid photo ID with their request.[399]

---

[392] 25 Tex. Admin. Code § 181.22(a), (c), (g), (s); Trial Tr. 366:12-16 (Farinelli) (Day 6).
[393] 25 Tex. Admin. Code § 181.22(q); Trial Tr. 366:17-367:1 (Farinelli) (Day 6).
[394] Tex. Health & Safety Code § 191.0045(h); Trial Tr. 367:7-13 (Farinelli) (Day 6).
[395] Trial Tr. 121:5-11, 121:18-21 (Mora) (Day 2).
[396] PL228 (ACS 08-12 tbl. B05002); Trial Tr. 395:20-396:25 (Farinelli) (Day 6).
[397] PL474 at 5, 31 (CDC Vital Statistics Guide).
[398] PL474 at 7, 27, 44, 52 (CDC Vital Statistics Guide).
[399] PL474 (CDC Vital Statistics Guide).

265.    Approximately 1% of American citizens residing in Texas were born abroad of American parents and—absent a name change or possession of an expired Texas ID—any such individuals who apply for an EIC must present a United States Department of State certification of birth.[400] A certified copy of a Department of State certification of birth costs $50 and must be requested via a notarized application.[401]

266.    Approximately 6% of American citizens residing in Texas are naturalized U.S. citizens and—absent a name change or possession of an expired Texas ID—any such individuals who apply for an EIC must present a citizenship certificate.[402]  A replacement copy of a certificate of citizenship costs $345.[403]

267.    Voters who have changed their name or gender by order of a Texas court may obtain a copy of a court order to that effect by requesting the order directly from the issuing court and paying one dollar per page plus a five-dollar search fee.[404]  The underlying petition for an official change of name or gender must be notarized and accompanied by a complete set of the petitioner's fingerprints,[405] and appears to require at least $152 in mandatory fees.[406]  For those Texas voters whose names were changed by order of a court outside of Texas, the cost of obtaining that court order varies by state.

---

[400] PL228 (ACS 08-12 tbl. B05002).
[401] PL467 (DOS FS-240).
[402] PL228 (ACS 08-12 tbl. B05002).
[403] PL891 (USCIS N-565 Instructions).
[404] Tex. Gov't Code § 51.318(b).
[405] Tex. Fam. Code §§ 45.101-.102.
[406] Tex. Gov't Code § 51.317(b)(1), (4); Tex. Local Gov't Code §§ 133.151, .152, .154.

268.    SB 14 does not require that employers offer paid leave to allow an employee time to obtain an EIC and neither does SB 14 provide any reimbursement for expenses incurred to acquire an EIC.[407]

269.    Supporting identification includes numerous forms of identification including a voter registration card, school records, medical records, or a Social Security card.[408]

270.    Many restrictions on the use of particular documents as supporting identification lack a rational basis and could not be explained by DPS, such as the requirement that an insurance policy be at least two years old and inconsistent rules concerning expiration dates.[409]

271.    The names on underlying documentation must match the name to be placed on an EIC, rendering a birth certificate issued to an individual who has changed his or her name since birth – including, most notably, individuals who took their spouse's name when they married – insufficient to establish identity independently.[410]  The costs of obtaining additional documents, such as certified copies of marriage licenses, are extremely high; in some counties, those fees exceed $30.[411]

272.    Numerous individuals who have applied for an EIC have been rejected for failure to present sufficient documentation, including a voter who informed DPS that he never had a birth certificate.[412]

273.    The experience of Sammie Bates, an African-American citizen from Round Rock, Texas is illustrative.  In November 2013, Ms. Bates attempted to vote for the first time under the

---

[407] PL016 (SB 14); PL034 (Tex. H.J., 82d Leg., Regular Sess., at 1009-1012 (40th Day)).
[408] 37 Tex. Admin. Code § 15.182(3).
[409] Peters Dep. 53:7-54:9.
[410] Rodriguez Dep. 88:4-25.
[411] PL795 (Carson County Clerk Fees for Official Public Records); PL836 (Walker County Clerk Vital Records Fee Schedule).
[412] PL447; PL386 (List of Invalid EIC Applications); PL475 (9/16/13 Email from Silva to Rodriguez).

requirements of SB 14.  At that time, she did not have photo identification issued by the State of Texas, nor any other form of ID required by SB 14, but instead only her photo ID from her previous state of residence, Illinois, and her Texas voter registration card.[413]

274.     When Ms. Bates attempted to vote, she was told that she did not have the proper photo ID to cast a regular ballot, and instead would have to vote provisionally. She was told that after casting her provisional ballot, she would have a certain number of days after the election to present a Texas photo ID in order to get her vote counted.  Ms. Bates was unable to obtain a Texas photo ID in the requisite time to cure her provisional ballot and ensure it was counted.[414]

275.     After her experience at the polls, Ms. Bates attempted to get a copy of her birth certificate from the State of Mississippi, where she was born, so that she could thereafter obtain a Texas photo ID.  In order to obtain a copy of her birth certificate, Ms. Bates first had to save up $42 to order the birth certificate, a burden on her family which lives on a school bus driver salary and social security.[415]  Ms. Bates could not immediately obtain her birth certificate in part because she had to spend her limited funds on more pressing concerns. She testified that, "we couldn't eat the birth certificate . . . and we couldn't pay rent with the birth certificate."[416]

> **b.     The cost to obtain a Texas birth certificate can be significant, and the procedure cumbersome**

276.     Individual voters who lack SB 14 ID, as well as employees of non-profit organizations that assist individuals in obtaining government-issued identification, have testified that

---

[413] Bates Dep. at 13:19-24, 22:3-15.
[414] Bates Dep. at 12:19-13:6, 14:2-8; PL1090 (Bates Video Excerpts).
[415] Bates Dep. at 15:12-16:9, 16:10-17; PL1090 (Bates Video 9:30-11:52).
[416] Bates Dep. at 16:13-17:10; PL1090 (Bates Video Excerpts).

purchasing a certified birth certificate for approximately $22 constitutes a significant financial burden for low-income voters.[417]

277.    Even though the state has in other contexts waived costs for acquiring a certified copy of a birth record,[418] SB 14 does not provide for waiver of fees to obtain a certified copy of a Texas birth record needed to apply for an EIC.[419]  The Texas House and Texas Senate rejected amendments that would have provided for such a waiver.[420]

278.    Requests for a certified copy of a Texas birth record may be made online, by mail, in person at the Austin Office of the Department of State Health Services, in person at a remote issuance site, or in person at the office of the local birth registrar with jurisdiction over the location of the individual's birth.[421]

279.    To apply online for a certified Texas birth record, one must submit a valid driver license or personal identification issued by Texas or another state.[422]

280.    To apply by mail or in person for that record, one must submit an enumerated form of valid government-issued photo ID (not including student ID) or multiple enumerated forms of secondary and supporting identification.[423]  Many of the forms of ID that the State has

---

[417] *See supra* ¶¶ 158-170; Eagleton Dep. 18:6-21:5, 27:8-28:13, 52:9-53:25, 88:22-89:6, 106:5-19, 121:22-123:14; PL1095 (Eagleton Video Excerpts); Holmes Dep. 36:2-15; PL1094 (Holmes Video Excerpts).
[418] Trial Tr. 372:22-373:3 (Farinelli) (Day 6).
[419] PL001 (SB 14); Trial Tr. 372:25-373:21 (Farinelli) (Day 6).
[420] PL011 (Tex. Sen. J., 82d Leg., Regular Sess., at 118 (5th Day Continued)); PL034 (Tex. H.J., 82d Leg., Regular Sess., at 969 (40th Day)); Trial Tr. 372:8-11, 372:15-20 (Farinelli) (Day 6).
[421] Trial Tr. 367:14-368:3, 375:9-12, 375:18-22, 376:21-24 (Farinelli) (Day 6).
[422] Trial Tr. 367:14-24 (Farinelli) (Day 6).
[423] 25 Tex. Admin. § 181.28(i); Trial Tr. 120:5-17 (Mora) (Day 2); Trial Tr. 367:25-368:4 (Farinelli) (Day 6).

determined are sufficient to establish identity for purposes of obtaining a birth certificate are not considered sufficient to establish identity for purposes of voting.[424]

281.    Voters who are applying for a birth certificate in order to apply for an EIC often will not possess the required primary or secondary identification, trapping them in a circular set of rules that leaves them unable to obtain SB 14 ID.[425]

282.    It is not possible to apply for a copy of a Texas birth record online or by mail and receive it during the six-day provisional ballot cure period.[426]

283.    In order for an individual to obtain a certified copy of a Texas birth record in person, an individual must travel to the Austin Office of the Department of State Health Services, to a birth registrar connected to the remote access system, or to the office of the birth registrar with jurisdiction over their place of birth.[427]

284.    There are 85 counties in Texas in which there is no remote access office, and there are no more than five remote access sites in any county, although some access sites have sub-offices not listed by the Texas Department of State Health Services.[428]

### c.    The Election Identification Birth Certificate program is not successful

285.    The election identification birth certificate program, a partial fee waiver program for individuals seeking a copy of their birth certificate for the purpose of applying for an EIC, has

---

[424] Trial Tr. 369:3-370:20 (Farinelli) (Day 6).
[425] PL758 ¶ 87 (Burden Corr. Rep.); Trial Tr. 315:24-317:9 (Burden) (Day 3).
[426] Farinelli Dep. 75:16-19, 77:8-11.
[427] Trial Tr. 375:7-376:24 (Farinelli) (Day 6).
[428] PL223 (Remote Access Sites); Trial Tr. 375:23-376:10 (Farinelli) (Day 6).

not successfully alleviated the costs associated with obtaining a birth certificate needed to apply for an EIC.[429]

286.   As of May 2014, only 60 election identification birth certificates had been issued.  None had been issued from the Austin Office of the Department of State Health Services.[430]

287.   The State of Texas has discussed the availability of a reduced price election identification birth certificate more in this litigation than it has advertised it to the population that has need for such a document.[431]

288.   None of the voters who testified in this litigation—including voters who needed to obtain a birth certificate in order to apply for an EIC—knew that they could obtain an election identification birth certificate at a defrayed cost prior to their involvement in this litigation.[432] Witnesses who work for organizations that provide assistance to low-income individuals seeking to obtain identification documents were also unaware of the reduced price.[433]  Even county election officials have been unaware of the program.  Even a county election official was unaware of the program.[434]

289.   After the commencement of this litigation, the Department of State Health Services proposed an amendment to Section 181.22 of Title 25 of the Texas Administrative Code to waive

---

[429] *Infra* ¶¶ 286-305.
[430] Trial Tr. 393:7-10 (Farinelli) (Day 6).
[431] Mot. to Dismiss at 29 (ECF No. 52); Corr. Answer ¶ 24 (ECF No. 417); PL758 ¶ 86 (Burden Corr. Rep); Trial Tr. 390:15-393:6 (Farinelli) (Day 6).
[432] Trial Tr. 172:10-14 (Day 6); Holmes Dep. 36:11-15; PL1094 (Holmes Video Excerpts); Espinoza Dep. 35:4-6; Mendez Dep. 21:14-20; Maximina Lara Dep. 55:7-11.
[433] Trial Tr. 133:13-134:2 (Mora) (Day 2).
[434] Newman Dep. 47:5-47:11.

all fees for a certified birth record where an applicant represents that the certified record is required for the purpose of obtaining an EIC.[435]

290.    This proposal received substantial criticism from numerous local officials, who expressed concerns about the potential fiscal impact of the proposed rule, including the cost of security paper required for certified birth certificates, costs relating to staff resources and training needed to process the birth certificates, and the loss of county revenue, and declared the proposal to be an unfunded mandate.[436]

291.    The final promulgated rule provides for waiver of administrative search and copying costs but does not waive the $2 statutory surcharge or the $1 local registrar fee.[437]

292.    In order to administer the rule, the Department of State Health Services created a new form of birth certificate, the election identification birth certificate.  An election identification birth certificate is valid only for the purpose of obtaining an EIC and bears the notation "FOR ELECTION PURPOSES ONLY CANNOT BE USED AS IDENTIFICATION."[438]

293.    An individual may only obtain an election identification birth certificate in person and cannot apply for one online or by mail.[439]  Therefore, an individual seeking to obtain an election identification birth certificate—who by definition does not have a Texas driver license (since if

---

[435] PL215 at 2 (Proposed Rules, 38 Tex. Reg. 5416, 5417 (Aug. 23, 2013)).
[436] PL216 at 2 (Adopted Rules, 38 Tex. Reg. 7307, 7308 (Oct. 18, 2013)); *see also, e.g.*, PL452 (Letter from Stacey Kemp, Collin County Clerk, to Lisa Hernandez, Texas Department of State Health Services (Sept. 19, 2013)); PL446 (Email from Paula Faris, Williamson County Clerk, to Office of General Counsel, Department of State Health Services (Sept. 20, 2013)).
[437] 25 Tex. Admin. § 181.22(t); PL216 at 2 (Vital Statistics, 38 Tex. Reg. 7307, 7308 (Oct. 18, 2013)); Trial Tr. 331:3-14 (Farinelli) (Day 6).
[438] PL449 (Sample Election Identification Birth Certificate); Trial Tr. 400:12-401:9 (Farinelli) (Day 6).
[439] PL216 at 3 (Adopted Rules, 38 Tex. Reg. 7307, 7309 (Oct. 18, 2013)); Trial Tr. 374:3-6 (Farinelli) (Day 6).

she had one, she would not need the EIC birth certificate to obtain an EIC)—must arrange for travel and incur travel costs, which may include lost wages.[440]

294.    Unlike an ordinary birth certificate, an individual may only apply for an election identification birth certificate on his or her own behalf.  This eliminates the possibility that a relative with identification needed to complete the application may apply on his or her behalf and restricts the practical availability of an election identification birth certificate in a way that makes it difficult for the population that needs it to obtain one.[441]

295.    The election identification birth certificate application that is available in the offices of local registrars states, "APPLICATIONS WITHOUT PHOTO IDENTIFICATION WILL NOT BE PROCESSED," although the State has committed to updating the form.[442]  This has likely deterred the population that needs an election identification birth certificate from requesting one and may continue to do so until the form is removed from circulation, as most people who need an election identification birth certificate will not have a photo ID.[443]  The application is also not available in Spanish.[444]  Although the state claims to have fixed this error since the commencement of trial, the form used in offices throughout the state likely still contains this misstatement.[445]

---

[440] Trial Tr. 397:16-398:15 (Farinelli) (Day 6).
[441] Trial Tr. 380:9-17, 381:1-11 (Farinelli) (Day 6).
[442] PL221 (Election Identification Birth Certificate Application); Trial Tr. 382:23-383:17 (Farinelli) (Day 6)
[443] Trial Tr. 383:19-384:2 (Farinelli) (Day 6).
[444] Trial Tr. 384:3-5 (Farinelli) (Day 6).
[445] Trial Tr. 383:7-17 (Farinelli) (Day 6).

296.    The limitation on use of an election identification birth certificate reduces incentives for a voter to obtain or gather documents, travel to a remote access site, and pay the fee because an individual will not be able to use the birth certificate for other purposes.[446]

297.    There has been no effort to educate individuals who need an EIC and do not have a copy of their birth certificate that election identification birth certificates are available at a reduced price, including individuals who have attempted to apply for an EIC but were unable to do so because they lacked necessary documentation.[447]

298.    The Department of State Health Services has issued no press releases to advertise the availability of election identification birth certificates, has engaged in no other media outreach concerning this program, and has posted no notice that these reduced-cost birth certificates are available.[448]   Several days after the start of trial—and the day before offering a witness to testify concerning birth certificate availability—the State did hastily post a public-facing webpage concerning election identification birth certificates. [449]

299.    There are no notices posted concerning the availability of election identification birth certificates at remote birth certificate access sites or local birth registration offices and no required procedures mandating that local offices ask an applicant why they are obtaining a birth certificate or informing applicants that election identification birth certificates are available.[450]

300.    Producing an election identification birth certificate costs remote access sites money, and local officials have a financial incentive not to let individual voters know that they may obtain a

---

[446] Trial Tr. 398:5-15 (Farinelli) (Day 6).
[447] Trial Tr. 390:2-14(Farinelli) (Day 6).
[448] Trial Tr. 384:6-17, 390:2-393:6 (Farinelli) (Day 6).
[449] Trial Tr. 390:15-393:6 (Farinelli) (Day 6).
[450] Trial Tr. 384:10-17, 389:2-6 (Farinelli) (Day 6).

birth certificate at a reduced cost.[451]  County offices do not have procedures in place to notify voters that election identification birth certificates are available, and one county official has explained that a voter must specifically request an election identification birth certificate and that clerks will not inform voters that this document is available at a reduced price.[452]

301.     The Department of State Health Services has no plan to assess the success of this program or to alter it.[453]

302.     DPS considered and rejected verifying birth records directly from the Department of State Health Services vital statistics database.[454]

303.     A similar connection has been established between the Department of State Health Services and the Social Security Administration, and there is no technical or legal impediment to providing access via a web-based login.[455]

304.     Connecting DPS directly to the vital statistics database would have reduced the cost of obtaining an EIC by eliminating the need for Texas-born voters to travel to a separate office and to pay for either a birth certificate or an election identification birth certificate.[456]

305.     DPS also developed an affidavit that could be used by voters who were unable to provide an original or certified copy of a birth certificate but ultimately rejected this alternative.[457]

---

[451] Trial Tr. 385:18-386:15 (Farinelli) (Day 6); Trial Tr. 169:3-12 (Guidry) (Day 8).
[452] Trial Tr. 384:18-385:13 (Farinelli) (Day 6); Trial Tr. 169:3-12, 171:24-172:8 (Guidry) (Day 8); Guidry Dep. 77:20-78:17, 97:3-11.
[453] Trial Tr. 391:17-20 (Farinelli) (Day 6).
[454] PL227 (Email from Joe Peters to Robert Bodisch (Aug. 7, 2013)); Trial Tr. 147:18-148:8 (Peters) (Day 6); Trial Tr. 393:25-395:19 (Farinelli) (Day 6).
[455] Peters Dep. 97:1-6; Trial Tr. 393:25-395:19 (Farinelli) (Day 6).
[456] Trial Tr. 148:9-13 (Peters) (Day 6).
[457] Peters Dep. 98:5-100:6; PL348 (Birth Certificate Affidavit).

### 4.    DPS also requires EIC applicants to submit documentary proof of citizenship

306.    Texans are not required to present documentary proof of citizenship in order to register to vote; a voter is only required to sign an application that affirms citizenship.[458]

307.    DPS regulations do not require individuals to provide documentary proof of citizenship in order to apply for an EIC.[459]

308.    Nonetheless, if an EIC applicant presents primary or secondary identification that does not establish citizenship, DPS requires that the applicant to produce additional documentary proof of citizenship.[460]

309.    DPS has declined to issue EICs to potential applicants who did not present documentary proof of U.S. Citizenship.[461]

310.    A Texas driver license or personal ID card that has expired for more than 60 days but less than two years, a court order indicating an official change of name, and a court order indicating an official change of gender are each insufficient to establish citizenship.[462]

311.    The requirement to present documentary proof of citizenship in order to obtain an EIC is an additional requirement not imposed on individuals who apply for a concealed handgun license and one that has not yet been imposed on the vast majority of individuals who possess Texas drivers licenses or personal identification cards.  Indeed, some individuals who possess Texas driver licenses and personal identification cards will not have to satisfy the documentary proof of legal residency requirement until 2017.

---

[458] Tex. Elec. Code § 13.002(b), (c)(3); Trial Tr. 355:2-10 (Ingram) (Day 7).
[459] 37 Tex. Admin. Code § 15.182.
[460] Rodriguez Dep. 61:6-21, 69:1-18, 72:1-5, 74:3-11, 74:13-75:6; PL476 (EIC Documentation Requirements); Trial Tr. 354:22-355:1 (Ingram) Day 7); Trial Tr. 142:3-8 (Peters) (Day 6).
[461] PL473 at 3 (EIC Region 3 Report Oct 21-26).
[462] Rodriguez Dep. 69:1-4, 74:6-11.

312.    Senior staff working for non-profits assisting low-income Texans with obtaining official identifying documents testified that while the EIC can only be used for voting, the documentary proof requirements made it just as complicated for low-income voters to obtain as the Texas ID.[463]  For instance, Kristina Mora, a Senior Caseworker at one such non-profit, testified:  "Once reviewing the documents that are required for the EIC, it was more clear to us . . . that  . . . the requirements for the Texas ID and for the EIC are very similar, if not the same as far as the amount of barriers to obtaining those secondary documents.  And so, therefore, the value of obtaining the EIC did not seem higher than using those efforts to obtain the Texas ID itself."[464]

### 5.    Entrusting the EIC program with DPS, a law enforcement agency, deters individuals from seeking an EIC

313.    In SB 14, the Legislature vested responsibility for the EIC program with DPS, a law enforcement agency with no mission or experience related to voting.[465]  Predictably, DPS has administered this responsibility as a law enforcement agency, without considering the potential impacts of any of its decisions on voters.[466]

314.    SB 14 states that DPS "may require each applicant for an original or renewal election identification certificate to furnish to the department the information required by Section 521.142" of the Texas Transportation Code.  This provision gives DPS broad authority to determine the requirements for EICs.  Section 521.142, while listing several application requirements for driver licenses, also provides "[t]he application must include any other information [DPS] requires to determine the applicant's identity, competency, and eligibility."[467]

---

[463] Trial Tr. 131:22-133:12 (Mora) (Day 2).
[464] Trial Tr. 132:19-25 (Mora) (Day 2).
[465] Tex. Elec. Code § 63.0101; Tex. Transp. Code § 521A.001.
[466] Gipson Dep. 73:15-17; Ingram Dep. 35:16-36:25.
[467] Tex. Transp. Code §§ 521A.001, 521.142.

315.    Law enforcement officers are generally present at DPS driver license offices, particularly in urban areas.[468]  Even when offices are only open to issue EICs, DPS officials have requested that troopers be on site "for presence."[469]

316.    DPS runs a warrant check when individuals apply for driver licenses or personal identification cards and—if any outstanding warrant is found—will typically take the applicant into custody as soon as the applicant steps outside of the office.[470]  DPS has offered conflicting information to the public concerning whether a warrant check will be run on an EIC applicant, although current policy is said to be that DPS will not do so.[471]

317.    DPS is aware of a public perception that interactions with DPS will trigger a warrant check and that some Texans are afraid to visit a DPS office because they don't know if they have an outstanding warrant.[472]  Although acknowledging that this public perception exists among potential EIC applicants, DPS has taken no official steps to combat it.[473]  Voter registration applicants, by contrast, are not subject to warrant checks.[474]

318.    DPS's EIC regulations require EIC applicants to submit fingerprints.[475]  Voter registration applicants, on the other hand, need not provide fingerprints to register to vote.[476]

---

[468] Rodriguez Dep. 93:22-94:3; Peters Dep. 67:5-68:2; Trial Tr. 145:10-15 (Peters) (Day 6); Trial Tr. 357:12-14 (Ingram) (Day 7); Trial Tr. 257:12-259:10 (Rodriguez) (Day 6).
[469] PL396 (9/9/13 Email from Tony Rodriguez to Jose Rodriguez); Trial Tr. 258:11-259:1 (Rodriguez) (Day 6).
[470] Gipson Dep. 34:12-22, 72:25-73:14; PL699 (Email Sep. 18, 2013 from Bodisch to McCraw re: warrant checks); PL445 (7/23/14 Peters Email).
[471] PL345 (Fort Worth Star Telegram, No Warrant Worries); Peters Dep. 60:18-64:6.
[472] Peters Dep. 61:1-63:8; Trial Tr. 145:5-12 (Peters) (Day 6); Gipson Dep. 74:12-20.
[473] Trial Tr. 144:17-145:15 (Peters) (Day 6).
[474] Ingram Dep. 44:10-14.
[475] 37 Tex. Admin. Code § 15.183(3); Trial Tr. 143:25-144:6 (Peters) (Day 6); Rodriguez Dep. 86:4-8; Trial Tr. 256:7-25 (Peters) (Day 6).
[476] Trial Tr. 357:4-6 (Ingram) (Day 7).

319.    Until approximately September 2013, EIC applicants were required to provide fingerprints.[477] In approximately September 2013, officials from the Office of the Secretary of State requested that DPS stop fingerprinting EIC applicants, but DPS resisted suspending the taking of fingerprints because DPS wished to collect the data.[478]

320.    DPS has now officially suspended the fingerprinting program, but it has not altered its regulations and has no intention of doing so,[479] and has the discretion to start fingerprinting EIC applicants again at any time.[480]  DPS also cannot confirm that every driver license office has ceased requiring fingerprints from EIC applicants.[481]  DPS could not identify any specific notices or press releases by which it had informed the public that it has stopped collecting fingerprints from EIC applicants, and it does not post signage informing EIC applicants that their fingerprints will not be taken.[482]  When asked whether he was surprised that DPS fingerprinted EIC applicants, Dan Patrick, a leading supporter and cosponsor of SB 14, testified that he was not surprised.[483]  Prompted to address whether it was appropriate to fingerprint EIC applicants, Patrick testified, "You could back that down and say, 'Is it appropriate to make someone give a fingerprint to get a driver's license?' We're trying to establish to be sure that we have integrity at the ballot box."[484]

321.    DPS did not consider the difficulty or ease of obtaining particular documents when it established the requirements to apply for an EIC.  The list of required documents was modeled

---

[477] Rodriguez Dep. 86:4-14; Peters Dep. 57:23-59:5; Trial Tr. 355:11-16 (Ingram) (Day 7); Trial Tr. 257:12-259:10 (Rodriguez) (Day 6).
[478] Ingram Dep. 36:3-25, 38:16-40:15; Trial Tr. 355:17-356:17 (Ingram) (Day 7).
[479] Trial Tr. 144:23-145:4 (Peters) (Day 6); Peters Dep. 65:6-66:11.
[480] Trial Tr. 144:23-145:1 (Peters) (Day 6).
[481] Peters Dep. 59:6-24.
[482] Peters Dep. 66:12-24; Rodriguez Dep. 84:6-14; Gipson Dep. 35:3-36:3.
[483] Trial Tr. 304:17-21 (Patrick) (Day 7).
[484] Trial Tr. 304:22-305:13 (Patrick) (Day 7).

on requirements for a driver license for administrative convenience and not to benefit EIC

applicants.[485]

322.    The application for an EIC mirrors the application for a Texas driver license in order to

minimize training requirements for DPS customer service representatives.[486]  DPS also collects

and maintains information about EIC applicants—including physical description, mother's

maiden name, and father's last name—that is not included on the face of an issued EIC.[487]

323.    DPS did not consider how long it would take applicants to complete the application or

whether requesting information unrelated to EIC eligibility would deter voters from applying for

an EIC.[488]

324.    DPS has told at least one EIC applicant that he or she was required to surrender an out-

of-state driver license in order to apply for an EIC.  Current policy is not to require the surrender

of out-of-state driver licenses, although this policy has not been publicized.[489]

325.    Voters must surrender qualifying IDs, such as a driver license, if they wish to obtain an

EIC.[490]

326.    Before issuing an EIC, DPS checks its databases to confirm that the applicant does not

already possess a Texas driver license or personal identification card.[491]  The DPS driver license

database does not contain a field to indicate whether an individual's driver license has been

---

[485] Rodriguez Dep. 66:15-67:19; Trial Tr. 138:18-140:4, 254:3-13 (Peters, Rodriguez) (Day 6); Peters
Dep. 42:2-44:10.
[486] Rodriguez Dep. 25:12-26:4, 26:22-27:3, 37:15-24; Trial Tr. 253:23-254:2 (Rodriguez) (Day 6).
[487] Rodriguez Dep. 29:24-33:22, 34:1-4, 36:8-10.
[488] Rodriguez Dep. 29:12-14, 39:25-40:21.
[489] Rodriguez Dep. 99:2-100:15; PL377 (10/24/13 Email from Flores to Rodriguez).
[490] Rodriguez Dep. 28:12-15; Trial Tr. 137:20-138:5 (Peters) (Day 6); Peters Dep. 255:20-256:8.
[491] Rodriguez Dep. 91:19-92:2.

confiscated.  Consequently, individuals whose driver license has been confiscated will appear to have SB 14 qualifying ID and be ineligible for an EIC.[492]

327.    Voters testified that they were intimidated or fearful of traveling to the DPS to obtain ID.[493]

328.    Edcouch City Councilmember Daniel Guzman, who represents a predominantly Latino and socioeconomically depressed community in Hidalgo County, testified that when he offered to transport voters who did not have SB 14 IDs to DPS, many refused to go with him for fear of what would happen to them at DPS.[494]  He explained: "Some people are hesitant to step into a Department of Public Safety office where you have state troopers.  Some people are afraid that they might owe citations.  Some people are afraid that they owe child support and their names are going to get run once they go get an I.D. card and get arrested on the spot. . ."[495]

329.    The Secretary of State's office, the state agency responsible for managing voter registration, has little role to play in ensuring that validly registered voters have access to SB 14-compliant IDs. The Secretary of State's office cannot force DPS to implement policies maximizing the availability of EICs. In fact, Keith Ingram testified that "[t]he very day that we can tell DPS to do anything and they do it will be a very good day."[496]

---

[492] PL1034 (Defs.' Responses to Pls. 3d Interrogs.) (Response 1).
[493] Trial Tr. 368:15-22, 372:2-9 (Guzman) (Day 3); Bingham Dep. 39:5-23; PL1091 (Bingham Video Excerpts); Sanchez Dep. 8:23-9:21, see also Sanchez Dep. 30:4-32:9.
[494] Trial Tr. 368:15-22, 371:13-372:9 (Guzman) (Day 3).
[495] Trial Tr. 368:15-22 (Guzman) (Day 3).
[496] Trial Tr. 355:17-21 (Ingram) (Day 7); Trial Tr. 285:23-25 (Rodriguez) (Day 6).

330.    DPS did not coordinate with the Secretary of State's Office before promulgating its EIC regulations.[497] Tony Rodriguez testified that he is not familiar with the Secretary of State's website.[498]

331.    Even though, in theory, all validly registered voters should possess SB 14 compliant IDs, validly registered voters cannot receive SB 14 compliant ID at voter registration offices.[499] Compared to DPS offices, which are often inaccessible for those reliant on public transportation,[500] many voter registration offices are conveniently located near city centers, easy to visit on multi-function trips.

### 6.    Texas has failed to inform the public about EICs

332.    Education efforts concerning EICs are not targeted to reach those voters who are likely to need them, or the elected officials and candidates who expend resources to ensure registered voters are able to cast ballots.[501]

333.    SB 14 requires the Secretary of State to conduct a statewide effort to educate voters regarding the identification requirements for voting prescribed by the law.[502]

334.    The Texas House of Representatives passed an amendment to SB 14 requiring that this education effort include education targeted at low-income and minority voters.[503]  This amendment was removed in the conference committee and was not included in the enacted bill.[504]

---

[497] Trial Tr. 287:14-288:1 (Rodriguez) (Day 6).
[498] Trial Tr. 219:17-21, 310:9-14 (Rodriguez) (Day 6).
[499] Trial Tr. 255:8-256:5 (Rodriguez) (Day 6).
[500] Trial Tr. 95:14-24 (Chatman) (Day 5).
[501] *Infra* ¶¶ 333-343; Trial Tr. 374:21-375:8 (Guzman) (Day 3).
[502] Tex. Elec. Code § 31.012(b).
[503] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 982 (40th Day)).
[504] PL001 (SB 14).

335.    DPS takes the position that it is under no legal obligation to publicize the availability of EICs and has no plans to target such efforts towards particular communities that may have a greater need for EICs, including Hispanic or African-American voters.[505]

336.    DPS has no experience in educating voters concerning the election process and has not conducted outreach, research, or analysis concerning effective communication to the population who may need to obtain SB 14 ID in order to vote.[506]

337.    DPS has no budget for publicizing information about EICs—including time-sensitive information regarding temporary facilities—and has not bought any paid media to advertise where and when EICs are available.[507]  DPS has largely relied on press releases and messages broadcast to individuals who have elected to follow DPS on Twitter or Facebook.[508]

338.    DPS issues local press releases concerning temporary DPS locations three to five days in advance of the operations but does not track whether the information in press releases is actually published in local media, notwithstanding that this is the only means by which times and locations are broadly advertised.[509]

339.    The DPS website homepage makes no reference to EICs.  To navigate to the page that provides information about EICs, the website user must first click on the "Driver License" tab, and then from a drop-down list of options under "New Driver Licenses and ID Cards," select "Apply for an Election Identification Certificate.[510]

---

[505] Peters Dep. 294:2-12; Cesinger Dep. 49:30-50:6, 90.
[506] Cesinger Dep. 46:7-47:12, 62:20-62:22, 89:4-90:17, 111:1-111:12.
[507] Cesinger Dep. 50:7-50:22, 109:3-109:9; Trial Tr. 259:1-11 (Cornish) (Day 3) (Cornish testifying that "DPS received no additional funding relating to the issuance of the EICs" and that funding to assist in the issuance of EICs through mobile units came from their general funds).
[508] Cesinger Dep. at 37:23-38:7, 40:23-41:5, 43:4-43:25, 52:3-53:10, 55:25-56:13, 61:21-62:5.
[509] Id. at 48-49, 86-87, 111; Trial Tr. 156:18-157:2 (Peters) (Day 6); Peters Dep. 280:24-281:25.
[510] Cesinger Dep. 63:15-64:20; Texas Department of Public Safety, http://www.dps.texas.gov/.

340.    DPS publicizes the county-run mobile EIC stations through a document on its website and press releases that list all such counties along with contact information but do not provide locations, dates, or times when EICs are available from county offices.[511]

341.    County officials have not announced or advertised the availability of EICs in their counties, or otherwise provided information to persons seeking out such information.[512]

342.    No DPS press releases or online documents have been produced in Spanish.[513] Applications for an EIC were not available in Spanish until more than two months after SB 14 went into effect, and are not available in Spanish on the DPS website.[514]

343.    DPS has no policy or requirements to ensure that employees who speak Spanish are present to assist voters with limited English proficiency.[515]

## IX.   SB 14 IDS ISSUED BY FEDERAL GOVERNMENT ARE OF LIMITED AVAILABILITY AND ARE COSTLY

344.    The three forms of federal identification that voters may use to establish identity under SB 14—a U.S. military ID card that contains the person's photograph, a U.S. citizenship certificate that contains the person's photograph, or a U.S. passport—are either expensive or unavailable to most voters.[516]

---

[511] PL189 (County Locations Issuing EICs); Cesinger Dep. 51:7-55:5.
[512] Stanart Dep. 50:22-53:9, 127:11-134:11, June 17, 2014; Newman Dep. 27:22-24, July 24, 2014; Trial Tr. 38:12-39:18 (Jewell) (Day 5).
[513] Cesinger Dep. 55:10-55:20, 59:2-59:4.
[514] Rodriguez Dep. 46:2-5; Cesinger Dep. 71:8-71:10; Texas Department of Public Safety, http://www.dps.texas.gov/.
[515] Peters Dep. 246:16-21; Rodriguez Dep. 49:12-50:3.
[516] Tex. Elec. Code § 63.0101(3)-(5).

345.    The Office of the Texas Secretary of State interprets SB 14 to include four types of

military photo ID cards: Department of Defense Common Access Cards; Uniformed Services ID

Cards; Department of Defense Civilian Retiree Cards; and Veterans Affairs ID Cards.[517]

### A.    Military Photo ID Cards are Available to Very Few Texans

346.    Common Access Cards are available only to active duty uniformed service personnel,

Selected Reserve, Defense Department civilian employees, and eligible contractor personnel.[518]

Uniformed Services ID cards are only available to military members and retirees and their family

members.[519]   Department of Defense Civilian Retiree Cards are available only to civilians

employees retired from a Defense Department Service or Component.[520]

347.    There is no reason to believe that a meaningful number of individuals who do not

currently hold Common Access Cards, Uniformed Services ID cards, or Civilian Retiree Cards

qualify to obtain them.

348.    Veterans Identification Cards and Veterans Health Identification Cards are issued only to

Veterans who are enrolled in the Veterans Affairs Health System.[521]   Only 2.2% of all records on

Texas's voter registration list were matched to records for holders of Veteran Identification

Cards.[522]

349.    According to the 2010-2012 ACS, only 8.6% of the voting-age population (VAP) in

Texas is made up of military veterans.  This includes 12.0% of Anglo VAP but only 4.1% of

---

[517] PL466 at 12 (Acceptable Forms of Identification PowerPoint).
[518] PL889 (Common Access Card).
[519] PL894 (Uniformed Services ID Card).
[520] PL894 (Uniformed Services ID Card).
[521] PL895 (Veterans Health Identification Card).
[522] PL751 TableV.2 (Ansolabehere 2d Corr. Rep.).

Hispanic VAP and 9.7% of African-American VAP.[523]  Therefore, to the extent that there is a meaningful population of individuals who do not hold a Veterans Identification Card or Veterans Health Identification Card but qualify to obtain one, those individuals are disproportionately Anglo.

### B.   Citizenship Certificates with a Photograph are Available to Very Few Texans and are Expensive to Replace if Lost

350.   Citizenship certificates issued by the U.S. Citizenship and Immigration Services are only available to individuals who were born abroad but are U.S. citizens at birth through their parents, or who became citizens after birth but before the age of 18.[524]  Only 5.4% of registered Texas voters matched to records for either a certificate of naturalization or a certificate of citizenship.[525] The fee for obtaining a replacement copy of a U.S. citizenship certificate is $345.[526]

351.   Certificates of naturalization issued by the U.S. Citizenship and Immigration Services are likewise only available to naturalized U.S. citizens.[527]  Like citizenship certificates, it costs $345 to obtain a copy of this document.[528]

352.   SB 14 does not expressly permit use of a certificate of naturalization as SB 14 ID, but the Office of the Texas Secretary of State has stated in poll worker training materials that this document is acceptable proof of identification.  This decision has not been memorialized in regulations or in voter education materials, and the Office of the Secretary of State is unaware of whether it could reverse the decision.[529]

---

[523] PL454 ¶ 19 (U.S. Request for Judicial Notice).
[524] PL892 (N-600 Frequently Asked Questions).
[525] PL751 Table V.2 (Ansolabehere 2d Corr. Rep.).
[526] PL891 (USCIS N-565).
[527] PL890 (USCIS N-400).
[528] PL891 (USCIS N-565); Trial Tr. 367:9-17 (Hernandez) (Day 4).
[529] PL466 (12/9/13 SOS PowerPoint); Ingram Dep. 157:11-160:14, Apr. 23, 2014.

353.     Dr. Ansolabehere's No Match List did not include individuals who have been issued a certificate of naturalization because, when USCIS conducted its matching against the TEAM records, it included individuals with naturalization certificates as having SB 14 ID.[530]

### C.     U.S. Passports and Passport Cards Are Costly to Obtain

354.     A U.S. Passport costs $135 to obtain.  A U.S. Passport card costs $55 to obtain.[531]  An application for a passport or passport card must be submitted in person to one of numerous acceptance agents authorized by the U.S. Department of State.[532]

355.     An application for a passport or passport card must include documentary proof of citizenship or status as a non-citizen national, which in most cases must be a previous U.S. passport or certified birth certificate.  If no birth record exists, an applicant may submit alternative documentation such as hospital or baptismal records.[533]

356.     An applicant for a passport or passport card must also provide documentary proof of identity or be accompanied by a U.S. citizen who is able to serve as an identifying witness.[534]

### X.     HISPANIC AND AFRICAN-AMERICAN VOTERS ARE LESS LIKELY THAN ANGLO VOTERS TO HAVE THE UNDERLYING DOCUMENTS, TIME, TRANSPORTATION, AND MEANS TO OBTAIN SB 14 ID

357.     Minority voters are more likely to face substantial difficulty overcoming the burdens to obtain SB 14 ID.  Minority voters are more likely to be poor, to lack underlying documents required to obtain an SB 14 ID, and to lack the time and means to complete the bureaucratic processes necessary to obtain an EIC or other SB 14 ID.

---

[530] PL911 ¶¶ 2, 4 (Oshinnaiye Decl.).
[531] PL893 (Passport Fees).
[532] PL882 (Form DS-11, Application for a U.S. Passport).
[533] PL882 (Form DS-11, Application for a U.S. Passport).
[534] PL882 (Form DS-11, Application for a U.S. Passport).

358.    According to the Barreto/Sanchez Survey, African-American and Hispanic Texas citizen age voters who lack SB 14 ID are more than twice as likely to be low-income than are Anglo Texas eligible voters who lack SB 14 ID (61% African Americans and 51% of Hispanics without photo ID earn less than $20,000 annually compared to 23% of Anglos without photo ID).[535] Furthermore, among voters who earn less than $20,000 per year and lack SB 14-compliant ID, minorities are disproportionately represented:  16% of those voters are Anglo, 41% are African-American, and 40% are Latino.[536]

359.    According to the 2010-2012 ACS, approximately 3.9% of Texas households headed by an Anglo have no vehicle available, whereas 7.0% of households headed by a Hispanic and 12.9% of households headed by an African-American person have no access to a vehicle.  Along similar lines, only 12.0% of Anglo workers in Texas commute to work by carpool, public transportation, walking, or other means besides driving alone, whereas 21.0% of Hispanic workers and 17.1% of African-American workers do so.[537]

360.    From nearly any location in Texas, it is faster to travel by personal automobile to the nearest permanent location that accepts EIC applications than to take public transportation or to walk.[538]

361.    Scientific literature supports the conclusion that the time that people spend waiting for public transportation, walking to and from public transportations stops, and riding public transportation is perceived as more burdensome than time spent traveling in a car.[539]

[535] PL753 at 21 (Barreto/Sanchez Rep.).
[536] PL753 at 22 (Barreto/Sanchez Rep.).
[537] PL454 ¶¶ 14-15 (U.S. Request for Judicial Notice); PL758 ¶ 48 (Burden Corr. Rep.); Trial Tr. 312:11-19 (Burden) (Day 3).
[538] PL761 ¶ 47 (Chatman Rep.); Trial Tr. 95:14-23 (Chatman) (Day 5).
[539] PL761 ¶ 15 (Chatman Rep.); Trial Tr. 95:24-96:20 (Chatman) (Day 5).

362.     Persons of lower income may be expected to have greater difficulty in finding additional time to obtain an EIC than persons of higher income, because lower income individuals will find it more difficult to free up time by sacrificing paid work-time or freeing up time to obtain an EIC by paying for child care, laundry service, home cleaning services, or prepared meals.[540]

363.     Minority voters, who generally have less education and fewer financial resources than Anglo voters are thereby also less likely than Anglo voters to possess or be able to obtain information necessary to meet the requirements of voting under SB 14, including the complex process to obtain an EIC.[541]

364.     In sum, these burdens function in a manner analogous to a poll tax: voters who lack SB 14 ID are required to expend time and money in order to retain their right to vote.  The financial burdens of complying with SB 14 fall heaviest on African-American and Latino voters because of the continuing effects of discrimination reflected in racial disparities in education, employment, housing, and transportation.[542]

>      A.    **Dr. Henrici's Analysis Establishes that Obtaining Identification as Required Under SB 14 Disproportionately Burdens Low-Income Minority Voters**

365.     Dr. Jane Henrici, an anthropologist and professorial lecturer at George Washington University, reviewed the scholarly literature regarding the use of documents, including those necessary to obtain government services and benefits, by low-income minority citizens and particularly minority citizens living in Texas. She also examined demographic data concerning minorities and poverty in Texas, and official information concerning SB 14.[543]

---

[540] PL761 ¶ 16 (Chatman Rep.); PL767 ¶ 48 (Henrici Rep.).
[541] PL760 at 48-49 (Burton Rep.); Trial Tr. 45:3-46:3 (Burton) (Day 6).
[542] PL760 at 44-45 (Burton Rep.); Trial Tr. 35:22-36:15, 45:3-46:3, 52:4-20 (Burton) (Day 6).
[543] PL767 ¶¶ 18-20 (Henrici Rep.); Trial Tr. 179:4-17; 180:2-23; 185:4-9 (Henrici) (Day 3).

366.     Dr. Henrici ultimately concluded that poorer Texans will face significant difficulty obtaining photo identification if they do not already have one.  She further concluded that because Hispanics and African Americans are disproportionately represented among Texans living in poverty, Hispanics and African-Americans who do not already possess an acceptable and current form of photo identification will face greater burdens in obtaining SB 14 ID than Anglo voters will face.[544]

367.     Dr. Henrici found that poverty in Texas is strongly correlated with race and ethnicity, and Hispanic and African-American poverty rates are two to almost three times Anglo poverty rates.[545]

368.     Dr. Henrici also found that Texans who live in poverty often do not have reliable incomes, a fact that impacts their decisions about their resource expenditures.[546]

369.     Most of the job opportunities available to poorer Texans pay relatively low hourly wages and have few if any accompanying benefits; many are part-time, temporary, or seasonal.  Thus, many poorer Texans must work multiple jobs to feed and shelter themselves and their families and are subject to unreliable schedules and income.  These circumstances make planning for appointments—such as applying in person for an EIC—problematic, particularly during regular business hours.[547]

---

[544] PL767 ¶¶ 32, 60 (Henrici Rep.); Trial Tr. 185:10-16, 191:4-20 (Henrici) (Day 3).
[545] PL767 ¶¶ 32, 34 & fig.1 (Henrici Rep.); Trial Tr. 185:22-186:3, 190:20-191:3 (Henrici) (Day 3).
[546] PL767 ¶ 35 (Henrici Rep.); Trial Tr. 185:22-186:16 (Henrici) (Day 3).
[547] PL767 ¶ 36 (Henrici Rep.); Trial Tr. 186:17-187:1 (Henrici) (Day 3); PL760 at 45 (Burton Rep.); Trial Tr. 52:4-20 (Burton) (Day 6).

370.     Most job opportunities for poorer Texans do not include paid leave.  Therefore, taking time off of work to obtain identification during business hours is likely to result in lost income.[548]

371.     Many low-income Texans do not have access to credit or to formal banking accounts. Check cashing through local businesses and informal loans from friends, family, or acquaintances often do not require photographic identification.[549]

372.     Many low-income Texans do not own vehicles, own vehicles that do not run reliably, or cannot afford to maintain and insure their vehicles.  Some low-income Texans must also forgo vehicle ownership in order to qualify for means-tested benefits.[550]

373.     Many low-income Texans must travel on foot or rely on limited mass transit options, leaving them both less likely to need a driver license and more likely to face mobility challenges when seeking to apply in person for an SB 14 ID.[551]

374.     Poor Texans may not always have the option to rely on a car owner for a ride to a location that accepts EIC applications.  In urban areas, poorer families making use of housing assistance have been scattered across Texas cities; in rural and small-town Texas, geographic distances can be a substantial obstacle.  Many low-income Hispanic and African-American families experience frequent and abrupt relocation when they are unable to afford rent or utility payments, cutting them off from individuals who might otherwise provide assistance.[552]

375.     Hispanic and African-American Texans, particularly those who are low-income, experience higher levels of health impairment than Anglo Texans, although many disabled

---

[548] PL767 ¶ 38 (Henrici Rep.); Trial Tr. 186:17-187:1 (Henrici) (Day 3).
[549] PL767 ¶ 37 (Henrici Rep.); Trial Tr. 188:11-24 (Henrici) (Day 3).
[550] PL767 ¶¶ 41-42, 44 (Henrici Rep.); Trial Tr. 188:11-189:8 (Henrici) (Day 3).
[551] PL767 ¶ 41 (Henrici Rep.); Trial Tr. 188:25-189:4 (Henrici) (Day 3).
[552] PL767 ¶ 47 (Henrici Rep.).

Texans will lack federal disability status due to the onerous process to obtain it. They are also disproportionately likely to struggle with managing family members' disabilities. These health burdens often restrict low-income minority Texans' ability to obtain and maintain documents, even ones that relate to government benefits.[553]

376.    In some public discourse, poverty and public assistance have become associated with Hispanic and African-American communities. The associated stigma and awareness of stigma and prejudice discourages low-income minority individuals in Texas from seeking out documentation or replacing documents that have been lost, destroyed, or stolen.[554]

377.    Low-income minorities struggle more than other Texans with the need to care for their families, stay employed, afford transportation, and deal with health problems while confronting stigmas about poverty and racial identity. These factors inhibit their ability to obtain documentation or renew any photo documentation they might have let expire, even documentation that does not have a direct fee associated with its issuance such as the EIC.[555]

378.    In sum, Dr. Henrici found that low-income minorities in Texas are disproportionately likely to face some combination of the following impediments to obtaining photo identification: loss of wages, lack of access to transportation, health problems, and lack of accurate underlying documents needed to obtain ID.[556]

---

[553] PL767 ¶ 51 (Henrici Rep.); Trial Tr. 187:15-188:10 (Henrici) (Day 3); *see also* Bingham Dep. 12:11-13:12; PL1091 (Bingham Video Excerpts); Holmes Dep. 11:20-12:2; PL1094 (Holmes Video Excerpts).
[554] PL767 ¶ 53 (Henrici Rep.); Trial Tr. 189:20-190:15 (Henrici) (Day 3).
[555] PL767 ¶ 56 (Henrici Rep.); Trial Tr. 191:4-20 (Henrici) (Day 3).
[556] PL767 ¶¶ 58-99 (Henrici Rep.); Trial Tr. 185:10-186:3; 190:16-191:20 (Henrici) (Day 3).

379.     Due to the difficulty that poor Texans, particularly poor minority Texans, face in meeting immediate needs related to the health and welfare of their families, many will not expend scarce resources to obtain photo identification required by SB 14.[557]

>     **B.     Dr. Webster Found that Individuals in Areas with Low Access to Vehicles, Which Are Predominantly Minority, Face Substantial Travel Burdens to Obtain an EIC**

380.     Dr. Gerald C. Webster, a Professor of Geography at the University of Wyoming, conducted a geographic analysis of the travel burden related to obtaining an EIC and determined that the time required to travel to and from a DPS office can pose a significant obstacle for voters to obtain an EIC.[558]

381.     Dr. Webster identified the location of census tracts in Texas in which more than 25% of households lack access to a motor vehicle, according to data gathered by the U.S. Census Bureau, which he deemed low vehicle-access tracts.  He then focused his analysis on Houston, San Antonio, and Dallas, which collectively contain more than half of the low vehicle-access tracts in Texas.[559]

382.     With regard to each city, Dr. Webster first determined the travel distance and time to a DPS Office by motor vehicle from all census tracts within the city.  He then compared motor vehicle and public bus travel times to the nearest DPS Office from each low vehicle-access tract, as well as the travel times to either the nearest DPS Office or a mobile EIC unit deployed between January 1 and May 15, 2014.[560]

---

[557] PL767 ¶ 59 (Henrici Rep.); Trial Tr. 191:21-193:3 (Henrici) (Day 3).
[558] PL775R ¶ 8 (Webster Final Rep.); Trial Tr. 251:14-23 (Webster) (Day 4).
[559] PL775R ¶¶ 16-20, 23 (Webster Final Rep.); Trial Tr. 260:23-261:17 (Webster) (Day 4).
[560] PL775R ¶¶ 24-27 (Webster Final Rep.); Trial Tr. 261:18-264:24; 265:17-21 (Webster) (Day 4).

   Case 2:13-cv-00193   Document 610   Filed on 09/18/14 in TXSD   Page 115 of 353

383.    Dr. Webster estimated that the average one-way travel time by car to a permanent DPS location in Houston, San Antonio, and Dallas, is 9.8 minutes, 9.9 minutes, and 11.3 minutes respectively.  Average travel times by private vehicle from the low vehicle access tracts in Houston, San Antonio, and Dallas are similar: 10.5 minutes, 7.5 minutes, and 12.8 minutes respectively.[561]

384.    Dr. Webster also determined that in low vehicle-access tracts, the use of the public bus system increases trip travel time several-fold over the use of a motor vehicle. From low vehicle-access tracts in Houston, San Antonio, and Dallas, the respective one-way bus travel time to a DPS office (excluding walking to and from transit stops) was 66.7 minutes, 36.2 minutes, and 59.7 minutes, respectively.[562]

385.    Dr. Webster found that the potential to travel to temporary DPS locations reduced travel times, although travel times remained quite significant.  From low vehicle access tracts in Houston, San Antonio, and Dallas, the respective one-way bus travel time to a DPS office or temporary location (excluding walking to and from transit stops) was 44.6 minutes, 31.3 minutes, and 33.5 minutes.[563]

386.    Even taking into account temporary DPS locations, bus riders in Houston who reside in low vehicle access tracts will spend 5.6 times more time than those with access to a motor

---

[561] PL775R ¶¶ 37, 40, 49, 52, 59, 62 & tbls. 4, 6, 8 (Webster Final Rep.); Trial Tr. 267:17-24, 272:4-10, 276:4-10 (Webster) (Day 4).
[562] PL775R ¶¶ 40, 52, 62 & tbl. 2 (Webster Final Rep.); Trial Tr. 267:25-268:5, 272:11-13, 276:7-10 (Day 4).
[563] PL775R ¶¶ 43, 54, 64 & tbl. 2 (Webster Final Rep.); Trial Tr. 268:6-14, 272:22-273:2, 277:6:8 (Day 4).

vehicle in order to reach a location that accepts EIC locations, 6.4 times more time in San Antonio, and 4.3 times more time in Dallas.[564]

387.    Dr. Webster also found that the highly limited deployment of temporary DPS locations minimizes or negates any ameliorative effect that they may have on voters who seek to apply for an EIC.[565]

388.    Dr. Webster determined that the low vehicle-access tracts in these three cities were overwhelmingly minority in citizen voting-age population.  In Houston, 23 low vehicle access tracts are majority or plurality African American, 6 are majority or plurality Hispanic, and only one is majority or plurality Anglo.  In San Antonio, 19 low vehicle access tracts are majority or plurality Hispanic, 2 are majority or plurality Black, and 1 was dropped from the analysis because it included a prison.  In Dallas, 21 low vehicle access tracts are majority or plurality African American, 4 are majority or plurality Hispanic, and only one is majority or plurality Anglo.[566]

389.    Dr. Webster's analysis of Dr. Ansolabehere's No Match List found voters lacking SB 14 ID were substantially concentrated in low vehicle access tracts.  Dr. Webster found that statewide, 5.8% of voters were in the No Match List, but 13.2% of voters in low vehicle-access tracts lacked SB 14 ID.[567]

390.    In Houston, San Antonio, and Dallas, Dr. Webster found citywide average no-match rates ranging from 6.8% to 8.2%, but he found that citywide average no-match rates in low vehicle-

---

[564] PL775R ¶ 32 & tbl. 2 (Webster Final Rep.); Trial Tr. 268:6-14 (Webster) (Houston) (Day 4).
[565] PL775R ¶¶ 8, 31-32 (Webster Final Rep.).
[566] PL775R ¶¶ 38, 50, 60 (Webster Final Rep.); Trial Tr. 267:11-16, 271:20-272:3, 275:18-276:3 (Webster) (Day 4).
[567] PL775R ¶ 67 & tbl. 9 (Webster Final Rep.); Trial Tr. 258:5-22 (Webster) (Day 4).

access tracts ranged from 12.2% to 15.1%.[568] Therefore, individuals who lack SB 14 ID, and thus may need to apply for an EIC in order to vote in person, are likely to face a significant travel burden to obtain one.

391.   Dr. Webster analyzed demographic and socioeconomic data concerning Texas and specifically found that rates of poverty and vehicle access differ substantially across racial groups, with greater poverty rates and lower vehicle access rates among members of racial minority groups.[569]

392.   Dr. Webster determined that in the three largest cities in Texas, the burden to obtain an EIC will fall most heavily on Hispanic and African-American voters, who are the voters most likely to lack access to a motor vehicle.[570]

393.   Dr. Webster found that in Houston, San Antonio, and Dallas, the three cities in which he focused his analysis, the share of Hispanic households that lacked access to a vehicle consistently exceeded the share of Anglo households lacking vehicle access.  In these three cities, the share of African-American households lacking vehicle access was at least twice the share of Anglo households lacking vehicle access.[571]

394.   Along similar lines, poverty rates for Hispanics and African Americans were over twice the rates for Anglos in San Antonio and three times the rates for Anglos in Houston and Dallas.[572]

---

[568] PL775R ¶¶ 68-70 (Webster Final Rep.); Trial Tr. 279:13-280:2 (Webster) (Day 4).
[569] PL775R ¶¶ 9-14 & tbl. 1 (Webster Final Rep.); Trial Tr. 281:12-19 (Webster) (Day 4).
[570] PL775R ¶¶ 8, 44, 55, 65 (Webster Final Rep.); Trial Tr. 281:20-282:5, 282:13-19 (Webster) (Day 4).
[571] PL775R ¶¶ 36, 48, 58 (Webster Final Rep.).
[572] PL775R ¶¶ 35, 47, 57 (Webster Final Rep.).

395.    Of the 77 low vehicle-access tracts in these cities, only two had majority or plurality Anglo citizen voting age populations.  These 77 tracts are also characterized by high rates of poverty.[573]

396.    As noted above, travel burdens for individuals in low vehicle-access tracts who must rely on bus systems to travel to an office that accepts EIC applications are substantially greater than the travel burden for individuals who travel by private vehicle.[574]

   C.    **Dr. Chatman Found that African Americans and Hispanics Are Significantly More Likely Than Anglos to Experience a Burdensome Roundtrip Travel Time to an EIC Location**

397.    Dr. Daniel Chatman, an Assistant Professor of City and Regional Planning at the University of California at Berkeley, undertook an analysis of the travel burdens associated with obtaining of EIC for Texas citizens of voting age (CVAs).  Specifically, his analysis examined travel time burdens by race, first for CVAs generally and second for CVAs living in poverty.[575]

398.    Dr. Chatman defined "travel burden" in terms of the time individuals would spend in a round trip from their home to the closest location to apply for an EIC and back to their home.  While there are a number of burdens associated with travel to and from an EIC location, Dr. Chatman concluded that time may be the largest and most quantifiable of the burdens.[576]

399.    Dr. Chatman specified that an individual CVA would encounter a travel burden if the roundtrip travel time would exceed 90 minutes.  Dr. Chatman determined that 90 minutes is a reasonable standard taking into account travel patterns in Texas.[577]

---

[573] PL775R ¶¶ 29, 38-39, 44, 50-51, 55, 60-61, 65 (Webster Final Rep.).
[574] *Supra* ¶¶ 383-386.
[575] PL761 ¶ 4 (Chatman Rep.); Trial Tr. 77:9-15; 79:12-16; 79:22-80:21 (Chatman) (Day 5).
[576] PL761 ¶¶ 9, 13 (Chatman Rep.); Trial Tr. 80:22-81:16 (Chatman) (Day 5).
[577] PL761 ¶¶ 10, 18, 48 (Chatman Rep.); Trial Tr. 81:17-82:8 (Chatman) (Day 5).

400.    Dr. Chatman conducted his analysis in four steps.  First, he identified the beginning points (home locations) and end points (EAC locations) for travel by all CVAs.  He used the center of the census block group in which a CVA resides as the individual's estimated home location (which did not introduce meaningful error) and the precise locations of the 226 DPS offices and 55 county offices where voters can apply for an EIC as end points.  Addresses were not available online for six county offices, and Dr. Chatman chose not to include mobile EIC locations due to sporadic availability.[578]

401.    Second, Dr. Chatman estimated the time it would take for CVAs to travel from their home to the nearest EIC location by each of three travel modes:  personal automobile, public transportation, and on foot.[579]

402.    In calculating driving time, Dr. Chatman used computer programs that interfaced with Google Maps, and provided a time estimate for a standard, time-efficient route, accounting for ordinary travel delays.[580]

403.    To calculate public transportation times, Dr. Chatman used estimates prepared by the Center for Neighborhood Technology (a data collection center) that included information on transit routes, stop locations, and schedules for public transportation throughout almost the entire state.  Dr. Chatman also prepared walking time estimates for travel from homes to transit stops, and from transit stops to EAC locations.  Dr. Chatman determined that CVAs have access to public transit only if their home and the closest EAC location are both within a mile of a transit stop, there was scheduled transit service available within 30 minutes of predicted arrival at the

---

[578] PL761 ¶¶ 6, 19-22 (Chatman Rep.); Trial Tr. 83:12-84:6, 84:17-85:18 (Chatman) (Day 5).
[579] PL761 ¶ 6 (Chatman Rep.); Trial Tr. 85:24-86:8 (Chatman) (Day 5).
[580] PL761 ¶ 34 (Chatman Rep.); Trial Tr. 86:9-87:5 (Chatman) (Day 5).

transit stop, and the route to an EAC location included no more than two public transit transfers.[581]

404.    To calculate walking time for those who would not drive or take public transit to an EAC location, Dr. Chatman identified the shortest route to an EIC location from each home beginning point, and divided the route distance in miles by an average walking speed of 2.2 miles per hour, a rate which takes into account that walking distances to the nearest EIC location exceeded a mile in almost all instances.[582]

405.    Third, Dr. Chatman prepared an estimate of the number of CVAs, by race, in each census block group using 2010 Census voting-age population data and 2008-2012 ACS citizen voting-age population data at the larger census tract level.[583]  Dr. Chatman also estimated automobile availability and poverty among CVAs by race using census data, and calculated automobile availability separately for households above and below the poverty line.[584]

406.    Fourth, Dr. Chatman assigned estimates of roundtrip travel time to and from EAC locations using a two-step process.  First, CVAs estimated to reside in a household with an auto were assigned the fastest time resulting from either being driven by another household member (since those needing an EIC lack a driver license), taking public transportation (if accessible), or walking (driving was almost always fastest).  Second CVAs estimated to reside in a household without automobile access were assigned the fastest time between taking public transportation (if accessible) or walking.[585]

---

[581] PL761 ¶¶ 24-31 (Chatman Rep.); Trial Tr. 89:1-93:7 (Chatman) (Day 5).
[582] PL761 ¶ 33 (Chatman Rep.); Trial Tr. 93:8-94:4 (Chatman) (Day 5).
[583] PL761 ¶ 36-39 (Chatman Rep.); Trail Tr. 83:23-25 (Chatman) (Day 5).
[584] PL761 ¶¶ 41-44 (Chatman Rep.); Trial Tr. 94:5-19 (Chatman) (Day 5).
[585] PL761 ¶¶ 6, 13, 46-47 (Chatman Rep.); Trial Tr. 94:20-95:9 (Chatman) (Day 5).

407.    Ultimately, Dr. Chatman found that the average total travel time from home to and from the nearest EIC for people living in block groups accessible to public transportation is two and a half hours.  Ten percent of those living in block groups accessible to public transportation have a total round trip to and from the nearest EIC location of more than four hours.[586]

408.    Dr. Chatman found that across Texas, an estimated 4.7% of CVAs face a roundtrip burden of more than 90 minutes to access an EAC location, and 13.8% of impoverished CVAs face that travel burden.[587]

409.    Dr. Chatman's study of the burden to obtain an EIC ultimately concluded that SB 14 will place a disproportionate and significant travel burden on Hispanic and African-American eligible voters in comparison to Anglos.[588]

410.    Dr. Chatman also found that travel to an EAC location is almost always burdensome (*i.e.*, a roundtrip of more than 90 minutes) if the travel is done by public transportation or by walking, whereas travel by car is almost never burdensome.  Hispanics and African Americans are much more likely to have to travel by public transportation or walking because Hispanic citizens of voting age (CVAs) are twice as likely as Anglo CVAs to lack access to a vehicle (6% versus 3%) and African-American CVAs are four times more likely to lack vehicle access (12% versus 3%).[589]

411.    Accordingly, Dr. Chatman found that African-American CVAs have the highest travel burden and Hispanic CVAs have the second-highest travel burden.  Looking at all CVAs, African Americans are 3.3 times more likely than Anglos to travel more than 90 minutes to

---

[586] PL761 ¶ 32 (Chatman Rep.).
[587] PL761 ¶¶ 54, 60 (Chatman Rep.); Trial Tr. 97:13-99:3 (Chatman) (Day 5).
[588] PL761 ¶¶ 55, 58-60 (Chatman Rep.); Trial Tr. 82:9-23 (Chatman) (Day 5).
[589] PL761 ¶¶ 52-54 (Chatman Rep.); Trial Tr. 95:14-23 (Chatman) (Day 5).

obtain an EIC, and Hispanics are 1.5 times more likely than Anglos to travel more than 90 minutes to obtain an EIC.[590]

412.    Limiting the analysis to CVAs estimated to live in poverty, the disparities remain. African-American CVAs are seven times more likely to be both below the poverty level and lack vehicle access than Anglo CVAs (7.1% vs. 1.0%), and Hispanic CVAs are almost four times more likely (3.6% vs. 1.0%).  Looking only at CVAs living in poverty, African-American CVAs experiencing poverty are 2.7 times more likely than Anglo CVAs experiencing poverty to travel more than 90 minutes to obtain an EIC, and Hispanic CVAs experiencing poverty are 1.2 times more likely.[591]

413.    Dr. Chatman concluded that differences in travel burdens between Hispanics and Anglos and between African Americans and Anglos are statistically significant.[592]

### D.    Dr. Bazelon Found That Travel Burdens to an EIC Location, Analyzed in Monetary Terms, Are Significantly Greater for African Americans Than Anglos

414.    Dr. Coleman Bazelon, an economist and a principal at an economic consulting firm, conducted a separate estimate of the economic costs that registered voters lacking SB 14 ID will face to acquire an EIC.  He focused on EICs, since that generally is the least costly alternative form of SB 14 ID.[593]  Dr. Bazelon monetized only the travel costs to acquire an EIC, estimating those costs separately for African-American and other registered voters who lack SB 14 ID.[594] As previously noted, Dr. Bazelon's analysis focused on the group of registered voters who,

---

[590] PL761 ¶ 55 (Chatman Rep.); Trial Tr. 97:13-98:1 (Chatman) (Day 5).
[591] PL761 ¶¶ 58-61 (Chatman Rep.); Trial Tr. 97:6-10 (Chatman) (Day 5); Trial Tr. 98:5-99:3 (Chatman) (Day 5).
[592] PL761 ¶ 40 (Chatman Rep.); Trial Tr. 98:2-3 (Chatman) (Day 5).
[593] Trial Tr. 99:13-100:2 (Bazelon) (Day 6).
[594] PL757 ¶¶ 17-21, 34-60 (Bazelon Am. Rep.); Trial Tr. 111:13-112:7, 116:22-25 (Bazelon) (Day 6).

according to the matching analysis, lack SB 14 ID; in addition, he excluded from his analysis those registered voters who lack SB 14 ID but were matched to records in federal disability databases based on the presumption that these individuals are technically eligible to obtain a SB 14 disability exemption.

415.    To estimate the economic costs of travel to obtain an EIC, Dr. Bazelon used a geocoding algorithm to calculate, for each census block group in Texas, expected travel times and distances for each of three travel modes (walking, taxi, public transit) to each of three DPS locations nearest to the centroid of a census block group.  Dr. Bazelon's calculation of the total cost of travel includes both monetary (*e.g.*, transit and taxi fares) and non-monetary (value of time) costs.[595]

416.    Based on the U.S. Department of Transportation's guidance that "[p]ersonal time spent walking or waiting outside vehicles, as well as time spent standing in vehicles or bicycling, should be evaluated at 100 percent of hourly income," Dr. Bazelon valued the cost of time spent traveling to a DPS location at 100 percent of the wage rate.  Dr. Bazelon used median wage rates across census tracts to calculate wage rates by race in Texas.[596]

417.    Dr. Bazelon assumed that voters wishing to obtain an EIC would select the travel mode and DPS location that minimized their total cost of travel.  He thus selected the lowest cost method, when accounting for a voter's wage rate and subsequent value of time, in calculating average expected travel costs.[597]

---

[595] PL757R ¶¶ 46-58 (Bazelon Second Am. Rep.); Trial Tr. 100:3-101:20, 103:11-104:7 (Bazelon) (Day 6).  In his deposition and at trial, Dr. Bazelon mistakenly testified that he assumed a departure time of noon in calculating the costs of travel to obtain an EIC.  Trial Tr. 122:23-25 (Bazelon) (Day 6).  Dr. Bazelon has subsequently determined that he, in fact, used a departure time of 9:30am.  PL1181 ¶ 3.

[596] PL757R ¶¶ 51-52 (Bazelon Second Am. Rep.); Trial Tr. 103:24-104:20 (Bazelon) (Day 6).

[597] PL757R ¶ 53 (Bazelon Second Am. Rep.); Trial Tr. 100:3-101:5 (Bazelon) (Day 6).

418.    Based on this analysis, Dr. Bazelon found that the average travel cost to obtain an EIC across all registered voters who lack SB 14 ID (and are not disability-exemption eligible) is $36.23 per voter.[598]  As Dr. Bazelon explains, this estimate is limited to travel costs alone; it does not include all costs that might be incurred in obtaining an EIC—such as the costs of obtaining required underlying documentation, the time spent at DPS applying for an EIC, lost wages, and childcare costs.[599]  Dr. Bazelon further demonstrates that the average travel cost of $36.23 is 149% of average hourly earnings.  By comparison, when the Supreme Court found a poll tax of $1.75 in Texas to be an undue burden, that amount was only 69% of average hourly earnings.[600]

419.    Dr. Bazelon also calculated travel costs by race, finding that the average travel costs to obtain an EIC for African-American and Anglo registered voters, respectively, are $26.66 and $48.10.[601]  As Dr. Bazelon explained at trial, the significant wage rate disparity between African-American and Anglo registered voters in Texas drives the differential between their respective travel costs, affecting voters' value of time as well as their choice of mode of travel.[602]  Specifically, the median wage rate for African-American Texans is $13.03, as compared to $20.57 for Anglo Texans.[603]

420.    Moreover, as Dr. Bazelon testified, the travel costs that registered voters without an SB 14 ID will incur to acquire an EIC cannot be considered in a vacuum; they must be viewed in

---

[598] PL757R ¶¶ 21, 57 & Table 6 (Bazelon Second Am. Rep.); Trial Tr. 82:16-23, 108:12-19 (Bazelon) (Day 6).

[599] PL757R ¶ 59-60 (Bazelon Second Am. Rep.); Trial Tr. 107:24-108:11, 111:13-22 (Bazelon) (Day 6).

[600] PL757R ¶ 21 (Bazelon Am. Reply Rep.); PL1159R (Bazelon Am.Trial Demonstratives) at 8; Trial Tr. 116:5-21 (Bazelon) (Day 6).

[601] PL757R ¶ 57 & Table 6 (Bazelon Second Am. Rep.)

[602] Trial Tr. 109:8-110:7 (Bazelon) (Day 6); PL756R ¶ 19 (Bazelon Am. Reply Rep.).

[603] PL757R ¶ 52 & Table 3 (Bazelon Second Am. Rep.).

terms of the burden they impose.  Using data on income, wealth, and other social measures, Dr.

Bazelon evaluated whether the economic costs of acquiring an EIC fall disproportionately on

African-American voters who lack SB 14 ID (and are not eligible for a disability exemption) as

compared to white voters.[604]

421.    Dr. Bazelon first demonstrated that African-American Texans have lower incomes and

less wealth than Anglo Texans.  In 2010, Anglo Texans had an annual median income of

$52,392, approximately 68% greater than the median income of $31,104 for African-American

Texans.  The median household wealth of the Anglo population in Texas is $97,800, more than

seven times larger than the median household wealth of the African-American population

($11,961).[605]

422.    Dr. Bazelon further demonstrated that African-American Texans are more likely to be

poor than Anglo Texans.  One-quarter of all African-American Texans live below the poverty

line—a rate that is two-and-a-half times higher than the poverty rate for Anglos.[606]

423.    Dr. Bazelon also observed disparities between African-American and Anglo Texans in

other measures of socioeconomic well-being.  The unemployment rate of African-American

Texans, for example, is more than twice the unemployment rate of Anglos.[607]  There is also a

significant educational achievement gap:  16% of African-American Texans do not have a high

---

[604] PL756R ¶ 20 (Bazelon Am. Reply Rep.); PL757RR ¶¶ 61-62 (Bazelon Second Am. Rep.); Trial Tr.
117:15-118:22 (Bazelon) (Day 6).
[605] PL757R ¶ 63-66 (Bazelon Second Am. Rep.); PL1159R at 9-10 (Bazelon Am. Trial Demonstratives);
Trial Tr. 118:23-119:20 (Bazelon) (Day 6).
[606] PL757R ¶ 67 (Bazelon Second Am. Rep.); PL1159R at 11 (Bazelon Am. Trial Demonstratives); Trial
Tr. 119:21-120:2 (Bazelon) (Day 6).
[607] PL757R ¶ 68 (Bazelon Second Am. Rep.); PL1159R at 12 (Bazelon Am. Trial Demonstratives); Trial
Tr. 120:5-13 (Bazelon) (Day 6).

school diploma (as compared to 9% of Anglo Texans) and 58% of African-American Texans do not have an undergraduate degree (as compared to 51% of Anglo Texans).[608]

424.    Because costs have a greater impact on those with less socioeconomic well-being, Dr. Bazelon concluded that Senate Bill 14 creates a higher burden on African-American registered voters than on Anglo registered voters who lack SB 14 ID (and are not disability-exemption eligible).

425.    Specifically, comparing African-American and Anglo registered voters who must obtain an EIC to retain their right to vote in person—whose average travel costs to do so are $26.66 and $48.10, respectively—Dr. Bazelon's economic analysis establishes that the average African-American registered voter is required to expend a share of his wealth on such costs that is more than four times higher than the share required for the average Anglo registered voter in Texas.[609]

### E.    The Barreto-Sanchez Survey Also Identified Burdens Regarding Obtaining an EIC

426.    According to the Barreto/Sanchez Survey, 26.4% of Texas eligible voters who currently lack the required photo ID do not possess the underlying documents needed to obtain an EIC.[610]

427.    According to the Barreto/Sanchez Survey, Texas eligible voters without a high school degree have a higher probability of lacking documents required to obtain an EIC than Texans with greater educational attainment.[611]

---

[608] PL757R ¶ 69 (Bazelon Second Am. Rep.); PL1159R at 12 (Bazelon Am. Trial Demonstratives); Trial Tr. 120:13-17 (Bazelon) (Day 6).
[609] PL757R ¶¶ 70-73 (Bazelon Second Am. Rep.); PL1159R at 13 (Bazelon Am. Trial Demonstratives); Trial Tr. 120:20-121:5 (Bazelon) (Day 6).
[610] PL753 at 17, 20 (Barreto/Sanchez Rep.).
[611] PL753 at 23 (Barreto/Sanchez Rep.).

428.   According to the Barreto/Sanchez Survey, 23.4% of Hispanic and 30.4% of African-American eligible voters do not have underlying documents needed to obtain SB 14 ID, compared with 21.2% of white eligible voters.[612]

429.   According to the Barreto/Sanchez Survey, 91% of Texas eligible voters who lack the photo ID required by SB 14 state that they will face at least one potential burden in obtaining an EIC, such as not being able to visit the issuing office during operating hours, getting a ride or accessing public transportation, or paying the costs associated with obtaining the underlying documents.[613]

430.   According to the Barreto/Sanchez Survey, Hispanics and African Americans are approximately twice as likely to believe that they have SB 14 ID when they do not: 9.1% of Hispanics and 7.0% of African Americans compared to 3.8% of Anglos.[614]

431.   According to the Barreto/Sanchez Survey, Texas eligible voters without a high school degree are less likely than voters with greater educational attainment to have heard of an EIC.[615]

432.   According to the Barreto/Sanchez Survey, Texas eligible voters who lack SB 14 ID are almost four times more likely to be low-income than are Texas eligible voters who possess SB 14 ID (44.7% earn less than $20,000 annually versus 12.8%).[616]

### F.   The Costs to Obtain an EIC Significantly Limit the Ability of the Individual Ortiz Plaintiffs to Vote

433.   Kevin G. Jewell holds an MBA from the McCombs School of Business at the University of Texas in Austin and an A.B. in Mathematical Economics from Brown University in

---

[612] PL753 at 20, Table 7 (Barreto/Sanchez Rep.).
[613] PL753 at 18, 29 (Barreto/Sanchez Rep.).
[614] PL753 at 18-20 (Barreto/Sanchez Rep.).
[615] PL753 at 23 (Barreto/Sanchez Rep.)
[616] PL753 at 21 (Barreto/Sanchez Rep.).

Providence, Rhode Island, and undertook an analysis to quantify and contextualize the costs that the SB 14 voting scheme places on the *Ortiz* plaintiffs.[617]  He ultimately concluded that the costs created by SB 14 reduce the likelihood the *Ortiz* plaintiffs will complete the voting process, particularly in comparison to less budget-constrained Texans.[618]  Specifically, examining the costs created by SB 14, the *Ortiz* plaintiffs can expect costs ranging from $23 to $100.83.[619] These are costs on top of their already constrained budgets, thereby reducing their chance that they will vote compared to most Texans.

434.    Mr. Jewell's calculation of the expected costs created by the SB 14 voting scheme includes out-of-pocket documentation fees, transportation costs, and opportunity costs. Information search costs, while substantial, are not quantified.[620]

435.    Mr. Jewell calculated the income for each *Ortiz* plaintiff's household relative to federal poverty guidelines.  Mr. Jewell also calculated each *Ortiz* plaintiff's discretionary income (*i.e.*, income left after payment of basic expenses) and unobligated discretionary income (*i.e.*, discretionary income left after payment of pre-existing financial obligations such as debt).[621]

436.    Mr. Jewell also considered the cost of the *Ortiz* plaintiffs' debt and the savings reported by each *Ortiz* plaintiff.  Mr. Jewell recognized that among the tradeoffs facing the *Ortiz* plaintiffs is choosing to vote or to save for future emergencies.[622]

437.    Eulalio Mendez, whose income is less than half the 2014 federal poverty guidelines, is expected to incur a total of $44.93 in total monetized costs in order to obtain a SB 14 ID.[623]  Mr.

---

[617] PL770 ¶ 2 (Jewell Rep.); Trial Tr. 31:15-32:11 (Jewell) (Day 5).
[618] PL770 ¶¶ 1, 10 (Jewell Rep.); Trial Tr. 55:6-23 (Jewell) (Day 5).
[619] PL1157 at 14 (Jewell Demo Aid); Trial Tr. 32:15-23, 34:9-42:2, 42:11-43:14 (Jewell) (Day 5).
[620] PL770 ¶ 15 (Jewell Rep.); Trial Tr. 32:25-34:8 (Jewell) (Day 5).
[621] PL770 ¶ 16 (Jewell Rep.); Trial Tr. 48:1-49:19 (Jewell) (Day 5).
[622] PL770 ¶¶ 17-18 (Jewell Rep.); Trial Tr. 49:20-50:1 (Jewell) (Day 5).

Mendez is expected to use 90 minutes in total time to obtain SB 14 ID.[624]  Of the total he is expected to use 58 minutes  traveling to and waiting in line at DPS alone  (5.3 times the 2012 average voting wait time in Texas).[625]

438.    Lionel Estrada, whose income is 80% of the poverty guidelines and who has no unobligated discretionary income, has incurred over $60 in out-of-pocket costs so far for his commercial driver's license (CDL), but is unable to obtain it unless he pays surcharges of $260 for three years. [626] If he were to abandon his desire to obtain his CDL temporarily he is expected to incur $57.40 to obtain his EIC, plus he would have to pay $60 again to apply for his CDL at a later date.[627]  If he abandons his desire for his CDL and attempts to obtain an EIC now he is expected to use 90 minutes of lost time  traveling to and waiting in line at DPS (8.2 times the 2012 average voting wait time in Texas) to obtain the documentation to vote under SB 14.[628]

439.    Lenard Taylor, whose household income is 69% of the 2014 federal poverty guidelines, has incurred $23.00 in out-of-pocket costs (23% of his monthly unobligated discretionary income[629]) to obtain his birth certificate.[630]  He is expected to use another 104 minutes traveling to and standing in line at DPS (9.4 the 2012 average voting wait time in Texas) to obtain the

---

[623] PL1157 at 14 (Jewell Demo Aid); Trial Tr. 32:15-23, 34:9-42:2, 42:11-43:14 (Jewell) (Day 5).
[624] PL1157 at 14 (Jewell Demo Aid); Trial Tr. 32:15-23, 34:9-42:2, 42:11-43:14 (Jewell) (Day 5).
[625] PL1157 at 11 (Jewell Demo Aid); Trial Tr. 63:23-64:4, 64:7-10, 65:4-8, 65:16-18 (Jewell) (Day 5).
[626] Trial Tr. 134:3-136:16 (Estrada) (Day 3); Trial Tr. 45:17-46:25 (Jewell) (Day 5).
[627] Trial Tr. 45:17-46:25 (Jewell) (Day 5); PL1157 at 14 (Jewell Demo Aid)
[628] PL770 ¶¶ 3, 4, 28-30, Ex. 2.2 (Jewell Rep.); Trial Tr. 45:7-46:25, 65:19-67:4 (Jewell) (Day 5).
[629] PL1157 at 18 (Jewell Demo Aid).
[630] Trial Tr. 149:16-19 (Taylor) (Day 3).

documentation to vote under SB 14.[631]  Mr. Taylor has already made several trips to government offices to get him to this point,[632] but at present he still does not have SB 14 ID.[633]

440.    Estela Garcia Espinoza is expected to incur $90.84 in total monetized costs to obtain an SB 14 ID[634] and use 82 minutes traveling to and waiting at DPS (7.5 times the 2012 average voting wait time in Texas) to obtain the documentation to vote under SB 14.[635]

441.    Margarito Martinez Lara is expected to incur $94.41 and use 104 minutes in lost time in order to obtain the documentation to vote under SB 14.[636]

442.    Maximina M. Lara, whose income is 75% of the federal poverty guidelines, is expected to incur $100.83 and use 90 minutes in lost time to obtain the documentation to vote under SB 14.[637]

443.    Mr. Jewell found that several of the *Ortiz* plaintiffs face high credit costs.[638]  Ms. Lara, for example, has a payday loan with a 90 percent interest rate on her balance monthly.[639]  He concluded that should the *Ortiz* plaintiffs with debt choose to vote, they would expect to borrow funds, explicitly or implicitly, to do so.[640]

---

[631] PL770 ¶¶ 3, 4, 6, 37, 41, Ex. 3.2 (Jewell Rep.); Trial Tr. 43:21-22, 44:11, 44:17-45:6 (Jewell) (Day 5).
[632] Trial Tr. 148:1-149:17 (Taylor) (Day 3).
[633] Trial Tr. 150:1-12 (Taylor) (Day 3).
[634] PL1157 at 14 (Jewell Demo Aid).
[635] PL1157 at 11 (Jewell Demo Aid); Trial Tr. 44:11 (Jewell) (Day 5).
[636] PL1157 at 14 (Jewell Demo Aid).
[637] PL1157 at 14 (Jewell Demo Aid).
[638] Trial Tr. 50:2-24 (Jewell) (Day 5).
[639] Trial Tr. 50:19-24 (Jewell) (Day 5).
[640] PL770 ¶ 7 (Jewell Rep.).

444.    Mr. Jewell determined that none of the *Ortiz* plaintiffs has emergency savings.  He concluded that the expected out-of-pocket voting costs facing these plaintiffs create an implicit choice between voting and the possibility of working towards financial security.[641]

445.    Mr. Jewell also found the *Ortiz* plaintiffs have lower household gross and discretionary income than most Texans (ranging from 15 to 31 percent of the statewide median household income) and five have no income in excess of the federal poverty guidelines.[642]  He concluded that the expected out-of-pocket voting costs facing these low-income plaintiffs represent a larger portion of their gross and discretionary income than comparable costs to most Texans.[643]

446.    Mr. Jewell acknowledged that consumers with constrained budgets are more likely than less-budget-constrained consumers to explicitly consider the trade-offs required for new purchases, and considering opportunity costs reduces the likelihood of a consumer purchasing a given product.  He concluded that, as a result, the costs created by the SB 14 reduce the likelihood the *Ortiz* plaintiffs will choose to complete the voting process.[644]

## XI.    SOCIAL, ELECTORAL, AND HISTORICAL CONDITIONS IN TEXAS INTERACT WITH SB 14 TO LIMIT THE ABILITY OF MINORITY VOTERS TO PARTICIPATE IN THE POLITICAL PROCESS

447.    The costs that a voter must incur to cast a valid ballot are a substantial determinant of whether a voter will vote.  Such costs include the time, skill, financial resources, and effort required to overcome administrative requirements and other barriers to registering to vote and successfully casting a valid ballot.[645]

---

[641] PL770 ¶ 8 (Jewell Rep.); Trial Tr. 49:20-50:1 (Jewell) (Day 5).
[642] PL1157 at 17 (Jewell Demo Aid);  Trial Tr. 48:1-49:19, 63:5-24, 74:16-75:3 (Jewell) (Day 5).
[643] PL770 ¶¶ 9-10 (Jewell Rep.).
[644] PL770 ¶ 10 (Jewell Rep.); Trial Tr. 32:15-23 (Jewell) (Day 5).
[645] PL758 ¶¶ 9-12 (Burden Corr. Rep.); PL759 ¶¶ 5-12 (Burden Reply Rep.); PL753 at 25-28 (Barreto/Sanchez Rep.); Trial Tr. 297:14-23, 298:13-299:3 (Burden) (Day 3).

448.    Costs are especially consequential for people who suffer socioeconomic disadvantages
and for non-habitual voters.  Because of the lower socioeconomic status of minority voters, strict
voter qualification requirements or dramatic changes in election practices deter Hispanic and
African-American turnout.  Therefore, historical and demographic conditions may interact with a
general voting restriction to result in an undue burden on minority voters relative to Anglos.[646]

449.    Texas has a grievous history of official discrimination in voting, and elections in Texas
continue to be characterized by racially polarized voting, racial campaign appeals, and depressed
participation by minority voters.[647]  Indeed, Rev. Peter Johnson testified that within the civil
rights movement of the 1960s Texas had a "terrible, terrible reputation" and had no "civil rights
towns or cities [akin to Montgomery or Selma] because of the brutal, violent intimidation and
terrorism that still exists" in the State.[648]

450.    Rev. Johnson further testified that when he first arrived in Texas in 1969, his work
primarily involved attempting to form coalitions amongst African Americans and other lower
socio-economic groups to leverage their power in the political process.[649]  Because of the at-
large election system in place at that time, despite the fact that African-Americans were a
significant percentage of the potential voters, they could not elect representatives that would
represent their interests.[650]  He further testified that it was a tremendous challenge to get African
Americans to participate in the political process because there was a "historical pattern[] of
[African Americans] not participating in the political process," as it had been embedded in them

---

[646] PL758 ¶¶ 5-6 (Burden Corr. Rep.); PL759 ¶¶ 11, 29 (Burden Reply Rep.); PL753 at 26-28
(Barreto/Sanchez Rep.); Trial Tr. 299:4-9, 309:23-313:11, 323:6-324:19 (Burden) (Day 3).
[647] *Infra* ¶¶ 461-470.
[648] Trial Tr. 10:3-15 (Johnson) (Day 3).
[649] Trial Tr. 11:7-20 (Johnson) (Day 3).
[650] Trial Tr. 11:7-20 (Johnson) (Day 3).

for years and years" that this was not a privilege to which they were entitled.[651]   Because of this

lack of participation for so many years, it took tremendous work, effort, and time, "to get to a

level where elected officials had to respect the Black vote."[652]   Rev. Johnson testified that

because of the unique history of African Americans' struggle for the right to vote and the

struggle to exercise that right freely, it is especially important to the elderly African American

population to vote in person because they remember when they could not do so.[653]

451.    Plaintiff's expert witness, George Korbel, testified that the State of Texas recently

stipulated in *Perez v Perry* that racially polarized voting still exists in 252 of the 254 counties in

Texas.[654]   Korbel further testified that Texas had a long history of adopting election procedures

such as the "White Primary" and the Poll Tax that were found unconstitutional by federal

courts.[655]   Korbel also testified that redistricting plans for Texas Congressional and State House

and Senate seats were found unconstitutional in every decade beginning with *White v Regester*

and *Graves v. Barnes* in the 1970s and continuing to the present day with the redistricting

litigation currently occurring in the case of *Perez v Perry*.[656]

452.    In addition, widespread socio-economic disparities continue to hinder Hispanic and

African-American political participation. [657]   These factors and others interact with SB 14 to

result in a diminished opportunity for minority voters to participate in the political process

relative to Anglos.

---

[651] Trial Tr. 12:19-1, 15:24-16:23 (Johnson) (Day 3).
[652] Trial Tr. 12:19-5 (Johnson) (Day 3).
[653] Trial Tr. 19:25-19 (Johnson) (Day 3).
[654] Trial Tr. 200:22-201:12 (Korbel) (Day 5).
[655] PL771 pg 19; Trial Tr. 187:13-189:5 (Korbel) (Day 5).
[656] Trial Tr. 186:14-187:7, 189:9-190:9, 191:1-192:2, 192:8-193:3, 193:12-195:8, 197:21-198:9 (Korbel)
(Day 5).
[657] *Infra* ¶¶ 475-478.

## A.     Hispanic and African-American Voter Participation Rates Lag Behind the Anglo Rate

453.    Anglo voter turnout in Texas has exceeded Hispanic voter turnout in the last five statewide general elections by 15 to 20 percentage points.  African-American turnout also fell below Anglo turnout levels in 2004, 2006, and 2010.  Although some estimates suggest that African-American voter turnout approached or exceeded Anglo voter turnout in 2008 and 2012, there is a substantial likelihood that African-American turnout figures were inflated by measurement error and that African-American turnout has never surpassed Anglo turnout in contemporary Texas elections.[658]

454.    Ecological regression of voter registration as a percentage of citizen voting age population shows a persistent gap in rates of registration for both Blacks and Hispanics, as compared to Anglos.  From 2006 through 2012, Anglo registration exceeded Black registration by 3 to 13 percentage points, and exceeded Hispanic registration by 3 to 12 points. These rates were calculated using Census data and publicly available registration data reported by the Texas Legislative Council.[659]

455.    The Current Population Survey ("CPS") of the U.S. Census also reports a significant gap between Anglo and Hispanic rates of registration, with the disparity ranging between 14 to 23 percentage points from 2006 to 2012.   According to the CPS, black voter registration lagged 5 to 8 points behind Anglo registration in 2006 and 2010, but essentially equaled Anglo registration in 2008 and 2012.[660]  Numerous studies, however, suggest that measurement errors and certain

[658] PL758 ¶¶ 19-25 & fig.1 (Burden Corr. Rep.); Trial Tr. 130:23-131:4, 178:23-180:8 (Ansolabehere) (Day 1); Trial Tr. 299:23-302:4 (Burden) (Day 3).
[659] PL752R ¶¶ 114, 116, 118 & Table VIII.2b (Ansolabehere Corr. Supp. Rep.).
[660] PL752R ¶¶ 121-123 & Table VIII.4 (Ansolabehere Corr. Supp. Rep.).

systemic biases in CPS survey data are likely to overstate black registration and political participation in relative to Anglos.[661]

456.    In addition to registration gaps, there are also significant turnout disparities by race between voters in Texas.

457.    Texas's own record of which registered voters have cast votes in recent elections from the Texas Secretary of State's TEAM database, together with individual race estimates provided by Catalist, show an 11 percentage point disparity between Anglo and Black turnout in 2010, and a 5 percentage point disparity in 2012.   The same data show a 20 percentage point turnout disparity between Anglo and Hispanic voters for both the 2010 and 2012 elections.[662]

458.    Ecological regression analyses confirm the existence of this turnout disparity.  From 2006 to 2012, Black voter turnout in Texas lagged an estimated 17 to 22 points behind Anglo turnout. The same methodology shows that Hispanics turnout was 24 to 33 points lower than Anglo turnout during this time period.[663]

459.    The same general trend is repeated in the Census's Current Population Study.  Anglo voter turnout in Texas has exceeded Hispanic turnout in the last five statewide general elections by 15 to 20 percentage points.  According to the CPS, Black turnout also fell below Anglo turnout levels in 2004, 2006, and 2010. [664]

---

[661] PL758 ¶¶ 19-25 (Burden Corr. Rep.).
[662] PL752R ¶¶ 112, 115 & Tables VIII.1a, VIII.1b (Ansolabehere Corr. Supp. Rep.).
[663] PL752R ¶¶ 114, 120 & Table VIII.3b (Ansolabehere Corr. Supp. Rep.).
[664] PL758 ¶¶ 19-25 & fig.1 (Burden Corr. Rep.); PL752R ¶¶ 121-127 & Table VIII.5 (Ansolabehere Corr. Supp. Rep.).

460.    Lower socioeconomic status for voters of color and a "regional memory" of the time when it was dangerous for African Americans to vote contribute to reduced turnout.  Older, undereducated, and poor African-American voters are particularly unlikely to vote.[665]

   **B.    Texas has a Long History of Voting-Related Discrimination, Stretching Back Over a Hundred Years and Persisting Today**

461.    There is a long history of discrimination against Hispanic and African-American voters in Texas.[666]  For much of the State's history, public officials and party leaders were openly discriminatory.  Texas has tried to justify all-white primary laws, poll taxes, secret ballots, re-registration requirements, and, even, the illegal harassment of minority voters as necessary to prevent alleged voter fraud.   Some more recent discriminatory acts have been more subtle but no less intentional.[667]

462.    Over the course of fifty years, Texas officials invented a series of mechanisms to exclude minority voters from participating in Democratic primary elections, the only meaningful election in a state then dominated by the Democratic Party.  The stated purpose of early white primary provisions was the elimination of voter fraud, based on the notion that minority voters were more likely to sell their vote.[668]  White primary provisions persisted as late as 1953 and were eliminated only through repeated intervention by federal courts.[669]

---

[665] PL760 at 48-49 (Burton Rep.); Trial Tr. 45:3-46:3, 52:4-20 (Burton) (Day 6).

[666] *Infra* ¶¶ 462-470; PL758 ¶¶ 27-28 (Burden Corr. Rep.); PL760 at 5-6 (Burton Rep.); Trial Tr. 303:7-9 (Day 3); Trial Tr. 22:2-24 (Burton) (Day 6).

[667] *LULAC v. Perry*, 548 U.S. 399, 440 (2006); *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); Trial Tr. 17:17-18:6 (Johnson) (Day 3) (testimony of Rev. Johnson explaining poll watching intimidation tactics employed against voters in predominantly black precincts in Houston, Dallas, and portions of East Texas); Trial Tr. 22:18-23:16, 49:5-11 (Burton) (Day 6).

[668] PL760 at 7-8 (Burton Rep.); Trial Tr. 22:25-23:2, 23:17-25:6 (Burton) (Day 6).

[669] PL758 ¶ 30 (Burden Corr. Rep); Trial Tr. 303:10-304:6 (Burden) (Day 3); Trial Tr. 24:3-7, 24:18-26:15 (Burton) (Day 6); *Terry v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); *Nixon v. Condon*, 286 U.S. 73 (1932); *Nixon v. Herndon*, 273 U.S. 536 (1927); Trial Tr. 186:2-8 (Korbel)
(Cont'd...)

463.     In the early 20th century, Texas also established laws that both established a secret ballot and limited assistance or translation for voters.  These facially race neutral laws had a disparate impact on the 45.1% of African-American adult men in Texas who were illiterate—compared to only 8.6% of Anglo adult men (according to a 1900 estimate)—as well as Hispanic voters with limited English proficiency.[670]

464.     Texas established a poll tax in 1902 by state constitutional amendment, and a primary justification given by proponents was to remove the possibility that black voters would hold the balance of power between Anglo factions.[671]  The poll tax required voters to pay a fee to register to vote and to present a poll tax receipt in order to cast a ballot, and that cost fell harder on Hispanics and African Americans, who had fewer financial resources than Anglos.  Texas's poll tax was finally struck down as unconstitutional in 1966, after a federal court found that a primary purpose of the law was to disenfranchise black voters.  As late as 1963, however, Texas voters rejected a state constitutional amendment to forbid the practice, based in part on the claim that the poll tax was a valid means of preventing voter fraud.[672] Although the Twenty-Fourth Amendment to the Constitution, which made poll taxes unconstitutional for federal elections, was ratified and enacted in 1964, Texas did not ratify the amendment until 2009, thirty-five years after its enactment.[673]

---

(Day 5).

[670] PL760 at 9-10 (Burton Rep.); Trial Tr. 26:16-28:22 (Burton) (Day 6).

[671] PL760 at 10-12 (Burton Rep.); Trial Tr. 28:23-31:16 (Burton) (Day 6).

[672] PL758 ¶ 31 (Burden Corr. Rep); PL760 at 12-13 (Burton Rep.); Trial Tr. 304:7-305:15 (Burden) (Day 3); Trial Tr. 28:23-29:25, 31:17-33:7 (Burton) (Day 6); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966).

[673] Trial Tr. 187:18-189:5 (Korbel) (Day 5); Trial Tr. 31:17-33:7 (Burton) (Day 6).

465.    Even after federal courts struck down the poll tax, Texas enacted a series of onerous voter

registration systems patterned on the annual payment of the poll tax.  Texas officials again

supported these disenfranchising devices, claiming that they were a way of preventing voter

fraud.  Either the Constitution or Voting Rights Act struck down or blocked these laws in

succession.  These discriminatory disenfranchising devices and practices have had long lasting

effects on African-American and Latino political participation in Texas. For example, although

struck down in 1966, the poll tax continued to depress minority turnout through the 1980s.[674]

466.    In recent decades, poll workers and police officers in Texas have used ID requirements

and the pretext of "fraud prevention" to target Hispanic and African-American voters for

harassment.  In 1974, the U.S. House of Representatives received testimony concerning "a

highly visible presence of armed police officers near polling places, and excessive demands for

ID."  In 2004, poll workers reportedly subjected African-American voters to more stringent

screening processes than Anglos, and police officers outside of an early voting site in Harris

County demanded that voters present ID and threatened to arrest voters with outstanding

warrants.  Rev. Johnson testified that voter intimidation still exists in Texas today in

predominantly African American precincts.[675]  At polling places in recent elections in Dallas,

Houston, and east Texas, poll workers and poll monitors have intimidated or denied the right to

vote to African Americans.  For example in 2013, a federal court credited testimony that poll

---

[674] PL758 ¶ 32 (Burden Corr. Rep.); PL760 at 13-14 (Burton Rep.); Trial Tr. 305:16-306:13 (Burden)
(Day 3); Trial Tr. 188:14-20 (Korbel) (Day 5); Trial Tr. 33:8-35:15 (Burton) (Day 6); *Beare v. Smith*, 321
F. Supp. 1100 (S.D. Tex. 1971) (three-judge court), *aff'd, Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974)
(per curiam); Trial Tr. 188:14-20 (Korbel) (Day 5).
[675] Trial Tr. 17:15-18:6 (Johnson) (Day 3).

workers had been openly hostile toward Latino voters and had, under Texas's prior non-photo voter ID law, required Latino voters to show a driver license in order to vote.[676]

467.    In every decade since 1970, one or more of Texas's statewide redistricting plans have been struck down or blocked from implementation under the Voting Rights Act or the Fourteenth Amendment.[677]  In 1973, 2006, and 2012 courts found that Texas maps were intentionally discriminatory or bore the mark of intentional discrimination.[678]  Most recently, two courts (including a court within this circuit) either found that the very same Texas Legislature that enacted SB 14 (*i.e.*, the legislature that met in 2011) had enacted statewide redistricting plans with a discriminatory purpose or that purpose may well have underlain their adoption.[679]  The District Court for the District of Columbia (sitting as a three-judge court) denied Section 5 preclearance to the 2011 congressional and Texas Senate plans based on discriminatory purpose, and found that the Texas House plan had a discriminatory effect and also may well have involved discriminatory purpose.[680]  Additionally, the District Court for the Western District of Texas (also sitting as a three-judge court) concluded that Texas "may have focused on race to an impermissible degree by targeting low-turnout Latino precincts" when drawing the 2011 redistricting plan for the Texas House.[681]

---

[676] PL760 at 19-20 (Burton Rep.); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013); PL776 at 6-7 (Wood Rep.); Trial Tr. 209:20-211:18 (Wood) (Day 2); Trial Tr. 17:17-18:6 (Johnson) (Day 3).

[677] Trial Tr. 189:6-198:5, 248:22-249:5 (Korbel) (Day 5); Trial Tr. 69:14-70:19 (Burton) (Day 6).

[678] PL758 ¶ 33 (Burden Corr. Rep.); *LULAC v. Perry*, 548 U. S. 399 (2006); *White v. Regester*, 412 U.S. 755 (1973); *Texas. v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 133 S. Ct. 2885 (2013); Trial Tr. 185:2-187:12 (Korbel) (Day 5).

[679] Trial Tr. 201:23-202:7 (Korbel) (Day 5).

[680] *Texas v. United States*, 887 F. Supp. 2d 133, 159-62, 164-65, 177-78, & n. 32 (D.D.C. 2012).

[681] *Perez v. Perry*, No. 5:11-cv-360, Slip Op. at 6 (W.D. Tex. Mar. 19, 2012) (three-judge court).

468.    For over forty years, Waller County, Texas has specifically worked to prevent the students at Prairie View A&M University, a historically Black university, from voting. [682] Following ratification of the 26th Amendment in 1971, the Anglo county registrar imposed strict residency requirements, which were struck down by a federal court that was in turn summarily affirmed by the Supreme Court.[683]  In 1992, a county prosecutor indicted Prairie View students for "illegally voting," but dropped the prosecutions following Justice Department intervention. Again in 2003, a county prosecutor threatened to indict students for "voter fraud" merely for voting where they attend college, but Prairie View students successfully sued Waller County to stop the threats.  Over the last decade, Waller County officials repeatedly shifted polling places and voting hours and imposed unwarranted requirements on voter registration applications, all to the detriment of Prairie View students, and repeated litigation and Voting Rights Act enforcement was necessary to thwart these behaviors.[684]

469.    Between 1975, when Texas became subject to the preclearance requirement of Section 5 of the Voting Rights Act, and June 2013, when the Supreme Court effectively ended preclearance in its decision in *Shelby County v. Holder*, the Justice Department issued over 200 objection letters blocking discriminatory voting changes enacted by the State of Texas and its subjurisdictions.[685]  As more than one voting change may be the objected to in a single letter, this number understates the total number of affected practices.  These practices include discriminatory methods of election and redistricting plans, discriminatory purges of registered

---

[682] Trial Tr. 38:5-41:7 (Burton) (Day 6); PL760 at 17-19 (Burton Rep.).
[683] PL760 at 16-17 (Burton Rep.); Trial Tr. 37:24-39:7, 69:14-70:19 (Burton) (Day 6); *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) (three-judge court), *summarily aff'd sub nom.*, *Symm v. United States*, 439 U.S. 1105 (1979).
[684] PL760 at 18-19 (Burton Rep.); PL858 (LDF-Comment); Trial Tr. 37:24-40:7 (Burton) (Day 6).
[685] U.S. Dep't of Justice, http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=tx; Trial Tr. 220:2-12 (Korbel) (Day 5); Trial Tr. 69:14-70:19 (Burton) (Day 6); PL771 at 6 (Korbel Rep.).

voters, annexations that diluted minority voting strength, inadequate bilingual oral assistance programs, reduction in the number of elected officials, and discriminatory election-date changes, among others.[686]

470.    This history of official discrimination in elections continues to the present.  Immediately after the invalidation of the Voting Rights Act in June 2013, several jurisdictions in Texas sought to implement problematic election changes that had been previously found to discriminate against minority voters.[687]

     **C.    Hispanics and African Americans Bear the Effects of Discrimination in Education, Employment, Housing, and Health, Hindering the Ability of These Groups to Participate Effectively in the Political Process**

471.    Stark economic disparities persist in the State of Texas between Anglos, on the one hand, and Hispanics and African Americans, on the other.  These disparities include employment, income, and access to a motor vehicle.[688]  These disparities are the direct result of a continuous pattern of racial discrimination against Hispanic and African-American residents in all areas of public life, particularly education, employment, housing, and transportation.  Because racial discrimination creates cycles of socioeconomic disadvantage, the effects of which are slow to fade from minority communities, the present socioeconomic disparities in Texas are directly attributable to past periods and recent acts of racial discrimination and *de jure* segregation.[689]

---

[686] PL765 ¶ 85 (Davidson Supp. Rep.).
[687] PL771 at 26 (Korbel Rep.).
[688] PL758 ¶ 46 (Burden Corr. Rep.); PL771 at 21 (Korbel Rep.); Trial Tr. 310:21-313:11 (Burden) (Day 3).
[689] PL760 at 21 (Burton Rep.); Trial Tr. 309:23-310:20, 313:3-11 (Burden) (Day 3); Trial Tr. 41:18-46:3 (Burton) (Day 6).

Each of these disparities makes it more difficult for Hispanic and African-American voters in Texas to overcome the increase in the cost of voting caused by the implementation of SB 14.[690]

### 1.    Education

472.    De jure educational segregation in Texas existed from the first year of Reconstruction until *Brown v. Board of Education*, and the end of legal segregation was met with a policy of official resistance to integration. Into the 1970s, Dallas, Houston, and Austin all resisted attempts at desegregation, and minority students faced inadequate facilities, outdated curricula, and limited enrichment opportunities. The intervention of federal courts was necessary to challenge this widespread discrimination.[691]

473.    Today, African-American students face disproportionate disciplinary actions for the same low-level offenses committed by Anglo students, and these disciplinary actions are directly linked to drop-out rates.  Texas schools are also experiencing dramatic re-segregation, with over 39% of African-American students attending schools with a minority population of 90-100%.[692]

474.    According to the 2010-2012 ACS, approximately 7.6% of Anglo Texans lack a high school diploma or equivalent.  That figure is five times higher for Hispanics (39.5%) and nearly twice as high for African Americans (13.4%).  Data from the U.S. Department of Education show similar disparities.  Education provides people with both the skills needed to navigate the administrative process of qualifying to vote, and a sense of confidence in the electoral process.[693]

---

[690] PL758 ¶¶ 45, 47, 50-51 (Burden Corr. Rep.); Trial Tr. 310:6-11 (Burden) (Day 3); Trial Tr. 51:24-52:13 (Burton) (Day 6).

[691] PL760 at 21-24 (Burton Rep.); Trial Tr. 41:22-46:3 (Burton) (Day 6); *see also Sweatt v. Painter*, 339 U.S. 629 (1950); *United States v. Tex. Educ. Agency*, 467 F.2d 848 (5th Cir. 1972).

[692] PL760 at 25-26 (Burton Rep.).

[693] PL454 ¶ 10 (U.S. Request for Judicial Notice); PL758 ¶ 44 (Burden Corr. Rep.); Trial Tr. 310:21-311:24 (Burden) (Day 3); Trial Tr. 45:3-46:3 (Burton) (Day 6); PL771 at 20-21 (Korbel Rep.).

## 2.   **Employment and income**

475.   Racial discrimination in employment by Texas state or local agencies also continues to disadvantage African-American and Latino residents of Texas.  In the last two decades, the Texas Department of Family and Protective Services, Matagorda County, the City of El Paso, and the City of Houston have all entered into extensive consent decrees that required them to change their practices to address claims of employment discrimination.[694]

476.   According to the 2010-2012 ACS, the State of Texas has an unemployment rate of 8.4% (±0.1%) within the civilian labor force. The unemployment rate is 6.7% (±0.1%) for non-Hispanic white persons, 9.2% (±0.2%) for Hispanic persons, and 14.1% (±0.3%) for non-Hispanic black persons.  African-American and Hispanic people in Texas with higher levels of unemployment and lower incomes are less likely to participate in the political process.[695]

477.   According to the 2010-2012 ACS, Anglos in Texas have an approximate poverty rate of 9.4%, whereas Hispanics have a poverty rate of 26.9% and African Americans have a poverty rate of 24.7%.  Similarly, the ACS found that the share of households in Texas receiving Supplemental Nutrition Assistance Program ("SNAP") benefits is more than three times as high for Hispanic and African-American households (23.2% and 22.8%) as it is for Anglo households (6.6%).[696]

478.   According to the 2010-2012 ACS, the median household income in Texas is approximately $62,426 for Anglo households but only $38,600 for Hispanic households and $37,041 for African-American households.  Similarly, the median per capita income is roughly

---

[694] PL760 at 26-27 (Burton Rep.).
[695] PL454 ¶ 13 (U.S. Request for Judicial Notice); Trial Tr. 311:25-312:10 (Burden) (Day 3); Trial Tr. 45:3-19 (Burton) (Day 6).
[696] PL454 ¶¶ 9, 18 (U.S. Request for Judicial Notice).

$35,598 for Anglos but $14,768 Hispanics and $19,133 for African Americans.  The monetary

costs of paying for underlying documents needed to obtain EICs are felt more sharply by

African-American and Hispanic Texans who have lower incomes and less wealth than Anglo

Texans.[697]

### 3.   Housing and transportation

479.   Texas enacted a statewide zoning statute in 1927 in order to facilitate local housing

segregation, and official segregation persisted into last decade (the 2000s) through local zoning,

restrictive covenants, and policies of municipal housing authorities.[698]  The establishment of

these segregated communities yielded present housing segregation throughout Texas, as

measured by several academic studies concerning Anglo/African-American segregation and

Anglo/Hispanic segregation in cities as recently as 2010.  Persistent housing segregation greatly

contributes to the lack of access to DPS offices for Hispanic and African-American Texans.[699]

480.   Texas ranks at the bottom of states in per capita investment in public transportation.

Because people of color are substantially less likely than Anglos to have access to motor

vehicles, Texas's lack of investment in public transportation disparately impacts communities of

color.  The more distance that a person has to travel from her home to the polling place, the less

likely she is to vote. Similarly, because minority voters must travel longer distances to obtain

EICs to vote and minority households are less likely to own a vehicle, as compared to Anglos,

SB 14 related travel costs bear more heavily on minorities and are more difficult to overcome.[700]

---

[697] PL758 ¶¶ 11-12 (Burden Corr. Rep.).
[698] PL760 at 27-30 (Burton Rep.); *Walker v. City of Mesquite* , 169 F.3d 973, 976 (5th Cir. 1999).
[699] PL760 at 30-33, 45-47 (Burton Rep.); Trial Tr. 316:17-317:9 (Burden) (Day 3); Trial Tr. 45:3-19 (Burton) (Day 6).
[700] *Supra* ¶ 380-413; PL454; PL760 at 32-33 (Burton Rep.); PL779 at 5; Trial Tr. 206:23-207:6 (Uresti) (Day 3); Trial Tr. 312:11-19; 314:15-315:23 (Burden) (Day 3).

### 4.  **Health**

481.   Based on survey data from the U.S. Centers for Disease Control, African Americans and Latinos are much more likely to report being in only "fair" or "poor" health, to lack a personal doctor, to lack health insurance, to have not visited a doctor in the past year due to the cost. Many of these disparities are approximately on the order of a ratio of two to one.[701]

482.   Older African Americans from the rural South are more likely to have been born at home to midwives who did not issue birth certificates. Similarly, a recent study from February 2013 found that 26.7% of African-American 18 to 29 year-olds lack a birth certificate, as compared to only 15.7% of white youth.[702]

### D.  **Racially Polarized Voting Continues in Texas**

483.   Federal courts have repeatedly and consistently found that elections in Texas are characterized by polarized voting between Hispanics and Anglos, and between African Americans and Anglos. [703]  *E.g., League of United Latin American Citizens v. Perry,* 548 U.S. 399, 427 (2006); *Campos v. City of Baytown,* 840 F.2d 1240 (5th Cir. 1988), *reh'g en banc denied,* 849 F.2d 943 (5th Cir. 1989); J*ones v. City of Lubbock,* 727 F.2d 364, 381 (5th Cir. 1984), *reh'g granted on other grounds,* 682 F.2d 504 (5th Cir. 1984); *Benavides v. Irving Independent School District,* No. 3:13-CV-0087-D, slip op. at 26 (N.D. Tex., August 15, 2014); *Rodriguez v. Harris County,* 964 F. Supp. 2d 686, 777 (S.D. Tex. 2013); *Fabela, v. City of Farmers Branch,* No. 3:10–CV–1425–D, 2012 WL 3135545 at *11 (N.D. Tex. Aug. 2, 2012); *Benavides v. City of Irving,* 638 F. Supp. 2d 709, 731 (N.D. Tex. 2009); *Vera v. Richards,* 861 F. Supp. 1304, 1316 (S.D. Tex. 1994); *Terrazas v. Slagle,* 789 F. Supp. 828, 833 (W.D. Tex. 1991),

---

[701] PL758 ¶ 49 (Burden Corr. Rep.); PL779 at 5; Trial Tr. 312:20-313:2 (Burden) (Day 3).
[702] PL755 at ¶ 45 (Bazelon Rep.).
[703] Trial Tr. 199:9-200:21 (Korbel) (Day 5).

*aff'd sub nom., Richards v. Terrazas,* 505 U.S. 1214 (1992); *Lipscomb v. Wise,* 399 F. Supp. 782, 795 (N.D. Tex. 1975).

484.    The State of Texas has conceded in other pending litigation in this district that, as a general matter, racially polarized voting persists in the State.[704]

485.    Analyses conducted in 2011 by the State of Texas, through the Office of the Attorney General, documented racially polarized voting patterns in statewide elections from 2002 to 2010.[705]

486.    According to exit polling, in the last five general elections a majority or plurality of Anglos have consistently favored the Republican candidate for president or governor, while a majority of Hispanic and African-American voters have consistently voted against the Republican candidate.  Excluding the unique 2006 gubernatorial election as an outlier, an average of 72% of Anglos voters cast their ballot for the Republican candidate, 41% of Hispanic voters did so, and only 10% of African-American voters favored the Republican candidate.[706] Other reviews of voting behavior in academic studies and expert reports indicate that voting preferences in congressional and other down-ballot races frequently differ between Anglo and minority voters in Texas by a range of 30 to 70 percentage points.  Because SB 14 imposes additional costs on African-American and Latino Texans, which can decrease minority political

---

[704] PL1037 at 114:18-115:17 (*Perez v. Perry*, July 29, 2014 Transcript); Trial Tr. 200:22-201:8 (Korbel) (Day 5).
[705] *See* PL935 (Racially Polarized Voting Analysis – Office of the Attorney General, State of Texas, Plan S148); PL936 (Racially Polarized Voting Analysis – Office of the Attorney General, State of Texas, Plan E120) ; PL937 (Racially Polarized Voting Analysis – Office of the Attorney General, State of Texas, Plan H283); PL938 (Racially Polarized Voting Analysis – Office of the Attorney General, State of Texas, Plan C185).
[706] PL758 ¶¶ 36-38 (Burden Corr. Rep.); Trial Tr. 306:22-307:11, 308:13-309:22 (Burden) (Day 3); PL753 at 31-32 (Barreto/Sanchez Rep.).  The 2006 gubernatorial election included two third-party candidates who garnered significant support.

participation in a way that it does not for Anglo voters, and because minority voters have different preferences than Anglos, it's likely that SB 14 will affect the outcome of elections.[707]

487.    According to the Barreto/Sanchez Survey, policy attitudes are racially divergent, particularly with regard to immigration laws:  63% of Anglo respondents favored repeal of the provision of the Fourteenth Amendment that provides for citizenship by birthright, while only 34% of Hispanic respondents and 32% of African-American respondents favored repeal; 55% of Anglo respondents favored ending bilingual education, compared to only 22% of Hispanic respondents and 30% of African-American respondents; and 46% of Anglo respondents favored local officials enforcing federal immigration law, while only 18% of Hispanic respondents and 32% of African-American respondents favored this policy.[708]

488.    Political science research has consistently found that discriminatory attitudes and racial prejudice are driving factors behind Anglo party identification, particularly in jurisdictions such as Texas that were formerly covered by Section 5 of the Voting Rights Act.[709]

E.    **Contemporary Political Campaigns in Texas Continue to be Marked by Racial and Anti-Immigrant Appeals**

489.    Race is a central feature of Texas politics.  Today, most Anglo voters in Texas have moved from the Democratic Party to the Republican Party, while consistent majorities of Hispanic and African-American voters favor the Democratic Party.[710]

490.    Implicit racial appeals make use of coded language to activate racial thinking. Racial cues and code words that may prime racial attitudes in Anglo voters include "welfare queen," "lazy," "criminal," "taking advantage," "poverty," "immigration," "corruption," and "fraud."[711]

---

[707] PL758 ¶¶ 40-41 (Burden Corr. Rep.); Trial Tr. 307:12-24 (Burden) (Day 3).
[708] PL753 at 30-31 (Barreto/Sanchez Rep.).
[709] PL753 at 33-34 (Barreto/Sanchez Rep.).
[710] PL760 at 33 (Burton Rep.); Trial Tr. 46:8-22 (Burton) (Day 6).

491.    There are numerous examples of racial appeals in campaigns in Texas in the last 6 years

alone.  For example, in 2008, Empower Texans sent a mailer to voters in Pasadena that depicted

an Anglo candidate next to pictures of minority politicians, with the captions "Birds of a Feather

Flock Together" and "Bad Company Corrupts Good Character."  Also in 2008, a candidate for

the Texas House manipulated photographs of his Anglo opponent to darken his skin and place a

Mexican flag button on his shirt.[712]

492.    The 2014 Texas Republican Party Platform calls for the return of a plaque honoring the

Confederate Women's Pension Fund to the Texas Supreme Court building, supports the adoption

of "American English" as the official language of Texas, urges limitations on bilingual

education, and calls for the wholesale repeal of the Voting Rights Act of 1965 (including

provisions requiring the translation of election materials), along with the use of any racial data to

create districts in which minority voters have the opportunity to elect their preferred

candidates.[713]

493.    Proponents of SB 14 also connected their support for voter ID to racial appeals by using

implicit and overt racial appeals that associated poor, inner-city, and minority voters with voter

fraud and associated immigration with SB 14 in order to prime racial attitudes in Anglo voters.

For example, in his 2012 Senate campaign, Lieutenant Governor David Dewhurst linked his

stance on immigration restrictions to the need for a strict voter ID law.  Representative Patricia

---

[711] PL760 at 35-36 (Burton Rep.); PL771 at 22-23 (Korbel Rep.).
[712] PL760 at 36-38 (Burton Rep.); PL1015 (Empower Texans mailer); PL795 (Chris Turner Mailer No. 1); PL796 (Chris Turner Mailer No. 2); PL797 (Chris Turner Mailer No. 3); Trial Tr. 46:8-48:16 (Burton) (Day 6).
[713] PL760 at 38 (Burton Rep.); PL786 (Texas GOP 2014 Platform)

Harless, the House sponsor of SB 14, did the same on her campaign website.[714]  Dan Patrick, an author of SB14, disseminated campaign materials in 2014 featuring shadowy, dark-skinned men and denouncing the "invasion" of illegal immigrants in Texas.[715]

494.    The King Street Patriots, a tea party group based in Harris County, recently posted a digitally-altered photo on its website showing a African-American person holding a sign with the words "I only got to vote once," with a white woman holding a second sign saying "I'm with stupid."  In 2010, this group organized a poll monitoring campaign where dozens of primarily Anglo volunteers showed up at 37 polling places throughout a predominately African-American congressional district, leading to over a dozen complaints of voter intimidation.  The leader of this group then addressed the Texas legislature in favor of SB 14.[716]

### F.    Hispanics and African Americans Have Been Underrepresented at All Levels of Government in Texas

495.    Hispanic and African-American voters continue to be underrepresented at all levels of government in Texas.[717]  While Hispanic and African-American representation in the Texas Legislature is substantial but below population share, representation at the local level remains extremely low.[718]

496.    While Hispanics make up approximately 30.3% of the citizen population of Texas and African Americans make up 13.3%, at the start of the 2013 legislative session, Hispanics held 21.1% of legislative seats and African Americans held 11.1% of seats.[719]

---

[714] PL760 at 39-40 (Burton Rep.); PL688 (Harless Website).
[715] Trial Tr. 305:22-307:5 (Patrick) (Day 7).
[716] PL760 at 40-41 (Burton Rep.); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 at 784-85 (S.D. Tex. 2013).
[717] PL771 at 26-28 (Korbel Rep.).
[718] *Infra* ¶¶ 496-497; PL758 ¶¶ 52, 55 (Burden Corr. Rep.).
[719] PL758 ¶ 53 (Burden Corr. Rep.).

497.    Taking into account federal, state, and local offices in Texas, an analysis from 2003 indicated that Hispanics make up only 7.1% of Texas elected officials, and analysis from 2000 indicated that African Americans make up only 1.7% of Texas elected officials, small fractions of their population share.  Political science research shows that when people are represented by elected officials that reflect their own race or ethnicity ("descriptive representation"), they feel more efficacious and, thus, are more likely to vote. SB 14 both decreases minority voter trust in efficacy, and dissuades African-American and Hispanic voter participation in Texas elections.[720]

### G.    SB 14 Addresses a Type of Voter Fraud That is Essentially Nonexistent in Texas and Does Not Address Any Other Form of Voter Fraud

#### 1.    Overview

498.    The threat of voter fraud has been used to justify nearly every disfranchising device in Texas history, from poll taxes, to annual registration requirements, to purges.[721]  Most Texas politicians grasp the basic rule that elections laws are never neutral in their effects although the ostensible reasons given for disfranchising election laws are usually benign.[722]  The connection between the actual threat of in-person voter fraud and Texas's shift from a voter identification requirement relying on a document all voters receive automatically to an unforgiving photographic voter identification law is tenuous at best.

499.    Some defenders of SB 14, when speaking in support of the bill, invoked forms of voting fraud that SB 14 could not prevent, such as absentee ballot fraud.[723]  Other defenders had no knowledge of the amount of in-person voter impersonation that had occurred in Texas.[724]

---

[720] PL758 ¶ 54 (Burden Corr. Rep.); Trial Tr. 317:10-319:9 (Burden) (Day 3).
[721] *Supra* ¶ 461-470.
[722] PL760 at 41 (Burton Rep.); Trial Tr. 48:20-49:23 (Burton) (Day 6).
[723] PL758 ¶¶ 93-96 (Burden Corr. Rep.); PL689 (8/22/13 OAG Press Release).
[724] PL758 ¶ 96 (Burden Corr. Rep.); PL006 (Senate Committee of the Whole Transcript, January 25,

(Cont'd…)

500.    In-person voter impersonation is extremely rare in Texas elections.[725]  From 2002 to the present, there has been one conviction and one guilty plea of which the Special Investigations Unit (SIU) is aware that involved in-person voter impersonation in any election in the State of Texas.[726]  The Secretary of State's Office is not aware of any additional convictions.[727]  The most recent guilty plea involved a local school district election.[728]  The conduct was discovered by a poll worker who recognized the voter.[729]  SIU does not know why the voter attempted to vote as another person.[730]  But the conduct was isolated:  the suspect was not charged with any connection to a broader effort to affect the outcome of the election.[731]

501.    Although more than 200 referrals of alleged voting by deceased persons were referred to SIU in July 2012, SIU is unaware how the Secretary of State identified those allegations for referral.[732]  Moreover, Major Mitchell testified allegations of deceased people voting are sometimes attributable to administrative or clerical error.[733]  None of those more than 200 referrals has resulted in a single referral for prosecution,[734] and Major Mitchell knew nothing about the status or disposition of any investigations.[735]

502.    The two instances of in-person voter impersonation from 2002 to the present must be evaluated in the context of the number of votes cast in elections conducted during this period.

---

2011, at 240).

[725] PL758 ¶¶ 91-96 (Burden Corr. Rep.); Trial Tr. 319:10-320:21 (Burden) (Day 3).

[726] Trial Tr. 171:20-25 (Day 5) (noting two adjudicated or pending cases from 2002 to 2011); Trial Tr. 173:6-16 (Day 5) (stating that Mr. Almanza pleaded guilty).

[727] Trial Tr. 377:4-8 (Ingram) (Day 7).

[728] Trial Tr. 173:17-174:3 (Mitchell) (Day 5).

[729] Trial Tr. 174:4-12 (Mitchell) (Day 5).

[730] Mitchell Dep. Tr. 121:8-16.

[731] Mitchell Dep. Tr. 121:17-22.

[732] Mitchell Dep. Tr. 148:5-6.

[733] Mitchell Dep. Tr. 178:17-24.

[734] Mitchell Dep. Tr. 149:25-150:7.

[735] Mitchell Dep. Tr. 152:14-23.

Looking only at regular statewide primaries, primary runoffs, special Constitutional elections, and general elections from 2002 through 2014  (*e.g.*, not counting separately scheduled municipal elections, special legislative elections, or special runoff elections), approximately 62.1 million votes were cast (although this includes absentee votes, the number of votes cast obviously remains extremely large even if those votes are removed).[736]

> **2.    Dr. Minnite's study of voter fraud across the country and in Texas found fewer than 10 credible claims of in-person voter impersonation fraud during a 10-year period**

503.    Dr. Lorraine Minnite conducted an exhaustive study of the incidence of voter fraud in recent elections nationally and in Texas, with a specific focus on the kind of voter fraud that would be prevented by SB 14—impersonation fraud. [737] On the basis of extensive research conducted throughout her career, Dr. Minnite concluded that from 2000 to 2010, fewer than ten credible claims of impersonation fraud at polling places were brought across the country.[738]  Her research led her to conclude that "nationwide and in Texas the incidence of voter impersonation is very, very rare."[739]  Rather, she found that allegations of voter fraud typically consist of unsubstantiated or false allegations filed by the losers of close elections, "mischief" (*e.g.*, the one-time successful registration of a wooden puppet), and claims reflecting voter error or administrative mistake.[740]

---

[736] *Turnout and Voter Registration Figures (1970-current)*,
http://www.sos.state.tx.us/elections/historical/70-92.shtml.
[737] Trial Tr. 123:16-21, 124:2-7, 129:14-19 (Minnite) (Day 5).
[738] PL773 at 4 (Minnite Rep.); Trial Tr. 129:20-24 (Minnite) (Day 5).
[739] Trial Tr. 124:2-7 (Minnite) (Day 5).
[740] PL773 at 14-15, 21 (Minnite Rep.); Trial Tr. 131:13-132:6, 140:23-141:7 (Minnite) (Day 5).

504.    Dr. Minnite defines "voter fraud" as "the intentional corruption of the voting process by voters."  She acknowledged that this definition does not capture election errors and mistakes but noted that SB 14 and Texas criminal law do not target mistakes.[741]

505.    Dr. Minnite conducted historical and contemporary research concerning the incidence of voting fraud, principally relying on records produced by the Department of Justice, the Administrative Office of U.S. Courts, and litigants in the 2004 Washington State gubernatorial election contest; news articles, press releases, and public documents, including those posted by the Office of the Texas Attorney General; referrals sent by Office of the Texas Secretary of State to the Office of the Texas attorney general between 2002 and mid-2006; the legislative history of SB 14; and discovery produced in this case and prior litigation concerning SB 14.[742]

506.    Dr. Minnite then applied her definition of "voter fraud" to these materials in order to identify and quantify incidents of voter fraud in Texas and nationally.  This Court finds that the methodology used by Dr. Minnite is acceptable and reliable within her field of expertise.

507.    Dr. Minnite concluded that jurisdictions newly placed the burden of establishing eligibility on individual voters when federal and state law vastly expanded the franchise in the Nineteenth Century.  She found that restrictive voting requirements have had a historically suppressive effect on African Americans and other voters, including across the South and in Texas, where poll taxes, for example, were not nullified until 1966.  Finally, Dr. Minnite found that historical research suggests "election fraud documented by early election reformers was not primarily committed by individual voters" but instead by corrupt election officials and

---

[741] PL773 at 9-10 (Minnite Rep.); Trial Tr. 124:8-15 (Minnite) (Day 5).
[742] PL773 at 4-5, 9-11, 17-18, 20-21 (Minnite Rep.); Trial Tr. 125:25-129:2, 129:25-134:22 (Minnite) (Day 5).

politicians.  Thus, Dr. Minnite observed that no conclusive tie between enfranchising reforms and voter fraud has ever been proven.[743]

508.    Contemporary evidence of voter fraud nationwide is quite limited.  For example, during the first three years (FY2002 to FY2005) of the Department of Justice's intensive Ballot Access and Voter Integrity Initiative (BAVII), the Department brought only 40 indictments against voters, yielding only 26 guilty pleas, during a period in which Americans cast over 200 million voters in federal elections.[744]

509.    Similarly, data from the federal courts shows that of 183,284 indictments in the 2005 fiscal year, only 60 were "election fraud" violations (a more expansive definition than "voter fraud") and that this number was dwarfed by indictments for other crimes of concealment, such as Social Security fraud, counterfeiting, and tax evasion.  Dr. Minnite concluded from this data that the alleged difficulty in detecting certain kinds of crime has not prevented their prosecution and that the low number of voter fraud indictments is likely a reliable indicator of the actual incidence of voter fraud.[745]

510.    Dr. Minnite also examined the 2004 Washington State gubernatorial election, which included intense judicial scrutiny of allegations of voter fraud.  In that matter, the court found that only 25 of 2,812,675 ballots (0.0009%) were invalid and declined to find that a single ballot had been cast with intent to defraud.[746]

---

[743] PL773 at 8-9 (Minnite Rep.)
[744] PL773 at 11-12 (Minnite Rep.).
[745] PL773 at 13, 16 (Minnite Rep.).
[746] PL773 at 14 (Minnite Rep.).

511.    Within the State of Texas, the Office of the Texas Attorney General referred only 62 criminal election fraud cases for prosecution from 2002 to 2011, only two of which involved in-person voter impersonation.[747]

512.    A 2006 study of election fraud by the Texas Legislative Council concluded that state and local officials most consistently cited absentee voting as a vulnerability in the state's voting system.  The study did not document any voter impersonation at the polls or, more generally, any significant record of intentional corruption of the voting process by voters.[748]

513.    Dr. Minnite's analysis of hundreds of news articles from 2000-2014 also yielded no evidence to rebut the notion that voter impersonation and voter fraud are rare in Texas.[749]

514.    In sum, from 2000 to the present, there were only four credible claims of voter impersonation fraud at the polls in Texas, and two of those cases occurred after SB 14 had been signed into law.[750]  According to Dr. Minnite, when you consider the number of votes that have been cast since 2000 in the State of Texas, "to have only four cases [of in person impersonation fraud] emerge would mean to me it's very rare."[751]  Dr. Minnite testified that it was not clear whether SB 14 would even have prevented those incidents because at least one involved a woman who had obtained a fake driver licenses with her picture on it.[752]

515.    In the decade preceding the passage of SB 14, only two credible claims of impersonation fraud at the polls were brought in Texas. These claims were not highly publicized and did not

---

[747] PL773 at 17 n. 56 (Minnite Rep.).
[748] PL773 at 18-19 (Minnite Rep.).
[749] PL773 at 21 (Minnite Rep.).
[750] PL773 at 4 (Minnite Rep.); Trial Tr. 134:23-135:20 (Minnite) (Day 5).
[751] Trial Tr. 136:17-22 (Minnite) (Day 5).
[752] Trial Tr. 136:23-137:7 (Minnite) (Day 5).

provide a reasonable policy justification to enact SB 14.[753]  Moreover, Dr. Minnite found that proceedings before the Texas Legislature presented no compelling evidence of intentional, recent voter corruption of the voting process, and concluded that there is a "lack of evidence of voter impersonation at the polling place, and more broadly, voter fraud in Texas."[754]  Dr. Minnite further testified that there is a misconception in the public that there is more voter fraud taking place than is actually occurring, in part because of inaccurate reporting on the issue.[755]  Ultimately, Dr. Minnite testified that SB 14 was not an effective policy response to either the goal of deterring voter fraud or the goal of increasing the integrity of the electoral system.[756]

### 3.      Mr. Wood's knowledge of voter fraud in Texas

516.    Mr. Randall Buck Wood has over forty years of experience concerning Texas election law, and over the course of his career, he has been involved in numerous depositions, witness interviews, and other discovery tactics related to in-person voter fraud.  Despite having tried to locate such fraud on behalf of clients, he has never found a case of in-person voter fraud in Texas that involved voter impersonation, such as in-person ballots cast on behalf of deceased persons.[757]

517.    Mr. Wood has found that it should not be difficult to detect in-person voter fraud.[758]

518.    Generally, to affect an election, one would need to cast (or have others cast) dozens of illegal votes.  This is easier to do with absentee ballots and extremely difficult, if not impossible, to do with in-person voter fraud.[759]

---

[753] PL773 at 4 (Minnite Rep.).
[754] PL773 at 20-21 (Minnite Rep.).
[755] Trial Tr. 137:8-139:3 (Minnite) (Day 5).
[756] Trial Tr. 142:11-25 (Minnite) (Day 5).
[757] PL773 at 4 (Wood Rep.); Trial Tr. 193:2-197:9 (Wood) (Day 2).
[758] PL776 at 5 (Wood Rep.); Trial Tr. 198:12-202:10 (Wood) (Day 2).

519.     Mr. Wood has found significant mail voter fraud over the course of his career.[760]
However, SB 14 does nothing to address absentee voting fraud.[761]

520.     This has led Mr. Wood to the logical conclusion that the Texas legislature did not address
absentee voting fraud because more Anglo voters cast ballots by mail than do non-Anglo voters,
which in turn suggests that SB 14 was designed to decrease the number of minority votes.  Mr.
Wood also testified that poll workers at times use their discretion to deny eligible Texans the
right to vote, including a recent example where poll workers in east Texas unlawfully prevented
African Americans from voting in a primary election. SB 14 gives poll workers another level of
discretion to decide who is eligible to vote.[762]

### 4.     SB 14 does not address the more common form of voter fraud, involving absentee voting by mail

521.     The only crime that can be prevented by a photographic voter identification requirement
for in-person voting is in-person voter impersonation.[763]  SB 14 would not prevent a variety of
other issues, including clerical errors, vote buying, voter intimidation, double-voting, absentee
ballot manipulation, or voting machine errors.[764]  Nor would SB 14 prevent or deter voter
registration fraud.[765]

522.     Absentee ballot fraud is, to a very substantial degree, a more common type of voting
fraud than in-person voter impersonation.[766]

---

[759] PL776 at 5 (Wood Rep.); Trial Tr. 203:18-204:1, 211:23-212:8 (Wood) (Day 2).
[760] PL776 at 4 (Wood Rep.); Trial Tr. 200:4-204:1 (Wood) (Day 2).
[761] PL776 at 4 (Wood Rep.); Trial Tr. 209:12-19 (Wood) (Day 2).
[762] PL776 at 4-7 (Wood Rep.); Trial Tr. 209:20-211:18 (Wood) (Day 2).
[763] PL758 ¶ 91 (Burden Corr. Rep.); PL773 at 4 (Minnite Rep.).
[764] Trial Tr. 141:17-142:10 (Minnite) (Day 5).
[765] Trial Tr. 159:10-160:3 (Minnite) (Day 5).
[766] PL758 ¶ 95 (Burden Corr. Rep.).

523.    SB 14 counter-intuitively imposes new burdens on in-person voting—where fraud is less likely and racial and ethnic disparities are greater—while excluding absentee voting from identification requirements.[767]

524.    In fact, Major Mitchell testified on behalf of OAG that any hypothetical individual who wanted to engage in voter impersonation after SB 14's photo ID requirement became effective could just as easily do so through absentee ballot fraud.[768]  SB 14's photo ID requirements do not apply to absentee ballots.[769]  Major Mitchell also testified that any hypothetical group attempting to affect an election outcome through voter fraud could do so through voter coercion, absentee ballot fraud, and vote buying—none of which are implicated by SB 14's photo ID requirement.[770]

### H.    SB 14 Does Not Address Non-Citizen Voting

525.    SB 14 does not address voting by non-citizens, to the extent that may be occurring. Individuals who are not U.S. citizens are able to obtain several forms of SB 14 ID, including a Texas driver license, personal identification card, and concealed handgun license, and lack of U.S. citizenship is not apparent on the face of these documents.[771]

### I.    SB 14 Also Does Not Address the State's Interest in Promoting Voter Confidence

526.    Political science research has established that there is no relationship between the strictness of state voter ID laws and voter confidence.  In addition, research has shown that

---

[767] PL758 ¶¶ 80-82 (Burden Corr. Rep.); Trial Tr. 319:17-320:21 (Burden) (Day 3).
[768] Mitchell Dep. 158:22-159:11; Trial Tr. 174:23-175:13 (Mitchell) (Day 5).
[769] Trial Tr. 174:19-22 (Mitchell) (Day 5).
[770] Trial Tr. 175:14-176:24 (Mitchell) (Day 5).
[771] Trial Tr. 141:15-142:2 (Peters) (Day 6); Gipson Dep. 13:1-12, 50:20-51:3; Zgabay Dep. 13:1-3, 50:20-51:3; Tex. Transp. Code §§ 521.101, .121(e), .142; Trial Tr. 319:22-320:3 (Burden) (Day 3).

confidence in the integrity of elections is not correlated with a voter's propensity to turn out to vote.[772]

527.    Voter confidence is improved when a voter is able to vote in person rather than by mail. By eliminating the right to vote in person for some absentee-eligible voters, SB 14 is likely to increase absentee voting and thereby decrease voter confidence.[773]

528.    SB 14 is an abrupt departure from Texas's prior voter ID law that is not justified by its ostensible purposes: to reduce voter fraud and to increase voter confidence.[774]

529.    SB 14 represents a sharp escalation in voter identification requirements relative to Texas's previous voter identification law, HB 331.[775]

530.    SB 14 omits numerous ameliorative features of Georgia and Indiana's voter ID laws, as well as laws enacted in 2011 and later.[776]

## XII.    THE LEGISLATIVE PROCESS LEADING TO THE ADOPTION OF SB 14

531.    SB 14, enacted in 2011, is the culmination of a legislative process that stretched across four legislative sessions during which the legislature advanced, and passed in one chamber, increasingly restrictive voter ID bills: HB 1706 (2005), HB 218 (2007), and SB 362 (2009).[777] SB 14 represents a sharp departure from its immediate predecessor, SB 362 (2009), both as to the forms of permissible voter ID and provisional ballot procedures.[778]

532.    Voter identification legislation was introduced and ultimately enacted in the context of a rapidly changing Texas population.  Specifically, Texas's substantial population growth over the

---

[772] PL758 ¶¶ 98-99 (Burden Corr. Rep.); Trial Tr. 320:22-321:6 (Burden) (Day 3).
[773] PL758 ¶¶ 99-101 (Burden Corr. Rep.); Trial Tr. 321:8-19 (Burden) (Day 3).
[774] Supra ¶¶ 498-502; Trial Tr. 322:16-323:23 (Burden) (Day 3).
[775] Supra ¶ 6-21; Trial Tr. 322:25-324:14 (Burden) (Day 3).
[776] Supra ¶ 23-30.
[777] Trial Tr. 185:2-5 (Ellis) (Day 4).
[778] Infra ¶¶ 636, 643.

last decade and a half has been largely among the state's minority populations.  From 2000 to 2010, for instance, African Americans and Latinos accounted for 78.7% of the population growth in the state, while whites accounted for only 11%.  As a result of these population changes, the Anglo voting age population dropped below 50% in 2010.  Among the citizen voting age population, the Anglo share decreased sharply from 64.5% in 2000 to 56.4% in 2010.[779]

533.    Bill supporters cited public support of voter ID as a justification for their enactment of SB 14, and some segments of the public expressed support for voter ID legislation as a means of preventing non-citizens from participating in U.S. elections and preventing illegal immigration. SB 14, however, could not further that interest because permanent residents may lawfully possess some forms of acceptable photo ID under SB 14.[780]

534.    Bill supporters also argued that voter ID was necessary to deter in-person voter impersonation.  However, there was scant evidence that the state's then-existing voter ID provisions were ineffective in preventing in-person voter impersonation.  At the same time, the legislature was aware that another form of voter fraud, absentee ballot fraud, was occurring.[781]

535.    Bill supporters ignored the repeated warnings of Hispanic and African-American legislators across sessions that minority voters were less likely to possess requisite ID.  Although the Secretary of State's office conducted an analysis of Texas voters who lacked a state driver license during consideration of SB 14, it withheld its analysis from Texas lawmakers, including the House bill sponsor.[782]

---

[779] PL772 at 8-9 (Lichtman Rep.); Trial Tr. 51:2-13 (Lichtman) (Day 4).
[780] *Infra* ¶ 667-673, 726-730, 776; *supra* ¶ 525.
[781] *Infra* ¶ 549-551, 629-630.
[782] *Infra* ¶ 674-688, 702-720, 733-734, 737.

536.    The legislature uniformly rejected amendments that would have reduced the bill's impact on poor and minority voters by expanding the forms of qualifying photo ID, waiving the cost of documents necessary to obtain state photo ID, and increasing access to driver license offices.[783] Sen. Dan Patrick acknowledged that these amendments could have alleviated burdens on minority voters yet did not recall why he voted to table these amendments.[784]

### A.    79th Texas Legislature (2005): House Bill 1706.

#### 1.    HB 1706 is introduced and would use non-photo ID to establish identity

537.    During the 2005 legislative session, the Texas legislature began to consider modifying the State's voter identification requirements.  House Elections Committee Chair Mary Denny, a conservative representing an overwhelmingly Anglo district, introduced HB 1706.[785]

538.    HB 1706 would have required a voter at the polling place to show his or her voter registration certificate and either one form of specified photo identification or two forms of specified non-photo identification.  The bill set out numerous forms of permissible photo identification and non-photo identification.[786]

539.    The stated rationale behind HB 1706 was fraud prevention.[787]

540.    In a hearing on HB 1706 before the House Elections Committee, representatives from MALDEF and other voting rights organizations argued that the proposed requirement was

---

[783] *Infra* ¶ 689-701, 737-743.
[784] Trial Tr. 288:19-295:6 (Patrick) (Day 7).
[785] PL099 (HB 1706 as filed); PL765 at ¶ 8 (Davidson Supp. Rep.); PL772 at 11-12 (Lichtman Rep.); Trial Tr. 56:25-57:5 (Lichtman) (Day 4).
[786] PL099 (HB 1706 as filed); PL765 at ¶ 9 (Davidson Supp. Rep.); PL772 at 11-12 (Lichtman Rep.); Trial Tr. 55:17-57:15 (Lichtman) (Day 4).
[787] PL101 at 53-54 (House Elections Subcommittee Transcript, Mar. 17, 2005); PL765 at ¶ 9 (Davidson Supp. Rep.); PL772 at 12 (Lichtman Rep.); Trial Tr. 58:6-17 (Lichtman) (Day 4).

unnecessary because of the absence of evidence of in-person voter fraud.[788]  Witnesses testified that requiring photo identification would disenfranchise voters who lack access to vehicles, including poor, elderly, and rural voters.[789]  On May 3, 2005, the Texas House passed HB 1706 by a vote of 78-67, over the opposition of every African-American legislator and all but one Latino legislator.[790]

## 2. HB 1706 is defeated by opposition by Hispanic and African-American Senators

541.    The Texas Senate received HB 1706 from the House on May 4, 2005.  The following day, Lieutenant Governor David Dewhurst referred it to the Committee on State Affairs.[791]

542.    Under the Texas Senate's "two-thirds rule," a bill cannot be considered out of the regular order of business unless a Senator moves to suspend the regular order of business and two-thirds of the Senators present vote in favor of the motion.[792]

543.    The Texas Senate's "two-thirds rule" has been in effect since the 1950s.  The rule has been justified as fostering comity and encouraging conciliation, cooperation, compromise, and negotiation.[793]

544.    During regular sessions of the Texas Senate, most bills are considered out of the regular order of business.  Thus, few if any bills are heard without passage of a motion requiring a two-thirds super-majority.[794]

---

[788] PL101 at 94-95 (House Elections Subcommittee Transcript, Mar. 17, 2005).
[789] PL101 at 13-16, 18, 66, 94-96, 101 (House Elections Subcommittee Transcript, Mar. 17, 2005); PL764 at ¶ 10 (Davidson Rep.).
[790] PL112 at 2553-55 (Tex. H.J., 79th Leg., Regular Sess. (61st Day)).
[791] PL1011 (HB 1706 bill history).
[792] Fraser Dep. 18:15-22:23, June 2012; 42 S.J. Reg. 1682 (1931); PL169 at 22 (2005 Senate Rules); PL765 at ¶ 12 (Davidson Supp. Rep.).
[793] Uresti Dep. 57:11-59:16, June 2012; Hebert Dep. 156:9-22, May 29, 2012; McCoy Dep. 120:14-121:17, May 16, 2012; Brunson Dep. 104:12-105:8, May 2012; PL765 at ¶ 12 (Davidson Supp. Rep.); Trial Tr. 215:5-20 (Uresti) (Day 3); Trial Tr. 165:8-166:9 (Ellis) (Day 4).

545.    Eleven senators vowed to prevent the consideration of HB 1706, including Senator

Rodney Ellis, an African American, who threatened to filibuster HB 1706 if it reached the Senate

floor.[795]

546.    In an effort to circumvent this opposition, the House voted to append the provisions of

HB 1706 to SB 89, a bill that had passed the Senate concerning another aspect of elections.[796]

The intent of this maneuver was to evade the two-thirds rule in favor of the majority vote

requirement for the Senate to concur with amendments added in the House.[797]

547.    Senate Minority Leader Leticia Van de Putte, a Latina, then successfully challenged the

Senate's right to debate SB 89, as amended, pursuant to the Texas Constitution.[798]

548.    Bill supporters attempted one last maneuver and sent SB 89, as amended by the House, to

a House-Senate conference committee.  However, the session ended before the conference work

was completed.[799]

       **B.**     **80th Texas Legislature (2007): House Bill 218**

          **1.**     **The Office of the Texas Attorney General launches an initiative to
combat voter fraud**

549.    In January 2006, Attorney General Greg Abbott announced that he was launching a

statewide initiative to combat the purported epidemic of voter fraud.[800]

---

[794] K. Davis Dep. 35:15-37:9, 41:20-42:15, June 2012; McCoy Dep. 75:10-12, May 16, 2012.

[795] PL765 at ¶ 12 (Davidson Supp. Rep.).

[796] PL765 at ¶ 12 (Davidson Supp. Rep.); PL1072 at 4321 *(Texas House Journal*, 79th Legislature. 76th day (May 24, 2005).

[797] PL765 at ¶ 12 (Davidson Supp. Rep.); PL169 at 106-07 (2005 Senate Rules).

[798] PL765 at ¶ 12 (Davidson Supp. Rep.); PL1179 at 4509 (*Sen Journal*, 79th Legislature, 80th day (May 27, 2005).

[799] PL765 at ¶ 13 (Davidson Supp. Rep.); PL1011 (HB 1706 bill history).

[800] "Attorney General Abbott Launches Training Initiative To Identify, Prosecute, Prevent Voter Fraud," https://www.texasattorneygeneral.gov/oagnews/release.php?id=1423; PL765 at ¶ 14 (Davidson Supp. Rep.).

550.     The Attorney General's press release noted four sets of indictments for voter fraud in Texas since 2005.  Only two individuals had been convicted, both for offenses related to mail-in absentee ballots.[801]

551.     The press release also announced the establishment of a Special Investigations Unit (SIU) tasked with assisting local law enforcement and prosecutors to identify, investigate, and prosecute various election crimes.  However, the activities of the SIU were only undertaken in 44 counties that contain most of the state's African-American and Latino voters.[802]

**2.      HB 218 is introduced and would use non-photo ID to establish identity**

552.     Representative Betty Brown introduced HB 218 (2007) on November 14, 2006.  Rep. Brown served a heavily Anglo East Texas district.[803]

553.     HB 218 would have required a voter at the polls to present a valid voter registration certificate and either one form of photo identification or two forms of non-photo identification. HB 218 specified eight acceptable forms of photo ID, including both additions to and subtractions from HB 1706, and eleven forms of acceptable non-photo ID.[804]

554.     The stated purpose of HB 218 was to prevent in-person voter fraud and voting by non-U.S. citizens.[805]  Grassroots supporters expressed concerns about non-citizen voting in

---

[801]  "Attorney General Abbott Launches Training Initiative To Identify, Prosecute, Prevent Voter Fraud," https://www.texasattorneygeneral.gov/oagnews/release.php?id=1423; PL765 at ¶ 14 (Davidson Supp. Rep.).
[802] "Attorney General Abbott Launches Training Initiative To Identify, Prosecute, Prevent Voter Fraud," https://www.texasattorneygeneral.gov/oagnews/release.php?id=1423; PL765 at ¶ 15 & n.29 (Davidson Supp. Rep.).
[803] PL859 (HB 218 as introduced); PL202 a (HB 218 bill history); PL765 at ¶ 16 (Davidson Supp. Rep.).
[804] PL859 (HB 218 as introduced); PL765 at ¶ 16 (Davidson Supp. Rep.); PL772 at 14 (Lichtman Rep.); Trial Tr. 56:4-16 (Day 4).
[805] McCoy Dep. 61:12-19, May 16, 2012; Williams Dep. 36:16-37:9, July 29, 2014; PL077 at 57-58; PL085 at 9; PL034 at 1030; PL765 at ¶ 16 (Davidson Supp. Rep.).

constituent mail to their elected officials both before and during consideration of HB 218.[806]

However, the House received no evidence of convictions of non-citizens for illegally voting.[807]

555.    The House Elections Committee took testimony on the costs of obtaining documents

necessary to acquire forms of allowable photo voter ID, as well as the anticipated effect on

minority voters.[808]

556.    Representative Rafael Anchía, a Latino, noted that HB 218 only addressed voter

impersonation.  He specifically cited testimony from Attorney General Abbott's office that no

case of voter impersonation at the polls in Texas had ever been prosecuted.[809]   Rep. Anchia also

testified that evidence of non-citizen voting was put forth in the form of conflicting affirmations:

the same individuals who stated that they were not citizens on their jury duty forms, then stated

they were citizens on their voter registration forms.  Rep. Anchia's staff investigated many of

these instances, and found that the number of non-citizens registered as voters was miniscule, if

any, and that most people claimed non-citizenship on their jury duty form merely to avoid jury

duty.[810]

557.    Representative Veasey, an African-American, recounted that it was in the middle of his

questioning of a witness about the bill's adverse impact on African-Americans when the Anglo

---

[806] PL734 (5/1/07 fax re: misc elections; PL736 (5/22/07 Wegner email); PL737 (5/23/07 Ramirez email);
PL742 (Cummins email); PL749 (5/2/07 McLeod email); PL745 (9/22 Hickson email); PL746 (illegal
immigration email); PL747 (6/9/06 Real email); PL748 (6/22/09 Mickan email).
[807] PL021 at 55; Williams Dep. 148:25-150:4, June 1, 2012; Straus Dep. 100:12-101:1, June 11, 2012;
PL765 at ¶ 16 (Davidson Supp. Rep.).
[808] PL082 at 115.
[809] PL085 (House Floor Transcript Vol. I, Apr. 23, 2007 at 11, 14-15; Vol. II, Apr. 23, 2007, at 128-29);
PL765 at ¶ 18 (Davidson Supp. Rep.).
[810] Trial Tr. 323:15-325:12 (Anchía) (Day 4).

Chairman of the House Elections Committee halted Representative Veasey's questioning and removed him from the hearing with no explanation.[811]

558.     Royal Masset, former political director of the Texas Republican Party, expressed strong opposition to HB 218 and argued that such requirements discriminated against otherwise legal minority voters.[812]

559.     On April 24, 2007, the House passed HB 218 by a vote of 76 to 69, over the opposition of all African-American members and nearly all Latino members.[813]

### 3.     Senate testimony in favor of HB 218 focuses on the threat of non-citizen voting

560.     Senator Troy Fraser sponsored HB 218 in the Senate.  Senator Fraser's district was also heavily Anglo.[814]  Senator Fraser and his chief of staff, Janice McCoy, had no knowledge of how HB 218 was drafted when agreeing to sponsor the bill in the Senate.[815]

561.     Ms. McCoy, assumed that Republicans would support HB 218 and that Democrats would oppose it because the bill would "reduce voter turnout among those individuals who typically vote [D]emocratic like the poor and the elderly."[816]

562.     Senator Fraser stated in the State Affairs Committee that "every American has [a] civil right not to have their ballot canceled out by someone who shouldn't be voting or is voting twice or in some cases has long since died."[817]  Supporters of HB 218—including the Immigration Reform Coalition of Texas, the Texas Eagle Forum, and Citizens for Immigration Reform—

---

[811] Trial Tr. 236:10-17, 237:7-16 (Veasey) (Day 1).
[812] PL765 at ¶ 19 (Davidson Supp. Rep.).
[813] PL088 (Tex. H.J., 80th Leg. Regular Sess. At 2246-47 (61st Day)); PL765 at ¶ 21 (Davidson Supp. Rep.).
[814] PL202 (HB 218 bill history); PL765 at ¶ 22 (Davidson Supp. Rep.).
[815] McCoy Dep. 30:9-21, July 9, 2014.
[816] McCoy Dep. 49:14-17, 51:2-4, July 9, 2014.
[817] PL096 (Senate Committee on State Affairs Transcript, Apr. 30, 2007, at 2-3).

raised concerns about non-citizens voting and voiced support for a proof of citizenship requirement for voter registration, although Senator Eddie Lucio and former Texas Elections Director Buck Wood pointed to the absence of any evidence of illegal voting by non-citizens.[818] Skipper Wallace, the state legislative chairman for the Republican County Chairmen's Association, also acknowledged that no person has ever been convicted in Texas of in-person voter impersonation fraud.[819]  Ann McGeehan, the Director of the Elections Division for the Secretary of State, testified that in the prior four years, the Division had not received a single complaint of voter impersonation.[820]  Witnesses testifying on behalf of civil rights organizations voiced strong concerns that HB 218 would disproportionately disenfranchise minority voters and members of other vulnerable groups.[821]

563.    Supporters of HB 218 argued that voter identification was necessary to prevent non-citizens from voting.  Lieutenant Governor Dewhurst asserted that "with eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is in danger," although he did not cite any evidence of undocumented immigrants or any other non-citizens participating in U.S. elections or attempting to do so.[822]  The Lieutenant Governor also asked: "Why isn't it necessary to prove that you are a U.S. citizen to vote in U.S. elections?"[823]

564.    The legislative record included no evidence that non-citizens had committed voter impersonation.[824]

---

[818] PL095 (Senate Committee on State Affairs Witness List, Apr. 30, 2007); PL096 (Senate Committee on State Affairs Transcript, Apr. 30, 2007, at 32-33, 35, 38, 78, 96-97).
[819] PL096 (Senate Committee on State Affairs Transcript, Apr. 30, 2007, at 29-30).
[820] Trial Tr. 261:25-263:19 (Day 5) (McGeehan).
[821] PL096 (Senate Committee on State Affairs Transcript, Apr. 30, 2007, at 6-7, 12, 82-85, 94-96).
[822] PL765 at ¶ 21 (Davidson Supp. Rep.).
[823] Dewhurst Dep. 224:12-226:23.
[824] PL085 (House Floor Transcript Vol. I, Apr. 23, 2007, at 14-15); PL096 (Senate Committee on State
(Cont'd…)

565.    Senator Fraser's staff was unaware of any analysis conducted concerning the bill's impact on minority voters.[825]  Senator Fraser made the decision to sponsor HB 218 without either he or his staff undertaking any analysis of which forms of IDs should and should not be included, or whether some voters lack the forms of ID included in HB 218.[826]

566.    The voter identification provisions of HB 218 did not address non-citizen voting since the forms of identification it sought to enact for in-person voting did not all require that an individual be a citizen to acquire the identification, and HB 218 did not address absentee voting at all.[827]

### 4.    HB 218 is defeated by Hispanic and African-American Senators relying on the two-thirds rule

567.    In 2007, 11 of 31 senators opposed HB 218, the minimum number necessary to block a procedural motion to hear HB 218 out of the regular order.[828]

568.    Lieutenant Governor Dewhurst had several conversations with Senator Fraser concerning the possibility of calling for a motion to suspend the regular order of business to bring up HB 218 when two-thirds of the Senators actually present on the Senate floor would vote for the bill, *i.e.*, the possibility of calling for a motion to suspend the regular order when one or more of the eleven Senators opposed to the bill would be absent.[829]  Senator Gallegos' leave to receive a liver transplant created the possibility that the Senate would lose its ability to block voter ID from

---

Affairs Transcript, Apr. 30, 2007, at 29-30, 78); Williams Dep. 148:25-150:4, June 1, 2012; PL765 at ¶ 21 (Davidson Supp. Rep.).
[825] McCoy Dep. 60:7-10, May 16, 2012.
[826] McCoy Dep. 58:13-59:7, 62:10-64:3, May 16, 2012.
[827] PL092 (HB 218 Bill Analysis); PL765 at ¶ 21 (Davidson Supp. Rep.).
[828] PL765 at ¶ 20 (Davidson Supp. Rep.); PL772 at 13 (Lichtman Rep.).
[829] Dewhurst Dep. 45:21-48:7.

passing by a two-thirds majority.  But Senator Gallegos returned from his transplant to the Senate, despite his doctor's orders, and vowed to stay there to block the voter ID bill.[830]

569.    On May 15, 2007, the Lieutenant Governor recognized Senator Fraser for a motion to suspend the regular order of business to take up and consider HB 218.[831]  The motion was adopted by a vote of 19 to 9 because two bill opponents, Senators Uresti and Whitmire, did not appear to be on the floor.[832]

570.    In response, Senator Shapleigh requested that the Lieutenant Governor permit a verification of the vote.[833]  Senator Uresti, who had been absent due to illness, rushed from his home to the Senate chambers and made it just in time for the verification vote.[834]  The verification resulted in the failure of the motion to suspend by a vote of 20 to 11, and the Senate took no further action on HB 218 for the rest of the session.[835]

## C.    81st Texas Legislature (2009): SB 362

### 1.    The Office of the Texas Attorney General announces findings of the initiative to combat voter fraud

571.    In 2008, more than two years after Attorney General Abbott had announced his initiative to uncover and prosecute voter fraud, he announced the findings to-date.  Of the 26 reported prosecutions of voter fraud, two had involved voter impersonation.  However, he did not say

---

[830] PL765 at ¶ 20-22 (Davidson Supp. Rep.).
[831] Dewhurst Dep. 48:8-10; Fraser Dep. 31:13-22, July 23, 2014; PL097 (Senate Floor Transcript, May 15, 2007, at 2).
[832] Fraser Dep. 198:7-10, July 23, 2014; PL097 (Senate Floor Transcript, May 15, 2007, at 12-13); Trial Tr. 216:25-220:19 (Uresti) (Day 3).
[833] PL097 (Senate Floor Transcript, May 15, 2007, at 15-17); PL098 (Tex. Sen. J., 82d Leg., Regular Sess., at 2063-64 (5th Day Continued)); PL765 at ¶ 22 (Davidson Supp. Rep.); Trial Tr. 216:25-220:19 (Uresti) (Day 3).
[834] PL765 at ¶ 22 (Davidson Supp. Rep.); PL772 at 13 (Lichtman Rep.); Trial Tr. 216:25-220:19 (Uresti) (Day 3).
[835] Dewhurst Dep. 42:21-49:16; PL097 (Senate Floor Transcript, May 15, 2007, at 19-20); Dewhurst Dep. 51:22-52:3; PL218 (HB 218 bill history); PL765 at ¶ 22 (Davidson Supp. Rep.).

whether the two impersonation matters had led to convictions.  One case, described as "non-citizen registration," pertained to a candidate for local office who was convicted of lying to non-citizens about their eligibility to register to vote.[836]

### 2. SB 362 passes through the Texas Senate using procedural deviations and over the opposition of all minority Senators

572.    In 2008, Lieutenant Governor Dewhurst continued to express support for voter identification legislation and ran a series of ads stressing the need to stop non-citizens from voting.[837]

### a. SB 362 includes non-photo ID to establish identity

573.    Senator Fraser approached the Lieutenant Governor to express interest in filing a voter ID bill in the 2009 session.  His office then developed the substantive provisions of SB 362 in coordination with Bryan Hebert, the Lieutenant Governor's deputy general counsel, and Jennifer Fagan, counsel to State Affairs Committee.[838]  The Lieutenant Governor was involved in both developing the substantive provisions of the bill and strategy.[839]

574.    SB 362 was modeled after HB 218, at least in part because the House had passed HB 218.[840]  The Lieutenant Governor intended that the Senate model its legislation on Indiana and Georgia's laws, but SB 362—like HB 218—permitted use of both photo and a non-photo ID, although in contrast to HB 218, SB 362 excluded employee ID cards and some student IDs.[841]

---

[836] PL765 at ¶ 23 (Davidson Supp. Rep.).
[837] Hebert Dep. 29:17-20, June 17, 2014; Williams Dep. 148:25-150:4, 2012; PL765 at ¶ 24 (Davidson Supp. Rep.).
[838] Dewhurst Dep. 58:18-24, 59:15-60:2; 67:4-24; Hebert Dep. 34:16-22, 35:13-21, June 17, 2014.
[839] Dewhurst Dep. 60:12-22; 67:4-24.
[840] Dewhurst Dep. 68:20-22, 69:11-24; Fraser Dep. 46:1-4.
[841] Dewhurst Dep. 60:22-61:21; PL842 (SB 362 as filed); Hebert Dep. 36:19-37:18, June 17, 2014; PL772 at 15-16 (Lichtman Rep.).

Senator Duncan, the Chair of the Committee of the Whole that considered SB 362, was unaware of the reason why student IDs from private institutions were excluded from the bill.[842]

575.    Prior to the consideration of SB 362, no analysis of the cost of obtaining the forms of identification permitted under SB 362 or of the impact of SB 362 on Texas voters was ever conducted.  And during consideration of SB 362, the Senate did not receive any testimony regarding the bill's compliance with Section 2 of the Voting Rights Act.[843]

576.    On December 15, 2008, Senator Fraser filed SB 362 along with SB 363, a bill requiring voter registration to include birth certificates or information about a naturalization ceremony.  Senator Fraser explained that the intent of both bills was to ensure that "illegal aliens, non-citizens and people otherwise not qualified do not dilute the legitimate votes cast by citizens."[844]

577.    SB 362 would not have prevented non-citizens from voting—a stated purpose of the bill—because some of the IDs permitted by SB 362 did not require proof of citizenship and because SB 362 did not address absentee voting.  The sole form of voter fraud that SB 362 would have addressed was in-person voter impersonation.[845]

578.    Speaker Straus later acknowledged that the provisions of SB 362 were moderate in comparison to subsequent voter ID legislation.[846]

---

[842] Dewhurst Dep. 60:22-61:21;PL842 (SB 362 as filed); Hebert Dep. 36:19-37:18, June 17, 2014; Duncan Dep. 107:23-108:9, 124:13-16, 124:18 , 124:25-125:3, 125:5-7, Aug. 28, 2014; PL772 at 15-16 (Lichtman Rep.).
[843] McCoy Dep. 192:11-16, 75:25-76:4, 87:6-9, 2014.
[844] PL273 (Fraser press release Dec. 15, 2008); Fraser Dep. 203:8-18, 206:5-12, 210:20-211:8, July 23, 2014; PL264 (bill history for SB 362); PL1013 (bill history for SB 363); PL842 (SB 362 as introduced); PL238 (SB 363 as introduced).
[845] Hebert Dep. 54:12-19, June 17, 2014; Fraser Dep. 44:18-20, 51:3-5, 55:7-10, July 23, 2014; Dewhurst Dep. 77:20-78:1.
[846] Straus Dep. 103:20-104:9.

### b. The Senate creates a unique exception to the two-thirds rule for voter identification legislation

579.    On January 14, 2009, about a month after Senator Fraser introduced SB 362, Senator Tommy Williams introduced Senate Resolution 14, which modified the Senate Rules to exempt voter identification legislation from the two-thirds rule and effectively permitted voter identification legislation to be passed with the support of only a simple majority.[847]  Senator Uresti testified that this rule change was "highly unusual" and "not how the Texas Senate operates."[848]

580.    In 2009, the Senate Rules did not permit any other substantive category of legislation to be approved for consideration out of order of the regular business by majority vote.[849]

581.    Senate Resolution 14 also provided that voter identification bills, such as SB 362, would be heard by the Committee of the Whole, a committee that is not frequently convened, and provided for expedited consideration in that committee.  SB 362 and SB 14 were the only two pieces of voter photo identification legislation submitted to the Committee of the Whole.[850]

582.    On January 14, 2009, the Senate debated Senate Resolution 14 for approximately six and a half hours.  Senator Shapleigh raised a point of order against further debate prior to committee

---

[847] PL154 (Tex. Sen. J. Addendum, 81st Leg., Regular Sess., at A-1, A-8-A-10 (2nd Day)); PL154 at 5.11(d), 16.07(7) (2009 Senate Rules); Dewhurst Dep. 83:9-84:17; Trial Tr. 112:4-113:24 (Williams) (Day 8); Hebert Dep. 63:10-64:5, June 17, 2014; PL772 at 15 (Lichtman Rep.); Trial Tr. 223:20-23 (Uresti) (Day 3).
[848] Trial Tr. 223:24-224:10 (Uresti) (Day 3).
[849] PL171 at Rules 5.11, 16.07(a) (2009 Senate Rules); PL765 at ¶ 97 (Davidson Supp. Rep.); PL772 at 15 (Lichtman Rep.); Trial Tr. 224:19-21 (Uresti) (Day 3).
[850] PL171 at Rules 5.11, 16.07(a) (2009 Senate Rules); *see* Trial Tr. 49:16-50:15, 52:14-20 (Dewhurst) (Day 7); Dewhurst Dep. 33:21-35:18; Hebert Dep. 62:13-22, June 17, 2014; Duncan Dep. 78:16-19, 143:22-144:1, Aug. 28, 2014.

consideration of the resolution, but Lieutenant Governor Dewhurst overruled the point of order.[851]

583.     In discussing his Senate Resolution 14, Senator Williams argued that the Senate, in certain previous regular and special sessions, had adopted a majority vote requirement, but he later conceded that none of the rules for the regular sessions that he had cited expressly exempted a specific subject matter of legislation from the usual rule that passage of a bill effectively requires the support of two-thirds of the Senate members.[852]  Lieutenant Governor Dewhurst had also never seen a special item like this added to the Senate's rules.[853]

584.     Senator Shapleigh raised a second point of order that the Lieutenant Governor had exceeded powers granted to him by the Texas Constitution by recognizing Senator Williams on Senate Resolution 14, by ruling on points of order, and other substantive matters and that, consequently, Senate Resolution 14 was void, but the Lieutenant Governor again overruled it.[854]

585.     Senate Resolution 14 was adopted by a simple majority of senators.[855]

586.     Senator Williams acknowledged that Senate Resolution 14 generated "the most controversy there ever was over a rules resolution during [his] time in the Senate" and may have been the most substantive change to the rules during his tenure.[856]

---

[851] PL154 (Tex. Sen. J. Addendum, 81st Leg., Regular Sess., at A-5-A-6 (2nd Day)); Trial Tr. 114:23-115:9 (Williams) (Day 8).

[852] PL154 (Tex. Sen. J. Addendum, 81st Leg., Regular Sess., at A8-A-10, A-74-75 (2nd Day)); Williams Dep. 210:18-225:15, July 29, 2014; Trial Tr. 115:10-116:9 (Williams) (Day 8).

[853] Trial Tr. 57:13-18 (Dewhurst) (Day 7).

[854] PL154 (Tex. Sen. J. Addendum, 81st Leg., Regular Sess., at A-57-A-58 (2nd Day)).

[855] PL154 (Tex. Sen. J. Addendum, 81st Leg., Regular Sess., at A-75 (2nd Day)); Trial Tr. 55:1-11 (Dewhurst) (Day 7); Hebert Dep. 61:20-62:4, June 17, 2014.

[856] Williams Dep. 229:8-12, 229:24-230:2, July 29, 2014.

587.    Lieutenant Governor Dewhurst interpreted Senate Rule 5.11(d), as amended by Senate Resolution 14, to require him to refer SB 362 to the Committee of the Whole.  Ordinarily, he referred election bills to the State Affairs Committee.[857]

588.    Since he took office in 2003, Lieutenant Governor Dewhurst referred only five pieces of legislation to the Committee of the Whole during regular session: three school financing bills in 2003 and two voter ID bills, SB 362 and SB 14, after passage of Senate Resolution 14.[858]

c.    The Lieutenant Governor's staff acknowledges that including non-photo ID in SB 362 reduces harm to minority voters

589.    On March 4, 2009, Bryan Hebert, at that time the deputy general counsel to Lieutenant Governor Dewhurst, wrote an email to Janice McCoy, chief of staff to Senator Fraser, to convey talking points and other materials to assist with passage of SB 362.   He may have shared them with the Lieutenant Governor.[859]

590.    In his email to Ms. McCoy, Mr. Hebert wrote that a reason to support SB 362 was that the bill "improves security in election process" but creates "less chance of disenfranchising elderly, poor, or minority voters."  Mr. Hebert may have been contrasting SB 362 with voter ID bills that did not allow the use of non-photo ID, or bills that allowed for fewer forms of identification.[860]

---

[857] Dewhurst Dep. 42:1-4, 91:1-16.
[858] PL201 (COTW bills since 2003); Trial Tr. 49:16-50:15, 52:14-20 (Dewhurst) (Day 7); Dewhurst Dep. 33:21; 34:9, 90:20-25, 148:16-149:11.
[859] PL205 (email from McCoy to Hebert); Trial Tr. 189:7-23 (Hebert) (Day 8); Hebert Dep. 261:14-23, 262:10-263:9, June 17, 2014; PL264 (SB 362 bill history); PL765 at ¶ 28 (Davidson Supp. Rep.).
[860] PL205 (email from McCoy to Hebert); Trial Tr. 189:7-17, 191:32-193:9 (Hebert) (Day 8); Hebert Dep. 88:14-93:3, 261:24-262:9, PL765 at ¶ 28 (Davidson Supp. Rep.).

591.    Mr. Hebert has conceded that it is possible that without SB 362's provision allowing for use of non-photo ID, the bill would have increased the likelihood of disenfranchising elderly, poor, and minority voters.[861]

592.    Mr. Hebert also wrote in the same email that a reason to support SB 362 was that the bill was "not as restrictive" as the Indiana and Georgia voter ID laws.[862]  Mr. Hebert subsequently testified that a major difference between SB 362 and those laws was the use of non-photo IDs.[863]

593.    And Mr. Hebert further stated in this email that another reason to support SB 362 was that the bill "[i]ncreases chance of federal pre-clearance (because many forms of ID are acceptable, and provisional ballot procedure is less burdensome)."[864]

594.    Mr. Hebert testified that SB 362's provisional ballot provision was less burdensome than the provisional balloting provisions in the Georgia and Indiana voter ID laws because it would not require voters who cast a provisional ballot due to lack of the required ID to return to the election office to ensure the ballot would be counted.[865]

595.    The talking points conveyed by Mr. Hebert stated that SB 362 would "protect Texas voters" by deterring and detecting fraud, improving and modernizing election procedures, protecting against fraud enabled by inaccurate registration rolls, counting only eligible voters' votes, and protecting public confidence in elections.  The Lieutenant Governor agreed with this assessment.  Senator Duncan also agreed that the provisions of SB 362 were sufficient to both identify a person at the polls and prevent the illegal "harvesting" of voter registration cards.[866]

---

[861] Trial Tr. 192:22-193:9 (Hebert) (Day 8).
[862] PL205 at 2 (email from McCoy to Hebert).
[863] Hebert Dep. 87:19-88:13, June 17, 2014.
[864] PL205 at 2 (email from McCoy to Hebert); Trial Tr. 193:12-19 (Hebert) (Day 8).
[865] Hebert Dep. 96:19-97:15, June 17, 2014.
[866] PL205 at 3 (email from McCoy to Hebert); Hebert Dep. 97:16-98:10, June 17, 2014; Dewhurst Dep.
(Cont'd…)

596.    Mr. Hebert also provided Ms. McCoy with information about the costs and process for obtaining a Texas birth certificate, Texas driver license, and Texas personal ID card.  Mr. Hebert acknowledged that the least expensive cost for a Texas birth certificate was $22.[867]

597.    In 2009, the Lieutenant Governor discussed with Senator Fraser and other members the cost of obtaining a Texas birth certificate and Texas personal ID card.[868]

598.    During consideration of SB 362, the Lieutenant Governor also advocated for a phase-in period for elderly voters—but not other classes of voters—who lacked the newly defined necessary identification.[869]

### d.    Opponents of SB 362 express concerns about the impact of SB 362 on minority voters

599.    On March 10, 2009, the Committee of the Whole held a hearing on SB 362 that lasted 23 hours.[870]

600.    Senator Robert Duncan served as chair of the Committee of the Whole.  At the beginning of the hearing, Senator Duncan announced the presence of a court reporter and that a transcript of the hearing would be provided to the Department of Justice if necessary.[871]

601.    Senator Royce West, an African American, raised a point of order to object to further consideration of SB 362 on the ground that insufficient notice of the hearing was provided. Senator Duncan overruled the point of order and stated that the rules cited by Senator West were

---

101:12-22; Duncan Dep. 127:7-25, 133:21-134:1, Aug. 28, 2014.
[867] PL205 at 6 (email from McCoy to Hebert); Trial Tr. 193:20-195:1 (Hebert) (Day 8); Hebert Dep. 101:6-17, June 17, 2014.
[868] Trial Tr. 60:4-61:16 (Dewhurst) (Day 7).
[869] Trial Tr. 58:17-60:3 (Dewhurst) (Day 7).
[870] PL264 (bill history SB 362); PL765 at ¶ 32 (Davidson Supp. Rep.).
[871] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 11-12, 19-20).

inapplicable to the Committee of the Whole.[872]  Senator Mario Gallegos, a Hispanic, appealed the chair's overruling of the point of order to the full Senate, but the ruling was sustained.[873]

602.    Senator Fraser's stated purpose in introducing SB 362 was to ensure that a voter confirms his or her identity when appearing at the polls, and Senator Fraser emphasized that SB 362 only addressed in-person voting and not mail-in ballots or any other form of election fraud.[874]

603.    Senator Watson asked Senator Fraser whether he had data on the racial composition of Texans who lack a driver license or other photo ID.  Other opponents, including Senators Davis, Ellis, Shapleigh, Watson, West, and Zaffirini, expressed concerns about the bill's impact on minority voters.  Senator Fraser provided data about the number of Texas voters who provided a driver license number when registering to vote but stated that he was unaware of the racial composition of those voters.[875]

604.    Senator Watson also asked Senator Fraser whether any statistical analysis had been conducted regarding the potential effect of SB 362's requirements on African Americans. Senator Fraser indicated that the Committee would hear testimony from Indiana and Georgia officials about the impact by race on those states' voters but did not offer information specific to Texas.[876]  Senator Ellis, an African American, specifically noted that the minority populations of Georgia and Texas differ significantly.[877]

---

[872] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 12-15).
[873] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 22, 37-40).
[874] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 49, 52); *see also* Dan Patrick 65:25-66:8, July 11, 2014 (only type of fraud combated by SB 362 was in-person voter impersonation fraud).
[875] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 68-75 (Watson), 87-88 (Shapleigh), 111-13 (Zaffirini), 133-35, 144-45 (Ellis), 147-48 (Davis), 169-75 (West); Fraser Dep. 198:22-199:19, 213:1-10, May 17, 2012; Williams Dep. 173:2- 14; Trial Tr. 21:12-22:5 (Davis) (Day 4).
[876] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 73-75, 131-33).
[877] PL054 (Senate Committee of the Whole Transcript Vol. 1A, Mar. 10, 2009, at 132).

605.     Adam Skaggs, a lawyer with the Brennan Center, presented estimates that nationally 8% of whites and 25% of African Americans lack photo IDs.  Moreover, people earning less than $35,000 per year were twice as likely to lack photo ID as those earning more than that amount.[878]

606.     Neither Senate proponents of SB 362 nor their staff investigated or addressed concerns about SB 362's impact on minority voters.  Senate staff was unaware of any analysis having been conducted to identify voters without allowable voter ID under SB 362 or any actions in response to the concerns about the impact of the bill on minority voters.[879]

607.     While the Secretary of State's office was aware that the impact of SB 362 on minority voters was relevant to the Voting Rights Act, the office did not undertake that analysis.[880]

608.     Eric Nichols, Deputy Attorney General for Criminal Justice with the Office of the Attorney General, stated to the Committee of the Whole that of the 192 allegations of voter fraud referred to the Attorney General's Office, 30 resulted in prosecutions and none related to in-person voter impersonation. Senator Shapleigh noted that not a single prosecution conducted by the Attorney General's office involved conduct that would have been prevented by having a photo ID requirement for in-person voting. [881]

609.     At the end of the hearing, the Committee of the Whole voted in favor of SB 362.[882]

---

[878] PL054 (Senate Committee of the Whole Transcript Vol. 1B, Mar. 10, 2009, at 417-419); PL765 at ¶ 30 (Davidson Supp. Rep.).

[879] Fraser Dep. 71:24-72:21, 2014; McCoy Dep. 115:6-116:15; Hebert Dep. 47:19-48:6, 68:16-70:2, June 17, 2014; Patrick Dep. 81:13-16, July 11, 2014; PL772 at 15 (Lichtman Rep.); McCoy Dep. 94:19-95:15, May 16, 2012; Rathgeber Dep. 153:11-154:6, 2012.

[880] PL920; Trial Tr. 272:16-273:1 (McGeehan) (Day 5).

[881] PL054 (Senate Committee of the Whole Transcript Vol. 1B, Mar. 10, 2009, at 234-35, 415-16, 420-21; Vol. 2, March 10, 2009, at 748-50, 760-61); PL765 at ¶ 32 (Davidson Supp. Rep.).

[882] PL054 (Senate Committee of the Whole Transcript Vol. 2, Mar. 10, 2009).

### e.   The Senate passes SB 362 over the objection of all Senators who are racial and ethnic minorities

610.    Based on operation of Rule 5.11(d), as amended by Senate Resolution 14, the full Senate moved SB 362 to the top of its calendar by majority vote.[883]

611.    On March 18, 2009, the Senate passed SB 362 by simple majority.  The eight Senate members who were African-American or Hispanic voted against it, as well as one Anglo representing a predominantly minority district.[884]

612.    It is unlikely that, in the absence of the amended Rule 5.11(d), the Senate would have voted by the required two-thirds margin to suspend the usual order of business to consider SB 362.[885]

613.    On the day of final passage, Senator Van De Putte read into the record a letter from Coby Shorter, the deputy Secretary of State, who explained that although Texas does not collect the race of voter registration applicants, it has data on the number of registered voters with Spanish surnames.  Similarly, the Shorter letter explained that the Texas Legislative Council compiles data on race and ethnicity for redistricting bills and that Texas may be required to submit racial data if it seeks preclearance of a voter identification bill.[886]

614.    Mr. Hebert is unaware of any response taken in response to this letter.[887]  Mr. Shorter had no further communications about the substance of the letter.[888]

---

[883] PL264.
[884] PL898 (Tex. Sen. J., 81st Leg., Regular Sess., at 589); PL765 at ¶ 32 (Davidson Supp. Rep.).
[885] Williams Dep. 163:1-8, 2012; Patrick Dep. 224:24-225:17, 226:10-227:17, 2012.
[886] PL898 (Tex. Sen. J., 81st Leg., Regular Sess., at 589-91 (23rd Day)); PL064 (Senate Floor Transcript, Mar. 18, 2009, at 2-7).
[887] Hebert Dep. 70:9-71:23, June 17, 2014.
[888] Shorter Dep. 45:18-46:4.

615.    After the vote on final passage, Senator West read a statement into the record stating that all of the Senators in the Senate during that legislative session who are ethnic minorities voted against SB 362 and the related procedural changes at every opportunity.[889]

### f.    SB 362 is defeated by "chubbing" in the House

616.    Representative Todd Smith, chair of the House Committee on Elections, sponsored SB 362 in the House.[890]

617.    Representative Smith was aware that minorities were less likely to have a photo ID and that it was "a matter of common sense" that the hundreds of thousands of people without a driver license would be "disproportionately poor, and therefore minority." [891] He also acknowledged that allowing the use of non-photo ID would "significantly lessen any marginal additional burden" that voter ID requirements placed on some voters.[892]

618.    During consideration of SB 362, Rep. Smith publicly estimated that roughly 700,000 Texas voters lacked a driver license.[893]  He sought approval of his analysis from Speaker Straus before presenting this estimate publicly, and he likely discussed it with other House members as well.[894]

619.    Grassroots supporters of SB 362 continued to base their support on concerns about non-citizen voting.[895]  Many constituents wrote their elected officials asked them to vote for voter ID to stop "illegal aliens," immigrants, or non-citizens from voting in Texas elections.[896]

---

[889] PL898 (Tex. Sen. J., 81st Leg., Regular Sess., at 591-92 (23rd Day)); PL064 (Senate Floor Transcript, Mar 18, 2009, at 8-10); PL765 at ¶ 31 (Davidson Supp. Rep.).
[890] PL264 (bill history of SB 362); Trial Tr. 322:21-323:23 (Smith) (Day 5).
[891] Trial Tr. 345:22-346:6 (Smith) (Day 5).
[892] Smith Dep. 202:1-5; PL765 at ¶ 34 (Davidson Supp. Rep.).
[893] Trial Tr. 327:11-329:7 (Smith) (Day 5).
[894] Smith Dep. 161:16-163:13; Trial Tr. 329:3-23 (Smith) (Day 5).
[895] Trial Tr. 325:10-326:11, 334:14-335:3 (Smith) (Day 5).

620.    In their responses to constituent mail, Reps. Tom Craddick and Linda Harper-Brown, among others, conflated illegal immigration with voter identification and SB 362.[897]  Rep. Charles Anderson regularly linked his support for voter identification laws to constituent frustrations about illegal immigration.[898]

621.    On March 31, 2009, Speaker Straus referred SB 362 to the House Committee on Elections, and on April 6, 2009, the Committee held a hearing on the bill.[899]

622.    At the hearing, Rep. Anchía stated that as of that date, the Committee had found no documented cases of in-person voter impersonation.[900]

623.    Representative Anchía further observed that while studies undertaken by the House indicated that voter fraud occurred with regard to mail-in ballots, SB 362 and its predecessors exempted voters of mail-in ballots from identification requirements.  Other bill opponents expressed concern that minorities were less likely to have a photo ID.[901]

624.    Representative (now Congressman) Mark Veasey, an African American, argued that SB 362 was intended to "shave enough of the minority vote, the Black and brown vote, because this is a racial issue."[902]

---

[896] PL700 (Bogan Incoming Correspondence Report); PL701 (Levis Incoming Correspondence Report); PL702 (Cole Outgoing Correspondence Report); PL703 (McMurray Outgoing Correspondence Report); PL707 (Kennedy Outgoing Correspondence Report); PL708 (fax to Speaker); PL709 (5/7/09 letters from Roseland); PL710 (Davey Contact Profile Report); PL729 (5/27/09 Bradley email); PL730 (5/11/09 Bradley email); PL733 (5/22/09 email); PL1017 (Gov. Visit/Phone record); PL1018 (constituent email); PL1021 (constituent email); PL1022 (constituent email); PL1023 (constituent email); PL1024 (constituent email).
[897] PL875 (5/25/11 Harper-Brown letter); PL877 (4/28/14 Craddick email).
[898] PL726 (4/22/09 Bradley letter); PL876 (8/16/10 Bradley letter); PL730 (5/11/09 Bradley email).
[899] PL264 (bill history of SB 362).
[900] PL069 at 9-10.
[901] PL069 at 9-10; Smith Dep. 116:21-117:8.
[902] PL069 at 14.

625.    Justin Levitt, an attorney with the Brennan Center who had extensively researched voter fraud across the nation over a period of years, testified in front of the House Elections Committee that "[t]here have been a tiny handful of substantiated [voter impersonation] cases out of hundreds of millions of ballots" and that "Americans are struck by lightning far more often."  He also explained that twenty to thirty different factors impact voter turnout.[903]

626.    During the hearing and subsequently, Rep. Anchía requested that the Secretary of State's office provide analysis of the number of voters without a form of photo ID.[904]

627.    After a brief hearing, the House Committee on Elections reported out a version of SB 362 favored by Rep. Smith, which included a fund of $7.5 million to encourage registration.  It was met with strong resistance among many House members favoring photo ID, who wanted to limit ameliorative provisions and eliminate funding for registration efforts.  Opponents of Rep. Smith's moderate version also wanted a photo ID as the sole form of identification.  Unable to work out a compromise, Rep. Smith decided to move the Senate version of the bill to the full House without any changes.[905]

628.    Opponents of SB 362 employed a strategy known as "chubbing."  To chub, legislators speak for the maximum possible duration about legislation calendared before the bill they oppose.  As a result, the 81st Legislature ended without a vote on SB 362 in the House.[906]

---

[903] PL069 (Transcript, House Committee-April 6, 2009); PL069 at 174; PL765 at ¶ 29 (Davidson Supp. Rep.).
[904] McGeehan Dep. 29:13-31:25, 32:10-14, June 18, 2014.
[905] PL765 at ¶ 35 (Davidson Supp. Rep.).
[906] Hebert Dep. 74:19-75:3, June 17, 2014.  Due to the chubbing of SB 362, the House did not pass the bill.  Fraser Dep. 319:18-321:7, July 23, 2014; Dewhurst Dep. 105:25-106:22; PL765 at ¶ 36 (Davidson Supp. Rep.).

### 3. The 2010 interim legislative study fails to find voter fraud that could be prevented by voter ID requirements

629.    In 2010, the House Committee on Elections convened a hearing on voter fraud at which then-Elections Director Ann McGeehan testified that the Elections Division had referred to the Office of the Attorney General 24 potential violations of the election code in the prior two years, of which only two involved allegations of in-person voter impersonation.  She later clarified that the two cases involved allegations of selling votes and a voter who had a driver license but unintentionally voted under the name of his deceased father.[907] Twenty million votes had been cast in Texas general elections form 2002 to 2010.[908]

630.    The Committee later issued a report cataloging known or suspected instances of voter fraud, which made no mention of voter impersonation at the polls (although it did include findings of voter registration fraud, mail-in ballot fraud, and vote buying).[909]

### D. 82nd Texas Legislature (2011): SB 14

### 1. Introduction of strict photo ID legislation in the Senate

631.    On August 29, 2010, Senator Dan Patrick sent an email to Senate colleagues, who would later become authors of SB 14, in which he referred to a meeting of these Senators at which voter ID and immigration were discussed and noted that "several" senators "thought the two issues were one in the same or at a minimum connected."  Senator Patrick had expressed concerns about the issue of photo ID legislation and immigration before this email.[910]

---

[907] PL047.
[908] Trial Tr. 274:3-275:6 (Day 5) (McGeehan).
[909] PL1028 (Representative Todd Smith, *Voter Identification Forum*, 81st Session Interim, 6 August 2010, p. 31; PL772 at 51 (Lichtman Rep.).
[910] PL329 (Patrick email); Duncan Dep. 172:22-173:13.

632.    Lieutenant Governor Dewhurst wanted to pass a voter ID bill early in 2011 in the 82nd

Legislature to preclude a "chub" in the House.  He believed that the optimum time to pass such a

bill was within the first sixty days of session when, under the Texas Constitution, legislation may

not be addressed unless the governor declares a legislative emergency.[911]

633.    In the fall of 2010, the Lieutenant Governor met with Senator Fraser to ask if he was

willing to carry a voter ID bill in 2011, and Senator Fraser's chief of staff, Janice McCoy,

worked with Bryan Hebert in developing a new bill.[912]

634.    Senator Fraser's photo ID bill was originally numbered SB 178, but Senator Fraser re-

filed the bill, at the request of Lieutenant Governor Dewhurst, in order to receive a lower bill

number reserved for bills that are a legislative priority.  Senator Fraser's photo ID bill was re-

numbered as SB 14.[913]

635.    On November 9, 2010, the day after filing SB 178, Senator Fraser issued a press release

in which he explained that the intent of the bill was to prevent voter impersonation and thereby

restore voter confidence.[914]

636.    SB 14 went far beyond the three bills passed in one legislative house in the previous three

sessions. [915]  The bill, as filed, required all in-person voters to present a photo ID at the polling

place (*i.e.* the previous bills' allowance for the use of non-photo ID was eliminated), with almost

---

[911] Dewhurst Dep. 106:23-107:8, 107:23-108:7.

[912] Fraser Dep. 225:24-25, May 17, 2012; Brunson Dep. 63:8-14, May 30, 2012; Hebert Dep. 258:10-259:3, 264:1-12, May 29, 2012; Dewhurst Dep. 111:13-112:6, 113:24-114:6; PL765 at ¶ 37 (Davidson Supp. Rep.).

[913] Fraser Dep. 102:6-9, 103:5-16, July 23, 2014; Hebert Dep. 105:23-106:11, June 17, 2014; Trial Tr. 65:15-22, 407:15-408:3 (Dewhurst, Fraser) (Day 7); PL1012 (SB 178 as filed, 2011); PL001 (SB 14 as filed).

[914] PL1014 (Fraser press release 11/9/2010).

[915] Trial Tr. 275:7-16 (McGeehan) (Day 5) (permitting use of non-photo ID in SB 362 but prohibiting use of these identifications in SB 14 was a "significant change").

no exceptions for able-bodied voters of any age, and allowed voters to use only five forms of photo ID to establish identity: a current Texas driver license issued by the Texas Department of Public Safety (DPS), current Texas personal identification card issued by DPS, current United States military identification card containing the person's photograph, a United States citizenship certificate containing the person's photograph, and a current United States passport.[916]

637.    Senator Fraser claimed that he based his decision not to include non-photo identification in SB 14 on the results of public opinion polls that asked for Texans' views on voter ID legislation and on the experience of the two states with strict photo ID legislation, Georgia and Indiana.[917]

638.    The polls to which Senator Fraser referred in advocating for SB 14 did not ask about the limited forms of voter identification that would have been permitted under SB 14, or whether respondents would support a voter ID bill that disproportionately impacted a portion of the population.  Instead, the polls very broadly asked if respondents agreed or disagreed that registered voters should be required to present "a government issued photo ID" or "valid photo ID" before being allowed to vote.[918]

639.    In drafting SB 14, Janice McCoy never reviewed the Indiana or Georgia laws.[919]

640.    Mr. Hebert could not identify anything that had occurred that made the forms of non-photo ID an acceptable option in 2009 for SB 362 but not in 2011 for SB 14.  Nor could he

---

[916] PL001 (SB 14 as filed); PL266 (McCoy email); PL765 at ¶ 41 (Davidson Supp. Rep.).
[917] Fraser Dep. 120:15-121:19, 123:13-125:5, 127:3-128:5, July 23, 2014; Dewhurst Dep. 117:5-15.
[918] Trial Tr. 419:21-422:6 (Fraser) (Day 7); PL244 (Hebert email); PL433 (Texas Politics); PL247 (Fall 2010 Statewide Landscape Benchmark Survey); PL251 (Texas Politics poll).
[919] McCoy Dep. 111:5-9.

explain why SB 362 permitted the use of all state and federal government photo ID without limitation, as well as employee IDs, but SB 14 did not.[920]

641.    Senator Fraser, whose criterion in deciding which forms of ID to include and exclude from SB 14 was whether a form of ID was "secure," does not know whether federal employee IDs are secure or whether some federal employee IDs encrypt the fingerprint of the cardholder into the card.[921]

642.    In drafting and later considering SB 14, Senator Fraser never asked for or received information, and the Senate never received testimony, regarding whether a student ID had been used to commit in-person voter fraud, either in Texas or in other states.[922]  Indeed, neither Janice McCoy nor Brian Hebert could point to a single instance where a forged student ID was used to commit in-person voter fraud.[923]  And neither Senator Fraser nor Mr. Hebert was aware of any assessment of the impact on minority voters of excluding student IDs as a form of permissible ID in SB 14.[924]

643.    SB 14 as filed made a significant change to provisional ballot procedures under the Texas election code that were not included in SB 362.  Under existing law, if a voter did not present the requisite personal identification, the voter could cast a provisional ballot and the registrar would subsequently determine whether to count the ballot without action by the voter.  By contrast, SB 14 required voters to make a second trip to the elections office within six days and present the requisite photo ID or (in nearly all cases) the provisional ballot would not be counted.[925]

---

[920] Hebert Dep. 143:15-18, 145:6-17, 146:6-24, 263:20-264:1, 264:18-265:9, June 17, 2014.
[921] Trial Tr. 418:17-419:2 (Fraser) (Day 7); Fraser Dep. 191:5-22, July 23, 2014.
[922] Trial Tr. 410:24-411:19 (Fraser) (Day 7).
[923] Trial Tr. 212:6-14 (Hebert) (Day 8); McCoy Dep. 153:12-18.
[924] Trial Tr. 411:20-412:11 (Fraser) (Day 7); Trial Tr. 212:15-23 (Hebert) (Day 8).
[925] PL001 (SB 14 as filed); PL842 (SB 362 as filed); Dewhurst Dep. 164:5-165:14.

644.     Senator Fraser did not recall ever having received information about the existing

procedures related to voters who cast a provisional ballot for lack of identification,

notwithstanding that SB 14's proposed changes in provisional ballot procedures were significant.

645.     Senator Fraser was not aware of any erroneous determinations by a county election

official to count a provisional ballot.[926]

646.     Senator Fraser, who testified that his goal behind SB 14 was to "protect the integrity of

the ballot box so that [voters] knew that their vote would be correctly counted," was not aware of

any voter who did not vote due to concerns that individuals ineligible to vote were participating

in elections."[927]

647.     Ann McGeehan, who was employed with the Elections Division for more than twenty

years, likewise could not identify a single voter who had been deterred from participating in

elections due to concerns that voter fraud would cancel out or dilute their vote.[928]  Similarly, Ms.

McGeehan could not identify any complaints from voters who said that they lacked confidence

in the voting system because a voter certificate could be used for voting.[929]  Conversely, Ms.

McGeehan conceded that a registered voter without necessary photo ID, who appeared at the

polls to vote and was required to vote by provisional ballot, might lose confidence in the election

system.[930]

### 2.     Introduction of legislation in the House that includes non-photo ID

648.     After an earlier request for a low bill number for her voter ID legislation was rejected,

Rep. Debbie Riddle waited for two-days outside the clerk's office in November 2010 in order to

---

[926] Fraser Dep. 231:3-19, 233:17-21, July 23, 2014.
[927] Fraser Dep. 278:4-19; Trial Tr. 419:2-6 (Fraser) (Day 7).
[928] Trial Tr. 279:21-25 (McGeehan) (Day 5).
[929] Trial Tr. 283:16-20 (McGeehan) (Day 5).
[930] Trial Tr. 280:1-6 (McGeehan) (Day 5).

be the first legislator to file both voter ID and anti-immigration bills.  Her ID bill would have required in-person voters to present a photo ID or two forms of non-photo ID.[931]

649.    In December 2010, Rep. Todd Smith introduced an even more demanding bill based on "feedback we got from our local party representatives and from the grass roots . . . that their preference is for a hard photo ID."[932]

650.    Grassroots supporters of SB 14 expressed concerns about non-citizen voting in constituent mail to their elected officials while SB 14 was being considered by the legislature.[933] However, Representative Hernandez testified that undocumented citizens living in the United States were "living in the shadows" and too fearful of deportation to risk getting caught "grocery shopping much less attempting to voter illegally." [934]  In fact, voter impersonation fraud is a second degree felony in Texas, punishable by a prison sentence of 2 to 20 years and up to a $10,000 fine.[935]

651.    Representative Smith also filed legislation to require voter registration applicants to supply documentary proof of citizenship.  Representative Smith had promised constituents he would file this bill, notwithstanding that he had not received facts showing need for this legislation.[936]

---

[931] Riddle Dep. 175:15-176:20, 2014; PL368 (Riddle's House bill 16); PL765 at ¶ 39 (Davidson Supp. Rep.).

[932] PL765 at ¶ 40 (Davidson Supp. Rep.).

[933] PL704 (2/16/11 Harless email); PL173 (Romero Contact Profile Report); PL174 (Outgoing Correspondence Report); PL732 (1/14/11 Frank email); PL739 (1/26/11 Lee email); PL740 (Ellington email); PL741 (Incoming correspondence); PL878 (2/7/11 webmail); PL879 (Senate website email); PL880 (Senate website email); PL881 (1/28/11 Governor email).

[934] Trial Tr. 373:5-14 (Davis) (Day 4).

[935] Trial Tr. 176:25-177:5 (Mitchell) (Day 5).

[936] PL1027 (HB 1338, 2011 reg. session, as filed); Smith Dep. 132:13-133:16, 133:25-134:17.

652.     Representative Patricia Harless, who would later be selected to sponsor SB 14 in the House, also filed voter ID legislation, HB 112, which permitted the use of both non-photo and photo ID.  Her chief of staff, Colby Beuck, later testified that he was unaware whether information exists about the rate of in-person voter fraud.[937]

653.     Mr. Beuck also testified that he was aware of opposition from minority groups to any voter ID proposal more restrictive than current law.  Mr. Beuck was responsible for ensuring that the voter ID proposal he drafted complied with the Voting Rights Act, but he believed that HB 112 complied with the Act based on his review of *Crawford v. Marion County Election Board*.[938]

654.     In the 82nd Legislature, twelve members of the Texas House and nine members of the Texas Senate introduced voter ID laws.[939]

### 3.     The Senate readopts special procedural rules for voter ID legislation

655.     On January 19, 2011, the Senate passed Senate Resolution 36 by majority vote, which largely carried over the Senate Rules of the previous regular session, including Rule 5.11(d) as amended by Senate Resolution 14, *i.e.*, the Senate Rules in 2011 continued the special carve-out for voter identification legislation allowing it to be called up out of order by a simple majority vote, and providing for voter identification legislation to be considered by the Committee of the Whole and not by a standing committee.[940]  Senator Uresti testified that the rule change

---

[937] Beuck Dep. 17:18-18:4, 55:22-56:12, 83:3-13, June 20, 2014; PL1039 (HB 112 as filed).
[938] Beuck Dep. 58:22-60:14, 61:22-62, 264:16-265:10, June 20, 2014.
[939] PL1038 (HB 6); PL1039 (HB 112); PL1040 (HB 186); PL1041 (HB 248); PL1042 (HB 250); PL1043 (HB 401); PL1044 (HB 539); PL1045 (HB 624); PL1046 (HB 1005); PL1047 (HB 1412); PL1049 (HB 1458); PL1048 (HB 1596); PL765 at ¶ 40 (Davidson Supp. Rep.).
[940] PL173 at Rule 5.11 (Texas Sen. Rules, Jan 19, 2011), PL176 at 43-44 (Jan 19, 2011 Sen. Journal); Hebert Dep. 153:12-20, June 17, 2014; Trial Tr. 224:19-21 (Uresti) (Day 3).

exempting voter identification legislation from the two-thirds rule was "highly unusual."[941]  Rep. Anchia testified that the two-thirds rule was "long a tradition" in the Senate, and intended to protect minority interests, meaning minority positions, not racial or ethnic minorities.[942]

656.    All senators present representing majority-minority districts voted against abrogating the traditional two-thirds procedural rule.  Senator Lucio explained on the floor that he voted against Resolution 36 because it "silences the voices of my constituents" on special orders such as voter ID.[943]

657.    Senator Van de Putte explained that she voted against Senate Resolution 36 because it "amounted to a proxy vote on voter ID legislation," which she opposed because it discriminates against minority, low-income, and elderly voters, "while claiming to solve a problem which bill supporters have been unable to document."[944]

## 4.    Governor Perry designates voter ID as a legislative emergency

658.    The Texas Constitution prohibits the passage of a bill within the first 60 days of a legislative session unless it has been designated as an emergency matter.[945]

659.    On January 20, 2011, Governor Perry submitted voter identification legislation as an "emergency matter for immediate consideration."  This designation may have occurred at the request of Lieutenant Governor Dewhurst.[946]  This designation allowed the Texas Senate to enact SB 14 quickly to, in turn, avoid the use of chubbing to defeat the bill in the House.

---

[941] Trial Tr. 222:8-12 (Uresti) (Day 3).
[942] Trial Tr. 353:20-354:2 (Anchía) (Day 4).
[943] PL176 at 43-44 (Jan 19, 2011 Sen. Journal); PL176 at 46 (Jan 19, 2011 Sen. Journal); PL765 at ¶ 42 (Davidson Supp. Rep.).
[944] PL176 at 46-47 (Jan 19, 2011 Sen. Journal).
[945] Fraser Dep. 109:5-10; PL765 at ¶ 43 (Davidson Supp. Rep.).
[946] PL004 at 54 (Sen. Journal Jan 24, 2011); Brunson Dep. 64:20-65:13, May 30, 2012; Trial Tr. 9:21-10:7 (Davis) (Day 4).

660.    Ann McGeehan testified that she was unaware of anything related to the administration of elections in the State of Texas that necessitated the legislature to consider voter ID legislation in the first sixty days of session, nor could she identify any elections legislation that had been designated as a legislative emergency prior to voter ID in the 2011 session.[947]

### 5.    Senate consideration

#### a.    The Senate begins scripting talking points

661.    On the day that the Governor designated voter identification as an emergency matter, Lieutenant Governor Dewhurst called senators to tell them that the Committee of the Whole would take up SB 14 the following week.  At that time, at least one bill supporter, Senator Estes, expressed concern that SB 14 was not compliant with the Voting Rights Act.[948]

662.    On January 21, 2011, Bryan Hebert sent an email to other senate staff to provide talking points and arguments in support of SB 14; a chart comparing SB 14 with Texas's current law, the Indiana photo ID law, and the Georgia photo ID law; and an overview of preclearance under Section 5 of the Voting Rights Act.  The purported state interests he set out in support of SB 14 were identical to those that he listed in support of SB 362 in the prior session (see paragraph ¶¶ 520-21 above).[949]

663.    On January 22, 2011, Bryan Hebert sent an email to other senate staff expressing skepticism about the likelihood that SB 14 would be precleared under the Voting Rights Act, and suggesting the addition to SB 14 of further forms of photo ID, including photo ID issued by the federal government and by agencies, institutions, and political subdivisions of the state, all of

---

[947] Trial Tr. 254:18-258:6, 276:25-277:19 (Day 5) (McGeehan).
[948] PL268 (Talking Points); Dewhurst Dep. 150:17-151:8, 151:18-153:6; PL267 (Hebert email); Hebert Dep. 109:3-110:5, June 17, 2014; PL765 at ¶ 45 (Davidson Supp. Rep.).
[949] *Compare* PL271 at 2 ("Legitimate State Interests") (Jan 21, 2011 email) *with* PL205 at 3 ("This Bill Protect Texas Voters") (Mar. 4, 2009 email); Trial Tr. 198:220-199:5 (Hebert) (Day 8).

which had been included in SB 362.  Mr. Hebert also suggested that voter education targeted at

minority voters could assist in ensuring preclearance.[950]

664.    Mr. Hebert also expressed concern with anti-Latino sentiment expressed in concert with

support for SB 14.  Mr. Hebert specifically responded to a memo from the Texas Conservative

Coalition that expressed support for SB 14 on the basis of its effect on undocumented

immigrants; he claimed that the intent of SB 14 was not "to crack down on illegals but to

generally strengthen the security and integrity of the voting process." [951]

665.    Mr. Hebert acknowledged that some supporters of SB 14 characterized the bill as anti-

immigrant, anti "illegals" legislation, designed to target persons who are not U.S. citizens.

However, he was not aware of any non-U.S. citizens participating in Texas elections.[952]

666.    Correspondence from constituents and interest groups who supported SB 14

demonstrated their belief that voter ID legislation would combat illegal immigration.[953]

### b.    Senator Fraser's reliance on polls to determine the impact of SB 14 on minority voters

667.    In determining whether SB 14 would have a disproportionate impact on minority voters

in Texas, the bill sponsor relied exclusively on the results of polls that asked for Texans' views

---

[950] PL272 (Stinson email); Trial Tr. 203:3-205:5, 205:6-12 (Hebert) (Day 8); PL765 at ¶ 45 (Davidson Supp. Rep.).
[951] PL275 (Hebert email); PL276 (Baxter email); Hebert Dep. 198:16-19, 199:1-200:23, June 17, 2014; PL765 at ¶ 45 (Davidson Supp. Rep.).
[952] Hebert Dep. 200:12-201:16, 204:10-205:1, June 17, 2014.
[953] PL704 (Harless email); PL713 (Contact Profile report); PL714 (Outgoing correspondence report); PL732 (Frank email); PL739 (Lee email); PL740 (Ellington email); PL741 (Currie incoming correspondence); PL878 (2/7/11 Governor email); PL879 (Senate website email); PL880 (Senate website email); PL881 (1/28/11 Governor email).

on voter ID legislation and on the experience of other states with photo ID legislation, specifically Georgia and Indiana.[954]

668.    The Lt. Governor agreed with the bill sponsor that polling data demonstrating Texans' support of a photo ID bill was sufficient basis to respond to bill opponents concerns that the burdens of SB14 would fall disproportionately on minorities.[955]

669.    The polls on which many bill supporters relied in advocating for SB 14 did not ask responders about specific forms of photo identification, nor did they ask whether responders would support a voter ID bill that disproportionately impacted a portion of the population.[956]

670.    The polls on which key SB14 proponents relied as evidence of public support for SB 14 asked responders only if they agreed or disagreed that registered voters should be required to present a "government issued photo ID" or "valid photo ID" before being allowed to vote.[957]

671.    The polls on which key SB14 proponents relied as evidence of public support for SB 14 did not define or limit the terms "government issued photo ID" or "valid photo ID."[958]  Further, Representative Hernandez testified that constituents who were previously supportive of photo ID switched their opinion when informed that SB14 permitted a very limited number of photo IDs.[959]

---

[954] Fraser Dep. 74:4-75:8, 167:18-168:9, 251:20-253:10, July 23, 2014.
[955] Fraser Dep. 251:20-252:10; PL849; Dewhurst Dep. 178:22-24, 179:7-11.
[956] Fraser Dep. 75:25-76:17, 78:9-17; Dewhurst Dep. 244:24-245:11; PL251 (2/2011 poll); PL433 (poll); Williams Dep. 297:23, 298:22-24, 298:22-24, 301:16-19; PL434 (poll); PL252 (poll); PL251 (poll).
[957] Trial Tr. 419:21-422:6 (Fraser) (Day 7); PL244 (Hebert email); PL433 (poll); PL247 (Fall 2010 Statewide Landscape Benchmark Survey); PL251 (poll).
[958] Trial Tr. 419:21-422:6 (Fraser) (Day 7); PL244 (Hebert email); PL433 (poll); PL247 (Fall 2010 Statewide Landscape Benchmark Survey); PL251 (poll); Dewhurst Dep. 242:15-243:5; 244:22-245:11, 250:12-251:9; PL251 (2/2011 poll); PL252 (poll); Williams Dep. 298:22-24; PL434 (poll).
[959] Trial Tr. 371:8-17 (Day 4).

672.    Bill sponsors acknowledged that there are more forms of government issued photo ID than are included in SB 14, and that there is no way to know how any given respondent interpreted the term "government issued photo ID" or "valid photo ID" (*e.g.* whether a respondent understood "government-issued photo ID" to mean a State University ID or a Texas State Employee ID card).[960]

673.    Bill supporters agree that public polling – including several polls cited by bill supporters – demonstrate that African American support of photo ID measures declined by 30% from 2009 to 2012.[961]

### c.    Senator Fraser is unresponsive to concerns regarding the impact of SB 14 on minority voters

674.    On January 25, 2011, the Committee of the Whole Senate considered SB 14.  Senator Fraser asserted that the allowable forms of photo IDs under SB 14 confirm a person's identity, eligibility to vote, and U.S. citizenship.  He later admitted in his deposition that SB 14 ID does not confirm citizenship or Texas residency.[962]

675.    Senator Fraser also claimed that SB 14 simply required voters to prove their identity at the polls, notwithstanding Texas's then-existing law provided for (non-photo) identification at the polls.[963]

---

[960] Fraser Dep. 336:11-339:4, 341:2-9, 341:25-345:2; PL244 (Hebert email); PL433 (poll); PL247 (Fall 2010 Statewide Landscape Benchmark Survey); PL251 (poll); Dewhurst Dep. 246:4-23; PL251 (2/2011 poll); PL252 (Texas Politics poll); Williams Dep. 299:15-22, 300:11-25, 301:1-3, 300:15-17, 300:25, 301:1-3.

[961] Williams Dep. 305:14-18; PL252 (poll); Dewhurst Dep. 248:6-14; PL251 (2/2011 poll).

[962] *See* PL006 at 40 (COTW Transcript Vol. II); *see also* Williams Dep. 115:10-23, July 29, 2014 (the purpose of SB 14 was to prevent in-person voter fraud, which includes non-U.S. citizens who attempt to vote). Fraser Dep. 193:22-194:25, 195:10-15, July 23, 2014; *see also* Trial Tr. 122:15-124:16 (Williams) (Day 8) (non-U.S. citizens serve in the U.S. military and may be issued military IDs; Texas poll workers may not be trained to distinguish among at least 10 types of military IDs; U.S. citizenship certificates may not contain a recent picture of the holder). *Id.* 195:1-6.

[963] PL006 at 60, 95, 158, 159, 191 (COTW Transcript Vol. II); Patrick Dep. 47:11-16, July 11, 2014.

676.    Senator Fraser's chief of staff testified that Tribal IDs were excluded from SB 14 because, after attempting some perfunctory Google searches, she could not determine how many Native American tribes were located in Texas and concluded that "tribal IDs are too broad and easy to be faked."[964]

677.    Senator Fraser also asserted that SB 14 was modeled after the Indiana photo ID law but conceded in the same hearing that SB 14 permits fewer photo IDs than the Indiana photo ID law and that he was unaware of whether Indiana's law permitted use of student IDs.[965]

678.    Senator Van de Putte asked whether any studies had been conducted on the impact of SB 14 on Latino and African-American voters, and Senator Fraser's response was that SB 14 is based on models approved by the Supreme Court and precleared by the Department of Justice.[966]

679.    When Senator West asked whether Senator Fraser was aware of research on whether the burdens of photo ID requirements fall disproportionately on racial minorities, Senator Fraser pointed to non-SB 14-specific public opinion polling as indicating that African-American and Hispanic Texans support photo ID requirements as well as the experience in other states.[967]

680.    Senator Fraser and other bill supporters did not undertake any analysis of the impact of SB 14 on minority voters, nor were they aware of any such analysis.[968]

681.    When Senator West asked whether the bill as filed was the least restrictive means to accomplish its goal of preventing voter identification fraud, Senator Fraser indicated that he was not sure whether or not that was the intent.[969]

---

[964] McCoy Dep. 261:20-25, 262:1-5.
[965] PL006 at 96, 188-89 (COTW Transcript Vol. II)
[966] PL006 at 8, 44-45 (COTW Transcript Vol. II); Dewhurst Dep. 175:2-176:14.
[967] PL006 at 162-166 (COTW Transcript Vol. II); Dewhurst Dep. 175:2-12, 177:19-180:10, 180:24-181:12.
[968] Fraser Dep. 167:18-168:9, July 23, 2014; Patrick Dep. 120:10-21, July 11, 2014.

682.     Senator Fraser and his staff did not conduct analysis on whether or not voter turnout in Texas had declined because of voter concerns about election fraud, nor were they aware any external analysis that would support that concept.[970]

683.     Senator Ellis asked Senator Fraser whether he would object to adding a provision in the bill requiring the Secretary of State to report annually on whether SB 14 has had a racially disparate impact.  Senator Fraser declined to agree to this request and claimed that the Supreme Court and the Department of Justice would report on that issue.[971]

684.     Similarly, Senator Ellis testified at trial that when he asked for specific data on the effects of SB 14, Senator Fraser would respond with something to the effect of "I'm not advised, ask the Secretary of State."  During trial, Senator Ellis testified that when he would request information from the Secretary of State he would not learn anything.[972]

685.     Several bill opponents testified about the hurdles facing their constituents in accessing a driver license office to obtain compliant photo ID.  Senator Carlos Uresti stated that some of his constituents must travel 175-200 miles round trip to a driver license office, and that his district included eight counties without DPS offices and several more with only sporadic access.[973] During trial, Senator Uresti also testified extensively about the lack of public transportation and high levels of poverty in his district and that he believed these issues presented obstacles to obtaining proper identification under SB 14.[974]  Senator Uresti testified that when he raised these concerns during the debate over SB 14 that the responses he received were not substantive and

---

[969] PL006 at 168 (COTW Vol. II).
[970] McCoy Dep. 139:8-17.
[971] PL006 at 200-202 (COTW Transcript Vol. II); *see also* Trial Tr. 211:4-22, 222:16-25 (Uresti) (Day 3).
[972] Trial Tr. 184:15-22 (Ellis) (Day 4).
[973] PL006 at 67-73 (COTW Transcript Vol. II).
[974] Trial Tr. 207:7-210:18 (Uresti) (Day 3).

were mostly "I'm not advised" or "You need to ask that question of the Secretary of the State" even though once the bill was brought to the Senate floor only questions to other senators are allowed.[975]

686.    Senator Mario Gallegos pointed to the difficulties that voters lacking necessary photo ID would face in accessing a driver license office, such as those in inner-city Houston, where there is no DPS office.  Senator John Whitmire, an Anglo representing a majority-minority district in Houston, spoke of hours-long waits to obtain a driver license in his district.[976]

687.    Senator Fraser was aware that his floor statements would be included in any review of SB 14 under the Voting Rights Act.[977]

688.    Catherine Engelbrecht, founder of Houston-based King Street Patriots and True the Vote, testified in favor of SB 14.  True the Vote had previously received publicity for monitoring minority polling sites in Houston in 2010, prompting the office of the Harris County Attorney to investigate whether its volunteers had intimidated prospective voters.[978]

### d.    The Senate refuses to adopt ameliorative amendments

689.    Senators proposed 37 amendments to SB 14, 28 of which were tabled, and nine of which were adopted.[979]

690.    One rejected amendment would have prohibited state agencies from charging a fee for issuance of documents used to obtain a photo ID, thereby reducing the burden of SB 14 on indigent voters.  Senator Ellis remarked that Indiana's photo ID law permits indigent voters to

---

[975] Trial Tr. 212:2-16 (Uresti) (Day 3).
[976] PL006 at 64-66, 82-83 (COTW Transcript Vol. II); PL765 at ¶ 49 (Davidson Supp. Rep.).
[977] Trial Tr. 417:25-418:9 (Fraser) (Day 7).
[978] PL006 (COTW Transcript Vol. II); PL765 at ¶ 46 (Davidson Supp. Rep.).
[979] PL013 (Tex. Sen. J., 82d Leg., Regular Sess. (5th Day Continued)); PL765 at ¶ 51 (Davidson Supp. Rep.).

obtain underlying documents to obtain a photo ID for voting free of charge, and SB 14 supporters conceded that the amendment would not have interfered with the purpose of SB 14.[980]

691.    The Senate rejected several amendments offered by Senator Davis to address two general categories of concerns levied against SB14.[981] The first category of rejected Amendments offered by Senator Davis were designed to ensure low-income and indigent voters had access to photo ID at no additional cost, including Amendment No. 2 which would have required DPS to notify all photo ID applicants that they could obtain an EIC for free and Amendment No. 12 which would have allowed indigent applicants to receive underlying documents necessary to obtain an SB14 photo ID at no cost.[982] Senator Dan Patrick, in explaining why he voted to table this amendment, testified that he wanted the cost of obtaining underlying documentation to be imposed on voters rather than on the State.[983] The second category of rejected amendments offered by Senator Davis were designed to ensure acceptance of photo IDs where there was an informational discrepancy between data recorded on the photo ID and data included on the voter roll (such as a misspelled last name or different last names due to marriage or divorce).[984]

692.    Other rejected amendments offered by Senator Gallegos would have required driver license offices to be open during evenings and Saturdays and to be accessible by bus in counties with bus service, concerns he linked to poverty and lack of vehicle access in minority communities.[985]    Senator Fraser repeatedly argued that SB 14 was not the appropriate bill in

---

[980] Williams Dep. 264:12-24, 265:15-266:21, July 29, 2014; Trial Tr. 289:15-25 (Patrick) (Day 7); PL014 (Tex. Sen. J., 82 Leg., Regular Sess. Excerpt: SB14 at 32 (Jan. 26, 2011).
[981] Trial Tr. 20:23-21:7 (Davis) (Day 4).
[982] Trial Tr. 22:20-23:23 (Davis) (Day 4).
[983] Trial Tr. 291:21-22 (Patrick) (Day 7).
[984] Trial Tr. 30:21-31:7 (Davis) (Day 4) (Senator Davis discussing Amendment Nos. 39 and 40).
[985] PL013 at 127 (Floor Amendment No. 26) (Sen. J. Jan 26, 2011); PL013 at 129 (Floor Amendment No. 29) (Sen. J. Jan 26, 2011); PL014 (transcript of Jan 26, 2011 floor debates); PL014 (Tex. Sen. J., 82d

(Cont'd…)

which to debate DPS operations, although Senator Williams conceded that this amendment would not have interfered with the purpose of SB 14.[986]

693.    Other tabled amendments would have added forms of acceptable ID used in Indiana or Georgia's voter ID laws, including federal, state, and county-issued IDs.[987]  Senator Fraser, who moved to table these amendments, was not aware that Indiana and Georgia's voter ID laws permitted the use of photo ID issued by state or federal agencies and institutions.[988]

694.    One of the tabled amendments would have allowed students at public universities to use their student ID as an acceptable form of ID.[989]  In response to an amendment to allow student IDs, Senator Williams asked whether student IDs indicate lawful presence in the country, a concern unrelated to voter impersonation.  Senator Patrick conceded in deposition testimony that a student identification card may in fact verify the identity of the holder.[990]  The director of Texas's Elections Division was unaware of any allegations that student ID had been used to commit voter fraud.[991]  Senator Ellis, who offered the amendment, testified at trial that "those young people, more and more, who are at our universities happen to be minorities" and that he believed that the legislators who opposed the amendment "knew that a driver's license is

_____

Leg., Regular Sess. Excerpt: SB14, at 32 (January 26, 2011)).

[986] PL014 (transcript of Jan 26, 2011 floor debates); PL014 (Tex. Sen. J., 82d Leg., Regular Sess. Excerpt: SB14, at 20, 23, 28 (January 26, 2011)); Williams Dep. 264:12-24, 275:21-276:3, 278:21-279:2, July 29, 2014.

[987] PL013 at 124 (Floor Amendment No. 21) (Sen. J. Jan 26, 2011); PL013 at 123 (Floor Amendment No. 19) (Sen. J. Jan 26, 2011); PL124 (transcript of Jan 26, 2011 floor debates); PL014 (Tex. Sen. J., 82d Leg., Regular Sess. Excerpt: SB14, at 9-11 (January 26, 2011)); PL013 at 126 (Floor Amendment No. 24) (Sen. J. Jan 26, 2011); PL014 (Tex. Sen. J., 82d Leg., Regular Sess. Excerpt: SB14, at 18 (January 26, 2011)).

[988] Fraser Dep. 128:6-15, 248:16-23, 275:11-14.

[989] Trial Tr. 177:22-178:14 (Ellis) (Day 4).

[990] Patrick Dep. 74:13-23, July 11, 2014.

[991] McGeehan Dep. 142:11-14, June 18, 2014.

something that a good number of minorities would not have" and that "[s]tudent I.D. would be one easier to get."[992]

695.    In response to some amendments to add forms of ID, Senator Fraser raised concerns about the burden that permitting additional photo IDs would place on election administrators. However, he raised no such concern when voting to adopt an amendment that added a license to carry a concealed handgun issued by DPS to the list of acceptable photo ID.[993]

696.    The Senate also tabled an amendment that would have required the Secretary of State to produce an annual report on the impact of SB 14's photo ID requirements on minority voters, the number of eligible voters without requisite SB 14 ID, and the average wait time to obtain a photo ID at a driver license office.[994]  Senator Ellis, who offered the amendment, testified that the amendment would not have delayed the implementation of SB 14, weakened the requirements of SB 14, or had any fiscal impact unless the amendment was funded.[995]  Senator Ellis testified that the amendment would have documented whether SB 14 had a discriminatory impact.[996]

697.    The Senate also tabled an amendment that would have allowed for same-day registration of voters.  Senator Ellis, who offered the amendment, testified that the purpose of the amendment had been to increase voter participation.[997]

698.    The Senate unanimously adopted an amendment offered by Senator Duncan that would have counted provisional ballots cast by voters who attested that they are indigent and lack SB

---

[992] Trial Tr. 178:15-179:2 (Ellis) (Day 4).
[993] PL013 at 123 (Floor Amendment No. 18) (Sen. J. January 26, 2011); PL014 (transcript of January 26, 2011 floor debates); PL014 (Tex. Sen. J., 82d Leg., Regular Sess. Excerpt: SB14, at 11, 16 (January 26, 2011)).
[994] PL013 at 130 (Floor Amendment No. 30) (Sen. J. January 26, 2011).
[995] Trial Tr. 183:16-184:3 (Ellis) (Day 4).
[996] Trial Tr. 183:8-13 (Ellis) (Day 4).
[997] Trial Tr. 180:22-181:17 (Ellis) (Day 4).

14 ID, but this provision was stripped from SB 14 prior to final passage. Senator Duncan offered this amendment because it tracked the Indiana voter ID law approved by the U.S. Supreme Court.[998]

699.    On January 26, 2011, the Senate voted to pass SB 14 as amended, including exemptions for voters over the age of 70 and voters who had proof of a disability from a doctor.  No minority senator voted in favor of passage and almost all Anglo senators voted in favor.[999]  Senator Ellis testified that there was no effort made by Senator Fraser or Lieutenant Governor Dewhurst to work with senators who represented minority communities to address their concerns about SB 14.[1000]

700.    On the date of the Senate's passage of SB 14, Lieutenant Governor Dewhurst issued a press release stating that SB 14 would "increase public confidence in our election process by ensuring only U.S. citizens—who are legally eligible—vote in Texas elections."[1001]

701.    After the bill passed the Senate, Bryan Hebert drafted and circulated a memo to select Senate staff summarizing the Senate-passed version of SB 14 in which he described it as "the strictest photo ID law in the country."[1002]

---

[998] PL013 at 137 (Floor Amendment No. 40) (Sen. J. Jan 26, 2011); Duncan Dep. 202:17-203:19, 202:22-25, 204:3-205:1, Aug. 28, 2014.  This amendment if adopted would have reduced the burden on poor voters, without interfering with the efficacy of the bill, but it was stripped from SB 14 prior to its final passage.  Trial Tr. 196:11-197:23 (Day 8); (Hebert) (Day 8); Hebert Dep. 220:4-10, 220:24-221:6, 221:21-23, June 17, 2014.
[999] PL016 (SB 14 as engrossed in by the Senate); PL013 (Tex. Sen. J., 82d Leg., Regular Sess., at 140 (5th Day Continued)); PL765 at ¶ 51 (Davidson Supp. Rep.).
[1000] Trial Tr. 186:21-187:4 (Ellis) (Day 4).
[1001] PL279 (LG press release 1/26/2011); Dewhurst Dep. 221:4-222:12.
[1002] PL234 (bill summary); Trial Tr. 209:24-211:24 (Day 8); (Hebert) (Day 8); Hebert Dep. 260:24-261:13, June 17, 2014.

e.        **Withholding of data on the impact of SB 14**

702.    On January 24, 2011 (two days before the Senate passed SB 14), Senator Duncan's staff member Jennifer Fagan wrote Texas Elections Director Ann McGeehan, to ask whether the Secretary of State or county election officials collected information on the ethnicity of registered voters. Ms. McGeehan advised Ms. Fagan that Spanish surname data was available, but Ms. McGeehan is unaware if she provided it to Ms. Fagan.[1003] The Elections Division routinely used Spanish surname analysis.[1004]

703.    As of January 25, 2011 the Elections Division had anticipated that the Department of Justice would seek information about the impact of the bill on minority voters because that information is at the core of the analysis under the Voting Rights Act.[1005]

704.    Prior to January 25, 2011, the Division had only analyzed the total number of registered voters who had not supplied either a driver license or social security number when they registered to vote. The Division did not conduct a Spanish surname analysis of Texas voters who lack a record in the DPS driver license database until it did so at the request of the Department of Justice after the State had submitted SB 14 for preclearance under the Voting Rights Act.[1006]

705.    During her testimony on January 25, 2011, Ms. McGeehan noted that Senator Williams had previously requested an analysis of the TEAM database and the DPS driver license database to determine who among registered voters did not have a DPS record for a Texas driver license or personal ID, and Senator Williams asked Ms. McGeehan at the hearing for a status report

---

[1003] PL325 (McGeehan email); McGeehan Dep. 47:11-51:20, June 18, 2014.
[1004] Trial Tr. 258:23-259:21 (McGeehan) (Day 5).
[1005] McGeehan Dep. 63:6-64:20, June 18, 2014.
[1006] McGeehan Dep. 56:7-11, 57:2-15, 63:6-12, 75:19-76:19, June 18, 2014; *see* ¶ 626, *supra*; Trial Tr. 289:23-290:11 (McGeehan) (Day 5).

concerning the analysis.  Ms. McGeehan responded that she hoped to have that information by week's end (January 25, 2011 was a Tuesday).  As indicated, the Senate proceeded to pass SB 14 the next day without waiting for the results of this analysis.[1007]

706.    That same day, January 25, 2011, the Secretary of State's IT department conducted comparisons of the voter registration database and a DPS database extract to determine the number of registered voters without a record in the Texas driver license database.  This analysis identified between 678,560 and 844,713 registered voters did not match a record in the Texas driver license database, and Ms. McGeehan drafted a summary of the results.[1008]

707.    Shortly after February 1, 2011, Ms. McGeehan discussed this analysis and the results with her superior, Deputy Secretary of State Coby Shorter, and with John Sepehri, general counsel to the Secretary of State.  She understood that Mr. Shorter and Mr. Sepehri would transmit the analysis to Senator Williams, and she did not provide the analysis herself to the Lieutenant Governor or any legislator.[1009]

708.    Ms. McGeehan believed that the analysis was the most accurate analysis that the Elections Division was capable of producing, and she was comfortable providing the analysis to the legislature with the caveat that although the Office of the Secretary of State cannot answer the question precisely, "we can provide an estimated range of voters who appear not to have been issued a TDL/personal identification card by the DPS."[1010]

---

[1007] PL006 (Senate Committee of the Whole Transcript, January 25, 2011, at 446-47, 490); McGeehan Dep. 170:15-173:11, May 31, 2012; Trial Tr. 128:15-129:25 (Williams) (Day 8).

[1008] McGeehan Dep. 65:2-13, 66:11-20, 68:15-70:13, June 18, 2014; Guyette Dep. 21:21-23:15, 33:24-34:15, 34:16-35:12; PL432 at 3 (McGeehan email re: Query to Identify Voters with no TDL/ID).

[1009] McGeehan Dep. 173:12-19, May 31, 2012.  McGeehan Dep. 13:25-14:12, 66:11-20, 78:24-79:24, 80:14-81:9, June 18, 2014.

[1010] Trial Tr. 286:18-287:6, 290:17-292:25 (McGeehan) (Day 5).

709.    Prior to the passage of SB 14 by the Senate, the Lieutenant Governor received a briefing by his staff that between 3 to 7 percent of Texas voters did not have a Texas driver license or personal ID, a figure in line with the SOS analysis.  The Lieutenant Governor did not request or receive information concerning race or Spanish surname of the registered voters lacking a Texas driver license or personal ID.[1011]

710.    Ms. McGeehan did not know that the Elections Division analysis had been provided to the Lieutenant Governor, and believes that the legislature did not learn of the analysis during the 2011 legislative session.[1012]

711.    Although Senator Williams did not recall whether he received the analysis requested from the Secretary of State's office, and notwithstanding his testimony that his staff generally followed up on requests from resource witnesses, Senator Williams testified that his staff never obtained the report.[1013]

712.    On February 25, 2011, Ms. McGeehan sent an email to the House sponsor of SB 14, Rep. Harless, and her chief of staff, Colby Beuck, in which she wrote that the Division's IT department was analyzing the number of registered voters who had not been issued a Texas driver license or personal ID card and hoped to have the analysis completed by February 28. However, this analysis had been completed since February 1 and remained pending with Deputy Secretary Shorter and General Counsel Sepehri.[1014]

---

[1011] Trial Tr. 69:21-70:11, 73:13-74:11 (Dewhurst) (Day 7); Dewhurst Dep. 186:13-187:13, 188:12-191:21, 194:2-7.

[1012] See McGeehan Dep. 80:14-22, 82:19-24, 84:19-24, June 18, 2014.

[1013] Trial Tr. 129:10-19 (Williams) (Day 8); Williams Dep. 246:7-249:9, 252:23-253:5, 256:15-20, 257:4-12, 261:9-12, July 29, 2014; see also Dewhurst Dep. 185:2-19, July 29, 2014 (assumed that the Secretary of State's office would have been conducted analysis requested by Senator Williams and provided it to him).

[1014] PL260 (email re HAVA dollars availability); Trial Tr. 293:6-10, 293:24-294:15, 294:20-295:22,

(Cont'd…)

713.    Ms. McGeehan also sent to Mr. Beuck the number of voters who did not have a driver license number associated with their voter record, a figure that does not accurately reflect whether voters possessed current, valid ID because the inclusion of a driver license number on a voter registration application was optional until January 2006.  Even while Deputy Secretary Shorter and General Counsel Sepehri expressed concerns to Ms. McGeehan about the accuracy of the match analysis between TEAM and the DPS database, Ms. McGeehan continued to disseminate this information about voters without driver license numbers in their voter records despite that it less accurately indicated who possessed current, valid ID.[1015]

714.    On March 1, 2011, Ms. McGeehan appeared before the House Select Committee on Voter Identification and Voter Fraud and testified in response to questioning by Rep. Rafael Anchía that her IT department was attempting to identify appropriate matching criteria for identifying registered voters lacking a Texas driver license or ID.  In truth, however, the IT department no longer had control of the data.[1016]

715.    Ms. McGeehan testified that she had likely sought authorization from Deputy Secretary Shorter and General Counsel Sepehri to release the results of the matching analysis to at the House hearing on SB 14, but her request was denied without a substantive reason.[1017]

716.    Ms. McGeehan cannot identify any other instance where she had completed analysis at the request of the legislature and then did not provide the analysis to the legislature.[1018]

---

297:10-298:4 (McGeehan) (Day 5).
[1015] PL261 (email re voters without driver's licenses).
[1016] PL021 (House Committee on Voter Identification and Voter Fraud Hearing, March 1, 2011, at 228-67); Trial Tr. 300:20-302:4 (McGeehan) (Day 5).
[1017] Trial Tr. 302:16-304:16 (McGeehan) (Day 5).
[1018] Trial Tr. 304:21-25 (McGeehan) (Day 5).

717.    Mr. Shorter testified that he recalls several matching exercises but that his staff was not comfortable with the accuracy of the results.  He does not remember who on his staff was uncomfortable with the results.  Mr. Shorter, the number two person in charge of elections in the State of Texas, stated that it was not his role to suggest to the staff that the matching results should be distributed with a disclaimer about possible inaccuracies.  He does not remember his staff making this suggestion.[1019]

718.    Mr. Shorter likewise does not remember whether he discussed with staff consulting with outside IT professionals on matching protocols. [1020]

719.    Mr. Shorter does not recall whether these concerns about the accuracy of the match results were recorded in writing at any time prior to the Section 5 submission to DOJ.[1021]

720.    Mr. Shorter is not aware whether the results of the matching analysis were provided to anyone outside the Secretary of State's office while SB 14 was being considered.[1022]

### 6.    House consideration of SB 14

721.    On January 27, 2011, the House received SB 14. Representative Trey Martinez Fischer, who has represented House District 116 for the last fourteen years and currently chairs the Mexican American Legislative Caucus, characterized as "divisive" and "anti-Hispanic" several issues the House considered in 2011, such as redistricting, English only initiatives, sanctuary cities, and rolling back the Affordable Care Act, which was significantly benefitting the Hispanic population.[1023]  This "tense" legislative climate came on the heels of the 2010 Census, which recorded the dramatic growth of Hispanics in Texas between 2000 and 2010.   Rep. Martinez

---

[1019] Shorter Dep. 11:9-14, 85:10-86:24.
[1020] Shorter Dep. 93:2-93:13.
[1021] Shorter Dep. 88:9-90:4.
[1022] Shorter Dep. 100:16-101:2.
[1023] Trial Tr. 93:1-16, 98:4-99:3 (Martinez Fischer) (Day 1).

Fischer categorized these legislative proposals in 2011 as "working against the growing demographic."[1024]

722.    On February 9, Speaker Straus announced the formation of a unique "fast track" Select Committee on Voter Identification and Voter Fraud that would consider only one bill: SB 14.[1025] Bill opponents asserted that this process circumvented time-honored legislative traditions in an unfair effort to prevent meaningful negotiation to amend the bill.[1026]

723.    Speaker Straus handpicked each member of the Select Committee; the Speaker had less control over the membership of the standing House Elections Committee, to which he sent all other voter ID and voter fraud bills.[1027]

724.    Speaker Straus chose Rep. Harless to serve as House sponsor of SB 14.[1028]

725.    In February, 2011, Rep. Harless solicited suggestions from Advocacy, Inc., a disability rights organization, on a standard by which to define disability under SB 14.  Rep. Harless supported including a disability exemption in voter ID legislation, notwithstanding opposition from some constituents.[1029]  Rep. Harless's chief of staff, Colby Beuck, could not recall having sought input from any other interest group, besides Advocacy, Inc., on changes to the language of SB 14.[1030]

---

[1024] Trial Tr. 97:11-98:3, 99:4-15 (Martinez Fischer) (Day 1).

[1025] PL666 (SB 14 bill history); PL1025; PL608 (Straus press release); Fowler Dep. 146:10-147:1; D. Davis Dep. 141:19-142:20, 2012; Trial Tr. 108:6-11, 108:16, 239:14-21 (Martinez Fischer, Veasey) (Day 1).

[1026] Trial Tr. 103:11-19, 108:17-109:19, 241:15-22 (Martinez Fischer, Veasey) (Day 1); Trial Tr. 354:3-8 (Anchía) (Day 4).

[1027] Straus Dep. 50:22-54:21, June 11, 2012; Straus Dep. 24:3-9, June 23, 2014; Trial Tr. 108:11-16 (Martinez Fischer) (Day 1).

[1028] Harless Dep. 223:4-224:11, June 13, 2012.

[1029] Beuck Dep. 109:5-113:22, June 23, 2014.

[1030] Beuck Dep. 113:22-114:15, June 23, 2014.

726.    On March 1, 2011, the House Select Committee on Voter Identification and Voter Fraud held a hearing on SB 14.  Testimony included a voter who claimed that a photo ID bill was necessary to prevent non-citizens from voting and who, when pressed to provide supporting facts, asserted that SB 14 would "fix the problem whether it exists or not."  Other witnesses explained that ID requirements would adversely impact minority voters and that voters were unlikely to validate provisional ballots by traveling to a county office after an election.[1031]

727.    On March 21, 2011, SB 14 was placed on the House's Emergency Calendar and debated that same day.[1032]  Rep. Harless explained that the bill addresses only voter impersonation and no other voter fraud.[1033]  Rep. Anchía  observed that during the development of voter ID legislation in the Texas legislature, the justification for such legislation had shifted from preventing voter impersonation, to concern about "illegal aliens coming across the border and voting," to increasing the integrity of elections.[1034]  Similarly, Rep. Martinez Fischer testified that throughout the legislative sessions supporters shifted the rationale for the bill from preventing election improprieties to protecting the integrity of the ballot box to preventing noncitizens from illegally voting.[1035]

---

[1031] PL666 (SB 14 bill history); Bonnen Dep. 44:24-45:2; PL021 (House Committee on Voter Identification and Voter Fraud Hearing, March 1, 2011, at 55); PL021 (House Committee on Voter Identification and Voter Fraud Hearing, March 1, 2011, at 123-25); PL021 (House Committee on Voter Identification and Voter Fraud Hearing, March 1, 2011, at 126-27).
[1032] PL030 at 1969 (House Journal, 3/21/2011); PL666 (SB 14 bill history).
[1033] PL031 (House Chambers Floor Debate, March 21, 2011, at 7 at 1995).
[1034] PL031 (House Chambers Floor Debate, March 21, 2011, at 11-12); *see also* PL031 (House Chambers Floor Debate, March 21, 2011, at 39 (narrative started with "allegations of busloads of undocumented immigrants coming and voting in our elections and stealing our elections"); Trial Tr. 318:14-326:2 (Anchía) (Day 4).
[1035] Trial Tr. 103:20-104:24 (Martinez Fischer) (Day 1).

728.     Rep. Anchía believed that supporters of SB 14, in focusing on "non-citizen voting," were targeting Hispanics.[1036]  SB 14 was one among other bills introduced in 2011, including bills that specified English as the state's official language— HB 176 by Jim Jackson, HB 301 by Leo Berman, and HB 81 by Dan Flynn—that were perceived as anti-Latino.[1037]

729.     Throughout the 2011 session, immigration issues, non-citizens voting, and the alleged need for a new photo ID law were linked, both in discussions and in bills, causing concern among Latinos in the legislature.[1038]  Although constituents likewise expressed these concerns to their elected officials, bill supporters did not attempt to determine whether these concerns were valid.[1039]

730.     Rep. Aaron Peña, one of the few Latino Republicans, was worried about this connection, and said at one point:  "The tone of the debate is basically saying, 'We don't want you. . . .  This is a war over our culture.  These people bring diseases into our country.'"  He also tried, he said, while alone with his Republican colleagues to tone down the racial aspects of the debates.[1040]

731.     Bill opponents also noted that there were virtually no prosecuted cases of voter impersonation at the polls in Texas.[1041]  Rep. Anchía observed that notwithstanding Rep. Harless's purported concern that voter fraud would cancel legitimate votes, she had never filed a

---

[1036] Anchía Dep. 59:13-19, 2012; *see also* Trial Tr. 318:14-320:5 (Anchía) (Day 4).

[1037] PL765 at ¶ 57 (Davidson Supp. Rep.); PL940 (HB 176); PL941 (HB 301); PL939 (HB 81).

[1038] Straus Dep. 95:12-18, 2014; *see also* Riddle Dep. 99:15-100:2 (purpose of voter ID bills in part is to prevent illegal immigrants from voting), 151:7-25 (Rep. Riddle is a member of the Texas Conservative Coalition), June 18, 2014; Trial Tr. 112:2-22 (Martinez Fischer) (Day 1); Trial Tr. 369:12-371:2 (Hernandez) (Day 4).

[1039] *See, e.g.*, Straus Dep. 94:6-24, 2014; Riddle Dep. 163:11- 21, 178:3-179:16, 2014.

[1040] PL765 at ¶ 57 (Davidson Supp. Rep.); *see also* Trial Tr. 370:16-371:2 (Hernandez) (Day 4) (trial testimony of Hispanic State Rep. Ana Hernandez echoing concerns raised by Rep. Peña).

[1041] PL031 (House Chambers Floor Debate, March 21, 2011, at 36-37; *see also* PL031 (House Chambers Floor Debate, March 21, 2011, at 40-42 (absence of documented cases of voter impersonation); Straus Dep. 140:13-20, June 23, 2014 (unaware of any specific incidents of in-person voter fraud anywhere in Texas or anywhere in the United States).

bill to address voter fraud associated with mail-in ballots –the most prevalent type of voter fraud in Texas.[1042]  Consequently, SB 14 would not address lowered confidence in elections caused by mail-in ballot fraud.[1043]  Rep. Harless repeatedly stated, in a conclusory manner, that this was not the appropriate venue in which to discuss mail-in ballots.[1044]

732.     Representative Harless later testified that she could not identify a single voter who had not voted due to concern that voter fraud would cancel his or her vote.[1045]

733.     During House floor debate, Rep. Anchía expressed concern about the impact of SB 14 on the poor, and on African Americans and Hispanics, and asked whether Rep. Harless was aware of any studies conducted by a state agency to project the number of voters who lack requisite photo ID and the percentage of these voters who are African American or Hispanic.[1046]  Although Harless stated that she was not "advised," the Secretary of State's office – as discussed above – had analyzed the number of voters who lack requisite photo ID (drivers licenses and state ID) almost two months before the hearing[1047] and could easily have conducted a Spanish surname analysis of those voters.[1048]  Speaker Straus was likewise unaware of any analysis conducted as to the availability of photo ID by racial group.[1049]

734.     Rep. Anchía also asked whether SB 14 might reduce Latinos and African Americans' electoral power.  Rep. Harless's response mirrored Sen. Fraser's response to a similar question:

---

[1042] PL031 (House Chambers Floor Debate, March 21, 2011, at 21, 2008); *see also* PL031 (House Chambers Floor Debate, March 21, 2011, at 41-42 (70% of AG's investigations were mail-in ballots).
[1043] PL031 (House Chambers Floor Debate, March 21, 2011), at 43.
[1044] PL031 (House Chambers Floor Debate, March 21, 2011), at 21-22.
[1045] Harless Dep. 113:24-114:3, June 20, 2014.
[1046] PL031 at 35 (House Chambers Floor Debate, March 21, 2011); PL031 at 46-47 (House Chambers Floor Debate, March 21, 2011).
[1047] *See* ¶ 702-720, *supra*.
[1048] *See* ¶ 613, 702, *supra*.
[1049] Straus Dep. 47:14-18, 97:23-99:1.

that SB 14 would increase turnout of all voters in Texas based on increases in turnout in Georgia and Indiana after those states had enacted voter ID laws.[1050]

735.    During the debate, Rep. Martinez Fischer raised a Constitutional point of order, which could have prevented the bill's passage.  While the point of order was overruled, the conference committee replaced the disputed language with a new provision that had not been in either the House or Senate passed versions of the bill.[1051]

736.    Rep. Anchia noted that the discussion of a voter fraud epidemic did not make sense given the lack of voter impersonation evidence.  He recounted telling his colleagues on the House floor, "I worry, members,that this is about something else and not about integrity of the ballot."[1052]

### 7.    The House refuses to adopt ameliorative amendments

737.    Rejected by the House were amendments that would have waived all fees for documents to obtain a driver license or personal ID for voting purposes;[1053] reimbursed low-income Texans for travel costs related to obtaining photo ID for voting purposes;[1054] allowed the use of student photo ID cards;[1055] allowed the use of photo ID cards issued by the federal government, or an agency, institution, or political subdivision of the state;[1056] allowed voters to sign an affidavit confirming the voter's identity and cast a regular ballot in lieu of having to cast an absentee

---

[1050] *Compare* PL031 (House Chambers Floor Debate, March 21, 2011), at 36-37 *with* PL006 (Fraser's similar response, discussed ¶¶ 677-679, *supra*).

[1051] Trial Tr. 107:16-112:1 (Martinez Fischer) (Day 1).

[1052] Trial Tr. 342:1-343:3 (Anchia) (Day 4).

[1053] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 969-70 (40th Day)) (Amendment No. 15).

[1054] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 1009-12 (40th Day)) (Amendment No. 50).

[1055] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 979 (40th Day)) (Amendment No. 23); Trial Tr. 105:23-106:2 (Martinez Fischer) (Day 1).

[1056] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 980-81 (40th Day)) (Amendment No. 25); Trial Tr. 105:20-23, 246:16-247:4, 255:5-13 (Martinez Fischer, Veasey) (Day 1) (Representative Veasey testifying that he can enter the White House using his Congressional ID, but cannot vote in Texas with that ID); Trial Tr. 372:11-19 (Hernandez) (Day 4).

ballot;[1057]and allowed for the use of expired IDs.[1058]  According to Representative Martinez Fischer, these proposals "fell on deaf ears."[1059]   Rep. Anchia offered an amendment tasking the Secretary of State to conduct an analysis regarding the impact of SB 14 on minorities, an amendment that "didn't even quarrel…with the substance of the bill," but was nonetheless tabled.[1060]

738.    Speaker Straus later could not identify any reason for the exclusion of federal and state employee IDs from SB 14.[1061]  He had no concerns with the use of federal employee IDs or student IDs issued by Texas higher educational institutions, for voting.[1062]  He was unaware of a student ID ever having been used for fraudulent purposes for voting in any election in Texas.[1063]  And he did not know why an ID's expiration date would be indicative of the cardholder's identity.[1064]

739.    Although an amendment was adopted to target voter education at low-income and minority voters, it was removed in the subsequent House-Senate conference.[1065]  The majority of amendments proposed by bill opponents were tabled.[1066]

740.    When later asked about several amendments to SB 14 that she had voted to table, Rep. Harless could not explain her votes or what the amendments purported to accomplish, nor could she identify her position on the amendments.[1067]

---

[1057] Trial Tr. 242:22-243:6 (Veasey) (Day 1) (amendment offered by Representative Veasey); Trial Tr. 372:3-9 (Hernandez) (Day 4) (amendment offered by Representative Hernandez).
[1058] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 976-77 (40th Day)) (Amendment No. 19).
[1059] Trial Tr. 105:1-106:11 (Martinez Fischer) (Day 1).
[1060] Trial Tr. 331:22-332:21 (Anchia) (Day 4).
[1061] Straus Dep. 116:4-8, June 23, 2014.
[1062] Straus Dep. 46:10-47:7, 115:17-116:8, 116:21-117:2, June 23, 2014.
[1063] Straus Dep. 117:3-6, June 23, 2014.
[1064] Straus Dep. 122:6-13, June 23, 2014.
[1065] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 982 (40th Day)) (Amendment No. 27).
[1066] Beuck Dep. 236:22-25, June 23, 2014.

741.    In addition to rejecting these amendments, the House also removed from SB 14 the provision allowing indigent voters' provisional ballots to be counted without showing photo ID and the exemption for voters over the age of 70.[1068]  The vote on final passage of the bill in the House reflected the same pattern of racial polarization as in the Senate vote.[1069]

742.    Rep. Anchia testified that by the time the House voted on the bill, "very few" of the questions raised regarding SB 14's potential negative impact on minority voters had been answered by the bill's supporters, and that any answers they did receive were evasive or otherwise nonresponsive.[1070]  Rep. Anchia testified that he believed that SB 14 was "baked," meaning that it was "a done deal" and that no ameliorative amendments were ever intended to be considered.[1071]

743.    Rep. Anchia testified that approximately 25 percent of his district lives in poverty.[1072] Rep. Anchia testified that almost 2.5 times as many of his constituents rely on public transportation than the state average, and that a significant portion of his constituency hold hourly wage jobs.[1073]  Given these hurdles, Rep. Anchia testified that SB 14 would adversely affect his constituents.[1074]

---

[1067] Harless Dep. 66:24-76:10, June 20, 2014.
[1068] PL034 (Tex. H.J., 82d Leg., Regular Sess., at 982-984 (40th Day)) (Amendment No. 28); PL034 (Tex. H.J., 82d Leg., Regular Sess., at 961-62 (40th Day)) (Amendment No. 7)].
[1069] PL119; PL765 at ¶ 60 (Davidson Supp. Rep.).
[1070] Trial Tr. 338:16-339:3 (Anchía) (Day 4).
[1071] Trial Tr. 339:8-16 (Anchía) (Day 4).
[1072] Trial Tr. 315:23-316:6 (Anchía) (Day 4).
[1073] Trial Tr. 341:10-22 (Anchía) (Day 4).
[1074] Trial Tr. 341:23-25 (Anchía) (Day 4).

## 8. Conference Committee consideration of SB 14

744.    Lieutenant Governor Dewhurst appointed Senate conferees to the conference committee to resolve the differences between the Senate and House-passed versions of SB 14.[1075]

745.    The provision enacted as part of SB 14 creating the new Election Identification Certificate ("EIC") was not inserted into SB 14 until the conference.  The conference committee bill did not specify the information to be required of EIC applicants but instead, permitted DPS to make that determination.[1076]  Mr. Hebert was involved in crafting the EIC provision but was unable to recall in deposition any analysis of the practical costs and fees that a voter would need to pay in order to obtain and EIC.[1077]  Speaker Straus later conceded that underlying documents are not free and that requiring a voter to pay $22 for a birth certificate burdens the right to vote.[1078]  Similarly, Senator Williams later agreed that to obtain an EIC a voter must take time to go to a DPS office (which may include time off from work) and that voters will incur a cost in order to drive to DPS, be it gasoline or public transportation, which some voters may not be able to afford.[1079]

746.    Rep. Anchia described the creation of the EIC during the conference committee as "unusual" in that it went "outside of the bounds" of harmonizing the House and Senate bills, and instead came back with "a completely different" piece of legislation that had not been vetted or debated.[1080]

---

[1075] Hebert Dep. 238:4-9, June 17, 2014.
[1076] Trial Tr. 280:7-282:6 (McGeehan) (Day 5).
[1077] Trial Tr. 213:21-23, 215:11-14 (Hebert) (Day 8).
[1078] Straus Dep. 129:19-25, 133:23-134:10, 2014.
[1079] Williams Dep. 170:24-171:8, 174:22-175:2, 176:13-20, July 29, 2014.
[1080] Trial Tr. at 354:9-20 (Anchía) (Day 4).

747.    The version of SB 14 that emerged from conference excluded the Senate's provision for counting the vote of an individual who signed an affidavit claiming a lack of ID due to indigence and also excluded the House provision targeting voter education at low-income and minority voters.[1081]

748.    On May 9, the Senate reported out its final version of SB 14.  The House approved the bill shortly thereafter, and Governor Perry signed SB 14 into law on May 27, 2011.[1082]

### E.    The Choices that the Legislature Made

749.    The specific changes that the legislature made in making voter ID legislation more restrictive from 2005 to 2011 could be expected to disproportionately affect minority voters, based on Census and other data that was publicly available at the time.[1083]

750.    For instance, the legislature eliminated government employee IDs.  African Americans and Latinos are overrepresented among government workers in Texas as compared to whites.[1084] Specifically looking at registered voters, Dr. Lichtman found that 16.2% of Black registered voters and 12.0% of Latino registered voters are government employees, while only 6.3% of white registered voters are government employees.  This means that Black and Latino registered voters are 157% and 90% more likely to be government employees than white registered voters.[1085]

---

[1081] PL044 (signed version of SB 14).
[1082] PL666 (SB 14 bill history); PL044 (signed version of SB 14).
[1083] PL772 at 23-24 (Lichtman Rep.); Trial Tr. 97:11-98:1 (Martinez Fischer) (Day 1); Trial Tr. 60:8-17, 63:14-20, 66:19-67:12, 135:2-20, 81:6-82:18 (Lichtman) (Day 4).
[1084] Trial Tr. 143:18-145:6 (Lichtman) (Day 4).
[1085] PL772 at 27-29 (Lichtman Rep.); Trial Tr. 60:18-62:17 (Lichtman) (Day 4).

751.     The legislature also eliminated student IDs as acceptable forms of photo ID.  African Americans and Latinos are overrepresented among students in Texas, as compared to whites.[1086] For example, 7.9% of the Black voting age population and 8.6% of the Latino voting age population are students at public colleges and universities in Texas, while only 5.9% of the white voting age population are students.  This means that voting age Blacks and Latinos are 34% and 46% more likely to be students at public colleges and universities in Texas than are voting age whites.[1087]  Now that the public education system population in Texas has become majority Latino after the most recent census this disparity is likely to increase as those students reach voting age.[1088]

752.     Contrariwise, the legislature added concealed handgun licenses.  Although the State does not differentiate between Hispanics and whites in the data it publishes on concealed handgun license holders, the data that is available shows that African Americans are underrepresented among these ID holders.[1089]  Specifically, African Americans constitute 11.6% of the voting age population, but only 5.9% of concealed carry license holders.[1090]

753.     With SB 14, the legislature also eliminated the alternative of presenting two forms of non-photo ID, most of which do not have a cost associated with obtaining them.  Each of the photo IDs acceptable under SB 14, however, with the exception of the newly created election identification certificate, have explicit and significant fees associated with them.  For example, concealed carry permits cost $140 to obtain and $70 to renew (or $70 and $35 respectively for

---

[1086] Trial Tr. 62:18-63:13; 126:24-127:4; 143:18-145:6 (Lichtman) (Day 4).
[1087] PL772 at 29-32 (Lichtman Rep.).
[1088] Trial Tr. 97:23-25 (Martinez Fischer) (Day 1); Trial Tr. 64:5-18 (Lichtman) (Day 4).
[1089] Trial Tr. 59:15-60:6; 130:18-22 (Lichtman) (Day 4).
[1090] PL772 at 25 (Lichtman Rep.).

the indigent).  Texas driver licenses generally cost $25 to obtain and $25 to renew,[1091] and U.S. passports cost in excess of $100.[1092]

754.    Limiting the list of acceptable IDs to those that cost money could be expected to disproportionately affect African Americans and Latinos, who disproportionately live in poverty in Texas.[1093]

755.    Also notable was the legislature's decision not to address mail-in voting.  African Americans and Latinos are underrepresented among seniors in Texas, while whites are overrepresented.  Among the white voting age population, 19.4% is 65 years or older; among the Black voting age population, only 10.5% is 65 years or older; and among the Latino voting age population, only 8.7% is 65 years or older.  Data from 2006 and 2008 also shows that whites are overrepresented among mail-in voters in Texas.[1094]

756.    In the 2011 legislative session, SB 14's proponents justified the restrictiveness of the bill, as compared to prior voter ID legislation, on the grounds that the bill was modeled after the Indiana and Georgia photo ID laws.  In actuality, SB 14 differed from Indiana and Georgia in many significant ways that would be expected to disproportionately impact African Americans and Latinos, such as by excluding student and government employee IDs.[1095]

757.    Senator Fraser also stated that SB 14 limited the forms of photo ID to make the law less confusing and easier to implement.  But Senator Fraser and other proponents had also stated that

---

[1091] Trial Tr. 64:19-65:4 (Lichtman) (Day 4).
[1092] PL772 at 33 (Lichtman Rep.).
[1093] PL772 at 26, 33 (Lichtman Rep.); Trial Tr. 65:18-66:11 (Lichtman) (Day 4).
[1094] PL772 at 52-53, 64 (Lichtman Rep.).
[1095] PL772 at 38-40 (Lichtman Rep.).

the Indiana law was implemented without problems, and Indiana allowed any federal or Indiana issued ID, including student IDs and government employee IDs.[1096]

758.    The restrictiveness of SB 14 led Bryan Hebert, General Counsel to Lieutenant Governor Dewhurst, to conclude that it was "doubtful" SB 14 would be precleared.[1097]  He recommended that the leadership revise SB 14 to reflect Georgia's statute by allowing any federal, state, or local government-issued ID. [1098]  The leadership did not follow this recommendation.

###    F.    Implementation of SB 14

759.    Texas submitted SB 14 to the Justice Department for preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, on July 25, 2011 but filed suit for judicial preclearance on January 24, 2012 with the District Court for the District of Columbia while the request remained pending.

760.    In August 2012, the three-judge Section 5 court unanimously held that the state had not met its burden under Section 5 of the VRA because it had not shown that SB 14 would not have a retrogressive effect on minority voters.  Lieutenant Governor Dewhurst did not propose any changes to SB14, or urge the Senate to conduct hearings related to voter ID, after the decision. The Senate did not hold any hearings about voter ID during the 2013 regular session or during the three special sessions held in the summer of 2013,[1099] nor did the Lieutenant Governor issue any interim charges between 2011 and 2013 to study voter ID issues.[1100]

---

[1096] PL772 at 38-39 (Lichtman Rep.).
[1097] PL272; Trial Tr. 203:5-13 (Hebert) (Day 8).
[1098] Trial Tr. 204:11-15 (Hebert) (Day 8).
[1099] Trial Tr. 289:15-25 (Patrick) (Day 7); Hebert Dep. 245:21-246:8, 246:22-247:9, June 17, 2014; Duncan Dep. 275:16-276:11, 276:14-21, 277:17-278:9, Aug. 28, 2014.
[1100] Duncan Dep. 277:17-278:9.

761.     Speaker Straus and another member of the House testified in deposition that they did not know if any consideration was given by the House to the denial of judicial preclearance.[1101]

762.     Representative Harless was unaware of whether the legislature examined the administration of the 2012 presidential election or whether in-person voter impersonation had occurred during that election.[1102]

763.     On June 25, 2013—the day on which the U.S. Supreme Court issued its decision in *Shelby County v. Holder*, 133 S. Ct. 2612, invalidating the formula that placed Texas under the Section 5 preclearance rule—Texas started to enforce SB 14.[1103]  Speaker Straus is unaware of any assessment of the impact of SB 14, as implemented since June 2013, on minority voters.[1104]

764.     The Senate plans to examine during an interim session the implementation of SB 14, including in the upcoming November 2014 general election.  The charge will not, however, report on the impact of SB 14 on voters disaggregated by race.[1105]

### G.     Dr. Allan Lichtman's Conclusions Regarding the Legislature's Purpose

765.     Dr. Allan Lichtman, a Distinguished Professor of History at American University, analyzed the events surrounding the passage of SB 14 and concluded that the legislature was motivated, at least in part, by racially discriminatory intent.[1106]

766.     Dr. Lichtman found SB 14 was far more restrictive than the voter ID bills the legislature had considered from 2005 to 2009 and also far more restrictive than Indiana and Georgia's photo

---

[1101] Straus Dep. 70:4-8, 2014; *see also* Riddle Dep. 125:17-126:1.
[1102] Harless Dep. 137:25-138:10, June 20, 2014.
[1103] Trial Tr. 328:10-329:10 (Ingram) (Day 7); Dewhurst Dep. 219:4-6.
[1104] Straus Dep. 41:7-42:7, 43:6-13, 77:6-23, June 23, 2014.
[1105] Dewhurst Dep. 219:7-220:23.
[1106] PL772 at 71-72 (Lichtman Rep.); Trial Tr. 98:6-99:13, 114:12-17, 133:1-134:3, 136:7-18 (Lichtman) (Day 4).

ID laws, upon which SB 14 was allegedly modeled.[1107]  The restrictive deviations from the other bills, such as the exclusion of student IDs and federal civil servant IDs, were ones that would be expected to disproportionately hurt minority voters.  The legislature had also noticeably failed to address mail-in ballots, despite evidence of mail-in ballot fraud— a decision that would be expected to help white voters, who disproportionately vote by mail.[1108]

767.    Dr. Lichtman further analyzed several other aspects of the legislative process, including that from 2005 to 2011, the legislature did not take the obvious step of investigating the likely impact of voter ID legislation on minority voters even though concerns were repeatedly raised.[1109]  He also determined that the stated justifications for SB 14 appear pretextual.[1110]

768.    Finally, Dr. Lichtman noted a number of statements tying the political success of the Republican Party to restricting minority voting opportunities.  For example, Ken Emanuelson, a leader of the Tea Party with close ties to the Dallas County Republican Party stated: "Well, I'm going to be real honest with you.  The Republican Party doesn't want black people to vote if they're going to vote nine to one for Democrats."[1111]  Texas Congressman Kenny Marchant said: "If you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are going to vote Democrat."[1112]

769.    Dr. Lichtman concluded that SB 14 was designed to reduce the votes of African-American and Hispanic voters and that it would have such an effect[1113] by viewing: the events in

---

[1107] Trial Tr. 55:17-56:16, 58:7-59:14, 69:10-75:11; 75:18-77:3, 112:6-113:12, 127:5-11 (Lichtman) (Day 4).
[1108] PL772 at 23-58; 64-65 (Lichtman Rep.); Trial Tr. 67:13-69:9 (Lichtman) (Day 4).
[1109] PL772 at 11-12, 15 (Lichtman Rep.).
[1110] PL772 at 25-43; 46-59; 65 (Lichtman Rep.); Trial Tr. 77:4-78:2 (Lichtman) (Day 4).
[1111] Trial Tr. 96:19-97:12 (Lichtman) (Day 4).
[1112] PL772 at 65-70 (Lichtman Rep.); Trial Tr. 96:8-18 (Lichtman) (Day 4).
[1113] PL772 at 70-72 (Lichtman Rep.); Trial Tr. 65:18-66:11, 80:19-82:18, 82:19-89:8, 131:2-7, 133:22-

(Cont'd…)

the 2005-2011 legislative process against the background of Texas's history of and ongoing discrimination against minorities;[1114] the state's patterns of racially polarized voting;[1115] the state's changing demographics which are leading Anglo voters to becoming a minority;[1116] the comments of Republican Party leadership tying their political success directly to the restriction of minority voting rights;[1117] and the fact that the very same legislature enacted a redistricting bill found to be racially discriminatory by a three-judge federal court.[1118]

### H. Dr. Chandler Davidson's Conclusions Regarding the Legislature's Purpose

770.   Dr. Chandler Davidson, a professor emeritus of sociology and political science at Rice University, concluded that SB 14 was adopted with a racially discriminatory purpose.[1119]

771.   Dr. Davidson found that efforts to adopt a restrictive voter identification law in Texas began in 2005 at a time when Texas legislators were well aware that Hispanic voting strength was increasing rapidly.  The 2000 census data showed a significant increase in the ratio of Texas Latinos of voting age to Whites, and the Census Bureau announced before the 2007 session that Texas had become a minority-majority state in 2004.[1120]  Meanwhile, the legislature was becoming increasingly racially polarized; following the Republican landslide victory in the 2010 elections, the opponents of a photo ID requirement in the legislature were almost entirely African American and Hispanic.[1121]

---

134:3, 135:7-20 (Lichtman) (Day 4).

[1114] PL772 at 5-7 (Lichtman Rep.); Trial Tr. 48:15-24, 49:14-24 (Lichtman) ((Day 4).

[1115] PL772 at 10 (Lichtman Rep.); Trial Tr. 51:14-53:9, 114:7-17, 118:2-123:6 (Lichtman) (Day 4).

[1116] PL772 at 8-9 (Lichtman Rep.); Trial Tr. 51:2-21 (Lichtman) (Day 4).

[1117] PL772 at 65-70 (Lichtman Rep.); Trial Tr. 95:17-97:25 (Lichtman) (Day 4).

[1118] PL772 at 18-19 (Lichtman Rep.); Trial Tr. 49:25-51:1, 55:9-16 (Lichtman) (Day 4).

[1119] PL772 at ¶ 95 (Davidson Supp. Rep.).

[1120] PL765 at ¶ 95 (Davidson Supp.  Rep.).

[1121] PL765 at ¶ 37 (Davidson Supp. Rep.).

772.     Dr. Davidson found that as opponents of voter identification successfully blocked the bills introduced in 2005 and each legislative session, bill supporters changed the procedures in each successive session to minimize their opponents' influence.[1122]  The most unusual change in procedures was the Senate' exemption of voter ID legislation in the 2009 and 2011 Senate Rules to permit such legislation to be brought for a vote by a majority vote, rather than two-thirds of the Senators present.  Procedural deviations also included the Senate's requirement that SB 14 and its predecessor be considered by the Committee of the Whole; the Governor's designation of SB 14 as emergency legislation; the Speaker's referral of SB 14 to the House Select Committee on Voter Identification and Voter Fraud; and alteration of House procedures related to "chubbing."[1123]

773.     Dr. Davidson noted that efforts to pass a photo ID requirement culminated with the adoption of SB 14 in 2011, the strictest of the bills filed since 2005.[1124]

774.     Dr. Davidson found that as in previous sessions, bill proponents refused to examine its likely impact on minority voters, despite repeated requests from minority legislators to do so.[1125] Instead, bill proponents justified the law with talking points emphasizing voter fraud and promoting the integrity of elections, similar to justifications previously used for the poll tax and re-registration requirement.  Virtually no cases of voter impersonation fraud addressable by SB 14 had been uncovered in Texas, despite ongoing investigations and attempts to seek it out.[1126]

775.     Dr. Davidson noted that supporters of SB 14 rejected almost all ameliorative amendments introduced by minority legislators, including multiple amendments that would have expanded the

---

[1122] PL765 at ¶ 96 (Davidson Supp. Rep.).
[1123] PL765 at ¶¶ 12, 25, 30, 36, 42-44, 52 (Davidson Supp. Rep.).
[1124] PL765 at ¶ 51 (Davidson Supp. Rep.).
[1125] PL765 at ¶ 50 (Davidson Supp. Rep.).
[1126] PL765 at ¶ 102 (Davidson Supp. Rep.).

types of acceptable photo IDs.  They even rejected amendments that would not alter the stated purpose of the bill, such as extending the hours of operation at DPS offices, studying the impact of SB 14 on minority voters, and waiving fees for documents needed to obtain ID such as birth certificates.[1127]

776.     As voter ID bills were considered, racial and ethnic minority legislators expressed concern about the racial climate surrounding the debate, which included some bill supporters' use of racially insensitive language and conflation of "non-citizens" and "illegal immigrants" with Latinos in discussing voter fraud.[1128]  Lieutenant Governor Dewhurst argued that voter ID legislation was needed because to stop "non-citizens" from voting and that "with eight to 12 million illegal aliens currently living in the U.S., the basic American principle of one person, one vote, is in danger."[1129]  Indeed, SB 14 passed in a climate that included the continuing use of racial campaign appeals by some legislators, and constituent appeals to legislators demanding the passage of voter ID legislation to stop "illegal aliens" from voting.[1130]

777.     In reaching his opinion that SB 14 was enacted with a racially discriminatory purpose, Dr. Davidson considered Texas's long history of voting discrimination.  Dating back to the Reconstruction, Texas has been singularly harsh in its efforts to prevent minority citizens from voting and electing their candidates of choice.[1131]  Passage of the Voting Rights Act has not ended efforts to limit the ability of minority citizens to participate equally in the political process,

---

[1127] PL765 at ¶ 50 (Davidson Supp. Rep.).
[1128] PL765 at ¶¶ 21, 24, 27, 57, 89-93 (Davidson Supp. Rep.).
[1129] PL765 at ¶¶ 21, 24 (Davidson Supp. Rep.).
[1130] PL765 at ¶ 24 n. 7 (Davidson Supp. Rep.).
[1131] PL765 at ¶¶ 73-78 (Davidson Supp. Rep.).

a point recognized by a federal court in determining that the same legislature that passed SB 14 also intentionally discriminated against minority voters in legislative redistricting.[1132]

## XIII.   PLAINTIFFS' EXPERT WITNESSES ARE QUALIFIED TO OFFER OPINION TESTIMONY

778.   Dr. Stephen D. Ansolabehere is a Professor of Government at Harvard University, where he has taught since 2008.  He earned his Ph.D. at Harvard University in 1989.  From 1995 until 2009, he was a Professor of Political Science at the Massachusetts Institute of Technology, where he served as Associate Head of the Department of Political Science.  He directed the Caltech/MIT Voting Technology Project from 2000 to 2004, is the Principal Investigator of the Cooperative Congressional Election Study, and is a member of the American Academy of Arts and Sciences.

779.   Dr. Ansolabehere's areas of expertise include electoral politics and statistical methods in the social sciences.   He has extensive experience with database management, record linkage and database matching, data validation, and integration of Census and electoral data.  He has published more than 60 articles in refereed journals on subjects including on matching survey data to voter files, validation of voting records, and statistical techniques for analyzing aggregate election and population data.   Dr, Ansolabehere has served as an expert witness or consultant in numerous voting rights cases.

780.   Dr. Ansolabehere is qualified to offer an opinion within his field of expertise on the results of the database matching conducted in this case, racial disparities in possession of SB 14 ID by Texas voters, rates of registration and voting by race, the academic literature regarding the photo voter identification laws, and the impact of SB 14 on voters in Texas.

---

[1132] PL765 at ¶¶ 81, 87 (Davidson Supp. Rep.).

781.    Dr. Matt Barreto is an Associate Professor of Political Science and Director of the Washington Institute for the Study of Ethnicity, Race & Sexuality at the University of Washington.  He received his Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the United States, political behavior and public opinions from the University of California, Irvine.[1133]

782.    Dr. Gabriel R. Sanchez is an Associate Professor of Political Science Executive Director of the Robert Wood Johnson Center for Health Policy at the University of New Mexico.  He received his Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the United States, political behavior, and public opinion from the University of Arizona.[1134]

783.    Drs. Barreto and Sanchez have collectively implemented more than 100 public opinion surveys, including multiple surveys about voter ID, and have published 5 books and over 60 academic research articles relating to their fields of expertise.[1135]

784.    Drs. Barreto and Sanchez are qualified to offer opinions relating to the design, conduct, and results of their survey.

785.    Dr. Coleman Bazelon is currently a principal at The Brattle Group, an economic consulting firm, and holds a Ph.D. and M.S in Agriculture and Resource Economics from the University of California Berkeley and a Diploma in Economics from the London School of Economics and Political Science.  As a practicing economist for the past two decades, he has testified before federal and state courts and arbitrators and has advised regulatory and legislative bodies, including the U.S. Congress and the U.S. Federal Communications Commission. In

---

[1133] PL753 at 1 (Barreto/Sanchez Rep.); Trial Tr. 23:11-15 (Barreto) (Day 3).
[1134] PL753 at 1-2 (Barreto/Sanchez Rep.).
[1135] PL753 at 2 (Barreto/Sanchez Rep.).

carrying out his economic analysis, he regularly utilizes statistical analysis and works with large data sets.[1136]

786.   Dr. Bazelon is qualified to render an opinion as to the economic burden imposed by SB 14 and whether that burden varies depending on a voter's race.

787.   Dr. Barry C. Burden is a Professor of Political Science at the University of Wisconsin-Madison.   He earned his Ph.D. at The Ohio State University in 1998.   From 1999 to 2006, he was a faculty member in the Department of Government at Harvard University, and he has been a full professor at the University of Wisconsin-Madison since 2006.   His scholarly research has focused on elections and election administration, and he has published approximately 40 articles in scholarly peer-reviewed journals.[1137]

788.   The U.S. District Court for the Eastern District of Wisconsin relied extensively on Dr. Burden's testimony concerning the impact of Wisconsin's photographic voter identification law.[1138]

789.   Dr. Burden is qualified to offer an opinion within his field of expertise on the impact of SB 14 on voters in Texas.

790.   Dr. Orville Vernon Burton is Creativity Professor of Humanities, History, Sociology, and Computers Science at Clemson University, as well as the Director of the Clemson CyberInstitute.   He received his Ph.D. in American History from Princeton University.[1139]

---

[1136] PL757R at ¶¶ 2-4 (Bazelon Second Am. Rep.); Trial Tr. 76:9-20, 77:22-78:14, 79:3-12 (Bazelon) (Day 6).
[1137] PL758 at ¶¶ 1-3 (Burden Corr. Rep); Trial Tr. 293:10-295:3 (Burden) (Day 3).
[1138] *Frank v. Walker*, ___ F. Supp. 2d ___, 2014 WL 1775432, at *8-10 & n.8, 17-18, 28, 30-32 & nn.38-39 (E.D. Wis. Apr. 29, 2014), *appeal pending*, Nos. 14-2058 & 14-2059 (7th Cir.).
[1139] PL760 at 2, 2A (Burton Rep.).

791.    Dr. Burton has served as an expert witness or consultant in numerous voting rights cases, and in the last five years he has served as an expert witness in *Perez v. Perry*, in the Western District of Texas, and *South Carolina v. United States*, in the District for the District of Columbia.[1140]

792.    Dr. Burton is qualified to offer an opinion within his field of expertise on the social and historical conditions in Texas that result in African Americans and other minorities disproportionately bearing the adverse effects of SB 14.

793.    Dr. Daniel Chatman is an Associate Professor of City and Regional Planning at the University of California, Berkeley, where he teaches urban and regional transportation planning. He received his Ph.D. in Urban Planning from the University of California, Los Angeles.  He focuses his research on travel behavior and the relationship between public transportation services and the economy, and has published numerous peer-reviewed articles and book chapters in his field.[1141]

794.    Dr. Chatman is qualified to offer an opinion within his field of expertise on the travel burdens associated with the obtaining of an EIC for Texas citizens.

795.    Dr. Ransom Cornish is a C.P.A. and an attorney.  He holds a B.B.A. in Accounting and a J.D. from the University of Houston.

796.    Dr. Cornish is qualified to testify on analysis of appropriation and expenditure data concerning the implementation of SB 14.  He is also qualified to testify concerning analysis and calculation of provisional ballot data that exists before and after implementation of SB 14.

---

[1140] PL760 at 3 (Burton Rep.).
[1141] PL761 at ¶¶ 1-3 (Chatman Rep.); Trial Tr. 79:17-20 (Chatman) (Day 5).

797.    Dr. Chandler Davidson is the Radoslav Tsanoff Professor of Public Affairs Emeritus at Rice University.  He earned his Ph.D. in Sociology at Princeton University in 1969.  Over the last 45 years, his scholarly research and writing has focused on the relationship between race, class, and politics in Texas.  He has published two books on Texas politics, edited three other books dealing with minority voting rights, and published numerous journal articles and chapters in co-authored books.[1142]

798.    Dr. Davidson's published work has been cited in numerous opinions of the United State Supreme Court.[1143]

799.    Dr. Davidson is qualified to offer an opinion within his field of expertise on the history of racial discrimination affecting voting in Texas, as well as the intent underlying the adoption of SB 14 by the State of Texas in 2011.

800.    Dr. Yair Ghitza is Chief Scientist at Catalist LLC, a data services company that collects, standardizes, and analyzes data from official voter registration databases, as well as other commercial, public, and private data sources.  He received a Ph.D. from Columbia University in Political Science.  His areas of expertise include statistical methods and American politics.  His academic work has been published in peer-reviewed journals such as the American Journal of Political Science and Statistics, Politics and Policy.[1144]

801.    Mr. Ghitza is qualified to offer an opinion within his field of expertise on the reliability Catalist's individual race estimations for Texas registered voters.

---

[1142] PL764  (Davidson CV).
[1143] *E.g.*, *Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2634 (2013) (Ginsburg, J., dissenting); *Thornberg v. Gingles*, 478 U.S. 30, 47 n.13, 49, 51, 56, 68, 70 (1986).
[1144] Trial Tr. 146:6-148:3 (Ghitza) (Day 2).

223

802.    Dr. Jane Henrici is a Senior Research Affiliate with the Institute for Women's Policy Research and a Professorial Lecturer at George Washington University.  She received her Ph.D. in Anthropology from the University of Texas at Austin.  Her research has focused on issues of poverty as they affect gender, racial and ethnic groups, as well as individuals with special needs such as the elderly and those with disabilities, and she has authorized and co-authored numerous reports, books, book chapters, evaluations, and policy recommendations.  She also has over two decades of experience, including substantial interview and observation hours within homes, recreational facilities, schools, stores, churches, child care centers, and social services offices in Texas.[1145]

803.    Dr. Henrici is qualified to offer an opinion within her field of expertise on the impact of policy changes on individuals experiencing poverty and the ability of individuals experiencing poverty, particularly members of racial minority groups, to overcome burdens created by SB 14.

804.    Dr. Michael Herron is the William Clinton Story Remsen 1943 Professor of Government at Dartmouth College.  He received his Ph.D. in political economics from Stanford University, along with an M.A. in statistics.  Dr. Herron has published numerous articles, book chapters, and other publications on topics such as the impacts of election law changes and political science research methods.[1146]

805.    The techniques Dr. Herron used to analyze the results of a database match in this case are typical of techniques he has used, and continues to use, as part of his academic research agenda.[1147]

---

[1145] PL767 ¶¶ 3-17 (Henrici Rep.).
[1146] PL768 at 1, app'x D (Herron Rep.).
[1147] PL768 at 1, app'x D (Herron Rep.).

806.   Dr. Herron is qualified to offer an opinion within his field of expertise concerning the results of the database matching process conducted in this case.

807.   Mr. Kevin Jewell holds an MBA from the McCombs School of Business at the University of Texas in Austin and an A.B. in Mathematical Economics from Brown University in Providence, Rhode Island.  He has worked as a consultant on litigation matters for twelve of the past seventeen years and has performed policy work largely focused on low-income households' interactions with housing and other markets.[1148]

808.   Mr. Jewell is qualified to offer an opinion within his field of expertise on the impact of the costs that the SB 14 voting scheme places on the *Ortiz* plaintiffs.

809.   Mr. George Korbel is a licensed attorney with more than forty years experience in election and voter law.  He has worked on and testified in many cases involving election law in Texas, including testifying as an expert in litigation after the 1981 and 1991 Texas Legislative redistrictings.  He also testified before the House and Senate Committees regarding the historical pattern of discrimination in Texas when the Voting Rights Act of 1965 was extended to cover Texas.[1149]

810.   Mr. Korbel continues to serve as an expert witness in numerous ongoing redistricting and Voting Rights Act cases.[1150]

811.   Mr. Korbel is qualified to offer an opinion about the history of, and ongoing patterns of, discrimination in Texas.[1151]

---

[1148] PL770 ¶ 2 (Jewell Rep.).
[1149] PL771 at 38-44 (Korbel Rep.); Trial Tr. 177:25-180:1, 181:2-182:24 (Korbel) (Day 5).
[1150] Trial Tr. 177:25-180:1 (Korbel) (Day 5).
[1151] PL771 at 38-44 (Korbel Rep.).

812.    Dr. Allan Lichtman is a Distinguished Professor of History at American University.[1152]

He received his Ph.D. in History from Harvard University.[1153]  His areas of expertise include

political history, electoral analysis, and historical and quantitative methodology.[1154]

813.    Dr. Lichtman has served as a consultant or expert witness in over 80 voting and civil

rights cases.[1155]  He used standard historical and social scientific methods to assess whether the

State of Texas acted with a discriminatory purpose when it enacted SB 14 in 2011, based on an

assessment of both historical events and social science data.[1156]

814.    Dr. Lichtman is qualified to offer an opinion within his field of expertise on the intent of

the Texas legislature in enacting SB 14.

815.    Dr. Lorraine C. Minnite is an associate professor in the Department of Public Policy and

Administration at Rutgers, the State University of New Jersey-Camden, where she teaches

subjects related to American elections and the political process.  She received her Ph.D. with

distinction in Political Science from the City University of New York.  Her research focuses on

the incidence and effect of voter fraud in American elections, and she has published an academic

monograph, peer-reviewed journal articles, and book chapters on the subject, as well as a number

of research reports.[1157]

816.    Dr. Minnite has been certified as an expert in trials or hearings concerning photographic

voter identification laws in Wisconsin, Pennsylvania, and North Carolina.[1158]

---

[1152] Trial Tr. 42:6-15 (Lichtman) (Day 4).
[1153] Trial Tr. 42:2-5 (Lichtman) (Day 4).
[1154] PL772 at 2-4 (Lichtman Rep.); Trial Tr. 46:24-47:2 (Lichtman) (Day 4).
[1155] Trial Tr. 44:3-9 (Gandy) (Day 4).
[1156] PL772 at 73-97 (Lichtman Rep.); Trial Tr. 47:5-48:24 (Lichtman) (Day 4).
[1157] PL773 at 23-34 (Minnite Rep.); Trial Tr. 119:5-21, 120:15-122:17 (Minnite) (Day 5).
[1158] PL773 at 39 (Minnite Rep.); Trial Tr. 122:18-123:11 (Minnite) (Day 5).

817.    Dr. Minnite is qualified to offer an opinion within her field of expertise on elections and voter fraud, including the empirical record of the incidence of voter fraud in Texas and nationally.

818.    Dr. Gerald Webster is a Professor of Geography at University of Wyoming, where he teaches political geography and serves as chair of the Geography Department.  He received his Ph.D. in Geography from the University of Kentucky.  He focuses his research on political geography and has published over 80 articles in refereed journals, book chapters, and edited volumes.  He has received the Lifetime Achievement Award by the Southeastern Division of the Association of American Geographers and has given the Political Geography Plenary Lecture at the Association of American Geographers meeting.[1159]

819.    Dr. Webster is qualified to offer an opinion within his field of expertise on obstacles associated with obtaining an EIC due to the residential patterns, access to motor vehicles, and poverty.

820.    Mr. Randall Buck Wood is an attorney who has practiced election law in the State of Texas for more than 40 years.  Mr. Wood served as Director of Elections for the State of Texas from 1969 to 1972 and has been involved in over one hundred election matters under Texas law, including election contests conducted before Texas courts and the Texas Legislature.[1160]

821.    Mr. Wood is qualified to offer an opinion within his field of expertise on the history of Texas election law, the operation of Texas elections, and the existence or nonexistence of particular forms of election fraud in Texas.

---

[1159] PL775R ¶¶ 1-2 (Webster Corr. Rep.); Trial Tr. 249:19-250:23 (Webster) (Day 4).
[1160] PL776 ¶ 3 (Wood Rep.).

## XIV.   DEFENDANTS' EXPERTS OFFERED NO CREDIBLE ANALYSIS OF SB 14

822.    Defendants retained two experts, Dr. M.V. Hood, III, and Dr. Jeffrey Milyo.  Defendants

chose to present only Dr. Hood live at trial.  The Court therefore had the opportunity to assess

Dr. Hood's ability to respond to cross-examination, and rests its findings as to Dr. Hood's

opinions principally on an assessment of his trial testimony.  The Court did not have the same

opportunity to assess Dr. Milyo's opinions, but relies instead on the live testimony of Plaintiffs'

experts who specifically addressed Dr. Milyo's opinions, and on the comprehensive deposition

taken of Dr. Milyo in this case.

### A.      Dr. Hood

823.    Dr. Hood is a Professor of Political Science at the University of Georgia.  His report and

testimony responded to those of Dr. Ansolabehere and Drs. Barreto and Sanchez.

#### 1.      Dr. Hood offered no meaningful criticisms of Dr. Ansolabhere's database match and accompanying analyses of racial disparities in ID possession

824.    Dr. Hood did not complete any independent study to provide a basis for questioning the

analyses conducted by the other experts in this case demonstrating that statistically significant

racial and ethnic disparities exist as to ID possession rates among Texas citizens and registered

voters.[1161]

825.    Initially, the Court notes that Dr. Hood's testimony supported aspects of Dr.

Ansolabehere's opinions.  First, Dr. Hood identified no problems with the TEAM database that

would systematically bias, on the basis of race or otherwise, the database matching results

obtained by Dr. Ansolabehere.[1162]  Nor did Dr. Hood identify errors in Dr. Ansolabehere's no-

---

[1161] Trial Tr. 132:4-12, 133:5-15; 168:5-11 (Hood) (Day 7).
[1162] Trial Tr. 195:1-6 (Hood) (Day 7).

match figure.  Dr. Hood's reports do not identify a single person on Dr. Ansolabehere's no match list who was included erroneously.[1163]  The no-match rate found by Dr. Ansolabehere in this case, 4.5%, is similar to the no-match rates found by Dr. Hood in his studies regarding photo ID possession in South Carolina (approx. 4.8%) and Georgia (6.04%).[1164]

826.    Second, Dr. Hood considers ecological regression analysis to be probably the most prevalent type of analysis used in the social sciences.  Dr. Hood has performed regression analyses many times in his scholarly work.[1165]  Dr. Hood offered no criticism of the ecological regression analyses performed by Dr. Ansolabehere in this case nor of Dr. Ansolabehere's homogenous block group analysis.[1166]

827.    Additionally, as set out below, Dr. Hood's criticisms of Dr. Ansolabehere's database matching undertaken in this case carry no weight because those criticisms amount to speculation unconnected to any showing of actual error.

828.    First, Dr. Hood suggests that error could have resulted from the fact that not all of the records Dr. Ansolabehere matched contained a full nine-digit social security number ("SS-9").  He conceded, however, that he has no evidence that the lack of a full SS-9 across all data bases resulted in any error whatsoever.[1167]  Dr. Hood agreed that his criticism was, at best, "informed intuition" that he would not ask this Court to credit.[1168]  He further conceded that the algorithm Dr. Ansolabehere designed – which used multiple identifiers relying upon address, name, gender,

---

[1163] Trial Tr. 179:8-12, 193:2-5 (Hood) (Day 7).
[1164] Trial Tr. 179:4-22 (Hood) (Day 7).
[1165] Trial Tr. 192:9-18 (Hood) (Day 7).
[1166] Trial Tr. 133:7-12, 176:9-12, 176:21-23, 176:24-177:1, 192:9-21 (Hood) (Day 7).
[1167] Trial Tr. 182:21-183:1, 183:8-11 (Hood) (Day 7).
[1168] Trial Tr. 184:7-14 (Hood) (Day 7).

and date of birth elements – served as the functional equivalent of matching on full social security number.[1169]

829.    Second, Dr. Hood speculates that because the State Identification Number in the TEAM database is not fully populated for every record, this may cause difficulties in matching the TEAM database to DPS data.  He conceded, however, that for Texas voters who have never held a form of DPS ID, this criticism is inapt.[1170]  He also conceded that he had no evidence even to suggest that the lack of a State ID number across most or all TEAM records caused any part of the racial disparities observed in Dr. Ansolabehere's analysis.[1171]

830.    Third, Dr. Hood pointed to inconsistent use of first names, such as "Jim" and "James" across different databases.  He conceded, however, that five of Dr. Ansolabehere's 13 different matching combinations did not involve first names.[1172]  This criticism cannot be credited.

831.    Next, Dr. Hood next notes that the TEAM database has inaccuracies related to birth dates.  He agreed, however, that three of Dr. Ansolabehere's 13 different matching combinations did not involve matching using birth dates, a fact that resolved his concern.[1173]  Accordingly, this concern carries no weight.

832.    Dr. Hood also suggested that the TEAM database may contain deceased voters.   Dr. Hood conceded that he has no idea how often Texas removes deceased voters from TEAM, that he made no effort to find out prior to raising this issue, and in fact has no evidence to suggest that Texas's procedures for removing deceased persons from the TEAM are ineffective.[1174]  Dr.

---

[1169] Trial Tr. 185:10-14 (Hood) (Day 7).
[1170] Trial Tr. 186:14-19 (Hood) (Day 7).
[1171] Trial Tr. 186:20-187:2 (Hood) (Day 7).
[1172] Trial Tr. 187:6-25 (Hood) (Day 7).
[1173] Trial Tr. 188:22-189:3 (Hood) (Day 7).
[1174] Trial Tr. 189:7-25 (Hood) (Day 7).

Hood also acknowledged that Dr. Ansolabehere used multiple methods to ensure that his no-match list excluded deceased persons.[1175]  Finally, Dr. Hood conceded he has not identified even one person on Dr. Ansolabehere's no-match list who is in fact deceased, nor suggested any other steps with respect to the deceased that Dr. Ansolabehere should have taken but did not.[1176]  Accordingly, this concern also carries no weight.

833.    Dr. Hood also pointed to the fact that Texas does not record voter registration information by race or ethnicity.  While such information could be useful, it is not necessary.  As Dr. Hood explained, social science provides a number of well-accepted methodologies for estimating racial characteristics among groups.  Those methods include ecological regression analysis and homogenous precinct/block group analysis.[1177] Dr. Ansolabehere employed both of those, among others.   Dr. Hood employed neither in this case.[1178]

834.    Dr. Hood's report claims that the approximately 180,000 Texas voters over age 65 who lack SB 14 are "unaffected" by SB 14 in that they can choose to vote by mail.  He therefore "subset" or removed from the no-match total all such voters.  On cross examination, however, Dr. Hood conceded that voters lacking SB 14 who are over 65 who choose to cast a ballot in person are in fact affected by SB14.[1179]  There is thus no basis to subset those voters from the no-match list, as Dr. Hood's report recommends.  For similar reasons, there is no basis to subset the state's nearly 74,000 disabled voters who have not applied for a disability exemption.  (The evidence demonstrates that of the state's 73,598 disabled voters lacking SB14 ID, just 18 have

---

[1175] Trial Tr. 190:5-11 (Hood) (Day 7).
[1176] Trial Tr. 190:12-16 (Hood) (Day 7).
[1177] Trial Tr. 191:10-17 (Hood) (Day 7).
[1178] Trial Tr. 133:7-12 (Hood) (Day 7).
[1179] Trial Tr. 196:24-197:4 (Hood) (Day 7).

applied for and been granted an SB 14 exemption.)[1180]  Dr. Hood's conclusion that disabled

voters who lack an SB 14 exemption can "choose to be unaffected" by SB 14 by applying for an

receiving an exemption should be rejected.[1181]

835.    Dr. Hood's attempts to challenge the correctness of the no-match list by noting that

certain no-matched voters have cast ballots since SB 14 was implemented is also without

support.  Dr. Hood demonstrated nothing untoward.  For instance, he made no attempt to

determine how many of those voters obtained proper SB 14 ID after January 15, 2014, the date

that Texas generated the TEAM database in this case.[1182]  Moreover, Dr. Hood conceded that the

political science literature confirms that poll workers poll often apply voting requirements

inconsistently in the polling place.[1183]  He also noted that poll workers make mistakes, especially

when implementing a new law.[1184]

836.    Finally, Dr. Hood designed a database matching algorithm on behalf of the Defendants

and had that algorithm run against the Texas and Federal data on Defendants' behalf.  The

purpose of drafting that algorithm was to determine as accurately as possible those Texas voters

who may lack SB 14 ID.  Dr. Hood received and compared the results of Defendants' algorithm

against the results of Dr. Ansolabehere's algorithm.  Dr. Hood found that the results of

Defendants' algorithm overlapped substantially with the results of Dr. Ansolabehere's algorithm,

at a rate of 95 percent or higher.[1185]  The results of this comparison were not included in Dr.

Hood's reports.

---

[1180] Trial Tr. 197:20-22 (Hood) (Day 7).

[1181] *See* Trial Tr. 198:10-13 (Hood) (Day 7).

[1182] Trial Tr. 199:7-10 (Hood) (Day 7).

[1183] Trial Tr. 199:11-14 (Hood) (Day 7).

[1184] Trial Tr. 200:9-12 (Hood) (Day 7).

[1185] Trial Tr. 193:9-13, 193:23-24, 194:1-4, 194:10-13, 194:19-22 (Hood) (Day 7).

837.     Accordingly, the Court should reject *in toto* Dr. Hood's opinions regarding the no-match list derived by Dr. Ansolabehere.

### 2.     Dr. Hood offered no valid criticisms of the Barreto Survey

838.     Dr. Hood purported to attempt to replicate the Barreto-Sanchez survey, and then to reconstruct it based on his own re-categorization of certain responses and his own weighting system. Initially, as was the case with his criticism of Dr. Ansolabehere, Dr. Hood's testimony provided crucial support for the results of the Barreto-Sanchez survey.  Specifically, Dr. Hood conceded that, even with the re-categorizations of the data that he made (which he agreed might not be accurate), there was still statistical significance between Black and White ID possession and Hispanic and White ID possession in the Barreto-Sanchez results.[1186]

839.     Beyond that, Dr. Hood's testimony revealed major flaws in his opinion.  First, Dr. Hood could not explain why he had categorized survey respondents as having SB 14 ID when they had indicated that their IDs had expired more than 60 days prior to the survey.[1187]

840.     Second, Dr. Hood could not explain why, in attempting to replicate the survey results, he had assumed that the variable in the survey data "id_type" indicated possession of SB 14, when there was nothing in the Barreto-Sanchez Report or data set to that effect.[1188]  Dr. Hood conceded that this assumption might have led him to categorize responses incorrectly as to whether particular survey respondents in fact possessed SB 14 ID.[1189]

841.     Third, Dr. Hood admitted that he did not weight the survey responses within each racial/ethnic group according to the demographic characteristics of that group as reported by the

---

[1186] DE0007 at 30 (Hood Report, Table 10C); Trial Tr. 232:2-233:10 (Hood) (Day 7).
[1187] Trial Tr. 218:6-24 (Hood) (Day 7).
[1188] Trial Tr. 219:13-221:6 (Hood) (Day 7).
[1189] Trial Tr. 221:7-222:21 (Hood) (Day 7).

ACS, including gender, age, education and income, even though he acknowledged that it is a standard practice in the field to do so and that ID possession varies by socio-economic demographics such as age.[1190]  As a result, Dr. Hood admitted that his reconstruction of the Barreto-Sanchez survey data did not accurately reflect the actual characteristics of the Anglo, Hispanic, and African American populations in Texas.[1191]

842.    Finally, Dr. Hood admitted that, even despite the possible inaccuracies in his re-categorization of the Barreto-Sanchez survey data and his failure to weight the response data according to the demographics of the groups surveyed, most of his analyses found statistically significant differences between Whites and Hispanics relating to possession of SB 14 IDs.[1192]

843.    The Court had an opportunity to listen to the testimony of Dr. Hood and see how his analysis could withstand cross-examination.[1193]  As a result, Dr. Hood's criticisms of the Barreto-Sanchez survey were not credible, and they should be rejected in their entirety.

### 3.    Dr. Hood's opinions support the conclusion that strict photo voter ID laws can impose significant burdens on voters

844.    Dr. Hood testified that there is no political science concept more firmly established with respect to the factors affecting voter turnout than the "costs of voting" model.  Under that model, the greater the cost a voting system imposes, the less likely a voter will turn out to vote.[1194]

845.    Dr. Hood further testified that socio-economic status and voter turnout are correlated. Voters with higher levels of income, education and occupational prestige typically turn out for elections at higher rates than those with lower socio-economic levels.  Dr. Hood considers it a

---

[1190] Trial Tr. 222:22-225:11, 226:9-12 (Hood) (Day 7).
[1191] Trial Tr. 228:5-229:13 (Hood) (Day 7).
[1192] Trial Tr. 230:20-234:21 (Hood) (Day 7).
[1193] *See generally* Trial Tr. 79:23-244:13 (Hood) (Day 7).
[1194] Trial Tr. 125:13-22 (Hood) (Day 7).

"known fact" that those without ID are less prone to participate in elections compared with those who possess photo ID.[1195]

846.    While Dr. Hood conducted no study to determine the costs that SB 14 imposes on Texas voters lacking acceptable ID, he agrees that requiring a photo ID to vote as a prerequisite to vote imposes institutional costs on voters who currently lack acceptable photo ID, even when that ID is available for "free."  He further testified that requiring registered voters to travel to county offices to obtain underlying documentation, such as a perquisite to obtaining a valid photo ID, imposes costs.[1196]

847.    Dr. Hood believes that Texas should waive all fees to obtain a birth certificate for obtaining a photo ID for voting.[1197]

848.    In a 2012 study, Dr. Hood attempted to gauge the impact of Georgia's Voter ID law on Georgia voters who, under Georgia standards, lacked acceptable photo ID.[1198]  Dr. Hood's study purported to compare turnout rates by race and ethnicity for those with and without ID in 2004 with those same data for 2008.[1199]

849.    Dr. Hood's 2012 study of Georgia's Voter ID law demonstrated that implementation of that law caused an across-the-board depression in voter turnout for voters without ID in all racial and ethnic groups, including Anglos, African Americans, and Hispanics.  According to Dr. Hood, the implementation of Voter ID depressed turnout in Georgia in 2008.[1200]  Dr. Hood's comparison of 2004 and 2008 turnout data demonstrated that implementation of Georgia's Voter

---

[1195] Trial Tr. 124:16-23, 129:18-25 (Hood) (Day 7).
[1196] Trial Tr. 126:8-11, 130:24-131:1 (Hood) (Day 7).
[1197] Trial Tr. 127:2-7 (Hood) (Day 7).
[1198] Trial Tr. 121:16-21 (Hood) (Day 7).
[1199] Trial Tr. 141:3-7 (Hood) (Day 7).
[1200] Trial Tr. 121:22-122:9, 122:12-16 (Hood) (Day 7).

ID law caused turnout for all Georgia voters lacking acceptable ID in 2008 to plummet nearly 17 percent from 2004 figures.[1201]

850.    Dr. Hood testified that Georgia's Voter ID law impacted Hispanic voters the most of all ethnic groups lacking ID in 2008, causing turnout for such voters to drop by 33.1 percent from 2004 figures.[1202]

851.    According to Dr. Hood's data, Anglo turnout in 2008 for those lacking ID dropped by 25.1 percent from 2004 figures.[1203]

852.    Dr. Hood's study of 2008 turnout data in Georgia occurred against the backdrop of what Dr. Hood and other political scientists referred to as "the Obama effect."[1204]   According to Dr. Hood, the "Obama effect" refers to the impact of the presidential candidacy of then-Senator Barack Obama on minority turnout.   Dr. Hood testified that the "unique stimulus" of then-Senator Obama's 2008 candidacy "sparked unprecedented African American turnout" for the 2008 presidential election.[1205]

853.    Despite what Dr. Hood referred to as the historic nature of that election, African American turnout in Georgia in 2008 for those lacking appropriate ID dropped nonetheless 6.7 percent from 2004 figures.[1206]

854.    Dr.  Hood readily admitted that he would have expected turnout for African American voters lacking ID to have been substantially lower had it not been for the Obama effect.  Dr. Hood's multivariate regression analysis did not, however, control for or isolate those minority

---

[1201] Trial Tr. 152:12-16 (Hood) (Day 7).
[1202] Trial Tr. 153:16-20 (Hood) (Day 7).
[1203] Trial Tr. 152:17-15 (Hood) (Day 7).
[1204] Trial Tr. 156:5-7 (Hood) (Day 7).
[1205] Trial Tr. 155:23-156:2, 156:11-13 (Hood) (Day 7).
[1206] Trial Tr. 153:12-15 (Hood) (Day 7).

voters who lacked ID but nonetheless turned out to vote because of the unique circumstances of that election.[1207]   Accordingly, he does not how much farther minority voter turnout would have been depressed during the 2008 general election in Georgia absent the galvanizing circumstances of that election.

855.   While Dr. Hood's prior work has in fact observed negative turnout effects from enforcement of photo voter ID laws, he discounts any other evidence of burden and instead focuses solely on voter turnout. As his expert declaration states, "ID disparity only matters; [sic] if it ultimately causes a disparity in voter turnout.  As well, to matter in a legal sense this turnout gap must fall disproportionately on minority registrants."[1208]  Dr. Hood's working rule for examining the impact of a Voter ID law finds no support in law or political science literature.[1209]

856.   Applying his rule, Dr. Hood testified that even patently improper laws that, for instance, required African American voters to pay $5 to cast a ballot imposed no undue burden so long as African American voters paid those fees and turned out to vote in sufficient numbers.  Similarly, Dr. Hood testified that a jurisdiction that required polling places in predominantly Hispanic neighborhoods to stay open just two hours on Election Day, but allowed polling places in predominantly Anglo neighborhoods to stay open for 14 hours, imposed no burden upon Hispanic voters so long as those voters in fact turned out to vote.[1210]

857.   Dr. Hood's limited analysis of provisional votes cast by voters lacking SB 14 ID following SB 14's implementation is methodological flawed.  Dr. Hood examined the numbers of provisional ballots cast in Harris County during the 2013 Constitutional Amendment election

---

[1207] Trial Tr. at 158:8-12,158:13-15, 159:4-7 (Hood) (Day 7).
[1208] DEF0007 at 9 (Hood Rep.).
[1209] Trial Tr. 168:12-169:19, 171:8-25 (Hood) (Day 7).
[1210] Trial Tr. 172:17-174:6 (Hood) (Day 7).  .

and the 2014 primary election that related to voters lacking SB 14 ID.   He similarly looked at the numbers of provisional ballots cast by voters lacking SB 14 ID in ten Texas counties for the 2013 Constitutional Amendment election.   Looking solely at the small numbers of ID-related provisional ballots cast in those elections, Dr. Hood concludes that small numbers of voters were affected by SB 14.   This analysis is too limited to be of any value.   Indeed, Dr. Hood conceded he was not asking the Court to speculate as to SB 14's impact statewide, based on the limited analysis he presented.[1211]

858.    Moreover, Dr. Hood conceded that looking at raw numbers of provisional ballots cast does not capture the degree of voter suppression that may be associated with a voter ID law's implementation.   As Dr. Hood explained, simply looking at raw numbers of provisional ballots cast by voters lacking SB 14 is not an accurate measure of a voter ID law's impact since it does not capture those voters who may have been deterred from attempting to cast an in-person ballot. When asked what he had done to measure voters lacking SB 14 ID who had been deterred from attempting to vote, Dr. Hood said, "the answer is nothing."[1212]   Dr. Hood's purported analysis of several South Carolina and Mississippi elections are likewise too small, too attenuated, and too incomplete to have any relevance to Texas.

**B.**    **Dr. Milyo**

**1.**    **Dr. Milyo's opinions overall should not accepted by this Court.**

859.    Defendants retained Dr. Jeffrey Milyo, an economist at the University of Missouri, to critique all 17 reports issued by Plaintiffs' experts.[1213]

---

[1211] Trial Tr. 204:16-205:12; 210:15-211:3 (Hood) (Day 7).
[1212] Trial Tr. 202:16-23 (Hood) (Day 7).
[1213] DEF0009 ¶¶ 1, 2 (Milyo Rep.).

860.    The reports that Dr. Milyo critiqued included those of Dr. Stephen Ansolabehere and Dr. Michael Herron, both political scientists, and Dr. Coleman Bazelon, an economist, who performed matching analyses of state and federal data bases; Drs. Barreto and Sanchez, survey experts who conducted a survey in this case; Dr. Gerald Webster, a geographer, and Dr. Daniel Chatman, a transportation expert, who performed analyses of travel burdens associated with obtaining SB 14 IDs; Dr. Jane Henrici, an anthropologist with expertise in poverty, Dr. Bazelon, and Kevin Jewell, an MBA and expert in financial analysis, who analyzed the financial impact on voters associated with obtaining SB 14 ID; historians Dr. Allan Lichtman and Dr. Vernon Burton, sociologist Dr. Chandler Davidson, and election lawyer George Korbel, who conducted historical analyses relating to the totality of circumstances and/or the discriminatory intent behind the passage behind SB 14; Dr. Barry Burden, a political scientist who applied social science methodology and research to the questions posed by the Section 2 Senate factors; Dr. Lorraine Minnite, an election fraud expert, and Buck Wood, an election lawyer, who analyzed the existence of voter fraud in Texas; and Ransom Cornish, a CPA, who analyzed provisional ballots and the budget for implementing SB 14.[1214]

861.    Initially, the idea that a single person has the qualifications to review, at a sufficiently high level of expertise, such a wide array reports by such a wide array of experts, many of whom have focused for years on the specific issues raised in their reports in this case, and all but one of whom testified live at this trial, calls into serious question the weight to be given to any of Dr. Milyo's opinions.

---

[1214] *See generally* PL753 (Barreto/Sanchez Rep.);  PL775R (Webster Rep.); PL761 (Chatman Rep.); PL767 (Henrici Rep.); PL755 (Bazelon Rep.); PL770 (Jewell Rep.); PL772 (Lichtman Rep.); PL760 (Burton Rep.); PL774 (Davidson Rep.); PL771 (Korbel Rep.); PL758 (Burden Rep.); PL773 (Minnite Rep.); PL776 (Wood Rep.); PL763 (Cornish Rep.); DE0009 (Milyo Rep.).

239

862.     This concern is magnified by Defendants' decision not to produce Dr. Milyo live at trial, thereby depriving the Court of the opportunity to judge his demeanor, which is particularly important given numerous questions raised as to the weight to be given to Dr. Milyo's qualifications and opinions on the face of his report and in his deposition.  This is particularly so because several of Plaintiffs' expert witnesses, including Drs. Ansolabehere, Barreto, Bazelon, and Chatman, and Mr. Jewell, directly refuted Dr. Milyo's assertions in open court, and allowed themselves to be subjected to cross-examination on these issues.  The credibility of these plaintiffs' experts remained in tact following cross-examination.[1215]

863.     Dr. Milyo is an economist, who describes his expertise as "American political economy, including the empirical analysis of the effects of political regulations and institutions."[1216]  While he claims that this expertise gives him the tools to perform the analyses he undertook in his report, Dr. Jeffrey Milyo does not have degrees in Political Science, Geography, Urban Planning, Sociology, or History.  Dr. Milyo has never conducted a large-scale database match and has never designed or executed a large-sample public opinion survey.[1217]

864.     In his deposition, Dr. Milyo admitted that the task assigned to him by Defendants was "potentially enormous and beyond what any one human could do."[1218]  This is in fact accurate, and, for the reasons set forth above, and further explicated below, no weight should be given to Dr. Milyo's opinions in this case.

---

[1215] Trial Tr. 178:12-22 (Ansolabehere) (Day 1); Trial Tr. 68:25-69:3, 73:15-74:5, 75:25-83:18 (Barreto) (Day 3); Trial Tr. 52:18-55:23 (Jewell) (Day 5);Trial Tr. 99:12-103:2 (Chatman) (Day 5); Trial Tr. 91:16-92:15 (Bazelon) (Day 6).
[1216] Milyo Dep. 62:19-63:18.
[1217] DEF0008 (Milyo CV); Milyo Dep. 68:7-16, 178:13-23.
[1218] Milyo Dep. 175:15-176:2.

### 2. Dr. Milyo's criticisms of the "No Match List" reports are not credible

865. Specifically, with respect to Dr. Ansolabehere's study and analysis (upon which Drs. Herron's and Bazelon's reports were partially based), Dr. Milyo offered no additional matching combinations or no additional steps that Dr. Ansolabehere should have taken but did not take.[1219] Dr. Milyo made no attempt to determine the proportion of erroneous registration records on Dr. Ansolabehere's no-match list in comparison to the TEAM database as a whole.[1220] Dr. Milyo made no attempt to quantify the effect of the error rate in Catalist estimates and has not offered a quantification disputing Dr. Ansolabehere's finding that that the racial disparity in ID possession rates is statistically significant.[1221] Dr. Milyo offered no methodological criticism of the use of ecological regression, homogeneous block groups, or Spanish surnames to estimate the racial effects of SB 14.[1222]

866. Indeed, as was the case with Dr. Hood, Dr. Milyo's opinions provided support for Dr. Ansolabehere's analysis. For example, even applying every step that Dr. Milyo could identify to eliminate potentially erroneous records, Dr. Ansolabehere continued to find a racial disparity in SB 14 ID possession.[1223]

867. Moreover, in his deposition, Dr. Milyo made several concessions supportive of Dr. Ansolabehere's analysis. For example, in prior litigation, Dr. Milyo incorporated in his "best

---

[1219] Milyo Dep. at 208:18-24, 210:4-9.
[1220] Milyo Dep. at 226:9-15, 253:11-18.
[1221] Milyo Dep. at 267:11-20, 269:10-16.
[1222] Milyo Dep. at 265:11-266:1.
[1223] Milyo Dep. at 244:22-245:6, 246:6-13.

estimate" the premise that individuals who do not possess a state-issued photo ID are more likely to be poor, less educated, and disproportionately composed of racial and ethnic minorities.[1224]

868.    Dr. Milyo also acknowledged that political science literature has found that increased travel costs associated with voting tend to reduce voter turnout, as do other costs and that scholarship has found that use of best election administration practices increase voter turnout, particularly for minority and poor voters.[1225]

869.    Dr. Milyo also acknowledged that prior research showing that voter ID did not have a racial effect did so only by controlling for education and income, and minority residents of Texas have lower average income and education levels.[1226]

870.    Dr. Milyo further acknowledged that voter turnout does not isolate the rate at which particular election administration provisions discourage individuals voting.  In fact, Dr. Milyo acknowledged that voter turnout is a much narrower concept than opportunity to participate in the political process.[1227]

871.    Dr. Milyo's deposition testimony raised questions as to his credibility.   First, Dr. Milyo misrepresented that he "was unaware of any scholarly studies that attempt to estimate the effects of voter ID by matching records to a state voter registration database."  In fact, Dr. Milyo is aware of multiple published works in peer-reviewed journals analyzing voter ID laws using database matching methodologies.[1228]

---

[1224] Milyo Dep. at 255:1-9, 259:7-17.
[1225] Milyo Dep. at 283:11-284:17, 285:19-286:6.
[1226] Milyo Dep. at 297:18-298:11.
[1227] Milyo Dep. at 271:11-15, 277:24-277:5.
[1228] DEF0009 ¶ 22 (Milyo Rep.); PL248 at 10 (Milyo Indiana Policy Report); Milyo Dep. at 183:23-184:10.

872.     Second, Dr. Milyo misleadingly claimed that "Dr. Ansolabehere has identified anomalies in Texas voter registration data that may suggest a large number of errors and deadwood in the TEAM database."  In fact, Dr. Ansolabehere had written that the low observed rate of deceased voters on voter files "might be attributable to states doing a good job at identifying and purging deceased voters."  Dr. Milyo has no knowledge of voter registration list maintenance practices in Texas and merely offered an "illustration" of a potential problem.  He offered no opinion regarding the number of erroneous records.[1229]

873.     Third, Dr. Milyo also misrepresented as fact his speculation that Dr. Ansolabehere's findings are "likely to be biased" on account of race.  Dr. Milyo admitted that he had no basis to claim that minority voters are "more likely to be in the set of non-matches that occur for reasons other than the lack of SB 14 ID."[1230]

874.     Fourth, Dr. Milyo misrepresented as fact his speculation that Catalist estimates "are systematic in that they are expected to be correlated with both lack of ID and minority status compounds this problem" and admitted that he had no basis for this claim.[1231]

875.     Finally, Dr. Milyo misrepresented that "[t]he error known to exist in Catalist estimates of race and ethnicity is not addressed by Ansolabehere."  Dr. Ansolabehere conducted a confirming analysis of the set of voters for whom the Catalist race estimate is "highly likely."[1232]

---

[1229] DEF0009 ¶ 44 n.28 (Milyo Rep.); Milyo Dep. at 213:22-214:2, 218:3-219:1, 219:11-221:7.
[1230] DEF0009 ¶ 98 (Milyo Rep.); Milyo Dep. at 236:14-19, 240:1-5.
[1231] DEF0009 ¶ 106 (Milyo Rep.); Milyo Dep. at 266:12-15, 267:3-6.
[1232] DEF0009 ¶ 106 (Milyo Rep.); PL753 at 103 tbl.VII.2 (Ansolabehere Rep.); Milyo Dep. at 269:22-270:2.

### 3.    Dr. Milyo's opinions on the Barreto-Sanchez survey are not credible

876.    Defendants' reliance on Dr. Milyo to provide a detailed critique of the Barreto-Sanchez survey is without merit.  Dr. Barreto responded in detail to each of the criticisms raised by Dr. Milyo at trial, fully rebutting Dr. Milyo on the survey issues.[1233]  Indeed, Drs. Barreto and Sanchez are recognized experts in the field of conducting public opinion surveys.  Even Defendants' only testifying expert, Dr. Trey Hood, acknowledged Dr. Barreto as "highly competent" in his field.[1234]  Drs. Barreto and Sanchez have conducted hundreds of public opinion surveys, and written scholarly literature on the issue of surveys.[1235]  Dr. Milyo has not designed or conducted a single survey.[1236]  For that additional reason, no weight should be given to Dr. Milyo's opinions in the Barreto-Sanchez survey.

877.    Additionally, Dr. Milyo admitted at his deposition that he had made crucial mistakes in his critique of the Barreto-Sanchez survey.  For example, he originally criticized Drs. Barreto and Sanchez for assuming that all of the respondents to the survey were eligible voters in Texas, on the basis that he thought there was just one screening question that touched on the issue.  But at his deposition, Dr. Milyo conceded that he had not read the survey closely enough and had not paid attention to a second screening question.[1237]

878.    In his report, Dr. Milyo had criticized Drs. Barreto and Sanchez for relying on citizen of voting age population ("CVAP") data, opining that it was well-known that CVAP overstates the numbers of eligible voters, relying on specific scholarly authority which did not stand for that

---

[1233] Trial Tr. 68:25-69:3, 73:15-74:5, 75:25-83:18 (Barreto) (Day 3).
[1234] Trial Tr. 212:10-23 (Hood) (Day 7).
[1235] PL753 at 3 (Barreto/Sanchez Rep.); Trial Tr. 25:16-26:6 (Barreto) (Day 3).
[1236] Milyo Dep. 66:15-68:16.
[1237] Milyo Dep. 99:19-100:20.

proposition.  Dr. Milyo acknowledged his mistake at his deposition and withdrew that portion of his opinion.[1238]

879.    In his report, Dr. Milyo criticized Drs. Barreto and Sanchez for not properly characterizing races and ethnicities "other" than Blacks and Hispanics, but conceded in his deposition that he may not have focused on Table 2 of the Barreto-Sanchez report, which clearly set forth the "Other" category.[1239]

880.    Dr. Milyo also appeared to expand scholarly literature beyond its plain meaning in an effort to support his criticisms of the Barreto-Sanchez survey.  For example, he relied on three scholarly articles to support his proposition that there was "upward bias" in the survey results, because it was well-known that survey respondents were subject to "motivated reasoning," which would imply, he opined, that "people who oppose voter ID laws very strongly may be motivated to report that they do not possess ID, even when they do."[1240]  But, at his deposition, Dr. Milyo conceded that the only three scholarly articles that he listed as support for this proposition dealt with the effect of people's political attitudes influencing their responses on policy issues, not their responses as to factual information, arguing that the literature applied to the "fact" of holding an "opinion."[1241]

881.    Similarly, in his report, Dr. Milyo opined that because of the length and number of questions in the Barreto-Sanchez survey, "it is easy to imagine" that not all respondents choose to cooperate "by answering completely and honestly."[1242]  At his deposition, Dr. Milyo conceded

---

[1238] Milyo Dep. 125:1-17.
[1239] Milyo Dep. 127:7-19.
[1240] DEF0009 ¶57 (Milyo Rep.)
[1241] Milyo Dep. at 114:1-120:2.
[1242] DEF0009 ¶58 (Milyo Rep.)

that the only scholarly literature he cited as support for this proposition did not support this opinion.[1243]

882.    Finally, Dr. Milyo constructed a number of "replications" of the Barreto-Sanchez survey, in which he ran the survey results, subtracting from the universe of respondents those who gave what Dr. Milyo characterized as "ambiguous responses" as to ID possession and others such as those who did not provide their date of birth, even though they had told the surveyors that they were 18 years or older; those who did not state how long they lived in Texas, although they had told the surveyors they were residents of Texas; and those who did not tell the surveyors when they became citizens, even though they told the surveyors they were citizens.[1244]  At trial, Dr. Barreto addressed to the Court's satisfaction each and every one of Dr. Milyo's concerns.[1245]  In addition, there is a fatal flaw in Dr. Milyo's "replications."  Although he reduced the universe of respondents by hundreds of respondents, Dr. Milyo conceded that did not re-weight the survey results so that the respondents in his "replications" would reflect the demographics of the actual racial/ethnic populations.[1246]  As Dr. Hood, another of Defendants' experts testified, re-weighting under such circumstances is standard in the field.[1247]

---

[1243] Milyo Dep. at 122:19-22.
[1244] Milyo Dep. at 91:12-98:14.
[1245] Trial Tr. 68:25-69:3, 73:15-74:5, 75:25-83:18 (Barreto) (Day 3).
[1246] Milyo Dep. at 146:12-148:11.
[1247] Trial Tr. 222:22-225:11 (Hood) (Day 7); *see also* Trial Tr. 49:10-51:5 (Barreto) (Day 3).

## XV.   THE PRIVATE PLAINTIFFS AND PLAINTIFF-INTERVENORS HAVE BEEN INJURED BY SB 14

### A.   Veasey Plaintiffs

#### 1.   Gordon Benjamin

883.    Gordon Benjamin, who is African American, was born on June 2, 1949 in Louisiana.[1248]

884.    Prior to returning to Texas, where he currently resides, Mr. Benjamin moved to Phoenix, Arizona from Texas.[1249]  In Arizona, Mr. Benjamin was able to surrender his Texas driver's license to obtain an Arizona driver's license.[1250]  Mr. Benjamin also registered to vote and voted in Arizona.[1251]  Upon returning to San Antonio, Texas, Mr. Benjamin registered to vote and voted in San Antonio up until the time that SB 14 went into effect.[1252]  Mr. Benjamin does not own a car or drive and, therefore travels by bus.[1253]

885.    When SB 14 went into effect, Mr. Benjamin did not have an original or certified copy of his birth certificate.[1254]  He had not had his birth certificate in his possession since 1978. Because he lacked a birth certificate, he could not obtain an EIC, a personal ID card, or a driver's license.[1255]

886.    Mr. Benjamin tried to obtain an SB 14 acceptable ID by visiting DPS on three occasions. For example, Mr. Benjamin has attempted on at least two occasions in the fall of 2013 and early 2014 to get a Texas driver's license or EIC from at least two different DPS offices—traveling there by bus and paying for travel with a senior citizen transit photo ID card at a reduced fare—

---

[1248] Benjamin Dep. 11:1-9; Trial Tr. 288:8-9 (Benjamin) (Day 2).
[1249] Trial Tr. 288:10-21 (Benjamin) (Day 2).
[1250] Trial Tr. 288:22-289:13, 289:16-18 (Benjamin) (Day 2).
[1251] Trial Tr. 289:14-18 (Benjamin) (Day 2).
[1252] Trial Tr. 289:19-290:1 (Benjamin) (Day 2).
[1253] Trial Tr. 295:22-296:6 (Benjamin) (Day 2)
[1254] Trial Tr. 293:6-294:10 (Benjamin) (Day 2).
[1255] Benjamin Dep. 28:1-30:3, 31:22-32:2, 35:5-12.

using his valid, unexpired Arizona driver's license, a copy of his original Social Security card, and voter registration card; however, he has been unable to obtain a Texas driver's license or EIC.[1256]

887.    Each time he was told that he could not get an EIC, a personal ID card, or a driver's license without providing a copy of his birth certificate.[1257]

888.    The cost of obtaining a birth certificate from Louisiana had inhibited Mr. Benjamin from obtaining one.[1258]   Recently, Mr. Benjamin's sister has helped him secure his birth certificate.[1259]

889.    Until June 2014, Mr. Benjamin was under 65 and therefore ineligible to vote by mail.[1260] As a result of SB 14, Mr. Benjamin was completely denied his right to vote in several elections and was forced to vote provisionally, and, on at least one occasion, was unable to perfect his provisional ballot.[1261]   Mr. Benjamin voters regularly whether early or on Election Day.[1262]

890.    Although Mr. Benjamin is now 65, he prefers to vote in person.[1263]

## 2.    Kenneth Gandy

891.    Kenneth Gandy, who is Anglo, moved to Corpus Christi, Nueces County, Texas thirty to thirty-five years ago and has lived at the same address for twenty to twenty-five years.[1264]   He has been registered to vote in Texas since he moved to the state.[1265]   He registered at the county

---

[1256] Trial Tr. 290:13-15, 290:19-23, 290:24-291:18 (Benjamin) (Day 2).
[1257] Benjamin Dep. 28:1-30:3.
[1258] Benjamin Dep. 32:13-33:15; Trial Tr. 293:6-14 (Benjamin) (Day 2).
[1259] Trial Tr. 292:17-293:3, 293:15-294:5 (Benjamin) (Day 2).
[1260] Benjamin Dep. 11:2-4; Trial Tr. 291:25-292:4 (Benjamin) (Day 2).
[1261] Trial Tr. 290:2-12, 294:19-22 (Benjamin) (Day 2).
[1262] Trial Tr. 292:10-12 (Benjamin) (Day 2).
[1263] Benjamin Dep. 54:8-17; Trial Tr. 292:5-9, 292:13-16 (Benjamin) (Day 2).
[1264] Gandy Dep. 9:24-10:3, 10:18-20.
[1265] Trial Tr. 207:18-20 (Gandy) (Day 4).

registrar's office.[1266] Mr. Gandy is on social security and does not currently possess a form of identification that would allow him to vote in Texas in person.[1267]

892.    Mr. Gandy is active in elections.  He is currently on the Ballot Board for Nueces County and has worked the last 7 or 8 years in that position. He has been precinct chair and election judge.[1268]

893.    Mr. Gandy had a Texas driver's license that he let expire in 1990 because he was not driving.[1269]  His only mode of transportation is the city bus.[1270]

894.    His Texas Personal Identification Card, which he carries with him all of the time, expired in 2000.[1271]

895.    He has not considered getting a new driver's license or a personal identification card.[1272]

896.    He does not possess, and has never possessed, a Texas concealed handgun license, a U.S. Passport, a U.S. military ID with a photo, a veterans identification card, or a U.S. citizenship or naturalization certificate.[1273]

897.    He also does not possess an Election Identification Certificate.[1274]  He tried to obtain an EIC but was unsuccessful.[1275]

898.    The closest DPS office is about an hour from his house by bus.[1276]  His polling place is approximately four to five blocks from his house.[1277]

---

[1266] Gandy Dep. 11:13-17, 63:24-64:11.
[1267] Trial Tr. 209:10-12, 212:25-213:1 (Gandy) (Day 4).
[1268] Gandy Dep. 15:18-16:1, 18:14-19:10; Trial Tr. 210:14-211:21, 213:4-9 (Gandy) (Day 4).
[1269] Gandy Dep. 15:2-8; Trial Tr. 208:2-4 (Gandy) (Day 4).
[1270] Gandy Dep. 13:8-11; Trial Tr. 208:15-17 (Gandy) (Day 4).
[1271] Gandy Dep. 25:17-26:2, 29:13-20.
[1272] Gandy Dep. 25:3-5.
[1273] Gandy Dep. 30:3-31:21; Trial Tr. 209:6-9 (Gandy) (Day 4).
[1274] Gandy Dep. 28:14-19.
[1275] Gandy Dep. 25:3-13, 50:22-25, 62:7-11.

899.    He has a copy of his New Jersey birth certificate, but it is not a certified copy.[1278]  He does not have a certified copy of his New Jersey birth certificate because the State charges $30.00 for a certified copy.[1279]

900.    He has voted by mail since implementation of SB 14, but he prefers to vote in person as he has done all of his life.[1280]

901.    It is his opinion that being forced to vote by mail treats him like a second-class citizen.[1281]

### 3.    Anna Burns

902.    Anna Burns, who is Hispanic, is a Texas registered voter.  Her maiden name was Anna Maria Bargas.  The name on her Texas driver's license is Anna Maria Bargas Burns, while the name on her voter registration card is Anna Maria Burns.[1282]

903.    Ms. Burns is concerned that she may have trouble voting in the future because of the discretion that election workers have in administering SB 14's substantially similar name provision.[1283]

### 4.    Penny Pope

904.    Penny Pope, who is African American, is an elected official serving as Justice of the Peace of Precinct 2 in Galveston.  She has served in that position since 1992.[1284]

---

[1276] Gandy Dep. 12:12-19.
[1277] Gandy Dep. 54:24-55:3.
[1278] Gandy Dep. 40:14-17, 41:15-25; Trial Tr. 208:23-209:3 (Gandy) (Day 4).
[1279] Gandy Dep. 41:4-12.
[1280] Gandy Dep. 51:13-17, 53:25-54:5, 54:11-16; Trial Tr. 209:13-210:13, 213:2-3 (Gandy) (Day 4).
[1281] Gandy Dep. 62:19-63:4.
[1282] Burns Dep. 12:18-13:25, 22:3-12
[1283] Burns Dep. 60:14-61:5.
[1284] Pope Dep. 28:1-29:24.

905.    SB 14 impacts the ability of Ms. Pope's constituents to vote.  Ms. Pope had to increase

activities in her political campaigns as a result of SB 14.  She also spent additional time, effort,

and funds to campaign in the 2014 primary because of SB 14.[1285]

### 5.    Michael Montez

906.    Michael Montez, who is Hispanic, is an elected official serving as Constable of Precinct 5

in Galveston.  He has served in that position since 2003.[1286]

907.    SB 14 impacts the ability of Constable Montez's constituents to vote.  Constable Montez

had to increase activities in his political campaign as a result of SB 14.  Constable Montez

anticipates having to spend additional time, effort, and funds to campaign in the 2016 election

because of SB 14.[1287]

### 6.    Congressman Marc Veasey

908.    Congressman Marc Veasey, who is African American, was born in Fort Worth, Texas.[1288]

909.    Prior to serving in Congress, he served in the Texas state legislature.  He ran in 2004

because he was upset about the mid-cycle redistricting.  While he was serving as a state

legislator, the legislature considered voter ID bills, including SB 14.[1289]  Among other things,

Congressman Veasey recalls election committee hearings in 2007 when he was kicked out by

Chair Leo Berman because he was asking questions.[1290]

910.    Congressman Veasey believes that SB 14 is discriminatory.[1291]

---

[1285] Pope Dep. 44:1-24, 82:13-18, 93:20-94:15.
[1286] Montez Dep. 21:9-22.
[1287] Montez Dep. 30:10-23, 62:1-63:25, 68:19-69:2, 70:10-15, 72:23-73:16.
[1288] Trial Tr. 231:23-232:12 (Veasey) (Day 1).
[1289] Trial Tr. 232:19-25, 233:6-9 (Veasey) (Day 1); Veasey Dep. 37:1-16, 46:17-47:10.
[1290] Trial Tr. 235:15-237:18 (Veasey) (Day 1).
[1291] Trial Tr. 234:18-25; 242:2-10 (Veasey) (Day 1).

911.     He believes it will affect minorities, especially African-Americans, Hispanics, disabled

individuals, and those who live in rural areas.[1292]

912.     Congressman Veasey also believes SB 14 is a hardship on his constituents and that it

requires additional resources, manpower, and time to educate his constituents about the new

requirements.[1293]

### 7.     Jane Hamilton

913.     Jane Hamilton, who is African American, has extensive experience with political

campaigns, having worked on and with numerous campaigns since she graduated college in

2000.[1294]

914.     Ms. Hamilton is registered to vote in Dallas County.[1295]

915.     She is currently Congressman Veasey's chief of staff.  During elections, she also works

for his campaign as his campaign manager.[1296]

916.     As a campaign manager, Ms. Hamilton does work to turn out voters and to get people

information about when, where, and how to go vote.  Since SB 14 has been in effect, her job has

been "significantly more difficult."  During the 2014 primary election, the campaign received

calls from voters about whether they have the proper ID.  One of the stories that made her

emotional was a voter who called because she had an expired ID and when the voter had gone to

vote, she had been unable.  The voter had gotten a ride to the polls and did not know how she

would get back to the polls and she also did not have what she needed to vote.  Hamilton testified

---

[1292] Trial Tr. 235:4-9 (Veasey) (Day 1); Veasey Dep. 91:11-92:6.
[1293] Veasey Dep. 84:4-85:4.
[1294] Hamilton Dep. 6:15:18, 12:2-6, 12:14-21, 14:17-15:4, 15:24-16:5, 17:11-19:20, 20:4-19, 21:10-17, 21:23-22:6.
[1295] Hamilton Dep. 24:4-7.
[1296] Hamilton Dep. 21:23-22:6, 47:11-13, 48:3-8.

that she and other staff would explain to callers how to get ID and that some callers were too overwhelmed by the process they would need to go through and the costs association with getting ID.[1297]

917.    Ms. Hamilton noted that telling seniors to vote by mail is "very, very sensitive." She said many seniors, some of whom "literally fought for the right to vote," want to go to the polls.[1298]

918.    Ms. Hamilton is also concerned about voters getting turned away for substantially similar name issues. As someone familiar with campaigns and elections, she stated that clerks are chosen through a political process and she is uncomfortable knowing that partisan people make the decisions about whether or not voters' names are substantially similar. It seems "like a lot to put in the hands of a clerk." She noted that the campaign received calls from voters with questions about name issues.[1299]

### 8.    Sergio DeLeon

919.    Sergio de Leon, who is Hispanic, is a Justice of the Peace in Tarrant County. He is currently up for re-election.[1300]

920.    Mr. de Leon believes that SB 14 discriminates against, and places an undue hardship, on the elderly. He believes that in this country, if a voter wishes to exercise his right to vote in person, he should be able to do so.[1301]

921.    Mr. de Leon believes SB 14 will increase the costs necessary to run political campaigns.[1302]

---

[1297] Hamilton Dep. 64:9-65:21, 75:6-79:19, 81:7-82:6.
[1298] Hamilton Dep. 66:17-67:6.
[1299] Hamilton Dep. 67:14-70:16, 76:2-22.
[1300] De Leon Dep. 4:10, 7:8-10, 7:20-23, 13:11-20.
[1301] De Leon Dep. 39:14-19, 40:15-21, 61:5-19.
[1302] De Leon Dep. 43:4-11, 44:12-15, 44:24-45:14.

922.    There has been a general concern among his constituents, particularly the elderly, that they may not have the proper forms of identification.[1303]

### 9.    Evelyn Brickner

923.    Evelyn Brickner, who is Anglo, was born December 17, 1916 and moved to Texas approximately three to four years ago.  She resides in Texas for half of the year with one of her daughters and in Phoenix the other half of the year with another daughter.  She had an Ohio driver's license.  She has never had a Texas driver's license.[1304]

924.    She has always voted in person.  She is unaware of the process of mail-in voting and has never voted by mail.[1305]

925.    She attempted to get an EIC on two or three occasions with the help of her daughter, but DPS informed her she did not have enough identification.[1306]

926.    Ms. Brickner was able to obtain a U.S. passport on November 20, 2013.  The name on her U.S. passport, Evelyn Ruth Brickner, does not match the name on her voter registration card, Evelyn R. Brickner.

### 10.    John Mellor-Crummey

927.    John Mellor-Crummey, who is Anglo, has been registered to vote in Texas since 1989.  The name on his voter registration card is John M. Mellor-Crummey.  The name on his driver's license is J M Mellor-Crummey.[1307]

928.    Mr. Mellor-Crummey was unsuccessful in getting DPS to put his full name on his driver's license when he moved to Texas.  If given the option to change his name on his driver's

---

[1303] De Leon Dep. 53:13-19.
[1304] Brickner Dep. 5:15-17, 8:14-19, 9:6-8, 11:7-8, 13:5-6.
[1305] Brickner Dep. 28:12-29:4, 42:10-12.
[1306] Brickner Dep. 57:11-58:4, 58:18-25, 59:13-24, 60:9-61:5, 62:6-8.
[1307] Mellor-Crummey Dep. 5:9-13, 10:2-23, 42:12-14.

license, he would change it to John M. Mellor-Crummey to match his voter registration

certificate.  He has never attempted to change his name on his voter registration card to match his

driver's license because the name on his voter registration card is correct.[1308]

929.    The name on his passport is John Michael Mellor-Crummey.  Mr. Mellor-Crummy is

unsure whether he possesses two forms of acceptable identification under SB 14.[1309]

930.    Mr. Mellor-Crummey is concerned that not all poll workers will view his name on his

driver's license as substantially similar to his name on the registration list and they might

therefore refuse him his right to vote.[1310]

## 11.    Floyd Carrier

931.    Floyd Carrier, who is African American, was born in a rural area by a midwife on

January 13, 1931, is a veteran, and l lives in China, Jefferson County, Texas.[1311]

932.    Mr. Carrier had a Texas driver's license that expired in 2006. [1312]  He has not driven since

he had a stroke in 1996 and is confined to a wheelchair, relying on his son and neighbors to drive

him places.[1313]

933.    Mr. Carrier has a veteran ID card with a photo, but the photo is not discernible.[1314]

934.    Mr. Carrier has tried to get identification from DPS, specifically a Texas I.D. card, but he

does not have the necessary underlying documents, including a birth certificate, and has had

---

[1308] Mellor-Crummey Dep. 46:16-23, 48:1-19, 54:20-25, 56:25-57:5, 63:12-21, 65:2-6, 66:5-10, 70:13-19, 113:10-19.
[1309] Mellor-Crummey Dep. 15:20-22, 43:19-24.
[1310] Mellor-Crummey Dep. 13:13-24, 77:15-79:21, 83:9-24, 94:18-25, 100:17-101:4, 110:9-12.
[1311] Carrier, C. Dep. 28:10-12, 46:4-10; Trial Tr. 9:22-25, 10:5-8, 13:9-12, 14:7-20, 15:15-18, 45:7-9, 75:20-21, 76:13-24 (Carrier, C; Carrier, F.) (Day 1).
[1312] Trial Tr. 10:12-16, 11:7-10, 12:8-14, 42:11-13, 53:7-13 (Carrier, C.) (Day 1).
[1313] Carrier, F. Dep. 65:4-67:14, 69:7-10; Trial Tr. 13:17-14:2, 23:25-24:3, 25:9-13, 42:5-10, 46:9-15, 47:1-10 (Carrier, C.) (Day 1).
[1314] Carrier, F. Dep. 58:2-24; PL814; Trial Tr. 10:17-18, 11:11-17, 48:2-4 (Carrier, C.) (Day 1).

difficulty obtaining them. [1315]  For instance, in spite of confusion over the location of his birth at home by a midwife, in a town bordered by three counties meet, Mr. Carrier notwithstanding obtained a birth certificate from the state of Texas that contained numerous errors, including the wrong date of birth, incorrect spellings for his first and last names, and the incorrect race of his father.[1316]  Just prior to trial, Mr. Carrier received an amended birth certificate, though it still contains errors, including the incorrect race of Mr. Carrier's father and Mr. Carrier's date of birth.[1317]

935.    To date, Mr. Carrier's son has spent between $34 and $36 assisting his father in obtaining to obtain an ID for his father.[1318]

936.    Mr. Carrier who has been voting in-person for most of his life and on election day, went as recently as November 2013 and was told he did not have the necessary ID to vote.[1319]  Poll workers did not offer Mr. Carrier the opportunity to cast a provisional ballot, nor did they provide him with any information about the availability of an EIC,[1320] despite recognizing Mr. Carrier and his son.[1321]

---

[1315] Trial Tr. 13:13-20, 14:3-25, 15:7-9, 15:21-25, 16:4-6, 16:10-24, 17:10-20, 18:20-20:23, 21:7-22:5, 22:9-24, 23:3-19, 53:14-21, 54:9-23, 55:7-15, 80:4-12, 85:10-14, 88:17-21 (Carrier, C.; Carrier, F.) (Day 1).
[1316] DEF0221, DEF2521; Trial Tr. 15:10-18, 17:21-18:1, 18:9-14, 19:25-20:4, 20:18-23, 21:1-5, 54:11-17, 56:16-57:17, 76:3-6, 80:6-12 (Carrier, C.; Carrier, F.) (Day 1).
[1317] DEF2521, DEF0221; Trial Tr. 33:1-10 (Carrier, C.) (Day 1).
[1318] Trial Tr. 16:25-17:9 (Carrier, C.) (Day 1).
[1319] Carrier, F. Dep. Dep. 95:8-96:2; Trial Tr. 13:2-4, 23:20-24, 24:17-20, 25:14-26:3, 27:3-6, 31:21-25, 79:13-80:3 (Carrier, C.; Carrier, F.) (Day 1).
[1320] Trial Tr. 26:20-27:2, 27:15-28:1-17 (Carrier, C.) (Day 1).
[1321] Trial Tr. 26:4-10 (Carrier, C.) (Day 1).

### 12.   Koby Ozias

937.   Koby Ozias, who is Anglo, was born in Kentucky on May 11, 1986.[1322]  He is a resident of Corpus Christi, Nueces County, Texas.[1323]

938.   Mr. Ozias is in the process of changing his name.[1324]

939.   Mr. Ozias has a U.S. passport with the name Stephanie Lynn Dees.  He is currently registered to vote as Stephanie Lynn Dees.  He had a Texas personal ID card but lost it and cannot afford to replace it right now.[1325]

940.   Since SB 14 went into effect, Mr. Ozias has been able to vote with his U.S. passport "[o]nly with great difficulty."  He believes certain poll workers would turn him away because his appearance does not really match his photograph and there are people who do not like transgender people.[1326]

941.   SB 14's requirements affect people like Mr. Ozias, who do not match their photographs and cannot afford to replace their ID.[1327]

### 13.   Oscar Ortiz

942.   Oscar Ortiz, who is Hispanic, is a County Commissioner for Nueces County, Texas.  He represents a largely minority community.[1328]  Commissioner Ortiz testified concerning recent discriminatory efforts to redistricting offices in Nueces County, Texas, including a recent Section 5 objection by the Department of Justice.[1329]  Commissioner Ortiz was forced to sign an affidavit

---

[1322] Ozias Dep. 29:12-30:3.
[1323] Ozias Dep. 16:21-17:1, 22:2-5.
[1324] Ozias Dep. 5:6-21.
[1325] Ozias Dep. 17:16-19, 18:1-2, 20:11-19, 21:20-1.
[1326] Ozias Dep. 18:14-16, 50:7-51:21.
[1327] Ozias Dep. 32:16-21, 32:16-21, 34:22-2.
[1328] Ortiz, O. Dep. 5:13-15, 9:4-7, 25:1-7, 28:3-16; Trial Tr. 9:12-10:10 (Ortiz, O.) (Day 5).
[1329] Trial Tr. 9:16-12:12, 14:11-15:23 (Ortiz, O.) (Day 5).

to vote when his name as printed on his I.D. did not match his voter registration.[1330] Commissioner Ortiz also described the relocation of the DPS office in Nueces County and the lack of concern by DPS with its election related responsibilities and the voiced concern over the lack of public transportation to a relocated DPS facility that is far from the residential population in the county.[1331]  DPS officials did not include issuing EICs on their agenda when considering moving the location but instead were focused on the ease the new location would have for issuing drivers licenses to commercial operators.[1332]

943.    SB 14 will make it more difficult for him to achieve re-election because he will need to make sure people have access to information about the law and ensure that they have the necessary voter ID.[1333]

## 14.    LULAC

944.    The League of United Latin American Citizens (LULAC) advances the economic condition, educational attainment, political influence, health and civil rights of the Hispanic population in the United States.  In the area of political influence, LULAC's goal includes protecting the rights of Hispanic and other minority groups, including voting rights.[1334]

945.    LULAC, through its local chapters, does voter registration and get out the vote activities.[1335]

946.    LULAC performs policy work related to legislation affecting Hispanic voters, including SB 14.  LULAC representatives testified against SB 14 in the Texas legislature.[1336]

---

[1330] Trial Tr. 12:16-13:13 (Ortiz, O.) (Day 5).
[1331] Trial Tr. 15:24-16:13 (Ortiz, O.) (Day 5).
[1332] Trial Tr. 18:15-19:19 (Ortiz, O.) (Day 5).
[1333] Ortiz, O. Dep. 32:15-37:17, 43:18-25; Trial Tr. 21:19-22:7 (Ortiz, O.) (Day 5).
[1334] See http://lulactx.org/history.html.
[1335] Ortiz, M. Dep. 46:1-20.

947.    LULAC has been harmed because the organization's individual chapters have been and will be required to expend time, effort, and funds to educate voters about SB 14.[1337]

### B.    Young Voters Education Fund Intervenors

#### 1.    Imani Clark

948.    Imani Clark, who is African American, has been a legally registered voter in Texas since 2010.[1338]

949.    Ms. Clark has been a student at Prairie View A&M University (PVAMU) since August 2010 and expects to graduate in May 2016.  She has resided in the University Village dormitory on campus since moving to Texas and has neither registered to vote nor voted in any other state.[1339]

950.    Ms. Clark does not possess SB 14-required photo ID.  She possesses a PVAMU student ID card, a California personal ID card, a California driver's license, an expired U.S. passport, a social security card, and a copy of her birth certificate.[1340]

951.    Ms. Clark voted in 2010 Prairie View municipal elections and 2012 presidential election in Texas using ID that she possessed at those times.  She would like to continue to vote in Texas using the ID she currently possess.[1341]

952.    Ms. Clark has not voted and has been unable to vote in any election since SB 14 went into effect in June 2013 because she lacks the required forms of photo ID.[1342]

---

[1336] PL006 (Tr. Senate Floor Debate, January 25, 2011).
[1337] Ortiz, M. Dep. 48:11-50:6
[1338] Trial Tr. 184:4-9 (Clark) (Day 6); PL973 (Clark Voter Registration Certificate).
[1339] Trial Tr. 184:10-21, 187:25-188:12 (Clark) (Day 6); Clark Dep. 14:3-19, 93:7-18.
[1340] Trial Tr. 181:10-17, 185:1-5 (Espinoza) (Day 6); Clark Dep.  12:17-13:2, 27:25-28:4, 34:21-35:5, 64:11-24, 74:19-24; PL839 (Clark CA ID card); PL972 (Clark expired US passport); PL837 (Clark birth certificate); PL840 (Clark Social Security card).
[1341] Trial Tr. 184:22-185:9, 186:11-25, 187:25-188:12, 188:21-189:8 (Clark) (Day 6).

953.    Until this lawsuit began, Ms. Clark was not aware of the Election Identification

Certificate. She also does not know where the closest Department of Public Safety office to her

dormitory is located.[1343]

954.    It would be unduly burdensome for Ms. Clark to acquire the SB 14 required forms of

photo ID because she does not have access to transportation or the time in her schedule, due to a

full course load (with classes beginning as early as 8 a.m.) and commitments to the Prairie View

band, a dance company, and a women's empowerment organization.[1344]  From February 2011

until May 2013, Ms. Clark also worked every weekday for at least five hours a day in an art

gallery.[1345]

955.    Ms. Clark typically gets around by using the campus shuttle or walking. She does not ride

off-campus buses.  She typically runs errands after 10:00 PM following her extracurricular

activities.[1346]

956.    For dance performances off-campus, Ms. Clark travels with the band by bus or with the

dance company by carpool. Ms. Clark does not own a car and has never rented a car or borrowed

a friend's car. Rarely, a friend will drive her on an off-campus errand, such as a visit to a

doctor.[1347]

---

[1342] Clark Dep. 94:13-95:4.
[1343] Clark Dep. 14:20-24, 63:22-64:2, 86:22-87:2.
[1344] Trial Tr. 186:15-187:5, 189:9-21 (Clark) (Day 6); Clark Dep. 16:6-16, 16:20-17:3, 17:19-19:9, 20:6-21:1, 85:2-15, 87:3-8, 88:2-6, 101:24-102:6, 109:7-14.
[1345] Clark Dep. 24:17-25:6.
[1346] Clark Dep. 83:19-84:3, 89:5-10, 90:3-4.
[1347] Clark Dep. 19:19-21, 20:1-3, 79:24-80:7, 83:2-18, 89:16-24, 92:15-18.

957.    Ms. Clark spent the summer of 2013 in California. She returned to the PVAMU campus in August 2013 and attended daily band camp practices from 4:40 a.m. until 10 or 11 p.m.[1348]

958.    Since October 2013, Ms. Clark has had a paid job as a dance instructor at an elementary school located on PVAMU campus. She normally works Mondays through Thursdays from 3 p.m. to 6 p.m., including during winter break while she remained in Texas.  Ms. Clark limited her work to Tuesdays and Thursdays in the spring of 2014, due to a heavier course load, but worked all five weekdays of her 2014 spring break.[1349]

959.    In the summer of 2014, Ms. Clark will visit California for three weeks before returning to PVAMU for summer school and to work. When she flies to California for winter breaks and other holidays, Ms. Clark presents her California personal identification to board the plane.[1350]

## 2.    The Texas League of Young Voters Education Fund

960.    The Texas League of Young Voters Education Fund was established in 2010. It is a non-profit, non-partisan 501(c)(3) organization, whose mission is to encourage young people—and, in particular, young people of color—to engage in civic participation through voting and the voting process.[1351]

961.    The Texas League accomplishes its mission through its core activities of voter registration, Get Out the Vote (GOTV) activities, leadership training of young voters, and election protection activities.[1352]

962.    The League performs policy work related to legislation affecting young voters.[1353]

---

[1348] Clark Dep. 29:17-30:12, 31:19-32:5.
[1349] Clark Dep. 21:23-22:3, 23:9-24:2, 32:13-17, 32:25-33:22, 39:25-40:10.
[1350] Clark Dep. 25:14-26:6, 27:22-28:4, 32:14-24, 34:13-17.
[1351] Green Dep. 25:15-24, 26:6-10; 157:2-7, June 18, 2014; PL857 (TLYVEF Mission and Purpose); Trial Tr. 248:1-14 (Green) (Day 2).
[1352] Green Dep. 37:6-20, 152:24-153:14; PL857 (TLYVEF Mission and Purpose); Trial Tr. 253:3-17 (Green) (Day 2).

963.    The League is not a membership organization. It represents the constituent interests of young Texans of color between the ages of 18 and 35, working on 25 college campuses across Texas.[1354]

964.    The League learned through student organization meetings and on-campus interviews that many college students who were not born in Texas, but are legally registered to vote in the state, lack SB 14-required forms of identification.  These students frequently cited the difficulty of paying for the underlying documents and lack of transportation to obtain the required identification as new burdens imposed by SB 14.[1355]

965.    The League has learned through outreach that some voters it serves do not possess any of the SB 14-required forms of identification, and some of them are not even aware of the steps they need to take to obtain those forms of identification.[1356]

966.    The enactment of SB 14 has also caused the Texas League to pivot from its core mission of registering and engaging voters in the democratic process to educating its target constituents on photo-ID requirements.  For example, rather than simply conducting voter registration activities and educational outreach, the League has conducted extensive voter education activities regarding SB 14, hosted voter ID clinics for voters who either do not have or do not know whether they have SB 14-required ID, visited college campuses to educate student voters about the new ID requirements, made phone calls to registered constituents regarding SB 14's requirements, monitored polling locations to ensure that voters were aware of and able to comply

---

[1353] Green Dep. 41:17-21; PL857 (TLYVEF Mission and Purpose); Trial Tr. 252:1-17 (Green) (Day 2).

[1354] Green Dep. 28:15-21, 38:8-24, 157:2-7; Trial Tr. 247:20-25 (Green) (Day 2).

[1355] Green Dep. 76:16-25, 80:24-18, 106:6-13; PL858 at 5-6 (LDF – Comment); PL1006 (TLYVEF Student Notification); Trial Tr. 253:12-255:8 (Green) (Day 2).

[1356] Green Dep. 132:19-24; Trial Tr. 255:21-256:24 (Green) (Day 2).

with SB 14, and helped constituents access DPS locations issuing EICs by providing free rides to these locations.[1357]

967.    The Texas League did not conduct any of these activities prior to SB 14's enforcement. In the wake of SB 14, the League has had to redirect portions of its limited resources to activities to counteract the disfranchising effects of SB 14 among its constituents.[1358]

968.    The Texas League has thus been unable to fulfill its core mission of growing the share of its constituents who are registered to vote, and instead has needed to devote resources to ensuring that its existing base of already-registered voters is, in fact, able to vote under SB 14's requirements.[1359]

969.    The League has focused particular attention on voter identification education at Prairie View A&M because of the long history of voter discrimination by Waller County officials against Prairie View students.[1360]

C.    **Texas Association of Hispanic County Judges and County Commissioners Intervenor**

970.    The Texas Association of Hispanic County Judges and County Commissioners is an association of elected Hispanic county officials that seek to protect the right to vote, free of racial discrimination.  The Association expends resources to promote political participation by

---

[1357] Green Dep. 44:2-47:11, 71:13-22, 79:5-10, 126:2-127:21, 131:3-133:1, 149:2-22; PL1010 (TLYVEF Awareness Week Flyer); PL1007 (TLYVEF Fact Sheet); PL1004 (TLYVEF Tip Sheet); PL1005, PL1002 (TLYVEF Supporter Notification); PL1003 (TLYVEF Press Release); Trial Tr. 255:21-257:6 (Green) (Day 2).
[1358] Green Dep. 47:6-11, 55:22-25, 56:23-57:4, 60:7-14, 126:22-127:21, 128:24-129:23, 131:3-133:1, 134:20-135:22, 147:5-148:9, 149:4-22, 151:4-24, 152:24-153:14; Trial Tr. 256:5-257:3 (Green) (Day 2).
[1359] Green Dep. 126:2-127:5, 149:2-22; Trial Tr. 257:5-258:13 (Green) (Day 2).
[1360] Trial Tr. 248:20-249:4, 250:3-251:20, 253:12-20 (Green) (Day 2).

Hispanic citizens in Texas, and has been forced to divert resources to educate the public about the requirements of SB 14.[1361]

### D.    Texas NAACP Plaintiffs

#### 1.    Texas State Conference of NAACP Branches

971.    The mission of the Texas State Conference of NAACP Branches (Texas NAACP), as is that of the national NAACP, is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.[1362]  Texas NAACP is dedicated to defending its constituents, minorities and low income people, in connection with their right to vote.[1363]

972.    Senate Bill 14 is harmful to the Texas State Conference of the NAACP because it impairs the organization's ability to fulfill its missions, by causing it to divert a portion of its financial and organizational resources from other pressing needs and issues to educating Texas citizens about the requirements of SB 14 and helping them to get the identification required by SB 14 so that they may be allowed to vote.[1364]

973.    By way of example, at the Texas NAACP's last convention, the organization had to offer two workshops on the requirements of Senate Bill 14, rather than provide workshops on other issues, including education and veterans' issues.[1365] Yannis Banks, the Texas NAACP's sole staff person, has shifted his work from mostly administrative tasks to spending 80% of his time

---

[1361] Garcia Dep. 29:18-22, 41:2-12, 134:6-11, 157:20-159:1.
[1362] PL750 (National NAACP Mission Statement); Banks Dep. 19:20-20:14.
[1363] Banks Dep. 74:21-75:1, 75:20-25.
[1364] Trial Tr. 348:23-349:14 (Banks) (Day 5); Banks Dep. 88:12-16; Trial Tr. 268:17-269:4, 270:8-271:3, 271:15-272:14 (Lydia) (Day 1).
[1365] Banks Dep. 85:2-19.

on legislative tasks as a result of Senate Bill 14.  The Texas NAACP is not able to accomplish its core missions because of the staff must divert significant resources to addressing SB 14.[1366]

974.    Senate Bill 14 changed the activities of the Texas NAACP in other ways as well.  Instead of simply getting people to fill out voter registration cards, the Texas NAACP also has had to give voters information about Senate Bill 14.[1367]   The Texas NAACP has had to provide additional printed material about the changes to the law under Senate Bill 14, making the most extensive changes ever to its voter education materials. [1368]  The Texas NAACP also devotes more resources to helping constituents obtain the documents needed to vote because of Senate Bill 14.[1369]

975.    Outside of the diversion of resources to voter ID issues and redistricting, Mr. Banks could not recall a time during his employment with the Texas NAACP when the organization has had to divert resources to one matter to the detriment of another.[1370]

976.    The diversion of resources that has been necessary for the Texas NAACP to deal with Senate Bill 14 has been ongoing, continuous, and increasing from the date of enactment of Senate Bill 14 until the present day.[1371]

977.    Texas NAACP believes it is necessary to devote its time and resources toward voter registration activities in the wake of Senate Bill 14 is because there is a long and egregious

---

[1366] Lydia Dep. 78:24-79:11; Trial Tr. 348:10-352:13 (Banks) (Day 5); Trial Tr. 270:8-18 (Lydia) (Day 1).
[1367] Lydia Dep. 71:24-72:12; Trial Tr. 268:17-269:15, 271:20-272:14 (Lydia) (Day 1).
[1368] Lydia Dep. 74:6-17, 76:16-77; Trial Tr. 269:16-270:7 (Lydia) (Day 1).
[1369] Lydia Dep. 90:2-24; Trial Tr. 270:19-271:14 (Lydia) (Day 1).
[1370] Banks Dep. 88:5-9.
[1371] Trial Tr. 350:3-351:25 (Banks) (Day 5); Trial Tr. 271:11-23 (Lydia) (Day 1).

history of disenfranchisement of African Americans and other minorities in this country, and the right to vote has been especially hard fought by African Americans.[1372]

### 2. Mexican American Legislative Caucus of the Texas House of Representatives

978.    The core mission of MALC is to assist MALC members and their staffs in being prepared to be a voice for the Mexican-Americans of Texas.[1373]  As MALC members, legislators are able to speak with a unified voice on issues of import to the Mexican-American community, and also use the MALC staff to assist with researching and enacting legislation to advance policies consistent with MALC's mission.[1374]

979.    MALC as an organization has been harmed by SB 14 because from the time that it was introduced in the legislature, a significant amount of financial resources, staff time, and other resources have been diverted to educating the public "about its effects and to combat its implementation." [1375]  Because of this diversion of resources to voter education since the enactment of SB 14, MALC has been unable to pursue the civil and social justice policy goals and initiatives it previously identified as key issues for the Mexican-American community.[1376] Prior to SB 14, little if any of MALC's resources were devoted to voter education, but since the enactment of SB 14, MALC has experienced a "radical uptick" in the amount of "money, time, [and] staff" spent on voter education.[1377]

---

[1372] Lydia Dep. 133:12-134:1; Trial Tr. 272:15-273:3 (Lydia) (Day 1).
[1373] Golando Dep. 31:10-14, 35:22-36:13, 46:21-47:10; Trial Tr. 276:24-277:4 (Golando) (Day 1).
[1374] Trial Tr. 277:23-278:16 (Golando) (Day 1).
[1375] Trial Tr. 278:14-279:22, 280:7-24, 283:17-286:1 (Golando) (Day 1).
[1376] Golando Dep. 70:18-22, 56:2-57:2, 71:23-72:13; Trial Tr. 281:8-282:9, 284:1-286:6, 287:6-288:10 (Golando) (Day 1).
[1377] Golando Dep. 55:19-56:1; Trial Tr. 280:25-282:25 (Golando) (Day 1).

980.    Today, it is estimated that 75 percent of MALC's resources are spent on voter education and voting rights issues with its Executive Director Martin Golando now spending approximately 80 percent of his time on these issues.[1378]

981.    MALC's voter education efforts are directed at ensuring that MALC members are informed as to voting requirements so that they can inform their constituents of the law.[1379]  In addition to communicating with legislators directly about the state of voting and election law, MALC also issues an electronic newsletter each week, a central portion of which is devoted to voter ID requirements.[1380]  Approximately one-third of this newsletter is devoted to these issues, space that could be used to promote other issues significant to the Mexican-American community.[1381]

982.    As a result of SB 14, MALC has had to change and divert financial and staffing resources away from other issues.  For instance, MALC has been unable to play a more significant role in the issue of unaccompanied minors at the Texas border because of the diversion of resources to voter education issues as a result of SB 14.[1382]  As well, MALC has been forced to let go of at least one staffer because it could no longer afford to pay him an appropriate salary given the costs associated with voter education and litigating these issues.[1383]

---

[1378] Golando Dep. 70:23-71:9, 81:12-82:12; Trial Tr. 284:1-285:1 (Golando) (Day 1).
[1379] Golando Dep. 53:15-54:2; Trial Tr. 278:21-279:22, 280:7-24, 282:10-25 (Golando) (Day 1).
[1380] Trial Tr. 278:21-279:22 (Golando) (Day 1).
[1381] Golando Dep. 54:7-15, 79:17-80:16; Trial Tr. 284:1-286:1 (Golando) (Day 1).
[1382] Trial Tr. 284:1-285:1, 287:6-288:10 (Golando) (Day 1).
[1383] Golando Dep. 71:14-22, 83:4-22, 83:4-84:10; Trial Tr. 287:6-288:10 (Golando) (Day 1).

### E.     Ortiz Plaintiffs

#### 1.     Lenard Taylor

983.    Lenard Taylor is an African American United States citizen who votes.[1384]  He does not

have an SB 14 ID. [1385]   At DPS, Mr. Taylor was told that in order to get a DPS ID he would need

his voter registration card, social security card, and birth certificate, none of which he had at the

time (he has since paid $23 to get a birth certificate).[1386] At the Social Security office, Mr. Taylor

was told he needed a Texas State ID to get a social security card, which, of course, he did not

have.[1387]  Mr. Taylor currently lives in a nursing home in Alice, Texas. [1388]   In the past he has

been homeless. [1389]   His only source of income is social security. [1390]   Mr. Taylor relies upon

occasional local rides from others. [1391]   Mr. Taylor has never voted by mail and would rather vote

in person. [1392]

#### 2.     Lionel Estrada

984.    Lionel Estrada is a United States citizen who is registered to vote and has voted in

elections. [1393]  He is Mexican American and has neither an SB 14 ID nor a certified copy of his

birth certificate. [1394] Mr. Estrada wants a driver's license, but he cannot afford outstanding

surcharges. [1395] Mr. Estrada works odd jobs.[1396]  He doesn't have any savings and often his

---

[1384] Trial Tr. 146:15-16, 147:18-19 (Taylor) (Day 3); PL1001 (Voting records, L. Taylor).
[1385] Trial Tr. 147:22-150:7 (Taylor) (Day 3); PL1000 (Taylor Decl.); Taylor Dep. 17:17-18:20.
[1386] Trial Tr. 147:22-148:15, 149:15-150:7 (Taylor) (Day 3).
[1387] Trial Tr. 148:16-21 (Taylor) (Day 3).
[1388] Trial Tr. 146:17-18 (Taylor) (Day 3); Taylor Dep. 21:16-19.
[1389] PL1000 (Taylor Decl.).
[1390] PL1000 (Taylor Decl.); Taylor Dep. 20:19-23.
[1391] Trial Tr. 147:14-17 (Taylor) (Day 3).
[1392] Trial Tr. 150:13-19 (Taylor) (Day 3).
[1393] Trial Tr. 131:18-19 (Estrada) (Day 3); PL999 (Voting records, L. Estrada); Estrada Dep. 10:10-12, 11:12-15.
[1394] Trial Tr. 129:18-19, 132:3-133:24, 144:3-14 (Estrada) (Day 3).
[1395] Trial Tr. 134:3-136:16 (Estrada) (Day 3).

expenses exceed his income. [1397]  Mr. Estrada often walks to get places; when they are too far he

tries to get rides. [1398]  The closest DPS office is over 30 miles away from his home in Kenedy,

Texas. [1399]  Mr. Estrada is ineligible to vote by mail and is ineligible for a disability

exemption.[1400]

### 3.      Estela Garcia Espinoza

985.      Estela Garcia Espinoza is a United States citizen who votes regularly.[1401]  She is Mexican

American and does not have an SB 14 ID. [1402]  Her birth certificate states her maiden name and

contains errors. [1403]  Her voter registration has her married name. [1404]  Ms. Espinoza would need

to obtain a copy of her marriage certificate and have the date of birth on her birth certificate

amended to obtain an EIC.[1405]  Ms. Espinoza's only income is social security and she has no

savings.[1406] Ms. Espinoza relies on her daughter for rides.[1407] Ms. Espinoza lives alone in

Raymondville, Texas and the closest DPS office is over 20 miles away.[1408]  Ms. Espinoza has

---

[1396] Trial Tr. 130:21-131:10 (Estrada) (Day 3); PL998 (Decl. Estrada).
[1397] PL998 (Decl. Estrada).
[1398] Trial Tr. 133:25-134:2, 140:25-141:6 (Estrada) (Day 3); Estrada Dep. 16:25-17:19, 34:17-35:19.
[1399] Trial Tr. 134:16-21 (Estrada) (Day 3).
[1400] Trial Tr. 129:9-10 (Estrada) (Day 3).
[1401] Trial Tr. 165:23-25, 170:3-171:10 (Espinoza) (Day 6); PL996 (Birth certificate, Espinoza); PL997 (Voting records, Espinoza).
[1402] Trial Tr. 169:1-170:2, 172:15-25 (Espinoza) (Day 6); PL996 (Birth certificate, Espinoza).
[1403] Trial Tr. 166:3-18, 174:9-15 (Espinoza) (Day 6); PL996 (Birth certificate, Espinoza).
[1404] Trial Tr. 176:15-18 (Espinoza) (Day 6); PL997 (Voting records, Espinoza).
[1405] Trial Tr. 172:7-9, 309:12-25 (Espinoza) (Day 6); PL770 ¶42 (Jewell Report);
http://www.dps.texas.gov/DriverLicense/electionID.htm.
[1406] PL770 ¶47 and Exh. 4.2 (Jewell Report).
[1407] Trial Tr. 179:6-8 (Espinoza) (Day 6).
[1408] Trial Tr. 167:15-19, 173:5-7 (Espinoza) (Day 6); PL770 ¶ 43 (Jewell Report).

never voted by mail.[1409]  Ms. Espinoza cannot pay the costs required to obtain an SB14 ID

without making extreme and unreasonable financial sacrifices.[1410]

### 4.  **Eulalio Mendez**

986.    Eulalio Mendez is a United States citizen who has voted regularly since Texas abolished

the poll tax.[1411]  He is Mexican American and does not have an SB 14 ID nor a certified copy of

his birth certificate.[1412] Mr. Mendez lives in Sebastian, Texas and relies upon others for rides.

His family's only source of income is social security and it would be a substantial financial

burden for him to obtain SB 14 ID.[1413] Mr. Mendez has never voted by mail.[1414]

### 5.  **Margarito Lara**

987.    Margarito Lara is a United States citizen who has been voting since the Poll Tax in Texas

was $1.75.[1415] He regularly voted in person until SB 14 went into effect.[1416]  He has never voted

by mail.[1417]  He is Mexican American and does not have an SB 14 ID.[1418]  Mr. Lara was born in

1936 on a ranch in Willacy County, Texas and his birth was never registered, so he was never

issued a birth certificate.[1419]  To get ID to vote, Mr. Lara needs to apply for and obtain a delayed

birth certificate at considerable cost ($69).[1420]  He cannot do so without making extreme and

---

[1409] Trial Tr. 170:19-22 (Espinoza) (Day 6).
[1410] PL770 ¶¶ 42-49 and Exh. 4.1, 4.2, 4.3.
[1411] Trial Tr. 98:1-9, 99:21-100:21 (Mendez) (Day 2).
[1412] Trial Tr. 98:8-9, 101:8-10, 103:17-21 (Mendez) (Day 2).
[1413] Trial Tr. 105:20-108:4 (Mendez) (Day 2); PL992 (Mendez Decl.).
[1414] Trial Tr. 100:24-101:3 (Mendez) (Day 2).
[1415] Trial Tr. 219:20-22, 220:14-16 (Lara, Margarito) (Day 4).
[1416] Trial Tr. 220:14-22, 221:3-9 (Lara, Margarito) (Day 4); PL991 (Mr. Lara voting records).
[1417] Trial Tr. 220:19-25 (Lara, Margarito) (Day 4).
[1418] Trial Tr. 220:6-8, 221:3-222:21 (Lara, Margarito) (Day 4); Margarito Lara Dep. 46:20-22, 49:17-19, 76:1-13.
[1419] Trial Tr. 219:18-220:2 (Day 4); PL989 (Tex. Corresp. to Mr. Lara re. Application for Delayed Birth Certificate);
[1420] *Id.*

unreasonable financial sacrifices.[1421] Mr. Lara lives with his wife in Sebastian, Texas.  Their only source of income is social security.  They do not own a car.[1422]

### 6.   Maximina Lara

988.    Maximina Lara is a United States citizen who votes regularly and has never voted by mail.[1423]  She is Mexican American, and like her brother, Margarito Lara, her birth was never registered.[1424]  Ms. Lara has a driver license; however on it her name appears incorrectly as Maxine Martinez Lara.[1425]  Ms. Lara may be unable to vote under SB 14's substantially similar name provision as her name on her voter registration card is correct.[1426] She cannot correct her name on her driver license without a delayed birth certificate.[1427] Further, Ms. Lara will be unable to renew her driver license or obtain an EIC when her license expires in 2015 without a delayed birth certificate.[1428] Ms. Lara does not have the documents required to apply for a delayed birth certificate.[1429] Moreover, even if able to secure the required documents, Ms. Lara cannot pay to obtain a birth certificate due to her severely constrained budget.[1430]

---

[1421] Trial Tr. 224:17-225:9 (Lara, Margarito) (Day 4); PL990 (Margarito Lara Decl.).

[1422] Trial Tr. 219:12-17, 223:21-224:13, 224:17-225:9 (Lara, Margarito) (Day 4); PL990 (Margarito Lara Decl.).

[1423] Trial Tr. 235:18-20, 236:9-20 (Lara, Maximina) (Day 4).

[1424] Trial Tr. 236:1-2 (Lara, Maximina) (Day 4); PL985 (Tex. Corresp. to Ms. Lara re. Appl. for Delayed Birth Certificate).

[1425] PL1151 (Maximina Lara driver license); Trial Tr. 237:14-17 (Lara, Maximina) (Day 4).

[1426] PL1152 (Maximina Lara voter registration card).

[1427] PL770 ¶ 58.

[1428] Tex. Transp. Code 521.1425(c); Tex. Transp. Code 521.101(d-1); Tex. Transp. Code 522.052(i); PL1033 (Defs.' Responses to Pls. 2d Interrogs.) (Responses 1-2).

[1429] Trial Tr. 239:22-242:20 (Lara, Maximina) (Day 4); PL985 (Tex. Corresp. to Ms. Lara re. Appl. for Delayed Birth Certificate).

[1430] Trial Tr. 246:8-14 (Lara, Maximina) (Day 4); PL986 (Maximina Lara Decl.).

### 7.    La Union del Pueblo Entero (LUPE)

989.    La Union del Pueblo Entero, Inc. ("LUPE") is a non-profit, non-partisan 501(c)(3) organization,[1431] whose mission is to provide services[1432] and organize members to improve society[1433] by encouraging civic participation in part through voting and the voting process.[1434]

990.    LUPE was originally established in 1989 by Cesar Chavez and Dolores Huerta[1435] and expanded into Texas in 2003.[1436]

991.    LUPE operates five offices in Hidalgo County, Texas[1437] and has a staff of over 25 of organizers, service providers and other staff.  LUPE raises operating funds primarily from dues paid by its members of less than $280,000 annually.[1438]

992.    LUPE accomplishes its mission in part through its core activities of voter education, registration, and Get Out the Vote (GOTV) activities.[1439]  LUPE also assists members with English classes, health care and immigration issues, and income tax assistance.[1440]

993.    LUPE is a membership organization with over 7,000 paid members who are predominately Mexican-American[1441] with very low incomes.[1442]  Many reside in *colonias* in

---

[1431] Trial Tr. 165:14-15 (Cox) (Day 3).
[1432] Cox Dep. 27:8-28:5.
[1433] Trial Tr. 162:22-163:2 (Cox) (Day 3).
[1434] Trial Tr. 158:6-159:3 (Cox) (Day 3).
[1435] Cox Dep. 107:8-13.
[1436] Cox Dep. 17:18-18:13.
[1437] Cox Dep. 107:14-22, 91:18-21.
[1438] Cox Dep. 88:6-12.
[1439] Cox Dep. 46:7-47:4; 105:1-13; Trial Tr. 157:5-12, 158:11-159:3, 166:15-167:15 (Cox) (Day 3).
[1440] Cox Dep. 27:8-28:13.
[1441] Trial Tr. 165:19-166:9 (Cox) (Day 3).
[1442] Cox Dep. 92:4-16.

rural areas of the Rio Grande Valley.[1443]  It has monthly meetings that are attended by 100-800 members.[1444]

994.    LUPE learned through member and community meetings that members of LUPE and the community who are legally registered to vote in the state lack SB 14-required forms of identification.[1445]  LUPE learned that voters in the community would have difficulty obtaining the underlying documents to obtain the SB 14-required identification in part because of the cost[1446] and lack of transportation.[1447]

995.    The enactment of SB 14 caused LUPE to divert from one of its core activities of registering and engaging voters in the democratic process to educating its target constituents on photo ID requirements.[1448]  For example, rather than simply conducting voter registration activities and educational outreach, LUPE has conducted extensive voter education activities regarding SB 14, including handing out educational flyers and booklets and teaching members of LUPE and the community about the requirements of SB 14.[1449]

996.    LUPE has thus been unable to conduct all of its traditional services and functions and has instead needed to devote resources to ensuring that its existing base of already-registered voters is, in fact, able to vote under SB 14's requirements.[1450]

997.    LUPE has reprioritized its activities because of the enactment of SB 14 to lessen the discriminatory impact it will cause to its members and community who are minorities.[1451]

---

[1443] Trial Tr. 155:3-156:11 (Cox) (Day 3).
[1444] Cox Dep. 83:21-84:8.
[1445] Trial Tr. 168:25-169:16, 170:16-171:21 (Cox) (Day 3); Cox Dep. 142:6-143:1, 146:5-147:6, 149:12-19.
[1446] Trial Tr. 167:1-15 (Cox) (Day 3); Cox Dep. 114:22-115:14.
[1447] Cox Dep. 80:15-81:5; Trial Tr. 162:4-21 (Cox) (Day 3).
[1448] Cox Dep. 46:7-47:4, 108:24-109:13.
[1449] Trial Tr. 160:8-161:13 (Cox) (Day 3); Cox Dep. 102:14-103:23, 109:24-112:20.
[1450] Trial Tr. 167:16-22 (Cox) (Day 3); Cox Dep. 113:19-114:2.

998.    LUPE is aware of the history of discrimination against Mexican-Americans in LUPE's service area in the Rio Grande Valley and believes SB 14 is just another obstacle placed on its community to disenfranchise its members and community and prevent them from participating in the democratic process.[1452]

---

[1451] Trial Tr. 172:7-173:10 (Cox) (Day 3); Cox Dep. 46:7-47:4.
[1452] Trial Tr. 167:23-168:24 (Cox) (Day 3).

## PROPOSED CONCLUSIONS OF LAW

***Introduction***

The proposed conclusions of law are divided into eleven parts.

Part I identifies the statutory and constitutional violations alleged by plaintiffs and plaintiff-intervenors in their Complaints.

Part II concludes that the United States has a cause of action to enforce Section 2 of the Voting Rights Act, and that the private plaintiffs and plaintiff-intervenors have causes of action under Section 2 and the Constitution.

Part III concludes that the private plaintiffs have standing to sue, and that there is no preclusion as to the standing of the plaintiff-intervenors.

Part IV notes the decision in the Section 5 litigation regarding SB 14, *Texas v. Holder*.

Part V provides an overview of the Supreme Court's decision in *Crawford v. Marion County Election Board*.

Part VI sets forth the legal principles underlying the "results" claim under Section 2 of the Voting Rights Act, and applies the law to the facts to conclude that SB 14 has a prohibited discriminatory result in violation of Section 2.

Part VII sets forth the legal principles underlying the claims under Section 2 and the Constitution alleging discriminatory purpose, and applies the law to the facts to conclude that SB 14 was enacted, at least in part, with a discriminatory purpose, and therefore violates Section 2 and the Fourteenth and Fifteenth Amendments.

Part VIII sets forth the legal principles underlying the claim alleging that SB 14 unconstitutionally infringes on the right to vote, and applies the law to the facts to conclude that

SB 14 substantially and unjustifiably burdens the right to vote, in violation of the First and Fourteenth Amendments.

Part IX sets forth the legal principles underlying the claim alleging that SB 14 functions as a poll tax, and concludes that SB 14 is an unconstitutional poll tax in violation of the Fourteenth and Twenty-Fourth Amendments.

Part X responds to defendants' assertion that Section 2 of the Voting Rights Act is unconstitutional, as set forth in their proposed pre-trial Conclusions of Law filed on August 22, 2014 (ECF No. 504).

Part XI addresses the injunction that should be issued against the implementation of the voter identification requirements of SB 14.

***Note Regarding Citations to the Voting Rights Act of 1965***

On September 1, 2014, the Office of Law Revision Counsel of the U.S. House of Representatives implemented a reclassification of all U.S. Code provisions relating to voting and elections. http://uscode.house.gov/editorialreclassification/t52/index.html. These code provisions, including those for the Voting Rights Act of 1965 previously contained in Title 42, have been transferred into a new Title 52, entitled "Voting and Elections."

The Proposed Conclusions of Law cite to both sets of code sections, the old Title 42 sections and the new Title 52 sections. For the convenience of the Court, the following is a cross-reference table showing the old and new numbering for the provisions of the Voting Rights Act cited in the Proposed Conclusions of Law.

| Section of the Voting Rights Act | Old Classification | New Classification |
|---|---|---|
| 2 | 42 U.S.C. § 1973 | 52 U.S.C. § 10301 |
| 3 | 42 U.S.C. § 1973a | 52 U.S.C. § 10302 |

| Section of the Voting Rights Act | Old Classification | New Classification |
|---|---|---|
| 4 | 42 U.S.C. § 1973b | 52 U.S.C. § 10303 |
| 5 | 42 U.S.C. § 1973c | 52 U.S.C. § 10304 |
| 12 | 42 U.S.C. § 1973j | 52 U.S.C. § 10308 |
| 14 | 42 U.S.C. § 1973*l* | 52 U.S.C. § 10310 |

## I.   ALLEGED STATUTORY AND CONSTITUTIONAL VIOLATIONS

1.      These consolidated actions seek to invalidate and enjoin the voter identification requirements for in-person voting enacted by Texas in SB 14 (2011).[1453]  Plaintiffs and plaintiff-intervenors, together, allege four claims (although not all plaintiffs and intervenors assert all of these claims): (a) SB 14 discriminates against African-American and Hispanic citizens of Texas in violation of the results test of Section 2 of the Voting Rights Act ("Section 2"), 42 U.S.C. § 1973, 52 U.S.C. § 10301; (b) SB 14 was enacted, at least in part, for the purpose of denying or abridging the right to vote of African-American and Hispanic citizens of Texas, in violation of Section 2 and the Fourteenth and Fifteenth Amendments to the Constitution; (c) SB 14 substantially and unjustifiably burdens the right to vote, in violation of the First and Fourteenth Amendments to the Constitution; and (d) SB 14 is a poll tax, in violation of the Fourteenth and Twenty-Fourth Amendments to the Constitution.

2.      Plaintiffs in *Veasey v. Perry* ("Veasey Plaintiffs"), No. 2:13-cv-193, allege that SB 14: violates the results test of Section 2; discriminates on the basis of race and ethnic origin in violation of the Fourteenth and Fifteenth Amendments; severely burdens the right to vote in

---

[1453] SB 14 includes a few provisions that do not concern voter identification requirements for in-person voting.  Unless otherwise indicated, all references in these Conclusions of Law to SB 14 are to the voter identification requirements of that legislation.

277

violation of the First and Fourteenth Amendments; and is a poll tax in violation of the Fourteenth and Twenty-Fourth Amendments.  Second Amended Complaint, ECF No. 109 (the Complaint also includes other claims not pursued at trial).

3.      The United States, in *United States v. Texas*, No. 2:13-cv-263, alleges that SB 14 has a discriminatory result and a discriminatory purpose in violation of Section 2 of the Voting Rights Act, a statute that enforces the voting guarantees of the Fourteenth and Fifteenth Amendments. Complaint, No. 2:13-cv-263, ECF No. 1.

4.      Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark ("Texas League Intervenors") in *United States v. Texas*, No. 2:13-cv-263, allege that SB 14: violates the Section 2 results test; intentionally discriminates on the basis of race or color in violation of Section 2 and the Fourteenth and Fifteenth Amendments; and severely burdens the right to vote in violation of the Fourteenth Amendment.  Amended Complaint, ECF No. 73.

5.      Plaintiff-Intervenor Texas Association of Hispanic County Judges and County Commissioners ("HJ&C Intervenor") in *United States v. Texas*, No. 2:13-cv-263, alleges that SB 14: violates the Section 2 results test; intentionally discriminates on the basis of race or color in violation of Section 2 and the Fourteenth and Fifteenth Amendments; and severely burdens the right to vote in violation of the Fourteenth Amendment.  Amended Complaint, ECF No. 153.

6.      Plaintiffs in *Texas State Conference of NAACP Branches v. Berry*, No. 2:13-cv-291 (Texas NAACP Plaintiffs), allege that SB 14: violates the Section 2 results test; intentionally discriminates on the basis of race or color in violation of Section 2 and the Fourteenth and Fifteenth Amendments; and substantially burdens the right to vote in violation of the Fourteenth Amendment.  Complaint, No. 2:13-cv-291, ECF No. 1.

7.      Plaintiffs in *Ortiz v. Texas* (Ortiz Plaintiffs), No. 2:13-cv-348, allege that SB 14: violates the Section 2 results test; intentionally discriminates on the basis of race or color in violation of Section 2 and the Fourteenth and Fifteenth Amendments; and substantially burdens the right to vote in violation of the Fourteenth Amendment.  First Amended Complaint, No. 2:13-cv-348, ECF No. 4.[1454]

8.      Plaintiffs and Plaintiff-Intervenors seek an injunction against the voter identification provisions of SB 14.  They also seek an order providing for this Court to retain jurisdiction and subject Texas to a preclearance requirement pursuant to Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), 52 U.S.C. § 10302(c), and for an order authorizing the appointment of federal election observers pursuant to Section 3(a) of the Act, 42 U.S.C. § 1973a(a), 52 U.S.C. § 10302(a).

## II.   THE UNITED STATES HAS A CAUSE OF ACTION TO ENFORCE SECTION 2, AND PRIVATE PLAINTIFFS AND PLAINTIFF-INTERVENORS HAVE CAUSES OF ACTION TO ENFORCE SECTION 2 AND THE CONSTITUTION

9.      Under Section 12(d) of the Voting Rights Act, 42 U.S.C. § 1973j(d), 52 U.S.C. § 10308(d), the United States has a cause of action to enforce Section 2 of the Voting Rights Act.

10.     As this Court previously has concluded, Order at 12-15 (ECF No. 385), the private Plaintiffs and Plaintiff-Intervenors in this litigation also have a Section 2 cause of action, notwithstanding that the Voting Rights Act does not explicitly grant a cause of action to plaintiffs other than the United States.  *But see* 42 U.S.C. § 1973a(c), 52 U.S.C. § 10302(c) (suggesting that "aggrieved person[s]" generally are authorized to sue "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment").  Private plaintiffs,

---

[1454] The Ortiz Plaintiffs also alleged that SB 14 violates the Texas Constitution, a claim this Court dismissed as precluded by the Eleventh Amendment.  Order at 44-45 (ECF No. 385).

including individuals and organizations, have regularly filed suit to enforce Section 2 since the statute's enactment, and have an implied cause of action to enforce that statute. *See, e.g., LULAC v. Perry*, 548 U.S. 399 (2006); *Johnson v. De Grandy*, 512 U.S. 997 (1994); *Chisom v. Roemer*, 501 U.S. 380 (1991); *Thornburg v. Gingles*, 478 U.S. 30 (1986); *LULAC v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012); *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984); *see also Allen v. State Board of Elections*, 393 U.S. 544, 556-57 (1969) (holding that private plaintiffs have an implied cause of action to enforce Section 5 of the Voting Rights Act). There is no case authority for the proposition that private plaintiffs lack a cause of action under Section 2. Moreover, the Senate Report accompanying the 1982 amendments to Section 2, which the Supreme Court has characterized as an "authoritative source" for interpreting the Voting Rights Act, *Gingles*, 478 U.S. at 43 n.7, affirmed "the existence of the private right of action under Section 2, as has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 30 (1982).

11.     Private plaintiffs, including individuals and organizations, have regularly filed suit to enforce constitutional guarantees relating to voting, and thus, likewise, have an implied cause of action to enforce those guarantees. *See, e.g., Crawford v. Marion County Election Board*, 553 U.S. 181 (2008); *Rogers v. Lodge*, 458 U.S. 613 (1982); *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966). Accordingly, the private Plaintiffs and Plaintiff-Intervenors in this litigation have a constitutional cause of action as well.

## III.     <u>STANDING TO SUE</u>

12.     Article III of the Constitution limits the federal judiciary to hearing and deciding "cases" and "controversies." U.S. Const. Art. III, § 2. Central to the "case or controversy" requirement is the doctrine of standing. "To establish Article III standing, a plaintiff must show (1) an injury

in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks and brackets omitted); *accord Bennett v. Spahr*, 520 U.S. 154, 162 (1999); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

13.     In this Circuit, individuals and organizations who have intervened in compliance with Rule 24 of the Federal Rules of Civil Procedure are not required to demonstrate Article III standing. *Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) ("Article III does not require that intervenors possess standing").  As to the Texas League Intervenors and the HJ&C Intervenor, the Court reaffirms its prior ruling allowing intervention, and these parties, accordingly, need not establish standing; however, as set forth below, the Intervenors also have demonstrated the components of Article III standing.

14.     For Article III standing, an injury must be real and immediate, not abstract or conjectural. *Lujan*, 504 U.S. at 560-61.  On the other hand, there is no requirement that an injury be of any particular magnitude in order to be real and immediate. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973).

15.     Organizations or associations, such as those who are plaintiffs in this litigation, may satisfy the requirement of standing in several ways.  First, the entity may demonstrate an injury to the organization or association itself which was caused by defendant's conduct and which may be redressed by judicial relief (sometimes referred to as "organizational standing"). *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Second, an entity may sue on behalf of its members ("representational standing"). *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). *See also Ass'n of*

281

*Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356-57, 365 (5th Cir. 1999) ("*ACORN*")

(discussing these two bases for organizations to obtain standing).  In this litigation, as of trial, the

four organizational plaintiffs, LULAC, Texas NAACP, MALC, and LUPE, are asserting

organizational standing only.

16.     The injury necessary for organizational standing is present where an entity demonstrates

that it has expended (or will expend) resources to counteract or otherwise respond to the conduct

of the defendant that is challenged in the litigation (*i.e.*, the entity has expended resources in

addition to those expended by pursing the litigation itself).  *Havens Realty Corp.*, 455 U.S. at

379; *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164–66 (11th Cir.

2008); *Crawford v. Marion County Election Board*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553

U.S. 181, 189 n.7 (2008); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir.

2006); *ACORN*, 178 F.3d at 356.  These cases do not require that the entity's expenditure of

resources to counteract the defendant's conduct be of any particular size or amount.

17.     The organizational Plaintiffs in this litigation, including LULAC, Texas NAACP,

MALC, and LUPE, all have expended resources to respond to the new photo ID requirements

put in place by SB 14.  FF ¶¶ 944-47 (LULAC), 971-77 (Texas NAACP), 978-82 (MALC), 989-

98 (LUPE).  Therefore, these organizations have suffered the requisite Article III injury.  The

Texas League and HJ&C also have expended resources to respond to SB 14.  FF ¶¶ 960-69

(Texas League), 970 (HJ&C).  Because these resources have been expended in direct response to

SB 14, there is a sufficient causal connection between the organizations' injuries and SB 14, and

these injuries would be redressed should the Court rule in plaintiffs' favor and enjoin SB 14.

Accordingly, the Plaintiff organizations all possess Article III organizational standing, and the

Plaintiff-Intervenor organizations also satisfy the Article III components of standing.

18.     The individual Plaintiffs in this litigation likewise must establish that they have suffered an injury causally connected to SB 14 and that entry of an injunction against SB 14 would redress that injury in order to have standing.

19.     Citizens eligible to vote in Texas, who neither have the type of photo ID that SB 14 requires for in-person voting nor have obtained the SB 14 disability exemption, have an Article III injury caused by the Texas statute.  The possibility that such individuals might obtain an SB 14 ID or a disability exemption in the future does not vitiate the existence of an injury sufficient for purposes of standing since it is undisputed that individuals must engage in at least some effort to obtain an allowable ID or the disability exemption.  *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *see also Northeastern Fla. Chapter of Assoc. General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  Furthermore, it would be inconsistent with the substantive standards governing this litigation to conclude that individuals suffer an Article III injury only if SB 14 imposes an absolute bar to voting that individuals cannot overcome: both Section 2 and the Fifteenth Amendment, by their terms, prohibit both the discriminatory abridgement and denial of the right to vote; and the Fourteenth Amendment applies to a "debasement" of the ability to participate in the political process and not simply a denial of the right to vote.  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (Fourteenth Amendment); *see Rogers v. Lodge*, *supra* (same).

20.     The following individual Plaintiffs have standing because they lack SB 14 photo ID and do not possess a disability exemption, and thus are suffering an Article III injury caused by SB 14 that would be redressed by a favorable ruling: Gordon Benjamin, FF ¶¶ 883-89; Floyd Carrier, FF ¶¶ 931-36; Estela Garcia Espinoza, FF ¶ 985; Lionel Estrada, FF ¶ 984; Kenneth Gandy, FF ¶¶ 891-901; Margarito Lara, FF ¶ 987; Eulalio Mendez, FF ¶ 986; and Lenard

Taylor, FF ¶ 163, 439, 983.   In addition, Plaintiff-Intervenor Clark has suffered an injury caused by SB 14, FF ¶ 948-59, and satisfies all three Article III requirements.

21.      Another way in which Texas citizens may suffer an Article III injury caused by SB 14 is if they have a SB 14 photo ID but their name on their ID differs from their name recorded on the registration rolls.  Under SB 14, these individuals are allowed to cast an in-person ballot that will be counted only if election officials conclude that the two forms of the voter's name are "substantially similar," and that decision is, at least in part, discretionary.  In addition, if the names are determined to be "substantially similar," the voter must take additional steps to be allowed to cast a regular ballot.  These requirements cause a real, not hypothetical, Article III injury to affected voters.

22.      The following individual plaintiffs have standing because, while they possess SB 14 ID, their name on that ID and their name on the registration rolls differ, and this Article III injury caused by SB 14 would be redressed by a favorable ruling by this Court:  Evelyn Brickner, FF ¶¶ 923-25; Anna Burns, FF ¶¶ 902-03; Maximina Lara, FF ¶ 988; John Mellor-Crummey, FF ¶¶ 927-30; and Koby Ozias, FF ¶¶ 937-41.

23.      Because organizations or associations suffer an Article III injury when, in the context of political campaigns, they expend resources to counteract or otherwise respond to a defendant's challenged conduct, *Benkiser*, 459 F.3d at 586, individuals who are similarly situated with regard to an expenditure of resources likewise suffer an Article III injury caused by defendant's conduct.

24.      The following individual plaintiffs have standing because, in the context of political campaigns and related efforts, they have expended resources to respond to SB 14, and thus have suffered an Article III injury caused by SB 14 that would be redressed by a favorable ruling by

this Court:  Sergio DeLeon, FF ¶¶ 919-22; Jane Hamilton, FF ¶¶ 913-18; Michael Montez, FF ¶¶ 906-07; Oscar Ortiz, FF ¶¶ 942-43; Penny Pope, FF ¶ 904-05; and Marc Veasey, FF ¶¶ 908-12.

## IV.  **TEXAS V. HOLDER**

25.  In *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012) (three-judge court), *vacated and remanded*, 133 S. Ct. 2886 (2013), the U.S. District Court for the District of Columbia denied preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, 52 U.S.C. § 10304(c), to SB 14.  This decision was vacated by the Supreme Court following its decision in *Shelby County v. Holder*, 133 S. Ct.  2612 (2013), holding that Congress could no longer use the coverage formula contained in Section 4(b) of the Act, 42 U.S.C. § 1973a(b), 52 U.S.C. § 10303(b), to subject jurisdictions to the preclearance requirements of Section 5.  As a result of the *Shelby County* decision, Texas is no longer required to obtain preclearance for its voting changes, including SB 14.  On remand, *Texas v. Holder* was dismissed.

26.  *Texas v. Holder* denied preclearance on the ground that Texas had not carried its burden under Section 5 of demonstrating that SB 14 would not have a discriminatory effect on Texas citizens who are African American or Hispanic.  Under Section 5, a voting change violates the "effect" standard if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise" (*i.e.*, worsen the electoral opportunity of minority citizens).  *Beer v. United States*, 425 U.S. 130, 141 (1976).

27.  *Texas v. Holder* does not control the resolution of this case.  Most particularly, the Section 5 retrogression standard differs from the legal standards that govern the instant litigation, including the results test of Section 2 of the Voting Rights Act.  *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 477-80 (1997) (distinguishing Section 2 and Section 5).  In addition, Texas had the burden of proof in the prior case whereas those opposing SB 14 have the burden here.

28.     This Court's decision rests on its application of the law set forth below to the facts

adduced at trial.  It does not rest on the district court decision in *Texas v. Holder*.

## V.     IMPACT OF SUPREME COURT'S DECISION IN *CRAWFORD V. MARION COUNTY ELECTION BOARD*

29.     In *Crawford v. Marion County Election Board*, 553 U.S. 181, 189 (2008), the Supreme

Court rejected a claim that a photo identification law for in-person voting enacted by the State of

Indiana was invalid on its face.  Plaintiffs alleged that the law "substantially burdens the right to

vote in violation of the Fourteenth Amendment." *Id.* at 187.

30.     *Crawford* did not address whether the Indiana law violated the results test of Section 2 of

the Voting Rights Act, or whether it had been enacted with a discriminatory purpose in violation

of Section 2 and the Fourteenth and Fifteenth Amendments. *Id.* at 187-89.  Accordingly, the

Supreme Court's holding in *Crawford* does not bar the instant challenges to SB 14 based upon

the Section 2 results standard, or based upon the prohibition on laws enacted with a racially

discriminatory purpose contained in Section 2 and the Fourteenth and Fifteenth Amendments.

As set forth below, however, this Court concludes that certain aspects of Justice Stevens' lead

opinion in *Crawford* are relevant in conducting the results and purpose analyses.

31.     *Crawford* bears most heavily on the claim by private plaintiffs and plaintiff-intervenors

that SB 14 unconstitutionally infringes the right to vote in violation of the First and Fourteenth

Amendments.  This Court's application of *Crawford* to that claim is discussed below.

32.     SB 14, on its face, differs significantly from the Indiana photo ID law addressed by the

Supreme Court in *Crawford*, FF ¶ 27-30, and, as discussed *infra*, important aspects of SB 14's

impact on the right to vote of Texas citizens also relate to the particular implementation

procedures Texas is utilizing.  Accordingly, this is not a case where the challenged photo ID law

"is materially identical to Indiana's photo ID statute." *Frank v. Walker*, No. 14-2058, 2014 WL

4494153 (7th Cir. Sept. 12, 2014) (order staying injunction issued against Wisconsin photo ID statute).

## VI.   SB 14 VIOLATES THE RESULTS STANDARD OF SECTION 2 OF THE VOTING RIGHTS ACT

(claim asserted by all Plaintiffs and Plaintiff-Intervenors)

### A.   Overview of the Section 2 Results Standard

33.    Section 2(a) of the Voting Rights Act prohibits the use of any "voting qualification or prerequisite to voting or standard, practice, or procedure" that is "imposed or applied . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]." Section 14(c)(3) of the Voting Rights Act, 42 U.S.C. § 1973*l*(c)(3), 52 U.S.C. § 10310(c)(3), defines "language minority group" to include "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."

34.    Section 14(c)(1) of the Voting Rights Act, 42 U.S.C. 1973*l*(c)(1), 52 U.S.C. § 10310(c)(1), defines the terms "vote" and "voting" to include "all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, . . . casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast." *See also Allen*, 393 U.S.at 565-66 ("the [Voting Rights] Act gives a broad interpretation to the right to vote, recognizing that voting includes all action necessary to make a vote effective." (internal quotation marks omitted)).

35.    The voter identification requirements of SB 14 serve as a "prerequisite to voting" in person, and more generally are a "standard, practice, or procedure" with respect to voting, since they determine whether a ballot will be "included in the appropriate totals of votes cast."

36.     Section 2, accordingly, prohibits the implementation of the voter identification requirements of SB 14 if the evidence demonstrates that these requirements "result[] in a denial or abridgement of the right . . . to vote" of African-American or Hispanic citizens of Texas.

37.     The Section 2 results test is further defined in Section 2(b) of the Voting Rights Act. That subsection provides that a results violation:

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election . . . are not equally open to participation [by members of a racial or language minority group] in that [these individuals] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b), 52 U.S.C. § 10301(b).

38.     As the Supreme Court has explained, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the [electoral] opportunities enjoyed by [minority] and white voters . . .." *Gingles*, 478 U.S. at 47; *see also De Grandy*, 512 U.S. at 1013 (the overarching question in a Section 2 results analysis is whether the challenged practices denies minority voters "an equal measure of political and electoral opportunity").

39.     There is no requirement that plaintiffs prove intentional discrimination to establish a Section 2 results violation. *Gingles*, 478 U.S. at 35 ("Congress substantially revised § 2 [in 1982] to make clear that a violation could be proved by showing discriminatory effect alone and to establish as the relevant legal standard the 'results test'"); *id.* at 43-44 ("First and foremost, the [Senate] Report [for the 1982 amendment to Section 2] dispositively rejects the position of the plurality in *Mobile v. Bolden,* 446 U.S. 55 (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters.") (footnote omitted); *accord Chisom*, 501 U.S. at 404.

288

40.     The "totality of the circumstances" analysis required by the Section 2 results standard "depends upon a searching practical evaluation of the 'past and present reality,' [citation omitted] and on a 'functional' view of the political process."  *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417 at 30).  In conducting this analysis, a court "must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'"  *Id.* at 44 (quoting S. Rep. No. 97-417 at 27).

41.     Accordingly, SB 14 results in a denial or abridgement of the right to vote on account of race, color, or membership in a language minority group, in violation of Section 2, if the statute's voter identification provisions interact with the totality of the political, social, and historical conditions in Texas (examined functionally and objectively) to result in African Americans and/or Hispanics in Texas having less opportunity than Anglo citizens to cast an in-person ballot that will be counted.

42.     Because Section 2 focuses on equality of electoral opportunity, and prohibits the use of any law or practice that either denies or abridges the right to vote in a discriminatory manner, plaintiffs need not demonstrate that the voter identification requirements of SB 14, on their face or as applied, establish an absolute bar to voting for any segment of the African-American or Hispanic citizen population.  Put differently, evidence that SB 14 results in African Americans or Hispanics having less opportunity than other members of the electorate to cast in-person ballots may not be rebutted under Section 2 by positing that this unequal opportunity may be overcome if individuals devote sufficient resources to the task or by positing that the unequal opportunity is somehow a product of individual "choice."  *See Teague v. Attala County,* 92 F. 3d 283, 293-95 (5th Cir. 1996); *United States v. Marengo County*, 731 F.2d 1546, 1568-69 (11th Cir. 1984); *Kirksey v. Bd. of Supervisors*, 54 F.2d 139, 145, 150 (5th Cir. 1977) (en banc), *cert. denied*, 434

289

U.S. 968 (1977); *Major v. Treen*, 574 F. Supp. 325, 351 n. 31 (E.D. La. 1983) (three-judge court).

43.     In *Miss. State Chapter, Operation PUSH v. Mabus*, 932 F.2d 400 (5th Cir. 1991) – the Fifth Circuit case most analogous to the instant litigation – the court held that a Mississippi restriction on voter registration violated the Section 2 results standard notwithstanding that the challenged law did not absolutely bar any citizen from registering to vote, and notwithstanding that it was possible, with a sufficient expenditure of effort, for citizens to overcome the obstacles to registration that the restriction imposed.

44.     "The [1982] Senate Report specifies factors which typically may be relevant to a § 2 claim." *Gingles*, 478 U.S. at 45.  These include:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of  the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

> 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

> 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

> 6. whether political campaigns have been characterized by overt or subtle racial appeals;

> 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs'

evidence to establish a violation are:

> 1. whether there is a significant lack of responsiveness on the part of elected
> officials to the particularized needs of the members of the minority group[;]
>
> 2. whether the policy underlying the state or political subdivision's use of such
> voting qualification, prerequisite to voting, or standard, practice or procedure is
> tenuous.

*Id.* at 36-37 (quoting S. Rep. 97-417 at 28-29).

45.     Another potential factor identified by the Supreme Court is whether, "in spite of

continuing discrimination and racial bloc voting," the challenged electoral practice offers

minority voters an electoral opportunity "roughly proportional to [their] respective shares in the

voting-age population." *De Grandy*, 512 U.S. at 1000.  This factor "does not, however, act as a

'safe harbor' for States in complying with § 2."  *LULAC v. Perry*, 548 U.S. at 436.

46.     The results test is to be applied in a "flexible, fact intensive" manner. *Gingles*, 478 U.S.

at 46.  The Senate Report's "list of typical factors is neither comprehensive nor exclusive. . . .

Furthermore, . . . 'there is no requirement that any particular number of factors be proved, or that

a majority of them point one way or the other.'" *Id.* at 45 (quoting S. Rep. 97-417 at 29).

47.     Section 2 is comprehensive in that it "prohibits all forms of voting discrimination." *Id.* at

45 n.10.  Generally speaking, voting discrimination takes two forms.  First, it can involve

restrictions on citizens' access to registration or the ballot box.  This form of voting

discrimination is sometimes broadly referred to as "vote denial" restrictions, although many such

challenged practices do not categorically deny minority citizens the right to vote but, instead,

impose obstacles to voting that disproportionately affect minority voters and deny minority

voters an equal electoral opportunity in the totality of the circumstances. *E.g.*, *Operation PUSH*,

*supra*.  Second, even where minority voters can register, cast a ballot, and have that ballot counted in a nondiscriminatory manner, "vote dilution" occurs where a practice such as at-large elections, multi-member districts, or a gerrymandered redistricting plan denies minority voters an equal opportunity to elect their candidates of choice.  *E.g.*, *LULAC v. Perry*, *supra*; *Johnson v. De Grandy*, *supra*; *Chisom v. Roemer*, *supra*; *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987); *Fabela* v. *City of Farmers Branch*, No. 3:10-cv-1425, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012).  The instant litigation involves a "vote denial" claim.

48.     The analytic framework for assessing Section 2 claims depends, in part, on the type of claim that is being advanced.  In vote dilution litigation, it is well established that the Section 2 results analysis is performed in two steps.  First, a court applies the three preconditions established by the Supreme Court in *Gingles*:  whether the minority population is "sufficiently large and geographically compact to constitute a majority in a single-member district"; whether the minority population is "politically cohesive"; and whether the "white majority votes sufficiently as a bloc to enable it . . .  to defeat the minority's preferred candidate."  478 U.S. at 50-51.  Second, if these preconditions are met, the reviewing court proceeds to consideration of other Section 2 factors to enable it to make the ultimate, "totality of the circumstances" determination of whether the challenged law or practice denies minority voters an equal electoral opportunity.  *See generally LULAC v. Perry*, 548 U.S. at 425-26.  In this regard, the Section 2 factors enumerated in the Senate Report are "particularly [pertinent] to vote dilution claims." *Gingles*, 478 U.S. at 45.  As noted, however, this is not a vote dilution case.

49.     Where litigation, instead, challenges a limitation on casting a ballot, a two-step analysis also should be followed.  The first step involves determining whether the limitation bears more heavily on minority citizens than white citizens.  This step can be satisfied, for example, by a

statistical analysis showing that the limitation has a disparate impact on minority citizens.  *See*

*Operation PUSH*, 932 F.2d at 413 ("It . . . was appropriate for the court to consider evidence of

statewide [voter registration] disparity to determine if Mississippi's [registration] procedures

violated § 2.").   If a disparate impact is established, the reviewing court proceeds to the second

step, assessing the "totality of the circumstances" relevant to the challenged practice.  The

Section 2 factors enumerated in the Senate Report that are particularly pertinent to "vote denial"

claims include: (a) any history of official discrimination touching the right of minority citizens to

register, to vote, or otherwise to participate in the democratic process (the first Senate Report

factor); (b) the extent of racially polarized voting (the second Senate Report factor); and (c) the

extent to which socioeconomic disparities hinder minority citizens' ability to participate

effectively in the political process (the fifth Senate Report factor).  *Gonzalez v. Arizona*, 677 F.

3d 383, 405-06 (9th Cir. 2012) (en banc), *aff'd on other grounds*, *Arizona v. Inter Tribal Council*

*of Arizona* , 133 S. Ct. 2247 (2013).  Whether the policy underlying the challenged practice is

tenuous (the ninth Senate Report factor) also is particularly important.  *See Ortiz v. City of*

*Philadelphia Office of the City Commissioners*, 28 F.3d 306, 312-313, 316 (3rd Cir. 1994).

Furthermore, the presence or absence of a proportional electoral opportunity for minority citizens

also must be taken into account.

50.     Proof that a ballot access restriction has a disparate impact on minority voters, without

more, does not establish a Section 2 results violation.  *See Gonzalez*, 677 F.3d at 406-07 &

nn.33-34 (Arizona voter identification law did not violate Section 2 where Hispanic voters were

not shown to disproportionately lack ID and plaintiffs "failed to explain how [the ID]

requirements interact with the social and historical climate of discrimination to impact Hispanic

voting."); *Ortiz*, 28 F.3d at 312-317 (Pennsylvania's voter-registration purge statute did not

violate Section 2 because, notwithstanding a statistical disparity between minorities and whites who were purged, plaintiffs failed to demonstrate that, in the totality of the circumstances, this disparity resulted in an unequal electoral opportunity).  Rather, Section 2 is violated when, under the totality of the circumstances, minority citizens are denied an equal opportunity to participate in the political process.

51.     Thus, to resolve whether SB 14 violates the Section 2 results test, this Court will: (a) review the evidence to determine whether SB 14 has a disparate impact on African-American and/or Hispanic citizens of Texas; and (b) if a disparate impact is shown, will proceed to a review of the totality of relevant electoral circumstances in Texas.

52.     Proof that SB 14's voter identification provisions result in minority voters having less opportunity to cast in-person ballots that will be counted also establishes that SB 14 denies minority voters' an equal opportunity to elect their preferred candidates.  *See Chisom v. Roemer,* 501 U.S. at 397 ("Any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election.").

53.     Section 2 requires a causal connection between SB 14 and the asserted injury, *i.e.*, a lack of equal electoral opportunity.  As stated above, "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to *cause* an inequality in the [electoral] opportunities enjoyed by [minority] and white voters . . . ." *Gingles*, 478 U.S. at 47 (emphasis added).  There is no requirement, however, that plaintiffs show that SB 14 caused the relevant social and historical conditions in Texas or that those conditions caused the passage of SB 14.  *See*, *e.g.*, *LULAC v. Perry*, 548 U.S. at 425-42 (affirming that Texas's congressional redistricting plan violated the Section 2 results test without any finding that the

plan caused the relevant social and historical conditions in Texas, or that those conditions caused the enactment of the plan).

54.     Defendants wrongly assert that a law which, on its face, is race neutral may violate the Section 2 results standard only if it is shown that the law is being enforced in a racially selective manner.  Defendants' Proposed FOF/COL ¶ 183 (ECF No. 504).  This is wholly inconsistent with the entire body of Section 2 caselaw.  For example, the Fifth Circuit affirmed that Mississippi's restriction on voter registration violated the results standard, notwithstanding that the law was neutral on its face and there was no evidence of selective enforcement.  *Operation PUSH*, *supra*.  Likewise, the Supreme Court has held that particular redistricting plans violated the results standard, although the plans were facially neutral and were not being selectively enforced.  *LULAC v. Perry*, *supra*; *Thornburg v. Gingles*, *supra*.

### B.     SB 14 Has a Discriminatory Result in Violation of Section 2

55.     Having carefully considered the evidence presented by plaintiffs and plaintiff-intervenors, and the evidence presented by defendants Texas and Texas state officials, the Court concludes that the voter identification requirements of SB 14 "interact[] with [the totality of] social and historical conditions [in Texas] to cause an inequality in the [electoral] opportunities enjoyed by [African-American and Hispanic voters] and white voters."  *Gingles*, 478 U.S. at 47. Thus, SB 14 "results in a denial or abridgement of the right of [African-American and Hispanic citizens] to vote on account of race or color, or [membership in a language minority group]," in violation of Section 2 of the Voting Rights Act.

56.     As set forth above, the analysis proceeds in two steps: first, the Court will determine whether SB 14 bears more heavily on minority than Anglo citizens; and second, the Court will

determine whether, in the totality of the circumstances, SB 14 denies minority citizens an equal electoral opportunity.

### 1. SB 14 bears more heavily on African Americans and Hispanics in Texas than on Anglos

57. Based upon the facts adduced at trial, the Court concludes that SB 14 bears more heavily on both African-American and Hispanic citizens than on Anglo citizens in Texas.

58. The Court will address three issues in assessing whether SB 14 disproportionately burdens the right to vote of African Americans and Hispanics: (a) whether the percentages of African Americans and/or Hispanics who lack SB 14 ID are greater than the percentage of Anglos who lack that ID; (b) whether SB 14 includes a safe harbor provision, *i.e.*, a provision that allows citizens without ID nonetheless to cast an in-person ballot that will be counted, without new attendant burdens; and (c) the nature and extent of burdens SB 14 directly or indirectly imposes on citizens lacking SB 14 ID to obtain that ID, and whether SB 14 functions to impose greater burdens on African Americans and/or Hispanics than Anglos.

59. These three issues are interrelated. Together they establish that SB 14 weighs more heavily on minority voters only if one or both of the following sets of circumstances is shown:

- a greater percentage of African Americans and/or Hispanics lack SB 14 ID than Anglos, *provided* that this disparity is not nullified by a safe harbor provision, a burden-free process to obtain SB 14 ID, or the existence of burdens to obtain SB 14 ID that disproportionately disadvantage Anglos; or

- African Americans and/or Hispanics are disproportionately burdened by the process required to obtain SB 14 ID, *provided* that this disparity is not nullified by a safe harbor provision, or the existence of ID possession rates that disproportionately disadvantage Anglos.

*See South Carolina v. United States*, 898 F. Supp. 2d 30, 40 (D.D.C. 2012) (three-judge court) (in case decided under Section 5 of the Voting Rights Act, held that South Carolina photo ID law did not have a retrogressive effect, although minority registered voters disproportionately lacked the required ID, because the state's "sweeping" safe harbor provision allowed citizens to vote in person without photo ID); *Texas v. Holder*, 888 F. Supp. 2d at 138, 143-44 (three-judge court) (in Section 5 case, held that SB 14 differentially burdened minority voters because, while the evidence did not establish that minority registered voters were less likely to possess the required ID, minority citizens without photo ID faced significantly greater burdens to obtain ID).

### a.   African Americans and Hispanics lack SB 14 photo ID at significantly higher rates than Anglos

60.   The evidence demonstrates that African-American and Hispanic citizens in Texas, and African-American and Hispanic registered voters in Texas, lack SB 14 photo ID at rates significantly higher than the rate at which Anglos in Texas lack such ID.

61.   The statistical analyses based on matching the TEAM voter registration database to databases for the various forms of SB 14 ID demonstrate that African-American and Hispanic registered voters lack SB 14 ID at substantially higher rates than Anglo registered voters.

a.   The matching analysis indicates that of the approximately 13.5 million registered voters in Texas (as of January 2014), 608,470, or 4.5 percent, lack acceptable SB 14 ID.  FF ¶ 42,56.

b.   Dr. Ansolabehere's analysis of the racial/ethnic composition of the no-match list of 608,470 registered voters, using the well-accepted statistical technique of ecological regression, estimates that 2.0 percent of Anglo registered voters, 8.1 percent of African-American registered voters, and 5.9 percent of Hispanic registered voters lack SB 14 ID.  FF ¶¶ 58-60.  Stated differently,

297

African-American registered voters are 305 percent more likely than Anglo registered voters to not possess SB 14 ID, and Hispanic registered voters are 195 percent more likely than Anglo registered voters to not possess SB 14 ID.  FF ¶ 61.

c.      Dr. Ansolabehere's alternative analysis of the race/ethnicity of the no-match list of 608,470 registered voters, using the racial/ethnic identifications compiled by Catalist LLC, estimates that 3.6 percent of Anglo registered voters, 7.5 percent of African-American registered voters, and 5.7 percent of Hispanic registered voters lack SB 14 ID.  FF ¶ 66-72.  Stated differently, the analysis using the Catalist race/ethnicity identifications shows that African-American registered voters are 108 percent more likely to lack SB 14 ID than Anglo registered voters, and Hispanic registered voters are 58 percent more likely to lack SB 14 ID than Anglo registered voters.  FF ¶ 73.  Furthermore, these disparities become larger when the analysis is limited to the subset of registered voters on the no-match list for whom Catalist reports its highest level of confidence with regard to race/ethnicity identifications.  FF ¶ 75.

d.      Dr. Ansolabehere's analysis of persons designated in TEAM as having a Spanish surname shows that these individuals are 41 percent more likely to lack SB 14 ID than registered voters who do not have a Spanish surname.  FF ¶ 78-79. This understates the disparity between Hispanic and Anglo registered voters since voters without a Spanish surname include African Americans who, all the evidence indicates, lack SB 14 ID to a substantially greater extent than Anglos.

e.      Dr. Ansolabehere confirmed the existence of substantial racial/ethnic

disparities in the possession rates of SB 14 ID by conducting sensitivity analyses

to ensure that potentially out-of-date or invalid voter registration entries in the

State's TEAM database were not causing the racial disparities observed.  These

analyses involved: (i) excluding from the no-match list persons identified by

Catalist as deceased, "deadwood," or having an address-change application on file

with the U.S. Postal Service; (ii) excluding from the no-match list persons

identified as "Suspense" registered voters by TEAM; (iii) excluding from the no-

match list persons matched as having a DPS ID more than 60-days old (this ID

does not qualify as SB 14 ID, but the expired status could indicate that the person

has moved or is deceased although, on the other hand, it simply may indicate that

the person no longer needs or desires to have that ID); and (iv) excluding all of

the previous three categories of persons from the no-match list.  In each of these

analyses, the percentages of African Americans and Hispanics lacking SB 14 ID

continue to be substantially higher than the Anglo percentage without ID.  FF ¶¶

81-85.

f.      In each of the analyses summarized above, the disparities between

African-American registered voters and Anglo registered voters, and between

Hispanic registered voters and Anglo registered voters, are statistically significant

and thus are highly unlikely to have arisen by chance.  FF ¶¶ 85-86.

g.      The existence of substantial disparities in ID possession between minority

and Anglo registered was confirmed by analyses of the no-match list performed

by Dr. Herron, Dr. Bazelon, and Dr. Webster.  These studies yielded slightly

different racial and ethnic estimates than the estimates obtained by Dr.

Ansolabehere, but the overall pattern of ID possession by race/ethnicity was the

same.  FF ¶¶ 89-90, 97-121.

62.     The telephone survey of persons eligible to vote in Texas, conducted by Dr. Barreto and

Dr. Sanchez, likewise indicates that African-American and Hispanic citizens in Texas lack SB 14

ID to a substantially greater extent than Anglo citizens.

>       a.     The survey estimates that 7.2 percent of Texas's voting age citizens, or
>       approximately 1.2 million eligible voters, do not possess SB 14 ID.  FF ¶ 97.
>
>       b.     According to the survey, there is a statistically significant difference in ID
>       possession rates between minority and Anglo citizens.  The survey estimates that
>       4.7 percent of Anglo voting-age citizens, 8.4 percent African-American voting-
>       age citizens, and 11.4 percent of Hispanic voting-age citizens lack SB 14 ID.  In
>       other words, African-American voting age citizens are 178 percent more likely to
>       lack SB 14 ID compared to Anglo voting age citizens of Anglos), and Hispanic
>       voting age citizens are 242 percent more likely to lack SB 14 ID compared to
>       Anglo voting age citizens  FF ¶ 98-101.

63.     Although, as discussed *infra*, there is a strong relationship between poverty and the

burdens involved in obtaining photo ID, the disparities in ID possession rates found by the

statistical analyses of the no-match list and by the survey of Texas citizens were not predicated

on, and thus are independent of, any relationship between ID possession rates and poverty.

Moreover, the survey found that the relationship between possession rates and poverty is

imperfect since, according to the survey results, African Americans in poverty and Hispanics in

poverty are substantially more likely than Anglos in poverty to lack SB 14 ID, and that these disparities are statistically significant.  FF ¶ 358.

64.    Defendants did not offer any study regarding the number of citizens or registered voters in Texas who lack SB 14 ID, or the percentages of Anglos, African Americans, and Hispanics who lack SB 14 ID.  The criticisms offered by defendants' experts of the statistical analyses conducted by plaintiffs' experts were lacking in substance and, in certain instances, were based on analyses containing significant errors.  FF ¶¶ 824-843, 865-867, 871-882.  Likewise, defendants' analysis of the Catalist race/ethnicity identifications using race/ethnicity data from DPS was flawed and did not undermine Dr. Ansolabehere's Catalist-based analysis.  FF ¶ 76-77.

65.    The testimony regarding the work of two social service organizations (one in Dallas and other in San Antonio) that assist individuals to obtain photo identification is consistent with the statistical analyses in that the testimony indicated that there are a large number of low-income Texas residents who lack photo ID, who are disproportionately minority.  FF ¶ 35, 160-61, 167, 207, 256, 312.

66.    In sum, multiple studies conducted using a variety of statistical techniques, as well as testimony regarding the actual experience of organizations that assist persons to obtain photo ID, demonstrate that that African Americans and Hispanics in Texas are substantially less likely than Anglos to possess SB 14 ID.

**b.    SB 14 does not provide for a safe-harbor for voters who lack SB 14 ID**

67.    SB 14 does not include a safe harbor that allows in-person voters a reasonable opportunity to cast a ballot that will counted if the individual appears to vote without SB 14 ID.

68.    SB 14's disability exemption is available to a limited number of individuals, has been rarely used, is burdensome to apply for, and has not been publicized.  FF ¶¶ 122-37.  Moreover,

the population of voters who neither have SB 14 ID or nor are eligible to apply for this exemption remains disproportionately minority, at statistically significant rates.  FF ¶ 137.

69.    No evidence indicates that SB 14's religious exception or "natural disaster" exception has any general application to individuals without SB 14 ID, and defendants did not so assert at trial. FF ¶ 118.

70.    The opportunity for in-person voters without SB 14 ID to cast a provisional ballot does not serve as a safe harbor.  In-person provisional voters without SB 14 ID must present that ID to election officials within six days after the election, *i.e.*, they must gather or obtain the underlying documentation required for an SB 14 ID, travel to the appropriate state or federal office to apply for and obtain the ID, and then travel to the registrar's office to present the new ID, all no later than the sixth day after the election.  The actions necessary to obtain SB 14 ID, in and of themselves, present a varied and substantial set of obstacles for individuals without ID, FF ¶¶ 365-79, and few such individuals will be able to carry them out within the short window of time allowed after casting a provisional ballot.

71.    The opportunity for some voters without SB 14 ID to vote absentee by mail, and thus avoid the SB 14 photo ID requirement, does not serve as a safe harbor.

      a.    Absentee voting by mail is available only to a subset of registered voters in Texas.  Tex. Elec. Code §§ 82.001-.004.  Voters age 65 or older may vote by mail, but Texas residents age 65 or older are disproportionately Anglo, FF ¶ 142, and excluding such individuals from the no-match list of registered voters does not obviate the existence of statistically significant racial/ethnic disparities in ID possession rates.  FF ¶ 144.  Overall, the registered voters in recent elections in

302

Texas who have voted by mail are disproportionately Anglo, and this disparity also is statistically significant.  FF ¶ 143.

b.      The requirements associated with applying for and voting by mail in Texas, FF ¶¶ 13-14 demonstrate that voting by mail is not, for many voters, equivalent to voting in person.  *See NAACP v. Husted*, No. 2:14-cv-404, 2014 WL 4377869, at *33 (S.D. Ohio Sept. 4, 2014).   Further, many voters – and in particular, many minority voters – prefer to vote in the traditional manner, in person, rather than voting absentee by mail.  FF ¶ 141.

c.      As a legal matter, this Court is unaware of any precedent for the proposition that a State may redirect a subset of its population from voting in person to voting by mail while continuing to maintain in-person voting as the primary means for casting a ballot in elections.

### c.      Voters without SB 14 ID face significant burdens in obtaining that ID, and these burdens disproportionately affect African Americans and Hispanics.

72.      The evidence demonstrates that the process for citizens to obtain SB 14 ID involves numerous burdens.  These include fees, documentation requirements, eligibility limitations, limited business hours to apply for ID, a lack of voter education and outreach, travel burdens, and potential loss of income due to in-person application requirements.  These burdens have been demonstrated in a variety of ways, through Census data, the testimony of expert witnesses and affected voters, and documents and testimony from state agencies.

73.      The evidence further demonstrates that the burdens involved in obtaining SB 14 ID bear more heavily on African Americans and Hispanics than on Anglos.

74.     All forms of SB 14 ID, with the exception of the Election Identification Certificate ("EIC") and military ID, require the payment of application, renewal, and replacement fees.  FF ¶¶ 172-80, 344-56.

75.     Functionally, obtaining an EIC is not "free" for many Texas citizens who lack a SB 14 ID.  For those citizens without SB 14 ID who do not have a Texas driver's license or state ID card that has been expired for less than two years, DPS requires that EIC applicants submit "secondary identification," which, for most citizens, means an original or certified copy of their birth certificate.  FF ¶¶ 254, 258-59.

> a.     For Texas citizens who were never issued a birth certificate or who no longer possess their birth certificate, obtaining one requires payment of a fee and also requires citizens to navigate a complex set of bureaucratic rules and obstacles (including rules concerning the presentation of underlying documents and limitations concerning the birth certificates available from a given registrar).  FF ¶¶ 259-60.

> b.     The cheapest form of a birth certificate, the newly created "Election Identification Birth Certificate," still requires the payment of a fee, and (unlike the regular birth certificate) requires the EIC applicant to apply in person and to establish identity personally, rather than relying on identifying documents held by a close relative.  FF ¶¶ 292-95.  Moreover, the Election Identification Birth Certificate may not be used for any purpose other than applying for an EIC (which serves to discourage individuals from taking the several steps involved in applying for it), and the Texas Department of State Health Services has taken no

steps to publicize the existence of the EIC Birth Certificate.  FF ¶¶ 296-300.  Very

few EIC Birth Certificates have been issued.  FF ¶ 286.

c.      Texas citizens without a birth certificate who were born in another State

likewise must pay a fee and navigate through that State's application

requirements.  FF ¶ 264-65.

d.      Finally, DPS imposes the additional requirement that, if the EIC

applicant's name on the birth certificate differs from the name on the "supporting

identification" and the name to be placed on the EIC, the applicant also must

submit documents that link the names together, which may require that the

individual obtain other documentation that involves a fee and a bureaucratic

process.  FF ¶ 271.

76.      DPS requires submission of numerous documents unrelated to confirming a person's

identity to obtain a driver's license, state ID card, or concealed handgun license.  FF ¶¶ 171, 175,

194.  In addition, citizens must submit documentary proof of citizenship to obtain these forms of

ID or an EIC.  FF ¶¶ 176, 266, 308. These requirements create additional obstacles to obtaining

an ID.

77.      The complexities and difficulties involved in obtaining a state-issued photo ID in Texas,

particularly for poor individuals, were further demonstrated by the fact that social service

agencies in the State devote significant resources to assisting such individuals to obtain photo ID,

and have the resources to assist only a portion of the population requesting services.  FF ¶ 35,

159-61.

78.      The limited availability of locations where Texas issues SB 14 ID pose obstacles for

persons seeking the ID needed to vote in person.  Driver's licenses, state personal ID cards,

concealed handgun licenses, and EICs may be obtained only through DPS, with the exception

that EICs may be obtained at a limited number of county and mobile locations pursuant to

memoranda of understanding entered into by DPS. FF ¶¶ 171-72, 200-01, 205, 217-22. Citizens

must appear in person to apply for an EIC, FF ¶ 200, as must first-time applicants for a driver's

license or personal identification card and certain renewal applicants. FF ¶¶ 171-72. There are a

limited number of DPS and county offices and their hours of operation are limited. Wait times at

DPS offices also are a problem. FF ¶¶ 181-93. In addition, DPS has made little effort to

publicize the EIC program and or engage in outreach, and little is done to publicize or engage in

outreach for county and mobile EIC locations. FF ¶¶ 230. As a result, there is little knowledge

about EICs among those Texas citizens who lack SB 14 ID. FF ¶¶ 207.

79.    DPS views itself to be a law enforcement agency, and that approach has contributed to

the lack of effectiveness of the EIC program. DPS treats EIC issuance as another aspect of its

law enforcement mission rather than as part of the democratic process of self-governance. The

documentation requirements to obtain an EIC were designed to mirror the requirements to obtain

a driver's license or state identification card, and are not based on any analysis of what is

appropriate for purposes of demonstrating identity for voting. FF ¶¶ 321-22. DPS also has

known of an incorrect public perception that warrant checks are run on EIC applicants, and did

nothing to counteract that perception until, on the last day of trial – after this issue was raised –

DPS belatedly posted on its website a notice that warrant checks will not be conducted on EIC

applicants. FF ¶¶ 316-17; ECF No. 587. Law enforcement officers are present at DPS offices,

even when an office opens on a weekend only to accept EIC applications, which may be

intimidating to some voters. FF ¶¶ 315, 317, 327-28. Although the Secretary of State is Texas's

chief election official, the Secretary of State has no authority over DPS's implementation of the

EIC program.  FF ¶ 329-31.  DPS's inability to implement the EIC program as something other than a law enforcement program is vividly illustrated by DPS's decision to include in the EIC regulations a requirement that EIC applicants be fingerprinted, a requirement that Defendants have made no effort to justify as being in any way related to voting; although DPS no longer enforces this requirement, it has not removed it from the EIC regulations.  FF ¶¶ 318-20. Finally, as shown by emails sent by a DPS supervisor, top officials at DPS are actively hostile to the EAC program, and have exhibited and countenanced the view that the fewer EICs issued by DPS the better that is for DPS.  FF ¶¶ 210-11.

80.    Judged by the very few number of EICs issued,  FF ¶ 200, 206,  as compared to the number of citizens in Texas who lack SB 14 ID, FF ¶ 56, 97,  the EIC program is a failure.

81.    For numerous reasons, low-income persons face disproportionate burdens in obtaining photo identification in Texas, including SB 14 ID.

       a.    The payment of a fee to obtain an ID, a birth certificate, or other required documents imposes a tangible and meaningful burden on low income persons because of their relative lack of discretionary income, their relative lack reliable income, and the possibility that taking time off from work will result in lost wages.  FF ¶¶ 158-70, 173-74, 276-84, 293.   This was illustrated by the expert analysis conducted of the financial circumstances of the Ortiz plaintiffs.  FF ¶¶ 443-46.

       b.    Expert analyses by Dr. Webster, Dr. Chatman, and Dr. Bazelon demonstrate that for those persons without SB 14 ID who live in a household without an automobile, or who are poor, there are significant travel burdens, both

in time and money, associated with travelling to a DPS office or other location where EICs are issued.  FF ¶¶ 380-425.

      c.      Low income persons face greater challenges with regard to staying employed, caring for their families, and addressing health issues.  FF ¶¶ 365-79.

      d.      Low income persons may be less able to navigate through the documentation processes because of time and resource limitations.  FF ¶¶ 161, 170, 357-64, 447, 1054, 1060.

82.     African Americans and Hispanics compose substantially disproportionate shares of the low income population in Texas, and therefore the fees and documentation requirements involved in obtaining SB 14 ID bear more heavily on them.  FF ¶¶ 5, 365-425.

83.     African Americans and Hispanics and are disproportionately less likely to reside in a household that has access to an automobile, FF ¶¶ 5, 359, 1055, 1060,  and the expert analyses by Dr. Webster, Dr. Chatman, and Dr. Bazelon demonstrate that African Americans and Hispanics face disproportionate travel burdens to obtain an EIC.    FF ¶¶ 380-425.

84.     Moreover, even among those in poverty (*i.e.*, even when the analysis is conducted by controlling for the factor of poverty), African Americans and Hispanics face greater travel burdens than Anglos.  FF ¶¶ 62, 380-413..

85.     Taken together, the burdens imposed by Texas for obtaining SB 14 ID significantly increase the burdens that otherwise are attendant to voting in this State.  For example, with regard to travel burden, there are fewer than 300 locations in the State at which to apply for an EIC (including DPS offices and the limited number of county offices which have agreed to provide EICs, but not counting mobile locations), FF ¶ 181-93, 241-53,  whereas, for in-person

voting, there are several thousand Election Day polling places, as well as sites in each county for early in-person voting.[1455]

> ### d. In sum, SB 14 substantially and disproportionately bears more heavily on African Americans and Hispanics

86. In conclusion, the evidence demonstrates that SB 14 substantially and disproportionately weighs more heavily on African Americans and Hispanics than on Anglos. This is true for two separate reasons:

- First, significantly greater percentages of African Americans and Hispanics lack SB 14 ID than Anglos. SB 14 does not contain a safe harbor provision that would nullify these disparities, nor are the disparities nullified by the existence of a burden-free process for obtaining SB 14 ID. Furthermore, the disparities in ID possession are not cancelled out by any countervailing racial/ethnic differences in the burdens for obtaining SB 14 ID, since these burdens do not weigh more heavily on Anglos than on African Americans or Hispanics.

- Second, the burdens to obtain SB 14 photo ID weigh more heavily on African-Americans and Hispanics than on Anglos. Again, SB 14 does not contain a safe harbor provision that would nullify these disparities, and the disparities are not cancelled out by countervailing ID possession rates, since Anglos do not lack SB 14 ID at a higher rate than African Americans or Hispanics.

---

[1455] Texas law requires that there be a polling place in every voting precinct, Tex. Election Code § 43.001, and that no precinct may have more than 5,000 active (non-suspense) registered voters. *Id.* § 42.006. As of March 2014, there were 11,789,120 non-suspense registered voters in the State, http://www.sos.state.tx.us/elections/historical/ mar2014.shtml, and thus, at a minimum there are 2,358 precincts and polling places in Texas for statewide general elections (precincts may be consolidated for special and primary elections, Tex. Election Code §§ 42.008, 42.009). Every county also has one or more in-person early voting sites. *Id.* §§ 85.002, 85.061, 85.062.

## 2. SB 14, in the totality of the circumstances, has a discriminatory result

87. Having determined that SB 14 bears more heavily on African Americans and Hispanics than on Anglos, the Court proceeds to the second step of the results analysis, consideration of this impact in the totality of historical, political, and social circumstances in Texas, based upon an examination of objective factors.

88. As recently as 2006, the Supreme Court recognized and emphasized the important role that Texas's long and well-documented history of discrimination plays in considering the totality of circumstances in a Section 2 case against the State of Texas. *LULAC v. Perry*, 548 U.S. at 439-40. This history includes flagrant efforts to bar minorities from the ballot box in the post-Reconstruction era and continuing during the first two-thirds of the 20th Century. FF ¶¶ 449-51, 461-66, 769, 777 , Texas's record of voting discrimination then continued after the enactment of the Voting Rights Act in 1965, continued after Congress's enactment in 1975 of amendments to the Act resulting in Texas becoming subject to the Section 5 preclearance requirement, *see Briscoe v. Bell*, 432 U.S. 404 (1977), and continued after Congress' enactment of the Section 2 results standard in 1982. Indeed, Texas and its subjurisdictions have been among the most prominent in the country in modern times in enacting discriminatory voting changes. FF ¶¶ 461, 466-70. Indeed, the same legislature that adopted SB 14 in 2011 also adopted discriminatory redistricting plans for the Texas Congressional delegation, the Texas Senate, and Texas House, at least two of which were motivated by a discriminatory purpose. FF ¶¶ 467, 769, 777.

89. SB 14 also operates in the context of an election process characterized by longstanding and widespread racially polarized voting. FF ¶¶ 449, 451, 483-88, 771. Consequently, the lesser ability of African Americans and Hispanics to cast in-person ballots because of SB 14 has great

310

significance with regard to their opportunity "to [equally] participate in the political process and to elect representatives of their choice."  42 U.S.C. § 1973(b), 52 U.S.C. § 10301(b).

90.     This is not a case where, "in spite of continuing discrimination and racial bloc voting," *De Grandy*, 512 U.S. at 1000, minority citizens have achieved a proportional role in the electoral process.  Hispanic citizens, in particular, continue to lag far behind Anglos in their registration and turnout rates.  FF ¶¶ 99, 453-59.  African Americans also generally are behind Anglos in this regard, although somewhat less so.  FF ¶¶ 453-59.

91.     Racially polarized voting "allows those elected to ignore [minority] interests without fear of political consequences."  *Rogers,* 458 U.S. at 623.  In the context of this case, racially polarized voting means that legislators elected without minority support faced no consequences for imposing an ID requirement that specially burdens minority voters.  If anything, polarized voting created an incentive for them to enact a bill that would disproportionately screen out voters who have opposed them.  In addition, as a consequence of racially polarized voting, minority voters depend heavily on the existence of majority-minority districts to elect candidates of their choice, and are underrepresented in elected office.  FF ¶¶ 495-97; *see also LULAC v. Perry*, 548 U.S. at 436-41.  As a result of their underrepresentation in elected office, minority citizens in Texas are less able to prevent the Texas Legislature from adopting laws that restrict their participation in the political process.

92.     Likewise, the Supreme Court in *LULAC v. Perry* recognized that the "political, social, and economic legacy of past discrimination for Hispanics in Texas [citation omitted] may well hinder their ability to participate effectively in the political process."  *Id*. at 440 (internal quotation marks omitted).  This is equally true for African Americans in Texas.  Current socioeconomic data demonstrate that both African Americans and Hispanics continue to lag far

behind Anglos in education, income, and employment.  FF ¶¶ 472-82.  Because the costs that a voter must incur to cast a valid ballot are a substantial determinant of whether a voter will vote, these socioeconomic conditions place minority voters at a substantial disadvantage in electoral process.  FF ¶¶ 170, 358-59, 362-63, 366-79, 388, 392-96, 409-25.

93.     These socioeconomic disadvantages have direct relevance to this Court's consideration of the functional reality of SB 14.  As discussed above, individuals who are poor and those who lack access to an automobile will encounter significantly greater difficulties in attempting to utilize the limited and narrowly defined opportunity Texas has provided for obtaining an EIC. And, as indicated, African Americans and Hispanics in Texas are significantly more likely to be poor and lack access to an automobile.  FF ¶¶ 5, 365-79, 388, 391-95, 410 , 412, 471-81.  In addition, individuals who are poor will face a greater burden in paying for underlying documentation, and will be burdened in other areas of life if they must divert their limited financial resources into obtaining the requisite ID.   Moreover, individuals with lower levels of education will face significantly greater difficulties understanding the requirements of, and navigating the bureaucratic process for, obtaining the necessary underlying documentation to acquire the requisite ID.  As indicated, African Americans and Hispanics in Texas have significantly lower educational levels than Anglo Texans.   FF ¶¶ 5, 159-61, 365-79, 433-46, 472-74.

94.     The enactment of SB 14 is itself evidence of a "significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."  S. Rep. 94-417, at 29.  Given the history of discrimination and the continued socioeconomic disparities between minority and Anglo voters in Texas, minority citizens have a particularized need for an electoral process that provides all citizens with an accessible and effective

opportunity to participate, and minority legislators (with a few exceptions) strongly opposed to SB 14. FF ¶¶ 5, 365-70, 461-71, 655-57, 699, 471.

95.     Finally, the policy underlying SB 14 is tenuous. At the outset, the Court acknowledges that Texas has a legitimate interest in enacting measures to combat election fraud and to promote public confidence in elections. *Crawford*, 553 U.S. at 194-96. Further, in order to prevent voter impersonation during in-person voting, a majority of the States "have passed laws requiring voters to show some form of identification at the polls." Nat'l Conf. of State Legislatures, "Voter Identification Requirements/Voter ID Laws," http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx. These laws, however, operate within a broad spectrum of alternative approaches to voter identification, and only a minority of the States with a voter ID requirement have chosen, like Texas, to enact a strict photo ID law. *Id.*

96.     Prior to the enactment of SB 14, Texas required voter identification at the polls. FF ¶¶ 16-21. That law was successful in preventing the one type of election fraud addressed by laws requiring voter identification for in-person voting, in-person voter impersonation. FF ¶¶ 21, 499-502, 511-16, 629-30. That law also had no apparent discriminatory effect because the principal form of identification required – the voter registration certificate – was provided by mail free of charge to all registered voters, and because the law also permitted use of numerous forms of non-photo ID for voters who were unable to present their registration certificate. FF ¶¶ 17, 19-20.

97.     Despite the absence of any problem that needed fixing, the Texas Legislature enacted what the chief staff member on SB 14 for Lieutenant Governor Dewhurst called "the strictest photo ID law in the country." FF ¶ 701. *Cf. Texas v. Holder*, 888 F. Supp. 2d at 144 (remarking that "at least to our knowledge" SB 14 "is the most stringent [voter ID law] in the country"). Moreover, despite the complete absence of evidence that voter impersonation was occurring at

all, let alone increasing, under the state's prior voter identification law, the photo ID bill became progressively more restrictive as the legislative process unfolded from 2005 to 2011.  FF ¶¶ 531, 538, 553, 574, 578, 636-37, 40, 643, 663, 766.  Ultimately, SB 14 was drafted to be more restrictive than the Georgia and Indiana laws after which it purportedly was modeled.  FF ¶¶ 23-28, 639, 662, 677, 690, 693, 698, 756, 758, 766.

98.     There is also no evidence that SB 14 was reasonably calculated to promote voter confidence.  The fact that several public opinion polls indicated public support for requiring voter identification for in-person voting does not explain the State's decision to jettison a voter identification system that was working.  The public opinion polls posed broad questions that could have justified a wide array of voter identification laws.  FF ¶¶ 669-71.  Also, such polling is only one way in which legislators gather public input; here, the legislature's hearings on voter identification demonstrated that the then-existing law was effective.  FF ¶¶ 556, 562, 564, 608, 625, 629-30, 726.   Likewise, the presence of other types of election fraud – which SB 14 does not prevent – in Texas and elsewhere in the United States, is of limited relevance; there is no credible evidence in the record, other than self-serving or post-hoc speculation, that enacting legislation to prevent in-person voter impersonation will deter other forms of voter fraud, thereby inspiring public confidence in elections.

99.     Finally, the Court also disregards as irrelevant the findings of Dr. Hood's 2012 study regarding the impact of Georgia's voter ID law in that State.  Among other things, the Georgia and Texas ID voter ID (and absentee voting) laws are different, and the two States have different demographic characteristics.  That said, the Court also notes that while Dr. Hood's 2012 study suffers from a number of methodological limitations, it appeared to demonstrate that implementation of Georgia's voter ID law caused an across-the-board depression in voter turnout

in the 2008 general election, with Hispanics suffering the greatest drop in turnout.   Although Dr. Hood's study found a comparatively small percentage reduction in African-American turnout, he conceded that the reduction would have been substantially larger had it not been for the galvanizing effect of the candidacy of then-Senator Barack Obama, a factor not controlled for in his study.  FF ¶¶ 844-56.

100.     In conclusion, the totality of the circumstances demonstrates that SB 14 results in African Americans and Hispanics having an unequal opportunity to participate in the political process, and thus denies or abridges the right to vote on account of race, color, or membership in a language minority group in violation of Section 2.  This unequal opportunity is a result of the manner in which SB 14 interacts with well-known social and historical conditions in Texas.  This holding applies to a specific photo ID law in a specific State, and does not speak generally to the legally appropriately voter identification requirements that Texas or other States may enact.  As was true in *LULAC*, this holding does not "reduc[e] the State's needed flexibility in complying with § 2, . . . [but rather] the problem here is entirely of the State's own making."  548 U.S. at 441.

## VII.   SB 14 WAS ENACTED WITH A DISCRIMINATORY PURPOSE

(statutory claim asserted by the United States; statutory and constitutional claims asserted by all private Plaintiffs and Plaintiff-Intervenors)

### A.     Legal Framework for Analyzing Discriminatory Purpose

101.     In addition to and apart from the results test, Section 2 of the Voting Rights Act is violated if a challenged voting law or practice is shown to have been adopted with a racially discriminatory purpose.  *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009); *Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990), *cert. denied*, 498 U.S. 1028 (1991); S. Rep. 97-417, at 27.  As discussed *supra*, this additional prohibition of Section 2 does not mean

315

that discriminatory purpose plays any role in determining whether a voting practice violates the Section 2 results standard.

102.    The Fourteenth and Fifteenth Amendments to the Constitution similarly prohibit the implementation of voting practices enacted with a racially discriminatory purpose.  *Reno v. Bossier Parish School Bd.*, 520 U.S. at 481.

103.    This Court must determine whether SB 14 was enacted with a discriminatory purpose, notwithstanding the holding that SB 14 violates the Section 2 results test.  The prayers for relief include a request that a preclearance requirement be ordered under Section 3(c) of the Voting Rights Act and that election observers be authorized under Section 3(a) of the Act, which require a finding of discriminatory purpose.  42 U.S.C. § 1973a, 52 U.S.C. § 10302.

104.    In order to prevail on a claim of racially discriminatory purpose, the evidence must demonstrate that discriminatory purpose was one of the motivating factors underlying the enactment.  The evidence need not show "that the challenged action rested solely on racially discriminatory purposes" or "that a particular purpose was the 'dominant' or 'primary' one." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Brown*, 561 F.3d at 433.

105.    "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. [Citation and footnote omitted.]  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

106.    Discriminatory purpose may be proved by direct evidence or circumstantial evidence. *Rogers*, 458 U.S. at 618.  It does not require proof of invidious racial animus (ill feelings toward

minorities), but rather simply an intent to disadvantage minority citizens.  *Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring and dissenting in part); *see also LULAC v. Perry*, 548 U.S. at 440 (noting that taking away political opportunity just as a minority group is about to exercise it "bears the mark of intentional discrimination that could give rise to an equal protection violation").

107.    Evidence regarding a particular decision-maker's individual intent in seeking to enact a voting change is relevant evidence in a purpose analysis, particularly where that decision-maker played a key role in the enactment of the voting change.  *See, e.g.*, *Busbee v.Smith*, 549 F. Supp. 494, 500 (D.D.C. 1982) (three-judge court), *aff'd mem.* 459 U.S. 1166 (1983).

108.    Public statements by legislative proponents of a challenged law regarding their intent in enacting the law are relevant in conducting a purpose analysis, but are not accorded any special weight because it is unlikely that proponents motivated by a discriminatory purpose would announce that purpose publicly.  *See, e.g., Smith v. Town of Clarkton*, 682 F. 2d 1055, 1064 (4th Cir. 1982).

109.    The framework for analyzing whether circumstantial evidence is probative of discriminatory purpose was established by the Supreme Court in *Arlington Heights*.

110.    *Arlington Heights* specifies that "an important starting point" for assessing discriminatory purpose is "the impact of the official action[, *i.e.*,] whether it bears more heavily on one race than another."  429 U.S. at 266 (internal quotation marks omitted).

111.    Additional evidentiary sources include, but are not limited to:  (a) "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes"; (b) "the specific sequence of events leading up to the challenged decision;" (c) "[d]epartures from the normal procedural sequence"; (d) "[s]ubstantive departures" from

what might typically might be expected, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; (e) "[t]he legislative . . . history" of the enactment; and (f) trial testimony by members of the decisionmaking body "concerning the purpose of the official action." *Id.* at 266-68.

112.    "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the [challenged] law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 118 (1985).

113.    Defendants misinterpret the discriminatory purpose analysis endorsed by the Supreme Court in *Arlington Heights*, claiming the Court held that circumstances demonstrating discriminatory purpose only "may exist in 'rare' cases in which there is a 'stark' pattern of state action, 'unexplainable on grounds other than race.'"  Defendants' pre-trial Proposed FOF/COL ¶ 134 (ECF No. 504).  In actuality, *Arlington Heights* merely noted that the instances in which the "impact alone" of a challenged law is "determinative" of racial purpose occur in those "rare" cases where a "stark" pattern of state action, "unexplainable on grounds other than race," exists. 429 U.S. at 266.  *Arlington Heights* then went on to say that, where "impact alone" is not determinative, the other circumstances the Court identified (discussed above, in paragraph 110) should be considered to determine whether the challenged law was enacted with a discriminatory purpose.

114.    Defendants also wrongly assert that the legal framework for analyzing racially discriminatory purpose is established by Supreme Court cases that did not address discriminatory purpose and did not discuss *Arlington Heights*.  Defendants' Proposed FOF/COL ¶ 131 (ECF No. 504).  Those cases, instead, dealt with a non-racial, equal protection issue, resolved by

318

applying the rational basis test, *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 461-63

(1981), and an issue of statutory construction, *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997).

> **B.     The Purpose of SB 14, At Least in Part, Was to Minimize Minority Participation**

115.     The evidence demonstrates that SB 14 was motivated, at least in part, by an intent to

minimize the opportunity of African Americans and Hispanics to participate in the political

process.

116.     As instructed by the Supreme Court in *Arlington Heights*, the starting point for this

analysis is whether SB 14 bears more heavily on African American and Hispanic citizens than on

Anglo citizens.  As set forth above, this Court has concluded that it does.

117.     A related question, and one that goes to the heart of this analysis, is whether the Texas

Legislature – or at least the leading proponents of SB 14 and its predecessor bills – knew or

understood that enacting voter identification requirements for in-person voting significantly

stricter than the then-existing law would disproportionately injure African-American and

Hispanic citizens, or willfully disregarded and sought to avoid that question.  The Court finds

strong evidence that both of these elements were part of the legislative process.

>     a.     Although no study was conducted of the racial impact of SB 14 prior to its
>
> enactment, the House sponsor of the 2009 ID legislation (SB 362) and the then-chair of
>
> the House Committee on Elections, Representative Smith, testified that it was "a matter
>
> of common sense" that Texas residents without a driver's license would be
>
> "disproportionately poor, and therefore minority," and he publicly estimated in 2009 that
>
> about 700,000 Texas voters lacked a driver's license.  FF ¶ 618.  Similarly, prior to the
>
> passage of SB 14, Lieutenant Governor Dewhurst (a key proponent of SB 14) was
>
> advised that between 3 and 7 percent of Texas registered voters (or about 400,000 to

900,000 registered voters) do not have a Texas driver's license or state identification card.  FF ¶ 709.

b.      In 2009, the deputy general counsel to Lieutenant Governor Dewhurst, Bryan Hebert, wrote that a reason to support SB 362, which permitted the use of photo or non-photo identification, was that the bill creates "less chance of disenfranchising elderly, poor, or minority voters."  FF ¶ 590.

c.      In 2011, Mr. Hebert advised other Senate staff that SB 14 likely would be found to be discriminatory under Section 5 of the Voting Rights Act unless additional forms of photo ID were included.  FF ¶¶ 663.

d.      Throughout the six-year legislative process, from 2005 to the passage of SB 14 in 2011, legislative opponents of stricter voter identification requirements argued that such requirements would disproportionately disadvantage minority citizens, and individuals from outside the Legislative testified at hearings that this would likely occur. FF ¶ 540,557,726,733  Legislative opponents also repeatedly asked that a study be conducted of this issue, to no avail, FF ¶ 733,  although, as early as 2009, the Secretary of State's office acknowledged that if and when the State would seek preclearance for the voter identification legislation, it could be required to submit data on the impact of the legislation on racial minorities.  FF ¶ 613.

e.      The knowledge that SB 14 likely would impact hundreds of thousands of voters, the "common sense" proposition that this population would be disproportionately minority, and opponents' assertions of a discriminatory impact, as well as the long history of voting discrimination in Texas, constituted strong objective reasons for the Legislature to conduct or obtain an analysis of whether photo ID legislation would have a

disparate racial impact, prior to enacting SB 14.  The refusal to do that strongly suggests an effort by bill proponents to avoid, and indeed to hide from, this question.  Emblematic of this was the Senate's decision to proceed with passing SB 14 notwithstanding Senator Williams' pending request for an analysis of the TEAM database and the DPS driver's license database to determine who among registered voters did not have a Texas license or personal ID.  FF ¶ 705.

f.      Furthermore, legislative leaders were aware that TEAM includes Spanish-surnamed data that could be used to analyze the effect of SB 14 on Hispanic voters.  In the 2009 Senate debate, the existence and potential usefulness of Spanish-surnamed data was specifically noted.   FF ¶ 613.  *See also United States v. Texas*, 887 F. Supp. 2d 133, 207 (D.D.C. 2012) (in 2010, an individual working on redistricting for Speaker Straus discussed the usefulness of Spanish-surnamed registered voter data in conducting a racial analysis of redistricting plans), *vacated on other grounds*, 133 S. Ct. 2885 (2013).

g.      The explanations offered by SB 14 proponents as to why the legislation would not disproportionately injure minority voters are not credible, and it not likely that the proponents believed these explanations.  Proponents primarily relied on information that voter turnout had increased in the 2008 general election in Indiana and Georgia after these States adopted photo ID laws.  However, as persons intimately familiar with elections, the proponents undoubtedly understood that many factors affect turnout and that a major reason for increased turnout in 2008 was the unique and powerful impetus provided by the candidacy of President Obama.  FF ¶ 852.   Moreover, proponents understood, prior to passage of SB 14, that the legislation was not the same as Indiana's and Georgia's photo ID laws; it was far stricter.  FF ¶ 622, 677, 690.  Proponents also

cited to polling data, but the polling data did not address the specific requirements of SB 14 or the impact of SB 14 on minority voters.

118.    As discussed above with reference to the Section 2 results claim, the policy interests underlying SB 14's specific ID requirements are weak.  SB 14 represents a "[s]ubstantive departure[]" from what typically would be expected, since "the factors usually considered important  by the decisionmaker strongly favor[ed] a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.  While Texas has a clear and legitimate interest in preventing election fraud and promoting voter confidence, *Crawford*, 553 U.S. at 194-96, there is little nexus between these concerns and the decision to replace Texas's prior – and successful – voter identification system with the strict photo ID provisions of SB 14.  Instead of enacting legislation to prevent mail-in ballot voter fraud, of which there was evidence, the legislature chose to target in-person voter impersonation, a form of voter fraud that appeared to be virtually nonexistent. The facts relevant to voter fraud in Texas were well known to the Legislature since, in 2010, the House Committee on Elections issued a report on this subject.   FF ¶ 630.

119.    Furthermore, while SB 14 proponents asserted that perhaps the preeminent factor they "considered important" was that SB 14 allegedly was modeled after the Indiana and Georgia photo ID laws, FF ¶¶ 23, 574, 637, 667, 677, 756, 766,  they also knew (as indicated above) that SB 14, in fact, was significantly stricter than the Indiana and Georgia laws.

120.    "The specific sequence of events leading up to" the passage of SB 14 also is significant. *Arlington Heights*, 429 U.S. at 267.  From 2007 to 2011, the voter identification bills became increasingly more restrictive, FF ¶¶ 531, 77,  notwithstanding that there was no evidence of any problem with in-person voter impersonation, let alone a growing problem in that regard.

121.    The passage of SB 14 was characterized by multiple "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267.  These included the highly-controversial abrogation of the Senate's two-thirds rule for calling up legislation, the assignment of SB 14 to a select committee in the House whose sole purpose was to address this legislation, the Governor's declaration that voter identification legislation was an "emergency matter," the decision not to address a bona fide constitutional point of order on the House floor, and the failure of the Secretary of State's office in 2011 to turn over to the Legislature the analysis it completed at the request of Senator Williams regarding the impact of SB 14.  FF ¶¶ 655, 659, 705-07, 715, 720, 735.

122.    "The historical background of the decision," *Arlington Heights*, 429 U.S. at 267, also points to a conclusion of discriminatory purpose.  Most significantly, SB 14 was enacted in the context of dramatic growth in the State's Hispanic population.  FF ¶¶ 3, 532, 721, 771.  In the context of racially polarized voting in Texas, this demographic change was viewed as a threat to Anglo electoral power.  The concern regarding the rising Hispanic percentage of Texas citizens was evidenced in the SB 14 legislative process by proponents' repeated assertions, in response to constituents' frustrations about "illegal aliens" participating in Texas elections, that stricter voter identification requirements were needed to counteract alleged voting by noncitizens, *i.e.*, Hispanics.  FF ¶¶ 650, 726, 776.  Taken together, the absence of evidence presented to the Legislature of any such illegal voting or a nexus between SB 14 and the prevention of noncitizen voting (since several forms of SB 14 ID may be obtained by noncitizens), as well as the foreseeable impact of SB 14 on Hispanic citizens, constitute strong circumstantial evidence of a racially discriminatory purpose.  FF ¶¶ 525, 728, 749.

123.    In addition, as noted, the same legislature that enacted SB 14 enacted discriminatory statewide redistricting plans, at least two of much were infected with a discriminatory purpose, FF ¶ 467, and also was involved in debates regarding other legislation viewed as being anti-Hispanic.  FF ¶ 728-29.

124.    The historical background also includes the fact that the same justification for SB 14, *i.e.*, combating voter fraud, has repeatedly been used in Texas to support other racially discriminatory devices to restrict voting, including the poll tax and re-registration requirements.  FF ¶¶ 461-62, 465-66, 774.

125.    Lastly, in enacting SB 14, the Texas Legislature chose to reject amendments that would have reduced the burden on minority voters but, as SB 14 proponents understood, would not have detracted from the stated purposes of the legislation.  These amendments included: expanding the forms of qualifying photo ID; waiving the cost of documents necessary to obtain state photo ID; and increasing access to DPS offices.  FF ¶¶ 690-94.  Further, data were readily available to the Texas Legislature that forms of photo ID the proponents chose to exclude (employee IDs issued by the federal, state, and local governments, and university and college IDs) was disproportionally held by minorities, while a special form of ID that was included (for concealed handgun licenses) is disproportionately held by Anglos.  FF ¶¶ 750-52.

126.    Although defendants have not presented evidence to support a claim that SB 14 was motivated by partisan concerns, or that any such partisan concerns would preclude the concurrent existence of a discriminatory purpose, the evidence at trial generally indicated that Republican legislators favored SB 14 and Democratic legislators opposed SB 14.  But, as was the case in *LULAC v. Perry*, the means the Legislature chose for attempting to skew political power in Texas was the minimization of African-American and Hispanic participation, and that establishes

that discriminatory purpose was at least one of the motivating factors for the passage of SB 14. *See LULAC v. Perry*, 548 U.S. at 442 (criticizing "the troubling blend of politics and race" that characterized the Texas congressional redistricting plan that the Court found to violate Section 2).

127.    In sum, evidence demonstrates that SB 14 was enacted with a discriminatory purpose, and that the Legislature adopted this legislation because of, and not simply in spite of, its discriminatory impact on minority voters.

## VIII.   CONSTITUTIONAL RIGHT TO VOTE

(claim asserted by all private Plaintiffs and Plaintiff-Intervenors)

### A.    Constitutional Framework

128.    Voting is a fundamental constitutional right, implicated by the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Burdick v. Takushi*, 504 U.S. at 433-34; *Harper v. Virginia Bd. of Elections*, 383 U.S. at 670; *Reynolds v. Sims*, 377 U.S. at 562. Indeed, the right to vote is "preservative of all other rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

129.    At the same time, States have a strong interest in regulating elections to ensure that they are fair, honest, and orderly. *Storer v. Brown*, 415 U.S. 724, 730 (1974). Such regulations "inevitably affect[] – at least to some degree – the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). The Supreme Court, first in *Anderson*, then in *Burdick v. Takushi*, 504 U.S. 428 (1992), and more recently in *Crawford*, has endorsed a flexible, balancing test to accommodate citizens' constitutional right to vote with States' interest in regulating elections:

> A court considering a challenge to a state election law must weigh "the character
> and magnitude of the asserted injury to the rights protected by the First and
> Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise
> interests put forward by the State as justifications for the burden imposed by its
> rule," taking into consideration "the extent to which those interests make it
> necessary to burden the plaintiff's rights."  [Citations omitted.]

*Burdick*, 504 U.S. at 434 (quoting *Anderson*).  If an election law imposes "severe" burdens on

the right to vote, that law is subjected to strict scrutiny.  *Id.* at 433-34.  If the burdens imposed

are not "severe," the reviewing court "must identify and evaluate the interests put forward by the

State as justifications for the burden imposed by its rule."  *Crawford*, 553 U.S. at 190; *see also*

*Burdick* 504 U.S. at 434.  The First and Fourteenth Amendment rights involved, and the

consequent requirement to conduct a close review of a challenged voting practice, make the

balancing test distinct from ordinary "rational basis" review, especially if the practice imposes a

substantial burden on the right to vote.

130.    In *Crawford*, plaintiffs asserted that Indiana's photo ID law, on its face, infringed the

right vote, and the Supreme Court, by a vote of six to three, upheld the statute.  There was no

majority opinion for the Court, but six Justices (Justice Stevens and two others in the majority

(who joined in Justice Stevens' lead opinion), and three dissenters) agreed that the Indiana law

was to be reviewed by weighing the interests asserted by the State in support of the statute

against the burdens it imposed on the right to vote.  553 U.S. at 190-91 (Justice Stevens), 209

(Souter, J., dissenting), 237 (Breyer, J., dissenting).

131.    In his lead opinion, Justice Stevens emphasized that, "[h]owever slight that burden may

appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to

justify the limitation" on voting.  *Id.* at 191 (citation and internal quotation marks omitted).

132.    Justice Stevens concluded that Indiana advanced several legitimate concerns relating to

the administration of elections, including "moderniz[ing] election procedures," "preventing voter

fraud," ensuring "orderly administration and accurate recordkeeping," and "safeguarding voter confidence." *Id.* at 191, 196.

133.    Justice Stevens further concluded that the factual record in that case failed to provide any substantial information regarding the nature and scope of the burdens imposed by the Indiana statute. *Id.* at 200.  In particular, plaintiffs failed to identify "the number of registered voters without photo identification" or "provide any concrete evidence of the burden imposed on voters who currently lack photo identification." *Id.* at 200-01.  This, in turn, limited the Court's ability to conduct a rigorous review of the interests asserted by Indiana, or the extent to which those interests justified the voting restrictions at issue. *Id.* at 200-02.

134.    Based upon the specific record before the Court in that case – in particular the inadequate and threadbare evidence relating to burden – as well as the difficulty plaintiffs faced in prevailing in a facial challenge, *id.* at 200, Justice Stevens concluded that Indiana's asserted interests were "sufficient" to uphold the statute. *Id.* at 203.

135.    Because *Crawford* was decided in large part based on the inadequacy of the record developed in that case, and because *Crawford* dealt with a photo ID law that differs in important respects from SB 14, *Crawford* does not bar the claims brought here that SB 14 unconstitutionally burdens the right to vote.

136.    Applying this balancing test to SB 14 requires this Court to identify the burdens imposed and weigh them against the interests Texas asserts so as to determine whether those interests justify burdening the right to vote.

### B.    The As-Applied Nature of the Claim

137.    Private Plaintiffs and Plaintiff-Intervenors assert an "as applied" challenge to SB 14, as to SB 14's photo identification requirements and their application to citizens who lack SB 14 ID or

have not obtained the SB 14 disability exemption.  Unlike the plaintiffs in *Crawford*, they do not assert a facial challenge to the challenged photo ID law. More specifically, unlike *Crawford* (and unlike *Common Cause/Georgia v. Billups*, *supra*), substantial and reliable evidence was introduced at trial identifying "the number of registered voters without photo identification" and "provid[ing] . . . concrete evidence of the burden imposed on voters who currently lack photo identification."  *Id.* at 200-01.

138.    Pursuant to the *Anderson/Burdick* test, these actual burdens are balanced against the interests asserted by Defendants in support of SB 14.  In this regard, Defendants advance interests similar to those advanced by Indiana and Georgia in *Crawford* and *Common Cause/Georgia*.  This Court fully adheres to the rulings in those cases that these interests, on their face, are legitimate and important.  As explained, however, these interests were not subjected to rigorous review in those cases due to the absence of evidence that the burdens imposed were anything more than minimal, or limited to discrete, small groups, and also the absence of evidence that the Indiana voter identification requirements  failed advance the asserted state interests.  Here, *Anderson/ Burdick* requires a close look at the degree to which the "precise" interests asserted by Texas are "sufficiently strong" to justify the substantial burdens SB 14 imposes on the right to vote.  *Crawford*, 553 U.S. at 203, 204.  This is undertaken "taking into consideration the extent to which those interests make it *necessary* to burden the plaintiff's rights."  *Burdick*, 504 U.S. at 434 (emphasis add; internal quotation marks omitted).

139.    Although intent is not an element of the *Anderson/Burdick* test, the Court notes that, as described above with regard to the issue of discriminatory results and purpose, the burdens imposed by SB 14 did not occur by happenstance, but rather result from the deliberate choices made by the Texas Legislature and by DPS.

### C.   SB 14 Imposes Unjustified Substantial Burdens on the Right to Vote, in Violation of the First and Fourteenth Amendments

#### 1.   Citizens lacking SB 14 ID are substantially burdened by SB 14.

140.   As set forth above, the expert analyses show that approximately 608,470 registered voters lack SB 14 ID.  In addition, the survey conducted of a representative sample of Texas voting age citizens indicates that over a million voting age citizens lack SB 14 ID.  FF ¶¶ 94, 97.

141.   The burden inflicted by SB 14, with regard to the number of citizens who are without an acceptable form of photo ID, is magnified by the fact that SB 14 excludes forms of photo ID included even in the "strict" type of photo ID laws, including photo ID issued by other states (the Georgia law) and student IDs issued by colleges and universities (the Wisconsin law).  FF ¶¶ 23-24; 2011 Wis. Act 23.  In addition, while certain IDs issued by DPS are included, others are not, FF ¶ 7, and while a variety of federal military IDs are included (including "military" IDs issued to civilians), federal employee IDs are not.

142.   As discussed above, the evidence demonstrates that obtaining SB 14 ID can be a rigorous, burdensome process and that the costs are real and concrete.  The significant burdens associated with obtaining SB 14 ID are summarized above in CL ¶¶ 72-80, and the Court incorporates by reference those Conclusions of Law here.  The Court highlights several important aspects of these burdens in the following paragraphs.

143.   Unlike other States, county voter registration offices are not included under SB 14 as sites for the issuance of qualifying photo ID; instead, in Texas the state-issued photo ID (including the EIC) is available only through DPS and a limited set of non-DPS offices established through memoranda of understanding entered into by DPS.  FF ¶¶ 201, 224-27. There is ample evidence of the inconvenience, stringent documentary requirements, and other

problems with the EIC program that discourage rather than facilitate access to the voting booth for a voter trying to obtain an EIC.  FF ¶¶ 200, 202, 204, 208, 217-22, 224, 245-53.

144.    In addition, there are costs associated with efforts to obtain underlying documents needed for an EIC.  In particular, the so-called "free" EIC is functionally not free because the underlying documents needed to apply for an EIC cost money and, in addition, Texas imposes limitations on the opportunity of citizens to apply for these documents.  FF ¶¶ 254-71.  In particular, an original or certified copy of a birth certificate typically is needed to apply for an EIC, but there are fees associated with obtaining a birth certificate in Texas (and in other States).  The new Election Identification Birth Certificate requires the payment of a fee, and the State imposes significant limitation with regard to the process for applying for that document.  FF ¶¶ 261-65, 292-300.

145.    The direct costs related to obtaining an EIC that are magnified by the paucity of DPS offices and other EIC-issuance locations.  For example, the testimony of Dr. Bazelon establishes that SB 14, on average, imposes an economic cost of $36.23 to travel to a location where EIC applications are accepted.  FF ¶ 418.  Other experts documented substantial travel costs measured in travel time.  FF ¶ 383-85, 408-13.

146.    The direct and indirect costs of obtaining an EIC fall particularly hard on poor voters.  CL ¶¶ 81, 93.

147.    Concern also was raised at trial regarding different applications of DPS requirements to different EIC applicants.  Evidence was presented of some applicants receiving an EIC without the documents required by DPS regulations, while other applicants who lacked the prescribed documents were turned away (compare as to Ms. Barber, FF ¶ 168, who received an EIC without a birth certificate after DPS engaged in web searches to confirm her identity, with Mr. Benjamin,

FF  ¶¶ 886-87, who brought extensive documentation proving identity to DPS but was denied an EIC because he lacked a birth certificate).

148.    Notable as well is that DPS has implemented the EIC program, without dedicated funding,  FF ¶ 202,  and as if it were a law enforcement program, akin to the regulation of highways, imposing additional requirements and procedures on voters seeking an EIC (often unrelated to the administration of elections), thus aggravating the burdens imposed by SB 14.  FF ¶¶ 315-20.   In this regard, the Court specifically incorporates by reference CL ¶ 79, where the Court set forth in detail the problems associated with DPS's law enforcement frame for implementing the EIC program.  As indicated in CL ¶ 79, this frame of reference is epitomized by DPS's initial decision to require that EIC applicants be fingerprinted.

149.    The weight of the burdens associated with obtaining an EIC is consistent with the fact that, as of September 2014, DPS had issued only 279 EICs.  FF ¶ 206.  In contrast, substantially more "free" voter IDs have been issued in Georgia with regard to the implementation of that State's photo ID law.  FF ¶ 206.

150.    As explained above, SB 14 also lacks mitigating features found in other statutes that might effectively counteract the burdens.  For example, the statute lacks any effective safe harbor, such as affidavit-identification for indigent voters (as in Indiana) or a provision allowing voters who state they were unable to obtain a photo ID to provide an alternative, non-photo ID (as in South Carolina).  FF ¶¶ 690, 1052.

151.    The analysis above demonstrates the burdens associated with obtaining SB 14 ID, burdens inflicted on the large number of registered and unregistered citizens who do not possess acceptable ID.  While the Court does not find these burdens rise to the level of being "severe,"

and so does not apply a strict scrutiny standard, they are significant and substantial, especially in the context of historical and social conditions in Texas.

### 2. The state interests advanced in support of SB 14 do not justify the burdens imposed by SB 14.

152.    Prior to SB 14, Texas enforced a voter ID law, one that (along with the criminal penalties that exist for committing election fraud) had successfully resulted in in-person voter impersonation fraud being exceptionally rare in Texas.  In that regard, at most there have been four cases of in-person voter impersonation fraud in Texas since 2000; in contrast, tens of millions of in-persons ballots have been cast during this time period.  FF ¶¶ 500-02, 511-20,  The evidence also shows no indication of in-person impersonation further back in Texas history and, based upon the evidence, there is no indication that such fraud is likely to occur in the future. Absentee voting fraud, on the other hand, does occur in Texas, FF ¶¶ 519, 522, and although the Texas Legislature was aware of the occurrence of this kind of fraud when SB 14 was passed, FF ¶ 534, SB 14 does not address voter impersonation in absentee balloting.

153.    The record also does not establish that Texas's decision to severely limit the forms of acceptable ID, and exclude forms of photo ID regularly used in modern society and relied upon by other state photo ID laws, serves to promote  its legitimate interest in preventing voter fraud. There is no evidence in the record connecting many types of excluded photo ID, such as student IDs, to any form of voter fraud.  FF ¶¶ 642, 694, 738.

154.    There also is no evidence that the strict limitations Texas has imposed on the availability of the new EIC form of "free" photo ID (including the limited number of issuing offices, strict documentary requirements, and other enforcement policies) or Texas's decision to place a law enforcement agency, DPS, at the center of the EIC issuance process (with minimal guidance from election officials), are necessary to advance the State's interest in combating voter fraud.

155.     Moreover, DPS's adoption of a law-enforcement framework for administering the EIC process appears to be "unrelated to voter qualifications," *Crawford*, 553 U.S. at 189, and, for that reason, may be unconstitutionally "invidious."  *See id*.

156.     Texas has asserted other state interests, including preventing other types of voting fraud and promoting voter confidence in elections.  Here as well, however, the provisions of SB 14, along with the manner in which the statute is being enforced, do not establish a strong nexus between the law and the claimed interests.   It is speculative and implausible that SB 14 would counteract fraud that is not voter-impersonation fraud.  FF ¶¶ 521-25.  Indeed, most of the law's proponents acknowledge that SB 14 was aimed only at in-person voter impersonation fraud.  FF ¶¶ 635, 727.  Likewise, any connection between SB 14 and voter confidence has not been shown, especially given the State's record of successfully implementing the pre-existing voter ID law. The proffer of ambiguous public opinion polls, FF ¶¶ 637-38, 667-73,  also does not support such a connection.   Texas may not unduly burden the right to vote to address remote dangers that are "no more than theoretically imaginable." *Williams v. Rhodes*, 393 U.S. 23, 33 (1968).

157.     On balance, therefore, this Court finds that the specific, substantial, and real burdens imposed by SB 14 outweigh the interests advanced by Defendants in support of  the statute's voter identification requirements.  While those interests, in general, are legitimate and important, they are insufficient in the context of the specific voter identification provisions enacted by Texas and the specific procedures Defendants have adopted to implement those provisions.  The Court therefore finds that SB 14 unconstitutionally infringes on the right to vote.

## IX.   SB 14 CONSTITUTES A POLL TAX

(claim asserted by the *Veasey* Plaintiffs)

158.    The Twenty-Fourth Amendment to the Constitution prohibits the imposition of "any poll tax or other tax" in elections for federal office.  The Equal Protection Clause of the Fourteenth Amendment similarly prohibits the imposition of a poll tax in state elections.  *Harper v. Virginia Board of Elections*, *supra*.

159.    All forms of SB 14 ID generally available to Texas residents (*i.e.*, those forms other than military ID) require payment of an application fee, except for the nominally free EIC.  FF ¶¶ 171-73, 195, 344-55.   Although EICs do not require payment of an application fee, the relevant statutes and regulations negate the statutory promise of a "free" EIC.  This includes a state-mandated fee which, for almost all voters, is a condition for obtaining an EIC.

160.    Specifically, DPS, which under SB 14 has the authority to determine qualifications for obtaining an EIC, has issued regulations that require an applicant for an EIC (with certain exceptions for limited categories of persons) to present an original or certified copy of a birth certificate.  37 T.A.C. 15.182; FF ¶¶ 254-65.

161.    The Election Identification Birth Certificate (the cheapest form of a birth certificate issued by Texas that may be used to obtain an EIC) is a document obtainable only upon a certification that the applicant needs it for voting, and requires payment of a fee.  25 TAC § 181.22(c), (t); FF ¶¶ 285-92.  Specifically, the Bureau of Vital Statistics must "collect an additional $2 fee" when "issuing a certified copy of a certificate of birth."  Tex. Health & Safety Code § 191.0045(e).  Because the Election Identification Birth Certificate qualifies as a "certified copy of a certificate of birth," the Department of State Health Services lacks authority to waive this statutory fee.  Moreover, because the EIC Birth Certificate is available only in

person, applicants must incur significant travel and time costs.  FF ¶¶ 293-94.  Thus, given that

the Election Identification Birth Certificate cannot be used for any purpose other than voting

(and is so labeled), and given that almost every member of the general public who seeks an EIC

must first possess or acquire a birth certificate, the costs associated with acquiring a birth

certificate in reality function as an admission fee to enter the voting booth.

162.    The Supreme Court has long held that a fee imposed on the right to engage in a regulated

enterprise or activity is a tax.  *License Tax Cases,* 5 Wall. 462, 471 (1867).  That case and the

broad reading of "tax" were recently reaffirmed in *National Fed. of Ind. Business v. Sibelius,* 132

S.Ct. 2566, (2012).  Thus, the fee to be paid for an EIC Birth Certificate is a tax.

163.    Whether or not it is a "poll tax" (literally a "head" tax), this tax clearly comes within the

meaning of any "other tax."

164.    The fee is a tax on the right to vote because it is a condition for obtaining a document

which under SB 14 and its regulations must be obtained in order to vote.  For the same reasons,

failure to pay denies or abridges the non-payer's right to vote.  The amount of the tax is

immaterial, and in any event it is larger than the poll tax struck down in *Harper v. State Bd of*

*Elections,* which was $1.50.

165.    This holding is not in conflict with other decisions.  The Court is mindful that, in

*Crawford*, the Supreme Court referred to costs of obtaining birth certificates, but that case did

not involve a closed regulatory system with a paid birth certificate as a virtual sine qua non for

obtaining a "free" ID, nor was the cost a uniform state mandate for documents to be used and

labeled solely for the right to vote and no other permitted purpose.  Moreover, the Indiana statute

had an exception for indigent voters.

166.     Other courts have held that a fee to a government agency for a document (such as a birth certificate) required for voting is an unconstitutional tax.  Most recently, in *Milwaukee Branch v. Walker,* 851 N.W.2d  262 (Wis. 2014), the Wisconsin Supreme Court held that charging even a "modest fees for documents necessary to prove identity would be a severe burden on the constitutional right to vote" because the state "may not enact a law that requires any elector, rich or poor, to pay a fee of any amount to a government agency as a precondition to the elector's exercising his or her constitutional right to vote." *Id.* at 277.  As a result, the Wisconsin Supreme Court interpreted state law to allow an applicant for voter ID to avoid paying any fees to the State of Wisconsin. *Id.* at 278-79.  Another court held that a fee-paid birth certificate was not an unconstitutional tax on voting where the voter could use many other types of free documents as alternatives. *Common Cause v. Billups,* 439 F.Supp.2d 1294, 1355 (N.D. Ga. 2006).

167.     The constitutional prohibition on poll taxes "nullifies sophisticated as well as simple-minded modes of violating the rights guaranteed." *Harman v. Forssenius,* 380 U.S. 528 (1965).

168.     Given that Texas law, unlike Wisconsin law, cannot be interpreted to eliminate the birth certificate fee, the Court holds that SB 14, in combination with the other statutes and regulations to which it is tied, is a poll tax that violates the Fourteenth and Twenty-Fourth Amendments to the Constitution.

## X.     THE SECTION 2 RESULTS STANDARD IS CONSTITUTIONAL

169.     On the eve of trial, defendants for the first time asserted that the Section 2 results standard in unconstitutional.  Notwithstanding that this is entirely a legal question, defendants did not raise this claim in their prior motions to dismiss filed under Rule 12 of the Federal Rules of Civil Procedure.  While this question more appropriately would have been addressed at that juncture, the Court now addresses defendants' challenge, and rejects it for the following reasons.

170.    This Court is bound by Supreme Court precedent to uphold the results standard as being

constitutional.  *Jordan v. Winter*, 604 F. Supp. 807, 811 (N.D. Miss. 1984) (three-judge court)

(the results standard is within Congress' enforcement power granted by the Fifteenth

Amendment), *sum. aff'd sub. nom.*, *Mississippi Republican Executive Committee v. Brooks*, 469

U.S. 1002 (1984).  The question whether the results standard is within Congress' Fifteenth

Amendment authority was specifically raised on appeal in that case, and the Supreme Court's

summary affirmance is binding on this Court as to that question.  *See Hicks v. Miranda*, 422 U.S.

332, 344-45 (1975).  The Fifth Circuit, as well as other Circuits, also have affirmed the

constitutionality of the Section 2 results standard.  *United States v. Blaine County*, 363 F.3d 897,

903-09 (9th Cir. 2004); *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1556-63

(11th Cir. 1984), *cert. denied*, 469 U.S. 976 (1984) *Jones v. City of Lubbock*, 727 F.2d 364, 373-

75 (5th Cir. 1984); *see also Major v. Treen*, 574 F. Supp. 325, 342-49 (E.D. La. 1983).

171.    Defendants contend that the results standard is unconstitutional under *City of Boerne v.*

*Flores*, 521 U.S. 507 (1997) and its progeny.  In *Boerne*, the Supreme Court held that, when

Congress enacts legislation pursuant to its Fourteenth Amendment enforcement authority,

"[t]here must be congruence and proportionality between the injury to be prevented or remedied

and the means adopted to that end."  *Id.* at 520.  Defendants' *Boerne* argument fails both

because, as indicated above, this Court must adhere to binding authority upholding the results

standard, and because defendants' argument is meritless.

        a.      Defendants cite a law review article but no actual authority in support of

their *Boerne* claim.  The one federal appeals court that applied *Boerne* to Section 2

upheld the constitutionality of the results standard.  *Blaine County*, 363 F.3d at 904

(holding that the B*oerne* line of cases "strengthens the case for section 2's

constitutionality" because the Voting Rights Act "stands out as the prime example of a congruent and proportionate response to well documented violations of the Fourteenth and Fifteenth Amendments.").

> b.      Successful challenges to congressional statutes under *Boerne* and its progeny have been predicated, in part, on determinations that Congress legislated without a meaningful record of relevant constitutional violations.  *E.g., Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365, 368 (2001); *Boerne*, 521 U.S. at 530.  In this regard, defendants overlook the massive record of intentional discrimination in voting that was before Congress when it enacted the results standard.  After conducting extensive fact-finding, Congress found in 1982 that constitutional violations "still occur with shocking frequency," and that "continued manipulation of registration procedures and the electoral process . . . effectively exclude minority participation from all stages of the political process."   S. Rep. No. 97-417, at 3 (1982).  Congress also heard compelling testimony documenting a pervasive, national pattern of jurisdictions *intentionally* diluting minority voting strength through a variety of procedures and methods.   *E.g.*, H.R. Rep. No. 97-227, at 18-19 (1981).  Congress reviewed evidence that these intentionally discriminatory practices had abridged or denied the voting rights of millions of voters throughout the country on account of their race or ethnicity.  *Extension of the Voting Rights Act: Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. On the Judiciary*, 97th Cong. 1st Sess. 450, 495-96, 516-18, 521-22, 583, 599, 606, 644-46, 695-700, 708-09, 790, 916, 943, 1013-23, 2025, 2030, 2034-35, 2042-43, 2386, 2388, 2391-95, 2443, 2451, 2454, 2457, 2467, 2471, 2485, 2520, 2566, 2574; Senate Hearings (1982): *Voting Rights Act: Hearings Before the Subcomm. on the*

*Constitution of the Senate Comm. on the Judiciary*, 97th Cong., 2nd Sess. (1982): vol. 1, 1183, 1216-26, 1803-05; vol. 2, 277-87, 407-11, 935-62, 1035-38, 1051.

c.      Consistent with *Boerne* and its progeny, the results standard is closely tethered to Supreme Court standards for determining a violation of the Fourteenth and Fifteenth Amendments.  The results standard was patterned after the constitutional standard enunciated by the Supreme Court in *White v. Regester*, 412 U.S. 755 (1973). *Gingles*, 478 U.S. at 36 n.4.  Although the Supreme Court subsequently made clear that a holding that a voting practice is unconstitutionally racial discriminatory must be predicated on a finding of discriminatory purpose, *Mobile* v. *Bolden*, 466 U.S. 55 (1980) (plurality opinion), the Court also has indicated that the constitutional purpose analysis may be undertaken by relying on factors similar to those used to conduct a Section 2 results analysis.  *Compare Rogers v. Lodge*, 458 U.S. 613, 623-27 (1982) (constitutional analysis) *with Gingles*, 478 U.S. at 36-37, 48 (Section 2 factors).  Moreover, as the Supreme Court has emphasized, Congress' enforcement power under the Civil War Amendments "includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader **swath** of conduct" than that which is forbidden by the Amendments themselves.  *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 82 (2000).

d.      In *Boerne*, the Supreme Court re-affirmed that "Congress must have wide latitude" in exercising its authority under the Civil War Amendments.  521 U.S. at 520. This is particularly true when Congress enforces fundamental or significant rights, such as the right to be free from racial discrimination in voting, whereas greater judicial scrutiny of congressional action is merited when Congress seeks to enforce other equal

339

protection rights.  As the Court explained in *Nevada Dep't of Human Res. v. Hibbs*, 538

U.S. 721, 735-36 (2003), and reaffirmed in *Tennessee v. Lane*, 541 U.S. 509, 528-29

(2004), the Supreme Court's decisions upholding congressional enactments under the

"congruent and proportionality" standard involved legislation where the constitutional

right is substantial and where state authority therefore is limited.

172.    In *Shelby County v. Holder*, 133 S. Ct. 2612 (2013), the Supreme Court held that it is

unconstitutional to use the coverage formula in Section 4(b) of the Voting Rights Act, 42 U.S.C.

§ 1973b(b), 52 U.S.C. § 10303(b), for determining the jurisdictions subject to the Section 5

preclearance requirement.  In so doing, the Court reaffirmed Section 2's vitality: "Our decision

in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2."

*Id.* at 2631.

173.    Finally, Defendants assert that the SB 14 fails the "rational means" test relied upon by the

Supreme Court in *South Carolina v. Katzenbach*, 383 U.S. 301,  324 (1966), and is

unconstitutionally vague.  The Fifth Circuit, however, rejected nearly identical claims in *Jones v.

City of Lubbock, supra*, and this Court, therefore, rejects them as well.

## XI.    <u>THE VOTER IDENTIFICATION PROVISIONS OF SB 14 ARE ENJOINED</u>

174.    The Court will enter an injunction against enforcement of the voter identification

provisions of SB 14.

175.    As reflected in the preceding Conclusions of Law, the Court has ruled on each of the

claims litigated at trial.  This is appropriate in order to avoid piecemeal decisionmaking,

including piecemeal appellate review, and also because the claims rely on many of the same

underlying facts.  In addition, the request for a preclearance order under Section 3(c) of the

Voting Rights Act, and for authorization of election observers under Section 3(a) of the Act,

depend on a finding that SB 14 was enacted with a discriminatory purpose, and therefore the Court is obligated to rule on the purpose issue.

176.    The appropriate remedy for the violation of the Section 2 results standard and the determination that SB 14 was enacted with a discriminatory purpose is a permanent and final injunction precluding implementation of the voter identification provisions of SB 14, namely Sections 1 through 15 and 17 through 22 of SB 14. "When devising a remedy to a § 2 violation, the district court's 'first and foremost obligation . . . is to correct the Section 2 violation.'" *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) (quoting *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1022 (8th Cir. 2006)) (alteration in original).  "In doing so, the district court 'should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength.'"  Id. (quoting S. Rep. 97-417, at 31 (1982)); see also S. Rep. 97-417, at 31 (requiring remedial orders to "fully provide[] equal opportunity for minority citizens to participate and to elect candidates of their choice").

177.    With regard to the appropriate remedy for the Court's determination that SB 14 imposes unconstitutional burdens on the right to vote, the Court recognizes that private Plaintiffs and Plaintiff-Intervenors do not assert a facial challenge to SB 14 but, instead, mount an as-applied challenge as to those citizens who lack SB 14 ID and who have not obtained a SB 14 disability exemption.  The appropriate relief as to this claim, therefore, should be tailored to these individuals to the extent possible.  Appropriate relief may be an injunction against enforcement as to these individuals of SB 14's ID requirements (including the provisions relating to EICs).  It may be the case, however, that a narrower injunction would be appropriate, so long as it ensures that citizens who lack SB 14 ID or the disability exemption are allowed to vote in-person without hindrances or burdens imposed by SB 14.  That said, in light of the broader remedy to be ordered

for the Section 2 results violation and the discriminatory purpose violation, the Court need not (as matters now stand) define the precise scope of the injunctive relief merited by the determination that SB 14 unconstitutionally infringes on the right to vote, and so defers that question.

178.    Similarly, the relief for the determination that SB 14 functions as an unconstitutional poll tax may be more limited than the relief based on the results and discriminatory purpose violations.  Here again, however, since the broader relief will be entered, the Court need not, and therefore will not, define the precise scope of the relief for the poll tax violation at this time.  The Court notes, however, that this relief would need to ensure that the underlying documents needed to obtain an EIC do not require the payment of a fee, a change that Texas possibly could address by the adoption of an administrative rule change.  The Court notes, however, that because a poll tax is illegal as to all citizens, regardless of income, Texas would not be able to cure this violation by accepting affidavits of indigency from voters unable to obtain SB 14 ID due to the fees that they would be required to pay.

179.    Under the injunction to be entered barring enforcement of SB 14's voter identification provisions, Texas shall return to enforcing the voter identification requirements for in-person voting in effect immediately prior to the enactment and implementation of SB 14.

180.    The Texas Legislature retains the authority to enact a different remedy for the statutory and constitutional violations and, if that should occur, this Court then would be obligated to review the legislation to determine whether it properly remedies the violations.  *Operation PUSH*, 932 F.2d at 405-06.  Because of the important role that the Texas Legislature may play subsequent to this ruling in passing an enactment for the purpose of remedying the violations, this Court cannot at this time accept Defendants' suggestion that the Court should proceed now

to re-fashion SB 14 by specifying that the law will not apply to voters who lack SB 14 ID but would continue to apply to voters who do possess that ID.  Moreover, Defendants' suggestion could raise equal protection concerns, *Bush v. Gore*, 531 U.S. 98, 104-05 (2000), and could improperly entangle the Court in developing procedures for implementing this new bifurcated system at early voting sites and polling places.  Any remedial enactment by the Texas Legislature, as well as any remedial changes Texas's administrative agencies, must come to the Court for approval, both as to the substance of the proposed remedy and the timing of implementation of the proposed remedy.

181.    SB 14 includes a severability clause, to which this Court must defer, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and therefore the injunction shall not apply to these provisions of SB 14 that do not relate to voter identification for in-person voting.  Accordingly, the injunction to be issued shall not apply to sections 16, 23, and 24 of SB 14.

182.    By subsequent order, the Court will set a status conference to address the procedures to be followed for considering plaintiffs' and plaintiff-intervenors' request for relief under Section 3(c) of the Voting Rights Act.

Date:  September 18, 2014

Respectfully submitted,


KENNETH MAGIDSON                    MOLLY J. MORAN
Unites States Attorney              Acting Assistant Attorney General
Southern District of Texas          Civil Rights Division


                                    */s/ Elizabeth S. Westfall*
JOHN ALBERT SMITH, III              T. CHRISTIAN HERREN, JR
Office of the U.S. Attorney         MEREDITH BELL-PLATTS
800 Shoreline Blvd                  RICHARD DELLHEIM
Ste 500                             ROBERT S. BERMAN
Corpus Christi, TX 78401            ELIZABETH S. WESTFALL
361-888-3111                        BRUCE I. GEAR
john.a.smith@usdoj.gov              JENNIFER MARANZANO
                                    ANNA M. BALDWIN
                                    DANIEL J. FREEMAN
                                    AVNER MICHAEL SHAPIRO
                                    BRADLEY E.HEARD
                                    Attorneys, Voting Section
                                    Civil Rights Division
                                    U.S. Department of Justice
                                    950 Pennsylvania Avenue, N.W.
                                    Washington, DC 20530
                                    202-305-7766
                                    elizabeth.westfall@usdoj.gov

344

/s/ Chad W. Dunn
CHAD W. DUNN
KEMBEL SCOTT BRAZIL
Brazil & Dunn
4201 Cypress Creek pkwy
Ste 530
Houston, TX 77068
281-580-6310
chad@brazilanddunn.com

J. GERALD HEBERT
Campaign Legal Center
215 E St. NE
Washington, DC 20002
202-736-2200
esimson@campaignlegalcenter.org

NEIL G. BARON
Law Offices of Neil G. Baron
914 FM 517 Rd W
Suite 242
Dickinson, TX 77539
281-534-2748
neil@ngbaronlaw.com

ARMAND DERFNER
Derfner, Altman, & Wilborn
P.O. Box 600
Charleston, SC 29402
843-723-9804
aderfner@dawlegal.com

LUIS ROBERTO VERA, JR.
Law Office of Luis Roberto Vera Jr.
111 Soledad
Ste 1325
San Antonio, TX 78205
210-225-2060
irvlaw@sbcglobal.net

*Counsel for Veasey Plaintiffs*

/s/ Marinda Van Dalen
MARINDA VAN DALEN
PRICILLA NORIEGA
ROBERT W. DOGGETT
KATHRYN NEWELL
Texas Rio Grande Legal Aid, Inc.
531 E St Francis
Brownsville, TX 78520
956-982-5543
mvandalen@trla.org

JOSE GARZA
Law Office of Jose Garza
7414 Robin Rest Drive
San Antonio, Texas 98209
210-392-2856
garzapalm@aol.com

*Counsel for Ortiz Plaintiffs*

/s/ Rolando L. Rios
ROLANDO L. RIOS
Law Offices of Rolando L. Rios
115 E. Travis
Ste 1645
San Antonio, TX 78205
210-222-2102
rrios@rolandorioslaw.com

*Counsel for Texas Association of Hispanic
County Judges and County Commissioners
Plaintiff-Intervenors*

*/s/ Ezra D. Rosenberg*
EZRA D. ROSENBERG
MICHELLE H. YEARY
STEVEN B. WEISBURD
AMY L. RUDD
LINDSEY COHAN
DECHERT LLP
902 Carnegie Center, Suite 500
Princeton, New Jersey 08540-6531
609-955-3222
Ezra.rosenberg@dechert.com

WENDY WEISER
MYRNA PEREZ
VISHAL AGRAHARKAR
JENNIFER CLARK
The Brennan Center for Justice at NYU Law
School
161 Avenue of the Americas, Floor 12
New York, New York 10013-1205
649-292-8310
Wendy.weiser@nyu.edu

ROBERT A. KENGLE
MARK A. POSNER
ERANDI ZAMORA
Lawyers' Committee for Civil Rights
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
202-662-8345
mposner@lawyerscommittee.org

DANIEL GAVIN COVICH
Covich Law Firm LLC
Frost Bank Plaza
802 N Carancahua, Ste 2100
Corpus Christi, TX 78401
361-884-5400
Daniel@covichlawfirm.com

GARY BLEDSOE
Potter Bledsoe, L.L.P.
316 W. 12th Street, Suite 307
Austin, Texas 78701
garybledsoe@sbcglobal.net
ROBERT NOTZON
The Law Office of Robert Notzon
1502 West Avenue
Austin, Texas 78701
Robert@notzonlaw.com

KIM KEENAN
MARSHALL TAYLOR
VICTOR GOODE
NAACP
4805 Mt. Hope Drive
Baltimore, Maryland 21215
kkeenan@naacpnet.org

*Counsel for Plaintiffs Texas State
Conference of NAACP Branches, Mexican
American Legislative Caucus of the Texas
House of Representatives*

*/s/ Christina Swarns*
CHRISTINA SWARNS
RYAN P. HAYGOOD
NATASHA M. KORGAONKAR
LEAH C. ADEN
DEUEL ROSS
NAACP Legal Defense and Educational
    Fund, Inc.
40 Rector Street, 5th Floor
New York, New York 10006
212-965-2200
rhaygood@naacpldf.org

DANIELLE CONLEY
JONATHAN PAIKIN
KELLY P. DUNBAR
SONYA L. LEBSACK
LYNN EISENBURG
RICHARD F. SHORDT
TANIA C. FARANSSO
WilmerHale LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
202-663-6006
danielle.conley@wilmerhale.com

*Counsel for Texas League of Young Voters*
*Plaintiff-Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 18, 2014, I served a true and correct copy of the foregoing via the Court's ECF system on the following counsel of record:

/s/ Michelle H. Yeary
Michelle H. Yeary