IN THE UNITED STATES DISTRICT COURT
**FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

MARC VEASEY, *et al.*,

      Plaintiffs,

   v.            Civil Action No. 2:13-cv-193 (NGR)

RICK PERRY, *et al.*,

      Defendants.

SECOND AMENDED REPLY REPORT
OF
Coleman Bazelon

ON BEHALF OF PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG VOTERS
EDUCATION FUND AND IMANI CLARK

September 21, 2014

## Table of Contents

I.     Assignment and Summary of Conclusions ...................................................... 1

II.    Concerns Raised About the Number of Affected Registered Voters and Their Distribution by Race ........................................................................................... 2

    II.A.  "Messiness" of the Data ........................................................................... 2

    II.B.  Preponderance of White Affected Registered Voters ............................... 4

III.   Concerns Raised About the Costs of Obtaining an Election Identification Certificate ........... 5

    III.A. Level of Travel Costs ................................................................................ 5

    III.B. Allocating Costs of Documents Over Multiple Uses ................................. 6

    III.C. Amortizing Costs Over Multiple Elections ............................................... 7

IV.    Concerns Raised About Burden ........................................................................ 8

    IV.A. Travel Cost Comparisons ......................................................................... 8

    IV.B. Significance of the Level of Costs ............................................................. 9

    IV.C. Validity of Welfare Comparisons ........................................................... 10

    IV.D. Calculus of Voting .................................................................................. 11

Appendix A – Explanation of Revisions to My Original Report ................................. 14

Appendix B – Materials Relied Upon ....................................................................... 16

Exhibit A: Amended Expert Report of Coleman Bazelon .......................................... 18

# I. Assignment and Summary of Conclusions

1.  I submitted an Expert Report in this matter on June 27, 2014.[1]  I have attached an amended version of that Report, reflecting updated data, to this Reply Report (Exhibit A).  I was asked to review the Rebuttal Declarations submitted by Professor Jeffrey Milyo[2] and Professor M.V. Hood III[3] and respond to their criticisms of my analysis.  In doing so, I also reviewed declarations submitted by Professor Stephen Ansolabehere,[4] Professor Daniel Chatman,[5] and Professor Gerald Webster.[6]

2.  The criticisms of my Report fall into three categories.  The first is that the number of Affected Registered Voters is exaggerated and biased by race.  The second is that the costs of obtaining an Election Identification Certificate (EIC) are exaggerated.  The third is that any costs associated with obtaining an EIC do not create a burden on Affected Registered Voters, or do not create a racially biased burden.  I find that:

---

[1] "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[2] "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

[3] "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

[4] "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

[5] "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

[6] "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, *et al*, against Rick Perry, *et al*, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

- Concerns raised about the number of Affected Registered Voters and their distribution by race are misplaced and, regardless, significant numbers of Texans are affected by SB 14;
- Criticisms about the costs of acquiring an EIC are misplaced and Affected Registered Voters bear meaningful economic costs to retain their right to vote; and
- Concerns about my analysis of the burden imposed on Affected Registered Voters, and specifically African-American Affected Registered Voters, are misplaced and SB 14 inflicts a concrete burden.

## II. Concerns Raised About the Number of Affected Registered Voters and Their Distribution by Race

3.   On July 31, 2014, I received supplemental data from the U.S. Department of Justice ("DOJ") that included additional matching results based on a submission by the State of Texas of previously omitted Department of Public Service ID records.  These additional data have led me to submit my Amended Expert Report.[7]  My Amended Report, based on the additional data provided by the State of Texas, addresses several of the criticisms raised by Professor Milyo and Professor Hood about seeming inconsistencies in the data used by Plaintiffs' experts.[8]

### II.A. "Messiness" of the Data

4.   Professor Milyo and Professor Hood make much of the so called "messiness" of the data used for my analysis of Affected Registered Voters.  For example, Professor Milyo argues that "deadwood" or out-of-date registered voter records from the TEAM database inflate the number of registered voters.[9]  The TEAM database is the official State of Texas record of registered voters and it is well beyond the scope of the present analysis to verify each of the more than 13 million TEAM records beyond that which has already been done by DOJ.  But the specific level of potentially affected voters is not relevant here.  As I noted in my Report, the scope of potential harm from SB 14 includes all potential voters, not just registered voters.[10]  Whether the basis of the analysis is all potential voters, registered voters as reported in the TEAM database, or some subset of the TEAM database, the conclusions of my analysis would be the same so long as the difference between these sets

---

[7]   See Exhibit A.

[8]   Milyo, ¶ 92; Hood, p. 19.

[9]   Milyo, ¶ 23.

[10]   Bazelon Report, footnote 5.

of Texans were not racially biased.  I am not aware of any evidence presented that would indicate that, in particular, the so-called "deadwood" entries in the TEAM database are racially biased.

5.   Professor Milyo also criticizes the use of Current Population Survey (CPS) data, which he claims suffers from over-reporting of registration rates.  This criticism does not impact my analysis unless the over-reporting demonstrated a racial bias because I only use the CPS estimates of voter registration by race to calculate the *relative* racial composition of registered voters.[11]  Moreover, even in the case of racial bias in the CPS estimates there is unlikely to be substantial impact on my disparity analysis.  I conducted a sensitivity analysis to test the impact of reducing the CPS estimate of the African-American registration rate.  I found that while this assumption would reduce my estimate of the total number of registered African-American voters, it would not affect my estimate of the share of registered African-American voters that are affected by SB 14.[12]

6.   Professor Milyo and Professor Hood raise concerns about how inconsistencies in the data fields between databases will lead to false negatives or no-matches where there should be a match.[13]  Professor Hood uses, as an example, one database having "James" and another database having "Jim" for the same individual, leading to a no-match when comparing two strings of data that include the first name.  Although he is correct that the specific string comparison (or sweep) would not match, he mischaracterizes the matching process to suggest that the example he gives would lead to a no-match between the databases.  Of the primary identifier variables used in the matching protocol, only 4 of the 7 combinations include first names.[14]  Consequently, in his example, the individual would have matched on one of the other sweeps.  A true false positive would require multiple errors from the "messiness" of the data that would have to accumulate to run-the-table on no-match errors from individual sweeps.

7.   A final point is worth mentioning about Professor Milyo's and Professor Hood's criticisms of the number of individuals affected by SB 14:  They both agree that a substantial number of people are impacted.  Professor Milyo suggests that by one measure "fewer than 2% of all

---

[11]   Bazelon Report, Section VI.C.

[12]   I reduced the CPS estimate of the African-American registration rate to 65.9% from 70.9%.

[13]   Milyo, ¶ 28; Hood, pp. 19 – 21.

[14]   Combinations A, D, E and F include "First Name," but Combinations B, C, and M do not.  See "United States' Database Matching Protocol," p. 8.

registered voters lack SB 14 ID."[15]   Even after adjusting for his estimate of 24% "deadwood,"[16] this suggests that more than 200,000 registered voters are affected by SB 14.[17] (He also implies that a more appropriate measure would be voting age population, citizen voting age population, or voting eligible population, each of which would form a much larger base than TEAM's records of registered voters.[18])   Professor Hood suggests the number of registered voters affected by SB 14 could be over 500,000.[19]   Although I do not agree with either estimate, both suggest that a very large number of individuals will be impacted by SB 14.

## II.B. PREPONDERANCE OF WHITE AFFECTED REGISTERED VOTERS

8.   Professor Milyo asks us to "consider" that the number of white Affected Registered Voters is significantly larger than the number of African-American or Hispanic Affected Registered Voters and is about as large as both groups combined.[20]   However, evaluating these numbers outside of the context of the total number of registered voters in each racial group is very misleading, as the numbers alone do not account for the proportion of individuals in each group that are impacted.   Proportionality is important because it suggests how much the impact is *related to race*.   As an example, about 65,000 Texans are Native Americans.[21] A law that burdened *nearly all* Native Americans (say, 99%), but only 1% of white Texans, would burden about twice as many[22] white Texans as Native American Texans, even though Native Americans would be over 9,000 times more likely to be burdened by the law than whites.[23]

---

[15]   Milyo, ¶ 81.

[16]   Milyo, ¶ 25.

[17]   13,350,209 * (1 − 0.24) * 0.02 = 202,923.

[18]   Milyo, ¶ 22.

[19]   Hood, p. 37.

[20]   Milyo, ¶ 89.   In my initial report, 48% of Affected Registered Voters are white; in my Amended Report, 44% of Affected Registered Voters are white.

[21]   http://www.texasalmanac.com/topics/culture/american-indian/american-indian.

[22]   My revised Table 1 reports 11,311,834 white Texans; 1% of them would be 113,118 white Texans.

[23]   The odds ratio is [0.99/(1-0.99)] / [0.01/(1-0.01)] = 9801.

9.   Professor Milyo further compares my estimate that 48% (revised to 45% in my Amended Report) of Affected Registered Voters are white to the Barreto and Sanchez estimate that 45% of Texas citizens of voting age are white to suggest that "non-Hispanic whites are disproportionately likely to lack SB 14 ID relative to their share of CVAP."[24]   This comparison is inconsistent and incorrect.   The relevant comparison is between the 48% (revised to 45%) of Affected Registered Voters who are white and the 58% of registered voters in Texas who are white.[25]   That the share of white Affected Registered Voters is fourteen percentage points *fewer* than the share of white registered voters shows that whites are much *less* likely to be affected by SB 14 than African Americans or Hispanics.[26]

## III. Concerns Raised About the Costs of Obtaining an Election Identification Certificate

### III.A.   Level of Travel Costs

10.   Professor Milyo argues that experts for the Plaintiffs exaggerate travel costs.[27]   He claims that we do not take into account the marginal costs of obtaining an EIC and instead measure the total costs.  This criticism is misplaced.

11.   First, most trips to an EIC issuing center that would be taken by public transport or walking (56% of the trips taken by African-American Texans versus 21% of the trips taken by white Texans, in my travel cost analysis[28]) would be unlikely to be useful for most other errands.  If the costs of acquiring a ride were discounted because of combining trips with other errands, as Professor Milyo suggests, this would likely reduce the economic costs to

---

[24]   Milyo, ¶ 90.

[25]   Both estimates come from the same data set relied on in my initial report.  *See* Bazelon Amended Report at Table 1.

[26]   See Bazelon Report, Table 1.   The equivalent numbers from my Amended Report for African Americans are 18% Affected Registered Voters and 13% of all registered voters (five percentage points *more*) and for Hispanics are 34% of Affected Registered Voters and 25% of all registered voters (ten percentage points *more*).

[27]   Milyo, ¶ 119.

[28]   Bazelon Report, Table 5.

white Texans more than to African-American Texans, who are less likely to be driven to obtain an EIC.[29]

12. Second, Professor Milyo argues that individuals may seek rides from a "friend or relative who also desires to obtain an EIC or has some nearby errand to run."[30]  This speculation may be true in some cases (though Professor Milyo offers no empirical evidence of how often this might occur), but even in those cases that would not make the travel costs zero.  The economic value of the gift from the friend or relative is the opportunity cost that would be incurred absent that gift.  For an individual who cannot drive, that opportunity cost is the cost of a taxi.  To be clear, my use of estimated taxi fares is not premised on every individual who travels to obtain an EIC by car actually taking a taxi.  It is an estimate of the economic value of being driven to obtain an EIC.

### III.B. ALLOCATING COSTS OF DOCUMENTS OVER MULTIPLE USES

13. Professor Milyo argues that because the documents necessary to support an application for an EIC are useful to citizens for purposes beyond the EIC application, only a portion of the costs should be allocated to the EIC process.[31]  This argument ignores that it is SB 14's voter ID requirement that is causing an individual to acquire the supporting documents now instead of in the future, if at all.  If, however, such an allocation of costs were undertaken, an accounting of *when* and *whether* the other uses of the documents would take place would be important.  Paying now for a document that may be used many years in the future creates additional costs for individuals.  It ties up money now that might not need to be spent for years, if ever.  This increases the share of costs allocated to initial (EIC application) use of the documents.  Given potentially high personal discount rates, especially among minorities who are less banked and more frequent users of non-traditional financial institutions such as pay day loans,[32] this could make current costs much more salient than future benefits.

---

[29]  Apart from my analysis of transport mode choice, household vehicle ownership rates are 89% among African-American Texans, approximately 8 percentage points less than for white Texans.  Percentages calculated from Chatman Report, Table 4.

[30]  Milyo, ¶ 120.

[31]  Milyo, ¶ 121.

[32]  Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598.

### III.C.    AMORTIZING COSTS OVER MULTIPLE ELECTIONS

14.    Professor Milyo argues that "[a]n EIC is also valid for 6 years and can be renewed.  This means that the costs of obtaining an EIC should be apportioned in some manner over this time."[33]  This argument is incorrect for at least three reasons.

    a.    It is the next election that is triggering or causing the costs of obtaining an EIC; without paying all of these costs a citizen would not be able to vote in that election.

    b.    Many registered voters do not vote in every election, so allocating the costs over several elections, as Professor Milyo suggests, is inappropriate.  Voters are not given the choice of paying for only a portion of an EIC if they only vote in this year's elections.  The investment in voting is sunk and irreversible—a voter cannot recover a portion of the cost of an EIC if she does not vote in a future election.

    c.    The benefits of voting in future elections would need to be discounted in deciding how much of the costs should be allocated to each election.  Because we value things less in the future than the same things today, the value of voting in later elections is less than the value of voting sooner.  This, in turn, means that the value of voting or, equivalently, the share of costs allocated to later elections should be less than the share of costs allocated to nearer term elections.

15.    For example, suppose that a voter goes to the polls in one election a year for six years.  For the first election, she must pay the costs of obtaining an EIC.  But, from the perspective of the first vote, she would not value the benefits of voting in the 6th year as highly she values the first vote.  Consequently, a greater share of the costs should be allocated to the nearer-term elections.

16.    Voters are not indifferent between paying for an ID now or in the future—they would always prefer to delay payment.  But because they must pay the costs of getting an ID now, the costs in the future are higher today than if those costs were paid in the future.[34]

---

[33]    Milyo, ¶ 122.

[34]    For example, pay day loans often carry implied interest rates in excess of 300% per year.  Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?," available at: http://ssrn.com/abstract=2145598.  A voter that relies on pay day loans would pay an implicit value of $18 in interest for every $1 in costs over the course of the 6 years she used the EIC to vote.  300% of $1 is $3; over 6 years the total interest costs would be $18.  Although this calculus would not apply to all voters, it would be more likely to apply to a minority voter than a white voter because minority voters are more likely to use pay day loan services.

# IV. Concerns Raised About Burden

## IV.A.  TRAVEL COST COMPARISONS

17.   Professor Milyo argues that because my estimated travel costs of getting to an EIC issuing office are higher for white Affected Registered Voters than for African-American Affected Registered Voters, and because there are more white than African-American Affected Registered Voters, my analysis contradicts "claims made by several experts that travel costs are higher for minority voters than for white voters in Texas."[35]  This is incorrect and fundamentally misunderstands my analysis.

18.   The other Plaintiff experts in this case perform alternative analyses that are not directly comparable to mine, in part because they focus directly on measures of time and not economic costs.[36]  Importantly, their travel-time calculations support my conclusions that African-American registered voters in Texas are more burdened by SB 14 than white registered voters in Texas.[37]  My analysis, in contrast, measures economic costs and places the burden in an economically-based context.  Nevertheless, my calculations of travel costs are based on an estimation that includes African-American Texans spending significantly more time traveling than white Texans: 85 minutes on average for African-American Texans compared to 38 minutes on average for white Texans.[38]  Consequently, on the metric preferred by the other Plaintiff experts—travel time—my analysis reinforces rather than contradicts their claims.

19.   More importantly, Professor Milyo ignores *why* the nominal dollar travel costs are lower on average for African-American Texans than for white Texans—African Americans in Texas earn on average $13.69 per hour whereas white Texans earn on average $23.08 per hour.[39]  As explained in my Report, the relatively lower wage rate for African Americans skews their transport choice toward public transportation and walking.  This can be seen in Table 5:  41% of African-American Texans would choose public transport and 15% would choose walking as compared to white Texans, who choose public transportation 14% of the

---

[35]   Milyo, ¶ 116.

[36]   Chatman Declaration; Webster Declaration.

[37]   Chatman, p. 33; Webster, p. 50.

[38]   Amended Bazelon Report, Table 6.  In my initial Report the average travel time was 81 minutes for African American Texans and 37 minutes for white Texans.

[39]   Bazelon Report, Table 3.

time and walking 7% of the time.[40]   The lower value of nominal travel costs for African-American Texans in Table 6 of my Report reflects both a significantly lower wage for time spent traveling and lower out of pocket travel costs (for public transport or walking) compared to white Texans, whose higher wages lead them to take more expensive trips by car (valued at the opportunity cost of a taxi.)

20.   But more fundamentally, Professor Milyo misses the point by comparing the nominal dollar costs between different races.   My understanding is that one of the questions before the Court is whether the *burden*, not the cost, imposed by SB 14 on groups of voters, such as African-American Texans, is different than the burden imposed on other groups, such as white Texans.   Other than one (incorrect) theoretical point, neither of the experts for the Defense mentions, much less addresses, my analysis of the burden imposed by SB 14. Section VIII of my initial report illustrates why the costs imposed on African-American Texans by SB 14 are more burdensome than for white Texans.   In that analysis I conclude: "For only the travel-cost portion of the burden created by SB 14, an African-American Affected Registered Voter is required to expend a share of their wealth that is more than four times higher than the share required for a white Texan."[41]

## IV.B.   SIGNIFICANCE OF THE LEVEL OF COSTS

21.   Both Professor Milyo and Professor Hood argue that any costs imposed by SB 14 are not burdensome.   I disagree and show that the costs are burdensome.   I estimate that the average travel costs associated with obtaining an EIC, across all Affected Registered Voters, is $36.33.[42]   As discussed in my initial report, this estimate does not include all of the costs that might be incurred in obtaining an EIC.[43]   The average travel cost of $36.33 is 149% of average hourly earnings.   When, in 1966, the Supreme Court found a poll tax of $1.75 in Texas an undue burden, that amount was only 69% of average hourly earnings.[44]   Clearly, the burden estimated in terms of travel costs alone is sufficient to be considered a barrier to voting.

---

[40]   Bazelon Report, Table 5.

[41]   Bazelon Report, ¶ 71.

[42]   Bazelon Report, Table 6.

[43]   Bazelon Report, Section VII.D.

[44]   In *Harper v. Virginia*, the court said, "We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard. Voter qualifications have no relation to wealth nor to paying or not paying this or any other tax."  383 U.S. 663, 666 (1966).

**Table 1: Comparison of Voting Burdens Versus Wages**

|                           |     | 1966   | 2014    |
|---------------------------|-----|--------|---------|
| Average Hourly Earnings   | [1] | $2.52  |         |
| Texas Poll Tax            | [2] | $1.75  |         |
| Average Hourly Earnings   | [3] |        | $24.38  |
| Travel Cost Burden        | [4] |        | $36.33  |
| Percentage                | [5] | 69.4%  | 149.0%  |

Notes and Sources:

[1] & [3]: BLS total private sector average hourly earnings
    for February 1966 and May 2014.
[2]: Poll tax at date of repeal in 1966, *United States v.*
    *Texas* (1966).
[4]: Average total burden of travel cost for all registered voters
    to obtain EIC, based on Brattle analysis.
[5]: For 1966, [2]/[1]. For 2014, [4]/[3].

## IV.C.   VALIDITY OF WELFARE COMPARISONS

22.   Professor Milyo claims that my burden analysis is theoretically invalid because I compare
the relative utility of money of wealthier versus less wealthy individuals.  He mistakenly
claims that in doing so, I am using cardinal utility estimates where the utility level of one
individual is directly compared to another individual.  My comparison of relative burdens
compares *changes* in wealth (in the form of the costs of obtaining an EIC) rather than *total*
utility of individuals.  Rather than making direct comparisons of how much a white or
African-American Texan values a dollar, I avoid direct interpersonal utility comparisons by
expressing the travel-cost portion of obtaining an EIC in terms of the average wealth of
each racial group.

23.   Professor Milyo is correct that economic theory has trouble comparing how two
individuals value a dollar.   Nevertheless, economic theory is unambiguous that an
individual with higher wealth will value a dollar less than that individual would with
lower wealth.  Consequently, in assessing burden, we do not have a basis for comparing the
burden of a dollar lost between two *random* or *equally situated* people, but do know that
for any given person having a lower income implies a greater burden from a lost dollar.

24.   In my Report I express the costs of obtaining an EIC as a share of wealth to extrapolate
from the technical issues of interpersonal comparison that Professor Milyo raises.  To defeat
my conclusions on relative burden, Professor Milyo would have to argue that white Texans

get more—much more—benefit from an additional dollar than African-American Texans. In fact, he would have to argue that a white Texan, who is on average 7 times wealthier than an African-American Texan, feels the pain of losing a small share of her income more than 4 times as much as a less wealthy African-American Texan would feel from losing the same share of her (smaller) wealth.  This seems a completely implausible argument to make.[45]

### IV.D.   CALCULUS OF VOTING

25.   As a threshold matter, Professors Milyo and Hood seem to believe that the only way to show harm in this matter is through statistically significant changes in voter turnout.[46] That is not my understanding of the appropriate measure of harm.  Rather, the question at hand is whether or not SB 14 creates different burdens for different groups of voters, such as African American versus white Texans.  Therefore, Professor Milyo's criticism that I, and the other Plaintiff experts, did not focus on voter turnout is misplaced.

26.   Professor Milyo helpfully explains that the calculus of voting weighs the costs and benefits of voting and that the literature recognizes that one of the benefits is what he calls "the non-instrumental value of voting."[47]  He goes on to say:

> Importantly, under the modified theory of voting, a small change in the cost of voting is expected to result in some small reduction in turnout.  This is because in general, not everyone will be just barely motivated to vote and therefore hypersensitive to small changes. … Consequently, this modified theory does imply that the costs of voting are related to turnout, but the model does not generate the dramatic prediction that even a small change in the cost of voting will result in a large change in turnout."[48]

27.   Of course, even if changing the results of an election was the correct standard, a change in turnout that changes the results of an election does not have to be large.  More importantly,

---

[45]   To illustrate with round, hypothetical numbers, Professor Milyo would have to argue that an individual with $100,000 in the bank would be more burdened by losing $100 than an individual with $15,000 in the bank would be burdened with losing $60, which assumes the share of wealth lost is 4 times as much for the lower wealth individual.

[46]   Milyo, Section VIII & ¶ 153; Hood, p. 9.

[47]   Milyo, ¶ 133.

[48]   Milyo, ¶ 134.

Professor Milyo's suggestion that I implied that the calculus of voting theory suggests that a small change in costs would "generate the dramatic prediction" of a "large change in turnout" is simply a straw man argument.

28.   Professor Milyo suggests that the lack of statistically significant changes in voter turnout indicates that there must be benefits of SB 14 that offset the costs.  This would depend crucially on the nature of those benefits.

29.   First, Professor Milyo suggests that increasing confidence in the election process may be one offsetting benefit.[49]  The Court's opinion in the recent Wisconsin decision suggests the opposite—that voter ID laws "undermine the public's confidence in the electoral process as much as they promote it."[50]

30.   Second, Professor Milyo suggests that any increases in the "salience" of voting from SB 14 would create benefits.  But this surely depends on how SB 14 increases salience.  Voter education efforts are laudable, but if groups of voters derive a greater benefit from voting (that justifies bearing a greater cost to vote) in reaction to perceiving their right to vote being under attack, then it seems inappropriate to count that perceived attack as a benefit that off-sets the costs imposed by the law.

31.   Other so-called benefits offered by Professor Milyo are more properly called efforts to mitigate harm and should not be counted as benefits of SB 14.  For example, he suggests that voter ID laws may motivate advocacy groups to increase voter mobilization efforts.[51]  Such efforts, however, do not change the burden created by SB 14.  Even if a philanthropist paid all the costs, including opportunity cost of time, for all Affected Registered Voters to acquire ID to vote, we would not say that SB 14 did not create a burden on the Affected Registered Voters; rather we would say that the burden created by SB 14 was compensated for by the philanthropist.

---

[49]   Milyo, ¶ 149.

[50]   Frank v. Walker, 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

[51]   Milyo, ¶ 149.

Respectfully submitted,

_____                    Date: September 21, 2014

Coleman Bazelon, Ph.D.

# Appendix A – Explanation of Revisions to My Original Report

32.   Following the submission of my original report, the State of Texas provided the DOJ with an updated list of records from the Texas Department of Public Service (DPS).  It is my understanding that the DOJ used this list to identify additional individuals in the TEAM database who have an eligible ID.  Such individuals would not be Affected Registered Voters, and, to the extent that they were not previously matched to one of the other state or Federal ID databases, this new information would decrease the number of Affected Registered Voters in my analysis.

33.   The DOJ provided me with an updated list of matches for each of the databases to the TEAM database.  I have examined this information and identified 562,348 registered voters that I had previously coded as Affected Registered Voters that would now be coded as "matched," *i.e.*, not needing to obtain an ID in order to vote.  I now estimate there to be 541,143 (previously 1,103,491) Affected Registered Voters overall. The number of African-American Registered Voters falls to 95,393 (previously 185,095), and the associated Affected share of African-American Registered Voters falls to 5.5% (previously 10.7%).  The number of white Registered Voters falls to 241,812 (previously 530,636), and the associated Affected share of white Registered Voters falls to 3.1% (previously 6.9%).

34.   My Amended Report shows that African-American Registered Voters are still disproportionately more likely to be affected by SB 14, with a differential in the share of Affected Registered Voters of 2.4 percentage points.  The odds ratio between African-American and white Registered Voters is 1.81, meaning that among registered voters, African-American registered voters are 1.81 times more likely to require an ID in order to vote than are white registered voters.

35.   In the course of updating my Report, I discovered an error in the way that matched, deceased voters were incorporated into my analysis.  This error caused me to overstate the values in column [B] of Table 1 of my original report by 4,703 voters.  It had no impact on my estimates of Affected Registered Voters and an immaterial impact on my estimate of the Affected Share of Registered Voters.  A version of Table 1 of my original report, correcting for this error but not incorporating the new DPS information, is provided below (as Table 2 of this reply report).  Table 2 is meant only to describe the effect of the error on my original report, showing that it had no material effect on my racial disparity results.  This error is not present in my Amended Report.

**Table 2: Corrected Table 1 of Original Report, Before Supplemental DOJ Data Submission**

| | All Texans [A] | All Registered Texan Voters [B] | | All Affected Registered Texan Voters [C] | Affected Share of Registered Voters [D] |
|---|---|---|---|---|---|
| African American | 2,835,493 | 1,722,452 | | 185,095 | 10.7% |
| White | 11,311,834 | 7,689,234 | | 530,636 | 6.9% |
| Hispanic | 9,389,496 | 3,386,737 | | 350,224 | 10.3% |
| | | | | | |
| All | 24,932,741 | | *EIC required* | | 8.3% |
| | | 13,354,912 | | 1,103,491 | |
| | | | *EIC required, or disability exempt* | 1,232,231 | 9.2% |

Notes and Sources:

U.S. Census Bureau 2010 population counts; U.S. Census Bureau, Current Population Survey, November 2012; TEAM database.

[B]: TEAM consists of a total of 13,564,410 voters, of whom 13,515,665 were not known to be deceased; 13,411,173 of these voters have addresses or zipcodes that are able to be mapped to Census Block Groups; 13,354,912 of these voters map to Census Block Groups without prisons.

[C]: Results of DOJ Matching data.

[D]: [C] / [B].

## Appendix B – Materials Relied Upon

### Articles and Book Chapters

1. Nathalie Martin and Ernesto Longa, "High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Class?" *Loyola Consumer Law Review,* 24 (4), 2012, p. 524. Available at: http://ssrn.com/abstract=2145598.

### Court Documents

2. "Expert Report of Coleman Bazelon," On Behalf of Plaintiff-Intervenors Texas League of Young Voters Education Fund and Imani Clark" In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

3. "Rebuttal Declaration of Jeffrey Milyo," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193, August 1, 2014.

4. "Rebuttal Declaration of M.V. Hood III," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), August 1, 2014.

5. "Declaration of Stephen D. Ansolabehere," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), July 1, 2014.

6. "Report of Daniel G. Chatman, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

7. "Report of Gerald R. Webster, Ph.D.," In the Matter of Marc Veasey, et al, against Rick Perry, et al, United States District Court for the Southern District of Texas Corpus Christi Division, Civil Action No. 2:13-CV-00193 (NGR), June 27, 2014.

8. *Harper v. Virginia,* 383 U.S. 663, 666 (1966).

9. *Frank v. Walker,* 2014 WL 1775432, at *18 (E.D.Wis. Apr. 29, 2014).

10. *United States v. Texas,* 252 F.Supp. 234 (1966).

### Databases

11. Department of Justice Matching Data

12. "Table B-3. Average hourly and weekly earnings of all employees on private nonfarm payrolls by industry sector, seasonally adjusted," U.S. Bureau of Labor Statistics Economic News Release, August 01, 2014, retrieved from < http://data.bls.gov/cgi-bin/print.pl/news.release/empsit.t19.htm> (accessed 08/15/14).

13. National Employment, Hours, and Earnings Series (SIC) EES00500006, Bureau of Labor Statistics, retrieved from < http://data.bls.gov/pdq/querytool.jsp?survey=ee> (accessed 08/08/14).

## Other Sources

14. "American Indians in Texas," Texas Almanac, retrieved from <http://www.texasalmanac.com/topics/culture/american-indian/american-indian> (accessed 08/15/14).

## Exhibit A: Amended Expert Report of Coleman Bazelon