UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION


MARC VEASEY, ET AL.,            )     CASE NO: 2:13-CV-00193
                               )
            Plaintiffs,        )          CIVIL
                               )
      vs.                      )     Corpus Christi, Texas
                               )
RICK PERRY, ET AL.,            )   Monday, September 22, 2014
                               )   ( 8:28 a.m. to 10:14 a.m.)
            Defendants.        )   (10:30 a.m. to 12:12 p.m.)


BENCH TRIAL - DAY 9
(CLOSING ARGUMENTS)

BEFORE THE HONORABLE NELVA GONZALES RAMOS,
UNITED STATES DISTRICT JUDGE



Appearances:               See Next Page

Court Recorder:            Genay Rogan

Clerk:                     Brandy Cortez

Transcriber:               Exceptional Reporting Services, Inc.
                           P.O. Box 18668
                           Corpus Christi, TX 78480-8668
                           361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>

Plaintiffs:                    CHAD W. DUNN, ESQ.
                               Brazil and Dunn
                               4201 Cypress Creek Parkway, Suite 530
                               Houston, TX 77068

                               ARMAND DERFNER, ESQ.
                               P.O. Box 600
                               Charleston, SC 29402

                               J. GERALD HEBERT, ESQ.
                               Attorney at Law
                               191 Somervelle Street #405
                               Alexandria, VA 22304

Mexican American              EZRA D. ROSENBERG, ESQ.
Legislative Caucus,           Dechert, LLP
et al.:                       902 Carnegie Center, Suite 500
                               Princeton, NJ 08540-6531

                               MARK A. POSNER, ESQ.
                               Lawyers' Committee for Civil Rights
                               1401 New York Ave. NW, Suite 400
                               Washington, DC 20005

Mexican American              MYRNA PEREZ, ESQ.
Legislative Caucus,           Brennan Center for Justice
et al.:                       161 Avenue of the Americas
                               12th Floor
                               New York, NY 10013

United States                 RICHARD DELLHEIM, ESQ.
of America:                   ELIZABETH S. WESTFALL, ESQ.
                               DANIEL FREEMAN, ESQ.
                               ANNA BALDWIN, ESQ.
                               MEREDITH BELL-PLATTS, ESQ.
                               U.S. Department of Justice
                               950 Pennsylvania Ave. NW
                               Washington, DC 20530

Ortiz Plaintiffs,             ROBERT W. DOGGETT, ESQ.
et al.:                       Texas Rio Grande Legal Aid, Inc.
                               4920 North IH 35
                               Austin, TX 78751

3

<u>APPEARANCES FOR:</u>            (CONTINUED)

```
Ortiz Plaintiffs,          MARINDA VAN DALEN, ESQ.
et al.:                    Texas RioGrande Legal Aid, Inc.
                           531 E. St. Francis
                           Brownsville, TX 78520


Texas League of Young      RYAN HAYGOOD, ESQ.
Voters Education Fund:      NATASHA KORGAONKAR, ESQ.
                           LEAH ADEN, ESQ.
                           NAACP Legal Def. and Educational Fund
                           40 Rector St., 5th Floor
                           New York, NY 10006


                           DANIELLE CONLEY, ESQ.
                           KELLY DUNBAR, ESQ.
                           TANIA C. FARANSSO, ESQ.
                           Wilmer Cutler Pickering, et al.
                           1875 Pennsylvania Avenue, NW
                           Washington, DC 20006


Texas Association of       ROLANDO L. RIOS, ESQ. (via phone)
Hispanic County Judges     115 E. Travis
and County                 Suite 1654
Commissioners:             San Antonio, TX 78205


State of Texas:            JOHN BARRET SCOTT, ESQ.
                           Deputy Attorney General
                           for Civil Litigation
                           Office of the Attorney General
                           P.O. Box 12548
                           Austin, TX 78711


                           ADAM ASTON, ESQ.

                           JOHN REED CLAY, JR., ESQ.
                           LINDSEY E. WOLF, ESQ.
                           G. DAVID WHITLEY, ESQ.
                           STEPHEN L. TATUM, JR., ESQ.
                           STEPHEN R. KEISTER, ESQ.
                           Office of the Attorney General
                           P.O. Box 12548
                           MC001
                           Austin, TX 78711


State of Texas:            BEN A. DONNELL, ESQ.
                           Donnell Abernethy Kieschnick
                           555 N. Carancahua, Suite 400
                           Corpus Christi, TX 78401
```

4

## INDEX

**CLOSING ARGUMENT**                                                    **PAGE**

BY MR. DELLHEIM                                                      15/133

BY MR. ROSENBERG                                                    34/136

BY MR. HAYGOOD                                                      54/138

BY MS. VAN DALEN                                                        71

BY MR. DUNN                                                         80/140

BY MR. ASTON                                                          104

1    <u>**Corpus Christi, Texas; Monday, September 22, 2014; 8:28 a.m.**</u>

2                        **(Call to Order)**

3              **THE COURT:**  Good morning.

4        **(Counsel greet the Court)**

5              **THE COURT:**  You can have a seat.

6              Court calls Cause Number 213-CV-193, *Veasey, et al.*

7    *versus Perry, et al.*  I'm having sinus/allergy issues this

8    morning, so it's affecting my hearing a little bit.  You-all

9    may need to speak up.

10             The Plaintiffs will announce?

11             **MR. DUNN:**  Good morning, your Honor.  Chad Dunn on

12   behalf of the Veasey/LULAC Plaintiffs.  Joined with me at

13   counsel table is Gerry Hebert, Armand Derfner.  And we'll be

14   presenting on behalf of the Veasey/LULAC Plaintiffs.  Good

15   morning.

16             **THE COURT:**  Okay.

17             **MR. ROSENBERG:**  Good morning, your Honor.

18             **THE COURT:**  Good morning.

19             **MR. ROSENBERG:**  Ezra Rosenberg from Dechert on behalf

20   of the Texas State Conference of NAACP Branches and MALC.  And

21   joining me at counsel table is Mark Posner from the Lawyers'

22   Committee for Civil Rights, Myrna Perez from the Brennan

23   Center, and I think that's it for now.

24             **THE COURT:**  All right.

25             **MR. DELLHEIM:**  Good morning, your Honor.

1              **THE COURT:**  Good morning.

2              **MR. DELLHEIM:**  Richard Dellheim for the United

3    States.  With me at counsel table is Meredith Bell-Platts,

4    Elizabeth Westfall, Anna Baldwin -- excuse me -- and Dan

5    Freeman.

6              **THE COURT:**  Okay.

7              **MR. DELLHEIM:**  Thank you.

8              **THE COURT:**  Good morning.

9              **MR. HAYGOOD:**  Good morning, your Honor.  Ryan Haygood

10   for the Texas League of Young Voters Education Fund.  I'm

11   joined by a host of my colleagues, including Danielle Conley,

12   and Kelly  Dunbar, Tania Faransso from Wilmer Hale, along with

13   my LDEF colleagues, Natasha Korgaonkar, Leah Aden, and Deuel

14   Ross.

15             **THE COURT:**  Thank you.

16             **MS. VAN DALEN:**  Good morning, your Honor.

17             **THE COURT:**  Good morning.

18             **MS. VAN DALEN:**  Marinda Van Dalen, Texas Rio Grande

19   Legal Aid, representing the Ortiz Plaintiffs.  With me in the

20   courtroom is my colleague, Robert Doggett.

21             **THE COURT:**  Okay.  Is that all on the Plaintiffs?

22   All right.

23             **MR. DUNN:**  For common interest?

24             **MR. SCOTT:**  Yeah, John Scott on behalf of the State

25   Defendants.  They -- Adam Ashton from our office, who's sat

1    through trial, will be doing the closing on our behalf.

2              **THE COURT:**  Okay.

3              **MR. DUNN:**  Your Honor, if I could take up a point of

4    privilege here.  We had perhaps been a little too aggressive by

5    limiting ourselves to two hours.  And if the Court would permit

6    it, we'd like to go just a few minutes longer.  I'll be the one

7    that's last, so I'll take the punishment for it.  But is that

8    acceptable?

9              **THE COURT:**  Fine with the Court, a few minutes over.

10             **MR. SCOTT:**  We're going to be shorter, so we'll,

11   we'll give him some time.

12             **MR. DUNN:**  Thank you.  And we may also do some

13   rebuttal.  A few of us may do that.  We'll keep it to just a

14   handful of minutes apiece.

15             **THE COURT:**  Okay.  There's a couple of matters

16   that -- pending matters that, I guess, we need to address.  On

17   the last day of trial, I think the Defendants had filed the

18   opposed request for judicial notice of the criminal complaint.

19   I heard a little bit of argument on that, but I don't think

20   that I actually ruled.  I was going to review it.

21             And so, the Court will grant that; take judicial

22   notice of the complaints only, not whether what is set forth

23   through the contents of the affidavits, whether that is true or

24   not.

25             Then there's been some pleadings filed since you-all

1    were here last or some objections by the Plaintiffs to some

2    exhibits.  Then on Saturday there was an amended report by

3    Dr. Hood.  So I'm just not sure where we, we are on that.

4           MR. FREEMAN:  Your Honor, it's my understanding that

5    the issues with regard to documents may have been resolved

6    amongst the parties.  It's my understanding, I believe, that

7    there's only one outstanding exhibit at this point.

8           THE COURT:  Okay.  But let me ask, what was the

9    agreement on Dr. Hood?  What, what was filed?  Does it

10   change --

11          MR. SCOTT:  There was an amended report, yet another

12   one, where the last file, your Honor, is the report for the

13   Court's consideration.  That was the revision that addressed

14   Dr. Ansolabehere's report that was filed the previous week.

15          THE COURT:  Okay.

16          MR. SCOTT:  Right.  And to be clear, the penultimate

17   report, the report that was filed on Thursday by Dr. Hood, is

18   withdrawn.  That's correct.  And --

19          THE COURT:  Okay.  So what was filed on Thursday by

20   the Defendants regarding Dr. Hood is not to be addressed by the

21   Court, it's this Saturday --

22          MR. SCOTT:  Yes, ma'am.

23          THE COURT:  -- report --

24          MR. SCOTT:  Yes, ma'am.

25          THE COURT:  -- that was filed.  That -- was that

9

1    included with your findings, what was set forth in that

2    Saturday report?

3              **MR. ROSENBERG:**  There is --

4              **THE COURT:**  I haven't looked at the details to know

5    exactly what the changes were.

6              **MR. ROSENBERG:**  There is one reference, I believe, in

7    Paragraph 104 of the State's findings of fact to the report

8    that has been withdrawn.

9              **MR. CLAY:**  Is it -- is it a --

10             **MR. ROSENBERG:**  It's a quote -- it's a quote from it

11   from Page 6 or 7 of, of the report.

12             **MR. CLAY:**  From the part that we struck?

13             **MR. ROSENBERG:**  Yes.

14             **MR. CLAY:**  Okay.  Well --

15             **MR. ROSENBERG:**  Yeah.

16             **THE COURT:**  Okay.

17             **MR. CLAY:**  We're happy to file an amended one that --

18             **THE COURT:**  You don't need to do that.

19             **MR. CLAY:**  Okay.

20             **THE COURT:**  I just thought we'd clear it up right

21   now --

22             **MR. CLAY:**  Sure.

23             **THE COURT:**  -- so that it would take me longer than

24   for you-all to just get to the point and let me know.

25             **MR. DUNBAR:**  And, your Honor, Kelly Dunbar for the

10

1    Texas League of Young Voters.  I just wanted to make clear for

2    the record, we filed a third amended expert report of

3    Dr. Coleman Bazelon last night per agreement with the

4    Defendants.  It was basically so that the report that we

5    filed -- the amended report that we filed on Wednesday can be

6    withdrawn, or the Court should be looking at what we filed last

7    night with respect to Dr. Bazelon.

8              THE COURT:  What does that do?

9              MR. DUNBAR:  I'm sorry?

10             THE COURT:  What does that amended report do?

11             MR. DUNBAR:  What does it --

12             THE COURT:  Well, does it change anything?

13             MR. DUNBAR:  Oh, I'm sorry.

14             THE COURT:  Your findings or …

15             MR. DUNBAR:  No.  There is a disagreement just about

16   which figures we should have been using, in terms of revising

17   the numbers and the -- we reached an agreement with the State

18   on how to deal with that.  And the report we filed last night

19   should be the one that the Court uses.

20             THE COURT:  Does it change your proposed findings

21   that you submitted?

22             MR. DUNBAR:  There may be one place where we need,

23   need to make a tweak.  We were going to take a look at that

24   and, with your Honor's permission, file an errata or correction

25   on that.

1          **THE COURT:**  What -- I think this is the deal, at this

2    point, I don't want a lot -- a lot of filings to occur, even if

3    they're agreed to, because at some point I need to know where

4    we are so that I can move forward.  And even if you-all agree

5    to certain things to be filed, it -- it's just not efficient

6    for the Court.

7          So, is there an anticipation that more pleadings are

8    going to be filed?  And if so, what?  And is it necessary what

9    you filed already, I mean, to need to connect it?  So where are

10   we on that?

11         **MR. ROSENBERG:**  Your Honor, if I may make a

12   suggestion, in terms of this last issue, it might be easier

13   because I think what Mr. Dunbar is talking about is perhaps one

14   or two numbers being changed that aren't big, if you were just

15   to file an errata file instead of a whole big --

16         **THE COURT:**  Okay.  When?

17         **MR. ROSENBERG:**  -- document and perhaps the State can

18   do the same thing on, on the other issue, and that might ease

19   the burden on your Honor.

20         **THE COURT:**  On Dr. Hood for the State?

21         **MR. CLAY:**  Absolutely.

22         **THE COURT:**  And then when will the Court have that?

23         **MR. ROSENBERG:**  That can be done within 24 hours, I

24   think.

25         **THE COURT:**  Okay.  Any other anticipated filings?

1          **MR. ROSENBERG:**  No, your Honor.

2          **MR. CLAY:**  Nothing from us, your Honor.

3          **THE COURT:**  Okay.  And at this point you do not file

4   anything unless you seek leave from the Court, even if it's

5   agreed to.  Okay?

6          **MR. CLAY:**  Thank you.

7          **THE COURT:**  What -- anything else before we go --

8          **MR. ROSENBERG:**  I think just to be clear, Ms. Wolf's

9   going to be addressing, I guess, a few exhibit issues, but I

10  think at this point all, I've forgotten what number the parties

11  are, in terms of supplemental exhibit lists, but all of those

12  are now admitted pursuant to all of our agreements, except for

13  anything else that you're going to be addressing right now; is

14  that correct?

15         **MS. WOLF:**  Yes, your Honor.  There, there may be a

16  chance we need to amend a list based on how your Honor rules

17  today, and also based on something I just told Mr. Freeman

18  about five minutes ago, but it's only going to be one exhibit

19  list and it will be with respect to one exhibit and however

20  your Honor rules today.

21         **THE COURT:**  Okay.  So which are the exhibits that are

22  still left to be addressed?

23         **MS. WOLF:**  The first, if I can address, Defendants'

24  456 was an exhibit that we had discussed before we left, and

25  that was the exhibit from Ms. Guidry's file.  And I've come to

1    an agreement with Mr. Hebert.  We've submitted certain pages

2    that the Defendants wanted to submit, and we added some pages

3    that the Plaintiffs asked to submit, and we've agreed that

4    those pages are not being submitted for the truth of the

5    matters contained therein, but the revised version of

6    Defendants' 456 that your Honor received on the drives that

7    were submitted last week, that's the final exhibit.

8               **THE COURT:**  Okay.  And that's agreed to, correct?

9               **MR. HEBERT:**  Yes, your Honor.  That is agreed to.

10   Gerry Hebert for the LULAC/Veasey claim.

11              **THE COURT:**  Okay.

12              **MS. WOLF:**  So the remaining exhibit issue is with

13   respect to something that was added last week, and actually

14   which we sought to amend yesterday as well, which is

15   Defendants' 2756.  And what that is, your Honor, is a list of

16   the currently available EIC mobile stations for 2014.  And the

17   reason the Defendants submitted -- would like to include the

18   most recent version of that list is because, as Mr. Ingram

19   testified, it -- we're in election season and that list is

20   currently being added to and being negotiated as well.  And he

21   testified specifically, I believe, that they were trying to

22   schedule EIC mobile stations between a certain date in

23   September and, I believe, it was October 15th.

24              And so, so that your Honor has a complete picture of

25   where we are with the EIC mobile stations as of this date, we'd

1  ask that DEF 2756, which is the list as of yesterday afternoon,

2  be admitted into evidence.

3            **THE COURT:**  Okay.

4       **MR. FREEMAN:**  And, your Honor, the United States'

5  concern is principally to find out when the close of evidence

6  would really occur, because this was a --

7            **THE COURT:**  Right now.

8       **MR. FREEMAN:**  -- document that had been created --

9            **THE COURT:**  That's it.

10      **MR. FREEMAN:**  -- after trial.  And with your Honor's

11 earlier ruling, I think that largely resolves our concern.

12 This is a document that was created after trial, but so long as

13 we can say that the box is closing, I think that we can live

14 with it.

15           **THE COURT:**  All right.  So then that's admitted.

16      (**Defendants' Exhibit Number 2756 was received in evidence**)

17           **MS. WOLF:**  Thank you, your Honor.

18           **THE COURT:**  Any other exhibits or anything else to

19 address, to finalize?

20           **MR. SCOTT:**  Well -- and -- this is, I guess, both

21 addresses Hood's last report and Bazelon's last report, to make

22 sure, and I'm assuming the rest of the reports that were filed

23 last week, to make sure that they're all part of the exhibit

24 list as well, is that something we're doing by agreement?  Is

25 that the -- whatever the last number --

1    **MR. SPEAKER:**  We put Farr onto our exhibit list as a

2  revised of the same exhibit number.

3    **MR. SCOTT:**  Is that what --

4    **MS. WOLF:**  Dr. Hood's report is on our list, so we're

5  going to need to sub out the revised Hood report, but we'll use

6  the same exhibit number.  So we'll provide the Court with a

7  final list within 24 hours of what we're subbing out.

8    **MS. CONLEY:**  And we'll do the same for Dr. Bazelon's

9  report.

10    **THE COURT:**  All right.  So those are the only matters

11  pending then, correct?

12    **MR. SCOTT:**  Yes.

13    **THE COURT:**  And, and nothing more.  Closing

14  arguments.  No more evidence.  No more filings.

15    Okay.  I say we go for about an hour and a half, take

16  a break, short break, and then we'll do the remainder of the

17  argument, or thereabouts?  So we can proceed.

18    Good morning.

19    **CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES**

20    **BY MR. DELLHEIM:**  Good morning, your Honor.  Richard

21  Dellheim on behalf of the United States.

22    I will address the United States' claims under the

23  results standard of Section 2.  My colleague, Mr. Rosenberg,

24  will address the discrimination purpose standard under

25  Section 2.

16

1          Your Honor, what is most striking about this case is

2     not that it presents novel issues uncontemplated by the

3     Congress and the President who passed the <u>Voting Rights Act</u>,

4     what is perhaps so striking about this case is how easily it

5     fits within the line of cases over the years in which Texas

6     courts have confronted and stopped discriminatory voting laws.

7          The Court has heard much about how SB 14 was a

8     solution in search of a problem; and that, of course, is true.

9     But the evidence, and much of it undisputed, shows that SB 14

10    is a serious problem in search of a solution.  The problem is

11    that it violates the <u>Voting Rights Act</u>.  And the solution is

12    that SB 14 should be enjoined.

13         The Court, of course, is well familiar with the

14    Section 2 standards, and I won't belabor them here.  In short,

15    SB 14 denies or abridges the right to vote on the count of

16    race, if its ID. requirements interact with the totality of the

17    political, social, and historical conditions in Texas, so as to

18    result in African Americans and Hispanic voters having less

19    opportunity than the State's Anglo voters to cast an in-person

20    ballot that counts.

21         And we know from the Operation Push case from the 5th

22    Circuit that the Court is to engage in a two-part inquiry:

23    first, is whether there's a disparate impact; and second, if a

24    disparate impact is established, then the Court assesses the

25    totality of the circumstances.

1           With respect to disparate impact, your Honor, the

2    Court has heard abundant, consistent, and essentially,

3    unrefuted evidence of the disparate racial and ethnic impact of

4    SB 14.  The Court heard from Dr. Stephen Ansolabehere, a

5    distinguished professor of government at Harvard University.

6    Dr. Ansolabehere, through painstakingly careful analysis

7    determined that over 608,000 Texas registered voters lacked

8    SB 14 ID.  And among those voters without ID., there are stark

9    and undeniable racial disparities.

10          Dr. Ansolabehere used four different well-established

11   methodologies to reach his determinations.  Each one on why

12   persistent and statistically significant gaps in ID. possession

13   rates by minority voters in Texas versus Anglo voters.

14          First, Dr. Ansolabehere used ecological regression,

15   and that is the method, as the Court may recall, that Dr. Hood,

16   Texas expert, said was, quote, "The most prevalent type of

17   analysis used in the social sciences."  This long-accepted

18   methodology using census race data estimates that African

19   American voters lack ID. at a rate of four times that of Anglo

20   voters.  Hispanic voters are impacted at a rate nearly three

21   times as high.

22          The second methodology Dr. Ansolabehere used to form

23   his analysis was homogeneous precinct analysis, and it shows

24   the same statistically significant racial disparities.  Using

25   this methodology, African American voters are nearly four times

1    as likely than Anglos to lack SB 14 ID.  And, similarly,

2    Hispanic voters are three times as likely not to possess SB 14

3    ID.

4            The third methodology used individual race estimates

5    from catalysts.  And those results are no different.

6            The fourth methodology, the Spanish surname analysis,

7    which compared voters that Texas, itself, has flagged in its

8    photo registration database as having a Spanish surname.  That

9    analysis confirms the same trends.  Voters with Spanish

10   surnames are 41 percent more likely not to possess SB 14 ID.

11           Your Honor, the bottom line is this, whatever

12   generally accepted methodology is used, however the data are

13   analyzed or sliced or diced, from whatever angle they are

14   appraised, Dr. Ansolabehere's results demonstrate across the

15   board that minority voters possess SB 14 ID. at statistically

16   significant rates that lag far behind Anglos.

17           Of course, Dr. Ansolabehere did not stop there.  The

18   Court can be certain of the evidence of wide racial disparities

19   because of the multiple sensitivity analysis that

20   Dr. Ansolabehere employed.  Dr. Ansolabehere specifically

21   showed that racial disparities and ID. possession were not

22   caused or correlated with any possible deadwood on the voter

23   rolls.  And the Court may recall the deadwood refers to those

24   in the rolls who may be deceased or may have moved away.

25   Dr. Ansolabehere used multiple methods of -- to identify

1   potentially out-of-date registrants for people likely to have

2   moved away or passed away.  And in every instance, the racial

3   disparities remained.

4          The Court also heard discussion during trial about

5   voters over 65 and the disabled.  The United States and the

6   defense disagree about how to treat those voters.  The

7   Defendants believe that voters over 65 or those eligible to

8   apply for disability exemption are unaffected or choose not to

9   be affected by SB 14.  We disagree.

10          Persons over 65 who choose to vote in person have to

11  show ID. just like everybody else.  And this Court heard

12  numerous witnesses who were over 65 testify to the fact that

13  they profoundly desire to vote in person for, among other

14  legitimate reasons, that include needing assistance or concerns

15  over -- about mail -- concerns about mail, or just the desire

16  to see the ballot go as far into the process as possible.

17  Those concerns are legitimate, and SB 14's disfranchising

18  affect on those voters is real.

19          But even if we remove those voters from the no match

20  list, the results are the same.  And moreover, your Honor, in

21  fairness, the disability exemption appears to be illusory, at

22  least in practice.  Just 18 voters across the State of Texas

23  have successfully applied for that exemption as of January of

24  2014.

25          The Court may also recall Dr. Webster's testimony.

1    Dr. Gerald Webster is the geographer from the University of

2    Wyoming.  His analysis showing how these data play out in -- on

3    the ground in Texas is illuminating.  He looked at Houston, San

4    Antonio, and Dallas.  And his geographic analysis established

5    that predominately minority communities have higher shares of

6    voters who lack SB 14.

7              And he also showed the opposite.  He brought up a

8    slide from Dallas.  The top slide shows a color map of those in

9    Dallas who lack SB 14 ID.; those are the heavily shaded areas

10   in the southern portion of Dallas.  The second slide shows the

11   Anglo population.  The two slides are mirror opposites.  Race

12   and ID. are highly correlated and statistically significant in

13   Texas.

14             In short, your Honor, every last analysis

15   demonstrates the same thing, Black and Hispanic voters in Texas

16   stand to be disenfranchised by SB 14 at much higher statically

17   significant rates than do Anglo voters.

18             And the Court may ask, what is the contrary evidence?

19   And the answer is none.  Defendants have offered virtually no

20   evidence showing that Dr. Ansolabehere's no match list is

21   systematically inflated, racially biased, or simply wrong.

22   Indeed, Defendants' expert, Dr. Hood, did not identify a single

23   error on the no match list, nor did Dr. Hood or Texas' other

24   expert, Dr. Milyo, an economist who did not appear in court.

25   They did not conduct any empirical analysis of the key racial

1   demographics at the heart of this case.

2            And importantly, your Honor, Dr. Hood testified he

3   had no criticism whatsoever of Dr. Ansolabehere's ecological

4   regression analyses or his homogeneous precinct analyses.  And,

5   of course, he agreed those methods were well established and

6   reliable for estimating race among groups.  Nor, of course, did

7   Dr. Hood or Dr. Milyo perform any data matching, any regression

8   analyses, any homogeneous precinct analyses, or Spanish surname

9   analyses of their own.

10            To be sure, Dr. Hood speculated about potential

11   problems with the data matching process, but he acknowledged on

12   cross examination that his concerns were essentially baseless,

13   given Dr. Ansolabehere's comprehensive methodology.

14            He also acknowledged that the results of the

15   algorithm that he designed and had run on behalf of the

16   Defendants essentially matched those of Dr. Ansolabehere.  He

17   did not choose to share those results in his report, but he

18   testified to them on the stand.

19            The data and the racial analysis of -- demonstrating

20   SB 14's disparate racial impact is compelling, your Honor, and

21   it is essentially unrebutted.  But, of course, the Court's

22   inquiry does not end there.  Objective evidence demonstrates

23   that SB 14 imposes unique and onerous burdens that are borne

24   most heavily by minority voters, burdens that go far beyond the

25   ordinary burdens of voting itself.  And part of the reason for

1    that are pervasive and troubling socioeconomic disparities in

2    Texas that exist between African Americans and Hispanic voters

3    and Anglos.

4          Minorities in Texas suffer significantly in

5    comparison to Anglos with respect to socioeconomic well being.

6    And the reason this is important, as Dr. Hood, in fact,

7    conceded, is that socioeconomic status impacts the ability to

8    bear the institutional cost that a voting system imposes.  And

9    it's highly correlated with turnout.  The higher the costs, the

10   less likely a voter is to turn out to vote.  And in Texas, the

11   main indicators of socioeconomic status by race are

12   disquieting.  With respect to poverty, the poverty rate for

13   African Americans is twice that of Anglos.  For Hispanics, it's

14   about three times that of what it is for Anglos.

15         With respect to income, African Americans and

16   Hispanics earn about 60 percent of what Anglos earn.  With

17   respect to vehicle access, which is so important in a state as

18   large as Texas, Hispanics lack vehicle access at about twice

19   the rate of Anglos, and for African Americans it's about three

20   times the rate.

21         With respect to education, African Americans lack a

22   high school degree at a little less than a two to one rate

23   versus Anglos; Hispanics lack a high school degree at a rate of

24   approximately -- it's about five to one.

25         The practical import is this, your Honor, the fees,

1   the documentation, the travel requirements, the information

2   costs required to obtain SB 14 ID., including the underlying

3   documentation fall more heavily on minorities in Texas than

4   they do on Anglos, and the pervasive grip of poverty plays a

5   meaningful role here.

6          The Court heard from Dr. Jane Henrici, a scholar with

7   years of experience studying low income communities in Texas.

8   She testified that low income African Americans and Hispanics

9   who do not already possess SB 14 ID. will be disproportionately

10  burdened in trying to obtain one; and that's because there are

11  compounding and especially severe burdens faced by minorities

12  in Texas trying to meet SB 14 requirements.

13         They include unreliable incomes, time constraints,

14  pervasive health problems, social isolation, and the stigma

15  associated with poverty.  And even if these individuals are

16  able to take time off from work to navigate the system, it is

17  rarely in the form of paid leave.  So taking time off from work

18  actually costs them money.  And that's before they pay money

19  for ID. or underlying documentation necessary to obtain it.

20         The Court also heard a lot about the travel burdens.

21  Dr. Webster testified that African Americans and Hispanics in

22  Texas are disproportionately less likely to reside in a

23  household with access to an automobile.  And, of course, it

24  makes sense that those who faces the greatest travel burdens

25  are those who lack access to a car.  And in Texas, minority-led

1   households have lower vehicle access rates than Anglo-led

2   households.

3           And from low vehicle access tracts in Houston and San

4   Antonio and Dallas, respective one-day bus travel time to a DPS

5   office is respectively 66.7 minutes, 36.2 minutes, and 59.7

6   minutes.  These are about five or six times the travel time for

7   those who have a car or access to a car.  Accordingly, your

8   Honor, the evidence shows that African Americans and Hispanics

9   in Texas face disproportionate travel burdens trying to obtain

10  ID.

11          With respect to education, I think it's axiomatic

12  that individuals with lower levels of education face

13  significantly greater difficulties understanding the

14  requirements of and navigating the bureaucratic maze for

15  obtaining underlying necessary documentation to obtain ID.

16          And the Court heard a lot about the EIC program.  And

17  while Texas touts the EIC program as a free alternative to

18  other forms of SB 14 ID., it is, in many respects, and is true

19  in many respects, that free in this case is not really free and

20  the program is, at best, terribly flawed.

21          The EIC and the burdens of obtaining the EIC make it

22  exceedingly difficult for the very population that needs them,

23  people who by definition don't already have a Texas driver's

24  license or personal ID. card.  And the requirements for an EIC

25  are elaborate.  But, in short, virtually all voters needing EIC

1  are required to present three pieces of underlying

2  documentation, including a certified birth certificate.  And in

3  every instance, for those who don't already have one, getting a

4  certified birth certificate imposes costs, and the costs can be

5  significant.

6        A delayed birth certificate, an amended birth

7  certificate, birth certificates ordered on line, birth

8  certificates by mail and out-of-state birth certificates, not

9  to mention out-of-country birth certificates, all cost money.

10  And even the election identification birth certificate is not

11  free, which was a concern even to Dr. Hood.  The documentation

12  required to obtain the birth certificates poses an additional

13  substantial impediment to obtaining the birth certificate.

14        Moreover, the public is simply unaware that the

15  election identification birth certificates even exist.  DPS has

16  failed to post notices, failed to post the web site until the

17  day before this trial ended, and failed to implement procedures

18  to inform customers of the EIBC and its availability.

19        And this is important, your Honor.  Voters can apply

20  for an EIBC only in person, which maximizes the burden

21  requirement for every single voter to make at least two trips:

22  first to a local registrar; and then to a location that accepts

23  EIC applications, which in Texas may involve vast distances.

24  And with fewer than 300 locations in the state where one can

25  apply for an EIC, the burdens are maximized.  And these are not

 1    the usual burdens of voting.

 2           For those who lack these birth certificates, it

 3    imposes punishing costs and requires Texans to make at least

 4    two trips.  Given the costs, the vast distances involved, the

 5    paucity of EIC locations, the burden is far beyond what is

 6    usual to vote and, under the circumstances, unsupportable.  And

 7    this is especially so given Texas' inexplicable rejection of a

 8    simpler, less burdensome alternative of a direct connection

 9    between the Department of State Health Services and DPS, to

10    verify Texas birth records.

11           But there is more.  The list of supporting

12    documentation for EICs in no way accounts for those who need

13    them.  Tony Rodriguez testified to this Court that there was no

14    consideration given to the forms of documentation listed and

15    whether they were appropriate, things like pilot licenses, and

16    boat titles, nor how burdensome it is for many minorities to

17    obtain the necessary documents.

18           And even worse, DPS has taken a law enforcement

19    approach for the provision of EICs.  That's why they originally

20    fingerprinted applicants.  Why the regulations still state that

21    fingerprints are required.  And perhaps even more troubling is

22    why they've asked that state troopers be present when EIC

23    offices are open for the sole purpose of issuing EICs.  It's no

24    wonder there's a public perception, shared even among DPS

25    personnel, that a warrant check will be run on EIC applicants.

1          DPS has done little outreach, has not sought any paid

2    media or attempted to contact voters directly.  And at the end

3    of the day, your Honor, one simple gauge of the burdens of the

4    EIC program are how easily -- and how easily those burdens have

5    been borne is how widespread the program is and the number of

6    EICs issued.  On both counts, the evidence appalls.  Seventy-

7    eight counties lack a permanent DPS office.  In another 46

8    counties the DPS office is not even open every business day.

9    DPS ordinarily has no weekend hours or evening hours.  And as

10   the Court heard, wait times at DPS offices can stretch for many

11   hours.

12          The 25 mobile units from which EICs can be issued

13   were deployed for just eleven days, and with little or no

14   notice.  They yielded just 82 EICs.  And the county-based

15   program is even less effective.  Multiple counties without a

16   DPS office simply refused to participate.  The counties that do

17   participate choose their hours, which can be just a few hours a

18   month.  Other counties have never decided on hours.  And still

19   many others, not only the hours, but the basic fact of EIC

20   availability has not been publicized at all.  Just 32 EICs have

21   been issued from county offices across the State of Texas.

22          And while DPS has been issuing EICs for more than a

23   year, just 279 EICs have been issued in total.  Consider that

24   number with respect to a state like Georgia, a state far

25   smaller, less populated than Texas.  Where in half as much time

1    after photo ID. was first implemented there, they issued nearly

2    2,200 photo -- voter photo ID. cards that are genuinely free

3    and simple to obtain.

4            All of this objective evidence, your Honor, together

5    imposes an unsustainable and unjustifiable burden on Texas

6    voters who lack ID., the majority of whom are African American

7    and Hispanic.

8            I would like to mention briefly the senate factors.

9    And the Court is well aware that that's -- in Section 2 cases

10   courts consider what are called the senate factors as a guide

11   when considering the challenge before them.  The senate factors

12   that we believe most pertinent to the vote denial plan or the

13   first senate factor, which is the history of official

14   discrimination in the jurisdiction; the second senate factor,

15   which is the extent of racially polarized voting; and the fifth

16   senate factor, the extent to which socioeconomic disparities

17   hinder minority citizens' ability to participate effectively in

18   the political process.

19           The senate factor list is not comprehensive nor

20   exclusive, and there's no requirement that any particular

21   factor be proved, or that a majority of them point one way or

22   the other.  But with respect to the most pertinent factors,

23   again, the evidence is compelling and virtually undisputed.

24           With respect to the first factor, it need not be

25   belabored here, but Texas has a lengthy and troubling history

1    of discriminatory voting practices that were intended to and

2    have the effect of discriminating against minority voters.

3    Some of those practices, including the poll tax, were justified

4    as a means to prevent voter fraud.  Dr. Davidson commented on

5    that in his report; Dr. Burton testified to that from the

6    stand.

7           The White primary, the poll tax, reregistration

8    requirements, decades of discriminating, redistricting, have

9    characterized Texas' history.  But there are a few recent

10   events of note, as recently as 2006, the Supreme Court of the

11   United States in *LULAC versus Perry* emphasized the role that

12   Texas' long and well-documented history of discrimination plays

13   in considering the totality of circumstances in a Section 2

14   case.  And in that case, the Supreme Court found that Texas'

15   2003 redistricting process bore the mark of intentional

16   discrimination against minorities.

17          The same legislature that adopted SB 14 in 2011 was

18   also found by three federal judges in Washington in a Section 5

19   proceeding, who have adopted discriminatory redistricting plans

20   for the Texas Congressional delegation, Texas Senate, and Texas

21   House, at least two of which were motivated by discriminatory

22   purpose.  And, of course, three federal judges in Washington --

23   different judges in Washington, also concluded two years ago

24   that Texas could not meet its burden under Section 5 that SB 14

25   lacked a discriminatory effect.

1          Texas' history of voting-related discrimination, your

2     Honor, including recent events, is sadly and starkly

3     unfavorable.

4          With respect to the second factor, racially-polarized

5     voting, Dr. Burden, Dr. Barry Burden testified that the last

6     ten years of statewide general elections have been

7     characterized by pervasive racially-polarized voting.

8          With respect to the fifth factor, we've talked a

9     little bit about the socioeconomic disparities, but it is said,

10    your Honor, that history has a heavy hand, and that is

11    certainly true in Texas with respect to the present day effects

12    of official discrimination.  The stark socioeconomic

13    disparities are a direct link to a much darker past.

14         Accordingly, minority political participation lags

15    far behind that of Anglos.  Dr. Ansolabehere testified that

16    African Americans and Hispanic voters register and turn out for

17    elections at rates that lag far behind Anglo voters.  SB 14 is

18    simply another burden being imposed on minority voters in Texas

19    that have yet to achieve equal access to the political process.

20         And all of these factors put into context, SB 14's

21    genesis, what it is, what it does, where it comes from, and the

22    extraordinary burdens it imposes on minority voters in Texas,

23    some of whom this Court heard from in live testimony.

24         The Court may recall the testimony of Daniel Guzman.

25    Mr. Guzman is a member of the city council of Edcouch, a small

1    economically depressed city in Hidalgo County that's over 95

2    percent Hispanic.  He testified that during the November 2013

3    election he witnessed numerous voters being turned away at the

4    polls simply because they lacked SB 14 ID.  He offered to carry

5    some of those voters to the DPS office so that they could get

6    the necessary ID. and cast a vote that counted.  Of the roughly

7    30 to 40 voters he arranged to take to DPS, many simply

8    couldn't get the ID.s because they lacked the necessary

9    documentation.

10           The Court heard from Kristina Mora, a manager at a

11   Dallas nonprofit that helps homeless people get, among other

12   things, identifying documentation.  She testified about the

13   difficulties her clients have in getting documentation that

14   include -- that involve their lack of an educational

15   background, their lack of infrastructure, the lack of access to

16   a computer, the lack of financial resources, and noting that

17   getting a certified birth certificate can cost upwards of $40

18   and more, including bus fare.  She noted that money is the

19   equivalent of two weeks in a shelter.

20           The Court heard from additional witnesses that the

21   United States called to the stand, their experiences informed

22   of the findings of the experts regarding the burdens SB 14

23   imposes.

24           The Court may recall the testimony of Naomi Eagleton

25   who appeared by video.  The Court may recall that Naomi

32

1    Eagleton is an 83-year-old, low-income African American

2    Houstonian that had been living without -- who has been living

3    without SB 14 ID. for many years.  Ms. Eagleton cast a vote in

4    the November 2013 election, and because she does not have SB 14

5    ID., that vote did not count.  Ms. Eagleton stands to be

6    disenfranchised again.  She does not have a certified original

7    birth certificate or any of the other documents needed to

8    obtain SB 14 ID.  And to get those documents, she would have to

9    navigate a maze of state bureaucracies and spend money she

10   simply doesn't have.

11          The Court may recall that her understanding of SB 14

12   and the photo requirement of SB 14 caused her to go out and get

13   a new bus pass with a photo on it.  That, of course, will not

14   work.  And while Ms. Eagleton can vote by mail, under SB 14 she

15   emphatically prefers to vote in person because she gets needed

16   assistance at the polls.

17          Your Honor, the evidence is virtually undisputed,

18   that SB 14 imposes significant costs, institutional and

19   monetary, and because minority voters in Texas lack SB 14 at

20   significantly lower rates than do Anglos, and because minority

21   voters are significantly more impoverished, less educated, and

22   have less access to transportation, the burdens SB 14 imposes

23   place minority voters at a substantial disadvantage in the

24   electoral process.  These factors are linked to and flow from

25   the state's history of discrimination, a history that is not

1    yet passed.  And the EIC process does not lessen these burdens.

2    In fact, it often intensifies them.

3         I'd like to mention briefly one other senate factor,

4    and that is tenuousness.  The United States is forced to agree,

5    your Honor, that eliminating voter fraud is an important state

6    interest.  The evidence in this case demonstrates that the

7    United States properly devotes substantial resources to

8    investigating and prosecuting voter fraud in all its forms

9    across this country.  Yet the connection between the

10   elimination of voter fraud and, and SB 14 is tenuous because

11   the law targets an extraordinarily rare form of voter fraud,

12   while ignoring mail-in balloting and other forms of fraud that

13   the evidence in this case showed are far more common.

14        And while Texas relies on the *Crawford* decision to

15   justify SB 14, that reliance is tenuous as well.  As this Court

16   is well aware, *Crawford* did not confer blanket approval over

17   any state voter ID. law, including any past with a racially

18   discriminatory purpose or intent.  *Crawford* did not say that

19   states can simply invoke the term "voter fraud" as a talisman

20   to justify potentially discriminatory ID. laws.

21        Your Honor, we should be clear, not all voter ID.

22   laws violate Section 2, but this one does, and it imposes

23   significant and especially harsh burdens on Texans who lack

24   ID., the majority of whom are African American and Hispanic,

25   and the least able to pay SB 14's numerous institutional costs.

34

1    SB 14 simply hits hardest at those who can bear its burdens the

2    least, and it imposes burdens demonstrably far beyond those

3    attendant to the usual act of casting a ballot that counts.

4           This case implicates the fundamental right to vote,

5    perhaps the most sacred right, the right that the Supreme Court

6    instructs is the one that preserves all others.  SB 14

7    interacts with Texas' unique political social and historical

8    conditions and results in African Americans and Hispanic voters

9    having less opportunity to participate equally and effectively

10   in the political process.  It violates Section 2's result

11   standard.  It should be enjoined.

12           **CLOSING ARGUMENT ON BEHALF OF TEXAS NAACP AND MALC**

13           **BY MR. ROSENBERG:**  Good morning, your Honor.

14           **THE COURT:**  Good morning.

15           **MR. ROSENBERG:**  Ezra Rosenberg on behalf of Texas

16   NAACP and MALC.  If I may, for a minute before I start, thank

17   some people.  I've already thanked the Lawyers' Committee for

18   Civil Rights Under Law and the Brennan Center, my co-counsel

19   along with Jose Garza, Gary Bledsoe and Robert Notzon of the

20   Texas NAACP, Victor Goode of the National NAACP, and our local

21   counsel, Daniel Covich.

22           I'd also like to thank all of the Plaintiffs, their

23   wonderful attorneys at the Department of Justice, and all of

24   the attorneys for the private Plaintiffs, Plaintiff

25   intervenors, who really collectively did something that I think

1    was harder than perhaps building the Hoover Dam.  We put on 38

2    live witnesses, 7 witnesses by deposition, some 15 to 20

3    readings of deposition designations, cross-examined 5

4    witnesses, all in under our allotted 40 hours.

5              And I thank everyone for all of the cooperation that

6    everyone showed.  I also would like to acknowledge the

7    attorneys at the Texas Attorney General's Office, Mr. Scott,

8    Mr. Clay; all of the attorneys who acted honorably, I hope in

9    vain on behalf of their clients.

10       **(Laughter)**

11             But it was a pleasure litigating against you, and I

12   appreciate the civility and cooperation.  And of course, your

13   Honor, for holding our feet to the fire and bringing this case

14   to the expeditious conclusion that it merits; your entire

15   staff, Genay, Ms. Cortez, Mr. Perez, who made us feel at home.

16   And thank you very much.

17             Your Honor, I'm going to address, as Mr. Dellheim

18   mentioned, one issue; and that issue is discriminatory purpose.

19   And to demonstrate the compelling evidence that there was a

20   discriminatory purpose behind SB 14.

21             Initially, just to lay the groundwork, it's important

22   to emphasize that Plaintiffs do not have to prove

23   discriminatory purpose as part of their Section 2 results case.

24   It is relevant only to the Section 2 purpose case; it's

25   relevant to the request for relief under Sections 3(a) and 3(c)

1    of the Voting Rights Act; and it's relevant to the private

2    claim to constitutional claims under the Fourteenth and

3    Fifteenth Amendment.

4         The standards are set forth in *Arlington Heights*.

5    The Plaintiffs have to prove that discriminatory intent was a

6    motivating factor; not the sole factor; not even the prime

7    factor behind SB 14.  And in *Arlington Heights* -- if I can

8    remember how to use this.  There we go.

9         The United States Supreme Court set forth a series of

10   guidelines of direct and circumstantial evidence that can prove

11   discriminatory intent in cases like this; and the first one of

12   which is impact.  And Mr. Dellheim has ably discussed the

13   impact of the statute on Blacks and Hispanics, and I just want

14   to emphasize a few points kind of from a 30,000 foot level.

15        The first is there were several experts,

16   Dr. Ansolahehere, Dr. Herron, Dr. Bazelon, Dr. Webster, who

17   relied on the no match list to do an analysis of burden on

18   Blacks and Hispanics of SB 14 in this case, and all of the data

19   point in the same direction, generally finding any place from a

20   1.6 to 4 times less likely for Blacks and Hispanics to possess

21   the SB 14 than Whites in Texas.  The data is completely

22   consistent -- are completely consistent.

23        Second, there is another -- another group of experts,

24   Drs. Barreto and Sanchez, who used a completely different

25   methodology.  And this methodology of course was a survey of

1   Texas citizens of voting age; 2,400 of them.

2           And that survey -- those survey results are smack dab

3   in the middle of the results that came from the no match

4   analysis.  So the Barreto/Sanchez survey provides strong

5   corroborative evidence of the no match analysis and independent

6   evidence in and of itself of the disproportionate burden on

7   Blacks and Hispanics of SB 14.

8           And third, there were another set of experts; those

9   who analyzed travel burdens.  Dr. Webster, Dr. Bazelon, and

10  Dr. Chatman.  And of their results point in the same direction

11  of a disproportionate impact on Blacks and Hispanics of the

12  travel burden to obtain SB 14 if they don't have it as compared

13  to Whites.  The data are consistent, they are uniform in their

14  direction, and they are consistent in their magnitude.  And

15  there is absolutely no doubt that Plaintiffs have proved a

16  disproportionate burden on Blacks and Hispanics caused by SB 14

17  on their right to vote.

18          And as Mr. Dellheim said, it's virtually

19  unchallenged.  He talked about Dr. Hood's response to

20  Dr. Ansolahehere, and I'll briefly talk about Dr. Hood's

21  response to the Barreto survey.

22          Your Honor saw the cross examination.  Dr. Hood

23  admitted that he perhaps mischaracterized people who did not

24  have IDs as having IDs in his attempt to replicate and in his

25  attempt to reconstruct the Barreto survey.

1              Dr. Hood admitted that even though taking into

2    account socioeconomic demographics in weighting the results of

3    a survey to see whether the Black respondents accurately

4    represent the Blacks in the population; the Hispanic

5    respondents accurately represent the Hispanics in the

6    population; and so on.  He did not do that, but Dr. Barreto

7    did.

8              And just in passing, I noted -- I noticed that in

9    Plaintiffs' findings of fact that we received this weekend, I

10   think it's in Paragraphs 103 or 104, there is a reference to

11   Dr. Hood's criticism of Dr. Barreto as improperly weighting,

12   and therefore Dr. Barreto's racial analysis is inaccurate.  And

13   I respectfully refer your Honor to Pages 225 and 226 of

14   Dr. Hood's testimony where he admits that criticism has nothing

15   to do with the comparison of race-to-race-to-race in

16   Dr. Barreto's survey.

17             So, your Honor -- and one last point about Dr. Hood.

18   He admitted that even with the possibility of his errors as to

19   recategorization, even with the possibility that he weighted

20   wrong, he still found statistical significance in virtually

21   every run as between Whites and Hispanics except when he

22   finally came down to the subsets of about 30 -- between 5 and

23   30 people; and no surprise, did not find statistical

24   significance there.  So Dr. Hood's entire attack on this

25   survey, we respectfully submit, can be disregarded.

1        There was one other expert here.  The man who wasn't

2   there, Dr. Mylo (phonetic).  And I think your Honor heard about

3   Dr. Mylo a lot because several of the experts responded to him;

4   Dr. Ansolahehere, Dr. Webster, Dr. Chatman, Mr. Jewell

5   (phonetic), Dr. Bazelon.  They all confronted head-on the

6   critiques of their reports, dismissed him dispositively, and

7   the testimony, I think, is compelling, and was not subject to

8   redirect -- to cross examination.

9        And in fact, Dr. Mylo, of course, did not testify

10  live.  He was a person that the state had retained to critique

11  17 reports including reports of political scientists when he

12  has no degree in political science; reports of historians when

13  he's not a historian; report of a transportation expert when

14  he's not a transportation expert.  And to do an overall

15  critique of the Barreto survey when Drs. Barreto and Sanchez

16  had performed over 100 public opinion polls, but Dr. Mylo had

17  not ever conducted or designed a single survey.

18       So I think if your Honor reads the deposition

19  designations that we submitted for Dr. Mylo, it will be clear

20  perhaps why the state was right in not putting him on the

21  stand, and it will be clear that your Honor, I believe, will be

22  right in rejecting his opinions in their entirety.

23       But the bottom line is that on impact, Plaintiffs

24  have proved undisputedly that the burden falls

25  disproportionately on Blacks and Hispanics.  But there's more.

1    Even though under *Arlington Heights*, of course, impact alone in

2    the very rare case can support a finding of discriminatory

3    intent.  We're not arguing that here because under the other

4    *Arlington Heights* standards there is abundant evidence of

5    discriminatory intent.

6            And we'll turn first to legislative history and touch

7    upon a point that Mr. Dellheim made.  He dealt with it under

8    tenuousness, and this is the justification by the proponents of

9    SB 14 to support the change in the voting identification law.

10           And this was not an easy thing for them to do because

11   you had a voting identification law that was working.  There

12   were no problems with the voting identification law, but they

13   had to come up with some kind of justification for what they

14   wanted to do.  So in the words of Representative Anchia, they

15   kept shifting their rationales.

16           And the first rationale that they turned to was that

17   of we have to stop noncitizens from voting.  Well, there was no

18   real proof of noncitizens voting.  In fact, when one person

19   testified in one of the hearings on one of the Voter ID Bills,

20   he was forced to say, "Well, we want to fix that even if there

21   isn't a problem."

22           And Representative Hernandez explained that it's

23   common sense that undocumented immigrants who live in the

24   shadows don't even want to go t the grocery store, let alone

25   walk into a polling place and vote illegally.  And in fact,

1    none of the Bills that eventually led up to SB 14 dealt with

2    noncitizens voting because they allowed for identification that

3    noncitizens could use.

4         The biggest hobgoblin of the world perhaps was that

5    voting photo ID legislation would do away with election fraud.

6    And Mr. Dellheim pointed out, SB 14 only deals with in person

7    voter fraud.  And virtually every witness who testified in this

8    trial agreed that it is extraordinarily rare.  You heard it

9    from national renown election fraud expert Lorraine Minnite;

10   your Honor heard it from election expert Wood; even Dr. Hood,

11   Plaintiffs' expert, testified he's never seen in person voter

12   fraud.

13        And Major Mitchell, the man charged with -- by the

14   state with starting up voter fraud was able to identify two

15   instances in the last 14 years of votes; out of some 62 million

16   votes cast in this state.  And the reason is obvious; it's a

17   really hard thing to pull off.  And it's an extraordinarily

18   ineffective way of affecting an election, and the penalties are

19   really stiff.  So just because a crime can be committed, as

20   Major Mitchell also agreed, it doesn't mean it is being

21   committed.

22        Now the third rationale for SB 14 and for the prior

23   formulations of voter ID law was a very noble-sounding

24   sentiment that it's meant to increase confidence in the

25   integrity of the ballot box.

1               Well, from the start that concept was always wrapped

2    up with the same concepts of noncitizen voting and of election

3    fraud, and here's Lieutenant Governor Dewhurst who, on the day

4    SB 14 was passed, said that it would increase public confidence

5    in our election process ensuring only U.S. citizens were

6    legally eligible to vote in Texas elections.

7               So, the two -- the concepts were always intertwined.

8    Sometimes the supporters of SB 14 would point to polls and say,

9    "Well, the people want this."  So let's look at those polls

10   that they pointed to.

11              These polls essentially beg the question; you favor

12   or oppose requiring a valid photo ID?  You agree that voters

13   should be required to present a government-issued photo ID.  If

14   that's what we're talking about, we probably -- or we might not

15   be here today if we were just talking about any valid photo ID

16   or any government-issued photo ID.  The question doesn't ask

17   would you agree to this if it meant for the -- at the cost of

18   saving two fraudulent votes out of 62 million casts in exchange

19   for suppressing hundreds of thousands of valid votes.  That

20   question wasn't asked and these polls don't provide the

21   support.

22              There was also sometimes a thought expressed, well,

23   this will increase turnout at elections; when the support for

24   that were the 2008 elections which the proponents of SB 14 knew

25   were affected by what's been called the Obama effect in terms

1    of the increased minority turnout.

2            So as Mr. Dellheim said, what was going on here was a

3    solution in search of a problem.  And when you have people who

4    are pressing the legislation, where they're dealing in

5    overstatements and half-truths and shifting rationales, as

6    Representative Anchia said, I respectfully submit that your

7    Honor has the right to suspect that something else was going

8    on.

9            And to talk about this, look into what that something

10   else is, we can go to another one of the *Arlington Heights*

11   factors which is the historical background of voter -- of

12   racial discrimination in Texas.  And again, Mr. Dellheim

13   touched upon it.  I'm not going to repeat it, but that is a --

14   is a long history and a sad history, and it does deal with all

15   White primaries and reregistration, and as Mr. Dellheim said,

16   each of those mechanisms, and this is the key point, was

17   justified as a way of stopping election fraud.

18           So the lesson from that is that there's precedent in

19   Texas' own history of legislatures using that justification to

20   support what on their face were supposed to be neutral election

21   law changes, and secondly, that simply mouthing some very noble

22   sentiments such as "increasing confidence in the integrity of

23   the ballot" or "stopping election fraud" is not sufficient to

24   give the legislature a free pass on intentional discrimination.

25           Perhaps the most vivid portrayal of racial

1   discrimination in voting that this Court had in the trial was

2   the testimony of Peter Johnson.

3            Reverend Johnson, as you know, was the man who was

4   sent by Dr. King in the late '60's to specifically deal with

5   voter -- racial discrimination and voter fraud in Texas and he

6   testified not only in terms of the intimidation at the polls

7   that he saw back then but the intimidation at the polls that he

8   sees right now including, for example, the presence of khaki

9   dressed election poll workers which he described as

10  intimidating and perhaps it's connected at least in some

11  people's minds with what -- with the use of DPS, a law

12  enforcement agency for the implementation of SB 14.  And

13  Reverend Johnson also discussed, what he described, what he

14  called the brutal bigotry in Texas.  Whatever the motivations

15  and situation were in the years that Reverend Johnson discussed

16  what we also heard was additional reasons for motivation for

17  racial discrimination that occurred in the decade leading up to

18  SB 14.

19            By 2004, Texas had become a minority/majority state.

20  In 2010 -- in the years leading up to 2010 about three quarters

21  of the population growth in Texas was the result of mostly

22  Hispanic and Black population increase and as Representative

23  Anchia and Representative Hernandez and Representative

24  Martinez-Fischer testified, that resulted in a change in what

25  was going on in the legislature.  They used words like "tense"

```
 1   and "divisive" and the legislature turned its attention to a
 2   series of what was also described by these representatives as
 3   anti-immigrant and in some cases anti-Hispanic legislative
 4   initiatives including sanctuary cities, including English only
 5   legislation, including the two redistricting -- including the
 6   redistricting bills that Mr. Dellheim described that were
 7   struck down by two different federal courts as racially
 8   discriminatory.  And out of this caldron voter ID emerged, the
 9   idea that we have to change our voter ID statutes.  In fact,
10   the first voter ID statute was introduced in 2005 within a year
11   after Texas becoming a minority/majority state and from the
12   start voter ID was intertwined with anti-immigration from the
13   grassroots level.
14          This is a constituent e-mail, PL 707, talking about
15   sanctuary cities and passing voter ID declaring English the
16   official language of Texas, et cetera.
17          The legislators themselves, Senator Patrick, wrote in
18   a memo, "In view of our discussion on voter ID and immigration
19   several of you mentioned you thought that the two issues were
20   one in the same."
21          It was in this racially charged environment that
22   voter ID emerged and that voter ID was passed and photo ID and
23   SB 14 is inextricably connected with this racially charged
24   atmosphere.
25          Now Arlington Heights also says that some of the
```

1   factors that the Court should look at include whether or not

2   there were substantive or procedural departures from what you

3   would expect -- of how you would expect the legislature to act.

4          For example, one would think that the legislature

5   acting in good faith and without discriminatory intent upon

6   listening to years and there were six years of warnings from

7   minority legislatures that photo ID -- that voter ID bills and

8   increasingly stringent photo ID bills would have a devastating

9   impact on the voting rights of minorities in the state of

10  Texas.  Repeatedly as Representative Anchia testified they

11  asked for the legislature to undertake studies.  What did the

12  legislature do?  It did nothing.  In the six years that voter

13  ID was pending before the Texas legislature, the legislature

14  never undertook an analysis, never undertook any study of any

15  kind as to the impact of increasingly strict voter ID laws on

16  minority citizens in Texas and they failed to act.  They put

17  their head in the sand even though they knew that the Secretary

18  of State could undertake at least an analysis comparing the

19  team database, the voter database, with the DLS database and

20  they knew that the Secretary of State in fact could compare the

21  team database to the Spanish surname database.  That analysis

22  was not done.

23         We did learn in the Section Five litigation that an

24  analysis was done by the Secretary of State on January 25th,

25  2011, the day before SB 14 was passed by the senate which

1    showed that some 750,000 Texas voters lacked a driver's

2    license.  That study for mysterious reasons was not shown to

3    the legislature before SB 14 was enacted.

4         Now we submit that perhaps the proponents of SB 14

5    did not really need to see the studies because the evidence

6    also showed that they knew the results.  Back in 2009,

7    Representative Todd Smith who was a sponsor of SB 362 which was

8    the bill right before SB 14, two years before, that bill had

9    non-photo ID provisions in it.  At the time, he estimated that

10   there were 700,000 Texans who lacked a driver's license, very

11   similar to the undisclosed 750,000 result that the Secretary of

12   State reached two years later and that commonsense dictated

13   that they were disproportionally poor and, therefore, minority

14   and, therefore, that non-photo ID requirements would

15   significantly lessen any marginal additional burden.

16        Bryan Hebert who was at that time Deputy General

17   Counsel to Lieutenant Governor Dewhurst wrote a memo to staff

18   members, including Janice McCoy who was the Chief of Staff for

19   Senator Frazier who became the sponsor of SB 14 referring to SB

20   362 and said "This bill improves security in election process,

21   not as restrictive as Indiana and Georgia" -- and again, we're

22   talking about a bill that had non-photo ID -- "There is less

23   chance of disenfranchising elderly, poor, or minority voters."

24        SB 362 did not pass.  Minority legislatures felt that

25   there was again no need to change the law because again there

48

1    was no problem and there would still be an increased disparate

2    impact on minorities.  But one would think that if you were in

3    favor of increased voter ID and you wanted to put forward

4    another bill after your bill was defeated you would look for

5    ways if you were a legislature acting in good faith and without

6    discriminatory intent to negotiate, to reach a consensus, to

7    compromise but the opposite happened in Texas.  In fact, what

8    the proponents of stricter voter ID did was to eliminate the

9    very procedures in the Texas senate that were designed to

10   foster negotiation, compromise, and consensus and of course I'm

11   talking about the two-thirds rule that required a super

12   majority before nontrivial legislation could be passed.

13          They passed a resolution that not only eliminated the

14   two-thirds rule only for voter ID but also assigned only voter

15   ID to the committee as a whole as opposed to the established

16   committees that dealt with such issue.

17          Senator Williams who sponsored that resolution said

18   it was the most substantial change in his history in the

19   senate.  Senator Wendy Davis said she had never seen any single

20   category of legislation be consigned in that way to this

21   combination of no two-thirds rule and assignment to the

22   committee on the whole.

23          But the proponents didn't stop there.  They got

24   Governor Perry to issue an executive order declaring a

25   legislative emergency.  For what?  For one thing and one thing

49

1    only, voter ID legislation.  And what did that do?  That meant

2    that voter ID legislation and specifically SB 14 had to be

3    dealt with, had to be considered within 60 days of the start of

4    the session and it precluded what is called chubbing in Texas,

5    essentially filibustering another procedure that ultimately

6    could result in negotiation, and compromise, and consensus.

7           And then the proponents of SB 14 went further.

8    Instead of again assigning to establish committees used to

9    dealing with these sorts of issues, they assigned it to a

10   select committee, a committee handpicked by Speaker Strauss and

11   assigned one bill and one bill only, SB 14, and to deal with it

12   on a fast track.  One would also think if the legislature was

13   operating in good faith and not with discriminatory intent that

14   after having a bill fail like SB 362 would actually sit down

15   and negotiate and see what provisions are bothering the

16   minority, is there something else we could do.  The opposite

17   happened here in Texas.  Instead of putting forward a bill that

18   was less strict than SB 362 or perhaps even as strict as SB

19   362, SB 14 was stricter.  It was stricter than SB 362 primarily

20   and not including non-photo ID alternatives and it was stricter

21   than the Georgia and Indiana statutes upon which the proponents

22   of SB 14 said that they had modeled and that did not include

23   the sort of governmental IDs that the Georgia and Indiana

24   statutes did include.

25           As a result, and Dr. Lichtman testified to this in

1    detail, the proponents of SB 14 and the Texas legislature went

2    ahead and made a series of choices and every time it made a

3    choice it was a choice to discriminate as opposed to a choice

4    not to discriminate.  It made that choice when it chose to

5    exclude non-photo IDs from SB 14.  It made that choice when it

6    -- knowing that Blacks and Hispanics are poorer than Whites in

7    Texas and the non-photo ID alternatives were less expensive

8    than the photo ID alternatives.  It chose to exclude government

9    employee IDs when it was known that Blacks and Hispanics make

10   up a disproportionately larger proportion of government

11   employees than do Whites.  It chose to exclude students of --

12   it chose to exclude public college and university IDs when it

13   was known that Blacks and Hispanics make up a disproportionate

14   amount of those student populations.  It chose to include

15   license to carry when it was known that Blacks have -- or have

16   a lower proportion of possession of licenses to carry.  It

17   chose not to address absentee ballots, undisputedly the most

18   important contributor to election fraud in Texas, when it was

19   known that Whites disproportionately use absentee ballots

20   compared to minorities, and it chose to dismiss amendment after

21   amendment that were ameliorative of SB 14, amendments that

22   would in fact include the provisions that were in Georgia and

23   Indiana, amendments that would waive the fees necessary to

24   obtain the underlying documents, amendments that would monitor

25   the effect of SB 14 on minorities.  And interestingly, after

```
 1   this was all done those who were major actors in this drama
 2   could offer no explanation.  Brian Hebert could not explain why
 3   non-photo ID, all state and federal photo ID and employee photo
 4   ID were acceptable in 2009 but all of a sudden not acceptable
 5   in 2011.  Senator Patrick acknowledged that the amendments that
 6   were proposed by the legislators could have alleviated the
 7   burden, yet he did not recall why he voted to table them.
 8   Speaker Strauss couldn't identify a single reason to exclude
 9   federal and state employee IDs from the bill and it's not up
10   there but we cited it in our findings of fact, we deposed
11   Representative Harliss who was a house sponsor of SB 14 and she
12   could not explain a -- she could not give a single reason why
13   she agreed to table amendment after amendment.
14            So at the end of the day, your Honor, we're left with
15   a situation where you have a legislature that was motivated by
16   the changing demographics to do something about the voter ID
17   laws.  You had a system that was working and did not have to
18   be fixed but they chose to change it.  You had a legislature
19   that heard warnings from the minority senators that this would
20   have a devastating impact on the voting rights of Blacks and
21   Hispanics in Texas.  You had a legislature that heard warning
22   from its own staff members like Brian Hebert to the same effect
23   but did not undertake any study, did not undertake any
24   analysis, yet proceeded to steamroll the legislation through by
25   making seismic parliamentary changes and hallowed rules that
```

1    were unprecedented in the history of the Texas legislature, and

2    then proceeded to put forward stricter statutes and could not

3    explain why they were doing so.  And by the way, at the same

4    time, this was the same legislature that had passed the

5    redistricting rule -- bills that were found to be racially

6    discriminatory.

7            So we submit, your Honor, that the proof is

8    overwhelming of discriminatory intent and the burden at this

9    point would shift to the state to prove that SB 14 would be

10   passed even absent the discriminatory intent and there, your

11   Honor, is another major gap in the state's proof in this case.

12           We put on six different legislators, each of whom had

13   been in the legislature during the time SB 14 was passed.  They

14   went up to the stand.  They testified and they subjected

15   themselves to cross-examination before your Honor so your Honor

16   could judge their credibility.

17           The state did not produce a single legislator who was

18   a proponent of SB 14 in this court and subjected himself or

19   herself to cross-examination.  What we heard were some

20   deposition designation readings to the effect that "I didn't

21   mean to discriminate."  Well, as the Fourth Circuit has said,

22   "Even individuals acting from invidious motivations understand

23   the unattractiveness of publicly saying that they're

24   discriminating."

25           Your Honor, in lots of ways this case has been

1    somewhat of a humbling experience at times.  I'm the son of

2    immigrants but when they came to this country they were so

3    lucky and I was so lucky that they never felt the pain of

4    official discrimination and when I sit in the court and I watch

5    Sammie Bates talking about counting out coins to help her

6    grandmother pay the poll tax or Elizabeth Gholar argue that "I

7    earned the right to vote in person," or witness the heroism of

8    people like Leonard Taylor, and Floyd Carrier, and Eulalio

9    Mendez who overcome physical obstacles and walk into this court

10   to plead their case for the right to vote, or the dignity of

11   Margarito Lara and Maximina Lara who bared the most private

12   details of their finances in order to press their case for the

13   right to vote, or listen to Christine Mora and Dawn White and

14   their dedication to helping people find their identities or the

15   bravery of Reverend Johnson who came to this court and

16   explained he was here because he has friends in the graveyard

17   for the right to vote.

18           I'd like to think that the good men and women of the

19   Texas legislature would not have passed SB 14 if they saw and

20   heard this testimony.  I don't know if they saw or heard

21   testimony like it but if so I would submit that they were

22   blinded by an impermissible and discriminatory intent to

23   minimize the opportunities for Blacks and Hispanics to

24   participate in the local process of Texas and respectfully

25   submit that that's wrong, that's illegal, and that's

54

1   unconstitutional.  Thank you.

2            **THE COURT:**  Thank you.

3        **CLOSING ARGUMENT ON BEHALF OF TEXAS LEAGUE OF YOUNG VOTERS**

4                        **EDUCATION FUND, ET AL**

5            **BY MR. HAYGOOD:**  Good morning, your Honor.

6            **THE COURT:**  Good morning.

7            **MR. HAYGOOD:**  My name is Ryan Haygood of the NAACP

8   Legal Defense and Educational Fund and I, along with my

9   colleagues here in court this morning:  Natasha Korgaonkar;

10  Leah Hayden; Darrell Ross, also of the Legal Defense Fund; as

11  well as Danielle Conley; Kelly Dunbar; and Tania Faransso of

12  Wilmer Hale represent the plaintiff interveners, the Texas

13  League of Young Voters Education Fund, which is a Houston based

14  nonprofit, nonpartisan organization that seeks to engage young

15  people of color in the political process; and Ms. Imani Clark,

16  a registered Black voter and student at Prairie View A & M

17  University which is one of Texas' nine historically Black

18  colleges and universities as also referred of course as HBCUs.

19           Your Honor, the fundamental question before this

20  Court is whether the State of Texas can disfranchise hundreds

21  of thousands of voters through a racially discriminatory voting

22  restriction that the Texas legislature enacted purportedly to

23  address a phantom problem, mainly in person voter fraud.  As

24  the evidence in this case has made clear, your Honor, the

25  answer to that question is a resounding no.

55

1          Section Two of the Voting Rights Act and the

2    Fourteenth and Fifteenth Amendments as you've heard

3    unequivocally bar Texas from enforcing SB 14's photo ID

4    requirements.  At its core, as courts have recognized, Section

5    Two of the Voting Rights Act demands that racial discrimination

6    not spread to the ballot box.  But, your Honor, the evidence

7    adduced at this trial has established overwhelmingly that that

8    is precisely what has happened in Texas.  SB 14 hastily

9    enforced in the wake of the Supreme Court's ruling in Shelby

10   County has already and will in the future in election after

11   election disproportionately deny voters of color the right to

12   fully participate in the political process and that, your

13   Honor, is the precise evil that the Voting Rights Act was

14   designed to remedy.  In fact, it is the reason that Section Two

15   of the Voting Rights Act exists.  SB 14's photo ID requirement

16   should, indeed it must, be enjoined.

17          As you've heard, your Honor, the evidence in this

18   case has shown that SB 14 imposes unjustified district burdens

19   and racially discriminatory effects on the voting rights of

20   more than 600,000 registered voters.  That number, 600,000, is

21   nearly twice the population of all of Nueces County where we

22   sit today.  It's half of the population of the city of Dallas

23   and two-thirds of the population of the city of Austin.

24   Moreover, there has been an abundant amount of expert testimony

25   in this case that shows there's a significant racial disparity

1    among the more than 600,000 registered voters affected by

2    SB 14.

3              Dr. Stephen Ansolahehere's ecological regression

4    analysis shows that in Texas an incredible eight percent of all

5    Black registered voters and six percent of all Latino

6    registered voters lack SB 14 compliant ID and thus are

7    disfranchised by SB 14, as compared to only two percent of

8    White registered voters.  Those figures remain virtually

9    uncontradicted by the record before this Court.  But to be

10   clear, your Honor, plaintiffs' and plaintiffs' intervener's

11   argument does not rely on district impact alone.  As Mr. Dale

12   Harmick explained, Section Two results test require that this

13   Court conduct a searching inquiry into whether voters of color

14   in Texas have an equal opportunity to participate in the

15   political process under the totality of the circumstances

16   analysis and here, your Honor, an inquiry into those factors

17   shows that SB 14 creates precisely the type of inequality that

18   Section Two of the Voting Rights Act was enacted to proscribe.

19   The testimony of Doctors Vernon Burton and Barry Burden, and

20   Coleman Bazelon, and others demonstrates that SB 14

21   disproportionately impairs the ability of Black voters to elect

22   their candidate of choice and participate fully in the

23   political process because of their race.  As Dr. Lichtman

24   testified, SB 14 was "passed not in spite of but because of

25   race," and all of the evidence points in that direction.

1          Your Honor, it is in fact because of race and in

2    particular because of Texas' pattern of official historical and

3    modern day racial discrimination in the areas of voting and

4    education and employment and housing in more areas that SB 14

5    causes an inequality of access to the political process for

6    Black voters and other voters of color here in Texas and the

7    evidence at trial made clear that SB 14 is the latest iteration

8    in a series of discriminatory voting practices and devices that

9    were intended to suppress the votes and the voices of Black

10   people and other people of color that stretch back more than a

11   century.  As Dr. Burton testified, for Black and other voters

12   of color here in Texas a democratic experience historically and

13   into the present has been contested.  It has been an experience

14   that has been characterized by periods of democratic expansion

15   often followed swiftly by efforts to restrict and constrict the

16   franchise for people of color.  Dr. Burton testified at length

17   in this courtroom that gains in political participation by

18   Black people have been time and time again met with official

19   efforts to restrict access to the franchise or to completely

20   eliminate it, and this happens often precisely at the point

21   when communities of color are on the verge of influencing their

22   political will and effecting democratic outcomes.  Such

23   official efforts have included but are not limited to the all

24   White primary elections, secret ballots, the Texas poll tax,

25   and re-registration requirements, and voter purging, and each

1  of these devices was implemented by Texas as a discriminatory

2  response to Black democratic expansion and each of these

3  devices, your Honor, over a long century of struggle and

4  sacrifice was ultimately invalidated either by the Voting

5  Rights Act and/or by the Constitution.  Then, your Honor,

6  against the backdrop of Texas' substantial growth of more than

7  four million people in the last decade, nearly ninety percent

8  of whom are people of color, Texas once again enacted a

9  purportedly race neutral device that in fact unnecessarily and

10  purposefully erects barriers to the ballot box for voters of

11  color.  Like its ancestor, discriminatory voting practices,

12  SB 14, must be struck down.

13          Now, for its part, Texas argues that this history is

14  largely irrelevant.  That it doesn't inform the present and

15  that the relevant period for your Honor to consider for SB 14

16  is limited to 2011.  But as Dr. Burton testified here in this

17  Court, SB 14 simply cannot be properly understood apart from

18  its historical context.  As Dr. Burton testified, SB 14

19  functions for example very much like its poll tax ancestor,

20  relying on social economic disparities and inequality which

21  themselves spring from Texas' state sponsorship of racial

22  discrimination in many areas of life.  SB 14 discourages, if

23  not outright prevents, Black voters and other voters of color

24  from participating in the political process.

25          And has been said here, your Honor, the testimony has

1    made clear that Texas' stated rationale for the use of SB 14

2    boils down to protecting against in person voter fraud.  This

3    particular pretextual rationale however is familiar as

4    Dr. Burton testified; Texas has repeatedly used that very

5    rationale to pass laws that discriminate against voters of

6    color.

7             Dr. Burton testified for example that the stated

8    rationale for the use of all white primaries here in Texas was

9    to help prevent voter fraud.  Dr. Burton also testified that

10   the stated rationale for the use of the secret ballot

11   provisions here in Texas was a prevention of voter fraud.

12   Dr. Burton testified that the stated rationale for the use of

13   the poll tax here in Texas was also the prevention of voter

14   fraud.  And Dr. Burton testified that the stated rationale for

15   the use of re-registration requirements and voter purges in

16   Texas was a prevention of voter fraud.

17            But these laws actual purpose and what they in large

18   measure were able to accomplish was racial exclusion.  That is

19   the prevention of voters of color from holding the balance of

20   power in elections.  But the evidence at trial made clear that

21   in person voter fraud as has been said is vanishingly rare and

22   is simply not a credible justification for disfranchising

23   hundreds of thousands of registered voters, particularly given

24   discriminatory effects of SB 14.

25            Now Texas has also argued that complying with SB 14

60

1    for these more than six hundred thousand registered voters is

2    not burdensome because they can obtain a free EIC or Election

3    Identification Certificate and this argument too, your Honor,

4    is wholly without merit.  As this Court heard from multiple

5    witnesses, the EIC program has been an utter failure for at

6    least two reasons.  The first is that the purported ease with

7    which disfranchised voters can obtain an EIC is belied by the

8    testimony from affected registered voters that the EIC program

9    has been fought with inconsistencies, with miscommunications

10   and with mass confusion.

11          The Court also received testimony from DPS employees

12   who themselves viewed the EIC program with a disappointing

13   degree of cynicism.  And the utter failure of the program is

14   confirmed by DPS representative, Tony Rodriguez who testified

15   that to date fewer than three hundred EIC's have been issued in

16   all of the State of Texas.

17          Second, your Honor, EIC has been said is simply not

18   free in any meaningful respect.  Instead, the evidence

19   established is that SB 14 imposes a real concrete cost on

20   voters who must obtain an SB 14 compliant ID in order to vote

21   in person in Texas.  Specifically as Dr. Bazelon demonstrated

22   at trial, the average cost for an affected registered voter to

23   obtain an EIC is $36.33.

24          Now, as Dr. Bazelon explained, that's a conservative

25   number and that it only reflects the cost of travel but it

1    doesn't include all other potential cost the voter might incur

2    in obtaining an EIC such as fees for the underlying

3    documentation, time spent gathering such documentation or

4    waiting at the DPS.  But even standing alone, the travel cost

5    of obtaining an EIC imposed significant burdens on affected

6    voters.

7            And as Dr. Bazelon demonstrated in his testimony to

8    the Court the average travel cost of $36.33 represents a 140

9    percent of -- represents 149 percent of average hourly earnings

10   in Texas.  By comparison, your Honor, a poll tax of $1.75 which

11   the Supreme Court found to constitute undue burden on the right

12   to vote in 1966 represented 69 percent of the average hourly

13   earnings at that time.  More over these costs are felt most

14   acutely by Black voters in Texas who because of Texas' long and

15   enduring history of racial discrimination and ongoing racial

16   discrimination are disproportional poor.

17           Dr. Bazelon walked us through several social economic

18   factors showing that Black Texans have lower income.  They have

19   less household wealth.  Black Texans are more likely to live in

20   poverty and have higher unemployment rates than White Texans.

21   The burden imposed by the cost of obtaining an EIC thus far

22   more heavily on Black Texans who are disproportionately poorer

23   than on White Texans.

24           And the economic principle here, your Honor, is

25   straight forward.  The poorer a person, the more impoverished a

1   person, the more a dollar is worth to that person.  Indeed as

2   Dr. Bazelon demonstrated the travel costs of obtaining an SB 14

3   ID alone require that Black people expend the share of their

4   wealth that is more than four times higher than the share of

5   wealth required for White Texans.

6        The testimony has also demonstrated in this case that

7   the cost of obtaining an EIC are real and for some

8   overwhelming.  Ms. Sammie Bates testified, powerfully for

9   example, that she literally had to choose between paying $42 to

10  obtain her birth certificate or feeding her family.  Because as

11  Ms. Bates testified she and her family could not "eat her birth

12  certificate" she chose to feed her family.  Testimony like that

13  from Ms. Bates perfectly crystalizes the burden of the cost to

14  comply with SB 14 for poor Black people and other voters of

15  color here in Texas.  And for many Texans of color, like

16  Ms. Bates, paying $42 to vote is prohibitive.

17       Ms. Elizabeth Gollar similarly testified that she had

18  secured legal counsel in Louisiana to try to amend her birth

19  certificate just so that she can vote.  She does not yet know

20  how much money in legal fees and cost she will incur in that

21  endeavor nor your Honor does she even know whether those

22  efforts will ultimately be successful in the end.  And it's the

23  testimony of these affected individuals that demonstrates the

24  palpable harm that results from SB 14.  Harm that is a tragic

25  continuation of a long and abiding history of state sponsored

1   efforts to silence the voices and the votes of people of color.

2          And, your Honor, the impact of SB 14 is about far

3   more than dollars and cents, though those matter greatly.

4   Ms. Gollar testimony validly illustrates that reality.

5   Ms. Gollar who has lived in the South for most of her life

6   testified about her experience coming of age in an era where

7   racial discrimination was so pervasive that the births of Black

8   people, including her own, were deemed so insignificant as not

9   to take place in proper medical facilities or be recorded in

10  accurate, contemptuous birth certificates.

11         For Ms. Gollar that historical discriminating is

12  exacerbated now by Texas' refusal on two occasions to issue her

13  Texas State identification.  Both times pointing to her

14  inaccurate birth certificate as the reason why she could not

15  obtain an SB 14 required identification.

16         Now, Texas will argue that Ms. Gollar and other

17  similarly situated elderly voters are not in fact disfranchised

18  by SB 14 because as voters over the age of 65 they can vote by

19  mail.  But, your Honor, the testimony of many witnesses at

20  trial has made resoundingly clear that this is not defense at

21  all.  Voting in person confers a unique special dignitary

22  benefit, particularly to voters of color who recall a time in

23  the not too distant past including right now when they could

24  not vote at all.  As the evidence has shown, it is the history

25  of exclusion from the political process that makes voting in

1    person for people of color so important.

2            Reverend Peter Johnson explained to the Court in his

3    testimony that understanding Black America in the South means

4    "understanding that going to vote and standing in line is a big

5    deal."  Reverend Johnson also testified that "it is extremely

6    important for an 80 year old Black woman to stand in line to

7    vote because she remembers a time when she was not permitted to

8    do so."  Reverend Johnson's testimony was reinforced by the

9    testimony of several affected voters for whom voting in person

10   was not just preferred but for whom voting in person was

11   essential.

12           Ms. Gollar, for example, testified that she has

13   earned the right to vote in person, that that right is precious

14   to her and that she wishes to exercise that right to vote in

15   person in November.

16           Texas' argument that elderly voters of color should

17   simply vote at home and forego the opportunity to cast their

18   ballots in person is deeply offensive.  Each of these elderly

19   voters of color, like Ms. Gollar, testified powerfully and

20   unequivocally that voting in person for them is a celebration,

21   one that Texas should not be allowed to ignore or deny them.

22           Unfortunately, your Honor, Ms. Gollar's case is

23   illustrative of the inevitable impact that SB 14 has had and

24   will continue to have in election after election on the

25   fundamental rights of the most vulnerable segments of Texas'

1    population.

2              One of those vulnerable populations is young voters

3    in Texas, particularly young voters of color.  Your Honor heard

4    testimony from Blake Green who joins us in the courtroom this

5    morning from the Texas League of Young Voters Education Fund.

6    Ms. Green testified that focusing on young voters is

7    particularly important for the Texas League because voting like

8    many forums of civic participation is a learned behavior.

9    Mr. Green testified the young voters of color can become agents

10   for changing the respectful communities as he has and they can

11   ultimately create better conditions under which people live in

12   those communities.

13             But Ms. Green also testified that rather than

14   strengthening their confidence in the democratic process here

15   in Texas, SB 14 actually serves to discourage political

16   participation among young voters by erecting unnecessary

17   requirements to casting a ballot.

18             One of the places where the league has done some of

19   its most important work is at Prairie A&M University, a

20   historical Black college here in Texas.  It has been a subject

21   of a history of voter suppression efforts.  Mr. Green testified

22   that the League refers to Prairie View as "ground zero" because

23   of the serial attempts by public officials and others to

24   deprive Black students of their right to vote, going back more

25   than 40 years.  Mr. Green stated that through their work the

1   League has interacted with unregistered scores of young voters

2   at Prairie View and at other historically Black colleges across

3   the state who do not have SB 14 required forms of ID.

4           Your Honor, these young people don't need drivers

5   licenses when they have no cars, nor do they need concealed

6   handgun licenses when they're not armed.  Nor do they need

7   passports when they've not yet had a chance to travel abroad.

8   These students do of course have student IDs but a student ID

9   is one of the many forms of identification that Texas has

10  inexplicably prohibited for use when voting in person at the

11  polls.  Even though students had been using their university

12  and college IDs to vote at the polls for years in Texas.

13          On this point, Drs. Lichtman and Burden testified

14  that the use of student IDs is acceptable in other states

15  including both in Indiana and in Georgia and significantly,

16  your Honor, not a single legislature who voted for SB 14.  He

17  testified before this Court about why the Texas legislature

18  chose to diverge from States like Indiana and Georgia that

19  allow the use of student IDs at the polls.

20          Senator Rodney Ellis by contrast testified that the

21  82nd Legislature knew that the exclusion of student IDs would

22  be harmful to Black voters.  What makes the exclusion of

23  student IDs particularly disturbing is that this Court heard

24  testimony from one official after another who admitted that

25  they were not aware of a single instance of a student using a

1    student ID to commit voter fraud here in Texas or frankly

2    anywhere in the United States.

3           One affected Black student voter is our client, Imani

4    Clark, a student at Prairie View A&M.  Ms. Clark who has voted

5    in the past using her student ID is now disfranchised by SB 14.

6    And Ms. Clark, a voter that has now blocked from using -- from

7    voting by SB 14 for a substantial portion of the time that

8    she's been registered to vote in Texas is but one student out

9    of a generation of young Texans of color who are disfranchised

10   by operation of SB 14.

11          Texas' final defense of this discriminatory voting

12   law is based as you've heard on polls.  Specifically Texas

13   argues that polling data show the voter ID laws enjoin support

14   here in Texas including from republicans, democrats and even

15   from voters of color.  But, your Honor, these polls are no

16   defense to any of the claims in this case for at least two

17   reasons.  The first is that none of these polls actually

18   addressed the law that the Texas Legislature enacted and that

19   bears envious.  Not one of the polls cited by Texas was

20   actually about SB 14 itself.

21          As representative Anchia testified, the precise

22   language used in a particular polling question often determines

23   the responses that the pollers receive.  Thus, your Honor, we

24   can imagine a very different result that may have been obtained

25   if the question asked were would you support a photo ID

1  requirement that is so strict that it will likely prevent more

2  than six hundred thousand registered voters from voting, a

3  disproportionate number of whom are voters of color.  The fact

4  that not one of the polls relied on by Texas actually asked

5  about SB 14 or similar law is a critical failure of proof that

6  wholly undermines Texas' reliance on them.

7          A second, your Honor, and more fundamentally, the

8  popularity of SB 14 or of any law cannot insulate it from

9  scrutiny under the Voting Rights Act or the Constitution any

10  more than it could have insulated shameful laws that provided

11  for such things as slavery, the Texas White Primary, poll taxes

12  and racial segregation.  For example, your Honor, even if

13  defendants could show what you have not here, that the will of

14  all Texans was to truly impose such a burden on voters of color

15  that law would still violate the Voting Rights Act and the

16  Constitution.  Thankfully, your Honor, polls have never been a

17  proxy for a law of constitutionality.

18          Just one generation ago, in a poll reported in the

19  Victoria Advocate in 1954, an important year to be sure, an

20  astounding 75 percent of adults in Texas disapproved of a

21  Supreme Court ruling which would outlaw racial segregation in

22  the public schools.  Dr. Burden also testified that in 1963, a

23  majority of Texas voters declined to remove the poll tax

24  requirements from the State Constitution through a state wide

25  referendum.

1        Your Honor, we can unfortunately imagine sitting in

2   this Courtroom this morning, what contemporaneous polls would

3   have shown here in Texas regarding, for example, the Chinese

4   Exclusion Act in 1943 or the internment of Japanese Americans

5   in 1946 or Interracial Marriage in 1967 and yet we are not

6   bound in this Court of Law by majority impulses that isolated

7   moments in time.

8        Instead, we are bound by the U.S. Constitution and

9   those laws passed in support thereof like the Voting Rights

10  Act.  Polls purportedly showing public support for SB 14 list

11  offer no basis whatsoever for this Court's upholding Texas' use

12  of a racially discriminatory and unconstitutional photo ID law.

13  And this, your Honor, is especially true when the right at

14  stake, the right to vote, a right that the Supreme Court

15  respects as the right that is preservative of all other

16  fundamental rights, is itself fundamental and intersects with

17  another fundamental right, the right to be free of racial

18  discrimination.

19        Respectfully, your Honor, we submit that this Court's

20  role in Texas' democracy is to be the bulwark here against

21  SB 14's erosion of Plaintiffs and Plaintiff Intervener's

22  constitutional protections.

23        Your Honor, the evidence at trial has established

24  that the truth of SB 14 is as follows:  in 2011, the

25  Legislature of the State of Texas found itself at a critical

1    crossroads in the wake of two very important and recent

2    developments.  First, there was historic participation in the

3    political process by voters of color in Texas in the last

4    several election cycles.  And the second that there was

5    substantial growth of Black and Latino populations as reflected

6    in the 2010 Census.

7            These voting and demographic trends foreshadowed a

8    political landscape in which people of color in Texas would

9    play a leading role.  But, your Honor, instead of recognizing

10   this point of inflection in Texas' demographics as an

11   opportunity for all elected officials to respond to the needs

12   of new voters of color and an opportunity for the State

13   Legislative agenda to turn to the more pressing concerns of an

14   increasingly diverse population.  Those in power chose instead

15   to resurrect the tactic they had relied on faithfully before,

16   racial exclusion and they sought to make it more difficult for

17   this burgeoning Black and Latino community to cast their

18   ballots.

19           As Dr. Lictman testified, "you can't change the

20   democracy of Texas but you can pass laws that place disparate

21   burdens for voting on African American and Latino people."

22           Your Honor, SB 14, in a very real sense is a vivid

23   reminder of the salience of William Faulkner's declaration

24   years ago, "the past is never dead.  Indeed, it's not even

25   past."  Through SB 14 Texas is repeating its dark past in an

1   effort to disfranchise hundreds of thousands of voters

2   including a disproportionate share of voters of color allegedly

3   to prevent a problem that simply doesn't exist.  Such a cynical

4   infringement on a fundamental right is precisely what the 14th

5   and 15th Amendments to the U.S. Constitution and the Voting

6   Rights Act were enacted to proscribe and on behalf of the Texas

7   League of Young Voters and Imani Clark and the other Plaintiffs

8   in this case, your Honor, we respectfully urge this Court to

9   enter an Injunction against the enforcement of the Voter ID

10  Provisions of SB 14.  Thank you, your Honor, to you and your

11  staff for your tireless work in hearing this matter.

12          **THE COURT:**  Why don't we go ahead and take a 15

13  minute break.

14          **THE CLERK:**  All rise.

15      **(A recess was taken from 10:14 a.m. to 10:30 a.m.; parties**

16  **present)**

17          **THE COURT:**  We'll continue then.

18      **CLOSING ARGUMENT ON BEHALF OF LA UNION DEL PUEBLO ENTERO,**

19                              **ET AL..**

20          **MS. VAN DALEN:**  Your Honor, Marinda Van Dalen, Texas

21  Rio Grande Legal Aid.  It's a privilege to be here representing

22  my clients La Union Del Pueblo Entero also known as LUPE,

23  Eulalio Mendez, Lionel Estrada, Lenard Taylor, Margarito Lara,

24  Maximina Lara and Estela Espinosa.

25          These are the real people who have been affected and

1   disenfranchised by SB 14.  They are people who voted in the

2   past who brought this lawsuit along with the other Plaintiffs

3   to assure their right to vote in the future and who are unable

4   to vote because of SB 14's ID requirements or will be able --

5   unable to vote in the very near future.

6           They are Mexican American and African American.  They

7   are poor living at, near or below the federal poverty

8   guideline.  They have minimal educations.  They share

9   transportation problems and they lack the type of information

10  -- access to information that all of us enjoy and have -- and

11  struggle with the bureaucracies and intricacies of our

12  government's laws and regulations.

13          Mr. Mendez was the first of our clients to testify in

14  your courtroom.  He testified the second day of trial with a

15  translator.  He is a proud man of principle who testified to

16  how when Texas had a poll tax, he refused to vote because he

17  thought it was unfair.  He has no SB 14 ID since his driver's

18  license expired.  He's gone twice to DPS to try to get a

19  personal ID.

20          Both times the lines were too long for him to be able

21  to wait because of his health and it's just as well that he

22  didn't wait and that he hasn't gone back again because he would

23  have been turned away regardless because he doesn't have a

24  certified copy of his birth certificate which he understands he

25  will need to pay at least $22 to obtain.

1           Mr. Mendez's financial situation speaks for himself.

2    When asked to testify in this courtroom in front of so many

3    people about it, he said, "It's something sad.  I don't like to

4                remember it or think about it but I'll do it.  Each

5                month at the last week, there's no food in the house

6                and nothing with which to buy any, especially though

7                for the children.  Then my wife has to go to the

8                place to ask for food at a place where they give food

9                to poor people and they give us about three or four

10               gallons of milk."  His family lives at half the

11   poverty level guideline.  Our expert Kevin Jewell, the

12   economist, monetized the cost that he would face to obtain an

13   EIC at $44.93.

14          Defendants in their findings of fact state that

15   Mr. Mendez hasn't been disenfranchised because he can simply

16   vote by mail.  Mr. Mendez has never voted by mail in the past

17   and he testified that that's the case.  And I quote, "Because I

18   don't trust in that type of voting.  I don't know where my vote

19   is going to end up."

20          Defendants also state in their findings of fact that

21   Mr. Mendez should get an EIC birth certificate which would cost

22   substantially less.  There are two problems with that, however.

23   One is that he testified in this courtroom that he's unaware of

24   such a birth certificate being available and secondly and

25   perhaps more importantly and showingly, Mr. Mendez testified

1    that he doesn't want an EIC.  He wants a personal

2    identification card from DPS because he believes that the EIC

3    is part of a scheme designed to disenfranchise minority voters

4    in Texas.

5           Our next client to testify in this courtroom was

6    Lionel Estrada, a gentleman about my age from Kenedy, Texas.

7    He used to be a truck driver and now does odd jobs since he

8    lost his commercial driver's license.  He's been trying to get

9    another copy -- another commercial driver's license.  He

10   applied for it but it never properly arrived in the mail and

11   now in order for him to get a copy -- a new one, he'd have to

12   pay substantial surcharges of $260 a year for three years which

13   he testified to he cannot afford.

14          He presented to the Court the only photo ID that he

15   now has which, in fact, is merely a Xeroxed copy of an expired

16   temporary permit.  Defendants would have Mr. Estrada relinquish

17   his commercial driver's license in order to get an EIC.  If --

18   were he to do that, he would lose the $60 that's he already

19   paid towards getting a commercial driver's license and in

20   addition, when he's ready to get his commercial driver's

21   license, he'd have to figure out how to get another ride 30

22   miles to Beeville to the DPS office to get that.

23          And Mr. Estrada testified that he doesn't want to

24   give up his commercial driver's license because, of course,

25   that's his path to future financial stability.  Mr. Jewell

1   testified that -- or put in his report that Mr. Estrada is

2   living at 80 percent of the federal poverty guidelines and that

3   the cost for him to obtain an EIC were he to relinquish his

4   commercial driver's license would be $57.40 plus, of course,

5   then he would have to pay that $60 again when he's ready to get

6   his commercial driver's license.  Mr. Estrada is ineligible to

7   vote by mail or for any kind of disability exemption.

8           Mr. Taylor also testified before the Court on the

9   third of our trial.  He's the African American gentleman who

10  came up to the witness stand with his walker with the American

11  flags on it.  He's voted in the past.  Due to homelessness

12  which he's experienced, he's lost or had stolen many of his

13  identification documents but he does want ID and he's tried to

14  get ID.  He went, in fact, to the DPS office in Corpus to

15  obtain a personal identification where he was told that he

16  would -- he could not get one unless he produced his social

17  security card, his voter registration card and his birth

18  certificate, none of which he had at that time.

19          He, nonetheless, went to the Social Security

20  Administration to try to get a copy of his social -- a new

21  social security card to get that ID.  He was told there that

22  they would not be able to issue him a social security card

23  without a DPS ID which, of course, he didn't have.

24  Nonetheless, he went to the Vital Statistics office where the

25  paid $23 to get a birth certificate in the hopes of getting a

1    personal ID to use.

2            When he testified in trial -- at trial, he still did

3    not have a voter registration card, a social security card or,

4    of course, an SB 14 ID.  Texas would have Mr. Taylor vote by

5    mail as a remedy to his problem.  However, Mr. Taylor has never

6    voted by mail and he testified that he doesn't trust in the

7    process.  Texas would also incorrectly state some findings of

8    fact that Mr. Taylor now has the documents necessary to obtain

9    an EIC or a Texas personal ID when, in fact, at trial he

10   testified that that was not the case.  Mr. Taylor's income is

11   below the poverty -- federal poverty guidelines and he lives

12   only on his social security payments.

13           The next two Plaintiffs that testified that are

14   represented by Legal Aid are Margarito Lara and his sister

15   Maximina Lara.  They are representative of the Texans who were

16   born in this state but whose births were never registered.

17   These two Texans were born in a ranch in the Rio Grande Valley

18   and though both of them testified that they had each wanted and

19   needed a birth certificate for many decades, neither of them

20   has one still to this date.

21           Margarito Lara has no SB 14 ID.  For him to obtain a

22   delayed birth certificate necessary to obtain an EIC, he would

23   need to pay documentary costs of $69 and that assumes that

24   Mr. Lara with his seventh grade education and -- would be able

25   to navigate the process and complete the application to obtain

1    such a certificate.  Correspondence received by the Department

2    of State Health Services in response to an inquiry made by

3    Legal Aid regarding Mr. Lara's birth contains 14 pages of

4    instructions and information on how to obtain a delayed birth

5    certificate.  That's been identified as Plaintiffs' Exhibit

6    989.

7             At trial, Mr. Lara testified that the only thing he

8    knows to do to try to get a birth certificate, which he wants,

9    is to repeat what he's already done which has been

10   unsuccessful, travel himself to government offices in the

11   county he lives and into nearby counties and to contact Vital

12   Statistics in Austin.  The Defendants represent in the findings

13   of fact that the local Registrar would help Mr. Lara complete

14   the application for a delayed birth certificate.  That is not

15   contained in the letter that Vital Statistics mailed regarding

16   Mr. Lara's birth and there's no authority cited in the findings

17   of fact to that statement and I'm unaware of any evidence in

18   the record supporting it.

19            Mr. Jewell has estimated -- has calculated the cost

20   for Mr. Lara to obtain EIC at $94.41 and that is substantial

21   given the testimony Mr. Lara gave about his family's finances

22   and the fact that he and his wife live only on their social

23   security benefits.

24            Mr. Lara's sister, Maximina Lara, unlike our other

25   clients in this litigation, does have a driver's license which

1    would allow her to vote under SB 14.  However, it will be

2    expiring next year and she will be unable to renew it without

3    having obtained a delayed birth certificate which, of course,

4    she does not have.  Ms. Lara does not have the underlying

5    documentation required for an application for a delayed birth

6    certificate.

7           In addition, Ms. Lara's right to vote is jeopardized

8    by the substantially-similar-name provision in SB 14.

9    Ms. Lara's driver's license states incorrectly that her name is

10   Maxine.  In order for her to correct the driver's license to

11   have her -- to state her name properly, she would need a birth

12   certificate which, of course, she does not have.

13          Mr. Jewell has calculated the cost for Ms. Lara to

14   obtain an SB 14 ID when her driver's license expires to be a

15   hundred dollars and eighty-three cents.  He noted that due to a

16   high-interest payday loan that she has with an interest rate of

17   90 percent that Ms. Lara, in effect, would be borrowing money

18   in order to be able to vote.

19          Ms. Espinosa, who lives in Raymondville, Texas,

20   unfortunately did not testify in court and instead portions of

21   her deposition were read.  She does not have SB 14 ID.  She

22   spent most of her life until this litigation believing that her

23   birth had never been registered, as is the case with many of

24   her siblings.  Over the course of this litigation, Legal Aid

25   obtained a birth certificate and discovered that her birth had,

1    in fact, been registered and at a cost of $23, she now has a

2    birth certificate.  However, that birth certificate contains

3    the wrong date of birth and other inaccurate information.  So

4    it needs to be amended before she'll be able to get an SB 14

5    ID.

6           Additionally, because Ms. Espinosa uses her marriage

7    -- her married name and her birth certificate contains her

8    maiden name, she would need to get a copy of her marriage

9    certificate, which she doesn't know -- does not have, at

10   additional cost.  Mr. Jewell has estimated that the cost to

11   Ms. Espinosa of obtaining SB 14 ID would be $90.84.  For

12   Ms. Espinosa, as with the other Ortiz Plaintiffs, this would be

13   a substantial financial burden.

14          In conclusion, the Ortiz Plaintiffs share a desire to

15   have ID, whether it's a driver's license or personal ID or even

16   a birth certificate.  They also share many of the impediments

17   with other disenfranchised voters in Texas, transportation

18   problems, crushing poverty and despite their efforts, many of

19   them having testified to making multiple trips to government

20   offices from having received assistance from family members,

21   these individuals still do not have the ID required to vote

22   which so many of us take for granted.

23          These Plaintiffs have voted in the past and through

24   this lawsuit, they hope to vote in the future.  Without the

25   relief requested from this Court, Mr. Mendez, Mr. Estrada,

80

1   Ms. Espinosa, Mr. Lara, Ms. Lara and Mr. Mendez will be unable

2   to vote in the future.

3         Your Honor, it's been an honor to represent these

4   Plaintiffs in this lawsuit.  Speaking for myself and my

5   colleague Robert Doggett, several of these people would have

6   liked to have been in this courtroom today and I thank you very

7   kindly for your time and attention.  Thank you.

8         **THE COURT:**  Okay.

9         **CLOSING ARGUMENT ON BEHALF OF VEASEY LULAC PLAINTIFFS**

10        **BY MR. DUNN:**  May it please the Court and counsel.

11  Chad Dunn on behalf of the Veasey LULAC Plaintiffs and, again,

12  I'm joined by Mr. Derfner and Mr. Hebert.  I neglected to

13  mention earlier Joshua Bone, who has replaced Ms. Simson on our

14  team, is also here with us and of course I had Scott Brazil and

15  Neil Baron assisting us in this case.

16        I do want to take just a few seconds to thank the

17  lawyers behind me.  I, of course, started this proceeding in my

18  opening statement before talking about duty and responsibility.

19  I hope we've lived up to it.  I hope the Court and the public

20  believes that we have ably come here and brought this case and

21  properly tried to prove it.  I have worked with some of the

22  greatest women and men in this case that I have ever worked

23  with in a courtroom.

24        I say that on behalf of the Plaintiffs but also on

25  behalf of the State and the State had, in my view, an

1    indefensible law to defend but they did it honorably and ably.

2    Mr. Scott, Mr. Clay, Mr. Donnell, Mr. Keister, Ms. Wolf -- in

3    fact, I'll say about Ms. Wolf, she must be the most ferocious

4    and able litigator I've ever dealt with in my life.  There were

5    mornings I would open emails from Ms. Wolf and question my will

6    to living.  So with that, I can certainly commit that the State

7    has done everything that it can possibly have done to defend

8    this law.

9            I do want to turn for a minute and talk about the

10   historical nature of this case.  I mentioned in my opening

11   statement that Mr. Hebert and Mr. Derfner like to tell stories

12   about the 40-some years they fought racial discrimination,

13   whether it's intentional discrimination in segregated schools

14   or voting discrimination throughout the south.  They tell these

15   stories sometimes over and over again and sometimes the same

16   way but nevertheless the point has hit home with me and I'd

17   like to share it with this Court, that the right to vote was

18   fought for in a court of law in the beginning because

19   governments like Texas were denying the right to vote.

20           And then we improved as a society and we passed laws

21   that merely diluted the right to vote and we recognized as a

22   people that denying the right to vote was not permitted

23   although some still thought abridging could be proper.  And we

24   began to whittle away at those laws as well but something has

25   happened recently where we have returned to vote-denial cases

1    and that is what this one is and that is why it is so critical

2    that this Court today put a stop to it.

3              Texas is proud.  It's a proud state.  There's

4    probably no one in the room more proud than I to have been from

5    Texas, to have been born here, to raise my family here and I

6    represent some individuals who are also Texans though they

7    didn't have a vote in the legislature.  They come here with

8    their ten-gallon hat in hand asking that the Constitution

9    applies to them and the rights that they have that they ask for

10   here were given to them in some measure by another great Texan.

11             When President Johnson announced that he would do all

12   that was necessary to pass The Voting Rights Act, he said every

13   American citizen was to have an equal right to vote.  There is

14   no reason which can excuse the denial of that right.  There is

15   no duty which weighs more heavily on us than the duty we have

16   to protect this right.

17             I and Ms. Van Dalen and so many others who have

18   spoken before you have described the testimony of individuals

19   who have come into this court rather humbly describing to this

20   Court their -- let's say it -- impoverished means in ways that

21   most of us in this room would be unable to get past our pride

22   but they did it because what they did was as important as what

23   any soldier does on a battlefield.  They stood up for what was

24   wrong and they used what weapons they had at their disposal to

25   fight evil and now they ask this Court to finish the job.

1          So I'm honored today to represent these voters who

2     seek to exercise their fundamental right to vote and I'm going

3     to do all in my power today, as I have up until now, to do what

4     is necessary to protect their right to vote because their cause

5     has become our cause.  It has become my cause and it is not

6     just the cause of Latinos and African Americans but it's really

7     our cause to overcome a legacy of discrimination and injustice

8     that his Court must find -- we beg it to find in the final

9     matter still continues today in Texas.

10          Now, I've been told by co-counsel that whatever

11     rhetorical flourishes I would be able to make today would be

12     insufficient to show the Court what is necessary on how to rule

13     on this case.  So I prepared a Power Point and I'll tell the

14     Court that I enjoy giving a Power Point about as much as I

15     enjoy sitting through a Power Point but I will agree up front

16     not to read every phrase, not to read every slide, not to use

17     any animations but I do think it's important as -- as important

18     as to how this Court rules and whether it issues an injunction

19     is how it does it and how it deals with the legal -- important

20     legal issues at issue.

21          My time before the Court I'm going to deal with the

22     poll tax and the Crawford claims which have not received much

23     attention to this point.  That means nothing and the Court

24     should not take it as Veasey/LULAC Plaintiffs not agreeing with

25     the racial claims.  We agree with them entirely.  I brought

84

1    those claims and helped support them with evidence.

2            But if I could ask that the projector be transferred

3    to our table.  Many of the slides I will skip past because

4    they've been discussed.  I'll also just reference them in case

5    the Court would like to reference them later or its clerks and

6    if it's acceptable, we would file this unchanged with the Court

7    after the proceedings.

8            So the first two slides result -- relate to the --

9    first, the Crawford claim and then the poll tax claim and

10   really this is just the road map to where in the findings of

11   fact and conclusions of law the Court is able to look up these

12   issues and -- if it chooses to do so.

13           I want to start with Crawford and it's important that

14   if we have been successful to convince the Court to rule in

15   favor of the Crawford plan, how it does so is very important.

16   So what we've suggested to the Court is a standard that it

17   might relate in its opinion as to how Crawford and the

18   Anderson-Burdick analysis will overlap one another and the way

19   we treat it is a rule of necessity.

20           So we believe and assert and certainly understand the

21   directors of the Crawford opinion that preventing in-person

22   voter fraud is an important State interest which we don't argue

23   with.  The question is, does Senate Bill 14 need to be as

24   restrictive and burdensome as it is to meet that interest.

25   That's what we think the rule in Crawford-Burdick requires and

1    that's what we think we have met and exceeded in our burden of

2    proof in this case.

3            So for using as for example the interest of

4    impersonation fraud that the State has, the question is, the

5    fact that there hasn't been any real fraud means we believe

6    that it should have been possible for the State to protect or

7    achieve that interest without putting so much of a burden on

8    the people.  And what is important, I think, to note about

9    Crawford in particular in the Indiana statute is, of course,

10   the testimony that we heard from so many legislators who

11   supported this bill that said that they adopted this measure

12   because it was the same as Indiana and Georgia.  And that's

13   plainly not true.  We've heard about that.  I won't belabor

14   here.

15           But what I will point out is that as we do the

16   Anderson-Burdick analysis, the Crawford analysis, and we look

17   at whether it was necessary to be this burdensome in order to

18   meet the state interests.  We know it wasn't necessary in

19   Georgia and Indiana.  It met its state burden and the state's

20   interest in stopping voter fraud but also did it in such a way

21   that at least with respect to Georgia -- it came after some

22   Court opinions.  They did it in such a way so that individuals

23   could still obtain the right to vote.

24           So we provide a slide comparing Crawford versus

25   Veasey and I won't go through it here but I will stress that

1   they -- that Crawford was a facial challenge that involved

2   cross motions for summary judgment, very little evidence, no

3   analysis as to the number of people affected and certainly no

4   identification of individuals who would be affected and all of

5   that is different in this case.

6          This is an as-applied challenge which we'll discuss

7   later is important in how this -- the Court crafts its

8   individual injunction assuming we've been successful at

9   obtaining one.  So Texas' individual choices -- again, getting

10  back to the necessity question, Texas' individual choices are

11  what have added to the burdens.  They picked it over a

12  restricted list.  We've heard about that.  In order to vote by

13  mail and claim the disability under the prior law, one merely

14  checked a box.

15         Now one has to go to the government with a "Mother

16  May I" and plead to them that they're sufficiently disabled in

17  order to vote by mail.  Then you can only obtain a reduced-cost

18  birth certificate and not by mail.  If you paid a higher fee,

19  you can have it mailed to you.  And then the birth certificate

20  application, up until moments into this trial, showed that one

21  had to bring a photo ID in order to get the birth certificate,

22  creating an impossible burden.

23         What I think is so noteworthy about that, although I

24  appreciate the State repairing the error, the fact that it

25  occurred here in court after litigation has begun with no

87

1   public notice goes to show how the State's implementation of

2   Senate Bill 14 is fatally flawed.

3          Senate Bill 14 for the first time made a law

4   enforcement agency responsible for election laws in the state.

5   We walked through various regulations as it pertains to the

6   statute and although it's not, in my view, an entertaining

7   thing to spend some time discussing, it's critically important

8   in the Crawford analysis and the opinion that this Court issues

9   that it deals with the web of the statute and the regulation as

10  it's entered.

11         And what the legislature essentially did was it

12  provided to the Department of Public Safety, a law enforcement

13  agency, unfettered discretion, standardless discretion to

14  decide how it would administer the EIC program.  The Department

15  of Public Safety did so in the administrative code.  It came up

16  with the process by which a person could present documents to

17  get an ID and without walking through them today, the bottom

18  line is one must bring a birth certificate in in order to

19  obtain an EIC.

20         The supporting documentation has been listed.  We've

21  also provided it on the slide.  We've also talked here today

22  about the significant cost, the $22 for a certified copy, the 2

23  to $3 for the so-called EIC copy but what we've also heard from

24  individual witnesses here is that very rarely is the 2 or $3

25  charge.  It's not advertised.  People have to know to ask for

88

1    it and in some cases, they have to beg for it.

2            So how does somebody get an EIC?  How would a citizen

3    out there who becomes aware that an EIC is necessary or photo

4    ID is necessary, how do they go get one?  Well, first they have

5    to learn about it.  And of course as Ms. Van Dalen pointed out

6    during one of her examinations, there was no way to go to the

7    website and in Spanish and find out where one might obtain an

8    EIC.  We know the Department of Public Safety is not committed

9    to the EIC program, one of their authors referred -- officers

10   referring to it as "Mission Creek."  And then we also know that

11   the DPS employee who is involved in this spends little time on

12   it and we can tell from his demeanor and his testimony take no

13   interest in it.  What documents do you have to get?  Well, of

14   course you have to get a birth certificate.

15           But more importantly, the regulations allow DPS to

16   demand virtually any information they want to confirm your

17   identity and, in fact, there is nothing in this record that

18   prohibits in any way for the Department of Public Safety the

19   moment judgment was entered in this case were requiring

20   additional or other documentation which incidentally goes to

21   show what the State is clearly trying to do with Senate Bill 14

22   because with its unfettered discretion, it clearly could have

23   relieved some of these burdens in the regulatory nature and

24   chose not to do so.

25           One has to visit a DPS office which are largely

1    inaccessible.  Many counties don't have them.  It's a law

2    enforcement agency again that fingerprinted, did background

3    checks up until the point in time that this lawsuit brought

4    those issues to this -- to the attention.  We have to convince

5    a DPS employee accept certain documentation and in some DPS

6    locations, one gets luckier than others.  So essentially the

7    right to vote comes down to a game of chance.

8            DPS exercises its discretion, as I said, on a case-

9    by-case basis and we reference here testimony that Mr. Derfner

10   elicited from the DPS officer and asked him what might happen

11   in individual situations in Waco and other locations around the

12   state.  We think it's important to note Rudy Barber's store, an

13   Anglo woman from Waco who went to the DPS with supporting

14   documentation and was unable to obtain an EIC.  She finds

15   herself on the front page of the Waco newspaper and the

16   Department of Public Safety contacts her and obtains an EIC for

17   her despite the fact that she never had a birth certificate.

18   Instead, what the DPS does is they go online and find her birth

19   history on a website and call that good enough.

20           Again, Senate Bill 14 is fatally flawed in that it

21   provides unfettered discretion to a state agency, that that

22   state agency we know based on this record is administering in

23   an ad hoc inconsistent manner.  We know it because Floyd

24   Carrier didn't receive the same benefit that Ms. Barber did.

25   We know that Gordon Benjamin didn't receive it who went down to

1    a DPS office in San Antonio with many more documents than

2    Ms. Barber ever had and he stands today without an EIC.

3            On these slides, we describe for the Court the

4    intersection of Senate Bill 14 and its changes to the

5    Transportation Code, not the Election Code and in its reference

6    to Section 521.142 of the Transportation Code which is the code

7    of law that provides the requirements to obtain a driver's

8    license.  And it goes to show that Senate Bill 14 was drafted

9    in mind to provide the Department of Public Safety an agency

10   designed to issue driver's license and do law enforcement.

11   They hand out EICs and that it's chosen to do as a law

12   enforcement and not an election assistance agency.

13            But the second perhaps most insidious way that the

14   statutory language DPS standardless discretion is when it comes

15   to all the necessary documents that a clerk can ask for and,

16   again, we compare the examples of one individual after another

17   who goes to DPS and different documents work in some situations

18   and not in others.  When the director of the EIC program was

19   asked about this different treatment, he admitted it.  He

20   affirmed it.  We give you the citation to the trial transcript.

21   There is no dispute that Senate Bill 14 is being inconsistently

22   applied across the state.

23            Again, because of the unfettered discretion that DPS

24   has been given by Senate Bill 14, we have debacles like we did

25   with the thumb-printing of applicants which Mr. Peters of DPS

1    testified had been done and had been stopped but goes on to

2    state that his regulations or the rules actually still require

3    it.  So even insofar as DPS has been given discretion to

4    administer this program, they do it in such a way where they

5    even ignore their own regulations again on an ad hoc,

6    inconsistent basis.

7              So as a result of this unfettered discretion, there

8    has been a limited issuance of EICs.  As been noted by

9    Mr. Dellheim earlier, there are other places like Georgia that

10   issued a great deal -- number of EICs and I think we know why.

11   It's because Mr. Rodriguez, who no doubt knows the direction

12   that he received from the legislature, never took it seriously

13   to ensure these EICs were issued, saying at one point, zero is

14   a good number for the number of EICs requested at issue and

15   pointing out that in one of -- incidence there was a close call

16   involving an inquiry to get an EIC but it turns out it was not

17   issued and there was a clean sweep that day.

18             Your driver's license now in Texas is your ticket to

19   vote but the State gives no consideration to what might happen

20   to people who lose their driver's license for issues that have

21   nothing to do with their right to vote, for example, being

22   pulled over for a DWI.  Furthermore, people decide to

23   voluntarily turn over their driver's license when they've

24   exceeded the years they should be behind the wheel, activities

25   that we should encourage from a law enforcement basis but

92

1   there's nothing in SB 14 to give these folks notice that when

2   they hand over that driver's license, they're now losing their

3   right to vote when the State so simply could have turned around

4   and issued an EIC.

5           So the State gives various explanations for why they

6   passed this law.  For one of them was so they could ensure

7   citizens to vote.  Well, we know that's not true because

8   several of the IDs they put on the list, you don't have to be a

9   citizen to get, a concealed handgun license or a military ID,

10  for example.  Moreover, we know the driver's license database

11  indicates that only 4 million out of the 18 million or so

12  applicants have actually had to show their papers like

13  Mr. Estrada and Mr. Carrier have been asked to do.  And so at

14  least for the next four years, there will be approximately 14

15  million Texans who get to vote under a completely different

16  standard than do the rest of the Texans who do not have the

17  privilege to drive.

18          We heard about voter fraud but of course we know from

19  Mr. Wood that it's irrational to change one vote, that there

20  are no election outcomes in the evidence that have been changed

21  with one or even a handful of in-person voter fraud.  There are

22  two cases in 14 years and there's uncontroverted testimony that

23  in-person voter fraud is easy to discover.  And, again, we know

24  that the real problem is with mail ballots and Texas turns a

25  blind eye to it.

1            Now, again, as I said earlier, it's not that we

2      question the State's important interest.  We question how the

3      State served that important interest and I won't touch on it

4      much except the racial motivation.  Dr. Lichtman went through

5      one change after another where the State had available to it

6      information that would have -- that would cause Senate Bill 14

7      changes to benefit or disadvantage African Americans and

8      Latinos.  In every single opportunity, it took the path that

9      would damage minority voting rights.  And we have Mr. Korbel's

10     testimony talking about redistricting which we've heard so much

11     of here today.

12            We've offered another slide as to various case

13     authorities dealing with the standard of appellate review when

14     a Court decides issues of intent despite some of the witnesses

15     not having testified live.  Now, I have my suspicions as to why

16     the State didn't call any of the authors of this legislation.

17     In fact, I like to joke in our recesses that this is the most

18     beautiful baby anybody's ever seen but it's got no mama.

19            But nevertheless, the State made the decision to not

20     bring a single legislator here to testify live in favor of this

21     statute but that should not form the basis of this Court

22     finding intent.  Those legislator's language in their testimony

23     that was described by the earlier attorneys who have become

24     before me is sufficient for this Court to find intent along

25     with all of the collateral circumstantial evidence that

94

1   Arlington Heights says is sufficient.

2          There's been a great deal of talk by vote-by-mails.

3   I won't belabor that point.  The number of Texans who currently

4   lack ID -- I suspect that the State will argue here as they

5   have in their findings of fact and conclusions of law that the

6   percentages are small but percentages hide real people in one

7   analysis after another jelled in a basic area of 5 to 600,000

8   registered voters who lacked Senate Bill 14.  Also

9   Dr. Barreto and Dr. Sanchez provided a number of eligible

10  voters of 1,130,000 Texans who are not able to vote unless they

11  somehow meet the burdens of Senate Bill 14.

12         But really none of this is news to the State and it

13  surprised me that they came in here and defended it.  Ann

14  McGeehan at the Secretary of State had already done her own

15  match and came up with an 800,000-dollar figure you saw

16  earlier.  Representative Smith had done an analysis and came up

17  with a 700,000 figure and to attack these scientists with the

18  methodology that they used to reach a conclusion that everybody

19  has reached, it seemed to me was an unnecessary herring.

20         But nevertheless, the Court should find that whether

21  the number is 597,000 or 608,000 or something in between, there

22  is an enormous number of people who are affected by this law

23  and there is an enormous disparity between Anglos, African

24  Americans and Hispanic, so much so that Dr. Hood found this

25  when he began to perform his own match and then decided not to

1  complete such an analysis.

2          Again, we offer another slide describing how the

3  percentages both in disparity and compared the citizen voting

4  age population are significant and also legally relevant.   I

5  thought one of the turning points of the testimony in this case

6  was Mr. Ingram.   The director of elections sat on the witness

7  stand and talked about how implementation of Senate Bill 14 was

8  like flying an airplane while trying to build it.

9          Well, Senate Bill 14 was passed in the spring of

10  2011.   It was held up by a Section 5 lawsuit that ultimately

11  enjoined the law and then wasn't -- Section 5 wasn't listed --

12  lifted from the State until June of 2013 which means the State

13  of Texas had two years to prepare its implementation of Senate

14  Bill 14.   So to the degree that the State was flying its plane

15  while trying to build it was certainly its own decision.

16          But nevertheless the fact that this state admits that

17  its implementation of the law has been rocky on top of the fact

18  that the statute is irrevocably flawed and that it provides

19  standardless discretion to election officers tells us that we

20  can't merely trust the Elections Division to ameliorate some of

21  the disadvantages that the law creates or the harm that it

22  creates.

23          I think it's also important to note because it didn't

24  come out in the testimony but it is in the depositions that Ann

25  McGeehan who had been the Director of Elections in Texas for

1  some time -- she testifies as a resource witness on Senate

2  Bill 14 and then not much longer, she's reassigned out of the

3  Voting Department.  Mr. Ingram then is brought in from the

4  Governor's Calendars' office to implement Senate Bill 14 and

5  under his own testimony in his deposition in the record had no

6  election law experience, save from having worked on an election

7  case in Arkansas for some lawyer that he worked for there.

8           So it's not surprising that if we were building the

9  airplane while we were trying to fly it that we crashed it a

10  few times.  That's why we had fingerprint applications and we

11  had background checks, websites provided misinformation --

12  websites are still being updated today -- no Spanish language

13  support, mobile EIC units that nobody can find, no signage in

14  DPS concerning EIC issuance and one issue after another.  Texas

15  only spent $400,000 of its own money to implement a voter plan

16  that would apply to all of its residents.

17           It used Help American Vote Act money as we heard from

18  Mr. Cornish but that money really just went to tell the public

19  that they would need an ID.  That's a hopeful, helpful message

20  but there was no effort to explain to the public how to get one

21  of these IDs.  Georgia spent $700,000 and put a camera in every

22  one of its voter registration offices in all of its hundred and

23  fifty-nine counties.  Texas, with its immense wealth and

24  opportunity, could have done better, should have done better if

25  it was actually interested in issuing EICs.

97

1          The other thing that came from Mr. Ingram that I

2   found so shocking was a complete lack of interest in

3   provisional ballots issued in this case.  Now, the State is

4   critically concerned about the two cases of in-person voter

5   fraud it has discovered in the last 14 years but it pays no

6   attention to the number of provisional ballots cast since

7   Senate Bill 14 was adopted that relate to ID.

8          In fact, Mr. Ingram says now, I have no idea how many

9   of IDs in Harris County were related -- or in the Senate Bill

10  -- Senate District 28 election were related to ID but there

11  were a hundred and twenty-seven provisional ballots in a

12  special election of only 27,000 votes cast and the State is

13  taking no interest and even if the State doesn't believe that

14  Senate Bill 14 is a problem, why not try to determine who cast

15  these provisional ballots and get an EIC in their hand?

16         There were a hundred and five provisional ballots in

17  a low turnout election in Harris County, a hundred and five

18  that were related solely to not having an ID.  And Mr. Ingram

19  said, "So, you know, we could ask them to do a lot of things"

20  -- talking about the County -- "but you'd have to do a cost-

21  benefit analysis as to whether or not that information that you

22  received would be useful."

23         So now I turn to the poll tax claim.  It's undisputed

24  that Texas charges money for a poll tax and it's undisputed

25  that every other law like Senate Bill 14 has been struck down

1    or changed by a Court to make the document itself the EIC free

2    and underlying documents to be free.  It's simply inexcusable

3    that Texas reduced the fee but still charges a fee.  The other

4    issue that we know is that for so many the 2- to 3-dollar fee

5    is not going to get it done.  Mr. Carrier's paid $42 and he

6    still doesn't have a correct birth certificate to get an EIC.

7            Texas imposes an indirectly higher fee on people born

8    in other states or in other nations who are citizens of the

9    United States and, again, it makes no accommodation for this.

10   And it wasn't that it was a mistake.  It was an active decision

11   because Senator Davis and others proposed amendments to make

12   the EIC supporting documents free or provide for reimbursement

13   of those documents and each and every one of those amendments

14   was defeated.

15           So Texas adopted the law that required people to

16   bring a birth certificate.  It knew it would cost money.  It

17   knew that 25 percent of the people in the state were born

18   elsewhere and they would have to pay more money.  It knew the

19   U.S. Supreme Court said in 1965, "Any material requirement, any

20   material fee imposed on the federal voter is unconstitutional."

21           And more importantly or at least to put a face with

22   it, Ken Gandy came in here and testified -- a citizen here from

23   Nueces County -- that he works on the ballot board and actually

24   makes sure that elections are fairly administered and he can't

25   vote in person now without paying a poll tax.

1          So we submit to the Court that it should decide all

2     four of the claims submitted, the Section 2 claim, the

3     purposeful discrimination claim, the Crawford claim and the

4     poll tax claim.  Now, the State may counsel the Court against

5     doing this because often it's the case that Courts should avoid

6     constitutional questions when it could resolve a case on a

7     statutory answer.  But if the Court is to find an injunction in

8     this case and my clients have secured an injunction in this

9     case, it is certain that the State will seek a stay of that

10    injunction.  And the Court of Appeals, given the closeness of

11    the election, will be in the best position to determine an

12    outcome in this case if it has adjudication of all of the

13    claims pending before the Court.

14          Now I turn to remedy.  Obviously we agree with the

15    earlier Plaintiffs who have testified that if there is

16    purposeful discrimination or a violation of Section 2, Senate

17    Bill 14 is to be enjoined in total but we've read Crawford.  We

18    understand that the Anderson verdict analysis requires this

19    Court to tailor a remedy that is directly crafted to solve the

20    harm and is no broader than is necessary to deal with the

21    constitutional violation.

22          So we believe that even though the Court need not

23    reach the contours in the injunction under the Crawford and

24    poll tax analysis that it should do so given the closeness of

25    the election and that it should say that this Court chooses to

1   enjoin senate Bill 14 as it pertains to people who do not have

2   an ID and then permit the State to come back to the Court if it

3   chooses to do so and provide for what procedure it would like

4   to use to identify those people who don't have a Senate Bill 14

5   proposed ID.  We suggest the easiest way to administer an

6   upcoming election is to simply allow people who present their

7   voter registration card to vote, the system that was in place

8   successfully for decades before.

9          Nevertheless, the State, in its sovereignty, is

10  entitled first to address the issue.  They broke it.  They

11  bought it.  They should assist the Court in fixing and

12  repairing the problem that they created.

13         The same is true with the poll tax claim.  We'll note

14  that both in Georgia and Wisconsin, courts have had to find

15  that laws such as Senate Bill 14 amount to a poll tax.  And in

16  both places remedial orders were entered in pace to make sure

17  that the documents were free; and, in Wisconsin, so that the

18  underlying document, the birth certificate, was free.

19         And, again, once the State has demonstrated it's

20  complied with this Court's order, if it's forthcoming, to

21  resolve the poll tax issue, then it ought -- then the State

22  must then demonstrate to the Court that it has allowed

23  sufficient time for people to obtain this free documentation to

24  get an EIC before they can be demanded of same in an election.

25         Lastly, I want to talk -- on the legal issues, I want

1    to talk about the Wisconsin Seventh Circuit issue.  As the

2    Court might be aware, many of these issues are working its way

3    through Wisconsin Federal Court, as the Seventh Circuit

4    recently issued an opinion lifting an injunction from the

5    Wisconsin District Court, and that opinion is strongly in favor

6    -- both the District Court and the Circuit opinion are strongly

7    in favor of this Court enjoining this law.

8            In fact, it was the Seventh Circuit that said the

9    reason that they were lifting the injunction in that case was

10   because the State Supreme Court had already adopted changes to

11   the law that made it not be a poll tax -- changes that have not

12   been permitted or made in this case.

13           Next, I'd like to talk about what the emergency is.

14   One of the issues that I think the State will raise is that

15   there's an election coming up, and that we have a number of

16   people -- and the State ought to be able to meet its interest

17   in this election.

18           But that rings hollow, since the State, as we noted

19   earlier, has 14 million of the 18 million people in the

20   driver's license database who have never proved any of these

21   documents.

22           So one way or the other, injunction or not, this

23   election to be held in a few weeks is going to be held with

24   millions of Texans going to the polls without having done what

25   Senate Bill 14 and the Legislature required them to do.  That's

1    going to occur whether the Court chooses to enjoin the law to

2    protect against the harms that have been described here -- and

3    as long as that's the case, what's the rush?

4            Now, lastly, I want to return to the issue of race.

5    One of the things that the State of Texas has tried to do is

6    ferret out voter fraud in every place that it can find it.  And

7    it has spent the last decade, as the record reflects, trying to

8    locate voter fraud.

9            One of the things it did was prepare a PowerPoint

10   that it delivered to various officers around the State,

11   district attorneys, criminal investigators, telling them how to

12   find voter fraud.  And this is how the State of Texas chooses

13   to speak, and this is the images that the State of Texas

14   chooses to use to cue others into what voter fraud looks like.

15           When the State of Texas talks about early voting in

16   person, it uses an image of African-American folks lined up to

17   vote.

18           When Texas talks about in-person -- when Texas talks

19   about voter fraud as it relates to mail ballots, they ask

20   regulators, they ask district attorneys, people with the power

21   to take somebody's liberty away, to look for unique stamps, and

22   the one they pick in their presentation is one involving

23   testing for sickle cell anemia and an African-American mother

24   holding her baby.

25           Texas, whether we call it a dog whistle or subtle

1  cues, has for all too long used race as an issue that has

2  defined its politics and has too often defined its policy.

3          So, today, we have come here asking the Court to

4  enjoin Senate Bill 14.

5          And the quest and thirst of Latino and African-

6  American voters for justice fuse and blend into our own noble

7  calling as lawyers, my calling to be here.  And whether we are

8  judged or served by an almighty God, our conscience, our

9  friends, or the trustful eyes of young ones looking up to us,

10 it is our duty at this time and at this place to call this what

11 it is -- to what we know in our heart that it is.  We have

12 arrived at a place in time today where we must do our duty.

13         We ask this Court to enter judgment for the

14 Plaintiffs.  And if it does so, it will do what President

15 Johnson said the enactment of the Voting Rights would do for

16 all Americans, "It will be a triumph for equality and freedom,

17 and as huge as any victory that has been won on any

18 battlefield."

19         And if I and the other lawyers behind me have done

20 what we should have done to convince this Court that an

21 injunction should lie, we will do anything and everything

22 that's necessary to make sure that it remains the law, because

23 for all too often, as proud as we are as Texans, we've needed

24 the Federal Court to be our conscience.

25         And, today, unfortunately, our conscience didn't get

1    it done, so we're asking for this Court's.  Enjoin this law,

2    please.

3            THE COURT:  Thank you.

4            CLOSING ARGUMENT ON BEHALF OF STATE DEFENDANTS

5            BY MR. ASTON:  Adam Aston for the State Defendants.

6    Good morning, your Honor --

7            THE COURT:  Good morning.

8            MR. ASTON:  -- and counsel.  May it please the Court.

9            As the Defendants noted in opening argument, this

10   case asks whether Texas may require in-person voters to provide

11   photo identification prior to casting a vote.  The Supreme

12   Court answered that question yes for Indiana in 2008.

13           The Seventh Circuit answered that question yes for

14   Wisconsin a week ago.

15           And in between these two decisions, states across the

16   country and across the political spectrum passed voter

17   identification requirements for the purposes of deterring and

18   detecting voter fraud and preserving voter confidence in the

19   integrity of their elections.

20           Photo identification requirements remain immensely

21   popular with Latino, African-American, and Anglo voters, both

22   nationwide and in Texas.

23           Over the course of two weeks, the Court heard

24   testimony from -- and reviewed evidence from Texas voters,

25   civil rights leaders like Reverend Johnson, public officials,

1   community organizations, and 18 paid experts.

2           While the focus of the State's argument today will be

3   on that evidence, a brief review of Plaintiffs' claims and the

4   burdens that they bear will provide an appropriate context for

5   the consideration of that evidence.

6           For Plaintiffs' Section 2 vote dilution, poll tax,

7   and Fourteenth Amendment claims, Plaintiffs must prove Senate

8   Bill 14 has the effect of substantially burdening voters.

9   Under Section 2, Plaintiffs must show the effect of Senate

10  Bill 14 will be the denial or abridgment of the right to vote

11  on account of race or because of membership in a language

12  minority group.

13          And under the Fourteenth Amendment claim, they must

14  show that the substantial burdens are not justified by

15  legitimate State interests.

16          To prove Senate Bill 14 was enacted with a

17  discriminatory purpose, Plaintiffs must show it was enacted

18  because the Legislature desired to harm minority voters.  As

19  the Supreme Court has explained:

20          "'Discriminatory purpose' under the Fourteenth

21          Amendment implies more than intent as volition or

22          intent as awareness of consequences.  It implies that

23          the decision maker selected or reaffirmed a

24          particular course of action at least in part because

25          of, not merely in spite of, its adverse effects upon

1           an identifiable group."

2           Finally, *Crawford versus Marion County* instructs that

3    Plaintiffs' burden is a particularly heavy one, given their

4    facial challenge to Senate Bill 14.

5           Keeping these principles in mind, we turn first to

6    the effects of Senate Bill 14.

7           Much of the evidence presented by the Plaintiffs

8    involved estimating the potential effects of SB 14, but the

9    critical question for this Court is what are the actual effects

10   Senate Bill 14 will have on actual Texas voters.  Even under

11   Plaintiffs' worst-case scenario view, at least 95.5 percent of

12   Texans already -- Texas voters already possess an acceptable

13   form of photo ID.

14          Indeed, *Crawford* finds that, for most voters, even if

15   they do not yet have an ID, obtaining one involves no increased

16   burden.  For most voters who need them, the inconvenience of

17   making a trip to the DMV, gathering the required documents, and

18   posing for a photograph surely does not qualify as a

19   substantial burden on the right to vote, or even represent a

20   significant increase over the usual burdens of voting.

21          Thus, *Crawford* stands for the proposition that voter

22   ID is not unconstitutional, even as applied to voters who do

23   not yet possess an ID.

24          *Crawford* goes on to note that a somewhat heavier

25   burden may be placed on a limited number of persons.

1           Yet Texas took care to mitigate this burden.  Senate

2    Bill 14 allows the disabled to vote in person without an ID.

3    Texas law allows the disabled and those over 65 years of old to

4    vote by mail without a photo ID.  And for an EIC, the charge

5    for a birth certificate is 2 or $3.

6           The State Defendants appreciated hearing the personal

7    testimonies from so many Texas voters.  Some expressed

8    lingering concerns over whether they will be able to vote, but

9    the State is committed to ensuring that these Texans can vote.

10   It's because of Texans like these that the State carefully

11   crafted and implemented Senate Bill 14.

12          Indeed, as their testimony demonstrates, SB 14 will

13   not prevent from voting a single one of the 17 voters who

14   testified.

15          Ms. Ruby Barber from Bellmead, Texas, went with her

16   son to DPS to obtain a photo ID.  Although she lacked a birth

17   certificate, Texas DPS located her in the 1940 census records

18   and issued her an EIC.  Ms. Barber and her son said that she

19   appreciated the efforts of DPS, and Ms. Barber intends to vote

20   in November.

21          Ms. Vera Trotter is a lifelong Dallas resident, who

22   went to DPS a few days after learning that she needed to obtain

23   a photo ID to vote in person.  She has since used the EIC

24   temporary receipt in March of 2014 and voted by mail in May of

25   2014.  Ms. Trotter also intends to use her expired driver's

1    license to obtain a Texas ID card as soon as possible.

2          Ms. Phyllis Washington has voted using her Texas ID,

3    and she lives near the Holland Street Baptist Church in

4    Houston, where a mobile EIC unit was stationed for several

5    weeks.

6          Mr. Floyd Carrier testified regarding his service in

7    the United States Army as a paratrooper, and he can vote with

8    his veteran's ID.  He lives in Jefferson County, where he

9    retired after becoming disabled.

10          Ms. Maximina Lara lives in Sebastian, next door to

11    her older brother, Margarito.  She has a driver's license that

12    she has used to vote without incident in three elections

13    following the implementation of Senate Bill 14.

14          Ms. Ramona Bingham has an expired driver's license,

15    which she hopes to renew, and a valid Texas ID card.

16          Each of these six voters already owns an acceptable

17    photo ID.

18          Mr. Ken Gandy of Corpus Christi has served his

19    community as a precinct chairman and ballot board member for

20    several election cycles.  Mr. Gandy has voted by mail without

21    difficulty in the three elections following the implementation

22    of Senate Bill 14.

23          Ms. Gholar would prefer to obtain a Texas driver's

24    license rather than an EIC, and she was working on obtaining

25    her birth certificate to do so.  Until she does, she's able to

1   vote by mail.

2          Mr. Margarito Lara and his wife live in Sebastian,

3   Texas, near Mr. Lara's sister.  Mr. Lara is eligible to vote by

4   mail, and would have the necessary documentation to obtain an

5   EIC if he obtains a delayed birth certificate, and he has all

6   of the documentation necessary to obtain that birth

7   certificate.

8          Ms. Sandy Bates is able to vote by mail.  She is also

9   interested in acquiring a Texas ID for purposes in addition to

10  voting, and she is working towards doing so.

11         Ms. Naomi Eagleton is a lifelong Houstonian.  Because

12  she has a Medicare card, a voter registration card, and a bus

13  pass, she has the necessary documents to obtain a birth

14  certificate and then an EIC.  In the meantime, she's eligible

15  to vote by mail.

16         Ms. Espinoza has lived and worked -- or voted in

17  Raymondville in Willacy County since 1970.  She has the

18  necessary documentation to obtain a birth certificate and an

19  EIC, and she is eligible to vote by mail.

20         Mr. Mendez was born and raised in Willacy County,

21  where he currently resides with his wife and family.

22  Mr. Mendez says he doesn't want an EIC out of principle, yet he

23  has the documents necessary to obtain a birth certificate and

24  an EIC.

25         Mr. Leonard Taylor is a retired resident of Alice,

1    Texas.  He has voted in the past with a Texas ID card that has

2    since been stolen or lost, but which he intends to replace.

3    Until then, he could obtain an EIC or vote by mail.

4         Mr. Benjamin has lived and voted in San Antonio in

5    the five years since he moved back to Texas from Arizona.

6    Since 2011, he has served as a volunteer deputy voter

7    registrar.  He is eligible to vote by mail, or could obtain an

8    EIC with the documents in his possession.

9         And Ms. Imani Clark is a senior at Prairie View A&M,

10   where she has been a student since August of 2010.  She has

11   registered and voted in two elections in Texas, the 2010 city

12   elections and the 2012 presidential election.  She chose to

13   obtain a California driver's license in January, and she has

14   the documents necessary to obtain an EIC; but she contends that

15   she lacks the time to do so, even during the summer, when she

16   took a reduced class schedule.

17        And, finally, Mr. Lionel Estrada lives in Kenedy,

18   Texas.  He has maintained a commercial driver's license since

19   1997, sometimes paying as much as a hundred dollars to

20   reinstate or maintain that license.  Mr. Estrada was issued

21   another commercial license, but in order to receive the

22   license, he must pay no insurance surcharges and prove that he

23   has acquired insurance.  He has the documentation necessary to

24   obtain a birth certificate and an EIC in the meantime, but he

25   does not wish to relinquish his commercial driver's license.

1           Your Honor, what this evidence shows is that through

2   Senate Bill 14 and preexisting mail-in voting provisions, the

3   State of Texas has provided accommodations for voters who might

4   face the somewhat heavier burden noted in *Crawford*.

5           This chart shows that Texas has made sure that voters

6   like Plaintiffs and witnesses who testified here remain able to

7   vote under Senate Bill 14.  After the Department of Justice and

8   the Plaintiffs spent three years challenging Senate Bill 14 and

9   diligently searching for Texans who will be prevented from

10  voting, it's quite telling that the individuals who remain able

11  to vote are those held up as the most likely to be affected by

12  Senate Bill 14.

13          And the State's efforts continue even to this day.

14  The Legislature appropriated $63 million to improve driver's

15  license services.  The DPS has built seven mega centers, an

16  eighth is coming to Corpus Christi, and the DPS has hired

17  hundreds of new employees.

18          Mobile EIC units, in coordination with the county

19  officials, have ensured that all 254 counties in Texas have a

20  location that issues EICs.

21          We'll talk more about the no match list in a minute,

22  but a review of the effects of Senate Bill 14 should account

23  for the fact that more than 27,000 of the individuals on

24  Dr. Ansolabehere's original no match list have voted in at

25  least one election since Senate Bill 14 took -- most of those

1    voting in person.  And these are elections in which Plaintiffs

2    claim no one votes.

3          The Court should also take note of the lack of

4    complaints or problems raised by voters in the three elections

5    under Senate Bill 14.

6          Keith Ingram, of the Secretary of State's Office,

7    testified that they get lots of calls -- thousands, in fact --

8    offering real-time feedback from the public, but there has been

9    absolutely almost no phone calls, e-mails, problems related to

10   the lack of an ID.

11         "The few that we've had have primarily related to

12         elderly folks who have been using an expired driver's

13         license but don't drive anymore.  That has been --

14         we've had maybe three or four of those who have been

15         unable to have an ID; and, obviously, they can vote

16         by mail.

17         "But as far as a pattern of people who said, 'I don't

18         have an ID.  I don't know what to do.  How can I get

19         one?' doesn't exist.  Thousands of phone calls every

20         month.  We've got a public hotline that is on the

21         back of every voter registration card, and we get all

22         kinds of calls.  We get calls because my name doesn't

23         match.  We get calls because of a lot of reasons, but

24         not that I don't have an ID."

25         Jefferson County Clerk Ms. Guidry testified, at Pages

1   156, Line 18, through 158, Line 19, that her county has

2   experienced no problems with the implementation of Senate

3   Bill 14:

4               "QUESTION:  So that letter is the only complaint

5               you're aware of in March for the 2014 primary related

6               to SB 14, correct?

7               "ANSWER:  Yes.

8               "QUESTION:  And the gentleman who made that complaint

9               was not complaining that he was not allowed to vote

10              because of the photographic requirement, correct?

11              "ANSWER:  No, he was allowed to vote.  He was

12              complaining why was he not asked for his photo ID."

13              Finally, it's also telling that DOJ and the

14   Plaintiffs made no attempt to study or survey the actual voters

15   who appear on the no match list.  Worse still, DOJ instructed

16   experts to not study actual voters.  As Dr. Ansolabehere

17   testified on Page 215, from Lines 2 through 14 of the September

18   2 trial transcript:

19              "Given that DOJ seemingly spared no expense in this

20              litigation, one can assume that DOJ knew that the

21              results of such a study would confirm that Texas

22              voters remain able to vote under Senate Bill 14, and

23              chose not to undertake that effort."

24              Thus, both the evidence that the Plaintiffs did

25   present and the evidence that they were either unwilling or

1 unable to present point clearly toward finding that Senate

2 Bill 14 will not have the effect or -- of denying or abridging

3 the right to vote.

4          The evidence in this case confirms for Texas what

5 Dr. Stephen Ansolabehere has observed for more than 20,000

6 actual voters in multi-state surveys.

7          "How many people were denied the right to vote as a

8 result of voter identification requests?"

9          The answer is, "Very few."

10          The actual denials of the vote in these two surveys

11 suggest that photo ID laws may prevent almost no one from

12 voting.  Voter ID does not appear to present a significant

13 barrier to voting.  Although the debate over this issue is

14 often draped in the language of the civil and voting rights

15 movements, voter ID appears to present no real barrier to

16 access.

17          Unable to produce evidence of actual Texans who will

18 not be able to vote under the provisions of SB 14, and

19 unwilling to acknowledge that this means SB 14 will not deny or

20 abridge the right to vote in violation of federal law, DOJ and

21 Plaintiffs spent vast resources in an effort to estimate voters

22 who may not yet have a photo ID.  They engaged many experts in

23 this pursuit, yet this effort likewise failed to meet

24 Plaintiffs' substantial burden.

25          This effort began with Dr. Ansolabehere's attempt to

1    create a no match list of registered voters who do not have one

2    of the acceptable forms of photo ID.  But the people who would

3    belong on such a list are constantly in flux; and the race of

4    the voters on any such list is unknowable, because the database

5    of registered voters does not contain race.

6              The ID disparity rate is thus unknowable.

7              In particular, the no match list is unreliable for

8    six reasons, at least.

9              One, the SOS database lacks full social security

10   numbers for more than 50 percent of the entries.

11             Two, there are inconsistencies in the data across the

12   fields.  For example, a woman might be named "Katherine" in one

13   and "Kay" in another.

14             Three, in the TEAM database, over 18,000 voters have

15   the date of birth listed as 1/1/1900.

16             Four, the deceased, felons, and those who have moved

17   out of state are still on the list.

18             Five, Catalist was used to guess race, because the

19   Secretary of State does not record it.

20             Six, Dr. Ansolabehere did not attempt to estimate

21   false no matches, even though techniques to do so are

22   available.

23             Plaintiffs compounded these errors by not removing

24   those with a qualifying disability and by not removing those

25   who are over the age of 65.

1          As the Supreme Court explained in *Crawford*:

2          "Even for those who would prefer to vote in person,

3          allowing mail-in voting offers the opportunity to

4          cast a ballot.  Although it may not be a completely

5          acceptable alternative, the elderly in Indiana are

6          able to vote absentee without presenting photo

7          identification."

8          And it's worth noting here that the Wisconsin law,

9    which was allowed to go into effect just a week ago, their

10   absentee provision still requires the presentation of a photo

11   ID unless you're in the military, or a permanent oversea voter,

12   or you're a confidential elector.

13          The September no match list -- that's the updated no

14   match list -- greatly overstates those voters who could even

15   potentially be affected.  The 608,470 figure does not take into

16   account 73,958 people with disqualifying -- with qualifying

17   disabilities, or the 160,389 who are over the age of 65, or the

18   21,731 unique individuals who, on this updated no match list,

19   have voted since SB 14 went into effect.

20          And the serious flaws with Catalist warrant their own

21   brief discussion.

22          Catalist misclassified the race of 6 out of 22 party

23   Plaintiffs.  Comparing Catalist's race guesses to the self-

24   reported data in DPS yields 3.15 million discrepancies,

25   including 1.8 million discrepancies for those who have self-

1    reported in person since 2010.

2            DOJ instructed Dr. Ansolabehere to not check Catalist

3    data against the self-reported DPS data.

4            The Plaintiffs' other expert studies are likewise

5    unreliable, often because they began with Dr. Ansolabehere's

6    flawed data.  Dr. Barreto's survey is unreliable because he

7    applied arbitrary weighting factors to account for the over-

8    sampling of minorities in his survey.  Barreto claims that his

9    weighting factor was based on the Texas CVAP data, but his

10   numbers do not bear that out when compared to the most recent

11   data.

12           Dr. Barreto estimated that 53.52 percent were Anglo,

13   but the data shows it's 56.31.  He estimated 10.36 for African-

14   American when the data shows it's 12.93.  And he estimates

15   31.09 percent for Hispanic, when the data shows it's 26.49.

16           Dr. Barreto's weighting factor, therefore,

17   overestimates by 4.6 points the size of the Hispanic voting-

18   eligible population and underestimates the size of Anglo

19   population by 2.8 points.

20           And as Dr. Barreto's testimony at trial demonstrated

21   on Pages 91 through 99 of the September 4 transcript:

22           "Although this study suggests that more than 23,000

23            Harris County voters would incorrectly believe that

24            they have an acceptable photo ID, only about 150

25            provisional ballots have been cast in Harris County

EXCEPTIONAL REPORTING SERVICES, INC

1          in the combined elections under Senate Bill 14."

2          Dr. Herron's block group analysis include less than 1

3     percent of the registered voters in Texas.  And Herron, in the

4     end, could express no opinion on whether any individual had

5     been deprived the right to vote under Senate Bill 14.

6          Dr. Chatman's analysis of the potential burdens of

7     Senate Bill 14 made assumptions designed to maximize those

8     burdens.  He arbitrarily determined that anyone living more

9     than a mile from a bus stop had no access to transit.  He

10    calculated travel times on mass transit during rush hour, yet

11    he used mid-afternoon for travel times by car.

12         Dr. Bazelon's analysis refutes the claim that Senate

13    Bill 14 imposes a disparate impact on minority voters.

14    Dr. Bazelon's study determined that the economic costs

15    associated with travel to obtain an EIC were actually higher

16    for Anglos than for African-Americans, and he did not study

17    Hispanic voters.

18         The average costs for Anglos were higher both in

19    actual dollars, $48.68 to $27.46; and also in percentage of the

20    average daily wage, 29 person to 26 percent.

21         Dr. Webster also sought to study travel burdens.  He

22    studied low-access census tracts -- a term that he coined and

23    that is not defined by the census.  Webster analyzed

24    approximately 20 percent of the census tracts in Texas, all in

25    urban areas.  He estimated travel times during rush hour, and

1    the areas studied represented only 2 percent of the total

2    voters on the no match list.

3          Despite recognizing that Texas is rapidly growing,

4    Dr. Webster used 2006 to 2010 ACS data, meaning that his data

5    was between four and eight years old.

6          And all of these travel burden studies failed to

7    appreciate that even in a state the size of Texas, 98.7 percent

8    of the total population live within 25 miles of a DPS office.

9    When you also add in the mobile EICs and the local county

10   offices that are being used to produce an EIC, that number, of

11   course, would go higher.

12         Consideration of the effects of Senate Bill 14 comes

13   down to a review of the facts versus statistical guesses.  The

14   facial invalidation of a statute requires flesh and blood

15   plaintiffs, with concrete and particularized injuries.  Social

16   science and statistics can be used to support claims, but they

17   cannot be used to create hypothetical plaintiffs, yet

18   Plaintiffs ask the Court to facially invalidate a statute that

19   their own experts argue will pose no burden for more than 95

20   percent of Texas voters.  And they seek that drastic remedy

21   based upon their flawed estimates as to the remaining Texas

22   voters and despite their inability to identify actual voters

23   who are prevented from voting by Senate Bill 14.

24         It is all the more inexcusable that Plaintiffs had

25   the data on individual voters and did nothing with that data,

1    considering Plaintiffs' recognition that merely knowing the

2    number of no matches would be insufficient.

3           And a quote from the May 28 Status Hearing is one of

4    many that makes this point:

5           "Because just knowing that there's X number of no

6           matches, that doesn't tell us very much.  We need to

7           know who's in there, where do they live, what is the

8           gender, what is the race, their language, status, et

9           cetera, so that's what it's about."

10          Thus, the registered Texas voters who do not

11   currently possess and who could not readily obtain a photo ID

12   is not known.  Challengers to the Indiana law likewise failed

13   to establish this critical fact.

14          The studies conducted by Plaintiffs' experts only

15   truly seek to answer the first part of this inquiry, and the

16   results fall far short of satisfying the burden of showing that

17   Senate Bill 14 will have the effect of denying or abridging the

18   right to vote for a significant number of Texans, or that it

19   will do so on account of race or because of membership in a

20   language minority group.

21          Next, we turn to the purpose claim.  The Supreme

22   Court has recognized that several state interests are

23   unquestionably relevant to the implementation of a photo

24   identification requirement.  The first is the interest in

25   deterring and detecting voter fraud.

1          "The State has a valid interest in participating in a

2          nationwide effort to improve and modernize election

3          procedures that have been criticized as antiquated

4          and inefficient.  The State also argues that it has a

5          particular interest in preventing voter fraud in

6          response to a problem that is, in part, the product

7          of its own maladministration; namely, that Indiana's

8          voter registration rolls include a large number of

9          names of persons who are either deceased or no longer

10          live in Indiana.  Finally, the State relies on its

11          interests in safeguarding voter confidence."

12          The Texas Legislature considered photo identification

13     bills in four consecutive sessions -- 2005, 2007, 2009, and

14     2011 -- and the legislative record from the 2009 Committee of

15     the Whole was incorporated into the Senate record in 2011.  The

16     public records for these legislative sessions, which are the

17     best and most reliable sources for determining the purpose of

18     any legislative enactment, consistently show that the

19     Legislature was motived by these same principles.

20          First, to detect and deter voter fraud.  Plaintiffs'

21     expert, Mr. Buck Wood, testified regarding the large volume and

22     variety of fraud in Texas.  Fraud by mail is a serious problem.

23     Fraud can decide elections, including one of his cases in Llano

24     County, that ended in a tie.  In a Bexar County election

25     contest, Mr. Wood disqualified over 1,200 votes.  And vote

1    harvesting is very prevalent and very hard to catch.

2           And Mr. Wood also testified that he has defended

3    voter fraud cases prosecuted by the Attorney General.

4           "Did you look at any information from the Office of

5    the Attorney General regarding referrals, regarding voter

6    fraud, or prosecutions of voter fraud?"

7           And his answer was, "I'm familiar with some of them.

8    I've actually defended some of them."

9           The Texas Legislature heard testimony that is

10   detailed in Findings of Fact 52 through 55 that in-person fraud

11   is both difficult to detect and a low priority to prosecute for

12   local officials; but the Legislature and others are also aware

13   that in-person voter fraud has occurred in Texas.

14          The 2011 House Committee heard testimony from

15   individuals who had witnessed in-person fraud.  Dr. Minnite

16   testified that she was aware of in-person fraud in Texas.

17   Major Mitchell testified regarding investigations by the Texas

18   Attorney General as well as the difficultly in detecting in-

19   person fraud.

20          Testimony of two federal witnesses sealed by the

21   Court provides additional evidence that fraud has occurred in

22   Texas.

23          The potential for in-person fraud cannot be disputed.

24   Counsel for Plaintiffs discussed at length with witness Keith

25   Ingram a recent report by the New York City Department of

1   Investigation.  Pages 12 through 20 of that report detail how,

2   in 61 of 63 attempts, 97 percent of the time city officials

3   were able to successfully go to the polls posing as a

4   registered voter, obtain a ballot, and cast a vote on behalf of

5   that registered voter.  This was accomplished, at least in

6   part, because of New York's bloated voter rolls.

7          Keith Ingram testified that he was aware of this

8   study.

9          This and other evidence cataloged in the Defendants'

10  Findings of Fact plainly satisfy *Crawford*'s standard, which

11  holds that, quote, "No evidence of in-person fraud within the

12  state is required."

13         And the Supreme Court also explained that:

14         "There is no question about the legitimacy or

15         importance of the State's interest in counting only

16         the votes of eligible voters.  Moreover, the interest

17         in orderly administration and accurate recordkeeping

18         provides a sufficient justification for carefully

19         identifying all voters participating in the election

20         process.  While the most effective method of

21         preventing election fraud may well be debatable, the

22         propriety of doing so is perfectly clear."

23         Second, the purpose regarding deficiency in

24  registration rolls.  As the Defendants detail in Paragraphs 38

25  through 46 of the Findings of Fact, the National Voter

1    Registration Act hinders the removal from the voter rolls those

2    who have moved out of state.

3            THE COURT:  I just have a real quick question.  I

4    don't mean to throw you off, but the NDRA, it only deals with

5    voters who have moved.  It doesn't deal with those who have

6    died or have been convicted of felonies.  That's done at the

7    county level for anybody.  It doesn't matter.

8            MR. ASTON:  In --

9            THE COURT:  I just wasn't clear on the testimony.

10   Was the NVRA only applied to purging --

11           MR. ASTON:  Well, the --

12           THE COURT:  -- some requirements --

13           MR. ASTON:  The way it's done in Texas -- and that's

14   the next point -- is the counties across the board administer

15   the voter registration, whether it's because of people who have

16   moved, because of people who have died --

17           THE COURT:  Right.

18           MR. ASTON:  -- people who have changed their names --

19           THE COURT:  I just wasn't sure if the NVRA only

20   applied -- the purging requirement only addressed those who

21   have moved -- voters who have moved.  I don't know.  The --

22           MR. DELLHEIM:  Forgive me.  I don't mean to --

23           MR. ASTON:  I think so.

24           MR. DELLHEIM:  -- interrupt.  But the NVRA requires

25   every state to initiate a uniform and nondiscriminatory system

1    for purging voters.  So it's any voters who --

2            THE COURT:  Any voters?

3            MR. DELLHEIM:  Yes, ma'am.

4            THE COURT:  Okay.  And then Texas has a process

5    regarding those who have died, those who have been convicted of

6    felonies, those who have been declared incompetent?

7            MR. ASTON:  Right.

8            THE COURT:  Okay.  So -- okay.  I'm sorry.  I didn't

9    mean to throw your --

10           MR. SCOTT:  And then that's effectuated --

11           THE COURT:  -- argument off.

12           MR. SCOTT:  -- at the county level.

13           MR. ASTON:  Right.

14           MR. SCOTT:  And so --

15           MR. ASTON:  And that's what Mr. Ingram testified --

16           THE COURT:  That's your next place --

17           MR. ASTON:  I'm sorry, your Honor.  Yeah, Mr. Ingram

18   testified that, in Texas, it is the counties that administer

19   the registration.  They administer the adding and the

20   subtracting of the -- to the rolls.

21           And as a result, Texas voter rolls contain the dead,

22   those who have moved, and those who are ineligible to vote.

23           Inflated registration rolls can lead to fraudulent

24   votes, as demonstrated by a candidate for justice of the peace

25   in Port Lavaca, who was convicted of registering noncitizens

1   and then illegally voting by mail.

2             The Supreme Court has determined that the fact of

3   inflated voter rolls does provide a neutral and

4   nondiscriminatory reason supporting the State's decision to

5   require photo identification.

6             And, third, ensuring voter confidence.  The

7   bipartisan Carter-Baker Commission recognized that photo ID

8   requirements can instill voter confidence.  The Texas

9   Legislature heard concerns from voters and sought to address

10  those concerns, as they explained in four statements in the

11  Texas House of Representatives, and testimony in this trial.

12  These statements are catalogued on Paragraphs 59 through 61 of

13  the Defendants' Findings of Fact, and they demonstrate that

14  this was one of the Legislature's purposes for enacting a photo

15  ID requirement.

16            The Supreme Court has recognized that voter

17  confidence is a concern of independent significance, because it

18  encourages citizen participation in the democratic process.

19            The public records from four legislative sessions

20  make clear that the Texas Legislature considered and enacted a

21  photo ID bill for the same reasons Indiana had done so.  The

22  record provides no evidence of intentional discrimination on

23  behalf of the Legislature, and that should have ended

24  Plaintiffs' inquiry into Texas' purposes.

25            Instead, in the absence of this direct evidence of

1    discrimination, Plaintiffs contend that Texas was not

2    responsive to voiced concerns, and that this failure

3    constitutes intentional discrimination.  That's not so.

4         Texas was responsive to *Crawford*.  Abiding by the

5    Supreme Court's parameters can hardly be deemed unresponsive to

6    minority voting rights.

7         Texas accepted amendments from Democratic legislators

8    -- for example, including the concealed handgun license within

9    Senate Bill 14 was proposed by Senator Hinojosa, a Latino

10   Democrat.  And the substantially similar name amendment was

11   offered by Senator Wendy Davis.

12        And Texas had good reasons for not accepting other

13   IDs, such as a college ID, which need not contain an address, a

14   birth date, or an expiration date.

15        And it's worth noting that, again, in the Wisconsin

16   law that was just allowed to go into place, they do allow

17   student IDs, but only if they include a date of issuance, the

18   signature of the student, an expiration date no later than two

19   years after the date of issuance, and the university or college

20   ID must be accompanied by a separate document that proves

21   continued enrollment.

22        Texas was responsive to overwhelming polling.

23   Democrats and Republicans, African Americans, Latinos, and

24   Anglos all support photo ID requirements.  And the testimony

25   shows that the Democrats who voted against this bill knew they

1   were going against public opinion.  The Democrats now complain

2   about the process, but both public records and documents that

3   remain sealed by the Court demonstrate that, over the course of

4   several Legislatures, the Democratic members of the Legislature

5   had a plan to engage in a concerted effort to thwart the

6   passage of the bill -- for example, killing the bill in 2009 in

7   the House via chubbing.  And they had a plan to impede the

8   implementation of Senate Bill 14 -- for example, by

9   coordinating with the Department of Justice, as Senator Ellis

10  testified.

11          This coordinated effort continued even after Senate

12  Bill 14 passed and was signed into law.  Representative

13  Martinez Fischer testified that he may have sent an e-mail

14  suggesting that colleagues assert privilege if they had

15  something to hide.  And Lieutenant Governor Dewhurst explained

16  that Democratic senators continued to add to the legislative

17  record even after the bill was passed.

18          Bald assertions of discrimination were raised by some

19  legislators, but those who testified were aware of no evidence

20  of a discriminatory motive of any of their colleagues, and

21  those testifying legislators include Senator Uresti, Senator

22  Davis, Representative Anchia.  Lieutenant Governor Dewhurst

23  likewise testified that he was not aware that anyone had voted

24  for this bill for a discriminatory purpose.

25          And Plaintiffs repeatedly told this Court it was

1    vital to dig into large quantities of privileged legislative

2    documents, all the while insisting that their own documents

3    must remain confidential.

4         The Plaintiffs said the legislative documents, which

5    are documents that are at the heart of the United States' claim

6    that this law was passed in part based on a discriminatory

7    intent -- they said that evidence is going to be very, very

8    important in this case, dealing with the intent behind Senate

9    Bill 14 itself.  And finally they wrote:

10        "Defendants, the State of Texas, John Steen, and

11        Nandita Berry, demanded that the United States issue

12        subpoenas to obtain," quote, "'vital discovery from

13        current and former legislators who have supported

14        photographic photo -- photo identification

15        legislation in Texas."

16        This led to much discovery.  But where did that

17   substantial intrusion into highly confidential documents get

18   us?  The documents that Plaintiffs have introduced do not make

19   Plaintiffs' case.  Indeed, DOJ and the Plaintiffs didn't even

20   bother to show them to the experts who offered their opinions

21   on the purposes of Senate Bill 14.  And DOJ's purpose expert,

22   Dr. Davidson, did not even testify at trial.

23        Instead, these purpose experts recycled arguments

24   that they raised unsuccessfully in amicus briefs in the Supreme

25   Court in _Shelby County_ and in _Crawford_, and they asked this

1    Court to credit arguments they made unsuccessfully when they

2    testified before the Texas Legislature.

3         The Legislature's purposes behind the passage of

4    Senate Bill 14 are clear from the 2011 legislative record,

5    consistent with the legislative records of 2005, 2007, and

6    2009, and they comply with the Supreme Court's *Crawford*

7    decision.

8         Finally, we turn to the scope of relief sought.  The

9    relief Plaintiffs seek, complete invalidation of Texas' photo

10   ID law, not to mention bail in under Section 3(c) of the Voting

11   Rights Act, is inconsistent with *Crawford*, the need to proceed

12   cautiously for an election that is already underway, and the

13   severability clause of Senate Bill 14.

14        First, as to *Crawford*, the Supreme Court explained

15   that:

16        "Even assuming that the burden may not be justified

17             as to a few voters, that conclusion is by no means

18             sufficient to establish petitioner's right to the

19             relief they seek in this litigation.  Given the fact

20             that petitioners have advanced a broad attack on the

21             constitutionality of SEA 483, seeking relief that

22             would invalidate the statute in all its applications,

23             they bear a heavy burden of persuasion."

24        The Court continued on Page 203:

25        "Finally, we note that petitioners have not

1          demonstrated that the proper remedy -- even assuming

2          an unjustified burden on some voters -- would be to

3          invalidate the entire statute.  When evaluating a

4          neutral, nondiscriminatory regulation of voting

5          procedure, we must keep in mind that a ruling of

6          unconstitutionality frustrates the intent of the

7          elected representatives of the people."

8     *Crawford* thus forecloses Plaintiffs' attempt to

9  invalidate wholesale Texas' photo identification requirement

10 based upon this legislative record and the evidence in this

11 case.

12          Moreover, as Keith Ingram testified, preparation and

13 training for the November 2014 general elections are already

14 underway.  They're expecting 8,000 poll locations and 25,000

15 poll workers to conduct this election.  Training began last

16 week and it continues this week for those workers.  The

17 training materials were prepared beginning in June of 2013.  In

18 a very real sense, the election has already begun.

19          Changes to the voting procedures to be used by

20 millions of Texans at this late date would create confusion for

21 voters and poll workers alike.  The uncertainty that would

22 follow from granting the drastic relief sought is especially

23 unwarranted, given SB 14 and the record produced by the

24 Plaintiffs.

25          And, third, Section 25 of Senate Bill 14 contains a

1    severability clause, expressing the intent of the Legislature

2    that all valid provisions and applications of SB 14 should be

3    allowed to stand by severing the invalid provisions and

4    applications and leaving the valid ones in force.

5            Just a week ago, the Seventh Circuit stayed a

6    District Court injunction quite similar to the one sought in

7    this case.  There, the District Court had held the state law

8    invalid and enjoined its implementation based on findings that

9    it thought showed that Wisconsin did not need this law to

10   promote an important governmental interest, and that persons of

11   lower income, disproportionately minorities, are less likely to

12   have driver's licenses, other acceptable photo ID, or the birth

13   certificates needed to obtain them, which led the court to hold

14   that the statute violates Section 2 of the Voting Rights Act.

15           But as a result of the Seventh Circuit stay,

16   Wisconsin law, which we discussed the particulars of just a

17   moment ago, will be permitted to implement its photo --

18   Wisconsin will be permitted to implement that photo ID law for

19   the November election.

20           The final paragraph in Crawford versus Marion County

21   likewise offers the proper resolution of the attacks on Senate

22   Bill 14:

23           "If a nondiscriminatory law is supported by valid

24            neutral justifications, those justifications should

25            not be disregarded simply because partisan interests

1            may have provided one motivation for the votes of

2            individual legislators.  The state interests

3            identified as justifications for SEA 483 are both

4            neutral and sufficiently strong to require us to

5            reject petitioner's facial attack on the statute.

6            The application of the statute to the vast majority

7            of Indiana voters is amply justified by the valid

8            interests in protecting the integrity and reliability

9            of the electoral process."

10           The Court should enter judgment denying all relief

11   sought by Plaintiffs and the Department of Justice.

12           Thank you.

13           **THE COURT:**  Thank you.

14           **REBUTTAL ARGUMENT ON BEHALF OF THE UNITED STATES**

15           **BY MR. DELLHEIM:**  Before I respond, your Honor, a bit

16   of personal privilege, if I may?

17           I made an error in my presentation to the Court

18   before, and that is I omitted to recognize Samuel Oliker-

19   Friedland, who is also part of the Department of Justice's

20   team, and he was our master thespian reader of deposition

21   testimony --

22           **THE COURT:**  Yeah.

23           **MR. DELLHEIM:**  -- and I regret the error to the Court

24   and to Sam.

25           Your Honor, it is a bit surprising that Texas would

1    rely so heavily on the Wisconsin opinion and what occurred in

2    the Seventh Circuit, given that following the District Court's

3    opinion, the Supreme Court of Wisconsin found that charging

4    even a cent for a birth certificate or any underlying

5    documentation to obtain an ID as a prerequisite to vote was

6    utterly improper, and it cited *Harper*, the Supreme Court

7    decision outlawing poll taxes.

8           It thus gave the Wisconsin statute -- this is the

9    Supreme Court of Wisconsin -- it gave the Wisconsin statute a

10   saving construction, and now Wisconsin employs a procedure

11   whereby those applying for photo IDs are relieved of the

12   obligation to present a birth certificate; and the obligation

13   is, in fact, now taken on by the state to verify the

14   applicant's birth certificate by checking with Wisconsin

15   agencies, agencies in all other states, and with the federal

16   government.

17          That situation could not be more different than what

18   we face here in Texas.

19          Mr. Aston also mentioned that voters over 65 can

20   simply vote by mail, and I don't want to -- as a former client

21   of mine -- just say "beat a dead horse to death," but it

22   recalls the question that Texas counsel asked of Ms. Sammi

23   Bates, which was something like, quote, "Would you rather vote

24   by mail or not vote at all?"

25          We submit that is simply not an appropriate choice

1    for any state to impose on a voter.

2             I did not expect to hear about the 2 million errors

3    that were allegedly in the Catalist list.  That number has

4    ballooned to 3 million today, but I guess I would be remiss if

5    I did not remind the Court that the errors that were claimed to

6    have been found in the Catalist lists were based on a

7    comparison of the no match list to the DPS race

8    classifications.  Those race classifications, Keith Ingram, the

9    state election director, said were hopelessly inaccurate.  It's

10   a resource that Dr. Ansolabehere did not use, and properly so,

11   because they were so inaccurate.  And they're tied to the fact

12   that Hispanics could not self-identify to DPS until May of

13   2010.  That's why Dr. Ingram -- Mr. Ingram said, quote, "The

14   number of Hispanic ID holders in Texas is exponentially higher

15   than the DPS's raw data indicates," end quote.

16            And he also noted that DPS's data for, quote, "racial

17   classifications other than Hispanic are no doubt significantly

18   distorted," end quote.

19            So whether there are 2 million errors or 3 million

20   errors, whatever that number may be, those errors are not in

21   the Catalist list or the no match list.  They are, in fact, in

22   the DPS database, and that is the resource that

23   Dr. Ansolabehere steadfastly avoided.

24            Moreover, your Honor, the Defendants argue that there

25   can be no denial or abridgement of Section 2 because we have

1   not demonstrated that it's metaphysically impossible for

2   someone to obtain -- that it's not metaphysically impossible

3   for someone to obtain ID.  That standard is simply not the law.

4   It ignores and contravenes the *Operation PUSH* standard in which

5   the Fifth Circuit held that a Mississippi restriction on voter

6   registration violated Section 2, notwithstanding that the

7   challenged law did not act as an absolute bar to anyone

8   registering to vote and notwithstanding that it was possible

9   with a sufficient expenditure of effort for citizens to

10  overcome the obstacles to registration that the restriction

11  imposed.

12          And that's at 932 F.2d 400, from the Fifth Circuit,

13  1991.

14          And with that, I'll conclude my presentation, unless

15  the Court has questions.

16          **THE COURT:**  No, I don't --

17          **MR. DELLHEIM:**  We thank you very much.

18          **THE COURT:**  -- at this time.  Thank you.

19      **REBUTTAL ARGUMENT ON BEHALF OF TEXAS NAACP AND MALC**

20          **BY MR. ROSENBERG:**  Thank you, your Honor.  Very

21  briefly, just a few points.

22          One, on the point made concerning the Barreto survey,

23  we -- I had hoped to scare them away from dealing with that

24  when I dealt with it in my closing.

25          Again, on Pages 225 and 226 of the Hood transcript,

137

1    Dr. Hood admits that that criticism, albeit a slight criticism,

2    is -- does not apply at all to the racial comparisons made by

3    Dr. Barreto.  Dr. Barreto himself explained how he properly

4    weighted the survey in terms of his overall conclusions as to

5    the total amount of persons affected.

6            Secondly, in terms of the fraud issues, the bottom

7    line is no matter what is said by the State, there are still

8    only two instances of fraud of the sort that SB 14 could have

9    been prevent -- could have prevented that have been identified.

10           The reliance on that New York study, quite frankly,

11   is somewhat -- is amazing to me, because, first of all, if your

12   Honor looks -- I don't have the exact cite of the exhibit, but

13   I'm pretty sure it's Page 13, Footnote 25 -- where, after they

14   talk about the sting, at the bottom, they say election fraud is

15   rare, and then they say in-person fraud is really rare, and the

16   reason it's really rare is because it's too easy to be caught,

17   it's too ineffective to affect an election, and the penalties

18   are really severe.

19           So reliance on a crime without -- a so-called "fraud

20   without motive" does not prove that the fraud occurs.

21           In terms of the reliance on -- the reliance on the

22   highly confidential material, in fact, your Honor saw a couple

23   of documents today -- the Hebert memo, the Patrick memo -- it

24   also led to depositions that were taken that were very useful,

25   including the deposition testimony of Todd Smith, which your

1    Honor saw.

2           And, finally, on *Crawford* and its relevance to the

3    Section 2 claims, it's not there.  *Crawford* was not a claim

4    dealing with discrimination.  So the fact is there's no

5    discussion there of what happens when you have, as we have in

6    this case, abundant evidence of an intention to discriminate

7    against Blacks and Hispanics in the exercise of their vote --

8    not at issue in *Crawford* whatsoever.

9           Thank you.

10   **REBUTTAL ARGUMENT ON BEHALF OF TEXAS LEAGUE OF YOUNG VOTERS**

11                    **EDUCATION FUND, ET AL**

12          **BY MR. HAYGOOD:**  Your Honor, just a few quick points.

13   This is Ryan Haygood from the Texas League of Young Voters.

14          You've heard a lot by now, your Honor, but I think

15   it's worth repeating that this case really is about real people

16   who are impacted by real discrimination and real efforts by

17   Texas to erect impediments to the franchise that, for them, is

18   a precious, fundamental right.

19          Texas has essentially said that the Plaintiffs and

20   the Plaintiff Interveners here have failed to identify actual

21   voters who have been prevented from voting because of SB 14.

22   And what that statement reflects is an ignorance to the real

23   lived experience of a high percentage of voters of color who

24   are prevented from voting from SB 14.

25          And, more precisely, what it reflects is a proximity

1    or a distance from the actual harm.  It impacts voters of

2    color, Black, and Latino, and other voters of color, from

3    voting in the state because of SB 14.

4           The State mentioned that Ms. Elizabeth Gholar came

5    and said that she could vote by absentee ballot, but it is not,

6    your Honor, an acceptable substitute to prevent voters from

7    voting in the avenue in which they want to vote -- here, in

8    person -- by providing an alternative to the expression of

9    participation in the franchise that they are choosing --

10   indeed, that they are regarding as essential.

11          Your Honor, 600,000 registered voters are impacted by

12   SB 14.  A disproportionate number of those voters are people of

13   color.  You've heard from these people live.  They are

14   impacted.  They exist.  They are real.  And their votes and

15   their voices matter.

16          Dr. Bazelon, your Honor, made clear that the

17   disparity between Whites and Blacks -- White people and Black

18   people in travel costs was driven in large measure because of a

19   significant disparity in wage rates between Black and White

20   Texans.

21          He testified unequivocally that the burdens are

22   substantially heavier for Black people due to their

23   socioeconomic disparities and the ways in which they lag far

24   behind in the areas of employment, housing, health care, and

25   education.

1          Thank you.

2          **THE COURT:**  Thank you.

3     **REBUTTAL ARGUMENT ON BEHALF OF VEASEY LULAC PLAINTIFFS**

4          **BY MR. DUNN:**  Chad Dunn again, for the record.  I

5     just have a couple of points.

6          I wanted to address the Court's question on voter

7     registration.  I don't have Internet connection, but I'm pretty

8     sure that the provision of federal law the Court might be

9     interested in is 42 U.S.C. 1973gg-6(i).  That is where the NVRA

10    requirements -- whoever codified the NVRA, by the way, ought to

11    be an interesting fellow.

12         But in any event, there are requirements there that

13    lay out what the State is supposed to do in terms of getting

14    felons, and deceased folks, and other ineligible people off of

15    the --

16         **THE COURT:**  But -- and I guess that's kind of where I

17    was headed, because I think Mr. Ingram's testimony was that the

18    counties have certain responsibilities to provide information

19    to the State, but it's ultimately the State's responsibility to

20    ensure that there is integrity in these voter rolls --

21         **MR. DUNN:**  That's exactly what --

22         **THE COURT:**  Or --

23         **MR. DUNN:**  -- the statute says.  It says, "The State

24    shall adopt a system to maintain the voter roll."

25         **THE COURT:**  Anyway, you can --

1    **MR. DUNN:**  Okay.

2    **THE COURT:**  You can move ahead.  I just --

3    **MR. DUNN:**  Just two other points.  The -- I want to

4 follow up on this mail vote issue, because it is an important

5 choice, and these people ought to be able to make their own

6 choice on whether to vote by mail or in person.

7    But it's not simply a choice.  It is an abridgement

8 of the right to vote.  A person who has to vote early at a

9 different time than everybody else has a less of a valuable

10 right to vote than people who can go on election day at the end

11 of the day on election day.

12    Courts enjoin all the time elections to hold polling

13 locations open longer because of wait times or to ensure that a

14 polling location in one place has the same hours as the other,

15 because courts recognize that is an abridgement of the right to

16 vote.

17    So although the choice is important, abridgement is

18 what is unconstitutional here.

19    Next, I would add that, obviously, this is an as-

20 applied challenge, so the paragraphs that you saw from *Crawford*

21 were applied to a facial challenge, which will be different in

22 this case.  The Supreme Court has yet to deal with an as-

23 applied challenge in this case.

24    Lastly, I will note that the State has essentially

25 conceded that Senate Bill 14 is a poll tax.  It's offered no

1    defense to the claim.  It wasn't mentioned today in the closing

2    argument.  And every court that has looked at a law similar to

3    this, where there are charges for underlying documents, has

4    found it to be a poll tax, and ordered relief.

5            And the State simply has no defense or response to

6    that claim.

7            Thank you.

8            **THE COURT:**  All right.  I have a quick question for

9    the State.  Anybody can respond.

10           But there was some reference in the testimony to

11   deceased voters voting, some hearsay testimony in Lieutenant

12   Governor Dewhurst's deposition, I guess, that was read about a

13   legislator's deceased father and brother maybe voting, and then

14   one of the legislators maybe testified also about a grandfather

15   voting -- a deceased grandfather voting for years.

16           Excuse my voice.  I'm having issues this morning.

17           But wouldn't there be evidence of that?  You compare

18   the voter rolls with the deceased list roll?  You may not be

19   able to show who did it to prosecute and investigate that

20   person, but shouldn't you be able to tell if dead people are

21   voting?

22           **MR. SCOTT:**  And, your Honor, that is part of the

23   process that our agency goes under in these referral

24   investigations.  So when we're notified that a dead voter has

25   voted -- or somebody has voted on behalf of a dead voter, the

1    process goes to backtracking and finding out why that somebody

2    believes that.

3              THE COURT:  But where is the --

4              MR. SCOTT:  Typically --

5              THE COURT:  -- evidence of that?

6              MR. SCOTT:  Well, and some of that is still under

7    investigation, the --

8              THE COURT:  But that -- if somebody has been

9    voting --

10             MR. SCOTT:  Some of those claims --

11             THE COURT:  -- for 62 years --

12             MR. SCOTT:  Yes, and --

13             THE COURT:  -- a deceased voter --

14             MR. SCOTT:  And I think --

15             THE COURT:  -- wouldn't there be evidence of that?

16             MR. SCOTT:  I think the vast majority, your Honor, is

17   cases where someone that -- maybe a family relative signs on

18   the wrong spot.  And so when we see that, we see no intent to

19   do a crime, and that closes that investigation.

20             So that's the --

21             THE COURT:  But --

22             MR. SCOTT:  -- vast majority of those.

23             THE COURT:  But there could be -- if, in fact, that

24   is happening, there could be evidence of that.  I get that you

25   may not be --

1          **MR. SCOTT:**  Yes.

2          **THE COURT:**  -- able to -- you might not know who did

3   it to prosecute a particular person, but you would be able to

4   show that --

5          **MR. SCOTT:**  The Court is correct.

6          **THE COURT:**  -- by comparing the voter --

7          **MR. SCOTT:**  Yes, ma'am.

8          **THE COURT:**  -- rolls with the dead persons --

9          **MR. SCOTT:**  Yes, ma'am.

10          **THE COURT:**  -- list.  Yeah.

11          **MR. SCOTT:**  Yes.

12          **THE COURT:**  Okay.  Anything else from anyone?

13          **MR. DELLHEIM:**  Just one point of clarification --

14          **THE COURT:**  Okay.

15          **MR. DELLHEIM:**  -- your Honor.

16          Mr. Dunn recited what was, in fact, the accurate cite

17   for the NVRA as of a couple of weeks ago.  It has since

18   changed, and so the new cite is 52 U.S.C. 20507.  That's

19   Section 8 of the NVRA, which codifies the states list

20   maintenance procedures, which of course -- and nothing, of

21   course, prevents the states from taking whatever measures are

22   necessary to ensure that their rolls -- their voter rolls are

23   clean and consistent with federal law.

24          **THE COURT:**  Okay.  Anything else from the Plaintiffs,

25   the other Plaintiffs, the Defense?

1          **MR. DUNN:**  I guess I do have one question, Judge.

2          **THE COURT:**  Of course.

3          **MR. DUNN:**  Do you want the presentations filed or do

4    you want nothing to be filed?

5          **THE COURT:**  You don't need to file those.  They're

6    not evidence.  You can certainly provide them to the Court if

7    you would like.  I've got a couple of them, but I would not

8    file them.

9          Do you have a question?

10         **MR. SCOTT:**  No.  Well, they both hit me --

11         **THE COURT:**  Okay.

12         **MR. SCOTT:**  -- Mr. Donnell and Reid.  They want me to

13   point out that we have to be notified first to be able to find

14   that.  And so I think the vast majority of those times that

15   someone may have been referring to potential dead people voting

16   in place of dead people, it has been historically this

17   perception that no one ever picks up on that because there's no

18   -- it's never brought to the forefront.

19         So I think that's the unknown unknown, to quote

20   somebody.  I should have just quoted --

21         **THE COURT:**  Okay.  All right.  If nothing further,

22   thank you very much for your attention, and you're excused.

23         **MR. SPEAKER:**  Thank you, your Honor.

24         **THE COURT:**  You can be excused.

25         **(This proceeding was adjourned at 12:12 p.m.)**

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    September 23, 2014

              Signed                                          Dated


                        *TONI HUDSON, TRANSCRIBER*