UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 13-CV-00193 |
| | § | |
| RICK PERRY, *et al*, | § | |
| | § | |
| Defendants. | § | |

## OPINION

The right to vote: It defines our nation as a democracy.  It is the key to what Abraham Lincoln so famously extolled as a "government of the people, by the people, [and] for the people."[1]  The Supreme Court of the United States, placing the power of the right to vote in context, explained:  "Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized."[2]

In this lawsuit, the Court consolidated four actions challenging Texas Senate Bill 14 (SB 14), which was signed into law on May 27, 2011.  The Plaintiffs and Intervenors (collectively "Plaintiffs")[3] claim that SB 14, which requires voters to display one of a

---

[1]  Gettysburg Address.

[2]  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

[3]  In **No. 13-cv-193 (Veasey Case)**, the **Veasey Plaintiffs** are Marc Veasey, Floyd James Carrier, Anna Burns, Michael Montez, Penny Pope, Jane Hamilton, Sergio DeLeon, Oscar Ortiz, Koby Ozias, John Mellor-Crummey, Evelyn Brickner, Gordon Benjamin, Ken Gandy, and League of United Latin American Citizens (LULAC). D.E. 109, 385. Intervenors in the Veasey Case include Texas Association of Hispanic County Judges and County Commissioners (HJ&C) (**HJ&C Intervenors**) (D.E. 153, 385) and Texas League of Young Voters Education Fund

very limited number of qualified photo identifications (IDs) to vote, creates a substantial burden on the fundamental right to vote, has a discriminatory effect and purpose, and constitutes a poll tax.  Defendants[4] contend that SB 14 is an appropriate measure to combat voter fraud, and that it does not burden the right to vote, but rather improves public confidence in elections and, consequently, increases participation.

This case proceeded to a bench trial, which concluded on September 22, 2014. Pursuant to Fed. R. Civ. P. 52(a), after hearing and carefully considering all the evidence, the Court issues this Opinion as its findings of fact and conclusions of law.  The Court holds that SB 14 creates an unconstitutional burden on the right to vote, has an impermissible discriminatory effect against Hispanics[5] and African-Americans, and was imposed with an unconstitutional discriminatory purpose.  The Court further holds that SB 14 constitutes an unconstitutional poll tax.

---

(TLYV) and Imani Clark (**TLYV Intervenors**) (D.E. 73).  In **No. 13-cv-263 (US Case)**, the Plaintiff is the United States of America.  D.E. 1.  In **No. 13-cv-291 (NAACP Case)**, the Plaintiffs are Texas State Conference of NAACP Branches (NAACP) and Mexican American Legislative Caucus of the Texas House of Representatives (MALC).  D.E. 1.  In **No. 13-cv-348 (Ortiz Case)**, the Plaintiffs are Eulalio Mendez Jr., Lionel Estrada, Lenard Taylor, Estela Garcia Espinoza, Margarito Martinez Lara, Maximina Martinez Lara, and La Union Del Pueblo Entero, Inc. (LUPE).  D.E. 4.

[4]  Defendants include the State of Texas, Rick Perry in his official capacity as Governor of the State of Texas, John Steen in his official capacity as Texas Secretary of State, and Steve McCraw in his official capacity as Director of the Texas Department of Public Safety.  Mr. Steen was Texas Secretary of State when this action was filed.  The current Texas Secretary of State is Nandita Berry.

[5]  For purposes of this Opinion, the terms "Hispanic" and "Latino" will be used interchangeably.

# I.

## TEXAS'S HISTORY WITH RESPECT TO
## RACIAL DISPARITY IN VOTING RIGHTS

The careful and meticulous scrutiny of alleged infringement of the right to vote, which this Court is legally required to conduct, includes understanding the history of impairments that have plagued the right to vote in Texas, the racially discriminatory motivations and effects of burdensome qualifications on the right to vote, and their undeniable legacy with respect to the State's minority population.  This uncontroverted and shameful history was perhaps summed up best by Reverend Peter Johnson, who has been an active force in the civil rights movement since the 1960s.  "They had no civil rights towns or cities in the State of Texas because of the brutal, violent intimidation and terrorism that still exists in the State of Texas; not as overt as it was yesterday.  But east Texas is Mississippi 40 years ago."[6]

State Senator Rodney Ellis testified about the horrific hate crime in the east Texas town of Jasper in the late 1990s in which James Byrd, an African-American man targeted for his race, was dragged down the street until he died.[7]  A few years later, two African-American city council members spearheaded the effort to name a highly-qualified African-American as police chief in Jasper.  Thereafter, those city council members were

---

[6]  Johnson, D.E. 569, p. 10.

[7]  Ellis, D.E. 573, pp. 159-62.

removed from their district council seats through "a strange quirk in the law" that allowed an at-large recall election.[8]

### A.  Access to the Polls

This anecdote demonstrating Texas's racially charged communities, the power of the polls, and the use of election devices to defeat the interests of the minority population is, unfortunately, no aberration.  Dr. O. Vernon Burton has focused much of his career in American History on the issue of race relations.[9]  Dr. Burton testified about the use in Texas of various election devices to suppress minority voting from the early days of Texas through today.   Other experts, including Dr. Chandler Davidson, a professor emeritus of sociology and political science at Rice University, and George Korbel, an attorney with an expertise in voting rights, corroborated Dr. Burton's findings.   This history is summed up as follows:

- 1895-1944:  All-White Primary Elections

  - On the heels of Reconstruction, freed slaves and other minority men were just gaining access to the right to vote.  The white primary method denied minority participation in primaries which effectively disenfranchised minority voters because Texas was dominated by a single political party (the Democratic Party) such that the primary election was the only election that mattered. The state law that mandated white primaries was found unconstitutional by the Supreme Court in 1927.[10]

  - In response, the Texas Legislature passed a facially neutral law allowing the political parties to determine who was qualified to

---

[8]  Ellis, D.E. 573, p. 161.

[9]  Dr. Burton is Creativity Professor of Humanities, History, Sociology, and Computer Science at Clemson University.  D.E. 376-2, p. 5.

[10]  *Nixon v. Herndon*, 273 U.S. 536 (1927).

vote in their primaries, resulting in the parties banning minority participation.  This law was held unconstitutional in 1944.[11]

- 1905-1970:  Literacy and "Secret Ballot" Restrictions

  o The Terrell Election Law, which also enabled white primaries, prohibited voters from taking people with them to the polls to assist them in reading and interpreting the ballot.  Only white Democratic election judges were permitted to assist these voters who could not verify that their votes were cast as intended.  Because minority voters had not been taught to read while enslaved or were subject to post-Civil War limited and segregated educational opportunities, and could not use their own language interpreter, these restrictions were struck down in 1970 as rendering voting an empty ritual.[12]

- 1902-1966:  Poll Taxes

  o The Texas Constitution included the requirement that voters pay a $1.50 poll tax[13] as a prerequisite for voting.[14]  While race-neutral on its face, this was intended to, and had the effect of, suppressing the African-American vote.  In 1964, the practice was eliminated as to federal elections when the 24th Amendment to the United States Constitution was adopted.[15]

  o However, Texas retained the poll tax for elections involving only state issues and campaigns.  This practice was ruled

---

[11]  *Smith v. Allwright*, 321 U.S. 649 (1944).

[12]  *Garza v. Smith*, 320 F. Supp. 131 (W.D. Tex. 1970), *vacated and remanded on procedural grounds*, 401 U.S. 1006 (1971), *on appeal after remand*, 450 F.2d 790 (5th Cir. 1971).

[13]  Dr. Burton notes that $1.50 is equivalent to $15.48 in current dollars.  Burton, D.E. 376-2, p. 13 (report) (citations omitted).

[14]  A 1902 amendment, proposed by Acts 1901, 27th Leg., p. 322, S.J.R. No. 3 and adopted at the Nov. 4, 1902 election, added a provision requiring voters subject to poll tax to have paid the poll tax and hold a receipt therefor, or make affidavit of its loss.  TEX. CONST. ART. VI, § 2 (amended 1966); *see also* TEX. CONST. ART. VIII, § 1 (historical notes, reflecting prior authorization for imposing poll tax among authorized taxes).

[15]  The Texas Legislature did not vote to ratify the 24th Amendment's abolition of the poll tax until the 2009 legislative session.  S.J. of Tex., 81st Leg., R.S. 2913 (2009) (HJR 39); H.J. of Tex., 81st Leg. R.S. 4569 (2009) (HJR 39); *see also* Korbel, D.E. 578, p. 189 (testimony).  Even so, the process has not been completed and the measure last went to the Secretary of State.   http://www.capitol.state.tx.us/BillLookup/BillStages.aspx? LegSess=81R&Bill=HJR39.

unconstitutional as disenfranchising African-Americans in 1966.[16]

- **1966-1976:  Voter Re-Registration and Purging**

  o Having lost the poll tax, the Texas Legislature passed a re-registration requirement by which voters had to re-register annually in order to vote.  It was characterized as a "poll tax without the tax."   Because of its substantial disenfranchising effect, it was ruled unconstitutional in 1971.[17]

  o In response, Texas enacted a purge law requiring re-registration of the entire electorate.  Because Texas was, by then, subject to the Voting Rights Act (VRA) preclearance requirements, the United States Department of Justice (DOJ) objected to the change in the law and it was ultimately enjoined by a federal court in 1982.[18]

- **1971-2008:  Waller County Students**

  o In 1971, after the 26th Amendment extended the vote to those 18 years old and older, Waller County which was home to Prairie View A&M University (PVAMU), a historically Black university, became troubled with race issues.  Waller County's tax assessor and voter registrar prohibited students from voting unless they or their families owned property in the county.  This practice was ended by a three-judge court in 1979.[19]

  o In 1992, a county prosecutor indicted PVAMU students for illegally voting, but dropped the charges after receiving a protest from the DOJ.[20]

  o In 2003, a PVAMU student ran for the commissioner's court.  The local district attorney and county attorney threatened to

---

[16]   *United States v. Texas*, 252 F. Supp. 234 (W.D. Tex. 1966).  The Supreme Court extended the ban on poll taxes to state elections in *Harper v. Virginia State Board of Elections,* 383 U.S. 663 (1966).

[17]    *Beare v. Smith*, 321 F. Supp. 1100 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

[18]   *See Flowers v. Wiley*, 675 F.2d. 704, 705-06 (5th Cir. 1982); Dr. Burton, D.E. 376-2, p. 14 (report).

[19]    *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) (three-judge court), *aff'd mem. sub nom. Symm v. United States*, 439 U.S. 1105 (1979).

[20]   Burton, D.E. 376-2, p. 20 (report) (citations omitted).

prosecute students for voter fraud—for not meeting the old domicile test. These threatened prosecutions were enjoined, but Waller County then reduced early voting hours, which was particularly harmful to students because the election day was during their spring break. After the NAACP filed suit, Waller County reversed the changes to early voting and the student narrowly won the election.[21]

o In 2007-08, during then Senator Barack Obama's campaign for president, Waller County made a number of voting changes without seeking preclearance. The county rejected "incomplete" voter registrations and required volunteer deputy registrars (VDRs) to personally find and notify the voters of the rejection. The county also limited the number of new registrations any VDR could submit, thus limiting the success of voter registration drives. These practices were eventually prohibited by a consent decree.[22]

- 1970-2014: Redistricting

o In every redistricting cycle since 1970, Texas has been found to have violated the VRA with racially gerrymandered districts.[23]

This history describes not only a penchant for discrimination in Texas with respect to voting, but it exhibits a recalcitrance that has persisted over generations despite the repeated intervention of the federal government and its courts on behalf of minority citizens.

---

[21] *Id.*

[22] Consent Decree, *United States v. Waller Cnty.*, No. 4:08-cv-03022 (S.D. Tex. Oct. 17, 2008), *available at* http://www.justice.gov/crt/about/vot/sec_5/waller_cd.pdf.

[23] *E.g., LULAC v. Perry*, 548 U.S. 399 (2006); *Bush v. Vera*, 517 U.S. 952 (1996); *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973). While the Supreme Court eliminated the formula for the preclearance requirement in *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), prior to that opinion, a three-judge court had found that two of Texas's 2011 redistricting plans violated the VRA. *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013). The 2011 redistricting plans are still the subject of ongoing litigation. *See Perez v. Perry*, SA-11-CV-360, 2014 WL 2740352 (W.D. Tex. June 17, 2014).

In each instance, the Texas Legislature relied on the justification that its discriminatory measures were necessary to combat voter fraud.[24]   In some instances, there were admissions that the legislature did not want minorities voting.[25]   In other instances, the laws that the courts deemed discriminatory appeared neutral on their face. There has been a clear and disturbing pattern of discrimination in the name of combatting voter fraud in Texas. In this case, the Texas Legislature's primary justification for passing SB 14 was to combat voter fraud.  The only voter fraud addressed by SB 14 is voter impersonation fraud, which the evidence demonstrates is very rare (discussed below).

This history of discrimination has permeated all aspects of life in Texas.  Dr. Burton detailed the racial disparities in education, employment, housing, and transportation, which are the natural result of long and systematic racial discrimination. As a result, Hispanics and African-Americans make up a disproportionate number of people living in poverty,[26] and thus have little real choice when it comes to spending money on anything that is not a necessity.

Minorities continue to have to overcome fear and intimidation when they vote. Reverend Johnson testified that there are still Anglos at the polls who demand that minority voters identify themselves, telling them that if they have ever gone to jail, they

---

[24]    Burton, D.E. 582, pp. 22-23 (testimony) (Texas's stated rationale for the white primaries, secret ballot provisions, poll tax, re-registration requirements, and voter purges was to reduce voter fraud).

[25]    Burton, D.E. 376-2, pp. 10-11 (report).

[26]    Burden, D.E. 391-1, p. 14 (report) (citing *Poverty Rate by Race/Ethnicity*, THE HENRY J. KAISER FAMILY FOUNDATION, http://kff.org/other/stateindicator/poverty-rate-by-raceethnicity/ (last visited June 3, 2014)).

will go to prison if they vote.[27]   Additionally, there are poll watchers who dress in law enforcement-style clothing for an intimidating effect.   State Representative Ana Hernandez-Luna testified that a city in her district, Pasadena, recently made two city council seats into at-large seats in order to dilute the Hispanic vote and representation.[28]

And even where specific discriminatory practices end, their effects persist.   It takes time for those who have suffered discrimination to slowly assert their power. Because of past discrimination and intimidation, there is a general pattern by African-Americans of not having the power to fully participate.[29]   Other than to assert that today is a different time, Defendants made no effort to dispute the accuracy of the expert historians' analyses and other witnesses' accounts of racial discrimination in Texas voting laws—its length, its severity, its effects, or even its obstinacy.

### B.  Racially Polarized Voting

Another relevant aspect in the analysis of Texas's election history is the existence of racially polarized voting throughout the state.   Racially polarized voting exists when the race or ethnicity of a voter correlates with the voter's candidate preference.[30]   In other

---

[27]   Johnson, D.E. 569, pp. 17-18; *see also Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013) (describing poll workers being hostile to Latinos and requiring them to show driver's licenses to vote).

[28]   Hernandez-Luna, D.E. 573, pp. 373-74; *see also* Korbel D.E. 365, p. 26 (report).

[29]   Rev. Johnson testified that it took five years after Rosa Parks spurred the integration of public accommodations for African-Americans to sit in the front of the bus. D.E. 596, p. 13.   This delayed progress was confirmed by Sen. Ellis, who testified that, in his experience negotiating political power, African-Americans remain deferential to Anglos.   D.E. 573, pp. 158, 162-63.

[30]   *Thornburg v. Gingles*, 478 U.S. 30, 53 n.21 (1986) (racially polarized voting "exists where there is a consistent relationship between [the] race of the voter and the way in which the voter votes, or to put it differently, where black voters and white voters vote differently") (internal quotation marks and citations omitted).

words, and in the context of Texas's political landscape, Anglos vote for Republican candidates at a significantly higher rate relative to African-Americans and Hispanics.

Dr. Barry C. Burden, a political science professor at the University of Wisconsin-Madison, testified regarding racially polarized voting in Texas.  Dr. Burden explained that the gap between Anglo and Latino Republican support is generally 30-40 percentage points.  The rate of racially polarized voting between Anglo and African-American voters is even larger.  These racial differences were much greater than those among other socio-demographic groups—including differences between those of low and high income, between men and women, between the least and most educated, between the young and the old, and between those living in big cities and small towns.[31]  Many courts, including the United States Supreme Court, have confirmed that Texas suffers from racially polarized voting.[32]  And Mr. Korbel testified without contradiction that, in the current redistricting litigation pending in the Western District of Texas, San Antonio Division, Texas admitted that there is racially polarized voting in 252 of its 254 counties.[33]  Mr. Korbel opined that racially polarized voting extends to the remaining two counties as well.[34]  Defendants offered no evidence to the contrary on this issue.

---

[31]  Burden, D.E. 391-1, p. 13 (report); Burden, D.E. 569, p. 307 (testimony).

[32]  *See, e.g., LULAC*, 548 U.S. at 427 ("The District Court found 'racially polarized voting' in south and west Texas, and indeed 'throughout the State.'"); *League of United Latin Am. Citizens (LULAC), Council No. 4434 v. Clements*, 986 F.2d 728, 776 *on reh'g*, 999 F.2d 831 (5th Cir. 1993); *Benavidez v. Irving Indep. Sch. Dist.*, 3:13-CV-0087-D, 2014 WL 4055366, at *12 (N.D. Tex. Aug. 15, 2014); *Fabela v. City of Farmers Branch, Tex.*, 3:10-CV-1425-D, 2012 WL 3135545, at *11, *13 (N.D. Tex. Aug. 2, 2012); *see also Bush v. Vera*, 517 U.S. 952, 981 (1996).

[33]  Korbel, D.E. 578, pp. 200-01 (discussing *Perez v. Perry,* 2014 WL 2740352).

[34]  *Id.*

## C.  Extent to Which Texans Have Elected African-
##     Americans and Hispanics to Public Office

Texas's long history of racial discrimination may explain why African-Americans as well as Hispanics remain underrepresented within the ranks of publicly elected officials relative to their citizen population size.  According to Dr. Burden's findings, as of 2013, African-Americans held 11.1% of seats in the Texas Legislature although they were 13.3% of the population in Texas as estimated by the 2012 U.S. Census.[35] Hispanics fared worse.  In 2013, Hispanics held 21.1% of seats in the state legislature even though they were 30.3% of the Texas citizen population the year before.[36]

African-American and Hispanic underrepresentation did not improve when reviewing elected seats beyond the legislature.  The most recent data available indicates that, as of 2000, only 1.7% of all Texas elected officials were African-American.[37]  A similar analysis from 2003 found that approximately 7.1% of all Texas elected officials were Hispanic.[38]  Defendants did not challenge these findings or offer any controverting evidence.  Thus, this Court adopts Dr. Burden's conclusion that African-Americans and Hispanics remain woefully underrepresented among Texas's elected officials.

## D.  Overt or Subtle Racial Appeals

Another aspect of Texas's electoral history is the use of subtle and sometimes overt racial appeals by political campaigns.  As Dr. Burton explained in his report,

---

[35]  Burden, D.E. 391-1, p. 16 (report).

[36]  *Id.*

[37]  *Id.*

[38]  *Id.*

"[t]hrough the twentieth century, racial appeals—once more explicit—have become increasingly subtle."[39]   He noted that, words like "welfare queen," "lazy," and "immigration" have been used by campaigns to activate racial thinking in the minds of voters.[40]

Instances of campaigns relying on racial messages persist in Texas.[41]   For example, in a 2008 Texas House of Representatives race, an Anglo candidate sent a mailer featuring a manipulated picture of his Anglo opponent.  The opponent's skin was darkened, a Mexican flag button was superimposed on his shirt, and an oversized Chinese flag was positioned directly behind him—all while questioning his commitment against illegal immigration.[42]   Another example is a campaign mailer sent by an Austin-based political action committee against an Anglo candidate running for a Texas House of Representatives seat.  The mailer, titled "Birds of a Feather Flock Together," featured black birds and the Anglo candidate surrounded by various minority elected officials— the late Texas State Senator Mario Gallegos, Congresswoman Sheila Jackson Lee, and President Barack Obama—with the caption "Bad Company Corrupts Good Character."[43] Dr. Burton offered another example of a 2008 campaign mailer aimed at dissuading African-Americans from voting.  The mailer, sent to African-Americans in Dallas, Texas, warned that a group suspected of voter fraud was trying to get people to the polls and that

---

[39]   Burton, D.E. 376-2, p. 36 (report).

[40]   *Id*. at 38.

[41]   Additional examples were provided by Dr. Korbel, D.E. 365, p. 23 (report).

[42]   Burton, D.E. 376-2, pp. 41, 65 (report).

[43]   *Id*. at 39-40.

"[p]olice and other law enforcement agencies [would] be at the voting locations." The mailer further stated that a victim of voter fraud could serve jail time.[44]

This Court finds that racial appeals remain a tactic relied on by Texas's political campaigns. Defendants offered no controverting evidence on this issue.

## II.

## THE STATUS QUO BEFORE SB 14 WAS ENACTED

In-person voter impersonation in Texas is rare. Before SB 14 went into effect, the only document required for a registered voter to cast a ballot in Texas was his or her voter registration certificate.[45]   Absent the certificate, the voter could use a driver's license or any number of other documents such as a utility bill that would, as a practical matter, identify the person as the registered voter. Major Forrest Mitchell works in the Texas Attorney General's law enforcement division. He testified regarding the Special Investigations Unit which handles all claims of election violations brought to the Attorney General. In the ten years preceding SB 14, only two cases of in-person voter impersonation fraud were prosecuted to a conviction—a period of time in which 20 million votes were cast.[46]

In the first case, Lorenzo Almanza, Jr., appeared at the polls with his brother Orlando's voter registration certificate and represented himself to be Orlando, who was incarcerated at the time. The poll worker knew the brothers and alerted the election

---

[44]   *Id*. at 40, 62-63 (the message warned that a national political group was engaging in voter fraud by taking people to the polls on election day and that their victims—the voters—would be prosecuted).

[45]   TEX. ELEC. CODE § 63.001(b) (Vernon 2011).

[46]   McGeehan, D.E. 578, p. 274.

judge.  Because Lorenzo had Orlando's valid voter registration certificate, the elections department permitted him to vote.  Lorenzo was convicted, along with his mother, who accompanied him to the polls and fraudulently vouched that Lorenzo was, in fact, Orlando.[47]  In the other case, Jack Crowder, III voted as his deceased father.[48]

According to Major Mitchell, since the implementation of SB 14's photo ID requirements over three elections, there has been no apparent change in the rate of voter fraud referrals and no higher rate of convictions.[49]  This is not surprising, considering the testimony of several experts who are abundantly familiar with the nature of in-person voter impersonation fraud and election history, and who testified convincingly that such fraud is difficult to perpetrate, has a high risk/low benefit ratio, and does not occur in significant numbers.

While there have always been allegations of in-person voter impersonation fraud, the reality is that the allegations are seldom substantiated.  According to Randall Buck Wood, an attorney who was formerly the Director of Elections for the Texas Secretary of State (SOS) and whose specialty is election law, in over 44 years of investigating and litigating election issues, including allegations of rampant voter impersonation fraud, he has never found a single instance of successful voter impersonation in an election contest.[50]

---

[47]   Mitchell, D.E. 592, pp. 70-72.

[48]   *Id*. at 76.

[49]   Mitchell, D.E. 578, p. 174.

[50]   Wood, D.E. 563, pp. 198, 204 (testimony).

Dr. Lorraine Minnite, a tenured Associate Professor of Public Policy at Rutgers University, has done extensive work since 2000 studying voter fraud in American contemporary elections. She produced a report specific to Texas, which was consistent with other states' history of very little in-person voter impersonation fraud.[51] Dr. Minnite found fewer than ten cases of in-person voter impersonation fraud in the United States between 2000 and 2010.[52] Two of those were in Texas, with one involving a woman with a falsified driver's license bearing her actual photo, so it is questionable whether SB 14 would have had any effect on that case.[53] Two occurred after SB 14 was passed.[54]

Dr. Minnite's research found that sloppy journalism regarding voter fraud and officials repeatedly suggesting that voter fraud has occurred have instilled a misconception in the public. Press releases making allegations of voter fraud were often repeated in news stories without having been verified, feeding a baseless skepticism about election integrity.[55] Looking at the pre-SB 14 procedures in place and the rarity of in-person voter impersonation fraud, she concluded: "So SB 14 doesn't add anything, in my opinion, to what we already have in place."[56]

U.S. Representative Marc Veasey previously served as a state representative in Texas. He served on the House Elections Committee over several sessions and did not

---

[51]   Minnite, D.E. 578, pp. 119-20 (testimony).

[52]   *Id*. at 130.

[53]   *Id*. at 134-37.

[54]   *Id*. at 135.

[55]   *Id*. at 137-38; *see also* Patrick, D.E. 588, p. 249 (testifying that the public had a widespread belief that there was fraud in elections based on news accounts).

[56]   Minnite, D.E. 578, p. 142 (testimony).

see any evidence of widespread in-person voter fraud.   Instead, it was always just innuendo.[57]   Defendants claim that voter impersonation fraud is difficult to detect and could potentially be more widespread than the two incidents actually shown would indicate.   They further claim that the voter rolls are bloated with deceased voters, which creates an opportunity to commit in-person fraud.   However, they failed to present evidence that the deceased are voting, which they could have done by comparing the deceased voter list against the list of those who have voted.

As Mr. Wood and Dr. Minnite made clear, in-person voter impersonation fraud is difficult to perpetrate with success.   The perpetrator would have to:   (1) know of an existing registered voter; (2) gain possession of that person's voter registration certificate or some other documentation of name and residence; (3) precede that person to the polls; (4) elude recognition as either who they actually are or as not being who they pretend to be; and (5) hope that the actual voter does not appear at the polls later to cast his or her own ballot.   In State Representative Todd Smith's terms, such a person would have to be a fool to take such risks, with significant criminal penalties, in order to cast a single additional ballot in that election.[58]

The cases addressing voter photo ID laws hold that the states have a legitimate interest in preventing in-person voter impersonation fraud despite minimal evidence that it exists as a real threat to any election, and Defendants here have offered very little

---

[57]   Veasey, D.E. 561, pp. 239-40.

[58]    Smith, D.E. 578, p. 343 ("My presumption is that you are a fool or you're uninformed if you're willing to commit a felony in order to add a single vote to the candidate of your choice.").

16

evidence that such fraud is occurring.  This Court finds that instances of in-person voter impersonation fraud in Texas are negligible.  In contrast, there appears to be agreement that voter fraud actually takes place in abundance in connection with absentee balloting.[59] Mr. Wood testified that some campaign assistants befriend the elderly and raid their mailboxes when mail-in ballots arrive from the county.[60]  SB 14 does nothing to combat fraud in absentee ballots and, ironically, appears to relegate voters who are over 65 and do not have qualified SB 14 ID to voting by absentee ballot.  Justifiably, many of the registered voters who testified in this case stated that they need to vote in person because they do not trust that their vote will be properly counted if they have to vote by absentee ballot.[61]

## III.

## THE TEXAS PHOTO IDENTIFICATION LAW

### A.  The Challenged Provisions of SB 14

Effective January 1, 2012, Texas registered voters are required to present a specified type of photo ID when voting at the polls in person.  SB 14, § 26 (effective date).  The law has a number of provisions placed in issue in this case, described generally as follows.

---

[59]     Wood, D.E. 563, p. 202 (testimony); Burden, D.E. 569, p. 320 (testimony); Lichtman, D.E. 573, p. 67 (testimony); Anchia, D.E. 573, p. 322; Minnite, D.E. 375, p. 21 (report) (most of the voter fraud referrals concern violations of the state's absentee and early voting laws, mishandling of mail ballots, unlawful assistance to the voter, coercion or intimidation of voters, and alleged ballot tampering); Mitchell, D.E. 578, p. 176.

[60]   Wood, D.E. 563, pp. 224-26.

[61]   See Section IV(B)(2)(a), *infra*.

The only acceptable forms of photo ID are:  (1) a driver's license, personal ID card, and license to carry a concealed handgun, all issued by the Department of Public Safety (DPS); (2) a United States military ID card containing a photo; (3) a United States citizenship certificate containing a photo; and (4) a United States passport.  *Id.*, § 14.  All of these forms of photo ID must be current or, if expired, they must not have expired earlier than sixty days before the date of presentation at the polls.  *Id.*

If a voter does not have such photo ID, that voter may obtain an election identification certificate (EIC), which is issued by DPS upon presentation of proof of identity.  *Id.*, § 20.  Persons with a verifiable disability may obtain an exemption from the photo ID requirement, but must provide required documentation of the disability to the voter registrar.  *Id.*, § 1.  The sources of that documentation are limited to the United States Social Security Administration and United States Department of Veterans Affairs. *Id.*

When the voter appears at the polling place, the law requires that the voter's registered name and name on the photo ID be exactly the same or "substantially similar." *Id.*, § 9(c).  If they are exactly the same, the voter may cast a ballot without further complication.  If they are not exactly alike, but are deemed by the poll workers to be "substantially similar" under the SOS's guidelines, the voter is permitted to vote, but must first sign an affidavit that the actual voter and the registered voter are one and the same.  *Id.*

If the registered name and the name on the photo ID are not deemed by the poll workers to be "substantially similar," or if the voter does not have any of the necessary photo ID, the voter may cast a provisional ballot, which will be counted only if the voter, within six days of the election, goes to the voter registrar with additional documentation to verify his or her identity. *Id.*, §§ 15, 17, 18.  Those who have a religious objection to being photographed or who lost their photo ID in a natural disaster may also cast a provisional ballot subject to later proof of identity within six days of any election in which that person votes. *Id.*, § 17.

The law requires each county voter registrar to provide notice of the photo ID law when issuing original or renewal registration certificates. *Id.*, § 3.  The registrar must post a notice in a prominent location at the county clerk's office and include notice in any website maintained by that registrar. *Id.*, § 5.  The SOS is required to include the notice of this law on the SOS website and must conduct a statewide effort to educate voters regarding the new requirements. *Id.*, § 5.  The SOS must also issue training standards for poll workers regarding accepting and handling the photo IDs. *Id.*, § 6.  The county clerks are directed to provide training pursuant to the SOS's standards for their respective poll workers. *Id.*, § 7.

19

**B. The Texas Law is Comparatively the
Strictest Law in the Country**

States began considering voter photo ID laws in the late 1990s.[62]  As of 2014,
eleven states, including Texas, have enacted laws described as "Strict Photo ID" by the
National Conference of State Legislatures, with two of those states delaying
implementation.[63]  There are several features of photo ID laws to evaluate when
determining how strict they are, including soft rollouts (which Texas did not adopt),
educational campaigns (which are woefully lacking in Texas), the time frame during
which an expired ID will be accepted (a matter on which Texas is relatively strict), the
time frame in which provisional ballots may be cured (a matter on which Texas is
arguably in the middle ground), and terms on which provisional ballots may be cured
(where Texas's requirements that the voter still produce a qualified photo ID make it
strict).  Comparing the acceptable forms of photo IDs of the strict states, it is clear that
SB 14 provides the fewest opportunities to cast a regular ballot, as demonstrated in the
following table.

---

[62]   The first challenge to a photo ID requirement for voting was in Virginia in 1999.  *See Democratic Party of Va. v.
State Bd. of Elections*, HK-1788, 1999 WL 1318834 (Va. Cir. Ct. Oct. 19, 1999).

[63]   North Carolina and New Hampshire enacted strict voter photo ID laws in 2012 and 2013, respectively, but they
will not be implemented until 2015 and 2016.  *See Voter Identification Requirements – Voter ID Laws*, NATIONAL
CONFERENCE OF STATE LEGISLATURES, http://www.ncsl.org/research/elections-and-campaigns/voter-id.aspx.

STRICT STATE COMPARISON[64]

| | Arkansas | Georgia | Indiana | Kansas | Mississippi | North Carolina | New Hampshire | Tennessee | Texas | Virginia | Wisconsin |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Home state driver's license or ID | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Home state handgun/firearm license | ✓ | | | ✓ | ✓ | | * | ✓ | ✓ | ✓ | |
| U.S. passport | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| U.S. citizenship or naturalization certificate with photo | | | | | | | * | | ✓ | | ✓ |
| Home state voter ID | ✓ | ✓ | ✓ | | ✓ | | * | ✓ | ✓ | ✓ | ✓ |
| U.S. military ID with photo | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Religious accommodation | ✓ | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | | ✓ |
| Any state driver's license | | | | ✓ | ✓ | ✓ | ✓ | | | | |
| Any state concealed handgun license | | | | | ✓ | | * | | | | |
| Any home state photo ID | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | | ✓ | |
| Any home state sub-jurisdiction ID | | ✓ | | | ✓ | | * | | | ✓ | |
| Any federal government ID | ✓ | ✓ | ✓ | | ✓ | | * | ✓ | | ✓ | |
| Home state college or university student ID | ✓ | ✓ | | ✓ | ✓ | | ✓ | | | ✓ | ✓ |
| Home state/U.S. public employee badge or ID | ✓ | ✓ | | ✓ | ✓ | | * | ✓ | | ✓ | |
| Private employee badge or ID | | | | | | | * | | | ✓ | |
| Public assistance ID | ✓ | | | ✓ | | | * | | | | |
| Tribal ID | | ✓ | | ✓ | ✓ | ✓ | * | | | ✓ | ✓ |
| Public high school student ID | | | | | ✓ | | ✓ | | | | |
| Nonpublic (accredited) high school student ID | | | | | | | ✓ | | | | |
| Public school district employee ID | | | | | ✓ | | * | | | | |
| City library card | | | | | ✓ | | * | | | | |
| Emergency management card | | | | | ✓ | | * | | | | |
| Transit/airport authority card | | | | | ✓ | | * | | | | |
| Exemption for voting in nursing/care facility | ✓ | | ✓ | | | | | ✓ | | | |
| Elderly permitted to use expired ID | | | | ✓ | | ✓ | ✓ | ✓ | | | |
| Indigence accommodation | ✓ | | ✓ | | | | | ✓ | | | |

*New Hampshire may allow these forms of photo identification if they are approved by an authorized individual.

---

[64] *See* ARK. CODE ANN. §§ 7-1-101, 7-5-201, 7-5-305, 7-5-321; GA. CODE ANN. § 21-2-417; IND. CODE §§ 3-5-2-40.5, 3-11-8-25.1, 3-11.7-5-2.5; KAN. STAT. ANN. §§ 25-2908, 25-1122; MISS. CODE ANN. § 23-15-563; N.C. GEN. STAT. ANN. § 163-166.13 (effective 2016); N.H. REV. STAT. ANN. § 659:13; TENN. CODE ANN. § 2-7-112; VA. CODE ANN. §§ 24.2-643, 24.2-653; WIS. STAT. ANN. §§ 5.02, 6.79(2), 6.97(3). Arkansas law held unconstitutional and stayed pending appeal. *See Ark. State Bd. of Election Comm'rs v. Pulaski Cnty. Election Comm'n*, 2014 Ark. 236, 2014 WL 2694226. Oral arguments heard Oct. 2, 2014. Wisconsin law enjoined, but reinstated upon appeal *Frank v. Walker*, No. 14-2058, 2014 WL 4966557 (7th Cir. Oct. 6, 2014), still subject to further appeal.

21

This table demonstrates that there are at least 16 forms of ID that some of the other strict states permit, but that Texas does not, and there are three classes of persons, including the elderly and indigent, who are excused in whole or in part from the photo ID requirement in many states, but not in Texas.

According to the evidence, the costs to obtain the respective forms of photo IDs permitted in Texas, if the voter does not already have an accurate original or certified copy of his or her birth certificate, are as follows:[65]

| Texas EIC | | |
|---|---|---|
| Issued by DPS | Application Fee | $0.00 |
| Issued by DSHS or County Registrar | EIC-only Birth Certificate if the application is tendered in person (not by mail or online) and only if already registered and accurate | $2.00—3.00[66] |
| | Full-purpose Birth Certificate (the only type issued by mail, even if for EIC purposes) | $22.00—23.00 |
| | Search Fee to find Birth Certificate plus statutory surcharge | $22.00 |
| | Delayed Birth Certificate—Search fee plus certified copy | $47.00 |
| | Application to Amend Birth Certificate plus certified copy | $37.00 |
| Other State or Territory | Out-of-State Birth Certificate[67] | $5.00—34.00 |
| | **Total Fees Required To Be Paid To Obtain EIC** | **$2.00—47.00** |
| Texas Driver's License | | |
| Issued by DPS | Application Fee | $9.00—25.00 |
| | Replacement Fee | $11.00 |
| | Birth Certificate (see above) | $22.00—47.00 |
| | **Total Fees Required To Be Paid To Obtain Driver's License** | **$31.00—72.00** |

---

[65]  Bazelon, D.E. 614-1, p. 19 (report); Farinelli, D.E. 582, pp. 312-98.  These figures, of course, do not include travel costs, or time off of work.  The cost of a birth certificate is used because it is ordinarily the most widely available and least expensive alternative of primary identification.

[66]  The State did not reduce the charge of $22.00 for a birth certificate until after SB 14 passed and was signed into law.  Hebert, D.E. 592, pp. 183-84; *see generally* Farinelli, D.E. 582, p. 323.

[67]  Pls.' Ex. 474, pp. 5, 31 (CDC Vital Statistics Guide).

| Texas Personal Identification Card | | |
|---|---|---|
| **Issued by DPS** | Application Fee | $6.00—16.00 |
| | Replacement Fee | $11.00 |
| | Birth Certificate (see above) | $22.00—47.00 |
| | **Total Fees Required To Be Paid To Obtain Personal ID Card** | **$28.00—63.00** |
| Texas Concealed Handgun License | | |
| **Issued by DPS** | Application Fee-new | $70.00-140.00 |
| | Application Fee-renewed | $70.00 |
| Issued by DPS | Texas Driver's License or Personal Identification Card | $9.00—63.00 |
| Private Vendor | Classroom Training | Varies |
| | **Total Fees Required To Be Paid To Obtain Handgun License** | **Over $79.00** |
| Passport | | |
| **Issued by US** | Application Fee--New | $55-135 |
| | Application Fee--Renewed | $30.00-110.00 |
| Private Vendor | Photo | Varies |
| | **Total Fees Required To Be Paid To Obtain Passport** | **Over $30.00** |
| Citizenship Certificate with Photo | | |
| **Issued by US** | Original Naturalization Certificate | $680.00 |
| | Original Certificate of Citizenship | $600.00 |
| | Copy of Naturalization Certificate[68] | $345.00 |
| | **Total Fees Required To Be Paid To Obtain Citizenship Cert.** | **$345—680** |
| Military ID with Photo | | |
| | Not Quantifiable | |

Thus, unless the voter already has an official copy of his or her birth certificate, the minimum fee to obtain an SB 14-qualified ID to vote will be $2.00 and, according to the individual Plaintiffs' testimony, will likely be much more because of prevalent problems with the accurate registration of births of minorities.

---

[68]   Hernandez-Luna, D.E. 573, p. 367.  While naturalization certificates are not listed in SB 14, the SOS has allowed them by administrative rule.  *See generally* 1 TEX. ADMIN. CODE § 81.8; 37 TEX. ADMIN. CODE § 15.182.

# IV.

## THE METHOD AND RESULT OF PASSING SB 14

### A.  The Texas Legislature's Approach to the Consideration of SB 14 Was Extraordinary

SB 14 was the Texas Legislature's fourth attempt[69] to enact a voter photo ID law. Over time, the provisions became increasingly strict[70] and the procedural mechanisms engaged to ensure passage became more aggressive.

- HB 1706 (2005)

   o  In addition to the ID permitted under SB 14, the provisions included:  (1) driver's licenses and personal ID cards issued by a DPS-equivalent of any state, further accepting those IDs even if they were expired for two years; (2) employer IDs issued in the ordinary course of business; (3) student photo IDs issued by a public or private institution of higher education; (4) a state agency ID card; and (5) a photo ID issued by an elections administrator or county clerk.  Non-photo ID, such as utility bills, bank statements, and paychecks that were permitted under existing law continued to be acceptable.   A personal identification certificate would have been available free of charge upon execution of an affidavit, with no underlying documentation specified.  It further provided that it would not take effect unless it passed VRA scrutiny.[71]

   o  The bill, after being reported out of the Elections Committee, passed the House but died in the Senate Committee on State Affairs.[72]

---

[69]   Tex. S.B. 362, 81st Leg., R.S. (2009); Tex. H.B. 218, 80th Leg., R.S. (2007); Tex. H.B. 1706, 79th Leg., R.S. (2005).

[70]   Ellis, D.E. 573, p. 185; *see also* HB 1706 (2005), *supra;* HB 218 (2007), *supra;* SB 362 (2009), *supra*.

[71]   http://www.capitol.state.tx.us/tlodocs/79R/billtext/pdf/HB01706E.pdf#navpanes=0.

[72]   http://www.capitol.state.tx.us/BillLookup/Actions.aspx?LegSess=79R&Bill=HB1706.

- HB 218 (2007)

  o The provisions, as the bill was reported out of the Senate State Affairs Committee, included (in addition to the ID permitted under SB 14): (1) a DPS driver's license or personal ID card even if it was expired for two years (leaving out those IDs issued by other states); (2) employer IDs issued in the ordinary course of business; (3) student photo IDs issued by a public or private institution of higher education (now requiring that the school be located in Texas); (4) an ID issued by an agency or institution of the federal government (added); and (5) an ID issued by an agency, institution, or political subdivision of the State of Texas. This bill still permitted the use of non-photo ID. The free election identification certificate provision left out the requirement of an affidavit or any other proof of identity. There was no requirement that it pass VRA scrutiny.[73]

  o The bill was reported out of the House Elections Committee and several House amendments were adopted. In the Senate, it was reported out of the State Affairs Committee. While the rules were initially suspended to take it up out of order for second reading, the vote was reconsidered and the measure failed. The rules were not suspended, at which point the bill died.[74]

- SB 362 (2009)

  o As it emerged from the House Elections Committee, the provisions included (in addition to ID permitted by SB 14): (1) a driver's license or personal ID card issued by DPS, which has not been expired for more than two years; (2) an ID issued by an agency or institution of the federal government; and (3) an ID issued by an agency, institution, or political subdivision of the State of Texas. Employer and student IDs were omitted. Non-photo ID was still permitted. This bill repeated the free election identification certificate with no underlying documentation requirement.[75]

---

[73] http://www.capitol.state.tx.us/tlodocs/80R/billtext/pdf/HB00218S.pdf#navpanes=0.

[74] http://www.capitol.state.tx.us/BillLookup/Actions.aspx?LegSess=80R&Bill=HB218.

[75] http://www.capitol.state.tx.us/tlodocs/81R/billtext/pdf/SB00362H.pdf#navpanes=0.

o The bill started in the Senate this time.  The Senate adopted a rules change just for voter ID legislation, allowing it to be set as "special order" upon majority vote, which vote was obtained.  It was referred to the Committee of the Whole Senate, from which it was reported favorably with no amendments.  Upon second reading, two amendments offered by a primary author, Senator Troy Fraser, were adopted.  A point of order complaining of the lack of a fiscal note, evidenced by the Finance Committee's contingency rider authorizing $2 million for voter education from the general revenue fund, was overruled.  It passed the Senate and went to the House Elections Committee.  It was reported out of committee, but died on the calendar, due to chubbing.[76]

Based on this experience, the proponents of voter ID legislation knew that additional procedural changes would be required to get the legislation passed.  With the 2010 elections giving Republicans a majority in both the House and the Senate, they had the votes to pass a law as long as they could eliminate any two-thirds vote requirement in the Senate and keep the bill at the front of the line in both houses.

### 1.  New Uncompromising Sponsorship

In 2011, SB 14 appeared with nineteen authors[77] and was described by some of the Texas legislators as having questionable authorship because the authors and sponsors seemed to not have full command of the text of the bill, and it was presented as "pre-packaged," already "baked," or a "done deal."[78]  Sponsors exhibited an aggressive attitude and were reluctant to answer questions, appearing evasive or disinterested in any

---

[76]   http://www.capitol.state.tx.us/BillLookup/Actions.aspx?LegSess=81R&Bill=SB362.  *See also* Dewhurst, D.E. 588, pp. 26, 31-33, 45-47 (SB 362 was "chubbed to death"); Patrick, D.E. 588, pp. 279-84.

[77]   http://www.capitol.state.tx.us/BillLookup/Authors.aspx?LegSess=82R&Bill=SB14.

[78]   Anchia, D.E. 573, pp. 339, 355 ("I think the evasiveness of the bill authors, the failure to act to answer questions – the fact that a lot of the bills authors – or that the bill authors didn't really even know their bill that well caused me to believe that maybe somebody else was writing that bill for them."); Veasey, D.E. 561, p. 248 (pre-packaged).

26

consideration of opponents' substantive concerns.[79]   When Senator Ellis asked primary author Senator Fraser questions about SB 14, the response was, "I am not advised."[80] This attitude, which Ellis testified was out of character for sponsors of major bills, was explained when Senator Fraser indicated that he had "drawn the straw."[81]   The attitude in the 2011 session was dramatically different from that of 2009 in that SB 14 proponents were not willing to negotiate in their shared interests.[82]

### 2.   Speed Through the Texas Senate

**Special Priority and the Need for Speed**.   According to Senator Ellis, Texas legislation is a "game for the swift"[83] and SB 14 was "on a spaceship.  I mean, it – was trying to rocket this bill out of there."[84]   It was pre-filed on November 8, 2010, and had a bill number of SB 178.[85]   So on January 12, 2011, the sponsors obtained the permission of Lieutenant Governor David Dewhurst to re-file the bill under one of the low numbers reserved for his priorities, thus giving it the number "SB 14."[86]   That number telegraphs to the Senate a priority for the Lieutenant Governor.[87]

---

[79]   Anchia, D.E. 573, pp. 338-39; Martinez-Fischer, D.E. 561, p. 106 (testifying that his concerns "fell on deaf ears").

[80]   Ellis, D.E. 573, pp. 184-85 ("My  . . . friend Senator [Fraser] would say something to the effect, 'I'm not advised, ask the Secretary of State.'"); Fraser, D.E. 588, p. 414.

[81]   Ellis, D.E. 573, p. 186.

[82]   *Id*. at 186-87 (specifically disputing Sen. Fraser and Lt. Gov. Dewhurst's assertions that they were trying to work out a consensus on SB 14); Martinez-Fischer, D.E. 561, pp. 98-99.

[83]   Ellis, D.E. 573, pp. 165-66.

[84]   *Id*. at 176.

[85]   Fraser, D.E. 588, p. 407.

[86]   Fraser, D.E. 588, pp. 407-08.

[87]   Dewhurst, D.E. 588, pp. 65-66.

**Emergency Designation**.   Governor Rick Perry designated "Legislation that requires a voter to present proof of identification when voting" as an "emergency matter for immediate consideration" by both houses of the Texas Legislature.[88]   According to Senator Wendy Davis, no one could explain what the emergency was.[89]   The effect of this was to permit the legislature to process SB 14 during the first sixty (60) days of the legislative session.[90]   Without that designation, it would have taken a four-fifths vote of the Senate to take up the legislation that early in the session.[91]   With the emergency designation and the ability to proceed during the first two months of the session when the calendar was clear, other techniques for slowing down the process were eliminated.   For instance, there were no "blocker bills" in the way.[92]

**Two-Thirds Rule Change**.   At the beginning of the 2011 legislative session, the Senate adopted the governing rules of the prior session.[93]   Under Senate Rule 5.11(a), a two-thirds majority vote is required to make a bill or resolution a "special order."   When designated as a "special order," the bill is considered prior to other business of the Senate.   The Senate of the 2009 Texas Legislature had adopted a significant rules change to Rule 5.11 providing that a bill relating to voter ID requirements that was reported

---

[88]   S.J. of Tex., 82nd Leg., R.S. 54 (2011); H.J. of Tex., 82nd Leg., R.S. 80 (2011).

[89]    Davis, D.E. 573, pp. 9-10; *see also* McGeehan, D.E. 578, pp. 276-77 (testifying that she did not know of any election law emergency and did not know why the Governor declared one).

[90]   Senate Rules 7.08, 7.13 (2011).

[91]   Senate Rule 7.13 (2011).

[92]    A blocker bill is a bill on a relatively mundane subject that is never passed.  It sits in the way of other legislation, requiring a vote to suspend the regular order of business to move other legislation through.  Patrick, D.E. 588, pp. 261-64.

[93]   S.J. of Tex., 82nd Leg., R.S. 43 (2011) (Sen. Res. 36).

favorably from the Committee of the Whole Senate could be set as a special order at least 24 hours after a motion to set it was adopted by a majority of the members of the Senate.[94]   That rules change, made solely for voter ID legislation, followed the 2007 session when the two-thirds rule blocked predecessor HB 218 from being taken up out of the ordinary order of business and the rule remained in place for the 2011 Texas Senate.[95]

Senators Davis, Ellis, and Carlos Uresti all testified that the suspension of the two-thirds rule was an extraordinary measure.[96]   While the rule may not be enforced for insignificant matters, and has been suspended by agreement for politically sensitive votes,[97] it is unprecedented to suspend that rule for contentious legislation as important as SB 14.[98]   Senator Uresti testified that the rule had been in place at least five decades and he had never seen it waived for any other major legislation,[99] and Senator Ellis considered it a 100-year honored tradition.[100]   Even Lieutenant Governor Dewhurst admitted that he was not aware of any similar rule change for any other bill.[101]

**Committee Bypass**.   Pursuant to Senate rules, no action may be taken on a bill until it has been reported on by a committee.   Immediately after the emergency

---

[94]   S.J. of Tex., 81st Leg., R.S. 23, 28 (2009) (Sen. Res. 14).  The 2009 Texas Senate had also made a special rules change regarding Senate Rule 16.07, allowing any bill regarding voter ID requirements to be set for special order by a simple majority vote.  That rule was carried forward in the 2011 rules.

[95]   Williams, D.E. 592, pp. 107-11; S.J. of Tex., 82nd Leg., R.S. 43 (2011) (Sen. Res. 36).

[96]   Davis, D.E. 573, p. 9; Uresti, D.E. 569, pp. 221-22; Ellis, D.E. 573, p. 164.

[97]   Ellis, D.E. 573, pp. 167-68 (Senate suspended the two-thirds rule during the "Segregation Forever" special session in the 1950s and during redistricting).

[98]   Davis, D.E. 573, p. 9; Ellis, D.E. 573, p. 164; Uresti, D.E. 569, p. 216.

[99]   Uresti, D.E. 569, pp. 221-22.

[100]   Ellis, D.E. 573, p. 165.

[101]   Dewhurst, D.E. 588, p. 57.

designation was made, the Texas Senate passed a resolution to convene the Committee of the Whole Senate that same day, on January 24, 2011, to consider only SB 14.[102] According to Representative Trey Martinez-Fischer, use of the Committee of the Whole is unusual, with no useful purpose in this instance other than to eliminate the natural delay attendant to the ordinary committee process.[103]

The first reading in the Senate was on January 24, 2011, at which time SB 14 was referred to the Committee of the Whole, with Senator Robert Duncan presiding.[104]  The next day, January 25, 2011, at 9:20 p.m., Senator Duncan reported SB 14 out of committee and to the Senate with the recommendation that it be passed.[105]  Immediately, Senator Fraser moved that it be set as a special order for 9:20 p.m. Wednesday, January 26, 2011, and the motion passed by majority vote.[106]

**Questionable Fiscal Notes**.  Ordinarily, fiscal notes signed by the Director of the Legislative Budget Board (and kept current as legislation changed) were required to accompany any legislation.[107]  This requirement was particularly important in 2011 because the legislative session was confronting a $27 billion budget shortfall.[108]

---

[102]   S.J. of Tex., 82nd Leg., R.S. 60 (2011) (Sen. Res. 79).

[103]   Martinez-Fischer, D.E. 561, pp. 107-08; McGeehan, D.E. 578, pp. 267-68; Duncan Dep., Aug. 28, 2014, pp. 79-80 (D.E. 592, pp. 221-22 (admitting dep.)).

[104]   S.J. of Tex., 82nd Leg., R.S. 54, 61-62, 99 (2011).  When a Committee of the Whole Senate is formed, the President (Lieutenant Governor) leaves the chair and appoints a chair to preside in committee.  The President may then participate in debate and vote on all questions.  Senate Rule 13.02, 13.03 (2011).

[105]   S.J. of Tex., 82nd Leg., R.S. 99 (2011).

[106]   *Id.*

[107]   Senate Rule 7.09(b)-(h) (2011).  The House rule on that issue appears at H.J. of Tex., 82nd Leg., R.S. 116-17 (2011); Davis, D.E. 573. pp. 11-12 (requirement to keep current).

[108]   Davis, D.E. 573, pp. 12-13; Anchia, D.E. 573, p. 358.

Lieutenant Governor Dewhurst, presiding over the Senate, and Speaker Straus, presiding over the House, instructed both chambers that they were not to advance any bill with a fiscal note in the 2011 session because no additional costs could be added to the state's budget.[109]   However, the $2 million fiscal note that had accompanied the prior legislature's voter ID bill[110] was eventually continued with SB 14, unchanged.

Senator Davis explained that a one-time expenditure of $2 million would never be enough to accurately reflect the cost of SB 14.[111]   A quarter of that amount was earmarked for research just to determine what type of voter education was needed.[112] The remainder was grossly insufficient for any media campaign.[113]   The failure to fund SB 14 was clear at trial—no real educational campaign was initiated, and the individuals such a campaign needed to reach knew little, if anything, about the change in the law, including which photo IDs were allowed and the availability of EICs.[114]

Defendants failed to adduce any evidence to controvert Senator Davis' assertion that it would take far more than $2 million of publicity to reach registered voters who

---

[109]  Davis, D.E. 573, pp. 12-13.

[110]  In 2005, the 79th Legislature's fiscal note for the voter ID law was $130,000 per year, based on the estimated number of indigents (using poverty guidelines) that would require free state ID cards at $15 per card.  Davis, D.E. 573, p. 14.  In the 80th Legislature (2007), the fiscal note reflected $171,000 per year based on only 11,000 indigents needing free ID.  *Id.*  That session's fiscal note was later raised to $670,000 based on changes to the legislation that offered a free ID without necessity of showing indigence.  *Id.* at 15.  In the 81st Legislature (2009), when the bill originated in the Senate for the first time, the voter ID bill was originally filed without a fiscal note. *Id.* at 16.  Later, there was a fiscal note attached, showing no impact on the state's budget.  *Id.* at 16.  When that was questioned, a $2 million note was attached.  *Id.*

[111]  Davis, D.E. 573, pp. 17-18.

[112]  *Id.* at 18.

[113]  *Id.* at 18-19.

[114]  Peters, D.E. 582, pp. 146-47 (testified as the assistant director of DPS's Driver License Division that they did not conduct any targeted outreach for EICs); Cesinger Dep., May 20, 2014, pp. 50, 55, 59, 90 (D.E. 592, pp. 221-22 (admitting dep.)) (testifying that DPS did not have a budget to publicize the EIC program, did not attempt to target its outreach, and did not translate any of their communications into Spanish).

would need to be educated effectively and in a timely manner on this significant change in the ability to vote.  And it is clear from the testimony of registered voters in this case that many heard about the change in the law only after they appeared at the polls to cast their vote.[115]  For many, six days to cure a provisional ballot with a qualified photo ID was an unreasonable expectation because they did not understand the procedure, they needed time to save money (if they could) and obtain underlying documents (if they could), and it would take a significant effort to get to the proper office to apply for and get the necessary photo ID, which might take weeks or months to arrive.[116]

**Passed from Senate Without Meaningful Debate**.  As set out below, the proponents allowed no real debate on SB 14's strict requirements, tabling most amendments and thus preventing discussion.  There was evidence that Senator Tommy Williams requested that the DPS ID databases be compared to the SOS registered voter database to get an idea of how many voters would not have the required photo ID.[117]  That database match was performed by the SOS, but the results showing 504,000 to 844,000 voters being without Texas photo ID were not released to the legislature.[118]

---

[115]   C. Carrier, D.E. 561, p. 27 (learned about the EIC identification only after being deposed by the State for this case); Bates, Pls.' Ex. 1090, p. 13 (did not know that her existing ID would be insufficient until she arrived at the polls); Mendez, D.E. 563, p. 104 (was not informed about his option to purchase an EIC-only birth certificate).

[116]   See Section IV(B)(2)(a), *infra*.

[117]   Williams, D.E. 592, pp. 128-29.

[118]   Sen. Williams requested the analysis from the SOS's office in 2011.  While the analysis was done, it was not turned over to the legislature.  Williams, D.E. 592, pp. 128-29; McGeehan, D.E. 578, pp. 285-92.  Sen. Ellis asked for discriminatory impact data from SOS and never got it.  Ellis, D.E. 573, pp. 182-84.  Sen. Uresti never saw any such statistical analysis.  Uresti, D.E. 569, pp. 211-12.  However, Lt. Gov. Dewhurst was aware of the No-Match List results showing 678,000 to 844,000 voters being potentially disenfranchised.  Dewhurst, D.E. 588, pp. 71-72; *see also* McGeehan, D.E. 578, pp. 284-92.

As scheduled, on January 26, 2011, SB 14 was passed[119] having spent three days before the Senate prior to being passed on to the House of Representatives.

### 3.   Committee Process, Evidence, and Debate in the Texas House

**Special Committee**.   While there was slightly greater lag time in the House, compared to the three days it took to get SB 14 through the Senate, the bill did not get any more meaningful debate there.   As in the Senate, House rules require that all bills be referred to a committee and be reported from that committee before consideration by the House.[120]   On February 11, 2011, SB 14 was assigned to a Select Committee on Voter Identification and Voter Fraud,[121] instead of the standing committee on elections which generally considered election matters.[122]   Using the Select Committee allowed the Speaker of the House to assign representatives to the committee.

Representative Veasey, who was on both the Elections Committee and the Select Committee, felt that the Select Committee's membership was not a fair representation of the House and his appointment as vice-chair was only for appearances.[123]   Representative Martinez-Fischer commented that seniority was not honored on a select committee,

---

[119]   S.J. of Tex., 82nd Leg., R.S. 146 (2011).

[120]   H.J. of Tex., 82nd Leg., R.S. 153 (2011) (House Res. 4; Rule 8, § 12).

[121]   H.J. of Tex., 82nd Leg., R.S. 329 (2011).

[122]   Martinez-Fischer, D.E. 561, p. 561; Anchia, D.E. 573, p. 317.

[123]   Veasey, D.E. 561, p. 241 (not a fair representation).

and[124] Representative Anchia noted that the select committee device was highly unusual, particularly to consider a single bill.[125]

**Fiscal Note, Impact Study, and Emergency**.  As noted, there is some question whether SB 14 was accompanied by an appropriate fiscal note.  Representative Martinez-Fischer testified that there had been no impact study submitted to the legislature.[126] Under the House rules, bills are required to be accompanied by an impact statement when they create or impact a state tax or fee.[127]  Furthermore, Representative Anchia's questions about racial impact went unanswered.[128]

On March 21, 2011, SB 14 was placed on the emergency calendar of the House. However, due to a point of order related to a misleading bill analysis, it was returned to the Select Committee and re-emerged on March 23, 2011, to again be placed on the emergency calendar, and the proposed amendments were immediately reviewed.  The following day, SB 14 passed the House, bearing only a few amendments.[129]

---

[124]   Martinez-Fischer, D.E. 561, p. 108.

[125]   Anchia, D.E. 573, p. 354.

[126]   Martinez-Fischer, D.E. 561, pp. 112-13.

[127]   H.J. of Tex., 82nd Leg., R.S. 117-18 (2011) (House Res. 4).  The imposition of the requirement of photo ID was considered by many to place a fee on the right to vote.  As amended in the House, the bill would have reduced the fee for a Texas personal ID card.

[128]   Anchia, D.E. 573, pp. 338-39  ("And on the House floor, when I was asking . . . the House sponsor . . . what were the impacts on minority populations, or had she seen a study, or had she engaged in a study, the answers were very evasive and . . . nonresponsive.").

[129]   H.J. of Tex., 82nd Leg., R.S. 1081-82 (2011).

### 4.  The Amendments that Were Considered

While a total of 104 amendments were proposed in the two houses of the legislature, those that would have ameliorated the harsh effects of SB14 were largely tabled.[130]   Representatives Veasey and Hernandez-Luna testified that there was an attitude that amendments were simply not going to be accepted.[131]   The amendments proposed terms that, in some cases, were similar to those adopted by other states—even those that have passed strict photo ID laws.   Some sought provisions that had been included in prior Texas photo ID bills.   But the amendments in Texas, when tabled,[132] were effectively eliminated from any debate or consideration.

> A motion to lay on the table, if carried, shall have the effect of killing the bill, resolution, amendment, or other immediate proposition to which it was applied. Such a motion shall not be debatable, but the mover of the proposition to be tabled, or the member reporting it from committee, shall be allowed to close the debate after the motion to table is made and before it is put to a vote.[133]

Appended to this Opinion is a table outlining the proposals that would have accommodated the voters.   They included the use of additional forms of ID, allowing the use of IDs that were not exact matches or that had expired for a longer period than SB 14

---

[130]     http://www.capitol.state.tx.us/BillLookup/Amendments.aspx?LegSess=82R&Bill=SB14  (listing  amendments and the disposition of each, including copies for viewing and downloading).

[131]    Veasey, D.E. 561, pp. 247, 253; Hernandez-Luna, D.E. 573, p. 371 ("It seemed like there was no desire to have a discussion about the issues that were being raised through amendments").

[132]    S.J. of Tex., 82nd Leg., R.S. 103, 112-139 (2011) (SB 14); H.J. of Tex., 82nd Leg., R.S., 943, 958-1029 (2011) (C.S.S.B. 14).

[133]    H.J. of Tex. 82nd Leg., R.S. 144 (2011) (House Res. 4; House Rule 7, § 12).

allows, making it easier to register to vote and obtain photo ID, requiring voter education, requiring SOS reporting of data relevant to the implementation of SB 14, and funding.

Senator Davis attempted to communicate to her colleagues that the terms of SB 14 created a Catch-22 for voters who did not have the necessary underlying documents to obtain photo ID.  She created a detailed and informative diagram of the burden involved.[134]  In essence, for the most common documentation, Senator Davis showed that a DPS ID was required in order to request a certified copy of a voter's birth certificate and a certified copy of a birth certificate was required to get a DPS ID.  And obtaining both required payment of fees.  So if the registered voter had neither, he or she could get neither—without going to extraordinary lengths and, in some cases, significant expense.[135]  Many of the legislative amendments offered and tabled sought the loosening of the ID requirements and/or elimination of fees for a DPS personal ID card (if a registered voter had the underlying documentation to get one.)[136]

Knowing that all amendments were being tabled, Senator Davis withdrew her proposed amendment which would allow indigents to vote a provisional ballot that could be cured by affidavit, and prevailed upon Senator Duncan, the Republican who had been placed in charge of SB 14, to include the indigent-friendly terms with his amendment which included similar terms for those with religious objections to having their photo

---

[134]   Davis, D.E. 573, pp. 24-25; Pls.' Ex. 650.

[135]   *See* Pls.' Exs. 13, 650.

[136]   Victor Farinelli, Communication Manager for Texas Department of State Health Services (DSHS), testified that it was possible for DPS to set up a portal with DSHS to allow DPS to verify a birth at no charge to the voter, but this has not been pursued.  Farinelli, D.E. 582, pp. 393-95; *see also* Peters, D.E. 582, pp. 147-48.

taken.  Senator Duncan's amendment, containing the indigent provision, passed the Senate.[137]  However, the House stripped the indigent provision and added in the natural disaster provision, which is how SB 14 emerged from the conference committee.

### 5.  Refusal of Amendments and Going "Outside the Bounds"

A few ameliorative amendments passed the House and remained in the enrolled version of SB 14, such as a contingency plan (provisional balloting) for voters whose photo IDs were stolen or lost in a natural disaster.  However, the House passed a few more, leading the Senate to refuse to concur in the House amendments.  Of particular note are the following amendments:  (1) including as a qualified ID an ID card that contains the person's photograph and is issued or approved by the State of Texas (H 20; Alonzo);[138] (2) including as a qualified ID a valid ID card that contains the person's photograph and is issued by a tribal organization (H 30; Gonzalez, N.); and (3) preventing DPS from collecting a fee for a duplicate personal identification certificate from a person who seeks a voter ID (H 45; Anchia).

To resolve matters regarding SB 14, the two bodies formed a conference committee.[139]  Rather than accept the amendment to make duplicate DPS IDs free, the conference committee sought approval to go outside the bounds of both the Senate and House versions of the bill.  Ordinarily, Senate Rule 12.03 (2011) prescribed the bounds within which the conference committee was to work:  conference committees are not to

---

[137]   S.J. of Tex., 82nd Leg., R.S. 137-38 (2011).

[138]   *See* Appendix to Opinion: TABLE OF AMENDMENTS OFFERED ON SB 14.

[139]   S.J. of Tex., 82nd Leg., R.S. 918 (2011); H.J. of Tex., 82nd Leg., R.S. 1014 (2011).

"add text on any matter which is not included in either the House or Senate version of the bill or resolution."[140]  A similar rule governs the jurisdiction conferred on the conference committee by the House.[141]  Resolutions permitting the conference committee to go outside the bounds were passed in both houses and the resulting language of SB 14 included the invention of the election identification certificate (EIC).[142]

The EIC additions were apparently offered to resolve concerns that registered voters needed access to a photo ID without the necessity of paying a fee.  However, Representative Anchia testified that it was very unusual to go outside the bounds in this manner and include an entirely new provision that had not been properly vetted by either the Senate or the House.[143]  And as illustrated by the voters testifying in this case, an EIC does not resolve the substantial issues that had been identified with respect to voters obtaining the underlying documents that are needed in order to apply for an EIC (just as they are needed for Texas driver's licenses and Texas personal ID cards).

A conference committee report was passed, and SB 14 was sent to Governor Perry, who signed it into law on May 27, 2011.[144]  SB 14, as signed into law, did not include photo IDs issued by Texas state agencies or departments (other than the original IDs issued by DPS) and did not include tribal IDs.

---

[140]  Pls.' Ex. 173, p. 92 (2011 Senate Rules).

[141]  H.J. of Tex., 82nd Leg., R.S. 167-68 (2011) (House Res. 4; House Rule 13, § 9).

[142]  S.J. of Tex., 82nd Leg., R.S. 2082 (2011) (Res. 935); H.J. of Tex., 82nd Leg., R.S. 4049 (2011) (Res. 2020).  In creating the EIC, no one from the legislature consulted SOS.  McGeehan, D.E. 578, p. 280.

[143]  Rep. Anchia, D.E. 573, p. 354.

[144]  S.J. of Tex., 82nd Leg., R.S. 4526 (2011).

### 6.  Shifting Rationales

As the Texas Legislature pushed the voter photo ID laws over the years, the justifications shifted, starting with combatting voter fraud mixed with prohibiting non-citizens from voting, and then to improving election integrity and voter turnout. Although, these rationales are important legislative purposes, there is a significant factual disconnect between these goals and the new voter restrictions.  As Mr. Wood put it, the 2011 Texas Legislature did not really try to determine if photo ID was necessary, nor did it try to determine whether SB 14 would have a positive effect.[145]  Plaintiffs argued that it was a solution looking for a problem.

### a.  Preventing Voter Fraud

As demonstrated above, the Texas Legislature had little evidence of in-person voter impersonation fraud.[146]  While there is general agreement that voting fraud exists with respect to mail-in ballots, the same was not demonstrated to be a real concern with in-person voting.  And it was generally agreed that in-person voting fraud is the only type of voting fraud that would be addressed by a photo ID law.  Even with respect to policing in-person voting, Representative Anchia testified that DPS officers had shown a collection of photo IDs to legislators and they could not tell which ones were fake,[147] leading him to conclude that poll workers would be no better at evaluating what IDs were authentic, a matter not addressed by the terms of SB 14.

---

[145]  Wood, D.E. 563, pp. 208-09.

[146]  See Sections II, IV(B)(6)(a), *supra*.

[147]  Anchia, D.E. 573, p. 327.

Over time, proponents of the photo ID bill began to conflate voter fraud with concern over illegal immigration.[148]  The 2010 U.S. Census had revealed a large increase in the Hispanic population in Texas.  In 2011, bill proponents were pointing to illegal immigration in relation to voter ID while the legislature also addressed redistricting, the elimination of sanctuary cities, an English-only bill, and rollbacks of the Affordable Care Act.[149]  There was a lot of anti-Hispanic sentiment.[150]  Representative Martinez-Fischer testified,

> From a Legislative perspective, I think it takes a census to sort of wake people's eyes up, and so in the context of 2011 that we evaluated their ID and other proposals, it came on the heels of a census release that showed that the State of Texas grew by over 4 million people in the course of a decade; 89 percent of that minority; 65 percent of that Hispanic, 23 million children 95 percent Hispanic.  It marked the first time in the history of the State of Texas that our public education system became majority Hispanic.  These were astronomical metrics of demographic growth.[151]

As Dr. Burton testified, voter restrictions tend to arise in a predictable pattern when the party in power perceives a threat of minority voter increases.[152]

---

[148]  Martinez-Fischer, D.E. 561, p. 104.

[149]  Anchia, D.E. 573, p. 319.  "Sanctuary cities" are cities that have refused to fund law enforcement efforts to look for immigration law violators, leaving that to the federal government.  S.J. of Tex., 82nd Leg., R.S. 8 (2011) (designating the elimination of sanctuary cities as a legislative emergency).

[150]  Hernandez-Luna, D.E. 573, pp. 369-70; Martinez-Fischer, D.E. 561, p. 120.

[151]  Martinez-Fischer, D.E. 561, pp. 97-98.

[152]  Burton, D.E. 582, p. 36 (testimony) (relating SB 14 as equivalent to the poll tax, in part, because "both come at times when the party in power in politics in Texas perceives the threat of African Americans, in particular, and minority voter increased voter ability to participate in the electoral process"); see also Lichtman, D.E. 374, p. 9 (report) ("Demographic changes help explain why the Republican-dominated state legislature and the Republican governor enacted the specific provisions of the photo identification law that discriminate against African-American and Latinos").

But Representative Hernandez-Luna testified convincingly that illegal immigrants are not likely to try to vote.  "They are living in the shadows.  They don't want any contact with the government for fear of being deported because that—I mean, my family was afraid to even go grocery shopping much less attempt to illegally vote."[153]  Instead, the issue of non-citizen voting appears related to citizens who have confused the voter registration records because, when they are summoned for jury duty, they deny their citizenship in order to be exempt from service.  So that "non-citizen" report filters into voter records despite the fact that it is false.[154]

Representative Todd Smith admitted that he had no facts to support his concerns about non-citizen voting, but was reacting to allegations.[155]  Furthermore, non-citizens (legal permanent residents and visa holders) can legally obtain a valid Texas driver's license and a concealed handgun license,[156] making the use of those IDs to prevent non-citizen voting rather illusory.  Only one instance of a non-citizen voter was revealed at trial.  In that case, a Norwegian citizen, who had truthfully filled out his form to reflect that he was not a citizen, was mailed a voter registration card anyway.[157]  So he thought he had the right to vote.  Clearly, he was not trying to improperly influence an election.[158]

---

[153]  Hernandez-Luna, D.E. 573, p. 373; *see also* Anchia, D.E. 573, pp. 319, 322-25.

[154]  Anchia, D.E. 573, pp. 323-24.

[155]  Smith, D.E. 578, pp. 333-34.

[156]  *See* TEX. TRANSP. CODE § 522.021; TEX. GOV'T CODE ANN. § 411.172; Anchia, D.E. 573, p. 325; McGeehan, D.E. 578, p. 264.

[157]  Anchia, D.E. 573, pp. 322-23.

[158]  *Id.* at 323.

Representatives Anchia, Hernandez-Luna, and Martinez-Fischer and Senator Uresti indicated that the repeated references to illegal-aliens and non-citizens voting generated anti-Hispanic feelings.[159]   Representative Hernandez-Luna even testified that lawmakers were equating Hispanic immigration with risks of leprosy in a very tense atmosphere.[160]   Senator Davis added that there was unfounded concern about non-citizen students.[161]

### b.  Increasing Public Confidence and Voter Turnout

Proponents of the voter ID law argued that such laws fostered public confidence in election integrity and increased voter turnout.   However, there was no credible evidence to support (a) that voter turnout was low because of any lack of confidence in the elections, (b) that a photo ID law would increase confidence, or (c) that increased confidence would translate to increased turnout.[162]   Senators Fraser and Dan Patrick were unaware of anyone not voting out of concern for voter fraud.[163]   Ann McGeehan, who was the Director of the Elections Division at SOS, said the same.[164]   She further admitted that implementing the provisional ballot process might even cause voters to lose confidence.[165]

---

[159]   *Id.* at 329; Hernandez-Luna, D.E. 573, p. 377; Martinez-Fischer, D.E. 561, p.104; Uresti, D.E. 569, p. 232.

[160]   Hernandez-Luna, D.E. 573, pp. 369-70.

[161]   Davis, D.E. 573, pp. 8-9.

[162]   *See* Dewhurst, D.E. 588, p. 15.

[163]   Fraser, D.E. 588, p. 419; Patrick, D.E. 588, p. 304.

[164]   McGeehan, D.E. 578, p. 279.

[165]   *Id.* at 280.

The public confidence argument was, for the most part, premised on the United States Supreme Court's approval of the Indiana photo ID law and implementation of similar laws in other states, along with the increase in voter turnout in the 2008 general election.  Representative Anchia noted that the 2008 increase in voter turnout was nationwide (not just in photo ID law states) and was in response to Barack Obama's presidential campaign rather than any photo ID law.[166]  Defendants' expert, Dr. M. V. (Trey) Hood, testified that he linked the 2008 increased voter turnout to the unprecedented Obama campaign.[167]  His study of the voter turnout in Georgia in the 2012 election reflected an across-the-board suppression of turnout, which he concluded was caused by implementation of that state's photo ID law.[168]  He did not do a study of Texas for this case.[169]

Dr. Burden testified that SB 14 would decrease voter turnout because it increases the cost associated with voting.  Because the poor are more sensitive to cost issues,[170] he concluded that SB 14's terms raising the cost of voting would almost certainly decrease voter turnout, particularly among minorities.[171]  Dr. Hood admitted that it was a firmly established political science principle that increased costs of voting are related to

---

[166]   Anchia, D.E. 573, pp. 320-21.  Likewise, increased voter turnout in the elections in Ed Couch, Texas, had more to do with the fact that all six councilmembers were up for election than that any voter had increased confidence. Guzman, D.E. 569, p. 381.

[167]   Hood, D. E. 588, pp. 154-56.

[168]   *Id*. at 121-22, 144.

[169]   *Id*. at 131; Patrick, D.E. 588, pp. 245-47.

[170]   Burden, D.E. 569, pp. 298-99.

[171]   *Id*. at 295, 298-99, 315, 323, 332.

decreased turnout, which could be expected with respect to the cost of obtaining an EIC unless some other factor outweighed it for the voters.[172]

Defendants presented evidence that public opinion polls showed that voters overwhelmingly approved of a photo ID requirement.[173]  Polls showed approval ratings as high as 86% for Anglos, 83% for Hispanics, and 82% for African-Americans in 2010.[174]  In similar polls conducted in 2011 and 2012, those numbers dropped, but were still over 50%.[175]  As Senators Davis and Ellis and Representative Anchia pointed out, Defendants have not shown that those voters were informed of (1) the low rate of in-person voter impersonation fraud, (2) the limited universe of documents that were considered to be qualified photo ID under SB 14, or (3) the plight of many qualified and registered Texas voters who did not have and could not get such ID without overcoming substantial burdens.[176]  So while the Court is aware that legislators should be responsive to their constituents, the particular polls were not formulated to obtain informed opinions from constituents and, more importantly, polls cannot justify actions by the legislature which have the effect of infringing the right to vote in violation of the United States Constitution or the VRA.

Defense counsel's questioning noted that there have been few voter complaints since SB 14 was implemented in November 2013, indicating, they argue, that the

---

[172]  Hood, D.E. 588, pp. 125-29 (testimony).

[173]  *E.g.*, Dewhurst, D.E. 588, pp. 32, 76-79; Patrick, D.E. 588, pp. 245-46.

[174]  Pls.' Ex. 214.

[175]  Pls.' Exs. 251, 252.

[176]  Davis, D.E. 573, pp. 39-40; Ellis, D.E. 573, pp. 188-89; Anchia, D.E. 573, pp. 360-61; Patrick, D.E. 588, p. 251.

electorate is not unhappy with SB 14 as implemented.[177]   However, the demographics of those likely to be burdened by SB 14—the poor, minorities, disabled, and elderly—are persons unlikely to have the wherewithal to register a complaint in any officially meaningful way.   The evidence does not support the proponents' assertions that SB 14 was intended to increase public confidence or increase voter turnout.   While those justifications are appropriate concerns of a state, the Court finds that the justifications do not line up with the content of SB 14.

### c.  Racial Discrimination

Senators Davis, Ellis, and Uresti and Representatives Anchia and Veasey testified that SB 14 had nothing to do with voter fraud, but instead had to do with racial discrimination.[178]   The legislature had been working on the voter ID issue for six years and Representative Martinez-Fischer had done quite a bit of fact-checking and had found that there was no substance to the claims of in-person voter impersonation fraud, non-citizen voting, or improving election integrity related to the terms of the photo ID bills.[179]   Representative Anchia had served on a number of voter ID-related committees and was Chair of the Subcommittee to Study Mail-In Ballot Fraud and Incidence of Noncitizen

---

[177]   *See generally* Ellis, D.E. 573, p. 191; Williams, D.E. 592, p. 100; Guidry, D.E. 592, pp. 151-53, 156-60; Patrick, D.E. 588, pp. 253-54.

[178]   Davis, D.E. 573, pp. 8, 31; Ellis, D.E. 573, p. 187; Uresti, D.E. 569, p. 223; Anchia, D.E. 573, pp. 354-55; Veasey, D.E. 561, pp. 254-55.

[179]   Martinez-Fischer, D.E. 561, pp. 103-04.

Voting.  He testified that they had done quite a bit of work in interim sessions and issued a report in 2008 showing that the incidence of non-citizen voting was very low.[180]

Other issues were also investigated in committee hearings, with testimony from state agencies, state officials, advocacy groups, and the Attorney General's office.  It was clear that in-person voter impersonations were almost non-existent.[181]  It was also clear that a photo ID law would hurt minorities.

> In our subcommittee, gosh, we went down to Brownsville and we took testimony on the very issue that you heard from Mr. Lara earlier, which was people -- a lot of people, especially in rural areas or along the border who were birthed by midwives or were born on farms, didn't have the requisite birth certificates and were in limbo. We took a ton of testimony at UT Brownsville on that, and that was an issue of concern.[182]

Contrasting the legislature's willingness to barrel-through a voter ID law despite the lack of need and countervailing evidence, Representative Anchia noted that critically important issues such as the $27 billion budget shortfall and transportation funding did not get a select committee or an exemption from the two-thirds rule.[183]  He stated, "I have not seen a bill other than this one get that kind of procedural runway."[184]

Senator Uresti complained that he had made it clear that SB 14 would hurt minorities and the legislators knew that when they passed it.[185]  He testified that he knew

---

[180]   Anchia, D.E. 573, pp. 320-21, 323-24.

[181]   *Id*. at 321-22.

[182]   *Id*. at 329-30.

[183]   *Id*. at 362.

[184]   *Id*. at 362.

[185]   Uresti, D.E. 569, p. 223.

his district's racial and ethnic makeup (many of his constituents live in colonias), and he knew the impact that SB 14 would—and was intended to—have on those voters. From the terms of the law and the way it was passed, he firmly believes that it had a discriminatory purpose.[186]

Representative Smith expected that SB 14 might cause up to 700,000 voters to be without necessary ID.[187] After acknowledging that those affected voters would most likely be poor, he stated,

> You know, to me, again, if the question is are the people that do not have photo IDs more likely to be minority than those that are not, I think it's a matter of common sense that they would be. I don't need a study to tell me that.[188]

Bryan Hebert, Deputy General Counsel in the Office of the Lieutenant Governor, also assumed that the poor, who would be most affected by the law, would be minorities.[189] Senator Ellis testified that all of the legislators knew that SB 14, through its intentional choices of which IDs to allow, was going to affect minorities the most.[190] Despite the evidence against SB 14 being a necessary or appropriate change in the law, Representative Smith said, "I think every Republican member of the legislature would have been lynched if the bill had not passed."[191] It is clear that the legislature knew that

---

[186]  *Id.* at 223.

[187]  Smith, D.E. 578, pp. 327-28.  Lt. Gov. Dewhurst testified that he estimated 3-7% of registered voters did not have a Texas DPS-issued ID and believed the number could be as high as 844,000 based on what he had learned from the unpublished SOS no-match exercise.  *See* Dewhurst, D.E. 588, pp. 70-73.

[188]  Smith, D.E. 578, p. 346.

[189]  Hebert, D.E. 592, pp. 195-98.

[190]  Ellis, D.E. 573, pp. 178-79.

[191]  Smith, D.E. 578, pp. 339-40; Patrick, D.E. 588, pp. 305-07; Pls.' Ex. 330.

minorities would be most affected by the voter ID law.  However, the political lives of some legislators depended upon SB 14's success.[192]

The fact that past discrimination has become present in SB 14 is apparent from both the obvious nature of the impact and the manner in which the legislature chose options that would make it harder for African-Americans and Hispanics to meet its requirements.   This was demonstrated by the analysis of Dr. Alan Lichtman, Distinguished Professor of History at American University, who is an expert in quantitative and qualitative historical analysis of voting, political, and statistical data. His report documents "intentional discrimination against minorities to achieve a partisan political advantage."[193]  Dr. Davidson and Mr. Korbel echo Dr. Lichtman's opinions.

Dr. Lichtman analyzed the extraordinary procedural history of SB 14, described above.  He noted that since 1981, the Senate has only made an exception to its two-thirds rule for two categories of legislation:   redistricting and voter ID bills.[194]   The Texas Legislature accepted amendments that would broaden Anglo voting and rejected amendments that would broaden minority voting.  For instance, the provision allowing the use of concealed handgun permits favors Anglos because they are disproportionately represented among those permit holders.[195]   Likewise, Anglos are a disproportionate share of Texas's military veterans of voting-age population relative to African-Americans

---

[192]   *See* Pls.' Exs. 707, 734, 736, 746, 749.

[193]   Lichtman, D.E. 374, p. 5 (report).

[194]   Davidson, D.E. 481-1, p. 29 (report).

[195]   Lichtman, D.E. 374, pp. 24-25 (report).

and Hispanics.[196]   Anglos are also disproportionately represented among those using mail-in ballots, which were left untouched by SB 14.[197]   When the legislature rejected student IDs, state government employee IDs, and federal IDs, they rejected IDs that are disproportionately held by African-Americans and Hispanics.[198]

Dr. Lichtman also pointed out that SB 14's sponsors' justifications for the bill were disingenuous.  They claimed to have modeled SB 14 after Indiana and Georgia laws but had substantially departed from those laws.[199]   Bryan Hebert, with the Lieutenant Governor's office, expressly warned them that SB 14 would likely fail any preclearance standard without the additional methods of proving identity found in Georgia's law.[200] The legislature also knew that a disproportionate number of African-Americans and Hispanics had their driver's licenses suspended under various law enforcement programs that involved payment of surcharges before the license-holder could regain the license.[201] Those minority drivers, disproportionately poor, would have a more difficult time getting their licenses reinstated, and the legislature rejected measures to warn people that tendering their license in a suspension action might leave them without ID necessary to vote.[202]

---

[196]   Pls.' Ex. 454, p. 7.

[197]   Lichtman, D.E. 374, pp. 53-54 (report)

[198]   *Id.* at 24-29.

[199]   *Id.* at 38-41.

[200]   *Id.* at 42-44; Pls.' Exs. 205, 272; Hebert, D.E. 592, pp. 189-91, 203-05; Hebert Dep. June 20, 2014, pp. 88-93, 261-62; Davidson, D.E. 481-1, pp. 20, 30 (report).

[201]   Lichtman, D.E. 374, pp. 33-35 (report) ("The DPS has also released the ten zip codes with the largest number of surcharges.  [T]hese zip codes are overwhelmingly Latino and African-American in their voting age population.").

[202]   *Id.* at 46-47.

Dr. Lichtman opined that in passing SB14, the legislature passed a measure that minimized minority voting while doing little to address the stated purposes of fighting in-person voter impersonation fraud and non-citizen voting.[203]   Consequently, the record as a whole (including the relative scarcity of incidences of in-person voter impersonation fraud, the fact that SB 14 addresses no other type of voter fraud, the anti-immigration and anti-Hispanic sentiment permeating the 2011 legislative session,[204] and the legislators' knowledge that SB 14 would clearly impact minorities disproportionately and likely disenfranchise them) shows that SB 14 was racially motivated.

## B. The Result

### 1. Expert Analysis Demonstrates the Magnitude of the Harm

#### a. The No-Match List and the Number and Race of Burdened Registered Voters.

Several experts were tasked with determining the number of registered voters who might lack SB 14 ID, along with their demographic characteristics.[205]   Based on the testimony and numerous statistical analyses provided at trial, this Court finds that approximately 608,470 registered voters in Texas, representing approximately 4.5% of all registered voters, lack qualified SB 14 ID and of these, 534,512 voters do not qualify for

---

[203]   *Id*. at 67-71.

[204]   Reps. Martinez-Fischer and Hernandez-Luna testified that the 2011 session was highly racially-charged, and anti-Hispanic, with consideration of the abolition of sanctuary cities, an English-only bill, and the rollback of the Affordable Health Care Act.  Martinez-Fischer, D.E. 561, p. 98; Hernandez-Luna, D.E. 573, pp. 369-70; *see also* Davidson, D.E. 481-1, pp. 37-38 (report).

[205]   Dr. Stephen Ansolabehere and Dr. Yair Ghitza on behalf of the United States; Dr. Michael C. Herron, Dr. Matthew A. Barreto, and Dr. Gabriel R. Sanchez on behalf of the Veasey Plaintiffs; Dr. Coleman Bazelon on behalf of the Texas League of Young Voters Education Fund.

a disability exemption.  Moreover, a disproportionate number of African-Americans and Hispanics populate that group of potentially disenfranchised voters.

Dr. Stephen Ansolabehere, professor of Government at Harvard University, performed an extensive match of various databases to arrive at the figures set out above, which is referred to as the "No-Match List."  First, he determined which of the 13.5 million voters in Texas's voter registration database, the Texas Election Administration Management System (TEAM), lacked SB 14 ID.  He did this by comparing individual TEAM voter records with databases containing the records of those who possessed SB 14 ID—current DPS-issued Texas driver's licenses, Texas personal ID cards, EICs, Texas concealed handgun licenses, United States passports, citizenship certificates, and military photo IDs—to arrive at a list of voter records that did not match with any SB 14 qualified photo ID.[206]

Dr. Ansolabehere "scrubbed" the list by removing entries that appeared to be duplicates and those appearing in other databases that identified persons who were deceased and who had relocated (potentially out of state).  He also removed voters identified as inactive,[207] and those who were eligible for SB 14's disability exemption to further ensure that he was counting only those who had no alternative for voting other

---

[206] This database comparison was performed using a matching protocol by which database fields were standardized, identifiers such as DPS and Social Security numbers were constructed, and the data went through multiple algorithmic "sweeps" to find matches.  Ansolabehere, D.E. 600-1, pp. 8-9, 14, 16-31 (report).  There was no disagreement among the experts as to the propriety of these methods for performing the statistical analysis.  *See generally* Herron, D.E. 563, pp. 14-24 (testimony); Hood, D.E. 588, pp. 175-76 (testimony).

[207] An inactive, or "suspense," voter is one whose registration renewal notice was returned by mail to the county registrar as undeliverable, failed to respond to a confirmation notice, or was excused or disqualified from jury service because he was not a resident of the underlying county.  TEX. ELEC. CODE § 15.081; Ingram, D.E. 588, p. 311-12; Ansolabehere, D.E. 600-1, p. 48 (report).

than with a qualified SB 14 ID.  All of these matches were performed with algorithms designed to address different name spellings and the use of nicknames or other variations in the way individuals are identified or would be input into a database.  He concluded that approximately 608,470 voters in the TEAM database lack qualified SB 14 ID.[208]

Plaintiffs also offered the testimony of Dr. Michael Herron, Professor of Government at Dartmouth College, who is an expert in database analysis and statistical methods and who also performed a series of database matches.  Dr. Herron described his methodology in much the same terms as did Dr. Ansolabehere.  Both experts had to write codes so that the fields of the respective databases were compared correctly, even though the databases were formatted differently.  The match was programmed so that entries like "last name," "social security number," and "Texas driver's license number" were each compared to the corresponding field across databases.  Dr. Herron's results were highly consistent with Dr. Ansolabehere's results, confirming that the coding and algorithms used in the matching methodology were consistent with the demands of the scientific field.[209]

Defendants challenged Dr. Ansolabehere's findings by arguing that he failed to remove felons and voters who subsequently re-registered in another state.  There was evidence that the SOS purges the TEAM database on a daily basis for felons, and Dr. Ansolabehere testified that recent data from both the Pew Research Center and various secretaries of state established that the number of voters who may have re-registered in

---

[208]   Ansolabehere, D.E. 600-1, p. 2 (report).

[209]   Herron, D.E. 473, pp. 10-27 (report).

another state is extremely small—less than one percent.[210]    Additionally, Dr. Ansolabehere removed the records of voters who filed a change of address form with the post office.[211]

Defendants' expert, Dr. Hood, who did not perform a match himself, criticized the Plaintiffs' No-Match List because, according to his analysis, 21,731 of the individuals on the No-Match List voted in the elections held in the Spring of 2014, several weeks or months after the data exchange offered by the parties for analysis.  However, some of these votes were cast by mail, which does not require a qualified SB 14 ID, and some of these individuals may have obtained SB 14 ID in the interim.

### b. The Demographic Characteristics of the No-Match List Demonstrate the Impact on Minorities.

Texas does not maintain racial or ethnic data in its voter registration list and while DPS forms requested this information, the form did not offer applicants the choice of "Hispanic" until May of 2010.[212]    This rendered all self-reported ethnicity data "anomalous and highly misleading."[213]    To compensate for the state's failure to collect reliable data on this issue, Dr. Ansolabehere relied on four complementary and widely

---

[210]   Ansolabehere, D.E. 561, p. 204 (testimony).

[211]   *Id*. at 181; *see also* Ghitza, D.E. 360-1, pp. 6-7 (report).

[212]   Crawford, D.E. 592, pp. 38-39.

[213]    "[T]he number of Hispanic ID-holders in Texas is exponentially higher than DPS's raw data indicates."  Pls.' Ex. 942 (letter from Keith Ingram, Texas Director of the Elections Division at the Secretary of State's Office, to the Department of Justice).

accepted methodologies used in the social sciences for geocoding[214] the No-Match List and determining its racial makeup.

Dr. Ansolabehere (1) conducted an ecological regression analysis, (2) performed a homogenous block group analysis, (3) compared data to a Spanish Surname Voter Registration list (SSVR),[215] and (4) consulted Catalist LLC, an election data utility company.  All four methods yielded equivalent results.

Dr. Ansolabehere's first method, an ecological regression analysis, measured the correlation between his No-Match List and race.  Using this method, which is often used in political science studies, Dr. Ansolabehere compared individuals in his No-Match List with the racial composition of Census areas.[216]  Dr. Ansolabehere concluded that Hispanic registered voters are 195% and African-American registered voters are 305% more likely than Anglo voters to lack SB 14 ID.  Such racial disparities are statistically significant and "highly unlikely to have arisen by chance."[217]

Dr. Ansolabehere's homogenous block group analysis corroborated his initial finding as to racial disparities.  According to this method, Dr. Ansolabehere assigned each of his No-Match voter records to its corresponding 2010 Census block group.  Relying only on those block groups reported to be homogenous, he inferred the racial

---

[214]   The experts agreed that there is no discretion involved in geocoding this data.  Ansolabehere, D.E. 561, p. 226 (testimony); Ghitza, D.E. 563, pp. 150-51 (testimony).

[215]   The SSVR was developed based upon U.S. Census Bureau data in 2000.  Dr. Ansolabehere testified that the Texas Legislative Council uses the Spanish Surnames list in conducting analyses (D.E. 561, p. 135), as does the SOS.  McGeehan, D.E. 578, p. 259; Dewhurst, D.E. 588, pp. 64-65.  It is considered a reliable way to estimate data related to Latinos.

[216]   *See* Ansolabehere, D.E. 600-1, p. 38 (report).

[217]   *Id.* at 40.

composition of those voters.  Dr. Ansolabehere concluded that Hispanic registered voters are 177% and African-American voters are 271% more likely than Anglo voters to lack SB 14 ID.  These racial disparities are statistically significant.

Assigning his data the ethnicity information used in the SSVR, Dr. Ansolabehere found that 5.8% of all SSVR voters lacked qualified SB 14 ID compared to 4.1% of non-SSVR registered voters—a pool including Anglos, African-Americans and all other races.[218]  This 1.7% difference is statistically significant."[219]

Last, Dr. Ansolabehere compared his No-Match List to race estimates maintained by Catalist LLC.  Catalist is a private company that maintains demographic information based on a statistical model provided by its vendor, CPM Technologies.[220]  The data assigns demographic characteristics to individuals referencing the person's name in combination with their location.[221]  Catalist data on ethnicity estimates are widely used in academic research and are considered highly reliable.[222]  According to Dr. Yahir Ghitza, Catalist's Chief Scientist,  "[f]or records with the highest race confidence scores, Catalist has found that CPM Technologies' predictions match the voter's self-reported race with 90% accuracy or greater in most cases."[223]  Relying on this data, Dr. Ansolabehere

---

[218]  *Id*. at 105.

[219]  *Id*. at 54.

[220]  Ghitza, D.E. 563, pp. 154-55 (testimony); Ghitza, D.E. 360-1, pp. 4-5 (report).

[221]  Ghitza, D.E. 360-1, p. 4 (report).

[222]  Ansolabehere, D.E. 561, p. 227 (testimony); Ansolabehere, D.E. 600-1, p. 23 (report).

[223]  Ghitza, D.E. 360-1, p. 5 (report).

concluded that Hispanic registered voters are 58% more likely and African-American registered voters are 108% more likely than Anglo voters to lack qualified SB 14 ID.[224]

Defendants challenged Dr. Ansolabehere's findings by pointing out that the Catalist analysis misclassified the race of six Plaintiffs, suggesting that the overall results were thus biased in favor of Plaintiffs.  As Dr. Ansolabehere explained, the effect of misclassifications in this analysis is counter-intuitive.  Both Dr. Ansolabehere and Dr. Ghitza testified that misclassification of individuals on the No-Match List would actually bias in favor of Defendants.  "It's well known in statistics that if you have measurement error in a classification variable such as race it will bias toward finding no effect, bias toward finding nothing, no difference across groups."[225]  Defendants did not challenge that statistical concept.

Dr. Herron also conducted various statistical analyses to determine the racial composition of registered voters lacking SB 14 ID.  He based his analyses on two algorithms, one provided by the Plaintiffs and the other by the Defendants. Notwithstanding the different methods, his results were effectively the same as those of Dr. Ansolabehere[226]—the possession rate of qualified SB 14 ID among Anglo registered voters is higher than that of African-American and Hispanic voters.  Dr. Herron also conducted his own ecological regression analysis and homogenous block group analysis on Dr. Ansolabehere's No-Match List and his findings were essentially the same as those

---

[224]   Ansolabehere, D.E. 600-1, p. 41 (report).

[225]   *Id.* at 153-54; *see also* Ghitza, D.E. 563, pp. 163-65 (testimony).

[226]   Herron, D.E. 563, p. 66 (testimony).

of Dr. Ansolabehere.[227]   A third expert, Dr. Coleman Bazelon,[228] also testified that the conclusions resulting from his own homogenous block group analysis were "highly consistent" with those of Dr. Ansolabehere.[229]

Added to this array of experts, methodologies, and consistent results are the field survey findings of Drs. Matthew Barreto and Gabriel Sanchez.  Dr. Barreto, a Professor of Political Science at the University of Washington, and Dr. Sanchez, an Associate Professor of Political Science at the University of New Mexico, are experts in survey research, particularly in the field of racial and ethnic politics.[230]  They conducted a four-week survey of over 2,300 eligible voters in Texas,[231] and concluded that African-American eligible voters are 1.78 times more likely to lack qualified SB 14 ID than Anglo eligible voters.[232]   The observed racial disparity was magnified with Hispanic eligible voters as they are 2.42 times more likely to lack qualified SB 14 ID compared to Anglo eligible voters.[233]  In addition, Drs. Barreto and Sanchez observed an even greater

---

[227]   *Id.* at 69.

[228]      Dr. Coleman Bazelon is a principal in the Washington, D.C. office of The Brattle Group, an economic consulting firm and received a Ph.D. and M.S. in Agricultural and Resource Economics from the University of California, Berkeley, a Diploma in Economics from the London School of Economics and Political Science, and a B.A. from Wesleyan University.  Bazelon, D.E. 614-1, p. 4 (report).

[229]    Bazelon, D.E. 582, p. 96 (testimony).

[230]    Barreto-Sanchez, D.E. 370, pp. 2-3 (report) (Dr. Barreto received a Ph.D. in Political Science, with an emphasis on racial and ethnic politics in the U.S., political behavior, and public opinion, at the University of California, Irvine. Dr. Sanchez received a Ph.D. in Political Science, with the same emphasis, at the University of Arizona.)

[231]    They reported a response rate of 26.3%.  Barreto, D.E. 569, pp. 47-49 (testimony).  According to Drs. Barreto and Sanchez, the field survey's response rate is well within the acceptable range of 20 to 30%, making it scientifically valid.  Barreto-Sanchez, D.E. 370, p. 16 (report).

[232]    Barreto-Sanchez, D.E. 370, p. 18 (report).

[233]    *Id.*

impact when analyzing the smaller universe of Hispanic and African-American eligible voters who were also registered to vote.[234]

Dr. Hood's evaluation of Drs. Barreto and Sanchez's field survey contained several significant methodological oversights.  For example, Dr. Hood failed to properly classify certain responses, resulting in a miscount,[235] and did not properly weight his reconstruction of Drs. Barreto and Sanchez's survey data to account for disparities within the African-American and Hispanic populations as to income, education, gender, and age—a necessary step to ensure the survey's accurate reflection of the population as a whole.[236]  On cross-examination, Plaintiffs pointed out a multitude of errors, omissions, and inconsistencies in Dr. Hood's methodology, report, and rebuttal testimony, which Dr. Hood failed to adequately respond to or explain.[237]  The Court thus finds Dr. Hood's testimony and analysis unconvincing and gives it little weight.[238]  Even with its flaws, Dr. Hood's result still confirmed Plaintiffs' experts' conclusions regarding a statistically significant disparity in the lack of qualified SB 14 ID among African-American and Hispanic registered voters as well as eligible voters relative to the Anglo population.[239]

---

[234]  *Id.* at 19.

[235]  Hood, D.E. 588, pp. 217-22 (testimony).

[236]  *Id.* at 222-36.

[237]  *See id.* at 121-244 (testimony).

[238]  *Frank v. Walker*, 11-CV-01128, 2014 WL 1775432, at *35, *38 (E.D. Wis. Apr. 29), *rev'd*, No. 14-2058, 2014 WL 496657 (7th Cir. Oct. 6, 2014); *Florida v. United States*, 885 F. Supp. 2d 299, 324-30, 365-68 (D.D.C. 2012); *Common Cause/Georgia v. Billups*, 4:05-CV-0201-HLM, 2007 WL 7600409, at *14 (N.D. Ga. Sept. 6, 2007).

[239]  Dr. Hood's reconstructed survey results conclude that 4.0% of Anglo voting eligible population lack qualified SB 14 ID compared to 5.3% of African-Americans and 6.9% of Hispanics.  Similarly, his reconstructed results indicate that 2.5% of registered Anglo voters lack qualified SB 14 ID while 4.2% of African-American and 5.1% of Hispanic registered voters lack such ID.  Hood, D.E. 450, p. 30 (report) (Dr. Hood did not update this analysis in his amended report).

Accordingly, the Court credits the testimony and analyses of Dr. Ansolabehere, Dr. Herron, and Dr. Barreto, all of whom are impressively credentialed and who explained their data, methodologies, and other facts upon which they relied in clear terms according to generally accepted and reliable scientific methods for their respective fields. The Court finds that approximately 608,470 registered voters in Texas lack proper SB 14 ID. The Court also finds that SB 14 disproportionately impacts both African-Americans and Hispanics in Texas.

### c.  The No-Match Numbers Matter

When 4.5% of voters are potentially disenfranchised, election outcomes can easily change. According to Councilman Daniel Guzman, in 2013, four out of six councilmembers up for election in the small town of Ed Couch, Texas, won by a margin of 50 votes or less.[240] As will be explained later, Councilman Guzman took many individuals who were not allowed to vote to the local DPS office and they were unable to get SB 14 ID.[241] The Court finds that the number of voters potentially disenfranchised by SB 14 is significant in comparison to the number of registered voters in Texas.

### d.  The Discriminatory Effect

Evidence shows that a discriminatory effect exists because: (1) SB 14 specifically burdens Texans living in poverty, who are less likely to possess qualified photo ID, are less able to get it, and may not otherwise need it; (2) a disproportionate number of Texans

---

[240]  Guzman, D.E. 569, p. 375.

[241]  *Id*. at. 368, 372-73.

living in poverty are African-Americans and Hispanics; and (3) African-Americans and Hispanics are more likely than Anglos to be living in poverty because they continue to bear the socioeconomic effects caused by decades of racial discrimination.

**SB 14 Disproportionately Burdens the Poor**.   The draconian voting requirements imposed by SB 14 will disproportionately impact low-income Texans because they are less likely to own or need one of the seven qualified IDs to navigate their lives.  A legacy of disadvantage translates to a substantial burden when these people are confronted with the time, expense, and logistics of obtaining a photo ID that they did not otherwise need.  Drs. Barreto and Sanchez's field survey found that 21.4% of eligible voters who earn less than $20,000 per year lack a qualified SB 14 ID.  That number compares to just 2.6% of eligible voters who earn between $100,000 and $150,000 per year.[242]  In other words, lower income Texans are over eight times more likely to lack proper SB 14 ID.

In addition, Drs. Barreto and Sanchez also found that lower income respondents were the most likely to lack underlying documents to get an EIC—a finding that is echoed by various other trial experts and witnesses.  Also, 22.5% of those earning less than $20,000 annually believed that they had a qualified SB 14 ID when, in fact, they did not—making it more likely that poll workers will be forced to turn away more low-income voters than others on election day.[243]

---

[242]   Barreto-Sanchez, D.E. 370, p. 24 (report).

[243]   *Id*.

Dr. Jane Henrici, an anthropologist and professorial lecturer at George Washington University, testified at trial and offered an expert report to contextualize why lower income Texans are less likely to have a qualified SB 14 ID.  First, Dr. Henrici found that lower income Texans have difficulties obtaining, keeping, replacing, and renewing government-issued documentation.  Dr. Henrici explained:

> [U]nreliable and irregular wage work and other income . . . affect the cost of taking the time to locate and bring the requisite papers and identity cards, travel to a processing site, wait through the assessment, and get photo identifications. This is because most job opportunities do not include paid sick or other paid leave; taking off from work means lost income. Employed low-income Texans not already in possession of such documents will struggle to afford income loss from the unpaid time needed to get photo identification.[244]

Second, the lack of reliable income leaves many lower income Texans without access to credit and other formal financial services.[245]  This, in turn, allows poor Texans to go without the types of photo ID that SB 14 requires.[246]  Dr. Henrici testified that they may not have bank accounts and their checks are likely cashed by their local grocer who knows them personally.[247]  Last, Dr. Henrici concluded that many lower income Texans do not own vehicles or own vehicles that are unreliable, which illustrates why low-

---

[244] Henrici, D.E. 369-1, p. 17 (report).

[245] *Id.*

[246] *Id.*

[247] Henrici, D.E. 569, p. 188 (testimony).

income Texans may not have an incentive to renew their driver's license—an adequate SB 14 ID.[248]

The poor also feel the burden most acutely.  The concept is simple—a $20.00 bill is worth much more to a person struggling to make ends meet than to a person living in wealth.  Economists call this concept the diminishing marginal utility of wealth.[249]  Mrs. Bates, an African-American retiree living on a $321.00 monthly income, described it well.  She testified that it took a while to save the $42.00 she needed to pay for her Mississippi birth certificate because "when you're getting a certain amount of money, you're going to put the money where you feel the need is most urgent at the time . . . I had to put the $42.00 where it was doing the most good.  It was feeding my family, because we couldn't eat the birth certificate . . . [a]nd we couldn't pay rent with the birth certificate, so, [I] just wrote it off."[250]  Mrs. Bates's dire circumstances illustrate how SB 14 effectively makes some poor Texans choose between purchasing their franchise or supporting their family.

Thus, based on Drs. Barreto, Sanchez, and Henrici's findings, which confirm the demographic findings of the No-Match List, this Court finds that SB 14 will disproportionately impact lower income Texans because they are less likely to own and need proper SB 14 ID, because they are less likely to have the means to get that ID, and

---

[248]   Henrici, D.E. 369-1, pp. 18-19 (report).

[249]   Bazelon, D.E. 614-1, p. 11 (report).

[250]   Bates, Pls.' Ex. 1090, pp. 14 –17.

because the choice of how they spend their resources lacks the voluntary quality of most choices.

**The Poor Are Disproportionately Minorities**.  As already discussed, and as confirmed by multiple methods, the persons on the No-Match List are disproportionately African-American or Hispanic.  Members of those minority groups are significantly more likely to lack qualified photo ID, live in poverty (lacking the resources to get that ID), live without vehicles for their own transportation to get to ID-issuing offices, and live substantial distances from ID-issuing offices.

**Minorities Live in Poverty Because of Discrimination**.  African-Americans and Hispanics are substantially more likely than Anglos to live in poverty throughout Texas because they continue to bear the socioeconomic effects caused by decades of discrimination.  As Dr. Burton stated in his expert report:

> Since the State's admission to the Union, Texas, as well as its political subdivisions, have engaged in racial discrimination against its African-American and Latino citizens in all areas of public life . . . [t]he foreseeable result of such past and present discrimination is the substantial inequalities that exist between minority and Anglo voters in the state.[251]

Discrimination against Texas's African-Americans and Hispanics can be found in the fields of employment and income.  The latest U.S. Census figures show that 29% of African-Americans and 33% of Hispanics in Texas live in poverty—in other words,

---

[251]   Burton, D.E. 376-2, pp. 24-35 (report); *see also* Burden, D.E. 391-1, pp. 14-16 (report).

nearly one in every three.  On the other hand, at 12%, just one in every ten Anglos in Texas lives in poverty.[252]

Similarly, the unemployment rate for Anglos is 6.1% compared to 8.5% for Hispanics and 12.8% for African-Americans.[253]  And the median household incomes for Anglos is $63,393, while it is $38,848 for Hispanics and $37,906 for African-Americans.[254]  According to Dr. Burton, these economic disparities continue to this day because employment discrimination persists in Texas.  For instance, within the last twelve years, the Texas Department of Health, the Texas Department of Family and Protective Services, the City of El Paso, and the City of Houston have all entered into consent decrees or settlement agreements to redress claims of racial discrimination in employment.[255]

African-Americans and Hispanics also face the adverse effects caused by discrimination in educational institutions.  The 1875 Texas constitution required that "[s]eparate schools shall be provided for the white and colored children . . . ."[256]  Even after the Supreme Court's landmark 1954 decision in *Brown v. Board of Education*,[257] Texas resisted integration that extended well through the following three decades.[258]

---

[252]    Burden, D.E. 391-1, p. 14 (report) (citing *Poverty Rate by Race/Ethnicity*, THE HENRY J. KAISER FAMILY FOUNDATION, http://kff.org/other/stateindicator/poverty-rate-by-raceethnicity/ (last visited June 3, 2014)).

[253]    Burden, D.E. 391-1, p. 15 (report).

[254]    *Id*. at 14-15.

[255]    Burton, D.E. 376-2, pp. 26-27 (report).

[256]    *Id*. at 24.

[257]    347 U.S. 483 (1954).

[258]    Burton, D.E. 376-2, pp. 23-24 (report).

Educational achievement gaps between Anglo and both African-American and Latino students continue to plague Texas.  According to the U.S. Department of Education, 91.7% of Anglo 25-year-olds in Texas graduated from high school, while 85.4% of African-Americans and 58.6% of Latinos earned a diploma.[259]  Likewise, Anglos are significantly more likely to have earned a college degree.  The bachelor's degree completion rate for Anglos is 33.7% in comparison to 19.2% for African-Americans and 11.4% for Latinos.[260]

According to Dr. Burton, the performance gaps in Texas could partially be explained by discriminatory disciplinary procedures.  In Texas, African-American students are three times more likely to be removed from school for lower-level offenses relative to Anglo students.[261]  African-American students were 31% more likely to face a school discretionary action compared to otherwise identical Anglo and even Hispanic students.[262]  Such disparities are of great concern because, as Dr. Burton outlined, students who were suspended or expelled have a higher drop-out rate than students who did not face disciplinary action.[263]

---

[259]   Burden, D.E. 391-1, p. 14 (report) (citing *Percentage of Persons Age 25 and Over with High School Completion or Higher and a Bachelor's or Higher Degree, by Race/Ethnicity and State: 2008-2010*, NATIONAL CENTER FOR EDUCATION STATISTICS, http://nces.ed.gov/programs/digest/d12/tables/dt12_015.asp (last visited June 3, 2014)).

[260]   *Id.*

[261]   Burton, D.E. 376-2,  p. 28 (report).

[262]   *Id.*

[263]   *Id.* (citing Tony Fabelo, et al., *Breaking School's Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement*, Council of State Governments Justice Center/The Public Policy Research Institute, July 2011, *available at* http://csgjusticecenter.org/wp-content/uploads/2012/08/Breaking_ Schools_Rules_Report_Final.pdf (last accessed June 27, 2014), pp. 46, x-xi).

The harmful effects of discrimination can also be seen in the field of health. According to the U.S. Centers for Disease Control, African-Americans and Hispanics in Texas are much more likely to report being in poor or fair health, to lack health insurance, and to have been priced-out of visiting a doctor within the past year.[264]   And compared to adult Anglos throughout the state, minorities in Texas experience higher levels of health impairment—particularly those minorities who are low-income.[265]   This is a predictable effect of discrimination because health, education, and employment opportunities are all interdependent.[266]

African-Americans and Latinos are less educated because of discrimination, suffer poorer health because of discrimination, are less successful in employment because of discrimination, and are likewise impoverished in greater numbers because of discrimination.   Based on this evidence, which Defendants did not contest, this Court finds that SB 14's requirements will fall significantly more heavily on the poor and that African-Americans and Latinos are substantially more likely than Anglos to live in poverty in Texas because they continue to bear the socioeconomic effects caused by more than a century of discrimination.

---

[264]   Burden, D.E. 391-1, p. 15 (report) (citing *Texas: Minority Health*, HENRY J. KAISER FAMILY FOUNDATION, http://kff.org/state-category/minority-health/?state=TX (last visited June 3, 2014)).

[265]   Henrici, D.E. 369-1, p. 24 (report) (citing Ronald Angel, Laura Lein, and Jane Henrici. *Poor Families in America's Health Care Crisis: How the Other Half Pays*, pp. 79–100 (New York: Cambridge University Press, 2006)).

[266]   *See* Bazelon, D.E. 521-1, pp.39-40 (report); Burton, D.E. 376-2, pp. 48-49 (report); Henrici, D.E. 369-1, pp. 14, 24, 30, 32 (report); Burden, D.E. 391, pp. 14-15 (report).

### 2.  The Plaintiffs Demonstrate the Impact

Plaintiffs assert three general types of injuries associated with the implementation of SB 14: personal, political, and organizational.  Those asserting personal injuries include Plaintiffs whose ability to vote has been threatened by SB 14 requirements or those who fear poll workers could keep them from voting because the name on their ID may not be "substantially similar" to that on the voter registration rolls.  Those asserting political injuries include those Plaintiffs who state that SB 14 has or will cause their political campaigns to spend additional time, effort, or funding to educate their constituents about SB 14 requirements.  Last, those asserting organizational injuries include Plaintiff groups who state that they were forced to divert resources from their core missions to respond to the adverse effect of SB 14 on the people they serve.

### a.  The Personal Injury Plaintiffs

Fourteen of the twenty-six Plaintiffs assert that SB 14 will:  (1) deny them the right to vote; (2) cause them a substantial burden in exercising their right to vote; or (3) require them to vote in an unequal manner.  Of those fourteen, nine lack a qualified SB 14 ID - Floyd Carrier, Gordon Benjamin, Ken Gandy, Eulalio Mendez, Jr., Lionel Estrada, Lenard Taylor, Estela Garcia Espinoza, Margarito Martinez Lara, and Imani Clark.  Most of these Plaintiffs attempted to obtain, but were unsuccessful in securing, a qualified SB 14 ID because they lacked the underlying documentation required to obtain such forms of identification.

**Free EIC is Obscure**.  Defendants assert that no one is denied the right to vote because SB 14 allows individuals without a qualified photo ID to get a free EIC.  The problem is that the implementation of the EIC program has been insufficient.  A voter without qualified SB 14 ID must first know that they need such identification to vote.  And if they do not have the generally available ID, they must know that an EIC exists before they are able to apply for it.  The word is not out.  A number of Plaintiffs had not heard of an EIC until they were deposed—even those who had shown up at the polls and were turned away for not having the necessary photo ID[267] and those who made multiple attempts to obtain DPS-issued photo IDs.[268]  And some of those turned away at the polls were not offered a provisional ballot so that they could attempt to resolve the identification issue after election day.[269]  For instance, Floyd Carrier was well-known to the election workers at his polling place, but was not offered a provisional ballot and was not permitted to cast a vote.[270]  His son went to great efforts to get him an SB 14-qualified photo ID, never learning that an EIC was an option.[271]

---

[267]  *See* Bates, Pls.' Ex. 1090, p. 13 (did not know that her existing ID would be insufficient until she arrived at the polls); Washington, Pls.' Ex. 1093, pp. 17-24; *see also* Barreto, D.E. 569, p. 66 (testimony) (testifying that 87% of survey respondents without a high school diploma had never heard of an EIC).  Sen. Uresti testified that his constituents were not aware of EICs.  Uresti, D. E. 569, p. 249.  City Councilman Guzman testified that, while helping registered voters turned away at the polls during the November 2013 election to obtain appropriate identification, he was not aware of EICs.  Guzman, D.E. 569, pp. 359-62, 364, 367-68, 372-74.

[268]  Calvin Carrier testified that throughout his efforts to obtain the underlying documentation and qualifying ID for his father, no one mentioned the EIC.  C. Carrier, D.E.561, pp. 14-28; *see also* Barber, Pls.' Ex. 1108, pp. 26-30; Espinoza, D.E. 582, p. 177.

[269]  Bingham, Pls.' Ex. 1091, pp. 33-34 (was not offered a provisional ballot until she specifically asked if there was some other way she could vote).  Councilman Guzman testified that his constituents who were turned away from the polls did not know about provisional ballots.  Guzman, D.E. 569, pp. 367-68, 375.

[270]  C. Carrier, D.E.561, pp. 26-27.

[271]  *Id*. at 27-28.

No real effort has been made by Texas to educate the public about the availability of an EIC to vote, where to get it, or what is required to obtain it.[272]  In order to obtain an EIC, an applicant must provide: (1) documentation of identity, (2) documentation of U.S. citizenship, and (3) a valid Texas voter registration card.[273]  An applicant may satisfy the documentation of identity requirement in three ways by: (1) providing one primary form of identification, (2) providing two secondary forms of identification, or (3) providing one secondary form of identification and two supporting identification documents.[274]  To prove citizenship, an applicant must provide: (1) a U.S. passport book or card, (2) a birth certificate issued by a U.S. state or the U.S. Department of State, (3) a U.S. Certificate of Citizenship or Certificate of Naturalization, or (4) an Immigration and Naturalization Service U.S. Citizen ID card.[275]  Thus, for the vast majority of applicants who lack a primary form of identification, the only way to prove identity for EIC purposes is through

---

[272]  *See* Jewell, D.E. 578, pp. 35-36, 38-39 (testimony); Uresti, D.E. 569, pp. 214-15; Cornish, D.E. 569, pp. 259-66, 287; Peters, D.E. 582, pp. 156-57.

[273]  37 TEX. ADMIN. CODE §§ 15.181-.183.

[274]  A primary form of identification is a Texas driver license that has been expired for at least 60 days but no more than two years.  *Id.* at § 15.182.  A secondary form of identification can be: (1) an original or certified copy of a birth certificate issued by the appropriate State Bureau of Vital Statistics or equivalent agency; (2) an original or certified copy of United States Department of State Certification of Birth (issued to United States citizens born abroad); (3) an original or certified copy of a court order with name and date of birth indicating an official change of name or gender; or (4) a U.S. Citizenship or Naturalization Certificate (regardless of whether it contains an identifiable photo).  *Id.*  An EIC-only birth certificate issued by the Texas Department of State Health Services is also an accepted form of a secondary identification.  Peters, D.E. 582, p. 156.  Supporting documentation includes twenty-eight different documents—including a Social Security card, a Texas driver license or identification card that has been expired for more than two years, a voter registration card, a Texas vehicle title or registration, as well as certain school records.  37 TEX. ADMIN. CODE § 15.182.

[275]  *Election Identification Certificates (EIC) – Documentation Requirements*, TEXAS DEPT. OF PUBLIC SAFETY, http://www.txdps.state.tx.us/DriverLicense/eicDocReqmnts.htm (last visited October 7, 2014).

a birth certificate.  As of the trial, however, DPS's website failed to identify EIC-only birth certificates as one of the secondary forms of identification.[276]

**Underlying Documents are Not Free**.  Even if the EIC, itself, is issued at no charge, the problem for the registered voters who do not have one of the approved photo IDs is getting the documents that they need to obtain an EIC—the same documents DPS requires for a Texas driver's license.[277]  Ordinarily, the easiest and cheapest underlying document is a birth certificate.  SB 14 was passed with no provision reducing or eliminating the $22.00-$23.00 fee charged in Texas for a birth certificate despite Senator Davis' warning to the legislature that this would cripple the ability of those without SB 14 ID in their effort to obtain it.[278]  The State has since reduced the fee for obtaining a birth certificate (if sought exclusively for an EIC), but that reduced fee of $2.00-$3.00 has not been publicized and the Texas Department of State Health Services (DSHS) forms for requesting birth certificates do not address an EIC-only version.[279]

Mr. Mendez paid $22.00 for his birth certificate because he did not know and was not informed about an EIC birth certificate.[280]  Also, as Plaintiffs' individual stories substantiate, the reduced-fee EIC-only birth certificate is not readily available to anyone

---

[276]  Peters, D.E. 582, p. 156.

[277]  Mr. Peters testified that the application requirements for an EIC were simply adopted from those required for a driver's license or personal ID card in order to provide continuity and simplicity for the customer service representatives.  Peters, D.E. 582, pp. 138-39.  Mr. Rodriguez confirmed this.  Rodriguez, D.E. 582, pp. 253-54.

[278]  Davis, D.E. 572, pp. 24-27; Pls.' Ex. 650.

[279]  *See* Farinelli, D.E. 582, pp. 340-41, 384-85, 389-92.

[280]  Mendez, D.E. 563, pp. 103-04.

whose birth has not been registered or if there are inaccuracies on the birth certificate requiring amendment.

**Delayed Birth Certificates for Unregistered Births**.  Plaintiffs testified as to the varied bureaucratic and economic burdens associated with purchasing a proper birth certificate when their births were not registered.  Mr. Lara, a 77-year-old Hispanic retiree from Sebastian, Texas, has attempted to locate his birth certificate for more than twenty years.[281]  He was born in what he described as a "farm ranch" in Cameron County, Texas.[282]  With the help of his daughter, he visited three offices in two counties but was unsuccessful in locating his birth certificate.[283]  Mr. Lara later paid a $22.00 search fee to DSHS to confirm what he already suspected—his birth was never registered.[284]  Thus, Mr. Lara must now apply for a delayed birth certificate (using a 14-page packet of instructions and forms) at a cost of $25.00.  Additionally, he will have to pay $22.00 for a certified copy of the birth certificate.[285]  He testified that he has twice attempted to apply for the delayed birth certificate to no avail.[286]

Like her brother, Maximina Lara's birth was not registered.[287]  Although she currently has a driver's license, it will expire in October 2015, and because of a change in Texas law, she will need to show proof of citizenship to renew her license.  Therefore,

---

[281]  Mar. Lara, D.E. 573, pp. 219-20.

[282]  *Id.*

[283]  *Id.* at 222.

[284]  *Id.* at 222-23.

[285]  *Id.*; Pls.' Ex. 989.

[286]  Mar. Lara, D.E. 573, p. 231.

[287]  Max. Lara, D.E. 573, p. 235.

Ms. Lara will need to obtain a delayed birth certificate at a cost of $47.00, which she cannot afford.  And she does not have the underlying documents to get the delayed birth certificate.  Similarly, Mr. Carrier was forced to endure an exhaustive course that is further documented below to purchase a delayed birth certificate because he was born at home.[288]  This problem is far from unusual.

**Amended Birth Certificates to Correct Errors**.  It is important that birth certificates be accurate in order for individuals to use them to obtain identification. Mistakes tend to crop up on birth certificates of those born at home with the help of midwives and many of those born at home are minorities.[289]  Mistakes occur in the names of parents and child, gender of child, date of birth of parents and child, and place of birth. Ms. Gholar, who intends to vote in person as long as she can walk, will be required to hire a lawyer in Louisiana, where she was born, to amend her birth certificate there.[290]

Mr. Carrier, an 84-year-old retiree from China, Texas, was born at home and, with the help of his son, contacted three different counties trying to locate his birth certificate to no avail.[291]  He then paid DSHS $24.00 for them to conduct a search for his birth certificate.[292]  After twelve weeks, DSHS sent him a birth certificate, but it was riddled

---

[288]  C. Carrier, D.E. 561, p. 14.

[289]  Gholar, Pls.' Ex. 1092, p. 64 (testifying that it was common when she was born in the 1930s for midwives to not read and write very well, adding that church birth records were better kept because "they didn't hold Black people very valuable"); Bazelon, D.E. 603-1, p. 24 (report) ("Evidence provided at trial in the recent Wisconsin voter ID case of *Frank v. Walker* found that '[m]issing birth certificates are also a common problem for older African American voters who were born at home in the South because midwives did not issue birth certificates.'" (citation omitted)).

[290]  Gholar, Pls.' Ex. 1092, pp. 61, 79.

[291]  C. Carrier, D.E. 561, pp. 14-16.

[292]  *Id.* at 16-17.

with mistakes (his first name was listed as "Florida," his last name was misspelled, and his date of birth was wrong).[293]  Mr. Carrier, again with the help of his son, submitted an application to amend his birth certificate which included a $12.00 notary fee.[294]  After some months, DSHS contacted him and requested additional documentation to execute the amendment, one of which included the same document he was attempting to obtain in the first place—a birth certificate.[295]  Eventually his son received a call from the Texas deputy registrar, who assured him that the matter would be resolved.[296]  A week before he was to testify in this case, Mr. Carrier received his amended birth certificate. Unfortunately, the birth certificate still contains the incorrect birth date.[297]

Mrs. Espinoza testified that she did not have a birth certificate until January of 2014 when Texas Rio Grande Legal Aid paid for the document.[298]  The birth certificate contains her maiden name and misstates her date of birth.[299]  She must now obtain an amended birth certificate, as well as a copy of her marriage license, to obtain an EIC.

**Out-of-State Birth Certificates**.  Many people living in Texas were born in other states.  If they do not have their birth certificate, it can be difficult and costly to obtain one.  Mr. Benjamin, a 65-year-old African-American, was unable to afford a certified copy of his birth certificate because Louisiana charged $81.32 to process his online

---

[293]  *Id*. at 56-57.

[294]  *Id*. at 16-17, 20.

[295]  *Id.* at 23.

[296]  *Id*. at 32.

[297]  *Id.* at 33.

[298]  Espinoza, D.E. 582, p. 167.

[299]  *Id*. at 166; Pls.' Ex. 996 (birth certificate).

application.[300]   He later discovered that Louisiana allowed a relative to request a birth certificate in person at no cost.[301]   Fortunately, his sister was able to request his birth certificate on her way to a family reunion in Atlanta, Georgia—a trip he could not make himself.[302]

Mr. Gandy does not have a certified copy of his New Jersey birth certificate.[303] He conducted Internet research to determine what he had to do to get it, but did not order it because the $30.00 fee is "quite a bit of money" for him.[304]   This Court heard testimony from other witnesses regarding the difficulty in obtaining identification for individuals born in states outside of Texas.[305]

**Suspension of, and Surcharges on, DPS-Issued ID**.  Mr. Estrada, a 41-year-old Hispanic part-time construction worker from Kenedy, Texas, testified that he has been unable to renew his commercial driver's license (CDL) because he cannot afford the surcharges imposed for failure to comply with financial responsibility laws.[306]   He testified that he would have to pay $260.00 a year for the next three years to renew his CDL.[307]   To obtain an EIC, he would have to forfeit his CDL, which would threaten his

---

[300]   Benjamin, D.E. 563, pp. 291-93.

[301]   *Id*. at 292-93.

[302]   Benjamin, D.E. 563, pp. 293-94.

[303]   Gandy, D.E. 573, pp. 208-09.

[304]   *Id*. at 215; Gandy Dep., June 11, 2014, p. 41 (D.E. 592, pp. 221-22 (admitting dep.)).

[305]   Bates, Pls.' Ex. 1090, p. 7 (Mississippi); Barber, Pls.' Ex. 1108, p. 6 (Tennessee); Gholar, Pls.' Ex. 1092, p. 62 (Louisiana).

[306]   Estrada, D.E. 569, pp. 129, 135, 140.

[307]   *Id*. at 135.

future ability to earn a living as a truck-driver.[308]  Mrs. Ramona Bingham went without a Texas driver license for about four years because she could not afford to pay the traffic-related fines.[309]

Dr. Lichtman noted that the suspension of more than a million driver's licenses because of substantial surcharges related to traffic violations disparately burdened African-Americans and Latinos.[310]  The legislature rejected amendments that would require the issuance of substitute photo ID if a driver's license was suspended or at least provide notice to the individual that the right to vote was in jeopardy.[311]

**Inability to Pay the Costs**.  Some Plaintiffs testified that they were either unable to pay or that they would suffer a substantial burden in paying the cost associated with getting a qualified SB 14 ID or the necessary underlying documents.  Mr. Mendez testified about his family's "very sad" financial state, explaining that "[e]ach month by the last week there's no food in the house and nothing with which to buy any, especially milk for the children.  Then my wife has to go to a place to ask for food at a place where they give food to poor people."[312]  Mr. Mendez was embarrassed to admit at trial that having to pay for a new birth certificate was a burden on him and his family.[313]  Mr. Lara described his financial situation by stating that "we got each our little . . . small amount of

---

[308]  *Id*. at 141.

[309]  Bingham Dep., July 29, 2014, pp. 16-18.

[310]  Lichtman, D.E. 374, pp. 33-35 (report).

[311]  *See* Appendix: Table of Amendments Offered on SB 14.

[312]  Mendez, D.E. 563, p. 107.

[313]  *Id.*

cash . . . and we try to  . . . stretch it out as possible by the end of the month, and sometimes we'll make it and sometimes we won't."[314]  Ms. Lara described her financial state as both difficult and very stressful.[315]

**Travel Required for ID or Underlying Documents**.  The cost of traveling to a DPS office to obtain SB 14 ID is a particular burden in Texas because of its expansive terrain.  Of the 254 counties in Texas, 78 do not have a permanent DPS office.[316]  For some communities along the Mexican border, the nearest permanent DPS office is between 100 and 125 miles away.[317]  Dr. Daniel G. Chatman, Associate Professor of City and Regional Planning at the University of California, Berkeley, concluded that over 737,000 citizens of voting age face a round-trip travel time of 90 minutes or more when visiting their nearest DPS office, mobile EIC unit, or nearest county office that agreed to issue EICs.[318]

While that number represents only 4.7% of citizens of voting age, for those who do not have access to a household vehicle, 87.6% have that long commute to obtain an SB 14-qualified ID, reflecting an extraordinary burden on the poor.[319]  Dr. Chatman's study also concluded that over 596,000 citizens of voting age faced a travel time of at least two hours and over 418,000 faced a commute of three hours or more, which is 54%

---

[314]   Mar. Lara, D.E. 573, p. 225.

[315]   Max. Lara, D.E. 573, p. 245.

[316]   Peters, D.E. 582, pp. 148-49.

[317]   Burton, D.E. 376-2, p. 46 (report) (citing *Texas v. Holder*, 888 F. Supp. 2d 113, 140 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2886 (U.S. 2013).

[318]   Chatman, D.E. 426-1, pp. 2, 9, 27 (report).

[319]   *Id*. at 29.

of those without access to a vehicle.[320]   He further testified that the travel burden fell most heavily on poor African-Americans and Hispanics at differential rates that were statistically significant at the very highest level.[321]   The travel times would be both burdensome and unreasonable to most Texans—regardless of wealth or income.[322]

Some of the Plaintiffs without SB 14 ID do not have the ability or the means to drive.[323]   Four of them—Ms. Clark, Mr. Gandy, Mr. Benjamin, and Mr. Taylor—rely almost exclusively on public transportation.[324]   The lack of personal transportation adds to both the time and the cost of collecting the underlying documents.   Mr. Taylor, who was recently homeless, declared that he sometimes cannot afford a bus pass.[325]   And for those who can afford the fare, like Mr. Gandy, it can take an hour to reach the nearest DPS office.[326]   Others, like Mr. Estrada and Mrs. Espinoza are forced to rely on the kindness of family and friends to move about town, much less for a 60-mile roundtrip ride to the nearest DPS station.[327]   Mr. Lara, who is nearing his eightieth birthday,

---

[320]   Chatman, D.E. 426-1, p. 27 (report).

[321]   The 90-minute burden was expressed as falling on Whites at the rate of 3.3%, on Hispanics at the rate of 5%, and on Blacks at the rate of 10.9%. Chatman, D.E. 578, pp. 97-98 (testimony); Chatman, D.E. 426-1, p. 29 (report).

[322]   Using generally accepted quantitative data principles, Dr. Bazelon quantified the general travel burdens associated with obtaining an EIC for those registered voters on the No-Match List.  Dr. Bazelon considered both monetary costs, like bus or taxi fares, and non-monetary costs such as travel time.  Dr. Bazelon estimated that the average travel cost to obtain an EIC for all affected registered voters was $36.23—a conservative estimate because it did not attempt to quantify the totality of costs associated with acquiring underlying documentation like day care or time off work.

[323]   Mendez, D.E. 563, p. 101 (does not have a driver's license).

[324]   Clark Dep., May 2, 2014, p. 89 (D.E. 592, pp. 221-22 (admitting dep.)); Gandy, D.E. 573, p. 208; Benjamin, D.E. 563, pp. 291, 295; Taylor, D.E. 569, p. 147; Taylor Decl., Pls.' Ex. 1000.

[325]   Taylor Decl., Pls.' Ex. 1000.

[326]   Gandy Dep., June 11, 2014, p. 12 (D.E. 592, pp. 221-22 (admitting dep.)).

[327]   Estrada, D.E. 569, p. 134; Espinoza, D.E. 582, p. 173.

testified that he has to ride his bicycle when he is unable to find a car ride.[328]   And Mr. Carrier, who is in a wheelchair, must rely on others to drive him even to his own mailbox because it is, as is the case with everyone's mailbox in China, Texas, located at the local post office.[329]

**DPS, Using Discretion, Can Apply the Burdens Inconsistently**.  The evidence demonstrated that there are inconsistencies in the enforcement of SB 14 by DPS and other Texas officials.  Plaintiffs' likelihood of acquiring qualified photo ID may be determined not by the underlying documents they possess but by the luck of the customer service representative (CSR) they draw during their DPS visit.

Mr. Tony Rodriguez, a DPS senior manager in charge of the EIC program, testified at trial that CSRs and other DPS officials are granted discretion to circumvent the underlying document requirements when granting EICs.[330]   He was unable to articulate a protocol as to how and when DPS staff could exercise their discretion.[331]   He admitted that there were no written instructions or training materials on the matter.[332]   Thus, DPS may grant or reject an EIC application based not on the underlying documentation but rather on the office's location,[333] with little to no consistency.

---

[328]   Mar. Lara, D.E. 573, pp. 219, 223-24.

[329]   C. Carrier, D.E. 561, pp. 13-14, 29, 42.

[330]   Rodriguez, D.E. 582, pp. 251-52.

[331]   *Id*. at 276-79.

[332]   *Id*. at 251-52.

[333]   *Id*. at 278.

This may explain Ruby Barber's trip through the system. Mrs. Barber, a 92-year-old woman from Bellmead, Texas, went to DPS to get an EIC but was unsuccessful because she did not have a birth certificate or other required documents.[334] She or her son called the press, and the Waco Tribune ran a story on her difficulties obtaining an EIC.[335] Within a matter of days, without any additional documentation submitted by Mrs. Barber, DPS gave her an EIC, explaining that DPS had found a U.S. Census entry from the 1940s that supported her claim to her identity.[336]

**Name Changes and Variations**. Five Plaintiffs possess SB 14 ID, but fear that poll workers could keep them from voting in the future because the name on their ID may not be deemed "substantially similar" to that on the voter registration rolls. These Plaintiffs include: Anna Burns, Koby Ozias, John Mellor-Crummey, Evelyn Brickner, and Maximina Martinez Lara. After marriage, Anna Burns, whose maiden name is Anna Maria Bargas, changed her name to Anna Maria Bargas Burns and that is the name on her driver's license.[337] However, she registered to vote as Anna Maria Burns.[338]

Ms. Lara's only form of SB 14 ID is her driver's license, which states her name as Maxine Martinez Lara.[339] However, Ms. Lara is registered to vote as Maximina M. Lara.[340]

---

[334] Barber, Pls.' Ex. 1108, pp. 6, 27-30.

[335] Barber, D.E. 578, p. 320; *see also* Defs.' Exs. 270, 271, 272.

[336] Rodriguez, D.E. 582, pp. 207-08; Barber Dep., Pls.' Ex. 1108, pp. 36, 37- 38.

[337] Burns Dep., July 21, 2014, pp. 12-13 (D.E. 592, pp. 221-22 (admitting dep.)).

[338] *Id*. at 22.

[339] Max. Lara, D.E. 573, pp. 236-37; Pls.' Ex. 987.

Mr. Mellor-Crummey was concerned that a poll worker would turn him away because he was registered to vote as John M. Mellor-Crummey but the name on his driver license is J M Mellor-Crummey.[341]     Mr. Ozias, who is in the process of changing his name, is registered to vote as Stephanie Lynn Dees.[342]  Mr. Ozias fears he will be turned away from the polls because, in his words, "I don't really match my photograph and you always get people who just don't like transgender people . . . ."[343]

Commissioner Oscar Ortiz, who asserts a political injury, testified that he had a bit of a problem voting because the name on his driver license and voter registration card do not match—one has Oscar O. Ortiz and the other has Oscar Ochoa Ortiz.[344]  In order to vote, he had to sign a substantially similar name affidavit.[345]

**The Disability Exemption is Strict**.  At least four Plaintiffs may qualify for SB 14's disability exemption.  Mr. Carrier, Ms. Espinoza, Mr. Mendez, and Mr. Taylor testified that they suffer from a disability.  SB 14 provides for a disability exemption which can be obtained with written documentation from (a) the United States Social Security Administration evidencing the individual's disability or (b) the United States Department of Veterans Affairs evidencing a disability rating of at least 50%.[346]  These

---

[340]   Max. Lara, D.E. 573, p. 237.

[341]   Mr. Mellor-Crummey has since obtained the necessary alignment of names between his voter registration and driver's license. Defs.' Ex. 2520.

[342]   Ozias Dep., July 22, 2014, pp. 5, 17-18 (D.E. 592, pp. 221-22 (admitting dep.)).

[343]   *Id*. at 51.

[344]   Ortiz, D.E. 578, pp. 13-14.

[345]   *Id*. at 28-29.

[346]   TEX. ELEC. CODE ANN. § 13.002(i).

Plaintiffs were not made aware of this exemption when they went to DPS or other relevant offices.[347]   As of January 15, 2014, only 18 voters were granted a disability exemption in Texas.[348]

   **A Widespread, Practical Problem**.  The experiences of these Plaintiffs are not unusual.  Other than for voting, many of the Plaintiffs in this case do not need a photo ID to navigate their lives.  They do not drive (many do not own a car), they do not travel (much less by plane), they do not enter federal buildings,[349] and checks they cash are cashed by businesspeople who know them in their communities.[350]

   At trial, the Court heard from witnesses who painted a compelling picture of the more universal photo ID plight.  Kristina Mora worked for a non-profit organization in Dallas, Texas, The Stew Pot, which assists the homeless who are trying to get a photo ID to obtain jobs or housing.  She testified that her indigent clients regularly number 50 to 70 per day.[351]   Dawn White is the Executive Director of Christian Assistance Ministry (CAM), a church-funded organization in San Antonio, Texas, providing crisis management and ID recovery services.[352]   Her clients are the homeless or working poor,

---

[347]   *See* C. Carrier, D.E. 561, pp. 72-73; Taylor, D.E. 569, p. 150.  In helping his constituents vote in light of SB 14's ID requirements, Councilman Guzman testified that he was not aware of any disability exemption from the photo ID requirement.  Guzman, D.E. 569, p. 375.

[348]   Ansolabehere, D.E. 600-1, p. 8 (report).

[349]   A federal employee ID will not permit a person to vote under SB 14.

[350]   Henrici, D.E. 569, p. 188 (testimony); Henrici, D.E. 369-1, pp. 18-19 (report).

[351]   Mora, D.E. 563, pp. 114-15.

[352]   White, D.E. 563, pp. 268-69.

80% of which are African-American and Hispanic.[353]   Of approximately 10,000 people eligible for and seeking CAM services regarding obtaining an ID, CAM can only accept 5,000 and is successful in obtaining ID for about 2,500.[354]

According to Ms. Mora, these clients confront four general barriers to getting necessary ID:  (1) understanding and navigating the process; (2) financial hardship; (3) investment of time; and (4) facing DPS or any type of law enforcement.[355]  The Stew Pot and CAM, exist in part, to help with the first barrier and to an extent, the second barrier. These two witnesses testified that it costs on average, $45.00 to $100.00 per person in document and transportation costs to get a photo ID.[356]  It generally takes an individual two trips to obtain the necessary documents to get an ID.[357]  Many homeless individuals do not have a birth certificate or other underlying documents because they have nowhere to secure them and they get lost, stolen, or confiscated by police.[358]  Furthermore, most are not in communication with their families and cannot get assistance with any part of this process.  Ms. Mora testified that it generally takes about one hour to get to DPS or the necessary office, one hour to stand in line and be served, and one hour to return to the shelter.[359]  This generally has to be done in the morning because homeless shelters have

---

[353]   *Id*. at 271-72.  CAM has two offices.  The one on the north side of town services a population that is largely Anglo.  Requests for ID recovery in that office are so rare that they do not know how to do it and have to phone the downtown office.  *Id*. at 285-86.

[354]   White, D.E. 563, p. 277.

[355]   Mora, D.E. 563, p. 177.

[356]   *Id*. at 118; White, D.E. 563, pp. 279-80.

[357]   Mora, D.E. 563, p. 118.

[358]   *Id*. at 130.

[359]   *Id*. at 119.

early afternoon curfews.[360]  The $45.00 cost to obtain a Texas ID card is equivalent to what these clients would pay for a two-week stay in a shelter.[361]

The clients served by CAM who work have difficulties obtaining IDs because they cannot get time off of work, they do not have transportation, and a two-hour bus ride to the DPS office is not uncommon.[362]  For those who are able to obtain an ID, the process usually takes four to six weeks, but can take much longer.  Fear of law enforcement by this population is widespread and justified.[363]  Many homeless people have outstanding tickets that they cannot pay and DPS is a law enforcement office where their names can be checked for outstanding tickets and arrest warrants.[364]  Testimony at trial confirmed that DPS took fingerprints for EICs until the SOS asked them to stop.[365]  DPS has done nothing to allay public perception that DPS can fingerprint, conduct a warrant check, and arrest EIC applicants.[366]

Despite both Mora and White's expertise in obtaining photo ID for many people every day, they were not aware of the existence of an EIC until they were contacted for

---

[360]  *Id.* at 119-20.

[361]  *Id.* at 118-19.

[362]  White, D.E. 563, p. 282.

[363]  Sen. Uresti and Councilman Guzman both testified that many of their constituents are afraid to be near DPS officers or the Sheriff because they owe tickets that they cannot pay or because they are simply intimidated.  Uresti, D.E. 569. p. 246; Guzman, D.E. 569, p. 372.

[364]  Mora, D.E. 563, p. 120; Peters, D.E. 582, pp. 144-45 (confirming that law enforcement is present at DPS offices where driver's licenses and EICs are issued, and that a public perception exists that interactions with DPS will trigger a check for warrants).

[365]  Peters, D.E. 582, pp. 144-45 (confirming that existing regulations give DPS discretion to take fingerprints); McGeehan, D.E. 578, p. 282;  *see* 37 TEX. ADMIN. CODE 15.183(a)(3) (DPS has may re-implement this requirement at any time).

[366]  Pls.' Ex. 345; Peters, D.E. 582, p. 144.

this case.[367]   Despite Mora's familiarity with the DPS website, she had trouble finding any instructive materials for obtaining an EIC.[368]   And the information said nothing about any reduction in the fee for birth certificates.[369]   The EIC, because it requires the same underlying documents, is not easier for the clients to obtain and, because its only use is for voting, it is likely that neither organization will assist their clients in obtaining one.[370]

**Alternatives and Choices**.   Defendants argue that none of the individual Plaintiffs are disenfranchised or substantially burdened because (1) those over 65 or disabled can vote by mail; and (2) any remaining Plaintiffs can get qualified SB 14 ID, but choose not to.   Defendants fail to appreciate that those living in poverty may be unable to pay costs associated with obtaining SB 14 ID.   The poor should not be denied the right to vote because they have "chosen" to spend their money to feed their family, instead of spending it to obtain SB 14 ID.

**Insufficiency of Mail-In Ballots**.   The evidence also indicates that the choice of using the absentee ballot system is not truly an appropriate choice.   At trial, there was universal agreement that a much greater risk of fraud occurs in absentee balloting, where some campaign workers are known to harvest mail-in ballots through several different methods, including raiding mailboxes.[371]   Mail-in ballots are not secure and require an

---

[367]   Mora, D.E. 563, p. 131; White, D.E. 563, p. 283.

[368]   Mora, D.E. 563, pp. 131-32.

[369]   *Id*. at 133-34.

[370]   *Id*. at 133; White, D.E. 563, p. 284.

[371]   Wood, D.E. 563, p. 202 (testimony); Burden, D.E. 569, p. 320 (testimony); Lichtman, D.E. 573, p. 67 (testimony); Anchia, D.E. 573, p. 322; Minnite, D.E. 375, p. 21 (report).

application in advance of the election and mailing or returning the ballot before election day.[372]

There was substantial testimony that people want to vote in person at the polls, not even in early voting, but on election day, and they were highly distrustful of the mail-in ballot system.[373]  For some African-Americans, it is a strong tradition—a celebration— related to overcoming obstacles to the right to vote.[374]  Reverend Johnson considers appearing at the polls part of his freedom of expression, freedom of association, and freedom of speech.[375]

Nine of the fourteen Plaintiffs are eligible to vote by mail because they are over the age of 65 and/or are disabled,[376] and all but two of the nine expressed a reservation about casting their vote by mail.[377]  Even Mr. Gandy, who voted by mail rather than not vote at all, stated that he felt as though he was being treated like "a second-class citizen."[378]  He is on the Nueces County Ballot Board, but cannot vote in person.  Mr.

---

[372]  Ingram, D.E. 588, pp. 338, 341.

[373]  Bates, Pls.' Ex. 1090, p. 21; Eagleton, Pls.' Ex. 1095, pp. 10, 12; Benjamin, D.E. 563, p. 292; Gholar, Pls.' Ex. 1092, pp. 60-61; Johnson, D.E. 569, p. 19 ("But if you understand Black American in the terms of Blacks in the south . . . going to vote and standing in line to vote is a big deal.  It's much more important for an 80-year-old Black woman to go to the voting poll, stand in line, because she remembers when she couldn't do this."); Hamilton, Dep., June 5, 2014, pp. 66-67 (D.E. 592, pp. 221-22 (admitting dep.)) ("[F]or some people who literally fought for the right to vote, there are a lot of seniors . . . who do not, women especially, who do not want to vote by mail.  They want to go to the polls . . . like they've always gone.").

[374]  Ellis, D.E. 573, p. 157; Washington, Pls.' Ex. 1093, pp. 12, 76.

[375]  *See* Johnson, D.E. 569, p. 21.

[376]  F. Carrier, D.E. 561, p. 75; Benjamin, Pls.' Ex. 815; Gandy, Pls.' Ex. 850; Mendez, D.E. 563, p. 98; Taylor, D.E. 569, p. 146; Espinoza, D.E. 582, p. 166; Mar. Lara, D.E. 573, p. 219; Brickner Dep., July 23, 2014, p. 8; Max. Lara, Pls.' Ex. 987.

[377]  C. Carrier, D.E. 561, pp. 29-31; Benjamin; D.E. 563, p. 292; Gandy Dep., June 11, 2014, pp. 62-63; Mendez, D.E. 563, pp. 100-01; Taylor, D.E. 569, p. 150; Mar. Lara, D.E. 573, p. 220; Max. Lara, D.E. 573, p. 236.

[378]  Gandy Dep., June 11, 2014, pp. 62-63.

Benjamin expressed his distrust of voting by mail when he stated that "mail ballots have a tendency to disappear."[379]  Calvin Carrier testified that his father's mail often gets lost and his father does not want to rely on a mail-in ballot to exercise his franchise.[380]

In a case in which Defendants claim that voter fraud and public confidence motivated and justified the change in the law, it is ironic that they want the voters adversely affected by that law to vote by a method that has an increased incidence of fraud and a lower level of public confidence.

### b.  The Political Injury Plaintiffs

Six of the twenty-six Plaintiffs assert a political injury:  Congressman Marc Veasey, Constable Michael Montez, Justice of the Peace Penny Pope, Justice of the Peace Sergio de Leon, Commissioner Oscar Ortiz, and Jane Hamilton.  Congressman Veasey, who testified that he represents a majority-minority district, believes that SB 14 is a hardship on his constituents and that it requires additional resources, manpower, and time to educate his constituents about the new requirements.[381]  Any election campaign must address voter registration, but with the enactment of SB 14, campaigns must now ensure that those who are registered to vote also possess the necessary photo ID to cast their ballots, or they must persuade them to give up the privilege of voting in person and vote by mail—if they are eligible to do so and can timely register for the mail-in ballot.[382]  Ms.

---

[379]  Benjamin, D.E. 563, p. 292.

[380]  C. Carrier, D.E. 561, pp. 29-31.

[381]  Veasey Dep., June 20, 2014, pp. 84-85 (D.E. 592, pp. 221-22 (admitting dep.)).

[382]  Veasey Dep., June 20, 2014,  pp. 84-85; Hamilton Dep., June 5, 2014, pp. 64-67; *see also* D.E. 592, pp. 221-22 (admitting deps.)

Hamilton, Congressman Veasey's chief of staff and campaign manager, declared that SB 14 has made her job significantly more difficult as she has screened numerous calls from voters who did not know how to obtain proper ID and who were overwhelmed by the process.[383]   Constable Montez, Justice of the Peace Pope, Justice of the Peace de Leon, and Commissioner Ortiz all asserted an injury because they anticipated having to spend additional time, effort, and funds to campaign in their upcoming elections.

### c.  The Organizational Injury Plaintiffs

The last six of the twenty-six Plaintiffs assert an organizational injury.  Those Plaintiffs include the League of United Latin American Citizens (LULAC), the Texas Association of Hispanic County Judges and County Commissioners (HJ&C), the Texas League of Young Voters Education Fund (TLYV), the Texas State Conference of NAACP Branches (Texas NAACP), La Union Del Pueblo Entero, Inc. (LUPE), and the Mexican American Legislative Caucus of the Texas House of Representatives (MALC). Like the political injury Plaintiffs, the organizational Plaintiffs assert that they must now expend additional time, effort, and funding in order to educate their constituents about SB 14.

A Texas NAACP representative testified that the organization had to make the most extensive changes ever to its printed voter education materials because of SB 14.[384] In addition, the Texas NAACP had to shift the responsibilities of one of its employees

---

[383]   Hamilton Dep., *supra* at 64-65, 77.

[384]   Lydia, D.E. 561, pp. 269-70.

from mostly administrative work to 80% legislative work as a result of SB 14.[385] Similarly, a representative from the TLYV testified that the organization was forced to pivot from its core mission of encouraging young people—and, in particular, young people of color—to engage in civic participation through voting by redirecting resources to print additional marketing materials and by launching the "Got ID Texas Coalition."[386] Almost the entire "get out the vote" mission has changed from focusing on why to vote to how to vote.[387]

LULAC asserts that it is and will be required to expend time, effort, and funds to educate its members about the requirements of SB 14.   To that end, LULAC representatives testified in the Texas Legislature, held press conferences, conducted trainings, and sent out various communications to its members regarding SB 14.[388] LUPE asserts that SB 14 caused it to divert resources to educate its constituents on voting requirements.[389]   In doing so, LUPE—a non-partisan organization whose mission is to improve the community by encouraging civic engagement—created and distributed flyers and booklets to educate its members and the greater community about SB 14.   Thus, according to LUPE's executive director, the organization has been unable to completely fulfill its mission because of SB 14.[390]

---

[385] Lydia, D.E. 561, p. 270.

[386] Green, D.E. 563, pp. 255-58, 261; TLYV, Pls.' Ex. 857 (mission statement).

[387] *See* Green, D.E. 563, p. 257.

[388]  Ortiz Dep., Aug. 14, 2014, pp. 36-45, 49-50 (D.E. 592, pp. 221-22 (admitting dep.)); Pls.' Ex. 006 (Tr. Senate Floor Debate, Jan. 25, 2011).

[389] Cox, D.E. 569, pp. 160-61.
[390] Cox, D.E. 569, pp. 172-73.

Before SB 14, MALC allocated few of its resources to voter education.  But since SB 14's adoption, MALC has experienced a radical uptick in the amount of time, effort, and funding to address SB 14's requirements.  MALC's executive director stated that the organization now spends approximately 80% of its resources on voter education, and voting rights issues.[391]  As a result, it has been hindered in pursuing its policy goals and initiatives.[392]  MALC was also forced to let go of a staff member because of the additional costs.[393]  HJ&C also asserts that SB 14 has diverted the organization from its core mission of Hispanic voter turnout because it must now educate its constituents on how to satisfy SB 14 requirements.[394]

### d.  Plaintiffs' Standing

The Court finds that Plaintiff Jane Hamilton's claimed injury is not the kind of injury that the VRA or the United States Constitution was intended to redress.  Her claims are DISMISSED.  The Court finds that each of the remaining Plaintiffs has standing to sue and has stated a legal injury sufficient to support his or her respective claims regarding SB 14 requirements.

---

[391]   *Id*. at 284.

[392]   Golando, D.E. 561, pp. 281-82.

[393]   *Id*. at 287-88.

[394]   Garcia Dep., July 14, 2014, p. 158 (D.E. 592, pp. 221-22 (admitting dep.)).

# V.

## CHALLENGES TO PHOTO ID LAWS.

This Court does not write on a clean slate, as there are several cases that have addressed challenges to voter photo ID laws on United States constitutional and VRA grounds.  Understandably, Defendants rely heavily on the Supreme Court of the United States' *Crawford v. Marion County Election* Board[395] opinion.  That case involved a facial challenge to the Indiana voter photo ID law, with the argument that it imposed an unconstitutional burden on the right to vote.  The Supreme Court upheld the Indiana law, but it did not hold that all voter photo ID laws are valid.  This case is different because the Indiana law is materially different from SB 14, this is an as-applied rather than a facial challenge, there are substantial differences in the evidentiary record developed in this case, and this case includes claims of discriminatory effect, discriminatory purpose, and a poll tax, which were not present in *Crawford*.

Notably, while Defendants claim that SB 14 was modeled after the Indiana law, the Indiana law is more generous to voters.  Unlike SB 14, it permits the use of any Indiana state-issued or federal ID and contains a nursing home resident exemption.  Furthermore, Indiana is more generous in its acceptance of certain expired ID.[396]  Of particular relevance here, Indiana's accommodation of indigents, while requiring an additional trip to the county election office to claim an exemption, does not require an

---

[395]   553 U.S. 181 (2008).

[396]   *See* IND. CODE ANN. § 3-5-2-40.5(a)(3) (West 2014).

indigent to actually obtain, or pay any fees associated with, a qualified photo ID.[397]  This is significant, as demonstrated in this case.  There was also a reference in *Crawford* to a "greater public awareness" of the law, which would prompt voters to secure qualified ID, as opposed to a relative dearth of publicity and instruction in Texas.[398]

Even more compelling, however, is the difference in the record developed by the parties.  In *Crawford*, the Court was confronted with sparse evidence.  An expert report was deemed unreliable and the number of voters potentially disenfranchised in that case was estimated at 43,000 or 1% of eligible voters.[399]  Here, Plaintiffs' experts were abundantly qualified, produced meticulously prepared figures regarding voters who lack SB 14 ID, and that number is estimated at 608,470, or 4.5% of registered (not just eligible) voters.[400]  Unlike the record in *Crawford*,[401] the experts here provided a clear

---

[397]  *Id*. at § 3-11.7-5-2.5 (West 2011).

[398]  *Crawford*, 553 U.S. at 187-88 & n.6.  Here lack of information was demonstrated by evidence that, *inter alia*: (1) the Department of Public Service's website was difficult to navigate regarding EICs and places to get EICs in both English and Spanish; (2) registered voters were confused about the requirement and believed that a metro card would be sufficient; (3) mobile EIC locations were determined at the last minute and were poorly advertised; (4) many county offices offering EICs had not posted on their websites any information regarding the ID requirements or the availability of EICs; (5) the availability of birth certificates at a reduced charge was not disclosed at offices capable of issuing those birth certificates; and (6) the form used to request an EIC birth certificate is not available in Spanish.  *See* Mora, D.E. 563, pp. 131-32; Rodriguez, D.E. 582, pp. 303-09; Eagleton, Pls.' Ex. 1095, pp. 30-31; Guidry, D.E. 592, pp. 154-65; Peters, D.E. 586, p. 146; Ingram Dep., Apr. 23, 2014, p. 338 (D.E. 592, pp. 221-22 (admitting dep.)); Pls.' Exs. 455-61; Farinelli, D.E. 582, pp. 383-84.  Mr. Farinelli testified that there was no public education effort with respect to EIC birth certificates—no posted notices, no press releases, no media campaign, no direct mail to voters, no materials developed for DPS to publicize.  Farinelli, D.E. 582, pp. 389-92.  Neither were there adequate procedures to make sure EIC rates for birth certificates were ever offered.  Farinelli, D.E. 582, pp. 388-89.  The DSHS webpage addressing EICs first went live the day before Mr. Farinelli testified in this trial.  Farinelli, D.E. 582, p. 392.

[399]  *Crawford*, 553 U.S. at 187-88.

[400]  Ansolabehere, D.E. 600-1, p. 4 (report); *see also* Herron, D.E. 473 (report); Ghitza, D.E. 360-1 (report); Barreto-Sanchez, D.E. 370, 483 (report).

[401]  *Crawford*, 553 U.S. at 202 n.20.

and reliable demographic picture of those voters based on the best scientific methodology available.

And while the *Crawford* case apparently had no evidence of a single actual voter who was disenfranchised or unduly burdened,[402] this record contains the accounts of several individuals who were turned away at the polls, who could not get a birth certificate to get the required ID, or for whom the costs of getting the documents necessary to get qualified photo ID exceeded their financial and/or logistical resources.

*Crawford* applied the *Anderson/Burdick* balancing test by which the law's burden on the right to vote is weighed against the state's justifications for the law to see if the law is constitutional. The differences in the particular voter ID law and the evidence between this case and *Crawford* affect the weight of the burden side of the *Anderson/Burdick* calculus. On the justification side, Texas relies on two of the four justifications discussed in *Crawford*: (1) detecting and deterring voter fraud; and (2) increasing public confidence in elections. There is no question these are legitimate legislative interests. It is this Court's task to make the "hard judgment,"[403] based on the record provided, of how to navigate the intersection of the individual's fundamental right to vote and the state's obligation to ensure the integrity of elections.

The Eleventh Circuit's decision in *Common Cause/Georgia v. Billups* (*Common Cause III*),[404] which addressed the Georgia voter photo ID law, is similarly

---

[402]  *Id.* at 187.

[403]  *Id.* at 190.

[404]  554 F.3d 1340 (11th Cir. 2009).

distinguishable.  Like Indiana's law, the Georgia law is substantially more liberal than SB 14.  It permits the use of IDs issued by the federal government (and its branches or departments) as well as those issued by the State of Georgia (and any of its political subdivisions, such as counties, municipalities, boards, and authorities).  It also includes certain employee badges and tribal IDs.[405]

Like the Supreme Court in *Crawford*, the Eleventh Circuit applied the *Anderson/Burdick* balancing test.  And, as in *Crawford*, the *Common Cause III* court found the evidence regarding the burden on voters to be fatally insufficient.  Instead of determining how many registered voters had no qualifying ID, the plaintiffs produced a list of registered voters who had no qualifying ID *issued by the Department of Driver Safety*.  Because the Georgia law includes a number of other qualifying IDs, databases for which had not been tested against the registered voter list, the resulting number was not probative of the number of registered voters who might not have ID.[406]  Furthermore, there was no evidence of any particular voters who were unable to obtain, or were substantially burdened in getting, a qualifying ID.[407]

The Texas law here is far more restrictive and the evidence is far more robust—both with respect to the integrity of the No-Match List and with respect to individual voters who face substantial, and perhaps insurmountable, burdens in obtaining the necessary documents to vote in person.

---

[405] *Id.*

[406] *Id.*

[407] *Id.*

The Tennessee voter photo ID law was challenged in *Green Party of Tennessee v. Hargett*[408] under only the First and Fourteenth Amendments.   This recent decision addressed whether a preliminary injunction should issue.  The Court recognized that the plaintiffs had raised substantial issues, but it denied the preliminary injunction because the plaintiffs chose not to submit any evidence in support of the issues they had raised.[409]

*Frank v. Walker*[410] involves the Wisconsin voter photo ID law.  Wisconsin's voter photo ID law is the most similar to SB 14, including the requirement of presenting to the Department of Motor Vehicles certain underlying documents in order to obtain a free state photo ID card.  However, it includes two categories of photo ID that Texas does not: an ID issued by a federally recognized Indian tribe in Wisconsin and an ID issued by an accredited Wisconsin university or college.  The trial court struck down this slightly more liberal law, but the Seventh Circuit reversed.[411]

The trial court found that the claimed purpose of preventing in-person voter impersonation fraud was very weak.  The trial court found no evidence that such fraud was much of a problem, perhaps because the risk/benefit of the crime prevents it from being a rational goal and because it is not easy to commit.[412]   Existing measures, including significant criminal penalties, were held to provide any necessary deterrence,

---

[408]   No. 3:14cv1274, 2014 WL 3672127 (M.D. Tenn. July 23, 2014).

[409]   *Id.* at *4.

[410]   No. 11-CV-01128, 2014 WL 1775432 (E.D. Wisc. April 29, 2014), *rev'd*, No. 14-2058, 2014 WL 496657 (7th Cir. Oct. 6, 2014).

[411]   *Id.*

[412]   *Id.* at *6-8.

particularly given that a successful perpetration of the fraud would net only a single additional vote, unlikely to sway an election.[413]

There was no empirical evidence to support the claim that a voter photo ID law would increase public confidence in elections.[414]  The trial court stated that the public may perceive the state's conduct—of choosing to combat voter fraud by raising substantial obstacles to voting—as projecting a much larger problem than there is, thereby undermining confidence.[415]  Further, the law did nothing to boost confidence among those individuals the law would disenfranchise or put to unnecessary trouble.  The trial judge found unpersuasive the state's goals of detecting and deterring other voter fraud and promoting orderly election administration and accurate recordkeeping.[416]

The trial judge weighed those weak justifications against the same types of burdens evidenced here:  (a) the challenge of navigating the process so as to understand the requirements; (b) the cost and difficulty of obtaining underlying documents that are required to support an application for a free election ID; (c) the distance between voter residences and the offices that can issue the election ID and the special trip needed, often without ready access to transportation, for the exclusive purposes of proving up the right to vote; and (d) the fact that the number of voters potentially disenfranchised were

---

[413]  *Id*. at *8.

[414]  *Id*.

[415]  *Id*. at *8-9 (citing testimony of Professor Lorraine Minnite, who testified in this case as well).

[416]  *Id*. at *10.

certainly sufficient to sway elections.[417]   The trial judge in *Frank* found that the Wisconsin voter photo ID law was an unconstitutional burden on the right to vote.

The *Frank* trial court also found that the Wisconsin voter photo ID law violated Section 2 of the VRA because the burdens of the law disproportionately impacted Black and Latino voters and the law suppressed those minority voters in part because they are disproportionately impoverished due to a historical legacy of past, combined with present, discrimination.[418]   The evidence and arguments in the *Frank* case are similar to those presented here.

The trial court permanently enjoined the implementation of the Wisconsin photo ID law, but on appeal, the Seventh Circuit, citing *Crawford*, reversed.  This Court notes several distinguishing factors between this case and the Seventh Circuit's view of the facts in *Frank,* including:  evidence before this Court regarding the attempt by Plaintiffs to overcome the multiple obstacles to obtaining ID, such as the State's determination of location and hours of ID-issuing offices, the strict requirements regarding underlying documentation necessary to apply for IDs, and the cost involved with obtaining those underlying documents (rather than Plaintiffs appearing "unwilling to invest the necessary time"); and uncontroverted record evidence regarding the extensive history of official discrimination in Texas and the extraordinary legislative history of SB 14.  In addition, the Supreme Court's determination that another state's law is constitutional in response to a facial challenge does not govern this as-applied challenge to SB 14.  In sum, this record

---

[417]   *Id.* *11-18.

[418]   *Id.* at *32.

is compelling in detailing how SB 14's particular terms are functionally preventing motivated and historically faithful voters from casting their ballots in person at the polls.

In Pennsylvania, the focus of *Applewhite v. Commonwealth (Applewhite I)*[419] was on the initial implementation of the voter photo ID law.  In particular, the question was whether the voters had adequate access to the free ID that the law provided to those who did not have any other qualifying ID.  The Pennsylvania Department of Transportation was requiring an original or certified copy of a birth certificate or its equivalent, along with a social security card and two forms of documentation showing current residency.[420]  It was clear that some qualified voters would be unable to meet these requirements because they either did not have an adequate opportunity to become educated about the requirements and navigate the process or, because of age, disability, and/or poverty, they would be unable to meet the requirements in time for the upcoming election.[421]

The Supreme Court of Pennsylvania, over two dissenting opinions that called for an immediate imposition of injunctive relief against the photo ID law's implementation, remanded to the trial court for a determination of whether the flaws in implementation could be cured prior to the election.[422]  Finding that they could not, the trial court entered a limited preliminary injunction against enforcement of the law until such time as all qualified voters could have a reasonable opportunity to obtain a free identification without application requirements that would have the effect of disenfranchising those

---

[419]  617 Pa. 563 (2012) (per curiam).

[420]  *Id*. at 567.

[421]  *Id*. at 567-68.

[422]  *Id*. at 570-71.

voters.[423]   While that court did not enjoin poll workers from requesting to see photo ID,

they were enjoined from prohibiting a voter from casting a ballot without that ID.[424]

That decision was made on a partial record addressing the implementation of the

voter photo ID law prior to the November 2012 election.  Subsequently, the trial court

permanently enjoined the law on state grounds not present here, which require that a

registered voter have liberal access to his or her right to vote.[425]   Among other reasons,

the court held that there was no substance to Pennsylvania's claim that photo ID was

necessary to combat in-person voter impersonation fraud because there was no evidence

that such fraud was a real problem.[426]   The court also found that the voter ID law would

not increase voter confidence in election integrity because of the numbers of qualified,

but disenfranchised, voters who would be turned away at the polls.[427]   The free voter ID

cards were not being issued at expected levels, and thus they were insufficient to offset

the vast numbers of registered voters who were disenfranchised by the law and may not

know about the free IDs or be able to get them.[428]

The Tenth Circuit, in *ACLU of New Mexico v. Santillanes*,[429] considered a federal

equal protection challenge to a city charter's photo ID law, which required "one current

---

[423]   *Applewhite v. Commonwealth* (*Applewhite II*), No. 330 M.D. 2012, 2012 WL 4497211, at *3-7 (Pa. Commw. Ct. Oct. 2, 2012).

[424]   *Id*. at *4.

[425]   *See Applewhite v. Commonwealth* (*Applewhite III*), No. 330 M.D. 2012, 2014 WL 184988 (Pa. Commw. Ct. Jan. 17, 2014) (unreported).

[426]   *Id*. at *56-57.

[427]   *Id*. at *57.

[428]   *Id*. at *50-54.

[429]   546 F.3d 1313 (10th Cir. 2008).

valid identification card containing the voter's name and photograph."[430]  There, the list of acceptable IDs was non-exclusive, and included any government-issued ID, student ID, credit or debit cards, insurance cards, union cards, and professional association cards. No address or expiration date was required.  In the absence of sufficient identification, the voter could cast a provisional ballot, supported by affidavit, with ten days to cure. Moreover, a free ID was available from the city clerk's office (even on the day of the election and each of the following ten days) with no evidence of the need for costly or difficult-to-obtain underlying documentation.[431]

In relevant part, the court determined that the law was not unconstitutionally vague and survived the *Anderson/Burdick* balancing test.  While the court gave significant weight to the city's desire to prevent in-person voter impersonation fraud, it noted that there was insufficient evidence to support the challengers' assertion that there was voter confusion because of lack of education.  In the final analysis, the court appeared to rely heavily on the liberality of the requirements and the measures in place to ensure that all voters could obtain a truly free voter certificate at a conveniently located office.

Finally, SB 14 itself was previously considered by a three judge court in the District of Columbia pursuant to Texas's prior preclearance requirement.[432]  While the Court is fully cognizant that the resulting opinion was vacated when the Supreme Court

---

[430]   *Id*. at 1324 (quoting Albuquerque, N.M., City Charter, art. XIII, § 14 (as amended Oct. 4, 2005)).

[431]   *Id*. at 1316, 1324.

[432]   *Texas v. Holder* (*Texas v. Holder I*), 888 F. Supp. 2d 113 (D.D.C. 2012).

"invalidated the Section 4(b) preclearance coverage formula of the VRA",[433] and while the burden of proof in that case was on the State and retrogression was the standard, it is instructive that the court found that SB 14 weighs more heavily on the poor, who are more likely to be minorities.[434]  "A law that forces poorer citizens to choose between their wages and their franchise unquestionably denies or abridges their right to vote."[435]

## VI.

## DISCUSSION

### A.  SB 14 Places an Unconstitutional Burden on the Right to Vote—1st and 14th Amendment Claims[436]

The individual's right to vote is firmly implied in the 1st Amendment of the United States Constitution[437] and is protected as a fundamental right by both the Due Process and Equal Protection Clauses of the 14th Amendment.[438]  An equal protection

---

[433]  *Texas v. Holder* (*Texas v. Holder II*), 133 S. Ct. 2886 (2013); *see also Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013).

[434]  *Texas v. Holder I*, at 127.  While the Court acknowledges the previous Section 5 proceeding, the decision in this case rests solely on the record developed at the trial of this case from September 2 to September 22, 2014.

[435]  *Texas v. Holder I*, at 140.

[436]   This claim is brought by all of the private Plaintiffs and Intervenors:  (Veasey) Gordon Benjamin, Kenneth Gandy, Anna Burns, Penny Pope, Michael Montez, Congressman Marc Veasey, Sergio DeLeon, Evelyn Brickner, John Mellor-Crummey, Floyd Carrier, Koby Ozias, Oscar Ortiz, and LULAC; (TLYV) Imani Clark and Texas League of Young Voters Education Fund; (HJ&C) Texas Association of Hispanic County Judges and County Commissioners; (NAACP) Texas State Conference of NAACP Branches and Mexican American Legislative Caucus of the Texas House of Representatives; and (Ortiz) Lenard Taylor, Lionel Estrada, Estela Garcia Espinoza, Eulalio Mendez, Margarito Lara, Maximina Lara, and La Union del Pueblo Entero.

[437]   *See Kusper v. Pontikes*, 414 U.S. 51 (1973); *Briscoe v. Kusper*, 435 F.2d 1046, 1053 (7th Cir. 1970); *Paul v. State of Ind., Election Bd.*, 743 F. Supp. 616, 623 (S.D. Ind. 1990); *Wright v. Mahan*, 478 F. Supp. 468, 473 (E.D. Va. 1979), *aff'd*, 620 F.2d 296 (4th Cir. 1980); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 224 (2010) (Scalia, J. concurring) ("We have acknowledged the existence of a First Amendment interest in voting."); *Storer v. Brown*, 415 U.S. 724, 756 (1974) (Brennan, J. dissenting) ("The right to vote derives from the right of association that is at the core of the First Amendment."); *Harper v. Va. State Bd. Of Elections*, 383 U.S. 663, 665 (1966).

[438]   *See Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 786 n.7, 787 (1983); *see also Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964); *Yick Wo. v. Hopkins*, 118 U.S. 356, 370 (1886).

challenge applies either when a state "classifies voters in disparate ways, or places restrictions on the right to vote."[439]   It is the restriction on the right to vote that applies here.  And while the right to vote is not absolute,[440] the state may not burden it unduly.

### 1.   The Test For Evaluating the State's Interest Against the Individual's Right

The determination of what is an undue burden is made by applying one of three tests formulated to calibrate the respective interests of individual voters against the state in a constitutional dispute.[441]   If the burden is severe, such that the individual loses the ability to vote, for instance, the standard of review is one of strict scrutiny.[442]   Strict scrutiny requires courts to review the restriction to assure that it is "narrowly drawn to advance a state interest of compelling importance."[443]   Plaintiffs concede, and the Court finds, that the burden SB 14 imposes on Texas voters is not severe as that term is used in this constitutional analysis.

On the opposite end of the spectrum are those regulations that do not treat individuals differently and do not impose much of a burden at all.  In those cases, the courts apply a rational basis test.[444]   That test does not apply here because a burden on the

---

[439]   *See Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (internal citations omitted).

[440]   *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citations omitted).

[441]   *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-90 (2008).

[442]   *Burdick*, 504 U.S. at 434.

[443]   *Id*. (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

[444]   *Obama for Am.*, 697 F.3d at 429.

right to vote, which is preservative of other rights,[445] implicates heavier burdens than the rational basis test will accommodate.[446]

Here, Plaintiffs assert a substantial, albeit not severe, burden on their right to vote. To evaluate claims in this middle ground, the Court applies the *Anderson/Burdick* balancing test as the standard of review.[447]   The balancing test is articulated in *Burdick* as follows:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," ***taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights***."[448]

In other words, the Court must "determine the legitimacy and strength of each of [the State's] interests"[449] and the extent to which those particular interests cannot be achieved without imposing the particular resulting burden on Plaintiffs' right to vote.[450]

### 2.  How to Apply the Balancing Test

The question is whether the State's interests, including detecting and preventing voter fraud, preventing non-citizen voting, and fostering public confidence in election

---

[445]   *Wesberry v. Saunders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined.").

[446]   *Crawford*, 553 U.S. at 189.

[447]   *See id.* at 190; *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789.

[448]   *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789; emphasis added).

[449]   *Anderson*, 460 U.S. at 789.

[450]   *Id.*

integrity, justify the specific burdens that are imposed on voters who are required to produce one of the limited SB 14-qualified photo IDs in order to vote in person at the polls. There is some question whether, when assessing this balance, a court is to consider the magnitude of the law's burden on the electorate generally or on a specific subgroup.[451] In other words: Does the burden imposed by having to produce an SB 14-qualified ID have to unduly burden all of the registered voters in Texas or just those who do not already have the ID?

In *Crawford's* lead opinion, Justice Stevens concluded that the Supreme Court was not supplied with the evidence necessary to assess the burden on a subgroup and therefore evaluated Indiana's law as it applied generally.[452] Justice Stevens' reasoning in dismissing the subgroup-particularized balancing test does not apply here because the type of evidence that Justice Stevens needed in order to consider the burden on the subgroup has been supplied as to Texas voters in this case.

On the other hand, Justice Scalia's concurring opinion dismisses any need to evaluate subgroups because he treats them not as having a particularized burden, but rather as having individual impacts from a single burden—and he considered the law to be unconcerned with individual impacts. He treated the Indiana voter ID law as one slight burden applied universally.[453] This Court reads *Anderson* and *Burdick*, as well as

---

[451] *See Ohio State Conference of the NAACP v. Husted (Ohio NAACP II)*, No. 14-3877, 2014 WL 4724703, at *14-15 (6th Cir. Sept. 24), *stayed*, 573 U.S. ___ (Sept. 29, 2014); *Frank v. Walker*, 11-CV-01128, 2014 WL 1775432, at *4-5 (E.D. Wis. Apr. 29), *rev'd*, No. 14-2058, 2014 WL 496657 (7th Cir. Oct. 6, 2014).

[452] *Crawford*, 553 U.S. at 201-03 (Stevens, J., lead opinion).

[453] *Crawford*, 553 U.S. at 205, 209 (Scalia, J. concurring).

the lead opinion in *Crawford*, to require balancing the state's interest against the burdens imposed upon the subgroup—here, those who do not possess an SB14-qualified photo ID.[454]

### 3. The Balancing Test, Applied

Unlike in *Crawford*, this Court is confronted with an as-applied challenge to the voter photo ID law. This decision comes after full trial on the merits in which the Court heard abundant evidence of specific Plaintiffs' individual burdens as well as evidence of more categorical burdens that apply to the population represented by the No-Match List. The Court must determine the nature of SB 14's burden, the nature of the state's justifications, and whether the state's interests make it necessary to burden the Plaintiffs' rights. While Plaintiffs have not demonstrated that any particular voter absolutely cannot get the necessary ID or vote by absentee ballot under SB 14, such an extreme burden is not necessary in an as-applied challenge.

### a. The Burden

### i. The Extent of the Burdened Voters

As set out above, sophisticated statistical methods employed by highly qualified experts have revealed that approximately 608,470 registered voters in Texas lack SB 14-qualified ID.[455] Even if that number is discounted by the numbers Dr. Hood challenges,

---

[454]    *See Ohio NAACP II*, 2014 WL 4724703, at *15-16; *Frank*, 2014 WL 1995432, at *5.

[455]    Ansolabehere, D.E. 600-1, p. 4 (report); *see also* Herron, D.E. 473 (report); Ghitza, D.E. 360-1 (report); Barreto-Sanchez, D.E. 370, 483 (reports).

over half a million registered voters are expected to lack the ID necessary to cast their votes in person at the polls.[456]

To vote in person at the polls, all but the disabled (who fall into a limited class of officially acknowledged disability) and those who have a religious objection to being photographed must have one of the prescribed forms of photo ID.  The evidence is clear that there is significant time, expense, and travel involved in obtaining SB 14-qualified ID, even if a person has the necessary documents, time, and transportation available to do so.  The evidence in this case is extensive and has been detailed above.

### ii.  The EIC is Not a Safe Harbor

Knowing that a substantial number of registered voters lack SB 14-qualified ID, and knowing that voting must be accessible to the poor, the legislature created the EIC as a safe harbor.  But the terms on which an EIC is available do little to make it a bona fide safe harbor for those having difficulty obtaining other SB 14-qualified ID.  Applicants still need the same underlying documents required to obtain a driver's license or personal ID card.  Those underlying documents will cost at least $2.00.  Voters must go to a DPS office, or in some cases the county clerk's office, which may be substantially further than their polling place and is sometimes a prohibitive distance.[457]

---

[456]   Hood, D.E. 604-1, p. 4 (report).
[457]   Sen. Patrick testified that he supported an exemption from ID requirements for the disabled because he knew that the travel distance could be prohibitive.  D. E. 588, p. 299; Pls.' Ex. 331.

DPS officers are present at driver's license offices that issue EICs, the law still permits fingerprinting,[458] and there is still the impression that EIC applicants will be screened for outstanding tickets and warrants, instilling a fear of arrest.  While mobile EIC units have been created, the evidence at trial indicated that there are too few and their schedules are too erratic to make a real difference.  The fact that only 279 EICs had been issued as of the time of trial, compared to the rate of issuance of free IDs offered in other states, indicates that the EIC safe harbor program has failed to mitigate the burdens on Texas voters who do not have SB 14-qualified ID.

### iii.  Provisional Balloting is Not A Safe Harbor

A registered voter who appears at the polls without the required SB 14 ID is supposed to be given the opportunity to cast a provisional ballot, which must be cured within six days of the election.  Some Plaintiffs testified that they were turned away without being given the provisional ballot opportunity.  More important, however, is the fact that the only way to cure a provisional ballot and have it count is to later produce SB 14-qualified ID.  If a voter does not have that ID on election day, the evidence indicates that it will be very difficult for the voter to get it within six days.

Thus the provisional ballot procedure may work for voters who know to ask for a provisional ballot, who need one simply because they forgot the SB 14-qualified ID they already have, and who will suffer no substantial impediment to returning to the designated location to later cure the ballot.  On the other hand, the provisional ballot

---

[458]   The fingerprinting of EIC applicants was stopped at the request of the SOS, but the law still permits it.

procedure does nothing for voters who are not informed of the procedure, who do not have SB 14-qualified ID already available and do not have an original or certified copy of their birth certificate or other necessary proof of identity at the ready, or who do not have necessary transportation.   Plaintiffs, who fall squarely within the demographic expectations of the individuals on the No-Match List, are largely unable to cast a provisional ballot that can be cured in a timely manner and thus be counted.

### iv.  The Mail-In Alternative Does Not Relieve the Burden

In reviewing the extent of the burden imposed by SB 14 on individual Plaintiffs, the Court has considered the alternative of voting by mail.  Defendants argue that many of the individual Plaintiffs—those who are 65 years of age or older, or disabled—are not burdened by SB 14 because they are eligible to vote by mail-in ballot, for which SB 14 ID is not required.[459]  However, absentee balloting carries other burdens.

**Voters May Not Be Aware**.  Some individuals who are eligible to vote by mail may be unaware that it is permitted or that SB 14-qualified ID is not required with that method.  This problem was evidenced by the testimony of witnesses at trial.

**The Procedure is Complicated**.  The mechanics of voting by mail create a different set of procedural hurdles that may prevent an individual from successfully casting a ballot and having that ballot counted.[460]  In order to vote by mail in Texas, an

---

[459]   *See* TEX. ELEC. CODE ANN. §§ 82.002-.003, 86.001.

[460]    *See Ohio State Conference of NAACP v. Husted (Ohio NAACP I)*, 2:14-CV-404, 2014 WL 4377869, at *33 (S.D. Ohio Sept. 4) ("The associated costs and more complex mechanics of voting by mail" along with other factors,

eligible voter must complete an application and mail it to the early voting clerk.[461] Eligible voters who reside in Texas[462] and wish to vote by mail must apply for a mail-in ballot within a specific window of time:  no earlier than 60 days and no later than 9 days before election day.[463]

If an application that was received 12 or more days before the election is rejected, the applicant will be notified of the reasons for the rejection and will be able to submit a second application.[464]  If an application that was received fewer than 12 days before the election is rejected, the voter will be notified of the reasons for the rejection but will be unable to submit a second application.[465]  If the application is accepted, the clerk mails the voter a ballot, which the voter must fill out and return so as to be received before polls close (generally 7:00 p.m.) on election day.[466]

Requiring elderly or disabled voters—the population that is most likely to need assistance—to vote by mail can deny them the opportunity to receive assistance with their ballots.[467]  In contrast, when voting in person, if the voter needs help with the

---

including demographics, "indicate to the Court that voting by mail may not be a suitable alternative for many voters"), *aff'd*, 14-3877, 2014 WL 4724703 (6th Cir. Sept. 24), *stayed*, 573 U.S. ___ (Sept. 29, 2014).

[461] TEX. ELEC. CODE ANN. § 86.001.

[462]  Slightly different timelines apply to out-of-state military and overseas voters voting by mail.  *See* Military & Overseas Voters, http://votetexas.gov/military-overseas-voters.

[463]  *See* http://www.votetexas.gov/voting/when.

[464] TEX. ELEC. CODE ANN. § 86.008.

[465]  *Id.*  There are at least 13 reasons for which an application for mail-in ballot may be rejected by the early voting clerk.  *See Notice of Defective Application for Ballot by Mail*, *available at* http://www.sos.state.tx.us/elections/forms/pol-sub/5-16f.pdf.

[466]  The ballot must be received, not merely post-marked, by the deadline.  TEX. ELEC. CODE ANN. § 86.007.

[467]  *See Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Absentee voters also are more prone to cast invalid ballots than voters who, being present at the polling place, may be able to get assistance from the election judges if they have a problem with the ballot.").

logistics of casting a ballot, poll workers are there to assist, as testified to by Ms. Eagleton.[468]  Other factors outside of a voter's control may also affect the reliability of an absentee ballot.[469]

**Materials Go Missing**.  Voting by mail also carries a risk of the application or the ballot itself being delayed or lost in the mail, which would prevent the voter from actually casting a ballot.  No such risk exists for those voting in person.  Several Plaintiffs testified that they do not trust the process of voting by mail-in ballot and prefer to vote in-person, for reasons that include seeing their vote actually being cast.[470]  Plaintiff Benjamin testified that he was suspicious of voting by mail, stating that "mail ballots have a tendency to disappear."[471]  Calvin Carrier testified that his father's mail often gets lost and that his father does not want to rely on a mail-in ballot to exercise his franchise.[472]

**Timing Requires Pre-Planning and Deprives a Voter of Considering Last-Minute Campaign Developments**.  Voting by mail also requires significantly more advance planning than voting in person does.  Any individual wishing to vote by mail-in ballot must plan far enough in advance to make a timely application and then must also mail the ballot early enough to ensure that the ballot is received no later than 7:00 p.m.

---

[468]  Eagleton, Pls.' Ex. 1095, p. 10.

[469]  *See, e.g., Thompson v. Willis*, 881 S.W.2d 221, 222 (Tex. App.—Beaumont 1994, no writ) (invalidating a local election where the Early Voting Ballot Board improperly marked 120 early/absentee ballots).

[470]  *See* Veasey, D.E. 561, pp. 251-52; Mendez, D.E. 563, pp. 100-01; Taylor, D.E. 569, p. 150; Bates, Pls.' Ex. 1090, p. 21.

[471]  Benjamin, D.E. 563, p. 292.

[472]  C. Carrier, D.E. 561 pp. 29-31.

the day of the election.[473]  Because of that timing issue, individuals voting by mail are deprived of using relevant information that becomes available immediately prior to the election to possibly change how they want to vote in a particular contest.[474]

**Different is Not Equal**.  Otherwise eligible voters should not be abridged in the manner in which they choose to exercise their franchise.  The Supreme Court has repeatedly found that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."[475]  "The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise."[476]

Some Plaintiffs desire the ability to fully carry out their civic duty and exercise a right that some Plaintiffs remember being effectively abridged or denied within their lifetimes.[477]  Plaintiff Gholar does not consider voting by mail equivalent to voting in person, and describes voting in person on election day as a "celebration" that she has

---

[473]     In reviewing the availability of mail-in (or absentee) voting in Georgia, which has significantly less strict timelines for requesting a mail-in ballot than Texas, the court found that "[t]he majority of voters—particularly those voters who lack Photo ID—would not plan sufficiently enough ahead to vote via absentee ballot successfully.  In fact, most voters likely would not be giving serious consideration to the election or to the candidates until shortly before the election itself."  *Common Cause I*, 406 F. Supp. 2d at 1364-65.

[474]     *See Griffin*, 385 F.3d at 1131 ("[B]ecause absentee voters vote before election day, often weeks before, they are deprived of any information pertinent to their vote that surfaces in the late stages of the election campaign.") (internal citations omitted); *Selph v. Council of City of Los Angeles*, 390 F. Supp. 58, 60 (C.D. Cal. 1975) ("Plaintiffs present a strong argument to support their contention that many voters either change their minds as to the manner in which they will vote on candidates and issues in the two or three days preceding Election Day or wait until that period to seriously concentrate on the ballot decisions they must make.").

[475]     *Dunn*, 405 U.S. at 336 (citations omitted); *accord Obama for Am.*, 697 F.3d at 428.

[476]     *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (internal quotations marks omitted) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)); *accord Obama for Am.*, 697 F.3d at 428; *see also Baker v. Carr*, 369 U.S. 186 (1962) ("Our form of representative democracy is premised on the concept that every individual is entitled to vote on equal terms.").

[477]     *See* Washington, Pls.' Ex. 1093, pp. 12, 16-17, 75-76; Gholar, D.E. 1092, pp. 60-61; Mendez, D.E. 563, p. 100; Johnson, D.E. 569, p. 19; Mar. Lara, D.E. 573, p. 220; Ellis, D.E. 573, p. 157.

"earned."[478]  Plaintiff Gandy testified that he regards being forced to vote by mail as akin to being treated like a "second-class citizen."[479]  Plaintiff Hamilton testified that the senior citizens that she works with resent being told to vote by mail and that many want to personally go to the polls, especially those who "literally fought for the right to vote."[480]

**Mail-In Balloting is Not a Cure for SB 14 Burdens**.  There is extensive evidence in the record that "voting by mail is not actually a viable 'alternative means of access to the ballot'" for many of the Plaintiffs.[481]  This record confirms what other courts have found:  that voting by mail is fundamentally different from voting in person and, itself, constitutes a burden on the right to vote.[482]  Elderly and disabled voters especially should not be required to vote by mail, while most others continue to vote in person, merely to avoid the obstacles created by the State.  The Court thus finds that voting by mail is not a satisfactory alternative for elderly and disabled voters who lack SB 14 ID and thus does not excuse the significant burdens placed on those voters by the State.

---

[478]   Gholar Dep., July 16, 2014, pp. 21, 83 (D.E. 592, pp. 221-22 (admitting dep.)).

[479]   Gandy Dep., June 11, 2014, pp. 62-63 (D.E. 592, pp. 221-22 (admitting dep.)).

[480]   Hamilton Dep., June 5, 2014, pp. 66-67 (D.E. 592, pp. 221-22 (admitting dep.)).

[481]     *See Ohio NAACP II*, 2014 WL 4724703, at *13; *see also Common Cause I*, 406 F. Supp. 2d at 1365 ("[A]bsentee voting simply is not a realistic alternative to voting in person that is reasonably available for most voters who lack Photo ID.").

[482]     *See ACLU of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (citing *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830–31 (S.D. Ind. 2006)); *see also United States v. Texas.*, 445 F. Supp. 1245, 1254 (S.D. Tex. 1978) (implicitly recognizing that requiring young voters to obtain absentee ballots may constitute a special burden), *aff'd mem. sub nom. Symm v. United States*, 439 U.S. 1105 (1979); *Walgren v. Howes*, 482 F.2d 95, 100, 102 (1st Cir. 1973) (implicitly recognizing that absentee voting has inherent burdens, additional procedural requirements, and disadvantages, as compared to in-person voting).

### b.   The State's Interests

"A State indisputably has a compelling interest in preserving the integrity of its election process."[483]   States must be able to regulate elections if they are to be fair, honest, and orderly.[484]   Likewise, the restrictions they use must, in fact, be "generally applicable, even-handed, politically neutral, and . . . protect the reliability and integrity of the election process."[485]   Proper administration of elections further works to the individual's benefit in assuring the individual's right to vote and to associate with others for political ends.[486]   Yet even a slight burden on voters "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"[487]

In the time period during which voter photo ID laws were debated in the Texas Legislature, the asserted rationales shifted.   At one time or another, Defendants argued five justifications for the photo ID law:  (1) detecting and preventing voter fraud;[488] (2) preventing non-citizen voting;[489] (3) improving the electorate's confidence in the integrity of elections;[490] (4) increasing voter turnout;[491] and (5) addressing bloated voter

---

[483]   *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted).

[484]   *Storer*, 415 U.S. at 730.

[485]   *Gonzalez v. Arizona (Gonzalez I)*, 485 F.3d 1041, 1049 (9th Cir. 2007) (internal quotation marks and citations omitted).

[486]   *See Anderson*, 460 U.S. at 788.

[487]   *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89).

[488]   This was the first concern, expressed in 2005 using terms like "a voter fraud epidemic."  Anchia, D.E. 573, p. 318.

[489]   The non-citizen narrative started in 2007.  Anchia, D.E. 573, p. 322.  Between 2007 and 2009, legislators began conflating the issue of non-citizen voting with illegal immigration, while a 2008 report debunked the prevalence of non-citizen voting.  Anchia, D.E. 573, p. 319.

[490]   *Id*. at 320.

[491]   *Id*. at 326.

registration rolls.[492]  There is no question that the State has a legitimate interest in each of those issues.[493]   The question for this Court is whether those interests justify the particular burdens imposed.

**Detecting and Deterring Fraud**.  SB 14, if effective, would operate only against in-person voter impersonation fraud.  That type of fraud is very rare.  Yet, the State is not required to prove specific instances of voter fraud in order to have some interest in protecting against it.[494]   Because the record contains proof of four instances of in-person voter impersonation fraud in Texas, only two of which predated the passage of SB 14 with any proximity, there is some question whether a change in the law was required.  The existing pre-SB 14 framework, outlined in Section II, of requiring the voter registration card and, in the absence of that, other forms of identification that included non-photo ID, was demonstrated to be sufficient to assure that those showing up to vote were the registered voters that they claimed to be.  Defendants failed to rebut this evidence, and witnesses for the state were unable to articulate a reason that additional measures were required to combat this type of voter fraud.

SB 14's proponents were unable to articulate any reason that a more expansive list of photo IDs would sabotage the effort other than speculation that the limited universe of SB 14 IDs would be easier for poll workers to process.  While the state has an interest in detecting and deterring voter fraud, SB 14 was clearly overkill in that its extreme

---

[492]  Ingram, D.E. 588, p. 375.

[493]   *Crawford*, 553 U.S. at 196-97 (voter fraud and confidence in elections); *Texas v. Holder I*, 888 F. Supp. 2d at 125 (confidence in elections).

[494]   *ACLU of N.M.*, 546 F.3d at 1323.

limitation on the type of photo IDs that would qualify does not justify the burden that it engenders.

**Non-Citizen Voting.**   There is very limited evidence that non-citizen voting is a problem.  Only one instance was described.  It involved a Norwegian, who was legally in the country and who filled out paperwork admitting that he was not a citizen.  When he nonetheless received a voter registration card, he thought he was legally permitted to vote and did so.[495]   Representative Hernandez-Luna indicated that most illegal immigrants would be afraid to vote.  The problem, if there is one, is rare.

Importantly, it is undisputed that SB 14-qualified ID can be legally obtained by non-citizens.  Those who are legal permanent residents or who hold unexpired visas are entitled to obtain a Texas driver's license[496] even though they are not entitled to vote.  Non-citizen members of the military will have military IDs.  Thus requiring those persons to produce an SB 14-qualified photo ID at the polls would not stop them from voting.  Again, the nature of the concern and the method for addressing it do not line up well and this is not a compelling justification for the specific terms of SB 14.

**Improving Confidence in Elections**.   Lieutenant Governor Dewhurst reported general hearsay that people lack confidence in elections and Defendants relied on opinion polls in which people reported that they favored some sort of photo ID requirement to vote.  However, nothing in the evidence linked the particular terms of SB 14 with voter confidence.  In fact, the provisional ballot requirement for those without SB 14 ID would

---

[495]   Anchia, D.E. 573, p. 323.

[496]   TEX. TRANSP. CODE § 522.021 (driver's license requirements).

likely decrease voter confidence.  There is a substantial risk of the loss of confidence when fully qualified, registered voters cannot vote in person and are relegated to the less reliable mail-in ballot or cannot vote at all.  Because there is always some state interest in running elections in a manner that instills confidence, the Court gives this justification some weight, but finds that the justification is not served by the overly strict terms of SB 14.

**Increasing Voter Turnout**.  This was often stated in conjunction with improving voter confidence.  There was some evidence that photo ID laws suppress voter turnout and no competent evidence that any photo ID law has improved voter turnout.  SB 14 has been enforced since November 2013, and there is no credible evidence that election turnout since then has been any better than before.  The Court finds that this justification has weight only in its abstract form and does not justify the burdens accompanying the restrictive terms of SB 14.

**Bloated Voter Registration Rolls**.  This justification came up during the trial and in the Defendants' proposed findings of fact and conclusions of law.  While stated as a separate justification, it is part of the concern over voter impersonation fraud.  With registration rolls including the names of persons who do not belong on them, it is easier (although not necessarily more likely) for voter impersonation to take place.  The Court combines this interest with the first interest in detecting and deterring voter fraud.

The Court is mindful of the various burdens placed on the Plaintiffs and the right to vote discussed above.[497]   They face obstacles far in excess of the usual burdens of voting in that they have to go through complicated and expensive lengths to obtain an accurate birth certificate, they have to prove up name discrepancies, and one would even have to forfeit a commercial driver's license or pay surcharges that he cannot now afford. The State's legitimate interests are so rarely implicated, that it is difficult to conceive how any restriction that places a substantial burden on voters without SB 14-qualified ID could be justified.

### c.   Under *Anderson/Burdick*, SB 14 Places an Unconstitutional Burden on Voters

The record in this case does not support the legislature's specific choices in passing the strictest law in the country—allowing the fewest types of ID and providing no safe harbor for indigents.[498]   SB 14's restrictions go too far and do not line up with the proffered State interests.   Thus Plaintiffs have sustained their legal burden to show a violation of the 1st and 14th Amendments because SB 14 imposes a substantial burden on the right to vote, which is not offset by the state's interests.

---

[497]   The burden created by SB 14 may not be rebutted under Section 2 by positing that this unequal opportunity may be overcome if individuals devote sufficient resources to the task or by positing that the unequal opportunity is somehow a product of individual "choice."   *See Teague v. Attala County*, 92 F.3d 283, 293-95 (5th Cir. 1996); *Kirksey v. Bd. Of Supervisors*, 54 F.2d 139, 145, 150 (5th Cir. 1977) (en banc), *cert. denied*, 434 U.S. 968 (1977); *United States v. Marengo County*, 731 F.2d 1546, 1568-69 (11th Cir. 1984); *Major v. Treen*, 574 F. Supp. 325, 351 n.31 (E.D. La. 1983) (three-judge court).

[498]   The opportunity for in-person voters without SB 14 ID to cast a provisional ballot does not serve as a safe harbor because they still must present that ID within six days after the election.   That means that the documentary requirements and any associated fees are obstacles that must still be overcome and few individuals will be able to complete the process and have ID in hand within the short window of time allowed after casting a provisional ballot. Neither is the availability of a mail-in ballot a safe harbor.   Absentee ballots are only available to a subset of voters, most of whom are Anglo.   TEX. ELEC. CODE §§ 82.001-.004.   Because of the requirements for obtaining a mail-in ballot and the risks associated with such ballots, they are not equivalent to voting in person.

The unconstitutionality of SB 14 lies not just in the fees the State charges for birth certificates, although that is part of it.  It is not just about causing people to make extra trips—in many cases covering significant distance—to county and state offices to get their photo IDs, although that is part of it.  It is not just about making people figure out the requirements on their own and choose whether to go to work or go get a photo ID, although that is part of it.  It is not just about creating a second class of voters who can only vote by mail, although that is part of it.  And it is not just about placing the administration of voting rights in the hands of a law enforcement agency, although that, too, is part of it.

The unconstitutionality of SB 14 lies also in the Texas Legislature's willingness and ability to place unnecessary obstacles in the way of a minority that is least able to overcome them.  It is too easy to think that everyone ought to have a photo ID when so many do, but the right to vote of good citizens of the State of Texas should not be substantially burdened simply because the hurdles might appear to be low.  For these Plaintiffs and so many more like them, they are not.

### B. The Voting Rights Act is Constitutional and SB 14 Violates the Act

Defendants contend that Plaintiffs' Section 2 claims are unconstitutional as exceeding the scope of the 14th and 15th Amendments and being unduly vague in applying a "totality of the circumstances" test.  This Court has previously rejected these arguments[499] and continues to hold that, under *LULAC v. Clements*[500] and *Jones v. City of*

---

[499]   D.E. 385, pp. 32-34.

*Lubbock*,[501] Plaintiffs have stated viable claims to relief pursuant to Section 2 of the Voting Rights Act.  The Court rejects Defendants' challenges to the constitutionality or viability of the Section 2 claims.

### 1.   SB 14 Produces a Discriminatory Result—Voting Rights Act, Section 2[502]

Section 2 of the Voting Rights Act prohibits a state from imposing a voting qualification, prerequisite to voting, or standard, practice, or procedure that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race[,] color[, or language minority status]."[503]  This is referred to as the "results test." When analyzing a violation under the results test, proof of intentional discrimination is not required.[504]

A results violation "is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected

---

[500]   986 F.2d 728, 759-60 (5th Cir. 1993).

[501]   727 F.2d 364, 373 (5th Cir. 1984).

[502]   This claim is brought by the United States of America and all of the private Plaintiffs and Intervenors:  (Veasey) Gordon Benjamin, Kenneth Gandy, Anna Burns, Penny Pope, Michael Montez, Congressman Marc Veasey, Sergio DeLeon, Evelyn Brickner, John Mellor-Crummey, Floyd Carrier, Koby Ozias, Oscar Ortiz, LULAC, (TLYV) Imani Clark, Texas League of Young Voters Education Fund, (TAHCJ) Texas Association of Hispanic County Judges and County Commissioners, (NAACP) Texas State Conference of NAACP Branches, Mexican American Legislative Caucus of the Texas House of Representatives, (Ortiz) Lenard Taylor, Lionel Estrada, Estela Garcia Espinoza, Eulalio Mendez, Margarito Lara, Maximina Lara, La Union del Pueblo Entero.

[503]   52 U.S.C. § 10301(a), transferred from 42 U.S.C. § 1973(a).

[504]    S. Rep. No. 97-417, 97th Cong., 2d Sess., at 2 (1982); *Chisom v. Roemer*, 501 U.S. 380, 394 & n.21. The legislative history and case opinions issued since the 1982 amendments to Section 2 make it clear that Plaintiffs may bring a claim based on discriminatory voting practices using either the results test or an intentional discrimination test.  *See* 52 U.S.C. § 10301(a), transferred from 42 U.S.C. § 1973(a); S. Rep. No. 97-417; *League of United Latin Am. Citizens (LULAC), Council No. 4434 v. Clements*, 986 F.2d 728, 741-42, *on reh'g*, 999 F.2d 831 (5th Cir. 1993); *Velasquez v. City of Abilene, Tex.*, 725 F.2d 1017, 1021 (5th Cir. 1984).

class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[505]   In vote denial cases, a two-part analysis is conducted under the "totality of the circumstances" test.[506]   First, a court determines whether the law has a disparate impact on minorities.[507] Second, if a disparate impact is established, the court assesses whether that impact is caused by or linked to social and historical conditions that currently or in the past produced discrimination against members of the protected class.[508]   The Court finds both that SB 14 imposes a disparate impact on African-Americans and Latinos and that its voter ID requirements interact with social and historical conditions to cause an inequality in voting opportunity.[509]

### a. SB 14 Has a Disparate Impact on African-Americans and Latinos

It is clear from the evidence—whether treated as a matter of statistical methods, quantitative analysis, anthropology, political geography, regional planning, field study, common sense, or educated observation—that SB 14 disproportionately impacts African-

---

[505]   52 U.S.C. § 10301(b), transferred from 42 U.S.C. § 1973(b).

[506]   *See Ohio NAACP II*, 2014 WL 4724703, at *24; *League of Women Voters of N.C. v. North Carolina*, 14-1845, 2014 WL 4852113, at *12 (4th Cir. Oct. 1), *stayed*, 574 U.S. ___ (Oct. 8, 2014).

[507]   *See Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) ("the 'right' question . . . is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice. . . .   In order to answer this question, a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'") (internal citations omitted); *Gonzalez v. Arizona (Gonzalez II)*, 624 F.3d 1162, 1193 (9th Cir. 2010).

[508]   *See Gingles*, 478 U.S. at 46 ("Plaintiffs must demonstrate that, under the totality of the circumstances, the [practices] result in unequal access to the electoral process."); *Gonzalez II*, 624 F.3d at 1193 ("Rather, pursuant to a totality of the circumstances analysis, the plaintiff may prove causation by pointing to the interaction between the challenged practice and external factors such as surrounding racial discrimination, and by showing how that interaction results in the discriminatory impact.").

[509]   *See Gingles*, 478 U.S. 47.

American and Hispanic registered voters relative to Anglos in Texas.  The various studies of highly credentialed experts compel this conclusion.[510]   And while Defendants criticized Plaintiffs' experts' methods on cross-examination and with proffered experts of their own, they failed to raise a substantial question regarding this fact.

To call SB 14's disproportionate impact on minorities statistically significant would be an understatement.  Dr. Ansolabehere's ecological regression analysis found that African-American registered voters were 305% more likely and Hispanic registered voters 195% more likely than Anglo registered voters to lack SB 14-qualified ID.  Drs. Barreto and Sanchez's weighted field survey, a different but complementary statistical method, found that Hispanic voting age citizens were 242% more likely and African-American voting age citizens were 179% more likely than Anglos to lack adequate SB 14 ID.  This evidence was essentially unrebutted and the Court found the experts' methodology and testing reliable.

Thus, regardless of the method, the experts[511] and this Court conclude that SB 14 will have a disparate impact on both Hispanics and African-Americans throughout the State of Texas.  However, a bare statistical showing of a disproportionate impact is not enough.[512]  It is only the first part of the Section 2 results standard.

---

[510]   Even Dr. Hood, Defendants' expert witness, admitted that his findings demonstrated a disproportionate impact with respect to the rate of qualified SB 14 ID possession for African-Americans and Hispanics compared to those of Anglos.  Hood, D.E. 588, pp. 179, 194, 230-37 (testimony).

[511]   Discussed in Section IV(B)(1), *supra*.

[512]   *Smith v. Salt River Project Agric. Improvement & Power Dist.*, 109 F.3d 586, 595 (9th Cir. 1997).

### b. SB 14's Terms Combine With the Effects of Past Discrimination to Interfere with the Voting Power of African-Americans and Latinos

The Section 2 results standard also requires "a searching practical evaluation of the 'past and present reality'" and "a 'functional' view of the political process"[513] to determine whether the voting regulation diminishes voting opportunities for African-Americans and Latinos.  Generally, factors to review in assessing whether a law violates the Section 2 results standard include, but are not limited to:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. Whether political campaigns have been characterized by overt or subtle racial appeals;

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

---

[513] *Gingles*, 478 U.S. at 45 (quoting from S. Rep. 97-417, p. 30).

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

[8.]  Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; [and]

[9.]  Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.[514]

"[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."[515]

These Senate factors were designed with redistricting and vote-dilution in mind.[516] In contrast, "Vote denial occurs when a state employs a 'standard, practice, or procedure' that results in the denial of the right to vote on account of race."[517]  Vote denial is at issue here.[518]  At least one court declined to apply the Senate factors to a vote denial case."[519] Although the courts most commonly apply the Senate factors in vote dilution cases, multiple courts have expressly found these factors to be relevant to vote denial cases as

---

[514]  *Id*. 36-37 (quoting from S. Rep. No. 97-417's non-exhaustive list, at pp. 28-29).

[515]  *Id*. at 45.

[516]  *Frank*, 2014 WL 1775432, at *23; *Mississippi State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1263 (N.D. Miss. 1987), *aff'd sub nom. Mississippi State Chapter, Operation Push v. Mabus*, 932 F.2d 400 (5th Cir. 1991).

[517]  *Johnson v. Governor of Florida*, 405 F.3d 1214, 1227 n.26 (11th Cir. 2005) (en banc) (citations omitted).

[518]  "Vote denial" includes not only practices that categorically deny minority citizens the right to vote but, also, those that impose obstacles to voting that disproportionately affect minority voters and deny minority voters an equal electoral opportunity in the totality of the circumstances.  *See, e.g.*, *Chisom*, 501 U.S. at 397-98.

[519]  *Frank*, 2014 WL 1775432, at *31 (citing *Gingles*, 478 U.S. at 47); s*ee also N.C. State Conference of NAACP v. McCrory*, 997 F. Supp. 2d 322, 348 (M.D.N.C.), *aff'd in part, rev'd in part and remanded on other grounds sub nom. League of Women Voters of N.C. v. North Carolina*, 14-1845, 2014 WL 4852113 (4th Cir. Oct. 1), *stayed*, 574 U.S. ___ (Oct. 8, 2014).

well.[520]   The Court finds that Senate factors 1, 2, 5, 6, 7, 8, and 9 are relevant and have been demonstrated by the evidence.

**Factor One:  History of Official Discrimination**.  The Court has set out above in Section I(A) the long history of official discrimination practiced in Texas that impacted the right to vote of minorities.  It will not be repeated here.  This factor weighs strongly in favor of finding that SB 14 produces a discriminatory result.

**Factor Two:  Racially Polarized Voting**.  Included in the historical discussion above is evidence that racially polarized voting has been prevalent, including in recent years, with the State of Texas admitting as much in redistricting litigation currently pending.  This finding is particularly relevant because, as Dr. Burden explained, "SB 14 imposes additional costs on Blacks and Latinos in a way it does not on Anglos, and is more likely to deter minority participation than Anglo participation.  Because those minority groups have different preferences, it's likely that SB 14 could affect the outcome of elections."[521]  This factor weighs in favor of finding that SB 14 produces a discriminatory result.

**Factor Five:   Education, Employment, and Health Effects on Political Participation**.   As outlined in Section IV(B)(1)(d) above, African-Americans and Hispanics bear the effects of discrimination in education, employment, and health. African-Americans are 2.4 times more likely and Hispanics are 2.75 times more likely

---

[520]   *Ohio NAACP II*, 2014 WL 4724703, *25 (listing cases); *see League of Women Voters of N.C.*, 2014 WL 4852113, at *11-13.

[521]   Burden, D.E. 569, p. 309 (testimony).

than Anglo Texans to live in poverty.  The median household income for Anglos is more than 50% higher compared to Hispanics and African-Americans.  Hispanics and African-Americans suffer considerably lower high school graduation and college completion rates than Anglos.  And in the field of health, African-Americans and Hispanics are more likely to report they are in "poor" health and lack health insurance—a matter often related to employment and income status.  The evidence at trial clearly related the current socioeconomic status of these minorities to the effects of discrimination.[522]  These socioeconomic disparities have hindered the ability of African-Americans and Hispanics to effectively participate in the political process.  Dr. Ansolabehere testified that these minorities register and turnout for elections at rates that lag far behind Anglo voters.  This factor weighs strongly in favor of finding that SB 14 produces a discriminatory result.

**Factor Six:  Racial Appeals in Campaigns**.  Overt or subtle racial appeals by political campaigns were identified and discussed in Section I(D).  This factor weighs in favor of finding that SB 14 produces a discriminatory result.

**Factor Seven:  Proportional Representation**.  Hispanics and African-Americans remain underrepresented within the ranks of publicly elected officials relative to their population size, as discussed in Section I(C) above.  This factor weighs in favor of finding that SB 14 produces a discriminatory result.

**Factor Eight:  Lack of Legislative Responsiveness to Minority Needs**.  Texas's long history of state-mandated discrimination, along with the process and outcome

---

[522]  See Section IV(B)(2)(d), *supra*.

relating to SB 14 itself, are strong indicators of a significant lack of responsiveness to the needs of Texas's minority voters.  Significant amendments proposed for SB 14, which would have expanded the type of IDs accepted, allowed the use of expired IDs, and provided exemptions for indigents, were summarily rejected despite the fact that bill sponsors knew that the harsh effects of SB 14 would fall on minority voters.  This factor weighs in favor of finding that SB 14 produces discriminatory results.

**Factor Nine:  Policy Underlying SB 14 is Tenuous**.  As discussed in Section IV(A)(5) and (6) regarding the unjustified burden placed on the right to vote by SB 14's photo ID requirement, the rarity of in-person voter impersonation fraud and non-citizen voting, coupled with the fact that SB 14's photo ID requirements are unduly restrictive yet still would not prevent non-citizens from voting or have any effect on potential mail-in voter fraud, lead to the conclusion that the stated policies behind SB 14 are only tenuously related to its provisions.  Given that the severity of its provisions falls disproportionately on minorities, this factor weighs heavily in favor of finding that SB 14 produces a discriminatory result.

**SB 14 Creates a Discriminatory Result**.  This Court finds that Plaintiffs have met their burden of proving that SB 14 produces a discriminatory result that is actionable because SB 14's voter ID requirements interact with social and historical conditions in Texas to cause an inequality in the electoral opportunities enjoyed by African-Americans and Hispanic voters as compared to Anglo voters.  In other words, SB 14 does not disproportionately impact African-Americans and Hispanics by mere chance.  Rather, it

does so by its interaction with the vestiges of past and current racial discrimination.[523]

SB 14 results in the denial or abridgement of the right of African-Americans and Latinos

to vote on account of their race, color, or membership in a language minority group in

violation of Section 2 of the Voting Rights Act.

### 2. SB 14 Has a Discriminatory Purpose-- Voting Rights Act, Section 2 and 14th and 15th Amendments[524]

Plaintiffs challenge SB 14 on the basis that it was enacted with a discriminatory

purpose under the VRA and the 14th and 15th Amendments.  While the United States

proceeds under VRA Section 2 and the remaining Plaintiffs proceed under both Section 2

and the constitutional provisions, the rubric for making a determination of a

discriminatory purpose is the same.[525]  Discriminatory intent is shown when racial

discrimination was a motivating factor in the governing body's decision.[526]

Discriminatory purpose "implies more than intent as volition or intent as awareness of

consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular

---

[523]   This holding applies to the specific photo ID law in this case—SB 14—and does not speak generally to the legality of any other law regarding voter identification requirements that any state, including Texas, may enact.

[524]   The statutory claim is brought by the United States of America.  The statutory claim as well as the constitutional claims are brought by all of the private Plaintiffs and Intervenors: (Veasey) Gordon Benjamin, Kenneth Gandy, Anna Burns, Penny Pope, Michael Montez, Congressman Marc Veasey, Sergio DeLeon, Evelyn Brickner, John Mellor-Crummey, Floyd Carrier, Koby Ozias, Oscar Ortiz, and LULAC; (TLYV) Imani Clark and Texas League of Young Voters Education Fund; (HJ&C) Texas Association of Hispanic County Judges and County Commissioners; (NAACP) Texas State Conference of NAACP Branches and Mexican American Legislative Caucus of the Texas House of Representatives; (Ortiz) Lenard Taylor, Lionel Estrada, Estela Garcia Espinoza, Eulalio Mendez, Margarito Lara, Maximina Lara, and La Union del Pueblo Entero.

[525]   *See generally Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977) (constitutional test); *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) (Section 2 test; quoting *Arlington Heights*).

[526]   *Arlington Heights*, 429 U.S. at 265-66; *Brown*, 561 F.3d at 433.

course of action at least in part 'because of,'. . . its adverse effects upon an identifiable group."[527]  In the final analysis, discriminatory purpose need not be the primary purpose of the official act for a violation to occur as long as it is one purpose.[528]

The Court does not attempt to discern the motivations of particular legislators and attribute that motivation to the legislature as a whole.[529]  Instead, to determine intent the Court considers direct and circumstantial evidence, "including the normal inferences to be drawn from the foreseeability of defendant's actions."[530]

The Supreme Court in *Arlington Heights* and the Fifth Circuit in *Brown* noted the relevance of some of the Senate factors, discussed above, as circumstantial evidence of discriminatory purpose.[531]  The foregoing discussion of the Senate factors is thus incorporated by reference into this analysis of purposeful discrimination.  Pursuant to *Arlington Heights* and *Brown*, the Court further considers the following nonexclusive and nonexhaustive list of factors in determining whether discriminatory intent was a motivating factor in enacting SB 14:[532]

- The historical background of the decision;

---

[527]  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations and footnotes omitted).

[528]  *Brown*, 561 F.3d at 433 (citing *Velasquez v. City of Abilene*, 725 F.2d 1017, 1022 (5th Cir. 1984)).

[529]  See *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968); *Florida v. United States*, 885 F. Supp. 2d 299, 354 (D.D.C. 2012); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996); *but cf. Busbee v. Smith*, 549 F. Supp. 494, 500-03, 508-09, 516-18 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983) (finding discriminatory intent based in part on overt racial statements made by the chairman of the Georgia redistricting committee who "used the full power of his position and personality to insure passage of his desired Congressional plan").

[530]  *Brown*, 561 F.3d at 433 (internal quotation marks and citations omitted).

[531]   *Arlington Heights*, 429 U.S. at 266 (referring to disparate impact); *Brown*, 561 F.3d at 433 (referring to the Senate factors as *Zimmer* factors); *see also Terrazas v. Clements*, 581 F. Supp. 1329, 1343, 1347 (N.D. Tex. 1984).

[532]  Some courts additionally consider the comparative nature and weight of the state interest claimed to justify the decision.  *See N.C. State Conference of NAACP*, 997 F. Supp. 2d at 361; *Florida*, 885 F. Supp. 2d at 348, 355.

- The sequence of events leading up to the decision;

- Whether the decision departs from normal practices;

- Contemporaneous statements by the decisionmakers;[533] and

- Whether the impact of the decision bears more heavily on one racial group than another.[534]

**Historical Background**.  As amply demonstrated, the Texas Legislature has a long history of discriminatory voting practices.[535]  To put the current events into perspective, Texas was going through a seismic demographic shift at the time the legislature began considering voter ID laws.  Hispanics and African-Americans accounted for 78.7% of Texas's total population growth between 2000 and 2010.[536]  In addition, it was during this time that Texas first became a majority-minority state, with Anglos no longer comprising a majority of the state's population.[537]  As previously discussed, this Court gives great weight to the findings of Dr. Lichtman that "[t]he combination of these demographic trends and polarized voting patterns . . . demonstrate that Republicans in Texas are inevitably facing a declining voter base and can gain partisan advantage by suppressing the overwhelmingly Democratic votes of African-Americans and Latinos."[538]

---

[533]   This includes the legislative drafting history, which can offer interpretive insight when the legislative body rejected language or provisions that would have achieved the results sought in Plaintiffs' interest.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006).

[534]   *Arlington Heights*, 429 U.S. at 266 (citations omitted).

[535]   See Section I(A), *supra*.

[536]   Lichtman, D.E. 374, p. 8 (report).

[537]   *Id*.

[538]   *Id*. at 9.

**Sequence of Preceding Events**.  The more specific background of SB 14 shows that the voting rights of minorities were increasingly threatened, despite the failure of three prior efforts to pass a voter photo ID bill.  Rather than soften its provisions that would accomplish the bill's stated purpose while not affecting a disproportionate number of African-Americans and Hispanics, the bill sponsors made each bill increasingly harsh, turning to procedural mechanisms to pass the bill rather than negotiation and compromise.  Throughout the prior six years of debating this issue, and despite opposing legislators' very vocal concerns, no impact study or analysis was done to demonstrate whether the bill would unduly impair minority voting rights.  This same legislature also enacted at least two redistricting plans that were held by a three-judge federal court to have been passed with a discriminatory purpose.[539]

**Departures from Normal Practices**.  The passage of SB 14 involved extraordinary departures from the normal procedural sequences.  As set forth in Section IV(A) of this opinion, the proponents of SB 14 engaged in a number of procedural devices intended to force SB 14 through the legislature without regard for its substantive merit.  Calling it an emergency, they disposed of the usual order of business, and ensured that—with unnatural speed—it would reach the end of the legislative journey relatively unscathed.  It was, procedurally, unorthodox.

---

[539] *Texas v. United States*, 887 F. Supp. 2d 133, 225 (D.D.C. 2012), *vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013); *see Perez v. Texas*, No. 5:11-cv-360, slip. op. at 6 (W.D. Tex. Mar. 19, 2012) (finding that Texas "may have focused on race to an impermissible degree by targeting low-turnout Latino precincts"), explaining interim plan issued by *Perez v. Texas*, 891 F. Supp. 2d 808, 810 (W.D. Tex. 2012), *stay denied sub nom. LULAC v. Perry*, 133 S. Ct. 96 (2012).

The passage of SB 14 was also a substantive departure because "the factors usually considered important by the decisionmakers strongly favor a decision contrary to the one reached."[540]

o   SB 14 proponents offered the bill as a way to address voter fraud and to assure the integrity of the ballot box.  Yet, by all accounts, a real effort to reduce voter fraud would have focused on the rather prevalent mail-ballot fraud rather than the extremely rare in-person voter impersonation fraud.   Oddly, in supposedly fighting voter fraud, the Legislature would relegate a large number of voters from the relatively secure in-person polls to the mail-in system that is openly acknowledged to suffer a higher incidence of fraud.[541]

o   In ostensibly fighting non-citizen voting, the legislature approved of the use of a very small number of photo IDs, including some which are legally issued to non-citizens, while the legislature rejected many others that would be needed to permit citizens who are registered to vote to cast their ballots in person.

o   Whereas the proponents of SB 14 claim to want to foster the public's perception of election integrity and improve voter turnout, it chose legislation that will cause many qualified, registered voters to be turned away at the polls and, at best, require many to use the fraud-riddled mail-in ballot system.

As outlined in Section IV(A) above, there is a tenuous nexus between SB 14's purported goals and the legislation's design.

**Legislative Drafting History**.  Proponents of SB 14 claimed that it was modeled after voter ID laws in Georgia and Indiana which had passed constitutional and VRA muster.   However, SB 14 was a material departure from those other state laws, was

---

[540]   *Arlington Heights*, 429 U.S. at 267.

[541]   *E.g.*, Wood, D.E. 363, pp. 4-5.

openly understood to be "the strictest photo ID law in the country,"[542] and it lacked any accommodations for indigents, who the legislature knew were disproportionately African-American and Latino.

As addressed in Section III(B) of this opinion, Georgia allows citizens to vote with a valid out-of-state photo ID while SB 14 does not, Georgia and Indiana allow any federal government-issued photo ID to vote while SB 14 does not, Georgia allows in-state college and university photo ID to vote while SB 14 does not, and Indiana allows for an indigence accommodation at the polls while SB 14 does not. Both Georgia and Indiana permit the use of expired IDs for a much longer period of time than does SB 14. The expiration factor, alone, would permit a number of Plaintiffs to continue to vote in person because they simply allowed their otherwise-qualified SB 14 photo ID to expire because they did not need it anymore.

SB 14's legislative proponents knew at the time that they would face VRA Section 5's preclearance requirement, which precluded passing a bill that would have retrogressive effects on ethnic minorities. As set forth in Section IV(A) above, SB 14 proponents' decision to bar the use of government employee and college and university photo IDs to vote while allowing concealed handgun permits made the voting requirements much more restrictive for African-Americans and Hispanics while making it less so for Anglos.[543]

---

[542]   Hebert Dep., June 17, 2014, pp. 260-61 (D.E. 592, pp. 221-22 (admitting dep.)).

[543]     Lichtman, D.E. 374, pp. 25-34 (report) (based on information publicly available when the 82nd Legislature passed SB 14).

Even Mr. Hebert, who assisted Lieutenant Governor Dewhurst in shepherding SB 14 through the legislature and who drafted the EIC provision, expressed concern to various legislative staffers about preclearance, recommending that, at a minimum, the list of acceptable photo IDs should be expanded to include federal, state, and municipal government-issued IDs.[544]  His warning was not heeded.  As outlined in Section IV(A)(4)[545] above, proponents of SB 14 rejected a litany of ameliorative amendments that would have redressed some of the bill's discriminatory effects on African-Americans and Hispanic voters—amendments that would not have detracted from the legislation's stated purpose.

**Contemporaneous Statements**.  There are no "smoking guns" in the form of an SB 14 sponsor making an anti-African-American or anti-Hispanic statement with respect to the incentive behind the bill.  However, the 2011 legislative session was a racially charged environment.  With the 2010 U.S. Census results showing substantial gains by minority populations, there were a number of measures proposed that exhibited an anti-Hispanic sentiment—anti-immigration laws, an effort to abolish sanctuary cities—and there were even concerns about leprosy being raised.[546]  Add to this environment that Representative Smith admitted that it was "common sense"—he did not need a study to tell him—that minorities were going to be adversely affected by SB 14.  Yet SB 14 was pushed through in the name of goals that were not being served by its provisions.

---

[544]   Hebert, D.E. 592, pp. 195-96, 213; Pls.' Ex. 272.

[545]   See Appendix: Table of Amendments Offered on SB 14.

[546]   See Section IV(A), *supra*.

**Disparate Impact**.  As set out above, this Court has concluded that SB 14's effects bear more heavily on Hispanics and African-Americans than on Anglos in Texas. This impact evidence was virtually unchallenged.

**Conclusion**.  The evidence establishes that discriminatory purpose was at least one of the motivating factors for the passage of SB 14.  "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the [challenged] law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."[547]  The record demonstrates that SB 14 was discriminatory, among other reasons, because: (a) its list of acceptable IDs was the most restrictive of any state and more restrictive than necessary to provide reasonable proof of identity; (2) IDs that had expired more than 60 days before an election were still capable of identifying the ID-holder, yet were not permitted; and (3) there is no cost-free way for an indigent to prove up his or her identity in order to vote.

Defendants did not provide evidence that the discriminatory features of SB 14 were necessary to accomplish any fraud-prevention effort.  They did not provide evidence that the discriminatory features were necessary to prevent non-citizens from voting.  They did not provide any evidence that would link these discriminatory provisions to any increased voter confidence or voter turnout.  As the proponents who appeared (only by deposition) testified, they did not know or could not remember why they rejected so many ameliorative amendments, some of which had appeared in prior

---

[547]  *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

bills or in the laws of other states.  There is an absence of proof that SB 14's discriminatory features were necessary components to a voter ID law.

Defendants rely on the proposition that SB 14 is a facially-neutral law imposing burdens that do not exceed the normal burdens associated with a normal life, including voting.  Given the demographic statistics of the No-Match List, and the Plaintiffs' testimony, it is clear that possessing a photo ID, possessing a birth certificate, having a nearby DPS or other ID-issuing office, having transportation, and having the funds to purchase an ID are all things that are not within normal, tolerable burdens.

This Court concludes that the evidence in the record demonstrates that proponents of SB 14 within the 82nd Texas Legislature were motivated, at the very least in part, *because of* and not merely *in spite of* the voter ID law's detrimental effects on the African-American and Hispanic electorate.  As such, SB 14 violates the VRA as well as the 14th and 15th Amendments to the Unites States Constitution.

### C. SB 14 Constitutes an Unconstitutional Poll Tax—24th and 14th Amendments[548]

The 24th Amendment provides that a citizen's right to vote in a federal election may not be "denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."[549]  The 24th Amendment "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed."[550]   A statute also violates the

---

[548]   This claim is brought by the Veasey Plaintiffs:  Gordon Benjamin, Kenneth Gandy, Anna Burns, Penny Pope, Michael Montez, Congressman Marc Veasey, Jane Hamilton, Sergio DeLeon, Evelyn Brickner, John Mellor-Crummey, Floyd Carrier, Koby Ozias, Oscar Ortiz, and LULAC.

[549]   U.S. Const. amend. XXIV, § 1.

[550]   *Harman v. Forssenius*, 380 U.S. 528, 540-41 (1965) (internal quotations omitted).

24th Amendment if "it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax."[551]

In *Harper v. Virginia State Board of Elections*,[552] the Supreme Court extended the ban on poll taxes to state elections, using the Equal Protection Clause of the 14th Amendment.  Specifically, the Court held that a State may not use "the affluence of the voter or payment of any fee [as] an electoral standard" because "wealth or fee paying has . . . no relation to voting qualifications."[553]   In finding that a $1.50 poll tax for state elections violated the Equal Protection Clause, the *Harper* Court held that "[t]he degree of the discrimination is irrelevant."[554]

The Veasey Plaintiffs argue that SB 14 is a poll tax, in violation of the 14th and 24th Amendments.  They do not claim that the requirement to show photo identification prior to voting itself is a tax, but that the underlying costs (including the payment of fees as well as travel and time costs), which must be incurred by individuals without acceptable identification, effectively function as a poll tax.  Defendants respond that SB 14 is not like the poll taxes struck down by the Supreme Court and, furthermore, Texas provides, free of charge, an EIC to individuals who need qualifying ID to vote. Defendants also claim that the incidental economic costs of obtaining appropriate

---

[551]   *Id*. at 541.

[552]   383 U.S. 663 (1966).

[553]   *Id*. at 666, 670.

[554]   *Id*. at 668.

identification cannot constitute a poll tax prohibited by the Constitution since in-person voting itself often entails unavoidable travel costs.

The Supreme Court has not considered whether a voter photo ID law constitutes a poll tax.  However, several other courts have recently done so regarding laws that were different in important respects from SB 14.  Various versions of the Georgia voter photo ID law were challenged as constituting an impermissible poll tax.[555]  In *Common Cause I*, voters without an approved form of government-issued ID were required to pay a $20.00 fee to obtain a five-year photo ID card (or a $35 fee to obtain a ten-year photo ID card) in order to vote in person.[556]  The Court found that "as a practical matter, most voters who do not possess other forms of Photo ID must obtain a Photo ID card to exercise their right to vote, even though those voters have no other need for a Photo ID card" and thus "requiring those voters to purchase a Photo ID card effectively places a cost on the right to vote" in violation of the 24th and 14th Amendments.[557]   The court further held that the possibility of the fee being waived for voters who complete an affidavit of indigency did not save the law from being a poll tax because it constituted a material requirement in lieu of a poll tax, as rejected in *Harman*.[558]

---

[555]   *Common Cause/Georgia v. Billups (Common Cause I)*, 406 F. Supp. 2d 1326, 1369 (N.D. Ga. 2005); *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups (Common Cause II)*, 439 F. Supp. 2d 1294, 1354 (N.D. Ga. 2006).

[556]   406 F. Supp. 2d at 1369.

[557]   *Id.*

[558]   *See Common Cause I*, at 1370.

Indiana's voter ID law was also challenged as a poll tax and prevailed because it only potentially imposed incidental costs on certain voters.[559]  The court found that "the imposition of tangential burdens does not transform a regulation into a poll tax" and "the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because these same 'costs' also result from voter registration and in-person voting requirements, which one would not reasonably construe as a poll tax."[560]

The Indiana court did recognize that, although the state-issued voter photo ID card was free, the fee required to obtain a birth certificate (which would then be used to obtain the photo ID card) might plausibly be considered a poll tax.[561]  Nonetheless, the court decided that it was not, because it found that the need to pay that fee was "purely speculative and theoretical" due to the plaintiffs not providing evidence that anyone would actually be required to incur this cost in order to vote."[562]

When the Georgia law was challenged again, the state provided photo ID free of charge and eliminated the previous requirement of an indigency affidavit.[563]  The plaintiffs nonetheless argued that the law still constituted a poll tax because voters without approved photo ID were required to arrange for transportation to a registrar's

---

[559] *See Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 827-28 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007).  When the Supreme Court later reviewed the Indiana law and affirmed the district's court's decision, the Court did not review the issue whether the photo ID law constituted an impermissible poll tax.  *See Crawford v. Marion Cnty.*, 553 U.S. 181 (2008).

[560] *Rokita*, 458 F. Supp. 2d at 827.

[561] *Id.*

[562] *Id.*

[563] *See Common Cause II*, at 1354.

office and to successfully navigate the process of receiving the state photo ID.[564]
Additionally, the plaintiffs contended that some voters "might be required to pay a fee to
obtain a birth certificate in order to obtain a Voter ID card."[565]  The court rejected these
arguments, finding that the cost of time and transportation did not qualify as a prohibited
poll tax.[566]  The court further found entirely speculative the contention that any voter
would be required to pay a fee to obtain a birth certificate to vote, because the registrar
could accept a number of other documents to issue a voter ID card and there was no
evidence that any particular voter would actually be required to incur the cost for a birth
certificate.[567]  The court thus found that the plaintiffs had not demonstrated that the cost
of obtaining a birth certificate [was] sufficiently tied to the requirements of voting so as
to constitute a poll tax."[568]

Pursuant to SB 14, any individual wishing to vote in person must procure one of
seven forms of approved photo ID if he or she currently lacks such identification.
Individuals must pay an application fee in order to obtain any of the required forms of ID,
except for the EIC.  The EIC itself, issued by DPS, must be issued free of charge.  But in
order to receive an EIC, an applicant must provide one of several supporting documents,

---

[564]  *Id.*

[565]  *Id.* at 1355.

[566]  *Id.* at 1354 (citing *Rokita*, 458 F. Supp. 2d at 827).

[567]  *Id.* at 1355.  In addition to a birth certificate, a multitude of other documents could be presented by an individual in order to receive a Georgia voter ID card, including: a student ID card, a transit card, an employee ID card, a state or federal government benefits card, a copy of the applicant's state or federal tax return, an original Medicare or Medicaid statement, etc.  *Id.* at 1310.

[568]  *Id.*

the cheapest of which is a birth certificate.  If the applicant does not have a birth certificate, it must be purchased at a minimum fee of $2.00 in Texas.[569]

In addition to the fee, individuals also must expend time and resources, which are significant in some instances, in order to travel to the vital statistics office, a local registrar, or a county clerk to obtain a birth certificate (even more so if more than one visit is required).[570]  Nonetheless, the Court cannot reasonably conclude at this time that the incidental time, travel, and information search costs constitute either a poll tax or "other tax" prohibited by the 24th Amendment, or a "material requirement" imposed "solely upon those who refuse to . . . pay[] a poll tax."[571]

But the fact that a voter without an approved form of SB 14 ID and without a birth certificate, in order to vote, must pay a fee to receive a certified copy of his or her birth certificate, which is functionally essential for an EIC, violates the 24th Amendment as an impermissible poll tax or "other tax."[572]  It also violates the 14th Amendment by making the "payment of any fee . . . an electoral standard."[573]

---

[569]  As demonstrated above, an EIC-only birth certificate may be purchased for $2.00-$3.00 if the person applies in person.  That fee can be as much as $47.00 if the birth was not previously registered and a delayed birth certificate is required from the DSHS.  It may also cost more than the minimum fee if an inaccuracy needs to be corrected and an amended birth certificate is issued.

[570]  The incidental time and travel costs associated with obtaining an EIC, especially for individuals lacking a birth certificate, can be quite onerous.  According to the uncontroverted expert report of Mr. Jewell, the cost of securing an EIC, including the costs of obtaining the underlying documents, the transportation costs, the opportunity/time costs, and the information search costs, approached $100 for some of the named Plaintiffs.  D.E. 367, p. 3.  In a vacuum, these costs are considerable; for five of the seven Plaintiffs Mr. Jewell studied, who have no household income in excess of poverty guidelines, these costs are extraordinary.  *See id.*, pp. 4-5.  Dr. Bazelon noted that a poll tax of $1.75 in 1966 was 69% of the average hourly wage.  Dr. Bazelon estimated that the average travel cost alone to get an EIC in Texas is $36.23, which is 149% of today's average hourly wage.  Bazelon, D.E. 603-1, p. 4. (report).

[571]  *Harman*, 380 U.S. at 542.

[572]  *See Common Cause I*, 406 F. Supp. 2d at 1369.  Although voters are not required to obtain an EIC in order to vote, and may instead wish to obtain a different form of SB 14 ID, none of the other acceptable forms of ID may be

Unlike in *Common Cause II* and *Rokita* (and by extension *Crawford*), there is ample evidence in the record of several Plaintiffs having to pay a substantial fee in order to obtain a birth certificate (in some cases a delayed or amended birth certificate) for the purpose of receiving an EIC.[574]   Victor Farinelli, who testified with comprehensive knowledge of how the State of Texas issues birth certificates, demonstrated that they are never free.  Even at birth, a newborn's birth certificate must be ordered and paid for.[575]

Although as of October 21, 2013, the fee to receive a certified copy of a birth certificate specifically for the purpose of receiving an EIC is only $2.00, the amount of the fee is irrelevant.[576]   Plaintiffs have thus demonstrated that every form of SB 14-qualified ID available to the general public is issued at a cost.  And for voters without appropriate SB 14 ID, they can only obtain a free EIC with a birth certificate that they

---

obtained without paying a fee to a government agency (except perhaps for the United States military ID card, which is not available to all individuals).

[573]   *See Harper*, 383 U.S. at 666; *Common Cause I*, 406 F. Supp. 2d at 1368; *see also Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826 (N.D. Ohio 2006) (finding unconstitutional the requirement that some naturalized citizens would be required to pay $220 to the United States Citizenship and Immigration Service for a replacement certificate of naturalization in order to vote); *Milwaukee Branch of NAACP v. Walker*, 2014 WI 98, 851 N.W.2d 262, 277 (July 31, 2014) (interpreting as unconstitutional the portion of the Wisconsin voter ID law that required payment to a government agency to obtain the underlying documents necessary to receive a Department of Transportation ID for voting because  "the State of Wisconsin may not enact a law that requires any elector, rich or poor, to pay a fee of any amount to a government agency as a precondition to the elector's exercising his or her constitutional right to vote").

[574]   Although the *Crawford* Court discussed the cost of obtaining photo ID, the Court noted that the evidence in the record was insufficient to determine the actual costs borne by individuals, including individual plaintiffs, of obtaining an appropriate form of photo ID.  *See* 553 U.S. at 200-02.

[575]   Farinelli, D.E. 582, pp. 317-18.

[576]   *See Harper*, 383 U.S. at 668.  Additionally, the availability of a fee waiver (which may only be requested in person) to reduce the fee for a birth certificate for the purpose of voting to $2.00 is not well publicized and the evidence does not indicate that the State has made an effort to advertise it.

140

have already purchased or one for which they now must pay at least $2.00.[577]  The cost of obtaining a birth certificate is thus sufficiently tied to the requirements of voting as to constitute an unconstitutional poll tax or other tax.

The fact that those Plaintiffs who were either disabled or over the age of 65 could have opted to vote by mail-in ballot, thus avoiding the cost of obtaining an EIC, does not change the result.  First, being forced to vote by mail-in ballot in lieu of paying for a birth certificate constitutes "a material requirement" imposed "solely upon those who refuse to surrender their constitutional right to vote . . . without paying a poll tax."[578]  Voting by mail requires properly filling out and mailing a form in order to request a mail-in ballot, well before, but no more than 60 days before, the election, for every single election in which the voter wishes to participate.[579]  That process is analogous to the yearly re-registration requirement that was struck down in *Harman*.[580]  Second, mail-in voting, for the many reasons discussed in Sections IV(B)(2)(a) and VI(A)(3)(a)(iv), *supra*, is "not a realistic alternative to voting in person."[581]

Therefore, the Court finds that SB 14 imposes a poll tax in violation of the 24th and 14th Amendments.

---

[577]   Furthermore, nothing in SB 14 eliminates the cost of obtaining a birth certificate issued by other jurisdictions for those who reside in Texas but were not born in Texas.  And while Texas clearly cannot control the costs imposed by other jurisdictions, it is no doubt aware that such fees exist.

[578]   *See Harman*, 380 U.S. at 541.

[579]   *See Early Voting*, http://www.votetexas.gov/voting/when#early-voting; TEX. ELEC. CODE ANN. § 86.001 et seq.

[580]   *See* 380 U.S. at 541.

[581]   *See Common Cause I*, 406 F. Supp. 2d at 1365; *see also Ohio NAACP II*, 2014 WL 4724703, at *13.

# VII.

## THE REMEDY

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.  Other rights, even the most basic, are illusory if the right to vote is undermined"[582]  To preserve that right, the Court, pursuant to its equitable powers and to redress the VRA claims of discriminatory result and discriminatory purpose, will enter a permanent and final injunction against enforcement of the voter identification provisions, Sections 1 through 15 and 17 through 22, of SB 14.[583]

To avoid piecemeal decisionmaking, including piecemeal appellate review, and also because the claims rely on many of the same underlying facts, the Court has ruled on each of the legal theories presented. In addition, the requests for a preclearance order under Section 3(c) of the Voting Rights Act, and for authorization of election observers under Section 3(a) of the Act, depend on a finding that SB 14 was enacted with a discriminatory purpose, and therefore the Court was obligated to rule on the purpose issue.  The injunction described above is sufficient to remedy the Plaintiffs' as-applied challenge to the unconstitutional burden that SB 14 places on the right to vote, along with

---

[582]   *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

[583]   SB 14 includes a severability clause, to which this Court defers, *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and therefore the injunction shall not apply to these provisions of SB 14 that do not relate to voter identification for in-person voting.  Accordingly, the injunction to be issued shall not apply to sections 16, 23, and 24 of SB 14.

the challenge to SB 14 as a poll tax.  No further delineation of relief as to those claims is required at this time.

Under the injunction to be entered barring enforcement of SB 14's voter identification provisions, Texas shall return to enforcing the voter identification requirements for in-person voting in effect immediately prior to the enactment and implementation of SB 14.  Should the Texas Legislature enact a different remedy for the statutory and constitutional violations, this Court retains jurisdiction to review the legislation to determine whether it properly remedies the violations.  Any remedial enactment by the Texas Legislature, as well as any remedial changes by Texas's administrative agencies, must come to the Court for approval, both as to the substance of the proposed remedy and the timing of implementation of the proposed remedy.

By subsequent order, the Court will set a status conference to address the procedures to be followed for considering Plaintiffs' request for relief under Section 3(c) of the Voting Rights Act.

ORDERED this 9th day of October, 2014.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE

# APPENDIX
## TABLE OF AMENDMENTS OFFERED ON SB 14

| NUMBER[584] | SUBSTANCE OF PROPOSED AMENDMENT | SPONSOR |
|---|---|---|
| **Allowing the Use of Additional Forms of ID** | | |
| S F10 | Allowing proof of identity by affidavit | Zaffirini |
| S F16 | Two forms of non-photo ID<br>Voter registration certificate accompanied by reliable documents<br>United States Military ID with photo<br>ID issued by Federal government agency or institution<br>ID issued by Texas agency, institution, or political subdivision | Van de Putte |
| S F17 | Temporary driving permit | Gallegos |
| S F19 | Student photo IDs issued by accredited public university in Texas[585] | Ellis |
| S F20 | Medicare ID cards issued by Social Security Administration accompanied by voter registration certificate | West |
| S F21 | Employee photo IDs issued by<br>    Federal government agency or institution<br>    Texas agency, institution, or political subdivision<br>    Institution of higher education located in Texas | Davis |
| S F24 | Voter registration certificates with photo issued by county election administrator or county clerk | Hinojosa |
| H 11 | Allowing proof of identity by affidavit | Veasey |
| H 12 | Allowing proof of identity by personal knowledge of election judge | Dutton |
| H 17 | Temporary driving permit | Dukes |
| H 21 | Employee photo IDs issued by any employer in ordinary course of business | Veasey |
| H 23 | Student photo IDs issued by public or private high school or institution of higher education | Dutton |
| H 24 | Any photo IDs issued by the State of Texas[586] | Martinez-Fischer |
| H 25 | IDs issued by Texas agency, institution, or political subdivision or Federal  agency or institution | Hernandez-Luna |
| H 38 | Temporary driving permit issued after license revocation  (defeated by vote) | Burnam |
| H 39 | Provisional ballot accepted when voter signs affidavit at polls and signature on affidavit is substantially similar to voter registration application or other public document | Anchia, Strama |

---

[584]   The Senate voted SB 14 out of committee without amendments.  References of "S F#" were amendments offered on the floor of the Senate and were disposed of by being tabled immediately.  Those beginning with "H #" were disposed of after SB 14 emerged from committee and prior to the full House of Representatives vote and were disposed of by being tabled unless otherwise noted.

[585]   While those advocating the use of student IDs faulted SB 14 proponents for failing to show that such IDs were ever used fraudulently, Rep. Martinez-Fischer could not state how frequently student IDs were needed as voting ID.

[586]   According to the State, DPS issues three types of IDs not included in SB 14 and over 90 state agencies use DPS resources to issue secure access cards, including Libraries, the Veterans Commission, university systems, and many other state employers.

144

| Number[584] | Substance of Proposed Amendment | Sponsor |
|---|---|---|
| H 42 | Allowing county voter registrars to issue voter registration certificates with photos and providing for cooperation with DPS and other Texas state agencies for access to voter photos | Walle |
| H 30 | Tribal IDs allowed (adopted, but omitted from the Conference Committee Report and is not in SB 14 as enacted)[587] | Naomi Gonzalez |
| **Allowing the Use of IDs With Irregularities** | | |
| S F13 | Allowing the use of any expired IDs[588] | Davis |
| S F15 | Expanding use of expired IDs by including those that expired after the last general election | Davis |
| S F16 | Expanding the use of expired IDs by including those that expired within two years of the current election | Van de Putte |
| S F22 | Allowing the use of IDs expired within 60 days of election; For those over 65 years of age, allowing the use of any expired driver's license or personal identification cards issued by Texas or any other state | Lucio |
| S F11 | Allowing nonconforming names of women upon a showing of a marriage certificate, divorce decree, or upon execution of an affidavit affirming identity | Davis |
| H 37 | Allowing nonconforming names upon voter's execution of affidavit stating voter's name was changed as a result of marriage or divorce (defeated by vote) | Hernandez-Luna |
| **Making Qualified Photo IDs or Voting More Accessible** | | |
| S F1 | Providing criminal penalties for intimidating voters | Watson |
| S F2 | Ensuring that those seeking a new or renewed personal identification card that it is free if needed for voting (upon presentation of voter registration certificate). | Davis |
| S F12 | Eliminating the fees for underlying documents (needed to obtain photo ID) ordinarily charged by Texas agencies, institutions, and political jurisdictions | Davis |
| S F25 | Requiring DPS to have one driver's license office for every 50 voting precincts, centrally located by voting age population | Gallegos |
| S F26 | Requiring DPS to open any new driver's license facility no more than 5 miles from public transportation, if county has public transportation | Gallegos |
| S F28 | Allowing for same-day voter registration | Ellis |
| S F29 | Enlarging the hours of DPS offices to at least 7:00 p.m. one weeknight per week and for four hours on two Saturdays per month | Gallegos |
| S F36 | Giving the disabled the option of voting by mail without having to renew the disability exemption; providing reasonable notice of the availability of the disability exemption to those likely to need it | Davis |
| S F39 | Exempting the indigent by allowing cure of provisional ballot upon execution of affidavit of indigency | Davis |
| H 15 | Eliminating the fee for underlying documents (needed to obtain photo ID) ordinarily charged by Texas agencies, institutions, and political subdivisions | Martinez |

---

587    http://www.lrl.state.tx.us/scanned/82ccrs/sb0014.pdf#navpanes=0, p. 22.

588    Ann McGeehan, overseeing the Elections Division of the Secretary of State's office testified that an expired ID is still capable of establishing identity.  D.E. 578, p. 276.

| Number[584] | Substance of Proposed Amendment | Sponsor |
|---|---|---|
| H 16 | Allowing exemption upon proof of an employee paycheck and affirmation that the employer does not permit taking off work to get photo ID and the DPS office is not open for at least two consecutive hours when employee is off work | Raymond |
| H 36 | Expanding the time to cure a provisional ballot, using only "business days" | Dutton |
| H 43 | Allowing for same-day voter registration | Rodriguez |
| H 44 | Prohibiting application of changes to counties that do not have a DPS full-service driver's license office | Gallego |
| H 49 | Allowing for same-day voter registration | Alonzo |
| H 50 | Providing for reimbursement of travel expenses incurred by indigent voters to secure photo ID | Raymond |
| H 52 | Allowing only a poll worker to request to see photo ID; any other person requesting ID is harassing a voter and commits a felony | Castro |
| H 61 | Exempting application of the requirement to lineal descendants of those prevented from voting by white primary laws or other laws targeting a citizen's right to vote based on race, nationality, or color | Martinez |
| H 63 | Exempting voters over age 65 from photo ID requirement<br>Allowing for same-day voter registration<br>Authorizing the Secretary of State to establish additional documents to prove residency | Eiland |
| **Educating the Public About Photo ID Requirements** | | |
| S F2 | Providing for notice to those renewing an ID by mail that an ID is free for voting purposes | Davis |
| S F27 | Providing for notice to applicants for marriage license that any name change requires updating of voter registration | Lucio |
| S F37 | Requiring the Secretary of State to develop uniform statewide voter registration outreach program and ombudsmen to address allegations of voter suppression, discrimination, or other abuse | Davis |
| S F38 | Expanding the triggers for providing a voter with notice of the cancellation of voter registration | Davis |
| H 46 | Requiring DPS to give notice to applicants for new or renewed driver's license or personal identification card that ID for voting is available at no charge | Martinez |
| **Requiring Analysis and Reporting by Secretary of State** | | |
| S F30 | Requiring the SOS to produce an annual report disclosing:  the comparative number of eligible voters who have and do not have the necessary ID to vote; the number and percentage of voters who are disqualified by name changes, address changes, or expired IDs; the average amount of time a voter must wait for qualified ID from DPS; the number of provisional ballots cast; and an analysis of photo ID requirements on women, elderly, disabled, students, and racial or ethnic minorities. | Ellis |
| H 54 | Requiring the SOS to keep detailed records by county and precinct, including demographic information regarding the number of voters who were prohibited from voting because of photo ID requirements and the number of provisional ballots that were not counted | Alvarado |

| NUMBER[584] | SUBSTANCE OF PROPOSED AMENDMENT | SPONSOR |
|---|---|---|
| H 55 | Requiring the SOS to determine whether the majority of provisional ballots cast for lack of photo ID were cast by members of a racial or ethnic minority; if so, subsequent election qualification would be by voter registration certificate | Veasey |
| H 58 | SB 14 not to take effect until SOS completes (a) a study of the impact of the law on state residents, including the availability of offices to issue qualified photo ID and (b) an analysis of the law's impact on voter turnout | Anchia |
| H 62 | Requiring the SOS to conduct election integrity training to enhance detection, investigation, and prosecution of in-person voter impersonation fraud and establishing election integrity task forces to prosecute such crimes; requiring county clerks to conduct an election integrity audit and publish the results after each general election, along with requiring any evidence of voter fraud to be referred for prosecution | Strama |
| **Requiring Funding** | | |
| S F31 | SB 14 not to take effect until implementation is fully funded and SOS has certified that it and all counties are in compliance or have developed training and information required to implement. | Van de Putte |
| S F32 | SB 14 not to take effect until funded | Watson |
| H 57 | SB 14 not to take effect unless there is a specific appropriation to fund implementation | Anchia |

147