CONSIDERATION OF SENATE BILL 14 1/25/2011

253

1 a photograph, does not qualify as a substantial burden
2 on most voters' right to vote or represent a significant
3 increase over the usual burdens of voting. And I think
4 that's interesting that that was noted.
5          And those provisions that we have are
6 essentially -- in your bill, there are very similar
7 provisions with respect to those matters. Correct?
8          SEN. FRASER: They -- yes, and I want to
9 clarify. The Crawford case went to the U.S. Supreme
10 Court. and those observations were made in the -- the
11 majority opinion.
12          SEN. WILLIAMS: Now, they go on to say
13 that it's generally applicable, nondiscriminatory voting
14 regulation, it's universally applicable, it's imminently
15 reasonable because the burden of acquiring, possessing,
16 and showing a free photo identification is not a
17 significant increase over the usual voting burdens, and
18 the State's interest are sufficient to sustain whatever
19 those minimal burdens are.
20          So we know there's some inconvenience, but
21 we've done everything we can to make that inconvenience
22 as insignificant as possible. Is that --
23          SEN. FRASER: I will actually go with that
24 in the -- the Crawford/Indiana case.
25          SEN. WILLIAMS: Just in closing, in my

254

1 final comments as -- before we go to take testimony, I
2 just think that it's noteworthy to look back at what the
3 opponents of this legislation have said on the floor
4 thus far today, and what I've heard is very little
5 debate about the actual content of your legislation.
6 And I think that speaks to the fact that it's
7 unequivocally a good idea that people ought to be able
8 to be positively identified as who they say they are
9 when they come to vote.
10          What I've heard today is a lot of talk
11 about procedures, even though what we're doing is very
12 normal for a Committee of the Whole, and it's the same
13 procedure that we used the last session when we
14 considered this. Is that correct, Senator Fraser?
15          SEN. FRASER: It is, and I think it's very
16 difficult for a member to argue the merits of the bill
17 when it's so straightforward when you ask someone in
18 their district do they think that someone should --
19 should have -- be required to show a photo ID when they
20 vote, that you've got near 90 percent of the population
21 across the state of Texas. Again, every one of these
22 members, it's hard to argue the merits -- argue the
23 merits of the bill.
24          SEN. WILLIAMS: Yeah, the other thing that
25 I've heard that I think is interesting is fiscal notes.

255

1 A lot of talk about fiscal notes, even though we have a
2 letter from the Secretary of State that states that
3 there are going to be HAVA funds that will be available
4 to help with the voter education, and I think we're
5 going to have testimony in a few moments.
6          And I tried to clarify that early on that
7 the cost of issuing for the state these free ID cards is
8 less than $2. It's a very minimal cost, and with almost
9 16 million people that we have who have a driver's
10 license or -- or an ID card now, it seems unlikely that
11 there's going to be a whole lot of people out of that
12 13 million that actually don't already have a driver's
13 license or a state ID card.
14          In fact, Senator Fraser, I spoke last
15 night with the Department of Public Safety and today
16 with the Secretary of State and just asked them if it
17 would be possible for us to target those voters who are
18 below age 65 and have -- don't have an ID card, a
19 driver's license or an ID card issued by the state; and
20 they said, yes, it would be possible for us to direct
21 our voter education to those people specifically so that
22 we could step it up and let them know before your bill
23 takes effect -- not till, when, in January? Is that --
24 am I remembering that correctly?
25          SEN. FRASER: January, 2012.

256

1          SEN. WILLIAMS: So a year from now. So
2 we've got a lot of time to let these people know what's
3 coming.
4          And then the other thing I've heard a lot
5 about is current law, and, you know, there's been a lot
6 of discussion. In fact, a lot of what we've talked
7 about is what's actually on the books right now, and
8 your bill is not touching any of that top side or
9 bottom. Really, most of what you do is very limited by
10 changing what the requirements are when you come to the
11 polls. Is that correct? There's not any other real
12 substantive change to election law here.
13          SEN. FRASER: We're only addressing the --
14 the actual in-person voting and the identification
15 required when somebody votes in person. We're not
16 addressing mail-in ballots or any of the other
17 provisions. It's just that one section.
18          SEN. WILLIAMS: Well, thank you for
19 allowing me to question you about this and I appreciate
20 you bringing this issue before us and I especially
21 appreciate the fortitude that you've shown during this
22 long debate. Thank you.
23          SEN. FRASER: Thank you, Senator.
24          CHAIRMAN DUNCAN: Chair recognizes Senator
25 Shapiro.

TX_00000120

USA_00015001

CONSIDERATION OF SENATE BILL 14 1/25/2011

257

1        SEN. SHAPIRO:  Thank you, Mr. Chairman.
2        I would just like to ask one question
3  because we're getting mixed signals, and I just want to
4  make sure.  It's just going to take a yes-or-no answer,
5  and I think that will be the easiest.
6        In Section 7 of your bill, which is
7  actually on Page 5, the requirements for identification
8  prescribed for people who do not have to have a vote --
9  a photo ID, where it references their age, does the bill
10  require that people 70 or older present a voter
11  registration card and that they be at least 70 years of
12  age on January 1st, 2012?
13        SEN. FRASER:  My understanding and this
14  is, again, something probably the Secretary of State
15  will address, but I believe your age is -- is on the
16  card.  So if someone is 70 or January 1, 2012, they will
17  not be asked to show a photo ID.
18        SEN. SHAPIRO:  Okay.  And this is
19  something that the Secretary of State has put into this
20  bill?
21        SEN. FRASER:  No.  No, I --
22        SEN. SHAPIRO:  This is something that you
23  have --
24        SEN. FRASER:  -- inserted it into the
25  bill.  It'd be your interpretation --

258

1        SEN. SHAPIRO:  I got you.
2        SEN. FRASER:  -- to -- to make sure --
3        SEN. SHAPIRO:  Identify whether it's at
4  hand?
5        SEN. FRASER:  -- that they can identify
6  themselves --
7        SEN. SHAPIRO:  Okay.
8        SEN. FRASER:  -- but it's not intended
9  that they would -- I believe they're --
10        SEN. SHAPIRO:  Separate.
11        SEN. FRASER:  Yes.
12        SEN. SHAPIRO:  It's not intended to be
13  separate.  It's intended --
14        SEN. FRASER:  No.
15        SEN. SHAPIRO:  -- to be the same document.
16        SEN. FRASER:  Yes, as long as they're --
17        SEN. SHAPIRO:  Okay.
18        SEN. FRASER:  -- you know, 70 on
19  January 1, 2012.
20        SEN. SHAPIRO:  And the date of birth is on
21  our current voter registration card?
22        SEN. FRASER:  You need to ask that of the
23  Secretary of State.
24        SEN. SHAPIRO:  Okay.  And my recollection
25  is it is.  Thank you.

259

1        SEN. FRASER:  Okay.
2        CHAIRMAN DUNCAN:  Chair recognizes Senator
3  Huffman.
4        SEN. HUFFMAN:  Thank you, Mr. Chairman.
5        Senator Fraser, will you yield for a
6  couple of questions?
7        SEN. FRASER:  I would love to yield.
8        SEN. HUFFMAN:  Thank you, sir.  I'd like
9  to commend you, too, for a long day of answering a lot
10  of tough questions.
11        SEN. FRASER:  Thank you.
12        SEN. HUFFMAN:  But I think it's important,
13  as we kind of wrap this part of the procedures up today,
14  that -- that we circle back to -- to the idea and the
15  concept that -- that we got here today.  But there is a
16  line of Supreme Court cases that have brought us here.
17  Would you agree with that?
18        SEN. FRASER:  Yes.
19        SEN. HUFFMAN:  And certainly, the Crawford
20  v. Marion case gives us guidance on how to do what we're
21  doing here today properly.  Would you agree --
22        SEN. HUFFMAN:  I think that's the one --
23        SEN. HUFFMAN:  -- with that?
24        SEN. FRASER:  -- was referenced, I think,
25  in the Indiana case, I believe.

260

1        SEN. HUFFMAN:  Okay.
2        SEN. FRASER:  And that's yes.
3        SEN. HUFFMAN:  And did you, as you sat
4  down with your staff and so forth in, you know,
5  pre-session, in the interim, and you started thinking
6  about this bill and so forth, did you and your staff
7  take into consideration Crawford v. Marion and try to
8  follow the law and the rules the Supreme Court has laid
9  out for us?
10        SEN. FRASER:  Yes, without a doubt.
11  That's already been approved by the Supreme Court, and
12  obviously, we wanted to make sure we stayed within those
13  parameters.
14        SEN. HUFFMAN:  All right.  Now, you know,
15  the Supreme Court, I think -- we know that the Supreme
16  Court has told us that there is a balancing test, and we
17  understand that the right to vote is sacred.  And so we
18  know that the law tells us that if there is a burden
19  placed upon a voter, that they're going to look very
20  carefully at that; and it's going to have weight, but
21  it's going to be balanced against legitimate state
22  interest.  And so I think what we need to explore, just
23  briefly, is that, in fact, we -- we have legitimate
24  state interest.  The state of Texas has an interest to
25  make sure that our elections are done with -- well, as

TX_00000121

USA_00015002

CONSIDERATION OF SENATE BILL 14 1/25/2011

261

1 perfect as we can get them but with integrity, right,
2 and with voter confidence.
3           So as you prepared the bill and as you
4 look at the bill -- and the Supreme Court has told us
5 that there are legitimate interests, and they define
6 those for us.  So as you prepared the bill and you look
7 at Senate Bill 14 today, do you think that it addresses
8 the relevant and legitimate concerns of deterring and
9 detecting voter fraud?  And I know you've been asked
10 this question a lot.
11           SEN. FRASER:  Absolutely.
12           SEN. HUFFMAN:  Right.  Do you think that
13 it -- that it's important in that the bill will help to
14 improve and modernize the election procedures of Texas?
15           SEN. FRASER:  Yes.
16           SEN. HUFFMAN:  Do you think that there's a
17 larger scheme nationwide through the Help America Vote
18 Act and the National Voter Registration -- National
19 Act to do just that, to make elections come up to modern
20 times?
21           SEN. FRASER:  Absolutely.
22           SEN. HUFFMAN:  Do you think that Senate
23 Bill 14 will help to prevent voter fraud and actually
24 help to ensure that only the votes of eligible Texas
25 voters are counted in these crucial elections that

262

1 happen in the state of Texas?
2           SEN. FRASER:  That is our intent, and we
3 believe the bill does that.
4           SEN. HUFFMAN:  And do you believe that
5 once we have established these safeguards, that the
6 voters will feel more confident about their vote being
7 counted and only the votes of registered Texans who can
8 vote to be counted?
9           SEN. FRASER:  Yes, that is our belief.
10           SEN. HUFFMAN:  Do you think that once
11 that's established, that it will actually encourage the
12 democratic process and that it will encourage more
13 voters to go to the polls?
14           SEN. FRASER:  The thing we've seen in
15 other states that have implemented photo ID, the -- the
16 voter turnout actually increased.  And so, yes, we
17 believe the confidence in the voters will increase, and
18 we believe it will actually increase the voting
19 percentages.
20           SEN. HUFFMAN:  Now, we've heard comments
21 today from many senators, Senator Whitmire, Senator
22 Davis, Senator Uresti, about hypothetical burdens that
23 may be placed on some hypothetical voter.  But taking
24 that into account and looking at and trying to balance
25 it, do you feel like we have a bill here that -- that

263

1 presents and moves forward our legitimate interest in
2 Texas as it regards voting?
3           SEN. FRASER:  Without a doubt.
4           SEN. HUFFMAN:  All right.
5           SEN. FRASER:  We believe it does.
6           SEN. HUFFMAN:  Thank you very much,
7 Senator Fraser.
8           SEN. FRASER:  Thank you, Senator.
9           SEN. HUFFMAN:  Thank you.
10           CHAIRMAN DUNCAN:  Chair recognizes Senator
11 Wentworth.
12           SEN. WENTWORTH:  Thank you, Mr. Chairman.
13           Will the gentleman yield?
14           SEN. FRASER:  I will yield.
15           SEN. WENTWORTH:  Senator, I want to
16 compliment you on your long hours of being on your feet
17 in responding to these questions.  I just wanted to
18 touch on a couple of things.
19           One is we had -- we had some testimony
20 here two years ago on a very similar bill, and I just
21 wanted -- since it's been raised earlier today, the
22 issue about whether or not maybe passage of this bill
23 would reduce voter participation.  There are only a
24 couple of other states, Indiana and Georgia, where these
25 sorts of bills have been passed.  One of the witnesses

264

1 in March of '09 said to us:  Not only does voter ID help
2 prevent fraudulent voting, but where it has been
3 implemented, it has not reduced turnout.  There is no
4 evidence that voter ID decreases the turnout of voters
5 or has a disparate impact on minority voters, the poor,
6 or the elderly.  The overwhelming majority of Americans
7 have photo ID or can easily obtain one.
8           Now, this is in the record from the 2009
9 hearing, which we've already adopted, but I just wanted
10 to recall some of the testimony that we had.
11           Another quote was:  Recent election
12 results in Georgia and Indiana also confirmed that the
13 suppositions that voter ID will hurt minority turnout
14 are incorrect.
15           In addition -- and I'm not sure whether
16 this was part of the record in '09, but there is a study
17 of Indiana's photo ID law that was conducted by a
18 University of Missouri professor.  He found that
19 requiring identification doesn't have much impact on
20 voter turnout rates.  His name is Jeffery Milyo.  He's
21 professor of economics and public affairs at the
22 University of Missouri, a part of the Institute of
23 Public Policy of the Harry S. Truman School of Public
24 Affairs.
25           And his conclusion is -- if I can find it

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000122
JA_000121

TX_00000122

USA_00015003

CONSIDERATION OF SENATE BILL 14 1/25/2011

265

1 quickly -- it's a many-page study, and his conclusion is
2 that the findings that emerge from his analysis are that
3 photo ID is associated with an overall county level
4 turnout increase of almost 2 percentage points -- and
5 this is just in Indiana.  This isn't Georgia as well --
6 an insignificant increase in relative turnout for
7 counties with a greater percentage of minority and poor
8 population; no consistent or significant impact on
9 relative turnout in counties with a greater percentage
10 of less educated or elderly voters; and finally, a
11 significant relative increase in turnout for counties
12 with a higher percentage of Democrat voters.
13          I was just wondering if you remembered
14 those things that were testified to two years ago or
15 whether you were familiar with this university
16 professor's study.
17          SEN. FRASER:  Thank you for bringing that
18 forward.  It -- yes, I -- now, as you mention it, I do
19 remember it.  The other thing that comes to mind that
20 was through the testimony two years ago is in the '09 --
21 I'm sorry -- the '08 president election for '09, that
22 even though the president was from Illinois, the
23 adjoining state, Indiana, had doubled the increase of
24 voting next door in the state -- in Indiana where they
25 had put in photo ID.  Illinois did not have it, but the

266

1 increase was double the amount of increase next door.
2 So it certainly didn't show that they were hurt by the
3 implementation of the --
4          SEN. WENTWORTH:  Where Indiana has a photo
5 ID law --
6          SEN. FRASER:  Illinois does not.
7          SEN. WENTWORTH:  Thank you very much,
8 Senator.
9          SEN. FRASER:  Thank you, Senator.
10          CHAIRMAN DUNCAN:  Okay.  Members, we
11 have -- that completes all of the Members who want to
12 ask questions of the author.  You can sit down for a
13 second, Senator, if you want to.  Take a rest.
14          We have a little bit of housecleaning.
15 There's a few witnesses that -- or a few exhibits that
16 may want to go in that we have now made copies of.  I
17 think, Senator Van de Putte, you had -- Senator
18 Zaffirini had Exhibit 6 which was a map of the DPS, and
19 we've now had that copied and available to distribute.
20 Do you want to go ahead and offer it into the record?
21          SEN. VAN de PUTTE:  Yes, I will.
22          CHAIRMAN DUNCAN:  Okay.  It'll be
23 received.
24          (Exhibit No. 6 marked and admitted)
25          CHAIRMAN DUNCAN:  And then I believe we

267

1 had -- Senator Davis had a chart that -- excuse me.
2          SEN. VAN de PUTTE:  Mr. Chairman, do -- I
3 move to add to Exhibit 6 the counties with Department of
4 Public Safety Driver's License Office Closures prepared
5 by legislative counsel.
6          CHAIRMAN DUNCAN:  Okay.  Thank you.  That
7 will be received in the record.
8          Senator Davis, you had an exhibit that you
9 wanted to offer.
10          SEN. DAVIS:  Yes, Mr. Chair.  I'd like to
11 add that as -- I guess it would be Exhibit No. 7 to the
12 record.
13          CHAIRMAN DUNCAN:  And I think we have
14 copies to distribute to the Members?  Would you describe
15 it, please?
16          SEN. DAVIS:  Yes, I'm sorry.  It's the
17 chart that I displayed and talked about earlier in my
18 questions of Senator Fraser.  It's exact -- an exact
19 replica of the chart that was displayed on the Senate
20 floor.
21          CHAIRMAN DUNCAN:  It has a -- it's a
22 graphic that has a -- at the top, a title that says,
23 "DL/State ID."  Okay.  Exhibit 7 will be received in the
24 record.
25          SEN. DAVIS:  Thank you.

268

1          (Exhibit No. 7 marked and admitted)
2          CHAIRMAN DUNCAN:  Are there any other
3 exhibits that --
4          SEN. FRASER:  Mr. President?
5          CHAIRMAN DUNCAN:  -- were discussed that
6 we'd like to include?  Senator Fraser?
7          SEN. FRASER:  And I had one that I
8 mentioned that I was going to enter in that I have not
9 yet.  It is the Lighthouse Opinion Poll.  This is the
10 most current poll that is taken and has a very good
11 breakout of not only across the state, the regions, but
12 also has a breakout, Republican, Democrat, and it breaks
13 out for the African American, Hispanic, and --
14          CHAIRMAN DUNCAN:  Do you have copies of
15 that to distribute?
16          SEN. FRASER:  I have one copy.
17          CHAIRMAN DUNCAN:  Okay.  Well, Exhibit 8
18 will be received, but if you'll go ahead and get copies
19 so that we can distribute those at this time.
20          (Exhibit No. 8 marked and admitted)
21          SEN. GALLEGOS:  Mr. President?
22          CHAIRMAN DUNCAN:  Senator Gallegos, for
23 what purpose?
24          SEN. GALLEGOS:  I have also some diagrams,
25 but I wasn't going to present them until the time of my

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000123
JA_000122

TX_00000123

USA_00015004

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 5 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-1 Filed 06/20/12 Page 124 of 156

64

CONSIDERATION OF SENATE BILL 14 1/25/2011

269

1 amendments. I mean, do they need to be entered now or
2 at the time of the amendment?
3            CHAIRMAN DUNCAN: I don't see any problem
4 with entering them at the time when it's relevant to
5 what you're trying to do.
6            SEN. GALLEGOS: Yeah.
7            CHAIRMAN DUNCAN: You can put them in the
8 record at that time --
9            SEN. GALLEGOS: Okay.
10           CHAIRMAN DUNCAN: -- when we're --
11           SEN. GALLEGOS: Then I'll wait till --
12 till the time of the amendment. Thank you,
13 Mr. President.
14           CHAIRMAN DUNCAN: All right. Members, the
15 next phase is the invited testimony.
16           And Senator Van de Putte and Senator
17 Fraser, if you could come up to the -- make sure we've
18 got everybody in the right order.
19           And while they're coming up, I want to
20 announce that it's my intention to -- we have about
21 17 -- last check, 17 registered witnesses for public
22 testimony, and I would like to accommodate those
23 witnesses, if we could. So remember that when you're
24 questioning and -- that we have some folks that would
25 like to testify here later or.

270

1            All right. Members, let's go ahead and
2 move into the invited testimony.
3            The first witness will be Jerry Bonnett, a
4 general counsel, Indiana Secretary of State.
5 Mr. Bonnett? Mr. Bonnett, you'll have ten minutes the
6 timer is right before you. You'll get a yellow light at
7 30 seconds, I think. And then we'll strictly hold you
8 to the time, and then open it to questions at that time.
9 You'll not be interrupted during your testimony.
10           INVITED TESTIMONY
11           TESTIMONY BY JERRY BONNETT
12           MR. BONNETT: All right. Thank you,
13 Chairman Duncan. I want to thank Senator Fraser and
14 supporters of Senate Bill 14 for inviting me to be here
15 today.
16           CHAIRMAN DUNCAN: Would you state your
17 name and --
18           MR. BONNETT: Yes. My name is Jerry
19 Bonnett. I've served as general counsel for the Indiana
20 Secretary of State Todd Rokita from 2005 to the end of
21 2010 when he completed his second term in office. I am
22 currently serving as general counsel to Indiana's next
23 Secretary of State and chief election officer, the
24 Honorable Charles White.
25           Since 2005, my duties as general counsel

271

1 have involved assisting with the implementation of
2 Indiana's photo ID law, including working with multiple
3 players in Indiana's election process, which is included
4 the Bureau of Motor Vehicles, county election boards,
5 poll workers, our Help America Vote Act, and support
6 agencies in coming up with the procedures and rules to
7 administer our photo ID law.
8            I've also been responsible for statewide
9 monitoring of election day activity in elections in our
10 statewide and primary -- primary general elections in
11 2006, 2007, 2008, and 2010. I've reviewed every
12 complaint from the -- regarding voting submitted to the
13 Secretary of State, the Indiana Election Division, the
14 Indiana Election Commission, the Department of Justice,
15 our Help America Vote Act, and other county election
16 boards.
17           I've also assisted the Indiana Attorney
18 General and the Indiana Solicitor General with the
19 discovery trials appeals and ultimately Supreme Court
20 review in the state courts and in the U.S. Supreme Court
21 of Indiana's photo ID law.
22           Prior to the first statewide election in
23 Indiana under the photo ID law, there was no shortage of
24 organizations claiming that we smell a rat of some sort
25 and that the law has some illegal discriminatory effect

272

1 or political subtext. My job has been to look for
2 exactly any application of the law that was illegal or
3 overburdensome.
4            Despite the intense scrutiny of the law
5 that has been locally -- local, state, national, and
6 even international, in my impression, Indiana has
7 been -- and our courts who have been very open to giving
8 a fair and complete hearing to anyone feeling agreed or
9 disenfranchised by our voter ID laws. In the five years
10 and eight statewide primary general elections I've been
11 involved with, there's been scant evidence of
12 disenfranchisement or discrimination in Indiana. If the
13 naysayers and conspiracy theorists and armchair social
14 scientists were correct in their prognostications,
15 Indiana would have experienced hundreds of thousands of
16 disenfranchised voters after the laws passed in 2005,
17 but hardly any group or individual or circumstance has
18 been found that has genuinely disenfranchised or
19 inconvenienced a voter beyond what the Supreme Court has
20 held to be the reasonable, orderly regulation of
21 elections.
22           Did Indiana fix something that wasn't
23 broke? Was it a law in search of a crime? Admittedly,
24 there's been little evidence of in-person voter fraud in
25 Indiana, but that's been of little consolation to

TX_00000124

USA_00015005

CONSIDERATION OF SENATE BILL 14 1/25/2011

273

1 citizens who have come to Secretary of State's office
2 with concerns about the confidence in our elections.
3            What Indiana has experienced were
4 manipulation of voter registrations with thousands of
5 voter registrations submitted just prior to the closing
6 of registration which have confounded the orderly
7 registration of voters.  Indiana has experienced issues
8 with voter list maintenance where -- where partisan
9 activists have refused to update voter registration
10 lists. insisting the U.S. Department of Justice to
11 intervene and require voter list maintenance in Indiana.
12 Indiana has seen inconsistent agency-to-agency
13 cooperation in the sharing of information.  There have
14 been times when the Social Security office was unable to
15 provide verifications of voter registrations, times when
16 other state agencies were not able to exchange
17 information that would assist in verifying voter
18 registrations.
19            There have been reports of people in urban
20 areas being bussed around from poll location to poll
21 location.  There is evidence, after the fact, of dead
22 voters having registered or of dead voters having voted.
23 There was also a report of a well-intentioned high
24 school civics teacher who was intent on having every 17
25 year old that came into her class register to vote and

274

1 every 18 year old vote even though there were some
2 students of hers who are not students -- who are not
3 U.S. citizens, but they were shamed into going through
4 the registration process and that resulted in illegal --
5 an illegal vote being cast and also confounded those
6 students eventual efforts to become naturalized U.S.
7 citizens.
8            In my position, I am in a position to say
9 that the law has not been applied -- has been applied in
10 the strict and unbending manner that the dissenters have
11 suggested.
12            After the 2005 photo ID law was enacted
13 but before the first election was held, the Secretary of
14 State and the election division and interested groups
15 developed procedures to deal with the issue of the
16 conformity of names on an ID to voter registration
17 lists.  Rules were developed that would allow for a
18 voter named Mary Ellen Smith to -- who might appear on
19 the voter registration in as many as ten different ways
20 to -- to proceed to vote.
21            Also, Indiana -- rules were adopted by the
22 Election Division in Indiana so that if a voter had
23 married between the time of the voter registration, at
24 the polls on election day, they could update their voter
25 registration by signing the poll book and proceed to

275

1 vote.  In Indiana, voters can conform their voter
2 registration up through election day to the IDs that
3 they have.
4            Other state agencies have reached out to
5 anyone identified who has been experiencing problems of
6 obtaining photo IDs.  In Indiana, it's not a money
7 issue.  And an ID is reviewed by social service agencies
8 in Indiana as key to other social services and other
9 benefits of citizenship, and there's been an interest in
10 working with individuals who had difficulty obtaining
11 photo ID.  Also, in the Indiana Election Day Handbook,
12 in bold print, it says, on -- in several locations, that
13 lack of ID or problems with an ID is not a cause for
14 someone -- for a voter to be turned away.
15            After five busy years of monitoring
16 primary general elections in Indiana, working with
17 deputies, reviewing complaints, I can say that Indiana's
18 photo ID law is not only constitutional as it is written
19 but as it has been applied in routine use -- is applied
20 and become routinely used in good faith and in -- and in
21 an accommodating matter in the state.
22            Now, keeping to its principal and intent,
23 Indiana's law, subject to all matter of partisan,
24 nonpartisan, state, national scrutiny, has not been
25 applied with the rigid inflexibility and consequences

276

1 predicted by detractors.  After exhaustive review in the
2 state and federal courts involving the application of
3 the law as applied -- instance of the law and in -- and
4 in Indiana's informed public opinion, Indiana photo ID
5 has earned broad acceptance, even from skeptics, as
6 become -- as having become integral component of voter
7 confidence and law that honors the privilege and the
8 dignity of American's right to free and equal
9 participation in elections.
10            So I honor you for the difficult work
11 you're doing here today.  I assure you that the work
12 won't be done if and when you pass Senate Bill 14.  I
13 can certainly tell you that the sun came up in Indiana
14 after Indiana's photo ID was passed.  It continued to
15 come up and continues to come up after each election
16 that we have.  So I'm ready to address your questions,
17 please.
18            CHAIRMAN DUNCAN:  Thank you, Mr. Bonnett.
19            So we'll have our first questions.
20 Senator Van de Putte, you're recognized.
21            QUESTIONS FROM SENATE FLOOR
22            SEN. VAN de PUTTE:  Thank you very much,
23 Mr. Chairman.
24            And thank you very much, Mr. Bonnett, for
25 traveling from Indiana.  I know on such short notice.

TX_00000125

USA_00015006

CONSIDERATION OF SENATE BILL 14 1/25/2011

277

1 We appreciate you being here to help us with your expert
2 testimony as we deliberate this very, very important
3 issue.
4          I had a few questions that -- that I
5 wanted to ask because here in Texas, we looked at the
6 Indiana law, and we're looking toward -- this is -- as
7 our bill author has said, it's kind of a Texas bill,
8 which we think is more restrictive than yours.  And we
9 have heard from testimony that there is increased
10 turnout, and you haven't found any instances in where
11 the burden of the new Indiana law was placed upon
12 anybody.  And -- and I think in your testimony and in --
13 said that it is working and even in your Supreme Court
14 case, no party or amicus cited -- well, of course, there
15 were no cases of impersonation at the polls in Indiana.
16          So I have some confusion because in the
17 bill that you passed, we had reports in Marion County in
18 2007 that 32 vote -- voters cast ballots that could not
19 be counted because of the voter ID law, and I want to
20 ask you about them because just a couple of them really
21 bring to mind some difficulties, and yet you cited that
22 there were no problems.
23          In South Bend, Indiana, ten retired nuns
24 were barred from voting in the 2008 Indiana democratic
25 primary.  Some of them were in their 80s and 90s.  They

278

1 no longer had driver's license.  They lived at the
2 convent, and the convent actually had the polling place
3 in their convent.  The irony was that I believe in that
4 case, the election judges were actually other nuns who
5 lived with these nuns, but they were barred from casting
6 a ballot even though they had previously voted in at
7 least ten elections in Indiana but that these nuns were
8 not able to because they did not have an ID, even though
9 the election judges live with them.  And so can you
10 comment?  This was in the newspapers, but it was also in
11 Catholic Digest magazine and so wanted to know because
12 we heard --
13          MR. BONNETT:  I can't --
14          SEN. VAN de PUTTE:  -- that there were no
15 instances, yet we had these reports.  And so could you
16 tell us?  I mean, what happened to these nuns?
17          MR. BONNETT:  I can't speak to the -- the
18 Marion County voters that you referenced to, although I
19 think that was covered in the Indiana League of Women
20 Voters v. Rokita case that was heard by the Indiana
21 Supreme Court.
22          In the case of the -- the -- the nuns, in
23 Northern Indiana, the -- it's my understanding and
24 that -- that situation was also discussed in -- in the
25 Crawford case -- the -- the nuns did have passports.

279

1 They did have a form of ID that was acceptable, but they
2 refused to present that.  They were eligible for other
3 exceptions under the law, absentee voting exception, and
4 it was really a media event because the media had been
5 brought to the scene before.  And they also refused to
6 go provisionally.  I did not -- I believe they were
7 brought in a van to a polling location that was not --
8 not, I understand, any time that they were voting at the
9 place that they lived.
10          SEN. VAN de PUTTE:  So --
11          MR. BONNETT:  That incident was -- seemed
12 to be discredited as a -- as a legitimate case of
13 disenfranchisement.
14          SEN. VAN de PUTTE:  So you're saying these
15 nuns organized in a -- in a fraudulent matter, that
16 these nuns all got together?  But even though they're --
17 from the report what was reported, they lived at the
18 convent, and they were all in their 80s and 90s.  So I
19 don't know.  You know, maybe they had passports, maybe
20 they didn't.  But you're saying that this was
21 orchestrated by these devious nuns to actually prove up
22 Indiana law, and really, they intended to mess you up
23 purposefully or --
24          MR. BONNETT:  Yes, Your Honor.
25          SEN. VAN de PUTTE:  Oh, thank you.

280

1          (Laughter)
2          SEN. VAN de PUTTE:  Well, let me ask you
3 about another case.  One of them was Lauren McCallick
4 who was an 18-year-old freshman at Saint Mary's College
5 in South Bend and who was not able to cast her ballot
6 that was due because of the law, and so that was one of
7 the cases that was there.  And can you tell me about
8 her?  Was she devious, as well, or was it orchestrated?
9          I mean, from the reports and from what was
10 happened, she was crying and she -- it was the first
11 time that she was going to be able to vote, and she
12 tried to -- she did do a provisional ballot.  But since
13 she couldn't get the documentation that she needed
14 within the time requirement, she didn't have a chance to
15 vote because she was in class and she couldn't go back
16 to her -- so can you tell me what happened to Ms. Lauren
17 McCallick in this case?
18          MR. BONNETT:  Unfortunately, I'm not
19 familiar with -- with that case.
20          SEN. VAN de PUTTE:  Oh.
21          MR. BONNETT:  So --
22          SEN. VAN de PUTTE:  Well, then what
23 happened in -- again, in Marion County, when we had some
24 senior citizens that weren't able to?  Now, they weren't
25 devious nuns.  These were seniors who were living in

## CONSIDERATION OF SENATE BILL 14 1/25/2011

281

1 a -- some sort of a -- it wasn't a senior assisted, but
2 it was some sort of a temporary, like rehab, where
3 people go after strokes or after a motor vehicle
4 accident, and that they weren't allowed. I mean, I can
5 understand your story about the nurses, you know,
6 I'm a Catholic and sometimes they get really organized,
7 and they make their point. But what --
8         MR. BONNETT: I am too.
9         SEN. VAN de PUTTE: What -- what about the
10 people who were living in the -- again, in Marion
11 County, in a -- not their full residence --
12         MR. BONNETT: Uh-huh.
13         SEN. VAN de PUTTE: -- but for a certain
14 period of time because they had a disability, they had
15 had a stroke, and they were living in this. What
16 happened to those folks?
17         MR. BONNETT: Well, and I don't know the
18 specifics without more information, but every -- every
19 reported case has been investigated and reviewed. The
20 state election division, the state social service
21 agencies, and Bureau of Motor Vehicles Division have
22 been quite willing to assist voters who have -- have had
23 difficulties obtaining an ID.
24         The largest group of voters in Indiana had
25 some form of ID, a -- a -- of what was left over, the

282

1 exceptions covered many of those voters, and the --
2 ultimately, you know, anyone registered to vote who
3 didn't have the ID, that group was small and has not
4 been identifiable in such a way that the state has been
5 able to even identify them, and certainly efforts have
6 been made in litigation to try and identify a group.
7 But I -- I believe the state would develop
8 administrative procedures to assist anyone having
9 trouble with an ID faster than the litigation would
10 proceed through the courts to try and validate the law.
11         SEN. VAN de PUTTE: Well, I appreciate
12 your answer, but you can understand my concern.
13 Particularly in the district that I represent, we have,
14 that I know of, six convents, the Sisters of Divine
15 Providence with their mother house with over 120 retired
16 nuns living there from orders all over; the Society of
17 Mary, which they're Marianist priests, and after they
18 finish at the University of Dayton and other Marianist
19 schools, they come to San Antonio and live right there
20 at Saint Mary's University. We have over 56 nuns from
21 Incarnate Word and that community, and they're, you
22 know, in their 80s, 90s. In fact, we even have a couple
23 that are over a hundred, and while on and on, you see my
24 problem.
25         And when I read things about Indiana and

283

1 having the religious who don't live outside in homes but
2 who all have the same residences and who come back to
3 that convent or retirement home run by the nuns or run
4 by the priests, it's -- it's very difficult, and so I
5 have some concerns because I have so many voters that
6 are retired religious, and that's why I wanted to clear
7 that up.
8         But let me ask you about something else.
9         MR. BONNETT: If I may, before you change
10 the subject, I will note that Indiana, for example, has
11 a Mennonite population that objects to being
12 photographed, and our law provided an exception for
13 individuals for religious reasons who objected to being
14 photographed; and there is an exception for disabled
15 individuals who live within a state licensed
16 convalescent or care center. So Indiana has developed
17 exceptions for identifiable groups.
18         SEN. VAN de PUTTE: Oh, well, I think
19 that's wonderful that Indiana did that, but you may not
20 know that that's in our Texas bill.
21         MR. BONNETT: Uh-huh.
22         SEN. VAN de PUTTE: And so why this is
23 more restrictive than Indiana is we don't have the
24 protections that you do in Indiana under this bill, for
25 those who live in religious communities, for those who

284

1 are disabled.
2         And that's the other thing I wanted to
3 talk to you about because I understand that, you know,
4 this is about the other thing that you said about
5 increased turnout. But I really wanted to talk to you
6 about -- because, I mean, let's face it, isn't the
7 turnout from 2008 November election because we had a
8 highly contested primary season, but it was because we
9 had this wonderful, wonderful, very, very active
10 electorate in electing between now President Obama and
11 John McCain. I mean, it was fabulous. I mean, so you
12 really can't compare turnouts to turnouts because the
13 turnout was wonderful in November, and we're all very
14 excited about that. So I wonder a little bit because, I
15 mean, everybody's turnout went up.
16         MR. BONNETT: May I respond to that?
17         SEN. VAN de PUTTE: Absolutely, please.
18         MR. BONNETT: If you compare the turnout
19 in the 2006 election, which was a nonpresidential
20 off-election year but -- for statewide primary and
21 general elections the 2010 election last year, there
22 was also an increase between 2006 and 2010 in -- in
23 voter turnout in Indiana, which would be more comparing
24 the apples -- apples to oranges.
25         And you're right, in 2008, Indiana voted

TX_00000127

USA_00015008

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

285

1 it's electoral votes for a Democratic presidential

2 candidate for the first time in over 30 years. Also, in

3 the 2006 state Congressional races after the photo ID

4 was enacted, three of Indiana's nine Congressional seats

5 switched from Democrat -- or from Republican to

6 Democrat, which tended to dispute the theory of the

7 political subtext of the law.

8                SEN. VAN de PUTTE:  Thank you.  There --

9 there are a couple of other questions that I wanted

10 to -- to --

11                MR. BONNETT:  Uh-huh.

12                SEN. VAN de PUTTE:  -- check on Indiana

13 law.  Can you tell me -- your law has a free voter ID

14 card issued by the state or the county.  Are there

15 restrictions or affidavits or a means test for access to

16 a free voter identification card from Indiana?

17                MR. BONNETT:  I don't want to misstate --

18 misspeak that.  It's on the Bureau of Motor Vehicle

19 Regulations.  I -- I believe that the person applied for

20 that ID needs to sign an affidavit that they don't

21 have -- have another ID with the state.  But beyond

22 that, I'm not -- I can't say about the issue of the

23 means --

24                SEN. VAN de PUTTE:  Well --

25                MR. BONNETT:  -- test.

---

286

1                SEN. VAN de PUTTE:  Well, I looked at it,

2 and I didn't think so.  It just says that they have to

3 state that they don't have a driver's license and they

4 don't have another.

5                MR. BONNETT:  Uh-huh.

6                SEN. VAN de PUTTE:  But there is no

7 affidavit of indigency or -- or anything required, at

8 least from what I looked at your law.  But I'm not sure.

9 That's why I wanted to ask.

10                MR. BONNETT:  That's my understanding.

11 Now, a related issue is when a provisional ballot is

12 verified, if a voter who has voted provisionally within

13 the ten days after the election signs an affidavit that

14 they don't have an ID and cannot get one without expense

15 and possibly can't afford one -- I'm not sure of the

16 exact language on the affidavit -- then they're entitled

17 to have their vote counted.

18                SEN. VAN de PUTTE:  Well, one of the

19 things that I wanted to look at, and I have the Indiana

20 law and I -- because ours is a little bit more

21 restrictive.  But under your section of the -- of the

22 Indiana bill, it has something in here because -- that

23 has me a little troubled because we don't, and I'm going

24 to read it.

25                But the voter prescribed by -- and it has

---

287

1 Indiana code that has not complied with -- and I think

2 that Indiana code 3-7-33-4.5 -- on election day must

3 present one of the following documents to the -- and it

4 says, "A current and valid photo ID," or it says,

5 "current utility bill, bank statement, government check,

6 paycheck, government document that shows the name and

7 address of the voter."  And yet we've been told that

8 Indiana only has a photo.

9                So what -- what is this section referring

10 to?  Is it a provisional ballot or is it a first-time

11 voter or -- or does Indiana allow for the photo ID, but

12 if they don't have the photo ID, can they use other

13 forms?

14                MR. BONNETT:  I'm not aware that Indiana

15 accepts any alternative than a photo ID.  That might --

16 I'd have to look at the law carefully on that.  Might

17 refer to the verification of address or the residency

18 with respect to voters who have moved, but I do not

19 believe that Indiana has any requirement other than --

20 than that of a -- of a government-issued photo ID with

21 an expiration date for in-person voting.

22                SEN. VAN de PUTTE:  Well, I think that

23 is -- it was very hard to follow, but I think it's under

24 a provisional ballot that has a state's licensed care

25 facility or something.  But there is at least that

---

288

1 protection for those who are at a temporary facility;

2 that even if they don't have a photo ID, the exception

3 is not that they're just exempted but I think that they

4 can utilize other forms of ID, which our Texas bill

5 doesn't have.

6                To your knowledge, was -- since this was

7 from the Indiana Legislature, do you remember any

8 discussions on why they -- they put that in?  Was this

9 put in at the same time as the original voter ID

10 legislation, or was this only done after the mess up

11 with, you know, the nuns and the -- the other folks who

12 were at this temporary facility?

13                MR. BONNETT:  I didn't live in Indiana

14 during the time that this legislation was -- was

15 discussed and deliberated, but it's my understanding

16 that the -- the exceptions to the provisions for

17 individuals who live in state-licensed assisted living

18 facilities has always been part of the -- of the

19 scheme -- or the bill, and I think the -- the utility

20 bills and the other documents you refer to might go to

21 the issue of establishing their residency in the

22 state-licensed facility, which is then an exception if

23 the polling place is located in that facility.

24                SEN. VAN de PUTTE:  Thank you.  I really

25 appreciate your candid answer; and, again, we thank you

---

TX_00000128

USA_00015009

CONSIDERATION OF SENATE BILL 14 1/25/2011

289

1 very much for your travel here to help us on this
2 important deliberation. Thank you.
3          MR. BONNETT: Thank you.
4          SEN. VAN de PUTTE: I don't have any other
5 questions, Mr. Chairman.
6          CHAIRMAN DUNCAN: Chair recognizes Senator
7 Davis.
8          SEN. DAVIS: Thank you, Mr. Chair.
9          Mr. Secretary, thank you so much for
10 traveling to be with us today and to help inform us
11 about the work that you've done in Indiana on this
12 issue. I just want to make sure that I clearly
13 understand because today there's been a great deal of
14 discussion about your bill, as you can imagine, as the
15 reason why the bill that's being proposed in the Texas
16 Senate today would be able to withstand constitutional
17 scrutiny. So I want to make sure that we have a clear
18 record in terms of how the bill that Indiana has
19 introduced, or the law that you've introduced, mirrors
20 or does not mirror what we are -- are discussing on the
21 Senate floor today.
22          So I think I heard you say that you do
23 allow women who have been married or divorced to come in
24 to vote and to provide some affidavit that they -- their
25 name has changed and is different than is on the ID that

290

1 they have because of marriage or divorce. Is that
2 correct?
3          MR. BONNETT: That's correct. That's by
4 administrative directive. It's not part of the statute.
5 And I'll say that when the -- when the Indiana courts
6 and the -- the federal courts reviewed the law, it was
7 reviewed in the context not just of the statutory
8 language but other administrative procedures that were
9 developed after the law was passed, after the framework
10 of the law was passed, for the -- view of -- as
11 applied, how the law was applied.
12          SEN. DAVIS: Absolutely. And I think
13 that's terribly important, and I'd like to invite you
14 to -- to please inform us as much as possible both
15 statutorily what was reviewed in terms of what you've
16 done to try to preserve the integrity of someone's right
17 to vote and administratively what's been done.
18          So you said on that particular one, that
19 was a rule that was instituted administratively, but it
20 was part of what was reviewed by the court system in
21 terms of the implementation of that law?
22          MR. BONNETT: Yes. That -- that directive
23 clarified procedures for poll workers in -- in viewing
24 IDs for conforming names.
25          SEN. DAVIS: And then I believe you said

291

1 that in the -- the language that's presented to a voter
2 in terms of their right to vote in Indiana, in bold
3 language, you have clarified for voters there that not
4 having a photo ID will not in and of itself be
5 sufficient cause for them not to be able to vote. Is
6 that correct?
7          MR. BONNETT: Yes. I'll -- I'll just look
8 up the exact -- the exact bold language, one example's
9 are referred to on Page 13 of the Indiana Election Day
10 Handbook. This is the 2008 copy. In bold, "No voter
11 should be turned away from the polls for failing to
12 provide photo ID." That's -- that's instruction to all
13 poll workers.
14          SEN. DAVIS: And does that wording go to
15 instances where, for example, as you -- as you talked
16 about earlier, if a person comes to the poll and they do
17 not have a photo ID, they can vote a provisional
18 balance -- or ballot -- excuse me -- on the condition
19 that they attest that they do not have a photo ID
20 because there would be a cost to receiving that ID
21 either through having to get the underlying
22 documentation that would qualify them to receive the ID
23 or some other cost that would be associated with
24 receiving the ID?
25          MR. BONNETT: Yes, there are several

292

1 alternatives to means to -- to verifying a provisional
2 ID to allow --
3          SEN. DAVIS: And can you discuss what
4 those several alternatives are, please?
5          MR. BONNETT: Well, generally, providing
6 the -- the ID or providing the -- the -- the voter
7 registration correction or an affidavit that there is a
8 religious exception to being photographed, that an ID
9 cannot be obtained without -- without cost. There may
10 be another. That's provided for in the Voter Bill of
11 Rights which is posted at each poll site, and then
12 voters who vote provisionally are given a paper receipt,
13 so to speak, with the instructions on how to verify
14 their provisional ballot and have it cast, how and
15 where.
16          SEN. DAVIS: Thank you. That's very
17 helpful.
18          And I believe you also have a provision in
19 Indiana, do you not, that allows for the use of an
20 expired driver's license for a certain period of time.
21 Is that correct?
22          MR. BONNETT: Yes. And I believe if it --
23 if it goes back to the beginning of the -- the opening
24 of registration for the election which is generally 30
25 days from the prior election. So it's generally about a

KENNEDY REPORTING SERVICE, INC.
512.474.2233

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 11 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-1 Filed 06/20/12 Page 130 of 156

70

## CONSIDERATION OF SENATE BILL 14 1/25/2011

293

1 year, year past.
2           SEN. DAVIS: Okay. Have you done any work
3 in Indiana to track or to attempt to track the
4 percentage of persons based on categories, whether it be
5 senior status, whether it be minority status, whether it
6 be indigent status, where people have claimed that
7 somehow their right to vote has been interfered with as
8 a result of this particular law?
9           MR. BONNETT: I'm not familiar with the
10 state doing that research. Certainly the -- there are
11 interest groups that have -- have made a concerted
12 effort to identify individuals, groups, or
13 characteristics, identify them and locate beyond the
14 theoretical basis; and generally, it's not been
15 something that's been accomplished. There's been a
16 tremendous separation between the theoretical concerns
17 and what's actually been experienced in our elections
18 over the last five years.
19           SEN. DAVIS: When you started your
20 comments this afternoon, you began by saying that there
21 had been scant evidence of disenfranchisement, and scant
22 to me means that there must have been some. So can you
23 talk a little bit with us about what that's looked like
24 for Indiana?
25           MR. BONNETT: There -- there was a single

294

1 media report prior to the 2010 election, a few days
2 prior to the election. It was not officially reported
3 to the state, but the media account was a gentleman
4 of -- in a particular county of 40-something years, due
5 to some unusual circumstances did not have a birth
6 certificate. I think it involved him having been
7 discharged to foster care through state programs,
8 et cetera. But it also was evident that the Bureau of
9 Motor Vehicles Division has a special group -- team that
10 works with individuals who have particular problems to
11 address those needs. And the -- the report did not
12 result in -- in a complaint, and there was no indication
13 the state got that the person wasn't able to vote
14 under -- under one of the exceptions.
15           There have been some reports, also, that
16 generally upon investigation, the individuals were able
17 to vote under -- under some provision.
18           SEN. DAVIS: And you mentioned that -- a
19 moment ago, that through both administrative rule and
20 through the statute itself, in the state of Indiana,
21 you've tried to be cognizant of this disenfranchisement
22 issue through some of the -- the rules that you've
23 enacted along with it. We talked about the fact that
24 you have a religious exception for -- for people who
25 cannot be photographed or refused to be photographed for

295

1 religious purposes. We talked about the fact that if a
2 person comes to the polling location without an ID, they
3 can vote a provisional ballot so long as they attest as
4 one of the -- the reasons for voting that provisional
5 ballot, that they had to pay a fee in order to -- to get
6 a photo ID and they were unable to pay that fee. You
7 talked about the special rule that's been created to
8 handle the situation where women have been married or
9 divorced and their -- their name would be different than
10 what is on their ID.
11           Are there other -- and excuse me -- you
12 also talked about the expiration of a driver's license
13 not being a reason to immediately turn that -- that
14 voter away so long as it's within that --
15           MR. BONNETT: Uh-huh.
16           SEN. DAVIS: -- period of time that you
17 described earlier.
18           Are there any other conditions that were
19 implemented, either through the statute or through
20 administrative rule, that you feel we should know about
21 in terms of reflecting a sensitivity to trying to
22 preserve the enfranchisement of your voters as much as
23 possible?
24           MR. BONNETT: Yes. College -- college
25 students at some state universities have -- it came

296

1 about, they have IDs that don't have an expiration date,
2 and through arrangements with -- with state colleges,
3 the universities provided through some type -- I believe
4 it was a secure online facility -- a way for the polling
5 locations to -- to verify the expiration date
6 independent of the actual ID. And so arrangements were
7 made, then, for students with -- with a university ID
8 that did not have the expiration date but where the
9 college was able to provide that information
10 independently to go ahead and vote on election day.
11           SEN. DAVIS: Very good. Are there any
12 other?
13           MR. BONNETT: Not that come to mind.
14           SEN. DAVIS: Okay. Thank you,
15 Mr. Secretary. I appreciate it.
16           MR. BONNETT: Uh-huh.
17           CHAIRMAN DUNCAN: There being no further
18 questions, Mr. Bonnett. Thank you for your testimony
19 today and for traveling here.
20           SEN. WEST: Mr. Chairman?
21           CHAIRMAN DUNCAN: Senator West, you're a
22 little late on the light there.
23           SEN. WEST: I thought it was on. I
24 apologize. And I just have a couple of questions,
25 anyway.

## KENNEDY REPORTING SERVICE, INC.
### 512.474.2233

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 12 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-1 Filed 06/20/12 Page 131 of 156

71

CONSIDERATION OF SENATE BILL 14 1/25/2011

297

1          And it may have already -- you may have
2 already addressed this, and I just may not have heard
3 it.  As it relates to the provisional ballots in your
4 state --
5          MR. BONNETT:  Uh-huh.
6          SEN. WEST:  -- an individual can, in fact,
7 cast a provisional ballot.  Is that correct?
8          MR. BONNETT:  Yes.
9          SEN. WEST:  Okay.  And they have to --
10 what's the process?  Once they cast the ballot, in order
11 for the ballot to count, they have to come back within a
12 certain number of days?
13          MR. BONNETT:  Within ten days.
14          SEN. WEST:  And what do they have to do?
15          MR. BONNETT:  They can correct any -- any
16 issue with -- with voter registration.  For example, if
17 a person appears at a poll and they're simply not
18 registered at all, they can still cast a provisional
19 ballot.  You know, there may be some administrative
20 issue in the -- with kind of registration board about
21 why they didn't show up in the precinct where they
22 believe they needed to vote.  That -- that can be
23 corrected, and the Election Board is free to correct
24 that through and beyond the election.  They can bring in
25 the identification, and they can certainly seek

298

1 assistance with obtaining the identification that's
2 required.  They can also come and execute an affidavit
3 that -- obviously, we talked about the exception to
4 being photographed for religious reasons.  They can
5 execute an affidavit that says they -- they don't have
6 the ID.  They cannot get one without cost, and then
7 they're eligible to have that vote counted.
8          SEN. WEST:  Okay.  So there's a process in
9 place.
10          Does the state keep any tally or report on
11 the number of provisional ballots that are cast in the
12 state of Indiana?
13          MR. BONNETT:  Yes.  The county election
14 boards submit that information with their -- with their
15 poll results data to the Election Division, and it's --
16 it's published online for every election.  The -- the
17 number of provisional ballots and the disposition and
18 the counties actually are also required to send copies
19 of the affidavits to the Secretary of State's office,
20 which then can be examined for the reason.  For example,
21 how many didn't show up on a poll book or there was a
22 challenge raised of some sort so that we can -- we've
23 been able to investigate the status and disposition of
24 provisional ballots.
25          SEN. WEST:  Is that information

299

1 disaggregated by ethnicity?
2          MR. BONNETT:  No.  I'm not -- I do not
3 believe that there's an indication on the provisional
4 ballot affidavit.
5          SEN. WEST:  So you really don't -- I mean,
6 in terms of the provisional ballots, the tallies, in
7 terms of provisional ballots, is it disaggregated by
8 ethnicity; that is, the number of Hispanics, African
9 Americans that are voting?
10          MR. BONNETT:  It's not, although the
11 copies of the affidavits are -- are -- are public
12 information, and there have been some social scientists
13 who have been studying and attempting to write about
14 provisional ballots and determine if there's any -- any
15 meeting or conclusions that can be gathered --
16          SEN. WEST:  Has there been any -- any such
17 studies done in Indiana?
18          MR. BONNETT:  I have looked at one study
19 from a adjunct law professor.  It did not appear to
20 provide any -- any academic or statistically sound
21 conclusions.  It was more a discourse on the issue of
22 photo ID, in general, but it made some reference to some
23 statistics that were, you know, tallies of the number of
24 provisional ballots.
25          The provisional balloting started at the

300

1 same time as the photo ID, so we don't have a calculus
2 of the provisional balloting before Indiana's photo ID.
3          SEN. WEST:  Do you happen to have the cite
4 for that particular professor's study or article?
5          MR. BONNETT:  I'll be most happy to --
6          SEN. WEST:  Okay.
7          MR. BONNETT:  -- to get it to you or get
8 it to the committee.
9          SEN. WEST:  To the chairman and the staff?
10 I'd appreciate that.
11          As it relates to provisional ballots, is
12 there any type of report on the number of individuals or
13 the percentage of individuals that come back and go
14 through the process to make certain their vote count?
15 Is it less than 10 percent of those individuals that
16 cast?
17          MR. BONNETT:  I'm not aware of an
18 aggregated report.  The data exists, and it's -- it's
19 online.  I'm not aware of an aggregated analysis of how
20 many.
21          Some provisional ballots, you know, there
22 are some instances where a person would go to a precinct
23 and not be registered to vote a provisional ballot and
24 then be directed to, and the poll workers are advised to
25 have someone go ahead and vote that provisional ballot.

TX_00000131

USA_00015012

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

301

1 But then they may later in the day be directed to the
2 right precinct, and then the -- you know, so there can
3 be more than one provisional ballot.
4          There's also some of the scholarship
5 related to the issue that if the outcomes of elections
6 have been determined by substantial margins, then
7 individuals may not feel a need to go back and verify
8 the provisional ballots if the election were not so
9 close that --
10         SEN. WEST:  Right.
11         MR. BONNETT:  -- that the votes were
12 meaningful.  So it's not really what -- what -- clear
13 what the meaning of the numbers of provisional ballots
14 and the ones that are verified means, as far as I'm
15 aware.
16         SEN. WEST:  But there's no statewide study
17 or report that's done on an annual basis that looks at
18 the percentage of individuals that cast provisional
19 ballots that actually go back and verify their ability
20 to --
21         MR. BONNETT:  That data is reported in --
22 but I'm not aware of analysis of it.  The number by
23 county of provisional ballots, probably by precinct,
24 that were cast and their ultimate disposition is -- is
25 reported in -- in election return statistics.  Analysis

---

302

1 of it is not something that I'm aware of, though.
2          SEN. WEST:  Okay.  You indicated that the
3 affidavit was -- is public.  Is it a --
4          MR. BONNETT:  Yes.
5          SEN. WEST:  -- public record?
6          And that's the -- when you say "the
7 affidavit," what do you mean by that?
8          MR. BONNETT:  That's a document that is
9 initially executed by the voter at the time of casting
10 the provisional ballot --
11         SEN. WEST:  Okay.
12         MR. BONNETT:  -- and then later, handled
13 by the Election Board within that ten days to determine
14 whether or not that vote -- the vote is sealed.  The
15 vote is sealed in an envelope.
16         SEN. WEST:  All right.  I just wanted to
17 make certain we were on the same page.
18         Okay.  Thank you very much, Mr. Chairman.
19         MR. BONNETT:  You're welcome.
20         SEN. WEST:  I would like to get that cite
21 for the study, though.
22         CHAIRMAN DUNCAN:  Senator Gallegos?
23         SEN. GALLEGOS:  Mr. Secretary, let me ask
24 you one question.  Is your Indiana driver's license, is
25 it a valid form of ID under Indiana law?

---

303

1          MR. BONNETT:  Yes, it is a state-issue ID.
2          SEN. GALLEGOS:  It is valid?
3          MR. BONNETT:  Uh-huh.
4          SEN. GALLEGOS:  And any supplements of
5 that Indiana license, is that also a form of ID?  What I
6 mean supplements is, if it -- if a driver's license is
7 confiscated and you get a temporary, is that also a
8 valid -- a valid form of ID?
9          MR. BONNETT:  If the -- I don't believe
10 that the state driver's license is specified in the
11 legislation.  It's specified more generically, a
12 state-issued ID with photograph with an expiration date
13 or government-issued ID.
14         It's my understanding when a driver's
15 license is confiscated that the Bureau of Motor Vehicles
16 will immediately issue another form of ID that is a --
17 for example, driving is restricted.
18         SEN. GALLEGOS:  And that is a valid form
19 of ID?
20         MR. BONNETT:  Yeah.
21         SEN. GALLEGOS:  Okay.
22         MR. BONNETT:  I don't believe the -- I
23 remember when I lived in Texas and in Louisiana
24 sometimes the police would take away your ID and give
25 you a piece of paper that was sort of -- to cover for

---

304

1 you, and that type of document would not be.
2          SEN. GALLEGOS:  Yeah.  But that is a valid
3 form of ID in Indiana?
4          MR. BONNETT:  It would be required to
5 have -- the ID would be required to have a picture and
6 have the expiration date.  And so something other than
7 that would not be allowed for voting.  It would still be
8 required to have a picture.
9          SEN. GALLEGOS:  Thank you.
10         MR. BONNETT:  Does that answer your
11 question?
12         SEN. GALLEGOS:  Yeah.
13         CHAIRMAN DUNCAN:  Thank you, Mr. Bonnett.
14 We appreciate your appearance here today.
15         TESTIMONY BY LUIS FIGUEROA
16         CHAIRMAN DUNCAN:  The Chair calls Luis
17 Figueroa -- Figueroa, Mexican American Legal Defense
18 Education Fund, or MALDEF.  Would you state your name,
19 please, and who you represent?
20         MR. FIGUEROA:  Absolutely.  My name is
21 Luis Figueroa.  I'm the legislative staff attorney with
22 the Mexican American Legal Defense and Educational Fund,
23 MALDEF.  Thank you very much for this opportunity to
24 testify before the Senate on this important legislation.
25         MALDEF works to promote and protect the

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000132
JA_000131

CONSIDERATION OF SENATE BILL 14 1/25/2011

305

1 rights of Latinos, including voting rights and in the
2 state of Texas and across the nation. We have an
3 extensive history in the Voting Rights Act and in
4 protecting voting rights across the nation and, of
5 course, here in Texas, going back to the case of White
6 v. Register and most recently in LULAC v. Perry
7 challenging the redistricting implementation from the
8 last decade for last -- from the last session.
9          We stand here opposed to SB 14 because it
10 lacks the safeguards to ensure that eligible voters will
11 not be disenfranchised at the polls.  If SB 14 was
12 enacted, it would be the most restrictive photo ID
13 requirement in the nation, more restrictive than
14 Indiana, more restrictive than Georgia, more restrictive
15 than Arizona.  They would allow for viewer identity
16 documents, less time to cure for provisional ballots,
17 and it would be even more difficult to cure than any of
18 the other states.
19          Studies after studies have shown that
20 voter ID and additional identification requirements at
21 the polls do have an impact on minority voters and on
22 other protected classes.  The study from voter ID
23 requirements and disenfranchisement of Latino, black and
24 Asian voters by Barreto, Nino & Sanchez states
25 "Controlling for age, income and education, we find the

306

1 naturalized citizens and minority voters are
2 significantly less likely to be able to provide multiple
3 forms of identification such as a copy of their original
4 birth certificate or recent bank statements.
5 Respondents were asked about their ability to provide
6 approximately six unique forms of identification, and
7 naturalized citizens and minority voters were
8 consistently less likely to have each form of
9 identification.  Data reflects identification trends of
10 actual voters, not just adult citizens, the findings go
11 far to suggest that photo -- that voter identification
12 laws could immediately disenfranchise many Latino,
13 Asian. African-American citizens."
14          From the Rutgers study, protecting the
15 enfranchised or restricting it, the effects of voter
16 identification requirements and turnout, by Vercellotti
17 and Anderson, states that "The predicted probability
18 that Hispanics would vote in states that required
19 nonphoto identification was about 10 percent points
20 lower than in states where Hispanic voters gave their
21 names."
22          In the Wisconsin study, the driver's
23 license status of the voting age population was counted
24 by John Pawasarat. It stated that "Minorities in poor
25 populations are the most likely -- are the most likely

307

1 tc have driver's license problems.  Less than half,
2 40 percent, of Milwaukee County African-American adults
3 and 43 percent of Hispanic adults have a valid driver's
4 license compared to 85 percent of white adults in the
5 balance of the state."
6          The Brennan Center, in their report
7 Citizens Without Proof, A Survey of Americans'
8 Possession of Documentary Proof of Citizenship and Photo
9 Identification, stated, "Citizens with comparatively low
10 incomes are less likely to possess documentation proving
11 they are citizens.  As many as 11 percent of United
12 States Citizens, more than 21 individuals, do not have
13 government-issued photo identification."  It goes on to
14 state that "25 percent of African-American voting-aged
15 citizens have no current government-issued photo ID
16 compared to 8 percent of white voting-aged citizens."
17          Study after study has shown that Latinos,
18 African-Americans, elderly, the poor, students are less
19 likely -- the disabled community are less likely to have
20 the photo identification requirements required under
21 SB 14.
22          It's important to note that Texas under
23 current law has a voter ID requirements.  It has an ID
24 requirement that -- it requires that you bring a voter
25 registration certificate or additional forms of

308

1 identification.  The question is, how much stricter can
2 we make the voter identification requirement?  The
3 question is not whether to have a voter identification
4 or not have it.  The question is, how restrictive do we
5 want to make it?
6          The current legislation presented before
7 us does not provide for any alternative photo
8 identification.  It does not allow for student ID cards,
9 for Medicaid, Medicaid cards, for expired driver's
10 license, for expired military cards or for state-issued
11 employer identifications.
12          We know that in our other states that have
13 implemented strict voter identification laws that the
14 ability to cure and to come back day to day and fix
15 their provisional ballot, it does not happen with much
16 frequency.  Voters do not return within the allotted
17 time period to fix their voter identification.
18          It's also worth noting that in SB 14 it
19 actually lowers the amount of time from what Indiana
20 requires, from ten days to six days -- six days to
21 return and fix their voter identification.  In Arizona,
22 739 ballots were not counted where -- conditional
23 provisional ballots were not counted, and only 158 were
24 counted after voters cured their identification
25 requirements.

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000133
JA_000132

TX_00000133

USA_00015014

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

309

1        What we found in Arizona when we litigated
2 was that the most common problem was a driver's license
3 that did not match an address, that did not match a
4 voter registration certificate.  We know that Latinos,
5 African-Americans and low income are the most mobile
6 populations often moving from a rental apartment, moving
7 from home to home, and as a result are most likely to
8 have matching -- most likely have identification that
9 doesn't match their voter registration certificate.
10        We know that providing a free personal
11 identification certificate does not solve the problem if
12 the documents needed to get a personal identification
13 certificate are the same ones that the study show the
14 minorities don't have.  And we know that if people are
15 required to bring birth certificates and other
16 documentation that they are unable to get a current
17 driver's license, that they are not likely to get the
18 free personal identification if they lack those same
19 documents.
20        We believe that there are ways to
21 create -- there are ways to ensure that people who are
22 voting are who they say they are.  There are ways to do
23 it without disenfranchising voters.  What we need are
24 appropriate safeguards in a photo identification law.
25 We need to expand the current list of documents that are

---

310

1 provided in SB 14, and most importantly we should
2 incorporate a signature affidavit similar to Michigan
3 and Florida to ensure that people who lack the
4 identification requirements are still able to cast a
5 ballot and have their vote count.  It's about finding
6 the right balance between security and access.
7        SB 14 only focuses on voter impersonation
8 fraud while ignoring voter intimidation, deceptive
9 practices and poll worker error.  There are ways to
10 ensure that voters who say they are -- are who they say
11 without disenfranchising voters.  Finding that right
12 balance includes including two forms of nonphoto
13 identification, requiring signature affidavit attesting
14 to name, address and eligibility, including voter
15 integrity task force, allowing for same-day election
16 voter registration with an ID requirement, free ID that
17 is not limited to the current requirements that require
18 the same documents that are required to get a driver's
19 license right now, training for poll workers and voter
20 education.
21        When we find the right balance between
22 access and security, we will ensure that we have the
23 voter confidence in our system, a system that is not
24 predicated on trying to disenfranchise voters, a system
25 that is not so unsecure that we don't have faith in our

---

311

1 electoral system, but a system that provides for access
2 and security to ensure that all votes are counted, and
3 that is what we are aiming for.
4        With that, I'm open for questions, and I
5 thank you again for this opportunity.
6        SEN. ELTIFE:  Members any questions?
7        (No response)
8        SEN. ELTIFE:  Thank you, sir, for being
9 here today.  Hold on one second.
10        QUESTIONS FROM SENATE FLOOR
11        SEN. ELTIFE:  Senator Rodriguez?
12        SEN. RODRIGUEZ:  Thank you, Mr. Chairman.
13 Mr. Figueroa, first of all, thank you for coming here to
14 testify this afternoon, particularly on such short
15 notice.  I am familiar with MALDEF's work.  In fact, I
16 serve on its board.  So I know the great work that the
17 organization does to protect the rights of citizens,
18 particularly in the area of voting rights.
19        I want to ask you just a few questions and
20 mainly for clarification.  I believe you started out by
21 comparing the legislation in Senate Bill 14 with the
22 Arizona -- the Indiana law, and I believe you even
23 mentioned the Arizona law.  Could you give us
24 specifically in which ways SB 14 is more restrictive
25 than these other laws?

---

312

1        MR. FIGUEROA:  Absolutely.  Senate Bill 14
2 has a very limited scope of identification requirements.
3 It only allows for a driver's license, a passport,
4 a citizen certification and a military identification.
5 Arizona, which at the time was considered a pretty
6 restrictive identification requirement, allows for photo
7 ID, but also allows for two alternative nonphoto
8 identification.  It was most similar to the proposal
9 that was introduced last session.
10        In Indiana where they do have a photo ID
11 requirement, they do allow for -- when you cast a
12 provisional ballot, you can come back within ten days
13 and you can attest to being indigent or you can attest
14 that you were unable to get the identification, and
15 they'll allow you an opportunity to have your vote
16 counted.
17        This law in SB 14 does not have any such
18 assertion to ensure the voters are counted.  In fact, it
19 lowers the amount of time for you to cure that
20 provisional ballot.  We're going from ten days to six
21 days -- six days.
22        And in Georgia, again, there are also
23 other forms of identification that were allowed that are
24 not allowed under Texas.  Even in Indiana, the
25 expiration date, you are allowed to have an expiration

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

313

1 date if you're within the last -- within the last
2 election. If your driver's license was expired within
3 the last election, they'd still allow you to vote. This
4 would be by far the most restrictive ID requirements in
5 the nation.
6          SEN. RODRIGUEZ: So given that, is it your
7 opinion that this law, this bill that we're considering,
8 would be much more likely to disenfranchise voters than
9 these other states' laws?
10          MR. FIGUEROA: I do think the more -- the
11 more requirements you put, the more limits on
12 identification, the more likely you are to have an
13 impact on the working poor and Latinos and
14 African-Americans and other -- and other voters.
15          SEN. RODRIGUEZ: Could you go over some of
16 the implementation challenges or issues that were
17 confronted when the Arizona law was being implemented to
18 give us a sense of what we might expect? And
19 particularly you might -- if you could focus on how it
20 may have impacted the Latino voters in Arizona.
21          MR. FIGUEROA: Absolutely. Our studies
22 did find -- our expert did find a disparate impact in
23 Arizona on Latino voters, and I grant you this was even
24 with more broader identification requirements than this
25 bill. So this bill would even have a stronger impact

314

1 than Arizona. What we found in Arizona was -- the most
2 significant impact were poll workers who tried -- who
3 claimed that the address had to match the voter
4 registration certificate to the driver's license.
5          Poll worker training has got to be a key
6 component of this. It's not clear from SB 14 about what
7 to do if a driver's license doesn't match the voter --
8 the voter registration certificate, whether that's
9 because a recently married woman has a different last
10 name, because there's a misspelling on the voter
11 registration certificate, because the address doesn't
12 match or the date of birth doesn't match. There's any
13 numerous possibilities of a mismatch between the voter
14 registration and the licenses that are going to be
15 required. Are poll workers going to use that to
16 disenfranchise voters? Well, we would hope not, but
17 we -- in our experience, it has had that impact.
18          SEN. RODRIGUEZ: All right. Thank you.
19 You stated the Latino voters are less likely to have the
20 identification required by the bill. Can you tell us
21 why?
22          MR. FIGUEROA: Yeah. I mean, a lot of
23 this has to do with the difficulty in obtaining a
24 driver's license right now. So we know that getting a
25 driver's license has become increasingly more difficult

315

1 by DPS under the current rules. Obtaining the -- having
2 the birth certificate, the documentation that you need
3 to get a driver's license is sometimes difficult to get.
4 The cost involved is also somewhat of a problem.
5          It's also a lot of people live in these
6 rural counties or don't live near a DPS station and
7 don't have a driver's license. Also, students who live
8 with their -- with their parents and don't have a
9 driver's license or they only have a student ID card may
10 not have a driver's license or the funds or the time
11 necessary to go get a driver's license.
12          SEN. RODRIGUEZ: I see. Finally, let me
13 ask you just for the record here -- I think we know the
14 answer -- but have Latino voters generally experienced,
15 in the history of this state, disenfranchisement when it
16 comes to exercising their right to vote?
17          MR. FIGUEROA: Yes. Texas has a long
18 history of voter discrimination in Texas, which is why
19 we're a Section 5 state under the Voting Rights Act. It
20 is precisely because of our history and the all-white
21 primaries, poll tax, disenfranchising voters through
22 cracking and splitting and redistricting that we are a
23 Section 5 state. And I believe that there's going to be
24 a witness here today that's going to talk about that.
25          SEN. RODRIGUEZ: Do you feel that this

316

1 long-standing history has engendered mistrust on the
2 part of the Latino voters as far as coming out and
3 voting?
4          MR. FIGUEROA: Yes. And ironically the
5 voter ID or the photo ID legislation has been touted as
6 a way to install voter confidence in our electoral
7 system, but it's only confidence on the security side.
8 It's not confidence on the access side. And from the
9 Latino community, there needs to be stronger confidence
10 on the access side. There's a long history of
11 discrimination on the voting side of Latinos, and there
12 is this feeling among many Latinos that there is a
13 continual effort to prevent our ability to elect our
14 candidates of choice and our ability to vote. So we
15 need to work on our confidence on the access side,
16 particularly with the Latino community.
17          SEN. RODRIGUEZ: Could you tell us whether
18 on this last point even those Latinos with the required
19 ID feel a distrust in participating?
20          MR. FIGUEROA: Yes. I mean --
21          SEN. RODRIGUEZ: And if so why?
22          MR. FIGUEROA: Texas has one of the lowest
23 voter turnouts in the nation. I believe it may actually
24 be the lowest in the nation. Latino voter turnout is
25 dismal in comparison to other states. And those are

TX_00000135

USA_00015016

## CONSIDERATION OF SENATE BILL 14 1/25/2011

317

1 people who are eligible -- who are eligible to vote,
2 have registered to vote and in many cases may have the
3 identification. But there is this feeling that there's
4 going to be a systematic way for their vote not to
5 count. that their vote won't make a difference. And so
6 we need to make efforts in this state to encourage
7 voting, not discourage it.
8        SEN. RODRIGUEZ: Thank you.
9        Thank you, Mr. Chairman.
10        CHAIRMAN DUNCAN: I think there's
11 another -- Senator Huffman was wishing to ask questions,
12 and I don't know that she's on the floor. Can you hold
13 on just a minute?
14        (Brief pause)
15        SEN. ELLIS: Mr. President?
16 Mr. President, parliamentary inquiry.
17        CHAIRMAN DUNCAN: State your inquiry.
18        SEN. ELLIS: You know the time of the
19 State of the Union Address tonight?
20        CHAIRMAN DUNCAN: It's this evening.
21        SEN. ELLIS: This evening? I was hoping I
22 could hold hands with some of my Republican colleagues
23 and watch it. So I'm wondering how long are we going to
24 be here tonight?
25        CHAIRMAN DUNCAN: We have two televisions

318

1 in the lounge, Senator.
2        SEN. ELLIS: Well, if I really want to
3 feel the love, I'd like to be -- I'd like to be at home.
4        (Laughter)
5        CHAIRMAN DUNCAN: Senator Huffman -- have
6 you finished your inquiry, Senator Ellis?
7        SEN. ELLIS: (No audible response)
8        CHAIRMAN DUNCAN: Senator Huffman, you are
9 recognized.
10        SEN. HUFFMAN: Yes, sir. Thank you. Just
11 a couple of questions.
12        Sir, you said that this legislation
13 conveniently disenfranchises minority voters. Is that
14 correct?
15        MR. FIGUEROA: I don't think I used the
16 word "conveniently," but disenfranchises voter -- could
17 potentially disenfranchise voters.
18        SEN. HUFFMAN: Didn't MALDEF also claim in
19 the Crawford litigation that the Indiana photo ID law
20 disenfranchises minority voters?
21        MR. FIGUEROA: We actually didn't litigate
22 the Crawford litigation. We did submit an amicus brief
23 related to our Arizona litigation, and we were concerned
24 about the impact of Crawford as well as the Arizona
25 legislation and the potential disenfranchising impact.

319

1        SEN. HUFFMAN: And didn't the Supreme
2 Court of the United States reject your assertions that
3 voter photo ID laws unduly burden the right to vote?
4        MR. FIGUEROA: What the Crawford decision
5 said was it was, one, not a voting rights case. It
6 wasn't a Section 5 case or a Section 2 Voting Rights
7 case. It was a 14th Amendment undue burdens case. And
8 what they essentially held was the burdens that it
9 imposes on voters was not significant enough to cause a
10 violation of the 14th Amendment.
11        SEN. HUFFMAN: Thank you.
12        MR. FIGUEROA: I would state that this
13 bill is more restrictive than the Indiana bill, though.
14        CHAIRMAN DUNCAN: Thank you, Mr. Figueroa.
15 There's no other questions -- oh, I'm sorry.
16 Senator Gallegos has a question.
17        SEN. GALLEGOS: Thank you, Mr. Chairman.
18 Mr. Figueroa, I don't know if you remember my testimony
19 two years ago, and I showed the maps. If we're going to
20 mandate voter ID in Texas, that we should allow the
21 folks that we're mandating access to DPS centers where
22 they get this photo ID. And if you saw inside the 610
23 Loop in Houston, there are no DPS centers.
24        MR. FIGUEROA: That's right.
25        SEN. GALLEGOS: And also -- or inside the

320

1 820 Loop in Fort Worth there's no DPS centers, and
2 there's only one inside the city of Dallas that would,
3 in fact, make getting, number one, a photo ID costly,
4 and time-consuming. I'm concerned that especially in
5 inner-city Houston and Fort Worth and some there in
6 Dallas that don't have vehicles or use mass transit as a
7 means of transportation that there's no bus lines to the
8 DPS centers --
9        MR. FIGUEROA: That's right.
10        SEN. GALLEGOS: -- that provide the photo
11 ID that we are fixing to mandate them. I wanted to ask
12 your -- you know, whether MALDEF -- you know, would that
13 be subject to any type of retrogression as far as
14 allowing somebody poor or doesn't have a vehicle or
15 can't afford the transportation to the outskirts to try
16 to get a photo ID, that there would be subject to any
17 Section 5 violations in the civil rights code?
18        MR. FIGUEROA: Yeah. Ironic -- the
19 Indiana case did make the one reference that we've been
20 talking about, and the Supreme Court did make
21 significant references to the fact of the free ID
22 provided by Indiana, how to eliminate some of these
23 burdens. However, Indiana, like I mentioned, wasn't a
24 Section 5 state.
25        And that was a larger issue in Georgia

TX_00000136

USA_00015017

CONSIDERATION OF SENATE BILL 14 1/25/2011

321

1 where similarly the DPS departments were not in the
2 inner city. So I do think it is a factor that they will
3 consider in preclearance about how accessible is it to
4 obtain that free identification. And in the rural
5 counties of Texas, the inner cities, if it shows that it
6 does have extreme difficulties for minorities to access
7 those free IDs because of the inability to get to a DPS
8 office, the amount of time it takes, the money it takes,
9 the documents it requires to get that free
10 identification, I think that does play an important part
11 of it.
12         SEN. GALLEGOS: So what you're saying
13 is -- your testimony is that it definitely is a factor.
14 And then like -- other than the areas that I mentioned
15 in my district and Fort Worth and Dallas. let's say an
16 area like Senator Uresti's area where in some cases
17 they've got to go 200 miles, you'll have to catch --
18 you'll have to either rent a helicopter or get a
19 Southwest Airlines flight to go, and even though we're
20 offering free ID, you know, the issue is how to get
21 there.
22         MR. FIGUEROA: Yeah.
23         SEN. GALLEGOS: And what I described to
24 you on these instances where, you know, these people
25 cannot provide themselves with -- especially the elderly

322

1 in these areas, you know, with transportation or don't
2 have the money to provide it, I mean, we can tell them
3 that we have free voter ID available to them if they can
4 get there.
5         MR. FIGUEROA: Right.
6         SEN. GALLEGOS: Is that -- is that what
7 your testimony is here?
8         MR. FIGUEROA: Yes. If they can get
9 there. if they have the means to get there, if they have
10 the documents to get the documentation, absolutely.
11 Free isn't necessarily free.
12         SEN. GALLEGOS: All right. Thank you.
13         CHAIRMAN DUNCAN: Are there any other
14 questions of the witness?
15         (No response)
16         CHAIRMAN DUNCAN: All right. The Chair
17 hears none. Thank you for your testimony, Mr. Figueroa.
18         TESTIMONY BY CHRISTIAN WARD
19         CHAIRMAN DUNCAN: The Chair calls
20 Christian Ward. Mr. Ward, state your name and who you
21 represent, please. You have ten minutes with a --
22         MR. WARD: Thank you, Mr. Chairman.
23         CHAIRMAN DUNCAN: I think it's either a
24 one-minute warning or 30 seconds. I can't remember.
25         SECRETARY SPAW: One.

323

1         CHAIRMAN DUNCAN: One-minute warning.
2         MR. WARD: Thank you, Mr. Chairman. My
3 name is Chris Ward. I'm essential here representing
4 myself. I'm an attorney. I'm a partner with the firm
5 of Yetter Coleman. I practice primarily in complex
6 appeals, including regarding constitutional issues and
7 have some expertise and experience in particular in
8 voting rights law, including the 2009 Supreme Court case
9 Northwest Austin MUD v. Holder.
10         I'm here primarily to testify regarding
11 the general constitutional standard as explained by the
12 Supreme Court for analyzing a facial challenge to the
13 validity of a voter ID bill. Before I go into that, I
14 do want to say, because it's come up, that in my reading
15 of the Texas bill, it has an exemption for elderly nuns
16 and any other Texan over 70 whether or not they reside
17 in a nursing home. So that's something that's come up,
18 and I wanted to bring that out.
19         With regard to the legal constitutional
20 standard, the Supreme Court in the case Crawford v.
21 Marion County Election Board examined the Indiana voter
22 ID law, and it went through a very careful analysis of
23 that law, and the essential holding of that law is that
24 a voter ID act is not, in general, constitutionally
25 invalid on its face. And the Indiana law that the court

324

1 was considering at the time it issued the Crawford
2 opinion was at that time considered the most restrictive
3 voter ID law on the books of any state. And so the fact
4 that the Supreme Court found that law constitutional
5 says that there is a lot of room for imposing voter ID
6 laws under the Court's interpretation of the
7 Constitution.
8         There were two primary opinions in the
9 Crawford case. The first one that I'll talk about is
10 considered the main or controlling opinion of the case.
11 It was a case decided by a plurality, which means there
12 were three Justices signed onto one opinion that's
13 regarded as the controlling opinion by Justice Stevens,
14 of course who was one of the most liberal members of the
15 Court. And the other opinion by Justice Scalia also
16 garnered three votes. Justice Stevens' opinion is
17 regarded as the controlling opinion because it -- it
18 puts a little more stricter review, but essentially
19 those two opinions get to the same result by slightly
20 different analysis, which actually on further
21 examination turned out to be somewhat the same.
22         In Justice Stevens' controlling opinion,
23 he first looked -- he first described what the
24 appropriate test would be for a constitutional challenge
25 to an election regulation like a voter ID law, and the

CONSIDERATION OF SENATE BILL 14 1/25/2011

325

1 test that the Court will apply, he says, is you weigh
2 the asserted injury to the right to vote against the
3 precise interests put forward by the state.  So you look
4 at the alleged injury or impairment of the right to
5 vote, the alleged burden imposed by the voter ID
6 requirement, and you compare that with the severity of
7 the harm that the state is trying to avoid.
8            That opinion identifies at least three
9 valid state interests that the state of Indiana was
10 attacking with its voter ID legislation.  Number one,
11 deterring and detecting voter fraud, Justice Stevens
12 says that you can't -- nobody can question the
13 importance of detecting and deterring voter fraud.
14            Now, he noted that in that case there was
15 nothing in the record of that case that in-person voting
16 fraud. showing up and impersonating another person, had
17 actually occurred or was a big problem in Indiana, but
18 it was enough that this is a possibility.
19            He tells a story of an associate,
20 Boss Tweed, in New York back during the 1860s, and this
21 associate would send his repeaters.  He would recruit
22 men who had whiskers and send them to vote once with a
23 full beard and then send them to a barber and get the
24 chin shaved off and send them back with mutton chops and
25 a mustache and then send them back with just a mustache.

326

1 And then if you needed another vote, send them back skin
2 face, it said, plain face, and that makes each one good
3 for four votes.
4            Now, I mention that both because I thought
5 it was a little amusing story, but the more serious
6 point is that the Court looked at this.  This is an
7 anecdote from history.  This is not saying that a state
8 has to have any showing that this a current modern
9 problem.  The Court cites this anecdote as an example of
10 this is a potential problem that a legislature is within
11 its rights to attempt to address by this type of law.
12            Other valid state interests that the Court
13 identified with regard to a voter ID legislation is the
14 improvement and modernization of election procedures.
15 The Court noted that Congress has shown that it believes
16 that photo ID is an effective method of establishing
17 voters' qualifications to vote.  The National Voter
18 Registration Act of 1993, also known as the Motor Voter
19 Act, is the act that says when you go to apply for your
20 driver's license, you have to be offered the chance to
21 register to vote.  It's also the act -- it also has
22 requirements that limit the states' abilities to purge
23 their voter rolls.  So that's one reason why voter rolls
24 tend to have more voters than actually continue to
25 reside in a particular state or a particular

327

1 jurisdiction.
2            The Court also noted the Carter-Baker
3 report, which has also been mentioned in earlier
4 testimony today by Former President Carter and Former
5 Secretary of State James Baker. In that report, they
6 identified photo identification as an appropriate step
7 to take to deter voter fraud.
8            The Court also mentioned safeguarding
9 voter confidence in the system as another valid state
10 interest that is served by a voter ID requirement.
11            Justice Stevens' opinion then looked to
12 the alleged burdens on the right to vote, and he noted
13 that the photo ID requirement imposes some burdens that
14 other identification methods do not.  For example, you
15 might lose your driver's license or lose your wallet on
16 the way to the polls and then you'd have a problem.  But
17 he noted that these are not serious or frequent enough
18 to cause a constitutional infirmity.
19            And he noted that the relevant burden to
20 be considered here is the burden that is on persons who
21 are eligible to vote but who do not happen to possess a
22 valid photo ID.  So you look at the fact that that
23 affects, for one thing, a -- probably a small minority
24 of voters -- of eligible voters in the state already.
25            The Court noted that if you had to pay a

328

1 tax or a fee to get the ID, that would be the equivalent
2 of a poll tax, and that would be unconstitutional.  So
3 one important provision which the Indiana legislation
4 had and which the Texas bill has is the fact that free
5 voter ID cards are available.
6            The Court noted that some people will have
7 heavier burdens and -- but the fact that some people may
8 have heavier burdens does not make the statute itself
9 facially invalid and unconstitutional.  It means that
10 perhaps in an individual case an individual might be
11 able to show that the burden -- the specific burden on
12 that individual is so high that it would be
13 unconstitutional to apply the statute to that
14 individual, but that's not the same thing as saying that
15 the statute is facially invalid and unconstitutional as
16 a whole.  And that's what we usually think of when we
17 think of the Court striking down a law.  When we
18 think of the Court striking down a law as
18 unconstitutional.  That strikes down the whole law as
19 invalid.
20            So that was the ultimate conclusion.
21 Justice Scalia, in his opinion concurring, would go a
22 little bit further than Justice Stevens, but he
23 essentially reaches the same result.  Justice Scalia
24 says that the voter ID law is a generally applicable,
25 nondiscriminatory voting regulation, and thus individual

TX_00000138

USA_00015019

CONSIDERATION OF SENATE BILL 14 1/25/2011

329

1 impacts on specific voters are irrelevant for
2 determining the severity of the burden. In Justice
3 Scalia's analysis, he said you look at the burden is not
4 severe on anyone. The burden is show a photo ID. That
5 burden could have some different impacts on particular
6 individuals, again, who might have a particular hardship
7 getting that ID. But, again, that's not enough to say
8 that the law, as a whole, is unconstitutional.
9           SEN. ELTIFE: Members, any questions of
10 the witness?
11           (No response)
12           SEN. ELTIFE: No questions.
13           Mr. Ward, thank you for being here.
14           MR. WARD: Thank you very much.
15           TESTIMONY BY GARY BLEDSOE
16           SEN. ELTIFE: At this time, we'll call
17 Gary Bledsoe forward.
18           MR. BLEDSOE: Good evening. My name is
19 Gary Bledsoe. I represent the Texas State Conference of
20 NAACP branches, and I am proud to stand before you as a
21 fellow Texan, and indeed I want to emphasize the term
22 "fellow Texans."
23           You know, the Texas that we have today is
24 very different from the Texas that I grew up in, and
25 indeed I've seen many things occur that have been

330

1 extremely positive for me. I grew up in a segregated
2 Texas when voting was really a luxury, something that
3 was not to be expected in my community. It was
4 something very much that people cherished and desired,
5 desired to occur.
6           And many of you might even remember back
7 in 1974 when Frank Robinson, an African-American who was
8 registering individuals to vote out in Palestine, was
9 actually killed at his home because of his attempts to
10 register people to vote. Now, I happened to be a
11 freshman in law school at that time. So it's not all
12 that long ago that that actually occurred.
13           And, you know, when I -- when I look at
14 the ways that we have had to struggle to get the
15 opportunity to vote, I want you to know that we cherish
16 that and know that's extremely important. And in many
17 ways, our state had become exemplary. When I go around
18 the country and you -- we understand how we've enabled
19 people that have been on paper with felony convictions
20 to vote and things of that nature, that's a good thing.
21           And, you know, the fact that -- we don't
22 really have a problem with voter fraud in elections. I
23 think that all the testimony seems to indicate that,
24 that indeed people who go to vote are indeed people who
25 actually are registered to vote. So there's really not

331

1 a problem in that regard from what we've seen.
2           However, I'm aware that what we're
3 discussing now is whether or not we will have a bill.
4 So I would reach out to each and every one of you and
5 say that if we are going to discuss voter
6 identification, then let's do so in a way to be
7 constructive and to be enabling so that we can try and
8 empower all the people within our state to presume that
9 all people who would be eligible to vote ought to be
10 allowed to vote. And so we should reduce impediments
11 and not present additional impediments that would
12 prevent people from voting.
13           Now, frequently we have come before you
14 and talked about this issue. I know that the last time
15 I came before you we talked about a number of instances
16 of serious irregularities that have occurred in our
17 state, and I don't want to go back and go over all
18 those, but I want to point some of those out to you
19 because I think if we're talking about voter problems
20 that really and truly we ought to be talking about some
21 of the issues that prevent access because we think
22 that's a much more significant problem than the problem
23 with people voting who are not the people who were --
24 who were actually registered to vote.
25           In just this past year, we had a situation

332

1 with elderly citizens up in Bowie County who were
2 harassed by individuals after they had voted absentee
3 and people were demanding to know how they voted,
4 terrorizing the elderly people who made contact with us
5 because they were very concerned, but it was very
6 obvious it was because of politics, from our
7 observation.
8           We know that we had so many problems or
9 complaints directed to us out of Harris County this last
10 session where people were intimidated by other
11 individuals who hovered over them, who stared at them
12 and gave very hateful looks towards them, intimidating
13 some people from going forward with actually voting.
14           So we know these things continue and
15 occur, and it's not just the kinds of things that we've
16 seen in the recent past, such as when an
17 African-American candidate for sheriff in a county
18 outside Houston had -- one of his white supporters had
19 their home catch fire. And so instead of investigating
20 what might have occurred, they ended up investigating
21 the African-American candidate for sheriff.
22           We know that where they've used off-duty
23 police along with improper uses of mailboxes in Tarrant
24 County to intimidate African-Americans from being able
25 to vote. So it goes on and on, and all these things

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000139
JA_000138

TX_00000139

USA_00015020

CONSIDERATION OF SENATE BILL 14 1/25/2011

333

1 have occurred within the last decade and some within the
2 past six months. So we know that indeed we have not
3 arrived to where we have eliminated problems with
4 preventing our having access to be able to vote.
5           And, you know, I was able to be an
6 election observer for an election down in Venezuela, and
7 that was really quite illuminating to me in that the
8 individuals had to give a fingerprint whenever they
9 voted. and an untrained person had to look at the
10 fingerprint and determine whether or not it was the
11 right person. And we know that the photograph came up
12 on the screen and you had to look and see if this was
13 the right person.
14          And, you know, they had armed guards
15 around, and I actually had the misfortune of having a
16 gun directed at me by a guard. When I was asked by an
17 official in the Secretary of State's office to actually
18 go and observe them vote, I actually had to back off
19 when a gun was directed right at my face for -- five or
20 six feet away.
21          So I think we look at those things, we
22 don't need to move in that direction. We need to be
23 going out and telling people that what we have is really
24 good. What we have is actually working, where we have a
25 democracy, we have people that are engaged that are from

334

1 different backgrounds, different races, different
2 ethnicities, and we get there and we debate and we
3 discuss issues.
4           You know, when they had the birth of a
5 nation years ago and they talked about what would occur
6 in our country with enfranchising African-Americans, we
7 found out just the opposite was true, and that indeed
8 we're moving toward something that's very special, but
9 there are people that are competing against what we've
10 been trying to accomplish.
11          But, Senators, I really want to say to you
12 that we have a system that I feel is actually a good
13 system.
14          Now, besides all the other matters that I
15 can talk about, I wanted to visit with you about some of
16 the problems that we see with where we're proceeding
17 with SB 14. You know, I don't understand why, but in
18 many ways I look at SB 14 and SB 14 is much more
19 problematic than the Indiana law and much more
20 problematic than the Georgia law that have been
21 utilized. When we look at the Indiana law, the Indiana
22 law -- we can see where individuals can actually come in
23 and if they are indigent, they can give an affidavit and
24 be allowed to vote by saying that they can't afford to
25 have a voter ID.

335

1           We know that under the Texas law in
2 comparison with the Indiana law you've got to come back
3 in a stated period of days, and these six days. And the
4 way that six days is worded and the time that's
5 involved, it's going to require people to come during
6 their workdays from 8 to 5, which is a real problematic
7 thing for individuals to do. And we know that when you
8 have to come in from 8 to 5 and you're a working person,
9 that's going to be something that's difficult for you to
10 do.
11          We have a law that says if you're voting
12 in an election, that on election day you can go and have
13 time off from your work. There's not a law that says
14 you can come and have that taken care of.
15          Now, the -- we know, too, that the other
16 thing about an Indiana law -- and I would note that
17 Indiana is not a covered jurisdiction. So Indiana and
18 the Indiana case involved constitutional issues and not
19 the Voting Rights Act.
20          But, now, Indiana allows you the one free
21 bite. So when you go in and you have an expired
22 identification, you can still use that identification
23 for one election. The idea is that then the person will
24 be put on notice that their identification is expired,
25 and they will go and have that identification come up to

336

1 date. So I think that's another distinction.
2           Now, in Georgia and in Indiana, they did
3 some things that we have not done here. They did
4 diligent inquiries, and they determined that prior to
5 adoption of their laws, they determined that indeed
6 almost every one in those states had DMV
7 identifications. So everyone in Georgia had a DMV
8 identification, and only 43,000 people in Indiana did
9 not have a DMV identification. So that's much different
10 from what we have here.
11          Also, those states are much smaller. And
12 in Texas with the location of driver's license offices,
13 et cetera, some people have to travel over 100 miles.
14 So even with an indigent's provision, that's not going
15 to allow people who are poor, indigent, impaired, have
16 difficult access to these places to be able to actually
17 register. And I don't know what the implications are
18 for obligations under the NVRA, but we have not complied
19 with our obligations under the law. And that has been a
20 problem in Indiana as well.
21          And I'd just say, finally, it's very clear
22 that the Texas law will impair and have a clearly
23 disparate disadvantage on people of color. The forms of
24 ID selected are problematic. There would have been
25 something better. The forms of ID selected in Indiana

TX_00000140

USA_00015021

CONSIDERATION OF SENATE BILL 14 1/25/2011

337

1 and Georgia were both superior. The criminal
2 prosecution will discourage. We know that this might
3 impair compliance with the NVRA. We know that there
4 have been so many problems with election officials that
5 this will empower them more so to disadvantage
6 individuals. And we know that because of the time to
7 vote, the problem with identification and especially
8 cross-racial identifications, the issue of the
9 expirations and the types of the IDs selected, those
10 things are going to further reduce the minority vote.
11 So we think this is a covered jurisdiction, and you can
12 look at this in a different way. Thank you.
13          SEN. ELTIFE: Mr. Bledsoe, thank you. And
14 some members do have questions for you.
15          Senator West?
16          QUESTIONS FROM SENATE FLOOR
17          SEN. WEST: Thank you very much,
18 Mr. Chairman.
19          Mr. Bledsoe, thank you also. Now, you've
20 been the President of the NAACP Conference -- state
21 conference for how many years now?
22          MR. BLEDSOE: Twenty years.
23          SEN. WEST: Twenty years. Is there a
24 well-documented history of voter suppression that is
25 specifically related to race and ethnicity in this

338

1 state? And how would this voter ID law fit into that
2 particular history?
3          MR. BLEDSOE: Well, I think it's
4 consistent with the history, and that's sad. You know,
5 I think that we've seen Texas really evolve in a lot of
6 ways. And, you know, Texas has had a history where in
7 recent years I had a lot of bipartisan cooperation. And
8 I know that when we've done report cards in the past, we
9 had people in both parties that were doing exceptionally
10 well on our report card.
11          But we haven't extricated ourselves from
12 the past. And indeed when we look at the past and we
13 look at all the disenfranchisement that's taking place,
14 this is a direct extension of that because indeed if one
15 wanted a voter ID law, there would be a way of having a
16 voter ID law that would be more enabling, that would not
17 suppress the vote. Because what we want people to do is
18 to go out and to compete and to actually say that we
19 will compete for the minority vote and not have a law
20 that we think will have a clear disadvantage in terms of
21 suppressing the minority vote.
22          SEN. WEST: Would you -- so do you believe
23 that this voter ID law will, in fact, discriminate
24 against people of color?
25          MR. BLEDSOE: There's no question, again,

339

1 the types of IDs that are selected, the time period with
2 the nature of the jobs that African-Americans have and
3 the requirement for African-Americans to come in and
4 actually produce their proof within a certain period of
5 time. We've had enormous problems in this state with
6 the cross-racial identifications, and I can just see
7 enormous problems with that. Especially with the kinds
8 of things that we've seen in Bell County and some other
9 places here recently, we know that's going to be a
10 problem.
11          And we know, too, that in terms of the
12 issue of expirations, that's going to be a problem. And
13 if you look at state data on like voter -- excuse me --
14 motor vehicle ownership, our access to vehicles, you'll
15 find there's a big disparity among racial groups. And
16 so we're talking about the poorest of minority groups
17 not truly having access to be able to go and access the
18 identification. So I think it's clearly going to have a
19 disparate impact.
20          SEN. WEST: So is it your testimony that
21 this particular voter ID bill will discourage as opposed
22 to encourage people to participate in the electoral
23 system?
24          MR. BLEDSOE: It will; it clearly will.
25 And, you know, one of the big things obviously is the

340

1 criminal prosecution, but then there are the other
2 provisions as well where you make it so difficult for
3 people. You know, we've had, in numerous instances,
4 Fort Bend, Harris, Bowie Counties, where individuals
5 have been turned away, who weren't even allowed to cast
6 a provisional ballot. And so that's a problem. You
7 know, it's kind of like the thing in Indiana when the 12
8 nuns were attempting to vote, and they did not allow 12
9 nuns to vote because they didn't bring their voter
10 identification with them.
11          SEN. WEST: It was 12 of them?
12          MR. BLEDSOE: Twelve; 12 nuns, yes.
13          SEN. WEST: Twelve. Okay. Huh,
14 interesting.
15          Now, let me ask this question, sir:
16 You've had an occasion to speak with many
17 African-American elected officials concerning voter
18 identification laws over the last few years. Is that
19 correct?
20          MR. BLEDSOE: That's correct.
21          SEN. WEST: Have you found any
22 African-American legislators -- any African-American
23 elected officials in the state of Texas that are in
24 favor of the voter identification laws that are being
25 considered by the Texas Legislature?

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000141
JA_000140

TX_00000141

USA_00015022

CONSIDERATION OF SENATE BILL 14 1/25/2011

341

1 MR. BLEDSOE: We've seen none. And, you
2 know, our group is unanimously opposed to it. And, you
3 know, we've got Republicans and Democrats in our
4 leadership. And let me say that one of our folks that I
5 think you even know, Senator -- I don't know that you
6 know this -- but Obie Greenleaf, who is a city
7 councilman now up in Sherman, he just went and tried to
8 renew his registration, and he was pulled out of line,
9 told he had to go home and get -- and get his birth
10 certificate.
11 SEN. WEST: And he's a city councilman?
12 MR. BLEDSOE: He's a city councilman. And
13 another African/American male, who is 80 years old, was
14 told to do the same thing. Now, all the whites in line
15 were not pulled out.
16 And, you know, we've done some surveys
17 around the state, and we're not complying with NVRA. So
18 there is a real problem with our people being registered
19 to vote by our agencies.
20 SEN. WEST: Well, there have, in fact,
21 been some campaigns that have been launched lately -- or
22 back in 2005, 2006, campaigns against voter fraud. Do
23 you remember those campaigns by the Attorney General?
24 MR. BLEDSOE: I'm aware.
25 SEN. WEST: And some of the images that

342

1 were used there within the content of those campaigns?
2 MR. BLEDSOE: I think those things became
3 part of litigation, if I'm not --
4 SEN. WEST: All right. So, frankly, the
5 passage of this particular bill will encourage
6 additional litigation in the civil rights area. Is that
7 correct?
8 MR. BLEDSOE: There's no question. Let's
9 look at the PV 19, for example --
10 SEN. WEST: Right.
11 MR. BLEDSOE: -- and the 19 children who
12 bore the names of their fathers, and they were
13 wrongfully prosecuted because they voted in Waller
14 County. And that county still has enormous problems.
15 You know, we had a couple years ago where the county
16 registration officials declined to follow through and
17 tender legitimately completed voter registration cards
18 to be registered, and that was right before an election,
19 and that continues to be a problem. And if it wasn't
20 for the AG's Office telling them ultimately to register
21 those voters, I don't know if they ever would have been
22 registered, but they were not registered before the
23 election. So there was an impact in them not following
24 through and registering those voters.
25 SEN. WEST: Well, sir, I appreciate your

343

1 advocacy, and needless to say you're steadfast as it
2 relates to protecting the rights and civil rights of
3 people in this state. Thank you.
4 MR. BLEDSOE: Thank you.
5 CHAIRMAN DUNCAN: The Chair recognizes
6 Senator Hinojosa.
7 SEN. HINOJOSA: Thank you, Mr. Chairman.
8 Mr. Bledsoe, thank you for your testimony. And I was
9 very interested as you described the history in where
10 minorities for a long time were being kept from voting
11 and exercising their right to vote. You talk about many
12 problems from intimidation, I guess, to the poll tax.
13 Can you name some of those situations, for example,
14 where laws have been passed for the sole purpose of
15 trying to suppress the vote of minorities?
16 MR. BLEDSOE: Obviously there were --
17 there were a number of those that occurred. One of the
18 things that we had in our state was the grandfather
19 clause. You know, we had had poll taxes in this state,
20 and ultimately in this state they ended up passing the
21 rule that was used in the Democratic Primary, which at
22 that time there were -- the two parties were the
23 conservative Democrats and the liberal Democrats. And
24 so if you didn't vote in that Democratic primary, you
25 really didn't have a vote.

344

1 And that had to go -- the NAACP litigated
2 that case, and we first defeated that system back in, I
3 think, '28 or '29 before the Supreme Court, but they
4 finessed the rule. And so the NAACP had to litigate it
5 again, go to the Supreme Court again in 1944 where it
6 was finally invalidated. So there have been quite a few
7 instances. But if you happened to be African-American
8 or Latino and your grandfather had not been able to vote
9 in 1910, the teens or the '20s, '30s, you couldn't vote
10 either.
11 SEN. HINOJOSA: And as you well know,
12 Texas right now is under a Voting Rights Act.
13 MR. BLEDSOE: That is correct.
14 SEN. HINOJOSA: And they have an actual
15 burden to prove that whatever laws they pass in terms of
16 voting doesn't discriminate or suppress the vote against
17 minorities.
18 MR. BLEDSOE: And that's one thing they
19 didn't have in Indiana. That's an additional obstacle
20 that they'll have to encounter with the law in this
21 state.
22 SEN. HINOJOSA: And as you recite history,
23 it seems to me that many times different laws, different
24 methods are used to try to suppress the vote of
25 minorities, and they use different euphemisms and

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000142
JA_000141

TX_00000142
USA_00015023

CONSIDERATION OF SENATE BILL 14 1/25/2011

345

1 different names. And it seems to me that the purpose of
2 the voter ID legislation is, again, to suppress the
3 vote. Are you familiar with the Carter-Baker Commission
4 and Federal Election Reform?
5         MR. BLEDSOE: Yes, I am.
6         SEN. HINOJOSA: Yeah. Well, one of the
7 studies they made would show that here in Texas where we
8 have approximately 13 million registered voters, that if
9 we pass voter ID, it would disenfranchise approximately
10 3 million voters, mostly minorities. Are you surprised
11 at that?
12         MR. BLEDSOE: I'm not, because I think
13 this will have enormous implications. And again, if we
14 wanted to look at Indiana or Georgia, I would have
15 problems, but those laws -- they are so much less
16 restrictive than what's being proposed here. This law
17 would have enormous implications because of the way that
18 it is written. So it seems like instead of seeking the
19 least restrictive means, we're seeking the most
20 restrictive means.
21         SEN. HINOJOSA: And as you describe the
22 different problems that exist in terms of sometimes
23 intimidation, sometimes in placing obstacles to
24 minorities to vote, have you come across a lot of
25 instances where there's voter fraud where a person tried

346

1 to impersonate a registered voter?
2         MR. BLEDSOE: I have not seen of such a
3 situation, Senator. I think there are very few
4 situations because you are putting yourself in harm's
5 way when you do that, even under the current laws. So I
6 think there are fail-safes under the current law that
7 would prevent you from doing that. But be that as it
8 is, I think that it's pretty much widely acknowledged
9 today that that's really -- really not a problem.
10         SEN. HINOJOSA: And, for example, the last
11 ten years, do you know how many prosecutions have taken
12 place in terms of indicting a person for trying to
13 impersonate a registered voter?
14         MR. BLEDSOE: I think I saw something on
15 the Internet maybe about one in South Texas recently and
16 one person, and there might have been something in
17 Harris County. But in all those years, maybe one or
18 two, and I don't know if they were successful or not.
19         SEN. HINOJOSA: Well, if you compare the
20 number of people who have been indicted, maybe three or
21 four or five in the last five or six years that try to
22 impersonate a voter, to the negative impact that this
23 piece of legislation would have on minorities by
24 disenfranchising approximately 3 million who do not
25 carry photo ID, don't you think it's a little bit out of

347

1 balance and a steep price to pay?
2         MR. BLEDSOE: It is. Again, if we wanted
3 to have the integrity, there are things we could do to
4 ensure integrity more so than what we're actually doing
5 here. You know, there have been good and great
6 suggestions that have been put forth. And again, the
7 distinctions between Indiana and Georgia is the DMV had
8 IDs on almost all those folks. So when we went to the
9 Department of Justice in Georgia to get preclearance,
10 Georgia could tell DOJ that 100 percent of our people we
11 have IDs on already, and that's something we don't have.
12         SEN. HINOJOSA: Thank you for your
13 testimony.
14         MR. BLEDSOE: Thank you, sir. Thank you,
15 Mr. Chair.
16         CHAIRMAN DUNCAN: Hold on just a minute.
17 Senator Ellis?
18         SEN. ELLIS: Yeah, briefly, Mr. President.
19 I just wanted to thank Mr. Bledsoe. I called him last
20 night and asked him to come. I know he had client
21 business and court matters toady, and you've been
22 waiting all day to testify. I think my colleagues asked
23 the questions I would have asked, but I just wanted to
24 publically thank you for staying here all day today.
25         MR. BLEDSOE: Thank you, Senator. I

348

1 appreciate it. Thank you.
2         CHAIRMAN DUNCAN: Are there any other
3 questions of the witness?
4         (No response)
5         CHAIRMAN DUNCAN: Thank you, Mr. Bledsoe.
6 We appreciate your appearance here today.
7         TESTIMONY BY ANDRES TIJERINA
8         CHAIRMAN DUNCAN: Dr. Andres Tijerina.
9 Dr. Tijerina, state your name and who you represent.
10         MR. TIJERINA: My name is Andres Tijerina
11 representing myself.
12         CHAIRMAN DUNCAN: You may begin.
13         MR. TIJERINA: I'm a citizen of Austin, a
14 citizen of Texas, born in Texas, and I'd like to provide
15 some useful information to give a historical perspective
16 to voting laws and specifically those that have been
17 discriminatory against Mexican-Americans and minorities
18 in Texas.
19         As I said, I am from Texas. I'm from West
20 Texas. I have a BA from A&M, a masters from Tech, a
21 Ph.D. from The University of Texas at Austin, and I also
22 worked as the liaison officer for the United States Air
23 Force Academy in Colorado Springs. I'm a retired Air
24 Force officer. I'm a member of the Texas State
25 Historical Association among other associations. I'm

TX_00000143

USA_00015024

CONSIDERATION OF SENATE BILL 14 1/25/2011

349

1 also a Fellow of the TSHA, and I've conducted research
2 here at the State Archives, the National Archives,
3 University of Texas and other places in order to write
4 numerous books and publications that I've published
5 through Texas A&M University press and other refereed
6 publications, primarily on Texas history and
7 Mexican-American history that's given me this -- a
8 perspective that I'd like to share with you all this
9 afternoon.
10          Texas, I think, has a legacy and a history
11 of voter discrimination that is very clearly directed
12 and explicitly directed at Mexican-Americans to
13 specifically and effectively keep them from voting that
14 goes way back to the establishment of Texas right after
15 it was annexed to the United States and goes right on up
16 to the present.
17          It has a record of establishing and
18 writing laws to create legal devices and to take actions
19 specifically intended to intimidate Mexican-Americans
20 and minorities from voting, to drive them away from the
21 polls; actions to divide and to redistrict their
22 population base, their counties, specifically directed
23 to keep them from voting or to weaken their voting
24 effect in Texas; devices and actions to literally
25 terrorize them through the years, through the decades.

350

1          The effect has been to effectively reduce
2 the number of Mexican-Americans who have voted through
3 the years, through the history of Texas, and at the same
4 time to leave an impact or a legacy among their
5 community of distrust of the state government and even a
6 fear of state government and state law enforcement
7 officials.  This has been done in many ways that
8 appeared beneficial or that were presented as beneficial
9 even innocuous laws.  Many of the people who effected
10 this were people who approached Mexican-Americans
11 innocuously or supposedly to help them.
12          Political bosses, Texas has some of the
13 most powerful political bosses, or had through history,
14 Jim Wells, Robert Kleberg, George Parr, who used very
15 explicit and physical methods, literally corralling
16 hundreds of Mexican-American voters, thousands of
17 Mexican-American voters, primarily in the years from
18 around 1870 until around 1940, 1950, where they would
19 literally corral hundreds or thousands and direct those
20 votes, either through assistance to them by hiring them
21 to work on the county at election time or literally
22 through intimidation or specific assassinations.  In any
23 case, taking hundreds or thousands of Mexican-Americans
24 and then directing them to vote for people who became
25 great Texans, Lyndon B. Johnson, John Nance Garner,

351

1 Edward M. House, who benefited from corralling of
2 Mexican-American voters, either through assistance to
3 those voters or intimidation and threats of those
4 voters.
5          The Terrell Election Law, which was
6 presented as a beneficial law, actually created a poll
7 tax specifically directed at Mexican-American voters to
8 keep them from voting, a 1918 law to explicitly
9 eliminate interpreters; other devices like the white
10 man's primary that required that people take an oath
11 that said that they were a white man and a Democrat; but
12 also violence, violence that is almost unbelievable
13 today, even considering the violence that we see in
14 today's newspapers, even considering the violence you
15 see in Mexico; Texas Rangers, law enforcement officials
16 or vigilante groups in Harlingen, Edinburg, across Texas
17 all the way out to El Paso, riots in which the
18 Anglo-American, 4,000 Anglo-American riders in 1916 in
19 Harlingen chanting, "Keep the Mexicans from voting,"
20 literally rioted and lynched several Mexican-American
21 U.S. citizens to keep them from voting; Texas Rangers
22 literally ethnic-cleansing hundreds and thousands of
23 U.S. citizens, shooting them in the back of the head
24 under sworn testimony that we have here in the Texas
25 State library, all of them explicitly to keep them from

352

1 voting at election time; going through the barrios in
2 Corpus Christi and Harlingen at election time, riding
3 through and telling them, "Any Mexican-American citizen
4 caught voting would be either killed or sent to prison."
5          That's the heritage of Texas, and it goes
6 all the way on up to the lynchings in the 1930s, 1940s
7 of Mexican-Americans.  And then later all the way up
8 through the 1960s and 1970s, Mexican-American
9 organizations, LULAC, GI forum and voter right --
10 Southwest Voter Education Project of Woody Velasquez,
11 having to literally engage in lawsuits to try to enforce
12 the 1965 Voter Rights Act that has continued up until
13 last -- well, 2008, in this very county, a group tried
14 to, in effect, limit the extension of the Voter Rights
15 Act and actually had to go up to an appeals court of the
16 U.S. Supreme Court.
17          So the record of Texas has been
18 specifically directed against Mexican-Americans and
19 minority voters, and it's been very effective, not only
20 in limiting and reducing their votes, but also in
21 creating a legacy among their community of distrust of
22 our state government, distrust of our voting process,
23 distrust of the democratic process and even fear.  Thank
24 you.
25          CHAIRMAN DUNCAN:  Thank you, Dr. Tijerina.

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000144
JA_000143

TX_00000144

USA_00015025

CONSIDERATION OF SENATE BILL 14 1/25/2011

353

```
1           Are there any questions?
2           (No response)
3           CHAIRMAN DUNCAN:  All right.  The Chair
4  hears none.  We appreciate your testimony.
5           MR. TIJERINA:  Thank you.
6           QUESTIONS FROM SENATE FLOOR
7           CHAIRMAN DUNCAN:  Oh, I'm sorry.  Excuse
8  me.  We do have Senator Gallegos.
9           Excuse me, Senator.
10          SEN. GALLEGOS:  Professor, let me ask
11 you -- I mean, I just heard your testimony and the
12 history, and you've said all that discrimination has
13 been targeted mainly to Mexican-Americans here in the
14 state of Texas.  Is that correct?
15          MR. TIJERINA:  Yes, sir, very explicitly
16 to Mexican-Americans.
17          SEN. GALLEGOS:  So let me ask you, in your
18 expertise on history discrimination except as compared
19 to voting rights, how would you compare the present bill
20 that is before us as to some of the intimidation and
21 discrimination factors that you had just described to us
22 in the past and some of the bills that were for like the
23 no interpreters?  That was in 1918?
24          MR. TIJERINA:  Yes, sir.
25          SEN. GALLEGOS:  And some of the other
```

354

```
1  issues that you brought up.  How would you compare this
2  Senate Bill to the past history that you described to
3  this chamber?
4           MR. TIJERINA:  That those in history also
5  were presented in a very positive good light.  The
6  people who presented these laws and the people who took
7  the action, the rioters who lynched Mexican-Americans
8  called themselves the Good Government League.  They had
9  good names.  The people who killed and assassinated
10 hundreds, even thousands of Mexican-American/U.S.
11 citizens, called themselves Progressives.  The laws that
12 were passed by Terrell himself in the Terrell Election
13 Law of 1903, he explicitly stated that he wanted to
14 "kill the Mexican vote."  The candidates during that
15 time period who campaigned for the U.S. Senate -- it's
16 in the Senate record -- campaigned that their intent --
17 that their intent was to kill the Mexican vote.  And yet
18 the way the poll tax was written, the way the Terrell
19 Election Law was written, it was innocuous.  It was
20 beneficial.  It was written specifically to assure that
21 only those legal voters could vote and to clean up the
22 elections.
23          So to read the Terrell Election Law itself
24 was very innocuous or beneficial, and yet to hear
25 Terrell himself speak, he was very explicit.  He wanted
```

355

```
1  to "kill the Mexican vote," and that's how I would
2  compare them.
3           Many of these devices through the years
4  are written to sound beneficial or innocuous, and yet
5  they have just the opposite effect.
6           SEN. GALLEGOS:  Professor Tijerina, what
7  you're describing to me and what I just heard is what
8  I've seen on television recounts of what happened in
9  Mississippi and in Alabama and those southern states
10 that prevented African-Americans from either registering
11 or voting.  Is that what you're comparing this to?
12          MR. TIJERINA:  I think it would -- it
13 would have a parallel, yes, sir.
14          SEN. GALLEGOS:  Let me ask you, is there
15 any evidence that old historical discriminatory actions
16 are relevant or applicable today?
17          MR. TIJERINA:  Yes, sir, in the sense that
18 there has been and there is a legacy today in Texas of
19 voter discrimination, voter intimidation and a legacy of
20 fear and distrust; yes, sir.
21          SEN. GALLEGOS:  Professor, let me ask you
22 also, is there any evidence -- well, I think you just
23 answered this -- of innocuous or beneficial election
24 laws that may have actually had the intent to
25 disenfranchise Mexican-Americans -- Mexican-American
```

356

```
1  voters?
2           MR. TIJERINA:  Yes, sir, those that I just
3  cited.
4           SEN. GALLEGOS:  Okay.  I just -- I just
5  wanted to be clear on that fact.  Thank you very much,
6  Professor.
7           MR. TIJERINA:  Thank you.
8           CHAIRMAN DUNCAN:  Are there any other
9  questions of the witness?
10          (No response)
11          CHAIRMAN DUNCAN:  All right.  The Chair
12 hears none.  The witness will be excused.  Thank you.
13          TESTIMONY BY CHASE BEARDEN
14          CHAIRMAN DUNCAN:  The Chair calls
15 Chase Bearden.  Please state your name and who you
16 represent.
17          MR. BEARDEN:  My name is Chase Bearden.
18 I'm with the Coalition of Texans with Disabilities.
19 Good afternoon.  Thank you for a chance to speak to all
20 of you.
21          We have spent some time looking at voter
22 ID, and we feel that there is a portion that will
23 disenfranchise a large number of Texans with
24 disabilities.  We've looked at just the logistics of
25 trying to reach a place to get this free ID that
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000145
JA_000144

TX_00000145

USA_00015026

CONSIDERATION OF SENATE BILL 14 1/25/2011

357

1 everyone has talked about.

2       There's a large cost associated for a
3 person with a disability who lives in a rural area or
4 place that's farther out to try and reach a DPS office
5 to try and get these IDs. The majority of people with
6 disabilities, especially that have had one for their
7 entire life, may not have ever gotten a driver's
8 license. They may not have a Texas license. They more
9 than likely don't have a passport. So when you look at
10 trying to get the IDs that you need to go and vote,
11 you're starting off at a large cost.

12       The majority of people with disabilities
13 that are wanting to get these IDs will have to probably
14 go and get their birth certificate. To find someone who
15 can actually pick them up, drive them there, find an
16 accessible vehicle, if they don't have one, or find a
17 bus line that actually goes to where they can get a
18 birth certificate is going to be very difficult. A lot
19 of people said, "Well, maybe they can go online. They
20 could access and get their birth certificate sent to
21 them online." There's a large number of Texans with
22 disabilities who are living on a very small amount of
23 money each month. They more than likely don't have a
24 computer to even access the Internet much less a
25 provider or a credit card that they could use to access

358

1 the birth certificate they need. It also takes quite a
2 while to get that birth certificate if you were to
3 access that online unless you were to expedite it.

4       Then after getting that, you would have to
5 find a way to get to the DPS office. If you do live in
6 a very rural area and you have a significant disability,
7 maybe you're using a power chair and your family doesn't
8 have an accessible van to be able to get you somewhere,
9 you have to look at how are you going to be able to make
10 it to where that person can access these IDs easily.

11       One of the other areas that we looked at
12 was people living in nursing homes, state-supported
13 living centers who might not be able to access the IDs
14 they need to go and get identification. Do we have
15 something in place that's going to allow them to be able
16 to go and more than likely not be able to catch a ride
17 or hop in their car and drive down to the DPS office.
18 They are living in a state-supported living center, but
19 they still have the right to vote.

20       So looking at how they would get their
21 identifications, we feel like they would still more than
22 likely be put in a place where they are not going to be
23 able to get the identification they need.

24       One of the other areas that we looked at
25 was that there's an exemption for a person that's over

359

1 70. And when we thought about that, isn't that similar
2 to the same issues that a person with a disability might
3 be facing, a harder time getting transportation to get
4 in to go get that ID, maybe the cost, living on a fixed
5 income? So we have an inconsistency that kind of keeps
6 the same person from getting the ID they need, that free
7 ID, but we're giving an exemption to someone else.

8       When we started looking at a person who is
9 traveling to go and actually vote and they get there and
10 they don't have the correct ID or they are missing
11 something, so they have to cast a provisional ballot,
12 trying to get back there within six days can sometimes
13 be logistically impossible for a person. They might
14 have had to get public transportation to go and get
15 there. So they had to set up a ride through one of the
16 kind of disability bus systems, but they might not be
17 able to get a ride again or to get to the place to get
18 the documentation they need to get back and cure their
19 ballots.

20       Currently right now there are being bills
21 filed that would reduce the accessibility at some of the
22 polling places on nonfederal elections. They wouldn't
23 have to use all the accessible voting machines. We feel
24 like if you end up passing a law like that and then you
25 add voter ID to that and you're kind of putting a burden

360

1 on someone trying to force them to get an ID that they
2 might not be able to get to, and then they get to the
3 polling place and they don't even have the accessibility
4 they need to cast a private ballot. It's just recently
5 in 2001 that we've been able to get the technology we
6 need to cast that private ballot without someone else
7 doing it for us. And now we're looking at having that
8 removed and then being forced to try and find an ID
9 that's acceptable that might not be obtainable by
10 everyone.

11       So we ask that y'all take the time to
12 really investigate how these IDs will really affect
13 someone who might not be able to obtain what it is y'all
14 are asking for. Thank you.

15       CHAIRMAN DUNCAN: Thank you, Mr. Bearden.

16       QUESTIONS FROM SENATE FLOOR

17       CHAIRMAN DUNCAN: Senator Zaffirini?

18       SEN. ZAFFIRINI: Thank you for being with
19 us this afternoon, Mr. Bearden. Excellent testimony. I
20 have several questions for you that will focus on the
21 needs of persons with disabilities and how they will be
22 impacted if Senate Bill 14 were to pass.

23       First, are persons with disabilities less
24 likely to have a current driver's license, military ID
25 or passport than the general population of voters?

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000146
JA_000145

TX_00000146

USA_00015027

CONSIDERATION OF SENATE BILL 14 1/25/2011

361

1        MR. BEARDEN:  I think there's probably a
2 large number of people with disabilities who don't have
3 a current driver's license or who don't have a driver's
4 license.  Many depend on the bus system, and they live
5 in areas where they can access buses.  Not all the bus
6 systems will access DPS.  Not all people with
7 disabilities are going to have a passport.  Many of them
8 are living on a fixed income and more than likely are
9 not traveling abroad.  They more than likely have not
10 been in the military or are carrying any other type of
11 ID.
12        SEN. ZAFFIRINI:  And what is the reason
13 for this?  Why is it that persons with disabilities --
14 and I'm trying to enter it into the record.  Why is it
15 that persons with disabilities are less likely than
16 other voters to have these documents?
17        MR. BEARDEN:  People with disabilities
18 tend to be of the lowest demographics when it comes to
19 having jobs, having income.  They are having a harder
20 time trying to get the services they need.  So being
21 able to have a driver's license or a passport is a lot
22 of times unobtainable.
23        SEN. ZAFFIRINI:  Thank you.  What
24 additional barriers do persons with disabilities have in
25 obtaining the forms of ID requested or required by

362

1 Senate Bill 14.
2        MR. BEARDEN:  Could you repeat that again?
3        SEN. ZAFFIRINI:  What additional barriers
4 do persons with disabilities have or would have in
5 obtaining the forms of identification required by Senate
6 Bill 14?
7        MR. BEARDEN:  I think many of the barriers
8 would be -- I think it was brought up that one of the
9 DPS offices was inaccessible.  There's still
10 accessibility issues in Texas.  We've had accessibility
11 issues in polling places.
12        When you look at trying to get $22 put
13 together to buy a birth certificate, have to take the
14 time to get that birth certificate, then go to get
15 another ID, I think when you look at the amount of money
16 that that is -- and I know everyone doesn't feel it's a
17 large amount of money -- but someone living on a fixed
18 income, on SSI, that is a large portion of their funds,
19 and a lot of them won't be able to obtain it.
20        SEN. ZAFFIRINI:  Would the voter
21 identification required in this bill be sufficient to
22 ensure access to accurate information about the new ID
23 requirement information for the full range of persons
24 with disabilities in our state?
25        MR. BEARDEN:  We don't feel it will.  The

363

1 majority of people who have disabilities are living on a
2 fixed income.  They don't have access to a computer.
3 They don't have access to the Internet and more than
4 likely not to have a newspaper to receive the
5 information.  So we don't feel that they will be able to
6 get all the information.
7        SEN. ZAFFIRINI:  Thank you.  What effect
8 do you believe that Senate Bill 14 would have on the
9 turnout of voters with disabilities?
10        MR. BEARDEN:  The turnout of voters with
11 disabilities has increased up to -- we feel like it will
12 decrease.  The majority of people will show up.  They'll
13 try and cast their vote.  They will have to do a
14 provisional ballot, and I think when they start to look
15 at having to come back, they will have a harder time
16 making it.  The journey getting there sometimes is
17 incredibly difficult, trying to find a way to get there,
18 trying to get everything in order to be able to get
19 there.  So we do think it will decrease the turnout.
20        SEN. ZAFFIRINI:  Thank you.  Now, thinking
21 specifically of persons with disabilities who are
22 registered voters and who do have a photo ID, is there
23 any way that they would be impacted negatively by Senate
24 Bill 14?
25        MR. BEARDEN:  I think they could be if

364

1 they do not bring their ID.  The majority of people with
2 disabilities, if they had a photo ID and were to show up
3 without it or to have one that has expired, may not have
4 the time to actually go afterwards, get an ID redone or
5 to get a current ID to be able to make it back and have
6 their ballot cured in time.
7        SEN. ZAFFIRINI:  Would part of the problem
8 be that they might have a photo ID that is very old?
9        MR. BEARDEN:  I think that's very
10 possible.  There's a lot of people who might have
11 received an injury who were driving before who are not
12 driving anymore, who have held onto an ID that has
13 expired.  That's all they've needed.  So more than
14 likely if they are not driving and their ID is expired,
15 they probably won't have a current ID.
16        SEN. ZAFFIRINI:  And they might have a
17 driver's license that has expired, too --
18        MR. BEARDEN:  Uh-huh, yes.
19        SEN. ZAFFIRINI:  -- that would have a
20 photo?
21        What affect do you believe Senate Bill 14
22 would have on the number of provisional ballots cast by
23 voters with disabilities?
24        MR. BEARDEN:  I think we'll have a lot --
25 a larger amount of provisional ballots casted, and I

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000147

USA_00015028

CONSIDERATION OF SENATE BILL 14 1/25/2011

365

1 don't think we will be able to -- in the next few
2 elections be able to educate people fast enough to be
3 able to lower that level.  We've spent since 2001
4 educating people, that they have the technologies now to
5 make an independent, private vote themselves.  And it
6 took time to get people to understand that if they were
7 visually impaired, they didn't have to rely on someone
8 else anymore.  They went before, they had a bad
9 experience, weren't able to cast their own ballot, and
10 then once we passed HAVA and they had the technology to
11 cast their own ballot, it took us time to get people
12 educated to know that they can still do that and how to
13 do that.  So I think we would be kind of taking steps
14 backwards by doing this.
15             SEN. ZAFFIRINI:  To your knowledge, have
16 HAVA funds been used specifically to increase the access
17 of persons with disabilities to polling places.
18             MR. BEARDEN:  Yes, they have.  We've
19 specifically worked with HAVA and the Secretary of
20 State's Office to increase Texans with disabilities
21 voter outreach.  We've also worked with them on finding
22 access issues.  So I think these funds would be greatly
23 hampered, and the ability for Texans to be able to vote
24 would have problems.
25             SEN. ZAFFIRINI:  Do you have any concerns

366

1 about the plan or the possibility of diverting
2 $2 million in HAVA funds to pay for this Senate Bill 14
3 instead?
4             MR. BEARDEN:  Yes.  Because right now I
5 believe that's about what they are spending to do all
6 the outreach and to work on accessibility and to
7 maintain some of the voting machines.  Right now what
8 they've said, the reason -- I believe one of the House
9 bills that's been filed to not have to have the
10 accessible voting machines is that it's a higher cost
11 during nonfederal elections.  If that's the case and the
12 counties are not able to afford to make -- have an
13 accessible machine, the funds that could have helped
14 them are probably now going to be taken away to let
15 people know that they're going to need an ID.
16             SEN. ZAFFIRINI:  So it is your testimony
17 that if $2 million in HAVA funds are diverted for the
18 purpose of Senate Bill 14, that there could be a
19 negative impact on the accessibility of persons with
20 disabilities to the polling places?
21             MR. BEARDEN:  Yes.
22             SEN. ZAFFIRINI:  Thank you.  Now,
23 Mr. Bearden, you represent the Coalition of Texans with
24 Disabilities?
25             MR. BEARDEN:  Yes, I do.

367

1             SEN. ZAFFIRINI:  And that comprises
2 different member organizations?
3             MR. BEARDEN:  Yes, it does.
4             SEN. ZAFFIRINI:  Who are some of those
5 member organizations?
6             MR. BEARDEN:  We have organizations that
7 are not disability related.  We have a majority of
8 disability groups that are out there.  I think we
9 have --
10             SEN. ZAFFIRINI:  Do you have veterans, for
11 example --
12             MR. BEARDEN:  We do; we do.
13             SEN. ZAFFIRINI:  -- with disabilities?
14             MR. BEARDEN:  We have veterans'
15 associations.  We have organizations that are more
16 specific to single disabilities.  We've worked with
17 groups of older Texans.
18             SEN. ZAFFIRINI:  And is your testimony
19 today personal, or are you representing this Coalition
20 of Texans with Disabilities?
21             MR. BEARDEN:  I'm representing the
22 Coalition of Texans with Disabilities.
23             SEN. ZAFFIRINI:  Have they discussed this
24 bill thoroughly?
25             MR. BEARDEN:  Yes.

368

1             SEN. ZAFFIRINI:  And what is their
2 consensus about this bill?
3             MR. BEARDEN:  We feel it will
4 disenfranchise a portion of Texans with disabilities.
5             SEN. ZAFFIRINI:  And you are speaking for
6 this coalition --
7             MR. BEARDEN:  -- yes.
8             SEN. ZAFFIRINI:  -- when you stand in
9 opposition to this bill?
10             MR. BEARDEN:  Yes.
11             SEN. ZAFFIRINI:  Thank you.  Now, you're
12 familiar with the bill, of course, and you've seen
13 different versions of it through the years?
14             MR. BEARDEN:  Yes.
15             SEN. ZAFFIRINI:  Can you think of any
16 amendments that we could propose that would help address
17 the issues that are of concern to persons with
18 disabilities?
19             MR. BEARDEN:  I think an amendment that
20 might be similar to a person who is 70 years old who
21 would be able to say that they have a disability and
22 that maybe they have the registrar -- they have written
23 earlier to the voter registrar and stated they have a
24 disability that would affect them from being able to get
25 the ID to be able to just present their voter

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 30 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-1 Filed 06/20/12 Page 149 of 156

89

CONSIDERATION OF SENATE BILL 14 1/25/2011

369

1 registration card.
2       SEN. ZAFFIRINI: Are there any other
3 amendments that could cure this bill for you?
4       MR. BEARDEN: I can't think of any right
5 now, but I could ask more of our groups.
6       SEN. ZAFFIRINI: Well, I offer you the
7 opportunity to work with my staff today, and we will
8 address those concerns, and we will try to craft some
9 amendments that would suit your issues --
10      MR. BEARDEN: Sounds good.
11      SEN. ZAFFIRINI: -- and try to cure them.
12      MR. BEARDEN: Thank you.
13      SEN. ZAFFIRINI: Thank you very much,
14 Mr. Bearden.
15      Thank you, Mr. Chairman.
16      CHAIRMAN DUNCAN: Thank you, Senator. Are
17 there any other questions of Mr. Bearden?
18      (No response)
19      CHAIRMAN DUNCAN: All right. Thank you,
20 Mr. Bearden. I appreciate your testimony.
21      Members, that concludes the invited
22 testimony for the day. We have been going now for a
23 little over three hours, and so it's time for a short
24 break. We'll take a 15-minute break, and then we'll
25 begin testimony with regard to our resource witnesses.

370

1 My plan is just to call them up in the order that I've
2 previously announced, and you can ask any questions, and
3 then we'll go into public testimony after that.
4       So the Senate Committee of the Whole will
5 stand at ease until 5:45.
6       (Recess: 5:30 p.m. to 5:45 p.m.)
7       CHAIRMAN DUNCAN: Senate Committee of the
8 Whole will come back to order.
9             RESOURCES TESTIMONY
10            TESTIMONY BY REBECCA DAVIO
11      CHAIRMAN DUNCAN: We have -- Members, the
12 next portion of this hearing will be our resource
13 witnesses. The first resource witness we announced
14 earlier will be Rebecca Davio (sic) with the Texas
15 Department of Public Safety.
16      Ms. David, why don't you come on up, state
17 your name and who you represent, and then we'll open the
18 floor to questions.
19      MS. DAVIO: My name is Rebecca Davio. I
20 am the Assistant Director for Driver Licenses at DPS.
21            QUESTIONS FROM SENATE FLOOR
22      CHAIRMAN DUNCAN: Okay. Senator
23 Zaffirini, you have a light on. Are you -- would you
24 like to ask any questions?
25      SEN. ZAFFIRINI: (Nodded)

371

1       CHAIRMAN DUNCAN: All right. Any other
2 member have a question? Senator Watson, you're
3 recognized.
4       SEN. WATSON: Yes. Thank you,
5 Mr. Chairman. Ma'am, you may not be the right person to
6 ask this, but I was deferred earlier, and so I thought I
7 would ask a couple of questions and see if you are the
8 right person.
9       Right now when someone goes in to get an
10 identification, is it your office that provides that
11 identification card?
12      MS. DAVIO: Yes, sir.
13      SEN. WATSON: And how much is charged for
14 that identification card?
15      MS. DAVIO: That card is $15.
16      SEN. WATSON: All right. So how much does
17 it cost you to produce the card?
18      MS. DAVIO: $1.67 to produce and mail it.
19      SEN. WATSON: All right. So if we're
20 looking at it from a budgetary standpoint for the state
21 of Texas, it costs you $1.60, but currently the state
22 collects $15?
23      MS. DAVIO: Yes, sir. $1.67 is what our
24 costs are.
25      SEN. WATSON: I'm sorry. $1.67. I

372

1 rounded that down, didn't I? So now you've made the
2 math completely hard for me and probably impossible.
3       MS. DAVIO: I'm sorry.
4       SEN. WATSON: But the bottom line to it is
5 there's a net -- 15 minus $1.67 gives the state of Texas
6 a net return?
7       MS. DAVIO: Yes, sir.
8       SEN. WATSON: Now, under this legislation,
9 have you seen that there is no means test for someone
10 that comes in to get an ID card?
11      MS. DAVIO: No, sir.
12      SEN. WATSON: You've not seen that, or am
13 I saying that right?
14      MS. DAVIO: By "means test," do you mean
15 do they qualify? Do they have to show economic
16 disadvantage?
17      SEN. WATSON: That's right.
18      MS. DAVIO: No, sir.
19      SEN. WATSON: There's not a means test, is
20 there?
21      MS. DAVIO: No, sir. I didn't see one.
22      SEN. WATSON: And, in fact, it forbids
23 your department from collecting a fee if an eligible
24 voter -- if a person is an eligible voter or submits a
25 registration application. Is that right?

TX_00000149

USA_00015030

CONSIDERATION OF SENATE BILL 14 1/25/2011

373

1    MS. DAVIO: Yes, sir. That's the way that
2 I understand it.
3    SEN. WATSON: And have you had a chance to
4 look at the fiscal note for this legislation?
5    MS. DAVIO: Yes, sir.
6    SEN. WATSON: Have you seen anywhere in
7 that fiscal note where it looks to try to determine what
8 the cost to the state of Texas would be for the state
9 losing the fees if people were able to get these
10 identification cards for free?
11    MS. DAVIO: No, sir. I don't believe
12 that's covered in the fiscal note. We were unable to
13 estimate that because we didn't know how many people
14 would take advantage of the card -- of the free ID card.
15    SEN. WATSON: But you would anticipate
16 some would, otherwise it wouldn't be in the bill. Is
17 that right?
18    MS. DAVIO: I'm sorry. I don't understand
19 that question.
20    SEN. WATSON: You would anticipate that
21 some people would attempt to get the card for free?
22    MS. DAVIO: Yes, sir. That would make
23 sense.
24    SEN. WATSON: Are you familiar with the
25 legislation or the fiscal note that was attached to

374

1 House Bill 218 in the 2007 session?
2    MS. DAVIO: I'm sorry, sir. I am not. I
3 just started this job in June of this year.
4    SEN. WATSON: Well, I don't -- that's one
5 of the better answers I've heard today. So thank you.
6    Are you familiar with the fiscal note that
7 was attached to House Bill 2335 in the last session of
8 the legislature?
9    MS. DAVIO: Again, no, sir.
10    SEN. WATSON: Okay. Thank you very much.
11    MS. DAVIO: Thank you.
12    CHAIRMAN DUNCAN: Senator Williams, you
13 are recognized.
14    SEN. WILLIAMS: Thank you. I appreciate
15 you being here tonight and staying with us all day. I
16 have several questions that I wanted to ask just to
17 clarify some things that I think have been brought up as
18 we went along here. For the record, can you tell us
19 what the requirements are for someone to receive
20 either -- well, to receive an official identification
21 card from the state of Texas?
22    MS. DAVIO: Yes, sir. Basically, those
23 requirements are quite simple. You can say that you
24 have to verify that you qualify, and currently that is
25 proving that you are a U.S. citizen or you have lawful

375

1 residence here. And the second thing is to demonstrate
2 who you are, to prove who you are by providing various
3 different types of identification.
4    SEN. WILLIAMS: Okay. Anything else? Do
5 you have to be photographed or fingerprinted or anything
6 like that?
7    MS. DAVIO: Yes, sir, you do have to be
8 photographed and fingerprinted and provide your
9 signature.
10    SEN. WILLIAMS: Okay. Can someone have
11 both a Texas driver's license and an ID?
12    MS. DAVIO: Yes, sir.
13    SEN. WILLIAMS: And if someone had a
14 driver's license and they wanted to come back and get a
15 free ID, if they wanted to stand in line to do that,
16 they could do that. Is that correct?
17    MS. DAVIO: Yes, sir, as I understand it.
18    SEN. WILLIAMS: Okay. How long does it
19 take once an applicant has submitted all of their
20 materials to DPS to actually mail out the physical ID?
21    MS. DAVIO: We issue a temporary receipt
22 that's good for 45 days. The time that it takes varies.
23 We are currently, I believe, running about 35 days
24 production and mailing time. There are times -- we're
25 having some equipment problems right now. There are

376

1 times when it's shorter than that.
2    SEN. WILLIAMS: Okay. And the temporary
3 ID is valid for how long?
4    MS. DAVIO: Forty-five days.
5    SEN. WILLIAMS: Okay. About the same
6 amount of time that it takes to get the physical
7 license. Okay.
8    MS. DAVIO: Yes, sir.
9    SEN. WILLIAMS: What security features
10 does a temporary ID have?
11    MS. DAVIO: The temporary ID has a picture
12 of the ID or driver license applicant and also has their
13 basic demographic information that's shown on the
14 license.
15    SEN. WILLIAMS: Okay. There's been a lot
16 said about how many licenses -- how many license
17 offices -- driver's license offices we have around the
18 state.
19    MS. DAVIO: Yes, sir.
20    SEN. WILLIAMS: Can you tell me what the
21 total number of driver's license offices are?
22    MS. DAVIO: Yes, sir. There are 307
23 locations. Currently 226 of those are operating. That
24 includes 174 full-time offices, 34 part-time offices and
25 18 mobile offices that are open.

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

377

1  SEN. WILLIAMS: Okay. And how many
2  counties do not have a driver's license office?
3  MS. DAVIO: There are 77.
4  SEN. WILLIAMS: Seventy-seven. Okay.
5  MS. DAVIO: Yes, sir. And I do have a map
6  that shows the driver license offices if you'd like to
7  have that passed out.
8  SEN. WILLIAMS: Okay. I think we've had
9  one submitted earlier and -- no, we haven't? Okay.
10 Well, let's -- why don't we go ahead and submit that
11 into evidence.
12 MS. DAVIO: This map, when you get it,
13 will show the full-time, the part-time and mobile
14 offices that are open and the offices that are
15 temporarily closed.
16 SEN. WILLIAMS: Okay.
17 CHAIRMAN DUNCAN: Okay. Ms. Davio, let us
18 first -- this will be Exhibit 9.
19 (Exhibit No. 9 marked)
20 CHAIRMAN DUNCAN: And you've just
21 described Exhibit 9 as a map. Driver's License Offices
22 in Texas is what the label is, and that will be
23 distributed. Exhibit 9, is there any objection to
24 receiving that?
25 (No response)

378

1  CHAIRMAN DUNCAN: Exhibit 9 is received.
2  (Exhibit No. 9 admitted)
3  SEN. WILLIAMS: Okay. So we have 77
4  counties that don't have a license office. Is that
5  correct?
6  MS. DAVIO: Yes, sir.
7  SEN. WILLIAMS: Okay. And could you
8  describe for me briefly -- you mentioned that some
9  offices are temporarily closed. Why are those offices
10 temporarily closed, and what is the department doing to
11 remedy that situation?
12 MS. DAVIO: Yes, sir. The DPS just
13 implemented our new driver license system, fully
14 implemented in May. Our mobile offices are functioning
15 on equipment from our Legacy system, and that equipment
16 is very, very old. And as it breaks, we are unable to
17 replace it. We simply can't get parts. We can't get
18 replacement pieces even trying to go out and buy things
19 on eBay, and so we have no other choice other than to
20 temporarily close that office.
21 We have tried to get new equipment --
22 equipment for our new system to work in these mobile
23 locations. And the way that we've changed -- the way
24 that we have changed the way we do driver license, we're
25 pushing much more data through, and so we find it very

379

1  difficult, impossible really, to get the new equipment
2  to work.
3  SEN. WILLIAMS: So when you say Legacy
4  equipment and the new equipment, you're talking about
5  computers that you use to process the information --
6  MS. DAVIO: Yes, sir. I'm sorry.
7  SEN. WILLIAMS: -- that people get in?
8  MS. DAVIO: Yes, sir.
9  SEN. WILLIAMS: Okay. And so what kind of
10 information is being submitted? I guess what we're
11 trying to do is meet the qualifications of the REAL ID
12 Act, which is a federally mandated program -- right --
13 and that's why we're switching to this new equipment?
14 MS. DAVIO: Well, we're switching to the
15 new equipment because our old system was so old.
16 SEN. WILLIAMS: Right.
17 MS. DAVIO: There are many safeguards that
18 are built into the new technology. For example, we now
19 scan real-time all the documents that are brought in.
20 So it used to be that we had to make copies and send
21 those back to headquarters for scanning. They are now
22 scanned real-time, and we give the originals back to the
23 customer. We also capture a photo, the fingerprints and
24 the image of the person's signature.
25 SEN. WILLIAMS: So --

380

1  MS. DAVIO: And that's a lot of data.
2  SEN. WILLIAMS: Yeah. And the issue is --
3  and have you tried using these mobile phone air cards or
4  anything like that to be able to have --
5  MS. DAVIO: We have tried using air cards.
6  We have tried using DSL lines. All of our offices,
7  full-time offices, use T1 lines, and that's been the
8  only thing that we can find.
9  SEN. WILLIAMS: Okay. So you mentioned to
10 me yesterday when we visited that you have an initiative
11 going on. Tell us a little bit about what you're trying
12 to do.
13 MS. DAVIO: Yes, sir. We realized that
14 closing these offices even temporarily might cause a
15 burden. What we're trying to do is look and be able to
16 provide a more consistent level of service. We found
17 that in some locations we only serve one or two or a
18 very small number of customers, when in our other
19 offices customers experience a very long wait time. And
20 so we're trying to equalize that level of service as
21 much as we can, provide a consistent high quality level
22 of service across the state.
23 So to do this we are doing a business
24 intelligence analysis project. That actually means that
25 we are looking at our data very carefully to see how

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000151
JA_000150

TX_00000151

USA_00015032

## CONSIDERATION OF SENATE BILL 14 1/25/2011

**381**

1 many transactions are conducted at what location, how
2 long those transactions take, that kind of thing, so
3 that we can optimize the use of our resources. We
4 realize this is not a good time to come and ask for
5 additional resources, and so we're trying to make the
6 best use of the resources that we can through this
7 analysis project.
8           SEN. WILLIAMS:  Okay.  Can a noncitizen
9 get an ID card from the state?
10          MS. DAVIO:  A noncitizen, yes.  If you are
11 an asylee or a refuge or have some other status of
12 lawful presence, yes, sir, you can.
13          SEN. WILLIAMS:  Illegal foreign visitor,
14 for instance.  You wouldn't have to be an asylee.
15 Right?  You could be a legal foreign visitor?
16          MS. DAVIO:  Yes, sir, a legal foreign
17 visitor.
18          SEN. WILLIAMS:  Okay.  And is there
19 anything unique about that card?
20          MS. DAVIO:  The cards do say "temporary
21 visitor" on them.
22          SEN. WILLIAMS:  Okay.  How many driver's
23 license holders do we have in this state?
24          MS. DAVIO:  There are a little better than
25 15 million.

**382**

1           SEN. WILLIAMS:  Okay.  And how many people
2 hold ID cards?
3           MS. DAVIO:  Approximately 750,000.
4           SEN. WILLIAMS:  And just to clarify, I
5 think I may have -- I'm not sure about the cost of an
6 ID.  Is there anything you want to add to what my
7 remarks are?  I'm not sure I was actually on the money
8 with everything.  Is what I said early, $1.67, is the
9 cost to produce those cards?  Is that --
10          MS. DAVIO:  Yes, sir.  The cost of
11 producing and mailing, yes, sir.
12          SEN. WILLIAMS:  Okay.  And then what is
13 the cost to the state to give those IDs away?
14          MS. DAVIO:  What is the cost to the state
15 to give those away?  The loss of the revenue, the
16 $15.00 --
17          SEN. WILLIAMS:  Okay.
18          MS. DAVIO:  -- or the $5 for over 65.
19          SEN. WILLIAMS:  Okay.  And have you been
20 able to determine how many people this would apply?  You
21 can't tell?
22          MS. DAVIO:  No, sir.
23          SEN. WILLIAMS:  Okay.
24          MS. DAVIO:  We don't have any way of
25 estimating.

**383**

1           SEN. WILLIAMS:  So when we talk about
2 ccst, there could be a loss of revenue, but really the
3 ccst to produce that document is pretty negligible --
4 right -- $1.67?
5           MS. DAVIO:  Yes, sir.
6           SEN. WILLIAMS:  All right.  All right.
7 That's all the questions I have.  Thank you very much.
8           MS. DAVIO:  Thank you.
9           SEN. ELTIFE:  Thank you, Senator Williams.
10          Senator Gallegos?
11          SEN. GALLEGOS:  Thank you, Mr. Chairman.
12 Now, you're representing the DPS.  Is that what you
13 said?
14          MS. DAVIO:  Yes, sir.  I'm the assistant
15 director --
16          SEN. GALLEGOS:  I'm sorry.  I didn't -- I
17 didn't hear your name or --
18          MS. DAVIO:  My name is Rebecca Davio --
19          SEN. GALLEGOS:  Rebecca.
20          MS. DAVIO:  -- and I'm the Assistant
21 Director for Driver Licenses at DPS.
22          SEN. GALLEGOS:  Okay, Rebecca.  And you
23 passed out this map right here.  Right?
24          MS. DAVIO:  Yes, sir.
25          SEN. GALLEGOS:  Okay.  Now, I'm trying to

**384**

1 see real close here.  It's got a big green spot right in
2 the middle of Harris County.
3           MS. DAVIO:  Yes, sir.
4           SEN. GALLEGOS:  Is that correct?
5           MS. DAVIO:  Yes, sir.
6           SEN. GALLEGOS:  But the maps I have shows
7 ncthing within the 610 Loop.
8           MS. DAVIO:  That actually -- I believe
9 that green -- that big green circle that you commented
10 on is -- indicates that there are seven driver license
11 offices within Harris County.
12          SEN. GALLEGOS:  Yeah, but I'm looking at
13 this one.  It says there's nothing within the 610 Loop.
14 Is that correct?
15          MS. DAVIO:  I'm sorry, sir.  I'm not
16 familiar with that map.  That point has been made
17 earlier and --
18          SEN. GALLEGOS:  No.  I introduced this map
19 two years ago, and I'm introducing it again today.  I'm
20 just asking if you're the assistant of DPS, you don't
21 know that there's not a DPS office within the 610 Loop
22 in the largest city in the state?
23          MS. DAVIO:  I can't claim to be intimately
24 familiar with the layout of Houston.  I have been to the
25 offices.

CONSIDERATION OF SENATE BILL 14 1/25/2011

385

1          SEN. GALLEGOS: Well, wait a minute. What
2 was your title again?
3          MS. DAVIO: I'm the Assistant Director for
4 Driver Licenses at DPS.
5          SEN. GALLEGOS: Okay. Well, then if you
6 don't know the answer, who can give me the answer? I
7 haven't been getting any answers today. And we are told
8 to ask DPS. Now you're before us, and you can't answer
9 that question for me. So who can I -- I mean, who do I
10 ask?
11          MS. DAVIO: I'll verify that for you, sir.
12          SEN. GALLEGOS: Before we finish today?
13          MS. DAVIO: Yes, sir.
14          SEN. GALLEGOS: All right. And not only
15 that, in Fort Worth, I only see one within the loop. In
16 Dallas, only one inside the city. But you're still --
17 on your map that you're introducing here. it shows a
18 bunch of green spots. Now, I think it needs to be
19 clarified by cities of how many are there, how many are
20 open, how many are closed, after your 10 percent cut in
21 the agency how many are proposed to be closed and the
22 hours that they open up. You know, that is what I'd
23 like to know.
24          Now, the other question that I had is --
25 and Senator Williams brought up a good point. The

386

1 problem that I have on temporary license. the
2 temporaries -- my son lost his, and he went and got a
3 temporary license, and its got his photo ID. That's a
4 temporary license. So what Senator Williams said is
5 correct.
6          My concern is on a confiscated license
7 when the DPS picks up -- or the law enforcement agency
8 picks up that license and replaces it with this
9 temporary license. Well, this confiscated license.
10 Let's not call it temporary because temporaries have a
11 photo ID. This confiscated license does not have a
12 photo ID, yet the verbiage on it says this will act as a
13 valid DPS license and valid ID. That's what it says,
14 for 40 days. Okay? And the date of it y'all gave us
15 that we asked for, is in 2010 there's almost 100,000
16 drivers out there with this license without a photo ID,
17 yet the verbiage on it has that this will be a valid DPS
18 license for 40 days. Now, is that correct? Yes or no.
19          MS. DAVIO: Yes, those are issued --
20          SEN. GALLEGOS: Okay.
21          MS. DAVIO: -- by law enforcement. They
22 are not issued through the DPS offices.
23          SEN. GALLEGOS: So there's two different
24 classes. I just wanted to make it clear for Senator
25 Williams. He's pretty -- he's pretty almost correct. I

387

1 just want to make the difference between a temporary and
2 a confiscated that I just showed you that y'all give
3 out.
4          MS. DAVIO: That sheet of paper is
5 actually given by law enforcement officers at the time
6 of stop on the street.
7          SEN. GALLEGOS: I understand, but it has
8 DFS verbiage on it.
9          MS. DAVIO: Yes, sir. It's our form, but
10 we do not issue it.
11          SEN. GALLEGOS: Okay. Now -- and this is
12 just one -- one avenue that we looked. That's just
13 100,000 in one category. There's four other categories
14 that we have not got a tally on, that confiscated --
15 that licenses are confiscated for whatever issue,
16 nonpayment of child support or some other categories
17 that you confiscate licenses. And we haven't taken the
18 tally on those. I'm just going on this one avenue where
19 licenses are confiscated and that person has not been
20 convicted yet. He or she is innocent until proven
21 guilty. But this is the only form of ID that they have,
22 and it doesn't have a picture on it.
23          MS. DAVIO: It would be possible for the
24 people whose license are confiscated to apply for an ID.
25          SEN. GALLEGOS: It doesn't say that on

388

1 here. Nowhere does it say that. I understand what you
2 just told me.
3          MS. DAVIO: Yes, sir.
4          SEN. GALLEGOS: But when they stop me and
5 take my license and give me in return, it has
6 nowhere that instructs me that I have an option to go
7 get a license with a picture. It doesn't say that on
8 here. That's why you have about 100,000 out there with
9 this type of license. And not only that, in just one
10 month, last month -- well, let's see in December of
11 2010, we have 10,000 out there driving right now with
12 this license without a picture.
13          So I just wanted to make that clear that
14 this is -- that this is out there, that it's got DPS
15 language on it. It doesn't tell us that we can -- we
16 have an option to go get one with a picture. It doesn't
17 say that on here. So that's why you have the high
18 number out there driving with this license.
19          So I just wanted to make that clear for
20 the record that that's how many drivers that we know of.
21 We haven't gone into the other categories. There could
22 be more that are driving with this license, that's their
23 only form of ID, and I just want to make it sure --
24 Senator Fraser is not on the floor -- but that he
25 understood that. But Senator Williams is, and I just

CONSIDERATION OF SENATE BILL 14 1/25/2011

389

1 wanted to make sure that that is understood, the
2 difference between the two licenses, that one, the
3 temporary has a photo ID --
4           MS. DAVIO: Yes, sir.
5           SEN. GALLEGOS: -- the confiscated does
6 not, but yet it shows here that this -- by the DPS that
7 it is a valid ID that you can use.
8           MS. DAVIO: As I understand that, sir,
9 it's valid for driving purposes. And because it's
10 provided by the law enforcement officer on the side of
11 the street, they don't have any of the equipment to take
12 a person's picture or do any of that.
13           SEN. GALLEGOS: I understand that; I
14 understand that. I just wanted to make the difference
15 in the two. And I can use this paper ID, you know, go
16 to Wal-Mart, "Where is your ID?" "Here it is right
17 here; here it is right here. The DPS gave it to me," or
18 it's got DPS language that I can use it as a valid ID.
19 I just wanted to make sure that that's clear. Is that
20 correct?
21           MS. DAVIO: Sir, I'm unable to comment on
22 whether Wal-Mart would accept that as an ID.
23           SEN. GALLEGOS: Well, it says here -- it
24 says here that this is valid per DPS language and I can
25 use as an ID.

390

1           MS. DAVIO: I believe it's valid for
2 driving purposes. It's a temporary driving permit, and
3 so I can't speak to whether a bank or retail
4 establishment would accept it for identification
5 purposes.
6           SEN. GALLEGOS: Okay. Well, let's just
7 say they'll take it because it's got your language on
8 it, but I just wanted to make that point out there to
9 the members that, you know, when you're talking about an
10 ID from the DPS, there are differences, and this one
11 just doesn't happen to have a photo ID on it. I just
12 want to make that clear.
13           And you will give me those answers before
14 we get through tonight?
15           MS. DAVIO: Yes, sir. I will work to do
16 that. I know I can give you the answer about the
17 offices within the 610 Loop in Houston. We have the
18 information about the hours that the offices are open,
19 and we'll look into the cuts -- the proposed cuts.
20           SEN. GALLEGOS: Let me ask you this
21 question: Do you anticipate any other closures per the
22 shortfall that we have now of any DPS office, whether in
23 Houston or anywhere in the state?
24           MS. DAVIO: Well, there may be some more
25 of the temporary closures because of the equipment

391

1 failure because we don't have any other way to replace
2 that failing equipment with new equipment. Because of
3 this need for a higher, larger data pipeline, there may
4 be some additional closures, but we're looking at where
5 our offices are located and how they are staffed through
6 our business intelligence project. And so we plan on
7 coming to all the legislators and the local judges and
8 bringing you that information about office closures and
9 what our recommendations would be to provide the optimal
10 level.
11           SEN. GALLEGOS: I'm only asking that
12 because if we're going to mandate Texans to obtain a
13 photo ID and we have to go to DPS to get that and you're
14 telling us you anticipate some more closures, I'd like
15 to know where they are at. And then that way we can
16 tell our folks that these particular locations -- that
17 you're going to get a free ID under this bill, that
18 those offices are going to be closed.
19           MS. DAVIO: Sir, we don't plan to close
20 any more offices unless the equipment breaks. Right now
21 we have no plans to close any of our driver license
22 offices, those mobile locations, unless the equipment
23 fails.
24           SEN. GALLEGOS: Unless the equipment
25 fails?

392

1           MS. DAVIO: Yes, sir, in the short term.
2           SEN. GALLEGOS: So you have no plans to
3 close any other offices?
4           MS. DAVIO: In the short --
5           SEN. GALLEGOS: Is that what you're
6 telling me?
7           MS. DAVIO: In the short-term, yes, sir.
8 We want to do the business --
9           SEN. GALLEGOS: What do you mean
10 "short-term"?
11           MS. DAVIO: We want to -- we need to do
12 this business intelligence analysis so that we can
13 really look to determine how we can best use our
14 resources to provide the optimal level of service for
15 all Texans when they are trying to get their driver
16 license or an ID.
17           SEN. GALLEGOS: All right. And you'll get
18 me those answers before we finish today?
19           MS. DAVIO: Yes, sir.
20           SEN. GALLEGOS: Okay. Thank you.
21           MS. DAVIO: Yes, sir.
22           CHAIRMAN DUNCAN: The Chair recognizes
23 Senator Ellis.
24           SEN. ELLIS: Ms. Davio, I know you've been
25 here all day, and we're all very appreciative of that,

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000154
JA_000153

TX_00000154

USA_00015035

CONSIDERATION OF SENATE BILL 14 1/25/2011

393

1 and we know you don't have a position on the bill.
2 You're just here as a resource.
3          MS. DAVIO: Yes, sir.
4          SEN. ELLIS: Including Senator Gallegos,
5 we appreciate you being here and the work you do.
6          MS. DAVIO: Thank you.
7          SEN. ELLIS: Let me ask you this: Now, I
8 saw this article in the paper today about the driver
9 surcharges.
10          MS. DAVIO: Yes, sir.
11          SEN. ELLIS: Are you familiar with that
12 program?
13          MS. DAVIO: Yes, sir.
14          SEN. ELLIS: Does that come under your
15 jurisdiction?
16          MS. DAVIO: Yes, sir, it does.
17          SEN. ELLIS: If I'm reading this right, it
18 says it's estimated that a total of about 1.2 million
19 Texans are in default?
20          MS. DAVIO: Yes, sir. I believe that's
21 the number.
22          SEN. ELLIS: Okay. Now, how do we get to
23 that? I mean, can you give us some sense -- since we
24 passed that in '03, is it about 100,000 per year, a
25 half? Is it getting better? Worse? I'm just trying to

394

1 get a sense of how much -- how many more people may end
2 up in that category between now and when Senator
3 Fraser's bill goes into effect.
4          MS. DAVIO: You're asking about the number
5 of people that are in default on their surcharges?
6          SEN. ELLIS: Yeah. About 1.2 million now,
7 and I'm asking how much do you think that will grow
8 between now and January of 2012, next year, a year from
9 now?
10          MS. DAVIO: We actually hope that the
11 number of people in default will be reduced. There is a
12 program going on now -- that was probably what the
13 article in the paper was -- about the amnesty program.
14 So what this program does is it allows people who are in
15 default, if they've received a surcharge between 2004
16 and 2008 and are in default on that surcharge, then they
17 can pay 10 percent up to a maximum of $250. And if they
18 pay that reduced amount and their reinstatement fees and
19 do the other things, then they will no longer be in
20 default. That program will run -- the amnesty program
21 will run through -- I believe it's April 17th.
22          And then we will begin a program for
23 indigent folks that cannot pay their surcharges. And so
24 we will enable those people to pay their surcharges, and
25 so we really do hope the number of people in default

395

1 will be reduced.
2          SEN. ELLIS: Is this your first amnesty
3 program?
4          MS. DAVIO: Yes, sir, it is.
5          SEN. ELLIS: Now, you know -- I'm sure you
6 know -- two other states that had a similar program for
7 trying to balance their budgets abandoned the programs.
8 And in those states, I'm told that they tried the
9 amnesty programs, they tried virtually everything you
10 could think of, and it didn't work. So they just
11 abandoned the programs.
12          So is there any empirical evidence that
13 would make you think that 1.2 million people who have
14 lost their licenses in Texas because they didn't pay on
15 average, I guess, what -- I guess this is a thousand
16 dollars a year if you were drunk, 2,000 if the blood
17 alcohol level was twice the legal limit? Is there any
18 reason why you would think the amnesty program in Texas
19 will work when it didn't work in the other two states
20 that abandoned the program?
21          MS. DAVIO: We actually have had a pretty
22 good response so far. I'm sorry. Off the top of my
23 head, I can't give you the statistics of the people that
24 have opted in, but I'd be happy to get that information
25 for you.

396

1          SEN. ELLIS: Now, I think I heard you say
2 in response to a question from Senator Williams
3 15 million Texans have a driver's license.
4          MS. DAVIO: Yeah.
5          SEN. ELLIS: Or did you mean authorized to
6 have one? Are you counting the 1.2 million who have
7 lost them?
8          MS. DAVIO: I believe that's active driver
9 licenses.
10          SEN. ELLIS: Okay. So 15 million have
11 active driver's licenses. And just as a point of
12 reference to Senator Williams, there are 12.6 million
13 registered voters in Texas. So he was correct earlier
14 when he made the point that --
15          SEN. WILLIAMS: (No mic)
16          SEN. ELLIS: Yeah, that's right. Probably
17 about 30 percent of them vote. Of course, maybe half of
18 them vote wrong; maybe half of those vote wrong, but
19 about 30 percent of them vote, Senator.
20          But I just wanted to make the point 15
21 million people have driver's license in Texas, 12.6
22 million registered voters. Most people who go to vote
23 do what most of us on this floor do, they show their
24 driver's license. And if the trend of 1.2 million who
25 have drivers -- who had driver's licenses haven't lost

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000155
JA_000154

TX_00000155

USA_00015036

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 37 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-1 Filed 06/20/12 Page 156 of 156

96

CONSIDERATION OF SENATE BILL 14 1/25/2011

**397**

1 them since 2003 continues, if your amnesty program does
2 not work, if it's not something unique about the Lone
3 Star State that would make it work here when it didn't
4 work in those other states, that means that 15 million
5 figure is going to be going down in terms of the people
6 who have a driver's license. Correct?
7          MS. DAVIO: Yes, sir.
8          SEN. ELLIS: Okay. Now --
9          MS. DAVIO: Those people --
10          SEN. ELLIS: Those people who owe those
11 surcharges, is that a felony, or what is it?
12          MS. DAVIO: I don't believe it's a felony.
13          SEN. ELLIS: It's a civil offense?
14          MS. DAVIO: I mean, it depends upon
15 what -- there's five different things that you can
16 receive a surcharge for.
17          SEN. ELLIS: How about drunk?
18          MS. DAVIO: Yes, sir. Driving while
19 intoxicated is one of them.
20          SEN. ELLIS: Wouldn't that be a felony
21 when they get a surcharge? It's a civil fine. I'm
22 really making a point to my colleagues.
23          And can -- what can you-all do to those
24 folks short of taking a driver's license? You know, can
25 we -- maybe the finance chair can start building some

**398**

1 more debtor prisons. Can you put them in prison, or do
2 you know? If you don't know, it's okay.
3          MS. DAVIO: I don't know, sir.
4          SEN. ELLIS: Okay. I just want to raise
5 that point so my colleagues do realize what we're doing,
6 Senator Fraser, under your bill. 15 million people have
7 a driver's license. 1.2 million have lost them. I
8 don't think we're going to start building debtor
9 prisons. I don't think we're going to get to the point
10 where three times you're drunk and get a surcharge we
11 lock you up. We can't afford to do it, but it's making
12 it more and more challenging, and it is a burden that
13 we're putting on these folks. Thank you.
14          SEN. WHITMIRE: Mr. President?
15          CHAIRMAN DUNCAN: The Chair recognizes
16 Senator Whitmire.
17          SEN. WHITMIRE: Briefly. First of all,
18 how long -- how long have you been in your present job?
19 Pretty recent?
20          MS. DAVIO: Yes, sir. I just started
21 June 1st of 2010.
22          SEN. WHITMIRE: So about six months?
23          MS. DAVIO: Yes, sir.
24          SEN. WHITMIRE: Did you ever envision when
25 they gave you the job you were going to be here today

**399**

1 and have the opportunity to meet Senator Gallegos?
2          (Laughter)
3          MS. DAVIO: The pleasure is all mine.
4          (Laughter)
5          SEN. WHITMIRE: No; we appreciate you as
6 we do our other state employees.
7          MS. DAVIO: Thank you.
8          SEN. WHITMIRE: A couple of things I want
9 to clarify, Senator Ellis was talking about the folks
10 who have had their license suspended because of the
11 severance. I don't believe he asked if you have no
12 license but we're going to require you to go get an ID
13 at a DPS office, what is the relationship if I come into
14 the office, I don't have a license because it's been
15 suspended because I can't pay the severance, it's a
16 civil penalty. Is there any chance that you're arrested
17 because you haven't paid your back severance? I mean,
18 first I think whether you confiscate the person or
19 handcuff them, it would probably be a huge deterrent for
20 someone to go there knowing they owe you thousands of
21 dollars. Would you not agree?
22          MS. DAVIO: Yes, sir.
23          SEN. WHITMIRE: Okay. But going one step
24 further, if someone chose to do that what -- and they
25 apply for a voter ID and the computer is going to kick

**400**

1 out "you owe us" -- and some of these figures are
2 fantastic amounts, thousands of dollars -- what will be
3 the conduct of the DPS? I walk up to your station for
4 voter ID and you say Mr. Whitmire you owe us $20,000 in
5 back severance, is that going to be brought up and
6 you're going to be asked to not leave until you have a
7 payment plan?
8          MS. DAVIO: No, sir. Those are really
9 handled as separate transactions. If you come in and
10 you say you want to get an ID and you don't already have
11 an ID, then they will determine if you are eligible, and
12 you should be eligible. And they do have the
13 information in the driver license system about the
14 surcharges. But if you aren't getting to get a driver
15 license then that won't be brought up.
16          SEN. WHITMIRE: Okay. It's your
17 testimony -- y'all have actually discussed this
18 internally. It's going to be the policy, as you state
19 before us today, I come in there, I owe you a surcharge,
20 but I don't want to deal with the surcharge today, they
21 are not going to bring it up or ask me for my intention
22 of paying it, don't leave until you make a payment plan?
23          MS. DAVIO: No, sir. I haven't witnessed
24 that. I have visited the --
25          SEN. WHITMIRE: Well, you haven't

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000156
JA_000155

TX_00000156

USA_00015037

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**401**

1 witnessed it -- excuse me for interrupting because this
2 is all in the planning stage. So I know you haven't
3 seen it because no one has been in there asking for a
4 voter ID.
5        MS. DAVIO: No, sir, they haven't asked.
6        SEN. WHITMIRE: Would it be -- and can
7 you -- has it really been decided or is that just your
8 opinion or you've got to go upstairs to the colonel or
9 the DPS board? I mean, this is a pretty serious matter
10 in my mind because you have no license because you can't
11 afford to pay the surcharge, but we're fixing -- if this
12 law will pass -- require you to go to that location, law
13 enforcement, a pretty intimidating setup anyway to some.
14 You know, they've already run afoul, but they've got to
15 go to that site for a voter ID. Are you telling me
16 there won't be any discussion of the surcharge, or is it
17 really you don't know?
18        MS. DAVIO: You're right. We haven't
19 discussed voter ID, but I have witnessed numerous
20 transactions where somebody comes in and they request to
21 get an ID. And, you know, they may -- they may make an
22 inquiry about can I -- you know, what about a driver
23 license or something like that, and actually the records
24 come up and show that they are ineligible to get a
25 driver license. But if there --

---

**402**

1        SEN. WHITMIRE: Because of the surcharge?
2 Because of the surcharge?
3        MS. DAVIO: Yes, sir. And so then they
4 can still continue to get an ID, and I haven't witnessed
5 any occasion where there was discussion of the
6 surcharges unless the customer brought that up.
7        SEN. WHITMIRE: Well, if this passes, and
8 of course none of us are going anywhere, but -- and I
9 understand you're just representing the DPS, but I would
10 think that would be a major policy decision, that you
11 deal with something as important and precious as the
12 right to vote, but we're fixing to require you to come
13 in contact with law enforcement that you owe thousands
14 of dollars with the same personnel. I think someone is
15 going to have to really put some safeguards, Senator
16 Williams, that you can enter one of these sites and not
17 have to deal with the surcharge.
18        And would you not agree, even though you
19 have an amnesty program and you said it's working pretty
20 good -- in fact, pretty expensive, it's 250 and I think
21 there's a fee schedule. You've still got to pay a fee
22 to the folks that are doing y'all's collection work. So
23 what is the actual cost, 250? I think 150 to the
24 collection agency, and then it's going to run about five
25 or $600 if you want to -- if you want to use the amnesty

---

**403**

1 program. But that -- do you know the amount that's
2 working pretty good? What does "pretty good" to you
3 mean out of a million folks?
4        MS. DAVIO: I'm sorry. I will work to get
5 you those information.
6        SEN. WHITMIRE: Yeah, and I'm not trying
7 to pin you down. It's just, you know, you're the best
8 source we've got at the time.
9        Let me ask you something. You said a
10 while ago if someone confiscated your license, you could
11 apply for an ID. What if they confiscate it the week
12 before the election? What's the processing time to
13 apply for this ID? Say you're unfortunate, you come to
14 Austin before a Saturday election. On Thursday, if
15 you're real unfortunate, they get your license because
16 you have been pulled over. How are you going to get
17 that before Saturday's election? Do you know the
18 turnaround?
19        MS. DAVIO: You can come into our office,
20 and we -- as long as you qualify, we issue a temporary
21 receipt immediately.
22        SEN. WHITMIRE: Come in your office, what
23 do you mean by that?
24        MS. DAVIO: You can go to any driver
25 license office.

---

**404**

1        SEN. WHITMIRE: Any office?
2        MS. DAVIO: Yes, sir. And as long as you
3 qualify, then you can walk out with a temporary receipt.
4        SEN. WHITMIRE: Of course under my
5 scenario, you've first got to get out of jail, but
6 that's not mine or your problems tonight.
7        Let's talk about that office, and then
8 I'll pass. The truth of the matter is, is it not, as
9 you stand before us today, you have no idea what the
10 future budget considerations are going to do to your
11 office locations, do you not? When you're having a
12 question and answer with Senator Williams, that's under
13 today's setup, is it not?
14        MS. DAVIO: Yes, sir.
15        SEN. WHITMIRE: Have you been in meetings
16 recently at the command headquarters where you're
17 contemplating a significant, maybe as much as a
18 10 percent cut in your budget? Have y'all made your
19 plans for how to deal with the shortfall and expected
20 reduction of DPS funding?
21        MS. DAVIO: Yes, sir. The 5 percent cut.
22        SEN. WHITMIRE: That you've already been
23 requested to make.
24        MS. DAVIO: Yes, sir. I believe that that
25 did envision the closing of some -- I believe --

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

CONSIDERATION OF SENATE BILL 14 1/25/2011

405

1  SEN. WHITMIRE: Have you looked at the
2  House proposed budget and the Senate proposed --
3  MS. DAVIO: I have not.
4  SEN. WHITMIRE: -- and calculated the
5  impact and reduction of services and maybe troopers and
6  personnel as it relates to the licensing division?
7  MS. DAVIO: I'm sorry, sir. I have not.
8  SEN. WHITMIRE: So the truth of the matter
9  is when you were answering Senator Williams' question,
10 that's under current funding levels, is it not, as you
11 understand them? Since you took the job in June and
12 here we are the second week of January, that's really
13 the funding and the resources that you were using to
14 answer his questions. It certainly wasn't going
15 forward. Is that not correct?
16 MS. DAVIO: That's correct, sir.
17 SEN. WHITMIRE: You do expect significant
18 reductions in your operating resources, do you not?
19 MS. DAVIO: I would remain optimistic.
20 SEN. WHITMIRE: Do you see that guy
21 sitting right in front of you right there? We don't
22 call him Mr. -- we don't call him Mr. Optimistic around
23 here.
24 (Laughter)
25 SEN. WHITMIRE: The truth of the matter

406

1  is -- and I really understand this position you're in.
2  And, quite frankly, I'm not even sure it's fair that
3  they brought you here to answer our questions, but
4  you're here, and they had the right to do so. But we
5  haven't even written the budget. Our first meeting is
6  next Monday, and the operation of these offices and
7  their hours, their personnel, is yet to be determined as
8  we go and consider this legislation. Is that not
9  correct?
10 MS. DAVIO: Yes, sir, I think that --
11 SEN. WHITMIRE: You have no idea what
12 you're going to have after September 1.
13 MS. DAVIO: I think that's a fair
14 statement, sir.
15 SEN. WHITMIRE: But we do know that in
16 Houston -- and Senator Gallegos was asking you about the
17 locations -- that's an important factor, but I'm really
18 more important -- or concerned about when you get to one
19 of our locations. Are you familiar with 290 and Tacoma?
20 MS. DAVIO: Yes, sir.
21 SEN. WHITMIRE: Gessner and I-10?
22 MS. DAVIO: Yes, sir.
23 SEN. WHITMIRE: South Houston? Nearly
24 each of our Harris County sites, you know it takes from
25 two to three hours to enter that office and renew your

407

1  driver's license on many days of the week.
2  MS. DAVIO: Yes, sir, I think that's true.
3  That is the way it's happened in the past. We are
4  implementing a queuing system which we hope will bring
5  about reductions in wait times at our 50 largest
6  offices.
7  SEN. WHITMIRE: But today, this week, it's
8  not unusual -- and I've checked -- it can still take you
9  up to three hours. In fact, if we accomplish anything
10 in this discussion with you, I would like to appeal to
11 you to work with your supervisors and Senator Ogden and
12 each of the 31 Senators and fix that problem. That's a
13 very fixable problem that we've been talking about too
14 long.
15 But you know it takes up to three hours.
16 People cannot take off their lunch hour or expect to go
17 over there before work or after work. It is a major
18 challenge to enter one of those offices today and get
19 your license renewed. But have you had an opportunity
20 to factor in what it's going to be like to get
21 additional people now for voter ID? You really don't
22 know what the demands or the numbers will be --
23 MS. DAVIO: That's correct.
24 SEN. WHITMIRE: -- as we talk?
25 MS. DAVIO: We were unable to estimate the

408

1  impact.
2  SEN. WHITMIRE: And then I'll repeat one
3  more time. That's today's circumstances, and we're
4  faced with budget cuts to the DPS going forward that
5  could even compound the current wait at those Houston
6  offices. And I was even told by a colleague of mine
7  that it can happen in other even rural settings in this
8  state, that you would literally wait two and three hours
9  to renew your driver's license. Is that not correct?
10 MS. DAVIO: It is possible that you can
11 have a two- or three-hour wait in many of our offices at
12 this moment.
13 SEN. WHITMIRE: Have y'all had much
14 internal discussion about the impact that this proposed
15 legislation will have in detail in terms of personnel
16 required, equipment required? I mean, have y'all had
17 any initial planning?
18 MS. DAVIO: We have had discussions, yes,
19 sir. It's very, very difficult, we found it impossible,
20 to estimate the impact of this legislation.
21 SEN. WHITMIRE: I really appreciate you
22 being here tonight and your hard work. And if I was
23 you, I would say -- I'd speak to Senator Ogden before
24 you leave here tonight and make a pitch for your budget.
25 MS. DAVIO: Okay. Thank you.

CONSIDERATION OF SENATE BILL 14 1/25/2011

409

1        CHAIRMAN DUNCAN:  The Chair recognizes
2 Senator Van de Putte.
3        SEN. VAN de PUTTE:  Thank you,
4 Mr. Chairman.  Good evening.  Thank you for being here.
5 My questions are fairly quick.  But I want to follow up
6 with the fiscal impact, and you stated there were how
7 many counties that don't have offices right now?
8        MS. DAVIO:  There are currently 77
9 counties without a functioning --
10        SEN. VAN de PUTTE:  Seventy-seven.
11        MS. DAVIO:  Yes, sir -- yes, ma'am.
12        SEN. VAN de PUTTE:  Mr. Chairman, could we
13 have the resource witness look at exhibit -- or Item No.
14 6, which was the map that was displayed, compiled by the
15 legislative counsel?  The map that this expert witness
16 brought shows us dots.  And if you could just glance at
17 that, that was prepared by legislative counsel.  As you
18 can see, the counties are outlined with closed,
19 temporarily closed, permanently closed, those counties
20 that may have one, but they are there -- would you
21 suggest that since that was compiled by legislative
22 counsel that that document is correct?
23        MS. DAVIO:  Senator, this is the first
24 time I've seen this map.  Just doing a very quick visual
25 check on the counties that they have in red that say

410

1 that there are no offices, I can verify that.  I haven't
2 gone through and done all the others to give you a
3 completely accurate response.  If you could give me a
4 little bit more time, I'd be happy -- I'd be happy to do
5 that.
6        SEN. VAN de PUTTE:  We will certainly
7 allow you to do that because we have another resource
8 witness.
9        MS. DAVIO:  Okay.
10        SEN. VAN de PUTTE:  Let me ask you, we
11 have 77 where they are closed, they have no one.  We
12 have temporary ones because of equipment malfunction.
13 But are you aware of the document that is the
14 legislative appropriations request that was sent on
15 August 23, 2010 and printed to us in 2010?
16        MS. DAVIO:  I did not see that document
17 personally.
18        SEN. VAN de PUTTE:  Well, let me tell you
19 why I'm a little bit concerned because when Senator
20 Williams talked to you, you said you had -- the division
21 had no plans or no intention of closing any more unless
22 there was equipment failure, and you talked a little bit
23 about equipment failure.  That's correct.  Right?
24        MS. DAVIO:  Yes, ma'am.  No more offices
25 unless there were equipment failure until we had

411

1 completed our business intelligence analysis.
2        SEN. VAN de PUTTE:  Well, let me tell you
3 why I'm a little concerned.
4        MS. DAVIO:  Okay.
5        SEN. VAN de PUTTE:  On Page 704 of the
6 legislation appropriations request, DPS says, "No. 10,
7 building program and deferred maintenance."  The
8 category is under "Program Service Reduction (Other).
9 Item Comment:  11 additional DPS offices would be closed
10 due to lack of funding for utilities."  So it's
11 utilities funding, not -- "resulting in 215 FTEs that
12 would be displaced and DPS customers would travel
13 further for any assistance."
14        Now, this is in a document that was given
15 to the legislature dated August 23, 2010.  You said you
16 don't have to plan any more, but somewhere in the agency
17 under this request, they are closing another -- I'm
18 sorry -- they are closing another 11.  Do you know where
19 those other 11 are that they plan to close?
20        MS. DAVIO:  I do not have personal
21 knowledge of that.  I believe this was for 2012 and
22 the 2013 --
23        SEN. VAN de PUTTE:  Well, yeah, but --
24        MS. DAVIO:  -- legislative appropriation
25 request.

412

1        SEN. VAN de PUTTE:  This is the
2 legislative appropriations.  So right now what you're
3 saying is nothing is going to be closed.  But in the
4 document that DPS supplied to us as their legislative
5 appropriations request, on Page 704, they tell us, "Oh,
6 we're closing 11 more."  And it's not due to equipment
7 failure.  It's due to the reduction in utilities funding
8 as a result of our crisis in our revenue and not the
9 displacement of 215 FTEs where DPS says, "Customers will
10 travel further for assistance."
11        So I'm trying to figure out -- you say,
12 "Okay.  We're not going to," but then we have a
13 document.  I just don't know what part of DPS to
14 believe.
15        MS. DAVIO:  I'm terribly sorry.  I was
16 imprecise.  I should have said this fiscal year we had
17 no more plans to close any offices.
18        SEN. VAN de PUTTE:  This fiscal year.  Oh.
19 We just didn't ask the right question then.
20        MS. DAVIO:  I'm sorry.
21        SEN. VAN de PUTTE:  We should have
22 asked --
23        MS. DAVIO:  I don't claim to be --
24        SEN. VAN de PUTTE:  -- do you plan to
25 close any maybe after September 1st of next year?

KENNEDY REPORTING SERVICE, INC.
512.474.2233

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 41 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 205-2 Filed 06/20/12 Page 5 of 196
100

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**413**

1 MS. DAVIO: I'm sorry. I don't claim to
2 be an expert on our legislative appropriation request.
3 I'm not our chief financial officer.
4 SEN. VAN de PUTTE: Thank you for that
5 clarification.
6 MS. DAVIO: I'm sorry.
7 SEN. VAN de PUTTE: And I'm sorry you were
8 caught like this. But, you know, you can understand our
9 confusion when you testify as the expert witness for DPS
10 one thing, and then the budget documents that are turned
11 into us say another. And I am so sorry that you were
12 put in this predicament, but the documents are the
13 documents. So let me, again, ask some other questions
14 since I think that one is pretty well taken care of.
15 Can you tell me in obtaining an
16 identification card what types of birth certificates are
17 allowed under current DPS guidelines?
18 MS. DAVIO: What types of birth
19 certificates?
20 SEN. VAN de PUTTE: Yes.
21 MS. DAVIO: An original or a certified
22 copy of a birth certificate issued by the appropriate
23 state Bureau of Vital Statistics or the equivalent
24 agency from a U.S. state, U.S. territory, the District
25 of Columbia or a Canadian province, or an original or

---

**414**

1 certified copy of a United States Department of State
2 certification of birth abroad.
3 SEN. VAN de PUTTE: Are any of those
4 documents a Department of Defense hospital or facility?
5 MS. DAVIO: I don't know for certain if
6 the Department of Defense would be included in a
7 Department of State certification of birth abroad.
8 SEN. VAN de PUTTE: No, there are two
9 different ones. And this is why I'm asking. Members,
10 this is very, very clear. We have many, many citizens
11 and your constituents who were born on military basis
12 within the United States. And if I right now had to go
13 get an identification card, I don't have -- I wouldn't
14 have a birth certificate. And the reason, I was born in
15 Madigan Hospital, Fort Lewis, Tacoma, Washington. But
16 if you were born before 1960, the records are slowly
17 being updated into the state of Washington as many
18 of our military hospitals. But my birth certificate is
19 not from the Department of State. It is not from the
20 city. The only birth certificate that I have is from a
21 military hospital on a military installation.
22 Now, it was valid for me to get my
23 passport, and it was valid for me to get my driver's
24 license when I got my driver's license. But should I
25 have to apply today and what I think might happen under

---

**415**

1 our current regulations is that the type of birth
2 certificate that is required for those of us who happen
3 to be born prior to 1960, which would be anybody, '40s,
4 '50s, '30s and on, we would not have a birth certificate
5 that would be recognized by DPS if you were born on a
6 military -- in a military hospital. Is that correct?
7 MS. DAVIO: I can't be absolutely positive
8 of that. I'll confirm, and we will look.
9 SEN. VAN de PUTTE: If you could, because
10 I think --
11 MS. DAVIO: Yes, ma'am.
12 SEN. VAN de PUTTE: And I don't know how
13 many would be, but if -- for those that were born when
14 there was a mandatory draft and there was a mandatory
15 thing, if you were born in a military hospital, those
16 are Department of Defense hospitals, not Department of
17 State. Some states have included them as they start to
18 update and others haven't because a lot of those
19 military hospitals are now closed as those bases have
20 been closed. So I just wanted to make sure. And if you
21 would check that for us?
22 MS. DAVIO: Yes, ma'am.
23 SEN. VAN de PUTTE: And then if it's a
24 birth certificate, what happens if for many of our
25 elderly who were born not in a hospital and not -- but

---

**416**

1 they used baptismal or church records to establish their
2 social security, to establish anything? Right now if
3 there is not a recorded birth certificate in one of the
4 state registries, is a church document that was allowed
5 back then for a driver's license, is that allowed --
6 MS. DAVIO: There are --
7 SEN. VAN de PUTTE: -- currently to get --
8 MS. DAVIO: There are a variety of
9 documents, and we're expanding the list, but we try and
10 work with our customers to -- if you can bring in a
11 variety and demonstrate to us our satisfaction.
12 SEN. VAN de PUTTE: Yes, I understand.
13 What types of birth certificates? Is it only those
14 that --
15 MS. DAVIO: Typically we would not allow a
16 church or a baptismal birth certificate.
17 SEN. VAN de PUTTE: So that would affect
18 people like my mother.
19 MS. DAVIO: She may be able to find other
20 documentation that she can bring.
21 SEN. VAN de PUTTE: She might be.
22 Let me also ask you for one other thing.
23 I have a wonderful constituent and she asked that I
24 relate her story and has given me permission. She
25 contacted us last June in that -- Ms. Hardy who needed

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000160
JA_000159

TX_00000160

USA_00015041

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 42 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 6 of 196
101

CONSIDERATION OF SENATE BILL 14 1/25/2011

417

1 to have a DPS identification card. However, she's very,
2 very ill and could not travel to the DPS office. I put
3 in a request to DPS to ask what sort of options she had
4 since she needed an ID but could not travel.
5          MS. DAVIO: Yes, ma'am.
6          SEN. VAN de PUTTE: That was on June the
7 18th, and we were very pleased at least that a week
8 later someone was able to call her and give her some
9 options.
10         Well, the options included that she had to
11 physically go. And so luckily she was able to go, but
12 not until months later, but it entailed bus trips, a
13 nurse going with her, on public transit, going to the
14 offices.
15         And so my question is, what sort of -- and
16 it took her months, months to get this. Are there any
17 accommodations currently for those with disabilities if
18 they are unable to physically go to a DMV station to
19 acquire identification documents?
20         MS. DAVIO: We do have a home bound
21 program where we send an employee out to take their
22 picture and gather their information.
23         SEN. VAN de PUTTE: Do you know how robust
24 that program is? Is there one in -- and why weren't we
25 told about it when we called last summer?

418

1          MS. DAVIO: I can't tell you why you
2 weren't told about it. I apologize for that. I
3 don't -- I don't know how many of those IDs we issue. I
4 could check into that if you'd like me to.
5          SEN. VAN de PUTTE: Well, I'm a little bit
6 worried because we had several employees of DPS call,
7 including the Chief of the Complaint Resolution
8 Specialty Department, assisting with inquiries of
9 identification cards, who said the only option for my
10 constituent was physical presence.
11         MS. DAVIO: There may --
12         SEN. VAN de PUTTE: So within DPS if
13 there's a program, certainly didn't tell a Senator's
14 office and certainly didn't tell the client. And if
15 this is -- I mean, what happened here? We didn't know
16 about a program. Are there plans to make that known in
17 light of -- or publicize it in any way in light of the
18 new additional restrictions?
19         MS. DAVIO: I apologize that you weren't
20 told about it. There may have been particular
21 circumstances that your constituent didn't qualify for
22 that, but we can certainly make sure that all of our
23 employees know about that and are informed so that there
24 won't be such an oversight in the future.
25         SEN. VAN de PUTTE: So you mean you have

419

1 to qualify? So if you're like undergoing chemotherapy,
2 can't leave the house or an organ transplant, you have
3 certain categories to qualify? So even if you're a
4 person with disabilities, you have to have a person of
5 disabilities with certain qualifications to get the home
6 bound program?
7          MS. DAVIO: I'm sorry. I can't discuss
8 the detailed reasons why someone would qualify and
9 someone wouldn't, but I will certainly check into that
10 for you.
11         SEN. VAN de PUTTE: Well, thank you. And
12 I am -- I apologize for my mean tone, but understand how
13 frustrating it is --
14         MS. DAVIO: I understand.
15         SEN. VAN de PUTTE: -- when people call
16 our offices, they are trying to do the right thing.
17 They are trying to get an ID card, they have situations,
18 and then the people who are employed and hired from
19 state government to provide the information who are head
20 of the departments of this don't know of their own
21 programs. It's really disheartening.
22         And then if you would, please find out
23 from someone on the fiscal side so that we don't have
24 two opposing statements from DPS of the additional 11
25 offices that are scheduled to be closed, not this fiscal

420

1 year, but probably starting in 2012 and 2013. And then
2 if you would, please get back with us with the
3 information of what types of birth certificates would be
4 eligible to be used for someone seeking to obtain a
5 personal identification card.
6          Thank you very much, Mr. Chairman. I
7 don't have any other questions.
8          CHAIRMAN DUNCAN: The Chair recognizes
9 Senator Zaffirini.
10         SEN. ZAFFIRINI: Thank you, Mr. Chairman.
11         Ms. Davio, your title is Assistant
12 Director for Driver Licenses, Department of Public
13 Safety. Is that correct?
14         MS. DAVIO: Yes, ma'am.
15         SEN. ZAFFIRINI: And were you expected to
16 testify on all aspects of the bill or only what refers
17 to driver's licenses specifically?
18         MS. DAVIO: Only what refers to a driver
19 license specifically, as I understand it, in DPS.
20         SEN. ZAFFIRINI: When Senator Fraser laid
21 out the bill, I asked a number of questions about the
22 criminal justice impact statement. Is there someone
23 available from DPS who can answer my questions related
24 to the criminal justice impact statement?
25         MS. DAVIO: I don't believe that there's a

KENNEDY REPORTING SERVICE, INC.
512.474.2233

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 43 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 7 of 196
102

CONSIDERATION OF SENATE BILL 14 1/25/2011

421

1 resource witness here that can answer that currently.
2          SEN. ZAFFIRINI:  And you cannot?
3          MS. DAVIO:  I'm sorry.  I can't.
4          SEN. ZAFFIRINI:  That's all right.  I
5 assumed that you could not based on your title.  But I
6 would like to have someone answer my questions, if not
7 today. maybe tomorrow.
8          And just to put a face on the issues that
9 we have been discussing today, I happened to receive a
10 letter from the County Judge of Frio County recently,
11 and he explained to me that the office -- the DPS
12 driver's license office in Frio County has been closed.
13 And he wrote in his letter, "Signage on the door directs
14 drivers needing their services to go to San Antonio,
15 Hondo or Jourdanton."
16          Now, San Antonio is 55 miles from
17 Pearsall, Hondo is 42, and Jourdanton is 41.  That's an
18 average of 46 miles.  You said earlier that 77 counties
19 do not have driver's license offices.
20          MS. DAVIO:  Currently, yes. ma'am.
21          SEN. ZAFFIRINI:  Do you know how far those
22 residents of those counties have to drive to get a
23 driver's license?
24          MS. DAVIO:  I do not have the average for
25 every single location.  That would probably be pretty

422

1 difficult to calculate, but, you know, that is something
2 that we're looking at.
3          SEN. ZAFFIRINI:  Well, certainly because
4 if that's the average distance, double that for a round
5 trip.
6          MS. DAVIO:  Yes, ma'am.
7          SEN. ZAFFIRINI:  That's a lot of mileage,
8 especially for low-income persons, for persons with
9 disabilities who have to get a ride, because that's a
10 one-way distance that I just mentioned to you.
11          MS. DAVIO:  Yes, ma'am.  Driver licenses
12 do have to be renewed every six years, once every six
13 years.  And if the option to renew online would be used,
14 then they'd actually only have to go to the office once
15 every 12 years.
16          SEN. ZAFFIRINI:  Do you have mobile units
17 that can go to these counties?
18          MS. DAVIO:  We do not presently have
19 mobile units.  As I mentioned before, the amount of data
20 that we're collecting with your photo, your
21 fingerprints, your -- all the scans of your documents,
22 we have not been able to get that to work with an air
23 card or a DSL line, and we tried for several months.
24          SEN. ZAFFIRINI:  Now, I can't speak for
25 the 77 counties, but I know that for the ones in my

423

1 district that have been closed or temporarily closed --
2 in fact, I mentioned earlier that in my district there
3 are -- there is one office that has wheelchair
4 accessible barriers, there are two counties that have no
5 offices, four counties in which the offices have been
6 temporarily closed and one that is open three days or
7 fewer per week.
8          Now, in the counties in my district, there
9 is a digital divide.  So it's easy to say "renew
10 online," but when you're dealing with counties where
11 there is a predominantly low income, minority population
12 and there is a digital divide, imagine the impact.  Do
13 you have any data relating to addressing those issues
14 and how to increase the accessibility of the residents
15 of those counties to your particular services?
16          MS. DAVIO:  One of the elements of the
17 business intelligence analysis project that we're doing
18 is actually to try and get information to understand
19 where people have connectivity and aren't using that.
20 Maybe they don't know that they can renew online and
21 being able to encourage people to do that there, but
22 that would also give us information about where people
23 don't have accessibility.
24          SEN. ZAFFIRINI:  Thank you.  Judge Garcia
25 writes, "This has caused quite a bit of inconvenience

424

1 and consternation for our drivers and potential drivers
2 in this county when they need driver's license renewals,
3 driver's licenses," et cetera, and you can imagine the
4 consternation and the inconvenience that they are
5 suffering.
6          There's been some reference to how long
7 persons have had to wait to get their driver's license,
8 and I know that before we got our driver's license in
9 Laredo, the big joke -- and it wasn't really a joke.  It
10 was a cruelty joke because it was so true -- is that
11 persons who were waiting for their driver's licenses
12 could stand in line, order pizza, receive it and eat it
13 and still be waiting for their driver's license.
14          Now, there has been some improvement in
15 that, but I wonder what kind of inconvenience we're
16 talking about when we're talking about these long, long
17 lines in the different counties.  And if that isn't bad
18 enough, dealing with the issues related to the counties
19 that don't have any offices.
20          And you, I understand from your exchange
21 with Senator Van de Putte, do expect more offices to
22 close, at least temporarily -- is that correct -- in the
23 next fiscal year?
24          MS. DAVIO:  If the equipment fails in our
25 mobile offices, we will have to close those offices.

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000162
JA_000161

TX_00000162

USA_00015043

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**425**

1    SEN. ZAFFIRINI: And have you looked at

2 Senate Bill 1 thoroughly yet?

3    MS. DAVIO: I'm sorry?

4    SEN. ZAFFIRINI: Have you looked at Senate

5 Bill 1, the appropriations bill, thoroughly yet?

6    MS. DAVIO: I have not done any detailed

7 analysis of that, no, ma'am.

8    SEN. ZAFFIRINI: So you have no idea

9 what -- how that budget will impact you at this point in

10 time?

11    MS. DAVIO: No, ma'am. I know people

12 at -- the experts at our agency are looking at it now.

13    SEN. ZAFFIRINI: Well, when you have that

14 information -- I assume that you will -- would you share

15 that us, please?

16    MS. DAVIO: Yes, ma'am.

17    SEN. ZAFFIRINI: From your perspective.

18 Thank you very much.

19    Thank you, Mr. Chairman.

20    CHAIRMAN DUNCAN: Senator Williams?

21    SEN. WILLIAMS: Thank you, Mr. Chairman.

22 Just a couple of things that I wanted to clarify. And I

23 guess, first of all, I wanted to thank Senator Gallegos

24 and Senator Whitmire because I really wasn't that

25 familiar with people who had their licenses confiscated

---

**426**

1 or taken away because of the driver responsibility plan.

2    Now, by the way, if you have your license

3 confiscated, what kind of traffic offense would you have

4 had to have been involved in for law enforcement to take

5 your -- confiscate your license? Do you know? It

6 doesn't have to be an exhaustive list, but just --

7    MS. DAVIO: The major reason that people

8 give those particular forms apart -- away, that law

9 enforcement issues those, as I understand it, is for

10 intoxication offenses where they've failed or refused to

11 provide a specimen.

12    SEN. WILLIAMS: Okay.

13    MS. DAVIO: That's my understanding.

14    SEN. WILLIAMS: So if you refused to take

15 a breathalyzer test or give blood, then they'll take

16 your license away?

17    MS. DAVIO: That's my understanding, sir.

18    SEN. WILLIAMS: Okay. Now, that person

19 can apply for a temporary license, a work permit, you

20 know, to be able to get back and forth to work.

21    MS. DAVIO: They may be able to, yes, sir.

22    SEN. WILLIAMS: And they could come and

23 get a state ID -- correct -- at no cost if they wanted

24 to have it to vote?

25    MS. DAVIO: Yes, sir, they could.

---

**427**

1 Absolutely.

2    SEN. WILLIAMS: Okay. And then what about

3 if you had your license taken away because of -- what

4 kinds of things under the driver responsibility? Are

5 those also going to be a lot of speeding tickets? I

6 guess it could be. Or more than likely it's going to

7 involve a DWI since we have one of the worse records of

8 any state in the country on that, I believe?

9    MS. DAVIO: It could be DWI. It could be

10 driving while your license is invalid. It could be

11 traffic offenses as you mentioned, driving without

12 insurance.

13    SEN. WILLIAMS: So the bottom line is

14 these law breakers would be inconvenienced by having to

15 go get a free ID so they could go and vote if that's --

16 if they wish to exercise their constitutional

17 responsibility. Is that correct?

18    MS. DAVIO: Yes, sir. They would be able

19 to get an ID.

20    SEN. WILLIAMS: Okay. And then how often

21 would -- once you had this state ID card and assuming

22 that you were a citizen and you had met all the

23 requirements that it took to get the license or the

24 state ID card, how often would that be renewed? How

25 often are they going to have to appear in person to get

---

**428**

1 that renewed?

2    MS. DAVIO: The ID cards just like the

3 driver licenses are good for six years, and it is

4 possible to renew them online.

5    SEN. WILLIAMS: Okay. So it could be 12

6 years?

7    MS. DAVIO: Yes, sir.

8    SEN. WILLIAMS: So they would be able to

9 vote with that ID card at least six and maybe 12 years?

10    MS. DAVIO: Yes, sir.

11    SEN. WILLIAMS: Okay. That -- okay. I

12 just wanted to make sure that we had cleared that up.

13 Thank you very much. I really appreciate you hanging in

14 here with us tonight.

15    MS. DAVIO: Thank you.

16    SEN. WILLIAMS: I did have one last

17 question. Excuse me, Mr. Chairman, if I could. The

18 other thing I wanted to ask is, in a moment when we have

19 the Secretary of State's Office up here, I'm going to

20 talk to them, and I visited with you about it, I'm

21 hoping that we can take your driver's license file and

22 cross-match that with the voter registration files and

23 try to find that group of people who are voting and

24 registered to vote, but they don't have a driver's

25 license or a state ID card so that we can focus our

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000163
JA_000162

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 45 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 9 of 196
104

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**429**

1 efforts on education on -- especially on that group.

2          Now, would you be able to do that, provide

3 that information to the Secretary of State's Office

4 with -- under the current resources that you have?  And

5 I'm not going to ask you about the next biennium's

6 budget.  We're just trying to get through this biennium

7 now.  But under the current biennium, would you be able

8 to provide that information to the Secretary of State

9 with the resources?

10          MS. DAVIO:  They already -- they already

11 have the information, and I believe they are working on

12 the analysis now.

13          SEN. WILLIAMS:  Oh, okay.  Great.  Boy,

14 y'all are quick.  Thank you.

15          CHAIRMAN DUNCAN:  Okay.  Thank you.

16          We have a few more -- a few more questions

17 from -- this witness has been going about an hour and

18 ten minutes.

19          Senator West?

20          SEN. WEST:  Thank you, Mr. Chairman.  I'm

21 not going to be redundant.  I just have a couple of

22 requests.  Can your office provide an analysis of how

23 long the average wait in each one of the offices that

24 you have -- what is the average wait in order to get a

25 driver's license?  I assume that you have that sort of

---

**430**

1 an analysis.

2          MS. DAVIO:  Actually, sir, currently we do

3 not have that information.  We have anecdotal

4 information, but we do not have wait times.  We're in

5 the process of installing a queuing system in our 50

6 largest offices.  And so in a matter of months I'd be

7 able to provide that information for you in our largest

8 offices, but I do not have any complete information for

9 wait times in our offices.

10          SEN. WEST:  Give us the best guesstimate

11 that you have.  I assume that there are conversations

12 about wait time that you have internally.  And, you know

13 just make sure you just qualify it based on what you

14 have.  It's not -- it's not a perfect example, a perfect

15 study or anything like that, but get us -- give us the

16 best estimates that you have concerning that.  Okay?

17          MS. DAVIO:  The average wait time?

18          SEN. WEST:  Yes.

19          MS. DAVIO:  In all of our offices?

20          SEN. WEST:  Yeah, broken down by office,

21 so I don't just want a global -- to the extent that you

22 can.  And what you may want to do is just contact the

23 offices and get an idea from the individuals that are in

24 the offices.

25          As you go about implementing this

---

**431**

1 particular identification procedure, have you given an

2 idea as to whether or not you are going to be using

3 troopers or civilian employees to do this?

4          MS. DAVIO:  There really aren't troopers

5 in the driver license division anymore.  That was a

6 recommendation from the Sunset Commission.  So there are

7 no commissioned troopers in the driver license office.

8          SEN. WEST:  So it would be civilian

9 employees?

10          MS. DAVIO:  Yes, sir.

11          SEN. WEST:  All right.  Thank you.

12          CHAIRMAN DUNCAN:  Senator Gallegos?

13          SEN. GALLEGOS:  Let me ask you, Rebecca --

14 and I'm sorry you drew the short straw.  And Senator

15 West asked the question I was going to ask you, but

16 Senator Williams brought up an issue that, you know, I

17 disagree with him.  When you're stopped, it's an

18 alleged -- you're not a law breaker, it's an alleged.

19 You know, I'm not the jury, and I'm not the judge.  So

20 that person that's stopped is not guilty until he or she

21 has their day in court.

22          So when you confiscate the license, you

23 have confiscated on an alleged offense.  And until he or

24 she has their day in court and they are convicted, you

25 you can call him or her a law breaker.  So I disagree

---

**432**

1 with Senator Williams.  Is that correct?  I mean, am I

2 wrong?  Am I wrong?  When you arrest that person, is he

3 or she convicted right then and there?

4          MS. DAVIO:  No, sir.

5          SEN. GALLEGOS:  So you're telling me they

6 are not guilty until they have their day in court.  Is

7 that correct?

8          MS. DAVIO:  I believe that's the way the

9 legal system works.

10          SEN. GALLEGOS:  I didn't hear you.  I'm

11 sorry.

12          MS. DAVIO:  I believe that's the way the

13 legal system works.

14          SEN. GALLEGOS:  Okay.  So that person --

15 that person that has that temporary license is innocent

16 until proven guilty.  Is that correct?

17          MS. DAVIO:  You're asking me to testify on

18 something that's outside my area of expertise, sir.  I

19 don't -- I don't know the intricacies of traffic --

20          SEN. GALLEGOS:  The document that your

21 office gives these law enforcement agencies when

22 somebody is stopped either on DWI or whatever issue,

23 whatever issue when you confiscate a license, that

24 person is innocent until proven guilty under the --

25 under the temporary license that I'm seeing here, that

---

TX_00000164

USA_00015045

Case 2:13-cv-00193  Document 660-4  Filed on 11/11/14 in TXSD  Page 46 of 57
Case 1:12-cv-00128-RMC-DST-RLW  Document 206-2  Filed 06/20/12  Page 10 of 96
105

CONSIDERATION OF SENATE BILL 14 1/25/2011

433

1  has your language on it, that you give to these law
2  enforcement agencies when you stop these people.  Is
3  that correct?
4          MS. DAVIO:  As I understand it, a DWI, if
5  they get a mandatory suspension, that does not start
6  until after their conviction.
7          SEN. GALLEGOS:  After a conviction?
8          MS. DAVIO:  Yes, sir, for a --
9          SEN. GALLEGOS:  So when you stop that
10  person, that is not a conviction?
11          MS. DAVIO:  Or DWI mandatory suspension.
12          SEN. GALLEGOS:  That is not a conviction,
13  though?
14          MS. DAVIO:  Just shopping them I don't
15  believe is a conviction.
16          SEN. GALLEGOS:  And you give they one of
17  these licenses.  You have confiscated their license and
18  have given them a temporary.  Is that correct?
19          MS. DAVIO:  Law enforcement does that,
20  yes, sir.
21          SEN. GALLEGOS:  Well, you gave them the --
22          (Simultaneous discussion)
23          MS. DAVIO:  We simply give them the form.
24          SEN. GALLEGOS:  You give the law
25  enforcement this paper.  It has your language on it.  Is

434

1  that correct?
2          MS. DAVIO:  Yes, sir.  That is our form.
3  Yes, sir.
4          SEN. GALLEGOS:  Okay.  Thank you.
5          CHAIRMAN DUNCAN:  Senator Wentworth?
6          SEN. WENTWORTH:  I'm going to be very
7  brief and thank you for your testimony this evening and
8  tell you that this probably happened before you arrived
9  here in June of last year.  But there were some
10  considerable complaints from people in my district in
11  north Bexar County --
12          MS. DAVIO:  Uh-huh.
13          SEN. WENTWORTH:  -- about a driver license
14  office on Perrin Beitel Road --
15          MS. DAVIO:  Uh-huh.
16          SEN. WENTWORTH:  -- where I can testify
17  anecdotally, as you have, that it was an hour or
18  longer --
19          MS. DAVIO:  Yes, sir.
20          SEN. WENTWORTH:  -- about the wait.
21          MS. DAVIO:  Yes, sir.
22          SEN. WENTWORTH:  And there were enough
23  complaints over the years that you all let the lease
24  expire.
25          MS. DAVIO:  Yes, sir.

435

1          SEN. WENTWORTH:  And then you found a new
2  location on Pat Booker Road out near Randolph Air Force
3  Base, and my constituents are very pleased with that
4  improvement and were grateful that that improvement has
5  been made.
6          MS. DAVIO:  Thank you so much.
7          SEN. WENTWORTH:  Thank you.
8          MS. DAVIO:  I appreciate that.  It's nice
9  to hear a good story.
10          SEN. WENTWORTH:  You bet.
11          CHAIRMAN DUNCAN:  Thank you, Senator
12  Wentworth.
13          Are there any other questions of the
14  resource witness?
15          (No response)
16          CHAIRMAN DUNCAN:  All right.  Thank you
17  very much, Ms. Davio.
18          MS. DAVIO:  Uh-huh.
19          CHAIRMAN DUNCAN:  All right.  The Chair
20  calls Ann McGeehan, Secretary of State's Office.  If
21  you'll state your name and who you represent, please.
22          TESTIMONY BY ANN MCGEEHAN
23          MS. McGEEHAN:  Ann McGeehan, and I'm
24  Director of Elections in the Texas Secretary of State's
25  Office.

436

1          CHAIRMAN DUNCAN:  All right.  Thank you,
2  Ms. McGeehan.
3          The Chair recognizes Senator Davis.
4          QUESTIONS FROM SENATE FLOOR
5          SEN. DAVIS:  Hello.  Good evening.  Thank
6  you so much for being here with us to provide answers
7  for our questions.  I know you've had a long day.
8          I just want to ask you a few questions
9  about the current state of voter education as its taking
10  place today in the Secretary of State's Office.  Can you
11  describe for us the use of the HAVA funds and how those
12  are currently being used today?
13          MS. McGEEHAN:  We received -- when
14  Congress passed the Help America Vote Act, the state of
15  Texas received a set amount of funds.  And pursuant to
16  the Help America Vote Act, there are certain purpose
17  areas that we can use those funds for, and one of the
18  purpose areas is voter education.  So since two -- we
19  have conducted three statewide education -- voter
20  education programs, one in 2006, one in 2008 and one in
21  2010 using those federal dollars.  And they have been --
22  we've worked with a public education firm to do
23  research, and then they develop creative material.  We
24  run PSAs on TV, radio.  In this last cycle, 2010, we
25  used the Internet quite a bit as well.

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000165

USA_00015046

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 47 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 11 of 196
106

CONSIDERATION OF SENATE BILL 14 1/25/2011

437

1    SEN. DAVIS:  And how many people do you
2 think you reach through your voter education efforts
3 right now?  And how much have each of those cycles of
4 voter education effort cost?
5    MS. McGEEHAN:  The average cost is about
6 $3 million for each one, around that amount.  As far as
7 the number of people we've touched through the campaign,
8 we do have some reports on that.  I don't have that
9 number at my fingertip, but we have a report for each
10 one of the voter education campaigns that talks a little
11 bit about the effectiveness and how many people saw the
12 media spots and things of that nature.
13    SEN. DAVIS:  And are the Help America Vote
14 Act funds funds that are continually given to the state
15 from the federal government, or was it a one-time
16 disbursement that's been used over the course of those
17 three cycles?
18    MS. McGEEHAN:  It was authorized in that
19 one bill.  We've received it in about three or four
20 separate payments.  We don't contemplate that we're
21 going to be receiving any more.
22    SEN. DAVIS:  And what was the total amount
23 that was given to Texas?
24    MS. McGEEHAN:  Let me grab that.  The
25 total amount for all the purpose areas is $224,092,477.

438

1    SEN. DAVIS:  That's the amount that was
2 given to the state of Texas?
3    MS. McGEEHAN:  Yes.
4    SEN. DAVIS:  Okay.  And so of that amount,
5 how much have we spent so far?
6    MS. McGEEHAN:  Let's see here.  We -- I
7 think we have spent $177,798,488.
8    SEN. DAVIS:  Okay.  And you described
9 spending about $3 million over the last three two-year
10 cycles.  How have we spent the balance of that?
11    MS. McGEEHAN:  Well, I mean, the bulk of
12 the money or about half of the money went to counties to
13 obtain HAVA compliant voting systems, electronic voting
14 systems that made -- that complied with HAVA and allowed
15 disabled voters to vote independently.  So let's see.
16 $140 million went to the counties for that purpose.
17    The other program areas are for developing
18 a statewide voter registration system.  We've spent
19 25 million on that.  And then as far as the
20 administrative expenses, we've spent about 2.8 million
21 on that.  For voter education, we've spent 9.5 million
22 so far.
23    SEN. DAVIS:  And what are the -- setting
24 aside the requirements of the bill that's being
25 introduced today, what are the intended plans for the

439

1 balance of that money?  Were this bill not to come
2 forward to your department, what would the intended use
3 for those funds be?
4    MS. McGEEHAN:  I can't speak necessarily
5 for, you know, exactly what would be done in the next
6 general election cycle, but I would contemplate we would
7 do another statewide voter education program in 2012,
8 and if funds remained in 2014.
9    SEN. DAVIS:  Is there a plan for ongoing
10 capital expenditures as you talked about, which was the
11 use of the bulk of the funds that we've received so far?
12    MS. McGEEHAN:  Yeah.  There are --
13 there's 24 -- roughly $24 million left in the -- in the
14 purpose area for grants to counties to obtain voting
15 equipment.
16    SEN. DAVIS:  Okay.  And so after you take
17 out that 24 million, what will the balance be that
18 remains for voter education efforts?
19    MS. McGEEHAN:  Well, that's -- that's
20 already frozen as far as the -- in order to draw down
21 those funds, the state had to submit a state plan.  We
22 had to meet with stakeholders, publish in the Register
23 and submit it to the Election Assistance Commission.
24    And so pursuant to that state plan, we had to define how
25 we were going to spend the money, and so these -- the

440

1 budget that I discussed is following that state plan.
2    SEN. DAVIS:  Okay.  And under that state
3 plan right now, what portion of funding remains for
4 voter education?
5    MS. McGEEHAN:  For voter -- okay.  And
6 actually to be more precise, what the -- the purpose
7 area for voter education is for voter education and also
8 for election official and poll worker training; that's
9 grouped.  And the amount remaining is between 5 and
10 $7 million.
11    SEN. DAVIS:  Okay.  And that is expected
12 to extend us or to take us through the next how many
13 years under that plan?
14    MS. McGEEHAN:  It will -- again, it's
15 going to depend how extensive our next few voter
16 education programs are because that's what the bulk of
17 the money has been spent on, voter education programs.
18 The average is about 3 million.  So I guess the hope
19 might be for at least two other statewide voter
20 education programs.
21    SEN. DAVIS:  Okay.  And I'm sure you've
22 seen the fiscal note that was a part of this bill.  And
23 by the way, I think it would be very helpful if you
24 would enter that state plan into the record as an
25 exhibit for our further use.

TX_00000166

USA_00015047

Case 2:13-cv-00193   Document 660-4   Filed on 11/11/14 in TXSD   Page 48 of 57
Case 1:12-cv-00128-RMC-DST-RLW   Document 206-2   Filed 06/20/12   Page 12 of 96
107

CONSIDERATION OF SENATE BILL 14 1/25/2011

441

1 I'm sure you've seen the fiscal note that
2 came as a part of this bill in terms of the expected
3 expenditures.  Part of that note talks about a fiscal
4 impact that's related to researching and developing ways
5 to inform the public of the new ID requirements.  That's
6 $5 million expenditure, an additional cost of
7 1.5 million for media advertisements, television, radio,
8 print and Internet.  That's specifically to educate
9 voters about the new requirements under this bill.
10 What will go undone that's currently in
11 the state plan -- if we take 2 million of the 5 million
12 remaining, what will go undone that's currently in the
13 state plan in terms of voter education effort?
14 MS. McGEEHAN:  I don't know that I have an
15 exact answer to that.  If we're able to incorporate the
16 new voter ID requirements that would be required by this
17 bill into a voter education program, then maybe we
18 wouldn't need 2 million just for the voter ID.  We could
19 parlay that into the -- basically the voter education
20 campaigns that we've done or the voter education
21 programs have been to educate voters on the basic rights
22 on how to vote, what you need to vote.  So it may not be
23 such an extension to incorporate these new requirements
24 for voter ID, or they may.  I mean, depending on the
25 research that we get back from stakeholders and whatnot,

442

1 but it's hard for me to say today exactly how much that
2 may take away from future voter education efforts.
3 SEN. DAVIS:  When was the last time in the
4 state of Texas we made any changes of significance to
5 the voter rules?
6 MS. McGEEHAN:  Probably the -- when we had
7 to implement the federal Help America Vote Act.  That's
8 when provisional voting became a requirement.  There
9 were significant changes to voter registration as to
10 what's required to become a registered voter, and that's
11 why we have these HAVA dollars for voter education.
12 SEN. DAVIS:  And that began in '06.
13 Correct?
14 MS. McGEEHAN:  Correct.
15 SEN. DAVIS:  Okay.  In '06, the Texas
16 voter registration application form changed in
17 accordance with those requirements, that's my
18 understanding, and that's when we began to collect this
19 data that requested a driver's license number or a
20 social security number.  Is that correct?
21 MS. McGEEHAN:  That's correct.
22 SEN. DAVIS:  Okay.  So we have data, I
23 guess, only from '06, and that would -- would that only
24 be then for new registrants from '06?  If I had already
25 registered to vote prior to that, you wouldn't have that

443

1 information from me.
2 MS. McGEEHAN:  That's right.
3 SEN. DAVIS:  Correct?
4 MS. McGEEHAN:  That's right.  It was
5 voluntary before.  So we have some TDLs and SSN numbers
6 from -- but it wasn't required until 2006.
7 SEN. DAVIS:  So we've been able to gather
8 that information from that point in time for people who
9 are newly registering to vote in the state of Texas.  Of
10 that group, how many people or what percentage of people
11 are answering one or both of those questions in response
12 to No. 8 versus signing the attestation clause in
13 Section No. 9?
14 MS. McGEEHAN:  Are you asking the number
15 of --
16 SEN. DAVIS:  Let me -- let me break it
17 down better.
18 MS. McGEEHAN:  Okay.  Okay.
19 SEN. DAVIS:  So under Question No. 8, what
20 percentage of people currently, who are requesting a
21 voter registration card, who are filling out the
22 application starting in '06 with this new form, what
23 percentage of people are providing their Texas driver's
24 license in response to the questions on the application?
25 MS. McGEEHAN:  Okay.  I don't have the

444

1 percent number, but the actual number is 2.3 million
2 since 2006.  Since January 1, 2006 through December 31,
3 2010, 2.3 million, when they registered, provided their
4 driver's license number.
5 SEN. DAVIS:  What's the total number of
6 applications in that time period?
7 MS. McGEEHAN:  And the total number -- I
8 think it's going to be just under 3 million, and I'm
9 doing math on the fly.  I might have to -- I'd prefer to
10 give that --
11 SEN. DAVIS:  Can you provide that
12 information --
13 MS. McGEEHAN:  Yes.
14 SEN. DAVIS:  -- to us?
15 MS. McGEEHAN:  Yes.
16 SEN. DAVIS:  That would be appreciated.
17 So what's the number of people who are not
18 filling out either the driver's license number or the
19 social security number in Section 8 but instead are
20 going to Section 9 and signing the attestation clause of
21 Section 9?
22 MS. McGEEHAN:  And that's the attestation
23 clause saying they have not been issued either form of
24 ID?
25 SEN. DAVIS:  (Nodded)

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000167
JA_000166

TX_00000167

USA_00015048

Case 2:13-cv-00193  Document 660-4  Filed on 11/11/14 in TXSD  Page 49 of 57
Case 1:12-cv-00128-RMC-DST-RLW  Document 206-2  Filed 06/20/12  Page 13 of 196
108

CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**445**

1      MS. McGEEHAN:  Yeah, that number is
2 34,506.
3      SEN. DAVIS:  Okay.  Do we have any -- any
4 estimate of the number of people who are currently
5 registered today?  If we've only been gathering that
6 information since 2006, do we have any kind of an
7 estimate of the number of people who are currently
8 registered to vote today who do not have a driver's
9 license number to provide?
10      MS. McGEEHAN:  Well, if we -- if we look
11 at our entire statewide file, we have 5.2 million voters
12 that did provide a driver's license number or an ID
13 number.  We have 2.1 million voters that present -- that
14 provided a social security number.  4 million of them
15 provided both.  And then the numbers that have
16 neither -- or the voters that hadn't provided either one
17 is 690,887.  So it doesn't necessarily mean that those
18 people haven't been issued, but they didn't -- either
19 they don't have those numbers or they registered before
20 it was required, and so they didn't provide them when
21 they registered if it was pre-2006.
22      SEN. DAVIS:  But the question wasn't
23 asked.  It was -- I guess as you said, you could
24 voluntarily provide that information prior to '06.
25      MS. McGEEHAN:  Well, it was asked, but it

**446**

1 was optional.  It was on the form.
2      SEN. DAVIS:  Uh-huh.  Okay.  So we really
3 don't know how many of that group were answering the
4 question voluntarily because they have the number versus
5 those who were not answering it, not because they chose
6 to, but because they did have their driver's license
7 number?
8      MS. McGEEHAN:  Yes, you are correct.
9 That's right.
10      SEN. DAVIS:  So when we're putting
11 together an estimate of what the cost to educate our
12 voters is going to be and when we think about how
13 significant the changes are that are addressed in this
14 bill, what's your -- what's your process been to try to
15 determine how many people will be impacted and what that
16 voter education is going to need to look like?
17      MS. McGEEHAN:  Well, we -- I mean, to be
18 very honest, we haven't done much planning yet.  We
19 prepared this fiscal note on Friday.  That would be
20 obviously a very important component is trying to
21 identify who the appropriate audiences are, who you need
22 to get the information out to.
23      Senator Williams had approached us earlier
24 today to see if we could do some comparisons to try and
25 further focus in on who those registered voters are that

**447**

1 don't have -- have not been issued a driver's license
2 or a personal ID number.  So we're trying to run some of
3 those numbers right now.
4      SEN. DAVIS:  I guess a confusion for me is
5 how we came up with the $2 million fiscal note for that
6 and yet we don't really know, as you said a moment ago
7 we don't really know how many people will be impacted by
8 it and what that statewide voter education effort is
9 going to need to look like.  So where did the $2 million
10 number come from?
11      MS. McGEEHAN:  Well, the $2 million number
12 came from the way the bill is written because the bill
13 simply says "a statewide voter education effort."  So
14 there's not too much detail in the bill as to what's
15 required.  Our assumption is that our previous voter
16 education programs might be the model, and they've been
17 around 3 million.  And plus, we also noticed that last
18 session the Senate put a $2 million fiscal note on it.
19 So we thought, well, maybe that's some representation of
20 legislative intent as to what an appropriate voter
21 education program might cost, but --
22      SEN. DAVIS:  So we've had voter education
23 efforts in the past that have cost about $3 million each
24 time we've engaged in the voter education effort.  We're
25 talking today about making some sweeping changes to

**448**

1 what's required in order to vote in the state of Texas.
2 Why is the number to educate -- on such a sweeping
3 change for what will likely be a much larger group of
4 impacted people in the state of Texas, why is that
5 number so much lower than the $3 million number that's
6 currently being spent for voter education?
7      MS. McGEEHAN:  Well, if the -- if a
8 $2 million program is added into an existing $3 million
9 program, then you've got a $5 million program.  I mean,
10 our voter education under HAVA is directed to all
11 registered voters.  And so, you know, a new voter -- a
12 new photo ID requirement would also need to be directed
13 to all registered voters because it's a change for all
14 voters.
15      SEN. DAVIS:  So we're talking about -- I'm
16 sorry to interrupt you.  We're talking a $2 million
17 addition to the $3 million that was already intended for
18 voter education in this next two-year cycle.
19      MS. McGEEHAN:  Possibly, possibly.  I
20 mean, we -- you know, we've got a communications
21 director that would have some input on that.  This
22 fiscal note represented what we thought might be a
23 reasonable fiscal note.  If we have, you know,
24 legislative direction to take it a different way or do
25 additional outreach, that's fine.  But based on the way

---

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000168
USA_00015049

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 50 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 14 of 196
109

CONSIDERATION OF SENATE BILL 14 1/25/2011

```
                                          449
1  the bill was written and based on the fiscal note filed
2  last time, we thought that was a reasonable number.
3             SEN. DAVIS:  So let's say we spend about a
4  total of $5 million in the next two years with our
5  intended voter education effort that's already been
6  planned and with an additional cost for educating on the
7  requirements of this proposed new law.  That's about the
8  balance of the voter education fund right now.  Is that
9  correct?
10            MS. McGEEHAN:  Well, it's about -- we've
11 spent 9 million.  I think the balance -- yeah, the
12 balance is between 5 and 7 million.  That's correct.
13            SEN. DAVIS:  Okay.  So that will take us
14 through about what -- how long of a period of time will
15 that take us through?
16            MS. McGEEHAN:  If we used 5 million to do
17 a voter -- a general voter education plan and then
18 another 2 million to do a detailed photo -- photo
19 identification plan, that might -- that might use it up.
20            SEN. DAVIS:  And if it uses it up, what
21 will we do in future years to educate our voters about
22 these requirements?
23            MS. McGEEHAN:  Well, frankly -- I mean,
24 state law has never appropriated state funds to educate
25 voters.  So, you know, these federal funds have been
```

```
                                          450
1  really nice to have them to do that.  We never had that
2  kind of funding before.  So if there's a desire to do
3  voter education programs of this -- of this type, then
4  we would need state appropriation.
5             SEN. DAVIS:  So these federal funds will
6  take us basically through a one-time voter education
7  drive on the requirements of this new law, but it's not
8  going to take us further than that?
9             MS. McGEEHAN:  Not if we use it all,
10 not -- it could possibly use up the remainder of the
11 voter education funds.
12            SEN. DAVIS:  Okay.  So we've talked about
13 the voter education.  Talk to us a little bit about the
14 costs of training the poll workers and the registrars.
15            MS. McGEEHAN:  We currently have several
16 training programs for -- well, we have training programs
17 for the county election officials and then other
18 training programs for the poll workers.  We have an
19 online training program.  We have a video.  We have
20 handbooks.  So we would have to update all of those --
21 all those different formats of training.
22            SEN. DAVIS:  And what's the anticipated
23 costs for updating all those forms of training?
24            MS. McGEEHAN:  We don't usually put a
25 fiscal note when there's a change in state law and we
```

```
                                          451
1  have to change and update training like that because at
2  least it's always been considered that is part of our
3  mandate in election administration.  So when we get
4  appropriation under the election administration
5  umbrella, our statutory mandate is to train and assist
6  election authorities.
7             SEN. DAVIS:  And what's happened to
8  your -- your budget, not only in this current biennium
9  that we're in, but the proposed budget going forward?
10            MS. McGEEHAN:  We're still digesting that
11 as far as on the House side.  I don't know about the
12 Senate side yet.  But on the House side, I believe we
13 took about a 14.5 percent budget reduction on the
14 House -- HB 1 bill.
15            SEN. DAVIS:  So we're talking about a
16 fairly dramatic budget cut for your agency while at the
17 same time we are talking about adding some very
18 significant requirements in terms of the changes that
19 you would need to make to your training programs and
20 materials for purposes of educating election workers and
21 county administrators on the new rules that would be
22 implemented in this bill?
23            MS. McGEEHAN:  That's correct.
24            SEN. DAVIS:  And there's no fiscal note
25 currently estimated for what that cost might be?
```

```
                                          452
1             MS. McGEEHAN:  It's my understanding that
2  when we've been asked to prepare fiscal notes for these
3  kinds of issues, we have not added a fiscal impact for
4  something that's already a statutory duty.  As we
5  analyze HB 1, maybe we're going to have to revise that,
6  but at least our standing policy was if it was a
7  statutory duty that we're already charged to do, that we
8  don't put an additional fiscal note on it.
9             SEN. DAVIS:  Are you concerned that you're
10 going to find yourselves fairly flatfooted in terms of
11 not being prepared with the resources that you need, to
12 train election workers and to train county
13 administrators on the requirements of this new law
14 facing the budget cuts that you're facing without a
15 fiscal note that's going to add resources to your
16 department for purposes of carrying out these
17 requirements?
18            MS. McGEEHAN:  I think all state agencies
19 in the state have concerns about providing the services
20 they are charged to provide in light of significant
21 budget cuts.  But on the issue of training, the analysis
22 was that that was not going to cost anything additional
23 as to what we've already been appropriated.
24            SEN. DAVIS:  And do you agree with that,
25 that it's not going to cost anything additional for your
```

TX_00000169

USA_00015050

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 51 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 19 of 196
110

CONSIDERATION OF SENATE BILL 14 1/25/2011

453

1 agency to provide the training for the significant
2 changes in the law that will be imposed if this bill is
3 passed into law?
4          MS. McGEEHAN:  Well, after every session,
5 we have to change all our materials.  And, you know,
6 maybe I can talk to our fiscal officer and maybe we'll
7 start putting in fiscal notes for these kinds of things,
8 but it has been our policy not to add a fiscal note for
9 something we're currently doing under state law and
10 funded for.
11          SEN. DAVIS:  And so the change in
12 materials is all that would occur?  If I'm an election
13 worker in the state of Texas and I'm facing some pretty
14 significant changes -- and I have to tell you I've read
15 this bill numerous times, and I'm still confused in
16 terms of what it would require of me as an election
17 worker.  Is that the only costs that we assume will be
18 incurred, is the cost of the change of the material?
19 Isn't there some training -- active training that has to
20 occur to be able to make sure that the election workers
21 and the county administrators who are tasked with
22 carrying out this new law will understand exactly what's
23 expected of them in terms of its implementation?
24          MS. McGEEHAN:  We do -- we do, I think,
25 pretty extensive training right now.  I mean, in an odd

454

1 numbered year, we hold four seminars, and we have very
2 good attendance from our county election officials.  So
3 I would be certain that our August county election
4 official seminar will be heavily -- if this passes will
5 heavily emphasize these new rules.
6          To go back to the federal funds, which we
7 know are limited, the grant for voter education also
8 includes election official training and poll worker
9 training.  So if there are any remaining HAVA dollars in
10 that category that we don't use on voter education, we
11 could perhaps use to additional -- to develop additional
12 training materials.
13          SEN. DAVIS:  Yes, and we talked about that
14 a moment ago, and you did state on the record that that
15 category of 5 to $7 million that's remaining is the
16 entirety of the federal resource that you have available
17 to you right now, both for voter education and for
18 training purposes.  And we've also talked about the fact
19 that the expectation and the demand on that particular
20 fund for public education is going to take the
21 significant balance that remains there.  Correct?
22          MS. McGEEHAN:  Right.  Well, just to be
23 clear, the remaining balance in the HAVA is all we have
24 for voter education, but there are some state funds -- I
25 don't think it's a lot -- but that would go towards

455

1 updating handbooks and video and things likes that that
2 we normally produce as training materials.
3          SEN. DAVIS:  When the Help America Vote
4 Act was implemented and in '06, as you said, that was
5 the first significant change that's been made or it's
6 the most recent significant change that's been made in
7 election laws in the state of Texas in terms of the
8 requirements of your agency and the training of your
9 agency, did the costs that your agency realize as a
10 result of the training component for HAVA increase as a
11 result of those new requirements?
12          MS. McGEEHAN:  We -- what we did do was
13 develop an online training component.  So we used a
14 portion of the HAVA dollars to develop an online
15 training component, which was in addition to our other
16 training.  I could get -- I don't know the cost of that,
17 but I could get you the cost.
18          SEN. DAVIS:  It would be a helpful number
19 to have.
20          There's also a discussion in terms of the
21 fiscal note on this bill, including a coordinated voter
22 registration drive or other activities that would be
23 designed to expand voter registration.  What would the
24 costs of such a registration drive be?  It's on Page 2
25 of the fiscal note.

456

1          MS. McGEEHAN:  Okay.  I think that what
2 that is referring to is that at the end of Senate
3 Bill 14, there's a reference that says county voter
4 registrars can use Chapter 19 funds to defray costs in
5 conducting a voter registration drive.  But I don't see
6 anything -- and I may have missed it -- but I don't see
7 anything in Senate Bill 14 that requires a voter
8 registration drive.  I think it's -- what that section
9 in the bill is doing is trying to make clear that these
10 funds, which are -- go to county voter registrars to
11 enhance voter registration could be used to do voter
12 registration drives, but I don't see anything that
13 requires a voter registration drive in Senate Bill 14.
14          SEN. DAVIS:  What resources currently are
15 expected of our local governments in carrying out the
16 training and the public awareness programs under our
17 election code.
18          MS. McGEEHAN:  The -- there's no state law
19 requirement to do voter education by the county
20 officials.  Most of them do it as a public service
21 because they want to, but there's not a mandate under
22 state law to do that.
23          Under Senate Bill 14, there's required
24 training of poll workers on the new photo ID
25 requirements.  And I may have missed part of your

KENNEDY REPORTING SERVICE, INC.
512.474.2233

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 52 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 10 of 196
111

CONSIDERATION OF SENATE BILL 14 1/25/2011

**457**

1 question.

2  SEN. DAVIS: And that required training is
3 to be done at the county level. It's expected that the
4 county will fulfill that requirement through their own
5 resources?

6  MS. McGEEHAN: Well, they are required to
7 use the Secretary of State materials. I think that the
8 election code gives them discretion as to how they
9 implement it and how they conduct their training.

10  SEN. DAVIS: So it's foreseeable that at
11 the county level increased costs will be realized as a
12 consequence of the expectations of this bill?

13  MS. McGEEHAN: Most counties conduct
14 training today. So they would just be incorporating
15 another component into their training program.
16 Depending on how they handled it would impact how
17 significant the fiscal impact would be in that county.

18  SEN. DAVIS: If I'm a voter today and I
19 want to go to the bill itself in terms of making sure I
20 understand what would be expected of me under today's
21 rules versus under the rules of the new bill, if I'm a
22 voter today and I come in to vote and I don't have my
23 voter registration card, instead I have an ID, I have a
24 state issued ID, I have a valid driver's license, and my
25 driver's license shows a different name than is

**458**

1 currently on the roll because I've married or I've
2 divorced, how is that situation handled today?

3  MS. McGEEHAN: State law doesn't directly
4 address it. So I think that as a practical matter
5 what's happening is the poll workers are making judgment
6 calls as they qualify those voters for voting.

7  SEN. DAVIS: But they are not being given
8 guidance or rules or requirements in terms of how they
9 are to deal with that situation today?

10  MS. McGEEHAN: No.

11  SEN. DAVIS: It's within their discretion?

12  MS. McGEEHAN: At this point. I mean,
13 state law is silent on it, and our office has not issued
14 any guidance on it. So we're hearing a lot about that
15 today. That's definitely something we'll probably need
16 to look into, but right now there is no rule or statute
17 on that issue.

18  SEN. DAVIS: Okay. And today if I go to
19 vote and my identification that I use for purposes of
20 voting has a different address on it than is listed on
21 the precinct roll, I think it's the interpretation today
22 under 2004 Secretary of State opinion that I am asked
23 for my correct address, and I am to be believed if I say
24 that my address is the address that's on the precinct
25 list as opposed to what might be on my ID?

**459**

1  MS. McGEEHAN: I think that's basically
2 correct. The purposes -- you know, showing ID today is
3 only for purposes of proving who you are. It's not to
4 prove where you live. So independent from the
5 requirement to show ID, either certificate or one of the
6 other authorized ID, there's a separate requirement in
7 the code where the election -- where the poll worker has
8 to ask every voter "Have you moved," so regardless of
9 what ID they show. And if they say yes, they've moved,
10 then they have to sign a statement of residence and
11 update their information. If they say no, they haven't,
12 they still live at the address on the list of registered
13 voters, then they are permitted to vote.

14  SEN. DAVIS: And what is your
15 understanding of whether -- how or whether that would
16 change under the requirements of the new bill if
17 everyone now is going to come in with a state-issued ID
18 or a driver's license? If the address on that ID does
19 not match the address that's on the voter file, how is
20 that to be handled going forward if this bill were to
21 pass into law?

22  MS. McGEEHAN: My current understanding is
23 that that process wouldn't change, that the purpose of
24 SB 14 is, again, just to prove up ID, not prove where
25 you reside.

**460**

1  SEN. DAVIS: And what steps would the
2 Secretary of State's Office engage in to assure that the
3 ID wasn't being used to establish an understanding of
4 the voter's residency?

5  MS. McGEEHAN: Would definitely, I think,
6 be included in our training materials to emphasize that.

7  SEN. DAVIS: Currently, is there any
8 information that the Secretary of State's Office gathers
9 that breaks down by category voters in the state? And
10 when I say "by category," I mean by race, by gender, by
11 disability, by age.

12  MS. McGEEHAN: We have some information.
13 We have -- we have age for sure. On gender -- we have
14 some information on gender, but it's not conclusive
15 because gender is now -- it used to be a required
16 element on the voter registration application. In 1995,
17 it was taken -- or it became optional after the National
18 Voter Registration Act. So we have some data on gender
19 but, again, it's not complete.

20  Regarding ethnicity, we really -- we don't
21 have any information like that because it's not
22 collected when a person applies to register to vote.
23 The only data that we do have is we do have the number
24 of voters that have an Hispanic surname. And so we can
25 run the list of registered voters against this list of

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00000171
JA_000170

TX_00000171

USA_00015052

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 53 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 1 of 196
112

CONSIDERATION OF SENATE BILL 14 1/25/2011

461

1 Hispanic surnames that is provided by the census
2 department.
3          SEN. DAVIS: I'm sure you understand that
4 one of the sensitive issues that will arise as a
5 consequence of this legislation will be a question as to
6 whether the implementation of this law creates a
7 disproportionate impact on minorities, on seniors, on
8 the disabled, on women. How will the Secretary of
9 State's Office work to be able to answer those questions
10 when they are asked if we currently don't track that
11 data? And is there an intention to track it going
12 forward?
13          MS. McGEEHAN: When we changed the voter
14 registration application in '94, '95, due to the
15 National Voter Registration Act, there was a long
16 discussion regarding this issue of whether the state
17 application should request a voter's race. The
18 determination at that time, based on feedback from all
19 the stakeholders, was not to do it because the thought
20 was that might be intimidating to a minority voter, "Why
21 are you asking, you know, what my ethnicity is? It
22 doesn't impact whether I can register or not."
23          We can revisit that issue because in order
24 to provide data, you know, if the legislature wants data
25 like that from the Secretary of State's Office, we have

462

1 to have some way to collect it. So we could revisit
2 putting that question or adding that as a question to
3 the voter registration application. I'd be happy to
4 visit on ways where we could try and collect that, but
5 right now we would not have the tools that we would need
6 to be able to collect that data.
7          SEN. DAVIS: It seems rather important as
8 implementation of this law advances that that
9 information be made available for the Justice Department
10 review as well as any judicial review that might occur
11 in terms of the impact of the implementation of the law.
12          I believe that's all the questions I have
13 for you. Thank you so much.
14          MS. McGEEHAN: Thank you.
15          CHAIRMAN DUNCAN: The Chair recognizes
16 Senator West.
17          SEN. WEST: Thank you very much,
18 Mr. Chairman. Many of the questions Senator Davis has
19 already asked, but have you had a chance to look at the
20 bill as introduced?
21          MS. McGEEHAN: Yes.
22          SEN. WEST: Okay. Do you happen to have
23 it there in front of you?
24          MS. McGEEHAN: Yes, I do.
25          SEN. WEST: Okay. Great. Before I get

463

1 into it, does this bill provide you any rulemaking
2 authority?
3          MS. McGEEHAN: No.
4          SEN. WEST: Okay. So in interpreting
5 the -- let me back up. Are you often called upon by
6 county registrars to answer questions concerning issues
7 that arise in local counties?
8          MS. McGEEHAN: Yes.
9          SEN. WEST: How do you normally decide
10 those questions? Do you just look at the black and
11 white law? Do you issue opinions? How is that --
12 what's that process?
13          MS. McGEEHAN: We issue opinions in a
14 couple of different ways. We have a toll-free number.
15 One is dedicated just for county officials. So if it's
16 a fairly straightforward, simple question, we give a
17 quick answer over the phone. If it's a -- if it's a
18 less involved question, we might get an email. We'll
19 give a response via email. If it's something that's
20 hard or we're really interpreting several different laws
21 or it's a new law and we feel like it has statewide
22 impact, we want to make sure that everyone is operating
23 under the same understanding, we'll issue an advisory.
24          SEN. WEST: Okay. And so an advisory or
25 just depending upon the circumstances maybe an email

464

1 opinion or something like that?
2          MS. McGEEHAN: Well, advisories are
3 usually a little more -- it's like the most formal that
4 we do.
5          SEN. WEST: Right.
6          MS. McGEEHAN: Yeah. Okay.
7          SEN. WEST: All right. Let me ask you to
8 go to Page 4 of the bill.
9          MS. McGEEHAN: Okay. Can you tell me the
10 section? Because I think I have a different format.
11          SEN. WEST: Okay. It's Section 7, and
12 Section 7(c) and (d).
13          MS. McGEEHAN: Okay.
14          SEN. DAVIS: Let me know when you get
15 there.
16          MS. McGEEHAN: Yes.
17          SEN. WEST: Okay. It's my understanding
18 that the election officer that's being referred to in
19 Section (d) is -- is the individual working at the poll.
20 Is that right?
21          MS. McGEEHAN: Yes.
22          SEN. WEST: Okay. That person will be
23 called upon in Section (d) to determine if the voter's
24 name is on the precinct list of registered voters, and
25 the voter's identity can be verified from the

TX_00000172

USA_00015053

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 54 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 18 of 196
113

CONSIDERATION OF SENATE BILL 14 1/25/2011

465

1 documentation presented. Is that correct?

2          MS. McGEEHAN: Yes.

3          SEN. WEST: Okay. In advising on that,
4 will that be a strict interpretation? Let me -- this is
5 what I mean. I think that some of the hypotheticals
6 that were provided by Senator Davis may be illustrative
7 of what I'm asking. My last name is West, W-e-s-t. And
8 say that there's a typographical error where my name is
9 spelled W-e-s on the voters' roll, precinct list, and
10 then my -- but my identity I'm using my driver's license
11 and it has "t" on it. How does a poll -- an election
12 officer in that situation resolve that problem?

13          MS. McGEEHAN: That's a good question, and
14 I don't think the bill necessarily defines what
15 verification --

16          SEN. WEST: I know. Senator Fraser said
17 I'd have to ask the Secretary of State that question.
18 That's why I'm asking you that question.

19          MS. McGEEHAN: I think -- you know, based
20 on the way the bill is written now and if we had to
21 develop training materials for the poll workers on how
22 to implement this, we would look to the best practices
23 of the states that have implemented. I heard Indiana
24 testify earlier today that they have written some
25 guidelines. We'd look to that and try and incorporate

466

1 the best practices on reasonable methods to verify the
2 ID document against the list of registered voters.

3          SEN. WEST: Okay. But you would agree
4 with me that in interpreting Section (c) and (d) without
5 some sort of guidance would lend itself to a great deal
6 of subjectivity; thus inconsistent application
7 throughout the state?

8          MS. McGEEHAN: It could, yes.

9          SEN. WEST: Okay. As it relates to --
10 let's see. What page is it on? The next page, which
11 will be (h), it's in the same section.

12          MS. McGEEHAN: Okay.

13          SEN. WEST: Would you read Section (h) and
14 tell me how you interpret that as the chief
15 administrator of the election laws in the state of Texas
16 next to, needless to say, Secretary of State?

17          MS. McGEEHAN: (h) reads, "The
18 requirements for identification prescribed by Subsection
19 (b) do not apply to a voter who: (1) presents the
20 voter's voter registration certificate on offering to
21 vote; and (2) was 70 years of age or older on January 1,
22 2012, as indicated by the date of birth on the voter's
23 voter registration certificate."

24          The way I had -- until earlier this
25 afternoon when Senator Ellis asked the question, I had

467

1 assumed that anybody that is 70 years of age or older
2 would not have to provide the photo ID. I think the
3 wording is less than perfect. I think that's the
4 intent, and I heard Senator Fraser, I think, answer that
5 his intent is it would apply. You know, even if a
6 person became 70 after January 1, 2012, they could still
7 take advantage of this exception.

8          SEN. WEST: Okay. But would it be your
9 suggestion that we need to reword that language to make
10 certain that whether you're there or someone else -- I
11 understand that you're here and you heard the
12 discussion, but if for some reason you're not in the
13 same position you're in right now, there's going to be
14 someone else, and they won't have -- they will not have
15 had the benefit of this discussion. So, therefore, do
16 you think it would be advisory to -- advisory to reword
17 that to make certain it's perfectly clear?

18          MS. McGEEHAN: I think so. If people are
19 reading it inconsistent, it would probably help it if it
20 were.

21          SEN. WEST: Okay. Now, a couple of other
22 questions. As it relates to the counties, it's my
23 understanding that you -- that your agency and maybe
24 either yourself or someone working for you put together
25 the fiscal note. Is that correct?

468

1          MS. McGEEHAN: Yes. Our agency put it --
2 I helped.

3          SEN. WEST: Okay. Did someone under your
4 supervision contact local governments to determine the
5 impact, the fiscal impact, that implementation of this
6 will have?

7          MS. McGEEHAN: No, we did not.

8          SEN. WEST: That was done by someone else?

9          MS. McGEEHAN: I think LBB does that. We
10 just -- we just --

11          SEN. WEST: Provided the information?

12          MS. McGEEHAN: Yeah. Right.

13          SEN. WEST: And based on your experience
14 when these types of changes -- let me back up.

15          How much experience have you had in this
16 particular area, that is, the election laws, in
17 administration of election laws?

18          MS. McGEEHAN: I have been working in the
19 elections division for 21 years.

20          SEN. WEST: So you've had a little
21 experience, huh?

22          MS. McGEEHAN: Yes.

23          SEN. WEST: Okay. All right. As it
24 relates to when changes are made in state law of this
25 nature, is there an impact, a fiscal impact, on local

TX_00000173

USA_00015054

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 55 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 19 of 196
114

## CONSIDERATION OF SENATE BILL 14 1/25/2011

---

**469**

1 units of governments when they have to make changes to
2 comply with these types of changes or laws that are
3 being suggested?
4          MS. McGEEHAN: I think it really depends
5 on what the change is. You know, if there's a new
6 mandate for a county or if the county has to do
7 something different, then obviously there would be a
8 fiscal impact.
9          SEN. WEST: Well, will -- and, again,
10 drawing on your expertise, will counties have to do
11 something different to implement this particular law?
12          MS. McGEEHAN: They will have to -- they
13 are going to have to post information on their website
14 notifying the public what the new photo ID requirements
15 are.
16          SEN. WEST: Right.
17          MS. McGEEHAN: When they issue voter
18 registration certificates, they are going to have to
19 mail out -- which they have to mail out every two years
20 under current law. The new certificates will have new
21 language, but -- informing voters of the voter ID
22 requirements, but that should be cost neutral because
23 they are already mailing out the voter registration
24 certificates.
25          The piece that I think might have a fiscal

---

**470**

1 impact is the training. If the counties have to change
2 up their training procedures much or do more training
3 because they want to make sure the word is out to all
4 their -- that might increase their training costs.
5          SEN. WEST: Okay. So there are some
6 factors that need to be taken into consideration as to
7 whether or not counties will be burdened with additional
8 cost to implement this law. Is that correct?
9          MS. McGEEHAN: Yes.
10          SEN. WEST: Okay. And would it be a fair
11 statement to say the larger the county, the more of the
12 burden -- of the financial burden -- well, that's not a
13 fair question.
14          Would it be a fair statement to say that
15 the larger the county, the larger the potential
16 financial obligation that they would have to encounter
17 in order to implement the law?
18          MS. McGEEHAN: I think that's true, but I
19 can hear small counties say that it might be
20 proportional, you know, since their budgets are -- I
21 mean --
22          SEN. WEST: Right. It's all relative to
23 what your budgets are.
24          MS. McGEEHAN: Yeah.
25          SEN. WEST: But the fact is that that --

---

**471**

1 do you -- is there any -- you've read the fiscal note
2 associated with this bill?
3          MS. McGEEHAN: Yes.
4          SEN. WEST: The $2 million that's in the
5 fiscal note, does any of that go to the county to --
6 counties in order to implement this legislation?
7          MS. McGEEHAN: No.
8          SEN. WEST: So any cost that is not
9 covered by the state for counties would be -- have to be
10 borne by the counties. Right?
11          MS. McGEEHAN: Yes, yes.
12          SEN. WEST: Okay. Now, as it relates
13 to -- is there any way that the Secretary of State's
14 Office can give us -- do an analysis or get with the
15 various counties to determine exactly what the fiscal
16 impact of implementing this legislation would be?
17          MS. McGEEHAN: We could -- we could
18 certainly solicit that information from counties and ask
19 them what -- how they see this impacting them fiscally.
20          SEN. WEST: You could do that for each and
21 every one of the counties?
22          MS. McGEEHAN: We can do it.
23          SEN. WEST: Mr. Chairman, I'd like to
24 request that the Secretary of State's Office provides
25 the Senate an analysis of -- I shouldn't say an

---

**472**

1 analysis -- at least solicit from the various counties
2 what the fiscal implication is going to be in order to
3 implement this bill.
4          CHAIRMAN DUNCAN: Okay. I think, Senator,
5 that will be an individual request from you, and then it
6 can be distributed to all members of the Senate --
7          SEN. WEST: Okay.
8          CHAIRMAN DUNCAN: -- whenever it's done.
9 You know, I doubt that that will be done by the time we
10 rise and report to the Senate.
11          SEN. WEST: Okay. We can't get it
12 tonight?
13          (Laughter)
14          SEN. WEST: I'm just joking with you.
15          CHAIRMAN DUNCAN: You won't be a very
16 popular guy if the --
17          SEN. WEST: I'd like --
18          (Laughter)
19          SEN. WEST: I'd like to get it as soon as
20 possible, though.
21          Let's see. No further questions. Thank
22 you very much.
23          MS. McGEEHAN: Thank you.
24          CHAIRMAN DUNCAN: Thank you, Senator West.
25          Senator Gallegos?

---

TX_00000174

USA_00015055

Case 2:13-cv-00193  Document 660-4  Filed on 11/11/14 in TXSD  Page 56 of 57
Case 1:12-cv-00128-RMC-DST-RLW  Document 206-2  Filed 06/20/12  Page 20 of 196
115

CONSIDERATION OF SENATE BILL 14 1/25/2011

473

1        SEN. GALLEGOS: Let me ask you, I don't
2 know if you heard my question earlier to Senator Fraser
3 and he referred to you or the Secretary of State's
4 Office to answer it.  My concern was in the fiscal note
5 that we ranked number two in the country in population.
6 And Missouri ranks number nineteenth, and to implement
7 their voter ID program, they came up with -- they only
8 have 5.9 million people.  We have 25 million.  They came
9 up with a fiscal note of 6 million in the first year and
10 then 4 million in the second year for a total of 10
11 million second and third.  That's $10 million.  And you
12 just -- I think earlier testimony with Senator Davis,
13 you said once the 2 million runs out, that's it.  Is
14 that what you said?
15        MS. McGEEHAN: For -- yeah. the amount of
16 money we have for voter education is limited.  So when
17 that runs out, that's all we have.
18        SEN. GALLEGOS: I guess my concern is if
19 Missouri only has 5.9 million people, just to implement
20 their voter ID program they start with 6 million in the
21 first year and 4 million in the second and third year
22 for a total of $10 million, for just 5.9 million folks,
23 what are they -- you know, I don't -- what are they
24 doing as far as when they are reading the bill?  I heard
25 that you said you're going by the bill, and that's how

474

1 you came up with your fiscal note.  Is that correct?
2        MS. McGEEHAN: Yes.
3        SEN. GALLEGOS: Okay.  Well, then what are
4 they doing that we're not or, you know, how can you --
5 you know, for $10 million for 5.9 million people and
6 we're only going to spend 2 million, I mean, what's the
7 difference?
8        MS. McGEEHAN: I am not familiar with the
9 Missouri voter identification bill, and I did hear you
10 ask that earlier today, but I've been trying to listen
11 to all the questions.  So we can -- we can research it
12 and see.  Some states actually provide more to their
13 local county governments and print ballots and things
14 like that.  I don't know if that's the situation in
15 Missouri, but I honestly don't know the answer to that
16 question because I don't know what the Missouri voter ID
17 law requires.
18        SEN. GALLEGOS: Well, it's a substantial
19 more amount of money than we're looking --
20        MS. McGEEHAN: Yeah.
21        SEN. GALLEGOS: -- at the fiscal note that
22 you have -- that you've given this committee on Senate
23 Bill 14.  And I just -- it concerns me that that amount
24 of money, if somebody is doing -- in the formula or
25 methodology that you came up with that number -- I mean,

475

1 is that a true number?  I mean, you know, as far as are
2 we really doing voter education that should be done, you
3 know, on 25 million people as opposed to what Missouri
4 is doing with only 5.9?  I mean, it just -- I mean, that
5 would send up a red flag to me.  Wouldn't it you?
6        MS. McGEEHAN: Sure.  I would like to
7 understand those numbers because they are very
8 different.
9        SEN. GALLEGOS: You know, I -- if we're
10 going to mandate to Texans, you know, and then do it --
11 do a good educational program and Missouri is spending
12 $10 million on their folks and we're only spending
13 2 million on ours, I'd like to know what the -- what the
14 difference is.  Are their people better than ours?  You
15 know, do they deserve, you know, more education?  You
16 know, I just -- you know, with the population as opposed
17 to our population, you know, I don't -- you know, I'm a
18 little concerned there.  You know, are we cutting our
19 folks short?  Are we really going to do what you're
20 telling us that you're going to do as far as educating
21 the public out there on this bill?
22        And it just concerns me that, you know, we
23 see -- and I haven't even taken a comparison of the
24 other states.  And we're number two, and Missouri is 19,
25 and they are spending 10 million bucks.  You know, that

476

1 would concern me, and I would hope it would concern any
2 of the other Senators on this floor.  Are we, you know,
3 really going to do -- in implementing this bill, are we
4 going to educate those folks out there?
5        Now, you know -- and I'd like that answer.
6 I mean, you can't answer it now, I understand, but I
7 would like an answer to that.
8        MS. McGEEHAN: We'll get you an answer.
9        SEN. GALLEGOS: And a comparison on what
10 really your states that have implemented voter ID, how
11 much are they paying, you know, to implement the program
12 and what they do.
13        Now, on the fiscal note, it says you're
14 going to do TV and radio and some other things.  I mean,
15 can you explain to this body the process on TV, or is it
16 going to be in different languages, or how are you going
17 to -- how are you going to split up the money?  Who gets
18 the most?  You know, I mean, it's not -- it's not
19 explained to us in the fiscal note how you're going to
20 spread the money around.  And is that going to be
21 accessible to us or how the process is going to be, or
22 how much money are you going to spend in Harris County
23 as opposed to Lubbock, Texas or wherever?
24        MS. McGEEHAN: Yes, that would be
25 available.  And, you know, the programs that we've done

TX_00000175

USA_00015056

Case 2:13-cv-00193 Document 660-4 Filed on 11/11/14 in TXSD Page 57 of 57
Case 1:12-cv-00128-RMC-DST-RLW Document 206-2 Filed 06/20/12 Page 21 of 196
116

## CONSIDERATION OF SENATE BILL 14 1/25/2011

477

1 previously, we have detailed records that show, you
2 know, where the media ran, and so we would -- that would
3 be a part of any program going future.
4          The way -- the way it has worked thus far,
5 the three statewide voter education programs that we
6 have done, is we've gone out for bid for a public
7 education firm.  And then the first thing that firm does
8 is research, and they meet with stakeholders, and then
9 they craft the creative proposal.  And then they turn
10 that into the actual media and do the media buys for TV,
11 radio and cycle, Internet and also print.
12          For the PSAs -- and I'm not the expert on
13 this -- but I understand that we pay for a certain
14 amount, and then we get some earned credit where TV
15 stations will run them for free.  If you pay them, you
16 know, to run it once, they'll run it three times and
17 only charge you for once, something along those lines.
18          SEN. GALLEGOS:  And is that going to be --
19 is there going to be access as far as different
20 languages in than budget?
21          MS. McGEEHAN:  Oh, yes.  We -- our current
22 programs are in English and in Spanish, and in Harris
23 County, we've had a component for Vietnamese.
24          SEN. GALLEGOS:  Okay.  Now. on Page 2 of
25 the bill under what y'all are going to do under voter --

478

1 under 31.012, Voter Identification, Senator West brought
2 it up about -- it says here you and -- your office and
3 the voter registrar of each county that maintains it
4 shall provide notice of the ID requirements as
5 prescribed by this change.
6          Now, my concern there is, is at the county
7 level -- you know, I think Senator West brought it up --
8 is how much is going to be incumbent on each county, you
9 know?  I and others here on this floor represent the
10 largest county, Harris County, and Harris County is
11 already starting to lay off, and they have a shortfall,
12 and they are laying off as we speak right now.  So, you
13 know -- and I see what it says in the bill, you know,
14 that you're going to get together with them.  I mean,
15 are they going to have the money?  Or where is the -- if
16 they don't have the money, where is the other money
17 going to come from?  Other than the 2 million you
18 already have prescribed here and any federal matches
19 that come in, where is that money going to come if those
20 counties cannot provide?
21          MS. McGEEHAN:  I think that the bill
22 presumes that counties have a website, and so this
23 requirement is that they post, you know, the information
24 about the new photo ID requirements that the Secretary
25 of State's Office will actually prescribe.  So we will

479

1 send that out to the counties, and then they'll have to
2 post it on their website.
3          Now, in light of the fiscal
4 circumstances -- and Senator West has asked us to do a
5 survey -- we'll probably get some very detailed
6 information, you know, as far as the counties' fiscal
7 circumstances, if they are going to have to take down
8 their websites or, you know, where they are going to
9 have to cut.
10          SEN. GALLEGOS:  Well, you know, with all
11 due respect, I mean, we can presume a lot of things, and
12 I could presume a lot of things, you know, just on
13 anything, but I can tell you right now -- I'm not
14 presuming -- I know that they're laying off in Harris
15 County right now.  That's not a presumption.  That's a
16 fact; that's a fact.  And they're also furloughing in
17 the City of Houston.
18          So, I mean, it just concerns me that this
19 section here that says you're going to work hand-in-hand
20 with each registrar in each county, and if those
21 counties are already going through a budget shortfall
22 like we are, then how can you presume that they're going
23 to have -- I'm just saying that this bill presumes that
24 they're going to have a website and they're going to
25 have people to handle the education.

480

1          You can't presume anything if they're
2 laying off right now as we speak, and that's a fact.
3 Like I said, that's not a presumption.  That concerns
4 me.  And what I'm asking is that if that can't happen in
5 Harris County or any other county in this state, where
6 is the extra money?  If they don't have, obviously, the
7 funds to provide what is prescribed under Senate Bill
8 14, where is that money going to come from?
9          MS. McGEEHAN:  Well, you know, Senate Bill
10 14 doesn't make an appropriation to the county, so I
11 don't know the answer to your question on that because,
12 like I said, the bill -- I think the assumption is that
13 counties have a website.  So if they're not going to
14 have a website --
15          SEN. GALLEGOS:  But the bill prescribes
16 that you will work in conjunction with the county
17 registrar.  Is that what I'm reading --
18          MS. McGEEHAN:  Yes.
19          SEN. GALLEGOS:  -- or am I reading the
20 wrong bill?
21          MS. McGEEHAN:  Maybe I'm not -- the way I
22 read that was that we would provide them the wording,
23 the language that they would put up on their website.
24          SEN. GALLEGOS:  Well, you're going to
25 provide them with that.  But what about the bodies and

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00000176

USA_00015057