3  fraud, and I -- that actually -- I'm -- I'm responding
4  to things I've read they've said in the media.  But I
5  believe there are numerous registrars that believe this
6  is a -- a large problem.
7       SEN. HINOJOSA:  Well, I hear what you're
8  saying, but I don't see any evidence.  There's a lot of
9  anecdote, a lot of rumors and guessing and speculation,
10  which I don't think it's a way to make good public
11  policy.
12       Are you familiar with the Carter-Baker
13  Commission on federal election reform?
14       SEN. FRASER:  Senator, what are you -- I'm
15  sorry.  What --
16       SEN. HINOJOSA:  Are you familiar with the
17  Carter-Baker Commission on federal election reform?
18       SEN. FRASER:  Yes, I am.
19       SEN. HINOJOSA:  Okay.  Are you aware that
20  by putting a requirement of having a photo ID to be able
21  to vote, that there are approximately 3 million
22  registered voters in the state of Texas that do not have
23  voter ID?
24       SEN. FRASER:  I don't know where you get
25  that number.
0243
1       SEN. HINOJOSA:  Well, if you look at
2  3 million people who are going -- who will be kept from
3  voting as compared to you cannot show anybody getting
4  prosecuted -- getting prosecuted and convicted voter
5  fraud, that's one big difference, one big price to pay
6  for a bill that you don't have any evidence to support
7  there's voter fraud.
8       SEN. FRASER:  One second, Senator.  My --
9  my iPhone is interfering with my microphone.
10       The 3 million number, where do you get
11  that?
12       SEN. HINOJOSA:  That's the estimate by the
13  Carter-Baker Commission on federal election reform that
14  here in Texas --
15       SEN. FRASER:  Can you -- can you show me
16  where it says in that Commission report?  I don't
17  remember.
18       SEN. HINOJOSA:  Yes, sir, it's a letter
19  dated January 24th, 2011, from Professor Spencer Overton
20  addressed to Senator Judy Zaffirini where he states that
21  approximately 3 million Texas voters do not have photo
22  ID.
23       SEN. FRASER:  Senator, that is --
24       (Simultaneous speaking)
25       SEN. FRASER:  -- pure speculation by that
0244
1  gentleman.  He has nothing to base that on, and that is
2  not in reference to the Carter-Baker report.  That is a
3  estimation by some, you know, political hack that --
4  that y'all have asked to write a letter.

TX_00001006
JA_001005
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001006

USA_00015887

5      SEN. HINOJOSA: Well, actually, I thought
6  it was the opposite. I thought your side was pure
7  speculation. Thank you.
8      CHAIRMAN DUNCAN: The chair recognizes
9  Senator Williams.
10      SEN. WILLIAMS: Thank you, Mr. Chairman.
11      Would Senator Fraser yield for some
12  questions?
13      SEN. FRASER: I will yield.
14      SEN. WILLIAMS: Senator Fraser, there's
15  several things that I wanted to clear up for the record.
16      The first, I'd like to make a reference
17  back to the Secretary of State has recently sent this
18  letter -- she sent it over today -- that indicated that
19  there would be probably $2 million of the HAVA funds
20  that would be available for voter education, to help
21  fund the voter education efforts that we would have in
22  connection with this bill. And it would be -- normally,
23  it would be the Secretary of State's office who would
24  develop what those problem programs are with taking into
25  account our legislative intent about what we're trying
0245
1  to accomplish. Is that right?
2      SEN. FRASER: Yes.
3      SEN. WILLIAMS: The other thing that I
4  wanted to correct, for the record, Senator Watson opined
5  earlier that a lot of this funding for these items had
6  been struck in the budget, and actually, I went back and
7  pulled a copy of the budget. I had not looked at this
8  part, and so there were some budget riders that had
9  expired and that were no longer relevant in the current
10  budget. Those were struck. And under Strategy B.1.4,
11  under elections improvement, administer Federal Help
12  America Vote Act, we actually have, it looks like, a
13  total of about $43 million over the next biennium that's
14  been appropriated in the budget that Senator Ogden laid
15  out for us earlier. So I just wanted to clear that up
16  for the record because that's kind of been a moving
17  target.
18      Another question that I had for you was
19  the -- I wanted to go back, if I could, and -- and just
20  touch on what my understanding after hearing all this
21  questioning that's gone on, what your -- the purpose of
22  your bill is -- really is to deter and detect fraud
23  in-person voter fraud at the polls. Is that correct?
24      SEN. FRASER: That is correct.
25      SEN. WILLIAMS: Okay. And has the United
0246
1  States Supreme Court -- I believe they've stated that
2  it's been documented throughout our nation's history by
3  respected historians and journalists, and they
4  demonstrate not only that the risk of voter fraud is
5  very real, but they could affect the outcome in a close
6  election. Does Senate Bill 14 provide the kind of

TX_00001007
JA_001006
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001007

USA_00015888

7  safeguard against that fraud that might be crucial in an
8  election?
9        SEN. FRASER: Yes, it does, Senator.
10       SEN. WILLIAMS: Now, we've had some close
11 elections, even in the Texas Legislature. I know over
12 in the House right now, there is an election contest
13 that's been -- for Senate, State House District 48.
14 It's being contested. The last numbers that I saw from
15 the Secretary of State showed that Donna Howard had won
16 her seat by 12 votes, which amounts to .02 percent of
17 all the votes cast in that race. And, of course, back
18 in 2008, Linda Harper Brown up in Dallas County defeated
19 her opponent by 19 votes, or .05 percent of the total
20 votes cast in that race.
21       Are those the kind of close elections you
22 think that the Supreme Court might have been referencing
23 when they said in Crawford 533 U.S. at 11-12 that
24 it's -- the threat's not only real, but it's actually --
25 you know, it demonstrates it's not real, but it could
0247
1  affect the outcome of a close election?
2        SEN. FRASER: The answer is absolutely,
3  yes, and it actually the -- it's even closer to home.
4  Senator Jackson, when he was elected to the Texas House,
5  ended up winning by seven votes.
6        SEN. WILLIAMS: Landslide Jackson --
7        SEN. FRASER: Landslide Jackson.
8        SEN. WILLIAMS: -- I think they called
9  him.
10       SEN. FRASER: So if -- fraud, in an
11 election like that, could have changed history.
12       SEN. WILLIAMS: Senator Fraser, Senate
13 Bill 14 provides safeguards to protect the reliability
14 and integrity of our voting system, especially those in
15 close elections like we've just talked about?
16       SEN. FRASER: Yes.
17       SEN. WILLIAMS: Okay. I believe in this
18 Crawford v. Marion, on Page 10, the Supreme Court brief,
19 they quoted -- the United States Supreme Court quoted
20 the Carter-Baker report that has been referenced here.
21 And in that report, their quote was, "There's no
22 evidence of extensive fraud in the U.S. elections or of
23 multiple voting, but both occur, and it could affect the
24 outcome of a close election. The electoral system
25 cannot inspire public confidence if no safeguards exist
0248
1  to deter or detect fraud or to confirm the identity of
2  voters. Photo identification cards currently are needed
3  to board a plane, enter federal buildings, and cash a
4  check. Voting is equally important."
5        Is that your understanding? Is Senate
6  Bill 14 designed to inspire that public confidence in
7  close elections like --
8        SEN. FRASER: Yes, it is.

TX_00001008
JA_001007
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001008

USA_00015889

9          SEN. WILLIAMS:  -- we talked about?
10         Senator Fraser, do you recall the
11   testimony and exhibits that we provided in 2009 -- now
12   it's been admitted earlier today as Exhibit 1 -- that
13   detail the extensive voter fraud in Harris County and
14   other areas of the state?
15         SEN. FRASER:  Yes, I'm very familiar with
16   it.
17         SEN. WILLIAMS:  Okay.  Senator, having
18   listened to what I heard and just read a minute ago from
19   the Carter-Baker Commission and the language that was
20   adopted from them in the Supreme Court brief, are you
21   aware of how difficult it is to not only to discover but
22   to prosecute voter fraud?
23         SEN. FRASER:  Yes, it is very difficult.
24         SEN. WILLIAMS:  And having said that,
25   do -- do you think that that's one of the reasons we
0249
1    don't see many of these cases that are prosecuted
2    because if someone is voting deceptively as someone
3    else, it's going to be very difficult to discover that
4    if they're successful?
5          SEN. FRASER:  And that was recognized by
6    the U.S. Supreme Court in their decision.
7          SEN. WILLIAMS:  So are you offering Senate
8    Bill 14 as a tool for the state of Texas to detect and
9    deter this type of voter fraud and further inspire
10   confidence in our voters and the voting system, to make
11   sure that all Texans and all of our elections are
12   conducted with the upmost integrity and equity to all
13   Texans?
14         SEN. FRASER:  Absolutely.  That would be
15   my reasoning.
16         SEN. WILLIAMS:  Okay.  Couple of things
17   that I just think that it was important to get back into
18   the record again about what the Supreme Court actually
19   said in Crawford v. Marion; and all of this, of course,
20   was included in the record last time.
21         I thought it was interesting that Justice
22   Stevens comments about this.  He said first, the state
23   has an interest in deterring and detecting voter fraud.
24   They have a valid interest in participating in a
25   nationwide effort to improve and modernize the election
0250
1    procedures that have been criticized as antiquated and
2    inefficient, and the state, in that case, also argues
3    that it has a particular interest in preventing voter
4    fraud in response to a problem that is, in part, the
5    product of its own maladministration; namely, that in
6    the case -- in this case, Indiana's voter registration
7    roles included a large number of people who were either
8    deceased or no longer live in Indiana.
9          Now, Senator Fraser, when I look back at
10   the record that we had introduced as Exhibit 1 today,

TX_00001009
JA_001008

TX_00001009

USA_00015890

11  didn't that record include many, many instances where we
12  had people who were registered at fictitious addresses
13  who had been voting or people who were deceased?  I
14  think my own brother came and testified that our
15  grandfather had voted for 62 years after his death, and
16  my grandmother had a very difficult time trying to get
17  him taken off the voter roles and, in fact, had not been
18  able to do so.
19          SEN. FRASER:  Yes, I'm -- I'm -- remember
20  that very well.
21          SEN. WILLIAMS:  Okay.  And so, you know,
22  there's been a lot of talk about the burden on people,
23  and Senator Davis made some very compelling and
24  interesting remarks in her comments.  But I would say
25  that, you know, wouldn't you think that especially for
0251
1  the elderly, which we've had a big focus on here today,
2  of the inconvenience on elderly voters, people who are
3  age 65, don't they have an opportunity to use a mail-in
4  ballot and they completely bypass any restrictions that
5  your bill or inconveniences that it might cause them?
6          SEN. FRASER:  I'm actually surprised at
7  the percentage now of people that do mail in ballots.
8  That percentage continues to increase, and so someone
9  that did have a problem getting to the polls -- and, you
10  know, I gave the example last year of my -- my mother in
11  the retirement center, that she couldn't get to the --
12  it was too much -- it's too hard for her to get to the
13  polls, but she voted by mail.  And there's -- there are
14  people in that category, and we have that safeguard in
15  Texas.
16          SEN. WILLIAMS:  Well, and -- and I think
17  we all care about everyone being able to exercise their
18  constitutional right to vote, and along with the
19  provisions that you have for people that are 70 and over
20  plus the mail-in ballots and the fact that provisional
21  ballots can be cast and allow people with expired
22  licenses and that sort of thing the opportunity to prove
23  up who they are, don't you think that addresses many of
24  the concerns that have been raised here today?
25          SEN. FRASER:  Absolutely.  They -- and
0252
1  that was our intent, is that obviously, we want to make
2  sure everyone is afforded the -- the ability to vote,
3  and we think we have those provisions in place so that
4  all Texans, every Texan, will be allowed to vote.
5          SEN. WILLIAMS:  Well, I -- I think it's
6  also interesting, and you've noted several times today,
7  that so far as we could determine from our research,
8  there isn't a single voter in Indiana or Georgia who's
9  raised the issue that they've been disenfranchised since
10  those laws have been enacted.  Is that true, to the best
11  of your knowledge?
12          SEN. FRASER:  To the best of my knowledge.

TX_00001010
JA_001009

TX_00001010

USA_00015891

13    And we have asked that question repeatedly, and to the
14    best of our knowledge, we have -- not a single person
15    has come forward in either state.
16          SEN. WILLIAMS:  And I think it's -- you
17    know, when I look at the syllabus of the Crawford v.
18    Marion County election board case that went to the Texas
19    Supreme Court, they note in the syllabus that there's no
20    question about the legitimacy or importance of the
21    State's interest in counting only eligible votes.  And I
22    think they go on to say that -- that requiring that and
23    the fact that the cards in the Indiana case, as we're
24    doing, they make those cards free.  The inconvenience of
25    going -- of gathering the required documents, posing for
0253
1     a photograph, does not qualify as a substantial burden
2     on most voters' right to vote or represent a significant
3     increase over the usual burdens of voting.  And I think
4     that's interesting that that was noted.
5          And those provisions that we have are
6     essentially -- in your bill, there are very similar
7     provisions with respect to those matters.  Correct?
8          SEN. FRASER:  They -- yes, and I want to
9     clarify.  The Crawford case went to the U.S. Supreme
10    Court, and those observations were made in the -- the
11    majority opinion.
12          SEN. WILLIAMS:  Now, they go on to say
13    that it's generally applicable, nondiscriminatory voting
14    regulation, it's universally applicable, it's imminently
15    reasonable because the burden of acquiring, possessing,
16    and showing a free photo identification is not a
17    significant increase over the usual voting burdens, and
18    the State's interest are sufficient to sustain whatever
19    those minimal burdens are.
20          So we know there's some inconvenience, but
21    we've done everything we can to make that inconvenience
22    as insignificant as possible.  Is that --
23          SEN. FRASER:  I will actually go with that
24    in the -- the Crawford/Indiana case.
25          SEN. WILLIAMS:  Just in closing, in my
0254
1     final comments as -- before we go to take testimony, I
2     just think that it's noteworthy to look back at what the
3     opponents of this legislation have said on the floor
4     thus far today, and what I've heard is very little
5     debate about the actual content of your legislation.
6     And I think that speaks to the fact that it's
7     unequivocally a good idea that people ought to be able
8     to be positively identified as who they say they are
9     when they come to vote.
10          What I've heard today is a lot of talk
11    about procedures, even though what we're doing is very
12    normal for a Committee of the Whole, and it's the same
13    procedure that we used the last session when we
14    considered this.  Is that correct, Senator Fraser?

TX_00001011
JA_001010
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001011

USA_00015892

15     SEN. FRASER:  It is, and I think it's very
16  difficult for a member to argue the merits of the bill
17  when it's so straightforward when you ask someone in
18  their district do they think that someone should --
19  should have -- be required to show a photo ID when they
20  vote, that you've got near 90 percent of the population
21  across the state of Texas.  Again, every one of these
22  members, it's hard to argue of the merits -- argue the
23  merits of the bill.
24     SEN. WILLIAMS:  Yeah, the other thing that
25  I've heard that I think is interesting is fiscal notes.
0255
1  A lot of talk about fiscal notes, even though we have a
2  letter from the Secretary of State that states that
3  there are going to be HAVA funds that will be available
4  to help with the voter education, and I think we're
5  going to have testimony in a few moments.
6     And I tried to clarify that early on that
7  the cost of issuing for the state these free ID cards is
8  less than $2.  It's a very minimal cost, and with almost
9  16 million people that we have who have a driver's
10  license or -- or an ID card now, it seems unlikely that
11  there's going to be a whole lot of people out of that
12  13 million that actually don't already have a driver's
13  license or a state ID card.
14     In fact, Senator Fraser, I spoke last
15  night with the Department of Public Safety and today
16  with the Secretary of State and just asked them if it
17  would be possible for us to target those voters who are
18  below age 65 and have -- don't have an ID card, a
19  driver's license or an ID card issued by the state; and
20  they said, yes, it would be possible for us to direct
21  our voter education to those people specifically so that
22  we could step it up and let them know before your bill
23  takes effect -- not till, when, in January?  Is that --
24  am I remembering that correctly?
25     SEN. FRASER:  January, 2012.
0256
1     SEN. WILLIAMS:  So a year from now.  So
2  we've got a lot of time to let these people know what's
3  coming.
4     And then the other thing I've heard a lot
5  about is current law, and, you know, there's been a lot
6  of discussion.  In fact, a lot of what we've talked
7  about is what's actually on the books right now, and
8  your bill is not touching any of that top side or
9  bottom.  Really, most of what you do is very limited by
10  changing what the requirements are when you come to the
11  polls.  Is that correct?  There's not any other real
12  substantive change to election law here.
13     SEN. FRASER:  We're only addressing the --
14  the actual in-person voting and the identification
15  required when somebody votes in person.  We're not
16  addressing mail-in ballots or any of the other

TX_00001012
JA_001011
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001012

USA_00015893

17  provisions.  It's just that one section.
18          SEN. WILLIAMS:  Well, thank you for
19  allowing me to question you about this and I appreciate
20  you bringing this issue before us and I especially
21  appreciate the fortitude that you've shown during this
22  long debate.  Thank you.
23          SEN. FRASER:  Thank you, Senator.
24          CHAIRMAN DUNCAN:  Chair recognizes Senator
25  Shapiro.
0257
1           SEN. SHAPIRO:  Thank you, Mr. Chairman.
2           I would just like to ask one question
3   because we're getting mixed signals, and I just want to
4   make sure.  It's just going to take a yes-or-no answer,
5   and I think that will be the easiest.
6           In Section 7 of your bill, which is
7   actually on Page 5, the requirements for identification
8   prescribed for people who do not have to have a vote --
9   a photo ID, where it references their age, does the bill
10  require that people 70 or older present a voter
11  registration card and that they be at least 70 years of
12  age on January 1st, 2012?
13          SEN. FRASER:  My understanding and this
14  is, again, something probably the Secretary of State
15  will address, but I believe your age is -- is on the
16  card.  So if someone is 70 on January 1, 2012, they will
17  not be asked to show a photo ID.
18          SEN. SHAPIRO:  Okay.  And this is
19  something that the Secretary of State has put into this
20  bill?
21          SEN. FRASER:  No.  No, I --
22          SEN. SHAPIRO:  This is something that you
23  have --
24          SEN. FRASER:  -- inserted it into the
25  bill.  It'd be your interpretation --
0258
1           SEN. SHAPIRO:  I got you.
2           SEN. FRASER:  -- to -- to make sure --
3           SEN. SHAPIRO:  Identify whether it's at
4   hand?
5           SEN. FRASER:  -- that they can identify
6   themselves --
7           SEN. SHAPIRO:  Okay.
8           SEN. FRASER:  -- but it's not intended
9   that they would -- I believe they're --
10          SEN. SHAPIRO:  Separate.
11          SEN. FRASER:  Yes.
12          SEN. SHAPIRO:  It's not intended to be
13  separate.  It's intended --
14          SEN. FRASER:  No.
15          SEN. SHAPIRO:  -- to be the same document.
16          SEN. FRASER:  Yes, as long as they're --
17          SEN. SHAPIRO:  Okay.
18          SEN. FRASER:  -- you know, 70 on

TX_00001013
JA_001012
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001013

USA_00015894

19  January 1, 2012.
20          SEN. SHAPIRO:  And the date of birth is on
21  our current voter registration card?
22          SEN. FRASER:  You need to ask that of the
23  Secretary of State.
24          SEN. SHAPIRO:  Okay.  And my recollection
25  is it is.  Thank you.
0259
1           SEN. FRASER:  Okay.
2           CHAIRMAN DUNCAN:  Chair recognizes Senator
3  Huffman.
4           SEN. HUFFMAN:  Thank you, Mr. Chairman.
5           Senator Fraser, will you yield for a
6  couple of questions?
7           SEN. FRASER:  I would love to yield.
8           SEN. HUFFMAN:  Thank you, sir.  I'd like
9  to commend you, too, for a long day of answering a lot
10  of tough questions.
11          SEN. FRASER:  Thank you.
12          SEN. HUFFMAN:  But I think it's important,
13  as we kind of wrap this part of the procedures up today,
14  that -- that we circle back to -- to the idea and the
15  concept that -- that we got here today.  But there is a
16  line of Supreme Court cases that have brought us here.
17  Would you agree with that?
18          SEN. FRASER:  Yes.
19          SEN. HUFFMAN:  And certainly, the Crawford
20  v. Marion case gives us guidance on how to do what we're
21  doing here today properly.  Would you agree --
22          SEN. FRASER:  I think that's the one --
23          SEN. HUFFMAN:  -- with that?
24          SEN. FRASER:  -- was referenced, I think,
25  in the Indiana case, I believe.
0260
1           SEN. HUFFMAN:  Okay.
2           SEN. FRASER:  And that's yes.
3           SEN. HUFFMAN:  And did you, as you sat
4  down with your staff and so forth in, you know,
5  pre-session, in the interim, and you started thinking
6  about this bill and so forth, did you and your staff
7  take into consideration Crawford v. Marion and try to
8  follow the law and the rules the Supreme Court has laid
9  out for us?
10          SEN. FRASER:  Yes, without a doubt.
11  That's already been approved by the Supreme Court, and
12  obviously, we wanted to make sure we stayed within those
13  parameters.
14          SEN. HUFFMAN:  All right.  Now, you know,
15  the Supreme Court, I think -- we know that the Supreme
16  Court has told us that there is a balancing test, and we
17  understand that the right to vote is sacred.  And so we
18  know that the law tells us that if there is a burden
19  placed upon a voter, that they're going to look very
20  carefully at that; and it's going to have weight, but

21 it's going to be balanced against legitimate state
22 interest. And so I think what we need to explore, just
23 briefly, is that, in fact, we -- we have legitimate
24 state interest. The state of Texas has an interest to
25 make sure that our elections are done with -- well, as
0261
1 perfect as we can get them but with integrity, right,
2 and with voter confidence.
3          So as you prepared the bill and as you
4 look at the bill -- and the Supreme Court has told us
5 that there are legitimate interests, and they define
6 those for us. So as you prepared the bill and you look
7 at Senate Bill 14 today, do you think that it addresses
8 the relevant and legitimate concerns of deterring and
9 detecting voter fraud? And I know you've been asked
10 this question a lot.
11          SEN. FRASER: Absolutely.
12          SEN. HUFFMAN: Right. Do you think that
13 it -- that it's important in that the bill will help to
14 improve and modernize the election procedures of Texas?
15          SEN. FRASER: Yes.
16          SEN. HUFFMAN: Do you think that there's a
17 larger scheme nationwide through the Help America Vote
18 Act and the National Voter Registration -- Registration
19 Act to do just that, to make elections come up to modern
20 times?
21          SEN. FRASER: Absolutely.
22          SEN. HUFFMAN: Do you think that Senate
23 Bill 14 will help to prevent voter fraud and actually
24 help to ensure that only the votes of eligible Texas
25 voters are counted in these crucial elections that
0262
1 happen in the state of Texas?
2          SEN. FRASER: That is our intent, and we
3 believe the bill does that.
4          SEN. HUFFMAN: And do you believe that
5 once we have established these safeguards, that the
6 voters will feel more confident about their vote being
7 counted and only the votes of registered Texans who can
8 vote to be counted?
9          SEN. FRASER: Yes, that is our belief.
10          SEN. HUFFMAN: Do you think that once
11 that's established, that it will actually encourage the
12 democratic process and that it will encourage more
13 voters to go to the polls?
14          SEN. FRASER: The thing we've seen in
15 other states that have implemented photo ID, the -- the
16 voter turnout actually increased. And so, yes, we
17 believe the confidence in the voters will increase, and
18 we believe it will actually increase the voting
19 percentages.
20          SEN. HUFFMAN: Now, we've heard comments
21 today from many senators, Senator Whitmire, Senator
22 Davis, Senator Uresti, about hypothetical burdens that

TX_00001015
JA_001014
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001015

USA_00015896

23  may be placed on some hypothetical voter.  But taking
24  that into account and looking at and trying to balance
25  it, do you feel like we have a bill here that -- that
0263
1  presents and moves forward our legitimate interest in
2  Texas as it regards voting?
3           SEN. FRASER:  Without a doubt.
4           SEN. HUFFMAN:  All right.
5           SEN. FRASER:  We believe it does.
6           SEN. HUFFMAN:  Thank you very much,
7  Senator Fraser.
8           SEN. FRASER:  Thank you, Senator.
9           SEN. HUFFMAN:  Thank you.
10          CHAIRMAN DUNCAN:  Chair recognizes Senator
11  Wentworth.
12          SEN. WENTWORTH:  Thank you, Mr. Chairman.
13          Will the gentleman yield?
14          SEN. FRASER:  I will yield.
15          SEN. WENTWORTH:  Senator, I want to
16  compliment you on your long hours of being on your feet
17  in responding to these questions.  I just wanted to
18  touch on a couple of things.
19          One is we had -- we had some testimony
20  here two years ago on a very similar bill, and I just
21  wanted -- since it's been raised earlier today, the
22  issue about whether or not maybe passage of this bill
23  would reduce voter participation.  There are only a
24  couple of other states, Indiana and Georgia, where these
25  sorts of bills have been passed.  One of the witnesses
0264
1  in March of '09 said to us:  Not only does voter ID help
2  prevent fraudulent voting, but where it has been
3  implemented, it has not reduced turnout.  There is no
4  evidence that voter ID decreases the turnout of voters
5  or has a disparate impact on minority voters, the poor,
6  or the elderly.  The overwhelming majority of Americans
7  have photo ID or can easily obtain one.
8           Now, this is in the record from the 2009
9  hearing, which we've already adopted, but I just wanted
10  to recall some of the testimony that we had.
11          Another quote was:  Recent election
12  results in Georgia and Indiana also confirmed that the
13  suppositions that voter ID will hurt minority turnout
14  are incorrect.
15          In addition -- and I'm not sure whether
16  this was part of the record in '09, but there is a study
17  of Indiana's photo ID law that was conducted by a
18  University of Missouri professor.  He found that
19  requiring identification doesn't have much impact on
20  voter turnout rates.  His name is Jeffery Milyo.  He's
21  professor of economics and public affairs at the
22  University of Missouri, a part of the Institute of
23  Public Policy of the Harry S. Truman School of Public
24  Affairs.

TX_00001016
JA_001015
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001016

USA_00015897

25      And his conclusion is -- if I can find it
0265
1  quickly -- it's a many-page study, and his conclusion is
2  that the findings that emerge from his analysis are that
3  photo ID is associated with an overall county level
4  turnout increase of almost 2 percentage points -- and
5  this is just in Indiana.  This isn't Georgia as well --
6  an insignificant increase in relative turnout for
7  counties with a greater percentage of minority and poor
8  population; no consistent or significant impact on
9  relative turnout in counties with a greater percentage
10  of less educated or elderly voters; and finally, a
11  significant relative increase in turnout for counties
12  with a higher percentage of Democrat voters.
13      I was just wondering if you remembered
14  those things that were testified to two years ago or
15  whether you were familiar with this university
16  professor's study.
17      SEN. FRASER:  Thank you for bringing that
18  forward.  It -- yes, I -- now, as you mention it, I do
19  remember it.  The other thing that comes to mind that
20  was through the testimony two years ago is in the '09 --
21  I'm sorry -- the '08 president election for '09, that
22  even though the president was from Illinois, the
23  adjoining state, Indiana, had doubled the increase of
24  voting next door in the state -- in Indiana where they
25  had put in photo ID.  Illinois did not have it, but the
0266
1  increase was double the amount of increase next door.
2  So it certainly didn't show that they were hurt by the
3  implementation of the --
4      SEN. WENTWORTH:  Where Indiana has a photo
5  ID law --
6      SEN. FRASER:  Illinois does not.
7      SEN. WENTWORTH:  Thank you very much,
8  Senator.
9      SEN. FRASER:  Thank you, Senator.
10      CHAIRMAN DUNCAN:  Okay.  Members, we
11  have -- that completes all of the Members who want to
12  ask questions of the author.  You can sit down for a
13  second, Senator, if you want to.  Take a rest.
14      We have a little bit of housecleaning.
15  There's a few witnesses that -- or a few exhibits that
16  may want to go in that we have now made copies of.  I
17  think, Senator Van de Putte, you had -- Senator
18  Zaffirini had Exhibit 6 which was a map of the DPS, and
19  we've now had that copied and available to distribute.
20  Do you want to go ahead and offer it into the record?
21      SEN. VAN de PUTTE:  Yes, I will.
22      CHAIRMAN DUNCAN:  Okay.  It'll be
23  received.
24      (Exhibit No. 6 marked and admitted)
25      CHAIRMAN DUNCAN:  And then I believe we
0267

TX_00001017
JA_001016
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001017

USA_00015898

1 had -- Senator Davis had a chart that -- excuse me.
2      SEN. VAN de PUTTE:  Mr. Chairman, do -- I
3 move to add to Exhibit 6 the counties with Department of
4 Public Safety Driver's License Office Closures prepared
5 by legislative counsel.
6      CHAIRMAN DUNCAN:  Okay.  Thank you.  That
7 will be received in the record.
8      Senator Davis, you had an exhibit that you
9 wanted to offer.
10      SEN. DAVIS:  Yes, Mr. Chair.  I'd like to
11 add that as -- I guess it would be Exhibit No. 7 to the
12 record.
13      CHAIRMAN DUNCAN:  And I think we have
14 copies to distribute to the Members?  Would you describe
15 it, please?
16      SEN. DAVIS:  Yes, I'm sorry.  It's the
17 chart that I displayed and talked about earlier in my
18 questions of Senator Fraser.  It's exact -- an exact
19 replica of the chart that was displayed on the Senate
20 floor.
21      CHAIRMAN DUNCAN:  It has a -- it's a
22 graphic that has a -- at the top, a title that says,
23 "DL/State ID."  Okay.  Exhibit 7 will be received in the
24 record.
25      SEN. DAVIS:  Thank you.
0268
1      (Exhibit No. 7 marked and admitted)
2      CHAIRMAN DUNCAN:  Are there any other
3 exhibits that --
4      SEN. FRASER:  Mr. President?
5      CHAIRMAN DUNCAN:  -- were discussed that
6 we'd like to include?  Senator Fraser?
7      SEN. FRASER:  And I had one that I
8 mentioned that I was going to enter in that I have not
9 yet.  It is the Lighthouse Opinion Poll.  This is the
10 most current poll that is taken and has a very good
11 breakout of not only across the state, the regions, but
12 also has a breakout, Republican, Democrat, and it breaks
13 out for the African American, Hispanic, and --
14      CHAIRMAN DUNCAN:  Do you have copies of
15 that to distribute?
16      SEN. FRASER:  I have one copy.
17      CHAIRMAN DUNCAN:  Okay.  Well, Exhibit 8
18 will be received, but if you'll go ahead and get copies
19 so that we can distribute those at this time.
20      (Exhibit No. 8 marked and admitted)
21      SEN. GALLEGOS:  Mr. President?
22      CHAIRMAN DUNCAN:  Senator Gallegos, for
23 what purpose?
24      SEN. GALLEGOS:  I have also some diagrams,
25 but I wasn't going to present them until the time of my
0269
1 amendments.  I mean, do they need to be entered now or
2 at the time of the amendment?

TX_00001018
JA_001017
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001018

USA_00015899

3       CHAIRMAN DUNCAN:  I don't see any problem
4   with entering them at the time when it's relevant to
5   what you're trying to do.
6       SEN. GALLEGOS:  Yeah.
7       CHAIRMAN DUNCAN:  You can put them in the
8   record at that time --
9       SEN. GALLEGOS:  Okay.
10      CHAIRMAN DUNCAN:  -- when we're --
11      SEN. GALLEGOS:  Then I'll wait till --
12  till the time of the amendment.  Thank you,
13  Mr. President.
14      CHAIRMAN DUNCAN:  All right.  Members, the
15  next phase is the invited testimony.
16      And Senator Van de Putte and Senator
17  Fraser, if you could come up to the -- make sure we've
18  got everybody in the right order.
19      And while they're coming up, I want to
20  announce that it's my intention to -- we have about
21  17 -- last check, 17 registered witnesses for public
22  testimony, and I would like to accommodate those
23  witnesses, if we could.  So remember that when you're
24  questioning and -- that we have some folks that would
25  like to testify here later on.
0270
1       All right.  Members, let's go ahead and
2   move into the invited testimony.
3       The first witness will be Jerry Bonnett,
4   general counsel, Indiana Secretary of State.
5   Mr. Bonnett?  Mr. Bonnett, you'll have ten minutes the
6   timer is right before you.  You'll get a yellow light at
7   30 seconds, I think.  And then we'll strictly hold you
8   to the time, and then open it to questions at that time.
9   You'll not be interrupted during your testimony.
10          INVITED TESTIMONY
11       TESTIMONY BY JERRY BONNETT
12      MR. BONNETT:  All right.  Thank you,
13  Chairman Duncan.  I want to thank Senator Fraser and
14  supporters of Senate Bill 14 for inviting me to be here
15  today.
16      CHAIRMAN DUNCAN:  Would you state your
17  name and --
18      MR. BONNETT:  Yes.  My name is Jerry
19  Bonnett.  I've served as general counsel for the Indiana
20  Secretary of State Todd Rokita from 2005 to the end of
21  2010 when he completed his second term in office.  I am
22  currently serving as general counsel to Indiana's next
23  Secretary of State and chief election officer, the
24  Honorable Charles White.
25      Since 2005, my duties as general counsel
0271
1   have involved assisting with the implementation of
2   Indiana's photo ID law, including working with multiple
3   players in Indiana's election process, which is included
4   the Bureau of Motor Vehicles, county election boards,

TX_00001019
JA_001018
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001019

USA_00015900

5   poll workers, our Help America Vote Act, and support
6   agencies in coming up with the procedures and rules to
7   administer our photo ID law.
8           I've also been responsible for statewide
9   monitoring of election day activity in elections in our
10  statewide and primary -- primary general elections in
11  2006, 2007, 2008, and 2010.  I've reviewed every
12  complaint from the -- regarding voting submitted to the
13  Secretary of State, the Indiana Election Division, the
14  Indiana Election Commission, the Department of Justice,
15  our Help America Vote Act, and other county election
16  boards.
17          I've also assisted the Indiana Attorney
18  General and the Indiana Solicitor General with the
19  discovery trials appeals and ultimately Supreme Court
20  review in the state courts and in the U.S. Supreme Court
21  of Indiana's photo ID law.
22          Prior to the first statewide election in
23  Indiana under the photo ID law, there was no shortage of
24  organizations claiming that we smell a rat of some sort
25  and that the law has some illegal discriminatory effect
0272
1   or political subtext.  My job has been to look for
2   exactly any application of the law that was illegal or
3   overburdensome.
4           Despite the intense scrutiny of the law
5   that has been locally -- local, state, national, and
6   even international, in my impression, Indiana has
7   been -- and our courts who have been very open to giving
8   a fair and complete hearing to anyone feeling agreed or
9   disenfranchised by our voter ID laws.  In the five years
10  and eight statewide primary general elections I've been
11  involved with, there's been scant evidence of
12  disenfranchisement or discrimination in Indiana.  If the
13  naysayers and conspiracy theorists and armchair social
14  scientists were correct in their prognostications,
15  Indiana would have experienced hundreds of thousands of
16  disenfranchised voters after the laws passed in 2005,
17  but hardly any group or individual or circumstance has
18  been found that has genuinely disenfranchised or
19  inconvenienced a voter beyond what the Supreme Court has
20  held to be the reasonable, orderly regulation of
21  elections.
22          Did Indiana fix something that wasn't
23  broke?  Was it a law in search of a crime?  Admittedly,
24  there's been little evidence of in-person voter fraud in
25  Indiana, but that's been of little consolation to
0273
1   citizens who have come to Secretary of State's office
2   with concerns about the confidence in our elections.
3           What Indiana has experienced were
4   manipulation of voter registrations with thousands of
5   voter registrations submitted just prior to the closing
6   of registration which have confounded the orderly

TX_00001020
JA_001019
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001020

USA_00015901

7  registration of voters.  Indiana has experienced issues
8  with voter list maintenance where -- where partisan
9  activists have refused to update voter registration
10 lists, insisting the U.S. Department of Justice to
11 intervene and require voter list maintenance in Indiana.
12 Indiana has seen inconsistent agency-to-agency
13 cooperation in the sharing of information.  There have
14 been times when the Social Security office was unable to
15 provide verifications of voter registrations, times when
16 other state agencies were not able to exchange
17 information that would assist in verifying voter
18 registrations.
19         There have been reports of people in urban
20 areas being bussed around from poll location to poll
21 location.  There is evidence, after the fact, of dead
22 voters having registered or of dead voters having voted.
23 There was also a report of a well-intentioned high
24 school civics teacher who was intent on having every 17
25 year old that came into her class register to vote and
0274
1  every 18 year old vote even though there were some
2  students of hers who are not students -- who are not
3  U.S. citizens, but they were shamed into going through
4  the registration process and that resulted in illegal --
5  an illegal vote being cast and also confounded those
6  students eventual efforts to become naturalized U.S.
7  citizens.
8         In my position, I am in a position to say
9  that the law has not been applied -- has been applied in
10 the strict and unbending manner that the dissenters have
11 suggested.
12         After the 2005 photo ID law was enacted
13 but before the first election was held, the Secretary of
14 State and the election division and interested groups
15 developed procedures to deal with the issue of the
16 conformity of names on an ID to voter registration
17 lists.  Rules were developed that would allow for a
18 voter named Mary Ellen Smith to -- who might appear on
19 the voter registration in as many as ten different ways
20 to -- to proceed to vote.
21         Also, Indiana -- rules were adopted by the
22 Election Division in Indiana so that if a voter had
23 married between the time of the voter registration, at
24 the polls on election day, they could update their voter
25 registration by signing the poll book and proceed to
0275
1  vote.  In Indiana, voters can conform their voter
2  registration up through election day to the IDs that
3  they have.
4         Other state agencies have reached out to
5  anyone identified who has been experiencing problems of
6  obtaining photo IDs.  In Indiana, it's not a money
7  issue.  And an ID is reviewed by social service agencies
8  in Indiana as key to other social services and other

TX_00001021
JA_001020

TX_00001021

USA_00015902

9  benefits of citizenship, and there's been an interest in
10 working with individuals who had difficulty obtaining
11 photo ID. Also, in the Indiana Election Day Handbook,
12 in bold print, it says, on -- in several locations, that
13 lack of ID or problems with an ID is not a cause for
14 someone -- for a voter to be turned away.
15        After five busy years of monitoring
16 primary general elections in Indiana, working with
17 deputies, reviewing complaints, I can say that Indiana's
18 photo ID law is not only constitutional as it is written
19 but as it has been applied in routine use -- is applied
20 and become routinely used in good faith and in -- and in
21 an accommodating matter in the state.
22        Now, keeping to its principal and intent,
23 Indiana's law, subject to all matter of partisan,
24 nonpartisan, state, national scrutiny, has not been
25 applied with the rigid inflexibility and consequences
0276
1  predicted by detractors. After exhaustive review in the
2  state and federal courts involving the application of
3  the law as applied -- instance of the law and in -- and
4  in Indiana's informed public opinion, Indiana photo ID
5  has earned broad acceptance, even from skeptics, as
6  become -- as having become integral component of voter
7  confidence and law that honors the privilege and the
8  dignity of American's right to free and equal
9  participation in elections.
10        So I honor you for the difficult work
11 you're doing here today. I assure you that the work
12 won't be done if and when you pass Senate Bill 14. I
13 can certainly tell you that the sun came up in Indiana
14 after Indiana's photo ID was passed. It continued to
15 come up and continues to come up after each election
16 that we have. So I'm ready to address your questions,
17 please.
18        CHAIRMAN DUNCAN: Thank you, Mr. Bonnett.
19 So we'll have our first questions.
20 Senator Van de Putte, you're recognized.
21        QUESTIONS FROM SENATE FLOOR
22        SEN. VAN de PUTTE: Thank you very much,
23 Mr. Chairman.
24        And thank you very much, Mr. Bonnett, for
25 traveling from Indiana. I know on such short notice.
0277
1  We appreciate you being here to help us with your expert
2  testimony as we deliberate this very, very important
3  issue.
4        I had a few questions that -- that I
5  wanted to ask because here in Texas, we looked at the
6  Indiana law, and we're looking toward -- this is -- as
7  our bill author has said, it's kind of a Texas bill,
8  which we think is more restrictive than yours. And we
9  have heard from testimony that there is increased
10 turnout, and you haven't found any instances in where

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001022

USA_00015903

11  the burden of the new Indiana law was placed upon
12  anybody.  And -- and I think in your testimony and in --
13  said that it is working and even in your Supreme Court
14  case, no party or amicus cited -- well, of course, there
15  were no cases of impersonation at the polls in Indiana.
16          So I have some confusion because in the
17  bill that you passed, we had reports in Marion County in
18  2007 that 32 vote -- voters cast ballots that could not
19  be counted because of the voter ID law, and I want to
20  ask you about them because just a couple of them really
21  bring to mind some difficulties, and yet you cited that
22  there were no problems.
23          In South Bend, Indiana, ten retired nuns
24  were barred from voting in the 2008 Indiana democratic
25  primary.  Some of them were in their 80s and 90s.  They
0278
1  no longer had driver's license.  They lived at the
2  convent, and the convent actually had the polling place
3  in their convent.  The irony was that I believe in that
4  case, the election judges were actually other nuns who
5  lived with these nuns, but they were barred from casting
6  a ballot even though they had previously voted in at
7  least ten elections in Indiana but that these nuns were
8  not able to because they did not have an ID, even though
9  the election judges live with them.  And so can you
10  comment?  This was in the newspapers, but it was also in
11  Catholic Digest magazine and so wanted to know because
12  we heard --
13          MR. BONNETT:  I can't --
14          SEN. VAN de PUTTE:  -- that there were no
15  instances, yet we had these reports.  And so could you
16  tell us?  I mean, what happened to these nuns?
17          MR. BONNETT:  I can't speak to the -- the
18  Marion County voters that you referenced to, although I
19  think that was covered in the Indiana League of Women
20  Voters v. Rokita case that was heard by the Indiana
21  Supreme Court.
22          In the case of the -- the -- the nuns, in
23  Northern Indiana, the -- it's my understanding and
24  that -- that situation was also discussed in -- in the
25  Crawford case -- the -- the nuns did have passports.
0279
1  They did have a form of ID that was acceptable, but they
2  refused to present that.  They were eligible for other
3  exceptions under the law, absentee voting exception, and
4  it was really a media event because the media had been
5  brought to the scene before.  And they also refused to
6  go provisionally.  I did not -- I believe they were
7  brought in a van to a polling location that was not --
8  not, I understand, any time that they were voting at the
9  place that they lived.
10          SEN. VAN de PUTTE:  So --
11          MR. BONNETT:  That incident was -- seemed
12  to be discredited as a -- as a legitimate case of

TX_00001023
JA_001022
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001023
USA_00015904

13    disenfranchisement.
14           SEN. VAN de PUTTE: So you're saying these
15    nuns organized in a -- in a fraudulent matter, that
16    these nuns all got together? But even though they're --
17    from the report what was reported, they lived at the
18    convent, and they were all in their 80s and 90s. So I
19    don't know. You know, maybe they had passports, maybe
20    they didn't. But you're saying that this was
21    orchestrated by these devious nuns to actually prove up
22    Indiana law, and really, they intended to mess you up
23    purposefully or --
24           MR. BONNETT: Yes, Your Honor.
25           SEN. VAN de PUTTE: Oh, thank you.
0280
1           (Laughter)
2           SEN. VAN de PUTTE: Well, let me ask you
3    about another case. One of them was Lauren McCallick
4    who was an 18-year-old freshman at Saint Mary's College
5    in South Bend and who was not able to cast her ballot
6    that was due because of the law, and so that was one of
7    the cases that was there. And can you tell me about
8    her? Was she devious, as well, or was it orchestrated?
9           I mean, from the reports and from what was
10    happened, she was crying and she -- it was the first
11    time that she was going to be able to vote, and she
12    tried to -- she did do a provisional ballot. But since
13    she couldn't get the documentation that she needed
14    within the time requirement, she didn't have a chance to
15    vote because she was in class and she couldn't go back
16    to her -- so can you tell me what happened to Ms. Lauren
17    McCallick in this case?
18           MR. BONNETT: Unfortunately, I'm not
19    familiar with -- with that case.
20           SEN. VAN de PUTTE: Oh.
21           MR. BONNETT: So --
22           SEN. VAN de PUTTE: Well, then what
23    happened in -- again, in Marion County, when we had some
24    senior citizens that weren't able to? Now, they weren't
25    devious nuns. These were seniors who were living in
0281
1    a -- some sort of a -- it wasn't a senior assisted, but
2    it was some sort of a temporary, like rehab, where
3    people go after strokes or after a motor vehicle
4    accident, and that they weren't allowed. I mean, I can
5    understand your story about the nuns because, you know,
6    I'm a Catholic and sometimes they get really organized,
7    and they make their point. But what --
8           MR. BONNETT: I am too.
9           SEN. VAN de PUTTE: What -- what about the
10    people who were living in the -- again, in Marion
11    County, in a -- not their full residence --
12           MR. BONNETT: Uh-huh.
13           SEN. VAN de PUTTE: -- but for a certain
14    period of time because they had a disability, they had

TX_00001024
JA_001023

TX_00001024

USA_00015905

15  had a stroke, and they were living in this.  What
16  happened to those folks?
17          MR. BONNETT:  Well, and I don't know the
18  specifics without more information, but every -- every
19  reported case has been investigated and reviewed.  The
20  state election division, the state social service
21  agencies, and Bureau of Motor Vehicles Division have
22  been quite willing to assist voters who have -- have had
23  difficulties obtaining an ID.
24          The largest group of voters in Indiana had
25  some form of ID, a -- a -- of what was left over, the
0282
1  exceptions covered many of those voters, and the --
2  ultimately, you know, anyone registered to vote who
3  didn't have the ID, that group was small and has not
4  been identifiable in such a way that the state has been
5  able to even identify them, and certainly efforts have
6  been made in litigation to try and identify a group.
7  But I -- I believe the state would develop
8  administrative procedures to assist anyone having
9  trouble with an ID faster than the litigation would
10  proceed through the courts to try and validate the law.
11          SEN. VAN de PUTTE:  Well, I appreciate
12  your answer, but you can understand my concern.
13  Particularly in the district that I represent, we have,
14  that I know of, six convents, the Sisters of Divine
15  Providence with their mother house with over 120 retired
16  nuns living there from orders all over; the Society of
17  Mary, which they're Marianist priests, and after they
18  finish at the University of Dayton and other Marianist
19  schools, they come to San Antonio and live right there
20  at Saint Mary's University.  We have over 56 nuns from
21  Incarnate Word and that community, and they're, you
22  know, in their 80s, 90s.  In fact, we even have a couple
23  that are over a hundred, and while on and on, you see my
24  problem.
25          And when I read things about Indiana and
0283
1  having the religious who don't live outside in homes but
2  who all have the same residences and who come back to
3  that convent or retirement home run by the nuns or run
4  by the priests, it's -- it's very difficult, and so I
5  have some concerns because I have so many voters that
6  are retired religious, and that's why I wanted to clear
7  that up.
8          But let me ask you about something else.
9          MR. BONNETT:  If I may, before you change
10  the subject, I will note that Indiana, for example, has
11  a Mennonite population that objects to being
12  photographed, and our law provided an exception for
13  individuals for religious reasons who objected to being
14  photographed; and there is an exception for disabled
15  individuals who live within a state licensed
16  convalescent or care center.  So Indiana has developed

TX_00001025
JA_001024
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001025

USA_00015906

17 exceptions for identifiable groups.
18      SEN. VAN de PUTTE: Oh, well, I think
19 that's wonderful that Indiana did that, but you may not
20 know that that's in our Texas bill.
21      MR. BONNETT: Uh-huh.
22      SEN. VAN de PUTTE: And so why this is
23 more restrictive than Indiana is we don't have the
24 protections that you do in Indiana under this bill, for
25 those who live in religious communities, for those who
0284
1 are disabled.
2      And that's the other thing I wanted to
3 talk to you about because I understand that, you know,
4 this is about the other thing that you said about
5 increased turnout. But I really wanted to talk to you
6 about -- because, I mean, let's face it, isn't the
7 turnout from 2008 November election because we had a
8 highly contested primary season, but it was because we
9 had this wonderful, wonderful, very, very active
10 electorate in electing between now President Obama and
11 John McCain. I mean, it was fabulous. I mean, so you
12 really can't compare turnouts to turnouts because the
13 turnout was wonderful in November, and we're all very
14 excited about that. So I wonder a little bit because, I
15 mean, everybody's turnout went up.
16      MR. BONNETT: May I respond to that?
17      SEN. VAN de PUTTE: Absolutely, please.
18      MR. BONNETT: If you compare the turnout
19 in the 2006 election, which was a nonpresidential
20 off-election year but -- for statewide primary and
21 general elections to the 2010 election last year, there
22 was also an increase between 2006 and 2010 in -- in
23 voter turnout in Indiana, which would be more comparing
24 the apples -- apples to oranges.
25      And you're right, in 2008, Indiana voted
0285
1 it's electoral votes for a Democratic presidential
2 candidate for the first time in over 30 years. Also, in
3 the 2006 state Congressional races after the photo ID
4 was enacted, three of Indiana's nine Congressional seats
5 switched from Democrat -- or from Republican to
6 Democrat, which tended to dispute the theory of the
7 political subtext of the law.
8      SEN. VAN de PUTTE: Thank you. There --
9 there are a couple of other questions that I wanted
10 to -- to --
11      MR. BONNETT: Uh-huh.
12      SEN. VAN de PUTTE: -- check on Indiana
13 law. Can you tell me -- your law has a free voter ID
14 card issued by the state or the county. Are there
15 restrictions or affidavits or a means test for access to
16 a free voter identification card from Indiana?
17      MR. BONNETT: I don't want to misstate --
18 misspeak that. It's on the Bureau of Motor Vehicle

TX_00001026
JA_001025
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001026

USA_00015907

19  Regulations.  I -- I believe that the person applied for
20  that ID needs to sign an affidavit that they don't
21  have -- have another ID with the state.  But beyond
22  that, I'm not -- I can't say about the issue of the
23  means --
24            SEN. VAN de PUTTE:  Well --
25            MR. BONNETT:  -- test.
0286
1             SEN. VAN de PUTTE:  Well, I looked at it,
2   and I didn't think so.  It just says that they have to
3   state that they don't have a driver's license and they
4   don't have another.
5             MR. BONNETT:  Uh-huh.
6             SEN. VAN de PUTTE:  But there is no
7   affidavit of indigency or -- or anything required, at
8   least from what I looked at your law.  But I'm not sure.
9   That's why I wanted to ask.
10            MR. BONNETT:  That's my understanding.
11  Now, a related issue is when a provisional ballot is
12  verified, if a voter who has voted provisionally within
13  the ten days after the election signs an affidavit that
14  they don't have an ID and cannot get one without expense
15  and possibly can't afford one -- I'm not sure of the
16  exact language on the affidavit -- then they're entitled
17  to have their vote counted.
18            SEN. VAN de PUTTE:  Well, one of the
19  things that I wanted to look at, and I have the Indiana
20  law and I -- because ours is a little bit more
21  restrictive.  But under your section of the -- of the
22  Indiana bill, it has something in here because -- that
23  has me a little troubled because we don't, and I'm going
24  to read it.
25            But the voter prescribed by -- and it has
0287
1   Indiana code that has not complied with -- and I think
2   that Indiana code 3-7-33-4.5 -- on election day must
3   present one of the following documents to the -- and it
4   says, "A current and valid photo ID," or it says,
5   "current utility bill, bank statement, government check,
6   paycheck, government document that shows the name and
7   address of the voter."  And yet we've been told that
8   Indiana only has a photo.
9             So what -- what is this section referring
10  to?  Is it a provisional ballot or is it a first-time
11  voter or -- or does Indiana allow for the photo ID, but
12  if they don't have the photo ID, can they use other
13  forms?
14            MR. BONNETT:  I'm not aware that Indiana
15  accepts any alternative than a photo ID.  That might --
16  I'd have to look at the law carefully on that.  Might
17  refer to the verification of address or the residency
18  with respect to voters who have moved, but I do not
19  believe that Indiana has any requirement other than --
20  than that of a -- of a government-issued photo ID with

TX_00001027
JA_001026
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001027

USA_00015908

21  an expiration date for in-person voting.
22          SEN. VAN de PUTTE:  Well, I think that
23  is -- it was very hard to follow, but I think it's under
24  a provisional ballot that has a state's licensed care
25  facility or something.  But there is at least that
0288
1   protection for those who are at a temporary facility;
2   that even if they don't have a photo ID, the exception
3   is not that they're just exempted but I think that they
4   can utilize other forms of ID, which our Texas bill
5   doesn't have.
6          To your knowledge, was -- since this was
7   from the Indiana Legislature, do you remember any
8   discussions on why they -- they put that in?  Was this
9   put in at the same time as the original voter ID
10  legislation, or was this only done after the mess up
11  with, you know, the nuns and the -- the other folks who
12  were at this temporary facility?
13          MR. BONNETT:  I didn't live in Indiana
14  during the time that this legislation was -- was
15  discussed and deliberated, but it's my understanding
16  that the -- the exceptions to the provisions for
17  individuals who live in state-licensed assisted living
18  facilities has always been part of the -- of the
19  scheme -- or the bill, and I think the -- the utility
20  bills and the other documents you refer to might go to
21  the issue of establishing their residency in the
22  state-licensed facility, which is then an exception if
23  the polling place is located in that facility.
24          SEN. VAN de PUTTE:  Thank you.  I really
25  appreciate your candid answer; and, again, we thank you
0289
1   very much for your travel here to help us on this
2   important deliberation.  Thank you.
3          MR. BONNETT:  Thank you.
4          SEN. VAN de PUTTE:  I don't have any other
5   questions, Mr. Chairman.
6          CHAIRMAN DUNCAN:  Chair recognizes Senator
7   Davis.
8          SEN. DAVIS:  Thank you, Mr. Chair.
9          Mr. Secretary, thank you so much for
10  traveling to be with us today and to help inform us
11  about the work that you've done in Indiana on this
12  issue.  I just want to make sure that I clearly
13  understand because today there's been a great deal of
14  discussion about your bill, as you can imagine, as the
15  reason why the bill that's being proposed in the Texas
16  Senate today would be able to withstand constitutional
17  scrutiny.  So I want to make sure that we have a clear
18  record in terms of how the bill that Indiana has
19  introduced, or the law that you've introduced, mirrors
20  or does not mirror what we are -- are discussing on the
21  Senate floor today.
22          So I think I heard you say that you do

TX_00001028
JA_001027
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

23 allow women who have been married or divorced to come in
24 to vote and to provide some affidavit that they -- their
25 name has changed and is different than is on the ID that
0290
1 they have because of marriage or divorce. Is that
2 correct?
3        MR. BONNETT: That's correct. That's by
4 administrative directive. It's not part of the statute.
5 And I'll say that when the -- when the Indiana courts
6 and the -- the federal courts reviewed the law, it was
7 reviewed in the context not just of the statutory
8 language but other administrative procedures that were
9 developed after the law was passed, after the framework
10 of the law was passed, for the -- the view of -- as
11 applied, how the law was applied.
12        SEN. DAVIS: Absolutely. And I think
13 that's terribly important, and I'd like to invite you
14 to -- to please inform us as much as possible both
15 statutorily what was reviewed in terms of what you've
16 done to try to preserve the integrity of someone's right
17 to vote and administratively what's been done.
18        So you said on that particular one, that
19 was a rule that was instituted administratively, but it
20 was part of what was reviewed by the court system in
21 terms of the implementation of that law?
22        MR. BONNETT: Yes. That -- that directive
23 clarified procedures for poll workers in -- in viewing
24 IDs for conforming names.
25        SEN. DAVIS: And then I believe you said
0291
1 that in the -- the language that's presented to a voter
2 in terms of their right to vote in Indiana, in bold
3 language, you have clarified for voters there that not
4 having a photo ID will not in and of itself be
5 sufficient cause for them not to be able to vote. Is
6 that correct?
7        MR. BONNETT: Yes. I'll -- I'll just look
8 up the exact -- the exact bold language, one example's
9 are referred to on Page 10 of the Indiana Election Day
10 Handbook. This is the 2008 copy. In bold, "No voter
11 should be turned away from the polls for failing to
12 provide photo ID." That's -- that's instruction to all
13 poll workers.
14        SEN. DAVIS: And does that wording go to
15 instances where, for example, as you -- as you talked
16 about earlier, if a person comes to the poll and they do
17 not have a photo ID, they can vote a provisional
18 balance -- or ballot -- excuse me -- on the condition
19 that they attest that they do not have a photo ID
20 because there would be a cost to receiving that ID
21 either through having to get the underlying
22 documentation that would qualify them to receive the ID
23 or some other cost that would be associated with
24 receiving the ID?

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

25

0292

1 MR. BONNETT: Yes, there are several
2 alternatives to means to -- to verifying a provisional
3 ID to allow --
4     SEN. DAVIS: And can you discuss what
5 those several alternatives are, please?
6     MR. BONNETT: Well, generally, providing
7 the -- the ID or providing the -- the -- the voter
8 registration correction or an affidavit that there is a
9 religious exception to being photographed, that an ID
10 cannot be obtained without -- without cost. There may
11 be another. That's provided for in the Voter Bill of
12 Rights which is posted at each poll site, and then
13 voters who vote provisionally are given a paper receipt,
14 so to speak, with the instructions on how to verify
15 their provisional ballot and have it cast, how and
16 where.
17     SEN. DAVIS: Thank you. That's very
18 helpful.
19     And I believe you also have a provision in
20 Indiana, do you not, that allows for the use of an
21 expired driver's license for a certain period of time.
22 Is that correct?
23     MR. BONNETT: Yes. And I believe if it --
24 if it goes back to the beginning of the -- the opening
25 of registration for the election which is generally 30
26 days from the prior election. So it's generally about a

0293

1 year, year past.
2     SEN. DAVIS: Okay. Have you done any work
3 in Indiana to track or to attempt to track the
4 percentage of persons based on categories, whether it be
5 senior status, whether it be minority status, whether it
6 be indigent status, where people have claimed that
7 somehow their right to vote has been interfered with as
8 a result of this particular law?
9     MR. BONNETT: I'm not familiar with the
10 state doing that research. Certainly the -- there are
11 interest groups that have -- have made a concerted
12 effort to identify individuals, groups, or
13 characteristics, identify them and locate beyond the
14 theoretical basis; and generally, it's not been
15 something that's been accomplished. There's been a
16 tremendous separation between the theoretical concerns
17 and what's actually been experienced in our elections
18 over the last five years.
19     SEN. DAVIS: When you started your
20 comments this afternoon, you began by saying that there
21 had been scant evidence of disenfranchisement, and scant
22 to me means that there must have been some. So can you
23 talk a little bit with us about what that's looked like
24 for Indiana?
25     MR. BONNETT: There -- there was a single

0294

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

1  media report prior to the 2010 election, a few days
2  prior to the election. It was not officially reported
3  to the state, but the media account was a gentleman
4  of -- in a particular county of 40-something years, due
5  to some unusual circumstances did not have a birth
6  certificate. I think it involved him having been
7  discharged to foster care through state programs,
8  et cetera. But it also was evident that the Bureau of
9  Motor Vehicles Division has a special group -- team that
10  works with individuals who have particular problems to
11  address those needs. And the -- the report did not
12  result in -- in a complaint, and there was no indication
13  the state got that the person wasn't able to vote
14  under -- under one of the exceptions.
15        There have been some reports, also, that
16  generally upon investigation, the individuals were able
17  to vote under -- under some provision.
18        SEN. DAVIS: And you mentioned that -- a
19  moment ago, that through both administrative rule and
20  through the statute itself, in the state of Indiana,
21  you've tried to be cognizant of this disenfranchisement
22  issue through some of the -- the rules that you've
23  enacted along with it. We talked about the fact that
24  you have a religious exception for -- for people who
25  cannot be photographed or refused to be photographed for
0295
1  religious purposes. We talked about the fact that if a
2  person comes to the polling location without an ID, they
3  can vote a provisional ballot so long as they attest as
4  one of the -- the reasons for voting that provisional
5  ballot, that they had to pay a fee in order to -- to get
6  a photo ID and they were unable to pay that fee. You
7  talked about the special rule that's been created to
8  handle the situation where women have been married or
9  divorced and their -- their name would be different than
10  what is on their ID.
11        Are there other -- and excuse me -- you
12  also talked about the expiration of a driver's license
13  not being a reason to immediately turn that -- that
14  voter away so long as it's within that --
15        MR. BONNETT: Uh-huh.
16        SEN. DAVIS: -- period of time that you
17  described earlier.
18        Are there any other conditions that were
19  implemented, either through the statute or through
20  administrative rule, that you feel we should know about
21  in terms of reflecting a sensitivity to trying to
22  preserve the enfranchisement of your voters as much as
23  possible?
24        MR. BONNETT: Yes. College -- college
25  students at some state universities have -- it came
0296
1  about, they have IDs that don't have an expiration date,
2  and through arrangements with -- with state colleges,

TX_00001031
JA_001030
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001031

USA_00015912

3    the universities provided through some type -- I believe
4    it was a secure online facility -- a way for the polling
5    locations to -- to verify the expiration date
6    independent of the actual ID.  And so arrangements were
7    made, then, for students with -- with a university ID
8    that did not have the expiration date but where the
9    college was able to provide that information
10   independently to go ahead and vote on election day.
11           SEN. DAVIS:  Very good.  Are there any
12   other?
13           MR. BONNETT:  Not that come to mind.
14           SEN. DAVIS:  Okay.  Thank you,
15   Mr. Secretary.  I appreciate it.
16           MR. BONNETT:  Uh-huh.
17           CHAIRMAN DUNCAN:  There being no further
18   questions, Mr. Bonnett.  Thank you for your testimony
19   today and for traveling here.
20           SEN. WEST:  Mr. Chairman?
21           CHAIRMAN DUNCAN:  Senator West, you're a
22   little late on the light there.
23           SEN. WEST:  I thought it was on.  I
24   apologize.  And I just have a couple of questions,
25   anyway.
0297
1            And it may have already -- you may have
2    already addressed this, and I just may not have heard
3    it.  As it relates to the provisional ballots in your
4    state --
5            MR. BONNETT:  Uh-huh.
6            SEN. WEST:  -- an individual can, in fact,
7    cast a provisional ballot.  Is that correct?
8            MR. BONNETT:  Yes.
9            SEN. WEST:  Okay.  And they have to --
10   what's the process?  Once they cast the ballot, in order
11   for the ballot to count, they have to come back within a
12   certain number of days?
13           MR. BONNETT:  Within ten days.
14           SEN. WEST:  And what do they have to do?
15           MR. BONNETT:  They can correct any -- any
16   issue with -- with voter registration.  For example, if
17   a person appears at a poll and they're simply not
18   registered at all, they can still cast a provisional
19   ballot.  You know, there may be some administrative
20   issue in the -- with kind of registration board about
21   why they didn't show up in the precinct where they
22   believe they needed to vote.  That -- that can be
23   corrected, and the Election Board is free to correct
24   that through and beyond the election.  They can bring in
25   the identification, and they can certainly seek
0298
1    assistance with obtaining the identification that's
2    required.  They can also come and execute an affidavit
3    that -- obviously, we talked about the exception to
4    being photographed for religious reasons.  They can

TX_00001032
JA_001031
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001032

USA_00015913

5    execute an affidavit that says they -- they don't have
6    the ID.  They cannot get one without cost, and then
7    they're eligible to have that vote counted.
8             SEN. WEST:  Okay.  So there's a process in
9    place.
10            Does the state keep any tally or report on
11   the number of provisional ballots that are cast in the
12   state of Indiana?
13            MR. BONNETT:  Yes.  The county election
14   boards submit that information with their -- with their
15   poll results data to the Election Division, and it's --
16   it's published online for every election.  The -- the
17   number of provisional ballots and the disposition and
18   the counties actually are also required to send copies
19   of the affidavits to the Secretary of State's office,
20   which then can be examined for the reason.  For example,
21   how many didn't show up on a poll book or there was a
22   challenge raised of some sort so that we can -- we've
23   been able to investigate the status and disposition of
24   provisional ballots.
25            SEN. WEST:  Is that information
0299
1    disaggregated by ethnicity?
2             MR. BONNETT:  No.  I'm not -- I do not
3    believe that there's an indication on the provisional
4    ballot affidavit.
5             SEN. WEST:  So you really don't -- I mean,
6    in terms of the provisional ballots, the tallies, in
7    terms of provisional ballots, is it disaggregated by
8    ethnicity; that is, the number of Hispanics, African
9    Americans that are voting?
10            MR. BONNETT:  It's not, although the
11   copies of the affidavits are -- are -- are public
12   information, and there have been some social scientists
13   who have been studying and attempting to write about
14   provisional ballots and determine if there's any -- any
15   meeting or conclusions that can be gathered --
16            SEN. WEST:  Has there been any -- any such
17   studies done in Indiana?
18            MR. BONNETT:  I have looked at one study
19   from a adjunct law professor.  It did not appear to
20   provide any -- any academic or statistically sound
21   conclusions.  It was more a discourse on the issue of
22   photo ID, in general, but it made some reference to some
23   statistics that were, you know, tallies of the number of
24   provisional ballots.
25            The provisional balloting started at the
0300
1    same time as the photo ID, so we don't have a calculus
2    of the provisional balloting before Indiana's photo ID.
3             SEN. WEST:  Do you happen to have the cite
4    for that particular professor's study or article?
5             MR. BONNETT:  I'll be most happy to --
6             SEN. WEST:  Okay.

TX_00001033
JA_001032
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001033

USA_00015914

7        MR. BONNETT:  -- to get it to you or get
8  it to the committee.
9        SEN. WEST:  To the chairman and the staff?
10  I'd appreciate that.
11        As it relates to provisional ballots, is
12  there any type of report on the number of individuals or
13  the percentage of individuals that come back and go
14  through the process to make certain their vote count?
15  Is it less than 10 percent of those individuals that
16  cast?
17        MR. BONNETT:  I'm not aware of an
18  aggregated report.  The data exists, and it's -- it's
19  online.  I'm not aware of an aggregated analysis of how
20  many.
21        Some provisional ballots, you know, there
22  are some instances where a person would go to a precinct
23  and not be registered to vote a provisional ballot and
24  then be directed to, and the poll workers are advised to
25  have someone go ahead and vote that provisional ballot.
0301
1  But then they may later in the day be directed to the
2  right precinct, and then the -- you know, so there can
3  be more than one provisional ballot.
4        There's also some of the scholarship
5  related to the issue that if the outcomes of elections
6  have been determined by substantial margins, then
7  individuals may not feel a need to go back and verify
8  the provisional ballots if the election were not so
9  close that --
10        SEN. WEST:  Right.
11        MR. BONNETT:  -- that the votes were
12  meaningful.  So it's not really what -- what -- clear
13  what the meaning of the numbers of provisional ballots
14  and the ones that are verified means, as far as I'm
15  aware.
16        SEN. WEST:  But there's no statewide study
17  or report that's done on an annual basis that looks at
18  the percentage of individuals that cast provisional
19  ballots that actually go back and verify their ability
20  to --
21        MR. BONNETT:  That data is reported in --
22  but I'm not aware of analysis of it.  The number by
23  county of provisional ballots, probably by precinct,
24  that were cast and their ultimate disposition is -- is
25  reported in -- in election return statistics.  Analysis
0302
1  of it is not something that I'm aware of, though.
2        SEN. WEST:  Okay.  You indicated that the
3  affidavit was -- is public.  Is it a --
4        MR. BONNETT:  Yes.
5        SEN. WEST:  -- public record?
6        And that's the -- when you say "the
7  affidavit," what do you mean by that?
8        MR. BONNETT:  That's a document that is

TX_00001034
JA_001033
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001034

USA_00015915

9    initially executed by the voter at the time of casting
10   the provisional ballot --
11          SEN. WEST:  Okay.
12          MR. BONNETT:  -- and then later, handled
13   by the Election Board within that ten days to determine
14   whether or not that vote -- the vote is sealed.  The
15   vote is sealed in an envelope.
16          SEN. WEST:  All right.  I just wanted to
17   make certain we were on the same page.
18          Okay.  Thank you very much, Mr. Chairman.
19          MR. BONNETT:  You're welcome.
20          SEN. WEST:  I would like to get that cite
21   for the study, though.
22          CHAIRMAN DUNCAN:  Senator Gallegos?
23          SEN. GALLEGOS:  Mr. Secretary, let me ask
24   you one question.  Is your Indiana driver's license, is
25   it a valid form of ID under Indiana law?
0303
1           MR. BONNETT:  Yes, it is a state-issue ID.
2           SEN. GALLEGOS:  It is valid?
3           MR. BONNETT:  Uh-huh.
4           SEN. GALLEGOS:  And any supplements of
5    that Indiana license, is that also a form of ID?  What I
6    mean supplements is, if it -- if a driver's license is
7    confiscated and you get a temporary, is that also a
8    valid -- a valid form of ID?
9           MR. BONNETT:  If the -- I don't believe
10   that the state driver's license is specified in the
11   legislation.  It's specified more generically, a
12   state-issued ID with photograph with an expiration date
13   or government-issued ID.
14          It's my understanding when a driver's
15   license is confiscated that the Bureau of Motor Vehicles
16   will immediately issue another form of ID that is a --
17   for example, driving is restricted.
18          SEN. GALLEGOS:  And that is a valid form
19   of ID?
20          MR. BONNETT:  Yeah.
21          SEN. GALLEGOS:  Okay.
22          MR. BONNETT:  I don't believe the -- I
23   remember when I lived in Texas and in Louisiana
24   sometimes the police would take away your ID and give
25   you a piece of paper that was sort of -- to cover for
0304
1    you, and that type of document would not be.
2           SEN. GALLEGOS:  Yeah.  But that is a valid
3    form of ID in Indiana?
4           MR. BONNETT:  It would be required to
5    have -- the ID would be required to have a picture and
6    have the expiration date.  And so something other than
7    that would not be allowed for voting.  It would still be
8    required to have a picture.
9           SEN. GALLEGOS:  Thank you.
10          MR. BONNETT:  Does that answer your

11  question?
12      SEN. GALLEGOS:  Yeah.
13      CHAIRMAN DUNCAN:  Thank you, Mr. Bonnett.
14  We appreciate your appearance here today.
15      TESTIMONY BY LUIS FIGUEROA
16      CHAIRMAN DUNCAN:  The Chair calls Luis
17  Figueroa -- Figueroa, Mexican American Legal Defense
18  Education Fund, or MALDEF.  Would you state your name,
19  please, and who you represent?
20      MR. FIGUEROA:  Absolutely.  My name is
21  Luis Figueroa.  I'm the legislative staff attorney with
22  the Mexican American Legal Defense and Educational Fund,
23  MALDEF.  Thank you very much for this opportunity to
24  testify before the Senate on this important legislation.
25      MALDEF works to promote and protect the
0305
1  rights of Latinos, including voting rights and in the
2  state of Texas and across the nation.  We have an
3  extensive history in the Voting Rights Act and in
4  protecting voting rights across the nation and, of
5  course, here in Texas, going back to the case of White
6  v. Register and most recently in LULAC v. Perry
7  challenging the redistricting implementation from the
8  last decade for last -- from the last session.
9      We stand here opposed to SB 14 because it
10  lacks the safeguards to ensure that eligible voters will
11  not be disenfranchised at the polls.  If SB 14 was
12  enacted, it would be the most restrictive photo ID
13  requirement in the nation, more restrictive than
14  Indiana, more restrictive than Georgia, more restrictive
15  than Arizona.  They would allow for viewer identity
16  documents, less time to cure for provisional ballots,
17  and it would be even more difficult to cure than any of
18  the other states.
19      Studies after studies have shown that
20  voter ID and additional identification requirements at
21  the polls do have an impact on minority voters and on
22  other protected classes.  The study from voter ID
23  requirements and disenfranchisement of Latino, black and
24  Asian voters by Barreto, Nino & Sanchez states
25  "Controlling for age, income and education, we find the
0306
1  naturalized citizens and minority voters are
2  significantly less likely to be able to provide multiple
3  forms of identification such as a copy of their original
4  birth certificate or recent bank statements.
5  Respondents were asked about their ability to provide
6  approximately six unique forms of identification, and
7  naturalized citizens and minority voters were
8  consistently less likely to have each form of
9  identification.  Data reflects identification trends of
10  actual voters, not just adult citizens, the findings go
11  far to suggest that photo -- that voter identification
12  laws could immediately disenfranchise many Latino,

TX_00001036
JA_001035

TX_00001036

USA_00015917

13  Asian, African-American citizens."
14          From the Rutgers study, protecting the
15  enfranchised or restricting it, the effects of voter
16  identification requirements and turnout, by Vercellotti
17  and Anderson, states that "The predicted probability
18  that Hispanics would vote in states that required
19  nonphoto identification was about 10 percent points
20  lower than in states where Hispanic voters gave their
21  names."
22          In the Wisconsin study, the driver's
23  license status of the voting age population was counted
24  by John Pawasarat.  It stated that "Minorities in poor
25  populations are the most likely -- are the most likely
0307
1  to have driver's license problems.  Less than half,
2  40 percent, of Milwaukee County African-American adults
3  and 43 percent of Hispanic adults have a valid driver's
4  license compared to 85 percent of white adults in the
5  balance of the state."
6          The Brennan Center, in their report
7  Citizens Without Proof, A Survey of Americans'
8  Possession of Documentary Proof of Citizenship and Photo
9  Identification, stated, "Citizens with comparatively low
10  incomes are less likely to possess documentation proving
11  they are citizens.  As many as 11 percent of United
12  States Citizens, more than 21 million, do not have
13  government-issued photo identification."  It goes on to
14  state that "25 percent of African-American voting-aged
15  citizens have no current government-issued photo ID
16  compared to 8 percent of white voting-aged citizens."
17          Study after study has shown that Latinos,
18  African-Americans, elderly, the poor, students are less
19  likely -- the disabled community are less likely to have
20  the photo identification requirements required under
21  SB 14.
22          It's important to note that Texas under
23  current law has a ID requirements.  It has an ID
24  requirement that -- it requires that you bring a voter
25  registration certificate or additional forms of
0308
1  identification.  The question is, how much stricter can
2  we make the voter identification requirement?  The
3  question is not whether to have a voter identification
4  or not have it.  The question is, how restrictive do we
5  want to make it?
6          The current legislation presented before
7  us does not provide for any alternative photo
8  identification.  It does not allow for student ID cards,
9  for Medicaid, Medicaid cards, for expired driver's
10  license, for expired military cards or for state-issued
11  employer identifications.
12          We know that in our other states that have
13  implemented strict voter identification laws that the
14  ability to cure and to come back day to day and fix

TX_00001037
JA_001036

TX_00001037

USA_00015918

15  their provisional ballot, it does not happen with much
16  frequency.  Voters do not return within the allotted
17  time period to fix their voter identification.
18        It's also worth noting that in SB 14 it
19  actually lowers the amount of time from what Indiana
20  requires, from ten days to six days -- six days to
21  return and fix their voter identification.  In Arizona,
22  739 ballots were not counted where -- conditional
23  provisional ballots were not counted, and only 158 were
24  counted after voters cured their identification
25  requirements.
0309
1         What we found in Arizona when we litigated
2  was that the most common problem was a driver's license
3  that did not match an address, that did not match a
4  voter registration certificate.  We know that Latinos,
5  African-Americans and low income are the most mobile
6  populations often moving from a rental apartment, moving
7  from home to home, and as a result are most likely to
8  have matching -- most likely have identification that
9  doesn't match their voter registration certificate.
10        We know that providing a free personal
11  identification certificate does not solve the problem if
12  the documents needed to get a personal identification
13  certificate are the same ones that the study show the
14  minorities don't have.  And we know that if people are
15  required to bring birth certificates and other
16  documentation that they are unable to get a current
17  driver's license, that they are not likely to get the
18  free personal identification if they lack those same
19  documents.
20        We believe that there are ways to
21  create -- there are ways to ensure that people who are
22  voting are who they say they are.  There are ways to do
23  it without disenfranchising voters.  What we need are
24  appropriate safeguards in a photo identification law.
25  We need to expand the current list of documents that are
0310
1  provided in SB 14, and most importantly we should
2  incorporate a signature affidavit similar to Michigan
3  and Florida to ensure that people who lack the
4  identification requirements are still able to cast a
5  ballot and have their vote count.  It's about finding
6  the right balance between security and access.
7         SB 14 only focuses on voter impersonation
8  fraud while ignoring voter intimidation, deceptive
9  practices and poll worker error.  There are ways to
10  ensure that voters who say they are -- are who they say
11  without disenfranchising voters.  Finding that right
12  balance includes including two forms of nonphoto
13  identification, requiring signature affidavit attesting
14  to name, address and eligibility, including voter
15  integrity task force, allowing for same-day election
16  voter registration with an ID requirement, free ID that

TX_00001038
JA_001037
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001038

USA_00015919

17  is not limited to the current requirements that require
18  the same documents that are required to get a driver's
19  license right now, training for poll workers and voter
20  education.
21        When we find the right balance between
22  access and security, we will ensure that we have the
23  voter confidence in our system, a system that is not
24  predicated on trying to disenfranchise voters, a system
25  that is not so unsecure that we don't have faith in our
0311
1  electoral system, but a system that provides for access
2  and security to ensure that all votes are counted, and
3  that is what we are aiming for.
4        With that, I'm open for questions, and I
5  thank you again for this opportunity.
6        SEN. ELTIFE:  Members any questions?
7        (No response)
8        SEN. ELTIFE:  Thank you, sir, for being
9  here today.  Hold on one second.
10        QUESTIONS FROM SENATE FLOOR
11        SEN. ELTIFE:  Senator Rodriguez?
12        SEN. RODRIGUEZ:  Thank you, Mr. Chairman.
13  Mr. Figueroa, first of all, thank you for coming here to
14  testify this afternoon, particularly on such short
15  notice.  I am familiar with MALDEF's work.  In fact, I
16  serve on its board.  So I know the great work that the
17  organization does to protect the rights of citizens,
18  particularly in the area of voting rights.
19        I want to ask you just a few questions and
20  mainly for clarification.  I believe you started out by
21  comparing the legislation in Senate Bill 14 with the
22  Arizona -- the Indiana law, and I believe you even
23  mentioned the Arizona law.  Could you give us
24  specifically in which ways SB 14 is more restrictive
25  than these other laws?
0312
1        MR. FIGUEROA:  Absolutely.  Senate Bill 14
2  has a very limited scope of identification requirements.
3  It only allows for a driver's license, a passport,
4  citizen certification and a military identification.
5  Arizona, which at the time was considered a pretty
6  restrictive identification requirement, allows for photo
7  ID, but also allows for two alternative nonphoto
8  identification.  It was most similar to the proposal
9  that was introduced last session.
10        In Indiana where they do have a photo ID
11  requirement, they do allow for -- when you cast a
12  provisional ballot, you can come back within ten days
13  and you can attest to being indigent or you can attest
14  that you were unable to get the identification, and
15  they'll allow you an opportunity to have your vote
16  counted.
17        This law in SB 14 does not have any such
18  assertion to ensure the voters are counted.  In fact, it

TX_00001039
JA_001038
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001039

USA_00015920

19  lowers the amount of time for you to cure that
20  provisional ballot. We're going from ten days to six
21  days -- to six days.
22          And in Georgia, again, there are also
23  other forms of identification that were allowed that are
24  not allowed under Texas. Even in Indiana, the
25  expiration date, you are allowed to have an expiration
0313
1  date if you're within the last -- within the last
2  election. If your driver's license was expired within
3  the last election, they'd still allow you to vote. This
4  would be by far the most restrictive ID requirements in
5  the nation.
6          SEN. RODRIGUEZ: So given that, is it your
7  opinion that this law, this bill that we're considering,
8  would be much more likely to disenfranchise voters than
9  these other states' laws?
10          MR. FIGUEROA: I do think the more -- the
11  more requirements you put, the more limits on
12  identification, the more likely you are to have an
13  impact on the working poor and Latinos and
14  African-Americans and other -- and other voters.
15          SEN. RODRIGUEZ: Could you go over some of
16  the implementation challenges or issues that were
17  confronted when the Arizona law was being implemented to
18  give us a sense of what we might expect? And
19  particularly you might -- if you could focus on how it
20  may have impacted the Latino voters in Arizona.
21          MR. FIGUEROA: Absolutely. Our studies
22  did find -- our expert did find a disparate impact in
23  Arizona on Latino voters, and I grant you this was even
24  with more broader identification requirements than this
25  bill. So this bill would even have a stronger impact
0314
1  than Arizona. What we found in Arizona was -- the most
2  significant impact were poll workers who tried -- who
3  claimed that the address had to match the voter
4  registration certificate to the driver's license.
5          Poll worker training has got to be a key
6  component of this. It's not clear from SB 14 about what
7  to do if a driver's license doesn't match the voter --
8  the voter registration certificate, whether that's
9  because a recently married woman has a different last
10  name, because there's a misspelling on the voter
11  registration certificate, because the address doesn't
12  match or the date of birth doesn't match. There's any
13  numerous possibilities of a mismatch between the voter
14  registration and the licenses that are going to be
15  required. Are poll workers going to use that to
16  disenfranchise voters? Well, we would hope not, but
17  we -- in our experience, it has had that impact.
18          SEN. RODRIGUEZ: All right. Thank you.
19  You stated the Latino voters are less likely to have the
20  identification required by the bill. Can you tell us

TX_00001040
JA_001039
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001040

USA_00015921

21  why?
22         MR. FIGUEROA:  Yeah.  I mean, a lot of
23  this has to do with the difficulty in obtaining a
24  driver's license right now.  So we know that getting a
25  driver's license has become increasingly more difficult
0315
1  by DPS under the current rules.  Obtaining the -- having
2  the birth certificate, the documentation that you need
3  to get a driver's license is sometimes difficult to get.
4  The cost involved is also somewhat of a problem.
5         It's also a lot of people live in these
6  rural counties or don't live near a DPS station and
7  don't have a driver's license.  Also, students who live
8  with their -- with their parents and don't have a
9  driver's license or they only have a student ID card may
10  not have a driver's license or the funds or the time
11  necessary to go get a driver's license.
12         SEN. RODRIGUEZ:  I see.  Finally, let me
13  ask you just for the record here -- I think we know the
14  answer -- but have Latino voters generally experienced,
15  in the history of this state, disenfranchisement when it
16  comes to exercising their right to vote?
17         MR. FIGUEROA:  Yes.  Texas has a long
18  history of voter discrimination in Texas, which is why
19  we're a Section 5 state under the Voting Rights Act.  It
20  is precisely because of our history and the all-white
21  primaries, poll tax, disenfranchising voters through
22  cracking and splitting and redistricting that we are a
23  Section 5 state.  And I believe that there's going to be
24  a witness here today that's going to talk about that.
25         SEN. RODRIGUEZ:  Do you feel that this
0316
1  long-standing history has engendered mistrust on the
2  part of the Latino voters as far as coming out and
3  voting?
4         MR. FIGUEROA:  Yes.  And ironically the
5  voter ID or the photo ID legislation has been touted as
6  a way to install voter confidence in our electoral
7  system, but it's only confidence on the security side.
8  It's not confidence on the access side.  And from the
9  Latino community, there needs to be stronger confidence
10  on the access side.  There's a long history of
11  discrimination on the voting side of Latinos, and there
12  is this feeling among many Latinos that there is a
13  continual effort to prevent our ability to elect our
14  candidates of choice and our ability to vote.  So we
15  need to work on our confidence on the access side,
16  particularly with the Latino community.
17         SEN. RODRIGUEZ:  Could you tell us whether
18  on this last point even those Latinos with the required
19  ID feel a distrust in participating?
20         MR. FIGUEROA:  Yes.  I mean --
21         SEN. RODRIGUEZ:  And if so why?
22         MR. FIGUEROA:  Texas has one of the lowest

TX_00001041
JA_001040
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001041

USA_00015922

23  voter turnouts in the nation.  I believe it may actually
24  be the lowest in the nation.  Latino voter turnout is
25  dismal in comparison to other states.  And those are
0317
1  people who are eligible -- who are eligible to vote,
2  have registered to vote and in many cases may have the
3  identification.  But there is this feeling that there's
4  going to be a systematic way for their vote not to
5  count, that their vote won't make a difference.  And so
6  we need to make efforts in this state to encourage
7  voting, not discourage it.
8          SEN. RODRIGUEZ:  Thank you.
9          Thank you, Mr. Chairman.
10         CHAIRMAN DUNCAN:  I think there's
11  another -- Senator Huffman was wishing to ask questions,
12  and I don't know that she's on the floor.  Can you hold
13  on just a minute?
14         (Brief pause)
15         SEN. ELLIS:  Mr. President?
16  Mr. President, parliamentary inquiry.
17         CHAIRMAN DUNCAN:  State your inquiry.
18         SEN. ELLIS:  You know the time of the
19  State of the Union Address tonight?
20         CHAIRMAN DUNCAN:  It's this evening.
21         SEN. ELLIS:  This evening?  I was hoping I
22  could hold hands with some of my Republican colleagues
23  and watch it.  So I'm wondering how long are we going to
24  be here tonight?
25         CHAIRMAN DUNCAN:  We have two televisions
0318
1  in the lounge, Senator.
2          SEN. ELLIS:  Well, if I really want to
3  feel the love, I'd like to be -- I'd like to be at home.
4          (Laughter)
5          CHAIRMAN DUNCAN:  Senator Huffman -- have
6  you finished your inquiry, Senator Ellis?
7          SEN. ELLIS:  (No audible response)
8          CHAIRMAN DUNCAN:  Senator Huffman, you are
9  recognized.
10         SEN. HUFFMAN:  Yes, sir.  Thank you.  Just
11  a couple of questions.
12         Sir, you said that this legislation
13  conveniently disenfranchises minority voters.  Is that
14  correct?
15         MR. FIGUEROA:  I don't think I used the
16  word "conveniently," but disenfranchises voter -- could
17  potentially disenfranchise voters.
18         SEN. HUFFMAN:  Didn't MALDEF also claim in
19  the Crawford litigation that the Indiana photo ID law
20  disenfranchises minority voters?
21         MR. FIGUEROA:  We actually didn't litigate
22  the Crawford litigation.  We did submit an amicus brief
23  related to our Arizona litigation, and we were concerned
24  about the impact of Crawford as well as the Arizona

TX_00001042
JA_001041
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001042

USA_00015923

25   legislation and the potential disenfranchising impact.
0319
1        SEN. HUFFMAN:  And didn't the Supreme
2   Court of the United States reject your assertions that
3   voter photo ID laws unduly burden the right to vote?
4        MR. FIGUEROA:  What the Crawford decision
5   said was it was, one, not a voting case.  It
6   wasn't a Section 5 case or a Section 2 Voting Rights
7   case.  It was a 14th Amendment undue burdens case.  And
8   what they essentially held was the burdens that it
9   imposes on voters was not significant enough to cause a
10  violation of the 14th Amendment.
11       SEN. HUFFMAN:  Thank you.
12       MR. FIGUEROA:  I would state that this
13  bill is more restrictive than the Indiana bill, though.
14       CHAIRMAN DUNCAN:  Thank you, Mr. Figueroa.
15  There's no other questions -- oh, I'm sorry.
16  Senator Gallegos has a question.
17       SEN. GALLEGOS:  Thank you, Mr. Chairman.
18  Mr. Figueroa, I don't know if you remember my testimony
19  two years ago, and I showed the maps.  If we're going to
20  mandate voter ID in Texas, that we should allow the
21  folks that we're mandating access to DPS centers where
22  they get this photo ID.  And if you saw inside the 610
23  Loop in Houston, there are no DPS centers.
24       MR. FIGUEROA:  That's right.
25       SEN. GALLEGOS:  And also -- or inside the
0320
1   820 Loop in Fort Worth there's no DPS centers, and
2   there's only one inside the city of Dallas that would,
3   in fact, make getting, number one, a photo ID costly,
4   and time-consuming.  I'm concerned that especially in
5   inner-city Houston and Fort Worth and some there in
6   Dallas that don't have vehicles or use mass transit as a
7   means of transportation that there's no bus lines to the
8   DPS centers --
9        MR. FIGUEROA:  That's right.
10       SEN. GALLEGOS:  -- that provide the photo
11  ID that we are fixing to mandate them.  I wanted to ask
12  your -- you know, whether MALDEF -- you know, would that
13  be subject to any type of retrogression as far as
14  allowing somebody poor or doesn't have a vehicle or
15  can't afford the transportation to the outskirts to try
16  to get a photo ID, that there would be subject to any
17  Section 5 violations in the civil rights code?
18       MR. FIGUEROA:  Yeah.  Ironic -- the
19  Indiana case did make the one reference that we've been
20  talking about, and the Supreme Court did make
21  significant references to the fact of the free ID
22  provided by Indiana, how to eliminate some of these
23  burdens.  However, Indiana, like I mentioned, wasn't a
24  Section 5 state.
25       And that was a larger issue in Georgia
0321

TX_00001043
JA_001042
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001043

USA_00015924

1  where similarly the DPS departments were not in the
2  inner city.  So I do think it is a factor that they will
3  consider in preclearance about how accessible is it to
4  obtain that free identification.  And in the rural
5  counties of Texas, the inner cities, if it shows that it
6  does have extreme difficulties for minorities to access
7  those free IDs because of the inability to get to a DPS
8  office, the amount of time it takes, the money it takes,
9  the documents it requires to get that free
10  identification, I think that does play an important part
11  of it.
12          SEN. GALLEGOS:  So what you're saying
13  is -- your testimony is that it definitely is a factor.
14  And then like -- other than the areas that I mentioned
15  in my district and Fort Worth and Dallas, let's say an
16  area like Senator Uresti's area where in some cases
17  they've got to go 200 miles, you'll have to catch --
18  you'll have to either rent a helicopter or get a
19  Southwest Airlines flight to go, and even though we're
20  offering free ID, you know, the issue is how to get
21  there.
22          MR. FIGUEROA:  Yeah.
23          SEN. GALLEGOS:  And what I described to
24  you on these instances where, you know, these people
25  cannot provide themselves with -- especially the elderly
0322
1  in these areas, you know, with transportation or don't
2  have the money to provide it, I mean, we can tell them
3  that we have free voter ID available to them if they can
4  get there.
5          MR. FIGUEROA:  Right.
6          SEN. GALLEGOS:  Is that -- is that what
7  your testimony is here?
8          MR. FIGUEROA:  Yes.  If they can get
9  there, if they have the means to get there, if they have
10  the documents to get the documentation, absolutely.
11  Free isn't necessarily free.
12          SEN. GALLEGOS:  All right.  Thank you.
13          CHAIRMAN DUNCAN:  Are there any other
14  questions of the witness?
15          (No response)
16          CHAIRMAN DUNCAN:  All right.  The Chair
17  hears none.  Thank you for your testimony, Mr. Figueroa.
18          TESTIMONY BY CHRISTIAN WARD
19          CHAIRMAN DUNCAN:  The Chair calls
20  Christian Ward.  Mr. Ward, state your name and who you
21  represent, please.  You have ten minutes with a --
22          MR. WARD:  Thank you, Mr. Chairman.
23          CHAIRMAN DUNCAN:  I think it's either a
24  one-minute warning or 30 seconds.  I can't remember.
25          SECRETARY SPAW:  One.
0323
1          CHAIRMAN DUNCAN:  One-minute warning.
2          MR. WARD:  Thank you, Mr. Chairman.  My

TX_00001044
JA_001043
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001044

USA_00015925

3   name is Chris Ward. I'm essential here representing
4   myself. I'm an attorney. I'm a partner with the firm
5   of Yetter Coleman. I practice primarily in complex
6   appeals, including regarding constitutional issues and
7   have some expertise and experience in particular in
8   voting rights law, including the 2009 Supreme Court case
9   Northwest Austin MUD v. Holder.
10          I'm here primarily to testify regarding
11  the general constitutional standard as explained by the
12  Supreme Court for analyzing a facial challenge to the
13  validity of a voter ID bill. Before I go into that, I
14  do want to say, because it's come up, that in my reading
15  of the Texas bill, it has an exemption for elderly nuns
16  and any other Texan over 70 whether or not they reside
17  in a nursing home. So that's something that's come up,
18  and I wanted to bring that out.
19          With regard to the legal constitutional
20  standard, the Supreme Court in the case Crawford v.
21  Marion County Election Board examined the Indiana voter
22  ID law, and it went through a very careful analysis of
23  that law, and the essential holding of that law is that
24  a voter ID act is not, in general, constitutionally
25  invalid on its face. And the Indiana law that the court
0324
1   was considering at the time it issued the Crawford
2   opinion was at that time considered the most restrictive
3   voter ID law on the books of any state. And so the fact
4   that the Supreme Court found that law constitutional
5   says that there is a lot of room for imposing voter ID
6   laws under the Court's interpretation of the
7   Constitution.
8           There were two primary opinions in the
9   Crawford case. The first one that I'll talk about is
10  considered the main or controlling opinion of the case.
11  It was a case decided by a plurality, which means there
12  were three Justices signed onto one opinion that's
13  regarded as the controlling opinion by Justice Stevens,
14  of course who was one of the most liberal members of the
15  Court. And the other opinion by Justice Scalia also
16  garnered three votes. Justice Stevens' opinion is
17  regarded as the controlling opinion because it -- it
18  puts a little more stricter review, but essentially
19  those two opinions get to the same result by slightly
20  different analysis, which actually on further
21  examination turned out to be somewhat the same.
22          In Justice Stevens' controlling opinion,
23  he first looked -- he first described what the
24  appropriate test would be for a constitutional challenge
25  to an election regulation like a voter ID law, and the
0325
1   test that the Court will apply, he says, is you weigh
2   the asserted injury to the right to vote against the
3   precise interests put forward by the state. So you look
4   at the alleged injury or impairment of the right to

TX_00001045
JA_001044
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001045

USA_00015926

5  vote, the alleged burden imposed by the voter ID
6  requirement, and you compare that with the severity of
7  the harm that the state is trying to avoid.
8           That opinion identifies at least three
9  valid state interests that the state of Indiana was
10  attacking with its voter ID legislation.  Number one,
11  deterring and detecting voter fraud, Justice Stevens
12  says that you can't -- nobody can question the
13  importance of detecting and deterring voter fraud.
14           Now, he noted that in that case there was
15  nothing in the record of that case that in-person voting
16  fraud, showing up and impersonating another person, had
17  actually occurred or was a big problem in Indiana, but
18  it was enough that this is a possibility.
19           He tells a story of an associate,
20  Boss Tweed, in New York back during the 1860s, and this
21  associate would send his repeaters.  He would recruit
22  men who had whiskers and send them to vote once with a
23  full beard and then send them to a barber and get the
24  chin shaved off and send them back with mutton chops and
25  a mustache and then send them back with just a mustache.
0326
1  And then if you needed another vote, send them back skin
2  face, it said, plain face, and that makes each one good
3  for four votes.
4           Now, I mention that both because I thought
5  it was a little amusing story, but the more serious
6  point is that the Court looked at this.  This is an
7  anecdote from history.  This is not saying that a state
8  has to have any showing that this a current modern
9  problem.  The Court cites this anecdote as an example of
10  this is a potential problem that a legislature is within
11  its rights to attempt to address by this type of law.
12           Other valid state interests that the Court
13  identified with regard to a voter ID legislation is the
14  improvement and modernization of election procedures.
15  The Court noted that Congress has shown that it believes
16  that photo ID is an effective method of establishing
17  voters' qualifications to vote.  The National Voter
18  Registration Act of 1993, also known as the Motor Voter
19  Act, is the act that says when you go to apply for your
20  driver's license, you have to be offered the chance to
21  register to vote.  It's also the act -- it also has
22  requirements that limit the states' abilities to purge
23  their voter rolls.  So that's one reason why voter rolls
24  tend to have more voters than actually continue to
25  reside in a particular state or a particular
0327
1  jurisdiction.
2           The Court also noted the Carter-Baker
3  report, which has also been mentioned in earlier
4  testimony today by Former President Carter and Former
5  Secretary of State James Baker.  In that report, they
6  identified photo identification as an appropriate step

TX_00001046
JA_001045
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001046

USA_00015927

7    to take to deter voter fraud.
8           The Court also mentioned safeguarding
9    voter confidence in the system as another valid state
10   interest that is served by a voter ID requirement.
11          Justice Stevens' opinion then looked to
12   the alleged burdens on the right to vote, and he noted
13   that the photo ID requirement imposes some burdens that
14   other identification methods do not.  For example, you
15   might lose your driver's license or lose your wallet on
16   the way to the polls and then you'd have a problem.  But
17   he noted that these are not serious or frequent enough
18   to cause a constitutional infirmity.
19          And he noted that the relevant burden to
20   be considered here is the burden that is on persons who
21   are eligible to vote but who do not happen to possess a
22   valid photo ID.  So you look at the fact that that
23   affects, for one thing, a -- probably a small minority
24   of voters -- of eligible voters in the state already.
25          The Court noted that if you had to pay a
0328
1    tax or a fee to get the ID, that would be the equivalent
2    of a poll tax, and that would be unconstitutional.  So
3    one important provision which the Indiana legislation
4    had and which the Texas bill has is the fact that free
5    voter ID cards are available.
6           The Court noted that some people will have
7    heavier burdens and -- but the fact that some people may
8    have heavier burdens does not make the statute itself
9    facially invalid and unconstitutional.  It means that
10   perhaps in an individual case an individual might be
11   able to show that the burden -- the specific burden on
12   that individual is so high that it would be
13   unconstitutional to apply the statute to that
14   individual, but that's not the same thing as saying that
15   the statute is facially invalid and unconstitutional as
16   a whole.  And that's what we usually think of when we
17   think of the Court striking down a law as
18   unconstitutional.  That strikes down the whole law as
19   invalid.
20          So that was the ultimate conclusion.
21   Justice Scalia, in his opinion concurring, would go a
22   little bit further than Justice Stevens, but he
23   essentially reaches the same result.  Justice Scalia
24   says that the voter ID law is a generally applicable,
25   nondiscriminatory voting regulation, and thus individual
0329
1    impacts on specific voters are irrelevant for
2    determining the severity of the burden.  In Justice
3    Scalia's analysis, he said you look at the burden is not
4    severe on anyone.  The burden is show a photo ID.  That
5    burden could have some different impacts on particular
6    individuals, again, who might have a particular hardship
7    getting that ID.  But, again, that's not enough to say
8    that the law, as a whole, is unconstitutional.

TX_00001047
JA_001046
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001047

USA_00015928

9          SEN. ELTIFE:  Members, any questions of
10  the witness?
11          (No response)
12          SEN. ELTIFE:  No questions.
13          Mr. Ward, thank you for being here.
14          MR. WARD:  Thank you very much.
15          TESTIMONY BY GARY BLEDSOE
16          SEN. ELTIFE:  At this time, we'll call
17  Gary Bledsoe forward.
18          MR. BLEDSOE:  Good evening.  My name is
19  Gary Bledsoe.  I represent the Texas State Conference of
20  NAACP branches, and I am proud to stand before you as a
21  fellow Texan, and indeed I want to emphasize the term
22  "fellow Texans."
23          You know, the Texas that we have today is
24  very different from the Texas that I grew up in, and
25  indeed I've seen many things occur that have been
0330
1  extremely positive for me.  I grew up in a segregated
2  Texas when voting was really a luxury, something that
3  was not to be expected in my community.  It was
4  something very much that people cherished and desired,
5  desired to occur.
6          And many of you might even remember back
7  in 1974 when Frank Robinson, an African-American who was
8  registering individuals to vote out in Palestine, was
9  actually killed at his home because of his attempts to
10  register people to vote.  Now, I happened to be a
11  freshman in law school at that time.  So it's not all
12  that long ago that that actually occurred.
13          And, you know, when I -- when I look at
14  the ways that we have had to struggle to get the
15  opportunity to vote, I want you to know that we cherish
16  that and know that's extremely important.  And in many
17  ways, our state had become exemplary.  When I go around
18  the country and you -- we understand how we've enabled
19  people that have been on paper with felony convictions
20  to vote and things of that nature, that's a good thing.
21          And, you know, the fact that -- we don't
22  really have a problem with voter fraud in elections.  I
23  think that all the testimony seems to indicate that,
24  that indeed people who go to vote are indeed people who
25  actually are registered to vote.  So there's really not
0331
1  a problem in that regard from what we've seen.
2          However, I'm aware that what we're
3  discussing now is whether or not we will have a bill.
4  So I would reach out to each and every one of you and
5  say that if we are going to discuss voter
6  identification, then let's do so in a way to be
7  constructive and to be enabling so that we can try and
8  empower all the people within our state to presume that
9  all people who would be eligible to vote ought to be
10  allowed to vote.  And so we should reduce impediments

TX_00001048
JA_001047

TX_00001048

USA_00015929

11   and not present additional impediments that would
12   prevent people from voting.
13            Now, frequently we have come before you
14   and talked about this issue.  I know that the last time
15   I came before you we talked about a number of instances
16   of serious irregularities that have occurred in our
17   state, and I don't want to go back and go over all
18   those, but I want to point some of those out to you
19   because I think if we're talking about voter problems
20   that really and truly we ought to be talking about some
21   of the issues that prevent access because we think
22   that's a much more significant problem than the problem
23   with people voting who are not the people who were --
24   who were actually registered to vote.
25            In just this past year, we had a situation
0332
1    with elderly citizens up in Bowie County who were
2    harassed by individuals after they had voted absentee,
3    and people were demanding to know how they voted,
4    terrorizing the elderly people who made contact with us
5    because they were very concerned, but it was very
6    obvious it was because of politics, from our
7    observation.
8            We know that we had so many problems or
9    complaints directed to us out of Harris County this last
10   session where people were intimidated by other
11   individuals who hovered over them, who stared at them
12   and gave very hateful looks towards them, intimidating
13   some people from going forward with actually voting.
14            So we know these things continue and
15   occur, and it's not just the kinds of things that we've
16   seen in the recent past, such as when an
17   African-American candidate for sheriff in a county
18   outside Houston had -- one of his white supporters had
19   their home catch fire.  And so instead of investigating
20   what might have occurred, they ended up investigating
21   the African-American candidate for sheriff.
22            We know that where they've used off-duty
23   police along with improper uses of mailboxes in Tarrant
24   County to intimidate African-Americans from being able
25   to vote.  So it goes on and on, and all these things
0333
1    have occurred within the last decade and some within the
2    past six months.  So we know that indeed we have not
3    arrived to where we have eliminated problems with
4    preventing our having access to be able to vote.
5            And, you know, I was able to be an
6    election observer for an election down in Venezuela, and
7    that was really quite illuminating to me in that the
8    individuals had to give a fingerprint whenever they
9    voted, and an untrained person had to look at the
10   fingerprint and determine whether or not it was the
11   right person.  And we know that the photograph came up
12   on the screen and you had to look and see if this was

TX_00001049
JA_001048
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001049

USA_00015930

13  the right person.
14          And, you know, they had armed guards
15  around, and I actually had the misfortune of having a
16  gun directed at me by a guard.  When I was asked by an
17  official in the Secretary of State's Office to actually
18  go and observe them vote, I actually had to back off
19  when a gun was directed right at my face for -- five or
20  six feet away.
21          So I think we look at those things, we
22  don't need to move in that direction.  We need to be
23  going out and telling people that what we have is really
24  good.  What we have is actually working, where we have a
25  democracy, we have people that are engaged that are from
0334
1  different backgrounds, different races, different
2  ethnicities, and we get there and we debate and we
3  discuss issues.
4          You know, when they had the birth of a
5  nation years ago and they talked about what would occur
6  in our country with enfranchising African-Americans, we
7  found out just the opposite was true, and that indeed
8  we're moving toward something that's very special, but
9  there are people that are competing against what we've
10  been trying to accomplish.
11          But, Senators, I really want to say to you
12  that we have a system that I feel is actually a good
13  system.
14          Now, besides all the other matters that I
15  can talk about, I wanted to visit with you about some of
16  the problems that we see with where we're proceeding
17  with SB 14.  You know, I don't understand why, but in
18  many ways I look at SB 14 and SB 14 is much more
19  problematic than the Indiana law and much more
20  problematic than the Georgia law that have been
21  utilized.  When we look at the Indiana law, the Indiana
22  law -- we can see where individuals can actually come in
23  and if they are indigent, they can give an affidavit and
24  be allowed to vote by saying that they can't afford to
25  have a voter ID.
0335
1          We know that under the Texas law in
2  comparison with the Indiana law you've got to come back
3  in a stated period of days, and these six days.  And the
4  way that six days is worded and the time that's
5  involved, it's going to require people to come during
6  their workdays from 8 to 5, which is a real problematic
7  thing for individuals to do.  And we know that when you
8  have to come in from 8 to 5 and you're a working person,
9  that's going to be something that's difficult for you to
10  do.
11          We have a law that says if you're voting
12  in an election, that on election day you can go and have
13  time off from your work.  There's not a law that says
14  you can come and have that taken care of.

TX_00001050
JA_001049
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001050

USA_00015931

15       Now, the -- we know, too, that the other
16  thing about an Indiana law -- and I would note that
17  Indiana is not a covered jurisdiction.  So Indiana and
18  the Indiana case involved constitutional issues and not
19  the Voting Rights Act.
20       But, now, Indiana allows you the one free
21  bite.  So when you go in and you have an expired
22  identification, you can still use that identification
23  for one election.  The idea is that then the person will
24  be put on notice that their identification is expired,
25  and they will go and have that identification come up to
0336
1  date.  So I think that's another distinction.
2       Now, in Georgia and in Indiana, they did
3  some things that we have not done here.  They did
4  diligent inquiries, and they determined that prior to
5  adoption of their laws, they determined that indeed
6  almost every one in those states had DMV
7  identifications.  So everyone in Georgia had a DMV
8  identification, and only 43,000 people in Indiana did
9  not have a DMV identification.  So that's much different
10  from what we have here.
11       Also, those states are much smaller.  And
12  in Texas with the location of driver's license offices,
13  et cetera, some people have to travel over 100 miles.
14  So even with an indigent's provision, that's not going
15  to allow people who are poor, indigent, impaired, have
16  difficult access to these places to be able to actually
17  register.  And I don't know what the implications are
18  for obligations under the NVRA, but we have not complied
19  with our obligations under the law.  And that has been a
20  problem in Indiana as well.
21       And I'd just say, finally, it's very clear
22  that the Texas law will impair and have a clearly
23  disparate disadvantage on people of color.  The forms of
24  ID selected are problematic.  There would have been
25  something better.  The forms of ID selected in Indiana
0337
1  and Georgia were both superior.  The criminal
2  prosecution will discourage.  We know that this might
3  impair compliance with the NVRA.  We know that there
4  have been so many problems with election officials that
5  this will empower them more so to disadvantage
6  individuals.  And we know that because of the time to
7  vote, the problem with identification and especially
8  cross-racial identifications, the issue of the
9  expirations and the types of the IDs selected, those
10  things are going to further reduce the minority vote.
11  So we think this is a covered jurisdiction, and you can
12  look at this in a different way.  Thank you.
13       SEN. ELTIFE:  Mr. Bledsoe, thank you.  And
14  some members do have questions for you.
15       Senator West?
16      QUESTIONS FROM SENATE FLOOR

TX_00001051
JA_001050
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001051

USA_00015932

17   SEN. WEST:  Thank you very much,
18  Mr. Chairman.
19       Mr. Bledsoe, thank you also.  Now, you've
20  been the President of the NAACP Conference -- state
21  conference for how many years now?
22       MR. BLEDSOE:  Twenty years.
23       SEN. WEST:  Twenty years.  Is there a
24  well-documented history of voter suppression that is
25  specifically related to race and ethnicity in this
0338
1  state?  And how would this voter ID law fit into that
2  particular history?
3       MR. BLEDSOE:  Well, I think it's
4  consistent with the history, and that's sad.  You know,
5  I think that we've seen Texas really evolve in a lot of
6  ways.  And, you know, Texas has had a history where in
7  recent years I had a lot of bipartisan cooperation.  And
8  I know that when we've done report cards in the past, we
9  had people in both parties that were doing exceptionally
10  well on our report card.
11       But we haven't extricated ourselves from
12  the past.  And indeed when we look at the past and we
13  look at all the disenfranchisement that's taking place,
14  this is a direct extension of that because indeed if one
15  wanted a voter ID law, there would be a way of having a
16  voter ID law that would be more enabling, that would not
17  suppress the vote.  Because what we want people to do is
18  to go out and to compete and to actually say that we
19  will compete for the minority vote and not have a law
20  that we think will have a clear disadvantage in terms of
21  suppressing the minority vote.
22       SEN. WEST:  Would you -- so do you believe
23  that this voter ID law will, in fact, discriminate
24  against people of color?
25       MR. BLEDSOE:  There's no question, again,
0339
1  the types of IDs that are selected, the time period with
2  the nature of the jobs that African-Americans have and
3  the requirement for African-Americans to come in and
4  actually produce their proof within a certain period of
5  time.  We've had enormous problems in this state with
6  the cross-racial identifications, and I can just see
7  enormous problems with that.  Especially with the kinds
8  of things that we've seen in Bell County and some other
9  places here recently, we know that's going to be a
10  problem.
11       And we know, too, that in terms of the
12  issue of expirations, that's going to be a problem.  And
13  if you look at state data on like voter -- excuse me --
14  motor vehicle ownership, our access to vehicles, you'll
15  find there's a big disparity among racial groups.  And
16  so we're talking about the poorest of minority groups
17  not truly having access to be able to go and access the
18  identification.  So I think it's clearly going to have a

TX_00001052
JA_001051

TX_00001052

USA_00015933

19  disparate impact.
20        SEN. WEST:  So is it your testimony that
21  this particular voter ID bill will discourage as opposed
22  to encourage people to participate in the electoral
23  system?
24        MR. BLEDSOE:  It will; it clearly will.
25  And, you know, one of the big things obviously is the
0340
1  criminal prosecution, but then there are the other
2  provisions as well where you make it so difficult for
3  people.  You know, we've had, in numerous instances,
4  Fort Bend, Harris, Bowie Counties, where individuals
5  have been turned away, who weren't even allowed to cast
6  a provisional ballot.  And so that's a problem.  You
7  know, it's kind of like the thing in Indiana when the 12
8  nuns were attempting to vote, and they did not allow 12
9  nuns to vote because they didn't bring their voter
10  identification with them.
11        SEN. WEST:  It was 12 of them?
12        MR. BLEDSOE:  Twelve; 12 nuns, yes.
13        SEN. WEST:  Twelve.  Okay.  Huh,
14  interesting.
15        Now, let me ask this question, sir:
16  You've had an occasion to speak with many
17  African-American elected officials concerning voter
18  identification laws over the last few years.  Is that
19  correct?
20        MR. BLEDSOE:  That's correct.
21        SEN. WEST:  Have you found any
22  African-American legislators -- any African-American
23  elected officials in the state of Texas that are in
24  favor of the voter identification laws that are being
25  considered by the Texas Legislature?
0341
1        MR. BLEDSOE:  We've seen none.  And, you
2  know, our group is unanimously opposed to it.  And, you
3  know, we've got Republicans and Democrats in our
4  leadership.  And let me say that one of our folks that I
5  think you even know, Senator -- I don't know that you
6  know this -- but Obie Greenleaf, who is a city
7  councilman now up in Sherman, he just went and tried to
8  renew his registration, and he was pulled out of line,
9  told he had to go home and get -- and get his birth
10  certificate.
11        SEN. WEST:  And he's a city councilman?
12        MR. BLEDSOE:  He's a city councilman.  And
13  another African/American male, who is 80 years old, was
14  told to do the same thing.  Now, all the whites in line
15  were not pulled out.
16        And, you know, we've done some surveys
17  around the state, and we're not complying with NVRA.  So
18  there is a real problem with our people being registered
19  to vote by our agencies.
20        SEN. WEST:  Well, there have, in fact,

TX_00001053
JA_001052
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001053

USA_00015934

21  been some campaigns that have been launched lately -- or
22  back in 2005, 2006, campaigns against voter fraud.  Do
23  you remember those campaigns by the Attorney General?
24       MR. BLEDSOE:  I'm aware.
25       SEN. WEST:  And some of the images that
0342
1  were used there within the content of those campaigns?
2       MR. BLEDSOE:  I think those things became
3  part of litigation, if I'm not --
4       SEN. WEST:  All right.  So, frankly, the
5  passage of this particular bill will encourage
6  additional litigation in the civil rights area.  Is that
7  correct?
8       MR. BLEDSOE:  There's no question.  Let's
9  look at the PV 19, for example --
10       SEN. WEST:  Right.
11       MR. BLEDSOE:  -- and the 19 children who
12  bore the names of their fathers, and they were
13  wrongfully prosecuted because they voted in Waller
14  County.  And that county still has enormous problems.
15  You know, we had a couple years ago where the county
16  registration officials declined to follow through and
17  tender legitimately completed voter registration cards
18  to be registered, and that was right before an election,
19  and that continues to be a problem.  And if it wasn't
20  for the AG's Office telling them ultimately to register
21  those voters, I don't know if they ever would have been
22  registered, but they were not registered before the
23  election.  So there was an impact in them not following
24  through and registering those voters.
25       SEN. WEST:  Well, sir, I appreciate your
0343
1  advocacy, and needless to say you're steadfast as it
2  relates to protecting the rights and civil rights of
3  people in this state.  Thank you.
4       MR. BLEDSOE:  Thank you.
5       CHAIRMAN DUNCAN:  The Chair recognizes
6  Senator Hinojosa.
7       SEN. HINOJOSA:  Thank you, Mr. Chairman.
8  Mr. Bledsoe, thank you for your testimony.  And I was
9  very interested as you described the history in where
10  minorities for a long time were being kept from voting
11  and exercising their right to vote.  You talk about many
12  problems from intimidation, I guess, to the poll tax.
13  Can you name some of those situations, for example,
14  where laws have been passed for the sole purpose of
15  trying to suppress the vote of minorities?
16       MR. BLEDSOE:  Obviously there were --
17  there were a number of those that occurred.  One of the
18  things that we had in our state was the grandfather
19  clause.  You know, we had had poll taxes in this state,
20  and ultimately in this state they ended up passing the
21  rule that was used in the Democratic Primary, which at
22  that time there were -- the two parties were the

TX_00001054
JA_001053
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001054

USA_00015935

23  conservative Democrats and the liberal Democrats. And
24  so if you didn't vote in that Democratic primary, you
25  really didn't have a vote.
0344
1            And that had to go -- the NAACP litigated
2  that case, and we first defeated that system back in, I
3  think, '28 or '29 before the Supreme Court, but they
4  finessed the rule. And so the NAACP had to litigate it
5  again, go to the Supreme Court again in 1944 where it
6  was finally invalidated. So there have been quite a few
7  instances. But if you happened to be African-American
8  or Latino and your grandfather had not been able to vote
9  in 1910, the teens or the '20s, '30s, you couldn't vote
10  either.
11           SEN. HINOJOSA: And as you well know,
12  Texas right now is under a Voting Rights Act.
13           MR. BLEDSOE: That is correct.
14           SEN. HINOJOSA: And they have an actual
15  burden to prove that whatever laws they pass in terms of
16  voting doesn't discriminate or suppress the vote against
17  minorities.
18           MR. BLEDSOE: And that's one thing they
19  didn't have in Indiana. That's an additional obstacle
20  that they'll have to encounter with the law in this
21  state.
22           SEN. HINOJOSA: And as you recite history,
23  it seems to me that many times different laws, different
24  methods are used to try to suppress the vote of
25  minorities, and they use different euphemisms and
0345
1  different names. And it seems to me that the purpose of
2  the voter ID legislation is, again, to suppress the
3  vote. Are you familiar with the Carter-Baker Commission
4  and Federal Election Reform?
5           MR. BLEDSOE: Yes, I am.
6           SEN. HINOJOSA: Yeah. Well, one of the
7  studies they made would show that here in Texas where we
8  have approximately 13 million registered voters, that if
9  we pass voter ID, it would disenfranchise approximately
10  3 million voters, mostly minorities. Are you surprised
11  at that?
12           MR. BLEDSOE: I'm not, because I think
13  this will have enormous implications. And again, if we
14  wanted to look at Indiana or Georgia, I would have
15  problems, but those laws -- they are so much less
16  restrictive than what's being proposed here. This law
17  would have enormous implications because of the way that
18  it is written. So it seems like instead of seeking the
19  least restrictive means, we're seeking the most
20  restrictive means.
21           SEN. HINOJOSA: And as you describe the
22  different problems that exist in terms of sometimes
23  intimidation, sometimes in placing obstacles to
24  minorities to vote, have you come across a lot of

TX_00001055
JA_001054
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001055

USA_00015936

25  instances where there's voter fraud where a person tried

0346

1  to impersonate a registered voter?

2          MR. BLEDSOE:  I have not seen of such a

3  situation, Senator.  I think there are very few

4  situations because you are putting yourself in harm's

5  way when you do that, even under the current laws.  So I

6  think there are fail-safes under the current law that

7  would prevent you from doing that.  But be that as it

8  is, I think that it's pretty much widely acknowledged

9  today that that's really -- really not a problem.

10          SEN. HINOJOSA:  And, for example, the last

11  ten years, do you know how many prosecutions have taken

12  place in terms of indicting a person for trying to

13  impersonate a registered voter?

14          MR. BLEDSOE:  I think I saw something on

15  the Internet maybe about one in South Texas recently and

16  one person, and there might have been something in

17  Harris County.  But in all those years, maybe one or

18  two, and I don't know if they were successful or not.

19          SEN. HINOJOSA:  Well, if you compare the

20  number of people who have been indicted, maybe three or

21  four or five in the last five or six years that try to

22  impersonate a voter, to the negative impact that this

23  piece of legislation would have on minorities by

24  disenfranchising approximately 3 million who do not

25  carry photo ID, don't you think it's a little bit out of

0347

1  balance and a steep price to pay?

2          MR. BLEDSOE:  It is.  Again, if we wanted

3  to have the integrity, there are things we could do to

4  ensure integrity more so than what we're actually doing

5  here.  You know, there have been good and great

6  suggestions that have been put forth.  And again, the

7  distinctions between Indiana and Georgia is the DMV had

8  IDs on almost all those folks.  So when we went to the

9  Department of Justice in Georgia to get preclearance,

10  Georgia could tell DOJ that 100 percent of our people we

11  have IDs on already, and that's something we don't have.

12          SEN. HINOJOSA:  Thank you for your

13  testimony.

14          MR. BLEDSOE:  Thank you, sir.  Thank you,

15  Mr. Chair.

16          CHAIRMAN DUNCAN:  Hold on just a minute.

17          Senator Ellis?

18          SEN. ELLIS:  Yeah, briefly, Mr. President.

19  I just wanted to thank Mr. Bledsoe.  I called him last

20  night and asked him to come.  I know he had client

21  business and court matters toady, and you've been

22  waiting all day to testify.  I think my colleagues asked

23  the questions I would have asked, but I just wanted to

24  publically thank you for staying here all day today.

25          MR. BLEDSOE:  Thank you, Senator.  I

0348

1   appreciate it.  Thank you.
2         CHAIRMAN DUNCAN:  Are there any other
3   questions of the witness?
4         (No response)
5         CHAIRMAN DUNCAN:  Thank you, Mr. Bledsoe.
6   We appreciate your appearance here today.
7         TESTIMONY BY ANDRES TIJERINA
8         CHAIRMAN DUNCAN:  Dr. Andres Tijerina.
9   Dr. Tijerina, state your name and who you represent.
10         MR. TIJERINA:  My name is Andres Tijerina
11   representing myself.
12         CHAIRMAN DUNCAN:  You may begin.
13         MR. TIJERINA:  I'm a citizen of Austin, a
14   citizen of Texas, born in Texas, and I'd like to provide
15   some useful information to give a historical perspective
16   to voting laws and specifically those that have been
17   discriminatory against Mexican-Americans and minorities
18   in Texas.
19         As I said, I am from Texas.  I'm from West
20   Texas.  I have a BA from A&M, a masters from Tech, a
21   Ph.D. from The University of Texas at Austin, and I also
22   worked as the liaison officer for the United States Air
23   Force Academy in Colorado Springs.  I'm a retired Air
24   Force officer.  I'm a member of the Texas State
25   Historical Association among other associations.  I'm
0349
1   also a Fellow of the TSHA, and I've conducted research
2   here at the State Archives, the National Archives,
3   University of Texas and other places in order to write
4   numerous books and publications that I've published
5   through Texas A&M University press and other refereed
6   publications, primarily on Texas history and
7   Mexican-American history that's given me this -- a
8   perspective that I'd like to share with you all this
9   afternoon.
10         Texas, I think, has a legacy and a history
11   of voter discrimination that is very clearly directed
12   and explicitly directed at Mexican-Americans to
13   specifically and effectively keep them from voting that
14   goes way back to the establishment of Texas right after
15   it was annexed to the United States and goes right on up
16   to the present.
17         It has a record of establishing and
18   writing laws to create legal devices and to take actions
19   specifically intended to intimidate Mexican-Americans
20   and minorities from voting, to drive them away from the
21   polls; actions to divide and to redistrict their
22   population base, their counties, specifically directed
23   to keep them from voting or to weaken their voting
24   effect in Texas; devices and actions to literally
25   terrorize them through the years, through the decades.
0350
1         The effect has been to effectively reduce
2   the number of Mexican-Americans who have voted through

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

3  the years, through the history of Texas, and at the same
4  time to leave an impact or a legacy among their
5  community of distrust of the state government and even a
6  fear of state government and state law enforcement
7  officials. This has been done in many ways that
8  appeared beneficial or that were presented as beneficial
9  even innocuous laws. Many of the people who effected
10  this were people who approached Mexican-Americans
11  innocuously or supposedly to help them.
12        Political bosses, Texas has some of the
13  most powerful political bosses, or had through history,
14  Jim Wells, Robert Kleberg, George Parr, who used very
15  explicit and physical methods, literally corralling
16  hundreds of Mexican-American voters, thousands of
17  Mexican-American voters, primarily in the years from
18  around 1870 until around 1940, 1950, where they would
19  literally corral hundreds or thousands and direct those
20  votes, either through assistance to them by hiring them
21  to work on the county at election time or literally
22  through intimidation or specific assassinations. In any
23  case, taking hundreds or thousands of Mexican-Americans
24  and then directing them to vote for people who became
25  great Texans, Lyndon B. Johnson, John Nance Garner,
0351
1  Edward M. House, who benefited from corralling of
2  Mexican-American voters, either through assistance to
3  those voters or intimidation and threats of those
4  voters.
5        The Terrell Election Law, which was
6  presented as a beneficial law, actually created a poll
7  tax specifically directed at Mexican-American voters to
8  keep them from voting, a 1918 law to explicitly
9  eliminate interpreters; other devices like the white
10  man's primary that required that people take an oath
11  that said that they were a white man and a Democrat; but
12  also violence, violence that is almost unbelievable
13  today, even considering the violence that we see in
14  today's newspapers, even considering the violence you
15  see in Mexico; Texas Rangers, law enforcement officials
16  or vigilante groups in Harlingen, Edinburg, across Texas
17  all the way out to El Paso, riots in which the
18  Anglo-American, 4,000 Anglo-American riders in 1916 in
19  Harlingen chanting, "Keep the Mexicans from voting,"
20  literally rioted and lynched several Mexican-American
21  U.S. citizens to keep them from voting; Texas Rangers
22  literally ethnic-cleansing hundreds and thousands of
23  U.S. citizens, shooting them in the back of the head
24  under sworn testimony that we have here in the Texas
25  State library, all of them explicitly to keep them from
0352
1  voting at election time; going through the barrios in
2  Corpus Christi and Harlingen at election time, riding
3  through and telling them, "Any Mexican-American citizen
4  caught voting would be either killed or sent to prison."

TX_00001058
JA_001057
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001058

USA_00015939

5       That's the heritage of Texas, and it goes
6   all the way on up to the lynchings in the 1930s, 1940s
7   of Mexican-Americans.  And then later all the way up
8   through the 1960s and 1970s, Mexican-American
9   organizations, LULAC, GI forum and voter right --
10  Southwest Voter Education Project of Woody Velasquez,
11  having to literally engage in lawsuits to try to enforce
12  the 1965 Voter Rights Act that has continued up until
13  last -- well, 2008, in this very county, a group tried
14  to, in effect, limit the extension of the Voter Rights
15  Act and actually had to go up to an appeals court of the
16  U.S. Supreme Court.
17       So the record of Texas has been
18  specifically directed against Mexican-Americans and
19  minority voters, and it's been very effective, not only
20  in limiting and reducing their votes, but also in
21  creating a legacy among their community of distrust of
22  our state government, distrust of our voting process,
23  distrust of the democratic process and even fear.  Thank
24  you.
25       CHAIRMAN DUNCAN:  Thank you, Dr. Tijerina.
0353
1        Are there any questions?
2        (No response)
3        CHAIRMAN DUNCAN:  All right.  The Chair
4   hears none.  We appreciate your testimony.
5        MR. TIJERINA:  Thank you.
6        QUESTIONS FROM SENATE FLOOR
7        CHAIRMAN DUNCAN:  Oh, I'm sorry.  Excuse
8   me.  We do have Senator Gallegos.
9        Excuse me, Senator.
10       SEN. GALLEGOS:  Professor, let me ask
11  you -- I mean, I just heard your testimony and the
12  history, and you've said all that discrimination has
13  been targeted mainly to Mexican-Americans here in the
14  state of Texas.  Is that correct?
15       MR. TIJERINA:  Yes, sir, very explicitly
16  to Mexican-Americans.
17       SEN. GALLEGOS:  So let me ask you, in your
18  expertise on history discrimination except as compared
19  to voting rights, how would you compare the present bill
20  that is before us as to some of the intimidation and
21  discrimination factors that you had just described to us
22  in the past and some of the bills that were for like the
23  no interpreters?  That was in 1918?
24       MR. TIJERINA:  Yes, sir.
25       SEN. GALLEGOS:  And some of the other
0354
1   issues that you brought up.  How would you compare this
2   Senate Bill to the past history that you described to
3   this chamber?
4        MR. TIJERINA:  That those in history also
5   were presented in a very positive good light.  The
6   people who presented these laws and the people who took

TX_00001059
JA_001058
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001059

USA_00015940

7   the action, the rioters who lynched Mexican-Americans
8   called themselves the Good Government League.  They had
9   good names.  The people who killed and assassinated
10  hundreds, even thousands of Mexican-American/U.S.
11  citizens, called themselves Progressives.  The laws that
12  were passed by Terrell himself in the Terrell Election
13  Law of 1903, he explicitly stated that he wanted to
14  "kill the Mexican vote."  The candidates during that
15  time period who campaigned for the U.S. Senate -- it's
16  in the Senate record -- campaigned that their intent --
17  that their intent was to kill the Mexican vote.  And yet
18  the way the poll tax was written, the way the Terrell
19  Election Law was written, it was innocuous.  It was
20  beneficial.  It was written specifically to assure that
21  only those legal voters could vote and to clean up the
22  elections.
23          So to read the Terrell Election Law itself
24  was very innocuous or beneficial, and yet to hear
25  Terrell himself speak, he was very explicit.  He wanted
0355
1   to "kill the Mexican vote," and that's how I would
2   compare them.
3          Many of these devices through the years
4   are written to sound beneficial or innocuous, and yet
5   they have just the opposite effect.
6          SEN. GALLEGOS:  Professor Tijerina, what
7   you're describing to me and what I just heard is what
8   I've seen on television recounts of what happened in
9   Mississippi and in Alabama and those southern states
10  that prevented African-Americans from either registering
11  or voting.  Is that what you're comparing this to?
12          MR. TIJERINA:  I think it would -- it
13  would have a parallel, yes, sir.
14          SEN. GALLEGOS:  Let me ask you, is there
15  any evidence that old historical discriminatory actions
16  are relevant or applicable today?
17          MR. TIJERINA:  Yes, sir, in the sense that
18  there has been and there is a legacy today in Texas of
19  voter discrimination, voter intimidation and a legacy of
20  fear and distrust; yes, sir.
21          SEN. GALLEGOS:  Professor, let me ask you
22  also, is there any evidence -- well, I think you just
23  answered this -- of innocuous or beneficial election
24  laws that may have actually had the intent to
25  disenfranchise Mexican-Americans -- Mexican-American
0356
1   voters?
2          MR. TIJERINA:  Yes, sir, those that I just
3   cited.
4          SEN. GALLEGOS:  Okay.  I just -- I just
5   wanted to be clear on that fact.  Thank you very much,
6   Professor.
7          MR. TIJERINA:  Thank you.
8          CHAIRMAN DUNCAN:  Are there any other

TX_00001060
JA_001059
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001060

USA_00015941

9   questions of the witness?
10         (No response)
11         CHAIRMAN DUNCAN:  All right.  The Chair
12   hears none.  The witness will be excused.  Thank you.
13         TESTIMONY BY CHASE BEARDEN
14         CHAIRMAN DUNCAN:  The Chair calls
15   Chase Bearden.  Please state your name and who you
16   represent.
17         MR. BEARDEN:  My name is Chase Bearden.
18   I'm with the Coalition of Texans with Disabilities.
19   Good afternoon.  Thank you for a chance to speak to all
20   of you.
21         We have spent some time looking at voter
22   ID, and we feel that there is a portion that will
23   disenfranchise a large number of Texans with
24   disabilities.  We've looked at just the logistics of
25   trying to reach a place to get this free ID that
0357
1   everyone has talked about.
2         There's a large cost associated for a
3   person with a disability who lives in a rural area or
4   place that's farther out to try and reach a DPS office
5   to try and get these IDs.  The majority of people with
6   disabilities, especially that have had one for their
7   entire life, may not have ever gotten a driver's
8   license.  They may not have a Texas license.  They more
9   than likely don't have a passport.  So when you look at
10   trying to get the IDs that you need to go and vote,
11   you're starting off at a large cost.
12         The majority of people with disabilities
13   that are wanting to get these IDs will have to probably
14   go and get their birth certificate.  To find someone who
15   can actually pick them up, drive them there, find an
16   accessible vehicle, if they don't have one, or find a
17   bus line that actually goes to where they can get a
18   birth certificate is going to be very difficult.  A lot
19   of people said, "Well, maybe they can go online.  They
20   could access and get their birth certificate sent to
21   them online."  There's a large number of Texans with
22   disabilities who are living on a very small amount of
23   money each month.  They more than likely don't have a
24   computer to even access the Internet much less a
25   provider or a credit card that they could use to access
0358
1   the birth certificate they need.  It also takes quite a
2   while to get that birth certificate if you were to
3   access that online unless you were to expedite it.
4         Then after getting that, you would have to
5   find a way to get to the DPS office.  If you do live in
6   a very rural area and you have a significant disability,
7   maybe you're using a power chair and your family doesn't
8   have an accessible van to be able to get you somewhere,
9   you have to look at how are you going to be able to make
10   it to where that person can access these IDs easily.

TX_00001061
JA_001060
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001061

USA_00015942

11          One of the other areas that we looked at
12  was people living in nursing homes, state-supported
13  living centers who might not be able to access the IDs
14  they need to go and get identification.  Do we have
15  something in place that's going to allow them to be able
16  to go and more than likely not be able to catch a ride
17  or hop in their car and drive down to the DPS office.
18  They are living in a state-supported living center, but
19  they still have the right to vote.
20          So looking at how they would get their
21  identifications, we feel like they would still more than
22  likely be put in a place where they are not going to be
23  able to get the identification they need.
24          One of the other areas that we looked at
25  was that there's an exemption for a person that's over
0359
1  70.  And when we thought about that, isn't that similar
2  to the same issues that a person with a disability might
3  be facing, a harder time getting transportation to get
4  in to go get that ID, maybe the cost, living on a fixed
5  income?  So we have an inconsistency that kind of keeps
6  the same person from getting the ID they need, that free
7  ID, but we're giving an exemption to someone else.
8          When we started looking at a person who is
9  traveling to go and actually vote and they get there and
10  they don't have the correct ID or they are missing
11  something, so they have to cast a provisional ballot,
12  trying to get back there within six days can sometimes
13  be logistically impossible for a person.  They might
14  have had to get public transportation to go and get
15  there.  So they had to set up a ride through one of the
16  kind of disability bus systems, but they might not be
17  able to get a ride again or to get to the place to get
18  the documentation they need to get back and cure their
19  ballots.
20          Currently right now there are being bills
21  filed that would reduce the accessibility at some of the
22  polling places on nonfederal elections.  They wouldn't
23  have to use all the accessible voting machines.  We feel
24  like if you end up passing a law like that and then you
25  add voter ID to that and you're kind of putting a burden
0360
1  on someone trying to force them to get an ID that they
2  might not be able to get to, and then they get to the
3  polling place and they don't even have the accessibility
4  they need to cast a private ballot.  It's just recently
5  in 2001 that we've been able to get the technology we
6  need to cast that private ballot without someone else
7  doing it for us.  And now we're looking at having that
8  removed and then being forced to try and find an ID
9  that's acceptable that might not be obtainable by
10  everyone.
11          So we ask that y'all take the time to
12  really investigate how these IDs will really affect

TX_00001062
JA_001061
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001062

USA_00015943

13  someone who might not be able to obtain what it is y'all
14  are asking for.  Thank you.
15        CHAIRMAN DUNCAN:  Thank you, Mr. Bearden.
16         QUESTIONS FROM SENATE FLOOR
17         CHAIRMAN DUNCAN:  Senator Zaffirini?
18         SEN. ZAFFIRINI:  Thank you for being with
19  us this afternoon, Mr. Bearden.  Excellent testimony.  I
20  have several questions for you that will focus on the
21  needs of persons with disabilities and how they will be
22  impacted if Senate Bill 14 were to pass.
23         First, are persons with disabilities less
24  likely to have a current driver's license, military ID
25  or passport than the general population of voters?
0361
1         MR. BEARDEN:  I think there's probably a
2  large number of people with disabilities who don't have
3  a current driver's license or who don't have a driver's
4  license.  Many depend on the bus system, and they live
5  in areas where they can access buses.  Not all the bus
6  systems will access DPS.  Not all people with
7  disabilities are going to have a passport.  Many of them
8  are living on a fixed income and more than likely are
9  not traveling abroad.  They more than likely have not
10  been in the military or are carrying any other type of
11  ID.
12         SEN. ZAFFIRINI:  And what is the reason
13  for this?  Why is it that persons with disabilities --
14  and I'm trying to enter it into the record.  Why is it
15  that persons with disabilities are less likely than
16  other voters to have these documents?
17         MR. BEARDEN:  People with disabilities
18  tend to be of the lowest demographics when it comes to
19  having jobs, having income.  They are having a harder
20  time trying to get the services they need.  So being
21  able to have a driver's license or a passport is a lot
22  of times unobtainable.
23         SEN. ZAFFIRINI:  Thank you.  What
24  additional barriers do persons with disabilities have in
25  obtaining the forms of ID requested or required by
0362
1  Senate Bill 14.
2         MR. BEARDEN:  Could you repeat that again?
3         SEN. ZAFFIRINI:  What additional barriers
4  do persons with disabilities have or would have in
5  obtaining the forms of identification required by Senate
6  Bill 14?
7         MR. BEARDEN:  I think many of the barriers
8  would be -- I think it was brought up that one of the
9  DPS offices was inaccessible.  There's still
10  accessibility issues in Texas.  We've had accessibility
11  issues in polling places.
12         When you look at trying to get $22 put
13  together to buy a birth certificate, have to take the
14  time to get that birth certificate, then go to get

TX_00001063
JA_001062
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001063

USA_00015944

15 another ID, I think when you look at the amount of money
16 that that is -- and I know everyone doesn't feel it's a
17 large amount of money -- but someone living on a fixed
18 income, on SSI, that is a large portion of their funds,
19 and a lot of them won't be able to obtain it.
20      SEN. ZAFFIRINI:  Would the voter
21 identification required in this bill be sufficient to
22 ensure access to accurate information about the new ID
23 requirement information for the full range of persons
24 with disabilities in our state?
25      MR. BEARDEN:  We don't feel it will.  The
0363
1 majority of people who have disabilities are living on a
2 fixed income.  They don't have access to a computer.
3 They don't have access to the Internet and more than
4 likely not to have a newspaper to receive the
5 information.  So we don't feel that they will be able to
6 get all the information.
7      SEN. ZAFFIRINI:  Thank you.  What effect
8 do you believe that Senate Bill 14 would have on the
9 turnout of voters with disabilities?
10      MR. BEARDEN:  The turnout of voters with
11 disabilities has increased up to -- we feel like it will
12 decrease.  The majority of people will show up.  They'll
13 try and cast their vote.  They will have to do a
14 provisional ballot, and I think when they start to look
15 at having to come back, they will have a harder time
16 making it.  The journey getting there sometimes is
17 incredibly difficult, trying to find a way to get there,
18 trying to get everything in order to be able to get
19 there.  So we do think it will decrease the turnout.
20      SEN. ZAFFIRINI:  Thank you.  Now, thinking
21 specifically of persons with disabilities who are
22 registered voters and who do have a photo ID, is there
23 any way that they would be impacted negatively by Senate
24 Bill 14?
25      MR. BEARDEN:  I think they could be if
0364
1 they do not bring their ID.  The majority of people with
2 disabilities, if they had a photo ID and were to show up
3 without it or to have one that has expired, may not have
4 the time to actually go afterwards, get an ID redone or
5 to get a current ID to be able to make it back and have
6 their ballot cured in time.
7      SEN. ZAFFIRINI:  Would part of the problem
8 be that they might have a photo ID that is very old?
9      MR. BEARDEN:  I think that's very
10 possible.  There's a lot of people who might have
11 received an injury who were driving before who are not
12 driving anymore, who have held onto an ID that has
13 expired.  That's all they've needed.  So more than
14 likely if they are not driving and their ID is expired,
15 they probably won't have a current ID.
16      SEN. ZAFFIRINI:  And they might have a

TX_00001064
JA_001063
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001064

USA_00015945

17  driver's license that has expired, too --
18        MR. BEARDEN:  Uh-huh, yes.
19        SEN. ZAFFIRINI:  -- that would have a
20  photo?
21        What affect do you believe Senate Bill 14
22  would have on the number of provisional ballots cast by
23  voters with disabilities?
24        MR. BEARDEN:  I think we'll have a lot --
25  a larger amount of provisional ballots casted, and I

0365
1  don't think we will be able to -- in the next few
2  elections be able to educate people fast enough to be
3  able to lower that level.  We've spent since 2001
4  educating people, that they have the technologies now to
5  make an independent, private vote themselves.  And it
6  took time to get people to understand that if they were
7  visually impaired, they didn't have to rely on someone
8  else anymore.  They went before, they had a bad
9  experience, weren't able to cast their own ballot, and
10  then once we passed HAVA and they had the technology to
11  cast their own ballot, it took us time to get people
12  educated to know that they can still do that and how to
13  do that.  So I think we would be kind of taking steps
14  backwards by doing this.
15        SEN. ZAFFIRINI:  To your knowledge, have
16  HAVA funds been used specifically to increase the access
17  of persons with disabilities to polling places.
18        MR. BEARDEN:  Yes, they have.  We've
19  specifically worked with HAVA and the Secretary of
20  State's Office to increase Texans with disabilities
21  voter outreach.  We've also worked with them on finding
22  access issues.  So I think these funds would be greatly
23  hampered, and the ability for Texans to be able to vote
24  would have problems.
25        SEN. ZAFFIRINI:  Do you have any concerns

0366
1  about the plan or the possibility of diverting
2  $2 million in HAVA funds to pay for this Senate Bill 14
3  instead?
4        MR. BEARDEN:  Yes.  Because right now I
5  believe that's about what they are spending to do all
6  the outreach and to work on accessibility and to
7  maintain some of the voting machines.  Right now what
8  they've said, the reason -- I believe one of the House
9  bills that's been filed to not have to have the
10  accessible voting machines is that it's a higher cost
11  during nonfederal elections.  If that's the case and the
12  counties are not able to afford to make -- have an
13  accessible machine, the funds that could have helped
14  them are probably now going to be taken away to let
15  people know that they're going to need an ID.
16        SEN. ZAFFIRINI:  So it is your testimony
17  that if $2 million in HAVA funds are diverted for the
18  purpose of Senate Bill 14, that there could be a

TX_00001065
JA_001064
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001065

USA_00015946

19  negative impact on the accessibility of persons with
20  disabilities to the polling places?
21          MR. BEARDEN:  Yes.
22          SEN. ZAFFIRINI:  Thank you.  Now,
23  Mr. Bearden, you represent the Coalition of Texans with
24  Disabilities?
25          MR. BEARDEN:  Yes, I do.
0367
1          SEN. ZAFFIRINI:  And that comprises
2  different member organizations?
3          MR. BEARDEN:  Yes, it does.
4          SEN. ZAFFIRINI:  Who are some of those
5  member organizations?
6          MR. BEARDEN:  We have organizations that
7  are not disability related.  We have a majority of
8  disability groups that are out there.  I think we
9  have --
10          SEN. ZAFFIRINI:  Do you have veterans, for
11  example --
12          MR. BEARDEN:  We do; we do.
13          SEN. ZAFFIRINI:  -- with disabilities?
14          MR. BEARDEN:  We have veterans'
15  associations.  We have organizations that are more
16  specific to single disabilities.  We've worked with
17  groups of older Texans.
18          SEN. ZAFFIRINI:  And is your testimony
19  today personal, or are you representing this Coalition
20  of Texans with Disabilities?
21          MR. BEARDEN:  I'm representing the
22  Coalition of Texans with Disabilities.
23          SEN. ZAFFIRINI:  Have they discussed this
24  bill thoroughly?
25          MR. BEARDEN:  Yes.
0368
1          SEN. ZAFFIRINI:  And what is their
2  consensus about this bill?
3          MR. BEARDEN:  We feel it will
4  disenfranchise a portion of Texans with disabilities.
5          SEN. ZAFFIRINI:  And you are speaking for
6  this coalition --
7          MR. BEARDEN:  -- yes.
8          SEN. ZAFFIRINI:  -- when you stand in
9  opposition to this bill?
10          MR. BEARDEN:  Yes.
11          SEN. ZAFFIRINI:  Thank you.  Now, you're
12  familiar with the bill, of course, and you've seen
13  different versions of it through the years?
14          MR. BEARDEN:  Yes.
15          SEN. ZAFFIRINI:  Can you think of any
16  amendments that we could propose that would help address
17  the issues that are of concern to persons with
18  disabilities?
19          MR. BEARDEN:  I think an amendment that
20  might be similar to a person who is 70 years old who

TX_00001066
JA_001065
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001066

USA_00015947

21  would be able to say that they have a disability and
22  that maybe they have the registrar -- they have written
23  earlier to the voter registrar and stated they have a
24  disability that would affect them from being able to get
25  the ID to be able to just present their voter
0369
1   registration card.
2           SEN. ZAFFIRINI:  Are there any other
3   amendments that could cure this bill for you?
4           MR. BEARDEN:  I can't think of any right
5   now, but I could ask more of our groups.
6           SEN. ZAFFIRINI:  Well, I offer you the
7   opportunity to work with my staff today, and we will
8   address those concerns, and we will try to craft some
9   amendments that would suit your issues --
10          MR. BEARDEN:  Sounds good.
11          SEN. ZAFFIRINI:  -- and try to cure them.
12          MR. BEARDEN:  Thank you.
13          SEN. ZAFFIRINI:  Thank you very much,
14  Mr. Bearden.
15          Thank you, Mr. Chairman.
16          CHAIRMAN DUNCAN:  Thank you, Senator.  Are
17  there any other questions of Mr. Bearden?
18          (No response)
19          CHAIRMAN DUNCAN:  All right.  Thank you,
20  Mr. Bearden.  I appreciate your testimony.
21          Members, that concludes the invited
22  testimony for the day.  We have been going now for a
23  little over three hours, and so it's time for a short
24  break.  We'll take a 15-minute break, and then we'll
25  begin testimony with regard to our resource witnesses.
0370
1   My plan is just to call them up in the order that I've
2   previously announced, and you can ask any questions, and
3   then we'll go into public testimony after that.
4           So the Senate Committee of the Whole will
5   stand at ease until 5:45.
6           (Recess:  5:30 p.m. to 5:45 p.m.)
7           CHAIRMAN DUNCAN:  Senate Committee of the
8   Whole will come back to order.
9               RESOURCES TESTIMONY
10          TESTIMONY BY REBECCA DAVIO
11          CHAIRMAN DUNCAN:  We have -- Members, the
12  next portion of this hearing will be our resource
13  witnesses.  The first resource witness we announced
14  earlier will be Rebecca David (sic) with the Texas
15  Department of Public Safety.
16          Ms. David, why don't you come on up, state
17  your name and who you represent, and then we'll open the
18  floor to questions.
19          MS. DAVIO:  My name is Rebecca Davio.  I
20  am the Assistant Director for Driver Licenses at DPS.
21          QUESTIONS FROM SENATE FLOOR
22          CHAIRMAN DUNCAN:  Okay.  Senator

23  Zaffirini, you have a light on.  Are you -- would you
24  like to ask any questions?
25          SEN. ZAFFIRINI:  (Nodded)
0371
1           CHAIRMAN DUNCAN:  All right.  Any other
2   member have a question?  Senator Watson, you're
3   recognized.
4           SEN. WATSON:  Yes.  Thank you,
5   Mr. Chairman.  Ma'am, you may not be the right person to
6   ask this, but I was deferred earlier, and so I thought I
7   would ask a couple of questions and see if you are the
8   right person.
9           Right now when someone goes in to get an
10  identification, is it your office that provides that
11  identification card?
12          MS. DAVIO:  Yes, sir.
13          SEN. WATSON:  And how much is charged for
14  that identification card?
15          MS. DAVIO:  That card is $15.
16          SEN. WATSON:  All right.  So how much does
17  it cost you to produce the card?
18          MS. DAVIO:  $1.67 to produce and mail it.
19          SEN. WATSON:  All right.  So if we're
20  looking at it from a budgetary standpoint for the state
21  of Texas, it costs you $1.60, but currently the state
22  collects $15?
23          MS. DAVIO:  Yes, sir.  $1.67 is what our
24  costs are.
25          SEN. WATSON:  I'm sorry.  $1.67.  I
0372
1   rounded that down, didn't I?  So now you've made the
2   math completely hard for me and probably impossible.
3           MS. DAVIO:  I'm sorry.
4           SEN. WATSON:  But the bottom line to it is
5   there's a net -- 15 minus $1.67 gives the state of Texas
6   a net return?
7           MS. DAVIO:  Yes, sir.
8           SEN. WATSON:  Now, under this legislation,
9   have you seen that there is no means test for someone
10  that comes in to get an ID card?
11          MS. DAVIO:  No, sir.
12          SEN. WATSON:  You've not seen that, or am
13  I saying that right?
14          MS. DAVIO:  By "means test," do you mean
15  do they qualify?  Do they have to show economic
16  disadvantage?
17          SEN. WATSON:  That's right.
18          MS. DAVIO:  No, sir.
19          SEN. WATSON:  There's not a means test, is
20  there?
21          MS. DAVIO:  No, sir.  I didn't see one.
22          SEN. WATSON:  And, in fact, it forbids
23  your department from collecting a fee if an eligible
24  voter -- if a person is an eligible voter or submits a

TX_00001068
JA_001067
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001068

USA_00015949

25   registration application.  Is that right?
0373
1            MS. DAVIO:  Yes, sir.  That's the way that
2   I understand it.
3            SEN. WATSON:  And have you had a chance to
4   look at the fiscal note for this legislation?
5            MS. DAVIO:  Yes, sir.
6            SEN. WATSON:  Have you seen anywhere in
7   that fiscal note where it looks to try to determine what
8   the cost to the state of Texas would be for the state
9   losing the fees if people were able to get these
10   identification cards for free?
11            MS. DAVIO:  No, sir.  I don't believe
12   that's covered in the fiscal note.  We were unable to
13   estimate that because we didn't know how many people
14   would take advantage of the card -- of the free ID card.
15            SEN. WATSON:  But you would anticipate
16   some would, otherwise it wouldn't be in the bill.  Is
17   that right?
18            MS. DAVIO:  I'm sorry.  I don't understand
19   that question.
20            SEN. WATSON:  You would anticipate that
21   some people would attempt to get the card for free?
22            MS. DAVIO:  Yes, sir.  That would make
23   sense.
24            SEN. WATSON:  Are you familiar with the
25   legislation or the fiscal note that was attached to
0374
1   House Bill 218 in the 2007 session?
2            MS. DAVIO:  I'm sorry, sir.  I am not.  I
3   just started this job in June of this year.
4            SEN. WATSON:  Well, I don't -- that's one
5   of the better answers I've heard today.  So thank you.
6            Are you familiar with the fiscal note that
7   was attached to House Bill 2335 in the last session of
8   the legislature?
9            MS. DAVIO:  Again, no, sir.
10            SEN. WATSON:  Okay.  Thank you very much.
11            MS. DAVIO:  Thank you.
12            CHAIRMAN DUNCAN:  Senator Williams, you
13   are recognized.
14            SEN. WILLIAMS:  Thank you.  I appreciate
15   you being here tonight and staying with us all day.  I
16   have several questions that I wanted to ask just to
17   clarify some things that I think have been brought up as
18   we went along here.  For the record, can you tell us
19   what the requirements are for someone to receive
20   either -- well, to receive an official identification
21   card from the state of Texas?
22            MS. DAVIO:  Yes, sir.  Basically, those
23   requirements are quite simple.  You can say that you
24   have to verify that you qualify, and currently that is
25   proving that you are a U.S. citizen or you have lawful
0375

TX_00001069
JA_001068
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001069

USA_00015950

1  residence here. And the second thing is to demonstrate
2  who you are, to prove who you are by providing various
3  different types of identification.
4        SEN. WILLIAMS: Okay. Anything else? Do
5  you have to be photographed or fingerprinted or anything
6  like that?
7        MS. DAVIO: Yes, sir, you do have to be
8  photographed and fingerprinted and provide your
9  signature.
10       SEN. WILLIAMS: Okay. Can someone have
11  both a Texas driver's license and an ID?
12       MS. DAVIO: Yes, sir.
13       SEN. WILLIAMS: And if someone had a
14  driver's license and they wanted to come back and get a
15  free ID, if they wanted to stand in line to do that,
16  they could do that. Is that correct?
17       MS. DAVIO: Yes, sir, as I understand it.
18       SEN. WILLIAMS: Okay. How long does it
19  take once an applicant has submitted all of their
20  materials to DPS to actually mail out the physical ID?
21       MS. DAVIO: We issue a temporary receipt
22  that's good for 45 days. The time that it takes varies.
23  We are currently, I believe, running about 35 days
24  production and mailing time. There are times -- we're
25  having some equipment problems right now. There are
0376
1  times when it's shorter than that.
2        SEN. WILLIAMS: Okay. And the temporary
3  ID is valid for how long?
4        MS. DAVIO: Forty-five days.
5        SEN. WILLIAMS: Okay. About the same
6  amount of time that it takes to get the physical
7  license. Okay.
8        MS. DAVIO: Yes, sir.
9        SEN. WILLIAMS: What security features
10  does a temporary ID have?
11       MS. DAVIO: The temporary ID has a picture
12  of the ID or driver license applicant and also has their
13  basic demographic information that's shown on the
14  license.
15       SEN. WILLIAMS: Okay. There's been a lot
16  said about how many licenses -- how many license
17  offices -- driver's license offices we have around the
18  state.
19       MS. DAVIO: Yes, sir.
20       SEN. WILLIAMS: Can you tell me what the
21  total number of driver's license offices are?
22       MS. DAVIO: Yes, sir. There are 307
23  locations. Currently 226 of those are operating. That
24  includes 174 full-time offices, 34 part-time offices and
25  18 mobile offices that are open.
0377
1        SEN. WILLIAMS: Okay. And how many
2  counties do not have a driver's license office?

TX_00001070
JA_001069
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001070

USA_00015951

3      MS. DAVIO:  There are 77.
4      SEN. WILLIAMS:  Seventy-seven.  Okay.
5      MS. DAVIO:  Yes, sir.  And I do have a map
6  that shows the driver license offices if you'd like to
7  have that passed out.
8      SEN. WILLIAMS:  Okay.  I think we've had
9  one submitted earlier and -- no, we haven't?  Okay.
10  Well, let's -- why don't we go ahead and submit that
11  into evidence.
12      MS. DAVIO:  This map, when you get it,
13  will show the full-time, the part-time and mobile
14  offices that are open and the offices that are
15  temporarily closed.
16      SEN. WILLIAMS:  Okay.
17      CHAIRMAN DUNCAN:  Okay.  Ms. Davio, let us
18  first -- this will be Exhibit 9.
19      (Exhibit No. 9 marked)
20      CHAIRMAN DUNCAN:  And you've just
21  described Exhibit 9 as a map.  Driver's License Offices
22  in Texas is what the label is, and that will be
23  distributed.  Exhibit 9, is there any objection to
24  receiving that?
25      (No response)
0378
1      CHAIRMAN DUNCAN:  Exhibit 9 is received.
2      (Exhibit No. 9 admitted)
3      SEN. WILLIAMS:  Okay.  So we have 77
4  counties that don't have a license office.  Is that
5  correct?
6      MS. DAVIO:  Yes, sir.
7      SEN. WILLIAMS:  Okay.  And could you
8  describe for me briefly -- you mentioned that some
9  offices are temporarily closed.  Why are those offices
10  temporarily closed, and what is the department doing to
11  remedy that situation?
12      MS. DAVIO:  Yes, sir.  The DPS just
13  implemented our new driver license system, fully
14  implemented in May.  Our mobile offices are functioning
15  on equipment from our Legacy system, and that equipment
16  is very, very old.  And as it breaks, we are unable to
17  replace it.  We simply can't get parts.  We can't get
18  replacement pieces even trying to go out and buy things
19  on eBay, and so we have no other choice other than to
20  temporarily close that office.
21      We have tried to get new equipment --
22  equipment for our new system to work in these mobile
23  locations.  And the way that we've changed -- the way
24  that we have changed the way we do driver license, we're
25  pushing much more data through, and so we find it very
0379
1  difficult, impossible really, to get the new equipment
2  to work.
3      SEN. WILLIAMS:  So when you say Legacy
4  equipment and the new equipment, you're talking about

TX_00001071
JA_001070
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001071

USA_00015952

5 computers that you use to process the information --
6   MS. DAVIO: Yes, sir. I'm sorry.
7   SEN. WILLIAMS: -- that people get in?
8   MS. DAVIO: Yes, sir.
9   SEN. WILLIAMS: Okay. And so what kind of
10 information is being submitted? I guess what we're
11 trying to do is meet the qualifications of the REAL ID
12 Act, which is a federally mandated program -- right --
13 and that's why we're switching to this new equipment?
14   MS. DAVIO: Well, we're switching to the
15 new equipment because our old system was so old.
16   SEN. WILLIAMS: Right.
17   MS. DAVIO: There are many safeguards that
18 are built into the new technology. For example, we now
19 scan real-time all the documents that are brought in.
20 So it used to be that we had to make copies and send
21 those back to headquarters for scanning. They are now
22 scanned real-time, and we give the originals back to the
23 customer. We also capture a photo, the fingerprints and
24 the image of the person's signature.
25   SEN. WILLIAMS: So --
0380
1   MS. DAVIO: And that's a lot of data.
2   SEN. WILLIAMS: Yeah. And the issue is --
3 and have you tried using these mobile phone air cards or
4 anything like that to be able to have --
5   MS. DAVIO: We have tried using air cards.
6 We have tried using DSL lines. All of our offices,
7 full-time offices, use T1 lines, and that's been the
8 only thing that we can find.
9   SEN. WILLIAMS: Okay. So you mentioned to
10 me yesterday when we visited that you have an initiative
11 going on. Tell us a little bit about what you're trying
12 to do.
13   MS. DAVIO: Yes, sir. We realized that
14 closing these offices even temporarily might cause a
15 burden. What we're trying to do is look and be able to
16 provide a more consistent level of service. We found
17 that in some locations we only serve one or two or a
18 very small number of customers, when in our other
19 offices customers experience a very long wait time. And
20 so we're trying to equalize that level of service as
21 much as we can, provide a consistent high quality level
22 of service across the state.
23   So to do this we are doing a business
24 intelligence analysis project. That actually means that
25 we are looking at our data very carefully to see how
0381
1 many transactions are conducted at what location, how
2 long those transactions take, that kind of thing, so
3 that we can optimize the use of our resources. We
4 realize this is not a good time to come and ask for
5 additional resources, and so we're trying to make the
6 best use of the resources that we can through this

TX_00001072
JA_001071
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001072

USA_00015953

7    analysis project.
8           SEN. WILLIAMS: Okay. Can a noncitizen
9    get an ID card from the state?
10          MS. DAVIO: A noncitizen, yes. If you are
11   an asylee or a refuge or have some other status of
12   lawful presence, yes, sir, you can.
13          SEN. WILLIAMS: Illegal foreign visitor,
14   for instance. You wouldn't have to be an asylee.
15   Right? You could be a legal foreign visitor?
16          MS. DAVIO: Yes, sir, a legal foreign
17   visitor.
18          SEN. WILLIAMS: Okay. And is there
19   anything unique about that card?
20          MS. DAVIO: The cards do say "temporary
21   visitor" on them.
22          SEN. WILLIAMS: Okay. How many driver's
23   license holders do we have in this state?
24          MS. DAVIO: There are a little better than
25   15 million.
0382
1           SEN. WILLIAMS: Okay. And how many people
2    hold ID cards?
3           MS. DAVIO: Approximately 750,000.
4           SEN. WILLIAMS: And just to clarify, I
5    think I may have -- I'm not sure about the cost of an
6    ID. Is there anything you want to add to what my
7    remarks are? I'm not sure I was actually on the money
8    with everything. Is what I said early, $1.67, is the
9    cost to produce those cards? Is that --
10          MS. DAVIO: Yes, sir. The cost of
11   producing and mailing, yes, sir.
12          SEN. WILLIAMS: Okay. And then what is
13   the cost to the state to give those IDs away?
14          MS. DAVIO: What is the cost to the state
15   to give those away? The loss of the revenue, the
16   $15.00 --
17          SEN. WILLIAMS: Okay.
18          MS. DAVIO: -- or the $5 for over 65.
19          SEN. WILLIAMS: Okay. And have you been
20   able to determine how many people this would apply? You
21   can't tell?
22          MS. DAVIO: No, sir.
23          SEN. WILLIAMS: Okay.
24          MS. DAVIO: We don't have any way of
25   estimating.
0383
1           SEN. WILLIAMS: So when we talk about
2    cost, there could be a loss of revenue, but really the
3    cost to produce that document is pretty negligible --
4    right -- $1.67?
5           MS. DAVIO: Yes, sir.
6           SEN. WILLIAMS: All right. All right.
7    That's all the questions I have. Thank you very much.
8           MS. DAVIO: Thank you.

file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001073

USA_00015954

9       SEN. ELTIFE:  Thank you, Senator Williams.
10      Senator Gallegos?
11      SEN. GALLEGOS:  Thank you, Mr. Chairman.
12 Now, you're representing the DPS.  Is that what you
13 said?
14      MS. DAVIO:  Yes, sir.  I'm the assistant
15 director --
16      SEN. GALLEGOS:  I'm sorry.  I didn't -- I
17 didn't hear your name or --
18      MS. DAVIO:  My name is Rebecca Davio --
19      SEN. GALLEGOS:  Rebecca.
20      MS. DAVIO:  -- and I'm the Assistant
21 Director for Driver Licenses at DPS.
22      SEN. GALLEGOS:  Okay, Rebecca.  And you
23 passed out this map right here.  Right?
24      MS. DAVIO:  Yes, sir.
25      SEN. GALLEGOS:  Okay.  Now, I'm trying to
0384
1 see real close here.  It's got a big green spot right in
2 the middle of Harris County.
3      MS. DAVIO:  Yes, sir.
4      SEN. GALLEGOS:  Is that correct?
5      MS. DAVIO:  Yes, sir.
6      SEN. GALLEGOS:  But the maps I have shows
7 nothing within the 610 Loop.
8      MS. DAVIO:  That actually -- I believe
9 that green -- that big green circle that you commented
10 on is -- indicates that there are seven driver license
11 offices within Harris County.
12      SEN. GALLEGOS:  Yeah, but I'm looking at
13 this one.  It says there's nothing within the 610 Loop.
14 Is that correct?
15      MS. DAVIO:  I'm sorry, sir.  I'm not
16 familiar with that map.  That point has been made
17 earlier and --
18      SEN. GALLEGOS:  No.  I introduced this map
19 two years ago, and I'm introducing it again today.  I'm
20 just asking if you're the assistant of DPS, you don't
21 know that there's not a DPS office within the 610 Loop
22 in the largest city in the state?
23      MS. DAVIO:  I can't claim to be intimately
24 familiar with the layout of Houston.  I have been to the
25 offices.
0385
1      SEN. GALLEGOS:  Well, wait a minute.  What
2 was your title again?
3      MS. DAVIO:  I'm the Assistant Director for
4 Driver Licenses at DPS.
5      SEN. GALLEGOS:  Okay.  Well, then if you
6 don't know the answer, who can give me the answer?  I
7 haven't been getting any answers today.  And we are told
8 to ask DPS.  Now you're before us, and you can't answer
9 that question for me.  So who can I -- I mean, who do I
10 ask?

TX_00001074
JA_001073
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001074

USA_00015955

11    MS. DAVIO: I'll verify that for you, sir.
12    SEN. GALLEGOS: Before we finish today?
13    MS. DAVIO: Yes, sir.
14    SEN. GALLEGOS: All right. And not only
15 that, in Fort Worth, I only see one within the loop. In
16 Dallas, only one inside the city. But you're still --
17 on your map that you're introducing here, it shows a
18 bunch of green spots. Now, I think it needs to be
19 clarified by cities of how many are there, how many are
20 open, how many are closed, after your 10 percent cut in
21 the agency how many are proposed to be closed and the
22 hours that they open up. You know, that is what I'd
23 like to know.
24         Now, the other question that I had is --
25 and Senator Williams brought up a good point. The
0386
1 problem that I have on temporary license, the
2 temporaries -- my son lost his, and he went and got a
3 temporary license, and its got his photo ID. That's a
4 temporary license. So what Senator Williams said is
5 correct.
6         My concern is on a confiscated license
7 when the DPS picks up -- or the law enforcement agency
8 picks up that license and replaces it with this
9 temporary license. Well, this confiscated license.
10 Let's not call it temporary because temporaries have a
11 photo ID. This confiscated license does not have a
12 photo ID, yet the verbiage on it says this will act as a
13 valid DPS license and valid ID. That's what it says,
14 for 40 days. Okay? And the date of it y'all gave us
15 that we asked for, is in 2010 there's almost 100,000
16 drivers out there with this license without a photo ID,
17 yet the verbiage on it has that this will be a valid DPS
18 license for 40 days. Now, is that correct? Yes or no.
19         MS. DAVIO: Yes, those are issued --
20    SEN. GALLEGOS: Okay.
21    MS. DAVIO: -- by law enforcement. They
22 are not issued through the DPS offices.
23    SEN. GALLEGOS: So there's two different
24 classes. I just wanted to make it clear for Senator
25 Williams. He's pretty -- he's pretty almost correct. I
0387
1 just want to make the difference between a temporary and
2 a confiscated that I just showed you that y'all give
3 out.
4         MS. DAVIO: That sheet of paper is
5 actually given by law enforcement officers at the time
6 of stop on the street.
7         SEN. GALLEGOS: I understand, but it has
8 DPS verbiage on it.
9         MS. DAVIO: Yes, sir. It's our form, but
10 we do not issue it.
11    SEN. GALLEGOS: Okay. Now -- and this is
12 just one -- one avenue that we looked. That's just

TX_00001075
JA_001074
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001075

USA_00015956

13  100,000 in one category. There's four other categories
14  that we have not got a tally on, that confiscated --
15  that licenses are confiscated for whatever other issue,
16  nonpayment of child support or some other categories
17  that you confiscate licenses. And we haven't taken the
18  tally on those. I'm just going on this one avenue where
19  licenses are confiscated and that person has not been
20  convicted yet. He or she is innocent until proven
21  guilty. But this is the only form of ID that they have,
22  and it doesn't have a picture on it.
23          MS. DAVIO: It would be possible for the
24  people whose license are confiscated to apply for an ID.
25          SEN. GALLEGOS: It doesn't say that on
0388
1  here. Nowhere does it say that. I understand what you
2  just told me.
3          MS. DAVIO: Yes, sir.
4          SEN. GALLEGOS: But when they stop me and
5  take my license and give me this in return, it has
6  nowhere that instructs me that I have an option to go
7  get a license with a picture. It doesn't say that on
8  here. That's why you have almost 100,000 out there with
9  this type of license. And not only that, in just one
10  month, last month -- well, let's see in December of
11  2010, we have 10,000 out there driving right now with
12  this license without a picture.
13          So I just wanted to make that clear that
14  this is -- that this is out there, that it's got DPS
15  language on it. It doesn't tell us that we can -- we
16  have an option to go get one with a picture. It doesn't
17  say that on here. So that's why you have the high
18  number out there driving with this license.
19          So I just wanted to make that clear for
20  the record that that's how many drivers that we know of.
21  We haven't gone into the other categories. There could
22  be more that are driving with this license, that's their
23  only form of ID, and I just want to make it sure --
24  Senator Fraser is not on the floor -- but that he
25  understood that. But Senator Williams is, and I just
0389
1  wanted to make sure that that is understood, the
2  difference between the two licenses, that one, the
3  temporary has a photo ID --
4          MS. DAVIO: Yes, sir.
5          SEN. GALLEGOS: -- the confiscated does
6  not, but yet it shows here that this -- by the DPS that
7  it is a valid ID that you can use.
8          MS. DAVIO: As I understand that, sir,
9  it's valid for driving purposes. And because it's
10  provided by the law enforcement officer on the side of
11  the street, they don't have any of the equipment to take
12  a person's picture or do any of that.
13          SEN. GALLEGOS: I understand that; I
14  understand that. I just wanted to make the difference

TX_00001076
JA_001075
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001076

USA_00015957

15  in the two.  And I can use this paper ID, you know, go
16  to Wal-Mart, "Where is your ID?"  "Here it is right
17  here; here it is right here.  The DPS gave it to me," or
18  it's got DPS language that I can use it as a valid ID.
19  I just wanted to make sure that that's clear.  Is that
20  correct?
21            MS. DAVIO:  Sir, I'm unable to comment on
22  whether Wal-Mart would accept that as an ID.
23            SEN. GALLEGOS:  Well, it says here -- it
24  says here that this is valid per DPS language and I can
25  use as an ID.
0390
 1            MS. DAVIO:  I believe it's valid for
 2  driving purposes.  It's a temporary driving permit, and
 3  so I can't speak to whether a bank or retail
 4  establishment would accept it for identification
 5  purposes.
 6            SEN. GALLEGOS:  Okay.  Well, let's just
 7  say they'll take it because it's got your language on
 8  it, but I just wanted to make that point out there to
 9  the members that, you know, when you're talking about an
10  ID from the DPS, there are differences, and this one
11  just doesn't happen to have a photo ID on it.  I just
12  want to make that clear.
13            And you will give me those answers before
14  we get through tonight?
15            MS. DAVIO:  Yes, sir.  I will work to do
16  that.  I know I can give you the answer about the
17  offices within the 610 Loop in Houston.  We have the
18  information about the hours that the offices are open,
19  and we'll look into the cuts -- the proposed cuts.
20            SEN. GALLEGOS:  Let me ask you this
21  question:  Do you anticipate any other closures per the
22  shortfall that we have now of any DPS office, whether in
23  Houston or anywhere in the state?
24            MS. DAVIO:  Well, there may be some more
25  of the temporary closures because of the equipment
0391
 1  failure because we don't have any other way to replace
 2  that failing equipment with new equipment.  Because of
 3  this need for a higher, larger data pipeline, there may
 4  be some additional closures, but we're looking at where
 5  our offices are located and how they are staffed through
 6  our business intelligence project.  And so we plan on
 7  coming to all the legislators and the local judges and
 8  bringing you that information about office closures and
 9  what our recommendations would be to provide the optimal
10  level.
11            SEN. GALLEGOS:  I'm only asking that
12  because if we're going to mandate Texans to obtain a
13  photo ID and we have to go to DPS to get that and you're
14  telling us you anticipate some more closures, I'd like
15  to know where they are at.  And then that way we can
16  tell our folks that these particular locations -- that

TX_00001077
JA_001076
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001077

USA_00015958

17  you're going to get a free ID under this bill, that
18  those offices are going to be closed.
19          MS. DAVIO:  Sir, we don't plan to close
20  any more offices unless the equipment breaks.  Right now
21  we have no plans to close any of our driver license
22  offices, those mobile locations, unless the equipment
23  fails.
24          SEN. GALLEGOS:  Unless the equipment
25  fails?
0392
 1          MS. DAVIO:  Yes, sir, in the short term.
 2          SEN. GALLEGOS:  So you have no plans to
 3  close any other offices?
 4          MS. DAVIO:  In the short --
 5          SEN. GALLEGOS:  Is that what you're
 6  telling me?
 7          MS. DAVIO:  In the short-term, yes, sir.
 8  We want to do the business --
 9          SEN. GALLEGOS:  What do you mean
10  "short-term"?
11          MS. DAVIO:  We want to -- we need to do
12  this business intelligence analysis so that we can
13  really look to determine how we can best use our
14  resources to provide the optimal level of service for
15  all Texans when they are trying to get their driver
16  license or an ID.
17          SEN. GALLEGOS:  All right.  And you'll get
18  me those answers before we finish today?
19          MS. DAVIO:  Yes, sir.
20          SEN. GALLEGOS:  Okay.  Thank you.
21          MS. DAVIO:  Yes, sir.
22          CHAIRMAN DUNCAN:  The Chair recognizes
23  Senator Ellis.
24          SEN. ELLIS:  Ms. Davio, I know you've been
25  here all day, and we're all very appreciative of that,
0393
 1  and we know you don't have a position on the bill.
 2  You're just here as a resource.
 3          MS. DAVIO:  Yes, sir.
 4          SEN. ELLIS:  Including Senator Gallegos,
 5  we appreciate you being here and the work you do.
 6          MS. DAVIO:  Thank you.
 7          SEN. ELLIS:  Let me ask you this:  Now, I
 8  saw this article in the paper today about the driver
 9  surcharges.
10          MS. DAVIO:  Yes, sir.
11          SEN. ELLIS:  Are you familiar with that
12  program?
13          MS. DAVIO:  Yes, sir.
14          SEN. ELLIS:  Does that come under your
15  jurisdiction?
16          MS. DAVIO:  Yes, sir, it does.
17          SEN. ELLIS:  If I'm reading this right, it
18  says it's estimated that a total of about 1.2 million

TX_00001078
JA_001077
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001078

USA_00015959

19  Texans are in default?
20        MS. DAVIO: Yes, sir. I believe that's
21  the number.
22        SEN. ELLIS: Okay. Now, how do we get to
23  that? I mean, can you give us some sense -- since we
24  passed that in '03, is it about 100,000 per year, a
25  half? Is it getting better? Worse? I'm just trying to
0394
1  get a sense of how much -- how many more people may end
2  up in that category between now and when Senator
3  Fraser's bill goes into effect.
4        MS. DAVIO: You're asking about the number
5  of people that are in default on their surcharges?
6        SEN. ELLIS: Yeah. About 1.2 million now,
7  and I'm asking how much do you think that will grow
8  between now and January of 2012, next year, a year from
9  now?
10       MS. DAVIO: We actually hope that the
11  number of people in default will be reduced. There is a
12  program going on now -- that was probably what the
13  article in the paper was -- about the amnesty program.
14  So what this program does is it allows people who are in
15  default, if they've received a surcharge between 2004
16  and 2008 and are in default on that surcharge, then they
17  can pay 10 percent up to a maximum of $250. And if they
18  pay that reduced amount and their reinstatement fees and
19  do the other things, then they will no longer be in
20  default. That program will run -- the amnesty program
21  will run through -- I believe it's April 17th.
22       And then we will begin a program for
23  indigent folks that cannot pay their surcharges. And so
24  we will enable those people to pay their surcharges, and
25  so we really do hope the number of people in default
0395
1  will be reduced.
2        SEN. ELLIS: Is this your first amnesty
3  program?
4        MS. DAVIO: Yes, sir, it is.
5        SEN. ELLIS: Now, you know -- I'm sure you
6  know -- two other states that had a similar program for
7  trying to balance their budgets abandoned the programs.
8  And in those states, I'm told that they tried the
9  amnesty programs, they tried virtually everything you
10  could think of, and it didn't work. So they just
11  abandoned the programs.
12       So is there any empirical evidence that
13  would make you think that 1.2 million people who have
14  lost their licenses in Texas because they didn't pay on
15  average, I guess, what -- I guess this is a thousand
16  dollars a year if you were drunk, 2,000 if the blood
17  alcohol level was twice the legal limit? Is there any
18  reason why you would think the amnesty program in Texas
19  will work when it didn't work in the other two states
20  that abandoned the program?

TX_00001079
JA_001078
file:///C|/DOCUME~1/ssc1/LOCALS~1/Temp/A9RE300.tmp/3-CONSIDERATION_OF_SENATE_BILL_14.txt[3/19/2012 5:28:21 PM]

TX_00001079

USA_00015960