Case 2:13-cv-00193  Document 661-21  Filed on 11/11/14 in TXSD  Page 1 of 111
Case 1:12-cv-00128-RMC-DST-RLW  Document 210-2  Filed 06/20/12  Page 205 of 262

427

1    cite studies that attempt to show voter ID laws do not

2    suppress turnout, and they even try to claim that

3    turnout increases in Indiana and Georgia were caused

4    by the voter ID laws.  What are your thoughts on that

5    claim?

6              MR. SKAGGS:  You know, again, I suppose

7    it's a good rhetorical point for proponents of such

8    policies, but I think it's a specious argument, and it

9    just doesn't withstand any kind of scrutiny,

10   statistically or otherwise.  Any social science

11   methodology would suggest that those studies are

12   completely incredible.

13             Bear in mind that the main study we're

14   talking about that the first witness here this evening

15   discussed concluded that voter ID policies in Georgia

16   and Indiana actually drove voter turnout up, that

17   there was a casual relationship between adopting these

18   strict ID policies and turnout going up.  And it came

19   to its conclusion by comparing Indiana with Illinois

20   and Georgia with Mississippi.

21             When asked about the possible

22   methodological flaws, Mr. von Spakovsky said, "We

23   controlled for any impact that Barack Obama's presence

24   on the ticket would have had in skewing this data,

25   because then Sen. Obama was not only on the ticket --

TX_00004305

USA_00018610

1     on the ballot in Indiana and Georgia, but he was also

2     on the ballot in Illinois and Mississippi.  And that's

3     true insofar as it goes, but I don't think that goes

4     very far in explaining why we should give any

5     credibility to these studies.

6            What these studies didn't take account

7     of at all is the status of these states, the swing

8     states, the status of these as hotly contested

9     elections.  There was no controlling for the amount of

10    advertising that was run in Indiana versus Illinois.

11    There was no taking account for number of candidate

12    appearances in Indiana versus Illinois of Georgia

13    versus Mississippi, the number of ads run by the

14    campaigns that are ads run by other interested groups.

15           So any study that fails to take account

16    this sort of intense mobilization efforts that were

17    poured into these states as compared to states,

18    Mississippi and Illinois, that one campaign had

19    essentially conceded and were ready hardly contested

20    at all because the results were a foregone conclusion,

21    any study that doesn't look at those factors -- the

22    amount of mobilization, the amount of money spent by

23    the campaigns and others -- is simply incredible.

24           Now, I'm not suggesting that changes in

25    turnout were caused specifically by the number of

Case 2:13-cv-00193   Document 661-21   Filed on 11/11/14 in TXSD   Page 2 of 111
Case 1:12-cv-00128-RMC-DST-RLW   Document 210-2   Filed 06/20/12   Page 207 of 262

429

1    appearances that the candidates made or their proxies

2    or the amount of advertising that either of the

3    campaigns put up.  But what I am suggesting is that

4    first, those are much more I think credible

5    explanations of why voter turnout went up in those two

6    states and, secondly, that we simply can't -- the

7    point is that you can't prove what the causation was

8    in any of these cases.  There are too many factors.

9    The studies that have been conducted are far too

10   crude.

11          So if there is any single take-away, I

12   would just suggest that any of these claims that voter

13   turnout actually goes up because of strict voter ID

14   requirements and some resulting increase in confidence

15   amongst the voting population should just simply be

16   looked at with a tremendous amount of skepticism.

17          SEN. DAVIS:  Are you aware in your work

18   on behalf of the Brennan Center, are you aware of any

19   empirical data -- exit polling, surveys or

20   otherwise -- in which people were asked whether their

21   appetite for voting indeed increased by virtue of the

22   passage of photo ID laws in the states in which

23   they're voting?

24          MR. SKAGGS:  I am aware of one study in

25   particular on that subject.  We've heard about it from

TX_00004307

USA_00018612

1    a couple of the folks that have testified here before

2    this me evening, and that's a study that was published

3    in the Harvard Law Review not long ago.  And the

4    conclusion that that came to was that there was simply

5    no correlation, there was no increase in voting based

6    on any feelings of the possibility of fraud or the

7    possibility that fraud would be addressed by voter ID.

8             MR. DAVIS:  Do you think it might be a

9    more valid analysis to compare states with and without

10   photo ID requirements over a period spanning several

11   election cycles in the same -- or the same national

12   election cycle in order to determine the impacts of

13   voter ID?

14            MR. SKAGGS:  I think it would.  And I

15   think -- I'll echo an observation made by Dr. Moore

16   earlier this evening which is that it's a shame that

17   the empirical data is not there to the extent it could

18   be.  And I think studies of the sort that you've just

19   described, Senator, would be very helpful in that

20   regard.

21            The one thing I would add to the sort of

22   proposed research that you talked about would be

23   factors such as candidate campaign mobilization, the

24   number of resources that were poured into the states.

25   I think the more variables that you can plug into

TX_00004308

USA_00018613

1   these studies that look at issues that actually have

2   an impact on voters being mobilized, the more accurate

3   the data would be.

4          SEN. DAVIS:  I want to ask you for a

5   moment about claims that are made that support the

6   argument for voter ID.  I would like to hear your

7   thoughts on claims that are made by voter ID

8   supporters that suggest that thousands of dead people

9   or non-citizens are registering and possibly voting.

10         MR. SKAGGS:  Well, we hear these sorts

11  of claims all the time.  And what a detailed analysis

12  of these claims proves again and again and again is

13  that there is no "there" there.  These are erroneous

14  reports.  The biggest reason why we have these sorts

15  of claims and why they ultimately fail when they're

16  scrutinized is the data-matching that I talked about

17  earlier, the attempt to compare voter lists, list of

18  voters who cast ballots against lists of dead people

19  or felons, for example, that in many states are

20  disenfranchised.

21         And what we see again and again is that

22  initial data-matching comes up with huge numbers,

23  thousand of voters, and that when resources are

24  dedicated to actually going record-by-record and

25  case-by-case and match-by-match and investigating

432

1    this, it ends up that virtually all these fall away.

2                     One of the most well-known examples is

3    an article in the Atlanta Journal-Constitution that

4    came out with a huge dramatic headline that over 5,000

5    dead voters had voted in Georgia over a number of

6    years.  And the specific example that was cited in

7    that article was a gentleman by the name of Allen J.

8    Mandel, M-a-n-d-e-l, who was decreased and who the

9    article claimed someone had definitely voted in his

10   name.

11                    An investigation was conducted and it

12   turned out there was actually an Allen J. Mandell,

13   M-a-n-d-e-l-l -- two l's as opposed to one -- who was

14   very much alive and well, and he was actually the

15   gentleman that cast a vote, eligible citizen, no

16   wrongdoing at all.

17                    But these sorts of claims, this 5,000

18   number was latched onto by elected officials,

19   advocates, partisans, and was repeatedly trumpeted.

20   And, of course, once the careful analysis is done and

21   once each of these cases is looked at and it turns out

22   that, in fact, there really is no problem, oftentimes

23   those reports and those studies don't get as much air

24   play.

25                    SEN. DAVIS:  You've mentioned the

TX_00004310

USA_00018615

1    Indiana experience in your comments and in your

2    answers to my questions today.  But even Appeals Judge

3    Posner, an outspoken conservative appointee, said in

4    his Opinion upholding the Indiana photo ID law -- and

5    I quote him -- "No doubt, most people who don't have

6    photo ID are low on the economic ladder and, thus, if

7    they do vote, are more likely to vote for Democratic

8    than Republican candidates.  Thus, the new law injures

9    the Democratic Party by compelling the party to devote

10   resources to getting to the polls those of its

11   supporters who would otherwise be discouraged by the

12   new law from bothering to vote," end quote.

13           His comment seems to illustrate why

14   Republicans use voter fraud claims to justify vote

15   suppression activities that date back decades and that

16   continue today.  Do you know of any evidence of

17   systematic voter fraud to contradict findings from

18   academic studies that suggests that the only real

19   reason for the photo ID push is to provide Republicans

20   a partisan advantage?

21           MR. SKAGGS:  I don't.  The answer would

22   be no.  I don't pretend to understand why certain

23   folks would support theses policies.  There's

24   certainly some obvious explanations of the sort that

25   you just gave.  But I think Judge Posner was actually

434

1    right in the selection that you read.  I think where

2    he was wrong was when he went on later in the Opinion

3    to say, "And that's not a problem."  That's where I

4    disagree with him.

5              And I don't disagree with Judge Posner,

6    because I think anything that hurts the Democrats

7    should be rejected.  That's not why I disagree with

8    him.  My fundamental disagreement is because there is

9    a certain cavalier attitude towards any sort of policy

10   that disenfranchises people as long as it's just a

11   small number of them.  And I don't think 92 notes or

12   33 notes or 700 votes is an acceptable number of

13   voters to be disenfranchised, particularly when the

14   excuse for doing so just doesn't hold any water.

15             SEN. DAVIS:  Thank you very much for

16   your testimony and your answer to my questions.

17             I have no more questions for this

18   witness, Mr. President.

19             SEN. DUNCAN:  Thank you, Mr. Skaggs.

20   There are no other members queued up, so you are

21   excused.  Thank you for your appearance here today.

22             MR. SKAGGS:  Thank you, Mr. Chairman.

23             SEN. DUNCAN:  The Chair calls Wes

24   Tailor.

25             Mr. Tailor, you have 10 minutes.  Let me

TX_00004312

USA_00018617

435

```
 1    introduce your written testimony first.  I've got an

 2    Exhibit 25, which is the written testimony of Robert

 3    Simms.  Is that --

 4              MR. TAILOR:  Yes, sir.  That's our

 5    Deputy Secretary of State.

 6              SEN. DUNCAN:  Okay.  Would you

 7    explain -- well, go ahead and state your name and who

 8    you represent.

 9              MR. TAILOR:  Yes, sir.  My name is Wes

10    Tailor.  I am the Elections Director for the State of

11    Georgia, and I was appointed to that position by the

12    Secretary of State.

13              SEN. DUNCAN:  And you have given us

14    Exhibit 23 -- or 25, rather -- as the written

15    testimony of Robert Simms, the Georgia Deputy

16    Secretary of State, before the United States Committee

17    on Rules and Administration.  We'll submit that to the

18    record.

19              (Exhibit No. 25 marked and admitted)

20    TESTIMONY BY ROBERT A. SIMMS (SUBMITTED BY WES TAILOR)

21              MR. TAILOR:  Thank you.

22              Well, thank you-all very much for having

23    me in the great State of Texas.  I will try not to

24    take up too much of your time.  Obviously, I can't,

25    since I only have 10 minutes.  But I did want to
```

TX_00004313

USA_00018618

1   describe Georgia's experience with our photo ID law.

2   And, obviously, it is up to you as legislators in the

3   great State of Texas to decide whether that experience

4   in Georgia has application for the voters in Texas

5   while you consider this bill.

6          One of the things that you may want to

7   consider is that I am an actual elections

8   administrator. I have administered several elections

9   under a photo ID statute. In Georgia, prior to the

10   implementation of our photo ID law in August of 2007,

11   voters could use, actually much like this current

12   Texas bill, 17 forms of voter identification when they

13   were voting in person.

14          The current statute allows generally in

15   Georgia six forms of photo identification: A driver's

16   license, a U.S. passport, government employee photo

17   identification, a valid federal or state government

18   photo ID, a military photo ID or a tribal photo ID.

19          If a voter shows up at the polls, much

20   like has been discussed here, and they do not have one

21   of those appropriate forms of ID, they may cast a

22   provisional ballot and return within two days after

23   the election to verify their information or verify who

24   they are, at which point their ballot would be

25   counted.

Case 2:13-cv-00193  Document 661-21  Filed on 11/11/14 in TXSD  Page 11 of 111
Case 1:12-cv-00128-RMC-DST-RLW  Document 210-2  Filed 06/20/12  Page 215 of 262

437

1          And I'm going to take issue right here

2     with the previous testimony talking about provisional

3     ballots and the allowance of provisional ballots and

4     the failure of people to then either return to the

5     registrar's office, as disenfranchisement.  That is

6     not disenfranchisement.  Those people -- everyone in

7     Georgia is allowed the ability to cast a vote.

8          Now, with the provisional ballots, under

9     federal statute, however a provisional ballot is cast,

10    there is an opportunity to then verify the individual

11    or verify the information.  That's true in Georgia.

12    Those people were not disenfranchised; they were given

13    every opportunity to have their vote count.  Now, why

14    they didn't return, we don't know yet.  That is true.

15    But to say it's only because that they couldn't get a

16    ride, we don't know.  They could have not been the

17    people that they said they were when they arrived at

18    the polls, but we don't know that at this point.

19          Now, the entire State of Georgia has

20    been set as a Section 5 state, and DOJ did pre-clear

21    our current statute.  I will note, by the way, that

22    DOJ did pre-clear the broader statute which is more

23    akin to the current Texas Senate Bill, back early on,

24    well before 2006.

25          But let me tell you about Georgia's

TX_00004315

USA_00018620

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 12 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 216 of 262

438

1    experience with the photo ID.  The arguments that have

2    been raised are numerous, that in-person voter fraud

3    doesn't exist or it's not such a problem that you

4    should think to address it.  Well, I can tell you, as

5    an elections official, that I take voter fraud very

6    seriously.  I also take each and every person in

7    Georgia's ability to cast a vote very seriously.  I

8    would equal and hold those two on equal footing.

9              And what we have found in the

10   administration of photo ID in Georgia is that it does

11   not disenfranchise voters, but it does serve as a true

12   barrier to voter fraud, an in-person voter fraud.

13   Another argument that I've heard is that it will place

14   an undue burden on however many people folks have come

15   up with.  In the litigation in Georgia, it was

16   hundreds of thousands of individuals and you've heard,

17   and so I won't go over and belabor that after four

18   years of litigation, the most prominent lawyers in

19   Georgia, one being a former governor, failed to find

20   even one single individual who was unduly burdened by

21   Georgia's photo ID statute.  We've conducted 15

22   elections with photo ID.  Georgia voters have cast

23   more than nine and a half million ballots under photo

24   ID, without a single issue or problem.

25              Looking at the 2008 General Election, we

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004316
JA_003739

TX_00004316

USA_00018621

1    had, as has been stated, the highest turnout we've

2    ever seen, and it was about 700,000 more votes cast in

3    2008 than ever before in Georgia.  By registration

4    deadline, we had 550,000 new voter registration

5    applications in 2008, as compared to 480,000 in 2004.

6              You heard that during the presidential

7    prejudices primary, we had more than one million

8    votes -- or I'm sorry -- 2.2 million votes cast in the

9    presidential preference primary, which was more than a

10   million than we had ever had cast in the presidential

11   preference primary before, with photo ID requirement

12   in place.

13             What's really interesting is that

14   100,000 more ballots were cast for the Democratic

15   candidates than for the Republican candidates.  For

16   the General Election, Georgia has the option to mail

17   in ballots without a photo ID or to show up in person

18   with a photo ID.  92 percent of Georgians decided,

19   elected, chose to show up in person with a photo ID

20   when they had the choice not to do so.

21             Another argument I've heard today is

22   that photo ID requirements place an undue burden on

23   minority and elderly voters, and I've also heard that

24   it places an undue burden on female voters.  Well,

25   I've heard all the reasons why you should discount the

TX_00004317

USA_00018622

440

1    statistics, but let me just give you what Georgia saw,

2    based on 2004 to 2008.

3                Hispanic Latino votes cast went up by

4    140 percent from 2004 to 2008 in Georgia, with photo

5    ID.  Black votes, African-American votes went up by

6    42 percent.  The white vote went up by 8 percent.

7    Those casting votes who were 65 and older went up by

8    24 percent.  And 65 and older voters still make up the

9    single largest category of voters in the State of

10   Georgia.

11               With respect to the increase in voting

12   between male and female voters, male voters, the votes

13   cast increased by about 17 percent, and female voters

14   went up by 18 percent.  So at least on the face of the

15   votes and the number of votes cast with photo ID and

16   without, there was no correlation with a suppression

17   of any votes.

18               The other argument I've heard, that

19   photo ID is designed to favor one party over another.

20   And we'll tell you that in Georgia, we do not register

21   by party.  As I said, in the 2008 presidential

22   preference primary, almost 100,000 more ballots were

23   cast for the Democratic primary than the Republican

24   primary.  In the General Election, Sen. McCain did

25   receive a majority of the votes for president.

TX_00004318

USA_00018623

441

1      However, Georgia's sitting Republican incumbent

2      senator was forced into a runoff with his Democratic

3      opponent very close behind in the vote totals.

4              At least from those figures, there does

5      not appear to be a favoritism of one party over

6      another with the photo ID requirement.  I can tell you

7      that Georgia's experience statewide shows that common

8      sense voter ID requirements are needed and do not

9      unduly burden voters.  The arguments against that have

10     been stated here by certain groups do not appear and

11     still do not have any basis in fact and are pure

12     hyperbole and empty rhetoric and are not seen by

13     actual elections administrators on the ground.

14              Thank you.

15              SEN. DUNCAN:  Thank you, Mr. Tailor.

16     There are no members queued up for questions.  I

17     appreciate your testimony.

18              MR. TAILOR:  Thank you.

19              SEN. DUNCAN:  The next witness will be

20     J. Gerald Hebert.

21              Mr. Hebert, if you will approach.  And

22     do you have written testimony?  You do?

23              And just for the record, Exhibit 26 is

24     the written testimony of J. Gerald Hebert and will be

25     submitted to the record.

442

```
 1              (Exhibit No. 26 marked and admitted)
 2              SEN. DUNCAN:  Go ahead and state your
 3    name and who you represent.  And you have 10 minutes.
 4              TESTIMONY BY J. GERALD HEBERT
 5              MR. HEBERT:  My name is Joe Hebert, and
 6    I'm a voting rights attorney.  I'm also Executive
 7    Director and Director of Litigation at the campaign
 8    legal center.  Today I am here representing myself.
 9              I've spent over 20 years at the U. S.
10    Department of Justice as a federal prosecutor of
11    voting rights cases.  I've taught courses on voting
12    rights at Georgetown Law School and University of
13    Virginia, among other schools.
14              But I want to start my testimony today a
15    little different than most of the other witnesses.
16    I'm going to start by making clear what I think is
17    really going on here with the Texas voter ID bill.
18    You see, this is just the latest in a series of
19    measures taken by Texas Republicans in the state to
20    harm voters within their own state, particularly
21    minority voters being the real targets.  And it was
22    just a few years ago you enacted a redistricting
23    bill --
24              (Applause from the gallery)
25              SEN. DUNCAN:  (Raps gavel)
```

443

1          MR. HEBERT:  -- that was aimed at --

2          SEN. DUNCAN:  Just a minute, Mr. Hebert.

3          Any more outbursts, and the persons that

4   are participating in that will be asked to leave the

5   gallery.  Thank you.

6          You can proceed.

7          MR. HEBERT:  In 2003, there was a

8   redistricting bill that was needlessly passed that was

9   aimed at minimizing not only Democratic influence but

10  hurting minority voters.  Republicans in the State of

11  Texas today, and particularly in the Senate, are using

12  their majority status to enact legislation that can't

13  be justified by urgency or need.  Instead, it will

14  simply make it harder for hundreds of thousands

15  perhaps of Texans to vote.

16          They cast aside the bipartisan

17  legislative tradition or rule, the two-thirds rule, to

18  take up this issue so that they can ramrod the voter

19  ID bill down the throats of the minority.  And they've

20  done so even though implementation of a photo ID bill

21  will cost the state millions of dollar.  So you Texans

22  out there, that's where your tax dollars are going to

23  go, to defend the measure before the Department of

24  Justice and in the federal courts and then to

25  implement and approve -- and implement it and

TX_00004321

USA_00018626

1    administer it if it ever is approved.

2              Now, I realize that saying these raw

3    partisan politics is largely motivating this is a

4    pretty serious charge, and so I'm going to take a few

5    minutes to tell you on what I base them.  First of

6    all, understand that voter ID bills are of recent

7    vintage and they've only been enacted in states where

8    Republicans control the entire process in the state,

9    they control the Governor's chair, the Senate and the

10   House.  That's where this has come up recently, And

11   it's not by accident.  It's being considered in Texas,

12   as it was in those other states, without policy

13   substance.  There simply is no widespread organized or

14   even occasional voter impersonation fraud in Texas

15   that will be addressed by this bill.

16             Now, I have personal experience with

17   this in Texas, because I filed a lawsuit against Greg

18   Abbott and the Secretary of State challenging their

19   assertions that there was a voter fraud epidemic here

20   in the state.  And guess what?  There isn't.  I've

21   also led Attorney General Abbott to admit that persons

22   that he prosecuted for what he called in various press

23   releases an epidemic of voter fraud -- and they were,

24   by the way, with one exception all elderly black and

25   Latino political activists, and all of them were

TX_00004322

USA_00018627

445

1    Democrats -- that they hadn't engaged in any fraud at

2    all whatsoever.

3              The particular type of voter fraud that

4    this legislation is purported to address, voter

5    impersonation, is virtually unheard of.  There is

6    considerable evidence -- and you've heard it today --

7    that enacting a voter ID bill will create a series of

8    barriers that make it harder for senior citizens,

9    younger voters, poor people, people of color, women in

10   general, to exercise their right to vote.

11             Now, the fact is that most, if not all,

12   of these groups are growing as a percentage of Texas'

13   voting population, and most of them tend to vote

14   Democratic.  So that skew tends to explain to me the

15   urgency of Republican leadership in pushing this bill.

16   This is about partisan politics and protecting

17   political power and marginalizing your opposition,

18   exactly what you did in the redistricting bill.  And I

19   have personal experience with that as well, because I

20   was one of the lawyers who bought a suit against that

21   and took it to the Supreme Court where we did prove

22   that it discriminated against Latinos in South Texas.

23   That's what this is about.

24             Now, the Republican members of this

25   Senate and in the House, they can go ahead if they

TX_00004323

USA_00018628

446

```
 1     want to and choose to use their majority status to
 2     waste Texas' tax dollars of hard-working Texans during
 3     the short legislative session in this way.  That's
 4     their choice.  They have that power.
 5               But it's important to realize that the
 6     path being taken and the methods used by Republicans
 7     have ramification that extend beyond politics.  What's
 8     at stake is much bigger than a Republican majority
 9     imposing its will on a Democratic majority.
10               The path and method in enacting the
11     photo ID bill is the latest in a long series of
12     relentless attacks on minority voters by this state,
13     which is covered by the Voting Rights Act, because you
14     have a long history of denying minority people the
15     right to vote.  That's a simple fact.
16               Now, Texas, along with other deep south
17     states, has a long dark history of using voting as a
18     way to keep people on the reservation.  Let me give
19     you, however, more recent examples than ancient
20     history involving the office of your current Attorney
21     General who has used his office to manufacture false
22     claims of voter fraud.
23               Take, for example, this:  He created a
24     training manual about main-in balloting to try to go
25     around and inform DAs about how to find voter fraud.
```

TX_00004324

USA_00018629

447

1     And on one of his PowerPoint slides, he said, "Hey,

2     they use certain stamps to mail their ballots, these

3     fraudulent people." And he had a big picture of the

4     stamp, a sickle cell anemia stamp featuring a

5     prominent African-American woman holding her baby.

6     Boy, that's a real subtle indicator, isn't it, of

7     voter fraud and who is committing it.

8                 He sent investigators from the Attorney

9     General's office -- get this! -- to peep into the

10    bathroom window of my client, an elderly African-

11    American woman in Fort Worth, when she was coming out

12    of the shower. And they were there to harass her

13    about whether or not she had helped her neighbors

14    vote. What a terrible thing to do, help your

15    neighbors to vote if they're shut in and disabled

16    people.

17                The Attorney General here was asked to

18    intervene to help the Prairie View students in Waller

19    County. In three years he did nothing. Repeatedly

20    meetings were asked with the Attorney General to ask

21    him to come in and help them. It took -- get this! --

22    the Bush Justice Department to use Waller County, to

23    step in after two years of inaction by the Attorney

24    General and protect the African-American students at

25    the university. Ancient history? No. 2008.

TX_00004325
JA_003748

TX_00004325

USA_00018630

448

```
 1              Now, the cases that were brought against
 2    elderly Latino and African-American women by
 3    Mr. Abbott, in which he claimed were voter fraud, were
 4    the following activities:  They actually had the
 5    audacity to go to their neighbors' homes, at the
 6    neighbors' homes request, who are often very elderly
 7    and disabled people, to pick up their mail-in ballot
 8    that had already been sealed and drop it in the mail
 9    to them.
10              Notice, I didn't say they marked the
11    ballot for them.  Notice I didn't say that they
12    pressured the neighbor.  They simply mailed a ballot,
13    and then they were prosecuted for vote fraud.  Where
14    is the fraud?  Kind of like the old commercial,
15    "Where's the beef?"
16              And when they stood up and filed a
17    lawsuit saying, "Hey, we weren't -- we didn't engage
18    in voter fraud," Greg Abbott's former Solicitor
19    General, Ted Cruz, put out a press release and said,
20    "Oh, none of their claims have any merit, because
21    they're all a bunch of criminals."
22              Just last week we find the Attorney
23    General's office failed to comply with a proper open
24    records request from Texas legislators who asked him
25    for records about voter impersonation fraud, the
```

TX_00004326

USA_00018631

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 23 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 227 of 262

449

1   so-called target of this bill.

2          And then there is a glaring example --

3   and it's detailed in my testimony -- where you had

4   voter fraud apparently committed in Highland Park, a

5   very rich areas of Dallas, Texas, where, by the way,

6   George Bush and Dick Cheney lived before they went in

7   the While House, where Republicans engaged in voter

8   fraud and the Attorney General was asked to prosecute

9   and investigate by the DA in Dallas, and he failed to

10  do so.  Explain that lack of even-handedness.

11         Now, these recent actions by the

12  Attorney General should serve as an important warning

13  to those of you who are going to vote on this

14  legislation.  This hearing is a sham, just like your

15  redistricting public hearings were a sham.  You said

16  you wanted to listen to the voters, and 90 percent of

17  Texans said, "Don't do redistricting."  Did you

18  listen?  No.  You were hell bent on enacting Tom

19  DeLay's dirty work, because you couldn't stand up to

20  him and pass the bill.

21         Let me say, since I have only a few

22  minutes left, one minute left to say this:  I can

23  assure you that as a former Justice Department

24  official, all of the actions that I just described,

25  along with your procedural departures from the norm,

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004327
JA_003750

TX_00004327

USA_00018632

450

```
 1    such as abolishing the two-thirds rule, not allowing

 2    certain rules to be enforced, even though they're in

 3    the Texas rules, as Sen. West said this morning, that

 4    all of that will come back to haunt you, because those

 5    are indicators under a decision called Arlington

 6    Heights, in the Supreme Court that really what's going

 7    on here is not about good government reform, this is a

 8    measure that has as its root an illicit purpose.  And

 9    you-all ought to know a lot about that, because it's

10    been going on in Texas for a long time.

11              Thank you.

12              QUESTIONS FROM SENATE FLOOR

13              SEN. DUNCAN:  The Chair recognizes

14    Sen. West.

15              SEN. WEST:  Thank you very much,

16    Mr. Chairman.

17              Mr. Hebert, as it relates to

18    non-citizens, what about those who claim that

19    non-citizens are on the voters roll and will a voter

20    ID law for voting stop that?

21              MR. HEBERT:  A photo ID bill will not

22    affect that whatsoever.  Right now you don't have to

23    be a citizen to get a driver's license.  Many people

24    who are non-citizens, if they end up on the rolls --

25    and this has been true in not only Texas, it's true in
```

TX_00004328

USA_00018633

451

1    other states -- that they go to get a driver's license
2    and there is a -- in many places, you automatically
3    get put on the voter registration rolls if you check a
4    box that says, "Do you want this to double as a voter
5    registration application?"  So they end up being on
6    the rolls.
7              Now, there is no indication in most
8    states that these people ever vote.  But if they do,
9    it's usually because someone has given them -- you
10   know, they've gone to the polls and they've been given
11   a registration card.  But it happens so rarely.  The
12   photo ID bill wouldn't affect that at all, because
13   they get a photo ID.
14             SEN. WEST:  You know, there's been some
15   questions raised about whether you need a photo ID to
16   get on an airplane or cash a check.  What is the
17   answer to that question?
18             MR. HEBERT:  You do not need a photo ID
19   to get on an airplane in this country.  In fact, the
20   Department of Homeland Security's TSA office has
21   regulations that they've issued about this.  If you go
22   to the airport and you don't have your picture ID,
23   they will pull you aside, put you in a room, ask you a
24   series of questions, make you sign a statement, and
25   then you will get on the plane.  In fact, I believe

TX_00004329

USA_00018634

452

1    Dr. Moore who testified earlier today did not have his

2    picture ID with him when he came down here, and he

3    went through that exact procedure.

4              SEN. WEST:  No photo ID?

5              MR. HEBERT:  Yes, no photo ID.

6              SEN. WEST:  How does the legal --

7              MR. HEBERT:  And he was who he said he

8    was, by the way, so he wasn't impersonating somebody

9    else.

10             SEN. WEST:  Okay.  How does the legal

11   standard that the Department of Justice will employ to

12   any Texas voter ID law differ from the legal standard

13   the Supreme Court used to decide the Indiana case?

14             MR. HEBERT:  The Indiana case was a

15   constitutional challenge, what we call a facial

16   challenge to a statute.  In a lawsuit like that -- it

17   didn't even involve race, by the way.  I mean, we

18   haven't said that in all the debate today.  But the

19   Indiana case, there was no allegations that the

20   Indiana bill violated the Voting Rights Act in the

21   Indiana case.  Instead, it was a challenge that the

22   voter ID bill there burdened the fundamental right to

23   vote, in violation of the constitution.

24             It was challenged even before it went

25   into effect, so that's why I always find it amusing

TX_00004330

USA_00018635

1   that people quote the Supreme Court that say, "They
2   couldn't produce a single case."  Well, of course.
3   They hadn't had an election yet by the time the case
4   was brought to trial and the decision was made.
5               So the legal standard there is that you
6   have to prove that it's an unconstitutional burden on
7   the right to vote, fundamental right to vote.  It's a
8   very high burden, because the state is given
9   considerable latitude when it comes to regulating
10  elections and voting.
11              In the Department of Justice proceeding,
12  the total focus is on race and ethnicity, something
13  that wasn't at issue in Indiana when the case went to
14  the Supreme Court.  There the state, as was reported
15  earlier, bears the burden of demonstrating that
16  enacting a photo ID bill will not lead to a
17  retrogressive effect from minority voters in the state
18  and is not being enacted with a discriminatory
19  purpose.
20              SEN. WEST:  So the Indiana case is not
21  really applicable to Texas?
22              MR. HEBERT:  Not really.  When it comes
23  to the Section 5 pre-clearance process, it really has
24  very little, if any, relevance.
25              SEN. WEST:  Okay.  Now, what relevance

TX_00004331

USA_00018636

1 is it to obtaining Section 5 pre-clearance if the vast

2 majority of minority legislators vote against a

3 particular bill?

4     MR. HEBERT: Well, there is a Supreme

5 Court case on point now that's called Georgia vs.

6 Ashcroft where Georgia enacted a redistricting plan.

7 And virtually all but I believe one legislator voted

8 against the bill. And when the Legislature went for

9 pre-clearance, there were arguments made by

10 Republicans, actually, that the redistricting plan

11 violated the voting rights of minorities.

12     And the State of Georgia produced voting

13 records and statements from minority legislators

14 saying, "We support this redistricting plan. And the

15 Supreme Court, in fact, cited that as evidence that

16 there was not a retrogressive effect and that, in

17 fact, there was no discriminatory purpose.

18     SEN. WEST: Have you had a chance to

19 look at the draft of the bill that's being proposed?

20     MR. HEBERT: I have looked at it, yes.

21     SEN. WEST: In terms of direction for

22 this legislative body, can you kind of give us your

23 assessment of whether or not this, quote unquote,

24 voter ID bill is needed in the State of Texas?

25     MR. HEBERT: Well, I mean, I know that

TX_00004332

USA_00018637

455

```
 1    there are no cases -- in fact, I believe the Attorney
 2    General's Deputy Attorney General testified just last
 3    year that there were no proven cases of voter
 4    impersonation fraud that would be addressed by the
 5    photo ID bill.  That was testimony that Mr. Eric
 6    Nichols gave last year.  I was at that hearing, by the
 7    way, and I brought actually his statement, the news
 8    articles that quoted him.
 9              So I know that that kind of a problem --
10    this is a bill in search of a problem and doesn't
11    really -- in my mind doesn't really address a lot of
12    what is really voter fraud in Texas, which are things
13    like voter intimidation of minorities -- that's voter
14    fraud -- minorities who are being denied the right to
15    vote, because they're being intimidated and harassed
16    by people.  That's voter fraud, and that ought to be
17    the kind of measure that ought to be enacted by the
18    Texas Legislature.
19              SEN. WEST:  All right.  Thank you very
20    much.
21              SEN. DUNCAN:  Sen. Wentworth.
22              SEN. WENTWORTH:  Welcome to Texas,
23    Mr. Hebert.
24              MR. HEBERT:  Thank you, Senator.
25              SEN. WENTWORTH:  Welcome back, I should
```

TX_00004333

USA_00018638

456

```
 1    say.
 2                    MR. HEBERT:  Yes, sir.
 3                    SEN. WENTWORTH:  I gathered from your
 4    prepared remarks tonight you were critical and did not
 5    approve of the Legislature's drawing of Congressional
 6    districts in 2003?
 7                    MR. HEBERT:  I did not.  That's correct,
 8    I did not approve of it.
 9                    SEN. WENTWORTH:  Now, recognizing that
10    you don't live in Texas, you live in I guess either
11    Maryland or Virginia or Washington, D.C., you may not
12    know the answer to these questions and I don't expect
13    you to, but you might, because you're an expert in
14    redistricting matters and have represented folks in
15    redistricting matters in Texas.
16                    Do you happen to know how many statewide
17    elected officials are in Texas?
18                    MR. HEBERT:  The total number I don't
19    know.  I believe they're all Republicans.
20                    SEN. WENTWORTH:  There are 29, and
21    they're all Republicans and they've all been
22    Republicans for over a decade.
23                    Do you remember offhand how many members
24    of Congress we had before the 2000 census?
25                    MR. HEBERT:  You had 30, I believe.
```

TX_00004334

USA_00018639

457

```
 1              SEN. WENTWORTH:  Yes, sir, we had 30.
 2    Do you remember the partisan division of those 30?
 3              MR. HEBERT:  It was two-thirds Democrat
 4    at least.  21/9 I believe.
 5              SEN. WENTWORTH:  It wasn't quite that
 6    bad; it wasn't quite.  It was 17 Democrats and 13
 7    Republicans.
 8              MR. HEBERT:  Prior to 2000?
 9              SEN. WENTWORTH:  Yes, sir.
10              MR. HEBERT:  Okay.
11              SEN. WENTWORTH:  And as a result of the
12    2000 census, Texas had two new congressional districts
13    added.  So we went from 30 to 32.  And as a result of
14    the redistricting that was done by federal court in
15    2001 and the election, it became 17 Democrats to 15
16    Republicans --
17              MR. HEBERT:  I remember that.
18              SEN. WENTWORTH:  -- in a state that had
19    29 statewide elected Republicans.  We elected George
20    Bush governor, we re-elected George Bush governor, and
21    this state voted for George Bush as President of the
22    United States.  And, yet, this state, even after 2002,
23    was still sending a Democratic majority congressional
24    delegation to Washington D.C., to fight President
25    Bush.  And it didn't seem to those of us in the
```

TX_00004335

USA_00018640

458

1    majority here that that was fair.  And that,

2    Mr. Hebert, is why we re-drew the lines in 2003.

3                    MR. HEBERT:  Do you want me to comment

4    on that or are you --

5                    SEN. WENTWORTH:  Be pleased to have you

6    comment on it, yes, sir.

7                    MR. HEBERT:  I would just make two

8    points, Sen. Wentworth.  One is that it is true that

9    Democrats controlled 17 of 32, as of 2003.  But in

10   probably five of the districts that Democrats held --

11   for example, Ralph Hall, Max Sandlin, Jim Turner,

12   Charlie Stenholm, all Democrats -- in those districts,

13   the Republicans were winning.  The statewide office-

14   holders you mentioned were carrying those districts,

15   including George Bush, as I recall.

16                   So the people who were actually voting

17   in those districts, those five districts or so, were

18   actually splitting their tickets and maybe voting for

19   Republicans at the top of the ticket.  But then when

20   it came to the congressional district, they liked the

21   fact that maybe Charlie Stenholm did support George

22   Bush a lot of the times, or Ralph Hall did, so they

23   ended up splitting their vote.

24                   So even though it was 17 Democrats,

25   really the way the districts were drawn to my mind was

TX_00004336

USA_00018641

459

1 really, a vast majority of them were drawn to skew in
2 favor of the Republicans. That is to say that they
3 roughly equated with the Republican share of the vote.
4 The second point I would make is that --
5 and a lot of Texans don't know this -- but as a result
6 of the redistricting in 2003, it is true that all the
7 people I justed mentioned, except for Ralph Hall --
8 and I would add Martin Frost to the list -- all left
9 Congress.
10 There was a huge amount of tenure in
11 those people, and power in Washington is given out on
12 the basis of how long you've been there. So as a
13 result, Martin Frost was bounced out of Congress by
14 the map when he ran. Charlie Stenholm was. Martin
15 Frost would be Chairman of the Rules Committee today,
16 because Democrats control the House. Charlie
17 Stenholm would be Chairman of the Agriculture
18 Committee today, and Jim Turner would be Chairman of
19 the Homeland Security committee, very important
20 committees in Congress, all of whom are now gone
21 because of the redistricting that was done here in
22 2003. So it really ultimately -- and I know you
23 Texans don't really probably look on New York very
24 favorably, but the Rules Committee, that's now
25 headed by somebody from New York instead of somebody

TX_00004337
USA_00018642

```
1   from Texas, as a result of just what I saw was a
2   partisan power grab in 2003.  That would be my answer.
3              SEN. WENTWORTH:  Well, let me give you a
4   little more history about Texas redistricting when
5   Democrats controlled the redistricting process.  In
6   1971 when we had 25 members of Congress, 22 were
7   Democrats and only three were Republicans.  And the
8   Democratic majority, after the 1970 census, looked at
9   those three Republicans and said, "How in the world do
10  we allow three Republicans to be elected from Texas?"
11             So they sent us out to eliminate those
12  three Republicans.  The three back then were George
13  Bush from Houston, Jim Collins from Dallas and Bob
14  Price from Pampa.  And as they were drawing the lines,
15  they realized too many Texans in Houston were voting
16  Republican, so they couldn't get rid of George Bush.
17  And they realized too many Texans were voting
18  Republican in Dallas and they couldn't get rid of Jim
19  Collins.
20             But they looked out to the Panhandle and
21  realized that Bob Price from Pampa had his
22  congressional district right next to Wichita Falls,
23  which had as its congressman a Democrat, Graham
24  Purcell, who chaired the House Agriculture Committee.
25  And so the Democratic majority in the Legislature
```

461

1  decided that those farmers and ranchers in West Texas

2  would vote for the Chairman of the House Ag Committee,

3  so they paired, intentionally paired those two

4  congressmen to run against each other.

5          But the voters got to vote, and they

6  voted for Bob Price and defeated the Chairman of the

7  House Agriculture Committee.  Thirty years later when

8  my party was in control, one of the congressmen that

9  you failed to mention was targeted for defeat, but he

10 wasn't defeated.  Chet Edwards from Waco was reelected

11 even though he was supposed to lose.

12         So, fortunately, voters had the final

13 say.  And in my judgment, both parties have been

14 guilty of doing things that they probably shouldn't

15 have been doing.

16         I appreciate you being here.

17         MR. HEBERT:  Thank you.  Thank you,

18 Senator.

19         SEN. DUNCAN:  Senator Hegar.

20         SEN. HEGAR:  Thank you, Mr. Chairman.

21         Thank you, Mr. Hebert, for being here.

22 I can tell you're very passionate, and definitely we

23 appreciate that.  So I appreciate you being here and

24 stating everything that you have.

25         I had just a couple of questions as I

TX_00004339

USA_00018644

462

```
1    was listening to your testimony.  One, I was curious
2    on the issue of voter fraud allegations in Highland
3    Park that you mentioned.  And I just wanted to make
4    sure that you were aware that Craig Watkins, the
5    Criminal District Attorney, sent a letter to our
6    Attorney General on March 14th of '07, formally
7    thanking for the investigation, yet also declining to
8    pursue any prosecution in that case.  And I just
9    wanted to make sure that you were obviously aware of
10   that; so, therefore, the decision was back in the
11   local jurisdiction not to pursue that prosecution.
12              And if you would like to comment on
13   that, please.
14              MR. HEBERT:  I am aware that the
15   District Attorney did decline himself to do it.
16   Oftentimes when a local DA makes a decision like that,
17   it's not based, obviously, on whether or not he or she
18   thinks there is voter fraud that has taken place.  But
19   in any event, you know, they often defer to the
20   Attorney General who has far greater resources for
21   prosecuting such cases than the locals do.
22              I would have to talk to Mr. Watkins and
23   find out precisely what reasons he gave.
24              SEN. HEGAR:  Right.  And I just wanted
25   to make sure that we're all able to understand that
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004340
JA_003763

TX_00004340

USA_00018645

463

1  there was decisionmaking going on in the local
2  jurisdiction as to how to pursue this matter as well,
3  so it's not just a one-sided street, and make sure
4  that everybody knows that.  And hopefully we can
5  figure out some further discussions on that, because I
6  don't know the exact facts on it either.
7          Another thing I was curious, you
8  mentioned, I guess it was your client, with the window
9  of the bathroom.  Now, I've heard that story before
10  and so I wanted some clarification on that, because
11  since that was your client, you can obviously be the
12  person to tell me this, since I've heard this story
13  before.
14          This situation -- and I wanted to make
15  sure this is the right one -- where people come to the
16  door but the home of the front door is also adjacent
17  to the window.  The window is right immediately next
18  door to the door.  And so, therefore, when anybody is
19  standing at the front door, the lady was going to see
20  them outside her bathroom window, because it's
21  immediately adjacent to the door.  And so somebody was
22  not necessarily going around the fence, over the
23  fence, back through the back of the yard.
24          MR. HEBERT:  Well, they were --
25          SEN. HEGAR:  Is that the structure?

TX_00004341
USA_00018646

464

1    I've heard that story before, and I just wanted to
2    make sure, since you were here, I could find out the
3    real facts.
4             MR. HEBERT:  Well, you've got a pretty
5    good handle on it, but let me just give you a little
6    bit more --
7             SEN. HEGAR:  Please; please.
8             MR. HEBERT:  -- facts.  Two
9    investigators come up from the Attorney General's
10   office to interview Gloria Meeks, elderly African-
11   American woman.  She's in the shower.  And as I recall
12   her home -- and I haven't been there in a number of
13   years now -- but you walked up to the front door which
14   is, say, right in front of you here.  On the porch,
15   down a little bit down from there is a window that
16   does go into the bathroom, and the investigators went
17   into the window first.  They didn't knock on the door
18   first; they went into the window first, which just
19   struck me as pretty unusual, because there was
20   actually somebody there in her living room waiting to
21   drive her to the doctor.  And when --
22            SEN. HEGAR:  How far is the window from
23   the front door?
24            MR. HEBERT:  Several feet --
25            SEN. HEGAR:  Okay.

TX_00004342

USA_00018647

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 39 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 243 of 262

465

```
 1              MR. HEBERT:  -- a couple of feet.
 2              SEN. HEGAR:  Okay.
 3              MR. HEBERT:  But the guest, who was her
 4    driver taking her -- you know, giving her a lift to
 5    the doctor, I think it was, heard her yell and scream
 6    that there was somebody looking at her while she was
 7    getting out of the shower.  And it turns out it was
 8    the Attorney General's investigator.
 9              SEN. HEGAR:  You know, I would probably
10    scream, too, if y'all were on either side of the
11    window, I can imagine.  I just wanted to make sure
12    everybody understood, if I heard the story correctly.
13    It was very close proximity, and I don't know how
14    anybody walked in the yard.
15              MR. HEBERT:  Well, yes.
16              SEN. HEGAR:  Obviously, I can understand
17    how that happened.  And it would disturb me very much
18    so if someone would go around to the back of the house
19    and peep in windows, which is extremely a long ways
20    off.  And I just wanted to make sure we understood the
21    context.
22              MR. HEBERT:  Well, the explanation by
23    the investigators was almost as bad as the offense,
24    because when she protested to them, they said, "Oh,
25    I'm sorry.  We thought we were looking in your kitchen
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004343
JA_003766

TX_00004343
USA_00018648

466

```
 1    window."  So I don't know that investigators --
 2              SEN. HEGAR:  I imagine they figured out
 3    pretty quickly that wasn't a kitchen window.
 4              MR. HEBERT:  Yes, they did.
 5              SEN. HEGAR:  At least I hope so.
 6              MR. HEBERT:  I think the door is the
 7    best place to start.
 8              SEN. HEGAR:  Let me ask, if you don't
 9    mind, allegations that are sent to the Attorney
10    General for prosecution -- in other words, they don't
11    go out and seek prosecutions; people send that to
12    them -- and I was curious, you had mentioned about the
13    lawsuit that you had against the Attorney General, and
14    I was curious.  How did that end?
15              MR. HEBERT:  We ended up filing a
16    stipulated dismissal where the Attorney General agreed
17    to modify his prosecution policies in how he would
18    prosecute cases, particularly cases where the only
19    offense was the hyper-technical violation, if you
20    will, of failing to sign the mail-in envelope --
21              SEN. HEGAR:  Okay.
22              MR. HEBERT:  -- which was really
23    important, because that's what most of our clients
24    have been investigated or prosecuted for.
25              SEN. HEGAR:  And so there was something
```

TX_00004344

USA_00018649

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 41 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 243 of 262

467

1   entered into the record at the court, and it actually

2   did not go to trial, but there was some settlement

3   prior to, and I guess you had prayer for five or six

4   different issues for relief. But it was really just

5   an issue put into the record for this one narrow

6   aspect that you were asking for. Is that correct?

7                MR. HEBERT: Right. All the rest of the

8   case we agreed to dismiss our challenges -- similar to

9   Indiana, challenges to the fundamental right to vote

10  of various mail-in ballot --

11               SEN. HEGAR: Was there an admission on

12  the that the state was violating some statute?

13               MR. HEBERT: No, no.

14               SEN. HEGAR: Okay.

15               MR. HEBERT: If you're going to settle a

16  case, you're not going to make the other side -- you

17  know, let you rub their nose in anything.

18               SEN. HEGAR: Okay. Well, let's hope

19  not, but sometimes those things happen. So anyway,

20  everybody just walked away, and there were some

21  changes, technical changes to the manual and that was

22  the end of that case?

23               MR. HEBERT: Well, they agreed to

24  redesign the ballot envelope for the mail-in ballots,

25  because the problem was that, as you probably know, in

TX_00004345

USA_00018650

468

1    a mail-in ballot, there was no place for a person who

2    simply mailed the ballot, to sign it.  You could sign

3    it if you were a witness and you could sign it if you

4    provided assistance.  But there was no place, if you

5    simply mailed it.

6                So we agreed to work with the SOS to

7    modify that and also to change one other procedure in

8    Texas, and talked with them about, you know, better

9    ways to do that.

10               SEN. HEGAR:  Okay.  Well, good.  I just

11   wanted to make sure I had that.  And then one other

12   thing, since you brought up Waller County, and Waller

13   County is a little near and dear to me, since I'm a

14   lifelong resident of Waller County.  And I wanted to

15   make sure that I understood exactly what you're

16   talking about when you were talking about Waller

17   County, if that was in regards to voter eligibility of

18   students at Prairie View campus several years back and

19   to make sure that -- I think Sen. Ellis had asked for

20   back then in maybe '04, if I remember correctly, for

21   some kind of statement to clearly state from the

22   Attorney General what the definition of the law was

23   and that people who reside in a county, intend to

24   reside there, they do reside there, they're eligible

25   to vote.  And that was clearly demonstrated in the

TX_00004346

USA_00018651

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 43 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 247 of 262

469

```
 1    Opinion that was given to Sen. Ellis at that time.  Is

 2    that the situation that you were talking about?

 3                 MR. HEBERT:  The situation in Waller

 4    County for Prairie View students has been going on, as

 5    you correctly point out --

 6                 SEN. HEGAR:  Trust me.  I've lived there

 7    all my life.

 8                 MR. HEBERT:  Okay.  -- at least since

 9    2004.  The issue that I became involved in, and I

10    represented several of the Prairie View students, was

11    last year where a number of them were being denied the

12    right to become deputy registrars, and they were being

13    denied to register voters without certain burdens

14    being put on them, like limits of how many

15    applications and so on.

16                 And when we went to the Justice

17    Department, as a former official of the Justice

18    Department, I was able to go to the federal

19    prosecutors and say, "This is a violation of their

20    fundamental rights here, and it seems to be race-

21    based."  And the Justice Department, to their

22    credit -- you know, I didn't give the Bush

23    Administration much credit for prosecuting voting

24    rights cases on behalf of African-Americans -- but

25    they stepped up and Waller County signed a
```

TX_00004347

USA_00018652

473

```
 1    comprehensive consent judgment in --
 2               SEN. HEGAR:  Very comprehensive.
 3               MR. HEBERT:   -- admitting violations.
 4    And --
 5               SEN. HEGAR:  Well, I think the issue was
 6    expanding the number of voting locations in the county
 7    and trying to make sure everybody was tended to in
 8    dealing with those issues.
 9               MR. HEBERT:  That was one issue.  But I
10    think the remedy actually also extended to ensuring
11    that they would go on campus, the registration
12    officials --
13               SEN. HEGAR:  Correct; correct.
14               MR. HEBERT:  -- and talk --
15               SEN. HEGAR:  Correct; correct.
16               MR. HEBERT:  -- more with the students
17    rather than putting barriers up.
18               SEN. HEGAR:  Correct; correct.  And I
19    can just say this:  If there is anything dealing with
20    the people that I represent in any of the district --
21    and I can tell you, especially with Waller County -- I
22    would appreciate, if you don't mind, calling me,
23    because I will get involved in any form or fashion,
24    because I want to make sure we don't have any issues
25    in the county whatsoever.  So you have my pledge on
```

TX_00004348

USA_00018653

471

```
 1    that.
 2                   MR. HEBERT:  Thank you.
 3                   SEN. HEGAR:  Thank you very much.
 4                   MR. HEBERT:  Thank you, Senator.
 5                   SEN. DUNCAN:  The Chair recognizes
 6    Sen. Shapleigh.
 7                   SEN. SHAPLEIGH:  Thank you, Mr. Chair.
 8                   Mr. Hebert, we've discussed since the
 9    evening started the summary of the Attorney General's
10    investigation and prosecution of some of these cases
11    which he characterized in his March press release as
12    an "epidemic of fraud."  Can you give us an overview
13    of how many cases were brought, how many were actually
14    indicted and who actually was involved in the
15    indictments?
16                   MR. HEBERT:  Well, there have been about
17    30 cases brought, as I understand it, by the Attorney
18    General over the last few years since he launched this
19    voter fraud project initiative, about 30 cases.  My
20    recollection is, there were roughly 50 people involved
21    in these cases.  I may have that part wrong, but
22    that's sticking in my mind.  For the most part, they
23    were issuing involving mail-in balloting, these 30
24    case.  They were not cases -- and not a single
25    instance that I can remember involved voted
```

TX_00004349

USA_00018654

472

```
1    impersonation of somebody pretending, at the polls, to

2    be somebody else.

3                SEN. SHAPLEIGH:  How many of these

4    individuals that were indicted were minorities?

5                MR. HEBERT:  I don't really have a hard

6    figure on that.  What I do know is that of the people

7    who were prosecuted for simply mailing the ballot of

8    other people, there were I believe 13 of those, and 12

9    of them were Latinos or Hispanics or African-

10   Americans, and all 13 were Democrats.  By and large, I

11   don't know of any Republicans in those 30 cases that

12   have been defendants or indictees.

13               SEN. SHAPLEIGH:  Now, these names I

14   think people here on this floor know, or some of us.

15   Willie Ray, who I think lives in Sen. Eltife's

16   district.

17               MR. HEBERT:  Willie Ray was my client.

18               SEN. SHAPLEIGH:  City Councilwoman, 69

19   years old, African-American from Texarkana.  Walter

20   Hinojosa, retired school teacher and labor organizer

21   from here in Austin.  What was the crime of these

22   individuals?  What were they charged with?

23               MR. HEBERT:  Well, Mr. Hinojosa was

24   never charged with a crime.  He was a plaintiff in the

25   lawsuit, and he was one of my clients.
```

TX_00004350

USA_00018655

473

```
1              Ms. Ray was charged with mailing --
2    possessing ballots of other people.  And what was
3    described in the case, the indictment, and what was
4    described in our lawsuit was that she had gone to
5    several shut-ins and taken their ballots and dropped
6    them in the mail for them, and sometimes put a stamp
7    on it, because they didn't have the money for a stamp.
8              SEN. SHAPLEIGH:  And so what's the
9    alleged violation of the law in that act?
10             MR. HEBERT:  Possessing the ballot of
11   another person and not putting your name on the
12   carrier envelope.
13             SEN. SHAPLEIGH:  And that was what she
14   was prosecuted for?
15             MR. HEBERT:  That's correct.
16             SEN. SHAPLEIGH:  Thank you.
17             SEN. DUNCAN:  Sen. Williams.
18             SEN. WILLIAMS:  Thank you, Mr. Chairman.
19             Is it Mr. "A-bear" or Mr. "He-bert"?
20             MR. HEBERT:  In Louisiana it's "A-bear."
21   In Texas it's "He-bert."
22             SEN. WILLIAMS:  Well, we're in Texas, so
23   you'll be "He-bert" then, I guess, although I have
24   some "A-bears" in my district and it's in Texas.  So I
25   just wanted to be sure I had it right.
```

TX_00004351

USA_00018656

474

```
1              Mr. Hebert, I would like to go back to
2     the Texas redistricting, because my recollection is
3     that you represented the Democrats when we did the
4     2003 congressional redistricting.  Is my memory
5     correct about that?
6              MR. HEBERT:  That is correct.
7              SEN. WILLIAMS:  And would it be fair to
8     say that in the -- I'm not an attorney.  So, I mean,
9     I'm going to kind of try to summarize this in
10    non-legal language.  But my recollection is that the
11    basic argument you had was that it was
12    unconstitutional for us to draw a map that reflected
13    the majority voting patterns that Sen. Wentworth
14    referenced, that we had to protect those incumbent
15    Democrats.  Is that the gist of the argument that you
16    had, it was unconstitutional, what we were trying to
17    do to redraw this map so that it reflected the
18    majority will of the state?
19             MR. HEBERT:  No, that was not the claim.
20             SEN. WILLIAMS:  What was it, then?
21             MR. HEBERT:  We had a partisan
22    gerrymandering claim as one of the claims in the
23    lawsuit, which was the allegation that a mid-decade
24    redistricting that was being undertaken solely for the
25    purpose of achieving partisan gain -- that is, to
```

TX_00004352

USA_00018657

475

1    replace Democratic officeholders with Republican

2    officeholders in some districts -- that that was a

3    violation of the 14th Amendment's prohibition on

4    partisan gerrymandering.

5           SEN. WILLIAMS:  And I think we're saying

6    the same thing.  You're just phrasing it a little

7    differently than I would.  And then in Pennsylvania,

8    you also represented the Democrats up there.  But

9    wasn't the argument in Pennsylvania that it was

10   unconstitutional to have a congressional map that

11   didn't reflect the will of the majority there?

12          MR. HEBERT:  No.  First, I did not

13   represent the plaintiffs in the Pennsylvania case.  I

14   was not involved in that lawsuit as one of the

15   attorneys.  The claim there was a similar partisan

16   gerrymandering claim, but it did not include the

17   mid-decade aspect of it, which we in Texas took the

18   position that when you do redistricting in mid-decade

19   and you're replacing a perfectly valid map with

20   another map, that that creates a presumption that

21   you're doing it for partisan purposes, because why

22   else would you do redistricting twice?  Most

23   legislatures don't like to even do it once.

24          SEN. WILLIAMS:  And you mentioned

25   earlier your association with Martin Frost.  Have you

TX_00004353

USA_00018658

Case 2:13-cv-00193 Document 661-21 Filed on 11/11/14 in TXSD Page 50 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-2 Filed 06/20/12 Page 254 of 262

4 / 6

```
 1    represented him?  Are you friend with him?  Can you

 2    tell me a little bit more about what your relationship

 3    with him is?

 4                MR. HEBERT:  Martin Frost is a former

 5    client of mine.  I would consider Martin Frost a

 6    friend.  I went to his wife's funeral two years ago.

 7    I don't socialize with Martin Frost.

 8                SEN. WILLIAMS:  I'm sorry.  Could you

 9    repeat -- I missed part of what you said.  I think you

10    said he was a client of yours.  And what did you say

11    after that?

12                MR. HEBERT:  He was a former client of

13    mine.

14                SEN. WILLIAMS:  I see.

15                MR. HEBERT:  I said I would consider him

16    a friend, but I don't socialize with him.  I haven't

17    seen him in a couple of years, probably in person.

18    And I think the last time I saw him was when I

19    attended -- I stand corrected.  I saw him about two

20    months ago at a meeting at a law firm.  But I think

21    the time before that was at his wife's funeral that I

22    attended.

23                SEN. WILLIAMS:  And what about Eddie

24    Bernice Johnson, the African-American congresswoman,

25    have you ever represented her?
```

TX_00004354

USA_00018659

477

1        MR. HEBERT:  I have represented her in

2   the past, yes.

3        SEN. WILLIAMS:  Okay.  And during a

4   redistricting trial, isn't it true that she pointed

5   you out in open court from the witness stand and said

6   that you had been her attorney and that you had lied

7   to her and that you had stabbed her in the back and

8   that you had double-crossed her when she was your

9   client, because you wanted to curry favor with Martin

10  Frost and the Anglo Democrats with more political

11  power?  Did that happen?

12        MR. HEBERT:  She did make some

13  accusations in open court about me.  I don't remember

14  that precise language.  I thought, frankly, that she

15  made some of those allegations against Martin Frost.

16        SEN. WILLIAMS:  So are you saying she

17  was lying?

18        MR. HEBERT:  I will tell you that I did

19  not -- I never have lied to any client, including

20  Eddie Bernice --

21        SEN. WILLIAMS:  That's not what I asked

22  you.  I ask you, was she lying?

23        MR. HEBERT:  If she said that I lied to

24  her, then she was not telling the truth.

25        SEN. WILLIAMS:  Okay.  And then one last

TX_00004355

USA_00018660

Case 2:13-cv-00193  Document 661-21  Filed on 11/11/14 in TXSD  Page 52 of 111
Case 1:12-cv-00128-RMC-DST-RLW  Document 210-2  Filed 06/20/12  Page 256 of 262

478

1   thing.  In 2003, is it true, the story that I've

2   heard, that we've got -- that you were caught on tape

3   stealing maps from the redistricting room?  Couldn't

4   you be disbarred for that kind of activity?

5            MR. HEBERT:  I will answer the second

6   part fist.  Yes, you could be disbarred for that

7   activity.  And I never stole any maps.  I was never --

8            SEN. WILLIAMS:  Well, I understand that

9   there is actually a videotape of you taking maps from

10  the redistricting room.  Is that not -- that's not

11  true?  Those videotapes don't exist?

12           MR. HEBERT:  That is not true.  I have

13  never seen such a tape, but I never took any maps from

14  any redistricting room.

15           SEN. WILLIAMS:  Okay.  Thank you.

16           SEN. DUNCAN:  Members, it's 12 o'clock,

17  and the Court Reporter has been serving us well since

18  about 12:30.  And we have a relief coming in at 12:00.

19  She's been going for two and a half hours straight

20  now.  And so I'm going to --

21           SEN. LUCIO:  Mr. President?

22           SEN. DUNCAN:  -- ask the Committee --

23  Sen. Lucio?

24           SEN. LUCIO:  I had asked you earlier --

25  I do have with me the correspondence from my Senate

TX_00004356

USA_00018661

```
 1    district, from the District Attorney there from

 2    Hidalgo County.  And I would ask at this time to be

 3    able to present it to you and to each member of the

 4    Committee of the Whole.  It's addressed to the

 5    Committee of the Whole.

 6                 SEN. DUNCAN:  Well, certainly.  Bring it

 7    down and we will put an exhibit number on it.  And it

 8    will be Exhibit No. 27, and it's dated today.  Is that

 9    correct?

10                 SEN. LUCIO:  Yes, it's dated -- no.

11    Actually, it's dated March the 6th.

12                 SEN. DUNCAN:  Okay.  And it's from whom?

13                 SEN. LUCIO:  It is from Rene Guerra,

14    Criminal District Attorney, Hidalgo County, Texas.

15                 SEN. DUNCAN:  All right.  If you'll

16    bring that down, we'll submit that into the record as

17    Exhibit No. 27.

18                 (Exhibit No. 27 marked and admitted)

19                 SEN. LUCIO:  Thank you, Mr. President,

20    and thank you, members.

21                 SEN. DUNCAN:  And members, with that, we

22    will take a 10-minute -- we'll stand at ease for 10

23    minutes, until 12:10 a.m., to give our court reporter

24    a break and I think do a transition there.

25                 (Recess:  12:00 midnight to 12:17 a.m.)
```

TX_00004357

USA_00018662

480

```
 1              C E R T I F I C A T E
 2    STATE OF TEXAS      )
 3    COUNTY OF TRAVIS  )
 4              I, Aloma J. Kennedy, a Certified
 5    Shorthand Reporter in and for the State of Texas, do
 6    hereby certify that the above-mentioned matter
 7    occurred as hereinbefore set out.
 8              I FURTHER CERTIFY THAT the proceedings
 9    of such were reported by me or under my supervision,
10    later reduced to typewritten form under my supervision
11    and control and that the foregoing pages are a full,
12    true and correct transcription of the original notes.
13              IN WITNESS WHEREOF, I have hereunto set
14    my hand and seal this 25th day of March 2009.
15
16
17
18            Aloma J. Kennedy
              Certified Shorthand Reporter
19            CSR No. 494 - Expires 12/31/10
20            Firm Certification No. 276
              Kennedy Reporting Service, Inc.
21            Cambridge Tower
              1801 Lavaca Street, Suite 115
22            Austin, Texas  78701
              512.474.2233
23
24
25
```

TX_00004358

USA_00018663

TRANSCRIPT OF PROCEEDINGS BEFORE

THE SENATE OF THE STATE OF TEXAS

EIGHTY-FIRST LEGISLATURE

(COMMITTEE OF THE WHOLE SENATE)

AUSTIN, TEXAS

IN RE:                          §
                                §
CONSIDERATION OF                §
SENATE BILL 362                 §

## COMMITTEE OF THE WHOLE SENATE

### WEDNESDAY, MARCH 11, 2009

BE IT REMEMBERED THAT AT 12:17 a.m., on Wednesday, the 11th day of March 2009, the above-entitled matter continued at the Texas State Capitol Senate Chamber, Austin, Texas, before the Committee of the Whole Senate; and the following proceedings were reported by Kim Pence, a Certified Shorthand Reporter of:

VOLUME 2                        PAGES 481 - 870



KENNEDY

REPORTING

SERVICE

*a record of excellence*

**1801 Lavaca • Suite 115 • Austin, Texas 78701 • 512-474-2233**

ORIGINAL

TX_00004359
JA_003782

TX_00004359

USA_00018664

i

```
1                        TABLE OF CONTENTS

2                                                           PAGE

3                           VOLUME 1A

4    PROCEEDINGS, TUESDAY, MARCH 10, 2009                     2

5    ROLL CALL NO. 1                                          2

6    OPENING INSTRUCTIONS BY SEN. DUNCAN                      5

7    OBJECTION TO FURTHER CONSIDERATION OF SB 362
     (SEN. WEST)                                             12
8
     ROLL CALL NO. 2                                         38
9
     LAYING OUT OF SENATE BILL 362
10   (SEN FRASER)                                            44

11   QUESTIONS FROM SENATE FLOOR                             53

12                          VOLUME 1B

13   INVITED TESTIMONY                                      210

14       TESTIMONY BY HANS VON SPAKOVSKY                    210
         QUESTIONS FROM SENATE FLOOR                        218
15
         TESTIMONY BY TOVA ANDREA WANG                      277
16       QUESTIONS FROM SENATE FLOOR                        287

17       TESTIMONY BY CAMERON QUINN                         300
         QUESTIONS FROM SENATE FLOOR                        306
18
         TESTIMONY BY TOBY MOORE                            336
19       QUESTIONS FROM SENATE FLOOR                        344

20       TESTIMONY BY FRANK B. STRICKLAND                   373
         QUESTIONS FROM SENATE FLOOR                        417
21
         TESTIMONY BY ADAM SKAGGS                           408
22       QUESTIONS FROM SENATE FLOOR                        417

23       TESTIMONY OF ROBERT A. SIMMS
         SUBMITTED BY WES TAILOR                            435
24
         TESTIMONY BY J. GERALD HEBERT                      442
25       QUESTIONS FROM SENATE FLOOR                        450
```

TX_00004360
JA_003783

TX_00004360

USA_00018665

ii

1        TABLE OF CONTENTS

2                                                              PAGE

3                        **VOLUME 2**

4    PROCEEDINGS, WEDNESDAY, MARCH 11, 2009                    482

5
         QUESTIONS FROM SENATE FLOOR (CONTINUED)              482
6

7        TESTIMONY BY THOMAS WHEELER                          502
         QUESTIONS FROM SENATE FLOOR                          510
8
         TESTIMONY BY CHANDLER DAVIDSON                       521
9        QUESTIONS FROM SENATE FLOOR                          527

10       TESTIMONY BY ED JOHNSON                              559
         QUESTIONS FROM SENATE FLOOR                          566
11
         TESTIMONY BY DANIEL B. KOHRMAN                       621
12       QUESTIONS FROM SENATE FLOOR                          628

13       TESTIMONY BY COBY SHORTER                            653
         QUESTIONS FROM SENATE FLOOR                          655
14
         TESTIMONY BY DENNIS BOREL                            706
15       QUESTIONS FROM SENATE FLOOR                          713

16       TESTIMONY BY GARY GLEDSOE                            724
         QUESTIONS FROM SENATE FLOOR                          731
17
         TESTIMONY BY ERIC NICHOLS                            742
18       QUESTIONS FROM SENATE FLOOR                          750

19

20   PUBLIC TESTIMONY                                         771

21       CLAIRE OXLEY GLUCK                                   771

22       HAZEL COTTON                                         773
         QUESTIONS FROM SENATE FLOOR                          775
23
         KATHY HICKS                                          776
24       JAMES E. CARTER                                      779
         RUSTY HICKS                                          781
25

TX_00004361
JA_003784

TX_00004361

USA_00018666

iii

```
 1                    TABLE OF CONTENTS

 2                                              PAGE
     PUBLIC TESTIMONY (CONTINUED)
 3
         TINA BENKISER                          784
 4       B.R. SKIPPER WALLACE                   787
         ANITA PRIVETT                          789
 5       MARY ANN COLLINS                       792

 6       ROSA ROSALES                           794
         QUESTIONS FROM SENATE FLOOR            797
 7
         DUSTIN RYNDERS                         800
 8
         MARSHA CORREIRA                        803
 9       QUESTIONS FROM SENATE FLOOR            806

10       RENE LARA                              807
         LEE MEDLEY                             810
11       JOHN WATKINS                           811
         KENNETH FLIPPEN                        813
12       ANNIE BANKS                            816
         RACHEL HERNANDEZ                       817
13       RENATO DE LOS SANTOS                   819
         JUDY HOLLOWAY                          823
14       LYDIA CAMARILLO                        825
         EDWARD B. WILLIAMS                     828
15       MADELEINE DEWAR                        830
         HELEN VILLARREAL                       833
16       MARK WILLIAMSON                        835
         VANESSA FOSTER                         838
17
         LUIS FIGUERO                           840
18       QUESTIONS FROM SENATE FLOOR            844

19       PATTI EDELMAN                          844
         SYLVIA MENDOZA                         846
20       KENNETH KOYM                           848
         KAREN RENICK                           850
21       JONI ASHBROOK                          853
         DUANE RAWSON                           856
22       ROD FLUKER                             858

23   ROLL CALL NO. 3                            864

24
     PROCEEDINGS CONCLUDED                      869
25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00004362
JA_003785

TX_00004362

USA_00018667

iv

```
 1                          EXHIBIT INDEX

 2                                       MARKED   ADMITTED

 3     1A    Sen. Van de Putte 3/3/09 Memo
             to Sen. Duncan re ground rules
 4           for Committee of the Whole
             Pubic hearing                 21        21
 5
       1B    Sen. Duncan 3/5/09 Memo to Sen.
 6           Van de Putte re response to
             concerns about ground rules
 7           for the Committee of the Whole
             Senate                        21        21
 8
       2.    Letter to Texas Attorney General
 9           Greg Abbott re:  Hearing on SB
             362, signed by 11 Senators    21        21
10
       3.    Senate Notice of Public
11           Hearing on SB 362 for 3/10/09 21        21

12     4.    Texas Senate Agenda, 3/10/09  21        21

13     5A    3/10/09 Tag Form signed by
             Sen. Royce West, et al        21        21
14
       5B    3/10/09 Tag Form signed by
15           Sen. Mario Gallegos           21        21

16     6.    Roll Call No. 2 - Sen.
             Gallegos' Appeal of Ruling
17           of Chair on Sen. West's
             Point of Order                120      120
18
       7.    Institute of Public Policy
19           Publication entitled "The
             Effects of Photographic
20           Identification on Voter
             Turnout in Indiana:  A
21           County-Level Analysis"
             by Jeffrey Milyo, Report
22           10-2007, Revised December
             2007                          120      120
23

24

25
```

TX_00004363
JA_003786

TX_00004363

USA_00018668

v

| | | MARKED | ADMITTED |
|---|---|---|---|

EXHIBIT INDEX (continued)

1

2                                      MARKED   ADMITTED

3  8.  AU News publication entitled
"Much-hyped Turnout Record
4      Fails to Materialize -
Convenience Voting Fails to
5      Boost Balloting"        120     120

6  9.  Symposium paper entitled
"The Empirical Effects of
7      Voter-ID Laws:  Present or
Absent?" by Jason D. Mycoff,
8      Michael W. Wagner and
David C. Wilson       120     120
9

10  10. 9/10/07 Report of the
Heritage Center for Data
11     Analysis entitled "New
Analysis Shows Voter
12     Identification Laws Do Not
Reduce Turnout" by David B.
13     Muhlhausen and Keri  Weber
Sikich         120     120

14  11. *New York Times* article -
September 23, 2005 - entitled
15     "Voting Reform is in the
Card's," by Jimmy Carter
16     and James A. Baker III  160     160

17  12. Harvey Kronberg's Quorum Report
April 23, 2007, entitled "Royal
18     Masset:  The Voter ID Bill Will
Kill My Mother's Right to Vote"  160     160
19

20  13. 2/3/08 article entitled "A
Clearer Picture on Voter ID"
21     by Jimmy Carter and James A.
Baker III      160     160

22  14. Testimony of Hans A. von
Spakovsky, March 10, 2009,
23     re SB 362     217     217

24

25

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004364
JA_003787

TX_00004364

USA_00018669

vi

```
 1                    EXHIBIT INDEX (continued)

 2                                        MARKED   ADMITTED

 3    15A   6/11/07 Letter to Senate
            Committee on Rules and
 4          Administration re Hans A.
            von Spakovsky nomination       254       254
 5
      15B   6/12/07 Article entitled
 6          "Obama Raises Concerns Over
            FEC Nominee's Record of
 7          Partisanship"                  254       254

 8    15C   10/3/07 Letter to the U.S.
            Senate from Public Citizen     254       254
 9
      16.   Institute of Public Policy
10          Publication entitled, "The
            Effects of Photographic
11          Identification on Voter
            Turnout in Indiana:  A
12          County-Level Analysis" by
            Jeffrey Milyo, Report
13          10-2007, Revised December
            2007 (SAME AS EXHIBIT 7)       265       265
14
      17.   Testimony of Tova Andrea Wang,
15          Vice President, Research Common
            Cause, March 10, 2009, re SB 362  300    300
16
      18.   Report of the Commission on
17          Federal Election Reform entitled,
            "Building Confidence in U.S.
18          Elections," September 2005     313       313

19

20

21

22

23

24

25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004365
JA_003788

TX_00004365

USA_00018670

```
 1            EXHIBIT INDEX (continued)

 2                                    MARKED   ADMITTED

 3    19.  Fifteen letters to the Hon.
           Dianne Feinstein, Chair, and the
 4         Hon. Robert F. Bennett, ranking
           minority member, U.S. Senate
 5         Committee on Rules and
           Administration:
 6
           1.   6/29/07 letter from Hans
 7              A. von Spakovsky
           2.   3/22/07 letter from various
 8              members of Congress
           3.   3/13/07 letter from William
 9              H. Jordan
           4.   2/08/07 letter from Gary J.
10              Smith
           5.   2/26/07 letter from P. K.
11              Brunelli
           6.   3/01/07 letter from J. A.
12              Borras
           7.   2/21/07 letter from Trey
13              Grayson
           8.   2/20/07 letter from Beverly
14              B. Kaufman
           9.   2/19/07 letter from Todd
15              Rokita
          10.  2/16/07 letter from Frank
16              B. Strickland
          11.  2/14/07 letter from Tom Lowe
17        12.  2/13/07 letter from
                T. Rogers Wade
18        13.  2/14/06 letter from Johnny
                Isakson
19        14.  2/09/07 letter from Wesley
                R. Kliner, Jr.
20        15.  3/13/07 letter from Ray
                Martinez III                 333      333
21
      20.  Brennan Center For Justice letter
22         dated October 3, 2007, by
           Executive Director Michael
23         Waldman, with attachments         335      335

24

25
```

TX_00004366

USA_00018671

Case 2:13-cv-00193  Document 661-21  Filed on 11/11/14 in TXSD  Page 63 of 111
Case 1:12-cv-00128-RMC-DST-RLW  Document 210-5  Filed 06/20/12  Page 6 of 265

viii

| | EXHIBIT INDEX (continued) | | |
|---|---|---|---|
| | | MARKED | ADMITTED |
| 21. | Prepared Remarks of Dr. Toby Moore, Research Triangle, regarding "Evidence of the impact of voter ID requirements and the prospects of US DOJ preclearance," March 10, 2009 | 358 | 358 |
| 22. | Harris County Map submitted by Sen. Gallegos | 366 | 366 |
| 23. | Testimony of Frank B. Strickland re SB 362 March 10, 2009 | 373 | 373 |
| 24. | Testimony of Adam Skaggs, Counsel, Democracy Program, Brennan Center for Justice at NYU School of Law, regarding *The Myth of Voter Impersonation Fraud at the Polls* March 10, 2009 | 408 | 408 |
| 25. | Written Testimony of Robert A. Simms, Georgia Deputy Secretary of State, presented to the United States Senate Committee on Rules and Administration, submitted by Wes Tailor | 435 | 435 |
| 26. | Testimony of J. Gerald Hebert re SB 362, March 10, 2009 | 442 | 442 |
| 27. | Letter from Rene Guerra (March 6, 2009) Criminal District Attorney of Hidalgo County, Submitted by Sen. Lucio | 479 | 479 |
| 28. | 3/4/09 Letter from Todd Rokita, Indiana Secretary of State, to Sen. Fraser re SB 362 | 502 | 502 |

TX_00004367
JA_003790

TX_00004367

USA_00018672

|  | | | MARKED | ADMITTED |
|---|---|---|---|---|

EXHIBIT INDEX (continued)

29. Testimony of Chandler Davidson, Tsanoff Professor of Public Affairs Emeritus, Rice University, regarding "The Historical Context of Senate Bill 362," March 10, 2009 — 521 — 521

30. 3/06 Printout from Texas AG Website entitled "Helping Stamp Out Voter Fraud in Texas," by Greg Abbott, Attorney General of Texas, submitted by Sen. Shapleigh — 550 — 550

31. Dashwood case documents submitted by Ed Johnson, Harris County Tax Assessor-Collector and Voter Registrar's Office — 559 — 559

32. Records from specific Harris County voting documents, submitted by Ed Johnson — 559 — 559

33. Harris County Deceased Voting History, miscellaneous registration applications, submitted by Ed Johnson — 559 — 559

34. Texas Voter Registration Application form submitted by Sen. Huffman — 570 — 570

35. Testimony of Daniel B. Kohrman, Senior Attorney, AARP Foundation, re SB 362 March 10, 2009 — 621 — 621

36. Photographs of Voter Education, Anderson County Workshop, 2008 — 724 — 724

37. Testimony of Gary L. Bledsoe, President, Texas NAACP, re SB 362, March 10, 2009 — 724 — 724

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00004368
JA_003791

TX_00004368

USA_00018673

×

```
 1              EXHIBIT INDEX (continued)

 2                              MARKED   ADMITTED
       38.  Number of voters who have
 3          registered since 2006 without
            a driver's license number,
 4          submitted by Sen. Watson        767        767

 5     39.  The Special Investigations
            Unit Role and Investigative
 6          Efforts and Funding,
            submitted by Sen. Huffman       767        767
 7
       40.  Slip Opinion, U.S. Supreme
 8          Court, Crawford vs. Marion
            County Election Board,
 9          October Term, 2007              768        768

10     41.  U.S. Supreme Court, Crawford
            vs. Marion County Election
11          Board, on Writ of Certiorari
            to U.S. Court of Appeals for
12          the Seventh Circuit, Brief of
            Texas, Alabama, Colorado,
13          Florida, Hawaii, Michigan,
            Nebraska, Puerto Rico and
14          South Dakota, as Amici Curiae
            Supporting Respondents          768        768
15
       42.  Written Testimony of Claire
16          Oxley Gluck from Boerne, in
            Kendall County, re SB 362       773        773
17
       43.  Written Testimony of Hazel
18          Cotton of Texarkana, Texas
            re SB 362                       775        775
19
       44.  Written Testimony of Kathy
20          Hicks of Texarkana, Texas
            re SB 362                       779        779
21
       45.  Written Testimony of Donald
22          Giles of Texarkana, Texas
            re SB 362                       783        783
23
       46.  Written Testimony of Anita
24          Privett, League of Women
            Voters of Texas, re SB 362      789        789
25
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004369
JA_003792

TX_00004369

USA_00018674

xi

```
 1                    EXHIBIT INDEX (continued)

 2                                      MARKED   ADMITTED

 3      47.  Written Testimony of Rosa
             Rosales, League of United
 4           Latin American Citizens,
             National President
 5           re SB 362                    794        794

 6      48.  Written Testimony of Dustin
             Rynders, Advocacy, Inc.,
 7           re SB 362                    800        800

 8      49.  Written Testimony of Marsha
             Correira re SB 362           804        804
 9

10      50.  Written Testimony of Rachel
             A. Hernandez re SB 362       817        817
11

12      51.  10/17/08 Article by Nelda
             Wells Spears, Voter Registrar,
             Travis County, entitled "40,000
13           Voter Registration Applications
             Processed in Time For Early
14           Voting"                      825        825

15      52.  Written Testimony of Lydia
             Camarillo, SVREP Vice
16           President, re SB 362         826        826

17      53.  Written Testimony of Luis
             Figueroa, Mexican American
18           Legal Defense and Education
             Fund (MALDEF), re SB 362     841        841
19
        54.  Written Testimony of Sylvia
20           Mendoza re SB 362            848        848

21      55.  Written Testimony of Dr. Rod
             Fluker, Sr., Executive Director
22           for Texas Association of Black
             Personnel in Higher Education,
23           re SB 362                    861        861

24

25
```

TX_00004370

USA_00018675

```
  1                    P R O C E E D I N G S

  2              WEDNESDAY, MARCH 11, 2009

  3                     (12:17 a.m.)

  4              SEN. DUNCAN:   The Committee of the Whole

  5    will come back to order.   Members, we -- our very

  6    capable court reporter, Ms. Kennedy is -- we're doing

  7    a transition, and we let her have the rest of the

  8    night off.

  9              And we have Kim Pence who is with us,

 10    who will continue taking our testimony, and if --

 11    we'll continue to observe that so that she can get a

 12    good record.

 13              The next person on the queue is

 14    Sen. Zaffirini.   Sen. Zaffirini, you are recognized.

 15              SEN. ZAFFIRINI:   Thank you,

 16    Mr. President.   And first, could we recognize the

 17    court reporter who has been with us for 12 hours?   She

 18    certainly does deserve a round of applause.

 19              (Applause)

 20              SEN. ZAFFIRINI:   Thank you.

 21    QUESTIONS FROM SENATE FLOOR (CONTINUED)

 22              SEN. ZAFFIRINI:   Mr. Hebert, I know that

 23    you have read the bill.   Have you also read the fiscal

 24    note?

 25              MR. HEBERT:   Yes, I have.
```

TX_00004371

USA_00018676

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 68 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 11 of 265

483

```
 1                    SEN. ZAFFIRINI:  And did you see that it
 2      says that there would be no fiscal implications to the
 3      State if this bill were passed?
 4                    MR. HEBERT:  I did see that.
 5                    SEN. ZAFFIRINI:  Do you believe that
 6      fiscal note?
 7                    MR. HEBERT:  While I accept it at face
 8      value, I think it's preposterous.
 9                    SEN. ZAFFIRINI:  Do you -- why do you
10      believe that that -- that if we pass the lot it will
11      cost the State millions of dollars, according to your
12      testimony?
13                    MR. HEBERT:  Well, I think it will cost
14      money because notwithstanding the fact there may some
15      line item in the Secretary of State's budget, I can't
16      believe that there's a line item that would cover the
17      cost of seeking pre-clearance and gathering all of the
18      data necessary, all the staff time to do that; and
19      then to go to the Justice Department, which is going
20      to have a very skeptical eye about this bill.
21      Remember, they recommended -- the career staff
22      recommended that the Georgia map be blocked.  And if
23      you read their memo, which is now a matter of public
24      record, there was -- I think there was like 55
25      single-spaced pages of all of the data that they
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004372
JA_003795

TX_00004372

USA_00018677

484

1    forced the State of Georgia to come up with.  And even
2    in the end of having them produce all that data,
3    Georgia still couldn't get pre-clearance from the
4    career people.
5         The process as it turns out, we now
6    know, is somewhat corrupt there, but I think the Texas
7    bill could very well suffer the same effects, not to
8    mention all the time, of course, the State is taking
9    to enact the bill; and then, of course, ultimately if
10   it does get approved, to defend it in court for the
11   inevitable legal challenge that will follow; and then,
12   of course, administering and implementing the bill at
13   the local level, it requires extensive training of
14   local Election Officials to ensure that they know how
15   to administer a very complicated set of identification
16   provisions.
17        SEN. ZAFFIRINI:  And that is on Page 3
18   of your written testimony.  You wrote "though
19   implementation of a photo ID bill will cost the State
20   of Texas millions of dollars to defend the measure
21   before the Department of Justice and in federal
22   courts, and then to implement and administer it if
23   ever approved."  What do you think it would cost the
24   State to defend this lawsuit?
25        MR. HEBERT:  Well, to defend the lawsuit

TX_00004373
JA_003796

TX_00004373

USA_00018678

```
 1    if one is challenged and assuming the bill is enacted

 2    exactly as it appears in the bill pending before you,

 3    you know, to bring such a lawsuit and to challenge it,

 4    I can tell you on the plaintiff's side costs a quarter

 5    of a million dollars, at least on the plaintiff's

 6    side.  I suspect the defendants usually spend more.

 7    So I would say, you know -- and it also depends

 8    whether there's an appeal, which usually there is.

 9    The more appeals there are, the more it costs.  So

10    usually litigation of this nature costs like, you

11    know, probably half a million dollars is what -- is

12    what the bill is.

13            SEN. ZAFFIRINI:  Okay.  Thank you.  On

14    Page 4 of your written testimony, you write that

15    "There is considerable evidence, however, that

16    enacting a Voter Photo ID bill will create a series of

17    barriers making it harder for senior citizens, younger

18    voters, poor people, people of color, and women in

19    general to exercise their right to vote."  Precisely

20    what barriers are you talking about?

21            MR. HEBERT:  Well, as Ms. Wang testified

22    earlier, you and I may have IDs in our pockets, in our

23    purses, but poor people don't oftentimes have those.

24    And the burdens and barriers that they face are that

25    they have -- if they don't have a photo ID now, and we
```

TX_00004374
JA_003797

TX_00004374

USA_00018679

486

```
 1    now know that there are thousands of Texans who vote
 2    and don't have a photo ID, that they're going to now
 3    presumably have to get one or make sure that they
 4    carry around these two other methods of identification
 5    with them.  So that's -- you know, we're putting up --
 6    we're putting up conditions on people exercising the
 7    fundamental right to vote.  We're putting the burden
 8    on them to do more than just show up at the polls and
 9    vote.
10              You know, I heard earlier, for example,
11    I think it was Sen. Fraser say, you know, to
12    Sen. Davis, you know, when Wendy Davis goes the polls
13    and votes, I want to make sure that, you know, it is
14    Wendy Davis.  And the fact is that we don't really
15    have any examples right now of where somebody is
16    showing up pretending to be Wendy Davis who is not
17    Wendy Davis.
18              And so when you don't have a lot of
19    those situations happening, forcing people to have a
20    photo ID when it really isn't going to accomplish --
21    the kind of alleged fraud that exists, it really, I
22    think, ends up putting people in a burdensome
23    situation where they have to then go out and do
24    something to get the right documentation.
25              And I think that -- you know, in
```

TX_00004375

USA_00018680

Case 2:13-cv-00193   Document 661-31   Filed on 11/11/14 in TXSD   Page 72 of 111
Case 1:12-cv-00128-RMC-DST-RLW   Document 210-3   Filed 06/20/12   Page 15 of 265

487

1    Georgia, I mean, there were -- I believe I saw a
2    statistic in the Houston Chronicle this morning that
3    there were roughly -- I think it was like a little
4    over a thousand, I think it was 1100 voters who had to
5    vote a provisional ballot in Georgia in 2008 because
6    they didn't have the requisite photo ID.  And of that
7    number, I believe only 300 came back after the
8    election and produced within 48 hours the necessary
9    documentation.
10            Once the election is over, there's not
11   as much incentive for people to come back and do
12   whatever it is they need to do to validate their vote.
13            SEN. ZAFFIRINI:  Thank you.  Isn't it
14   interesting that every minority member of the Texas
15   Senate, every Hispanic and the two African-Americans,
16   oppose the effort to re-redistrict, as I'd like to
17   call it, and today every minority member of the Texas
18   Senate, the two African-Americans and every
19   Hispanic-American in the Texas Senate, oppose this
20   bill.  Some coincidence, wouldn't you say?
21            MR. HEBERT:  I would say not very
22   coincidental at all actually.  I think it's
23   understandable given the ultimate impacts of what I
24   see the two bills having.
25            SEN. ZAFFIRINI:  Mr. Hebert, you heard

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00004376
JA_003799

TX_00004376

USA_00018681

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 73 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-5 Filed 06/20/12 Page 10 of 265

488

```
1    my question to Sen. Fraser asking him why he included
2    documentation of a sex change as proof of
3    identification.  He said in response that he would
4    punt to the House author of the bill considered in
5    2007.  Can you explain to us why that language would
6    be in the bill?
7              MR. HEBERT:  No.  I mean, it's -- you
8    know, I don't really know about a lot of the documents
9    on that list of things you can produce, why producing
10   two of those documents is, you know, a reliable way of
11   proving who you are.  For example, we won't allow
12   people now, if this bill goes into effect, to use
13   their voter ID card, their voter registration card,
14   when they show up even if their name is on the books
15   and their card matches that name, but we'll allow them
16   to use a court record from a sex change operation and
17   a library card to vote.
18             Now, you know, the last time I checked a
19   library card to me doesn't seem to be as reliable as a
20   government-issued voter registration card.  So, you
21   know, there's some real questionable things like that
22   in the bill.  Sen. Duncan -- I mean, Sen. Fraser would
23   probably know why he put it in there, but for the life
24   of me -- I haven't seen that in a bill before I have
25   to say.
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004377
JA_003800

TX_00004377

USA_00018682

489

```
 1                    SEN. ZAFFIRINI:  You haven't?

 2                    MR. HEBERT:  No.

 3                    SEN. ZAFFIRINI:  Thank you very much.

 4     Thank you.

 5                    MR. HEBERT:  Thank you.

 6                    SEN. DUNCAN:  The Chair recognizes

 7     Sen. Gallegos.

 8                    SEN. GALLEGOS:  Thank you, Mr. Chairman.

 9     Gerry, let me ask you going back on redistricting and

10     let's go to those states that have enacted -- well,

11     let's go to the states that have enacted photo ID

12     laws.  Some of those states I understand were red

13     states and all of a sudden they turned to blue.  And

14     it's my understanding that in a lot of those states

15     the Latino population has surged.  Is that -- is that

16     your understanding?

17                    MR. HEBERT:  Well, the Latino population

18     is surging in Georgia.  I wouldn't describe Georgia as

19     a state that's gone from red to blue.

20                    SEN. GALLEGOS:  I understand, but

21     Indiana --

22                    MR. HEBERT:  I mean, I would -- Indiana

23     is no longer completely controlled by Republicans, I

24     don't think.  So you have a situation there where

25     maybe they've gone from red to purple trending, you
```

TX_00004378

USA_00018683

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 75 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 18 of 265

490

```
 1    know, obviously in both of those states and in other

 2    states that have considered voter ID, and I believe

 3    it's now pending in the Utah legislature.  Republicans

 4    have controlled and had a monopoly on the entire state

 5    government.

 6              SEN. GALLEGOS:  I guess what I'm trying

 7    to ask you is that in these state that are all of a

 8    sudden turning minority, what I would say minority,

 9    the Latino population coupled with the

10    African-American population is outranking the Anglo

11    population in those states, and it's showing in the --

12    at the ballot box especially during this last

13    election.  Would you -- would you agree?

14              MR. HEBERT:  Well, certainly in Georgia

15    the Latino population has been growing substantially

16    in recent years.  I'm not familiar that much with

17    Indiana's demographics as I am with Georgia's.

18              SEN. GALLEGOS:  Well, let's just stay

19    with Indiana.  You know, what we saw on CNN and some

20    of the other figures that we're seeing is there was a

21    tremendous increase in Latino votes in that state that

22    turned it -- a red state into a blue state.  And what

23    I'm looking at here, Mr. Hebert, is that as these

24    states grow all of a sudden -- for example, Indiana,

25    as they grow into -- the population increased in the
```

TX_00004379

USA_00018684

491

```
1    Latino community.  Like Indiana all of a sudden, they
2    introduced and passed a voter ID bill, a photo -- a
3    voter ID bill.  And I guess what I'm concerned is that
4    it's starting a pattern as where the Latino population
5    is increasing, that all of a sudden you have proposed
6    legislation on photo ID.
7             And now we're in Texas.  Let me just
8    give you some early numbers that we've gotten before
9    we get into the census and before the Secretary of
10   Commerce approves numbers.  The State of Texas in the
11   last ten years from 2000 to 2010 over 90 percent of
12   the Texas growth will be minority.  There's an
13   indication of projected growth by 4 million in the
14   last ten years out of -- for 4 million.  Out of those
15   4 million, 3,158,077 Hispanic, 3 million -- over
16   3 million of that 4 million is Hispanic.  Now -- and
17   that's just projected.  I think it's going to be
18   higher after the Secretary of Commerce confirms the
19   numbers.
20            Now, in Houston, we're looking at --
21   we're looking at a 1.1 -- in the last ten years -- in
22   the last ten years a 1.1 million increase in ten
23   years.  Now, I'll tell you that the Secretary of
24   Commerce has not confirmed those numbers.  I believe
25   that number will be 1.5 million.
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004380
JA_003803

TX_00004380

USA_00018685

```
 1            So what I'm getting at here and I'd like
 2    you to answer is that all of a sudden we have a Latino
 3    explosion population here -- which by the way, we
 4    probably will get minimum three, probably maximum four
 5    congressional districts in Texas, one for sure in
 6    Houston and one for sure in Dallas.  Now, the
 7    others -- I don't know where the others go, and
 8    probably additional Latino seats -- and I'm talking
 9    about these will be Latino seats, additional Latino
10    seats in Houston, maybe two, and another extra Senate
11    seat -- another Senate seat belt for Dallas, Latino,
12    and probably four other State Rep seats in Houston,
13    Latino.
14            So my concern is looking at these
15    patterns all over the country with Latino explosion in
16    population, and all of a sudden voter ID legislation
17    in these areas, in these states, all of a sudden we
18    have an explosion like this.  Oh, yeah, we'll take the
19    money from Washington after the census is taken and
20    those educational monies, those transportation monies,
21    education monies and healthcare monies, we'll take it,
22    we'll take it.  But all of a sudden, we have a voter
23    ID bill that's on the table here before us.  Because
24    of this Latino explosion, they know that we're going
25    to get these congressional districts, which is going
```

TX_00004381

USA_00018686

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 78 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 21 of 265

493

1    to empower Latinos.

2            And in redistricting -- and I was there

3    with you.  Troy Fraser was a co-chairman with me, and

4    I saw what happened.  I saw what happened, this little

5    debate you had with Sen. Wentworth, I saw what

6    happened.  Who really lost were the Latinos.  They

7    were the ones that lost.  They got cut up three ways

8    in Dallas.  They tried to cut us up in Houston, and

9    they tried to cut us up in some other areas.  What

10   they do is put us in areas to elect whoever and cut us

11   up and keep us -- and keep us separated.  I saw that,

12   and you saw that.

13           So what I'm asking you is that this

14   pattern -- this pattern where Latino explosion

15   population and all that is do you see a pattern of

16   where that growth is?  All of a sudden we want voter

17   ID, voter ID to suppress -- that's my guess -- is to

18   not only suppress our votes, but also try to suppress

19   our empowerment.

20           MR. HEBERT:  Well, let me say that there

21   clearly is a surging Latino population in Texas and in

22   other states that have seen a photo ID bill go into

23   effect.  And as I testified earlier, Sen. Gallegos,

24   the fact is that most, if not all, of the groups that

25   are going to be adversely affected -- and I'll single

TX_00004382

USA_00018687

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 79 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 22 of 265

494

```
 1    out Latinos because that's your question -- that they
 2    are growing, and they are growing fast, and they are
 3    growing as a percentage of the Texas voting
 4    population, and they tend to skew Democratic, at least
 5    now.  And so that to me explains the urgency that
 6    Republicans have in these states to enact a voter ID
 7    bill.
 8                SEN. GALLEGOS:  Mr. Hebert, what I'm --
 9    I mean, what I meant and really wanted your opinion is
10    that as this population grows and all this population
11    is coming to Texas, which obviously enriches us with
12    four more congressional seats, these other seats I
13    spoke about, plus the money that the census gives us
14    in those numbers -- what I'm saying is that Texas is
15    benefiting from that population increase, not only in
16    empowerment, but also in money.
17                And for some reason, like in Indiana
18    where the Latino population is increasing, Denver and
19    those other states that were red, now going blue, that
20    legislation is proposed or being proposed in these
21    states that all of a sudden are turning
22    minority/majority.
23                My concern is that Texas will take the
24    population increase, they'll take the empowerment,
25    they'll take the four congressional districts, they'll
```

TX_00004383
JA_003806

TX_00004383

USA_00018688

495

```
 1    take the money from the census, yet they introduce a
 2    bill to suppress the Latino and the minority
 3    community.  That's my concern on the pattern.  So
 4    wouldn't you agree with me or at least give me your
 5    opinion that that's the type of pattern we're seeing?
 6    Increase in Latino population?  All of a sudden we've
 7    got a suppression bill here.  They might as well put
 8    an amendment to suppress -- that this bill suppresses
 9    all Latinos, the elderly and the African-Americans.
10    You might as well.  That's what I see here.  That's
11    the pattern I'm seeing.  I just want your opinion.
12              MR. HEBERT:  Well, my opinion is that
13    voter ID bills, including the one in Texas, are a part
14    of a pattern of suppressing minority votes, and that's
15    what this bill will do in my opinion, and I've
16    testified to that effect.  And I agree with you that
17    the surging Latino population here will likely justify
18    the creation of additional Latino seats when
19    redistricting comes around.  And it goes counter to
20    the fact that you have the Latino population growing
21    as fast as it is as a proportion of the state, and at
22    the same time that they're growing and giving benefits
23    to the State of Texas, as you point out, that we end
24    up with a photo ID bill that actually will target them
25    and suppress a lot of people's voting rights.
```

TX_00004384

USA_00018689

496

```
1              SEN. GALLEGOS:  Thank you for
2   your opinion, Gerry.  Thank you.
3              SEN. DUNCAN:  The Chair recognizes
4   Sen. Shapiro.
5              SEN. SHAPIRO:  Thank you,
6   Mr. President -- Mr. Chairman and Members.  I have a
7   couple of issues that I'd just like to visit with you
8   about, Mr. Hebert.  I do remember very closely the
9   debate and the dialogue on redistricting and your role
10  in that.  And certainly one of the issues that still
11  kind of gnaws at me is the idea -- and I just want a
12  yes or a no answer.  I don't want anything else.  Did
13  you take maps from the offices in this building during
14  redistricting?  Yes or no?
15             MR. HEBERT:  Yes.
16             SEN. SHAPIRO:  Okay.  That's all I
17  needed to hear.  So you did take maps that were not
18  yours out of this building?
19             MR. HEBERT:  Now you're adding more
20  facts.  No, I did not take maps that were not mine.  I
21  took my maps, or maybe my client's maps maybe.
22             SEN. SHAPIRO:  Did you get permission to
23  take those maps, or did you just take them?
24             MR. HEBERT:  The maps that I took I had
25  permission to have in my possession.
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004385
JA_003808

TX_00004385

USA_00018690

497

```
 1              SEN. SHAPIRO:  And who gave you
 2    permission to take those maps?
 3              MR. HEBERT:  My clients.
 4              SEN. SHAPIRO:  Your clients gave you
 5    permission.  Okay.  So you did take maps?
 6              MR. HEBERT:  I did.
 7              SEN. SHAPIRO:  Okay.  That's what I need
 8    to know.
 9              The second question I have is completely
10    different, and that is why do you believe the federal
11    government has rules in place, laws in place, that
12    actually say that when you go to an airport you must
13    have a photo ID?
14              MR. HEBERT:  For security purposes.
15              SEN. SHAPIRO:  For security purposes.
16    And you testified earlier that someone came through --
17    I'm sorry I don't remember who you said -- came
18    through, did not have to use their photo ID, went
19    back, was integrated, came back out and went through
20    as they did.
21              MR. HEBERT:  Correct.
22              SEN. SHAPIRO:  It's ironic because about
23    a week ago I was going through, as we all do so often,
24    and I happened to see a sign up right there at that
25    isle as you -- before you give your ID.  And the note
```

TX_00004386

USA_00018691

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 83 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 20 of 265

498

```
 1    on the poster says "Why" -- with a question mark --
 2    "Why do I have to show my ID?  Identity matters.  We
 3    need to make sure your ID and your boarding pass
 4    match."  And it's signed Transportation Security
 5    Administration.
 6                    These rules, these laws that are put in
 7    place have exceptions, as you mentioned earlier, and
 8    it seems to me the correlation between what this bill
 9    is saying and what we are trying to do and what maybe
10    the federal government has done are very similar
11    because in essence it's the same methodology.
12                    We have a law.  We say we want you to
13    have a photo ID.  You don't have it.  In this
14    particular bill, it says here are the other options
15    that you can go through in order to qualify.  I don't
16    think there's a whole lot of difference between the
17    two.
18                    And I think that we're doing what you're
19    asked to do with a Sam's card.  As we mentioned
20    earlier, I can't charge on my Cosco card unless my
21    picture is on it.  Identity matters.  I can't go to my
22    bank and cash a check or another bank without my photo
23    ID.  Identity matters.  I mean, you could go on and
24    on.  The library books, identity matters.
25                    And in this case, I think that's, in
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004387
JA_003810

TX_00004387

USA_00018692

```
 1    fact, what we're doing.  Do you agree that identity
 2    matters?
 3                 MR. HEBERT:  I agree that identity
 4    matters, but I disagree that what you're doing in this
 5    bill is similar to what, say, the TSA is doing at the
 6    airport.
 7                 SEN. SHAPIRO:  Okay.  The methodology is
 8    the same.  It may not be the same heightened awareness
 9    or the same difficulty with security, but we happen to
10    believe that the integrity of the vote is just as
11    important and just as secure.
12                 MR. HEBERT:  I see the procedures as
13    being different at the airport than they are in
14    voting.
15                 SEN. SHAPIRO:  And how -- and how is
16    that?
17                 MR. HEBERT:  Well, for example, at the
18    airport when you go through security and you don't
19    have a picture ID, they pull you aside and they ask
20    you questions.  And if they're satisfied, you can get
21    on, you get on.
22                 SEN. SHAPIRO:  That's what I just said.
23                 MR. HEBERT:  Well, the difference is
24    that in Texas if you go to show up at the polls and
25    you have a voter -- valid voter registration card
```

TX_00004388

USA_00018693

500

1    under this bill and that's all the information you

2    have, you have to cast a provisional ballot, and

3    that's not going to get counted.  So the difference is

4    that in one, you're getting on the plane, and in the

5    example of the voter ID, you're not getting on the

6    plane.

7              SEN. SHAPIRO:  And you wouldn't have the

8    opportunity then to say "Here is my valid information.

9    Here is my check.  Here is my electricity bill"?  I

10   mean, there's a whole litany of things that you could

11   have with you at the same time that you went to go

12   vote.

13             MR. HEBERT:  Right, but if you go to the

14   airport with nothing, you get to get on the plane if

15   you can establish, through questions, that you're not

16   a security risk.  If you go to the polls with no ID

17   except for your voter card, you're not going to be

18   able to vote except for a provisional ballot, and

19   there's no procedure in the bill for how to rectify

20   that situation once your provisional ballot is

21   counted.  70 percent of the provisional ballots never

22   get counted.

23             SEN. SHAPIRO:  Well, I think the issue

24   here is identity matters, and I think what we're

25   trying to do is just make sure that everybody's

TX_00004389

USA_00018694

501

1   identity matches who they are.  That's not -- that is
2   not out of line with about 25 other things that we do
3   currently under laws or procedures or rules that exist
4   throughout this country on lots of different issues.
5   It was just ironic that you mentioned the airport
6   because I just happen to have written that down while
7   I was at the airport.  Thank you.
8           MR. HEBERT:  Thank you.  You know,
9   Sen. Shapiro, I own a restaurant, and we check IDs for
10  people who we think are underage drinking.  And when I
11  went through the ABC training course, the alcoholic
12  beverage, and they showed me fake IDs, I could not
13  tell the difference between a valid driver's license
14  and a fake one.  So I agree identity matters, but it's
15  often very difficult to base that decision on a photo
16  ID, including a driver's license.
17          SEN. DUNCAN:  Mr. Hebert, there are no
18  other Members in queue to question you.  So you are
19  free to leave.
20          MR. HEBERT:  Thank you.
21          SEN. DUNCAN:  Thank you.
22          Mr. Patrick, for what purpose --
23  Sen. Patrick?
24          SEN. PATRICK:  I was going to ask
25  Mr. Hebert a question, but I don't think (inaudible).

TX_00004390

USA_00018695

1      **TESTIMONY BY THOMAS WHEELER**

2              SEN. DUNCAN:  Our next witness, Members,

3      is Thomas Wheeler.  Mr. Wheeler, you have written

4      testimony that you've submitted.  It will be

5      Exhibit 28, and it will be entered into the record.

6              (Exhibit No. 28 marked and admitted)

7              SEN. DUNCAN:  If you'll state your name

8      and who you represent?  You have ten minutes.

9              MR. WHEELER:  Thank you, Mr. Chairman,

10     Members of the Committee.  My name is Tom Wheeler.  I

11     represent myself.  I am the Chairman of the Indiana

12     State Election Commission.  I have held that position

13     for the last five years.

14              The Indiana State Election Commission is

15     a bipartisan Commission, it is made up of two

16     Republicans and two Democrats, and as I mentioned I am

17     the Chair of the Commission.  We share responsibility

18     for elections, campaign finance, candidate inquiries

19     and related matters with the Indiana Secretary of

20     State.

21              The document and the statement that has

22     been introduced as Exhibit 28 is a statement prepared

23     by the Indiana Secretary of State Todd Rokita, whose

24     name is -- it probably won't be unfamiliar to you for

25     those of you who have read the Crawford decision.

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 88 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 31 of 265

503

1          I'm not going to engage in a polemic

2     here this evening.  I know we're late at night, and a

3     lot of people are still behind us queued up ready to

4     speak.  What I would like to do, though, is spend just

5     a couple of minutes telling you in Indiana how we got

6     to where we are and how well it has worked in Indiana.

7     I would not presume to lecture the legislators here

8     from the great State of Texas about how that's going

9     to work here.  That's your job as elected officials.

10    But what I can do is tell you how -- why we

11    implemented what we did and how well it worked.

12          Let me take to you 2003, Lake County,

13    Indiana, City of East Chicago.  Lake County, a pretty

14    industrial area just outside Chicago filled with steel

15    mills and industrial area.  The situation is a

16    contested Democratic Primary race for the Mayor

17    of East Chicago.  Mr. Pabey, the Police Chief, is

18    running against the long-time Mayor Mr. Pastrick.

19    Mr. Pastrick was actually filmed and documented in a

20    documentary called The King of Steel Town.  For those

21    of you who are involved in the election-related issue,

22    it's a fairly fascinating documentary about how to

23    move forward with election fraud.

24          In this particular case, on election

25    day, May 6, 2003, Jose Torres walked into the Roberto

TX_00004392

USA_00018697

504

```
 1    Clemente Center in East Chicago.  He signed his name.
 2    He cast a vote in this hotly contested Democratic
 3    Primary battle for Mayor.  In fact, he was one of four
 4    people, four family members from the same address who
 5    also voted in that election.
 6              The problem, Mr. Torres died on December
 7    26, 1997 in the Chicago Hospital.  Indeed his family
 8    had moved out of East Chicago in 1998, yet they kept
 9    voting, religiously going to the polls and voting up
10    to 2003.  Interesting enough, Mayor Pastrick, the
11    individual who was running as Incumbent Mayor, was
12    actually a funeral home owner where Mr. Torres and
13    many other voters in East Chicago had been prepared
14    for burial.
15              The issue in this case, this was a hotly
16    contested election.  It was in a Democratic Primary.
17    Very frankly, the Republicans had no idea that there
18    was any fraud going on.  This was whistle blowing
19    between two Democratic candidates.
20              Mr. Pastrick, Mayor Pastrick, lost on
21    election day by 199 votes.  He challenged that loss.
22    He alleged wide spread and systemic fraud by
23    Mr. Pabey.  Mr. Pabey alleged the same by him.  This
24    went to the Indiana Supreme Court.  The Indiana
25    Supreme Court found, and I quote, "There was an
```

TX_00004393

USA_00018698

Case 2:13-cv-00193 Document 661-31 Filed on 11/11/14 in TXSD Page 90 of 111
Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 33 of 265

505

```
 1    occurrence of a deliberate series of actions that
 2    perverted the voting process and compromised the
 3    integrity and results of the election.  In view of the
 4    uncontested factual findings of the trial court, the
 5    contestant established that a deliberate series of
 6    actions occurred, making it impossible to determine
 7    the candidate who received the highest number of legal
 8    votes."
 9              When our Supreme Court said to us the
10    fraud was so bad -- "We didn't just have dead people
11    voting.  The fraud was so bad that we can't even
12    figure out who won this election, we're going to do it
13    over," that caught the attention of the people of the
14    State of Indiana and the General Assembly.
15              The second factor that caused us to look
16    at our -- look at photo ID as an option was the fact
17    that in Indiana we learned -- and this is set forth in
18    the statement of Secretary Rokita -- we learned that
19    voter registration rates in many of our counties
20    exceeded 100 percent of the estimated voting eligible
21    population.  It was opined during the Pabey/Pastrick
22    matter that these excessive voter registration rates
23    encouraged precisely the kind of fraud that we saw
24    during the Pabey/Pastrick election and the subsequent
25    litigation.
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004394
JA_003817

TX_00004394

USA_00018699

506

1          Taking those two together, the Indiana
2     General Assembly made a determination based upon the
3     concerns about outright fraud, clearly what the
4     Indiana Supreme Court had found in our case, that
5     there was a need to instill voter confidence in the
6     integrity of our election process and in the manner in
7     which we conducted that election process particularly
8     with respect to the in-person voting.
9          As a consequence, the Indiana General
10    Assembly adopted what is the nation's most restrictive
11    photo ID law.  I would note that it's far more
12    restrictive than many of the provisions that you have.
13    For example, we don't have an opt-out provision where
14    an individual can bring two forms of various different
15    pieces of ID, including as I believe one of the
16    Senators referred to, a court document related to a
17    gender change.  We don't have any of those.  Basically
18    you have to -- you have to come forward with a
19    state-issued ID that displays the voter's photo and
20    expiration date and the voter's name.
21         Now, if I might, stepping forward,
22    recognizing my limited time, you've spent some time
23    talking about -- and I believe Mr. Von Spakovsky
24    discussed the University of Missouri study.  What have
25    we learned over the course of this?  We've had now

TX_00004395

USA_00018700

507

```
1   three elections in which we've done photo ID, and what
2   we've learned is that there haven't been any problems.
3   The Secretary of State in his notation in the 2008
4   election, for example, received 1300 calls, complaints
5   from voters.  Two dealt with photo ID.  It's not a
6   situation where we're having massive problems.
7              The case that went to Crawford -- the
8   Crawford case, the ACLU and the various litigants,
9   including the Indiana Democratic party, referred to a
10  apocalyptic disenfranchisement of voters.  The simple
11  fact is that hasn't happened in Indiana.  It just
12  hasn't happened.
13             Now, with respect to the impact of this
14  on minority voters, we do know from the University of
15  Missouri study that Indiana voter registration and
16  Indiana turnout has increased rather dramatically.
17  Indeed attached to Secretary Rokita's statement, the
18  2004 General Election, 58 percent; 2008 General
19  Election, 62 percent.  Now, I've heard some of the
20  Senators say "Well, that was because Barack Obama was
21  on the ticket."
22             The key factor -- and this is what the
23  University of Missouri report looked at was that 2002,
24  which was an off-year election, pre-Barack Obama,
25  which was nonphoto ID, our turnout was 34 percent.
```

TX_00004396
JA_003819

TX_00004396

USA_00018701

```
 1    The 2006 General Election, again pre-Barack Obama, a
 2    comparable off-year election, turnout was 40 percent.
 3    We went up 6 percent after implementing photo ID.
 4    That certainly wasn't the kind of disenfranchisement
 5    that was predicted, the apocalyptic prediction of
 6    disenfranchisement.  Indeed we had a better voter
 7    turnout.  I would suggest that that's counter to most
 8    of the states within the union.
 9              Now, what happened there?  I don't know
10    what the answer is.  I mean, there's been speculation,
11    and there's been discussion and studies that talk
12    about voter confidence.
13              What I can tell you and one of the most
14    interesting things is the conclusion in the University
15    of Missouri report, that, in fact, photo ID actually
16    benefits Democrat -- traditional Democratic voters,
17    minorities and otherwise.  And one of the interesting
18    parts that has not been referenced in this -- and it's
19    in this report at -- under Section 4.  They refer to
20    the fact that on the other hand, the fact that there
21    were no Democratic candidates in the 2006 Senate race
22    might have led to a lower turnout than otherwise.  In
23    fact, my examination of historical Senate election
24    data does indeed suggest that state voter turnout
25    tends to be lower when there's an uncompetitive Senate
```

509

```
 1     election at the top of the state ticket, all else

 2     constant.  Assuming that this phenomenon occurred in

 3     2006 in Indiana, then the photo ID likely led to an

 4     even greater increase in the voter turnout than the

 5     2 percent observed in the raw data.

 6               So the University of Missouri study said

 7     we saw 2 percent because there was -- and in 2006 very

 8     frankly Democrats really didn't run anybody on a

 9     statewide thing, yet the Democratic voter turnout went

10     up.  Well, it doesn't sound like photo ID has pushed

11     Democratic turnout down, at least based upon the

12     University of Missouri study which was focused purely

13     upon Indiana.

14               Now, I'm not going to make predictions

15     about what's going to happen in Texas.  That's your

16     responsibility to take this information and figure out

17     if it works for Texas, but I can tell you that with

18     respect to us it's worked pretty well.

19               And let me tell you the other thing that

20     photo ID does, and this is the most significant thing

21     that photo ID did in Indiana.  You guys have spent the

22     last 14 or so hours -- we've got Republicans pointing

23     at Democrats and saying "Voter fraud."  We've got

24     Democrats pointing at Republicans and saying "Voter

25     suppression."
```

TX_00004398

USA_00018703

510

1              Well, what photo ID has done in Indiana,
2       it's taken that argument off the table.  We've been
3       unable to engage in election reform, and we in Indiana
4       weren't able to do that for years because we just
5       pointed at each other that way.  Photo ID brought
6       confidence to the parties, to the Republicans, to the
7       Democrats, to allow us to engage in meaningful
8       election reform.  A, we were allowed -- we began
9       purging our voter rolls.  B, we went to satellite
10      voting.  We went to early voting.  We've got no
11      absentee balloting.  I mean, we've been able to do
12      that because photo ID built a trust level between our
13      legislators to allow us to engage in other election
14      reforms and needed election reforms.  And I would
15      suggest to you that's probably the most valuable part
16      of photo ID is it allows you to get past the finger
17      pointing you've been doing for the last 14 hours of
18      voter suppression versus voter fraud.  It gets you
19      past that and allows you to engage in meaningful
20      election reform.
21              I see that my time is up.  I'd be happy
22      to answer any questions.
23              **QUESTIONS FROM SENATE FLOOR**
24              SEN. WENTWORTH:  Thank you.  The Chair
25      recognizes Sen. Whitmire.

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004399
JA_003822

TX_00004399

USA_00018704

511

```
 1                    SEN. WHITMIRE:  Mr. Wheeler?

 2                    MR. WHEELER:  Yes, sir?

 3                    SEN. WHITMIRE:  Thank you for appearing.

 4     I was curious listening to your describing what

 5     instigated your program in Indiana.  You were talking

 6     about this massive fraud that the Supreme Court said

 7     they couldn't even determine who the winner was.

 8     Could you describe the massive fraud that was so

 9     prevalent?

10                    MR. WHEELER:  The massive fraud as

11     described by this?

12                    SEN. WHITMIRE:  Yeah.  You went through

13     this long scenario about an election that was settled

14     by a hundred votes, and it went to the Supreme Court,

15     and the Supreme Court said it was so bad they just

16     really couldn't hardly tell who won.  What are the

17     facts of that massive fraud?  I'm trying to see --

18     I've never heard of anything like that in Texas.  I'm

19     trying to appreciate what you were facing.

20                    MR. WHEELER:  Absolutely.  In the Pabey

21     case, we saw fraud in two areas:  We saw some

22     in-person fraud, and we saw a lot of absentee fraud.

23     What they did is they used our bloated voter

24     registration list to engage in both absentee ballot

25     fraud and direct in-person voting, according to the
```

TX_00004400

USA_00018705

512

```
 1    record that was in -- before the Indiana Supreme
 2    Court, which was --
 3                   SEN. WHITMIRE:  Where -- do you-all
 4    have -- do you-all have laws against voter fraud?
 5                   MR. WHEELER:  Absolutely we do.
 6                   SEN. WHITMIRE:  Was anyone prosecuted?
 7                   MR. WHEELER:  Not that I'm aware of,
 8    Senator.
 9                   SEN. WHITMIRE:  Why not?
10                   MR. WHEELER:  Well, I believe the record
11    showed that a gentleman by the name of Bernard Carter
12    was the Lake County Prosecutor at the time.  According
13    to the records in the case, he owned several of the
14    apartment buildings that were vacant but were used as
15    home addresses for fraudulent voters.  Now, I don't
16    believe that Mr. Carter, in fact, was ever implicated
17    in that, but I do believe that a lot of those
18    fraudulent addresses did take place at --
19                   SEN. WHITMIRE:  Is it fair to say
20    you-all have pretty laxed prosecution of criminal
21    acts?
22                   MR. WHEELER:  I'd say it's very fair
23    that there's laxed prosecution of voter fraud,
24    absolutely.
25                   SEN. WHITMIRE:  Well, would you -- have
```

KENNEDY REPORTING SERVICE, INC.
512.474.2233

TX_00004401
JA_003824

TX_00004401

USA_00018706

513

```
 1    you learned -- been in the state long enough to know

 2    that we don't tolerate it?  And if you could show us

 3    instances of fraud -- do you know of any fraud that's

 4    been alleged in the State of Texas?

 5              MR. WHEELER:  I believe there's a

 6    witness coming up immediately after me that is

 7    familiar with fraud in Texas.

 8              SEN. WHITMIRE:  Do you know in that

 9    instance was someone prosecuted?

10              MR. WHEELER:  No, sir, I don't.

11              SEN. WHITMIRE:  Well, it makes a big

12    difference if you're trying to fix something and if

13    you can discover the fraud and you don't prosecute it,

14    I think you've got a criminal justice problem, which

15    we don't have in the State of Texas.

16              Do you have a significant bilingual

17    speaking population in Indiana?

18              MR. WHEELER:  We have a 5 percent

19    Hispanic population.

20              SEN. WHITMIRE:  Are you familiar with

21    our numbers in the State of Texas?

22              MR. WHEELER:  Yes.  If you'll give me

23    just a moment.

24              SEN. WHITMIRE:  Well, let me just help

25    you.  Would you not agree that Texas is much more
```

TX_00004402

USA_00018707

514

1    diverse and has many more Spanish-speaking residents
2    than you'd find in Indiana?
3                    MR. WHEELER:  I'm told 36 percent.
4                    SEN. WHITMIRE:  What about the cost of
5    introducing your ID program in Indiana, what did you
6    approximately spend?
7                    MR. WHEELER:  That's an excellent point,
8    and that is, if you'll look at Secretary Rokita's
9    statement -- I don't know if you happen to have it in
10   front of you.
11                   SEN. WHITMIRE:  Yeah, I've read it.
12                   MR. WHEELER:  We spent about
13   1.25 million in HAVA Funds, which were federally
14   provided funds.  So we were lucky enough not to have
15   to use our own state funds.  I have no idea whether
16   you have HAVA Funds that are available for this
17   particular use, but the --
18                   SEN. WHITMIRE:  Well, we've been
19   promised.  Are you familiar with how they intend to
20   fund the plan that you're here endorsing?
21                   MR. WHEELER:  I have no idea.
22                   SEN. WHITMIRE:  Well, it's pretty much a
23   promise by Senator Williams that he would work with us
24   to get those funds and that we've got some spots, but
25   we haven't scheduled those spots, nor do we know the

TX_00004403

USA_00018708

```
 1    amount.  Do you think that would be significant?
 2              MR. WHEELER:  I think it's significant
 3    to make those expenditures because I think it makes it
 4    work.  If you'll look at Indiana, what you heard again
 5    and again earlier that Indiana was special because we
 6    had 99 percent of people that had photo IDs, and I'd
 7    suggest it's even higher than that, and that's
 8    specifically because of this outreach.
 9              SEN. WHITMIRE:  One last thing that
10    you've got my attention on at this late hour.  You
11    keep being so impressed with the turnout in 2008.
12              MR. WHEELER:  I think I mentioned --
13              (Simultaneous discussion)
14              SEN. WHITMIRE:  Don't you think the
15    2004 -- and I was reading the Secretary of State's
16    comparison about the Presidential Election in 2004,
17    particularly the Democratic Primary.  Surely would you
18    not agree with me that's not apples and apples
19    comparing turnout and the dynamics and the reasons for
20    the 2004 election versus the 2008 when you had such a
21    contested Presidential Primary?
22              MR. WHEELER:  Let me tell you the most
23    amazing thing about the 2008 race.  If you buy into
24    the argument that photo ID in Indiana was designed to
25    suppress African-American and Hispanic voters and
```

516

```
 1    typical Democratic voters, that's the first year in
 2    the last 40 years that Indiana went Democratic in the
 3    Presidential Election.
 4              SEN. WHITMIRE:  Well, probably because
 5    of the state -- wouldn't you agree that your economy,
 6    your unemployment and the elements that were a part of
 7    that campaign caused that turnout and also for sure
 8    the selection and opportunity to vote for the --
 9    whether it be Mrs. Clinton or Obama or others?  I
10    mean, everywhere in the country they were experiencing
11    huge additional turnouts.  And, in fact, I will turn
12    and ask you, how do you know it wouldn't have been
13    greater had you not had the voter ID?
14              MR. WHEELER:  I'll tell you why I know
15    that, because the governor of the State of Indiana won
16    by almost 20 points, Republican governor.  Every
17    statewide --
18              SEN. WHITMIRE:  No, we're talking
19    about -- you're talking about the General Election.
20    I'm talking about -- I'm talking about the Primary.
21    You like to point out your great increase in numbers
22    in 2008.  How do you know it wouldn't have been
23    greater if you had not had the voter ID?
24              MR. WHEELER:  I have no idea.  What I
25    will tell you --
```

TX_00004405

USA_00018710

517

```
 1              SEN. WHITMIRE:  You have no idea.
 2   Repeat that for me.  You sit up there and say you had
 3   an outstanding turnout.
 4              MR. WHEELER:  Can I finish my
 5   question -- my answer?
 6              SEN. DUNCAN:  Hold on a minute, sir.
 7   You're talking over each other, and the court reporter
 8   can't get a record.  Senator, if you-all could
 9   exchange questions and answers?
10              SEN. WHITMIRE:  I'm sorry.  Is it not
11   true you have no way of knowing whether you would have
12   had a greater turnout if you had not had the voter ID
13   in the Democratic Primary in 2008?
14              MR. WHEELER:  In the Democratic Primary?
15              SEN. WHITMIRE:  Yeah.
16              MR. WHEELER:  We had 73 percent
17   Democratic turnout in the Primary.
18              SEN. WHITMIRE:  And I think I -- and you
19   probably know the reason because of the opportunity to
20   vote for those outstanding candidates.  It was a very
21   contested Presidential Democratic Primary much more so
22   than the 2004 experience, but you keep pointing to
23   that as such a success for the voter ID.  And I would
24   just ask you, how do you know it would not have been
25   greater had you not had the obstacles of a voter ID?
```

TX_00004406

USA_00018711

518

```
1              MR. WHEELER:  How do I know it wouldn't
2     have been less?  I mean, the University of Missouri
3     study tells me that but for photo ID it should have
4     been less.
5              SEN. WHITMIRE:  Do you-all have --
6              MR. WHEELER:  If I can answer -- answer
7     the question that you had asked?  What I do know is
8     that in 2008 in the General Election we had massive
9     turnout.
10             SEN. WHITMIRE:  Yeah.
11             MR. WHEELER:  Barack Obama won in
12    Indiana, the first Democrat in the last 40 years.  We
13    also had -- and you asked me if I could control for
14    economic conditions.  You said, "Well, couldn't it
15    have been bad economic conditions that caused that?"
16             SEN. WHITMIRE:  Sure.
17             MR. WHEELER:  And the answer is no.  The
18    governor of the State of Indiana won re-election by 20
19    points.  Every Republican officeholder won in Indiana
20    other than Barack Obama.  So what I would answer your
21    question is no, it was not economic conditions.
22             SEN. WHITMIRE:  Without -- excuse me.
23    Without knowing the circumstances of the contested
24    races and the popularity of your governor who may
25    have, you know, adopted Democratic policies for all I
```

TX_00004407

USA_00018712

```
 1    know --
 2                   MR. WHEELER:  This was Mitch Daniels.
 3    He did --
 4                   SEN. WHITMIRE:  You know, I do not know
 5    the circumstances.  All I'm simply saying is
 6    everywhere in the country, Texas included, we
 7    experienced greater turnout because of the shape of
 8    the country, the opportunity to vote for the popular
 9    candidates on both sides.  So the fact that you -- the
10    fact that you're trying to attribute voter ID to
11    allowing a greater turnout, we experienced it in
12    Texas, and we don't have voter ID.
13                   MR. WHEELER:  Senator, I did not --
14                   SEN. WHITMIRE:  One last thing I want to
15    ask you about.  Did you say your reforms did away with
16    absentee voting, your voters?
17                   MR. WHEELER:  No.  We were able to
18    get -- we went to no-fault absentee voting.
19                   SEN. WHITMIRE:  You went to what?
20                   MR. WHEELER:  We have no-fault absentee
21    voting, which is to say that basically all you have to
22    do is say "I'm going to be out on election day," and
23    you may go vote.
24                   SEN. WHITMIRE:  We have that.  Do you
25    have mail-in early voting?
```

TX_00004408

USA_00018713

```
 1                    MR. WHEELER:  We do.

 2                    SEN. WHITMIRE:  Do you ever experience

 3    any alleged fraud in that area?

 4                    MR. WHEELER:  I think in Pabey vs.

 5    Pastrick there's documentation of it.

 6                    SEN. WHITMIRE:  Why didn't you address

 7    that?

 8                    MR. WHEELER:  Because there was a

 9    political compromise.

10                    SEN. WHITMIRE:  Oh, really?  You-all do

11    that, too?

12                    MR. WHEELER:  Occasionally.

13                    SEN. WHITMIRE:  All right.  Thank you

14    for being here.

15                    MR. WHEELER:  Thank you, Senator.

16                    SEN. DUNCAN:  The Chair recognizes

17    Sen. Watson.

18                    SEN. WATSON:  I appreciate you being

19    here.  Senator Whitmire covered most of what I wanted

20    to ask, but I just want to make sure I'm clear.  You

21    came here to give some very specific examples about

22    Indiana, but you don't have any statistical analysis

23    or data about the effects that Senate Bill -- proposed

24    Senate Bill 362 would have on Texas, African-Americans

25    in Texas or Hispanics in Texas or anybody else in
```

```
 1    Texas, do you?
 2                MR. WHEELER:  Absolutely not.  I served
 3    as an elected official prior to resigning to taking
 4    this Commission job.  That's your job.  That's the job
 5    of you guys.  I wouldn't presume to tell you that.
 6                SEN. WATSON:  I appreciate you being
 7    here.  Thank you very much.
 8                MR. WHEELER:  Thank you.
 9                SEN. DUNCAN:  Thank you, Mr. Wheeler.
10    There are no other members queued up to ask questions.
11                MR. WHEELER:  Thank you.
12                SEN. DUNCAN:  We appreciate your
13    appearance, and welcome to Texas.
14                **TESTIMONY BY CHANDLER DAVIDSON**
15                SEN. DUNCAN:  The next witness we'll
16    have is Chandler Davidson.  Mr. Davidson, as you're
17    approaching, you have submitted written testimony.
18    That will be Exhibit 29.
19                (Exhibit No. 29 marked and admitted)
20                SEN. DUNCAN:  And you are -- if you
21    will, state your name and who you represent, and you
22    have ten minutes.
23                MR. DAVIDSON:  Honorable Senators, I'm
24    privileged to be here at your invitation.  Thank you.
25    Between 1966 and 2003, I taught politics and sociology
```

Case 2:13-cv-00193   Document 661-31   Filed on 11/11/14 in TXSD   Page 107 of 111
Case 1:12-cv-00128-RMC-DST-RLW   Document 210-5   Filed 06/20/12   Page 50 of 265

522

1    at Rice University and specialized in voting behavior

2    and voting rights.

3                When I joined the Rice University

4    faculty in 1966, two persons I made a point of meeting

5    because of my research interests both had offices on

6    Lyons Avenue in Houston's Fifth Ward.  One was a

7    charming, if rather formidable young woman, who had

8    just been nominated for a seat in this body and with

9    whom I enjoyed a friendship that lasted the rest of

10   her life, Barbara Jordan.  I see her smiling face over

11   there.  She had twice previously failed to win

12   nomination for a House seat in a heavily white

13   district in which racially polarized voting prevailed.

14   Her Senate district, however, was almost half black,

15   and she was able to win.

16               The other person I met was a dentist,

17   also a charming individual, Dr. Lonnie Smith, the

18   named plaintiff in Smith v. Allright, the case

19   Thurgood Marshall successfully argued before the

20   Supreme Court in 1944 invalidating the Texas White

21   Primary.  Ladies and gentlemen, I feel their presence

22   today in this room.

23               Given the long history of legally

24   sanctioned disfranchisement of large and disparate

25   groups of citizens from the founding of the Republic

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004411
JA_003834

TX_00004411

USA_00018716

```
 1    to the recent past, Senate Bill 362 raises important
 2    questions to scholars of voting rights.  Indeed the
 3    bill brings to mind events during the half century
 4    following the Civil War when the language of
 5    progressive reform in Texas cloaked the
 6    disfranchisement of blacks, Latinos and poor whites,
 7    those most likely to vote for Republican or populist
 8    candidates.  Actually adopted for partisan and
 9    racially discriminatory purpose, these laws were often
10    presented as high-minded attacks on fraud, efforts to
11    purify the electorate that would only inconvenience
12    vote sellers or the ignorant and shiftless.
13            The poll tax was one of the most
14    notorious disfranchising mechanisms of its day.  The
15    current debate over Senate Bill 362 as well as similar
16    bills in other states has led to claims that they are
17    a modern day poll tax.  This implies that the Texas
18    bill, too, falls within the ignominious American
19    tradition of disfranchising laws passed under the
20    guise of good government reform.
21            Frederick Ogden, perhaps the foremost
22    scholar of the poll tax, wrote in the 1950s, I quote,
23    "While critics of legalized restrictions on Negro
24    voting may find it hard to discover any high moral
25    tone in such activities, these restrictions reflected
```

TX_00004412

USA_00018717

524

1    a movement for purifying the electoral process in
2    southern states."
3                    Ogden quotes the editor of the
4    San Antonio Express writing in 1902, "By requiring a
5    poll tax receipt, secured six months previous to an
6    election, fraudulent elections can be prevented almost
7    entirely."
8                    The most accessible photo ID required by
9    Bill 362 probably consists of the state's driver's
10   license.  Obtaining one has been shown in other states
11   to be a good deal more difficult for some people than
12   it might seem at first glance.  For example, at least
13   43,000 persons of voting age in Indiana are estimated
14   to have neither a driver's license or the other most
15   likely form of photo ID in that state.  The number
16   of -- the number in Texas would probably be
17   significantly greater.
18                   The demographic characteristics of
19   persons lacking the requisite ID are suggested by a
20   November 2006 telephone survey of 987 randomly
21   selected voting-age American citizens by the
22   independent Opinion Research Corporation conducted for
23   the Brennan Center for Justice at NYU School of Law.
24   11 percent did not have valid government-issued photo
25   ID, while 18 percent of citizens 65 years of age or

KENNEDY REPORTING SERVICE, INC.
512.474.2233
TX_00004413
JA_003836

TX_00004413

USA_00018718

525

1   older lacked it, as did 25 percent of

2   African-Americans.  The latter two demographic groups,

3   the elderly and African-Americans, are more likely to

4   self-identify as Democrats, African-Americans

5   disproportionally so.  There is no reason to believe

6   that this national pattern is much different than that

7   in Texas.

8          Have supporters of Senate Bill 362

9   demonstrated that there is a significant degree of

10  fraud of the kind -- that the bill is fashioned to

11  prevent?  Others today and tonight have described

12  Attorney General Abbott's unsuccessful effort to

13  uncover personal impersonation fraud.

14         Suffice it to say that Senate Bill 362

15  is designed solely to prevent voter impersonation at

16  the polls.  In both 2005 and 2007 Republicans in the

17  legislature introduced similar photo ID bills.  In

18  2007, according to a newspaper reporter, Republicans

19  liked the voter ID bill because they believe it will

20  weaken Democrats, but can argue that it is a

21  reasonable requirement because it would prevent vote

22  fraud.

23         Not all Republicans, however, shared the

24  belief that it would curtail fraud.  Royal Masset,

25  Former Political Director of the Texas Republican

TX_00004414

USA_00018719

526

1   Party, was one.  He told a reporter that among his

2   fellow Republicans it was an article of religious

3   faith that voter fraud is causing us to lose

4   elections.  Masset did not share that faith.  He did

5   believe, however -- he told the reporter, that

6   requiring photo IDs could cause enough of a dropoff in

7   legitimate Democratic voting to add 3 percent to the

8   Republicans vote.

9            When Mr. Abbott's failure to find almost

10  any voter impersonation fraud is placed alongside the

11  fact that the previous legislative votes for a Texas

12  photo ID bill were almost entirely along partisan

13  lines and that the people most likely to be

14  disfranchised by it would be Democratic voters,

15  particularly African-Americans and Latinos as well as

16  lower income, elderly and disabled citizens, Texas

17  Senate Bill 362 appears to fit comfortably within the

18  long and sad history of those in positions of power

19  disfranchising the above populations for partisan

20  gain.

21           Moreover, today's Republicans' attempt

22  at justifications of the bill with claims of voter

23  fraud are at least as dubious as those which attempted

24  to justify the now and unconstitutional poll tax at

25  the beginning of the 20th century.

TX_00004415

USA_00018720