If Texas enacts a photo ID bill, it will join only seven other states that request a photo ID to vote, states disproportionally among the 11 states of the former Confederacy. This, in my opinion, as a scholar whose work is focused on the protection of minority voting rights for more than 40 years, would be an egregious step backward for my native state, one which harks back to the post-reconstruction era disfranchisement whose effects Barbara Jordan and Dr. Lonnie Smith fought with such courage to put behind us. Thank you.

**QUESTIONS FROM SENATE FLOOR**

SEN. DUNCAN: The Chair recognizes Sen. Shapleigh.

SEN. SHAPLEIGH: Thank you, Mr. Chair.

Dr. Davidson, let's go over your CV and see just exactly what you've done to get your reputation here in Texas as the leading expert on these issues. You since the '90s have joined with Professor Bernard Grofman with the University of California to do a multi-year study on the Voting Rights Act of 1965, have you not?

MR. DAVIDSON: Yes, sir.

SEN. SHAPLEIGH: And how many people were involved in that, political scientists,

historians, sociologists, voting rights lawyers, others?

MR. DAVIDSON: About 30 people, yes, sir.

SEN. SHAPLEIGH: And what was the result of that multi-year study? Did you write a book? Did you put out a paper?

MR. DAVIDSON: We wrote a book entitled Quiet Revolution in the South, published by Princeton University Press. And in 1994, it had funding from the National Science Foundation and the Rockefeller Foundation. And it was designed to measure the impact of the Voting Rights Act of 1965 on the states that were covered by it -- no, the southern states, the states that are covered by Section 5 of the Voting Rights Act.

SEN. SHAPLEIGH: Now, has this work been cited in Supreme Court opinions, United States Supreme Court opinions?

MR. DAVIDSON: Senator, I can't remember. A number of pieces of my research have, but I'm not sure that that one has. It was entered in its entirety into the congressional record in 2006 when the question of reauthorizing the nonpermanent features of the Voting Rights Act were under

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 57 of 265

discussion and when those features were coming up for renewal.

SEN. SHAPLEIGH: Were you asked to serve on and did you serve on the National Commission on the Voting Rights Act?

MR. DAVIDSON: Yes, sir.

SEN. SHAPLEIGH: And what was the result of that work?

MR. DAVIDSON: The Commission held ten hearings around the state -- around the country, various parts of the nation to hear people testify as to problems of voting that they encountered. And on the basis of those hearings and other research, I was tasked with drafting the report that the Commission ultimately published entitled Protecting Minority Voters.

SEN. SHAPLEIGH: Now, we've heard from a bunch of folks from Indiana, a bunch from Georgia. Is it safe to say you're the leading expert in Texas on the Voting Rights Act?

MR. DAVIDSON: I am one expert, yes.

SEN. SHAPLEIGH: Let me ask you this: You've recited in your paper, you've recited in your testimony here the long and sad and dark history of voter suppression in the State of Texas. Do you have

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 58 of 265

any doubt having looked at what is going on here today that this bill is in line with that long, dark history as an act of voter suppression?

MR. DAVIDSON: Senator, it looks to me as though it does fall within that historical framework.

SEN. SHAPLEIGH: Let me ask you this: When we look at this bill and based on your Texas studies, as this bill will be enforced, we've looked at the fiscal note, this is going to be enforced by poll workers all across the vast diverse state, 24 million people from the border to the Panhandle, is there serious potential for discriminatory enforcement of the ID requirements that are contained in this bill at the polls?

MR. DAVIDSON: Yes, sir, I think there are. One of the things that came through in the hearings which the National Commission on the Voting Rights held across the country and especially in areas with significant Hispanic populations was that there is still a great deal of difficulty that Hispanics encounter voting.

When they get to the polls -- there was a study that was presented by a former member of the Justice Department and a special -- and another who is

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 59 of 265

a specialist in voting at the University of Arizona which looked into the question of how well the Voting Rights Act law regarding language minorities was being conducted at the polling places. And it was found that a significant percentage of Latinos in many of these areas experienced difficulties, and that the actual laws governing language for Latinos and some of the other ethnic minorities were not being enforced.

SEN. SHAPLEIGH: Let me ask you this: You are from Texas. Is that correct?

MR. DAVIDSON: Yes, sir.

SEN. SHAPLEIGH: As a matter of fact, you've spent a lot of time right in these border counties that Sen. Watson has been talking about. Is that true?

MR. DAVIDSON: That's correct. I was born on a cattle ranch between Alpine and Fort Davis, Texas.

SEN. SHAPLEIGH: So you do know what a colonia is?

MR. DAVIDSON: I do indeed.

SEN. SHAPLEIGH: Let me ask you this: Let's talk about the Hispanics in the State of Texas. I represent a community that is 77 percent Hispanic. 55 percent make less than $35,000 a year. I just

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 60 of 265

looked that up in the 2000 census numbers. 73 percent speak Spanish as a primary language. So you've got -- in addition to the income issues that we see in some of these other cases, you've got the language barrier issues that are not common in Georgia, not common in Indiana. Based on your studies, what potential exists under this bill for discriminatory enforcement of ID requirements at the polls given that language barrier?

MR. DAVIDSON: I think there's a significant possibility of problems there, and that goes back to what I mentioned just a minute ago with regard to the finding of how Latinos are treated at polling places.

SEN. SHAPLEIGH: Let me ask this question: Many here on this floor have made the allegation and believe that noncitizen Hispanics are voting in large numbers in the State of Texas. We've heard from the Attorney General that there is an epidemic of voter fraud, many quotes in different publications about illegal aliens coming and voting in the State of Texas. Based on your studies and what you know, is there any evidence whatsoever that noncitizen Hispanics are voting in large numbers illegally in this state?

MR. DAVIDSON: Well, first of all,

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 61 of 265

Senator, I have not directly addressed that question in any of my studies. So I can't -- I really can't provide an answer based on that. But I will say that it seems to me that given the $1.4 million that General Abbott spent trying to -- trying to uncover voter fraud and the fact that over a three-year period he has essentially not done so, and to my knowledge, this is the largest effort by the State of Texas in modern history, perhaps ever, to uncover voter fraud, it strikes me as not very plausible that there is much voting going on among illegals in the state, although there's a significant number of them, perhaps as many as 2 million according to the anti-immigration group FAIR.

SEN. SHAPLEIGH: Let me ask you this: There has been much made about a free ID being offered in connection with the administration of this act. What, in your opinion, are the hidden costs of getting such a free ID?

MR. DAVIDSON: Well, several people have mentioned some of the hurdles and, of course, one of them is just the difficulty that people who don't have automobiles and are poor have in getting a driver's license, the of lack accessibility of DPS and things of that sort.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 62 of 265

SEN. SHAPLEIGH: When one goes to get one of the other documents that are permitted under this bill, a birth certificate, for example, is there a cost attached to getting that to produce that for the free ID?

MR. DAVIDSON: What was the example that you gave, sir?

SEN. SHAPLEIGH: Birth certificate.

MR. DAVIDSON: Yes, that -- that can be rather expensive. And, in fact, some of the -- some of the studies that were done in the Indiana case where the ID was -- the government issued ID was all supposed to be free indicated that people often had to spend a good deal of money and a good deal of time getting birth certificates and/or material that indicated that they were born in the United States.

SEN. SHAPLEIGH: In my district, I believe the charge is $22 for a birth certificate to get one in order to go get the free ID. Would that, in your opinion, be a barrier to folks trying to achieve a constitutional right to vote?

MR. DAVIDSON: When the 24th Amendment outlawed the poll tax in Texas in the middle 1960s, the tax, as I recollect, was $1.50, and in some counties there was a 25 percent surcharge, so that

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 63 of 265

would bring it to $1.75. And in today's dollars, that would be somewhere around $11. So the figure that you have quoted is almost twice as high as the poll tax laws in current buying power when it was abolished.

SEN. SHAPLEIGH: Thank you, sir. Thank you for coming.

MR. DAVIDSON: Thank you.

SEN. DUNCAN: The Chair recognizes Sen. Williams.

SEN. WILLIAMS: Thank you, Mr. President.

Mr. -- Dr. Davidson. Correct? I want to be sure. Is that --

MR. DAVIDSON: Yeah.

SEN. WILLIAMS: Do I have your name right? Okay. Thank you.

A couple of questions. As I read your written testimony, you say some things here that really call up some unfortunate parts of our history here in Texas with relation to racial issues and voting. And I think the one that strikes me the most is the poll tax. And you say that the poll tax is -- was one of the most disenfranchising mechanisms of its day. Tell me how you think this bill, Senate Bill 362, help me understand how you believe that this

imposes a poll tax on voters.

MR. DAVIDSON: Well, as I explained to the other Senator just a minute ago, it is sometimes expensive to get various forms of photo ID that are required to vote.

SEN. WILLIAMS: Well, have you read our Senate Bill 362? Have you reviewed the bill?

MR. DAVIDSON: Yes. I reviewed it briefly, yes.

SEN. WILLIAMS: Well, did you read the whole bill?

MR. DAVIDSON: Yes.

SEN. WILLIAMS: You did? And did you note in the bill that you don't need a photo ID to vote? You can also bring alternate forms --

MR. DAVIDSON: Yes.

SEN. WILLIAMS: -- of information, like a utility bill and a government check or a social security document, or it could be a Medicare enrollment card, those kinds of things that might be very common for people, especially the kinds of folks that you're talking about, to have? And you still think this imposes a poll tax even in light of the alternate forms? All you talked about and all you referenced in the paper here is the cost of a photo

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 65 of 285

ID. But isn't it true, in fact, that there are alternate forms of identification that are available that would be available to most people at no cost?

MR. DAVIDSON: In that case, if it's not a photo ID that's shown at the polls, isn't one required to cast a provisional ballot?

SEN. WILLIAMS: No.

MR. DAVIDSON: No?

SEN. WILLIAMS: No, if you bring two alternate forms of identification -- and there's a list in the bill. I'd be glad to read them to you if you'd like for me to do that.

MR. DAVIDSON: Could you do that, please?

SEN. WILLIAMS: Yes, yes, give me just a second to get that in front of me. Okay. "the following documentation is acceptable as proof of identification under this chapter. Any two of these items would be sufficient: A copy of a current utility bill; a bank statement; a government check, a paycheck or other government document that shows the name and address of the voter; official mail addressed to the voter -- addressed to the person by name from a governmental entity; a certified copy of a birth certificate or other document confirming birth that is

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 66 of 265

admissible in a court of law and establishes the person's identity; United States citizenship papers; an original or certified copy of a marriage license or a divorce decree; court records of the person's adoption, name change or sex change; an identification card issued to the person by a governmental entity of this state or the United States for the purpose of obtaining public benefits, including veterans' benefits, Medicaid or Medicare; a temporary driving permit issued to the person by the Department of Public Safety; a pilot's license; a library card that contains the person's name issued to the person by a public library located in this state; or a hunting and fishing license issued by the Parks & Wildlife Department."

Now, really, Dr. Davidson, do you think it's so burdensome that if we're going to allow someone to bring a copy of a government-issued document of any type plus a library card or anything issued by a government entity like that, I mean, that's a pretty long list, is that really that burdensome? All the things that you talked about, how do you call this a poll tax if we're giving these alternate forms of ID?

MR. DAVIDSON: I think for some people

it will be difficult to get those kinds of things.

SEN. WILLIAMS: But is it a poll tax? That's my question.

MR. DAVIDSON: Well, it's not officially a poll tax.

SEN. WILLIAMS: No, it wouldn't be a poll tax.

MR. DAVIDSON: It would be a burden of time or in some cases money, yes.

SEN. WILLIAMS: Yes. And didn't the Supreme Court speak to that very point in their opinion in the Crawford case? Are you familiar with that?

MR. DAVIDSON: Yes.

(Simultaneous discussion)

SEN. WILLIAMS: Okay. And I believe that what the Supreme Court said that burdens of that sort arising from life's vagaries, however, are neither so serious nor frequent to raise any question about the constitutionality. The availability of the right to cast a provisional ballot provides an adequate remedy to the problems of that character.

So in addition to the long list of alternative documents that we would allow under the provisions of Senate Bill 362, we also have the

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 68 of 285

provisional ballot provisions that are referenced here, and we don't require them to come back like the other states do.

Now, I just fail to see -- I think it's very inflammatory for you to come before this body and talk about the legislature imposing a poll tax when the bill doesn't provide for that at all, and, in fact, recognizes that the very things that Sen. Shapleigh has been talking about over here, the burden of having to come up with some of these documents might be too much, and we provided these alternate forms. I just don't think that's fair at all.

MR. DAVIDSON: Well, we disagree on that, and four members of the Supreme Court apparently disagreed, too, with regard to the issue --

SEN. WILLIAMS: Now --

MR. DAVIDSON: -- that it was not a poll tax.

SEN. WILLIAMS: I believe that you referenced also in your remarks earlier the Attorney General and the record that he had in his failure to find any voter fraud after expending a vast sum of money, I believe you said $1.9. I think it's actually $1.4 million that the Special Investigations Unit

spent. Did you speak of that earlier? Did I --

MR. DAVIDSON: I believe I did, yes. $1.4 million, yes.

SEN. WILLIAMS: Right. Okay. Maybe I misunderstood you, but it was, in fact, $1.4 million that was erroneously reported in a newspaper that the funds were spent on election fraud and enforcement. In '03 the Office of the Attorney General launched a Special Investigations Unit. Initially it was funded by a Justice Department grant that's administered by the Governor's Office. Contrary to the reports that you seem to have bought into without any real digging into the facts is that the SIU, the Special Investigations Unit, it handles many types of cases, not just election fraud.

Here are some of the cases that they were involved in: The El Dorado YFZ Ranch, we had three Special Investigation Unit investigators that are currently assigned there full time to that case; the Texas Youth Commission, including a case where a TYC officer was indicted for drug possession, they handled more than 840 abuse allegations; hurricane related rapid response efforts, including serving subpoenas on potential price gougers; market manipulation and penny stock fraud case that was

jointly pursued with the Securities and Exchange Commission; an ERCOT case; the Cyber Crimes Unit and Fugitive Unit assistance for combined arrests of over 100 cyber predators and child pornographers and more than 1,000 fugitives; identity theft; public corruption, including a Bastrop County case and the Potter County Sheriff's case; money laundering, including investigations into the bulk transportation of drug currency, money couriers and money services businesses; and then finally election fraud.

Now, I don't think it's fair for you to come before this body and characterize that $1.4 million as an investigation into election fraud when, in fact, some of the most horrific things that have happened in this state that the AG has had to get involved in, that's what they've been spending that money on.

MR. DAVIDSON: "Vote fraud has been an epidemic in Texas for years, but it hasn't been treated like one, Abbott said, in announcing the SIU. It's time for that to change. He promised that his newly created Special Investigations Unit would help the Police Departments, Sheriff's Offices and District and County Attorneys successfully identify, investigate and prosecute various types of voter fraud

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 71 of 285

offenses. Established with a $1.4 million grant from the Governor's Office, the SIU would have as one of its prime responsibilities investigating voter fraud allegations, he said. Abbott targeted 44 counties containing 78 percent of registered voters in the state. According to the Austin American Statesman, complaints originate from voting officials, District Attorneys or citizens and are sent to the Secretary of State or the Attorney General. Each complaint is evaluated by a professional employee to determine whether the complaint is legitimate and warrants further investigation."

Now, that sounds to me like the Attorney General was certainly representing this as a major effort to uncover voter fraud.

SEN. WILLIAMS: So whatever you read in the paper, that's what you pretty much take at its face value?

MR. DAVIDSON: Most of what I quoted, Senator, is taken from the Attorney General's Website when he was announcing this voter fraud initiative.

SEN. WILLIAMS: Dr. Davidson, for the record, to date the Office of the Attorney General has resolved 22 election fraud prosecutions at a cost of approximately $600,000. There are an additional eight

election fraud indictments that are pending currently. There has been approximately $100,000 spent on those eight cases. And of the 700,000 -- of $700,000 spent on election code investigations, about $93,000 of that came from Department of Justice grants. DOJ grants aren't used to fund these Special Investigations Units any longer, and it's now funded with general revenue from the state.

So I just felt like when you come before this body and you make allegations about a poll tax being levied on voters and you haven't even read the bill to know what the alternative voting provisions are, and you then come and accuse our Attorney General of doing something with that Special Investigations Unit without even really looking into what the unit had really cost, I just felt like the record needed to be set straight.

Thank you very much. I appreciate you being here so late at night.

MR. DAVIDSON: Thank you, sir.

SEN. CARONA: Sen. Van de Putte, for what purpose?

SEN. VAN de PUTTE: I would like to hold, Mr. President, until -- Sen. Shapleigh, I think, would like to continue on this, and then I have a

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 73 of 285

separate set of questions for the professor.

SEN. CARONA: Okay. Sen. Ellis, for what purpose do you wish to be recognized?

SEN. ELLIS: On this point to just ask a couple of questions.

SEN. CARONA: Certainly.

SEN. ELLIS: Dr. Chandler, thank you for being here at this late hour. I know you've been here all day. I think you mentioned the year the poll tax was enacted in Texas. I think you said it was 1901.

MR. CHANDLER: Yes, sir.

SEN. ELLIS: And then it was abolished by the courts in 1966, so from about --

MR. CHANDLER: It was the 24th Amendment.

SEN. ELLIS: Yeah. So I guess the 24th Amendment abolished it, but I think it took us a little longer to --

MR. CHANDLER: It was actually the result -- I mean, once that had been abolished, there was a court case that was heard --

SEN. ELLIS: Yeah.

MR. CHANDLER: -- in Texas I think right after the Voting Rights Act was passed, yeah.

SEN. ELLIS: So I assume the Attorney

General in Texas at the time or the Members of this body didn't see fit to come in and abolish it right away?

MR. CHANDLER: That's correct.

SEN. ELLIS: It was a long and tortious road to get there. So about 62 years we had a poll tax in Texas.

Now, I assume you're guessing, but I just want your opinion on, do you think anybody on this floor has pulled up the legislation and read the poll tax bill in Texas? Just a guess.

MR. CHANDLER: I doubt it. I don't know.

SEN. ELLIS: Okay. Just as someone was asking you whether or not you read every word in this bill, I happen to agree with you, this bill is nothing more than a modern day poll tax. And if it hurts somebody's feelings because it's referred to as that, well, let their feelings fall where they may.

You're a student of history, a great and respected student of government and history. I assume when Members sat in these chairs on this floor at these desks in 1901, 1902 or maybe 1899 in a session, maybe a special session -- I don't know if they had to suspend the rules to do it by 16 votes or if they

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 75 of 285

could get their 21 or 31 pretty darn easily. Do you have any sense -- could you give us some sense of what you think the discussion was like, or do you think anybody got up in one of these -- behind one of these desks and said "Maybe if we have a poll tax it will have a disproportionate impact on certain groups of people"?

MR. CHANDLER: I think that was certainly well understood whether it was said on the floor or not.

SEN. ELLIS: If you were guessing, what kind of people probably would not have had a sex change or have two forms of government -- two letters that they can bring in, maybe they wouldn't have a light bill or maybe they wouldn't have a library card because they're not reading books, would you assume that most of those people are probably low income?

MR. CHANDLER: Yes, sir.

SEN. ELLIS: Most of them are probably African-American or Hispanic?

MR. CHANDLER: Yes, sir.

SEN. ELLIS: Would you assume that most of them would probably vote in the Democratic Party for whatever reason?

MR. CHANDLER: Now, we're talking about

1901?

SEN. ELLIS: No, no, we're talking about this bill.

MR. CHANDLER: Oh, now, yes. I'm sorry.

SEN. ELLIS: I'm sorry. Yes, under this bill.

MR. CHANDLER: Yes.

SEN. ELLIS: Yeah, I know my colleague went through a long litany of things. And as I listened to him, I was thinking maybe some of our colleagues on this floor don't run into people who fall into those categories because they don't get invited to dinner parties, or maybe they don't show up at the legislature. Maybe they don't have the ID to get a Southwest Airlines flight to get here. Maybe they don't like getting searched or going into the back room. Maybe they don't have the money to get a ticket on Southwest Airlines.

So my question was, do you think most of those people who would fall under that laundry list of people who wouldn't have those forms of identification would probably be African-American or Hispanic?

MR. CHANDLER: Yes, sir.

SEN. ELLIS: So there is a corollary between the people who would not meet the requirements

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 77 of 265

laid out in this bill and the people who would not comply with the requirement to pay a dollar or dollar and a half to pay a poll tax?

MR. CHANDLER: Yes, sir.

SEN. ELLIS: Okay. I think it's a perfect analogy, and I appreciate you being here.

MR. CHANDLER: Thank you.

SEN. CARONA: Senator Shapleigh, do you wish to be recognized?

SEN. SHAPLEIGH: I do, Mr. Chair.

SEN. CARONA: You're recognized.

SEN. SHAPLEIGH: Dr. Davidson, you were questioned about representations by the Attorney General, and I think you accurately had actually read his press release. Do you recall that he sent out a press release in connection with his investigation launch that he intended to do in March of 2006?

MR. CHANDLER: Yes, sir. In fact I went back and just tread it a couple of days ago. It's on his Website.

SEN. SHAPLEIGH: And do you recall him in that press release saying "In Texas an epidemic of voter fraud is harming the electoral process"?

MR. CHANDLER: Yes, sir.

SEN. SHAPLEIGH: And it's in his own

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 78 of 285

press release where he announces he's going to dedicate a $1.5 million grant from the Governor's Office. That's where that number came from. Correct?

MR. CHANDLER: That's correct. Not out of the newspaper, but from him.

SEN. SHAPLEIGH: Mr. Chair, if I may, I'd like to make this a part of the record as Exhibit 30, which is the Attorney General's press release titled Helping Stamp Out Voter Fraud in Texas from March of 2006.

(Exhibit No. 30 marked and admitted)

SEN. CARONA: Senator Shapleigh, if you'd bring it forward, please? Have you concluded your remarks?

SEN. SHAPLEIGH: Yes, sir.

SEN. CARONA: The Chair recognizes Sen. Van de Putte.

SEN. VAN de PUTTE: Thank you, Mr. Chairman.

Professor, thank you for being here. I know that it has been a long day and now I guess beginning a couple hours into the second day. You are probably one of the best national scholars on historic suppression and disenfranchisement of certain classes of voters. Is that correct?

MR. CHANDLER: Yes, ma'am.

SEN. VAN de PUTTE: And because of that you are now -- you are considered Professor Emeritus at Rice, one of our prestigious universities here in Texas and one that is nationally and internationally renowned. And is that right, you are --

MR. CHANDLER: Yes, ma'am.

SEN. VAN de PUTTE: -- Emeritus? With the work that you have done, much of what had been documented in other states was a poll tax. I would like for you to comment on literacy tests and how they were used. And I think one reason why that is so important is because for the first time the State of Texas was called into that Section 5 on Hispanics and language barriers because not just of the poll tax, but because of the literacy test.

And I'm going to explain what happened to my own very mother, and if you could elaborate in your research if this was something that occurred rarely or something that occurred pretty often. My mother in 1952 was going to cast her first vote in a presidential ballot. My mother, a college sophomore at the time, went to the polls with her poll tax to cast that ballot.

Now, in San Antonio, what they used to

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 80 of 265

do with people who had Spanish names is they put them in a room until enough people got there, and then somebody would go administer a reading test. And for my mother she was one of about ten or twelve she said, and she waited and then she got administered a reading test. Now, she was in a group of she said ten or twelve, she didn't remember, and being a college sophomore she thought she probably had a pretty good chance of passing that reading test. But because she had the audacity to be in a group with someone who supposedly failed, none of those people were allowed to vote, none of them. That's how they disenfranchised my mother and people with Spanish surnames.

And so when I took my mom to the Democratic National Convention in August of last year, she cried every day because she was at a convention, and the first time she tried to cast a ballot she was discriminated against because her maiden name was Aguilar, and her name was Maria Isabella Aguilar.

Knowing now what you know about my family, and some of my colleagues just can't seem to understand why we just can't get over it, that happened a long time ago, and they keep questioning "Why do we have to go to the Justice Department? Why

do we have to do this?" Well, that's what happened to my family, and yet we know there are records not only of poll tax, but we have pretty good accounts of what occurred in South Texas communities as well.

Given the fact that that's just personal family history and that you have studied this, how prevalent was that discrimination and those tools, not just the poll tax, but reading tests and literacy tests and not just owning property, but how was that used and how is that different from just one more barrier, one more hoop to jump for someone to cast a ballot as proposed in this bill today?

MR. CHANDLER: Well, it's certainly true that Latinos in Texas have been severely discriminated against. The White Primary, the Democratic Party, in most places allowed Latinos as distinct from blacks from voting, but they were local White Primaries along the border that were set up by individual counties. And so they suffered much of the same discrimination in that regard that blacks did.

The State of Texas officially did not have a literacy test like some of the other southern states did, but at the same time there is much anecdotal evidence of the kind that you have just described about Hispanics being treated differently

and being required essentially to pass an informal literacy test.

And continuing up into the current time, there are efforts that have been documented to put the fear of God into Latinos going to vote, such things as people standing outside the polling place and taking a video -- videos of them and of their license plates. There have been incidents of people dressing up in official looking outfits, police-appearing uniforms and informing Latinos who come up to the polls that they better look out. If they are not legal, they may be in big trouble. And some of my historian colleagues and I at Rice a few year ago uncovered a number of those instances in Texas and throughout the southwest with regard to Latinos.

So this is not -- what your mother experienced, well, it is not ancient history that Latinos are still being discriminated against at polling places in the southwest, including the State of Texas.

SEN. VAN de PUTTE: Professor, I know that you've done a lot of work in this, and certainly the books that you've used and much of the case law and much of the folks that studied this have said that you are pretty much the expert on this. And although

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 83 of 285

reading our bill I'm still a little bit confused because as I read it, everybody is going to have to have at least that voting -- the certificate that's issued by the elections administrator of that jurisdiction and a photo identification. But I worry that if you don't have that with you and with no money put in to the fiscal note to do any education, training of poll workers, when in your work, in your research, is there any effect when those officials who are supposed to be administering the election, the election clerks and judges, is there any evidence to show us when there is not sufficient training of those?

And particularly with the litany of documents that could be possibly used, is that -- should that give us pause with no training about how this is going to be enacted and what's going to happen basically at the grassroots level? Does this have the potential to cause further disenfranchisement of Hispanics, blacks and those people in poverty, given the fact that we have zero dollars in that fiscal note for the training?

MR. CHANDLER: That would certainly be my supposition, Senator.

SEN. VAN de PUTTE: Thank you,

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 84 of 265

Professor. I appreciate you being here till two in the morning.

MR. CHANDLER: Thank you.

SEN. CARONA: Members, is there anyone else with a question for the professor?

SEN. LUCIO: Mr. President?

SEN. CORONA: It appears not.

SEN. LUCIO: Mr. President?

SEN. CORONA: Senator, for what purpose?

SEN. LUCIO: Just to ask a question or two. I might not have another chance to do this with this professor. I'd like to ask a question.

SEN. CARONA: You're recognized.

SEN. LUCIO: Thank you, Mr. President. And very briefly, Professor, thank you. I join my colleagues in welcoming you here and commending you for all your studies over the years.

MR. CHANDLER: Thank you.

SEN. LUCIO: Leticia Van de Putte, Senator Van de Putte, reflected on literacy tests. My father worked at the Sheriff's Office for 30 years in Cameron under about four different Sheriffs and, of course, he took me to a lot of political parties in the old days when I was just a kid, and I heard many stores obviously along the way.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 85 of 265

And I want to ask you, in your studies -- you also included some of these studies, and one was when the poll tax was in effect, I'm told that the politicos, those obviously in power, would buy all the poll taxes that people needed as long as obviously they had control over those votes.

MR. CHANDLER: Yes, there were machines along -- along the border, yes.

SEN. LUCIO: Exactly. Now, that being the case and putting it -- comparing that to today's standards in terms of illegal activities during the election -- during the elections that took place then, buying or purchasing the poll tax for somebody and then driving them to the polls and then making sure they voted a certain way, what kind of -- what kind of -- let's say the Attorney General -- what kind of prosecution would those individuals be -- you know, be in effect -- be affected by under the laws of today? How could they be prosecuted? I mean, in today's -- with today's laws, how would those people back then be prosecuted? Could they be prosecuted?

MR. CHANDLER: You mean the bosses who would buy poll taxes?

SEN. LUCIO: What would they be subject to in terms of today's laws and being prosecuted for

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 86 of 265

those kinds of political activities? Is what I'm trying --

MR. CHANDLER: Well, they -- I mean, it would certainly be illegal, and they would be -- if the law were carried out like it was supposed to be, they would certainly be prosecuted if their behavior came to light.

SEN. LUCIO: And the point I wanted to make is simply this: That that, in fact, took place.

MR. CHANDLER: Yes.

SEN. LUCIO: And that was part of the suppression. That was part of what Hispanics or Latinos or Mexican-American citizens on the north side of the border, Texas-Mexico border went through, and maybe some of the Members here on this floor are not -- are not aware of, and I wanted to share that because that was just rampant. That was just part of any politics at the time in the 19 what, '40s, '50s?

MR. CHANDLER: Into the '50s certainly. The old machines were the Patrones, and it was almost a feudal relation. And the Latinos were looked upon as inferior, as foreign in some sense, as people to be manipulated and used for the purposes of the -- of the Patrones, and that's -- that is undeniable Texas history.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 87 of 265

SEN. LUCIO: I lived those days as a young boy. I remember them, and I think that's what Sen. Van de Putte was pointing out as to bad memories of past. Thank you.

MR. CHANDLER: Yes. Thank you.

SEN. DUNCAN: There are no more -- no more questions in the queue. So you are free to -- or excused. Thank you for your testimony.

MR. CHANDLER: Thank you, sir.

**TESTIMONY BY ED JOHNSON**

SEN. DUNCAN: The Chair calls Ed Johnson. Okay. Mr. Johnson, I think you have some documents you'd like to introduce into the record. We'll mark those as Exhibit No. 31, and they'll be in the record.

(Exhibit No. 31 marked and admitted)

SEN. DUNCAN: Identify -- let me identify these as it looks like records that are from specific voting documents. So at some time in your testimony I assume you'll explain these. Exhibit 27 or -- 32? I'm sorry. Exhibit 32 will be received in the record.

(Exhibit No. 32 and 33 marked and admitted)

SEN. DUNCAN: You have ten minutes.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 88 of 285

State your name and who you represent.

MR. JOHNSON: Okay. Good morning. My name is Ed Johnson. I'm with the Harris County Tax Office, and in Harris County the Tax Office does voter registration. I have worked for the voter registration department for eight years now at the Harris County Tax Office. I was asked to come and present to you-all today some cases of voter rarity or voter registration fraud that we have presented to the House in previous testimony. We have a sampling of it to show you here today. I was asked by the new Tax Assessor/Collector of Harris County, Leo Vasquez, who was just appointed this last December the 23rd. So he's only been in a couple of months, and he asked me to give the, I guess, testimony today.

One of the things that Leo is real proud of and really works on hard on our voter registration staff is -- his goal for us is to have every citizen that is eligible to vote registered. That is his goal, and we are making all kinds of strides to make that possible in voter registration. On the same note, he also doesn't want any of these real, valid voter registrations to be disenfranchised by someone taking their vote. So the integrity of the voter roll is also very important to us.

The first case that I was going to lay out is a case of voter fraud. It was committed by a volunteer deputy, Janice Shelvin. Janice Shelvin was a college student that became a volunteer deputy in one of her college classes. And according to her testimony, her professor asked her to do a voter registration drive as part of her, I guess, class for credit or some course. Ms. Shelvin unfortunately procrastinated in her testimony and waited to the last day and realized that she had to turn in quite a few applications.

She then stated that she pulled out her phone book and started filling in voter registration cards. After 25 names she ran out of names in her phone book and then proceeded on with the other 36, making up names and filling them in. She turned this in. I think several of her classmates were all gathered into one bundle and were delivered to the Harris County Tax Office to be registered.

It was the, I guess, observance or diligence of one of our very good clerks as they were processing these applications actually started to note that these applications all had very similar handwriting and were all used by the same pen. So there was a red flag waived in her head that there's

something amiss here and brought it to the attention of her supervisor, where we then challenged these applications because they did appear to be all signed by the same person and written all in the same penmanship. So there were 61 cases.

We, under the I guess Texas Election Code, sent these voters a letter challenging these applications thinking they were fraudulent. We got 25 replies from voters, and then the other 36 were -- no reply was found. In fact, the post office were sent certified mail as part of the documentation that you-all received, and the post office said that there was no residence there to deliver it to. So they were returned. So I think that those were the fraudulent ones.

This was sent to the Harris County District Court, and Ms. Shelvin, I guess, pleaded guilty to this offense and was convicted for 61 cases of voter fraud. If -- and this was back in the year 2000. At that point in time as in the election code, voter registration cards are accepted on face value. When the voter signs the bottom, or the alleged voter, when the alleged voter signs the cards, they are accepted on face value until they are challenged. So that's what happened to these.

And if they were not caught by our clerk that had the real judgment here, these people would have become registered voters. We would have sent them voter registration cards with the possibility of someone collecting those cards and possibly voting them in an early voting scenario or something like that.

The second case I would like to present is -- we refer to it as the Dashwood case. This happened in 2006. We received 121 voter registration applications. The resident address that they -- these vultures were trying to use was a street called Dashwood. There is a street in Houston called Dashwood, but the address range that they were writing on the voter registration card was nonexistent. There isn't that address block on Dashwood.

And in our office, the procedures are when our processors can't find it in the database, the street database, a street range, they send it to our mapping department who has all the plots and the plats and all the new maps and everything, and they start researching to find it. They found out that this address of Dashwood is nonexistent and then really quickly realized "Oh, boy, I have a whole bunch of applications here all in this block range of

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 92 of 285

Dashwood." And so we started looking at them and found that, once again, they were similar penmanship, the wide variations of the name, they switched the first name, last name, they would turn the dates of the birth date around. They had them all just jumbled up trying to register a whole bunch of different people that were fraudulent at this address on Dashwood.

Thank goodness they didn't know Houston that well to know that that was a nonexistent address, or we never would have caught these for that. But the only other characteristic they had was all these applications were actually mailed from El Paso to us. So whoever was doing it was mailing them from El Paso here. And those were turned over to our D.A., and they are still under investigation. I think they took it to the D.A. in El Paso where they did have some people that were questioned. I don't know what the final outcome of that one was.

Then the last case I'd like to present is we have 24 examples here of deceased -- people that are deceased, and they voted after their date of death. These are 24 examples that, once again, we had a diligent clerk as we were going through and cleaning up our voter roll, taking the social security death

list and matching it to voters to send notices, that she started to realize that some of these people had voting history after their date of death on the social security list. And some of these 24 people voted numerous times here.

I can tell you that these were registered voters in Harris County, and they are now deceased, and they do have a voting history. Our County Clerk keeps our voting history records, and the County Clerk has voting history for these people in elections that were past their date of death.

In this documentation, you will see that we have a complete voter file for each one of these voters. It's their voter registration application, how they get registered, if they had any changes of address. It will have a front cover page that has the computer screen shot of that voter's record in our office, and then also on the bottom corner it will show what elections they voted in and the date of those elections. And then on the last page is a notice from the social security department of their date of death, and you can go through these, and you-all can get the documents and look at them.

Several of these voters voted early in person during early election. We had a couple of them

on election day and a couple by ballot by mail. The majority of them were done early in person in early voting.

And I know it's getting late, and so I'll stop with this fine set of documents.

**QUESTIONS FROM SENATE FLOOR**

SEN. DUNCAN: The Chair recognizes Sen. Huffman.

SEN. HUFFMAN: Mr. Johnson, thanks for staying with us so late.

MR. JOHNSON: You bet.

SEN. HUFFMAN: I appreciate it. I want you to go over again that last group that you were talking about to make sure that it's clear. I'm not sure that it was. As I understood your testimony, you've established that, in fact, that last group of 24, at least some of those people, or someone, actually cast a ballot in Harris County after it was determined that they were dead. Is that correct?

MR. JOHNSON: That is correct.

SEN. HUFFMAN: Okay. And what are the numbers? How many of those were you able to establish?

MR. JOHNSON: Well, we have proof here that 24 -- and this is just a random, you know,

sampling that we found -- 24 of these people are deceased, were registered voters in Harris County they are deceased now, and they had voting history after their date of death on the social security list.

SEN. HUFFMAN: And how was it that you came to investigate that particular group of people?

MR. JOHNSON: This is something that we routinely do. Almost on a daily basis now in our office we get probate court records and go through them to find if any of those people were registered voters to remove them from the voter roll. Right now what we're working on is we get notes in poll books, family members will write notes in poll books, you know, this was my husband or wife and is deceased, and we go through these, we mail these people letters asking them to confirm this information.

And this particular project we actually purchased a copy of the social security death database and started comparing our voter roll to it to see if we had any matches to clean our voter roll up.

SEN. HUFFMAN: Is that a procedure that's required by the Secretary of State, or is that something that Harris County has taken on?

MR. JOHNSON: That's something that Harris County took on as an attempt to, like I said,

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 96 of 285

make a clean and accurate voter roll. It actually cost our department quite a bit of money to make that purchase and to do that work.

SEN. HUFFMAN: And is that a cost that Harris County has taken on itself?

MR. JOHNSON: Yes.

SEN. HUFFMAN: Do you have knowledge as to whether or not there are other counties in the state that are taking this additional obligation on?

MR. JOHNSON: Yes, in fact -- yes, there are other counties that take this on. In fact this particular run here, we did this in partnership with Tarrant County at the time.

SEN. HUFFMAN: Okay. Do you know whether or not all the other counties in the State of Texas are participating in this?

MR. JOHNSON: No, I do not know if all the other counties in the State of Texas are.

SEN. HUFFMAN: Okay. Do you believe that there could be some counties that are not purging their rolls of deceased individuals?

MR. JOHNSON: I would believe that that's very possible.

SEN. HUFFMAN: Okay. I want to go through something with you because I think you've

established through some of the cases that you've brought to us and the investigations that have been done that there are, in fact, people being registered in Harris County who -- in some fraudulent manner. But let's take an example, and I'm going to ask you about a situation where an individual would fill out the -- a Texas Voter Registration Application. This is just a form that is provided by the Secretary of State. Is that correct?

MR. JOHNSON: Yes.

SEN. HUFFMAN: And do you have one of those forms in front of you?

MR. JOHNSON: I have several copies. Would you like for --

SEN. HUFFMAN: Okay. All right. If you could just make those available? And if anyone who would like to look at this, we'll provide you a copy. And these are the original ones. Actually you brought a stack from Harris County. Is that correct?

SEN. DUNCAN: Senator, do you want to put these in the record?

MR. JOHNSON: These were actually produced by the Secretary of State's Office.

SEN. HUFFMAN: Yes? Yes, sir? Yes, Mr. Chair?

SEN. DUNCAN: Do you want to put that in the record?

SEN. HUFFMAN: Yes, could we put this in the record and mark it as an exhibit? I don't know what number we're on.

SEN. DUNCAN: It will be Exhibit No. 34, and describe it, if you would.

(Exhibit No. 34 marked)

SEN. HUFFMAN: Yes, it is a Texas Voter Registration Application. This is one that is particularly from Harris County, but it's -- I believe it would be produced by the Secretary of State. Is that -- is that correct, Mr. Johnson?

MR. JOHNSON: Yeah, these are produced by the Secretary of State, and they can be used in any county across the State of Texas.

SEN. HUFFMAN: All right.

SEN. DUNCAN: It will be -- it will be received in the record.

(Exhibit No 34 admitted)

SEN. HUFFMAN: All right. Thank you, sir.

Just to see how this process would work, let's just pretend that -- let's pretend that I'm Elvis Presley. Okay? And let's say I fill out this

Texas Voter Registration Application and I mark -- and there's a place at the bottom that provides space to present a Texas driver's license number and a social security number. Is that correct?

MR. JOHNSON: Yeah, that's Step No. 9. Let me have my glasses -- let me put my glasses on.

SEN. HUFFMAN: All right.

MR. JOHNSON: Or 8 -- that's 8.

SEN. HUFFMAN: That's No. 8.

MR. JOHNSON: Sorry.

SEN. HUFFMAN: And at the bottom of No. 8 is an option "Check if you do not have a Texas driver's license or Texas personal identification number," and then next to it is "Check if you do not have a social security number." So let's say I do not have either one of those, either one, do not have a TDL or an ID card, nor do I have a social security number. So I check both, I sign it and I mail it off. Where does it go? Does it go to your office?

MR. JOHNSON: Yes.

SEN. HUFFMAN: And then what would happen when it arrived at your office with that information from me asking to register to vote?

MR. JOHNSON: The first thing when one of these applications comes into our office, we check

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 100 of 265

it for what the date is on it because if you mailed it, it becomes effective 30 days from the date it was postmarked or the date we receive it from a volunteer deputy or some other government agent. We check it for completeness, make sure all the boxes are filled in. If the application is not complete, we'll mail them a letter of incomplete and ask -- with another application in it and ask them to try again and make sure they fill all the required boxes out.

In the scenario you were talking about, if you checked the box that said "I do not have a Texas driver's license" and you checked the box that said "I do not have a social security number," under the Help America Vote Act, the Secretary of State is supposed to provide a unique ID number for this voter, and they do. They provide a state voter ID number, and this person becomes registered.

SEN. HUFFMAN: Okay. So that is happening, and that is the law in the State of Texas at this point. Is that correct?

MR. JOHNSON: Correct.

SEN. HUFFMAN: Okay. Once they provide that unique ID number, then what would happen?

MR. JOHNSON: Well, then we mail them a voter certificate card.

SEN. HUFFMAN: Okay. What form of identification would they then need to vote with that voter registration card?

MR. JOHNSON: In this particular example, you are marked on the poll book. When we print the poll book or the list of registered voters for an election, you would be marked as not being ID compliant because you haven't shown ID to who you are. And in the state law, what it states there is that you can use any one of the currently prescribed IDs with the exception of the voter registration card. I have the list here. You know, you can use your driver's license. Most people do something like that. You can use, you know, birth certificate, citizenship papers, you know, a passport. The one that I find real interesting is you can use a letter, an official letter mailed from a government entity. So if I had mailed them a letter saying that they hadn't had a complete application to try again, that is a letter from a government entity, and they could use it for proof.

SEN. HUFFMAN: So if I had no other form of ID, I could use the letter that you had sent to me as meeting the requirements under 63.0101 described as official mail addressed to the person by name from a

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 102 of 265

governmental entity. Is that correct?

MR. JOHNSON: That is correct. That is an acceptable form of ID.

SEN. HUFFMAN: Okay. So a person who wanted to commit fraud could, in fact, send in applications -- is that correct -- using false names as long as they had an address where they could receive mail, go through this dance with the Secretary of State and the tax assessors and get voter registration cards along with letters from your office, and they could use those things to get individuals to go in to the poll to vote, and it would be virtually impossible under the current state of the law for them to be detected. Is that correct?

MR. JOHNSON: Correct. The election judge could not deny them the right to vote. They are on the poll book. They are listed as a registered voter. They have shown one of the acceptable forms of ID, and they would be allowed to vote on election day.

SEN. HUFFMAN: Okay. So that's just one way that voter fraud can be committed in the State of Texas under the current law, and no one would know actually that it was going on probably other than the individuals involved with the committing the offense. Is that correct?

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 103 of 265

MR. JOHNSON: That is correct.

SEN. HUFFMAN: All right. One of the other records that you provided to us was the young woman, I believe, who was registering people for a school project. I think you indicated that she as well managed to successfully register some individuals who you believed were nonexistent individuals. Is that correct?

MR. JOHNSON: No, she was never able to register anybody.

SEN. HUFFMAN: All right.

MR. JOHNSON: We caught them before. Like I said, the clerk that was working these applications noticed this pattern before we mailed any voter registration certificates out, and we were able to stop them and challenge these voters. But we had officially accepted the applications and noticed everything being complete, and they were in the process of being registered.

SEN. HUFFMAN: All right. What is your experience as you find cases that you believe are cases of voter fraud and you bring them to the District Attorney's Office? Has it been your experience that those cases had been difficult to prosecute?

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 104 of 265

MR. JOHNSON: Yes, we have turned quite a few cases over to the District Attorney, and I will tell you our District Attorney has made attempts to prosecute this, going back to one of our long-time District Attorneys Johnny Holmes. And he basically said that there is not the tools in the election law to prosecute a voter. Basically in order to get voter fraud prosecuted, you have to have that person committing the offense confess to that offense for prosecution.

One of the things they always state was because -- just a signature on the poll book is not really enough evidence for them so far to get a conviction, that if we ever had some other form of ID that they contend it was a harder match, you could actually have successful convictions probably on some of these voter fraud issues.

SEN. HUFFMAN: Isn't it true that the current state of the law does not facilitate proof that a particular person cast a ballot? Is that -- is that a fair statement?

MR. JOHNSON: Yes.

SEN. HUFFMAN: Do you think that the current Public Integrity Division of the Harris County District Attorney's Office is meeting the same

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 105 of 265

problems that were met, as you mentioned, back in Johnny Holmes' days?

MR. JOHNSON: Correct.

SEN. HUFFMAN: All right.

MR. JOHNSON: There was a recent case that I just saw pending on a Website. We had an open record request for -- right before this last November 2008 election from Texas Watchdog. They sent us a list of over 4,000 voters that they believed to be deceased. This was information that they found from the social security death list. We are currently working that list trying to, you know, find out if they are deceased or not, and several of them we have removed from the rolls.

Texas Watchdog also gave that same list to one of our local news stations, Channel 2 in Houston. Channel 2 did an investigation and actually found two of the voters on that list as being deceased and voting during the Primary, and that was after they had passed away. They actually placed a vote in the Primary, and they had interviews with the family members showing the death certificates and everything. And the family members were really upset about this, that someone would steal or fraud their deceased relative's name.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 106 of 265

Watchdog actually turned these over to the District Attorney's Office, these cases, and they were unable to -- the District Attorney had to put a comment back they were unable to get any prosecution on these cases because they didn't have anyone to prosecute nor anyone to confess to the crime.

SEN. HUFFMAN: All right. So each one of these cases is actually pretty much a "Who done it?" Is that correct?

MR. JOHNSON: That is correct.

SEN. HUFFMAN: And just like any other criminal case, the State of Texas has to prove these cases beyond a reasonable doubt. Is that correct?

MR. JOHNSON: I believe that is correct.

SEN. HUFFMAN: So they have to prove identity, they have to prove intent, they have to prove the elements of the offense. And many times they're confronted with a situation where they just don't have any way to prove it. Is that correct?

MR. JOHNSON: That's what I have been told.

SEN. HUFFMAN: All right. Do you think that just because -- you know, we've had a lot of talk today about the fact that there's just -- there's no evidence that there's any kind of voter fraud or voter

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 107 of 265

impersonation going on because if there -- if it was happening, then there would be all these convicted cases out there. Do you think that because it is so difficult to prove these cases and because the law does not facilitate the proof, that that may be one of the reasons why there aren't a lot of convictions that have been shown through the records? Would you agree with that?

MR. JOHNSON: Yes. I will say that the Texas Election Code does not give us the tools to really do the job that we're, you know, trying to do, even the D.A.'s Office. It's very difficult to get prosecution in these cases.

SEN. HUFFMAN: All right. Would it surprise you to know that this -- well, in the General Election in November of '04 that the Harris County District Attorney's Office received 3,324 electric fraud complaints for that one election, or that for the Primary Election in March of '08 that they received 1,502 complaints of election fraud that came in as -- I would assume slightly -- during the election and probably for a couple of days thereafter? Do those numbers surprise you?

MR. JOHNSON: No, they do not.

SEN. HUFFMAN: As the election is taking

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 108 of 265



place, does your office along with the D.A.'s Office and Beverly Kaufman's Office monitor the situations that are going on, try to field phone calls and receive complaints of election fraud violations?

MR. JOHNSON: Well, I can speak for our office, the tax office. We're actually by election code obligated to review the poll book and all the documents from the election after the election has taken place, to validate that everybody that was marked as voting were registered voters. If we find someone that had been written into the poll book and wasn't a registered voter and allowed to vote, we're, by the Texas Election Code, supposed to turn those names over to the District Attorney, and we do that after every election, and, you know, they do their best in trying to work this. And I know Beverly Kaufman's Office, who runs the election, has the same responsibilities for any voter fraud that goes on. They compile a report after every election and submit it to the D.A.'s Office.

SEN. HUFFMAN: Just a couple of more quick questions, Mr. Johnson. Based on your experience, your years at the Tax Assessor's Office and working on these issues all these years, do you believe -- in your opinion, do you believe that there

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 109 of 265

is a voter fraud problem in Harris County?

MR. JOHNSON: I will tell you there is voter fraud in Harris County. We have one of the few convicted cases of it. We have examples here. I can't tell you how extensive it is. We have never done a voter fraud study on our voter roll. The cases that I presented to you here today were just found due to workers, clerks in our office being diligent and accidentally stumbling across these records to discover them.

SEN. HUFFMAN: Does current law actually make it difficult to assess the scope of the problem?

MR. JOHNSON: Yes. The current election law is very loose and makes it very difficult to -- doesn't give us the tools to do the types of investigations needed for these projects.

SEN. HUFFMAN: All right. Thank you very much, Mr. Johnson. And thank you, Members, for bearing with me. Thank you, Mr. Chairman.

SEN. DUNCAN: Thank you Senator. Members, we've been going for over two hours, and we need to give our court reporter an at ease. So we'll be at ease for ten minutes. That will be until 2:35.

(Recess: 2:25 a.m. to 2:38 a.m.)

SEN. DUNCAN: The Committee of the Whole

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 110 of 265

will come back to order. Sen. Gallegos, did you want to yield to Sen. West?

(No response heard)

SEN. DUNCAN: Sen. West?

SEN. WEST: Thank you, Mr. Chairman. Mr. Johnson --

SEN. DUNCAN: If we could have order, please. Go ahead, sir.

SEN. WEST: It's Mr. Johnson. Is that correct?

MR. JOHNSON: Yes.

SEN. WEST: Okay. I'm sorry. Your position there in Harris is --

MR. JOHNSON: I'm sorry I didn't say that earlier. I'm the Associate Director of Voter Registration in Harris County.

SEN. WEST: Okay. Is it true that at least 13,000 timely voter registration applications had not been processed when early voting began in Harris County during the fall of 2008 elections, and that many of them were not processed before early voting concluded?

MR. JOHNSON: I do not have those figures, you know, right off the top of my head. I could find those answers out for you, but I can't --

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 111 of 265

SEN. WEST: But let me ask it this way: Was there a substantial number of voter registration applications not processed during that particular time period?

MR. JOHNSON: You know, that's -- you have to define "a substantial number." We received about 120,000 voter registration applications the day -- the day of and day after the cutoff. By the start of early voting, we had probably 95 percent of those worked. And by the time we got to election day, all of them were complete.

SEN. WEST: So you did have a backlog prior to the start of early voting? You only had -- I'm sorry. You had only completed about 95 percent of the voter registration applications at the time that early voting started?

MR. JOHNSON: Correct.

SEN. WEST: Okay. Do you know that Harris County disqualified nearly 70,000 voter registration applications that were received in time for the 2008 election? Do you know that?

MR. JOHNSON: No, I do not know that.

SEN. WEST: Were a substantial number of people disqualified?

MR. JOHNSON: I do not -- you know, you

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 112 of 265

have to define what is "disqualified." What's your definition of "disqualified"?

SEN. WEST: Seventy thousand. You know, in terms -- were there --

MR. JOHNSON: Are you talking about we received 70,000 applications that were incomplete, or are you telling me that we didn't --

SEN. WEST: You disqualified.

MR. JOHNSON: -- register and rejected 70,000 applications? There's a big difference between the two.

SEN. WEST: Did you know that Harris County disqualified nearly 70,000 voter registration applications that were received in time for the 2008 election?

MR. JOHNSON: I will tell you we had quite a few applications that were not completed correctly, and we mailed those people letters, the letter with a new application, and they had ten days to reply, and they received the original date of the first application, which still made them qualify.

SEN. WEST: So there's a process?

MR. JOHNSON: Yes, there's a process.

SEN. WEST: Okay. All right. Now, did you know that Harris County Election Officials have

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 113 of 265

acknowledged that in many polling locations in Harris County when voters were in line to vote at seven o'clock and had the right to cast a ballot, that they were routinely given provisional ballots rather than standard ballots?

MR. JOHNSON: That unfortunately is not my department. You would have to ask the County Clerk about that. The tax office just handles voter registration.

SEN. WEST: Okay. But you have processes in place in your office to handle different types of election-related issues?

MR. JOHNSON: Yes. On election day for that scenario you were just talking about, we had over 240 people on the phone, and we actually answered close to almost 60,000 -- I guess 55,000 phone calls on election day, helping people find their polling locations, helping the election judge qualify voters they were having problems with.

SEN. WEST: In terms of -- my colleague Senator Huffman went methodically through the voter registration application card, and I assume that you have processes in place there to verify all the information necessary to determine whether or not a person should be issued a voter -- voting registration

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 114 of 265

certificate?

MR. JOHNSON: We follow the Texas Secretary of State -- I mean, the Texas state law on elections.

SEN. WEST: But you do have processes in place in order to --

MR. JOHNSON: Yes. We have manuals that we have for all of our employees on the processes to, you know, handle voter registration applications.

SEN. WEST: All right. In terms of the handling of these applications, are individuals given certain specific duties as it relates to the applications, or do they just kind of look at the application, you have individuals looking at application after application?

MR. JOHNSON: With the volume that we handle, yes, you know, the assembly line method is proven to be the most efficient for handling high volumes, you know, in a quick manner. So, yes, we have different departments that do different tasks in each one. And the very first step when we receive an application is it is validated to make sure it is complete. And then after it's completed, even after that, they put a document number on it and image it, and that is cataloged in our voter registration system

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 115 of 265

even on the incomplete ones so we can refer back at any point in time and find out if a voter submitted a complete or incomplete. But that is the very first step when they come through the door of our office.

SEN. WEST: Is there a statutory duty imposed by Texas law to go through and purge the voter registration rolls of persons that are deceased?

MR. JOHNSON: If you're referring to -- and the definition of "purge" in the Texas Election Code is by the National Voter Registration Act when you have reached the end of your suspense cycle.

SEN. WEST: Explain "suspense."

MR. JOHNSON: Okay. I'll start at the beginning on the definition of "purge" in the election code.

SEN. WEST: Okay.

MR. JOHNSON: If every two years we mail -- and this is where the majority of people end up on suspense. Every two years we mail every voter, registered voter, a new voter registration certificate or renewal certificate, the card that you get in the mail. If that card -- and it has instructions on that card. If the postman cannot deliver it, if the resident no longer lives at that address they're trying to mail it to, then the post office is

instructed to return it to our office as being undeliverable.

When your voter registration card is returned to our office as being undeliverable, that you no longer live at that address, we put you on what's called "suspense." You're still a registered voter. You can still vote. When you walk into a polling location, you're on the poll book, you're going to have an "s" by your name, which stands for "suspense." And the election judge will ask you, "Sir, would you please fill out a statement of residence?" An address correction card is basically what that is with your new address. Once you fill out that card or any other voter application, your name is removed off suspense.

By the National Voter Registration Act, once you go on suspense and you remain on suspense without updating your address, without filling out a change of address card or application for two General Election cycles, you are then removed from the voter roll.

SEN. WEST: Okay. Thank you. As it relates to checks and balances, do you have checks and balances in your office?

MR. JOHNSON: Yes, we do.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 117 of 265

SEN. WEST: Describe those checks and balances.

MR. JOHNSON: I mean, are you asking me what the procedure is that I'm checking and balancing?

SEN. WEST: Of the registration cards.

MR. JOHNSON: We probably have the most robust in the state. And the fact that every document that comes through our door, the very first thing that happens to it is I give it a document number and I image it, and then it is logged into our computer system, and I can find that document at any point in time. So I have a count of how many documents I receive.

As the processors are working these documents, it records all the steps that happened to it throughout the way and will finally record when it is completed and the person is registered or they have been sent some notice of incomplete. I can run a report at any time and find out how many applications I have and what status.

SEN. WEST: Okay. As it relates to -- you have several -- I think you have about three different exhibits up there, and I'll refer to them that way. One of them you have -- I think it's 121 applications.

MR. JOHNSON: Yeah, we referred to that as the Dashwood.

SEN. WEST: Dashwood, okay. Let's talk Dashwood.

MR. JOHNSON: Okay.

SEN. WEST: Did the system -- did your system work in terms of the Dashwood applications? And what I mean by that --

MR. JOHNSON: Yes, it did.

SEN. WEST: What I mean by that -- hold on for one second. And what I mean by that when those applications came in, I assume that you assigned them a number, you imaged them and then sent them through the process to determine whether they were complete?

MR. JOHNSON: Yes. One of the hearts of any voter registration system is what we call the street guide, the list of streets broken into what streets and block ranges belong to a precinct. Because in order to register a voter, you have to assign them to some precinct so they receive the correct ballot, so they're voting for the correct districts and correct members, you know.

SEN. WEST: And that would be one of the, I guess, checks so to speak?

MR. JOHNSON: Correct.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 119 of 265

SEN. WEST: All right.

MR. JOHNSON: So that is the heart of any voter registration system is the street guide.

These particular -- these particular addresses or cards when they came in, the processor could not find this -- these streets, these addresses in our master list of addresses. Now, we get new streets all the time, so that's why we have a whole separate mapping department. These applications were sent to our mapping department so that they could do research to find this address. They did extensive research, actually drove to the street to look it up and found that this block range of that street did not exist.

SEN. WEST: Okay. And were all of the applications properly filled out?

MR. JOHNSON: Not all of them were properly filled out.

SEN. WEST: In fact the majority of them were not properly filled out. Is that correct?

MR. JOHNSON: I have not done a count on it. I would say, you know, a good percentage of them were not properly filled out.

SEN. WEST: Okay. So in that instance, the system worked?

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 120 of 265

MR. JOHNSON: Yes.

SEN. WEST: Okay. And so the process worked, and you were able to stop those particular applications from being processed.

As it relates to the issues where we had people that were voting that were deceased, can you tell us whether or not -- you can't tell us whether -- how those persons appeared, whether they went to the polling place, anything like that. Your records just indicate that someone voted. Is that correct?

MR. JOHNSON: No. Now, the voting information actually comes from our County Clerk's Office.

SEN. WEST: Okay.

MR. JOHNSON: They are in charge of elections, but it does appear on our computer system. We did a screen shot of those in these records. So if you want to -- I mean, I can go through the first one.

SEN. WEST: I mean, just a question. Can you tell us whether --

MR. JOHNSON: Yes, and let me just describe the code for any of you-all that have it.

SEN. WEST: Well, hold on; hold on for one second because I just want to know whether you can tell us whether or not they voted at the -- someone

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 121 of 265

voted at the poll.

MR. JOHNSON: Yes, we have a code.

SEN. WENTWORTH: Okay. Now, let me --

MR. JOHNSON: In the very first column -- let me tell you something.

SEN. WEST: Hold on for a second; hold on for a second, please. You can tell us that. That's all I wanted to know.

MR. JOHNSON: Okay.

SEN. WEST: Now, as it relates to your office's responsibility for doing any type of check -- well, let me back up.

Does your office have a process that you utilize on a regular basis to check the probate -- check the probate court, anything like that, or check any type of records to determine whether persons on the voter roll are now deceased?

MR. JOHNSON: Correct.

SEN. WEST: How often -- you do have a process?

MR. JOHNSON: We have several processes.

SEN. WEST: Okay.

MR. JOHNSON: And to start with the -- you asked first about the probate. Probate courts are, in the Texas Election Code, required to send us

their cases that they process.

SEN. WEST: Okay.

MR. JOHNSON: We receive that documentation probably once a week from the probate courts.

SEN. WEST: Once a week?

MR. JOHNSON: Yeah, I would say roughly, from Harris County.

Then our office takes this upon ourself -- because I will tell you it's probably one of the things that's most upsetting to a voter is when they come in and see their deceased familiar member on the roll. It's really upsetting. So we actually go through the Houston newspaper every day and cut out --

SEN. WEST: Every day?

MR. JOHNSON: Every day.

SEN. WEST: Okay.

MR. JOHNSON: -- and cut out the copies of the obituaries to check for those people to see if they're registered, to remove them.

And then the final way that this happens is actually through the Secretary of State's Office. They are really now the voter registrar for the State. They received from -- I believe it's the health department, the list on -- I don't know if it's weekly

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 123 of 265

or monthly basis, but some basis they receive the records from the health department of the people that have passed away, and they pass that through the statewide system and send us notification.

SEN. WEST: Let me ask you something. Is that the three methods that you utilized, the Secretary of State --

MR. JOHNSON: Yeah.

SEN. WEST: -- the obituaries and also the probate records, court records?

MR. JOHNSON: Yeah. Then the other one that I found that is currently not being recorded that we do periodically is we also go get the secretary's -- I mean not the Secretary's -- the Social Security Administration's death list. Unfortunately our Texas Secretary of State just receives death notices from the State of Texas.

SEN. WEST: How long --

MR. JOHNSON: So if you pass from outside the state, you would not be on that list.

SEN. WEST: How long has that process or those processes been in place?

MR. JOHNSON: They had been in place -- Help America Vote went into place in what, 2004. They probably didn't get the computer system implemented

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 124 of 265

until 2006.

SEN. WEST: Until 2006?

MR. JOHNSON: Yes.

SEN. WEST: And so when you look at the -- those persons that -- quote-unquote that are dead and someone else is voting, how far back does that go?

MR. JOHNSON: I believe most of these people were canceled in the year 2000.

SEN. WEST: I'm sorry?

MR. JOHNSON: I believe most of the people on this list were canceled in the year 2000.

SEN. WEST: They were canceled? When you say "canceled," they were purged from your roll?

MR. JOHNSON: Yes. Well, a purge is for suspense voters.

SEN. WEST: Okay. What I --

MR. JOHNSON: Cancellations are for -- you know, if they are a deceased, felon, noncitizen --

(Simultaneous discussion)

SEN. WEST: Okay. So they were canceled using the process or at least part of the process you just mentioned?

MR. JOHNSON: Yes.

SEN. WEST: And part of it had not been

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 125 of 265

implemented by that time, probably 2005, but at least maybe the Secretary of State going through the obituaries was utilized for purposes of canceling those individuals?

MR. JOHNSON: You know, since I have been working in our office, we have -- we have done all four of those activities before -- before TEAM came into place where the state was in charge of it. We used to get records on about a monthly, quarterly basis from the health department that we would run against our voter roll, too. We requested those records, and we'd run them against our voter rolls to try to clean them up, but that was basically implemented in about the year 2000 when Mr. Bettencourt became the Tax Collector/Assessor.

SEN. WEST: Would it be a fair statement that -- say that at least as it relates to those two that Dashwood and those persons that have been canceled that there were processes in place in your office that enabled you, "you" being the office generically, to find those individuals -- find out those applications and then turn around and deal with them?

MR. JOHNSON: Well, we found these cases.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 126 of 265

SEN. WEST: Okay.

MR. JOHNSON: And we found these cases, you know, I believe just by the due diligence of a good processor.

SEN. WEST: Okay. But you --

MR. JOHNSON: I think this is probably the tip of the iceberg --

SEN. WEST: Okay.

MR. JOHNSON: -- because we're not out looking for these cases. They were just ones we came across.

SEN. WEST: Okay. But the reality is that if someone submits a voter registration application that's not filled out correctly, that goes into a pile?

MR. JOHNSON: Well, that day we actually generate a letter out of our system, a letter of incomplete --

SEN. WEST: Okay. But I mean --

MR. JOHNSON: -- and we mail it to the voter.

SEN. WEST: But if you have an application that's not complete --

MR. JOHNSON: That's correct.

SEN. WEST: -- you will not issue any

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 127 of 265

type of voter registration card. Right?

MR. JOHNSON: That is correct.

SEN. WEST: Okay. You have a process in place that you can cancel out persons that are deceased also. Is that correct?

MR. JOHNSON: That is correct.

SEN. WEST: All right. And so you have obviously competent individuals working these processes because otherwise you wouldn't have them in your office. Now, so there are processes in place as it relates to those two?

MR. JOHNSON: That is correct.

SEN. WEST: Okay. Now, as it relates to the young lady that was -- received deferred adjudication, she wasn't convicted, she received deferred adjudication --

MR. JOHNSON: Okay.

SEN. WEST: -- what type of case was that? I me, what actually did your records show to lead you to believe she had done something?

MR. JOHNSON: What made us discover the case?

SEN. WEST: Yeah, what made you think that there was some fraud going on?

MR. JOHNSON: Like I said, a

processor --

SEN. WEST: Okay.

MR. JOHNSON: -- one of the ladies that actually keys in all the information into our computer system from the cards, received -- went over to the tray to be worked, picked up this pile. And as she's flipping through these cards processing them, she noticed right off the bat that these were all the same handwriting. You know, when you're looking at card after card --

SEN. WEST: Okay.

MR. JOHNSON: -- you notice that it's the same handwriting. In fact it was the same pen. You know, normally when you pick up a stack of cards, one would be blue, one would be black --

SEN. WEST: Sure.

MR. JOHNSON: -- you get purple, pastel, all kinds of colors. Now, they were all the exact same pen. You know, 60 of them in a row, the same writing, same pen, it sends off a red flag.

SEN. WEST: Okay. And I agree with you on that. And so again, the process was able to pick that up?

MR. JOHNSON: Correct.

SEN. WEST: Okay. All right. Now, you

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 129 of 265

would agree with me -- you may agree with me, I'll put it like that -- that you have processes in place in order to make certain that you don't certify or provide a voter registration card for someone that doesn't complete the application appropriately; that you have a process in place to cancel out individuals that are deceased; and you have competent individuals working within your establishment to -- if they see instances of what they believe rises to the level of voter fraud, that they take those cards out and review them or investigate them. Is that correct?

MR. JOHNSON: We have processes to try to catch, you know, voter registration fraud when it comes through. I will tell you the election code is written real loosely and doesn't give us the proper tools to do this job, I would say, in the best manner it could be done.

SEN. WEST: Okay. Let's -- you said "the tools." What tools would you need?

MR. JOHNSON: Well, this one -- one that was just brought up here for an example, that you can take our current voter registration application, write any name you want to on here, check the boxes that you don't have a driver's license or a citizenship, there's no validation check at all. All I'm looking

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 130 of 265

for is did you fill in every box on here, and you're registered to vote. And there's nothing -- there's no tools, there's nothing in the law that allows me to validate this. There's no list to validate it against that this is a real person. So I consider that kind of a hole in the -- in the system.

SEN. WEST: Now, would you agree or disagree that most states have the same process, though?

MR. JOHNSON: I'm not real familiar with all states' laws. I do know that all state laws have to comply with the National Voter Registration Act and Help America Vote.

SEN. WEST: Does this particular voter registration card comply with that act?

MR. JOHNSON: It does comply with that act, but I will tell you there are a lot of different voter registration cards. I do see other states' applications because they can mail them to me. You do not have -- in Texas you do not have to use this official card to register. As long as you have the information that's required to register written on a piece of paper, we can use it as a voter registration card.

SEN. WEST: But it does comply with the

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 131 of 265

national act?

MR. JOHNSON: This does.

SEN. WEST: All right. Thank you on that. I don't think I have any other questions. Thank you.

MR. JOHNSON: All right. Thank you.

SEN. DUNCAN: The Chair recognizes Senator Gallegos.

SEN. GALLEGOS: Thank you, Mr. Chairman.

Mr. Johnson, you said you're the Assistant Registrar at Harris County?

MR. JOHNSON: Associate Director. I have one person above me. Then he reports -- that person above me reports to the Tax Collector/Assessor.

SEN. GALLEGOS: Who is the Director?

MR. JOHNSON: Leo Vasquez is the Tax Collector/Assessor in Harris County now.

SEN. GALLEGOS: So he's the one right above you?

MR. JOHNSON: No. I have a person in between us.

SEN. GALLEGOS: Oh, who is the one in between?

MR. JOHNSON: His name is George Hammerlein.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 132 of 265

SEN. GALLEGOS: Who?

MR. JOHNSON: His name is George Hammerlein.

SEN. GALLEGOS: Oh, okay. All right. But I mean, you work in the registrar's office?

MR. JOHNSON: Yes. George was not able to make it today --

SEN. GALLEGOS: Okay.

MR. JOHNSON: -- as your colleague behind you knows because of a knee injury.

SEN. GALLEGOS: But he's lucky; he's lucky, let me tell you. Okay. So you work in the registrar's office.

Now, Sen. West asked you about these first -- one of the first questions he asked you about these -- and I live in Harris County, by the way.

MR. JOHNSON: Yes, sir.

SEN. GALLEGOS: And that 13 timely -- 13,000 timely voter registration applications had not been processed for early voting. That came out in the news. You worked under Bettencourt. Right?

MR. JOHNSON: Yes, sir.

SEN. GALLEGOS: Okay. It came out in the news. Bettencourt was there. We had no answer

from him. You didn't know that? You told Sen. West you didn't know that. You're the Assistant Registrar, or whatever your title is, and you didn't know that? I was there. Were you there?

MR. JOHNSON: Where is "there" that I'm --

SEN. GALLEGOS: In Harris County, that's where "there" --

MR. JOHNSON: I'm there in Harris County. Now, you know what I need is --

SEN. GALLEGOS: Well, if you didn't know that and you're the Assistant Registrar, is that your job?

MR. JOHNSON: If you give me a date --

SEN. GALLEGOS: Is that your job?

MR. JOHNSON: No, it's not my job.

SEN. GALLEGOS: It's not your job to look at these?

MR. JOHNSON: It's my job to process those voter registrations.

SEN. GALLEGOS: I understand that, sir.

MR. JOHNSON: If you tell me a date -- sir, if you tell me a date, I can tell you exactly how many cards we had worked and not worked.

SEN. GALLEGOS: Well, I can tell you

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 134 of 265

this: If I had your job, somebody asked me that question, about 13,000, the majority of them minorities that had not been processed when early voting started, I would know that because that's my job. That's what the taxpayers pay me for.

MR. JOHNSON: Can I ask you a question?

SEN. GALLEGOS: You didn't know that?

MR. JOHNSON: Can I ask you a question? How do you --

SEN. GALLEGOS: No, no, no. I'm asking the questions. You cannot ask questions. You're a witness. I'm asking the questions.

Now, answer me yes or no. Is that your job?

MR. JOHNSON: I have not seen the article that you're referring to.

SEN. GALLEGOS: There's no article. It was in the papers. Everybody, everybody, everybody was arguing with Bettencourt.

MR. JOHNSON: Well, in the paper there was an article.

(Simultaneous discussion)

SEN. GALLEGOS: Obviously you were on vacation. I'm sorry.

SEN. DUNCAN: Let me please instruct

both of you to allow -- or not talk at the same time because the court reporter can't get your testimony.

SEN. GALLEGOS: I'll ask you again. Were you -- were you on vacation during that period?

MR. JOHNSON: In which period of time are you referring to?

SEN. GALLEGOS: Well, the election. That's exactly the question that Sen. West asked you, the election -- the election in the fall, the Presidential Election when early voting started.

MR. JOHNSON: If you're talking about the month before the election, no, I was not on vacation.

SEN. GALLEGOS: Well, then you should know these answers. That's what we pay you for. Is that not correct?

MR. JOHNSON: I'm sorry, sir. I have not seen that article. I don't know what you're referring to.

SEN. GALLEGOS: All right.

MR. JOHNSON: If you would like to know how many people -- how many voter registration cards I had on any particular day, you know, I can -- when I get back to the office, I can look that up for you.

SEN. GALLEGOS: That's not -- that's not

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 136 of 265

the question I asked you. That is not --

MR. JOHNSON: Well, you're asking me about how many applications we --

(Simultaneous discussion)

SEN. GALLEGOS: That is not the question I asked you.

Okay. Let me -- let me go to the second question where Sen. West asked you and you did not answer him, and you're the Assistant Registrar in Harris County being paid by taxpayers, that Harris County disqualified nearly 70,000 -- 70,000 applications, the majority minority. I mean, you didn't know about this? That's a lot -- that's a lot of disqualifications. And you're the assistant registrar. You didn't know that?

MR. JOHNSON: What is the time period that you're talking about there in the article?

SEN. GALLEGOS: I just told you, right before -- right before the General Election in the fall of '08.

MR. JOHNSON: Is that -- is the month before the General Election, two months, three months? You know, I have to know a timeframe, and I can tell you exactly how many letters we sent out of incomplete during that time.

SEN. GALLEGOS: Right before the election.

MR. JOHNSON: And that is not a -- that is not a disqualification. A letter of incomplete just says that you have missed one of the required fields in the application. It gives them another opportunity to register to vote.

SEN. GALLEGOS: These applications, these people were disqualified. Either way you call it, you can call it -- you sent out a letter, whatever you say, they were disqualified. They couldn't vote.

All right. Let me -- let me go to another question.

MR. JOHNSON: Can I ask you a question while that --

SEN. GALLEGOS: No, no, you can't ask me a question. I'm the one asking the questions. Obviously whoever told you you could testify here didn't tell you the rules of the Senate, whether we're in the Committee of the Whole or in a Committee.

Now, let me ask you, I'm looking at a document that Paul Bettencourt put out, and I was there because he did -- he did a PowerPoint on -- and I don't know if you were there with him when he did this PowerPoint. It was called the Texas Voter

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 138 of 265

Registrar, Keeping It Real. Do you remember that one?

MR. JOHNSON: I have seen that PowerPoint.

SEN. GALLEGOS: Have you seen the PowerPoint?

MR. JOHNSON: Yes, I have.

SEN. GALLEGOS: All right. In his PowerPoint -- okay. I'm going by his document, the document he passed out to everybody there. I'm going by his -- it says "Paul Bettencourt" on there. He was the registrar, wasn't he?

MR. JOHNSON: Yes, he was.

SEN. GALLEGOS: Okay. It says here "City of Houston Case Study." This is his document, not mine. "The General Election of November 2001 and Runoff Election December 2001, these are results of the Harris County book audit on potential fraud in these elections." He said the majority of what he found was the wrong precinct. And there's another column that a majority of what he found was not registered. And in another column, the majority of what he found was deleted. And then the graph goes from zero to 700. It says "moved out of county" -- that was another one that he found -- "was right under 100."

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 139 of 265

Now, the real things that we're looking for and what this bill is trying to clear up is felons and not a citizen and deceased, which I'm going to get to in a minute. On felons it looks here barely ten, about ten per Paul Bettencourt's graph; not a citizen, it's barely a speck on this chart; and deceased, none. This is per his PowerPoint that he passed out at the seminar that I was at. These are his numbers, not mine, that say there was hardly anything from felon to not a citizen to deceased is almost zero. It's almost zero per his chart.

MR. JOHNSON: Can I explain this part?

SEN. GALLEGOS: And have you even seen this chart? Do you know about this chart?

MR. JOHNSON: I've seen that chart. Can I explain that chart, sir?

SEN. GALLEGOS: Go ahead and explain it.

MR. JOHNSON: Okay. That is a -- what we refer to as a poll book audit that happened after a City of Houston election in 2001. After every election I told you we review the poll book -- this is after the election is over with -- we review the poll book to find voter registration problems or discrepancies. One of the things we checked for since it was a City of Houston election, they have what they

call split precincts, not the whole precinct can possibly be in the city. So you can have a precinct that's voting, but you cannot live in the City of Houston. That's what those out-of-precincts are, is those people were in that precinct voting --

SEN. GALLEGOS: I know what they are.

MR. JOHNSON: -- but they didn't live in the City of Houston, but they voted in the City of Houston election. That is -- that is someone voting in the wrong district. That is against the law.

The ones that moved out of county, they didn't live in Harris County, and they voted in Harris County. That is someone that is not registered here or should not have been registered here that voted in our county.

SEN. GALLEGOS: Were any of these -- were any of these what you're saying voted in the wrong county, were they convicted?

MR. JOHNSON: They were all turned over -- that whole report was turned over to the District Attorney's Office, and once again --

SEN. GALLEGOS: All right.

MR. JOHNSON: -- they didn't have the evidence to make the prosecution.

SEN. GALLEGOS: That leads me to my next

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 141 of 265

question. You said you had 133 complaints that are still at the District Attorney's Office. Do we know if any of those were convicted? Do you know that?

MR. JOHNSON: No, I do not know the status.

SEN. GALLEGOS: But you did say there was 133 complaints at the D.A.'s Office, and you can't tell us yes or no? You don't know?

MR. JOHNSON: No, the D.A. does not report to me.

SEN. GALLEGOS: Okay. All right. All right. Let's go back to your deceased. I don't know how you explained it to Sen. West. Tell me the process on how you -- okay. You go through the Chronicle, you go through the obituaries. Is that correct?

MR. JOHNSON: In our office our procedures for finding out or trying to discover deceased voters is, yes, we go through the obituaries of the Houston Chronicle every day.

SEN. GALLEGOS: So you go through the obituaries and you find out who died?

MR. JOHNSON: We get the probate records from the probate court, and we get a list --

SEN. GALLEGOS: And you put them up

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 142 of 265

against -- up against your list on your registrar list?

MR. JOHNSON: Correct.

SEN. GALLEGOS: Okay. And you determine --

MR. JOHNSON: We get the list from -- we get the list from the Texas Health Department of the deceased voters here in Texas, and then periodically we also purchase the social security death index and run it against the voter roll to try to find matches.

SEN. GALLEGOS: And that's how you determine that they are deceased?

MR. JOHNSON: We determine that they are possibly deceased. Then on those voters we actually send them notices to the last known address. We call it "To The Family Of" letters asking the family members if they're still there to confirm our findings.

SEN. GALLEGOS: Okay. But the 24 in your testimony, that's kind of like the process you went through. You went through the newspaper, you went through the --

MR. JOHNSON: That is correct.

SEN. GALLEGOS: Okay. All right. Now, that's a "yes." Right?

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 143 of 265

MR. JOHNSON: Yes.

SEN. GALLEGOS: Okay. Well, let me -- Mr. Johnson, would it interest you to know that right before the end of the year it was time for me to renew my license, and I went to your office and --

MR. JOHNSON: Can I make a correction? We do not do driver's license renewals.

SEN. GALLEGOS: Well, no, no, no, it's under -- it's under the registrar's office.

MR. JOHNSON: No, we do not -- that's under the Department of Public Safety. We do not do driver's license renewals.

SEN. GALLEGOS: Well, it was Bettencourt that called me.

MR. JOHNSON: If Mr. Bettencourt called you, he wasn't affiliated with our office.

SEN. GALLEGOS: Well, he's the one that called me. Are you sure you're not -- you're not with the driver's license renewals?

MR. JOHNSON: Are you talking about -- now, are you talking about your driver's license, or are you talking about your --

SEN. GALLEGOS: No, no, no. I'm talking about -- excuse me -- my license on my car.

MR. JOHNSON: Your auto plates?

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 144 of 265

SEN. GALLEGOS: Yeah.

MR. JOHNSON: The plates on your car? Yes, we do do --

SEN. GALLEGOS: That's what you're in charge of. Right?

MR. JOHNSON: We do do that in our office.

SEN. GALLEGOS: Okay. That's a "yes." Right?

MR. JOHNSON: Yes.

SEN. GALLEGOS: Okay. Would it interest you to know that when I went to renew my license and entered your office there at the registrar's office that they told me I could not renew, and they told me the reason was because on their rolls it showed that I was deceased? Did you know that?

MR. JOHNSON: No, I did not know that.

SEN. GALLEGOS: Okay.

MR. JOHNSON: That is -- that is a whole different department, and that is actually run by TxDOT.

SEN. GALLEGOS: Well, wait, wait, wait a minute.

MR. JOHNSON: And if that was a TxDOT record that showed you --

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 145 of 265

SEN. GALLEGOS: I went to the registrar's office. It was your office. It's was --

MR. JOHNSON: The TxDOT --

SEN. GALLEGOS: At that time, was Paul Bettencourt your boss or not?

MR. JOHNSON: Yes, he was --

SEN. GALLEGOS: Okay.

MR. JOHNSON: -- but we report to TxDOT. TxDOT runs that organization. If there was your record marked as deceased, it was TxDOT that marked it.

SEN. GALLEGOS: Well, why would Paul Bettencourt call me and apologize?

MR. JOHNSON: We are -- we are an agent of theirs. I guess he was being --

SEN. GALLEGOS: Well, then it was your people.

(Simultaneous discussion)

SEN. DUNCAN: Okay. Let me -- let me interrupt. I hate to interrupt, but you're not making a record. And if you want to make a record, you really need -- both of you need to maintain the decorum of one speaking at a time. The court reporter cannot get your testimony if you're speaking over each other, and both of you are doing it. It's not just

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 148 of 265

one of you, both of you are. So if you could slow it down a little bit and let the court reporter keep up with you, that would be helpful for the record.

SEN. GALLEGOS: Mr. Chairman, I'm trying to make a point here that it was the registrar's office that was handling -- that was handling my renewal of my license tag, and Mr. Johnson says that's TxDOT, but it's the registrar that's handling that, all the information on the registrar's computer -- on the registrar's computer in that -- in that county office. Is that correct? Is that yes or no?

MR. JOHNSON: That is a "yes" --

SEN. GALLEGOS: Okay.

MR. JOHNSON: -- that it's in our office, but, sir --

SEN. GALLEGOS: All right.

MR. JOHNSON: -- you were just talking about things that I need, and that's the tools I need. TxDOT will not let us link into their system to copy or get access to those records so that we can match it up to voter rolls to find out when people move so that we can send them notices or applications to try to get them re-registered. So if you would like to help us, pass a bill that would allow TxDOT to give us that information.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 147 of 265

SEN. GALLEGOS: But it was your computer, not TxDOT's.

MR. JOHNSON: No, it's TxDOT's computers. The computers that we use in our office belong to TxDOT.

SEN. GALLEGOS: But it was your agents that were handling it.

MR. JOHNSON: Yes, they work for the Harris County Tax Office.

SEN. GALLEGOS: Okay. All right.

MR. JOHNSON: The computer system is TxDOT's, and it's closed, and they do not let us have access to it.

SEN. GALLEGOS: Well, if you had me deceased there on that computer at the registrar's office, whether it's TxDOT or not, and your agents were handling it, if I had -- if I had voted during that time that you had me deceased, would I show up -- would I show up on your rolls?

MR. JOHNSON: You were still a registered voter on our rolls. That TxDOT record has nothing to do with your voter registration.

SEN. GALLEGOS: That's not what -- that wasn't my question. On your computer, the computer that your agents handle --

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 148 of 265

MR. JOHNSON: On the computer that I'm in charge of that handles the voter registration roll, you are an active voter.

SEN. GALLEGOS: How do you know that?

MR. JOHNSON: Did you vote?

SEN. GALLEGOS: I'm talking -- yeah, I voted, but I'm talking about during the time --

MR. JOHNSON: Then you're an active voter.

SEN. GALLEGOS: -- during the time that the computer showed that I was deceased, had I voted, would I be on that list with those 24? Yes or no?

MR. JOHNSON: No, you would not have been on that list.

SEN. GALLEGOS: Are you sure?

MR. JOHNSON: I'm sure.

SEN. GALLEGOS: You're positive?

MR. JOHNSON: I'm positive.

SEN. GALLEGOS: Okay. All right. So -- and your office is not -- so you're saying it's Beverly Kaufman's Office that's in charge of the last question that Sen. West asked you on the provisionary ballots given after seven o'clock instead of letting them cast their ballots. Is that correct?

MR. JOHNSON: That is correct.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 149 of 265

SEN. GALLEGOS: Okay. Mr. Johnson, thank you.

SEN. DUNCAN: Mr. Johnson, I don't think there's any other queued up. If you want to -- you are excused. Thank you for your testimony.

MR. JOHNSON: Thank you.

**TESTIMONY BY DANIEL B. KOHRMAN**

SEN. DUNCAN: The Chair calls Daniel Kohrman. Mr. Kohrman, do you have written -- you have written testimony, I believe. It will be Exhibit No. --

MR. KOHRMAN: Yes, sir.

SEN. DUNCAN: -- 35. We'll go ahead and put that in the record.

(Exhibit No. 35 marked and admitted)

SEN. DUNCAN: If you'll state your name and who you represent, and you have ten minutes.

MR. KOHRMAN: Thank you. Good morning, Mr. Chairman, Members of the Committee. My name is Daniel Kohrman. I'm a senior attorney with the AARP Foundation. The foundation is the charitable arm of AARP. I represent AARP, AARP's members and older persons generally.

One of my responsibilities is to represent the cause of access to the ballot for older

voters. By way of background, I'm one of the lawyers for voters, including older voters, in the litigation regarding photo ID in Arizona and in Georgia. I've also filed briefs on behalf of AARP in photo ID cases in Michigan and Missouri in the state courts and also in the U.S. Supreme Court in the Indiana case that we've discussed. Finally, AARP has filed a brief supporting the senior citizen plaintiffs in the absentee ballot case here in Texas, the Ray case that we discussed a little earlier this evening.

And just so that you know a bit more about me before I came to AARP, about seven years ago I worked for a big law firm, a civil rights organization, the lawyers committee that you heard about before, and also for the U.S. Department of Justice.

As you know, AARP members vote in very large numbers and are very proud of their active participation in the political process at all levels, state, local and federal. I work out of the headquarters in D.C., but today I'm here representing AARP of Texas, which is one of 53 state offices we have across the U.S.

I want to say that given the intense partisanship that we've seen here today and that has

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 151 of 265

developed around this issue of voter ID, photo ID, I want to emphasize that AARP is a nonprofit nonpartisan organization dedicated to addressing the needs and interests of Americans age 50 and older. AARP has no interest in the partisan aspects of the photo ID issue.

What we do care about is representing the interests of older Americans. We have more than 40 million members nationwide and about two and a half million here in Texas, and both in this state and across the U.S. We're the largest membership organizations of older persons and older voters.

All right. While I appreciate the opportunity to speak with you here so late and so early about Senate Bill 362, just to start, I want to say that AARP's overall perspective is that the right to vote is the most basic right in our Democratic system, and our view is that legislative bodies and politicians should tread carefully in the field of voting rights. Voting rights should not be casually restricted.

Now, we understand that historically and under our Constitution the states are the principle sources of laws and regulations in the area of voting, but we do not conclude from this that states should

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 152 of 265

feel free to take whatever action is expedient. Certainly where there's a need to act to protect voters, there's a duty to step forward. But absent such a need, our view is that states have a duty not to rush in. And as it is said of doctors, so it is true in the field of voting and elections, first do no harm.

AARP policy is clear. We have focused on trying to encourage simple, fair procedures. And most relevant for our purposes here today our policy states that state government should adopt procedures to detect and prevent voter fraud, but policies that do not permit arbitrary and discriminatory reviews, ID challenges and misuse of provisional ballots in ways that discourage voter registration and turnout. And our concern about photo ID laws is that they do just that.

Just this past Sunday in the Rio Grande Guardian, the paper reported one in five senior woman don't have a driver's license, quoting the U.S. Census Bureau. 18 percent of Americans over age 65 don't have a driver's license, quoting the Brennan Center from whose representative you heard earlier today, and also that 37 percent of Texans over 80 don't have a driver's license.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 153 of 265

We did some surveys in connection with some of the litigation matters you've heard about. In Indiana our survey suggested that 3 percent of people over 65 have neither a driver's license nor a state-issued ID, and that's about 23,000 people. In Georgia our estimates suggested over 100,000 over age 65 lack a driver's license and the number is something like double that in Missouri.

What's hard to understand for us is why public officials would embrace measures that have this kind of impact on older voters when in the next couple of decades the older population will be growing by leaps and bounds so that most of the growth in the voting population will be among the older voters.

I want to refer you to testimony that AARP Texas' Advocacy Director Amanda Fredericksen gave to a House Committee in 2006 noting some of the harms and difficulties posed for older persons who seek to access the ballot, but are caught up in photo ID requirements and are precluded from voting.

There was an 80 year old who sought a state-issued ID card in Indiana. We put this in our Supreme Court brief. She finally succeeded only after paying multiple fees, navigating a maze of public record laws and making multiple trips to public

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 154 of 285

offices. And then there was a 61-year-old social security recipient who was barred from voting in the lobby of her retirement home as she had done for past elections. Poll workers who had known her for years were not allowed to let her vote because she didn't have the form of ID, and we're concerned that's going to happen in Texas.

Now, let me cut to the chase here, and I've summarized in my testimony some major concerns we have with this law in particular. We've talked about big picture issues, other states, other cases and we've talked, to some degree, precious little about the actual bill that's before this chamber.

The first concern is that the law does very little to educate the public about the changes it proposes to make. It relies almost exclusively on the individual voter registration renewal process. It relies on Websites, the Secretary of State and the counties, but as far as I understand it, only one-third of the counties actually have Websites.

Our members in particular, I would have the concern, would both be adversely affected by a process that relies on a routine mailing procedure. They have voted for many, many years and cannot be expected to automatically pick up on all the new

changes. More likely they're going to assume that their registration is just as it has been before. And as far as Websites, our members are getting ever more tech savvy, but relying on the Internet to serve older voters is a dangerous proposition.

The second concern is a related one. There's lack of plans for public outreach. One way to describe the approach of this bill, in our frame of thinking, is that it's completely passive. You get a mailing, you have a bit of information posted on a Website. There's nothing going out to the public. There's nothing going out in terms of mobile vans as there was in Georgia or other public education. We heard about advertisements. I noted that nothing of that was planned to involve photo ID in particular.

As far as the substantive concern about what the experience is like for voters, I just want to make two quick points.

SEN. DUNCAN: I've been holding everybody pretty strict. If somebody wants to ask a question --

MR. KOHRMAN: Okay.

SEN. DUNCAN: I think Sen. Uresti -- your time has expired.

**QUESTIONS FROM SENATE FLOOR**

SEN. DUNCAN: Sen. Uresti, you're recognized.

SEN. URESTI: Thank you, Mr. Chairman.

Mr. Kohrman, good morning, and I'll follow up on what you were just completing in a moment, but I wanted to go back to something that you just talked about with regard to the Websites. And I think you mentioned in your testimony one-third of the counties have Websites. But do you have an idea of how many of your members actually have a computer much less access to the Internet?

MR. KOHRMAN: Well, I would say two things: One, I think it's very easy to stereotype older voters and older people. I think more and more of them -- the profile is more typical of the average population than what most people think. But the plain fact of it is when you look at people who are infirm, older people with disabilities that is, older people in assisted living or nursing homes, those kinds of residential situations, people of low income certainly, they are very unlikely to have access to the Internet and very unlikely to benefit from that kind of information.

SEN. URESTI: And one of the reasons I

bring that up, and I realize many of our seniors are more advanced when it comes to the Internet, but speaking about my parents specifically and they're in their 70s, very intelligent. However, my father refuses to use a computer, probably because he doesn't know how, much less accessing the Internet. So I'm sure that there are many other seniors in Texas, specifically in the district that I represent, that don't have access.

You were about to complete a sentence, and I know the time cut you off. Would you like to finish that thought?

MR. KOHRMAN: No. I just -- that the public outreach activities that were demanded by the court in Georgia, in effect, are very much relevant here because what we have is a law that proposes to take effect at the very beginning of 2010 and yet relies almost completely on a notification process in the course of renewing registrations that has, as I understand it, a two-year cycle.

Therefore, in our view, the minimum time that should be required for this set of new requirements to be effective should be at least two years and probably longer than that so that you have a whole cycle. If you're going to rely on mailings that

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 158 of 285

people will only get some time in the next two years, it should be a cycle that long at least before this law takes effect.

SEN. URESTI: And the reason for the two years is so that you can allow for training and outreach?

MR. KOHRMAN: Well, in the first place, there's no guarantee that people will be notified of the requirements of the law at all. Given that there's nothing in this bill by way of funding or programs, at least as far as I can tell, to contact voters about the specific requirements of photo ID, people won't know. And what you will have is people showing up at the polls, registered voters who have -- who expect that they can vote on the terms they always have. And what they will find -- in particular in some circumstances, they will come perhaps without their registration. And under current law if you come without your registration but you're on the rolls, you sign an affidavit and you cast a regular ballot. But under the law as it would be revised, you have to show photo ID.

Now, if you haven't had notice except if you read the papers closely enough to know what this body and the House may pass someday, you're not going

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 159 of 285

to know that requirement. And so what you're going to do is you're going to show up -- and we think that's typical of our members. They are going to do what they've always done, they're going to show up, they may forget, they may misplace, they may lose, they may not get in time their certificate. They show up to vote and whereas in the past they could just sign an affidavit, cast a regular ballot, they'll have to file a provisional ballot that won't be counted, and that's a big problem for us.

SEN. URESTI: And we've heard over the past several hours of testimony from some of my colleagues that it's no big deal, that you can just show up with an electricity bill or another piece of documentation, but I would assume that many of our seniors may be widowed, and some of the documentation that they have was in their husband's name, for instance, or perhaps in their wife's name. And as you said, Mr. Kohrman, they may show up, they may be waiting for a ride from one of their sons or their neighbors at the end of the day. By the time they do show up to vote, they will not have that documentation. Do you think that's going to be a problem for our seniors when it comes time for voting?

MR. KOHRMAN: Well, we've heard from a

number of people about problems with some of the specific alternative forms of identification that have been alluded to by some of the proponents. And of course older voters have and older persons have particular problems with some of those forms of ID, very much so. Older women may have been -- have moved into the state from other states. They may have marriage certificates from -- with a name that's -- in other words, the documents that they might need to get a birth certificate are different in name than their current married name, they've changed their name. And so if they have to get an out of state marriage document or divorce decree or birth certificate, they're going to have trouble.

We've had problems in many of these southern states with older -- older woman, older men who were born -- and this really applies to people of color in particular who were born outside of hospitals and may not even be able to get a birth certificate.

SEN. URESTI: Do you see any potential barriers for our seniors that are trying to obtain a photo identification?

MR. KOHRMAN: Well, what is of concern, as I've said, is the fact that there's no -- there's no effort to notify them, and there's not a realistic

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 161 of 285

set of measures that will likely notify them.

Furthermore, there appears to be no plan or money for training of the actual people who will interact most often and most intensely at the polling place with all voters, but particularly older voters, election officers so called. There appears to be no money or plan for training these folks so that when people show up at the polls surprised by the new laws and the changes, what we're concerned about is that our people will have particular troubles, especially if a lot of folks that they're going to have to interact with are given insufficient training.

SEN. URESTI: Mr. Kohrman, do you think there will be additional barriers if this legislation does pass for the voters that may reside with family members who are in an assisted living facility or in a nursing home?

MR. KOHRMAN: Well, that raises the issue of outreach again. Our fundamental view is that -- and you've heard this from many people -- that this is an issue that is a solution that's looking for a problem. Our view of it is that what this chamber should focus on is the fact that there are lots of voters who need assistance and encouragement and facilitation to get them to vote.

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 182 of 285

We have lots of people, for instance, who change addresses when they move into different residential facilities when they become somewhat more infirm or interested in finding a situation where they can age in place and have access to medical care. When they change their address and if they don't have family who are looking out for them, what they may need is registrars who are going out to facilities where older people are to register people to vote and to help them to vote.

There are states across this country that have allocated resources, not to these ID checks that we feel are not very productive and not likely to solve this supposed problem of fraud, but instead of allocating their resources to seek out voters who have -- who are not participating but want to participate. So we would like -- we would like state officials and county officials to be seeking out older voters who are still capable of voting, but may have mobility challenges that keep them from voting like they did 10, 20 years ago.

SEN. URESTI: Mr. Kohrman, we've heard testimony about different forms of nonphoto identification, and one example that I heard earlier was Texas -- was a Medicaid card. Do you know if

Texas actually issues a Medicaid card?

MR. KOHRMAN: Well, I apologize. I don't really know that, but there may be -- there may be some forms of this photo ID that are available to many seniors, and we're not saying that this is an impossible situation, but I will say about the best you can say about this photo ID proposal is that it is not as harsh and not as bad as the most restrictive laws in a few states, but it imposes all kinds of burdens on voters who are the most committed to participating in our democracy, which are older voters, and it's going to make a lot of unnecessary impediments.

If you imagine the situation -- another situation that's covered by the law, which is someone who shows up at the polls who has their voting card but isn't on the rolls, and that's, I think, Section 9 of the bill. Right. It seems to me that that would be another situation where instead of requiring a photo ID, what you should require is a -- is an affidavit, which under other circumstances is provided for under current law.

A lot of these older voters are well known to people at their polling place. There's no need to impose these additional requirements. I would

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 184 of 285

find it highly dubious if I were to hear that there is any evidence or any record that older voters in particular pose a problem of fraud, that there's any worry that people 50 -- age 50 and older are the ones who have been identified as posing a risk of illegal voting activities.

What we need to do is to reach out, take advantage of the fact that these mature voters are very committed to participating and yet face a variety of challenges over time as they age that makes it more difficult for them to participate. This law raises barriers where there need be no such barrier.

SEN. URESTI: And, Mr. Kohrman, by placing those additional barriers through this bill on our seniors, do you -- is it your opinion that there will be some seniors that may not be able to vote come election day?

MR. KOHRMAN: Well, it's interesting. We've heard a lot of back and forth about what aggregate data shows. You know, a state -- a state shows big increases in turnout, and some people think they know exactly what the sole cause of that is, and supposedly it's photo ID.

I think -- and this is by way of answering your question. I think what we -- what

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 165 of 285

we -- what's most important here is what we don't see in the numbers. You can't measure the effect on people who are deterred from voting particularly when their numbers are swamped by turnout increases that result from a variety of causes. And what we fear is that lots of older voters -- and remember older voters are going to be a growing population. So to some degree if you just have a gradual growth in the turnout of older voters, that's a problem because that -- this should be a very significant growth trend as the population ages.

So what we're concerned about is that people will -- whether they're in their 50s and have disabilities, whether they're in their 40s, for that matter, but certainly greater numbers in their 60s and 70s who are very avid voters, you know, voting for some of our seniors is the highlight of the year or a highlight of their life. It shows that they are still active, they're still engaged, they're still contributing to society. And what we fear is that if the impediments grow and become more diverse, they're just not going to show up. And so what is important is what we won't see.

And again, when the numbers are growing in terms of older voters, what you'll see is an

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 160 of 285

increase. And so people will say, "Well, older voters are growing in greater numbers, so there's no problem," and we think that's just a very short-sighted and narrow view that isn't called for.

SEN. URESTI: That's all the questions I have, and thank you, Mr. Kohrman. Thank you, Mr. Chairman.

MR. KOHRMAN: Thank you.

SEN. DUNCAN: The Chair recognizes Sen. Ogden.

SEN. OGDEN: Mr. Kohrman, I represent a lot of people in the AARP, and I wonder --

MR. KOHRMAN: Glad to hear that.

SEN. OGDEN: I wonder how you purport to represent them. How does the AARP, when you talk on behalf of the AARP, come to the position that you have espoused?

MR. KOHRMAN: Well, you may know, you may be surprised, I don't know. We spend a great deal of time and effort surveying our membership. I would venture to say more so than any membership organization in the United States we allocate more resources.

SEN. OGDEN: So you surveyed your membership on this state law? Did you survey the

Case 1:12-cv-00128-RMC-DST-RLW Document 210-3 Filed 06/20/12 Page 187 of 285

Texas membership, or did you just survey the membership of the Continental United States? What membership did you survey?

MR. KOHRMAN: Well, now you're -- now you're taking what is a huge allocation of resources suggesting it should be even probably more than anyone would suggest reasonable. No, Senator, we don't -- we do not every year survey nationally and statewide --

SEN. OGDEN: All right. So then --

MR. KOHRMAN: -- on every proposal, but we have surveyed on the specific issue of photo ID. I'm sorry. I'm not trying to filibuster here. I just want to answer on photo ID, but also more generally on government integrity.

SEN. OGDEN: All right. So what was the result of your survey on the Texas voter identification bill?

MR. KOHRMAN: Well, we haven't surveyed on the Texas bill because, of course, I don't think it's been out there very long, but we have the Georgia law, we have the Arizona law. And frankly, Senator, there is a commonality to a lot of these laws, and that's what we built on.

SEN. OGDEN: Okay. So what was the result of your survey amongst Texans who are members