

(AP Photo/Rogelio Solis)

TX_00001905

USA_00019546

## 5. Improving Ballot Integrity

Because the integrity of the ballot is a hallmark of democracy, it is imperative that election officials guarantee eligible voters the opportunity to vote, but only once, and tabulate ballots in an accurate and fair manner.

### 5.1 INVESTIGATION AND PROSECUTION OF ELECTION FRAUD

While election fraud is difficult to measure, it occurs. The U.S. Department of Justice has launched more than 180 investigations into election fraud since October 2002. These investigations have resulted in charges for multiple voting, providing false information on their felon status, and other offenses against 89 individuals and in convictions of 52 individuals. The convictions related to a variety of election fraud offenses, from vote buying to submitting false voter registration information and voting-related offenses by non-citizens.[54]

In addition to the federal investigations, state attorneys general and local prosecutors handle cases of election fraud. Other cases are never pursued because of the difficulty in obtaining sufficient evidence for prosecution or because of the low priority given to election fraud cases. One district attorney, for example, explained that he did not pursue allegations of fraudulent voter registration because that is a victimless and nonviolent crime.[55]

Election fraud usually attracts public attention and comes under investigation only in close elections. Courts may only overturn an election result if there is proof that the number of irregular or fraudulent votes exceeded the margin of victory. When there is a wide margin, the losing candidate rarely presses for an investigation. Fraud in any degree and in any circumstance is subversive to the electoral process. The best way to maintain ballot integrity is to investigate all credible allegations of election fraud and otherwise prevent fraud before it can affect an election.

Investigation and prosecution of election fraud should include those acts committed by individuals, including election officials, poll workers, volunteers, challengers or other nonvoters associated with the administration of elections, and not just fraud by voters.

---

**Recommendations on Investigation and Prosecution of Election Fraud**

**5.1.1** In July of even-numbered years, the U.S. Department of Justice should issue a public report on its investigations of election fraud. This report should specify the numbers of allegations made, matters investigated, cases prosecuted, and individuals convicted for various crimes. Each state's attorney general and each local prosecutor should issue a similar report.

**5.1.2** The U.S. Department of Justice's Office of Public Integrity should increase its staff to investigate and prosecute election-related fraud.

---

TX_00001906

USA_00019547

> **5.1.3** In addition to the penalties set by the Voting Rights Act, it should be a federal felony for any individual, group of individuals, or organization to engage in any act of violence, property destruction (of more than $500 value), or threatened act of violence that is intended to deny any individual his or her lawful right to vote or to participate in a federal election.
>
> **5.1.4** To deter systemic efforts to deceive or intimidate voters, the Commission recommends federal legislation to prohibit any individual or group from deliberately providing the public with incorrect information about election procedures for the purpose of preventing voters from going to the polls.

## 5.2 ABSENTEE BALLOT AND VOTER REGISTRATION FRAUD

Fraud occurs in several ways. Absentee ballots remain the largest source of potential voter fraud.[56] A notorious recent case of absentee ballot fraud was Miami's mayoral election of 1998, and in that case, the judge declared the election fraudulent and called for a new election. Absentee balloting is vulnerable to abuse in several ways: Blank ballots mailed to the wrong address or to large residential buildings might get intercepted. Citizens who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation. Vote buying schemes are far more difficult to detect when citizens vote by mail. States therefore should reduce the risks of fraud and abuse in absentee voting by prohibiting "third-party" organizations, candidates, and political party activists from handling absentee ballots. States also should make sure that absentee ballots received by election officials before Election Day are kept secure until they are opened and counted.

Non-citizens have registered to vote in several recent elections. Following a disputed 1996 congressional election in California, the Committee on House Oversight found 784 invalid votes from individuals who had registered illegally. In 2000, random checks by the Honolulu city clerk's office found about 200 registered voters who had admitted they were not U.S. citizens.[57] In 2004, at least 35 foreign citizens applied for or received voter cards in Harris County, Texas, and non-citizens were found on the voter registration lists in Maryland as well.[58]

The growth of "third-party" (unofficial) voter registration drives in recent elections has led to a rise in reports of voter registration fraud. While media attention focused on reports of fraudulent voter registrations with the names of cartoon characters and dead people, officials in 10 states investigated accusations of voter registration fraud stemming from elections in 2004, and between October 2002 and July 2005, the U.S. prosecuted 19 people charged with voter registration fraud.[59] Many of these were submitted by third-party organizations, often by individuals who were paid by the piece to register voters.

States should consider new legislation to minimize fraud in voter registration, particularly to prevent abuse by third-party organizations that pay for voter registration by the piece. Such legislation might direct election offices to check the identity of individuals registered through third-party voter registration drives and to track the voter registration forms.

HAVA requires citizens who register by mail to vote in a state for the first time to provide

TX_00001907

USA_00019548

an ID when they register or when they vote. Some states have interpreted this requirement to apply only to voter registration forms sent to election offices by mail, not to forms delivered by third-party organizations. As a result, neither the identity nor the actual existence of applicants is verified. All citizens who register to vote with a mail-in form, whether that form is actually sent by mail or is instead hand-delivered, should comply with HAVA's requirements or with stricter state requirements on voter ID, by providing proof of identity either with their registration application or when they appear at the polling station on Election Day. In this way, election offices will be obliged to verify the identity of every citizen who registers to vote, whether or not the registration occurs in person.



John Fund and Colleen McAndrews at the April 18 hearing (American University Photo/Jeff Watts)

In addition, states should introduce measures to track voter registration forms that are handled by third-party organizations. By assigning a serial number to all forms, election officials will be able to track the forms. This, in turn, will help in any investigations and prosecutions and thus will serve to deter voter registration fraud.

Many states allow the representatives of candidates or political parties to challenge a person's eligibility to register or vote or to challenge an inaccurate name on a voter roll. This practice of challenges may contribute to ballot integrity, but it can have the effect of intimidating eligible voters, preventing them from casting their ballot, or otherwise disrupting the voting process. New procedures are needed to protect voters from intimidating tactics while also offering opportunities to keep the registration rolls accurate, and to provide observers with meaningful opportunities to monitor the conduct of the election. States should define clear procedures for challenges, which should mainly be raised and resolved before the deadline for voter registration. After that, challengers will need to defend their late actions. On Election Day, they should direct their concerns to poll workers, not to voters directly, and should in no way interfere with the smooth operation of the polling station.

---

### Recommendations on Absentee Ballot and Voter Registration Fraud

**5.2.1** State and local jurisdictions should prohibit a person from handling absentee ballots other than the voter, an acknowledged family member, the U.S. Postal Service or other legitimate shipper, or election officials. The practice in some states of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated.

**5.2.2** All states should consider passing legislation that attempts to minimize the fraud that has resulted from "payment by the piece" to anyone in exchange for their efforts in voter registration, absentee ballot, or signature collection.

**5.2.3** States should not take actions that discourage legal voter registration or get-out-the-vote activities or assistance, including assistance to voters who are not required to vote in person under federal law.

TX_00001908

USA_00019549



(AP Photo/J. Pat Carter)

TX_00001909

USA_00019550

# 6. Election Administration

To build confidence in the electoral process, it is important that elections be administered in a neutral and professional manner. Election officials, from county clerks and election board members to secretaries of state and U.S. Election Assistance Commission members, generally have shown great skill and dedication in administering elections in a fair and impartial manner. The institutions of election administration, however, are in need of improvement, so that they may instill greater public confidence in the election process and allow election officials to carry out their responsibilities more effectively (see Table 5 on page 52).

Elections are contests for power and, as such, it is natural that politics will influence every part of the contest, including the administration of elections. In recent years, some partisan election officials have played roles that have weakened public confidence in the electoral process. Many other partisan election officials have tried to execute their responsibilities in a neutral manner, but the fact that they are partisan sometimes raises suspicions that they might favor their own party. Most other democratic countries have found ways to insulate electoral administration from politics and partisanship by establishing truly autonomous, professional, and nonpartisan independent national election commissions that function almost like a fourth branch of government. The United States, too, must take steps to conduct its elections impartially both in practice and in appearance.

Impartial election administration, however, is not enough. Elections must also be administered effectively if they are to inspire public confidence. Long lines at polling stations, inadequately trained poll workers, and inconsistent or incorrect application of electoral procedures may have the effect of discouraging voter participation and may, on occasion, raise questions about bias in the way elections are conducted. While problems at polling stations usually reflect a shortage of trained poll workers or poor management of polling station operations, rather than an attempt to seek partisan advantage, the result is much the same. Such problems raise public suspicions or may provide grounds for the losing candidate to contest the result in a close election.

## 6.1 INSTITUTIONS

The intense partisanship and the close division of the American electorate, coupled with the Electoral College system, raise the possibility of another presidential election decided by a razor-thin margin in one or more battleground states. Although voting technology is improving, presidential elections are held in a decentralized system with a patchwork of inconsistent rules. In addition, in recent years, election challenges in the courts have proliferated.

Close elections, especially under these conditions, put a strain on any system of election administration, and public opinion demonstrates this. Significant segments of the American public have expressed concern about voter fraud, voter suppression, and the fairness of the election process in general.[60] While substantially more Democrats than Republicans surveyed in national polls considered the 2004 presidential election unfair, 41 percent more Republicans than Democrats said the electoral process was unfair in Washington state's 2004 gubernatorial election, which the Democratic candidate won by a very narrow margin.[61] The losing side, not surprisingly, is unhappy with the election result, but what is new and dangerous in the United States is that the supporters of the losing side are beginning to believe that the process is unfair. And this is true of both parties.

TX_00001910

Building Confidence in U.S. Elections    49

TX_00001910

USA_00019551

At its base, the problem is a combustible mixture of partisan suspicion and irregularities born in part from a decentralized system of election administration with differing state laws determining voter registration and eligibility and whether a ballot is actually counted. The irregularities, by and large, stem from a lack of resources and inadequate training for election workers, particularly those who work just on Election Day. In other countries, such irregularities sometimes lead to street protests or violence. In the United States, up until now, we have been relatively fortunate that irregularities are addressed in court. The dramatic increase in election-related litigation in recent years, however, does not enhance the public's perception of elections and may in fact weaken public confidence. The average number of election challenges per year has increased from 96 in the period of 1996 to 1999 to 254 in 2001 to 2004.[62]



Elections manager Lori Augino, left, Pierce County Auditor Pat McCarthy, U.S. EAC Commissioners Ray Martinez, III, and Paul DeGregorio, right, observe the 2004 manual gubernatorial recount in Washington (AP Photo/*The News Tribune*, Janet Jensen)

Another major source of public mistrust of the election process is the perception of partisanship in actions taken by partisan election officials. In a majority of states, election administration comes under the authority of the secretary of state. In 2000 and 2004, both Republican and Democratic secretaries of state were accused of bias because of their discretionary decisions — such as how to interpret unclear provisions of HAVA. The issue is not one of personality or a particular political party because allegations and irregularities dogged officials from both parties. The issue is the institution and the perception of partiality that is unavoidable if the chief election officer is a statewide politician and the election is close, has irregularities, or is disputed. The perception of partiality is as important, if not more so, than the reality.

Bipartisan election administration has the advantage of allowing both parties to participate, but the flaws of such a system are evident in the experience of the Federal Election Commission (FEC). The FEC has often become deadlocked on key issues. In the cases when the FEC commissioners agree, they sometimes protect the two parties from enforcement rather than represent the public's interest in regulating campaign finance.

**NONPARTISAN ELECTION ADMINISTRATION.** To minimize the chance of election meltdown and to build public trust in the electoral process, nonpartisan structures of election administration are very important, and election administrators should be neutral, professional, and impartial. At the federal level, the U.S. Election Assistance Commission should be reconstituted on a nonpartisan basis to exercise whatever powers are granted by law, and the EAC chairperson should serve as a national spokesperson, as the chief elections officer in Canada does, for improving the electoral process. States should consider transferring the authority for conducting elections from the secretary of state to a chief election officer, who would serve as a nonpartisan official.

States could select a nonpartisan chief elections officer by having the individual subject to approval by a super-majority of two-thirds of one or both chambers of the state legislature. The nominee should receive clear bipartisan support. This selection process is likely to yield a respected consensus candidate or, at least, a nonpartisan candidate.

The EAC, in its 18 months of operation, has managed to make its decisions by consensus. While this is a significant accomplishment for a bipartisan, four-member commission, it has come at a cost. The EAC has been slow to issue key guidance, and the guidance it has issued has often been vague. The process of forging consensus among the EAC's commissioners appears to have slowed and watered down key decisions, particularly as they have come under pressure from their respective political parties. If the EAC were reconstituted as a nonpartisan commission, it would be better able to resist partisan political pressure and operate more efficiently and effectively.

To avoid the dangers of bipartisan stalemate, the EAC should be reconstituted as a five-member commission, with a strong chairperson and nonpartisan members. This would be done initially by adding a fifth position to the EAC and making that position the chairperson, when the current chairperson's term ends. The new EAC chairperson would



Kansas Secretary of State Ron Thornburgh at the April 18 hearing (American University Photo/Jeff Watts)

be nonpartisan, nominated by the President, and confirmed by the U.S. Senate. Later, as the terms of other EAC commissioners expired, they would be replaced by nonpartisan commissioners, subject to Senate confirmation as well.

**INDEPENDENCE AND AUTHORITY.** For the positions of EAC commissioners and state chief elections officers to remain both nonpartisan and effective, they must be insulated from political pressure. This can be done by the terms of appointment and the lines of responsibility. The EAC commissioners and state chief elections officers should receive a long-term appointment, perhaps 10 years. The grounds for dismissal should be limited, similar to the rules for removal of a federal or state judge. The EAC should have the autonomy to oversee federal election laws that Congress directs it to implement and advise Congress and the President on needed improvements in election systems. State chief elections officers should have similar autonomy.

Under HAVA, the EAC distributes federal funds to the states, issues voluntary guidance on HAVA's mandates, and serves as a clearinghouse for information on elections. In addition, it develops standards for voting equipment and undertakes research on elections.

The flaws identified in the electoral system described in this report were due in large part to a very decentralized system with voting standards implemented in different ways throughout the country. If HAVA is fully and effectively implemented, states should be able to retrieve authority to conduct elections from counties and impose a certain degree of uniformity.

In this report, we have proposed the kinds of reforms needed to improve significantly our electoral process. To implement those reforms, a new or invigorated institution like the EAC is needed to undertake the following tasks:

- Statewide registration lists need to be organized top-down with states in charge and counties assisting states rather than the other way around;

- A template and a system is needed for sharing voter data across states;

- The "REAL ID" needs to be adapted for voting purposes and linked to the registration list;

- To ensure that the new requirements — ID and registration list — do not impede access to voting, an expanded effort is needed to reach out and register new voters;

- Quality audits of voter databases and certification of voting machine source codes is essential;

- Voting machines need a voter-verifiable audit trail; and

- Extensive research on the operations and technology of elections is needed.

| TABLE 5: Types of Electoral Administration | | | | | |
|---|---|---|---|---|---|
| Type of Institution | WORLD REGION | | | | |
| | The Americas | Asia & the Pacific | East & Central Europe | Sub-Saharan Africa | Total Number of Cases (percent of total) |
| Government | 5* | 9 | 0 | 3 | 17 (14%) |
| Government supervised by judges or others | 6 | 2 | 6 | 14 | 28 (23%) |
| Independent electoral commission | 25 | 19 | 12 | 19 | 75 (63%) |

\* The U.S. is included in this category.

SOURCE: Rafael López-Pintor. *Electoral Management Bodies as Institutions of Governance* (NY: United Nations Development Programme, Bureau for Development Policy, 2000).

These reforms, but particularly those that require connecting states, will not occur on their own. The EAC needs to have sufficient authority to assure effective and consistent implementation of these reforms, and to avoid repeating past problems, its guidance must be clear and compelling. A stronger EAC does not mean that the states will lose power in conducting elections. To the contrary, the authority of state election officials will grow with the creation of statewide voter databases, and their credibility will be enhanced by the new nonpartisan structure and professionalism.

**CONFLICT-OF-INTEREST RULES.** No matter what institutions are responsible for conducting elections, conflict-of-interest standards should be introduced for all federal, state, and local election officials, including some of the provisions in Colorado's new election law and of the Code of Conduct prepared by the International Institute for Democracy and Electoral Assistance (IDEA).[63] This Code of Conduct requires election administrators to avoid any activity, public or private, that might indicate support or even sympathy for a particular candidate, political party, or political tendency.

Election officials should be prohibited by federal and/or state laws from serving on any political campaign committee, making any public comments in support of a candidate, taking a public position on any ballot measure, soliciting campaign funds, or otherwise campaigning for or against a candidate for public office. A decision by a secretary of state to serve as co-chair of his or her party's presidential election committee would clearly violate these standards.

---

## Recommendations on Institutions

**6.1.1**  To undertake the new responsibilities recommended by this report and to build confidence in the administration of elections, Congress and the states should reconstitute election management institutions on a nonpartisan basis to make them more independent and effective. U.S. Election Assistance Commission members and each state's chief elections officer should be selected and be expected to act in a nonpartisan manner, and the institutions should have sufficient funding for research and training and to conduct the best elections possible. We believe the time has come to take politics as much as possible out of the institutions of election administration and to make these institutions nonpartisan.

**6.1.2**  Congress should approve legislation that would add a fifth member to the U.S. Election Assistance Commission, who would serve as the EAC's chairperson and who would be nominated by the President based on capability, integrity, and nonpartisanship. This would permit the EAC to be viewed more as nonpartisan than bipartisan and would improve its ability to make decisions. That person would be subject to Senate confirmation and would serve a single term of ten years. Each subsequent vacancy to the EAC should be filled with a person judged to be nonpartisan so that after a suitable period, all the members, and thus the institution, might be viewed as above politics.

**6.1.3**  States should prohibit senior election officials from serving or assisting political campaigns in a partisan way, other than their own campaigns in states where they are elected.

**6.1.4**  States should take additional actions to build confidence in the administration of elections by making existing election bodies as nonpartisan as possible within the constraints of each state's constitution. Among the ways this might be accomplished would be if the individuals who serve as the state's chief elections officer were chosen based on their capability, integrity, and nonpartisanship. The state legislatures would need to confirm these individuals by a two-thirds majority of one or both houses. The nominee should receive clear bipartisan support.

**6.1.5**  Each state's chief elections officer should, to the extent reasonably possible, ensure uniformity of voting procedures throughout the state, as with provisional ballots. Doing so will reduce the likelihood that elections are challenged in court.

---

## 6.2 POLL WORKER RECRUITMENT

For generations, civic-minded citizens, particularly seniors, have served as poll workers. The average age of poll workers is 72.[64] Poll workers generally are paid minimum wages for a 15-hour day. Not surprisingly, recruitment has proven more and more difficult. For the 2004 election, the United States needed 2 million poll workers, but it fell short by 500,000.

Effective administration of elections requires that poll workers have the capability and training needed to carry out complex procedures correctly, the skills to handle increasingly sophisticated voting technology, the personality and skills to interact with a diversity of people in a calm and friendly manner, and the energy to complete a very long and hard day of work on Election Day. Poll workers must administer complex voting procedures, which are often changed with each election. These procedures include issuing provisional ballots, checking voter identification in accordance with state law, and correctly counting the votes after the polling station closes. Poll workers must also set up voting machines, instruct voters to use these machines, and provide helpful service to voters, including to voters with disabilities and non-English speakers.



Commissioner Sharon Priest, Daniel Calingaert, Michael Alvarez, and Election Center Executive Director Doug Lewis (Rice University Photo/Jeff Fitlow)

A broad pool of potential recruits, drawn from all age groups, is needed to meet the demands made on today's poll workers. To adequately staff polling stations, states and local jurisdictions must offer better pay, training, and recognition for poll workers and recruit more citizens who have full-time jobs or are students. Recruitment of teachers would serve to spread knowledge of the electoral process, while recruitment of students would educate future voters and attract individuals who may serve as poll workers for decades to come.

Local election authorities should also consider providing incentives for more rigorous training. Guilford County, North Carolina, for example, initiated a "Precinct Officials Certification" program in cooperation with the local community college. The program requires 18 hours of class and a final exam. While voluntary, more than 80 percent of Guilford County's 636 permanent precinct officials completed the course. Certified officials receive an additional $35 per election in pay. Retention of officials has risen from roughly 75 percent to near 95 percent.

In addition, poll workers deserve greater recognition for their public service. States might establish a Poll Worker Appreciation Week and issue certificates to thank poll workers for their contribution to the democratic process.

Several states have passed laws to provide paid leave for state and local government workers who serve as poll workers on Election Day. A pilot program titled "Making Voting Popular" was implemented in 1998 in six counties surrounding the Kansas City metropolitan area to encourage employers to provide a paid "civic leave" day for employees who work as poll workers. Many states have introduced laws to encourage the recruitment of student poll workers. Partnered with experienced poll workers, student poll workers can learn about elections while contributing their technological skills.

It will be easier to recruit skilled poll workers if they are given flexibility in the terms of their service by working part of the day. Since a large proportion of voters arrive either at the beginning or the end of the day, it would make sense to hire more poll workers for those periods, although this is not now the case. Bringing poll workers in from other jurisdictions might also serve to provide partisan balance in jurisdictions where one party is dominant. Flexibility in terms of service by poll workers is often restricted by state laws. Where this is the case, states should amend their laws to allow part-day shifts for poll workers on Election Day and to permit state residents to staff polling stations in a different jurisdiction.

In addition, states might consider a new practice of recruiting poll workers in the same way that citizens are selected for jury duty. This practice is used in Mexico, where citizens are selected randomly to perform what they consider a civic obligation. About five times as many poll workers as needed are trained in Mexico, so that only the most skilled and committed are selected to serve as poll workers on Election Day. The process of training so many citizens serves the additional purpose of educating the public in voting procedures. This practice both reflects and contributes to a broad civic commitment to democracy.

---

### Recommendations on Poll Worker Recruitment

**6.2.1** States and local jurisdictions should allocate sufficient funds to pay poll workers at a level that would attract more technologically sophisticated and competent workers. Part-time workers should also be recruited for the beginning and the end of Election Day. States should amend their laws to allow shifts for part of the day for poll workers on Election Day.

**6.2.2** States and local jurisdictions should implement supplemental training and recognition programs for poll workers.

**6.2.3** To increase the number and quality of poll workers, the government and nonprofit and private employers should encourage their workers to serve as poll workers on Election Day without any loss of compensation, vacation time or personal time off. Special efforts should be made to enlist teachers and students as poll workers.

**6.2.4** Because some jurisdictions have large majorities of one party, which makes it hard to attract poll workers from other parties, local jurisdictions should allow poll workers from outside the jurisdiction.

**6.2.5** States should consider legislation to allow the recruitment of citizens as poll workers as is done for jury duty.

---



A long line of Ohio voters on Election Day 2004
(AP Photo/Mark Duncan)

## 6.3 POLLING STATION OPERATIONS

A visible problem on Election Day 2004 was long lines. This should have been anticipated because there was a surge in new registrations and people expected a close election, particularly in "battleground states." Still, too many polling stations were unprepared. While waiting until 4 a.m. to vote was an extreme case, too many polling stations experienced long lines at the beginning of the day when people went to work or at the day's end when they returned. Fast-food chains hire extra workers at lunchtime, but it apparently did not occur to election officials to hire more workers at the times when most people vote. Long lines were hardly the only problem; many polling stations had shortages of provisional ballots, machines malfunctioned, and there were too many inadequately trained workers on duty. Although most states ban campaigning within a certain distance of a polling station, other states or counties permit it, though many voters find it distasteful if not intimidating.

Problems with polling station operations, such as long lines, were more pronounced in some places than in others.[65] This at times gave rise to suspicions that the problems were due to discrimination or to partisan manipulation, when in fact the likely cause was a poor decision by election administrators. The U.S. Department of Justice's investigation into the allocation of voting machines in Ohio, for example, found that problems were due to administrative miscalculations, not to discrimination.[66]

The 2004 elections highlighted the importance of providing enough voting machines to each polling place. While voter turnout can be difficult to predict, the ratio of voters per machine can be estimated. Texas, for example, has issued an administrative rule to estimate the number of machines needed per precinct at different rates of voter turnout.[67]

The impression many voters get of the electoral process is partially shaped by their

TX_00001917

USA_00019558

experience at the polling station, and yet, not enough attention has been given to trying to make them "user-friendly." Elementary questions, which most businesses study to become more efficient and responsive to their customers, are rarely asked, let alone answered by election officials. Questions like: How long does it normally take for a citizen to vote? Would citizens prefer to go to a neighborhood precinct, or to a larger, more service-oriented but more distant "voting center"? How many and what kinds of complaints and problems do polling stations hear in an average day? How do they respond, and are voters satisfied with the response? How many citizens find electronic machines useful, and how many find them formidable? By answering these fundamental questions, we might determine ways to provide efficient and courteous service at polling locations

A simple way to compile useful information about problems voters face on Election Day would be to require that every voting station maintain a "log book" on Election Day to record all complaints from voters or observers. The log book would be signed by election observers at the end of the day to make sure that it has recorded all the complaints or problems. An analysis of the log books would help identify common problems and help design more efficient and responsive polling sites.

---

**Recommendations on Polling Station Operations**

**6.3.1**  Polling stations should be made user-friendly. One way to do so would be to forbid any campaigning within a certain distance of a polling station.

**6.3.2**  Polling stations should be required to maintain a "log-book" on Election Day to record all complaints. The books should be signed by election officials and observers and analyzed for ways to improve the voting process.

**6.3.3**  Polling stations should be organized in a way that citizens would not have to wait long before voting, and officials should be informed and helpful.

---

## 6.4  RESEARCH ON ELECTION MANAGEMENT

Despite the wealth of expertise and literature on U.S. elections and voting behavior, little research focuses on the administration or conduct of elections. Until the 2000 election stirred interest in the subject, we had no information on how often votes went uncounted. Today, we still do not know how many people are unable to vote because their name is missing from the registration list or their identification was rejected at the polls. We also have no idea about the level of fraud or the accuracy and completeness of voter registration lists.

To effectively address the challenges facing our election systems, we need to understand better how elections are administered. The log books and public reports on investigations on election fraud, described above, can provide some good raw material. But we need more systematic research to expand knowledge and stimulate needed improvements in U.S. election systems. Moreover, beyond the reforms needed today, U.S. election systems will need to adapt in the future to new technology and to social changes.



A North Dakota election judge on Election Day 2004 (AP Photo/Will Kincaid)

The Center for Election Systems at Kennesaw State University in Georgia is the first university center established to study election systems and to assist election administration. With funding from the state government, this Center develops standards for voting technology used in Georgia and provides an array of other services, such as testing all election equipment, providing training, building databases, and designing ballots for many counties. The Center thus provides critical services to state election authorities and supports constant improvements in election systems. Since election laws and procedures vary significantly, each state should consider supporting university centers for the study of elections.

In addition to research on technology, university election centers could assist state governments on issues of election law, management, and civic and voter education. They could assemble experts from different disciplines to assist state governments in reviewing election laws, improving administrative procedures, strengthening election management, and developing programs and materials to train poll workers.

Comparative research is also needed on electoral systems in different states, and national studies should be conducted on different elements of election administration and causes of voter participation. These studies might address such questions as: What factors stimulate or depress participation in elections? How do voters adapt to the introduction of new voting technologies? And what are the costs of conducting elections? Research on these and a host of other questions is needed at the national, state, and local levels, with findings shared and efforts coordinated. Moreover, federal, state, and private foundation funds are needed to generate the research our election systems require to effectively inform decision-making, to monitor and advance best practices, and to measure implementation and enforcement.[68]

---

**Recommendation on Research on Election Management**

**6.4.1** The Commission calls for continuing research on voting technology and election management so as to encourage continuous improvements in the electoral process.

---

## 6.5 COST OF ELECTIONS

Based on the limited available information, the cost of elections appears to vary significantly by state. Wyoming, for example, spent $2.15 per voter for the 2004 elections, while California spent $3.99 per voter.[69] Information on the cost of elections is difficult to obtain, because both state and local authorities are involved in running elections, and local authorities often neglect to track what they spend on elections. At the county level, elections typically are run by the county clerk and recorder, who rarely keeps track of the staff time and office resources allocated to elections as opposed to other office responsibilities.

Election administration expenditures in the United States are on the low end of the range of what advanced democracies spend on elections. Among advanced democracies, expenditures on election administration range from lows of $2.62 in the United Kingdom and $3.07 in France for national legislative elections, through a midrange of $4.08 in Spain and $5.68 in Italy, to a high of $9.30 in Australia and $9.51 in Canada.[70] While larger expenditures provide no guarantee of greater quality in election administration, they tend to reflect the priority given to election administration. The election systems of Australia and Canada are the most expensive but are also considered among the most effective and modern election systems in the world. Both local and state governments should track and report the cost of elections per registered voter. This data would be very important in offering comparisons on alternative and convenience voting.

---

**Recommendations on Cost of Elections**

**6.5.1** As elections are a bedrock of our nation's democracy, they should receive high priority in the allocation of government resources at all levels. Local jurisdictions, states, and the Congress should treat elections as a high priority in their budgets.

**6.5.2** Both local and state governments should track and report the cost of elections per registered voter.

---

USA_00019561



(AP Photo/Hidajet Delic)

TX_00001921

USA_00019562

# 7. Responsible Media Coverage

The media's role in elections is of great consequence. Effective media coverage contributes substantially to the electoral process by informing citizens about the choices they face in the elections and about the election results. In contrast, irresponsible media coverage weakens the quality of election campaigns and the public's confidence in the electoral process.

## 7.1 MEDIA ACCESS FOR CANDIDATES

More than $1.6 billion was spent on television ads in 2004 by candidates, parties, and independent groups.[71] This was a record for any campaign year and double the amount spent in the 2000 presidential election.

The pressure to raise money to pay for TV ads has tilted the competitive playing field in favor of well-financed candidates and has created a barrier to entry in politics. Moreover, TV ads tend to reduce political discourse to its least attractive elements—campaign spots are often superficial and negative. This has a significant impact on the quality of campaigns, as television is the primary source of campaign information for about half of all Americans.[72]

Broadcasters receive free licenses to operate on our publicly owned airwaves in exchange for a pledge to serve the public interest. At the heart of this public interest obligation is the need to inform the public about the critical issues that will be decided in elections.

In 1998, a White House advisory panel recommended that broadcasters voluntarily air at least five minutes of candidate discourse every night in the month preceding elections. The goal of this "5/30 standard" was to give television viewers a chance to see candidates in nightly forums that are more substantive than the political ads that flood the airwaves in the final weeks of election campaigns. National networks were encouraged to broadcast a nightly mix of interviews, mini-debates, and issue statements by presidential candidates, and local stations were asked to do the same for candidates in federal, state, and local races. Complete editorial control over the forums for candidate discourse was, of course, left to the national networks and local stations, which would decide what campaigns to cover, what formats to use, and when to broadcast the forums.

In 2000, about 103 television stations pledged to provide at least five minutes of campaign coverage every night in the final month of the election campaign, yet they often fell short of the 5/30 standard. Local news broadcasts of these 5/30 stations provided coverage, on average, of only two minutes and 17 seconds per night of candidate discourse.[73] On the thousand-plus stations that did not pledge to meet the 5/30 standard, coverage of candidate discourse was minimal.

During the 2004 campaign, substantive coverage of candidate discourse was still modest:[74]

- Little attention was given to state and local campaigns. About 92 percent of the election coverage by the national television networks was devoted to the presidential race. Less than 2 percent was devoted to U.S. House or U.S. Senate races.

- The presidential campaign also dominated local news coverage, but the news focuses on the horse race between candidates rather than on important

TX_00001922

USA_00019563

issues facing Americans. While 55 percent of local news broadcasts contained a story about the presidential election, only 8 percent had one about a local race. About 44 percent of the campaign coverage focused on campaign strategy, while less than one-third addressed the issues.

- Local campaign coverage was dwarfed by other news. Eight times more local broadcast coverage went to stories about accidental injuries, and 12 times more coverage went to sports and weather than to all local races combined.

- Only 24 percent of the local TV industry pledged to meet the "5/30" standard.

Notwithstanding the dramatic expansion of news available on cable television, broadcasters can and should do more to improve their coverage of campaign issues. Some propose to require broadcasters to provide free air time to candidates, but others are concerned that it might lead toward public financing of campaigns or violate the First Amendment.

---

### Recommendations on Media Access for Candidates

**7.1.1** The Commission encourages national networks and local TV stations to provide at least five minutes of candidate discourse every night in the month leading up to elections.

**7.1.2** The Commission encourages broadcasters to continue to offer candidates short segments of air time to make issue statements, answer questions, or engage in mini-debates.

**7.1.3** Many members of the Commission support the idea that legislation should be passed to require broadcasters to give a reasonable amount of free air time to political candidates, along the lines of the provisions of the Our Democracy, Our Airwaves Act of 2003 (which was introduced as S.1497 in the 108th Congress).

---

## 7.2  MEDIA PROJECTIONS OF ELECTION RESULTS

For decades, early projections of presidential election results have diminished participation in the electoral process. Projections of Lyndon Johnson's victory in 1964 came well before the polls closed in the West. The same occurred in 1972 and in 1980. In all of these cases, candidates further down the ballot felt the effect. In 1980, the estimated voter turnout was about 12 percent lower among those who had heard the projections and not yet voted as compared with those who had not heard the projections.[75]

On Election Night in 2000, the major television news organizations — ABC, CBS, NBC, CNN, and Fox — made a series of dramatic journalistic mistakes. While polls were still open in Florida's panhandle, they projected that Vice President Gore had won the state. They later reversed their projection and predicted that Governor Bush would win Florida and, with it, the presidency. Gore moved to concede the election, beginning with a call to Bush. Gore later withdrew his concession, and the news organizations had to retract their projection of Bush's victory. The first set of mistakes may have influenced voters in Florida and in other states where the polls were still open. The second set of mistakes irretrievably influenced public perceptions of the apparent victor in the election, which then affected the subsequent controversy over the outcome in Florida.

TX_00001923

USA_00019564