16    CRAWFORD *v.* MARION COUNTY ELECTION BD.

Opinion of STEVENS, J.

that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote.

The severity of that burden is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted. To do so, however, they must travel to the circuit court clerk's office within 10 days to execute the required affidavit. It is unlikely that such a requirement would pose a constitutional problem unless it is wholly unjustified. And even assuming that the burden may not be justified as to a few voters,[19] that conclusion is by no means sufficient to establish petitioners' right to the relief they seek in this litigation.

## IV

Given the fact that petitioners have advanced a broad attack on the constitutionality of SEA 483, seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion. Only a few weeks ago we held that the Court of Appeals for the Ninth Circuit had failed to give appropriate weight to the magnitude of that burden when it sustained a preelection, facial attack on a Washington statute regulating that State's primary election procedures. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. ___ (2008). Our reasoning in that case applies with added force to the arguments advanced by petitioners in these cases.

---

[19]Presumably most voters casting provisional ballots will be able to obtain photo identifications before the next election. It is, however, difficult to understand why the State should require voters with a faith-based objection to being photographed to cast provisional ballots subject to later verification in every election when the BMV is able to issue these citizens special licenses that enable them to drive without any photo identification. See Ind. Code Ann. 9-24-11-5(c) (West Supp. 2007).

TX_00002525

USA_00020166

Cite as: 553 U. S. ____ (2008)     17

Opinion of STEVENS, J.

Petitioners ask this Court, in effect, to perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity. Petitioners urge us to ask whether the State's interests justify the burden imposed on voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting. But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified.

First, the evidence in the record does not provide us with the number of registered voters without photo identification; Judge Barker found petitioners' expert's report to be "utterly incredible and unreliable." 458 F. Supp. 2d, at 803. Much of the argument about the numbers of such voters comes from extrarecord, postjudgment studies, the accuracy of which has not been tested in the trial court.

Further, the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification. The record includes depositions of two case managers at a day shelter for homeless persons and the depositions of members of the plaintiff organizations, none of whom expressed a personal inability to vote under SEA 483. A deposition from a named plaintiff describes the difficulty the elderly woman had in obtaining an identification card, although her testimony indicated that she intended to return to the BMV since she had recently obtained her birth certificate and that she was able to pay the birth certificate fee. App. 94.

Judge Barker's opinion makes reference to six other elderly named plaintiffs who do not have photo identifications, but several of these individuals have birth certifi-

TX_00002526
JA_005285

TX_00002526

USA_00020167

cates or were born in Indiana and have not indicated how difficult it would be for them to obtain a birth certificate. 458 F. Supp. 2d, at 797–799. One elderly named plaintiff stated that she had attempted to obtain a birth certificate from Tennessee, but had not been successful, and another testified that he did not know how to obtain a birth certificate from North Carolina. The elderly in Indiana, however, may have an easier time obtaining a photo identification card than the nonelderly, see n. 17, *supra,* and although it may not be a completely acceptable alternative, the elderly in Indiana are able to vote absentee without presenting photo identification.

The record says virtually nothing about the difficulties faced by either indigent voters or voters with religious objections to being photographed. While one elderly man stated that he did not have the money to pay for a birth certificate, when asked if he did not have the money or did not wish to spend it, he replied, "both." App. 211–212. From this limited evidence we do not know the magnitude of the impact SEA 483 will have on indigent voters in Indiana. The record does contain the affidavit of one homeless woman who has a copy of her birth certificate, but was denied a photo identification card because she did not have an address. *Id.,* at 67. But that single affidavit gives no indication of how common the problem is.

In sum, on the basis of the record that has been made in this litigation, we cannot conclude that the statute imposes "excessively burdensome requirements" on any class of voters. See *Storer* v. *Brown,* 415 U. S. 724, 738 (1974).[20]

---

[20] Three comments on JUSTICE SOUTER's speculation about the non-trivial burdens that SEA 483 may impose on "tens of thousands" of Indiana citizens, *post,* at 1 (dissenting opinion), are appropriate. First, the fact that the District Judge estimated that when the statute was passed in 2005, 43,000 citizens did not have photo identification, see 458 F. Supp. 2d 775, 807 (SD Ind. 2006), tells us nothing about the number of free photo identification cards issued since then. Second, the

Opinion of STEVENS, J.

A facial challenge must fail where the statute has a "'plainly legitimate sweep.'" *Washington State Grange*, 552 U. S., at ___ (quoting *Washington* v. *Glucksberg*, 521 U. S. 702, 739–740, and n. 7 (1997) (STEVENS, J., concurring in judgments)). When we consider only the statute's broad application to all Indiana voters we conclude that it "imposes only a limited burden on voters' rights." *Burdick*, 504 U. S., at 439. The "'precise interests'" advanced by the State are therefore sufficient to defeat petitioners' facial challenge to SEA 483. *Id.*, at 434.

Finally we note that petitioners have not demonstrated that the proper remedy—even assuming an unjustified burden on some voters—would be to invalidate the entire statute. When evaluating a neutral, nondiscriminatory regulation of voting procedure, "[w]e must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S.

---

fact that public transportation is not available in some Indiana counties tells us nothing about how often elderly and indigent citizens have an opportunity to obtain a photo identification at the BMV, either during a routine outing with family or friends or during a special visit to the BMV arranged by a civic or political group such as the League of Women Voters or a political party. Further, nothing in the record establishes the distribution of voters who lack photo identification. To the extent that the evidence sheds any light on that issue, it suggests that such voters reside primarily in metropolitan areas, which are served by public transportation in Indiana (the majority of the plaintiffs reside in Indianapolis and several of the organizational plaintiffs are Indianapolis organizations). Third, the indigent, elderly, or disabled need not "journey all the way to their county seat each time they wish to exercise the franchise," *post*, at 29, if they obtain a free photo identification card from the BMV. While it is true that obtaining a birth certificate carries with it a financial cost, the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates. Supposition based on extensive Internet research is not an adequate substitute for admissible evidence subject to cross-examination in constitutional adjudication.

TX_00002528
JA_005287

TX_00002528

USA_00020169

20        CRAWFORD v. MARION COUNTY ELECTION BD.

Opinion of STEVENS, J.

320, 329 (2006) (quoting *Regan* v. *Time, Inc.*, 468 U. S. 641, 652 (1984) (plurality opinion))" *Washington State Grange*, 552 U. S., at ___ (slip op., at 8).

V

In their briefs, petitioners stress the fact that all of the Republicans in the General Assembly voted in favor of SEA 483 and the Democrats were unanimous in opposing it.[21] In her opinion rejecting petitioners' facial challenge, Judge Barker noted that the litigation was the result of a partisan dispute that had "spilled out of the state house into the courts." 458 F. Supp. 2d, at 783. It is fair to infer that partisan considerations may have played a significant role in the decision to enact SEA 483. If such considerations had provided the only justification for a photo identification requirement, we may also assume that SEA 483 would suffer the same fate as the poll tax at issue in *Harper.*

But if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators. The state interests identified as justifications for SEA 483 are both neutral and sufficiently strong to require us to reject petitioners' facial attack on the statute. The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting "the integrity and reliability of the electoral process." *Anderson,* 460 U. S., at 788, n. 9.

---

[21] Brief for Petitioners in No. 07–25, pp. 6–9. Fifty-two Republican House members voted for the bill, 45 Democrats voted against, and 3 Democrats were excused from voting. 3 Journal of the House of Representatives of Indiana, Roll Call 259 (Mar. 21, 2005). In the Senate, 33 Republican Senators voted in favor and 17 Democratic Senators voted against. 3 Journal of the Senate of Indiana, Roll Call 417 (Apr. 12, 2005).

TX_00002529

USA_00020170

Cite as: 553 U. S. ____ (2008)          21

Opinion of STEVENS, J.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

TX_00002530

USA_00020171

Cite as: 553 U. S. ____ (2008)          1

SCALIA, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

Nos. 07–21 and 07–25

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                                  *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                                  *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE SCALIA, with whom JUSTICE THOMAS and JUS-
TICE ALITO join, concurring in the judgment.

The lead opinion assumes petitioners' premise that the
voter-identification law "may have imposed a special
burden on" some voters, *ante,* at 16, but holds that peti-
tioners have not assembled evidence to show that the
special burden is severe enough to warrant strict scrutiny,
*ante,* at 18–19. That is true enough, but for the sake of
clarity and finality (as well as adherence to precedent), I
prefer to decide these cases on the grounds that petition-
ers' premise is irrelevant and that the burden at issue is
minimal and justified.

To evaluate a law respecting the right to vote—whether
it governs voter qualifications, candidate selection, or the
voting process—we use the approach set out in *Burdick* v.
*Takushi,* 504 U. S. 428 (1992). This calls for application of
a deferential "important regulatory interests" standard for
nonsevere, nondiscriminatory restrictions, reserving strict

TX_00002531

USA_00020172

2    CRAWFORD *v.* MARION COUNTY ELECTION BD.

scrutiny for laws that severely restrict the right to vote. *Id.,* at 433–434 (internal quotation marks omitted). The lead opinion resists the import of *Burdick* by characterizing it as simply adopting "the balancing approach" of *Anderson* v. *Celebrezze,* 460 U. S. 780 (1983) (majority opinion of STEVENS, J.). See *ante,* at 6; see also *ante,* at 6–7, n. 8. Although *Burdick* liberally quoted *Anderson, Burdick* forged *Anderson*'s amorphous "flexible standard" into something resembling an administrable rule. See *Burdick, supra,* at 434. Since *Burdick,* we have repeatedly reaffirmed the primacy of its two-track approach. See *Timmons* v. *Twin Cities Area New Party,* 520 U. S. 351, 358 (1997); *Clingman* v. *Beaver,* 544 U. S. 581, 586–587 (2005). "[S]trict scrutiny is appropriate only if the burden is severe." *Id.,* at 592. Thus, the first step is to decide whether a challenged law severely burdens the right to vote. Ordinary and widespread burdens, such as those requiring "nominal effort" of everyone, are not severe. See *id.,* at 591, 593–597. Burdens are severe if they go beyond the merely inconvenient. See *Storer* v. *Brown,* 415 U. S. 724, 728–729 (1974) (characterizing the law in *Williams* v. *Rhodes,* 393 U. S. 23 (1968), as "severe" because it was "so burdensome" as to be "'virtually impossible'" to satisfy).

Of course, we have to identify a burden before we can weigh it. The Indiana law affects different voters differently, *ante,* at 14–16, but what petitioners view as the law's several light and heavy burdens are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters. To vote in person in Indiana, *everyone* must have and present a photo identification that can be obtained for free. The State draws no classifications, let alone discriminatory ones, except to establish *optional* absentee and provisional balloting for certain poor, elderly, and institutionalized voters and for religious objectors. Nor are voters who already have photo identifications exempted from the burden, since those

TX_00002532
JA_005291

TX_00002532

USA_00020173

Cite as: 553 U. S. ____ (2008)  3

SCALIA, J., concurring in judgment

voters must maintain the accuracy of the information displayed on the identifications, renew them before they expire, and replace them if they are lost.

The Indiana photo-identification law is a generally applicable, nondiscriminatory voting regulation, and our precedents refute the view that individual impacts are relevant to determining the severity of the burden it imposes. In the course of concluding that the Hawaii laws at issue in *Burdick* "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote," 504 U. S., at 439, we considered the laws and their reasonably foreseeable effect on *voters generally.* See *id.,* at 436–437. We did not discuss whether the laws had a severe effect on Mr. Burdick's own right to vote, given his particular circumstances. That was essentially the approach of the *Burdick* dissenters, who would have applied strict scrutiny to the laws because of their effect on "some voters." See *id.,* at 446 (KENNEDY, J., dissenting); see also *id.,* at 448 ("The majority's analysis ignores the inevitable and significant burden a write-in ban imposes upon *some individual voters* . . . ." (emphasis added)). Subsequent cases have followed *Burdick*'s generalized review of nondiscriminatory election laws. See, *e.g., Timmons, supra,* at 361–362; *Clingman, supra,* at 590–591, 592–593. Indeed, *Clingman*'s holding that burdens are not severe if they are ordinary and widespread would be rendered meaningless if a single plaintiff could claim a severe burden.

Not all of our decisions predating *Burdick* addressed whether a challenged voting regulation severely burdened the right to vote, but when we began to grapple with the magnitude of burdens, we did so categorically and did not consider the peculiar circumstances of individual voters or candidates. See, *e.g., Jenness* v. *Fortson,* 403 U. S. 431, 438–441 (1971). Thus, in *Rosario* v. *Rockefeller,* 410 U. S. 752 (1973), we did not link the State's interest in inhibit-

TX_00002533

USA_00020174

SCALIA, J., concurring in judgment

ing party raiding with the petitioners' own circumstances.
See *id.*, at 760–762. And in *Storer* v. *Brown, supra,* we
observed that the severity of the burden of a regulation
should be measured according to its "nature, extent, and
*likely impact.*" *Id.*, at 738 (emphasis added). We therefore
instructed the District Court to decide on remand whether
"a *reasonably diligent* independent candidate [could] be
expected to satisfy the signature requirements, or will it
be only rarely that the unaffiliated candidate will succeed
in getting on the ballot?" *Id.*, at 742 (emphasis added).
Notably, we did not suggest that the District Court should
consider whether one of the petitioners would actually find
it more difficult than a reasonably diligent candidate to
obtain the required signatures. What mattered was the
general assessment of the burden.

Insofar as our election-regulation cases rest upon the
requirements of the Fourteenth Amendment, see *Ander-
son, supra,* at 786, n. 7, weighing the burden of a nondis-
criminatory voting law upon each voter and concomitantly
requiring exceptions for vulnerable voters would effec-
tively turn back decades of equal-protection jurisprudence.
A voter complaining about such a law's effect on him has
no valid equal-protection claim because, without proof of
discriminatory intent, a generally applicable law with
disparate impact is not unconstitutional. See, *e.g., Wash-
ington* v. *Davis,* 426 U. S. 229, 248 (1976). The Fourteenth
Amendment does not regard neutral laws as invidious
ones, *even when their burdens purportedly fall dispropor-
tionately on a protected class. A fortiori* it does not do so
when, as here, the classes complaining of disparate impact
are not even protected.* See *Harris* v. *McRae,* 448 U. S.

_____

*A number of our early right-to-vote decisions, purporting to rely
upon the Equal Protection Clause, strictly scrutinized nondiscrimina-
tory voting laws requiring the payment of fees. See, *e.g., Harper* v.
*Virginia Bd. of Elections,* 383 U. S. 663, 670 (1966) (poll tax); *Bullock* v.
*Carter,* 405 U. S. 134, 145 (1972) (ballot-access fee); *Lubin* v. *Panish,*

TX_00002534

USA_00020175

SCALIA, J., concurring in judgment

297, 323, and n. 26 (1980) (poverty); *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442 (1985) (disability); *Gregory* v. *Ashcroft*, 501 U. S. 452, 473 (1991) (age); cf. *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872, 878–879 (1990) (First Amendment does not require exceptions for religious objectors to neutral rules of general applicability).

Even if I thought that *stare decisis* did not foreclose adopting an individual-focused approach, I would reject it as an original matter. This is an area where the dos and don'ts need to be known in advance of the election, and voter-by-voter examination of the burdens of voting regulations would prove especially disruptive. A case-by-case approach naturally encourages constant litigation. Very few new election regulations improve everyone's lot, so the potential allegations of severe burden are endless. A State reducing the number of polling places would be open to the complaint it has violated the rights of disabled voters who live near the closed stations. Indeed, it may even be the case that some laws already on the books are especially burdensome for some voters, and one can predict lawsuits demanding that a State adopt voting over the Internet or expand absentee balloting.

That sort of detailed judicial supervision of the election process would flout the Constitution's express commitment of the task to the States. See Art. I, §4. It is for state legislatures to weigh the costs and benefits of possible changes to their election codes, and their judgment must prevail unless it imposes a severe and unjustified overall burden upon the right to vote, or is intended to

---

415 U. S. 709, 716–719 (1974) (ballot-access fee). To the extent those decisions continue to stand for a principle that *Burdick* v. *Takushi,* 504 U. S. 428 (1992), does not already encompass, it suffices to note that we have never held that legislatures must calibrate *all* election laws, even those totally unrelated to money, for their impacts on poor voters or must otherwise accommodate wealth disparities.

TX_00002535

USA_00020176

6        CRAWFORD *v.* MARION COUNTY ELECTION BD.

disadvantage a particular class. Judicial review of their handiwork must apply an objective, uniform standard that will enable them to determine, *ex ante*, whether the burden they impose is too severe.

The lead opinion's record-based resolution of these cases, which neither rejects nor embraces the rule of our precedents, provides no certainty, and will embolden litigants who surmise that our precedents have been abandoned. There is no good reason to prefer that course.

\*        \*        \*

The universally applicable requirements of Indiana's voter-identification law are eminently reasonable. The burden of acquiring, possessing, and showing a free photo identification is simply not severe, because it does not "even represent a significant increase over the usual burdens of voting." *Ante*, at 15. And the State's interests, *ante*, at 7–13, are sufficient to sustain that minimal burden. That should end the matter. That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.

TX_00002536

USA_00020177

Cite as: 553 U. S. \_\_\_\_ (2008)    1

SOUTER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

Nos. 07–21 and 07–25

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                          *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                          *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins,
dissenting.

Indiana's "Voter ID Law"[1] threatens to impose nontriv-
ial burdens on the voting right of tens of thousands of the
State's citizens, see *ante*, at 14–15 (lead opinion), and a
significant percentage of those individuals are likely to be
deterred from voting, see *ante*, at 15–16. The statute is
unconstitutional under the balancing standard of *Burdick*
v. *Takushi*, 504 U. S. 428 (1992): a State may not burden
the right to vote merely by invoking abstract interests, be
they legitimate, see *ante*, at 7–13, or even compelling, but
must make a particular, factual showing that threats to
its interests outweigh the particular impediments it has
imposed. The State has made no such justification here,
and as to some aspects of its law, it has hardly even tried.
I therefore respectfully dissent from the Court's judgment

---

[1] Senate Enrolled Act No. 483, 2005 Ind. Acts p. 2005.

TX_00002537

USA_00020178

SOUTER, J., dissenting

sustaining the statute.[2]

## I

Voting-rights cases raise two competing interests, the one side being the fundamental right to vote. See *Burdick, supra,* at 433 ("It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure'" (quoting *Illinois Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 184 (1979)); see also *Purcell* v. *Gonzalez,* 549 U. S. 1, 3–4 (2006) *(per curiam); Dunn* v. *Blumstein,* 405 U. S. 330, 336 (1972); *Reynolds* v. *Sims,* 377 U. S. 533, 561–562 (1964); *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886). The Judiciary is obliged to train a skeptical eye on any qualification of that right. See *Reynolds, supra,* at 562 ("Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized").

As against the unfettered right, however, lies the "[c]ommon sense, as well as constitutional law . . . that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick, supra,* at 433 (quoting *Storer* v. *Brown,* 415 U. S. 724, 730 (1974)); see also *Burdick, supra,* at 433 ("Election laws will invariably impose some burden upon individual voters").

Given the legitimacy of interests on both sides, we have avoided pre-set levels of scrutiny in favor of a sliding-scale balancing analysis: the scrutiny varies with the effect of the regulation at issue. And whatever the claim, the

---

[2] I agree with the lead opinion that the petitioners in No. 07–25 have standing and that we therefore need not determine whether the remaining petitioners also have standing. See *ante,* at 5, n. 7.

TX_00002538

USA_00020179

SOUTER, J., dissenting

Court has long made a careful, ground-level appraisal both of the practical burdens on the right to vote and of the State's reasons for imposing those precise burdens. Thus, in *Burdick*:

"A court considering [such] a challenge . . . must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" 504 U. S., at 434 (quoting *Anderson* v. *Celebrezze*, 460 U. S. 780, 789 (1983)).

The lead opinion does not disavow these basic principles. See *ante*, at 6–7 (discussing *Burdick*); see also *ante*, at 7 ("However slight [the] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation" (internal quotation marks omitted)). But I think it does not insist enough on the hard facts that our standard of review demands.

II

Under *Burdick*, "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights," 504 U. S., at 434, upon an assessment of the "character and magnitude of the asserted [threatened] injury," *ibid.* (quoting *Anderson*, *supra*, at 789), and an estimate of the number of voters likely to be affected.

A

The first set of burdens shown in these cases is the travel costs and fees necessary to get one of the limited variety of federal or state photo identifications needed to

TX_00002539

USA_00020180

4          CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

cast a regular ballot under the Voter ID Law.[3]  The travel
is required for the personal visit to a license branch of the
Indiana Bureau of Motor Vehicles (BMV), which is de-
manded of anyone applying for a driver's license or non-
driver photo identification.  See *Indiana Democratic Party
v. Rokita*, 458 F. Supp. 2d 775, 791 (SD Ind. 2006).  The
need to travel to a BMV branch will affect voters according
to their circumstances, with the average person probably
viewing it as nothing more than an inconvenience.  Poor,
old, and disabled voters who do not drive a car, however,
may find the trip prohibitive,[4] witness the fact that the

---

[3]Under Indiana's law, an ID does not qualify as proof of identification
unless it "satisfies all [of] the following":

"(1) The document shows the name of the individual to whom the
document was issued, and the name conforms to the name in the
individual's voter registration record.

"(2) The document shows a photograph of the individual to whom the
document was issued.

"(3) The document includes an expiration date, and the document:

"(A) is not expired; or

"(B) expired after the date of the most recent general election.

"(4) The document was issued by the United States or the state of
Indiana."  Ind. Code Ann. §3–5–2–40.5 (West 2006).

[4]The State asserts that the elderly and disabled are adequately ac-
commodated through their option to cast absentee ballots, and so any
burdens on them are irrelevant.  See Brief for Respondents in No. 07–
25, p. 41.  But as petitioners' *amici* AARP and the National Senior
Citizens Law Center point out, there are crucial differences between
the absentee and regular ballot.  Brief for AARP et al. as *Amici Curiae*
12–16.  Voting by absentee ballot leaves an individual without the
possibility of receiving assistance from poll workers, and thus increases
the likelihood of confusion and error.  More seriously, as the Supreme
Court of Indiana has recognized, Indiana law "treats absentee voters
differently from the way it treats Election Day voters," in the important
sense that "an absentee ballot may not be recounted in situations
where clerical error by an election officer rendered it invalid."  *Horse-
man v. Keller*, 841 N. E. 2d 164, 171 (2006).  The State itself notes that
"election officials routinely reject absentee ballots on suspicion of
forgery."  Brief for Respondents in No. 07–25, p. 62.  The record indi-
cates that voters in Indiana are not unaware of these risks.  One

TX_00002540

USA_00020181

Cite as: 553 U. S. ____ (2008)          5

BMV has far fewer license branches in each county than
there are voting precincts.[5]  Marion County, for example,
has over 900 active voting precincts, see Brief for Respon-
dents in No. 07–21, p. 4,[6] yet only 12 BMV license
branches;[7] in Lake County, there are 565 active voting
precincts, see n. 6, *supra*, to match up with only 8 BMV
locations;[8] and Allen County, with 309 active voting pre-
cincts, see *ibid.*, has only 3 BMV license branches.[9]  The
same pattern holds in counties with smaller populations.
Brown County has 12 active voter precincts, see *ibid.*, and
only one BMV office;[10] while there were 18 polling places
available in Fayette County's 2007 municipal primary,[11]

---

elderly affiant in the District Court testified: "I don't trust [the absen-
tee] system. . . . Because a lot of soldiers vote like that and their votes
wasn't counted in the last election according to what I read, absentee."
App. 209 (deposition of David Harrison).

   It is one thing (and a commendable thing) for the State to make
absentee voting available to the elderly and disabled; but it is quite
another to suggest that, because the more convenient but less reliable
absentee ballot is available, the State may freely deprive the elderly
and disabled of the option of voting in person.

   [5] Under Indiana law, county executives must locate a polling place
within five miles of the closest boundary of each voting precinct, and,
with limited exceptions, no precinct may cover more than 1,200 active
voters at the time it is established.  See Brief for Respondents in No.
07–21, p. 3 (citing Ind. Code Ann. §§3–11–8–3(b), 3–11–1.5–3).  The
result is that the number of polling places tends to track the number of
voting precincts in a county.  In Henry County, for example, there are
42 active precincts, see n. 6, *infra*, and 42 polling places have been
approved for the 2008 elections, see n. 13, *infra*.

   [6] See also Count of Active Precincts by County, online at
http://www.in.gov/sos/pdfs/Precincts_by_County_and_State_022706.pdf
(all Internet materials as visited Apr. 21, 2008, and available in Clerk
of Court's case file).

   [7] See Marion County License Branches, http://www.in.gov/bmv/
3134.htm.

   [8] See Lake County, http://www.in.gov/bmv/3150.htm.

   [9] See Allen County, http://www.in.gov/bmv/2954.htm.

   [10] See Brown County, http://www.in.gov/bmv/3302.htm.

   [11] See   http://www.co.fayette.in.us/2007%20polling_locations_munic.

TX_00002541

USA_00020182

there was only 1 BMV license branch;[12] and Henry County, with 42 polling places approved for 2008 elections,[13] has only 1 BMV office.

The burden of traveling to a more distant BMV office rather than a conveniently located polling place is probably serious for many of the individuals who lack photo identification.[14] They almost certainly will not own cars, see Brief for Current and Former State Secretaries of State as *Amici Curiae* 11, and public transportation in Indiana is fairly limited. According to a report published by Indiana's Department of Transportation in August 2007, 21 of Indiana's 92 counties have no public transportation system at all,[15] and as of 2000, nearly 1 in every 10

---

htm.

[12] See Fayette County, http://www.in.gov/bmv/3246.htm.

[13] See News Release, Henry County, Indiana, Polling Places Approved for the 2008 Elections, http://www.henryco.net/cm/node/52.

[14] The travel burdens might, in the future, be reduced to some extent by Indiana's commendable "BMV2You" mobile license branch, which will travel across the State for an average of three days a week, and provide BMV services (including ID services). See http://www.in.gov/bmv/3554.htm. The program does not count in my analysis, however, because the program was only recently opened in August 2007, see Indiana BMV Opens License Branch at State Fair, http://www.in.gov/newsroom.htm?detailContent=93_10400.htm, and its long-term service schedule has yet to be determined.

[15] Indiana Public Transit: Annual Report 2006, p. 29, http://www.in.gov/indot/files/INDOT_2006.pdf (hereinafter Annual Report). The 21 counties with no public transportation, according to the study, are: Adams, Blackford, Brown, Carroll, Clay, De Kalb, Gibson, Jennings, Lagrange, Parke, Perry, Posey, Putnam, Rush, Spencer, Steuben, Tipton, Vermillion, Warren, Warrick, and Whitley Counties. See *ibid.*

A Website of the American Public Transportation Association, which compiles public transit information across the States, confirms that each of those 21 counties lacks any public transportation offerings, and in fact adds another 13 counties to this category: Boone, Decatur, Fayette, Fulton, Hancock, Hendricks, Huntington, Miami, Morgan, Noble, Pike, Shelby, and Wells. See Transit Systems in Indiana, http://www.publictransportation.org/systems/state.asp?state=IN#A44.

TX_00002542

USA_00020183

Cite as: 553 U. S. ____ (2008)          7

SOUTER, J., dissenting

voters lived within 1 of these 21 counties.[16]  Among the
counties with some public system, 21 provide service only
within certain cities, and 32 others restrict public trans-
portation to regional county service, leaving only 18 that
offer countywide public transportation, see n. 15, *supra*.
State officials recognize the effect that travel costs can
have on voter turnout, as in Marion County, for example,
where efforts have been made to "establis[h] most polling
places in locations even more convenient than the statu-
tory minimum," in order to "provid[e] for neighborhood
voting." Brief for Respondents in No. 07–21, pp. 3–4.

Although making voters travel farther than what is
convenient for most and possible for some does not amount
to a "severe" burden under *Burdick*, that is no reason to
ignore the burden altogether. It translates into an obvious
economic cost (whether in work time lost, or getting and
paying for transportation) that an Indiana voter must bear
to obtain an ID.

For those voters who can afford the roundtrip, a second
financial hurdle appears: in order to get photo identifica-
tion for the first time, they need to present "'a birth cer-
tificate, a certificate of naturalization, U. S. veterans
photo identification, U. S. military photo identification, or
a U. S. passport.'" *Ante*, at 14, n. 16 (lead opinion) (quot-
ing Ind. Admin. Code, tit. 140, §7–4–3 (2008)). As the lead
opinion says, the two most common of these documents
come at a price: Indiana counties charge anywhere from
$3 to $12 for a birth certificate (and in some other States
the fee is significantly higher), see *ante*, at 14, n. 16, and

_____

The discrepancy appears to arise, in part, from the fact that the Ameri-
can Public Transportation Association has not counted demand re-
sponse systems that have been established in at least 6 of these 13
counties. See Annual Report 36, 50, 56, 96, 110, 144.

[16] In 2000, approximately 9% of Indiana's population lived within 1 of
these 21 counties.  See County and City Extra: Special Decennial
Census Edition 169, 176 (D. Gaquin & K. DeBrandt eds. 2002).

TX_00002543

USA_00020184

8          CRAWFORD *v.* MARION COUNTY ELECTION BD.

that same price must usually be paid for a first-time pass-
port, since a birth certificate is required to prove U. S.
citizenship by birth.  The total fees for a passport, more-
over, are up to about $100.[17]  So most voters must pay at
least one fee to get the ID necessary to cast a regular
ballot.[18]  As with the travel costs, these fees are far from
shocking on their face, but in the *Burdick* analysis it
matters that both the travel costs and the fees are dispro-
portionately heavy for, and thus disproportionately likely
to deter, the poor, the old, and the immobile.

### B

To be sure, Indiana has a provisional-ballot exception to
the ID requirement for individuals the State considers
"indigent"[19] as well as those with religious objections to
being photographed, see *ante*, at 15 (lead opinion), and
this sort of exception could in theory provide a way around
the costs of procuring an ID.  But Indiana's chosen excep-
tion does not amount to much relief.

---

[17] See Department of State, How to Apply in Person for a Passport,
http://travel.state.gov/passport/get/first/first_830.html; Department of
State, Passport Fees (Feb. 1, 2008), http://travel.state.gov/passport/
get/fees/fees_837.html (total fees of $100 for a passport book and $45 for
a passport card for individuals 16 and older).

[18] The lead opinion notes that "the record does not provide even a
rough estimate of how many indigent voters lack copies of their birth
certificates." *Ante*, at 19, n. 20.  But the record discloses no reason to
think that any appreciable number of poor voters would need birth
certificates absent the Voter ID Law, and no reason to believe that poor
people would spend money to get them if they did not need them.

[19] To vote by provisional ballot, an individual must (at the circuit
court clerk's office) sign an affidavit affirming that she is "indigent" and
"unable to obtain proof of identification without payment of a fee." Ind.
Code Ann. §3–11.7–5–2.5(c)(2)(A).  Indiana law does not define the key
terms "indigent" or "unable," but I will assume for present purposes
that the Indiana Supreme Court will eventually construe these terms
broadly, so that the income threshold for indigency is at least at the
federal poverty level, and so that the exception covers even individuals
who are facing only short-term financial difficulties.

TX_00002544

USA_00020185

Cite as: 553 U. S. ____ (2008)  9

The law allows these voters who lack the necessary ID to sign the poll book and cast a provisional ballot. See 458 F. Supp. 2d, at 786 (citing Ind. Code Ann. §3–11–8–25.1 (West Supp. 2007)). As the lead opinion recognizes, though, *ante*, at 15, that is only the first step; to have the provisional ballot counted, a voter must then appear in person before the circuit court clerk or county election board within 10 days of the election, to sign an affidavit attesting to indigency or religious objection to being photographed (or to present an ID at that point),[20] see 458 F. Supp. 2d, at 786. Unlike the trip to the BMV (which, assuming things go smoothly, needs to be made only once every four years for renewal of nondriver photo identification, see *id.*), this one must be taken every time a poor person or religious objector wishes to vote, because the State does not allow an affidavit to count in successive elections. And unlike the trip to the BMV (which at least has a handful of license branches in the more populous counties), a county has only one county seat. Forcing these people to travel to the county seat every time they try to vote is particularly onerous for the reason noted already, that most counties in Indiana either lack public transportation or offer only limited coverage. See *supra*, at 6–7.

That the need to travel to the county seat each election amounts to a high hurdle is shown in the results of the 2007 municipal elections in Marion County, to which Indiana's Voter ID Law applied. Thirty-four provisional ballots were cast, but only two provisional voters made it

---

[20] Indiana law allows voters to cast a provisional ballot at the county clerk's office starting 29 days prior to election day until noon of the day prior to election day, see Ind. Code Ann. §3–11.7–5–2.5, and this might enable some voters to make only one burdensome trip to the county seat. But for the voters who show up at the polls to vote and are there told that they lack the photo identification needed to cast a regular ballot, the Voter ID Law effectively forces them to make two trips.

TX_00002545

USA_00020186

10      CRAWFORD v. MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

to the County Clerk's Office within the 10 days. See Brief
for Respondents in No. 07–21, pp. 8–9. All 34 of these
aspiring voters appeared at the appropriate precinct; 33 of
them provided a signature, and every signature matched
the one on file; and 26 of the 32 voters whose ballots were
not counted had a history of voting in Marion County
elections. See *id.*, at 9.

All of this suggests that provisional ballots do not obvi-
ate the burdens of getting photo identification. And even
if that were not so, the provisional-ballot option would be
inadequate for a further reason: the indigency exception
by definition offers no relief to those voters who do not
consider themselves (or would not be considered) indigent
but as a practical matter would find it hard, for nonfinan-
cial reasons, to get the required ID (most obviously the
disabled).

C

Indiana's Voter ID Law thus threatens to impose serious
burdens on the voting right, even if not "severe" ones, and
the next question under *Burdick* is whether the number of
individuals likely to be affected is significant as well.
Record evidence and facts open to judicial notice answer
yes.

Although the District Court found that petitioners failed
to offer any reliable empirical study of numbers of voters
affected, see *ante,* at 17 (lead opinion),[21] we may accept
that court's rough calculation that 43,000 voting-age
residents lack the kind of identification card required by
Indiana's law. See 458 F. Supp. 2d, at 807. The District

---

[21] Much like petitioners' statistician, the BMV "has not been able to
determine the approximate number of Indiana residents of voting age
who are without an Indiana driver's license or identification card," 458
F. Supp. 2d 775, 791 (SD Ind. 2006), but the BMV does acknowledge
"that there are persons who do not currently have [the required ID] and
who are, or who will be, eligible to vote at the next election," *ibid.*

TX_00002546
JA_005305

TX_00002546

USA_00020187

Cite as: 553 U. S. ____ (2008)          11

SOUTER, J., dissenting

Court made that estimate by comparing BMV records
reproduced in petitioners' statistician's report with U. S.
Census Bureau figures for Indiana's voting-age population
in 2004, see *ibid.*, and the State does not argue that these
raw data are unreliable.

The State, in fact, shows no discomfort with the District
Court's finding that an "estimated 43,000 individuals"
(about 1% of the State's voting-age population) lack a
qualifying ID. Brief for Respondents in No. 07–25, p. 25.
If the State's willingness to take that number is surpris-
ing, it may be less so in light of the District Court's obser-
vation that "several factors . . . suggest the percentage of
Indiana's voting age population with photo identification
is actually lower than 99%," 458 F. Supp. 2d, at 807, n.
43,[22] a suggestion in line with national surveys showing

_____

[22] The District Court explained:
"[O]ur simple comparison of raw numbers does not take into account:
individuals who have died but whose Indiana driver's license or identi-
fication cards have not expired; individuals who have moved outside
the state and no longer consider themselves Indiana residents but who
still retain a valid Indiana license or identification card; individuals
who have moved into Indiana and now consider themselves Indiana
residents but have not yet obtained an Indiana license or identification;
and individuals, such as students, who are residing in Indiana tempo-
rarily, are registered to vote in another state, but have obtained an
Indiana license or identification." *Id.*, at 807, n. 43.
The District Court also identified three factors that, in its view,
might require deductions of the 43,000 figure. First, the District Court
noted that BMV records do not cover all forms of identification that
may be used to vote under the Voter ID Law (*e.g.*, federal photo identi-
fication, such as a passport). This is a valid consideration, but is
unlikely to overcome the additions that must be made for the various
factors listed above. Second, the court noted that the BMV records do
not account for the exceptions to the photo identification requirement
(such as the indigency and absentee-ballot exceptions). This factor does
not warrant a deduction of the 43,000 number because, as I have
argued, the indigency exception imposes serious burdens of its own, see
*supra*, at 8–10, and the absentee-ballot exception is not a wholly
adequate substitute for voting in person, see n. 4, *supra*. Finally, the

TX_00002547

USA_00020188

12      CRAWFORD *v.* MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

roughly 6–10% of voting-age Americans without a state-issued photo-identification card. See Brief for Petitioners in No. 07–21, pp. 39–40, n. 17 (citing National Commission on Election Reform, To Assure Pride and Confidence: Task Force Reports, ch. VI: Verification of Identity, p. 4 (Aug. 2001), http://webstorage3.mcpa.virginia.edu/commisions/comm_2001_taskforce.pdf). We have been offered no reason to think that Indiana does a substantially better job of distributing IDs than other States.[23]

So a fair reading of the data supports the District Court's finding that around 43,000 Indiana residents lack the needed identification, and will bear the burdens the law imposes. To be sure, the 43,000 figure has to be discounted to some extent, residents of certain nursing homes being exempted from the photo identification requirement. 458 F. Supp. 2d, at 786. But the State does not suggest that this narrow exception could possibly reduce 43,000 to an insubstantial number.[24]

---

District Court noted that many individuals are not registered to vote. For reasons I lay out in note 24, *infra,* I am not convinced that this fact is relevant at all.

[23] Although the lead opinion expresses confidence that the percentage of voters without the necessary photo ID will steadily decrease, see *ante,* at 4, n. 6, and suggests that the number may already have dropped, see *ante,* at 18, n. 20, there is reason to be less sanguine. See ACLU Sues To Halt License Revocation, Fort Wayne J. Gazette, Feb. 9, 2008, p. 3C ("The American Civil Liberties Union is suing the state to prevent the possible revocation of up to 56,000 driver's licenses that don't match information in a Social Security database. Many of the mismatches were created by typographical errors or by people getting married and changing their last names, the [BMV] said last week when it announced it had sent warning letters to about 206,000 people in Indiana"); see also Dits, Court Date Set for Bid To Stop BMV, South Bend Tribune, Feb. 21, 2008; Who To Blame in Name Game? Many Caught in Name Game; Merging BMV, Social Security Databases Forcing Many To Hire Lawyers, The Post-Tribune, Jan. 8, 2008, p. A5; Snelling, Name Issue Blocks License, Merrillville Post-Tribune, Jan. 7, 2008, p. A6.

[24] The State does imply that we should further discount the 43,000

TX_00002548

USA_00020189

Cite as: 553 U. S. ____ (2008)          13

SOUTER, J., dissenting

The upshot is this. Tens of thousands of voting-age residents lack the necessary photo identification. A large proportion of them are likely to be in bad shape economically, see 472 F. 3d 949, 951 (CA7 2007) ("No doubt most people who don't have photo ID are low on the economic ladder"); cf. *Bullock* v. *Carter*, 405 U. S. 134, 144 (1972) ("[W]e would ignore reality were we not to recognize that this system falls with unequal weight on voters . . . according to their economic status").[25] The Voter ID Law places hurdles in the way of either getting an ID or of voting provisionally, and they translate into nontrivial economic costs. There is accordingly no reason to doubt that a significant number of state residents will be discouraged or

_____

estimate to exclude citizens who are not registered to vote, or who are registered but not planning to vote. See Brief for Respondents in No. 07–25, p. 25; see also *ante*, at 17 (lead opinion) ("[T]he evidence in the record does not provide us with the number of registered voters without photo identification"). But that argument is flatly contradicted by this Court's settled precedent. As our cases have recognized, disfranchisement is disfranchisement, whether or not the disfranchised voter would have voted if given the choice. That is why in *Dunn* v. *Blumstein*, 405 U. S. 330 (1972), the Court did not ask whether any significant number of individuals deprived of the right to vote by durational residence requirements would actually have chosen to vote. And in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), the Court did not pause to consider whether any of the qualified voters deterred by the $1.50 poll tax would have opted to vote if there had been no fee. Our cases make clear that the Constitution protects an individual's ability to vote, not merely his decision to do so.

[25] Studies in other States suggest that the burdens of an ID requirement may also fall disproportionately upon racial minorities. See Overton, Voter Identification, 105 Mich. L. Rev. 631, 659 (2007) ("In 1994, the U. S. Department of Justice found that African-Americans in Louisiana were four to five times less likely than white residents to have government-sanctioned photo identification"); *id.*, at 659–660 (describing June 2005 study by the Employment and Training Institute at the University of Wisconsin-Milwaukee, which found that while 17% of voting-age whites lacked a valid driver's license, 55% of black males and 49% of black females were unlicensed, and 46% of Latino males and 59% of Latino females were similarly unlicensed).

TX_00002549

USA_00020190

14    CRAWFORD v. MARION COUNTY ELECTION BD.

disabled from voting. Cf. 458 F. Supp. 2d, at 823 ("We do not doubt that such individuals exist somewhere, even though Plaintiffs were unable to locate them"); 472 F. 3d, at 952 ("No doubt there are at least a few [whom the law will deter from voting] in Indiana . . ."); see also *ante*, at 15 (lead opinion).

Petitioners, to be sure, failed to nail down precisely how great the cohort of discouraged and totally deterred voters will be, but empirical precision beyond the foregoing numbers has never been demanded for raising a voting-rights claim. Cf. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. ___, ___ (2008) (ROBERTS, C. J., concurring) (slip op., at 4) ("Nothing in my analysis requires the parties to produce studies regarding voter perceptions on this score"); *Dunn* v. *Blumstein*, 405 U. S. 330, 335, n. 5 (1972) ("[I]t would be difficult to determine precisely how many would-be voters throughout the country cannot vote because of durational residence requirements"); *Bullock, supra*, at 144 (taking account of "the obvious likelihood" that candidate filing fees would "fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs"). While of course it would greatly aid a plaintiff to establish his claims beyond mathematical doubt, he does enough to show that serious burdens are likely.

Thus, petitioners' case is clearly strong enough to prompt more than a cursory examination of the State's asserted interests. And the fact that Indiana's photo identification requirement is one of the most restrictive in the country, see Brief for Current and Former State Secretaries of State as *Amici Curiae* 27–30 (compiling state voter-identification statutes); see also Brief for Texas et al. as *Amici Curiae* 10–13 (same),[26] makes a critical examina-

───────────────

[26] Unlike the Help America Vote Act of 2002, 116 Stat. 1666, 42 U. S. C. §5301 *et seq.* (2000 ed., Supp. V), which generally requires

TX_00002550

USA_00020191

Cite as: 553 U. S. ____ (2008)          15

SOUTER, J., dissenting

tion of the State's claims all the more in order.  Cf. *Ran-*

---

proof of identification but allows for a variety of documents to qualify, see *ante*, at 8–9 (lead opinion), Indiana accepts only limited forms of federally issued or state-issued photo identification, see n. 3, *supra*, and does not allow individuals lacking the required identification to cast a regular ballot at the polls.  Only one other State, Georgia, currently restricts voters to the narrow forms of government-issued photo identification.  See Ga. Code Ann. §21–2–417 (Supp. 2007).  But a birth certificate is not needed to get a Georgia voter identification card.  See Ga. Code Ann. §21–2–417.1 (Supp. 2007); Ga. Comp. Rules & Regs., Rule 183–1–20.01 (2006).

Missouri's Legislature passed a restrictive photo identification law comparable to Indiana's, but the Missouri Supreme Court struck it down as violative of the state constitution.  *Weinschenk* v. *State*, 203 S. W. 3d 201 (2006) *(per curiam)*.  Florida requires photo identification, but permits the use of several forms, including a debit or credit card; military identification; student identification; retirement center identification; neighborhood center identification; and public assistance identification.  See Fla. Stat. Ann. §101.043(1) (West Supp. 2008).  Moreover, a Florida voter who lacks photo identification may cast a provisional ballot, and that ballot will be counted so long as the signature on the ballot matches the one on the voter's registration. §§101.043(2), 101.048.

All other States that require identification at the polls either allow voters to identify themselves using a variety of documents, see Ala. Code §17–9–30 (2007); Alaska Stat. §15.15.225 (2006); Ariz. Rev. Stat. Ann. §16–579 (West 2006); Ark. Code Ann. §7–5–305(a)(8) (2007); Colo. Rev. Stat. §§1–1–104(19.5), 1–7–110 (2007); Ky. Rev. Stat. Ann. §117.227 (Lexis 2004); Mont. Code Ann. §13–13–114 (2007); N. M. Stat. Ann. §§1–1–24, 1–12–7.1, as amended by 2008 N. M. Laws ch. 59; §1–12–8 (Cum. Supp. 2007); Ohio Rev. Code Ann. §§3503.16(B)(1), 3505.18 (Lexis Supp. 2007); S. C. Code Ann. §§7–5–125, 7–13–710 (Cum. Supp. 2007); Tenn. Code Ann. §2–7–112 (2003); Texas Elec. Code Ann. §§63.001–63.009 (West 2003 and Supp. 2007); §63.0101 (West Supp. 2007); Wash. Rev. Code §29A.44.205 (2006), or allow voters lacking identification to cast a regular ballot upon signing an affidavit (or providing additional identifying information), see Conn. Gen. Stat. §9–261 (2007); Del. Code Ann., Tit. 15, §4937 (2007); Haw. Rev. Stat. §11–136 (2006 Cum. Supp.); La. Rev. Stat. Ann. §18:562 (West Supp. 2008); Mich. Comp. Laws Ann. §168.523(1) (West Supp. 2007); N. D. Cent. Code Ann. §16.1–05–07 (Lexis Supp. 2007); S. D. Codified Laws §§12–18–6.1, 12–18–6.2 (2004); Va. Code Ann. §24.2–643 (Lexis 2006).

TX_00002551

USA_00020192

16          CRAWFORD *v.* MARION COUNTY ELECTION BD.

*dall* v. *Sorrell,* 548 U. S. 230, 253 (2006) (plurality opinion) (citing as a "danger sig[n]" that "contribution limits are substantially lower than . . . comparable limits in other States," and concluding that "[w]e consequently must examine the record independently and carefully to determine whether [the] limits are 'closely drawn' to match the State's interests"); *id.,* at 284, 288 (SOUTER, J., dissenting) (finding that deference was appropriate on the reasoning that limits were "consistent with limits set by the legislatures of many other States, all of them with populations larger than Vermont's," and that "[t]he Legislature of Vermont evidently tried to account for the realities of campaigning in Vermont").

### III

Because the lead opinion finds only "limited" burdens on the right to vote, see *ante,* at 18, it avoids a hard look at the State's claimed interests. See *ante,* at 7–13. But having found the Voter ID Law burdens far from trivial, I have to make a rigorous assessment of "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' [and] 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick,* 504 U. S., at 434 (quoting *Anderson,* 460 U. S., at 789).

As this quotation from *Burdick* indicates, the interests claimed to justify the regulatory scheme are subject to discount in two distinct ways. First, the generalities raised by the State have to be shaved down to the precise "aspect[s of claimed interests] addressed by the law at issue." *California Democratic Party* v. *Jones,* 530 U. S. 567, 584 (2000) (emphasis omitted); see *ibid.* (scrutiny of state interests "is not to be made in the abstract, by asking whether [the interests] are highly significant values; but rather by asking whether the *aspect* of [those interests] addressed by the law at issue is highly significant"

TX_00002552

USA_00020193

Cite as: 553 U. S. ____ (2008)          17

(emphasis in original)).  And even if the State can show
particularized interests addressed by the law, those inter-
ests are subject to further discount depending on "the
extent to which [they] make it necessary to burden the
plaintiff's rights."  *Burdick, supra,* at 434 (internal quota-
tion marks omitted).

As the lead opinion sees it, the State has offered four
related concerns that suffice to justify the Voter ID Law:
modernizing election procedures, combating voter fraud,
addressing the consequences of the State's bloated voter
rolls, and protecting public confidence in the integrity of
the electoral process.  See *ante,* at 7–13.  On closer look,
however, it appears that the first two (which are really
just one) can claim modest weight at best, and the latter
two if anything weaken the State's case.

### A

The lead opinion's discussion of the State's reasons
begins with the State's asserted interests in "election
modernization," *ante,* at 8–10, and in combating voter
fraud, see *ante,* at 11–13.  Although these are given sepa-
rate headings, any line drawn between them is unconvinc-
ing; as I understand it, the "effort to modernize elections,"
Brief for Respondents in No. 07–25, p. 12, is not for mod-
ernity's sake, but to reach certain practical (or political)
objectives.[27]  In any event, if a proposed modernization
were in fact aimless, if it were put forward as change for
change's sake, a State could not justify any appreciable
burden on the right to vote that might ensue; useless
technology has no constitutional value.  And in fact that is
not the case here.  The State says that it adopted the ID
law principally to combat voter fraud, and it is this claim,

_____

[27] See generally R. Saltman, The History and Politics of Voting Tech-
nology: In Quest of Integrity and Public Confidence (2006) (tracing the
history of changes in methods of voting in the United States, and the
social and political considerations behind them).

TX_00002553
JA_005312

TX_00002553

USA_00020194

18      CRAWFORD v. MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

not the slogan of "election modernization," that warrants
attention.

1

There is no denying the abstract importance, the com-
pelling nature, of combating voter fraud. See *Purcell*, 549
U. S., at 4 (acknowledging "the State's compelling interest
in preventing voter fraud"); cf. *Eu* v. *San Francisco County
Democratic Central Comm.*, 489 U. S. 214, 231 (1989) ("A
State indisputably has a compelling interest in preserving
the integrity of its election process"). But it takes several
steps to get beyond the level of abstraction here.

To begin with, requiring a voter to show photo identifi-
cation before casting a regular ballot addresses only one
form of voter fraud: in-person voter impersonation. The
photo ID requirement leaves untouched the problems of
absentee-ballot fraud, which (unlike in-person voter im-
personation) is a documented problem in Indiana, see 458
F. Supp. 2d, at 793; of registered voters voting more than
once (but maintaining their own identities) in different
counties or in different States; of felons and other disquali-
fied individuals voting in their own names; of vote buying;
or, for that matter, of ballot-stuffing, ballot miscounting,
voter intimidation, or any other type of corruption on the
part of officials administering elections. See Brief for
Brennan Center for Justice et al. as *Amici Curiae* 7.

And even the State's interest in deterring a voter from
showing up at the polls and claiming to be someone he is
not must, in turn, be discounted for the fact that the State
has not come across a single instance of in-person voter
impersonation fraud in all of Indiana's history. See 458
F. Supp. 2d, at 792–793; see also *ante*, at 11–13 (lead
opinion). Neither the District Court nor the Indiana Gen-
eral Assembly that passed the Voter ID Law was given
any evidence whatsoever of in-person voter impersonation
fraud in the State. See 458 F. Supp. 2d, at 793. This

TX_00002554

USA_00020195

Cite as: 553 U. S. ____ (2008)          19

SOUTER, J., dissenting

absence of support is consistent with the experience of
several veteran poll watchers in Indiana, each of whom
submitted testimony in the District Court that he had
never witnessed an instance of attempted voter imper-
sonation fraud at the polls. *Ibid.* It is also consistent with
the dearth of evidence of in-person voter impersonation in
any other part of the country. See *ante*, at 11, n. 11 (lead
opinion) (conceding that there are at most "scattered
instances of in-person voter fraud"); see also Brief for
Brennan Center for Justice, *supra*, at 11–25, 25 (demon-
strating that "the national evidence—including the very
evidence relied on by the courts below—suggests that the
type of voting fraud that may be remedied by a photo ID
requirement is virtually nonexistent: the 'problem' of voter
impersonation is not a real problem at all").[28]

  The State responds to the want of evidence with the
assertion that in-person voter impersonation fraud is hard
to detect. But this is like saying the "man who wasn't
there" is hard to spot,[29] and to know whether difficulty in
detection accounts for the lack of evidence one at least has
to ask whether in-person voter impersonation is (or would
be) relatively harder to ferret out than other kinds of fraud
(*e.g.,* by absentee ballot) which the State has had no trou-
ble documenting. The answer seems to be no; there is
reason to think that "impersonation of voters is . . . the
most likely type of fraud to be discovered." U. S. Election
Assistance Commission, Election Crimes: An Initial Re-

---

[28]The lack of evidence of in-person voter impersonation fraud is not
for failure to search. See, *e.g.,* Lipton & Urbina, In 5-Year Effort, Scant
Evidence of Voter Fraud, N. Y. Times, Apr. 12, 2007, p. A1 ("Five years
after the Bush Administration began a crackdown on voter fraud, the
Justice Department has turned up virtually no evidence of any organ-
ized effort to skew federal elections, according to court records and
interviews").

[29]"As I was going up the stair / I met a man who wasn't there." H.
Mearns, Antigonish, reprinted in Best Remembered Poems 107 (M.
Gardner ed. 1992).

TX_00002555

USA_00020196

20      CRAWFORD v. MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

view and Recommendations for Future Study 9 (Dec.
2006), http://www.eac.gov/clearinghouse/docs/reports-and-
surveys-2006electioncrimes.pdf/attachment_download/file
(hereinafter EAC Report).    This is in part because an
individual who impersonates another at the polls commits
his fraud in the open, under the scrutiny of local poll
workers who may well recognize a fraudulent voter when
they hear who he claims to be.  See Brief for Respondents
in No. 07–21, p. 6 ("[P]recinct workers may recognize an
imposter, and precinct election workers have the authority
to challenge persons appearing to vote if the election board
member 'is not satisfied that a person who offers to vote is
the person who the person represents the person to be'"
(quoting Ind. Code Ann. §3–11–8–27 (West 2006))).

   The relative ease of discovering in-person voter imper-
sonation is also owing to the odds that any such fraud will
be committed by "organized groups such as campaigns or
political parties" rather than by individuals acting alone.
L. Minnite & D. Callahan, Securing the Vote: An Analysis
of Election Fraud 14 (2003).   It simply is not worth it for
individuals acting alone to commit in-person voter imper-
sonation, which is relatively ineffectual for the foolish few
who may commit it.   If an imposter gets caught, he is
subject to severe criminal penalties.  See, e.g., Ind. Code
Ann. §3–14–2–9 (making it a felony "knowingly [to] vot[e]
or offe[r] to vote at an election when the person is not
registered or authorized to vote"); §3–14–2–11 (with cer-
tain exceptions, "a person who knowingly votes or offers to
vote in a precinct except the one in which the person is
registered and resides" commits a felony); §3–14–2–12(1)
(making it a felony "knowingly [to] vot[e] or mak[e] appli-
cation to vote in an election in a name other than the
person's own"); §3–14–2–12(2) (a person who, "having
voted once at an election, knowingly applies to vote at the
same election in the person's own name or any other
name" commits a felony); see also 42 U. S. C. §1973i(e)(1)

TX_00002556

USA_00020197

SOUTER, J., dissenting

(any individual who "votes more than once" in certain federal elections "shall be fined not more than $10,000 or imprisoned not more than five years, or both"). And even if he succeeds, the imposter gains nothing more than one additional vote for his candidate. See EAC Report 9 (in-person voter impersonation "is an inefficient method of influencing an election"); J. Levitt, The Truth about Voter Fraud 7 (2007) ("[F]raud by individual voters is a singularly foolish and ineffective way to attempt to win an election. Each act of voter fraud in connection with a federal election risks five years in prison and a $10,000 fine, in addition to any state penalties. In return, it yields at most one incremental vote. That single extra vote is simply not worth the price" (footnote omitted)); cf. 472 F. 3d, at 951 ("[A] vote in a political election rarely has any *instrumental* value, since elections for political office at the state or federal level are never decided by just one vote" (emphasis in original)).

In sum, fraud by individuals acting alone, however difficult to detect, is unlikely. And while there may be greater incentives for organized groups to engage in broad-gauged in-person voter impersonation fraud, see Minnite & Callahan, *supra*, at 20, it is also far more difficult to conceal larger enterprises of this sort. The State's argument about the difficulty of detecting the fraud lacks real force.

2

Nothing else the State has to say does much to bolster its case. The State argues, for example, that even without evidence of in-person voter impersonation in Indiana, it is enough for the State to show that "opportunities [for such fraud] are transparently obvious in elections without identification checks," Brief for Respondents in No. 07–25, p. 54. Of course they are, but Indiana elections before the Voter ID Law were not run "without identification checks";

22    CRAWFORD *v.* MARION COUNTY ELECTION BD.

on the contrary, as the Marion County Election Board informs us, "[t]ime-tested systems were in place to detect in-person voter impersonation fraud before the challenged statute was enacted," Brief for Respondents in No. 07–21, p. 6. These included hiring poll workers who were precinct residents familiar with the neighborhood, and making signature comparisons, each effort being supported by the criminal provisions mentioned before. *Id.,* at 6–8.

For that matter, the deterrence argument can do only so much work, since photo identification is itself hardly a failsafe against impersonation. Indiana knows this, and that is why in 2007 the State began to issue redesigned driver's licenses with digital watermarking.[30] The State has made this shift precisely because, in the words of its BMV, "visual inspection is not adequate to determine the authenticity" of driver's licenses. See Indiana BMV, *supra,* n. 30. Indeed, the BMV explains that the digital watermarks (which can be scanned using equipment that, so far, Indiana does not use at polling places) is needed to "tak[e] the guesswork out of inspection." *Ibid.*[31] So, at least until polling places have the machines and special software to scan the new driver's licenses, and until all the licenses with the older designs expire (the licenses issued after 2006 but before the 2007 redesigning are good until 2012, see 458 F. Supp. 2d, at 791), Indiana's law does no more than assure that any in-person voter fraud will take place with fake IDs, not attempted signature forgery.

---

[30] See Indiana BMV, Digital Drivers License: Frequently Asked Questions, "What is a digital watermark and why is Indiana incorporating it into their driver license?", http://www.in.gov/bmv/3382.htm.

[31] In the words of Indiana's Governor, Mitch Daniels: "'Not very long ago, Indiana driver's licenses were a late-night talk show joke [because of] the ease of their fraudulent issuance and also their duplication . . . . [The new design] will make particularly their duplication dramatically more difficult.'" Udell, Digital Driver's Licenses Designed To Stem ID Theft, Evansville Courier, June 7, 2007, p. B6.

TX_00002558

USA_00020199

SOUTER, J., dissenting

Despite all this, I will readily stipulate that a State has an interest in responding to the risk (however small) of in-person voter impersonation. See *ante*, at 12 (lead opinion). I reach this conclusion, like others accepted by the Court, because "'[w]here a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments.'" *Randall*, 548 U. S., at 285 (SOUTER, J., dissenting) (quoting *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring)). Weight is owed to the legislative judgment as such. But the ultimate valuation of the particular interest a State asserts has to take account of evidence against it as well as legislative judgments for it (certainly when the law is one of the most restrictive of its kind, see n. 26, *supra*), and on this record it would be unreasonable to accord this assumed state interest more than very modest significance.[32]

3

The antifraud rationale is open to skepticism on one further ground, what *Burdick* spoke of as an assessment of the degree of necessity for the State's particular course of action. Two points deserve attention, the first being that

---

[32] On such flimsy evidence of fraud, it would also ignore the lessons of history to grant the State's interest more than modest weight, as the interest in combating voter fraud has too often served as a cover for unnecessarily restrictive electoral rules. See F. Ogden, The Poll Tax in the South 9 (1958) ("In Arkansas and Texas, the argument was frequently presented that a poll tax payment prerequisite would purify elections by preventing repeaters and floaters from voting"); see also Brief for Historians and Other Scholars as *Amici Curiae* 4–15 (detailing abuses); R. Hayduk, Gatekeepers to the Franchise: Shaping Election Administration in New York 36 (2005) ("In both historical and contemporary contexts certain groups have had an interest in alleging fraud and thereby shaping electoral rules and practices in a restrictive direction, and other groups have had an opposite interest").

TX_00002559

USA_00020200

24        CRAWFORD v. MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

the State has not even tried to justify its decision to im-
plement the photo identification requirement immediately
on passage of the new law. A phase-in period would have
given the State time to distribute its newly designed li-
censes, and to make a genuine effort to get them to indi-
viduals in need, and a period for transition is exactly what
the Commission on Federal Election Reform, headed by
former President Carter and former Secretary of State
Baker, recommended in its report. See Building Confi-
dence in U. S. Elections §2.5 (Sept. 2005), App. 136, 140
(hereinafter Carter-Baker Report) ("For the next two
federal elections, until January 1, 2010, in states that
require voters to present ID at the polls, voters who fail to
do so should nonetheless be allowed to cast a provisional
ballot, and their ballot would count if their signature is
verified"). During this phase-in period, the report said,
States would need to make "efforts to ensure that all
voters are provided convenient opportunities to obtain" the
required identification. *Id.*, at 141. The former President
and former Secretary of State explained this recommenda-
tion in an op-ed essay:

"Yes, we are concerned about the approximately 12
percent of citizens who lack a driver's license. So we
proposed that states finally assume the responsibility
to seek out citizens to both register voters and provide
them with free ID's that meet federal standards.
States should open new offices, use social service
agencies and deploy mobile offices to register voters.
By connecting ID's to registration, voting participa-
tion will be expanded." Carter & Baker, Voting Re-
form is in the Cards, N. Y. Times, Sept. 23, 2005, p.
A19.

Although Indiana claims to have adopted its ID require-
ment relying partly on the Carter-Baker Report, see Brief
for Respondents in No. 07–25, pp. 5, 13, 49; see also *ante*,

TX_00002560

USA_00020201

SOUTER, J., dissenting

at 10 (lead opinion), the State conspicuously rejected the Report's phase-in recommendation aimed at reducing the burdens on the right to vote, and just as conspicuously fails even to try to explain why.

What is left of the State's claim must be downgraded further for one final reason: regardless of the interest the State may have in adopting a photo identification requirement as a general matter, that interest in no way necessitates the particular burdens the Voter ID Law imposes on poor people and religious objectors. Individuals unable to get photo identification are forced to travel to the county seat every time they wish to exercise the franchise, and they have to get there within 10 days of the election. See *supra*, at 8–10. Nothing about the State's interest in fighting voter fraud justifies this requirement of a post-election trip to the county seat instead of some verification process at the polling places.

In briefing this Court, the State responds by pointing to an interest in keeping lines at polling places short. See Brief for Respondents in No. 07–25, p. 58. It warns that "[i]f election workers—a scarce resource in any election— must attend to the details of validating provisional ballots, voters may have to wait longer to vote," and it assures us that "[n]othing deters voting so much as long lines at the polls." *Ibid.* But this argument fails on its own terms, for whatever might be the number of individuals casting a provisional ballot, the State could simply allow voters to sign the indigency affidavit at the polls subject to review there after the election.[33] After all, the Voter ID Law already requires voters lacking photo identification to

—————

[33] Florida has accommodated voters in this manner. In Florida a voter who casts a provisional ballot may have that vote counted if the voter's signature on the provisional-ballot certification matches the signature on the voter's registration. See Fla. Stat. Ann. §§101.043, 101.048. The voter is not required to make a second trip to have her provisional ballot counted.

TX_00002561

USA_00020202

26    CRAWFORD v. MARION COUNTY ELECTION BD.

sign, at the polling site, an affidavit attesting to proper registration. See 458 F. Supp. 2d, at 786.

Indeed, the State's argument more than fails; it backfires, in implicitly conceding that a not-insignificant number of individuals will need to rely on the burdensome provisional-ballot mechanism. What is more, as the District Court found, the Voter ID Law itself actually increases the likelihood of delay at the polls. Since any minor discrepancy between a voter's photo identification card and the registration information may lead to a challenge, "the opportunities for presenting challenges ha[ve] increased as a result of the photo identification requirements." *Id.*, at 789; cf. 472 F. 3d, at 955 (Evans, J., dissenting) ("The potential for mischief with this law is obvious. Does the name on the ID 'conform' to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one—Schmit versus Schmitt—does it conform? If a 'Terence' appears on one and a shortened 'Terry' on the other, does it conform?").

B

The State's asserted interests in modernizing elections and combating fraud are decidedly modest; at best, they fail to offset the clear inference that thousands of Indiana citizens will be discouraged from voting. The two remaining justifications, meanwhile, actually weaken the State's case.

The lead opinion agrees with the State that "the inflation of its voter rolls is further support for its enactment of" the Voter ID Law. *Ante*, at 12. This is a puzzling conclusion, given the fact, which the lead opinion notes, that the National Government filed a complaint against Indiana, containing this allegation:

"Indiana has failed to conduct a general program that

TX_00002562

USA_00020203

SOUTER, J., dissenting

> makes a reasonable effort to identify and remove in-
> eligible voters from the State's registration list; has
> failed to remove such ineligible voters; and has failed
> to engage in oversight actions sufficient to ensure that
> local election jurisdictions identify and remove such
> ineligible voters." App. 309, 312.

The Federal Government and the State agreed to settle
the case, and a consent decree and order have been en-
tered, see *ante*, at 12–13, requiring Indiana to fulfill its
list-maintenance obligations under §8 of the National
Voter Registration Act of 1993, 107 Stat. 82, 42 U. S. C.
§1973gg–6.

How any of this can justify restrictions on the right to
vote is difficult to say. The State is simply trying to take
advantage of its own wrong: if it is true that the State's
fear of in-person voter impersonation fraud arises from its
bloated voter checklist, the answer to the problem is in the
State's own hands. The claim that the State has an inter-
est in addressing a symptom of the problem (alleged im-
personation) rather than the problem itself (the negli-
gently maintained bloated rolls) is thus self-defeating; it
shows that the State has no justifiable need to burden the
right to vote as it does, and it suggests that the State is
not as serious about combating fraud as it claims to be.[34]

The State's final justification, its interest in safeguard-
ing voter confidence, similarly collapses. The problem
with claiming this interest lies in its connection to the
bloated voter rolls; the State has come up with nothing to
suggest that its citizens doubt the integrity of the State's

---

[34] The voting-rolls argument also suggests that it would not be so
difficult to detect in-person voter fraud after all. If it is true that
practitioners of fraud are most likely to vote in the name of registered
voters whom they know to have died or left the jurisdiction, then
Indiana could simply audit its voting records to examine whether, and
how often, in-person votes were cast using these invalid registrations.

TX_00002563

USA_00020204

28      CRAWFORD *v.* MARION COUNTY ELECTION BD.

electoral process, except its own failure to maintain its rolls. The answer to this problem is not to burden the right to vote, but to end the official negligence.

It should go without saying that none of this is to deny States' legitimate interest in safeguarding public confidence. The Court has, for example, recognized that fighting perceptions of political corruption stemming from large political contributions is a legitimate and substantial state interest, underlying not only campaign finance laws, but bribery and antigratuity statutes as well. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 390 (2000). But the force of the interest depends on the facts (or plausibility of the assumptions) said to justify invoking it. See *id.*, at 391 ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"). While we found in *Nixon* that "there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters," *id.*, at 395, there is plenty of reason to be doubtful here, both about the reality and the perception. It is simply not plausible to assume here, with no evidence of in-person voter impersonation fraud in a State, and very little of it nationwide, that a public perception of such fraud is nevertheless "inherent" in an election system providing severe criminal penalties for fraud and mandating signature checks at the polls. Cf. *id.*, at 390 ("[T]he perception of corruption [is] 'inherent in a regime of large individual financial contributions' to candidates for public office" (quoting *Buckley* v. *Valeo*, 424 U. S. 1, 27 (1976) *(per curiam)*).

## C

Without a shred of evidence that in-person voter impersonation is a problem in the State, much less a crisis,

TX_00002564
JA_005323

TX_00002564

USA_00020205

SOUTER, J., dissenting

Indiana has adopted one of the most restrictive photo identification requirements in the country. The State recognizes that tens of thousands of qualified voters lack the necessary federally issued or state-issued identification, but it insists on implementing the requirement immediately, without allowing a transition period for targeted efforts to distribute the required identification to individuals who need it. The State hardly even tries to explain its decision to force indigents or religious objectors to travel all the way to their county seats every time they wish to vote, and if there is any waning of confidence in the administration of elections it probably owes more to the State's violation of federal election law than to any imposters at the polling places. It is impossible to say, on this record, that the State's interest in adopting its signally inhibiting photo identification requirement has been shown to outweigh the serious burdens it imposes on the right to vote.

If more were needed to condemn this law, our own precedent would provide it, for the calculation revealed in the Indiana statute crosses a line when it targets the poor and the weak. Cf. *Anderson* v. *Celebrezze*, 460 U. S. 780, 793 (1983) ("[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status"). If the Court's decision in *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663 (1966), stands for anything, it is that being poor has nothing to do with being qualified to vote. *Harper* made clear that "[t]o introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor." *Id.*, at 668. The State's requirements here, that people without cars travel to a motor vehicle registry and that the poor who fail to do that get to their county seats within 10 days of every election, likewise translate into unjustified economic

TX_00002565

USA_00020206

30      CRAWFORD v. MARION COUNTY ELECTION BD.

SOUTER, J., dissenting

burdens uncomfortably close to the outright $1.50 fee we struck down 42 years ago. Like that fee, the onus of the Indiana law is illegitimate just because it correlates with no state interest so well as it does with the object of deterring poorer residents from exercising the franchise.

*     *     *

The Indiana Voter ID Law is thus unconstitutional: the state interests fail to justify the practical limitations placed on the right to vote, and the law imposes an unreasonable and irrelevant burden on voters who are poor and old. I would vacate the judgment of the Seventh Circuit, and remand for further proceedings.

TX_00002566

USA_00020207

Cite as: 553 U. S. ____ (2008)        1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

Nos. 07–21 and 07–25

WILLIAM CRAWFORD, ET AL., PETITIONERS
07–21                    *v.*
MARION COUNTY ELECTION BOARD ET AL.

INDIANA DEMOCRATIC PARTY, ET AL., PETITIONERS
07–25                    *v.*
TODD ROKITA, INDIANA SECRETARY OF STATE,
ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[April 28, 2008]

JUSTICE BREYER, dissenting.

Indiana's statute requires registered voters to present
photo identification at the polls. It imposes a burden upon
some voters, but it does so in order to prevent fraud, to
build confidence in the voting system, and thereby to
maintain the integrity of the voting process. In determin-
ing whether this statute violates the Federal Constitution,
I would balance the voting-related interests that the stat-
ute affects, asking "whether the statute burdens any one
such interest in a manner out of proportion to the statute's
salutary effects upon the others (perhaps, but not neces-
sarily, because of the existence of a clearly superior, less
restrictive alternative)." *Nixon* v. *Shrink Missouri Gov-
ernment PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., con-
curring); *ante*, at 6–7 (lead opinion) (similar standard);
*ante*, at 2–3 (SOUTER, J., dissenting) (similar standard).
Applying this standard, I believe the statute is unconstitu-
tional because it imposes a disproportionate burden upon

TX_00002567

USA_00020208

2        CRAWFORD *v.* MARION COUNTY ELECTION BD.

BREYER, J., dissenting

those eligible voters who lack a driver's license or other statutorily valid form of photo ID.

Like JUSTICE STEVENS, I give weight to the fact that a national commission, chaired by former President Jimmy Carter and former Secretary of State James Baker, studied the issue and recommended that States should require voter photo IDs. See Report of the Commission on Federal Election Reform, Building Confidence in U. S. Elections §2.5 (Sept. 2005) (Carter-Baker Report), App. 136–144. Because the record does not discredit the Carter-Baker Report or suggest that Indiana is exceptional, I see nothing to prevent Indiana's Legislature (or a federal court considering the constitutionality of the statute) from taking account of the legislatively relevant facts the report sets forth and paying attention to its expert conclusions. Thus, I share the general view of the lead opinion insofar as it holds that the Constitution does not *automatically* forbid Indiana from enacting a photo ID requirement. Were I also to believe, as JUSTICE STEVENS believes, that the burden imposed by the Indiana statute on eligible voters who lack photo IDs is indeterminate "on the basis of the record that has been made in this litigation," *ante*, at 18, or were I to believe, as JUSTICE SCALIA believes, that the burden the statute imposes is "minimal" or "justified," *ante*, at 1 (opinion concurring in judgment), then I too would reject the petitioners' facial attack, primarily for the reasons set forth in Part II of the lead opinion, see *ante*, at 7–13.

I cannot agree, however, with JUSTICE STEVENS' or JUSTICE SCALIA's assessment of the burdens imposed by the statute. The Carter-Baker Commission *conditioned* its recommendation upon the States' willingness to ensure that the requisite photo IDs "be easily available and issued free of charge" and that the requirement be "phased in" over two federal election cycles, to ease the transition. Carter-Baker Report, at App. 139, 140. And as described

TX_00002568

USA_00020209

Cite as: 553 U. S. ____ (2008)     3

BREYER, J., dissenting

in Part II of JUSTICE SOUTER's dissenting opinion, see *ante*, at 3–16, Indiana's law fails to satisfy these aspects of the Commission's recommendation.

For one thing, an Indiana nondriver, most likely to be poor, elderly, or disabled, will find it difficult and expensive to travel to the Bureau of Motor Vehicles, particularly if he or she resides in one of the many Indiana counties lacking a public transportation system. See *ante*, at 6–7 (SOUTER, J., dissenting) (noting that out of Indiana's 92 counties, 21 have no public transportation system at all and 32 others restrict public transportation to regional county service). For another, many of these individuals may be uncertain about how to obtain the underlying documentation, usually a passport or a birth certificate, upon which the statute insists. And some may find the costs associated with these documents unduly burdensome (up to $12 for a copy of a birth certificate; up to $100 for a passport). By way of comparison, this Court previously found unconstitutionally burdensome a poll tax of $1.50 (less than $10 today, inflation-adjusted). See *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 664 n. 1, 666 (1966); *ante*, at 30 (SOUTER, J., dissenting). Further, Indiana's exception for voters who cannot afford this cost imposes its own burden: a postelection trip to the county clerk or county election board to sign an indigency affidavit *after each election*. See *ante*, at 8–10 (same).

By way of contrast, two other States—Florida and Georgia—have put into practice photo ID requirements significantly less restrictive than Indiana's. Under the Florida law, the range of permissible forms of photo ID is substantially greater than in Indiana. See Fla. Stat. §101.043(1) (West Supp. 2008) (including employee badge or ID, a debit or credit card, a student ID, a retirement center ID, a neighborhood association ID, and a public assistance ID). Moreover, a Florida voter who lacks photo ID may cast a provisional ballot at the polling place that will be

TX_00002569
JA_005328

TX_00002569

USA_00020210

4     CRAWFORD *v.* MARION COUNTY ELECTION BD.

BREYER, J., dissenting

counted if the State determines that his signature
matches the one on his voter registration form.
§§101.043(2); 101.048(2)(b).

    Georgia restricts voters to a more limited list of accept-
able photo IDs than does Florida, but accepts in addition
to proof of voter registration a broader range of underlying
documentation than does Indiana. See Ga. Code Ann.
§21–2–417 (Supp. 2007); Ga. Comp. Rules & Regs., Rule
183–1–20.01 (2008) (permissible underlying documents
include a paycheck stub, Social Security, Medicare, or
Medicaid statement, school transcript, or federal affidavit
of birth, as long as the document includes the voter's full
name and date of birth).    Moreover, a Federal District
Court found that Georgia "has undertaken a serious,
concerted effort to notify voters who may lack Photo ID
cards of the Photo ID requirement, to inform those voters
of the availability of free [State-issued] Photo ID cards or
free Voter ID cards, to instruct the voters concerning how
to obtain the cards, and to advise the voters that they can
vote absentee by mail without a Photo ID." *Common
Cause/Georgia* v. *Billups*, 504 F. Supp. 2d 1333, 1380 (ND
Ga. 2007). While Indiana allows only certain groups such
as the elderly and disabled to vote by absentee ballot, in
Georgia *any* voter may vote absentee without providing
any excuse, and (except where required by federal law)
need not present a photo ID in order to do so. Compare
Ind. Code §3–11–4–1 (West 2006) with Ga. Code Ann.
§21–2–381 (Supp. 2007).    Finally, neither Georgia nor
Florida insists, as Indiana does, that indigent voters travel
each election cycle to potentially distant places for the
purposes of signing an indigency affidavit.

    The record nowhere provides a convincing reason why
Indiana's photo ID requirement must impose greater
burdens than those of other States, or than the Carter-
Baker Commission recommended nationwide.    Nor is
there any reason to think that there are proportionately

TX_00002570

USA_00020211

Cite as: 553 U. S. ____ (2008)          5

BREYER, J., dissenting

fewer such voters in Indiana than elsewhere in the country (the District Court's rough estimate was 43,000). See 458 F. Supp. 2d 775, 807 (SD Ind. 2006). And I need not determine the constitutionality of Florida's or Georgia's requirements (matters not before us), in order to conclude that Indiana's requirement imposes a significantly harsher, unjustified burden.

Of course, the Carter-Baker Report is not the Constitution of the United States. But its findings are highly relevant to both legislative and judicial determinations of the reasonableness of a photo ID requirement; to the related necessity of assuring that all those eligible to vote possess the requisite IDs; and to the presence of alternative methods of assuring that possession, methods that are superior to those that Indiana's statute sets forth. The Commission's findings, taken together with the considerations set forth in Part II of JUSTICE STEVENS' opinion, and Part II of JUSTICE SOUTER's dissenting opinion, lead me to the conclusion that while the Constitution does not in general forbid Indiana from enacting a photo ID requirement, this statute imposes a disproportionate burden upon those without valid photo IDs. For these reasons, I dissent.

TX_00002571

USA_00020212

**American Bar Association**
**www.supremecourtpreview.org**

Nos. 07-21 & 07-25

# In the
# Supreme Court of the United States

WILLIAM CRAWFORD, ET AL.,
*Petitioners*,

v.

MARION COUNTY ELECTION BOARD, ET AL.,
*Respondents*.

INDIANA DEMOCRATIC PARTY, ET AL.,
*Petitioners*,

v.

TODD ROKITA, ET AL.,
*Respondents*.

On Writ of Certiorari to the
United States Court of Appeals for the Seventh Circuit

**BRIEF OF TEXAS, ALABAMA, COLORADO, FLORIDA, HAWAII,
MICHIGAN, NEBRASKA, PUERTO RICO, AND SOUTH DAKOTA
AS *AMICI CURIAE* SUPPORTING RESPONDENTS**

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney
General

DAVID S. MORALES
Deputy Attorney General for
Civil Litigation

R. TED CRUZ
Solicitor General
*Counsel of Record*

PHILIP A. LIONBERGER
Assistant Solicitor General

P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

[Additional counsel listed on
inside cover]

Exhibit 41

TX_00002572

USA_00020213

ADDITIONAL COUNSEL FOR AMICI

TROY KING
Attorney General of Alabama

JOHN W. SUTHERS
Attorney General of Colorado

BILL McCOLLUM
Attorney General of Florida

MARK J. BENNETT
Attorney General of Hawaii

MICHAEL A. COX
Attorney General of Michigan

JON BRUNING
Attorney General of Nebraska

ROBERTO J. SÁNCHEZ-RAMOS
Secretary of Justice of the Commonwealth of Puerto Rico

LAWRENCE E. LONG
Attorney General of South Dakota

TX_00002573

USA_00020214

i

## TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . iii

Interest of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . 1

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  Voter Fraud Is a Serious Concern.. . . . . . . . . . 2

   A. The History of Our Nation Demonstrates the
      Ongoing Threat of Voter Fraud.. . . . . . . . . . . . 3

   B. Voter Impersonation at the Polls Is Likewise a
      Serious Threat to the Integrity of Our Electoral
      Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   C. Congress and All 50 States Have Legislated to
      Prohibit and Prevent Voter Fraud.. . . . . . . . . . 9

II.  The Seventh Circuit Was Correct to Apply the
    "More Flexible" Standard of the "Ordinary
    Litigation" Test to Indiana's Photo-ID
    Requirement.. . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.  Indiana's Photo-ID Requirement Passes
     Constitutional Muster Under the Ordinary
     Litigation Test. . . . . . . . . . . . . . . . . . . . . . . . . . 17

TX_00002574
JA_005333

TX_00002574

USA_00020215

ii

A. Requiring Photo ID Imposes a Negligible Burden
on the Right to Vote.... . . . . . . . . . . . . . . . . . . . . 17

B. Photo-ID Requirements Curtail Voting Fraud and
Help to Promote Voter Confidence in the Electoral
Process.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C. The Substantial State Interests Outweigh the
Slight Burden on Petitioners' Interests.. . . . . . 30

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

TX_00002575
JA_005334

TX_00002575

USA_00020216

iii

## TABLE OF AUTHORITIES

**Cases:**

*Anderson* v. *Celebrezze,*
   460 U.S. 780 (1983)................ 14-17, 24, 26, 30

*Burdick* v. *Takushi,*
   504 U.S. 428 (1992)........... 14, 16, 17, 26, 30, 31

*Clingman* v. *Beaver,* 544 U.S. 581 (2005). ......... 15

*Common Cause/Georgia* v. *Billups,*
   504 F.Supp.2d 1333 (N.D. Ga. 2007)............ 10

*Crawford* v. *Marion County Election Bd.,*
   472 F.3d 949 (CA7 2007). ......... 14-15, 18, 27, 28

*Eu* v. *San Francisco County Democratic*
   *Cent. Comm.,* 489 U.S. 214 (1989)............. 1, 27

*FCC* v. *Beach Commc'ns,* 508 U.S. 307 (1993)....... 30

*Ill. State Bd. of Elections* v. *Socialist Workers Party,*
   440 U.S. 173 (1979)......................... 15

*Ind. Democratic Party* v. *Rokita,*
   458 F.Supp.2d 775 (S.D. Ind. 2006)........... 30, 31

*McIntyre* v. *Ohio Elections Comm'n,*
   514 U.S. 334 (1995)..................... 14, 16, 17

TX_00002576

USA_00020217

iv

*Munro* v. *Socialist Workers Party*,
479 U.S. 189 (1986)..................... 15, 29, 30

*Norman* v. *Reed*, 502 U.S. 279 (1992). ......... 14, 16

*Purcell* v. *Gonzalez*, 127 S.Ct. 5 (2006).......... 2, 27

*Reynolds* v. *Sims*, 377 U.S. 533 (1964)............. 2

*Storer* v. *Brown*, 415 U.S. 724 (1974)........ 15, 16, 30

*Tashjian* v. *Republican Party of Conn.*,
479 U.S. 208 (1986)......................... 15

*Timmons* v. *Twin Cities Area New Party*,
520 U.S. 351 (1997)..................... 14, 16, 30

*Weinschenk* v. *State*,
203 S.W.3d 201 (Mo. 2006)................. 10, 30

## Statutes, Rules, and Constitutional Provisions:

10 ILL. COMP. STAT. ANN. 5/4-105................. 11

108-00-009 ARK. CODE R. §901................... 11

21-000-021 MISS. CODE R. §§1-13................ 11

25 PA. CONS. STAT. ANN. §3050(a)-(a.1). ........... 13

42 U.S.C. §15301, *et seq*....................... 9, 13

TX_00002577

USA_00020218

v

42 U.S.C. §15483(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. §15484. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. §15485. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

950 MASS. CODE REGS. 52.03(5B). . . . . . . . . . . . . . . . 11

ALA. CODE §17-9-30(b). . . . . . . . . . . . . . . . . . . . . . . . . 13

ALA. CODE §17-9-30(f). . . . . . . . . . . . . . . . . . . . . . . . . 13

ALASKA STAT. §15.15.225(a)-(b). . . . . . . . . . . . . . . . . . 13

ARIZ. REV. STAT. ANN. §16-579(A). . . . . . . . . . . . . . . . 13

ARK. CODE ANN. §7-5-305(a). . . . . . . . . . . . . . . . . . . . 11

CAL. CODE REGS. tit. 2, §20107. . . . . . . . . . . . . . . . . . . 11

CAL. ELEC. CODE §14243. . . . . . . . . . . . . . . . . . . . . . . 12

COLO. REV. STAT. ANN. §1-1-104(19.5). . . . . . . . . . . . 13

COLO. REV. STAT. ANN. §1-7-110(1)-(2). . . . . . . . . . . . 13

CONN. GEN. STAT. ANN. §9-261(a). . . . . . . . . . . . . . . . 13

D.C. CODE §1-1001.7(i)(1), (3). . . . . . . . . . . . . . . . . . . 12

D.C. CODE §1-1001.7(i)(6). . . . . . . . . . . . . . . . . . . . . . 11

DEL. CODE ANN. tit. 15, §4937(a). . . . . . . . . . . . . . . . 13

TX_00002578
JA_005337

TX_00002578

USA_00020219

vi

FLA. STAT. ANN. §101.043. . . . . . . . . . . . . . . . . . . . . . . . . . 10

FLA. STAT. ANN. §101.048. . . . . . . . . . . . . . . . . . . . . . . . . . 10

FLA. STAT. ANN. §97.0535. . . . . . . . . . . . . . . . . . . . . . . . . . 10

GA. CODE ANN. §21-2-417. . . . . . . . . . . . . . . . . . . . . . . . . 10

GA. CODE ANN. §21-2-417.1. . . . . . . . . . . . . . . . . . . . . . . 10

GA. CODE ANN. §21-2-417(b). . . . . . . . . . . . . . . . . . . . . . 10

HAW. REV. STAT. ANN. §11-136. . . . . . . . . . . . . . . . . . . 11

Help America Vote Act of 2002 (HAVA),
  Pub. L. 107-252, 116 Stat. 1666. . . . . . . . . . . . . . . . . 9

IDAHO CODE §34-410. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IND. CODE ANN. §3-11.7-5-2.5. . . . . . . . . . . . . . . . . . . . . 10

IND. CODE ANN. §3-11-10-1.2. . . . . . . . . . . . . . . . . . . . . 32

IND. CODE ANN. §3-11-10.5. . . . . . . . . . . . . . . . . . . . . . . 17

IND. CODE ANN. §3-11-8-16. . . . . . . . . . . . . . . . . . . . . . . 17

IND. CODE ANN. §3-11-8-18. . . . . . . . . . . . . . . . . . . . . . . 17

IND. CODE ANN. §3-11-8-25.1(a). . . . . . . . . . . . . . . . . . 10

IND. CODE ANN. §3-11-8-25.1(d). . . . . . . . . . . . . . . . . . 10

TX_00002579
JA_005338

TX_00002579

USA_00020220

vii

IND. CODE ANN. §3-5-2-40.5. . . . . . . . . . . . . . . . . . . . . .   10

IND. CODE ANN. §9-24-16-10. . . . . . . . . . . . . . . . .   25, 32

IND. CODE ANN. §§3-11.7-1-2 to -6-3. . . . . . . . . . . . . . .   17

IND. CODE ANN. §§3-11-8-7 to -8. . . . . . . . . . . . . . . . .   17

IND. CODE ANN. §§3-7-10-1 to -48-10. . . . . . . . . . . . .   17

IOWA CODE ANN. §49.77(1). . . . . . . . . . . . . . . . . . . . .   12

IOWA CODE ANN. §49.77(4)(a). . . . . . . . . . . . . . . . . . .   12

KAN. STAT. ANN. §25-2908(c)(4). . . . . . . . . . . . . . . .   13

KAN. STAT. ANN. §25-2908(d). . . . . . . . . . . . . . . . . . .   13

KAN. STAT. ANN. §25-2908(h). . . . . . . . . . . . . . . . . . .   13

KY. REV. STAT. ANN. §117.227.. . . . . . . . . . . . . . . . . .   13

LA. REV. STAT. ANN. §18:562(A). . . . . . . . . . . . . . . . .   12

MASS. GEN. LAWS ANN. ch.54, §76B(a). . . . . . . . . . . .   11

MD. CODE ANN., ELEC. LAW §10-312. . . . . . . . . . . . . .   12

ME. REV. STAT. ANN. tit. 21-A, §121(1-A). . . . . . . . . . .   12

MICH. COMP. LAWS ANN. §168.523(1). . . . . . . . . . . . .   12

MINN. R. 8200.5500. . . . . . . . . . . . . . . . . . . . . . . . . . .   12

TX_00002580

USA_00020221

viii

MINN. STAT. ANN. §201.061(3). . . . . . . . . . . . . . . . . . 12

MISS. CODE ANN. §23-15-169.5. . . . . . . . . . . . . . . . . . 11

MO. ANN. STAT. §115.427. . . . . . . . . . . . . . . . . . . . . . 10

MO. ANN. STAT. §115.427(5). . . . . . . . . . . . . . . . . . . . 10

MONT. ADMIN. R. 44.3.2102(6). . . . . . . . . . . . . . . . . . 13

MONT. CODE ANN. §13-13-114(1)(a). . . . . . . . . . . . . . 13

N.C. GEN. STAT. §163-166.12(a). . . . . . . . . . . . . . . . . 11

N.D. CENT. CODE §16.1-05-07(1)-(3). . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §654:12(III). . . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §654:7-a(II). . . . . . . . . . . . . . . 12

N.H. REV. STAT. ANN. §659:13. . . . . . . . . . . . . . 11, 12

N.J. STAT. ANN. §19:15-17(b). . . . . . . . . . . . . . . . . . . 11

N.M. STAT. ANN. §1-1-23. . . . . . . . . . . . . . . . . . . . . . 13

N.M. STAT. ANN. §1-1-24. . . . . . . . . . . . . . . . . . . . . . 13

N.M. STAT. ANN. §1-12-7.1(D). . . . . . . . . . . . . . . . . . 13

N.Y. COMP. CODES R. & REGS. tit. 9, §6217.6(k). . . . . 11

N.Y. ELEC. LAW §8-302(2). . . . . . . . . . . . . . . . . . . . . 11

TX_00002581
JA_005340

TX_00002581

USA_00020222

ix

N.Y. Elec. Law §8-302(2-a). . . . . . . . . . . . . . . . . . . . . 11

N.Y. Elec. Law §8-303(1)-(2)(a)(1). . . . . . . . . . . . . . . 11

Neb. Rev. Stat. Ann. §32-914(2)(a)-(b). . . . . . . . . . . 11

Neb. Rev. Stat. Ann. §32-914(2)(c). . . . . . . . . . . . . . 11

Nev. Rev. Stat. Ann. §293.2725(1)(a). . . . . . . . . . . . 11

Ohio Admin. Code §111-12-03(C)(8). . . . . . . . . . . . . 13

Ohio Rev. Code Ann. §3505.18(A)(1).. . . . . . . . . . . . 13

Okla. Admin. Code §230:35-5-113.3. . . . . . . . . . . . . 11

Okla. Stat. Ann. tit. 26, §7-115.2. . . . . . . . . . . . . . . 11

Or. Rev. Stat. §254.385(1). . . . . . . . . . . . . . . . . . . . . 12

Or. Rev. Stat. §254.465. . . . . . . . . . . . . . . . . . . . . . . 12

Or. Rev. Stat. §254.474. . . . . . . . . . . . . . . . . . . . . . . 12

P.R. Laws Ann. tit. 16, §3059. . . . . . . . . . . . . . . . . . 13

P.R. Laws Ann. tit. 16, §3061. . . . . . . . . . . . . . . . . . 13

R.I. Gen. Laws §17-20-6.2. . . . . . . . . . . . . . . . . . . . . 11

S.C. Code Ann. §7-13-710. . . . . . . . . . . . . . . . . . . . . 13

S.C. Code Ann. §7-5-620. . . . . . . . . . . . . . . . . . . . . . 13

TX_00002582

USA_00020223

x

S.D. ADMIN. R. 5:02:05:25. . . . . . . . . . . . . . . . . . . . . . . 12

S.D. CODIFIED LAWS §12-18-6.1. . . . . . . . . . . . . . . . . 12

S.D. CODIFIED LAWS §12-18-6.2. . . . . . . . . . . . . . . . . 12

TENN. CODE ANN. §2-7-112(a)(1). . . . . . . . . . . . . . . . . 13

TEX. ELEC. CODE ANN. §63.008(a). . . . . . . . . . . . . . 13

TEX. ELEC. CODE ANN. §63.0101. . . . . . . . . . . . . . . . 13

U.S. CONST. art. I, §4, cl.1. . . . . . . . . . . . . . . . . . . . . . . 15

UTAH CODE ANN. §20A-3-104(1)(a)-(c). . . . . . . . . . . . 13

UTAH CODE ANN. §20A-3-105.5(4). . . . . . . . . . . . . . . 13

VA. CODE ANN. §24.2-643(B). . . . . . . . . . . . . . . . . . . . 13

VT. STAT. ANN. tit. 17, §2563. . . . . . . . . . . . . . . . . . . 11

W. VA. CODE ANN. §3-2-10(g). . . . . . . . . . . . . . . . . . . 11

WASH. REV. CODE ANN. §29A.08.113(1). . . . . . . . . . . 13

WASH. REV. CODE ANN. §29A.44.205. . . . . . . . . . . . . 13

WIS. STAT. ANN. §6.34(2)-(3). . . . . . . . . . . . . . . . . . . . 11

WYO. STAT. ANN. §22-3-118(b). . . . . . . . . . . . . . . . . . 11

TX_00002583
JA_005342

TX_00002583

USA_00020224

xii

*Commissioner Given Probation for Voting Fraud*,
  Nov. 10, 2005, Assoc. Press, http://abclocal.go.
  com/ktrk/story?section=state&id=3622674 . . . . . . . . 5-6

David B. Muhlhausen & Keri Weber Sikich,
  A Report of the Heritage Center for Data Analysis:
  "New Analysis Shows Voter Identification Laws
  Do Not Reduce Turnout," (2007), http://www.
  heritage.org/Research/LegalIssues/upload/
  cda_07-04.pdf. . . . . . . . . . . . . . . . . . . . . . . 19, 20, 23

Debate, Prof. Bradley A. Smith of Capital Univ.
  Sch. of Law & Prof. Edward B. Foley of Ohio
  State Univ., "Voter ID: What's at Stake?,"
  156 U. Pa. L. Rev. (PENNumbra) 241 (2007),
  at http://www.pennumbra.com/debates/pdfs/
  voterid.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . 24-25, 26

Derrick Nunnally, *Man Covicted of Double Voting:
  "I Forgot" Dosen't Get Toas Resident Off Hook*,
  Milwaukee J. Sentinel, Aug. 22, 2007,
  http://www.jsonline.com/story/index.aspx?
  id=651215. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Five Rio Grande Valley Residents Indicted for
  Voter Fraud Allegedly from 2006 Election Cycle*,
  June 1, 2007, http://www.edinburgpolitics.com/
  ?p=82. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Former Port Lavaca Councilwoman Briseno to
  Serve Five Years in Prison for Voter Fraud*,
  June 25, 2007, http://www.freerepublic.com/
  focus/f-news/1856131/posts. . . . . . . . . . . . . . . . . 5

TX_00002584
JA_005343

TX_00002584

USA_00020225

xiii

Frank B. Strickland & Anne W. Lewis,
*It's About Fraud, Not Jim Crow*,
WASH. POST, Aug. 30, 2005..................... 8

Ga. S. Res. 4, R.S. (2007). ..................... 14

Greg Reeves, *One Person, One Vote? Not Always*,
KANSAS CITY STAR, Sept. 5, 2004,
http://www.angelfire.com/pa/sergeman/issues
/elections/onevote.html....................... 7-8

Hearing on Non-Citizen Voting Before the
Comm. on House Admin., 109th Cong. (2006)....... 4

Ill. H.B. 3418, 95th Leg., R.S. (2007)............. 14

Iowa S.F. 84, 82d Leg., R.S. (2007)................ 14

Jeffrey Milyo, Draft Policy Rep. for the Inst. of
Pub. Pol'y in theTruman Sch. of Pub. Affairs,
Univ. of Mo.: "The Effects of Photographic
Identification on Voter Turnout in Indiana:
A County-Level Analysis" (2007)............... 24

Jennifer Liberto, *Vote Illegally, Get Caught:
What Happens? Very Little*, ST. PETERSBURG
TIMES, July 18, 2004, http://www.sptimes.com/
2004/07/18/State/ Vote_illegally__get_c.shtml. .... 28

John Fund, *Jimmy Carter Is Right*,
WALL ST. J., May 22, 2006, http://www.opinion
journal.com/diary/?id=110008411. ............... 31

TX_00002585

USA_00020226

xiv

JOHN FUND, STEALING ELECTIONS:
   HOW VOTER FRAUD THREATENS
   OUR DEMOCRACY (2004). . . . . . . . . . . . . . . . . . . . . . .  31

John R. Lott, Jr., Report: "Evidence of Voter
   Fraud and the Impact That Regulations to
   Reduce Fraud Have on Voter Participation
   Rates" (Rev. ed. 2006), http://www.vote.
   caltech.edu/VoterID/ssrn-id925611.pdf. . . . .  20, 23, 27

Kan. S.B. 169, R.S. (2007). . . . . . . . . . . . . . . . . . . . . . .  14

LARRY J. SABATO & GLENN R. SIMPSON,
   DIRTY LITTLE SECRETS: THE PERSISTENCE OF
   CORRUPTION IN AMERICAN POLITICS (1996). . . . . . . . .  3

Manny Garcia and Tom Dubocq, *Unregistered
   Voters Cast Ballots in Dade: Dead Man's Vote,
   Scores of Others Were Allowed Illegally,
   Herald Finds*, MIAMI HERALD, Dec. 24, 2000, http:
   //www.englishfirst.org/ballots/deadvote.htm. . . . . . . .  8

Mary Ann Cavazos, *Robstown Woman Indicted
   and Jailed in Voter-Fraud Case*, CALLER-TIMES,
   June 16, 2006, http://www.caller.com/ccct/
   local_news/article/0,1641,CCCT_811_4779588,00.
   html. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Mass. S.B. 440, 185th Leg., R.S. (2007). . . . . . . . . . . .  14

Md. S.B. 597, R.S. (2007). . . . . . . . . . . . . . . . . . . . . . .  14

Minn. H.F. 121, 85th Leg., R.S. (2007). . . . . . . . . . . .  14

TX_00002586

USA_00020227

xv

Miss. H.B. 309, 824, 920, 1386, 1388,
   1408, S.B. 2038, 2121, 2256, 2617, 2700,
   R.S. (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

N.C. H.B. 185, R.S. (2007). . . . . . . . . . . . . . . . . . . . .  14

N.M. H.B. 628, 48th Leg., R.S. (2007). . . . . . . . . . . . .  14

Nev. S.B. 385, 74th Leg., R.S. (2007). . . . . . . . . . . . . .  14

*Nueces County Indictment in Voter Fraud*
   *Investigation*, Assoc. Press, Jan. 19, 2007,
   http://www.kristv.com/global/story.
   asp?s=4263338. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

Okla. S.B. 15, 51st Leg., R.S. (2007). . . . . . . . . . . . . .  14

Reeves County Woman Convicted for Voter Fraud,
   June 28, 2006, http://www.brackettville.info/
   modules/news/article.php?storyid=1186. . . . . . . . . . .  6

*Refugio County Commissioner Pleads Guilty to*
   *Election Fraud Scheme*, Oct. 9, 2007,
   http://www.setexasrecord.com/news/
   202316-refugio-county-commissioner-
   pleads-guilty-to-election-fraud-scheme. . . . . . . . . . . .  5

Report of Nat'l Comm'n on Fed. Election
   Reform: Building Confidence in
   U.S. Elections (2005). . . . . . . . . . . . . . . . . . .  9, 25, 27

TX_00002587

USA_00020228

xvi

Report to the U.S. Election Assistance
Comm'n on Best Practices to Improve
Voter Identification Requirements Pursuant
to the Help America Vote Act of 2002,
Eagleton Inst. of Pols., Rutgers, The State
Univ. of N.J., & Moritz College of Law,
Ohio State Univ. (2006). . . . . . . . . . . . . . . . . . . . . . . 18

Sara Perkins, *Hidalgo County DA: Convictions
Hard to Get in Voter Fraud Cases*, THE MONITOR,
Aug. 4, 2007, http://www.themonitor.com/
onset?id=4277&template=article.html. . . . . . . . . . . 28

Sara Perkins, *Valley Officials, Observers at
Odds Over Need for New Voter ID Laws*,
THE MONITOR, Apr. 24, 2007, http://www.
themonitor.com/common/printer/
view.php?db=monitortx&id=1855. . . . . . . . . . . . . . . 8

Stephen Ansolabehere, Elting R. Morison
Professor, Dep't of Pol. Sci., MIT, Paper
Presented at N.Y.U. Ann. Surv. Am. L.
Symp.: "Access Versus Integrity in Voter
Identification Requirements" (2007),
http://web.mit.edu/polisci/portl/cces/material/
NYU_Identification1.pdf. . . . . . . . . . . . . . . . . . . 22, 32

Steven F. Huefner, *Remedying Election Wrongs*,
44 HARV. J. ON LEGIS. 265 (2007). . . . . . . . . . . . . . . . 3-4

TX_00002588

USA_00020229

xvii

Task Force on Fed. Election Sys.,
John Mark Hansen, *Chap. VI: Verification
of Identity* (2001), http://www.tcf.org/
publications/electionreform/
ncfer/hansen_chap6_verification.pdf. . . . . . . . . . . .  23

Tenn. H.B. 938, S.B. 227,
105th Leg., R.S. (2007). . . . . . . . . . . . . . . . . . . . . . .  14

Tex. H.B. 218, 80th Leg., R.S. (2007). . . . . . . . . . . . .  14

Timothy Vercellotti & David Anderson,
Paper Presented at 2006 Ann. Meeting
of Am. Pol. Sci. Ass'n, Philadelphia, Pa.,
Aug. 31-Sept. 3, 2006: "Protecting the
Franchise, or Restricting It?: The
Effects of Voter Identification Requirements
on Turnout," http://moritzlaw.osu.edu/blogs/
tokaji/voter%20id%20and%20turnout
%20study.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18-19

TRACY CAMPBELL, DELIVER THE VOTE:
A HISTORY OF ELECTION FRAUD, AN AMERICAN
POLITICAL TRADITION—1742-2004 (2005) . . . . . . . .  3, 4

Wash. H.B. 1468, 60th Leg., R.S. (2007). . . . . . . . . . .  14

### INTEREST OF *AMICI CURIAE*

*Amici* States have a compelling interest in safeguarding the integrity of democratic elections. *Eu* v. *San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). All 50 States, the District of Columbia, and Puerto Rico have enacted laws concerning voter qualifications, ballot security, and voter fraud. Indiana's photo-ID statute reflects that tradition, ensuring that every qualified voter's vote counts and that those votes are not diluted by illegal votes cast by others.

Voter fraud undermines respect for democracy and public confidence in the electoral process. *Amici* States have a strong interest—indeed, an obligation—to combat voter fraud and to protect the fundamental right to vote for every citizen.

### SUMMARY OF THE ARGUMENT

Voter fraud is a serious concern, and Congress and every State in the Union have legislated to address it. The bipartisan Commission on Federal Election Reform, co-chaired by former President Jimmy Carter and former Secretary of State James Baker, expressly urged that States require photo IDs for voting, and several States, including Indiana, have followed that recommendation.

Requiring a photo ID to vote serves important government interests. It protects the integrity of elections, promotes confidence in the democratic process, and avoids diluting the votes of legal voters. And the burden on voters is slight. In our modern age, photo IDs are required for the most mundane activities, from driving a car to entering a government building to renting a DVD. As recommended by the Carter-Baker Commission, Indiana has provided photo IDs *without cost*, and so the burden of securing one is minimal.

TX_00002590

USA_00020231

2

Under longstanding precedent, the States have substantial leeway to balance competing policy interests, and Indiana has implemented a commonsense measure to prevent fraud in democratic elections. Nothing in the Constitution prohibits this law.

## ARGUMENT

### I.   VOTER FRAUD IS A SERIOUS CONCERN.

The foundation of Petitioners' challenge is the notion that voter fraud, and in particular in-person voter fraud, is not a very serious problem. They urge that "the record is . . . bereft of evidence suggesting any fraud problem," and that Indiana in particular lacks "any reasonable basis to suspect that such fraud is a risk in Indiana." Pet'r Br. (07-021), at 46-47, 54. Petitioners are incorrect.

At the most general level, the falsity of Petitioners' position is easily demonstrated. Voter fraud is a serious problem. Just last Term, the Court explained,

> "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. *Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.* Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised. '[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Purcell* v. *Gonzalez*, 127 S.Ct. 5, 7 (2006) (per curiam) (emphasis added) (quoting *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964)).

Indeed, the threat of voter fraud is sufficiently pronounced that the Carter-Baker Commission was

TX_00002591

USA_00020232

3

convened to carefully study the issues and to make recommendations. That Commission, in turn, issued a final report in 2005 entitled "*Building Confidence in U.S. Elections.*" The bipartisan report began,

"[e]lections are at the heart of democracy . . . . *Americans are losing confidence in the fairness of elections*, and while we do not face a crisis today, we need to address the problems of our electoral system . . . ." REPORT OF NAT'L COMM'N ON FED. ELECTION REFORM: BUILDING CONFIDENCE IN U.S. ELECTIONS, at ii (2005) [CARTER-BAKER COMM'N REP.].

### A. The History of Our Nation Demonstrates the Ongoing Threat of Voter Fraud.

From New York's Tammany Hall to the Kansas City Pendergast machine, from Alice, Texas and the 1948 Senate race between Lyndon B. Johnson and Coke Stevenson to Mayor Richard Daley's Chicago machine in the 1960 presidential race, the specter of voter fraud has threatened the integrity of the electoral process for the entire history of our Nation. And that threat continues to this day. *See, e.g.*, TRACY CAMPBELL, DELIVER THE VOTE: A HISTORY OF ELECTION FRAUD, AN AMERICAN POLITICAL TRADITION—1742-2004, at xvi-xvii (2005) [CAMPBELL, ELECTION FRAUD] (noting that the American political process has been "deeply corrupted . . . for over two hundred years" and that voting fraud "is a deeply embedded culture within American politics that considers cheating fully justifiable"); LARRY J. SABATO & GLENN R. SIMPSON, DIRTY LITTLE SECRETS: THE PERSISTENCE OF CORRUPTION IN AMERICAN POLITICS 276 (1996) ("Our nation has a long and depressing history as a happy haven for the vote thief."); Steven F. Huefner, *Remedying*

TX_00002592

USA_00020233

4

*Election Wrongs*, 44 HARV. J. ON LEGIS. 265, 271 (2007)
("Voting fraud of course is a long-standing plague on
democratic elections.").

Recent notorious instances of alleged voting fraud
include the 1996 Dornan-Sanchez congressional race for
California's 46th District, in which investigators turned up
evidence of at least 784 illegal votes cast by noncitizens,
*see* Hearing on Non-Citizen Voting Before the Comm. on
House Admin., 109th Cong. 2 (2006) (testimony of Dan
Stein); the 2000 Miami mayor's race between Joe Carollo
and Xavier Suarez involving tainted absentee ballots,
CAMPBELL, ELECTION FRAUD, at 286-91; and the 2004
Washington gubernatorial race, where a state judge
determined that 1,678 votes had been illegally cast, *see*
CARTER-BAKER COMM'N REP., at 4. In addition, since
October 2002 the U.S. Department of Justice has launched
more than 180 investigations into election fraud that have
resulted in charges against 89 individuals and 52
convictions. *Id.*, at 45. These events serve as sad
reminders that voting fraud is a real and persistent part
of American politics and that, even assuming that voting
fraud is not as widespread as it was in decades past, it can
still affect the outcome of a close election. *Id.*, at 18.

Petitioners' claim that voting fraud is largely chimerical
is belied by the facts. For example, for decades, the State
of Texas has grappled with the challenges of voting fraud.
Lyndon B. Johnson's 1946 Senate campaign is only the
most infamous instance, but serious allegations of voter
fraud have persisted, especially in South Texas, for more
than a century.

Over the past five years, the Texas Attorney General's
Office has vigorously enforced the voter-fraud laws, and

TX_00002593

USA_00020234

5

has obtained numerous indictments, guilty pleas, and
convictions. In one case, a city councilwoman was
convicted and sentenced to five years in prison for
registering noncitizens to vote and then facilitating
noncitizen voting by tampering with government
documents. *See Former Port Lavaca Councilwoman
Briseno to Serve Five Years in Prison for Voter Fraud*, June
25, 2007, http://www.freerepublic.com/focus/f-
news/1856131/posts. Another instance of voter fraud
involved allegations that a woman escorted voters into
polling sites and illegally marked ballots without their
consent. *See* Mary Ann Cavazos, *Robstown Woman
Indicted and Jailed in Voter-Fraud Case*, CALLER-TIMES,
June 16, 2006, http://www.caller.com/ccct/local_news/article/
0,1641,CCCT_811_4779588,00.html. In yet another case,
a man was indicted for double voting in the November
2006 general election. *See Five Rio Grande Valley
Residents Indicted for Voter Fraud Allegedly from 2006
Election Cycle*, June 1, 2007, http://www.edinburgpolitics.com/
?p=82. There was also a Refugio County Commissioner
who pled guilty to the felony of tampering with
government documents during a primary election, an East
Texas former State Senator who was indicted for official
oppression in trying to keep two candidates for a water
board off the ballot, and a Beeville, Texas resident who
pleaded guilty to casting ballots for her deceased mother.
And many more instances of voting fraud relating to the
illegal possession, handling, and transport of mail-in
ballots have occurred. *See, e.g., Refugio County
Commissioner Pleads Guilty to Election Fraud Scheme*,
Oct. 9, 2007, http://www.setexasrecord.com/news/202316-
refugio-county-commissioner-pleads-guilty-to-election-
fraud-scheme; *Nueces County Indictment in Voter Fraud
Investigation*, ASSOC. PRESS, Jan. 19, 2007, http://www.kristv.com/

TX_00002594
JA_005353

TX_00002594

USA_00020235

6

global/story.asp?s=4263338; *Reeves County Woman Convicted for Voter Fraud*, June 28, 2006, http://www.brackettville. info/modules/news/article.php?storyid=1186; *Commissioner Given Probation for Voting Fraud*, Nov. 10, 2005, ASSOC. PRESS, http://abclocal.go.com/ktrk/story?section =state&id=3622674.

## B. Voter Impersonation at the Polls Is Likewise a Serious Threat to the Integrity of Our Electoral Process.

Petitioners could be heard to answer, no doubt, that while voter fraud writ large might perhaps be a problem, the specific problem of fraudulent voting at the polls—which photo-ID laws seek to prevent—is not at all significant. Again, Petitioners are incorrect.

Although the precise magnitude of voter-impersonation fraud has been disputed, "there is no doubt that it occurs." *See* CARTER-BAKER COMM'N REP., at 18. For example, witnesses who testified during the last Regular Session of the Texas Legislature on proposed photo-ID legislation reported that voter impersonation, in which people's IDs or voter-registration cards have been stolen and false votes had been cast in those persons' names, is not uncommon. *See* A Bill Relating to Requiring a Voter to Present Proof of Identification: Hearing on Tex. H.B. 218 Before the House Comm. on Elections, 80th Leg., R.S. (Feb. 28, 2007), http://www.house.state.tx.us/committees/ broadcasts.php?session=80&committeeCode=240 (testimony of Ed Johnson of the Harris County Tax Office); *id.*, Hearing on Tex. H.B. 218 Before S. Comm. on State Affairs, 80th Leg., R.S. (Apr. 30, 2007), http://www.senate.state.tx.us/avarchive/?yr=2007&lim= 200 (testimony of Skipper Wallace, State Legislative

TX_00002595
JA_005354

TX_00002595

USA_00020236

7

Chairman for the Republican County Chairmans Association).

In Harris County, for example, there was an instance in which one candidate in a primary election registered hundreds of voters, changed their addresses, and then voted for them on election day. *See* A Bill Relating to Requiring a Voter to Present Proof of Identification: Hearing on Tex. H.B. 218 Before the House Comm. on Elections, 80th Leg., R.S. (Feb. 28, 2007), http://www.house.state.tx.us/committees/broadcasts.php? session=80&committeeCode=240 (testimony of Ed Johnson). There have also been reports of stolen voter-registration cards, *see id.* (testimony of Skipper Wallace), a crime that makes sense only if one is intending to impersonate legal voters.

Other examples abound. Consider the case of Michael Zore who voted twice in 2006 by going to the polling stations of two Milwaukee, Wisconsin suburbs in the space of six hours. His excuse: "I forgot." The evidence against him, however, showed that he signed up to vote using a false address from one precinct when he already voted in another precinct. Derrick Nunnally, *Man Covicted of Double Voting: "I Forgot" Dosen't Get Toas Resident Off Hook*, MILWAUKEE J. SENTINEL, Aug. 22, 2007, http://www.jsonline.com/story/index.aspx?id=651215.

Another double voter was James Scherzer, an attorney, who cast two ballots in the same election several times in 2000 and 2002; he did this by voting in Kansas and then crossing the state line and voting again in Missouri. Mr. Scherzer acknowledged, "I was wrong in what I did." Greg Reeves, *One Person, One Vote? Not Always*, KANSAS CITY STAR, Sept. 5, 2004, http://www.angelfire.com/pa/sergeman/

TX_00002596

USA_00020237

8

issues/elections/onevote.html. And his case was but one of dozens of potential double-voting cases in Kansas City. *Id.*

Besides double voting, dead people casting votes is not an uncommon type of voting fraud. For example in the 2000 election, André Alismé, who died of cancer in 1997, had a ballot cast in his name in the presidential election. Manny Garcia & Tom Dubocq, *Unregistered Voters Cast Ballots in Dade: Dead Man's Vote, Scores of Others Were Allowed Illegally, Herald Finds*, MIAMI HERALD, Dec. 24, 2000, http://www.englishfirst.org/ballots/deadvote.htm. A November 2000 Atlanta Journal-Constitution report showed that between 1980 and 2000, there were more than 5,000 documented cases of people voting in Georgia after their deaths. Frank B. Strickland & Anne W. Lewis, *It's About Fraud, Not Jim Crow*, WASH. POST, Aug. 30, 2005, at A17. And in South Texas, as one local government watchdog stated, it is well known that "[d]own here, we have dead people vote," referring to the fraudulent practice of using dead voters' registration cards to cast extra ballots. Moreover, voter registration cards have been issued to imaginary voters and then distributed to real people who were not registered. Sara Perkins, *Valley Officials, Observers at Odds Over Need for New Voter ID Laws*, THE MONITOR, Apr. 24, 2007, http://www.themonitor.com/common/printer/view.php?d b=monitortx&id=1855.

At the end of the day, there is considerable national evidence of in-person voter fraud. And, regardless of whether one believes that voter impersonation is widespread or relatively rare, there can be no serious dispute that its real effect can be substantial because, in a close election, even a small amount of fraud could make

TX_00002597

USA_00020238

9

the margin of difference. CARTER-BAKER COMM'N REP., at 18.

### C. Congress and All 50 States Have Legislated to Prohibit and Prevent Voter Fraud.

Congress and all 50 States, the District of Columbia, and Puerto Rico have enacted some form of voter-ID law. Collectively, these laws provide a continuum of regulatory responses to polling-place fraud and ballot security.

At the federal level, the Help America Vote Act of 2002 (HAVA), Pub. L. 107-252, 116 Stat. 1666 (codified at 42 U.S.C. §15301, *et seq.*), mandated that all States require photo ID, or in lieu of a photo ID some other form of approved nonphotograhic ID, from first-time voters who registered to vote by mail and did not provide verification of their identity with their mail-in registration. *See* 42 U.S.C. §15483(b). Congress explicitly provided, however, that this requirement was only a "minimum requirement[]," that States could establish "requirements that are more strict," and that States have "discretion" in implementing HAVA's requirements. *Id.* §§15484, 15485.

Even after HAVA, the Commission on Federal Election Reform expressly found that "[t]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters." CARTER-BAKER COMM'N REP., at 18. Pursuant to that finding, the Carter-Baker Commission explicitly recommended as follows:

> "[T]o make sure that a person arriving at a polling site is the same one who is named on the lists, *we propose a uniform system of voter identification* based on the 'REAL ID card' or an equivalent for people without a drivers license." *Id.*, at iv (emphasis added).

TX_00002598

USA_00020239

10

Consistent with both the federal mandate of HAVA and with the recommendation of the Carter-Baker Commission, the Indiana Legislature has chosen to require a valid photo ID at the ballot box.[1] Similarly, both Georgia and Missouri have enacted laws that strictly enforce a photo-ID requirement.[2] All of these laws allow a voter without ID to nonetheless cast a provisional ballot, but then count that provisional ballot only if either the voter's signature on file with the election authority can be verified or if the voter presents a valid photo ID to election officials within the time period for verifying provisional ballots.[3] Florida likewise requires all in-person voters to present a "current and valid picture identification."[4] And, like Indiana, Georgia, and Missouri, Florida allows a voter without photo ID to cast a provisional ballot, and that ballot will be counted only if the voter's signature on the provisional-ballot certification and affirmation matches the signature on the voter's registration or if written evidence confirms the voter's identity.[5]

---

1. *See* IND. CODE ANN. §§3-5-2-40.5, & 3-11-8-25.1(a).

2. *See* GA. CODE ANN. §§21-2-417, & 21-2-417.1; MO. ANN. STAT. §115.427. In 2006, the Missouri Supreme Court declared §115.427's photo-ID requirement to be invalid under that State's constitution. *See Weinschenk* v. *State*, 203 S.W.3d 201, 204, 221-22 (Mo. 2006). Recently, the United States District Court for the Northern District of Georgia upheld Georgia's photo-ID requirement, finding that the plaintiffs did "not demonstrate[] that the Photo ID requirement place[d] an undue or significant burden on the right to vote" and that the Plaintiffs' equal-protection challenge was meritless. *See Common Cause/Georgia* v. *Billups*, 504 F.Supp.2d 1333, 1382 (N.D. Ga. 2007).

3. *See* GA. CODE ANN. §21-2-417(b); IND. CODE ANN. §§3-11-8-25.1(d), & 3-11.7-5-2.5; MO. ANN. STAT. §115.427(5).

4. *See* FLA. STAT. ANN. §§97.0535, 101.043.

5. *See id.* §101.048.

TX_00002599

USA_00020240

11

At the other end of the continuum are jurisdictions that have currently chosen to require less rigorous measures for ballot security. These jurisdictions include Arkansas, California, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Dakota, Vermont, West Virginia, Wisconsin, and Wyoming. Collectively, these States employ an array of voter-ID laws, including: (i) relying on an honor system of announcing one's identity and matching the person's name on the registration list,[6] (ii) requiring compliance with HAVA's minimum identification standards for first-time voters who registered by mail,[7] (iii) requesting but not requiring that a person provide photo or written ID,[8] (iv) asking for ID and a written affirmation of identity if a person does not

---

6. *See, e.g.,* NEB. REV. STAT. ANN. §32-914(2)(a)-(b); N.H. REV. STAT. ANN. §659:13; N.Y. ELEC. LAW §8-302(2); VT. STAT. ANN. tit. 17, §2563.

7. *See, e.g.,* CAL. CODE REGS. tit. 2, §20107; D.C. CODE §1-1001.7(i)(6); IDAHO CODE §34-410; 10 ILL. COMP. STAT. ANN. 5/4-105; MISS. CODE ANN. §23-15-169.5; 21-000-021 MISS. CODE R. §§1-13; NEB. REV. STAT. ANN. §32-914(2)(c); NEV. REV. STAT. ANN. §293.2725(1)(a); N.J. STAT. ANN. §19:15-17(b); N.Y. ELEC. LAW §§8-302(2-a), & 8-303(1)-(2)(a)(1); N.Y. COMP. CODES R. & REGS. tit. 9, §6217.6(k); N.C. GEN. STAT. §163-166.12(a); OKLA. STAT. ANN. tit. 26, §7-115.2; OKLA. ADMIN. CODE §230:35-5-113.3; R.I. GEN. LAWS §17-20-6.2; VT. STAT. ANN. tit. 17, §2563; W. VA. CODE ANN. §3-2-10(g); WIS. STAT. ANN. §6.34(2)-(3); WYO. STAT. ANN. §22-3-118(b).

8. *See* ARK. CODE ANN. §7-5-305(a); 108-00-009 ARK. CODE R. §901 (Ar. State Bd. Election Comm'rs); HAW. REV. STAT. ANN. §11-136; MASS. GEN. LAWS ANN. ch.54, §76B(a); 950 MASS. CODE REGS. 52.03(5B).

TX_00002600

USA_00020241

12

appear on the election register,[9] (v) asking for ID and an attestation of identity if a person's identity is challenged,[10] (vi) requiring a person to sign an oath if their identity is challenged,[11] (vii) requiring a person to sign a poll book,[12] (viii) allowing a person without ID to vote if the voter provides his or her birth date and if a member of the election board or a clerk vouches for the individual,[13] or (ix) allowing a person without photo ID to vote, subject to challenge, if the voter executes an affidavit swearing to his or her identity.[14]

Between the two ends of the ballot-security continuum lie the voter-ID laws of Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, Kansas, Kentucky, Montana, New Mexico, Ohio, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington. These laws do not employ the same rigor as a strict photo-ID requirement, but they incorporate more numerous and greater ballot-security controls than other States. For instance, several States take an intermediate approach that requires all persons to present either photographic ID, written ID, or another form of unique

---

9. *See* IOWA CODE ANN. §49.77(4)(a); ME. REV. STAT. ANN. tit. 21-A, §121(1-A); MINN. STAT. ANN. §201.061(3); MINN. R. 8200.5500; N.H. REV. STAT. ANN. §§654:7-a(II), 654:12(III), 659:13.

10. *See* MD. CODE ANN., ELEC. LAW §10-312.

11. *See, e.g.,* CAL. ELEC. CODE §14243; D.C. CODE §1-1001.7(i)(1), (3); IOWA CODE ANN. §49.77(1).

12. *See* OR. REV. STAT. §254.385(1). Oregon is unique in that all elections there are conducted by mail. *See id.* §254.465. Nevertheless, "[a]t each primary election and general election, the county clerk [still must] maintain voting booths . . . ." *Id.* §254.474.

13. *See* N.D. CENT. CODE §16.1-05-07(1)-(3).

14. *See* LA. REV. STAT. ANN. §18:562(A); MICH. COMP. LAWS ANN. §168.523(1); S.D. CODIFIED LAWS §§12-18-6.1, -6.2; S.D. ADMIN. R. 5:02:05:25.

TX_00002601

USA_00020242

13

identifier before casting an in-person ballot.[15] Among these States, Arizona is unique in that it requires either one form of photo ID or *two* forms of written ID.[16] Alabama, Alaska, and Kentucky also require either photo or written ID, but the requirement will be waived if one or more election officers confirm the voter's identity.[17] Kansas and Pennsylvania require either photo ID or other written identification to cast an in-person ballot, but only for certain first-time voters.[18] Puerto Rico requires voters to present a photo ID issued by the Commonwealth's Election Commission.[19] Utah requires "valid voter identification" from an in-person voter only if it is indicated on the official register or if the poll worker does not know the voter and has reason to doubt the voter's identity.[20] And Texas requires that all in-person voters present their voter-registration cards to election officials.[21] If a voter does not have their registration card, he or she must execute an affidavit and present an accepted form of photo or written ID.[22]

---

15. *See* ARIZ. REV. STAT. ANN. §16-579(A); COLO. REV. STAT. ANN. §§1-1-104(19.5), & 1-7-110(1)-(2); CONN. GEN. STAT. ANN. §9-261(a); DEL. CODE ANN. tit. 15, §4937(a); MONT. CODE ANN. §13-13-114(1)(a); MONT. ADMIN. R. 44.3.2102(6); N.M. STAT. ANN. §§1-1-24, 1-1-23, & 1-12-7.1(D); OHIO REV. CODE ANN. §3505.18(A)(1); OHIO ADMIN. CODE §111-12-03(C)(8); S.C. CODE ANN. §§7-5-620, & 7-13-710; TENN. CODE ANN. §2-7-112(a)(1), (c); VA. CODE ANN. §24.2-643(B); WASH. REV. CODE ANN. §§29A.08.113(1), & 29A.44.205.

16. *See* ARIZ. REV. STAT. ANN. §16-579(A).

17. *See* ALA. CODE §17-9-30(b), (f); ALASKA STAT. §15.15.225(a)-(b); KY. REV. STAT. ANN. §117.227.

18. *See* KAN. STAT. ANN. §25-2908(c)(4), (d), (h); 25 PA. CONS. STAT. ANN. §3050(a)-(a.1).

19. P.R. LAWS ANN. tit. 16, §§3059, 3061.

20. *See* UTAH CODE ANN. §§20A-3-104(1)(a)-(c), & 20A-3-105.5(4).

21. *See* TEX. ELEC. CODE ANN. §63.008(a).

22. *See id.* §§63.008(a), .0101.

TX_00002602

USA_00020243

14

Of course, none of these laws is static. Following the recommendation of the Carter-Baker Commission, a significant number of state legislatures are actively debating whether to require a photo ID to vote,[23] much as Indiana, Georgia, Missouri, and Florida have already done. Thus, the laws are in flux, with the legislatures of the several States vigorously fulfilling their constitutional roles as Justice Brandeis's famous laboratories to determine the precise policy prescriptions that best protect democratic integrity.

## II. THE SEVENTH CIRCUIT WAS CORRECT TO APPLY THE "MORE FLEXIBLE" STANDARD OF THE "ORDINARY LITIGATION" TEST TO INDIANA'S PHOTO-ID REQUIREMENT.

In analyzing Indiana's photo-ID requirement, the Seventh Circuit refused to apply strict scrutiny and instead applied the "more flexible"[24] standard of the "ordinary litigation" test for statutes that "control the mechanics of the electoral process,"[25] as articulated in *Anderson* v. *Celebrezze*, 460 U.S. 780 (1983), and its progeny.[26] *See Crawford* v. *Marion County Election Bd.*,

---

23. *See , e.g.,* Ala H.B. 381, R.S. (2007); Cal. A.B. 9, R.S. (2007); Cal. S.B. 173, R.S. (2007); Ga. S. Res. 4, R.S. (2007); Ill. H.B. 3418, 95th Leg., R.S. (2007); Iowa S.F. 84, 82d Leg., R.S. (2007); Kan. S.B. 169, R.S. (2007); Md. S.B. 597, R.S. (2007); Mass. S.B. 440, 185th Leg., R.S. (2007); Minn. H.F. 121, 85th Leg., R.S. (2007); Miss. H.B. 309, 824, 920, 1386, 1388, 1408, S.B. 2038, 2121, 2256, 2617, 2700, R.S. (2007); Nev. S.B. 385, 74th Leg., R.S. (2007); N.M. H.B. 628, 48th Leg., R.S. (2007); N.C. H.B. 185, R.S. (2007); Okla. S.B. 15, 51st Leg., R.S. (2007); Tenn. H.B. 938, S.B. 227, 105th Leg., R.S. (2007); Tex. H.B. 218, 80th Leg., R.S. (2007); Wash. H.B. 1468, 60th Leg., R.S. (2007).

24. *Burdick* v. *Takushi*, 504 U.S. 428, 434 (1992).

25. *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995).

26. *Norman* v. *Reed*, 502 U.S. 279, 288-89 (1992); *Burdick*, 504 U.S., at 434-40; *Timmons* v. *Twin Cities Area New Party*, 520 U.S. 351,

TX_00002603
JA_005362

TX_00002603

USA_00020244

15

472 F.3d 949, 952-53 (CA7 2007). The Seventh Circuit was correct to do so. It cannot be that strict scrutiny applies—as Petitioners seem to claim—whenever so much as a single voter's ability to exercise his or her fundamental right to vote is burdened. Such a rule would be inconsistent with well-established precedent of this Court.

The right to vote is of course fundamental. *Burdick* v. *Takushi*, 504 U.S. 428, 433 (1992); *Ill. State Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 184 (1979). But that right is not absolute. *Burdick*, 504 U.S., at 433; *Munro* v. *Socialist Workers Party*, 479 U.S. 189, 193 (1986). Under the Constitution, States are expressly authorized to regulate the times, places, and manner of holding elections, U.S. CONST. art. I, §4, cl.1; *Tashjian* v. *Republican Party of Conn.*, 479 U.S. 208, 217 (1986), and, indeed, are compelled to take "an active role in structuring elections," *Burdick*, 504 U.S., at 433 (1992), to assure that the electoral process is orderly, fair, and honest. *Storer* v. *Brown*, 415 U.S. 724, 730 (1974).

All "[e]lection laws will invariably impose some burden upon individual voters." *Burdick*, 504 U.S., at 433. But there is no right to be free from any inconvenience or burden in voting. Indeed, a contrary rule would impermissibly "tie the hands of States seeking to assure elections are operated equitably and efficiently." *Id.* Thus, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Id.*, at 441 (citing *Anderson*, 460 U.S., at 788; *Storer*, 415 U.S., at 730).

---

359-64 (1997); *Clingman* v. *Beaver*, 544 U.S. 581, 591-97 (2005).

TX_00002604

USA_00020245

16

In assessing a challenge to an election-law provision that regulates the electoral process, the Court's analysis focuses on "the relative interests of the State and the injured voters" and "evalute[s] the extent to which the State's interests necessitated the contested restrictions." *McIntyre*, 514 U.S. at 345. Specifically, the Court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." *Anderson*, 460 U.S. at 789. Next, the Court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* The Court "determine[s] the legitimacy and strength of each of those interests," and "consider[s] the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* All of these factors are weighed "to decide whether the challenged provision is unconstitutional." *Id.*

When weighing the competing interests, a "'severe' restriction[]" upon the plaintiff's First and Fourteenth Amendment rights requires the challenged state election-law provision to be "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S., at 434; *Norman*, 502 U.S., at 289. But a "reasonable, nondiscriminatory restriction[]" triggers a "less exacting review," *Timmons*, 520 U.S., at 358, and will generally be upheld if "important regulatory interests" support the State's election-law provision. *Burdick*, 504 U.S., at 434; *Anderson*, 460 U.S., at 788 & n.9. In making these determinations, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." *Timmons*, 520 U.S., at 358 (citing *Storer*, 415 U.S., at 730).

TX_00002605

USA_00020246

17

The Seventh Circuit correctly applied the ordinary-litigation test because Indiana's photo-ID requirement is a component of that State's comprehensive scheme controlling participation in the electoral process. *See, e.g.,* *McIntyre*, 514 U.S., at 345 (explaining that because Ohio's statute prohibiting the distribution of anonymous campaign literature was not an election-law provision that controlled the mechanics of the electoral process but, rather, was a regulation of pure speech, the ordinary-litigation test did not apply). Other components of that scheme include extensive voter-registration laws, *see, e.g.,* IND. CODE ANN. §§3-7-10-1 to -48-10, regulations governing polling places, *see, e.g., id.,* §§3-11-8-7 to -8, -10.5, & -16 to -18, and laws on casting provisional ballots, *see, e.g., id.,* §§3-11.7-1-2 to -6-3, to name but a few. Like these other components of the State's scheme, the photo-ID provision is a type of time-place-and-manner restriction subject to the ordinary-litigation test of the *Anderson-Burdick* line of cases. The question thus reduces to whether the Seventh Circuit correctly assessed Indiana's photo-ID requirement under that test.

III. **INDIANA'S PHOTO-ID REQUIREMENT PASSES CONSTITUTIONAL MUSTER UNDER THE ORDINARY LITIGATION TEST.**

A. **Requiring Photo ID Imposes a Negligible Burden on the Right to Vote.**

Application of the ordinary-litigation test to Indiana's photo-ID provision starts with an assessment of the "character and magnitude" of Petitioners' asserted injury to their right to vote under the First and Fourteenth Amendments. The Seventh Circuit correctly identified the extent of the burden on the right to vote when it observed that "[t]here is not a single plaintiff who intends not to

TX_00002606

USA_00020247

18

vote because of the new law—that is, who would vote were it not for the law," and that "the sponsors of this litigation" found no "such person to join as a plaintiff." *Crawford*, 472 F.3d, at 952. This fact suggests that the burden here has more to do with "the Democratic Party and other organizational plaintiffs [having] to work harder to get every last one of their supporters to the polls," than it does with any voters being actually disenfranchised. *Id.*

Petitioners have not met their burden of demonstrating a significant burden on the individual right to vote. And, even apart from the slight evidence proffered by Petitioners on this question, the empirical data contradict their claim.

Although the data are subject to competing interpretations, the research as a whole suggests that voter-ID laws do not have any significant dampening effect on voter turnout. The strongest support for Petitioners can be found in a "preliminary" study conducted for the U.S. Election Assistance Commission by Rutgers University's Eagleton Institute of Politics and the Moritz College of Law at Ohio State University ("Eagleton Study"). In that study, Professor Timothy Vercellotti conducted a statistical analysis of the effect of voter-ID requirements on voter turnout in each State and the District of Columbia during the 2004 election. *See* Report to the U.S. Election Assistance Comm'n on Best Practices to Improve Voter Identification Requirements Pursuant to the Help America Vote Act of 2002, Eagleton Inst. of Pols., Rutgers, The State Univ. of N.J., & Moritz College of Law, Ohio State Univ. (2006). Professor Vercellotti and David Anderson presented a new version of the analysis to the 2006 American Political Science Association conference. *See* Timothy Vercellotti & David Anderson, Paper

TX_00002607

USA_00020248

19

Presented at 2006 Ann. Meeting of Am. Pol. Sci. Ass'n, Philadelphia, Pa., Aug. 31-Sept. 3, 2006: "Protecting the Franchise, or Restricting It?: The Effects of Voter Identification Requirements on Turnout," http://moritzlaw.osu.edu/blogs/tokaji/voter%20id%20and%20turnout%20study.pdf. The Eagleton Study found that more stringent voter-ID requirements exerted some negative influence on turnout in the 2004 election. *See id.*, at 13. It determined that "[t]he overall effect for all registered voters was fairly small, but still statistically significant." *Id.*

Significant doubt, however, has been cast on the validity of the Eagleton Study's findings. *See* Jeffrey Milyo, Draft Policy Rep. for the Inst. of Pub. Pol'y in the Truman Sch. of Pub. Affairs, Univ. of Mo.: "The Effects of Photographic Identification on Voter Turnout in Indiana: A County-Level Analysis," at 6 (2007) [Milyo, "Effects of Photo ID on Voter Turnout"]. The methodology of the Eagleton Study has been criticized for its use of a one-tailed hypothesis test, instead of the more commonly accepted two-tailed test; for its misclassification of some 2004 voter ID laws; and for the inappropriate use of some variables. *See* David B. Muhlhausen & Keri Weber Sikich, A Report of the Heritage Center for Data Analysis, "New Analysis Shows Voter Identification Laws Do Not Reduce Turnout," at 6 (2007), http://www.heritage.org/Research/LegalIssues/upload/cda_07-04.pdf [Muhlhausen & Sikich, "Voter ID Laws Do Not Reduce Turnout"] (stating that Eagleton Study is "fatally flawed"). Particularly problematic is the Eagleton Study's use of the one-tailed test because it "allows researchers to double their chances of finding statistically significant results." *Id.*, at 2.

In 2007, a reanalysis of the Eagleton Study by David Muhlhausen and Keri Sikich of the Center for Data

TX_00002608

USA_00020249

20

Analysis at the Heritage Foundation ("Heritage Foundation Study"), using a two-tailed test, found "that voter identification requirements, such as requiring nonphoto and photo identification, have virtually no suppressive effect on reported voter turnout." *Id.*, at 21. The Heritage Foundation Study reported that when "[c]ontrolling for factors that influence voter turnout, states with stricter voter identification laws largely do not have the claimed negative impact on voter turnout when compared to states with more lenient voter identification laws," and that "minority respondents in states that required photo identification are just as likely to report voting as minority respondents from states that only required voters to say their name." *Id.*, at 22. Finally, the report also noted that "[w]hen statistically significant and negative relationships [were] found in [its] analysis, the effects [were] so small that the findings offer[ed] little policy significance." *Id.*

Another study by Professor John Lott of the State University of New York-Binghampton, Department of Economics ("Lott Study"), found that election regulations that can affect the cost of voting have no statistically significant negative impact on voter turnout. John R. Lott, Jr., Report: "Evidence of Voter Fraud and the Impact That Regulations to Reduce Fraud Have on Voter Participation Rates," at 11 (Rev. ed. 2006), http://www.vote.caltech.edu/VoterID/ssrn-id925611.pdf [Lott, "Voter Participation Rates"]. The Lott Study examined existing election regulations including nonphoto-ID laws that affected the cost of voting during the decade of 1996 to 2006, which although not as strict as mandatory photo-ID laws like those enacted in Indiana, Georgia, Missouri, and Florida, still made it more difficult for some people to vote. *See id.*, at 5. The study found that adopting a photo-ID

TX_00002609

USA_00020250

21

requirement "produced a drop in voter participation of 1.5 percent, a statistically insignificant change." *Id.*, at 7. And it found "only minimal support for the notion that IDs—whether photo IDs with substitution or non-photo IDs—reduce voting participation rates." *Id.*, at 8. But even more telling was its finding that nonphoto-ID requirements in areas identified as voter-fraud "hot spots" actually *increased* voting participation, supporting the hypothesis that "[g]reater confidence that the election is fair and that votes will be counted accurately encourages additional voter participation." *Id.*, at 10; *see also id.*, at 4.

Yet another study examined the change in voter turnout across Indiana counties before and after the implementation of photo-ID requirements prior to the 2006 general election. Milyo, "Effects of Photo ID on Voter Turnout," at 1. The study concluded that overall statewide turnout increased by 2% from 2002 to 2006 and that no consistent evidence existed to support the theory that counties with higher percentages of minority, poor, elderly, or less-educated population suffered a reduction in voter turnout relative to other counties. *Id.*, at 2, 18-19. In fact, the only consistent and statistically significant impact of photo ID in Indiana was to increase voter turnout for counties with a higher percentage of Democrat voters. *Id.*

In February of 2007, Professor Stephen Ansolabehere presented a paper at the New York University Law School's Election Law Symposium for the Annual Survey of American Law. His paper presented the findings of a 2006 collaborative survey project among 37 universities involving a 36,500-person national sample survey conducted over the Internet, which included a battery of

TX_00002610

USA_00020251

22

questions to gauge election-day practices and a handful of questions probing the use of voter ID. Stephen Ansolabehere, Elting R. Morison Professor, Dep't of Pol. Sci., MIT, Paper Presented at N.Y.U. Ann. Surv. Am. L. Symp.: "Access Versus Integrity in Voter Identification Requirements," at 3 (2007), http://web.mit.edu/polisci/portl/cces/material/NYU_Identification1.pdf [Ansolabehere, "Access Versus Integrity in Voter ID Requirements"]. In looking at the rate at which voter-ID requirements excluded or prevented people from voting, the survey found "[o]nly 23 people in the entire 36,500 person sample said they were not allowed to vote because of voter identification requirements," which "translates into approximately one-tenth of one percent of voters." *Id.*, at 7. According to the researchers, "[t]he real lesson from the data is that the total number of people who said they were not allowed to vote because of voter identification requirements [was] trivially small." *Id.* These findings and others led the survey to conclude that "[v]oter identification is the controversy that isn't," and the fact "[t]hat almost no one is prevented from voting because of voter ID requirements casts doubt on arguments from the left that this amounts to a new poll tax or literacy test." *Id.*, at 9.

Despite studies like these that show no statistically significant negative effect on voters because of voter-ID requirements, opponents of voter ID still maintain that requiring in-person voters to establish their identity by presenting an accepted form of photo ID negatively impacts the ability of minorities, the elderly, the disabled, and the poor to vote. *See, e.g.*, Brennan Ctr. for Just. at N.Y.U. Sch. of Law & Spencer Overton, Response to Report of 2005 Comm'n on Fed. Election Reform 3 (2005), http://www.carterbakerdissent.com/final_carterbaker_re

TX_00002611

USA_00020252

23

buttal092005.pdf. These voters, the argument goes, are less likely to possess driver's licenses or other forms of acceptable photo ID. *Id.* Pointing to research showing that between 6 and 10% of voting-age Americans do not have a driver's license or a state-issued non-license photo ID, these critics argue that those numbers translate into approximately 20 million eligible voters. *Id.* They also argue that, in terms of both time and money, the costs of obtaining such identification would deter voting and likely cause lower voter turnout among poor voters and those who do not have easy access to government offices. *See* Task Force on Fed. Election Sys., John Mark Hansen, *Chap. VI: Verification of Identity*, 4 (2001), http://www.tcf. Lorg/publications/electionreform/ncfer/hansen_chap6_ve rification.pdf.

But these figures can be misleading. For several reasons, they substantially overstate the magnitude of any effect on voter turnout. First, long history unfortunately demonstrates that a significant number of eligible voters will choose not to vote, regardless of whether there is any photo-ID requirement. Lott, "Voter Participation Rates," at 3. Second, of those who do choose to vote, many of those currently lacking photo IDs will choose to obtain photo IDs if needed to vote. *Id.*; Muhlhausen & Sikich, "Voter ID Laws Do Not Reduce Turnout," at 5. And third, the critics' figures do not address whether those individuals without driver's licenses have other accepted forms of photo ID or may otherwise cast valid ballots via absentee voting or exceptions for indigency. *See* Muhlhausen & Sikich, "Voter ID Laws Do Not Reduce Turnout," at 5.[27]

---

27. Perhaps a better measure of the difficulty voters face in meeting the photo-ID requirement is the percent of registered voters who have driver's licences. Lott, "Voter Participation Rates," at 3. But even this measure fails to take into account that people who currently

TX_00002612

USA_00020253

24

In sum, there is no study or other empirical data that definitively supports the claim that a photo-ID requirement will result in significant voter self-disenfranchisement. *See* Milyo, "Effects of Photo ID on Voter Turnout," at 2, 18-19. And the balance of the data is to the contrary.

Nevertheless, even assuming *arguendo* that there exists some hypothetical set of voters who (i) would have voted without a photo-ID law, but (ii) will not vote because of the time and effort required to obtain a photo ID, Petitioners' claim nonetheless fails, for three reasons.

*First*, every regulation on voting necessarily imposes some burden on voters. *See Anderson*, 460 U.S., at 788; *Burdick*, 504 U.S., at 433. Requiring preregistration burdens voters, setting Election Day on a Tuesday burdens voters, fixing a limited number of polling places burdens voters, keeping the polls open principally during business hours burdens voters, and restricting who is eligible for absentee voting burdens voters.

"In fact, all democracies in history have placed restrictions on the power to vote. In modern times, the United States and other democracies have gone much further than ever before, and almost entirely for the good, in expanding the franchise. But restrictions on voting remain. Even the concept of 'adult' is up for grabs—how old must one be? Sixteen? Eighteen? Twenty-one? And why only citizens, a somewhat arbitrary concept that itself can be influenced—and limited—by law?" Debate, Prof. Bradley A. Smith of

---

lack a photo ID may get one once it is required. *Id.* Not to mention, this measure can be exaggerated because the lists of registered voters may not be updated to eliminate people who have died or changed addresses. *Id.*

TX_00002613

USA_00020254

25

Capital Univ. Sch. of Law & Prof. Edward B. Foley of
Ohio State Univ., "Voter ID: What's at Stake?," 156 U.
PA. L. REV. (PENNUMBRA) 241, 252 (2007), at
http://www.pennumbra.com/debates/pdfs/voterid.pdf
[Debate].

The point is that each restriction drives up the time and
expense of exercising the franchise, and yet each of these
regulations is undoubtedly constitutional. The
requirement of photo ID is not qualitatively different.

*Second*, the requirement of a photo ID is becoming all
but ubiquitous in the modern age. Photo IDs are required
to drive a car; to board an airplane; to travel abroad; to
enter many state and federal government buildings; to buy
alcohol or cigarettes; to purchase firearms; to obtain a
hunting or fishing license; to open a bank account; to
purchase medical prescriptions; to obtain most health care
or dental care; to rent a hotel room, a car, or a DVD from
Blockbuster; and even to watch an R-rated movie at the
cinema. *See Crawford*, 472 F.3d, at 951 (stating that "it is
exceedingly difficult to maneuver in today's America
without a photo ID . . . and as a consequence the vast
majority of adults have such identification").

And *third*, and most critically, Indiana has ensured that
voters without a photo ID can obtain one *without cost*.
IND. CODE ANN. §9-24-16-10. This case would be
altogether different—and might even present serious
issues under the Twenty-Fourth Amendment—if the State
were to require a photo ID for voting and then to charge a
significant amount to obtain a photo ID. But, following
the Carter-Baker Commission's express recommendation,
Indiana has ensured that government-issued photo IDs
can be obtained free of cost. *See* CARTER-BAKER COMM'N
REP., at 20 (stating that concerns over voter-ID

26

requirements presenting a barrier to voting can be addressed in part by assuring that government-issued photo ID is available without expense to any citizen).

In every election, some voters undoubtedly choose to disenfranchise themselves because of the perceived inconvenience or burden of voting. That is a disappointing fact of life, and turnout suffers for it. *See* Debate, at 253 ("[Photo ID] may keep a small number from voting, but it is not quite the same as denying them the vote. Every restriction on voting will burden the franchise, and at each step some small number of voters may decide voting is not worth the effort."). But it is no answer to have no controls or such low standards that the entire electoral process is vulnerable to manipulation and fraud. If such were the case, the voters' faith in our elections would be considerably shaken. And "[l]ittle can undermine democracy more than a widespread belief among the people that elections are neither fair nor legitimate." CARTER-BAKER COMM'N REP., at 1.

Thus, both the empirical data and the practical realities demonstrated that any burden on voting caused by the Indiana statute is negligible.

### B. Photo-ID Requirements Curtail Voting Fraud and Help to Promote Voter Confidence in the Electoral Process.

On the other side of the scale is the State's interests that have been put forward as justifications for the photo-ID requirement. *See Burdick*, 504 U.S., at 434; *Anderson*, 460 U.S., at 789. As the Seventh Circuit recognized, "the purpose of the [photo-ID law] is to reduce voting fraud, and voting fraud impairs the right of legitimate voters to vote by diluting their votes—dilution being recognized to

TX_00002615

USA_00020256

27

be an impairment of the right to vote." *Crawford*, 472 F.3d, at 952. Voting fraud compromises the integrity of the electoral process, and preserving the integrity of that process is indisputably a compelling state interest. *Purcell*, 127 S.Ct., at 7; *Eu*, 489 U.S., at 231. Concomitantly, fear of voting fraud can breed a lack of voter confidence in the integrity of the electoral process, driving honest voters away from the polls and breeding a distrust of government. *Id.*; *see* CARTER-BAKER COMM'N REP., at 18 ("The electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."); Lott, "Voter Participation Rates," at 11 ("Regulations meant to prevent fraud can actually increase the voter participation rate[,]" especially "on turnout in counties where fraud is alleged to be rampant."). These interests are weighty and amply justify enactment of a photo-ID requirement.

Nevertheless, Petitioners question the legitimacy and strength of these interests, arguing that there is little or no evidence of voter-impersonation fraud, either in Indiana or about the country, that very few people have been convicted of illegal voting since 2002, and that claims of voting fraud are based largely on rumor, anecdote, and

TX_00002616

USA_00020257

28

speculation.[28]   These claims are false, as has been
demonstrated exhaustively in Part I, *supra.*

Moreover, unlike with many other forms of voting
regulations, with photo-ID requirements the fundamental
right to vote appears on both sides of the ledger: as a

---

28. Petitioners place great reliance on the relative scarcity of
criminal convictions for in-person voter fraud. *See* Pet'r Br. (07-025),
at 43, 45, 48; Pet'r Br. (07-021), at 7. But other factors account for the
difficulty of obtaining convictions in this area.   Unsurprisingly,
harried election officers often do not report incidents of voting
impersonation and fraud, and law-enforcement officials frequently
choose not to pursue such cases because they are not high on the
D.A.'s priority list, are too onerous to prove, and are viewed as
victimless crime that are treated leniently by judges and juries. *See,
e.g.,* Sara Perkins, *Hidalgo County DA: Convictions Hard to Get in
Voter Fraud Cases,* THE MONITOR, Aug. 4, 2007,
http://www.themonitor.com/onset?id=4277&template=article.html.;
Jennifer Liberto, *Vote Illegally, Get Caught: What Happens? Very
Little,* ST. PETERSBURG TIMES, July 18, 2004, http://www.sptimes.com/2004/07/18/State/
Vote_illegally__get_c.shtml; A Bill Relating to Requiring a Voter to
Present Proof of Identification: Hearing on Tex. H.B. 218 Before S.
Comm. on State Affairs, 80th Leg., R.S. (testimony of Skipper Wallace)
("[As a]n election worker, if you've ever worked as an election judge,
you understand the hectic nature of the balloting process itself. It's
very hurried, there are people waiting in lines. You want to move
them through as fast as you can. You think this guy is impersonating
somebody else but you don't have a lead pipe proof of stench, so you go
ahead and let it ride. Well, then later you find out, well he did it.
Well, you don't have any proof to be able go to a DA with to document
that. There is a significant amount of evidence you have to take to
actually prove up one of these cases—which makes it very difficult.").
As the Seventh Circuit appropriately recognized, "the absence of
prosecutions is explained by the endemic underenforcement of minor
criminal laws (minor as they appear to the public and prosecutors, at
all events) and by the extreme difficulty of apprehending a voter
impersonator." *Crawford,* 472 F.3d, at 953. Indeed, this difficulty in
obtaining convictions after the fact is yet another reason for the
Indiana Legislature to have focused on preventing the crime *ex ante.*

29

potential cost, if eligible voters are in fact kept away from the polls, but also as a potential benefit, if increased voter confidence increases turnout and avoids dilution of legal votes. Thus, both the supporters and the detractors of photo ID often focus on the same broad concern—protecting against vote dilution.[29] On the one hand, "[e]xcluding [otherwise] qualified voters from the polls . . . eliminates those votes from the count[] and dilutes the value of others who voted for the same candidate or party."[30] On the other hand, ballots that are cast unlawfully "dilute the value of qualified votes."[31]

At the end of the day, regardless of whether there are a multitude of people in Indiana or elsewhere who have been convicted for voting fraud or voter impersonation, that does not impugn the legitimacy of the State's interests in preventing voter fraud. The State need not "make a particularized showing" of the existence of voter impersonation and "does not have the burden of demonstrating empirically the objective effects on [the electoral process] that were produced by" the photo-ID requirement. *See Munro*, 479 U.S., at 195. Requiring States to show substantial evidence of voter impersonation

---

29. Ansolabehere, "Access Versus Integrity in Voter Identification Requirements," at 1.

30. *Id.*

31. *Id.*; *see also, e.g.*, 148 Cong. Rec. S10488 (Oct. 16, 2002) ("[I]llegal votes dilute the value of legally cast votes—a kind of disenfranchisement no less serious than not being able to cast a ballot.") (statement of Sen. Bond); *id.*, at S2529 (Apr. 11, 2002) ("These twin goals—making it easier to vote and harder to corrupt our Federal elections system—underpin every provision of [the HAVA of 2002]. These goals are fundamental to ensuring that not only does every eligible American have an equal opportunity to vote and have that vote counted, but that the integrity of the results is unquestioned.") (statement of Sen. Dodd).

TX_00002618

USA_00020259

30

as a predicate to the imposition of reasonable photo-ID requirements would "invariably lead to endless court battles over the sufficiency of the 'evidence' marshaled by a State to prove the predicate" and would require "a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* State legislatures are not required to do that; instead, they are permitted to respond to potential voting fraud "with foresight rather than reactively." *Id.*; *see also Timmons,* 520 U.S., at 364 (stating that there is no requirement of "elaborate, empirical verification of the weightiness of the State's asserted justifications"); *Ind. Democratic Party* v. *Rokita,* 458 F.Supp.2d 775, 826 (S.D. Ind. 2006) (same); *Weinschenk,* 203 S.W.3d, at 229 (Limbaugh, J., dissenting) (same); *cf. FCC* v. *Beach Commc'ns,* 508 U.S. 307, 315 (1993) (regarding rational-basis review of an equal-protection challenge: "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

### C. The Substantial State Interests Outweigh the Slight Burden on Petitioners' Interests.

Given all that has already been said about burdens and interests, all that remains is to weigh the respective advantages and disadvantages. *Burdick,* 504 U.S., at 434; *Anderson,* 460 U.S., at 789. No bright line demarcates the boundary between a constitutional and unconstitutional election regulation, and this weighing is not susceptible of a "litmus-paper test," *Timmons,* 520 U.S., at 358; *Storer,* 415 U.S., at 730. No judgment will be "automatic," *Anderson,* 460 U.S., at 789, but when an election law "imposes only reasonable, nondiscriminatory restrictions" on the right to vote, "'the State's important regulatory

Case 2:13-cv-00193 Document 662-22 Filed on 11/11/14 in TXSD Page 96 of 98
Case 1:12-cv-00128-RMC-DST-RLW Document 213-1 Filed 06/20/12 Page 95 of 199

31

interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S., at 434.

For the reasons given above, the burden on Petitioners' stated interest of voting in person without having to establish one's identity by presenting an accepted form of photographic likeness—and its purported effect of inducing eligible voters without ID to disenfranchise themselves—can only be characterized as negligible. Common sense and experience tell us that a government-issued photo ID is something that is readily available and easily obtainable. The fact that the vast majority of Indiana's registered voters, not to mention American adults, have one proves that. *See Ind. Democratic Party*, 458 F.Supp.2d, at 824.

Indeed, this commonsense balance is reflected in the widespread attitudes of American voters. For example, a Wall Street Journal/NBC poll in 2006 "found that 80% of voters favored a photo ID requirement, with 62% favoring it strongly. Only 7% were opposed."[32] Another poll similarly found that 82% of Americans, including 75% of Democrats, believe that "people should be required to show a driver's license or some other form of photo ID before they are allowed to vote."[33] And a recent survey found: (1) 95% of people who identify themselves as conservatives or as Republicans supported voter ID requirements; (2) slightly more than 70% of moderates and Independents expressed support; and (3) two-thirds of Democrats supported the idea, as did 60% of people who identified themselves as liberal and 50% who identified

---

32. John Fund, *Jimmy Carter Is Right*, WALL ST. J., May 22, 2006, http://www.opinionjournal.com/diary/?id=110008411.
33. JOHN FUND, STEALING ELECTIONS: HOW VOTER FRAUD THREATENS OUR DEMOCRACY 5, 136 (2004).

TX_00002620

USA_00020261

32

themselves as very liberal.[34] When respondents were categorized by race, the findings were that over 70% of Whites, Hispanics, and Blacks support the requirement, and Black and Hispanic voters did not express measurably less support for voter ID requirements than Whites.[35]

This popular consensus is also reflected in the recommendations of the Carter-Baker Commission, which explicitly urged the adoption of photo-ID legislation. Thus, Petitioners' stated fears that photo-ID requirements are merely cloaked attempts at voter suppression are belied by the fact that requiring a photo ID to vote was urged by, *inter alia*, former President Jimmy Carter—surely not a proponent of suppressing minority and Democratic votes.

Because the burden on Petitioners' rights is slight, the weight of the State's interests need not be overwhelming. Even so, here the State's interest is substantial. The photo-ID requirement is reasonable and nondiscriminatory. It is an evenhanded regulation that applies equally to all voters regardless of party affiliation or any suspect classification. To the extent that the indigent lack the means to pay for a photo ID, Indiana's law provides them with a government-issued ID card free of charge, IND. CODE ANN. §9-24-16-10, and others may vote absentee without having to show proof of ID, *id.* §3-11-10-1.2. Preventing in-person voting fraud is undeniably an important state interest. Indeed, the State's compelling interest in protecting the integrity of the electoral process could well satisfy strict scrutiny, and *a fortiori* it suffices under the "more flexible" test of

---

34. Ansolabehere, "Access Versus Integrity in Voter ID Requirements," at 4-5.

35. *Id.*, at 5.

TX_00002621

USA_00020262

33

*Burdick.* Because Indiana's voter-ID law is a reasonable, nondiscriminatory measure directed at the important state interest of preventing voting fraud, it is more than sufficient to outweigh the slight interest of those who wish to vote in person without having to show a photo ID. Indiana's photo-ID requirement should be upheld.

### CONCLUSION

The Court should affirm the judgment of the Seventh Circuit.

Respectfully submitted,

| | |
|---|---|
| GREG ABBOTT<br>Attorney General of<br>Texas | R. TED CRUZ<br>Solicitor General<br>*Counsel of Record* |
| KENT C. SULLIVAN<br>First Assistant Attorney<br>General | PHILIP A. LIONBERGER<br>Assistant Solicitor<br>General |
| DAVID S. MORALES<br>Deputy Attorney General<br>for Civil Litigation | P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>(512) 936-1700 |

December 2007

TX_00002622

USA_00020263