PL062
9/2/2014
2:13-cv-00193



# TWENTY-SECOND DAY
## (TUESDAY, MARCH 17, 2009)

# ADDENDUM
## (Senate Bill 362)

### EIGHTY-FIRST LEGISLATURE

### REGULAR SESSION

TX_00001152
JA_005483

TX_00001152

USA_00020365

existing laws haven't been enforced with the rigor–or, at least, the money–that we've all been led to believe. I suppose this debate has provided a service if all it's done is help establish once and for all that the Attorney General has not, in fact, spent about a million and a half of a grant battling voter impersonation. I know if there's anything we all share in this Chamber, it's a hope that we'll get double-checked, typo-free data about what cases are being investigated, what's being spent on them, and where they're occurring–even if it means fewer boisterous political proclamations about epidemics. So, let's be clear about the record: According to the witnesses, voter impersonation hasn't had any impact on any election, at any level, at any time, in any part of this big state. But none of that matters today. Today isn't about proof. It's not about the law. Today is about politics. We can, and we will, shoot at this thing until we put holes in the holes. But that doesn't change the numbers in this room. And it really doesn't change that one potent question on every political poll that gets waved around like a DNA test in a murder trial: Should people have to show photo identification before they vote? Well, let's take that head-on. It's a very simple question. And surely a simple question would have an easy and simple answer, right? Well, every one of you who's tried to fix schools, fix health care, fix property taxes, fix tuition, or fix traffic knows that just isn't so. And no amount of hoping or guessing is going to turn this bill into an adequate answer to this question. I wish this bill did what some say it does. We all do. Every single one of us on this floor wishes we could end all voter fraud and maintain full access to voting without costing the state or the counties a single dime. But if that bill exists, Members, this one sure isn't it. This one isn't it. So, let's talk for a minute about what we'd be working on if we were actually serious about this. Just for fun, let's think about solutions that aren't partisan gut-checks but actually go after the cheaters without harming legitimate, conscientious voters.

– We could, and we should, increase penalties on every criminal on every side who tries to influence the outcomes of our elections.

– We could seal shut whatever loopholes people have found to get documents they need to register falsely.

– We could empower election judges to crack down on people they know are cheating without harming those who aren't.

– We could follow the lead of some counties and do a better job of keeping our voter rolls clean.

– We could develop bold, innovative strategies that expanded registration even while imposing new voting restrictions.

– We could even have a serious, bipartisan effort to figure out how the state–which currently bears the full burden of providing voter ID in the form of a voter registration certificate–can add photo identification to its responsibilities, and how it can pay for it as cheaply as possible.

I favor all of those things. I'd imagine that just about all of you in this room do. We want to stop fraud wherever it exists. We all believe in the sanctity of the voting booth. So, how is it possible that voter ID is not just divisive, but wrenching? Because, in the end, I really don't think it's about the policy of providing identification before voting. This has risen to the top of everything–over property tax relief, over the economic crisis, over health care, over education reform, over tuition

TX_00001153
JA_005484

TX_00001153

USA_00020366

and university funding–because it's not like those things.  Those are policy questions. This is a political bill being considered in a political place.  And there's no clearer demonstration of how obviously political, or maybe politically obvious, this bill is than the fiscal note.  Last week, the folks flew in from other states to talk about their voter ID programs, and they couldn't stop talking about what a great job they did educating people about what the law meant.  They didn't just brag about spending money; they used it in court to justify their actions.  But last week, we were told we didn't need any money.  And then yesterday, we're told there's now a $2 million rider for the broad label of "voter education."  Well, I suppose that's some recognition of this bill's failings.  But it also highlights those failings.  It demonstrates the expediency with which this is pursued–no fiscal note, but it now costs $2 million? And it reaffirms the lack of data.  Why not $1 million?  Why not $5 million?  What does a real, appropriate effort cost?  And, of course, it also shows the hidden cost if we're wrong.  People won't be educated on this new obligation.  And, of course, that's just the Secretary of State's office.  What about DPS?  DPS told us last session that by giving a free photo identification card to anyone who claims they want it for voting, they would lose $671,000 a year, more than $1.3 million per budget, and more than $4 million every six years out of our highway fund.  The methodology's in that bill and everything:

    – More than a half-million people have these ID cards;

    – At least half of those would use this voting exemption to avoid having to pay for them;

    – Those folks pay an average of $15 per card;

    – And you have a fiscal impact of negative $4 million through 2012.

Folks, look it up–House Bill 218, 80th Session.  It's really quite convincing.  But this year, the fiscal note informs us that while "there could be a revenue loss" due to the voting exemption, "it is unknown how many people would make the request, and therefore unknown the amount of revenue loss that could occur."  Members, that is not an answer.  In fact, it speaks to the other problems–we don't know how many should or will need the ID.  And, of course, as has been pointed out, nothing was said about the cost of submitting this for preclearance under the Voting Rights Act.  This ignorance of basic facts is particularly troubling given Texas has a special burden on voting rights issues.  The state earned it with a terrible legacy of intimidation, suppression, and outright violence that hovers darkly over our history.  Now no one, not one of you in this Chamber, has any desire to go back to those terrible times.  I know you love Texas and its people too much to even consider it.  But I wonder if you've really studied this bill and made sure that it won't turn us back toward the past. I keep looking and asking and hoping for any data that proves this bill won't harm the very voters who once were explicitly targeted by laws and thugs, those treated so shamefully in a past that's far more recent than the transgressions inside Box 13.  No one, it seems, knows just what this bill could mean to people who are poor enough, old enough, or just plain disconnected enough that they haven't needed to get a driver's license.  No one tells us how many Texans don't have a photo ID, what those millions of people may look like, or whether they'll be able to meet this bill's requirements.  And no one has shown a single study or can say for sure just how common it is to have all of these shards of paper that we in this Chamber seem to take

for granted. No one, frankly, has demonstrated a level of thought and care that gives me any confidence that this bill stands a chance of holding up outside these partisan confines and partisan rules. And that should be troubling to all of us. Because if I'm wrong, and if the will of this Chamber is somehow upheld, then this bill will have consequences. And, believe it or not, those consequences will have nothing whatsoever to do with politics, games, or power. The consequences will play out on decent, hard-working, patriotic citizens who just want to vote but can't find time for yet more hurdles and burdens, let alone those imposed on them by their own government. We all talk about the sanctity of the voting booth. Well, it isn't the registration card, the judge, the rulebook, or even the ballot itself that makes it sacred. It's the person. It's you and me. It's our constituents. In the end, this bill targets far too many of us by declaring a crisis that doesn't exist and adding new burdens that for some will be expensive and difficult. This bill makes it harder for honest people to vote. It's wrong, no matter what happens today. Thank you, Mr. President.

**Senator Van de Putte:** Voting is a fundamental right, the right to choose our leaders and to choose the direction of our state and our nation, and I would hope before we place any additional burden on Texans to exercise that right that we would have some proof that the problem of voter impersonation actually exists. We know that this problem does not exist in Texas, but some of my colleagues are determined to proceed with this misguided effort that will have the effect of disenfranchising many Texans. I don't think my Republican colleagues really want this fight, or want to disenfranchise voters in our communities, but it's the effect of a law, and not intentions, that carry the weight of discrimination. Make no mistake, voter ID laws are part of a national partisan agenda designed to suppress voters–women, the elderly, minorities, and college students who tend to vote more Democratic. In Texas, however, the history of vote suppression began long before 2009, and it didn't end when the poll tax was abolished or when required literacy tests were discontinued by law. In November 1964 letters were sent to residents in the Rio Grande Valley in English and Spanish warning them to stay at home because if they went to the polls they "could get arrested for interfering with the election judge." That same year, the *Houston Post* reported on election day that handbills had been distributed in Black and Hispanic neighborhoods telling voters that police would be stationed at polling places to arrest voters who had outstanding traffic tickets, parking tickets, or owed child support payments. In 1982, when Karl Rove was running Bill Clements' campaign, Secretary of State David Dean sent local election officials a "Felons List" of voters to be purged from voter rolls. But a federal court forced him to drop the effort when the list was found to include eligible voters, including one State Representative candidate. On election day in Dallas that same year, 33 African American precincts ran out of ballots as voters waited up to four and a half hours in the rain to vote. That same year in Dallas, large black and red signs posted in those precincts by five Republican state judges that read: Do not remove this sign by order of the Sheriff of Dallas County. You can be imprisoned for, and then listed six "voting fraud" offenses. These are just a few examples of voter suppression tactics designed to scare people away from voting in areas with heavy Democratic turnout. These same suppression tactics used in Dallas in 1982 are sadly still being used today. In 2005-2006, Attorney General Abbott launched a wide-reaching voter fraud campaign that included training

TX_00001155

TX_00001155

USA_00020368

materials with images of African Americans. He netted very few prosecutions, and none that would be solved by this voter ID bill. Instead, the vast majority of those prosecuted were older Hispanics and African Americans accused of hyper-technical violations of a new mail ballot law. Sadly, a vote suppression agenda still exists in 2009, and we must put this voter ID bill in the context of that history as we defend all Texans' right to vote. We may not win the battle in the Senate, that was predetermined the day we set this issue and no other pressing challenge as a "special order." I hope that this voter ID bill as written will never become law.

**Senator Gallegos:** Members, two years ago I came back to Austin against my doctor's orders to stand together with my colleagues to block the passage of voter ID. And on the last day when we heard the bill and Lieutenant Governor told me that the bill would not be brought up, I told you that I would fight this bad piece of legislation at any cost. And I told you that I'd be back if this bill came up again, and, well, here I am. It's a shame, Members, that it has come to this day. And it's a sad day in Texas history when we are wasting our taxpayers' time and money on a non-issue. Texas is first in the country for uninsured people, home foreclosures are skyrocketing, and thousands of young Texans and their families are trying to figure out how to pay for college education. People are still living out of trailers in my district and several of your districts since Hurricane Ike. And, Members, you know, Texans have some real problems to deal with, but voter ID legislation does not solve any of them. Let me read to you what was an editorial, this Sunday's *Chronicle,* and this coming from the *Houston Chronicle,* not me. Texas currently must show a voter registration card or other ID at the polls. This measure would add a photo ID or other alternatives. Democrats call requirements a tactic to intimidate the elderly, the disabled, the poor, and minorities who are less likely to vote Democratic into staying away from the polls, thereby shaving off a few points from the total vote. The Republicans call it guarding against voter fraud and impersonation. But on a larger scale, it seems to boil down to an illustration that Republicans in Texas and throughout the United States are fearful for their future political viability and are desperately trying to regain a power and an identity that has been severely eroded as of late. If that's the case, Members, and there are better, more constructive ways to begin in recouping lost ground than throwing their weight around, especially on the issue with as little merit as this one. Chandler Davidson, a Rice sociology professor and an expert on minority voting rights, told the *Chronicle* that the only aspect of voter fraud that a photo ID addresses is voter impersonation. The Republicans are offering a solution for a problem that does not exist, he said. And there is no credible evidence to show that there is a problem in Texas or elsewhere, end quote. Colleagues like my colleague Leticia Van de Putte said that General Greg Abbott spent $1.4 million in a crusade against an epidemic of voter fraud that has yet to see anyone convicted of any voter fraud, $1.4 million. Wouldn't Texans like to see this money and, used more wisely, or at least one conviction come out of this? At least one conviction, Senator Fraser. Now that we are voting on a passage of a bill that no one has seen a fiscal note, until we've seen $2 million that all of a sudden come in, which is sure to cost hundreds of thousands, if not millions, but really, who knows? Who knows? I mean, when you mandate the voters of this state to have a photo ID, I mean, somebody's going to have to pay, somebody's going to have to pay something. And if you mandate Texans to go get a

photo ID, then what is the state's responsibility? That's a big question, Members. If you're going to mandate for a Texas voter to get a photo ID, then the State of Texas is going to be responsible for that person on how to get an ID, whether it's free, whether they have to go to a DPS center, and, however it is. Somebody's going to have to pay on both sides. On the voter side, I call it a poll tax. You know, Members, I think it's time to stop wasting Texans' money. The right to vote is the most cherished right that a citizen could have. And in our nation's history, the right has been denied to many. Just last week, we heard of Leticia's story that there is, this was not an uncommon practice. The fight to open the doors of voting booth, it was a long struggle, and I thought we were past this. Members, let me, you know, some of the fears that I've heard about voter impersonation and somebody going to the polls and saying who they're not, and trying to impersonate somebody, I mean, we've got illegal immigration coming from Canada, from Europe, from Asia, and from Latin America. You know, I would, you know, let me walk you through of some of the fears that I've heard on the other side. You know, you got somebody, let's say, for example, from Mexico, coming across the border, it's going to take him or her, oh, at least, you know, maybe two weeks to get across. And here she's got to go through the brush, through the mesquite, eating Spam and sardines, and crackers, water, whatever, you know, whatever they can drink. And in going through that for at least a month or two months to get to Houston or Dallas or San Antonio, after two months, I mean, blood, sweat, going through that, fields and all that, here's what the fears that I'm hearing on the other side, you think that that person is going to wait for the first vote, first election, and go to the polls and try to vote and try to impersonate a voter. I don't think so. I mean, just going through all of that blood, sweat, and tears, just to go stand in line and try to impersonate a voter. You know, when I first got elected to the House in '91, you know, I went to the floor. The only ID I had was my driver's license, and when I got to the door, they stopped me and asked me, well, where are you going? And I said, well, I'm going to my seat there in the House of Representatives, my seat's inside. Well, they made me wait. They made me wait until, that I said, until they confirmed that I, you know, who I was. And then, finally, with my family with me, they let me go in. And I, you know, I said, well, it's 150 Members, I'm new. Didn't think anything about it, and just went to my seat. Well, four years later, I got elected to the Senate. And I, you know, here I am with my family coming to the Senate door. The only ID I had on me was my driver's license. I had to wait. They said, where are you going? I'm going to my seat on the Senate floor, that I got elected. You know, and they said, well, wait a couple of minutes. So, I had to wait for them to confirm that I said, who I said I was. You know, as far as ID, that the picture on my driver's license was the picture of the ID that they had in me in the back. So, you know, if they're going to stop me at the door after I got elected in the House and I got elected in the Senate, and they're asking me who I am, if I stand on who I am, then they got to confirm me here, right outside these doors. Then, how do you think those people are going to feel out there? When they know they're U.S. citizens and they're going to go to the voting booth and the election judge is going to tell them, well, we need, you know, this ID, this ID, and this ID. Well, obviously, when you're going to challenge somebody and tell them they are not who they say they are, and they know that they're a U.S. citizen, you know, you might get some violence. I don't know. When

you challenge me, I'm going to challenge you, you know, if I know that I'm a U.S. citizen. And then, I mean, how they going to react. You know, Senator Fraser, the only amendment that you left off was back in the Jim Crow days, and if you're going to have, if you're going to do voter suppression, do it right. You know, put German shepherds and a fire hose there, and if I go, if somebody goes there and they're impersonating a voter, well, then, throw the dogs on them and, you know, throw the hose on them. You know, that's what this bill is all about. You know, I think that when you really look at it, it's voter suppression any way you call it. Like Leticia said, back to the Jim Crow, George Wallace days. It's a shame. It's a shame that we got down to this. And, you know, I hope when you vote, Members, when you vote on this bill, just think about that. Think about that. When they stopped me here at the door, not only in the House but in the Senate. Thank you.

**Senator Hegar:** Thank you, Mr. President. Members, I just wanted to make a couple of points because I've heard several of the statements earlier today, and I know when we had the very long hearing the other night, we had a lot of numbers being thrown out about the amount of expenditures from the Attorney General's office, the number of convictions, the number of guilty pleas, because we've talked about how difficult it is to prosecute cases of voter fraud. We all talked about how difficult it was, witnesses, all the witnesses were consistent on that point, and I just wanted to make sure everybody was clarified that the actual number of expenditure wasn't the 1.4 million, it was actually 697,000, and that's for 30 individuals, or 30 indictments. Of those 30 indictments, 23 have either been a guilty plea or a conviction. One of those convictions, as I mentioned the other night, and I forget at what point in the night I mentioned it, was a constituent of mine from Port Lavaca where actually the outcome of the election was changed because of the fraud that went on. And so, I wanted to make sure we all were aware of those numbers and make sure that we heard all those, because I would think it's important, the record was set straight the other night, and I think it's important that we make sure it's set straight as well as today. I also wanted to mention that sometimes, try being a Member in my shoes. A Member who, Dean, you entered the Senate, the House many years ago, you looked a little bit younger, maybe had a little full hair like I do today. And I tell you, when I go to the Senate Chambers, there's been times that Rick has had to correct people, said, no, he's actually a Senator, he does get to walk onto the Senate floor. The other day I went to the House and I got stopped because the guy said, wait, who are you? You're going onto the House floor. You don't have permission to go? Well, I'll get out my ID and I'll show you, or you just take my word, I'm Senator Glenn Hegar. So, sometimes, the youthful look can have those problems as well. Also, Dean, I'll let you know, I didn't vote for President Jimmy Carter. Actually, I was too young. I wasn't able to vote in that election. So, I just wanted to make sure. I didn't know if anybody else would tell you who voted back then, but I didn't. I didn't have the opportunity. So, my point is just making sure the record's straight. So, with that, thank you all, Members. I just think it's important that we know the exactual [sic] number of convictions that have occurred. There has been 23, and one of them was a constituent of mine who actually did change the outcome of that election. Thank you.

**Senator Shapleigh:** Thank you, Mr. President. Members, I want to share with you the story of David Iglesias, the former Republican U.S. Attorney for New Mexico, because I think his story and his firing give context and reveal to us here today the real story behind what you, Senator Fraser, call voter ID. Iglesias was appointed by George Bush in August of 2001 and became embroiled in one of the largest scandals ever to hit the United States Department of Justice. Soon after his appointment, Iglesias came under intense pressure from Pete Domenici, Heather Wilson, the Department of Justice, and White House to take action on alleged voter fraud in New Mexico. In 2004, Patrick Rogers, a Republican operative in New Mexico, sent an E-mail to Iglesias that said this, quote, I believe the voter ID issue should be used at all levels, federal, state legislative races. You are not going to find a better wedge issue. Soon thereafter, based on E-mails, calls, and letters from DOJ, Republican officeholders and Republican Party, David Iglesias did the right thing. He set up a task force in 2004 to investigate the scope of voter fraud in New Mexico. He included local, state, and federal law enforcement and both Democratic and Republican officials. After reviewing over 100 cases, he and his task force concluded there were no prosecutable cases of voter fraud and refused to bring charges where there was no evidence to support it. In a PBS interview, David Iglesias said he was not willing to engage in unlawful activities, those were his words, to prosecute cases that just weren't there. Let me emphasize this point, David Iglesias was a loyal Bush appointee, a Republican who had previously run for statewide office and could not find evidence of voter fraud in the State of New Mexico. He let DOJ and the White House know that he would not prosecute these cases because they did not exist, and for that, David Iglesias was fired. His determination to stick to the law and his values got him fired. Later, when asked how he would characterize using United States Attorneys to benefit a particular political party at the polls, Iglesias said this: It's reprehensible. It's unethical. It's unlawful. It very well may be criminal. And I know it's a marked departure from prior administrations, both Republican and Democratic, who understood that U.S. Attorneys, as chief federal law enforcement officials, have to stay out of politics. When asked why he thought he was fired, Iglesias said this, for illicit, partisan political reasons, specifically, not coming up with voter fraud cases, number 1, and number 2, not rushing forward indictments involving prominent Democrats during the election cycle. When asked about the motivations of those pushing voter fraud indictments, he said that their motivations, quote, were clearly partisan. There appears to be a growing body of evidence that suggests there's voter suppression going on throughout the country. The investigation into the firing of David Iglesias and eight other U.S. Attorneys continues to this day. Just two weeks ago, Karl Rove, who is actively involved in these U.S. Attorney cases, agreed to testify before Congress under oath regarding his role. And, coincidentally, the first witness for the proposition in Texas that we need a voter ID bill was Hans von Spakovsky, who himself was part of that DOJ. Fast forward to last session, when House Bill 218, the predecessor of this bill, was passed in the House. In a column he wrote at that time from the *Quorum Report*, Royal Masset, who for 15 years was the political director of the Republican Party of Texas, stated in writing this, voter ID is a direct descendant of poll taxes and of allowing only white male property owners to vote. In its effect, it is racist, barbaric, antidemocratic, and contrary to everything that

TX_00001159

TX_00001159

USA_00020372

made America great. Mr. Masset said that requiring photo IDs could cause enough of a drop-off in legitimate Democratic voting to add 3 to 5 percent to the Republican vote. And, really, that's what this bill is all about. In 2005 the Census announced that Texas has joined Hawaii, New Mexico, and California as the only majority-minority states. By 2035, Texas' state demographer predicts that Hispanics will make up the majority ethnic group in Texas. In my district, this bill is about Maria Lopez, 70 years of age, who cleans offices. She's never had a driver's license, never needed one. And when she is asked for one, or a birth certificate, or a pilot's license, or any of the documents listed in Senate Bill 362, she won't have them, because of the time and expense to go get one are too much for a lady who works 60 hours a week at minimum wage. So, she won't vote. And keeping her home is what this bill is about. As Mr. Masset stated yesterday in *The Dallas Morning News*, Hispanics should take this personally because it is aimed at them. This bill is about Republicans scaring off just enough elderly, disabled, Blacks, and Hispanics to stay in power four more years, plain and simple. Thank you, Mr. President.

**Senator Williams:** Thank you, Mr. President. Members, today I stand in support of Senate Bill 362. In the course of this debate, there have been many concerns that have been raised about the voter impersonation and whether or not that really occurs. Many of you, in fact most of the folks who have spoken so far today would argue that voter impersonation does not occur. I disagree. I have here in my hand four newspaper articles, two from *The Monitor* in Progreso about a story in Progreso and another from the *Rio Grande Guardian*. These four newspaper articles that are dated March 9th, March 14th for *The Monitor* and March 10th and March 16th for the *Rio Grande Guardian*, reference voting irregularities in the Progreso Independent School District with a school board election. This prompted me to make an open records request of the Attorney General, and I have as a result of that open records request signed, notarized affidavits demonstrating that voter impersonation does in fact occur in Texas. Following the May 4th, 2008 election conducted in the Progreso Independent School District, several citizens and noncitizens attested that various individuals had perpetrated numerous forms of voter fraud including voter impersonation. I'd now like to read some excerpts from these affidavits, these sworn affidavits, and I'm going to introduce them into the record. The first is from Mr. Torres and in his affidavit he attests to the following:

> On Monday, April the 28th, 2008, I was brought to the Progreso Independent School District election site by Lorenzo Castillo, who handed me a voter registration card to participate in the elections. He stated that they would pay me to go vote for Juan Ramos, Michael Vela, and a David Hernandez. I proceeded to go in and cast the vote with the registration card that belonged to Alfredo Medrano. After I went in to vote, I was paid $10 by Jose Guadalupe Vela and at this time, Mr. Lorenzo Castillo took the card from my possession.

We also have an affidavit from Abigail Infante and Maricela Infante who were both poll watchers. In their affidavits, these women both attest that on April 28th around 2:00 p.m. a voter by the name of Jimmy Vasquez went in to vote with a voter registration card in the name of Juan Pablo Maldonado. Priscilla, the clerk, told him, you're not Juan Pablo Maldonado, you're Jimmy Vasquez. Then he answered, yes, I

TX_00001160
JA_005491

TX_00001160

USA_00020373

am. He was asked to present ID and he turned around and walked out. Members, but for the fact that this poll worker recognized Mr. Vasquez and realized that he was not who he claimed to be, he would've been allowed to vote and his vote would've counted in this election. There's another affidavit by Jessica Rangel, and in her affidavit she attests that Mr. Guadalupe Vela asked her to recruit a friend to vote and that her friend would be provided with a voter registration card. And Jesus Vasquez in his affidavit attests that he did not exercise his right to vote in the Progreso School Board elections on May 10th, and that someone used his identity to vote in the election and appeared in person at the early voting site. And finally, an affidavit from Andrea Peña and in her affidavit, she attests:

> Mr. Oscar Vela forced me to vote with another person's voter registration card, when I very clearly told him I could not vote because I am not a citizen of the United States. He said it wasn't a problem. All I had to do was go to the park in Progreso, and he would give me a voting card. I told, he told me that if I helped him, he would fix my legal problems, referring to how he'd help me so that they wouldn't take away my children. When I arrived at the park, he gave me the card of Mrs. Maria de los Angeles Martinez and proceeded to tell me that someone inside there was waiting to help me and that I shouldn't forget the names he had given me. When I entered the voting building, a young man who was one of those acting judges entered the booth with me and voted for me.

Members, these affidavits demonstrate that in-person voting fraud is very real. It happens. It's happened just a few weeks ago, or a few months ago in the Progreso Independent School District election. These affidavits are also supported by the testimony of Mr. Ed Johnson, who's an employee of the Harris County Tax Assessor-Collector and a voter registrar, Leo Vasquez. If you will recall, last week Mr. Johnson testified that a variety of voter fraud had occurred in one of our state's most populous counties, including the casting of vote by people who were not alive. Not only does voter fraud, in-person voter fraud occur, but Texas has a legitimate interest in deterring and detecting this voter fraud. As Justice Stevens remarked in the majority opinion in *Crawford v. Marion County,* there is no question about the legitimacy of the importance of our state's interest in counting only the votes of eligible voters. The interest in orderly administration and accurate recordkeeping provide a significant justification for carefully identifying all voters participating in the election process, Members, and ladies and gentlemen who are with us here today, that we as elected officials have a duty to protect the integrity and legitimacy of representative government. As the report of the Commission on Federal Election Reform that was chaired by former President Jimmy Carter and former Secretary of State James Baker observed, Americans are losing confidence in the fairness of elections. And while we do not face a crisis today, we need to address the problem of our electoral system. The electoral system cannot inspire public confidence if no safeguards

exist to deter or detect fraud or to confirm the identity of voters. We must have an electoral system that inspires confidence. We must prevent fraud and we must prevent the disenfranchisement of legitimate votes. Members, I ask you to join me in voting "Aye" for Senate Bill 362. Mr. President, I would also move that my remarks be reduced to writing and placed in the record. And I would like to include, as a part of my remarks, these sworn affidavits that I made reference to in my remarks.

USA_00020375

# Exhibit #1

May 12, 2008

I, Simon Torres, SS#                      , P.O. Box 704, Progreso, Texas, and am over the age of eighteen and am of sound mind and state the following:

I participated in the Progreso School ISD School Board Election held on May 10, 2008. I state that on Monday, April 28, 2008, I was brought to the Progreso ISD School election site by Lorenzo Castillo who handed me a voters registration card to participate in the elections. He stated they would pay for me to go vote and vote for Juan Ramos, Michael Vela and David Hernandez. I proceeded to go in and cast a vote with the registration card that belonged to Alfredo Medrano. After, I went in to vote I was paid $10.00 by Jose Guadalupe Vela and at this time Mr. Lorenzo Castillo took the card from my possession.



Simon Torres

State of Texas          §
County of Hidalgo       §

Before me, a notary public, on this day personally appeared Simon Torres                    , known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statement therein contained are true and correct.

BLAS MEDRANO
Notary Public, State of Texas
My Commission Expires
February 08, 2011

Notary Public Signature

TX_00001163
JA_005494

TX_00001163

USA_00020376

# Exhibit #2

I, Maricela Infante, date of birth 10/04/62, reside in Progreso, Texas and am of sound mind and over the age of 18 and state the following:

I was appointed as a poll watcher for the Progreso ISD School Board Election by the Candidate Eleazar Perez, Jr.

❖ On April 28, 08 on or about 8:30 am, Mrs. Maria Isabel Vela was allowed to enter and vote without providing an ID or a voter registration Card..
❖ On April 28, 2008 on or about 10:00 a.m. Mr. Guadalupe Vela was allowed to enter and vote without providing an ID or a voter registration card.
❖ On April 28, on or about 2:00 pm a voter by the name of Jimmy Vasquez walked in to vote, but with a voter registration card with the name of Juan Pablo Maldonado. Priscilla, the clerk, told him he was not Juan Pablo Maldonado. When the voter was asked for an ID, he turned around and walked out. Mr. Juvencio Rocha, the presiding judge told Priscila, the clerk, to confiscate the voters registration card. The election clerk kept the voter registration card.
❖ Various people were allowed to vote with an expired voter registration card and were not asked to provide an ID.
❖ As a poll watcher I continued to observe the election judge and other election staff stand close by the voting machines while the voters voted. They were being intimidated to vote their way.

On this _12th_ day of _May_ , personally appeared Maricela Infante and states that the above is true and correct.

_____
Maricela Infante

TX_00001164
JA_005495

TX_00001164

USA_00020377

I, Abigail Infante, date of birth 01/03/86, reside in Progreso, Texas and am of sound mind and over the age of 18 and state the following:

I was appointed as a poll watcher for the Progreso ISD School Board Election by the Candidate Eleazar Perez, Jr. held on May 10, 2008.

- ❖ On April 28, 08 around 8:30 am, Maria Isabel Vela came in to vote without showing an ID or voter registration card.
- ❖ On April 28, 2008 around 10:00 am, Guadalupe Vela voted without showing an ID or voter registration card
- ❖ On April 28, 2008 around 2:00 pm, a voter by the name of Jimmy Vasquez went in to vote and when he showed his voter registration card, Priscilla told him "Your not Juan Pablo Maldonado, your Jimmy Vasquez" And then Jimmy answered "Yes, I am" then Jerry Jasso Jr. asked him for an ID and Jimmy walked out.  Then Judge Juvencio Rocha told the clerks to confiscate the voter registration card.
- ❖ On May 5, 08 the clerks were asking some voters to show both and ID and voter registration cards.
- ❖ As a poll watcher I continued to observe the election judge and other election staff stand close by the voting machines while the voters voted.  They were being intimidated to vote their way.

On this _12_ day of _May_ , personally appeared Abigail Infante and states that the above is true and correct.

Abigail Infante

TX_00001165

USA_00020378

# Exhibit #3

May 15, 2008

I, Jessica Rangel, (SS#            ,PO Box 11, Progreso Texas 78579 and am over the age of eighteen and am of sound mind and state the following:

Mr. Guadalupe Vela offered me money in exchange for my vote; I was to put in my vote for JJ Ramos, David Hernandez and Michael Vela. Also numerous times I had been offered to have traffic tickets removed in order for me to help them. They also asked me to recruit a friend, which name I prefer not to mention, and they would provide a voting registration for them to use. They stated that they had people that worked that elections on there side and that they would help my friend vote.

 I guess that thought that I would help them since I had help them in past elections by recruiting people and giving them money for there vote.

_Jessica Rangel_
Jessica Rangel

State of Texas                    §
County of Hidalgo              §

Before me, a notary public, on this day personally appeared _Jessica Rangel_ , known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statement therein contained are true and correct.

BLAS MEDRANO
Notary Public, State of Texas
My Commission Expires
February 06, 2011

_Notary Public Signature_

TX_00001166

USA_00020379

*Exhibit #4*

May 12, 2008

I, Jesus Vasquez (certificate number 212570), state that I am registered in Progreso, Pct 40 and state that I did not exercise my right to vote in the Progreso School Board Elections held on May 10, 2008. I understand someone used my identity to vote in this election and appeared in person at the Progreso Early Voting site.

Jesus Vasquez

State of Texas
County of Hidalgo

Before me, a notary public, on this day personally appeared *Jesse Vasquez*, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statement therein contained are true and correct.

BLAS MEDRANO
Notary Public, State of Texas
My Commission Expires
February 08, 2011

Notary Public Signature

TX_00001167
JA_005498

TX_00001167

*Exhibit #5*

15 de Mayo del 2008

Yo, Andrea Peña (SS#        , testigo lo siguiente

El Sr. Omar Vela, me forzo a votar con una tarjeta de votar de algien mas, cuando yo muy claramente le dije que yo no podia votar porque no soy ciudadana de los Estados Unidos. El me dijo que no habia problema, que el me diria como le ivamos a hacer. Que nandamas fuera al parque de Progreso y el me daria una tarjeta de votar (Maria De Los Angeles Martinez VUID#1053620795). Dijo que si le ayudava, me "areglaba" mis problemas legales, referiendose a que el me ayudaria a que no me quitaran a mis hijos. Cundo yo llege al parque, el me dio la tarjeta de la señora Maria De Los Angeles Martinez, y procedio a decirme que algien alla dentro ya me estava esperando para ayudarme y que no se me olvidaran los nombres que me avia dicho (Micheal Vela, Juan Ramos, David Hernandez). Cuando entre al edificion de las votaciones, un muchacho de los que estaban de juez, se metio con migo y voto por mi. Entonces me dijo que le oprimiera al boton rojo que decia "VOTE", opremi el boton y me retire.


Andrea Peña

*Turn Page for Translation*

State of Texas      §
County of Hidalgo      §

Before me, a notary public, on this the _15th_ of May 2008, Personally appeared ANDREA PEÑA, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statement therein contained are true and correct.

BLAS MEDRANO
Notary Public, State of Texas
My Commission Expires
February 08, 2011

Notary Public Signature

TX_00001168
JA_005499

TX_00001168

USA_00020381

*Exhibit #5*

**Ryan LaRue**

| | |
|---|---|
| **From:** | marycogden@comcast.net |
| **Sent:** | Monday, March 16, 2009 9:16 PM |
| **To:** | E. LaRue; Ryan LaRue |
| **Subject:** | Translation |

The text in the attached document reads as follows:

I, Andrea Pena (SS#            ), testify as follows:

Mr. Oscar Vela forced me to vote with another person's voter registration card, when I very clearly told him I could not vote because I am not a citizen of the United States. He said it wasn't a problem, that he would tell me how we were going to do it. All I had to do was go to the park of Progress and he would give me a voting card. (Maria de los Angeles Martinez, VUID# 1053620795). He told me if I helped him he would "fix" my legal problems, referring to how he'd help me so that they wouldn't take away my children.

When I arrived at the park, he gave me the card of Mrs. Maria de los Angeles Martinez, and he proceeded to tell me that someone inside there was waiting to help me and that I shouldn't forget the names that he had given me (Michael Vela, Juan Ramos, David Hernandez).

When I entered the voting building, a young man who was one of those acting as judges, entered the booth with me and voted for me. Then he told me that I should press the red "VOTE" button. I pressed the button and left.

Signed:  Andrea Pena

*(translated by Mary C. Ogden, B.A. English & Spanish, Rice University, 1981.)* *Father was in Foreign Services throughout South America.*

----- Original Message -----
From: "E. LaRue" <famlarue@earthlink.net>
To: marycogden@comcast.net
Sent: Monday, March 16, 2009 8:46:17 PM GMT -06:00 US/Canada Central
Subject: FW:

Mary,
Thank you so much!
Edell
Ryan's cell:  713.542.1381


-----Forwarded Message-----
From: Ryan LaRue
Sent: Mar 16, 2009 8:36 PM
To: famlarue@earthlink.net
Subject: FW:

TX_00001169
**JA_005500**

3/16/2009

**Senator Shapleigh:** I don't have any objection to it, but I'm hoping that we put everyone's remarks into the record so we have an accurate record of what took place on this bill here today. I'll make that motion at the appropriate time.

**President:** There's a motion by Senator Shapleigh to include–

**Senator Shapleigh:** I would make the motion that we include everybody's comments on this bill to the culmination of the bill, including all the exhibits and discussions that are had on any of the votes.

**Senator Williams:** Okay, in light of the motion that's coming in a few moments, I just also like to correct the record. There was a statement made earlier by Senator Gallegos that the Attorney General spent $1.4 million investigation voter fraud and, respectfully, I would direct the body's attention to our testimony in committee, which conclusively demonstrated that that is not the case. With that, I am done with my remarks for the day. Thank you.

**Senator Lucio:** Thank you, Mr. President. And I will be very brief, Members. I need to, I rise only because Senator Williams brought up my district. And I did turn in, and it was noted as one of the exhibits back when we met at the Committee as a Whole. I'd like to read the letter from our District Attorney down in Hidalgo County, one of the biggest counties in the state, as Senator Williams mentioned, and it states:

To the Senate Committee-of-the-Whole, Voter Identification Legislation:

Allegations of a few cases of voter impersonation occurring in Hidalgo County during 2008 came to my attention on Thursday, March 5, 2009, by several members and staff members in the Texas Legislature.  Apparently they were obtained from the Texas Secretary of State's Office, who along with the Office of the Attorney General, have been in possession of this evidence for a time.

Without discussing the details of allegations currently pending, I can tell you that I believe that if there is a problem with compliance with the law, it lies more in the quality of the administration of elections, than in law itself.

The irregularities we have seen occur mostly in non-partisan local elections of small governmental entities such as school districts, water districts, and municipalities, some of which decline to contract the administration of their elections to the County election administrators office. This has in the past led to questions.

If I were to recommend an amendment to the Texas Election Code, it would not be to increase burdens placed on honest voters attempting to cast their ballots, but instead to further professionalize the administration of elections by requiring small governmental entities to contract with their county's elections administrator, instead of administering those elections themselves.

Tuesday, March 17, 2009          SENATE JOURNAL                         A-13

Further, I would require the Secretary of State, and/or the Office of Attorney General, to very quickly forward to local District or County Attorneys the irregularities of which they have credible evidence, so that we can investigate those incidents, and prosecute them when the evidence suggests a violation of the law.

Thank you very much for the opportunity to share my views.

Respectfully Yours,

/s/René Guerra
Criminal District Attorney
Hidalgo County, Texas

Members, I share this letter with you because Mr. Guerra was not able to be here last week when we had the Committee of the Whole. And it's important for you to hear from a gentleman that has served that county for two decades in these matters that we're dealing here today. So, I ask you to understand that there's not widespread voter fraud in that county, especially at a higher level. As I mentioned, in some local units of government there has been some discrepancies, but, certainly, we will be working to try to, you know, address those issues. Thank you, Mr. President.

TX_00001171

USA_00020384

# RENE GUERRA



March 6, 2009

To the Senate Committee-of-the-Whole, Voter Identification Legislation:

Allegations of a few cases of voter impersonation occurring in Hidalgo County during 2008 came to my attention on Thursday, March 5, 2009, by several members and staff members in the Texas Legislature. Apparently they were obtained from the Texas Secretary of State's Office, who along with the Office of the Attorney General, have been in possession of this evidence for a time.

Without discussing the details of allegations currently pending, I can tell you that I believe that if there is a problem with compliance with the law, it lies more in the quality of the administration of elections, than in law itself.

The irregularities we have seen occur mostly in non-partisan local elections of small governmental entities such as school districts, water districts, and municipalities, some of which decline to contract the administration of their elections to the County election administrators office. This has in the past led to questions.

If I were to recommend an amendment to the Texas Election Code, it would not be to increase burdens placed on honest voters attempting to cast their ballots, but instead to further professionalize the administration of elections by requiring small governmental entities to contract with their county's elections administrator, instead of administering those elections themselves.

Further, I would require the Secretary of State, and/or the Office of Attorney General, to very quickly forward to local District or County Attorneys the irregularities of which they have credible evidence, so that we can investigate those incidents, and prosecute them when the evidence suggests a violation of the law.

Thank you very much for the opportunity to share my views.

Respectfully Yours,

Rene Guerra
Criminal District Attorney
Hidalgo County, Texas

HIDALGO COUNTY COURTHOUSE – 100 N. CLOSNER, ROOM 303 – EDINBURG, TEXAS 78539 – (956) 318-2300 – FAX (956) 318-2301

TX_00001172

USA_00020385

**Senator Ellis:** Thank you, Mr. President. Members, I'll be as brief as I can be. Obviously, both sides have put together a pretty good record on this piece of this legislation, but there're a couple of points that I do think I want to make. I don't know if I made them before or not. Chairman Fraser, this is the 64th day of a 140 day legislative session. I just want to reiterate to you and all of the Members that on our opening day, obviously, the decision was made to change the rules so that this bill could come up. Now, in a unprecedented time in our history, with all of the problems, economic problems that we have in this country and around the world, the most important thing, some would have us believe, in Texas, Senator Fraser, is this voter ID bill. Now, clearly, the votes are there because you only need 16 to pass it, so I guess I don't have to give a real long speech, but I do want to point out to you that as important as it is to some, that you on the right side of the politics on this issue, because as a drumbeat in the base of your party to try to get this bill passed. For you, for your sake, I'm glad you are going to go ahead and get it out of here early, because you're certainly on the wrong side of history. And at least for the remainder of this session, maybe we'll be able to focus on issues that really matter to people. It's interesting when the witnesses came in, I didn't see some of the Titans of election opportunity from Texas. Our experts come in and served as resource witnesses. Now, based on the way some of their questions were answered, it looks like some of those people bought their tickets at the last minute to get in here, because they certainly weren't very prepared. It's interesting this bill does not cover mail balloting. It's interesting it doesn't cover it because most of the fraud that has been discussed on this floor, or allegations of fraud, have been instances where it's involved mail-in balloting. Now, if you were to guess, if you can't guess, just go ask some expert in either party. Who's more apt to benefit from mail-in balloting? Are people more educated? Are they more high income? Do they tend to be more from the Democratic Party or the Republican Party? We had a little interesting lesson in history. We heard a lot about President Jimmy Carter, Secretary of State James Baker. We didn't have a clear idea of where HAVA came from? The Help America Vote Act was passed because of the debacle in Florida, that regardless of which side any of us in this Chamber may have been on the issue, you couldn't help but be embarrassed when developing countries were saying, Jimmy Carter needs to put together an election team and monitor the elections in America, particularly in Florida. That was a comprehensive piece of legislation, Senator Fraser, you passed out the recommendations. It's a great set of recommendations, even the summaries, only about eight pages. But what has happened here, with the Help America Vote Act and with the Carter-Baker Commission, has been to do a little cherry picking. This bill is an attempt to pull out the part of that recommendation from HAVA, Help America Vote Act and the Carter-Baker Commission, that tends to benefit one party over the other and one group of people over the other. That's the reason why Texas was put under the Voting Rights Act. Hey, it's not a partisan comment when I make it. Democrats controlled this Chamber when Lyndon Johnson signed the historic Voting Rights Act. Leticia made reference to my predecessor over here on the Senate wall. When Senator, then Congresswoman, Jordan added Texas to the Voting Rights Act, it was a bilingual amendment, of all things. Didn't just put Texas in, but other states, because even President Johnson didn't want to admit that there were problems in the

Lone Star State. He wanted to believe that in his political lifetime, the doctrine of states' rights, I guess, Texas would clean it up on its own. We didn't, and we still haven't. We ought to really take a deep breath and pause and hope when it gets over to the House side, that they exercise better judgment than us. Hey, I could read the political tea leaves. I know you're concerned that the Voting Rights Department at the Justice Department won't preclear this piece of you-know-what that's going to pass here today. So, I suspect that there'll be an attempt, I've heard the rumor mill says, you just bypass the Justice Department and go to a three-judge panel in Washington, D.C. One of your witnesses that testified, nice young man, nice young man–but interesting, all of those career professionals in the Justice Department who have been there under Democrats, as well as under Republicans, Troy, resigned because the career professional said, Georgia's voter identification suppression bill shouldn't be precleared, that's what the professional said–that gentleman that you had testifying here the other day overruled the career professionals, and they eventually quit. I mean, part of his résumé indicated he was on the Federal Elections Commission. He was. Never got approved because his history came back to haunt him. We're making a serious mistake today. More than anything else, we ought to be worried about Texas being 46 among the 50 states in the country in terms of the number of people who show up to vote, last cycle, 54.7 percent voter participation rate, voter participation rate in Texas in 2008. Part of that Carter-Baker Commission recommends a lot of commonsense approaches like election day registration. That's probably why Minnesota has a 78 percent participation rate, Wisconsin 72, Maine 71. Even New Hampshire, without election day registration, they're 71 percent, Colorado 69, Iowa 69, Michigan 68, Alaska 68. You made the comment on the floor the other day, during the Committee of the Whole meeting, that election rates had gone up in those states, those that have passed a voter identification bill. I would make the argument to you, maybe election rates went up because people were angry because that bill did pass in Georgia and Indiana. And, tell you, you might be surprised what happens this next go 'round. Last comment I want to make, there's been a lot of talk about what we do in Texas today and other states that have some version of voter identification. Just so Members will know what happens now, somebody made the comment that about 24 states have some form of photo ID. I want to make it very clear what happens in America today. This is according to the Pew Center on the States. Only three states require a photo identification: Florida, Georgia, and Indiana. Florida, the same state that was the impetus for creating the Carter-Baker Commission and the Help America Vote Act, Georgia, and Indiana. Another four request it, don't require it, but they request it: Hawaii, Louisiana, Mississippi, and South Dakota. Eighteen states require ID, photo or nonphoto ID, for all voters. Texas is one of those states, along with a number of our neighboring states, Alabama, Arkansas, Arizona, Colorado, Connecticut. The short of what I want to say is, when this bill passes out of this Chamber today–House sponsor's been here a good part of the debate today and he was here when we started the debate on this bill–hopefully, they'll take the time, look at the pause button, which we didn't do on this side, and either take this bill and clean it up, address all of those issues, like same day registration, election day registration. Hey, if you really want to do something about voter fraud, all those instances you talked about, well, do something about mail-in ballots. If you're really serious about

impacting how to make sure people have faith in the electoral system, disenfranchising one group of people, any group of people, as opposed to another one is not the way to do it. Troy, you made the comment to me, who would I know that couldn't fit into one of these categories that you laid out. Don't have a hunting license. If you don't have a hunting license, you can have a library card. You could cast a provisional ballot. You didn't know the process on how it would be counted, so I even suggested one. Your witnesses never answered that question. The people who don't have a library card, oftentimes the people who cannot read, which is why they don't have a library card. People who don't have a utility bill oftentimes are people who don't have utilities. People who don't have a phone bill are probably people who don't have a phone. There are people. They may not come in this Chamber, they may not be people that we run into and have a conversation with everyday, Chairman Ogden, but those people exist, not just in my district, but in yours as well, and every Member on this floor. They're the folks, when you got up this morning, were catching their early bus and didn't have to have an identification card to get on that bus. They go and work the jobs that we don't have to work because we're privileged. And I'm saying, in this body, we ought to be as concerned about those people who have the least among us as we are concerned about those people who are more apt to vote for or against us. Thank you.

**Senator West:** Mr. President. Members, I will not be long, but you know, we have a lot of people in the gallery. And I'm glad you're here, the citizens of the State of Texas, because the reality is the history of Texas is upon this very moment, in this Chamber, on this particular day as we cast this vote. It's a very important vote. I'm glad you're here listening to the debate. The history has been well-chronicled by Senators Watson, Van de Putte, and Gallegos, and they've illuminated the tragic past, in terms of voter participation in this particular state, and also ad hoc obstacles that have been placed in the way by those in the majority in order to maintain political dominance. Members, we should not forget the history of our civil rights in this particular state and to know that the Members of this body are a good and decent people that bring different backgrounds and perspectives to bear on this issue that we address today. What is the real, what is this really all about? What is this all about? This is, will be the second bill, Members, that we will have passed out of this Chamber, the second bill. So, what is this all really about? Maintaining political dominance in this state, that's what it's all about. And let's just kind of call it what it is, maintaining political dominance. Members, this is a solution looking for a problem. My deskmate chronicled a couple of affidavits that he received from the Attorney General, but I suggest to you, that it's basically a nonexistent, significant issue in the State of Texas. Members, supporters of this legislation, this is an issue that you need to come to grips with when you begin to look at the demographic changes in the State of Texas. And let me just kind of go through those with you. Based on the latest statistical analysis, at least as of July 1st, 2007, 23.9 million Texans, all of us heard, basically, what the demographic changes will be in this particular state, and we know that this state is going to be predominantly Hispanic. Well, the fact of the matter is now, that's predominantly minority. When we begin to look in the out years, and the number of citizens that we're going to have in the State of Texas, what is it going to look like? When we begin to look at the individuals that will be in this Chamber,

Tuesday, March 17, 2009      SENATE JOURNAL      A-17

what is it going to look like? When we begin to look at the people that will be in attendance, what will Texas look like? It's going to be predominantly minority. And so, the question that I ask those of you that are gung ho on making this our second legislative initiative coming out of this body, what's the purpose behind it? You'll say again that, you know, there's a problem. There's no significant problem. It's all about political dominance. Let's call it what it is. But you got to understand also, I want you to hear my words today, Members, demographics in this state are changing and ultimately the makeup of the voting populace will change also. Those that are being suppressed by the pretext will ultimately control this body politic and the laws that future generations of Texas live under. There's that old saying, sometimes what goes around, ultimately will come around. And I hope that as future generations look at this particular issue, that they can pretty much dissect exactly what occurred on this particular day in the State Senate, and judge it for exactly what it is and, ultimately, if this bill becomes law, ultimately repeal it, if we can't get it taken care of at the Justice Department or circuit courts in D.C.

**Senator Hinojosa:** Thank you, Mr. President. Members, I would like to speak against the bill. First of all, I would like to address a couple of points made by Senator Williams on the affidavits out of Progreso, Rio Grande Valley. Let me first say that those affidavits are tainted for the simple reason it's a very small community and there were outside activists of Republicans who came in with the sole purpose of trying to find people who would sign affidavits that they themselves drew up. Also, these affidavits were never turned in to the District Attorney's office for prosecution. Addition to that, it was not the DA's office who received any of these complaints. Furthermore, what also happened is that the affidavits were not made by investigators or trained people. There again, they were made by a group of Republicans who live outside this small community, looking and trying to fabricate this type of evidence. And I'm somewhat disappointed that again, here we are dealing with a partisan issue, at a time when we have people losing their homes, their jobs, and they would pay their bills, we're dealing with an issue that's not going to help them have a better quality of life. I will tell you that I thought that the voters of the last election spoke loud and clear that they wanted no more issues like this to come before this body. They want us to deal with the bread and butter issues like health care, education, jobs, economic development. And here we are, again, dealing with an issue that's not going to help one cent, or one penny, all Texans to better their life. And for that reason, I'm voting against Senate Bill 362, which ought to be named the Voter Suppression Bill. Thank you.

**Senator Whitmire:** Thank you, Mr. President. Members, thank you, Senator Hinojosa, for pointing out that Senator Williams only mentioned allegations. And it's amazing to me that, if this is such a prevalent problem, that you have to go, to take a Senator from The Woodlands, has to, he borders Harris County with its hundreds of thousands of voters, and has to go to South Texas to try to find some allegations of voter fraud. It's, that in itself, I think, makes a case that you have to really search long and hard for instances. It's also, Senator Williams, in his allegations, pointed out the tests that I give, to not only my decisions as a public official but even in my personal life. What is the greater good? If you wanted to assume Senator Williams was correct and he found three cases in deep South Texas, what is the greater good, to address that

TX_00001176

JA_005507

TX_00001176

USA_00020389

in the fashion that the proponents would have, or is the greater good to not set up obstacles that we know will exist for people to vote? When I complimented the Senate last Wednesday morning after our marathon session, I mentioned the decorum, the respect for one another that had been demonstrated. Again, it's present today, but, Members, that cannot overshadow the fact that this is a bad time to be debating a really bad, bad, bad piece of legislation. Maybe the all-time worst legislation, in terms of one that does so little for so few and harm to so many. I'm also struck by the attitude of some of my colleagues: Let's just get this behind us. And, in fact, I would name this bill, Can't We Just Get Behind, Can't We Just Get This Behind Us Act of 2009. It barely beat out the title of the bill or the Hard to Vote Act of 2009. I cannot stand and let you just get it behind us because we've heard credible testimony that 3 to 4 percent of the eligible voters would not be able to cast their vote next election. But let's assume it's just 1 percent, Senator Duncan, or how about one person. Troy Fraser did an excellent job the other night of talking about how sacred the ballot box is–and we all join him in that respect–but it is so sacred that now we're about to tamper with the system that's going to disenfranchise others. I would ask the proponents just for a moment, okay, and just for a moment, assume that we're right and you're wrong. Just absorb that for a minute. And do you even want to go into the discussion, assume Tommy Williams' allegations are going to be prosecuted and punished, which I think he made the point that the system's working pretty good. But what if, what if the next election date, there's someone in one of your districts, attempts to vote, if it's one person, and that sacred process of voting is prohibited because of what we're doing today. You know, I've heard folks talk about, they would rather 10 guilty murderers go free than to execute one innocent man or woman. I was thinking about that last night. I believe whatever allegations of fraud that you can come up with cannot make the case to make major obstacles, and I think part of the problem is, some of my colleagues don't really understand how difficult it's going to be. You've not campaigned in communities that are not as organized as maybe your life. I have knocked on doors, talked to voters, they didn't know how they were going to get a ride to the polls, didn't know if they were going to feel like it, been doing this for 56 years and now, for the first time, we put a new responsibility on them. Members, we have a responsibility, if it's going to disenfranchise just one person, to fight this really bad, bad, bad bill, and I respect Senator Fraser's intent, but, Troy, we disagree on the method. What I don't understand, if you really think there's fraud and you continue to make allegations, I don't think you have proven your case. But let's just, for the sake of the conversation, you believe there's fraud, you're worried about, as you mentioned the other night, you voting and then your brother coming back 30 minutes later and voting with your card. First of all, precinct judges, election judges have the power of a district judge. They can have the person arrested at that moment. What I don't understand is why you address it with this bill instead of making it a criminal justice issue. No one in this body hesitates to address criminal acts by, one, enhancing the penalties, or creating a new offense. I just don't understand why any of your witnesses did not address it as a criminal justice issue. They didn't do it in Indiana, they didn't do it in Georgia, even our Harris County prosecutor, Rosenthal, who was so aggressive, till he was disgracefully run off. There's no, no instance of voter fraud in Harris County that has been proven up. The gentleman the other day was talking

about mail-in ballots. The Attorney General, our own Attorney General, after spending 1.4 million and spending over a year looking at, came up with 26 cases. Eighteen of them were mail-in ballots, Senator Fraser. You haven't touched that, topside or bottom. And because you haven't addressed it as a criminal justice issue and try to enhance the penalties, I'll show you how you should have handled it. This afternoon in Administration, we're going to hear a Zaffirini bill that's going to make parking in a handicap zone twice the current penalties. We're going to double the fines if you park in a handicap zone. That's the way Senators address crime and illegal acts. They don't come up with some civil voting procedure that is going to make it difficult for people to go cast that precious vote that Senator Fraser talked about. I can only conclude, because you haven't dealt with it by enhancing the penalties or creating a new offense like we do on other illegal acts, that is pure politics. And let me suggest, Senator Fraser, it's bad politics. And I believe, I believe it's going to backfire on you. I think this is a political bill for years to come. It will backfire on the proponents. And let me just go ahead and put this on the table, I think it's largely being done so some communities can think they're getting after undocumented citizens. It's not mentioned, in none of the debate conversations, but I listen to talk shows, I read comments, I get my share of letters. There's a misconception that's being encouraged by this legislation that undocumented citizens are voting. It does not occur, you can't find the instance. Those folks don't want nothing to do with a ballot box, but this is largely driving it. Let me close by saying, the real sad note, Senator Fraser, is if we had not changed the rules of this body, we would not even be having this conversation. This is a great body. If we had not changed the rules to make this the priority that doesn't exist, we wouldn't even be having this discussion.

**Senator Fraser:** Thank you. Members, the, this actually has been a very interesting issue for all of us. The, I think there's, it's obvious that there's people in this body that feel very strongly on both sides of this issue, and I respect that. I don't think there's any point that I felt that anyone is in opposition to my views ever was disrespectful to my views. We have, as we do on all issues, we have the right to disagree. And, to that point, I think there's a lot of pieces of legislation that move the Legislature, Senator Ellis, that I question why are we taking time to do this. But that usually is my opinion and the person laying it out feels very passionate that we should be doing it. Yes, we've taken some time in debating this, and I think I'd make the point that most of the questions and the time was taken by the opposition. But the opposition on any bill has the right to do that, and I'm, I respect that and would never ever try to deny someone their ability to do this. But we also have to recognize that we are sent down by our voters. We were sent down by the people of this state to make sure that what we're doing down here protects those rights that they're either guaranteed by the Constitution or the laws that we pass. And we have an obligation for that. This issue, I believe, strikes to that very thing that we were sent down here to do. And I will, I read this earlier, but Steve Wolens was my Chairman when I was in the House, Steve Wolens was a Democratic Representative from Dallas, and he stated, and I think it is, you know, the essence of what we're talking about, the ability to cast a vote and have our vote counted is the bedrock of our democracy. We must do everything possible to ensure the sanctity of the vote of this state, which leads us to the point, Dean, Senator Whitmire was, asked earlier, how did we get to the point of talking about this bill?

USA_00020391

A-20        81st Legislature — Regular Session        22nd Day

Senate Bill 362, it's not rocket science. It is not a complicated issue. It's a very simple concept. My goal in laying out Senate Bill 362 is very simple. It is, the goal is to make sure that every person arriving at a polling site is the same one who is named on that voter list, that you are who you say you are. I believe Senate Bill 362 makes voting easy. A voter showing up can either show a photo identification or two nonphoto IDs, including even an electric bill or a library card. Even if voters can't verify their identity, they're still going to be allowed to cast a provisional ballot. Every person walking into the polling place will allow, be allowed to vote. No one will leave not being able to cast a ballot. Senator Ellis, I would raise the issue that if we go back and look at the polling that has been done on this issue, there have been multiple polls that have done.  The one, obviously, I like best is the one that's the most favorable, the Rasmussen poll in October of this last year showed that 88 percent of Texans, people in Texas, not a one political party or the other, 88 percent of Texans, when they're asked the question, should you have to show identification when you vote, 88 percent of the public said, yes, I agree with that concept. Now, the interesting thing is that of those 88 percent, 80 percent of them identified themselves as Democrats. There's been two other polls. The latest poll this, this last weekend by The University of Texas showed that in their poll, 69 percent, and even though that's less than 88, 67 percent. If I told you two-thirds of your voter was for something, I would suspect you'd be for that. Now, I've been doing my own personal poll. You asked me the question, have I been visiting with other people, and more especially, if I have visited with African Americans or Hispanics about this. I've actually been doing my own polling on this for a long time. Actually, going back a couple of years because we had this bill two years ago. And anytime I'm getting the chance where I can engage someone in conversation, I ask them the question, it's a very simple question, should you have to show identification to verify who you say you are whenever you have to vote? Since I've been asking that question of all people that I've engaged, I am yet to have a single person tell me that they disagree with that. Now, obviously, there's some pressure of the fact that I'm the one asking the question, but I find it interesting that if a person, if you ask them should they, you know, do that, no matter who the person is, they go, no, I think that's fair. I think that someone, you know, if they're going to be voting, should have to prove they are who they say they are. So, Senator Ellis, I would make the point that of the people that are opposed to this, I know there's 12 in this room and probably some more on the other side, but if 88 percent of the people in the State of Texas, I'm assuming that a bunch of those live in your district, and I would make the case, I'm on the side of the people in this case. Two, the voter ID bill has been passed, photo ID has been passed, a strict photo identification in two states. There's 24 states that have some form of photo identification, but the two that are the most strictest are Indiana and Georgia. Indiana's case was put into place, they've had two election cycles, in '06 and '08. Since it was put in place it's gone all the way up the Supreme Court. The Supreme Court, the confirming, the opinion on this was written by John Paul Stevens, which generally is a left-leaning, more liberal judge, and he wrote the opinion, the majority of the opinion confirming the Indiana law six to three. The Georgia case that was passed, again, went all the way through the, being approved by the Department of Justice, and has been confirmed at every level, and both of those have gone through a last election cycle.  So, I guess a question I would ask, can

TX_00001179

USA_00020392

someone say, is this going to suppress vote? Both Indiana and Georgia have found that, even Indiana, through two election cycles, not only did it not depress vote, it actually encouraged voters, that they felt better that their vote was going to be counted and not diluted by someone that was voting illegally, that the vote count in both those states went up. And, actually, in the last election in 2008, Georgia had the second largest increase in Democratic voters in the United States, much more than the surrounding states that did not have a like ID law in place. Indiana was the largest increase in Democratic voters in the entire United States. The total increase they had was a 6.7 increase, almost double the increase of the adjoining state, which was Illinois, where the President nominee was from. I'm going to give a couple of examples here just to make sure, and I hate that the press missed the, all the testimony we had the other night when we stayed here through 28 hours, and most of the press went home the middle of the night, so you missed a lot of the very important testimony. And I think the one that probably was the most compelling, or was, I thought was telling, was the testimony of the Secretary of State, when they were talking about the way that the Texas law works in Texas. To clarify, making sure you understand, that if someone walks into a polling place and they have a voter registration certificate, now, it doesn't make any difference whether it's theirs or their brother's or their wife's or the guy down the street or someone that's died, as long as they have a voter registration certificate. Current Texas law says, on offering to vote, a voter must present a voter registration certificate to the election officer. On presentation of the certificate, an election officer shall determine whether the voter's name is on the certificate, to check the names there, and if it's at the proper precinct. If you meet those two parameters, they hand you a ballot and you go and vote. No, any circumstance, and the question I asked the Secretary of State, if I walked into the voting booth with my brother's registration card and I was voting, I'd already voted, and then I was now going to vote with my brother's card, Steve, could they stop me from voting? And the answer was, no. There is not the ability under current law to do that. Question was raised about the ability to convict. I would make the point that under current law, not only is it virtually impossible to identify that someone is voting illegally but it is much harder to convict that person. The testimony earlier, we referenced the District Attorney René Guerra out of Hidalgo County, the DA, René Guerra, here's his exact quote that he gave to the, I believe this was to the McAllen paper, no, I'm sorry, it was to *Rio Grande Guardian* paper, he says, he said, voter fraud is nearly impossible to prove. Since losing a county ballot tampering case in '78, Guerra has shied away from taking on new cases involving election regularities, even though all the cases that Senator Williams just laid out came from that county and has been reported for years. It goes on to say, to convince a jury these days, you almost need a videotape of someone voting illegally, the District Attorney said. The article goes on to say that he has lost his appetite to prosecute. So, in trying to say that Texas doesn't have a problem, I would greatly disagree. I think we've got a huge problem because not only do we not have the ability to identify someone, we don't have the ability to prosecute it. And it actually goes much further than that. Mary Ann Collins from Plano, a 70-year-old woman, stayed here all night, other night, in order to come up here and give us her testimony about the fact that she was working as a poll worker. She had watched someone vote and a few hours later she

had noticed someone else, and I think she had seen her with a bright hat, and she recognized this was a outstanding, or someone that, she was easy to identify. She saw the woman come back in, a couple hours later, to vote again with a different card. She went to the election judge to notify the judge that that woman was voting illegally, and the election judge said, sorry, there's nothing we can do to stop that. To assume there is not voting fraud in Texas is really almost laughable. To assume that we can prosecute someone for voting fraud is about as difficult. In affirming the Supreme Court case, John Paul Stevens made a couple of observations about voting, talks about the fact that the actual act of voting is a burden, but it's a burden that everyone accepts. The burdens of that sort arising from life's vagaries, however, are neither serious, nor so frequent as to raise a question about the constitutionality of the Indiana law. The availability of the right to cast a provisional ballot provides an adequate remedy for problems of this character. For most voters who need the inconvenience of making a trip to the Bureau of Motor Vehicles, gathering the required documents, and posing for a photograph does not qualify as a substantial burden for the right to vote, or even represent a significant increase over the usual burdens of voting. The last example I will give you, and I hope this is one that hits close to home, is someone raised the example, or the issue, well, there's a few here and a few there, but we have an example, actually, here sitting with us in this body, that Mike Jackson, when he was elected in Houston in 1988, won by seven votes. I went back and looked at the records of the voter irregularities in Houston, the number of dead people that have voted, the number of complaints that have been made, and the thought comes to my mind, if seven people had cheated during an election, it would've changed history. Mike Jackson would not be here with us today, four, if four people had flipped it. Four people could've changed history and changed his ability to serve as he has in the Texas Senate. To assume that someone cheating in an election is not important is, the best example is right here, is that there's been a lot of elections, especially a primary, and more especially in rural areas where you have a county commissioners race, one vote makes a huge difference. And if someone can cheat on that one vote, it could impact the election. The dangers of voting fraud has always threatened the integrity of the electoral process for the entire history of the United States. I believe that threat continues today. And quoting again, as I did in my opening comments, the 2005 bipartisan Carter-Baker Commission reaffirms the dangers when they say, elections are at the heart of democracy, Americans are losing confidence in the fairness of elections. And while we do not face a crisis today, we need to address the problem of our electoral system. Members, I would be concerned if I thought this bill in any way would suppress turnout, but I also believe it does not do that. It just protects legitimate vote. It offers multiple ways to prove you are who you say you are before you cast your vote. Thank you.

# SENATE JOURNAL

## EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

## AUSTIN, TEXAS

## PROCEEDINGS

### ADDENDUM
### (TWENTY-SECOND DAY — Tuesday, March 17, 2009)

The following remarks regarding **SB 362** were ordered reduced to writing and printed in the *Senate Journal:*

**Senator Watson:** Members, the outcome today we all know isn't really in doubt. It hasn't been since we opened this legislative session. We knew what would happen, what we should expect, well before our meeting last week of the Committee of the Whole. But even knowing what's about to happen today, there was still a debate to be had last week, and a case that needed to be made. People who are watching us–and maybe, more importantly, those who weren't watching, those millions of legally voting Texans whose lives won't be the same if this bill passes–have a right to expect someone to prove that the supposed voter impersonation problem is at least significant enough to justify all the time we're spending on it or that this bill actually was the answer to stopping what cases we're being told about or, more importantly, that this bill would not reduce the ability of people to vote. These folks on both sides of this debate, most of them good, concerned, everyday Texans, are entitled to proof, not assumptions or rationalizations or anecdotes, but actual, statistical proof that Senate Bill 362 won't target some of our most vulnerable citizens and block them from fulfilling their right and duty. Members, the case was not made. And I deeply believe that whether it's in the Department of Justice or before a federal court, that will be confirmed. There remains only the flimsiest evidence that voter impersonation–the only type of fraud addressed by this bill–even exists. Not counting 60-year-old history and the unverified testimony of a controversial witness for a partisan elections administrator, nothing at all we've heard demonstrates that this is actually occurring any more than anecdotally in Texas. And let's be honest–if someone had the goods on a case that was going to settle this fight once and for all, they probably would have been testifying at some time other than four in the morning. It's also far from clear that Senate Bill 362 will stop whatever irregularities might conceivably be out there. We've heard of concerns about absentee ballots–this bill does nothing about them. We've heard about suspicious voter registrations–this bill leaves registration procedures entirely in place. We've been showered with hypotheticals about how much could possibly go wrong if some shadowy figure decided they'd rather steal a voter registration card than an election. Yet we've heard of no instances in memory where our elections failed our democracy because people impersonated voters. Unfortunately, the most significant new information we got last week was that our

TX_00001182
JA_005513