Hearing                                                        April 6, 2009

307

| | | | | |
|---|---|---|---|---|
| 17:9 21:8 | 15:16 18:11 | **win** | 182:16 | 102:14 190:9 |
| 33:13 35:23 | 21:7 51:9 | 17:22 18:2 | 188:16 | 190:10 |
| 35:24 36:2 | 54:9 57:17 | **wine** | 193:5,18 | 207:3 |
| 36:16,17 | 68:17 72:16 | 225:24 | 196:6,15 | 213:25 |
| 37:2 42:5 | 77:2 79:9 | **wise** | 199:16,22 | 219:18 |
| 42:10 51:18 | 86:14 91:15 | 243:11 | **woman** | **workers** |
| 61:21 69:11 | 124:3 | **wish** | 81:19 98:4 | 63:3 69:1 |
| 71:25 72:10 | 144:23 | 5:6 33:22 | 102:21,24 | 109:22 |
| 77:5 87:19 | 147:4,14 | 45:14 75:7 | 151:7 | 110:13,16 |
| 89:20 91:16 | 149:3 | 75:8 93:17 | **women** | 110:17 |
| 91:22 | 153:15,15 | 145:4,8 | 62:5 241:8 | 112:18 |
| 109:19 | 153:18 | **wishes** | **wonder** | 132:25 |
| 112:23 | 156:5,20 | 9:4 13:23 | 64:12 | 151:10 |
| 113:11,17 | 158:21 | 18:9 117:13 | **wonderful** | 189:21 |
| 113:21 | 166:25 | 200:7 | 81:19 | 202:18,20 |
| 117:11 | 172:12 | **witness** | **wondering** | 203:18 |
| 134:19 | 186:6 | 5:5 6:9 | 69:5 | 205:12,13 |
| 143:24 | 198:15,17 | 11:25 20:16 | **wording** | 205:21 |
| 147:15 | 203:14 | 29:22 47:5 | 21:23 22:9 | 214:11 |
| 153:16,20 | 215:5 218:4 | 75:6 95:15 | **words** | 217:18 |
| 154:23 | 218:5 | 105:25 | 42:15 85:13 | 218:16,18 |
| 170:13 | 224:14 | 106:16 | 130:15 | 218:21 |
| 173:16 | 231:4,12,19 | 117:13 | 207:16 | 219:24 |
| 175:24 | 240:1 | 120:8 121:9 | **work** | 225:18 |
| 177:21,22 | **whatsoever** | 152:23 | 11:25 30:18 | 232:25 |
| 178:19 | 83:16 149:15 | 193:25 | 65:20 70:5 | 233:2,6,6 |
| 179:16 | 187:16 | 194:2 196:1 | 78:23 99:16 | **working** |
| 180:10 | **whichever** | 196:21,25 | 99:19 | 12:18 15:16 |
| 187:24 | 33:20 | 197:1,19 | 103:25 | 95:25 100:1 |
| 189:4,10 | **whine** | 199:8,10,18 | 111:20 | **works** |
| 191:7 194:3 | 225:24 | 199:20 | 117:1 | 34:1 |
| 195:22,25 | **white** | 229:3 | 130:11 | **world** |
| 196:9,17 | 14:21 112:9 | 238:17 | 195:10 | 49:22 132:16 |
| 197:5,18,23 | 112:17 | **witnesses** | 202:18 | 132:17 |
| 199:12,13 | 201:21 | 3:20,24,25 | 219:20 | **worry** |
| 201:18,20 | **wholly** | 4:3,6,7,7,8 | **workability** | 12:13 53:18 |
| 201:21 | 10:23 69:7 | 5:1 6:17,20 | 194:10 | 183:6,7,8 |
| 203:21 | **widespread** | 7:20 8:9 | **workable** | 184:19 |
| 212:2 | 107:8 | 9:12 19:19 | 195:12 | 190:3,4 |
| 213:15 | **Wildlife** | 20:6,15,18 | **worked** | **worse** |
| 214:9 223:7 | 26:12 | 36:17 45:3 | 51:1 61:18 | 51:24 98:22 |
| 225:24 | **wildly** | 57:6 91:15 | 110:6 | **worth** |
| 233:14 | 215:18 | 103:1,22 | 116:22 | 43:1 65:4 |
| 235:4,13 | **willing** | 106:11 | 117:2 | 225:17,17 |
| 240:7 | 9:22 13:3 | 120:2,7,8 | 120:15 | 225:18 |
| **we've** | 79:17 | 147:19 | 211:14 | **worthy** |
| 5:3 10:21 | 129:14 | 153:12 | 224:14 | 117:11 |
| 14:13 15:9 | 131:15 | 159:7 | **worker** | **wouldn't** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031335

USA_00020859

| | | | | |
|---|---|---|---|---|
| 4:11 62:13 | 143:14 | 168:1 | **09** | 137:19 |
| 102:1 132:1 | **yeah** | **young** | 107:15 | **126** |
| 146:2 | 41:12 42:2 | 96:20 124:25 | | 239:24 |
| 166:18 | 42:24 65:21 | 126:4 | **1** | **13** |
| 174:7 | 71:9 78:12 | 143:20 | **1** | 2:24 110:11 |
| 177:24 | 79:21 80:1 | 151:1 | 5:10 21:25 | 137:17,23 |
| 178:7 179:4 | 184:2 | 184:16,16 | 22:23 23:7 | 166:25 |
| 186:15,15 | 219:19 | | 28:2,7 | 169:3 171:3 |
| 223:12 | 220:10 | **Z** | **1,000** | 175:12 |
| **wreaks** | 221:15 | **z** | 68:1 | 240:23 |
| 81:9 | 223:8,14 | 153:19 | **1,947,080** | **13,000** |
| **write** | 224:19 | **zealous** | 237:14 | 99:1 |
| 137:19 138:1 | 226:16 | 82:7 | **1.2** | **14** |
| 216:23 | 227:21 | **zero** | 64:7 | 126:22 |
| **writing** | 228:20 | 166:15,20 | **1/2-minute** | 127:12 |
| 75:3 123:11 | 237:6 243:8 | 167:6 | 5:10 | 209:20,21 |
| 200:6 | **year** | **zip** | **1:30** | 210:3,12,14 |
| 236:17 | 12:5,5,5 | 239:20,22,24 | 3:22 | 210:15,22 |
| **written** | 14:13 47:13 | **Zorr** | **10** | 211:15 |
| 30:3 39:3,5 | 47:14 67:20 | 104:12,15 | 58:20,25 | 213:10 |
| 47:21 | 83:24 87:7 | | 237:19 | 215:5 |
| 144:22 | 97:16 98:19 | **$** | **10.4** | 236:15 |
| 145:3 | 137:19 | **$1.2** | 237:22 | 238:6 |
| **wrong** | 149:20 | 62:23 | **100** | **15** |
| 11:17 15:25 | 167:2 | **$100,000** | 58:20,25 | 109:1,4 |
| 32:25 50:25 | 202:18,19 | 64:24 | 106:22 | 150:17 |
| 109:14 | 208:19 | **$2** | **11** | 229:14 |
| 116:4 | 215:20,22 | 29:14,18 | 141:5 169:2 | **15.005** |
| 141:23 | 224:9 243:2 | 30:9 34:12 | 171:3 | 194:12 |
| 162:1 | **years** | **$200,000** | 175:12 | **16** |
| 211:13 | 15:15 16:14 | 64:10 | **11,000** | 35:13 211:12 |
| 217:21 | 24:24 41:19 | **$7,500** | 111:3,4 | **18** |
| **wrote** | 47:25 60:8 | 132:14 | 113:24 | 215:16 |
| 70:24 94:22 | 63:11 71:5 | | **11-percent** | **18-year** |
| 127:25 | 81:6 92:23 | **0** | 179:1 | 48:25 110:21 |
| 137:14 | 97:23 98:8 | **0** | **11:00** | **19** |
| 244:25 | 124:3 | 29:14 30:8 | 20:3 | 52:22 |
| | 126:22 | 238:7 | **111** | **1950s** |
| **X** | 127:12 | **01** | 238:9 | 92:10 |
| **X** | 130:2 217:5 | 228:11 | **12** | **1960s** |
| 153:18 | **yellow** | **04** | 43:21 44:1,4 | 14:7 124:23 |
| **x-ray** | 5:11 | 167:3 | 92:5 140:4 | **1965** |
| 150:18 | **Yep** | **05** | **12th** | 48:1,8 |
| | 210:5 | 231:7 | 111:19 | **1970s** |
| **Y** | **York** | **08** | **12-31-13** | 148:2 |
| **Y** | 89:8 144:4 | 102:24 | 246:22 | **1980** |
| 153:18 | 167:22,24 | 168:25 | **120** | 105:6 |
| **Yang** | **Yorker** | | | **1984** |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_005978

TX_00031336

USA_00020860

Hearing                                                                 April 6, 2009

| | | | | |
|---|---|---|---|---|
| 204:12 | 137:17,23 | **25** | 54:25 55:15 | 171:17 |
| **1988** | 168:17,20 | 168:20,23,24 | 55:19 73:19 | 196:25 |
| 215:15 | **2005** | 238:7 | 90:1 141:8 | 197:18 |
| **1989** | 10:8,24 | **25,000** | **35** | 199:18 |
| 126:19 | 57:14 | 166:24 | 171:17 | **400,000** |
| **1990s** | 124:19 | **250** | 187:24 | 208:21 |
| 31:19 | 201:8 | 195:15 | **36** | **41** |
| **1997** | 224:12 | **26** | 57:8 99:4 | 195:25 |
| 105:4 157:12 | **2006** | 55:22 228:8 | **362** | **45** |
| | 10:9 104:15 | 240:21 | 20:25 21:14 | 63:11 171:17 |
| **2** | 110:10 | **264** | 22:4,24 | **475** |
| **2** | 129:19 | 208:23 | 23:8,15 | 211:8 |
| 58:21 237:9 | 142:8 | **264,000** | 24:19 25:16 | **49,000** |
| 238:10 | **2007** | 208:21 | 26:14,24 | 166:23 |
| **2,000** | 10:9,24 | **264,366** | 27:9 28:1 | |
| 111:23 | **2008** | 208:24 | 45:15 95:17 | **5** |
| **2,661,672** | 10:10 96:7 | **27** | 122:20 | **5,000** |
| 237:12 | 98:24 | 235:25 | 144:5 | 105:7 |
| **2.6** | 111:15 | | 200:16 | **5,400** |
| 158:11 | 168:21 | **3** | 245:12 | 156:16 |
| **2.9** | 170:2 | **3** | **38** | **5:07** |
| 83:8 87:18 | **2009** | 53:1 94:5,7 | 237:8 238:7 | 113:6 |
| 158:11 | 1:6 10:12,25 | 194:20 | **381** | **50** |
| **20** | 21:25 22:23 | 219:4,10 | 97:18 | 96:11 171:17 |
| 22:14 58:21 | 23:7 28:3,8 | 228:7 | **39** | 206:18,19 |
| 98:24 174:8 | **21** | **3,893,184** | 194:1 215:15 | 227:6 |
| **200** | 47:15 | 237:11 | 215:16 | **500** |
| 105:17 | **21st** | **3.8** | 238:9 | 209:12 |
| 106:22 | 48:4 65:22 | 237:8 | **394** | |
| **200th** | 100:4 | **30** | 236:21,23 | **6** |
| 47:15 | 150:21 | 5:16 16:14 | 237:16 | **6** |
| **200,000** | **22** | 115:25 | 243:7 | 1:6 44:18 |
| 209:3 210:3 | 97:20,24 | 116:3 | | 94:5,6 |
| 215:6 | **224** | 168:25 | **4** | **6.7** |
| **2000** | 210:20 | 171:4 174:9 | **4** | 168:16 |
| 105:1,5,7 | **227** | 196:1,24 | 194:20 | **63** |
| 156:16 | 211:7,21,24 | 197:20 | **4,500** | 228:11 |
| 201:7 | 212:12,25 | 203:3 | 106:25 | **63.1-B** |
| 231:12,12 | 213:4,10 | **30-percent** | **4.5** | 39:17 |
| 231:20 | **23** | 175:13 178:1 | 65:8 | **65** |
| **2002** | 166:23 | **315** | **4.89** | 70:3 71:5 |
| 105:1 155:7 | 237:20 | 97:19 | 65:8 | **66** |
| 155:8 157:9 | **23,000** | **32** | **4:50** | 228:5 |
| **2003** | 167:4 | 55:22 | 131:8 | |
| 238:1 242:12 | **24** | **33** | **40** | **7** |
| **2004** | 23:14 237:20 | 55:20 | 16:14 20:14 | **7** |
| 105:14 | **244** | **34** | 110:11 | 47:14 |
| | 209:5 | | 115:23 | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_005979

TX_00031337

USA_00020861

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 4 of 104

| | | | | |
|---|---|---|---|---|
| **70**<br>36:24 41:19<br>132:25<br>**740**<br>209:6,17<br>211:2,6<br>**798**<br>209:4 | | | | |

**8**

| | | | | |
|---|---|---|---|---|
| **8**<br>237:16<br>**80**<br>50:7<br>**80-percent**<br>50:12<br>**800**<br>73:12<br>**81**<br>195:15 238:9<br>**81ST**<br>1:5<br>**8462**<br>246:21<br>**85**<br>213:5,6,8,10<br>**87**<br>60:25<br>**88**<br>216:24 | | | | |

**9**

| | | | | |
|---|---|---|---|---|
| **95**<br>205:4,10,12<br>205:22<br>232:16,23 | | | | |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031338

USA_00020862

247

Job No. 330579

VOLUME 2

TEXAS HOUSE OF REPRESENTATIVES

COMMITTEE ON ELECTIONS

April 6, 2009

Transcribed:  April 15, 2012



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031339

USA_00020863

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 6 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 197 of 223
Hearing - Volume 2                                    April 6, 2009

248

 1            CHAIRMAN SMITH:  At this time, the chair
 2    calls Dewayne Charleston, a Walker County Justice of Peace
 3    who is here to testify against Senate Bill 362.
 4            SPEAKER:  Mr. Chairman, before we begin I
 5    just want to clarify procedure with the committee.  I'm
 6    looking at the memorandum that was sent to committee
 7    members on April 3rd regarding the committee hearings on
 8    April 6th and 7th.  We just had an exchange before the
 9    prior witness related to time limits -- Mr. Leavitt,
10    specifically -- and in the one, two, three, fourth
11    paragraph on the memo it says, "As indicated on the post,
12    testimony at Monday's hearing will be limited to invited
13    guests.  A witness list is attached.  These witnesses will
14    be allowed to provide an opening presentation of up to 10
15    minutes and then stand before the committee to answer
16    questions.
17            When I read that, I didn't see anything
18    related to 30 minutes of total question time.  It's my
19    understanding that you took the total number of witnesses
20    and divided that time by the time that we started and the
21    hours available before midnight and came to the conclusion
22    it would be 30 minutes, but I just wanted to point out for
23    the record that there was nothing in the memorandum that
24    said that there would be 30 minutes.
25            So, when you question my understanding of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031340

USA_00020864

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 7 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 198 of 223
Hearing - Volume 2                                    April 6, 2009

249

1    the deal, there's some ambiguity as to whether or not 30

2    minutes was the standard or not the standard.  It's been

3    past practice on the committee with Chairman Burman that

4    we were able to ask questions -- all of our questions, and

5    I don't -- I don't believe that any member of the

6    committee has asked a question to date, and I think it's

7    important for the Democratic process and also to make the

8    record, to the extent the Frazier bill goes to the justice

9    Department, that we be able to ask our questions.

10                   CHAIRMAN SMITH:  To respond to that, the

11   memorandum that was circulated expressed my intent as to

12   how we would handle this hearing.  I think it expressed it

13   as clearly as a memorandum could before we knew what time

14   the hearing would start because of the fact that we did

15   not have the ability to anticipate what time we would

16   leave the House floor.  What the memorandum clearly says

17   is that it is my intention to conclude Monday's hearing no

18   later than midnight.  No later than midnight.  The reason

19   for my intention to do that was because -- for the

20   convenience of the public and their ability to testify on

21   this question, we have separated the invited testimony

22   from the public testimony and have no way of knowing but

23   reasonably anticipate in light of the significant interest

24   on this particular issue that we could go well into the

25   night listening to public testimony tomorrow night.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031341

USA_00020865

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 8 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 199 of 223
Hearing - Volume 2                                          April 6, 2009

250

1          And so, for the health of the members on

2    the committee as well as for the convenience of these

3    expert witnesses who have gone to the trouble in some

4    instances of traveling from many other parts of the

5    country, it was my intent to -- to take the time when we

6    started, divide it by the number of witnesses, and

7    distribute that time fairly among the members in terms of

8    their ability to ask questions.

9          I will note that the witness list is 13,

10   seven of which were provided by my friends on the

11   Democratic side of the aisle, six of which were provided

12   by my friends on the Republican side of the aisle.  So, my

13   proposal would result in us being here until midnight and

14   would result in 40 more minutes' of testimony from expert

15   witnesses on the Democratic side of this issue than the

16   Republican side of this issue.  If -- if anybody believes

17   that that is somehow unfair against those people who are

18   in opposition to Senate Bill 362, then, you know, I

19   suppose that that is a matter of opinion and everybody has

20   one, but I -- I certainly, you know, am open for

21   discussion on the committee to the extent that there are

22   any of my members -- I'm one of the younger members on the

23   committee.  I think I can stay up all night two nights in

24   a row, although it's been a long time since I've tried.

25          If it is the desire of the committee to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031342

USA_00020866

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 9 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 200 of 223
Hearing - Volume 2                                           April 6, 2009

251

1    take the eight remaining witnesses that we have left and

2    the six hours and 15 minutes that we have left and allow

3    members to ask as many questions as they wish for whatever

4    purpose they wish and to ask of these expert witnesses to

5    stay until we are done along with the members of the

6    committee, then I am certainly open to a discussion along

7    those lines.

8              I do think that the proposal to take the

9    seven witnesses that were provided by the Democrats and

10   the six witnesses that were provided by my Republican

11   friends and divide the time up to midnight equally a fair

12   one.  More than fair.  If for whatever reason that's --

13             SPEAKER:  Just two comments, Mr. Chairman.

14   It was expected that the Republicans would have seven

15   witnesses, as well, and one of them dropped out.

16             CHAIRMAN SMITH:  But we took that time and

17   divided it equally among the witnesses rather than half

18   the time for the Democrats and half the time for the

19   Republicans.

20             SPEAKER:  Let me finish just really

21   quickly.  I would just like to finish.  The inequity in

22   number of witnesses from Democrats and Republicans is

23   not -- is clearly not the fault of Democrats.  We were

24   asked to provide seven.  We provided seven.  We thought

25   you were going to provide seven.  You provided six.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031343

USA_00020867

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 10 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 201 of 223
Hearing - Volume 2                                          April 6, 2009

252

1      That's clearly not our fault.

2                      The other assumption I think is worth

3      exploring is that very few of the witnesses have actually

4      used up all their time.  I think one or two.

5                      CHAIRMAN SMITH:  I think there is one

6      witness that didn't use all his time because he was late

7      for a flight, and I believe I'm correct in saying there

8      was only one witness who didn't use up all their time

9      because of a lack of questions, and that was Ms. --

10                     SPEAKER:  Did the last witness use all

11     their time?

12                     CHAIRMAN SMITH:  Yes, she did.

13                     SPEAKER:  He did?

14                     CHAIRMAN SMITH:  He did, more than.

15                     SPEAKER:  One quick comment, Mr. Chairman.

16                     CHAIRMAN SMITH:  So, you-all let me know.

17     I'm here, and I'm trying to be fair to the witnesses and

18     to the House and members of the committee.  If the

19     consensus says that we wish to proceed and let each of

20     these witnesses --

21                     SPEAKER:  I just want to comment that

22     Ms. Brown and I have sat on several committees together

23     and spent many late nights up here and I would guarantee

24     we've been back here early the next morning before some of

25     these young whipper snappers.  We defer to the age



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031344

USA_00020868

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 11 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 202 of 223
Hearing - Volume 2                                          April 6, 2009

253

```
 1     questions.

 2                 CHAIRMAN SMITH:  So, do we have a forum?

 3     At this time --

 4                 SPEAKER:  Mr. Chairman, I would say -- I

 5     have something I wanted to put into the record, a

 6     deposition here from Ken George.  Mr. George is a former

 7     chairman of the Republican party in Dallas County, and I

 8     wanted to give a copy of this one deposition to the

 9     committee so it becomes a part of the official record just

10     in case this deal comes under Justice Department review.

11                 In this particular deposition, Mr. George

12     is unable to identify any voter fraud in Dallas County,

13     even though he did send a letter at the time to the Dallas

14     County DA asking the DA to investigate voter fraud when

15     Tony (inaudible) was running against Harry Miller back in

16     2006 and -- and, you know, just like many of the witnesses

17     that are here today, that report by Mr. George has not

18     produced any voter fraud even though he said initially

19     that there was.

20                 CHAIRMAN SMITH:  Thank you.  And now

21     it's -- I believe I can welcome and I will go ahead and

22     begin the clock and we'll kind of be loosey-goosey about

23     this to the extent that we can until someone complains

24     about the hour.

25                 Mr. Dewayne Charleston, would you please
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031345

USA_00020869

Case 2:13-cv-00193   Document 663-5   Filed on 11/11/14 in TXSD   Page 12 of 104
Case 1:12-cv-00128-RMC-DST-RLW   Document 213-3   Filed 06/20/12   Page 205 of 223
Hearing - Volume 2                                            April 6, 2009

254

1       state your name and who you represent?

2                   DEWAYNE CHARLESTON:  Yes.  My name is

3       Dewayne Charleston.  I'm a justice of the peace from

4       Waller County.

5                   CHAIRMAN SMITH:  And you're here to testify

6       against Senate Bill 362?

7                   DEWAYNE CHARLESTON:  Yes, I am.

8                   CHAIRMAN SMITH:  Please proceed.

9                   DEWAYNE CHARLESTON:  Dewayne Charleston,

10      Waller County.  I'm a justice of the peace, and I come to

11      oppose this particular bill.  I want to thank you for the

12      opportunity to provide testimony about voting rights in

13      Texas and how they relate to the voter ID bill that you

14      may be now considering.  Prior to the 2008 election and

15      for the past 20 years I've been deeply involved in trying

16      to end rationally discriminatory voting practices in

17      Waller County, Texas.

18                  I met with officials from the United States

19      Department of Justice and from the Texas Attorney

20      General's office and I had been given the assurances based

21      on detailed information that Prairieview students were

22      being subjected to racially discriminatory voting

23      practices, and I got those assurances that action would be

24      taken.  And each time I contacted the Texas Attorney

25      General's office I was told that they were still looking



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031346

USA_00020870

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 13 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 204 of 223
Hearing - Volume 2                                    April 6, 2009

255

1       into it, that there were ongoing investigations.

2                       During the 2008 election, especially during

3       the spring primary, students at historically black

4       (inaudible) campus once again encountered significant

5       barriers to becoming registered voters and, again, the

6       Texas Attorney General did very little to help.

7                       I then contacted the Campaign Legal Center

8       in Washington, D.C. which agreed to and provided legal

9       counsel to another student at the historically black

10      university who believed that their voter registration

11      application was being rejected for racially discriminatory

12      reasons.

13                      Upon investigation, the Campaign Legal

14      Center concluded that the actions of Waller County

15      officials violated the Voting Rights Act of 1965.  There

16      had been many previous complaints about the unnecessary

17      obstacles to voter registration being placed on the

18      Prairieview students.  It would widely known that the

19      Department of Justice had been investigating these

20      problems for the last few years.  They provided the

21      departmental attorneys with updated information on the

22      continuing problems, including the significant hurdles

23      erected in violation of the Voting Rights Act by Waller

24      County officials who were attempting to keep Prairieview

25      students from exercising their right to vote.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031347

USA_00020871

Case 2:13-cv-00193   Document 662-5   Filed on 11/11/14 in TXSD   Page 14 of 104
Case 1:12-cv-00128-RMC-DST-RLW   Document 213-3   Filed 06/20/12   Page 205 of 223
Hearing - Volume 2                                          April 6, 2009

256

1                    In the fall of 2008, the United States

2       Department of Justice signed a lawsuit against Waller

3       County for violations of the Voting Rights Act.   The

4       violations concerned various aspects of Waller County's

5       racially discriminatory voter registration process.

6                    Specifically, the Justice Department

7       identified several new voter registration procedures that

8       had been implemented by Waller County election officials

9       in violation of Section 5 of the Voting Rights Act, which

10      is known as pre-clearance requirements.

11                   These changes in voter registration

12      procedures included numerous barriers that Waller County

13      officials had erected and which were aimed at Prairieview

14      students, particularly those students who had volunteered

15      to serve as deputy voting registrars.   These barriers

16      included refusing to accept voter registration

17      applications submitted by voluntary deputy registrars that

18      the registrars have (inaudible), requiring the voluntary

19      deputy registrars to notify each such applicant of the

20      rejection and imposing limitations on the number of voter

21      registration applications -- documents that voluntary

22      deputy registrars could obtain in facilitating voter

23      registration drives.

24                   The Department of Justice also alleged that

25      Waller County election officials violated federal law



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031348

USA_00020872

Case 2:13-cv-00193  Document 662-5  Filed on 11/11/14 in TXSD  Page 15 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-3  Filed 06/20/12  Page 206 of 223
Hearing - Volume 2                                          April 6, 2009

257

 1          because in processing voter registration applications

 2          county officials rejected applications of Prairieview

 3          students for arbitrary reasons that were not authorized by

 4          state law, such as failure to include difficult and other

 5          hyper-technical reasons.

 6                    On October 17th, 2008, a consent judgment

 7          and decree was agreed upon by the United States Department

 8          of Justice and Waller County officials and approved by the

 9          federal court.  The agreement provided for far-ranging

10          relief for African-American students at Prairieview.

11          Under the settlement agreement, Waller County officials

12          admitted that it had made several changes in its voter

13          registration procedures in violation of the Voting Rights

14          Act.  The county also admitted that its rejection of

15          Prairieview's voter registration applications that were

16          inconsistent with Texas law.  Under the consent judgment,

17          Waller County agreed to review previously-rejected

18          applications within seven days of the settlement

19          agreement, and county officials were required to notify

20          Prairieview students in sufficient time so that they could

21          cast ballots on election day 2008.

22                    Also as part of the settlement, election

23          officials in Waller County agreed to develop by

24          December 1st, 2008, a training program for volunteer

25          deputy registrars, including appropriate written materials



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031349

USA_00020873

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 16 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 207 of 223
Hearing - Volume 2                                        April 6, 2009

258

1     for purposes of improving the training registrars.

2                    The consent judgment also required -- put

3     Waller County officials to coordinate with Prairieview

4     officials to hold twice annual events on the Prairieview

5     campus at which students can become voluntary deputy voter

6     registrars and receive training (inaudible).

7                    As the Waller County case clearly

8     illustrates, problems in voter registration procedures are

9     not a thing of the past.  We can all do what we can to

10    eradicate impediments to registration and voting starting

11    with a clear and acceptable voter registration process.

12                    What is most troubling to me is the fact

13    that here we have the State of Texas considering the

14    enactment of a law that requires a photo voter ID in order

15    to vote and why, to solve a problem of in-person voter

16    fraud even though such examples of such voter

17    impersonalization fraud are either nonexistent or nearly

18    so.

19                    We have a real and actual voting

20    discrimination problem as we did in Waller County, the

21    Texas attorney general barely lifted a finger to help us.

22    As it appears to me, the proposed voter ID bill is but an

23    initiative to identify class of voters who my be further

24    disenfranchised by real or perceived additional on-site

25    voting requirements, and a few of these requirements -- at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031350

USA_00020874

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 17 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 208 of 223
Hearing - Volume 2                                    April 6, 2009

259

1    least from the perspective of those who seek to

2    discriminate against legitimate voters -- is that the

3    voters who are intimidated by photo ID measures are often

4    deterred from even attempting to vote and are subsequently

5    difficult to identify.  Hence the question:  Who is

6    denied?

7              It is interesting that since the U.S.

8    supreme Court affirmed the right of Prairieview students

9    to vote in Waller County in 1979 there has been a constant

10   erosion of that right.  We need the committee members and

11   those House members who are concerned about voting fraud

12   to join those House members like Representative Al Edwards

13   who marched the 7.2 miles in the rain because they truly

14   cared about protecting the integrity of elections in

15   Texas.

16              Fraudulent elections do have consequences.

17   You should know that the Justice Department sued Waller

18   County in 2008 and Waller County admitted that they had in

19   fact violated the civil rights of students at Prairieview,

20   that a $49.3 million bond construction was passed by the

21   voters in a local school district that includes

22   Prairieview.

23              In that election, that fraudulent election

24   by local government officials, they disenfranchised

25   thousands of Prairieview students.  The bond cast by a few



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031351

USA_00020875

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 18 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 209 of 223
Hearing - Volume 2                                          April 6, 2009

260

1      hundred votes and state officials who were now concerned

2      about tainted elections stood silent.  $49.3 million and

3      state officials stood silent though local officials now

4      admit -- those same local officials now admit after the

5      election was over that the election was fraudulent and not

6      pre-cleared.  This small school district, which is Waller

7      Independent School District, relied on the voter

8      registration practices of Waller County who admitted that

9      they had in fact disenfranchised Prairieview students.

10             The bond construction measure passed.  The

11     one that passed has pitted a white town against a black

12     town.  It pitted a white town versus a black town, and of

13     the $49.3 million that passed through this fraudulent

14     election, 49.1 went to the white town and $230,000 went to

15     the black town.  And House Bill 1, which I guess was

16     passed a couple years, ago allowed that white town -- that

17     white school board to part in a joint election with the

18     one municipality to the full use of a second municipality.

19             So, you can guess why the one white town,

20     Waller, got $49.1 million in educational construction and

21     we got the 230,000 in Prairieview.  They built a

22     17-million-dollar football stadium that they called

23     educational construction, and we got air conditioning in

24     our gymnasium for the first time -- for the first time in

25     54 years.  It was the election and we marched and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031352

USA_00020876

Case 2:13-cv-00193   Document 662-5   Filed on 11/11/14 in TXSD   Page 19 of 104
Case 1:12-cv-00128-RMC-DST-RLW   Document 213-3   Filed 06/20/12   Page 210 of 223
Hearing - Volume 2                                              April 6, 2009

261

1    protested, and I just can't imagine that right now we have

2    such a strong movement in state -- by state officials to

3    make sure that we don't have tainted elections and now we

4    pay the bills for this football stadium, the

5    17 million-dollar football stadium and all the Waller

6    County officials had to do was apologize and say that we

7    were wrong and yet state officials just stay absolutely

8    silent.  Tainted elections, disenfranchised students.  And

9    even if all the students came with all of the 11 or 12

10   pieces of non-photographic identification, most of them,

11   their driver's licenses would say Houston and Dallas.

12   Most of their deals would be going to their parents.  We

13   don't even have rural delivery in Prairieview, Texas.  And

14   so, they only have P.O. boxes for the most part.

15            So, you could go down the list and ask how

16   does this affect Prairieview students, and I will tell you

17   that it is a softball that you-all are attempting to throw

18   at Waller County officials.  They use this softball to

19   make it easy to cheat, to make it easy to cheat more of

20   these students out of the ballot box.  You-all are

21   throwing or proposing to throw a softball to Waller County

22   officials.  (Inaudible) more of these students out of the

23   ballot box.  Thank you.

24      Q.  (By Representative Bonnen) Let me begin --

25   because I'm a little confused with some of your testimony.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_005995

TX_00031353

USA_00020877

262

1    Let me begin by referring to March 11 of 2009, earlier

2    this last month.  Senator Ellis had Mr. Bledsoe -- I

3    imagine you know Mr. Bledsoe -- Mr. Bledsoe said, "Well,

4    you know, we have had a number of problems and Attorney

5    General Abbott, you know he assisted the folks in

6    Prairieview when a situation arose where you had a number

7    of people wrongfully purged from the rolls who could not

8    vote in the city election.  And he also had, I think,

9    about a thousand ballots.  I mean voter registration

10   applications that were just sat on that no one -- just sat

11   on so the folks were not able to vote in the particular

12   election and they were found in the county office and they

13   were --- the attorney general had them filed -- the

14   attorney general had to file them," said by Mr. Bledsoe.

15              Is that -- was Mr. Bled inaccurate?

16        A.   I don't know the conversation that he has had.

17        Q.   It's a public record that he had testified for

18   Ellis before the state Senate on November 11th of 2009.

19        A.   I can tell you that over a thousand voter

20   registration cards were never processed and to this day

21   those cards were never processed in Waller County.  It was

22   those thousand cards that allowed that

23   $49.3 million-dollar bond election pass.  And Greg -- I'm

24   going to ask you a question.  Greg Abbott, he did hold up

25   the federal lawsuit that we had temporarily for two or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031354

USA_00020878

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 21 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 212 of 223
Hearing - Volume 2                                                 April 6, 2009

263

 1     three days.  That's why you'll notice that I did say he

 2     barely lifted a finger.

 3          Q.  Well, let's discuss that.  I have an attorney

 4     general's opinion from February 4th of 2004.  I'm from

 5     the South of Houston, so I see a lot of this in meetings

 6     discussing some of these issues, and I find it interesting

 7     that you say barely lifted a finger and the state

 8     government hadn't done anything.  You're pretty serious

 9     about those comments, but eventually this attorney general

10     is the one who wrote the opinion saying that those

11     students who were being denied previously by your county

12     officials the right to vote there.  It was General Abbott

13     who wrote the opinion in response to Senator Ellis'

14     question that they could vote there.  That's pretty

15     significant.

16               REPRESENTATIVE BONNEN:  Well, if you look

17     at the opinion, maybe you may think so.  But in '04, he

18     wrote the opinion.  In '06 the registration office in

19     Waller County said, "Okay.  Just fine."

20          Q.  I'm trying to clarify your comments between maybe

21     issues with local officials in Waller County and your

22     claim that the state and the attorney general have done

23     nothing.

24          A.  Right.  And I'm going to respond to it.  In '04

25     he wrote the opinion that those students were entitled to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_005997

TX_00031355

USA_00020879

Case 2:13-cv-00193   Document 662-5   Filed on 11/11/14 in TXSD   Page 22 of 104
Case 1:12-cv-00128-RMC-DST-RLW   Document 213-3   Filed 06/20/12   Page 213 of 223
Hearing - Volume 2                                          April 6, 2009

264

1    unfettered access and they were entitled to vote.  In '06

2    county officials just flat-out refused to process the

3    cards.  We found out that they were seeking criminal

4    charges in '06.  Now, he already an opinion saying this is

5    an illegal process or thought it was an illegal process.

6    That was in '06.  Not a single person lost their job, was

7    punished, and he assured me that he was going to pass a

8    bill that would provide criminal penalties for election

9    administrators who refused to process cards.  That was two

10   years ago.  I don't see that there's been any legislation

11   presented --

12        Q.   Now, didn't the Waller County DA apologize and

13   resign at that point?

14        A.   The Waller County DA did apologize.

15        Q.   Didn't he step down?

16        A.   Not because of that.  Not because of that.

17        Q.   Why did he step down?

18        A.   He claimed it was because of health issues.

19        Q.   Oh, okay.  So, when football coaches resign after

20   bad seasons, it's because they are tired of coaching

21   there?

22             REPRESENTATIVE BONNEN:  The one thing that

23   I will say is that after he stepped down, a thousand

24   students were still disenfranchised.  So, apparently

25   whatever took place at the state and at the local level,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031356

USA_00020880

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 23 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 214 of 223
Hearing - Volume 2                                            April 6, 2009

265

1      it did nothing to eradicate that impediment.

2          Q.  What got the Department of Justice involved?  Was

3      it the referral from the attorney general's office?

4          A.  New first contacted the justice department and

5      had been dealing with the Justice Department many months

6      before Greg Abbott got involved.  In fact, Greg Abbott got

7      involved when I was walking to Austin to protest the fact

8      that he refused to prosecute anybody for withholding those

9      ballots.  I remember that.

10         Q.  You had to march on off, then, and sit out in

11     front of the attorney general's office until he had a

12     meeting, correct?

13         A.  That's not exactly what I said.

14         Q.  What did you say?

15         A.  I said when I called and he refused to meet with

16     me --

17         Q.  Did you actually make a phone call and they

18     refused to meet with you?

19         A.  He refused to meet with me until I was 10 miles

20     on the other side of Prairieview and he got a phone call.

21         Q.  So, you called his scheduling office and they

22     refused to meet with you?

23         A.  As I recall, they did.

24         Q.  As you recall?

25         A.  Let me say this.  When I was 10 miles on the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031357

USA_00020881

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 24 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 215 of 223
Hearing - Volume 2                                          April 6, 2009

266

1    road, he called and then --

2         Q.  Did you make a phone call prior to setting out on

3    the road?

4         A.  I made many phone calls.

5         Q.  And asked for a specific meeting?

6         A.  Many phone calls.

7         Q.  But did you ask for a specific meeting with the

8    attorney general?

9         A.  I said, "I want to speak with Greg Abbott."

10        Q.  Did you ask for a specific meeting with the

11   attorney general?  My understanding is that as soon as you

12   set out on the road and said that you were going there to

13   demand your meeting, you had a meeting within a day.

14        A.  Same day.

15        Q.  Even better.  So, prior to that did you call to

16   specifically ask for a meeting with the attorney general?

17        A.  Oh, absolutely.

18        Q.  And you had been told that?

19        A.  Absolutely.

20        Q.  Okay.  That's interesting.  You talked about the

21   bonds.  Were there monitors in the election, bond election

22   from the State of Texas, Secretary of State's office?

23        A.  In the 2007?

24        Q.  Correct.

25        A.  I believe so, but the students were registered.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031358

USA_00020882

Case 2:13-cv-00193  Document 662-5  Filed on 11/11/14 in TXSD  Page 25 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-3  Filed 06/20/12  Page 216 of 223
Hearing - Volume 2                                          April 6, 2009

267

1        They had never processed the cards.

2             Q.  I understand that, but were there not state

3        monitors there to watch that election?

4             A.  I believe there were.

5             Q.  And did that come from the office of attorney

6        general, the state, Secretary of State's office?

7             A.  I can't say for sure.  Yeah, that's where that

8        probably come from.

9             Q.  The state -- Secretary of State's office?  I

10       guess I'm concerned with your claims that the state has

11       done nothing.  The interesting thing is that you talked

12       about Department Of Justice.  That's who has

13       responsibility over these voting rights claims.

14            A.  Well, the Department of Justice claimed that they

15       had already pre-cleared House Bill 1 and because they had

16       already pre-cleared House Bill 1, Waller ISD did not need

17       pre-clearance.

18            Q.  So, then, the Department of Justice decided that

19       they were in --

20            A.  The Department of Justice hadn't been -- they had

21       (inaudible.)

22            Q.  Right.  I'm trying to understand.

23            A.  They weren't on paper.

24            Q.  Sure.  I'm not saying they were.  What I'm simply

25       saying is that that's who has that authority, correct?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031359

USA_00020883

Case 2:13-cv-00193  Document 662-5  Filed on 11/11/14 in TXSD  Page 26 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-3  Filed 06/20/12  Page 217 of 223
Hearing - Volume 2                                    April 6, 2009

268

1      You're blaming the attorney general for authority he

2      doesn't have, but did he not refer that case to the

3      Department of Justice?

4          A.  We have been in contact with the Department of

5      Justice 15, 20 years regarding these issues.  I can't --

6          Q.  Did the Department of Justice take up an actual

7      case and go into an investigation, though?

8          A.  I can't say -- I can't say for sure.  I can't say

9      for sure that it was on Attorney General Greg Abbott's

10     recommendation or --

11         Q.  Did it happen around the same time, though?

12         A.  They were already investigating.  They were being

13     prodded and pushed forward by him. I'm not sure, but that

14     was alleged.

15         Q.  What did the Department of Justice find?  I want

16     to be clear about that.  The Department of Justice, what

17     was their findings?

18         A.  With respect to those thousand students?

19         Q.  Uh-huh.

20         A.  That's when the (inaudible) that was part of the

21     investigation that led to the consent decree, and that was

22     they had changed many processes and he held many elections

23     over the last 25 years that have not been pre-cleared.

24         Q.  I understand, but did they find wrongdoing,

25     though?  Did they find Voting Act law violation?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006002

Case 2:13-cv-00193  Document 662-5  Filed on 11/11/14 in TXSD  Page 27 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-3  Filed 06/20/12  Page 218 of 223
Hearing - Volume 2                                          April 6, 2009

269

1          A.   There was a consent decree in which waller County

2     admitted that they had, in fact --

3          Q.   Waller County admitted that?

4          A.   Right.

5          Q.   Okay.  My understanding, though, is that there

6     was not any criminal conduct alleged.  Is that true?

7          A.   That's pretty much why they jumped at it.  In

8     fact, on the very same day the Justice Department --

9          Q.   Well, I have the degree here.  My understanding,

10     though, is that there wasn't any criminal --

11          A.   Let me say this.  When the Justice Department

12     issued that consent decree on the same day, when they

13     issued the log on the same degree that decree had already

14     been agreed to.  So, I don't know the details of what

15     happened back behind, but we do know that students were

16     disenfranchised and an election was tainted because of

17     Jackson County.

18          Q.   I guess the other thing in regards to what the

19     attorney general's office did or did not do for you, in my

20     records I have that the attorney general's office actually

21     held up that election for -- for bonds.  The attorney

22     general's office actually held the sale of bonds for I

23     believe four months because there was a question on the

24     election; is that correct?

25          A.   No, the election was initially -- the validation



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031361

USA_00020885

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 28 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 219 of 223
Hearing - Volume 2                                        April 6, 2009

270

 1    of the bond was held up initially by the Justice

 2    Department before we even knew that they had got

 3    pre-clearance.  Sometime two months after the election,

 4    the Justice Department realized that the local officials

 5    didn't even have the election pre-cleared.

 6         Q.  You're the one who held it up?  I'm not talking

 7    about the election.  I'm talking about the selling of the

 8    bonds.

 9         A.  The bond election should not be valid -- the bond

10    could not be validated until the judge -- until the

11    election had been pre-cleared.  That was held up initially

12    by the Justice Department.

13         Q.  Did they reject the claim at that point?

14         A.  No.  That's interesting.  I'm glad you asked.

15    There was a guy name John Tanner who made an agreement

16    with the local officials -- and this was after a meeting

17    he had with Attorney General Greg Abbott.  John Tanner

18    made an agreement with the local officials, and this was

19    after a meeting that he -- I know that you read it.  He

20    said, "We want to go ahead and retroactively pre-clear the

21    49.3-million-dollar bond election as long as Waller

22    Independent School District agreed that in the future they

23    will have joint elections with the City of Prairieview."

24              So, Waller called a special board meeting

25    at 8:00 o'clock in the morning in August after the meeting



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031362

USA_00020886

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 29 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 220 of 223

Hearing - Volume 2                                          April 6, 2009

271

1     between Greg Abbott and Justice Department and they agreed

2     that they will have joint elections with the City of

3     Prairieview.  They signed this resolution, they sent it

4     overnight to D.C.  On Monday morning, people in the

5     Justice Department get it and they agree to pre-clear or

6     retroactively pre-clear the election based on this

7     resolution, okay?  So then they released the money at that

8     particular time and Greg Abbott had an opportunity -- but

9     they released the money at that particular time.

10                     Then fast forward to 2008.  When they fast

11    forward to 2008 and we're in federal court and we're stuck

12    in federal court, we're asking for Mr. Abbott's office to

13    intercede and help us --

14         Q.   Explain to me how they would intercede in federal

15    court.  They don't have jurisdiction in that court.

16         A.   No.  I suspect that maybe they could get

17    involved.  I'm not an attorney, but I suspect they could

18    get involved and say, "Well, hold up.  There was an

19    agreement" --

20         Q.   I've just discussed several situations where they

21    have involved themselves where they have the authority as

22    the attorney general of the State of Texas.

23         A.   All I'm saying, we were in federal court.  Waller

24    ISD then, once the money was released -- a week after the

25    money was released and made available, then they went back



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031363

USA_00020887

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 30 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 221 of 223
Hearing - Volume 2                                                    April 6, 2009

272

1    and said, "Well, we see that House Bill 1 allows us to

2    only go with one city," they go back to saying, well,

3    we're no longer going to have joint elections with the

4    City of Prairieview.  At some point the attorney general's

5    office could have gotten involved and said, "Hey, you guys

6    had an agreement."

7        Q.  Well, I'm confused.  I thought a few seconds ago

8    you were telling me the attorney general's office -- was

9    involved.

10       A.  They were involved, but everybody who was

11   involved was not involved to help you.  They were

12   involved.

13       Q.  What I don't understand, you're going back and

14   forth through whether they were or were not involved.

15       A.  No, no.  I told you from the very beginning, they

16   did little to help us.  Does that not imply that they

17   were, in fact, involved?

18       Q.  I'm amazed that you said they did little to help

19   you when they wrote an opinion of holding the right of

20   those students to vote in Prairieview, something that the

21   local officials were flatly denying.  They held off on the

22   sale of the bonds.  They were declined -- declined the

23   improvement through the bonds, and another thing is that

24   the scheduling office has no record of your request to

25   meet with the attorney general.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031364

USA_00020888

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 31 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 222 of 223
Hearing - Volume 2                                          April 6, 2009

273

1        A.  I'm not in charge of their office.

2        Q.  I didn't ask you whether you were in charge of

3   the office.  You're sitting here under oath and telling me

4   that you made a request to the scheduling office of the

5   attorney general?

6        A.  I called the attorney general's office.  Now, if

7   I need to clarify myself, I don't know if I was speaking

8   to the scheduling office or not.  I know that their

9   response was once I was on the road was, "Okay.  He will

10  meet with you now."

11       Q.  Well, I want to be clear, though.  I think it's

12  pretty important when you made a request to meet with the

13  attorney general.

14       A.  Right.

15       Q.  When did you make that request?  After you made a

16  press statement saying you were marching on Austin, or did

17  you make a phone call --

18       A.  No, I didn't.  I made phone calls.  Monday

19  morning at, like, 8:05 in the morning.  I was waiting for

20  them to come into the office.  If fact, I can be more

21  specific about it because I told my wife that morning,

22  "I'm going to call the attorney general's office and if he

23  doesn't agree to meet with me, I'll just walk down there.

24  I'll just stay there until he meets with me."

25       Q.  So, what you're -- so, let me piece this



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031365

USA_00020889

Case 2:13-cv-00193 Document 662-5 Filed on 11/11/14 in TXSD Page 32 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-3 Filed 06/20/12 Page 223 of 223
Hearing - Volume 2                                            April 6, 2009

274

1    together.  What you're basically telling me is you woke up

2    Monday morning and decided you wanted to meet with the

3    attorney general and made a phone call at 8:05 -- and did

4    you get somebody or no?

5         A.  In the context of it, that was when I made a

6    decision that I would walk.  But for months before I had

7    been in contact with the attorney's general office about

8    the issue.

9         Q.  Had you requested a face-to-face meeting with the

10   attorney general over that time?

11        A.  I'm not so sure that I had.

12        Q.  That's your answer.

13             REPRESENTATIVE BONNEN:  Thank you.  I rest.

14        Q.  (By Alma Allen) Mr. Charleston, I feel your

15   passion, and I feel you're very passionate about this

16   issue and take it very, very seriously.

17             Did Congresswoman Sheila Jackson Lee assist

18   you in connecting you with the Justice Department in

19   question, do you think?

20        A.  Absolutely.  She made a request of the -- I think

21   it was in the general to get involved in the Waller ISD

22   case, and she was a witness from the very beginning.  In

23   fact, it was in 2004 when she initially wrote the attorney

24   general and requested an investigation, and she's the one

25   who really got the Justice Department involved from --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031366

USA_00020890

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 33 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 2 of 221
Hearing - Volume 2                                          April 6, 2009

275

1    certainly from 2004 on forward.

2         Q.  So, you had help not only from your local or your

3    Houston reps, but you had help from (inaudible)?

4         A.  Twice he marched with us, in 2004 and also in

5    2008.  2008.

6         Q.  And how long had this been going on with

7    discriminated of the students at Prairieview A&M?

8         A.  The initial began with a guy named Chuck Ballard.

9    In 1972, Chuck Ballard was a white student enrolled --

10   (inaudible) in the first lawsuit and Craig Washington was

11   one of his attorneys.  He filed that and for seven

12   years -- he fought it all the way to the U.S. Supreme

13   Court.  The Supreme Court affirmed it in 1979 and Chuck

14   Ballard (inaudible) and everybody knows the story of Chuck

15   Ballard and that it's been going on for better than 35

16   years.

17        Q.  Do you know the bill (inaudible) to spend

18   millions, millions of dollars to implement voter ID.

19             Based on your prior happenings at

20   Prairieview, based on records, do you personally have the

21   confidence that the state would invest in necessary

22   resources to educate voters and train election workers in

23   the 254 counties and over 8,000 precincts to provide

24   adequate access to require IP documents if necessary to

25   make such a law not disenfranchise voters?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031367

USA_00020891

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 34 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 3 of 221
Hearing - Volume 2                                                April 6, 2009

276

1          A.  Well, one of the problems that Waller County

2    constantly told us as they sought to eliminate the --

3    spring (inaudible) they sought to eliminate all early

4    polling sites.  In a county that's 525 square miles, they

5    were going to have only one early polling site, and they

6    said they could not afford a 3,000-dollar voting machine.

7    And so, they had to begin to consolidate.  The money was

8    so tight.  Another time they talked about the reason that

9    they couldn't use the hundreds of thousands of the

10   (inaudible) was because we had a new freshman class in and

11   they did not have the labor necessary to process these

12   cards.  And most recently they said they did not have the

13   labor to staff all the polling sites.

14          So, you start creating more and more

15   confusion, more and more requirements even if -- I think

16   that Waller County, being a small county with a minimal

17   budget they are going to be more empowered to say that

18   they cannot afford to do these things unfunded mandate.

19        Q.  That's what you think if this bill is

20   implemented?

21        A.  Absolutely.  I think it's a step in the wrong

22   direction, certainly for Waller County.  We went from

23   having 600 students in the campus precinct vote in the

24   November general election to 3200 that voted in 2008,

25   three weeks after the Justice Department got involved.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031368

USA_00020892

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 35 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 4 of 221
Hearing - Volume 2                                          April 6, 2009

277

1    But I think this is definitely the wrong direction because

2    we made some tremendous headway in working with the county

3    administration, county elections office and to now throw

4    that says, okay, bring a bill or bring something from a

5    government agency when they know locally that Prairieview

6    is the only city in the whole county that does not have a

7    mail delivery to their homes, and it's the most popular

8    city in the county.  So, students get very little, if

9    anything, mailed to them at a Prairieview address and they

10   can present 10 forms of ID with their names on it and all

11   of it would lead to the preponderance of the evidence that

12   they are not residents of Waller County because everything

13   would say -- have their parents' address.  That's the

14   different piece of evidence that I've seen only.

15            REPRESENTATIVE BONNEN:  Thank you.

16       Q.  (By Chairman Smith)  Let me just say that I

17   completely understand why you might be very sensitive to a

18   very suspicious -- any changes of any kind in voting laws

19   because of the fact that there is a history in this

20   country of things occurring that are unacceptable and that

21   resulted in the passage of the Voting Rights Act, which

22   was a piece of legislation that was needed, unfortunately,

23   and as a result of that legislation, anything that this

24   state does -- and those, you know -- you know, anything

25   that this state does has got to be pre-cleared by either



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031369

USA_00020893

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 36 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 5 of 221
Hearing - Volume 2                                                  April 6, 2009

278

1    the federal courts or by what would now be the Obama

2    Justice Department.

3                    Are you -- do you -- do you have a reason

4    to be concerned about that pre-clearance process that you

5    might not get a fair shake in terms of being protected

6    against any inappropriate practices as a result of this

7    legislation having to be reviewed by and approved by

8    either the Obama Justice Department or our federal court

9    system in Washington, D.C.?

10        A.  Well, obviously I have a degree of confidence in

11   the Justice Department now that they would pre-clear it,

12   but we're not going to just roll over because we have a

13   new administrative in.  When we filed a lawsuit, we found

14   out that Waller independent School District -- the State

15   of Texas got Waller into this pre-clearance requirement in

16   the early Seventies.  It was Waller County that involved

17   Texas.  Texas wasn't initially a part of it.  It was

18   because of Waller County.  And so, Waller County -- the

19   whole State of Texas got in in part due to Waller County

20   and after they brought them in in 1976, Waller County

21   refused to have -- for 17 years even ask for pre-clearance

22   and nobody questioned them.  For 17 years they passed

23   bonds and built schools and built them all in Harris

24   County, built them all in Waller and didn't even ask.

25                    So, we are -- like you said, I appreciate



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031370

USA_00020894

Case 2:13-cv-00193  Document 663-5  Filed on 11/11/14 in TXSD  Page 37 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-4  Filed 06/20/12  Page 0 of 221
Hearing - Volume 2                                                      April 6, 2009

279

 1      your acknowledgement and understanding that we are all
 2      suspects because all of our tax dollars and all of our
 3      infrastructure dollars went other places.  And then we get
 4      mad and we decide to stand up, we still lose the issue
 5      because of House Bill 1 that says that nobody -- because
 6      of House Bill 1 that says that you only have to choose one
 7      state to have joint elections with and the Justice
 8      Department says their hands are tied.  Nobody in the state
 9      legislation -- they don't want to get involved, but they
10      had joint elections with one city and we're not going to
11      have it with Prairieview and we lost out.
12           Q.  I understand why some people might have been
13      concerned or suspicious arguably from your perspective of
14      the political appointees in the Bush Justice Department.
15      There was some questions there.  But now, given the fact
16      that the choice is between the Obama Justice Department
17      and the Washington, D.C. Court of Appeals -- I'm not
18      saying that if you disagree with legislation because of
19      that protection you should just vote yes, but do you -- do
20      you -- are you not comforted that that process will
21      protect any legitimate consequence upon voting rights?
22           A.  When we as a group of individuals -- Mayor mare
23      Jackson, his children, when we file a lawsuit, we filed a
24      lawsuit, had two court -- two individual attorneys that
25      took our cases.  Waller Independent School District spent



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031371

USA_00020895

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 38 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 7 of 221

Hearing - Volume 2                                              April 6, 2009

280

 1    better than $1.3 million with Vinson & Elkins to fight us

 2    all of the way in order to deal with that.

 3              We went all the way to putting every --

 4    every court, every level in the State of Texas, went

 5    before seven Republican judges, and to this day have never

 6    had an opportunity to present our case in court.

 7              So, on the one hand we feel confident with

 8    the Justice Department, but the other question is how much

 9    is it going to cost us?  Right now I have a hundred

10    thousand dollars over my head in judgments in attorneys'

11    fees and I'm okay with that, but how much is it going to

12    cost us to get to the Justice Department?  How much is it

13    going to cost us, and who can afford to continue filing

14    federal lawsuits if you know that you can't even get

15    justice at the local level because of politics and things

16    like that.  You have legislation that -- regarding

17    pre-cleared, and no one corrected it.

18              So, I mean, we're rightfully, I believe,

19    skeptical and don't know that we can ever make it all the

20    way to the Justice Department without some major damage.

21    Q.  Justin Leavitt with the Brennan Center for

22    Justice at the New York University School of Law agreed

23    that there's not any study of any kind that would -- at

24    least he's not aware of any -- that would suggest that the

25    change we're talking about in Texas where there is a small



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031372

USA_00020896

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 39 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 8 of 221
Hearing - Volume 2                                          April 6, 2009

281

1    change in the current identification requirements would in

2    any way suppress any kind of voter turnout.

3                Are you aware of any studies that he was

4    not aware of that would suggest that this small change --

5    not Vermont versus Indiana, but the little change that the

6    Senate is proposing here in Texas would, in fact, suppress

7    any voter turnout?

8        A.   I think with respect to Waller County, it would.

9    Because, for one, they are already struggling right now

10   with just getting 5,000 students registered to vote

11   because of the residency requirements and the other

12   rulings.  They are already struggling right now.  If they

13   are struggling right now -- and Greg Abbott made a ruling

14   in 2005 -- the Supreme Court made a ruling in '79, it has

15   gotten progressively worse and it has.  If you pass

16   another law that imposes even slight changes, that

17   suggests to me that it's certainly not going to get any

18   better.

19       Q.   Would the concern that you have apply to any

20   college student at any college regardless of their race

21   and economic background?

22       A.   I think it's a very real concern for every

23   college student.  I went to William & Mary, and they were

24   having the same problem with William & Mary -- and I think

25   it's Williamsburg -- and that was a virtually all-white



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031373

USA_00020897

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 40 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 9 of 221
Hearing - Volume 2                                          April 6, 2009

282

1      campus and they were having the very same problems.  It

2      probably is certainly hurtful to college students.  But

3      when you go into a small county like Waller County, it

4      becomes much more exaggerated against predominantly

5      African Americans that represent 25 percent of the voting

6      base.

7                    CHAIRMAN SMITH:  Okay.  Representative

8      Bonnen?

9          Q.  (By Representative Bonnen) I appreciate what you

10     just said there.  I don't know if you meant it or not, but

11     you made the comment about some general -- making the

12     decision in 2004.  One of the things I wanted to ask you

13     is you said the comment about the general since '76.

14     Roughly.  Right?  Did you say that?

15         A.  -- opinion in '04.  I didn't say that.

16         Q.  Well, you said when the general agreed that those

17     students should be allowed to vote.

18         A.  I made the comment that in '04 he made a ruling

19     and the Supreme Court affirmed the decision in '79 and it

20     had gotten progressively worse.  That's what I said.

21         Q.  Because of his ruling?

22         A.  No.  I said --

23         Q.  Due to your local politics.  Right?  Not because

24     of the attorney general's ruling.

25         A.  What it suggests to me is that if he made a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031374

USA_00020898

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 41 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 10 of 221
Hearing - Volume 2                                          April 6, 2009

283

1    ruling in '04, the very next election when he saw

2    something going wrong, then there should be been some

3    teeth behind that decision and they do have some law

4    enforcement authority.

5         Q.  Well, they do and you have to find criminal

6    action to have -- for them to have that authority, and my

7    understanding is the Department of Justice themselves

8    found no criminal wrongdoing.

9         A.  Well, in 2006 the attorney general -- in 2006 the

10   attorney general's office sat down two or three lawsuit

11   enforcement officials.  They were investigating for

12   criminal charges, and the last I heard -- this is '09 --

13   it's still an ongoing criminal investigation.

14        Q.  The Department of Justice, in their consent

15   decree, say there was not criminal activities.  I don't

16   recall reading that at all.

17        A.  Okay.

18        Q.  Another thing I wanted to ask you:  You're

19   saying, though, that the problem does stem back to 1972.

20   You said that earlier.

21              Are you familiar with who the attorney

22   general for the State of Texas has been since 1972 moving

23   forward?  You're laying a lot of this on one attorney

24   general, but we've had multiple attorney generals since

25   then.  You realize that one of them was Mark White?



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006017

TX_00031375

USA_00020899

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 42 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 11 of 221
Hearing - Volume 2                                    April 6, 2009

284

1          A.  Correct.

2          Q.  He became the governor of Texas.  Did he do

3     anything?

4          A.  I'm not sure.

5          Q.  You know, prior to Mark White was John Hill, a

6     highly-regarded, recognized statewide Democratic official

7     and Jim Maddox, a good man who passed away last year.  He

8     was the attorney general from '82 to '90.

9               Was he involved?

10         A.  I'm not here to say that it's a Republican versus

11    Democrat thing.  I believe in Waller County it's a racial

12    issue.

13         Q.  I'm not certain, though, because you keep saying

14    this specific attorney general, General Abbott, who in my

15    view -- maybe I'm totally wrong in this -- is within the

16    limits of his authority in the law has tried to be

17    beneficial.  I mean, I'm baffled, quite candidly.  I

18    respect maybe the challenge on a local level.  I respect

19    the other challenge there.  I'm baffled that you would

20    blame the attorney general -- if I'm putting words in your

21    mouth, stop me -- for making a ruling that those students

22    should be allowed to vote in Prairieview only made it

23    worse and that that's bad.  I mean, that's amazing to me.

24    I would think that that's a local problem but that the man

25    on the state level made a great ruling and a very positive



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031376

USA_00020900

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 43 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 12 of 221
Hearing - Volume 2                                           April 6, 2009

285

1    ruling for you.

2         A.  I'm not so -- I'm not saying that his ruling is

3    what made it bad.  I'm saying he barely lifted a finger.

4         Q.  That's a stunning comment to me.

5         A.  If you went and looked at that gym at 54 years

6    old -- if you went and saw the gym and you say, "Well, how

7    can attorney general sit back when the county says we

8    violated their civil rights?"

9         Q.  Who deals with that is the Department of Justice.

10        A.  -- ongoing criminal investigation.

11             CHAIRMAN SMITH:  At this point, gentlemen,

12   I'm just going to indicate on the record that the time

13   allotted for questions has expired and my general

14   impression was the extent to which we go beyond this will

15   be the extent to which we go past midnight, but I will

16   allow questions of Mr. Raymond after Mr. Bonnen if that's

17   what people desire.

18        Q.  (By Representative Bonnen) Let me just, again,

19   back up, to Mr. Bledsoe, who I believe is a significant

20   leader in the NAACP said that all General Abbott.  I mean,

21   I'm just -- I think there may be some confusion about what

22   his powers are and what the abilities that his office

23   provides him, but we've probably exhausted it at this

24   point.

25             CHAIRMAN SMITH:  Any other members of the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031377

USA_00020901

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 44 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 13 of 221
Hearing - Volume 2                                          April 6, 2009

286

1   committee before I go to non-committee members?  I'm going

2   to exercise my discretion to allow a few questions of

3   non-committee members.  Representative Raymond, we're not

4   going to announce when the time is up and ask the members

5   to -- it is up and ask the members to please, please --

6   I'm not going to prevent additional questions, but I am

7   going to ask people to take into consideration the fact

8   that we're going to be here very late if after we get to

9   that point they don't take that into consideration.

10  Representative Raymond?

11       Q.   (By Representative Raymond)  I won't be very long,

12  Mr. Chairman.  With all respect to my friend, Mr. Bonnen,

13  my point of view is a little different.

14            Mr. Abbott -- I've sat here in many

15  meetings with Mr. Abbott and seen him do everything he

16  could to suppress and violate the voting rights of the

17  minorities in the state before when we dealt with

18  redistricting.  So, I've seen it up close and personal.

19  And as far as, you know, saying he was your friend and

20  trying to help you, you know, when something cuts off five

21  fingers here and leaves -- cuts off three and leaves you

22  two, well, they're being a friend to the two fingers if

23  you cut off the other eight first.  I think that's what

24  we've got with Mr. Abbott.  By the way, Mr. Hill was a

25  Republican a lot longer than he was a Democrat.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006020

TX_00031378

USA_00020902

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 45 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 14 of 221
Hearing - Volume 2                                        April 6, 2009

287

1            Are you familiar with -- excuse me?  In any

2    event, Judge, are you familiar with -- you've heard a

3    little bit probably about the Indiana case?

4        A.  Yes.

5        Q.  Well, did you know that the federal appellate

6    judge who upheld the Indiana photo ID law said -- this

7    contradicts a little bit whatever you expert cited, Mr.

8    Chairman -- and I quote, "No doubt most people who don't

9    have photo IDs are low on the economic ladder and, thus,

10   if they do vote are more likely to vote for Democratic

11   than Republican candidates.  Thus, the new law injures the

12   Democratic party by compelling the party to devote

13   resources to getting to the polls those of its supporters

14   who would otherwise be discouraged by the new law of

15   bothering to vote."

16           Do you know if the federal judge -- I mean,

17   that's pretty interesting to me that a federal judge would

18   put that in writing in terms of who this law hurts.

19           Are you aware that the AARP, the League of

20   Women Voters, common Cause, NAACP, Lulac and others have

21   testified in opposition to voter ID?

22       A.  A little bit familiar.

23       Q.  You're familiar that they opposed it?  Do you

24   think all these groups are opposing it because they are --

25   and then that the people who were pushing for this because



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031379

USA_00020903

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 46 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 15 of 221
Hearing - Volume 2                                              April 6, 2009

288

```
 1        they want help minorities and folks on the lower end of

 2        the economic scale?

 3            A.   I believe they do.

 4            Q.   You think they want to help them?

 5            A.   Yes, I do.

 6            Q.   You think they are going to help them with this?

 7            A.   No, I'm talking about those who are opposing this

 8        bill, particularly those who are helping minority groups

 9        and people on lower income.

10            Q.   So, if they are opposing it, do you think maybe

11        they are doing it because they are convinced as this

12        federal judge from up North --

13            A.   Absolutely.

14            Q.   -- was convinced that it would affect minorities,

15        lower income?

16            A.   Absolutely.

17            Q.   All right.  Let me just ask you because it's very

18        frustrating for me and the chairman is my friend and we've

19        worked on things together and I appreciate him giving me a

20        chance as a non-member of this committee to ask a couple

21        of questions, but I told the chairman the other day that

22        believe it or not my two grandmothers, they didn't have

23        photo IDs.  When I told him, he was surprised to know

24        that, I guess, my two grandmothers wouldn't have photo ID.

25        They are both Hispanic, they both live out in a rural
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031380

USA_00020904

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 47 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 18 of 221
Hearing - Volume 2                                                April 6, 2009

289

1    community, and that was a fact.  And the fact is there are

2    a lot of folks in Laredo, which is not a rural community

3    that I represent now, a lot of people in the rural

4    community that I used to represent -- I represented seven

5    rural counties, 25 little towns, that would be adversely

6    affected by this kind of law.

7              So, I, you know -- and I want to -- I'm

8    listening to Mr. Bonnen going on about -- I guess he wants

9    you to say that Mr. Abbott is our champion of minorities,

10   but, you know, with all respect, it's hard -- it's hard

11   for us to ever accept that because we know better in the

12   actions that he has taken in the past.

13             You know, what do you think is going on?

14   What is your perspective about why they are pushing this

15   voter ID bill so hard?

16        A.  I'm just a lay person, but my thing is I know in

17   Waller County that any time they are throwing a softball

18   like this, they are going to use it and they're going to

19   choke -- choke the students at Prairieview.  And I suspect

20   that it happens in rural counties even more so, people who

21   don't have the means and wherewithal to get media

22   attention and other things.  But they are going to

23   election workers who come in very temporary, volunteer

24   workers or 7-dollar an hour workers to come in and

25   actually determine that this -- this bill that came to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031381

USA_00020905

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 48 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 17 of 221
Hearing - Volume 2                                                    April 6, 2009

290

1    this particular address, which really means nothing, and

2    give them the discretion.  And the more discretion that is

3    given to these poll workers, the more partisan it's going

4    to be.

5         Q.  So, you think that maybe -- and I've mentioned

6    this to the chairman, but maybe they can put into this

7    bill that if there were provisions that said if you are an

8    election judge and you prevent somebody from voting, you

9    know, it ought to be a felony.  Let's protect the voter

10   because voters get turned -- I'll tell you what.  What we

11   have seen is that voters get turned away a lot more and

12   the law is broken in that way a lot more than somebody

13   going in impersonating you or me or Mr. Bonnen or the

14   chairman and trying to say, "Oh, I'm James Bonnen and I

15   want to vote here."  You know, that's -- what we have seen

16   is that doesn't happen, but what does happen is --

17   everywhere -- is that you have election judges that turn

18   people away.

19             Do you think it would be a good idea if

20   they were so committed to making this a better system that

21   they would put something in there that says if you turn

22   somebody away and we prove that, it's a felony?

23        A.  Absolutely.  When we filed the affidavit and

24   complaint for criminal charges -- seeking criminal charges

25   against Waller County officials, the county commissioner's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031382

USA_00020906

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 49 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 18 of 221
Hearing - Volume 2                                          April 6, 2009

291

1    court went into closed session, abolished the elections

2    office rather than fire the three young ladies who were

3    working in the elections office.  Those people were -- the

4    office was abolished, they got severance pay, and all we

5    know is that they went into closed session and something

6    occurred so bad regarding those 1,000 voter registration

7    applications that they saw fit to abolish the elections

8    office.  And you combine that with the county saying, "We

9    admit that we disenfranchised students" with three people

10   who were let go of their jobs and will all the resources

11   of Texas Attorney General, they couldn't find a single

12   criminal offense?

13        Q.  What's going to happen if this passes and Waller

14   County and the other 253 counties -- I just want to get

15   your opinion based on your experience -- you can go to

16   vote and they look at your ID and say, "No, that looks --

17   you don't look like this picture and you can't vote"?

18   What does this bill do to that judge that said, "No, you

19   can't vote because you don't look like that picture"?

20        A.  Right.  It gives them the discretion to -- one,

21   it proves his case -- I can only speak to that.  It gives

22   them the discretion to say, "Get over in this line, vote

23   provisional, and then you back this line up.  And, of

24   course, Prairieview students and college students don't

25   have the right to miss class.  They can't go back to the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031383

USA_00020907

Case 2:13-cv-00193 - Document 663-5 - Filed on 11/11/14 in TXSD - Page 50 of 104
Case 1:12-cv-00128-RMC-DST-RLW   Document 215-4   Filed 06/20/12   Page 19 of 221
Hearing - Volume 2                                              April 6, 2009

292

1    teacher and say, "Well, I was voting," like an employee

2    can do and going back to his employer saying, "I was

3    voting."  They can call it a five or six hour wait like

4    they typically try to do, cause a five- or six-hour wait.

5        Q.  I'm sure that won't discourage voters.

6        A.  It will discourage voters, and we have a problem

7    because we know that hundreds of students turn away when

8    they know they have to go to a job, they've got to catch a

9    ride with somebody to go to a job, they have to go back to

10   class, they have to go eat because they're on a meal plan

11   that they've already paid.

12            So, when we see them all going away, then

13   people come back and say, "Well, who was disenfranchised

14   because of the long lines and the fact they only had one

15   voting machine and they didn't have the resources?"  Well,

16   we can't really prove it because all we saw was them

17   walking away.  I believe that the purpose of this bill

18   will be to discourage those people from staying at the

19   polls and even going to the polls to begin with.

20       Q.  The last thing I want to ask you about, you told

21   Mr. Bonnen -- you were talking about -- who was it that

22   resigned because -- for health reasons or whatever?

23       A.  Oliver Kingsley.

24       Q.  And who was -- remind me of who --

25       A.  He was the criminal district attorney in 2004 who



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031384

USA_00020908

Case 2:13-cv-00193 - Document 663-5 - Filed on 11/11/14 in TXSD - Page 51 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 20 of 221
Hearing - Volume 2                                                April 6, 2009

293

1    threatened criminal prosecution for attempting to register

2    and vote in Waller County.

3         Q.  Okay.  So, the penalty was you just deny it, and

4    it'll be okay.  We'll let you walk away.  That's the

5    system that's set up now.

6         A.  No criminal charges ever in Waller County.

7         Q.  But he resigned and walked away.  So, he's okay.

8    Do you know what it reminds me of?  It reminds me of when

9    Haliburton was first found out that they were cheating for

10   millions of dollars, charging for gasoline that they

11   weren't selling and President Bush had a press conference

12   and said, "Let me tell you something.  If I find out this

13   is true, they're going to have to give every bit of that

14   money back."  I'm thinking, "Man, it it's one of my guys

15   from south Texas" -- you know, you go steal a thousand

16   dollars from the federal government, you're going to

17   prison.  It's a different standard.

18        A.  That's right.

19        Q.  I appreciate you being here, and I want to ask

20   you -- you may not want to stick around much longer

21   because, with all respect, I've heard him ask you about a

22   hundred times -- he wants you to think Greg Abbott is

23   great and it's like he's trying to twist you up and I

24   expect him to say (inaudible) how much bubbles are in it?

25             REPRESENTATIVE BONNEN:  With all due



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031385

USA_00020909

294

1       respect, I'm simply trying to get some facts on the

2       record.  I know that bothers you at times.

3                   REPRESENTATIVE RAYMOND:  What you're trying

4       to do is you're trying to defend something (inaudible.

5               (Simultaneous conversation)

6                   REPRESENTATIVE BONNEN:  Mr. Raymond, I'm

7       simply quoting from Mr. Bledsoe on March 11 of 2009 --

8                   REPRESENTATIVE RAYMOND:  -- out of context.

9                   REPRESENTATIVE BONNEN:  We'll let you

10      know -- all Frank Attorney General Abbott.  That's what I

11      was reading, Mr. Raymond.

12                  REPRESENTATIVE RAYMOND:  Thank you for

13      cutting off eight fingers and leaving three.

14                  REPRESENTATIVE BONNEN:  We're actually

15      having a pretty civil discussion.

16                  REPRESENTATIVE RAYMOND:  Let me tell you

17      where I get worked up.  This is a systematic effort to try

18      to disenfranchise blacks and browns and people who are

19      poor.  If this was an effort to disenfranchise, you know,

20      white folks that weren't poor and that tended to vote

21      Republican, you'd be raising hell, too.

22                  REPRESENTATIVE BONNEN:  I've seen the

23      numbers from the State of Indiana and the State of

24      Georgia.

25                  CHAIRMAN SMITH:  Let me interrupt,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031386

USA_00020910

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 53 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 22 of 221
Hearing - Volume 2                                        April 6, 2009

295

1      gentlemen, please.  Please, please.  The --

2                  SPEAKER:  Mr. Chairman, I wanted to ask him

3      a couple questions.

4                  CHAIRMAN SMITH:  Okay.  First of all, I

5      would just like to make a quick and civilized comment, if

6      possible.  Not that these weren't civilized, but I want to

7      maintain decorum -- the proper decorum at this hearing if

8      we possibly can on both sides.

9                  The -- I want to emphasize that I agree,

10     first of all, with your concerns about the Senate bill in

11     terms of part-time workers making decisions about whether

12     you look enough like your picture to be able to cast a

13     vote, okay?  I agree with that.

14                 I want to emphasize, however, that the

15     photo identification requirements that are currently in

16     law do not change at all in this legislation.  So, to the

17     extent that your granddaddy didn't have a photo ID,

18     there's no change in current law with regard to photo

19     identification in this legislation.  All that's being

20     changed is the provisions regarding non-photo

21     identification to require two forms rather than one.

22                 You currently have the right to vote with a

23     photo identification, and then this law you'll still have

24     the right to vote with a photo identification.  The only

25     change is with regard to non-photo identification.  And



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031387

USA_00020911

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 54 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 23 of 221
Hearing - Volume 2                                      April 6, 2009

296

 1      insofar as Chief Justice Stephen -- I don't know if that's

 2      where the quote that Representative Raymond was referring

 3      to came from, but he is one of the more liberal of

 4      justices on the Supreme Court who wrote the majority

 5      opinion.

 6                  SPEAKER:  Mr. Chairman, just so you'll

 7      know, it was a federal judge from Indiana who upheld the

 8      opinion.

 9                  CHAIRMAN SMITH:  District court or Court of

10      Appeals?

11                  SPEAKER:  Court of appeals.  But it was a

12      judge that upheld the opinion.

13                  CHAIRMAN SMITH:  Justice Stephens who wrote

14      the majority opinion on the Supreme Court indicated in his

15      words on Page 15 that the inconvenience -- he was talking

16      about Indiana, which requires a photo ID, not Texas, which

17      the Senate bill would not.

18                  He said, relating to the bill that did

19      require a photo ID, "The inconvenience of making a trip to

20      the Bureau of Motor Vehicles, gathering the required

21      documents, and posing for a photograph surely does not

22      qualify as a substantial burden on the right to vote or

23      even represent a significant increase over the usual

24      burdens of voting."

25                  If that is one of the liberal justice's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031388

USA_00020912

Case 2:13-cv-00193 · Document 663-5 · Filed on 11/11/14 in TXSD · Page 55 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 24 of 221
Hearing - Volume 2                                          April 6, 2009

297

1    opinions with regard to the Indiana law which does require

2    a photo identification, I presume that that opinion is

3    even more so with regard to a Texas law that simply alters

4    the requirements for casting a non- -- for providing

5    non-photo identification.

6              That's all the Senate bill would do.  And

7    so, a lot of the rhetoric and so forth about a law that is

8    not even before us is really academic.

9              Yes, representative?

10             SPEAKER:  While we're on Abbott, I wanted

11   to ask you a couple questions.

12        Q.  (By Speaker) What type of -- because there were

13   allegations that there was students there, there were

14   citizens there, African-American citizens that were denied

15   their suffrage, denied their right to vote.

16             What sort of evidence or what sort of

17   refunds and resources did the state attorney general's

18   office to come into Waller County to help that situation?

19        A.  One, they gave us no resources.  In fact, even

20   with the information I had to FedEx them I had to pay for

21   it out of my pocket and they were trying to investigate --

22   they sent on two or three different occasions criminal

23   investigators down.  I constantly made suggestions that if

24   you-all will just come set up in the MSC, the student

25   center, you could come set up and then you could just pull



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031389

USA_00020913

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 56 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 23 of 221
Hearing - Volume 2                                                   April 6, 2009

298

1    people over and say, "Were you denied the right to vote?

2    Were you turned away?"  I told them that they could run an

3    ad in the newspaper and ask the question "Were you turned

4    away?" because it's very difficult to find seven or 800

5    students who were denied the right to vote.

6                  They didn't advertise.  They didn't set up

7    any tables.  They didn't do any phone calls, to my

8    knowledge.  Maybe they did from the offices, but I don't

9    know.  We had copies of all of the applications that were

10   turned in.  And so, they had the ability to -- to vote for

11   all those applications.  We turned over seven or 800

12   applications in that were never processed.  And for five

13   months later not processed until the day that I was

14   walking with copies of these applications that would

15   appear in the Houston Chronicle and then the very next day

16   county officials admitted that they, in fact, did have

17   those applications.

18                  In fact, when I asked the attorney's

19   general's office where were the applications found, they

20   were found in the district attorney's office.  They were

21   found in the district attorney's office and still no

22   prosecution, no nothing.

23        Q.  So, you had numerous African-American students --

24   predominantly African-American students because

25   Prairieview is a campus that is predominantly black?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006032

TX_00031390

USA_00020914

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 57 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 28 of 221
Hearing - Volume 2                                    April 6, 2009

299

1        A.   Right.

2        Q.   So, you had allegations from a wide -- a large

3   number of people that attended school at Prairieview

4   University that lived in Waller County.

5             Now, are you aware that over the last

6   several years that the attorney general was investigating

7   people for mail and ballot fraud?  Are you aware that most

8   of those allegations of mail and ballot fraud was usually

9   just, you know, from what we can see, like one person

10   making an allegation at times?  Are you aware that most of

11   the people, with the exception of one -- everybody that

12   was accused of it and everybody that was investigated was

13   minority, either black or brown?

14        A.   Absolutely.  In fact, the representative here was

15   asking me about that.  I didn't know about what was going

16   on in Fort Worth and the federal case that took place in

17   March until I got a call from the AG's office asking if I

18   could do Greg Abbott a favor, and that favor was they

19   wanted me to provide testimony on -- about what Greg

20   Abbott had done for the students at Prairieview.

21             And it was then that I got involved and was

22   able to go and say, "Hold up.  I didn't know all of that

23   was going on.  Now I see what I was being used for,"

24   because they wanted me to provide some character testimony

25   at a case up in Marshall when I didn't know what was going



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031391

USA_00020915

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 58 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 27 of 221
Hearing - Volume 2                                        April 6, 2009

300

1      on and I refused to provide that testimony.  And so, now,

2      as I said, I understand how I was trying to be played.  I

3      understand that now.

4          Q.  How were you being played?  I'm confused.

5          A.  Because they thought that because of their

6      holding up a bond temporarily, they thought because of

7      their intervening and sending a couple of investigators

8      out that I would be beholden to them and provide testimony

9      about what a great job he had done for us.

10         Q.  What authority did the attorney general's office

11     beyond sending investigators?

12         A.  I don't know.  I'm not --

13         Q.  Did the Department of Justice, who has the

14     significant amount of authority and dollars and ability to

15     investigate this, did they file or find any criminal

16     actions?

17         A.  There were no criminal --

18         Q.  And in my county -- let me just clarify, too,

19     that in my county that no one found any criminal

20     allegations.  These were just allegations that were made

21     by one person.  Let me finish my line of questions, and

22     I'll be more than happy to let you jump back in.  But

23     these were allegations that were made and they were

24     investigated -- investigators were sent out, people were

25     questioned because I know that these folks in my district



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006034

TX_00031392

USA_00020916

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 59 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 28 of 221
Hearing - Volume 2                                        April 6, 2009

301

1        felt like they were violated.  They felt like that -- I

2        know one lady who is still not (inaudible) the day because

3        it was such a traumatic experience for her that, you know,

4        they were never the same after this and they felt like

5        their -- their reputation in the community had been

6        tarnished.

7                So, I'm asking you in Waller County did the

8        attorney general go after the citizens that were

9        discriminated against and make those other folks on the

10       other side of town feel like they made folks on my side of

11       town?

12            A.   I'm glad you asked the question.  The first level

13       of criminal complaints of AG's office -- the AG's office

14       came around, they sealed the offices -- they assured me

15       the office was sealed -- and put tape on the door.  They

16       sealed the office.  And then five months later, even

17       though they had come in and got copies of everything and

18       said that they couldn't find anything -- five months after

19       they sealed the office and investigated, the copies were

20       found in the very building that had been sealed by the

21       attorney general's office and those girls had already

22       resigned and everything was -- nobody faced any criminal

23       charges and there didn't seem to be any real criminal

24       prosecution or effort to prosecute those who later

25       admitted they had, in fact, disenfranchised those



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006035

TX_00031393

USA_00020917

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 60 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 29 of 221
Hearing - Volume 2                                    April 6, 2009

302

1   students.

2       Q.  Now, let me ask you a question --

3           CHAIRMAN SMITH:  I'm going to give you a

4   chance.  I just want to make sure you understand that we

5   have seven witnesses left and two of them are with the

6   NAACP.  One of them is with AARP.  These people are going

7   to be very late if we don't try to -- we're 20 minutes

8   over.  I'll take that into consideration.

9       Q.  (By Speaker) I promise I only have one more

10  question because I think this is important because you

11  understand and the students that you have worked with

12  understand -- we're not talking about something that

13  happened in 1950 or '60 something that today people are so

14  dismissive of.

15      A.  That's right.

16      Q.  The students that you represent know what it's

17  like to be discriminated today.

18      A.  Absolutely.

19      Q.  So, out of everything that you heard -- and I'm

20  talking about people that are for this legislation, people

21  that are for voter ID bill.

22          Have you heard anything in any of the

23  testimony or any of the comments that have been made by

24  anyone that would indicate to you that these folks are as

25  concerned about the voting rights of African-Americans or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031394

USA_00020918

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 61 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 30 of 221
Hearing - Volume 2                                    April 6, 2009

303

1     black students as they are concerned about the integrity

2     of the ballot box?

3          A.  Absolutely not, and that's one reason I'm here

4     because I can't imagine that so many people are concerned

5     about tainted elections.  Tainted elections that knew

6     anything about what was going on in Waller County -- and

7     it didn't just happen in Waller County.  But if you can

8     see where $49.1 million went to a white town and $230,000

9     went to a black town to air condition a gymnasium that we

10    had been trying to get air conditioning for 54 years, and

11    that was a tainted election.  Everything that we alleged

12    proved true.  We couldn't get any criminal prosecution,

13    but everything we alleged came true.  But now we're left

14    paying a tab to put infrastructure in somebody else's

15    playground.  We haven't got the support but for

16    African-American legislation -- not even our own

17    legislation, but African-American legislatures were the

18    only ones who had come to our defense.  And this tainted

19    election -- a tainted election, the very county that drug

20    the State of Texas into this pre-clearance requirement,

21    the very county, the whole county that made Texas spend

22    millions of dollars in pre-clearance is still running

23    rolls and we haven't got anybody concerned about tainted

24    elections to come to our defense but for the legislative

25    black population.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031395

USA_00020919

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 62 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 31 of 221
Hearing - Volume 2                                    April 6, 2009

304

1          CHAIRMAN SMITH:  Any other questions,
2    members?  Thank you, Mr. Charleston.  Appreciate you being
3    here today.
4              (David Mulhausen)
5          CHAIRMAN SMITH:  At this time, the chair
6    calls David Mulhausen, who is the senior policy analyst
7    with the Heritage Foundation and, for the record, I will
8    identify you as being a fairly conservative (inaudible).
9    I want to be an equal opportunity accuser in terms of
10   ideological bent.
11             You're here to testify in favor of Senate
12   Bill 362; is that correct?
13          MR. MULHAUSEN:  Yes, it is.
14          CHAIRMAN SMITH:  Please state your name
15   again and who you represent.
16          MR. MULHAUSEN:  My name is David Mulhausen.
17   I am a senior policy analyst in the Center for (inaudible)
18   the Heritage Foundation.  I thank Chairman Smith and the
19   rest of the committee for the opportunity to testify
20   today.  The views expressed in this testimony are my own
21   and should not be construed as representing any official
22   position of the Heritage Foundation.
23             Last year, the United States Supreme
24   Court's Crawford versus Marion decision ruled that on its
25   face Indiana's photo ID law did not pose an



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_006038

TX_00031396

USA_00020920

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 63 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 32 of 221
Hearing - Volume 2                                                April 6, 2009

305

1    unconstitutional burden on voters.  Associate Justice John

2    Paul Stephens concluded that a state may put into effect

3    even-handed restrictions to protect the integrity and the

4    reliability of the electoral process itself.

5              For those without a government-issued photo

6    ID, Justice Stephens noted that the Indiana Bureau of

7    Motor Vehicles provided free photo identification cards.

8    For those that need to obtain the free photo ID, Justice

9    Stephens commented that the inconvenience of making a trip

10   to the Indiana Bureau of Motor Vehicles, gathering the

11   required documents, and posing for a photograph certainly

12   do not qualify as a substantial burden on the right to

13   vote or even represent a significant increase over the

14   usual hassles of voting.

15             In Texas many voters are already required

16   to present photo identification at the polls.  The Help

17   America Vote Act passed by United States Congress in 2002

18   requires all first-time voters who register to vote by

19   mail provide a valid photo identification or other

20   documentation at the polls.

21             For those voting without identification,

22   the Help the America Vote Act requires the states to set

23   provisional balance.

24             I would say that there are several social

25   science studies that indicate voter ID laws do not



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031397

USA_00020921

Case 2:13-cv-00193  Document 663-5  Filed on 11/11/14 in TXSD  Page 64 of 104
Case 1:12-cv-00128-RMC-DST-RLW  Document 213-4  Filed 06/20/12  Page 33 of 221

Hearing - Volume 2                                              April 6, 2009

306

1    disenfranchise voters.  The Heritage Foundation office

2    study I co-author with my colleague analyzed the effect of

3    photo identification laws on voter turnout during the 2004

4    election.

5               Our study found that these laws do not have

6    a negative impact as previously suggested.  Once

7    statistically significant and negative relationships are

8    found, the effects are so small that there's little policy

9    significance.  For example, Foundation -- the Heritage

10   Foundation office found that white surveyed respondents in

11   photo ID states are two one-thousandths of a percent less

12   likely to report voting than white respondents of states

13   that only require voters to state their name.

14              African-American respondents in non-photo

15   ID states are one one-hundredth of a percent less likely

16   to report voting than African-American respondents from

17   states that only require voters to state their name.  In

18   other cases, no effect was found.

19              In general, respondents of all races in

20   photo ID states and non-photo ID states are just as likely

21   to report voting compared to respondents in states that

22   only require voters to state their name.  African-American

23   respondents in photo ID states are just as likely to

24   report voting similar to respondents in states that only

25   require voters to state their name.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031398

USA_00020922

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 65 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 34 of 221
Hearing - Volume 2                                    April 6, 2009

307

1           The findings of the Heritage analysis
2    suggests that voter ID laws, such as requiring photo
3    identification have virtually no suppressive effect on
4    voter turnout.
5           Additional research strongly suggests that
6    photo ID laws do not suppress voter turnout.  Using
7    Indiana County level data from 2002 to 2006, Professor
8    Jeffrey Miller at the University of Missouri performed a
9    rigorous analysis of the impact of Indiana's photo ID law.
10   Professor Miller analyzed the changes in voter turnout in
11   Indiana counties before and after implementation of the
12   state's photo ID law.  Overall, the statewide turnout
13   increased by 2 percentage points.  The law had no effect
14   on turnaround in counties with higher concentrations of
15   minorities, poor, hourly, or less educated.  Furthermore,
16   turnout increased in counties with greater percentage of
17   Democrats than other counties.
18          A 2009 study by Professor Jason Mikoff of
19   the University of Delaware and his colleagues used
20   state-level individual data to analyze national voter
21   turnout in four elections from 2000, 2006.  This study is
22   rigorous because they examined the effect of photo ID laws
23   on voter turnout over four elections.  Their study
24   controls for the political interests such as
25   self-importing enthusiasm from participating in a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006041

TX_00031399

USA_00020923

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 66 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 39 of 221
Hearing - Volume 2                                        April 6, 2009

308

 1    political process.  Political interest is considered one

 2    of the best predictors of voter turnout.  As the

 3    controller for motivation to participate in the electoral

 4    process, Mikoff and his colleagues assert that there's

 5    little reason to believe that voter ID laws would induce a

 6    person's desire to vote.  Their study found that photo

 7    identification laws do not effect turnout.

 8              Americans in general support photo ID laws

 9    for good reason.  First, there's little evidence to

10    suggest that these policies disenfranchised voters.

11    Second, voter ID laws are a common-sense policy to help

12    ensure the integrity of elections.

13              CHAIRMAN SMITH:  Let me start your clock.

14        Q.  (By Chairman Smith) You mentioned -- I want to

15    get my hands a little bit around -- I have so many

16    documents behind me, I have had trouble identifying the

17    report that I'm looking for.

18              In terms of the report studies that are out

19    there and the attempt to look at this issue and the extent

20    to which these laws have affected turnouts, it's my

21    understanding -- we've got your study, which I'm getting a

22    bottom line conclusion is concluding that there's no

23    effect on voter turnout; is that right?

24        A.  Right.

25        Q.  We've got this University of Delaware and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031400

USA_00020924

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 67 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 38 of 221
Hearing - Volume 2                                        April 6, 2009

309

1     University of Nebraska professor's study that was in

2     Political Science Magazine?

3          A.   The Mikoff study.

4          Q.   That's an indication that there's no effect?

5     That's their conclusion, correct?

6          A.   Yes.

7          Q.   And then we've got a Missouri study.  And did

8     they not, in fact, determine that they thought it had a

9     positive impact on turnout?

10         A.   Well, basically what the state found basically

11    that percentage of votes actually increased, but also

12    found that the law had no effect even though the raw

13    number suggests that voter turnout increased by 2 percent.

14         Q.   So, they found the law itself had no effect?

15         A.   Yes.

16         Q.   And so, there is a study out there on the other

17    side of this issue that indicates a 2 point

18    something percent adverse effect in turnout.

19              What study is that?

20         A.   I'm not sure off the hand.  I know that there's

21    been a study that compares states that use very weak

22    statistical techniques that I would not consider a very

23    rigorous study.

24         Q.   What study was that?

25         A.   I believe it's a study that compared Indiana to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031401

USA_00020925

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 68 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 37 of 221
Hearing - Volume 2                                          April 6, 2009

310

1     another state that had Professor Brennan's --

2          Q.  Was that the Brennan Department or --

3          A.  I can't remember offhand.

4          Q.  So, I'm trying desperately to find out in that

5     study what they were comparing, what to what?

6          A.  What they were controlling for, too.  That's very

7     important, too.

8               CHAIRMAN SMITH:  Okay.  Any questions,

9     members, of this witness?  Representative Anchia.

10         Q.  (By Representative Anchia) Mr. Mulhausen, thank

11    you for being here today.  Was your study peer reviewed?

12         A.  It actually didn't go through a journal process.

13    My study was basically a -- a response to a study that was

14    funded by the federal government that on its face used

15    questionable methods, and I just go through in my study

16    and just show that --

17         Q.  Is that the Eagleton study?

18         A.  The Eagleton study.  I just to show that

19    basically they have a lot of coding errors, mistakes in

20    classification of laws.  If you account for those errors,

21    the effect that they found disappears.

22         Q.  And the Eagleton study did conclude -- I think

23    you say this in your -- include this in your written

24    testimony.  This is Professor Timothy Versalotti found

25    that more stringent voter identification requirements



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031402

USA_00020926

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 69 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 38 of 221
Hearing - Volume 2                                    April 6, 2009

311

1    appear to reduce voter turnout.  That was the conclusion?

2        A.  That was the conclusion, but when you corrected

3    the further mistakes, those findings disappear.

4        Q.  And are you aware -- are you familiar with the

5    Erickson and Midnight study entitled Modeling Programs in

6    Voter ID:  Voter Turnout Debate?

7        A.  I actually haven't read that study.

8        Q.  Okay.  Well, they conclude that we should be wary

9    of claims on both sides of the controversy because of the

10   limitations of the modeling that are used, and I think

11   Mr. Leavitt alluded to that from the Brennan Center.

12            Did you hear his testimony?

13       A.  Yes.

14       Q.  And would you agree with that, that they are

15   inherent limitations to proving -- using turnout year over

16   either and in -- turnout from before the implementation of

17   voter ID and after, that it would be very difficult to

18   prove one situation or another?

19       A.  Well, I think that it wouldn't be too difficult

20   to prove.  I think the Mikoff study is probably, in my

21   opinion, the best study out there because they controlled

22   for the political motivation of the voter.

23       Q.  How did they do that?

24       A.  Basically they have a survey of voters and the

25   voters are asked how strongly you are engaged into the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_006045

TX_00031403

USA_00020927

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 70 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 39 of 221
Hearing - Volume 2                                    April 6, 2009

312

1        total process -- not very likely, moderately, and very.

2            Q.  Was it statistically significant?

3            A.  Yes.  And once you control for that, you'll find

4        that some of the previous -- my own study doesn't control

5        for the motivation of the voter simply because it's based

6        on current population survey which doesn't ask the voter

7        or the respondent what their motivations are.

8            Q.  So, you did you calculate -- were your results

9        statistically significant or were your -- was your survey

10       statistically significant?

11           A.  Some of my results are statistically significant.

12           Q.  What about others?  Were all of them

13       statistically significant?

14           A.  Well, it depends -- found had statistically

15       significant finding, but after you correct it for the

16       misclassification of Arizona, the results disappear.  And

17       so, it was no longer statistically significant.  So, you

18       can get statistically significant with a bad model.

19           Q.  Are you aware of any evidence at all that voters

20       are more likely to vote because of new voter ID laws?

21           A.  I am not aware of any evidence that consistently

22       points in that direction.  What I would say is --

23           Q.  Can you cite any work that points in that

24       direction?

25           A.  Well, the Miller study of Indiana, Jeffrey



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031404

USA_00020928

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 71 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 40 of 221
Hearing - Volume 2                                            April 6, 2009

313

1          Miller, he indicates that --

2               Q.  Was that peer reviewed?

3               A.  I do not know.

4               Q.  Okay.  Have you studied any instances of -- let's

5          back up.

6                        Have you read this bill, the Frazier bill?

7               A.  I'm not expert in the bill.

8               Q.  Have you read the bill analysis, the summary to

9          the bill?

10              A.  No.  I've read the summary to the bill.

11              Q.  But you haven't read the bill itself?  And you

12         wouldn't be able to tell us, based on your Heritage Center

13         report, how it might impact voters in Texas?

14              A.  What I would suggest is probably the overwhelming

15         majority of Texans already have appropriate form of

16         identification.

17              Q.  What percentage?

18              A.  Don't know.  I would be very interested -- wish

19         somebody would actually find that out because I would bet

20         it's a very high percentage.  And second, I would say that

21         people who are engaged in the voting process are going to

22         go out and get photo ID if necessary.

23              Q.  Would it be relevant to your conclusion that

24         about 810,000 Texans who are eligible and registered

25         voters when they registered to vote did not furnish either



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006047

TX_00031405

USA_00020929

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 72 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 41 of 221
Hearing - Volume 2                                          April 6, 2009

314

1          the last four digits of their Social Security number or a

2          Texas driver's license?

3               A.  Well, I think that under this court of law

4          there's already enough outs where you can actually vote

5          without presenting a photo ID.

6               Q.  And how many -- and what are those outs?

7               A.  I believe if you have two letters from the

8          government, official letters, that they can be used and

9          there's some other -- I don't have the whole list.

10                   REPRESENTATIVE ANCHIA:  Okay.  Okay.  Thank

11         you for your time.

12              Q.  (By Chairman Smith) Just for the record, I want

13         to state I been given a copy and it looks like it is

14         the Eagleton Institute of Politics at the State University

15         of New Jersey and the Morenz College of Law at the Ohio

16         State University that has issued this report, and I just

17         want to indicate for the record that their finding on

18         Page 28 is that "Voters and states that required photo

19         identification were 2.7 percent less likely to vote than

20         voters in states where individuals had to give their

21         names."

22                   So, that you would agree would indicate to

23         me what they were doing when they made the comparison was

24         comparing -- I think Vermont is like that, where you just

25         walk in, you give them the name, if you're on voter



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JA_006048

TX_00031406

USA_00020930

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 73 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 42 of 221
Hearing - Volume 2                                      April 6, 2009

315

1      registration, you vote -- to Indiana, which has a

2      requirement that you provide a photo ID and if you do not,

3      the only way your vote counts is if a justice approves it

4      within 10 days.

5          A.  They looked at all 50 states.  They classified

6      each state by their voting laws, and they found that --

7      again, I replicate the findings in their study.  They

8      found that, for instance, after you corrected for

9      Arizona -- in 2004, Arizona had a ballot to require a

10     photo ID.  And so, what they do is before the law was

11     actually passed and after you correct for that mistake,

12     the findings disappear so that --

13         Q.  I understand that you don't agree with the

14     conclusion.  I'm just trying to determine what this study,

15     which as far as I know is the only study that I have seen

16     that indicates that there's an adverse effect on turnout.

17     So, I'm trying to determine for the record what their

18     assertion or allegation is.

19             In reading this sentence, it sounds like to

20     me they are comparing states that require photo

21     identification to states where individuals had to give

22     their names.  So, what they are doing is comparing an

23     Indiana-like law to a Vermont-like law.  Is that correct?

24         A.  Yes.

25         Q.  And their conclusion was that even where you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031407

USA_00020931

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 74 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 43 of 221
Hearing - Volume 2                                    April 6, 2009

316

 1    compare the most extreme possibilities from one end of the
 2    spectrum to the other, there's a 2.7 percent reduction in
 3    turnout.  Right?
 4        A.  Yes.
 5        Q.  Other studies have indicated no effect?
 6        A.  Yes.
 7        Q.  But even if this were accepted as truth, it would
 8    not be any kind of an indication of the effect of a change
 9    in Texas where we do not change the photo identification
10    requirement that is in place already.  It's not a
11    requirement.  It's an option -- and we simply change the
12    non-photo requirement to require if you use that form of
13    identification that you back your voter registration up
14    with some sort of additional non-photo documentation.
15    There's nothing in place that would suggest or infer that
16    that in any way is going to suppress any kind of turnout.
17            Do you agree with that?
18        A.  I agree with you totally.
19            CHAIRMAN SMITH:  Any other questions?  Dr.
20    Allen?
21        Q.  (By Alma Allen) In your study you use the term
22    "state your name."  Do you simply mean walk up and say,
23    "I'm Alma Allen," and they said okay?
24        A.  Yes.  In some states -- I voted in Maryland where
25    I said, My name is David Mulhausen," and they look in the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031408

USA_00020932

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 75 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 44 of 221
Hearing - Volume 2                                          April 6, 2009

                                                                317

1    roll and they find a David Mulhausen and say, "Okay.  You

2    can vote."

3                  CHAIRMAN SMITH:  That's the way Texas was

4    until the late Nineties.

5                  ALMA ALLEN:  Great.  The late Nineties?

6    Okay.  1990?

7                  CHAIRMAN SMITH:  No, late Nineties.

8                  ALMA ALLEN:  I didn't know that.

9                  CHAIRMAN SMITH:  You may not have ever

10   tried to do that.

11                 ALMA ALLEN:  No, because I always had

12   something else.  Since 1964, I couldn't walk up.  Until

13   then, I had to do something.

14                 CHAIRMAN SMITH:  I don't know how far back

15   that goes, but my understanding is the requirement to

16   provide identification did not come into play until the

17   1990s.

18                 Any other members of the committee that

19   wish to ask some questions before I give Representative

20   Raymond the opportunity to?

21        Q.  (By Representative Raymond) First, I just want to

22   ask you, Mr. Mulhausen, looking at your testimony, at the

23   top it's a letterhead from the Heritage Foundation but

24   then, you know, the second sentence says, "The views I

25   express in this testimony are my own and should not be



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031409

USA_00020933

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 76 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 45 of 221
Hearing - Volume 2                                      April 6, 2009

318

1       construed as representing any official position of the

2       Heritage Foundation."

3                     So, is it the Heritage Foundation's

4       position or not?

5            A.  It's my position, and basically it's standard

6       practice for Heritage Foundation where they are

7       testifying --

8            Q.  Is this the position of the Heritage Foundation

9       or not?

10           A.  This is the position of David Mulhausen.

11           Q.  Why would you use this -- it's a little

12      misleading.  Would you agree it's a little misleading?

13           A.  Well, this is actually how it's done.

14           Q.  I'm really -- I want to ask because this is a

15      well-known foundation.  And so, you know, is this the

16      position of the foundation or not?

17           A.  It is the position of David Mulhausen.

18           Q.  Okay.

19           A.  An employee of the Heritage Foundation.

20           Q.  But not the foundation?

21           A.  Not necessarily the foundation.

22           Q.  You don't believe that that's misleading?

23           A.  No.  I'm here --

24           Q.  Well, I'm sorry, but I think it is.  But

25      nonetheless, it's not the position of the Heritage



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031410

USA_00020934

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 77 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 48 of 221
Hearing - Volume 2                                        April 6, 2009

319

1      Foundation.  You're based in D.C.?

2            A.  Yes, we are.

3            Q.  Flew down there?

4            A.  Yes, I did.

5            Q.  Who pays for your expenses to come down here?

6            A.  It depends.  Sometimes the Heritage Foundation,

7      sometimes not.  In this case, somebody else did.

8            Q.  You're not telling us who?

9            A.  Safe Texas.

10           Q.  Say again?

11           A.  Safe Texas.

12           Q.  Safe Texas?

13           A.  Safe Texas.

14           Q.  I'm sorry.  Who is Safe Texas?

15           A.  It's an organization concerned about photo ID

16     issues in the state.

17           Q.  Where are they based?

18           A.  I think you should ask Safe Texas.

19           Q.  Well, I'm asking you because that's who you're

20     representing.

21           A.  I'm representing myself.  I think you're making a

22     big deal out of nothing here.

23           Q.  I'm sure you're right, you think we're making a

24     big deal out of nothing.  This is a big deal for us

25     because what we feel -- a lot of us feel, and I guess



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031411

USA_00020935

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 78 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 47 of 221
Hearing - Volume 2                                          April 6, 2009

320

1    we're -- you know, you're all right or we're all wrong,

2    that every minority who is involved in trying to make sure

3    the minorities have voting rights feel like this is an

4    effort to suppress voting rights.  So, it is a big deal to

5    us.  I'll move on.

6              The -- is it your feeling -- you came all

7    the way down here, but is it your feeling that the voting

8    system in Texas right now is not good or it needs to be

9    made better?

10        A.  Well, I think in general -- I think most states

11   should adopt --

12        Q.  I'm talking about Texas.

13        A.  I think most states, including Texas, should

14   adopt --

15        Q.  Do you feel that our election system right now is

16   being corrupted or not efficient or it allows people to

17   cheat or --

18        A.  I think there are reasonable steps to help ensure

19   the integrity of the process that could be adopted.

20        Q.  Is it your feeling that there is something wrong

21   with Texas now or not?

22        A.  I think the voting system could be improved in

23   Texas.

24        Q.  So, you think that there are problems with the

25   voting system in Texas?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031412

USA_00020936

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 79 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 48 of 221
Hearing - Volume 2                                              April 6, 2009

321

1          A.   I think a lot of states have problems.

2          Q.   I'm trying to ask you a reasonable question.

3          A.   Sure.  I'm trying to answer.

4          Q.   Well -- so, do you think that Texas has problems?

5          A.   I think Texas can improve its electoral process.

6     There are some problems in Texas.

7          Q.   And you're aware that we've had a Republican

8     governor in this state since 1994.  Right?

9          A.   Right.

10         Q.   So, from '94 to now we've had a Republican

11    governor, a Republican state senator.  From 2002 until

12    today, the majority of the state House is Republicans.

13              So, you think we have problems in our

14    voting system and we're electing all these Republicans, is

15    it your view that if we pass this it's going to be better

16    and that --

17         A.   Well, I'm -- to be honest with you, I don't

18    really care who you elect as long as you elect somebody

19    and a system that has -- that has held to certain

20    standards to make sure that it's a valid election.

21         Q.   You have a bunch of examples of where people in

22    Texas have tried to impersonate voters?

23         A.   I think there's some other people here who can

24    testify to that better who are coming after me.

25         Q.   Well, you came here, so I was trying to ascertain



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031413

USA_00020937

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 80 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 49 of 221
Hearing - Volume 2                                          April 6, 2009

322

1      what got you on the airplane.

2          A.  What got me on an airplane is that I've studied

3      the effect of voter ID laws, and that's where my expertise

4      lies.  There appears to be no effect from photo ID laws on

5      voter turnout.

6          Q.  You mentioned here the Rasmussen report on Page 2

7      of your paper.  Right?

8          A.  Uh-huh.

9          Q.  And it says that, quote, on here 57 percent of

10     Americans favor ID laws.  9 percent of white, 15 percent

11     of African Americans, and you don't mention Hispanics, but

12     is it your contention that there would be that great

13     disparity from 9 to 58 percent in terms of that there are

14     a lot more Anglos that support it as opposed to a lot more

15     African-Americans who obviously don't?

16         A.  Well, I mean, the odds --

17         Q.  Does it matter to you or not?

18         A.  Well, what matters to me is that it looks like

19     the majority of Americans in this poll support the law.

20     I'm not somebody who obsesses about racial differences or

21     ethnicity among people.  I don't spend my whole time

22     obsessed with that.  You are who you are, and I accept you

23     for that.

24         Q.  So, you wouldn't take notice of the fact that a

25     lot more African-Americans are concerned about this than



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031414

USA_00020938

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 81 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 50 of 221
Hearing - Volume 2                                                        April 6, 2009

323

1    Anglo Americans?

2         A.  Well, I think the fact -- I think certain

3    segments of the population could be better educated on the

4    effect of these laws.

5         Q.  Really?

6         A.  Yeah.

7         Q.  So, you think African-Americans aren't educated

8    enough?

9         A.  Well, I read some literature of some

10   organizations and -- comparing the -- required to show

11   identification supports some form of identification to a

12   poll tax and I think that's a very unfair comparison.  It

13   doesn't hold much merit.

14        Q.  Really?

15        A.  Yes.

16        Q.  So, you've lived a life amongst the folks who --

17   and you can't imagine folks that would actually think it

18   would be cumbersome or costly or hard to go get a voter

19   ID?

20        A.  Actually, I think Justice Stephens wrote is that

21   once every six years to go get a free photo ID.

22        Q.  Justice Stephens, is he African-American?

23        A.  No, but --

24        Q.  Is he Hispanic?

25        A.  No, he's not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031415

USA_00020939

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 82 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 51 of 221
Hearing - Volume 2                                        April 6, 2009

324

1          Q.   Answer my question, then you can -- is he

2     African-American or Hispanic?  Yes or no?

3          A.   He looks to be white American.

4          Q.   And how old is he, more or less?

5          A.   He's quite elderly.

6          Q.   And he's lived in Washington, D.C. how long?

7          A.   Since -- probably a good portion of his life.

8          Q.   Right, a good portion of his life.  And how much

9     experience do you think he has had in his life -- in the

10    last 50 years of his life of understanding our community

11    and what would be too hard or too easy?  (Inaudible) who

12    didn't have a photo ID, it would be easy for them to go

13    get it.  From his point of view and his vantage point -- I

14    don't care if he's liberal.  He's a white, rich guy

15    sitting up on the Supreme Court for the last 45 years,

16    however many years it's been, and he has no clue about

17    what's hard or what's easy for folks in the communities we

18    represent.

19         A.   I can't delve into his mind, but my perspective

20    is that I consider all human beings to have enough

21    capacity to not just -- if there's a law passed that says

22    you need to have certain forms of identification, I don't

23    think for some reason that minorities are going to be

24    unable to fill that obligation.  I just --

25              (Simultaneous conversation).



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031416

USA_00020940

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 83 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 52 of 221
Hearing - Volume 2                                      April 6, 2009

325

1          A.  I think it's a disrespectful sort of view of
2     minorities to think that they are incapable of --
3          Q.  I'm saying would it be more difficult?  Can you
4     fathom how that might be more difficult?
5          A.  How much more difficult?  How much more difficult
6     it is to go and -- go to Department of Public Safety and
7     get a free voter ID card?
8          Q.  Right, you can't.  Have you represented five
9     rural towns -- 25 rural towns in south Texas like I did?
10         A.  No.
11         Q.  You grew up in a town of 1500 with 99 percent
12    Hispanics like I did?
13         A.  No.
14         Q.  Then you can't -- you can't understand.
15              CHAIRMAN SMITH:  Any other questions?
16         Q.  (By Speaker) You mentioned something just a
17    second ago about fair and reasonable steps as it relates
18    to the photo ID voter integrity.
19              I don't remember exactly how you phrased
20    it, but do you remember making that comment?
21         A.  I was supporting Justice Stephens.
22         Q.  About the fair and reasonable steps.  Can you
23    tell me that the organization or the individual -- because
24    you said you treat everybody equally and that you believe
25    that everybody is the same and we're all created equal.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031417

USA_00020941

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 84 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 53 of 221
Hearing - Volume 2                                          April 6, 2009

326

```
 1                   Can you come up (inaudible) idea on how
 2       people that don't have ID and they go vote on election day
 3       at 6:55 p.m. and they don't have any ID, how they are
 4       likely to vote and be protected?
 5            A.  Well, first of all, any voter ID law should not
 6       take effect immediately.  There must be some period where
 7       the voting public can be educated.  We must assume that
 8       all voters will be able to easily understand their
 9       obligations and take the time over the course of a year or
10       two -- or in this case, this bill, four years -- to go get
11       the appropriate identification.
12                   Now, if you didn't have appropriate ID,
13       there's still alternative forms of documentation that can
14       be brought.  So, I think that any reasonable person should
15       be able to -- given enough time be able to get the
16       appropriate documentation together because at some point
17       you have to go out and register to vote.  At some point
18       you have to go find out where you're supposed to go vote,
19       and then you've got to go vote.
20            Q.  There's a large stigma of the population that's
21       already been noted by several people that may not have
22       access to that or may not carry that on them or because of
23       various, you know, ways they get around, transportation,
24       you know, may not have that readily available and they may
25       go and vote and -- which is not unusual in the district
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031418

USA_00020942

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 85 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 54 of 221
Hearing - Volume 2                                          April 6, 2009

327

 1      that I represent.  And, you know, by your answer you're

 2      telling me that, you know, that you haven't gave as much

 3      thought and consideration to reasonable measures that can

 4      be taken that those people vote and that's what's missing

 5      here today and everybody for this deal, that they are

 6      looking at one side of the equation but they could care

 7      less.  Everyone else is invisible.  Everyone else is an

 8      invisible man and it doesn't matter what happens with

 9      those folks.

10           A.  Appears that you're asking -- you have a

11      hypothetical person who decides at 10 minutes before the

12      polls are going to close that, "Oh, I'm going to go vote."

13      I mean, you would presume that the person would

14      have registered in advance to vote.

15                Are you assuming the person did or didn't

16      register to vote in the first place?

17           Q.  (By Alma Allen) -- that you need to go get a

18      driver's license.  How much does a driver's license cost?

19           A.  I never said you had to get a driver's license.

20           Q.  ID.

21           A.  One of the things is this bill would provide a

22      free ID and, if you don't get that free ID, there's other

23      materials that you can -- you can get to get your access

24      to vote.  So, I don't understand -- there's so many outs

25      in this bill as it's currently written that it's really



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031419

USA_00020943

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 86 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 59 of 221

Hearing - Volume 2                                    April 6, 2009

328

1       not even a photo ID law.

2           Q.  Okay.  What about senior citizens who live in a

3       house with -- they don't drive, but they live in a house

4       with their children so the light bill doesn't come to them

5       in their name?  I don't know we would get an ID for them.

6           A.  They may have a Social Security card.  They may

7       have other documentation that they can use.  I know that

8       the list of acceptable documents is not a brief list.

9           Q.  Okay.  So, if we were looking at the number of

10      people who needed to at this moment -- the law came into

11      effect at this moment, then the number of people who would

12      have to do something extra to be in a position to vote,

13      then usually I ask in meetings, "Do you have two forms of

14      ID right now and you can vote," and I find very few people

15      able to do that.  But the research shows that 25 percent

16      of blacks don't have the proper ID, 25 percent right this

17      minute, to go and vote.  Of course I'm supposing if you

18      put another hurdle out there, we would probably jump it,

19      too.  It would be a little hard.  We always have to jump

20      it.  16 percent of the Hispanics don't have an ID compared

21      to 8 percent of whites.

22                  It's going to impact everybody.  So -- and

23      18 percent of senior citizens don't have an ID right now.

24      So, any money you would spend -- think about it.

25          A.  I think the Supreme Court actually sort of took



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031420

USA_00020944

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 87 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 58 of 221
Hearing - Volume 2                                          April 6, 2009

329

1    that up and basically said that there are reasonable

2    expectations for a voter to exercise some responsibility

3    in ensuring a fair -- an election that has integrity

4    behind it is not a poll tax.  I mean, it's -- I think

5    that's rhetoric that's stopped moving the debate forward.

6         Q.  Are you talking about the 1964 --

7         A.  No, I'm talking about the recent Supreme Court's

8    decision on photo ID laws.

9         Q.  Oh, okay.  I didn't think you were talking about

10   the poll tax.

11        A.  My understanding, poll taxes are illegal.

12        Q.  Not in the State of Texas.  We haven't done that

13   yet.  Every state has to ratify the Constitution of -- the

14   24th Amendment of the Constitution of the United States

15   which abolished poll tax.  The state of Texas has not done

16   that yet.  Neither has Mississippi, Florida, Alabama, and

17   a couple of other states.  So, we're kind of behind the

18   eight ball already.

19        A.  So, there's a poll tax in Texas right now?

20        Q.  Officially on the books.  It may come up if you

21   wanted to use it.  If it's on the books, you can use it.

22        A.  You made your point.

23             ALMA ALLEN:  Thank you.

24             CHAIRMAN SMITH:  Any other questions,

25   members?  Mr. Mulhausen, I don't hear any.  Thank you very



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031421

USA_00020945

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 88 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 57 of 221
Hearing - Volume 2                                        April 6, 2009

1    much.

2                    MR. MULHAUSEN:  Thank you.

3                    CHAIRMAN SMITH:  Thanks for coming down.

4                    MR. MULHAUSEN:  Appreciate it.

5                    CHAIRMAN SMITH:  At this time, the chair

6    will call Jenigh Garrett, representing the NAACP Legal

7    Defense and Educational Fund to testify against Senate

8    Bill 362.

9                    SPEAKER:  Mr. Chairman, as she comes up, I

10   though you might make a clarification on the witness

11   affirmation form for the preceding witness, but he said

12   that he was not representing the Heritage Foundation that,

13   in fact, a company called Safe Texas was paying his way

14   here and that's who he's representing.

15                   Are you familiar with Safe Texas?

16                   CHAIRMAN SMITH:  Yeah.  No, I don't think

17   he said he's representing Safe Texas.  It's certainly not

18   my understanding he's representing Safe Texas.

19                   SPEAKER:  They paid him to come here.

20                   CHAIRMAN SMITH:  Transportation.

21                   SPEAKER:  Oh, that doesn't count?

22                   CHAIRMAN SMITH:  I don't think that means

23   he's representing them.

24                   SPEAKER:  Okay.

25                   CHAIRMAN SMITH:  All right.  How are you?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031422

USA_00020946

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 89 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 58 of 221
Hearing - Volume 2                                    April 6, 2009

331

1        Why don't you go ahead, Ms. Garrett, and state your name

2        and who you represent on the record?

3                    JENIGH GARRETT:  Jenigh Garrett.  I'm

4        assistant counsel of the NAACP Legal Defense and

5        Educational Fund.  It's my pleasure to be here.  I thought

6        it was this afternoon, but that's fine.

7                    (Inaudible) has been a pioneer in the

8        efforts to secure minority voter rights in the United

9        States, particularly those of African-Americans over many

10       decades.  Part of the efforts are involved in nearly all

11       of the precedents in litigation.  Voting rights, including

12       cases abolishing white primaries, creating and/or

13       defending the first majority African-American

14       Congressional and state legislative (inaudible) in several

15       states and eliminating various black voter participation

16       in office holdings.  (Inaudible) has also worked across

17       the country and in Texas to educate voters, election

18       officials, and poll workers about the importance of

19       developing state election processes that empower voters

20       and ensure that all eligible voters have an opportunity to

21       exercise their vote though our voter education, Prepare to

22       Vote, and our work in the National Election Protection

23       Program.

24                    I'm pleased to offer testimony today

25       regarding SB 362, the legislative (inaudible) current



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031423

USA_00020947

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 90 of 104

332

```
 1        identification procedures by requiring certain forms of

 2        identification on election day, including photo

 3        identification.

 4                    My testimony today will address how photo

 5        identification laws work against the goals of achieving a

 6        more inclusive democracy.  In our experience, photo

 7        identification laws restrict access to the political

 8        process and discourage political participation.

 9                    Just to begin -- our democracy requires

10        electoral processes that encourage the participation of

11        all citizens and I think it's important that this body, as

12        it was doing today, carefully evaluate the impact that a

13        voting law will have on the entire electorate and the

14        impact that the law will have on minority voters in

15        particular.

16                    Unfortunately, LDM has determined that

17        photo identification requirements undermine the 14th and

18        15th Amendments to the Constitution and the Voting Rights

19        Act.  Photo identification requirements place onerous

20        burdens on racial minorities because they are marginalized

21        voters.

22                    While the adoption of a photo

23        identification requirement might pose no significant

24        threat to the most mobile and affluent among the Texas

25        citizens, in the state the most marginalized population
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031424

USA_00020948

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 91 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 60 of 221
Hearing - Volume 2                                                    April 6, 2009

333

1    remain at the forefront of the legislature's analysis, and

2    I take two cases to really point this out that I found.

3                    One was in a different context.  Justice

4    Marshall on the Supreme Court discussing in a different

5    context about saving money, (inaudible) that a weekly

6    savings of less than $2 -- $2 even a burden.  But no one

7    who has had close contact with the poor people can fail to

8    understand how close to the margin of survival many of

9    them are.

10                   A study found, for example, may destroy

11   whatever savings that they have accumulated and by

12   eliminating that sense of security may destroy the sense

13   to save in the future.  A pack or two of cigarettes may be

14   for them not able to purchase but a luxury indulged in

15   only rarely.  The poor almost never go to see a movie,

16   which the majority seems to believe is almost weekly

17   activity.  They have more important things to do with what

18   little money they have, like attempting to provide some

19   comfort for a gravely ill child -- and the quote goes on.

20   (Inaudible) the Missouri Supreme Court took that principle

21   and looked at it in the context of photo ID (inaudible)

22   who move beneath the poverty line, the $15 they must pay

23   in order to obtain a birth certificate and vote, that's

24   $15 that they must subtract from the meager ability to

25   feed, shelter and clothe their family.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031425

USA_00020949

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 92 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 61 of 221
Hearing - Volume 2                                                    April 6, 2009

334

1          So, you have to look at that economic

2    burden in the context of race.  And in 2005 Hurricane

3    Katrina in its aftermath demonstrated that rising poverty

4    can distort reality from many of our nation's most

5    marginalized citizens.  Even there in the context of life

6    and death, (inaudible) were without cars.  They were

7    without ATM cards.  Many did not have a driver's license.

8    All of those instances (inaudible) remain part of our

9    democracy.

10          My testimony -- my written testimony goes

11   on to talk about depressed voter participation.  I would

12   like to go on and just talk about our on-the-ground

13   observations since 2000 and in 2008 and particularly in

14   Indiana.

15          Most recently we observed the application

16   of the Indiana photo identification requirement during the

17   2008 primary and general election.  LDF attorneys were on

18   the ground to monitor the election, to determine to the

19   extent to which African-Americans in Gary, Indianapolis

20   and surrounding communities in Lake and Marion Counties

21   were adversely impacted by the identification requirement.

22   LDF noted -- encountered difficulty casting ballots as a

23   result of Indiana's photo identification law.  LDF

24   attorneys were informed by poll workers that voters who

25   did not submit qualifying identification were not always



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031426

USA_00020950

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 93 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 62 of 221
Hearing - Volume 2                                                April 6, 2009

335

1    informed of their right to cast a provisional ballot.

2    Instead, some of those voters were turned away.

3              Our observations demonstrated that

4    provisional ballots, although designed to protect voters

5    in such situations did not provide an adequate safeguard.

6    In light of the reality that provisional ballots are not

7    always immediately available and even if poll workers

8    uniformly offer provisional ballots to voters who lack

9    valid government-issued identification, the extra step

10   required to count the ballot is a trip to the county seat

11   within 10 days of the election proved excessively

12   burdensome for many of the poor voters.  For example, if a

13   voter without photo ID cast a provisional ballot in Gary,

14   they would have to travel to the county seat in Crown

15   Point in order to make sure that their ballot counted.

16   And when we went there, we learned that often these

17   ballots went uncounted.

18              I know there were questions about how many

19   were counted.  It's my understanding that at least in Lake

20   County they are segregated so they know which ones are

21   photo ID ballots and which ones are other types of

22   provisional ballots.  I'm not quite sure why the Secretary

23   of State wasn't able to get all that information and then

24   comply with the requirements to report it.

25              So, what this shows is that the provisional



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031427

USA_00020951

Case 2:13-cv-00193 · Document 663-5 · Filed on 11/11/14 in TXSD · Page 94 of 104

 1    ballot option does not guarantee the rights of otherwise

 2    eligible voters who are simply unable to satisfy the photo

 3    identification requirement at the outset.  And although

 4    the Texas proposal does not require that additional trip

 5    in order to make the ballot count, the exceptionally high

 6    rate of rejected provisional ballots in Texas illustrates

 7    that provisional ballots will not neutralize the burden of

 8    photo identification requirements.

 9                Based on our experiences, we really think

10    it's important for the legislature to really consider some

11    specific things about how any type of photo identification

12    law will impact voters along racial lines.  We have a few

13    examples of data that's very informative in that regard --

14    the number of facilities, the distance between facilities

15    where individuals can obtain free identification for

16    voting purposes in minority communities as compared to

17    non-minority communities, the number of minority voters

18    without acceptable photo identification, the number of

19    minority voters with driver's licenses as compared to the

20    number without, the number of minority voters who are

21    transient and/or homeless and are less likely to have

22    photo identification or photo identification that matches

23    their voter registration address, the impact of the

24    requirement that voters present two forms of non-photo

25    identification on minority student voters at Texas



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031428

USA_00020952

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 95 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 64 of 221
Hearing - Volume 2                                          April 6, 2009

337

1     universities, the impact of the requirement that voters

2     bring two forms of non-photo identification on the elderly

3     citizens in nursing homes, and the current levels of

4     rejected provisional ballots and the grounds for the

5     rejection in minority precincts in particular.

6               Voting is a fundamental right because it is

7     the basis of all other rights.  It appears that a number

8     of states, including Texas, are now considering moving to

9     adopt laws that would effectively restrict or deny access

10    to the ballot box, and I would just like to say that the

11    course -- explicitly left open the possibility of future

12    challenges that demonstrate how identification laws burden

13    the rights of voters.  Accordingly, Texas call for it as a

14    blanket endorsement of the photo identification.

15               Thank you.  I'm open for any questions that

16    you may have.

17         Q.   (By Representative Bonnen) Are they issued

18    most of the photo identification cards at the

19    universities?

20         A.   Which universities are you talking about?  In

21    Texas?

22         Q.   In Texas.  Do you know the extent to which that

23    occurs at state universities?  If I go to University of

24    Texas, do I get a photo identification?

25         A.   I do not know those specifics.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031429

USA_00020953

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 96 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 69 of 221
Hearing - Volume 2                                          April 6, 2009

338

1         Q.  Prairieview University had a gentleman earlier

2    testifying about Prairieview University or any other

3    predominantly minority institutions, is there anything to

4    prevent -- to the extent that there is any college who

5    currently does not already have a photo identification for

6    their students, do you know of anything that would prevent

7    them from providing that?

8         A.  Not to my knowledge, but I would like to talk

9    about our experience on the ground in Indiana.  A

10   particular called us during the early voting period, an

11   African-American student attending a state university and

12   when she appeared to early vote, she was presenting her

13   state university ID and her driver's license and she was

14   there (inaudible), but it was her second, and she was told

15   that that was not adequate in order to vote, that she

16   would have to go and get a state ID from the Indiana DMV

17   down in Indiana and she was told by a white voter from New

18   Hampshire that all she had to do -- because the white lady

19   was explaining that she went down and she picked up her ID

20   by just turning in her New Hampshire ID.  And went she

21   went down to the DMV, she was told that she would have --

22   she could get a driver's license, but she would have to

23   disqualify her Minnesota license, re-take and pass a

24   written driver's license test, provide proof of living on

25   campus, bring her original birth certificate and Social



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006072

TX_00031430

USA_00020954

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 97 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 68 of 221
Hearing - Volume 2                                          April 6, 2009

339

1    Security card and surrender her Minnesota license.

2                        She wrote the instructions down and she

3    called her mother and asked her mother to help her get her

4    original copy of her birth certificate.  They couldn't

5    FedEx it there in enough time because the early voting

6    closed on the weekend, couldn't get the FedEx delivery in

7    enough time for her to get down to the DMV to get the ID

8    that she needed so that she could actually cast her vote

9    on that day.  The reason why the state ID wasn't counted

10   was because it didn't have an expiration date on it

11   because the state made a decision not to do that.  So,

12   there's still students definitely impacted (inaudible).

13        Q.  And I can't -- I can't -- I don't know the list

14   of documents that are acceptable in Indiana as

15   photographic documents -- I probably have some evidence

16   somewhere back here in the file -- but in the Senate bill

17   it does indicate that any valid identification card that

18   contains the person's photograph and is issued by an

19   agency, institution, or political subdivision of Texas is

20   certainly a valid ID.  Along with, of course, any such

21   document issued by an agency that's an extension of

22   federal government.

23                        So, I guess that raises a question with

24   regard to private universities, and I don't know if that's

25   otherwise addressed in here or not.  But certainly with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006073

TX_00031431

USA_00020955

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 98 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 67 of 221
Hearing - Volume 2                                                April 6, 2009

340

1    regard to public universities, it seems clear that to the

2    extent -- and I'm getting head shakes from the audience

3    that would seem to indicate that at least as I asked the

4    University of Texas, that is already done and you don't

5    know if there is any university that does not already

6    provide a photo identification for their students?

7         A.   In the State of Texas?

8         Q.   You don't know?

9         A.   I do not know about Texas specifically, no.  I do

10   believe, however, there's someone who could testify.

11        Q.   I think that's -- I think that's a legitimate

12   point to be made to the extent that the students are --

13   you know, I suppose that's already an issue with regard to

14   the identification that's already required, but, you know,

15   if there is a significant problem I would really want to

16   know specifics in terms of the absence of photo

17   identification documents that are already available in

18   those universities rather than simply presuming the

19   problem.  I would like to see some indication that it

20   can't be corrected simply by the university issuing a

21   photo identification to their students.

22        A.   Well, I think there are additional issues in the

23   Senate bill that should give you pause with that

24   consideration in mind.  Particularly, it seems as if the

25   specifics as far as whether it is simply presentation of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031432

USA_00020956

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 99 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 215-4 Filed 06/20/12 Page 68 of 221
Hearing - Volume 2                                           April 6, 2009

341

1      the ID or if it's looking at the ID or the signature or

2      looking at the ID and the address and expiration date, et

3      cetera, is not addressed.  Instead, the Secretary of State

4      will give training materials (inaudible) and so that the

5      election official will look at the -- have the discretion

6      to look at the non-photo identification and then make a

7      determination.

8             That leads to the question of the election

9      official who will be presenting the two forms of non-photo

10     identification.  And again, some things may be resolved in

11     training materials.  However, that stuff is not in the

12     bill right now and these are the types of things that we

13     see actually misapplied, particularly in minority

14     precincts.  So, if you go to the polling place and when

15     they even present, let's say, in Indiana a photo ID

16     instead of -- they take the ID and they use it for a lot

17     of different things that they should not use it for and

18     they can't vote and unfortunately it's been used as a

19     mechanism to actually stop people from voting.

20     Q.  Well, to the extent that that has occurred, I

21     presume the question is to what extent does this

22     legislation advance the likelihood of that occurring

23     because, again, this legislation doesn't change existing

24     law with regard to photo identification.  It simply

25     changes the existing law with regard to non-photo



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031433

USA_00020957

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 100 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 69 of 221
Hearing - Volume 2                                        April 6, 2009

342

 1    identification.  I can only imagine what things might
 2    happen at the polls that you are concerned about, but I
 3    presume that to the extent that that is possible it's
 4    currently every bit as possible as it would be after this
 5    legislation was passed.
 6              Do you have any reason to doubt that?
 7         A.  Well, I have -- I guess, respectfully, I do
 8    disagree a little bit about what the law is actually doing
 9    and I could be corrected, definitely.
10         Q.  Well, do you understand that current law gives
11    you the option of using a photo ID?
12         A.  It's my understanding that what is required under
13    the current law is your voter's registration certificate.
14         Q.  No.  You don't have to have a voter registration
15    certificate.  I never have a voter registration
16    certificate when I vote.
17         A.  Then I was going to go on to say and that if you
18    do not have a voter registration certificate, you can
19    provide a photo ID.  I think this law is different because
20    it creates two different classes of voters.  It creates
21    two different classes of voters.  It's saying, "Okay.
22    You're the photo ID voter.  Just go through."  And it's
23    saying, "Oh, you're the non-photo ID voter."  Now I'm
24    going to take your ID, and I'm going to -- we don't know.
25    Who knows?  I'm going to make a judgment and decision



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031434

USA_00020958

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 101 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 70 of 221
Hearing - Volume 2                                    April 6, 2009

343

1    based on what you're giving me, and I'm going to say

2    whether you can cast that vote.  I think that is my main

3    concern with this particular bill that is before us.

4        Q.  The only change is that you go through that

5    process with regard to two documents rather than one.

6        A.  It's not my understanding -- and again, I may be

7    corrected, but it's not my understanding that when you're

8    presenting your voter registration card it's subject to

9    some type of discretionary determination by the election

10   official.

11           SPEAKER:  Mr. Chairman, I think what she's

12   referring to, if I can shed some light on it, I think

13   you're missing the difference between current law which is

14   a presentment standard and the Frazier bill, which is an

15   identify standard.  And that's why it really does change

16   what current law is because the documents -- the language

17   in the Frazier bill says if your identity can be verified

18   from the proof presented, which is -- and if -- I'm just

19   offering this up for clarification purposes -- I think in

20   certainly my opinion potentially the opinion of the

21   witness, that's very subjective.

22       Q.  (By Chairman Smith) So, if the standard coming

23   out of the House was a presentment standard rather than an

24   identity standard, then that would comfort you?  In other

25   words, an objective black and white test, either have the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031435

USA_00020959

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 102 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 71 of 221
Hearing - Volume 2                                          April 6, 2009

344

1    document or you don't have it.  You don't have part-time

2    workers making decisions on whether or not you look enough

3    like your picture to cast a regular ballot.

4              Does that comfort you as described?

5        A.   I'm pausing on the word "comfort."

6        Q.   You don't like using it, do you?

7        A.   No.

8              CHAIRMAN SMITH:  Okay.  I won't make you.

9    Any other questions, members?

10             SPEAKER:  Yes, sir.  Thank you, Chairman.

11       Q.   (By Speaker) Ms. Smith -- I am so sorry.  I

12   imagine one of the things that gives you concern -- I

13   know.  I know.  I know -- let me ask it this way.

14             Does it give you concern that there's

15   language in the bill that says your identity must be

16   verified by the poll worker from the proof presented?

17             Does that give you concern?

18       A.   Yes.

19       Q.   And does it give you concern because there could

20   be address match problems for denying persons?  For

21   example, on your photo ID it says you lived in your old

22   apartment, but you are on the rolls at your new place.

23             Do you think that it gives people wiggle

24   room to deny somebody for that reason?

25       A.   I would agree with that.  I have a given concern



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

TX_00031436

USA_00020960

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 103 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 72 of 221
Hearing - Volume 2                                              April 6, 2009

345

1      because different people are treated differently under

2      photo identification law.  Everyone is not treated equally

3      under photo identification law.  And whether it's the

4      address, whether it's the expiration date, whether it's

5      because as reported to us in Indiana a white voter enters

6      the polling place and they say, "Go ahead."  (Inaudible)

7      this is also reported, and the black voter and that the

8      poll worker reported it because she observed it.

9          Q.  Does it give you also concern that we had someone

10     testify about systematic disenfranchisement of African

11     Americans that continues presently in Waller County?  Does

12     that add to your concern?

13         A.  Not only -- yes, not only Waller County but that

14     discrimination persists throughout the State of Texas.

15     And I know it's uncomfortable, but it is true.

16             SPEAKER:  Thank you.

17         Q.  (By Chairman Smith) When you talk about not

18     having the right address or not having the right name, how

19     do I alleviate the concerns without eliminating

20     identification requirements of any kind?

21         A.  I think that the real focus should be, one, on

22     making sure that the process is open to everyone equally

23     in that if there are concerns about the name and about the

24     address, about transients, homeless folks, then ID may not

25     be the right solution if this is really looking to not



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JA_006079

TX_00031437

USA_00020961

Case 2:13-cv-00193 Document 663-5 Filed on 11/11/14 in TXSD Page 104 of 104
Case 1:12-cv-00128-RMC-DST-RLW Document 213-4 Filed 06/20/12 Page 73 of 221
Hearing - Volume 2                                    April 6, 2009

346

 1      give additional mechanism for racial discrimination in

 2      jurisdictions and elections that are racially charged.

 3      This is the reality of voting, unfortunately for me, a

 4      minority citizen.  It may not be your experience

 5      personally, but it is the experience of many minority

 6      citizens.

 7           Q.  I'm going to kiddingly object as nonresponsive.

 8      I don't -- if you're expressing a concern that the voters

 9      might not have the right address or might not have the

10      right name -- and again, I have difficulty understanding

11      how that concern can be dramatically different in this

12      proposal than under current law, but how do I eliminate

13      that concern without eliminating identification

14      requirements of any kind?

15           A.  For me, I would say that you can have an

16      affidavit requirement where a person can sign an affidavit

17      that they are who they say they are and vote a regular

18      ballot.

19                CHAIRMAN SMITH:  All right.  Any other

20      questions?

21           Q.  (By Speaker) -- address the issue of the poor and

22      not wanting to place any -- anything on them that would

23      cause them to not be able to survive is what I'm thinking.

24      And I start thinking about the poorest among us who

25      would -- quite a few people without a bank account.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

TX_00031438

USA_00020962