# SENATE JOURNAL

## EIGHTY-FIRST LEGISLATURE — REGULAR SESSION

## AUSTIN, TEXAS

### PROCEEDINGS

### ADDENDUM
(SECOND DAY — Wednesday, January 14, 2009)

The following remarks regarding **SR 14** were ordered reduced to writing and printed in the *Senate Journal:*

**President:**  The Chair lays out the following resolution. The Secretary will read the resolution.

**Secretary:**  Senate Resolution 14 adopting the Rules of the Senate of the 80th Legislature as the permanent Rules of the Senate of the 81st Legislature with the following modifications, by Williams.

**President:**  The Chair recognizes Senator Williams to explain the resolution.

**Senator Williams:**  Thank you Mr. President.   Members, this resolution, Senate Resolution–

**Senator West:**  Mr. President, parliamentary inquiry.

**President:**  Senator West, state your inquiry, please.

**Senator West:**  As it relates to laying out the resolution for rules, historically we have allowed the Dean to lay out the rules. The Chair has appointed someone to lay out the rules, it's normally the Dean. Has that not been what we normally do?

**President:**  No, my understanding is that historically, different people have laid out the rules, sometimes in the past, the Chair of Administration.  Recently we've asked the Dean to lay out the rules. I was asked by Senator Williams if he could lay them out, he thought, as a courtesy to the Dean, but if the Dean would like to lay out these rules, it's really up to–

**Senator West:**  During the 79th and the 80th legislative sessions, the Dean was the person who laid the rules out. So, you're saying, as a courtesy to the Dean, Tommy Williams, Senator Williams is laying them out?

**President:**  I'm advised, Senator West, I'm advised that here in the Senate, over many sessions in the past, sometimes the Chair of Administration, sometimes Members, sometimes the Dean has laid out the resolution on the rules. Senator Williams has filed a resolution on the rules.  I've recognized him.  What is your parliamentary inquiry, Sir?

**Senator West:**  Well, I'm just trying to make certain, traditionally, what we normally do, as it relates to who lays out the rules. Over, it appears as though during the 79th and 80th sessions, the Dean has laid out the rules. I mean, if we're going to change it, that's fine. I mean, I just wanted to know.

**President:**  I'm advised by the Parliamentarian, Senator West, that traditionally, it's whoever's the most knowledgeable on the rules. Senator Williams has laid out a proposal which has a change to the rules and so, since he filed the resolution, I just got through recognizing him.

**Senator West:**  Thank you, Sir.

**Senator Shapleigh:**  Parliamentary inquiry, Mr. President.

**President:**  State your inquiry, Senator Shapleigh.

**Senator Shapleigh:**  What rules are we operating under right now?

**President:**  Senator Shapleigh, since rules have not been adopted, as you obviously know, for the 81st Legislature, I'm going to try and follow, until the rules are adopted, the rules that we had in place for the 80th Legislature, where applicable. But we're just going to have to look at the facts and see what makes common sense.

**Senator Shapleigh:**  So, yesterday we passed a resolution that set up the officers of the Senate, the Secretary of the Senate, the pay, and today, in this resolution, the first sentence has to do with adopting the rules of the 80th Legislature, subject to a couple of amendments that Senator Williams has, is that correct?

**President:**  Senator Shapleigh, I have not read the resolution. I just was handed it, but I take, I'm assuming that that's correct.

**Senator Shapleigh:**  So, when we are looking at this book, which is the Senate Rules from the 80th legislative session, can we assume that this is what you'll make rulings on?

**President:**  Senator Shapleigh, I think you can use it as a guide, as I will use it as a guide, but since we haven't adopted rules for this 81st session, I'm going to have to look at individual inquiries on a case-by-case basis.

**Senator Shapleigh:**  So, for this important process we're going through right now, the rules are in your head?

**President:**  No, it's not.

**Senator Shapleigh:**  Okay, let me ask a specific question. Will you apply Senate Rule 8.02 for the purposes of what we're about to do?

**President:**  If you'd give me a moment to take a look at what Senate Rule 8.02 is. No.

**Senator Shapleigh:**  So, the Senate Rules that we adopted last session, for the purposes of this important rule, will not be applied. Can you explain to us why, so we can understand?

**President:**  We didn't refer last year, we didn't refer in 2007 on the same rule.

**Senator Shapleigh:** I'm not sure I understood that. I need to understand what the process would be for a resolution coming to this floor that would change a Senate rule.

**President:** Senator Shapleigh, as I said earlier, you can rely on the rules of the previous session as a guide, and I will use them as a guide. We haven't adopted rules. We're in the process. I have stayed out of this process.  I have been brought a resolution saying that it has the majority support, and I'm looking at these issues fresh and your parliamentary inquiry fresh. We don't have any committees to refer, so I'm governed, we're governed by the Constitution of the State of Texas, and my duties are to follow that Constitution. And in this case, it doesn't make sense, common sense, to follow that rule since we have no committees.

**Senator Shapleigh:** Okay, if I may, I'd like to read the rule, because I think it is exactly where we are in this process and then follow it up with a parliamentary inquiry. This is Rule 8.02: Petitions, concurrent and joint resolutions, and resolutions setting or defining legislative or state policy or amending Senate Rules shall be referred to an appropriate standing committee when introduced and shall not be considered immediately unless the Senate so directs by a two-thirds vote of the Members present. The motion to consider such petition or resolution immediately is not debatable. Is this, parliamentary inquiry, is this resolution, Senate Resolution 14, a Senate, a resolution changing or amending the Senate Rules?

**President:** No.

**Senator Shapleigh:** This is not a resolution changing or amending the Senate Rules?

**President:** No, because we have no Senate Rules at this very moment.

**Senator Shapleigh:** Okay.

**President:** We have no Senate Rules so we're not amending the Senate Rules. What we have in front of us is clearly a resolution. This is your body, for you all to vote on, to debate, but we do not have rules at the present time. We did not adopt rules yesterday, and I have left this matter in your hands.

**Senator Shapleigh:** Alright.

**President:** This is a resolution submitted by one Senator as proposed rules.  We do not have rules. That's why I was, carefully used the word guide.

**Senator Gallegos:** Mr. President.

**President:** Senator Gallegos, for, to what–

**Senator Gallegos:** Parliamentary inquiry.

**President:** State your inquiry.

**Senator Gallegos:** If we, we don't have any rules at all–we adopted a resolution yesterday, the Dean of the Senate adopted a resolution yesterday–what rules were we under when the Dean, when he laid out that resolution?  What rules were we under when we adopted that resolution?

**President:** We adopted a resolution yesterday naming the officers of the Senate.

**Senator Gallegos:** I understand that, but it was a resolution laid out by the Dean of the Texas Senate. He laid it out, we adopted it, what rules were we under? I'd like a ruling from the Parliamentarian and yourself, Mr. President, what rules were we under when the Dean of the Texas Senate laid out that resolution that we adopted? And what rules are we under right now? If we adopted a resolution, we had to be under some kind of rules.

**President:** Do you mind if I consult with the Parliamentarian, just once. Senator Gallegos, if I can address your parliamentary inquiry, yesterday's resolution, which the Dean put forward naming the officers of the Senate was a resolution under parliamentary rules. And again, again, since we don't have Senate Rules, we've been using the previous rules, as I advised Senator Shapleigh, as a guide. But under the Constitution, Article 3, Section 11, each house, Senate and House, may determine the rules of its own proceeding. So, therefore, what is before us is a resolution to be debated, which is pursuant to the Constitution, Article 3, Section 11, as proposed rules for this body.

**Senator Gallegos:** Mr. President, well, then, let me ask you, if we don't have any rules, then we don't have to be here? Can I get a ruling from the Parliamentarian on that? If we don't have any, we're not working under any rules, then in the rules that we've had, if we walked, then we'd be punished. If we don't have any rules, then we can leave. Is that correct? If we don't have any rules, we're not, you know, anybody can do anything on this floor. We don't get punished. We can walk.

**President:** Senator Gallegos, I know why I'm here. If there's a question in your mind why you're, why you're here, I don't mean to be at all disrespectful, but we gaveled in yesterday pursuant to the Constitution. The rules are the Senators' rules, and a resolution is in front of us on the rules to be debated by the Members.

**Senator Gallegos:** Mr. President, with all due respect, I understand that. But, but what you're telling Senator Shapleigh is we're not under any rules. I mean, you just told him that he couldn't use Rule 8.02 on, on Senator Williams' resolution.

**President:** Senator Gallegos, with total respect, I think I tried to answer your question. We have not adopted rules with the 81st Legislature. As a guide for our proceeding guide, we have rules from the previous session. I'm going to use them as a guide. I'm also going to use common sense as we move forward to adopt your rules.

**Senator Gallegos:** Mr. President, with all due respect, if we don't have any rules, then Senator Shapleigh's parliamentary inquiry, then we should go by the rules of last session. And I think his question as to the rules that he cited are in order.

**President:** Senator Gallegos, I believe I've answered your question. Thank you, Sir.

**Senator Shapleigh:** Parliamentary inquiry. If I may follow up, I didn't get to finish on the questions that I had.

**President:** Senator Shapleigh is recognized.

**Senator Shapleigh:** In this document, Senate Resolution No. 14, the first sentence says, be it resolved by the Senate of the State of Texas that the rules of the Senate of the 80th Legislature are adopted. And subsequent to that, there are proposed amendments. Can we assume that the rules of the 80th will control when we ask questions about Senate Rule 8.02?

**President:** Senator, in consultation with the Parliamentarian and her reading of this resolution, this resolution needs to be read in its entirety. Now, as far as, since we do not have rules in place, and I don't hear you arguing with me on that. Then, as I said earlier, I think logically we need to use the rules of the 80th Legislature as a guide. But we're going to have to take a look at these if there's a parliamentary inquiry on a case-by-case basis. Certainly, as an agreed, debate, things of that nature, I'm sure that the rules which are, which we had in place for the 80th Legislature will be a valid guide.

**Senator Shapleigh:** Mr. President, with due respect, no body can operate without rules. And we've seen what happens when there are no rules, or rules are interpreted in a way that most of us don't believe was true, in the other body. And to help this session go forward, to get a guide as to what the rules are now, I call a point of order on further consideration of this resolution, because under the rules we've been operating under to this point, which you admit are a guide and should be looked at, this has not been referred to a committee, a standing committee of the Senate for consideration, which is obviously an amendment to existing rules. So, at this time, I'd like to call a point of order so that we don't have any further consideration of this until it's referred to the appropriate committee by you under the existing rules of the 80th legislative session.

**President:** You are aware that we have no standing committees, and it's not been our practice in previous Legislatures to do that, Sir.

**Senator Shapleigh:** Well, I–

**President:** But I don't want to take any–

**Senator Shapleigh:** I believe there should be some kind–

**President:** Thing away from the point of order, but–

**Senator Shapleigh:** Of process to understand–

**President:** But–

**Senator Shapleigh:** What rules we're operating under, so.

**President:** Sir?

**Senator Shapleigh:** Whether we are operating under the 80th rules right now, or the minute that this resolution is considered, that then we're operating under it because it's in the first sentence of it. We need to know what rules we can rely on for a ruling from the Chair.

**President:** Well, Senator, with all due respect, I'm not going to debate or argue with you. You're a personal friend of mine. I respect you. I'm not going to argue with you. We have not adopted rules. We have no standing committees. It's been our practice, at least in my last six years of Lieutenant Governor, not to refer rules to standing

committees but to adopt the rules through discussion, in caucus, if there's discussion, as there, there was, as I recall in 2007, in the 80th, then there's discussion on the floor. But that's been our practice, that's been our historical tradition, certainly since 2003. So, I respectfully do not agree with your point of order, but–

**Senator Shapleigh:**  I would like to have a formal ruling from the Chair, if I may, on that point of order.

**President:**  I'm sorry. I could not hear you, the Parliamentarian was talking to me.

**Senator Shapleigh:**  If we could get a formal ruling on the point of order, which is, this is not here properly, it should've been referred to a committee, and therefore, it is not–

**President:**  Your point of order is–

**Senator Shapleigh:**  Proper and right for consideration.

**President:**  Your point of order, respectfully, is overruled. That's not been the historical precedent, certainly in my tenure as Lieutenant Governor, to refer to committees when the rules which set up committees are being adopted because we don't have any standing committees. Your point of order is overruled, Sir.

**Senator Shapleigh:**  If I may, an additional inquiry.

**President:**  State your inquiry, Sir.

**Senator Shapleigh:**  When we resolve, and we have this resolution in front of us, will it then be right for consideration, to then refer to committee before a substantive amendment is being offered to our existing rules?

**President:**  Senator Shapleigh, that's going to be determined by what you all adopt or don't adopt, and so, my answer is, I think we need to go back to Senator Williams, and for him to explain this resolution. At any point, if you want to raise a parliamentary inquiry, you're free to do so, Sir.

**Senator Shapleigh:**  Thank you, Sir.

**President:**  Thank you. Before we go forward, Senator Van de Putte, for what purpose do you rise, Ma'am?

**Senator Van de Putte:**  Mr. President, I rise on a point of personal privilege.

**President:**  Please state that.

**Senator Van de Putte:**  May I be recognized–

**President:**  Yes, you're recognized.

**Senator Van de Putte:**  On a point of personal privilege?

**Senator Whitmire:**  Could we have strict enforcement, have the Members please take their seats and give Senator Van de Putte their undivided attention?

**President:**  The Chair recognizes Senator Van de Putte.

**Senator Van de Putte:**  Thank you Mr. President. Mr. President and Members, I rise on a matter of personal privilege. When people always ask me, Leticia, you know, why doesn't the Senate kind of fight like the House? I was elected to the House in

1991 and served under different Speakers and since 1999 have been a proud Member of this esteemed body. I usually reply that we don't often fight or argue because we generally like each other. We believe in responsive and responsible public policy. And we believe that it is built on diplomacy, that it is built on consensus, on negotiation, and, yes, compromise. And we believe that this is all best for Texas and her citizens. I also like to tell them that we share lunch. And we have pretty good manners. You know, when you break bread with people, it's difficult to come back out on the Senate floor and tear each other to pieces. We don't pick unnecessary battles in this Chamber, because at the end of the day, we all do sit down for a meal together. Instead, we nurture the relationships and the friendships for which I have been so grateful and truly blessed. I've seen a lot of pain in this body. We share each other's grief when we lose a parent. We console each other when unfortunate things happen to our own families. We relish in each other's successes. We celebrate births of children and grandchildren because we are a family. Key to this working body is the leadership that we have in Lieutenant Governor David Dewhurst. And he always likes to say that there are 32 of us and that we are responsive to the needs of this state. He has a leadership style, and we have followed that, that builds bridges instead of burning them, and ruled from that dais with diplomacy, not dictatorship. And that's why I love working in this Senate. You know, we're not called the upper Chamber by accident. We are the consensus builders; we share principles; we share passions; and we share ideas to move Texas forward. Now we enter this 81st legislative session, and I worry about all the things I've always said to the people that ask me about the Senate. I want it to always ring true, the words that I have said. Members, we were elected to this great body by the people of this state, and from the cotton farmers to the Panhandle, and the ranchers of South Texas, the oilmen of West Texas, the fishermen of the Coast, the bankers and high tech workers of here, Central Texas, we owe all of them sound policy and not partisan bickering. We only have 139 days to accomplish our work, so I wonder why we waste one day on this or any other partisan issue that has no hope of resolution and chip away at the great traditions of this body. I appreciate the great work that Senator Williams has done in trying to solve the dilemma that we find ourselves, and I know that it is with a true heart that he comes before us with the business of this resolution. It is not appropriate for me to talk about the resolution at this time, but I wonder if special orders are only for partisan issues. I hold a hope out in this state that the special order should be the middle class of Texas, that if we're going to create special types of legislation and different processes for different issues, that we look at the myriad of things that affect middle-class Texans. And why not special public school finance? At a time when college tuition has soared, at a time when utility costs and home insurance rates continue to rise, at a time when our own business leaders are telling us that we need a more prepared and better educated workforce, are we really going to prioritize into special, something that's just partisan? At a time when our economy needs the best minds and seen, because we're seeing the most severe meltdown that we have seen since the Great Depression, when our economy continues to slow, we have less money to work with than we hoped, are we really going to spend this special time for a partisan issue? What we need to be focused on is our commitment to a quality public education, to accessibility to our colleges and universities, to some stability in home insurance rates, to the abysmal

lack of coverage for health insurance for our children, for job creation and job retention, and to honor those men and women who have served in our armed forces, those veteran issues, so maybe I'm, maybe I've got it all wrong. I hope not, because I want special orders to be about middle-class Texans, not about a partisan issue. I have hope, though. Even when we have imploded, we always come back together. I want to still be proud of this Senate, and I want to say we are the upper Chamber and that we are family and that we are dedicated to what's best for all Texans. I am greatly saddened that this is the first step in the opposite direction. Thank you, Members.

**President:**  Senator Gallegos, for what purpose do you rise, Sir?  Oh, was that a mistake? Senator Ogden, for, for what purpose do you rise, Sir?

**Senator Ogden:**  To ask the Chair for a clarification on the previous parliamentary inquiry from Senator Shapleigh.

**President:**  You're recognized.

**Senator Ogden:**  And as I understood Senator Shapleigh, he was saying that if we're going to operate under the rules of the 80th Legislature, then why doesn't Rule 8.02 apply?  And the reason was, is because it doesn't make sense, there isn't any committees. But I would also like, for the purpose of the record, to ask you and the Parliamentarian to comment on another rule in the book, Rule 16.02, which basically says, nope, it's not 16.02, it is, the rule says that a majority vote of the Members of the Senate is required to adopt rules initially, Rules of the Senate. And it, I missed, it's Rule 16.07, and it says a vote of the majority of the Members of the Senate is required to pass a resolution, initially adopting temporary or permanent Rules of the Senate. And at least from what I'm seeing is that that rule, if we were operating under the rules of the 80th legislative session as they apply to this, would be controlling, that that's the rule: that a vote of the majority of the Members is required to pass a resolution initially adopting temporary rules or permanent rules and that, therefore, we really aren't operating in conflict to what the Rules of the 80th Legislature implied.

**President:**  Would you approach the podium for a second?

**Senator Ogden:**  Yes.  Mr. Speaker–

**President:**  Senator.

**Senator Ogden:**  Mr. Speaker.

**President:**  Don't do that.

**Senator Ogden:**  Mr. President, I withdraw my parliamentary inquiry.

**President:**  Thank you. The Chair recognizes Senator Williams to explain the resolution.

**Senator Williams:**  Thank you Mr. President.  Members, if the Members would allow me, I would, I'm happy to take any questions. I'd like the opportunity to lay this out and take questions after I have had a chance. The Senate resolution before us, let me start with the easy part. We passed a constitutional amendment during the last legislative session that Senator Carona sponsored, that required a record vote on our votes in the Senate. There is a portion of our rules that's in conflict with that constitutional requirement, and the language that you see on, I believe it's on page 2

and page 3, is correcting that inconsistency.  So, I wanted to be, just be sure that the Members understood what was going on with that portion of the resolution. I want to begin by laying out this resolution by saying that this is a difficult issue for us to deal with, and I recognize and respect that there are strong feelings on both sides, whether, you know, about what we're doing here. I also think it's important, as I've expressed in our caucus meeting, and I want to do publicly now, that I believe that the two, maintaining our tradition of requiring two-thirds of the Members to bring substantive issues before the body is an important process that we go through in this Senate to build a consensus and to allow us to work with the Lieutenant Governor, so that through our ability to get 21 votes and his ability to recognize us, there is a balancing of the issues that come before this body. And I think that's a good thing. And I've been a House Member who lost my entire legislative package in the Calendars Committee in the House, and so I understand how a Calendars Committee works, and it's really only one or two people that decide in that committee how things work. And I think it would be a travesty if our body went to that method.  Although it may serve the House very well, I don't think this body would be well-served by that. Now, having said that, I was very disappointed with the results of our attempt to bring this issue before the Legislature during the last legislative session. And by that I mean, yes, of course, you know that I'm in favor of us getting a voter identification bill passed, and I voted for it in committee. I don't think that's any secret. But when I say I was disappointed, I was disappointed in how we handled that. And I want to tell you that I was a part of that process and that process was that Senator Uresti was out ill and we scrambled, under the rules, it's, we're following the rules, and I was one of the people that was involved in it, trying to make sure we had our votes on the floor. And, you know, ultimately we ended up with a very ugly scene here on the floor of the Senate. I have given this a tremendous amount of thought and put a lot of research into this during the interim period, and I think that I, my goal here was to make sure that every Member of the body is empowered to have their point of view expressed on this very important issue. And I think the provisions that I've included in this measure that would require the President of the Senate to refer a bill dealing with the issue of voter identification to prevent voter fraud, that issue would have to go to the Committee of a Whole, and we would all have an opportunity to have ourselves heard and to let the issues be aired out. One of the things that I heard–I'm a Member of the Senate State Affairs Committee–we had hearings on this, the vote to get that bill out of committee was along, strictly along party lines in the committee, as I recall, and it was strictly a party-line vote on the floor. We have attempted to resolve this issue many, many times unsuccessfully in this body. And so, as I look back over the last 50 years of history in the Senate, what I was surprised to find, after all that I had heard about our sacred tradition of the two-thirds rule, that there are literally hundreds of instances where this body has chosen to either ignore, or go around the two-thirds rule to bring legislation to the floor. But I didn't want to leave it at that point. My research further indicated that there was a mechanism that was used during, especially, extensively during Bill Hobby's administration as Lieutenant Governor that allowed a special order to bring a redistricting bill to the floor of the Senate, to the Committee of the Whole, to have that issue debated and to let a majority then set a special order to bring that issue to the floor with a majority vote. And that topic was limited strictly to

apportionment during 1981 when that issue was done. That struck me as an issue that is very similar to the one that we have with voter ID. People across the state, whether you're Republican or Democrat, no one favors voter fraud. And yet, we continue to have a partisan divide on this issue. It seems intractable. We've had discussions among ourselves outside of the caucus, in small groups, to see if there was some middle ground that we could find. And I don't believe that that middle ground is there.

**Senator Whitmire:**  Mr. President.

**Senator Williams:**  And so, what I would like to, what I'm proposing here is a rule change.

**President:**  Senator Whitmire, for what reason do you rise, Sir?

**Senator Whitmire:**  Would the Senator yield and–

**Senator Williams:**  Not at this time. I would like to continue, finish laying out the bill, and I will be glad to take any questions.

**Senator Whitmire:**  I was primarily going to ask him if he'd yield, Mr. President, had he talked to Governor Hobby about what the circumstances were.

**Senator Williams:**  I'm not yielding at this time, Mr. President.

**Senator Whitmire:**  I would just ask and speak to that issue later. I think Governor Hobby–

**Senator Williams:**  I'll be happy to yield in a moment, Dean. So, what, what I've proposed is to use something that is a part of our Senate tradition, the setting of special orders by a majority vote on a specific topic and that has happened on more than one occasion in our past. I know that not everybody's in agreement. I know that many people feel that this is a slippery slope that we're on. What I would say is, this, plus other ways of accomplishing the same thing, have been used in the past, and this body has always been able to return to the tradition that we have of forging a consensus on substantive issues before we bring those issues to the body. It is not my objective to run over any Member of this body by doing this. Quite to the contrary, I don't want to resort to legislative tricks or parliamentary sleights of hand to accomplish getting this issue before us so that it can be properly debated, and that is the purpose of this change to the rules. This is a very serious issue in our state, that we deal with it and that we deal with it decisively. Whatever the outcome is, I will be happy to live with that. But I think we need to get this issue before the body and everyone can have an opportunity to debate. Mr. President, I would be happy to yield to the Dean at this time.

**President:**  The Chair recognizes Senator Whitmire.

**Senator Whitmire:**  Thank you Senator Williams. And I will reserve most of my comments to when I speak against your resolution, but I think, in hearing your comments, I thought it was timely when you certainly make the reference to Governor Hobby.  I think you mentioned the 1981 session, which I was still a House Member. Do you think it's not, would it be more appropriate if you're going to cite, certainly,

such an outstanding public servant and probably the greatest Lieutenant Governor, certainly in recent times, in all due respect, history's still being made, so I'm saying, up to this point.

**President:**  Just keep in mind that the committee assignments have not come out.

**Senator Whitmire:**  I understand.

(Laughter)

**Senator Whitmire:**  I've been around here long enough to know how it works. But no, seriously, don't you think it would be beneficial, if you're going to make such a major altercation, alteration in an amendment, that you ought to have a public hearing, refer it to a committee?  And I know we don't have committees yet, but that could be accomplished very quickly and allow Governor Hobby, Ben Barnes, the Honorable Bill Ratliff to speak to how they handled the two-thirds rule, because I believe, and first, let me ask you a specific. Have you talked to Governor Hobby that you're mentioning his decision making, because if–

**Senator Williams:**  I have not. His record is clear in the *Senate Journal.*

**Senator Whitmire:**  I understand, but the journal doesn't, would you not agree, always tell the full story. For instance, I don't think anyone objected to what Governor Hobby did. And I know for a fact when Governor Bullock did it, we were following a court order, are you familiar?  So, we came in and did not have a blocker bill because the court had told us what to do on congressional redistricting, and we just came in and amended the previous adopted plan, didn't need a blocker bill because it was unanimous. And I think if you go back in history, Senator Williams, and I respect you greatly, and I know you wouldn't intentionally mislead us, but I'm not so sure your version of history would be supported by the people who actually made those decisions, such as Governor Hobby.  So, I would ask you, would you consider postponing this to allow a public hearing where the principals that were involved, that you continue to refer to, could have public testimony and allow us to have a fuller understanding of what the circumstances were that you continue to depend on for your decision making?

**Senator Williams:**  Dean Whitmire, quite to the contrary, there was objection to Senate Resolution 256 in 1981, in the 67th session when this issue became before the Legislature, much as it is today.

**Senator Whitmire:**  How significant?

**Senator Williams:**  And, in fact, the issue was postponed until a time certain, and the original form of the resolution did not include the language referring the bill, the apportionment bill, in the case of the Senate Resolution 256, to the Committee of the Whole. And so it's–

**Senator Whitmire:**  What, what–

**Senator Williams:**  Quite apparent from reading the journal and the transcripts of what happened, which I read every transcript of all the debate that happened, related to this, and so it's quite obvious to me that there was not, initially, consensus on this. What's interesting is that the resolution was ultimately adopted and that there was a

redistricting bill that was reported out, and it, actually, my recollection is, received two-thirds of the vote of the Members present. So, by using this mechanism of taking the issue to the Committee of the Whole, they were actually able to forge a consensus in this body on an issue that had proved to be untractable to that point. Now, to complete the thought, it was later, died later in the legislative process, and this body adopted the rules in the next called session that included the special order to set apportionment issues by a majority vote. So, the body not only acted on this once, but twice in this specific instance that I'm citing, and the record and the transcripts are clear and they're available, and all you had to do to get the comfort from that was ask me to read them, and I would've been happy to provide them to you. There is no advantage to engaging in a, in a dilatory tactic of delaying this decision until we can receive testimony from somebody who is no longer a Member of this body. The record is clear and I invite you to read it, and I've made it available to all Members of the Senate.

**Senator Whitmire:** Now, Senator Williams, that sounds great, unless we break down what's happened in the last 24 hours. First of all, is it not correct, certainly I, and I think I speak for most Members, the first time we heard of this issue was yesterday morning in our caucus where we organized to be sworn in. Is it not correct that's the first time that you and I, I mean, it just–(inaudible, overlapping conversation)

**Senator Williams:** Dean, I talked to you about this before we went into the caucus because–

**Senator Whitmire:** Well, okay.

**Senator Williams:** I felt like I owed it to you to, to let you know–

**Senator Whitmire:** I–

**Senator Williams:** As the Presiding–

**Senator Whitmire:** I apologize–

**Senator Williams:** Officer, to let you know what I was about to propose to the Members.

**Senator Whitmire:** It was exactly 9:00 when you came to my office.

**Senator Williams:** Yes.

**Senator Whitmire:** Okay, so I was off by an hour. Yesterday morning at 10:00, we took it up, 10:30 we took it up in caucus. You briefed me briefly at 9:00. So, I'm just putting on the record, and for the public to know, when you suggest I should read transcripts from the 1981 redistricting session, I don't know when I could've done it, because had we not also been in around-the-clock discussions to how to resolve this matter before we came out here and had this debate. So, I don't–

**Senator Williams:** I don't think you were.

**Senator Whitmire:** That, that's, you were making my point, Senator Williams, would you not agree, of why we need a hearing to hear from all the stakeholders–

**Senator Williams:** No.

**Senator Whitmire:**  That were there? For instance, do you know what the makeup of the Senate was in 1981 along the partisan lines?

**Senator Williams:**  I don't recall exactly. I believe there were nine–

**Senator Whitmire:**  No, about three–

**Senator Williams:**  Republicans, but–

**Senator Whitmire:**  Maybe four. I mean, partisanship was not even a serious discussion on the Senate floor in 1981. And so when you say there was objection, I would like to know where the objection came from and how strenuous it was. I know it did, it could not compare with what we're presented with today.  So, for you to reach back in history, I just, let me ask you this, and then I'll reserve my remarks for later. What harm would be done, of something of this magnitude, and you're the, you have the unique advantage over all other hundred, 100, 30 Members, of having briefed this, researched it, thought about it, and we've all only known about it for approximately 24 hours. There may be a couple of your associates that have known about it, perhaps the leadership, but why wouldn't we, the rules call for an amendment to the rules. And I still am not certain what we're operating under. I've heard it both ways today, that we have no rules or we're operating under last session's rules.  But once we've adopted rules, we actually take amendments so serious that the rules require you to go to a committee. So, why wouldn't you give us the advantage of having a full debate on this in committee?  We all know committee work is much more intense, you have time to call witnesses, than what we're going through today.

**Senator Williams:**  Well–

**Senator Whitmire:**  What is the, what is the rush, I guess, is my–

**Senator Williams:**  Senator Whitmire, I guess the first thing that I want to say is that, yes, to answer, you raised a number of issues there. And certainly, I spent a lot of time researching this, and I appreciate what you're saying. I want to make it clear that this is not something that was driven by the leadership, quite to the contrary. The Lieutenant Governor has, I have informed him of the issue that I was working on as I brought this forward to the Members, because, I think, as our Presiding Officer, he had the right to know, and I actually discussed this with you very shortly after I laid it out before the Republican Caucus, and I think you knew about it. You were discussing it. It was being discussed the night before I came to talk to you. And so, what I would say is that I've certainly made myself available. I called you, I called Senator Van de Putte several times, I offered to join you at dinner last night and bring this information. I want everybody to understand how I made this decision. What I would say is, the way I would characterize it is that, you know, it's one of those issues that we're not going to agree on because neither side wants to give up their advantage on this. And taking this issue up later after the rules have been adopted is a very dicey proposition from a parliamentary standpoint, and we all know that if you want to make any substantive change to the rules, the time to do it is at the beginning of the session.

**Senator Whitmire:**  Well. You make–

**President:**  Senator Whitmire.

**Senator Whitmire:**  You make reference, excu– I have a, one more–

**President:**  Do you mind if I break in just for a second?

**Senator Whitmire:**  No, Sir.

**President:**  I am, it is not my procedure to ever debate a Member. That's not my role. I'm the Presiding Officer. You just made a reference that I'd like, have I not told you that I've not talked to any Republicans, that I was just briefed right before we came in this session by Senator Williams? I have talked repeatedly to the Democrats about the need to come together, but I am, I've told you, and you knew that, that I have not been advised nor have I worked on this issue. So, if you'd leave me out of the debate, Sir.

**Senator Whitmire:**  Okay.  Maybe you mis–

**President:**  That's all I ask.

**Senator Whitmire:**  Maybe.  Well, I'd like to correct your understanding of what I said. I'm talking about the timeframe when this was going to come down. I did not suggest that you were a part of the proposal, which you have made it clear to all of us. It's a decision by the Members. The rules are passed, but, I was making reference to the opportunity to discuss and review the substantive matter of his proposal. And I'm not familiar with when you learned of Senator Williams' interest in this, and I still am not.

**President:**  He came by to advise me, not ask me, but to advise me one day last week, Tues– Wednesday, Thursday.

**Senator Whitmire:**  And that's all I was referencing, Governor.

**President:**  And just advised me.

**Senator Whitmire:**  I was referencing–

**President:**  Thank you.

**Senator Whitmire:**  I absolutely, Tommy, at our function Monday night, there was a rumor that you were going to do it on voter ID and redistricting. And rumors are rampant in this building and no one got too excited. You came to my office at approximately 9:00 yesterday and told me what you planned on doing. I saw it for the first time in the caucus. And we've been in round-the-clock discussions about is there a better way to do this. So, I will, once again, for the record, let you know, I had not had the opportunity, one, I was still hopeful, that we would go and refer voter ID to a committee, have a hearing, like we normally do pieces of legislation.

**Senator Williams:**  Well, Dean, that's–

**Senator Whitmire:**  So, and to infer–

**Senator Williams:**  Exactly what my–(inaudible, overlapping conversation)

**Senator Whitmire:**  To infer that I've had this great opportunity to research this and call Hobby, or all that, it's just wrong.

**Senator Williams:** Dean, my resolution precisely requires that this issue be referred to the Committee of the Whole, that it be considered by the entire body. And so, I find that far preferable to engaging in some parliamentary sleight of hand to get this issue before the body.

**Senator Whitmire:** Well, can I ask you–

**Senator Williams:** This will ensure that what you want actually happens, that the issue is brought before our entire body.  No one can say, well, I'm not on State Affairs, so I don't know what happened to that. We're all going to hear the same testimony.  We're all going to have the same opportunity.  We're all going to work on this, and I think we all want to empower all of our citizens to be able to vote, who are eligible to vote, and what we want to do is minimize or eliminate voter fraud in the election process. And there is nothing more sacred to us, and, as a body and as a country, than to protect the ballot box from–

**Senator Whitmire:** Sure.

**Senator Williams:** Fraudulent activity.

**Senator Whitmire:** Well, and we'll debate voter ID later today, and, of course, you know, for the record, all 31 of us are very much opposed, all 32 of us are very much opposed to voter fraud, that is a given. What we're really discussing at this time is the process of how you pass a piece of legislation and the protections that we're looking for in that piece of legislation. What would concern me, Senator Williams, and I think this is a fair question, voter ID is very important to everyone here, the merits or lack of.  What about vouchers?  What about parental notification?  What about hate crimes?  I mean, why this?  And what will be the next issue that you want to place in special order because you can't pass it under a normal two-thirds tradition. For instance vouchers, I mean, why don't you do vouchers this way? It's pretty important to your side of the fence, I understand.

**Senator Williams:** Dean Whitmire, as I said in the caucus, everyone in this body was there to hear me say that it is my solemn commitment to this body that I have no other issue to bring before us and that is not the precedent under which I'm acting. The precedent is to take a single issue that does not lend itself to compromise or resolution and solve that problem. Now, I have filed a bill that deals with school choice so that parents can have a choice where their kids go to school. That issue is very important to me and to others. I would like to see kids that are under a special education program, that have special needs, that are a bur– that may be troubling to the schools, they may be hard for them to educate those kids, that we give those parents a choice for their kids, to get the very best help that they can get. And as important as that issue is to me and to some of my colleagues, I don't think that it rises to the level that we're talking about here when we talk about the integrity of the ballot box, because it's fundamental to who we are and how we govern ourselves. I don't believe that it rises to that level. And I'm content to leave that issue to the body to decide, and if you want to deny parents that choice, that is certainly your privilege to do that.

**Senator Whitmire:**  Well, we can debate that on another day. You, obviously, did you not, have redistricting as a part of your original proposal? So, see, that is another example of, where you're kind of, what is the most important to you and perhaps your caucus.  You changed our way of doing business around here to address those political partisan issues. So, now, why did you take redistricting out?

**Senator Williams:**  Senator Whitmire, this issue is a single issue that needs to come before us. And I think that you raised a valid point, and Senator Gallegos raised the same point in the caucus meeting, and out of deference to you and Senator Gallegos, while I think that was a good thing to include in this, you were uncomfortable with that, so it's been removed from the resolution out of deference to you.

**Senator Whitmire:**  Thank you, Sir. And last question before I sit, and I'll participate with you on the merits of your amendment later, I want to thank you for carrying this resolution, not the content, but you know, it has been a tradition, certainly since I became Dean, and since I've been in the Senate, that the Dean would lay out the resolution.  But you know how strenuously opposed I am to this change that I could not have my name on it or have anything to do with something that was going to change what I perceived as a very sacred tradition that has served this body well. So, that is the reason I understand you're laying out the resolution, because I could not in good conscience carry something that I so strongly disagree with.

**Senator Williams:**  Dean, I have deep and abiding respect for you and every Member of this body.

**Senator Whitmire:**  Thank you.

**President:**  Senator Ellis, for what purpose do you rise, Sir?

**Senator Ellis:**  Will the Senator yield for a question?

**President:**  Will Senator Williams yield?

**Senator Williams:**  I yield.

**Senator Ellis:**  Thank you Senator. Senator, obviously, I'll speak against it at the appropriate time, but from time to time we do say that we think, or some of us think we're the most deliberative body in the world, I've heard that a number of times. I just think it merits a few questions because just as you, Senator Williams, took the time to go, not just through the computer, but obviously you had to go back to the journal. I don't want anybody who is going in the computer and looking at what we do on this day to think that it is just a minor change. So, my first question to you, do you think this is just a minor change from the norm? You think this is a big deal, or it's just–

**Senator Williams:**  Senator Ellis–

**Senator Ellis:**  (inaudible, overlapping conversation)

**Senator Williams:**  I know that many Members of this body feel that this is a dramatic change and departure from the way this body has historically conducted itself. I do not share that view. I do take our rules very seriously, and I have during my tenure in the Senate worked very diligently to master the rules and to understand how this body operates, and this, the result of that is the issue that's before us today. So, I guess I would answer you by saying, I don't believe that this is a dramatic departure

from the way the body has historically dealt with these types of issues and conducted themselves. And I would also further reiterate that there are Members on both sides of the aisle who would prefer that we do away with the two-thirds tradition to gain partisan advantage, or advantage on a particular issue. I do not share those views. I am a proponent of what we do, but I also understand that there are important issues that come before our body that our citizens expect us to resolve and take action on. And sometimes, we have to deal with those issues separate and apart from the issues that we deal with on everything else. And in fact, my feeling about that was not, I didn't feel that way until I did the research and found that it is not uncommon for the State Senate to deal with the tough issues like this that aren't resolved in any other way by some special method.

**Senator Ellis:**  Okay.

**Senator Williams:**  Whether that be setting the issue as a blocker bill itself, so that there's nothing before it and you're in the regular order of business, whether that be setting a special order, I felt like the special order was the appropriate way to do it, because I think you have expressed to me very legitimate concerns about some of our elderly citizens who might be disenfranchised.  And I want those concerns brought before the entire body and debated in a open meeting so that we can address those concerns, because I don't want to see that happen.

**Senator Ellis:**  Okay. Senator, just so the issue of this rule change on the merits of voter ID, obviously there was ample time to have debated that last session, and there'll be ample time when it comes, but just on this, and just for the record, because somebody will look at this 20 or 30 years from now.

**Senator Williams:**  I understand.

**Senator Ellis:**  So, in your opinion, obviously there's a difference of opinion, reasonable minds can disagree. You don't think this is a big deal, this is just–

**Senator Williams:**  I didn't say that, and I wouldn't characterize it that way. What I would say is that it is not out of the ordinary for the way this body has dealt with these issues in the past.

**Senator Ellis:**  Okay.

**Senator Williams:**  I would, I'd prefer that you not characterize my, I'm stating to you what I believe.

**Senator Ellis:**  And we're just making a record. What would be your thought on a process for deciding which issues ought to come up without a two-thirds vote?

**Senator Williams:**  I think that we're going through that process right now.

**Senator Ellis:**  But you only, you have one issue, you had two on yesterday, and now you have one issue, but is there some thought process? I mean, what's the litmus test for deciding when a issue, I think you used a term, is one where there is a partisan divide.

**Senator Williams:**  Well, I think we're–

**Senator Ellis:**  Is that–

**Senator Williams:** Going through that very process right now. This is how we resolve it.

**Senator Ellis:** Okay, now I looked at this research that you put together. In the first four and a half pages, the first 34 bills you cited in the document were votes in special sessions, and I think in 70 bills, of the 70 bills, a resolution cited in total, eight were listed as occurring during a regular session. Can you give us just a rough idea of what some of them were about, other than the one from 1981, that you made reference to–

**Senator Williams:** Well, I can go through–

**Senator Ellis:** That they–

**Senator Williams:** Senator Ellis, and read this list of bills if you'd like for me to do that.

**Senator Ellis:** I want to, just, I just wanted to, if you don't mind, from the 67th session, I just pulled a few. I didn't have time–

**Senator Williams:** Right.

**Senator Ellis:** To go through them all, because this has been so quick. You've looked at, as you stated, for some time, that my staff and I have looked at it for about 24 hours. Senate Bill 800 in 67th session, by Ogg, was a redistricting bill. That was a big one that you talked about. House Bill 1400, a redistricting bill that did pass by 28 to 3. That Ogg bill was 27 to 7. Some criminal justice bill, House Bill 1922 in that session, 67th session, passed by 31 votes. And then, in the 66th session, that was a killer bill, I was here by the way, working for Governor Hobby then, but then a number of local bills, city government code, water code bill, all 30-0 votes. Did you look at the votes in, you know, just roughly how many of those were contested? How many of the bills that you went through were–

**Senator Williams:** I think a lot of the issues that were cited there were issues that weren't controversial, as many of the issues that last session that we dealt with, and the session before that one, many of us were here, where the Senate adheres to the regular order of business on House bill days and brings those issues forward, or they follow the regular order of business and take up a resolution, and there's not a blocker resolution, if you will, like we often have. So, some of the issues are minor. There are some major issues, as I mentioned. This redistricting issue, I consider that to be a major issue. Workers' comp is another issue that was cited, and that was done by Governor Hobby, and he actually put the workers' comp bill first in the regular order of business, and if the newspaper accounts are to be believed, he related to the Members that they better solve this or he was going to pass the blocker bill out that he had, that it was, you know, here's how we're going to do this. This is first in line. And so, I know the newspapers aren't all exactly right of what they're saying or is very consistent with what I see in the journal. Another issue, interestingly, the Peveto bill was dealt with this way, nothing probably more sweeping, tax reform, in the history of this body, and that bill was taken up in the regular order of business without suspending the rules. So, I mean, there have been major issues that have been dealt with. We deal with minor issues like this on a regular basis. I think this is an important

issue, as I said. It's important that this be resolved, and my goal, Senator Ellis, is that we all have input into that and that we not do it through some parliamentary sleight of hand.

**Senator Ellis:** Well, Senator, I called Governor Hobby. I mentioned to you yesterday–

**Senator Williams:** Right.

**Senator Ellis:** That I thought you ought to talk to him. I did send him your research. I waited until late last night to do it because you were concerned about it getting to other people. So, I did send it to him last night, and I called him. Now, based on his recollection, the one time in which he suspended the two-thirds bill triggered the Killer Bee incident. And he told me that Babe Schwartz was a designated person who had talked to him, and that on the third day he made the decision, enough was enough, bygones be bygones. What I do remember, as a young intern in this building when that happened in 1981, just as a junior intern in a staffers' meeting back in what is now the Ramsey Room, Governor Hobby was upset because the Senators had taken leave of the Capitol building and left, and he was very upset.  And I do remember when he walked out of the room, I stood up and kind of went, "Yes." And I was shocked that the rest of the staff members, instead of cutting my pay, said, well, we agree with you, but you better not do that again. But he saw that that created such havoc in this body, he backed away from it, and I just want to state that as a former staffer of his. Now, I don't know if these other local bills that are referenced here, I saw one was a resolution to the Congress of the United States on your list commenting on religious freedom.  But I would encourage other Members and you and the press to talk to Governor Hobby, to talk to Governor Barnes, talk to other people, and I would hope that the record will reflect clearly that they were not consulted if you're using what they did, particularly the ones who are still alive, and get their input as well.

**Senator Williams:** Senator Ellis, I appreciate what you're saying, and certainly we all remember things sometimes the way we would like to remember them. And I don't, I wasn't privy to your conversation with Lieutenant Governor Hobby. He is an honorable man, and there's no question in my mind that he sincerely believed what he told you. I also, in my research, came across a newspaper account where the Lieutenant Governor, Lieutenant Governor Hobby said that he hadn't, referring to the session that had just ended that, you know, he didn't, he wasn't in favor of suspending the two-thirds rule, and he would never do that, and when, in fact, 40 bills had passed that session through the regular order of business. And so, what I would say is that maybe our memory of it, after many years, I know in my case, I have a hard time remembering sometimes what happened last session, or yesterday, so our memory isn't always perfect, and that's why we reduce things to writing and why we have a journal and why we have transcripts. And I certainly don't want to cast any dispersions [sic] or make an inference about the sincerity or the correctness of what Governor Hobby told you. But the fact of the matter is, that I don't believe it's that relevant. We have a record of what happened. It's clear what happened, that we had three major bills that I just named to you, property tax reform, workers' compensation, and redistricting that had been dealt with, maybe not in this exact way, but in a similar

manner. And so, I think that, you know, we make, it's certainly the Presiding Officer's prerogative to set the order of business, but that, to me, seemed a little heavy-handed to put a bill up there and say, you're either going to take this or you're going to come up with something else. Far better that our body should debate the issue, that we should do it as a Committee of the Whole, and that we all have an opportunity to have input rather than have the sword of Damocles hanging over our heads, knowing that we're going to get something that we might not like if we don't compromise with somebody else because of the regular order of business and what's hanging before us. This, to me, is a much more inclusive way. That's what's motivated me in this process. I want you to have the opportunity. I know you're on State Affairs, but there're other Members of this body who are not, in any other way, would, by necessity, have some people outside of that process, consumed with other business. We will address this together.

**Senator Ellis:**  Well, that's mighty generous of you. Let me ask this question. Do you think that in any way, the input of anybody on this floor is reduced by being able to pass this bill with 16 votes instead of 21? Do you think you're helping the–

**Senator Williams:**  I–

**Senator Ellis:**  Input instead of–

**Senator Williams:**  Senator Ellis–

**Senator Ellis:**  Letting the process by–

**Senator Williams:**  I do believe I'm–

**Senator Ellis:**  I, I'm just for the record–(inaudible, overlapping conversation)

**Senator Williams:**  I, I do believe that I'm helping it. And the proof is that when this same thing was done with redistricting and it appeared to be an intractable issue, when they took it to the Committee of the Whole, they were able to get two-thirds even though they didn't need it, the record reflects that they had two-thirds. And so, I think it's the way for us to build the consensus that we need around this issue, and I don't want anybody's influence to be diminished but, in fact, what's happening are parliamentary procedures to prevent this issue from becoming before the body, or parliamentary issues to try to, maneuvering, to try to get it, slide it by the bow– body. And you know, there's plenty of instances I found in my research where Members and Lieutenant Governors had resorted to what appeared to me to be sleights of hand. I have not included those in my research because the record's not clear on that.  But when you see them take up the regular order of business and move down and postpone consideration of bills so they could get down to one bill and take that issue up, and then the next day they go back to suspending the two-thirds rule, it certainly appears to me that maybe, you know, not everybody was on the floor, maybe not everybody was paying attention, I don't know.  And so, I didn't include those kinds of things in my research. But what I am saying is, that it's important to me that you and every Member has input into this, and the only way we're going to get there is to bring this before a Committee of the Whole. And it is my fervent hope and prayer that

we will be able to come together and find 31 votes for this issue, that it will be something that we can all be proud of, and that it will be the Texas State Senate's proudest moment when we vote that out.

**Senator Ellis:** You make reference to sleight of hand. Now, the first time I heard about this was at the dinner on Monday night. It was after the dinner, so I wasn't sure if the person heard everything they thought they heard. I heard it from two Members. And then the discussion came up the next morning. Now, if your concern is about sleight of hand, do you think that's quite the most appropriate way to debate, to change what some, maybe not all, but at least a good number of Members, I think, in this body, on this, both sides of the aisle would agree is a pretty major change in precedent setting? I mean, the notion of looking at it for a week, two weeks, you know, I've heard the discussion from the Parliamentarian about whether or not we could change the rules at some point down the road. But we adopt rules today, if we wanted to give ourselves a option of making the decision on this matter for this bill in two weeks, when Bill Hobby, Ben Barnes, Governor Ratliff, anybody else wants to say what the record was, they could do that. But I mean, you, your concern, you're saying do this because you don't want somebody pulling a fast one on someone when somebody's absent. Now, I don't know–I travel a little bit, I've been told from time to time, during the interim–I don't know whether other caucuses were meeting and this was developed quietly, but I haven't talked to anyone else who's told me that they went through all of this research. I don't think you would appreciate me coming on the floor making a major substantive push to get something done, and I did the research with just my staff or just me. I assume you didn't use the offices of the Senate to do this research, I'm just guessing. I mean, this, when you make your references to sleight of hand, do you really think that's the best way to work on legislation–

**Senator Williams:** Senator Ellis–

**Senator Ellis:** Of changes of this magnitude?

**Senator Williams:** I certainly respect the point that you, and the point that you're trying to make, but what I would say is, that I think we have a difference of opinion about it. I believe that this is a very straightforward change, that it is clear that it has happened in our past, that it's a part of our history as a body. The record reflects that. I've made that available to everybody. The time that we make changes in our rules is at the beginning of the session, and this is the time that we do that. And there is no reason that I've been able to come up with that we should compromise, or that we would be able to reach a compromise by waiting a few weeks. If I thought there was a hope of that, but based on the discussions that you were a part of, Senator Van de Putte was a part of, Senator West was a part of, where a small group of us met and tried to see if there were some common ground, there was no sense on my part that there was a common ground, that what we really had were delaying tactics and trying to gain advantage in the process of changing our rules. This is a decision that this body makes. I don't believe that we need to bring outside pressure from interest groups, and I have resisted that and, in fact, you know, back home, the Harris County Republican Party is pressing very hard to completely do away with the two-thirds rule, and I've stood firmly in opposition to that, as I do today. And so, I think that this is a way for us to get this issue behind us, limited to this issue, and we, there won't be

another item like this during the session. And when we convene again in two years, we will consider the issues before us, and we will consider what changes need to be made in the rules, and we will act at that time, just as we always do.

**Senator Ellis:** Well, obviously, at the end of the day, I'll get to make any closing points that I want to make. But, Senator, I think the new tradition that we're establishing is, it's a two-thirds vote as long as somebody who has 16 can get that two-thirds. And if an issue is important enough to them, that person that has 16 but they cannot get the two-thirds, then the rules will be changed, they will say this item is a partisan issue, or they'll say it's a philosophical issue, and I just don't think that's a good precedent for our Senate.

**Senator Williams:** Well, I disagree that it sets that precedent, and if you review the record, you'll find that that's not the way the body has operated when this has been done before. And so, the history is that we return and we do things just as I've contemplated in this rule, in these rules, and that is that we maintain the two-thirds issue, that, that's been the history. And so, what happened as I did my research is, we all had short memories, and they're imperfect, including mine, and really, our experience, our knowledge of this issue, was really only based on our own experience in the body. When, in fact, if you look back over time, it's quite different. And you know, I looked back to the mid '50s, that's when the current form of using a blocker bill and having an intent calendar began to develop, and I believe Ramsey was the Lieutenant Governor at that point, if my memory serves me correct. And so, this is a issue that I don't take lightly, but I think that it's not the dramatic abandonment that some would characterize it as.

**Senator Ellis:** Thank you.

**President:** Senator West, for what purpose do you rise, Sir?

**Senator West:** Question of the author.

**President:** Will Senator Williams yield to Senator West?

**Senator Williams:** I yield.

**Senator West:** Senator Williams, I've heard you characterize the reason why you're doing this is because of the importance of the issue to the citizens of the State of Texas, being, quote unquote, voter fraud. I've heard you also characterize this as the reason that you're doing it is because it's intractable and because of the lines that have been drawn, partisanwise, as it relates to this particular issue. I've also heard you say that it defies compromise between the people on the floor of the Senate. Right? And so, that's your reason for bringing this particular extraordinary rule change of the State Senate. Correct me if I'm wrong.

**Senator Williams:** Senator West, I believe, and I see that you've been carefully taking notes as I spoke–

**Senator West:** I have tried.

**Senator Williams:** And I believe that I did say all those things. If I said I believe this defies compromise, either I misspoke or you didn't hear everything I said.

**Senator West:** Okay. That's why I'm saying, correct me–

**Senator Williams:** And–

**Senator West:** If I'm wrong.

**Senator Williams:** And I think what I just tried to express to Senator Ellis is, that I, it truly is my fervent hope and prayer that this will allow us to bring this issue before the body and that we can find a resolution to this problem that our state faces and that we can do it in a way that can have bipartisan support. Unfortunately, partisan politics has injected itself into this issue, and it has made it difficult, if not impossible, to resolve the issue under our current procedures.

**Senator West:** Okay. I, but I, let me go back to the question. So, the reasons, reason or reasons, that you're bringing this particular extraordinary rule change is because, number one, it's an important issue for the State of Texas, correct?

**Senator Williams:** Correct.

**Senator West:** Okay. Number two, hereto before, it's been a partisan issue incapable of resolution.

**Senator Williams:** Correct.

**Senator West:** Okay. And is there any other reason?

**Senator Williams:** Well, all the things that I've stated, and I think you've outlined them, so if you have a question for me–

**Senator West:** Well, I'm, I'm just trying to, because I want to make certain I stay close to your reasons.

**Senator Williams:** Okay.

**Senator West:** Okay.

**Senator Williams:** I'm all ears.

**Senator West:** You're all ears. So, let's deal with the importance to the State of Texas. Is there any empirical evidence in the State of Texas that this is a big issue to the citizens of the State of Texas?

**Senator Williams:** I think that that, the question of whether there is empirical evidence–

**Senator West:** Yes.

**Senator Williams:** About this is a issue that has to be vetted through the committee process.

**Senator West:** Okay.

**Senator Williams:** Some would say, yes, some would say, no. The problem is that when it ends up in committee, it's a partisan vote, we're not all hearing everything that everyone else heard, and it's a huge benefit, as you know, for the Members to hear that testimony.

**Senator West:** So, what leads you then to believe that this is such a high priority for the citizens of the State of Texas, but for some evidence that you have that would warrant such a conclusion?

**Senator Williams:**  Senator West, I believe that the integrity of the ballot box–

**Senator West:**  As we all do.

**Senator Williams:**  Is very important issue, and it is fundamental to our way of life. And it is fundamental–

**Senator West:**  I agree.

**Senator Williams:**  To protecting your rights and mine.

**Senator West:**  I think we agree.

**Senator Williams:**  And I think, when I look around the country at what happened in this last election cycle–

**Senator West:**  I'm talking about the State of Texas.

**Senator Williams:**  I know, I agree.

**Senator West:**  Not around the country, the State of Texas.

**Senator Williams:**  And what happened in recent presidential elections–

**Senator West:**  In the State of Texas?

**Senator Williams:**  And what happened, and what has happened in elections in our state, that there have been questions that have been raised about whether fraudulent votes were cast or not.

**Senator West:**  In the State of Texas?

**Senator Williams:**  Yes.

**Senator West:**  Okay.

**Senator Williams:**  In the last election in the pri– in a primary race in Harris County, I have, it's been asserted that the 5 to 7 percent of the people who voted in the primary were not registered to vote–

**Senator West:**  That's an assertion–

**Senator Williams:**  And didn't appear–

**Senator West:**  An assertion.

**Senator Williams:**  On registration rolls anywhere.

**Senator West:**  That's an assertion, though.

**Senator Williams:**  That's an assertion. And so, the way we resolve these issues is–

**Senator West:**  Were those persons prosecuted?

**Senator Williams:**  Is that we take the issue to the Committee of the Whole, and we all get to hear the same evidence, and we all get to draw our own conclusions, because, as you know, it's very difficult if someone walks in with a voter iden– a voter registration card, how do you know that the person who is voting is actually the person who is registered?  That's what we're talking about here. Do you think that's important–

**Senator West:**  I want to get back–

**Senator Williams:** Or that we should just be able to trade them like baseball cards?

**Senator West:** Hold on, let me go back to, you said that was an assertion. Were those individuals, when the assertion was made, was it made just in the media, was it made to the district attorney, and what, was there any follow-up?

**Senator Williams:** You know, I think that the process is–(inaudible, overlapping conversation)

**Senator West:** Hold on, let me finish.  Let me finish.

**Senator Williams:** Sure.

**Senator West:** Do we just have assertions that have been made in the State of Texas? Now, I'm not talking about around the country as it relates to voter fraud, because just like Senator Whitmire said, the Dean, all of us want to make certain that we have a secure voting system, but the question becomes whether or not these assertions are just that, just assertions. I can recall, and I hadn't had the benefit of researching it, I thought that the Attorney General or some groups did an analysis of voter fraud in the State of Texas and concluded that there was not significant voter fraud in the State of Texas. And so, again, I go back to the point, you're saying that one of the reasons that you're bringing this is because it's such an important issue for the citizens of the State of Texas. I will say it is an important issue. Let me ask you this. Is this more important than dealing with tuition deregulation?

**Senator Williams:** Senator West, I believe that it is.

**Senator West:** Okay.

**Senator Williams:** As important as I think tuition deregulation is, I think that we will resolve that issue to your satisfaction and to mine. And you know, we've been–

**Senator West:** And we've been on the same–

**Senator Williams:** (inaudible, overlapping conversation)

**Senator West:** Okay. So, this voter ID, to the citizens of the State of Texas, this is a more important issue than dealing with the rising cost of tuition, which has been, like, 53 percent since we've had deregulation, and you know those number's great.

**Senator Williams:** Senator West, I think they're both important issues–

**Senator West:** Would you–

**Senator Williams:** But I think that the whole idea that people who aren't eligible to vote–

**Senator West:** Is more important.

**Senator Williams:** Are voting, are cheating in that electoral process, that that is fundamental to our democracy–

**Senator West:** Okay, hold your–(inaudible, overlapping conversation)

**Senator Williams:** And I don't think that anything else that we do, unless we're sure, unless our citizens are comfortable that voter fraud has been eliminated, or at least minimized, if not eliminated.

**Senator West:**  Yeah, now let me–

**Senator Williams:**  That–

**Senator West:**  Here–

**Senator Williams:**  It would be, that is a, it's fundamental to our process and the way we govern, and that tuition deregulation, well that's very important, that's an issue that we're elected to come down here and debate. And it is an outgrowth of the–

**Senator West:**  So–

**Senator Williams:**  It is an outgrowth–

**Senator West:**  So is voter ID.

**Senator Williams:**  Of the process that we're trying to protect.

**Senator West:**  Now, again, let me go back to the first question I asked you. There is no empirical data in the State of Texas that you can point to that there's significant voter fraud in our system. But there is empirical data that you can point to that we've had a rise in cost in tuition for our middle-class families, would you agree to that?

**Senator Williams:**  No, I would not.

**Senator West:**  Okay, you would not agree that tuition has increased some 53 percent–

**Senator Williams:**  No, I did not say that.

**Senator West:**  Since deregulation?

**Senator Williams:**  What I was saying–

**Senator West:**  That there is empirical data, I'm saying that there is empirical data–

**Senator Williams:**  There–

**Senator West:**  The difference between those two issues, and I've got some others for you, is that there's no empirical data that you can point to that voter ID, that voter fraud is a more important issue than tuition deregulation, based on empirical data or credible evidence.  That's the point I'm making.

**Senator Williams:**  Senator West, I think that's where we disagree, is that I–

**Senator West:**  Okay, where is the credible evidence?

**Senator Williams:**  I'm, I believe that all of that whole body of evidence–

**Senator West:**  What body of evidence?

**Senator Williams:**  That it exist and it doesn't exist, needs to be brought, that's what the committee process is about–

**Senator West:**  I agree.

**Senator Williams:**  And we need to bring that issue before the Committee of the Whole, and let us all decide.

**Senator West:**  But, okay.  But here's the thing.  You're saying, because of that body of evidence, which we have not seen, that you are taking the extraordinary step to change the rules where only a majority of the Members of this august body would be

required to vote on this. But you're saying it's based on it being a number, a, the number one issue in the State of Texas, is based on some evidence, but you can't point to any evidence that it's based on.

**Senator Williams:**  Senator West, I think that that is a debate on the substance and the merits of the issue and that should be taken up by the body, not taken up as a part of this rule change, and I understand what you're saying, but I think what we, the fundamental problem is, that we disagree whether that body of evidence–

**Senator West:**  And that's fine.

**Senator Williams:**  Exists or not.

**Senator West:**  Okay.  But you have not pointed to any body of evidence at this point in time–

**Senator Williams:**  I'm not–(inaudible, not speaking into the microphone)

**Senator West:**  Even though I would, you would agree with me that we've had a rising cost in tuition that's basically, that's basically preventing Texas families to affording, to afford to send their kids to school, would you agree?

**Senator Williams:**  Senator West, you know I think that issue is important.  It was the first bill that I filed.

**Senator West:**  And you and I were together on that. You and I–

**Senator Williams:**  Oh, I'm–(inaudible, overlapping conversation)

**Senator West:**  We went over to UT–

**Senator Williams:**  We did, and we've been together, and Senator Hinojosa and I are joint authors of a bill–

**Senator West:**  That's right.

**Senator Williams:**  To try to address that very issue this session.

**Senator West:**  What about setting that for a special order? Would you, would you take an amendment that set tuition, reregulating tuition in the State of Texas for middle-class families as a special order?

**Senator Williams:**  No.

**Senator West:**  Why?

**Senator Williams:**  Because I think that issue is not intractable like the other issue that we resolved, that it's a bipartisan issue as evidenced by the fact that you and I are working together on that issue.

**Senator West:**  Alright, let's, now we're going to deal with intractable, what, how do you define intractable?

**Senator Williams:**  Something that can't be resolved by the body because of some underlying differences between the Members and, in this case, partisan issues with respect to voter ID. The tuition deregulation is completely different, because while it is, I agree with you that it's, it's egregious what's happened, and many of you've heard me say that I wish we could get that genie back in the bottle. But it is an issue

that both Republicans and Democrats have worked together on, and it hasn't been a partisan issue or a partisan divide that in this Chamber kept that from coming to a resolution.

**Senator West:** So, intractability, if intractability is tied to some sort of bipartisan inability to resolve an issue, then we can still use the two-thirds rule, but if intractability is tied to partisanship, then we can set something for a special order? Because, I mean, essentially, that's what we're doing. I think you would agree with me that since we did tuition deregulation back in 2003, each session several of us, the two of us, have tried to put that genie back in the bottle, and the Members of the body, be they Democrat or Republican, have said, no, to that particular issue. And so, it seems like that's intractable. The issue of voter ID has been in this body for the past two sessions also, and each time the majority of us have decided, or at least, I shouldn't say the majority, but it hasn't been able to get a vote on the floor. So, it's intractable. So, the only difference between the definition of intractability as it relates to tuition deregulation and that of voter ID, is the partisan issue. Correct me if I'm wrong.

**Senator Williams:** I think that partisanship is one of the issues that can lead to intractability, and in this case, that is true.

**Senator West:** So, for future–

**Senator Williams:** And it was also true, excuse me, with respect to redistricting.

**Senator West:** I was getting ready to bring that up. So, with, this body does today is set a precedent that any time you have some intractable issue that defies resolution based on partisanship, then it's appropriate for future Legislatures to set up a special order.

**Senator Williams:** I think that the precedent has already been set for us that when an issue is intractable, such as redistricting, which is an example of a partisan, intractable issue, whether that be workers' comp, which was intractable maybe for other reasons, other than partisan, it could've been partisan reasons, but it could've also been other reasons besides partisanship–

**Senator West:** Like tuition deregulation?

**Senator Williams:** That the issue, once it, the body decides that it's to that point that it is within our power to bring that issue before us.

**Senator West:** The majority of the body. Right?

**Senator Williams:** That's correct.

**Senator West:** So again, what you do, what we do, assuming that this passes today, is codify what you have said is past practices based on some research that you've done that no one has had the benefit to analyze.

**Senator Williams:** It, I would say the precedent has already been set, Senator West.

**Senator West:** Okay. And so, we codify that in the rule today? Is that what you're doing?

**Senator Williams:** I think it's already there.

**Senator West:** Well, where is it in the rules today? Show me–

**Senator Williams:** I think–

**Senator West:** Show me how, based on the 80th, I think the 80th–

**Senator Williams:** It's in–

**Senator West:** The 80th, where is it in the rules today?

**Senator Williams:** It was in the rules in the 67th session, and now it's not in those rules, the body decides–

**Senator West:** There, there was a specific rule?

**Senator Williams:** Yes, there was a very specific rule, modeled after the rule that I'm proposing today.

**Senator West:** But the 80th Legislature, the 79th, there weren't in those rules.

**Senator Williams:** Wasn't there, that's correct.

**Senator West:** Okay, so we're codifying it in, for the 81st legislative session–

**Senator Williams:** Yes, we are.

**Senator West:** Alright, now, let me ask you this. So, you will not, you will not accept, you will not accept the premise that dealing with tuition issues is more important to the citizens of the State of Texas than dealing with voter ID?

**Senator Williams:** What I'm saying, Senator West, is, I think that that issue can be resolved in our normal–

**Senator West:** That's not the question I asked.

**Senator Williams:** Process.

**Senator West:** Sir, out of all due respect, that's not the question I asked. Dealing with the rising cost of tuition is not, is not as important, well, it's not as more important than voter ID issues. Which one is more important, voter ID or the rising cost of tuition?

**Senator Williams:** You, you may be saying that, but, Senator West, we're not in the courtroom, you're not going to put words in my mouth–

**Senator West:** Well, I'm not trying to put–

**Senator Williams:** I'm telling you this–

**Senator West:** I'm just asking if–(inaudible, overlapping conversation)

**Senator Williams:** That I think that issue can and will be resolved by this session of the Legislature.

**Senator West:** I'm acting like I'm in the courtroom right now? If I am, I don't mean that. I'm trying to act like I'm on the Senate floor–

**Senator Williams:** Okay.

**Senator West:** But I'm just asking a specific question–

**Senator Williams:** But I'm telling–

**Senator West:**  If I am, I, I apologize–

**Senator Williams:**  And my answer to you is that I believe the difference is the issue related to tuition deregulation can be resolved, and Senator Hinojosa and I are working on a solution, just as you and I have worked on a solution to this before, and–

**Senator West:**  But historically, I'm sorry–

**Senator Williams:**  And so–

**Senator West:**  But historically, it has not been resolved, and it's–

**Senator Williams:**  Exactly.

**Senator West:**  Intractable–

**Senator Williams:**  That's correct.

**Senator West:**  And the intractability has not been tied to partisanship but philosophical beliefs of the Members of this body.

**Senator Williams:**  It could be partisanship, it could be other reasons that an issue becomes intractable.

**Senator West:**  So, if I offered an amendment to set deregulation, tuition rates for a special order, you will oppose that?

**Senator Williams:**  I would.

**Senator West:**  Okay, I plan on offering it. What about full funding of the Children's Health Insurance Program? Do you think that's an issue that's been intractable over the course of the last sess– few sessions?

**Senator Williams:**  You know, Senator West, I think that we have had some healthy debates about that in the Senate Finance Committee.

**Senator West:**  Yes, we have.

**Senator Williams:**  And as you will recall in, I believe it was the '03 session where the eligibility for the Children's Health Insurance Program, maybe it was the '05 session, had been–

**Senator West:**  Six months.

**Senator Williams:**  Substantially curtailed about who was eligible.  And the, in fact, I was on the prevailing side of that issue. But through the hard work of you and Senator Averitt and others on the Finance Committee who persuaded me of the error of my ways on that issue, we, I, as being on the prevailing side, made a motion to reconsider that vote in the Finance Committee.  And we changed that, and that's an example of how things work on issues like that, so I would say, no, that issue has and can be resolved through the normal process and through the budgeting process.

**Senator West:**  But you don't think that is more important to the citizens of the State of Texas, providing our children insurance is more important than voter ID?

**Senator Williams:**  That's, that's not what I said. What I said was, I think that issue is important.  I've listened to folks on both sides of that issue, and I have had my mind changed about that from time to time.

**Senator West:** I'm trying to change your mind about this, too.

**Senator Williams:** So, what I would say is, that I don't think it represents an intractable issue that the Legislature has been unable to address and resolve and that–

**Senator West:** Intractability defined–

**Senator Williams:** Is my answer to you.

**Senator West:** Intractability defined as a partisan difference, a partisan difference on the issue, intractability defined–

**Senator Williams:** I don't know that that's really a partisan issue. I think that it could be in some instances, and, but you had people on both sides of the aisle voting both different ways on that. You had some Republicans that were in favor of increasing that. So, I mean, I think that example, while this is an important issue, I don't think that the resolution of this issue has been hindered by the process.

**Senator West:** Would you agree or disagree with me, that once we pass, once y'all, as we use it in Texas, pass this resolution that it's going to be easier to pass a voter ID bill in the State Senate?

**Senator Williams:** I think that what this will do is, it will get the issue before the body as a whole, and then we can make the decision together, whether we want to vote that out by a simple majority or whether we want to require two-thirds, the rules won't require it, but we still have the option of deciding that. And I think that what my sense is, that there is enormous willingness on the Republican side to accommodate the concerns that have been expressed by Democrats about the potential of disenfranchising people in our state. And so, I hope that we will come out of this with, maybe not singing "Kumbaya," but having known that we debated the issue, that we dealt with it, and we had disposed of the matter, and that we do it in a way that everyone had input and concern. I hope, I hope, that it is not a party-line vote–

**Senator West:** So, we can't do it–

**Senator Williams:** (inaudible, overlapping conversation)

**Senator West:** We can't do it under current rules, that–

**Senator Williams:** Apparently not.

**Senator West:** That hope cannot be realized under current rules?

**Senator Williams:** Apparently not.

**Senator West:** So, the reality is this then, if we don't have two–a majority will determine whether it's two-thirds or a simple majority, right?

**Senator Williams:** The majority determines the rules of the Senate–

**Senator West:** Okay, but–

**Senator Williams:** It's always been that way.

**Senator West:** As it relates to this issue–

**Senator Williams:** The rules–

**Senator West:** Assuming that this has passed, and you have the votes to pass it, then the reality is, it's going to be easier for those that advocate voter ID to pass this particular bill, it's–

**Senator Williams:** (inaudible, overlapping conversation)

**Senator West:** Going to be easier for them to, for those that advocate this particular position, to pass voter ID. It's going to be easier for them to do that, for this body to do that, than to pass any laws dealing with reregulating tuition for middle-class families. It's going to be easier to pass voter ID than it will be to deal with the Children's Health Insurance Program. It's going to be easier–

**Senator Williams:** Senator West–

**Senator West:** Hold on, hold on, let me finish.

**Senator Williams:** Okay.

**Senator West:** It's going to be easier to pass a voter ID bill that you're setting as a special order that gives a certain status, if you will, as being a very important issue. It's going to be easier to pass that than it will be to vote to pass any type of increases in veterans' benefits, would you agree or disagree?

**Senator Williams:** I would disagree, Senator West, and here's why I would disagree.

**Senator West:** Okay.

**Senator Williams:** I would agree with you that we will be able to address and dispose of the issue of voter ID because of this rule change that I'm making. I think whether it's easier than tuition deregulation, the Children's Health Insurance Program, or a host of other issues, remains to be seen, because I've seen many big issues pass out of here 31 to nothing, where everybody, you know, there was no agreement, and then we were able to reach agreement, and I think that–

**Senator West:** Tuition deregulation–

**Senator Williams:** I think–

**Senator West:** Isn't one.

**Senator Williams:** I think to say now, that that would be easier or harder, I just, I think we don't know.

**Senator West:** Okay, maybe I shouldn't have characterized it that way. Let me put it like this. It doesn't take as many votes, would you agree that it would not take as many votes?

**Senator Williams:** Yes, Sir.

**Senator West:** Okay.

**Senator Williams:** I agree.

**Senator West:** And if it doesn't take as many votes, it appears to me that that would be synonymous with being easier, would you agree or disagree?

**Senator Williams:** I, I don't know that it would make it easier.

**Senator West:** If it doesn't require as many votes?

**Senator Williams:** No. I mean it could be that whatever the resolution to those other problems are, that we're, that we could, the votes could be very easy to get.

**Senator West:** Let's go back to tuition deregulation. Has it been easy to get the necessary votes to suspend the rules in the past in order to take up reregulating tuition in the State of Texas?

**Senator Williams:** Senator West, as I recall, I had an amendment to a bill that Senator Shapiro had last session that dealt with this issue, and we had 17 votes to adopt the amendment. And then, I think after all the process of the motions to table and all that had gone through, I had 21 or 22 votes to address the tuition deregulation, but it was in the top 10 percent bill. And I think–

**Senator West:** Well, let's set that for special order, too.

**Senator Williams:** Well, wait, wait, let, are you going to let me finish?

**Senator West:** Yes, I will. I apologize.

**Senator Williams:** Okay. That, so, what that indicates to me is that there is broad support in this body from both sides of the aisle to try to address that problem. And I think that we will and that we will satisfactory, that, satisfactorily get it resolved. The problem hasn't been that we haven't been able to get a tuition deregulation bill out of the Senate, the problem has been that we haven't been able to get it on the Governor's desk.

**Senator West:** Let me ask you this. And out of all due respect, whatever decision is made about voter ID here in the Senate, do you think it's going to pass in the House?

**Senator Williams:** I think we'll have to wait and see as we do with all issues.

**Senator West:** Okay.

**Senator Williams:** I can't speak for the House. I think it would be highly inappropriate for me, as a Member of the Senate, at this early stage of the game, to opine what our colleagues in the House might or might not do.

**Senator West:** In closing, it is your belief, and I respect your rights as a State Senator and as a friend, that this particular voter ID issue is more important than reregulating tuition, that it's more important than dealing with children's health insurance, increasing benefits of veterans, creation of jobs in the State of Texas, public school finance, and investment, because we're going to set this where it becomes a special order, and we're not setting these particular issues for special order. Thus, it gives voter ID a higher, I guess you'd say priority, I shouldn't say priority, a higher place on the agenda than the issues that we're dealing with right now.

**Senator Williams:** Senator West, I respect your opinion that you've just expressed, but I don't agree with it.

**Senator West:** Thank you very much.

### (Senator Duncan in Chair)

**Presiding Officer:** Senator Watson, for what purpose?

**Senator Watson:** Question of the author, will you yield?

**Presiding Officer:** Senator Williams.

**Senator Watson:** I want to make sure I, I'm clear of, on the way this plays out. Under the rules that we had last session, if they were to just be adopted, if a voter ID bill were to be filed, that would then be referred to a committee. Correct? The Lieutenant Governor refers that bill to a committee under the old rules?

**Senator Williams:** Yes, and presumably it'd be to State Affairs, which is where it's–

**Senator Watson:** But, but–

**Senator Williams:** Gone in the past.

**Senator Watson:** But without presuming that, the Lieutenant Governor would also be able to refer that bill to a Committee of the Whole.

**Senator Williams:** That would be his prerogative.

**Senator Watson:** So, there's nothing under our old rules, that you're seeking to amend, that would prevent the Lieutenant Governor from sending a voter ID bill to a Committee of the Whole and allowing the Committee of the Whole, the entire Senate, to participate, to discuss, to debate, to compromise, whatever needs to be done to try to reach the consensus that you referred to when you said that in previous legislative sessions, it's been referred to a Committee of the Whole.

**Senator Williams:** It's been, it hasn't been referred to a substantive committee in the past–

**Senator Watson:** But–

**Senator Williams:** This issue hasn't been.

**Senator Watson:** (inaudible, not speaking into the microphone)

**Senator Williams:** I'm sorry, I'm not sure I understand your question.

**Senator Watson:** Let me, you have given some examples during the course of the discussion today where you've indicated that your hope is that, like in past sessions, it could be sent to a Committee of a Whole where everybody will be able to participate, everybody can hear each other's discussions, and perhaps it will get to a point where, you've cited at least one example, two-thirds might be in favor of it.

**Senator Williams:** I, it'll be my hope that we could get there.

**Senator Watson:** There is nothing under the current rules that prevents the Lieutenant Governor from referring a voter ID bill to the Committee of the Whole–

**Senator Williams:** That's correct.

**Senator Watson:** Allowing that Committee of the Whole to participate in all of the discussion that you've referred to, in answering previous questions, is that correct?

**Senator Williams:** That's correct.

**Senator Watson:** The only difference, and by the way, that Committee of the Whole could vote that out with a simple majority.

**Senator Williams:** That is correct, but it could not be taken up for consideration on the floor–

**Senator Watson:**  The only difference–

**Senator Williams:**  Without suspension of the rules.

**Senator Watson:**  The, that's right. The only difference is, this new requirement that you're offering that instead of the two-thirds vote to bring it up, that simple majority then can bring it up.

**Senator Williams:**  That's correct.

**Senator Watson:**  Alright.  Thank you.

### (President in Chair)

**Senator Whitmire:**  Say, Mr. President, can I ask–(inaudible, not speaking into the microphone)

**President:**  Dean, for what purpose do you rise, Sir?

**Senator Whitmire:**  Will the gentleman yield for a quick question?

**Senator Williams:**  Of course.

**President:**  Will Senator Williams yield to–

**Senator Whitmire:**  I've heard it both ways, I think, in the, today, I've been at so many meetings, it's kind of running together, but, what was the direction that the Parliamentarian decided, or what do the rules say? If we wanted to do what you're doing, like, in April, after we give this legislative process and this body a month, two, maybe three months, to try to work out a bill on voter ID, and you know what, you know, as I've said, we're all against fraud, but what we'd like to incorporate in your proposal is voter participation. We actually got close, did we not, Senator Williams, in discussing issues related to voting that would enhance participation, like same-day registration, maybe a voting holiday? I'm outraged, in Harris County the first week of early voting only went from 8:00 to 5:00. Working people, carpenters, plumbers, people who work by the hour, cannot take off from 8:00 to 5:00, so, in my judgment, that was a disenfranchisement. Why couldn't you, because you were saying in our meetings that it takes two-thirds to change the rules, but–

**Senator Williams:**  Senator–

**Senator Whitmire:**  Didn't I hear today in–

**Senator Williams:**  We–

**Senator Whitmire:**  One meeting that we could actually do this–

**Senator Williams:**  Senator Whitmire–

**Senator Whitmire:**  With a simple majority?

**Senator Williams:**  It's all in the question that you ask. And I think the question that was presented to the Parliamentarian, which she answered, this was what I heard–

**Senator Whitmire:**  Yeah.

**Senator Williams:**  Was that how, what would it take to adopt the resolution.  And the answer is the same answer that it would be to adopt a bill or any issue, except a constitutional amendment–

**Senator Whitmire:** Yeah.

**Senator Williams:** Becomes before this body. We adopt those with a simple majority. And–

**Senator Whitmire:** Why couldn't–

**Senator Williams:** The difference is that if there were any other issues on the resolutions portion of the calendar, you would have to suspend the rule to take that rule chan– pardon me, that rule change would have to be, will, would require two-thirds rule suspension, because you would be taking the resolution out of the regular order of business, and that's presuming that, you know, we typically have 10, 12, maybe 20 resolutions, including constitutional amendments, memorializations, and all types of things that would be on the resolutions calendar at that point. And so, I think what was lost, maybe in that, is that we always adopt with a simple majority. That's not the question, the question is, what would it take to bring the matter before the body, and the answer is, that it would require two-thirds.

**Senator Whitmire:** And so, that's why you're supposedly doing this today, because you–

**Senator Williams:** Not supposing–

**Senator Whitmire:** Are threatened, you're afraid–

**Senator Williams:** But what I am doing.

**Senator Whitmire:** You're afraid that if we can't reach an agreed bill about first of April, first of May, you don't think you could make this, what I consider a very serious move, you want to go ahead and start out that way.

**Senator Williams:** I think, and I believe that every Member of this body understands that if you want to make a rule change, the time to do it is at the beginning of the session. Any time later, it will likely require a rule suspension and a two-thirds vote.

**Senator Whitmire:** Okay. Thank you.

**President:** Members, the following amendment. The Secretary will read the amendment.

**Secretary:** Floor Amendment No. 1 by Ellis.

**President:** Chair recognizes Senator Ellis to explain Floor Amendment No. 1.

**Senator Ellis:** Thank you Mr. President. As much as I think it is a mistake for us to change the tradition of the Senate of having a two-thirds vote on an issue, I'm a pretty good counter, and Senator Tommy Williams has assured me that he has his 16-plus. It appears that it is going to happen, if we were going to change the rules for what in my judgment is very partisan, divisive issue, if that is going to happen, if that is the tradition, or if the tradition is that now, in the Texas Senate, any time an issue is important enough to someone, if they cannot get 21 votes and recognize that rich tradition of the Texas Senate that's helped make us such a deliberative body, they're going to do it by 16. Clearly the people of Texas would prefer that before we get to those issues, those partisan issues, we use a simple vote, majority vote, this procedure that Senator Tommy Williams has laid out, to protect families through insurance rate

regulation and foreclosure prevention, and I want to tell you why, Members. The average cost to insure a U.S. home is approximately $729.00, according to the most recent data. Texas was the most expensive state at $1,362.00, 215 percent of the average. And that's with adjustments brought on by the 2003 legislation that did pass this body, I think unanimously, that eliminated exemptions in the insurance business. The U.S. Census Bureau's most recent Current Population Survey, CPS, reports that more than 5.9 million Texans were without health insurance during the entire 2007 calendar year, up from 5.7 million in 2006. One quarter of Texans were uninsured, the highest uninsured rate in the country. Texas' poor health insurance is stifling businesses that are needed to jumpstart our faltering economy. The average insurance premium for each employee in a business with fewer than 10 employees was almost $3,877 in 2002, but only $3,195 of companies with 50 or more employees, a difference of $682 per employee. Since 1988, inflation has risen 38 percent. Wages, Senator Williams, have risen 39 percent. Health insurance premiums have risen by 125 percent. Eighty-three percent of uninsured people in Texas work either full-time or part-time. This is a working-class, middle-class issue. On issue of foreclosures, foreclosures in our county, Harris County, Montgomery County, Fort Bend counties, shot up 21 percent to 14,538 from 11,983 in 2006. In Travis County, foreclosures were up 32.7 percent in 2008. They were up 30 percent in Williamson, 9.2 percent in Hays. It's a serious problem. The vast majority of foreclosures are homes that cost less than $200,000. Members, I would prefer that we recognize the two-thirds tradition, but if we, if this body is about to make the decision not to recognize that two-thirds tradition, in my judgment, first and foremost, you ought to pass a measure, the Governor ought to give it the emergency tag, and we ought to pass measures to protect families through insurance rate regulation and foreclosure–

**Senator Hegar:** Mr. President.

**Senator Ellis:** Prevention.

**Senator Hegar:** Mr. President.

**President:** Senator Hegar, for what purpose do you rise, Sir?

**Senator Hegar:** May I ask Senator Ellis, Senator Ellis would yield so I'd asked you a question, please?

**Senator Ellis:** Yes, Sir.

**Senator Hegar:** You and I talked earlier about insurance and insurance rate regulation. I wanted to make sure you're aware that the Texas Department of Insurance is undergoing just a little review right now called Sunset.

**Senator Ellis:** A great–

**Senator Hegar:** I've had the distinct privilege of sitting on your committee, Government Organization, and serving as your Vice-chair, which sometimes you give me some heated humor. I also learned quite a few things and enjoy being there. Don't know if I'll be in that capacity again. However, I assume you're aware that, undoubtedly, if you're in that capacity that that bill may be coming through that committee, and we're going to get to have extensive debate, not only on rate regulation, whether it's homeowners insurance or other lines of insurance, because

Texas Department of Insurance is coming under review.  We're going to have that in your committee, and we're going to have that on this floor.  Because if we don't pass that legislation, TDI wraps up in one year. So, obviously, we are going to have that debate. I can't talk about your foreclosure, because they don't handle foreclosure, and last time I checked, I don't know any of the agencies under review of the 27 that are under foreclosure, but TDI, we're going to have that extensive debate, Senator.

**Senator Ellis:**  Good point.  And, Senator, a good try. As you know, we're going to have the debate on this voter ID bill, which is–

**Senator Hegar:**  It appears that way–

**Senator Ellis:**  (inaudible, overlapping conversation)

**Senator Hegar:**  Because we're debating some of that right now.

**Senator Ellis:**  Oh, I, I shou– now I didn't–

**Senator Hegar:**  And I, and I'm–

**Senator Ellis:**  Today–

**Senator Hegar:**  Happy to debate–

**Senator Ellis:**  Today–

**Senator Hegar:**  Some of that insurance–

**Senator Ellis:**  Today–

**Senator Hegar:**  Right now, too.

**Senator Ellis:**  Today, all we're debating is whether or not we're going to change the rules, in my judgment, of the Texas Senate. Now, if you want to go to the merits of the issue, I'll give you a simple one, take credit scoring, big middle-class issue in your district and mine, in particular.  I assure you, it'll be very difficult to get 21 votes to bring up a bill that bans credit scoring.

**Senator Hegar:**  And I look forward to having that debate, which I know–

**Senator Ellis:**  It, we will have it–

**Senator Hegar:**  We are going to do that–

**Senator Ellis:**  No, no doubt about it, we'll have it, but–

**Senator Hegar:**  We're going to do that no matter what.

**Senator Ellis:**  The issue here is to pass the bill.

**Senator Hegar:**  But the good thing about–

**Senator Ellis:**  That's what Senator Tommy Williams–

**Senator Hegar:**  The insurance–

**Senator Ellis:**  Is saying, he's not saying we won't get to the vote, to debate voter ID, I assure you that bill will get filed. I'll bet it'll have a good number of Co-authors, and I assure you, it will have a hearing, a speedy hearing. What I'm saying is, out of all of the issues that are important to the people in Texas.

**Senator Hegar:**  And I cannot speak as to his resolution, because that's his.  All I can speak of is the issues that I've been working on over the interim, and one of those is the TDI and the rate regulations–

**Senator Ellis:**  You, you're talking about, you're talking about–

**Senator Hegar:**  And I can speak to that, and so that's the reason I want to point out, of all the priority issues, it is one of the ones top on the list–

**Senator Ellis:**  That's a great one.

**Senator Hegar:**  And we're going to have that priority–

**Senator Ellis:**  That's a good one, and it's going to help us–

**Senator Hegar:**  And I wanted to make sure that you remembered that–

**Senator Ellis:**  Oh, I do.  It's going to help–

**Senator Hegar:**  Right now.

**Senator Ellis:**  If that bill can come up with 16 votes, it will be a substantive bill. Here's the point, and you'll get it, there'll be other Members, there'll be other amendments coming up, Members going to offer, to help you get it. If the Texas Senate is going to change its tradition, Members, and decide to pass a bill by a majority vote instead of the two-thirds tradition, that in my judgment, has made us a more deliberative body than most state legislatures, I won't say the most deliberative in the world, some, sometimes we hear that on the floor, but clearly, I think, in my judgment, more deliberative than most state–

**Senator Hegar:**  And of course, we're–

**Senator Ellis:**  Legislatures–

**Senator Hegar:**  We're a little biased, because we're Senators here, so I don't think–

**Senator Ellis:**  I know.  But the point–

**Senator Hegar:**  (inaudible, overlapping conversation)

**Senator Ellis:**  But the point is, if I know, Senator Hegar, that I'm going to need your vote after you debate me and possibly win, most of the time, on a given issue, 10 minutes later, I will need your vote to bring a bill up, that helps me think through, if I can find some middle ground.  That's all we've been saying about this resolution, this rule change that Senator Williams has, and here's what I'm saying to you. If you or anybody else on this floor think you can go back and look in the eyes of your constituents, and say, we thought we ought to have a lower threshold to pass a bill, a very partisan bill, divisive bill, about voter identification–

**Senator Hegar:**  And that's something we're all going to have to decide on–

**Senator Ellis:**  That's right–

**Senator Hegar:**  Whether to vote on–

**Senator Ellis:**  But, but–

**Senator Hegar:**  As you have just–(inaudible, overlapping conversation)

**Senator Ellis:** But you don't think anybody else on this floor does not think that it's equally as important to have the same standards to bring up a bill to deal with families that are having problems with insurance–

**Senator Hegar:** And the beautiful thing is–

**Senator Ellis:** That's killing them.

**Senator Hegar:** That we get to have, we get to have that discussion right now–

**Senator Ellis:** You–

**Senator Hegar:** We're having that–

**Senator Ellis:** Well–

**Senator Hegar:** And I wanted to make sure–

**Senator Ellis:** So, I got your vote–(inaudible, overlapping conversation)

**Senator Hegar:** My only, my only–

**Senator Ellis:** If you got the vote–

**Senator Hegar:** My only question, I wanted to make sure you have had that knowledge–

**Senator Ellis:** You'd probably vote with–

**Senator Hegar:** Because we're going to get to work on it together, and I know you knew that, but I–

**Senator Ellis:** I know it–

**Senator Hegar:** I wanted to remind you of it.

**Senator Ellis:** I know it.

**Senator Williams:** Mr. President.

**President:** Senator.

**Senator Williams:** I move to table Floor Amendment No. 1.

**President:** Members, you've heard the motion. The Chair recognizes Senator Ellis to speak on the motion to table Floor Amendment 1.

**Senator Ellis:** Members, just vote your conscience. This issue is at least, it is at least as important as voting on a voter identification bill, and if you think that it's more important or folks in your district care more about the issue of voter identification than what we do on insurance reform in trying to do something to reduce the number of foreclosures in Texas, you vote your conscience.

**President:** Senator Gallegos, normally the, the motion that the closing argument by the sponsor of the amendment closes debate, if you wish to say something, then I've got to open it back up to Senator Williams and Senator Ellis, but–

**Senator Gallegos:** I wanted to ask a question of Senator Ellis.

**Senator Ellis:** Mr. President, I–

**President:** You want to withdraw your motion and take the question?

**Senator Ellis:**  I withdraw my motion–

**President:**  Okay.

**Senator Ellis:**  It changed quite a bit, so I withdraw my motion.

**Senator Fraser:**  Parliamentary inquiry.

**President:**  State your inquiry.

**Senator Fraser:**  Is this a debatable motion?  If, I think that he has the right to close, but is it debatable?  We have a motion before us to table.

**Senator Ellis:**  I thought he's asking a question.  I didn't think he was debating. There're no rules.

**Senator Williams:**  We're following Robert's Rules of Order.

**Senator Ellis:**  Do we need a, parliamentary inquiry, do we need a two-thirds vote on this?

**President:**  Alright, with all due respect, Senator Gallegos, we've got a motion to table by Senator Williams.  I've given Senator Ellis the opportunity to make closing arguments, the Secretary will call the roll.

**Secretary:**  Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:**  Members, there being 19 ayes and 12 nays the motion to table prevails. Floor [sic] lays out the, the following Floor Amendment No. 2 by Senator Lucio, the Secretary will read the amendment.

**Secretary:**  Floor Amendment No. 2.

**President:**  The following floor amendment by Senator Uresti.

**Secretary:**  Floor Amendment No. 2 by Uresti.

**President:**  The Chair recognizes Senator Uresti to explain Floor Amendment No. 2.

**Senator Uresti:**  Thank you Mr. President.  Members, good afternoon. Today I rise to ask that we give due respect to the service of our veterans and in support of my amendment. This amendment asks that we prioritize improving benefits for our veterans over this partisan issue. As many of you know, I enlisted in the Marine Corps right after high school at the age of 19.  I served four years active duty.  My son also enlisted in the Marines at the age of 18 and is currently serving in the Marine Corps Reserves.  Our families have answered the call that so many other Texans have as well, to serve and protect this great country of ours.  These veterans and their families have continually sacrificed on our behalf so that this body can actually be here to debate these issues today. Currently, we have 1.7 million veterans in Texas, and we're also preparing for many more to come home and hopefully soon. According to recent data, one in five veterans returning from Iraq, Members, and Afghanistan are currently unemployed.  One in five veterans returning from Iraq and Afghanistan are currently unemployed.  And one in four of those, who are employed, make $22,000 or less,

Senator Fraser. These numbers suggest that returning veterans and their families may have an especially difficult time during the current economic downturn. In addition to facing employment difficulties, there are concerns that returning troops and their families may also feel the need to cut back on mental health services. Many returning vets may not continue or sometimes cannot afford counseling services. Not three months ago, the Health and Human Services Committee, Senate committee, sat right here and heard testimony that many of our vets are not accessing mental health services for many different reasons. One, there are no services to access, or very, very few. Two, many of our servicemen and women, before they leave the military, are too concerned about having in their record, documented the fact that they have some sort of mental illness, whether it be depression, posttraumatic stress, etcetera, because they don't want that to continue on in their record book and affect them when they seek out employment. Unfortunately, though, Members, when they do return to the civil world and start to seek employment, or they start to remember some of those things that they saw in Iraq or Afghanistan, it's only then that those issues start to surface. It's only then that they realize maybe they do need to access mental health care. This is a serious situation for all Americans who need mental health care, but it is especially concerning for the veterans and their families who must cope with the invisible wounds of war, including posttraumatic stress and traumatic brain injury. Our returning warriors should not have to choose between healing the wounds of war and putting food on their families' table. We must ensure that those in need of care are able to access appropriate support easily, instead of grabbling over what has already been demonstrated as a partisan issue, and that's not a way to start this session. These men and women have fought bravely for us. We have honored many of their families on the past, this past session. Many of their families have stood before us, because they, their sons or their daughters have died, and it's the worst thing to go up and look them in the eye and see the tears in their eyes and shake their hand or give them a hug and try to understand the pain and the suffering that they're going through. They don't fight for red, they don't fight for blue, they fight for the red, white, and blue, and their sacrifice in doing so should not be dishonored by our prioritizing this partisan battle over our debt to them, and what we need to do, as a body, to take care of them. It's our turn to serve them. Let's make our veterans a top priority. With that, Mr. President, I move for adoption of Floor Amendment No. 2.

**President:** Thank you Senator Uresti. The Chair recognizes Senator Williams on Floor Amendment 2.

**Senator Williams:** Thank you Mr. President. Senator Uresti, I share your concern for the veterans that we have, who have served in past wars, as well as the veterans who are returning from the current conflicts that they're engaged in around the globe. Last session, because Senator Ogden gave me the opportunity, I had a chance to work on this very issue in the state budget, and we were successful in increasing funding for the programs that the state funds for veterans. I will continue to work with you to try to resolve these issues and to make sure that our veterans have the help that they need and deserve when they return, and that they have the opportunity to avail themselves of every state and federal program that might help them meet their very serious needs. Having said that, I respectfully move to table Floor Amendment No. 2.

**President:** Senator Uresti, would you like a motion to close on the motion?

**Senator Uresti:** If I may, Mr. President.

**President:** You're recognized.

**Senator Uresti:** Thank you Mr. President. Members, this is an issue that can't wait. If we were to poll these veterans and ask them what's more important, the voter ID bill or getting more health care, mental health care, to our veterans and to their families, it would far exceed 72 percent. I ask you to support my amendment. Thank you.

**President:** Thank you Senator. Members, you've heard the motion by Senator Williams to table, you've heard the closing comments by Senator Uresti. I'm sorry, Senator Hinojosa, but the, pardon me, Sir, the Secretary will call the roll.

**Secretary:** Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:** Members, there being 19 ayes and 12 nays, the motion to table prevails. The following floor amendment, Floor Amendment No. 3 by Senator Lucio, the Secretary will read the amendment.

**Secretary:** Floor Amendment No. 3 by Lucio.

**President:** Chair recognizes Senator Lucio to explain Floor Amendment 3.

**Senator Lucio:** Thank you Mr. President. Senator Williams, Members, Texas is expected to lose 111,000 jobs in the year 2009, the year of our Lord. And I, you know, one of the things that concerns me the most, Senator, is the fact that the Valley has been either double the state and triple the national average, has gotten better, but I'm wondering where we're going here, so this is a major, major issue for, for us, and it should be for the whole state. I believe we need to focus on creating jobs and helping Texans get back to work through two things:  number one, retraining workers from declining industries and, number two, investing in the creating, in creating the jobs in our growing green economy. I also want to add that Texas only has enough unemployment insurance reserves to pay for less than six months of benefits. If nothing is done, the unemployment fund is projected to be below the floor at 145 billion by September if no federal funding is received. Lastly, and significantly, if the fund goes under the floor, the funding drawn from the Unemployment Insurance Fund from the Governor's Enterprise Fund, and the Skills Development Fund ceases. That is a great concern of mine, and I would like to move adoption of Amendment No. 3 at this time.

**President:** Senator Ogden, for what purpose do you rise, Sir? The, the Chair recognizes Senator Williams to speak on Floor Amendment No. 3.

**Senator Williams:** Thank you Mr. President. Senator Lucio, I look forward to working with you. We've worked together on these issues when I was a Member of the Business and Commerce Committee, sat alongside you, and we tried to address many of these issues. I, too, share your concern about the fiscal soundness of our state

unemployment fund, and I think that we will have an opportunity to appropriately address that in the Senate Finance Committee. And you and I are there together, and we can look at that and hopefully come up with a solution that is satisfactory to both of us. I do feel like it's important to note that while the future is somewhat uncertain with the job market in Texas, we're fortunate because of the hard-working people in Texas and the fact that the Legislature has stayed out of the way in giving them an opportunity to do what they do best, and that's work and create jobs and create wealth, that we have added 221,000 jobs in the past 12 months during the period that the entire United States lost 1.9 million jobs. So, we've been very blessed. I don't think that we should rest on our laurels, or that we should take anything for granted, and that we need to look at that. With respect to how that might affect your particular area of the state, which you brought that up, the Valley–I think you know, because I've mentioned to you many times, I've a really warm spot in my heart for the Valley, because I met my wife in McAllen, Texas–and I'm always interested in what I can do to keep that important part of our state a vital economic part of the entire state. We've worked together before. We'll continue to do that. Respectfully, I move to table Floor Amendment No. 3.

**President:** Members, Senator Williams moves to table Floor Amendment No. 3. The Chair recognizes Senator Lucio to close.

**Senator Lucio:** Thank you Mr. President. Senator, Members, I got here in 1990, '91, never in my entire years in the Texas Senate have I tried to be disrespectful, have been disrespectful. I think Senator Harris and I had a squabble one time, but we became best friends. This is in no way, my amendment, to show disrespect to you and what you're trying to do and the work that you've done. It's merely setting priorities, you know, priorities that are extremely important to us, not only in South Texas but throughout the state. Everywhere I travel people talk about the economy, about jobs, about wanting to balance their checkbook. Secondly, I held, you know, was responsible for various public meetings around my district in five counties. Never was the issue of voter ID ever a top issue. As a matter of fact, I don't remember discussing it, period. No one brought it to my attention. So, it wasn't a top priority. That's why, when you mention, I respectfully disagree, that when you mention that this would be the most important issue, maybe that we would take up and consider, maybe I heard that wrong. You know, I've lost a little bit of hearing, but I, I thought you said something to that effect at the beginning. I just wanted to let you know that there are people, even in your district, Senator, in my district as well, who went through two hurricanes, Hurricane Dolly, Hurricane Ike, who would really want us to spend time addressing their issues, especially at the very beginning of the session, which really goes by pretty quick, 140 days is not that long. And I would want us to focus on them as well. That's what we should be talking about here. But again, I, I'm glad to be part of the process and be able to discuss with you some of the priorities I believe are important to, not only in my area but to the state as well. Thank you, Mr. President and Members.

**President:** Thank you Senator Lucio. Members, you've heard the motion by Senator Williams, the Secretary will call the roll.

**Secretary:** Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:** Members, there being 19 ayes and 12 nays, the motion to table prevails. Chair lays out Floor Amendment No. 4 by Senator Watson.

**Senator Watson:** Thank you Mr. President.

**President:** The Secretary will read the amendment.

**Secretary:** Floor Amendment No. 4 by Watson.

**President:** Chair recognizes Senator Watson.

**Senator Watson:** Thank you Mr. President. Members, I, too, strongly favor preservation of the two-thirds rule as it applied in the last session of the Legislature in our rules. But if we're going to have what I consider to be a proposed corruption of that historic two-thirds rule, where we're going to create a special class of bills where the normal rules don't apply–and as it's been pointed out during the floor discussion and question and answer period, there is nothing that prevents a voter ID bill from being referred by the Lieutenant Governor to a Committee of the Whole so that that sort of work that is being argued needs to occur, can occur–but if we want to create a special class for bills such as that, I believe that it's important for us to create a special class of bills that would focus on the full funding of our Children's Health Insurance Program and make the appropriate priority out of the Children's Health Insurance Program that it deserves to be.  This is more than just a moral issue, although Texas has the biggest percentage of uninsured kids in the country. And it's more than a fiscal issue, though the number of uninsured who show up for treatment in our emergency rooms is surely a needlessly expensive problem. In addition to that, it's also an economic development issue at a time when we need to be in a position of stimulating the economy on behalf of Texas citizens. It affects the ordinary citizens, ordinary Texans, who face the fifth highest health care premiums in the country. It affects small businesses, 70 percent of all employers, about seven out of eight Texans who work for small businesses. Our neighborhood stores, our restaurants, our garages, our pharmacies, and everything else, can't afford to even find, be able to find health insurance, and it affects the state budget and the budgets of our local jurisdictions. As you all know, for every $1.00 the state puts up, we get back over $2.50 in funds through the federal program. We take that combined money and we put it into the economy, and it spurs about $7.00, so a seven for one return on our economic investment. Yet, over about a five-year period, Texas has turned its back on nearly a billion dollars in federal matching funds, money paid by Texas taxpayers that the federal government was ready and wanted to give back to us. That money would have paid not only for healthier kids but it would have gone to small businesses like doctor's offices, hospitals, and health care clinics, and made a difference for those businesses in Texas. So, while we need to look at health insurance generally, specifically, by making sure we focus more on making things easier for insurers than customers, we also have to make a commitment to funding our Children's Health Insurance Program. Now, I know I need to make a motion, before I do, I want to read

two quotes from the Code Red report, which is essentially a study that was done by a range of nonpartisan experts about how to improve health care in Texas. It said two things. One, they said, the long-term economic vitality and security of Texas depends on the health of its children and their parents who must learn and be prepared to join the workforce. They also said, Texas should continue its effort to obtain additional federal funds in support of health care and prevention. Texas leadership should strongly support and expand the Children's Health Insurance Program to provide insurance coverage for children and their mothers. With that, Members, I move that we amend the resolution along the floor in line with what we've put forward in Floor Amendment No. 4 to clarify that if the Senate is going to change its commitment to bipartisanship, cooperation, and harmony, it will do so only for a critical policy issue that protects kids, helps the middle class, and shores up our economy, and that's by insuring full funding for the Children's Health Insurance Program. Mr. President, I move passage of Amendment No. 4.

**Senator West:** Mr. President, question.

**President:** Thank you Senator. Senator West, for what purpose do you rise, Sir?

**Senator West:** Question of the author.

**President:** Will Senator Watson–

**Senator Watson:** I will yield.

**Senator West:** Senator Watson, I just want to make sure I understand this. You're saying that you want to create a special order for these type, your amendment creates a special order for Children's Health Insurance Programs?

**Senator Watson:** What I'm saying is, I prefer to have the two-thirds rule stay in place the way it was–

**Senator West:** Right.

**Senator Watson:** But if we're going to create a special class of legislation, I believe that that's what the special class ought to be, the children of the State of Texas.

**Senator West:** Okay. Over voter ID?

**Senator Watson:** I would put it over voter ID, yes, that's what this amendment would do.

**Senator West:** Is there any empirical data that you know of, that I, you may have already quoted some, that says that we have a Herculean problem with insuring our kids in the State of Texas?

**Senator Watson:** Yes. Since I've, I've indicated, first of all, we have a problem in that we're the largest, we have the largest number of uninsured children in the nation. Our small businesses, seven out of, they're having great trouble finding insurance, and what it means is that property taxes in local communities are going up, because when we don't fully fund the Children's Health Insurance Program, those kids still show up at the local health care clinics, the local hospitals, and they're taken care of. That money that they, that must be paid for, and typically, where that comes from is local jurisdictions having to raise their property taxes because we've made the decision that

our children are not a priority. And what this amendment would do, it would say is, if we're going to start violating the traditional two-thirds rule, to create a special class of legislation, our priority ought to be children.

**Senator West:** So, help me with this, because, you know, I, make sure I understand this. If we, if your amendment is tabled, it's going to make it more difficult to pass legislation addressing that issue than it would be to pass legislation dealing with voter ID.  Is that correct?

**Senator Watson:** Yes, I believe that is correct, because what it would do, is it would say that we, this Senate places a higher priority on something, partisan issue like voter ID, where it would only require 16 to bring it up to the floor as opposed to two-thirds to bring it up to the floor for things such as the full funding of the Children's Health Insurance Program.

**Senator West:** So, tabling it or not passing it, says that the Senate puts a higher priority on passing a partisan issue as opposed to an issue dealing with our children?

**Senator Watson:** I believe that's correct.

**Senator West:** I just want to make sure I understood that.

**President:** Senator Gallegos, for what purpose do you rise, Sir?

**Senator Gallegos:** Question of the author.

**President:** Will Senator Watson yield?

**Senator Watson:** I will.

**Senator Gallegos:** Senator Watson, I just heard what you told Senator West.  Let me make this clear on this amendment that the full funding of this is children across the state?

**Senator Watson:** Yes.

**Senator Gallegos:** So every part of the state, including Senator Williams' district, the children in his district would–

**Senator Watson:** Yes.

**Senator Gallegos:** Would be affected by this amendment?

**Senator Watson:** Yes.

**Senator Gallegos:** Is that correct?

**Senator Watson:** That is correct.

**Senator Gallegos:** Okay, so you're saying, outside of the other amendments that have been offered, that those, I think that, and I couldn't ask Senator Ellis that question, but I'm going to ask you, so you would, in the amendments that have been offered, would you agree with me that those amendments are really the issues that Texans want to hear and want, want to resolve in this session?  Would you agree with me that?

**Senator Watson:** I believe that Texans would place a higher priority on the issues that have been raised in the previous three amendments and this fourth amendment than they would on voter ID.

**Senator Gallegos:** So, the issue, dealing not only with your amendment but the veterans issue, and Senator Ellis' issue, would you agree with me that those issues in polling and what Texans are saying out there, not only in Texas but across this country, as was seen on the nationwide election, obviously the economy, the economy is the number one issue. We have Texans, Texans are affected by the economy, is that not true, Senator Watson?

**Senator Watson:** Texans are now facing rougher times in the economy, and they're expecting that what we will do is place a priority on their needs and their economic needs, as opposed to voting on and creating a special class, an elevated class, if you will, of special bills related to purely partisan issues such as redistricting, which this resolution had yesterday, just yesterday, and voter ID.

**Senator Gallegos:** So, you would agree with me that the economy, benefits for veterans that are dying over in Iraq and Afghanistan, that are fighting this war for us, and in children's health care, and plus the insurance amendment that Senator Ellis, those are the real issues that Texans want to hear about here at the beginning of this session. Would you not agree with me on that?

**Senator Watson:** I believe we should place a priority on them, yes, Senator Gallegos.

**Senator Gallegos:** And there's several other issues that we need to, and I respect Senator Williams bringing out–

**Senator Watson:** So do I.

**Senator Gallegos:** That's his right to bring out a resolution on this. But I also think that if he's got the right to bring out a resolution on voter ID, I think every one of those amendments that were offered have the right to deal with the real issues that Texans want to hear about here at the beginning of this session, not an issue on voter ID. We have plenty of time to debate that issue. But I think your, especially with the children of the State of Texas, that your issue is just as important or about even more important than voter ID and a lot of other issues. Would you agree with me on that?

**Senator Watson:** I do, and that's why I filed it.

**Senator Gallegos:** Senator Watson, I think that your amendment dealing with Texas children across this state is a very good amendment, and I vote with you.

**Senator Watson:** Thank you, Sir.

**President:** Senator Averitt, for what purpose do you rise, Sir?

**Senator Averitt:** To ask Senator Williams a question at the appropriate time?

**President:** You're recognized.

**Senator Averitt:** Thank you Mr. President. Senator–

**President:** Will–

**Senator Watson:** I'd be happy to let him ask whatever–

**President:** Will Senator Watson yield to Senator–

**Senator Watson:** Absolutely.

**President:** Alright.

**Senator Averitt:** Thank you Mr. President. Thank you Senator Watson.

**Senator Watson:** Sure.

**Senator Averitt:** Of course, I share your concerns, Senator Watson, on this particular issue and many of the other issues that we've talked about today. I carried that legislation, and I fight those battles in the Finance Committee, very important issues, of course. Senator Williams, have we ever had a problem getting those important issues that have been discussed here today to the floor of the Senate for debate?

**Senator Williams:** Never.

**Senator Averitt:** So, really, we're not talking about squashing these issues, we're talking about, those issues will be taken up in due course, as we always take them up, when we have our normal course of debate on these issues.

**Senator Williams:** They do, and we come to a resolution every session, and we have worked together on this particular issue in the Senate Finance Committee along with Members of both sides of the aisle, I don't–

**Senator Averitt:** And right here on the Senate floor as well.

**Senator Williams:** On the Senate floor as well, you're absolutely right.

**Senator Averitt:** Thank you.

**Senator Williams:** Thank you.

**President:** The Chair recognizes Senator Williams on Floor Amendment No. 4.

**Senator Williams:** I respectfully move to table Floor Amendment No. 4.

**President:** The Chair recognizes Senator Watson.

**Senator Watson:** Thank you Mr. President. Members, as Senator Averitt asked those questions, it reminds me time, again and again that, yes, these issues can and will be debated. They can and will be debated if we are able to develop the coalitions and bring them forward in a way that puts the coalition, can and should put the coalitions together to pass this legislation. The issue here, however, is that we are being asked to vote on establishing priorities with this resolution on the rules. This resolution says that as a matter of priority we are going to create a special class of legislation, and that special class of legislation deals with one issue, and that is a partisan issue that could be referred to the full Senate anyway for debate, discussion, compromise, and coalition building. And what I'm saying is, that as a matter of priority, if we are going to change our rules and create a special class, that special class ought to be the children of the State of Texas. I move, I ask you to vote against tabling this amendment.

**President:** Thank you Senator Watson. Members, you've heard the motion by Senator Williams, the response by Senator Watson. The Secretary will call the roll.

**Secretary:** Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:** Members, there being 19 ayes and 12 nays, the motion to table prevails. The following Floor Amendment No. 5 by Senator Van de Putte, the Secretary will read the amendment.

**Secretary:** Floor Amendment No. 5 by Van de Putte.

**President:** The Chair recognizes Senator Van de Putte to explain Floor Amendment No. 5.

**Senator Van de Putte:** Thank you Mr. President. Mr. President and Members, this amendment asks that we put into a special order and prioritize the education of our Texas children over this poison partisan battle. At a time when our school districts have seen rising fuel costs, rising utility costs, increase in insurance rates, and a growing number of children enrolled in our schools, this amendment puts increasing public school investments and resulting property tax relief in that special category. You know our business leaders have come to us and talked to us about an unprepared workforce. And we know that in the toughest of times we depend on Texas' workforce. We want to make sure that the graduates of our public school system meet the challenges and have the skill sets to either enter the job market, go on to community college or technical schools, or enter our four-year universities. At a time when we're seeing the most severe meltdown in the U.S. economy, workforce needs and public education should be our priorities. Members, we have close to four, well really, absolutely more than 4.6 million schoolchildren. We know that we have over 1,200 school districts and campuses, those charter schools as well. You need to think about our schools, the different campuses, there are 8,000 of those with more than half of our public school students being classified as economically disadvantaged. What this means, Members, is that we prioritize the future of Texas and public education as one, as being more important than a voter ID bill. And, yes, I know that the intent is just to get past this bridge. You've tried so many times before, and I say you as a collective body. Those folks who want voter ID have tried over and over again. So, this is just a change in the rules to let it happen. Well, I think Texas schoolchildren deserve to let it happen. Nothing prevents us from debating more resources into our public schools, and in fact, all of you have heard from your school superintendents. When schools are forced to cut campuses, fire teachers, eliminate efficient programs, then we have not done our job by increasing the investment in our public schools. We have over 300,000 school teachers and close to 20,000 administrators and diagnosticians. Those professionals that guide the future of Texas deserve a priority. They deserve to be special, too. And so, Members, I am asking with this amendment that we put the needs of our growing workforce, by investing in Texas public schools, at a higher priority than a voter ID bill. Members, I ask that you look favorably on Floor Amendment No. 5.

**President:** Thank you Senator Van De Putte. The Chair recognizes Senator Williams on Floor Amendment No. 5.

**Senator Williams:** Thank you Mr. President. Senator, I appreciate, more than you may ever know, your passion for the children of our state and for public education. And it has been so wonderful to sit beside you in the Public Education Committee and work on these issues side by side. And I believe that we have successfully brought these issues to the floor for consideration time and time again. And with that, I would respectfully move to table Floor Amendment No. 5.

**President:** The Chair recognizes Senator Van de Putte to close.

**Senator Van de Putte:** Thank you Mr. President. Mr. President and Members, I love being on the Senate Education Committee and working with our Chair, Florence Shapiro. And I have had the honor of being on that committee since 1999. In fact, Florence and I have often joked that we have been in so many drop-out taskforces, that we ourselves were dropping out of the drop-out taskforce. There were so many, session after session after session. But, Members, it only seems, if we reflect on past history, that we put investments into our public school system when we are forced to because of a judge's orders or because of looming shutdown in our public school system. Prioritizing school children would give us the opportunity to be proactive, to give schools what they need, to get rid of the things that everyone is talking about now, called the target revenue, to allow us to invest in our schools, to make sure that it's easier to do that than to have voter ID. I enjoy working with all of the Senators on public school finance, and I ask that you vote no on the motion to table. Please put the investments in our public schools above a partisan issue.

**President:** The Chair recognizes Senator Williams on Floor Amendment No. 5. I'm sorry, I was doing something else. Thank you, Senator–

**Senator Van de Putte:** Thank you.

**President:** Senator Van de Putte. Senator Williams moves to table. Senator Van de Putte has closed. The Secretary will call the roll.

**Secretary:** Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Frazer, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:** There being 19 ayes and 12 nays, the motion to table prevails.

**Senator Van de Putte:** Thank you Mr. President.

**President:** Thank you Senator Van de Putte. The following Floor Amendment No. 6 by Senator West. The Secretary will read the amendment.

**Secretary:** Floor Amendment No. 6 by West.

**President:** The Chair recognizes Senator West to explain Floor Amendment No. 6.

**Senator West:** Thank you very much Mr. President. Members, do you believe that one of the most important priorities, while Texas, is whether one presents an ID to vote, then you must agree that our working families are at least as interested in the rising cost of college tuition. Is there anyone on this floor that has had to deal with the issue of rising tuition? If you have not had to deal with that, I want you to stand up. So, everybody sitting down has had to deal with the issue of rising tuition. And so,

you should be very interested in this particular amendment. This particular amendment will put dealing with rising tuition, reregulating tuition, on the same footing as voter ID. Now, I know that, based on some of the prior votes today, that it's been tabled. I know that. And I know that it's been done along partisan lines. I would ask you to send a message today about reregulating tuition. I'd ask you to just kind of think about the cost of tuition today. Senator Hinojosa, the increase since, I think 2003, has been about 53 percent. So, as of this evening, if news accounts portray the Senate and deal with this particular issue, and as families are gathered around the television, gathered around, they're probably gathered around the computers right now watching this, gathered around the kitchen table, trying to determine how to afford an education, a college education, let's not send a message that voter ID is more important than financing higher education in the State of Texas for our children. You see, all of us recognize that based on statistics, empirical data, evidence that the U.S. Department of Education Advisory Committee on Student Financial Assistance estimated that the, in the first half of this century, financial barriers will keep nearly two million low- and middle-income college qualified high school graduates from attending college. And according to the U.S. Department of Education, only 36 percent of college qualified low-income students complete their baccalaureate degree within eight and one-half years.  They're not on time compared to 81 percent of high-income students. Now, when you look at the State of Texas, when you look at the State of Texas and look at what our institutions of higher education have had to do, at UT-Dallas, Senator Shapiro, 101 percent increase during this time period of 2003 to present. When you look at Texas A&M, around a 70 percent increase. UT-Austin has had an increase. Texas Tech has had an increase. Texas State has also had an increase. So, the question is, over from 2003, so, the question becomes one of whether or not this should be a special order that's given more priority, or equal priority, as that of voter ID. Now, is this an intractable issue, as defined by my esteemed colleague? No. It's not intractable based on partisanship. But it has been intractable over the last three sessions. I can recall Senator Tommy Williams and myself going over to the UT Board of Regents to discuss this issue with them, and we were not able to get anywhere with it. I can recall us trying to get something done in the legislative body and were not able to get anything done. That's intractable as I define it. So, I would ask for a vote on this issue. I would ask for us to send a message to Texans that we're going to create a special class. We're going to create a special class–each and every one of us always campaigns on education–what we're going to do in order to make Texas the number one state as it relates to education. Well, this is an opportunity to lower the barrier, in terms of the requirements for the number of votes, in order to effectively do something about reregulating tuition. The fact is, I want to remind you, that if this particular rule passes, you will only need 16 votes in order to pass voter ID. But if this amendment doesn't pass, you're still going to need to suspend the two-thirds rule. So, the question is, what message do we want to send to Main Street America, Main Street Texas, as this evening they're sitting around their television, listening to the news about what we have done here in Austin on the early days of this session. I'll leave it up to your discretion.

**Senator Hinojosa:**  Mr. President.

**President:**  Senator Hinojosa, for what purpose do you rise, Sir?

**Senator Hinojosa:**  Will Senator West yield?

**Senator West:**  I shall.

**President:**  Will Senator West–

**Senator West:**  Yes, Sir.

**Senator Hinojosa:**  You know, Senator West, as I was listening to your remarks, you know, I voted against deregulation. I think that we're pricing a lot of students out of a college education. And I always saw that as a backdoor tax on students and families with students in college. But why I think it's happening, also on the part of the State of Texas, we have not met our responsibilities in funding higher education adequately.

**Senator West:**  That's correct.

**Senator Hinojosa:**  But were you aware that, you stated that tuition has increased by 53 percent?

**Senator West:**  Fifty-three percent.

**Senator Hinojosa:**  Since the year 2003?

**Senator West:**  Since 2003.

**Senator Hinojosa:**  And do you know–

**Senator West:**  Let me say, let me say that again, 53 percent.

**Senator Hinojosa:**  And do you know that the Consumer Price Index increased only 12 percent?

**Senator West:**  No, I did not know that.

**Senator Hinojosa:**  Twelve percent. Were you also aware that tuition is going up higher than health, than health cost, health care cost?

**Senator West:**  No, I didn't know that, Sir.

**Senator Hinojosa:**  And one of the things that I always argue with and tell people is that a college education is very good for the State of Texas, for the economy, keeps us competitive. But tuition is hurting many of our students, that now, when they graduate from college, the average salary is 30,000, but they owe about 20,000-plus dollars, plus interest.

**Senator West:**  Is that right? We heard Senator Hinojosa, we had a special hearing this summer, Higher Education, and we had Billy Hamilton, who used to be with the Comptroller's Office, telling us about the increase in tuition and fees for kids that are born today. There's something about like $50,000. But we're talking about putting voter ID ahead of that particular issue, making it easier to pass a voter ID bill than dealing with issues concerning making it affordable for our kids to get an education.

**Senator Hinojosa:**  And you know, education is the best equalizer that we have in our society. But at the same time we increase tuition, increases in financial aid are not keeping up with the increases. Were you aware of that?

**Senator West:**  No, Sir, I was not.

**Senator Hinojosa:** And would you agree that education is one of the top priorities in our state?

**Senator West:** I would say that getting a college education is, according to the U.S. Census Bureau, they said over a lifetime, an individual with a baccalaureate degree will earn an average of $2.1 million, maybe twice that, as a worker with only a high school degree. And so, what that tells me is that, in order for Texas, Senator Hinojosa, in answering your question–I'm also told by the year 2040, well, the data, the data center projects that the Texas population will increase by 71.5 percent, some 14.9 million people between the years 2000 and 2040–which means we're going to have about 40 million people, and 80 percent of that growth is going to be coming in the Hispanic population. And about, by 2040, two-thirds of all students in our public school system will, in fact, be Hispanic. Here's another interesting statistic. By age 25 to 29, every 100 Anglos obtain a baccalaureate degree, compared to 17 out of every 100 African Americans, and just 11 out of every Latino, 100 Latinos. So, the question is, is that more of an important issue than dealing with voter ID? And I mean, that's the issue.

**Senator Hinojosa:** And do you know that when this bill, tuition deregulation, was brought to the Senate floor, it was blocked for debate by one vote?

**Senator West:** No, I didn't.

**Senator Hinojosa:** By one vote.

**Senator West:** One vote.

**Senator Hinojosa:** So, that means that this type of issue is such a priority, that I think you have a good amendment and that it ought to be set as a special order in this resolution.

**Senator West:** Thank you, Sir.

**Senator Hinojosa:** Thank you.

**President:** The Chair recognizes Senator Williams.

**Senator Williams:** Thank you Mr. President. Members, everyone knows that this is a pet peeve of mine, what's happened with tuition deregulation. We also have been able to get this issue to the floor. I understand what Senator Hinojosa's saying about the, the bill, but we did get an opportunity to vote on this last session through an amendment that I offered. Our problem in this body has not been that we couldn't bring the issue to the floor and deal with the issue and bring it to resolution. The problem is that we haven't been able to get a bill on the Governor's desk. And so, with that, I would respectfully move to table Floor Amendment No. 6.

**President:** The Chair recognizes Senator West to close on Floor Amendment 6.

**Senator West:** Thank you very much Mr. President. Members, my esteemed deskmate has basically said earlier on that, as it relates to voter ID, that hereto before, one of the reasons that he's bringing the bill is to make certain that we don't have to use any type of trickery or parliamentary maneuvers in order to try to get it to the floor. Well, the reality is, is that when that vote came up last session, it was an amendment. Did we get an opportunity when the vote came up concerning tuition

deregulation? It was an amendment. Did we get the opportunity to debate it? Yes. Did it pass? No. The analysis of what we're about to do is real simple. If we pass this bill, it's going to be, the, the rule changes. It's going to be easier to, yes, bring it to the floor, and also, to pass voter ID. So, why should we make it easier to pass voter ID, debate it and pass it, and not make it just as easy for these other classes of bills that some of my colleagues have decided not to consider? I'll leave it up to you. Each and every one of you have constituents back home that have to deal with the issue of tuition increase. And if you want to vote today, to tell them that voter ID, consideration of voter ID, making it easier to pass voter ID, to debate it and pass it is more important than dealing with the issue of rising tuition, you have the right to do it. I'm asking you to oppose this particular motion to table.

**President:** Thank you Senator West. Members, you've heard the motion by Senator Williams. The Secretary will call the roll.

**Secretary:** Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:** Members, there being 19 ayes and 12 nays, the motion to table prevails. Members, if there're no additional amendments, I'm going to recognize Senator–

**Senator Shapleigh:** Parliamentary inquiry, Mr. President.

**President:** Senator Shapleigh, state your inquiry.

**Senator Shapleigh:** Now, I believe yesterday, we did pass a Senate Resolution, for the purpose of naming the different employees of the Senate, Secretary of the Senate, Calendar Clerk, the Doorkeeper. Am I correct?

**President:** Yes, Sir. That was the caucus resolution, and yes, Sir, we did.

**Senator Shapleigh:** And on page 2 of that resolution, we created the Administration Committee. Am I correct?

**President:** Senator Shapleigh, we don't have that, that resolution in front of us. If you have a copy, we'll be glad to take a look.

**Senator Shapleigh:** I do and I'll be glad to read it to help jet the process forward: Duties of the Administration Committee, page 2, Section 5. In addition to the duties of the Administration Committee, expressly imposed by this resolution, the committee shall take actions necessary to ensure that the administrative operations of the Senate comply with the applicable law and are conducted effectively and efficiently. Is that the way the Chair, the President reads that section of the resolution passed?

**President:** If you give me just a moment, I'm taking a look at it, please. (Pause) Senator Shapleigh, your reading of the paragraph is correct.

**Senator Shapleigh:** Now, despite the fact that we do have committee, at least this–

**President:** No, Sir, we don't have a committee.

**Senator Shapleigh:** This committee–

**President:**  No, Sir, we don't have it.

**Senator Shapleigh:**  Whatever we're calling the Administration Committee.

**President:**  Well, I understand that, but we haven't created it yet. We don't create it until we pass the rules, Sir.

**Senator Shapleigh:**  I understand. Do we have any rules yet?

**President:**  Well, the rules, Sir, are what we're debating now.

**Senator Shapleigh:**  So–

**President:**  Your rules, the Senate Rules have not yet been passed.

**Senator Shapleigh:**  Except for this resolution.

**President:**  That resolution was passed yesterday, but in consultation with the Parliamentarian, that committee has yet to be formed.

**Senator Shapleigh:**  So, what we're calling an administrative committee didn't exist under the rules, even though we have it in this resolution and are calling it administrative committee.

**President:**  I'm advised that the way that that has been drafted, historically, is to reflect the expectation that an administrative committee will be formed. But the forming of the committee doesn't occur until we pass whatever rules you all agree on, and that's what we've been debating today, Sir.

**Senator Shapleigh:**  And I'm correct in stating that this resolution was never referred to an Administration Committee. Is that correct?

**President:**  If you would, ask your question again, because there's been no referral to the Administration Committee, because the Administration Committee hasn't been established yet, until the Senate Rules are passed.

**Senator Shapleigh:**  So, I'm correct in saying it has not been referred?

**President:**  You're correct in saying it has not been referred.

**Senator Shapleigh:**  Now, let me ask this question, is the Lieutenant Governor a Member of the legislative body or the executive body?

**President:**  I refer you to the State Constitution.

**Senator Shapleigh:**  So, the answer is, under Article 4, the Lieutenant Governor is a Member of the executive body. Am I correct?  (inaudible, background conversation)

**President:**  Perhaps we can make this a little clearer. Parliamentary inquiries, according to established parliamentary laws, deal with current business. And your inquiry as to whether or not the Lieutenant Governor is a Member of the Senate or Member of the executive branch, it's clear in the Constitution that the Lieutenant Governor is constitutionally the President and the Presiding Officer of the Senate.

**Senator Shapleigh:**  Okay. Let me ask this question. If we don't have any rules, my read is that all of your powers, without the rules, are in Article 16, Section (b). Am I correct in saying that?

**President:** Senator Shapleigh, I don't want to debate you on what the rules of the Lieutenant Governor are. We can sit down and discuss that at some other time. What is your parliamentary inquiry, Sir?

**Senator Shapleigh:** Here is my parliamentary inquiry. My belief is that absent rules, we're under the Constitution. And my belief in reading of the Constitution, is that the sum total of your powers to conduct this meeting are in Article 16, Section (b). You can, when we are in a Committee of the Whole, debate and vote. And when we are equally divided, the Lieutenant Governor can cast a vote. But to have and rule on issues as the President has done, under Rule 1.01, deciding other questions here before the Senate is expressly a power granted in the Senate Rules from the 80th session. So, if you don't have those powers, then this hearing has been conducted, this proceeding has been ongoing without your power to make those rulings. And I would at this time, raise a point of order to further consideration of this measure, this resolution, until we have formed ourselves under the Senate Rules and created a set of rules, so that at the end of the day, we can follow the Constitution of the State of Texas.

**President:** Senator Shapleigh, we'll stand At Ease for a few minutes while you put that point of order in writing, so I can consider it.

**Senator Shapleigh:** Thank you. I'll be glad to.

**President:** We'll stand At Ease for about five minutes. Senators, the Dean has asked, instead of standing At Ease for five minutes, if we take a recess until, alright, for 20 minutes, until 10 after. Okay. If there's no objection, the Senate will stand in recess until 4:10.

**(Recess)**
**(After Recess)**

**President:** Members, the Senate was, will come to order. Before we stood in recess, we had a point of order that was raised by our friend, Senator Shapleigh. And after consultation, Senator Shapleigh, giving your, your point of order in writing a lot of consideration, the Texas Constitution, Article 4, Section 16(b), clearly makes the Lieutenant Governor, elected among the people of the State of Texas, the President of the Senate. Accordingly, the Presiding Officer has the duty and the right to rule on points of order and conduct the business of the body in an orderly fashion. You have talked about the rules, we've discussed it, we've thought about it more, but you've, we have discussed earlier on an earlier parliamentary inquiry, the status of the rules from the 80th Legislature. And I ruled that they're a guide and should be followed whenever applicable. I have, in my three regular sessions here, I have never seen the Senate, as a body, ever refer the proposed rules to committee. I've consulted, I've consulted with the Parliamentarian. She has not, I have not had a chance to ask every Member here their experience, but the President Pro Tem, Senator Duncan, advises me that in his 18 years, he hasn't seen that procedure. They also, to the extent that the rules of the 80th are a guide to be followed, whenever practical, whenever possible, the rules say, your rules, Senate Rules of the 80th, under Rule 1.01, the Lieutenant Governor shall by the Constitution be President of the Senate. Specifically, your rules

call the Lieutenant Governor the Presiding Officer of the Senate and, quote, decide all questions of order, subject to appeal by any Member, end of quote. Respectfully, I'm going to have to overrule your point of order, Sir.

**Senator Shapleigh:** Mr. President, I appreciate your due consideration of the point of order.

**President:** Thank you for your graciousness, Sir. Members, the question before us is on the adoption of the resolution. Do we have Members who want to, wish to, speak for or against? Senator Williams, do you want to close at the end, or do you want to speak first, Sir? Alright, you want to close at the end. Senator Watson, you're recognized to speak on the resolution, Sir.

**Senator Watson:** Thank you Mr. President. Members, it's been a long day. I appreciate this body more than you'll ever know and the way it goes about its business. But let's take a step back for just a minute. This whole big fight is over, really, a procedure, a technical maneuver, a technical matter. In other words, it's really, it's a really complicated thing that I think most folks find rather boring. So, if you don't serve in the Texas Senate, if you're just a, a Texan who's interested in this, you're going to go to a computer, and you'll pull up Google, and you'll type in Texas Senate two-thirds rule. And the very first thing that will come up is a page from our own Legislative Reference Library Website. And here's what that page, our official government explanation about what we do says, quote, though it has been set aside on rare occasions, this practice known as the two-thirds rule has been an honored tradition in the Senate. Among other things, it is generally acknowledged that the Senate's two-thirds rule fosters civility, a willingness to compromise, and a spirit of bipartisanship, close quote. Before we vote, and certainly before we leave here, we need to figure out what that next sentence will be. We should think about what the history books are going to say about what's going to happen today. In my view, the proposed corruption of the historic two-thirds rule would create a special class of bills, a special class of bills that the normal rules don't apply to. As has been pointed out today, if a partisan bill, such as a redistricting bill or a voter ID bill, is introduced, under the old rules the President of the Senate, the Lieutenant Governor, may refer that bill to a Committee of the Whole. It can go to a Committee of the Whole, so that the Committee of the Whole, the entire Senate, can engage in the process that Senator Williams has referred to during the course of the day, to build coalitions, to build compromise, to debate, to discuss, to try to figure out how we can get to two-thirds. This special class of bills, yesterday, it included redistricting. Today, it just includes voter ID, but that special class of bills doesn't include children's health needs. It doesn't include methods for making college affordable for Texans. It doesn't include help on growing high utility bills. That so-called special class doesn't include relief from insurance bills or predatory insurance companies. It doesn't include protection of the environment or laws that would stimulate our economy, create a single job, or increase the wages of working Texans. All this special class of bills includes are purely partisan bills aimed, really, at preserving power. Texans, I believe, have a justifiable right, in 2009 they have a justifiable right and reason to ask why state government is failing them. Why are they seeing skyrocketing tuition increases? Why are they seeing skyrocketing insurance bills and utility bills? Why are they having to

fear a declining economy? But also, why do we have such corruption at the TYC? Why is the federal government looking so strongly at our state schools? Why are they choking in traffic congestion, and why has there been failures of our primary public safety agency? And the answer may be that it is because state government appears to be more concerned with protecting partisan rule than governing to protect the people. We can be candid. These bills are the most partisan and political things on our agenda. These aren't the things that matter to ordinary, hard-working Texans. And frankly, if they made enough sense that they could pass in the way that every other bill is passed by the Texas Senate, then we wouldn't be here talking about this. They have not passed because, so far, they can't or shouldn't, be able to build the coalition around those bills. And we've heard, today, discussion of hate crimes legislation and other pieces of legislation that originally couldn't build that coalition. But over time, through debate, discussion, and people changing their minds, and compromise, at some point it did. But if, but these bills can't, or the people carrying them won't make those coalitions, and so they haven't done it yet. And make no mistake, we aren't here fighting about this today, because it's just the right thing to do to have these kind of bills. We're fighting about this because it's the only way these bills can pass. It is the only way these bills can pass, is to somehow, make them a special category of bills. These issues are too partisan to be considered under normal procedures. I believe that this will be the full and final victory of politics over policy on this issue. We need to remember, it's been a long day, but history's going to look at this day. It will remember the cooperation and bipartisanship that protected Texans, that blocked bad ideas, and, by rule, forced us to work together, forced us to work together in a bipartisan manner. It will look, history will look clear-eyed and cold at these bitter partisan issues like this that have nothing to do with today's struggles of middle class Texans. And I believe it will judge all of the backbiting, the bickering, and the gridlock that the Senate should fear if it gives up the best part of itself by creating -a special class of bills that corrupts the two-thirds rule, that we all, at least, say we believe in. Members, I encourage you, set your priorities, and vote against this resolution. Thank you Mr. President.

**President:** Thank you Senator Watson. Chair recognizes Senator West to speak on the resolution.

**Senator West:** Thank you very much Mr. President. Members, I don't know too much more I can add to what Senator Watson said, and I know the die is going to be cast. Let's see, I, I bet the vote is going to be 19 to 12. What we are about to do is, basically, say that the majority will, and this is going to be in perpetuity, whether this body is controlled by Democrats or Republicans, we're going to say that the majority will, will be done. That's the signal that we're sending, as opposed to the deliberate body that we, quote unquote, that we say that we are, requiring us to reach across the aisle on issues. We're saying that the majority will, will be done. The reality is, is that, yes, redistricting was taken out of the, out of this particular draft, but guess what, that's one of those intractable issues, too, that is partisan-based. And I see a special order coming for redistricting next time around. The Republicans have the majority now. The question is, is what's going to happen in the future, the next 10 years? Will Democrats control the Senate? Will Democrats do the same thing that's happening today? Will they use this as a precedent in order to have their will? We need to think

about the decision that we're going to make today. I don't know that any speeches can change the minds of anyone. It looks like the vote's going to be 19 to 12 on a very partisan issue. But the message that we send is a very clear message, that as it relates to issues concerning the middle class that we should be preoccupied with, that voter ID issues, partisan issues, prevail over those issues. And each and every one of us will be accountable to our constituents for this vote.

**President:** Thank you Senator West. The Chair recognizes Senator Patrick to speak on the resolution.

**Senator Patrick:** Thank you Mr. President. I'm standing to speak in support of this resolution. I think it's a proud day for our body. Two reasons. I, first, I think that everyone has conducted themselves in a very respectful manner. As passionate as everyone is on both sides of this issue, Senator Williams did a masterful job on a long day. And I think the Democrats who spoke did it in a very respectful and sincere and passionate manner. And so, I commend both sides. I also think it's a significant day for our body, because while some would disagree and say it's a step, maybe backward, in the rules, I think it's a step forward for the people of Texas. Everyone knows how I feel on the two-thirds vote. I believe it should be three-fifths. And I think this resolution is a step forward to a great compromise in that regard. And while it may be that a majority may not be in favor of changing to a three-fifths vote, I'm not so sure that's the case, but let me say that two years ago, if I was the lone ranger, there are a lot of rangers today who believe it was time to move forward so that we could do the business of the people. On all the amendments that were brought up today, I know that Republicans support, Senator West, your call to lower the cost of higher education. And I, also, have co-authored the bill with Senator Hinojosa. Senator Watson, I was a Republican who voted to fully fund CHIP. So, I support children's health care, as I know my Members do. And our Members all support the middle class and every class of Texans seeing their insurance rates lowered. But there's not an amendment that you offered today that I don't think there would be wide disagreement in the concept. In fact, I think those amendments even make my case that if we had a three-fifths vote, it might be easier to pass all of that legislation. And, and, Senator Uresti, any time you speak about our brave warriors, I listen. They deserve our support and respect, and we, as Republicans, will be there to do that. This is a step forward, and I think it says to the body that when we have an issue where the majority has no choice, because those in the minority will just not compromise on that issue, because maybe they can, maybe they believe it, that that is the rule of the majority. And if one day the Democrats are the majority, I would expect them to do the same thing. I think our President of the Senate goes out of his way to make sure everyone has a voice on this floor, everyone has a say in committees. I think there's been a lot of work for a long time on this issue, and this was, at the end of the day, the way to resolve it. And I hope it's the first step of the next several steps that will eventually bring this body to rule on legislation, based on the United States Senate, and that's a three-fifths rule. The people of Texas want us to address all of the issues in these amendments and many more issues. They don't know about our rules. They don't care about our rules. They just want us to get the job done. And it's not always Republicans and Democrats. It's sometimes urban and rural or border and suburban. There are lots of different coalitions here and lots of different issues that everyone

wants to protect. And I just think this is a great day for the Senate, the way it conducted itself. And I think it's a great day for the people of Texas, because overriding, and I know the arguments, and I respect the arguments of what issue is more important. Someone asked me that yesterday from the media. I said, well, I think property taxes are a priority and the repeal, the business tax is a priority and issues with illegal immigration are a priority and health care. And the number one priority for me is education. But above all that, someone has to sit on this floor in the future and deliberate these bills and cast a vote. So, really, the most important, highest priority may well indeed be this resolution for voter ID. Because, I want to be sure that in the future that Texas can be assured that the people who are elected were duly elected. And I think that is important to the people of Texas, and I think they've spoken. And again, I commend you, Senator Williams. This is a great step forward on having us vote on these key issues, and I commend the Democrats who, who handled this debate in a very respectful way today, because I know this is a tough issue. Thank you Mr. President.

**President:**  Thank you Senator. The Chair recognizes Senator Hinojosa to speak on the resolution.

**Senator Hinojosa:**  Thank you Mr. President. I rise to speak against the resolution. I know that most of you have made up your minds, don't want to be confused with facts. But you know, we just went through an election in November where the voters in this country sent us a clear message not to be partisan, to deal with the bread and butter issues of health care, jobs, economic development. And what are we doing here today? We wasted all day focused on voter ID, another divisive issue that divides us, not brings us together. I will tell you that when we started this debate, I was somewhat surprised the decision came up, and as you all know, this is just a backdoor way, just a backdoor way to get around the two-thirds rule. And I will tell you that this is a partisan issue where the Republicans continue to lose ground. If I recall, Tom DeLay, at one point, thought the Congress would forever stay Republican. Well, guess what, Congress is now Democratic. Tom DeLay thought that the White House would always belong to Republicans. Guess what, we now have a Democrat in the White House. The same thing is happening here in Texas. The Republicans have lost Members in the House. They lost Members in the Senate. The reason is, we don't stay focused on the key issues that impact the middle-class families, health care, education, economic development, jobs. Instead, we spent all day debating voter ID. I will tell you that, for me, this is not an issue. I've seen nothing to prove that there's a lot of fraud dealing with votes, and I would respectfully request that we look at issues that impact our families and vote against this resolution. Thank you.

**President:**  I thank you, Senator. The Chair recognizes Senator Gallegos to speak on the resolution.

**Senator Gallegos:**  Thank you Mr. President. Members, colleagues, and friends, I rise to speak against changing the traditions and the rules of the Texas Senate. You know, last session, I was absent most of the session, but we knew that, I knew that this issue would come up, and came back to at least be the eleventh vote at that time on a two-thirds rule, to block the, this piece of legislation. And I knew we were going to have to deal with it again, because, you know, everybody knew that it was going to

come back again, but I didn't know it was going to come back this early, so, especially through the, in the rules and in, and through a resolution. But you know when, and I respect Senator Williams introducing, because that's our right. Anybody can introduce anything they want on this floor. And I respect him introducing this resolution, which is his right, his right. But when he talks about trickery and the power of the pen, you know, I barely knew a few days ago that it was going to be brought up, hadn't had a chance to do, do any research on any, anything that he debated about, changes in the past or anything else, and, or I would have done it if I had known it was going to be addressed this early. You know, if we would address the issues on the amendments that were presented, most of our packages in last legislative session would have been taken care of today, except the passing of the budget, Steve, you know, all our main issues, if we would have passed those amendments. But yet, you know, Senator Williams chose to bring this issue as one of the major issues, and they give it to me in emergency. If you talk about it before legislative session is already started, and I think that Senator Hinojosa is right, then you talk about real issues that we just saw in the presidential election, people want change. They're tired of bickering, political, partisan bickering. And they want real issues answered, real issues like jobs, the economy, health care, education. Those are the issues that really, and Texans want those issues answered right now, I can tell you that right now. Not voter ed, we, I mean voter ID, we still have time to address that issue in the real way and address the majority issues first, folks that don't have health care, children without health care, jobs, the economy. Now, those are the issues that we were elected to hear, to address first, first, not voter ID. And that's why I came back from, fresh off a liver transplant, to address that issue, to stop this issue. But it was way, we didn't address it until late in the session, and I was strong enough to come up here and, you know, vote against it. I think to set the tone of a session that has not even started and set a tone like this political bickering we had today, and it'll probably, you'll probably read it in the papers tomorrow, sets a bad tone that was the same tone that was addressed in the House of Representatives all last year. All that, all we've proved here today, that we're acting like the Texas House did last session, and, and really, it really disappoints me, disappoints me to have to get up and talk, and talk against it, but I'm going to talk against voter ID. But it disappoints me that this body is now looking like the Texas House did two years ago. At least they cleaned up their house the other day. And now, we set the tone in political fighting and not deal with the real issues of really, why the people elected us. And demographics are changing, your districts, regardless whether you're Democrat or Republican, they're changing. You'll see that when the census numbers come up, you know, you have people that live in your district now that, you know, some of you probably don't know live there. Now, are they there for this issue right now, voter ID being number one, or education, or health care, jobs, the economy? Those are the real issues, and that's why you'll have a Democratic President in the White House next week. You know, if that election didn't tell the real story of how Americans and Texans are feeling, then, you know, I don't know what will. I don't know what will. But I can tell you right now, this resolution, once again, is the worst, worst thing that could happen here at the beginning of a legislative session, sets a bad message, not only to my constituency out there but yours, but yours, that we care more about a voter ID bill than health care for Texans,

for children, than education, tuition, tuition regulation, and the other issues that we know, you and I know, that those issues have to be dealt with first. You know, there's people out there starving. They're dying. They don't have health care. They don't have insurance. That's the number one issue to me. And it's just like I said, it's sad for me to stand up and say that we're acting like the House of Representatives did last session, and that's the very thing that's happening here.

**President:** The Chair recognizes Senator, Senator Zaffirini to speak on the resolution.

**Senator Zaffirini:** Thank you Mr. President. Mr. President and Members, at the beginning of my twenty-third year in the Texas Senate, I will say that I never thought I would hear myself say these words: We should learn from our colleagues in the House of Representatives. I am embarrassed by the issues that we have addressed today, in terms of amending the two-thirds rule in such a way that those who cannot win otherwise will win by changing the rules. I believe, frankly, that that is unfair and that is unwise. I agree with everyone who has said that changing the rules is simply not the wise thing to do. And I agree with everyone who has said that this sets a bitter and partisan tone for what we hoped, optimistically, would be a great session. Look at what the media are saying. Look specifically at the newspapers, yesterday, and today's *Austin American-Statesman:* House opens smoothly, but Senate roiling; *Houston Chronicle:* Partisan fight breaks out in State Senate; *Dallas Morning News:* Senate begins session at odds. What will they say about us tomorrow? That there were some in this body who placed politics above partisanship. And I believe that we, in placing partisanship and politics above policy, are making a terrible, terrible mistake. I implore every Member of the Senate to think wisely about this issue and to consider the issues that many Democrats articulated today, the issues that Texans care about. This, frankly, is a political issue. Who are the winners because of today's action, because of today's vote, that we all know is coming? I believe, quite frankly, that there are two, and you're not going to like hearing this, except for Senator Patrick, because, I believe, Senator Patrick, that you are one of the winners today. You said it so well. Last session you were the lone ranger. Today, you refer to many rangers following you, in effect. You, Senator Patrick, are a winner and I congratulate you. The other winner is the state Republican Party, because there are many, many Republicans who said, today and other days, this is really not about us. We're getting hundreds, we're getting thousands of letters. This is a priority issue for the State Republican Executive Committee. If the members of the State Republican Executive Committee want to serve in their Texas Senate, they should raise their $3 million and run. But there is no executive committee of either party who should be dictating the decisions of this body. We have been heralded, sometimes by ourselves, as the most deliberative body in the world or in the nation. Today, I am ashamed of a statement like that, because it simply does not ring true. And every one of us has issues that we would like to identify as special orders. You know what mine would be, education in general with a focus on the very young, the very old, and certainly, always, attracting new persons to come into the educational arena. I would focus on health and human services, again, with a function, with a focus on the very young, the very old, and persons with disabilities. I know that I could get 16 votes to reduce waiting lists. Why can't I change the rules and say, reducing or eliminating the waiting lists for health and

human services should be a special order for this body? Each of us can do that. And so, what are we going to do if we can't win according to the rules that are good for this body? We're going to change them? You saw the amendments and how they all went down in flames, 19 to 12, 19 to 12, 19 to 12. How many, Mrs. Spaw, six amendments, all 19 to 12? How embarrassing. What does that say to the people of Texas, and for what reason: for an issue that could have been debated later, for an issue that could have been focused upon, and could have been discussed, and perhaps negotiated? We all heard the Lieutenant Governor say, he's talked to Democrats. There are Democrats who are willing to negotiate. But we will lose today, simply because we were outnumbered, and it is true that the majority will prevail today. But, ladies and gentlemen of the Senate, men and women of the Senate, you and I know that the majority is not always right. Today, the majority will prevail, and I'm embarrassed for the Texas Senate. Thank you Mr. President. Thank you Members.

**President:**  The Chair recognizes Senator Ellis to speak on the resolution.

**Senator Ellis:** Thank you Mr. President. Senator Williams, you did a good job of laying out your position. I have known you long enough to know that it probably was not a easy decision for you to put together the research that you did during the interim or to walk into this Chamber on the first day and decide to make a bold move to change these rules. But you did. In my judgment, it's not a good day for the Texas Senate. Robert Duncan, we talked a bit about traditions when we elected you as our President Pro Tempore yesterday. And traditions mean a lot. It will be interesting for all of us when we get a chance to go back and do a little research on where this two-thirds tradition came from. It's been around about 100 years, based on the best guess, because there's not much of a recorded history. But the best guess I've been able to come up with is that it was patterned after the tradition in the United States Senate to cut off a debate, a filibuster, the cloture rule. That's where this tradition came from. To my knowledge, no other State Senate in the country does this. We're a big state. We're a difficult state, difficult because at one time most of the battles in this Chamber, when all the people were Democrats by the way, was based on urban and rural issues. In a lot of ways, this two-thirds tradition, rural Members, has protected some of your interests, long after the votes to protect those interests were there. I've heard a lot of talk about this voter ID bill, and some have stated poll numbers. I don't know what it is, 70, 72 percent of the people in the State of Texas favor a voter ID bill. Senator Zaffirini made the comment, very eloquently, the majority is not always right. Initially, to vote in this country, not just in this state but in this country, you had to be a property owner. And you know what, most of the people, including the ones who didn't own property, if a poll could have been taken, they would have been gullible enough to think, well, that's okay, because I'm going to own property one day. Initially, to vote in this country, you had to be a male. And if a poll was taken, even women, some, many were gullible enough to believe, or wouldn't say that they didn't believe, that that was okay. You know the rest of it. Initially, in this country and in this state, you had to be a white male and own property to be able to vote. Tomorrow will be Martin Luther King's real birthday. He'd be 80 years old. Tommy, when you did your research, you went back and you cited a number of precedents where this two-thirds tradition was not used. I stated this when we had our debate over redistricting, and I just want to briefly review, again, what happened in a special

session of the Texas Legislature in 1957. It was called the "Segregation Forever" session. There were a number of bills that couldn't pass in the regular session of the Texas Legislature. You had 30 white men and one Hispanic, Senator Henry B. Gonzalez. Now, the good news is, at that time in Texas, that you couldn't get 21 votes to bring these bills up, and you couldn't get 21 votes just because of Henry B. Gonzalez. There were 10 other people of privilege in this deliberative body, sitting in these chairs that we sit in today, who said they would not bring those bills up, although the polling data indicated that if you were wise politically, you would've voted for those bills. But they had to go into a special session in order to pass these bills. One of those bills provided for a provision that would attempt to block desegregation to public schools in Texas; a bill would have changed the method used to fill vacancies in the U.S. House of Representatives; a voter registration bill to replace the poll tax that required annual registration, with the registration period limited to 30 days per year; and four bills that would have implemented a grievance with minority plaintiffs for the reapportionment of the Texas House of Representatives and the Texas Senate to replace plans that were more favorable to the Republican Party at that time. Now, this voter ID bill obviously has partisan overtures to it. I assume that activists in the Republican Party think, they don't know, but they think that it will get more Democrats from voting. They don't know that, but they think that. I'm not so convinced that we couldn't find some common ground on a voter protection, voter ID, whatever you want to call it, bill. People who handle elections for us in Texas, it's an awful job. People probably make $25, $30 a day. They do it out of a labor of love. Some of them do it because they're party activists. A lot of them are older people. We put very little money, in terms of resources of the public, into running elections. If you want to enhance the penalty for people who commit voter fraud, we could look at that. You could look at making sure that people who have committed a crime serve their time in jail. You streamline the process so they'd be put back on the voter rolls. Maybe you would take the partisan nature of running elections out of a state office that is controlled by a Governor that, obviously, has to be in one party or the other. In our county, Senator Williams, in Harris County, they're looking at whether or not the issue of voter registration ought to be in the tax appraiser's office. Interesting footnote in history, the reason in Harris County, Senator Patrick, it's in the tax appraiser's office is because that's who collected the poll tax. Other counties in the state opt to put it in a nonelected, nonpartisan office. But what we do today, one day before Martin Luther King would turn 80 years old, is have spent our entire day in this legislative Chamber arguing about changing a rich, and I think an important, tradition that as you stated correctly, from time to time, people have gotten around. Bill Hobby attempted to do it, to change the date of the Texas primary to help John Connally become President of the United States. That's what the bill would have done. Maybe that's not why he did it, but that would have been an effect of the bill. It blew up when he wanted to change that two-thirds tradition. Members of the Texas Senate walked. Three days later, he decided it's not really worth that. I don't remember the Peveto bill, whether or not that happened or not, or the workers' comp bill that you cited. It happened on redistricting in this Chamber. And we all went through a very difficult period as a result of that. Regardless of which side won, I'll tell you what's interesting, both parties right now, with the change in Congress, wish

that we had certain Members with that seniority, regardless of which party they were in, so they'd have more access in Washington, D.C. I know most Members have probably made up their mind on what they're going to do on this issue. I've been here for 18 years, and like a lot of you on this floor, I'm here because I choose to be here. I've not opted to try to run for political office because it's a good club. It's been a very good club. But after you ramrod this change in tradition through this Chamber today and you codify it, Tommy, in the rule book, at some point in the not too distant future, with the changing demographics, with the change from a more rural population to a more urban population, our Republican colleagues control this Chamber now, at some point the Democrats may control it. I was in this Chamber when you all were a very small minority. When you got to 11, Senator Shapiro, I asked you earlier today, did you all think that the Democrats would change the rules? I was a baby Senator then. I remember being in those back rooms, and people talked about it, but calmer heads prevailed, and they opted not to do that. When you all had a clear majority and Bob Bullock was Lieutenant Governor of the State of Texas, Republicans decided you wanted more committee slots. I remember reading in the papers, I was not in the back room, I think it was Sibley, Ratliff, Bivins, as I recall, press accounts said that Governor Bullock threw them out of his office, sure looked good in the headlines. But the next week those committee slots changed, didn't they, Mr. Chairman Ogden? You remember that. You were here, as well. So, all I'm saying is what goes around comes around. This tradition was based on common sense, finding a way to force people to try and work together. The blocker bill tradition didn't come along until 1939, I believe. It was really put in as a tool by Allan Shivers, I think, to give the office of Lieutenant Governor more power. Over time, Members saw that it also gave each Member of the Senate more power. I think it's a bad, bad move for us to change this tradition, and it's even worse to codify it in the rules. Thank you.

**President:** The Chair recognizes Senator Carona to speak on the resolution.

**Senator Carona:** Colleagues, I'm a proud Republican. I stand here without any hesitation to tell you that. And I recently ran in reelection in one of the least Republican districts in the state and won by what was effectively a 60-40 margin. I think we'd all agree, that's a pretty good victory. The primary platform that I ran on was working in a bipartisan fashion, and I was proud to do that. I was proud to present that to my Republican, as well as my Democratic supporters, and there were many from both parties that were willing to give me and entrust me with their vote. And I say that as a preface to what I'm about to say, and that is, I stand in opposition to this resolution. And I want to explain to you why. But first I want to tell you, today, I was told that, you know, standing up as what perhaps might be the lone Republican, I guess we'll see when the vote's counted, could well affect my legislative agenda this session, the passage of it, and might well affect my next Republican primary. And I guess we'll see. Because the fact of the matter, I guess the irony here is that I actually favor very strongly reforming the voter ID laws. When, in fact, we do meet as what sounds like, it will be a Committee of the Whole, in all probability, unless there's overwhelming evidence that certainly is not available to me, overwhelmingly, I'll be voting in favor of a voter ID bill, because I think we need to reform the process. But the problem here is this issue's become about politics, not policy. And that's where I began to look closer as to whether or not it was something that I could, in fact, stand

up here proudly and support, and yet, at the same time, maintain the kind of credible relations that I enjoy with so many of you in here, both Republican and Democrat. I listened earlier to Senator West and the remarks earlier today, and I thought he made very good points. He listed, one by one, the priorities of the State of Texas, as he believed. And the truth of the matter is, I think, most of you believe what Senator West was trying to say. There are many priorities in this state that truly rise well above this particular priority today. And that's what makes it clearly, without any question, a partisan issue. I think it sends a terrible message after the very recent November election we had, when this country seemed to be crying for bipartisan cooperation and an attitude of working together with people that you might happen to disagree with but that you would respect enough to listen to and put forth solutions. And we've, you've heard it all before. I can't say it any better than it's been said. This has been a body that's been very capable of doing that. But this all flies in the face of logic to me, as this one Republican standing here today, because it seems so contrary to the very message the public gave us just a short time ago: Stop the partisan gamesmanship; deal on issues of substance and importance; and even though you have disagreement, reflect that disagreement, but at the end of the day, resolve the issue in a bipartisan fashion and move on. But don't do things to disrupt the effectiveness of government. Again, it's hard for me to understand with such a recent message, how we could be going with what I believe is a, the wrong direction. If this were, in fact, the most important issue of the day, voter ID, I have to tell you, Tommy, because I respect you enormously and we're personal friends as well, I'd be voting with you. I'd say, you know, this is the most important issue of the day, and I'm going to make that exception even though I think that it does deteriorate the effectiveness and the longevity, perhaps, of the two-thirds rule, but I'm going to vote with you. But I can't with a straight face, and I dare say that most of you, with a straight face, cannot admit to this being the most important issue of the day, Republican or Democrat. I think it really sounds more, speaks more to sheer partisanship and sheer opportunity. And I just can't support that. This is the first time in a long time, I might add, that I've observed, while we were in session and debate, that when one colleague asked for a delay, albeit a brief delay, to further consider this issue, give us a day longer, give us a few days longer, that the other party denied it. The last time that happened in this Chamber, that I can recall, I had to walk across this Chamber and swat Senator West. And I hope never to do that again.

(Laughter)

**Senator West:**  You didn't do it that time.

**Senator Carona:**  And I didn't do it that time, as Senator West so righteously says. But the fact of the matter is, we do, as a standard of business around here, we do respect it when any one of our colleagues comes forward and says, give us just a little more time. Now, Tommy, I can't speak to everyone in this Chamber, but I didn't learn about this issue at all until this past Monday. To me, on something as major as this, I don't care how we try to couch it in intractable arguments, and the fact that we're at a stalemate, we'll never resolve this. I've seen some of the toughest issues in Texas politics resolved by this body in the time I've been here. So, I refuse to believe that, in a spirit of goodwill and statesmanship, we couldn't sit down together, given the

appropriate amount of time, and work through this issue. And I know you say, well, yes, we'll have that now, and in a Committee of the Whole. But we know that's not the same, because the leverage changes entirely when all you need is 16 votes, and you've already got them. Today's certainly an indication. What kind of leverage is that? What incentive is there for the Republican Party, of which I'm proud to be a member, to work with the Democratic Party when, once the process is over, we've already got the votes in the bag? That's the kind of leverage I don't think that makes for good public policy around here. So, my vote today is not in opposition to the issue. I intend, when the issue does come up, be it in Committee of the Whole, or otherwise, I intend to vote for voter ID. But I'm voting against, today, the process. This is the wrong process. We're setting a very foolhardy precedent here, and I can assure you, as a Republican that would like to be around a little bit longer, I think we'll rue the day when we did this, because we're going to see the same tactics employed by what might perhaps be a different majority party somewhere in the not so distant future. And with that, again, I restate my opposition to this resolution, respectfully of course, Tommy, to you.

**President:** I thank you, Senator. The Chair recognizes Senator Lucio to speak on the resolution.

**Senator Lucio:** Thank you Mr. President. I'll be brief. Members, we've heard some history, Senator Ellis. We've heard about the research, very effective research, by Senator Williams. In that research, Senator, I only wish you would've looked at and remembered what might have happened before you came to the Chamber in the early '90s. When I came here, we were very fortunate to have what I considered a mentor to many of us, a gentleman that preached bipartisanship. I was very proud of that, because I believe in being inclusive. I always preach that I wanted everyone to be at the table, at the Texas table, I call it. And quite frankly, three of us were chastised by our own party, the late Senator Madla, myself, and Senator Armbrister, because there was talk about doing away with the two-thirds rule during the redistricting issues in the early '90s, and we said no, as a matter of fact, h-e-double-l, no. We wanted our Republican brothers and sisters to be part of the process. Now, I, my faith teaches me to be forgiving, and that's exactly what I intend to do. Because I have great hope that the whole membership will come back to the middle and head on into addressing the issues that have been talked about here today, issues, everyday issues that are important to our constituents and the whole state. I want to be part of that process. I want to make sure that all of us have a place at the table. And I'm not going to be any more critical than that, only to remind my brothers and sisters in the Republican Party, in this body, that I was one of those that stepped across in the early '90s, and it cost me, and it was okay because I had to work just a little harder, politically, to make people understand, Tommy, that I wanted to be inclusive. I wanted to earn the respect of everyone in this body. That was my goal. That's the goal, I think, of my brothers and sisters in the Democratic Party as well. They want inclusiveness. They want to make sure that we're part of the system. When I came to this body, there was 23 Democratic Senators in 1990, and that deteriorated because there was so much infighting. And I hated to see that, because we didn't get to accomplish the things we wanted to. It took years, and it took new leadership, and it took us coming together and hashing things out. And we've done a lot in the last, in my opinion, 18 years that

I've been here. And I know that this will be a successful session. I agree with my colleagues on both sides of the aisle that we have the necessary leadership, that we have the desire, that we have the ability, but most important, we need to continue to have the heart, to be understanding, to work with one another, and to recognize the fact that everyone, everyone should be part of the process. Thank you Mr. President.

**President:** Thank you Senator Lucio. I'm going to recognize one additional Senator that's asked. Then I'm going to close by going to Senator Williams. The Chair recognizes Senator Deuell to speak on the resolution.

**Senator Deuell:** Thank you Mr. President. Charles Dickens said it was the best of times and it was the worst of times. It was an age of wisdom and an age of foolishness. It was an epic of belief and an epic of incredulity. It was a season of light and a season of darkness. It was the spring of hope and it was the wisdom of despair. We had everything before us, we had nothing before us. We were all going to heaven, or we were all going the other way. In short, the period was so far like the present period, that some of its noisiest authorities insisted on its being received for good, for evil. I think if we had 21 Republicans in the Senate, or 15 Republicans in the Senate, we wouldn't, we wouldn't be doing this. And I believe in the two-thirds rule. But I looked at the two-thirds rule in terms of Senate Bill 10, a Medicaid reform bill or Jessica's Law or the budget where there are so many complex issues and so many moving parts that we, together as a body, have to work through and come to a consensus. Some people don't like a consensus, but this is an issue that is very cut and dry. You're either for voter ID or you're not. My pastor once told me that there are absolutes, and that would be Scripture. There are convictions. These are things that we are convinced will better the state or be worse for the state, or however you're convicted. And then there are preferences. And I don't see where this issue at hand, we're debating actually whether we change some rules, but let's not hide the fact that we're talking about voter ID. I don't see an absolute violated here. We are talking about the integrity of the ballot box. We are all here because of what we hope is the integrity of the ballot box. Senator West, you and I grew up several miles apart in the southern part of Dallas County, in different worlds, unfortunately. I remember those days when water fountains were separate and restrooms were separate. You and I went to different schools, and I remember derogatory comments about Mexicans that were made in those days, I wasn't comfortable with that, lived in West Virginia as a smaller child where that wasn't an issue, lived in an integrated neighborhood. And I think the premise here, Mr. President and Members, has been that, in somehow, photo voter ID is somehow evil, and that we can't do it in a way that's fair to some people that were in their lifetime, unfortunately again, disenfranchised from the voting process. I don't think any Member here would let that happen. But what Senator Williams, and he has expressed it much more eloquently than I could, has basically said is that if we keep the two-thirds rule with this particular issue, which we already know what the bill is, we already know what the outcome will be, that it may have worse consequences for the body. And that's what he, what he's trying to do. So, again, I'm not totally comfortable with making a rule change on a particular issue. But when I think that it is so cut and dry, and there's not a lot to massage and work together with, and that it will cause less problems in the future, I think this is a vote that we have to make. And Senator Carona, the problem here is that there are good points on both sides. Senator

Zaffirini, I'm not ashamed. I think we've been very civil with this. We've aired it. We've gone through a process here, and I think like Dickens, I think it's the best of times and in some way the worst, in the sense that it's a tough issue. But I intend to vote and support the resolution, and I would encourage all 31 of us to do so. Thank you Mr. President.

**President:**  Thank you Senator Deuell. Members, I had said that right after Senator Deuell, I would go to Senator Williams to close. I'm advised, although she hadn't advised me earlier, I'm just recently advised that the Parliamentarian had been asked by the Dean if he could speak before Senator Williams closed. So, with your permission, I'm going to go ahead and recognize the Dean to speak.

**Senator Whitmire:**  Thank you Mr. President.  Members, first I would like to pay my respect to John Carona. John, I've stood alone in my caucus, and I know it's difficult times, but you have my respect and you have a lot of credibility in this body. I want to break my discussion into the two subject matters. One, the vote to change the rule and then address voter ID and how I think this body could've come together on a reasonable bill. First of all, I think the press used to characterize this session, this meeting today, as good news, bad news. The good news, and I've been here 26 years, I became a Senator in 1983, I have never, the good news is, seen a Senate work harder the first two days. Literally, yesterday and today, we have worked hard, harder than any group of Senators I've ever been sworn in with. The bad news is, we've been working on the wrong subject matter. Are any of you aware, and I've heard the different topics that were mentioned that should be special order, but let's talk about what we should have been doing today. Do you know Sunset was scheduled at 10:00 this morning? Very critical issues, decisions to be made, recommendations to be made, one dealing with Texas Youth Commission, who last week told us that they do not have a policy against mixing sex offenders with non-sex offenders. That will not be addressed today. I am told they may meet later tonight, but those subject matters will not get the attention that they deserve. You and I have run to committee hearings after being on the floor all day. Your witnesses often have left, we missed the boat, working hard on this today, when our representatives on Sunset should have been taking up serious matters. Yesterday when we were working hard was a very good day. I was very proud of this body yesterday.  I was proud and exhausted last night, because Senators were shuttling back and forth. You know why? Because of the two-thirds rule. We knew yesterday that we had an opportunity to come together and preserve that rule, and on several occasions yesterday, I thought we were going to do it. We had some real meaningful discussions about voter ID, how Democrats and everyone on this floor is opposed to voter fraud. We wanted to protect the ballot box. It's in the public's interest, but we even have selfish interest. I don't want to be involved in a campaign where someone may be fraudulently taking votes away from me. We also talked about how, as we protected the integrity of the ballot process, we could also enhance participation. I know the Republicans want full participation and, certainly, the Democrats do. We would like to have a consideration of the same-day registration, but I, and maybe a voting holiday where we actually allow people to take off to go vote. And I definitely want early voting in Harris County not to be from eight to five, because I represent a lot of people that just can't exercise their right and go vote early during eight and five. So, yesterday was a very good day, it was what

this body's about. I saw Democrats and Republicans sitting down and getting so close to working this out, where this exercise today would have not been necessary. But for whatever reason, and I think there are several, partisanship required some Members to feel like they had to go forward. We had such good discussions yesterday, and I thought I even had a proposal where we keep working, we do it in a committee, you hear us, we hear you on participation in security of the ballot box. And then come April, if the leadership and the majority of this body felt like that the Democrats were playing partisan politics and digging their heels in, and not dealing in good faith, you could run over us in April or May. I don't think it would have been necessary, because I think as we have all seen on very difficult, difficult matters, we come together, and the two-thirds rule requires us to do it. So, yesterday was a great day, I was proud last night, today I am very disappointed. Dan and other people have referenced how civil we've been today. You know why I think we've been so civil? Because we're sad. We're tired and we're sad. You know normally I'd be just throwing my hands up in the air. You know, in the House you can change some votes with a good speech. I've spent 10 years over there. I've seen good speakers turn some 20, 30 votes, it's a 150 Member body, you can get 30 votes with a good talk. Here you really can't, and I have told people, primarily because we're so deliberative, we're a small enough body that we discuss matters. But I think we're being so civil today not only because we're civil people but we're not showing the passion and emotion that we would normally show, and we've shown on other emotional issues, beause I think we're sad. I read body language. When I am up there chairing the caucus, I can look into some of my good friend Republican colleagues. This is not a day to celebrate, I know a number of you have said, well, this is a one-time deal. No, it's a chipping away of what makes this body so special. And several of you have alluded to, John did it a moment ago, I think, Dan, you said you wouldn't blame the Democrats if they'd do the same thing. Well, first of all let me suggest to you we don't have to speculate what the Democrats would do. We've been in control, we've had the majority most of history. And it's interesting that Tommy always says, these exceptions and where special orders have been made, you never said it was the body or a group of Republicans or Democrats, you name the Presiding Officer. Well, we didn't experience that this time. This is the first time in anyone's memory where a group of Members, a partisan group of Members decided to take steps to pass something that normal rules would not allow. I have been here 26 years, and if I had to comment, what really makes this body different from certainly the House, or Congress, it's this two-thirds rule. You all know it. I'm not telling you anything you don't know. And let me just tell you how effective it's been used. The Hate Crimes Bill: After James Byrd, an African American in East Texas, was brutally dragged to death, we had the opportunity to address that, hate crime, and we included the elements, one was sexual orientation. George Bush was the sitting Governor, intending to run for President. And I know David Sibley is against hate crimes. But partisan politics, George Bush's political future, they used the two-thirds vote, bill, and rule to not take up hate crimes, because they didn't want that bill to get on George Bush's desk, dealing with sexual orientation as one of the elements of a hate crime. Because I guess in South Carolina Republican primary or the Georgian or maybe even the Texan Republican primary, that's not acceptable. So, the two-thirds rule was used by David Sibley to block that bill when we had such

emotional reasons to pass that. It was the right thing to do and would have passed by huge majority I believe. But Sibley took it upon himself to use that rule. Did we change the special order? No, we did not. Because we understood how important the two-thirds rule was. Fast forward to 2001, Democrats still controlled this place. You all had won, the Republicans had won statewide offices and controlled redistricting board. It was critical during redistricting for the Democrats to get a plan. We did not want to face the redistricting board. David Sibley used the two-thirds rule for partisan reasons, to block a redistricting which jeopardized many of the sitting Members. Did we change the two-thirds rule? Did we go to a special order? No, because we respected and knew how fundamentally important it was. Members, the two-thirds rule allows 31 people to have input, it requires you to be talked to. We work the floor, we don't stop at 16. If I had a hard 16, and I'm busy on something else, I might put it in my desk. No, I go up and talk to the next five, and then you better have a couple extras, I am learning. The bottom line is the two-thirds rule is what makes this special. Now, I respect Senator Williams saying he wouldn't do it on anything else. I believe him, but let me tell you the real danger. It's not going to come in the distant future when Democrats control this body again. The real danger, Members, and you remember I told you this tonight, I'm predicting it, it will happen, you all are showing your party and some activists and some extremists how you can get something passed when you don't have two-thirds. The pressure is going to come on this body, this current makeup, by political partisans, to do it for other emotional issues that you can't get two-thirds for. It's going to happen, just write it down, and remember I told you. It will come on vouchers, it will come on immigration, undocumented workers. I don't know what the next emotion will be. The pressure's going to come, maybe even this session, for certain on redistricting two years from now. You all have shown the world and the insiders and the political activists and consultants how to do it. And if you couldn't stand up to the pressure to not do it for voter ID, I don't know how in the world you'll stand up to them on other partisan issues. This is not a good day for the State Senate, Dan. I respectfully disagree. And I've been here 26 years, you've been here two years. And I would just suggest to you, I have seen them come and go, and consistently they know the two-thirds rule is what makes this body so special. It is a bad day for this body. I'm sad. Now, let me quickly and briefly talk about the voter ID. I mentioned a moment ago everyone is against voter fraud. You all seem like you don't realize, those that are going to such extreme measures to pass it, that we don't have laws against voter fraud. Tommy, you even cited a couple personal experiences. Prosecute those people. Let's increase the penalties on dishonest elections. We're all for that. But you all act like it's a national security issue. And what I am most fearful about, Members, and I will not pass judgment on my colleagues, but I listen to talk shows, Dan, and I talk to a lot of folks, I'm afraid this is a backhanded way to get after undocumented citizens. There is a fear in some communities, in some activists that there are large numbers of undocumented people voting. Now, I don't know how many of you have been an Anglo running against a Hispanic, in a Hispanic district. After redistricting in 2001, federal judge on Christmas Eve flipped me into the east side of Houston, and I had to run against Roman Martinez, who was a sitting State Rep. I've run in the Hispanic community. I've run where undocumented people live. They don't vote. You can't document, they don't want to be messing with the

government, they want to work, raise their family, and be left alone. You couldn't drag an undocumented person, I'm not going to say never, but routinely the practice is undocumented people don't want any contact with official business. And quite frankly, they don't even call their State Senator. I represented a Hispanic community in the entire '80s. Undocumented people do not want to contact officials. So, this fear that there are large numbers of undocumented people voting cannot be supported. And I think, though, in some corners, in some partisan areas, it's an effort to beat up that community. What it does do, Tommy, and I think I've cited this in one of our working groups: My 86-year-old mother, and I had a stepfather who lived to be 95, the last 10 years of their lives I took them to vote, if they vote right, and the way I told them. That was probably some voter f– that probably needs to be checked out, too, by the way. So, I would run by, busy working, being in the Legislature, I would swing by the house and pick this old couple up. I didn't have time to be doing it, but I feel strong about the vote, they wanted to vote, and they were going to vote right. And I would get them down there. If they had not had something, I probably wouldn't have had the time and they probably wouldn't have had the opportunity to go back and get it. Now, we were going to address that. I understand we were going to, we, going to protect seniors. We were going to protect seniors by giving them, you know, an exemption at 65 and 70, maybe give them a couple of elections to pass. But all I am simply pointing out is, and I am kind of having a little hearing, and I'll cut it short, those are the things that should be done in the committee. And I know we'll have, under your proposal we'll have a Committee of the Whole, and we'll get to hear these issues. But I just can't imagine voter ID, as you call it, is so critical that we're going to jeopardize the longstanding tradition of this body. You're going to put yourself under pressure from your party to do it again. And let me just say, I think you're opening a horrible, horrible situation where I'm not sure you can withstand it. I doubt if you can, for certain, under redistricting in two years, because you've already indicated when you started this process, redistricting was one of those issues that probably ought to have a special order. And I thank you for taking it out of this discussion, but I think it's right on the horizon. I will close by saying that, again, Dan, I think we're so civil because we generally are, but I don't think you see the emotion and the loud voices about something that we care so much about, because this is a sad day for the State Senate. I respectfully disagree with those who say, and then let me point out something as I am looking at my friend Dan. See, the sad news is, there's certain Members are not satisfied with this, Tommy. And let me just suggest to you before we go to the three-fifths, and I think Judith's right, I think Senator Patrick's done well by this, because he's articulated why he thinks two-thirds is wrong. He'd like to go three-fifths. I'm prepared, Dan, to have a serious discussion to go to the simple majority. If we're going to have special orders like this and we're going to pick and choose, because like I've already predicted, this ain't the end of this. I would suggest we be consistent, Dan, and go on down to a simple majority. And that's what you really ought to worry about, because you'll get to 16, you'll put it in your desk. And you know it's not going to be Democrats and Republicans getting to 16, it's going to be urban Members getting the 16. We will on the state budget with 16 or the three-fifths, or if you want to make it a special order, we'll start spending all the money where the people live. And, Robert, your brush eradication, sorry, you won't

have to talk to the rural guys about boll weevils. We'll talk about health care in the inner city, we'll talk about transportation.  So, let me close, I don't kid myself I've changed any votes, but I feel very strongly about this.  I think as we vote, changing this, putting this topic, and where I started was, and a lot of the Members have done a great job of pointing out other important items is, we've worked our tails off the last two days, but unfortunately it wasn't on things that matter.  I spoke to the Downtown Houston Kiwanis Club last week, business group, mostly conservative, mostly Republican, answering questions.  Folks, this don't come up. It don't come up in the civic clubs. And I have watched some pretty heated campaigns this year, certainly the two of our successful freshmen, it ain't a high priority there either–property taxes, transportation, the environment, the business tax, I could go on and on, you know it as well as I do.  And I'll just close by saying, it's unfortunate.  I wish I'd never, never seen this day happen, and I hope I don't see another one like it, where we're stripping away one of the outstanding traditions that makes people talk together on this Senate floor.

**President:**  The Chair recognizes Senator Williams to close.

**Senator Williams:**  Thank you Mr. President.  Members, there, it's been a long day, I'm going to keep this as brief as I'm, I possibly can.  There are four things that I feel like I need to speak about in closing. The first is to say thank you, to thank you for the civility in this debate and for working with me, and I know and respect each Member's opinion and will take that into my heart.  The one exception to that, Senator Zaffirini, is I don't feel ashamed, and I think that, that we have conducted the business, and I think that was a little out of line, quite frankly. And so, but I think the overall tone of the remarks that have been made here today have been respectful.  I appreciate that, and believe me I have heard you, I understand what your concerns are, and it is my intention to continue to work with every Member of this body as I have since I arrived. Secondly, the issue of partisan political pressure, first of all, you haven't heard me talk about polls, you haven't heard me talk about my SREC members, or about any political pressure that I'm under. That is not what motivated me on this issue.  And so, I'm not saying that's not what motivates some of the Members of this body, but I want to make it clear for the record that that wasn't my motivation, and I haven't had one phone call from a political operative threatening me or pressuring me on this particular issue, although I know that it's important to many people. And then, I'd like to speak about the issue next. And I believe, and I think that all of us believe, that preventing voter fraud is a unique and prominent bipartisan concern across Texas. Nobody wants voter fraud, everybody is in favor of the integrity of our ballot box. Requiring voters to provide a valid photo ID is critical to protecting the integrity of the electoral process in our state. Combating voter fraud and requiring voters to have a valid photo identification has been upheld as constitutional by the Supreme Court of the United States of America and has gone through the federal court system and an appeals process. Currently, there are seven states in the country who have voter photo ID requirements that I am aware of: Florida, Michigan, Indiana, Louisiana, Georgia, and Hawaii, according to the National Conference of State Legislatures. Fourth, and finally, I want to talk about the process. A majority vote special order is being sought by me specifically because the two-thirds rule has blocked valid consideration of this issue in the past, and the objections that I have

heard tonight for the most part are political rhetoric, they have no real basis in the issue. And there has been a lot of political baiting that's gone on in this process as people spoke against what we are doing. This special order is permissible under our rules, and its adoption will allow the Senate Committee of the Whole, which includes all of our Members, during the regular session to have a proper floor debate in consideration of this very critical issue. Members, this preserves the two-thirds rule. We are not doing away with that tradition as has been asserted here. Historical precedent for allowing majority vote on issues that do not require two-thirds support for debate have deep historical roots in the traditions of the Texas Senate. In recent times majority vote rules have been invoked in regular and special sessions under Democrats' State Senate majorities in 1971, 1972, 1973, 1975, 1977, 1978, 1981, 1984, 1985, 1986, 1987, 1989, 1990, and 1992. And a majority vote requirement was invoked under a Republican majority in the 2003, third called special session after we had spent all summer trying to resolve the issue of congressional redistricting. So, this has ample historic precedent that my opponents on this issue have chosen to ignore. Concerns for allowing an orderly phase-in of the voter ID requirement, especially with regard to addressing our senior citizens, I have reiterated over and over again that I want to see that issue properly addressed, as I am sure it will be by this body. Members, I respectfully move adoption of **SR 14** as the new Senate Rules for the 81st session of the Texas Senate.

**President:**  Members, you've heard the motion by Senator Williams. The Secretary will call the roll.

**Secretary:**  Averitt, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Gallegos, Harris, Hegar, Hinojosa, Huffman, Jackson, Lucio, Nelson, Nichols, Ogden, Patrick, Seliger, Shapiro, Shapleigh, Uresti, Van de Putte, Watson, Wentworth, West, Whitmire, Williams, Zaffirini.

**President:**  Members, there being 18 ayes and 13 nays, Senate Resolution 14 is adopted.

**Senator Williams:**  Mr. President.

**President:**  Senator Williams, for what purpose do you rise?

**Senator Williams:**  I rise to make a motion that my closing remarks be reduced to writing and placed in the journal.

**President:**  Thank you. You've heard the motion by Senator Williams, is there any objection from any Member?

**Senator Ellis:**  Accept a friendly amendment, I'd like to make sure all the remarks on this are placed in the journal for posterity.

**Senator Williams:**  I think that'd be fine. I'm, let me amend, let me change my motion so that all of the closing remarks are reduced to writing and placed in the journal.

**Senator West:**  Will you accept an amendment that all discussions, rulings, concerning **SR 14** including closing remarks and speeches be spread upon the, reduced to writing.

**Senator Williams:** Senator West, you know if you want to make that motion–

**Senator West:** Okay.

**Senator Williams:** I'd be happy for you to make it. What I'd like to do is get our closing remarks–

**Senator West:** Okay, that's fine.

**Senator Williams:** On here, I think we got record votes on everything else. So, with all due respect–

**President:** Members, you've heard the motion by Senator Williams that all of the closing remarks be reduced to, to writing, excuse me, and included in the journal, is there any objection from any Member? Chair hearing no objection, the motion is adopted.

**Senator West:** Mr. President.

**President:** The Chair recognizes Senator West for a motion.

**Senator West:** I'd ask that all of the discussions, motions, concerning **SR 14** be reduced to writing. Everything related that we've talked about today, I'm asking that we have it reduced to writing.

**President:** Members, you've heard the motion by Senator West, is there any discussion? If not, is there any objection to the motion by Senator West? The Chair hears none, and the motion is adopted.

# RULES OF THE SENATE

### Table of Senate Rules
### 66th Legislature

Rule                                                                    Page

  1. Quorum .................................................... 1
  2. Absentees ................................................. 2
  3. Absences .................................................. 2
  4. Roll Call ................................................. 2
     Call Of The Senate ...................................... 2
     Senate's Right To Await Attendance Of All Absentees .......... 3
  5. Presiding Officer Of The Senate ........................... 4
  6. Election Of President Pro Tempore ......................... 5
  7. Election Of Officers ...................................... 5
  8. Open Doors ............................................... 6
  9. Order Of Business ......................................... 6
 10. Roll Call, Prayer By Chaplain, Reading Of Journal ......... 6
 11. Morning Call ............................................. 6
 12. Order Of Considering Bills And Resolutions ................ 7
 13. House Bill Days .......................................... 8
 14. Special Orders ........................................... 9
 15. Rulings By President ..................................... 10
 16. Motions And Their Precedence ............................. 10
 17. Limitation Of Debate ..................................... 14
 18. Written Motions .......................................... 15
 19. Withdrawal Of Motion ..................................... 15
 20. Motions To Fix Sum Or State Time ......................... 16
 21. Division Of Question ..................................... 16
 22. Reason For Vote .......................................... 16
 23. Reconsideration .......................................... 17
 24. Spreading Motion To Reconsider On Journal ................ 19
 25. Reading Of Papers ........................................ 19
 26. Mode Of Stating And Voting Upon Questions ................ 20
 27. Lieutenant Governor To Give Casting Vote ................. 20
 28. Effect Of Tie Vote When Lieutenant Governor Absent ....... 20
 29. Calls For Yeas And Nays By Three Members ................. 20
 30. Members Refusing To Answer Recorded Present .............. 21
 31. Matters Requiring Vote Of Two-Thirds Of All Members ...... 21
     Vetoed Bills ............................................ 22
 32. Matters Requiring Vote Of Two-Thirds Of Members Present ... 22
 33. Suspension Of Three-Day Rule ............................. 24
 34. Elections ................................................ 24
 35. Elections ................................................ 24

36. Nominations By The Governor .......................... 24
37. Nominations By The Governor .......................... 24
38. Nominations By The Governor .......................... 25
39. Nominations By The Governor .......................... 25
40. Secrecy Of Executive Session ......................... 25
41. Secrecy Of Executive Session ......................... 25
42. Secrecy Of Executive Session ......................... 25
43. Violation Of Secrecy ................................ 26
44. Messages To The House .............................. 26
45. Reception Of House Messages ......................... 26
46. Journal Of The Senate ............................... 26
47. Return Of Vetoed Senate Bills ........................ 27
48. Report To Governor Of Final Result Of Executive Session ........ 27
49. Adjournment ...................................... 27
    Adjournment Of Senate For More Than Three Days ........... 27
50. When Senate Rules Are Silent ......................... 28
51. Previous Question .................................. 29
52. Demand For Immediate Ruling ......................... 30
53. Decorum—Removal Of Senator From Chair ................ 31
54. Decorum And Debate ............................... 32
55. Recognition Of Members In Debate ..................... 32
56. Speaking More Than Once In Single Debate ................ 33
57. Member Called To Order ............................. 33
58. Refusal Of Member Called To Order To Be Seated ........... 33
59. Interruption Of President ............................ 34
60. Interruption Of Member Speaking ...................... 34
61. Punishment For Misconduct .......................... 37
62. Obstructing Proceedings Of Senate—Punishment ............ 37
63. Bribery ......................................... 37
64. Admittance To Senate Chamber; Restrictions
        On Dress And Behavior ........................... 37
    Persons Lobbying Not Admitted ....................... 38
    Press Correspondents .............................. 38
    Forfeiture Of Admittance Privilege .................... 38
    Suspension Of Admittance Rule ....................... 39
    Exceptions ...................................... 39
65. No Eating Or Drinking In Senate Chamber ................ 40
66. Persons Must Be Properly Attired In Senate Chamber ......... 40
67. Legislation—Consideration Of House Bill In Lieu Of Senate
        Bill On Same Subject ............................ 40
68. Procedure In Passage Of Bills ......................... 41
69. Announcement Of Stage Of Bill ....................... 42
70. First Reading And Reference Of Bills .................... 42
71. Motion To Pass Bill Is Not Necessary ................... 43
72. Germaneness ..................................... 43

73. Seventy-Two And Twenty-Four Hour Rules . . . . . . . . . . . . . . . . . 46
74. Printing Of Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
75. Adoption Of Amendment On Final Passage Of Bill . . . . . . . . . . . . 48
76. Signing Of Bills And Resolutions By Presiding Officer . . . . . . . . . . 48
77. House Amendments To Senate Bills . . . . . . . . . . . . . . . . . . . . . . 48
78. Petitions And Resolutions . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
79. Congratulatory, Memorial And Courtesy Resolutions . . . . . . . . . . 50
80. Amendments To The Constitution . . . . . . . . . . . . . . . . . . . . . . . 51
81. Failure Of Joint Resolution To Be Adopted After Third Reading . . . . 51
82. Call For Yeas And Nays By Presiding Officer . . . . . . . . . . . . . . . . 51
83. Defeated Bill Or Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . 52
84. Course Of Committee Substitute Bills . . . . . . . . . . . . . . . . . . . . . 52
85. Custodian Of Bills And Resolutions . . . . . . . . . . . . . . . . . . . . . . 53
86. Periods For Introduction And Consideration Of Bills . . . . . . . . . . . . 53
87. Suspension Of Time Limit Rule . . . . . . . . . . . . . . . . . . . . . . . . . 53
88. Introduction And Consideration Of Local Bills . . . . . . . . . . . . . . . 53
    Meaning Of Term Local Bills As Used In Rules 86 And 88 . . . . . . . . 54
89. Suspension Of Rule Limiting Consideration Of Bills . . . . . . . . . . . . 54
90. Committees Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
91. Recommendations Of Committees . . . . . . . . . . . . . . . . . . . . . . . 55
92. Motions To Refer Or Commit . . . . . . . . . . . . . . . . . . . . . . . . . . 55
93. Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
94. List Of Standing Committees . . . . . . . . . . . . . . . . . . . . . . . . . . 56
95. Conference Committees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
96. Instructions To Conference Committees . . . . . . . . . . . . . . . . . . . . 59
97. Committee Of The Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
98. Chairman Of Committee Of The Whole . . . . . . . . . . . . . . . . . . . . . 64
99. Right Of Lieutenant Governor To Speak And Vote In Committee
    Of The Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
100. Procedure In Committee Of The Whole . . . . . . . . . . . . . . . . . . . . . 64
101. Procedure In Committee Of The Whole . . . . . . . . . . . . . . . . . . . . . 64
102. Record Of Committee Attendance . . . . . . . . . . . . . . . . . . . . . . . . 65
103. Public Notice Of Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
104. Minutes Of Committee Meetings . . . . . . . . . . . . . . . . . . . . . . . . . 65
105. Committee Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
106. Quorum Of Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
107. Filing Reports Of Committees . . . . . . . . . . . . . . . . . . . . . . . . . . 68
108. Consideration Of Bills In Committees . . . . . . . . . . . . . . . . . . . . . . 68
109. Minority Committee Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
     Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## RULES OF THE SENATE

### GENERAL PROCEDURE
### QUORUM

1. Two-thirds of all the Senators elected shall constitute a quorum, but a smaller number may adjourn (or recess) from day to day, and compel the attendance of absent Members (Constitution, Article 3, Section 10).

#### Editorial Note

The exact text of Section 10 of Article 3 of the State Constitution is as follows:

"Two-thirds of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and compel the attendance of absent members, in such manner and under such penalties as each House may provide."

#### Notes of Rulings

Twenty Members of the Senate constitute a quorum when only thirty Members have qualified (35 S. J. 2 C. S. 23, 32 (1917)).

A point of order that no quorum is present does not deter continued transaction of business by Senate if in fact a quorum is known by the Presiding Officer to be present and he so announces (50 S.J. Reg. 417 (1947)).

The raising of a point of order that no quorum is present justifies an order by the Presiding Officer that the roll be called to ascertain the presence or absence of a quorum (50 S.J. Reg. 417 (1947)).

Under Senate Rule No. 1 which states that "two-thirds of all of the Senators elected shall constitute a quorum, but a smaller number may adjourn (or recess) from day to day," a motion to recess (or adjourn) until a later time on the same day is a proper motion (61 S.J. Reg. 945 (1969)).

A quorum of the Senate is present when 21 Members answer the Roll Call (61 S.J. Reg. 954 (1969)).

The Senate must have 21 Members present or two-thirds of the elected Members for a quorum of the Senate (61 S.J. Reg. 945, 1099, 1759 (1969)).

The Senate must have 21 Members or two-thirds of the Members elected to the Senate for a quorum (61 S.J. Reg. 1817 (1969)).

Rule 2

There is a quorum of the Senate present when the last Roll Call taken by the Secretary shows that a quorum was present (61 S.J. Reg. 1926 (1969)).

## ABSENTEES

2.   In case a less number shall convene, the Members present may send the Sergeant-at-Arms, or any other person or persons, for any or all absent Members.

### Notes of Rulings

The attendance of absentees may be enforced only on order of Senators present (48 S.J. Reg. 355 (1943)).

The attendance of absentees may be enforced although a quorum is present (48 S.J. Reg. 508 (1943)).

## ABSENCES

3.   No Member shall absent himself from the sessions of the Senate without leave unless he be sick or unable to attend.

### Editorial Note

Rule 32, Subdivision (a), item (2) provides that a vote of two-thirds of the Members present shall be required "to excuse absentees." The main effect of granting leave to an absent Member is that he is recorded "absent-excused" on all votes taken instead of "absent".

## ROLL CALL

4.   Upon every roll call the names of the Members shall be called alphabetically by surname, except when two or more have the same surname, in which case the name of the county shall be added.

## CALL OF THE SENATE

It shall be in order to move a call of the Senate at any time to secure, to maintain, or to secure and maintain a quorum for the following purposes:

(a)   for the consideration of a specific bill, resolution or other measure;

(b)   for a definite period of time or for the consideration of any particular class of bills.

When a call of the Senate is moved for one of the above purposes and seconded by five Members, and ordered by a majority of those present, the Doorkeeper shall close the main entrance of the Hall, and all other doors leading out of the Hall shall be locked and no Member be permitted to leave the Senate without written permission of the Presiding Officer until after the subject matter upon which the call was ordered has been disposed of. The Secretary shall call the roll of Members and note the absentees and those for whom no sufficient excuse is made may, by order of the majority of those present, be sent for and arrested wherever they may be found, by the Sergeant-at-Arms or officers appointed by him for that purpose, and their attendance secured and retained, and the Senate shall determine upon what conditions they shall be discharged. Members who voluntarily appear shall, unless the Senate otherwise directs, be immediately admitted to the Hall of the Senate, and they shall report their names to the Secretary to be entered upon the Journal as present. Until a quorum appears, should the roll call fail to show one present, no business shall be done except to compel the attendance of absent Members or to adjourn.

## SENATE'S RIGHT TO AWAIT ATTENDANCE OF ALL ABSENTEES

When a quorum is shown to be present, the Senate may proceed with the matters upon which the call was ordered, or may enforce and await the attendance of as many of the absentees as it desires to have present. If the Senate decides to proceed, the Sergeant-at-Arms shall not be required to bring in other absentees unless so ordered by a majority vote of the Senate.

When a call of the Senate is ordered, as hereinabove authorized, the Hall of the Senate shall be held to include the Senate Chamber, the Sergeant-at-Arms room, the Senate reception room, the Senate cloak room and the corridors leading thereto.

### Editorial Notes

After a call has been ordered and a quorum has been announced present, it is then proper for the Senate to resume the transaction of business, or, on the adoption of a motion to do so, to secure the attendance of one or more of the Members still absent before resuming consideration of any business.

It is, no doubt, within the province of the Senate to adopt a rule authorizing the Presiding Officer of the Senate during a call of the Senate to issue to any absentee a written demand that the absentee attend the

Rule 5

Senate's session and giving to the Sergeant-at-Arms or his deputies authority to serve and to enforce the demand by whatever means necessary.

### Notes of Rulings

The disclosure of the presence of a quorum during a call to secure and maintain a quorum does not automatically dissolve the call (32 S.J. Reg. 1274 (1911)).

A motion for a call of the Senate may not include a further provision to grant leaves of absence to certain Members (43 S.J. Reg. 1654 (1933)).

A call of the Senate may not be ordered to maintain a quorum "until the final disposition" of a particular bill unless that bill is "pending before the Senate" (44 S.J. 1 C.S. 262 (1935)).

A motion for a call of Senate "to obtain a quorum" is not in order if a quorum is present (47 S.J. Reg. 1007 (1941)).

When under a call, the Senate may compel and await the attendance of all or any number of the absentees before proceeding to transaction of business (48 S.J. Reg. 508, 553 (1943)).

A roll call, following a point of "no quorum," which reveals the absence of a quorum, prevents further consideration of a bill that is being considered on passage to third reading until a quorum is present and permits a motion to be made that a call of the Senate be ordered for the purpose of securing and maintaining a quorum until the disposition of the bill. (50 S.J. Reg. 1137 (1947); 50 S.J. Reg. 1181 (1947)).

A motion for a Call of the Senate is not debatable (61 S.J. Reg. 1759 (1969)).

## PRESIDING OFFICER OF THE SENATE

5. The Lieutenant Governor of the State shall by virtue of his office be President of the Senate (Constitution, Article 4, Section 16) and decide all questions of order subject to appeal by any Member. He shall have control of such parts of the Capitol as have been, or may be, set apart for the use of the Senate and its officers. He shall have the right to name a Member to perform the duties of the Chair, but such substitution shall not extend beyond such time as a majority of the Senators present vote to elect another Member to preside, and if a majority of the Senators present so vote, the Member called to the Chair by the Lieutenant Governor or by the President Pro Tempore of the Senate shall vacate the Chair, and the Member elected by a majority shall preside until the Lieutenant Governor or President Pro Tempore shall take the gavel and preside (Constitution, Article 3, Section 9).

## Editorial Note

The President of the Senate may refuse to rule on a point of order relating to the constitutionality of the substance of a proposition or on one that does not relate to any question of procedure or practice. (See also Rule 15.)

### Note of Ruling

No motion is in order while a point of order is pending (43 S.J. Reg. 1156 (1933)).

## ELECTION OF PRESIDENT PRO TEMPORE

6.  The Senate shall, at the beginning and close of each session, and at such other times as may be necessary, elect one of its Members President Pro Tempore, who shall perform the duties of Lieutenant Governor in any case of absence or disability of that officer and whenever the said office of Lieutenant Governor shall be vacant (Constitution, Article 3, Section 9).

## Editorial Notes

In the absence of both the Lieutenant Governor and President Pro Tempore for a short period of time, either of them may designate in writing a Senator to occupy the Chair, but in case the President Pro Tempore is compelled, for any reason, to be absent for an extended or indefinite period, the Senate elects another President Pro Tempore. For the form of the designation by the Lieutenant Governor or President Pro Tempore, see 49 S.J. Reg. 515 (1945).

## ELECTION OF OFFICERS

7.  A Secretary, Journal Clerk, Calendar Clerk, Enrolling Clerk, Sergeant-at-Arms, Doorkeeper, Chaplain, and such other officers as a majority vote may determine to be necessary shall be elected at the opening of the session of the Legislature to continue in office until discharged by the Senate, and shall perform such duties as may be incumbent upon them in their respective offices, under the direction of the Senate. Such officers may not be related to any current Member of the Texas Legislature, nor may any employee of the Senate be related to any current Member of the Texas Legislature. The Secretary of the Senate shall, in addition to his other duties, be responsible for the coordination of the other offices and divisions of the Senate.

Rule 8

### Editorial Note

This rule is not binding unless and until it is adopted by the Senate at its biennial session. The Senate may, of course, omit the adoption of the rule as written and provide by a simple resolution for the election of such officers as it sees fit.

## OPEN DOORS

**8.** The doors of the Senate shall be kept open, except when there is an Executive Session (Constitution, Article 3, Section 16 and Rules 37-43).

### Editorial Note

When the Senate is in session, the entrances to the main floor of the Senate Chamber are closed, but the galleries are always open to the public except when Senate is in executive session.

## ORDER OF BUSINESS

**9.** The Presiding Officer shall take the Chair at the hour to which the Senate last adjourned.

## ROLL CALL, PRAYER BY CHAPLAIN, READING OF JOURNAL

**10.** The names of the Senators shall be called alphabetically; should a quorum not be in attendance, a majority of those present shall be authorized to send the Sergeant-at-Arms, or a special messenger, for the absentees; when there is a quorum present, prayer shall be offered by the Chaplain and then the Journal of the preceding day shall be read and corrected, if necessary.

## MORNING CALL

**11.** The President then shall call:

(1)  for petitions and memorials;

(2)  for reports from standing committees;

(3)  for reports from select committees;

(4)  for Senate bills on first reading and referral to committee;

(5) for introduction of resolutions;

(6) for messages and executive communications;

(7) for motions to print on minority report;

(8) for other motions not provided herein, including, but not limited to motions to set a bill for special order, to reconsider, to print and not print bills, to re-refer bills, to concur in House amendments to Senate bills, to not concur in House amendments to Senate bills, to request the appointment of conference committees and to adopt conference committee reports.

This concludes the morning call, which the President shall announce to the Senate.

It shall not be in order, during the morning call, to move to take up a bill or resolution out of its regular order; and the Presiding Officer shall not recognize any Senator for the purpose of making any such motion or making a motion to suspend this rule.

### Editorial Notes

The last paragraph of the foregoing rule was adopted by the Senate on June 6, 1947.

A motion to set a bill for a special order may be made under item (8) of this rule, and motions to reconsider, to print or not print bills, and to re-refer bills may properly be made under item (8) of the morning call.

### ORDER OF CONSIDERING BILLS AND RESOLUTIONS

12. At the conclusion of the morning call, the Senate shall proceed to consider business on the President's table, which shall be disposed of in the following order:

(1) special orders;

(2) unfinished business;

(3) Senate Joint Resolutions;

(4) Senate Resolutions;

(5) Senate Concurrent Resolutions;

Rule 13

      (6)   Senate bills on third reading;

      (7)   Senate bills on second reading;

      (8)   House Joint Resolutions;

      (9)   House bills on third reading;

      (10)  House bills on second reading;

      (11)  House Concurrent Resolutions.

**The above order is for Senate bill days, except as modified by the Joint Rules.**

### Notes of Rulings

The order of business as set forth above may be changed by a two-thirds vote of the Senate (42 S.J. Reg. 1682 (1931)).

A House bill laid before the Senate as an unfinished special order should be disposed of before any other House bill which has been set for a special order is taken up for consideration (46 S.J. Reg. 1853 (1939)).

A motion to suspend the regular order of business is not in order while other business is pending under a rule suspension (46 S.J. Reg. 1886 (1939)).

The bill next on calendar is not to be passed over, due to author's absence (47 S.J. Reg. 397 (1941)).

A motion to suspend the regular order of business is not a debatable motion (61 S.J. Reg. 1101 (1969)).

### HOUSE BILL DAYS

**13. After the morning call has been concluded on calendar Wednesday and calendar Thursday of each week, House Joint Resolutions and House bills on special order and on third and second readings, respectively, and House Concurrent Resolutions, shall be taken up and considered until disposed of; provided in case one should be pending at adjournment on Thursday, it shall go over until the succeeding calendar Wednesday as unfinished business.**

### Notes of Rulings

A House bill, by a two-thirds vote, may be taken up and considered by the Senate on any day of the week (46 S.J. Reg. 634-635 (1939)).

When the Senate adjourns on Thursday of any week with a House bill pending, the bill then pending, whether it is a special order or not, may not be further considered until Wednesday of the next succeeding week unless the Senate by a two-thirds vote agrees to consider it further prior to that day (46 S.J. Reg. 1704 (1939)).

House bills may be considered in Senate under a suspension of the regular order of business on days other than calendar Wednesday and calendar Thursday (48 S.J. Reg. 1051 (1943)).

When a Member is discussing a Senate Bill on calendar Monday or calendar Tuesday (which are considered Senate Bill Days in the Senate) and 12:01 o'clock a.m. Wednesday arrives (which is considered a House Bill Day in the Senate), no further discussion may be had on the Senate Bill (61 S.J. Reg. 956 (1969)).

## SPECIAL ORDERS

14.  Any bill, resolution or other measure may, on any day, be made a special order for a future time of the session by an affirmative vote of two-thirds of the Members present.

A special order shall be considered at the time for which it is set and considered from day to day until disposed of, unless at the time so fixed there is pending business under a special order, but such pending business may be suspended by a two-thirds vote of all the Members present. If a special order is not reached or considered at the time fixed, it shall not lose its place as a special order; provided further that all special orders shall be subject to the Joint Rules and Senate Rule 13.

### Editorial Notes

A bill once set as a special order does not lose its place on the Calendar of special orders if not taken up at the hour for which it is set.

A special order, the hour for the consideration of which has arrived, takes precedence of the unfinished business unless the unfinished business is itself a special order.

#### Notes of Rulings

An affirmative vote of two-thirds of all Senators present including those who ask to be recorded as "present-not voting" is required to set a special order (49 S.J. Reg. 427 (1945)).

The motion to set a bill for a special order is not a proper substitute for a motion to suspend the regular order of business and take up a bill for immediate consideration (50 S.J. Reg. 1005 (1947)).

A bill being considered as a special order that is laid on the table subject to call is no longer a special order (43 S.J. Reg. 980 (1933)).

Refusal of Senate to set bill as special order for a certain hour does not prevent a motion's being made and adopted immediately thereafter to set the bill as a special order for a different specified hour (45 S.J. Reg. 860 (1937)).

The Senate, by a two-thirds vote, may take up a bill out of its regular order for immediate consideration although there is an unfinished special order on the President's table awaiting the Senate's consideration (49 S.J. Reg. 1053 (1945)).

When the business before the Senate is a Special Order, the order of business may be suspended in order to consider other business (61 S.J. Reg. 2034 (1969)).

## RULINGS BY PRESIDENT

**15.   Every question of order shall in the first instance be decided by the President, from whose decision any Member may appeal to the Senate.   Rulings which set or alter precedent shall be printed as an annotation to the Rules.**

### Editorial Note

A Member called to the Chair pending an appeal does not entertain any motions nor accept any further point of order.

See also Editorial Note following Rule 5.

## MOTIONS AND THEIR PRECEDENCE

**16.   When a question is under consideration by the Senate, no motion shall be made except:**

(1)   to fix the day to which the Senate shall adjourn or recess;

(2)   to adjourn or recess;

(3)   to proceed to the transaction of executive business;

(4)   the previous question;

(5)   to lay on the table;

(6)   to lay on the table subject to call;

    (7)  to postpone to a time certain;

    (8)  to commit;

    (9)  to amend;

    (10)  to postpone indefinitely;

which several motions have precedence in the order named. It shall be in order to make any number of the above motions before any vote is taken; but the votes shall be taken on all such motions made in the order of the precedence above stated.

## Editorial Notes

Rule 16 apparently prevents a motion to suspend a pending question for the purpose of taking up another, but the Senate's presiding officers have recently interpreted Item 5 of Rule 32 to mean that any rule of the Senate may be amended, suspended, or rescinded by a two-thirds vote at any time and that a motion to suspend Rule 16 and any other interfering rule in order to take up for immediate consideration a question different from the one pending is in order. However, an undebatable privileged question that is pending or a question that is itself under consideration as the result of a rule suspension should be disposed of by the Senate before another question is taken up under a suspension of the rules. No rule suspension, of course, is in order during the morning call.

There are several kinds of motions to amend, which motions have precedence in the order named below:

1.  Committee amendments and amendments by the author or Senator in charge of the bill offered from the floor to the body of the bill.

2.  Other amendments offered from the floor to the body of the bill.

3.  Amendments to the caption of the bill.

4.  Amendments to strike out the enacting clause of a bill.

If a bill is considered section by section, an amendment is not in order except to the section under consideration. After all of the sections have been considered separately, the whole bill is open for amendment.

### Notes of Rulings

**Adjourn**

    (See also Rule 49.)

## Rule 16

After a motion to adjourn has been made no business may precede a vote on the motion except by unanimous consent (43 S.J. Reg. 906 (1933)).

### Table

A motion to table report of conference committee is not in order (47 S.J. Reg. 1128 (1941)).

### Table Subject to Call

A motion to table a bill subject to call is not a proper substitute motion for a motion to set a bill as special order (45 S.J. Reg. 1426 (1937)).

A motion to call from the table a bill tabled subject to call is not in order while joint resolution on passage to third reading is pending (49 S.J. Reg. 820 (1945)).

The motion to table subject to call is not debatable. (51 S.J. Reg. 1336 (1949)).

### Postpone

When the hour to which a bill postponed to a time certain arrives, the postponed measure does not immediately displace a special order (or other matter) already under consideration by the Senate (45 S.J. Reg. 1854 (1937)).

### Commit

A motion to recommit a bill permits discussion of the merits of the bill (42 S.J. Reg. 496 (1931)).

### Amend

[For rulings relating to germaneness of amendments, see under Rule 72.]

The Senate may amend a revenue bill from the House by adding a new field of taxation, and so may place a tax on cigarettes in a bill levying certain other taxes (42 S.J. Reg. 893 (1931)).

An amendment directly contrary to and including the same subject matter as an amendment previously adopted is not in order (42 S.J. Reg. 242 (1931)).

It is not in order to attempt to take out matter inserted after the Senate has refused to reconsider the vote by which it was inserted (42 S.J. Reg. (1931)).

An amendment defeated at a particular stage of a bill may not be again submitted at the same stage of the bill (42 S.J. 1 C.S. 647 (1931)).

Amendment having the same effect as an amendment which has been defeated is not in order (42 S.J. 2 C.S. 95 (1931)).

A substitute for both an amendment and an amendment to an amendment is in order (43 S.J. Reg. 1367 (1933)).

An amendment that has been tabled may not be offered again at the same stage of the bill (44 S.J. Reg. 156 (1935)).

A substitute for a substitute is not in order (44 S.J. Reg. 613 (1935)).

Matter identical with that stricken from a bill by amendment may not be re-inserted at the same stage by further amendment (44 S.J. Reg. 867 (1935)).

A single substitute for both an amendment and an amendment to the amendment may be offered (44 S.J. 2 C.S. 24 (1935)).

An amendment accomplishing same result as defeated amendment but different in text and inserted in bill at different place is in order (45 S.J. Reg. 622 (1937)).

An amendment containing only one of several provisions contained in a defeated amendment is in order (45 S.J. Reg. 1348 (1937)).

An amendment, defeated at one stage of a bill, is again in order when the bill has reached another stage (45 S.J. Reg. 1642 (1937)).

An amendment to make an appropriation from the available school fund for a purpose not authorized by the Constitution is not in order (45 S.J. 2 C.S. 80-81 (1937)).

An amendment changing only load limit in bill relating to weight of trucks is a proper substitute for amendment striking out all after enacting clause and inserting new text (47 S.J. Reg. 475 (1941)).

An amendment inserted in a bill by an amendment is not subject to change at same stage of bill (48 S.J. Reg. 841 (1943)).

A substitute for an amendment is not in order if the substitute relates to a different subject matter (49 S.J. Reg. 436 (1945)).

An amendment to a joint resolution, defeated when the resolution is on passage to engrossment, may be offered again when resolution is on final passage (49 S.J. Reg. 444 (1945)).

An amendment to levy tax on fuel used in aircraft offered to bill exempting from motor fuel tax law fuels used for non-highway purposes subjects the bill to the constitutional prohibition against revenue-raising measures originating in Senate and is not in order (49 S.J. Reg. 527 (1945)).

An amendment to permit a loan by the State in violation of the Constitution is not in order (49 S.J. Reg. 613 (1945)).

A point of order that a line and word reference in a proposed amendment is incorrect does not deter consideration of the amendment containing the reference (50 S.J. Reg. 422 (1947)).

An amendment making it mandatory that the salaries of certain county officers be raised is not in order, after the adoption (at the same stage of the bill) of an amendment that makes the raising of those salaries permissive instead of mandatory. (50 S.J. Reg. 826 (1947)).

An amendment that has been tabled may not be again considered at the same stage of the bill, even though it is resubmitted as only one of two distinct propositions in another amendment. (51 S.J. Reg. 183 (1949)).

An amendment substantially different in any particular from one defeated would not be out of order because of its similarity to the defeated amendment. (51 S.J. Reg. 628 (1949)).

An amendment making an appropriation for the conversion of certain properties to be donated to the State by the Southwestern Medical Foundation into a College of Medicine of The University of Texas is not in violation of Section 6 of Article 16 of the Constitution prohibiting appropriations for private or individual purposes. (51 S.J. Reg. 1127 (1949)).

An amendment which makes a revenue-raising measure of a bill further defining the term "carbon black" as used in the omnibus tax law is not in order. (51 S.J. Reg. 1641 (1949)).

An amendment that does not indicate the portion of a bill it seeks to change is not in order (51 S.J. 1 C.S. 95 (1950)).

## LIMITATION OF DEBATE

17. No debate shall be allowed on a motion to lay on the table, for the previous question, or to adjourn or recess; provided, however, that the author of a measure, or whichever one of the several authors of the same may be by them selected so to do, shall have the right, when a motion to lay on the table shall have been made, to close the debate, which privilege he may yield to any other Senator subject to all of the Rules of the Senate.

### Editorial Note

If the Member having the right to close after a motion to table yields his right to another Senator, he is not permitted himself to debate the question any further.

### Notes of Rulings

The substance of a bill may be stated under a motion to suspend the order of business to take up for consideration (35 S.J. Reg. 1149 (1917)).

The motion to reconsider is debatable unless the proposition upon which the motion to reconsider is made is not debatable (44 S.J. Reg. 368-369 (1935)).

The motion to table subject to call is not debatable (46 S.J. Reg. 479 (1939)).

A resolution to fix date of sine die adjournment is debatable (47 S.J. Reg. 1902 (1941)).

When an amendment to a bill is pending, all debate must relate to the amendment (49 S.J. Reg. 1019 (1945)).

The motion to suspend the regular order of business is not debatable, but a limited explanation of the bill to which any such motion applies is permitted. (50 S.J. Reg. 1349 (1947)).

The author of a bill who has moved to suspend a rule so that the bill might be introduced may explain it briefly. (51 S.J. Reg. 502 (1949)).

A motion for a Call of the Senate is not debatable (61 S.J. Reg. 1759 (1969)).

A congratulatory resolution when offered is not debatable and therefore may be considered immediately or referred to a committee by the Presiding Officer (61 S.J. 1 C.S. 124 (1969)).

## WRITTEN MOTIONS

**18. All motions shall be reduced to writing and read by the Secretary, if desired by the Presiding Officer or any Senator present.**

### Note of Ruling

After the commencement of a roll call on the question of agreeing to a motion to suspend the regular order of business, a Senator may not interrupt the roll call to demand that the motion be submitted in writing and may not then insist as a matter of right that the motion be reduced to writing. (50 S.J. Reg. 602 (1947)).

## WITHDRAWAL OF MOTION

**19. After a motion has been stated by the President, or read by the Secretary, it shall be deemed to be in possession of the Senate, but it may be withdrawn at any time before it has been amended or decided.**

Rule 20

## Note of Ruling

An amendment may be withdrawn by its author at any time before it has been voted on, even when a Senator is debating it; and its withdrawal cuts off immediately any further discussion of it. (50 S.J. Reg. 1237 (1947)).

## MOTIONS TO FIX SUM OR STATE TIME

20.   On a motion to fix a sum or state a time, the largest sum and the longest time shall have precedence.

## DIVISION OF QUESTION

21.   Any Member may have the question before the Senate divided, if it be susceptible of a division, into distinct questions; but on a motion to strike out and insert, it shall not be in order to move for a division of the question; but the rejection of a motion to strike out and insert one proposition shall not prevent a motion to strike out and insert a different proposition; nor prevent a subsequent motion simply to strike out; nor shall the rejection of a motion simply to strike out prevent a subsequent motion to strike out and insert. A motion to table shall only affect the matter to which it is directed, and a motion to table an amendment shall never have the effect of tabling the entire measure.

### Notes of Rulings

A motion to suspend the regular order of business to take up a bill is susceptible of division when there is more than one Senate rule banning the immediate consideration of the bill, but after the motion has been made and carried by a two-thirds vote and the bill has been laid before the Senate and read second time, it is too late to call for a division of the question or to invoke the rule requiring bills to be printed before consideration. (50 S.J. Reg. 1056 (1947)). See also note of ruling following Rule 74.

A motion that Senate Rule 13 (now Rule 12) and the regular order of business be suspended and a certain general bill be laid out is not susceptible of division if Senate Rule 13 (now Rule 12), which relates to the order of business, is the only Senate rule banning the laying out of the bill and its immediate consideration by the Senate. (50 S.J. Reg. 1239 (1947)).

## REASON FOR VOTE

22.   Any Member shall have the privilege to have spread upon the Journal of the Senate a brief statement of his reason for any vote he may cast.

## Editorial Note

A Senator's privilege of inserting his reasons for a vote is frequently exercised; and in some instances a considerable amount of matter quoted from letters, newspapers, etc., is incorporated in the reasons inserted (40 S.J. Reg. 416-418 (1927); 40 S.J. 1 C.S. 42-43 (1927); 42 S.J. 1 C.S. 24 (1931); 49 S.J. Reg. 582 (1945)).

## RECONSIDERATION

23. After a question shall have been decided, either in the affirmative or negative, any Member voting with the prevailing side may, at any time on the same legislative day in which the vote was taken or on the next legislative day, move the reconsideration thereof. When a bill, resolution, report, amendment, order or message upon which a vote was taken shall have gone out of the possession of the Senate and have been delivered to the House of Representatives, or to the Governor, the motion to reconsider shall be accompanied by a motion to request the House or the Governor to return same, which last motion shall be acted upon, and if determined in the negative shall be a final disposition of the motion to reconsider. If the motion to request the House to return same is successful, the motion to reconsider shall then be acted upon and if sustained, the bill, resolution, report, amendment, order or message upon which the vote was taken and which vote was reconsidered, shall be placed upon the calendar as unfinished business and may be called up on the first appropriate day on or after the return of same to the possession of the Senate.

### Editorial Notes

If a vote on a Senate bill is reconsidered on House bill day, the bill itself may not be considered in the Senate until the arrival of a Senate bill day.

Under Senate Rule 23, recalling is made the first requirement for further considering a bill passed by the Senate and sent to the House. Hence, a motion or resolution to recall the bill is privileged.

#### Notes of Rulings

Reconsideration of a vote recommitting a bill has the immediate effect of placing the bill back to its status before the motion to recommit prevailed (34 S.J. Reg. 250 (1915)).

Reconsideration of vote by which a bill passed to engrossment places the bill back before the Senate just as it was before the vote on its engrossment was taken (37 S.J. Reg. 578 (1921)).

Rule 23

A motion to reconsider a vote may be made on the first day after the vote is taken on which there is a quorum of the Senate present (38 S.J. Reg. 619 (1923)).

Vote on adoption of amendment, adopted on second reading of a bill that is later ordered engrossed, may not be reconsidered until vote on passage of bill to engrossment has been reconsidered (39 S.J. Reg. 388 (1925)).

The motion to reconsider a vote is not debatable when the motion on which the vote was taken is not debatable (40 S.J. Reg. 415 (1927)).

A motion to reconsider the vote by which the previous question has been ordered may be made by any Senator voting to order it; and in case the vote is not a "yea and nay" recorded vote, it may be made by any Senator (40 S.J. Reg. 415 (1927)).

Upon reconsideration of the vote on a House bill, it automatically takes its place on the calendar of House bills on the President's table for consideration by the Senate (42 S.J. Reg. 608 (1931)).

The vote on an amendment to a bill, adopted before engrossment of the bill, may not be reconsidered until the vote on the passage of the bill to engrossment has first been reconsidered (42 S.J. Reg. 1573 (1931)).

A motion to adopt a conference committee report on joint resolution is in order at any time, and without a reconsideration of a previous adverse vote on the report (44 S.J. Reg. (1935)).

A motion to reconsider a vote is not debatable if at the time the vote was taken the previous question on the proposition voted on had been ordered (44 S.J. 1 C.S. 219 (1935)).

The motion to reconsider the vote on the passage of a bill must be made on the same day the bill was passed to engrossment or on the next succeeding legislative day (46 S.J. Reg. 1129 (1939)).

A bill may be recalled from the House before motion is made to reconsider vote on its passage (46 S.J. Reg. 1209 (1939)).

The vote by which a conference report has been adopted by the Senate may be reconsidered by the Senate and the bill recalled from the Governor although the bill has been enrolled, signed by the presiding officers of each House and presented to the Governor (46 S.J. Reg. 1487 (1939)).

Debate of motion to reconsider vote by which main question ordered is not in order (47 S.J. Reg. 2258 (1941)).

A motion to reconsider a vote must be made on the same day the vote is taken or on the next legislative day (49 S.J. Reg. 807 (1945)).

The motion to reconsider a vote may not be made by a Member who is not recorded as having voted on the prevailing side if the vote was a yea and nay recorded vote (49 S.J. Reg. 1019, 1214 (1945)).

A motion to reconsider the vote by which a motion to table has prevailed may not be made (50 S.J. Reg. 805 (1947)).

A concurrent resolution to recall for further consideration a bill passed by the Senate is in accord with Senate Rule 60 (now Rule 23), and is privileged. (51 S.J. 1 C.S. 120 (1950)). (See also Hinds' Precedents, 5, 5669-5671.)

## SPREADING MOTION TO RECONSIDER ON JOURNAL

24.  At any time before the expiration of the next legislative day following that on which the vote was taken, a motion to reconsider a vote may be made by any Senator who is permitted by Rule 23 to make it; and the maker of the motion may accompany it with a request that it be spread on the Journal to be called up and acted on at a later time, which request shall be granted unless another Senator demands immediate action thereon. In case a motion to reconsider that has been spread upon the Journal is not called up to be acted on by the Senate within five legislative days after it has been made, it shall not thereafter be called up or acted upon; and any such motion that has been made during the last six days of the session that has not been called up before the final 24 hours of the session shall not thereafter be called up or acted upon by the Senate. In all cases, a motion to reconsider shall be decided by a majority of the vote.

## READING OF PAPERS

25.  When the reading of a paper is called for, and the same is objected to by any Member, it shall be determined by a majority vote of the Senate, and without debate.

### Notes of Rulings

The Senate may determine whether a Senator who is explaining a bill prior to a vote on a motion to permit its introduction may read the bill in full (51 S.J. Reg. 502 (1949)).

Although the Senate on a previous occasion has ordered the full reading of a certain bill dispensed with, a full reading may be called for when the bill is again before the Senate for consideration and may be dispensed with only on order of the Senate (51 S.J. Reg. 503 (1949)).

A Senator addressing the Senate on the question of whether or not the Senate shall concur in the House amendments to a bill may read in full a legal opinion relating to the subject matter of the amendments unless the Senate orders its reading discontinued (51 S.J. Reg. 603-604 (1949)).

A second reading of an amendment in full may be dispensed with by order of the Senate (51 S.J. Reg. 625, 628 (1949)).

## MODE OF STATING AND VOTING UPON QUESTIONS

**26. All questions shall be distinctly put by the President and the Members shall signify their assent or dissent by answering "yea" or "nay."**

### Note of Ruling

After a roll call has been ordered and before the calling of the roll has commenced, it is not in order for a Member to address the Senate (44 S.J. 2 C.S. 83 (1935)).

## LIEUTENANT GOVERNOR TO GIVE CASTING VOTE

**27. If the Senate be equally divided on any question, the Lieutenant Governor, if present, shall give the casting vote (Constitution, Article 4, Section 16).**

### Editorial Note

A vote on a motion to refer a resolution was yeas 15, nays 15. Lieutenant Governor Davidson voted "nay" and declared the motion lost. A second vote was taken on a motion to refer to another committee and resulted in a tie. Lieutenant Governor A. B. Davidson voted "nay" and declared the motion lost (32 S.J. Reg. 39 (1911)).

## EFFECT OF TIE VOTE WHEN LIEUTENANT GOVERNOR ABSENT

**28. If the Senate is equally divided on any questions when the Lieutenant Governor is not present, such question or motion shall be lost.**

## CALLS FOR YEAS AND NAYS BY THREE MEMBERS

**29. (a) At the desire of any three Members present, the yeas and nays shall be entered on the Journal, and the names of the Members present and not voting shall be recorded immediately after those voting in the affirmative and negative, and such Members shall be**

counted in determining the presence of a quorum (Constitution, Article 3, Section 12).

(b) If a Member who is absent desires to be recorded on a pending question he may cast a paired vote by signing a pair slip which indicates his yea or nay vote with a Member who is present and casting an opposite vote, if the Member who is present so desires. Pair slips must be signed by both the absent and present Member and filed with the Secretary of the Senate before the vote. The paired votes of the present and absent Members shall be recorded as an expression of opinion on the matter considered but shall not be counted in the total of votes for or against the measure or motion. However, the Member present shall be counted to make a quorum.

## Editorial Note

Verification of a yea and nay vote is not provided for by any rule, but when a vote is close, it has been the practice for the presiding officer to order a verification when requested by any Member to do so.

## MEMBERS REFUSING TO ANSWER RECORDED PRESENT

30. Upon a roll call of the Senate, should any Member who is in the Senate Chamber fail or refuse to answer when his name is called, the Secretary of the Senate shall, under the direction of the President of the Senate, record such Member as present.

## MATTERS REQUIRING VOTE OF TWO-THIRDS OF ALL MEMBERS

31. (a) A vote of two-thirds of all Members elected to the Senate shall be required:

(1) for the final passage of proposed amendments to the Constitution (Constitution, Article 17, Section 1);

(2) in cases of great public calamity to release the payment of taxes (Constitution, Article 8, Section 10);

(3) for the final passage of bills to reduce a county to a less area than nine hundred square miles (Constitution, Article 9, Section 1);

(4) for the passage of an address to the Governor for the removal of any civil officer (Constitution, Article 15, Section 8);

Rule 32

(5) to expel a Member (Constitution, Article 3, Section 11).

### Note of Ruling

A vote of two-thirds of the Members is not required for passage of bill to create flood control district and donate portion of taxes collected therein to the district (48 S.J. Reg. 1053 (1943)).

## VETOED BILLS

(b) A vote of two-thirds of all Members elected to the Senate shall be required for the passage of House bills that have been returned by the Governor with his objections, and a vote of two-thirds of the Members of the Senate present shall be required for the passage of Senate bills that have been returned by the Governor with his objections (Constitution, Article 4, Section 14).

### Note of Ruling

A specific case in which the vote of yeas and nays did not pass the bill over the Governor's veto is found at 47 S.J. Reg. 2748 (1941).

## MATTERS REQUIRING VOTE OF TWO-THIRDS OF MEMBERS PRESENT

32. (a) A vote of two-thirds of all Members present shall be required:

(1) for the impeachment of any officer (Constitution, Article 15, Section 3);

(2) to excuse absentees;

(3) to adopt an amendment at third reading of a bill or a joint resolution;

(4) to postpone or change the order of business;

(5) to suspend, rescind or amend any Rule of the Senate. Joint Rules of the two Houses may be adopted or amended by a simple majority of the Members elected to the Senate and shall take precedence over Senate Rules in conflict.

(b) A vote of two-thirds of the Members present shall be required for the confirmation of any appointee of the Governor, unless otherwise directed by law (Constitution, Article 4, Section 12).

## Historical Notes

The following rule was adopted by the Senate in 1911 (32 S.J. Reg. 790): "Rule 61a. It shall only require a majority vote of all Senators present to suspend pending business for the purpose of taking up and considering Senate Bill No. 1 and House Bill No. 226, any other rule or order to the contrary notwithstanding."

Rule 63 as adopted at the regular session in 1911 read as follows: "Any rule or order of the Senate may be rescinded by a majority vote of all members elected. . . ."

The following rule of the preceding legislature was eliminated from the 1911 Senate rules: "No standing rule or order of the Senate shall be rescinded or changed without one day's notice being given of the motion therefor."

The following is the text of the old rule on rescinding, which was adopted by the Senate of the 34th Legislature:

"(64) Any rule, order or act of the Senate may be rescinded or changed by a two-thirds vote of all Members present, except where otherwise provided by the Constitution or the laws." (34 S.J. Reg. 977 (1915)).

The rule was later amended to require two-thirds of all Members to rescind or change a rule, and in 1939 the item (5) above was inserted in lieu of the old Rule 64.

### Note of Ruling

Pending consideration of a conference report, a motion to suspend its consideration and take up a Senate bill for immediate consideration is in order. The motion is divisible, since it involves the suspension of Rule 26 (now Rule 16) and also of Rule 13 (now Rule 12), 61st Leg. (51 S.J. Reg. 1555 (1949)).

### Editorial Note

This ruling and other late Senate precedents relative to suspending a pending question for the purpose of taking up another indicate that it has become the prevailing opinion of the Senate's presiding officers and its Members that any pending debatable question, even a highly privileged one or one with high priority for consideration, may be suspended by a two-thirds vote of the Senate for the purpose of taking up another matter on the President's table for immediate consideration. Suspending a question that has itself been taken up under a suspension would most likely not be permitted.

Rule 34

## SUSPENSION OF THREE-DAY RULE

33. It shall require a vote of four-fifths of the Senate to suspend the Rule requiring bills to be read on three several days (Constitution, Article 3, Section 32).

### Editorial Note

"Four-fifths of the Senate" means four-fifths of the Members present, provided a quorum is present.

#### Note of Ruling

A motion to suspend the Constitutional Rule and Senate Rule 32 (now Rule 68) requiring bills to be read on three several days may be made although the same motion has been made and defeated on the same bill on the same legislative day (55 S.J. Reg. 1561 (1957)).

### ELECTIONS

34. In all elections of the Senate, the vote shall be given viva voce, except in the election of officers of the Senate (Constitution, Article 3, Section 41).

35. A majority of the whole number of votes cast shall be necessary for a choice in all elections by the Senate.

## NOMINATIONS BY THE GOVERNOR

36. When nominations shall be sent to the Senate by the Governor, a future day shall be assigned for action thereon, unless the Senate unanimously direct otherwise. They shall be referred directly to either the Subcommittee on Nominations or the standing committee with jurisdiction over the subject matter involved, which shall hold hearings and report its actions directly back to the Senate.

37. Nominations having been reported out of the Nominations Subcommittee, or other appropriately designated standing committee shall not be acted upon unless the names of the nominees or individual nominee shall have been printed and laid on the Members' desks 24 hours beforehand.

### Notes of Rulings

No action can be taken on nominations on same day submitted except by suspending rule requiring nominations to be considered on a "future day" (43 S.J. Reg. 199 (1933)).

A motion that the Senate hold an executive session the same day the motion is made is not in order, since Rule 86 (now Rule 36) provides that a future day shall be set for the consideration of Governor's nominations (48 S.J. Reg. 139 (1943)).

38. Hearings on nominations by the proper committee shall be open meetings, unless an Executive Session is ordered by a majority vote of the membership of that committee.

39. All nominations approved or definitely acted on by the Senate, shall be returned to the Governor, by the Secretary, from day to day, as such proceedings may occur.

### Editorial Notes

The Senate of the 43rd Legislature in open session, on a motion made by Senator Woodruff, granted the request of Governor Ferguson to withdraw certain nominations that had been submitted by outgoing Governor Sterling, but not yet acted on by the Senate (43 S.J. Reg. 108 (1933)).

The Governor may re-submit a nomination of a particular person to a particular office after the Senate has failed to confirm the appointment of that person to that office. For briefs on this point and full text of the ruling of Lieutenant Governor Witt thereon, see 43 S.J. Reg. 373 (1933).

### SECRECY OF EXECUTIVE SESSION

40. When the Senate is in Executive Session, the Senate Chamber and gallery shall be cleared of all persons except the Secretary of the Senate and the Sergeant-at-Arms who shall keep secret proceedings of such session until the injunction of secrecy is removed by unanimous vote of the Senate.

41. Consideration of all information and remarks touching the character and qualifications of nominees for confirmation by the Senate shall be in open session unless an executive session is ordered by a proper motion adopted by a majority vote of the membership of the Senate. Members of the Senate shall vote to confirm or not confirm in open session of the Senate and the votes to confirm and not confirm shall be entered in the journal of the Senate.

42. No Member of the Senate shall be prohibited from revealing his own view on any matter, or his vote on any matter, pending or having been decided by the Senate.

## VIOLATION OF SECRECY

43. Any officer or Member convicted of violating any provisions of either Rule 40 or 41 shall be liable, if an officer, to dismissal from the service of the Senate, and, if a Member, to expulsion.

## MESSAGES TO THE HOUSE

44. Messages, bills, resolutions and other papers shall be sent to the House of Representatives by the Secretary, who shall previously endorse upon them the final determination of the Senate thereon.

### RECEPTION OF HOUSE MESSAGES

45. Messages may be received at any time, except while a question is being put, while the yeas and nays are being taken, or while the ballots are being counted.

## JOURNAL OF THE SENATE

46. The proceedings of the Senate, when not in Committee of the Whole or in Executive Session, shall be entered on the Journal as concisely as possible, care being taken to detail a true and accurate account of the proceedings; the titles of the bill and such parts thereof only as shall be affected by proposed amendments, shall be inserted in the Journal; every report of a committee and vote of the Senate; and a brief statement of the contents of each memorial, petition, or paper presented to the Senate, shall also be inserted in the Journal. Resolutions of a congratulatory nature, and resolutions recognizing visitors to the Senate shall not be numbered or printed in the Journal, but the names of the sponsor and the persons concerned and the recognition accorded may be listed for each day at the end of the day's proceedings. Originals of congratulatory recognition and memorial resolutions shall be limited to five in number.

### Editorial Note

House amendments to any Senate Bill, Senate Joint Resolution, or Concurrent Resolution shall be printed in the Senate Journal on the day that action is taken by the Senate thereon.

#### Notes of Rulings

The Senate can take cognizance of an action by House only if officially notified of such action (35 S.J. 2 C.S. 61 (1917)).

The President of the Senate and the Senate may refuse to abide by an erroneous entry in the Journal and an erroneous endorsement on a bill and may proceed as though no such entry or endorsement had been made (37 S.J. Reg. 638 (1921)).

It is not out of order for a Member to request that the Journal show the subjects as well as the numbers of certain bills the recommitment of which has been moved (51 S.J. Reg. 562 (1949)).

A letter relating to supply of natural gas to San Antonio may be inserted in the Senate Journal and the rule relative to contents can be suspended by Member requesting same if there is no other matter pending before Senate at that time (62 S.J. 2 C.S. (1972)).

## RETURN OF VETOED SENATE BILLS

47.    When a bill shall be returned to the Senate by the Governor, with his objections, they shall be entered at large upon the Journal (Constitution, Article 4, Section 14).

### Note of Ruling

Consideration of a motion to override the Governor's veto of a particular bill may be postponed (45 S.J. Reg. 1484 (1937)).

## REPORT TO GOVERNOR OF FINAL RESULT OF EXECUTIVE SESSION

48.    The proceedings of the Senate, when in Executive Session shall be kept in a separate book. The proceedings of the Senate, when in open session acting upon nominations made by the Governor, shall be entered in the journal of the Senate, and the Secretary shall report the final result to the Governor.

## ADJOURNMENT

49.    A motion to adjourn or recess shall always be in order, and shall be decided without debate, and the Senate may adjourn or recess while operating under the previous question.

## ADJOURNMENT OF SENATE FOR MORE THAN THREE DAYS

The Senate shall not adjourn or recess for more than three days, nor to any other place than that in which it may be sitting, without the concurrence of the House of Representatives (Constitution, Article 3, Section 17).

Rule 50

## Editorial Note

The motion to recess or adjourn is not debatable, and the maker of either motion may not hold the floor to the exclusion of other Senators who might want to move to adjourn or recess to a different hour. After a series of such motions has been made, the motions must be voted on immediately.

### Notes of Rulings

Under Senate Rule 1 which states that "two-thirds of all of the Senators elected shall constitute a quorum but a smaller number may adjourn (or recess) from day to day", a motion to recess (or adjourn) until a later time on the same day is a proper motion (61 S.J. Reg. 945 (1969)).

The Legislature may repeal or set aside a resolution setting a date for sine die adjournment (42 S.J. Reg. 1656 (1931)).

A resolution setting a new time for sine die adjournment is in order and requires only a majority vote to adopt it (42 S.J. 2 C.S. (1931)).

A motion to adjourn may not be made immediately after the defeat of a series of motions to adjourn and recess (51 S.J. Reg. 577 (1949)).

A motion to adjourn or recess is not a proper motion where further business has not been transacted by the Senate since a previous motion to adjourn or recess had been made and defeated (61 S.J. Reg. 1059 (1969)).

A concurrent resolution containing a provision that "no date for adjournment be fixed until the appropriation bills have been passed and all important measures upon the calendar have been disposed of" was held out of order by Lieutenant Governor Lynch Davidson, because it sought "to deny the Legislature its constitutional right to adjourn at any time it desires" (37 S.J. Reg. 392 (1921)).

The Legislature may repeal or set aside a resolution setting a future date and hour for sine die adjournment, and a resolution setting a new time for sine die adjournment is in order, and only a majority vote is required to adopt it (42 S.J. Reg. 1656, 1682 (1931)).

An adjournment from Thursday to Monday is not for more than three days, and consent of the House to such an adjournment by the Senate is not needed (49 S.J. Reg. 640 (1945)).

## WHEN SENATE RULES ARE SILENT

**50. The President of the Senate shall decide all questions not provided for by the standing Rules of Order of the Senate, and Joint Rules of Order of both Branches of the Legislature, according to parliamentary practice, laid down by approved authors subject to appeal to the entire Senate, as in other cases.**

## Editorial Note

The rulings of the presiding officers of the Senate as shown in the Texas Legislative Manual, the practice in Congress as shown in Hinds' Precedents and in Cannon's Precedents, the practice in the Texas House of Representatives as shown in the Legislative Manual, and the rules and precedents as set forth in Jefferson's Manual, Cleaves' Manual and the Manual of the United States Senate have been resorted to by the presiding officers of the Senate for guidance in deciding questions of order.

## PREVIOUS QUESTION

51.   Pending the consideration of any question before the Senate any Senator may call for the previous question, and if seconded by five Senators, the Presiding Officer shall submit the question: "Shall the main question be now put?" And if a majority vote is in favor of it, the main question shall be ordered, the effect of which shall be to cut off all further amendments and debate, and bring the Senate to a direct vote— first upon pending amendments and motions, if there be any, then upon the main proposition. The previous question may be ordered on any pending amendment or motion before the Senate as a separate proposition, and be decided by a vote upon said amendment or motion.

### Editorial Notes

After the previous question has been ordered, no motions are in order until the question or questions on which it is ordered have been voted upon, except the motions to adjourn, for a call of the Senate and to reconsider the vote by which the previous question was ordered, and the motion to reconsider can be made only once.

It has also been held that a motion may be withdrawn after the previous question has been ordered on it. (See Senate Journal, 46th Legislature, Regular Session, pages 2112-2113; Senate Journal, 50th Legislature, page 1237.)

#### Notes of Rulings

The previous question may not be ordered on final passage of bill prior to its being placed on third reading (34 S.J. Reg. 1063 (1915)).

Ordering of the previous question does not violate the "free discussion" section of the Constitution (38 S.J. Reg. (1923)).

When the main question has been ordered but not voted on, a Member is not entitled to speak on a question of personal privilege (42 S.J. Reg. 1203; 42 S.J. 1 C.S. 675 (1931)).

**Rule 52**

The previous question may not be moved to include the votes to be taken on a bill or on any subsidiary motions applied to it at a more advanced stage (42 S.J. 1 C.S. 675 (1931)).

It is not in order to speak to a question of personal privilege after the previous question has been ordered (43 S.J. Reg. 691 (1933)).

A motion may be made (even by a Senator not voting on the prevailing side) to rescind the "action and vote of the Senate" in ordering the previous question (45 S.J. Reg. 432 (1937)). (A vote of two-thirds of all members present is required to suspend, rescind or amend any rule of the Senate.)

The vote by which the main question is ordered on series of questions may be reconsidered after vote has been taken on one or more of the questions (45 S.J. 2 C.S. 82 (1937)).

The motion for the previous question on a bill may be made and voted on after the previous question has been ordered on a proposed amendment to the bill and before a vote has been taken on the amendment (46 S.J. Reg. 2041 (1939)).

A motion for previous question is not in order immediately after defeat of same motion (47 S.J. Reg. 1743 (1941)).

The constitutional rule (Section 32 of Article 3) calling for "free discussion" on a bill does not prevent the making of a motion for the previous question on the passage of a bill or prevent the Senate's ordering the main question on the bill as provided for in its own rule relating to the previous question. The Senate determines by its vote on the motion for the previous question whether or not the constitutional rule has been complied with (50 S.J. Reg. 1174 (1947)).

A motion for the previous question may be put at the same time on a motion to re-refer a bill from one committee to another committee and also a substitute motion that the same bill be referred from the original committee to still another committee (61 S.J. Reg. 1762 (1969)).

## DEMAND FOR IMMEDIATE RULING

**52.** Pending the consideration or discussion of any point of order before the Presiding Officer and the Senate, or either, any Senator may demand that the point of order be immediately decided, and if seconded by 10 Senators, the Presiding Officer shall submit the question: "Shall the point of order be now decided?" If a majority vote is in favor of it, the point of order shall immediately be decided by the Presiding Officer, and if an appeal from his decision is taken, the appeal shall be immediately decided by the Senate without debate.

## Editorial Note

The President of the Senate is required by the rules of the Senate to decide questions of order, but he is not required to rule on the constitutionality of the substance or content of any proposed law, resolution, or amendment. He usually decides questions as to the constitutionality of a certain procedure or as to the Senate's constitutional jurisdiction, but he usually submits to the Senate for its decision questions as to the constitutionality of the substances or content of any proposal. See also Rules 5 and 15 and notes following them.

### Note of Ruling

The constitutionality of a bill or resolution should not be ruled on by the Presiding Officer of the Senate (61 S.J. Reg. 2034 (1969)).

## DECORUM
## REMOVAL OF SENATOR FROM CHAIR

53. If any Senator other than the regularly elected President Pro Tempore be presiding and fails or refuses to recognize any Senator to make a motion that is in order, or to raise a point of order that it is in order to raise, or fails or refuses to entertain an appeal from his decision, or to put such question to the Senate or fails to recognize any Senator to demand that a point of order under discussion be immediately decided, or fails to put the question, if seconded by 10 Senators, "Shall the point of order be now decided?" such Senator so offending shall be deemed guilty of violating the high privileges of the Senate, and until such offending Senator shall purge himself of such contempt and be excused by the Senate, he shall not again be called to the Chair during the session. If such Senator so presiding shall refuse to recognize any Senator when addressed in proper order, or to entertain the motion, the point of order, or appeal of any Senator, or to pass upon the same, or to recognize a Senator to make the demand when seconded by 10 Senators that a point of order under discussion be immediately decided, then the Senator seeking recognition may rise in his seat, and without recognition, read a written demand upon the Senator presiding, provided the same is signed by a majority of the Senators present, and if the Senator presiding persists in his refusal, then any number of Senators constituting a majority of the Senators present may present such written demand to the Sergeant-at-Arms, or the Assistant Sergeant-at-Arms, and such written demand shall be a full and sufficient warrant for arrest, empowering such officer, or either of them to arrest said Senator so presiding and eject him from the Chair, and retain him under arrest until he shall be released by order of the Senate.

Rule 54

Should the Sergeant-at-Arms or the Assistant Sergeant-at-Arms fail or refuse to act and carry out such demand, they shall be removed from office on a majority vote of the Senate.

When such Senator is removed as aforesaid and the Chair remains vacant, the Secretary shall call the Senate to order, and a President Pro Tempore ad interim shall be elected to preside until the Lieutenant Governor or a regular elected President Pro Tempore shall appear and take the gavel.

As soon as order is restored the Chair shall cause a record of the fact of removal to be made.

### Editorial Note

This rule is one of several first adopted in 1911 to prevent the Lieutenant Governor or any Senator occupying the Chair temporarily and the Senators opposing a measure from killing it by dilatory tactics.

## DECORUM AND DEBATE

54. When a Senator is about to speak in debate or to communicate any matter to the Senate, he shall rise in his place and address the President.

### Editorial Note

A Member who desires to speak on a pending question should address the Chair, and, having obtained recognition, may speak, in an orderly and parliamentary way, and subject to the rules of the Senate, as long as he desires.

## RECOGNITION OF MEMBERS IN DEBATE

55. When two or more Members rise at once, the Presiding Officer shall decide which one shall speak first, but from his decision an appeal without debate may be taken to the Senate by any Member.

### Editorial Note

When a bill or other measure is before the Senate, the President first recognizes, for motions for its disposition, the author or sponsor of the bill, who is entitled at all stages to prior recognition for motions that are in order which are intended to expedite the passage of the bill. In recognition for general debate, the President alternates between those favoring and those opposing a measure.

### Note of Ruling

If the sponsor of a bill does not seek recognition to debate the question of its passage, and another Member obtains the floor to debate it, the Member so obtaining the floor should be permitted to finish his remarks on the bill before the sponsor is allowed to discuss it (46 S.J. Reg. 1869 (1939)).

## SPEAKING MORE THAN ONCE IN SINGLE DEBATE

56. No Member shall speak more than once in any one debate until every Member desiring to do so shall have spoken, nor shall any Member speak more than twice in any one debate without leave of the Senate.

### Note of Ruling

A Senator who yields the floor for a motion to adjourn without having concluded his address does not have to await the debate of all other Senators desiring to be heard on the question being considered before being recognized to resume and conclude his address (51 S.J. Reg. 181 (1949)).

## MEMBER CALLED TO ORDER

57. When a Member shall be called to order by the President, or by a Senator, he shall sit down and not be allowed to speak, except to the point of order, until the question of order is decided. If the decision be in his favor he shall be at liberty to proceed; if otherwise, he shall not proceed without leave of the Senate.

### Editorial Note

In 1925, Senator Fairchild obtained the floor to discuss a point of order which he had raised. Pending his remarks, Senator Wood raised the point of order that Senator Fairchild was not discussing the point of order but another matter. Lieutenant Governor Barry Miller sustained the point of order and submitted to the Senate the question of whether or not Senator Fairchild would be permitted to continue his discussion. The Senate refused to permit Senator Fairchild to continue the discussion by a vote of yeas 15, nays 16 (39 S.J. Reg. 1110 (1925)).

## REFUSAL OF MEMBER CALLED TO ORDER
## TO BE SEATED

58. Whenever a Member is called to order by the President of the Senate, or by the Presiding Officer then in the Chair, in accordance

Rule 59

with Rule 57 hereof, and such Member fails to sit down and be in order, but continues disorderly, it shall be the duty of the Sergeant-at-Arms and/or his assistants upon the direction of the Presiding Officer to require such recalcitrant Member to take his seat and be in order. Any Member who persists in disorderly conduct, after being warned by the Presiding Officer, may, by motion duly made and carried by two-thirds vote of the Members in attendance, be required to purge himself of such misconduct and until such Member has purged himself of such misconduct he shall not be entitled to the privileges of the floor.

### Editorial Note

When speaking, a Member must confine himself to the subject under debate. In discussing an amendment, the debate must be confined to the amendment and not include the general merits of the bill or other proposition.

## INTERRUPTION OF PRESIDENT

59. While the President is putting the question or addressing the Senate, he shall not be interrupted.

## INTERRUPTION OF MEMBER SPEAKING

60. While a Member has the floor, no Member shall interrupt him or otherwise interrupt the business of the Senate, except for the purpose of making a point of order, calling him to order, moving the previous question, demanding that a point of order under discussion or consideration be immediately decided, or a motion to adjourn or recess; and any Member shall, though another Member has the floor, be recognized by the Presiding Officer, and be in order to call to order the Member, to make a point of order, or to move the previous question, or to demand that a point of order be immediately decided. A Member who has the floor must yield to permit the Senate to receive messages from the Governor and from the House of Representatives and shall not lose the floor. A Member who has the floor may yield for questions from other Members and shall not lose the floor. In the event a Member is interrupted because of a motion to adjourn or recess and the motion fails, the floor shall be immediately returned to the interrupted Member. In the event the interrupted Member was speaking under the previous question and a motion to adjourn or recess prevails, he shall resume the floor and finish speaking when the bill is next considered by the Senate.

## Editorial Notes

It is the custom of the President to request a Member to yield for a message.

Although there is no Senate rule by which a Member can be taken from the floor for pursuing "dilatory tactics" (40 S.J. Reg. 882 (1927)), a Senator who has been repeatedly called to order for not confining his debate to the question before the Senate, may be required by the Senate to discontinue his address.

A point of order against further debate of a question by a Senator on the ground that his remarks are not germane to the question before the Senate is often disposed of by the Chair with a warning to the Senator who has the floor to confine his remarks to the pending question.

The point of order having been raised for the third time that a Senator who had the floor was filibustering and not confining his remarks to the bill before the Senate, the Chair requested the Senate to vote on the point of order. It was sustained and the Senator speaking yielded the floor (44 S.J. Reg. 1780 (1935)).

The withdrawal of a pending motion by its maker is a privilege that may be exercised at any time, even while a Member is addressing the Senate (46 S.J. Reg. 1931, 2112-2113 (1939); 50 S.J. Reg. 1237 (1947)).

### Notes of Rulings

A Member who has the floor may not be removed by the adoption of a motion for the previous question (38 S.J. Reg. 1169 (1923)).

By raising a point of order, the speaker loses his right to resume speaking if the previous question has been ordered (42 S.J. Reg. 1683 (1931)).

The motion for the previous question may be made at any time, even when another Member has the floor (42 S.J. 2 C.S. 236 (1931)).

A Member may not take the floor on a point of personal privilege while another Member is addressing the Senate (43 S.J. Reg. 1430 (1933)).

A parliamentary inquiry is a privileged matter (43 S.J. Reg. 1430 (1933)).

A speaker yielding the floor for the reception of a message from the House does not lose his right to resume the floor immediately after message received (46 S.J. Reg. 1873 (1939)).

Remarks not in the nature of an inquiry are not in order by a Member to whom a Senator has yielded for a question (48 S.J. Reg. 519 (1943)).

A digression by a Senator in his speech on a pending amendment to another subject does not ban his resuming and continuing a germane discussion of the amendment (50 S.J. Reg. 417 (1947)).

A second digression by a Senator on the floor from a discussion of the pending amendment does not necessarily prevent his resuming and continuing a germane discussion of the amendment (50 S.J. Reg. 418 (1947)).

Raising of a third point of order against further debate by a Senator on the floor who has digressed for a third time from a discussion of the pending amendment, after having been twice requested to confine his debate to the amendment, justifies the Presiding Officer in calling for a vote by the Senate on the question of whether or not he shall be permitted to resume and continue his remarks. (50 S.J. Reg. 418 (1947)).

A Senator addressing the Senate may not yield the floor temporarily except by unanimous consent to allow an address by another Senator on a point of personal privilege. (50 S.J. Reg. 483 (1947)).

When a Member has been recognized and is speaking on a motion to re-refer a bill, he must stand upright at his desk and may not lean thereon (61 S.J. Reg. 1760, 1762 (1969)).

When a Member has been recognized and is speaking on a bill or resolution, he may make a Parliamentary Inquiry but not raise a Point of Order without yielding the floor (61 S.J. Reg. 1057 (1969)).

When a Member has the floor and is speaking on a bill or resolution, he must stand upright at his desk and may not lean or sit on his desk or chair (61 S.J. Reg. 1059 (1969)).

A Member speaking on a bill or resolution must confine his remarks to the subject of the bill or resolution (61 S.J. Reg. 1517 (1969)).

When a Member has been recognized and is speaking on an amendment to a bill or resolution, he must confine his remarks to the subject of the amendment pending before the Senate (61 S.J. Reg. 856, 857 (1969)).

When a Member has been recognized and is speaking for or against a bill or resolution, he must confine his remarks to the bill or resolution. After three warnings to do so, he must yield the floor (61 S.J. Reg. 2191 (1969)).

A Committee Report can only be submitted during the Morning Call unless the Member has the unanimous consent of the Members of the Senate and he may not interrupt a Member speaking for or against a bill or resolution for that purpose unless the Member speaking yields the floor for that specific purpose. (61 S.J. 1 C.S. 124 (1969)).

When a Member has been recognized and is speaking on a bill or resolution, he must confine his remarks to the subject of the bill and speak audibly (62 S.J. Reg. 778 (1971)).

## PUNISHMENT FOR MISCONDUCT

61. The Senate may punish any Member for disorderly conduct, and, with the consent of two-thirds of the elected Members, may expel a Member, but not a second time for the same offense (Constitution, Article 3, Section 15).

## OBSTRUCTING PROCEEDINGS OF SENATE—PUNISHMENT

62. The Senate, during its session, may imprison for 48 hours, any person, not a Member, for disrespectful or disorderly conduct in its presence, or for obstructing any of its proceedings (Constitution, Article 3, Section 15).

## Note of Ruling

While a Member has the floor and is speaking and there is a demonstration or applause from the gallery, the Presiding Officer shall give those persons in the gallery two Warnings to refrain from such demonstrations or applause, stating each time that it is a Warning. If a third Warning becomes necessary, the Presiding Officer is authorized to direct the Sergeant-at-Arms to clear the gallery and lock the doors leading to the Senate Chamber (55 S.J. Reg. 1117 (1957)).

## BRIBERY

63. Any Member who shall receive or offer a bribe, or who shall suffer his vote to be influenced by promise or preferment of reward, shall on conviction, be expelled (See also Articles 158, 161, Penal Code).

## ADMITTANCE TO SENATE CHAMBER; RESTRICTIONS ON DRESS AND BEHAVIOR

64. Persons hereinafter named and no others shall be admitted to the Senate Chamber while the Senate is in session provided that persons other than members of a Senator's family, Members of the House of Representatives of the State of Texas, and Pages and Sergeants-at-Arms of the Senate, shall be required to remain behind the brass rail.

(1) Members of the Senate and their families, Secretary of the Senate and his family, employees of the Senate and House of Representatives when on official business, Representatives, the Governor, his family and his private secretary, the Lieutenant Governor and his family, the President and Vice-President of the

Rule 64

United States, United States Senators and Members of Congress, Governors of other states, judges of the Supreme Court, Secretary of State, the Courts of Criminal and Civil Appeals, duly accredited newspaper reporters and correspondents and radio commentators and television cameramen and commentators who have complied with Sections (2) and (3) of this Rule. It shall be the special duty of the President to see that officers and employees remain upon the floor of the Senate only when actually engaged in the performance of their official duties. Such persons other than the Lieutenant Governor and Members of the Senate shall not be permitted to work for or against any proposition before the Senate while on the floor.

## PERSONS LOBBYING NOT ADMITTED

No newspaper reporter, or other person whomsoever, whether a State officer or not, who is lobbying or working for or against any pending or prospective legislative measure, shall in any event be permitted upon the floor of the Senate or in the rooms leading thereto, except the Senate reception room, when the Senate is in session.

## PRESS CORRESPONDENTS

(2) While the Senate is in session, no person shall be admitted to the floor of the Senate or allowed its privileges, as a press correspondent or radio commentator or television cameramen and commentators, unless said person is a regularly employed, salaried staff correspondent or reporter in the employ of a newspaper publishing general news, or press association serving newspapers, or publications requiring telegraphic coverage, or unless said person is a regularly employed, salaried employee of a duly licensed radio or television station.

## FORFEITURE OF ADMITTANCE PRIVILEGE

(3) If any person, admitted to the Senate under this rule, shall lobby or work for or against any pending or prospective legislation or shall violate any of the other rules of the Senate, the privileges extended to said person under this rule shall be suspended by a majority of the Committee on Administration. The action of the committee shall be reviewable by the Senate only if two members of the committee request an appeal from the decision of the committee, which appeal shall be in the form of a minority report, and shall be subject to the same rules that are applicable to minority reports on bills.

Every newspaper reporter and correspondent, and radio commentator and television cameramen and commentators, before being admitted to the Senate during its session, shall file with the Committee on Administration a written statement showing the paper or papers which he represents, and certifying that no part of his salary or compensation is paid by any person, firm, corporation or association except the paper or papers or radio station or television station which he represents.

## SUSPENSION OF ADMITTANCE RULE

(4) It shall be in order for the President to entertain a request, motion or resolution for the suspension of this rule, or to present from the Chair the request of any Member for unanimous consent.

(5) It shall be the duty of the Sergeant-at-Arms and his assistants to clear the hall of all persons not entitled to the privilege thereof 30 minutes before the hour of the meeting of the Senate.

## EXCEPTIONS

(6) Provided that this rule shall not apply to persons who are invited to address the Senate when in session, nor shall it apply to any person who desires to appear before any committee, while going to or returning from the session of said committee, nor to the Governor while delivering an official message; provided further that this rule shall not apply during the inauguration of the Governor and other public ceremonies provided for by resolution of the Senate. All officers and employees of the Senate are prohibited from lobbying in favor of or against any measure or proposition pending before the Senate, and should any officer or employee violate this rule, the same shall be cause for dismissal from the service of the Senate by the President.

(7) Provided further that the privileges of the floor shall not be extended to any person or persons except Members of the Senate, and the Governor, desiring to make an address before the Senate on pending or contemplated legislation.

(8) Solicitors and collectors shall not be admitted to the Senate during its sessions.

(9) Messages or call slips shall not be delivered to Members of the Senate when a roll call is in progress. Individuals desiring to pass

Rule 65

a message to Members of the Senate must sign their names to that message.

### Editorial Notes

Section 10 of Article 183-1 of the Texas Penal Code provides: "No person who is registered or required to be registered under the provisions of this Act and no person not authorized by law shall go upon the floor of either House of the Legislature, reserved for the members thereof, while such House is in session, except on invitation of such House."

The rule relating to admission to the floor of the Senate, as written prior to 1939, provided that the rule could not be suspended.

#### Note of Ruling

The rule relative to admittance to the Senate Chamber, when invoked, cannot be suspended by the Senate (42 S.J. 1 C.S. 644 (1931)). (Explanatory Note: When this ruling was made, part (4) of the rule specifically prohibited the Chair's entertaining a request for the suspension of the rule.)

## NO EATING OR DRINKING IN SENATE CHAMBER

65.  No employee, Senator, Representative or other person shall be allowed to eat or drink in the Senate Chamber proper at any time. The Sergeant-at-Arms and other custodians will strictly enforce this rule.

## PERSONS MUST BE PROPERLY ATTIRED IN SENATE CHAMBER

66.  While the Senate is actually in session, no male Senator or Representative or any other male person shall come on the floor of the Senate without wearing a coat and tie. The Sergeant-at-Arms and doorkeepers are instructed to strictly enforce this rule, and only the President of the Senate may suspend the rule as to any person or to all persons, and that action to be taken in writing to the Sergeant-at-Arms.

## LEGISLATION
## CONSIDERATION OF HOUSE BILL IN LIEU OF SENATE BILL ON SAME SUBJECT

67.  When any Senate bill shall be reached upon the Calendar, or shall be before the Senate for consideration, it shall be the duty of the

President to give the place of such bill on the Calendar to any House bill which has been referred to and reported from a committee of the Senate containing the same subject, or to lay such House bill before the Senate to be considered in lieu of such Senate bill.

## Editorial Notes

The purpose of this Rule is to save the time and labor of the Legislature by disposing of the most advanced legislation first. The House bill is not substituted for the Senate bill, but simply is considered instead of the Senate bill, which is displaced on the Calendar by the House bill.

It is not necessary that the bills be identical if generally they cover the same subject and are directed to the same end.

### Note of Ruling

A House bill that has been reported favorably and relates to the same subject as a Senate bill that has been reached on the calendar should be considered by Senate in lieu of the Senate bill if said House bill is "of the same general tenor" (38 S.J. Reg. 470 (1923)).

## PROCEDURE IN PASSAGE OF BILLS

68. No bill shall have the force of a law until it has been read on three several days in each House and free discussion allowed thereon, but in case of imperative public necessity (which necessity shall be stated in a preamble or in the body of the bill), four-fifths of the House in which the bill may be pending may suspend this Rule, the yeas and nays being taken on the question of suspension and entered upon the Journals (Constitution, Article 3, Section 32).

## Editorial Note

"Four-fifths of the House in which the bill may be pending" has been interpreted repeatedly to mean four-fifths of all of the Senators present, a quorum being present.

### Notes of Rulings

Only four-fifths of those present are required to suspend constitutional rule requiring bills to be read on three several days (42 S.J. Reg. 253 (1931)).

A motion to suspend the Constitutional Rule and Senate Rule requiring bills to be read on three several days may be made although the same motion has been made and defeated on the same Legislative Day (55 S.J. Reg. 1561 (1957)).

For ruling of Lieutenant Governor Shivers during Regular Session, 50th Legislature, relative to allowance of ''free discussion'' on a bill, see notes on rulings following Senate Rule 51.

(See ruling after Rule 33.)

## ANNOUNCEMENT OF STAGE OF BILL

69. The President shall, at each reading, announce whether the bill originated in the Senate or House of Representatives, and whether it be the first, second, or third reading.

## FIRST READING AND REFERENCE OF BILLS

70. (a) Beginning the first Monday after the general election preceding the next regular legislative session, or within 30 days prior to any special session, it shall be in order to file with the Secretary of the Senate bills for introduction in that session. Upon receipt of such bills the Secretary of the Senate shall number them and make them a matter of public record, available for distribution. Once a bill has been so filed it may not be recalled.

(b) A bill, when introduced, shall be read and referred to a committee. The first reading of a bill, if a Senate bill, shall be the reading thereof when first introduced; if a House bill, the reading thereof when submitted to the Senate. And all House bills, when received in the Senate, shall be read and referred to a committee. No action shall be taken upon a bill accepting, rejecting or amending the same until it has been reported upon by a committee. And it shall be the duty of each committee of the Senate when there has been referred to it or is before it for consideration a Senate bill and a House bill containing the same subject to consider first and report upon the House bill. During the first 60 days of the session, a bill may be introduced by filing same with the Secretary of the Senate at any time whether the Senate is in session or not. A bill filed with the Secretary of the Senate shall be read on first reading at the appropriate point in the morning call during the next legislative day after said bill has been filed.

## Editorial Notes

This rule clearly forbids tabling a bill that has not been reported from a Committee. The practice of tabling a bill not properly before the Senate for consideration is not in accordance with good parliamentary practice, since the practice deprives the sponsors of a fair opportunity of protecting the life of the bill.

Lieutenant Governor Barry Miller declined to refer a bill that had been presented for introduction at a called session, holding that it was not covered by the call of the Governor (41 S.J. 5 C.S. 9, 14 (1930)). (See also Appendix under heading Jurisdiction — Special Sessions.)

### Notes of Rulings

The Senate may not grant by vote or by unanimous consent permission to a Member to introduce a bill not within Governor's call (43 S.J. 1 C.S. 24 (1933)).

A point of order, made and sustained at a special session, that a bill (which has been read second time) is not within the Governor's call prevents any further consideration of it at that session (43 S.J. 2 C.S. 27 (1934)).

A motion to re-refer a bill is in order at any time there is not another question already before the Senate for immediate consideration (51 S.J. Reg. 755-756 (1949)).

A bill making an appropriation for the activation of an agency to distribute surplus commodities to State hospitals and special schools and for certain other related purposes is within the call of the Governor for a special session "to make and to finance such appropriations as the Legislature may deem necessary for State hospitals and special schools . . . ." (51 S. J. 1 C. S. 161 (1950)).

## MOTION TO PASS BILL IS NOT NECESSARY

71. No motion shall be necessary to pass a bill to its second reading. The main question on the second reading of the bill shall be, if a Senate bill, "Shall this bill be engrossed and passed to a third reading?" and if it be a House bill, "Shall this bill pass to a third reading?"

### Note of Ruling

A motion to pass to third reading a bill not pending before the Senate is not in order (45 S.J. Reg. 1231 (1937)).

## GERMANENESS

72. No motion or proposition on a subject different from that under consideration shall be admitted under color of amendment or as a substitute for the motion or proposition under debate (Constitution, Article 3, Sections 30 and 35).

Rule 72

## Notes of Rulings

An amendment to a tax-raising measure, which amendment has for its purpose the reduction of appropriations already made is not germane (45 S.J. 2 C.S. 184-185 (1937)). (This ruling was sustained by the Senate by a vote of 15 to 14.)

An amendment to the rural aid bill that has for its purpose a change in a general law is not in order (46 S.J. Reg. 1633 (1939)).

An amendment relative to maximum gross weight of trucks is not germane to bill regulating private motor carriers (46 S.J. Reg. 1732 (1939)).

An amendment to general bill to exempt one senatorial district from its provisions is not germane (46 S.J. Reg. 2142-2143 (1939)).

Amendment allocating penalties and interest collected on delinquent taxes to special county fund not germane to bill remitting penalties and interest (47 S.J. Reg. 801 (1941)).

An amendment must be germane to that portion of bill proposed to be amended (47 S.J. Reg. 1062 (1941)).

Amendment to restrict site for building, etc., held germane to bill providing for new office building (47 S.J. Reg. 2282 (1941)).

Amendment to change general law not germane to bill primary purposes of which are to allocate and to appropriate certain revenues (48 S.J. Reg. 420 (1943)).

An amendment to place a tax on fuel used in aircraft is not in order to a Senate bill to exempt certain fuels from tax imposed by motor fuel tax law (49 S.J. Reg. 537 (1945)).

An amendment to increase franchise tax of any corporation availing itself of bill's provisions is germane to bill to increase rights and powers of certain corporations (49 S.J. Reg. 751 (1945)).

An amendment to require payment of all taxes due by automobile owner as prerequisite for obtaining license for car is not germane to bill to require only the payment of property taxes on car as prerequisite for license (49 S.J. Reg. 880 (1945)).

An amendment providing that a bill increasing district judges' salaries shall become effective only upon passage of another bill to redistrict the State into judicial districts is germane (50 S.J. Reg. 317 (1947)).

An amendment prescribing a penalty for effecting a sale of liability insurance by misrepresentation that the law requires such insurance of all automobile drivers is not germane to a bill relating to the financial responsibility of drivers (50 S.J. Reg. 976 (1947)).

An amendment (which is in effect a complete substitute bill) that provides a system of civil service regulations and also a system of retirement of State employees is germane to a bill providing only for a State employees retirement system (50 S.J. Reg. 1006 (1947)).

An amendment to exempt one county and one Senatorial district from the provisions of a joint resolution, the original purpose of which is to increase the compensation of all members of the Legislature, is not germane (50 S.J. Reg. 1483 (1947)).

An amendment prescribing a minimum allocation to school districts from a certain fund is not germane to a bill the purpose of which is only to create the fund (51 S.J. Reg. 338 (1949)).

An amendment prescribing a penalty for practitioners of healing arts receiving rebates is germane to bill prescribing minimum basic qualifications of such practitioners (51 S.J. Reg. 729 (1949)).

The amendment of a general appropriation bill by inserting therein additional matter creating a new medical college or branch of The University of Texas is not permissible (51 S.J. Reg. 1126 (1949)). [Note.—Lieutenant Governor Shivers supplemented this ruling with the further statement that in his opinion it would be permissible to insert in a general appropriation bill a specific appropriation to be used by the University Board of Regents to establish another medical department or branch and to include with the appropriation so inserted detailed directions to the Board for spending the appropriation for that purpose pursuant to the pre-existing law authorizing said Board to "establish the departments of a first-class University."]

An amendment that seeks to transfer a State University from the Board of Regents, State Senior Colleges, that includes the University in the subject of the bill is germane to the bill that seeks to transfer another State University from the same Board (61 S.J. Reg. 204 (1969)).

An amendment that seeks to amend a bill setting up a "Memorial for John F. Kennedy in Dallas" by changing the procedures for setting up the "Commission" and eliminates the appropriation of State funds therefor is germane to the subject of the bill (61 S.J. Reg. 520 (1969)).

An amendment that seeks to amend a bill setting up a "Memorial for John F. Kennedy in Dallas" by striking all below the enacting clause and setting up a "Commission to Memorialize all native and adopted Texans" is not germane to the caption (subject) of the bill (61 S.J. Reg. 521 (1969)).

An amendment that seeks to amend a Joint Resolution "to repeal the requirement that voters register annually" which sets an effective date therefor is not a proper amendment to the resolution when an amendment has previously been adopted setting such date at the same stage of the resolution (61 S.J. Reg. 693 (1969)).

An amendment that seeks to set up procedures and funds in other geographical areas of the State for "The Texas Technical Institute" is not a proper amendment to a bill which changes the name of the James Connally Technical Institute of Texas A & M University to "The Texas Technical Institute" and sets specific locations therefor (61 S.J. Reg. 708 (1969)).

An amendment that seeks to change "the age of persons eligible to vote" is germane to the caption (subject) of a Joint Resolution that "repeals the requirement that voters register annually" and since no amendment has been offered at the same stage of the resolution, it is a proper amendment (61 S.J. Reg. 720 (1969)).

An amendment that seeks to amend a Section of the bill which has been amended to provide for the role and scope of the Texas State Technical Institute may not be amended again to provide other roles thereof at the same stage of the bill (61 S.J. Reg. 857 (1969)).

An amendment that seeks to add an appropriation for another school is not germane to the caption (subject) of a bill that "makes a supplemental appropriation to The Coordinating Board, Texas College and University System for contracts with Baylor University College of Medicine" (61 S.J. 2 C.S. 179 (1969)).

An amendment that seeks to include a corporate income tax is germane to the caption (subject) of a bill (omnibus tax bill) to provide taxation for the operation of State government (62 S.J. Reg. 861 (1971)).

An amendment that provides for additional schools other than those submitted by the Governor as an emergency matter is not germane to caption (subject) of bill (62 S.J. Reg. 357 (1971)).

An amendment that seeks to amend a Section of the bill that has been previously amended at the same stage of the bill is not a proper amendment. (62 S.J. Reg. 1168 (1971))

An amendment that seeks to amend other sections of The Election Code is not germane to a bill to "enact temporary provisions relating to method of conducting and financing primary elections" (62 S.J. 1 C.S. 19 (1971))

## SEVENTY-TWO AND TWENTY-FOUR HOUR RULES

73. No bill shall be considered unless it has been referred to a committee and reported thereon, and no bill shall be passed which has not been presented and referred to and reported from a committee at least three days before the final adjournment of the Legislature (Constitution, Article 3, Section 37). And no vote shall be taken upon the passage of any bill within the last 24 hours of the session unless it be to correct an error therein.

## Notes of Rulings

The twenty-four hour Senate rule forbidding vote on passage of a bill during the last 24 hours of a session may be suspended by a two-thirds vote of the Senate, and a joint rule containing the same provision may be suspended by a majority vote of each House by concurrent resolution (42 S.J. 2 C.S. 237 (1931)).

The twenty-four hour rule that prohibits a vote on a bill during the last 24 hours of a session of the Legislature makes further consideration and debate of the bill out of order when the 24th hour before final adjournment has arrived (44 S.J. Reg. 1819 (1935)).

## PRINTING OF BILLS

74. Every general bill reported favorably shall be printed, unless the Senate, on the same day it is reported or on the next legislative day, shall order it not printed. Each local bill shall be printed, unless the committee reporting it recommends that it not be printed, in which case the committee's recommendations shall be effective as an order of the Senate that the bill be not printed. A list of all bills ordered not printed by the Senate or ordered not printed by committee recommendation shall be listed by number, author, and caption and distributed to each member at the close of each day's business. Copies of all bills printed shall be placed on the desks of Senators on the same day the printed copies are delivered by the printer. No bill except local bills and except general bills that have been ordered not printed by the Senate shall be considered by the Senate until a printed copy thereof has been on the desk of each Senator at least 24 hours. Motions that bills be not printed are privileged when there is no other matter pending before the Senate.

74a. When a Senate bill has been received from the House with amendments all House amendments must be printed and laid on each Member's desk for 24 hours prior to a motion to concur.

### Editorial Note

The rules governing the printing of bills also apply to the printing of concurrent and joint resolutions.

#### Notes of Rulings

Multigraphed copies of a bill are equivalent to printed copies so far as the 24-hour printing rule is concerned (42 S.J. Reg. 55 (1931)).

Setting a bill that has not been printed as a special order permits its consideration at the time for which it is set even though it has not been printed (43 S.J. 2 C.S. 96 (1934)).

Rule 75

## ADOPTION OF AMENDMENT
## ON FINAL PASSAGE OF BILL

**75.** No amendment shall be adopted at the third reading of a bill without the consent of two-thirds of the Members present.

### Note of Ruling

A majority vote only is necessary to adopt an amendment to a joint resolution on its final passage (45 S.J. Reg. 1849 (1937)). (See also Rule 80.)

## SIGNING OF BILLS AND RESOLUTIONS
## BY PRESIDING OFFICER

**76.** The Presiding Officer of each House shall, in the presence of the House over which he presides, sign all bills and joint resolutions passed by the Legislature, after their titles have been publicly read before signing, and the fact of signing shall be entered on the Journals (Constitution, Article 3, Section 38).

## HOUSE AMENDMENTS TO SENATE BILLS

**77.** When the House of Representatives shall adopt and send to the Senate amendments to a Senate bill, the President may refer the bill and the amendments to the Senate committee that previously had reported on the bill. The committee shall promptly report and recommend whether the Senate should concur in any or all of the House amendments.

### Editorial Note

The Editor has found no instance of a Senate bill being substituted in the House and then coming back to the Senate and taking the course in the Senate of a bill originating in the House.

#### Note of Ruling

A point of order raised by Senator Caldwell against a report of conference committee on the ground that the House amendments to the bill (S.B. 147) constituted a complete substitute bill and should therefore take the course of a newly received House bill in the Senate was overruled (36 S.J. Reg. 1023 (1919)).

## PETITIONS AND RESOLUTIONS

**78.** **(a)** Every resolution that requires the approval of the Governor shall be subject to the rules that govern the proceedings on bills.

**(b)** Petitions, Concurrent and Joint Resolutions, and Resolutions setting or defining legislative or State policy shall be referred to an appropriate standing committee when introduced and shall not be considered immediately unless the Senate so directs by a two-thirds vote of the Members present. The motion to consider such petition or resolution immediately is not debatable.

**(c)** The resolution to initially adopt temporary or permanent rules of the Senate shall require a majority vote of the Members of the Senate.

### Editorial Notes

Due to the special provision in the Constitution excepting resolutions relating to adjournment and to another special provision making it the duty of each House to adopt its own rules of procedure, concurrent resolutions relating to adjournment, and probably those adopting or suspending joint rules or relating to legislative procedure do not require the approval of the Governor.

Joint resolutions proposing amendments to the State Constitution do not require the Governor's approval.

A Senate or a concurrent resolution providing for a rule suspension or the carrying out of a particular procedure authorized by the rules is usually regarded as privileged and is considered when introduced without a vote being taken to consider immediately. (See also note of ruling following Rule 23.)

#### Notes of Rulings

Senate resolution that reflects on member of House may not be considered by Senate (35 S.J. 3 C.S. 1002 (1917)).

An appropriation cannot be made by resolution (45 S.J. Reg. 570 (1937)).

A resolution attempting to amend a general law is not in order (45 S.J. 1 C.S. 101 (1937)).

A Senate resolution which does not require the approval of both Houses may be adopted at a special session, although it relates to a subject not submitted by the Governor (41 S.J. 3 C.S. (1929)).

1-9-79  SR 2

The only changes that can be made in a bill by resolution are corrections of typographical or clerical errors (43 S.J. Reg. 1946 (1933)). A House concurrent resolution which has been referred to a Senate standing committee during a called session, may, under a suspension of rules, be taken up and considered and adopted although no report on it has ever been submitted by the Chairman of the committee to which it was referred. (See procedure had on H.C.R. 5, 51 S.J. 1 C.S. 114 (1950)).

A motion to suspend the regular order of business to consider a resolution immediately is not debatable (54 S.J. Reg. 1433 (1955)).

A motion to take up and consider a resolution is not debatable but a limited explanation of the resolution to which the motion applies is permissible. (55 S.J. Reg. 1596 (1957)).

A corrective resolution that seeks to correct a wrong Section reference in a bill does not change the language or meaning of the bill (61 S.J. Reg. 1873 (1969)).

A congratulatory resolution when offered is not debatable and therefore may be considered immediately or referred to a committee by the Presiding Officer of the Senate (61 S.J. 1 C.S. 124 (1969)).

A resolution on which Senate Rules have been suspended for consideration thereof does not have to be referred to and considered by a committee (62 S.J. 3 C.S. (1972)).

## CONGRATULATORY, MEMORIAL AND COURTESY RESOLUTIONS

79. Congratulatory and memorial petitions and resolutions, after a brief explanation by the author or sponsor, shall be considered immediately without debate unless otherwise ordered by a majority of the Members present. Upon request by any Member, the Presiding Officer shall, at an appropriate time during the proceedings, recognize guests of such Member in the Senate Chamber or gallery. Any Member may request and the Secretary of the Senate shall provide a maximum of five copies of a courtesy recognition certificate for each person or group so recognized by the Presiding Officer.

### Note of Ruling

A congratulatory resolution when offered is not debatable and therefore may be considered immediately or referred to a committee by the Presiding Officer of the Senate (61 S.J. 1 C.S. 124 (1969)).

## AMENDMENTS TO THE CONSTITUTION

80. All amendments proposed to the Constitution shall be subject to rules that govern the proceedings on bills, except that they shall, in all cases, be read on three several days, and shall only be passed by a vote of two-thirds of the Members elected to the Senate. When a proposed amendment to the Constitution may be under consideration, the votes of a majority of the Members present shall be sufficient to decide an amendment thereto, or any collateral or incidental questions short of the final question.

### Editorial Note

The opinion of Attorney General Cureton, dated May 17, 1913, relative to the validity of an appropriation section in a joint resolution and to the mode and manner of amending the Constitution, holds that Section 1 of Article 17 of the Constitution provides a complete formula for proposal of constitutional amendments and that any rule or resolution attempting to limit, add to, or modify that formula is null and void.

### Note of Ruling

A joint resolution that receives a vote of two-thirds of all the members of the Senate on being read second time is not finally passed by the Senate and must take the full course of a bill (44 S.J. Reg. 670 (1935)).

## FAILURE OF JOINT RESOLUTION TO BE ADOPTED AFTER THIRD READING

81. When a Joint Resolution has failed of adoption on third reading, it shall not be again considered during that session.

## CALL FOR YEAS AND NAYS BY PRESIDING OFFICER

82. Upon the final passage of all amendments proposed to the Constitution, of all bills appropriating money or lands for any purpose, and of all questions requiring a vote of two-thirds of the Members elected, the Presiding Officer shall call for the yeas and nays, and they shall be entered in the Journal. Upon all other questions requiring a vote of two-thirds of the Members present, including a motion to suspend the rules, the Presiding Officer shall determine if there is objection and, if so, call for the yeas and nays, but they shall not be entered into the Journal unless required under Rule 29. If no objection is made, the Journal entry shall reflect a unanimous consent vote of the Members present without necessity of a roll call of yeas and nays.

1-9-79   SR 2

## DEFEATED BILL OR RESOLUTION

83.   After a bill or resolution has been considered and defeated by either Branch of the Legislature, no bill or resolution containing the same substance shall be passed into a law during the same session (Constitution, Article 3, Section 34).

### Editorial Note

For an exhaustive ruling by Lieutenant Governor Stevenson on the effect on other bills on the same subject of the defeat of one bill on that subject, see 46 S.J. Reg. 666-671 (1939).

#### Notes of Rulings

Defeat of an amendment containing same substance as a bill does not prevent consideration of the bill (35 S.J. Reg. 915 (1917)).

A joint resolution containing same substance as one that fails to pass in the House may be considered and passed by Senate (35 S.J. Reg. 1140-1148 (1917)).

Defeat of a House bill in the House does not necessarily make an amendment having the same effect as the bill out of order in the Senate (42 S.J. Reg. 1565 (1931)).

A bill substantially the same as one held unconstitutional by Supreme Court may not be considered in Senate (44 S.J. Reg. 953 (1935)).

Consideration of a bill to create a textbook committee is not in order after the House has defeated a bill containing same substance (48 S.J. Reg. 873 (1943)).

### COURSE OF COMMITTEE SUBSTITUTE BILLS

84.   If a committee substitute is adopted by the committee for the pending bill or resolution, and such substitute receives a favorable report, the same shall be reported back to the Senate in lieu of the original bill or resolution. The original bill or resolution, for which the substitute was adopted, shall be dead unless reported to the Senate and handled under the same procedure as herein provided for minority reports. The substitute, when reported back to the Senate, shall be read with the report and shall be endorsed by the Secretary of the Senate as having been read the first time and shall take the same procedure as an original bill or resolution, and no action shall be required on the part of the Senate to confirm the substitution made by the committee.

## CUSTODIAN OF BILLS AND RESOLUTIONS

85. The Calendar Clerk shall be the official custodian of the bills and resolutions pending in the Senate, and the same may not be withdrawn from the custody of such clerk without the consent of the Senate.

## PERIODS FOR INTRODUCTION AND CONSIDERATION OF BILLS

86. During the first 60 calendar days of the session, it shall be in order to file with the Secretary of the Senate bills for introduction during that session. Such bills will be numbered upon receipt and will be introduced not later than the next legislative day; all House and Senate bills will be referred to a proper committee not later than the next legislative day after introduction; provided, however, that at any time during the session, resolutions, emergency appropriations, emergency matters specifically submitted by the Governor and special messages to the Legislature, and local bills (as defined in Rule 88) may be filed with the Secretary of the Senate, introduced and referred to the proper committee, and disposed of under the Rules of the Senate.

## SUSPENSION OF TIME LIMIT RULE

87. Except as otherwise provided in Rule 86, no bills shall be introduced after the first 60 calendar days of the session; provided, however, this rule may be suspended by the affirmative vote of four-fifths of the Members of the Senate.

### Note of Ruling

Refusal of the Senate to suspend the foregoing rule to permit the introduction of a bill does not prevent its being offered again for introduction later (43 S.J. Reg. 1656 (1933)).

## INTRODUCTION AND CONSIDERATION OF LOCAL BILLS

88. The constitutional procedure with reference to the introduction, reference to a committee, and the consideration of bills set forth in Article 3, Section 5, of the Constitution, shall not apply to local bills hereinafter defined, and the same may be introduced, referred, reported, and acted upon at any time under the general rules and order of business of the Senate.

Rule 89

## MEANING OF TERM LOCAL BILLS AS USED IN RULES 86 AND 88

A local bill is defined for the purposes of this rule as an Act the provisions of which relate to or affect directly a defined locality, district, or section of the State, and which do not include or require any appropriation out of State funds or which do not affect any State policies, and which do not affect directly the State at large, and the operation of which is confined solely to a particular locality, district or section of the State.

## SUSPENSION OF RULE LIMITING CONSIDERATION OF BILLS

89. Except as otherwise provided in Rule 86, bills shall not be taken up, considered or acted upon by the Senate during the first 60 calendar days of the session, unless this rule be suspended by the affirmative vote of four-fifths of the Members of the Senate.

### Note of Ruling

A motion to suspend Section 5 of Article III of the Constitution to consider a bill during the first 60 days of a Regular Session requires a vote of four-fifths of the Members of the Senate (25) not four-fifths of the Members present (59 S.J. Reg. 144 (1965)).

## COMMITTEES REPORTS

90. All committee reports shall be in writing.

### Notes of Rulings

A committee report properly signed, submitted, and received is conclusive as to its contents (42 S.J. 1 C.S. 718 (1931)). (See also notes of rulings following Rule 108.)

A committee report can only be submitted during the Morning Call unless the member has the unanimous consent of the members of the Senate and he may not interrupt a member speaking for or against a bill or resolution for that purpose unless the member speaking yields the floor for that specific purpose (61 S.J. 1 C.S. 124 (1969)).

## RECOMMENDATIONS OF COMMITTEES

91.   All reports of standing committees shall be advisory only, except that a recommendation in a report that a bill which is a local bill be not printed shall be effective as an order of the Senate that the bill be not printed. A recommendation in a report that a bill which is a general bill be not printed shall be advisory only, and the bill shall nevertheless be printed unless the Senate on the same day or the next legislative day orders the bill not printed, as provided in Rule 74. Bills and resolutions shall be considered on second reading and shall be listed on the daily calendars of bills and resolutions on the President's table for second reading in the order in which the committee reports on them are submitted to the Senate.

### Editorial Notes

On the very important matter of the order of considering each of the several bills reported from committees, the rules of the Senate were silent until Senate Rule 56 (now Senate Rule 91) was amended on June 6, 1947, to provide that bills be placed on the calendars of Senate and House bills on the President's table in the order in which the committee reports on the bills are submitted by the respective chairmen from the floor. Bills are listed for consideration on third reading in the order in which they have been passed by the Senate to engrossment or to third reading.

The list of bills on the President's table, shown in the order in which they are to be considered, is mimeographed daily during a legislative session and is generally known and referred to as the daily calendar.

#### Notes of Rulings

A bill may not be considered by the Senate which has not been reported from a committee (44 S.J. Reg. 713 (1935)).

A report of a committee on a bill may be received only, and the question of its adoption is not voted on by the Senate (42 S.J. 1 C.S. 748 (1931)).

A motion to recommit a bill is a proper substitute motion for a motion to not print a bill (55 S.J. Reg. 1546 (1957)).

### MOTIONS TO REFER OR COMMIT

92.   Any bill, petition, or resolution may be referred from one committee or subcommittee to another committee or subcommittee by a two-thirds vote of the Members present and voting. Any bill, petition or resolution may be committed to any committee or subcommittee at any stage of the proceedings on such bill, petition or resolution by a

Rule 93

majority vote of the elected Members of the Senate. A bill or joint resolution committed to a committee or subcommittee while on third reading shall be considered as on its second reading if reported favorably back to the Senate.

When several motions shall be made for reference of a subject to a committee, they shall have preference in the following order:

First:   To a Committee of the whole Senate

Second:   To a Standing Committee

Third:   To a Standing Subcommittee

Fourth:   To a select committee.

## COMMITTEES

93.   All committees shall be appointed by the President, unless otherwise directed by the Senate.

## LIST OF STANDING COMMITTEES

94.   (a)   The following standing committees and subcommittees shall be appointed and shall consist of the number of members indicated; provided, however, that the President shall have authority to appoint other committees if necessary with the consent of two-thirds of the membership of the Senate:

(1)   a Committee on Administration (7 members),
a Subcommittee on Rules (5 members);

(2)   a Committee on Economic Development (7 members);

(3)   a Committee on Intergovernmental Relations (9 members);

(4)   a Committee on Education (11 members);

(5)   a Committee on Finance (13 members);

(6)   a Committee on Jurisprudence (11 members),
a Subcommittee on Civil Matters (5 members),
a Subcommittee on Criminal Matters (5 members);

(7)  a Committee on Human Resources (11 members),
a Subcommittee on Consumer Affairs (5 members),
a Subcommittee on Public Health and Welfare (5

members);

(8)  a Committee on State Affairs (13 members),
a Subcommittee on Nominations (7 members),
a Subcommittee on Elections (5 members);

(9)  a Committee on Natural Resources (11 members),
a Subcommittee on Water (3 members),
a Subcommittee on Energy (3 members),
a Subcommittee on Agriculture (3 members).

(b)  For each new Legislature the President shall have the authority to designate a chairman and vice-chairman for each standing committee and subcommittee.  The President shall appoint the membership of all standing committees provided that three Members of each committee with 10 or less Members, and four Members of each committee with more than 10 Members must be Senators who were Members of the committee during the previous Legislature. The President shall have the authority to appoint the subcommittees set out in Rule 94(a) for each new Legislature.

(c)  Each Member may serve on no more than three of the nine named standing committees provided for in Rule 94(a) hereof and may hold no more than one chairmanship of a committee. Each Member may serve on no more than one standing subcommittee within a standing committee. No member may serve on more than two of the following committees:  Finance, State Affairs, and Jurisprudence.

(d)  Each committee and subcommittee shall adopt, at its first meeting, permanent rules for the operation of the committee to be filed with the Secretary of the Senate. Where applicable, the Rules of the Senate shall apply; provided however, if any committee rule shall be in conflict with a Senate Rule, the Senate Rule shall prevail. These rules must provide for, at least, the following:  a written record of attendance, lack of quorum, record of meetings, bill referral and re-referral, bill setting, order of hearing of bills, public hearing, subcommittee reports, minority reports, time limit on debate and provisions for news coverage.

1-9-79   SR 2

Rule 94

(e) Each committee and subcommittee shall meet regularly at an established hour and day, or give public notice at least 24 hours in advance if it will not meet or if a special meeting is held. If a committee is prohibited from meeting because of the Senate being in session, no such advance notice that the committee will not meet shall be necessary.

(f) No amendment shall be offered to any tax bill on second reading unless the subject matter it entails has been discussed at a public hearing.

(g)(1) Any bill or joint resolution which authorizes or requires the expenditure or diversion of any state funds for any purpose, except the general appropriations bill, shall have a fiscal note signed by the director of the Legislative Budget Board attached to the bill or resolution on first printing, outlining the fiscal implications and probable cost of the measure each year for the first five years after its passage and a statement as to whether or not there will be a cost involved thereafter. The fiscal note shall include the number of additional employees considered in arriving at the probable cost.

(2) Any bill or joint resolution that has statewide impact on units of local government of the same type or class and that authorizes or requires, presently or in the future, the expenditure or diversion of local funds, or that proposes any new local tax, fee, license charge, or penalty or any increased or decreased local tax, fee, license charge, or penalty, shall have a fiscal note signed by the director of the Legislative Budget Board attached to the bill or resolution on first printing, outlining the fiscal implications and probable cost of the measure to the affected unit or units of local government each year for the first five years after its passage and a statement as to whether or not there will be a cost involved thereafter. This requirement shall not apply to any local or special bill affecting only one unit of government.

(3) In Subdivision (2) of this subsection, 'unit of local government' means county, city, town, school district, conservation district, hospital district, or any other political subdivision or special district.

(4) In preparing a fiscal note, the director of the Legislative Budget Board may utilize information or data supplied by any person, agency, organization, or governmental unit the director deems reliable, and if so, may state the source or sources of the information or data used and the extent to which the director relied on the information or data in preparing the fiscal note. If the director determines that the fiscal implications of the bill or resolution cannot be ascertained or that the bill or resolution authorizes an unlimited expenditure or diversion of funds for any period to which the fiscal note applies, he shall so state

in the fiscal note, in which case the fiscal note shall be in full compliance with this rule.

(5) It shall be the duty of the chairman of each standing committee, immediately after the bill or resolution has been referred to the standing committee, to determine whether or not a fiscal note is required, and if so, to send a copy of the bill or resolution to the Legislative Budget Board for the preparation of the fiscal note. The chairman shall advise the Legislative Budget Board of the standing committee to which the bill or resolution has been referred and will request that the fiscal note be returned to the committee. The fiscal note shall be attached to the affected bill or resolution before a committee hearing can be conducted.

(6) In the event a bill or resolution is amended by the committee so as to alter its fiscal implications, either an updated fiscal note or statement prepared by the author, whichever is applicable, shall be obtained by the chairman and attached to the bill or resolution as a part of the committee report. All fiscal notes or author's statements, original and updated, shall remain with the bill or resolution throughout the entire legislative process, including submission to the governor.

## CONFERENCE COMMITTEES

95. All Conference Committees of the Senate shall be selected and appointed by the President or the President Pro Tempore when the latter shall be presiding. The Member authoring or sponsoring the bill for which the Conference Committee is selected shall be appointed Chairman of the Senate Conferees. The majority of the Senate Conferees must be from a standing committee which heard the bill.

## INSTRUCTIONS TO CONFERENCE COMMITTEES

96. Immediately after the Senate decides that any matter shall be submitted to a conference committee, the Presiding Officer shall state "Are there any motions to instruct the conference committee before appointment?" and the Presiding Officer shall thereupon recognize Members to make such motions to instruct and the Senate shall proceed to consider all such motions until disposed of or limited under the provisions of Rule 51.

(a) Conference committees shall limit their discussions and their actions solely to the matters in disagreement between the two Houses. A conference committee shall have no authority with respect to any bill or resolution:

Rule 96

    (1)   to change, alter, or amend text which is not in disagreement;

    (2)   to omit text which is not in disagreement;

    (3)   to add text on any matter which is not in disagreement;

    (4)   to add text on any matter which is not included in either the House or Senate version of the bill or resolution.

This rule shall be strictly construed by the Presiding Officer in each House to achieve the purposes hereof.

(b)   Conference committees on appropriation bills, like other conference committees, shall limit their discussions and their actions solely to the matters in disagreement between the two Houses. In addition to the limitations contained elsewhere in these rules, a conference committee on appropriation bills shall be strictly limited in its authority as follows:

    (1)   If an item of appropriation appears in both House and Senate versions of the bill, such items must be included in the Conference Report.

    (2)   If an item of appropriation appears in both House and Senate versions of the bill, and in identical amounts, no change can be made in such item or the amount thereof.

    (3)   If an item of appropriation appears in both House and Senate versions of the bill but in different amounts, no change can be made in the item, but the amount thereof shall be at the discretion of the Conference Committee, provided that such amount shall not exceed the larger version and shall not be less than the smaller version.

    (4)   If an item of appropriation appears in one version of the bill and not in the other, such item can be included or omitted at the discretion of the Conference Committee. If the item is included, the amount thereof shall not exceed the sum specified in the version containing such item.

    (5)   If an item of appropriation appears in neither the House nor the Senate version of the bill, such item must not be included in the Conference Report.

This rule shall be strictly construed by the Presiding Officer in each House to achieve the purposes hereof.

(c) Conference committees on tax bills, like other conference committees, shall limit their discussions and their actions solely to the matters in disagreement between the two Houses. In addition to the limitations contained elsewhere in these rules, a conference committee on a tax bill shall be strictly limited in its authority as follows:

(1) If a tax item appears in both House and Senate versions of the bill such item must be included in the Conference Report.

(2) If a tax item appears in both House and Senate versions of the bill, and in identical form and with identical rates, no change can be made in such item or the rate therein provided.

(3) If a tax item appears in both House and Senate versions of the bill but at differing rates, no change can be made in the item, but the rate thereof shall be determined at the discretion of the Conference Committee, provided that such rate shall not exceed the higher version and shall be not less than the lower version.

(4) If a tax item appears in one version of the bill and not in the other, such item can be included or omitted at the discretion of the Conference Committee. If the item is included, the rate thereof shall not exceed the rate specified in the version containing such item.

(5) If a tax item appears in neither the House nor the Senate version of the bill, such item must not be included in the Conference Report.

This rule shall be strictly construed by the Presiding Officer in each House to achieve the purposes hereof.

(d) Conference committees on reapportionment bills, to the extent possible, shall limit their discussions and their actions to the matters in disagreement between the two Houses. Since the adjustment of one district in a reapportionment bill will inevitably affect other districts therein, the strict rule of construction imposed on other conference committees must be relaxed somewhat when reapportionment bills are involved. Accordingly, the following authority and limitations shall apply only to conference committees on reapportionment bills:

1-9-79  SR 2

(1) If the matters in disagreement affect only certain districts, and other districts are identical in both House and Senate versions of the bill, the Conference Committee shall make adjustments only in those districts whose rearrangement is essential to the effective resolving of the matters in disagreement. All other districts shall remain unchanged.

(2) If the matters in disagreement permeate the entire bill and affect most, if not all, of the districts therein, the Conference Committee shall have wide discretion in rearranging the districts to the extent necessary to resolve all differences between the two Houses.

(3) Insofar as the actual structure of the districts is concerned, and only to that extent, the provisions of Senate Rule 96(a) shall not apply to conference committees on reapportionment bills.

(e) Conference committees on recodification bills, like other conference committees, shall limit their discussions and their actions solely to the matters in disagreement between the two Houses. The comprehensive and complicated nature of recodification bills makes necessary the relaxing of the strict rule of construction imposed on other conference committees only to.the following extent:

(1) If it develops in conference committee that material has been inadvertently included in both House and Senate versions which properly has no place in such recodification, such material may be omitted from the Conference Report, if by such omission the existing statute thereon is not repealed, altered or amended.

(2) If it develops in conference committee that material has been inadvertently omitted from both the House and Senate versions which properly should be included if such recodification is to achieve its purposes of being all-inclusive of the statutes being recodified, such material may be added to the Conference Report, if by such addition the existing statute is merely restated without substantive change in existing law.

(f) Limitations imposed on certain conference committees by the provisions of Senate Rule 96(b), (c), (d) and (e) may be suspended in part, by permission of both Houses, to enable consideration of and action on a specific matter or matters which otherwise would be in violation thereof. Such permission shall be granted only by concurrent resolutions passed by majority vote in each House, with yeas and nays

thereon to be recorded in the Journals of the respective Houses. Such concurrent resolution shall specify in detail: (1) the exact nature of the matter or matters proposed to be considered; (2) the specific limitation or limitations to be suspended thereby; (3) the specific action contemplated by the Conference Committee thereon; and (4) the reasons why suspension of such limitations is being requested. Permission thus granted shall suspend such limitations only for the matter or matters clearly specified in the resolution, and action of the Conference Committee shall be in conformity therewith.

(g)  All conference committee reports on the General Appropriations Bill, tax bills, reapportionment bills, and recodification bills must be reproduced and a copy thereof furnished to each Member at least 48 hours before any action thereon can be taken by either House, if convened in Regular Session, and 24 hours, if convened in Called Session.

(h)  All conference committee reports on bills other than the General Appropriations Bill, and tax, reapportionment and recodification bills must be reproduced and a copy thereof furnished to each Member at least 24 hours before any action thereon can be taken by either House; provided, however, .that the 24 hour delay on action by either House, as herein provided, shall not apply during the last 48 hours of any session.

(i)  Each conference committee report, regardless of its subject matter, must have attached thereto a section by section analysis showing the disagreements which have been resolved by the conference committee. This analysis must show, for each and every disagreement, in parallel columns: (1) the substance of the House version; (2) the substance of the Senate version; and (3) the substance of the recommendation thereon by the conference committee. No action shall be taken by either House on any conference committee report in the absence of such analysis except by an affirmative vote of two-thirds of the Members present, with the yeas and nays thereon to be recorded in the Journal of such House.

(j)  The President of the Senate shall rule out of order any conference committee report which is in violation of any of the provisions and limitations contained in these rules.

Rule 97

## Notes of Rulings

The Senate conferees may be instructed immediately after their appoint-
ment and before the House had been notified of the appointment of
conferees without instructions (43 S.J. Reg. (1933)).

See also annotations relating to Conference Reports in Appendix.

### COMMITTEE OF THE WHOLE

97. It shall be in order for the Senate at any time after bills and
resolutions have been called to resolve itself into a Committee of the
Whole.

### Editorial Note

A motion to resolve the Senate into a Committee of the Whole immedi-
ately requires only a majority vote, inasmuch as it is equivalent to a motion
to recess (43 S.J. Reg. 1559 (1933)).

### CHAIRMAN OF COMMITTEE OF THE WHOLE

98. In forming a Committee of the Whole Senate, the President
shall leave the Chair, and shall appoint a chairman to preside in
committee.

### RIGHT OF LIEUTENANT GOVERNOR TO SPEAK AND
### VOTE
### IN COMMITTEE OF THE WHOLE

99. When in Committee of the Whole, the President shall have
the right to debate and vote on all questions (Constitution, Article 4,
Section 16).

### PROCEDURE IN COMMITTEE OF THE WHOLE

100. The Rules of the Senate, as far as applicable, shall be
observed in Committee of the Whole.

101. Upon a bill being committed to a Committee of the Whole
Senate, the bill shall be read and debated by clauses, leaving the
preamble to be last considered; the body of the bill shall not be defaced
or interlined; but all amendments, noting the page or line, shall be duly
entered by the Secretary, on a separate sheet of paper, as the same shall
be agreed to by the committee, and so reported to the Senate; after the
report the bill shall again be subject to be debated and amended, or
committed, before a question to engross it be taken.

## Editorial Note

No journal is kept by the Journal Clerk of the proceedings of the Senate
when in Committee of the Whole.

### RECORD OF COMMITTEE ATTENDANCE

102. At all meetings of the Senate Committees, the Chairman
shall call the roll of the Members and cause to be made a record of
those present and the absentees, together with the excuses, if any, of
such absentees.

### PUBLIC NOTICE OF MEETINGS

103. A bulletin board shall be prepared and placed in the hallway
immediately to the rear of the Senate Chamber, upon which shall be
posted the time for meetings of standing committees. Immediately
after the time and place of any committee hearing have been fixed, this
information shall be given to the Secretary of the Senate, who shall
cause the same to be posted forthwith on said bulletin board. Public
notice of the cancellation of any committee or subcommittee meeting
shall be placed on the bulletin board at least 24 hours prior to the
previously announced time of that meeting. No committee or
subcommittee shall meet without at least 24 hours public notice.

### MINUTES OF COMMITTEE MEETINGS

104. (a) The Chairman of each committee and subcommittee
shall keep, or cause to be kept under his direction, an accurate record
of the proceedings of his committee, and the same shall be open for
inspection to any Member of the Legislature, and to the public. Each
committee meeting shall be recorded on magnetic tape.

(b) Each standing committee and subcommittee shall employ a
committee clerk, and as determined by the Administration Committee,
other staff necessary to coordinate and record the activities of the
committee. Such committee clerks, staff or any employee shall in no
way be related to any Member of the current Texas Legislature, or be
related to the person with the power of appointment for that position.

(c) It shall be the duty of the committee clerk, with the assistance
of other committee staff members, to keep a permanent, accurate
written record of committee proceedings, and to transcribe the
magnetic tape recordings of committee hearings as ordered by the

Rule 105

committee or subcommittee. It shall be the responsibility of the committee clerk to see that one copy of the transcript of proceedings and one copy of the permanent record be kept in the Committee Files, one copy of each be given to the Secretary of the Senate, and three copies of each be placed in the Legislative Reference Library. Such records shall be a matter of public record.

### Note of Ruling

A report on a bill that was considered at a committee meeting at which a quorum of the committee was not present (as shown by the minutes of the committee) may not be received by the Senate (46 S.J. Reg. 1548 (1939)).

(See also note of ruling following Rule 90.)

### COMMITTEE HEARINGS

105. No bill shall be reported to the floor unless it shall first have been the subject of a public hearing by committee. Hearings on bills before any committee or subcommittee shall be open to the public, unless otherwise provided by these Rules, and reasonable opportunity shall be afforded to interested parties to appear before the committee or subcommittee. All parties appearing before any committee or subcommittee shall be administered an oath or affirmation that the testimony they give is true and correct. This oath or affirmation shall be administered by the Chairman or Acting Chairman of the committee. Any person registered as a lobbyist and representing a client's interest at such hearing when possible shall submit a written statement of his presentation to the committee clerk to be made part of the permanent record of the meeting. The committee by a majority vote shall have the right to fix the order of appearance and the time to be allotted to any such interested party. Any Member of the Senate, by making timely written requests therefor upon the Chairman of the Committee, or Vice-Chairman in the absence of the Chairman, shall be entitled to receive at least 48 hours advance notice in writing of the time and place of the hearing on any bill or bills specified in the demand, but the time and place of hearing on any bill having been fixed in response to said request, the Chairman shall not be required to change or delay said hearing upon subsequent requests from other Members of the Senate. After the receipt of such notice by the Chairman of the Committee, or Vice-Chairman in the absence of the Chairman, no hearing shall be held by the Committee or action taken on such bill or bills unless such notice has been previously given as required herein. A Member of the Senate shall not be entitled to receive at least 48 hours

advance notice in writing of the time and place of the hearing on any bill or bills if a notice of the time and place of the hearing is posted at least 72 hours before the time of the hearing and the Senate is in session at any time during the first 24 hours of the 72 hour period.

## Notes of Rulings

A motion to suspend Senate Rule 106 (now Rule 105) for the purpose of permitting a hearing on a bill without giving a 48-hour notice to a Member who has requested it is not debatable (46 S.J. Reg. 1509 (1939)).

The committee's action on a bill at a meeting held without proper 48-hour notice to Member who has properly requested it is in violation of Senate Rule 106 (now Rule 105) [and void]. (Ruling sustained by vote of 13 to 12.) (49 S.J. Reg. 347, 358-359 (1945)).

Re-reference of bill from one committee to another does not vitiate a written request of a Member to the chairman of the first committee for a public hearing on the bill and a 48-hour notice of the hearing, and the request goes with the bill to the chairman of the committee to which the bill is re-referred and is binding on him. (Ruling sustained by vote of 13 to 12.) (49 S.J. Reg. 347, 358-359 (1945)).

The President of the Senate ascertains the facts concerning the giving of notice of a committee hearing on a bill, and his ruling as to the sufficiency of the notice based on the facts as ascertained by him is a final determination of that point when no appeal from the ruling is made. (50 S.J. Reg. 1169 (1947)). [Explanatory Note: Lieutenant Governor Shivers held sufficient a notice of a hearing at 2:00 o'clock p.m., duly given, after ascertaining (1) that the hearing was held at 4:00 o'clock p.m., instead of 2:00 o'clock p.m. on account of the Senate's being in session at 2:00 o'clock and (2) that the hearing was attended by the Senator requesting the notice.]

## QUORUM OF COMMITTEE

106.    A majority of any committee shall constitute a quorum, and no action shall be taken upon any bill in the absence of a quorum. At any stated meeting of the committee, if a roll call discloses lack of a quorum, the members present may order the names of the unexcused absentees turned over to the Sergeant-at-Arms of the Senate whose duty it shall be to secure promptly the attendance of such absent members.    The Sergeant-at-Arms shall have the same authority conferred upon him under the Rules of the Senate as when the Senate is operating under a call.

Rule 108

## FILING REPORTS OF COMMITTEES

107. The Chairman of the committee, or the Vice-Chairman in the absence of the Chairman, shall file with the Secretary of the Senate a written report showing the action of such committee on bills and resolutions pending before it. Such reports shall be signed officially by the Chairman, or Vice-Chairman in the absence of the Chairman. The Chairman of the committee, or the Vice-Chairman in the absence of the Chairman, shall file with the Secretary of the Senate a written report showing the final action of the committee on each bill and resolution pending before it. He shall file the report within three calendar days from the date the final action on the bill or resolution is taken. Sundays and days the Senate is not in session do not count in computing the three-day limit.

If the report is not filed within the three-day limit, any three members of the committee who were present when final action was taken on the bill or resolution may file the report without the signature of the Chairman or Vice-Chairman.

### Editorial Note

This rule indicates that reports may be filed with the Senate at any time by the chairmen of the several standing committees. However, it is the practice in the Senate to submit reports from the floor during the "morning call."

#### Notes of Rulings

The Chair may not go behind a committee report to ascertain if proceedings in the committee were regular (42 S.J. Reg. 1564, 1693 (1931)).

See also note of ruling following Rule 90.

Point of order as to validity of committee's action on bill may be made when bill is not before Senate for immediate consideration (49 S.J. Reg. 347 (1945)).

## CONSIDERATION OF BILLS IN COMMITTEES

108. It shall be in order for committees to consider bills and resolutions at any time during the session, make reports thereon, and file the same with the Senate.

No bill or resolution shall be reported favorably unless it has received the affirmative vote of a majority of the membership of the committee to which it was referred, except as provided in Rule 109.

### Note of Ruling

In absence of a Senate rule or resolution suspending it, the suspension of Section 5 of Article 3 relating to consideration of bills in committee requires separate vote for each bill. (42S. J. Reg 167 (1931)).

## MINORITY COMMITTEE REPORTS

109. When a motion to report a bill or resolution unfavorably receives the affirmative vote of a majority of the membership of the committee, the bill or resolution is dead. If a motion to report favorably or unfavorably fails to receive an affirmative vote of a majority of the membership of the committee, a favorable minority report may be made. The minority report must be filed with the Secretary of the Senate within two calendar days from the date the motion fails (Sundays and days the Senate is not in session excepted) and must be signed by three members of the committee, if the committee is composed of 10 or less, or four members if composed of more than 10, who were present and voted for the motion to report favorably or against the motion to report unfavorably. Within 10 calendar days from the date the motion to report fails (Sundays and days the Senate is not in session excepted), a motion to have the minority report placed on the calendar must be made by one of the members filing the minority report or by the sponsor of the original bill or resolution. The motion to have the minority report placed on the calendar must receive the affirmative vote of two-thirds of the members of the Senate present. If the motion fails or is not made within the time allowed, the bill or resolution is dead and may not be considered again during the session. A motion to have a minority report placed on the calendar is privileged.

### Notes of Rulings

Bills reported adversely but with a favorable minority report are not to be printed except on an order of the Senate (38 S.J. Reg. 646 (1923)).

A favorable minority report must be filed if a bill reported unfavorably by a majority of a committee is to receive the consideration of the Senate (43 S.J. Reg. (1933)).

## RULES OF THE SENATE—APPENDIX

## SENATE PRECEDENTS RELATING TO CONFERENCES

It is immaterial whether a committee to adjust differences be termed a conference committee or a free conference committee, there being no substantial difference between the two (34 S.J. 3 C.S. 670 (1915)).

A motion having been made to adopt a conference report, a motion to reject the report is not in order (42 S.J. 3 C.S. 163 (932)).

A conference committee may not be instructed after it has commenced its deliberations (43 S.J. Reg. 684 (1933)); (44 S.J. 3 C.S. 250-252 (1936)).

No points of order may be raised against a conference committee report (43 S.J. Reg. 1892 (1933)).

A motion to adopt a conference committee report on a joint resolution is in order at any time, and without a reconsideration of the vote by which it has once been lost (44 S. J. Reg. 1812 (1935)).

A motion to discharge a conference committee and request a new conference committee is in order before the original conference committee has submitted its report (45 S.J. 1 C.S. 44 (1937)).

Even after a conference report has been adopted and the bill as recommended in the report has been enrolled, signed and presented to the Governor, the vote by which report was adopted may be reconsidered, the report rejected, and the differences between the two Houses referred to a new conference committee for adjustment (46 S.J. Reg. 1437 (1939)).

A concurrent resolution to correct a House bill that has been passed by the Senate is in order and requires only a majority vote for adoption (46 S.J. Reg. 1891 (1939)).

Adoption of resolution to recede from Senate amendments to House bill after request made by House for conference committee and request granted but Senate conferees not appointed properly effects an adjustment of differences between two Houses (47 S.J. Reg. 1291 (1941)).

After a bill reaches a stage when the adjustment of the differences between the two Houses on the bill is all that remains to effect its final enactment, either or both Houses may take any action, separately or jointly, which will adjust those differences (47 S.J. Reg. 1291 (1941)).

A conference report may contain any matter germane to original bill if entire text of bill as passed in the two Houses are different (47 S.J. Reg. 2493 (1941)).

# PROCEDURE AND PRACTICE IN CONGRESS RELATIVE TO ADJUSTING DIFFERENCES BETWEEN HOUSES

## Steps Preliminary to Conference

The Senate cannot act until in possession of the papers (5, 6322, 6518-6522), and when transmitting papers should ask for or agree to conference (5, 6273).

The papers consist of the original engrossed copy of the bill attested by the Clerk of the House or the Secretary of the Senate, the engrossed amendments, and later the conference report signed by the managers.

The managers on the part of the House asking the conference bring the papers to the conference room. At the close of an effective conference the papers change hands, and the managers on the part of the House agreeing to the conference receive them and take them to their House, which first receives and considers the conference report (5, 6254; 8, 3330).

The motion to not concur yields precedence to the motion to concur (8, 3779).

The stage of disagreement between the two Houses is reached when one informs the other of disagreement (4, 3475; 6, 756, 757). A bill with amendments of the other House is privileged after the stage of disagreement has been reached (4, 3149, 3150; 6, 756; 8, 3185, 3194).

The stage of disagreement having been reached, that motion which tends most quickly to bring the Houses into agreement is preferential, and so a motion to adopt a conference report takes precedence over a motion to recommit it (8, 3204).

A majority of the managers of a conference should represent the attitude of the majority of the House on the disagreement in issue, and on exceptional occasions the Speaker has passed over the ranking member of the committee in the appointment of conferees in order to conform to this practice (8, 3223).

Resignations of conferees are properly addressed to the President, but are acted on by the Senate, and, being accepted, the President appoints successors and directs the Secretary to notify the House (5, 6373-6376; 8, 3224, 3227).

The motion to instruct conferees is not in order after the conferees have been appointed (5, 6379-6382; 8, 3233, 3240, 3256).

The motion to instruct conferees is divisible if it contains more than one substantive proposition (74-2-7945, 7951).

Motions to instruct conferees may not include directions which would be inadmissible if offered as motions during its consideration (8, 3235); may not require conferees to report back amendments outside the subjects in disagreement between the two Houses (8, 3243, 3244).

### Conference Reports

When conference results in disagreement, conferees reporting disagreement are thereby discharged (Cannon's Procedure, 4th Ed., 124).

Supplemental reports or minority views may not be filed in connection with conference reports (8, 3302).

Conference reports may not be considered when original bill and accompanying papers are not before the House (8, 3301).

When a conference report is called up only three courses are open: (a) agree, (b) disagree, or (c) recommit (5, 6546).

1-9-79  SR 2

Conference reports may not be—

Tabled (5, 6538-6544).

Referred to committee (5, 6558).

Amended (5, 6534, 6535), except by concurrent resolution (5, 6536, 6537; 8, 3306-3308).

Recommitted, if House has already agreed (5, 6545-6553, 6609).

When called up for consideration the motion to agree is regarded as pending, and the motion to disagree is not admitted (2, 1473; 5, 6517; 8, 3300).

A conference report must be acted on as a whole and agreed to or disagreed to in entirety (5, 6472-6480; 8, 3304, 3305).

If either House disagrees to conference report the bill returns to position before conference was asked (5, 6526), and amendments in disagreement come up for consideration as originally (2, 1473; 5, 6525).

Clerical errors in conference reports agreed to by the House are corrected by proper enrollment of the bill (Cannon's Procedure, 4th Ed., 127).

The Speaker may rule out a conference report if it is shown that the conferees have exceeded their authority (Sec. 547; 5, 6409, 6410, 6414-6416; 8, 3256, 3264). The Senate amendments are then before the House de novo, and motions to send to conference are again in order (Cannon's Procedure, 4th Ed., 129).

A conference report may be recommitted to the committee of conference if the House has not, by acting on the report, discharged its managers (Sec. 550; 5, 6545-6553, 6609; 8, 3310).

## PRECEDENTS ON CONSTITUTIONAL QUESTIONS

Lieutenant Governor T. W. Davidson refused to rule on the constitutionality of an amendment and stated that he would not rule on constitutionality of any amendment unless the particular part of the Constitution alleged to be violated had been carried forward in the rules of the Senate (38 S.J. Reg. 702 (1923)).

### Qualifications of Member

A person holding the office of district attorney may become candidate for Senator at a special election; and if elected, the Senate is judge of whether he is barred from serving as Senator by Section 19 of Article 3 of Constitution (44 S.J. 1 C.S. 103 (1935)).

### Amending Statutes

The Legislature, in an appropriation bill, may prescribe the qualifications of an officer or employee, for whose salary an appropriation is made (45 S.J. Reg. 1189 (1937)).

A general law may not be amended by an appropriation bill (44 S.J. 3 C.S. 50 (1936)).

A section of a general statute cannot be amended except by a general bill that re-enacts at length and as amended the section amended (44 S.J. 3 C.S. 50 (1936)).

## Donations by State

A bill granting and donating ad valorem taxes to the counties of the State for a period of five years for the purpose of constructing improvements to prevent soil erosion, and for flood control, highway construction, etc., does not violate Section 51 of Article 3, which provides that the Legislature shall have no power to make a grant of public moneys to any municipal or other corporation (45 S.J. Reg. 933 (1937)).

An amendment to permit a loan by the State in violation of Constitution is not in order (49 S.J. Reg. 613 (1945)).

An amendment making an appropriation for the conversion and enlargement of properties donated to the State by the Southwestern Medical Foundation into a College of Medicine of The University of Texas is not in violation of Section 6 of Article 16 of the Constitution prohibiting appropriations for private or individual purposes (51 S.J. Reg. 1127 (1949)).

## Amendment by Reference

The mere inclusion or exclusion of a designated thing, individual or class from the purview of a prior enactment does not constitute an ''amendment by reference'' within prohibition of Constitution. (Vernon's Ann. St. Const. Art. 3, Sec. 36; S.W. Gas & Elec. Co. vs. State, 190 SW 2d, 132.)

## Exclusive Powers of House or Senate

''The specific grant of a power to each House is an express denial of it to the courts or to precedent or subsequent Legislatures.''

''There are certain matters which each House determines for itself and in respect to which its decisions are conclusive''; for example, passing on the qualification of members, the adoption of rules of procedure, the confirmation of appointments by the Senate, impeachment by House, trial of impeachment by Senate (35 S.J. 3 C.S. 48-49 (1917)).

## Taxation

A bill to amend an article of the Revised Civil Statutes relative to tax on menageries, etc., held not a bill to raise revenue (36 S.J. Reg. 512 (1919)).

A Senate resolution that ''the Senate go on record as favoring a tax of one dollar on each pint of whiskey'' is not in order because it ''commits the Senate on a measure that should originate in the House''. (40 S.J. 2 C.S. (1927)).

1-9-79 SR 2

For ruling of the Attorney General relative to the adding by the Senate of a license tax to a bill providing for a gasoline tax, see (41 S.J. 1 C.S. 65-67 (1929)).

The Senate may amend a revenue bill from the House by adding a new field of taxation, and so may place a tax on the sale of cigarettes by amending a bill imposing a privilege tax on persons producing natural gas; and a tax on cement may be added to a bill levying tax on peddlers (42 S.J. Reg. 893, 1622 (1931)).

A measure which merely relates to revenue and is not a "revenue-raising measure" may originate in the Senate (45 S.J. Reg. 249 (1937)).

A Senate bill amending a revenue-raising law is a revenue-raising measure itself and cannot originate in the Senate (42 S.J. 1 C.S. 696 (1931)).

An amendment, the adoption of which will make of a Senate bill a revenue-raising measure, is not in order (45 S.J. Reg. 249 (1937)).

### Jurisdiction—Special Sessions

A bill relating to a subject not within the Governor's call for a special session, upon being submitted for introduction, is out of order, and the Chair may refuse to refer it to a committee (41 S.J. 5 C.S. 9, 14 (1930)).

A bill amending a law relating to a subject not within the Governor's call may not be introduced at a called session (44 S.J. 1 C.S. 63 (1935)).

A point of order as to the Senate's jurisdiction may be raised at any time, and a point of order against consideration of a bill at a Called Session on the ground that it relates to a subject not submitted for consideration at that session or a point of order that the bill is a revenue-raising measure that cannot originate in the Senate, if upheld, prevents consideration by the Senate of any such bill (44 S.J. 2 C.S. 24 (1935)).

A bill to prohibit betting on races by pari-mutuel method and by other methods as well is within call of Governor for a special session "to outlaw and prohibit the so-called pari-mutuel betting or gaming on horse races at race tracks" (45 S.J. 1 C.S. 19-20 (1937)).

In case the Chair holds a bill may not be introduced at a called session because it relates to a subject not submitted by the Governor and an appeal is taken from the ruling and the Chair is not sustained, the bill may be introduced and considered by the Senate at that session (45 S.J. 2 C.S. 60 (1937)).

A bill revising appropriations already made comes within the Governor's call of a special session to "balance the budget, etc." (45 S.J. 2 C.S. 71 (1937)).

A concurrent resolution to permit suit against State not in order at called session unless subject of resolution submitted by Governor (47 S.J. 1 C.S. 69 (1941)).

An amendment to authorize the use of a portion of certain revenues for the benefit of the M. D. Anderson Hospital for Cancer Research is not within the Governor's call for a special session "to make and to finance such appropriations as the Legislature

may deem necessary . . . for the agencies and institutions for which appropriations were made by Chapter 553, Acts of the 51st Legislature, Regular Session," since no reference is made in said Chapter to said M. D. Anderson Hospital for Cancer Research (51 S.J. 1 C.S. 79 (1950)).

An amendment making an appropriation to be used principally for distributing surplus commodities to the State hospitals and special schools is within the Governor's call for a special session "to make and to finance such appropriations as the Legislature may deem necessary for the State hospitals and special schools. . . ." (51 S.J. 1 C.S. 79 (1950)).

### Joint Resolution

A Senate joint resolution proposing an amendment to the Constitution is a matter that takes precedence of House bills and concurrent resolutions even on House bill days (44 S.J. Reg. 556 (1935)).

### Local Bills, Constitutionality

The message of Governor Stevenson to the 49th Legislature, Regular Session, contains excerpts from and citations to a number of court decisions holding so-called "bracket bills" to be unconstitutional (49 S.J. Reg. 286 (1945)).

### Uniform Tax Rule

Under the constitutional provision requiring all occupation taxes to be equal and uniform on same class, Legislature has power to classify subjects and court can only interfere when it is made clearly to appear that the attempted classification has no reasonable basis in the nature of businesses classified and that the law operates unequally upon subjects between which there is no real difference. (See Vernon's Annotated Constitution, Art. 8, Section 1.)